MORRISON & FOERSTER LLP
MICHAEL A. JACOBS (Bar No. 111664)
mjacobs@mofo.com
MARC DAVID PETERS (Bar No. 211725)
mdpeters@mofo.com
DANIEL P. MUINO (Bar No. 209624)
dmuino@mofo.com
755 Page Mill Road
Palo Alto, CA  94304-1018
Telephone: (650) 813-5600 / Facsimile: (650) 494-0792

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (Admitted *Pro Hac Vice*)
dboies@bsfllp.com
333 Main Street
Armonk, NY  10504
Telephone: (914) 749-8200 / Facsimile: (914) 749-8300
STEVEN C. HOLTZMAN (Bar No. 144177)
sholtzman@bsfllp.com
1999 Harrison St., Suite 900
Oakland, CA  94612
Telephone: (510) 874-1000 / Facsimile: (510) 874-1460

ORACLE CORPORATION
DORIAN DALEY (Bar No. 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (Bar No. 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (Bar No. 211600)
matthew.sarboraria@oracle.com
500 Oracle Parkway
Redwood City, CA  94065
Telephone: (650) 506-5200 / Facsimile: (650) 506-7114

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC. | Case No. CV 10-03561 WHA |
| Plaintiff, | **ORACLE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |
| v. | Dept.:  Courtroom 9, 19th Floor |
| GOOGLE INC. | Judge:  Honorable William H. Alsup |
| Defendant. | Tutorial: April 6, 2011, 1:30 p.m. |
| | Hearing: April 20, 2011, 1:30 p.m. |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

I.      The Play Executing Step ('520 Patent) ................................................................... 1

II.     Intermediate Form Code ('104 Patent)
        Intermediate Form Object Code ('104 Patent) ........................................................ 3

III.    Resolve / Resolving ('104 Patent) .......................................................................... 5

IV.     Symbolic Reference ('104 Patent) .......................................................................... 7

V.      Reduced Class File ('702 Patent) ........................................................................... 9

VI.     Computer-Readable Medium ('104 Patent)
        Computer-Readable Storage Medium ('720 Patent)
        Computer-Readable Medium ('520 Patent)
        Computer Usable Medium ('702 Patent)
        Computer-Readable Medium ('447 Patent)
        Computer-Readable Medium ('476 Patent) ........................................................... 10

        A.      '104 Patent ................................................................................................ 11

        B.      '720 Patent ................................................................................................ 13

        C.      '520 Patent ................................................................................................ 14

        D.      '702 Patent ................................................................................................ 15

        E.      '205 Patent ................................................................................................ 16

        F.      '447 and '476 Patents ................................................................................ 17

CONCLUSION .................................................................................................................. 19

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**CASES**

4

*Advanced Display Sys., Inc. v. Kent State Univ.*,

5
    212 F.3d 1272 (Fed. Cir. 2000)........................................................................................... 13

6

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
    632 F.3d 1246 (Fed. Cir. 2011)........................................................................................... 14

7

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,

8
    435 F.3d 1366 (Fed. Cir. 2006)............................................................................................. 2

9

*Ex Parte Daughtrey*,

10
    No. 2008-000202, 2009 WL 3489861 (B.P.A.I. July 31, 2009)........................................... 12

11

*Exxon Research & Eng'g Co. v. United States*,
    265 F.3d 1371 (Fed. Cir. 2001)............................................................................................. 2

12

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,

13
    535 U.S. 722 (2002)............................................................................................................ 18

14

*In re Beauregard*,

15
    53 F.3d 1583 (Fed. Cir. 1995)............................................................................................. 11

16

*Markman v. Westview Instruments Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ..................................... 12

17

*Phillips v. AWH Corp.*,

18
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)............................................................................ 5

19

*Reiffin v. Microsoft Corp.*,
    214 F.3d 1342 (Fed. Cir. 2000)........................................................................................... 12

20

*Schering Corp. v. Amgen Inc.*,

21
    222 F.3d 1347 (Fed. Cir. 2000)........................................................................................... 12

22

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,

23
    595 F.3d 1340 (Fed. Cir. 2010)........................................................................................ 6, 7

24

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
    473 F.3d 1173 (Fed. Cir. 2006)............................................................................................. 9

25

*Zenon Envtl., Inc. v. U.S. Filter Corp.*,

26
    506 F.3d 1370 (Fed. Cir. 2007)........................................................................................... 14

27

28

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**OTHER AUTHORITIES**

MANUAL OF PATENT EXAMINING PROCEDURE § 2106 (8th ed. 2001).......................................... 18

MANUAL OF PATENT EXAMINING PROCEDURE § 2106.01 (8th ed. 6th rev. 2007) ....................... 18

MICROSOFT PRESS COMPUTER DICTIONARY (2d ed. 1994) ............................................................ 8

1

**INTRODUCTION**

2   The only serious claim construction issue raised by Google's briefing is "computer-

3 readable medium" in only two patents where the evidence intrinsic to those patents arguably

4 gives rise to a construction which, in turn, may give rise to an invalidity challenge.  For the rest,

5 Google's proposed constructions fail basic tests of well-settled claim construction law.

6

**ARGUMENT**

7

**I.  THE PLAY EXECUTING STEP ('520 PATENT)**[1]

8   In Oracle's opening brief, we discussed the evidence supporting that the "play executing

9 step" in claims 3 and 4 is a reference to the "simulating execution" step in claim 1.  Most

10 important is the intrinsic evidence that "play executing" is synonymous with "simulating

11 execution," including the express definition in the specification (below) and the patent examiner's

12 use of the word "simulating" to refer to patent claims that contained the "play executing" phrase.

13
14
15
16
17

> The disclosed system represents an improvement over conventional systems for initializing static arrays by reducing the amount of code executed by the virtual machine to statically initialize an array. To realize this reduction, when consolidating class files, the preloader identifies all <clinit> methods and simulates executing ("play executes") these methods to determine the static initialization performed by them.

18 '520, 2:61-3:1.

19   Google chooses to disregard this evidence and instead makes an argument based on an

20 amendment to claim 1.  The amendment changed "play executing" to "simulating execution . . .

21 without executing the byte codes."  The substitution of "simulating execution" for "play

22 executing" did not change the scope of the claim; rather, the words that affected claim scope were

23 "without executing the byte codes."  The amendment merely brought the scope of claim 1 parallel

24 in relevant respect to claims 6 and 18, which the examiner had already determined to be

25 patentable:

26

---

27
28

[1] Unless otherwise indicated, all citations and internal quotations have been omitted, and all emphasis has been added.  Patents are referred to by their last three numbers, and citations to patent specifications are in the form "patent, column:line", such as "'104, 2:60-62".

| Claim 1 as amended and issued | Claim 6 as filed and issued | Claim 18 as filed and issued |
|---|---|---|
| <u>simulating execution of</u> the byte codes of the clinit method against a memory <u>without executing the byte codes</u> to identify the static initialization of the array by the preloader | play executing the code without running the code on the processing component to identify the operation if the code were run by the processing component | simulating execution of the code without running the code on the processing component to identify the operation if the code were run by the processing component |

Google's argument based on *Novo Nordisk* lacks substance.  Missing from Google's argument is any discussion of what "play executing" could mean if not "simulating execution." The specification makes the meaning of the claim clear notwithstanding the differing choice of words.  Thus, the relevant case is not *Novo Nordisk* but rather *Energizer Holdings*: "When the meaning of the claim would reasonably be understood by persons of ordinary skill when read in light of the specification, the claim is not subject to invalidity upon departure from the protocol of 'antecedent basis.'"  *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006).

When claim 3 recites "The method of claim 1 wherein the play executing step includes," it is immediately apparent which step of claim 1 is referred to.  Claim 1 is a method claim that comprises five steps: (1) compiling, (2) receiving, (3) simulating execution, (4) storing, and (5) interpreting.  "Simulating execution" is the natural and only choice for "the play executing step." In light of the specification and the prosecution history, no person of ordinary skill could read "the play executing step" to refer to nothing.  That is not subject to reasonable debate.  The claim is amenable to construction, and so is not indefinite.  *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375, 1376 (Fed. Cir. 2001) ("As is often the case when problems in document drafting lead to litigation, the ideal of precision was not achieved here, and we are left to deal with an imperfect product.  While we agree with the trial court that the product was less than perfect, we disagree that the flaws were fatal.").

## II.   INTERMEDIATE FORM CODE ('104 PATENT)
## INTERMEDIATE FORM OBJECT CODE ('104 PATENT)

Oracle's opening brief focused on the intrinsic evidence in support of Oracle's claim construction that "intermediate form [object] code" is executable code.  Oracle Opening Br. at 7-9.  For example, the first sentence of the "Summary of the Invention" states:

> A method and apparatus for generating ***executable code*** and resolving data references in the generated code is disclosed.

'104, 2:25-29.  The intrinsic evidence unambiguously drives a construction of "intermediate form code" and "intermediate form object code" as *executable* code that is generated by compiling source code and is independent of any computer instruction set.

Google misstates the issue when it asserts that "nothing in the specification amounts to a clear disavowal of claim scope that would narrow the term's ordinary meaning."  Google Opening Br. at 16.  The "executable" issue is not one of disavowal.  Google points to no pre-existing definition of "intermediate form object code" from which Oracle seeks to detract; rather, Oracle seeks to construe a phrase that is internal to and explained by the'104 patent.

Google's definition, by contrast, is based on a phrase that the'104 patent acknowledges is something different: "intermediate representation," which is an instantiation of a computer program that is used internally by a compiler and is indeed not executable code.  *See* Oracle Opening Br. at 8-9.  Google's conflation of these phrases is erroneous and should be rejected.

Google points to one sentence in the '104 specification, but even this does not support Google.  Google's sentence observes that "a variety of well known tokens, intermediate representations, annotations, and intermediate forms may also be used to practice the present invention."  '104, 4:29-32.  The sentence is silent on whether intermediate form code is executable, but by separately enumerating an intermediate "representation" and an intermediate "form," the sentence makes clear that the two are distinct.

The meaning of Google's sentence is further clarified by a description of the sequentially coupled compiler components that appears in the specification ten lines before: "Together, they transform program source code 52 into tokenized statements 54, intermediate representations 56, annotated intermediate representations 58, and ultimately intermediate form code 60 with data

references made on a symbolic basis." '104, 4:19-23.  "Intermediate form code 60" is shown in Figure 4 as "intermediate form object code 60," making it clear that those two phrases are used interchangeably in the '104 patent.  In contrast, that "intermediate representations" and "intermediate forms" are repeatedly enumerated separately in Google's citation further underscores the fact that they are not the same.

Figures 4 and 5, moreover, clearly illustrate that "intermediate form code 60" and "intermediate form object code 60" are the output of a compiler and that "intermediate representations" are not:



"FIG. 4 illustrates one embodiment of the compiler of the hybrid compiler-interpreter of the present invention.  FIG. 5 illustrates one embodiment of the code generator of the compiler of FIG. 4." '104, 3:14-17.  As explained in Oracle's opening brief, the qualifier of "intermediate form" indicates that the claimed code is not dependent on the instruction set of a specific type of machine ('104, 1:58-62), unlike the typical case for compiled object code ('104, 2:60-67).

Google argues that "intermediate form object code" need not be executable because the word "executable" supposedly does not modify "code" in the asserted claims, in contrast to original claims 1 and 6.  Google has it exactly backwards:  the recitation of "generating executable code in intermediate form" in claims 1 and 6 matches the usage in the asserted claims and confirms that "intermediate form code" as used in the patent refers to executable code.

1  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) ("Because claim terms

2  are normally used consistently throughout the patent, the usage of a term in one claim can often

3  illuminate the meaning of the same term in other claims.").

4      All of the other '104 patent claims are consistent with claims 1 and 6.  Each claim in which

5  "intermediate form code" or "intermediate form object code" is used consistently refers to it as

6  executable, as explained in Oracle's opening brief at pages 7-8.  Variants of "execute,"

7  "execution," "executing," and "interpreting" appear in each claim at issue, just as in claims 1 and

8  6.  Google's proposed construction is not consistent with the claim language.

9      **III.    RESOLVE / RESOLVING ('104 PATENT)**

10      Oracle's opening brief showed how its proposed construction of "resolve" and "resolving"

11  provides meaning to all relevant claim terms and is compatible with the specification.  Google's

12  proposed construction fails to account for the multiple objectives of the invention and is

13  inconsistent with the claim language, specification, and prosecution history of the '104 patent.

14      The claim language alone proves Google is wrong.  Claim 20 recites "resolving the

15  symbolic reference in the instruction by determining a numerical reference corresponding to the

16  symbolic reference."  That tells us that "resolving" does not necessarily mean anything more than

17  "determining a corresponding numerical reference" and, more particularly, does not necessarily

18  require "storing."

19      Claim 13 recites "resolving a symbolic reference in an instruction, said step of resolving

20  said symbolic reference including the substeps of: determining a numerical reference

21  corresponding to said symbolic reference, and storing said numerical reference in a memory."

22  Claim 14 recites: "The method of claim 13, wherein said substep of storing said numerical

23  reference comprises the substep of replacing said symbolic reference with said numerical

24  reference."  That tells us that "resolving" does not necessarily require "replacing."

25      The '104 patent's specification shows that "resolving" was a well-known term of art at the

26  time of the application.  The Court's construction of "resolving" should be consistent with that

27  meaning.  According to the specification, in some prior art interpreted programming languages,

28  "[e]ach of the symbolic references is resolved during execution ***each time*** the instruction

comprising the symbolic reference is interpreted." '104, 2:3-6. Google's argument that the quoted language is a "concession" that prior art interpreters "resolve a symbolic reference by replacing it" is without any textual support. Google Opening Br. at 19. If an instruction's symbolic reference were replaced by a numeric reference, it would be resolved only once—not each time the instruction was interpreted.

Figure 1 and its description further support Oracle's construction and negate Google's argument that Figure 8 is the only figure in the patent relevant to "resolving." Figure 1 "shows the prior art compiled approach and the prior art interpreted approach to resolving data reference." '104, 3:6-7. There is no "replacement" shown in Figure 1.

Moreover, the textual description of Figure 8, which Google cites but does not quote, actually supports Oracle's construction. Figure 8 "illustrates an exemplary ***resolution and rewriting*** of a data reference under the present invention." '104, 3:26-27. If resolution and rewriting had the same meaning, as Google argues, then the applicant would not have used both words to describe the figure.

Attempting to read limitations from the specification into the claim language, Google emphasizes the use of the phrase "under the present invention." But the very case Google cites for the significance of the words "the present invention" warns against "reading improperly a preferred embodiment into the claim." *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353 (Fed. Cir. 2010). The relevant portion of the '104 patent specification states:

> Thus, except for the first execution, the extra level of interpretation to resolve the symbolic reference is no longer necessary. Therefore, ***under the present invention, the "compiled" intermediate form object code of a program achieves execution performance*** substantially similar to that of the traditional compiled object code, ***and*** yet it has the ***flexibility*** of not having to be recompiled when the data objects it deals with are altered like that of the traditional translated code, since data reference resolution is performed at the first execution of a generated instruction comprising a symbolic reference.

'104, 5:39-49. Google fails to point out that the quoted text refers to Figure 8, which, as noted above, is merely "exemplary." '104, 3:26-27, 5:31-33. The sentence that recites "under the present invention" lists two objectives (performance and flexibility), and it explains why these goals are achieved in Figure 8, but it does not equate "resolving" with "replacing." Moreover,

1   "[b]ecause an inventor must evince a 'clear intention' to limit the claim terms to a specification

2   embodiment, [the Federal Circuit] examines other claims to detect any contrary intentions."

3   *Trading Techs.*, 595 F.3d at 1354.  There are several '104 patent claims that recite "replacing"

4   (claims 14, 30, 31, 32) and each one recites "replacing" in close proximity to "resolve" or

5   "resolving," indicating that these words mean different things.  Moreover, we know that the

6   inventor did ***not*** intend to limit the claims to a preferred embodiment, because the patent so states:

7   "While the present invention has been described in terms of presently preferred and alternate

8   embodiments, those skilled in the art will recognize that the invention is not limited to the

9   embodiments described. . . .  The description is thus to be regarded as illustrative instead of

10  limiting on the present invention."  '104, 5:50-57.

11       Google's citation to the prosecution history[2] does not support its proposal; it mentions

12  neither "replacing" a reference nor the "life of a process."  Google Opening Br. at 20.  What the

13  prosecution history does say is: "When an unresolved symbolic reference is encountered, a

14  numerical value corresponding to the reference is determined and stored in memory.  When a

15  resolved symbolic reference is encountered, the instruction is interpreted by reading the stored

16  numeric value."  '104 file history, 11/21/1996 Reissue Application Declaration of James Gosling

17  at 3-4 (Peters Decl. Ex. 6).  This quotation does not define "resolving" to mean "replacing."  And

18  it would be improper to use this quotation to construe "resolving" to include "storing," because

19  some claims that recite "resolving" do not recite "storing" at all (e.g., claims 20, 21, 23, and 41),

20  and because at least one claim recites "resolving" and "storing" as distinct substeps (claim 17).

21       Oracle's proposed construction fits ***all*** of the claims that use the term "resolving," and

22  hence should be adopted.

23       **IV.    SYMBOLIC REFERENCE ('104 PATENT)**

24       As demonstrated in Oracle's opening brief, Oracle's position that "symbolic reference"

25  needs no construction and that its ordinary meaning is "a reference by name" is directly supported

26

27  [2] Certified copies of the patents and their file histories are attached as Exhibit 11 to the
    Supplemental Declaration of Marc David Peters in Support of Oracle's Responsive Claim
    Construction Brief ("Peters Supp. Decl.").

28

1   by the specification.  The intrinsic evidence makes clear that when "references to data are made

2   on a symbolic basis," that reference is made "by name":

3   > References to data in the intermediate form are not fully resolved before execution
    > based on the layout of the data objects that the program deals with. Instead,

4   > **references to data are made on a symbolic basis**. Thus, an instruction that
    > accesses or fetches y, such as the Load instruction 14' illustrated in FIG. 1,

5   > references the variable y **by the symbolic name "y"**.

6   '104, 1:61-67; *see also* 5:34-36, Fig. 8.

7       Google's extrinsic evidence reveals that the ordinary meaning of "symbolic reference" is a

8   reference by name.  *See* Oracle Opening Br. at 13.  In Google's proffered dictionary, the

9   definition of "symbol" is "a name".  MICROSOFT PRESS COMPUTER DICTIONARY 379 (2d ed.

10  1994) (Peters Decl. Ex. 3).

11      Of course, a symbolic reference may contain or comprise a number.  Some commonsense

12  examples may help to illustrate the point:

13  - "280" is a symbolic reference comprising a number that is a name of a highway
      without identifying the numeric geo-coordinates of the highway referenced;

14  - "Courtroom 9" is a symbolic reference containing a number distinct from its location
      of "450 Golden Gate Avenue, 19th Floor, San Francisco, CA 94102";

15  - 1-800-MATTRES" is a symbolic reference containing letters and numbers that refers
      to a telephone number.

16
17      The constructions of "symbolic reference" and "numeric reference" are as straightforward

18  as they are unnecessary.  A symbolic reference is a reference by name.  A numeric reference is a

19  reference by location.  Both the '104 specification and dictionary definitions describe and employ

20  these well-known meanings.

21      Google's proposal is anything but straightforward.  Google argues that a symbolic

22  reference is a "dynamic reference to data that is string- or character- based."  This is not

23  supported by the plain language of the claims, the specification, prosecution history, nor Google's

24  own proffered dictionary definitions.  *See* Oracle Opening Br. at 12-14.

25      Google asks the Court to import "string- or character-based" into the claim, even though

26  the specification does not even contain these words.  Google's description (Google Opening Br.

27  at 15) of an example in the specification is incomplete—the '104 patent lists three examples of

28

1   symbolic references (x, y, and name), not two: "Continuing the preceding example, if the point

2   data object had a new field added at the beginning called name, which contains the name of the

3   point, then the variables x and y could be assigned to slots 2 and 3." '104, 1:51-54.  But these

4   examples are not limiting.  *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1181

5   (Fed. Cir. 2006) (claims are not limited to disclosed embodiment and need not cover every feature

6   disclosed in specification).  As Google has been known to say, "nothing in the specification

7   amounts to a clear disavowal of claim scope that would narrow the term's ordinary meaning."

8   Google Opening Br. at 16.

9         Google also attempts to import "dynamic" into "symbolic reference."  That is illogical, as

10   explained in Oracle's opening brief at page 13.  And what is a "dynamic reference"?  Google

11   doesn't say.  There will certainly be a need to "construe the construction" if "dynamic" simply

12   substitutes for "symbolic" in the claims.

13         Finally, Google's proposal is ambiguous.  In Google's phrase "dynamic reference to data

14   that is string- or character-based," is it the "reference" or the "data" that is string- or character-

15   based?  This lack of clarity alone should lead the Court to reject it.

16   **V.     REDUCED CLASS FILE ('702 PATENT)**

17         In Oracle's opening brief, we reviewed the intrinsic evidence showing that "reduced class

18   files" are not necessarily "class files": while reduced class files may have duplicated elements

19   removed and placed elsewhere, they also may have added to them a "new constant type" and

20   "corresponding constant type tag" that causes reduced class files to violate the class file format

21   specification.  *See, e.g.*, '702, 9:55-62.  Google's analysis is flawed because it focuses only on

22   what is removed from class files, and ignores what may be added to them.

23         In one embodiment of the '702 patent, the act of removing a duplicated element from a

24   class file to obtain a reduced class file is carried out by placing the duplicated constant element

25   into a shared constant pool outside the class file, and replacing the duplicated element with a new

26   constant type element that contains a pointer to the duplicated element in the shared constant

27   pool.  '702, 9:55-65.  This new element causes the reduced class file to violate the class file

28   format: its new tag type is not on the list of valid tags according to the class file format

1   specification ('702, 16:54-17:12), and the fact that it points outside the file means that the reduced

2   class file is not "self-contained," unlike a class file.  '702, 4:3-4.  None of the intrinsic evidence

3   cited by Google contradicts this disclosure.

4        It's not clear why Google objects to the phrase "code and data contained in a class file" in

5   Oracle's proposed construction, because this language (unlike Google's proposal) is taken

6   directly from the specification: "Each class contains ***code and data*** in a platform-independent

7   format called the class file format."  '702, 2:66-3:1.  Google tries to support its argument that the

8   "relevant elements of the class files at issue are 'data' and operations (i.e., 'instructions')" with a

9   citation to Figure 3 (Google Opening Br. at 13), but the figure does not contain any of the words

10  "data," "operations," or "instructions."  If the Court does construe this term, Oracle asks that it

11  use "code and data" instead of "data and instructions," if only because it hews to the

12  specification.

13

**VI.    COMPUTER-READABLE MEDIUM ('104 PATENT)**
**COMPUTER-READABLE STORAGE MEDIUM ('720 PATENT)**
**COMPUTER-READABLE MEDIUM ('520 PATENT)**
**COMPUTER USABLE MEDIUM ('702 PATENT)**
**COMPUTER-READABLE MEDIUM ('447 PATENT)**
**COMPUTER-READABLE MEDIUM ('476 PATENT)**

17       The appropriate way to construe a claim is elaborated in *Phillips*, which synthesizes a

18  large body of Federal Circuit claim construction jurisprudence since *Markman*.  The *Phillips*

19  methodology is accurately set out on pages 2 and 3 of Google's brief—if only Google would

20  follow it.  Google's claim construction approach with respect to the "computer-readable medium"

21  terms is to take the language that it most prefers, which appears in only two of the seven patent

22  specifications, and apply it indiscriminately to ***all*** of the patents in suit.  Google justifies its

23  approach by pointing to specifications of unrelated patents not even in the case.  In so doing,

24  Google has stood *Phillips* on its head, putting extrinsic evidence ahead of intrinsic evidence.

25  Nowhere is this more painfully obvious than in Google's treatment of the '104 patent, in which

26  the '104 specification does not rate a single mention.

27       Oracle does not take the position that all the terms in the various patents relating to

28  "computer readable medium" necessarily should have the same construction.  Oracle's position is

1    that the same claim construction **methodology** should be applied to each patent to construe its

2    claims.  For four of the patents (the '104, '520, '720, and '702 patents), because storage media are

3    the only disclosed embodiments and because the various claims require the media to hold code,

4    embody code, contain instructions, or be part of a computer program product, the intrinsic

5    evidence for each patent shows that the correct construction is "a storage device for use by a

6    computer."  For two of the patents (the '447 and '476), additional claim construction doctrines

7    apply, which mean that the Court should avoid construing "computer-readable media" to embrace

8    transmission media.

9                                  **A.    '104 Patent**

10          The specification of the '104 patent discloses only memories or storage devices to store

11   code for use by a computer in support of "computer-readable media."  '104, 3:52-56, Fig. 2.  The

12   specification does not disclose carrier waves, coaxial cables, copper wire, or any transmission

13   media as embodiments of computer-readable media.  The evidence from the prosecution history

14   is that the inventor added "computer-readable medium" claims through the reissue process in

15   order to claim "computer program code devices" as permitted by *In re Beauregard*.  How do we

16   know this?  Because he said so in his sworn reissue declaration.  '104 file history, 11/21/1996

17   Reissue Application Declaration of James Gosling at 3 (Peters Decl. Ex. 6).

18          Google's argument that the '104 inventor intended to encompass "waves" is a fantasy,

19   unsupported by any intrinsic evidence.  "Waves" are not disclosed in the '104 specification.

20   "Waves" are not computer program code devices.  "Waves" are not mentioned in *Beauregard*,

21   which concerned "computer program product claims" and "computer programs embodied in a

22   tangible medium, such as floppy diskettes."  *In re Beauregard*, 53 F.3d 1583, 1584 (Fed. Cir.

23   1995).

24          The '104 patent should be construed from the perspective of 1992, when its specification

25   was filed.  The '104 inventor, in his reissue declaration, stated "I believe I have the right to

26   further specifically claim computer program code devices which embody my invention as

27   supported by ***the original disclosure***."  '104 file history, 11/21/1996 Reissue Application

28   Declaration of James Gosling at 3 (Peters Decl. Ex. 6).  In the *Markman* case, which involved the

interpretation of a reissue patent, the Federal Circuit held *en banc*: "The focus is on the objective test of what one of ordinary skill in the art ***at the time of the invention*** would have understood the term to mean." *Markman v. Westview Instruments Inc.*, 52 F.3d 967, 986 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  Even Google agrees: "Courts must determine the meaning of disputed claim terms from the perspective of one of ordinary skill in the pertinent art ***at the time the patent was filed***."  Google Opening Br. at 2.  Google violates this rule when it uses an unrelated 1997 specification to construe the '104 patent instead of the '104 specification.  Google has cited no evidence from 1992, let alone 1996, that would indicate that "computer-readable medium" meant "carrier waves."  Google's argument regarding Sun's U.S. patent 5,953,522 misrepresents the facts.  Google Opening Br. at 9.  "Carrier wave" does ***not*** appear in that patent's July 1, 1996 specification or original claims—it was added to the claims by a 1998 amendment.  Peters Supp. Decl. ¶ 7 & Ex. 9.   Later definitions do not control the interpretation of earlier patent claims.  *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353-54 (Fed. Cir. 2000) (holding that when evidence showed that scientific term had one meaning at time application was filed, and acquired another meaning five months later, correct construction was earlier meaning).  Google's one cited case is *Reiffin*, which is not relevant to the issue at hand.  *Reiffin* was not a claim construction case; instead, it held that, for purposes of evaluating compliance with the written description requirement, the relevant specification is the one for the patent.  *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000).  The '104 specification was filed in 1992, and supports the claims introduced through the reissue process.

Google's argument regarding Oracle's "hundreds" of patents is without consequence.  Not only are such patents irrelevant, uncontemporaneous extrinsic evidence, but Google conceals the second half of the evidence:  Far more "computer-readable medium" patents do ***not*** mention "carrier waves" than do, and far more of Oracle's "computer-readable medium" patents do ***not*** mention "carrier waves" than do.  Peters Supp. Decl. ¶¶ 1-6.  No court has held that the meaning of "computer-readable medium" has ever been "widely recognized as a legal term of art that included wireless transmission."  Google Opening Br. at 10.  Not even the Patent Office believes this to be true.  *Ex Parte Daughtrey*, No. 2008-000202, 2009 WL 3489861, at *4 (B.P.A.I. July

31, 2009) (holding that it was "imprudent" to construe "computer readable medium" based on usage in contemporaneous patents and that "it does not appear that 'computer readable medium' had any commonly-recognized understanding in the art at the time of Appellant's invention [in 2001]").

**B.    '720 Patent**

Claim 19 of the '720 patent claims a "computer-readable storage medium holding code for performing the method according to claim 10."  Oracle demonstrated in its opening brief that the only storage media holding code disclosed in the '720 patent were "storage devices," and thus the Court should construe computer-readable storage medium in the '720 patent to mean "a storage device for use by a computer."  Google acknowledges that the "only relevant disclosure of the '720 patent specification is to storage device 19, storage device 15, and storage device 35."  Google Opening Br. at 7.  Though the '720 specification discloses "hardwired and wireless network configurations" that interconnect various computing devices, it does not disclose that they are storage media that hold code.

Google's argument that the '720 patent should be construed to mean "carrier waves" is based exclusively on extrinsic evidence.  The '720 specification does not disclose "carrier waves" and it is not true that "carrier waves" were imported into the '720 specification through incorporation by reference.  To incorporate matter by reference, a host document "must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents."  *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000).  Google's evidence does not meet this standard.  The '720 patent specification refers twice to the '661 application Google relies on, using the same sentence each time:

> The classes and interfaces are identified through profiling by ranking a set of classes according to a predetermined criteria, such as described in commonly-assigned U.S. patent application Ser. No. 09/970,661, filed Oct. 5, 2001, pending, the disclosure of which is incorporated by reference.

'720, 3:1-6, 6:41-46.  Under the rule in *Advanced Display Systems*, this sentence does not incorporate a definition of "computer readable storage medium" into the '720 patent.  Instead, it

incorporates only the '661 application's description of methods for identifying classes and interfaces through profiling by ranking a set of classes according to predetermined criteria. *Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1379 (Fed. Cir. 2007) ("We are not persuaded . . . that that language incorporates by reference the entire disclosures of the '373 and '083 patents. Such an interpretation is inconsistent with the plain language of the statement. The plain language expressly limits the incorporation to only relevant disclosures of the patents, indicating that the disclosures are not being incorporated in their entirety.").

*Arlington Industries*, which Google also relies on, does not hold to the contrary, and mentions an incorporated-by-reference patent only in dicta. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1256 (Fed. Cir. 2011) (holding that "spring steel adapter" meant "adapter made from spring steel" when patent at issue disclosed a spring steel adapter and patent incorporated by reference "in its entirety" did also); Google Opening Br. at 7.

And, in any event, the sentence from the '661 application that Google quotes does not even support its argument. The '661 application says that aspects of the invention "can also be stored on *or read from* other types of computer-readable media." Declaration of Truman Fenton (Dkt. 97) Exhibit A, 13:24-32. We do not doubt that information can be "read from" a carrier wave, but it is not the case that information is "stored on" a carrier wave. Instead, the '661 application discloses that aspects of that invention are "stored on" secondary storage devices. *Id.*

There is no evidence intrinsic to the '720 patent that suggests transient signals could be storage media holding code. It would be error to construe the '720 patent as Google proposes.

### C.   '520 Patent

The '520 patent does not define "computer readable medium" to include carrier waves. The phrase "carrier waves" appears once in the specification, though Google quoted only a portion of the sentence in which it appeared, and thereby changed its meaning. The full sentence, with its grammatical structure indicated by spacing, states:

Although an exemplary embodiment of the present invention is described as being stored in memory 206, one skilled in the art will appreciate that it may also be

> stored on other computer-readable media, such as secondary storage devices like hard disks, floppy disks, or CD-Rom;

> a carrier wave received from the Internet 204; or

> other forms of RAM or ROM.

'520, 4:48-56.  Semi-colon placement aside, Google's reading is also counterfactual, because it is not correct to say that computer code is "stored on" carrier waves (though it may be "transmitted by" carrier waves).

Google's overstated assertion that "any construction of phrases like 'computer-readable media' in the context of this patent *must necessarily* encompass carrier waves" (Google Opening Br. at 6) is not supported by the specification or the plain language of the claims at issue.  The claims recite a "computer-readable medium containing instructions for controlling a data processing system to perform a method."  '520, claims 18-23.  Subject matter embraced by Google's proposed construction—"acoustic waves," "light waves," and "radio-waves"—may participate in providing instructions but by themselves do not "contain" instructions for controlling a data processing system.

Google's three-sentence argument regarding the '520 patent is really an attempt to sweep it in with the '447 and '476 patents.  The specifications are quite different and Google's proposal should be rejected.

**D.      '702 Patent**

The phrase "computer-readable medium" does not appear in the '702 patent.  For that reason alone, it would be improper to import a paragraph concerning "computer-readable medium" from the '447 patent into the '702 claims as Google proposes.

The '702 claims recite a "computer program product comprising a computer usable medium having computer readable program code embodied therein . . . ."  '702, claims 7-12.  As explained in Oracle's opening brief at pages 21-22, these claim terms do not cover transmission media.

Google's one-paragraph argument relies primarily on this sentence from the specification:

> The received code may be executed by CPU 213 as it is received, and/or stored in mass storage 212, or other non-volatile storage for later execution. In this manner, computer 200 may obtain application code in the form of a carrier wave.

'702, 7:10-14.  The fact that a computer "may obtain" application code in the form of a carrier wave that a CPU may then execute does not mean that the carrier wave comprises a computer program product.  *See* '702, claims 7-12.  Google's cited portion of the '702 specification pertains to how copies of the invention are transmitted from one computer to another, not to the claimed invention itself.

Google also quotes a few phrases from the '702 specification entirely out of context.  For example, the '702 specification provides (with Google's quoted phrases underlined):

> Computer 200 may also include a communication interface 220 coupled to bus 218. …In any such implementation, communication interface 220 sends and receives <u>electrical, electromagnetic or optical signals</u> which carry digital data streams representing various types of information."  ('702, 6:37-52.)

> Network link 221 typically provides data communication through one or more networks to other data devices. For example, network link 221 may provide a connection through local network 222 to host computer 223 or to data equipment operated by an Internet Service Provider (ISP) 224. ISP 224 in turn provides data communication services through the world wide packet data communication network now commonly referred to as the "Internet" 225. Local network 222 and Internet 225 both use electrical, electromagnetic or optical signals which carry digital data streams. The signals through the various networks and the signals on network link 221 and through communication interface 220, which carry the digital data to and from computer 200, are exemplary forms of <u>carrier waves</u> transporting the information.  ('702, 6:53-67.)

The '702 specification discloses that carrier waves and electrical, electromagnetic, and optical signals transport information from one computer to another, but it does not disclose that such things are computer program products comprising a computer usable medium having computer readable program code embodied therein.

### E.    '205 Patent

There is no reason to consider the '205 patent with respect to "computer-readable medium."  No claim from that patent asserted in this case contains that term, and the '205 patent is irrelevant extrinsic evidence with respect to the construction of the other patents in suit.

1

## F.   '447 and '476 Patents

2    Google attempts to construe all of the patents in light of a paragraph from the '447 and

3    '476 specifications.  '447, 5:4-16; '476, 5:4-16.  Although that effort is improper, it is proper to

4    use the paragraph to construe "computer-readable medium" in the '447 and '476 patents.

5        Google's reading of the paragraph, however, is careless and incorrectly treats potential or

6    permissive language as definitional language.  Google Opening Br. at 5.  The paragraph is

7    reproduced here in full, with its grammatical structure indicated in chart form:

8

| The term "computer-readable medium" as used herein refers to any medium that participates in providing instructions to processor 104 for execution. |
| --- |

9

10

| Such a medium *may* take many forms, including but not limited to, non-volatile media, volatile media, and transmission media. |
| --- |

11

12

| Non-volatile media includes, for example, optical or magnetic disks, such as storage device 110. | Volatile media includes dynamic memory, such as main memory 106. | Transmission media includes coaxial cables, copper wire and fiber optics, including the wires that comprise bus 102. Transmission media can also take the form of acoustic or light waves, such as those generated during radio-wave and infra-red data communications. |
| --- | --- | --- |

13

14

15

16    The first sentence is definitional:  "The term 'computer-readable medium' as used herein

17    refers to any medium that participates in providing instructions to processor 104 for execution."

18    That is not in dispute.

19        The second sentence is not definitional.  The second sentence uses the word "may," which

20    stands in contrast to the "as used herein refers to" language used in the first sentence.  "May" is

21    used to express a proposition of possibility, opportunity or permission, contingency, or wish.

22    Some common-sense examples may help to illustrate the point:

23    • The proposition of "it *may* rain" imparts possibility.
24    • The proposition of "you *may* speak" imparts permission or opportunity.
      • The proposition of "I *may* attend if it doesn't rain" imparts contingency.
25    • The proposition of "*may* you live long" imparts a wish.

26    "May" does not inherently impart a definition or certainty.

27        Consistent with that usage, "may" does not impart a definition in the '447 and '476

28    patents either.  The remaining sentences in the paragraphs are not definitions of "computer-

1   readable medium," and the language that follows the paragraph does not alter the analysis

2   because it, too, is permissive and non-definitional.  '447, 5:17-6:21; '476, 5:17-6:21.

3          Even if the Court were to regard the language as definitional, it is not controlling.

4   Notwithstanding an express definition in a specification, a court may construe the term more

5   narrowly.  In its opening brief, Oracle explained why the Court should do so in this case.  Oracle

6   Opening Br. at 24-25.

7          The issue that "computer-readable medium" presents in the '447 and '476 patents is larger

8   than just these two patents: what shall courts do with the thousands of patents issued in the past

9   decade that have *Beauregard* claims and disclose both storage media and transmission media as

10  embodiments?  In 2001, the Patent Office instructed its examiners that "a signal claim directed to

11  a practical application of electromagnetic energy is statutory regardless of its transitory nature."

12  MANUAL OF PATENT EXAMINING PROCEDURE § 2106 at 2100-14 (8th ed. 2001) (Peters Supp.

13  Decl. Ex. 10).  To this day, the Patent Office instructs that a software invention claimed as a

14  program embodied in a tangible medium is statutory subject matter under Section 101.  MANUAL

15  OF PATENT EXAMINING PROCEDURE § 2106.01 at 2100-18 (8th ed. 6th rev. 2007) (explaining that

16  "a claimed computer-readable medium encoded with a computer program is a computer element

17  which defines structural and functional interrelationships between the computer program and the

18  rest of the computer which permit the computer program's functionality to be realized, and is thus

19  statutory.") (Peters Decl. Ex. 5).  Given a choice of constructions, it is appropriate to construe

20  claims in a manner that does not "risk destroying the legitimate expectations of inventors in their

21  property" or "unfairly discount the expectations of a patentee who had no notice at the time of

22  patent prosecution."  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 739

23  (2002) ("To change so substantially the rules of the game now could very well subvert the various

24  balances the PTO sought to strike when issuing the numerous patents which have not yet expired

25  and which would be affected by our decision.").

26

27

28

1

## **CONCLUSION**

2    For the foregoing reasons and the reasons presented in its opening brief, Oracle

3  respectfully requests that the Court adopt its proposed claim constructions.

4

5  Dated: March 31, 2011                MICHAEL A. JACOBS
                                        MARC DAVID PETERS
6                                       MORRISON & FOERSTER LLP

7                                       By:   /s/ Michael A. Jacobs

8                                       *Attorneys for Plaintiff*
                                        ORACLE AMERICA, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28