DONALD F. ZIMMER, JR. (SBN 112279)
fzimmer@kslaw.com
CHERYL A. SABNIS (SBN 224323)
csabnis@kslaw.com
KING & SPALDING LLP
101 Second Street – Suite 2300
San Francisco, CA 94105
Telephone:  (415) 318-1200
Facsimile:  (415) 318-1300

IAN C. BALLON (SBN 141819)
ballon@gtlaw.com
HEATHER MEEKER (SBN 172148)
meekerh@gtlaw.com
GREENBERG TRAURIG, LLP
1900 University Avenue
East Palo Alto, CA 94303
Telephone: (650) 328-8500
Facsimile: (650) 328-8508

SCOTT T. WEINGAERTNER (*Pro Hac Vice*)
sweingaertner@kslaw.com
ROBERT F. PERRY
rperry@kslaw.com
BRUCE W. BABER (*Pro Hac Vice*)
bbaber@kslaw.com
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036-4003
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

ROBERT A. VAN NEST (SBN 84065)
rvannest@kvn.com
CHRISTA M. ANDERSON (SBN 184325)
canderson@kvn.com
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188

Attorneys for Defendant
GOOGLE INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

ORACLE AMERICA, INC.

       Plaintiff,

   v.

GOOGLE INC.

       Defendant.

Case No. 3:10-cv-03561-WHA

Honorable Judge William Alsup

Hearing Date:  July 21, 2011
Hearing Time:  2:00 p.m.

**GOOGLE INC.'S BRIEF IN SUPPORT OF DAUBERT MOTION**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# TABLE OF CONTENTS

I.   STATEMENT OF FACTS ................................................................. 3

  A.   Patents-in-Suit ....................................................................... 3

  B.   Accused Functionality And Alternatives ............................... 4

  C.   Valuation Of The Asserted Patents And Java Generally ......... 5

  D.   Fragmentation Of Java ........................................................... 6

II.  LEGAL STANDARDS ..................................................................... 7

III. ARGUMENT .................................................................................. 8

  A.   Cockburn's reasonable royalty calculation rests entirely on improper
       categories not recoverable as patent damages ............................. 9

     1.   Cockburn improperly includes all of Google's
          worldwide advertising revenue from Android
          phones in his royalty calculation .............................. 9

     2.   Cockburn improperly smuggles Oracle's lost
          profits in his royalty calculation, with no
          attempt to satisfy the stringent *Panduit* test ............. 10

     3.   Cockburn improperly includes damages for so-
          called "fragmentation" in his royalty base ................. 11

  B.   Cockburn also calculates an unreasonable, inflated royalty rate by
       refusing to value the patented technology at issue, among other errors ........ 12

     1.   Cockburn's report makes no effort to base his
          royalty rate on the value of the patented technology ......... 12

  C.   Cockburn's methodology contains numerous other legal errors ............. 16

     1.   Cockburn inflates his damages estimate by double
          counting, including Oracle's alleged future
          damages despite Oracle's request for an injunction .......... 16

     2.   Cockburn improperly includes Google's revenues
          from international sales in his damages calculation ........... 16

     3.   Cockburn improperly sets the date of the hypothetical
          negotiation in 2008, when Android phones first launched,
          rather than when the Android code was first written .......... 17

  D.   Cockburn Ignores Record Facts And Undisputed Market Realities ........... 18

i

1.   Cockburn ignores the actual market value of Java, as proven by numerous licenses granted by Sun, Google's negotiations with Sun, and the value assigned to Java by Oracle ................................ 18

2.   Cockburn assumes, without any factual basis, that Sun and Google would have negotiated an expensive, Java-incompatible license rather than a cheap, Java-compatible license ................................ 19

   i.   Far from prohibiting fragmentation of Java, Sun promoted such fragmentation through its licensing program ................................ 20

   ii.   Even if Cockburn's assumptions about fragmentation are correct, it is improper to base a damages award on compatibility with nonpatented features ................................ 21

   iii.   Cockburn relies on fragmentation as a reason to ignore relevant evidence, including Java-compatible licenses ................................ 22

3.   Cockburn relies on inapposite licenses and ignores relevant ones to inflate the damages calculation ................................ 23

E.   Cockburn Offers No Meaningful Analysis Regarding Copyright Damages ...... 23

IV.   CONCLUSION ................................ 25

BRIEF IN SUPPORT OF DAUBERT MOTION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Civil Action No. CV 10-03561-WHA

## **TABLE OF AUTHORITIES**

### **Cases**

*Cornell Univ. v. Hewlett-Packard Co.*, 2008 WL 2222189 (N.D.N.Y. 2008) (Rader, J.) ........ 7

*Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279 (N.D.N.Y. 2009) (Rader, J.) ...... 15

*Fonar Corp. v. General Electric Co.*, 107 F.3d 1543 (Fed.Cir.1997) ..................................... 9

*Garretson v. Clark*, 111 U.S. 120 (1884) ......................................................................... 12

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970) ........ 12, 13

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371 (Fed. Cir. 2001) ............ 17

*Kalman v. Berlyn Corp.*, 914 F.2d 1473 (Fed.Cir.1992) ..................................................... 9

*Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649 (Fed. Cir. 1985) .......... 10

*Lucent Tech. Inc. v. Gateway Inc.*, 580 F.3d 1301, 1325-35 (Fed. Cir. 2009) .. 12, 13, 15, 16, 23

*Minks v. Polaris Indus., Inc.*, 546 F.3d 1364 (Fed. Cir. 2008) ........................................... 12

*Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293 (Fed. Cir. 2007) .................................... 16

*Panduit Corp. v Stahlin Bros. Fibre Works, Inc.* 575 F.2d 1152 (6th Cir. 1978) ................... 11

*Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11 (Fed.Cir.1984) .......... 9

*Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554 (Fed. Cir. 1986) ..................... 10

*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) ............................ 11, 14, 23

*Riles v. Shell Exploration & Production Co.*, 298 F.3d 1302 (Fed. Cir. 2002) .................... 8, 16

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) ......................... 8, 9, 15

### **Statutes**

35 U.S.C. § 284 ............................................................................................................. 14

GOOGLE INC'S BRIEF IN SUPPORT OF DAUBERT MOTION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
CIVIL ACTION NO. CV 10-03561-WHA

1     PLEASE TAKE NOTICE that on July 21, 2011 at 9:00 a.m., or as soon thereafter as

2   counsel may be heard, Defendant Google Inc. ("Google") will, and hereby does, respectfully

3   move to exclude the opinions and testimony of Oracle America, Inc.'s ("Oracle") damages

4   expert Dr. Iain M. Cockburn. This Motion is based on the following memorandum of points and

5   authorities in support, the Declaration of Scott T. Weingaertner ("Weingaertner Decl.") and

6   accompanying exhibits, the Declaration of Gregory K. Leonard, Ph.D. ("Leonard Decl.") and

7   accompanying exhibits, the entire record in this matter, and on such evidence as may be

8   presented at the hearing of this Motion.

9     This Court should exclude the unreliable and results-oriented opinions and testimony of

10   Oracle's damages expert Dr. Cockburn. Ignoring the settled legal framework for evaluating

11   patent damages and many years of evidence establishing the modest market value of Java

12   technology, Cockburn opines that Google would owe Oracle an amount in the breathtakingly

13   wide range of ██████████████ if Google is held to infringe *any* claim of *any* of the seven

14   patents at issue in this case. That range is orders of magnitude beyond any reasonable valuation

15   of the intellectual property at issue. ███████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ██████████████████████████

20     Cockburn's legal errors are fundamental and disqualifying. Although Cockburn purports

21   to calculate a reasonable royalty, he ignores the guidelines established by the Supreme Court and

22   Federal Circuit. He fails to separate out and value the patented technology at issue, instead using

23   the purported value of the entire Java platform as the basis for his damages claim. He also fails

24   to calculate the incremental value of the alleged infringing technology to the Android platform.

25   Instead, he improperly adds together as the basis for calculating a royalty rate: (1) Google's

26   incremental profit from advertising on *all* Android devices world-wide, and (2) the purported

27   harm to Sun's and Oracle's business from lost profits and alleged "fragmentation" of the Java

28   platform.

GOOGLE INC.'S BRIEF IN SUPPORT OF DAUBERT MOTION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
CIVIL ACTION NO. CV 10-03561-WHA

***None*** of these are proper components of a royalty calculation for patent damages:

- Google's advertising business is not the accused product. The accused product is the Android platform software, which Google does not sell and from which it earns no direct revenue. The value of the Android software and of Google's ads are entirely separate: the software provides for certain phone functionality, whether or not the user is viewing ads, and Google's ads are viewable on any software and are not uniquely enabled by Android.

- Oracle's lost profits cannot be used to inflate the royalty calculation. Lost profits are a separate category of patent damages, authorized only if the patentee meets a distinct and demanding test that Cockburn does not even attempt to satisfy.

- Oracle's purported damages from so-called "fragmentation" of Java relate to theoretical downstream harm to a wholly different Oracle product that is not recoverable as damages in this action.

After inflating his royalty calculation as described above, Cockburn opines that Oracle should be awarded more than 50% of the net benefit he claims Google would receive from licensing the patents and copyrights at issue from Oracle, resulting in a greater than ***20% royalty rate***. This "methodology" is not authorized by the law or consistent with any real-world negotiations regarding any aspect of the Java technology. Cockburn treats the patents and copyrights at issue as a single, indivisible unit, casually dismissing critical differences among the patents, including expiration dates over a decade apart. ███████████████████████

████████████████████████████████████████████████████

████████████████

Cockburn's factual errors and omissions are just as fundamental. He disregards market evidence about the value of the Java platform in favor of speculation. He dismisses Sun's history of licensing Java for a modest royalty and the fact that, during its acquisition of Sun, Oracle assigned a value of ███████████ to the entire Java platform—which includes far more than the Java mobile platform, only part of which is at issue here. He ignores Google's negotiation history with Sun regarding a Java license for the mobile space, which would have included far more than the patents-in-suit and during which Google *rejected* a proposal to pay Sun orders of magnitude less than what Cockburn now says Google would have paid. Even more glaring, he mischaracterizes Sun's and Microsoft's 2004 settlement of litigation that involved far more than claims of fragmentation, asserting that Sun demanded and received *$900*

2

1   *million* to cover the risk of fragmentation to Java, even though Sun and Microsoft settled

2   litigation relating to fragmentation in 2001 and Microsoft paid Sun just *$20 million*.

3          Finally, as to copyright damages, Cockburn provides no separate analysis at all.

4          All of these errors are foundational, and any one of them would be enough to render

5   Cockburn's report unreliable, misleading, and inappropriate for presentation to the jury.  Taken

6   together, they require exclusion of his opinions.

7   **I.      STATEMENT OF FACTS**

8          Oracle alleges infringement of seven patents[1] and two copyrights.   (*See* Amended

9   Complaint for Patent and Copyright Infringement ("Amended Complaint") (Dkt. 36) at ¶ 10

10  (Exs. A-G) and ¶ 11 (Ex. H).)  On May 21, 2011, Oracle served the Expert Report of Iain M.

11  Cockburn ("Cockburn Report" or "Cockburn Rep.") regarding its purported damages on these

12  claims.  (*See* Weingaertner Decl. at ¶ 1 (Ex. A), Cockburn Rep.)

13         **A.      Patents-in-Suit**

14         The patents-in-suit fall into two technology categories:  the '447 and '476 patents relate

15  to a security framework, and the five remaining patents relate to optimizations for use with a

16  virtual machine.  During claim construction, Oracle's counsel confirmed that the patents-in-suit

17  involve only these technology categories.  (*See, e.g.,* Weingaertner Decl. at ¶ 2 (Ex. B), Oracle's

18  Technology Tutorial Supplement at 1; April 6, 2011 *Transcript of Proceedings* (Dkt. 110) at

19  15:6-8.)

20         The patents-in-suit, either individually or collectively, do not encompass Java as a whole

21  or even a significant part of it.  The '720 patent provides a concrete example.  The purported

22  novelty of the '720 patent lies in optimizations useful for multitasking.  ('720 Patent (Dkt. 36,

23  Ex. D) at 1:27-33.)  Oracle has asserted that it uses this optimization in only two minor products,

24  not in the Java platform generally.  (Weingaertner Decl. at ¶ 3 (Ex. C), Oracle's Second

25  Supplemental Patent Local Rule 3-1 Disclosure Of Asserted Claims And Infringement

26  ────────────────────

27  [1]      U.S. Patent Nos. 6,125,447 ("the '447 patent"); 6,192,476 ("the '476 patent"); 5,966,702
    ("the '702 patent"); 7,426,720 ("the '720 patent"); RE38,104 ("the '104 patent"); 6,910,205
28  ("the '205 patent"); and 6,061,520 ("the '520 patent").

1  Contentions ("Oracle's Infringement Contentions") at 11.)  Each of the other patents is also

2  directed to a specific, discernible feature.  The patents also differ substantially in their remaining

3  life.  The '104 patent will expire in 2012, and five of the other six patents will expire in just over

4  six years.  Only one patent—the '720 multitasking patent discussed above—has a longer life.

5  **B.    Accused Functionality And Alternatives**

6  According to Oracle, the accused products break down into two groups:  a) devices

7  running or containing the Android operating system ("Android Devices"); and b) computers

8  running or containing the Android software development kit ("SDK").  The Android operating

9  system and the SDK are separate sets of code with distinct functionalities, and Oracle has

10 accused the two of infringing different patents.

11 Because Oracle's patents relate to either a security framework or virtual machine

12 optimizations, its Infringement Contentions are similarly limited.  Oracle alleges that only

13 portions of Android code referring to security infringe the security patents (*see, e.g.*,

14 Weingaertner Decl. at ¶ 4 (Ex. D), Oracle's Infringement Contentions, Exhibit D at 2-21 (citing

15 code referring to SecurityManager class)) and that only portions of code relating to the Dalvik

16 Virtual Machine infringe the optimization patents (*see, e.g.*, *id.* at ¶ 5 (Ex. E), Oracle's

17 Infringement Contentions, Exhibit G at 1-20 (citing Android functionality within Dalvik)).

18 The accused features of Android frame any damages analysis, yet they comprise only a

19 fraction of Android as a whole.  Some of the accused features have never been used and are

20 therefore hardly essential to Android's functioning or success.  "Google does not use

21 SecurityManager, and is not aware of any third party that uses or has ever used

22 SecurityManager"; Google "implemented changes to disable SecurityManager-related

23 functionality for the Gingerbread version of Android (version 2.3)"; and "[i]n the current version

24 of Android, as of December 6, 2010, users and application programs are prevented from even

25 installing an instance of SecurityManager."  (*See* Weingaertner Decl. at ¶ 6 (Ex. F), Defendant

26 Google Inc.'s Fourth Supplemental Responses to Plaintiff's Interrogatories, Set One, No. 3 at

27 28.)  In addition, the Android Native Development Kit, ("NDK") does not use the Java

28 programming language at all, instead allowing Android developers to implement applications

1  using native-code languages like C and C++.  (*See* Weingaertner Decl. at ¶ 7 (Ex. G),

2  http://developer.android.com/sdk/ndk/index.html.)

3      **C.**    **Valuation Of The Asserted Patents And Java Generally**

4        The Java platform and its components are not new.  As a result, the record contains

5  evidence of numerous instances when market participants have quantified the value of both Java

6  as a whole and the fraction of that value attributable to the asserted patents, including Sun's

7  historical Java licensing practices.  Sun's practice was ***always*** to license Java when asked to do

8  so. ████████████████████████████████████████████████

9  ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ██████████████████████████ ████████████████████████

12 ████████████████████████████████████████████████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ████████████████████████████

18       Oracle also made statements to the SEC regarding the value of the entire Java system in

19 connection with its acquisition of Sun. ████████████████████████

20 ████████████████████████████████████████████████

21 ████████████████████████████████████████████████

22 ████████████████████████████████████████████████

23 ████████████████████████████████████████████████

24 ████████████████████████████████████████████████

25 ████████████████████████████████████████████████

26 ████████████████████████ ██████████████████████████

27 ████████████████████████████████████████████████

28 ████████████████████████████████████████████████

5

GOOGLE INC.'S BRIEF IN SUPPORT OF DAUBERT MOTION

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

CIVIL ACTION NO. CV 10-03561-WHA

1 ███████████████████████████████ ██████████████████████████████

2 ████████████████████████████████████████████████████████

3      This case does not involve the entire Java platform.  It involves only certain features of

4 one small portion of the Java Platform.  Sun's and Oracle's overall investment in Java was

5 centered in the larger desktop, server, and enterprise markets, not in the mobile space.  ██████

6 █████████████████████████████████████████████████████████████

7 █████████████████████████████████████████████████████████████

8 ████████████████████████████████████

9      Even the features of the patents—which are not specific to or required by the Java

10 platform—are capable of valuation based on the documentary record.  ████████████████

11 █████████████████████████████████████████████████████████████

12 █████████████████████████████████████████████████████████████

13 █████████████████████████████████████████████████████████████

14 ██████████ ███████████████████████████████████████████

15 █████████████████████████████████████████████████████████████

16 █████████████████████████████████████████████████████████████

17 █████████████████████

18      Finally, there is no need to speculate about the terms Google and Sun might have reached

19 in a hypothetical negotiation because Google and Sun actually engaged in negotiations regarding

20 a license to the entirety of Java.  ████████████████████████████████████

21 █████████████████████████████████████████████████████████████

22 █████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████

24     **D.**       **Fragmentation Of Java**

25      A substantial portion of Cockburn's damages calculation is based on so-called

26 "fragmentation" of the Java platform into numerous incompatible sub-standards.  Such

27 "fragmentation"—which is the purported downstream harm to a separate Oracle product—is not

28 a recognized category of damages for patent infringement.  Cockburn not only includes it, he

vastly inflates the value Sun assigned to preventing that alleged harm.  In 2002, Sun sued Microsoft for various alleged unfair business practices and trademark infringement, including Microsoft's attempt to create its own version of Java, which might have led to fragmentation of Java standards and practices.  That case eventually settled in 2004.  Cockburn focuses on this 2004 agreement, which was a broad business arrangement involving more than settlement of litigation, including covenants not to sue under the parties' entire patent portfolios.  (Ex. A, Cockburn Rep. ¶ 312.)  Cockburn completely ignores a 2001 settlement agreement in which Microsoft paid Sun $20 million to settle litigation involving claims related to fragmentation.  (Weingaertner Decl. at ¶ 14 (Ex. .N), Microsoft Reaches Agreement to Settle Contract Dispute With Sun Microsystems at 1; Weingaertner Decl. at ¶ 15 (Ex. O), Settlement Agreement and Mutual Limited Release at 2.)

Even prior to the Microsoft litigations, Sun tolerated and even promoted fragmentation of Java through its own licensing program.

## II.   LEGAL STANDARDS

Trial judges serve as gatekeepers for both the relevance and reliability of expert testimony.  Federal Rule of Evidence 702 permits a trial court to admit only expert "testimony that is (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) delivered by a witness who has applied the principles and methods reliably to the facts of the case."  *Cornell Univ. v. Hewlett-Packard Co.*, 2008 WL 2222189, *1 (N.D.N.Y. 2008) (Rader, J.) (citing Fed. R. Evid. 702).  The Federal Circuit and district courts have excluded

7

GOOGLE INC.'S BRIEF IN SUPPORT OF DAUBERT MOTION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
CIVIL ACTION NO. CV 10-03561-WHA

1  expert testimony on damages that fails to meet these criteria.  *See Uniloc USA, Inc. v. Microsoft*

2  *Corp.*, 632 F.3d 1292 (Fed. Cir. 2011); *Cornell*, 2008 WL 2222189, at *4.

3       Oracle bears the burden of proving damages.  Here, Cockburn calculated damages by

4  employing the commonly used "hypothetical negotiation" approach to determining a reasonable

5  royalty.  That approach attempts to determine what a willing licensor and a willing licensee

6  would have agreed "just before infringement began."  *Id*.  The hypothetical negotiation must be

7  based in "sound economic and factual predicates."  *Riles v. Shell Exploration & Production Co.*,

8  298 F.3d 1302, 1311 (Fed. Cir. 2002).

9  **III.   ARGUMENT**

10       Cockburn's opinion is unreliable and should be excluded because he (1) ignored settled

11  legal standards; (2) relied on assumptions that are uniformly contradicted by the record; and (3)

12  offered no analysis whatsoever with respect to copyright damages.  The predictable result is a

13  hyper-inflated ████████████ damages calculation.

14       Cockburn's errors are several:

- he fails to tie his royalty calculation to sales of the allegedly infringing product (the Android platform software);

- ██████████████████████████████████████████████████████████████

- he inflates his royalty rate to **20 percent**, ignoring the time-honored *Georgia-Pacific* analysis;

- he does not even try to value the technology embodied in the asserted claims of the patents-in-suit, the relative contribution of that technology to the overall Android platform, or the value of individual patents, or to apportion the value of patented and non-patented features; and

- he ignores all of Sun's actual licenses, which establish a relatively modest value for Java as a whole and even more minuscule values for the Java components embodied by the patents-in-suit, crediting instead a handful of licenses for wholly unrelated technologies between other companies.

25       The ████████████████████████████████████████████████████

26  ████████████████ from advertising on all Android Devices.  No one has ever paid anywhere near

27  this amount for even the entire Java platform, much less the minor components of that platform

28  system that relate to the patents-in-suit.

### A.   Cockburn's Reasonable Royalty Calculation Rests Entirely On Improper Categories Not Recoverable As Patent Damages.

Cockburn's first task in his reasonable royalty analysis was to identify the allegedly infringing product and determine how much revenue Google, as the alleged infringer, earned from sales of that product.   Cockburn fails even this simple initial step, stuffing his royalty calculation with numerous unreliable, inflated, and improper components.

### 1.   Cockburn improperly includes all of Google's worldwide advertising revenue from Android phones in his royalty calculation.

First, Cockburn has no basis for including in his royalty base Google's worldwide revenue from advertising displayed on Android phones.   The accused product here is the Android software, which Google does not sell, and from which Google receives no direct revenue.   Google receives no payment, fee, royalty, or other remuneration for its contributions to the Android platform.   Only in specific circumstances is it proper to include revenues derived from downstream sales of non-infringing products, like advertising on Android phones, in a royalty base.   The royalty base may include non-infringing components when those infringing components are the basis for customer demand for the entire machine, *Fonar Corp. v. General Electric Co.*, 107 F.3d 1543, 1552 (Fed.Cir.1997); when physically separate products are sold together as a functional unit or parts of a complete machine, *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 23 (Fed.Cir.1984); and when separate components are analogous to a single functioning unit, *Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1485 (Fed.Cir.1992).   Cockburn's analysis ignores all these limitations.

Because Google's advertising is not sold with the Android software and does not consist of a single functioning unit along with that software, Google advertising revenue could be included in the royalty base only if Oracle could satisfy the requirements of the entire market value rule—*i.e.,* that the patented features of the Android software drive demand for Google's advertising or that Google's advertising create the value of the software.   *See Uniloc,* 632 F.3d at 1318-20.   Cockburn neither analyzes these questions nor answers them.   In fact, the value drivers of the Android software and of Google's ads are entirely separate: the software provides for

GOOGLE INC.'S BRIEF IN SUPPORT OF DAUBERT MOTION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
CIVIL ACTION NO. CV 10-03561-WHA

1   certain phone functionality, whether or not the user is viewing ads; and Google's ads are

2   viewable on any software and are not uniquely enabled by Android.

3          Because he fails to address the entire market value rule, Cockburn increases the

4   reasonable royalty by recovery of Oracle's purported lost profits even though "[t]he

5   determination of a reasonable royalty . . . is based not on the infringer's profit, but on the royalty

6   to which a willing licensor and a willing licensee would have agreed at the time the infringement

7   began." *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1557 (Fed. Cir. 1986).  At

8   most, an infringer's profits from the infringing product are a factor to be considered in the

9   royalty analysis.  *See Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 655

10  (Fed. Cir. 1985).  Here, Cockburn's analysis is even farther afield of what the law allows,

11  because he bases his damages estimate on Google's profits from non-infringing products.

12         Cockburn also increases damages by laying out, at considerable effort, speculative

13  theories as to direct and indirect revenue that Google purportedly attained or could have

14  anticipated with respect to Android.  That shows what Oracle is really after—any revenues that

15  could be associated with advertising on Android Devices.  Cockburn assumes that all of

16  Google's advertising revenues associated with Android Devices would have been fair game to

17  Sun and that Google would have given Sun "an even split" of its incremental profits from

18  advertisements, plus compensated Sun for half of what Sun lost.  (*See* Ex. A, Cockburn Rep. ¶¶

19  283-284.)  Out of the myriad actual licenses Sun granted to Java and its components, Cockburn

20  fails to point to a single one that adopted a structure whereby a licensee paid Sun any percentage

21  of its profits on downstream products associated with the use of the product that included Java

22  technology.

23                    **2.      Cockburn improperly smuggles Oracle's lost profits in his royalty**
24                    **calculation, with no attempt to satisfy the stringent *Panduit* test.**

25         Second, Cockburn improperly includes a lost profits recovery in his royalty calculation.

26  (*See* Leonard Decl. at ¶¶ 14-15.)  He assumes that "Sun would have required a relatively high

27  royalty rate to compensate it for the immediate losses" allegedly related to Android.  (Ex. A,

28  Cockburn Rep. ¶ 303.)  He thereby conflates a reasonable royalty recovery with a lost-profits

1    recovery, and bypasses the separate and well-developed legal framework for computing lost

2    profits in patent cases.  *See, e.g.*, *Panduit Corp. v Stahlin Bros. Fibre Works, Inc.* 575 F.2d 1152

3    (6th Cir. 1978).   If Cockburn's technique were valid, it would render the *Panduit* doctrine

4    pointless.  Patentees would have no need to try to prove lost profits in a "but-for" world or to

5    meet the high standards of *Panduit* when they could, instead, simply assert a reasonable royalty

6    would compensate for purported lost profits.  It would also open the door, as it has here, to an

7    increased recovery that would punish infringers instead of compensating patentees.

8            **3.     Cockburn improperly includes damages for so-called "fragmentation"**
9                     **in his royalty base.**

10          Third, Cockburn includes as a component of his royalty calculation money Sun

11   purportedly would have demanded as compensation for so-called "fragmentation" of the Java

12   platform into multiple, competing sub-standards.   These payments are unconnected to any

13   allegedly infringing product (or ***any*** product, for that matter) sold by Google, or any product sold

14   by Sun or Oracle embodying the patents-in-suit.  They relate only to theoretical harm to a

15   separate product that is not even at issue in this case.  This is neither a reasonable patent royalty

16   nor lost profits, and is not a patent damages theory at all; it is a general tort damages theory.

17   Oracle has not asserted any tort claims in this case.  Cockburn does not justify his inclusion of

18   fragmentation in his royalty calculation by reference to any case law.  In fact, he admits that the

19   "fragment or fork [of] Java generally" is "an effect going beyond the use of the specific

20   [purportedly] infringed intellectual property itself."  (*E.g.*, Ex. A, Cockburn Rep. ¶ 157; *see also*

21   *id.* at Ex. C-2 (citing same for *Georgia-Pacific* Factor 3 regarding "scope of the license").)  The

22   only conclusion is that he explicitly seeks royalties for compatibility with something other than

23   the intellectual property at issue.

24          Nothing in the Patent Act or case law supports an award for such attenuated "damages."

25   To the contrary, an award unrelated to the patented technology "punishes beyond the reach of the

26   statute."  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).  As will be

27   discussed further below, there is also no factual basis for Cockburn's approach, as Sun regularly

28   approved of and encouraged the sort of fragmentation it now claims would be fatal to Java.

**B.     Cockburn Also Calculates An Unreasonable, Inflated Royalty Rate By Refusing To Value The Patented Technology At Issue, Among Other Errors.**

"A determination of the royalty stemming from a hypothetical negotiation is often made by assessing factors such as those set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)." *Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1372 (Fed. Cir. 2008).  Not all of the 15 *Georgia-Pacific* factors are relevant in every case, and the Federal Circuit has recently weighed some factors more heavily than others.  *See Lucent Tech. Inc. v. Gateway Inc.*, 580 F.3d 1301, 1325-35 (Fed. Cir. 2009) (discussing factors 2, 10, 11, and 13). Cockburn has not analyzed these factors in any meaningful way.  He buries a cursory analysis of the factors in an appendix, but essentially reduces the analysis to the catch-all factor 15—the hypothetical negotiation between Sun and Google—thereby giving himself maximum freedom to maximize damages.

**1.     Cockburn's report makes no effort to base his royalty rate on the value of the patented technology.**

The most glaring of Cockburn's departures from the *Georgia-Pacific* standard is his express refusal to tie his calculation to the value of the patented technology at issue, both to Sun and Oracle as part of the overall Java platform and to Google in the context of the broader Android platform.  (*See* Leonard Decl. at ¶¶ 8-11.)

The Supreme Court held nearly 130 years ago that

> [t]he patentee . . . must in every case give evidence tending to separate or apportion . . . the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature.

*Garretson v. Clark*, 111 U.S. 120, 121 (1884).  Just two years ago, the Federal Circuit drove home that point by reversing a $357 million damages award because of "the glaring imbalance between infringing and non-infringing features" in the accused product.  *Lucent*, 580 F.3d at

1333; *see also id.* at 1337 (quoting *Garretson*).  Cockburn has not even attempted to distinguish between the relevant claims of the patents-in-suit and the rest of either Android or Java.

The principle of *Garretson* and *Lucent* is embodied in two *Georgia-Pacific* factors and has figured prominently in recent Federal Circuit cases.  *Georgia-Pacific* factor 10 looks to "[t]he nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention." *Georgia-Pacific*, 318 F. Supp. at 1120.  Factor 13 looks to "[t]he portion of the realizable profit that should be credited to the invention as distinguished from nonpatented elements" or other improvements.  *Id.*  The point of these factors is "to elucidate how the parties would have valued *the patented feature* during the hypothetical negotiation."  *Lucent*, 580 F.3d at 1332 (emphasis added).  Yet Cockburn essentially ignores the patented features entirely, both by failing to consider the patents' claimed technology on a claim by claim basis and in view of the expiration dates, and by assuming all Java and Android revenues are attributable to the patented features.

Cockburn treats the patents-in-suit—and the copyrights, too—as a single, indivisible unit, casually dismissing critical differences in the patents by deeming them all "essential."  (*See, e.g.*, Ex. A, Cockburn Rep. ¶¶ 130-132.)  Continuing to build this house of cards, he then equates the value of the patents-in-suit with the value of Java as a whole.  He never states a basis for that conclusion, points to any evidence in the record, or explains how his aggregate analysis could possibly satisfy *Garretson* and *Lucent*.  The closest he comes to analyzing any patented feature is to state that "five of the seven patents-in-suit relate to improved performance, including efficient memory utilization and optimized execution speed, of the virtual machines."  (*Id.* at ¶ 19.)  He jumps from that simple, descriptive statement to the conclusion that "the patents-in-suit are wholesale enablers of the Java architecture on a smartphone," without explaining why.  (*Id.* at ¶ 24).  ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████             ██████████████████████████████████████ ████████████████████████████████████████      Accordingly, just as was the case

GOOGLE INC.'S BRIEF IN SUPPORT OF DAUBERT MOTION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
CIVIL ACTION No. CV 10-03561-WHA

1    in *Lucent*, the '720 patent is "but a tiny feature of one part of a much larger software program."

2    *Lucent*, 580 F.3d at 1332.   As a matter of law, Cockburn's conclusion that the '720 patent

3    accounts for all of Java's value is unreasonable.[2]   His silence regarding the other patents means

4    there is no basis to conclude that those patents are essential to enabling Java architecture on a

5    smartphone either.

6            On the other side of the ledger, Cockburn also assumes the asserted patents are "essential

7    to the device," which is an apparent reference to Android Devices (*see, e.g.,* Ex. A, Cockburn

8    Rep. ¶ 130), but does not explain how they could possibly account for the entire value of

9    Android.   Even though the Federal Circuit has declared *Georgia-Pacific* factor 13—which looks

10   at the value of the patented features to the infringing product—as one of the most important

11   factors for purpose of calculating a royalty rate, Cockburn refuses to apply that factor at all.

12   Buried in an Appendix to his report, he states that there is "no clear economic basis at this time

13   for apportioning the total value of Android into value attributable to the patents and copyrights in

14   suit and any additional value added by Google."  (Ex. A, Cockburn Rep., Appx. C, at C-5 - C-6.)

15   That conclusion alone renders Cockburn's report unreliable as a matter of law because "the trial

16   court must carefully tie proof of damages to *the claimed invention's* footprint in the market

17   place."  *ResQNet.com*, 594 F.3d at 869 (emphasis added).   Instead, Cockburn has admitted to

18   endorsing a damages calculation that includes royalties for features beyond the scope of the

19   claimed invention and, therefore, inherently beyond what is "adequate to compensate for the

20   infringement."  35 U.S.C. § 284.

21           Finally, Cockburn's refusal to separate out each patented feature, either from the broader

22   Java system or from each other, leads to another obviously wrong conclusion:  that Oracle should

23   recover the same damages whether it proves complete infringement of all seven patents and both

24

25   ───────────────────

26   [2]       Cockburn briefly analogizes to patents required to practice an industry standard.  (Ex. A,
     Cockburn Rep. ¶ 131.)  With a standards essential patent, however, demonstrating essentiality is
27   simple:  one can compare the claim with the published standard and, if it matches, the patent is
     essential to practice the standard.  Cockburn cites no published reference standard, and instead
28   vaguely asserts the patents are essential to "Java on a smartphone."  (*Id.* at ¶ 24.)

GOOGLE INC.'S BRIEF IN SUPPORT OF DAUBERT MOTION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
CIVIL ACTION NO. CV 10-03561-WHA

1   copyrights or only infringement of a single claim of a single patent.  (Ex. A, Cockburn Rep.

2   ¶ 347 ("[A]lthough an adjustment could be made to my calculations to the extent Oracle

3   succeeds on some but not all of its claims, it is not necessary to do so.").)  Even apart from the

4   inherent differences in value in the patented features, the patents have widely disparate

5   expiration dates.  The '720 patent expires nearly eight years after every other patent-in-suit.  If

6   Google does not infringe that patent, there is no basis to extend damages liability to 2025.

7   Similarly, if Google is found to infringe only the '104 patent, there is no basis to extend liability

8   beyond 2012.  Yet Cockburn concludes that damages run throughout the life of the '720 patent

9   no matter what.  (*See, e.g.*, *id.* at ¶ 215, n.284.)  He attempts to justify that approach by asserting

10  "that Oracle generally offered portfolio licenses" for Java (*Id.* at ¶ 347), but the question in a

11  hypothetical negotiation is what deal a *willing* licensor and licensee would strike for the patent-

12  in-suit—not whether the licensor generally tried to license a larger portfolio.

13      Valuing each patented feature individually, as the law requires, would burst Cockburn's

14  overinflated damages estimate.  After all, Oracle has admitted the incremental value of the '720

15  patent is $0.  *See* p. 6, *supra*.  If Google is found to infringe only that patent, the damages award

16  may well be only a nominal figure.  Yet Cockburn incorporates ███████████ into his

17  reasonably royalty calculation for the time period between 2018 and 2025, when the '720 patent

18  would be the sole remaining patent.  (*See* Ex. A, Cockburn Rep., Appx. C, at C-4 (citing 2025 as

19  cutoff date in support of *Georgia-Pacific* Factor 7).)  There is no plausible way that a feature

20  admittedly without any commercial value could "constitute[ ] a substantial portion of the value"

21  of either Java or Android.  *Lucent*, 580 F.3d at 1332.

22      Cockburn's use of the Nash Bargaining Solution is not appropriate because he has not

23  tied its use to the particular value of the patented features.  It makes no difference that the Nash

24  Bargaining approach has been widely used.  (Ex. A, Cockburn Rep. ¶¶ 281-82.)  It is not

25  appropriate to apply the Nash Bargaining Solution in a way that does not reflect the reality the

26  parties would have confronted in an actual real-world negotiation.  The real question is "whether

27  [Cockburn] has justified the application of a general theory to the facts of the case."  *Uniloc*, 632

28  F.3d at 1316.  He has not.

1    There is no "credible and sufficient economic proof that the patented invention drove

2    demand for" Android, and Cockburn offers none. *Cornell Univ. v. Hewlett-Packard Co.*, 609 F.

3    Supp. 2d 279, (N.D.N.Y. 2009) (Rader, J.).  (*See also* Leonard Decl. at ¶¶ 18-19, 21.)   The

4    accused SecurityManager has never been used by Google and almost certainly never will be.  *See*

5    pp. 5, *supra*.   There are indisputably a host of "significant features or improvements added" to

6    Android.  (*See, e.g.,* Weingaertner Decl. at ¶¶ 22-24 (Exs. T-V).)   These other features of

7    Android "account for the overwhelming majority of the consumer demand" of Android

8    smartphones.  *Lucent*, 580 F.3d at 1333.   Cockburn's "model [does not support the award

9    because it] does not associate [the] proposed royalty with the value of the patented method at all,

10   but with the unrelated cost of the entire" Android platform.  *Riles*, 298 F.3d at 1312.

   **C.    Cockburn's Methodology Contains Numerous Other Legal Errors.**

       **1.    Cockburn inflates his damages estimate by double counting, including
              Oracle's alleged future damages despite Oracle's request for an
              injunction.**

     Cockburn boosts his damages number by straight-up double counting.   He includes

"future damages from May 20, 2011 through the different terminal dates I use in my hypothetical

license calculations:  October 2018 (ten years from the date the infringement began), December

2021 (six years following the date of the longest projections for which I currently have data, and

based on the assumption that sales would decline to zero over an approximately six-year period

after that point), and December 2025 (following the expiration date of the last-to-expire patent)."

(Ex. A, Cockburn Rep. ¶ 320.)   That calculation is error because future damages amount to

double counting in view of Oracle's request for an injunction.  *See, e.g., Paice LLC v. Toyota

Motor Corp.*, 504 F.3d 1293, 1314 (Fed. Cir. 2007) (ongoing royalty may be appropriate "in lieu

of an injunction").  (*See also* Leonard Decl. at ¶¶ 28-29; Amended Complaint (Dkt. 36) at ¶ 46,

¶ B.)

GOOGLE INC.'S BRIEF IN SUPPORT OF DAUBERT MOTION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
CIVIL ACTION NO. CV 10-03561-WHA

**2.     Cockburn improperly includes Google's revenues from international sales in his damages calculation.**

Cockburn makes no attempt to exclude extraterritorial—and therefore noninfringing—activities.  (*See* Leonard Decl. at ¶¶ 22-23.)    In discussing Java's purported value, Cockburn references the total number of Java-enabled phones, operators and developers without regard to where they are located.  (Ex. A, Cockburn Rep. ¶ 26.) ████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████

**3.     Cockburn improperly sets the date of the hypothetical negotiation in 2008, when Android phones first launched, rather than when the Android code was first written.**

Cockburn also inflates his calculation by arbitrarily setting the date of the hypothetical Google-Sun negotiation very late in time, after Android was allegedly commercially viable and Google was purportedly locked in to using certain technology.  (*See, e.g.*, Ex. A, Cockburn Rep. ¶ 233 ("with the window of opportunity closing"); ¶ 263 ("[Google] could not get to market in time with a product to justify the expense of the undertaking").)  This is another error.  The relevant date is much earlier, when there was no guarantee Android would ever gain a foothold in the market and before its development was locked in to any particular path.

The appropriate date of a hypothetical negotiation is "***the time infringement began***." *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001) (emphasis added).  Without explanation, Cockburn "chose" October 22, 2008—the date that the "first Google phone shipped"—as the date of the negotiation.  (Ex. A, Cockburn Rep. ¶ 119.) But Oracle's infringement contentions allege that Google's infringement began long before that date.   Oracle accuses the Android SDK, which, according to the same web page cited by

17

Cockburn, (*see* Weingaertner Decl. at ¶ 19 (Ex. S), http://www.android.com/timeline.html), was released on November 12, 2007, almost a year before the G1 phone first shipped.  Cockburn's date of hypothetical negotiation is, at a minimum, eleven months later than it should be for the SDK.  Cockburn completely ignored his client's own allegations in setting an artificially late date.

Cockburn magnifies the impact of this error by attributing so much significance to the 2008 date and the purported "window closing" or need to come to market so quickly that allegedly existed as of that date.  Most obviously, Cockburn uses the advanced date to justify his inflated damages number by asserting that Google knew Android would be successful and thus would pay anything to protect it.  Cockburn also uses the advanced date to posit a hypothetical negotiation between Google and *Oracle*, an unwilling negotiator who is seeking ██████ █████ rent in litigation, rather than between Google and *Sun*, which always licensed Java and its components on reasonable terms.  (Ex. A, Cockburn Rep. ¶ 134.)  This is another critical error, because Cockburn claims that the value of *Oracle's* Java-based products supports a higher royalty rate.  (*Id.* at ¶¶ 143-156.)  But Google and its proper negotiating counterparty Sun never would have negotiated license terms based on the value of Oracle's, or any third party's, products, in 2008 or at any other time.

**D.    Cockburn Ignores Record Facts And Undisputed Market Realities.**

**1.    Cockburn ignores the actual market value of Java, as proven by numerous licenses granted by Sun, Google's negotiations with Sun, and the value assigned to Java by Oracle.**

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

GOOGLE INC.'S BRIEF IN SUPPORT OF DAUBERT MOTION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
CIVIL ACTION NO. CV 10-03561-WHA

1   █████████████████████████████████████   Not coincidentally, the real world values Java

2   much less dearly than Oracle would prefer.  (*See* Leonard Decl. at ¶¶ 12-13.)

3        Cockburn acknowledges that Oracle valued Sun's assets prior to acquiring Sun, but he

4   ignores the implications of that valuation.  ████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████████   Instead,

10  Cockburn argues that these figures should not place a "cap" on the damages award.  (Ex. A,

11  Cockburn Rep. ¶ 327).  Of course they should.  Hypothetically, Google would be negotiating for

12  U.S. rights to a portion of the JavaME subset of the Java platform.  Essentially, Cockburn is

13  telling the Court that it is reasonable to value a single thread in a carpet at three times the price of

14  the entire carpet.  That does not pass any test, and certainly not *Daubert.*

15       Moving on to Java specifically, Oracle's own public filings disclose concrete numbers

16  valuing the entire Java platform at a fraction of the figure Cockburn's assigns to the asserted

17  claims of the patents-in-suit.  █████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████████████████

21  ██████████████████████████

22     ██████████████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

**2. Cockburn assumes, without any factual basis, that Sun and Google would have negotiated an expensive, Java-incompatible license rather than a cheap, Java-compatible license.**

As noted above, one of the fundamental premises of Cockburn's analysis is that Sun desperately feared, and wanted to avoid, any fragmentation of the Java standard. According to Cockburn, avoiding fragmentation was so critical to Sun that it would have insisted on an effective 50% royalty rate for the right to fragment Java.

i. *Far from prohibiting fragmentation of Java, Sun promoted such fragmentation through its licensing program.*

Cockburn's major premise, that Sun vigorously fought Java fragmentation, is false. As discussed below, Sun *promoted* fragmentation through its own licensing program. █████

████████████████████████████████████████████████████████

█████████████████████████ ██████████████████████████████

█████████████████████████████████████████████ and paid a modest TCK fee to Sun. In particular, JavaME—the subset of Java at issue here—was fragmented for several years *before Android had even been conceived*. (*See, e.g.*, Weingaertner Decl. at ¶¶ 24-29 (Exs. X-CC).) In other words, Sun was willing to live with some amount of fragmentation as long as it was compensated at fairly modest levels.

Cockburn also wrongly assumes that an "incompatible Android implementation . . . fragments and undermines not only Oracle's Java licensing business but also the value of Java as a whole." (*E.g.*, Ex. A, Cockburn Rep. ¶ 336.) Treating "Java" as one overarching technology for purposes of fragmentation is contrary to reality and would make no sense. JavaME is just one of several branches of the overall Java platform. Most of Java encompasses implementations for desktop, servers, or enterprise systems. Even if Android fragmented JavaME, it would have no effect on desktop- or server-based implementations of Java.

Cockburn makes one other effort to argue that fragmentation would have been the central issue driving Sun in a hypothetical negotiation. As discussed above, he analogizes to Sun's

20

1    settlement with Microsoft in a legal dispute over Java in the early 2000s.  (*See* p. 11, *supra*.)  As

2    Cockburn notes, the case itself concerned trademark infringement, false advertising, breach of

3    contract, and similar unfair competition claims—none of which are at issue here.  (Ex. A,

4    Cockburn Rep. ¶ 178 n.245.)  Cockburn focuses on the $900 million settlement of the case in

5    2004 even though the case involved far more than fragmentation and the agreement was a broad

6    business arrangement that involved more than settlement of litigation (*i.e.,* included covenants

7    not to sue under the parties' entire patent portfolios).  At the same time,  Cockburn completely

8    ignores a 2001 settlement in which Microsoft paid Sun just *$20 million* to settle litigation

9    involving claims related to fragmentation.  (Exs. N & O.)  In any event, the Sun–Microsoft

10   settlements relate to all of Java, not JavaME.  Cockburn gives no reason why the recovery here,

11   related only to JavaME, should be several times that amount.

ii.     *Even if Cockburn's assumptions about fragmentation are correct,*
        *it is improper to base a damages award on compatibility with*
        *nonpatented features.*

14       Cockburn opines that Sun would have charged Google a premium for "an incompatible

15   implementation of the intellectual property" because of its great fear of fragmentation.  (Ex. A,

16   Cockburn Rep. ¶ 157.)   As discussed above, Sun was more than willing to live with

17   fragmentation for a modest licensing fee.  But in any event, Cockburn has no basis for assuming

18   that Sun and Google hypothetically would have negotiated an "incompatible" license that would

19   have caused purported problems for JavaME.  By definition, a license to the patents-in-suit by a

20   willing licensor to a willing licensee would be "compatible" with those patents.  In any event,

21   Cockburn never explains what exactly is "incompatible" about the hypothetically negotiated

22   product.

23       Remarkably, Cockburn does not even consider a "compatible" product as a potential

24   "next-best alternative" in his analysis.  (*See, e.g.*, Ex. A, Cockburn Rep. ¶¶ 230-263.)  In other

25   words, Cockburn ignores that this is supposed to be a hypothetical negotiation between *willing*

26   parties, instead assumeing that Sun would have been unwilling to license a compatible product,

27   notwithstanding its longstanding TCK program.  (*See* Leonard Decl. at ¶ 20.)  ████████

28

GOOGLE INC.'S BRIEF IN SUPPORT OF DAUBERT MOTION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
CIVIL ACTION NO. CV 10-03561-WHA

1

2

3        Cockburn's emphasis on fragmentation, and his conclusion that fear of fragmentation

4   would have caused Sun not to license the patents-in-suit, contradicts his comparison of the

5   patents-in-suit to essential standards patents.  If indeed Oracle's patents are analogous to such

6   patents, then Oracle has an obligation to license them on Fair Reasonable And Non-

7   Discriminatory (FRAND) terms.  Cockburn dismisses that obligation in a footnote.  He

8   acknowledges that FRAND obligations arise because of "the significant bargaining power their

9   [essential] patents may provide," but concludes "[o]f course, in the context of a hypothetical

10  license for an implementation of a set of technologies that is by definition incompatible, those

11  considerations do not apply."  (Ex. A, Cockburn Rep. ¶ 130 n.196.)  Cockburn wants to have it

12  both ways—he gives Oracle all of the benefits of essential standards patents while refusing the

13  obligations inherent in such patents.  No sound economic principle supports that approach.

14                    iii.    *Cockburn relies on fragmentation as a reason to ignore relevant*
                              *evidence, including Java-compatible licenses.*
15

16

17

18

19

20

21

22        Cockburn offers contradictory statements that illustrate the unreliability of his entire

23  analysis on this issue.  He states that "Oracle's practice is not to license particular patents, but

24  rather to license Java."  (Ex. A, Cockburn Rep. ¶ 23.)  That suggests that prior Java licenses were

25  for compatible products, and contradicts his refusal to consider the possibility that Sun and

26  Google would have negotiated a Java-compatible license.  Sun's earlier Java licenses, which

27  were for the entire Java platform, not just specific patents, would be highly instructive to a

28  reasonable royalty.  Again, Cockburn tries to have it both ways.  On the one hand, he refuses to

1    value the patented technology at issue here, instead valuing Java as a whole. ██████████

2    ██████████████████████████████████████████████████████████████████████████████

3    ██████████████████████████████████████████████████████████████████████████████

4    ██████████████████████████████████████████████████████████████████████████████

5    ██████████████████████████████████████████████████████████████████████████████

6    ██ ████ ████ ██ ████ ████ ████ ████ ████ ████ ████ ████ ██

7    ██████████████████████████████████████████████████████████████████████████████

8    ██████████████████████████████████████████████████

9              **3.      Cockburn relies on inapposite licenses and ignores relevant ones to
                         inflate the damages calculation.**
10

11           After discarding Java licenses actually entered into by Sun, Cockburn trumpets various

12   "Other Mobile IP-Related Agreements."  (Ex. A, Cockburn Rep. ¶ 342.)  Those agreements

13   include a license between Qualcomm Inc. and Nokia Corp. for what Cockburn vaguely

14   characterizes as "various wireless technologies."  (*Id.* at ¶ 342.)  Using this contract as an

15   exemplar while ignoring Sun's agreement with Nokia for Java technology is methodologically

16   unsound, especially given the Federal Circuit's "vigilance when considering past licenses to

17   technologies *other* than the patent in suit."  *ResQNet*, 594 F.3d at 869 (emphasis in original)

18   (citation omitted).  Cockburn offers no reason that mere wireless technology "kinship imparts

19   enough comparability to support" his damages estimate.  *Lucent*, 580 F.3d at 1328.  Cockburn's

20   purpose in citing Qualcomm's agreement with Nokia while ignoring ***Sun's agreement with***

21   ***Nokia*** for Java technology serves only "to inflate the reasonable royalty analysis with

22   conveniently selected licenses without an economic or other link to the technology in question."

23   *ResQNet*, 594 F.3d at 872. ██████████████████████████████████

24   ██████████████████████████████████████████████████████████████

25           Cockburn also purports to look to "Other Mobile Operating Systems."  (Ex. A, Cockburn

26   Rep. ¶ 341.) ██████████████████████████████████████████████████

27   ██████████████████████████████████████████████████████████████████████████████

28   ██████████████████████████████████████████████████████████████████████████████

1

2

3

### E.    Cockburn Offers No Meaningful Analysis Regarding Copyright Damages.

Cockburn's analysis with respect to the asserted copyrights is even more cursory and unreliable.  (*See* Leonard Decl. at ¶ 30.)   Cockburn begins with the general premise that copyright-protected expression may be "essential or important to a product's success" and that such success may allow the copyright owner to "charge accordingly."  (*See, e.g.*, Ex. A, Cockburn Rep. ¶ 133.)   Yet he does not explain how the asserted copyrights are essential to Java's so-called success, leaving that critical issue to be filled in by "other witnesses."  (*Id.* at ¶¶ 21-22.)

Nor does Cockburn explain how any copyrighted features of the Java platform have benefited Google.  He merely describes Google's decision to "focus on a single programming language: Java" to leverage the "large Java developer community" to allow Android to quickly and seamlessly "enter the existing mobile ecosystem."  (*See, e.g.*, *id.* at ¶ 124.)  How the asserted copyrights allowed Google to leverage this community goes unexplained.   To the extent Cockburn relies on developers' ability to write applications in the Java programming language, Oracle has renounced any rights in the language itself.  (*See* February 9, 2011 *Transcript of Proceedings* (Dkt. 87) at 8:16-18 ("[T]he Java Programming Language, we're not asserting that we own that programming language for purposes of this case.").)  The rest of the report simply conflates copyright and patent damages.  (*See, e.g.,* Ex. A, Cockburn Rep. ¶ 9.2 ("a reasonable royalty for the infringement in this case would reflect the key enabling virtues of the patents and copyrights at issue"); *see also id.* at ¶ 9.3; ¶ 112; ¶ 113; ¶ 131; ¶ 232; ¶ 340.)

Cockburn offers no other copyright damages analysis.  He summarizes Oracle's entire basis for copyright damages in a single, conclusory sentence at the very end of his report:  "I understand that, because Android infringes the expression embodied in Oracle's copyrighted class libraries or APIs, Oracle may also be entitled to receive Google's profits attributable to the

28

1   infringement to the extent that they are not taken into account in computing actual damages."

2   (*Id.* at ¶ 349.)

3   **IV.      CONCLUSION**

4          For all the above reasons, the Court should exclude Cockburn's report under *Daubert*.

GOOGLE INC.'S BRIEF IN SUPPORT OF DAUBERT MOTION
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
CIVIL ACTION NO. CV 10-03561-WHA

DATED:  June 14, 2011

**KING & SPALDING LLP**

By:  /s/ Scott T. Weingaertner

SCOTT T. WEINGAERTNER (*Pro Hac Vice*)
sweingaertner@kslaw.com
ROBERT F. PERRY
rperry@kslaw.com
BRUCE W. BABER *(Pro Hac Vice)*
bbaber@kslaw.com
1185 Avenue of the Americas
New York, NY 10036-4003
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222

ROBERT A. VAN NEST - #84065
rvannest@kvn.com
CHRISTA M. ANDERSON - #184325
canderson@kvn.com
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone:  (415) 391-5400

Facsimile:  (415) 397-7188
DONALD F. ZIMMER, JR. (SBN 112279)
fzimmer@kslaw.com
CHERYL A. SABNIS (SBN 224323)
csabnis@kslaw.com
KING & SPALDING LLP
101 Second Street – Suite 2300
San Francisco, CA 94105
Telephone: (415) 318-1200
Facsimile:  (415) 318-1300

IAN C. BALLON (SBN 141819)
ballon@gtlaw.com
HEATHER MEEKER (SBN 172148)
meekerh@gtlaw.com
GREENBERG TRAURIG, LLP
1900 University Avenue
East Palo Alto, CA 94303
Telephone: (650) 328-8500
Facsimile: (650) 328-8508

ATTORNEYS FOR DEFENDANT
GOOGLE INC.