DONALD F. ZIMMER, JR. (SBN 112279)
fzimmer@kslaw.com
CHERYL A. SABNIS (SBN 224323)
csabnis@kslaw.com
KING & SPALDING LLP
101 Second Street – Suite 2300
San Francisco, CA 94105
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

IAN C. BALLON (SBN 141819)
ballon@gtlaw.com
HEATHER MEEKER (SBN 172148)
meekerh@gtlaw.com
GREENBERG TRAURIG, LLP
1900 University Avenue
East Palo Alto, CA 94303
Telephone: (650) 328-8500
Facsimile: (650) 328-8508

SCOTT T. WEINGAERTNER (*Pro Hac Vice*)
sweingaertner@kslaw.com
ROBERT F. PERRY
rperry@kslaw.com
BRUCE W. BABER (*Pro Hac Vice*)
bbaber@kslaw.com
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036-4003
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

ROBERT A. VAN NEST - #84065
rvannest@kvn.com
CHRISTA M. ANDERSON - #184325
canderson@kvn.com
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant
GOOGLE INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

ORACLE AMERICA, INC.

            Plaintiff,

      v.

GOOGLE INC.

            Defendant.

Case No. 3:10-cv-03561-WHA

Honorable Judge William Alsup

**DECLARATION OF GREGORY K. LEONARD, PH.D.**

I, Gregory K. Leonard, Ph.D., declare as follows:

## I.       QUALIFICATIONS

1.       I am a Senior Vice President at NERA Economic Consulting, 1 Front Street, Suite 2600, San Francisco, CA 94111.  I received an Sc.B. in Applied Mathematics-Economics from Brown University in 1985 and a Ph.D. in Economics from the Massachusetts Institute of Technology in 1989.  Prior to joining NERA, I was a senior vice president with Lexecon Inc.; prior to that, I was a founding member and director of Cambridge Economics, Inc.; prior to that, I was an assistant professor at Columbia University.

2.       My specialties within economics are applied microeconomics, the study of the behavior of consumers and firms, and econometrics, the application of statistical methods to economics data.  I have published a number of articles in scholarly journals, which are listed on my curriculum vitae, attached as Exhibit A.

3.       I have extensive experience with the economics of intellectual property.  I have published papers about intellectual property issues in the *Journal of Econometrics, the Berkeley Journal of Technology and Law,* and *les Nouvelles*, among others.  I co-edited a book entitled *Economic Approaches to Intellectual Property: Policy, Litigation, and Management* and co-authored several of its chapters, one of which was recently cited by the Court of Appeals for the Federal Circuit in its *Uniloc v. Microsoft* opinion.  In February 2009, I served as a panelist by invitation at a hearing on intellectual property issues held by the Federal Trade Commission (FTC).  In March 2011, the FTC issued a report, entitled *The Evolving IP Marketplace:  Aligning Patent Notice and Remedies with Competition* (March 2011), which cites my comments and publications extensively.

4.       I have served as referee for numerous economic journals, and am currently an associate editor of the American Bar Association publication *Antitrust Law Journal*.  I have given invited lectures at the FTC, the United States Department of Justice, the Fair Trade Commission of Japan, and the Ministry of Commerce and Supreme People's Court of the People's Republic of China.  In 2007, I served as a consultant to and testified before the Antitrust

1  Modernization Commission, which was tasked by Congress and the President with making

2  recommendations for revising the antitrust laws of the United States.

3      5.      I have served as an expert witness in a number of cases and have provided live

4  testimony at trial in nine cases.  A complete list of cases in which I have testified (in deposition

5  or at trial) is provided in my curriculum vitae.  NERA charges at an hourly billing rate of $625

6  for my work on this matter.

7  **II.      ASSIGNMENT**

8      6.      I have been asked by counsel for Google, Inc. ("Google") to review and comment

9  upon the methodologies employed in the Expert Report of Dr. Iain Cockburn ("Cockburn

10  Report") for the patents-in-suit and copyrights-in-suit.  I understand that Rule 702 of the Federal

11  Rules of Evidence state that

12  
13  
14  
15  
16  

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

17      7.      I have been asked to comment on the extent to which Dr. Cockburn's report meets

18  the requirements of Rule 702, particularly the requirements that the report be based on sufficient

19  facts and the report apply the principles and methods of economics reliably to the facts of the

20  case.  In addition to the Cockburn Report, I have reviewed the material cited by Dr. Cockburn,

21  the material cited in my declaration, and the exhibits to the Declaration of Scott T. Weingaertner

22  in Support of Google Inc.'s Daubert Motion, and I rely on my education and experience, in

23  coming to these conclusions.

24  **III.      DR. COCKBURN BASES HIS DAMAGES ANALYSIS ON THE
25          VALUE OF THE ENTIRE JAVA PLATFORM, NOT THE PATENTS-
          IN-SUIT AND COPYRIGHTS-IN-SUIT**

26      8.      Dr. Cockburn bases his analysis on the value of the entire Java platform even

27  though his role is to estimate the damages related to the infringement of only the seven patents

28  and the limited set of copyrights that have been asserted by Oracle America, Inc. ("Oracle") in

2

this matter.  His calculation of a reasonable royalty for all of the intellectual property associated with the Java platform is not relevant to determining the damages associated with the alleged infringement of the patents-in-suit and copyrights-in-suit.

9.      Furthermore, Dr. Cockburn states that his damages analysis would not change even if some of the patents-in-suit or copyrights-in-suit are found to be invalid or not infringed. Such a statement is economically unjustified, absent a showing that each individual patent-in-suit and copyright-in-suit was essential to the development of Android.  However, neither Dr. Cockburn nor Oracle makes such a showing.  Dr. Cockburn only asserts without support that the intellectual property in this case is "significant or essential" (Cockburn Report, Paragraphs 9.1, 126, 129-133).

10.     Dr. Cockburn goes on to inappropriately compare his bundling of the entire Java platform with the practices of a patent pool which generally licenses patents essential to meeting standards, which is not a relevant consideration here.  It is also notable that patent pools often allow licensees to license individual patents rather than the entire bundle.[1]

11.     Dr. Cockburn's assertion that it is Oracle's practice "not to license particular patents" (Cockburn Report, Paragraph 23) is not a reliable basis for asserting that only the entire Java platform will be licensed.  Moreover, regardless of Oracle's practices, it is inappropriate to calculate damages on the basis of the entire Java platform when the matter at hand concerns only the limited number of patents and copyrights that have been asserted.

## IV.   DR. COCKBURN'S ANALYSIS IS INCONSISTENT WITH ACTUAL MARKET TRANSACTIONS INVOLVING THE INTELLECTUAL PROPERTY AT ISSUE IN THIS CASE

12.     Dr. Cockburn ignores, misinterprets, or fails to give appropriate weight to relevant market transactions that indicate a much lower value for the intellectual property at issue in this case.  Economists recognize that arm's length market transactions generally provide important

---

[1] Statement of Baryn S. Futa, CEO and Manager, MPEG LA, LLC, Before the United States Department of Justice Antitrust Division and the Federal Trade Commission Joint Hearings on Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy, pp. 4-6.

1   indicators of value.  License agreements and transactions that involve the intellectual property at

2   issue in this case are available and are among the facts upon which Dr. Cockburn should have

3   relied, e.g., the license agreement between Oracle and Sun Microsystems, Inc. ("Sun")

4   (1/11/06)[2] and other measures of value mentioned in Google, Inc.'s Brief in Support of Daubert

5   Motion, such as the purchase price of Sun and Sun's annual revenues.  The fact that these license

6   agreements and transactions indicate very different values for the intellectual property at issue in

7   this case than the value estimated by Dr. Cockburn further indicates that his analysis is not

8   consistent with the facts.

9       13.    Economists also recognize that valuations undertaken by third parties in the

10   regular course of business can provide important indicators of value.  In the documents Dr.

11   Cockburn has reviewed, there are valuations of assets that include the intellectual property at

12   issue in this case.  These valuations differ substantially from the value estimated by Dr.

13   Cockburn.  For example, Oracle estimated the value of all of Sun's software-related Core

14   Technology, which includes but is not limited to its Java-related Core Technology, at about

15   $68.8 million.[3]  As the patents-in-suit and copyrights-in-suit are just a subset of the Java-related

16   Core Technology, the value of the intellectual property at issue must be much less than $68.8

17   million.  The very large disparity between this value and Dr. Cockburn's results for a small

18   subset of the overall portfolio of Sun's intellectual property indicates that his analysis is not

19   consistent with the facts in this case.

20   **V.    DR. COCKBURN ATTEMPTS TO RECOVER LOST PROFITS AS**
21   **       PART OF A REASONABLE ROYALTY ANALYSIS**

22       14.    Dr. Cockburn attempts to recover lost profits as part of his reasonable royalty

23   analysis, increasing his estimated damages award by over $200 million (see Cockburn Report,

Exhibit 26).  He does this by including, as part of the hypothetical negotiation called for in *Georgia Pacific* Factor 15, profits from Oracle's unrealized forecasts of sales of its mobile operating system, Acadia.  Purported lost sales associated with Acadia also enter into his analysis of *Georgia Pacific* Factor 5, "The commercial relationship between the licensor and licensee, such as whether they are competitors..." (see Appendix C to Cockburn Report).

15.     In addition, based on my experience in testifying on patent damages matters, lost profits are explicitly awarded only after a showing that certain economic conditions are satisfied, conditions described in the *Panduit*, *Mor-Flo*, and other decisions.[4]  Dr. Cockburn does not undertake the economic analysis required to show that these conditions are satisfied.  Indeed, he attempts to avoid having to conduct such an analysis and instead get lost profits "in the through the back door" of the reasonable royalty analysis.[5]

16.     Dr. Cockburn's report is made additionally unreliable by his failure to examine other possible reasons ███████████████████████████████████████ then there is no basis for a lost profits claim.

## VI.     DR. COCKBURN FAILED TO ADEQUATELY CONSIDER NON-INFRINGING ALTERNATIVES THAT GOOGLE COULD HAVE CONSIDERED

17.     To economists, a crucial element in determining the appropriate reasonable royalty is the availability of non-infringing alternatives.  However, Dr. Cockburn does not

---

[4] "The Evolving IP Marketplace:  Aligning Patent Notice and Remedies with Competition," Federal Trade Commission, March 2011, p. 151.

[5] See "The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition," Federal Trade Commission, March 2011, p. 20:

> First, compensatory damages for the strict liability offense of infringement are not meant to be punitive.  Second, arguments that the patentee would have rejected the maximum amount the infringer would have paid are based on assumptions that the patentee could have made more by not licensing.  The patentee may have been better if selling the invention or a competing product exclusively.  In that case, however, the patentee should be entitled to damages based on lost profits.  The law must be flexible in allowing the patentee to prove its lost profits in order to provide adequate compensation.  But a patentee who has failed or chosen not to do so should not be allowed to use unproven arguments of direct losses to inflate a reasonable royalty award beyond what a willing licensee would pay.

1  consider any non-infringing alternatives to the individual patents and copyrights at issue in this

2  case.

3       18.    Even if he is correct that the hypothetical negotiation would be over the entire

4  Java platform, Dr. Cockburn fails to undertake a comprehensive analysis of the full range of

5  alternatives to utilizing the entire Java platform.  He does not, for instance, undertake an analysis

6  of non-infringing alternatives to the use of Java such as C++, C, or other platforms.[6]  In fact, he

7  hardly mentions these alternatives.

8       19.    Among the reasons that Dr. Cockburn claims Google needed a license to the Java

9  platform is that Android would have operated at a lower speed, although he does not indicate the

10  size of the purported reduction in speed.  Dr. Cockburn does no analysis to show that a "slower"

11  non-infringing Android would have been commercially unacceptable or even been faced with

12  decreased consumer demand.  An important principle of economics is that consumers will make

13  trade-offs in deciding what products to buy or services to use.  There is evidence that users of the

14  Android platform make such trade-offs.  For example, the Android platform has historically had

15  fewer applications or "apps" than the iPhone available to consumers, yet consumers still have

16  chosen to buy Android phones in large numbers.[7]  Ultimately, many characteristics drive

17  demand for Android phones.[8]  Dr. Cockburn has not shown how much just one of these

18  characteristics, speed, would have been sacrificed or how such a sacrifice in speed would have

19  affected end-user demand.  Economists have available a set of tools that can measure the

20  importance of these trade-offs and the size of the impact of an alleged change in speed.

---

[6] Andrew E. Rubin testified that Google had considered other programming languages for Android, including C, C++, Microsoft C Sharp, Lua, and Python ("Deposition of Andrew E. Rubin," April 5, 2011, pp. 22-23) and had platform technology partnership discussions with companies such as ██████████ ("Deposition of Andrew E. Rubin," April 5, 2011, pp. 107-108).

[7] The number and ability to run such applications have become increasingly important to consumers.  See, for example, "Smart Phone Wars: Is It the Device or The Apps that Matter Most?" *The Globe and Mail*, October 19, 2009: "For smart phone makers – and, indeed, for an increasing number of electronics makers designing everything from radios to televisions – the emphasis is quickly shifting away from hardware design and toward the type and variety of applications that users can download and run."

[8] For example, in 2009, JD Power and Associates surveyed consumers based on a number of factors, including: (1) operation; (2) physical design; (3) features; and (4) battery function of various smart phones. ("As Customer Satisfaction with Feature-Rich Smartphones Continues to Increase, Satisfaction with Traditional Mobile Phones Declines," *JD Power and Associates Press Release,* October 9, 2009, available at http://businesscenter.jdpower.com/news/pressrelease.aspx?ID=2009224.)

DECLARATION OF GREGORY K. LEONARD, PH.D.
CIVIL ACTION NO. CV 10-03561-WHA

20.     Another relevant alternative scenario that is not considered by Dr. Cockburn would be for Google to license a Java-compatible Android.  In that case, Dr. Cockburn's damages would be significantly reduced ███████████████████████████████

███████████████████████████ Dr. Cockburn's heavy reliance on his assumption that the hypothetical negotiation would have been for a license that allowed an allegedly Java-incompatible Android further renders his conclusions unreliable.

21.     There is other relevant evidence that Dr. Cockburn ignores in his claim that Google "needed" to base Android on Java.  As Steve Jobs said in 2007, "Java's not worth building in.  Nobody uses Java anymore.  It's this big heavyweight ball and chain."[9]  Apple's iOS does not support Java, and Apple has been immensely successful without Java.  There is no reason that Google could not have taken a similar path.  Dr. Cockburn's entire analysis is contrary to this basic market fact.

## VII.   DR. COCKBURN FAILED TO CONSIDER THAT A LARGE PROPORTION OF ANDROID HANDSETS ARE SOLD AND USED OUTSIDE OF THE UNITED STATES

22.     Documents that Dr. Cockburn reviewed indicate that a large proportion of Android handsets are sold and used outside the United States.[10]  I understand that the patents-in-suit and copyrights-in-suit only apply within the United States, so that Google would have been able to supply Android for handsets outside the United States without infringing.

23.     Dr. Cockburn undertook no analysis of the implications of this for his damages analysis and, instead, appears to have assumed that the intellectual property at issue extends beyond the United States.

---

[9] "Ultimate iPhone FAQs List, Part 2," David Pogue's Blog on the *New York Times*, January 13, 2007, available at http://pogue.blogs nytimes.com/2007/01/13/ultimate-iphone-faqs-list-part-2/.

[10] For example, as of May 2010, ██ percent of Android users were outside of the United States. ("AdMob Mobile Metrics," May 2010, GOOGLE-00305222 at 43).

## VIII.  DR. COCKBURN IMPROPERLY APPLIED THE *MOR-FLO* METHODOLOGY

24.    Dr. Cockburn improperly applied a "Mor-Flo" methodology to determine smart phone market shares in a "but for" world without Android.  Even if all of Android's worldwide sales were found to infringe the patents at issue, Dr. Cockburn failed to recognize important differences in market shares across geographies that invalidate the use of the Mor-Flo methodology.  These market share differences are driven by, among other things, different tastes of consumers for the products offered by different vendors in various markets.[11]

25.    Dr. Cockburn improperly assumes that, in the but-for world without Android, sales of Android phones would have been allocated based on *worldwide* market shares.  In particular, he assumes a large portion of the sales of Android phones would have gone to Nokia's Symbian-based phones.  For example, Dr. Cockburn's estimates imply that 34.6 percent of Android sales in 2011 would have gone to Symbian-based phones.[12]

26.    Dr. Cockburn's calculations ignore the substantial variation across regions in the market shares of smart phone manufacturers.  For example, Symbian's sales and market shares are substantially higher outside of the US than in the US.[13]  In March 2011, Symbian's market share was reported to range from 11.4 to 46.9 percent in four European countries.[14]  At the same time, Symbian's market share was reported to be *less than 2 percent* in the US market.[15]  Dr.

---

[11] See, for instance, "Nokia and RIM bleeding smartphone share while Android cleans up," April 18, 2011, available at http://www.guardian.co.uk/technology/2011/apr/18/smartphone-market-android-win-nokia-rim-lose, showing extensive differences in the market shares of distinct mobile operating systems in different countries throughout the world.

[12] See Exhibit 16 and 23 of Cockburn Report.  Dr. Cockburn allocates the Android installed base for each year to non-Android platforms based on sales for the same year.  For 2011, the percentage of Symbian sales is calculated from Exhibit 16 as sales of Symbian-based phones divided by all non-Android phones (94,621,500) ÷ (94,621,500 + 67,202,900 + 24,835,600 + 71,047,100 + 15,856,300) = 34.6 percent.

[13] See, for example, GOOGLE-00305222 at 229.

[14] "Nokia and RIM Bleeding Smartphone Share While Android Cleans Up," *guardian.co.uk*, April 18, 2011, available at http://www.guardian.co.uk/technology/2011/apr/18/smartphone-market-android-win-nokia-rim-lose/print.

[15] "Nokia and RIM Bleeding Smartphone Share While Android Cleans Up," *guardian.co.uk*, April 18, 2011, available at http://www.guardian.co.uk/technology/2011/apr/18/smartphone-market-android-win-nokia-rim-lose/print.

Cockburn's methodology improperly allocates too large of a share to Symbian phones in the US. Because the majority of Google's Android phones are sold in the US,[16] this methodology necessarily leads to the incorrect calculation of the incremental profit associated with Android, even leaving unchanged the rest of Dr. Cockburn's assumptions.

27.     By over-allocating Android sales to Symbian, Dr. Cockburn substantially overstates the incremental profit that Google earns from Android phones.  This is because, by Dr. Cockburn's own estimates, Google earns far less per device on Symbian phones than it does on Android and Apple iOS phones.  ██████████████████████████████████████████ ██████████████████ ████ ███████████████████████████████ ████████████████████████████ ███ ████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ Allocating a large share to Nokia's Symbian-phones thus improperly results in large losses to Google when, in fact, using US market shares would substantially reduce the incremental losses to Google.[19]

---

[16] For example, as of May 2010, ██ percent of Android users in the United States. ("AdMob Mobile Metrics," May 2010, GOOGLE-00305222 at 243.)

[17] Cockburn Exhibit 22, "Net revenue per device (after TAC)."

[18] See Android's net revenue per device, see "Net Revenue Per Device (after TACs)" for 2011 for Exhibit 19 to the Cockburn Report.  For Apple iOS's net revenue per device, see Cockburn Exhibit 22, "Net revenue per device (after TAC)."

[19] Note also that, Dr. Cockburn's analysis is unlikely to "average out" such that Google would earn a higher incremental profit outside of the US that would cancel out the lower incremental profit in the US.  The majority of Android sales occur in the US where Nokia's sales are low and the largest portion of Nokia's sales occur in Asian countries (see Nokia 20-F, for period ending December 31, 2010, filed on March 11, 2011, p. 104) where Android's sales are low (see "AdMob Mobile Metrics," May 2010, GOOGLE-00305222 at 243.)

## IX.   DR. COCKBURN INCLUDES FUTURE DAMAGES IN HIS "PAST" DAMAGES CALCULATION, THEREBY LEADING TO DOUBLE RECOVERY

28.     Dr. Cockburn concludes that the hypothetical negotiation would have resulted in a combined lump sum/running royalty structure.  He includes the entire lump sum payment as "past" damages, even though a portion of this lump sum corresponds to future sales.  Thus, Dr. Cockburn improperly shifts what are actually future damages into his "past" damages calculation.

29.     Since Oracle has stated that it will seek an injunction if it prevails on liability, Dr. Cockburn's lump-sum damages award based upon future damages will result in double recovery for Oracle.  It will receive an award for damages based upon future sales at a time that Google will be forced out of the market by an injunction.

## X.    DR. COCKBURN DOES NOT PERFORM ANY ANALYSIS OF THE COPYRIGHT INFRINGEMENT DAMAGES

30.     Dr. Cockburn does not separate out damages due to copyright infringement from damages due to patent infringement.  I understand that, in a copyright matter, it is the copyright owner's responsibility to identify its lost profits and the alleged infringer's gross revenue due to infringement.  It is the alleged infringer's responsibility to deduct appropriate expenses and profits attributable to factors other than copyrighted material.  Dr. Cockburn provides inadequate basis for reviewing unjust enrichment or lost profits claims due to copyright infringement.  Dr. Cockburn's placement of copyright infringement into the same hypothetical negotiation as all of the patents-in-suit in this case makes this an inappropriately difficult egg to unscramble.

Executed on June 14, 2011 in San Francisco, California.

_____
Gregory K. Leonard

DECLARATION OF GREGORY K. LEONARD, PH.D.
CIVIL ACTION NO. CV 10-03561-WHA

# Exhibit A

# NERA
Economic Consulting

National Economic Research Associates, Inc.
1 Front St., Suite 2600
San Francisco, California 94111
415 291 1000 Fax 415 291 1020
Direct dial: 415 291 1015
gregory.leonard@nera.com
www.nera.com

# Gregory K. Leonard
## SENIOR VICE PRESIDENT

Dr. Leonard is a Senior Vice President in NERA's Antitrust and Intellectual Property Practices. His areas of expertise are applied microeconomics and econometrics. He has extensive experience analyzing competition and estimating damages in a wide variety of contexts. Dr. Leonard has provided written and oral testimony and presentations before federal and state courts, government agencies, and arbitration panels on issues involving antitrust, damages estimation, statistics and econometrics, surveys, valuation, and labor market discrimination.

Prior to joining NERA, Dr. Leonard was a Senior Vice President at Lexecon Inc., a founding member and Director of Cambridge Economics, Inc., and an Assistant Professor at Columbia University, where he taught statistics, econometrics, and labor economics.

Dr. Leonard has experience in a broad range of industries, including pharmaceuticals, telecommunications, airlines, semiconductors, hedge funds, securities, commercial and recreational fishing, medical devices, professional sports, credit card networks, payment systems, information services, computer software, computer hardware, chemicals, plastics, flat glass, retailing, advertising, beef processing, fertilizers, printing, petroleum, steel, beer, cereals, cosmetics, athletic apparel, film, milk, canned fish, vitamins, animal feed supplements, tissue, paperboard, industrial gas, concrete, automobiles, contact lens cleaners, sports beverages, soft drinks, diapers, tobacco products, graphite and carbon products, and modems, among others.

Dr. Leonard has published widely on the issues of antitrust, industrial organization, labor economics, and econometrics. His publications have appeared in the *RAND Journal of Economics*, the *Journal of Industrial Economics*, the *Journal of Econometrics*, the *International Journal of Industrial Organization*, the *Journal of Public Economics*, *Annales Economie et de Statistique*, the *Journal of Labor Economics*, the *International Journal of the Economics of Business*, *Antitrust Law Journal*, *Antitrust*, *Antitrust Source*, the *Journal of Economic Analysis & Policy*, *Journal of Competition Law and Economics*, the *Journal of Economic Surveys*, 法学家 (*Jurists' Review), Antitrust Chronicle,* the *Berkeley Technology Law Journal*, the *European Competition Law Review*, *les Nouvelles, Landslide, Managing Intellectual Property*, *Legal Issues of Economic Integration*, and the *George Mason Law Review*. Dr. Leonard co-authored two chapters in the American Bar Association Section of Antitrust Law (ABA) volume *Issues in Competition Law and Policy*, co-authored the "Econometrics and Regression Analysis" chapter of the ABA volume *Proving Antitrust Damages*, and was a contributor to the ABA volume *Econometrics*. He co-edited *Economic Approaches to Intellectual Property: Policy, Litigation, and Management* and authored or co-authored three of its chapters. One of these chapters (co-authored with Lauren J. Stiroh) was cited by the Court of Appeals for the Federal Circuit in its *Uniloc* decision.  Dr. Leonard is an Associate Editor of the *Antitrust Law Journal* and a co-editor

Gregory K. Leonard

of the ABA Section of Antitrust Law Economics Committee newsletter, and has served as a referee for numerous economics journals.

Dr. Leonard was invited to speak on merger simulation at the 2004 US Department of Justice and Federal Trade Commission (FTC) Merger Workshop, the econometrics of evaluating competition in local retail markets at the 2008 FTC Retail Mergers Workshop, and the calculation of patent damages at the 2009 Hearings on the Evolving IP Marketplace. The 2011 FTC report resulting from the latter hearings cited Dr. Leonard extensively.  In 2005, Dr. Leonard served as a consultant on the issue of immunities and exemptions to the Antitrust Modernization Commission (AMC), which was tasked by Congress and the President with developing recommendations for changes to the US antitrust laws. He testified before the AMC in December 2005.

Dr. Leonard has extensive experience with international antitrust and intellectual property issues, particularly in Asia. He has given invited presentations at the Anti-Monopoly Bureau of China's Ministry of Commerce (MOFCOM), the Supreme People's Court of China, Renmin University, the Chinese Academy of Social Sciences, and the University of Political Science and Law. He was a member of ABA and US Chamber of Commerce delegations to joint workshops with the Chinese antitrust agencies, MOFCOM, NDRC, and SAIC, and served on the working groups of the ABA's Sections of Antitrust Law and International Law that prepared comments on MOFCOM's and SAIC's draft regulations.  Dr. Leonard has also given presentations to the Japan Fair Trade Commission and the India Competition Commission.

Dr. Leonard received an ScB in Applied Mathematics-Economics from Brown University and a PhD in Economics from the Massachusetts Institute of Technology, where he was a National Science Foundation Graduate Fellow and an Alfred P. Sloan Foundation Fellow.

## Education

**Massachusetts Institute of Technology**
PhD, Economics, 1989
Alfred P. Sloan Foundation Fellowship, 1988-1989
National Science Foundation Graduate Fellowship, 1985-1988

**Brown University**
ScB, Applied Mathematics-Economics, 1985
Rohn Truell Memorial Premium in Applied Mathematics, 1985

## Professional Experience

| | **NERA Economic Consulting** |
| --- | --- |
| 2008- | Senior Vice President |
| 2004-2008 | Vice President |
| 1990-1991 | Senior Analyst |

|            | **Lexecon Inc.** |
|------------|------------------|
| 2000-2004  | Senior Vice President |

|            | **Cambridge Economics, Inc.** |
|------------|-------------------------------|
| 1991-2000  | Director |

|            | **Columbia University** |
|------------|-------------------------|
| 1989-1990  | Assistant Professor |
|            | Teaching Areas: Econometrics, Statistics, Labor Economics |

## Papers and Publications

"A Proposed Method for Measuring Competition Among Imperfect Substitutes," *Antitrust Law Journal* 60, 1992, pp. 889-900 (with J. Hausman and D. Zona).

"Issues in the Contingent Valuation of Environmental Goods:  Methodologies for Data Collection and Analysis," in *Contingent Valuation: A Critical Assessment*, Ed. by J. A. Hausman, North Holland Press, 1993 (with D. McFadden).

"Assessing Use Value Losses Due to Natural Resource Injury," in *Contingent Valuation:  A Critical Assessment*, ed. by J. A. Hausman, North Holland Press, 1993 (with J. Hausman and D. McFadden).

"Does Contingent Valuation Measure Preferences?  Experimental Evidence," in *Contingent Valuation:  A Critical Assessment*, ed. by J. A. Hausman, North Holland Press, 1993 (with P. Diamond, J. Hausman, and M. Denning).

"Competitive Analysis with Differentiated Products," *Annales d'Economie et de Statistique* 34, 1994, pp. 159-180 (with J. Hausman and D. Zona).

"A Utility Consistent, Combined Discrete Choice and Count Data Model:  Assessing Recreational Use Losses Due to Natural Resource Damage," *Journal of Public Economics* 56, 1995, pp. 1-30 (with J. Hausman and D. McFadden).

"Market Definition Under Price Discrimination," *Antitrust Law Journal* 64, 1996, pp. 367-386 (with J. Hausman and C. Vellturo).

"Achieving Competition:  Antitrust Policy and Consumer Welfare," *World Economic Affairs* 1, 1997, pp. 34-38 (with J. Hausman).

"Economic Analysis of Differentiated Products Mergers Using Real World Data," *George Mason Law Review* 5, 1997, pp. 321-346 (with J. Hausman).

"Superstars in the NBA:  Economic Value and Policy," *Journal of Labor Economics* 15, 1997, pp. 586-624 (with J. Hausman).

Gregory K. Leonard

"Efficiencies From the Consumer Viewpoint," *George Mason Law Review* 7, 1999, pp. 707-727 (with J. Hausman).

"Documents Versus Econometrics in Staples," contributed to www.antitrust.org, also available at www.nera.com (with J. Hausman).

"The Competitive Effects of a New Product Introduction: A Case Study," *Journal of Industrial Economics* 30, 2002, pp. 237-263 (with J. Hausman).

"Does Bell Company Entry into Long-Distance Telecommunications Benefit Consumers?" *Antitrust Law Journal* 70, 2002, pp. 463-484 (with J. Hausman and J. G. Sidak).

"On Nonexclusive Membership in Competing Joint Ventures," *RAND Journal of Economics* 34, 2003 (with J. Hausman and J. Tirole).

"Correcting the Bias When Damage Periods are Chosen to Coincide With Price Declines," *Columbia Business Law Review*, 2004, pp. 304-306 (with D. Carlton).

"Competitive Analysis Using a Flexible Demand Specification," *Journal of Competition Law and Economics* 1, 2005, pp. 279-301 (with J. Hausman).

"Using Merger Simulation Models:  Testing the Underlying Assumptions," *International Journal of Industrial Organization* 23, 2005, pp. 693-698 (with J. Hausman).

"Application of Empirical Methods in Merger Analysis," report to the Fair Trade Commission of Japan, June 27, 2005 (with C. Dippon and L. Wu).

"A Practical Guide to Damages," in *Economic Approaches to Intellectual Property, Policy, Litigation and Management*, ed. by G. Leonard and L. Stiroh, 2005 (with L. Stiroh).

"Applying Merger Simulation Techniques to Estimate Lost Profits Damages in Intellectual Property Litigation," in *Economic Approaches to Intellectual Property, Policy, Litigation and Management*, ed. by G. Leonard and L. Stiroh, 2005.

"Antitrust Implications of Pharmaceutical Patent Litigation Settlements," in *Economic Approaches to Intellectual Property, Policy, Litigation and Management*, ed. by G. Leonard and L. Stiroh, 2005 (with R. Mortimer).

"Framework for Policymakers to Analyze Proposed and Existing Antitrust Immunities and Exemptions," report to the Antitrust Modernization Commission, October 24, 2005 (with D. Bush and S. Ross).

"Real Options and Patent Damages:  The Legal Treatment of Non-Infringing Alternatives and Incentives to Innovate," *Journal of Economic Surveys* 20, 2006, pp. 493-512 (reprinted in *Economic and Legal Issues in Intellectual Property*, M. McAleer and L. Oxley, eds., Blackwell Publishing, 2007) (with J. Hausman).

"The Competitive Effects of Bundled Discounts," in *Economics of Antitrust:  Complex Issues in a Dynamic Economy*, ed. by L. Wu, 2007.

"Estimation of Patent Licensing Value Using a Flexible Demand Specification," *Journal of Econometrics* 139, 2007, pp. 242-258 (with J. Hausman).

"Patent Damages and Real Options: How Judicial Characterization of Non-Infringing Alternatives Reduces Incentives to Innovate," *Berkeley Technology Law Journal* 22, Spring 2007, pp. 825-853 (with J. Hausman and J. G. Sidak).

"Don't Feed the Trolls," *les Nouvelles*, Vol. 42, September 2007, pp. 487-495 (reprinted in *Patent Trolls:  Legal Implications*, C.S. Krishna, ed., The Icfai University Press, 2008) (with J. Johnson, C. Meyer, and K. Serwin).

"Are Three to Two Mergers in Markets with Entry Barriers Necessarily Problematic?" *European Competition Law Review* 28, October 2007, pp. 539-552 (with N. Attenborough and F. Jimenez).

"Economics and the Rigorous Analysis of Class Certification in Antitrust Cases," *Journal of Competition Law and Economics* 3, 2007, pp. 341-356 (with J. Johnson).

"Assessing the Competitive Effects of a Merger: Empirical Analysis of Price Differences Across Markets and Natural Experiments," *Antitrust*, Fall 2007, pp. 96-101 (with L. Wu).

"Incentives and China's New Antimonopoly Law," *Antitrust*, Spring 2008, pp. 73-77 (with F. Deng).

"Use of Simulation in Competitive Analysis," in *Issues in Competition Law and Policy*, ed. by W. Dale Collins, 2008 (with J.D. Zona).

"Allocative and Productive Efficiency," in *Issues in Competition Law and Policy*, ed. by W. Dale Collins, 2008 (with F. Deng).

"In the Eye of the Beholder:  Price Structure as Junk Science in Antitrust Class Certification Proceedings," *Antitrust*, Summer 2008, pp. 108-112 (with J. Johnson).

"Merger Retrospective Studies:  A Review," *Antitrust*, Fall 2008, pp. 34-41 (with G. Hunter and G. S. Olley).

"Roundtable Discussion:  Developments—and Divergence—In Merger Enforcement," *Antitrust*, Fall 2008, pp. 9-27.

"Dispatch From China," *Antitrust*, Spring 2009, pp. 88-89.

"A Hard Landing in the Soft Drink Market – MOFCOM's Veto of the Coca-Cola/Huiyuan Deal," *Antitrust Chronicle*, April 2009(2) (with F. Deng and A. Emch).

"Predatory Pricing after *linkline* and *Wanadoo*," *Antitrust Chronicle,* May 2009(2) (with A. Emch).

"Farrell and Shapiro:  The Sequel," *Antitrust*, Summer 2009, pp. 14-18 (with M. Lopez).

"掠夺性定价—美国与欧盟的法律及经济学分析" ("Predatory Pricing - Economics and Law in the United States and the European Union"), 法学家 (*Jurists' Review*), 2009, pp. 100-110 (with A. Emch).

"Revising the Merger Guidelines:  Second Request Screens and the Agencies' Empirical Approach to Competitive Effects," *Antitrust Chronicle,* December 2009(1) (with L. Wu).

"How Private Antitrust Litigation May Be Conducted in China," *Competition Law360*, January 6, 2010 (with F. Deng and W. Tang).

"Merger Screens:  Market-Share Based Approaches and 'Upward Pricing Pressure,'" *Antitrust Source*, February 2010 (with E. Bailey, G. S. Olley, and L. Wu).

"Minimum Resale Price Maintenance:  Some Empirical Evidence From Maryland," *BE Journal of Economic Analysis & Policy* 10, 2010 (with E. Bailey).

"Three Cases Reshaping Patent Licensing Practice," *Managing Intellectual Property*, March 2010 (with E. Bailey and A. Cox).

"Econometrics and Regression Analysis," in *Proving Antitrust Damages:  Legal and Economic Issues*, ABA Section of Antitrust (2nd Edition), 2010 (with J. Langenfeld, W. Li, and J. Morris).

"Patent Damages:  What Reforms Are Still Needed?," *Landslide* 2, May/June 2010 (with M. Lopez).

"The Google Books Settlement:  Copyright, Rule 23, and DOJ Section 2 Enforcement," *Antitrust*, Summer 2010, pp. 26-31.

"The 2010 Merger Guidelines:  Do We Need Them?  Are They All We Need?," *Antitrust Chronicle*, October 2010(2).

"Evaluating the Unilateral Competitive Effects of Mergers Among Firms with High Profit Margins," *Antitrust*, Fall 2010, pp. 28-32 (with E. Bailey and L. Wu).

"Predatory Pricing in China—In Line With International Practice?," *Legal Issues of Economic Integration* 37, 2010, pp. 305-316 (with A. Emch).

"What Can Be Learned About the Competitive Effects of Mergers From 'Natural Experiments'?," *International Journal of the Economics of Business* 18, 2011, pp. 103-107 (with G. S. Olley).

"District Court Rejects the Google Books Settlement:  A Missed Opportunity?," *Antitrust Source*, April 2011.

"A Comparison of the Almost Ideal Demand System and Random Coefficients Logit Models For Use with Retail Scanner Data," NERA Working Paper, 2007 (with F. Deng).

## Presentations

"Merger Analysis with Differentiated Products," paper presented to the Economic Analysis Group of the US Department of Justice, April 1991 (with J. Hausman and D. Zona).

"Assessing Use Value Losses Due to Natural Resource Injury," paper presented at "Contingent Valuation:  A Critical Assessment," Cambridge Economics Symposium, April 3, 1992 (with J. Hausman and D. McFadden).

"Contingent Valuation and the Value of Marketed Commodities," paper submitted to the Contingent Valuation Panel of the National Oceanic and Atmospheric Administration, U.S. Department of Commerce, August 12, 1992 (with J. Hausman).

"Economic Analysis of Differentiated Products Mergers Using Real World Data," paper presented to the George Mason University Law Review Antitrust Symposium, October 11, 1996 (with J. Hausman).

"Documents Versus Econometrics in Staples," paper presented to a program of the Economics Committee of the ABA Antitrust Section, September 5, 1997 (with J. Hausman).

Discussant, "New Developments in Antitrust" session, AEA meetings, January 7, 2000.

"In Defense of Merger Simulation," Department of Justice and Federal Trade Commission Merger Workshop, Unilateral Effects Session, February 18, 2004.

Discussant, "Proving Damages in Difficult Cases:  Mock Trial & Discussion," NERA Antitrust & Trade Regulation Seminar, July 10, 2004.

"Network Effects, First Mover Advantage, and Merger Simulation in Damages Estimation," LSI Workshop on Calculating and Proving Patent Damages, July 16, 2004.

"Early Exchange of Documents," LSI Workshop on Pre- and Early Stage Patent Litigation, July 23, 2004.

"Lessons Learned From Problems With Expert Testimony:  Antitrust Suits," LSI Workshop on Effective Financial Expert Testimony, November 4, 2004.

"Price Erosion and Convoyed Sales," LSI Workshop on Calculating & Proving Patent Damages, January 19, 2005.

"Economic Analysis of Rule 23(b)(3)," LSI Litigating Class Action Suits Conference, June 6, 2005.

"Early Exchange of Documents," LSI Workshop on Pre- & Early-Stage Patent Litigation, July 22, 2005.

"Issues to Consider in a Lost Profits Damages Analysis," Patent Litigation 2005, Practicing Law Institute, September 30, 2005.

"Antitrust Issues in Standard Setting and Patent Pools," Advanced Software Law and Practice Conference, November 3, 2005.

"New Technologies for Calculating Lost Profits," LSI Workshop on Calculating & Proving Patent Damages, February 27, 2006.

"Estimating Antitrust Damages," Fair Trade Commission of Japan, April 21, 2006.

"Economic Analysis of Rule 23(b)(3)," LSI Litigating Class Action Suits Conference, May 11, 2006.

"Permanent Injunction or Damages:  What is the Right Remedy for Non-Producing Entities?," San Francisco Intellectual Property Law Association/Los Angeles Intellectual Property Law Association Spring Seminar, May 20, 2006.

"Antitrust Enforcement in the United States" and "Economic Analysis of Mergers," Sino-American Symposium on the Legislation and Practice of Anti-Trust Law, Beijing Bar Association, Beijing, People's Republic of China, July 17, 2006.

"Economic Analysis in Antitrust," Chinese Academy of Social Sciences, Beijing, People's Republic of China, July 20, 2006.

"Issues to Consider in a Lost Profits Damages Analysis," Patent Litigation 2006, Practicing Law Institute, September 26, 2006.

"Comparison of the Almost Ideal Demand System and Random Coefficient Models for Use With Retail Scanner Data," Pacific Rim Conference, Western Economic Association, Beijing, People's Republic of China, January 12, 2007 (with F. Deng).

Discussant, "Applied Economics" Session, Pacific Rim Conference, Western Economic Association, Beijing, People's Republic of China, January 12, 2007.

"Balancing IPR Protection and Economic Growth in China," International Conference on Globalization and the Protection of Intellectual Property Rights, Chinese University of Political Science and Law, Beijing, People's Republic of China, January 20, 2007.

Gregory K. Leonard

"The Use and Abuse of Daubert Motions on Damages Experts:  Lessons from Recent Cases," LSI Workshop on Calculating & Proving Patent Damages, February 27, 2007.

"Will Your Licenses Ever be the Same?  Biotechnology IP Strategies," BayBio 2007 Conference, April 26, 2007.

"Tension Between Antitrust Law and IP Rights," Seminar on WTO Rules and China's Antimonopoly Legislation, Beijing, People's Republic of China, September 1, 2007.

"Issues to Consider in a Lost Profits Damages Analysis," Patent Litigation 2007, Practicing Law Institute, September 25, 2007.

Discussant, "Dominance and Abuse of Monopoly Power" Session, China's Competition Policy and Anti-Monopoly Law, J. Mirrlees Institute of Economic Policy Research, Beijing University, and the Research Center for Regulation and Competition, Chinese Academy of Social Sciences, Beijing, People's Republic of China, October 14, 2007.

"Opening Remarks," Seminar on China's Anti-monopoly Law and Regulation on Abuse of Intellectual Property Rights, Beijing, People's Republic of China, April 26, 2008.

"Issues to Consider in a Reasonable Royalty Damages Analysis," Patent Litigation 2008, Practicing Law Institute, October 7, 2008.

"Econometric Evaluation of Competition in Local Retail Markets," Federal Trade Commission and National Association of Attorneys General Retail Mergers Workshop, December 2, 2008

"Merger Review Best Practices:  Competitive Effects Analysis," International Seminar on Anti-Monopoly Law:  Procedure and Substantive Assessment in Merger Control, Beijing, People's Republic of China, December 15-17, 2008.

"The Use of Natural Experiments in Antitrust," Renmin University, Beijing, People's Republic of China, December 18, 2008.

"China's Antimonopoly Law:  An Economist's Perspective," Bloomberg Anti-Monopoly Law of China Seminar, January 29, 2009.

Panelist, "Standards for Assessing Patent Damages and Their Implementation by Courts," FTC Hearings on the Evolving IP Marketplace, February 11, 2009.

"Economic Analysis of Agreements Between Competitors" and "Case Study:  FTC Investigates Staples' Proposed Acquisition of Office Depot," Presentation to Delegation of Antitrust Officials from the People's Republic of China, Washington, DC, March 23, 2009.

"Reasonable Royalties in the Presence of Standards and Patent Pools," LSI Workshop, April 20, 2009.

Gregory K. Leonard

Presentations on Unilateral Effects, Buyer Power, and the Intellectual Property-Antitrust Interface to Delegation from the Anti-Monopoly Bureau of MOFCOM of the People's Republic of China, Washington, DC, May 10-11, 2009.

Panelist, "The Use of Economic and Statistical Models in Civil and Criminal Litigation," Federal Bar Association, San Francisco, May 13, 2009.

"Trends in IP Rights Litigation and Economic Damages in China," Pursuing IP in the Pacific Rim, May 14, 2009.

Presentation on the Economics of Antitrust, National Judicial College of the People's Republic of China, Xi'an, People's Republic of China, May 25-26, 2009.

"Case Study:  The Use of Economic Analysis in Merger Review," Presentation to the Anti-Monopoly Bureau of MOFCOM, Beijing, People's Republic of China, May 27, 2009.

"Economics and Antitrust Law," China University of Political Science and Law, Beijing, People's Republic of China, September 21, 2009.

"Case Study:  Economic Analysis of Coordinated Interaction," Presentation to the Anti-Monopoly Bureau of MOFCOM, Beijing, People's Republic of China, September 22, 2009.

"Relevant Market Definition," 4th Duxes Antitrust Law Seminar, Beijing, People's Republic of China, September 26, 2009.

"Expert Economic Testimony in Antitrust Litigation," Supreme People's Court, Beijing, People's Republic of China, February 2, 2010.

"New Case Law for Patent Damages," Law Seminars International Telebriefing, April 28, 2010.

"China/India:  Sailing in Unchartered Waters: Regulating Competition in the Emerging Economies – New Laws, New Enforcement Regimes and No Precedents," The Chicago Forum on International Antitrust Issues, Northwestern University School of Law Searle Center, May 20, 2010.

"Antitrust and Intellectual Property," Supreme People's Court, Beijing, People's Republic of China, May 26, 2010.

"Cartel Enforcement Trends in the United States," 2nd Ethical Beacon Anti-Monopoly Summit, Beijing, People's Republic of China, May 27, 2010.

Panelist, "The Future of Books and Digital Publishing: the Google Book Settlement and Beyond," 2010 American Bar Association Annual Meeting, August 7, 2010.

"Coordinated Effects" and "Non-Horizontal Mergers," Presentations to Delegation from India Competition Commission, US Chamber of Commerce, Washington, DC, October 26, 2010.

"UPP and Merger Simulation," Annual Conference of the Association of Competition Economics, Norwich, UK, November 11, 2010.

"Uniloc v. Microsoft:  A Key Ruling For Patent Damages," Law Seminars International Telebriefing, January 21, 2011.

"Correlation, Regression, and Common Proof of Impact," New York City Bar Association, January 19, 2011.

"Private Litigation Under China's New Antimonopoly Law," Bar Association of San Francisco, February 17, 2011.

"Competition Law and State Regulation:  Setting the Stage and Focus on State-Owned Enterprises," Competition Law and the State:  International and Comparative Perspectives, Hong Kong, People's Republic of China, March 18, 2011.

## Professional Activities

Member, American Economic Association

Member, Econometric Society

Member, American Bar Association

Contributor, www.antitrust.org

Contributor, ABA Section of Antitrust Law, *Econometrics*, 2005

Associate Editor, *Antitrust*, 2007-2010

Associate Editor, *Antitrust Law Journal*, 2010-

Co-Editor, ABA Section of Antitrust Law Economics Committee Newsletter, 2009-

Member, ABA Delegation to International Seminar on Anti-Monopoly Law: Procedure and Substantive Assessment in Merger Control, Beijing, People's Republic of China, December 15-17, 2008

Member, Working Group for drafting the "Joint Comments of the American Bar Association Section of Antitrust Law and Section of International Law on the MOFCOM Draft Guidelines for Definition of Relevant Markets," 2009

Member, Working Group for drafting the "Joint Comments of the American Bar Association Section of Antitrust Law and Section of International Law on

the SAIC Draft Regulations on the Prohibition of Acts of Monopoly
Agreements and of Abuse of Dominant Market Position," 2009.

Member, Working Group for drafting the "Joint Comments of the American Bar
Association Section of Antitrust Law and Section of International Law on
the SAIC Draft Regulations on the Prohibition of Acts of Monopoly
Agreements and of Abuse of Dominant Market Position," 2010.

Referee: *Econometrica*, *Review of Economics and Statistics*, *International
Journal of Industrial Organization*, *Review of Industrial Organization*,
*Journal of Sports Economics*, *Journal of Environmental Economics and
Management*, *Research in Law and Economics*, *Labour Economics*,
*Eastern Economic Journal*, *Journal of Forensic Economics, Antitrust,
Antitrust Law Journal, Journal of Competition Law and Economics*

## Depositions, Reports, and Testimony

*Mark Abdu-Brisson, et al. v. Delta Air Lines and ALPA*, US District Court for the Southern
District of New York, 1996 (Report, Deposition).

*Polar Air Cargo v. AFL Air Cargo*, US District Court for the Southern District of New York,
1998 (Report).

*Maxson Automatic Machinery Company, et al. v. the Washington Trust Company*, Superior
Court of the State of Rhode Island, 2000 (Affidavit).

*MCI Telecommunications Corporation, et al. v. U S WEST Communications, Inc.*, before the
Federal Communications Commission, File  No. E-96-25, 2000 (Affidavit).

*Sprint Communications Company L.P. v. U S WEST Communications, Inc.*, before the Federal
Communications Commission, File No. E-95-42, 2000 (Affidavit).

*AT&T v. U S WEST Communications, Inc.*, Arbitration, 2000 (Report).

*RDV Sports, Inc. v. Logo Connections, Inc.*, US District Court for the Middle District of Florida,
Orlando Division, Civil Action No. 99-1346-CV-31B, 2000 (Report).

*AT&T v. U S WEST Communications, Inc.*, before the Federal Communications Commission,
File No. E-97-28, 2001 (Affidavit).

*MCI Telecommunications Corporation v. U S WEST Communications, Inc.*, before the Federal
Communications Commission, File No. E-97-40, 2001 (Affidavit).

*AT&T v. U S WEST Communications, Inc.*, Arbitration, 2002 (Report, Deposition, Hearing
Testimony).

*Louie Alakayak, et al. v. All Alaskan Seafoods, et al.*, Superior Court of the State of Alaska, 1998, 2003 (Report, Deposition, Trial Testimony).

*Core Communications, Inc. v. Verizon Maryland, Inc.*, before the Federal Communications Commission, File No. EB-01-MD-007, 2003 (Declaration).

*Davol, Inc. v. Stryker Corporation*, United States District Court for the District of Rhode Island, Civil Action No. 01-388T, 2003-2004 (Report, Supplemental Report, Second Supplemental Report, Third Supplemental Report, Deposition).

*CSC Holdings, Inc. v. Yankees Entertainment and Sports Network, LLC*, American Arbitration Association, Case No. 13 181 02839 03, 2004 (Report, Hearing Testimony).

*Viacom, Inc., et al. v. Donald F. Flynn, et al.*, Circuit Court of Cook County, Illinois, No. 97 CH 3015, 2004 (Report, Deposition).

Hearing Before the Antitrust Modernization Commission, December 1, 2005 (Statutory Immunities and Exemptions).

*Joseph V. Kapusta  v. Gale Corporation*, United States District Court for the Eastern District of California, Case No. CIV-S-03-1232 LKK KJM, 2006 (Report).

*Central Valley Chrysler Jeep, Inc. et al. v. Witherspoon*, United States District Court for the Eastern District of California, Case No. CIV-F-04-6663 REC LJO, 2006-2007 (Report, Deposition).

*Bard Peripheral Vascular, Inc. and David Goldfarb, M.D. v. W.L. Gore & Associates, Inc.*, United States District Court for the District of Arizona, Case No. CIV-03-0597-PHX-MHM, 2006-2009 (Report, Reply Report, Deposition, Trial Testimony, Declarations, Report on Supplemental Damages, Deposition on Supplemental Damages; Report on Compulsory License, Deposition on Compulsory License).

*In re:  BULK [EXTRUDED] GRAPHITE PRODUCTS ANTITRUST LITIGATION*, United States District Court for the District of New Jersey, Master File No. 02-CV-06030 (WHW), 2006-2007 (Report, Deposition).

*Abbott Laboratories, et al. v. Impax Laboratories, Inc.*, United States District Court for the District of Delaware, C.A. No. 03-120-KAJ, 2006-2008 (Report, Rebuttal Report, Deposition).

*Novo Nordisk A/S v. Aventis Pharmaceuticals Inc., Sanofi-Aventis and Aventis Pharma Deutschland GMBH*, United States District Court for the District of Delaware, C.A. 05-645-SLR, 2007 (Report, Deposition).

*In the Matter of CERTAIN SEMICONDUCTOR CHIPS WITH MINIMIZED CHIP PACKAGE SIZE AND PRODUCTS CONTAINING SAME*, before the United States International Trade

Commission, Inv. No. 337-TA-605, 2008 (Report, Supplemental Report, Deposition, Trial Testimony).

*In the Matter of CERTAIN BASEBAND PROCESSOR CHIPS AND CHIPSETS, TRANSMITTER AND RECEIVER (RADIO) CHIPS, POWER CONTROL CHIPS, AND PRODUCTS CONTAINING SAME, INCLUDING CELLULAR TELEPHONE HANDSETS*, before the United States International Trade Commission, Inv. No. 337-TA-543, 2008 (Report, Rebuttal Report, Deposition, Trial Testimony).

*Convolve, Inc. and Massachusetts Institute of Technology v. Compaq Computer Corp. and Seagate Technology, LLC*, United States District Court for the Southern District of New York, Index No. 00 Civ. 5141 (JSM), 2008 (Report, Deposition).

*In re Static Random Access Memory (SRAM) Antitrust Litigation*, United States District Court for the Northern District of California, Case No. M:07-cv-1819 CW, 2008 (Report, Deposition).

*Venetec International, Inc. v. Nexus Medical, LLC*, United States District Court for the District of Delaware, C.A. No. 07-57 (MPT), 2008 (Report, Deposition, Supplemental Report, Second Supplemental Report).

*John W. Brantigan v. DePuy Spine, Inc.*, United States District Court for the Western District of Washington at Seattle, No. C08-0177 RSL, 2009 (Report, Deposition).

*Agilent Technologies, Inc. v. Joseph J. Kirkland, et al.*, Court of Chancery of the State of Delaware, C.A. No. 3512-VCS, 2009 (Report, Deposition, Supplemental Report, Trial Testimony).

*Greenberg Traurig v. Gale Corporation*, United States District Court for the Eastern District of California, No. 2:07-CV-01572 MCE DAD, 2009 (Report).

*In the Matter of CERTAIN SEMICONDUCTOR INTEGRATED CIRCUITS USING TUNGSTEN METALIZATION AND PRODUCTS CONTAINING SAME*, before the United States International Trade Commission, Inv. No. 337-TA-648, 2009 (Report, Deposition, Trial Testimony).

*Edwards Lifesciences AG and Edwards Lifesciences, LLC v. CoreValve, Inc.*, United States District Court for the District of Delaware, C.A. No. 08-091 (GMS), 2009-2011 (Report, Deposition, Updated Report, Trial Testimony, Declarations).

*WiAV Solutions, LLC v. Motorola, Inc., et al.*, United States District Court, Eastern District of Virginia, Richmond Division, Civil Action No. 3:09-cv-447-REP, 2010 (Report, Deposition).

*In the Matter of CERTAIN NOTEBOOK COMPUTER PRODUCTS AND COMPONENTS THEREOF*, before the United States International Trade Commission, Inv. No. 337-TA-705, 2010 (Report, Deposition).

*Technology Patents, LLC v. Deutsche Telekom AG, et al.*, United States District Court, District of Maryland, Civil Action No. 8:07-cv-03012-AW, 2010 (Report).

*Hollister Incorporated. v. C.R. Bard, Inc.*, United States District Court, Northern District of Illinois, Eastern Division, Civil Case No. 10-6427, 2011 (Declaration, Deposition).

*Quercus Trust v. LiveFuels, Inc., et al.,* Superior Court for the State of California, Civil No. 488685, 2011 (Declaration, Report, Deposition).

*In re:  Budeprion XL Marketing and Sales Practices Litigation*, Civil Action 2:09-CV-2811, MDL Docket No. 2017, 2011 (Declaration).

*In the Matter of CERTAIN COMPONENTS FOR INSTALLATION OF MARINE AUTOPILOTS WITH GPS OR IMU*, before the United States International Trade Commission, Investigation No. 337-TA-738, 2011 (Report).

*Convolve, Inc. v. Dell Inc., et al.*, United States District Court, Eastern District of Texas, Marshall Division, Case No. No. 2:08-cv-244, 2011 (Report, Deposition).

*Nicolosi Distributing, Inc. v. BMW of North America, LLC*, United States District Court, Northern District for California, Case No. CV-10-3256-SI, 2011 (Report).

*In the Matter of CERTAIN WIRELESS COMMUNICATION DEVICES, PORTABLE MUSIC AND DATA PROCESSING DEVICES, COMPUTERS AND COMPONENTS THEREOF*, before the United States International Trade Commission, Investigation No. 337-TA-745, 2011 (Report).

## Selected Merger Experience

R.R. Donnelley/Meredith Burda (1990-1993):  Merger of printing companies.  Reviewed by the FTC.  Preliminary Injunction Hearing.  Part III Hearing.

Kimberly-Clark/Scott (1995):  Merger of manufacturers of tissue products.  Reviewed by the DOJ and the European Commission.

Staples/Office Depot (1996-1997):  Proposed merger of office supply retailers.  Reviewed by the FTC.  Preliminary injunction hearing.

IMC/Western Ag (1997):  Merger of mining companies.  Reviewed by the DOJ.

Dow/Union Carbide (1999-2001):  Merger of chemical manufacturers.  Reviewed by the FTC.

Gregory K. Leonard

Volvo/Scania (2000):  Merger of truck manufacturers.  Reviewed by the European Commission.

First Data/Concord (2003-2004):  Merger of companies involved in merchant acquiring and payment networks.  Reviewed by the DOJ.

Bumble Bee/Connors (2004):  Merger of canned seafood manufacturers.  Reviewed by the DOJ.

Sonaecom/Portugal Telecom (2006):  Merger of telecommunications companies.  Reviewed by the Portuguese Competition Authority.

Graphic Packaging/Altivity (2007-2008):  Merger of paperboard manufacturers.  Reviewed by the DOJ.

Inbev/Anheuser-Busch (2008):  Merger of beer manufacturers.  Reviewed by the DOJ, the UK Competition Commission, and China's MOFCOM.

Serta/Simmons (2009):  Merger of mattress manufacturers.  Reviewed by the FTC.

Coty/OPI (2010):  Merger of nail polish manufacturers.  Reviewed by the DOJ.

## Other Supporting Documents

3:10-cv-03561-WHA Oracle America, Inc. v. Google Inc.

ADRMOP, AO279, E-Filing, PRVADR, REFDIS

U.S. District Court
Northern District of California
**Notice of Electronic Filing or Other Case Activity**

---

NOTE: Please read this entire notice before calling the Help Desk. If you have questions, please email the Help Desk by replying to this message; include your question or comment along with the original text.

Please note that these Notices are sent for all cases in the system when any case activity occurs, regardless of whether the case is designated for e-filing or not, or whether the activity is the filing of an electronic document or not.

---

If there are **two** hyperlinks below, the first will lead to the docket and the second will lead to an e-filed document.
*If there is no second hyperlink, there is no electronic document available .*
See the FAQ posting 'I have a Notice of Electronic Filing that was e-mailed to me but there's no hyperlink...' on the ECF home page at https://ecf.cand.uscourts.gov for more information.

---

The following transaction was received from by Sabnis, Cheryl entered on 6/14/2011 12:22 PM and filed on 6/14/2011

**Case Name:**           Oracle America, Inc. v. Google Inc.
**Case Number:**         3:10-cv-03561-WHA
**Filer:**               Google Inc.
**Document Number:** 173

**Docket Text:**
**Declaration of Gregory K. Leonard in Support of [171] MOTION To Exclude Expert Opinions and Testimony (Daubert) filed byGoogle Inc.. (Related document(s)[171]) (Sabnis, Cheryl) (Filed on 6/14/2011)**

**3:10-cv-03561-WHA Notice has been electronically mailed to:**

Brian Christopher Banner     bbanner@kslaw.com

Bruce W. Baber     bbaber@kslaw.com, rennyhwang@google.com

Cheryl A. Sabnis     csabnis@kslaw.com, ksparker@kslaw.com, rmiller@kslaw.com

Christa M. Anderson     canderson@kvn.com, efiling@kvn.com, gpadilla@kvn.com, rdarling@kvn.com, rmagat@kvn.com, scole@kvn.com

Christopher C. Carnaval     ccarnaval@kslaw.com, MOrman@KSLAW.com

Dana K Powers     powersdk@gtlaw.com

Daniel Edward Purcell     dpurcell@kvn.com, efiling@kvn.com, jwinars@kvn.com

Daniel Pierre Muino     dmuino@mofo.com, andrew.temkin@oracle.com, TLee@mofo.com

David Boies     dboies@bsfllp.com

Deborah Kay Miller     deborah.miller@oracle.com

Donald Frederick Zimmer , Jr     fzimmer@kslaw.com, balee@kslaw.com

Dorian Estelle Daley     dorian.daley@oracle.com

Eugene Morris Paige     EMP@kvn.com, dfox@kvn.com, efiling@kvn.com, kbringola@kvn.com

Geoffrey M. Ezgar     gezgar@kslaw.com

Heather Janine Meeker     meekerh@gtlaw.com

Ian Ballon     ballon@gtlaw.com, kolbers@gtlaw.com

Joseph Richard Wetzel     wetzelj@gtlaw.com, mckinneyc@gtlaw.com, SFOLitDock@gtlaw.com

Marc David Peters     mdpeters@mofo.com, lsova@mofo.com, msmoot@mofo.com

Mark H. Francis     mfrancis@kslaw.com

Matthew M. Sarboraria     matthew.sarboraria@oracle.com

Matthias Andreas Kamber     mxk@kvn.com, efiling@kvn.com, plemos@kvn.com

Michael A. Jacobs     mjacobs@mofo.com, cknisely@mofo.com

Michael Soonuk Kwun     mkwun@kvn.com, rcirelli@kvn.com

Renny F Hwang     rennyhwang@google.com

Robert Addy Van Nest     rvannest@kvn.com, efiling@kvn.com, scole@kvn.com

Robert F. Perry     rperry@kslaw.com, csplaine@kslaw.com

Roman A Swoopes     rswoopes@mofo.com

Ruchika Agrawal     RAgrawal@mofo.com

Scott T. Weingaertner     sweingaertner@kslaw.com, jschmidt@kslaw.com

Steven Christopher Holtzman     sholtzman@bsfllp.com, ajensen@bsfllp.com, cduong@bsfllp.com,

cseki@bsfllp.com, irivera@bsfllp.com, jchavez@bsfllp.com, jlipton@bsfllp.com, sphan@bsfllp.com

Steven T Snyder     ssnyder@kslaw.com, hperez@kslaw.com

Valerie Wing Ho      hov@gtlaw.com, lalitdock@gtlaw.com, secondom@gtlaw.com,
solorzanom@gtlaw.com

**3:10-cv-03561-WHA Please see General Order 45 Section IX C.2 and D; Notice has NOT been
electronically mailed to:**

Alanna Rutherford
Boies Schiller & Flexner LLP
575 Lexington Ave.
New York, NY 10022

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**h:\Hidden\Desktop\Daubert Motion\Daubert Mtn - Leonard Decl.pdf
**Electronic document Stamp:**
[STAMP CANDStamp_ID=977336130 [Date=6/14/2011] [FileNumber=7557296-0]
[4c1fc32c9f76d7d1f52c856e568dcb9f35cf1c54fa71b79a1fd87d1a0f5a6f0d21fa0
7545e7aef160f0f04b4c640e344c156d4b08fe57ad6f979eebf463d2c43]]