MORRISON & FOERSTER LLP
MICHAEL A. JACOBS (Bar No. 111664)
mjacobs@mofo.com
MARC DAVID PETERS (Bar No. 211725)
mdpeters@mofo.com
DANIEL P. MUINO (Bar No. 209624)
dmuino@mofo.com
755 Page Mill Road, Palo Alto, CA  94304-1018
Telephone: (650) 813-5600 / Facsimile: (650) 494-0792

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (Admitted *Pro Hac Vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY  10504
Telephone: (914) 749-8200 / Facsimile: (914) 749-8300
STEVEN C. HOLTZMAN (Bar No. 144177)
sholtzman@bsfllp.com
1999 Harrison St., Suite 900, Oakland, CA  94612
Telephone: (510) 874-1000 / Facsimile: (510) 874-1460
ALANNA RUTHERFORD (Admitted *Pro Hac Vice*)
575 Lexington Avenue, 7th Floor, New York, NY 10022
Telephone: (212) 446-2300 / Facsimile: (212) 446-2350 (fax)

ORACLE CORPORATION
DORIAN DALEY (Bar No. 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (Bar No. 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (Bar No. 211600)
matthew.sarboraria@oracle.com
500 Oracle Parkway, Redwood City, CA  94065
Telephone: (650) 506-5200 / Facsimile: (650) 506-7114

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.<br><br>                    Plaintiff,<br><br>        v.<br><br>GOOGLE, INC.<br><br>                    Defendant. | Case No. CV 10-03561 WHA<br><br>**ORACLE AMERICA, INC.'S OPPOSITION TO GOOGLE'S *DAUBERT* MOTION**<br><br>Dept.:  Courtroom 9, 19th Floor<br>Judge:  Honorable William H. Alsup |

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

SUMMARY OF THE COCKBURN EXPERT REPORT ................................................... 4

STANDARD OF REVIEW ...................................................................................................... 7

ARGUMENT ............................................................................................................................. 8

A.  Professor Cockburn's Calculations Do Not Rely On Any Unrecoverable Categories of
    Damages ......................................................................................................................... 8

   1.  Professor Cockburn Correctly Considers Google's Anticipated Android-Related
       Advertising Revenues ............................................................................................. 8

   2.  Professor Cockburn's Consideration Of Oracle's Anticipated Losses From The
       Infringement Is Appropriate ................................................................................. 11

   3.  Professor Cockburn Does Not Attach A Dollar Value To Fragmentation—But His
       Consideration Of It Is Appropriate ...................................................................... 12

B.  Professor Cockburn's Calculations Properly Account For The Value Of The Intellectual
    Property At Issue .......................................................................................................... 13

C.  Professor Cockburn's Calculations Do Not Reflect Any "Legal Errors" ................... 16

   1.  Professor Cockburn Does Not Double Count Future Damages ........................... 16

   2.  Professor Cockburn Does Not Improperly Include Worldwide Revenues ......... 17

   3.  Professor Cockburn Correctly Assesses The Hypothetical Negotiation As Of October
       2008 ....... ............................................................................................................... 18

D.  Professor Cockburn Considered Copyright Damages ................................................. 19

E.  The Cockburn Report Reflects Careful Consideration Of The Relevant Evidence And
    Market Realities ........................................................................................................... 20

   1.  Professor Cockburn Carefully Considered Evidence Regarding The Substantial
       Value Of Java ........................................................................................................ 20

   2.  Professor Cockburn Correctly Considered Other Licenses ................................. 21

   3.  Professor Cockburn Correctly Considered A License for an Incompatible Version of
       Java ........................................................................................................................ 22

CONCLUSION ....................................................................................................................... 23

i

## TABLE OF AUTHORITIES

### CASES

*Applied Medical Resources Corp. v. U.S. Surgical Corp.*,
    435 F.3d 1356 (Fed. Cir. 2006) ............................................................................... 19

*Conceptus, Inc. v. Hologic, Inc.*,
    2010 WL 5211454 (N.D. Cal. Dec. 16, 2010) ........................................................ 19

*Cornell Univ. v. Hewlett-Packard Co.*,
    609 F. Supp. 2d 279 (N.D.N.Y. 2009) .................................................................... 14

*DataQuill Ltd. v. Handspring, Inc.*,
    2004 WL 1102309 (N.D. Ill. May 10, 2004) .......................................................... 18

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ........................................................................................... passim

*Design Ideas, Ltd. v. Things Remembered, Inc.*,
    2009 WL 1259035 (C.D. Ill. May 6, 2009) ........................................................... 18

*Dorn v. Burlington N. Santa Fe R.R. Co.*,
    397 F.3d 1183 (9th Cir. 2005) ................................................................................... 8

*Fresenius Medical Care Holdings, Inc. v. Baxter Intern., Inc.*,
    2006 WL 1390416 (N.D. Cal. May 18, 2006) .......................................................... 8

*Funai Elec. Co. v. Daewoo Elec. Corp*,
    616 F.3d 1357 (Fed. Cir. 2010) ............................................................................... 15

*Garcia v. Coleman*,
    2009 WL 799393 (N.D. Cal. March 24, 2009) ....................................................... 10

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F.Supp. 1116 (S.D.N.Y. 1970) ...................................................................... passim

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
    426 F. Supp. 2d 211 (D. Del. 2006) ........................................................................ 16

*Honeywell Intern., Inc. v. Hamilton Sundstrand Corp.*,
    378 F. Supp. 2d 459 (D. Del. 2005) ........................................................................ 19

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010) ............................................................................. 7, 20

*IGT v. Alliance Gaming Corp.*,
    2008 WL 7084605 (D. Nev. Oct. 21, 2008) ........................................................... 15

ii

*Informatica Corp. v. Business Objects Data Integration, Inc.*,
    489 F. Supp. 2d 1075 (N.D. Cal. 2007) ........................................................ 17

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001)................................................................... 7

*Litecubes, LLC v. N. Light Prods., Inc.*,
    523 F.3d 1353 (Fed. Cir. 2008)................................................................. 17

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)................................................. 18, 19, 21

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*,
    545 U.S. 913 (2005) ................................................................................. 10

*Microsoft Corp. v. E & M Internet Bookstore, Inc.*,
    2008 WL 191346 (N.D. Cal. Jan. 22, 2008) ............................................ 19

*Oracle Corp. v. SAP AG*,
    734 F.Supp.2d 956 (N.D. Cal. 2010) ...................................................... 20

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978)................................................................... 23

*Polar Bear Prods., Inc. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004)............................................................. 10, 20

*Regents of the Univ. of Calif. v. Monsanto Co.*,
    2005 WL 3454107 (N.D. Cal. Dec. 16, 2005) ................................... 15, 17

*S.M. v. J.K.*,
    262 F.3d 914 (9th Cir. 2001).................................................................... 7

*SEB S.A. v. Montgomery Ward & Co.*,
    2007 WL 3165783 (S.D.N.Y. Oct. 9, 2007) ............................................ 11

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    87 F.Supp.2d 992 (N.D. Cal. 2000) ...................................................passim

*Tech. Patents, LLC v. Deutsche Telekom AG*,
    573 F. Supp. 2d 903 (D. Md. 2008) ......................................................... 18

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
    750 F.2d 1552 (Fed. Cir. 1984)............................................................ 9, 10

*Uniloc USA, Inc. v. Microsoft Corp*,
    632 F. Supp. 2d 147 (D.R.I. 2009).......................................................... 17

*z4 Technologies, Inc. v. Microsoft Corp.*,
    2006 WL 2401099 (E.D. Tex. Aug. 18, 2006) ......................................... 11

iii

*Zila, Inc. v. Tinnell*,
  502 F.3d 1014 (9th Cir. 2007)..........................................................................................16

**STATUTES**

17 U.S.C. § 106..........................................................................................................18

35 U.S.C. § 271..........................................................................................................18

35 U.S.C. § 271(a) ..............................................................................................17, 18

35 U.S.C. § 271(b) ......................................................................................................17

35 U.S.C. § 271(c) ......................................................................................................17

35 U.S.C. § 271(f) ................................................................................................17, 18

35 U.S.C. § 284..........................................................................................................23

**OTHER AUTHORITIES**

ECONOMIC APPROACHES TO INTELLECTUAL PROPERTY: POLICY, LITIGATION, AND MANAGEMENT
(Dr. Gregory K. Leonard & Dr. Lauren J. Stiroh eds., NERA 2005) ............................9

**RULES**

Federal Rule of Evidence 702 ....................................................................................7, 15

Plaintiff Oracle America, Inc. ("Oracle") opposes Defendant Google, Inc.'s ("Google") motion to exclude the opinions and testimony of Oracle's damages expert, Prof. Iain M. Cockburn.  (Google Inc.'s Brief In Support Of Daubert Motion (Dkt. No. 171) (hereinafter "Motion").)  Google fails to meet the threshold for exclusion of expert opinion established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.  Google's motion rests on mischaracterizations of Prof. Cockburn's methodology, factual disputes, and erroneous statements of the law, and its arguments largely distill down to assertions that, as it views the evidence, the infringed patents and copyrights are not really important to either Oracle or Google, and that Google's acts of infringement are not really closely related to the billions of dollars in revenues it earns each year from Android.  These issues provide no basis to exclude or limit Prof. Cockburn's testimony.  Google does not contend that Prof. Cockburn is unqualified to provide expert testimony, or that the reasonable-royalty analysis he uses is flawed.  In the absence of valid attacks on Prof. Cockburn's actual methodology or qualifications, Google's *Daubert* motion fails.

## INTRODUCTION

The intellectual property at issue in this case is immensely valuable for both Oracle and Google.  Oracle, formerly Sun Microsystems, has practiced the patents-in-suit and copyrighted materials embodied in the Java platform for well over a decade.  After Oracle acquired Sun for $7.4 billion, Larry Ellison, Oracle's CEO, described Java as "the single most important software asset we have ever acquired."  (Declaration of Fred Norton Ex. A (hereinafter "Norton Decl.").)  And Eric Schmidt, then Google's CEO, recently stated: "Google is positioning itself to earn $10 billion or more per year in the mobile device business, thanks to its Android operating system."  (Norton Decl. Ex. B.)  As described below, and as will be explained by both fact and expert witnesses at trial, the patents and copyrights at issue are an essential part of both the Java platform and the Android platform.

Long before the infringement began, Google recognized that, in order to protect its advertising-based business model, it needed to find a way to ensure that its web search technology was widely available on mobile devices.  Google repeatedly recognized that the mobile space is critical to the future of Internet advertising and, consequently, the future of Google's entire business.  Meanwhile, Google's top competitors were making inroads into the mobile platform space, threatening to lock Google out

1

from markets for complementary search and other applications.  Google concluded that, to respond to that threat, it had to offer an "open" platform that would provide Google unfettered access to the mobile environment for its core search and advertising products.   The evidence will demonstrate that Google had no effective alternatives to the Java intellectual property if it wanted to accomplish that objective.  ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████  Indeed, faced with a significant head start by competitors in the mobile space, including Apple's iPhone, Google needed a competitive smartphone platform immediately. Developing such a platform from scratch was not a viable option.  Tapping into Java, with its well-established, feature-rich development environment and massive developer community, solved Google's problem.

The core importance of Oracle's intellectual property to Google is confirmed by the negotiating record of the parties.  Over the course of four years, Google engaged in three rounds of licensing negotiations with Sun in connection with Android.  Google repeatedly rejected the reasonable licensing terms that Sun offered and ultimately chose to willfully infringe Oracle's intellectual property and release the Java-based Android platform, ███████████████████████████████ ███████████████████████████████████  Google did so because it was unwilling to accept the terms that Sun proposed, which would have obliged Google to pay up-front royalties and an additional royalty expressed as a percentage of Android-based advertising revenues, and to share control over the Android ecosystem with Sun (thereby providing Sun a substantial revenue stream in addition to royalties paid by Google).  The combined value of this control and royalty structure would have been in the billions of dollars.

In analyzing the value of the infringed intellectual property and modeling the outcome of a hypothetical license negotiation between Oracle and Google just before the infringement began, Prof. Cockburn properly takes into account the value of the technology to Oracle, Google's need for that technology, the harm to Oracle from allowing Google to use the technology in the manner it chose, the enormous value to Google from being able to exploit the technology, and the absence of competitively viable alternatives.

ORACLE AMERICA, INC.'S OPPOSITION TO GOOGLE'S *DAUBERT* MOTION
CASE NO. CV 10-03561 WHA

Google misconstrues or misunderstands Prof. Cockburn's report in multiple key respects.  For example:

- Google falsely claims that Prof. Cockburn concludes that Oracle is owed anywhere from $1.4 to $6.1 billion in damages.  (Motion at 1, 16, 19).  He does not.  His opinion is that the total damages that should be awarded to Oracle is $2.6 billion.  (Weingartner Decl. Ex. A (hereinafter "Cockburn Report") ¶ 8.)

- Google wavers between asserting that Prof. Cockburn applies a 20 percent royalty rate (Motion at 2, 8) and a 50 percent royalty rate (Motion at 20), suggesting that either was applied arbitrarily.  Neither figure is correct.  In fact, Prof. Cockburn does not preordain a royalty rate; rather, he applies a careful set of analytical steps, based on the evidence of what the parties would have considered had they entered into a license that permitted Google to do precisely what it has done, to derive an economically supportable royalty rate. (Cockburn Report ¶ 8 (opining that damages would be split between a $0.9–$1.4 billion up-front payment plus a revenue share of between 10 and 15 percent of Google advertising revenues on Android phones).)

- Google claims that Prof. Cockburn's calculations would award a royalty based on the "worldwide revenues from advertising displayed on Android phones."  (Motion at 9.)  In fact, Prof. Cockburn's royalty calculations are based on the **incremental** value to Google of Android compared to (and subtracting) the revenues it would have made if there been no Android and Google earned all of its mobile advertising revenues from other platforms.  (Cockburn Report ¶ 264.)

- Google claims that Prof. Cockburn's damages calculations are inflated by his consideration of the fragmentation of Java.  (Motion at 1, 6–7, 11.)  In fact, while the adverse consequences of fragmentation are important in informing Prof. Cockburn's analysis of how a reasonable royalty would be structured, the dollar amount that Prof. Cockburn currently assigns to fragmentation is **zero**.  (*See* Cockburn Report Exhs. 12, 25, 26.)

- Google contends that Prof. Cockburn calculates damages through 2025.  (Motion at 15.)  In fact, Prof. Cockburn carefully divides up past and future damages and, after considering a range of possible end dates from 2018 to 2025, concludes that the reasonable royalty would likely run through 2021 – well short of the 2025 expiration of the last patent at issue.  (Cockburn Report ¶ 216.)

- Google claims that Prof. Cockburn is "ignoring the time-honored *Georgia-Pacific* analysis" (Motion at 8) when, in fact, his report specifically considers each and every *Georgia-Pacific* factor as part of the hypothetical negotiation, and reiterates his thoughts regarding each factor in a separate Appendix.  (Cockburn Report App'x C.)

In short, by relying on these mischaracterizations, Google attacks a straw man – a poor and inaccurate caricature of Prof. Cockburn's report – rather than the methodology and analysis Prof. Cockburn actually employs.  A *Daubert* motion cannot rest on a misapprehension of the opinions it seeks to

3

challenge.  Prof. Cockburn's actual methodology is consistent with accepted economic principles and the law of patent and copyright infringement.

Prof. Cockburn's damages analysis and calculations are supported by an abundance of evidence and are reasonable in light of the parties' commercial relationship and the magnitude of the profits at stake.  Prof. Cockburn's overall calculation of $2.6 billion in damages over a more than ten-year period averages to approximately $200 million per year out of the billions that Google stands to make from Android.  This analysis is patently reasonable and well-grounded in fact, law, and economics.  Google may dispute certain factual premises and assumptions employed by Prof. Cockburn, but those disputes do not provide a basis for a *Daubert* motion.

## SUMMARY OF THE COCKBURN EXPERT REPORT

Prof. Cockburn is a Harvard-educated professor of Finance and Economics and Everett W. Lord Distinguished Faculty Scholar at the Boston University School of Management.  He has provided testimony in numerous cases concerning intellectual property damages and has never had his testimony or opinions rejected on the basis of a *Daubert* challenge.

The hypothetical license approach that Prof. Cockburn applies in this case is routinely used by damages experts in patent and copyright cases.  Prof. Cockburn analyzes the hypothetical negotiation by taking into account the anticipated gains to Google and anticipated losses to Oracle caused by the infringement, allocating the result according to the Nash Bargaining Solution, a standard, accepted methodology first posited by Nobel Laureate John Nash in the 1950s and widely used by economists to model bargaining outcomes.  Google does not challenge either the hypothetical license methodology or the Nash Bargaining Solution – nor could it.  Both the courts and the expert consulting firm retained by Google in this case support them, the latter in an article published just last week.  (*See, e.g.*, Norton Decl. Ex. E) (article by Dr. Gregory Leonard's consulting group, NERA Economic Consulting, describing the methodology used by Prof. Cockburn as "rooted in rigorous, well-established economic theory").

Prof. Cockburn begins with an analysis of the value of the patents and copyrights at issue to both Oracle (in the form of its importance to Java) and Google (in the form of its importance to Android).  (Cockburn Report ¶¶ 18–32, 122–33.)  Recognizing that discovery is still ongoing and that

4

other witnesses – including engineers whose depositions have not yet been taken and technical experts whose reports have not yet been submitted – will testify as to the technical benefits provided by the intellectual property at issue, Prof. Cockburn provides his opinion as to the importance of the patents and copyrights based on a combination of the evidentiary record thus far in the case, discussions with Oracle's technical expert, and (as instructed by the Court) "assumed fact scenario[s]."  (Dkt. No. 56 at ¶ 12.)

Next, Prof. Cockburn identifies the value that a prudent licensee would have placed on obtaining the rights to the intellectual property at issue.  (Cockburn Report ¶¶ 33–91, 98–104, 112, 196–229.)  In an extensive and detailed analysis based on Google's documents, including its contemporaneous profit and loss statements and revenue projections, Prof. Cockburn opines that Google would have anticipated that its infringement would generate significant revenues from a variety of sources.  (*Id.* ¶ 196.)  To calculate the present value of Google's anticipated profits, he then subtracts out Google's projected costs and applies a discount rate that Google itself uses.  (*Id.* ¶¶ 201–16.)  He does *not* assign values in his damages calculations to a number of other benefits of Android to Google, including its strategic benefits to Google's other businesses.[1]  (*Id.* ¶ 218.)  Finally, Prof. Cockburn subtracts out the value of Google's next best alternative – which he concludes would have been to rely on non-Google, non-Java platforms to propagate Google advertising in the mobile environment – to estimate the "***incremental*** value" of the infringement, including the conservative assumption that Android did not expand the market (*i.e.*, Google would have advertising revenue on precisely the same number of mobile units irrespective of Android's existence, even though it is very likely that the competitiveness of Android has made the total number of units larger in the real world).  (*Id.* ¶¶ 230–78 (emphasis in original); *see also* Norton Decl. Ex. F at 259 (Google's expert, Dr. Leonard, noted that a "sound economic approach" is to ensure that the reasonable royalty "reflect[s] the incremental value (in dollars) of the patented technology to the defendant as compared to the next best alternative.").)  The result is an anticipated

---

[1] Prof. Cockburn's decision not to calculate damages from these sources rested in large part on Google's refusal thus far to produce evidence about its non-mobile business in discovery.  When Oracle asked a third-party source for this data, it refused even to sell that data to either Oracle or to Prof. Cockburn because of its relationship with Google.

incremental profit to Google ███████████████████, depending on the projected revenue figures applied and the length of time for which they are applied, ranging from ten years (2018) to seventeen years (2025, the latest expiration date of any patent in suit).  (Cockburn Report Ex. 24.)

On the other side of the bargaining table, Prof. Cockburn analyzes what Oracle's position would have been in the hypothetical license negotiation by evaluating the revenue and other benefits that it reasonably would have expected to lose if it entered into the hypothetical license.  (*Id.* ¶ 134–95.)  Prof. Cockburn analyzes and quantifies two separate components of this anticipated harm: the loss of Sun's own planned Java/Linux-based smartphone operating system that could not compete if Google gave away essentially the same technology for free, and losses to its pre-existing Java revenue streams as a result of the infringement.  (*Id.* ¶¶ 135–56.)  Prof. Cockburn also analyzes the harm from further "fragmentation" of the Java platform only as an input in dividing damages between an up-front payment and a running share of Android revenues.  (*Id.* ¶¶ 158, 303–06.)

Finally, Prof. Cockburn uses the gain to Google and the loss to Oracle to understand the overall value to be attained by the parties entering into the bargain.  (*Id.* ¶¶ 280–85.)  Prof. Cockburn calculates that Google would reasonably have expected to gain $4.8 billion through 2021, while Sun/Oracle would reasonably have expected to lose $410 million, for a net total of $4.4 billion in gains from cooperation.  (*Id.* ¶ 287.)  Applying the Nash Bargaining Solution, Professor Cockburn evenly splits the gains between the two parties, on the assessment that the parties would have had equal bargaining power.  (*See* Norton Decl. Ex. F at 263 (Google's expert, Dr. Leonard, describes how "economic models of bargaining" provide that "when two companies are sufficiency patient and are roughly equally patient, the gains to trade will be approximately equally divided.").)  Thus, as a result of cooperation, each party would gain $2.2 billion.  Because Oracle came into the negotiation already expecting to earn $410 million (an amount that would be lost as a result of granting this license), the amount that Google would have paid to Sun, in October 2008 present value, is approximately $2.6 billion:  $2.2 billion plus $410 million.  (Cockburn Report ¶ 287; Ex. 25.)  Prof. Cockburn then uses the available evidence to divide this royalty into past and future damages amounts, and between an upfront payment and a share of Android revenues.

1

**STANDARD OF REVIEW**

2      As Google appears to agree, expert testimony is admissible under Federal Rule of Evidence 702

3 if it "rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.

4 "[T]he rules of evidence do not demand perfection.  Rather, a court need only determine whether the

5 reasoning and methods underlying the expert testimony are reliable, and whether they have been

6 properly applied to the facts."  *Gutierrez v. Wells Fargo & Co.*, No. C 07-05923 WHA, 2010 WL

7 1233810, *11 (N.D. Cal. Mar. 26, 2010).  "When the methodology is sound, and the evidence relied

8 upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above

9 this minimum threshold) may go to the testimony's weight, but not its admissibility."  *i4i Ltd. P'ship v.*

10 *Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd on other grounds*, -- S. Ct. --, No. 10–290,

11 2011 WL 2224428 (June 9, 2011).

12      Google does not dispute that Prof. Cockburn's reliance on a hypothetical negotiation and the

13 Nash Bargaining Solution comports with sound methodological standards, nor could it.  *See, e.g.*,

14 *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001) (the Federal

15 Circuit has "endorsed the conceptual framework of a hypothetical negotiation between patentee and

16 infringer as a means for determining a reasonable royalty"); *i4i*, 598 F.3d at 854 ("We have consistently

17 upheld experts' use of a hypothetical negotiation and *Georgia-Pacific* factors for estimating a

18 reasonable royalty.").  Thus, the sole issue for this motion is whether Prof. Cockburn properly applied

19 that methodology to the facts.  He has.  Accordingly, Google's motion should be denied.[2]

20

21

22 _____

23 [2] Google has submitted its own expert declaration in support of its *Daubert* motion. (Declaration of Dr.
   Gregory K. Leonard, Ph.D. (Dkt. No. 175).)  But *Daubert* is not a battle of the experts.  "Where experts
24 may reasonably differ as to the proper calculation of damages or harm, '[v]igorous cross-examination'
   and 'presentation of contrary evidence' are the 'traditional and appropriate means' of attacking their
25 opinions."  *Gutierrez*, 2010 WL 1233810, at *10 (quoting *Daubert*, 509 U.S. at 596); *see also S.M. v.*
   *J.K.*, 262 F.3d 914, 921 (9th Cir. 2001) ("A court may admit somewhat questionable testimony if it falls
26 within the range where experts might reasonably differ, and where the jury must decide among
   conflicting views." (quotations and citation omitted)), *amended by* 315 F.3d 1058 (9th Cir. 2003).  The
27 appropriate place for Google to present Dr. Leonard's opinion is in a rebuttal report or at his deposition.

28

**ARGUMENT**

The law is clear.  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2006 WL 1390416, *3 (N.D. Cal. May 18, 2006).  Prof. Cockburn far surpasses this "liberal standard of admissibility."  *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1196 (9th Cir. 2005).

### A.    Prof. Cockburn's Calculations Do Not Rely On Any Unrecoverable Categories of Damages

Google contends that Prof. Cockburn improperly considered (1) Google's advertising revenues from Android phones, (2) Oracle's "lost profits" resulting from the infringement, and (3) certain fragmentation harms.  (Motion at 9–11.)  The first and second are legally incorrect; the third simply mischaracterizes Prof. Cockburn's report.

#### 1.   Prof. Cockburn Correctly Considers Google's Anticipated Android-Related Advertising Revenues

Google does not challenge the accuracy of Prof. Cockburn's calculations and projections, which are based mainly on Google's own documents.  Instead, it argues that Prof. Cockburn should have assigned zero projected revenue to the infringement because Google does not derive any money directly from the "sale" of Android software.  (Motion at 9–10.)  Google's contention fails as a matter of law and common sense.  The idea that an infringer can immunize itself against damages, no matter how much it profits from infringement, so long as it does not charge directly for the infringing product would fly in the face of intellectual property law's fundamental purposes.  The courts have rejected this argument.

Prof. Cockburn appropriately considers the gains that Google reasonably expected to flow from its infringement.  Although Android itself is nominally "free", the record makes plain that Google expected to earn billions of dollars from Android, largely through advertising on Android devices.  Google's executives have stated publicly that "Android is hugely profitable" (Norton Decl. Ex. G at 9), and that revenue from Android is "large enough to pay for all of the Android activities and a whole bunch more" (Norton Decl. Ex. H).  As Google executive Jonathan Rosenberg recently stated about Google's open-source strategy for Android, "This is not philanthropy.  When the web is better, more

8

people use it more often, and that means they search more often." (Norton Decl. Ex. I at 6.)  Had Google sought a license instead of infringing, Google and Oracle would certainly have considered and accounted for those revenues because they determined the "anticipated amount of net profits that the prospective licensee reasonably thinks he will make."  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1121 (S.D.N.Y. 1970).  It is nonsense to think that the parties would negotiate with blinders on, ignoring the fact that Google, a company in the advertising business, expected to significantly boost its advertising revenues through Android.  In fact, Sun and Google discussed these anticipated revenues in their initial negotiations. ██████████████████████████ ████████████████████████████████████████ There is no reason to pretend now that these revenues do not exist, or would not have been considered in a hypothetical license negotiation.

The case law establishes that Prof. Cockburn was entitled to consider Google's ancillary revenues under the *Georgia-Pacific* framework.  Under *Georgia-Pacific* factor six, Prof. Cockburn considered "[t]he effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items. . . ."  318 F. Supp. at 1120.  Google's own expert, Dr. Leonard, has approved this exact methodology: "The additional profits from sales of noninfringing products that the licensor and licensee stand to make by practicing the patent at issue can be explicitly considered in determining the licensee's maximum willingness to pay and the licensor's minimum willingness to accept for the patent."  ECONOMIC APPROACHES TO INTELLECTUAL PROPERTY: POLICY, LITIGATION, AND MANAGEMENT 63 ((Dr. Gregory K. Leonard & Dr. Lauren J. Stiroh eds., NERA 2005) (Norton Decl. Ex. J).

The Federal Circuit has also held that consideration of associated gains is appropriate.  For example, in *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc*., a reasonable-royalty case, the defendant supplied infringing display racks to its customers for free in order to help display and sell unpatented eyeglasses.  750 F.2d 1552, 1567 (Fed. Cir. 1984).  The court held that the district court had improperly excluded evidence of profits from eyeglass sales, notwithstanding the fact that no patent-in-suit covered them, because the defendant "used the patented invention in promoting sales of" the eyeglasses.  *Id.* at 1568.  Thus, "the extent of the profits from such sales could be relevant in determining the amount of a

9

reasonable royalty.  If, for example, sales were increased because of the infringing use of the displays, that fact could affect the amount of royalties a potential licensee would be willing to pay." *Id.*  Other cases have reached a similar result in holding that an expert may consider the sales of non-infringing products and indirect revenue streams.  *See, e.g.*, *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 710–11 (9th Cir. 2004) (plaintiff need only demonstrate "causal nexus" between the infringer's profits and infringement); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 545 U.S. 913, 930-34, 941 (2005) (holding that "there is no question that . . . MGM [may] go forward with claims for damages" under a theory that defendants generated income by selling advertising space on free software); *Garcia v. Coleman,* No. C-07-2279 EMC, 2009 WL 799393 (N.D. Cal. Mar. 24, 2009) (denying judgment as a matter of law to defendant where testimony established a causal nexus between sale of non-infringing wine and infringing label).

The decisions Google relies on do not preclude consideration of its advertising revenues.  First, each of those decisions **upholds** a jury damages award.  Second, two consider lost profits, not a reasonable royalty, and are inapposite on that basis alone.  *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11 (Fed. Cir. 1984).  *Kalman v. Berlyn*, 914 F.2d 1473, 1484-85 (Fed. Cir. 1990).  The remaining opinion upheld a jury's award of both lost profits and a reasonable royalty because the evidence at trial was sufficient to show that the patented feature drove demand for the entire product – a principle that Prof. Cockburn considers, and which is discussed further below.  *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1552–53 (Fed. Cir. 1997).  None of these cases provides a basis to exclude Prof. Cockburn's testimony.

Prof. Cockburn's analysis of the incremental benefit to Google of its infringement is consistent with *Trans-World* and other pertinent caselaw.  Google's executives have admitted that Android is more profitable to Google than other mobile platforms, *see* Norton Decl. Ex. G at 9,[3] and Prof.

---

[3] Eric Schmidt: "[T]he evidence we have is that the people who use Android, search twice as much as everything else.  So, clearly there is more revenue associated with those searches.  Other thing, of course, is if they are using Android systems, the revenue that we share and the searches are shared with the operator, but not with anybody else.  So, again, it's more lucrative.  So, not only is there more searches, and there's more ads, but it's also more lucrative.  So, on that basis alone, Android is hugely profitable . . . ."

Cockburn's analysis ensures that only Android-related revenues attributable to the infringement are counted. Prof. Cockburn was not required to ignore those substantial benefits, taken from Google's own documents. Google's motion to exclude Prof. Cockburn's testimony regarding incremental revenues from advertising revenue should be denied.

### 2. Professor Cockburn's Consideration Of Oracle's Anticipated Losses From The Infringement Is Appropriate

Google's attempt to preclude consideration of Oracle's reasonably-anticipated losses (*see* Motion at 10–11) cannot be reconciled with the mandates of *Georgia-Pacific*, common sense, or the evidence in this case. Google cites no case for its proposition that it is improper to consider Oracle's anticipated losses, and several cases reject this argument. *See, e.g.*, *SEB S.A. v. Montgomery Ward & Co.*, No. 99 Civ. 9284 SCR, 2007 WL 3165783, *7 (S.D.N.Y. Oct. 9, 2007) (rejecting a lost-profits damages assessment but nonetheless ruling that the court's decision "does not mean that the jury could not consider [the patentee's] expectations of profits as part of a hypothetical negotiation"), *vacated on other grounds*, 2008 WL 4540416 (S.D.N.Y. Oct. 1, 2008); *z4 Techs., Inc. v. Microsoft Corp.*, No. 6:06-CV-142, 2006 WL 2401099, *10 (E.D. Tex. Aug. 18, 2006) (rejecting defendant's argument that plaintiff's expert's royalty calculation was "improperly based on a lost profits model" because the expert had "testified with regard to a hypothetical negotiation and based his royalty calculation on hypothetical royalty rates, infringing units sold, revenue from the infringed products, and an explanation of how he reached his damage amount"), *aff'd*, 507 F.3d 1340 (Fed. Cir. 2007).

Instead, *Georgia-Pacific* requires consideration of "the amount that a willing licensor would have accepted," including "the anticipated amount of profits that the prospective licensor **reasonably thinks he would lose** as a result of licensing the patent as compared to the anticipated royalty income. . . ." *Georgia-Pacific*, 318 F. Supp. at 1121 (emphasis added). This is exactly what Prof. Cockburn did. (Cockburn Report ¶¶ 134–80.) For example, as reflected in Prof. Cockburn's report, in 2006, Sun and Google discussed the losses that Sun would experience as a result of Android. (*See id.* ¶ 144.) Having infringed, Google now seeks to prevent consideration of those anticipated losses in order to pay a lower royalty. That approach does not reflect what would occur in a real-world negotiation, and would provide an incentive to infringe rather than seek a license. Google's argument is meritless.

11

### 3.   Professor Cockburn Does Not Attach A Dollar Value To Fragmentation—But His Consideration Of It Is Appropriate

Google repeatedly states that a "substantial portion of Cockburn's damages calculation is based on so-called 'fragmentation'" (*i.e.*, harm to the Java platform from loss of Java's core "write once, run anywhere" promise that has made it the programming environment of choice for millions of developers).  (Motion at 6, 11–12.)  Google is wrong.  Prof. Cockburn did not assign a dollar value to fragmentation.  (*See* Cockburn Report ¶¶ 181–95 (calculating Oracle's expectations based on two factors alone: forecasted Java ME and Acadia[4] revenues); *id.* Exs. 12, 25, 26 (fragmentation adds zero dollars to the total expected losses).)

Prof. Cockburn considers fragmentation only when analyzing the ***structure*** of the hypothetical license because those harms are "difficult to precisely quantify."  (Cockburn Report ¶ 158); *see also Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F. Supp. 2d 992, 998 (N.D. Cal. 2000) (granting an injunction after finding that harm to Sun's revenues and reputation resulting from Microsoft's distribution of software products incorporating non-compliant Java Technology was "difficult to quantify").  After examining evidence that the parties actually considered a license that included both an up-front payment and a revenue share (*id.* ¶¶ 290–300), Prof. Cockburn concludes that Oracle would have required, and Google would have paid, a large up-front payment to compensate Oracle for the business risk Oracle would have incurred by licensing its technology to Google for Android, an open-source and incompatible Java-based implementation (*Id.* ¶¶ 303–06).

Indeed, the evidence in this case will show that Sun and Oracle have vigorously defended against fragmentation.  ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Google chose to ignore Sun's requests to protect the integrity of its platform.  ██████████████████████████████████████████████████████████████████████

---

[4] Acadia was the name of Sun's plan for a complete Java/Linux-based smartphone stack.  (Cockburn Report ¶¶ 17, 135–42.)

12

1  ████████████████████████████████████████████████████████

2  ████████████████████████

3       Google not only distorts Prof. Cockburn's analysis and disregards the evidentiary basis for that

4  analysis, it resorts to nonsensical statements in discussing fragmentation, arguing that Oracle "tolerated

5  fragmentation" (and presumably therefore placed a low value on it) because Oracle "offers a license to

6  allow . . . developers to continue writing Java variants ***as long as those variants are tested for***

7  ***compatibility with Java using the licensed Testing*** [*sic*] ***Compatibility Kit ('TCK').***"[5]  (Motion at 7

8  (emphasis added); *see also id.* at 20.)  But the TCK is exactly the point.  A licensee who runs the TCK

9  ships a ***compatible*** version of Java, which protects against fragmentation.[6]  Prof. Cockburn explains this

10  in his report.  (*See, e.g.*, Cockburn Report ¶ 174.)

11       In any event, Google's reliance on its critique of the "factual basis for Cockburn's approach,"

12  *i.e.*, Sun's purported "tolerance" of fragmentation (Motion at 7, 20), raises a simple factual dispute.

13  This dispute is properly resolved by the factfinder.

14       **B.     Professor Cockburn's Calculations Properly Account For The Value Of The**
          **Intellectual Property At Issue**

15       Google contends that Prof. Cockburn failed adequately to address the "value of the patented

16  technology" and that he should have considered the technology on a "claim by claim" basis to calculate

17  damages.  (Motion at 12–16.)  Google misrepresents Prof. Cockburn's report and misunderstands the

18  purpose of his analysis.  Its argument is insufficient as a *Daubert* challenge and fails to consider this

19  Court's express instructions to regarding an opinion-based, assumed-fact scenario.  (Dkt. No. 56 at ¶

20  12.)

21

22

23  _____

24  [5] "TCK" actually stands for ***technology*** compatibility kit, as the documents Google cites explain.

25  [6]


26

27

28

First, Google improperly assumes that a damages expert must weigh in with technical expertise before the technical expert has delivered his report.  That is inconsistent with this Court's case and expert discovery schedule.

Second, Professor Cockburn did, in fact, carefully consider the value of the technology at issue. The evidence so far indicates that the infringing patents and copyrighted code are core to Java and provide significant improvements to existing technologies.  Prof. Cockburn considered the fact that neither Sun nor Oracle has ever licensed the patents or copyrights piecemeal and that Sun was not bargaining with Google in 2006 for any kind of patent-by-patent license.  (Cockburn Report ¶¶ 17–25); *see also* Motion at 6 (admitting that Google and Sun negotiated a license for "the entirety of Java").[7] Prof. Cockburn considered that the evidence at trial will show that the "smallest salable infringing unit" that practices the seven patents in suit is Android.  *Cf. Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 288 (N.D.N.Y. 2009) (Rader, J., by designation).  Google's expert, Dr. Leonard, appears to support this approach, as he wrote earlier this month that "[w]hen there are complementarities between assets, such that the combined use of two or more assets is worth more than their individual use, no unique way exists to apportion the overall value of the product among the assets (including the patented technology at issue)."  (Norton Decl. Ex. F, at 257.)

Importantly, Prof. Cockburn also considered ample evidence that suggests that the patents and copyrights in suit are essential **to Android,** ████████████████████████████
████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████████████
████████████████████████████████████

---

[7] It is also worth noting that Google has thus far withheld some of the evidence that may suggest that apportionment is necessary.  If ongoing discovery reveals facts that require revision of this analysis, Professor Cockburn has acknowledged that he will "revise [his] analysis . . . ."  (Cockburn Report ¶ 8.)

14

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████

4 ███████████████████████████████████████████ Even if Prof.

5 Cockburn were to ignore all of the evidence that showed that the intellectual property at issue and Java

6 were essential parts of Android's strategy, efficiency improvements can form the basis for customer

7 demand.  *Funai Elec. Co. v. Daewoo Elec. Corp*, 616 F.3d 1357, 1375 (Fed. Cir. 2010).

8 Most importantly, Google's disagreement that the patents and copyrights in suit drive demand

9 for Android is simply another factual dispute.  After hearing all of the evidence in this case, including

10 technical expert testimony, the jury will be able to resolve the factual question of whether the

11 intellectual property at issue drove demand for Android.  Google purports to cite different evidence in

12 order to come to a different conclusion, but "[t]he conflicting opinions merely create a credibility

13 question for the jury to resolve and [the] plaintiff is entitled to the benefit of every favorable inference"

14 in deciding a *Daubert* motion.  *IGT v. Alliance Gaming Corp.*, No. 2:04-CV-1676-RCJ-RJJ, 2008 WL

15 7084605, at *11 (D. Nev. Oct. 21, 2008).  As the Advisory Committee note to Rule 702 states,

> 16   When facts are in dispute, experts sometimes reach different conclusions based on
> 17   competing versions of the facts.  The emphasis in the amendment on 'sufficient facts or
>      data' is not intended to authorize a trial court to exclude an expert's testimony on the
> 18   ground that the court believes one version of the facts and not the other.

19 FED. R. EVID. 702, Advisory Committee Note.

20 None of Google's cited decisions require exclusion of a damages expert's testimony before the

21 technical expert has been able to present his report, and before the close of discovery.  Each of the four

22 cases Google cites in support of its argument were decided after presentation of evidence at trial, not as

23 the result of a pre-trial ruling, much less a ruling before the close of fact discovery.  (*See* Motion at 12–

24 16.)  By contrast, decisions concerning ***pre-trial*** exclusion motions have rejected Google's argument.

25 *See, e.g.*, *Regents of the Univ. of Calif. v. Monsanto Co.*, No. C 04-0634 PJH, 2005 WL 3454107, *28

26 (N.D. Cal. Dec. 16, 2005).

27 Finally, in support of its argument that the patented technology is worthless, Google

28 misrepresents the time frame for Prof. Cockburn's calculations, incorrectly asserting that "Cockburn

15

concludes that damages run throughout the life of the '720 patent no matter what." (Motion at 15.)[8]  In

fact, Prof. Cockburn concludes that a reasonable royalty would cover a much shorter period, based on

his conservative assessment (based on experience with and research regarding product lifecycles) that

Android revenues will increase through 2015 and then decline to zero.  (*See* Cockburn Report ¶ 215–

16.)  Even though Oracle has every right to collect damages through 2025, the life of the '720 patent (or

even longer to account for the copyright infringement), the vast majority of the royalty proffered by

Prof. Cockburn is for infringement through 2018, around when the bulk of the patents expire.  *See Zila,*

*Inc. v. Tinnell*, 502 F.3d 1014, 1019, 1026 (9th Cir. 2007) ("the ability to exact royalties runs to the last

of the patents providing monopoly protection.").  This is an appropriate calculation and is not subject to

attack under *Daubert*.

### C.    Professor Cockburn's Calculations Do Not Reflect Any "Legal Errors"

Google contends that Prof. Cockburn (1) engages in double counting by offering an opinion on

future damages while Oracle seeks an injunction, (2) improperly includes revenues from international

sales, and (3) sets the date of the hypothetical negotiation in 2008.  (Motion at 16–18.)  None of these

attacks has merit.

### 1.    Professor Cockburn Does Not Double Count Future Damages

Google's representation of Prof. Cockburn's treatment of future damages is selectively quoted

and misleading.  Consistent with this Court's Case Management Order (Dkt. No. 56 at ¶ 9), Prof.

Cockburn separately calculates past damages "through the date of the expert report" and future

damages.  (Cockburn Report ¶¶ 319–20 & Exs. 29–30.)  If an injunction is granted, then only past

damages need be awarded, in the form of the up-front payment plus revenue sharing from 2008 through

the date of trial.  However, as the damages report and its calculations are due before the parties know

---

[8] Google's assertions as to the value of the '720 patent represent a factual dispute and are not cognizable on a *Daubert* motion.  Oracle disputes Google's assertion that the patent is valueless, and forthcoming technical analysis will show that it provides substantial value to Android.  Further, the fact that Oracle licenses the '720 patent only "while they are licensing" certain other technologies (a point that Google concedes), does not in and of itself render the patent valueless.  (*See* Motion at 6); *see, e.g., Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 426 F. Supp. 2d 211, 226 (D. Del. 2006) (rejecting argument that patented technology has "little value because it was allegedly 'given away for free'" where it was only given away to existing customers).

whether an injunction will be ordered, Prof. Cockburn includes a future damages calculation to be used in the event that the Court and the parties opt for equitable relief in the form of an ongoing royalty. Google "cites no authority for the proposition that an expert must expressly discount for the value of any potential injunction in the content of his opinion as a prerequisite to providing expert testimony." *Monsanto*, 2005 WL 3454107, at *29.

### 2.   Professor Cockburn Does Not Improperly Include Worldwide Revenues

Google erroneously argues that Prof. Cockburn's damages calculation fails to exclude "extraterritorial—and therefore noninfringing—activities."  (Motion at 17.)  Google's argument is misplaced, as it raises a factual dispute concerning liability and the source of infringement for which the record is still being developed, rather than a contention about damages.

First, Google appears to assert that ***Oracle's*** current Java license revenues disproportionately come from outside the United States, and concludes on that basis that ***Google's*** revenues from its Android-based infringement would as well, proclaiming that "up to 88% of Cockburn's damages total is not recoverable for infringement of a United States patent or copyright."  (*Id.*)  The Court should reject this bait-and-switch.  The location of Java sales is irrelevant to the question of Google's infringement and the damages owed to Oracle as a result of Google's sales.

Second, Google cites no authority for its contention that foreign sales associated with infringing products categorically fall outside the measure of damages.  Oracle has asserted four different theories of patent liability in this case, arising under 35 U.S.C. § 271(a), (b), (c), and (f).  Oracle has also asserted copyright violations.  Several of these theories would entitle Oracle to damages that would include foreign sales.  *See, e.g.*, *Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1371 (Fed. Cir. 2008) ("[T]he Copyright Act does not explicitly require that sales be in the United States . . . ."); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F. Supp. 2d 147, 155 (D.R.I. 2009) (holding that evidence of foreign licenses may be included in damages calculation under § 271(a) in certain circumstances, and noting that there was a jury question as to whether the accused product was "used" in the United States), *rev'd on other grounds*, 632 F.3d 1292 (Fed. Cir. 2011); *Informatica Corp. v. Bus. Objects Data Integration, Inc.*, 489 F. Supp. 2d 1075, 1083 (N.D. Cal. 2007) (foreign sales may fall within scope of § 271(f));

17

1  *DataQuill Ltd. v. Handspring, Inc.*, No. 01 C 4635, 2004 WL 1102309, at *5 (N.D. Ill. May 10, 2004)

2  (foreign sales may fall within scope of § 271).

3       To the extent that Google contends that some of its "activities" are "extraterritorial – and

4  therefore noninfringing," or, in other words, that it is not liable for such conduct under 35 U.S.C. § 271

5  or 17 U.S.C. § 106, Google puts the cart (damages) before the horse (infringement).  As a damages

6  expert, Prof. Cockburn assumes that the patents and copyrights in suit are valid and infringed, as he

7  must.  (Cockburn Report ¶ 5); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir.

8  2009) ("The hypothetical negotiation . . . assumes that the asserted patent claims are valid and

9  infringed."); *Design Ideas, Ltd. v. Things Remembered, Inc.*, No. 07-3077, 2009 WL 1259035, *4 (C.D.

10  Ill. May 6, 2009) (assuming for purposes of the *Daubert* motion that plaintiff can establish copyright

11  infringement).  Any argument about the extent of infringement is a liability issue, not a damages issue,

12  and so is beyond the scope of a *Daubert* motion.  *See, e.g.*, *Tech. Patents, LLC v. Deutsche Telekom*

13  *AG*, 573 F. Supp. 2d 903 (D. Md. 2008) ("Just as it remains a question of fact whether the Defendants

14  are infringing the patents-in-suit under § 271(a), it remains a question of fact whether the foreign

15  activities are infringing under § 271(f).").  Google fails to discuss these legal principles.

16       Finally, Google does not identify a single piece of evidence that, if true, would render damages

17  for foreign sales unavailable as a matter of law.  There is no evidence supporting Google's position in

18  the negotiation history between Google and Sun and, indeed, it is plausible that the rate would have

19  been higher for a U.S.-only license.  (*See, e.g.,* Cockburn Report ¶ 300 (citing Verizon and T-Mobile

20  revenue share contracts).)

21       Google has identified no error – legal, methodological, or factual – in Prof. Cockburn's use of

22  Google's revenue projections, and provides no basis to exclude his testimony.

### 3.  Professor Cockburn Correctly Assesses The Hypothetical Negotiation As Of October 2008

24       Prof. Cockburn's use of October 22, 2008, as the date of the hypothetical negotiation is correct.

25  This Court recently held in both the patent and copyright contexts that the date of the hypothetical

26  negotiation is the date that the infringing product was first offered for sale in the United States.

27  *Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA, 2010 WL 5211454, *12 (N.D. Cal. Dec. 16,

28

18

1   2010); *Microsoft Corp. v. E & M Internet Bookstore, Inc*., No. C 06-06707 WHA, 2008 WL 191346, *3

2   (N.D. Cal. Jan. 22, 2008).  Other courts are in accord.  *See, e.g.*, *Applied Med. Res. Corp. v. U.S.*

3   *Surgical Corp*., 435 F.3d 1356, 1364 (Fed. Cir. 2006).

4          The date when all of the accused functionalities were available for download, according to

5   Android's website, is 2008, when the first Android phone was commercially shipped (October 22), the

6   Android 1.0 software developer kit ("SDK") was available (September 23), and the Android source

7   code was released (October 21).  (*See* Norton Decl. Ex. L (Android Timeline).)  Google apparently

8   thinks that the "***early look***" SDK, available in November 2007, is the appropriate date for the

9   hypothetical negotiation (Motion at 18).  But that early-look provided developers with only the

10  "opportunity to provide feedback and shape the SDK's development."  *Id.*  Google does not dispute that

11  the Android platform was not available on an open-source basis at this point, or that the SDK was only

12  in its nascent stages.

13         Equally important, the precise start date here is of little consequence.  Prof. Cockburn cites

14  evidence that demonstrates that whether the negotiation took place in 2007 or 2008, Google's and

15  Oracle's expectations, concerns, and needs were substantially the same.  (*See* Cockburn Report ¶¶ 37,

16  38, 47, 59, 66, 74, 78, 100–04, 109, 122, 124, 126–27, 135, 137, 141, 144, 164–65, 202, 221, 246, 249,

17  330.)  *See also Lucent*, 580 F.3d at 1333 (patent law "permits and often requires a court to look to

18  events and facts that occurred thereafter and that could not have been known to or predicted by the

19  hypothesized negotiators"); *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp*., 378 F. Supp. 2d 459,

20  464 (D. Del. 2005) ("the ascertainment of [a] hypothetical negotiation date does not rigidly foreclose

21  the factfinder from considering subsequent events.").  There was no disqualifying error in Prof.

22  Cockburn's analysis.

23         **D.       Professor Cockburn Considered Copyright Damages**

24         Google's contention that Prof. Cockburn offers "no meaningful analysis regarding copyright

25  damages" (Motion at 24–25) flatly misrepresents Prof. Cockburn's report.  The report discusses the

26  copyrighted material reflected in Java class libraries, which is "important to the existing set of Java

27  developers upon which Google relied to write applications for Android."  (Cockburn Report ¶¶ 9, 21,

28  22, 24, 110, 112–13, 129–33, 232, 349).  Copyright law enables a damages framework informed not

only by an infringer's profits analysis (which Prof. Cockburn addresses in conclusion because it is subsumed in his previous analysis), but also by a hypothetical license analysis, which Prof. Cockburn here expressly applies to both the patent and copyright infringement at issue.  *Polar Bear*, 384 F.3d at 708–09; *cf. Oracle Corp. v. SAP AG*, 734 F. Supp. 2d 956, 970–71 (N.D. Cal. 2010).  Google's argument provides no basis for excluding Prof. Cockburn's opinions regarding copyright damages.

     **E.**    **The Cockburn Report Reflects Careful Consideration Of The Relevant Evidence And Market Realities**

Google argues that Prof. Cockburn "ignores record facts" in a number of respects.  (Motion at 18–24.)  Even if true (and it is not, as explained below), these are jury arguments, not a proper basis for a *Daubert* motion.  "The existence of other facts . . . does not mean that the facts used failed to meet the minimum standards of relevance or reliability."  *i4i*, 598 F.3d at 855–56.  Even where the data an expert relies on is "imperfect, and more (or different) data might have resulted in a 'better' or more 'accurate' estimate in the absolute sense, it is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony.  Questions about what facts are most relevant or reliable . . . are for the jury."  *Id.* at 856 (quotations omitted).

     **1.**  **Professor Cockburn Carefully Considered Evidence Regarding The Substantial Value Of Java**

Google's allegations concerning the market value of Java rest on a fundamental misreading of the evidence it cites. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

_____

9 ████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████   Crucially, none of these valuations reflect the value of the technology *to*

*Google*, which comprises the large majority of the value Prof. Cockburn calculated and allocated as part

of the hypothetical license negotiation.  These simple evidentiary disputes – in which Google misreads

some figures and ignores others – are for the jury to resolve.

### 2.   Professor Cockburn Correctly Considered Other Licenses

In yet another effort to disqualify Prof. Cockburn simply for not relying on the evidence that

Google prefers, Google attacks Dr. Cockburn for "ignoring Sun's actual JavaME licenses" (Motion at

22) and for considering other mobile-related agreements (*id.* at 22–24).  That attack is factually and

legally baseless.  Dr. Cockburn, in fact, carefully considered, but distinguished on multiple bases, Sun's

Java licenses.  (Cockburn Report ¶¶ 335–36.)  Google may prefer its own assessment of these licenses,

but that is for the jury to decide.

Furthermore, Prof. Cockburn's opinions are not undermined simply because he considered other

mobile-related IP agreements, such as the one between Nokia and Qualcomm.  Prof. Cockburn does not

conclude that any of those licenses are comparable under *Georgia-Pacific* and *Lucent*.  Rather, he uses

the Nokia-Qualcomm agreement to demonstrate that it is not unprecedented to structure an agreement

to include both a substantial up-front payment and some form of revenue share (*id.* ¶¶ 342–44), and

uses the Nokia-Microsoft agreement to confirm that others have placed a high value on mobile platform

technologies, (*Id.* ¶ 341.)[10] *Lucent* and its progeny, which rejected an expert's opinion that licenses *are*

comparable, in no way bars Prof. Cockburn's opinion that those agreements *are not* comparable.  Any

concerns that Google has about Prof. Cockburn's consideration of those agreements can and should be

addressed through cross-examination.

---

[10] Contrary to Dr. Leonard's contentions (Leonard Decl. ¶¶ 17–21), Prof. Cockburn carefully considered Google's potential use of other platforms, and decided that none was a suitable non-infringing alternative.  (Cockburn Report ¶¶ 230–78.)

### 3. Professor Cockburn Correctly Considered A License for an Incompatible Version of Java

Google's insistence that the hypothetical negotiation would have been for a compatible implementation of the infringed technology, rather than the product Google actually created, asks this Court to deny reality and disregard the law. (*See* Motion at 20–22.)

First, Google's arguments about Java's fragmentation prior to Android are simply factual disputes that Oracle will vigorously contest. A plethora of evidence demonstrates that Java is a vibrant platform and that Sun and Oracle have fiercely defended against fragmentation, for example, by successfully suing Microsoft over conduct similar to Google's here.[11] Additionally, Prof. Cockburn addresses Google's contentions in his report. Though he acknowledges that, "like all platforms, Java has suffered from some degree of fragmentation even without Android," ███████████████████████████████████████████████████████████████████████████████████████████████

More to the point, Google is, in fact, using an incompatible implementation of Java. Its witnesses have repeatedly admitted that Android has never passed the TCK, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Google insists that Prof. Cockburn should have placed greater emphasis on the narrow terms of the license for which Sun and Google negotiated in 2006 (Motion at 19), but completely disregards Prof. Cockburn's broader view of those negotiations (*i.e.*, taking into account both the small up-front payment and a revenue-share percentage for a license to create a compatible, shared implementation, *plus* the substantial value that this implementation would have created for Sun compared to the situation that was thrust upon it by Google's actual infringement). Google cannot now seek a compatible license, or invoke the benefit of FRAND commitments that apply only to compatible

---

[11] Google contends that in the Sun/Microsoft settlement, Sun valued the harm from fragmentation at only $20 million, but the parties entered into an agreement providing for up to $1.35 billion payable by Microsoft to Sun for use of Sun's patents. The relevance of those agreements is a factual matter; it is not grounds for a *Daubert* challenge.

licenses.  In short, Google chose to infringe instead of working with Sun to create a compatible

implementation of the platform with joint control over the ecosystem.  As many courts have observed,

> The infringer would have nothing to lose, and everything to gain if he could count on
> paying only the normal, routine royalty non-infringers might have paid. As said by this
> court in another context, the infringer would be in a "heads-I-win, tails-you-lose"
> position.

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978).  To hold that

Google may reject Oracle's licensing terms, infringe its IP, fragment its platform, and then pay only

what it would have paid for a narrower license in 2006, would be inconsistent with patent and copyright

law, and would provide an incentive for Google to infringe.

Finally, there is no support for the proposition that the hypothetical license must differ in scope

and dimension from the infringer's actual implementation of the patents and copyrights at issue.  Patent

damages "compensate for the infringement."  35 U.S.C. § 284.  Android has deprived Oracle of the

benefits that a compliant, shared implementation would have provided, and taken those benefits for

itself.  A reasonable patentee would demand a higher royalty under those circumstances.  Google

provides no support to the contrary.

## CONCLUSION

For all the aforementioned reasons, Oracle respectfully requests that the Court deny Google's

*Daubert* motion.

Dated: June 28, 2011                                    BOIES, SCHILLER & FLEXNER LLP


By:  */s/ Alanna Rutherford*
       Alanna Rutherford

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.