United States District Court

Northern District of California

Before The Honorable William Alsup

| | |
|---|---|
| Oracle America, Incorporated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No. C10-3651 WHA ) |
| Google, Incorporated, | ) ) |
| Defendant. | ) ) |
| _____ | ) |

San Francisco, California
Thursday, July 21, 2011

**Reporter's Transcript Of Proceedings**


**Appearances**:


For Plaintiff:          Morrison & Foerster, LLP
                        755 Page Mill Road
                        Palo Alto, California  94304
              **By:  Michael A. Jacobs, Esquire**


For Plaintiff:          Oracle, Incorporated
                        500 Oracle Parkway, M/S 5op7
                        Redwood Shores, California 94065
              **By:  Matthew Sarboraria, Esquire**


(Appearances continued on next page.)


*Reported By:*          *Sahar Bartlett, RPR, CSR No. 12963*
                        *Official Reporter, U.S. District Court*
                        *For the Northern District of California*

(Computerized Transcription By Eclipse)

1    **Appearances,(continued:)**

2    For Plaintiff:          Boies, Schiller & Flexner
                             1999 Harrison Street, Suite 900
3                            Oakland, California  94612
                    By:   **Steven Christopher Holtzman, Esquire**
4                         **Meredith Richardson Dearborn, Esquire**

5    For Defendant:          Keker & Van Nest
                             710 Sansome Street
6                            San Francisco, California  94111
                    By:   **Robert A. Van Nest, Esquire**
7                         **Christa Anderson, Esquire**
                          **Dan Purcell, Esquire**
8
                             King & Spaulding, LLP
9                            1185 Avenue of the Americas
                             New York, NY  10036
10                  By:   **Bruce W. Baber, Esquire**

11

12                          ---o0o---

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **Thursday,  July  21,  2011**                        **2:01 P.M.**

2                      **P R O C E E D I N G S**

3            **THE CLERK:**  Calling civil action C10-3561, Oracle

4    America, Inc., versus Google, Inc.

5            Counsel, can you please state your appearances for

6    the record.

7            **MR. JACOBS:**  Michael Jacobs, Morrison & Foerster,

8    for Oracle.

9            **THE COURT:**  Welcome.

10           **MR. HOLTZMAN:**  Steve Holtzman, Boies, Schiller &

11   Flexner, for Oracle.

12           **THE COURT:**  Thank you.

13           **MR. SARBORARIA:**  Matt Sarboraria, in-house counsel

14   for Oracle.

15           **THE COURT:**  Thank you.

16           **MS. DEARBORN:**  Meredith Dearborn, Boies, Schiller &

17   Flexner, for Oracle.

18           **THE COURT:**  Welcome.

19           **MR. VAN NEST:**  Good afternoon, Your Honor.

20           Bob Van Nest, Keker & Van Nest, for Google.

21           I'm here with my partners, Christa Anderson and

22   Dan Purcell and Bruce Baber from King Spaulding.

23           And we have two Google representatives with us,

24   Catherine Lacavera and Renny Hwang.

25           **THE COURT:**  Welcome to all of you.

1          All right, we are here for a hearing on the damages

2     study.

3          Mr. Van Nest, it's your motion, so please proceed.

4          I have about 55 minutes, total, and then a 3:00

5     o'clock calendar, so let's try to divide it roughly evenly.

6          **MR. VAN NEST:**  Thank you, Your Honor.  We appreciate

7     very much your time, and I'll try to be brief in using it.

8          With respect to the Daubert, rarely have we seen a

9     report that seeks so much based on so little.  I'm going to

10    concentrate on three critical flaws that I think should prevent

11    this report, or the testimony that it represents, from going to

12    the jury.

13         The first and most fundamental is, there is a

14    complete failure to link the value of these asserted patents or

15    copyrights to the damages analysis.  Dr. Cockburn completely

16    punts on that.  He says throughout his report that someone else

17    is going to do that.

18         When he gets to the critical factor in the **_Georgia_**

19    **_Pacific_** test, he says, and I'll note this, it's from the

20    Appendix C:  "I understand that other witnesses may testify,"

21    may testify, "that the patents and copyrights are individually

22    and jointly important but right now there is no clear economic

23    basis at this point for apportioning the value of Android and

24    the value attributable to these patents and copyrights."

25         Well, that exercise is, as Your Honor knows, now

```
 1    required by the Federal Circuit.  And that -- that requirement

 2    has increased in the last several years with the *Uniloc* case

 3    and the *Lucent* case and these enormous damage reports going in

 4    without any attempt to tie the value of the patents to the

 5    technology.

 6              Now, we know --

 7              *THE COURT:*  It's more than that, it's the value of

 8    the claims asserted, not just the patents.

 9              *MR. VAN NEST:*  That's right.

10              *THE COURT:*  I mean, a patent might have ten claims,

11    and if only four are asserted, you got to laser-like zero in on

12    those four.  I agree with that.

13              And Mr. Jacobs, when it's your turn, you need to

14    address that point.  It's a good point.

15              Go ahead.

16              *MR. VAN NEST:*  Couple points about these patents.

17    We are still looking at 50 claims.  We are still looking at

18    seven patents, I'll talk about that a little later.  These are

19    7 patents out of what Oracle claims are 2000 patents covering

20    Java.

21              Now, of the seven --

22              *THE COURT:*  I didn't hear that.  That is a new piece

23    of info.  Say that again.

24              *MR. VAN NEST:*  Oracle claims there are 2000 patents

25    covering Java.
```

1              **THE COURT:**  Where is that in the record?

2              **MR. VAN NEST:**  I'm not sure it's in the brief, Your

3     Honor.  That's in material that they presented to us prior to

4     the commencement of the litigation.  And nowhere did

5     Dr. Cockburn try to take into account the number of patents

6     that even Oracle claims covers Java.

7              **THE COURT:**  Well, but if it's not in the record, how

8     can I rely on that?

9              In other words, you are making a potentially good

10    point, but what am I supposed to cite in my order?

11             **MR. VAN NEST:**  I'll take a look, Your Honor.  It may

12    well be in the record.  It may well be in the record.

13             **THE COURT:**  "May well be" is not the same thing as

14    "is be."

15             **MR. VAN NEST:**  I agree with you there.

16             Now, these patents, seven of them, so far, there is

17    no testimony that any of them are significant to Java.

18    Certainly, Dr. Cockburn doesn't cite any.  We haven't seen an

19    expert report that indicates that they're essential or

20    nonessential.

21             Essentially, as I said, he doesn't promise that

22    someone will say it, he promises that someone may say it.  And

23    unless and until someone says it, there is no basis for the

24    damages analysis whatsoever, and the report fails.

25             The second point which I think Your Honor has

 1    already recognized is that there is a complete failure to

 2    justify, including any Google advertising revenue whatsoever,

 3    in the royalty base.  There has been no analysis whatsoever of

 4    the Entire Market Value Rule, as you noted in your order.  The

 5    Entire Market Value Rule requires not only that they make a

 6    linkage between the asserted claims and the damages, but if

 7    they want the entire value of the product, and here we are

 8    talking about not only the value of the product, which is a

 9    handset, but then the advertising on top of that, you have to

10    show that those features are the demand, they create the demand

11    for the product, itself.  Again, absolutely no showing of that

12    here.

13          Obviously, Google earns ad revenue from many

14    different types of products, mobile is a very small part of

15    that.  And Google earns revenue off many different mobile

16    products: iPhone, Rim, BlackBerry, none of these are Android

17    products.

18          Dr. Cockburn hasn't made any effort to show, let

19    alone using Android, but stepping back from Android, linking up

20    the value of these asserted claims, there is nothing in his

21    report that gets anywhere near that.  No showing, really, of a

22    logical basis to believe that these tweaks, if that's what they

23    are, in the Java virtual machine, which is really all they are

24    ever claimed to be, could possibly have a relationship to what

25    ad revenues Google, or anyone else, might earn from the variety

1    of handsets that handset makers have published.  So that's the

2    second flaw.

3               The third flaw, and this is really based on **_Concord_**

4    **_Boat_**, Your Honor, is that the report ignores undisputed market

5    facts that we know are out there that are cited in

6    Dr. Leonard's declaration and cited in our opposition that they

7    just completely ignore.

8               Fact one is that they went to the federal regulators

9    when Oracle acquired Sun and said that the totality of our

10   revenues from handset makers, from handset makers annually, is

11   a number in mid 8 figures.  It may be a confidential number, so

12   I don't want to put it on the record, but it's a mid 8-figure

13   number for everybody.  And by "everybody," I mean all the big

14   boys:  Nokia, Motorola, Samsung, Rim.  He completely ignores

15   the existence of these, which arguably, are the closest, most

16   comparable thing to a license to an operating system for a

17   smart phone.

18              Secondly, they went ahead and represented to the

19   regulators, when Oracle acquired Sun, we have always licensed

20   this technology, Java, we have never refused to license it, and

21   we have always licensed it at diminimus rates, diminimus rates.

22              And yet, as Your Honor notes from Cockburn's

23   opinion, he is talking about a deal wherein Google would agree,

24   in a hypothetical negotiation, to share 15, 20 percent of its

25   ad revenue on every handset using Google.  Ridiculous.

```
 1              He overlooks the actual negotiations --

 2         THE COURT:  Repeat that last point again about

 3    diminimus and -- say that again.  Where did that come from?

 4         MR. VAN NEST:  Yeah, that came from Oracle's

 5    representations to the federal regulators when they acquired

 6    Sun.  And there was an investigation into whether this was

 7    anti-competitive or not, that, hey, we have always licensed

 8    Java, we have never refused to license Java, and we have

 9    licensed it at diminimus rates.

10              And now you have Dr. Cockburn coming in here and

11    claiming that in a hypothetical negotiation, Google would have

12    agreed to pay 15 to 20 percent of all of its ad revenue off

13    every handset sold by every carrier, not only using Android,

14    but as I understand his report, every other platform as well.

15              Now, the actual negotiations, in the actual

16    negotiations, Sun proposed a royalty all in for three years of

17    a hundred million dollars, and that was rejected by Google.

18    That was offered, according to Dr. Cockburn and according to

19    the evidence --

20         THE COURT:  Well, what difference does it make?  Why

21    does it matter if Google rejected it?  Google may have been

22    playing -- they may have just been trying to get it on the

23    cheap, that doesn't mean it was reasonable to reject it.

24         MR. VAN NEST:  No, Your Honor, Your Honor --

25         THE COURT:  It may mean that the offerer was willing
```

```
1    to take a hundred million, but the rejection means nothing,

2    does it?  What could it possibly mean?

3              MR. VAN NEST:  Well, it doesn't mean nothing, Your

4    Honor, but your point is well taken; it probably means more

5    that that's what Sun offered, that's what Sun was willing to

6    take.  In other words, in the hypothetical negotiation --

7              THE COURT:  And then your side -- tell me why there

8    isn't willful infringement here.

9              MR. VAN NEST:  I will.

10             THE COURT:  Because you went to get the license, you

11   didn't follow through, and now you got a production out there

12   that is in direct violation of these patents?

13             MR. VAN NEST:  None of those.

14             THE COURT:  That's a very hard scenario -- I am

15   going to ask you, but I bet you've never seen that scenario

16   before.  I have not.

17             MR. VAN NEST:  And you won't see it here, either,

18   Your Honor.

19             THE COURT:  Well, then, why isn't there willful

20   infringement?

21             MR. VAN NEST:  I'll explain why.

22             THE COURT:  All right.  Leave enough time.

23             MR. VAN NEST:  The negotiation that took place was

24   not a pure licensing negotiation.  And that's been confirmed by

25   all the participants, including Mr. Schwartz, the CEO of Sun at
```

1     the time.

2            Google had two essential options in building

3     Android:  They could have entered into a technology partnership

4     with another company and contributed resources and engineers

5     and built Android together, that's what they were discussing,

6     in fact, with Sun.

7            They discussed that same thing, Your Honor, with

8     several other companies that already had virtual machines.  So

9     they went to several companies, not just Sun, and said, do you

10    want to build this project with us together?  We'll provide

11    engineers and technology, you provide engineers and technology,

12    and we'll build the product together and the advantage of that

13    was, it might be a little faster.

14           The other option they had was to build it on their

15    own, build it independently and using their own engineers, own

16    technology and/or licensing technology from other third

17    parties, not -- not just Sun, because many other folks were

18    building virtual machines.

19           What happened was, they couldn't come to terms with

20    Sun -- by the way, in those negotiations, there wasn't any

21    specific discussion of the patents.  Nobody showed them Sun

22    patents.  Nobody said, are you infringing these patents.  They

23    didn't see these Sun patents until Oracle showed them to them a

24    month before --

25                 **THE COURT:**  Why did they need their license, then?

1          **MR. VAN NEST:**  They were negotiating a technology

2     partnership, they were negotiating an agreement.  They weren't

3     coming to say, we need a license to your technology, they were

4     coming to say, we have a product and a project we would like to

5     build, we would like to build it together, you guys have

6     technology that might be useful, we have technology that might

7     be useful, let's partner together and build it.

8          And that is what was being proposed in 2005 and 2006

9     in these discussions we've been talking about.  That was not

10    acceptable, ultimately, either to Google or to Sun, they

11    couldn't reach term on that.  So Google went out, they built

12    their own.  They used a clean-room environment.  They didn't

13    look at any of these Sun patents we're talking about.

14         And the kicker is, Your Honor, discussions

15    continued, there were further discussions; Sun became more and

16    more and more interested in getting on the Android bandwagon.

17         So when Android was announced in 2007, Sun didn't

18    throw up their hands and say, oh, my gosh, you're infringing,

19    Sun congratulated Google on Android, welcomed Android to the

20    Java community, put Android on Sun products, asked Google how

21    they could help Android.

22         The whole point was that Android was something that

23    Sun saw, then, as beneficial to them, something that would

24    spread the news and the word about Java.  They didn't come in

25    in 2007 --

1           **THE COURT:**  So you're saying that Android does not

2      use Java.

3           **MR. VAN NEST:**  I'm saying that Android does not use

4      Java, that we are going to prove noninfringement, that Android

5      uses the Java programming language, which nobody claims is

6      protected by Sun.

7           The Java programming language, Your Honor, is the

8      alphabet, the language that programmers use to write source

9      code.  That is open to everyone.  And that is being used not

10     only by Google, but by many, many others in the Java community,

11     and nobody's claiming that that's infringement.

12           With respect to how the Dalvik virtual machine works

13     and the Dalvik Java libraries that are used, those are original

14     Google technology or licensed from third parties.  Google has a

15     license from the Apache Software Foundation.  And they have a

16     license to use libraries that the Apache Software Foundation

17     created.  And nobody's contesting that they have that license.

18           And, Your Honor, the proof in this is that when this

19     thing was announced, and we just sat down with Mr. Schwartz

20     yesterday, when Google announced Android in '07 and when they

21     launched it in '08, the reaction from Sun was, welcome aboard,

22     we want to work together, you are another way of spreading the

23     Java programming language.  We welcome you, we want to work

24     with you, we want to be a part of Android.

25           There was never a threat of litigation.  There was

1   never a waiving of patents.  There was never a waiving of

2   copyrights.  All that started only after Mr. Ellison paid

3   7 billion for Sun and then turned around several months later

4   and sued.

5            But at the time, the people running Sun, the people

6   who had been in the negotiations, the people who were in direct

7   contact with Mr. Rubin, the people who were talking with Google

8   and who rejected this technology partnership, they didn't come

9   after Google.

10           *THE COURT:*  Well, what do they say now in their

11   depositions?

12           *MR. VAN NEST:*  Just exactly what I told you.

13           *THE COURT:*  So at the time of trial, the former Sun

14   executives are going to come in here and say there was no

15   infringement?

16           *MR. VAN NEST:*  They are going to come in here and

17   say that they negotiated for a technology partnership, they

18   hoped to be part of Android, it didn't work out.  But that when

19   Android was launched, they welcomed it, they publicly applauded

20   it.  They got aboard it.  They said it can help us.  They said

21   it will help us sell our hardware, and --

22           *THE COURT:*  What did they say about infringement?

23           *MR. VAN NEST:*  Their view was that Google had built

24   the Dalvik in a clean room, and they had a license from Apache.

25   And Sun said, the Apache license gives them the right to use

1    the Apache code, and we are not going to sue for that.

2            And they didn't sue for that, they recognized the

3    legitimacy of the third-party license that Google had.  They

4    recognized Google's right to publish its own product.  They

5    recognized Google's right to --

6            *THE COURT:*  I don't know if this is true or not, but

7    the allegation is made that you have hundreds of lines of code

8    that came straight -- copyright -- exactly the same code

9    that -- it belonged to Sun.

10           *MR. VAN NEST:*  The allegation is not right.  There

11   are -- there are a few lines of code that are identical to Java

12   code.  And we are still investigating that, but it turns out

13   that probably came from some third-party vendor that created it

14   in either Russia or Eastern Europe, imported it in.  We had

15   asked for them to build a module, and that is how it got in

16   there.

17           *THE COURT:*  I got you off track.

18           *MR. VAN NEST:*  Well --

19           *THE COURT:*  We only have about five more minutes,

20   and then I'm going to let you save 3 or 4 minutes for rebuttal.

21   So I'll be quiet for five minutes --

22                    **(Laughter.)**

23           *THE COURT:*  I know what you have in your brief, you

24   don't have to repeat it; I think it's important, though,

25   that -- you have said a few things I haven't heard before, so

```
 1    spend your time on those things you think you want to make sure

 2    that I have in mind.

 3              MR. VAN NEST:   Okay.

 4              The other two things that I want to make sure you

 5    have in mind, Your Honor, are, one, it seems to me that the

 6    level of scrutiny that the Court should apply to this should go

 7    up when you are talking about a $6 billion damage report.  It's

 8    not as though they threw a $250,000 report on the table.  This

 9    report is going to be exceedingly confusing for jurors,

10    especially if they would be allowed, through Dr. Cockburn, to

11    present that large a number with this many flaws without a

12    legal link to either the asserted claims or to the ad revenues.

13              And in your job as gatekeeper, it seems to me that

14    job is even more critical and more important the larger the

15    number is.  And in terms of protecting both Google and jurors

16    from the kind of confusion that could result from this sort of

17    report, it's absolutely critical that you take a hard look at

18    it.

19              Now, what are we asking you to do?  We are asking

20    you to strike this report based on all of the flaws that I've

21    identified and any others the Court thinks are meritorious.  We

22    are not asking you to bar Oracle from presenting a report.

23    They have expert report deadlines coming up on the 29th; they

24    can redo a report following the principles of *Uniloc*, and

25    *Panduit*, and setting forth the Entire Market Value Rule.
```

```
 1              But this report should fall, this report should be

 2    stricken, and they should be advised that unless and until they

 3    come up with a report that meets the requirement of Daubert,

 4    they won't have any expert report at all.

 5              THE COURT:  Thank you.

 6              MR. VAN NEST:  Thank you.

 7              THE COURT:  I'll let you have about 4 or 5 minutes,

 8    Mr. Jacobs --

 9              MR. JACOBS:  Your Honor, Mr. Holtzman will be --

10              THE COURT:  Very good.

11        Mr. Holtzman.

12              MR. HOLTZMAN:  Thank you, Your Honor.

13              I actually, especially in view of the limited time,

14    we have a binder for the Court I would like to hand up.

15              THE COURT:  All right.

16              MR. HOLTZMAN:  Hopefully some of which we will be

17    able to actually get to.  And it covers, Your Honor, each of

18    the aspects of the hearing today.  The Daubert issues are in

19    the first tab, and then the Court asked a number of questions,

20    and the second two tabs cover those.

21              I'd like to address, hopefully briefly, each of the

22    points that Mr. Van Nest made, which I think also will cover

23    the Court's questions in its previous orders.  And I would like

24    to do that, I think, in reverse order.

25              I want to start first with the willfulness issue.
```

1   It's interesting that in his presentation, Mr. Van Nest focused

2   with regard to willfulness entirely on what Sun said,

3   purportedly said regarding, you know, this issue of Android and

4   how they reacted to it.  The question with regard to

5   willfulness, the question under the law of willfulness, is what

6   Google knew and whether Google acted, despite an objectively

7   high likelihood there was infringement.

8        **THE COURT:**  What have you found in their files?  I

9   mean, in other words, do you have -- I saw that e-mail that you

10   referred to, but it doesn't call out any patents.  So do you

11   have some e-mail inside their files that says one of these

12   seven patents were be infringed?

13       **MR. HOLTZMAN:**  We have -- not as to the specific

14   patents, because, with all due respect, when you think about

15   Google and what we were the thinking at the time, it's not like

16   they went through each and every patent and the claim of the

17   patent and said, oh, this one's a problem, this one's not a

18   problem.

19       But, the evidence will show clearly and convincingly

20   that before the infringement began Google said -- and we have

21   documents on this -- Slides 67 through 70 in the binder.  I

22   don't want to discuss those documents at great length when the

23   public's here --

24       **THE COURT:**  You said it -- listen, there is no

25   restriction.  This is a public proceeding.  And you lawyers and

```
 1    the companies are not going to handcuff the public from knowing

 2    what goes on in its Federal District Court.

 3              This is not a wholly-owned subsidiary of Oracle

 4    Corporation.  So I'm going to have a public order.  No one is

 5    going to put my order under seal, even if I refer to your

 6    secret documents.  So you can say anything you want.

 7              MR. HOLTZMAN:  Okay, I completely agree, Your Honor.

 8    These are their designations and --

 9              THE COURT:  Fine, you say whatever you want.

10              If Google has a memo in their file saying, we are

11    about to willfully infringe, there is no way I'm going to keep

12    that secret from the public or the investing public.

13              MR. HOLTZMAN:  Okay.  Well, let me --

14              THE COURT:  So you say whatever you want to say.

15              MR. HOLTZMAN:  Absolutely.  I appreciate that, Your

16    Honor.

17              Let me summarize --

18              THE COURT:  The same goes for Oracle.

19              MR. HOLTZMAN:  Yep.

20              THE COURT:  You don't want to get me started on

21    this.  You big companies do not own the U.S. District Court.

22    So, yes, you can have your protective orders, but when it comes

23    to a public hearing, I'm not going to have to resort to Morse

24    Code to understand what you are trying to tell me.

25              MR. HOLTZMAN:  Okay, Your Honor.
```

1          **THE COURT:**  Go ahead.

2          **MR. HOLTZMAN:**  Let me summarize them, in the

3    interest of time, and they are in the slides that we present.

4          Prior to the time the infringement began, Google's

5    executives recognized that Sun's intellectual property was, as

6    they put it, critical and central.

7          **THE COURT:**  Where does it say that?  I didn't see

8    that e-mail.  "Critical and central"; where does it say that?

9          **MR. HOLTZMAN:**  Okay, so, looking, for example, at

10   page 67 of the binder --

11         **THE COURT:**  Okay, let's look at that.

12         **MR. HOLTZMAN:**  This is an excerpt from a document,

13   not the actual document.  I'll represent, of course, that it's

14   accurate.

15         **THE COURT:**  All right, okay, in 2005, Andy Rubin --

16         **MR. HOLTZMAN:**  Yes.

17         **THE COURT:**  -- "wrote to Larry Page, said Android

18   building a Java OS, and they were, quote, 'making Java central

19   to Android.'  He proposed that Google obtain a license.  My

20   proposal, quote, 'is that we take a license.'"

21         **MR. HOLTZMAN:**  And then --

22         **THE COURT:**  And your point is, your argument,

23   anyway, is, well, that's what they said, but they knew they

24   needed a license, and they didn't get it.

25         Did they use the word "license"?  I guess they did.

1           **MR. HOLTZMAN:**  They did, absolutely did, Your Honor.

2      Perhaps the --

3           **THE COURT:**  But wait a minute, Mr. Van Nest said it

4      was not a license, that it was a joint venture.

5           **MR. HOLTZMAN:**  Yeah, I wanted to address that

6      because, of course, the discussions proceeded on a broader

7      basis.  But, again, as it relates to willfulness, the issue is

8      what they thought they needed, what they thought was critical,

9      what they thought was central, what they were willing to do,

10     whether they were willing, in the words of another document, to

11     position ourselves against the industry.  That's on page 68.

12          Whether they are willing to make enemies along the

13     way, that's on page 70, okay?  And they did specifically use

14     the word "license," it was an integral part of those

15     discussions.

16          Perhaps the most telling example of this is in a

17     later document --

18          **THE COURT:**  Would you -- I want to stick with your

19     67, though.

20          **MR. HOLTZMAN:**  Yep.

21          **THE COURT:**  You use the word "critical," you put it

22     in quotes, and you say,

23          "Mr. Rubin stated in a presentation to Google's

24     executives, that a license from Sun was, quote, 'critical,'

25     closed quote.  So read to me -- but I want to hear it for

1   myself, read to me the wording.

2              **MR. HOLTZMAN:**  The exact -- I do not have that.

3   Maybe it can be pulled.

4              **THE COURT:**  Maybe if you can pull it in time?  I

5   would like to maybe even see the document, that would be good.

6              **MR. HOLTZMAN:**  Absolutely.

7              **THE COURT:**  I would like to see what the document

8   said.

9              **MR. HOLTZMAN:**  We can, of course, submit them,

10  Your Honor.

11             **THE COURT:**  No, no, come to court next time

12  prepared.

13             **MR. HOLTZMAN:**  Okay.

14             **THE COURT:**  Go to your next point.

15             **MR. HOLTZMAN:**  Yeah.  I wanted to, in the interest

16  of time --

17             **THE COURT:**  Dr. *[verbatim]* Dearborn is bringing

18  forward -- all right, would you show that to the clerk and then

19  let me see it.

20                  **(Handing up document.)**

21             **THE COURT:**  This does have the word "critical," but

22  it doesn't have the word "license."

23             **MR. HOLTZMAN:**  That page does not have the word,

24  "license."

25             **THE COURT:**  Why does your page 67 have the word

1    license on it when the word license doesn't appear on your

2    cite?

3              **MR. HOLTZMAN:**  It may be a different page of that

4    document, Your Honor.  I would have to look at it.

5              **THE COURT:**  That's not so good.  I think you should

6    be more accurate next time.

7              **MR. HOLTZMAN:**  The slide is accurate, Your Honor.

8              **THE COURT:**  The word critical is accurate, but the

9    word license is inaccurate.  Just said, why do the deal; well,

10   the deal could be a joint venture.

11             Earlier, you did have one that said license, so see

12   if you can find that one for me.

13             **MR. HOLTZMAN:**  Okay.

14             Well, in the interest of time, I'm not finding it at

15   the moment.

16             **THE COURT:**  All right.

17             **MR. HOLTZMAN:**  Let me switch to another document.

18   If you look at page 74.

19             **THE COURT:**  All right, let's look at that.

20             **MR. HOLTZMAN:**  It's a later document, Mr. Lindholm,

21   at Google, and he states in the document.

22             "What we've actually been asked to do by Larry and

23   Sergey" -- those are the cofounders of Google -- "is to

24   investigate what technical alternatives exist to Java for

25   Android and Chrome.  We have been over a bunch of these and

```
1    think they all suck.  We conclude that we need to negotiate a
2    license for Java" --
3              THE COURT:  That's a pretty good document for you.
4              MR. HOLTZMAN:  Yes.
5              THE COURT:  That ought to be, you know, big for you
6    at the trial.
7              MR. HOLTZMAN:  Yep.
8              So these are the kinds of evidence we focus on I
9    think will show clearly and convincingly they knew they needed
10   a license and acted despite that fact.
11             Now, let me go to the Daubert arguments.  Now,
12   Mr. Van Nest articulated three central arguments, he said.  And
13   the third, going in reverse order, he says that the report
14   ignores undisputed market facts.  Well, the first thing about
15   this is that none of the things he then said -- he said three
16   things, factually, about what Oracle said to the regulators,
17   about the value of Java revenue from handset manufacturers,
18   what Oracle said about always licensing at diminimus rates, and
19   then they talk about ignoring the actual negotiations between
20   the parties.
21             First of all, none of what he said is undisputed.
22   In other words, he has his evidence, Mr. Van Nest has the
23   evidence that he wants to focus on in terms of valuations or
24   public statements.  But he ignores the fact that Professor
25   Cockburn describes at great length a corpus of evidence,
```

1   including some of the things they want to focus on, assesses

2   it, and reaches a conclusion.  Daubert is not a battle of

3   experts, it's not about making -- resolving factual disputes,

4   and these things are all disputed.  So that is the first point.

5           The second point on this argument is the things that

6   Mr. Van Nest pointed to:  Oracle's statement about its Java

7   revenue, Oracle's statements about its licensing practices and

8   the actual negotiations between the parties, they are not

9   comparable.  These are things that under the ***Lucent*** case that

10  Mr. Van Nest referred to are specifically to be viewed with

11  skepticism.  You can't just take these simple benchmarks and

12  therefore transfer them over.

13          The licenses --

14      ***THE COURT:***  What did ***Lucent*** say that would make the

15  actual -- let's say that Sun made an offer to license, just to

16  make it simple, these seven patents for $100 million, let's say

17  that; why wouldn't that be a pretty good comparable?

18      ***MR. HOLTZMAN:***  The -- the key fact here -- I mean

19  ***Lucent***, the central teaching of ***Lucent***, of course, is that past

20  licenses have to be comparable, they have to be on similar

21  economic terms and under similar economic conditions.

22          The fact that --

23      ***THE COURT:***  Or you have to be able to adjust for it.

24  I agree with that, it has to be comparable, but let's say that

25  it involved more than these seven patents, let's just say it

1    was just a hundred million for these seven patents, why

2    wouldn't that be comparable?

3             **MR. HOLTZMAN:**   Because the conditions of those

4    licenses, as Professor Cockburn discusses in his report at some

5    length, revolve around the compatibility, the absence of

6    fragmentation, the compliance with Sun's, at the time,

7    technical compatibility kit that promoted the value of the Java

8    platform in Sun's ancillary products, not destroyed it, not

9    fragmented it, not forked it.

10            **THE COURT:**   How do you then respond to Mr. Van Nest,

11   who said as soon as this Android came out, the Sun executives,

12   they didn't recoil in horror and say, my God, fragmentation,

13   this is terrible, they applauded the product.

14            So why -- how can you now say through a hired

15   expert -- how much is he being paid per hour, by the way?

16            **MR. HOLTZMAN:**   He is being paid -- it's in his

17   report, Your Honor.

18            **THE COURT:**   How much is it?  I'm just curious.

19            **MR. HOLTZMAN:**   $700 per hour.

20            **THE COURT:**   Somebody being paid $700 per hour, of

21   course they are going to come in and -- but at the time, the

22   Sun people said, this is great.  They didn't say it was a

23   terrible thing.  They didn't -- who came up with the idea of

24   fragmentation?  That was after Larry Ellison bought the

25   company.

1              **MR. HOLTZMAN:**  Actually, that's not the case, Your

2    Honor.

3              **THE COURT:**  Well, then, tell me --

4              **MR. HOLTZMAN:**   In fact, as Andy Rubin testified in

5    his deposition, Google's Andy Rubin --

6              **THE COURT:**  Yes?

7              **MR. HOLTZMAN:**  -- in the discussions that the

8    parties had regarding a license or a partnership or both,

9    Mr. Rubin commented in his deposition that the Sun people were

10   hypersensitive to fragmentation.  This is before the

11   infringement began.

12             Now, what the factual record -- what the evidence

13   will ultimately show about what Sun executives said at the time

14   is what the record will show.  I would submit that that is not

15   to be resolved at this juncture based on a report that was

16   submitted 70 days before the end of discovery, before there is

17   anything, any record developed at all.  That's simply a factual

18   dispute.

19             The actual negotiations, as well as the past

20   licenses, have to be considered and adjusted for the

21   fundamental differences between them and the hypothetical

22   license which takes the infringement as it occurred.

23             **THE COURT:**  So if --

24             **MR. HOLTZMAN:**  And Professor Cockburn does that.

25             **THE COURT:**  If -- here's what I don't get, though:

```
1    If the e-mail from the inside -- Google recognized that Sun was
2    hypersensitive to fragmentation, why wasn't that sensitivity
3    already reflected in the 100 million-dollar offer?
4            MR. HOLTZMAN:  Because that offer, Your Honor, was
5    an offer for an implementation of the intellectual property
6    that would have promoted the value of the Java platform
7    overall, not defeat it.
8            And Professor Cockburn goes through this and
9    specifically addresses this issue.  If you take the hundred
10   million dollars, or so, that Mr. Van Nest talked about, and
11   then you add onto that the value -- and this is -- this is
12   evidenced in the contemporaneous documents that Sun had -- if
13   you add the value that that deal in those terms would have
14   generated for Sun, you get to a much, much larger number, a
15   number over a period of a number of years that is similar to
16   the $2.6 billion damages number.
17           Because on an analyzed basis, Sun showed that under
18   that deal, guaranteeing compatibility, guaranteeing a lack of
19   fragmentation, and sharing control, Sun would have generated in
20   just a three-year period ramping up to almost $600 million a
21   year in revenue.  This is what was lost, in part, by Sun, as a
22   result of the infringement.
23           THE COURT:  Is there a single former Sun executive
24   who you have found who will come forward -- who is not on the
25   payroll, by the way -- who will come forward and say, oh,
```

```
 1    fragmentation is terrible.

 2              MR. HOLTZMAN:  Absolutely, multiple ones.

 3              THE COURT:  Give me an example.

 4              MR. HOLTZMAN:  Fragmentation --

 5              THE COURT:  Somebody at Sun who can come and

 6    counter -- make a dent in the argument that when this product

 7    came out, Sun embraced it warmly and did not recoil in horror

 8    at the idea of fragmentation.

 9              So tell me somebody who -- who is the first Sun

10    executive not on the payroll who recoiled in horror?

11              MR. HOLTZMAN:  Well, one of them, certainly, is

12    Param Singh, who is now at Oracle.

13              THE COURT:  He is where?

14              MR. HOLTZMAN:  At Oracle.

15              THE COURT:  But he is on the payroll; I'm talking

16    about somebody who is not on the payroll or hired one of your

17    retainers.

18              MR. HOLTZMAN:  No, it's an employee.

19              THE COURT:  Somebody who maybe today works for

20    somebody completely different and has nothing to do with this

21    case and has no axe to grind, the kind of people that juries

22    tend to believe.

23              MR. HOLTZMAN:  Absolutely, Your Honor.

24              So you are talking about former employees of Sun?

25              THE COURT:  Former employees who were in a position
```

```
1    to know and would be willing to say, I've looked at this, I'm

2    not being paid by either side, and fragmentation is going to

3    ruin Java.

4              Who would that be?

5              MR. HOLTZMAN:  I'm a little hesitant to call them

6    out, Your Honor, but, for example, one --

7              THE COURT:  I don't care if you don't want to tell

8    me.  Then that's your problem.

9              MR. HOLTZMAN:  No, I appreciate that.

10             Rich Green, for example, now at Nokia, is

11   somebody --

12             THE COURT:  What's the name?

13             MR. HOLTZMAN:  Rich Green.

14             THE COURT:  Rich Green, all right.

15             What's he going to say?

16             MR. HOLTZMAN:  I don't know if he will testify,

17   Your Honor.  It's up to him, essentially.  We can subpoena him,

18   but we haven't made all those decisions yet.

19             THE COURT:  All right.

20             MR. HOLTZMAN:  Kathleen Knopoff is another one, and

21   she is also a former Sun employee.

22             THE COURT:  All right, I've taken a lot of your

23   time, and I want to give you some quiet time to make your

24   points and without me interrupting you.

25             MR. HOLTZMAN:  No, I appreciate that.
```

1          **THE COURT:**  Please go ahead.  I want to make sure

2     that you have a chance to say the things that you want to make

3     sure I haven't read yet.  I've read a lot, but I want to give

4     you that chance to make your main points.

5          **MR. HOLTZMAN:**  I appreciate that, Your Honor.  And

6     there are, by the way, other former Sun executives in that

7     category.

8          I think I've covered the third point that

9     Mr. Van Nest made, his supposedly undisputed market facts.

10          Professor Cockburn's report discusses, and the

11     record will show, that when you look at these facts, his facts

12     as well as our facts, and you adjust for them properly, you get

13     something that is extremely consistent with his damages number,

14     okay?

15          Now, going to his second -- his second argument that

16     the -- Professor Cockburn's report shouldn't have included,

17     Android or Google advertising revenue in his damages analysis,

18     Google's argument seems to be, and I think is, that there --

19     that damages should be zero in this case.

20          **THE COURT:**  That's ridiculous, too.  And we're

21     not -- that's not going to happen, so you don't have to worry

22     about that.

23          **MR. HOLTZMAN:**  Okay.

24          So let me --

25          **THE COURT:**  It's probably in the millions, I don't

1  know, maybe the billions, I'm not sure what it is.  But zero is

2  ridiculous.

3              *MR. HOLTZMAN:*  Yep.

4              *THE COURT:*  See, you are both just asking for the

5  moon, and you should be more reasonable.

6              *MR. HOLTZMAN:*  Yeah, but the issue on Daubert,

7  Your Honor, is whether the methodology --

8              *THE COURT:*  Yes, that's true.

9              *MR. HOLTZMAN:*  And the use of the -- the way that

10 Google monetizes Android, which is through advertising

11 revenues, is consistent with the economics, and it's consistent

12 with the law, and consistent with the --

13             *THE COURT:*  Well, you don't sell Android as a

14 product, right?

15             *MR. HOLTZMAN:*  That's exactly right, Your Honor, but

16 the way they --

17             *THE COURT:*  So the way you make your money on it --

18 no, the way Google makes the money on it is, it has a value,

19 Android has a value; how do we determine what that value is?

20 Well, one way you would do that is to look at the advertising,

21 the benefits, the advertising revenue that is attributable to

22 it.

23             *MR. HOLTZMAN:*  That's right.

24             *THE COURT:*  Seems to me -- they are totally wrong on

25 that.

1              **MR. HOLTZMAN:**  Okay.

2              **THE COURT:**  You don't have to waste your breath on

3      that one, but you do have to waste your breath on a few other

4      things.

5              **MR. HOLTZMAN:**  Okay, and that's the last one I was

6      going to get to.

7              **THE COURT:**  All right, go ahead.

8              **MR. HOLTZMAN:**  There is this is argument that there

9      is a key failure to link the value of these patents to the

10     damages, and this also --

11             **THE COURT:**  You don't even know what patents you are

12     going to assert.

13             **MR. HOLTZMAN:**  Well --

14             **THE COURT:**  You don't even know -- you can't even

15     tell me now which claims you are going to assert at trial.  And

16     you want me to just gamble that whatever you decide on is going

17     to be the Entire Market Value Rule?

18             **MR. HOLTZMAN:**  Well, Your Honor, we have --

19             **THE COURT:**  That is crazy, and you cannot get away

20     with that.

21             **MR. HOLTZMAN:**  Okay, well, we've asserted a number

22     of patents --

23             **THE COURT:**  You told me that -- you have gone from

24     123 -- you can't even make up your mind what is infringed.  You

25     go from 123, now you are at 50, and you are heading down to

```
1    somewhere below 25.
2            And now you want me to say, well, maybe, maybe we'll
3    roll the dice and see if they can come up with some that
4    translate to the Entire Market Value Rule, which is under
5    attack in the Federal Circuit and is on its way out?
6            MR. HOLTZMAN:  Okay --
7            THE COURT:  Come on, I'm not going to do that.
8            MR. HOLTZMAN:  Well, there are a lot of things in
9    there, actually, I disagree with.
10           THE COURT:  Well, you get to be the judge some
11   day --
12                      (Laughter.)
13           THE COURT:  -- but right now I'm the gatekeeper.
14   And that one you are going to lose on.
15           MR. HOLTZMAN:  I appreciate that.
16           I do think the Entire Market Value --
17           THE COURT:  You didn't even put in your report on
18   that, you said somebody else is going to do that.
19           MR. HOLTZMAN:  The Court asked our experts --
20           THE COURT:  I said everything you have on damages.
21           MR. HOLTZMAN:  Absolutely --
22           THE COURT:  And this is part of it, and there is
23   nothing there.
24           MR. HOLTZMAN:  Your Honor, of course, we are
25   prepared to supplement or fix, as the case may be.
```

1              **THE COURT:**  I made a big mistake giving you this

2    chance.

3              I went to this conference, Mike Jacobs was there; I

4    was thinking, how can we make these cases more simple?

5    Everyone in the room, Judge Rader, everyone, they were talking,

6    these damages reports are out of control, we got to do

7    something about it.  And so I'm thinking, okay, maybe a way to

8    do that is to let the lawyers submit their reports in advance,

9    and then I can say this is good, this is bad, that's good, you

10   know?

11             Instead, I get a report that calls for 6 billion,

12   not million, billion dollars.  You are never going to do it

13   again.  I'm never going to let -- the next time the lawyers are

14   going to take the -- gamble everything, one shot.  And if they

15   lose it, they don't get a report.  Just like Mr. Van Nest said,

16   if you get greedy, it goes out the window, no more report, you

17   just get an injunction, maybe.

18             **MR. HOLTZMAN:**  Your Honor, the Court's case

19   management order required, among other things, our experts to

20   put in their report based on assumed fact scenarios.  Now,

21   there are two parts to the Entire Market Value Rule analysis.

22   And by the way, this is a copyright case, too, Your Honor.

23             **THE COURT:**  There is an assumption there.  There is

24   nothing in there but a guy who is being paid $700 an hour who

25   comes up with $6 billion.  Come on.

1          **MR. HOLTZMAN:**  That's because the issue here of

2     what --

3          **THE COURT:**  He assumed every important point.

4          **MR. HOLTZMAN:**  I don't think every important point.

5          **THE COURT:**  What do I do?  This is not a good way to

6     run a railroad.  Maybe I'm the one that is at fault.

7          You will get another chance, I'm going to give you

8     another chance, but it was a mistake for me to do it this way.

9     I should have just made you gamble on whether or not you would

10    be too greedy, and if you were too greedy, you would not have a

11    damage report, too bad for you.

12         **MR. HOLTZMAN:**  No -- with all due respect,

13    Your Honor, what we and Professor Cockburn are trying to do is

14    comply with the Court's order.

15         The Court required us to put in our entire damages

16    report, not our entire technical expert report, for example.

17    The one issue here on which he says other witnesses -- and that

18    is fact witnesses as well as expert witnesses -- may testify to

19    is the specific extent to which the particular patents, the

20    particular claims, delivers things like speed, memory, and

21    security to Android.  That's a highly fact-intensive, a highly

22    technical inquiry.

23         Now, that is something that goes to liability as

24    well as damages.  A judgment call has to be made, Your Honor,

25    as to whether that has to be in and whether an economist like

```
 1   Professor Cockburn can competently do that.  That's a judgment
 2   call that has to be made.
 3         Now, he didn't omit everything, that is the one
 4   thing he did omit, and he deferred to other witnesses.
 5         THE COURT:  He didn't even tell what the claims
 6   were.  He didn't even say what the claims were.
 7         MR. HOLTZMAN:  That's true, Your Honor, that's not
 8   his fundamental core expertise, that goes to liability.
 9         What he did as an economist was address the demand
10   question, he said once -- you take an assumed fact scenario
11   that these claims of these patents provide speed, memory and
12   security.  He looked at the evidence, he discussed some of the
13   evidence and said that is sufficient to form the basis for
14   demand.
15         Now, also, there are copyrights at issue in this
16   case.  And by the way, the test is different under copyright.
17   If we show -- they acknowledge in their reply brief a causal
18   nexus, which doesn't mean forms the basis for demand, it means
19   under the law of the Ninth Circuit that the copyrights
20   materially enhance the value of the infringing product.  Then
21   you get direct and indirect profits as damages.  And that can
22   be in the form of reasonable royalty, or it can be in the form
23   of the infringer's profits.
24         And in terms of the infringer's profits, which in
25   their words are the lion's share of the damages in this case,
```

```
 1   the damages analysis, it is Google's burden.  It is not our

 2   expert's burden, it is not Oracle's burden to show under the

 3   Copyright Statute that the profits attributable to other --

 4   that some of the profits are attributable to other elements of

 5   the infringing product.  And that is an independent validation

 6   and justification of the approach that Professor Cockburn has

 7   here, both the reasonable royalty and the infringer's profits.

 8              THE COURT:  All right, thank you.

 9              Mr. Van Nest, I have a question for you:  When was

10   that date of first infringement?

11              MR. VAN NEST:  Well, if -- if --

12              THE COURT:  Ah, ah, ah --

13              MR. VAN NEST:  I would have to look back,

14   Your Honor.  The device was announced in '07.  It was tested --

15

16              THE COURT:  No, no, wouldn't the laboratory work --

17              MR. VAN NEST:  Yes.

18              THE COURT:  I will say this:  It is not the date of

19   first sale.

20              MR. VAN NEST:  No.

21              THE COURT:  That is wrong, that is wrong.  Oracle is

22   wrong on that.  That only applies when it's being shipped into

23   the country.

24              Somebody was using it in the lab or experimenting

25   with it.  So someplace you got to tell me, what was the date of
```

 1   first infringement?

 2            **MR. VAN NEST:**  It was in 2006, is when they used the

 3   product in the lab.  2007 is when they announced a software

 4   development kit to the public, which would -- included the --

 5            **THE COURT:**  When did Oracle buy Sun?

 6            **MR. VAN NEST:**  2010.

 7            So if I can tie this together a little bit --

 8            **THE COURT:**  Go ahead.  You have five minutes.  Yes.

 9            **MR. VAN NEST:**  -- and respond?

10            I want to talk first about a question you asked

11   Mr. Holtzman twice, and he didn't answer.

12            Where were the patents?  Where is the memo about the

13   patents?  The answer is, the patents are not in Google's files.

14   No one was shown these patents during the negotiations.

15   Nobody -- there is no memo out there that says, oh, my gosh, we

16   are infringing these Sun patents, there is none of that.

17            The first time anybody saw these patents is when the

18   Ellison crew came in about a month before this lawsuit was

19   filed and said, here are some Java patents, we think you are

20   infringing, pay up.

21            So it is undisputed that there is nothing back in

22   the files and nothing back in the records that anyone's turned

23   up at this point.  And discovery is almost over.

24            **THE COURT:**  What do you say to this memo right here?

25   I'm going to read it out loud, this is from Tim Lindholm:

```
 1              "I, Andy" -- Andy; is he the president now?  What is
 2     his job now?
 3              MR. VAN NEST:  It's Andy Rubin, Your Honor.
 4              THE COURT:  Yes.  What's his job now?
 5              MR. VAN NEST:  Andy Rubin is still the head of
 6     Android at Google.
 7              THE COURT:  Okay, so he'll be on the hot seat at
 8     trial and have to explain this e-mail, which says in the second
 9     paragraph:
10              "What we have actually been asked to do by Larry and
11     Sergey is to investigate what technical alternatives exist to
12     Java for Android and Chrome."
13              MR. VAN NEST:  Two points, Your Honor --
14              THE COURT:  Wait, wait, wait.
15              "We've been over a bunch of these and think they all
16     suck" -- that's a good technical term.
17              "We conclude that we need to negotiate a license for
18     Java under the terms we need."
19              Okay, "license for Java"; well, that's -- okay, I
20     agree with you, it doesn't say patents, but don't you think a
21     good lawyer will convince the jury that that meant a license
22     for patents and maybe for copyright?
23              But, I mean, how are you going to get around that?
24              MR. VAN NEST:  Your Honor --
25              THE COURT:  They -- you know what they used to say
```

1    about Joe Alioto?  He needed -- you know, in a big case like

2    this, he would come in, he only needed two documents:  He need

3    a document like this, the one I just read, and the Magna Carta,

4    and he won every case.

5            And you are going to be on the losing end of this

6    document, and with Andy Rubin on the stand.

7            **MR. VAN NEST:**  Judge Alsup, there is --

8            **THE COURT:**  You think about that.

9            And I want to say this:  If willful infringement is

10   found, there are profound implications for a permanent

11   injunction.  So you better think about that, and your client

12   ought to think about that.

13           I'm not saying there was willful, but that is a

14   serious factor when you are talking about an injunction.  If

15   somebody has willfully infringed, they had better be thinking

16   about an injunction.

17           **MR. VAN NEST:**  Your Honor --

18           **THE COURT:**  So you -- so how are you going to get

19   around this?

20           **MR. VAN NEST:**  Number -- two points, two points.

21           Number one, this is August 2010, this is 2010.  This

22   is after the Ellison crew has come in, about a month before the

23   lawsuit starts, and says, here's the patents, we think you're

24   infringing, you should take a license.

25           So this isn't back in the day when they are working

1    on the project, this is not in '05, '06, '07, '08, this is

2    2010.  I'm not sure this is even going to come into evidence.

3              These are negotiations by the parties --

4              **THE COURT:**  Why were they looking for an alternative

5    to Java, then?

6              **MR. VAN NEST:**  Because if Oracle comes in and says,

7    okay, you are going to have to spend all this money on a

8    lawsuit, and we are going to seek billions of dollars, the

9    question from the CEO is, is there any other way we can do this

10   and avoid it, altogether?

11             Now, let me point out a couple of things.  The

12   alternatives we're talking about here might be simply

13   alternative languages.  And again, Mr. Holtzman didn't dispute

14   that the Java programming language is open to everybody, open

15   to everybody.  You didn't hear him dispute that.

16             So what is happening in this e-mail --

17             **THE COURT:**  Well, explain that part to me.  Because

18   you keep saying that, but weren't there -- wasn't it open to

19   everyone, so long as there is no fragmentation, or so long as

20   you use their kit?  Is it really open to everyone, or were

21   there conditions?

22             **MR. VAN NEST:**  The programming language was open to

23   everyone.  You could use their virtual machine, if you didn't

24   fragment.  However, just yesterday, the boss -- you asked about

25   third parties that have no axe to grind?  The former CEO of

1   Sun, the guy making the decisions, said yesterday in deposition

2   under oath, Android is not a fragmentation of Java, Android is

3   a competitive alternative to Java.  I regarded Android as a

4   positive thing for Sun.  I wish it had been more positive, he

5   said, I wish it had been even more positive, they would have

6   paid me a lot of money, but even as it was, it was a positive,

7   and it is not fragmentation.

8           **THE COURT:**  Okay, wait, wait, that's an important

9   point.

10          Who said that?

11      **MR. VAN NEST:**  Jonathan Schwartz, who was the CEO

12  and president of Sun at the time, in 2007 and 2008.

13          **THE COURT:**  Where is he now?

14      **MR. VAN NEST:**  He's doing his own thing.  He left

15  Sun when Oracle came in and acquired because, as he put it

16  yesterday, I thought they already had a CEO.  So he is doing

17  his own independent development.  And he testified under

18  subpoena yesterday and said Java is not -- excuse me, Android

19  is not fragmentation.

20          But I want to come back to my --

21      **THE COURT:**  I -- you said something -- I'm going to

22  let you come back, but you also said something I want to make

23  sure I grasp.  You said that the Java software is open and

24  unconditional, and it's only the virtual machine that has this

25  kit; is that right?  Did I --

1        **MR. VAN NEST:**  The Java -- what I said was -- close.

2   It's the Java programming language; the language that you write

3   programs in is open to everyone.  And not even Oracle disputes

4   that.

5        **THE COURT:**  Okay, wait a minute:  Java program

6   language open, unconditional.

7        **MR. VAN NEST:**  Right.

8        **THE COURT:**  And what is it, then, that is

9   conditional?

10       **MR. VAN NEST:**  What's conditional is, if you want to

11  use Sun -- and many other companies developed a virtual machine

12  and a series of code libraries, so let's call them the Java

13  libraries and the Java virtual machine.  Anybody can take a

14  license to that, too.  Anybody can take a license to that for

15  free, nobody has to pay a penny for any of that.

16       But as to that, there are conditions.  The condition

17  is, if you take that license, which again, Your Honor, is open

18  free of charge, if you add your own code to it, you have to

19  make that public.

20       **THE COURT:**  All right, I got that distinction.

21       **MR. VAN NEST:**  Right.

22       **THE COURT:**  So two parts:  Does your Android use the

23  Java virtual machine?

24       **MR. VAN NEST:**  No.

25       **THE COURT:**  All right.

1           **MR. VAN NEST:**  It uses the Dalvik virtual machine.

2           **THE COURT:**  All right, so let's assume that's right

3    for the moment.

4           Does it use the code libraries?

5           **MR. VAN NEST:**  It uses code libraries that are

6    licensed from another party, Apache Software Foundation.  It

7    does not use the Java libraries, it uses --

8           **THE COURT:**  Well, then, what part of Java do you use

9    that you would need a license for?

10          **MR. VAN NEST:**  None.

11          **THE COURT:**  Then why did he write this memo?

12          **MR. VAN NEST:**  Well, what they're saying is -- and

13   again, this memo you are looking at is two weeks before the

14   lawsuit starts:  An alternative for us is take a license.

15   That's an alternative, take a license to the whole thing, take

16   a license to the code libraries and the virtual machine.

17          But what they have, and the reason Sun never sued

18   them, was that when they published Android, when they announced

19   it in '07 and launched the product in '08, they had a license

20   from Apache to use the libraries, that's not in dispute.

21          They had developed their own Dalvik virtual machine,

22   which now Oracle says infringes, but at the time, the position

23   of Sun was, welcome to Java, welcome to the community, we want

24   to work with you, I don't think you are a fragmentation, you

25   are a competitive alternative.  So that is from the number one,

```
 1   that's the boss, that's the CEO that was running the company --

 2              THE COURT:  What is that person's name?

 3         MR. VAN NEST:  Jonathan Schwartz.

 4              THE COURT:  Is he the one you deposed yesterday?

 5         MR. VAN NEST:  Yes, he is, right, deposed under

 6   subpoena yesterday here in town.

 7              THE COURT:  Hmm.

 8         MR. VAN NEST:  So I want to go back to the --

 9              THE COURT:  You got two minutes.

10         MR. VAN NEST:  Two minutes.

11              Couple of other key points.  One, they simply can't

12   get over the hump on the Entire Market Value Rule.  They made

13   no effort to link the asserted claims to any damages.  They can

14   talk about Java all day, they can talk about Android all day,

15   but until they start talking about the claims they are

16   asserting, even all 50 of them at this point, they don't have a

17   report that passes Daubert under **_Uniloc_** or under the Microsoft

18   **_Lucent_** case.

19              The other point I want to make is, he said that the

20   facts I gave you were all disputed, but then he didn't dispute

21   any.  In our brief at page 5, we recite all the statements that

22   I cited to you, Your Honor, that Sun made and Oracle made to

23   the SEC when they got approval for this deal.

24              Number one:  We are not aware of any instances where

25   we have refused to license the technology.
```

1                Number 2:  In licensing the entire system, not just

2        seven patents, the entire system in 2008, Sun charged a

3        diminimus percentage of software revenues, diminimus.

4                Third statement:  They said a projection for fiscal

5        year 2011 shows that with respect to all our significant

6        handset licenses, all of them, Nokia, Samsung, LG, Motorola,

7        they are going to generate a total of less than $70 million.

8        That's everybody, not just Google, not just Android, that is

9        the whole handset community.

10               So he said they were disputed, they are not

11       disputed.  They were in our brief.  They haven't disputed them

12       at all.

13               So the other point that I want to make is that if

14       the big issue here is fragmentation, and you kept asking, who

15       is going to come in, who is going to come in, who is going to

16       come in:  The guy in charge of this operation at Sun believed

17       in 2007 and 2008 and 2009 and 2010 and yesterday that Android

18       is not a fragmentation, Android is practicing using the Java

19       programming language with a proper license from Apache for the

20       libraries and its own Dalvik virtual machine.

21               And that is why in his view it was a good thing, not

22       a bad thing for Sun, and why he made the decision in 2007 and

23       2008 not to assert any patents they had, because this was a

24       good thing, not a fragmentation.

25               **THE COURT:**  Which -- the other side contends that

```
 1   there is fragmentation; does Oracle contend that the Dalvik

 2   virtual machine is fragmentation?

 3            MR. VAN NEST:  They contend that Android is

 4   fragmentation.  They say that the Android system, because it's

 5   not completely compatible with Java, is fragmentation.

 6            That's what they say, they say that it's

 7   fragmentation.  I say it's -- it uses Java programming

 8   language, and it uses technology built by Google or licensed

 9   properly from third parties; therefore, it doesn't infringe.

10            So our position is going to be, and will be, there

11   is no infringement, there's no willful infringement.  There is

12   still nothing in the record that shows Your Honor that at the

13   time Google was developing Android, at the time they announced

14   Android, or in 2008 when they launched Android, anybody had

15   shown them these Sun patents or anybody was aware of these Sun

16   patents or anybody inside Google thought they were infringing.

17            It's a little hard to imagine that when you announce

18   your product, and the guy at Sun says publicly on a blog, at a

19   conference, and in countless interviews -- it's not just what

20   he says now, he said it in interviews, he said it on blogs, he

21   said it at conferences, he said it to anybody that would

22   listen:  We welcome Google and we welcome Android to the Java

23   community.  Android is a pair of rockets strapped to Java.  It

24   is a set of rockets that is going to take our Java community

25   even higher.  It is 180 degrees --
```

 1                **THE COURT:**  Is that your term or his term?

 2                **MR. VAN NEST:**  That's his term.

 3                **THE COURT:**  Pair of rockets; kind of like the Space

 4     Shuttle.

 5                **MR. VAN NEST:**  Kind of like the Space Shuttle.

 6                **THE COURT:**  You know, you could have -- at the

 7     trial, you can have the --

 8                         **(Laughter.)**

 9                **THE COURT:**  -- Space Shuttle going off with the two

10     rockets, that would be a good graphic.

11                I need to ask the other side a question, if you

12     don't mind.

13                Assume for the sake of argument -- I know you

14     contend that this did not occur, but I would like to know what

15     you would say in this event:  Let's say someone like Google,

16     but not Google, had used just the Java program language and

17     nothing more; would that be a violation of any of your rights?

18                **MR. HOLTZMAN:**  It would not, Your Honor, but --

19                **THE COURT:**  All right.

20                **MR. HOLTZMAN:**  But the fundamental point is --

21                **THE COURT:**  Wait, wait, wait.

22                **MR. HOLTZMAN:**  Okay.

23                **THE COURT:**  So my next -- if somebody came up with

24     their own virtual machine, would that be a violation of Java?

25                **MR. HOLTZMAN:**  It might or it might not.  In this

1  case, it is.

2          **THE COURT:**  Let's say that they used the Java

3  programming language, which you say is not a violation, and

4  they come up with their own independent virtual machine that is

5  different from the virtual machine that Java has, so I guess,

6  theoretically, a virtual machine, even if you independently

7  developed it, might happen to infringe somebody's patent:  Is

8  that your theory, that they went into the clean room and just

9  happened to solve the problem the same way as your patent?

10          **MR. JACOBS:**  Can I cover this, Your Honor?

11          **THE COURT:**  Yes, of course.

12          **MR. JACOBS:**  No, it's more than that, Your Honor.

13          **THE COURT:**  Go ahead.

14          **MR. JACOBS:**  It started out with Java, it was Java

15  through and through.  And then they decided to do some

16  renaming, and they decided to add another layer.  And so the

17  basic architecture was retained.  It was retained with --

18          **THE COURT:**  But you admit that the Java programming

19  language is open to anybody.

20          **MR. JACOBS:**  Yes.  You and I can program in Java,

21  and we are not infringing anybody's --

22          **THE COURT:**  But so could Google.

23          **MR. JACOBS:**  But they didn't stay in just

24  programming in Java, Your Honor, they adopted the entire

25  architecture.

1          So actually, and in Android, for example, if I go

2     out and I write an Android application, I compile it in a Java

3     compiler, I output Java byte code at the next level down.

4          And they stuck on another layer and do a translation

5     into what they call dex code.  And then they have a virtual

6     machine for an Android's world:  Write once/run anywhere, and

7     by copying that architecture, our position is they --

8               **THE COURT:**  Wait, wait.

9          Is the patent on the architecture?

10              **MR. JACOBS:**  There are patents -- no.  There are

11    patents on the patented technologies.

12         Our testimony will show, the Google documents that

13    we will adduce will show, that once they went down that path,

14    in order to get satisfactory performance, in order to get

15    satisfactory memory usage, in order to provide satisfactory

16    security options to the Android community, they had to adopt

17    these technologies.  That will be our position.  That will be

18    our evidence.  That will be our expert's testimony.

19         And that will come in on the 29th, in part, and then

20    we will have Google witnesses on the stand at trial.  And we

21    will ask them, why did you adopt this technique?  And we will

22    hold them to their public announcement that says, we adopted

23    this technique in order to achieve satisfactory performance.

24    That is what will happen at trial.

25         And that is why our view is, on the fundamental

```
 1   factual questions that underpin our Entire Market Value Rule,

 2   we'll make our showing.

 3          THE COURT:  All right, time has run out.  It's a

 4   very interesting problem.

 5          I'm going to get an order out soon, so that's the

 6   best I can say to you.  And thank you for your hard work on

 7   this.  A lot of brains -- a lot of talent out there, is what I

 8   mean to say.

 9          Thank you.

10          MR. JACOBS:  Thank you, Your Honor.

11          MR. VAN NEST:  Your Honor?

12          THE COURT:  Yes?

13          MR. VAN NEST:  You asked us for a status report

14   on --

15          THE COURT:  I did.  I read your information on that.

16          MR. VAN NEST:  Do you need any further comment?

17          THE COURT:  I may -- I have some thoughts in mind.

18   And it was very useful to read your report, but I don't need to

19   take up your time.

20          MR. VAN NEST:  Thank you.

21          THE COURT:  But I may have a supplement on that

22   point.  Thank you.

23          MR. VAN NEST:  Appreciate it.

24          MR. JACOBS:  Thank you, Your Honor.

25               (Proceedings adjourned at 3:10 p.m.)
```

1

2                                    ---o0o---

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTER

I, Sahar Bartlett, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


**/s/ Sahar Bartlett**

**Sahar Bartlett, RPR, CSR No. 12963**

**Friday, July 22, 2011**