PAGES 1- 51

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM ALSUP, JUDGE

ORACLE AMERICA, INC.,

|                          |                             |
|--------------------------|-----------------------------|
|                          | )                           |
| PLAINTIFF,               | )                           |
|                          | )                           |
| VS.                      | ) NO. C 10-3561 WHA         |
|                          | )                           |
| GOOGLE, INC.,            | )                           |
|                          | ) SAN FRANCISCO, CALIFORNIA |
| DEFENDANT.               | ) FRIDAY                    |
|                          | ) AUGUST 19, 2011           |
| _____  | ) 8:00 O'CLOCK A.M.         |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF:**              **BOIES, SCHILLER & FLEXNER, LLP**
                                1999 HARRISON STREET, SUITE 900
                                OAKLAND, CALIFORNIA 94612
                                510-874-1460
                        BY:  **STEVEN C. HOLTZMAN, ESQUIRE**

AND

                                **MORRISON & FOERSTER LLP**
                                425 MARKET STREET
                                SAN FRANCISCO, CALIFORNIA 941205-7455

                        BY:  **MICHAEL A. JACOBS, ESQUIRE**

**FURTHER APPEARANCES ON NEXT PAGE**
*REPORTED BY:   KATHERINE WYATT, CSR 9866, RMR, RPR*
            *OFFICIAL REPORTER - US DISTRICT COURT*

1    **FURTHER APPEARANCES:**

2    **FOR DEFENDANT:**

3    **KEKER & VAN NEST LLP**

4    633 BATTERY STREET

5    SAN FRANCISCO, CALIFORNIA 94111-1809

6    **BY:  ROBERT A. VAN NEST, ESQUIRE**

7         **DANIEL PURCELL, ESQUIRE**

8    **ALSO PRESENT:**

9    **JOHN L. COOPER, ESQUIRE**

10   FARELLA BRAUN + MARTEL, LLP

11   RUSS BUILDING, 17TH FLOOR, 235 MONTGOMERY STREET

12   SAN FRANCISCO, CALIFORNIA 94104

13   954-4489

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   AUGUST 19, 2011                         8:00 O'CLOCK  A.M.

 2

 3                      P R O C E E D I N G S

 4            MR. VAN NEST:  GOOD MORNING, YOUR HONOR.

 5            MR. JACOBS:  GOOD MORNING, YOUR HONOR.

 6            THE COURT:  PLEASE BE SEATED.

 7            SO THIS IS ORACLE VERSUS GOGGLE, 10-3651.  LET'S HAVE

 8   OUR APPEARANCES, PLEASE.

 9            MR. VAN NEST:  GOOD MORNING, YOUR HONOR.  BOB VAN

10   NEST AND DAN PURCELL FROM KEKER & VAN NEST FOR GOOGLE.

11            THE COURT:  WELCOME.

12            MR. VAN NEST:  THANK YOU.

13            MR. JACOBS:  MICHAEL JACOBS AND STEVE HOLTZMAN FOR

14   ORACLE.

15            THE COURT:  OKAY. WELCOME TO YOU. OKAY.

16            WE'RE HERE BECAUSE I INVITED YOU HERE WITH RESPECT TO

17   THE 706 EXPERTS. SO DO WE HAVE OUR EXPERTS OUT THERE?

18            MR. VAN NEST:  WE DO, YOUR HONOR.

19            THE COURT:  OKAY.  GOOD.  AND I SEE ATTORNEY JOHN

20   COOPER THERE.

21            MR. COOPER:  GOOD MORNING.

22            THE COURT:  GOOD MORNING.  SO HERE'S WHAT I WANT TO

23   DO.  I WANT TO HAVE THE TWO EXPERTS COME SIT IN THE JURY BOX.

24   AND THEN, I WANT TO HAVE ATTORNEY COOPER COME SIT ON THE FRONT

25   ROW.
```

```
1                    THE LAW CLERK:  WOULD YOU LIKE ME TO MOVE?

2              THE COURT:  YOU CAN MOVE RIGHT OVER THERE.

3              THANK YOU.

4              HAVE YOU TWO GENTLEMEN MET MR. COOPER YET?

5              MR. KEARL:  YES, BRIEFLY.

6              THE COURT:  ALL RIGHT. WHY DON'T YOU EACH SIT ON THE

7   FRONT ROW?  YOU DON'T HAVE TO SIT SIDE-BY-SIDE.

8              MAYBE -- YES, SEATS ONE AND THREE WILL GIVE YOU

9   PLENTY OF ROOM TO SPREAD OUT.  THANK YOU.

10             WELCOME, AGAIN.  LET ME MAKE SURE I UNDERSTAND WHO IS

11  WHO.

12             YOU ARE WHO?

13             MR. DEGEN:  I'M CARL DEGEN.

14             THE COURT:  DEGEN?  DEGEN?

15             MR. DEGEN:  DEGEN.

16             THE COURT:  YOU ARE FROM WISCONSIN?

17             MR. DEGEN:  CORRECT.

18             THE COURT:  GOOD.  WE WILL COME BACK TO THAT.

19             AND YOU ARE WHO?

20             MR. KEARL:  JIM KEARL.

21             THE COURT:  AND YOU'RE FREE UTAH.

22             MR. KEARL:  YES.

23             THE COURT:  ALL RIGHT. SO, HERE IS THE SITUATION. WE

24  HAVE A PATENT CASE, POSSIBLY A PATENT AND COPYRIGHT CASE.  BUT I

25  WOULD SAY MAINLY A PATENT CASE. ONE SIDE IS ORACLE, ORACLE --
```

1    NOT ORACLE, BUT ORACLE SOMETHING.

2              **MR. VAN NEST:**   ORACLE AMERICA.

3              **THE COURT:**   ORACLE AMERICA. THEY ARE THE PLAINTIFF.

4              AND THEN, ON THE OTHER SIDE IS GOOGLE. AND THIS IS A

5    CASE WHERE ORACLE AMERICA IS ASSERTING PATENTS THAT IT ACQUIRED

6    THAT RELATE TO THE JAVA SYSTEM WHEN IT ACQUIRED THE SUN

7    MICROSYSTEMS COMPANY.

8              AND THEN, ORACLE SUED GOOGLE, AND PARTICULARLY WITH

9    RESPECT TO ITS ANDROID OPERATING SYSTEM, SAYING THAT IT

10   INFRINGES THOSE PATENTS. SO THAT'S A VERY SIMPLISTIC VIEW OF THE

11   CASE.

12             I HAVE HAD SOME DEALINGS WITH THE LAWYERS ALREADY ON

13   THE ISSUE OF DAMAGES, ASSUMING THAT LIABILITY IS PROVEN. AND

14   THAT HAS CAUSED THE COURT, MEANING ME, TO THINK THAT POSSIBLY,

15   VERY LIKELY, THE JURY WOULD BENEFIT FROM HAVING AN INDEPENDENT,

16   PROFESSIONAL VIEW AS OPPOSED TO THE VIEWS OF EXPERTS THAT ARE

17   RETAINED AND PAID FOR BY THE COMPETING SIDES.

18             NOW, OF COURSE, THE JURY WOULD STILL HEAR ALL OF THE

19   EXPERTS RETAINED BY THE TWO SIDES, BUT IN ADDITION THE JURY

20   WOULD HEAR THE COURT-APPOINTED EXPERT.  SO RULE 706 ALLOWS THE

21   JUDGE TO DO THIS.

22             THE FEDERAL CIRCUIT LAW ALLOWS THE JUDGE TO DO THIS,

23   ESPECIALLY IN A CASE LIKE THIS WHERE THE TWO SIDES ARE

24   DRAMATICALLY FAR APART, AND THE ISSUES ARE NOT SIMPLE.

25             SO I AM BASICALLY INTERVIEWING THE TWO OF YOU TO GIVE

1    YOU A HEADS-UP ON WHAT WOULD BE REQUIRED AND SEE IF YOU ARE

2    INTERESTED IN IT AND WHAT YOU WOULD CHARGE AND WHETHER YOU WOULD

3    DO THE WORK AS OPPOSED TO UNDERLININGS DOING THE WORK, WHICH IS

4    IMPORTANT TO ME. AND WHETHER YOU CAN EVEN FIT IT IN WITHIN THE

5    TIMETABLE WE'VE GOT. MAYBE YOU'RE UNABLE TO.

6             SO, IN ADDITION, ATTORNEY JOHN COOPER, WHO IS THE

7    MODEL OF THE OFFICER OF THE COURT WITHOUT ANY CHARGE, ZERO

8    CHARGE, HAS OFFERED TO REPRESENT WHOEVER OF YOU TWO GETS THIS

9    ASSIGNMENT TO ASSIST YOU.

10            IN OTHER WORDS, HERE YOU ARE THROWN INTO THIS LARGE

11   CASE. PROBABLY YOU COULD HANDLE IT ON YOUR OWN, BUT ATTORNEY

12   JOHN COOPER, WHO IS ONE OF THE FINEST LAWYERS IN CALIFORNIA,

13   PERHAPS AMERICA -- PROBABLY AMERICA -- CAN HELP GUIDE YOU

14   THROUGH THE PROCEDURES.  AND HE'S OFFERED TO DO THAT, AND I

15   CAN'T SAY HOW MUCH I APPRECIATE THAT.

16            I THINK WE'RE GOING TO START OFF, THOUGH, BY LETTING

17   EACH SIDE HAVE THREE OR FOUR MINUTES -- THEY DON'T KNOW THAT I'M

18   GOING TO MAKE THEM DO THIS -- TO JUST GIVE YOU THEIR PITCH TO

19   EXPLAIN THE CASE AND WHAT THEY SEE YOUR ROLE WOULD BE OR WHAT

20   THE ROLE OF THE DAMAGES ISSUE WOULD BE, AND SO THAT YOU CAN KIND

21   OF GET YOUR ARMS AROUND THE 50,000 FOOT VIEW OF THE CASE.

22            THAT'S ALL I'M INTERESTED IN AT THIS POINT. I'M NOT

23   INTERESTED IN THE DETAILS OF, YOU KNOW, HOW A PARTICULAR PATENT

24   GOT INFRINGED OR WHATEVER.

25            BUT I THINK IT WOULD BE IMPORTANT FOR YOU TO SEE AND

1    HEAR SOME OF THE EXCELLENT LAWYERS THAT ARE REPRESENTING BOTH

2    SIDES IN THIS CASE AND MAYBE IT WOULD HELP YOU ALSO TO LEARN

3    SOMETHING ABOUT THE CASE ITSELF.

4              SO, MR. JACOBS, YOU ARE THE PLAINTIFF. YOU GET TO GO

5    FIRST.

6              **MR. JACOBS:**  THANK YOU, YOUR HONOR.

7              GOOD MORNING, GENTLEMEN.

8              IN THE MIDDLE OF THE LAST DECADE, GOGGLE DECIDED TO

9    DEVELOP A PLATFORM FOR HANDSETS RECOGNIZING THAT, AS WE'VE ALL

10   COME TO KNOW, CARRYING AROUND A HANDSET, A MOBILE TELEPHONE,

11   WOULD BE THE OR AN IMPORTANT VEHICLE BY WHICH PEOPLE WOULD

12   ACCESS WEB SERVICES, INCLUDING GOOGLE SERVICES, INCLUDING GOOGLE

13   SEARCH, AND, THEREFORE, INCLUDING GOOGLE ADVERTISING, WHICH IS,

14   AFTER ALL, THE DRIVER OF GOOGLE'S REVENUES.

15             AND IN THAT PERIOD GOOGLE SET ABOUT DEVELOPING THIS

16   OPERATING SYSTEM AND BASING IT ON JAVA, WHICH WAS DEVELOPED BY

17   SUN, AND AS TO WHICH SUN HAS A RANGE OF INTELLECTUAL PROPERTY

18   RIGHTS, OR HAD A RANGE OF INTELLECTUAL PROPERTY RIGHTS.

19             IT HAD PATENTS.  IT HAD COPYRIGHTS.  IT HAD VARIOUS

20   LICENSING MECHANISMS.  IMPORTANT TO SUN AND IMPORTANT TO THE

21   SUCCESS OF JAVA WAS MAINTAINING JAVA COMPATIBILITY.  SO THE VERY

22   IDEA OF JAVA WAS:  WE'RE GOING TO PUT THIS LAYER OF SOFTWARE ON

23   A VARIETY OF DEVICES OUT THERE IN THE WORLD, WHICH MAY OTHERWISE

24   BE INCOMPATIBLE WITH EACH OTHER.  BUT BY PUTTING THIS LAYER ON

25   THERE WE'RE GOING TO CREATE COMPATIBILITY AND WE ARE GOING TO

1    ALLOW APPLICATIONS FROM A RANGE OF SOURCES TO RUN ON THIS

2    PLATFORM.

3                 AND SO THE JAVA PLATFORM FEATURED THIS CAPABILITY

4    KNOWN AS "WRITE ONCE, RUN ANYWHERE."

5                 GOOGLE DECIDED TO BASE ANDROID ON JAVA IN VARIOUS

6    WAYS AND ENGAGED SUN IN NEGOTIATIONS OVER A LICENSE THAT WOULD

7    PERMIT ANDROID'S DEVELOPMENT IN THE WAY THAT GOOGLE WANTED IT

8    DEVELOPED.

9                 ANDROID, IN PARTICULAR, GOOGLE WANTED TO OPEN SOURCE

10   ANDROID IN ORDER TO GAIN RAPID MARKET PENETRATION TO MAKE IT

11   VERY INEXPENSIVE FOR THE HANDSET MAKERS TO ADOPT IT.

12                THOSE NEGOTIATIONS INCLUDED VARIOUS BIDS AND ASKS.

13   THE COURT'S ORDER ON THE DAUBERT MOTION THAT GOOGLE FILED ON OUR

14   EARLIER DAMAGE REPORT RECOUNTS SOME OF THAT NEGOTIATION AND SOME

15   OF THE BIDS AND ASKS DURING THAT TIME FRAME.

16                ONE OF THE ELEMENTS OF THE NEGOTIATIONS WAS WHETHER

17   SUN WOULD GAIN A SHARE OF THE ADVERTISING REVENUE THAT WOULD

18   ACCRUE TO GOOGLE ON ACCOUNT OF THIS EXPANSION OF THE MARKET FOR

19   GOOGLE ADS ON ACCOUNT OF THE IMPLEMENTATION OF ANDROID ON ALL OF

20   THESE HANDSETS.

21                ANOTHER ASPECT OF THE NEGOTIATION WAS HOW WOULD WE,

22   WE SUN, WOULD ENSURE THAT ANDROID WOULD PRESERVE THIS WRITE ONCE

23   RUN ANYWHERE CAPABILITY FOR JAVA.

24                THE NEGOTIATIONS FAILED.  THERE WERE SEVERAL ROUNDS

25   OF SUCCESS.  THERE WERE SEVERAL SUCCESSIVE ROUNDS OF

1    NEGOTIATIONS. THEY FAILED, AS WELL.

2              ORACLE BOUGHT SUN. ACQUIRED, THEREFORE, THE

3    INTELLECTUAL PROPERTY ASSOCIATED WITH JAVA. JAVA WAS THE

4    FLAGSHIP AND COUNTED AS THE FLAGSHIP PRODUCT LINE OR ASPECT OF

5    SUN DURING THE ACQUISITION.

6              ANDROID HAS BEEN A PHENOMENAL SUCCESS. GOOGLE'S

7    BUSINESS STRATEGY FROM THE BUSINESS STANDPOINT HAS BEEN

8    EXTREMELY PROFITABLE FOR GOOGLE. DEVELOP AN OPERATING SYSTEM,

9    THAT'S ENGINEERING COSTS DISSEMINATED FOR FREE.  HANDSET MAKERS

10   ADOPT IT.  ADVERTISING REVENUE IN THE BILLIONS OF DOLLARS

11   ASSOCIATED WITH ANDROID AND ITS -- AND THE INCREMENTAL

12   ADVERTISING REVENUE HAS ENURED TO GOOGLE ON ACCOUNT OF IT.

13             ANDROID IS NOW PROLIFERATING INTO OTHER DEVICES, SO

14   PRESUMABLY THE REVENUE MODEL GOES BEYOND HANDSETS AND INTO OTHER

15   SPACES.

16             AFTER THE FAILURE OF A ROUND OF NEGOTIATIONS BETWEEN

17   ORACLE AND GOOGLE, ORACLE SUED FOR PATENT INFRINGEMENT AND FOR

18   COPYRIGHT INFRINGEMENT.  THE PATENT INFRINGEMENT RELATES TO

19   SEVEN PATENTS.

20             THE PARTIES HOTLY DISPUTE THE SIGNIFICANCE OF THESE

21   PATENTS. BUT THE EVIDENCE WE WILL BE PRESENTING WILL BE THAT

22   THESE PATENTS ARE VERY IMPORTANT TO THE COMMERCIAL SUCCESS OF

23   ANDROID BECAUSE THEY GO TO THINGS THAT USERS CARE A LOT ABOUT:

24   DOES MY HANDSET PERFORM VERY WELL?  DO THE APPLICATIONS MOVE UP

25   QUICKLY?  DO THEY RUN SMOOTHLY?  CAN I RUN A LOT OF

1    APPLICATIONS?  IN ANDROID, YOU CAN MULTITASK.  YOU CAN RUN

2    MULTIPLE APPLICATIONS SIMULTANEOUSLY.  THAT'S ONE OF THE

3    DIFFERENTIATORS OF ANDROID.

4            DO I HAVE THE ABILITY TO HAVE GOOD SECURITY ON MY

5    HANDSET?  SO WE WILL BE PRESENTING A LOT OF EVIDENCE ABOUT THESE

6    PATENTS.  NOT ONLY THAT THEY ARE INFRINGED, INFRINGED BY ANDROID

7    ON HANDSETS, INFRINGED BY ANDROID BEING DISTRIBUTED, ET CETERA,

8    BUT THAT THEY ARE QUITE VALUABLE.

9            THE COPYRIGHT ISSUE IS THAT GOGGLE, HAVING STARTED

10   OUT ON THIS PATH OF ADOPTING JAVA, THEN DEPARTED FROM THE JAVA

11   MODEL. IT DID NOT COMPLY WITH THE WRITE ONCE, RUN ANYWHERE

12   REGIME ASSOCIATED WITH JAVA.

13           THAT, TOO, IS ONE OF THE INJURIES THAT WE WILL BE

14   COUNTING ON THE PATENT SIDE AS WE TALLY UP OUR DAMAGES.  THE

15   JAVA PLATFORM HAS NOW BEEN FRAGMENTED BECAUSE GOOGLE PARTIALLY

16   ADOPTED JAVA.  THEY ADOPTED JAVA PROGRAMMING LANGUAGE.  AND MOST

17   IMPORTANTLY FOR PURPOSES OF OUR COPYRIGHT CLAIM THEY ADOPTED

18   AND IMPLEMENTED BOTH APPLICATION PROGRAM INTERFACES AND CODE FOR

19   EXTENSIONS TO THE JAVA PLATFORM CALLED "CLASS LIBRARIES."  37 OF

20   THEM ARE IN DISPUTE.

21           AND THEY, TOO, WERE EXTREMELY VALUABLE TO GOGGLE. IN

22   FACT, ON THIS POINT THE PARTIES ARE NOT IN DISPUTE.  GOOGLE'S

23   EXPERT SAYS THIS WAS ESSENTIALLY TO GAIN EARLY ADOPTION OF

24   ANDROID, BECAUSE THEY GAINED ACCESS TO THE JAVA COMMUNITY, THE

25   JAVA DEVELOPER COMMUNITIES, 6.5 MILLION OF THEM, OR SOMETHING

```
 1    LIKE THAT.  BY PARTIALLY ADOPTING JAVA, AND THEN FRAGMENTING IT

 2    AWAY FROM JAVA, THEY THREATENED THE VERY ESSENCE OF THE JAVA

 3    MODEL, THE JAVA PLATFORM, THE JAVA PROMISE.

 4              SO IN THE -- SO THE COPYRIGHT CLAIM AND THE DAMAGES

 5    CALCULATIONS, THE DAMAGES METHODOLOGIES ARE DIFFERENT FOR PATENT

 6    AND COPYRIGHT, AS YOU PROBABLY KNOW.

 7              THE COPYRIGHT CLAIM RELATES TO THESE 37 API'S THAT

 8    WERE IMPLEMENTED AND SOME OTHER EVIDENCE THAT WE HAVE OF REALLY

 9    LINE FOR LINE COPYING IN WHAT ARE CALLED THE "JAVA CORE

10    LIBRARIES."

11              IF YOU GO TO THE ANDROID WEBSITE AND YOU LOOK AT THE

12    DESCRIPTION OF ANDROID, IT SAYS:

13                   "WE OFFER THESE JAVA CODE LIBRARIES."

14              IF YOU LOOK AT THE ANDROID CORE LIBRARIES, THEY SAY:

15                   "JAVA DOT, LINE DOT."

16              SO, IN ESSENCE, THEN, FROM THE DAMAGES STANDPOINT, WE

17    HAVE AN ENORMOUSLY SUCCESSFUL BUSINESS MODEL.  IT DOESN'T

18    CONFORM TO THE TRADITIONAL DAMAGES CALCULATIONS BECAUSE ANDROID

19    IS NOT SOLD FOR A PRICE AS TO WHICH WE CAN ATTACH A PERCENTAGE

20    ROYALTY.  AND THEREIN, I THINK, LIES THE INTERESTING CHALLENGE

21    FOR DAMAGES EXPERTS ON BOTH SIDES IN THIS CASE:  HOW DO WE

22    CALCULATE AN APPROPRIATE COMPENSATION, ASSUMING LIABILITY, FOR

23    ORACLE AMERICA WHEN THE REVENUE MODEL IS NOT SELL ON A PER

24    DOLLAR CHARGE, BUT IS RATHER GENERATE ADVERTISING REVENUE.

25              INITIALLY, GOOGLE TOOK THE POSITION THAT THERE IS NO
```

1    DAMAGES BASE.

2              THE COURT'S DAUBERT RULING REJECTS THAT. SO WE'RE

3    INTO THE WORLD NOW OF CALCULATING DAMAGES BASED ON ADVERTISING

4    REVENUE.  AND THE ISSUE IS, IN A NUTSHELL, HOW MUCH?

5              AND AMONG THE HOTLY DISPUTED ISSUES WILL BE THE VALUE

6    OF THESE PATENTS AND HOW YOU CALCULATE OR ATTRIBUTE DAMAGES TO

7    THESE PATENTS GIVEN THEIR ROLE IN ANDROID, THE IMPLICATIONS OF

8    THE COPYRIGHT INFRINGEMENT.  WE WILL DO WHAT YOU NORMALLY DO IN

9    COPYRIGHT DAMAGES, WHICH IS PUT FORTH THE KIND OF REVENUE BASE.

10   AND THEN, THERE WILL BE APPORTIONMENT ISSUES.

11             SO I THINK THAT BOTH GIVES YOU OUR VIEW THAT WE'RE

12   ENTITLED TO VERY SUBSTANTIAL COMPENSATION BASED ON THE KIND OF

13   HISTORY OF THE NEGOTIATIONS OF THE PARTIES, THE ENORMOUS SUCCESS

14   OF ANDROID, THE FACT OF THE TAKING, IF YOU WILL, THE STRATEGIC

15   DECISION TO BASE ANDROID ON JAVA, BUT FRAGMENT JAVA.

16             WE WILL BE SEEKING VERY LARGE COMPENSATION FOR ORACLE

17   AMERICA ARISING OUT OF THAT INFRINGEMENT.

18             **THE COURT:**  ALL RIGHT.  THANK YOU, MR. JACOBS.

19             MR. VAN NEST.

20             **MR. VAN NEST:**  GOOD MORNING, YOUR HONOR.  IT'S ALWAYS

21   EXCITING TO COME IN.  JUDGE ALSUP ALWAYS HAS LOTS OF SURPRISES

22   FOR US, AND THIS IS ONE.

23             AS I SAID EARLIER, I WANT TO THANK BOTH OF YOU FOR

24   COMING OUT AND PARTICIPATING THIS MORNING.

25             THE SHORT STORY FROM GOOGLE'S STANDPOINT IS THAT

1   EVERYBODY WAS CHASING THE SMART PHONE MARKET.  WE ALL HAVE OUR

2   BLACKBERRIES.  YOU KNOW WHAT IPHONE IS.  BACK THEN THAT MARKET

3   WAS NOT YET DEVELOPED.

4           AND GOOGLE HAD A COUPLE OF OPTIONS IN COMING UP WITH

5   SMART PHONE.  THEY COULD BUILD THEIR OWN.  THEY HAD A BIG

6   ENGINEERING STAFF THAT RAN AND BUILT GOOGLE. THEY COULD GO OUT

7   AND PARTNER WITH SOMEBODY AND BUILD IT TOGETHER.

8           SO THEY HAD AN INTERNAL STAFF.  THEY WERE WORKING ON

9   SMART PHONE.  THEY HAD A SERIES OF MEETINGS.  THEY LOOKED AT A

10  LOT OF DIFFERENT COMPANIES.  THEY TALKED TO MANY DIFFERENT

11  POTENTIAL PARTNERS, INCLUDING SUN.  AND SUN HAD JAVA.

12          JAVA, IT'S IMPORTANT TO UNDERSTAND, IS A LOT

13  DIFFERENT THINGS.  WE SAY "JAVA" AS THOUGH IT'S ONE THING, BUT

14  IT'S LOTS OF COMPONENTS.

15          IT'S A PROGRAMMING LANGUAGE LIKE C OR C PLUS.  IT'S

16  OPEN. ANYBODY CAN USE IT.  THERE'S NO DISPUTE IN THIS CASE THAT

17  JAVA PROGRAMMING LANGUAGE, FREE FOR ANYBODY TO USE, AND JUDGE

18  ALSUP HAS ALREADY ACKNOWLEDGED THAT.

19          THERE ARE JAVA CODE LIBRARIES MR. JACOBS REFERRED TO.

20  THERE IS A JAVA VIRTUAL MACHINE.  THERE ARE LOTS OF DIFFERENT

21  STYLES OF JAVA VIRTUAL MACHINES BECAUSE JAVA IS AN OPEN SOURCE

22  SYSTEM.

23          SO GOOGLE HAD A VARIETY OF OPTIONS FOR WRITING THIS

24  CODE.  COULD HAVE USED C PLUS. COULD HAVE USED C.  COULD HAVE

25  USED JAVA.  TALKED TO A LOT OF DIFFERENT VENDORS.  HAD A SERIES

1   OF DISCUSSIONS WITH SUN.  AND AS MR. JACOBS MENTIONED, THOSE

2   DISCUSSIONS WERE ALONG THE LINES OF A TECHNOLOGY PARTNERSHIP.

3   THE IDEA WAS WE, GOOGLE, HAVE THIS ANDROID PROJECT. WE HAVE

4   ENGINEERS WORKING ON IT.  WE'D LIKE TO WORK WITH YOU GUYS AT

5   SUN, AND BRING YOUR ENGINEERS TO THE TABLE. LET'S BUILD A PHONE

6   TOGETHER.

7           THEY HAD A SERIES OF DISCUSSIONS IN '05, IN '06.

8   THOSE ULTIMATELY FAILED. AND THEY FAILED, REALLY, BECAUSE MORE

9   OF BUSINESS ISSUES THAN OF MONEY.

10          GOOGLE AND SUN DISCUSSED A NUMBER OF FINANCIAL

11  MODELS. AT ONE POINT SUN ASKED FOR A HUNDRED MILLION DOLLARS AS

12  PART OF THIS TECHNOLOGY PARTNERSHIP.

13          GOOGLE SAID:  "NO, THAT'S TOO EXPENSIVE."

14          SEVERAL MONTHS LATER THE NUMBER WENT DOWN. SEVERAL

15  MONTHS LATER IT WENT DOWN AGAIN.

16          IT FINALLY GOT DOWN TO ABOUT $26 MILLION, AND GOOGLE

17  SAID:  "NO, THAT'S TOO MUCH.  I MEAN, THIS IS AN EQUAL

18  PARTNERSHIP.  WE'RE BOTH GOING TO MAKE MONEY OTHER WAYS THAN

19  CHARGING FOR ANDROID.  WE'RE GOING TO MAKE IT ON OTHER TYPES OF

20  SERVICES THAT WE EACH PROVIDE."

21          INTERESTING THING.  WE'VE HAD THE OPPORTUNITY TO

22  DEPOSE SOME OF THE BIG PLAYERS IN THE INDUSTRY.

23          JONATHAN SCHWARTZ WAS DEPOSED.  USED TO BE THE CEO OF

24  SUN.

25          LARRY ELLISON WAS DEPOSED.

1          MR. SCHWARTZ TESTIFIED THAT GIVEN WHAT HE KNEW AND

2     GIVEN WHAT HE THOUGHT WAS GOING TO BE THE SUCCESS OF ANDROID, HE

3     WOULD HAVE PAID MONEY, PAID MONEY TO GOOGLE HAD THEY BEEN ABLE

4     TO COME TO BUSINESS TERMS IN ORDER TO GET A DEAL AND BE PART OF

5     THE ANDROID FAMILY.

6          THAT DIDN'T HAPPEN. ANDROID WAS RELEASED.  WHEN IT

7     WAS RELEASED IN '07, SCHWARTZ AND SUN SAID:  "WELCOME, ANDROID,

8     TO THE JAVA COMMUNITY.  WE LOVE HAVING YOU.  YOU'RE A ROCKET

9     THAT'S GOING TO TAKE JAVA HIGHER."

10         THEY WERE HAPPY THAT ANDROID HAD ADOPTED JAVA, THE

11    PROGRAMMING LANGUAGE.  AND THEY WERE HAPPY TO HAVE IT AS PART OF

12    THE GROUP.

13         WHEN MR. ELLISON BOUGHT THE COMPANY IN 2009, HE, TOO,

14    SAID: "I'M FLATTERED THAT ANDROID IS USING JAVA. WE'RE

15    FLATTERED TO HAVE ANDROID USING IT BECAUSE WE WANT JAVA TO BE

16    EVERYWHERE."

17         NOW, WHAT'S IMPORTANT TO UNDERSTAND IS YOU GUYS WON'T

18    BE ASKED TO DECIDE INFRINGEMENT.  BUT JUST SO YOU KNOW IT, WE

19    ACKNOWLEDGE THAT WE USED THE JAVA PROGRAMMING LANGUAGE.  WE

20    WROTE OUR OWN CODE LIBRARIES. WE WROTE OUR OWN VIRTUAL MACHINE

21    WE DO NOT INFRINGE THE JAVA PATENTS.

22         THESE JAVA PATENTS THAT ARE STILL IN THE CASE ARE

23    SEVEN. THEY AFFECT TWO OR THREE AREAS OF JAVA BUT, IN EFFECT,

24    THEY ARE TWEAKS, IMPROVEMENTS.  A NUMBER OF THEM WERE NEVER USED

25    IN JAVA ITSELF.  THEY WERE SIMPLY INVENTIONS.  THE INVENTORS

1   HAVE TESTIFIED THAT THEY WERE NEVER IMPLEMENTED, NEVER USED.

2           SOME OF THEM PERTAIN TO CODE THAT WAS NEVER INCLUDED

3   IN EITHER JAVA OR ANDROID. SO THERE'S A HOT DEBATE ABOUT THE

4   IMPORTANCE OF THESE AND A HOT DEBATE ABOUT THE SIGNIFICANCE OF

5   THEM.

6           ORACLE CAME IN WITH AN EXPERT REPORT. IT WAS A MULTI

7   BILLION DOLLAR REPORT.  IT WAS ALONG THE LINES OF WHAT MR.

8   JACOBS SAID:  ALL THIS ADVERTISING REVENUE AND THE LIKE.

9           WE FILED A MOTION TO STRIKE IT.  JUDGE ALSUP STRUCK

10  IT.  AND HE LAID OUT A ROADMAP. NOW, THE ROADMAP THAT HE LAID

11  OUT, WHICH IS AN ORDER THAT YOU GENTLEMEN WILL HAVE AN

12  OPPORTUNITY TO READ ESSENTIALLY SAYS:  "HEY, YOU GOT TO TIE THE

13  VALUE TO THESE PATENTS.  WE'RE NOT TALKING ABOUT ALL THE JAVA.

14  WE'RE TALKING ABOUT THESE SPECIFIC PATENTS?  YOU HAVE TO TIE

15  THERE LIKE WE DO IN EVERY OTHER CASE."

16          WE ALL KNOW THE CASE LAW IN THIS AREA. AND SO THIS

17  EXPERT DIDN'T DO THAT. AND A NEW EXPERT HAS GOT TO DO IT.  AND

18  WHAT JUDGE ALSUP SUGGESTED, WHICH WE THINK IS A GOOD IDEA, IS

19  LOOK BACK AT WHAT WAS THE NEGOTIATION BETWEEN THE PARTIES?  WHAT

20  WERE THE FACTORS THEY HAD IN MIND?

21          AND CERTAINLY ADVERTISING REVENUE, AT LEAST ON MOBILE

22  DEVICES, WAS ONE OF THE THINGS THAT GOOGLE WAS LOOKING FOR, NO

23  DOUBT ABOUT THAT.

24          ONE OF THE THINGS SUN WAS LOOKING FOR WAS GREATER

25  NOTORIETY FOR JAVA AND A GREATER BOOST FOR JAVA.

1          SO WE HAVE A RECORD OF ACTUAL NEGOTIATIONS WHICH

2     FAILED AT AROUND $26 MILLION. WHAT JUDGE ALSUP SUGGESTED WAS

3     TAKE A LOOK AT THOSE NEGOTIATIONS.  START THERE AND ADJUST UP OR

4     DOWN, DEPENDING ON WHAT OTHER FACTORS MAY COME INTO PLAY.

5          THOSE NEGOTIATIONS WERE FOR THE ENTIRETY, ALL THE

6     JAVA LIBRARIES, THE JAVA VIRTUAL MACHINE.  ALL OF JAVA, NOT JUST

7     THESE SEVEN REMAINING PATENTS. AND THERE WOULD BE FACTORS FOR

8     ACCOUNTING.  BUT WHAT WE THINK ONE OF THE MOST FACTORS IS WHAT

9     THE PARTIES ACTUALLY SAID AND DID.

10          JONATHAN SCHWARTZ WAS RUNNING SUN.  ANDY RUBIN WAS

11    RUNNING THE ANDROID PROJECT AT GOOGLE.  THERE'S A GOOD RECORD OF

12    WHAT THEY SAID TO EACH OTHER AND HOW THIS CAME ABOUT.

13          MR. SCHWARTZ HAS TESTIFIED ABOUT IT.  MR. RUBIN HAS

14    TESTIFIED ABOUT IT.  SO THERE'S A VERY GOOD RECORD TO WORK FROM.

15    AND WE LOOK FORWARD TO WORKING WITH WHICHEVER ONE OF YOU

16    GENTLEMEN IS SELECTED.  AND, AGAIN, THANKS VERY MUCH FOR BEING

17    HERE THIS MORNING.

18          **THE COURT:**  ALL RIGHT.  THANK YOU.  WELL, YOU BOTH

19    DID A GREAT JOB WITH NO NOTICE.  SO THANKS FOR RISING TO THE

20    OCCASION.

21          LET ME GIVE YOU A WORD OR TWO ABOUT WHAT THE

22    ASSIGNMENT WOULD BE. IT WOULD NOT BE BEING LIKE A LAW CLERK TO

23    ME. SOMETIMES JUDGES DO HAVE AN EXPERT COME IN TO ADVISE THE

24    JUDGE CONFIDENTIALITY. THAT'S NOT WHAT I HAVE IN MIND.

25          IN FACT, I DON'T WANT TO YOU GIVE ME -- YOU WOULD BE

1    TESTIFYING BEFORE THE JURY TO GIVE THE JURY YOUR BEST

2    PROFESSIONAL OPINION. AND I WOULD MOST LIKELY SAY TO THE JURY TO

3    EXPLAIN WHY YOU'RE THERE, THAT THE COURT HAS APPOINTED YOU AND

4    THAT NOT TO GIVE YOUR WEIGHT -- YOUR OPINION ANY MORE WEIGHT ON

5    THAT ACCOUNT.  BUT BY WAY OF EXPLANATION WHY THERE ARE THREE

6    EXPERTS INSTEAD OF JUST TWO.

7              SO YOU WOULD NOT BE MY LAW CLERK OR MY SPECIAL

8    ADVISOR. YOU WOULD BE APPEARING IN THIS SPECIAL ROLE THAT RULE

9    706 OF THE FEDERAL RULES OF EVIDENCE ALLOWS FOR.

10             WE WOULD WANT YOUR INDEPENDENT JUDGMENT, PROFESSIONAL

11   JUDGMENT. YOU WOULD NOT BE A MEDIATOR. I WOULD NOT WANT YOU

12   TO -- IN FACT, I WOULD SAY TO YOU IN YOUR WRITTEN INSTRUCTIONS

13   THAT YOU ARE NOT TO VIEW YOURSELF AS SOME KIND OF MEDIATOR TO

14   SAY:

15             "WELL, OKAY.  ONE SIDE WANTS X.  THE OTHER SIDE

16             WANTS Y.  WE WILL SPLIT THE DIFFERENCE," OR SOMETHING

17   LIKE THAT. ONE SIDE MAY BE TOTALLY RIGHT. BOTH SIDES MAY BE

18   TOTALLY WRONG. YOU MAY THINK A PARTICULAR ITEM IS WORTH ZERO.

19             WHEREAS, THE OTHER TWO SIDES WOULD SAY IT'S WORTH

20   SOMETHING. IN OTHER WORDS, YOU'RE NOT THERE TO SPLIT THE

21   DIFFERENCE OR TO MEDIATE. YOU ARE THERE TO GIVE YOUR OWN

22   PROFESSIONAL OPINION AND, OF COURSE, AS WELL TO CRITIQUE WHAT

23   THE TWO OTHER EXPERTS HAVE DONE.

24             NOW, THAT COMES TO:  WHAT HAVE THEY DONE?  I KNOW YOU

25   ARE THINKING:  WHAT IS THE STATUS OF THIS CASE?

```
1              DO WE EVEN HAVE THE PLAINTIFF'S EXPERT REPORT YET?

2              NOT YET, I THINK. WHEN IS IT GOING TO BE DUE?  35

3    DAYS BEFORE THE PRETRIAL CONFERENCE, RIGHT?

4              MR. HOLTZMAN:  THAT WILL BE SEPTEMBER 12.

5              THE COURT:  SO SEPTEMBER 12, COUPLE WEEKS FROM NOW,

6    WE WILL HAVE THE OPENING REPORT.

7              AND THEN, WHEN IS YOUR REPORT GOING TO BE DUE?

8              MR. VAN NEST:  I BELIEVE IT'S DUE OCTOBER 4TH, YOUR

9    HONOR, TWO WEEKS BEFORE THE PRETRIAL.

10             THE COURT:  ALL RIGHT.  AND THEN, THE TRIAL ITSELF IS

11   OCTOBER 31.

12             NOW, AS A FOOTNOTE ON THAT, MY 12 YEARS ON THIS JOB I

13   HAVE DONE OVER A HUNDRED TRIALS. ONLY TWO OF THOSE EVER HAD TO

14   SLIP. BY "SLIP" I MEAN 98 OF THEM WENT TO TRIAL TO THE MINUTE

15   THAT I HAD SET. THIS CASE, THOUGH, I CANNOT PROMISE YOU THAT.

16             EVEN IF THE LAWYERS ARE TOTALLY READY, WHICH I THINK

17   THEY WILL BE, I HAVE A MASSIVE CRIMINAL CASE THAT IS NOW -- THE

18   FIRST PART OF WHICH THE JURY IS DELIBERATING ON RIGHT NOW IN

19   ANOTHER COURTROOM.

20             AND THE SECOND PART WHICH IS SET TO START ON

21   OCTOBER 16TH. IF THAT CASE GOES ON OCTOBER 16TH, I CANNOT TRY

22   THIS CASE ON OCTOBER 31. IT WOULD BE ANOTHER THREE TO FOUR

23   MONTH. THIS ONE WAS SIX MONTHS.  THAT ONE WILL BE THREE OR FOUR

24   MONTHS.

25             AND THE CRIMINAL CALENDAR MUST TAKE PRIORITY UNDER
```

```
 1   THE SPEEDY TRIAL ACT. SO THAT IS A TOTAL QUESTION MARK. I DON'T

 2   KNOW WHERE THAT COMES OUT. BUT RIGHT NOW THE SCHEDULE IS

 3   OCTOBER 31.

 4            YES, SIR EXPERT.

 5            MR. DEGEN:  AS I EXPLAINED TO COUNSEL WHEN THEY

 6   CONTACTED ME, I HAVE COMMITMENTS THE WEEK OF THE 14TH IN

 7   NOVEMBER AND THE WEEK OF THE 21ST OF NOVEMBER. SO IF THIS

 8   DOESN'T SLIP I'M PRETTY CONFLICTED.

 9            THE COURT:  YES. WELL, ALL RIGHT. I'M NOT GOING TO

10   SAY THAT'S A DEAL-KILLER YET, BECAUSE I DON'T KNOW THAT IT'S A

11   DEAL-KILLER YET.  SO LET'S WAIT. LET'S WAIT.

12            MR. DEGEN:  OKAY.

13            THE COURT:  BUT YOU ARE RIGHT TO BRING THAT UP.

14            ALL RIGHT. SO THAT IS OUR PRESENT SCHEDULE, AND THESE

15   LAWYERS HAVE BEEN WORKING VERY HARD TO STAY ON IT.  AND SO HAVE

16   WE, TO BE HONEST.  I WON'T SAY HOW HARD I'VE BEEN WORKING, BUT

17   I'VE BEEN WORKING VERY HARD TO GET THE ORDERS OUT IN THIS CASE

18   EVEN THOUGH I'VE BEEN EMBROILED IN THIS LARGE CRIMINAL GANG

19   CASE.

20            SO WE'RE HOPING THAT OCTOBER 31 WE'LL GO.  THE TRIAL

21   IS SUPPOSED TO BE THREE WEEKS LONG. IT WILL INVOLVE SEVEN

22   PATENTS.  AND PLAINTIFF'S COUNSEL SAYS THEY ARE GOING TO GET IT

23   DOWN TO A TRIABLE NUMBER.

24            ALL RIGHT. HERE'S WHAT I THINK SOME OF THE FACTORS

25   WOULD BE OF IMPORTANCE TO THE COURT. I WOULD WANT YOU TO DO THE
```

```
1    WORK AND NOT UNDERLINGS. I CAN'T SAY THAT YOU COULDN'T DELEGATE.

2               I WORK ALLOW YOU TO DELEGATE SOME MINOR MINISTERIAL

3    THINGS TO AN ASSISTANT. BUT I KNOW HOW THESE LARGE COMPANIES

4    LIKE YOURS WORK.  IT KIND OF ALL FILTERS UP TO THE TOP.  AND

5    WHEN YOU GO IN TO TESTIFY, I WANT YOU TO BE THOROUGHLY VERSED IN

6    IT.  AND SO I WOULD WANT YOU TO MINIMIZE ASSISTANTS AND MAXIMIZE

7    YOUR OWN, YOU KNOW, BRAIN POWER ON THE PROJECT.

8               I WOULD WANT YOU TO READ AND CRITIQUE THE TWO

9    REPORTS. IN ORDER FOR YOU TO DO THAT YOU ARE GOING TO HAVE TO

10   KNOW A LOT OF MATERIAL. YOU WOULD HAVE TO GET THAT MATERIAL FROM

11   THE LAWYERS, AND REVIEW AND ANALYZE IT YOURSELF.

12               YOU COULD READ THAT -- I'LL GIVE YOU A COPY OF THAT

13   ORDER THAT I PUT OUT, BUT BOTH SIDES WON SOME POINTS IN THAT.

14   AND IT REALLY IS JUST A STARTING POINT FOR DOING A MORE FINAL

15   ANALYSIS THAT YOU WOULD BE EXPECTED TO DO.

16               BUT I WOULD WANT YOU TO CRITIQUE BOTH SIDE'S REPORTS

17   FOR THE JURY, AND THEN GIVE YOUR OWN INDEPENDENT VIEW OF WHAT

18   THE RIGHT ANSWER IS OR A RANGE OF WHAT THE RIGHT ANSWER COULD

19   BE. AND GIVE GUIDANCE TO THE JURY SO THAT THEY WILL HAVE SOMEONE

20   WHO IS NOT A COMPLETE ADVOCATE, BUT IS SOMEONE WHO IS MORE

21   DETACHED AND TO EXPLAIN TO THE JURY, YOU KNOW:  "HERE ARE SOME

22   OF THE CONSIDERATIONS.  THESE ARE MORE IMPORTANT. THESE ARE LESS

23   IMPORTANT. HERE ARE SOME RANGES."

24               WHAT THE INTERCONNECTIONS ARE BETWEEN FACTOR A AND

25   FACTOR B.
```

1              SO THAT'S THE GENERAL DESCRIPTION OF THE ASSIGNMENT.

2              I THINK THAT YOU -- BOTH SIDES, OF COURSE, AT TRIAL

3    WOULD CROSS-EXAMINE YOU. THAT'S FINE. AND BOTH SIDES WOULD TAKE

4    YOUR DEPOSITION BEFORE THE TRIAL STARTED.

5              I THINK IT WOULD BE A GOOD IDEA IF YOU WANTED TO, BUT

6    THIS ONE I WOULD WANT TO MAKE SURE THAT EVERYONE AGREED TO IT,

7    THAT YOU WOULD -- YOU COULD INTERVIEW THE OTHER EXPERTS WITHOUT,

8    YOU KNOW, OFF THE RECORD. NOT "OFF THE RECORD." I MEAN, WITHOUT

9    IT BEING RECORDED IS WHAT I MEAN. IT COULD BE -- BUT YOU MIGHT

10   READ THEIR REPORT, ASK THEM QUESTIONS, BOTH SIDES.  SEE IF THERE

11   ARE AMBIGUITIES, GET THOSE CLARIFIED. ASK FOR THE BACKUP ON

12   SOMETHING.

13             IF THAT IN YOUR OWN PROFESSIONAL OPINION WOULD BE

14   SOMETHING THAT WOULD BE USEFUL TO YOU, THEN I WOULD WANT TO TRY

15   TO MAKE THAT HAPPEN.

16             AGAIN, THOUGH, IT WOULD NOT BE A MEDIATION. THIS IS

17   NOT A MEDIATION. AND THE TIMES THAT I'VE DONE THIS IN THE PAST I

18   HAVE ASKED -- I'M GOING TO ASK YOU AFTER YOU LEAVE TODAY TO SEND

19   ME A LETTER EXPLAINING WHAT YOU THINK OF THIS PROCESS, WHETHER

20   YOU'RE WILLING TO DO IT, AND IF SO, AT WHAT PRICE AND HOW YOU

21   WOULD STAFF IT, WHICH I HOPE THE ANSWER IS 90 PERCENT YOU AND

22   TEN PERCENT SOMEBODY ELSE.  OR 80 PERCENT YOU AND 20 PERCENT

23   SOME ASSISTANT, AND WHAT THE STRUCTURE WOULD BE.

24             I HOPE YOU WILL REMEMBER THAT TO AVOID THE APPEARANCE

25   THAT THE COURT HAS TURNED THIS INTO A BOONDOGGLE FOR SOMEBODY, I

1   WOULD PREFER THAT YOUR BILLING RATE BE A LITTLE LESS THAN YOU

2   NORMALLY WOULD BILL.

3          SO YOU THINK ABOUT THAT.  I WOULDN'T REQUIRE IT. IT'S

4   JUST A FACTOR THAT I WOULD LIKE TO TAKE INTO ACCOUNT. SO WITH

5   THAT BACKGROUND -- OH, ONE OTHER THING. YOU KNOW, IF YOU HAD

6   DONE -- IF YOU HAD TESTIFIED BEFORE OR PREPARED REPORTS BEFORE

7   THAT YOU THINK WOULD COMPROMISE YOUR FREEDOM OF MOVEMENT, IN

8   OTHER WORDS, IF YOU HAVE ALREADY BOXED YOURSELF IN BY

9   REPRESENTING SOMEBODY IN A PATENT CASE WHERE YOU TOOK A POSITION

10  THAT IS GOING TO BE HARD TO EXPLAIN IN THIS CASE AND HAS SORT OF

11  COMMITTED YOU TO A POSITION, I THINK I SHOULD KNOW ABOUT THAT

12  NOW.

13         SO IF YOU -- IF ANYTHING COMES -- MAYBE IT WOULD BE

14  UNFAIR TO ASK YOU ON THE SPOT.  BUT YOU WOULD NEED TO DISCLOSE

15  THAT TO ME IN A LETTER BECAUSE YOU CAN SEE HOW IF YOU WERE TO

16  TAKE A POSITION, YOU KNOW, X, Y, Z, BUT TWO YEARS AGO IN A

17  DIFFERENT PATENT CASE YOU TOOK "NO" TO X, Y, Z, YOU WOULD BE

18  IMPEACHED FOR THAT.

19         AND SO I AM LOOKING FOR SOMEBODY WHO IS

20  UNIMPEACHABLE. YOU KNOW, AT LEAST UNIMPEACHABLE WITH PRIOR

21  INCONSISTENT STATEMENTS.

22         THAT'S WHAT I'M LOOKING FOR.  IF YOU TOLD ME THAT

23  YOU COULD DO IT, BUT IT MIGHT BE -- YOU MIGHT NEED AN EXTRA

24  MONTH, I WOULD CONSIDER MOVING THE TRIAL A MONTH TO ACCOMMODATE

25  YOU.  BUT I PROBABLY WOULD NOT DO IT FOR THAT REASON ALONE.  IT

1    MIGHT HAVE TO BE IN COMBINATION WITH OTHER CALENDAR PROBLEMS

2    THAT I HAVE.

3              BUT IT WOULD BE AN IMPORTANT FACTOR TO TAKE INTO

4    ACCOUNT.

5              YES, SIR.

6              **MR. DEGEN:**  I'M NOT FAMILIAR WITH THE RANGE OF

7    DOCUMENTS THAT HAVE BEEN PRODUCED IN THIS CASE, BUT ON THE KIND

8    OF SCHEDULE THAT YOU'RE TALKING ABOUT I WOULD BE FORCED TO

9    ESSENTIALLY RELY ON THE DOCUMENT SYNTHESIS THAT'S IN THE TWO

10   OPPOSING REPORTS THAT ARE BEFORE YOU. AND I HEAR YOU SAYING YOU

11   DON'T WANT A MEDIATOR.

12             BUT IN THE LIMITED TIME AVAILABLE IT WOULD BE

13   ESSENTIALLY IMPOSSIBLE TO COMPLETE A DE NOVO REVIEW OF ALL

14   UNDERLYING DOCUMENTS, ESPECIALLY WITHOUT CONSIDERABLE

15   ASSISTANCE.

16             SO WOULD YOU BE COMFORTABLE WITH THE NOTION THAT THE

17   FACTS EITHER OF US WOULD BE WORKING WITH WOULD BE TO A LARGE

18   EXTENT THE FACTS THAT EITHER SIDE HAS BROUGHT FORTH IN THEIR

19   REPORTS, OR, YOU KNOW, THE MAIN DOCUMENTS THAT THEY ARE CITING?

20             **THE COURT:**  THAT'S A POSSIBILITY. WELL, YOU KNOW,

21   THAT WOULD -- IT MAY BE THAT THE EXPERTS HAVE A UNIVERSE OF

22   MATERIALS THAT THEY THEMSELVES REVIEWED.  AND THEN, YOU COULD

23   REVIEW THE SAME UNIVERSE THAT THEY REVIEWED, WHICH WOULD NOT BE

24   THE ENTIRE UNIVERSE OF THE ENTIRE CASE, I ASSUME. I DON'T KNOW.

25             HAVE THE EXPERTS REVIEWED EVERY DOCUMENT IN THE CASE?

1    WHAT IS THE UNIVERSE THAT THE EXPERTS HAVE LOOKED AT SO FAR?

2              **MR. HOLTZMAN:**  ON OUR SIDE, YOUR HONOR, THE EXPERTS

3    HAVE HAD FULL ACCESS.  THOSE HAVE BEEN PRODUCED.  WHAT

4    PERCENTAGE OF THAT IS VERY LARGE NUMBER.  WHAT THEY HAVE ARRIVED

5    ON IS A LITTLE HARD TO SAY.  AND, OF COURSE, IT'S A SYNTHESIS.

6              **THE COURT:**  WOULD IT BE MORE THAN FIVE OR SIX BOXES

7    FULL OF DOCUMENTS?

8              **MR. HOLTZMAN:**  I THINK UNLIKELY.  AND THEY ARE LONG

9    LISTS.  IT'S BEEN IN THEIR REPORT, TOO, BUT IN OUR REPORT AS

10   WELL AS TO THE CASE.  AND THE INITIAL REPORT MADE IS A VERY LONG

11   LIST OF DOCUMENTS RELIED ON.  GOES ON FOR SEVERAL PAGES OF

12   DOCUMENT PRODUCTION NUMBERS.  BUT I THINK IT WOULD PROBABLY BE

13   MORE THAN FIVE OR SIX BOXES.

14             **MR. PURCELL:**  I THINK THE SAME IS TRUE FOR US, YOUR

15   HONOR.  I THINK FIVE BOXES IS PROBABLY A GOOD BALLPARK.  AND, OF

16   COURSE, THERE HAVE BEEN A BUNCH OF DEPOSITIONS TAKEN IN THE CASE

17   THAT RELATE TO DAMAGES ISSUE SINCE THE ORIGINAL ORACLE EXPERT

18   REPORT WAS SERVED.

19             AND SO I SUSPECT THEIR EXPERT IS REVIEWING THOSE, AS

20   OURS ARE.

21             **THE COURT:**  YES, SIR.

22             **MR. KEARL:**  I WOULD PUT THE QUESTION, I THINK, IN A

23   SLIGHTLY DIFFERENT WAY.  BUT I THINK IT'S THE SAME QUESTION.  I

24   THINK THIS IS DOABLE FOR ME AND FOR ANY EXPERT. AND A CRITIQUE

25   OF ACTUAL EXPERT REPORTS WHERE YOU ARE CRITIQUING THE SET OF

1    ASSUMPTIONS AND YOU HAVE THE REPORT BEFORE YOU AND YOU HAVE THE

2    MATERIALS RELIED ON BY THE EXPERTS.  TO PUT FORTH AN INDEPENDENT

3    OPINION IS A CHALLENGE.  AND I DON'T THINK, ONE, THE TIME

4    SCHEDULE; AND, TWO, I DON'T KNOW WHETHER MR. COOPER KNOWS THE

5    RECORD, BECAUSE TYPICALLY IN THESE KINDS OF CASES AN EXPERT HAS

6    ACCESS TO THE ENTIRE RECORDS, BUT SAYS TO THE ATTORNEYS:  "HERE

7    ARE THE ISSUES I'M INTERESTED IN.  TELL ME WHAT THE RELEVANT

8    DEPOSITIONS AND EVIDENCE IS."

9              AND I'M ASSUMING I CAN'T TURN TO THESE TWO GROUPS OF

10   ATTORNEYS FOR THAT. AND THERE'S JUST SIMPLY NO WAY THAT I THINK

11   IN A MONTH ONE COULD LOOK AT THIS RECORD AND DECIDE WHAT WAS

12   RELEVANT TO AN INDEPENDENT OPINION ABOUT THIS MATTER.

13             SO, IF MR. COOPER KNOWS THE RECORD WELL, THEN, COULD

14   I TURN TO HIM IN THE SAME WAY I WOULD TURN TO ANY OTHER ATTORNEY

15   ON THE SIDE, AND THAT WOULD WORK.  BUT OTHER SHORT OF THAT I

16   THINK, FRANKLY, THAT WHAT YOU COULD GET FROM ME -- AND I SUPPOSE

17   FROM MR. DEGEN, AND I THINK I SHOULDN'T SPEAK FOR HIM -- IS A

18   GOOD CRITIQUE OF THE EXPERTS, BUT NOT AN INDEPENDENT JUDGMENT OF

19   THE APPROPRIATE DAMAGES.

20             **THE COURT:**  YES, SIR.

21             **MR. DEGEN:**  I WOULD JUST ADD TO THAT I THINK WE CAN

22   GO A LITTLE BEYOND A CRITIQUE OF THE TWO SIDES, BUT OUR UNIVERSE

23   OF -- FOR FORMING OUR INDEPENDENT OPINIONS, OUR UNIVERSE WOULD

24   BE SOMEWHAT FILTERED BY THE DOCUMENTS AND THE DEPOSITION

25   TESTIMONY THAT THE TWO EXISTING EXPERTS --

1      **THE COURT:**  FAIR ENOUGH.  YOU COULD TURN TO WHAT WAS

2    IN THOSE TWO EXPERT REPORTS AND SAY "WHAT WAS -- IF I WERE TO DO

3    THIS, USING THAT INFORMATION, HOW WOULD I INDEPENDENTLY MAKE A

4    JUDGMENT ABOUT THIS?"

5          THAT YOU COULD DO. BUT EXPERTS SCREEN DATA  IN

6    DIFFERENT WAYS AND INFORMATION DIFFERENT WAYS.  AND SO --

7      **MR. COOPER:**  YOUR HONOR, MAY I MAKE AN OBSERVATION?

8      **THE COURT:**  OF COURSE.

9      **MR. COOPER:**  I DO NOT KNOW THE RECORD, AND SO I HAVE

10    JUST GOTTEN INTO THIS RECENTLY.  BUT WOULD IT BE POSSIBLE FOR

11    THE PARTIES OR THE COURT TO FOCUS THE ISSUES ON WHICH THE

12    EXPERTS WOULD BE ASKED TO OPINE, AND THEN TO THE EXTENT

13    POSSIBLE ASK THE PARTIES WHAT FACTS COULD BE STIPULATED TO?

14          IF THEY COULD -- IT STRIKES ME THAT THERE ARE

15    PROBABLY A CERTAIN NUMBER OF FACTS HERE THAT I'VE HEARD IN

16    COMMON FROM BOTH OF THE STATEMENTS THAT COULD BE STIPULATED TO.

17    AND THEN, WE COULD FOCUS THE OPINIONS THAT THESE EXPERTS WOULD

18    OFFER THAT MAY MAKE THIS A LITTLE MORE MANAGEABLE THAN JUST

19    START WITH EVERYTHING.

20      **THE COURT:**  WELL, I DON'T KNOW THE ANSWER TO THAT.

21          LET ME ASK THE LAWYERS THAT QUESTION.

22      **MR. VAN NEST:**  YOUR HONOR, I'M NOT -- I THINK BOTH

23    GENTLEMEN HAVE MADE REASONABLE POINTS. I'M NOT TERRIBLY TROUBLED

24    BY LIMITING THEIR REVIEW PRIMARILY TO WHAT'S IN THE EXPERT

25    REPORTS WITH THE CAVEAT THAT IF THEY LOOK AT THE REPORTS AND

```
 1    THERE'S SOME CRITICAL HOLE, THEY CERTAINLY COULD ASK MR. COOPER:

 2    "IS THIS INFORMATION AVAILABLE?"  AND HE CAN ASK US.

 3              I MEAN, I DON'T THINK --

 4              THE COURT:  WHEN YOU SAY "IN THE REPORT," YOU MEAN

 5    THE MATERIAL THAT -- EVERYTHING THAT THE EXPERT REVIEWED OR DO

 6    YOU MEAN LITERALLY WHAT'S WRITTEN INTO THE 25-PAGE REPORT?

 7              MR. VAN NEST:  WELL, BOTH, REALLY. I MEAN, THE EXPERT

 8    REPORTS WILL HAVE LONG LISTS OF WHAT WAS REVIEWED.  BUT,

 9    OBVIOUSLY, IN READING THE REPORT ONE CAN FIGURE OUT, AND

10    PARTICULARLY THESE TWO GENTLEMEN WILL FIGURE OUT WHAT ARE THE

11    IMPORTANT ITEMS?

12              WHAT ARE THE CRITICAL FACTS?  WHAT WERE THE OTHER

13    LICENSES?  WHAT WERE THE COURSE OF NEGOTIATIONS?  WHAT WAS OUT

14    THERE?

15              I MEAN, I THINK THAT WILL BE APPARENT.  I'M NOT

16    TROUBLED BY ACKNOWLEDGING THAT THEIR PRIMARY SOURCE OF

17    INFORMATION SHOULD BE THE UNDERLYING MATERIALS THAT THE EXPERTS,

18    BOTH, RELIED ON, BECAUSE IF SOMETHING IS NOT DEEMED SIGNIFICANT

19    ENOUGH FOR EITHER THE PLAINTIFF'S EXPERT OR THE DEFENSE EXPERT

20    TO LOOK AT AND REFERENCE, IT'S LIKELY, I THINK, GIVEN THE

21    CALIBER OF PEOPLE WE'RE DEALING WITH HERE THAT IT'S NOT GOING TO

22    BE THAT SIGNIFICANT.

23              IF THERE IS SOMETHING SIGNIFICANT THAT NEITHER OF OUR

24    INDEPENDENT ECONOMISTS THOUGHT WAS IMPORTANT, THEY COULD

25    CERTAINLY ASK MR. COOPER:  "WOULD YOU PLEASE INQUIRE?  IS THIS
```

1   AVAILABLE?  IS THIS INFORMATION AVAILABLE OR NOT?"

2            AND IF IT IS WE WILL MAKE IT AVAILABLE, AND IF IT

3   ISN'T, THEN IT ISN'T.  BUT I'M NOT TERRIBLY TROUBLED BY THE

4   LIMITATION THEY ARE SEEKING.

5            **MR. JACOBS:**  WE HAD EXACTLY THE SAME THOUGHT, YOUR

6   HONOR, THAT THE TWO REPORTS WILL DEFINE A BODY OF RELEVANT

7   INFORMATION. IT'S NOT MERELY REFERENCED, IT'S RELIED ON.  SO

8   IT'S A LITTLE NARROWER SCOPE THAN YOU MAY BE USED TO FROM THE

9   PAST.

10           AND WE COULD RAPIDLY RESPOND TO QUERIES FOR WHETHER

11  THERE'S ADDITIONAL INFORMATION.

12           IT OCCURS TO US FURTHER THAT THERE'S A CONSIDERABLE

13  BODY OF MATERIAL THAT HAS ALREADY BEEN RELIED ON IN -- I THINK

14  THE COURT WILL WANT TO MAKE KIND OF YOUR OWN DECISION ABOUT

15  WHETHER THEY SHOULD SEE THE REPORT THAT YOUR DAUBERT MOTION

16  ADDRESSED.  BUT SETTING THAT ASIDE, THERE'S A BODY OF MATERIAL

17  REFERENCED THERE AND A BODY OF MATERIAL REFERENCED IN THE

18  DAUBERT BRIEFING THAT I THINK IS RELATIVELY BALANCED, BECAUSE IT

19  WAS THAT MATERIAL THAT GOOGLE WAS RELYING ON TO TAKE A RUN AT

20  THAT REPORT. THAT MATERIAL COULD BE GATHERED UP.  THE SELECTED

21  EXPERT COULD START LOOKING AT THAT SOONER RATHER THAN WAIT FOR

22  BOTH REPORTS TO COME IN.

23           **THE COURT:**  WELL, IF I DID THAT I WOULD HAVE TO SHOW

24  THE ORIGINAL REPORT AND ALL THAT WAS RESPONSIVE TO, WHICH WAS

25  THEN STRICKEN IN THE SENSE THAT I SAID: "GO BACK AND START OVER

1    AGAIN."

2              BUT I DIDN'T SAY EVERYTHING IN IT WAS WRONG.  I SAID

3    CERTAIN THINGS IN THERE WERE WRONG.

4              BUT MR. COOPER ASKED ABOUT STIPULATIONS, AND NOBODY

5    SAID YOU WOULD STIPULATE TO ANYTHING.

6              I DON'T THINK YOU ARE GOING TO GET ANY STIPULATIONS

7    OUT OF THEM IN TERMS OF FACTS.  IS THAT WHAT YOU MEANT?

8              **MR. COOPER:**  YES, THAT THERE ARE -- FROM LISTENING TO

9    COUNSELS IT APPEARED TO ME THAT THERE MIGHT BE SOME COMMON SETS

10   OF FACTS THAT THEY COULD AGREE TO AND COULD FOCUS WHAT IS RELIED

11   UPON, AND THEN MAYBE WE COULD FOCUS ON WHAT THE ACTUAL -- WHAT

12   THE MOST CRITICAL ISSUES ARE; WHAT THE MOST CRITICAL QUESTIONS

13   ARE AS OPPOSED TO SAYING "LET'S DO A" --

14             **THE COURT:**  NO, JUST HEARING THAT LAST PART I CAN

15   TELL YOU THE ANSWER.

16             **MR. COOPER:**  NO?

17             **THE COURT:**  NO.

18             **MR. COOPER:**  OKAY.

19             **THE COURT:**  THEY WILL NOT EVEN AGREE ON WHAT THE MOST

20   CRITICAL ISSUES ARE, I DON'T THINK. I THINK THEY WOULD LIKELY

21   AGREE ON A VERY GENERAL TIME FRAME AND CHRONOLOGY. BUT OBVIOUSLY

22   THEY CAN'T DENY THAT THERE WERE CERTAIN E-MAILS AND CERTAIN

23   COMMUNICATIONS BACK AND FORTH.

24             BUT THEY -- I DON'T THINK THEY ARE GOING -- THEY ARE

25   NOT GOING TO SAY "THIS IS THE HEART OF THE CASE."

```
 1                YOU'LL NEVER GET THEM TO PIN THEMSELVES DOWN LIKE

 2     THAT.  I'VE JUST SEEN TOO MUCH OF THIS CASE ALREADY. I TELL YOU

 3     THEY ARE FIGHTING OVER MANY ITEMS.

 4                SO OKAY. SO LET ME COME BACK TO THIS.

 5                SO LET'S SAY INSTEAD OF DOING AN INDEPENDENT, YOU

 6     WOULD DO A CRITIQUE OF EACH SIDE. NOW, A CRITIQUE?  MAYBE A

 7     CRITIQUE PLUS.

 8                FOR EXAMPLE, LET'S SAY YOU LOOKED AT ONE REPORT, AND

 9     IT HAD TEN POINTS.  AND YOU THOUGHT THREE OF THE POINTS WERE

10     VERY WELL SUPPORTED, FIT IN WITH YOUR VIEW OF ECONOMICS, SEEMED

11     SOLID.  THREE OF THEM SEEMED COMPLETELY FLAKEY AND

12     ARGUMENTATIVE.  AND THE OTHERS WERE IN-BETWEEN.  I MEAN, SOME

13     SORT OF ANALYSIS OF -- AND ALSO A SENSITIVITY ANALYSIS IN THE

14     SENSE OF:  IF THIS ASSUMPTION GOES, THEN THE ENTIRE REPORT GOES

15     FROM X DOLLARS TO 1 PERCENT OF X DOLLARS.

16                AND SO THAT ASSUMPTION IS A BIG TICKET ITEM.

17                AND YOUR ANALYSIS OF THAT FOR THE JURY, AND THAT KIND

18     OF -- I'D CALL SENSITIVITY ANALYSIS -- WOULD BE USEFUL. AND THAT

19     WOULD BE WITHOUT YOU YOURSELF COMING TO YOUR OWN CONCLUSION.

20                IN OTHER WORDS, YOU DON'T HAVE TO NECESSARILY COME UP

21     WITH YOUR OWN NUMBER, THOUGH THAT'S WHAT I STARTED OUT THINKING

22     WOULD BE GOOD.  BUT A CRITIQUE OF THE -- A PROFESSIONAL

23     CRITIQUE.

24                DOES THAT SOUND LIKE IT'S A DOABLE PROJECT?

25                YES, SIR.
```

1          **MR. DEGEN:**  WOULD IT BE A PROFESSIONAL CRITIQUE WITH

2    INDEPENDENT OPINIONS BASED ON THE FACTS?

3          **THE COURT:**  WELL, NO.  THE CLOSER YOU COULD GET TO AN

4    INDEPENDENT OPINION OF WHAT YOU THOUGHT WOULD BE THE RIGHT

5    NUMBER OR RANGE, THAT WOULD BE BETTER. BUT EVEN IF THAT COULD

6    NOT BE DONE, THE LAST STEP COULD NOT BE DONE, I AM POSITIVE THE

7    JURY WOULD BENEFIT FROM A GOOD INDEPENDENT PROFESSIONAL CRITIQUE

8    OF THE TWO COMPETING SIDES.

9          ALL RIGHT.  WELL, THINK ABOUT THAT, THAT NOTION.

10         DO EITHER OF YOU KNOW THE EXPERTS THAT HAVE BEEN --

11   LET'S MAKE -- BECAUSE IF ONE OF THEM TURNED OUT TO BE YOUR GOOD

12   FRIEND, YOU MIGHT BE -- ONE SIDE OR THE OTHER MIGHT WONDER

13   WHETHER YOU WOULD BE ABLE TO BE CRITICAL OF THAT PERSON.

14         SO WHO ARE THE EXPERTS WE WILL BE CRITIQUING HERE?

15         **MR. HOLTZMAN:**  OUR ORIGINAL EXPERT WAS PROFESSOR IAIN

16   COCKBURN, BOSTON UNIVERSITY.  WE MAY OR MAY NOT ADD A SECOND

17   EXPERT, WHO WOULD MOST LIKELY BE KEN SERWIN.

18         **THE COURT:**  KEN WHO?

19         **MR. HOLTZMAN:**  SERWIN, S-E-R-W-I-N.  THOSE WOULD BE

20   THE PRIMARY DAMAGE-RELATED EXPERTS.

21         THERE, OF COURSE, ARE TECHNICAL EXPERTS IN THE CASE,

22   TOO.  AND TO THE EXTENT THAT ONE OF THE THINGS WE WILL BE

23   DEBATING WITH THE OTHER SIDE IS THE IMPORTANCE OF THE PATENTS

24   AND THE COPYRIGHTS, THE TECHNICAL ASPECTS OF THE PATENTS AND

25   COPYRIGHTS WILL VERY MUCH COME INTO THE ISSUE OF DAMAGES.

1          **THE COURT:**  I WANT TO COME TO THAT POINT IN A SECOND.

2    BUT LET ME JUST PAUSE HERE.

3          DID EITHER OF YOU KNOW THE TWO INDIVIDUALS THAT WERE

4    JUST NAMED?

5          **MR. KEARL:**  NO, I DON'T.

6          **THE COURT:**  NO.

7          **MR. DEGEN:**  THE NAME "SERWIN" IS FAMILIAR.  I MAY

8    HAVE OPPOSED HIM AT SOME POINT, BUT I DON'T KNOW HIM PERSONALLY.

9          **THE COURT:**  BUT YOU CERTAINLY DON'T HAVE ANY

10   PROFESSIONAL, CLOSE PROFESSIONAL RELATIONSHIP OR FRIENDSHIP THAT

11   WOULD GET IN THE WAY OF YOU BEING AN INDEPENDENT EXPERT.

12         **MR. DEGEN:**  THAT'S CORRECT, YOUR HONOR.

13         **THE COURT:**  OKAY.  THEN, ON YOUR SIDE.

14         **MR. PURCELL:**  OUR DAMAGES EXPERT IS GREGORY LEONARD

15   WHO IS LOCAL HERE IN SAN FRANCISCO WITH NERA CONSULTING FIRM.

16         **THE COURT:**  HOW ABOUT THAT NAME?

17         **MR. KEARL:**  GREG LEONARD IS A NAME I KNOW.  I'VE BEEN

18   OPPOSED TO HIM ON A COUPLE OF CASES. HE MAY HAVE BEEN ON THE

19   SAME SIDE IN ONE CASE.  I WOULD HAVE TO GO CHECK.  BUT I DON'T

20   KNOW HIM PERSONALLY.  I WOULDN'T RECOGNIZE HIM IF HE WALKED IN

21   THE ROOM.

22         **THE COURT:**  ALL RIGHT.  SO YOU WOULD NOT BE

23   IMPEACHABLE ON THE GROUND THAT -- I MEAN, IT'S OKAY THAT YOU

24   KNOW SOMEBODY BY REPUTATION.

25         **MR. KEARL:**  I KNOW HIM BY REPUTATION.  THAT'S IT.

```
 1    THAT'S IT.

 2              THE COURT:  OKAY. AND?

 3              MR. DEGEN:  I DON'T KNOW HIM, YOUR HONOR.

 4              THE COURT:  OKAY. GOOD. ALL RIGHT.  SO NOW LET'S TURN

 5    TO A DIFFERENT ISSUE THAT -- ARE YOU STILL GOING TO BE MAKING

 6    THE ARGUMENT THAT'S BASED ON THE ENTIRE MARKET VALUE RULE.

 7              MR. HOLTZMAN:  NO, YOUR HONOR. WE DON'T VIEW THIS

 8    AS AN ISSUE OF THE ENTIRE MARKET VALUE RULE.  WE VIEW THIS AS

 9    ONE WAY OR ANOTHER A QUESTION OF APPORTIONMENT:  WHAT IS THE

10    PROPER APPORTIONMENT OF VALUE OF PATENTS?  AND THE STANDARD, AS

11    YOU KNOW, IS A LITTLE DIFFERENT ON COPYRIGHTS, BUT FUNDAMENTALLY

12    IT'S THE SAME IDEA.

13              SO IT'S SOMEWHERE BETWEEN ZERO AND A HUNDRED PERCENT.

14    BUT EITHER WAY IT'S AN APPORTIONMENT VALUE.

15              THE COURT:  WELL, I HAVE TOLD YOU YOU HAVE TO

16    APPORTION.

17              MR. HOLTZMAN:  THAT'S WHAT I'M SAYING, YOUR HONOR.

18              THE COURT:  ALL RIGHT. SO -- BUT YOU SAID SOMETHING

19    EARLIER ABOUT IT BEING PART OF THE DAMAGES, THIS OTHER EXPERT

20    BEING PART OF THE DAMAGES.  WHAT DID YOU MEAN BY THAT?

21              MR. HOLTZMAN:  WHAT I MEANT, YOUR HONOR, IS AS WE

22    LOOK -- WHETHER YOU LOOK AT THE VALUE OF THE PATENTS AND THE

23    COPYRIGHTS IN THE CONTEXT OF THE WHOLE PORTFOLIO, WE TALKED

24    EARLIER ABOUT THE ACTUAL NEGOTIATIONS BETWEEN THE PARTIES, THAT

25    CONCERN PATENTS AND COPYRIGHTS, A LARGER GROUP OF THEM THAN JUST
```

1    THESE SEVEN PATENTS AND THE COPYRIGHTS AND THE 37 API'S THAT

2    WE'RE TALKING ABOUT HERE.

3         SO PART OF THE APPORTIONMENT ISSUE IS HOW MUCH OF THE

4    PORTFOLIO IS PROPERLY ACCOUNTED FOR BY THESE SEVEN PATENTS AND

5    COPYRIGHTS?  AND IN PART THAT GOES TO AS A TECHNICAL MATTER HOW

6    IMPORTANT THEY ARE, AND THE FUNCTIONING VIRTUAL MACHINES.  HOW

7    IMPORTANT ARE THEY TO DEVELOPERS IN HAVING THAT COMPATIBILITY

8    AND OPERABILITY COMPARED TO WHAT ELSE MAY BE IN THE PORTFOLIO.

9         SIMILARLY, HOW IMPORTANT ARE THEY TO THE FUNCTIONING

10   OF ANDROID, ANDROID BEING A COMMERCIALLY VIABLE PRODUCT AS

11   MR. JACOBS SAID BEFORE.  SO THERE ARE TECHNICAL ISSUES ON BOTH

12   SIDES OF THAT.  THE RELEVANCE OF THOSE ISSUES WILL I CAN SEE BE

13   DISPUTED, BUT THEY ARE BOTH OF A TECHNICAL NATURE.

14        **THE COURT:**  I SEE.  ALL RIGHT.  IF YOU WANT TO I'LL

15   GIVE YOU EQUAL TIME IF YOU WANT TO RESPOND TO THAT IN ANY WAY.

16        **MR. VAN NEST:**  I DON'T THINK WE NEED TO, YOUR HONOR.

17        **MR. DEGEN:**  YOUR HONOR?

18        **THE COURT:**  YES, SIR.

19        **MR. DEGEN:**  WOULD WE HAVE ACCESS TO BOTH SIDES'

20   TECHNICAL EXPERTS?  AND I ASK THAT BECAUSE IN MY EXPERIENCE

21   DEFINING WHERE THE METES AND BOUNDS OF THE PATENTS OR THE

22   COPYRIGHTED MATERIAL ARE IS IMPORTANT IN PLACING VALUE.

23        **THE COURT:**  WELL,  THE ANSWER TO THIS IS, I THINK,

24   YES.  IF THAT'S WHAT YOU WANT TO DO YOUR JOB, I WOULD -- YOU

25   WOULD ASK THESE LAWYERS OR THROUGH MR.  COOPER ASK THOSE LAWYERS

1    TO HAVE ACCESS TO THE TECHNICAL PEOPLE TO DO YOUR JOB.

2              **MR. DEGEN:**  THANK YOU, YOUR HONOR.

3              **THE COURT:**  IF THAT'S WHAT YOU FELT YOU NEEDED TO DO

4    YOUR JOB.

5              DO EITHER OF YOU KNOW ANY OF THE LAWYERS HERE OR THE

6    LAWS FIRMS INVOLVED?  YOU MIGHT KNOW THEM, BUT I MEAN DO YOU

7    HAVE ANY CLOSE PROFESSIONAL OR PERSONAL RELATIONSHIPS WITH

8    EITHER OF THE LAW FIRMS?  DO YOU KNOW WHO THE LAW FIRMS ARE?

9              **MR. KEARL:**  YES.

10             **THE COURT:**  OR THE INDIVIDUAL LAWYERS, OR FOR THAT

11   MATTER, GOOGLE OR ORACLE?

12             **MR. KEARL:**  FOR ME, NO.

13             **MR. DEGEN:**  I'VE NEVER WORKED WITH ANY OF THEM. I

14   DON'T KNOW ANY OF THEM.  I'VE NOT WORKED WITH ORACLE OR GOOGLE.

15             **THE COURT:**  OKAY. PERFECT.

16             NOW, I WANT TO GO BACK TO PAYMENT FOR A MINUTE. THE

17   RULE SPECIFICALLY SAYS THAT THE PARTIES CAN BE REQUIRED TO PAY

18   YOUR CHARGES IN SOME MANNER, WHICH I ALLOCATED. BUT AT THE END

19   OF THE DAY THE COURT CAN'T PAY YOU. IT'S THE PARTIES THAT PAY

20   YOU. SO YOU WOULD HAVE TO RELY UPON THE FULL FAITH AND CREDIT OF

21   THESE TWO BIG COMPANIES.

22             IN THIS CASE THAT'S PROBABLY NOT A PROBLEM. BUT IN

23   SOME CASES IT WOULD BE A PROBLEM. BUT I JUST -- YOU NEED TO

24   UNDERSTAND THAT THE COURT CANNOT WRITE YOU A CHECK. THE COURT

25   CAN ONLY ORDER THEM TO WRITE THE CHECK.

1          **MR. KEARL:**  THAT'S GOOD ENOUGH.

2          **THE COURT:**  OKAY.

3          **MR. DEGEN:**  SAME HERE.

4          **THE COURT:**  ALL RIGHT. THEN, BEFORE IT BECAME

5     OFFICIAL WE WOULD HAVE TO GIVE YOU LIKE AN ASSIGNMENT, A WRITTEN

6     ASSIGNMENT. AND YOU WOULD HAVE TO READ IT AND MAKE SURE IT'S

7     OKAY WITH YOU.  AND THEN, YOU WOULD UNDERTAKE TO DO IT. AND

8     AGAIN, THIS IS A -- YOU WOULD BE DOING THIS UNDER OATH.

9          IT WOULD BE YOUR BEST PROFESSIONAL JUDGMENT.  AND YOU

10    WOULD SAY THAT TO THE JURY. AND THAT'S WHAT WE WANT.  I DON'T

11    CARE WHERE YOU COME OUT ON IT.

12          WHAT IS IMPORTANT IS TO ASSIST THE JURY THROUGH AN

13    INDEPENDENT, PROFESSIONAL, UNDER OATH TESTIMONY FROM SOMEBODY

14    WITH YOUR QUALIFICATIONS.

15          AND, BY THE WAY, BOTH SIDES BELIEVE THAT YOU ARE

16    THOROUGHLY -- BOTH OF YOU ARE THOROUGHLY QUALIFIED TO DO THIS,

17    SO THERE'S NOT ANY ISSUE THERE.

18          SO THAT'S WHAT IT COMES DOWN TO.

19          YES, SIR.

20          **MR. DEGEN:**  DOES THAT MEAN WE WON'T BE FACING DAUBERT

21    MOTIONS IN THIS CASE?

22          **THE COURT:**  PROBABLY. PROBABLY THAT'S WHAT IT MEANS,

23    BUT I CAN'T RULE ANYTHING OUT. I CAN ONLY SAY I THINK THAT WOULD

24    BE UNLIKELY.

25          **MR. KEARL:**  A VIGOROUS CROSS.

1    **THE COURT:**  SO THE WAY I WANT TO LEAVE THIS IS THAT I

2    WANT TO GIVE YOU THE CHANCE TO DO A COUPLE OF THINGS; FOR YOU TO

3    GO BACK AND THINK ABOUT WHAT HAPPENED HERE TODAY. I WANT TO ALSO

4    GIVE YOU A CHANCE TO ASK ANY MORE QUESTIONS BEFORE WE BREAK UP.

5    AND I DON'T WANT TO PUT YOU ON THE SPOT RIGHT NOW.

6    THEN, I'D LIKE FOR YOU TO WRITE ME A LETTER.  AND

7    THEN, I PROBABLY WILL WIND UP SHARING IT WITH THE ATTORNEYS,

8    BUT -- SO BE MINDFUL OF THAT.

9    BUT FOR THE TIME BEING IT WOULD JUST BE A LETTER TO

10   ME, AND IT WOULD COVER THE TIMETABLE ISSUES, THE STAFFING

11   ISSUES, WHAT YOU WOULD CHARGE US TO DO THIS, AND ANYTHING ELSE

12   THAT'S COME UP HERE TODAY, ANY CONFLICTS THAT YOU MAY THINK OF

13   AFTER YOU ARE ON THE WAY BACK HOME.

14   AND THEN, I WILL PICK THE ONE OF YOU THAT OVERALL

15   FITS INTO THE SCHEDULE AND THE ASSIGNMENT IN THE BEST WAY I CAN.

16   WITHOUT ANY DOUBT, YOU BOTH ARE SUPERBLY QUALIFIED. SO THAT'S

17   NOT AN ISSUE HERE.

18   BUT DO YOU HAVE QUESTIONS THAT I CAN HELP YOU WITH?

19   YES, SIR.

20   **MR. DEGEN:**  WHEN YOU SAY WHAT WE WILL CHARGE YOU, ARE

21   YOU LOOKING FOR MORE THAN A FEE SCHEDULE?  ARE YOU LOOKING FOR A

22   BUDGET ESTIMATE?

23   **THE COURT:**  WELL, BOTH WOULD BE USEFUL.  AN HOURLY

24   RATE WOULD BE GOOD, YOU KNOW, WHAT YOU WOULD SEE AS THE POSSIBLE

25   BUDGET.  BUT I WOULDN'T HOLD YOU TO AN EXACT NUMBER.

```
 1            BUT IF ONE OF YOU CAME IN AND SAID "I THINK I'D NEED
 2    X HOURS," AND THE OTHER CAME IN AND SAID "I NEED 3X HOURS," I
 3    MIGHT GO WITH X HOURS BECAUSE I DO BELIEVE IN KEEPING COSTS
 4    DOWN.
 5            ON THE OTHER HAND, IF ONE OF YOU SAID "MY" -- THAT
 6    YOUR RATE WAS $5 AN HOUR MORE THAN THE OTHER WOULD BE, THAT
 7    WOULD BE A SMALL FACTOR.  BUT IF IT WAS $50 AN HOUR MORE THAT
 8    WOULD START TO MATTER.
 9            SO THE HOURLY RATE AND WHAT YOU WOULD ESTIMATE AS A
10    PROBABLY BUDGET WOULD BE GOOD.  YOU KNOW, I'VE GOT TO BE A
11    LITTLE FAIR TO YOU BECAUSE YOU DON'T KNOW ENOUGH ABOUT THE CASE
12    TO GIVE ME A FINAL BUDGET. THAT WOULD BE -- BUT MAYBE YOU COULD
13    GIVE ME A BALLPARK IDEA WHAT YOU THINK WOULD BE INVOLVED.
14            MR. DEGEN:  WELL, I THINK IT'S MAINLY AN ISSUE HERE
15    BECAUSE IF YOU STAY ON SCHEDULE, THIS IS PRETTY MUCH GOING TO
16    FILL THE TIME BETWEEN NOW AND THEN. I MEAN, IT'S BASICALLY A
17    FULL-TIME JOB. IF THE SCHEDULE SLIDES THREE OR FOUR MONTHS THE
18    AMOUNT OF WORK COULD EASILY DOUBLE, AND I'M SAYING THAT BECAUSE
19    ON THE CURRENT SCHEDULE --
20            THE COURT:  WELL, THEN, YOU COULD PUT IT BOTH WAYS.
21            MR. DEGEN:  OKAY.
22            THE COURT:  I THINK THOSE ARE BOTH VERY VALID
23    CONSIDERATIONS.
24            YES, SIR.
25            MR. DEGEN:  YOU KNOW, I WOULD DO THE BEST JOB I COULD
```

| | |
|---|---|
| 1 | FOR AN OCTOBER FILING OR AN OCTOBER TRIAL, BUT IN TRUTH I DON'T |
| 2 | THINK IT'S PROBABLY ENOUGH. |
| 3 | **THE COURT:**  RIGHT.  AND YOU NEED IN YOUR LETTER TO |
| 4 | REMIND ME OF THOSE TWO, THE DATES YOU ARE UNAVAILABLE IN |
| 5 | NOVEMBER, BECAUSE THIS IS AN OCTOBER 31 TRIAL DATE.  SO THAT |
| 6 | REALLY IS A NOVEMBER -- YOU KNOW, WOULD CONSUME ALL OF NOVEMBER, |
| 7 | BASICALLY. |
| 8 | YES, SIR. |
| 9 | **MR. KEARL:**  TWO OR THREE QUESTIONS?  WHEN IS THE |
| 10 | DEPOSITION ON THE DEFENDANT'S REPORT? |
| 11 | **THE COURT:**  SAY THAT AGAIN. |
| 12 | **MR. KEARL:**  TO THE REPORT IS DUE OCTOBER 4TH.  WHEN |
| 13 | IS DEPOSITION SCHEDULED? |
| 14 | **THE COURT:**  THAT'S A GOOD POINT.  YOU MIGHT WANT TO |
| 15 | ATTEND THOSE DEPOSITIONS. |
| 16 | **MR. KEARL:**  WELL, IF THE TRIAL BEGINS THE 31ST AND WE |
| 17 | DON'T KNOW WHAT SORT OF -- HOW THEY ARE TIED DOWN IN THE |
| 18 | DEPOSITION UNTIL SOMETIME BETWEEN THE 4TH AND THE 31ST, WE'RE |
| 19 | REALLY CLOSE.  I MEAN -- |
| 20 | **THE COURT:**  RIGHT.  THAT'S A GOOD POINT.  I DON'T |
| 21 | KNOW.  HAVE YOU ALL GOTTEN THAT FAR YET? |
| 22 | **MR. VAN NEST:**  NO, YOUR HONOR. |
| 23 | **MR. PURCELL:**  WE HAVEN'T, YOUR HONOR.  WE WOULD TRY |
| 24 | TO MAKE DR. LEONARD AVAILABLE AS QUICKLY AS WE COULD AFTER THE |
| 25 | 4TH.  I CERTAINLY UNDERSTAND THE SCHEDULE. |

```
 1                  WE WILL TRY TO WORK WITH --

 2            THE COURT:  WHEN IS YOURS DUE?

 3            MR. HOLTZMAN:  SEPTEMBER 12.

 4            THE COURT:  SO THE WAY IT WORKS I THINK THEY HAVE A

 5      TWO-WEEK PERIOD WITHIN WHICH -- I THINK IF IT COMES OUT ON THE

 6      12TH, MY GUESS IS WITHIN A WEEK THEY ARE GOING TO DEPOSE -- THE

 7      OTHER SIDE WOULD DEPOSE HIM, RIGHT?

 8            MR. PURCELL:  CORRECT.

 9            THE COURT:  AND THEN, THEIR EXPERT WOULD THEN BE

10      THERE TO LISTEN TO THAT TESTIMONY.  AND YOU'D PROBABLY WANT TO

11      BE THERE. YOU COULD BE THERE, ANYWAY, OR READ IT LATER.  BUT IT

12      COULD BE YOUR CHOICE, I THINK.  I WOULD BE ALL IN FAVOR OF YOU

13      ATTENDING THE DEPOSITION.

14            MR. KEARL:  A COUPLE OF THINGS.  WELL, TWO OR THREE

15      THINGS ON THAT. YOU OBVIOUSLY WILL NOT AND SHOULDN'T SCHEDULE

16      THIS AROUND THE PEOPLE YOU'RE GOING TO PULL IN ON THIS. BUT IF

17      THIS -- IF THIS DEPOSITION IS, LET'S SAY, ON THE 11TH OR 15TH OF

18      OCTOBER, I THINK IT'S ALMOST IMPOSSIBLE TO EXPECT A WRITTEN

19      REPORT FROM ME IN TIME FOR A DEPOSITION BEFORE -- BY BOTH SIDES

20      BEFORE A 31ST TRIAL DATE.  I DON'T SEE HOW THAT WORKS.

21            THE COURT:  I SEE THE PROBLEM.

22            MR. DEGEN:  AND I AGREE COMPLETELY.  I DON'T THINK

23      THE SCHEDULE IS WORKABLE.

24            MR. KEARL:  IN FAIRNESS, WE CAN SKETCH OUT A REPORT,

25      BUT I CAN'T WRITE A REPORT UNTIL I SEE A DEPOSITION AND I
```

1   COMPLETE A REPORT ON THAT. SO IF YOU WANT TO START THIS A MONTH

2   LATER I THINK THIS IS A MORE DOABLE PROJECT THAN THE PROJECT AS

3   SCHEDULED.  BUT THAT IS A DIFFERENT ISSUE.

4            SECOND, DO YOU EXPECT THAT THE EXPERT WILL BE -- THAT

5   WE WILL BE AT TRIAL OR ONLY AT TRIAL FOR THE TESTIMONY OF THE

6   DAMAGE EXPERTS?

7            **THE COURT:**  WELL, I DON'T THINK YOU WOULD NEED TO BE

8   THERE FOR THE WHOLE TRIAL.

9            **MR. KEARL:**  OKAY.

10           **THE COURT:**  YOU WOULD MOST LIKELY BE THERE FOR THE

11  EXPERT.  AND ONE ISSUE I'VE NOT YET RAISED WITH THE LAWYERS IS

12  THE IDEA OF BACK-TO-BACK EXPERTS.  AND THEN, YOU WOULD FOLLOW

13  THE TWO EXPERTS.  IN OTHER WORDS, THAT THE JURY CAN UNDERSTAND

14  THE -- WELL, THERE'S SEVERAL THINGS.  ONE IS BIFURCATING DAMAGES

15  TO BEGIN WITH, BECAUSE IF THE JURY WERE TO FIND AGAINST THE

16  PLAINTIFF WE WOULDN'T EVEN HAVE TO WORRY ABOUT DAMAGES AND

17  EVERYONE COULD GO HOME, WHICH I'M GIVING SERIOUS THOUGHT TO.

18           AND THE PLAINTIFFS ALWAYS HATE THAT, BUT THAT'S THEIR

19  PROBLEM.  I HAVE A VERY MASSIVE CALENDAR TO RUN. SO

20  THAT'S -- BUT REGARDLESS OF HOW THAT COMES OUT HAVING ONE, TWO,

21  THREE, YOU BEING THE THIRD, OR ONE OF YOU BEING THE THIRD, IS

22  ONE WAY TO GO THAT -- AND YOU WOULD DEFINITELY WANT TO BE THERE

23  FOR THE OTHER EXPERTS.

24           I DON'T KNOW HOW WE WILL SEQUENCE THE EXPERTS YET,

25  BUT YOU SHOULD BE THERE WHEN THEY TESTIFY.  BUT NOT FOR THE REST

1    OF THE TRIAL. THAT WOULD BE AN UNNECESSARY EXPENSE AND

2    UNNECESSARY.

3              **MR. KEARL:**  TWO OTHER THINGS.  IN SORT OF THE SPIRIT

4    OF FULL DISCLOSURE, ONE:  I CAN MEET THE SCHEDULE. I DO TEACH AT

5    BRIGHAM YOUNG UNIVERSITY.  AND I CAN ARRANGE FOR SOME MISSES,

6    BUT I WOULD NEED TO KNOW -- I NEED SOME LEADS ON WHEN I WOULD

7    HAVE TO BE HERE.

8              **THE COURT:**  OF COURSE.

9              **MR. KEARL:**  I CAN'T STRAND 500 STUDENTS AT THE LAST

10   MINUTE.

11             **THE COURT:**  VERY REASONABLE REQUEST.  I WOULD MAKE

12   THE LAWYERS GIVE YOU THAT KIND OF NOTICE.

13             **MR. KEARL:**  ALL OF THE WORK THAT I DO IS MY OWN WORK.

14   THAT IS, I WRITE THE FINAL REPORT, BUT IT IS ALWAYS

15   COLLABORATIVE WITH THE STAFF THAT I USE AT CRA. THEY MAKE ME A

16   BETTER EXPERT, FRANKLY. AND IN THIS CASE WITH THIS SHORT HORIZON

17   I JUST WANT YOU TO KNOW -- AND I'LL SAY IT IN THE LETTER -- BUT

18   YOU WILL GET MY BEST EFFORTS, AND IT WILL BE MY EFFORTS.  BUT I

19   SEE NO WAY OF DOING THIS, I DON'T THINK, ALONE.

20             **THE COURT:**  WELL, HOW MANY STAFF PEOPLE DO YOU THINK

21   WOULD YOU NEED?

22             **MR. KEARL:**  PARDON?

23             **THE COURT:**  HOW MANY STAFF PEOPLE WOULD YOU BE

24   NEEDING?

25             **MR. KEARL:**  I WOULD RELY ON PROBABLY TWO PEOPLE, A

1    PRINCIPAL IN THE SALT LAKE CITY OFFICE WHO HAS A PHD IN

2    ECONOMICS THAT WOULD SORT OF WORK WITH ME ON CRITIQUING THE

3    REPORTS.

4              AND THEN, ON WRITING MY OWN REPORT YOU DON'T WANT ME

5    TO SPEND THE TIME DOING THE FOOTNOTES AND ALL OF THAT SORT OF

6    STUFF.  AND I WOULD USE A RESEARCH ASSOCIATE BILLED AT A LOW

7    RATE TO DO THE SORT OF THE PULLING TOGETHER OF THE MATERIALS.

8              **THE COURT:**  WHEN THEY BUST YOU ON CROSS-EXAMINATION

9    BECAUSE THE FOOTNOTE IS NO GOOD THEN --

10             **MR. KEARL:**  NO.  NO.

11             **THE COURT:**  -- LET'S SAY ARE YOU GOING TO BLAME IT ON

12   THE --

13             **MR. KEARL:**  I VERIFY ALL THE FOOTNOTES.  BUT AT LEAST

14   I FOUND AS I WORK WITH CLIENTS THAT THEY DON'T WANT ME TO SPEND

15   MY TIME SORT OF DOING THAT KIND OF STUFF.

16             THE FINAL THING -- AND IT'S CERTAINLY IN THE SPIRIT

17   OF FULL DISCLOSURE -- I DON'T SEE A WAY TO PROVIDE A BUDGET FOR

18   YOU.  I CAN PROVIDE HOURS, BUT I KNOW NOTHING ABOUT THIS CASE

19   AND I KNOW NOTHING ABOUT THE SCOPE OF THE RECORD THAT EVEN

20   NARROWED TO THESE TWO EXPERTS AND WHAT WILL BE IN THEIR

21   FOOTNOTES, AND IN THEORY I CAN'T TELL YOU SORT OF WHAT SITTING

22   HERE TODAY -- I SIMPLY CAN'T TELL YOU HOW MANY HOURS.  BUT I CAN

23   TELL YOU WHAT MY HOURLY RATE WOULD BE AND THAT WOULD BE --

24             **THE COURT:**  WELL, I WOULD WANT TO KNOW YOUR HOURLY

25   RATE, BUT THE HELPERS --

1          **MR. KEARL:**  SURE.  AND I WOULD PROVIDE THAT.

2          **THE COURT:**  YOU KNOW, I HAVE TO TAKE INTO ACCOUNT THE

3     OVERALL BUDGET.  AND IF YOU IN FAIRNESS CAN'T DO IT, THEN YOU

4     CAN'T DO IT.  AND THAT'S NOT A DEAL KILLER, EITHER. IT'S JUST

5     ONE PIECE OF INFORMATION THAT WOULD BE USEFUL.  BUT IF YOU CAN'T

6     GIVE IT, THEN I HAVE TO DECIDE BASED ON WHAT INFORMATION I HAVE.

7     ALL RIGHT.

8          **MR. COOPER:**  YOUR HONOR, WOULD THE 706 EXPERTS BE

9     PERMITTED TO DIRECT QUESTIONS TO THE PARTIES' EXPERTS DURING

10    DEPOSITION?

11         **THE COURT:**  I'VE GOT TO THINK ABOUT THAT.  WHAT DO

12    YOU THINK?  I THINK YOU SHOULD BE THERE TO ASK THOSE QUESTIONS.

13         **MR. COOPER:**  I WOULD BE THERE, AND I WOULD TAKE THE

14    QUESTIONS, OBVIOUSLY, FROM THE 706 EXPERT.  FROM THE MATERIAL

15    THAT I'VE READ FOLLOWING FEDERAL CIRCUIT'S OPINION I BELIEVE

16    THEY ARE PERMITTED NOT ONLY TO ASK QUESTIONS DURING THE

17    DEPOSITION, BUT ARE PERMITTED SUBJECT TO YOUR HONOR'S DISCRETION

18    TO ASK QUESTIONS OR DIRECT QUESTIONS DURING TRIAL.

19         **THE COURT:**  WELL, I WOULD -- I'M GOING TO -- I LIKE

20    THAT IDEA. BEFORE I SAY "YES" TO IT I WOULD WANT TO LET THE

21    LAWYERS WEIGH IN ON IT. BUT LET'S PUT THAT ON THE TABLE AS A

22    POSSIBILITY.

23         **MR. COOPER:**  OKAY.

24         **THE COURT:**  MAY I ASK YOU WHILE YOU ARE STANDING -- I

25    NEED TO BRING THIS TO A CLOSE BECAUSE THE U.S. ATTORNEY'S OFFICE

1   WANTS TO HAVE A HEARING ON SOMETHING. BUT CAN YOU THINK OF ANY

2   OTHER WAY TO MAKE THIS RUN SMOOTHER, EVEN IF -- I'M FOCUSING

3   MAINLY IN THE NEXT WEEK AND A HALF TO HELP ME GET TO THE BOTTOM

4   OF WHAT -- AND COMING UP WITH WHAT THE ASSIGNMENT IS GOING TO

5   BE, WHAT IDEAS DO YOU HAVE?

6           **MR. COOPER:**  WELL, THE FIRST IDEA I HAD WAS TO SEE IF

7   WE COULD LOOK AT THE REPORTS TO DISCERN FOR THE 7O6 EXPERTS THE

8   COMMON FACTS AND THE COMMON ISSUES.

9           SECONDLY, I THINK THAT THERE'S SOME -- THERE ARE

10  TWO  -- I WOULD HAVE TWO CLIENTS HERE WHO ARE SOMEWHAT IN

11  COMPETITION.  SO I THINK THAT MY COMMUNICATION WITH THEM AT

12  LEAST IN THIS EARLY STAGE OF WRITING THE LETTERS PARTICULARLY

13  WITH REGARD TO FEES SHOULD BE SOMEWHAT LIMITED THERE.

14          BUT THEN, I ASK THE QUESTION AS TO WHETHER -- I KNOW

15  THE EXPERTS CANNOT COMMUNICATE WITH THE COURT INDEPENDENTLY, BUT

16  WOULD I -- WOULD THE PARTIES OBJECT TO THE EXTENT THAT I

17  COMMUNICATE WITH THE EXPERTS AND WITH THE COURT OR SHOULD THAT

18  ALL BE DONE WITH FULL VISIBILITY?

19          **THE COURT:**  LET'S BE CLEAR.  IT'S OKAY, ISN'T IT,

20  THAT THEY CAN SEND ME THEIR PROPOSALS, THEIR FEE PROPOSALS AND

21  THEIR AVAILABILITIES AND THAT SORT OF THING.

22          **MR. COOPER:**  OH, YES. BUT IN TERMS OF ME REPRESENTING

23  BOTH OF THEM AT THE SAME TIME DURING THE FEE PROPOSALS, I

24  THOUGHT THAT SHOULD BE INDEPENDENT.

25          **THE COURT:**  NO, YOU SHOULDN'T BE DOING THAT.  AND YOU

KATHERINE WYATT, OFFICIAL REPORTER, CSR, RMR (925) 212-5224

```
 1    DON'T NEED TO DO THAT PART.
 2              MR. COOPER:  RIGHT.
 3              THE COURT:  HOW ABOUT THIS?  WOULD EVERYONE AGREE
 4    THAT THE MATERIALS THAT WERE USED ON THE DAUBERT HEARING, ONE OF
 5    THE TWO SIDES, MAYBE BOTH OF YOU, THAT THAT BE MADE AVAILABLE?
 6    THAT IS AVAILABLE NOW, INCLUDING THE ORDER THAT I PUT OUT.  AND
 7    THAT THAT COULD BE -- THE EXPERTS COULD BE -- COULD LOOK AT THAT
 8    TO GET SOME BACKGROUND ON THE CASE EVEN BEFORE WE GET TO THE NEW
 9    REPORTS.  IS THAT SOMETHING THAT -- FIRST LET ME ASK THE TWO
10    SIDES:  IS THAT OKAY?
11              MR. VAN NEST:  SURE.  THAT'S FINE.  YOU ARE TALKING
12    ABOUT YOUR ORDER AND THE MATERIALS WE SUBMITTED WITH OUR MOTION?
13              THE COURT:  CORRECT, INCLUDING ANYTHING THAT WAS
14    UNDER SEAL.
15              MR. VAN NEST:  SURE.
16              THE COURT:  HOW ABOUT MR. JACOBS?
17              MR. JACOBS:  THAT'S FINE, YOUR HONOR.  I JUST ASSUMED
18    FOR THE SAKE OF GOOD ORDER THAT BOTH EXPERTS --
19              THE COURT:  THEY WOULD SIGN ON THE PROTECTIVE ORDER.
20              MR. JACOBS:  TERRIFIC.
21              THE COURT:  ALL RIGHT.
22              MR. KEARL:  YES.
23              THE COURT:  AND SO MR. COOPER WOULD YOU COORDINATE IN
24    GETTING TO -- YOU COULD AT LEAST SEND BOTH SIDES THE SAME PACKET
25    OF MATERIAL.
```

```
 1              MR. COOPER:  YES.  YES.

 2              THE COURT:  ALL RIGHT.

 3              MR. COOPER:  AND I ASSUME IT'S AVAILABLE

 4   ELECTRONICALLY.

 5              MR. VAN NEST:  YES.

 6              THE COURT:  NOW, I'M GOING TO WANT YOUR LETTERS, SAY,

 7   IN A WEEK OR SO.  SO COULD YOU GET THEM TO ME BY, SAY, AT LEAST

 8   IN A WEEK?  A WEEK FROM NOW SO THAT -- BECAUSE I WOULDN'T WANT

 9   YOU TO WAIT UNTIL YOU READ ALL THIS STUFF.  YOU MAY NOT EVEN GET

10   THIS MATERIAL FOR A WEEK.  AND MR. COOPER IS GOING TO HAVE TO

11   GET YOU SIGNED ON TO THE PROTECTIVE ORDER.

12              YES, SIR.

13              MR. DEGEN:  YES.

14              MR. KEARL:  LET ME CLARIFY.  YOU WANTED THE LETTERS,

15   A TIMETABLE, STAFFING PROPOSAL.  AND --

16              THE COURT:  AND ANY CONFLICTS.  ANY OF THE ISSUES

17   WE'VE TALKED ABOUT HERE TODAY YOU THINK I SHOULD KNOW ABOUT THAT

18   WOULD BE A PRO OR A CON, I WOULD LIKE TO KNOW ABOUT.

19              MR. KEARL:  OKAY.

20              THE COURT:  AND KEEP IN MIND THAT EVENTUALLY I'LL

21   PROBABLY LET THE LAWYERS SEE THE LETTER.

22              YES, SIR.

23              MR. DEGEN:  HONESTLY, YOUR HONOR, IF THE SPECTRUM IS

24   OCTOBER 1 TRIAL --

25              THE COURT:  OCTOBER 31ST.
```

1        **MR. DEGEN:**  OCTOBER 31 IS STILL ON THE TABLE MAYBE

2   YOU SHOULD ASK FOR THE LETTERS BY TUESDAY.

3        **THE COURT:**  TO DO WHAT?

4        **MR. DEGEN:**  ASK FOR THE LETTERS BY TUESDAY. I MEAN,

5   I'M VERY CONCERNED WITH THE WHOLE --

6        **THE COURT:**  I WON'T BE HERE NEXT WEEK, SO I WON'T BE

7   ABLE TO MAKE A DECISION BY TUESDAY.

8        **MR. DEGEN:**  I SEE.

9        **THE COURT:**  BUT LET'S SAY -- OKAY.  LET'S SAY BY

10  FRIDAY SO THAT I CAN MAKE A DECISION THE FOLLOWING WEEK.

11       **MR. DEGEN:**  BECAUSE, IN GENERAL, WHAT I'M HEARING IS

12  IF WE'RE GOING TO ASK QUESTIONS AT DEPOSITION, YOU KNOW THE

13  TIMETABLE FOR THIS WHOLE THING IS GOING TO BE REALLY TIGHT IF IT

14  STAYS ON ITS CURRENT TRIAL SCHEDULE.

15       **THE COURT:**  SEE, I WON'T HAVE ANY PROBLEM WITH

16  POSTPONING IT SOME.  BUT AS SOON AS I START SUGGESTING THAT,

17  THEN THE LAWYERS WILL ANGLE FOR WHAT THEY WANT TO HAVE. YOU

18  KNOW, THEY HAVE A HIDDEN AGENDA.  AND THE HIDDEN AGENDA'S ALWAYS

19  VERY WELL CAMOUFLAGED AND HIDDEN.  SO I JUST LIKE TO KEEP THEIR

20  FEET TO THE FIRE.  AND USUALLY I DO IT. BUT IT MAY BE -- SEE,

21  YOU HAVE THIS PRACTICAL PROBLEM. I WANT YOU AT THOSE

22  DEPOSITIONS, AND I WANT YOU TO HAVE TIME TO DO A GOOD

23  PROFESSIONAL JOB.

24       SO THAT MAY MEAN THAT WE WOULD SLIP THIS TRIAL FOUR

25  WEEKS.  IT WOULD BE IN THAT RANGE.  IT WON'T BE IN THE RANGE OF

1    THREE MONTHS.

2              I GOT TO COME BACK TO MY ORIGINAL PROBLEM, THOUGH. I

3    HAVE A -- I THINK IT'S THE LARGEST CASE IN THE HISTORY OF THIS

4    COURT THAT GOES BACK TO 1852.  WE'VE NOW SURPASSED 5,000 FILINGS

5    IN THE CASE.  AND I STILL HAVE TRIAL NUMBER TWO TO DO, WHICH IS

6    SET FOR OCTOBER.

7              I HAVE TO GIVE THAT AND THE REST OF MY CRIMINAL

8    CALENDAR PRIORITY. AND I DON'T KNOW HOW THAT'S GOING TO SHAKE

9    OUT. SO I HAVE THAT INDEPENDENTLY OF ALL OF THIS TO DO.

10             BUT IF IT LOOKS LIKE THAT CASE IS GOING TO GO AS

11   SCHEDULED AND THE LAWYERS THERE DO NOT NEED A CONTINUANCE, THEN

12   I MAY BE FORCED TO DO THIS CASE ON OCTOBER 31ST, MEANING OURS.

13             SO YOU SEE IF I ONLY HAD THIS CASE TO DEAL WITH, I

14   WOULD SAY RIGHT NOW LET'S JUST SLIP IT FOUR WEEKS.  WE WILL

15   START -- WE WILL JUST CONSUME OUR CHRISTMAS HOLIDAYS.  THE

16   HOLIDAYS NEVER GOT -- DID YOU KNOW YOU PROBABLY -- YOU CAN'T GET

17   A LAWYER TO DO ANYTHING IN THE, QUOTE, "HOLIDAYS."  IT'S TRUE.

18   AND THE HOLIDAYS RUN FROM OCTOBER 31 TO VALENTINE'S DAY. I HAVE

19   LEARNED THAT IN THIS JOB.

20             THE HOLIDAYS ARE NOT JUST, YOU KNOW, DECEMBER. ALL

21   RIGHT.

22             WE'RE GOING TO -- I NEED TO BREAK HERE.  AND I WANT

23   TO END BY THANKING YOU. YOU ARE WONDERFUL TO BE INTERESTED IN

24   DOING THIS.

25             IT WOULD BE A SERVICE TO THE COURT, AND I THINK TO

KATHERINE WYATT, OFFICIAL REPORTER, CSR, RMR (925) 212-5224

1    THE JURY.  AND I BELIEVE A MOST INTERESTING ASSIGNMENT TO BOOT.

2    SO GOOD LUCK TO YOU.  I LOOK FORWARD TO HEARING FROM YOU.  AND

3    THANK YOU FOR COMING.

4              WE WILL BE ADJOURNED.

5              I'M GOING TO STEP OUTSIDE AND GET MY OTHER FILE, AND

6    THEN I'M READY TO GO WITH THE CRIMINAL APPEAL IN JUST A MOMENT.

7              ALL RIGHT?  THANK YOU.

8              (THEREUPON, THIS HEARING WAS CONCLUDED.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2            I, KATHERINE WYATT, THE UNDERSIGNED, HEREBY CERTIFY

 3   THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED

 4   SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED BY ME INTO

 5   TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE

 6   RECORD OF SAID PROCEEDINGS.

 7            I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR

 8   ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING

 9   PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE

10   OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

11            THE FEE CHARGED AND THE PAGE FORMAT FOR THE

12   TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL

13   CONFERENCE.

14            IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS

15   22ND DAY OF AUGUST, 2011.

16

17

18

19

20        _____

21            \S\KATHERINE WYATT

22

23

24

25
```

KATHERINE WYATT, OFFICIAL REPORTER, CSR, RMR (925) 212-5224