EXHIBIT GG

APPEAL NO. 99-15852



THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

FILED

MAY 27 1999

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

**SONY COMPUTER ENTERTAINMENT INC., et al.,**

**Plaintiffs/Appellees,**

**vs.**

**CONNECTIX CORPORATION,**

**Defendant/Appellant.**

On Appeal From The United States District Court
For The Northern District Of California
No. C 99-00390 CAL

The Honorable Charles A. Legge, District Judge

---

OPENING BRIEF OF APPELLANT CONNECTIX CORPORATION

---

William Sloan Coats (94864)
Stephen J. Rosenman (170220)
Evangelina Almirantearena (138765)
Vickie L. Feeman (177487)
HOWREY & SIMON
301 Ravenswood Avenue
Menlo Park, CA 94025
Telephone: (650) 463-8100
Facsimile: (650) 463-8400

Counsel for Defendant/Appellant CONNECTIX CORPORATION

May 26, 1999

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................. 1

STATEMENT OF JURISDICTION ......................................................................... 2

STATEMENT OF THE ISSUES ............................................................................. 3

STATEMENT OF THE CASE ................................................................................ 4

I.     THE NATURE OF THE CASE ....................................................................... 4

II.    THE COURSE OF PROCEEDINGS ............................................................... 7

III.   STATEMENT OF THE FACTS ....................................................................... 8

       A.     Sony PlayStation ............................................................................. 9

       B.     Reverse Engineering Program Code. .............................................. 10

       C.     Functional Elements of Sony's BIOS. ............................................ 10

       D.     Connectix' Reverse Engineering of the PlayStation ...................... 11

              1.     Observing Unprotected Aspects of Sony's BIOS .................. 11

              2.     Emulating Sony's BIOS Functionality. ............................... 13

              3.     Comparing Unprotected Aspects of Sony's BIOS. ............... 14

              4.     Disassembling Small Portions of Code. ............................... 14

       E.     Success of Virtual Game Station ..................................................... 15

       F.     Examples of the District Court Misunderstanding Reverse
              Engineering Software And Emulation Technology ........................... 17

SUMMARY OF THE ARGUMENT ....................................................................... 21

ARGUMENT ..................................................................................................... 24

I.     STANDARD OF REVIEW ON APPEAL OF PRELIMINARY
       INJUNCTIVE RELIEF ................................................................................ 24

II. SONY DID NOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON ITS COPYRIGHT CLAIM BECAUSE CONNECTIX FAIRLY USED THE UNPROTECTED ELEMENTS OF SONY'S BIOS TO CREATE A COMPATIBLE PRODUCT ...................................... 24

    A.    The Balance of Fair Use Factors Weighs Overwhelmingly in Connectix' Favor. ............................................................... 25

    B.    The Evidence Establishes It Was Necessary For Connectix To Copy Sony's BIOS In Order To Access Its Unprotected Ideas And Functional Elements; Connectix Must Prevail On The Second Fair Use Factor........................................................ 27

        1.    The Ninth Circuit recognized the unique nature of software in <u>Sega v. Accolade</u>. .................................... 27

        2.    Connectix had a legitimate interest in accessing the unprotected elements of Sony's BIOS. ..................................... 29

        3.    The functional aspects of Sony's BIOS are invisible. ............. 29

        4.    Connectix necessarily used Sony's BIOS to discover the functional requirements needed to create a compatible product. ............................................................... 30

        5.    Connectix undertook substantial effort to develop its own innovative software product. ............................................. 31

        6.    There is no viable alternative to copying to access the unprotected elements, and a clean room approach would not have avoided the need to copy. ........................................... 33

        7.    The district court erroneously rejected some of Connectix' evidence of fair use. .............................................. 34

    C.    The Evidence Overwhelmingly Demonstrates VGS Is Transformative And That The Purpose And Character Of Connectix' Use Supports Finding The Second Fair Use Factor In Connectix' Favor........................................................ 36

D.      Connectix Disassembled Only Small Portions Of Sony's BIOS
        And The Third Fair Use Factor Should Weigh In Connectix'
        Favor. ..................................................................................... 38

E.      Any Impact On The Potential Market For The PlayStation
        Hardware Console Is Speculative, Minimal And Incidental And
        The Fourth Fair Use Factor Favors Connectix ................................... 39

F.      The District Court Improperly Put The Burden Of Proof Of
        Fair Use On Connectix At The Preliminary Injunction Stage ........... 40

G.      Connectix' Use Of Information Freely Available On The
        Internet Was Proper And Has No Impact On Its Fair Use
        Defense. .................................................................................... 41

III.    THE DISTRICT COURT ERRONEOUSLY ENJOINED THE SALE
        OF AN UNDISPUTEDLY NONINFRINGING PRODUCT BASED
        SOLELY ON INTERMEDIATE COPYING ................................................. 41

IV.     CONNECTIX IS PERMITTED TO COPY THE SONY BIOS IT
        OWNS AS AN ESSENTIAL STEP IN UTILIZING IT IN
        CONJUNCTION WITH A COMPUTER ....................................................... 44

V.      SONY CANNOT ENFORCE ITS COPYRIGHT BECAUSE IT IS
        MISUSING IT AS A MATTER OF LAW .................................................... 46

        A.      Sony Is Misusing Its Copyright To Obtain Patent-like
                Protection Over Its PlayStation Video Game System ...................... 46

        B.      Sony Is Misusing Its Copyright To Preclude Consumers From
                Choosing Other Platforms On Which To Play Video Games ........... 48

VI.     VGS DOES NOT TARNISH THE PLAYSTATION MARK ..................... 49

        A.      Although Some Users May Prefer The PlayStation, Other Users
                And Reviewers Enthusiastically Praise VGS .................................. 49

        B.      Sony Has Not Suffered Any Lessening Of The Capacity Of Its
                Marks To Identify And Distinguish Its Goods ................................ 53

VII.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT ................... 54

## TABLE OF AUTHORITIES

## <u>CASES</u>

Accuride Int'l, Inc. v. Accuride Corp., 871 F.2d 1531, 1538 (9th Cir. 1989) ..................................................................................... 49

Alcatel U.S.A., Inc. v. DGI Technologies, Inc., 166 F.3d 772, 790-91 (5th Cir. 1999) .................................................................. 42, 46, 47

Allen v. Academic Games League of America, 89 F.3d 614, 616 (9th Cir. 1996) .................................................................................. 48

Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 264 (5th Cir.) cert. denied, 449 U.S. 899 (1980) .................................................. 50

Cadence Design Systems, Inc. v. Avant! Corp., 125 F.3d 824, 830-31 (9th Cir. 1997), cert. denied, 118 S. Ct. 1795 (1998) ...................... 43

Campbell v. Accuff-Rose, 510 U.S. 569, 577 (1994) .........21, 25, 26, 27, 29, 38, 43

Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990) ................................ 24

Harper & Row, Publishers Inc. v. Nation Enterprises, 471 U.S. 539, 547 (1985) ................................................................................. 25

Kepner-Tregoe, Inc. v. Leadership Software, Inc., 12 F.3d 527, 538 (5th Cir.), cert. denied, 513 U.S. 820, 115 S. Ct. 82 (1994) ......................... 42

Lasercomb America, Inc. v. Reynolds, 911 F.2d 970, 977-79 (4th Cir. 1990)) ................................................................................ 47, 48

Lewis Galoob Toys, Inc. v. Nintendo of America, Inc., 964 F.2d 965, 971 (9th Cir. 1992) ..................................................................... 48

MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 517-19 (9th Cir. 1993) ................................................................................ 44, 45

Minnesota Mining and Manufacturing Co. v. Rauh Rubber, Inc., 943 F. Supp. 1117, 1132 (D. Minn. 1996), aff'd, 130 F.3d 1305 (8th Cir. 1997) ........................................................................... 49

Panavision Int'l L.P. v. Toeppen, 945 F. Supp. 1296, 1304 (C.D. Cal. 1996), aff'd, 141 F.3d 1316, 1325 (9th Cir. 1998) .................................. 49, 50

Practice Management Info. Corp. v. American Med. Ass'n, 121 F.3d 516, 521 (9th Cir. 1997), as amended, 133 F.3d 1140 (9th Cir. 1998), cert. denied, 119 S. Ct. 40 (1998) ............................................... 46, 47

Religious Technology Center v. Netcom On-line Communication Services Inc., 923 F. Supp. 1231, 1242 n.12 (N.D. Calif. 1995) ................ 25

Ringling Bros. – Barnum & Bailey Combined Shows, Inc. v. Utah Division of Travel Development, 170 F.3d 449, 452-61 (4th Cir. 1999) ........................................................................................................ 52

Roe v. Anderson, 134 F.3d 1400, 1402 (9th Cir. 1998), aff'd, 67 U.S.C.W. 4291 (1999) ........................................................................ 24

Sega v. Accolade, 977 F.2d 1510 (9th Cir. 1992) ..............................................4, 20, 21, 22, 27-34, 36-42, 46, 47

St. John v. North Carolina Parole Comm'n, 764 F. Supp. 403, 412 (W.D.N.C. 1991) aff'd, 953 F.2d 639 (4th Cir. 1992) ................................... 50

The New Kids On The Block v. News America Publ'g, 971 F.2d 302, 308 (9th Cir. 1992) .............................................................................. 53

Triad Systems Corp. v. Southeastern Express Company, 64 F.3d 1330, 1335 (9th Cir. 1995) cert. denied, 516 U.S. 1145 (1996) ............. 44, 45

Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156 (1975) ................... 48

Vault v. Quaid, 847 F.2d 255, 260 (5th Cir. 1988) ..................................... 45

## OTHER AUTHORITIES

3 McCarthy, Trademarks and Unfair Competition § 24.16[1] ............................... 49

European Software Directive, Article 5 and 6 ....................................................... 22

M. Nimmer & D. Nimmer, Nimmer on Copyright, § 13.03[A][1][d] .................... 24

# RULES

17 U.S.C. § 502(a) ................................................................ 41, 44

17 U.S.C. § 106 ........................................................................ 42

17 U.S.C. § 102(b) ......................................................... 24, 25, 28

17 U.S.C. § 107 .............................................................. 21, 25, 26

17 U.S.C. § 117 ................................................................. passim

17 U.S.C. § 502 ................................................................. 42, 44

17 U.S.C. § 504 ........................................................................ 43

17 U.S.C. § 1203 ...................................................................... 45

28 U.S.C. § 1292(a)(1) ............................................................... 2

28 U.S.C. § 1331 ........................................................................ 2

28 U.S.C. § 1338 ........................................................................ 2

28 U.S.C. § 1367 ........................................................................ 2

35 U.S.C. § 100 ......................................................................... 6

Fed. R. App. P. 4(a)(1) .............................................................. 2

Fed R. App. P. 26.1 .................................................................. 1

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, defendant-appellant Connectix Corporation states that it is a corporation organized under the laws of the state of California.  Connectix Corporation has no parent corporations or any publicly held companies owning 10% or more of its stock.

## STATEMENT OF JURISDICTION

This is an appeal from an interlocutory decision granting appellees' (collectively "Sony") motion for preliminary injunction. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

The district court's decision was entered on April 20, 1999. That decision is appealable and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1). Appellant Connectix Corporation ("Connectix") timely filed a notice of appeal on April 28, 1999, pursuant to Federal Rule of Appellate Procedure 4(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in finding that Connectix' necessary use of Sony's code in order to access its unprotected elements was not a fair use.

2.      Whether the district court erred in enjoining Connectix from selling its software product that all parties concede does not infringe any copyrighted work of plaintiffs.

3.      Whether the district court erred in enjoining Connectix from loading program code it owns into a computer as an essential step in utilizing the code in conjunction with that computer pursuant to 17 U.S.C. § 117.

4.      Whether the district court erred in enjoining Connectix based on copyrights that are being misused by Sony.

5.      Whether the district court erred in finding that Sony established a likelihood of success on its trademark dilution claim.

## STATEMENT OF THE CASE

### I.      THE NATURE OF THE CASE

In this case, Sony seeks to distort the copyright and trademark laws to give Sony a patent-like monopoly over its PlayStation video game system.  All Connectix has done is load and observe the operation of Sony's published BIOS computer code, and disassemble small portions of code into human readable form, for the sole purpose of achieving compatibility with PlayStation games.  Connectix' software product, Virtual Game Station ("VGS"), when installed on a personal computer, permits video games that play on a PlayStation to play on a personal computer.  Thus, the personal computer emulates a PlayStation console.  Connectix is not alone in using computer software to emulate the behavior of other products:  such well known products as Sun Microsystems' Java™ language use emulation.  [CR67, ¶¶10-11; CR69, Exh. G]

The issue in this case is not whether copying occurred, but rather whether the copying was necessary in order to understand and create a new noninfringing work compatible with PlayStation games.  The district court flatly has failed to follow the existing Ninth Circuit precedent on this issue, Sega v. Accolade, 977 F.2d 1510 (9th Cir. 1992).

Sony can assert a copyright claim for only one reason:  unlike every other copyrighted work, the ideas and functions embodied in object code are not visible and thus cannot be ascertained readily by human beings.  Accessing and studying the unprotected aspects of code requires either observing the code in operation or disassembling it.  Both of those processes, by necessity, create copies.  For every other copyrighted work the law is clear:  a copyright holder can retain control over

the ideas embodied in that work only if it keeps the work secret. If the copyright holder sells its work to the public, as Sony has done, then, unlike under patent law, the copyright holder can monopolize only the expression of its ideas. The ideas themselves are available for anyone to use. <u>This is the fundamental bargain of copyright law; it is the engine for human progress – one idea building upon another.</u>

Sony is attempting to break that fundamental bargain. Sony is economically exploiting its copyrighted BIOS and yet claiming that no one else can learn and use the ideas in its program code. If Sony wanted protection for its ideas, it should have sought a patent, which, unlike a copyright, does protect ideas. Absent a patent, Sony has no lawful right to monopolize the ideas in its programs. As is true with every other copyrighted work, Sony's ideas should be available to everyone.

The PlayStation is a video game console that enables users to play video games on a television set. Connectix necessarily used code resident in the PlayStation during Connectix' reverse engineering process to understand how to emulate it. Then, Connectix created an entirely new work, VGS, that allows PlayStation games to run on Macintosh computers. <u>Sony concedes that Connectix' final product does not contain or otherwise infringe any of Sony's copyrighted code; Sony also concedes that copying and disassembly of Sony's code is necessary to create a compatible product.</u> [CR5, ¶5; CR11, ¶5]

This is an appeal from the district court's order (1) enjoining Connectix from making copies of or using Sony's code as a step in developing a version of VGS for Windows-based computer systems, (2) enjoining Connectix from selling

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852                                                                 5

or distributing VGS for either Macintosh or Windows-based computer systems, and (3) ordering Connectix to deliver to the court all copies of Sony's code.

The district court's order prevents Connectix from using common reverse engineering techniques to make a compatible software product. Under the trial court's logic, the entire U.S. software industry would be prevented from making compatible products if they competed in any manner with the product being reverse engineered. Such logic would preclude competition and innovation in the American computer industry, and make a copyright, with its trivial requirements to obtain and its long duration, a far more powerful form of intellectual property protection than a patent. See, 35 U.S.C. § 100 et seq. Indeed, if such protection were available to other works under copyright law, new and unique works of literature, art and music produced by artists who had previously studied competing reproductions could also be enjoined from sale.

In this appeal, Connectix seeks reversal of the district court's preliminary injunction order because it was based on an erroneous view of the law and a clearly erroneous assessment of the evidence. The district court erroneously found that Connectix' necessary copying of Sony's code to access its unprotected functional elements in order to create a compatible product was not a fair use. Among other things, the district court erroneously placed the burden of fair use on Connectix, failed to determine whether or to what extent it was necessary for Connectix to copy Sony's code and rejected declarations submitted by Connectix in support of its opposition to Sony's motion. The court also erroneously found that Connectix' innovative product, which emulates the functionality of the unprotected PlayStation entirely in software, was not transformative. In prohibiting Connectix from fairly using Sony's code to access and study its

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852                                                                    6

unprotected aspects, the district court erroneously granted Sony a patent-like monopoly over the invisible ideas and functions embodied in its copyrighted code.

The district court also erred in enjoining Connectix from selling VGS despite the court's express finding that VGS does not contain or otherwise infringe any copyrighted material. The district court further erred by enjoining Connectix from loading program code it owns into a computer pursuant to 17 U.S.C. § 117. Additionally, the evidence and law do not support the district court's finding that Sony established a likelihood of success on its trademark dilution claim based merely upon evidence that a select group of survey participants marginally prefer the PlayStation.

Connectix requests that this Court reverse the district court's preliminary injunction order and allow Connectix to fairly use Sony's copyrighted code to access its unprotected elements and to sell its compatible VGS products.

## II.    THE COURSE OF PROCEEDINGS

On January 27, 1999, Sony filed its complaint alleging copyright infringement, trademark dilution and other causes of action. On February 3, 1999, Sony filed an *ex parte* application for a temporary restraining order, and Connectix filed an opposition to that application. The district court denied the application at a hearing on February 4, 1999. Sony again sought a temporary restraining order on March 3, 1999. Connectix filed an opposition to Sony's second application on March 5, 1999. On March 11, 1999, the district court denied Sony's second application, permitting Connectix to continue selling VGS but it did prohibit further copying of Sony's code in the development process.

After expedited discovery, Sony filed its Motion for Preliminary Injunction on March 10, 1999. Connectix filed its response on shortened time on March 19,

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852                                                          7

1999, and Sony filed its reply on March 26, 1999. A hearing on Sony's motion was held on April 9, 1999. On April 20, 1999, the district court issued an order enjoining Connectix' use of Sony's code and Connectix' sale of both Macintosh and Windows based VGS. [CR106]

On April 24, 1999, Connectix filed an *ex parte* motion with the district court to stay or modify the injunction. A hearing on the motion was held on April 27, 1999, during which the district court denied Connectix' motion.

Connectix filed a timely notice of appeal on April 28, 1999. On April 30, 1999, Connectix filed an emergency motion for stay of the district court's injunction order pending appeal, or an expedited briefing schedule. The Ninth Circuit issued an order denying the stay on May 12, 1999, but ordered that this appeal be set for the first available date for oral argument after Sony files its response.

## III.   STATEMENT OF THE FACTS

Ten years ago, inventor Jon Garber formed Connectix to market and distribute a software product known as Virtual that used emulation to virtually extend the RAM of a Macintosh II computer. [CR69, Exh. A] Since then, Connectix has invented a continuous stream of innovative and highly successful software products. Those products include Virtual PC, Ram Doubler, Speed Doubler and Surf Express. [CR70, Exh. F] Many of the products developed by Connectix are emulator products, designed to be compatible and compete with products reverse engineered by Connectix.

On September 17, 1998, Connectix privately demonstrated a working version of a PlayStation emulator to Sony. On January 5, 1999, Connectix

released VGS to the public at the MacWorld Expo 1999 trade show in San Francisco, at which it was selected Best of Show. [CR70, Exh. F]

VGS is an innovative computer software program that runs on an ordinary personal computer and allows a personal computer to emulate the Sony PlayStation console so users can play PlayStation compatible video games on their personal computers. [CR67, ¶10; CR65, ¶7]  VGS thus provides consumers an entirely new environment in which to play their PlayStation games. [CR67, ¶¶12, 15]

## A.    Sony PlayStation.

The PlayStation console is essentially a single-purpose computer that interfaces with a television set to allow users to play video games on their television set. [CR77, ¶2; CR67, ¶13]  The central component of the PlayStation console is a MIPS R3000 microprocessor.  The PlayStation also includes a graphics processing unit ("GPU"), a geometry transfer engine ("GTE"), a sound processing unit ("SPU"), a decompressor ("MDEC") and a compact disk drive ("CD-drive"). [CR77, ¶2]  PlayStation games are computer programs stored on compact disks, which are loaded into the CD-drive of a PlayStation console, and which interact and operate with the console. [CR65, ¶3]  The various console components work together to interpret and execute instructions from PlayStation games and to display resulting video images and sounds on a television set. [CR82, ¶6]

Basic control of the PlayStation hardware is provided by program code, which is resident in the hardware and which the parties have referred to as Sony's BIOS. [CR77, ¶3; CR40, ¶¶4-5; CR67, ¶¶14-15]  Sony's BIOS is stored in Read Only Memory ("ROM") in the PlayStation hardware as a series of 1's and 0's that

can be understood and executed by a microprocessor, but which cannot be read by humans.

## B.   Reverse Engineering Program Code.

Reverse engineering is the process of starting with a finished product and working backwards to analyze and understand how the product operates or how it was made. [CR67, ¶30; ER1, p. 28:19-23; ER2, p. 37:14-22]  There are only four ways to reverse engineer computer program code:  (1) by reading documentation about the code; (2) by observing the operation of the code; (3) by examining a printout of the instructions contained within the code; or (4) by examining individual instructions as the code is being run on a computer.  [CR67, ¶35]

The first method (reading documentation) rarely provides sufficient information to reverse engineer a product and the reverse engineer must of necessity typically resort to the last three methods, <u>each of which require intermediate copying</u> of the program code.  [CR67, ¶¶36-37]  In the second method, to observe its operation, the code must necessarily be loaded (copied) into a computer's main memory where it can be executed.  [CR67, ¶¶37-38, 40]  In the third method, examining printed instructions requires disassembling (copying) the code (translating the 1's and 0's of object code into human readable form) and printing a copy of the resulting text.  [CR67, ¶¶37, 39; ER2, pp. 37:23-38:10]  In the final method, observing instructions in real-time as program code is executed requires loading a copy of the code into memory and disassembling (copying) the instructions into human readable form.  [CR67, ¶¶37, 40]

## C.   Functional Elements of Sony's BIOS.

Sony's BIOS contains many functional elements, including the manner in which it interacts and interoperates with the PlayStation hardware and game

programs and the processes it instructs the hardware to perform.  [CR77, ¶¶2-3; CR40, ¶¶5-6; CR65, ¶¶2-6; CR68 ¶64; CR82, ¶¶3-4]  Those functional elements are not protected by copyright law.  17 U.S.C. § 102(b).  Moreover, the PlayStation consists mainly of hardware components, such as the MIPS R3000 microprocessor, GPU, GTE, SPU, and MDEC, [CR77, ¶¶2-3], which are likewise unprotected by copyright law.  To make VGS compatible with PlayStation games and allow them to play on a personal computer, it was necessary for Connectix to reverse engineer and emulate those unprotected elements.[1]  [ER1, p. 91:13-17; CR65, ¶¶6-7; CR67, ¶¶13-20]

### D.    Connectix' Reverse Engineering of the PlayStation.

#### 1.    Observing Unprotected Aspects of Sony's BIOS.

Connectix began developing its innovative product by writing software which would emulate or perform the same functions as the PlayStation hardware but on a whole new set of hardware — a personal computer.  [ER2, pp. 115:13-116:8; ER1, p. 159:3-17; CR65, ¶¶12-17]  Connectix first emulated the central component of the PlayStation, the MIPS R3000 microprocessor, which executes the game instructions and BIOS code.  [ER2, p. 116:14-18; CR65, ¶12; CR68, ¶19]  Connectix wrote an interpreter, which examines instructions one at a time from the BIOS or game programs, and then performs those operations on a Macintosh Power PC.  [CR65, ¶12; CR68, ¶¶19-26]

With this interpreter, Connectix engineers reverse engineered the unprotected interaction between Sony's BIOS and the hardware.  [ER2, p. 116:9-

---

[1] Compatibility is used here to mean compatibility between hardware and software.  This idea is often referred to as "interoperability."

18; CR65,¶¶14-15, 17, 27; CR68, ¶¶4, 35; CR67, ¶26]  Because the operation of
the BIOS and the hardware were not visible on the PlayStation, accessing those
unprotected aspects necessarily required loading the code onto a computer where
it could be run and observed.[2]  [CR40, ¶¶3-4; CR67, ¶¶33, 38-39; CR65, ¶¶9-10]
Once they understood the functionality the BIOS required from the hardware, the
engineers wrote software to emulate the hardware functionality.  [CR65, ¶16;
CR68, ¶¶40, 41, 50, 54].

Connectix next reverse engineered Sony's BIOS by running PlayStation
games in conjunction with the BIOS and its software emulator of the hardware.
[CR65, ¶17]  Not all games access all of the PlayStation hardware or utilize all of
the PlayStation functionality.  [CR68, ¶33]  Thus, Connectix had to run numerous
games in order to study the multitude of different requests received by the BIOS
and how it responded to those requests.  [CR65, ¶17]  Connectix needed to
understand every facet of this information to develop a software product that
would be compatible with PlayStation games.  [CR65, ¶¶15-17; CR68, ¶5]

---

[2] Connectix engineers, who each owned a PlayStation, first used a copy of Sony's
BIOS they downloaded from the Internet. [ER2, p. 110:2-13; CR64, ¶13]
Connectix was unaware at this point that there was more than one version of
Sony's BIOS, and assumed the version it was downloading was a captured image
of the code contained within the PlayStations that it already owned. [CR64, ¶13]
It was not until progress on the emulator was sufficient to display some text
screens (which appeared in Japanese) that it became obvious that this code was not
such a copy, whereupon Connectix purchased yet another new, up-to-date
PlayStation, and made sure it had an accurate, U.S. image. [CR64, ¶¶2, 13]
Connectix then downloaded and reverse engineered code from that PlayStation.
[CR64, ¶¶2-3; ER2, p. 122:16-24; ER1, pp. 54:21-56:16]

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852                                                                          12

### 2.    Emulating Sony's BIOS Functionality.

Once Connectix had gained some understanding of the unprotected manner in which the BIOS interacts with the hardware, the engineers removed Sony's BIOS from their emulation software in its entirety and proceeded to write code to emulate the necessary BIOS functionality. [ER2, pp. 121:24-122:8 ; ER1, pp. 65:23-66:14; CR65, ¶¶18-20; CR68, ¶¶63-74] Connectix wrote this code independently; it did not copy Sony's BIOS or examine a disassembled version of Sony's BIOS and most certainly did not gradually convert Sony's BIOS into its code. [ER2, pp. 120:9-121:5, 144:12-18; ER1, p. 157:5-7; CR64, ¶¶6-7; CR65, ¶23; CR68, ¶¶3, 6] Rather, Connectix began with an empty table consisting of entry points into the BIOS. [ER2, pp. 89:18-24, 120:9-18; CR65, ¶18; CR68, ¶¶64-65, 69; CR82, ¶7] For VGS to be compatible with PlayStation games, Connectix' table must necessarily contain the same entry points, and be in the same order and format, as the table in Sony's BIOS. [ER1, p. 91:13-17; CR65, ¶18; CR68, ¶69]

Many of the BIOS functions Connectix implemented (a third to a half) are standard "C" language functions that would be familiar to any experienced programmer. [CR65, ¶19; ER1, p. 86:4-11] To determine what was required of other functions, Connectix ran PlayStation games and recorded on its computer hard drive each time a game attempted to access Connectix' partially implemented "BIOS." [ER2, pp. 120:18-21, 121:15-19; CR65, ¶19; CR68, ¶76] Connectix did not use Sony's BIOS during this process. [ER2, pp. 121:24-122:8] Rather, using their experience and skill as programmers, Connectix engineers typically could deduce the requisite BIOS functionality simply by examining the function name, the information sent to and from the BIOS, or the general grouping of functions

requested by PlayStation games.[3]  [ER2, pp. 121:12-19, 144:16 - 145:3; CR65, ¶20; CR68, ¶77]  Other times they examined the hardware accesses performed before and after a function call to deduce the functionality the call supported. [ER2, pp. 121:15-19, 144:16-145:3; CR65, ¶¶17, 20; CR68, ¶78]  The engineers then independently wrote code to implement the required functionality.  [ER2, pp. 120: 21-24, 144:16-145:3; CR65, ¶¶19-20; CR68, ¶77]

### 3.    Comparing Unprotected Aspects of Sony's BIOS.

On a few occasions, Connectix engineers could not determine the required BIOS functionality by running games on their emulator.  [CR65, ¶21]  There were also times when their emulation software failed to operate in a manner fully compatible with PlayStation games.  [ER2, pp. 129:16-130:2; CR65, ¶21; CR68, ¶6]  On these occasions, the engineers again executed Sony's BIOS on their computer and observed its operation as described above.  [ER2, pp. 129:7-130:2; CR65, ¶21; CR68, ¶¶7, 9]  Using a combination of intuition and skill, they compared information generated by running a game with Sony's BIOS with information generated by running a game with their emulated "BIOS" to gain some understanding of the unprotected ideas and functionality embodied in Sony's BIOS.  [ER2, pp. 129:7-130:2, 130:17-131:4; CR65, ¶21; CR68, ¶6]

### 4.    Disassembling Small Portions of Code.

The engineers disassembled small portions of code as they ran the BIOS on their computer and examined the resulting human readable text on the computer

---

[3]  Connectix has implemented only 137 of the 242 functions implemented in Sony's BIOS.  [CR64, ¶10]

screen.[4]  [ER2, p. 125:16-24; ER1, pp. 62:2-22, 112:4-8; CR65, ¶¶22, 26, 28; CR68, ¶71]  The disassembled instructions provided one more piece of information to aid the engineers in deducing the unprotected aspects of Sony's BIOS.  [ER1, pp. 62:2-22, 154:21-25; CR65, ¶16; CR67, ¶27]  However, this technique of reverse engineering was even more time-consuming and difficult than observing the operation of the BIOS and Connectix used it only when necessary.  [ER2, p. 125:16-24; ER1, pp. 62:2-22, 116:14-16; CR65, ¶22; CR68, ¶7]

**E.    Success of Virtual Game Station.**

Using the reverse engineering techniques described above, Connectix independently created its noninfringing and innovative VGS.[5]  [ER2, pp. 120:9-121:5, 144:12-18; ER1, p. 157:5-7; CR64, ¶¶6-7; CR65, ¶23; CR68, ¶¶3, 6]

VGS has been a huge success.[6]  [CR70, Exh. N]  It won the prestigious "Best of Show" award upon its release at the MacWorld Expo 1999 trade show in

---

[4] Connectix engineers wrote a disassembler very early in the process that translates object code into human readable form.  [ER2, p. 113:10-11; CR65, ¶ 13; CR68, ¶ 23]  They tested this disassembler by running the Japanese BIOS obtained from the Internet through the disassembler in its entirety.  [ER2, pp. 110:1-13, 113:4-114:2; CR65, ¶13; CR68, ¶¶24-25]  Connectix' use of Sony's BIOS to test this disassembler is distinct from its use of the BIOS to develop VGS; Connectix engineers did not study or otherwise use the disassembled instructions generated by this test in their development of VGS.  [ER2, pp. 114: 3-14, 120:25-121:5; CR68, ¶3]

[5] At least one other PlayStation emulator product also has entered the market.

[6] Connectix has aggressively sought to protect its successful VGS product against piracy and to prevent consumers from playing pirated PlayStation games on VGS. Connectix has included technological measures in its software that detect and disable the play of counterfeit games.  [CR64, ¶11]  Unlike Sony, Connectix

San Francisco.  [CR69, Exh. L].  VGS has also been enthusiastically praised by reviewers:

> "As to whether the program works, the answer is yes, surprisingly well." *Newsweek Magazine*; "We have been playing around with the CVGS for hours now and we are really amazed with the outstanding performance.  The emulation is seamless. ... The games never jumped or became sluggish on any of the systems." *PlayStation Users Group;* "All of the games ran very smoothly, or at least as smoothly as the PlayStation in the other room." *consoledomain.com;* "IGNPSX has [had] the opportunity to test the software on the base-model G3 setup comparable in performance to an iMac, and the results were quite impressive to say the least." *psmonline.com, January 6, 1999;* "Not only did the game run just fine, it ran at full PlayStation speed!  I was completely and totally blown away." *kearney.net;* "I highly recommend VGS, and my highest compliments go to Connectix." *versiontracker.com.*

[CR 69, Exhs. E-K]

---

continuously polices the Internet for evidence that hackers have circumvented its measures and then attempts to update them accordingly in each new release of its software.  Id.  Owners of previous releases of VGS freely download upgrades (which also contain desirable performance improvements) off of Connectix' website and thus Connectix' updated antipiracy measures are effectively incorporated into prior releases of VGS.  Id.

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852

**F.     Examples of the District Court Misunderstanding Reverse Engineering Software And Emulation Technology.**

The district court did not have a clear understanding of the technological complexities of reverse engineering software in general, and emulation technology in particular:

- The district court mixed patent law and copyright law principles in attempting to understand and comprehend the issues surrounding reverse engineering of copyrighted computer code. [CR17, p. 38; CR28, p. 7] Indeed, that confusion has caused the district court to give Sony patent-like protection based only on a copyright.

- Although both Connectix engineers expressly testified at their depositions that they did not merely incrementally change Sony's BIOS, or use it as a template in any manner, but rather removed it in its entirety and independently wrote code to emulate the requisite BIOS functionality, [ER2, pp. 122:4-8, 130:6-131:4; ER1, p. 66:15-18], the district court nonetheless erroneously found that Connectix engineers "gradually converted" Sony's code. [CR106, pp. 9, 11]

- The district court erroneously found that "VGS does not do anything new, anything different, or anything unique from the PlayStation" because "it plays PlayStation games on a visual platform." [CR106, p. 15] In a software product, VGS has succeeded in emulating the hardware and firmware elements of the PlayStation console to allow VGS consumers to play video games on their personal computers – an entirely new and different environment for game play. It enables, for example, owners of PlayStation games to run their games on a laptop computer while flying at 30,000 feet, far from a television or electrical outlet for a

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852                                                    17

PlayStation game console.  Moreover, while no games currently exist solely for use on VGS, it is feasible that in the future such games could be developed.

- The district court erroneously found that "the Sony BIOS is the vital component of the PlayStation console," [CR 106, p. 18], despite evidence that the PlayStation contains many other components that are much more critical to the operation of the PlayStation – including the R3000 microprocessor, which executes the instructions from the BIOS and game programs.  [CR 77, ¶¶2-3; CR 67, ¶¶13-15]

- The district court mistakenly found that Connectix took "the heart of the original" (i.e., Sony's BIOS) and made it "the heart of a new" (i.e., VGS), when it is undisputed that Connectix independently wrote code to emulate the functionality of the BIOS, and did not copy the BIOS, or any portion of it, into its end product.  [ER2, pp. 121:24-122:8; ER1, pp. 65:23-66:14; CR65, ¶¶18-20; CR68, ¶¶63-74]  The evidence also does not demonstrate that the BIOS is "the heart" of the PlayStation – it simply controls some of the basic operation of the system.  [CR77, ¶3]  Moreover, Connectix has implemented only a portion (137 of the 242) of the functions implemented in Sony's BIOS.  [CR64, ¶10].  The other functions were not used by any game Connectix tested, and therefore the elements those functions required and what functionality they produced could not be ascertained from observation and were not emulated in VGS.  The absence of BIOS functions that are not actually used by games is direct evidence that Connectix did not gradually convert the BIOS but rather independently wrote its code.

- The district court also erroneously found that VGS contains the same components as a PlayStation, [CR106, p. 15], when VGS does not contain any

hardware components whatsoever, but rather emulates the necessary functionality of the PlayStation hardware entirely in software. [CR67, ¶10] Emulating hardware functionality with a software program is fundamentally different than building a console from identical hardware components. Such a transformation from hardware to software is inherently transformative; in fact, the resulting software expression is protectable by copyright, whereas the original hardware components are not.

- The district court states that "Connectix demonstrated and promoted" a VGS prototype with Sony's BIOS. [CR106, p. 15] Connectix only demonstrated a prototype VGS with Sony's BIOS to Sony once. [ER1, p. 67:12-68:4] Connectix never demonstrated, promoted, displayed or released a version of VGS containing any portion of Sony's BIOS to anyone else.

- The district court erroneously found that Connectix used the PlayStation logo on VGS packaging (which is simply not true) and that VGS was "an almost perfect substitute" for PlayStation but then found in its dilution discussions that VGS was not a substitute for PlayStation. [CR106, pp. 22, 24]

- The district court expressed doubt at the TRO hearing on March 11, 1999 that it fully understood the relevant technology, and that the record, including the deposition transcripts of Connectix engineers, was sufficiently clear or complete. [CR49, pp. 2, 5-6, 14-16] Yet the court refused to consider the declarations of Connectix engineers and expert submitted to explain the relevant technology, and clarify and complete the record necessary to decide the issues before the court. [CR106, pp. 11-12, 17]

- The district court was unable to separate the issues involving the normal copying of Sony's BIOS as part of the execution of the program in order to

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852

use it, from the fair use issues surrounding disassembly of the BIOS. That is dramatically illustrated by the district court confusing the 17 U.S.C. § 117 discussion in <u>Sega</u> regarding disassembly, with the relevance of Section 117 in this case to making a copy of the BIOS when Connectix started up its emulator software, which is expressly permitted by Section 117. [CR106, pp. 20-21]

- The district court tried to distinguish <u>Sega</u> by stating that Connectix was creating VGS to compete with, rather than to be used in conjunction with, Sony's PlayStation. This is a distinction without a difference because the <u>Sega</u> defendant likewise created its games to compete with, rather than be used in conjunction with, the <u>Sega</u> video games it had copied and disassembled. VGS is compatible with PlayStation games, not a PlayStation console.

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852

20

## SUMMARY OF THE ARGUMENT

The district court erroneously found that Connectix' observation and limited disassembly of Sony's BIOS during its development of VGS does not constitute a fair use of the code. <u>No case has ever held that merely running and observing computer code in order to access and study the unprotected ideas and functions embodied therein is not a fair use of the code</u>. To the contrary, in <u>Sega v. Accolade</u>, the Ninth Circuit recognized that observing the operation of computer code is one method of accessing the invisible unprotected elements of the code. 977 F.2d 1510, 1520, 1525 n.7 (9th Cir. 1992). Running and observing code, of necessity, requires copying. Such copying is a fair use and moreover protected under 17 U.S.C. § 117 which permits copying for the purpose of running code on a computer. Under <u>Sega</u>, disassembling program code – even wholesale disassembly – is also a fair use when, as in this case, it is necessary to understand the unprotected ideas and functions embodied in the code. <u>Id.</u> at 1520.

It is undisputed that Connectix independently created the entirety of its VGS software. Sony does not argue, and cannot argue, that there is any substantial similarity between VGS and Sony's BIOS. Thus, Sony's pejorative charge that Connectix is a "free-rider" is colorful rhetoric, but has nothing to do with reality. Connectix simply did not copy Sony's BIOS and then sell it.

The fair use doctrine, codified in 17 U.S.C. § 107, by its terms "permits and requires courts to avoid rigid application of the copyright statute when, on occasion it would stifle the very creativity which that law is designed to foster." <u>Campbell v. Acuff-Rose</u>, 510 U.S. 569, 577 (1994). As this Court recognized in <u>Sega</u>, reverse engineering of computer software is one situation where the copyright holder's right to control copying must give way to a competitor's right

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852                                                                21

to access unprotected aspects of the software and the public's interest in a greater selection of creative works. 977 F.2d at 1526. The district court's decision stifles the creativity of every independent developer of software and confers upon software copyright holders far greater rights than those afforded other literary works. This is in direct conflict with <u>Sega</u>. The district court's decision effectively makes copyright protection more restrictive than patent protection, a result which cannot be countenanced by this Court.

The district court's order also enables Sony to misuse its copyright to gain patent-like protection over its PlayStation and to preclude consumers from choosing other platforms on which to play their games. It denies consumers the choice of an alternative game platform under the guise of trademark law simply because a small and select group of survey participants indicated a slight preference for the PlayStation. Sony has not, and indeed cannot, show that VGS has lessened the distinctive quality or selling power of its PlayStation mark.

If the decision of the district court is not reversed, the American software industry, which has prospered in the existing environment of free access to ideas and free competition, will be severely and adversely impacted. The district court's decision would thus also impact the availability and price of consumer goods. For example, under the district court's ruling, IBM would be the only ones making IBM PC's and the PC-compatible market would never have come to exist.

Moreover, in Europe, the right to create compatible products through reverse engineering is protected by statute. European Software Directive, Articles 5 and 6. If the district court's decision is affirmed, Sony and other hardware manufacturers will gain absolute control over access to their computers and operating systems, and software companies in the United States will be precluded

by copyright law from producing interoperable software.  European companies and companies around the world will not be similarly restricted, to the detriment of American industry, workers and consumers.

## ARGUMENT

### I. STANDARD OF REVIEW ON APPEAL OF PRELIMINARY INJUNCTIVE RELIEF

The Ninth Circuit reviews a district court's order granting preliminary injunctive relief for abuse of discretion. <u>Roe v. Anderson</u>, 134 F.3d 1400, 1402 (9th Cir. 1998), <u>aff'd</u>, 67 U.S.C.W. 4291 (1999).  A district court necessarily abuses its discretion by basing its ruling on (1) an erroneous view of the law; or (2) a clearly erroneous assessment of the evidence.  <u>Cooter & Gell v. Hartmarx Corp.</u>, 496 U.S. 384, 405 (1990); <u>Roe</u>, 134 F.3d at 1402.  In this case, the district court's grant of injunctive relief was based on a combination of legal errors and a clearly erroneous assessment of the facts.

### II. SONY DID NOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON ITS COPYRIGHT CLAIM BECAUSE CONNECTIX FAIRLY USED THE UNPROTECTED ELEMENTS OF SONY'S BIOS TO CREATE A COMPATIBLE PRODUCT

Copyright law protects Connectix' right to access the ideas and functional elements of Sony's BIOS.  17 U.S.C. § 102(b) (no copyright protection for any "ideas, procedure, process, system, method of operation, concept, principle or discovery, regardless of the form in which it is . . . embodied in such work"); M. Nimmer & D. Nimmer, <u>Nimmer on Copyright</u>, § 13.03[A][1][d], at 13-41 ("If the defendant 'used' plaintiff's program only to extract its ideas . . . no infringement should be found regardless of the quantum of literal copying.").  The deposition and declaration testimony before the district court overwhelmingly demonstrates that Connectix necessarily copied Sony's BIOS in order to access the ideas and

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852

24

functional elements needed to create a product compatible with PlayStation games. Indeed, Sony's witness so testified. [CR5, ¶5; CR11, ¶5]

The district court's order erroneously grants Sony a patent-like monopoly over the ideas and functions embodied in its copyrighted code. [CR106, p.16] It thus conflicts with Section 102(b) of the Copyright Act as well as decisions of the United States Supreme Court. 17 U.S.C. § 102(b); Acuff-Rose, 510 U.S. at 575 n.5; Harper & Row, Publishers Inc. v. Nation Enterprises, 471 U.S. 539, 547 (1985). It further prevents Connectix from using Sony's copyrighted code in a reasonable and fair manner to develop its own creative work pursuant to 17 U.S.C. § 107. Acuff-Rose, 510 U.S. at 575 ("From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary "to promote the Progress of Science and useful Arts'"); Harper & Row, 471 U.S. at 549 ("Fair use was traditionally defined as a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent.") (internal quote omitted). It also unfairly limits consumers' choice of video game platforms.

Accordingly, the district court abused its discretion in enjoining Connectix from fairly reverse engineering Sony's BIOS during its development process and from selling its VGS products, and that injunction should be dissolved by this Court.

**A.    The Balance of Fair Use Factors Weighs Overwhelmingly in Connectix' Favor.**

The four statutory fair use factors "weighed together in light of the purposes of copyright" overwhelmingly support a finding that Connectix fairly copied Sony's BIOS in order to create a compatible product. Acuff-Rose, 510 U.S. at

578; 17 U.S.C. § 107. As described below, each individual factor strongly favors Connectix' necessary use of the BIOS to access its unprotected elements during Connectix' development of VGS; weighing those factors together, the support for fair use is indisputable.

Connectix prevails on the first statutory fair use factor, the purpose and character of the use, because its VGS software emulator is transformative and its copying was intermediate and thus any commercial benefit was indirect. The alleged "copying" was for research purposes; it is only the eventual use of the information learned that is commercial. [See Section C] Connectix prevails on the second factor, the nature of the work, because of the unique nature of software, which made it necessary for Connectix to copy the BIOS to access its invisible, unprotected aspects. [See Section B] Connectix prevails on the third fair use factor, the amount used, because Connectix only disassembled small portions of the BIOS to access the functional aspects necessary to create a compatible product, and used no Sony copyrighted material in VGS. [See Section D] Connectix prevails on the fourth factor, the effect on the market and value of the work, because Connectix copied the BIOS to create a compatible product and any loss to Sony resulting therefrom is purely speculative and minimal. [See Section E]

Moreover, the statutory factors are not exclusive and not to be rigidly applied. Acuff-Rose, 510 U.S. at 577-78. The undisputed facts of this case necessarily require a finding of fair use to further the fundamental copyright goal of promoting science and the arts. Id. It is undisputed that (1) the unprotected aspects of Sony's BIOS are invisible; (2) running and observing the BIOS necessarily requires copying it into a computer in its entirety; (3) creating VGS

required some disassembly of the BIOS; (4) Connectix disassembled only small portions of the BIOS; (5); Connectix' intermediate copying of Sony's BIOS simply facilitated its entry into the game console market and (6) VGS provides consumers a new environment in which to play their games.  This evidence goes to the heart of fair use and overwhelmingly demonstrates Connectix only did what was reasonably needed to create a product that fairly competes with the unprotected PlayStation and provides consumers a choice of platforms on which to play their PlayStation games.

> **B.    The Evidence Establishes It Was Necessary For Connectix To Copy Sony's BIOS In Order To Access Its Unprotected Ideas And Functional Elements; Connectix Must Prevail On The Second Fair Use Factor.**
>
> > **1.    The Ninth Circuit recognized the unique nature of software in <u>Sega v. Accolade</u>.**

In <u>Sega</u>, this Court expressly recognized that operating systems, such as Sony's BIOS, are invisible to the user and thus typically require copying in order to access the unprotected ideas and functional concepts embodied in the code.  977 F.2d at 1520, 1525.  Holding such copying "per se an unfair use" would unfairly grant owners of copyrighted object code "a de facto monopoly over the functional aspects of [their] work[s] - aspects that were expressly denied copyright protection by Congress." <u>Id.</u> at 1526; <u>see also,</u> 17 U.S.C. § 102(b).  Rather, because Copyright law protects expression, and not ideas, Section 107 necessarily permits the copying of a computer program if it is "the only means of gaining access to those unprotected aspects of the program." <u>Id.</u> at 1520.  The district court's order erroneously prevents Connectix from doing so and consequently grants Sony an unwarranted monopoly over unprotected elements of its BIOS.

In Sega, the Ninth Circuit independently examined the record and concluded that it was necessary for the defendant to copy the plaintiff's program code in order to understand its functional requirements.[7] Id. at 1525-26. In particular, the Sega Court relied on the following: (1) evidence that the unprotected aspects of the plaintiff's code were invisible because it distributed its computer program in only object code form; (2) evidence that the defendant copied the plaintiff's software solely to discover the functional requirements for compatibility; (3) lack of evidence that the defendant sought to avoid performing its own creative work; (4) evidence that the defendant did not simply copy the plaintiff's code into its final product, but rather wrote its own code; (5) lack of evidence of a viable alternative to disassembling the object code and (6) the fact that using a clean room would not avoid the need for disassembly. Id. at 1522, 1525-26. Based on this evidence, the Court determined the defendant fairly used the plaintiff's copyrighted code to create a compatible product. Id. at 1520.

The record in this case overwhelmingly demonstrates it was likewise necessary for Connectix to copy Sony's BIOS in order to access its unprotected functional aspects needed to develop Connectix' VGS product that is compatible with PlayStation games.

---

[7] The defendant in Sega used the plaintiff's program code as follows. The defendant first disassembled the entirety of both the plaintiff's video game code and code contained in the video game console, the Sega BIOS. Id. at 1514-15. The defendant then printed out the disassembled code and studied and annotated the printouts. Id. at 1515. Next, the defendant loaded the plaintiff's code into a computer and repeatedly modified it and studied the results in order to discover the functional requirements necessary for compatibility with the plaintiff's console and games. Id. The defendant then used the information it obtained to create video game programs that would play on the plaintiff's console and compete with the plaintiff's video game programs. Id.

### 2.   Connectix had a legitimate interest in accessing the unprotected elements of Sony's BIOS.

In the present case, it is undisputed that Connectix copied Sony's BIOS in order to develop an emulated video game platform that would be compatible with PlayStation games, and would provide consumers an entirely new environment in which to play their games. [CR106, pp. 5-6] Connectix needed to understand unprotected functional aspects of Sony's BIOS in order to emulate the PlayStation system such that VGS would be compatible with PlayStation games. [ER1, p. 91:13-17; CR65, ¶¶6-7; CR67, ¶¶13-20] Connectix thus had a legitimate interest in accessing the unprotected aspects of Sony's BIOS. See Sega, 977 F.2d at 1520 (a party determining how to make a compatible product has a legitimate interest in accessing the unprotected elements of a computer program); see also, Acuff-Rose, 510 U.S. at 575-576 (recognizing that the historical roots of fair use lie in the fact that progress is best served by permitting borrowing from, and building upon, the works of others).

### 3.   The functional aspects of Sony's BIOS are invisible.

It is undisputed that Sony's BIOS operating system cannot be read or observed by humans. [CR40, ¶¶3-4; CR67, ¶¶33, 38-39; CR65, ¶¶9, 10] Because the unprotected functional aspects of Sony's BIOS are invisible, it was necessary for Connectix to use a copy of the BIOS to study and understand those aspects. See Sega, 977 F.2d at 1525 (copying was necessary because the unprotected aspects of the code were not accessible to the human eye).

Moreover, because operation of Sony's BIOS is not visible on a PlayStation, it was necessary for Connectix to load a copy of the code into a computer in order to observe its operation. [CR40, ¶¶3-4; CR67, ¶¶33, 38-39;

CR65, ¶¶9-10]  The loading of code Connectix owns into a computer as part of the execution of the program is protected under 17 U.S.C. § 117.  It is also a fair use because it is necessary to observe, and thus access and study, the unprotected elements of the code.  See Sega, 977 F.2d at 1520.

### 4.    Connectix necessarily used Sony's BIOS to discover the functional requirements needed to create a compatible product.

Through their deposition and declaration testimony, Connectix engineers explained why it was necessary to observe the operation of Sony's BIOS in order to access the functional requirements needed to create a product that would be compatible with PlayStation games.  [CR65, ¶¶14-17; ER2, p. 116:9-18]  They further explained why it was necessary to load the code onto a computer where its operation would be visible.  [CR67, ¶¶33, 38-39; CR65, ¶¶9-10]  From observing its operation, Connectix was able to deduce unprotected functionality such as how the BIOS interfaced and interacted with the game programs, how the game programs used the BIOS to communicate with and control PlayStation hardware and what was expected from the hardware.  [ER2, pp. 144:16-145:3; CR65, ¶17; CR68, ¶¶4, 6; CR67, ¶26]  This information was essential to Connectix' development of software that is compatible with PlayStation games.  [ER1, p. 91:13-17; CR65, ¶¶5-7, 15-17; CR67, ¶¶13-20]

Sony's engineer testified that Connectix could not have created VGS without disassembling Sony's BIOS.  [CR5, ¶5; CR11, ¶5]; see also Sega, 977 F.2d at 1525 ("humans often cannot gain access to the unprotected ideas and functional concepts contained in object code without disassembling that code").  Connectix engineers also explained how they used disassembly when necessary to

access and understand certain BIOS functionality.  [ER2, p. 125:16-24; ER1, pp.
62:2-22; 112:4-8; 116:14-16, 154:21-25; CR65, ¶¶16, 22, 26, 28; CR68 ¶¶5, 7, 71]

### 5.    Connectix undertook substantial effort to develop its own innovative software product.

There is no evidence suggesting that Connectix sought to avoid performing
its own creative work.  See Sega, 977 F.2d at 1522 (finding fair use based in part
on fact that defendant developed its own creative work).  In fact, the evidence
demonstrates the opposite:  Connectix submitted declarations and source code
documentation showing the substantial effort Connectix undertook to create the
first commercially available PlayStation emulator, which increases consumers'
choice of products.  [ER2, pp. 73:3-75:2; ER1, p. 145:9-24; CR82, ¶¶9-11]
Connectix fully documented each step of VGS development through an Automatic
Source Code Control System, which automatically marked each change to any
source file.  [CR82, ¶9]  From July 6, 1998 to January 4, 1999, Connectix made a
total of at least 4106 changes to its software – an average of over 20 changes per
calendar day, virtually all of which were commented in the control system.[8]
[CR82, ¶10]

It is undisputed that Connectix did not copy any portion of Sony's BIOS
into its final product, but instead wrote its own code.  See Sega, 977 F.2d at 1522
(finding fair use based in part on fact that end product did not contain any of

---

[8] While the copyrighted BIOS is at issue in this case, the many hardware
components which make up a PlayStation, such as the central processor, CD and
gamepad controllers, sound and graphics hardware, none of which were
copyrighted, have all been emulated in entirely new expressions of software by
Connectix.  Emulation of these other elements dwarfs the amount of code written
for Connectix' "BIOS."

plaintiff's code). Connectix engineers testified, both at their depositions and in their declarations, that they removed Sony's BIOS from their software in its entirety prior to independently writing code to emulate necessary BIOS functionality. [ER2, pp. 121:24-122:8; ER1, pp. 65:23-66:14; CR65, ¶¶18-20; CR68, ¶¶63-74] They further testified that they wrote this code by operating PlayStation games on their emulator without Sony's BIOS and deducing the functionality the games were expecting the BIOS to perform. [ER2, pp. 116:9-18, 120:15-24, 121:12-19, 144:16-145:3; CR65, ¶¶17, 19-20; CR68, ¶¶4, 6, 76-78]

As they developed their own "BIOS" code, Connectix engineers used Sony's BIOS only on occasions when they could not deduce the functionality of the BIOS. [ER2, pp. 125:16-24, 129:16-130:2, 130:17-131:4; ER1, pp. 62:2-22, 109:6-110:17, 112:4-8; CR65, ¶¶17, 21-22, 28; CR68, ¶¶6, 17, 79-81] Even then, they did not copy any BIOS code; they studied the BIOS to determine the required functionality, and then independently wrote code to emulate it. [ER2, pp. 130:6-131:4, 144:16-145:3; CR65, ¶20; CR68, ¶77]

The record provides no support for the district court's finding that "Connectix' engineers admitted that they used copies to gradually convert Sony's code to their own code." [CR106, p.11] Indeed, the record is directly contrary: both Connectix engineers expressly testified at their depositions that they did not merely incrementally change Sony's BIOS, or use it as a template in any manner, in emulating the BIOS. [ER2, pp. 122:4-8, 130:6-131:4; ER1, p. 66:15-18] Not even Sony suggests that Connectix' software is substantially similar to Sony's BIOS, which one would expect if Connectix had simply converted Sony's code. Rather, it is undisputed that Connectix undertook substantial effort to

independently develop its own code and that the district court clearly erred in finding that Connectix simply converted Sony's code into its own.

### 6. There is no viable alternative to copying to access the unprotected elements, and a clean room approach would not have avoided the need to copy.

Sony has put forth no evidence of a viable alternative to Connectix' copying of Sony's BIOS. See Sega, 977 F.2d at 1526 (finding fair use based in part on fact that record provided no support for a viable alternative to copying). Rather, Sony simply seeks to make it impossible for Connectix, or any other potential competitor, to access the functional elements it needs to create a compatible product and thus to stifle game platform competition and limit consumers' choice of products.

Moreover, use of a clean room would not have avoided the need to copy Sony's BIOS. See Sega, 977 F.2d at 1526 (finding fair use based in part on fact that use of clean room would not have avoided the need for copying). As described above, it was necessary to disassemble small portions of Sony's BIOS in order to discover the unprotected ideas and functionality embodied in the code. The researchers in a clean room would still have to copy and disassemble the Sony BIOS. Use of a clean room would only be an issue where the end product is substantially similar to the copied product – which is not this case.

In sum, it is undisputed that Sony's BIOS contains "unprotected aspects that cannot be examined without copying." See Sega, 977 F.2d at 1526. It is thus afforded "a lower degree of protection then more traditional literary works. " Id. It was necessary for Connectix to copy the BIOS to access those unprotected aspects and thus the second fair use factor regarding the nature of the copyrighted work overwhelmingly favors Connectix.

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852                                                              33

### 7.   The district court erroneously rejected some of Connectix' evidence of fair use.

The district court clearly erred in rejecting the declarations submitted in support of Connectix' opposition to Sony's motion. [CR106, pp. 11-12, 17]  The deposition transcripts solely relied upon by the district court were conducted by Sony in preparing for its motion for preliminary injunction, and were shortened and expedited at Sony's request. [CR49, p. 14].  It would have been inappropriate and imprudent for Connectix to seek the direct testimony of its engineers at that time, and given the schedule the depositions were on, would have been impossible as well.

Sony's goal in the depositions was to discover whether Connectix had copied Sony's BIOS.  Connectix engineers freely admitted to copying the BIOS during the development process.  The engineers did not contradict or retract those admissions in their declarations.  [CR65, ¶¶14-17, 21-22, 25-28; CR68, ¶¶2-9, 37-39, 55]  <u>The issue in this case is not whether copying occurred, but rather whether the copying was necessary in order to understand and create a new, non-infringing work compatible with PlayStation games.</u>

The parties and the district court had always contemplated that the relevant facts would be presented through declarations.  [CR49, pp. 14-16, 26-27]  In their declarations, Connectix engineers described in detail their development process and the purpose, nature and quantity of their copying of Sony's BIOS during that process.  [CR65, ¶¶13-24; CR68, ¶¶19-90]  They further described why it was necessary to copy Sony's BIOS to access its functional aspects, and why they needed to understand those aspects to develop a compatible product.  [CR65, ¶¶1-7, 9-12, 15-17, 21-22; CR68, ¶¶31, 33, 37-39, 51, 64, 68, 78-81, 86, 89-90]  This testimony was crucial to Connectix' fair use defense and does not contradict or

retract the engineers' deposition testimony regarding their copying of Sony's BIOS, but does explain why such copying was necessary. [ER2, pp. 116:9-18, 120:18-21, 121:15-19, 125:16-24, 129:7-130:2, 130:17-131:4, 144:16-145:3; ER1, pp. 62:2-22, 112:4-8, 154:21-25]

Connectix' expert, Andrew Johnson-Laird, described reverse engineering of program code generally, and why it is necessary to copy code in developing compatible products. [CR67, ¶¶30-46] This testimony, and the attached articles on reverse engineering written by Mr. Laird, were intended as a tutorial to aid the district court's understanding of reverse engineering, as indicated at the March 11, 1999 hearing. [CR67, Exhs. B-C; CR49, pp. 15-16, 26-27] Mr. Laird also provided his opinion regarding the necessity of Connectix' copying of Sony's BIOS in developing VGS. [CR67, ¶¶10-29] Mr. Laird stated that in forming his opinion he reviewed certain portions of the deposition testimony of Connectix engineers as well as their declarations. [CR67, ¶8; See CR106, p. 17 (erroneously finding that Connectix' expert did not consider the depositions of its engineers in formulating his opinion)] Mr. Laird did not contradict the deposition testimony of the Connectix engineers, [CR106, p. 17], but rather stated that Connectix used well-accepted reverse engineering techniques in developing VGS and that the copying performed by Connectix was necessary to access the functional aspects of Sony's BIOS needed to create a compatible product. [CR67, ¶¶21, 24-29]

In sum, the district court clearly erred in refusing to consider the declarations submitted by Connectix in support of its fair use defense. The district court never understood that the issue in this case was not what was done, but why it was done. Those declarations, combined with the deposition testimony of Connectix engineers, clearly demonstrate the "why": that it was necessary for

Connectix to copy Sony's BIOS to access its unprotected functional aspects needed to create a compatible product. The district court's rejection of Connectix' fair use defense and its grant of injunctive relief are based upon a clearly erroneous assessment of the evidence.

### C.   The Evidence Overwhelmingly Demonstrates VGS Is Transformative And That The Purpose And Character Of Connectix' Use Supports Finding The Second Fair Use Factor In Connectix' Favor.

The district court's finding that VGS cannot be transformative because it directly competes with the PlayStation, [CR106, p. 15], conflicts with this Court's decision in Sega and is not supported by the evidence. See 977 F.2d at 1522-23 (concluding that directly competing video games were the result of defendant's own creative work and thus transformative). The record overwhelmingly establishes that Connectix expended substantial effort in developing its technologically innovative emulation software. VGS emulates the entire complex PlayStation console in software and is entirely different and unique from Sony's BIOS.

The evidence further demonstrates that VGS – a software emulation program – is entirely innovative, different, unique and creative as compared to Sony's game console hardware. It is undisputed that VGS provides consumers an entirely new environment in which to play their PlayStation games. Thus consumers could, and probably would, choose to buy both VGS and a PlayStation. VGS enables, for example, PlayStation game owners to run their games on a laptop computer while flying at 30,000 feet, far from a television or electrical outlet for a PlayStation game console. Moreover, while no games currently exist solely for use on VGS, it is feasible that such games could be developed.

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852                                                     36

The district court's attempt to distinguish <u>Sega</u> because "Connectix is not creating its own product to be used <u>in conjunction with</u> Sony's PlayStation" is a distinction without a difference. [CR106, p. 16] The defendant in <u>Sega</u> was not creating games to be used "in conjunction" with <u>the video games the Court found it had copied and disassembled.</u> Rather, the defendant created its games to be compatible with the Sega console, and those games competed directly with the plaintiff's games that were copied and disassembled. <u>Similarly, Connectix' emulation software is created for compatibility with PlayStation games, not the PlayStation console.</u>

Moreover, where, as in this case, a defendant makes only intermediate use of copyrighted material, the Court should examine the nature of the actual use of the copyrighted work, and not simply focus its inquiry on the end product. <u>Sega</u>, 977 F.2d at 1522-23 (making intermediate copies of code to discover the functional requirements for compatibility is a fair use). The inquiry as to whether a defendant's work is transformative was judicially created through cases involving actual copying of the plaintiff's copyrighted materials in the end product. <u>See Acuff-Rose</u>, 510 U.S. at 579 ("transformative use is not absolutely necessary for a finding of fair use"). <u>In this case, Connectix necessarily made only intermediate copies of Sony's BIOS, and did not copy any of that code into its final product.</u>

The compatible product created by Connectix provides consumers the option to play their video games on an entirely new and different platform. <u>Accordingly, the first fair use factor (i.e., "the purpose and character of use") overwhelmingly favors Connectix.</u>

**D.    Connectix Disassembled Only Small Portions Of Sony's BIOS And The Third Fair Use Factor Should Weigh In Connectix' Favor.**

The district court's finding that Connectix' copying was not a fair use because Connectix loaded the entire Sony BIOS into its computer is likewise erroneous. [CR106, pp. 18-19]  As described in section IV, Connectix is permitted to do so under Section 117 of the Copyright Act.  Moreover, Connectix necessarily loaded Sony's BIOS into its computer to observe the unprotected functional aspects of the code.  Because of the nature of the computer software, the entirety of a program must be loaded and copied into RAM as a preliminary step in order to access it. [CR67, ¶¶ 38-39; CR65, ¶¶9-11]  Connectix only did so in order to investigate and understand the unprotected elements and functions. [CR67, ¶¶17, 25-26; CR65, ¶¶9-11, 15, 17]  Observing the operation of a computer program is less intrusive, and less prone to copying in the final product, than the creation and direct examination of a human readable copy of the actual code.  See Sega, 977 F.2d at 1525, n.7.

Connectix disassembled only small portions of BIOS code in reverse engineering it. [ER1, pp. 53: 25- 54:20, 58:16-23]  In any event, because the copying was intermediary, even wholesale disassembly would not tip the balance in the copyright holder's favor.  Id. at 1525-27 (wholesale disassembly fair because "the ultimate (as opposed to direct) use" was limited).  This again reflects the fact that the four fair use factors were designed for the case where the defendant's product contained portions of the copyrighted work.

In sum, Connectix disassembled <u>limited portions</u> of Sony's code for the sole purpose of accessing the functional aspects necessary to create a compatible

product. <u>The third fair use factor regarding the extent of the use thus favors Connectix</u>.

### E. Any Impact On The Potential Market For The PlayStation Hardware Console Is Speculative, Minimal And Incidental And The Fourth Fair Use Favors Connectix .

Connectix' use of Sony's BIOS during the development of VGS simply enabled it to enter the market for running PlayStation games. <u>See</u> <u>Sega</u>, 977 F.2d at 1523 ("use which simply enables the copier to enter the market for works of the same type" is not per se unfair, even if it adversely affects potential sales). Thus, the district court's finding that Connectix' copying of the Sony BIOS during development of VGS was not a fair use because Sony is being harmed by the sale of VGS is not in accord with <u>Sega</u>.

The evidence does not support the district court's finding that individuals who purchase VGS will be less likely to buy a PlayStation console. [CR106, p. 19] It is more likely that VGS purchasers may already own a PlayStation console and simply buy VGS to give them another option of where to play their PlayStation games. [CR70, ¶¶13-18, 44] Indeed, VGS purchasers may be likely to choose a PlayStation system over a competitor's system, such as Nintendo or Sega, because they already own, and are familiar with, PlayStation games through their use of VGS. [CR70, ¶¶14-18, 26]

The district court completely ignored this evidence, as well as evidence that VGS could benefit Sony by increasing the sale of PlayStation games, which provides Sony a significantly greater profit margin than the sale of PlayStation consoles. [CR70, ¶¶12, 18, 26-30] Thus, any loss of Sony console sales or profits due to the sale of VGS is at best speculative, and at worst non-existent.

Connectix copied Sony's BIOS to create a product that provides consumers an alternative environment in which to run PlayStation games. See Sega, 977 F.2d at 1523-24 ("an attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine"). Any minor economic loss Sony may suffer does not justify prohibiting Connectix from fairly copying Sony's BIOS to access the unprotected elements necessary to create its compatible product and does not justify precluding consumers' choice of an alternative platform on which to play their games. The fourth fair use factor regarding the effect of VGS on the potential market for the PlayStation weighs in favor of Connectix notwithstanding any minor economic loss Sony may suffer.

F.     **The District Court Improperly Put The Burden Of Proof Of Fair Use On Connectix At The Preliminary Injunction Stage.**

The district court erroneously placed the burden of proving fair use on Connectix. [CR106, p. 13]  By forcing the burden of proof upon Connectix at this early stage in the litigation, the court erroneously assessed the evidence in a light most favorable to the moving party and clearly erred in finding that the fair use factors favored Sony. See Religious Technology Center v. Netcom On-line Communication Services Inc., 923 F. Supp. 1231, 1242 n.12 (N.D. Calif. 1995) ("plaintiffs, as the parties moving for a preliminary injunction, have the burden of proving a likelihood of success on their infringement claim, including the fair use defense").

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852                                                          40

### G.   Connectix' Use Of Information Freely Available On The Internet Was Proper And Has No Impact On Its Fair Use Defense.

Connectix obtained technical documentation from public websites during the initial stages of research and development and used them in good faith. The websites from which Connectix obtained documentation in no way indicated it was confidential or proprietary; they contained no warnings or restrictive language whatsoever. [CR68, ¶17] Moreover, this information was still available on the Internet eight months after it was first obtained by Connectix; indeed, most of it was even posted on the official web site of the Middlesex University School of Computing Science presumably with Sony's permission. [CR66, ¶¶3-5, Exh. C]. Connectix had no reason to know or suspect that any information it used was secret, or that it was not permitted to use the materials, and Connectix use of this information in no way bars it from asserting fair use as a defense.

## III.   THE DISTRICT COURT ERRONEOUSLY ENJOINED THE SALE OF AN UNDISPUTEDLY NONINFRINGING PRODUCT BASED SOLELY ON INTERMEDIATE COPYING

The district court exceeded its authority under Section 502 of the Copyright Act by enjoining Connectix from selling VGS despite the court's express finding that "it is undisputed that the VGS does not contain any copyrighted material." [CR106, pp. 26-27] Section 502 authorizes district courts to grant injunctive relief only where "reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a) (emphasis added). In this case Sony concedes, and the district court expressly found, that VGS does not itself infringe Sony's copyright. Enjoining the sale of VGS is thus not reasonably aimed at preventing or

restraining infringement of Sony's copyrights and is beyond the scope of remedial action authorized by Section 502.

The district court cited no statutory authority for enjoining the sale of Connectix' noninfringing product. Instead, the district court relied solely on <u>Sega</u>, a case in which the Ninth Circuit <u>overturned</u> a district court's grant of injunctive relief. 977 F.2d at 1514. In particular, the district court based its ruling on the <u>Sega</u> Court's holding that "intermediate copying of computer object code may infringe the exclusive rights granted to the copyright owner in Section 106 of the Copyright Act regardless of whether the end product of the copying also infringes those rights." [CR106, p. 26] The <u>Sega</u> Court did <u>not</u>, however, hold or even suggest that district courts have authority to enjoin sale of noninfringing end products based solely on such intermediate copying. <u>See id.</u> Such a remedy is not aimed at preventing or restraining the intermediate copying and thus is not authorized by the Copyright Act. <u>See</u> 17 U.S.C. § 502.

Although the Ninth Circuit has not expressly addressed this specific issue, Connectix is aware of no case in which the Ninth Circuit or any other court has enjoined sale of a noninfringing computer program based on intermediate copying. The Fifth Circuit, which was directly confronted with a district court enjoining noninfringing products based on prior infringement by the defendant, held that the district court had exceeded its authority. <u>Kepner-Tregoe, Inc. v. Leadership Software, Inc.</u>, 12 F.3d 527, 538 (5th Cir.), <u>cert. denied</u>, 513 U.S. 820, (1994). In <u>Kepner-Tregoe</u>, the district court found that the defendant had copied the plaintiff's copyrighted materials in developing its original software product. The district court enjoined the sale of that product, as well as all future modifications. The Fifth Circuit reversed, concluding that the district court could

enjoin only future versions of the defendant's software that infringe the plaintiff's copyrighted materials.  Id.; see also Alcatel U.S.A., Inc. v. DGI Technologies, Inc., 166 F.3d 772, 790-91 (5th Cir. 1999) (recognizing that the Fifth Circuit has "previously rejected such a 'fruit of the infringing tree' doctrine [for copyright infringement].)"

The issue of whether a district court may enjoin sale of a product where copyright infringement occurs only during the development process was recently raised (but not decided) before the Ninth Circuit in Cadence Design Systems, Inc. v. Avant! Corp., 125 F.3d 824, 830-31 (9th Cir. 1997), cert. denied, 118 S. Ct. 1795 (1998).  The comments made by the Court strongly suggest that the Ninth Circuit agreed with the Fifth Circuit's conclusion that Section 502 requires proof of actual copying in the enjoined product.  Id.  Indeed, the Court remanded the case to the district court and instructed it to determine whether there was any infringing material in the defendant's work, and, if so, to issue an injunction.  The Ninth Circuit also suggested that if the infringing portion of a work is minimal and damages to the plaintiff are minor, the balance of hardships must be determined, rather than presuming irreparable injury.[9]  Id. at 830.

The only rationale the district court provided for enjoining sale of a noninfringing end product is that it is the "only effective remedy" for intermediate infringement.  [CR106, pp. 26-27]  This explanation ignores Section 504 of the Copyright Act, which provides for recovery of damages upon a finding of copyright infringement.  17 U.S.C. § 504; see also, Acuff-Rose, 510 U.S. at 578 n.10 (recognizing that injunctive relief may not be appropriate in cases "raising

---

[9]  In this case, there is no infringing material in the final product and the balance of hardships weighs overwhelmingly against Sony.  [CR70, ¶12]

reasonable contentions of fair use where there may be a strong public interest in the publication of the secondary work and the copyright owner's interest may be adequately protected by an award of damages for whatever infringement is found")(internal quotes omitted). In this case, the question is not whether copying was done, nor even whether copying was necessary, but rather "how much" copying was necessary. To the extent that the district court ultimately determines some portion of Connectix' copying infringed Sony's copyright, monetary damages for those acts of infringement would provide an appropriate and effective remedy.

The district court's decision usurps the role of Congress by essentially ignoring the limited scope of injunctive relief authorized by 17 U.S.C. § 502. If Congress had determined that it is in the public's interest to authorize courts to enjoin the sale of noninfringing software programs or other works based solely on copyright infringement occurring during product development, then it could have amended Section 502. A district court may not exceed the authority granted it by the Copyright Act simply to achieve what it concludes is a desirable result.

## IV.   CONNECTIX IS PERMITTED TO COPY THE SONY BIOS IT OWNS AS AN ESSENTIAL STEP IN UTILIZING IT IN CONJUNCTION WITH A COMPUTER

The district court also erroneously enjoined Connectix from loading a copy of Sony's BIOS it owns into a computer pursuant to Section 117 of the Copyright Act. [CR106, pp. 20, 27] The district court relied on <u>MAI Systems Corp. v. Peak Computer, Inc.</u>, 991 F.2d 511, 517-19 (9th Cir. 1993) and <u>Triad Systems Corp. v. Southeastern Express Company</u>, 64 F.3d 1330, 1335 (9th Cir. 1995) <u>cert. denied,</u> 516 U.S. 1145 (1996), to find that Connectix loading of the BIOS into its

computer is a copy. [CR106, p. 10] In each of those cases, unlike the instant case, licensed software was loaded by an unlicensed third party in violation of a license agreement, and thus was outside the scope of the protection of Section 117.[10] MAI Systems Corp., 991 F.2d at 518, n.5; Triad Systems Corp., 64 F.3d at 1333, n.3. A license of software seemingly does not fall within the reach of 17 U.S.C. § 117.

In contrast, Connectix and each Connectix engineer owns a copy of Sony's BIOS and thus is permitted to load the code into a computer as an essential step in utilizing it. 17 U.S.C. § 117 (permitting the owner of a copy of a computer program to make a copy of that program "as an essential step in the utilization of the computer program in conjunction with a machine"). Congress, recognizing that computer programs must necessarily be used in conjunction with computers, and that such use requires loading (i.e., copying) the program into computer memory, enacted Section 117 to "provide that persons in rightful possession of copies of programs be able to use them freely without fear of exposure to copyright liability." Vault v. Quaid, 847 F.2d 255, 260 (5th Cir. 1988). Moreover, Section 117 protects Connectix' right, as an owner of a PlayStation that it purchased in a store, to copy Sony's BIOS as an essential step in using it with a machine, even if it is not "employed for a use intended by the copyright owner." Vault, 847 F.2d at 261 ("Section 117(1) contains no language to suggest that the copy it permits must be employed for a use intended by the copyright owner, and,

---

[10] Moreover, those cases involved loading a computer operating system in order to repair a computer and as such have been expressly overruled by statute. 17 U.S.C. § 1203.

absent clear congressional guidance to the contrary, we refuse to read such limiting language into this exception.").

Connectix does not claim that its disassembly of small portions of Sony's BIOS was protected by Section 117.  Accordingly, the district court's conclusion that <u>Sega</u> precludes Connectix' Section 117 defense because "the Ninth Circuit rejected the use of Section 117 to excuse intermediate copying by disassembly" is irrelevant and misses the point entirely.  [CR106, p. 21] <u>Sega</u> makes no reference to booting up a program, which was not an issue in <u>Sega</u>.  Connectix' booting up and running a program, as opposed to its disassembly, is protected by Section 117.  The district court's order erroneously prevents Connectix from legally copying program code it owns into a computer pursuant to 17 U.S.C. § 117, and this Court should reverse the district court's order.

## V.   SONY CANNOT ENFORCE ITS COPYRIGHT BECAUSE IT IS MISUSING IT AS A MATTER OF LAW

### A.   Sony Is Misusing Its Copyright To Obtain Patent-like Protection Over Its PlayStation Video Game System.

Connectix has established as a matter of law that Sony is misusing its copyright to obtain patent-like protection over its uncopyrighted PlayStation video game system.  See <u>Alcatel USA, Inc.</u>, 166 F.3d at 793 (upholding jury finding that plaintiff misused its copyright to obtain a monopoly over its uncopyrighted microprocessor cards); <u>see also</u> <u>Practice Management Info. Corp. v. American Med. Ass'n</u>, 121 F.3d 516, 521 (9th Cir. 1997), <u>as amended</u>, 133 F.3d 1140 (9th Cir. 1998), <u>cert. denied</u>, 119 S. Ct. 40 (1998)(holding that defendant established copyright misuse <u>as a matter of law</u>).

It is undisputed that the unprotected ideas and functionality embodied in Sony's BIOS are invisible and cannot be accessed without copying the code. [CR40, ¶¶3-4; CR67, ¶¶33, 38-39; CR65, ¶¶9, 10] It is also undisputed that those aspects of the BIOS are necessary to create a compatible product. [ER1, p. 91:13-17; CR65, ¶¶6-7; CR67, ¶¶13-20] Indeed, Sony's own chief engineer repeatedly testified that Connectix could not have created VGS without disassembling Sony's BIOS. [CR5, ¶5; CR11, ¶5] The law permits companies to compete with Sony through their own efforts by studying the elements necessary for compatibility with PlayStation games. See Sega, 977 F.2d at 1520.

Yet, through its series of TRO and preliminary injunction applications, Sony has prevented Connectix from using Sony's BIOS to access unprotected elements of the code and thus stifled Connectix' development and sale of its compatible and competitive VGS product. See Alcatel, 166 F.3d at 793-94 (upholding finding of misuse where plaintiff effectively prevented defendant from developing its product by not allowing defendant to use plaintiff's copyrighted software to test the product for compatibility). Sony is thus misusing its copyrighted BIOS to illegally extend its monopoly to its PlayStation video game system, a system that is not, and cannot, be protected by copyright law. See Practice Management Info., 121 F.3d at 520 ("defense of copyright misuse "forbids the use of the [copyright] to secure an exclusive right or limited monopoly not granted by the [Copyright] Office'") (quoting Lasercomb America, Inc. v. Reynolds, 911 F.2d 970, 977-79 (4th Cir. 1990)); Alcatel, 166 F.3d at 793-94 (same).

**B.    Sony Is Misusing Its Copyright To Preclude Consumers From Choosing Other Platforms On Which To Play Video Games.**

Connectix has also established as a matter of law that Sony is misusing its copyright to preclude consumers from choosing other platforms on which to play their video games. Practice Management Info. Corp., 121 F.3d at 520-21 (copyright misuse established as a matter of law where plaintiff used its copyright to preclude a third party from using a competitor's product). Through its maintenance of the present suit to restrain Connectix' development and sale of VGS, Sony is improperly seeking to restrict video game consumers' right to choose where and how they play their games. The Copyright Act does not grant Sony the right to control the manner in which consumers play games. See Allen v. Academic Games League of America, 89 F.3d 614, 616 (9th Cir. 1996)(refusing to interpret the Copyright Act in a manner that would allow copyright owners to control when and where purchasers may play games); see also Lewis Galoob Toys, Inc. v. Nintendo of America, Inc., 964 F.2d 965, 971 (9th Cir. 1992)("a party who distributes a copyrighted work cannot dictate how that work is to be enjoyed").

Sony's attempt to limit consumer choice is an impermissible extension of its rights and contrary to the public policies embodied in the grant of a copyright. See Lasercomb America, 911 F.2d at 977-79 (the crucial question in determining copyright misuse is "whether the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright"). The limited scope of Sony's monopoly "reflects a balance of competing claims upon the public interest," with the ultimate aim being to increase the availability of a broader

range of creative products.  See id., at 978, n.20 (quoting Twentieth Century
Music Corp. v. Aiken, 422 U.S. 151, 156 (1975)).

Sony's misuse of its copyright is established as a matter of law based on the
undisputed facts in the record, and thus precludes enforcement of Sony's
copyright.  Accordingly, the district court abused its discretion in enjoining
Connectix' use of Sony's BIOS in the development of VGS, as well as Connectix'
sale of its noninfringing VGS products.  [CR106, p. 20].

## VI.   VGS DOES NOT TARNISH THE PLAYSTATION MARK[11]

### A.   Although Some Users May Prefer The PlayStation, Other Users and Reviewers Enthusiastically Praise VGS.

Contrary to the district court's holding, the overwhelming case authority
provides that dilution by tarnishment claims "generally involve using the
trademark in an 'unwholesome or degrading context.'"  Minnesota Mining and
Manufacturing Co. v. Rauh Rubber, Inc., 943 F. Supp. 1117, 1132 (D. Minn.
1996), aff'd, 130 F.3d 1305 (8th Cir. 1997) (quoting 3 McCarthy, Trademarks and
Unfair Competition § 24.16[1]); see also Accuride Int'l, Inc. v. Accuride Corp.,
871 F.2d 1531, 1538 (9th Cir. 1989) ("Injury to business reputation is typically
invoked where the plaintiff's mark or name is tarnished or degraded through
association with something unsavory").

---

[11] Although the district court found that Sony established a likelihood of success
on its dilution claim, the court did not appear to base its grant of injunctive relief
upon that finding.  [CR106, pp. 26-27]  In any event, that finding is based on an
erroneous view of the law and a clearly erroneous assessment of the facts and thus
does not support the court's grant of injunctive relief.

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852                                                    49

Neither Sony nor the district court cited any authority (nor is there any) supporting a finding of tarnishment based on mere product preferences, as the district court did in this case. [CR106, pp. 24-25]  Indeed, the one case relied on by the district court, Panavision Int'l L.P. v. Toeppen, 945 F. Supp. 1296, 1304 (C.D. Cal. 1996), aff'd, 141 F.3d 1316, 1325 (9th Cir. 1998), did not deal with tarnishment.  Rather, Panavision dealt with the wholly inapposite situation of "cyber piracy" of Internet domain names.  The Panavision standard for tarnishment quoted by the district court is clearly dicta.  [CR106, p. 25]  Indeed, the Panavision court specifically stated that the defendant's conduct "varies from the two standard dilution theories" of tarnishment and blurring.  Panavision, 945 F. Supp. at 1304.

The only evidence submitted by Sony to support its tarnishment claim was the result of two focus groups commissioned by Sony indicating that a total of sixteen male participants marginally "preferred the PlayStation" to VGS.  [CR39, ¶10]  Sony's surveys did not suggest that participants were "confused about the source of their unsatisfactory game playing experience using the VGS," as argued by Sony – and Sony has submitted no evidence supporting that argument.  [CR106, p. 23]  Sony's survey evidence also did not indicate that VGS lessened the capacity of Sony's trademarks to identify or distinguish the PlayStation.  The mere product preferences described in Sony's survey evidence, even if true, do not suggest that VGS in any way tarnishes the PlayStation mark.[12]

---

[12]  Any reliance by the district court on Sony's focus group evidence would have been error in any event.  The sample size and composition of Sony's focus groups can not be generalized to the relevant population of home video game consumers, making its findings unreliable.  A group of sixteen young males does not appropriately represent the target population for the PlayStation and VGS, which appeal to a much larger universe, including younger children, women, and older

The district court appears, instead, to have based its finding of tarnishment exclusively on a single Internet website print-out containing reviews of VGS by consumers. [CR106, p. 24; CR69, Exh. I] The Internet print-out was part of a larger collection of mostly positive reviews of VGS by actual game players and product testers that Connectix submitted to the district court. [CR69, Exhs. E-L] Specifically, the district court found that the reviews contained in Exhibit "I" "indicate that game players are associating the poor performance with the PlayStation game, and not with VGS" and thus that VGS tarnishes the PlayStation mark.[13] [CR106, p. 24] The district court based this finding solely on the fact that these reviews mentioned the word "game" rather than "VGS" when describing performance. Id.

The district court's semantic misinterpretation of the Exhibit "I" reviews is clearly erroneous. Those reviews are of the <u>new VGS product</u> and <u>not the</u>

---

males. [CR 39, ¶3] See e.g., Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 264 (5th Cir.) cert. denied, 449 U.S. 899 (1980) (focus group survey inadmissible for failure to "include a fair sampling of those most likely to partake of the alleged infringer's goods or services"); St. John v. North Carolina Parole Comm'n, 764 F. Supp. 403, 412 (W.D.N.C. 1991) aff'd, 953 F.2d 639 (4th Cir. 1992) (relevant focus group results inadmissible since responses from 24 individuals were not of assistance to jury). Moreover, the focus groups were paid for by Sony and used Sony proffered equipment; the quality of computer equipment used with VGS effects game play.

[13] Connectix recognizes that Exhibit "I" does contain, along with numerous positive reviews, some negative comments about VGS performance. Connectix presented the "bad" along with the "good" to give the court a balanced, unbiased look at the public's opinion of VGS. Contrary to the district court's conclusion, the majority of the reviews were very positive: "Runs great ... Ran flawlessly. Very cool graphics ... Perfect, absolutely perfect ... Runs beautifully! Not even a small glitch during the movies or game play ... Played flawlessly. Frame rate and sound were perfect ... Perfectly, absolutely smooth." [CR 69, Exhs. E-L]

PlayStation games. The reviewers were commenting on how VGS performs with various existing PlayStation games; the reviewers were likely already familiar with how the games played on the PlayStation. That the reviewers specifically referred to the "game" rather than to VGS is perfectly logical – they were reviewing and commenting on VGS performance on a game by game basis. The reviewers' statements do not in any way support the district court's finding that game players are confused about the source of any alleged performance problems.

In fact, Connectix has made sure consumers understand any difference in game performance experienced while playing PlayStation games on VGS is attributable to VGS. Connectix has carefully noted that not all PlayStation games work on VGS and published a list for consumers of games that meet Connectix' strict quality standards. [CR6, Exh. 4] Furthermore, there could be no confusion about sponsorship of VGS that would diminish the ability of the PlayStation mark to identify Sony's product; the packaging for VGS is covered with a conspicuous disclaimer stating: "This product is not affiliated with, nor authorized, endorsed, or licensed in any way by Sony Corporation, its affiliates or subsidiaries." [CR12, Exh. 2]

There is simply no evidence supporting the district court's finding of tarnishment, which precludes consumers from choosing an alternative game platform based on the preferences of a select group of survey participants. The order is based on an erroneous view of the standard for tarnishment and a clearly erroneous assessment of the evidence, and should be reversed.

**B.   Sony Has Not Suffered Any Lessening Of The Capacity Of Its Marks To Identify And Distinguish Its Goods.**

The district court also failed to make a finding of actual economic harm. A recent ruling by the United States Court of Appeals for the Fourth Circuit has clarified that the federal Trademark Act requires a showing of actual "lessening of the capacity of a famous mark to identify and distinguish goods or services." Ringling Bros. – Barnum & Bailey Combined Shows, Inc. v. Utah Division of Travel Development, 170 F.3d 449, 452-61 (4th Cir. 1999). Harm of this sort may not be presumed; rather, the plaintiff must show the defendant's conduct "has caused ... actual economic harm to the famous mark's economic value by lessening its former selling power as an advertising agent for its goods or services." Id. at 461. No such showing was made here.

Connectix specifically argued to the trial court that Sony had not shown that Connectix' nominative use of Sony's trademarks[14] with VGS had lessened the capacity of Sony's mark to identify and distinguish Sony's goods or services. [CR62, pp. 33-34] Sony produced no evidence of actual economic harm to the value of Sony's marks or to the selling power of the marks. Indeed, it is entirely likely VGS has actually increased sales of PlayStation games by providing a new platform on which to play the games. Yet the district court would deny consumers this choice even absent any showing of harm to Sony. [CR106, p. 25]

---

[14] The district court erroneously found that the VGS packaging uses the PlayStation logo, which simply is not true. [CR106, p. 22] Sony does not, and cannot, object to Connectix' nominative use of the PlayStation mark to state compatibility with PlayStation games. See The New Kids On The Block v. News America Publ'g, 971 F.2d 302, 308 (9th Cir. 1992).

OPENING BRIEF OF APPELLANT
CONNECTIX CORPORATION
Case No. 99-15852                                                    53

## VII.  CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, Connectix respectfully requests that the

Court reverse the district court's grant of injunctive relief.


Dated:  May 26, 1999                          HOWREY & SIMON


                                     By: _William Sloan Coats_____
                                         William Sloan Coats

                                         Attorneys for Appellant
                                         Connectix Corporation

## STATEMENT OF RELATED CASES

Defendant-appellant is not aware of any related case pending before or previously heard by the United States Court of Appeal for the Ninth Circuit.

## CERTIFICATE OF COMPLIANCE
## <u>PURSUANT TO CIRCUIT RULE 32(e)(4)</u>

I, William Sloan Coats, hereby certify that the Brief of Appellant Connectix Corporation is in conformance with Federal Rule of Civil Procedure 32 and Circuit Rule 32(e)(3).  The brief is double spaced and printed in a proportionately spaced, fourteen point font.  The total word count is 13,986.

William Sloan Coats

Dated:  May 26, 1999

i

## CERTIFICATE OF SERVICE

I, Arlene Uyemura, declare as follows:

I am employed in the County of San Mateo, California.  I am over the age of eighteen years and not a party to the within action.  My business address is 301 Ravenswood Avenue, Menlo Park, California  94025-3453.  Upon this day, I caused service of a copy of the attached:

### OPENING BRIEF OF APPELLANT CONNECTIX CORPORATION
### (2 copies)

on all interested parties individually and through their attorneys of record by placing a true and correct copy thereof, addressed as shown below:

| | |
|---|---|
| James G. Gilliland<br>Jennifer Y. Liu<br>Erin E. Giacoppo<br>Townsend and Townsend and Crew<br>Two Embarcadero Center, 8th Floor<br>San Francisco, CA 94111<br>Tel: (415) 576-0200<br>Fax: (415) 576-0300 | Scott D. Baker<br>Morgan W. Tovey<br>Crosby, Heafey, Roach & May<br>Four Embarcadero Center, Ste. 1900<br>San Francisco, CA 94111<br>Tel: (415) 543-8700<br>Fax: (415) 391-8269 |

☒    **VIA FEDEX OVERNIGHT/NEXT BUSINESS DAY DELIVERY SERVICE** (CCP §§ 1011, 1012).  I caused said contents to be placed into an envelope, properly labeled, and caused it to be deposited into a FedEx pick-up receptacle as per the regular practice of this office.

Executed on **May 26, 1999,** at Menlo Park, California.

☒    **FEDERAL:** I declare that I am employed in the office of a member of the bar of this court at whose directions the service was made.

☒    **STATE:**    I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____
**ARLENE UYEMURA**

## CERTIFICATE OF SERVICE

I, Arlene Uyemura, declare as follows:

I am employed in the County of San Mateo, California.  I am over the age of eighteen years and not a party to the within action.  My business address is 301 Ravenswood Avenue, Menlo Park, California  94025-3453.  Upon this day, I caused service of a copy of the attached:

**OPENING BRIEF OF APPELLANT CONNECTIX CORPORATION**
**(2 copies)**

on all interested parties individually and through their attorneys of record by placing a true and correct copy thereof, addressed as shown below:

| | |
|---|---|
| James G. Gilliland<br>Jennifer Y. Liu<br>Erin E. Giacoppo<br>Townsend and Townsend and Crew<br>Two Embarcadero Center, 8th Floor<br>San Francisco, CA 94111<br>Tel: (415) 576-0200<br>Fax: (415) 576-0300 | Scott D. Baker<br>Morgan W. Tovey<br>Crosby, Heafey, Roach & May<br>Four Embarcadero Center, Ste. 1900<br>San Francisco, CA 94111<br>Tel: (415) 543-8700<br>Fax: (415) 391-8269 |

☒     **VIA FEDEX OVERNIGHT/NEXT BUSINESS DAY DELIVERY SERVICE** (CCP §§ 1011, 1012).  I caused said contents to be placed into an envelope, properly labeled, and caused it to be deposited into a FedEx pick-up receptacle as per the regular practice of this office.

Executed on **May 26, 1999,** at Menlo Park, California.

☒     **FEDERAL:** I declare that I am employed in the office of a member of the bar of this court at whose directions the service was made.

☒     **STATE:**     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____
**ARLENE UYEMURA**

a computer to bring about a certain re-     1986, 645 F.Supp. 590, 1 U.S.P.Q.2d
sult.  NEC Corp. v. Intel Corp., N.D.Cal.   1492.
1492.

## § 102. Subject matter of copyright: In general

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.  Works of authorship include the following categories:

(1) literary works;

(2) musical works, including any accompanying words;

(3) dramatic works, including any accompanying music;

(4) pantomimes and choreographic works;

(5) pictorial, graphic, and sculptural works;

(6) motion pictures and other audiovisual works;

(7) sound recordings; and

(8) architectural works.

(b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

(Pub.L. 94–553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2544; Pub.L. 101–650, Title VII, § 703, Dec. 1, 1990, 104 Stat. 5133.)

### HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports
1976 Acts.**
**Notes of Committee on the Judiciary,
House Report No. 94-1476**

**Original Works of Authorship.** The two fundamental criteria of copyright protection—originality and fixation in tangible form are restated in the first sentence of this cornerstone provision. The phrase "original works of authorship," which is purposely left undefined, is intended to incorporate without change the standard of originality established by the courts under the present copyright statute.  This standard does not include requirements of novelty, ingenuity, or esthetic merit, and there is no intention to enlarge the standard of copyright protection to require them.

In using the phrase "original works of authorship," rather than "all the writings of an author" now in section 4 of the statute [former section 4 of this title], the committee's purpose is to avoid exhausting the constitutional power of Congress to legislate in this field, and to eliminate the uncertainties arising from the latter phrase.  Since the present statutory language is substantially the same as the empowering language of the Constitution, [U.S.C.A. Const. Art. 1, § 8, cl. 8], a recurring question has been whether the statutory and the constitutional provisions are coextensive.  If so, the courts would be faced with the alternative of holding copyrightable something that Congress clearly did not intend to protect, or of holding constitutionally incapable of copyright something that Congress might one day want to protect.  To avoid these equally undesirable results, the courts have indicated that "all the writings of an author" under the present statute is narrower in scope than the "writings" of "authors" referred to in the Con-

**17 § 105**                                    **COPYRIGHTS    Ch. 1**

Constitutionality  1
Independent  contractor  as  copyright
  owner  5
Model codes  7
Power of Congress  3
Prior law  2

---

**1. Constitutionality**

Copyright to film series commissioned by federal government was not unconstitutional, despite contention that copyright fostered government censorship. Schnapper v. Foley, D.C.D.C.1979, 471 F.Supp. 426, 202 U.S.P.Q. 699, judgment affirmed 667 F.2d 102, 215 U.S.App.D.C. 59, 212 U.S.P.Q. 235, certiorari denied 102 S.Ct. 1448, 455 U.S. 948, 71 L.Ed.2d 661, 215 U.S.P.Q. 96.

**2. Prior law**

The copyrights laws, both old and new, permit the registration of works commissioned by the United States government for copyright. Schnapper v. Foley, C.A.D.C.1981, 667 F.2d 102, 215 U.S.App.D.C. 59, 212 U.S.P.Q. 235, certiorari denied 102 S.Ct. 1448, 455 U.S. 948, 71 L.Ed.2d 661, 215 U.S.P.Q. 96.

**3. Power of Congress**

It is within the power of Congress to enact into law acts purporting to allow registration for copyright of federally commissioned works. Schnapper v. Foley, C.A.D.C.1981, 667 F.2d 102, 215 U.S.App.D.C. 59, 212 U.S.P.Q. 235, certiorari denied 102 S.Ct. 1448, 455 U.S. 948, 71 L.Ed.2d 661, 215 U.S.P.Q. 96.

**4. Commissioned works**

Language of section 101 of this title defining a "work of the United States" Government as one "prepared by * * * an employee of the United States Government as part of that person's official duties" does not prohibit copyright protection for federally commissioned works. Schnapper v. Foley, C.A.D.C.1981, 667 F.2d 102, 215 U.S.App.D.C. 59, 212 U.S.P.Q. 235, certiorari denied 102 S.Ct. 1448, 455 U.S. 948, 71 L.Ed.2d 661, 215 U.S.P.Q. 96.

**5. Independent contractor as copyright owner**

Since Administrative Office of United States Courts was not in business of making movies, where it entered into contract with private party to produce for Judicial Conference of United States five films about Supreme Court and determined that the private party should have copyright in the films, the copyright issued was lawful under statute allowing government agency to determine whether to allow independent contractor to secure copyright in works prepared with government funds. Schnapper v. Foley, D.C.D.C.1979, 471 F.Supp. 426, 202 U.S.P.Q. 699, judgment affirmed 667 F.2d 102, 215 U.S.App.D.C. 59, 212 U.S.P.Q. 235, certiorari denied 102 S.Ct. 1448, 455 U.S. 948, 71 L.Ed.2d 661, 215 U.S.P.Q. 96.

**6. Assignments**

This section denying copyright protection for any work of the United States Government, but allowing the United States government to receive and hold copyrights transferred to it by assignment, request, or otherwise is not necessarily subverted by assigning to the government the copyright in a commissioned work that is neither produced by current or former employees nor related to the official duties of any government employee. Schnapper v. Foley, C.A.D.C.1981, 667 F.2d 102, 215 U.S.App.D.C. 59, 212 U.S.P.Q. 235, certiorari denied 102 S.Ct. 1448, 455 U.S. 948, 71 L.Ed.2d 661, 215 U.S.P.Q. 96.

**7. Model codes**

Provision of this section which establishes that federal government disclaims any abridgment of copyright protection by its own publication of copyrighted material did not protect copyrighted model building code developed and published by private organization, which also published edition of state building code based substantially on the model code, against loss of its copyright protection through adoption of material from the model code as state law. Building Officials & Code Adm. v. Code Technology, Inc., C.A.1 (Mass.)1980, 628 F.2d 730, 207 U.S.P.Q. 81, on remand 210 U.S.P.Q. 289.

---

## § 106.  Exclusive rights in copyrighted works

Subject to sections 107 through 120, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

(Pub.L. 94–553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2546; Pub.L. 101–318, § 3(d), July 3, 1990, 104 Stat. 288; Pub.L. 101–650, Title VII, § 704(b)(2), Dec. 1, 1990, 104 Stat. 5134.)

## HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports 1976 Acts.**

**Notes of Committee on the Judiciary, House Report No. 94–1476**

**General Scope of Copyright.** The five fundamental rights that the bill gives to copyright owners—the exclusive rights of reproduction, adaptation, publication, performance, and display—are stated generally in section 106 [this section]. These exclusive rights, which comprise the so-called "bundle of rights" that is a copyright, are cumulative and may overlap in some cases. Each of the five enumerated rights may be subdivided indefinitely and, as discussed below in connection with section 201 [section 201 of this title], each subdivision of an exclusive right may be owned and enforced separately.

The approach of the bill is to set forth the copyright owner's exclusive rights in broad terms in section 106 [this section], and then to provide various limitations, qualifications, or exemptions in the 12 sections that follow. Thus, everything in section 106 [this section] is made "subject to sections 107 through 118 [sections 107 through 118 of this title]," and must be read in conjunction with those provisions.

The exclusive rights accorded to a copyright owner under section 106 [this section] are "to do and to authorize" any of the activities specified in the five numbered clauses. Use of the phrase "to authorize" is intended to avoid any questions as to the liability of contributory infringers. For example, a person who lawfully acquires an authorized copy of a motion picture would be an infringer if he or she engages in the business of renting it to others for purposes of unauthorized public performance.

**Rights of Reproduction, Adaptation, and Publication.** The first three clauses of section 106 [this section], which cover all rights under a copyright except those of performance and display, extend to every kind of copyrighted work. The exclusive rights encompassed by these clauses, though closely related, are independent; they can generally be characterized as rights of copying, recording, adaptation, and publishing. A single act of infringement may violate all of these rights at once, as where a publisher reproduces, adapts, and sells copies of a person's copyrighted work as part of a publishing venture. Infringement takes place when any one of the rights is violated: where, for example, a printer reproduces copies without selling them or a

**COPYRIGHTS**                                    **17 § 106**

tion adhering to the Berne Convention or a WTO member country on such date; or

"**(B)** the date of adherence or proclamation, in the case of any other source country of the restored work."

Subsec. (h)(3). Pub.L. 105–80, § 2(4), rewrote the paragraph, which had formerly read:

"(3) The term "eligible country" means a nation, other than the United States, that is a WTO member country, adheres to the Berne Convention, or is subject to a proclamation under subsection (g)."

**1996 Amendments**

Subsec. (h)(3).   Pub.L. 104–295, § 20(e)(2), substituted   "subsection   (g)"   for   "section 104A(g)".

**Effective Dates**

**1998 Acts**

Title I (sections 101 to 105) of Pub.L. 105–304 and the amendments made by this title took effect on Oct. 28, 1998, except as otherwise provided in this title, see section 105(a) of Pub.L. 105–304, set out as a note under section 101 of this title.

Subparagraph (C) of subsec. (h)(1) of this section as amended by section 102(c)(1) of Pub.L. 105–304, and subparagraph (C) of subsec. (h)(3) of this section as amended by section 102(c)(2) of Pub.L. 105–304, to take effect upon the entry into force of the WIPO Copyright Treaty with respect to the United States, see section 105(b)(1) of Pub.L. 104–304, set out as a note under section 101 of this title.

Subparagraph (D) of subsec. (h)(1) of this section as amended by section 102(c)(1) of Pub.L. 105–304, subparagraph (D) of subsec. (h)(3) of this section as amended by section 102(c)(1) of Pub.L. 105–304, and section 102(c)(3) of Pub.L. 105–304 (amending subsec. (h)(6) of this section) to take effect upon the entry into force of the WIPO Performances and Phonograms Treaty with respect to the United States, see section 105(b)(2) of Pub.L. 105–304, set out as a note under section 101 of this title.

**1997 Acts**

Amendments by Pub.L. 105–80 effective Nov. 13, 1997, see section 13 of Pub.L. 105–80, set out as a note under section 119 of this title.

**LIBRARY REFERENCES**

**Law Review and Journal Commentaries**

GATT implementation bill restores copyright in foreign works.   Paul J. Sleven & Eric J. Weisberg, 42 J. Copyright Soc'y 272 (1995).

## § 105.   Subject matter of copyright: United States Government works

**LIBRARY REFERENCES**

**Encyclopedias**

Copyrights and subject matter of copyright, see C.J.S. Copyrights and Intellectual Property § 9 et seq.

18 Am Jur 2d, Copyright and Literary Property §§ 58, 66.

38 Am Jur Proof of Facts 2d, Subject matter of copyright under 1976 Act, p. 333.

**Law Review and Journal Commentaries**

Twin evils: Government copyright and copyright-like controls over government information. Robert M. Gellman, 45 Syracuse L.Rev. 999 (1995).

**Texts and Treatises**

Business and Commercial Litigation in Federal Courts §§ 65.2, 65.3, 65.15.

## § 106.   Exclusive rights in copyrighted works

Subject to sections 107 through 120, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

*[See main volume for text of (1) to (3)]*

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

(As amended Pub.L. 104–39, § 2, Nov. 1, 1995, 109 Stat. 336.)

**HISTORICAL AND STATUTORY NOTES**

**Revision Notes and Legislative Reports**

**1995 Acts**

Senate Report No. 104–128, see 1995 U.S. Code Cong. and Adm. News, p. 356.

Institution and conclusion of copyright arbitration royalty panel proceedings concerning rates and fees under this section, see 17 USCA § 803.

Sovereign immunity for violation of rights under this section, see 17 USCA § 511.

## LIBRARY REFERENCES

**American Digest System**

Civil actions for copyright infringement; persons liable, see Copyrights and Intellectual Property ⊜77.

Copyright; licenses in general, see Copyrights and Intellectual Property ⊜48.

Subjects of copyright; musical works, see Copyrights and Intellectual Property ⊜8.

**Encyclopedias**

Civil actions for copyright infringement; persons liable, see C.J.S. Copyrights and Intellectual Property § 64.

Compulsory licenses; jukeboxes, see C.J.S. Copyrights and Intellectual Property § 88.

**Forms**

Sentence and judgment, see West's Federal Forms § 7801 et seq.

## WESTLAW ELECTRONIC RESEARCH

Copyrights and intellectual property cases: 99k[add key number].

See, also, WESTLAW guide following the Explanation pages of this volume.

# [§ 116A.  Renumbered § 116]

# § 117.  Limitations on exclusive rights:  Computer programs

Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:

(1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or

(2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program.  Adaptations so prepared may be transferred only with the authorization of the copyright owner.

(Pub.L. 94–553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2565; Pub.L. 96–517, § 10(b), Dec. 12, 1980, 94 Stat. 3028.)

COPYRIGHTS                                                        17 § 117

**§ 117.  Limitations on exclusive rights:  Computer programs**

(a) **Making of additional copy or adaptation by owner of copy.**—Notwithstanding the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaptation of that computer program provided:

(1) that such a new copy or adaptation is created as an essential step in the utilization of the computer program in conjunction with a machine and that it is used in no other manner, or

(2) that such new copy or adaptation is for archival purposes only and that all archival copies are destroyed in the event that continued possession of the computer program should cease to be rightful.

(b) **Lease, sale, or other transfer of additional copy or adaptation.**—Any exact copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program.  Adaptations so prepared may be transferred only with the authorization of the copyright owner.

(c) **Machine maintenance or repair.**—Notwithstanding the provisions of section 106, it is not an infringement for the owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if—

(1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and

(2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not accessed or used other than to make such new copy by virtue of the activation of the machine.

(d) **Definitions.**—For purposes of this section—

(1) the "maintenance" of a machine is the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine; and

(2) the "repair" of a machine is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine.

(As amended Pub.L. 105–304, Title III, § 302, Oct. 28, 1998, 112 Stat. 2887.)

## HISTORICAL AND STATUTORY NOTES

**Amendments**

*1998 Amendments*

Subsec. (a).  Pub.L. 105–304, Title III, § 302(1), struck "Notwithstanding" and inserted "(a) Making of additional copy or adaptation by owner of copy.—Notwithstanding".

Subsec. (b).  Pub.L. 105–304, Title III, § 302(2), struck "Any exact" and inserted "(b) Lease, sale, or other transfer of additional copy or adaptation.—Any exact".

Subsec. (c), (d).  Pub.L. 105–304, Title III, § 302(3), added subsecs. (c) and (d).

**Effective Dates**

*1998 Acts*

Requirement that the Register of Copyrights and the Assistant Secretary for Communications and Information of the Department of Commerce jointly evaluate the effects of the amendments made by Title I of Pub.L. 105–304, and the relationship between existing and emergent technology, see section 104 of Pub.L. 105–304, set out as a note under section 109 of this title.

## AMERICAN LAW REPORTS

Copyright protection of computer programs under federal copyright laws. 70 ALR Fed 176.

## LIBRARY REFERENCES

**Encyclopedias**

Rights conferred by copyright and scope thereof, see C.J.S. Copyrights and Intellectual Property § 40 et seq.

18 Am Jur 2d, Copyright and Literary Property §§ 86, 96, 187.

**Law Review and Journal Commentaries**

A manifesto concerning the legal protection of computer programs. Pamela Samuelson, Randall Davis, Mitchell D. Kapor, and J.H. Reichman, 94 Colum.L.Rev. 2308 (1994).

Copyright and the protection of information on computer networks: speed bumps for the

COPYRIGHTS

(B) the term "cable system" has the meaning given that term in section 602 of the Communications Act of 1934 (47 U.S.C. 522).

(Added Pub.L. 105–304, Title I, § 103(a), Oct. 28, 1998, 112 Stat. 2872.)

## HISTORICAL AND STATUTORY NOTES

**Effective Dates**

1998 Acts. Title I (sections 101 to 105) of Pub.L. 105–304 and the amendments made by

this title to take effect on Oct. 28, 1998, except as otherwise provided in this title, see section 105(a) of Pub.L. 105–304, set out as a note under section 101 of this title.

## § 1203. Civil remedies

(a) **Civil actions.**—Any person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation.

(b) **Powers of the court.**—In an action brought under subsection (a), the court—

(1) may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation, but in no event shall impose a prior restraint on free speech or the press protected under the 1st amendment to the Constitution;

(2) at any time while an action is pending, may order the impounding, on such terms as it deems reasonable, of any device or product that is in the custody or control of the alleged violator and that the court has reasonable cause to believe was involved in a violation;

(3) may award damages under subsection (c);

(4) in its discretion may allow the recovery of costs by or against any party other than the United States or an officer thereof;

(5) in its discretion may award reasonable attorney's fees to the prevailing party; and

(6) may, as part of a final judgment or decree finding a violation, order the remedial modification or the destruction of any device or product involved in the violation that is in the custody or control of the violator or has been impounded under paragraph (2).

(c) **Award of damages.**—

(1) **In general.**—Except as otherwise provided in this title [17 U.S.C.A. § 1 et seq.], a person committing a violation of section 1201 or 1202 is liable for either—

(A) the actual damages and any additional profits of the violator, as provided in paragraph (2), or

(B) statutory damages, as provided in paragraph (3).

(2) **Actual damages.**—The court shall award to the complaining party the actual damages suffered by the party as a result of the violation, and any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages, if the complaining party elects such damages at any time before final judgment is entered.

(3) **Statutory damages.**—(A) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just.

(B) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000.

(4) **Repeated violations.**—In any case in which the injured party sustains the burden of proving, and the court finds, that a person has violated section 1201 or 1202 within 3 years after a final judgment was entered against the person for another such violation, the court may increase the award of damages up to triple the amount that would otherwise be awarded, as the court considers just.

(5) **Innocent violations.**—

(A) **In general.**—The court in its discretion may reduce or remit the total award of damages in any case in which the violator sustains the burden of proving, and the court finds, that the violator was not aware and had no reason to believe that its acts constituted a violation.

(B) Nonprofit library, archives, or educational institutions.—In the case of a nonprofit library, archives, or educational institution, the court shall remit damages in any case in which the library, archives, or educational institution sustains the burden of proving, and the court finds, that the library, archives, or educational institution was not aware and had no reason to believe that its acts constituted a violation.

(Added Pub.L. 105–304, Title I, § 103(a), Oct. 28, 1998, 112 Stat. 2874.)

### HISTORICAL AND STATUTORY NOTES

**Effective Dates**

1998 Acts. Title I (sections 101 to 105) of Pub.L. 105–304 and the amendments made by

this title to take effect on Oct. 28, 1998, except as otherwise provided in this title, see section 105(a) of Pub.L. 105–304, set out as a note under section 101 of this title.

## § 1204.   Criminal offenses and penalties

(a) In general.—Any person who violates section 1201 or 1202 willfully and for purposes of commercial advantage or private financial gain—

(1) shall be fined not more than $500,000 or imprisoned for not more than 5 years, or both, for the first offense; and

(2) shall be fined not more than $1,000,000 or imprisoned for not more than 10 years, or both, for any subsequent offense.

(b) Limitation for nonprofit library, archives, or educational institution.—Subsection (a) shall not apply to a nonprofit library, archives, or educational institution.

(c) Statute of limitations.—No criminal proceeding shall be brought under this section unless such proceeding is commenced within 5 years after the cause of action arose.

(Added Pub.L. 105–304, Title I, § 103(a), Oct. 28, 1998, 112 Stat. 2876.)

### HISTORICAL AND STATUTORY NOTES

**Effective Dates**

1998 Acts. Title I (sections 101 to 105) of Pub.L. 105–304 and the amendments made by

this title to take effect on Oct. 28, 1998, except as otherwise provided in this title, see section 105(a) of Pub.L. 105–304, set out as a note under section 101 of this title.

## § 1205.   Savings clause

Nothing in this chapter [17 U.S.C.A. § 1201 et seq.] abrogates, diminishes, or weakens the provisions of, nor provides any defense or element of mitigation in a criminal prosecution or civil action under, any Federal or State law that prevents the violation of the privacy of an individual in connection with the individual's use of the Internet.

(Added Pub.L. 105–304, Title I, § 103(a), Oct. 28, 1998, 112 Stat. 2876.)

### HISTORICAL AND STATUTORY NOTES

**Effective Dates**

1998 Acts. Title I (sections 101 to 105) of Pub.L. 105–304 and the amendments made by

this title to take effect on Oct. 28, 1998, except as otherwise provided in this title, see section 105(a) of Pub.L. 105–304, set out as a note under section 101 of this title.

## CHAPTER 13—PROTECTION OF ORIGINAL DESIGNS

Sec.
1301.   Designs protected.
1302.   Designs not subject to protection.
1303.   Revisions, adaptations, and rearrangements.
1304.   Commencement of protection.
1305.   Term of protection.
1306.   Design notice.
1307.   Effect of omission of notice.
1308.   Exclusive rights.
1309.   Infringement.
1310.   Application for registration.
1311.   Benefit of earlier filing date in foreign country.

Sec.
1312.   Oaths and acknowledgments.
1313.   Examination of application and issue or refusal of registration.
1314.   Certification of registration.
1315.   Publication of announcements and indexes.
1316.   Fees.
1317.   Regulations.
1318.   Copies of records.
1319.   Correction of errors in certificates.
1320.   Ownership and transfer.
1321.   Remedy for infringement.

## § 502.   Remedies for infringement: Injunctions

**(a)** Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.

**(b)** Any such injunction may be served anywhere in the United States on the person enjoined; it shall be operative throughout the United States and shall be enforceable, by proceedings in contempt or otherwise, by any United States court having jurisdiction of that person.   The clerk of the court granting the injunction shall, when requested by any other court in which enforcement of the injunction is sought, transmit promptly to the other court a certified copy of all the papers in the case on file in such clerk's office.

(Pub.L. 94–553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2584.)

### HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports**
**1976 Acts**
**Notes of Committee on the Judiciary,**
**House Report No. 94–1476**

Section 502(a) [subsec. (a) of this section] reasserts the discretionary power of courts to grant injunctions and restraining orders, whether "preliminary," "temporary," "interlocutory," "permanent," or "final," to prevent or stop infringements of copyright.   This power is made subject to the provisions of section 1498 of title 28 [section 1498 of Title 28, Judiciary and Judicial Procedure], dealing with infringement actions against the United States.   The latter reference in section 502(a) [subsec. (a) of this section] makes it clear that the bill would not

permit the granting of an injunction against an infringement for which the Federal Government is liable under section 1498.

Under subsection (b), which is the counterpart of provisions in sections 112 and 113 of the present statute [former sections 112 and 113 of this title], a copyright owner who has obtained an injunction in one State will be able to enforce it against a defendant located anywhere else in the United States.

**Effective Dates**
**1976 Acts.** Section effective Jan. 1, 1978, except as otherwise expressly provided, see section 102 of Pub.L. 94–553, set out as a note preceding section 101 of this title.

### CROSS REFERENCES

Form of complaint for injunction and damages, see Fed.Rules Civ.Proc. Form 17, 28 USCA.

Infringement actionable before or after fixation for works consisting of sounds or images where first fixation is made simultaneously with its transmission and subject to remedy provided by this section though no copyright registration has been made, see 17 USCA § 411.

Injunctions, see Fed.Rules Civ.Proc. Rule 65, 28 USCA.

Making and distribution of phonorecords subject to remedy provided by this section, see 17 USCA § 115.

Power of court to punish for contempt, see 18 USCA § 401.

Process, see Fed.Rules Civ.Proc. Rule 4, 28 USCA.

Remedies for unauthorized fixation and trafficking in sound recordings and music videos, see 17 USCA § 1101.

Satellite carriers willful or repeated secondary transmission of superstation or network station primary transmission subject to remedies under this section, see 17 USCA § 119.

cordings of 1960 production of "Peter Pan" in possession of videotape seller upon determination that they infringed its copyright in production. National Broadcasting Co., Inc. v. Sonneborn, D.Conn.1985, 630 F.Supp. 524, 231 U.S.P.Q. 513.

## § 504.   Remedies for infringement: Damages and profits

(a) **In General.**—Except as otherwise provided by this title, an infringer of copyright is liable for either—

(1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or

(2) statutory damages, as provided by subsection (c).

(b) **Actual Damages and Profits.**—The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

(c) **Statutory Damages.**—

(1) Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $500 or more than $20,000 as the court considers just. For the purposes of this subsection, all the parts of a compilation or derivative work constitute one work.

(2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $100,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court it [1] its discretion may reduce the award of statutory damages to a sum of not less than $200. The court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit

educational institution, library, or archives acting within the
scope of his or her employment who, or such institution, library,
or archives itself, which infringed by reproducing the work in
copies or phonorecords; or (ii) a public broadcasting entity
which or a person who, as a regular part of the nonprofit
activities of a public broadcasting entity (as defined in subsection
(g) of section 118) infringed by performing a published nondra-
matic literary work or by reproducing a transmission program
embodying a performance of such a work.

(Pub.L. 94–553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2585; Pub.L. 100–568,
§ 10(b), Oct. 31, 1988, 102 Stat. 2860.)

1 So in original.  Probably should be "in".

**HISTORICAL AND STATUTORY NOTES**

**Revision Notes and Legislative Reports
1976 Acts
Notes of Committee on the Judiciary,
House Report No. 94–1476**

In General. A cornerstone of the rem-
edies sections and of the bill as a whole is
section 504 [this section], the provision
dealing with recovery of actual damages,
profits, and statutory damages. The two
basic aims of this section are reciprocal
and correlative: (1) to give the courts
specific unambiguous directions concern-
ing monetary awards, thus avoiding the
confusion and uncertainty that have
marked the present law on the subject,
and, at the same time, (2) to provide the
courts with reasonable latitude to adjust
recovery to the circumstances of the case,
thus avoiding some of the artificial or
overly technical awards resulting from
the language of the existing statute.

Subsection (a) lays the groundwork for
the more detailed provisions of the sec-
tion by establishing the liability of a copy-
right infringer for either "the copyright
owner's actual damages and any addi-
tional profits of the infringer," or statuto-
ry damages. Recovery of actual damages
and profits under section 504(b) [subsec.
(b) of this section] or of statutory dam-
ages under section 504(c) [subsec. (c) of
this section] is alternative and for the
copyright owner to elect; as under the
present law, the plaintiff in an infringe-
ment suit is not obliged to submit proof of
damages and profits and may choose to
rely on the provision for minimum statu-
tory damages. However, there is nothing
in section 504 [this section] to prevent a
court from taking account of evidence

concerning actual damages and profits in
making an award of statutory damages
within the range set out in subsection (c).

Actual Damages and Profits. In allow-
ing the plaintiff to recover "the actual
damages suffered by him or her as a
result of the infringement," plus any of
the infringer's profits "that are attribut-
able to the infringement and are not tak-
en into account in computing the actual
damages," section 504(b) [subsec. (b) of
this section] recognizes the different pur-
poses served by awards of damages and
profits. Damages are awarded to com-
pensate the copyright owner for losses
from the infringement, and profits are
awarded to prevent the infringer from
unfairly benefiting from a wrongful act.
Where the defendant's profits are nothing
more than a measure of the damages
suffered by the copyright owner, it would
be inappropriate to award damages and
profits cumulatively, since in effect they
amount to the same thing. However, in
cases where the copyright owner has suf-
fered damages not reflected in the in-
fringer's profits, or where there have
been profits attributable to the copyright-
ed work but not used as a measure of
damages, subsection (b) authorizes the
award of both.

The language of the subsection makes
clear that only those profits "attributable
to the infringement" are recoverable;
where some of the defendant's profits re-
sult from the infringement and other
profits are caused by different factors, it
will be necessary for the court to make an
apportionment. However, the burden of
proof is on the defendant in these cases;
in establishing profits the plaintiff need

**COPYRIGHTS** 17 § 504

**28. Delivery to plaintiff**

Rogers v. Koons, C.A.2 (N.Y.) 1992, 960 F.2d 301, [main volume] 22 U.S.P.Q.2d 1492, certiorari denied 113 S.Ct. 365, 506 U.S. 934, 121 L.Ed.2d 278.

Operator of electronic computer bulletin board system who posted copyrighted software for downloading would be required to deliver to copyright holders all computer hardware and software used to make and distribute unlicensed or unauthorized copies of copyrighted software, including modems, disk drives, and central processing units. Central Point Software, Inc. v. Nugent, E.D.Tex.1996, 903 F.Supp. 1057, 37 U.S.P.Q.2d 1051.

## § 504. Remedies for infringement: Damages and profits

*[See main volume for text of (a) and (b)]*

(c) Statutory Damages.—

*[See main volume for text of (1)]*

(2) In a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $100,000. In a case where the infringer sustains the burden of proving, and the court finds, that such infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200. The court may remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords; or (ii) a public broadcasting entity which or a person who, as a regular part of the nonprofit activities of a public broadcasting entity (as defined in subsection (g) of section 118) infringed by performing a published nondramatic literary work or by reproducing a transmission program embodying a performance of such a work.

(d) Additional damages in certain cases.—In any case in which the court finds that a defendant proprietor of an establishment who claims as a defense that its activities were exempt under section 110(5) did not have reasonable grounds to believe that its use of a copyrighted work was exempt under such section, the plaintiff shall be entitled to, in addition to any award of damages under this section, an additional award of two times the amount of the license fee that the proprietor of the establishment concerned should have paid the plaintiff for such use during the preceding period of up to 3 years.

(As amended Pub.L. 105–80, § 12(a)(13), Nov. 13, 1997, 111 Stat. 1535; Pub.L. 105–298, Title II, § 204, Oct. 27, 1998, 112 Stat. 2833.)

### HISTORICAL AND STATUTORY NOTES

**Amendments**

1998 Amendments. Subsec. (d). Pub.L. 105–298, § 204, added subsec. (d).

1997 Amendments. Subsec. (c)(2). Pub.L. 105–80, § 12(a)(13), substituted "court in" for "court it".

**Effective Dates**

1998 Acts. Amendments by Pub.L. 105–298, Title II, effective 90 days after Oct. 27, 1998, see section 207 of Pub.L. 105–298, set out as a note under section 101 of this title.

1997 Acts. Amendments by Pub.L. 105–80 effective Nov. 13, 1997, see section 13 of Pub.L. 105–80, set out as a note under section 119 of this title.

### AMERICAN LAW REPORTS

Interest on award of damages and profits for federal copyright infringement. 91 ALR Fed 839.

Right to jury trial on issue of damages in copyright infringement action under 17 USCA § 504. 64 ALR Fed 310.

Measure of damages and profits to which copyright owner is entitled under 17 USCA § 504(b). 100 ALR Fed 258.

Measure of statutory damages to which copyright owner is entitled under 17 USCA § 504(c). 105 ALR Fed 345.

merged in the final judgment. Edwin Raphael Co. v. Maharam Fabrics Corp., C.A.7 (Ill.) 1960, 283 F.2d 310.

Order granting or denying an interlocutory or preliminary injunction is merged in a decree or order granting or denying the permanent injunction, and when both orders are appealed from, the appeal from the former will be dismissed. Peterson v. Brotherhood of Locomotive Firemen and Enginemen, C.A.7 (Ind.) 1959, 268 F.2d 567.

**771.  Judgment upon multiple claims or multiple parties**

In light of explicit determination that there was no just reason to delay entry of judgment and express direction that judgment be entered, summary judgment in favor of one defendant entirely and in favor of all defendants on certain claims was appealable, and time for appeal began to run on its entry; being final as to claims and parties within its scope, such judgment could not be reviewed as part of appeal from subsequent judgment as to remaining claims and parties, and thus, appellant, who had moved for, and was granted, voluntary dismissal premised on belief that judgment was not appealable, was entitled to reinstatement of appeal, since to deny reinstatement would have precluded possibility of any appellate review.

Williams v. Boeing Co., C.A.9 1982, 681 F.2d 615.

**772.  Jurisdiction**

Court of appeals is bound to review jurisdictional issues at all stages of the proceedings. U.S. v. Central Liquor Co., C.A.10 (Okl.) 1980, 628 F.2d 1264, certiorari denied 101 S.Ct. 590, 449 U.S. 1022, 66 L.Ed.2d 484, rehearing denied 101 S.Ct. 905, 449 U.S. 1104, 66 L.Ed.2d 833.

**773.  Three-judge district courts**

If a single judge oversteps his limited authority under section 2284 of this title, a court of appeals may correct his error, and, in addition, a temporary restraining order issued pursuant to section 2284 of this title is reviewable in a Court of Appeals to the extent that any such order is reviewable under provisions relating to final decisions of district courts and to interlocutory decisions. Hicks v. Pleasure House, Inc., Cal.1971, 92 S.Ct. 5, 404 U.S. 1, 30 L.Ed.2d 1.

**774.  Moot questions**

Where court had determined that first appeal, from judgment on verdict, was from a final and appealable order, second appeal, which was from order denying motion for judgment n.o.v., was moot. Hattersley v. Bollt, C.A.3 (Pa.) 1975, 512 F.2d 209.

## § 1292.  Interlocutory decisions

(a) Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to

admiralty cases in which appeals from final decrees are allowed.

**(b)** When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

**(c)** The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction—

    **(1)** of an appeal from an interlocutory order or decree described in subsection (a) or (b) of this section in any case over which the court would have jurisdiction of an appeal under section 1295 of this title; and

    **(2)** of an appeal from a judgment in a civil action for patent infringement which would otherwise be appealable to the United States Court of Appeals for the Federal Circuit and is final except for an accounting.

**(d)(1)** When the chief judge of the Court of International Trade issues an order under the provisions of section 256(b) of this title, or when any judge of the Court of International Trade, in issuing any other interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

**(2)** When the chief judge of the United States Court of Federal Claims issues an order under section 798(b) of this title, or when any judge of the United States Claims Court, in issuing an interlocutory order, includes in the order a statement that a controlling question of law is involved with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from that order may materially advance the ultimate termination of the litigation, the United States Court of Appeals for the Federal

Circuit may, in its discretion, permit an appeal to be taken from such order, if application is made to that Court within ten days after the entry of such order.

**(3)** Neither the application for nor the granting of an appeal under this subsection shall stay proceedings in the Court of International Trade or in the Claims Court, as the case may be, unless a stay is ordered by a judge of the Court of International Trade or of the Claims Court or by the United States Court of Appeals for the Federal Circuit or a judge of that court.

**(4)(A)** The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from an interlocutory order of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, granting or denying, in whole or in part, a motion to transfer an action to the United States Claims Court under section 1631 of this title.

**(B)** When a motion to transfer an action to the Claims Court is filed in a district court, no further proceedings shall be taken in the district court until 60 days after the court has ruled upon the motion. If an appeal is taken from the district court's grant or denial of the motion, proceedings shall be further stayed until the appeal has been decided by the Court of Appeals for the Federal Circuit. The stay of proceedings in the district court shall not bar the granting of preliminary or injunctive relief, where appropriate and where expedition is reasonably necessary. However, during the period in which proceedings are stayed as provided in this subparagraph, no transfer to the Claims Court pursuant to the motion shall be carried out.

**(e)** The Supreme Court may prescribe rules, in accordance with section 2072 of this title, to provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for under subsection (a), (b), (c), or (d).

(June 25, 1948, c. 646, 62 Stat. 929; Oct. 31, 1951, c. 655, § 49, 65 Stat. 726; July 7, 1958, Pub.L. 85–508, § 12(e), 72 Stat. 348; Sept. 2, 1958, Pub.L. 85–919, 72 Stat. 1770; Apr. 2, 1982, Pub.L. 97–164, Title I, § 125, 96 Stat. 36; Nov. 8, 1984, Pub.L. 98–620, Title IV, § 412, 98 Stat. 3362; Nov. 19, 1988, Pub.L. 100–702, Title V, § 501, 102 Stat. 4652; Oct. 29, 1992, Pub.L. 102–572, Title I, § 101, Title IX, § 906(c), 106 Stat. 4506, 4518.)

JUDICIARY—PROCEDURE                          28 § 1292

Union of Operating Engineers AFL-CIO, C.A.9
(Hawai'i) 1994, 37 F.3d 436.

§ 1292.  Interlocutory decisions

*[See main volume for text of (a) to (c)]*

(d)(1) When the chief judge of the Court of International Trade issues an order under
the provisions of section 256(b) of this title, or when any judge of the Court of
International Trade, in issuing any other interlocutory order, includes in the order a
statement that a controlling question of law is involved with respect to which there is a
substantial ground for difference of opinion and that an immediate appeal from that
order may materially advance the ultimate termination of the litigation, the United
States Court of Appeals for the Federal Circuit may, in its discretion, permit an appeal
to be taken from such order, if application is made to that Court within ten days after
the entry of such order.

(2) When the chief judge of the United States Court of Federal Claims issues an
order under section 798(b) of this title, or when any judge of the United States Court of
Federal Claims, in issuing an interlocutory order, includes in the order a statement that
a controlling question of law is involved with respect to which there is a substantial
ground for difference of opinion and that an immediate appeal from that order may
materially advance the ultimate termination of the litigation, the United States Court of
Appeals for the Federal Circuit may, in its discretion, permit an appeal to be taken from
such order, if application is made to that Court within ten days after the entry of such
order.

(3) Neither the application for nor the granting of an appeal under this subsection
shall stay proceedings in the Court of International Trade or in the Court of Federal
Claims, as the case may be, unless a stay is ordered by a judge of the Court of
International Trade or of the Court of Federal Claims or by the United States Court of
Appeals for the Federal Circuit or a judge of that court.

(4)(A) The United States Court of Appeals for the Federal Circuit shall have
exclusive jurisdiction of an appeal from an interlocutory order of a district court of the
United States, the District Court of Guam, the District Court of the Virgin Islands, or
the District Court for the Northern Mariana Islands, granting or denying, in whole or in
part, a motion to transfer an action to the United States Court of Federal Claims under
section 1631 of this title.

(B) When a motion to transfer an action to the Court of Federal Claims is filed in a
district court, no further proceedings shall be taken in the district court until 60 days
after the court has ruled upon the motion.  If an appeal is taken from the district court's
grant or denial of the motion, proceedings shall be further stayed until the appeal has
been decided by the Court of Appeals for the Federal Circuit.  The stay of proceedings
in the district court shall not bar the granting of preliminary or injunctive relief, where
appropriate and where expedition is reasonably necessary.  However, during the period
in which proceedings are stayed as provided in this subparagraph, no transfer to the
Court of Federal Claims pursuant to the motion shall be carried out.

(e) The Supreme Court may prescribe rules, in accordance with section 2072 of this
title, to provide for an appeal of an interlocutory decision to the courts of appeals that is
not otherwise provided for under subsection (a), (b), (c), or (d).

(June 25, 1948, c. 646, 62 Stat. 929; Oct. 31, 1951, c. 655, § 49, 65 Stat. 726; July 7, 1958, Pub.L.
85–508, § 12(e), 72 Stat. 348; Sept. 2, 1958, Pub.L. 85–919, 72 Stat. 1770; Apr. 2, 1982, Pub.L.
97–164, Title I, § 125, 96 Stat. 36; Nov. 8, 1984, Pub.L. 98–620, Title IV, § 412, 98 Stat. 3362; Nov.
19, 1988, Pub.L. 100–702, Title V, § 501, 102 Stat. 4652; Oct. 29, 1992, Pub.L. 102–572, Title I, § 101,
Title IX, §§ 902(b), 906(c), 106 Stat. 4506, 4516, 4518.)

## HISTORICAL AND STATUTORY NOTES

**Amendments**

1992 Amendments. Subsec. (d)(2).  Pub.L.
102–572, § 906(c), inserted "the chief judge of
the United States Court of Federal Claims is-
sues an order under section 798(b) of this title,
or when" following "When".

Pub.L.  102–572,  § 902(b)(1),  substituted
"United States Court of Federal Claims" for
"United States Claims Court".

Subsec.  (d)(3).  Pub.L. 102–572,  § 902(b)(2),
substituted "Court of Federal Claims" for
"Claims Court" in two places.

Subsec. (d)(4).  Pub.L. § 902(b), sub-
stituted "United States Court of Federal

differ as to one of issues, two decisions were to be reconciled in accordance with principles developed in multidefendant actions, such as rule of joint and several liability of joint tort-feasors in maritime cases, requirement that damages be assessed on basis of proportionate fault, and prohibition against double recovery. Diodato v. Turecamo Coastal & Harbor Towing, Inc., D.C.N.Y.1984, 100 F.R.D. 756.

**24. New trial**

Where, because court was uncertain whether Foreign Sovereign Immunities Act of 1976, section 1602 et seq. of this title, compelled nonjury trial the court, with consent of parties, let jury try case and enter judgment on its verdict but also recorded his own nonjury findings to be substituted for jury's should it be decided on appeal that the Foreign Sovereign Immunities Act of 1976 compelled nonjury trial but record showed that true nonjury trial was not held, in that court more than once expressed to counsel its view of what court would have done, but did not do, had case been tried without jury, new trial was necessary and, because both parties deserved

to be satisfied that new trial not only was but also appeared to be de novo, trial before another judge was appropriate. Houston v. Murmansk Shipping Co., C.A. 4 (Md.) 1982, 667 F.2d 1151.

**25. Arbitration**

Foreign Sovereign Immunities Act provision conferring jurisdiction on district court over civil actions against "foreign state" did not preclude reference to arbitration of importer's claims arising in connection with distribution contract with producer whose majority shareholder was French government, and district court was otherwise authorized to determine whether parties contracted to arbitrate their disputes. J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A. C.A.4(S.C.) 1988, 863 F.2d 315.

**26. Standard of review**

District court's conclusions that Republic of Bolivia did not waive its sovereign immunity and that Bolivia did not engage in sufficient commercial activity to invoke jurisdiction of United States court were subject to de novo review. Shapiro v. Republic of Bolivia, C.A.2(N.Y.) 1991, 930 F.2d 1013.

## § 1331.  Federal question

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

(June 25, 1948, c. 646, 62 Stat. 930; July 25, 1958, Pub.L. 85–554, § 1, 72 Stat. 415; Oct. 21, 1976, Pub.L. 94–574, § 2, 90 Stat. 2721; Dec. 1, 1980, Pub.L. 96–486, § 2(a), 94 Stat. 2369.)

### HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports**

Based on Title 28, U.S.C., 1940 ed., § 41(1) (Mar. 3, 1911, c. 231, § 24, par. 1, 36 Stat. 1091 [derived from R.S. §§ 563, 629]; May 14, 1934, c. 283, § 1, 48 Stat. 775; Aug. 21, 1937, c. 726, § 1, 50 Stat. 738; Apr. 20, 1940, c. 117, 54 Stat. 143).

Jurisdiction of federal questions arising under other sections of this chapter is not dependent upon the amount in controversy. (See, also, reviser's note [now Revision Notes and Legislative Reports] under section 1332 of this title.)

Words "wherein the matter in controversy exceeds the sum or value of

$3,000, exclusive of interest and costs," were added to conform to rulings of the Supreme Court. See construction of provision relating to jurisdictional amount requirement in cases involving a Federal question in *United States v. Sayward*, 16 S.Ct. 371, 160 U.S. 493, 40 L.Ed. 508; *Fishback v. Western Union Tel. Co.*, 16 S.Ct. 506, 161 U.S. 96, 40 L.Ed. 630; and *Halt v. Indiana Manufacturing Co.*, 1900, 20 S.Ct. 272, 176 U.S. 68, 44 L.Ed. 374.

Words "all civil actions" were substituted for "all suits of a civil nature, at common law or in equity" to conform

Sec.
1360. State civil jurisdiction in actions to which Indians are parties.
1361. Action to compel an officer of the United States to perform his duty.
1362. Indian tribes.
1363. Jurors' employment rights.
1364. Direct actions against insurers of members of diplomatic missions and their families.
1365. Senate actions.
1366. Construction of references to laws of the United States or Acts of Congress.
1367. Supplemental jurisdiction.

---

**WESTLAW COMPUTER ASSISTED LEGAL RESEARCH**

WESTLAW supplements your legal research in many ways. WESTLAW allows you to

● update your research with the most current information

● expand your library with additional resources

● retrieve direct history, precedential history and parallel citations with the Insta-Cite service

For more information on using WESTLAW to supplement your research, see the WESTLAW Electronic Research Guide, which follows the Explanation.

---

## § 1338. Patents, plant variety protection, copyrights, mask works, trade-marks, and unfair competition

(a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trade-marks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

(b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trade-mark laws.

(c) Subsections (a) and (b) apply to exclusive rights in mask works under chapter 9 of title 17 to the same extent as such subsections apply to copyrights.

(June 25, 1948, c. 646, 62 Stat. 931; Dec. 24, 1970, Pub.L. 91–577, Title III, § 143(b), 84 Stat. 1559; Nov. 19, 1988, Pub.L. 100–702, Title X, § 1020(a)(4), 102 Stat. 4671.)

## NOTES OF DECISIONS

Home Rule Act   1

---

**1. Home Rule Act**

The District of Columbia Home Rule Act, Pub.L. 93-198, sec. 24, 1973, 87 Stat. 774, does not apply exclusively to the District of Columbia; thus, it could provide a basis for the exercise of federal question jurisdiction in an action brought by former employees of the United States Department of Labor who were transferred to the District of Columbia Department of Employment Services, seeking an injunction which would either reinstate them to the federal competitive service or would grant them identical rights, benefits and privileges. Thomas v. Barry, 1984, 729 F.2d 1469, 234 U.S.App.D.C. 378.

## § 1367.  Supplemental Jurisdiction

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

(d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and

Case 3:10-cv-03561-WHA   Document 369-3   Filed 08/29/11   Page 86 of 114

for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

**(e)** As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(Added Pub.L. 101–650, Title III, § 310(a), Dec. 1, 1990, 104 Stat. 5113.)

# PRACTICE COMMENTARY
## by David D. Siegel
### The 1990 Adoption of § 1367, Codifying "Supplemental" Jurisdiction

Section 1367, part of the Judicial Improvements Act of 1990 (Pub.L. 101–650), codifies under the name of "supplemental jurisdiction" the caselaw doctrines of "pendent" and "ancillary" jurisdiction, strengthening them in some respects but perhaps weakening them in others. There is much to be said about this new statute, and a brief treatment of what the pendent and ancillary doctrines are and what they were designed to do will supply a helpful background before § 1367 itself is parsed and analyzed.

### "Pendent" Jurisdiction, Background

The doctrine of "pendent" jurisdiction, which had perhaps its best known and most generous interpretation in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130 (1966), recognizes that in our federal system a plaintiff who has a federal claim against a defendant will often find that the same wrongful conduct that grounded the federal claim has given rise to a claim under state law as well. They may be separate claims, or they may merely be different "counts" or "grounds" or "theories" in support of what is essentially a single claim. Each can be sued on in its own court system, of course, but that creates duplication and waste. If jurisdiction of the federal claim has not been conferred exclusively on the federal courts, both claims can be brought in the state court. More to the point here is that the doctrine of pendent jurisdiction permits the plaintiff to bring both claims in the federal court.

The "pendent" jurisdiction doctrine permits a federal court to entertain a state claim of which it would otherwise lack subject matter jurisdiction when it is joined with a related federal claim, the two arising out of the same event or connected series of events. Under pendent jurisdiction, the federal claim acts as the equivalent of a jurisdictional crutch. In the constitutional sense, the relatedness of the two claims makes both of them part of the same constitutional "case".

Pendent jurisdiction is mainly associated with the federal question jurisdiction, where the existence of a federal claim supports jurisdiction of a "pendent" state claim. The doctrine of "ancillary" jurisdiction is mainly associated with the diversity jurisdiction, but there is sometimes an overlap between the two doctrines, as noted below. Because they have similar missions, it is not urgent to draw a fine

tary of the Treasury shall prescribe, and may furnish to the Department facsimiles of his name, the name of the locality in which his goods are manufactured, or of his registered trademark, and thereupon the Secretary of the Treasury shall cause one or more copies of the same to be transmitted to each collector or other proper officer of customs.

(July 5, 1946, ch. 540, §42, 60 Stat. 440; Oct. 3, 1978, Pub. L. 95-410, title II, §211, 92 Stat. 903.)

### § 1125    False designations of origin, false descriptions, and dilution [Section 43]

(a) (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

(2) As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this Act in the same manner and to the same extent as any nongovernmental entity.

(b) Any goods marked or labeled in contravention of the provisions of this section shall not be imported into the United States or admitted to entry at any customhouse of the United States. The owner, importer, or consignee of goods refused entry at any customhouse under this section may have any recourse by protest or appeal that is given under the

**15 U.S.C. § 1125**

164 • Patent, Trademark, and Copyright Laws, 1998 Edition

customs revenue laws or may have the remedy given by this Act in cases involving goods refused entry or seized.

(c)(1) The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to any injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the famous mark, and to obtain such other relief as is provided in this subsection. In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to—

> (A) the degree of inherent or acquired distinctiveness of the mark;

> (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

> (C) the duration and extent of advertising and publicity of the mark;

> (D) the geographical extent of the trading area in which the mark is used;

> (E) the channels of trade for the goods or services with which the mark is used;

> (F) the degree of recognition of the mark in the trading areas and channels of trade of the mark's owner and the person against whom the injunction is sought;

> (G) the nature and extent of use of the same or similar marks by third parties; and

> (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

(2) In an action brought under the subsection, the owner of a famous mark shall be entitled **only to** injunctive relief unless the person against whom the injunction is sought **willfully intended** to trade on the owner's reputation or to cause dilution of the famous mark. If such willful intent is proven, the owner of a famous mark shall also be entitled to the remedies set forth in sections 35(a) and 36, subject to the discretion of the court and the principles of equity.

(3) The ownership by a person of a valid registration under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal

**15 U.S.C. § 1125**

register shall be a complete bar to an action against that person, with respect to that mark, that is brought by another person under the common law or statute of a State and that seeks to prevent dilution of the distinctiveness of a mark, label, or form of advertisement.

(4) The following shall not be actionable under this section:

(A) Fair use of a famous mark by another person in comparative commercial advertising or promotion to identify the competing goods or services of the owner of the famous mark.

(B) Noncommercial use of a mark.

(C) All forms of news reporting and news commentary.

(July 5, 1946, ch. 540, title VIII, §43, 60 Stat. 441; Nov. 16, 1988, Pub. L. 100-667, §132, 102 Stat. 3946; Oct. 27, 1992, Pub. L. 102-542, §3, 106 Stat. 3568; Jan. 16, 1996, Pub. L. 104-98, 109 Stat. 985).

## § 1126   International conventions [Section 44]

(a) *Register of marks communicated by international bureaus.*—The Commissioner shall keep a register of all marks communicated to him by the international bureaus provided for by the conventions for the protection of industrial property, trademarks, trade and commercial names, and the repression of unfair competition to which the United States is or may become a party, and upon the payment of the fees required by such conventions and the fees required in this Act may place the marks so communicated upon such register. This register shall show a facsimile of the mark or trade or commercial name; the name, citizenship, and address of the registrant; the number, date, and place of the first registration of the mark, including the dates on which application for such registration was filed and granted and the term of such registration; a list of goods or services to which the mark is applied as shown by the registration in the country of origin, and such other data as may be useful concerning the mark. This register shall be a continuation of the register provided in section 1(a) of the Act of March 19, 1920.

(b) *Benefits of section to persons whose country of origin is party to convention or treaty.*—Any person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, or extends reciprocal rights to nationals of the United States by

**15 U.S.C. § 1126**

granted by this section to persons described in subsection (b) of this section.

(July 5, 1946, ch. 540, title IX, §44, 60 Stat. 441; Oct. 3, 1961, Pub. L. 87-333, §2, 75 Stat. 748; Oct. 9, 1962, Pub. L. 87-772, §20, 76 Stat. 774; Nov. 16, 1988, Pub. L. 100-667, §133, 102 Stat. 3946.)

## § 1127   Construction and definitions; intent of chapter [Section 45]

In the construction of this Act, unless the contrary is plainly apparent from the context—

The United States includes and embraces all territory which is under its jurisdiction and control.

The word "commerce" means all commerce which may lawfully be regulated by Congress.

The term "principal register" refers to the register provided for by sections 1 through 22 hereof [§§1051–1072], and the term "supplemental register" refers to the register provided for by sections 23 through 28 thereof [§§1091–1096].

The term "person" and any other word or term used to designate the applicant or other entitled to a benefit or privilege or rendered liable under the provisions of this Act includes a juristic person as well as a natural person. The term "juristic person" includes a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law.

The term "person" also includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this Act in the same manner and to the same extent as any nongovernmental entity.

The terms "applicant" and "registrant" embrace the legal representatives, predecessors, successors and assigns of such applicant or registrant.

The term "Commissioner" means the Commissioner of Patents and Trademarks.

The term "related company" means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and

**15 U.S.C. § 1127**

quality of the goods or services on or in connection with which the mark is used.

The terms "trade name" and "commercial name" mean any name used by a person to identify his or her business or vocation.

The term "trademark" includes any word, name, symbol, or device, or any combination thereof—

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this Act,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

The term "service mark" means any word, name, symbol, or device, or any combination thereof—

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this Act,

to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown. Titles, character names, and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor.

The term "certification mark" means any word, name, symbol, or device, or any combination thereof—

(1) used by a person other than its owner, or

(2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this Act,

to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.

The term "collective mark" means a trademark or service mark—

**15 U.S.C. § 1127**

170 • Patent, Trademark, and Copyright Laws, 1998 Edition

(1) used by the members of a cooperative, an association, or other collective group or organization, or

(2) which such cooperative, association, or other collective group or organization has a bona fide intention to use in commerce and applies to register on the principal register established by this Act,

and includes marks indicating membership in a union, an association, or other organization.

The term "mark" includes any trademark, service mark, collective mark, or certification mark.

The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this Act, a mark shall be deemed to be in use in commerce—

(1) on goods when—

(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

(B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

A mark shall be deemed to be "abandoned" when either of the following occurs:

(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of that mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

(2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the

**15 U.S.C. § 1127**

generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

The term "dilution" means the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—

(1) competition between the owner of the famous mark and other parties, or

(2) likelihood of confusion, mistake, or deception.

The term "colorable imitation" includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive.

The term "registered mark" means a mark registered in the United States Patent and Trademark Office under this Act or under the Act of March 3, 1881, or the Act of February 20, 1905, or the Act of March 19, 1920. The phrase "marks registered in the Patent and Trademark Office" means registered marks.

The term "Act of March 3, 1881," "Act of February 20, 1905," or "Act of March 19, 1920," means the respective Act as amended.

A "counterfeit" is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.

Words used in the singular include the plural and vice versa.

The intent of this Act is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

(July 5, 1946, ch. 540, title X, §45, 60 Stat. 443; Oct. 9, 1962, Pub. L. 87-772, §21, 76 Stat. 774; Jan. 2, 1975, Pub. L. 93-596, §1, 88 Stat. 1949; Nov. 8, 1984, Pub. L. 98-620, §103, 98 Stat. 3336; Nov. 16, 1988, Pub. L. 100-667, §134, 102 Stat. 3946–48; Oct. 27,

**15 U.S.C. § 1127**

1992, Pub. L. 102-542, §3, 106 Stat. 3568; Dec. 8, 1994, Pub. L. 103-465, § 521, 108 Stat. 4981; Jan. 16, 1996, Pub. L. 104-98, 109 Stat. 985).

UNCODIFIED LANHAM ACT PROVISIONS

### § 46(a)    Time of taking effect—Repeal of prior acts

This Act shall be in force and take effect one year from its enactment, but except as otherwise herein specifically provided shall not affect any suit, proceeding, or appeal then pending. All Acts and parts of Acts inconsistent herewith are hereby repealed effective one year from the enactment hereof, including the following Acts insofar as they are inconsistent herewith: The Act of Congress approved March 3, 1881, entitled "An Act to authorize the registration of trademarks and protect the same"; the Act approved August 5, 1882, entitled "An Act relating to the registration of trademarks"; the Act of February 20, 1905 (U.S.C., title 15, secs. 81 to 109, inclusive), entitled "An Act to authorize the registration of trademarks used in commerce with foreign nations or among the several States or with Indian tribes, and to protect the same", and the amendments thereto by the Acts of May 4, 1906 (U.S.C., title 15, secs. 131 and 132; 34 Stat. 169), March 2, 1907 (34 Stat. 1251, 1252), February 18, 1909 (35 Stat. 627, 628), February 18, 1911 (36 Stat. 918), January 8, 1913 (37 Stat. 649), June 7, 1924 (43 Stat. 647), March 4, 1925 (43 Stat. 1268, 1269), April 11, 1930 (46 Stat. 155), June 10, 1938 (Public, Numbered 586, Seventy-fifth Congress, ch. 332, third session); the Act of March 19, 1920 (U.S.C., title 15, secs. 121 to 128, inclusive), entitled "an Act to give effect to certain provisions of the convention for the protection of trademarks and commercial names made and signed in the city of Buenos Aires, in the Argentine Republic, August 20, 1910, and for other purposes", and the amendments thereto, including the Act of June 10, 1938 (Public, Numbered 586, Seventy-fifth Congress, ch. 332, third session): *Provided*, That this repeal shall not affect the validity of registrations granted or applied for under any of said Acts prior to the effective date of this Act, or rights or remedies thereunder except as provided in sections 8, 12, 14, 15, and 47 [§§1058, 1062, 1064, 1065, and 47 (§47 is uncodified; see below)] of this Act; but nothing contained in this Act shall be construed as limiting, restricting, modifying, or repealing any statute in force on the effective

**Lanham Act § 46(a)**

1ST DOCUMENT of Level 1 printed in FULL format.

Copyright 1999 Commission of the European Communities

PUBLICATION DATE: May 17, 1991

Official Journal L 122 , 17/05/1991 p. 0042 - 0046


Finnish special edition....: Chapter 17 Volume 1 p. 111


Swedish special edition...: Chapter 17 Volume 1 p. 111

1991 OJ L 122

DOCUMENT DATE: May 14, 1991

TITLE: Council Directive 91/250/EEC of 14 May 1991 on the legal protection of computer programs

AUTHOR: COUNCIL

TYPE: DIRECTIVE

KEYWORDS: data-processing law

computer piracy

copyright

software

approximation of laws INTERNAL MARKET ; INDUSTRIAL AND COMMERCIAL PROPERTY

BODY:
COUNCIL DIRECTIVE of 14 May 1991 on the legal protection of computer programs (91/250/EEC)

THE COUNCIL OF THE EUROPEAN COMMUNITIES,

Having regard to the Treaty establishing the European Economic Community and in particular Article 100a thereof,

Having regard to the proposal from the Commission (1),

In cooperation with the European Parliament (2),

Having regard to the opinion of the Economic and Social Committee (3),

Whereas computer programs are at present not clearly protected in all Member States by existing legislation and such protection, where it exists, has

Copyright 1999 Commission of the European Communities

different attributes;

Whereas the development of computer programs requires the investment of considerable human, technical and financial resources while computer programs can be copied at a fraction of the cost needed to develop them independently;

Whereas computer programs are playing an increasingly important role in a broad range of industries and computer program technology can accordingly be considered as being of fundamental importance for the Community's industrial development;

Whereas certain differences in the legal protection of computer programs offered by the laws of the Member States have direct and negative effects on the functioning of the common market as regards computer programs and such differences could well become greater as Member States introduce new legislation on this subject;

Whereas existing differences having such effects need to be removed and new ones prevented from arising, while differences not adversely affecting the functioning of the common market to a substantial degree need not be removed or prevented from arising;

Whereas the Community's legal framework on the protection of computer programs can accordingly in the first instance be limited to establishing that Member States should accord protection to computer programs under copyright law as literary works and, further, to establishing who and what should be protected, the exclusive rights on which protected persons should be able to rely in order to authorize or prohibit certain acts and for how long the protection should apply;

Whereas, for the purpose of this Directive, the term 'computer program' shall include programs in any form, including those which are incorporated into hardware; whereas this term also includes preparatory design work leading to the development of a computer program provided that the nature of the preparatory work is such that a computer program can result from it at a later stage;

Whereas, in respect of the criteria to be applied in determining whether or not a computer program is an original work, no tests as to the qualitative or aesthetic merits of the program should be applied;

Whereas the Community is fully committed to the promotion of international standardization;

Whereas the function of a computer program is to communicate and work together with other components of a computer system and with users and, for this purpose, a logical and, where appropriate, physical interconnection and interaction is required to permit all elements of software and hardware to work with other software and hardware and with users in all the ways in which they are intended to function;

Whereas the parts of the program which provide for such interconnection and interaction between elements of software and hardware are generally known as 'interfaces';

Copyright 1999 Commission of the European Communities

Whereas this functional interconnection and interaction is generally known as 'interoperability'; whereas such interoperability can be defined as the ability to exchange information and mutually to use the information which has been exchanged;

Whereas, for the avoidance of doubt, it has to be made clear that only the expression of a computer program is protected and that ideas and principles which underlie any element of a program, including those which underlie its interfaces, are not protected by copyright under this Directive;

Whereas, in accordance with this principle of copyright, to the extent that logic, algorithms and programming languages comprise ideas and principles, those ideas and principles are not protected under this Directive;

Whereas, in accordance with the legislation and jurisprudence of the Member States and the international copyright conventions, the expression of those ideas and principles is to be protected by copyright;

Whereas, for the purposes of this Directive, the term 'rental' means the making available for use, for a limited period of time and for profit-making purposes, of a computer program or a copy thereof; whereas this term does not include public lending, which, accordingly, remains outside the scope of this Directive;

Whereas the exclusive rights of the author to prevent the unauthorized reproduction of his work have to be subject to a limited exception in the case of a computer program to allow the reproduction technically necessary for the use of that program by the lawful acquirer;

Whereas this means that the acts of loading and running necessary for the use of a copy of a program which has been lawfully acquired, and the act of correction of its errors, may not be prohibited by contract; whereas, in the absence of specific contractual provisions, including when a copy of the program has been sold, any other act necessary for the use of the copy of a program may be performed in accordance with its intended purpose by a lawful acquirer of that copy;

Whereas a person having a right to use a computer program should not be prevented from performing acts necessary to observe, study or test the functioning of the program, provided that these acts do not infringe the copyright in the program;

Whereas the unauthorized reproduction, translation, adaptation or transformation of the form of the code in which a copy of a computer program has been made available constitutes an infringement of the exclusive rights of the author;

Whereas, nevertheless, circumstances may exist when such a reproduction of the code and translation of its form within the meaning of Article 4 (a) and (b) are indispensable to obtain the necessary information to achieve the interoperability of an independently created program with other programs;

Whereas it has therefore to be considered that in these limited circumstances only, performance of the acts of reproduction and translation by or on behalf of a person having a right to use a copy of the program is legitimate and compatible with fair practice and must therefore be deemed not to require the

Copyright 1999 Commission of the European Communities

authorization of the rightholder;

Whereas an objective of this exception is to make it possible to connect all components of a computer system, including those of different manufacturers, so that they can work together;

Whereas such an exception to the author's exclusive rights may not be used in a way which prejudices the legitimate interests of the rightholder or which conflicts with a normal exploitation of the program;

Whereas, in order to remain in accordance with the provisions of the Berne Convention for the Protection of Literary and Artistic Works, the term of protection should be the life of the author and fifty years from the first of January of the year following the year of his death or, in the case of an anonymous or pseudonymous work, 50 years from the first of January of the year following the year in which the work is first published;

Whereas protection of computer programs under copyright laws should be without prejudice to the application, in appropriate cases, of other forms of protection; whereas, however, any contractual provisions contrary to Article 6 or to the exceptions provided for in Article 5 (2) and (3) should be null and void;

Whereas the provisions of this Directive are without prejudice to the application of the competition rules under Articles 85 and 86 of the Treaty if a dominant supplier refuses to make information available which is necessary for interoperability as defined in this Directive;

Whereas the provisions of this Directive should be without prejudice to specific requirements of Community law already enacted in respect of the publication of interfaces in the telecommunications sector or Council Decisions relating to standardization in the field of information technology and telecommunication;

Whereas this Directive does not affect derogations provided for under national legislation in accordance with the Berne Convention on points not covered by this Directive,

HAS ADOPTED THIS DIRECTIVE: Article 1

Object of protection 1. In accordance with the provisions of this Directive, Member States shall protect computer programs, by copyright, as literary works within the meaning of the Berne Convention for the Protection of Literary and Artistic Works. For the purposes of this Directive, the term 'computer programs' shall include their preparatory design material.

2. Protection in accordance with this Directive shall apply to the expression in any form of a computer program. Ideas and principles which underlie any element of a computer program, including those which underlie its interfaces, are not protected by copyright under this Directive.

3. A computer program shall be protected if it is original in the sense that it is the author's own intellectual creation. No other criteria shall be applied to determine its eligibility for protection.  Article 2

Copyright 1999 Commission of the European Communities

Authorship of computer programs 1. The author of a computer program shall be the natural person or group of natural persons who has created the program or, where the legislation of the Member State permits, the legal person designated as the rightholder by that legislation. Where collective works are recognized by the legislation of a Member State, the person considered by the legislation of the Member State to have created the work shall be deemed to be its author.

2. In respect of a computer program created by a group of natural persons jointly, the exclusive rights shall be owned jointly.

3. Where a computer program is created by an employee in the execution of his duties or following the instructions given by his employer, the employer exclusively shall be entitled to exercise all economic rights in the program so created, unless otherwise provided by contract.  Article 3

Beneficiaries of protection Protection shall be granted to all natural or legal persons eligible under national copyright legislation as applied to literary works.  Article 4

Restricted Acts Subject to the provisions of Articles 5 and 6, the exclusive rights of the rightholder within the meaning of Article 2, shall include the right to do or to authorize:

(a) the permanent or temporary reproduction of a computer program by any means and in any form, in part or in whole. Insofar as loading, displaying, running, transmission or storage of the computer program necessitate such reproduction, such acts shall be subject to authorization by the rightholder;

(b) the translation, adaptation, arrangement and any other alteration of a computer program and the reproduction of the results thereof, without prejudice to the rights of the person who alters the program;

(c) any form of distribution to the public, including the rental, of the original computer program or of copies thereof. The first sale in the Community of a copy of a program by the rightholder or with his consent shall exhaust the distribution right within the Community of that copy, with the exception of the right to control further rental of the program or a copy thereof.  Article 5

Exceptions to the restricted acts 1. In the absence of specific contractual provisions, the acts referred to in Article 4 (a) and (b) shall not require authorization by the rightholder where they are necessary for the use of the computer program by the lawful acquirer in accordance with its intended purpose, including for error correction.

2. The making of a back-up copy by a person having a right to use the computer program may not be prevented by contract insofar as it is necessary for that use.

3. The person having a right to use a copy of a computer program shall be entitled, without the authorization of the rightholder, to observe, study or test the functioning of the program in order to determine the ideas and principles which underlie any element of the program if he does so while performing any of the acts of loading, displaying, running, transmitting or storing the program which he is entitled to do.  Article 6

Copyright 1999 Commission of the European Communities

Decompilation 1. The authorization of the rightholder shall not be required where reproduction of the code and translation of its form within the meaning of Article 4 (a) and (b) are indispensable to obtain the information necessary to achieve the interoperability of an independently created computer program with other programs, provided that the following conditions are met:

(a) these acts are performed by the licensee or by another person having a right to use a copy of a program, or on their behalf by a person authorized to to so;

(b) the information necessary to achieve interoperability has not previously been readily available to the persons referred to in subparagraph (a); and

(c) these acts are confined to the parts of the original program which are necessary to achieve interoperability.

2. The provisions of paragraph 1 shall not permit the information obtained through its application:

(a) to be used for goals other than to achieve the interoperability of the independently created computer program;

(b) to be given to others, except when necessary for the interoperability of the independently created computer program; or

(c) to be used for the development, production or marketing of a computer program substantially similar in its expression, or for any other act which infringes copyright.

3. In accordance with the provisions of the Berne Convention for the protection of Literary and Artistic Works, the provisions of this Article may not be interpreted in such a way as to allow its application to be used in a manner which unreasonably prejudices the right holder's legitimate interests or conflicts with a normal exploitation of the computer program.  Article 7

Special measures of protection 1. Without prejudice to the provisions of Articles 4, 5 and 6, Member States shall provide, in accordance with their national legislation, appropriate remedies against a person committing any of the acts listed in subparagraphs (a), (b) and (c) below:

(a) any act of putting into circulation a copy of a computer program knowing, or having reason to believe, that it is an infringing copy;

(b) the possession, for commercial purposes, of a copy of a computer program knowing, or having reason to believe, that it is an infringing copy;

(c) any act of putting into circulation, or the possession for commercial purposes of, any means the sole intended purpose of which is to facilitate the unauthorized removal or circumvention of any technical device which may have been applied to protect a computer program.

2. Any infringing copy of a computer program shall be liable to seizure in accordance with the legislation of the Member State concerned.

Copyright 1999 Commission of the European Communities

3. Member States may provide for the seizure of any means referred to in paragraph 1 (c). Article 8

Term of protection 1. Protection shall be granted for the life of the author and for fifty years after his death or after the death of the last surviving author; where the computer program is an anonymous or pseudonymous work, or where a legal person is designated as the author by national legislation in accordance with Article 2 (1), the term of protection shall be fifty years from the time that the computer program is first lawfully made available to the public. The term of protection shall be deemed to begin on the first of January of the year following the abovementioned events.

2. Member States which alrea dy have a term of protection longer than that provided for in paragraph 1 are allowed to maintain their present term until such time as the term of protection for copyright works is harmonized by Community law in a more general way. Article 9

Continued application of other legal provisions 1. The provisions of this Directive shall be without prejudice to any other legal provisions such as those concerning patent rights, trade-marks, unfair competition, trade secrets, protection of semi-conductor products or the law of contract. Any contractual provisions contrary to Article 6 or to the exceptions provided for in Article 5 (2) and (3) shall be null and void.

2. The provisions of this Directive shall apply also to programs created before 1 January 1993 without prejudice to any acts concluded and rights acquired before that date. Article 10

Final provisions 1. Member States shall bring into force the laws, regulations and administrative provisions necessary to comply with this Directive before 1 January 1993.

When Member States adopt these measures, the latter shall contain a reference to this Directive or shall be accompanied by such reference on the occasion of their official publication. The methods of making such a reference shall be laid down by the Member States.

2. Member States shall communicate to the Commission the provisions of national law which they adopt in the field governed by this Directive. Article 11

This Directive is addressed to the Member States. Done at Brussels, 14 May 1991. For the Council

The President

J. F. POOS (1) OJ No C 91, 12. 4. 1989, p. 4; and OJ No C 320, 20. 12. 1990, p. 22. (2) OJ No C 231, 17. 9. 1990, p. 78; and Decision of 17 April 1991. yet published in the Official Journal). (3) OJ No C 329, 30. 12. 1989, p. 4.

IN-FORCE: 1991/05/16=EV

VALID-TO: 9999/99/99

NOTIFIED: 1991/05/16

Copyright 1999 Commission of the European Communities

INTEGRATION: 1993/01/01

DATES: OF DOCUMENT.......: 14/05/1991

OF NOTIFICATION...: 16/05/1991

OF EFFECT.........: 16/05/1991; ENTRY INTO FORCE DAT.NOTIF

OF END OF VALIDITY: 99/99/9999

OF TRANSPOSITION..: 01/01/1993; SEE ART 10
ADDRESSEE: THE MEMBER STATES

ORIGINAL-LANGUAGE: THE OFFICIAL LANGUAGES ; NORWEGIAN ; ICELANDIC

PREPARATORY-ACTS: PROPOSAL COMMISSION ; COM 88/0816 FINAL ; OJ C 91/89 P 4

PROPOSAL COMMISSION ; COM 90/0509 FINAL ; OJ C 320/90 P 22

COOPERATION PROCEDURE ; OPINION EUROPEAN PARLIAMENT ; OJ C 231/90 P 78

COOPERATION PROCEDURE ; DECISION EUROPEAN PARLIAMENT ; GIVEN ON 17/4/91

OPINION ECONOMIC AND SOCIAL COMMITTEE ; OJ C 329/89 P 4

TREATY: EUROPEAN ECONOMIC COMMUNITY

LEGAL-BASIS:
157E100A..................

157E149-P2................

MODIFIED-BY:
INCORP.-IN.... 294A0103(67)......

REPEALED-BY... 393L0098.......... REPEAL.... ART.8 FR 19/11/93

ALSO-CITED:
157E085..................

157E086..................

MODIFIES:
588PC0816.........ADOPTION......

OTHER-INFO: EXT 294A0103(01)

SYN 183

REGISTER: 17200000

DOC-NUMBER: 391L0250

Copyright 1999 Commission of the European Communities

LOAD-DATE: February 16, 1999

1 Wall. 531, 17 L.Ed. 650; Corning v. Burden, N.Y.1853, 15 How. 252, 14 L.Ed. 683; O'Reilly v. Morse, Ky.1853, 15 How. 62, 14 L.Ed. 601; Kneass v. Schuylkill Bank, C.C. Dist.Col.1820, 4 Wash. 9, Fed.Cas.No.7,875.

The word "art" means a useful art or manufacture which is beneficial, and which is described with exactness. Smith v. Downing, C.C.Mass.1850, Fed.Cas.No. 13,036.

**5.  New use**

A process may be patentable even though it is the new use of a known process but it is not enough merely to find latent qualities in an old discovery and adapt it to a useful end, even if others have failed to detect it. Research Corp. v. NASCO Industries, Inc., C.A.Wis.1974, 501 F.2d 358, certiorari denied 95 S.Ct. 689, 419 U.S. 1096, 42 L.Ed.2d 688.

The word "new", as used in this section and section 101 of this title describing inventions patentable, does not add any special novelty requirement to those set forth in section 102 of this title governing conditions for novelty. Application of Waldbaum, 1972, 457 F.2d 997, 59 CCPA 940, affirmed 559 F.2d 611.

Definition of "process" in this section to include a "new use of a known process" does not constitute a new statutory class of patentable subject matter different from those set forth in this chapter describing inventions patentable; new use must still meet requisite standards of invention, including that it not have been obvious to a person having ordinary skill in the art to which the subject matter pertains. Grinnell Corp. v. Virginia Elec. & Power Co., C.A.Va.1968, 401 F.2d 451.

A "use" can be claimed only by claiming invention as a process. Application of Papesch, 1963, 315 F.2d 381, 50 CCPA 1084.

This section, making patentable a new use of old material or process, does not mean that every new use of old process, machine, manufacture, composition of matter or material is patentable, and new use may be subject matter of patent only provided all other requisites of patentability are met. Sun Chemical Corp. v. Brenner, D.C.D.C.1967, 267 F.Supp. 617.

Added provision of this section that term "process" includes a new use of a known process, machine, manufacture, composition of matter, or material does not make every new use patentable, and the new use must still meet requisite standard of invention. Armour Pharmaceutical Co. v. Richardson-Merrell, Inc., D.C.Del.1967, 264 F.Supp. 1013, affirmed 396 F.2d 70.

For purposes of this section defining "process" in the patent law as a "new use" of a known process, machine, manufacture, composition of matter, or material, a different use of a known substance, machine, or process is not a "new use" if it is merely analogous or cognate to the uses theretofore made. Elrick Rim Co. v. Reading Tire Machinery Co., C.A.Cal.1959, 264 F.2d 481, certiorari denied 79 S.Ct. 1434, 360 U.S. 920, 3 L.Ed.2d 1535.

"Product patent" applies to discovered article, and "process patent" applies to new method of making an article. Ethyl Corp. v. Hercules Powder Co., D.C.Del.1963, 232 F.Supp. 453.

Though this title provides for patenting of new use of known process, new use must also be inventive. Cresap v. Chemplast, Inc., D.C.N.J.1962, 216 F.Supp. 870, affirmed 316 F.2d 920.

A "process patent" is one which outlines a method or means of producing a physical result independent of producing mechanism. Seismograph Service Corp. v. Offshore Raydist, Inc., D.C.La.1955, 135 F.Supp. 342, affirmed 263 F.2d 5.

**6.  Questions of fact**

The question of invention is question of fact, to be determined by rules of law. Hycon Mfg. Co. v. H. Koch & Sons, C.A. Cal.1955, 219 F.2d 353, certiorari denied 75 S.Ct. 881, 349 U.S. 953, 99 L.Ed. 1278.

# § 101.   Inventions patentable

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

(July 19, 1952, c. 950, 66 Stat. 797.)

necessary attributes of patentability, including invention, but in the final analysis invention is a question for the courts ultimately to decide. Kawneer Co. v. Pittsburgh Plate Glass Co., D.C.Mich.1952, 109 F.Supp. 228.

**311. Findings of lower courts**

*See, also, Notes of Decisions under section 281 of this title.*

District court's determination of novelty based upon examination and interpretation of two legal documents equally available to court of appeals was not factual conclusion binding upon court of appeals in patent case. American Infra-Red Radiant Co. v. Lambert Industries, Inc., C.A.Minn.1966, 360 F.2d 977, certiorari denied 87 S.Ct. 233, 385 U.S. 920, 17 L.Ed.2d 144.

When a trial court in a patent case has followed proper standards in determining question of presence or absence of patentable invention, its finding upon that issue, if sustained by the evidence, will not be disturbed on appeal. Rota-Carb Corp. v. Frye Mfg. Co., C.A.Iowa 1963, 313 F.2d 443.

## § 102.  Conditions for patentability; novelty and loss of right to patent

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention, or

(d) the invention was first patented or caused to be patented, or was the subject of an inventor's certificate, by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application for patent or inventor's certificate filed more than twelve months before the filing of the application in the United States, or

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent, or

(f) he did not himself invent the subject matter sought to be patented, or

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

(July 19, 1952, c. 950, 66 Stat. 797; July 28, 1972, Pub.L. 92–358, § 2, 86 Stat. 502; Nov. 14, 1975, Pub.L. 94–131, § 5, 89 Stat. 691.)

Prior invention, under this section providing that a person shall be entitled to a patent unless before applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it, requires only that invention be complete, i.e., conceived and reduced to practice, and not abandoned, suppressed or concealed. International Glass Co. v. U.S., 1969, 408 F.2d 395, 187 Ct.Cl. 376.

Each case of alleged suppression and concealment of invention must be considered and decided on its own facts. Engelhardt v. Judd, 1966, 369 F.2d 408, 54 CCPA 865.

In determining question of concealment in patent interference proceedings, court would not consider activities occurring prior to date of actual reduction to practice found by board, nor would court reexamine record in attempt to find actual reduction to practice prior to date established by board; furthermore, time between date alleged in preliminary statement and date of actual reduction to practice would be deemed immaterial. Dewey v. Lawton, 1965, 347 F.2d 629, 52 CCPA 1573.

After one has conceived an invention and reduced it to practice, he may lose any rights to an award of priority of invention by suppression and concealment of the invention. Jones v. Winsor, 1943, 133 F.2d 931, 30 C.C. P.A., Patents, 824.

A subsequent inventor of a new and useful manufacture, who has diligently pursued his labor to procurement of patent in good faith and without knowledge of preceding activities of another inventor will be regarded as the first inventor in law though he was not the first inventor in fact, where first inventor has deliberately concealed his invention from the public for a long period and then claimed it only when he was spurred into activity by knowledge of subsequent inventor's claim for patent reward. Nelson v. Lenning, 1938, 96 F.2d 508, 25 C.C.P.A., Patents, 1119.

Every case of alleged concealemnt or suppression should be considered on its own facts. Nystrom v. Mancuso, 1933, 64 F.2d 698, 20 C.C.P.A., Patents, 934.

Inventor concealing invention should not be regarded as first inventor, where he attempts to give invention to public only when more diligent rival independently makes same invention. Severson v. Olson, 1933, 64 F.2d 694, 20 C.C.P.A., Patents, 946.

Junior party to interference proceeding had not concealed and suppressed invention until after conception and reduction to practice and commercial use thereof by another so as to estop him from asserting priority of invention as against senior party. MacLaren v. Stoetzel, 1930, 38 F.2d 125, 17 C.C.P.A., Patents, 857.

Inventors have no right to conceal or withhold inventions without just cause. Vanore v. Improta, 1928, 25 F.2d 918, 58 App.D.C. 130.

Inventor, secreting and suppressing invention, is entitled to no consideration as against independent inventor who gives invention to public. Pyzel v. Black, 1928, 24 F.2d 281, 58 App.D.C. 16.

Deliberate suppression of invention precludes successful attack on rights of another. Hambuechen v. Schorger, 1926, 10 F.2d 1006, 56 App.D.C. 141.

A prior inventor loses his rights by concealing his invention and delaying his application until he learns that another has marketed his invention. Brown v. Campbell, 1914, 41 App.D.C. 499.

Reasons of public policy forbid prior suppressed and concealed activities from invalidating patent for lack of invention. Grinnell Corp. v. Virginia Elec. & Power Co., D.C.Va. 1967, 277 F.Supp. 507, affirmed 401 F.2d 451.

Placing a device aside after its completion, for business reasons, is suppression or concealment of such device under statute forbidding a patent if before applicant's invention thereof invention was made in this country by another who has not abandoned, suppressed or concealed it. Emerson v. National Cylinder Gas Co., D.C.Mass.1956, 146 F.Supp. 581, affirmed 251 F.2d 152.

## § 103. Conditions for patentability; non-obvious subject matter

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art

to which said subject matter pertains.   Patentability shall not be negatived by the manner in which the invention was made.

(July 19, 1952, c. 950, 66 Stat. 798.)

## Historical and Revision Notes

**Reviser's Note.** There is no provision corresponding to the first sentence explicitly stated in the present statutes, but the refusal of patents by the Patent Office, and the holding of patents invalid by the courts, on the ground of lack of invention or lack of patentable novelty has been followed since at least as early as 1850. This paragraph is added with the view that an explicit statement in the statute may have some stabilizing effect, and also to serve as a basis for the addition at a later time of some criteria which may be worked out.

The second sentence states that patentability as to this requirement is not to be negatived by the manner in which the invention was made, that is, it is immaterial whether it resulted from long toil and experimentation or from a flash of genius.

## Cross References

Citation of prior art bearing on patentability of claim, see section 301 of this title.
Definition of invention, see section 100 of this title.
Description of invention, see section 112 of this title.
Inventions patentable, see section 101 of this title.

## West's Federal Forms

Order for new trial on newly discovered evidence, see § 4962.5.

## West's Federal Practice Manual

Filing and prosecution of patent application—prosecution of patent application, see § 3933.
General knowledge regarding patents—what constitutes patentable invention, see § 3922.
Infringement—defenses in infringement suit, see § 3970.

## Library References

Patents ⚖18, 50 et seq.                    C.J.S. Patents §§ 24, 53.

## Notes of Decisions

I.   GENERALLY   1–100
II.  CONSIDERATIONS GOVERNING OBVIOUSNESS—GENERALLY   101–140
III.     SCOPE AND CONTENT OF PRIOR ART   141–190
IV.      SECONDARY CONSIDERATIONS   191–230
V.   DETERMINATION OF OBVIOUSNESS   231–280
VI.  PRACTICE AND PROCEDURE   281–330

————◆————

Generally   1–100
Ability of persons skilled in art   111
Absolute predictability unnecessary   235
Acceptance or recognition of invention   192
Accidental disclosures   142
Accidental discoveries, manner in which invention made   116
Adaptions or manipulations   33
Additional functions of combination   65
Addition of new element to old combination   61
Adjustments and corrections   34
Admissibility of evidence   304
Advancements   42

Affidavits   287
Affirmance   328
Amendment of claims   281
Analogous arts   143
Anticipation as epitome of obviousness   17
Anticipation distinguished   16
Application of old device to new use   35
Applications for patents
     Generally   144
     Copending applications   145
     Foreign applications   146
Arts patentee reasonably expected to consult   147
Attempts of persons skilled in art   112

**35 § 102**
**Note 244**

A prior invention is not abandoned, suppressed or concealed so as to invalidate subsequent application for anticipation unless prior inventor takes affirmative steps to make invention publicly known.   Friction Div. Products, Inc. v. E.I. DuPont de Nemours & Co., Inc., D.Del.1987, 658 F.Supp. 998, 3 U.S.P.Q.2d 1775, affirmed 883 F.2d 1027, 12 U.S.P.Q.2d 1575.

**§ 103.  Conditions for patentability; non-obvious subject matter**

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

(b)(1) Notwithstanding subsection (a), and upon timely election by the applicant for patent to proceed under this subsection, a biotechnological process using or resulting in a composition of matter that is novel under section 102 and nonobvious under subsection (a) of this section shall be considered nonobvious if—

(A) claims to the process and the composition of matter are contained in either the same application for patent or in separate applications having the same effective filing date; and

(B) the composition of matter, and the process at the time it was invented, were owned by the same person or subject to an obligation of assignment to the same person.

(2) A patent issued on a process under paragraph (1)—

(A) shall also contain the claims to the composition of matter used in or made by that process, or

(B) shall, if such composition of matter is claimed in another patent, be set to expire on the same date as such other patent, notwithstanding section 154.

(3) For purposes of paragraph (1), the term "biotechnological process" means—

(A) a process of genetically altering or otherwise inducing a single- or multi-celled organism to—

(i) express an exogenous nucleotide sequence,

(ii) inhibit, eliminate, augment, or alter expression of an endogenous nucleotide sequence, or

(iii) express a specific physiological characteristic not naturally associated with said organism;

(B) cell fusion procedures yielding a cell line that expresses a specific protein, such as a monoclonal antibody; and

(C) a method of using a product produced by a process defined by subparagraph (A) or (B), or a combination of subparagraphs (A) and (B).

(c) Patentability shall not be negatived by the manner in which the invention was made.  Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

(As amended Nov. 8, 1984, Pub.L. 98–622, Title I, § 103, 98 Stat. 3384; Nov. 1, 1995, Pub.L. 104–41, § 1, 109 Stat. 351.)

## HISTORICAL AND STATUTORY NOTES

**1995 Amendments**

Subsec. (a).  Pub.L. 104–41, § 1(1), designated the first of the two existing undesignated paragraphs as subsection (a).

Subsec. (b).  Pub.L. 104–41, § 1(3), added subsection (b).

Subsec. (c).  Pub.L. 104–41, § 1(2), designated the second of the two existing undesignated paragraphs as subsection (c).

**1984 Amendment**

Pub.L. 98–622 added "Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person."

**Effective Date of 1995 Amendments**

Section 3 of Pub.L. 104–41 provided that: "The amendments made by section 1 [enacting subsec. (b) of this section] shall apply to any application for patent filed on or after the date

new matter is such that it may fairly be supposed that the appellate court would have reached a different conclusion had it been advised of its existence, and the new matter should be clear, substantial, and reasonably

conclusive. Petersime Incubator Co. v. Bundy Incubator Co., D.C.Ohio 1942, 43 F.Supp. 446, affirmed 135 F.2d 580, appeal dismissed 64 S.Ct. 24, 320 U.S. 805, 88 LEd. 487.

## § 154.   Contents and term of patent

Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, for the term of seventeen years, subject to the payment of fees as provided for in this title, of the right to exclude others from making, using, or selling the invention throughout the United States, referring to the specification for the particulars thereof. A copy of the specification and drawings shall be annexed to the patent and be a part thereof.

(July 19, 1952, c. 950, 66 Stat. 804; July 24, 1965, Pub.L. 89–83, § 5, 79 Stat. 261; Dec. 12, 1980, Pub.L. 96–517, § 4, 94 Stat. 3018.)

### Historical and Revision Notes

**Reviser's Note.** Based on Title 35, U.S.C., 1946 ed., § 40 (R.S. 4884 [derived from Act July 8, 1870, c. 230, § 22, 16 Stat. 201], amended May 23, 1930, c. 312, § 1, 46 Stat. 376).

The reference to plants is omitted for inclusion in another section and the reference to the title is shortened since the title is of no legal significance.

The wording of the granting clause is changed to "the right to exclude others from making, using, or selling", following language used by the Supreme Court, to render the meaning clearer.

"United States" is defined in section 100.

**1980 Amendment.** Pub.L. 96–517 substituted "payment of fees" for "payment of issue fees".

**1965 Amendment.** Pub.L. 89–83 added "subject to the payment of issue fees as provided for in this title."

**Effective Date of 1980 Amendment.** Amendment by Pub.L. 96–517 effective Dec. 12, 1980, see section 8(a) of Pub.L. 96–517, set out as a note under section 41 of this title.

**Effective Date of 1965 Amendment.** Amendment of section by Pub.L. 89–83 effective three months after July 24, 1965, see section 7(a) of Pub.L. 89–83, set out as a note under section 41 of this title.

**Legislative History.** For legislative history and purpose of Pub.L. 89–83, see 1965 U.S. Code Cong. and Adm.News, p. 2315. See, also, Pub.L. 96–517, 1980 U.S.Code Cong. and Adm.News, p. 6460.

### Cross References

Contracts in restraint of trade and monopoly, see sections 1 and 2 of Title 15, Commerce and Trade.
Disclaimer or dedication of entire term or any terminal part of term of patent, see section 253 of this title.
Drawings, see section 113 of this title.
Duration and term—
 Copyright, see section 301 et seq. of Title 17, Copyrights.
 Design patent, see section 173 of this title.
 Extension for composition or process subjected to review by Food and Drug Administration, see section 155 of this title.
 Trademarks, see section 1058 of Title 15, Commerce and Trade.
Plant patents, grant of, see section 163 of this title.
Reissue of defective patents, see section 251 of this title.
Specification, see section 112 of this title.
United States defined, see section 100 of this title.

**PATENTS**                                                    **35 § 154**

## LIBRARY REFERENCES

Business and Commercial Litigation in Federal Courts §§ 63.2, 65.15.

60 Am Jur 2d, Patents § 802.

60 Am Jur 2d, Patents §§ 296 et seq.

4 Deller's Walker on Patents (2d ed) §§ 335, 345.

5 Deller's Walker on Patents (2d ed) §§ 436, 462.

## § 153. How issued

### Federal Forms

13A Fed Procedural Forms L Ed, Patents § 52:171.

## LAW REVIEW AND JOURNAL COMMENTARIES

Arbitration of patent disputes: An important option in the age of information technology.

Note, 4 Fordham Intell.Prop.Media & Ent.L.J. 599 (1993).

## LIBRARY REFERENCES

Business and Commercial Litigation in Federal Courts §§ 63.2, 65.15.

60 Am Jur 2d, Patents § 805.

60 Am Jur 2d, Patents §§ 296 et seq.

4 Deller's Walker on Patents (2d ed) §§ 209, 210.

5 Deller's Walker on Patents (2d ed) § 462.

## NOTES OF DECISIONS

### I. GENERALLY

**1. Construction with other laws**

Bloomer v. McQuewan, U.S.Pa.1852, [main volume] 55 U.S. 539, 14 How. 539, 14 L.Ed. 532.

### II. VALIDITY OF PATENTS

**21. Generally**

Woodworth v. Hall, C.C.Mass.1846, [main volume] 30 F.Cas. 572, 1 Woodb. & M. 248, No. 18016.

**74. Fraud—Generally**

It is accepted law that patent procured through exercise of fraud on Patent Office will be voided. Berger & Gorin, Inc. v. Gary Plastic Packaging Corp., S.D.N.Y.1988, 691 F.Supp. 740, 8 U.S.P.Q.2d 1480, reconsideration denied.

**77. —— Intent to deceive**

Patentee's taking of license in undisclosed technology did not require finding of deceitful intent for purpose of determining whether patent was procedure through exercise of fraud on Patent Office and should be voided. Berger & Gorin, Inc. v. Gary Plastic Packaging Corp., S.D.N.Y.1988, 691 F.Supp. 740, 8 U.S.P.Q.2d 1480, reconsideration denied.

**79. —— Materiality**

Hycor Corp. v. Schlueter Co., W.D.Wis.1983, 564 F.Supp. 996, 219 U.S.P.Q. 651, [main volume] affirmed in part, reversed in part 740 F.2d 1529, 222 U.S.P.Q. 553.

Patentee's failure to disclose to Patent Office prior patented belt hanger was not fraudulent and would not result in voiding of patentee's patents on plastic belt hangers designed to display belts as merchandise in store; earlier patent was not material in sense that there was substantial likelihood examiner would have considered it important in deciding whether to allow patent application and there was no wrongful or deceitful intent in patent attorney's failure to reveal prior art which was, at most, an oversight. Berger & Gorin, Inc. v. Gary Plastic Packaging Corp., S.D.N.Y.1988, 691 F.Supp. 740, 8 U.S.P.Q.2d 1480, reconsideration denied.

**80. —— Failure to cite prior art**

Innocent neglect or oversight in failing to advise examiner of prior art are not sufficient basis for voiding patent. Berger & Gorin, Inc. v. Gary Plastic Packaging Corp., S.D.N.Y.1988, 691 F.Supp. 740, 8 U.S.P.Q.2d 1480, reconsideration denied.

### III. PRACTICE AND PROCEDURE

**114. —— Estoppel**

A patent cannot be made void by action of the Patent Office [now Patent and Trademark Office] and the patentee's acquiescence in such action, however, when material, should be considered in ascertaining what rights he acquired by the grant. Mica Insulator Co v. Commercial Mica Co, C.C.N.D.Ill.1907, 157 F. 90, reversed on other grounds 166 F. 440, 92 C.C.A. 292, certiorari denied 30 S.Ct. 405, 215 U.S. 604, 54 L.Ed. 345.

**116. —— Limitations or laches**

U.S. v. Cold Metal Process Co., N.D.Ohio 1945, 62 F.Supp. 127, affirmed 164 F.2d 754, [main volume] 76 U.S.P.Q. 6, certiorari denied 68 S.Ct. 1016, 334 U.S. 811, 92 L.Ed. 1742, 77 U.S.P.Q. 676, rehearing denied 68 S.Ct. 1343, 334 U.S. 835, 92 L.Ed. 1761, 77 U.S.P.Q. 676.

## § 154. Contents and term of patent

**(a) In general.—**

**(1) Contents.—**Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from

35 § 154                                                              PATENTS

making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof.

(2) **Term.**—Subject to the payment of fees under this title, such grant shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed in the United States or, if the application contains a specific reference to an earlier filed application or applications under section 120, 121, or 365(c) of this title, from the date on which the earliest such application was filed.

(3) **Priority.**—Priority under section 119, 365(a), or 365(b) of this title shall not be taken into account in determining the term of a patent.

(4) **Specification and drawing.**—A copy of the specification and drawing shall be annexed to the patent and be a part of such patent.

(b) **Term extension.**—

(1) **Interference delay or secrecy orders.**—If the issue of an original patent is delayed due to a proceeding under section 135(a) of this title, or because the application for patent is placed under an order pursuant to section 181 of this title, the term of the patent shall be extended for the period of delay, but in no case more than 5 years.

(2) **Extension for appellate review.**—If the issue of a patent is delayed due to appellate review by the Board of Patent Appeals and Interferences or by a Federal court and the patent is issued pursuant to a decision in the review reversing an adverse determination of patentability, the term of the patent shall be extended for a period of time but in no case more than 5 years. A patent shall not be eligible for extension under this paragraph if it is subject to a terminal disclaimer due to the issue of another patent claiming subject matter that is not patentably distinct from that under appellate review.

(3) **Limitations.**—The period of extension referred to in paragraph (2)—

(A) shall include any period beginning on the date on which an appeal is filed under section 134 or 141 of this title, or on which an action is commenced under section 145 of this title, and ending on the date of a final decision in favor of the applicant;

(B) shall be reduced by any time attributable to appellate review before the expiration of 3 years from the filing date of the application for patent; and

(C) shall be reduced for the period of time during which the applicant for patent did not act with due diligence, as determined by the Commissioner.

(4) **Length of extension.**—The total duration of all extensions of a patent under this subsection shall not exceed 5 years.

(c) **Continuation.**—

(1) **Determination.**—The term of a patent that is in force on or that results from an application filed before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act shall be the greater of the 20-year term as provided in subsection (a), or 17 years from grant, subject to any terminal disclaimers.

(2) **Remedies.**—The remedies of sections 283, 284, and 285 of this title shall not apply to acts which—

(A) were commenced or for which substantial investment was made before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act; and

(B) became infringing by reason of paragraph (1).

(3) **Remuneration.**—The acts referred to in paragraph (2) may be continued only upon the payment of an equitable remuneration to the patentee that is determined in an action brought under chapter 28 and chapter 29 (other than those provisions excluded by paragraph (2)) of this title.

(As amended Aug. 23, 1988, Pub.L. 100–418, Title IX, § 9002, 102 Stat. 1563; Dec. 8, 1994, Pub.L. 103–465, Title V, § 532(a)(1), 108 Stat. 4983; Oct. 11, 1996, Pub.L. 104–295, § 20(e)(1), 110 Stat. 3529.)

**2. Purpose**

Purpose of section of Visual Artists Rights Act (VARA), which provides artist with right to prevent intentional distortion, mutilation, or modification of work of visual art if it would be prejudicial to artist's honor or reputation, is to protect artists' integrity. Carter v. Helmsley–Spear, Inc., S.D.N.Y.1994, 861 F.Supp. 303, 33 U.S.P.Q.2d 1225.

**3. Moral rights**

In passing Visual Artists Rights Act (VARA), Congress for first time provided for protection of artists' "moral rights" under Copyright Act. Carter v. Helmsley-Spear, Inc., S.D.N.Y.1994, 861 F.Supp. 303, 33 U.S.P.Q.2d 1225.

**4. Work of visual art**

Art work in lobby of building, including art work attached to ceiling and floor, interactive art, vast mosaic covering majority of floor of lobby and portions of walls and several sculptural elements, and interior of three elevators that opened into lobby, was, as a whole, not "applied art," and, thus, its protection was not proscribed under definition of "works of visual art" in Visual Artists Rights Act (VARA), even though work incorporated sculptural elements that, if viewed alone, could be defined as "applied art." Carter v. Helmsley-Spear, Inc., S.D.N.Y.1994, 861 F.Supp. 303, 33 U.S.P.Q.2d 1225.

**5. Work made for hire**

See, also, Notes of Decisions under section 101 of this title.

Artists had unfettered artistic freedom to create work, and hiring party did not have right to control manner and means of creation, for purpose of determining whether work was "work made for hire" that would not be within protection of Visual Artists Rights Act (VARA), where,

under terms of contract, artists had full authority in design, color and style with regard to work, even though artists were open to suggestions and occasionally adopted those suggestions. Carter v. Helmsley-Spear, Inc., S.D.N.Y.1994, 861 F.Supp. 303, 33 U.S.P.Q.2d 1225.

**6. Distortion, mutilation, or modification of work—Generally**

Refusal of building owner and owner's managing agent to permit artists to finish their work of visual art in building did not constitute "distortion, mutilation, or other modification" of work in violation of Visual Artists Rights Act (VARA), and, thus, artists were not entitled to complete their work. Carter v. Helmsley-Spear, Inc., S.D.N.Y.1994, 861 F.Supp. 303, 33 U.S.P.Q.2d 1225.

**7. —— Prejudice to honor or reputation**

In determining under Visual Artists Rights Act (VARA) whether intentional distortion, mutilation, or modification of work of visual art would be prejudicial to artists' honor or reputation, court will consider whether such alteration would cause injury or damage to artists' good name, public esteem, or reputation in artistic community. Carter v. Helmsley-Spear, Inc., S.D.N.Y.1994, 861 F.Supp. 303, 33 U.S.P.Q.2d 1225.

**8. Work of recognized stature**

Artist need not demonstrate that his or her work is equal in stature to that created by artists such as Picasso, Chagall, or Giacometti to satisfy provision of Visual Artists Rights Act (VARA) stating that author of work of visual art shall have right to prevent any destruction of work of "recognized stature." Carter v. Helmsley-Spear, Inc., S.D.N.Y.1994, 861 F.Supp. 303, 33 U.S.P.Q.2d 1225.

# § 107. Limitations on exclusive rights: Fair use

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

(Pub.L. 94–553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2546; Pub.L. 101–650, Title VI, § 607, Dec. 1, 1990, 104 Stat. 5132; Pub.L. 102–492, Oct. 24, 1992, 106 Stat. 3145.)

## HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports 1976 Acts.**
**Notes of Committee on the Judiciary, House Report No. 94–1476**

**General Background of the Problem.** The judicial doctrine of fair use, one of the most important and well-established limitations on the exclusive right of copyright owners, would be given express statutory recognition for the first time in section 107 [this section]. The claim that a defendant's acts constituted a fair use rather than an infringement has been raised as a defense in innumerable copyright actions over the years, and there is ample case law recognizing the existence of the doctrine and applying it. The examples enumerated at page 24 of the Register's 1961 Report, while by no means exhaustive, give some idea of the sort of activities the courts might regard as fair use under the circumstances: "quotation of excerpts in a review or criticism for purposes of illustration or comment; quotation of short passages in a scholarly or technical work, for illustration or clarification of the author's observations; use in a parody of some of the content of the work parodied; summary of an address or article, with brief quotations, in a news report; reproduction by a library of a portion of a work to replace part of a damaged copy; reproduction by a teacher or student of a small part of a work to illustrate a lesson; reproduction of a work in legislative or judicial proceedings or reports; incidental and for-

tuitous reproduction, in a newsreel or broadcast, of a work located in the scene of an event being reported."

Although the courts have considered and ruled upon the fair use doctrine over and over again, no real definition of the concept has ever emerged. Indeed, since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts. On the other hand, the courts have evolved a set of criteria which, though in no case definitive or determinative, provide some gauge for balancing the equities. These criteria have been stated in various ways, but essentially they can all be reduced to the four standards which have been adopted in section 107 [this section]: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."

These criteria are relevant in determining whether the basic doctrine of fair use, as stated in the first sentence of section 107 [this section], applies in a particular case: "Notwithstanding the provisions of section 106 [section 106 of this title], the fair use of a copyrighted work, including such use by reproduction in copies or

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

(Pub.L. 94–553, Title I, § 101, Oct. 19, 1976, 90 Stat. 2546; Pub.L. 101–650, Title VI, § 607, Dec. 1, 1990, 104 Stat. 5132; Pub.L. 102–492, Oct. 24, 1992, 106 Stat. 3145.)

## HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports 1976 Acts.**
**Notes of Committee on the Judiciary, House Report No. 94–1476**

**General Background of the Problem.** The judicial doctrine of fair use, one of the most important and well-established limitations on the exclusive right of copyright owners, would be given express statutory recognition for the first time in section 107 [this section]. The claim that a defendant's acts constituted a fair use rather than an infringement has been raised as a defense in innumerable copyright actions over the years, and there is ample case law recognizing the existence of the doctrine and applying it. The examples enumerated at page 24 of the Register's 1961 Report, while by no means exhaustive, give some idea of the sort of activities the courts might regard as fair use under the circumstances: "quotation of excerpts in a review or criticism for purposes of illustration or comment; quotation of short passages in a scholarly or technical work, for illustration or clarification of the author's observations; use in a parody of some of the content of the work parodied; summary of an address or article, with brief quotations, in a news report; reproduction by a library of a portion of a work to replace part of a damaged copy; reproduction by a teacher or student of a small part of a work to illustrate a lesson; reproduction of a work in legislative or judicial proceedings or reports; incidental and for-

tuitous reproduction, in a newsreel or broadcast, of a work located in the scene of an event being reported."

Although the courts have considered and ruled upon the fair use doctrine over and over again, no real definition of the concept has ever emerged. Indeed, since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts. On the other hand, the courts have evolved a set of criteria which, though in no case definitive or determinative, provide some gauge for balancing the equities. These criteria have been stated in various ways, but essentially they can all be reduced to the four standards which have been adopted in section 107 [this section]: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."

These criteria are relevant in determining whether the basic doctrine of fair use, as stated in the first sentence of section 107 [this section], applies in a particular case: "Notwithstanding the provisions of section 106 [section 106 of this title], the fair use of a copyrighted work, including such use by reproduction in copies or