MORRISON & FOERSTER LLP
MICHAEL A. JACOBS (Bar No. 111664)
mjacobs@mofo.com
MARC DAVID PETERS (Bar No. 211725)
mdpeters@mofo.com
DANIEL P. MUINO (Bar No. 209624)
dmuino@mofo.com
755 Page Mill Road, Palo Alto, CA  94304-1018
Telephone: (650) 813-5600 / Facsimile: (650) 494-0792

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (Admitted *Pro Hac Vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY  10504
Telephone: (914) 749-8200 / Facsimile: (914) 749-8300
STEVEN C. HOLTZMAN (Bar No. 144177)
sholtzman@bsfllp.com
1999 Harrison St., Suite 900, Oakland, CA  94612
Telephone: (510) 874-1000 / Facsimile: (510) 874-1460
ALANNA RUTHERFORD (Admitted *Pro Hac Vice*)
575 Lexington Avenue, 7th Floor, New York, NY 10022
Telephone: (212) 446-2300 / Facsimile: (212) 446-2350 (fax)

ORACLE CORPORATION
DORIAN DALEY (Bar No. 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (Bar No. 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (Bar No. 211600)
matthew.sarboraria@oracle.com
500 Oracle Parkway, Redwood City, CA  94065
Telephone: (650) 506-5200 / Facsimile: (650) 506-7114

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.<br><br>          Plaintiff,<br><br>     v.<br><br>GOOGLE, INC.<br><br>          Defendant. | Case No. CV 10-03561 WHA<br><br>**PLAINTIFF'S OPPOSITION TO GOOGLE'S MOTION IN LIMINE NO. 3 TO EXCLUDE PORTIONS OF COCKBURN REPORT ON DAMAGES**<br><br>Dept.:  Courtroom 8, 19th Floor<br>Judge:  Honorable William H. Alsup |

1

## I.      PRELIMINARY STATEMENT

Google's motion to exclude "certain aspects" of Prof. Cockburn's damages report rests on grounds that find no support in Prof. Cockburn's report, this Court's Orders, or the law.  Google's motion misrepresents Prof. Cockburn's analysis in an undisguised effort to shock the Court into thinking that his damages estimates are just too high.

Google's effort to mislead starts with its description of the bottom-line damages estimates included in Prof. Cockburn's September report.  Contrary to Google's suggestion (Google's Motion in Limine #3 ("MIL #3") at 1), nowhere does Prof. Cockburn calculate a damages figure of $2.7 billion in damages.  In fact, Google comes up with this fantasy figure by adding together past damages and supposed future royalties—a curious maneuver given that Google elsewhere takes Prof. Cockburn to task for **not** including "future damages" estimates that Google includes in its $2.7 billion figure.  Based on numerous misrepresentations of Prof. Cockburn's report and the law, Google's motion fails.

## II.     SUMMARY OF PROF. COCKBURN'S ANALYSIS

### A.      Past Damages For Patent Infringement

As the Court directed, Prof. Cockburn begins his patent-damages analysis with the formal offer from Sun to Google on February 8, 2006.  (*See* Order Granting In Part Motion to Strike Damage Report of Plaintiff Expert Iain Cockburn (Dkt. No. 230) at 14; (hereinafter "*Daubert* Order"); Cockburn Report ¶¶ 17–24.)[1]  Consistent with the Court's guidance, Prof. Cockburn then makes adjustments, both upward and downward, to the starting point.

Prof. Cockburn adjusts downward to account for the fact that the patents-in-suit account for only a portion of the value of the starting-point license.  (*See Daubert* Order at 14; Cockburn Report ¶¶ 25–34, 96 *et seq.*)  Prof. Cockburn's apportionment analysis draws on multiple sources of evidence as well as technical and market analyses that measure the importance of the features provided by the patents-in-suit.  First, Prof. Cockburn discusses standardized benchmark-test data provided by Oracle engineers who disabled the patented functionality from Android phones and measured the reduction in application

---

[1] Oracle understands that the Court is currently in possession of Prof. Cockburn's revised report, which Google submitted in camera.  (*See* Dkt. No. 456; Agrawal Decl. Ex. 3-1 (9/26/2011 Letter from Christa Anderson).)  Accordingly, Oracle has not submitted the Cockburn Report again here.  All paragraph numbers refer to the version that the Court currently has in its possession.

start time, execution time, boot time, multitasking, battery life, and memory, among others.  Second, Prof. Cockburn uses consumer purchasing data in an econometrics analysis that models demand for specific features in phones.  (Cockburn Report ¶¶ 268–73; *id.* Appendix C.)  Third, working with another expert, Prof. Steven Shugan, Prof. Cockburn analyzes a market survey that tested the relative importance of the patented features to consumers' purchasing decisions.  These analyses help inform Prof. Cockburn's conclusions as to apportionment, which also rest on dozens of Google documents that emphasize, over and over, the critical importance of speed and memory, provided in large measure by the patented inventions, to the viability of Android.  (Cockburn Report ¶¶ 252–63.)

Prof. Cockburn also adjusts downward to follow this Court's directive to "apportion worldwide revenue to isolate the part attributable to the features used in the United States."  (*Daubert* Order at 10.) He apportions the starting value by reference to the percentage of Android-enabled advertising revenue that flows from U.S.-based phones.  (Cockburn Report ¶¶ 41–45, 332–42.)

Prof. Cockburn concludes that significant upward adjustment is also warranted to compensate "for the use made of the invention by the infringer," 35 U.S.C. § 274, give appropriate weight to the "nature and scope of the license" as compared to the starting point license, account for Sun's "established policy" of "granting licenses under special conditions" designed to preserve its patent monopoly, and consider foregone Sun "derivative or convoyed sales."  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  Specifically, Prof. Cockburn adjusts upward (with the adjustment apportioned to correspond only to the intellectual property at issue) to account for the harm to Sun from having to forego expected, projected, and jointly contemplated payments to Sun by third-parties in connection with a compatible, jointly controlled Android that was the subject of the 2005-06 negotiations.  This adjustment is necessary to account for the harms that Google actually propagated through its infringement, including eliminating Sun's ability to offer licenses and services based on Android.  (Cockburn Report ¶¶ 35–38, 282–331.)

Prof. Cockburn also discusses, but does not quantify, the fragmentation harms that—particularly looking to the future—are a key issue in this lawsuit, and would have placed substantial upward pressure on even a short-term royalty for the intellectual property at issue.  Finally, to account for the fact that, in 2006, the claims asserted must be deemed valid and infringed (*Daubert* Order at 15), Prof.

2

Cockburn concludes that a "litigation premium" would have exerted upward pressure on the reasonable royalty.  Rather than specifically quantify the premium, Prof. Cockburn concludes that it is "best employed to resolve doubts" about the reasonableness of his calculations.  (Cockburn Report ¶¶ 39, 283–85.)

Prof. Cockburn's opinions result in the following calculation for past patent damages:

| (millions) | 2007-2011 |
| --- | --- |
| **Starting Value** | $\geq$ **$ 98.7 M** |
| Adjust Downward for Patent Apportionment | $\leq$ $ (69.1) M |
| Adjust Upward for Loss of Expected Armstrong Monetization (Seven Patents Only) | $\geq$ $ 167.2 M |
| Adjust Upward for Litigation Premium (Seven Patents Only) | + upward pressure |
| Adjust Upward Removal of Cap on Revenue Share | $\geq$ $ 8.4 M |
| Adjust Upward for Fragmentation Harm | + additional upward pressure |
| **Subtotal of Starting Value And Upward Adjustments** | **$ 205.1 M** |
| Adjust Downward for Portion of Royalty Not Attributable to U.S. Infringement | $\leq$ $ (3.3) M |
| **Estimated Patent Damages Through Trial** | $\geq$ **$ 201.8 M** |

(Cockburn Report ¶ 47.)

Prof. Cockburn also investigates whether Google, acting as a "prudent licensee" "reasonably and voluntarily trying to reach an agreement" for a license permitting the use it actually made of the patented inventions, *Georgia-Pacific*, 318 F. Supp. at 1120, would have been willing to pay such a hypothetical royalty for the period 2006 through 2011.  Based on extensive contemporaneous evidence, he concludes that the absence of viable alternatives, the importance of getting to market quickly, and the myriad revenue streams and strategic benefits Google expected to obtain through Android would have led it to conclude that the royalty was a worthy investment under the conditions set forth under *Georgia-Pacific*.  (*Id.* ¶¶ 343–416.)

**B.    Past Damages For Copyright Infringement**

The copyright statute provides that the copyright owner "is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the

3

infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."  17 U.S.C. § 504(b). Consistent with the statute, Prof. Cockburn calculates actual damages based on (in the alternative) Oracle's lost profits or a hypothetical license, and infringer's profits according to Oracle's statutory burden (*Cf.* Cockburn Report ¶ 56).

For the hypothetical license, Prof. Cockburn uses the methodology described above with regard to patent damages, but apportions at least 15% of the portfolio value to the value of the copyrights.   For infringer's profits, understanding that the copyright statute requires Google, not Oracle, to prove its deductible costs and profits attributable to factors other than the infringement, Prof. Cockburn notes, "I have therefore not calculated Google's costs or profits attributable to the infringement.  If experts retained by Google offer opinions or analysis on either of those matters, I expect that I will be asked to evaluate those opinions or analyses and respond."  (Cockburn Report ¶ 468.)

Accordingly, Prof. Cockburn's calculations for past copyright damages are as follows:

| | | |
|---|---|---|
| **Infringer's Profits** (subject to apportionment by Google) | | $ 823.9M |
| **Actual damages** (alternative) | Lost Fair Market Value License Fee | $ 102.6M |
| | Lost Profits | $ 136.2 M |

## C.    Future Royalties

Consistent with the Court's instructions, Prof. Cockburn structured the hypothetical license as a "series of yearly payments *with no additional lump sum up front.*"  (*Daubert* Order at 11.)  Consistent with the case law, Prof. Cockburn also notes that any future royalties should be adjusted to take into account the parties' changed circumstances, including the fact that Google would "already have been invested in the Android platform and Sun would have been in an advantageous position to renegotiate the terms of the licensing" (Cockburn Report ¶ 419–25), and that many of the factors of the hypothetical negotiation would shift in an upward direction, leading to a higher ongoing royalty. Perhaps more importantly, he also notes that any future royalty payment likely would not be sufficient to compensate Oracle for either the consequences of Google's past infringement or for the future harm from fragmentation of Java caused by the infringement.  (*Id.* ¶ 418.)

//

4

III.   **STANDARD OF REVIEW**

Google's motion relies on Rules 401, 403, and 702 of the Federal Rules of Evidence.  Expert testimony is admissible under Federal Rule of Evidence 702 if it "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (2003).  "[T]he rules of evidence do not demand perfection.  Rather, a court need only determine whether the reasoning and methods underlying the expert testimony are reliable, and whether they have been properly applied to the facts." *Gutierrez v. Wells Fargo & Co.*, No. C 07-05923 WHA, 2010 WL 1233810, *11 (N.D. Cal. Mar. 26, 2010).  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Fresenius Med. Care Holdings, Inc. v. Baxter, Int'l, Inc.*, No. C03-1431 SBA, 2006 WL 1390416, at *3 (N.D. Cal. May 18, 2006).

Under Federal Rule of Evidence 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  "The Rule's basic standard of relevance thus is a liberal one." *Daubert*, 509 U.S. at 587.  Under Rule 403, a district judge has wide latitude to make evidentiary rulings, but must appreciate "the offering party's need for evidentiary richness and narrative integrity in presenting a case." *Old Chief v. United States*, 519 U.S. 172, 183 (1997).

**IV.   ARGUMENT**

None of Google's arguments provides a basis to exclude or limit Prof. Cockburn's testimony.

**A.     Google Bears The Burden Of Apportioning Its Infringer's Profits**

Google preliminarily attacks Prof. Cockburn's infringer's profits figure, misrepresenting Prof. Cockburn's analysis in an attempt to suggest that his bottom-line opinion is that Oracle is entitled to $2.3 billion in copyright damages.  (MIL #3 at 2.)  Google's complaint is with the copyright statute, not Prof. Cockburn's analysis.  Google obstinately persists in arguing that Prof. Cockburn would award $823.9 million "based on the assumption that every cent of Google's gross Android revenue is attributable to the alleged copyright infringement." (*Id.*)  But the statute could not be clearer: it is Google's burden to prove its costs, and prove that part of its profits is attributable to factors other than the copyright infringement.  *See* 35 U.S.C. § 502(b); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 712  (9th Cir. 2004) (copyright holder was not required to apportion the gross profit figure); *Taylor*

5

1   *v. Meirick*, 712 F.2d 1112, 1121–22 (7th Cir.1983) ("It is too much to ask a plaintiff who has proved

2   infringement also to do the defendant's cost accounting.").

3       Google thus mischaracterizes both the $823.9 million figure and what it calls the "$1.2 billion

4   for future unjust enrichment damages." (MIL #3 at 2.)  The former figure is Android gross revenues

5   alone; the latter figure—a market projection of Google's Android revenues for 2012—is not part of

6   Prof. Cockburn's damages estimates at all, as Google itself complains elsewhere in its brief. (*See id.* at

7   7–9.)  Prof. Cockburn considers substantial evidence showing that the infringing acts had a significant

8   causal effect on Google's Android profits, and estimated Google's gross Android revenue figures.

9   Nothing more is required of him.  If Google or its expert seeks to meet its burden of apportioning, then

10   Prof. Cockburn may respond.  (Cockburn Report ¶ 468.)

11       **B.      Prof. Cockburn's Choice Of The $100-Million Starting Point Is Correct**

12       Throughout its motion, Google attacks Prof. Cockburn's use of a $100-million "starting point"

13   in his hypothetical license analysis.  (MIL #3 at 2–3, 6.)  In its *Daubert* Order, the Court wrote: "Given

14   the presence in this case of a real-world 'comparable' close on point—the last Sun offer in 2006—the

15   Court is strongly of the view that the hypothetical negotiation should take that $100 million offer as a

16   starting point and adjust . . ." (*Daubert* Order at 14.)  The Court's reference to $100 million stemmed

17   from ***Google counsel's*** reference to that amount in its argument on the previous Daubert motion.  (*See*

18   Agrawal Decl. Ex. 3-2 (July 21, 2011 *Daubert* Hearing Tr. at 9:15–23 ("Mr. VAN NEST: Sun proposed

19   a royalty all in for three years of a hundred million dollars, and that was rejected by Google. . . . THE

20   COURT: Well, what difference does it make? Why does it matter if Google rejected it? Google may

21   have been playing -- they may have just been trying to get it on the cheap, that doesn't mean it was

22   reasonable to reject it.").)

23       Google now repeatedly argues that a starting point of $28 million is more appropriate than $100

24   million (MIL #3 at 2–3, 4, 7).  Google's insistence on isolating one data point at its absolute lowest

25   level in the bargaining history between the parties reverts to the "Soviet-style negotiation" that the

26   Court has already rejected.  (*Daubert* Order at 10.)

27       Google latches on to a single phrase in the Court's *Daubert* Order to insist that the Court must

28   have actually meant to require Prof. Cockburn to begin with $28 million, despite the Court's clear and

6

specific language designating the $100-million figure as an appropriate starting point. (*Compare* MIL # 3 at 4 ("this Court's Order 'strongly' suggested Cockburn use 'the last Sun offer in 2006' as a starting point.") with Daubert Order at 14 ("Given the presence in this case of a real-world 'comparable' close on point – the last Sun offer in 2006 – the Court is strongly of the view that the hypothetical negotiation should take that $100 million offer as the starting point and adjust as follows.") ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████  Contrary to Google's contention that he "ignores" the evidence, Prof. Cockburn considers the entire licensing history between the parties, ***including*** their successive bargaining positions. (*Compare* MIL #3 at 3 *with* Cockburn Report ¶¶ 170–221 (describing Sun's licensing program and the licensing history between the parties).)

Prof. Cockburn concludes that the $100-million starting point is appropriate in light of numerous factual, economic, and legal considerations, including that:

(1) As contemporaneous Google documents acknowledge, Sun was willing to walk away from a $100-million-***per-year*** Java ME licensing business, and "compensating Sun for *at least* one year of business risk through licensing fees has a clear economic basis" (Cockburn Report ¶ 223);

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

7

███████████████████████████████████████████

██████████████████████████████

(5) "The test is not what the infringer actually bargained for but what *reasonable* parties would have negotiated." (Daubert Order at 10; *see also Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983) ("Whether the defendant was never willing to pay a reasonable royalty is irrelevant.  The willing buyer/willing seller concept is employed by the court as a means of arriving at reasonable compensation and its validity does not depend on the actual willingness of the parties to the lawsuit to engage in such negotiations.") (citations omitted.)

Against this backdrop, as Google appears to admit by never formally moving the court to exclude it, the choice of starting point is for the jury to decide.  "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 131 S.Ct. 2238 (2011); *see also United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) ("*Daubert* makes the district court a gatekeeper, not a fact finder.")

### C.    Prof. Cockburn's Copyright Hypothetical License Is Legally Correct And Supported By Substantial Evidence

Google's attack on Prof. Cockburn's hypothetical license analysis of "actual damages" for copyright infringement is meritless.  Google does not attack Prof. Cockburn's lost profits analysis.

Google's argument hinges on its assertion (MIL #3 at 3–5) that a copyright hypothetical license is available only if Oracle shows that the parties would have negotiated a license for an incompatible Android.  That is incorrect.  Google relies entirely on an interpretation of an order from Judge Hamilton, citing it five times without acknowledging that Judge Hamilton herself rejected that interpretation in a clarifying order that states:

> The court did not hold as a matter of law . . . that copyright damages based upon the amount a willing buyer would reasonably have paid a willing seller under a hypothetical license are available only if the copyright owner provides evidence of actual licenses it entered into or would have entered into for the infringed works, and/or actual "benchmark" licenses entered into by any party for comparable use of the infringed or comparable works.

8

1   *Oracle USA, Inc. v. SAP AG*, No. C07-1658 PJH, at Dkt. No. 1088.  Judge Hamilton thus expressly

2   disclaimed that her Order stands for the proposition that Google says it does.  Even after Oracle pointed

3   out the clarification in its September 22 précis (*see* Dkt. No. 452), Google makes no effort to either

4   explain its repeated reliance on the order or provide other authority in support of its argument.  The law

5   does not require Oracle to "offer . . . evidence of benchmark transactions" (MIL #3 at 4) to recover on a

6   hypothetical license theory.

7        Google's argument is not only wrong on the law; it is wrong on the facts.  Google's assertions

8   that there is no benchmark license in this case because competitors "do not commonly license one

9   another" and "Sun never gave a license to Google for Android" are simply baffling.  Sun ***did in fact***

10  offer Google a license.  As discussed above, as ordered by the Court, Prof. Cockburn expressly

11  discusses this license as a starting point, subject to upward and downward adjustments to take account

12  of differences between the starting point and the hypothetical license.  Moreover, Google cites no

13  evidence that precludes the possibility that Sun (or Oracle) would have entered into a license truly

14  comparable to the incompatible hypothetical license at issue, especially for a relatively short period of

15  time leading up to the date of trial.  Google's argument as to the supposed absence of benchmarks rests

16  on a straw man entirely of its own making.

17       Google's next argument is that the upward adjustment, built on Sun's expectations around a

18  jointly controlled Android, is improper because these expectations were "never the subject of any

19  licensing discussion."  (MIL #3 at 4.)  This is contradicted by the evidence.  The actual-world license

20  that the parties negotiated expressly contemplated that Sun would provide a commercial

21  implementation of Android—namely, a version of the stack that Sun would license for a fee to OEMs,

22  thereby generating substantial revenue.  (*See* Cockburn Report ¶¶ 292–93 (citing evidence).) ███

23  ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28

███████████████████████████████████████████████

███████████████████████

Because Google instead took Sun's intellectual property and used it to make Android incompatible with Java, the infringement deprived Sun of these revenues.  Because the hypothetical license is a proxy to identify the fair market value for the use taken by the infringer, *see On Davis v. The Gap, Inc.*, 246 F.3d 152, 167–72  (2d Cir. 2001), it is appropriate for Prof. Cockburn to make an upward adjustment to account for, among other things, derivative or convoyed sales Sun expected to earn from a compatible Android but lost when Google infringed the copyrights on an incompatible basis.  *Cf. Getaped.com, Inc. v. Cangemi*, 188 F.Supp.2d 398, 404, 406 (S.D.N.Y. 2002) ("[T]he value of [the] copyrighted work resides not in its intrinsic value, but rather . . . in its tendency to promote the sales of other products.") (citing Nimmer); *see also Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 707–09 (9th Cir. 2004).  The hypothetical license for copyright infringement is a measure of "actual damages," not a straight re-creation of the license that Google could have (and should have) accepted in 2006.

Unable to avoid the substantial evidence that the 2006 license promised additional value to Sun on top of payments to Google, or that Google's incompatible implementation destroyed that value, Google claims that Prof. Cockburn's upward adjustment is too large because it "relies entirely on a 'single internal Sun presentation'" that Google says is "rough," subject to change, and therefore unreliable.  (MIL #3 at 5, 8).  First, Google's *ipse dixit* that "rough" means "speculative" ████

████████████████████████████████████████████

███████████████████████████████████████

Second, Google's argument ignores the substantial other evidence supporting the amount of the upward adjustment.  For example, ████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

████  Sun's Java business was in no small part based on licensing Java and then providing products and services to third parties who used the licensed implementation.  The business model presentation Google attacks was a straightforward application of this approach.

Google's complaint about the business model presentation also fails because it merely goes to the appropriate weight to be given to the specific numbers included in it.  This complaint is not the proper basis for either a *Daubert* motion or a motion to exclude evidence in limine; it is for the jury to decide.  *i4i*, 598 F.3d at 852 ("disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility").

Similarly, Google argues (MIL #3 at 5) that "there is no evidence Sun would have been able to establish a viable business to exploit Android" and "it never did so in reality," but the first claim is false and the second is a tautology.  The reason Sun never did so was that there was no viable business to exploit an ***incompatible*** Android. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████

████████████ There is ample support for Prof. Cockburn's upward adjustment.

### D.      Prof. Cockburn's Patent Hypothetical License Is Correct Under The Law

Google's argument (MIL #3 at 6–7) as to Prof. Cockburn's calculation of the upward adjustment to the patent hypothetical license fails for exactly the same reasons as its arguments regarding copyright.  The reasonable royalty determined using a hypothetical-license analysis is a measure of damages that values the use that the infringer ***actually made*** of the invention, *see* 35 U.S.C. § 274, not some other, less harmful use, such as what the "starting point" negotiations between the parties contemplated.  To hold otherwise would not compensate for the infringement, which is what the patent statute requires.  Allowing Google to pay no more for a license than it would have paid had it not infringed would improperly put Google in a "heads-I-win, tails-you-lose" position.  *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978).

11

1    Google complains that because Prof. Cockburn's upward adjustment tracks "foregone licensing

2    revenues and convoyed sales," and because Prof. Cockburn does not specifically quantify other factors

3    that clearly warrant upward pressure on the reasonable royalty (MIL #3 at 6), the upward adjustment is

4    an attempt to import lost-profits under *Panduit*'s lost-profits four-factor test. Both Google's cavalier

5    dismissal of the unquantified factors and Google's reliance on *Panduit* are misplaced. The *Panduit* lost

6    profits factors do not apply to hypothetical-license analysis, and Google cites no authority supporting its

7    assertion that they do. Indeed, in discussing the assessment of a reasonable royalty (as distinguished

8    from its discussion of lost profits), the *Panduit* court itself approved the exact methodology that Google

9    challenges: in calculating the "future business [the patentee believes] he will lose by licensing a

10   competitor to make the machine," the Court held that "this expectant loss is an element to be considered

11   in retroactively determining a reasonable royalty," even if this expectation was only "reasonably based

12   on established business methods and customs." *Panduit*, 575 F.2d at 1163.

13   Prof. Cockburn's evaluation of Sun's losses is squarely in line with *Panduit*, as well as *Georgia-*

14   *Pacific*: the outcome of a hypothetical-license negotiation ***depends*** on such factors as "the anticipated

15   amount of profits that the prospective licensor reasonably thinks he would lose as a result of licensing

16   the patent as compared to the anticipated royalty income." *Georgia-Pacific*, 318 F.Supp. at 1121.

17   Google admits that *Georgia-Pacific* so holds, but complains that Prof. Cockburn's upward adjustment

18   of $176.2 million is just too big. But the evidence at trial will show that it is both a reasonable and

19   conservative adjustment, based on all of the factors that would have created significant upward pressure

20   on the reasonable royalty. And whereas the projections used by Prof. Cockburn to estimate the upward

21   adjustment are conservative, even overly optimistic projections can form the basis for inputs to the

22   hypothetical-negotiation analysis because they show the parties' expectations and state of mind at the

23   time the infringement began. *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384–

24   85 (Fed. Cir. 2001) (infringer's projections); *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d

25   1301, 1327 (Fed. Cir. 2009) (citing *Interactive Pictures*; patentee's projections).

26   Google also ignores that the upward adjustment applied by Prof. Cockburn is premised not only

27   on "foregone licensing revenues and convoyed sales" (Factor 6 of the *Georgia-Pacific* test), as Google

28   selectively argues, but also on several other independent *Georgia-Pacific* factors, including the "nature

12

1   and scope of the license" as compared to the starting point license (Factor 3), Sun's "established policy"

2   of "granting licenses under special conditions designed to preserve [its patent] monopoly" (Factor 4),

3   and the fact that the incompatibility of Android turned Sun and Google into "competitors in the same

4   territory in the same line of business" rather than "inventor and promoter" (Factor 5).  Each factor

5   supports both the fact of the upward adjustment and its amount.

### E.      Prof. Cockburn's Opinions Regarding Future Royalties Are Proper

7          Google next claims (MIL #3 at 7) that Prof. Cockburn's analysis is flawed because he does not

8   provide a "firm calculation of future damages" for either the copyright or patent claims.  In the *Daubert*

9   Order, the Court directed Prof. Cockburn to structure the hypothetical license as a "series of yearly

10  payments," and not to mix past and future royalties by advancing royalties in a lump-sum payment.

11  (*Daubert* Order at 11.)  That is what Prof. Cockburn did.  The jury can easily drop a curtain as of the

12  date of trial, awarding damages that are firm and exclusively based on the past.  (Cockburn Report ¶

13  47.)

14         Google otherwise misapprehends the law governing calculation of future royalties (MIL #3 at

15  8).  When awarding future royalties in lieu of an injunction, courts routinely follow the Federal Circuit

16  and hold that such royalties should be based on a post-verdict assessment of the parties' changed

17  bargaining position and other changed economic factors.  Google cites no case holding otherwise.

18         As the Federal Circuit has held, "in most cases, where the district court determines that a

19  permanent injunction is not warranted, the district court may wish to allow the parties to negotiate a

20  license amongst themselves . . . . Should the parties fail to come to an agreement, the district court

21  could step in to assess a reasonable royalty in light of the ongoing infringement." *Paice LLC v. Toyota*

22  *Motor Corp.,* 504 F.3d 1293, 1315 (Fed. Cir. 2007).  A year later, in *Amado v. Microsoft Corp.*, the

23  Federal Circuit reaffirmed these principles in a different factual context—a royalty during the stay of an

24  injunction pending appeal—extensively citing *Paice*.  517 F.3d 1353, 1361–62 (Fed. Cir. 2008).

25  Because "[t]here is a fundamental difference . . . between a reasonable royalty for pre-verdict

26  infringement and damages for post-verdict infringement[,]"  the court remanded, instructing the lower

27  court that "the assessment of damages for infringements taking place after the injunction should take

28

13

into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability." *Id.* at 1362.

Courts have applied *Paice* and *Amado* to find that the proper procedure for assessing an ongoing future royalty under § 273, if appropriate, is to perform a post-infringement analysis that accounts for changed circumstances since the date of first infringement. In *Boston Scientific Corp. v. Johnson & Johnson*, for example, Judge Illston held that she would "determine an ongoing royalty rate based on the date of the jury verdict as the date of the hypothetical negotiation," and set further evidentiary hearings. 2008 WL 5054955, at *3–5 (N.D. Cal. Nov. 25, 2008). In so doing, she noted that "[t]he Federal Circuit indicated that the trial court should consider 'additional economic factors arising out of the imposition of an ongoing royalty.'" *Id.* at *5 (citing *Paice*). Thus, "the hypothetical negotiation for post-judgment royalties should occur on the date of the verdict, when the determination of liability altered the parties' bargaining positions." *Id.* The parties later participated in an evidentiary hearing, introduced new expert testimony, and the court determined a continuing royalty. *Boston Scientific Corp. v. Johnson & Johnson*, No. C 02-0790 SI, 2009 WL 975424 (N.D. Cal. Apr. 9, 2009). Other courts have followed this methodology. *See, e.g.*, *Affinity Labs of Texas, LLC v. BMW N. Am., LLC*, --- F.Supp.2d ----, 2011 WL 1193207 (E.D. Tex. Mar. 28, 2011); *Presidio Components Inc. v. Am. Technical Ceramics Corp.*, No. 08-CV-335-IEG (NLS), 2010 WL 3070370 (S.D. Cal. Aug. 5, 2010).[2]

Google's argument seems to be that, because the hypothetical negotiation assumes validity, an injunction *always* looms. (MIL #3 at 8 ("***Every*** hypothetical negotiation presumes a finding of infringement and thus the immediate prospect of an injunction.") (emphasis in original).) If Google is conceding that an injunction is warranted in this case, Oracle would of course so stipulate; but barring

---

[2] Google argues that Judge Illston misapplied *Amado*. (MIL #3 at 8 n.2.) She did not. *Boston Scientific* is consistent with both *Paice* and *Amado*, and with the several other courts that have applied this precedent, including the two Eastern District of Texas cases that Google cites, both of which Judge Illston discusses. *Boston Scientific*, 2008 WL 5054955, at *3–*4. Both of those cases considered only whether submission of a future-damages question to a jury would be appropriate, and both discussed the "changed circumstances" that would apply in a post-verdict reasonable royalty, although neither case had occasion to apply the rule. *Cummins-Allison v Corp. v. SBM Co., Ltd.*, 584 F.Supp.2d 916, 919 (E.D. Tex. 2008) ("It is true that some factors such as the relative importance of the technology or the availability of a design-around may have changed since the date of first infringement."); *Ariba, Inc. v. Emptoris, Inc.*, 567 F. Supp. 2d 914, 918 (E.D. Tex. 2008) ("Of course, other factors . . . may have changed by the time of trial.").

14

1   that concession, Google's argument that infringement automatically leads to an injunction has been

2   rejected by the Supreme Court.  *eBay v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (no

3   presumption of an injunction in patent cases).

4         Whether a future ongoing royalty should be applied will be up to the Court, as a form of

5   equitable relief—not as a measure of damages.  However, imposing a future royalty likely would not be

6   adequate because the most significant harm at issue in this case is the largely unquantifiable and

7   irreparable harm from fragmentation of Java that will occur if Google is permitted to continue

8   infringing.  As Prof. Cockburn explains:

9   > In my opinion, awarding a royalty for future infringing conduct would not be sufficient to
10   > compensate Oracle for either the continuing consequences of Google's past infringement
   > or the full value of the infringement if it continues into the future.  For example, as
11   > discussed above, the future harm from fragmentation (attributable to the infringed
   > patents) of Java caused by the continued presence of an infringing, non-compatible
12   > version of Java on the market, both carried forward from the infringement to date and as
   > the likely result of any future infringement, is likely to be irreparable.  Carrying forward
13   > the structure of the original patent hypothetical negotiation would result in a projected
   > royalty of $203.1 million for 2012 alone.  Carrying forward the structure of the original
14   > copyright hypothetical negotiation would result in a projected royalty of $102.6 million
   > for 2012 alone.  Those sums would not adequately capture the value of the harms Oracle
15   > would continue to suffer.

16   (*Id.* ¶ 59.)   Oracle accordingly intends to strenuously pursue injunctive relief to resolve the key issue in

17   this case: whether Google can use Oracle's intellectual property to create an incompatible clone of Java

18   and thereby undermine Oracle's and many others' investments in "write once, run anywhere."

19         **F.**    **The Date Of Prof. Cockburn's Hypothetical Negotiation Is Appropriate**

20         Google requests that the Court bar Prof. Cockburn from "presenting any evidence or testimony

21   that the date of first infringement of any of the asserted patents postdates the date of first infringement

22   of the first patent infringed."  (MIL #3 at 9.)  Google has nothing to complain about because Prof.

23   Cockburn does no such thing.  Instead, consistent with the guidance of the *Daubert* Order, he explains

24   that the dates of first infringement, based on use (not commercial embodiment and sale) of the patented

25   features, ranges from mid-2006 to mid-2007, and he conservatively chooses July 2006 as the date of the

26   hypothetical negotiation, "immediately prior to the . . . date of first infringement of the first patent."

27   (Cockburn Report ¶ 170.)

28

1    In any event, selecting a different date anywhere in the range would have zero effect on the

2    royalty calculation,  because Prof. Cockburn is entitled to consider evidence that post-dates the

3    hypothetical negotiation if it is relevant in assessing the reasonableness of the royalty, *Lucent*, 580 F.3d

4    at 1333, and because the calculation includes three years of fixed payments (which would be paid by

5    the date of trial in any event) and a revenue share that is pegged to actual Google Android revenues that

6    do not vary according to the precise date of the negotiation.  There is no basis for any assertion that any

7    lower royalty would apply if the negotiation were later than July 2006.  Indeed, with regard to Prof.

8    Cockburn's original report, Google complained that an October 2008 hypothetical negotiation was too

9    late.  It is unclear what date Google thinks would be just right.

10              **G.       Prof. Cockburn's Apportionment Analysis Is Conservative And Granular**

11    Google makes no attempt to challenge the reliability of the conjoint analysis, the econometrics

12    analysis, or any other aspect of Prof. Cockburn's apportionment methodology.  Instead, it complains

13    that the apportionment analysis focuses on patents rather than claims (MIL #3 at 9) and fails to

14    specifically value the intellectual property that is not at issue in this case.  (*Id.* at 6.)  But the Court's

15    order instructed Prof. Cockburn to focus on infringing ***features***, which is what Prof. Cockburn did by

16    analyzing the effect on market share of an Android with the patented functionality removed.  (*Daubert*

17    Order at 6.)  Google cites no case in which any court has required an apportionment on a claim-by-

18    claim basis, and Google makes no argument that the various claims of any single patent provide

19    different functionality.  Even the cases on the entire market value rule stress the need to measure the

20    importance of the "invention," or the "feature," or the "component" on consumer demand.  *Lucent*, 580

21    F.3d at 1324 (feature), *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)

22    (feature); *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287 (N.D.N.Y. 2009)

23    (Rader, J., by designation) (damages calculation should be based on the smallest salable unit).

24    A patent-specific approach is also consistent with and necessary under the Court's case-

25    management practice.  If each claim carried with it an independently determined damages number, then

26    a requirement that Oracle drop claims would deprive Oracle of substantive rights without due process.

27    As Oracle noted in its Case Management Statement (Dkt. No. 471), there is no difference between an

28    economic measurement by claim and one by patent.  Oracle has proposed to proceed to trial by

16

grouping asserted claims that have the same technical substance.  The claims are basically

representative of the claimed invention, and vary only as to their type.  Google evidently understands

that the claims of the asserted patents are technically substantively the same, because Google has used

the same invalidity and non-infringement arguments for the various claims of the patents.  (*See id.*)

### H.    Prof. Cockburn's "Other Licenses" Inform But Do Not Figure Into His Damages Calculations

Google's argument about Prof. Cockburn's treatment of other mobile IP agreements (MIL #3 at

9–10) attacks a straw man.  Prof. Cockburn does not, as Google suggests, "inflate his damages estimate

by presenting data about licenses for noncomparable technologies or settlements of noncomparable

litigation."  (*Id.*at 9.)  Consistent with *Georgia-Pacific's* mandate to consider "the portion of the profit

or of the selling price that may be customary in a particular business or in comparable businesses to

allow for the use of the invention or analogous inventions," *Georgia-Pacific*, 318 F. Supp. at 1120,

Prof. Cockburn instead simply cites these agreements to underscore the reasonableness of the royalty.

Nothing is "inflated."  Indeed, the royalties paid under the other licenses and the Sun-Microsoft

settlement and license do not factor at all into Prof. Cockburn's damages calculations.

The other licenses Prof. Cockburn discusses and the Sun-Microsoft agreement are relevant and

instructive here, at least in the broad sense applied by Prof. Cockburn.  For example, the Sun-Microsoft

case involved the predecessor in interest to Oracle (Sun), the same technology (Java), and the same

overriding concern (fragmentation).  Google's insistence that fragmentation is about brand recognition

(MIL #3 at 10) is false, and there is no evidentiary basis for it.  Nothing in the court's opinion in that

case tied the harm of an incompatible version of the Java platform solely to Microsoft's trademark

violations:

> In the present case, Sun has demonstrated a possibility of irreparable harm, if an
> injunction re-straining Microsoft's distribution of non-compliant Java Technology is not
> issued. Microsoft's unauthorized distribution of incompatible implementations of Sun's
> Java Technology threatens to undermine Sun's goal of cross-platform and cross-
> implementation compatibility. The threatened fragmentation of the Java programming
> environment harms Sun's relationship with other licensees who have implemented Java
> virtual machines.... In addition, Microsoft's unparalleled market power and distribution
> channels relating to computer operating systems pose a significant risk that an
> incompatible and unauthorized version of the Java Technology will become the de facto
> standard. The court further finds that money damages are inadequate to compensate Sun

17

for the harm resulting from Microsoft's distribution of software products incorporating non-compliant Java Technology as the harm to Sun's revenues and reputation is difficult to quantify.

*Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F.Supp.2d 992, 997–98 (N.D. Cal. 2000).

Google is following in Microsoft's footsteps.  Its unauthorized use of Java is undermining "write once, run anywhere" and causing the developer community to migrate away from the community-based Java standard.  The Sun-Microsoft agreement is accordingly a reasonable and relevant data point for Prof. Cockburn and the jury to consider.

Google's willful infringement of Oracle's intellectual property has harmed, and continues to harm, the Java platform, which Oracle has publicly stated is the single most valuable software asset that it has ever acquired. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████ Despite repeated entreaties over the course of six years, Google continues to refuse to bring Android into the Java fold, and continues to seek to capture all the benefits of Java for itself without regard for the huge investments that Oracle and many others have made to prevent any one platform vendor from acquiring significant market power.

Google's motion in limine to exclude the testimony of Prof. Cockburn should be denied.

Dated: October 4, 2011          BOIES, SCHILLER & FLEXNER LLP

By: */s/ Steven C. Holtzman*
Steven C. Holtzman

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.