# EXHIBIT 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

_____

ORACLE AMERICA, INC.,    )

       Plaintiff,     )

   vs.                      ) No. CV 10-03561 WHA

GOOGLE, INC.,            ) VOLUME I

       Defendant.     )

_____)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Videotaped Patent Issues Deposition

of JOHN C. MITCHELL, Ph.D., taken at

755 Page Mill Road, Palo Alto, California,

commencing at 9:43 a.m., Tuesday,

September 6, 2011, before Leslie Rockwood,

RPR, CSR No. 3462.

PAGES 1 - 270

Page 78

1  A. I believe it's important to have adequate and
2  attractive networking connections. Something that's not
3  state-of-the-art would probably impede -- stands to
4  reason something that's not state-of-the-art may impede
5  sales.                                        11:35:25
6      As an additional factor, I just would point
7  out that as far as I understand -- and it should be easy
8  to find more information about it -- there are various
9  manufacturers of wireless networking hardware, and one
10 may be substitutable for another.              11:35:47
11     Q. So having a 3G air interface or above is also
12 the basis for consumer demand for Android products?
13     A. I think I've explained the importance of that
14 factor.
15     Q. Is it more or less important in the patents   11:36:04
16 patents-in-suit, sir?
17     A. Well, one factor that comes to mind -- and
18 there may be others -- that would occur to me on
19 reflection is that there is -- I believe a -- some degree
20 of substitutability across available networking hardware,  11:36:23
21 whereas as I've laid out in this report, based on my
22 study and evaluation to the best that I'm able to do
23 this, it doesn't appear that there is reasonable
24 substitutability of another platform for the platform
25 that draws critically on the patents-in-suit.   11:36:50

Page 79

1      Q. So in your opinion, the patents-in-suit are
2  more important than having a 3G air interface on an
3  Android device?
4      A. That's not what I said.
5      Q. Well, what is your opinion? Are the         11:37:06
6  patents-in-suit more important or is having a 3G air
7  interface more important?
8      MR. PETERS: Objection. Form.
9      THE WITNESS: I believe that the -- and it
10 would be possible to look into this if this is an   11:37:21
11 absolutely critical issue, and maybe other people know
12 more about it, but it strikes me that there are likely a
13 number of different ways to assemble a phone with
14 adequate networking so that an individual chip to provide
15 networking could be replaced with another, whereas as I   11:37:48
16 think I tried to explain, I don't see that as being an
17 aspect of the patents-in-suit in the software technology
18 at issue.
19     MR. PAIGE: Okay. We need to take a break to
20 change the tape, please.                       11:38:05
21     THE VIDEOGRAPHER: This is the end of Disk
22 Number 1, Volume 1. We are off the record at 11:38 a.m.
23     (Recess.)
24     THE VIDEOGRAPHER: This is the beginning of
25 Disk Number 2, Volume 1. We are back on the record at   11:59:13

Page 80

1  11:59 a.m.
2      You may proceed.
3      Q. BY MR. PAIGE: Welcome back, Professor
4  Mitchell.
5      A. Thank you.                              11:59:22
6      Q. You say that the Oracle employees Landau,
7  Poore and Vandette conducted certain experiments at your
8  direction; correct?
9      A. I believe that's what it says in that report.
10     Q. Why did you choose to use Oracle employees   11:59:37
11 rather than an independent consulting firm?
12     A. I believe that I asked if it was possible to
13 get someone to help with some kinds of experiments like
14 that or perhaps someone asked me if I knew students, and
15 I suggested that perhaps someone who works for Oracle   11:59:56
16 could be one possibility of doing that.
17     Q. Are there no consulting firms capable of
18 doing the type of work that those employees did?
19     A. There may be. I didn't -- I didn't research
20 that.                                          12:00:16
21     Q. Did you think it might be better to have
22 someone independent rather than a partisan with a stake
23 in the matter doing these experiments?
24     MR. PETERS: Objection. Form.
25     THE WITNESS: I didn't really even make that   12:00:28

Page 81

1  judgment. It didn't strike me that this would be an
2  issue where partisanship or opinion would have much
3  bearing on it. What I believe those engineers have done
4  is modify the system in various ways that's easily
5  documented and run the system with certain measurements   12:00:49
6  afterwards. I think the results there are probably
7  concrete and can be evaluated objectively.
8      Q. BY MR. PAIGE: Did you design the experiments
9  conducted by Landau, Poore and Vandette?
10     A. I believe I did to a certain degree. That   12:01:10
11 is, the experiments are to the -- as far as I recall,
12 basically comparisons against the Android system or
13 components of it as it exists now versus some
14 modification. As far as I recall, those modifications
15 were modifications that I suggested.           12:01:36
16     Q. Okay. So you're the one who came up with the
17 actual modifications they implemented; is that right?
18     A. At some degree of detail, I believe so.
19     Q. Okay. You might not have done the actual low
20 level code, but you told them on a high level, "This is   12:01:52
21 what I'd like you to do in order to carry out this
22 experiment"?
23     A. I don't remember the exact, you know, wording
24 of the discussion, but I believe I handled it the same
25 way I would with a graduate student. I want them to feel   12:02:09

21 (Pages 78 to 81)

Page 82

1  invested and convinced that they're doing something
2  that's correct.  And I'm happy to listen to someone
3  else's opinion if they think there's a better way to do
4  something, but I believe that the actual experiments that
5  were carried out reflected my suggestions and requests on    12:02:28
6  how to do it.
7      Q.  Was counsel for Oracle involved at all in
8  designing the experiments?
9      A.  I don't believe so.
10     Q.  Were they generally on the phone with you            12:02:36
11 when you would talk with these employees on the phone?
12     A.  As far as I recall, and there may be some
13 instance that I've forgotten about, I believe all of
14 the phone calls were from this office in an office --
15 from a room in this office building with a speakerphone     12:02:57
16 in the middle of the table.  On many of those calls
17 Peter Kessler from Oracle was present, and there may have
18 been someone from the law firm as well.
19     Q.  Okay.  And when you say this office building,
20 you mean Morrison & Foerster's office building here in      12:03:18
21 Palo Alto?
22     A.  That's correct.  The place we sit today, yep.
23     Q.  Okay.  And Peter Kessler is not a lawyer;
24 correct?
25     A.  That's correct.  Peter Kessler is an Oracle         12:03:27

Page 83

1  engineer.
2      Q.  Okay.  What lawyers did participate in those
3  phone calls, to your recollection?
4      A.  I don't know if participation is the right
5  characterization.  There may have been lawyers present      12:03:39
6  just to set up the call or make the phone number -- make
7  the connection.
8      Q.  Okay.  So they didn't actually speak on any
9  of these calls that you had; is that right?
10     A.  Well, I think they made an introduction.  I         12:03:59
11 think that they -- I don't -- I didn't unilaterally
12 arrange or locate these employees.  I don't know how they
13 were selected, so I was introduced to them by someone in
14 the firm.  But from that point forward, the technical
15 discussion was under my control and direction.              12:04:19
16     Q.  Okay.  I'd like to focus in on the report by
17 Noel Poore.  He did experiments on your behalf that
18 relate to the '520 and '702 patents; correct?
19     A.  I believe that's correct.
20     Q.  Okay.  And his methodology --                        12:04:33
21     A.  Uh-huh.
22     Q.  -- was to take the DX tool that's found on
23 the Android website --
24     A.  Uh-huh.
25     Q.  -- then run the DX tool with certain                 12:04:40

Page 84

1  modifications made to it and, thereby, estimate the
2  difference that the allegedly infringing functionality
3  made; right?
4      A.  I believe that's a correct characterization.
5          Could I look at the report just to remind            12:04:57
6  myself what's in it and how he carried out his
7  experiments?
8          (Exhibit Google 420 was marked for
9          identification.)
10         THE WITNESS:  I can read this further, but in        12:06:22
11 the interest of time, if you'd like to proceed.
12     Q.  BY MR. PAIGE:  I would like to proceed.
13         For the '702 patent he had three different
14 ways he estimated the effect of not using the allegedly
15 infringing functionality; right?                             12:06:33
16     A.  That's the way I remember it, and it's also
17 identified that way on page 304 of his report.  He lists
18 methodology experiment one, experiment two, experiment
19 three.
20     Q.  Okay.  And the first methodology involved            12:06:54
21 modifying the DX tool in order to prevent it from
22 carrying out the allegedly infringing functionality of
23 moving duplicates; right?
24     A.  Yes.  That's what the report says in
25 paragraph 15.                                                12:07:06

Page 85

1      Q.  Okay.  And for the '520 patent, he had one
2  way of disabling the alleged play execution of static
3  arrays; right?
4      A.  I can check to make sure if you'd like, but
5  that's also my recollection.                                 12:07:18
6      Q.  Okay.  So that way Mr. Poore could compare
7  what the size of the code looked like when the DX tool
8  allegedly play executed and what the size of the code
9  looked like when the DX tool did not use play execution;
10 right?                                                       12:07:34
11     A.  I believe that's the basic idea.
12     Q.  Okay.  And if you could turn to page 15 of
13 his report, the code following paragraph 65, that's what
14 Mr. Poore found when it was allegedly play executed;
15 correct?                                                     12:07:56
16     A.  I don't recall the exact context for this
17 paragraph.  If you just give me a second, I'll look at
18 the page or so before just to remind myself what this is
19 saying.
20         Okay.  I think I'm with you.  I think that           12:09:22
21 what he means by normal execution is the unmodified DX
22 tool and its output.
23     Q.  Okay.  What you would consider the infringing
24 DX tool; correct?
25     A.  That's correct.                                      12:09:35

Page 266

```
 1      I declare under the penalty of perjury
 2  under the laws of the State of California that the
 3  foregoing is true and correct.
 4      Executed on _____, 2011,
 5  at _____, _____.
 6
 7
 8
 9      _____
10           SIGNATURE OF THE WITNESS
```

Page 267

```
 1  STATE OF CALIFORNIA   ) ss:
 2  COUNTY OF MARIN       )
 3
 4      I, LESLIE ROCKWOOD, CSR No. 3462, do hereby
 5  certify:
 6      That the foregoing deposition testimony was
 7  taken before me at the time and place therein set forth
 8  and at which time the witness was administered the oath;
 9      That testimony of the witness and all
10  objections made by counsel at the time of the examination
11  were recorded stenographically by me, and were thereafter
12  transcribed under my direction and supervision, and that
13  the foregoing pages contain a full, true and accurate
14  record of all proceedings and testimony to the best of my
15  skill and ability.
16      I further certify that I am neither counsel
17  for any party to said action, nor am I related to any
18  party to said action, nor am I in any way interested in
19  the outcome thereof.
20      IN WITNESS WHEREOF, I have subscribed my name
21  this 7th day of September, 2011.
22
23
24      _____
25           LESLIE ROCKWOOD, RPR, CSR NO. 3462
```

Page 268

```
 1                  I N D E X
 2
 3  TUESDAY, SEPTEMBER 6, 2011
 4
 5  WITNESS                          EXAMINATION
 6
 7  JOHN C. MITCHELL, PH.D. Patent Issues Volume 1
 8
 9    By Mr. Paige                        5
10    By Mr. Weingaertner               180
```

Page 269

```
 1              DEPOSITION EXHIBITS
 2         JOHN C. MITCHELL, PH.D., VOLUME 1
 3  NUMBER           DESCRIPTION         IDENTIFIED
 4  Exhibit Google 418   U.S. Patent Number      31
 5                       6,061,520, 5/9/00
 6  Exhibit Google 419   Opening Expert Report   42
 7                       of John C. Mitchell
 8                       Regarding Patent
 9                       Infringement, 8/8/11
10  Exhibit Google 420   Summary and Report of   84
11                       Noel Poore, 8/6/11
12  Exhibit Google 421   Appendix A              87
13  Exhibit Google 422   Expert Report of Terence 128
14                       Parr, Ph.D., Regarding the
15                       Non-Infringement of U.S.
16                       Patent No. 6.061,520,
17                       8/25/11
18  Exhibit Google 423   Expert Report of Terence 134
19                       Parr, Ph.D., Regarding
20                       the Non-Infringement of
21                       U.S. Patent No. 6,061,520
22  Exhibit Google 424   Reply Expert Report     138
23                       of John C. Mitchell
24                       Regarding Patent
25                       Infringement, 9/1/11
```

68 (Pages 266 to 269)