Pages 1 - 122

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | | |
|---|---|---|
| AUTODESK, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | NO. C 08-04397-WHA |
| DASSAULT SYSTÈMES SOLIDWORKS CORPORATION, a Delaware corporation, | ) ) ) ) ) | |
| Defendant. | ) ) ) ) | San Francisco, California Wednesday December 30, 2009 9:00 a.m. |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**            Morrison & Foerster
                             425 Market Street
                             San Francisco, California  94105-2482
                   **BY:  MICHAEL A. JACOBS**
                        **DAVID E. MELAUGH**
                        **LYNN MARION HUMPHREYS**
                        **JACQUELINE BOS**
                        **DEOK KEUN MATTHEW AHN**

(Appearances continued on next page)

**Reported By:   Lydia Zinn**
**Official Reporter - U.S. District Court (415) 531-6587**

**EXHIBIT D**

1   in the United States.

2         It sounds like there may be a fact dispute about

3   whether these products actually originated in the

4   United States.  I don't dispute that they have salespeople

5   abroad, but it sounds like neither side can say with confidence

6   as to whether the disks are pressed in Concord, Massachusetts,

7   or elsewhere in the United States; but assuming that that's so,

8   I think we have a case under *Ocean Garden* to reach sales of

9   goods made in the United States and then exported abroad.

10         If your Honor has no other questions, I have --

11       **THE COURT:**  No.  That's all.  Thank you.

12       **MR. MELAUGH:**  Thank you.

13       **THE COURT:**  All right.  Let's go to the number two

14   for Autodesk.

15       **MR. JACOBS:**  Your Honor, there are three reasons I

16   wanted to focus on this particular motion.

17         The first is that it struck me, in looking at the

18   papers, that we are in this situation in this case in which we

19   have an administrative procedure in the Patent and Trademark

20   Office that is -- as will not be a surprise to anyone who has

21   litigated cases involving the Patent and Trademark Office --

22   specialized and distinct from the rules that are applicable in

23   this Court.

24         And one of the things that needs to be separated out

25   very carefully as the Court looks at the legal authority each

**EXHIBIT D**

1   side is citing is:   is the authority particularly pertinent to

2   what happens in the trademark -- what's called a Trademark

3   Office on a matter, as opposed to something that would guide

4   the Court's decision-making or the jury's instructions?

5          So, for example, there are procedures for disclaimer

6   in the Patent and Trademark Office and the Trademark Office for

7   disclaiming subject matter; but that's very peculiar to the

8   Trademark Office.  And the statute is quite clear about the

9   legal effect of a disclaimer.  And it struck me, in reading our

10  papers, this is something I wish we had quoted in *haec verba*.

11  So that's why I wanted to argue this motion.

12         Under 15 USC 1056, no disclaimer -- dot, dot, dot --

13  shall prejudice or affect the applicant's or registrant's

14  rights then existing or thereafter arising in a disclaimed

15  matter.

16         So the statute says you can make a disclaimer, and it

17  is completely without prejudice.  So that's the first point in

18  looking at this.  We need to look at what's going on in the

19  Trademark Office versus statutory and court -- statutory and

20  court-made authority governing this proceeding.

21         The second reason to focus on is I wanted to be clear

22  about the kind of the hierarchy of what we seek to exclude

23  here.

24         There is a disclaimer of DWG that Autodesk made in

25  1996 when it sought trademark registrations on DWG combination

**EXHIBIT D**

 1   terms.  We think 15 USC 1056 answers this question, since the

 2   statute says disclaimers should not prejudice you.  They're

 3   done -- in effect, they're done for convenience to address

 4   issues in the Trademark Office.  It would be prejudicial for

 5   the jury to hear that we made a disclaimer in 1996.  It

 6   wouldn't be without prejudice.

 7          If SolidWorks gets to tell the jury they disclaimed

 8   DWG in 1996, how could they now move forward and claim

 9   protectable subject matter?

10          Now, they cite on this point a TTAB case which says

11   in the TTAB, you give the disclaimer effective as of the date,

12   and then you look to see whether the situation changed; but the

13   statute doesn't say that.  In fact, it's very clear.  It says,

14   "then existing."  So this is another example where we need to

15   look -- this is an example of both the first and the second

16   points here.  And the hierarchy -- we don't want the jury to

17   hear about the disclaimer, because it would be prejudicial

18   within the meaning of the statute, and therefore, should be

19   barred.

20          The next thing that we don't want the jury to hear is

21   the decisions of the office actions from the Trademark

22   Examiner.  They want to cite those office actions because the

23   Trademark Examiner took issue with our expert survey, and

24   because the Trademark Examiner took issue with the

25   protectability of DWG, given its role as a file format.

**EXHIBIT D**

```
 1            This we think is based -- this is now -- there's --
 2   this is now basic decisions that you get to make about what the
 3   jury gets to hear about preliminary decisions from
 4   administrative agencies.
 5            Once again, we think it would be highly prejudicial
 6   for the jury to hear something that wasn't fully litigated in
 7   the Trademark Office.  Those proceedings were suspended, so
 8   that we could have court-made and statutory law apply to this
 9   dispute, as opposed to the procedures in the TTAB.
10            They cite some cases.  None of them are about what
11   the jury gets to hear.  They're all about courts deciding
12   preliminary-injunction motions, and taking note of what happened
13   in the Trademark Office in order to -- in order to exculpate
14   the record and make a preliminary-injunction determination or
15   similar kinds of situations in which the Court is referring to
16   what happened in the Trademark Office.  None of it is about
17   what the jury gets to hear.
18            The third component in our sort of hierarchy of what
19   we want to be excluded from the trial is the date that was
20   cited on the trademark applications in 2005.  And the date
21   was -- in 2006.  The date was framed as -- in the applications
22   as early as 2005.
23            The Trademark Office regulations -- and you have to
24   make sure when you're looking this up.  I discovered that
25   you're looking at the latest version.  It specifically allows
```

**EXHIBIT D**

1   you to say, "as early as," and then, when called upon to do so,

2   the applicant may undertake to prove a date earlier than the

3   one stated.

4          So indefinite phraseology of the type described above

5   is not considered to be misleading, because it does give notice

6   that, when called upon to do so, the applicant may undertake to

7   prove a date earlier than the one stated.

8          So that's at 903.06 in the Trademark Manual of

9   Examining Procedures.  So, given that you're allowed to do this

10  in the Trademark Office -- again, it's sort of a convenience to

11  have the jury here.  They said 2005.  It requires the kinds of

12  things I know this Court isn't keen on doing.

13         What -- if this kind of evidence comes in, you're

14  inviting litigants to present experts on Trademark Office

15  regulation and procedure, so that they can put this all in

16  context.  That's like patent-law experts.  And we don't like

17  those testifying in patent cases.

18         Those are the three things that are the most

19  important in this motion.

20         The fact that there were applications; the fact that

21  they're suspended may be confusing, may be necessary background

22  information.  We don't feel as strongly about the

23  precludability, if you will, or the prejudicial effect of those

24  components of this -- of this issue.

25         The third reason I wanted to argue is there's a

**EXHIBIT D**

1   relationship between this issue and another motion.  There kind

2   of fall-back argument is:

3           Well, okay, Autodesk.  We -- even assuming you're

4   right that the statute says what it says and the regulations

5   say what they say, we're entitled to testify to what we saw in

6   2004 when we chose DWGeditor as a trademark.  And what we saw,

7   they would argue, is a disclaimer of DWG, et cetera.  And they

8   would argue that that goes to their lack of willfulness.  The

9   relationship is with the motion *in limine* on advice of counsel.

10          What they want to be able to do is say, So it's very

11  clear.  The record's absolutely clear on that motion that they

12  instructed their only person who did this work --

13  Holly Stratford -- not to answer question after question after

14  question after question.

15          **THE COURT:**  That's not true.  She answered what she

16  looked up at the PTO.

17          **MR. JACOBS:**  Exactly.  That's their out.  They get to

18  say, "Well, here's what she did," but having instructed her not

19  to answer on all of the questions, how do we ask her, "Well,

20  what conclusion did you draw in light of 15 USC 1056, which

21  says that a disclaimer is without prejudice"?  Having

22  instructed her not to answer on the conclusions she draw from

23  that, to now allow her to testify --

24          **THE COURT:**  Is she supposed to testify that she is a

25  lawyer?

**EXHIBIT D**

1          **MR. JACOBS:**  She is a lawyer.

2          **THE COURT:**  Is she supposed to testify that she

3     decided it was okay to go forward, and did so in good faith?

4          **MR. JACOBS:**  She should not, your Honor, because they

5     instructed --

6          **THE COURT:**  I'm asking you:  is that what she's being

7     proposed so say?  I know that you don't want her to, but is

8     that what the proffer is?

9          **MR. JACOBS:**  It's not exactly clear, because the

10    litany of what she's supposed to testify on is very broad, but

11    given the instructions not to answer, I can only imagine when

12    you saw -- when they actually put a question to her, and we

13    showed you the transcript, that you would say, "Well, she can

14    answer what she answered" -- i.e., what steps she took -- but

15    to allow her to testify to what steps she took, and not allow

16    us to probe the conclusions she drew from those steps or to

17    ask -- that's one level what conclusions did you draw?

18          The next level is:  well, did you look at 1056, which

19    says that a disclaimer shall not have legal effect?

20          And if she says, "Yes," well, that's beyond what she

21    said she did before.

22          If she said, "No," I suppose we start to argue to the

23    jury she didn't do all of the steps she should have taken,

24    because she didn't look at the statute.

25          **THE COURT:**  Is good faith an element of the proof

**EXHIBIT D**

```
 1  here?
 2          MR. JACOBS:  Willfulness is an element, your Honor.
 3  They have not sought to negate willfulness with an
 4  advice-of-counsel defense, but they do want to be able to
 5  testify.  And I think this was very calculated.  They do want
 6  to use this as a sword and a shield.  They do want to be able
 7  to say, "Here's what she did.  Jury, draw the inference that
 8  she did her work properly and she's a competent lawyer."
 9          We can't test that because of all of the instructions
10  that they gave.
11          THE COURT:  Let's hear from the other side.
12          MS. PENNYPACKER:  Good morning, your Honor.
13          THE COURT:  Good morning.  Your name, again, is --
14          MS. PENNYPACKER:  Evette Pennypacker.
15          THE COURT:  Okay.  Please go ahead.
16          MS. PENNYPACKER:  Okay.  So Mr. Jacobs actually
17  raises, I think, the pivotal issue for the motion on the PTO
18  materials; and that is Autodesk would like to -- first of all,
19  there are a number of different proceedings taking place in the
20  PTO and in the TTAB that are not raised in Autodesk's motion.
21  And Autodesk would like to be able to refer to all of those
22  proceedings and all of the steps that they have taken in other
23  aspects of the TTAB and the PTO to cancel marks, and to -- and
24  specifically for the Open Design Alliance and for our client,
25  SolidWorks.
```

**EXHIBIT D**

1   **THE COURT:**  You mean the other side is trying to put

2   in before the jury proceedings in the PTO?

3   **MS. PENNYPACKER:**  Yes, your Honor, with respect to

4   other composite marks.  So Autodesk would like to be able to

5   use material that's taking place in the PTO for its own

6   benefit, but then keep out material that they think would be

7   harmful or prejudicial to them.  And that doesn't seem

8   particularly fair.  It also seems that it would be misleading

9   to the --

10  **THE COURT:**  What about the 1056 point:  the

11  disclaimer?

12  Congress itself says it can't be used against them.

13  **MS. PENNYPACKER:**  Well, the disclaimer, your Honor,

14  is not necessarily evidence that they disclaimed the mark.  And

15  that is not how SolidWorks would intend to use that material.

16  It is evidence of how Autodesk was treating the DWG at that

17  time in 1996.

18  It's also evidence of how our client would have

19  viewed what was going on in the Trademark Office at the time.

20  Mr. Jacobs cites to Ms. Stratford.  Holly Stratford

21  was the general counsel of SolidWorks at the time that the

22  first product came out -- DWGeditor -- in 2004.  And, as he

23  noted, she did look at Web sites.  And she did look at the PTO

24  Web site to see what was going on with respect to DWG, to

25  determine whether or not it would be all right to use it.  We

**EXHIBIT D**

1    did allow her to answer questions on all of those issues.

2              We also allowed a 30(b)(6) witness to answer

3    questions on that issue.

4              **THE COURT:**  Wait a minute.  Was she a lawyer?

5              **MS. PENNYPACKER:**  She's a lawyer.

6              **THE COURT:**  Did she know about 1056?

7              **MS. PENNYPACKER:**  I do not know if she knew about

8    1056.

9              **THE COURT:**  What if she had, in fact, in her mind --

10   the record doesn't support this, but it doesn't rule it out,

11   either.  What if she had in mind -- she said, well, I know

12   about 1056.  And I know good and well that this disclaimer is

13   solely for convenience.  And they are not really giving up on

14   DWG; at least, we can't rely upon that as evidence of -- that

15   they're giving up on DWG.

16             Let's say that she expressly told the big wheels at

17   SolidWorks exactly that.  That would be -- that would really

18   hurt your case, but you have concealed it under the cloak of

19   confidentiality.

20             **MS. PENNYPACKER:**  But we did so -- first of all,

21   your Honor, we also allowed a 30(b)(6) witness to answer

22   questions on this topic.  His name is Aaron Kelly.  And that

23   information is before your Honor in this record.

24             **THE COURT:**  What did Aaron Kelly say on this point?

25             **MS. PENNYPACKER:**  That SolidWorks observed what was

**EXHIBIT D**

1   going on in the PTO, looked at Web sites, also looked at

2   third-party use, and, with all of that information, thought

3   that the DWG was okay.

4           So let's say that Ms. Stratford wasn't a lawyer, and

5   she was just another employee who had looked at all of these

6   things.  Whether or not she formed a legal opinion is not

7   really the point.  The point is to show lack of willfulness.

8   You just have to show a good-faith basis.

9           This is also relevant to intent.  Autodesk has

10  vociferously argued that we are copying their mark.  And, in

11  fact, we took steps to see whether or not it was okay to use

12  this:  one of those steps, noticing that many third parties

13  were using the mark in their name, and another step being to

14  look at what was going on in the PTO.  All of that information

15  together is relevant to show a lack of intent to copy, and to

16  try on goodwill.

17          It's also important to note that in this proceeding,

18  that Autodesk would like to keep out -- a lot of the same

19  evidence that was presented to the PTO is being presented in

20  this case as well.  And the PTO proceeding has been

21  characterized as a non-final Offce action; but there were three

22  Office actions from the PTO on a very full record.  The survey

23  with declarations from multiple witnesses -- this wasn't an

24  interim --

25          **THE COURT:**  Well, but that litigation is still going

**EXHIBIT D**

```
 1  on.

 2         MS. PENNYPACKER:  It's suspended.

 3         THE COURT:  Well, it isn't over, right?  They're

 4  waiting to see what happens here.  So -- so how can you say

 5  that any of that stuff is final yet?

 6         MS. PENNYPACKER:  I'm not trying to represent that

 7  it's final, because it's not final; but it isn't as though it's

 8  like the cases that are cited to your Honor where there was

 9  just an interim decision.  There were three decisions in Office

10  actions made by the Examiner that were --

11         THE COURT:  All of which could be overruled yet.

12         MS. PENNYPACKER:  That's true.  And the jury could

13  actually find however it wants.  I mean, that actually cuts

14  towards allowing this information to be given to the jury so

15  that the jury gets a full picture of what's going on between

16  the parties and the PTO, and around the world and in this

17  court.

18         If it's true that strong instruction from the Judge

19  could negate all of the prejudicial issues that Autodesk is

20  raising, you know, we are not arguing that that is a final

21  Offce action, and that should control.

22         What we're saying is this should be allowed in, so

23  the jury has a complete picture of what's going on, and that

24  Autodesk shouldn't be allowed to have some of the information

25  going on in the PTO, and some of it that they don't like out.
```

**EXHIBIT D**

1          I mean, there's another issue, too.  The parties are

2    arguing over who's using DWG first.  So this date of first use

3    is very important.  They say that it is true that in the

4    materials submitted to the PTO, Autodesk said "as early as

5    2005."  That, again, is a piece of evidence that SolidWorks

6    observed, and realized, well, we came out in 2004 with

7    DWGeditor.  They're saying their earliest date of DWG is 2005.

8    That's another piece of evidence into the pile of no intent and

9    no willfulness.

10         **THE COURT:**  I'm sorry.  When did your product come

11   out?

12         **MS. PENNYPACKER:**  2004 was the first one.

13         **THE COURT:**  That is called "DWGeditor"?

14         **MS. PENNYPACKER:**  Correct.

15         **THE COURT:**  And then -- well, but you had already

16   come out with your product by the time they said, "as early as

17   2005."

18         **MS. PENNYPACKER:**  Right.  Additional products came

19   out after that.

20         So the first use date and the disclaimers are

21   relevant also to this issue of who used it first, and the state

22   of mind of SolidWorks and the state of mind of Autodesk on that

23   issue before this litigation.

24         **THE COURT:**  Well, you won't let them go into the full

25   state of mind.  You're hiding behind the attorney-client

**EXHIBIT D**

```
 1   privilege.  And it could be good and well that this lawyer knew
 2   all about the disclaimer statute, and was now trying to be
 3   cute.
 4           MS. PENNYPACKER:  It doesn't -- I don't --
 5           THE COURT:  That bothers me that you're trying to
 6   have it both ways.  You want the jury to think:  oh, a lawyer
 7   looked at it.  It must be okay.
 8           And -- but it's not okay.  Maybe she knew good and
 9   well that you couldn't rely upon that.
10           MS. PENNYPACKER:  So your Honor is concerned that
11   Ms. Stratford viewed the statute and formed an opinion on that,
12   and that's been held back.  I just want to make sure I
13   understand.
14           THE COURT:  Yeah.  That's what I'm concerned about,
15   because you won't let the other side find out if that's true.
16   You've hidden behind the attorney-client privilege, but you
17   want the jury to believe:  oh, it's a lawyer.  The lawyer
18   looked at it.  They acted in good faith.
19           MS. PENNYPACKER:  Mr. Stern is most prepared to talk
20   about the motion on Ms. Stratford.  Can I have him respond?
21           THE COURT:  Fine.  Let's have Mr. Stern respond.
22           MR. STERN:  Just to respond to your Honor's question,
23   Ms. Stratford was not asked this question.  I mean, with
24   respect to the question --
25           THE COURT:  Well, just a second.  Somebody's not
```

**EXHIBIT D**

1    being honest with me, because Mr. Jacobs told me she was asked
2    this question.
3               **MR. STERN:**   -- about the statute.
4               **THE COURT:**   We're going to take a five-minute break.
5               **MR. JACOBS:**   No.  I'm sorry, your Honor.  I didn't
6    represent to the Court that she was asked about 1056.  She was
7    asked what did she do.  She listed several steps.
8               **THE COURT:**   Yes.  You asked that.  That's fair.  What
9    did she do next?
10              And the attorney-client privilege was asserted.  Is
11   that true?
12              **MR. JACOBS:**   Well, what did you do next -- I think
13   the precise form of the instruction was:  she cannot testify as
14   to any advice she gave or conclusions she reached.  She has now
15   testified --
16              **THE COURT:**   Is that true?
17              **MR. JACOBS:**   -- testified everything she did.
18              **THE COURT:**   Is that true?
19              **MR. STERN:**   The record reflects that Ms. Stratford
20   was asked very specific questions.  And one of those questions
21   answered about what she did.
22              **THE COURT:**   All right.  You two will not -- I want
23   you to find it.  We're going to take a five-minute -- I'm tired
24   of the lawyers giving me this.  Find it.  See it.  We'll take a
25   five-minute break.  Come back.  I'll see the exact question.

**EXHIBIT D**

```
 1              (Thereupon, a recess was taken.)

 2         THE COURT:  Did you find the transcript?

 3         MR. STERN:  I have, your Honor.

 4         THE COURT:  Read to me the questions and the answers.

 5         MR. STERN:  This was in opposition to this motion.

 6  I'll use question-and-answer format, as your Honor likes.  I am

 7  starting at page 176, lines 3 through 14.

 8              Question:  What were the results?  You

 9         ran a search on the PTO Web site in

10         connection with the DWGgateway Web site or

11         the DWGgateway product.  What did you come

12         up with?

13              Answer:  My recollection is that I saw

14         at least two old applications from Autodesk

15         for registrations of names that included

16         DWG.  I think one was DWG DWG Unplugged,

17         and one might have been DWG Max or Max DWG,

18         each of which has a specific disclaimer as

19         to the rights in the three letters:  DWG.

20              Question:  What was the nature of the

21         disclaimer?

22              Answer:  I don't remember exactly.  I

23         mean, it's available on the site.

24              Question:  And what did you do?  What

25         else do you recall about the PTO Web site
```

**EXHIBIT D**

```
 1              search, if anything?
 2                   Answer:  Well, you know, I don't recall
 3              specifically, but I know I was looking to
 4              see whether the marks were active or dead.
 5              I can't remember what the answer was.
 6                   And I also saw some other marks that
 7              had DWG; compound marks, essentially, that
 8              had the letters DWG-W-G in them that were
 9              registered; live registered marks.
10                   Question:  Do you recall what those
11              were?
12                   Answer:  I remember at least two:  DWG,
13              and RasterDWG.
14              (Reporter interruption)
15              MR. STERN:  R-a-s-t-e-r DWG.
16                   Question:  What did you determine when
17              you looked at the Autodesk Web site in
18              connection with the DWGgateway?
19                   Answer:  I did not see DWG -- the
20              letters D-W-G -- listed as either a
21              registered trademark or a common law
22              trademark.
23                   Question:  When you say 'common law
24              trademark,' what are you referring to?
25                   Answer:  A trademark asserted by a
```

**EXHIBIT D**

```
1              company that has not been a trademark; a
2              trademark asserted as a trademark, but not
3              registered with the U.S. PTO.
4         I think I've gone beyond the area that you wanted me
5    to talk about, your Honor.  I don't know where I should stop,
6    but the point is on the desk -- on this issue of disclaimer,
7    and I want to make it clear I'm just reading from the
8    transcript.
9         And if Counsel has a different area, I don't see any
10   place --
11        THE COURT:  I'm interested in the part where she said
12   she was -- she was not going to testify about her opinions.
13        MR. STERN:  I'm sorry.
14        THE COURT:  Where she was instructed not to answer.
15   Do you have that, Mr. Jacobs?
16        MR. JACOBS:  Yes, I do, your Honor.
17        THE COURT:  Please read it to me.
18        MR. JACOBS:  Page 162 is really the clearest
19   expression of this.  It's a statement by Ms. Roberts in
20   response to the following.  I'm sorry.  I don't have the
21   previous page; the statement by Ms. Roberts.  I will permit her
22   to testify about the facts of what she did; no advice provided
23   or counsel provided.  Assuming there was an agreement that
24   allows her to get into work product like that does not -- that
25   going -- testifying as to those facts does not waive privilege.
```

**EXHIBIT D**

```
 1  And that was the consistent line that was drawn through the
 2  deposition, your Honor.
 3           MR. STERN:  And --
 4           MR. JACOBS:  I don't think they disputed that in --
 5           MR. STERN:  I don't think we dispute that, either.
 6  That is, your Honor, what Ms. --
 7           THE COURT:  Well, why do you want any of this into
 8  evidence, though?  I thought you said it was to show good
 9  faith.
10           MR. STERN:  It is, in part, to show intent and good
11  faith.
12           THE COURT:  What if she knew?  This was bad faith.
13           MR. STERN:  She was never asked.
14           THE COURT:  What do you mean she wasn't asked?  You
15  told the lawyers.  Mrs. Roberts says, "I won't permit her to
16  testify about what she" --
17           MR. STERN:  We're not offering her.  I want to make
18  it clear, your Honor.  We're not offering her on advice of
19  counsel.  We never have said otherwise.  There's no trickery
20  here.
21           THE COURT:  Well, how could it have been in good
22  faith if she, in fact, knew that the disclaimer statute meant
23  she couldn't rely upon that?
24           MR. STERN:  She was never asked whether she knew
25  that.  No one ever said to her, "Ms. Stratford, did you know
```

**EXHIBIT D**

```
 1  that under Section so-and-so of the United States Code, a

 2  disclaimer has no impact?"  She was never asked the question.

 3          It has nothing to do with advice.  I want to make it

 4  very clear, your Honor.  She answered questions about what she

 5  did.

 6          If she were not a lawyer, your Honor, if she were an

 7  engineer, and we were -- and there's no law that says that the

 8  only person that can testify about a company's intent is a

 9  lawyer.  If we put an engineer up and said, "What did you do,"

10  And the engineer said, "Well, I did these various things.  I

11  went on the Web.  And I checked out to see who was using DWG.

12  And I went on the PTO site, and I saw these things," they would

13  be allowed in.  This wouldn't be an issue.

14          MR. JACOBS:  That's exactly right, but there wouldn't

15  be an instruction not to answer on:  what conclusions did you

16  draw?

17          THE COURT:  Why didn't you ask her if she knew about

18  the statute?  That's not a conclusion.  That's a preliminary

19  fact:  did you know about the statute?

20          MR. JACOBS:  We were instructed over and over again.

21  I've given you the clearest -- that her advice, that the steps

22  of what she did --

23          THE COURT:  Advice?  No, no, no, no.  It said no

24  advice provided or counsel provided.

25          MR. JACOBS:  Correct.
```

**EXHIBIT D**

1          **THE COURT:**  That's not the same thing as:  did she

2    know about the statute.

3          **MR. JACOBS:**  So if she is on the stand under this

4    scenario, we get to ask her, "Did you consider 1056?"  We get

5    to read to her 1056.  Did you incorporate that?  How does this

6    work?  Did you incorporate that into your advice to SolidWorks?

7          We don't get to ask that, but we get to ask what her

8    state of mind was?

9          **THE COURT:**  Well, it would have been better if you

10   had asked the question, so that now we're at -- see, now we're

11   bogged down at:  did you ask the right question at the

12   deposition?  And now you're trying to jump over those hurdles

13   and get me to fix the problem for you by saying, "Well, I'm

14   going to assume that she would not have answered that

15   question."  I don't know how this will work, Mr. Jacobs.  It's

16   a tough problem; but you could have helped the Court out by

17   asking more questions, instead of just rolling over and playing

18   dead when this -- when you got this admonition.

19         **MR. JACOBS:**  There's more, your Honor, in the

20   transcript.

21         **THE COURT:**  Show me where you did ask the question.

22         **MR. JACOBS:**  We didn't ask the statutory question,

23   your Honor.  We were clearly told, "This is what she did.  This

24   is the extent of what she did.  And anything else, you're going

25   to be -- you're going to get an instruction on."  That's point

**EXHIBIT D**

1    number one.

2            Let me change the subject slightly, because there's

3    another aspect to this.  They have withheld on their privilege

4    log Holly Stratford's notes.  She testified in this deposition

5    that she took notes of what she did.  So even on the

6    what-she-did issue, they're claiming privilege over the

7    documentation of what she did; once again, trying to have it

8    both ways.  That can't be right.

9            So having withheld it, and it being a week before

10   trial, we think that what she did, she cannot testify to.

11           If she can testify to it, then I think that, you

12   know, we're again a week before trial.  I think we get to

13   reopen all of this, because we're going to get those notes, and

14   then we're going to see what she did and what she wrote down.

15   And we're going to look at the redactions.  And we're going to

16   be bringing the redactions to your Honor.  They can't have it

17   both ways.

18           **THE COURT:**  You mean you withheld the notes that she

19   took whenever she went on the Web site?

20           **MR. STERN:**  I believe we did withhold her notes; but

21   your Honor, if I could just make --

22           **THE COURT:**  How can that be?  You want the jury to

23   believe she actually did all of this.  She supposedly took

24   notes when she did it.  And you don't want to let the other

25   side have the ability to cross-examine her by showing that

**EXHIBIT D**

```
 1  maybe the notes show she didn't do everything she's claiming
 2  she did now?
 3       MR. STERN:  I understand, your Honor.  Just so that
 4  we're clear, there was never a -- they never moved to compel
 5  the notes.  They never pushed on the notes.
 6       THE COURT:  Why is it on the log?
 7       MR. STERN:  We presumptively put things that may
 8  reflect the advice of counsel, your Honor.
 9       THE COURT:  If it was on the privileged log I'm going
10  to presume it was requested.  Otherwise, there's no point in
11  putting it on a privileged log.  So you withheld it on the
12  ground that it was work product?
13       MR. STERN:  I'm sure.
14       THE COURT:  But you are trying to have it both ways,
15  because if she goes on the Web site and sees disclaimer, and
16  she writes down -- maybe it would help you; I don't know, but
17  maybe, on the other hand, it has some notations there that
18  don't fully support or contradict her story.
19       MR. STERN:  Your Honor, if I understand your Honor,
20  the question that is whether or not -- if the notes had been
21  produced, then this wouldn't be an issue.
22       THE COURT:  No.  It's -- if the notes had been
23  produced, it would be less of an issue.  It's just like
24  Mr. Jacobs should have asked the right question.  And it's just
25  like you trying to hold back more than you're entitled to hold
```

**EXHIBIT D**

```
 1   back.  And there's more to the problem than -- that's not the
 2   full solution.  That's not what I'm saying.
 3          MR. STERN:  Your Honor, the point that we're trying
 4   to make is this; is that there must be -- again, getting back
 5   to the engineer example, there may be a way by which a company
 6   can do certain things.  And again, in the capacity not as a
 7   lawyer -- I'm not suggesting that Holly Stratford wasn't a
 8   lawyer.
 9          THE COURT:  If you're going to use her as good faith,
10   I think it's a waiver.  That's what I think.  If she's the one
11   who did the homework, and you're going to be presenting her as
12   the one, then then she's wearing two hats.  Well, it's too fine
13   a point to make.  I think there's a waiver.  And you've got to
14   let it all hang out, and let the jury know everything that she
15   said to the client.  That's what I think.
16          MR. STERN:  So I understand, if your Honor is saying
17   that essentially if -- because she's a lawyer --
18          THE COURT:  No.  You don't have to present her at
19   all.
20          MR. STERN:  I understand.
21          THE COURT:  You're the one that wants the jury to
22   think that your client acted in good faith.  And you want her
23   to be the one to get up and showcase:  I'm a lawyer.  I went on
24   the Web site.  I did all this.  I thought it was okay.
25          That's what you want the jury to hear.
```

**EXHIBIT D**

```
 1              Then Mr. Jacobs gets up, and he wants to say, "Okay.
 2   You're a lawyer.  Didn't you know about 1056?  Didn't you
 3   consider that?"  Attorney-client privilege --
 4          MR. STERN:  And that's --
 5          THE COURT:  You know, I have half of a mind to let
 6   Mr. Jacobs do exactly that.  You know, Mr. Stern, you're too
 7   good a lawyer.  A jury would hate you for that.  They would
 8   say, "Mr. Stern is trying to trick us."
 9          MR. STERN:  Your Honor, first of all, I have just
10   been advised.  I want to tell you what I've been advised.  We
11   never withheld -- the notes that were withheld didn't have to
12   do with the extent to which -- the search she did.  So I'm
13   being told that now.
14          THE COURT:  All right.
15          MR. STERN:  Point number one.
16              Point number two is, your Honor, why isn't that the
17   solution?  If Mr. Jacobs wants to turn to her and cross-examine
18   her and say, "Were you aware of this statute?  Were you aware
19   of this," why isn't that the solution?
20              We're not trying to put a bubble around her and say
21   that she's immune from cross-examination.
22              What we're trying to do is, again, using the engineer
23   example, if this were not a lawyer that was doing this, and
24   just someone who had just done this, they had gone to the Web,
25   they had done these sorts of things, why would it not be
```

**EXHIBIT D**

1   evidence of good faith?

2          **THE COURT:**  Because you would then take it all the

3   way through to -- you would say, all right.  Then afterwards

4   you decided to make the product.  You thought it was free and

5   clear.

6          Did anyone ever give you any contrary advice?

7          Let's say that the lawyer had, in fact, given

8   contrary advice.

9          You can't invoke good faith in -- in the face of an

10  opinion by a lawyer that says it's not good faith.

11         **MR. STERN:**  We're not putting her opinion.

12         Second point, your Honor, just so we're clear --

13         **THE COURT:**  You're trying to leave the impression

14  with the jury that she's a lawyer, and thought it was okay.

15         **MR. STERN:**  Well, what we wanted to do was make clear

16  that -- we wanted to make clear what she had done, which we

17  weren't hiding the ball on at all; but the fact is, obviously,

18  we didn't want to rely on advice of counsel, because of the

19  waiver that does result from that.  And we're not trying to

20  have it both ways.

21         **THE COURT:**  You don't want to rely on th advice of

22  counsel formally.  That's the effect of what you want to do.

23  You want to say that Ms. Stratford was a lawyer.  She looked it

24  all up.  She acted in good faith.  They went ahead.  End of

25  story.

**EXHIBIT D**

```
 1              Now maybe, in fact, she did think her professional
 2   opinion was it was okay, possibly.  Possibly, she thought it
 3   was not okay.  And possibly, it's somewhere in between; but
 4   there are variations on this story that are cloaked now, being
 5   hidden under the veil of secrecy, that you don't want the jury
 6   to know.  You want the side that helps you, but not the part
 7   that hurts you, possibly.  That bothers me.  And I'm not sure
 8   that this ought to -- we ought to even get into any of this.
 9              All right.  I'm ready to rule.  Have a seat,
10   Mr. Jacobs.
11         MR. JACOBS:  Can I just clarify on the notes issue?
12         THE COURT:  Yes.
13         MR. JACOBS:  Let's my cite the passage of the
14   deposition relying on in the materials to you.
15         THE COURT:  Why don't you just bring it up?  You read
16   it into the record.
17         MR. JACOBS:  Okay.
18         THE COURT:  And I want you to hand it up to me so
19   that I can see it.
20         MR. JACOBS:  She has answered the question what she
21   did at page 163 at the top, at line 2.
22              I searched the trademark -- registered trademark
23   database up to the Internet.
24              So she lists what she does.  Then at line 8,
25              Question:  Did you create any written
```

**EXHIBIT D**

```
 1              record of any of these activities?
 2                  Answer:  Not at that time.
 3                  Question:  Did you at some later point
 4              create a written record of these
 5              activities?
 6                  Answer:  I did.
 7                  Question:  What is that written record?
 8                  Answer:  What is it?
 9                  Question:  What is it?  What form does
10              it take?
11                  Answer:  It's a bunch of notes to
12              myself.
13                  Question:  Notes on the things that you
14              did to search for -- what sort of notes are
15              they?
16                  Answer:  Notes of what it encompassed;
17              many things, including what I just
18              testified to.
19                  Question:  Namely, the searches that
20              you did in connection with the DWGeditor?
21                  Answer:  Yes.
22                  Question:  What is else is covered in
23              those notes?
24                  MS. ROBERTS:  I'll object as
25              privileged, and instruct not to answer.
```

**EXHIBIT D**

```
 1              I don't know what else is in those notes.
 2         THE WITNESS:  I won't answer.
 3              Question:  Where are those notes
 4         presently?
 5              Answer:  On a network drive at
 6         SolidWorks, possibly printed out in hard
 7         copy in a folder at the office that I use
 8         occasionally at SolidWorks.
 9              Question:  Are those handwritten notes,
10         or are they in --
11              Answer:  Electronic.
12              Question:  Electronic, like a Word
13         document?
14              Answer:  Yes.
15         She goes on and describes when she took the notes, et
16    cetera.  So that's what we're referring to.  Those notes were
17    not used.
18         THE COURT:  All right, did you request those notes?
19         MR. JACOBS:  We -- it would have been embraced for
20    sure in a document request concerning DWGeditor, et cetera.
21         THE COURT:  All right.  All right.  So, Mr. Stern,
22    since the privilege was not invoked as to these, you should
23    have produced them.  You just got through telling me that the
24    privilege log did not include these.
25         THE COURT:  You were referring to something else.  So
```

**EXHIBIT D**

1  you didn't invoke the privilege timely, and they should have

2  been produced.

3          **MR. STERN:**  Your Honor, again, I don't want to make

4  any representation.  I don't know about these particular notes.

5          **THE COURT:**  Now you're going the other way.  Now,

6  see, you've got yourself in some trouble by telling you that

7  you -- Mr. Jacobs this time asked the right question.  It is

8  clear as a bell on that testimony that those notes existed.

9  Why weren't they produced?  I want to know the answer.

10          **MR. STERN:**  I can't answer, your Honor.

11          I can say this is.  If someone reviewed them, I know

12  that we reviewed documents for -- with the client.  If they

13  were we withheld, it was because someone drew the conclusion

14  that they were privileged, and they must have had information

15  to assume that that was the case, or specifically informed them

16  that that was the case.

17          **THE COURT:**  All right.  Both of you have a seat.

18          Here's the answer.  The answer is this.  None of this

19  is going to come into evidence yet.  No reference will be made

20  to any of this in the opening statement.

21          Mr. Stern, I'm telling you:  in the opening

22  statement, do not get into this.

23          Anyway, this is part of your defense case.  You don't

24  have to get into any of this on the plaintiff's case.

25          We're going to have an evidentiary hearing at which

**EXHIBIT D**

1   she's going to testify, and I want those notes present.

2   They'll be out of the presence of the jury.  Possibly by the

3   time your case comes along, I will allow her to testify to some

4   of this.  I don't know.  I'm going to find out.

5          And in the meantime, maybe you'd better be making a

6   decision whether you want to continue to try to have it both

7   ways.

8          So while the trial is under way, we will some day

9   schedule a one-hour evidentiary hearing.  She's going to

10  testify.  I want to see those notes *in camera*.

11         There will be no reference to anything in the PTO.

12         Now, here's a problem you had, Mr. Jacobs.  And if --

13  and if you're trying to have it both ways and be too cute on

14  this, then I will be upset.  First question the jury's going to

15  ask to themselves:  where is the registration?  Where is the

16  registration on this?  If the plaintiff thinks this is so hot,

17  how come they don't have a registration?

18         What are you going to say in your opening statement

19  on that?

20         **MR. JACOBS:**  I'm going to say, your Honor, this is an

21  unregistered -- I'm going to say to the jury, your Honor, "This

22  is an unregistered trademark.  Under the trademark law, an

23  unregistered trademark can be valid.  That's something you get

24  to decide."

25         **THE COURT:**  And then they go into the jury room and

**EXHIBIT D**

### CERTIFICATE OF REPORTER

        We, the undersigned official reporters for the United States District Court, Northern District of California, hereby certify that the foregoing proceedings in C. 08-04397-WHA, Autodesk, Inc., v. Dassault Systèmes SolidWorks Corporation, were reported by us, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete, and true record of said proceedings as bound by us at the time of filing.

    The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


    _____

        /s/ Lydia Zinn, CSR 9223, RPR, FCRR


        Thursday, December 31, 2009


*Lydia Zinn, CSR, RPR*
*Official Reporter - U.S. District Court*
*(415) 531-6587*

**EXHIBIT D**