KEKER & VAN NEST LLP
ROBERT A. VAN NEST - #84065
rvannest@kvn.com
CHRISTA M. ANDERSON - #184325
canderson@kvn.com
DANIEL PURCELL - #191424
dpurcell@kvn.com
633 Battery Street
San Francisco, CA  94111-1809
Telephone:    415.391.5400
Facsimile:    415.397.7188

KING & SPALDING LLP
SCOTT T. WEINGAERTNER (*Pro Hac Vice*)
sweingaertner@kslaw.com
ROBERT F. PERRY
rperry@kslaw.com
BRUCE W. BABER (*Pro Hac Vice*)
1185 Avenue of the Americas
New York, NY  10036
Telephone:    212.556.2100
Facsimile:    212.556.2222

KING & SPALDING LLP
DONALD F. ZIMMER, JR. - #112279
fzimmer@kslaw.com
CHERYL A. SABNIS - #224323
csabnis@kslaw.com
101 Second St., Suite 2300
San Francisco, CA  94105
Telephone:    415.318.1200
Facsimile:    415.318.1300

IAN C. BALLON - #141819
ballon@gtlaw.com
HEATHER MEEKER - #172148
meekerh@gtlaw.com
GREENBERG TRAURIG, LLP
1900 University Avenue
East Palo Alto, CA 94303
Telephone:    650.328.8500
Facsimile:    650.328.8508

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>                              Plaintiff,<br><br>    v.<br><br>GOOGLE INC.,<br><br>                              Defendant. | Case No. 3:10-cv-03561-WHA<br><br>**GOOGLE'S TRIAL BRIEF**<br><br>Judge:      Hon. William Alsup<br><br>Date Comp. Filed:      October 27, 2010<br><br>Trial Date:      October 31, 2011 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................1

II.    RELEVANT FACTUAL BACKGROUND .................................................3

III.    LEGAL AND FACTUAL ISSUES TO BE TRIED....................................7

    A.    Oracle will not prevail on its patent infringement claims.....................7

        1.    The '476 patent ...............................................8

        2.    The '720 patent ...............................................9

        3.    The '205 patent ...............................................10

        4.    The '104 patent ...............................................10

        5.    The '520 patent ...............................................11

        6.    The '702 patent ...............................................12

    B.    Oracle will not prevail on its copyright infringement claim.................12

    C.    Google will prevail on its defenses of estoppel, waiver, laches, and implied license. .........................................15

    D.    Even if it could prove liability, Oracle would not be entitled to substantial damages. ...................................17

    E.    Oracle's willfulness case is a fiction................................20

    F.    No matter what, Oracle will not be entitled to an injunction................21

IV.    CASE MANAGEMENT ISSUES ........................................................24

# TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*
   960 F.2d 1020 (Fed. Cir. 1992) ................................................................24

*Akamai Techs., Inc. v. Limelight Networks, Inc.*
   2008 WL 364401 (D. Mass. Feb. 8, 2008) ..............................................25

*Banco Industrial de Venezuela v. Credit Suisse*
   99 F.3d 1045 (11th Cir. 1996) ..................................................................25

*Board of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Palladium*
   *Equity Partners, LLC*
   722 F. Supp. 2d 845 (E.D. Mich. 2010)...................................................26

*Brandon v. D.R. Horton, Inc.*
   07CV1256 J (POR), 2008 WL 2096883 (S.D. Cal. May 16, 2008) ..........26

*Cedarapids, Inc. v. CMI Corp.*
   1999 WL 33656876 (N.D. Iowa 1999) .....................................................24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
   509 U.S. 579 (1993) ..................................................................................19

*eBay, Inc. v. MercExchange, LLC*
   547 U.S. 388 (2006)..............................................................21, 22, 23, 24

*F.C. Cycles Intern., Inc. v. Fila Sport, S.p.A.*
   184 F.R.D. 64 (D. Md. 1998) ....................................................................26

*Figgie Int'l, Inc. v. Wilson Sporting Goods Co.*
   1987 WL 13574 (N.D. Ill. 1987) ...............................................................24

*Global-Tech Appliances, Inc. v. SEB S.A.*
   131 S. Ct. 2060 (2011) ................................................................................8

*i4i Ltd. P'ship v. Microsoft Corp.*
   598 F.3d 831 (Fed. Cir. 2010) ..................................................................22

*Lotus Dev. Corp. v. Borland Int'l, Inc.*
   49 F.3d 807 (1st Cir. 1995), *aff'd by an evenly divided court*, 516 U.S.
   233 (1996) ..................................................................................................14

*McKesson Information Solutions LLC v. Trizetto Group, Inc.*
   2006 WL 940543 (D. Del. Apr. 11, 2006) ................................................25

*Mitel, Inc. v. Iqtel, Inc.*
   124 F.3d 1366 (10th Cir. 1997) ................................................................14

*Newton v. Diamond*
   388 F.3d 1189 (9th Cir. 2004) ..................................................................15

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*
   575 F.2d 1152 (6th Cir. 1978) ..................................................................19

*Perfect 10, Inc. v. Google Inc.*
   653 F.3d 976 (9th Cir. 2011) ..........................................................5, 21, 24

*Qualcomm Inc. v. Broadcom Corp.*
   548 F.3d 1004 (Fed. Cir. 2008) ................................................................24

ii

582688.04

1

### TABLE OF AUTHORITIES
(cont'd)

2

Page(s)

3

*Sega Enterprises Ltd. v. Accolade, Inc.*
977 F.2d 1510 (9th Cir. 1992) .......................................................................................13

4

*Sony Computer Entm't, Inc. v. Connectix Corp.*
203 F.3d 596 (9th Cir. 2000) ........................................................................................14

5

*Starr Int'l Co. v. Am. Int'l Group, Inc.*
623 F. Supp. 2d 497 (S.D.N.Y. 2009) ..........................................................................24

6

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*
749 F. Supp. 2d 542 (E.D. Ky. 2010) ...........................................................................24

7

*Wang Labs., Inc. v. Mitsubishi Elecs. America, Inc.*
103 F.3d 1571 (Fed. Cir. 1997) ....................................................................................24

8

*WeddingChannel.Com, Inc. v. The Knot, Inc.*
2004 WL 2984305 (S.D.N.Y. Dec. 23, 2004) ..............................................................25

9

### Federal Statutes

10

35 U.S.C. § 101 ..................................................................................................................8

11

35 U.S.C. § 102(b) .......................................................................................................9, 13

12

35 U.S.C. § 251 ................................................................................................................11

13

### Other Authorities

14

Mitchell Patent Report ¶¶ 73, 80 .....................................................................................8, 9

15

PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT § 10.5.1 (3d ed. 2011)...........................14

16

.17

18

19

20

21

22

23

24

25

26

27

28

582688.04

1        **I.    INTRODUCTION**

2            This lawsuit is an attempt to obtain through the courts what the company formerly known

3    as Sun Microsystems (and now called "Oracle America") failed for years to achieve through

4    innovation, negotiation, or even costly corporate acquisitions—a viable path to competing in the

5    mobile computing market.  Oracle missed that boat and now wants the benefit of Google's

6    initiative and hard work, both on its own and with numerous partners.  Oracle's lawsuit targeting

7    Google's Android mobile operating platform rests on three equally rickety legs.

8            *Patent infringement.*  Although it is still unclear how many, or which, patent claims will

9    actually be tried, Oracle currently asserts that Google infringes 26 claims of six patents.  Oracle

10    alleges that the claimed inventions improve the performance and security of Android's Dalvik

11    virtual machine.  However many claims Oracle ultimately tries, either Oracle will fail to prove

12    that Google infringes or Google will prove those claims invalid.

13            *Copyright infringement.*  The two bases of Oracle's copyright infringement claim are (1)

14    Google's inclusion in Android of code libraries supporting core Java-language application

15    programming interfaces ("APIs") that Oracle and its expert agree are "fundamental to the design

16    of the Java language" and "functionally necessary" to make use of that language; and (2) a

17    handful of small portions of trivial code and comments, which Oracle alleges were directly

18    copied.  But the APIs are not copyrightable as a matter of law.  They are purely functional

19    mechanisms that facilitate use and preparation of code written in the Java language.  The Court

20    has already ruled that the short phrases comprising the names and "method signatures" of APIs

21    are not copyrightable.  Even if some aspect of the APIs were copyrightable, Google's inclusion

22    in Android of the libraries that implement those APIs would be fair use, because the APIs are

23    essential for compatibility and interoperability between Android and Java-language applications.

24    Only nine lines of allegedly copied code was even enabled on Android devices, and all the

25    allegedly copied code either has already been removed or disabled, or will be removed from the

26    imminent next release of the Android software.

27            Even if Oracle's infringement claims had merit (and they don't), it would be inequitable

28    to hold Google liable given the fact that Sun knew all along that Google was developing

1

1   Android, including the Dalvik virtual machine Oracle now claims is infringing.  Despite this, for

2   four years after breaking off its partnership negotiations with Google in 2006, Sun not only never

3   suggested Google was infringing any Sun intellectual property, it went out of its way to publicly

4   praise Android as the best thing ever to happen to its moribund Java platform.  Sun had a public

5   position of never using its patents offensively, and made numerous public statements that APIs

6   were not copyrightable.  When it acquired Sun, even Oracle publicly praised Android.  Only

7   when Oracle concluded it lacked the engineering skill to build its own "Java phone" did it choose

8   Plan B—this lawsuit.  Oracle's statements and acts should defeat liability.

9          *Damages*.  Even if Oracle could prove liability on some of its claims and overcome the

10  equitable defenses just discussed, it would not be entitled to significant damages.  Oracle's

11  expert, Dr. Iain Cockburn, insists Oracle is entitled to $404.9 million in damages for infringing

12  the six patents-in-suit, even though in 2006—before Android became a runaway success—Sun

13  offered Google full rights to what Oracle now claims is a portfolio of approximately *2,000* Java-

14  related patents for *just $28 million over three years*.  The features of the Dalvik virtual machine

15  that allegedly infringe the patents-in-suit are hardly essential to Android; most of them were

16  either not incorporated or not enabled in most releases of Android.  Oracle admitted in discovery

17  responses that none of those features was essential to Sun's own Java virtual machine, either.

18         Cockburn goes on to tentatively opine that Oracle is entitled to as much as $2.3 billion in

19  copyright damages, even though Sun's modest $28 million demand would have included a

20  copyright license as well.  Cockburn arrives at this massive figure by crediting the Sun

21  copyrights at issue with 100% of Android's advertising and applications revenue, and by

22  awarding Sun lost profits that it never could have earned given its inability to develop

23  commercially successful Java-related products.  For years before Android's release, Sun had the

24  opportunity to fill a yawning market void by releasing an Android-like mobile operating

25  platform.  It never did, for reasons having nothing to do with Google.  Even after Android was

26  announced, Sun tried and failed to develop a product to complement Android.  Cockburn inflates

27  his opinions about the supposed value of the infringing features with a flawed econometric

28  model and a rigged consumer study that assumed the conclusions that Cockburn wished to draw.

2

582688.04

1  If Oracle is entitled to any damages at all, that amount is closer to $50 million than billions.

2      Much has been said and written about this lawsuit; but in the end, all Oracle will prove is

3  that eleventh-hour threats and delayed litigation are no substitute for innovation.

4      ## II.      RELEVANT FACTUAL BACKGROUND

5      In 2005, Google acquired a small company called Android, Inc., intending to develop the

6  world's first free, open, and complete (*i.e.*, "full stack") operating platform for mobile devices.

7  Google believed that such a platform would be customizable and adaptable and would appeal to

8  device manufacturers.  Eventually Google's idea would become the Android platform.  In 2005,

9  Google knew that it needed to partner with other market participants to develop Android—and

10  that attracting more partners would boost Android's chances of success.  With that goal in mind,

11  Google entered into talks with numerous companies, including the plaintiff in this lawsuit, Sun—

12  the company later purchased by Oracle Corporation and renamed "Oracle America."

13      Google considered partnering with Sun because of Sun's experience developing the free

14  and open Java programming language and implementing "Java virtual machines" that enabled

15  Java-language applications to run on various kinds of hardware.  But Sun had never previously

16  attempted to develop a full stack mobile operating platform—an underlying operating system,

17  middleware, and applications, all working together.  Sun's business and expertise was limited to

18  middleware running on a given operating system and enabling third-party applications to work.

19      Not only did Sun's expertise provide only part of what Google needed, Google had other

20  options.  Whether or not it worked with Sun, Google could have used the freely available Java

21  language.  Google also seriously considered other languages, like C or C++.  Those languages

22  would have made Android speedier, but possibly less flexible than a Java-based system.

23      Google's discussions with Sun from late 2005 to April 2006 were not negotiations for an

24  intellectual-property license.  The deal that they discussed would have given both parties much

25  more—a partnership role in developing a new mobile platform; the ability to realize profits from

26  that platform as each of them saw fit; and access to each other's technology and personnel, ***in***

27  ***addition to*** a cross-license to some of each other's intellectual property.  The license component

28  alone would have given Sun the right to use substantial Google intellectual property, and would

582688.04

have allowed Google to use the approximately 2,000 patents Oracle now contends relate to Java, not to mention all the Java-related copyrights and the trademarked Java brand—which Sun had always treated as the crown jewel of its Java holdings.  Sun had a long-standing, publicly announced policy of using its patents only defensively, but was willing to go to court to prevent unauthorized use of the JAVA trademark or the ubiquitous Java coffee-cup logo.

By the end of April 2006, though other terms of their partnership remained unsettled, Sun had agreed to accept a payment from Google of $28 million over three years to compensate Sun for the risk of lost licensing revenue that might result from an open source Android platform. ■

[black redaction bars spanning lines 9 through 22]

---

[1] OAGOOGLE0001338193 (April 18, 2006 email).

[2] GOOGLE-01-0056549-50.

[3] Cockburn Report at 84 & ¶ 215.

[4] GOOGLE-12-00080359.

[5] OAGOOGLE0000358175.

[6] OAGOOGLE0000358175.

[7] Schwartz Dep. at 111:17-20 & Gupta Dep. at 225:20-226:20.

1    At that point, negotiations broke down over issues unrelated to money. Both Google and

2  Sun wanted greater control over Android's development, with Google wanting to make the

3  platform more open and Sun wanting restrictions that Google viewed as incompatible with open

4  source. Another cause of the breakdown, according to Gupta, was that Sun (without telling

5  Gupta or formally asserting infringement) brought to Google's attention certain patents unrelated

6  to Android or the current lawsuit. But there is no dispute that, had these other issues been

7  worked out, Sun would have been willing to partner with Google on Android for $28 million.

8  ████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████

10    After negotiations broke off, Google continued to develop Android with assistance from

11  numerous other companies that made up the Open Handset Alliance. Google and the OHA used

12  the freely available Java language and other open source materials, but avoided any proprietary

13  Sun technology. The Android engineering team used some open source code from existing

14  sources (including Java language API libraries available from the Apache Software Foundation

15  under an open source license) and wrote some all-new code. For the bottom layer of its stack,

16  the core operating system, Google used the open source Linux kernel. For the middleware layer,

17  rather than using Sun's proprietary Java virtual machine, it designed its own "Dalvik" virtual

18  machine, which can execute programs written in Java and other languages. (Google engineer

19  Dan Bornstein took name "Dalvik" from a village on the north coast of Iceland.) Google made

20  sure that no former Sun employees worked on Dalvik during its initial development.

21    During the 18 months between the end of negotiations with Google and Google's public

22  announcement of Android in November 2007, Sun knew that Google was continuing to develop

23  Android without Sun's help, including by designing the Dalvik virtual machine that Oracle now

24  accuses of infringing its patents. But Sun never suggested that Google was infringing, insisted

25  that Google needed to take a license before it could release Android, or identified any specific

26  patents or copyrights to Google. Sun occasionally talked to Google about ways that Sun might

27  join the Android ecosystem, but there were no further partnership or licensing discussions.

28

---

[8]  Schwartz Dep. at 111:21-112:1.

582688.04

1    When Google publicly announced Android in November 2007, Sun didn't file a lawsuit;

2  it didn't publicly condemn Android for having violated Sun's rights; it never even challenged

3  Google privately or demanded that Google take some sort of license.  Just the opposite: Sun

4  publicly and enthusiastically *supported* Android.  Schwartz congratulated Google in a blog post

5  for having "just strapped another set of rockets to the [Java] community's momentum—and to

6  the vision defining opportunity across our (and other) planets."[9]  Schwartz and Sun perceived

7  Android as an opportunity to revive the application developer community's interest in Java and

8  thus create more business opportunities for Sun.  Sun had no confidence in its own ability to get

9  a Java-based mobile handset to market.[10]  In fact, Sun had seen multiple, independent Android-

10  related projects end in failure. ████████████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████

13  ███████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  █████████████████████████████████████████████████████████████

16  ███████████████████████████████████████████████

17    For over two years, Google continued to develop Android while relying on Sun's public

18  praise for the platform.  In October 2008, Google released Android as free, open source software.

19  Although Android offered a good variety of applications from the start, growth of the platform

20  was initially slow. █████████████████████████████████████████████

21  ████████████████  Android really took off when it manufacturers of popular handsets began

22  to adopt it, starting with the release of the Motorola Droid in November 2009.  Since then,

23  Android has grown steadily into one of the most popular smartphone platforms in the world.

24    In early 2009, Oracle confirmed that it was negotiating to buy Sun.  That deal closed on

25  January 27, 2010, with Oracle paying a reported $7.4 billion for Sun and all its assets. ██████

---

[9]  GOOGLE-00-00000512.

[10]  Schwartz Dep. at 157.

[11]  *Id.* at 106-07.

GOOGLE'S TRIAL BRIEF
Case No. 3:10-cv-03561-WHA

582688.04

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████   Only when that didn't bear fruit did Oracle, for the first time, begin rattling its litigation saber at Google.  Oracle began suggesting to Google that Android infringed some of Sun's (now Oracle's) Java-related intellectual property.  But even then, Oracle remained frustratingly vague, refusing to identify what component of Android infringed what Oracle intellectual property.  After years of assurances and even encouragement from Sun, Oracle's contentions made no sense and Google therefore asked Oracle to specifically explain the basis of its infringement claims.  But Oracle refused to offer any details.

It was not until July 20, 2010—almost three years after the release of Android's Software Development Kit and Schwartz's congratulatory blog post—that Oracle finally supplied details about its infringement assertions.  Only then did Google hear for the first time a specific claim that a particular aspect of Android infringed an identified patent claim.  Oracle filed this lawsuit less than a month later, on August 12, 2010.

### III.   LEGAL AND FACTUAL ISSUES TO BE TRIED

**A.   Oracle will not prevail on its patent infringement claims.**

Oracle argues that Android's Dalvik virtual machine and the Dalvik VM's supporting set of core libraries, which are used to run applications on Android devices, practice the asserted claims of the six patents-in-suit.[12]  Critically, to prove the bulk of its patent infringement case, Oracle must rely on proof of acts by third parties, not Google.  Oracle's direct infringement case includes occasional uses of accused devices and methods by Google employees and a minuscule number of Android phones Google once manufactured, but Google no longer makes any phones. It does not sell, and has never sold, the Android software.  Accordingly, Oracle's patent case rests almost entirely on claims for contributory or induced infringement.  To win on those

---

[12]  U.S. Patent Nos. 6,192,476 (the '476 patent), 5,966,702 (the '702 patent), 7,426,720 (the '720 patent), RE 38,104 (the '104 patent), 6,910,205 (the '205 patent) & 6,061,520 (the '520 patent).

582688.04

1    claims, Oracle must prove direct infringement by third parties *plus* contributory infringement or

2    inducement by Google.  To prove Google contributed to or induced infringement of another,

3    Oracle will have to show that Google had knowledge "of the existence of the patent that is

4    infringed."[13]  Oracle, which steadfastly refused to notify Google of any allegedly relevant patents

5    until July 20, 2010—three weeks before filing suit—will not be able to make that showing.

6         Even if it could get over that hurdle, Oracle's infringement case will fail because it rests

7    on several false premises.  Oracle first mischaracterizes Google's Dalvik VM as a Java VM,

8    when the Dalvik VM was created independently by Google engineers without reference to any

9    proprietary Sun materials.  Oracle's infringement theories also improperly alter claim terms—

10   expanding or narrowing them depending on which construction favors Oracle at any given

11   time—and ignore relevant intrinsic evidence.  Just as important, each of the patents-in-suit is

12   invalid over prior art that clearly discloses all the core concepts and techniques claimed, most

13   notably the virtual machine concept, which was known and had been used for decades prior to its

14   use at Sun.  And several of the asserted claims attempt to cover non-patentable subject matter—

15   transitory propagating signals—and are thus invalid under 35 U.S.C. § 101. As the Court knows,

16   the U.S. Patent and Trademark Office ("PTO") granted Google's requests for reexamination of

17   all six patents-in-suit.  Thus far the PTO has preliminarily rejected every asserted claim of four

18   of the patents-in-suit, with a preliminary ruling on a fifth patent still to come.

19        **1.    The '476 patent**

20        The '476 patent relates to the security protocol for the Java ME platform.  It purports to

21   implement the "AccessController" class, which checks the "ProtectionDomain" class to

22   determine whether .class files should be given permission to perform a particular action.  Oracle

23   has no basis for even asserting this patent against Google, since the accused functionality is not

24   currently implemented in any accused product.

25        Oracle's own infringement expert, Dr. John Mitchell, admitted in his report that Google

26   has *never* implemented the accused functionality disclosed in the '476 patents.[14]  Mitchell even

27   _____

28   [13]  *Global-Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060, 2068 (2011).

     [14]  Mitchell Patent Report ¶¶ 73, 80 ("If Google chooses to provide fine-grained security," "the

1    concedes that Google's security implementation is "not comparable" to the alleged inventions in

2    the '476 patent.[15]   Although Oracle claims that this patent enhances security, the very code that

3    Dr. Mitchell identifies as infringing explicitly warns the user that it does **not** provide a secure

4    environment—in other words, that it does not do what the patent claims.[16]   In any event, the code

5    that Dr. Mitchell claims infringes the '476 patent is vestigial.  It was never actually implemented,

6    and either has been disabled and/or removed or will be removed in the next Android release.[17]

7            Moreover, the '476 patent is invalid because it is anticipated by Fischer, which describes

8    a security framework that maps onto the claims of that patent.  Although the PTO reviewed the

9    Fischer reference during the original examination, on reexamination the PTO issued an initial

10   rejection of all claims as anticipated by Fischer, under 35 U.S.C. § 102(b).

11           **2.     The '720 patent**

12           The '720 patent discloses a system and method for creating a clone of a virtual machine

13   by preloading classes identified during runtime and using copy-on-write functionality provided

14   by the underlying operating system.[18]   Google does not infringe for at least two reasons.

15           *First*, Android does not "dynamically preload" classes.  Its class preloader is "static," not

16   "dynamic," because it **always** preloads the **same** classes when it clones a child virtual machine.

17   It does not determine which classes should be preloaded at runtime, as the '720 patent requires.

18           *Second*, Android does not contain a "class preloader to obtain a representation of at least

19   one class from a source definition provided as object-oriented program code."  This claim

20   element requires that source code be compiled during runtime, but Android is not capable of

21   runtime source-code compilation.  Instead, all source compilation takes place at development

22   time (when an application is created), not on the Android device.

23   _____

24   best known approach" is the one in the '476 patent); *id.* ¶ 141 (If "Google aims to implement a
     sound security framework, the Java security patents would be essential to achieving that goal.").

25   [15]  *Id.* ¶ 140.

26   [16]  *Id.* ¶ 680 ("Warning: security managers do not provide a security environment for executing
     untrusted code.  Untrusted code cannot be safely isolated within the Dalvik VM.").

27   [17]  Bornstein 30(b)(6) Dep. at 111:23–112:18.

28   [18]  Copy-on-write uses references to memory locations until one of the processes accesses the
     data at that memory location.  This effectively delays the need to copy data up front.

GOOGLE'S TRIAL BRIEF
Case No. 3:10-cv-03561-WHA

1         Oracle wrongly argues that the claims of the '720 patent require only runtime preloading
2  of previously compiled classes using copy-on-write functionality.  This not only contradicts the
3  patent language, it would invalidate the patent, which was issued over prior art **only because** Sun
4  distinguished copy-on-write functionality, which had been well-known in the prior art for years.
5  Again, the PTO agrees—it has issued an initial office action invalidating the claims.

6     **3.**    **The '205 patent**

7         The '205 patent concerns a method for creating and executing, **_at runtime_**, new virtual
8  machine instructions that reference native machine-code instructions.

9         Oracle has two infringement theories, neither of which has merit.

10        _First_, Oracle claims Android's just-in-time functionality infringes.  But that functionality
11  does not "generate … a new virtual machine instruction," as the asserted claims require.  Even
12  Oracle's expert Dr. Mitchell agrees, in his description of the accused functionality, that it doesn't
13  generate a new VM instruction.  Mitchell tries to avoid his concession by resorting—for the only
14  time in this entire six-patent case—to the doctrine of equivalents.  But his equivalence theory
15  fails because it captures prior art and does not pass the "insubstantial differences" test.
16  Moreover, Oracle is barred from using the doctrine of equivalents because its claim amendments
17  during prosecution of the '205 patent contradict its equivalence theory.

18        _Second_, Oracle contends that the "dexopt" functionality infringes.  But that theory fails
19  because dexopt is not a runtime optimization at all.  It is invoked at install or boot time.  And
20  again, Oracle's attempt to stretch the claims to read on Android renders the '205 patent invalid
21  over the prior art.  The PTO agrees with Google, having preliminarily invalidated every one of
22  the asserted claims based on some of the same prior art combinations that Google cites here.

23     **4.**    **The '104 patent**

24        The '104 patent concerns systems and methods for (1) determining the memory location
25  (_i.e._, the "numerical reference") that (2) corresponds to a variable in an intermediate form code
26  instruction (_i.e._, the "symbolic reference") (3) at runtime, (4) saving the numerical reference; and
27  then (5) using the numerical reference to obtain data.  As was the case with the '205 patent,
28  Oracle asserts two infringement theories.  Again, both of them are wrong.

582688.04

1    *First*, Oracle contends that an index into a table in memory infringes because the index

2    itself qualifies as the required "symbolic reference."  But this theory, offered by Dr. Mitchell for

3    the first time in his ***reply*** report, is inconsistent with his opening report, in which he argued that

4    indexes into these in-memory tables are numerical, not symbolic, references.  Further, even if the

5    asserted claims could be read to encompass indexes into tables, they would be invalid over the

6    prior art.  The PTO has granted Google's reexamination request, which remains pending.

7    Second, Dr. Mitchell again points to "dexopt," but, as discussed above, dexopt does not

8    even operate at runtime, as the asserted claims require.

9    Finally, even if Oracle's infringement theories had merit (and they don't), the '104 patent

10   is a reissued patent that was improperly broadened after the two-year period for broadening

11   reissues had lapsed.  That violates 35 U.S.C. § 251 and renders the '104 invalid.

12   **5.    The '520 patent**

13   The '520 patent purports to cover a method of "play-executing," or simulating execution

14   of, source code that initializes static arrays, in order to determine the values that the code would

15   store into the static array upon initialization.  The process described by this patent exists only to

16   reverse an inefficiency that Sun built into Java bytecode.  Java bytecode initializes static arrays

17   using a cumbersome set of repeated instructions and thus takes up more space than it should.

18   But Android does not perform the "play executing" claimed by this patent.  Instead, it identifies

19   the initialization of the array through "pattern matching," where the software finds the familiar

20   pattern created by Java bytecode that is designed to initialize a static array.  The software then

21   takes the numbers in that pattern, using them to create an instruction that initializes the static

22   array.  Google's expert, Dr. Parr, performed a simple experiment showing that, when an

23   instruction is introduced that does not match the pattern, Android's pattern-matching algorithm

24   cannot properly create an instruction to initialize a static array.  The fact that the algorithm fails

25   in those cases means that the dx tool does not use play execution, because play execution—or

26   simulated execution—would not fail.  Oracle's expert could not and did not dispute this analysis.

27   Moreover, the relevant "play execution" aspect of the '520 patent is hardly novel.  There

28   are numerous references disclosing systems that simulate execution of Java and other bytecode.

11

582688.04

1       ### 6.      The '702 patent

2       The '702 patent concerns a method of eliminating duplicate constants from combined sets

3       of Java class files to create "reduced class files" that will minimize memory usage.  Android

4       does not use this alleged invention.  Google's expert, Dr. Parr, has shown that dex files (the

5       product of the Google software that Oracle accuses of infringement) lack many attributes of

6       reduced class files—including major version numbers, individual constant pools, and Java

7       bytecode.  Once again, Dr. Mitchell does not dispute Dr. Parr's analysis, conceding that dex files

8       lack these essential elements.  Yet he claims this does not matter, asserting that a "reduced class

9       file" exists whenever duplicate constants have been removed from Java class files.  This reading

10      of the claims is directly at odds with, and foreclosed by, the Court's claim construction.

11      Further, the alleged invention of the '702 patent is not new.  For years before Sun applied

12      for this patent, Java class files in Sun's own middleware used "constant pools" to minimize the

13      space taken up by class files.  Prior to prosecuting the '702, Sun disclosed, during prosecution of

14      U.S. Patent No. 5,815,718 to Tock, the aspects of the '702 patent that Oracle now claims are

15      new.  But Sun never cited Tock when prosecuting the '702, even though Tock was **Sun's own**

16      prior art.  The PTO has tentatively rejected all asserted claims of the '702 over Tock.

17      ### B.      Oracle will not prevail on its copyright infringement claim.

18      Oracle's copyright infringement claim has three components, each of them meritless.

19      *First,* Oracle ***does not*** claim that Google's code infringes any Oracle copyright, because

20      Google used entirely different code, much of it newly written by Google and its partners.

21      Instead, Oracle claims that Android's inclusion of code libraries implementing the APIs from 37

22      Java language API packages (including the method signatures for everyday functions like abs()

23      to calculate an absolute value and sqrt() to calculate a square root) infringes its copyrights.

24      Oracle cannot be right.  The API packages and their organization are functional elements

25      of the Java language that are essential for interoperability.  Oracle has conceded that the Java

26      programming language can be freely used by anyone.  For years, Sun promoted the use of that

27      language and its APIs by developers who write Java-language code.  It is impossible, practically

28      speaking, to use the Java language without the API packages.  Even Oracle's expert admits that

1    some of the API packages are "functionally necessary" to use the language.  The API packages

2    and their organization define the parts of speech—such as verbs and nouns—and rules of

3    grammar that enable Java-language speakers to understand one another.  Without Android

4    libraries implementing the API packages, an applications developer writing Java-language code

5    for Android today would have no way to ensure she could safely use existing code using the

6    APIs, and instead would have to learn a new vocabulary different from the standard widely-used

7    Java language vocabulary.

8         No court ever has accepted the copyrightability of APIs.  Oracle tries to justify its novel

9    argument for API copyrightability by arguing that the creation, selection, and organization of

10   APIs is a "creative" process.  But the Copyright Act protects only original and creative

11   **expression**, not **effort** or **ideas** (even if those efforts and ideas are creative).[19]  Programming

12   interfaces are thus not protectable, as the Ninth Circuit repeatedly has held.

13        In *Sega Enterprises Ltd.  v. Accolade, Inc.*, Accolade had copied and disassembled Sega

14   game cartridges "to discover the interface specifications for the Genesis console"[20] and then use

15   the specifications in its own product.  Accolade's games did not copy Sega's code; as Accolade

16   explained, "with the exception of the interface specifications, none of the code in its own games

17   is derived in any way from its examination of Sega's code."[21]  The Ninth Circuit held that the

18   fair use doctrine applied to Accolade's intermediate copying of interface specifications in order

19   to reverse-engineer the Genesis console's APIs.  The court relied heavily on the fact that copying

20   was the only way that Accolade could have gained access to the "unprotected ideas and

21   functional concepts" in Sega's code—the "interface specifications for the Genesis console."[22]

22        Eight years later, the Ninth Circuit again held that wholesale copying of a work (this time

23   the firmware for the Sony Playstation console) for the purpose of reverse engineering APIs is a

24

25

---

26   [19] *See* 17 U.S.C. § 102(b).

27   [20] 977 F.2d 1510, 1515 (9th Cir. 1992).

     [21] *Id.*

28   [22] *Id.* at 1525.

1   fair use.[23]  To create a Playstation emulator called the Virtual Game Station, Connectix needed to

2   replicate the interfaces to the Sony Playstation BIOS, but wrote its own code to implement those

3   interfaces after uncovering the interfaces through reverse engineering.  As in *Sega,* the court held

4   that intermediate copying to uncover, and then use, "unprotected functional elements" (*i.e.* the

5   interface specifications) was a fair use.[24]

6        *Sega* and *Sony* control this case, and this Court should rule as a matter of law that the API

7   packages and organization are not copyrightable.  In fact, Oracle's claim is even weaker than

8   Sega's or Sony's.  Here, there is not even an allegation of unauthorized intermediate copying of

9   Oracle's code.  Instead, Oracle contends that copying **the APIs themselves** is infringement.  But

10  if copying of the code that implements APIs is a fair use so long as the end product copies only

11  the APIs themselves, then, as a matter of law and logic, copying only the APIs cannot infringe.[25]

12       Indeed, courts routinely have held that programming interfaces are not protectable under

13  the Copyright Act.[26]  This Court already has ruled that the names and "method signatures" of

14  Java APIs are not copyrightable as a matter of law.

15       *Second,* Oracle points to only three instances of any alleged literal copying, all of which

16  are—individually and collectively—*de minimis* and thus not actionable.

17  •   One is a nine-line utility function that merely checks that three arguments
        related to sorting an array are "in-bounds."  It does this by performing
18      three simple checks—*i.e.*, that the starting index is not greater than the
        ending index, that the starting index is not less than zero, and that the
19      ending index is not greater than the size of the array to be sorted.  This
        function was quantitatively and qualitatively trivial and could have been
20      accomplished easily in numerous other, non-infringing ways.  In fact, in
        late 2010, the method was removed and replaced with an entirely new and

21

---

22  [23]  *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000).

    [24]  *Id.* at 603, 608.
23
    [25]  Because the premise of the *Sega* and *Sony* decisions was that copying of APIs does not even
24  constitute infringement, it follows that no fair use assessment is needed to conclude that
    Google's use of the APIs from the 37 Java language API packages is non-infringing.  But if the
25  jury reaches the fair use issue, Google's use presents a *stronger* fair use case than those cases.

    [26]  *See, e.g., Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807 (1st Cir. 1995) (menu-command
26  hierarchy that functioned as programming interface was uncopyrightable method of operation),
    *aff'd by an evenly divided court*, 516 U.S. 233 (1996); *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366
27  (10th Cir. 1997) (command codes serving as an interface to call controller were not protectable
    under *scenes à faire* doctrine); PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT § 10.5.1 (3d ed.
28  2011) (courts have "categorically excluded copyright protection for interface specifications").

582688.04

different method in a different file. That new code will be replaced to the public as part of the upcoming new release of Android. It cannot support an infringement claim. *See Newton v. Diamond*, 388 F.3d 1189, 1195 (9th Cir. 2004). Moreover, a year before this lawsuit was filed, Google donated the code files containing the allegedly copied lines of code to Oracle's Java-language development kit, OpenJDK. At that time, Oracle not only did not complain about alleged infringement, it actually ***thanked*** Google for its contribution.

- The second trivial instance of alleged literal copying consists of eight test files allegedly copied from decompiled versions of Oracle code. Those files—which Google obtained from an outside contractor—are quantitatively *de minimis* in the context of the allegedly infringed works as a whole (which is the standard by which *de minimis* infringement is judged). *See Newton*, 388 F.3d at 1195 ("Substantiality is measured by considering the qualitative and quantitative significance of the copied portion in relation to the plaintiff's work as a whole."). Qualitatively, those files were never used or shipped on any Android phones, and in fact are so insignificant that Google has removed them from Android entirely without replacing them with anything at all.

- The third instance of alleged literal copying does not even involve any executable code. Oracle points to scattered comments in two files that Google obtained from the same outside contractor. Those comments are quantitatively minimal, comprising a fraction even of the files in which they appear. They also are qualitatively mundane, offering short, functional descriptions that are in no sense creative expression. Finally, they are again so insignificant that Google has removed them from Android entirely without replacing them with anything at all.

*Third,* Oracle claims that Android's documentation—the short sentences that describe the function each API performs and collectively comprise the "specifications" for the APIs—infringes. This is akin to arguing that one dictionary infringes another because both define many of the same words using similar definitions. The sole example of this alleged infringement is the claim by Oracle's expert that the phrase "[r]eturns a reference to the private key component of this key pair" is similar to the phrase "[r]eturns the private key." But not only are those phrases different, any similarities are due to the unavoidable fact that they both describe the same Java method: "java.security.KeyPair.getPrivate." It cannot be copyright infringement to accurately describe something, just because someone else previously described that thing in a similar way.

**C.     Google will prevail on its defenses of estoppel, waiver, laches, and implied license.**

Even if Oracle could carry its burden of proving patent or copyright infringement, which is unlikely, it should be barred from enforcing those rights because of its long history of public statements and acts contrary to the positions it is taking here, and its long delay in filing suit.

1    Beginning as early as 2005, Sun was fully aware of Google's efforts to develop the free,

2  open source, full stack Android mobile operating platform partly written in the Java

3  programming language.  Sun also knew that, in addition to offering middleware functionality,

4  Android was a complete operating system with numerous components that Java ME lacked, such

5  as an operating kernel and applications.  Despite this knowledge, Sun never said a cross word to

6  Google when Android was publicly announced in 2007 and then released in late 2008.  Certainly

7  Sun never asserted infringement or threatened to sue.  Sun didn't change its tune until after it

8  changed its name to Oracle America in early 2010, by which time Google and its many partners

9  in the Open Handset Alliance had invested enormous amounts of time, money, and sweat in

10  building the Android platform into a commercial success.

11    Sun's inaction conceded that Google was not infringing any Sun patent and was acting in

12  a manner consistent with Sun's policies regarding the Android platform in particular and patent-

13  infringement suits in general.  Indeed, Sun publicly applauded Android's release as an open

14  source platform.  When Google first announced Android in 2007, Sun CEO Jonathan Schwartz

15  posted a statement on his blog saying that he "just wanted to add [his] voice to the chorus of

16  others from Sun in offering my heartfelt congratulations Google on the announcement of their

17  new Java/Linux phone platform, Android.  Congratulations!"  Later in the same blog post, he

18  declared that "Google and the Open Handset Alliance just strapped another set of rockets to the

19  community's momentum."  Moreover, Sun had an announced policy—reflected in numerous

20  statements over the years by its most senior executives, including Schwartz—that Sun "filed

21  patents defensively" and would use its "defensive portfolio" only to protect Sun's products

22  against suits by others, not to be a patent aggressor.  Indeed, Schwartz publicly stated in 2007

23  that the company wanted to "highlight the futility of using software patents to forestall

24  competition—in the commercial marketplace, and among the free community."  Consistent with

25  that policy, Sun never filed suit—or even threatened to file suit—against Google based on the

26  Android platform, even though Google told Sun from the beginning that it would proceed with

27  an independent full stack operating platform project if the Sun partnership did not work out.

28  Indeed, Google was one of Sun's largest customers, and Sun CEO Schwartz has explained that

1  Sun would never sue its customers, because it wasn't possible to do business with a company if it

2  was concerned Sun would turn around and file a lawsuit.

3       Similarly, with respect to Sun's copyright claim, as far back as June 1994, Sun executives

4  took a public stance that APIs—the same functional elements of the Java language that are now

5  the heart of Oracle's copyright infringement claim—are not copyrightable.  Sun reaffirmed that

6  position in publicly-filed amicus briefs, telling the world that it had no intention of asserting

7  copyrights in APIs, which essentially declared Java-language APIs available for use by anyone at

8  any time for any purpose.  And Sun and Oracle both consistently treated APIs as unprotectable,

9  public domain material, by copying and incorporating third-party APIs into their own products.

10       These and other similar policy statements by Sun establish Google's defenses of estoppel,

11  waiver, laches and implied license—each premised on the fact that Sun expressly and publicly

12  approved of Android and certainly never suggested it would sue Google.  In fact, even Oracle

13  applauded the Android platform, announcing in 2009 at the Java One conference that it was

14  "flattered" by Android and further emphasizing that there were likely to be Android netbooks as

15  a result of the efforts of "our friends at Google."  Oracle cannot renege on these representations,

16  claiming entitlement to revenues associated with Android now that Android is a success.

17  **D.**    **Even if it could prove liability, Oracle would not be entitled to substantial damages.**

18       As the Court is aware, Oracle's damages expert Dr. Iain Cockburn initially served a

19  report placing Oracle's damages for patent infringement alone somewhere in the vast range

20  between $1.4 billion and $6.1 billion—nearly enough to finance Oracle's acquisition of Sun and

21  all its many assets.  He barely mentioned, and did not attempt to quantify, Oracle's purported

22  copyright damages.  The Court threw out his report and ordered him back to the drawing board.

23  Dr. Cockburn has now returned with a damages estimate in the same ballpark—$2.7 billion in

24  total damages—though he now allocates most of that sum ($2.3 billion) to the previously

25  unexplored copyright claim and only $404.9 million to the patent claims.  This second damages

26  estimate is almost as groundless as the first one.

27       Dr. Cockburn's patent-damages calculation contains multiple fatal errors.  He starts with

28  the wrong baseline—using the $100 million demand that Sun made early in the negotiating

GOOGLE'S TRIAL BRIEF
Case No. 3:10-cv-03561-WHA

1   process rather than the $28 million figure that the parties essentially agreed to in April 2006.  He

2   then determines that the asserted claims of the six patents-in-suit represent 30% of the value of

3   Sun's entire Java-related intellectual-property portfolio—which included approximately 2,000

4   patents, copyrights, and the Java trademark, among other rights.  But the six patents-in-suit

5   contributed little to no value to Sun's implementation of the Java platform.  Oracle alleges only

6   one method in a commercial version of Java that practiced the '205 patent; and that method has

7   been disabled and is no longer available.  Oracle even ***gives away*** the functionality of the '720

8   patent as a free add-on, which suggests the market value of that functionality is zero.

9         The patents-in-suit are likewise unimportant, and certainly not essential, to Android.  As

10   discussed above, Google disabled functionality related to the '476 patent before Oracle filed this

11   suit.  Even if Oracle's overbroad (and probably invalidating) interpretations of the patent claims

12   were accurate, Google could have avoided the allegedly infringing features through design

13   changes, many of them trivial.  Android would work just fine even if Google disabled or excised

14   ***all*** the functionality that Oracle claims is infringing.

15         Dr. Cockburn reaches the 30% figure in three ways, each of them flawed.

16         *First*, he relies on made-for-litigation benchmarking studies by current Oracle employees,

17   in which the employees purported to disable the allegedly infringing features of Android and

18   concluded that doing so harmed performance.  Oracle failed to disclose how those studies were

19   done.  Google's review of the studies have shown that the Oracle employees disabled far more

20   than just the allegedly infringing functionality, shutting down elements of Android that are not

21   even alleged to infringe.  Unsurprisingly, having disabled the wrong features the studies arrived

22   at massively inflated conclusions about the importance of the functionalities at issue.  The true

23   performance impact of the features at issue is much less significant than Cockburn asserts.

24         *Second*, Dr. Cockburn relies on a flawed econometric study, which purported to measure

25   consumer preferences based on anecdotal evidence of second-hand eBay smartphone purchases.

26   But even if second-hand smartphone buyers qualified as a representative sample, the computer

27   code implementing the econometric study is riddled with errors, and the study fails Econometrics

28   101 by failing to control for numerous variables, thereby confusing correlation with causation.

1    *Third*, Dr. Cockburn offers a rigged consumer-preference study by another Oracle expert,

2    Dr. Steven Shugan, who asked consumers hypothetical questions about smartphone features

3    identified by Dr. Cockburn.  But Shugan failed to ask any questions about those consumers' real-

4    world smartphone purchases, experiences, or preferences; nor did he make sure that the features

5    that Dr. Cockburn identified were among the most significant to consumers deciding which

6    smartphone to purchase.  Dr. Shugan then assumed that, just because a certain percentage of

7    consumers valued an attribute in his study—for example, variety of applications—the exact same

8    percentage of consumers would have refused to buy an Android phone if the number of available

9    applications dropped to an arbitrary level.  None of these litigation-driven shenanigans provide

10   any justification for Dr. Cockburn's 30% figure.

11   That leaves Dr. Cockburn with a patent damages figure of about $30 million (30 percent

12   of $100 million), which he then gooses upward by adding in Sun's projected lost profits from █

13   ████████████████████████████████████████████████████████████████████████████

14   █████████████████████████████████████████████████████████   This is legal

15   error—Dr. Cockburn is directly importing lost profits into a patent royalty without satisfying the

16   demanding standard in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*[27]  His calculation lacks

17   any reasonable basis; instead, he relies entirely on a single Sun presentation speculating about

18   money that Sun might make from a product line that never came close to the market.  Cockburn

19   relies on that presentation even though the cover email attaching it makes clear that it is

20   preliminary and shouldn't be relied upon.  For all these reasons, Dr. Cockburn's patent-damages

21   analysis fails to help the jury decide any issue.  Google already has moved to strike Dr.

22   Cockburn's new analysis under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[28]

23   Dr. Cockburn's copyright damages analysis is even worse.  Cockburn has failed to offer

24   any opinion regarding the portion of Google's profits that are attributable to infringement.

25   Copyright law puts the burden on Google to deduct from its gross revenues (1) its expenses and

26   (2) any portion of its profits attributable to factors besides infringement.  Cockburn uses this rule

27   ───────────────────────

[27]  575 F.2d 1152 (6th Cir. 1978).

28   [28]  509 U.S. 579 (1993).

GOOGLE'S TRIAL BRIEF
Case No. 3:10-cv-03561-WHA

582688.04

1  as an excuse to punt.  In his initial report, he simply assumed that Oracle should recover **100%** of

2  Google's gross revenue for Android-related advertising and applications.  Google then submitted

3  its own expert report, which deducting Google's expenses and the portions of its profits created

4  by Android's many non-infringing components.  In his reply report, Cockburn questions

5  Google's expert opinion, but offers no alternative calculation.  The bottom line is that he is still

6  taking the most extreme position possible—that Oracle is entitled to 100% of Google's Android-

7  related revenue on its copyright claim.

8          Cockburn also calculates the value of the license Sun would have negotiated with Google

9  to use the copyrights; but in doing so, he commits another legal error.  He adds in the lost profits

10  that Sun purportedly would have made had it **competed** with Google, even though there is no

11  evidence Sun would have issued a license to a competitor, only to a **partner**.  The Sun-Google

12  license discussions in 2005 and 2006 always involved a partnership relationship.

13          Finally, Cockburn calculates Sun's lost profits separately, but again ignores the mountain

14  of evidence showing that Sun lacked the internal will and engineering resources to develop a

15  competing mobile platform.  His sole evidentiary basis consists of the same wishful-thinking Sun

16  presentation about possible revenues Sun might derive from a smartphone operating platform

17  that Sun lacked the expertise or will to bring to market.  And Cockburn violates established

18  copyright doctrine by double-counting amounts that overlap among Google's profits, Oracle's

19  purported lost profits, and the lost value of a fair-market license.

20  **E.      Oracle's willfulness case is a fiction.**

21          Oracle will not be able to increase its patent damages recovery by proving that Google

22  willfully infringed.  Discovery is over, and Oracle has no evidence that Google knew about the

23  patents-in-suit before Oracle identified them in a July 20, 2010 pre-litigation meeting.  All key

24  Android team members have testified that they had no such knowledge.  Sun's key negotiators

25  likewise have admitted that they never breathed a word, during any of their meetings with

26  Google about an Android partnership, that Android  might be infringing any patents, much less

27  identified the specific patents in this case.  Even after Oracle entered the picture in early 2010

28  with its more aggressive, litigation-oriented approach, it refused to identify specific patents.

1    Oracle will contend that Google must have known about the Sun intellectual property at

2  issue because it hired Sun employees.  That argument is evidence-free innuendo designed to

3  prejudice the jury.  The four former Sun employees who are inventors on the patents-in-suit and

4  later joined Google had no involvement whatsoever with Android, nor any knowledge of the

5  allegedly infringing Android functionality.  There is no evidence that any of the former Sun

6  employees who came to Google, other than the inventors, had any knowledge of the patents-in-

7  suit—which constitute just six patents out of Sun's portfolio of several thousand patents anyway.

8  Only one former Sun employee did any work at all on the Dalvik VM, and that work didn't

9  begin until 2009—over a year after the Android SDK was released.  Even then, it lasted less than

10  a year and did not involve any of the specific Android functionalities that allegedly infringe.

11    Willfulness should not be an issue as to Oracle's copyright claim either.  Under copyright

12  law, willfulness is relevant only to statutory damages, and Oracle is not seeking statutory

13  damages here.  But even if willfulness were relevant to copyright, Google did not willfully

14  infringe any of the copyrights at issue.  Even if APIs are copyrightable, Google reasonably relied

15  on Sun's repeated public insistence to the contrary, Sun's willingness to let others (such as the

16  Apache Software Foundation and The GNU Project) use those same APIs freely, and Sun's own

17  free use of third-party APIs.  Most of the alleged literal copying was done by contractors

18  working for Google without Google's knowledge, and was stripped out of Android when Google

19  was notified of the alleged copying.  The only alleged instance of literal copying of source code

20  by Google relates to fewer than a dozen lines of code out of millions.  Something so trivial and

21  unimportant to the success of Android cannot be a basis for a damages enhancement.

22  **F.**      **No matter what, Oracle will not be entitled to an injunction.**

23    Even if Oracle were to prevail on both its patent claims and copyright claim, it would not

24  be entitled to injunctive relief.  The standard governing entry of a permanent injunction in both

25  patent and copyright infringement cases is set forth in the Supreme Court's opinion in *eBay, Inc.*

26  *v. MercExchange, LLC.*[29]  That standard requires a plaintiff to

27

28  [29] 547 U.S. 388, 391-92 (2006).  Although *eBay* was a patent case, the Ninth Circuit confirmed
earlier this year in *Perfect 10, Inc. v. Google Inc.*, 653 F.3d 976 (9th Cir. 2011), that the *eBay*

1   demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[30]

4   Oracle cannot satisfy any of the four parts of the *eBay* standard.

5   First, Oracle has not suffered, is not suffering, and will not suffer any irreparable injury

6   because of Google's distribution of the Android software. Oracle has never developed, much

7   less sold, a product that competes with the full stack Android operating platform—not when the

8   company was called Sun, and not since it became Oracle. At most, Oracle offers middleware

9   products through its Java ME platform, but it has never come close even to developing a full

10  stack. ███████████████████████████████████████████████

11  ████████████████████████████████████████████████████

12  ████████████████████████████████████████   Both *eBay* and

13  subsequent Federal Circuit cases confirm that proof of harm to sales of a viable competing

14  product is critical to a showing of irreparable injury.[31] Even as to its Java middleware products,

15  Oracle has continued to do well in markets outside the mobile area, where the Java platform was

16  already in decline, and limited to older feature phones, before Android was released.

17  Second, and for similar reasons, Oracle cannot show that money damages are inadequate

18  to compensate it for the alleged infringement. Not only does Oracle not compete with Google,

19  but its argument that an injunction is the only way to prevent so-called "fragmentation" of "the

20  Java ecosystem" is baseless. The evidence at trial will show that the Java mobile space was

21  deeply fragmented, with various incompatible forks, long before Google acquired Android, Inc.

22  in 2005. For years, Sun had followed a practice of developing incompatible variations of its Java

23  mobile platform for paying customers. Similarly, the various iterations of Sun's own Java

---

standard also applied in copyright infringement suits.

25  [30] *eBay,* 547 U.S. at 391.

26  [31] *See eBay,* 547 U.S. at 395-96 (Kennedy, J., concurring, joined by Stevens, Souter, and Breyer, JJ.) (noting that injunctions are unjustified where patentee does not use patents "as a basis for producing and selling goods, but, instead, primarily for obtaining license fees"); *see also, e.g., i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 861-62 (Fed. Cir. 2010) (affirming finding of irreparable injury where infringement caused plaintiff's product to lose market share).

582688.04

1   mobile platform were incompatible with one another—with applications written for one version

2   being unable to run on others.  Even Oracle's claim that Sun assured compatibility by making its

3   licensees certify that they passed compatibility tests is fictitious.  Sun never audited the results of

4   those compatibility tests, and Oracle admits that the tests covered only 70% of the Java mobile

5   functionality, thus allowing for incompatibility in the other 30%.  The alleged "write once, run

6   anywhere" Java value proposition is marketing-speak that is contradicted by Sun's own conduct.

7   Any harm Oracle might have suffered can easily be compensated by payment of money.

8          Third, the balance of hardships strongly favors Google.  Oracle is asking the Court to bar

9   Google from distributing or supporting one of the most popular mobile operating systems in the

10   world, which system is used by tens of millions of people numerous times every day.  Any

11   disruption in Android distribution and support would damage the long-term viability of Android,

12   even if any allegedly infringing functionality were to be stripped out of the platform.  Oracle, by

13   contrast, is suffering only monetary harm (if it is suffering any harm at all).

14          Fourth, for similar reasons, an injunction in this case would massively disserve the public

15   interest.  Oracle's requested relief would essentially shut down Android, leaving tens of millions

16   of users without their preferred operating system, forcing OEMs to eat millions of dollars in sunk

17   costs and inventory, including development costs for future Android models.  An injunction

18   would likewise jeopardize similarly large investments by wireless carriers.  No corresponding

19   benefit to Oracle, or anyone, would offset that sort of chaos.

20          Finally, Oracle may try to introduce two red herrings into the injunction analysis, neither

21   with any basis in law.  First, Oracle may assert that, if Google is found to have willfully

22   infringed the asserted patents or copyrights, that should make the Court more willing to enter an

23   injunction.  But willfulness is not one of the relevant considerations under the four-part *eBay*

24   test.  Fundamentally, injunctive relief is designed to protect a party from irreparable harm where

25   money damages will not suffice—not to punish an alleged wrongdoer.  Second, to the extent

26   Oracle attempts to rely on the old Ninth Circuit rule that showing "a reasonable likelihood of

27   success on the merits in a copyright infringement claim raises a presumption of irreparable

28

1    harm," that rule was expressly declared dead by the Ninth Circuit earlier this year as having been

2    "effectively overruled" by *eBay*.[32]

### IV.   CASE MANAGEMENT ISSUES

4      Finally, there are at least two important, practical case management issues that the Court

5    should resolve before trial begins.

6      *First,* the Court should request an advisory verdict from the jury as to Google's equitable

7    defenses. Although the Court "will ultimately make its own independent findings of fact and

8    draw its own conclusions of law as to matters that fall within its purview, [it] will also benefit

9    from the parties' arguments to the jury on these issues."[33] For just that reason, trial courts often

10    submit to advisory juries the types of equitable defenses Google is asserting here.[34]

11      Asking for an advisory jury verdict on Google's equitable defenses makes sense, because

12    the evidence supporting those defenses overlaps substantially with evidence the jury will hear

13    anyway during the liability phase. For instance, there is overlap between the equitable defenses

14    and Oracle's infringement case. To prove inducement, Oracle will need to show that Google

15    knew or should have known its acts would lead to infringement by others. Google will rebut any

16    evidence Oracle might present with proof of Sun's and Oracle's inaction over many years in the

17    face of Android's development and release and Sun's and Oracle's public statements praising

18    Android—the same evidence that supports Google's equitable defenses. Further, Google's

19    laches defense requires proof that the patentee knew or should have known about the alleged

20    infringement,[35] and therefore "will require the court to examine the scope of the patent, which

21    will also be necessary in proving infringement."[36]

---

[32] *Perfect 10*, 653 F.3d 976, slip op. at 10127-28.

[33] *Starr Int'l Co. v. Am. Int'l Group, Inc.*, 623 F. Supp. 2d 497, 502 (S.D.N.Y. 2009).

[34] *See*; *e.g.*, *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1009 (Fed. Cir. 2008) (equitable waiver defense tried to advisory jury); *Wang Labs., Inc. v. Mitsubishi Elecs. America, Inc.*, 103 F.3d 1571, 1576 (Fed. Cir. 1997) (implied license, equitable estoppel, and laches tried to advisory jury); *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 749 F. Supp. 2d 542, 554 (E.D. Ky. 2010) (laches and estoppel defenses tried to advisory jury over plaintiff's objections).

[35] *See A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992).

[36] *Cedarapids, Inc. v. CMI Corp.*, 1999 WL 33656876 at *3 (N.D. Iowa 1999); *see also Figgie Int'l, Inc. v. Wilson Sporting Goods Co.*, 1987 WL 13574 at *2-3 (N.D. Ill. 1987) (same rule).

582688.04

1    There is even more significant overlap between the issue of willfulness and the equitable

2    defenses. Both require an extensive discussion of (1) the history of Sun's negotiations with

3    Google regarding what became the Android platform; (2) Sun's failure to file suit or even give

4    notice of purported infringement despite knowing that Google was developing Android; (3)

5    Sun's and Oracle's public praise for Android; (4) and Sun's public statements disavowing

6    copyrightability of APIs and oft-stated commitment to using its patent portfolio only defensively.

7    Because Google's "equitable defense evidence would in any event be properly presented to the

8    jury to negate elements of plaintiff's case,"[37] there would be no additional burden on anyone, and

9    a possible benefit to both the Court and the parties, if the Court requested an advisory verdict on

10   Google's equitable defenses.

11   *Second,* Google asks the Court to confirm that Google may use at trial two documents on

12   its exhibit list—JTX2686 and JTX2687—that Oracle belatedly and wrongly clawed back as

13   privileged. Oracle did not assert privilege in the first place until months after the documents had

14   been produced and had been used in one of Google's expert reports. Then, weeks ***after*** clawing

15   back the documents, Oracle itself affirmatively marked the documents as a deposition exhibit,

16   which waived any privileges or protections.

17   On August 25, 2011, Google technical expert Dr. Terence Parr served his report, in which

18   he relied on and discussed both documents. Dr. Parr attached both documents as exhibits to his

19   report. On August 29, 2011, Oracle gave notice to Google for the first time that it had produced

20   20 purportedly privileged documents, including the two at issue. Google complied with its

21   obligations under the protective order and destroyed all copies of those documents. But then, on

22   September 15, 2011, two weeks after its clawback request, Oracle ***reintroduced*** both documents

---

[37] *Banco Industrial de Venezuela v. Credit Suisse,* 99 F.3d 1045, 1051 (11th Cir. 1996); *see also, e.g., Akamai Techs., Inc. v. Limelight Networks, Inc.,* 2008 WL 364401 (D. Mass. Feb. 8, 2008) (evidence of the parties' pre-litigation business discussions is relevant to willfulness, inducement, damages and equitable defenses); *McKesson Information Solutions LLC v. Trizetto Group, Inc.,* 2006 WL 940543 (D. Del. Apr. 11, 2006) ("The entire history of the relationship between the parties will be admissible. ... Determination of willfulness is made on consideration of the totality of the circumstances. ... [E]vidence of laches, prior art known to the defendant and the parties' prior negotiations, is relevant to a willfulness defense[.]"); *WeddingChannel.Com, Inc. v. The Knot, Inc.,* 2004 WL 2984305 (S.D.N.Y. Dec. 23, 2004) (evidence relating to alleged willful infringement also relevant to implied license and estoppel).

582688.04

1  into the record when it marked the entire Parr report, including the attachments, as an exhibit at

2  Dr. Parr's deposition.  It remains an exhibit today; Oracle has never taken any corrective action

3  to remove it from the record.

4          Oracle's knowing, affirmative marking and use of the documents as a deposition exhibit

5  must constitute a waiver of any privilege.  Courts routinely find waiver in similar

6  circumstances.[38]  The Court should follow the logic of these cases and find both that Oracle has

7  waived privilege as to these documents and that Google may use them at trial.

8          Google understands that Oracle takes the position that Magistrate Judge Ryu, and not this

9  Court, ought to decide this issue.  But this is not a discovery dispute—it is a trial management

10  issue relating to Google's ability to use designated trial exhibits.  Particularly because trial is just

11  two weeks away, and the relevant factual background is both simple and fully before the Court, it

12  makes the most sense for this Court to rule on the waiver issue.

13

14                                              Respectfully submitted,

15  Dated:  October 14, 2011                    KEKER & VAN NEST LLP

16

17

18                                      By: /s/ Robert A. Van Nest
                                             ROBERT A. VAN NEST
19                                           Attorneys for Defendant
                                             GOOGLE INC.

20

21

22

23
_____

24  [38]  *See, e.g., Board of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Palladium Equity Partners, LLC,* 722 F. Supp. 2d 845, 850 (E.D. Mich. 2010) ("[W]hen a privileged document is

25  used at a deposition, and the privilege holder fails to object immediately, courts have found the privilege to be waived."); *Brandon v. D.R. Horton, Inc.,* 07CV1256 J (POR), 2008 WL 2096883

26  (S.D. Cal. May 16, 2008) ("Plaintiffs [sic] failure to assert the privilege at Plaintiff Brandon's deposition is clear proof that, even if there was a privilege, it was absolutely and irrevocably

27  waived, regardless of whether disclosure was inadvertent."); *F.C. Cycles Intern., Inc. v. Fila Sport, S.p.A.,* 184 F.R.D. 64, 73-74 (D. Md. 1998) (rejecting claim that disclosure of

28  memorandum was "inadvertent" when memorandum had been marked as exhibit without objection during two depositions).

582688.04