KEKER & VAN NEST LLP
ROBERT A. VAN NEST - #84065
rvannest@kvn.com
CHRISTA M. ANDERSON - #184325
canderson@kvn.com
633 Battery Street
San Francisco, CA  94111-1809
Telephone:    415.391.5400
Facsimile:    415.397.7188

KING & SPALDING LLP
SCOTT T. WEINGAERTNER (*Pro Hac Vice*)
sweingaertner@kslaw.com
ROBERT F. PERRY
rperry@kslaw.com
BRUCE W. BABER (*Pro Hac Vice*)
1185 Avenue of the Americas
New York, NY  10036
Tel:          212.556.2100
Fax:          212.556.2222

KING & SPALDING LLP
DONALD F. ZIMMER, JR. - #112279
fzimmer@kslaw.com
CHERYL A. SABNIS - #224323
csabnis@kslaw.com
101 Second St., Suite 2300
San Francisco, CA  94105
Tel:          415.318.1200
Fax:          415.318.1300

IAN C. BALLON - #141819
ballon@gtlaw.com
HEATHER MEEKER - #172148
meekerh@gtlaw.com
GREENBERG TRAURIG, LLP
1900 University Avenue
East Palo Alto, CA 94303
Tel:          650.328.8500
Fax:          650.328-8508

Attorneys for Defendant
GOOGLE INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE INC.,<br><br>Defendant. | Case No. 3:10-cv-03561-WHA (DMR)<br><br>**DEFENDANT GOOGLE INC.'S MEMORANDUM IN SUPPORT OF ITS DISPUTED JURY INSTRUCTIONS**<br><br>Dept.:     Courtroom 8, 19th Floor<br>Judge:     Hon. William Alsup<br><br>Date Comp. Filed:     August 12, 2010<br>Trial Date:     October 31, 2011 |

# TABLE OF CONTENTS

**Page**

I. DISPUTED INSTRUCTION NO. 1: PRELIMINARY INSTRUCTION— COPYRIGHT LAW.................................................................................................. 2

II. DISPUTED INSTRUCTION NO. 2: PRELIMINARY INSTRUCTION— WHAT A PATENT IS AND HOW ONE IS OBTAINED ................................. 5

    A. The patents in suit should be referred to as the "Asserted Patents"........................... 5

    B. It is unnecessary to characterize the history of the patents ........................................ 6

    C. A short explanation of the reexaminations, if in the case, will help the jury ........................................................................................................................ 6

III. DISPUTED INSTRUCTION NO. 4: PRELIMINARY INSTRUCTION— PATENT—SUMMARY OF CONTENTIONS ................................................. 7

IV. DISPUTED INSTRUCTION NO. 6: COPYRIGHT—DEFINED.................................... 8

V. DISPUTED INSTRUCTION NO. 7: COPYRIGHT—SUBJECT MATTER— GENERALLY.............................................................................................................. 8

VI. DISPUTED INSTRUCTION NO. 8: COPYRIGHT—SUBJECT MATTER— IDEAS AND EXPRESSION ........................................................................... 10

VII. DISPUTED INSTRUCTION NO. 9: COPYRIGHT—SUBJECT MATTER— FUNCTIONAL REQUIREMENTS ................................................................. 11

VIII. DISPUTED INSTRUCTION NO. 10: COPYRIGHT INFRINGEMENT— ELEMENTS—OWNERSHIP AND COPYING .............................................. 12

IX. DISPUTED INSTRUCTION NO. 11: COPYRIGHT INTERESTS— REGISTRATION WITH THE COPYRIGHT OFFICE.................................... 12

X. DISPUTED INSTRUCTION NO. 12: COPYRIGHT INFRINGEMENT— ORIGINALITY............................................................................................... 13

XI. DISPUTED INSTRUCTION NO. 13: COPYRIGHT—SUBJECT MATTER—SELECTION, ARRANGEMENT, OR ORGANIZATION........................ 14

XII. DISPUTED INSTRUCTION NO. 14: COPYRIGHT INTERESTS— DERIVATIVE WORK .................................................................................... 16

i

XIII. DISPUTED INSTRUCTION NO. 15: COPYING—ACCESS AND SUBSTANTIAL SIMILARITY OR VIRTUAL IDENTITY .......................................... 16

XIV.      DISPUTED INSTRUCTION NO. 16: COPYING—ACCESS DEFINED ............. 18

XV. DISPUTED INSTRUCTION NO. 17: SUBSTANTIAL SIMILARITY— EXTRINSIC TEST; INTRINSIC TEST .......................................................... 18

XVI.      DISPUTED INSTRUCTION NO. 18: COPYRIGHT INFRINGEMENT—COPYING FROM A THIRD PARTY .......................... 21

XVII.     DISPUTED INSTRUCTION NO. 19: COPYRIGHT LIABILITY— VICARIOUS INFRINGEMENT—ELEMENTS AND BURDEN OF PROOF ............. 22

XVIII.    DISPUTED INSTRUCTION NO. 20: COPYRIGHT LIABILITY— CONTRIBUTORY INFRINGEMENT ...................................................... 23

XIX.      DISPUTED INSTRUCTION NO. 21: COPYRIGHT—WILLFUL INFRINGEMENT ................................................................................ 23

XX. DISPUTED INSTRUCTION NO. 22: COPYRIGHT INFRINGEMENT—DE MINIMIS COPYING ..................................................................... 25

XXI.      DISPUTED INSTRUCTION NO. 23: COPYRIGHT—MERGER ....................... 27

XXII.     DISPUTED INSTRUCTION NO. 24: COPYRIGHT—*SCENES A FAIRE* ................................................................................................. 28

XXIII.    DISPUTED INSTRUCTION NO. 25: COPYRIGHT—FAIR USE ...................... 29

XXIV.     DISPUTED INSTRUCTION NO. 26: PATENT—SUMMARY OF CONTENTIONS .............................................................................. 33

XXV.      DISPUTED INSTRUCTION NO. 27: PATENT—PRESUMPTION OF VALIDITY ..................................................................................... 33

XXVI.     DISPUTED INSTRUCTION NO. 32: PATENT—DIRECT INFRINGEMENT ............................................................................. 33

          A.    Distributing source code for free does not qualify as a sale or offer for sale     33

          B.    Only certain identified mobile devices remain at issue ............................. 35

ii

XXVII.       DISPUTED INSTRUCTION NO. 33: PATENT—LITERAL
             INFRINGEMENT ...................................................................................... 36

XXVIII.      DISPUTED INSTRUCTION NO. 34: PATENT—DIRECT
             INFRINGEMENT UNDER THE "DOCTRINE OF EQUIVALENTS" ........ 36

XXIX.    DISPUTED INSTRUCTIONS NO. 35: PATENT—LIMITATIONS ON
         DIRECT INFRINGEMENT UNDER THE "DOCTRINE OF
         EQUIVALENTS" ...................................................................................... 38

XXX.     DISPUTED INSTRUCTION NO. 37: PATENT—CONTRIBUTORY
         INFRINGEMENT ...................................................................................... 39

XXXI.    DISPUTED INSTRUCTION NO. 38: PATENT—INDIRECT
         INFRINGEMENT—ACTIVE INDUCEMENT ............................................ 41

XXXII.       DISPUTED INSTRUCTION NO. 39: PATENT—
             INFRINGEMENT—WILLFUL BLINDNESS AS KNOWLEDGE .............. 42

XXXIII.      DISPUTED INSTRUCTION NO. 40: PATENT—WILLFUL
             INFRINGEMENT ...................................................................................... 43

    A.   Knowledge that Sun had a patent portfolio did not give rise to a duty of
         due care .................................................................................................... 43

    B.   Oracle improperly seeks to add factors to the subjective prong of
         *Seagate's* two-part willfulness test ........................................................ 44

XXXIV.       DISPUTED INSTRUCTION NO. 41: PATENT DEFENSE—
             INVALIDITY—BURDEN OF PROOF ........................................................ 45

XXXV.        DISPUTED INSTRUCTION NO. 43: PATENT—
             INVALIDITY—OBVIOUSNESS ................................................................ 45

XXXVI.       DISPUTED INSTRUCTION NOS. 46-49: GOOGLE'S
             EQUITABLE DEFENSES ........................................................................ 47

    A.   Disputed Instruction No. 46: Equitable Defense—Laches ........................ 47

    B.   Disputed Instruction No. 47:  Equitable Defense—Equitable Estoppel ................... 51

    C.   Disputed Instruction No. 48: Equitable Defense—Waiver ........................ 53

    D.   Disputed Instruction No. 49:  Equitable Defense—Implied License........................ 54

XXXVII.      DISPUTED INSTRUCTION NO. 52: COPYRIGHT—

iii

ACTUAL DAMAGES................................................................................56

XXXVIII.        DISPUTED INSTRUCTION NO. 53: COPYRIGHT—
ACTUAL DAMAGES DUE TO LOST LICENSE FEE ................................57

XXXIX.        DISPUTED INSTRUCTION NO. 54: COPYRIGHT—
DAMAGES—DEFENDANT'S PROFITS ATTRIBUTABLE TO
COPYRIGHT INFRINGEMENT ........................................................ 60

XL. DISPUTED INSTRUCTION NO. 55: PATENT—DAMAGES—BURDEN
OF PROOF............................................................................... 61

XLI. DISPUTED INSTRUCTION NO. 56: PATENT—DAMAGES—
REASONABLE ROYALTY—DEFINITION ................................ 61

XLII.        DISPUTED INSTRUCTION NO. 57:  PATENT—DAMAGES—
REASONABLE ROYALTY—RELEVANT FACTORS ................................ 63

XLIII.        DISPUTED INSTRUCTION NO. 58:  PATENT—DAMAGES—
EXTRATERRITORIAL ACTS ........................................................ 64

XLIV.        DISPUTED INSTRUCTION NO. 59:  PATENT—DAMAGES—DATE
OF COMMENCEMENT ........................................................ 65

**I.      Disputed Instruction No. 1: Preliminary Instruction—Copyright Law**

Both parties' proposed instructions are based on Ninth Circuit Model Instruction 17.0. They differ in the following respects:

Introduction

*First,* Google's proposed instruction refers to copyrights that were specifically asserted in this case, *i.e.*, copyrights allegedly covering Java 2 Standard Edition ("J2SE") versions 1.4 and 5.0.  Amended Complaint (Dkt. 36), Exh. H.  Oracle's proposed instruction, on the other hand, states that Oracle claims ownership of copyrights "of various components of the Java software platform."  This imprecise phrase fails to inform the jury what the asserted works are and will only confuse the jury.

*Second,* Google follows the model instruction by briefly describing its affirmative defenses, including that it made fair use of the work, "and that its use of the work was justified given Oracle's past statements and actions."  This is a summary of Google's affirmative defenses, which include waiver, estoppel, laches, and implied license.  Oracle has no basis for objecting to the quoted language, which summarizes Google's equitable defenses.

Definition of Copyright

*First,* Oracle agrees that "[f]acts, ideas, procedures, processes, systems, methods of operation, [and] concepts" cannot themselves be copyrighted.  Oracle, however, wants to omit from this list "names and functional requirements."  The Court already has ruled that the names of the Java language API files, packages, classes, and methods are not protectable as a matter of law because words and short phrases are not subject to copyright.  Order Partially Granting and Partially Denying Defendant's Motion for Summary Judgment on Copyright Claim (Dkt. 433) ("Copyright MSJ Order") at 7-8; 37 C.F.R. 202.1(a).  Functional requirements are just as unprotected.  *See Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1522 (9th Cir. 1992) ("The declarations of Accolade's employees indicate, and the district court found, that Accolade copied Sega's software solely in order to discover *the functional requirements for compatibility* with the Genesis console—*aspects* of Sega's programs *that are not protected by copyright*.") (emphases

2

1   added).  The jury will see the names of many API elements, and will hear testimony about

2   functional requirements for compatibility.  The jury should know that these elements are not

3   copyrightable.

4           *Second,* Oracle's instruction seeks to introduce more details about the standard for

5   originality.  This is inappropriate for a preliminary instruction.  The parties have both proposed a

6   later instruction that explains originality in more detail.  *See* Disputed Instruction No. 12

7           *Third,* Google's proposed instruction omits the following language from the model

8   instruction because, on the facts of this case, it is inaccurate and misleading:  "After examination

9   and a determination that the material deposited constitutes copyrightable subject matter and that

10  legal and formal requirements are satisfied, the Register of Copyrights registers the work and

11  issues [a certificate of registration]."  The issue is not whether the registered work as a whole—

12  J2SE 1.4 or 5.0—is copyrightable.  The issue is whether the allegedly copied elements of the

13  work are copyrightable.  And the Court has already rejected Oracle's argument that the

14  registration crates a presumption of copyrightability as to those elements.  Copyright MSJ Order

15  at 8 ("The decision Oracle cites for this proposition shows only that a certificate of registration

16  may entitle its holder to a presumption of copyright validity as to the registered work. *Swirsky v.*

17  *Carey,* 376 F.3d 841, 851 (9th Cir. 2004) (citing 17 U.S.C. 410(c)). Oracle cites no authority

18  requiring a presumption of originality as to specific elements of a registered work."); *see also* 4

19  Melville B. Nimmer and David Nimmer, NIMMER ON COPYRIGHT § 13.01 (plaintiff has burden to

20  prove copying of "constituent elements of the work *that are original*") (emphasis added).

21  Instructing the jury that the Register of Copyrights determined that the *registered works* are

22  copyrightable subject matter is irrelevant and can only confuse jurors, who may assume this

23  determination applies to the individual elements of the registered works.

24          *Fourth,* Oracle wants the Court to instruct the jury that the copyright registrations at issue

25  were obtained by Sun Microsystems, Inc., which changed its name to Oracle America, Inc. when

26  Oracle Corporation purchased Sun "but it is still the same legal entity."  Oracle wants to stand in

27  Sun's shoes for purposes of asserting the copyrights but rejects Google's proposed language that

28
                                                        3

585003.06

1   "Oracle is bound by Sun's actions, inaction and prior statements."  Oracle's position is one-

2   sided, and should be rejected for that reason.  For the reasons discussed in more detail with

3   respect to Disputed Instruction No. 4, *infra* Part III, the jury should be informed that Oracle is

4   bound by Sun's actions, inactions and prior statements.  It cannot be assumed that the jury will

5   understand this otherwise.

6          *Fifth,* Oracle wants the Court to pre-instruct the jury that Oracle is entitled to a

7   presumption of copyright validity.   Because the validity of the copyright for the *registered*

8   *works* is not at issue, this is irrelevant.  And, as discussed above, because no presumption applies

9   to the *elements* of the works that are at issue, Oracle's instruction is misleading and would

10  confuse the jury.

11         <u>Plaintiff's Burden of Proof</u>

12         *First,* Oracle's instruction asserts that it "accuses Google of copying 12 software code

13  files."  This is wrong.  Oracle alleges that code from *11* code files appear in 12 Android files.

14  The discrepancy between the number of files copied and the number of allegedly infringing

15  Android files arises because Oracle claims that code from its Arrays.java appears in two Android

16  files, TimSort.java and ComparableTimSort.java.  Thus, it is inaccurate to say that Google has

17  allegedly copied "12" code files.  Google's instruction, which states that Oracle accuses Google

18  of copying "from 11 software code files" is accurate, and the addition of the word "from"

19  eliminates any possible confusion whether the statement refers to the number of Oracle files (as

20  it does) or the number of Google files.  Finally, using the phrase "copying from 11 software code

21  files" is preferable to using the phrase "copying to 12 software code files," because copyright

22  infringement is judged by comparing the protectable material that was copied to the copyrighted

23  work as a whole.  Thus, the relevant question is *what was taken,* not *where it was taken to*.

24         *Second,* Google's instruction states that to prove copying, Oracle must prove that Google

25  copied "original, protectable" elements of the copyrighted work.  The Court has already so held.

26  Copyright MSJ Order at 8; *see also Jada Toys, Inc. v. Mattel, Inc., 518* F.3d 628, 636 (9th Cir.

27  2008) ("In order to succeed in a copyright infringement claim, 'a plaintiff must show that he or

28

1    she owns the copyright and that defendant copied protected elements of the work.'"); *Apple*

2    *Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994) ("the party claiming

3    infringement may place 'no reliance upon any similarity in expression resulting from'

4    unprotectable elements."). A failure to limit the infringement claim to *protectable* elements risks

5    granting Oracle a broad monopoly over aspects of its software that should be governed by the

6    other legal principles, such as patent law. *See Incredible Techs. v. Virtual Techs.*, 400 F.3d 1007,

7    1012 (7th Cir. 2005). Google's addition of "protectable" therefore is appropriate in the context of

8    this case.

9        Proof of Copying

10       Google's instruction makes clear that to find infringement, the relevant standard may be

11   "virtual identity" rather than "substantial similarity." This is taken from controlling authority.

12   *Apple Computer,* 35 F.3d at 1439 ("When the range of protectable and unauthorized expression

13   is narrow, the appropriate standard for illicit copying is virtual identity."). Whether the

14   allegedly copied elements are protectable is a key issue in this case, and the Court has already

15   held that at least the names of the elements are not protectable. Copyright MSJ Order at 8, 11.

16   A discussion of the virtual identity standard is not only appropriate, but necessary.

17       Liability for Infringement

18       Again, as above, Google requests that the Court instruct that liability requires proof of

19   copying of "original, protectable" elements.

20       Defenses to Infringement

21       Google's statement of its defenses to infringement conforms to defenses that it will

22   present. Oracle's statement, in contrast, refers to "independent creation," for which Google is

23   not even seeking a jury instruction.

24   **II.    Disputed Instruction No. 2: Preliminary Instruction—What a Patent Is and How**
         **One is Obtained**
25

         **A.    The patents in suit should be referred to as the "Asserted Patents"**
26

27       Google proposes identifying the patents-in-suit using the neutral phrase "Asserted

28   Patents," while Oracle insists on applying the misnomer "Oracle patents." This issue permeates

5

almost all of the proposed instructions, and in many cases is the only reason why Oracle refuses to stipulate to an instruction.  Oracle's proposed terminology is misleading.  The patents-in-suit were applied for and obtained by Sun long before it was acquired by Oracle Corporation, which changed Sun's name to Oracle America, Inc.  As discussed in other portions of this brief, it will already be difficult for the jury to make the appropriate connections and distinctions between the different corporate names and entities.  Their ability to make these connections and distinctions is an issue that is of particular importance with respect to a number of Google's affirmative defenses.  To add to the complexity by calling the patents-in-suit the "Oracle Patents" would only multiply the confusion, not to mention threaten to bias the jury in Oracle's favor.  Accordingly, Google's proposed use of "Asserted Patents" is more appropriate and should be adopted.

### B.      It is unnecessary to characterize the history of the patents

Along the same lines, Google objects to Oracle's proposed gratuitous insertion of the phrase "to Oracle's Java-related products and methods at issue" into an instruction designed to inform the jury of what patents are and how they are obtained.  The added description Oracle requests is unnecessary to distinguish these patents from any others in the case, and the question whether all of the patents are in fact related to Java products or methods may well be a subject of dispute in the case.  The Court should not weigh in on Oracle's side of any such dispute in a preliminary instruction.

### C.      A short explanation of the reexaminations, if in the case, will help the jury

Google proposes including a short explanation of the reexamination process in this instruction.  Oracle opposes this proposal.  This additional instruction will give the jurors context for certain evidence to be presented at trial.[1]  Evidence regarding the reexaminations may come up in at least one of two contexts:  relating to evidence of positions taken before the Patent Office in the course of the pending reexaminations and as a defense to willfulness.  In either or

---

[1] Should the Court grant Oracle's Motion *in Limine* No. 1 and exclude evidence of the reexamination proceedings, this additional language will no longer be needed.

both contexts, the jury will need some understanding of the reexamination procedure, and it is more appropriate for such an explanation to come from the Court, as part of this instruction's overall explanation of the patent system, rather than from either a percipient or expert witness.

**III.     Disputed Instruction No. 4: Preliminary Instruction—Patent—Summary of Contentions**

As the Court is aware, Google believes that the actions taken by Sun prior to its acquisition by Oracle Corporation provide it with numerous equitable defenses.  Google has therefore requested that the Court instruct the jury, in accordance with black-letter law, that Oracle America, Inc., which is the same company as Sun Microsystems, but with a new name, is bound by the actions and inaction of Sun over the course of the years leading to its acquisition. *See National Union Fire Ins. Co. of Pittsburgh, Pa. v. Stauffer Chemical Co.,* 1991 WL 138431 at *2-3 (Del. Super. July 15, 1991).

Oracle, however, will not agree to an instruction that informs the jury that Oracle is bound by what Sun has done in the past with respect to the intellectual property at issue in this case.  Its refusal to agree to this plainly correct statement of the law is mystifying:  even if Oracle Corporation had not purchased Sun lock, stock and barrel, and had decided only to buy the patents-in-suit, it would have been bound by what the prior assignee had done.  *See Valutron, N.V. v. NCR Corp.*, No. C-3-81-444, 1992 U.S. Dist. LEXIS 22129 (S.D. Ohio Aug. 18, 1992), at *13 n.2 (finding claim for infringement damages barred by laches; "successors in interest are charged with the knowledge and dilatory conduct of their predecessors").  The rule is no different for any of Google's other defenses that sound in equity.  *See Teradyne, Inc. v. Hewlett-Packard Co.,* No. C-91-0344 MHP, 1994 U.S. Dist. LEXIS 9066 (N.D. Cal. June 24, 1994), at *10 n.1 & *22 n.8 (holding that "conduct and knowledge must as a matter of law be attributed to" a "successor in interest" for purposes of both laches and equitable estoppel).  The Court could therefore properly instruct the jury that any successor company that obtained the intellectual property in suit would have to live with what Sun had done.  However, given that Oracle is in fact the same company as Sun, there is no need to delve that deeply into the law.  Instead, the Court need only make clear to the jury that Oracle must live with the actions that

1    Sun had previously taken.  Google therefore respectfully requests that the Court issue such an

2    instruction.

3           The only other dispute between the parties' proposals on this instruction is how to define

4    the patents in suit.  For the reasons discussed above, the Court should refer to them as the

5    "Asserted Patents."  *See infra* Part II.A.

6    **IV.    Disputed Instruction No. 6: Copyright—Defined**

7           The parties' proposed instructions are both based on Ninth Circuit Model Instruction

8    17.1, and in many respects are the same.  The differences are as follows:

9           *First,* Google's description of the exclusive rights at issue is shorter, omitting optional

10   language from the model instruction that is not applicable in this case.

11          *Second,* Google's proposal uses the word "reproduction" rather than "production," which

12   is closer to the language of the statute.  *See* 17 U.S.C. § 106.  This also will help the jury

13   distinguish between the patent claims and the copyright claim.

14          *Third,* as elsewhere in these instructions, Google proposes to instruct the jury on both

15   "substantial similarity" and "virtual identity," because both standards are potentially relevant.

16          *Fourth,* Google omits optional language about the difference between acquiring a copy of

17   a work and acquiring rights to a work, because it is not relevant to this case.

18          *Fifth,* Oracle proposes an additional paragraph not drawn from the model, which is

19   unnecessary and inaccurate.  It is unnecessary, because the elements of an infringement claim are

20   explained elsewhere in the instructions.  It is inaccurate because it blurs the distinction between

21   "copying" and "infringement."  Not all copying is infringement, because copying may be *de*

22   *minimis,* may only involve unprotected elements, may be a fair use, and so on.

23   **V.     Disputed Instruction No. 7: Copyright—Subject Matter—Generally**

24          The parties' proposed instructions are both based on the Ninth Circuit Model Instruction

25   17.1.  The differences between the parties' proposals are as follows.

26          *First,* Oracle defines the allegedly infringed works as "the Java software platform, the

27   Java API packages, Java class libraries, and Java source code files."  This description is

28

585003.06

1 hopelessly vague.  Mere days before trial is currently set to begin, Oracle is unable or unwilling

2 to define with any specificity what the allegedly infringed works are.  This is unfair to Google,

3 which is left wondering precisely what claims it is being asked to defend against, and unfair to

4 the jurors, who cannot decide the ultimate issue of infringement unless they know *precisely* what

5 works they must compare the allegedly copied material against.

6         *Second,* Oracle identifies two categories of works that allegedly are at issue in this case,

7 starting with literary works.  It defines literary works as including, among other things,

8 "compilations of data" and "computer databases."  Neither phrase appears in the model

9 instructions, and neither appears to be at issue in this case.  Moreover, compilations of data (and

10 databases) often are *not* copyrightable.  *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S.

11 340 (1991).  Oracle's other category is "computer programs," which it defines as being a type of

12 literary work.  Given that Oracle's proposal has just defined literary works separately, this will

13 confuse the jury.  Google's proposal simply refers the jury to the category of works that is

14 actually at issue in this case, computer programs.  It does so without defining computer programs

15 as literary works, because that definition has more to do with the history of how computer

16 programs came to be understood as potentially copyrightable subject matter than anything else.

17 Jurors can be expected to understand what computer programs are, and describing them as

18 "literary works" will likely confuse more than it will clarify.

19         *Third,* Oracle proposes that the jury be instructed that computer programs are "expressly

20 subject to copyright protection." This is true only in the sense that the Copyright Act recognizes

21 that computer programs *may* be copyrightable. A computer program or element from computer

22 code is not categorically copyrightable, which is why Google proposes to instruct the jury about

23 the circumstances under which code may be protectable. Google's proposal also explains that

24 names and functional requirements are not copyrightable, which is appropriate for the reasons

25 discussed above in connection with Disputed Instruction No. 1.

26         *Fourth,* Oracle also asks that the jury be told, "Copyright protection also extends to the

27 source code, object code, and other elements of computer software, such as structure, sequence,

28

9

585003.06

organization, user interface, screen displays, and menu structures." This is inaccurate, because

those items are only *potentially* subject to copyright.  The relevant and correct framework is

provided by Google's proposal.  Without any qualification regarding functional requirements,

names, ideas, procedures, and other categories of unprotectable subject matter, Oracle's one-

sided instruction misstates the law.

*Fifth,* Oracle proposes to instruct the jury that "[t]he works involved in this trial" "can"

be protected by copyright law.  The ambiguity over what works are "involved in this trial"

renders this statement vague and likely incorrect.  The word "can" is ambiguous.  If it means

"might be," it serves no purpose to include this sentence.  If it means that the works *are*

protected, it represents Oracle's position on a disputed issue of law that the Court will need to

resolve.  Either way, the sentence is inappropriate.

**VI.      Disputed Instruction No. 8: Copyright—Subject Matter—Ideas and Expression**

Oracle's proposed addition to the model for this instruction misrepresents the Court's

statement in the Copyright MSJ Order.  Oracle would have the Court instruct the jury that "I

have already determined that the 37 API design specifications at issue in this case are not

methods of operation; therefore this is not a basis for finding that these API design specifications

are not copyrightable."

However, in the Order, the Court recognized that the terminology about APIs is

"slippery."  Copyright MSJ Order at 4.  The language on which Oracle bases its addition appears

in the Order only after many pages of explanation.  *Id.* at 10-11.

Google's proposed instruction, based on the same passage from the Copyright MSJ

Order, is more accurate and informative than Oracle's additions.  Instead of speaking in vague

generalities about "written works," Google's proposed changes precisely follow the Summary

Judgment Order, stating clearly that API package specifications are protectable, and leaving open

the possibility that the APIs themselves, as distinct from the package specifications, are methods

of operation and therefore unprotectable.  Google's proposed instruction additionally clarifies for

the jurors what a method of operation is, using language from caselaw directly relevant to the

585003.06

question of APIs:

> We think that "method of operation," as that term is used in §
> 102(b), refers to the means by which a person operates something,
> whether it be a car, a food processor, or a computer. Thus a text
> describing how to operate something would not extend copyright
> protection to the method of operation itself; other people would be
> free to employ that method and to describe it in their own words.
> Similarly, if a new method of operation is used rather than
> described, other people would still be free to employ or describe
> that method.

> We hold that the Lotus menu command hierarchy is an
> uncopyrightable "method of operation." The Lotus menu command
> hierarchy provides the means by which users control and operate
> Lotus 1-2-3. If users wish to copy material, for example, they use
> the "Copy" command. If users wish to print material, they use the
> "Print" command. Users must use the command terms to tell the
> computer what to do. Without the menu command hierarchy, users
> would not be able to access and control, or indeed make use of,
> Lotus 1-2-3's functional capabilities.

*Lotus Dev. Corp. v. Borland Int'l, Inc.* 49 F.3d 807, 815 (1st Cir. 1995), *aff'd by an equally divided court*, 516 U.S. 233 (1996).

Oracle's other significant change to the model is to strike the model language that explains that other forms of legal protection may be obtained to protect ideas ("In order to protect any ideas in the work from being copied, the author must secure some other form of legal protection, because ideas cannot be copyrighted.").  Jurors in this case will learn about both patents and copyrights.  It is important to help the jury keep these two legal concepts separate and distinct.  The model language that Oracle seeks to strike fills exactly that role, helping make clear to jurors that the protection of *ideas* is the domain of patent, rather than copyright.

**VII.    Disputed Instruction No. 9: Copyright—Subject Matter—Functional Requirements**

Google's instruction is taken from Ninth Circuit precedent holding that copyright protection does not apply to those portions of a work—particularly a computer program—that are required to allow a computer system to function or to facilitate compatibility with a particular computer system.  *Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1524 (9th Cir. 1992).  In *Sega*, the Court explained:

585003.06

However, computer programs are, in essence, utilitarian articles -- articles that accomplish tasks.  As such, they contain many logical, structural, and visual display elements that are dictated by function to be performed, by considerations of efficiency, or by external factors such as compatibility requirements and industry demands. *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 1992 WL 372273 23 U.S.P.Q.2d (BNA) 1241, 1253-56 (2d Cir. 1992) ("*CAI*").  In some circumstances, even the exact set of commands used by the programmer is deemed functional rather than creative for purposes of copyright.  "[W]hen specific instructions, even though previously copyrighted, are the only and essential means of accomplishing a given task, their later use by another will not amount to infringement."

*Id.* (alterations in original); *see also Incredible Techs v. Virtual Techs*, 400 F.3d 1007, 1012 (7th Cir. 2005) ("Useful articles and functional elements are also excluded from copyright protection.").  This is a significant limitation on copyright protection for computer programs that is ignored by Oracle.  It is important that the jury understand the distinction between purely expressive and functional elements of a computer program, which may have many unprotectable elements that are dictated by function or considerations of efficiency and compatibility.

## VIII.    Disputed Instruction No. 10: Copyright Infringement—Elements—Ownership and Copying

Both parties' proposals for this instruction are based on Ninth Circuit Model Jury Instruction No. 17.4. Google's adds the word "protectable," which is necessary for all the reasons given above in the discussion of Disputed Instruction No. 1.

The parties also dispute Oracle's added reference from *L.A. News Serv. v. Reuters TV Int'l*, 149 F.3d 987 (9th Cir. 1998). Oracle's proposed addition relates to the *scope of damages* in the event the jury finds Google liable for copyright infringement.  This instruction, however, is not about damages.  The added language has no place in an instruction about the elements Oracle must prove to establish liability in the first place.  The jury cannot rely on the scope of potential damages in deciding whether Google is liable.

## IX.    Disputed Instruction No. 11: Copyright Interests—Registration with the Copyright Office

Oracle's proposed instruction is unnecessary, and merely repeats part of the preliminary instruction the Court will already have given.  Moreover, Oracle's proposed instruction regarding

12

585003.06

1  copyright registration is misleading, unnecessary in the context of this case, and encourages the

2  jury to accord much greater weight to registration than is legally warranted.

3       Oracle proposes to instruct the jury that it "may presume, for example, that the Java-

4  related works at issue are original copyrightable expression because they have a valid copyright

5  registration."  For the reasons offered above regarding Disputed Instruction No. 1, this is

6  inaccurate and misleading.  It is inaccurate because there is no presumption regarding *elements*

7  of the registered works.  *See* Copyright MSJ Order at 8  ("The decision Oracle cites for this

8  proposition shows only that a certificate of registration may entitle its holder to a presumption of

9  copyright validity as to the registered work. *Swirsky v. Carey,* 376 F.3d 841, 851 (9th Cir. 2004)

10 (citing 17 U.S.C. 410(c)). Oracle cites no authority requiring a presumption of originality as to

11 specific elements of a registered work.").  It is misleading because any presumption that applies

12 to the registered work as a *whole* is irrelevant, because Oracle does not claim that the registered

13 work *as a whole* was copied, and Google's copyrightability challenge relates to *elements,* not the

14 registered work *as a whole.*

15      Based on the Ninth Circuit Model Jury Instructions, Google has included a statement

16 about registration in its preliminary copyright instruction.  *See* Disputed Instruction No. 1.

17 Given that the elements in dispute in this case are not separately registered and do not enjoy any

18 presumption of validity, there is no reason to instruct the jury a second time regarding copyright

19 registration.  If, however, the Court is inclined to offer a second instruction on registration at the

20 close of evidence, Google proposes that the instruction should follow the language in Google's

21 proposed preliminary instruction.  *See* Disputed Instruction No. 1.

22 **X.      Disputed Instruction No. 12: Copyright Infringement—Originality**

23      Google's proposed instruction is largely taken from Ninth Circuit Model Jury Instruction

24 17.12, with additional clarification regarding the expenditure of effort (so-called "sweat of the

25 brow") and the amount of protection extended to works that are minimally creative.  Both of

26 these are highly relevant to this case.

27      Google's proposed instruction on the effort involved in the creation of a work reflects

28

13

585003.06

1   Supreme Court precedent holding that copyright law does not protect the "sweat of the brow."

2   *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 359-60 (1991) ("Rather, the facts

3   contained in existing works may be freely copied because copyright protects only the elements

4   that owe their origin to the compiler—the selection, coordination, and arrangement of facts.");

5   *see also CDN, Inc. v. Kapes*, 197 F.3d 1256, 1261 (9th Cir. 1999) ("That this process [of

6   compilation] takes much time and effort is wholly irrelevant to whether the end product of this

7   work is copyrightable."). Because Oracle has repeatedly discussed the amount of labor required

8   to create Java, this instruction is necessary to reduce jury confusion during the jury's discussion

9   of originality.

10       Google's proposed instruction on thin copyright protection also directly reflects

11   applicable Ninth Circuit law. *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th

12   Cir. 1989) ("As with factual compilations, copyright infringement of compilations consisting of

13   largely uncopyrightable elements should not be found in the absence of 'bodily appropriation of

14   expression'") (citation omitted); *see also Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435,

15   1443 (9th Cir. 1994), *cert. denied*, 513 U.S. 1184 (1995) ("Rather, considering the license and

16   the limited number of ways that the basic ideas of the Apple GUI can be expressed differently,

17   we conclude that only "thin" protection, against virtually identical copying, is appropriate.").

18       Oracle's proposed addition to the model language, that "copyright law will protect an

19   original element of a work as long as it does not utterly lack creativity," is taken out of context

20   and overstates the law. Using the categorical "will" rather than the more correct "may," is a

21   misleading representation of the applicable case law. Under Ninth Circuit cases dealing

22   specifically with software, such as *Apple Computer*, 35 F.3d at 1446, a variety of other factors

23   that Oracle's language does not address, such as merger and *scenes a faire*, can cause elements to

24   be unprotectable. Accordingly, Oracle's language is misleading and should not be adopted.

25   **XI.    Disputed Instruction No. 13: Copyright—Subject Matter—Selection, Arrangement, or Organization**

26       Google's proposed instruction is based on Ninth Circuit Model Instruction 17.12.

27   Oracle's proposed instruction ignores the model entirely.

28
                                    14

585003.06

1     Oracle's proposed instruction on "Selection and Arrangement of Names" should be

2  rejected as incomplete.  Oracle has used this instruction to inform the jury that although the

3  Court has found that the individual names that are used in the "37 API design specifications at

4  issue" are not copyrightable, they can be protected by copyright if "their selection and

5  arrangement original enough that their combination constitutes an original work of authorship."

6  Oracle's proposed instruction, which is limited only to the selection and arrangement of names,

7  is incomplete.

8     First, the Court agreed that "the names of the Java language API files, packages, classes,

9  and methods are not protectable as a matter of law."  Copyright MSJ Order at 7.  Oracle's

10 proposed instruction, which refers generally to the "names that are used" is therefore misleading

11 and incomplete.

12    Second, Oracle is not limiting its claim to the selection and arrangement of names; rather,

13 Oracle has argued that the selection and arrangement and organization of unprotectable elements

14 of the APIs, including the organization of the API specifications themselves, is copyrightable.

15 Google's proposed instruction will instruct the jury as to the correct standard to be applied as to

16 any element of the Asserted Works for which Oracle claims copyrightability in the selection and

17 arrangement.

18    Google's instruction is supported by the Supreme Court's decision in *Feist Publications,*

19 *Inc. v. Rural Telephone Service Co., Inc.*.  A "selection and arrangement" of unprotected facts

20 (such as but not limited to the names at issue in this case) is not sufficiently original if it is

21 obvious, routine, or otherwise lacks creativity. *See Feist Pubs. Inc. v. Rural Tele. Svc. Co.,* 499

22 U.S. 340, 363-64 (1991) ("As a constitutional matter, copyright protects only those constituent

23 elements of a work that possess more than a *de minimis* quantum of creativity. Rural's white

24 pages, limited to basic subscriber information and arranged alphabetically, fall short of the

25 mark.").

26    Google's proposed instruction therefore should be accepted over Oracle's incomplete and

27 misleading proposal.

28

15

1   **XII.   Disputed Instruction No. 14: Copyright Interests—Derivative Work**

2          Both parties base their proposed instruction on Ninth Circuit Model Instruction No.

3   17.13.  Oracle and Google dispute two points.

4          First, Google's proposal clarifies, in the first paragraph, that the owner of a copyrighted

5   work is only entitled to exclude others from recasting, transforming or adapting the original,

6   protectable elements of a copyrighted work.  Second, Google's proposal adds an additional

7   sentence at the end of the instruction, stating the corollary that the use of unprotected elements of

8   a copyrighted work cannot infringe the owner's exclusive right to create a derivative.  Both of

9   these changes follow from Ninth Circuit authority.  *See Mirage Editions v. Albuquerque A.R.T.*

10  *Co.*, 856 F.2d 1341, 1343 (9th Cir. 1988) ("[A] work will be considered a derivative work only if

11  it would be considered an infringing work if the material which it has derived from a preexisting

12  work had been taken without the consent of a copyright proprietor of such preexisting work.")

13  (quoting 1 Nimmer § 3.01).

14         Absent Google's modifications, the jury could incorrectly conclude that a "derivative

15  work" claim is somehow different from other infringement claims, and that a derivative work

16  claim need not be based on the taking of *protectable* expression.  The Court should adopt

17  Google's proposed instruction.

18  **XIII.  Disputed Instruction No. 15: Copying—Access and Substantial Similarity or Virtual**
            **Identity**

19
           The jury should be instructed that virtual identity, rather than substantial similarity, is the

20  correct standard to use for comparison of the works at issue.  Where the range of protectable

21  expression is narrow, such as where merger, scenes a faire, technological constraints, and market

22  demands constrain the range of possible expression, only "thin" protection is afforded to the

23  work, and the appropriate standard for copying is virtual identity.  *See Apple Computer, Inc. v.*

24  *Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994), *cert. denied*, 513 U.S. 1184 (1995); *see*

25  *also Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003) (sculpture only entitled to thin

26  protection against virtually identical copying due to the narrow range of expression); *Ets-Hokin*

27  *v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003) ("When we apply the limiting doctrines,

28
                                              16

585003.06

1   subtracting the unoriginal elements, Ets-Hokin is left with only a 'thin' copyright, which protects

2   against only virtually identical copying.").  All of these factors apply in this case; therefore, the

3   jury instructions should follow Google's proposal and reference and explain virtual identity.

4           Whether the copyright is thin, and therefore whether the standard to be applied by the

5   jury is substantial similarity or virtual identity, is an issue for the Court to decide.  *See Apple*

6   *Computer,* 35 F.3d at 1443 ("Having dissected the alleged similarities and considered the range

7   of possible expression, the court must define the scope of the plaintiff's copyright — that is,

8   decide whether the work is entitled to 'broad' or 'thin' protection. Depending on the degree of

9   protection, the court must set the appropriate standard for a subjective comparison of the works

10  to determine whether, as a whole, they are sufficiently similar to support a finding of illicit

11  copying."); *see also Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 207-208 (9th Cir.

12  1989) (jury instructions that did not specify the protectability of materials at issue constituted

13  error requiring a new trial).  Google requests (and Oracle agrees) that the Court should instruct

14  the jury on the appropriate standard to use.

15          Should the Court decline to so instruct the jury, then the jury must be instructed that both

16  standards exist and how to choose between them, because either standard could apply.  Google's

17  proposed instruction on this issue draws directly from *Apple Computer,* which states, "When the

18  range of protectable and unauthorized expression is narrow, the appropriate standard for illicit

19  copying is virtual identity."  35 F.3d at 1439.  Oracle proposes not educating jurors on the issue

20  at all, which under *Harper House* would be reversible error.

21          Oracle's additions to the model instruction on the subject of striking similarity are largely

22  drawn from cases where the affirmative defense of independent creation is at issue, such as

23  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485-486 (9th Cir. 2000).  In this case, Google

24  is not offering a jury instruction on the affirmative defense of independent creation, so the

25  additions to the model instructions discussing striking similarity and access are unnecessary and

26  confusing.

27

28
                                              17

585003.06

1   **XIV.   Disputed Instruction No. 16: Copying—Access Defined**

2          Oracle's additions to the model instruction are not necessary, because it is uncontested

3   that Oracle made the APIs at issue broadly available to the general public.  As a result, access

4   will not be a significant issue at trial.

5          The additions proposed by Oracle are also highly prejudicial.  The first prong of the test

6   is prejudicial under the circumstances of this case because it suggests that access may be shown

7   by mere employment of former Oracle employees, a common practice in Silicon Valley for a

8   company of Google's size.  The second prong of the test is unnecessary because Google does not

9   contest that Oracle widely disseminated the Java API design specifications.  The third prong is

10  also unnecessary, prejudicial, and irrelevant because the jury is not being asked to decide the

11  affirmative defense of independent creation, and so a striking similarity instruction would

12  conflict with the guidance provided in *Sega Enters. Ltd. v. Accolade, Inc.* and further confuse the

13  jury.  *Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1524 (9th Cir. 1992) ("In some

14  circumstances, even the exact set of commands used by the programmer is deemed functional

15  rather than creative for purposes of copyright.  '[W]hen specific instructions, even though

16  previously copyrighted, are the only and essential means of accomplishing a given task, their

17  later use by another will not amount to infringement.'") (citing National Commission on New

18  Technological Uses of Copyrighted Works, Final Report 1, 20 (1979)).  The added language

19  proposed by Oracle is a red herring intended to mislead the jury and should be rejected.

20  **XV.   Disputed Instruction No. 17: Substantial Similarity—Extrinsic Test; Intrinsic Test**

21          The parties agree that copyrightability is a question of law for the Court to decide, not the

22  jury.  In the event that the Court concludes that it is within the jury's purview to determine

23  whether Oracle's works are copyrightable, the parties have each proposed alternative instructions

24  on how to determine whether the alleged copying is sufficient to constitute infringement.[2]

25

26  [2] There is no current model jury instruction on substantial similarity.  *See* NINTH CIRCUIT
27  MANUAL OF MODEL JURY INSTRUCTIONS – CIVIL No. 17.7 (2007) (withdrawn) comment
    (advising that the committee withdrew the prior model instruction on substantial similarity after
28  having concluded that it was "not helpful in light of the diverse facts that might arise at trial

18

585003.06

1    Oracle's proposed instruction is fundamentally flawed because it fails to instruct the jury

2    to determine the scope of copyright protection (i.e., using analytic dissection to distinguish

3    between protectable and unprotectable features of the Java platform), and fails to instruct the jury

4    to determine the appropriate standard for comparison.  Instead, it misleads the jury into accepting

5    as true that the alleged works are copyrightable in their entirety, and that only one standard may

6    be applied, namely substantial similarity.

7    On the other hand, Google's proposed instruction tracks *Apple Computer, Inc. v.*

8    *Microsoft Corp.*, 35 F.3d 1435, 1443, 1446 (9th Cir. 1994), *cert. denied*, 513 U.S. 1184 (1995),

9    which sets forth the prevailing Ninth Circuit test for infringement **as applied to software**, and has

10   identified these steps to follow:

11   (1) The plaintiff must identify the *source(s)* of the alleged
     similarity between his work and the defendant's work.

12

13   (2) Using analytic dissection, and, if necessary, expert testimony,
     the court must determine whether any of the allegedly similar

14   features are protected by copyright.  Where, as in this case, a
     license agreement is involved, the court must also determine which

15   features the defendant was authorized to copy.  Once the scope of
     the license is determined, unprotectable ideas must be separated

16   from potentially protectable expression; to that expression, the
     court must then apply the relevant limiting doctrines in the context

17   of the particular medium involved, through the eyes of the ordinary
     consumer of that product.

18

19   (3) Having dissected the alleged similarities and considered the
     range of possible expression, the court must define the scope of the

20   plaintiff's copyright-that is, decide whether the work is entitled to
     "broad" or "thin" protection.  Depending on the degree of

21   protection, the court must set the appropriate standard for a
     subjective comparison of the works to determine whether, as a

22   whole, they are sufficiently similar to support a finding of illicit
     copying.

23

24

25   _____

26   pertinent to a substantial similarity assessment," and that "the court and counsel would be best
     served by specifically crafting instructions in this area based upon the particular work(s) at issue,

27   the copyright in question, and the evidence developed at trial").

28                                                 19

585003.06

1   35 F.3d at 1443 (italics in original); *see also id.* at 1439 & 1442 (ruling that the standard is

2   virtual identity "[w]hen the range of protectable and unauthorized expression is narrow," and

3   "only 'thin' protection, against virtually identical copying, [was] appropriate" in its case).[3]   The

4   process described in *Apple Computer* (and correspondingly in Google's proposed instruction) is

5   even supported by the cases Oracle cites in support of its version.   *See Brown Bag Software v.*

6   *Symantec Corp.*, 960 F.2d 1465, 1476 (9th Cir. 1992) (stating that "*Data East* [*USA, Inc. v.*

7   *Epyx, Inc.*, 862 F.2d 204 (9th Cir. 1988)] teaches that the source of the similarity must be

8   identified and a determination made as to whether this source is covered by plaintiff's

9   copyright," and concluding that the district court properly engaged in this process through

10   analytic dissection).

11        Oracle's version, however, does not provide instruction on analytic dissection or the

12   standard of infringement, and further errs by suggesting that in applying the intrinsic test the jury

13   cannot compare the works as a whole.   *Compare* Oracle's Disputed Jury Instruction No. 17

14   (stating "[i]n determining whether there was substantial similarity between the plaintiff's

15   copyrighted work and the defendant's work, your analysis should focus on the similarities

16   between what was allegedly copied, not on any additions to the work made by Google") *with*

17   *Apple Computer*, 35 F.3d at 1446 (stating that while protected elements must be distinguished

18   from unprotected elements, "[t]his does not mean that at the end of the day, when the works are

19

20   _____

     [3]   As explained in *Apple Computer*, this analysis applies both an "extrinsic" and "intrinsic" test.

21   *See id.*, 35 F.3d at 1442-43.  The extrinsic test "objectively considers whether there are
     substantial similarities in *both* ideas and expression," and is used to determine the scope of

22   copyrighted features.  *Id.* at 1442 (italics in original); *see also Mattel, Inc. v. MGA*
     *Entertainment, Inc.*, 616 F.3d 904, 913 (9th Cir. 2010) ("At the initial 'extrinsic' stage, we

23   examine the similarities between the copyrighted and challenged works and then determine
     whether the similar elements are protectable or unprotectable.") (citing *Apple Computer*, 35 F.3d

24   at 1442-43).  Further, in using analytic dissection under the extrinsic test, the doctrines of merger
     and scenes a faire must be applied.  *Apple Computer*, 35 F.3d at 1444.  Once the appropriate

25   standard is determined (substantial similarity or virtual identity), the intrinsic test is applied and
     measures "similarity of expression from the standpoint of the ordinary reasonable observer."  *Id.*

26   at 1442; *see also Mattel*, 616 F.3d at 914 ("The standard for infringement—substantially similar
     or virtually identical—determined at the 'extrinsic' stage is applied at the 'intrinsic' stage.")

27   (citing *Apple Computer*, 35 F. 3d at 1442-43).

28

1    considered under the intrinsic test, they should not be compared as a whole").  Oracle's proposed

2    instruction must therefore be rejected for failing to comply with *Apple Computer*.  *See Jada*

3    *Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 637 (9th Cir. 2008) (remanding and instructing that

4    "[t]he district court must analyze Mattel's copyright claim under the *Apple Computer*

5    framework").

6            Oracle's version is further unhelpful because it instructs the jury to examine the works

7    "objectively and subjectively" but does not explain for what purpose these two different tests are

8    to be applied.  It also relies on inapposite analogies that apply to literature (e.g., comparing "two

9    plays" and their component parts, "the plot, theme, character, and dialogue") but not software.

10           Therefore, if the Court declines to decide what portion, if any, of Oracle's Asserted

11   Works is copyrightable, the Court should instruct the jury using Google's proposed instruction.

12   **XVI.    Disputed Instruction No. 18: Copyright Infringement—Copying from a Third Party**

13           Google and Oracle largely agree on the language of this instruction.  Oracle's version of

14   the instruction, however, contains a statement that Google is liable for copying from a third party

15   "even if Google believed in good faith that it was not infringing a copyright."  Oracle's

16   categorical statement that Google "is liable" despite good faith belief that it was not infringing

17   Oracle's copyrights is incorrect, misleading, and could confuse the jury on an important issue,

18   and so should not be included in the instructions.

19           Oracle's additional language risks giving the jury the impression that any defense based

20   on good faith belief, such as a belief in the existence of a license, can be overcome merely by a

21   showing that code was copied from a third party.  Moreover, Oracle's additional language

22   incorrectly omits the many additional reasons why copying might not result in liability—the

23   copying might not be substantial enough, or might be a fair use, for example.  It thus is incorrect

24   to say that Google "is liable" even if it has a good faith belief it was not infringing; if the use is a

25   fair use, or insubstantial, Google is *not* liable, whether it had a good faith belief it was not

26   infringing or not.

27           Oracle's additional language is unnecessary to the purpose of the instruction, and also

28

585003.06

1    risks substantially confusing jurors while they evaluate any defenses offered by Google.  As a

2    result, Oracle's additions should be struck and Google's instruction should be adopted.

3    **XVII.  Disputed Instruction No. 19: Copyright Liability—Vicarious Infringement—**
     **Elements and Burden of Proof**
4

5           Both Oracle's and Google's proposed instructions derive from Ninth Circuit Model Civil

     Jury Instruction 17.20. Oracle's instruction, however, adds language suggesting that the jury
6
     should find Google had the right and ability to supervise the mobile device manufacturers',
7
     mobile service providers', and developers' alleged direct infringement because Google
8
     purportedly has the "ability to block or police use of its Android platform." (Oracle Proposed
9
     Instruction No. 20.) Oracle's addition is based on an overbroad application of *A&M Records,*
10
     *Inc. v. Napster, Inc.,* 239 F.3d 1004 (9th Cir. 2001), which is cited in the comment to the model
11
     instruction.
12
            In *Napster,* the Ninth Circuit found a right and ability to supervise where the service
13
     "ha[d] the ability to locate infringing material listed on its search indices, and the right to
14
     terminate users' access to the system." *Id.* at 1024. Google's relationship with mobile device
15
     manufacturers, mobile service providers, and developers does not exhibit this level of control.
16
     Unlike Napster, Google does not operate any network or service that serves as the "site and
17
     facilities" for distribution of executable copies of the Android operating system. Google offers
18
     the software freely for download by anyone, and maintains no ability to monitor activity or
19
     restrict access by developers or hardware vendors who download the code. While Google has the
20
     limited ability to influence device companies and developers by prohibiting such entities from
21
     using the Android trademark if they fail to comply with certain technical requirements, that alone
22
     cannot curtail use of the Android APIs in any way. Google has no contractual or technological
23
     means of managing such usage. *See Metro-Goldwyn-Mayer v. Grokster, Ltd.,* 380 F.3d 1154,
24
     1165–66 (9th Cir. 2004) (distinguishing *Napster* where even "shutting down [defendant's] XML
25
     file altogether would not prevent anyone from using the Gnutella network"), *vacated on other*
26
     *grounds by* 545 U.S. 913 (2005). Accordingly, the *Napster* language included by Oracle is not
27
     relevant to this case, and will confuse the jury into holding Oracle to a lower standard on its
28
                                                    22

1    vicarious infringement claim.

2    **XVIII.  Disputed Instruction No. 20: Copyright Liability—Contributory Infringement**

3           The only substantive dispute between the parties' proposal is how to define the works

4    allegedly infringed. For the reasons discussed above in connection with Disputed Instruction No.

5    1, the Court should refer to the allegedly infringed works as the "Asserted Works."

6    **XIX.   Disputed Instruction No. 21: Copyright—Willful Infringement**

7           Oracle has proposed a jury instruction regarding willful copyright infringement.  No such

8    instruction is necessary, because willfulness is irrelevant to the copyright claim.

9           The only place in the Copyright Act where willfulness is mentioned is in the provision

10   regarding statutory damages.  "In a case where the copyright owner sustains the burden of

11   proving, and the court finds, that infringement was committed willfully, the court in its discretion

12   may increase the award of statutory damages to a sum of not more than $150,000. "  17 U.S.C.

13   § 504(c)(2).  That $150,000 is a *per work* maximum, not a "per infringement" figure.  *Id.*

14   § 504(c)(1).  Oracle has not elected statutory damages, and has offered no jury instructions about

15   statutory damages (and had it done so, Google would be entitled to a corresponding instruction

16   on innocent infringement).  The reference to willful infringement in section 504(c)(2) cannot

17   support Oracle's request for a willful infringement instruction.

18          Instead, Oracle argues that it is entitled to this instruction because it believes that if

19   Google is found to be a willful copyright infringer, that limits the deductions allowed Google's

20   profits attributable to infringement are calculated.  This, however, is wrong.  Calculation of

21   profits is governed by section 504(b):

22              Actual Damages and Profits. - The copyright owner is entitled to
                recover the actual damages suffered by him or her as a result of the
23              infringement, and any profits of the infringer that are attributable
                to the infringement and are not taken into account in computing the
24              actual damages. In establishing the infringer's profits, the copyright
                owner is required to present proof only of the infringer's gross
25              revenue, and the infringer is required to prove his or her deductible
                expenses and the elements of profit attributable to factors other
26              than the copyrighted work.

27

28   17 U.S.C. § 504(b).  Nothing in that provision states that "profits of the infringer that are

23

585003.06

1   attributable to the infringement" has a different definition depending on whether the

2   infringement is willful.  *Id.*

3          Oracle presumably will rely on Ninth Circuit cases that mention the *possibility* that a

4   willful infringer might not be allowed to deduct certain overhead expenses from its gross

5   revenues.  None of these cases, however, actually holds that such deductions are not allowed.

6   For example, in *Kamar Int'l, Inc. v. Russ Berrie & Co.,* the Ninth Circuit acknowledged a

7   Second Circuit case holding that where the defendant engages in "deliberate plagiarism,"

8   overhead expenses should not be deducted when calculating wrongful profits.  752 F.2d 1326,

9   1331 (9th Cir. 1984) (citing *Sheldon v. Metro-Goldwyn Pictures Corp.,* 106 F.2d 45, 51 (2d Cir.

10  1939), *aff'd* 309 U.S. 390 (1940)). The logic of *Sheldon,* however, was not that a deliberate

11  plagiarist (which is not the standard that Oracle proposes in its "willfulness" instruction) should

12  be punished by disallowing deductions.  Instead, it was that, *on the facts presented,* some

13  overhead costs actually were not expenses related to generating the revenues attributable to the

14  infringement.  *See Sheldon,* 106 F.2d at 51.  Far from creating a rule of exclusion of overhead

15  deductions for deliberate plagiarists, the Second Circuit recognized that "out of all this no real

16  standard emerges."  *Id.*  Moreover, although the Ninth Circuit *discussed* the *Sheldon* case, it did

17  not *adopt* a rule that willful infringers cannot deduct overhead expenses.  Instead, it affirmed a

18  finding that the defendant was not a willful infringer, *Kamar,* 752 F.2d at 1331, which meant that

19  it was unnecessary to decide whether willful infringers are denied deductions for overhead

20  expenses.

21         Similarly, in *Three Boys Music Corp. v. Bolton*, the Ninth Circuit noted that "non-willful

22  infringers" are entitled to deduct income taxes and management fees actually paid.  212 F.3d

23  477, 487 (9th Cir. 2000).  That statement is non-controversial; even Oracle presumably would

24  concede that the deductions were proper in that case.  Moreover, as to taxes, it has no relevance

25  to this case, because Google's damages expert has not deducted taxes.  And, as to management

26  fees actually paid, those fees would be deductible even following the reasoning of the Second

27  Circuit in *Sheldon. See* 106 F.2d at 51 (*allowing* deductions for "factors as they bought and paid

28                                                  24

585003.06

1   for; the actors, the scenery, the producers, the directors and the general overhead").

2       Finally, in *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,* the Ninth Circuit held that

3   overhead expenses are deductible "at least where the infringement was not willful, conscious, or

4   deliberate."  772 F.2d 505, 515 (9th Cir. 1985).  Again, however, the court affirmed a finding

5   that the infringement was *not* willful, and thus did not reach the issue of whether a willful

6   infringer should be denied certain deductions.  *Id.*

7       Thus, no Ninth Circuit case holds that willfulness is relevant to determining what

8   expenses are deductible.  The plain language of section 504(b) offers no textual basis for

9   concluding that deductible expenses are different for willful infringers.  Nothing in the Copyright

10  Act suggests that willfulness has any bearing on a copyright claim for which statutory damages

11  are not being sought.  The Court should reject Oracle's willfulness instruction because it is

12  irrelevant to the copyright claim.

13  **XX.    Disputed Instruction No. 22: Copyright Infringement—De Minimis Copying**

14      Although framed slightly differently, Google and Oracle agree that for an unauthorized

15  use of a copyrighted work to be actionable, the use must be significant enough to constitute

16  infringement.  The parties also agree that in order to determine whether or not copying is

17  substantial enough to be considered infringement, the jury must consider the qualitative and

18  quantitative significance of the copied portion in relation to Oracle's Asserted Work as a whole.

19  *See Newton v. Diamond*, 388 F.3d 1189, 1192-93 (9th Cir. 2004), *cert. denied*, 545 U.S. 1114

20  (2005).  Google and Oracle differ because the parties' dispute what the relevant work is, and thus

21  what the jury should consider when it considers "the work as a whole."  Google contends that the

22  work as a whole is Oracle's Java platform.  Oracle (mostly) contends that the work as a whole is

23  each individual code file.

24      Oracle does not dispute that its Amended Complaint alleges as the works at issue J2SE

25  versions 1.4 and 5.0, and that it has not separately registered anything other than various versions

26  of the Java platform.  The Court has cited authority holding that "when a single published unit

27  contains multiple elements 'that are otherwise recognizable as self-contained works,' the unit is

28

25

585003.06

1    considered a single work *for the limited purpose of registration*, while its elements may be

2    recognized as separate works for other purposes."  Copyright MSJ Order at 6 (Dkt. No. 433)

3    (emphasis in original); *see also Tattoo Art, Inc. v. TAT Int'l, LLC*, -- F. Supp. 2d --, No.

4    2:10cv323, 2011 WL 2585376, at \*15-\*18 (E.D. Va. June 29, 2011) ("Although plaintiff's

5    manner of organizing the Books for purposes of copyright registration is not dispositive, the fact

6    that such organization was also adopted for purposes of the sale of plaintiff's tattoo images leads

7    the Court to conclude, pursuant to *Xoom* and *Bryant,* that plaintiff is only entitled to one statutory

8    damage award per Book infringed.").[4]   Hence, the pertinent question is whether there is any

9    evidence that the eleven files of code have any meaningful, independent economic existence.

10   The answer is that they do not.  At most, Oracle's technical expert speculates that these are

11   important file fragments, but this goes to the qualitative significance of the code files, not

12   whether they are economically independent and viable works.  Oracle's damages expert,

13   meanwhile, offers no analysis of the independent value of any of the eleven code files.

14         Moreover, even within this one instruction, and throughout its proposed instructions,

15   Oracle speaks out of both sides of its mouth.  For purposes of defeating Google's *de minimis*

16   argument with respect to the code files, Oracle has taken the position that the works at issue are

17   the individual code files.  The next paragraph of Oracle's instruction, however, states that "[t]he

18   *de minimis* defense does not apply if you find that Google infringed Oracle's copyrights in the 37

19   API design specifications, because, collectively, the copying in the API design specifications and

20   the code files would be more than *de minimis*."  This portion of the instruction makes sense only

21   if the "work as a whole" is *not* limited to the individual code files.

22         In short, when it suits it to do so, Oracle defines its work at issue narrowly as particular

23   elements of the J2SE versions it alleges Google copied.  But Oracle defines its work more

24   broadly as the "java platform" when it seeks to inflate the significance of what has been

25   _____

26   [4] The other case cited as authority by Oracle, *Idearc Media Corp. v. NorthwestNw. Directories,*
     *Inc*., 623 F. Supp. 2d 1223, 1230-31 (D. Or. 2008), is inapposite since it considers whether a
27   copyright registration for a directory satisfies the registration requirement for an infringement
     suit over the display ads contained within the directory.

28                                        26

1   allegedly copied, as it does for purposes of computing damages.  This is not only confusing for

2   the jury, but internally inconsistent.  Oracle's *de minimis* instruction defining the "work as a

3   whole" first as each individual code file and in the next paragraph as the Java platform should be

4   rejected.  The Court should adopt Google's proposed instruction, under which the "work as a

5   whole" would be version 1.4 or 5.0 of J2SE.

6   **XXI.   Disputed Instruction No. 23: Copyright—Merger**

7             Google's proposed instruction on the merger doctrine is substantively virtually identical

8   to ABA Model Jury Instruction 1.4.7. Google has adapted the ABA model jury instruction to the

9   specific computer software context of this litigation by removing portions relevant only to other

10  types of works, such as prose writing, and pictoral, graphic, and sculptural works. For the same

11  reason, Google adds language directly referencing the Ninth Circuit's decision in *Apple*

12  *Computer*: "The [merger] doctrine may apply to software, such as when an icon representing a

13  document stored in a computer program can only be expressed in a limited number of ways, such

14  as an image shaped like a page." *See Apple Computer, Inc. v. Microsoft Corp, Inc.,* 35 F.3d 1435,

15  1444 (9th Cir. 1994), *cert. denied,* 513 U.S. 1184 (1995) ("[I]n this case, the idea of an icon in a

16  desktop metaphor representing a document stored in a computer program can only be expressed

17  in so many ways. An iconic image shaped like a page is an obvious choice.")

18            In addition, Google's proposed instruction reflects that merger may arise subsequent to

19  the creation of a work and is evaluated based on conditions and constraints faced by the

20  defendant at the time of the alleged infringement. This was made clear in *Veeck v. S. Bldg. Code*

21  *Cong. Int'l,* 293 F.3d 791, 802 (5th Cir.), *cert. denied*, 537 U.S. 1043 (2002). There, the court

22  held that merger did not affect model building codes prior to passage, since at the time of

23  drafting the author had numerous expressive options available. Once enacted in a particular

24  jurisdiction, the idea underlying the code could only be expressed using its precise language.

25  Accordingly, a defendant who copied the language post-enactment could not be liable for

26  infringement. *Id.* ("Veeck copied from SBCCI's model codes, 1994 edition, because those codes

27  were transformed into the 'fact' and 'idea' of the towns' building codes. Veeck could not express

28

27

585003.06

1   the enacted law in any other way."); *see also Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510,

2   1524 & n.7 (9th Cir. 1992) (relying on the limited ways the *defendant* had to write software code

3   at issue).

4        Oracle's proposed instruction will not sufficiently inform the jury on the application of

5   merger doctrine in this context. First, Oracle's statement of the general principle is incomplete.

6   Oracle states that merger occurs only when "the idea underlying the copyrighted work can be

7   expressed in *only one way . . . .*" (emphasis added).  Merger is a broader concept that that—

8   merger may occur as well when there are "only a few ways of expressing the ideas or other

9   unprotected matter in a work." ABA Model Instruction 1.4.7.  Second, Oracle's proposed

10   instruction is devoid of any insight into the law relating specifically to computer software.  Its

11   purely abstract description of the doctrine will give the jury no guidance in applying key

12   precedent such as the *Apple Computer* decision cited above.

13        The Court therefore should accept Google's proposed instruction.

14   **XXII.  Disputed Instruction No. 24: Copyright—*Scenes a Faire***

15        Both parties have used the ABA Model Jury Instruction 1.4.8 as a base for the proposed

16   instruction on the limiting doctrine of *scenes a faire.*  Google's instruction, however, adds

17   language that informs the jury how the doctrine of *scenes a faire* is applied specifically in the

18   computer software context, whereas Oracle's relies solely on an analogy to literature.  Google's

19   instruction will provide context for the jury and inform the jury how to apply the doctrine in this

20   case.

21        The doctrine of *scenes a faire* is often applied in the software context.  For instance, in

22   *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435 (9th Cir. 1994), *cert. denied,* 513 U.S.

23   1184 (1995), the Ninth Circuit upheld a ruling that specific common mechanisms for operating a

24   computer via the graphical user interfaces of competing operating systems were not protectable.

25   *Apple Computer,* 35 F.3d at 1444 ("[U]se of overlapping windows inheres in the idea of

26   windows. A programmer has only two options for displaying more than one window at a time:

27   either a tiled system, or an overlapping system. As demonstrated by Microsoft's *scenes a faire*

28

video, overlapping windows have been the clear preference in graphic interfaces. Accordingly, protectable substantial similarity cannot be based on the mere use of overlapping windows, although, of course, Apple's particular expression may be protected."); *see also Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1375 (10th Cir. 1997) ("[I]n this case the district court correctly found that much of the expression in Mitel's command codes was dictated by the proclivities of technicians and limited by significant hardware, compatibility, and industry requirements. In particular, the record contains substantial evidence supporting the conclusion that Mitel's values should be excluded from protection against infringement under the *scenes a faire* doctrine.").

As the Second Circuit described in *Computer Associates Intern., Inc. v. Altai, Inc.* 982 F.2d 693, 709-10 (2d Cir. 1992):

> "[I]n many instances it is virtually impossible to write a program to perform particular functions in a specific computing environment without employing standard techniques." This is a result of the fact that a programmer's freedom of design choice is often circumscribed by extrinsic considerations such as (1) the mechanical specifications of the computer on which a particular program is intended to run; (2) compatibility requirements of other programs with which a program is designed to operate in conjunction; (3) computer manufacturers' design standards; (4) demands of the industry being serviced; and (5) widely accepted programming practices within the computer industry.

*Id.* (quoting 3 Nimmer on Copyright § 13.03[F][3], at 13-65).

The only other disputed issue is that Oracle insists that Google must identify the work at issue for this instruction. As is argued above in connection with Disputed Instruction No. 1, it is Oracle's burden to identify the work that has been infringed in this case and the work should be defined consistently throughout the instructions.

## XXIII. Disputed Instruction No. 25: Copyright—Fair Use

Both parties base their proposed fair use instruction on Ninth Circuit Model Instruction 17.18. The parties' modifications to this model instruction differ in three respects: (1) Google's preface replaces "public interest" with the "purpose of copyright, which is to promote the progress of sciences and the useful arts"; (2) Google's second paragraph defines the type of claimed fair use as "making a transformative use"; and (3) the parties offer different summaries

29

585003.06

1   of the four fair use factors.

2         Google's explanation that fair uses are those which advance the "purpose of copyright,

3   which is to promote the progress of sciences and the useful arts" is based on the Ninth Circuit's

4   admonition that "[t]he four factors are to be considered together in light of the purposes of

5   copyright, not in isolation."  *Sony v. Bleem*, 214 F.3d 1022, 1026 (9th Cir. 2000).  Because *Sony*

6   *v. Bleem* requires that the four factors be considered "in light of the purposes of copyright," the

7   Court should instruct the jury what those purposes are.  And as the Supreme Court has explained,

8   copyright's "very purpose" is "'[t]o promote the Progress of Science and useful Arts. . . .'"

9   *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 575 (1994) (quoting U. S. Const., Art. I, § 8,

10  cl. 8; ellipsis added by the Supreme Court).  While Oracle may dispute the need to inject policy

11  goals into this instruction, binding authority *requires* that the jury know the purposes of

12  copyright and consider the fair use factors in light of those purposes.

13        Google's characterization of the type of fair use it seeks to establish is more appropriate

14  than Oracle's characterization.  First, the illustrative examples from the model refer to *categories*

15  of fair use—criticism, comment, news reporting, teaching, scholarship, research—as does

16  Google's proposal—making a transformative use.  Second, Oracle's proposal ("allowing

17  applications written in the Java language to run on the Android platform") is unduly narrow.  A

18  key part of the fair use inquiry is whether the defendant's use "adds something new with a

19  further purpose or different character, altering the first with new expression, meaning or

20  message."  *Campbell*, 510 U.S. at 579.  As such, the appropriate frame for the question is not

21  merely the effect of implementing the API packages at issue, but what "further purpose" Google

22  added, which includes facts about the Android platform more generally.  It would mislead the

23  jury to suggest that all they are to consider is the issue of compatibility.

24        Finally, on the fair use factors, Oracle's explanations are entirely one-sided.  For each

25  factor, Oracle proposes to tell the jury precisely what facts would favor its position.  The jury

26  should instead be given a neutral presentation.  For example, for the first factor, Google adapts

27  language from the Supreme Court.

28
                                        30

585003.06

> The central purpose of this investigation [i.e. the first factor investigation] <u>is to see</u>, in Justice Story's words, <u>whether the new work merely "supersede[s] the objects" of the original creation,</u> *Folsom v. Marsh, supra,* at 348; *accord, Harper & Row, supra,* at 562 ("supplanting" the original), <u>or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message</u>; it asks, in other words, whether and to what extent the new work is "transformative." Leval 1111.

*Campbell,* 510 U.S. at 579 (underlined emphasis added to show the specific language relied upon for Google's instruction).

Similarly, Google's explanation of the second factor offers a neutral presentation, instructing the jury to consider where on the spectrum of creativity Oracle's work lies. Specifically, Google's instruction is based on the following discussion by the Ninth Circuit of the second factor:

> The second statutory factor, the nature of the copyrighted work, reflects the fact that <u>not all copyrighted works are entitled to the same level of protection</u>. The protection established by the Copyright Act for original works of authorship <u>does not extend to the ideas underlying a work or to the functional or factual aspects of the work</u>. 17 U.S.C. § 102(b). <u>To the extent that a work is functional or factual, it may be copied,</u> *Baker v. Selden,* 101 U.S. (11 Otto) 99, 102-04, 25 L.Ed. 841 (1879), <u>as may those expressive elements of the work that "must necessarily be used as incident to" expression of the underlying ideas, functional concepts, or facts,</u> *id.* at 104. <u>Works of fiction receive greater protection than works that have strong factual elements, such as historical or biographical works,</u> *Maxtone-Graham,* 803 F.2d at 1263 (citing *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 307 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967)), <u>or works that have strong functional elements, such as accounting textbooks,</u> *Baker,* 101 U.S. at 104. Works that are merely compilations of fact are copyrightable, but the copyright in such a work is "thin." *Feist Publications,* ___ U.S. at ____, 111 S.Ct. at 1289.

*Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1524 (9th Cir. 1992 ) (underlined emphasis added to show the specific language relied upon for Google's instruction). In addition, Google relies on the Ninth Circuit's statement, also in *Sega,* that "functional requirements for compatibility" are "not protected by copyright."  *Id.* at 1522 (explaining that Accolade was entitled to "discover the functional requirements for compatibility with the Genesis console—

31

1    aspects of Sega's programs that are not protected by copyright. 17 U.S.C. § 102(b)").

2        The model instruction's explanation of the third factor is, itself, enough. Moreover,

3    unlike Oracle's proposal, the model instruction's explanation is neutral. If the Court is inclined to

4    add any of Oracle's additional language, the instruction should also include still further language

5    to balance the presentation of this factor.  In particular, if the Court adopts Oracle's additions to

6    this factor, it should also instruct the jury that if Google has copied only "as much as is necessary

7    for [its] intended use, then this factor will not weigh against [it]."  *Kelly v. Arriba Soft Corp.,* 336

8    F.3d 811, 820-21 (9th Cir. 2003) ("If the secondary user only copies as much as is necessary for

9    his or her intended use, then this factor will not weigh against him or her.").

10       Finally, Oracle's explanation of the fourth factor is, again, misleadingly one-sided.

11   Indeed, Oracle's suggestion that competition weighs against fair use ignores the case that is most

12   closely on point, namely *Sony Comp. Ent't, Inc. v. Connectix Corp.,* 203 F.3d 596 (9th Cir.

13   2000).  In *Sony v. Connectix,* as here, the defendant created a new software platform that was

14   compatible with the plaintiff's work.  The Court recognized that the defendant's use would

15   compete with the plaintiffs:

16           Sony understandably seeks control over the market for devices that
             play games Sony produces or licenses. The copyright law,
17           however, does not confer such a monopoly. *See* [*Sega,* 977 F.2d] at
             1523-24 ("[A]n attempt to monopolize the market by making it
18           impossible for others to compete runs counter to the statutory
             purpose of promoting creative expression and cannot constitute a
19           strong equitable basis for resisting the invocation of the fair use
             doctrine.").
20

21   203 F.3d at 607-08.  Notwithstanding the competition, the court held that the forth factor *favored*

22   *the defendant.  Id.* at 608.  As the court explained, and as Google's proposed instruction also

23   explains:

24           But because the Virtual Game Station is transformative, and does
             not merely supplant the PlayStation console, the Virtual Game
25           Station is a <u>legitimate competitor</u> in the market for platforms on
             which Sony and Sony-licensed games can be played. *See Sega,* 977
26           F.2d at 1522-23. For this reason, <u>some economic loss by Sony as a</u>
             <u>result of this competition does not compel a finding of no fair use</u>.
27

28                                        32

585003.06

1   *Id.* at 607 (underlined emphasis showing the specific language relied upon for Google's

2   instruction added).

3   **XXIV. Disputed Instruction No. 26: Patent—Summary of Contentions**

4          The only disputed issue between the parties' proposals regarding this instruction is how

5   to define the patents in suit.  For the reasons discussed above, the Court should refer to them as

6   the "Asserted Patents."  *See infra* Part II.A.

7   **XXV.  Disputed Instruction No. 27: Patent—Presumption of Validity**

8          Google objects to including an instruction on the presumption of validity.  Neither the

9   Northern District of California Model Patent Jury Instructions nor the Federal Circuit Bar

10  Association Model Patent Jury Instructions contain any such instruction—and with good reason.

11  The presumption of validity is already accounted for in the heightened burden of proving

12  invalidity.  Indeed, that is reflected in the citation to 35 U.S.C. § 282 in Federal Circuit Bar

13  Association Model Patent Jury Instruction 4.1.  To provide an additional instruction on the

14  presumption would therefore be akin to double counting.

15         Furthermore, it would be prejudicial and misleading to allow Oracle to play up the

16  presumption while Oracle also seeks to exclude evidence of the re-examinations from trial (even

17  as to the issue of willfulness, where such evidence is probative on the existence of an objectively

18  high likelihood of infringing a valid patent).  To the extent Oracle wants to focus on the

19  presumption, it opens the door to allowing evidence of the re-examinations to level the playing

20  field.  Certainly Oracle cannot have it both ways:  relying on a presumption that the PTO did its

21  duty in the first instance, but did not do its duty in either granting a re-examination or issuing an

22  Office Action rejecting the claims.

23  **XXVI. Disputed Instruction No. 32: Patent—Direct Infringement**

24         **A.      Distributing source code for free does not qualify as a sale or offer for sale**

25         The parties dispute whether 35 U.S.C. § 271(a) makes offering a patented invention for

26  free an act of infringement.  Google proposes to instruct the jury that a sale or offer for sale must

27

28

585003.06

1    involve an exchange or offer to exchange something for value.  Oracle, however, proposes to

2    instruct the jury that offering or distributing something for free may constitute infringement.

3         Section 271(a) defines patent infringement to include only certain discrete acts:  "Except

4    as otherwise provided in this title, whoever without authority *makes, uses, offers to sell, or sells*

5    any patented invention, within the United States, or imports into the United States any patented

6    invention during the term of the patent therefore, infringes the patent."  35 U.S.C. § 271(a)

7    (emphasis added).  Because Congress did not define these terms, they take their well-known

8    ordinary meanings.  *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir.

9    2005); *see also Medical Solutions, Inc. v. C Change Surgical LLC*, 541 F.3d 1136, 1141 (Fed.

10   Cir. 2008); *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1255 (Fed. Cir. 2000).

11        Google's proposed instruction reflects the ordinary meaning of these terms.  "The

12   definition of 'sale' is:  '1.  The transfer of property or title *for a price*.  2.  The agreement by

13   which such a transfer takes place.  The four elements are (1) parties competent to contract, (2)

14   mutual assent, (3) a thing capable of being transferred, and (4) *a price in money paid or*

15   *promised*.'"  *NTP*, 418 F.3d at 1319 (quoting *Black's Law Dictionary* 1337 (7th Ed. 1999))

16   (emphases added).  "Plainly, the common, or usual meaning of the term sale includes those

17   situations in which a contract has been made between two parties who agree to transfer title and

18   possession of specific property *for a price*."  *Enercon GmbH v. ITC*, 151 F.3d 1376, 1382 (Fed.

19   Cir. 1998) (emphasis added).

20        By definition, distribution of a product for *free* does not constitute a transfer for *a price*.

21   In a case involving patents for collecting and using newborn umbilical cord blood, the Federal

22   Circuit found no infringement where "[t]he defendants simply transferred the cord blood units to

23   designated transplanters upon direction from the families.  Such a transaction does not constitute

24   a 'sale' to a transplanter under any definition of the term 'sale.'"  *PharmaStem Therapeutics, Inc.*

25   *v. Viacell, Inc.*, 491 F.3d 1342, 1359 (Fed. Cir. 2007).  Although *PharmaStem* construed the

26   meaning of "sells" in section 271(c), the term has the same meaning in section 271(a).  *See infra*

27   Part XXX.  Thus, district courts have concluded that distribution of free samples does not

28

1   constitute a sale within the meaning of section 271(a).  *See Cabot Corp. v. WGM Safety Corp.*,

2   562 F. Supp. 891, 892 (D. Mass. 1983).

3          Because free distribution is not a sale, *a fortiori* offering to distribute something for free

4   is not an offer for sale.  *See Rotec*, 215 F.3d at 1255; *HollyAnne Corp. v. TFT, Inc.*, 199 F.3d

5   1304, 1309-10 (Fed. Cir. 1999).  "If, as in this case, the offer included none of the hallmarks of a

6   potential commercial transaction (i.e., a quotation of a price and a product description, or a

7   communication that the item was available for purchase by the intended donee), it cannot be

8   considered an offer for sale."  *HollyAnne*, 199 F.3d at 1310.

9          Nor does free distribution constitute a "use" of a product.  "The ordinary meaning of

10  'use' is 'to put into action or service.'"  *Medical Solutions*, 541 F.3d at 1141 (quoting *NTP*, 418

11  F.3d at 1317).  The Federal Circuit has held that displaying a product and distributing brochures

12  were not "uses" because neither act put the product into service.  *See Medical Solutions*, 541

13  F.3d at 1141 ("Much more would be needed to qualify as an infringing use, including that the

14  device was used to heat medical items at the show.").  And other courts have held that "using a

15  device means using it *to perform its actual function or service*, not using it as a demonstrative

16  display."  *Id.* at 1141 n.4 (citing *Union Asbestos & Rubber Co. v. Evans Prods. Co.*, 328 F.2d

17  949, 951 (7th Cir. 1964); *Advanced Semiconductor Materials Am., Inc. v. Applied Materials,*

18  *Inc.*, No. 93-20853, 1995 WL 419747, at *6 (N.D. Cal. July 10, 1995)) (emphasis added).

19  Distributing a product—whether for a price or for free—does not put the product into service.

20  Oracle's contrary position would make the term "use" so broad that it would render the other

21  statutory terms superfluous.

22          Oracle's proposed instruction is therefore at odds with the words of the statute and

23  controlling Federal Circuit case law.  Oracle is essentially asking this Court to create a new

24  category of infringement—"offering for free."  But that is a job for Congress.  The Court should

25  adopt Google's instruction.

26  **B.     Only certain identified mobile devices remain at issue**

27          Oracle's proposed instruction also runs afoul of this Court's recent Order confirming that

28

35

585003.06

1    Oracle's patent infringement case is limited to the specific products Oracle identified in its Patent

2    Local Rule 3-1 Infringement Contentions ("ICs").  Rather than identify for the jury, as Google

3    would, the specific phones that Oracle has accused of infringing, Oracle would identify the

4    general category of "Android" or "Android mobile devices and software."  Specifically, Oracle's

5    proposed instructions state:

- "Oracle alleges that Google directly infringes the Oracle Patents by making, using, selling, or offering for sale **Android**."  Oracle Proposed Instr. No. 32.

- "Oracle claims that **Android mobile devices and software** and the Android SDK infringe the . . . [patents]."  Oracle Proposed Instr. No. 32.

9        Oracle's proposed instruction seeks to resurrect Oracle's argument that its infringement

10   case is directed to "all Android-branded phones" (*see* Oracle's Opposition to Motion to Strike

11   Portions of the Mitchell Patent Report, Dkt. No. 435 at 13, 10-13), which this Court has rejected.

12   Indeed, this Court made it clear that "Oracle's infringement theories may be directed only toward

13   accused products that were specifically named in its [ICs]."  (*See* Order Partially Granting and

14   Partially Denying Motions to Strike Portions of Mitchell Report, Dkt. No. 464 at 4.)

15       Thus, Google's instruction on direct infringement, which lists each of the accused

16   products that were specifically named in Oracle's ICs, is consistent with this Court's ruling and

17   with the Patent Local Rules.  *See* Google Proposed Instr. No. 32.  To be consistent (and so that

18   the instructions are not confusing to the jury), Google's proposed instructions on indirect

19   infringement also list the accused products that were specifically named in Oracle's ICs.  *See*

20   Google Proposed Instr. Nos. 37-38.

21   **XXVII.        Disputed Instruction No. 33: Patent—Literal Infringement**

22       The only disputed issue between the parties' proposals regarding this instruction is how

23   to define the patents in suit.  For the reasons discussed above, the Court should refer to them as

24   the "Asserted Patents."  *See infra* Part II.A.

25   **XXVIII.       Disputed Instruction No. 34: Patent—Direct Infringement Under the**
     **"Doctrine of Equivalents"**

26

27       The parties only substantive dispute is whether Oracle may advance a doctrine of

28
                                                     36

585003.06

1  equivalents claim in connection with the '702 patent.  Oracle's proposal seeks to revive a

2  contention that Oracle improperly raised for the first time in Dr. Mitchell's expert report—and

3  therefore agreed to withdraw.

4          The Local Patent Rules required Oracle to identify all of its doctrine of equivalents

5  theories in its infringement contentions.  Oracle did so only with respect to one patent: the '205

6  patent.  There, Oracle specifically invoked the doctrine of equivalents by saying the following:

7  "To the extent Android does not literally infringe this claim element, Android contains

8  equivalent elements corresponding to each and every requirement of this claim limitation."  *See*

9  Oracle Second Supplemental Infringement Contentions, Ex B-1, p. 34.  Oracle then went on to

10  provide a detailed paragraph applying the function-way-result test.

11          Nothing of the sort was done with respect to the '702 patent.  Rather, Oracle made only

12  the following statement in its contentions:  "In the illustration above, each of "string_ids,"

13  "type_ids" and "method_ids" are examples of the shared tables (*or, equivalently, a collective

14  shared table*)."  *See id.*, Ex. C, p. 10 (emphasis added).  There is no invocation of the doctrine of

15  equivalents.  Nor is there any function-way-result analysis—or any other analysis of

16  insubstantial differences, for that matter.  In short, Oracle has no basis for arguing that it

17  preserved the right to argue anything other than literal infringement.

18          Indeed, Oracle seemed to agree with Google about that.  When Dr. Mitchell's opening

19  report for the first time disclosed a doctrine of equivalents theory for the '702 patent, Google

20  challenged its belated appearance.  In response, Oracle agreed to strike it from Dr. Mitchell's

21  report.  As counsel for Oracle explained, referring to the substantive doctrine of equivalents

22  analysis (and included a discussion of shared tables in the chart): "Oracle will agree to strike

23  paragraphs 494-496, and the accompanying chart, from the August 8, 2011 Opening Expert

24  Report of John C. Mitchell."  The only substantive analysis under the doctrine of equivalents in

25  Dr. Mitchell's expert report was contained within those paragraphs.  Furthermore, Dr. Mitchell's

26  parroting of the contentions—that "In the illustration above, each of "string_ids," "type_ids" and

27  "method_ids" are examples of the shared tables (*or, equivalently, a collective shared table*)"—

28

1    does not a qualify as a doctrine of equivalents theory.  *See* Mitchell Opening Report ¶ 471.  This

2    is particularly true when considered alongside the fact that Oracle agreed to strike the paragraphs

3    where Dr. Mitchell did explicitly engage in a doctrine of equivalents analysis.  Therefore, Oracle

4    has no basis for requesting an instruction that the doctrine of equivalents applies to the '702

5    patent.

6    **XXIX. Disputed Instructions No. 35: Patent—Limitations on Direct Infringement Under
     the "Doctrine of Equivalents"**

7

8            Oracle contends that an instruction on the limitations of the doctrine of equivalents

9    (prosecution history estoppel) is improper, contending both that Google did not adequately

10   disclose this theory in discovery and that it does not apply here.  But Google disclosed this

11   theory in its response to Oracle's Interrogatory No. 3:

12           **All Asserted Claims:** Oracle is estopped as a matter of law from relying
             on the doctrine of equivalents to enlarge the scope of the '205 patent claims to
             cover the Accused Instrumentalities.  *See Festo Corp. v. Shoketsu Kinzoku Kogyo
13           Kabushiki*, 243 F.3d 558 (Fed. Cir. 2000) (en banc).

14          (Defendant Google Inc.'s Fifth Supplemental Responses to Plaintiff's Interrogatories, Set

15   One, No. 3 (Sept. 1, 2011); *see also* Defendant Google Inc.'s Fourth Supplemental Responses to

16   Plaintiff's Interrogatories, Set One, No. 3 (July 26, 2011).)

17          Google's expert, Dr. David August, similarly disclosed this theory in his opening expert

18   report:

19           165.    Equating a new bytecode with an entry in the jitEntry table is incorrect for
                     a number of reasons:
20

21                                              * * *

22           f.      In the prosecution history (Exhibit P, above), the applicant argued over the
                     prior art (Walters), in part by taking the position that it did not cover
23                   "generating . . . a new virtual machine instruction," and the USPTO
                     Examiner's statement of reasons for allowance specifically stated that the
                     claims were allowed because they "teach generating at run-time a new
24                   virtual machine instruction," noting that "[t]he cited prior art of record,
                     however, does not teach or allude to the generation of a new virtual
25                   machine instruction . . . ," and further explaining that the prior art "makes
                     the original non-native instruction an entry instruction for the native
26                   instruction(s), therefore, the original non-native instruction is always
                     executed and no new virtual instruction is created to be executed . . .
27                   [t]herefore the claims are allowable over the cited prior art of record for

28                                              38

585003.06

the reasoning discussed above."  Notably, in invoking the doctrine of equivalents, Dr. Mitchell effectively dismisses this very claim element, which was critical to allowance of the patent over the prior art during prosecution.

(Expert Report of David I. August, Ph.D. Regarding the Non-Infringement of U.S. Patent No. 6,910,205, at 49-50.)

The prosecution history estoppel theory applies to claims 1 and 2 of the '205 patent because claim 1 was added as a new claim in response to a prior art rejection of the originally filed claims.  (*See* '205 Patent File History, Amendment filed June 1, 2004.)  The Federal Circuit has held that prosecution history may apply to limit the doctrine of equivalents "even though the narrowing was effected through the addition of a new claim rather than through an amendment to the original claim."  *Mycogen Plant Science, Inc. v. Monsanto Co.*, 261 F.3d 1345, 1349 (Fed. Cir. 2001).  In its proposed instruction (Google Proposed Instr. No. 35), Google specifically lists the limitations of claim 1 and 2 that are affected by the patentee's amendment (i.e., that recite the "new virtual machine instruction" that is generated at runtime), and that, as Dr. August explains, led to the patentability of the claims over the cited prior art.

## XXX.  Disputed Instruction No. 37: Patent—Contributory Infringement

The parties dispute several issues in this instruction.  The Court should adopt Google's proposed instruction in full.

First, Oracle seeks to exclude a description of the accused products at issue.  As already explained , that runs afoul of this Court's recent ruling limiting Oracle to specific accused infringing devices.  *See supra* Part XXVI.A.

Second, Google proposes to modify the Model Instruction to change the word "supplies" to "sells or offers for sale."  This language tracks the statute.  *See* 35 U.S.C. § 271(c).  Google also proposes to define "sells or offers for sale" as defined in proposed instruction No. 11 for direct infringement.  As discussed above, those terms take their ordinary meaning, and evidence that a defendant has merely supplied or transferred a product for free is not sufficient to establish a sale, which requires a transfer *for a price*.  *See supra* Part XXVI.A; *see also PharmaStem*, 491 F.3d at 1359.

585003.06

1    Third, Google's proposal clarifies that the jury can find contributory infringement only if

2    Google sells or offers for sale a tangible thing that is actually used by a direct infringer.  This

3    instruction is required by the language of section 271(c), which applies only to "a *component* of

4    a patented machine, manufacture, combination, or composition, or a *material or apparatus* for

5    use in practicing a patented process . . . ."  35 U.S.C. § 271(c) (emphases added).

6    In *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437 (2007), the Supreme Court construed

7    the term "component" as used in 35 U.S.C. § 271(f).  Under ordinary rules of statutory

8    interpretation, the term "component" must have the same meaning throughout section 271.  *See*

9    *FCC v. AT&T Inc.*, 131 S. Ct. 1177, 1185 (2011).  Thus, two holdings of *Microsoft v. AT&T* are

10   relevant here.  First, the Court held that software can be a component of a patented invention

11   only if "it is expressed as a computer-readable 'copy.'"  *Microsoft*, 550 U.S. at 449.  Software

12   that is "uncoupled from a medium" is not "a combinable component."  *Id.* at 450.  Second, the

13   Court held that the tangible things supplied by the defendant must be the same things used by

14   another to create an infringing combination.  *See id.* at 452.  Thus, Microsoft was not liable in

15   that case because the physical discs and electronic transmissions that it supplied were not the

16   same copies used to create the infringing computers; those copies "did not exist until they were

17   generated by third parties outside the United States."  *Id.* at 453-54.

18   Oracle has already conceded that Google does not infringe under section 271(f).  *See*

19   Order Granting Unopposed Motion for Partial Summary Judgment Regarding 35 U.S.C. 271(f)

20   Theory (Sept. 26, 2011) (Dkt. 461).  The jury cannot find Google liable for contributory

21   infringement under section 271(c) for the same reasons.  If the alleged direct infringers (such as

22   handset makers) copy Android and use those copies, then Google cannot be liable under either

23   section 271(c) or 271(f).  *See Veritas Operating Corp. v. Microsoft Corp.*, 562 F. Supp. 2d 1141,

24   1274-75 (W.D. Wash. 2008).  Likewise, because intangible software is not a component for

25   purposes of section 271(f), it cannot be a component under section 271(c); and because source

26   code "cannot be installed or executed on a computer," it cannot be the kind of tangible

27

28

585003.06

1   component required for contributory infringement of product claims.  *Microsoft*, 550 U.S. at 449;

2   *see also Veritas*, 562 F. Supp. 2d at 1275.

3        To be sure, section 271(f) and *Microsoft v. AT&T* deal only with product claims, and as

4   noted above, Section 271(c) permits claims of contributory infringement for selling or offering

5   for sale "a *material or apparatus* for use in practicing a patented process."  35 U.S.C. § 271(c)

6   (emphasis added).  For purposes of this instruction, however, there is no reason to treat

7   "component" and "material or apparatus" differently.  In short, if the term "component" applies

8   only to tangible things, then the narrower terms "material" and "apparatus" do as well.  *See*

9   *Veritas*, 562 F. Supp. 2d at 1275.

10       Fourth, Oracle seeks to introduce a willful blindness statement into the instruction.

11  Google opposes that language for the reasons discussed below.  *See* Part XXXII, *infra*.

12       Finally, there is the issue regarding how to define the patents in suit.  For the reasons

13  discussed above, the Court should refer to them as the "Asserted Patents."  *See infra* Part II.A.

14  **XXXI. Disputed Instruction No. 38: Patent—Indirect Infringement—Active Inducement**

15       First, the parties dispute the phrasing of the inducement factors.  Google's proposed

16  factors are based on Northern District of California Model Patent Jury Instruction No. 3.10,

17  while Oracle's proposal is based on Federal Circuit Bar Association Model Patent Jury

18  Instruction 3.2.  The Northern District model instruction is more appropriate because they are

19  clearer and more straightforward, and will thus be easier for jurors to apply.  Moreover, because

20  this case is in the Northern District, the local model jury instructions are the more appropriate

21  starting point.  *See* Model Patent Jury Instructions for the Northern District of California,

22  Introduction ("These Revised Model Patent Jury Instructions have been adopted by the Northern

23  District of California as model patent instructions.").

24       Second, Oracle seeks to introduce a willful blindness statement into the instruction.

25  Google opposes that language for the reasons discussed below.  *See* Part XXXII, *infra*.

26       Third, there is the issue regarding how to define the patents in suit.  For the reasons

27  discussed above, the Court should refer to them as the "Asserted Patents."  *See infra* Part II.A.

28

585003.06

**XXXII.      Disputed Instruction No. 39: Patent—Infringement—Willful Blindness As Knowledge**

Disputed Instruction Nos. 37-39 involve the same underlying dispute – whether Oracle is entitled to an instruction on "willful blindness."  Oracle's proposed instructions for both active inducement of infringement and contributory infringement include an express statement that "willful blindness" can substitute for actual knowledge of the patents-in-suit, and Oracle also requests a separate, lengthy jury instruction explaining so-called "willful blindness."  As explained below, such an instruction should not be given at all absent proof of extraordinary circumstances that would justify doing so, and even in that case, the instructions Oracle has requested are duplicative and therefore unduly prejudicial.

Oracle claims to find support for its requested instructions in *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011).  That case addressed the question whether "a party who 'actively induces infringement of a patent' under 35 U.S.C. § 271(b) must know that the induced acts constitute patent infringement."  *Id.* at 2063.  It answered that question in the affirmative: "we now hold that induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement."  *Id.* at 2068.  But this was hardly a change in the law that requires the Court to inform jurors that they need not determine that an accused infringer actually knew of a patent.  Indeed, the Court actually criticized the Federal Circuit's test for knowledge of the patent-in-suit because it allowed jurors to impose liability on the basis of a "known risk" of infringement to which an accused infringer was only "deliberate[ly] indifferent."  *Id.* at 2071.  *Global-Tech* did nothing to lessen the need to show knowledge of the patents-in-suit, as Oracle's jury instructions suggest; instead, it confirmed that actual knowledge is central to the inquiry.

The Supreme Court approved the jury verdict in *Global-Tech* despite the fact that a proper instruction -- one requiring actual knowledge of the patent -- had not been given, because of an extreme set of facts demonstrating that the defendant's mental state "surpass[ed] recklessness and negligence," *id*. at 2070, as a result of actions that could only have been taken to "manufacture a claim of plausible deniability in the event that his company was later accused of patent infringement," *id*. at 2071.  Oracle will be able to introduce no evidence at trial coming

42

1    close to such a situation.  Nor can it cite any case that decides to give a willful blindness

2    instruction of the sort it requests; the cases it cites involving jury instructions uniformly

3    determine that those instructions, though not themselves invoking willful blindness, were

4    consistent with the *Global-Tech* ruling.

5           It would only encourage jury speculation and invite confusion as to the proper standard to

6    provide lengthy instructions suggesting that Oracle does not really need to demonstrate Google's

7    knowledge of the patents-in-suit in order to demonstrate liability for indirect infringement.  The

8    Court should refuse Oracle's invitation to do so.

9    **XXXIII.       Disputed Instruction No. 40: Patent—Willful Infringement**

10          Besides the issue regarding how to define the patents in suit, *see infra* Part II.A, there are

11   two issues for the Court to address related to the competing willfulness instructions.

12          **A.     Knowledge that Sun had a patent portfolio did not give rise to a duty of due
                     care**

13          The Court should reject Oracle's proposal to instruct the jury to consider whether Google

14   had knowledge of its patent portfolio as a whole.  That language is not contained in the District's

15   Model Patent Jury Instructions; nor does it come from any other set of model instructions or

16   from case law.  Oracle has created this self-serving language out of whole cloth.

17          In fact, contrary to Oracle's position, the Federal Circuit conditions a finding of

18   willfulness on a defendant's knowledge of the actual asserted patents.  *See, e.g.*, *Imonex Servs.,

19   Inc. v. W.H. Munzprufer Dietmar Trenner GmbH*, 408 F.3d 1374, 1377 (Fed. Cir. 2005); *WMS

20   Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1354 (Fed. Cir. 1999); *VNUS Med. Techs., Inc.

21   v. Diomed Holdings, Inc.*, 527 F. Supp. 2d 1072, 1075 & n.4 (N.D. Cal. 2007).  In other words,

22   the jury must find that Google "acted in disregard" of the asserted patents, not of Oracle or Sun's

23   entire patent *portfolio*.  *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 181 (Fed.

24   Cir. 1994); *cf. also In re Katz Interactive Call Processing Patent Litigation*, No. 07-ML-01816-

25   B-RGK, 2009 WL 3698470, *2 (C.D. Cal. 2009) (excluding expert testimony on willfulness that

26   "provides opinions about the portfolio as a whole").  Oracle's attempt to shift the jury's focus

27   away from the specific patents at issue here is directly at odds with this precedent.

28

43

585003.06

1    It is also a tacit acknowledgment that Oracle cannot meet the knowledge requirement.

2    Indeed, Google first learned of these patents when Oracle identified them in a July 20, 2010 pre-

3    litigation meeting.  The key Android team members testified that they had no prior knowledge,

4    and Sun's key negotiators likewise admitted that they never identified the specific patents in this

5    case.  That evidence is dispositive.  The possibility that Google may have known that Sun had a

6    Java-related patent portfolio—a portfolio allegedly consisting of around *2,000* patents—does not

7    substitute for knowledge of the *6* patents now asserted.  Oracle's failure to notify Google of the

8    asserted patents before July 2010 means it cannot show that Google acted in the face of an

9    objectively high risk of infringing these claims.  *See In re Seagate*, 497 F.3d 1360, 1371 (Fed.

10   Cir. 2007).  The Court should reject Oracle's blatant attempt to paper over its fundamental lack

11   of evidence that Google had knowledge of the patents-in-suit.

12   **B.    Oracle improperly seeks to add factors to the subjective prong of *Seagate's* two-part willfulness test**

13

14   Oracle further departs from the Model Jury Instruction by proposing to add factors

15   related to the subjective part of *Seagate*'s willfulness test.  Oracle has no legitimate reason to

16   alter the Model Instruction, which fully instructs the jury as to the relevant factors.  Moreover,

17   their inclusion could only confuse or prejudice the jury because Oracle has no evidence on these

18   points.

19   Oracle derives its proposed language from the Federal Circuit Bar Association's Model

20   Patent Jury Instructions, but even the committee that adopted the instruction acknowledged that

21   the list of factors was controversial and not appropriate for every case.  *See* FCBA Model Patent

22   Jury Instr. No. 3.8 (Committee Comments).  The committee explained that "[a]ppropriate factors

23   for the jury's consideration may be tailored to each case, or may be omitted."  *Id.*  This is hardly

24   a solid foundation for inserting new factors into this District's Model Instruction, which lists

25   only three specific factors:  the standards of commerce; copying; and reliance on a legal opinion.

26   *See* N.D. Cal. Model Patent Jury Instr. No. 3.11.  Also, to the extent that Oracle presents no

27   evidence as to many of those factors at trial (as Google suspects it will not), it would be

28   inappropriate to provide a jury instruction enumerating them.

44

585003.06

1    **XXXIV.        Disputed Instruction No. 41: Patent Defense—Invalidity—Burden of Proof**

2            Besides the issue regarding how to define the patents in suit, *see infra* Part II.A, there is

3    one other issue related to this disputed instruction:  Google's proposal clarifies that the burden of

4    proof applies to underlying facts and not the ultimate invalidity determination—which is a legal

5    question for the Court.  This is discussed in detail in the next section.  *See infra* Part XXXV.

6    **XXXV.        Disputed Instruction No. 43: Patent—Invalidity—Obviousness**

7            This Court's Model Patent Jury Instructions include two alternative instructions for

8    obviousness, which "is a question of law based on underlying findings of fact."  *Western Union*

9    *Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1369 (Fed. Cir. 2010).  Alternative 1

10   instructs the jury to find the factual issues underlying obviousness but reserves the ultimate legal

11   determination of obvious to the Court.  Alternative 2 instructs the jury to decide the factual and

12   legal issues.  This Court should adopt Alternative 1 in its entirety without modification.

13           The footnote to Alternative 1 speaks for itself:  "This instruction provides the jury with

14   an instruction on the underlying factual questions it must answer to enable the court to make the

15   ultimate legal determination of the obviousness question.  The court, not the jury, should make

16   the legal conclusion on the obviousness question based on underlying factual determinations

17   made by the jury."  N.D. Cal. Model Patent Jury Instruction 4.3b (Alternative 1) (citing *KSR Int'l*

18   *Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 1745 (2007) ("The ultimate judgment of obviousness is a

19   legal determination."); *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007)).

20   Alternative 1 therefore reflects the longstanding rule that questions of fact may be decided by

21   juries, but *courts* must decide questions of law.  *See, e.g.*, *McDermott Int'l, Inc. v. Wilander*, 498

22   U.S. 337, 355-56 (1991).  In the absence of a compelling reason, there is no basis to depart from

23   that rule here.

24           Indeed, the Supreme Court's recent decision in *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.

25   Ct. 2238 (2011), underscores the importance of adopting Alternative 1 and reserving questions of

26   law for the Court.  In *i4i*, the Supreme Court held that a party challenging the validity of a patent

27   must prove invalidity by clear and convincing evidence.  *See id.* at 2242.  As Justice Breyer

28

                                                   45

585003.06

1    explained, however, that heightened "evidentiary standard of proof applies to questions of fact

2    and not to questions of law." *Id.* at 2253 (Breyer, J., concurring) (citing *Addington v. Texas*, 441

3    U.S. 418, 423 (1979)).  And the Federal Circuit agrees:  "Standard of proof relates to specific

4    factual questions.  While undoubtedly certain facts in patent litigation must be proved by clear

5    and convincing evidence, the formulation of a legal conclusion on validity from the established

6    facts is a matter reserved for the court."  *SSIH Equip. S.A. v. ITC*, 718 F.2d 365, 375 (Fed. Cir.

7    1983) (internal citation omitted); *see also Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757,

8    767 (Fed. Cir. 1989).  Thus, the clear-and-convincing-evidence standard has no bearing on "how

9    the law applied to facts as given," including the determination whether the facts show that the

10   invention "was 'non-obvious.'"  *i4i*, 131 S. Ct. at 2253 (Breyer, J., concurring) (citing 35 U.S.C.

11   § 103).

12        Alternative 1 is therefore essential to "help to keep the application of [the] 'clear and

13   convincing' standard within its proper legal bounds by separating factual and legal aspects of an

14   invalidity claim, say, by using instructions based on case-specific circumstances that help the

15   jury make the distinction or by using interrogatories and special verdicts to make clear which

16   specific factual findings underlie the jury's conclusions."  *i4i*, 131 S. Ct. at 2253 (Breyer, J.,

17   concurring).  The Supreme Court, the Federal Circuit, the regional circuits, and commentators

18   have all strongly encouraged or required that practice.  *See, e.g.*, *Warner-Jenkinson Co. v. Hilton*

19   *Davis Chem. Co.*, 520 U.S. 17, 38 n.8 (1997); *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*,

20   725 F.2d 1350, 1361 (Fed. Cir. 1984); *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1547

21   (Fed. Cir. 1983); *see also Dual Mfg. & Eng'g, Inc. v. Burris Indus., Inc.*, 619 F.2d 660, 667 (7th

22   Cir. 1980) (en banc); *Baumstimler v. Rankin*, 677 F.2d 1061, 1071 (5th Cir. 1982); *Mfg.*

23   *Research Corp. v. Graybar Elec. Co.*, 679 F.2d 1355, 1364 n.19 (11th Cir. 1982); *Saturn Mfg.,*

24   *Inc. v. Williams Patent Crusher & Pulverizer Co.*, 713 F.2d 1347, 1352 (8th Cir. 1983);

25   Kimberly Moore, *Juries, Patent Cases, & a Lack of Transparency*, 39 Hous. L. Rev. 779 (2002).

26        For the same reasons, whether or not the Court adopts Alternative 1, the Court should

27   instruct the jury explicitly that the clear-and-convincing-evidence standard applies only to

28

questions of fact.  "By preventing the 'clear and convincing' standard from roaming outside its fact-related reservation, courts can increase the likelihood that discoveries or inventions will not receive legal protection where none is due."  *i4i*, 131 S. Ct. at 2253 (Breyer, J., concurring).

**XXXVI.       Disputed Instruction Nos. 46-49: Google's Equitable Defenses**

As discussed in Google's Trial Brief, Google believes it would be appropriate for the Court to request an advisory verdict from the jury with regard to Google's equitable defenses, as the relevant evidence will already be before them.

One issue applicable to all four of Oracle's proposed equitable defense instructions should be mentioned first:  for purposes of these instructions, to prevent juror confusion, it is necessary to refer to both Sun and Oracle.  As discussed in connection with an earlier instruction, Oracle cannot dispute that it is the same legal entity as Sun Microsystems, Inc., and that a corporate name change does not alter anything relevant to this case.  The jury may be confused, however, by whether these defenses may apply based only on the knowledge, statements and conduct of the corporation acting when it was known as Sun, even if it reversed course after being purchased by Oracle.  Therefore, reference to both Sun and Oracle is necessary throughout these four instructions.

**A.       Disputed Instruction No. 46: Equitable Defense—Laches**

The parties' competing laches instructions are both based on Federal Circuit Bar Association Model Patent Jury Instruction No. B.5.2, with supplementary language to address the copyright claims.  The parties' proposed instructions differ in several significant respects.

First, although the form instruction refers to the six-year presumptive period for patent claims, Oracle's proposal omits mention of the fact that the presumptive period is only three years long for copyright claims.  This difference exists because the statute of limitations for copyright infringement claims is three years, compared to six for patent infringement claims. 17 U.S.C. § 507(b) ("Civil Actions.— No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued.").  Just as the six-year statute of limitations governing patent lawsuits applies to the burden shifting with respect to the

patent infringement claims, the three-year statute of limitations governing copyright lawsuits applies to the burden shifting with respect to the copyright side of this case. *General Elec. Co. v. Sciaky Bros., Inc.,* 304 F.2d 724, 727 (6th Cir. 1962) ("There [sic] the unexplained delay exceeded the applicable period of the statute of limitations, injury to the defendant is presumed."). Oracle's proposed instruction is incomplete and misleading in its omission of the applicable three-year presumptive period for copyright.

Second, Google seeks to clarify the model instruction's suggestion that involvement in litigation can justify a long delay. The additional language is necessary because the model instruction does not state what "other litigation" may be considered under this factor. The sources cited make clear that the general category of "other litigation" involving Oracle is not sufficient to meet the relevant standard, and explicitly state that the other litigation must have involved the same patents and that the plaintiff must have given the defendant adequate notice of its intent to initiate litigation against the defendant upon the conclusion of the other litigation. *See Jamesbury Corp. v. Litton Indus. Prods., Inc.,* 839 F.2d 1544, 1552-53 (Fed. Cir. 1988) ("More recent cases have rejected the premise that involvement in other litigation automatically excuses delay. These cases have *required the patentee to give notice to the alleged infringer of the existence of the other litigation and of the patent owner's intent to enforce its rights* against the alleged infringer after the other litigation ends."); *Hottel Corp. v. Seaman Corp.,* 833 F.2d 1570, 1572-73 (Fed. Cir. 1987) ("For other litigation to excuse a delay in bringing suit there must be *adequate notice* of the proceeding. *See Watkins v. Northwestern Ohio Tractor Pullers Ass'n, Inc.,* 630 F.2d 1155, 1162 (6th Cir. 1980); *cf Broomall Industries, Inc. v. Data Design Logic Systems, Inc.,* 786 F.2d 401, 405-406 (Fed. Cir. 1986). The *notice must inform the alleged infringer of the other proceeding and of the patentee's intention to enforce its patent* upon completion of that proceeding."); *American Home Prods. Corp. v. Lockwood Mfg. Co.,* 483 F.2d 1120, 1123 (6th Cir. 1973) ("Although the 'other litigation' exception does permit a patent owner to sue multiple infringers consecutively, we are unable to find any authority for the proposition that the existence of 'other litigation' is a complete bar to the assertion of a laches

1    defense. Although multiple litigation need not be maintained against multiple infringers, *we see*

2    *no reason why a patent owner need not at least assert to the other infringers its intention to*

3    *bring a subsequent action at the termination of the presently pending action*.") (emphasis added).

4           Google has also proposed language to clarify the second circumstance listed in the form

5    instruction, involvement in negotiations with the alleged infringer, again because the model

6    instruction lacks detail necessary to prevent the jury from making mistaken assumptions about

7    the sort of "involvement in negotiations" that would justify a delay.  The mere fact of

8    negotiations does not rule out a finding of laches; rather, subsequent to the end of negotiations,

9    there may have been an unreasonable and unjustifiable delay before the filing of the lawsuit.

10   *Baker Mfg. Co. v. Whitewater Mfg. Co.,* 430 F.2d 1008, 1013-14 (7th Cir. 1970) ("In our view,

11   this reasoning erroneously places the burden on Whitewater, the alleged infringer, to take

12   affirmative action which would rescue Baker from its *inexcusable neglect* over a period of nine

13   years, contrary to the decisions of this court previously discussed. An alleged infringer acting in

14   good faith is under no obligation, so far as we are aware, to take affirmative action relative to the

15   alleged infringement. Of course, it can proceed under the Federal Declaratory Judgment Act,

16   Title 28 U.S.C.A. Sec. 2201, for an adjudication of its rights, but this court has held that it is not

17   obligated to pursue this remedy.  The fact that Baker did not suggest that it was abandoning its

18   claim of infringement is irrelevant. The *important fact is that at no time did it notify Whitewater*

19   *in any manner that it was pressing its claim*.") (citations omitted); *Whitman v. Walt Disney*

20   *Prods., Inc.,* 263 F.2d 229, 231 (9th Cir. 1958) ("It is the general rule that *one cannot have*

21   *knowledge of the alleged infringement, and then stand idly by* while the infringer embarks on a

22   costly expansion program. Mere passage of time cannot constitute laches, but *if the passage of*

23   *time can be shown to have lulled defendant into a false sense of security,* and the defendant acts

24   in reliance thereon, laches may, in the discretion of the trial court, be found."); *General Elec.*

25   *Co. v. Sciaky Bros., Inc.,* 304 F.2d 724, 727 (6th Cir. 1962) ("The fact that General Electric

26   wanted licenses on Sciaky's patents and negotiated with Sciaky on a cross-licensing basis did not

27   in our judgment excuse the *long delay* in enforcing its own rights. The District Court found that

28

1    in so doing General Electric was engaged in a *'fishing expedition.'* In any event the negotiations

2    between the parties ceased in 1951 and General Electric took no action until seven years later.")

3    (emphasis added).

4           Thus, the word "unreasonably" in Google's proposed instruction captures the type of

5    delay that would meet the applicable standard.  Similarly, Google seeks to add the statement that

6    "[d]elay is not permissible when its purpose is to determine whether the infringing conduct will

7    be profitable."  This language is a slightly simplified version of the following statement in

8    *Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001):  "Delay is impermissible when its

9    purpose is to capitalize on the value of the alleged infringer's labor, by determining whether the

10   infringing conduct will be profitable."  *Id.* at 954.  This statement also captures the concept of

11   "fishing expedition" and lulling the defendant into "a false sense of security" that is discussed in

12   the above quotes from *General Electric,* 304 F.2d at 727, and *Whitman,* 263 F.2d at 231.  In sum,

13   the added language is necessary because it clarifies for the jury that the reasons for the delay are

14   crucial to its consideration of whether the delay is justified in this case.  *See id.*

15          Finally, Oracle's proposed statement that "[i]f you find Google's infringement was

16   willful, then the defense of laches is not available to Google" is legally incorrect.  The case law

17   is clear that a finding of willfulness does *not* automatically preclude a finding of laches.  *See*

18   *TruePosition Inc. v. Andrew Corporation,* 568 F. Supp. 2d 500, 517 (D. Del. 2008) ("A finding

19   of egregious conduct, above willful infringement, typically justifies preclusion of an equitable

20   defense."); *Abbott Diabetes Care Inc. v. Roche Diagnostics Corp.,* 2007 WL 1241928 at *11 n.

21   14 (N.D. Cal. 2007) ("Moreover, mere willful infringement, without something 'particularly

22   egregious' such as proof of calculated plagiarism, is generally considered insufficient to preclude

23   application of the laches defense.") (citing *A.C. Aukerman Co. v. R.L. Chaides Const. Co.,* 960

24   F.2d 1020, 1033 (Fed. Cir. 1992); *Odetics, Inc. v. Storage Technology Corp.,* 14 F. Supp. 2d 800,

25   806 (E.D. Va. 1998) (refusing to follow suggestion in another case that the "circumstances

26   present in that case are always sufficient to preclude application of laches").

27

28
                                              50

585003.06

## B.      Disputed Instruction No. 47:  Equitable Defense—Equitable Estoppel

Both parties base their proposed instructions on Federal Circuit Bar Association Model Patent Jury Instruction No. 5.3.  The majority of the differences between the parties' proposed instructions are semantic or stylistic.  For instance, the parties slightly dispute how the factors for equitable estoppel in the copyright context should be stated.  Both parties base their proposed instructions on the following language from *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100 (9th Cir. 1960):  "Four elements must be present to establish the defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury."  *Id.* at 104.  Google has made minor changes to that language to make the instruction more comprehensible to the jury.  And, to incorporate the slightly different standard applicable to copyright claims, Google has added language to the last sentence of the fourth paragraph.

Despite starting from the same model, Oracle's proposed instruction differs from Google's in five substantive respects, none of which are well-founded.

First, Oracle seeks to insert the following sentence:  "A suggestion of infringement, coupled with an offer to license followed by silence is insufficient to establish equitable estoppel."  This language is taken not from the holding or even part of the court's analysis in the case Oracle has cited to support it, *Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290 (Fed. Cir. 1992), but is rather taken from a case parenthetical that appears in a footnote in that case.  *Id.* at 1294 n.5.  Examination of the underlying case—which was overruled on other grounds by *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992)—indicates that the facts of that case, and thus the theory behind the asserted defense, were very different from the case at bar.  *See Meyers v. Brooks Shoe Inc.*, 912 F.2d 1459 (Fed. Cir. 1990).  In *Meyers*, the *only* pre-suit contact between the parties was the plaintiff's giving notice to the defendant of the claimed infringement and offering a license, followed by no response after the defendant refused.  *Id.* at 1460-61.  Thus, the question is whether that conduct

1    reasonably suggested that plaintiff had abandoned the claim that he originally identified; under

2    those circumstances, the court found there was no basis for the defendant to claim that the

3    plaintiff's conduct was misleading.  *Id.* at 1464.  Here, however, Google does not claim that Sun

4    "abandoned" a threatened claim—instead, Google contends that Sun's statements and conduct

5    led Google to believe that either Sun did not believe an infringement claim existed, or did not

6    intend to pursue it.  As Google will prove at trial, rather than a claim of infringement and an

7    offer of a naked license, the parties' discussions here were over a bi-lateral technology

8    partnership, incidentally including a cross-license to a wide range of intellectual property, and

9    that there was ***no*** suggestion by Sun that Google ran the risk of infringement if it chose to build

10   the contemplated platform without Sun.  Therefore, because the underlying facts and theory of

11   the defense in this case are different from *Meyers*, including the proffered language from that

12   case would be inappropriate and prejudicial.

13          Second, Oracle also wishes to add the statement that: "You may not presume misleading

14   conduct from the passage of time."  This language is taken from *Hemstreet*, but leaves out

15   important information that the court conveys in applying the quoted principle: "Although

16   defendant correctly notes that equitable estoppel may in some instances be based upon a

17   misleading silence, mere silence must be accompanied by some *other* factor which indicates that

18   the silence was sufficiently misleading as to amount to bad faith."  972 F.2d at 1295.  Unless

19   Oracle's proposed language is modified to state "You may not presume misleading conduct from

20   the *mere* passage of time," or "passage of time *standing alone*," it will be an incorrect statement

21   of the holding in *Hemstreet*.

22          Third, Oracle wishes to add the statement that:  "Furthermore, equitable estoppel does not

23   erase Google's duty of due care and is not applicable if the harm Google will suffer is the result

24   of its own failure to act or inquire about Oracle's copyrights or patents," taken from *Hampton v.*

25   *Paramount Pictures Corp.* 279 F.2d 100 (9th Cir. 1960).  As an initial matter, it is clear that the

26   quoted statement was dictum in that opinion—estoppel was clearly inapplicable there because

27   the allegedly misleading statement came from a third party, while the plaintiff itself had marked

28

52

585003.06

1   its product with its copyright notice and done nothing to suggest that it would not enforce the

2   copyright.  *Id.*  at 104-05.  Moreover, the proposed language exists in a vacuum—nowhere else

3   in the proposed instructions does Oracle explain the duty of care to which it refers.  That is

4   unsurprising, given the Federal Circuit's recent explicit *rejection* of such a duty:  "Because we

5   abandon the affirmative duty of due care, we also reemphasize that there is no affirmative

6   obligation to obtain opinion of counsel."  *In re Seagate Technology, LLC,* 497 F.3d 1360, 1371

7   (Fed. Cir. 2007).   In light of *Seagate*, it would be legally erroneous to include the language

8   Oracle suggests.

9         The fourth significant difference is the fact that Oracle's proposal eliminates the form

10  instruction's explanation of evidentiary harm, without any apparent basis.  That portion of the

11  instruction is necessary to guide the jury's assessment of Google's evidentiary harm argument.

12  Google is, for instance, entitled to prove that evidence that would have been available to support

13  its defenses had Sun initiated this action promptly is no longer available now, and argue that it

14  has suffered evidentiary prejudice as a result.

15        Finally, Oracle's proposed instruction also misstates Google's contention by framing the

16  issue as "[w]hether in fact Oracle or Sun communicated with Google about having no intention

17  of enforcing the six Oracle Patents or the Java-related copyrights."  Google does not contend that

18  is what Oracle or Sun did.  No communications specific to these patents exist, because neither

19  Oracle nor Sun identified these patents to Google until shortly before filing suit.

20        **C.**　　**Disputed Instruction No. 48: Equitable Defense—Waiver**

21        The primary difference between the parties' proposed instructions is that Oracle's fails to

22  contain any instruction regarding implied waiver.  The patent aspect of Google's proposal is

23  modeled on the following jury instruction approved in *Qualcomm Inc. v. Broadcom Corp.*,

24  548 F.3d 1004 (Fed. Cir. 2008), which encompasses both express and implied waiver:  "In order

25  to prove waiver, Broadcom must show by clear and convincing evidence either that Qualcomm,

26  with *full knowledge of the material facts, intentionally relinquished its rights* to enforce the '104

27  and '767 patents or *that its conduct was so inconsistent with an intent to enforce its rights as to*

28

53

585003.06

1    *induce a reasonable belief that such right has been relinquished.*  Waiver Order at *32-33

2    (emphasis added)."  *Id.* at 1020 (original emphasis).  Because Google will present relevant facts

3    and argue at trial that Oracle expressly or implicitly waived all of the patent claims it belatedly

4    seeks to enforce through this lawsuit, Google is entitled to an instruction that tracks *Qualcomm*,

5    and covers *both* express and implied waiver.

6          In addition, the third paragraph of Google's proposed instruction is necessary to explain

7    the difference between express and implied waivers, as set forth in the different standards

8    governing the patent and copyright parts of this instruction, and makes explicit the point implied

9    in the *Qualcomm* case that this defense does not require any conduct by the party arguing for a

10   waiver.  548 F.3d at 1020-21.  This clarification will prevent the jury from mistakenly confusing

11   express and implied waivers and thereby ensure that the proper standards are used.

12         **D.    Disputed Instruction No. 49:  Equitable Defense—Implied License**

13         Both parties base their proposed instructions in large part on *Wang Laboratories, Inc. v.*

14   *Mitsubishi Electronics America, Inc.,* 103 F.3d 1571 (Fed. Cir. 1997), *cert. denied,* 522 U.S. 818

15   (1997), and the instructions are in large part identical.

16         The primary point of disagreement, however, is the description of the underlying conduct

17   that may give rise to an implied license:  Google's proposed instruction contemplates implied

18   waiver by conduct, but Oracle's in effect requires the grant of an express license.

19         According to Google:

20              The conduct that grants the license may include acts of
                acquiescence or acts of misrepresentation by Sun and/or Oracle.
21              The license may alternately be granted orally, or even implied
                from the conduct of a licensing party.
22

23         Google's proposed language comports with the caselaw.  *See De Forest Radio Tel. Co. v.*

24   *United States,* 273 U.S. 236, 241, 47 S. Ct. 366, 367, 71 L.Ed. 625 (1927) ("No formal granting

25   of a license is necessary in order to give it effect. *Any language used* by the owner of the patent,

26   *or any conduct* on his part exhibited to another from which that other may properly infer that the

27   owner consents to his use of the patent in making or using it, or selling it, upon which the other

28

54

1    acts, constitutes a license and a defense to an action for a tort."); *Effects Assocs. v. Cohen*, 908

2    F.2d 555, 558 (9th Cir. 1990) ("The leading treatise on copyright law states that '[a]

3    nonexclusive license may be *granted orally, or may even be implied from conduct.*' 3 M.

4    Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.03[A], at 10–36 (1989).  Cohen relies on the

5    latter proposition; he insists that, although Effects never gave him a written or oral license,

6    Effects's conduct created an *implied license* to use the footage in 'The Stuff.'") (emphasis

7    added).

8           According to Oracle:

9              [T]o prove that there was an implied license, more than just
10             misleading conduct is required.  Oracle and/or Sun must have
               made an affirmative grant of permission to Google to use the six
11             Oracle patents or the Java-related copyrighted works.

12          Oracle's proposed requirement of an "affirmative grant of permission" is clearly

13   unsupportable, because taken at face value, the language appears to rule out the possibility of an

14   implied license granted by conduct, and instead suggests that the jury must find an ***express***

15   license for an implied license to apply.  The likely source for Oracle's language is the *Wang*

16   case, but that opinion's use of the phrase "affirmative grant of permission" occurred in the course

17   of a discussion distinguishing the equitable estoppel and implied license defenses, explaining

18   that the former is aimed at statements and conduct "suggesting that the patentee will not enforce

19   patent rights" while the latter targets statements and conduct conveying an "affirmative grant of

20   consent or permission."  *See* 103 F.3d at 1581.  In that context, it is clear that "affirmative grant"

21   referred to the underlying message of the relevant statements or conduct, but in no way required

22   an *express statement*, which Oracle's proposed instruction appears to do.  In fact, one of the very

23   citations Oracle provides specifically recognizes that a license may be implied by conduct, citing

24   the *De Forest* case upon which Google relies.  *See McCoy v. Mitsuboshi Cutlery*, 67 F.3d 917,

25   920 (Fed. Cir. 1995) ("In some circumstances, however, the entire course of conduct between a

26   patent or trademark owner and an accused infringer may create an implied license.  *See Stickle v.*

27   *Heublein, Inc.*, 716 F.2d 1550, 1559, 219 USPQ 377, 383 (Fed.Cir.1983). The Supreme Court

28                                              55

585003.06

1    stated: 'Any language used by the owner of the patent or any conduct on his part exhibited to

2    another from which that other may properly infer that the owner consents to his use of the patent

3    in making or using it, or selling it, upon which the other acts, constitutes a license and a defense

4    to an action....' *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 241, 47 S.Ct. 366, 367,

5    71 L.Ed. 625 (1927).") (Ellipses in original).

6    **XXXVII.      Disputed Instruction No. 52: Copyright—Actual Damages**

7           In this instruction, Oracle proposes adding a single additional sentence fragment to the

8    model to address the complex problem of lost license fees, but it fails to even refer to them as

9    lost license fees and is therefore confusing.  Google addresses this issue, and proposes a more

10   complete and accurate statement of the law.

11          The paragraph that Google proposes to add at the end of this instruction clarifies the

12   standard that must be met in order to find actual damages in the copyright context, and is based

13   directly on relevant precedent.  To collect actual damages, Oracle must first establish with

14   reasonable probability that the infringement caused the loss of revenue, and the amount of the

15   lost revenue.  *See Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 567

16   (1985) ("Similarly, once a copyright holder establishes with reasonable probability the existence

17   of a causal connection between the infringement and a loss of revenue, the burden properly shifts

18   to the infringer to show that this damage would have occurred had there been no taking of

19   copyrighted expression."); *see also Polar Bear Prods, Inc. v. Timex Corp.*, 384 F.3d 700, 711

20   (9th Cir. 2004) ("Thus, a copyright owner is required to do more initially than toss up an

21   undifferentiated gross revenue number; the revenue stream must bear a legally significant

22   relationship to the infringement").   The award cannot be unduly speculative, and must be

23   supported by evidence.  *Id.* at 708 (citing *On Davis v. The Gap, Inc.*, 246 F. 3d 152 (2d Cir.

24   2001)).  In addition, expenses, including increased overhead costs related to the lost revenue, are

25   deducted.  *Taylor v. Meirick*, 712 F.2d 1112, 1121 (7th Cir. 1983).  Because all of these elements

26   are important to a correct calculation of actual damages, they must be included in the instruction.

27

28

585003.06

1

**XXXVIII.     Disputed Instruction No. 53: Copyright—Actual Damages Due to Lost License Fee**

2

3          Oracle's proposed instruction regarding a hypothetical negotiation in the copyright

4   context is an incorrect statement of copyright law and conflates lost license fees with a

5   reasonable royalty under patent law.  Google's separate instruction on actual damages based on a

6   lost license fee is more accurate and complete.  It also reduces potential confusion by clarifying

7   that a "license fee" in the copyright context is different from a "reasonable royalty" under patent

8   law.  *See, e.g.*, *Oracle USA, Inc. v. SAP AG*, No. C 07-1658 PJH, 2011 WL 3862074 (N.D. Cal.

9   Sept. 1, 2011) (rejecting the applicability of *Georgia Pacific* to copyright law); *Mattel, Inc. v.

10  MGA Entertainment, Inc.,* No. CV 04-9049 DOC, 2011 WL 836418 (C.D. Cal. Mar. 4, 2011)

    (same).

11         A "reasonable royalty" is not recoverable under copyright law.  Indeed, under the

12  Copyright Act, a lost license fee may only be recoverable as actual damages, not as an element

13  of the profits of the alleged infringer.  *See On Davis v. Gap, Inc*., 246 F.3d 152, 163-167 (2d Cir.

14  2001); *see also Polar Bear* Prods*, Inc. v. Timex Corp.,* 384 F.3d 700, 709-10 (9th Cir. 2004)

15  (upholding a lost revenue award based on a quote actually provided, but rejecting a profits

16  calculation of what it could have earned as "too 'pie in the sky'") (citing *On Davis*).  In contrast,

17  a reasonable royalty is recoverable under patent law even if the patentee cannot show that it had

18  lost profits.  *Rite-Hite Corp. v. Kelly Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995); 35 U.S.C. §

19  284.

20         In *On Davis*, the court held that "the [copyright] owner's actual damages may include in

21  appropriate cases the reasonable license fee on which a willing buyer and a willing seller would

22  have agreed for the use taken by the infringer."  *Id*. at 166.  According to the court, "[t]he

23  question is not what the owner would have charged, but rather what is the fair market value."

24  *Id*.; *see also Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002) ("Mackie sought to introduce

25  evidence of his personal objections to the manipulation of his artwork.  Although it is not hard to

26  be sympathetic to his concerns, the market value approach is an objective, not a subjective,

27  analysis."); *Jarvis v. K2 Inc.,* 486 F.3d 526, 534 (9th Cir. 2007) ("The court's inquiry was

28

57

585003.06

1   objective, avoiding references to what Jarvis thought he should have earned or wished he had

2   charged.").  Moreover, the amount of the license cannot be based on "'undue speculation.'"  *On*

3   *Davis,* 246 F.3d at 166.

4           To be recoverable, a copyright holder must introduce objective evidence of the fair

5   market value of a retroactive license based on (1) compensation actually paid to the copyright

6   holder or what the parties would have agreed if the copyright holder can prove that the parties

7   would have been able to reach a reasonable agreement, or (2) benchmark licenses based on

8   objective evidence of what others in fact have paid for similar licenses.  *See id.; see also Jarvis,*

9   486 F.3d at 534 ("The court also examined the financial perspectives of both the willing buyer

10  (in the form of evidence about what K2 typically pays for images and what it specifically paid

11  Jarvis in its prior dealings with him) and the willing seller (in the form of Jarvis' earlier deals

12  with K2 and his revenue from image databanks) at the hypothetical time of sale."); *Oracle USA,*

13  *Inc. v. SAP AG*, No. C 07-1658 PJH, 2011 WL 3862074, at *4 - *8 (N.D. Cal. Sept. 1, 2011).

14  "Objective evidence is necessary . . . because the hypothetical license is simply a construct

15  designed to help calculate actual damages suffered as a result of the infringement."  *Id.*at *8.

16          As this case involves both copyright and patent damages, there is significant potential for

17  juror confusion—and legal error—when the law on those issues diverges.  A "lost license fee"

18  under copyright law is different, and narrower, than a "reasonable royalty" under patent law.  *See*

19  *Mattel, Inc. v. MGA Entertainment,* Inc., CV 04-9049 DOC, 2011 WL 836418, at *4 (C.D. Cal.

20  2011) ("In determining 'actual market value,' '[t]he question is not what the owner would have

21  charged, but rather what is the fair market value."  [citation omitted.]  That is an *ex ante*

22  determination that considers the objective market value of the copyrighted work, as opposed to

23  the *Georgia Pacific* 'book of wisdom' framework, that employs a modified *ex post* examination

24  of what the specific copyright plaintiff and defendant would have agreed to in a hypothetical

25  bilateral negotiation.  Mr. Wagner's methodology [employing the *Georgia Pacific* factors] is

26  thus the opposite of the one required to determine a lost license fee as a measure of 'actual

27  damages' suffered by the copyright owner.").  Oracle's proposed instruction references the

28

58

585003.06

1  *Georgia-Pacific* factors and post-infringement facts that may be considered in determining a

2  reasonable royalty under patent law.  However, that methodology was soundly rejected in the

3  *Mattel* and *Oracle v. SAP* cases, as Oracle well knows.  Similarly, in *Jarvis*, the court ruled:

4  
> Weisgrau's $1,500 to $5,000 estimate also did not represent 'what
> a willing buyer would have been reasonably required to pay to a
> willing seller,' [citation omitted] but rather what K2 should have

5  
> paid Jarvis *after* its infringement.  As Weisgrau testified, his
> estimate was based on the likely outcome if K2 'tried to make a

6  
> deal after [it had] infringed'' and Jarvis saw that a photo of his 'was
> a proprietary image, that it had their logo, that it had a greater

7  
> value for them.'  In that case, Jarvis and K2 'would have

8  
> negotiated a higher fee.'  This legally defective emphasis on post-
> infringement damages rather than the pre-infringement fair market

9  
> value of Jarvis' images provided the district court with another
> compelling reason to discount Weisgrau's testimony.

10  

11  486 F.3d at 535 n. 9 (emphasis in original).  Furthermore, in her recent decision granting the

12  defendants' motion for judgment as a matter of law, the Honorable Phyllis J. Hamilton criticized

13  Oracle's attempt to "amend § 504(b) by reading in the Patent Act's requirement that an award of

14  (patent) damages be 'in no event less than a reasonable royalty for the use of the invention by the

15  infringer . . . . 35 U.S.C. § 284."  *Oracle USA, Inc. v. SAP AG*, No. C 07-1658 PJH, 2011 WL

16  3862074, at *8 (N.D. Cal. Sept. 1, 2011).  In granting defendants' motion, the court found:

17  
> Here, Oracle failed to present evidence of benchmark licenses.
> Indeed, Oracle executives testified that Oracle has never granted a

18  
> comparable license that would permit a competitor to use Oracle
> software to compete for oracle's customers, and that such a license

19  
> would be "unique" and "unprecedented."  Nor were the Oracle
> executives aware of any analogous situations in which any other

20  
> company had licensed software to or from a competitor to provide

21  
> support services.  Moreover, damages experts on both sides agreed
> that no benchmark licenses exist, and the evidence Oracle did

22  
> present proved that the parties would never have agreed to a
> license.  Absent evidence of benchmarks, Oracle cannot recover a

23  
> lost license fee award, because any such award would be based on
> a subjective, not an objective, analysis of air market value.

24  

25  *Id*. at *7.

26  
　　　Accordingly, Oracle's proposal should be rejected because it is incorrect and confusing.

27  In contrast, Google's proposed instruction correctly explains the distinction between a lost

28  license fee under copyright law and a reasonable royalty under patent law.  The Court should

adopt Google's instruction to reduce the possibility of jury confusion.

**XXXIX.     Disputed Instruction No. 54: Copyright—Damages—Defendant's Profits Attributable to Copyright Infringement**

The parties both base their instruction on Ninth Circuit Model Instruction 17.24.  Most of the differences between the parties' proposals reflect a difference of opinion about the best way to make that model instruction more understandable to a lay jury.  Google submits that its modifications are clearer and more easily applied by a jury.

In addition, the parties' proposals differ in that Oracle has made four additions that Google has not, and Google has made one that Oracle has not.

Oracle's first addition instructs the jury that it can award damages even if Google did not earn a net profit from its infringement.  This is needlessly confusing.  Oracle appears to have added this language in response to the report served Dr. Alan Cox, Google's copyright damages expert.  Dr. Cox explains that Google's net profits on the entire Android platform are, to date, negative, but does so only to show that *if the jury were to conclude that all of the Android revenues were attributable to infringement,* then there were no profits attributable to infringement after deducting all of the Android-related expenses.  Dr. Cox also calculates the profits attributable to infringement assuming only part of Android revenues are from infringement, and in that scenario he concludes that the incremental profits attributable to infringement are non-negative.  Oracle's addition to the instruction offer a complicated explanation that is unrelated to the facts in this case.

Oracle's second addition states that Google's gross revenues can include advertising revenues.  This is, essentially, a leading instruction.  The instruction already states that gross revenues include "all" of Google's receipts from the use of products containing the copyrighted work.  There is no need further to emphasize one particular source of revenue.

Oracle's third addition would instruct the jury that overhead is not deductible if it finds that Google willfully infringed.  This is wrong, for the reasons given above with respect to Disputed Instruction No. 21.

Oracle's fourth addition states that it is entitled to profits attributable to an act of copying

60

1  by Google in the United States even if those profits were earned because of further copying that

2  may have occurred elsewhere.  Again, this instruction is unnecessary.  Dr. Cox did not reduce

3  alleged wrongful profits in a manner that would be inconsistent with this instruction.  Thus, the

4  instruction only serves to confuse the jury for no reason.

5        Finally, Google's proposal includes an addition based on the following Ninth Circuit

6  authority:

> Although the statute imposes upon the infringer the burden of
> showing "the elements of profit attributable to factors other than
> the copyrighted work," 17 U.S.C. § 504(b), nonetheless where it is
> clear, as it is in this case, that not all of the profits are attributable
> to the infringing material, the copyright owner is not entitled to
> recover all of those profits merely because the infringer fails to
> establish with certainty the portion attributable to the non-
> infringing elements. "In cases such as this where an infringer's
> profits are not entirely due to the infringement, and the evidence
> suggests some division which may rationally be used as a
> springboard it is the duty of the court to make some
> apportionment." *Orgel v. Clark Boardman Co.*, 301 F.2d 119, 121
> (2d Cir. 1962).

14  *Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 828-29 (9th Cir. 1985).  It is

15  clear that Oracle intends to argue that Dr. Cox has not adequately supported his opinions

16  regarding how to apportion Android profits to the alleged copyright infringement.  Google is

17  entitled to an instruction that informs the jury that it should apportion profits so long as it has a

18  reasonable basis for doing so, even if the evidence does not allow it to establish with certainty

19  the precise apportionment.

20  **XL.   Disputed Instruction No. 55: Patent—Damages—Burden of Proof**

21        The only disputed issue between the parties' proposals regarding this instruction is how

22  to define the patents in suit.  For the reasons discussed above, the Court should refer to them as

23  the "Asserted Patents."  *See infra* Part II.A.

24  **XLI.   Disputed Instruction No. 56: Patent—Damages—Reasonable Royalty—Definition**

25        The parties dispute several aspects of this proposed instruction.  First, Google requests

26  that the Court instruct the jury that it "may not award damages based on [Google's] entire

27  revenue from all the accused products in the case."  *Uniloc USA, Inc. v. Microsoft Corp.*, 632

28                                                  61

585003.06

1    F.3d 1292, 1320 (Fed. Cir. 2011) (citation and quotation marks omitted).  This language is

2    derived directly from the Federal Circuit's decision in *Uniloc*—decided after the Model

3    Instruction was written—in which the court held that, where the elements of the entire market

4    value rule have not been established, it is inappropriate to use an infringing product's entire

5    value even as a check.  *See id.* at 1321.  Indeed, this Court previously cited *Uniloc* in holding that

6    Oracle's damages expert "must apportion the total value between the specific infringing features

7    versus the rest of Android."  Order Granting In Part Motion To Strike Damage Report of

8    Plaintiff Expert Iain Cockburn, 6 (July 22, 2011) (Dkt. No. 230).  The jury should be instructed

9    to apply the same legal standard.  Oracle has no basis to exclude this statement of controlling

10   law.

11        Second, Google believes it is necessary for the Court to instruct the jury that "[t]he most

12   a company would be willing to pay for patented technology is the incremental value (i.e., the

13   incremental profit) of the patented technology over the alternative."  FTC Report at 186.  As the

14   Federal Trade Commission has explained, "[b]ecause the incremental value of patented

15   technology over alternatives plays such a crucial role in licensing negotiations, it must play a

16   commensurate role in the hypothetical negotiation that determines reasonable royalty damages."

17   *Id.*  "Courts should recognize that when it can be determined, the incremental value of the

18   patented invention over the next-best alternative establishes the maximum amount that a willing

19   licensee would pay in a hypothetical negotiation.  Courts should not award reasonable royalty

20   damages higher than this amount."  *Id.* at 22.

21        In line with that principle, the Federal Circuit has held that "[t]he economic relationship

22   between the patented method and non-infringing alternative methods, of necessity, would limit

23   the hypothetical negotiation."  *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1312 (Fed.

24   Cir. 2002); *see also id.* ("[U]nder the constraints of the hypothetical negotiation, the market

25   could not award Riles a royalty for his method divorced of all relation to a potential non-

26   infringing alternative method.").  In another case, the Federal Circuit affirmed a damages award

27   where the district court had held that the difference between an infringing and noninfringing

28

1   product "effectively capped the reasonable royalty award."  *Grain Processing Corp. v. American*

2   *Maize-Products Co.*, 185 F.3d 1341 (Fed. Cir. 1999).  Likewise, the Supreme Court has also held

3   that a royalty reflects "the utility and advantage of the invention over the old modes or devices

4   that had been used for working out similar results."  *Suffolk Co. v. Hayden*, 70 U.S. (3 Wall.)

5   315, 320 (1866).  Google's proposed instruction is consistent with all of this controlling case

6   law, and the Court should instruct the jury accordingly.

7          Third, Oracle's proposed reasonable royalty instruction adds confusing language that

8   appears nowhere in the Model Rules.  Rather than simply telling the jury, as Google would, that

9   "[t]he test for damages is what royalty would have resulted from the hypothetical negotiation and

10  not simply what either party would have preferred," Oracle would add the additional language

11  "*granting Google the right to make, use, and sell the patented inventions in the manner that it*

12  *actually did*" after "hypothetical negotiation."  Oracle's language is absent from the Model Rules

13  because it does not fit.  The purpose of the model instruction is simply to tell the jury that the

14  royalty is to be determined by a hypothetical negotiation that takes both parties' interests into

15  account, not just the interests of one party.  Oracle's language relates to a different subject

16  having nothing to do with the mutual nature of the hypothetical negotiation.  It would muddle the

17  instruction and confuse the jury.

18  **XLII.  Disputed Instruction No. 57:  Patent—Damages—Reasonable Royalty—Relevant
         Factors**

19

20         Google and Oracle dispute whether it is appropriate to include an instruction listing the

21  *Georgia-Pacific* factors.  Oracle's proposal to list every *Georgia-Pacific* factor for the jury is a

22  stark departure from this District's Model Patent Jury Instruction, which does not list those

23  factors.  The burden is therefore on Oracle to identify a reason to inject the *Georgia-Pacific*

24  factors into the damages instructions.  No such reason exists.

25         To the contrary, there are strong reasons to reject Oracle's proposed instruction.  "When

26  jury instructions present a complete or partial list of the *Georgia-Pacific* factors, they provide

27  little guidance."  Fed. Trade Comm'n, *The Evolving IP Marketplace:  Aligning Patent Notice*

28  *and Remedies with Competition* 184 (2011), *available at* http://www.ftc.gov/os/2011/03/

                                              63

110307patentreport.pdf.  That means the *Georgia-Pacific* factors are at best unhelpful to a jury—and, more likely, confusing.  Oracle's proposed language would compound the jury's confusion by instructing that no factor is "dispositive" and that the jury "may also consider any other factors" it chooses—essentially telling the jury that its damages deliberation should be an unstructured free-for-all.  That is neither helpful to the jury nor a correct statement of the law.

The Federal Circuit recently made clear that the *Georgia-Pacific* factors are not a grab-bag that attorneys may freely mix and match to justify damage awards.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1335-36 (Fed. Cir. 2009).  Rather, the touchstone for any reasonable royalty is the value attributable to the patented invention.  *See id.* at 1337 (citing *Garretson v. Clark*, 111 U.S. 120 (1884)).  The *Georgia-Pacific* factors are relevant only to the extent they shed light on those questions; they have no independent value.  Thus, if the Court instructs the jury with respect to the *Georgia-Pacific* factors, that would only underscore the need to adopt Google's other proposed damages instructions.  *See infra* Part XLI.

**XLIII. Disputed Instruction No. 58:  Patent—Damages—Extraterritorial Acts**

The jury can only benefit from a short, discrete instruction stating the legally correct proposition that Oracle can recover damages only for domestic acts of patent infringement, not foreign ones.  *See Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 525 n.7 (1972); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1358, 1362-65 (Fed. Cir. 2009) (en banc) (rejecting "damages for overseas sales").  Oracle cannot and does not dispute that this is the law.  Google's proposed instruction would remind the jury that the parties must differentiate between domestic and foreign acts of infringement, and encourage a more careful damages assessment under governing law.  Failure to give Google's proposed instruction increases the likelihood that Oracle (and the jury) will blur the line between foreign and domestic acts of infringement and award Oracle damages to which it is not entitled.  Among the excesses of Oracle's damages expert Dr. Iain Cockburn is that, although he purports to calculate his reasonable royalty based on only U.S. sales of infringing products, he then adjusts that royalty upward based on purported harm to Oracle internationally.  With the parties likely to disagree

1    regarding geographic limitations on patent damages, it is important, helpful, and consistent with

2    the law to instruct the jury about what the law provides.

3    **XLIV. Disputed Instruction No. 59:  Patent—Damages—Date of Commencement**

4         Oracle's proposed instruction on the date of commencement for patent damages ignores

5    the governing law in numerous ways.

6         First, Oracle's instruction would incorrectly tell the jury that no notice requirement exists

7    where no Sun or Oracle product practices the patents.  But, in addition to covering Sun's and

8    Oracle's own practice of the patents, the marking requirement under 35 U.S.C. § 287(a) extends

9    also to any products practicing the patents that are sold by the patentee's licensees.  *See Amsted*

10   *Indus. v. Buckeye Steel Castings Co.,* 24 F. 3d 178, 185 (Fed. Cir 1994); *Devices for Med., Inc. v.*

11   *Boehl,* 822 F. 2d 1062, 1292 (Fed. Cir 1987).  Here, Oracle admitted in its response to Google's

12   Interrogatory No. 1 that it both practices the "patents in suit in its own Java-related products and

13   authorizes others to practice them through its Java licensing program."  Among the "others" are

14   mobile-phone manufacturers whose handsets sold in the United States practice the patents.

15   Oracle does not get a free pass on failure to mark by its licensees.

16        Second, Oracle's instruction would incorrectly inform the jury that its obligation to mark

17   existed only "during the period of infringement by Google."  Again, there is no legal support for

18   that proposition.  To the extent that Sun, Oracle, or any Sun or Oracle licensee *ever* marketed a

19   product that practiced the patents *at any time,* even if it was prior to the alleged infringement,

20   such a product would have triggered the marking obligation.

21        Third, Oracle's instruction would wrongly tell the jury that no notice requirement exists

22   where the jury *finds infringement* only as to method claims.  That is not the law.  Although it is

23   true that the marking statute does not extend to method claims because, "ordinarily, where the

24   patent claims are directed to only a method or process there is nothing to mark," *American Med.*

25   *Sys., Inc. v. Medical Eng'g Corp.,* 6 F.3d 1523, 1538-39 (Fed. Cir. 1993), the Federal Circuit has

26   long held that where "*both apparatus and method claims … were asserted* and there was a

27   physical device produced by the claimed method that was capable of being marked," the patentee

28
65

585003.06

1   must mark that physical device in order "to recover damages" prior to the date of notice, even

2   "under its method claims."  *Id.* at 1539 (emphasis added).  The Federal Circuit reaffirmed this

3   rule just two years ago in *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.,* 559 F.3d

4   1308, 1316-17 (Fed. Cir. 2009).  In other words, the notice requirement does not depend on what

5   sort of claims are *found infringed,* but on what sort of claims are *asserted.*  Here, as to five of the

6   six patents-in-suit (all but the '205 patent) Oracle has committed to assert non-method claims.

7   Oracle thus has to satisfy the notice requirement as to every patent-in-suit except the '205

8   regardless of which claims are found to be infringed.

9        Fourth, Oracle's instruction includes the vague, unhelpful, and confusing statement that

10  "[a]ctual notice may also be satisfied by an offer to license the patent."  By itself, the use of

11  "may" renders this instruction impossible to apply, since it gives the jury no guidance on *when* a

12  license offer qualifies as notice.  Moreover, to the extent Oracle would argue that the notice

13  requirement could be satisfied by an offer of the sort of blanket, portfolio-wide license the parties

14  discussed in 2006 as part of their failed partnership negotiation, there is no legal support for that

15  position.  Although an offer to license *a specific, identified patent* could satisfy the notice

16  requirement, that is not what happened in this case.  The model instruction already makes clear

17  that identification of a specific patent to an alleged infringer (including in an offer to license) can

18  amount to notice.  Oracle's new language adds nothing to that instruction.

19       Finally, Oracle's proposed instruction wrongly treats "Sun" and "Oracle" as two separate

20  entities, when (as discussed throughout this memorandum) they are in fact one and the same, and

21  should be described to the jury as such.

22                                        Respectfully submitted,

23  Dated:  October 14, 2011              KEKER & VAN NEST LLP

24

25

26                                        By: */s/ Robert A. Van Nest*
                                          ROBERT A. VAN NEST
27                                        Attorneys for Defendant
                                          GOOGLE INC.
28

                                66

585003.06