# EXHIBIT A

Attorneys' Eyes Only

1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                SAN FRANCISCO DIVISION

4

5    _____

6    ORACLE AMERICA, INC.,  )

7              Plaintiff,    )

8       vs.                  ) No. CV 10-03561 WHA

9    GOOGLE, INC.,           )

10             Defendant.    )

11   _____)

12

13                ATTORNEYS' EYES ONLY

14

15       Videotaped Deposition of ANDREW E. RUBIN,

16       taken at 333 Twin Dolphin Drive, Redwood

17       Shores, California, commencing at 9:31 a.m.,

18       Tuesday, April 5, 2011, before Leslie

19       Rockwood, RPR, CSR No. 3462.

20

21

22

23

24

25   PAGES 1 - 149

Attorneys' Eyes Only



Page 90

Page 92

19   developer ecosystem.  There is no purpose of building an
20   open platform other than to attract third-party         11:44:44
21   developers to it.  So anything that we would do to
22   jeopardize the support of third-party developers would be
23   bad for the success of the platform.
24
                                                             11:45:07

24 (Pages 90 to 93)

Attorneys' Eyes Only



Page 22

Page 24

12    Q.  Why did those negotiations end?

13    A.  Well, we were seeking out a partnership with

14  Sun to co-develop the next version of Java.  The

15  discussions doesn't proceed because the two companies    09:54:43

16  couldn't agree on terms.

17    Q.  And which terms could they not agree on?

18    A.  Well, we had kind of a whole block of open

19  items.  One was control of the ecosystem, I would call

20  it, which was the third-party developer ecosystem.    09:55:05

21  Third-party developers contribute to the success of a

22  platform by having their companies invest in the platform

23  by basing their businesses on the platform.

24        It was my intention to create an independent

25  third-party developer ecosystem, and one of the terms we    09:55:25

Page 25

1  couldn't agree on was Sun's desire to own the third-party

2  developer ecosystem.

3        The second term that we couldn't agree on is

4  the security -- who controlled the security model.  It

5  was my belief, similar to how I wanted the ecosystem to    09:55:44

6  be an independent third-party developer ecosystem, or in

7  other words, uncontrolled, the same with security is that

8  I think in an open platform, giving up control is one of

9  the key principles of an open platform.  And in that

10  term, Sun also wanted to control the security mechanism    09:56:03

11  of the platform.

12    Q.  Were there any other terms that you couldn't

13  agree on that co-contributed to the end of the

14  discussions?

15    A.  I don't think so.  I'm sure there were -- you    09:56:17

16  know, if the discussions had proceeded, there would have

17  been a handful of technical, you know, details that the

18  teams would have had to work out, but they didn't even

19  reach that phase.

20    Q.  So if I heard you correctly, you said there    09:56:33

21  were two main points of disagreement, the first being

22  Sun's desire to own a third-party ecosystem, as you put

23  it; is that correct?

24    A.  Yes.

25    Q.  And the second was who would control the    09:56:43

7 (Pages 22 to 25)

Attorneys' Eyes Only



Page 26

1  security mechanism or the security model; is that
2  correct?
3       A.  Yes.  And those are the two, to my
4  recollection.

Page 28

Veritext National Deposition & Litigation Services
866-299-5127

# EXHIBIT B

# Android Developers Blog 1/1/10-4/12/11



Oracle America v. Google, 3:10-cv-03561-WHA          GOOGLE-03169165

- Application switching on a mobile device is extremely critical; we target significantly less than 1 second to launch a new application. This is especially important when the user is switching between a few applications, such as switching to look at a new SMS message while watching a video, and then returning to that video. A noticeable wait in such situations will quickly make users hate you.
- The available APIs must be sufficient for writing the built-in Google applications, as part of our "all applications are created equal" philosophy. This means background music playback, data syncing, GPS navigation, and application downloading must be implemented with the same APIs that are available to third party developers.

The first two requirements highlight an interesting conflict. We don't want users to worry about closing their apps, but rather make it appear that all of the applications are always running. At the same time, mobile devices have hard limits on memory use, so that a system will degrade or even start failing very quickly as it needs more RAM than is available; a desktop computer, with swap, in contrast will simply start slowing down as it needs to page RAM to its swap space. These competing constraints were a key motivation for Android's design.

## When does an application "stop"?

A common misunderstanding about Android multitasking is the difference between a process and an application. In Android these are not tightly coupled entities: applications may seem present to the user without an actual process currently running the app; multiple applications may share processes, or one application may make use of multiple processes depending on its needs; the process(es) of an application may be kept around by Android even when that application is not actively doing something.

The fact that you can see an application's process "running" does not mean the application is running or doing anything. It may simply be there because Android needed it at some point, and has decided that it would be best to keep it around in case it needs it again. Likewise, you may leave an application for a little bit and return to it from where you left off, and during that time Android may have needed to get rid of the process for other things.

A key to how Android handles applications in this way is that processes don't shut down cleanly. When the user leaves an application, its process is kept around in the background, allowing it to continue working (for example downloading web pages) if needed, and come immediately to the foreground if the user returns to it. If a device never runs out of memory, then Android will keep all of these processes around, truly leaving all applications "running" all of the time.

Of course, there is a limited amount of memory, and to accommodate this Android must decide when to get rid of processes that are not needed. This leads to Android's process lifecycle, the rules it uses to decide how important each process is and thus the next one that should be dropped. These rules are based on both how important a process is for the user's current experience, as well as how long it has been since the process was last needed by the user.

Once Android determines that it needs to remove a process, it does this brutally, simply force-killing it. The kernel can then immediately reclaim all resources needed by the process, without relying on that application being well written and responsive to a polite request to exit. Allowing the kernel to immediately reclaim application resources makes it a lot easier to avoid serious out of memory situations.

Oracle America v. Google, 3:10-cv-03561-WHA    GOOGLE-03169188

# EXHIBIT C

# SUBMITTED UNDER SEAL PURSUANT TO THE PROTECTIVE ORDER

# EXHIBIT D

# SUBMITTED UNDER SEAL PURSUANT TO THE PROTECTIVE ORDER

# EXHIBIT E

# SUBMITTED UNDER SEAL PURSUANT TO THE PROTECTIVE ORDER

# EXHIBIT F

# SUBMITTED UNDER SEAL PURSUANT TO THE PROTECTIVE ORDER

EXHIBIT G

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

————————

| | |
|---|---|
| BARD PERIPHERAL VASCULAR,<br>et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) NO. **CV 03-597 PHX-MHM** |
| | ) |
| W. L. GORE AND ASSOCIATES,<br>et al., | ) Phoenix, Arizona |
| | ) November 15, 2007 |
| | ) 9:25 a.m. |
| Defendants. | ) |

————————————————

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

### (Jury Trial - Day 7)

### BEFORE THE HONORABLE MARY H. MURGUIA

Court Reporter:          Merilyn A. Sanchez, CRR
                         Sandra Day O'Connor U.S. Courthouse
                         401 W. Washington Street SPC-37
                         Phoenix, Arizona  85003-2118
                         (602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

1    A.  Well, there's really three factors.  The first is that it's

2    what's typically done, just generally speaking in license

3    agreements.  Why?  Because it's really easy.  You just say,

4    okay, here's the price at which I sold the product.  That's the

5    royalty rate, I'm going to apply my royalty rate to that price,    11:37:10

6    very easy.

7         If you try to break things up and say, well, maybe

8    there's just one component of the product, I'm going to try to

9    make that the base for the royalty.  The problem is, how much

10   is that component worth versus the whole product?  It makes it    11:37:25

11   difficult.

12   Q.  You're not saying that it's just easy for you personally?

13   A.  Oh, no, not at all, it's easy for the people that actually

14   have to calculate the royalties in the companies that are

15   licensing products.  And that's why they do it that way.    11:37:40

16   Q.  And in fact you have experience, have you observed that

17   same kind of use of net selling price in other industries,

18   other products for using the royalty base?

19   A.  Yes, absolutely.

20   Q.  And can you give us some examples of how that, using the    11:37:52

21   net selling price facilitated -- was easier for both sides in

22   the licensing negotiation?

23   A.  All right.  Because there's just no argument about it.  So

24   like let's take a car.  And let's say you had a patent on the

25   engine.  You could base a royalty for that using a patented    11:38:07

1  technology on the price of the whole car.  That's really what

2  I'm talking about here.  Or you could somehow try to figure out

3  what the value of the engine is.  But the problem is that the

4  engine isn't really sold separately.  It's really hard to

5  figure out what that value is.  And you're going to get into        11:38:25

6  disputes between the two sides, the person who is paying the

7  royalty is going to say, oh, the engine isn't worth much.  And

8  the person receiving the royalty is going to say, oh, the

9  engine is worth everything.  So to avoid those kind of disputes

10  you just set the royalty base as being the whole car.              11:38:44

11  Q.  With respect to, for example, the Gore stent grafts that we

12  have heard have some component beyond the ePTFE graft tube, did

13  you evaluate whether or not it made economic sense to apply the

14  net selling price as the royalty base?

15  A.  Yes.                                                           11:38:59

16  Q.  And what factors did you look at in reaching that

17  conclusion?

18  A.  Well, there's, again, three.  One is, again, the ease of

19  administration.  I think that is generally what would happen in

20  the real world.                                                    11:39:10

21  Q.  And again to focus on it, you are not talking about the

22  ease for you to do the calculation?

23  A.  No, not at all.

24  Q.  But it's your belief that in this hypothetical world the

25  parties would have decided that that was the easiest way?         11:39:18

# EXHIBIT H

# SUBMITTED UNDER SEAL PURSUANT TO THE PROTECTIVE ORDER

EXHIBIT I

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

1

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

5    ORACLE AMERICA, INC.,

6          Plaintiff,

7      vs.                          No. CV 10-03561 WHA

8    GOOGLE, INC.,

9          Defendant.

10   _____/

11

12      -- HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY --

13

14      Videotaped 30(b)(6) deposition of PARAM V. SINGH,

15      taken at the law offices of Morrison & Foerster

16      LLP, 755 Page Mill Road, Palo Alto, California,

17      commencing at 9:35 a.m., on Tuesday,

18      June 23, 2011, before Leslie Rockwood, RPR,

19      CSR No. 3462.

20

21

22

23

24

25

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**



```
 9        Q.  So you don't believe Sun had that practice or
10   you're just not aware of it?
11        A.  Sun had engineering services that would do
12   implementations for customers, but consistent with the
13   specification and consistent with the TCK.
```

13 (Pages 46 to 49)

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**



98

```
18        Q.  Has Sun ever considered making an investment
19   to permit that kind of business structure?
20        A.  For free?  Our business model is based on, as
21   I mentioned, on runtime licensing revenue for -- for the
22   platform functionality as well as adding in services
23   revenue on top of that.
```

production numbers OAGOOGLE 16621762 through 16621787.

26  (Pages 98 to 101)

# EXHIBIT J

# SUBMITTED UNDER SEAL PURSUANT TO THE PROTECTIVE ORDER

EXHIBIT K

Highly Confidential - Attorneys' Eyes Only

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4

 5      _____

 6   ORACLE AMERICA, INC.,      )

 7            Plaintiff,        )

 8       vs.                    ) No. CV 10-03561 WHA

 9   GOOGLE, INC.,              )

10            Defendant.        )

11   _____)

12

13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14

15       Videotaped deposition of VINEET GUPTA,

16       at 710 Sansome Street, San Francisco,

17       California, commencing at 9:38 a.m.,

18       Tuesday, July 26, 2011, before Leslie

19       Rockwood, RPR, CSR No. 3462.

20

21

22

23

24

25   PAGES 1 - 401
```

                                        Page 1

Highly Confidential Attorneys' Eyes Only



1       (Exhibit PX289 was marked for
2       identification.)
3       Q.  BY MS. RUTHERFORD:  My first question is
4       A.  Yes.
5       Q.    it says    this email was sent to
6   armstrong core@sun.com?
7       A.  Yeah.
8       Q.  Is that a distribution list?
9       A.  It is.
10      Q.  Were you a member of that distribution list?
11      A.  I don't remember.  I might be.  I may not be.
12  I can't remember what those were.
13      Q.  If you take a moment to review this
14  presentation, my next question is simply going to be:
15  Have you seen this document before?
16      A.  So the one thing I want to say is since my
17  memory is weak from those years now, all I know is
18  several of these slides are things that we all created
19  jointly.  The exact    you know, all of the slides
20  together as one, it might be in my email book.  I might
21  have seen it at that point.  My recollection of a lot of
22  this data is stuff that we've discussed.  And, you know,
23  I'm sure I have seen most of these files, but I can't be
24  accurate on was I in the Armstrong core and was I reading
25  each and every page of this and had access to each and
Page 308

Page 306

every part of this document.
2       Q.  Let me ask you, turning to the page ending in
3   8844    the Bates Number 884
4       A.  Okay.
5       Q.    do you recall seeing this page before?
6       A.  So the    I think there was a lot of
7   discussion on what revenues we could generate with the
8   different models.  So I think I've seen some pieces of
9   this data, but I can't recall and remember if all of the
10  data is the cost and gross margin.
11      Again, like I said, I was trying to stay away
12  from some of the devil in the details that were finance
13  and engineering teams involved in their cost structures.
14  I was more looking at the total proposals.
15      Q.  Do you know Kathleen Knopoff?
16      A.  Yes.
17      Q.  Do you find her to be a trustworthy and
18  valuable employee of Sun?
19      A.  Yes.  Yes.
20      Q.  Do you have any reason to doubt the integrity
21  of the information she would send you?
22      A.  No, no.  That's why I said I let other people
23  do their jobs.  And I would trust.  But that's the cost,
24  and that's the area.  That's what it is.
25
Page 309

24      MS. RUTHERFORD:  I am going to mark this as
25  Exhibit 289    Oracle Exhibit 289.
Page 307

78 (Pages 306 - 309)

# EXHIBIT L

# SUBMITTED UNDER SEAL PURSUANT TO THE PROTECTIVE ORDER

# EXHIBIT M

# SUBMITTED UNDER SEAL PURSUANT TO THE PROTECTIVE ORDER