| | |
|---|---|
| KEKER & VAN NEST LLP | KING & SPALDING LLP |
| ROBERT A. VAN NEST - #84065 | DONALD F. ZIMMER, JR. - #112279 |
| rvannest@kvn.com | fzimmer@kslaw.com |
| CHRISTA M. ANDERSON - #184325 | CHERYL A. SABNIS - #224323 |
| canderson@kvn.com | csabnis@kslaw.com |
| 633 Battery Street | 101 Second St., Suite 2300 |
| San Francisco, CA  94111-1809 | San Francisco, CA  94105 |
| Telephone:     415.391.5400 | Telephone:     415.318.1200 |
| Facsimile:      415.397.7188 | Facsimile:      415.318.1300 |
| KING & SPALDING LLP | GREENBERG TRAURIG, LLP |
| SCOTT T. WEINGAERTNER (*Pro Hac Vice*) | IAN C. BALLON - #141819 |
| sweingaertner@kslaw.com | ballon@gtlaw.com |
| ROBERT F. PERRY | HEATHER MEEKER - #172148 |
| rperry@kslaw.com | meekerh@gtlaw.com |
| BRUCE W. BABER (*Pro Hac Vice*) | 1900 University Avenue |
| 1185 Avenue of the Americas | East Palo Alto, CA 94303 |
| New York, NY  10036 | Telephone:     650.328.8500 |
| Telephone:     212.556.2100 | Facsimile:      650.328.8508 |
| Facsimile:      212.556.2222 | |

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>        Plaintiff,<br><br> v.<br><br>GOOGLE INC.,<br><br>        Defendant. | Case No. 3:10-cv-03561-WHA<br><br>**EXHIBIT K TO THE DECLARATION OF DAVID ZIMMER IN SUPPORT OF GOOGLE INC.'S OPPOSITION TO ORACLE AMERICA, INC.'S MOTION TO EXCLUDE PORTIONS OF THE EXPERT REPORTS OF GREGORY K. LEONARD AND ALAN J. COX (DKT. NO. 581)**<br><br>Judge:     Hon. William Alsup |

**PUBLICLY FILED VERSION**

# Exhibit K

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4
 5   ORACLE AMERICA, INC.,    )
 6          Plaintiff,        )
 7      vs.                   )   No. CV 10-03561 WHA
 8   GOOGLE, INC.,            )
 9          Defendant.        )
10   _____)
11
12
13
14
15       Videotaped deposition of STEVEN M. SHUGAN, PH.D.,
16       taken at the law offices of Boies, Schiller &
17       Flexner LLP, 1999 Harrison Street, Suite 900,
18       Oakland, California, commencing at 9:40 a.m.,
19       on Monday, September 26, 2011, before
20       Leslie Rockwood, RPR, CSR No. 3462.
21
22
23
24
25   PAGES 1 - 160
```

Page 1

```
 1          Q.  So the feature sets that you tested in the
 2    conjoint analysis was to some extent constrained by the
 3    subject matter of the case?
 4          A.  I wouldn't use the word "constrained."  I
 5    would use the word "focused" on the attributes involved       10:18:26
 6    in the case.
 7          Q.  Do you recall who communicated to you
 8    specific features that ought to be included in the
 9    conjoint analysis?
10          A.  Well, the -- your question is not really            10:18:45
11    clear in the sense that there are different features in
12    the analysis.  Now, some of the features were
13    communicated to me through Analysis Group that they were
14    required features and need to be there.  Other features I
15    decided should be there, and there were other features       10:19:09
16    that Cockburn decided needed to be there.  And then in
17    the end, I put it all together and decided which ones to
18    actually include in the analysis.
19              So the -- there wasn't one source where all
20    of the features came from.                                   10:19:23
21          Q.  Okay.  That's helpful.  Thank you.
22              So which features did Professor Cockburn
23    instruct you should be included in the conjoint analysis?
24          A.  Okay.  The features that -- at the time that
25    were communicated included multitasking, the application    10:19:43
```

Page 29

```
 1    startup time, and the features related to the operating
 2    system that are in the conjoint analysis.
 3              And then the brand and price features, I
 4    decided those needed to be included.  And then the voice
 5    command features, that was came up with through a          10:20:04
 6    discussion of -- with Analysis Group about what to
 7    include in the analysis and what not to include in the
 8    analysis.
 9              And the final one that also came from
10    Cockburn was the applications, the availability of the    10:20:18
11    applications.  And that's outlined in my report.
12         Q.   Were there any features that were discussed
13    for inclusion in the conjoint analysis but rejected?
14              MR. NORTON:  Objection to form.
15              Can you -- I just -- there are Rule 26          10:20:36
16    problems with some of your questions.  And so can you
17    just focus on whether he's having conversations with
18    counsel, having conversations with Analysis Group, or
19    having conversations with Mr. Cockburn?  Otherwise, I'll
20    have to give him instructions on all of your questions.   10:20:51
21              MR. PURCELL:  Right.
22         Q.   So just so you know, I'm referring to your
23    discussions with Dr. Cockburn and Analysis Group, not
24    your instruction -- or your discussions with Oracle's
25    counsel.                                                   10:21:00
```

Page 30

```
 1              So given that limitation, were there other
 2   features that were discussed for potential inclusion in
 3   the conjoint analysis but rejected?
 4        A.   The -- there was a large number of features
 5   that we discussed in general.  I believe probably maybe      10:21:13
 6   20 that were listed in the -- that came out of the focus
 7   group.  Now, some of those didn't seem very important,
 8   and some of them were found to be important by looking at
 9   the literature regarding the surveys and third-party data
10   available on smartphones.  And so there were other          10:21:44
11   features.
12              Now, in the end, the decision was made by me
13   and Analysis Group as to what features would be included
14   based on all these considerations.  Nothing was really
15   rejected in the sense that somebody along the way said     10:21:58
16   that this can't be included in there for some reason or
17   another.
18              In the end, I had to decide which ones to
19   include based on the ability of the conjoint analysis to
20   deal with the feature and the requirements of the case.   10:22:17
21              So there was a specific objective to the case
22   regarding supplying information to Cockburn, and that had
23   to be the primary determinant of how the study was
24   designed to give him the most accurate possible
25   information.                                               10:22:37
```

Veritext National Deposition & Litigation Services
866 299-5127

```
 1    one-on-one interviews; correct?
 2         A.   Right.
 3         Q.   And then they proceeded to conduct the focus
 4    group after that?
 5         A.   That's correct.                               10:42:49
 6         Q.   And you didn't communicate with Analysis
 7    Group in between the one-on-one interviews and the focus
 8    group; correct?
 9         A.   Not to my knowledge.
10         Q.   So Analysis Group made the decision what, if  10:42:55
11    any -- anything to take from the one-on-one interviews
12    that would then lead -- guide their behavior in the focus
13    group; is that right?
14         A.   I'm not sure.  What are you asking?
15         Q.   That was a pretty bad question.  Let me try   10:43:16
16    it again.
17              So Analysis Group made the decision regarding
18    how, if at all, to alter the design of the focus group
19    based on what they had learned from the one-on-one
20    interviews; correct?                                    10:43:32
21              MR. NORTON:  Objection to form.
22              THE WITNESS:  My understanding is that they
23    did the one-on-one interviews to get the attributes to be
24    used in the focus group.  I don't know what decisions are
25    really been made there.  I think that it's just a matter 10:43:42
```

Page 46

```
 1   of collecting information and using the information.
 2           Now, there may have been decisions, but I
 3   don't know of any decisions that were made at that point.
 4       Q.  BY MR. PURCELL:  So Analysis Group used the
 5   one-on-one interviews to gather a set of product features       10:43:56
 6   that they then might use in the focus group?
 7       A.  Correct.
 8       Q.  And so when the focus group was conducted --
 9   I think you mentioned this earlier -- Analysis Group
10   first asked open-ended questions about what product            10:44:09
11   features were important to the consumers; correct?
12       A.  Correct.
13       Q.  And then after that, they suggested potential
14   product features that might have been important and asked
15   the consumers whether those were important; correct?           10:44:19
16       A.  Right.  Standard unaided and aided recall
17   questions.
18       Q.  Okay.  So let's talk about the focus group.
19   We've mentioned that the focus group was conducted on
20   August 5th.  How soon after the one-on-one interviews did      10:44:34
21   the focus group take place?
22       A.  I assume they were very close together since
23   this whole thing was happening in one week and I had
24   talked to them earlier in the week before they had done
25   anything.                                                      10:44:52
```

Page 47

```
 1          Q.  Analysis Group conducted the focus group;
 2   correct?
 3          A.  That's correct.  Well, the person I had
 4   mentioned conducted it.
 5          Q.  Rene Befurt?                                      10:44:59
 6          A.  Right.
 7          Q.  Where physically was the focus group
 8   conducted?
 9          A.  Well, you asked that.  But my understanding
10   was generally that it was at Analysis Group which it was    10:45:06
11   done, but maybe that's not accurate.  But that was my
12   understanding at the time.
13          Q.  It was at Analysis Group where?
14          A.  In Boston.
15          Q.  In Boston.  Okay.  You weren't present at the    10:45:15
16   focus group?
17          A.  I was not present.
18          Q.  Was there any written material prepared, like
19   a discussion guide, to guide the focus group?
20              MR. NORTON:  Objection.  Asked and answered.     10:45:26
21              THE WITNESS:  I don't believe so.  I would
22   have to check with Analysis Group, though.  I -- things
23   were happening rapidly, and most of our discussions were
24   on the phone, and we were doing this for the conjoint
25   analysis.  And so we quickly sort of moved to the           10:45:38
```

Page 48

```
 1   conjoint analysis from the focus group.
 2           The focus really wasn't on the focus group.
 3   The goal was to quickly get the attributes set so that we
 4   could move to the conjoint analysis.  And to some extent,
 5   the focus group was somewhat superfluous in the sense          10:45:55
 6   that we sort of had an idea of what the attributes were
 7   from the literature already, but we wanted to cover all
 8   the bases and make sure we'd actually talked to consumers
 9   and the -- no new attributes sort of emerged that we
10   would have to think about that was related to the              10:46:14
11   requirements of the study.
12       Q.  BY MR. PURCELL:  After the focus group was
13   conducted, do you know if Analysis Group memorialized the
14   results of the focus group in any type of written form?
15       A.  My -- as I said, my understanding is they did          10:46:27
16   not, but I don't know that for a fact.  They may have
17   internally produced a document they didn't give to me
18   that sort of summarized the findings and the -- what
19   their conclusions was.
20           Now, if there was written documentation               10:46:44
21   associated with the focus group, I don't know whether
22   that was actually in a report form or it was just in a
23   notes form.
24       Q.  You mentioned that the purpose of the focus
25   group, or at least one of the purposes of the focus            10:46:56
```

1   group, was to gather data on which product attributes
2   were important to consumers with respect to smartphones;
3   correct?
4           A.  Yes.
5           Q.  Do you know whether Analysis Group kept any                10:47:12
6   record of which of the various product attributes they
7   considered were deemed most important by the participants
8   in the focus group?
9           MR. NORTON:  Objection to form.
10          THE WITNESS:  I don't think that they ever                     10:47:31
11  came up with that type of an analysis where they were
12  actually identifying which of the attributes seemed to be
13  more prominent on some criteria.
14          I believe they did send me a correspondence
15  that had a list of attributes in it at one point, now     10:47:50
16  that I think about it.  And so I may have a memo that
17  they sent me at one time that summarized -- or some of
18  the material we talked about in a telephone interview.  I
19  didn't use the memo directly, but I may have something if
20  I look for it that did list attributes.                   10:48:07
21          But there wasn't any type of analysis of the
22  attributes or ranking of the attributes.  It was just a
23  raw form of this is sort of some of the stuff we found in
24  the focus group.  It wasn't a report, anyway.
25          Q.  BY MR. PURCELL:  Wouldn't it have been         10:48:22

observe.

And so you can predict both hypothetical markets or counterfactual markets that don't exist and what the shares would be, and you can predict existing markets and what the shares would be, and you want to make sure that the shares that you predict for existing markets are pretty close to what we actually observe in the market.

Q. Let's talk for a second about sort of the conversion process of converting preference shares into market shares. How did you go about doing that in conducting this analysis?

A. Okay. What you would do in this particular analysis is you would take the preference shares and you would look at the shares and try to figure out whether or not the market share would be higher for a particular product than what the preference share would be.

And so in this particular analysis all that was important was the number that I was giving to Professor Cockburn was a conservative number. So I would look at all the different factors that make the market share different from the preference share and make sure each factor is working in a direction that would cause that number to be conservative or would not have much effect on the -- on the difference.

Veritext National Deposition & Litigation Services
866 299-5127

```
 1                  Now, I don't think that difference is large,
 2       because as I said, we could predict pretty accurately
 3       within 4 percent what the actual shares in the
 4       marketplace would be, but still it's useful to sort of
 5       consider all those factors.  So that's how you would do    13:21:43
 6       it.
 7              Q.  And what factors did you consider in this
 8       case?
 9              A.  Well, I considered all the typical marketing
10       mix variables, so that would be things such as             13:21:50
11       distribution, adoption by OEMs, adoption by carriers, the
12       availability of the product, word of mouth on the
13       product, reviews of the product, the effectiveness of
14       advertising on the product and so on.
15              Q.  And where is your calculation of those           13:22:10
16       factors shown?
17              A.  I didn't do a quantitative calculation on
18       that.  I did a qualitative calculation.
19              Q.  So you just considered those factors and
20       concluded that each of them supports your conclusion?      13:22:20
21              A.  Each of those factors works in the direction
22       that causes my conclusion to be conservative.
23              Q.  In terms of -- leaving aside those other
24       factors that you find confirmed your analysis, just in
25       terms of the sort of mathematical process, how did you     13:22:42
```

Page 118

```
1  STATE OF CALIFORNIA      ) ss:
2  COUNTY OF MARIN          )
```

I, LESLIE ROCKWOOD, CSR No. 3462, do hereby certify:

That the foregoing deposition testimony was taken before me at the time and place therein set forth and at which time the witness was administered the oath;

That testimony of the witness and all objections made by counsel at the time of the examination were recorded stenographically by me, and were thereafter transcribed under my direction and supervision, and that the foregoing pages contain a full, true and accurate record of all proceedings and testimony to the best of my skill and ability.

I further certify that I am neither counsel for any party to said action, nor am I related to any party to said action, nor am I in any way interested in the outcome thereof.

IN WITNESS WHEREOF, I have subscribed my name this 27th day of September, 2011.

*[Signature: Leslie Rockwood]*

LESLIE ROCKWOOD, CSR. NO. 3462

Page 158