**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORACLE AMERICA, INC., | No. C 10-03561 WHA |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION REGARDING RULE 706 EXPERT** |
| GOOGLE INC., | |
| Defendant. | |

FRE 706(a) states that a district court "may appoint expert witnesses of its own selection." The Supreme Court has long recognized the constitutionality of court-appointed experts. *See, e.g., In re Peterson*, 253 U.S 300, 312–13 (1920). The Court of Appeals for the Federal Circuit has acknowledged that "the Federal Rules do authorize those appointments," and "under Ninth Circuit law, district courts enjoy wide latitude to make these appointments." *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 558 F.3d 1341, 1346, 1348 (Fed. Cir. 2009).

In this patent and copyright infringement action, an independent damages expert was appointed pursuant to FRE 706 in accordance with the relevant case law, and this memorandum opinion explains why one was needed.

**1. CIRCUMSTANCES WARRANTING APPOINTMENT OF RULE 706 EXPERT.**

The appointment of a Rule 706 expert has been upheld "where the district court was confronted by what it viewed as an unusually complex case and what appeared to be starkly

conflicting expert testimony." *Monolithic*, 588 F.3d at 1348. This action, too, is unusually complex and involves starkly conflicting expert views on the subject of damages.

The facts of this action have been set forth in previous orders (*see* Dkt. Nos. 137, 230, 433). Plaintiff Oracle America, Inc. originally asserted 132 claims from seven United States patents, as well as an expansive copyright-infringement claim (Dkt. No. 137 at 4). Oracle now intends to try 26 claims from six patents and several copyright-infringement theories to the jury (Dkt. No. 471 at 6). Oracle anticipates that this will take "a minimum of 28–30 hours" of evidence time (Dkt. No. 481 at 5). Defendant Google Inc. estimates that its defense to the liability portion of the case will require 150–175 trial hours for the patent claims alone, and "an additional non-trivial amount of time" for the copyright portion of the case (Doc. No. 480 at 7). Without acquiescing in those estimates, this order finds the obvious, namely that the disputed facts span several fields of computer science and involve complex technologies and products.

The damages aspect of this controversy is particularly involved. Damages from patent infringement are governed by different legal standards than damages from copyright infringement, but some accused products and acts are relevant to both parts of the action. The accused items are not entire products but rather elements of products, whose roles and relative importance within the larger units are disputed. The damages question is further complicated by the fact that the parties employ elaborate, nontraditional business models for distributing and monetizing the relevant products. For example, Google allegedly distributes its accused Android software free of charge, hoping to later benefit from improved market position and advertising revenue generated by Google searches on Android devices. Oracle, for its part, claims to have been harmed by the supposed fragmentation of its Java platform and developer community due to Google's allegedly selective use of Java elements in Android.

Predictably, the parties and their retained economists have advanced extremely divergent views on the question of damages. The first damages study provided by Oracle's economic expert opined that the fair market value of a hypothetical license for the alleged infringement would have been "at least $1.4 billion" and "could be as much as $6.1 billion" (Dkt. No. 230 at 4). In response, Google argued for zero or in the alternative stated that the total value of a

1 real-life licensing offer it rejected — "at most, a figure around $100 million" — should serve as a
2 damages ceiling (*id.* at 10). The gap between these contentions was enormous. In light of the
3 parties' extremely divergent views on damages and the unusual complexity of the damages aspect
4 of this case, an independent economic expert was needed to aid the jury.

### 2. PROCEDURES FOR SELECTION AND APPOINTMENT OF RULE 706 EXPERT.

The Court of Appeals for the Federal Circuit upheld the appointment of an independent expert by a district court where it found that "the district court properly administered the standards set by Rule 706." *Monolithic*, 588 F.3d at 1347. FRE 706(a) provides the following procedural guidance:

> The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act. A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party, including a party calling the witness.

The *Monolithic* decision noted that the district court "allowed the parties to show cause why an expert witness should not be appointed" and then "instructed the parties to nominate candidates and confer upon a mutually agreeable witness." It further noted that "the district court provided detailed written instructions to [the expert] regarding his duties, and ordered [the expert] to make himself available for depositions and for examination at trial." In addition, it observed that appointment of the Rule 706 expert "did not limit in any way the parties' ability to call their own experts," and that the trial court allowed the parties' experts to attack, support, or supplement the testimony of the court-appointed expert. *Monolithic*, 588 F.3d at 1347.

All of these procedures have been followed in the instant action (or will be inasmuch as we are still in process in the pretrial stage). In July 2011, the parties were apprised of the Court's interest in appointing a Rule 706 damages expert "to testify before the jury at trial under FRE 706

3

and *not* [to serve] as a confidential advisor to the judge." The parties were invited to show cause why such appointment would or would not be advisable and to describe the assignments that would be preferable. Counsel were requested to agree on two qualified candidates in this district, jointly call the candidates to make sure they would be available and have no conflicts, and then submit the candidates' names and resumes to the Court (Dkt. No. 195).

Counsel initially were unable to agree on any joint candidate, so the geographical restriction was removed and the parties were invited to separately submit their own nominations (Dkt. No. 236). The parties ultimately found two mutually agreeable candidates for the position of independent damages expert. In August 2011, a conference was held with counsel and the two jointly nominated candidates for the purpose of vetting the candidates and discussing a proposed assignment-scope description which had been provided to counsel two weeks prior (Dkt. No. 273, 333). After the conference, the candidates were requested to provide follow-up information regarding possible conflicts and compensation (Dkt. No. 330).

After reviewing all relevant materials, Dr. James R. Kearl was appointed to serve as the Rule 706 damages expert. Attorney John Cooper was simultaneously appointed to serve as his *pro bono* counsel (Dkt. No. 374). The parties previously had been given notice that attorney Cooper agreed to represent the Rule 706 expert on a *pro bono* basis, and the parties were allowed to object to Attorney Cooper serving in this role (Dkt. No. 272). No objections were filed.

Attorney Cooper was instructed to work with counsel from both sides to draft a proposed order describing the scope of Dr. Kearl's assignment and the procedures by which the parties would pay for his work and expenses (Dkt. No. 374). The first proposed order that was submitted required some revision (Dkt. No. 394). A revised version was signed into effect in September 2011 (Dkt. No. 413).

The assignment order contained a detailed description of Dr. Kearl's assignment. It provided that Dr. Kearl would prepare an expert report and sit for deposition by stated deadlines. It also provided that each party would be able to examine Dr. Kearl at trial as though he were an adverse expert witness. The assignment order did not limit the ability of the parties to allow their experts critiqued by Dr. Kearl to respond at trial to his critiques. The order explicitly left open

4

the question of how Dr. Kearl's role at trial would be described to the jury (Dkt. No. 413). Of note, the appeals court in *Monolithic* did "not perceive an abuse of discretion in the district court's disclosure of [the expert's] independent status to the jury" where it was accompanied by an instruction that the jury should not assign the court-appointed expert's opinion greater inherent weight on account of his independent status. *Monolithic*, 588 F.3d at 1347.

To accommodate Dr. Kearl's request for more work time, the damages issues were tentatively bifurcated from the liability trial, which at the time of Dr. Kearl's appointment was scheduled to begin on October 31, 2011, a date that wound up being eclipsed by the need for the judge to preside over a long criminal trial. Dr. Kearl was instructed to be ready for a damages trial beginning in early December at the earliest (Dkt. No. 374). At a case management conference in October 2011, Dr. Kearl confirmed that he could complete his original assignment on the original time frame and also agreed to undertake a further analysis over the next three months. His deposition and report due dates were postponed accordingly (Dkt. No. 575). Although this is a particularly complex case, the scope of Dr. Kearl's assignments have been appropriately matched to the amount of time available. *See Monolithic*, 588 F.3d at 1347 (finding that where a court-appointed expert was given only 35 days to review all relevant materials and prepare a report, the "strictures of this time frame" did not amount to an abuse of discretion).

### 3. COMPENSATION OF RULE 706 EXPERT.

The Federal Rules of Evidence provide that court-appointed expert witnesses "are entitled to reasonable compensation in whatever sum the court may allow." In a civil action such as this, "the compensation shall be paid by the parties in such proportion and at such time as the court directs, and thereafter charged in like manner as other costs." FRE 706(b). The *Monolithic* court upheld a district court's appointment of an expert where "the court instructed the parties to share [the expert's] reasonable fees and expenses." *Monolithic*, 588 F.3d at 1347.

Here, the parties were warned in July 2011 that they would be required to pay the costs of any expert appointed pursuant to FRE 706 (Dkt. No. 236). The September 2011 order detailing Dr. Kearl's assignment, which counsel for both sides helped Attorney Cooper draft, provided that each party would pay one half of Dr. Kearl's monthly bills. The parties also reserved the right to

5

1 negotiate reductions in Dr. Kearl's bills through Attorney Cooper, who was tasked with
2 coordinating all payment matters (Dkt. No. 413 at 3). This arrangement was agreeable to counsel
3 for all parties and the expert.

*        *        *

In sum, Dr. Kearl was selected and appointed in accordance with the Federal Rules of Evidence and the guidance of our courts of appeals. The assistance of an independent economic expert was and remains necessary to aid the jury in this complex technical action in light of the parties' vastly divergent views on damages. The scope of Dr. Kearl's assignment and the arrangements for his compensation were crafted so as not to interfere with the parties' abilities to make their own presentations of the case.

Finally, the Court wishes to acknowledge again the exemplary role of Attorney John Cooper in volunteering his valuable services without compensation. John Cooper is an esteemed member of the bar and continues to serve with distinction in the highest tradition of this district.

Dated: November 9, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE