IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ORACLE AMERICA, INC.,

    Plaintiff,

  v.

GOOGLE INC.,

    Defendant.

No. C 10-03561 WHA

**TENTATIVE ORDER GRANTING IN PART AND DENYING IN PART GOOGLE'S MOTION IN LIMINE # 3 TO EXCLUDE PORTIONS OF DR. COCKBURN'S REVISED DAMAGES REPORT**

## INTRODUCTION

In this patent and copyright infringement action involving Java and Android, defendant moves in limine to strike portions of plaintiff's revised expert damages report. For the following reasons, the motion is tentatively **GRANTED IN PART** and **DENIED IN PART**.

## STATEMENT

The facts of this action have been set forth in previous orders (*see* Dkt. Nos. 137, 230, 433). Google's instant motion seeks to strike portions of the revised damages report by Oracle's expert, Dr. Iain Cockburn. A prior order rejected Dr. Cockburn's first damages report for failing to apportion the value of the asserted claims and instead using the total value of Java and Android in calculating damages, among other reasons (Dkt. No. 230).

In his second damages report, Dr. Cockburn estimated damages, from 2007 through 2011, to be $201.8 million for patent infringement, $823.9 million in unjust enrichment for copyright infringement (not deducting for expenses or apportionment), and $136.2 million in lost profits or $102.6 million in lost licensing fees for copyright infringement (Cockburn Report [Rpt] ¶¶ 47, 467, 496, and 474; Exhs. 3, 22, 23). Dr. Cockburn calculated patent damages using a

hypothetical negotiation method: he began with a $100 million starting value that was based on real-world negotiations between the parties in 2006, then adjusted downward for patent apportionment, then adjusted upward for lost revenue that was expected from the licensing agreement (Rpt ¶ 19). The same methodology was used to calculate a hypothetical lost license fee for copyright infringement (Rpt Exhs. 23–24). Unjust enrichment was calculated by adding together Android's ad revenue, the hardware revenue from selling Nexus phones, and applications sales in the Android Market store (Rpt ¶ 466). Lost profits were calculated by adding together lost revenue from licensing Java, ancillary revenue from back-end services, and revenue from a smartphone operating system (Rpt ¶ 475). Using similar methodology, Dr. Cockburn also estimated future royalties in 2012 to be $1.2 billion in unjust enrichment for copyright infringement, $102.6 million in lost license fees for copyright infringement, and $205.2 million for patent damages (Cockburn Rpt Exhs. 22, 25, 18).

**ANALYSIS**

An expert witness may provide opinion testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FRE 702. District courts thus "are charged with a 'gatekeeping role,' the objective of which is to ensure that expert testimony admitted into evidence is both reliable and relevant." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008).

Google raises several objections to Dr. Cockburn's report. Each of Google's arguments will be addressed below.

**1. SUN WOULD NOT HAVE LICENSED AN INCOMPATIBLE VERSION OF JAVA TO GOOGLE.**

Google argues that damages cannot be based on a hypothetical lost license fee because Sun would never have licensed an incompatible version of Java to Google (Br. 4, Supp. Br. 11–14). This tentative order disagrees.

"The [reasonable] royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant. The hypothetical negotiation requires the court to envision the terms of a licensing agreement

2

reached as the result of a supposed meeting between the patentee and the infringer at the time infringement began." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (citations omitted); *see also Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004) (applying the hypothetical lost license fee calculation in the context of copyright infringement).

In support of its argument that damages cannot be based on a hypothetical license, Google cites an unpublished opinion from this district, *Oracle USA, Inc. v. SAP AG*, No. C07-1658 PJH, 2011 WL 3862074 (ND Cal. Sept. 1, 2011) (Hamilton, J.). In *SAP*, the district court granted accused infringer's motion as a matter of law to strike the jury's award of actual damages based on a hypothetical license calculation. 2011 WL 3862074 at *1. Judge Hamilton gave two reasons for her holding: *first*, the copyright owner did not establish that, but for infringement, it would have licensed the asserted copyrighted works for the use at issue, and *second*, the copyright owner did not present evidence sufficient to value such a license. Judge Hamilton held that the awarded damages were too speculative in that situation. *Id.* at 9–10. In a subsequent opinion, Judge Hamilton shed light on her prior holding by stating, "The court did not hold as a matter of law . . . that copyright damages based upon the amount of a willing buyer would reasonably have paid a willing seller under a hypothetical license are available only if the copyright owner provides evidence of actual licenses it entered into or would have entered into . . . ." *Oracle USA, Inc. v. SAP AG*, No. C07-1658 PJH, Dkt. No. 1088 at 2.

The holding in *SAP* is distinguishable. Dr. Cockburn had a non-speculative factual basis to value a license for an incompatible version of Java. Dr. Cockburn did so by starting with the real-world negotiations between Sun and Google for a compatible Java, and then adjusting that amount up to compensate for the incompatibility. The amount of the upward adjustment was based on Sun's own revenue projections for the value of compatibility. Dr. Cockburn's calculation was based on real-world facts and not incurably speculative. Google fights the hypothetical by ignoring the legal requirement for a hypothetical negotiation that the licensing agreement must be *reached* as the result of a hypothetical meeting between the parties. *See Rite-Hite Corp.*, 56 F.3d at 1554. Google's objections are tentatively overruled.

3

### 2. STARTING POINT OF $100 MILLION.

Google argues that Dr. Cockburn erred by using $100 million as his starting point for the hypothetical negotiation instead of $28 million, which was the amount in a draft agreement dated April 19, 2006 for a "broad technology partnership" between the parties (Br. 2). This tentative order disagrees.

Dr. Cockburn's decision not to use the $28 million draft agreement as the starting point was within the bounds of reason, although a jury may eventually reject the premise. Contrary to Google's assertion that Dr. Cockburn ignored the agreement, he actually discussed it for two pages in his report (Rpt ¶¶ 211–16). Dr. Cockburn opined that important terms of the $28 million draft agreement were still being negotiated (Rpt ¶ 212). As a factual basis for his opinion that terms were not finalized, Dr. Cockburn cited the "Go To Market Plan" section of the agreement, which had the following text: "*Need to discuss*. We propose agreement to the price in return for Sun's hosting & ISV leadership" (Rpt ¶ 211) (emphasis added). Dr. Cockburn also cited emails from Sun executives suggesting that management had not decided on the final terms of the agreement (Rpt ¶¶ 213–16). Google does not rebut those citations. Having reviewed the available record, this order finds that Dr. Cockburn reasonably relied on sufficient facts when rejecting the $28 million draft agreement as a starting point.

The order also finds that Dr. Cockburn did not err in using $100 million as the starting point. Dr. Cockburn extensively reviewed the entire licensing history between the parties (Rpt ¶¶ 191–221). The $100 million was on the table during actual negotiations in February and April 2006 (Rpt ¶¶ 196, 207). Dr. Cockburn decided on a $100 million fee for "a worldwide [Java] license" (Rpt ¶ 228). Although not entirely clear from Dr. Cockburn's report, this license would likely have included "all Sun owned CD JavaME technologies, unencumbered rights" and "engineering and back-end support and services," and "joint promotion of the Java brand" (Rpt ¶¶ 230–31). Dr. Cockburn also opined that this $100 million amount would have been structured as $60 million in fixed payments and the remainder as ad-revenue sharing (Rpt. Exh. 14). This deal was very similar to the opening draft agreement by the parties in February 2006, and could be the basis for a hypothetical negotiation. Google's objections are tentatively overruled.

4

### 3. UPWARD ADJUSTMENT OF THE STARTING POINT.

Dr. Cockburn adjusted the starting point upward to account for lost convoyed sales that was expected from real-world negotiations (Rpt Exh. 3). Google argues that this upward adjustment was speculative because Dr. Cockburn relied on "a single internal Sun presentation that roughly sketch[ed] a projection of the money Sun might earn from a partnership with Google," (Br. 5). Google argues that this presentation reflected "Sun's optimistic hope, without any grounding in experience or past practice, that it might be able to earn money by partnering with Google" (Br. 5); and that Dr. Cockburn improperly ignored the fact that this would have been a new line of business, he did not vet the reliability of the projections with anyone at Oracle, and he did not see any other documents to support the lost profit projection (Br. 10).

A patent owner may be able to recover directly for loss of collateral sales on a lost-profits theory, but lost convoyed sales remain relevant to a reasonable royalty even where the patent owner's proof is insufficient to show lost profit. *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1121, 1128–1130 (S.D.N.Y. 1970); *see also Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554–55 (Fed. Cir. 1995) (en banc) (holding that lost profits can substantially inform a hypothetical negotiation analysis).

Dr. Cockburn based his upward adjustment on three factors: *first*, "harm to Sun, in the form of foregone licensing revenues and convoyed sales that Sun expected to generate pursuant to" licensing its technology to Google, *second*, "the effect of fragmentation on non-mobile Java revenues portended by [alleged] infringement," and *third*, a "litigation premium" reflecting the fact that the hypothetical negotiation must assume that the patents are valid and infringed (Rpt ¶¶ 35–40). Although noting that the harm from fragmentation would have been great, Dr. Cockburn opined that only lost convoyed sales had a reasonably calculated value (*ibid.*; Cockburn Dep. at 176:12–16).

This upward adjustment was not improper. From the parties' discussions during the 2006 negotiations and Sun's business model, it was clear that Sun expected convoyed sales after licensing a compatible version of Java to Google. Sun's expectations are catalogued qualitatively in a variety of documents (*see, e.g.*, Rpt ¶¶ 297–99) and quantitatively in financial projections

5

1 (Rpt ¶¶ 298–302; Purcell Exhs. 18–19). The jury could reasonably find that Google's
2 infringement led to an Android that is *incompatible* with Java and precluded Sun from receiving
3 convoyed sales "through licensing royalty bearing commercial implementations, using TCK
4 licenses to maintain the integrity of the Java platform, and providing backend services and
5 potentially other revenue opportunities" (Rpt ¶ 288). If so, then the hypothetical negotiation
6 should take that lost revenue into account and upwardly adjust the licensing fee Sun would have
7 required to license an incompatible version of Java. Dr. Cockburn has an sufficient factual basis
8 for this calculation.

9 While the amount of adjustment involves an element of uncertainty, Dr. Cockburn's
10 quantitative analysis is based on sufficiently reliable financial projections. *See Interactive*
11 *Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001) (upholding a
12 hypothetical royalty based on a contemporaneously created business plan projecting revenue).
13 The convoyed sales projections were contemporaneously calculated by Kathleen Knopoff, a
14 senior director of business operations at Sun. Google has not explained why Ms. Knopoff would
15 have projected an overly optimistic amount. Furthermore, Dr. Cockburn opined that the
16 unaccounted-for qualitative basis for the upward adjustment — harm from fragmentation and the
17 litigation premium — help to alleviate concerns that Ms. Knopoff's financial projections may
18 have been optimistic (*see, e.g.*, Rpt ¶¶ 283–85). Google's objections to the upward adjustment
19 are tentatively overruled.

20 **4. APPORTIONMENT OF THE STARTING VALUE AND UPWARD ADJUSTMENT.**

21 Dr. Cockburn's reasonable royalty calculation for both patent and copyright infringement
22 depended on his opinion that the patents-in-suit were worth 30% and the copyrights-in-suit
23 worth 15% of the $100 million starting value and upward adjustment of nearly $600 million.
24 These percentages were used to proportionally adjust the starting-point fee and the upward
25 adjustment in the hypothetical negotiation calculation. Google argues that because Dr. Cockburn
26 had no sense of the value of the intellectual property not at issue in this action, but that was on the
27 table during the 2006 negotiations, he could not quantify the relative value of the patents and
28

6

1 copyrights-at-issue to the entire licensing package encompassed in the $100 million starting
2 value. This tentative order agrees.

3     Dr. Cockburn admittedly did not analyze the rest of the license bundle that made up the
4 $100 million starting value. As contemplated by Sun and Google during their 2006 negotiations,
5 a $100 million fee gave Google access to "all Sun owned CD JavaME technologies,
6 unencumbered rights" and "engineering and back-end support and services," and "joint promotion
7 of the Java brand" (Rpt ¶¶ 230–31). This potentially included thousands of patents and all the
8 copyrightable source code. Moreover, in its opposition brief, Oracle even suggests that a portion
9 of the $100 million fee had nothing to do with licensing, but was needed to compensate Sun for
10 short-term revenue loss for moving into an open-source business model (Supp. Opp. 15).
11 Dr. Cockburn admitted that he had no specific information about what Google would have
12 received under the contemplated partnership besides licenses to the patents and copyrights-in-suit
13 (Cockburn Dep. at 78:14–23, 78:25–79:9). Thus, Dr. Cockburn did not value any of those other
14 components in the $100 million starting value: the other intellectual property licenses, Sun's
15 engineering know-how, and amount needed to supplement Sun's revenue for moving into open
16 source.

17     In his deposition, Dr. Cockburn admitted that he did not know how many total patents
18 were in the licensing bundle between Sun and Google (Cockburn Dep. 78:4–13). He did not
19 know what functionality the other patents covered (Cockburn Dep. 78:25–79:9). And he did not
20 try to calculate the value to Google of the other Sun-owned patents not at issue in this case
21 (Cockburn Dep. 78:25–79:9). Dr. Cockburn admitted that he similarly did not value the other
22 copyrights in the license bundle (Cockburn Dep. 79:14–80:13, 80:15). Dr. Cockburn also
23 admitted that he did not value the right to use Sun's trademarks (Cockburn Dep. 81:21–82:5).
24 Dr. Cockburn admitted that he did not value non-intellectual property, such as access to Sun's
25 engineers or the compensation for Sun's short-term revenue loss, that was contemplated in the
26 2006 negotiations (Cockburn Dep. 84:7–85:5).

27     Dr. Cockburn reached the 30% apportionment for the patents-in-suit by calculating the
28 "the specific contribution of the patents-in-suit to Android's success in generating revenues as

7

1  distinct from the contributions of other factors" (Rpt ¶ 29). He used the same methodology to
2  calculate the 15% apportionment for the copyrights-in-suit (Rpt ¶ 474). Using performance
3  studies, econometric studies, and conjoint analysis, Dr. Cockburn had a reliable basis for valuing
4  the patents and copyright-in-suit's relative contribution to the success of Android (*see* Rpt ¶¶
5  252–277). But that is insufficient by itself to apportion the value of the patent and copyrights-in-
6  suit relative to the *total value of the license bundle discussed in 2006*, which is encompassed in
7  the $100 million starting value, or to the amount of the upward adjustment for lost convoyed
8  sales.

9  Dr. Cockburn calculated the apportionment by "comparing the value added to Google
10 from its use of the patents-in-suit to the value added to Google from its use of the *Java technology*
11 *as a whole*" (Rpt ¶ 251) (emphasis added). Without describing what "Java technology as a
12 whole" encompassed, Dr. Cockburn then *assumes* that the value added to Google from its
13 supposed use of Java technology as a whole was the *entire value of Android* (Rpt ¶ 244). But
14 Android is not equivalent to the value of the license bundle discussed during the 2006
15 negotiations. The value of Android could been more or less. Dr. Cockburn even admitted that
16 the value of Android could be worth more (Rpt ¶ 272 n. 327). There is no explanation for why
17 Android's earnings would match the entire value of the 2006 license bundle, which included
18 potentially thousands of patents, copyrights, trademark, and access to Sun engineers.
19 Dr. Cockburn's explanation for why he used total Android ad revenue as his denominator:
20 because the license bundle was essential to developing Android (Rpt ¶¶ 244–45, 272). Even
21 assuming that is true, it does not explain why the values of the 2006 license bundle and Android
22 should be equal or even closely similar. In sum, Dr. Cockburn's methodology is flawed because
23 he does not adequately explain why the value of Android is an appropriate substitute for the value
24 of the 2006 licensing bundle.

25 There is no controlling law on point to guide this inquiry on the reliability of
26 Dr. Cockburn's methodology. Courts frequently allow experts to calculate a reasonable royalty
27 percentage based on the value of the patents-in-suit to the infringer's revenue from the accused
28 products. But in those cases, the next step is for the expert to calculate a reasonable royalty

amount by multiplying the *infringer's revenues* and the reasonable royalty rate. *See, e.g.*, *Finjan Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1208–1211 (Fed. Cir. 2010) (finding that, based on internal documents calling the patented features important, the jury could infer that a substantial fraction of the accused products' profits stemmed from the patented invention). In the instant action, Dr. Cockburn did not use the value of the patents to apportion infringer's profits, but instead apportioned the purchase price of a *broad license portfolio* without any basis to opine on the value of the rest of that license portfolio.

A similar situation arose in *Medtronic, Inc. v. Boston Scientific Corp.*, 2002 WL 34447587 at *12 (D. Minn. Aug. 8, 2002). The *Medtronic* court excluded an expert's opinion that two patents-in-suit "accounted for virtually all of the $25 million" paid for a license to an intellectual property portfolio without adequate factual support. The court faulted Medtronic's expert for not "determin[ing] the value to Medtronic of any of the items in that portfolio other than the patents-in-suit" and for speculating that the patents-in-suit accounted for substantially all of the value of the portfolio based on his "gut feeling." *Id.* at *11.

The order rejecting Dr. Cockburn's first damages report warned "[i]f the next and final report fails to measure up in any substantial and unseverable way . . . then it may be excluded altogether without leave to try again" (Dkt. No. 230 at 15). Now this order tentatively strikes Dr. Cockburn's opinion on apportionment and along with it a significant portion of his second damages report. Dr. Cockburn will not be able to opine on a reasonable royalty derived from a hypothetical negotiation if he is unable to apportion the value of the patents and copyrights-in-suit. It is undecided whether or not Dr. Cockburn should be given a third opportunity to fix his damages calculations. Counsel will be given an opportunity to submit statements on this question once this order is finalized.

**5.    CLAIM-BY-CLAIM INSTEAD OF PATENT-BY-PATENT ANALYSIS.**

Google argues that Dr. Cockburn should have conducted a claim-by-claim analysis of damages instead of a patent-by-patent analysis (Br. 9). As such, Google requests that Dr. Cockburn be precluded from apportioning an asserted patent's value among its claims at trial (*ibid.*). Google also requests that the Court instruct the jury that if they find any asserted claim

9

1  not infringed, they may assume that the non-infringed claim represented the full value of that
2  patent (*ibid.*). This tentative order agrees.

3  The prior order made clear that a claim-by-claim analysis of damages was preferable:
4  "determining the date of first infringement requires a claim-by-claim analysis" (Dkt. No. 230 at
5  7). There was a number of reasons for requesting a claim-by-claim analysis. *First*, this is
6  necessary to get the correct timeline to calculate past damages. *Second*, some of the asserted
7  claims might be less valuable, or easier to design around, than other claims contained within that
8  same patent. *Third*, this is necessary to calculate future damages if Google designs around some
9  claims but not others in the same patent. *Fourth*, the jury may find liability on some claims but
10 not others in the same patent. And *fifth*, some claims may be rejected by the USPTO on re-
11 examination.

12 Oracle does not deny that Dr. Cockburn treats each patent as an indivisible whole (*see* Rpt
13 Exhs. 2, 4–13). Therefore, Dr. Cockburn is tentatively precluded from apportioning an asserted
14 patent's value among its claims at trial. Furthermore, this tentative order holds that the jury will
15 be instructed that if they find any asserted claim not infringed, they may assume that the non-
16 infringed claim represented the full value of that patent.

17 **6. NO DIVISION OF SEPARATE COPYRIGHT CLAIMS.**

18 In a parallel manner, Google argues that Dr. Cockburn erred by not separating copyright
19 damages for the two categories of copyrighted material asserted in this action: the lines of
20 Android code and the structure, arrangement, and selection of the Application Programming
21 Interfaces (API) packages. This tentative order agrees.

22 Dr. Cockburn's discussion of copyright damages focused almost entirely on the value of
23 the APIs (*see* Rpt Part XI). But if the jury concludes that the structure, arrangement, and
24 selection of the APIs is not copyrightable or that Google engaged in fair use with respect to APIs,
25 then Oracle's copyright claim would be limited to only a dozen code files. Dr. Cockburn has not
26 adequately valued that code in his report and cannot do so at trial. The tentative order holds that
27 the jury will be instructed that if Google is found not liable for infringing the selection,

10

arrangement, and structure of the API packages, then Dr. Cockburn's copyright damages analysis is inapplicable.

### 7. INADEQUATE CALCULATION OF FUTURE DAMAGES.

Google argues that Dr. Cockburn erred by calculating future damages only through 2012 and not taking into account the varying expiration dates of the asserted patent claims (Br. 7–8). Oracle does not deny that Dr. Cockburn only calculated damages through 2012 and did not calculate damages for unexpired patents after that date.

The prior order instructed Dr. Cockburn that "any projection of future damages *must take into account the varying expiration dates of the asserted patent claims*" (Dkt. No. 230 at 11) (emphasis added). The reason for this requirement is that if Google were to design around a claim, this Court can exclude damages based on that claim. Also, future damages that do not allocate on a claim-by-claim bases are speculative because of the infringer's ability to design around claims. Although Dr. Cockburn did opine on the proportional value of each patent-at-issue, he did not show how future damages would be adjusted if certain patents expired or were designed around.

Because Dr. Cockburn's report is speculative and unhelpful for calculating future damages on a claim-by-claim basis, the portion of the report discussing future patent damages is tentatively **STRICKEN**.

### 8. REFERRING TO LICENSES INVOLVING UNRELATED TECHNOLOGY AND PARTIES.

Google argues that Dr. Cockburn should be precluded from referring to noncomparable licenses and settlements involving other companies (Supp. Br. 16). Specifically, Google seeks to preclude Dr. Cockburn from discussing licenses involving Nokia, Qualcomm, and Apple, and settlements between Sun and Microsoft (Br. 9–10).

Damges experts cannot use noncomparable licenses, with little relationship to the claimed invention or parties-in-suit, as a basis for calculating reasonable royalties. *See ResQNet, Inc. v. Lansa*, *Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010).

In his report, Dr. Cockburn cursorily discussed licenses involving Nokia, Qualcomm, and Apple (Rpt ¶¶ 104–105). Other than listing the licensing fees, Dr. Cockburn did little to describe

11

1   these licenses.  The only description given about the technology is that the licenses involved
2   "intellectual property associated with mobile devices and services" (Rpt ¶ 104).  Importantly, Dr.
3   Cockburn did not specify whether the referenced licenses related to software or hardware, or how
4   extensive the licenses were.  Because there is so little information given about these licenses, this
5   order cannot see how a jury could adequately evaluate the probative value of those agreements.
6   References in Dr. Cockburn's report to these licenses are tentatively **STRICKEN**.

7   Dr. Cockburn also referenced the settlement entered into between Sun and Microsoft in
8   2004, under which Microsoft agreed to pay Sun over $1 billion to settle ongoing litigation and to
9   enter into license agreements (Rpt ¶¶ 70–71).  Dr. Cockburn opined that the settlement
10  exemplified the importance of compatibility to Java because Microsoft was threatening to
11  fragment the Java platform (*ibid.*).  The problem with Dr. Cockburn's analysis is that he confused
12  *two separate* litigations between Sun and Microsoft in the late-1990s and early-2000s.
13  Dr. Cockburn used Sun's complaint from the earlier litigation to describe the importance of the
14  settlement amount from the later litigation.  In 1997, Sun sued Microsoft for $35 million, alleging
15  that Microsoft breached its contract by trying to extend Java so it would work differently on
16  Windows computers.  *Sun Microsystems, Inc. v. Microsoft Corp*, No. 97-20884 RMW (N.D. Cal).
17  One of Sun's main arguments in the case was that Microsoft wrongfully advertised that its
18  products were Java-compatible because, in Sun's eyes, they were not.  The two parties settled in
19  2001 for $20 million.  *Sun, Microsoft settle Java suit*, CNET News, January 23, 2001, accessed at
20  <http://news.cnet.com/2100-1001-251401.html>.  In 2002, Sun sued Microsoft for $1 billion
21  claiming that Microsoft engaged in anticompetitive actions against Java.  *Sun Microsystems, Inc.*
22  *v. Microsoft Corp*, No. 02-01150 RMW (N.D. Cal).   In 2004, Sun and Microsoft settled the
23  lawsuit (Rpt ¶ 71).  That settlement involved payments of $700 million to Sun by Microsoft to
24  resolve pending antitrust issues and $900 million to resolve patent issues.  In addition, Sun and
25  Microsoft agreed to pay royalties for use of each other's technology, with Microsoft making an
26  up-front payment of $350 million (*ibid.*).  This second settlement was about more than
27  fragmentation, patent and copyright infringement.  That litigation featured antitrust issues.  This
28  is too dissimilar to be relevant to the damages calculation in the instant case.  Dr. Cockburn did

12

not adequately describe the separate terms of the two different Sun-Microsoft settlements. His confused discussion cannot help a jury evaluate the probative value of the settlements and will be tentatively **STRICKEN** from the report.

## CONCLUSION

For the reasons stated above, Google's motion in limine is tentatively **GRANTED IN PART** and **DENIED IN PART**. Calculations of future damages and references to nonparty licenses and settlements are tentatively **STRICKEN**. Counsel for both parties may submit ten-page supplemental memoranda critiquing this tentative ruling by **DECEMBER 20 AT NOON.** This motion shall be one of the motions in limine to be heard at the final pretrial conference and shall count as one of those selected for argument by Google.

**IT IS SO ORDERED.**

Dated: December 6, 2001.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE