# EXHIBIT G

*Chakrabarty*, the Board of Patent Appeals and Interferences has also determined that animals are patentable subject matter under 35 U.S.C. 101. In *Ex parte Allen*, 2 USPQ2d 1425 (Bd. Pat. App. & Inter. 1987), the Board decided that a polyploid Pacific coast oyster could have been the proper subject of a patent under 35 U.S.C. 101 if all the criteria for patentability were satisfied. Shortly after the *Allen* decision, the Commissioner of Patents and Trademarks issued a notice (Animals - Patentability, 1077 O.G. 24, April 21, 1987) that the Patent and Trademark Office would now consider nonnaturally occurring, nonhuman multicellular living organisms, including animals, to be patentable subject matter within the scope of 35 U.S.C. 101.

If the broadest reasonable interpretation of the claimed invention as a whole encompasses a human being, then a rejection under 35 U.S.C. 101 must be made indicating that the claimed invention is directed to nonstatutory subject matter. Furthermore, the claimed invention must be examined with regard to all issues pertinent to patentability, and any applicable rejections under 35 U.S.C. 102, 103, or 112 must also be made.

## 2106  Patentable Subject Matter - Computer-Related Inventions

### I. INTRODUCTION

These Examination Guidelines for Computer-Related Inventions ("Guidelines") are to assist Office personnel in the examination of applications drawn to computer-related inventions. "Computer-related inventions" include inventions implemented in a computer and inventions employing computer-readable media. The Guidelines are based on the Office's current understanding of the law and are believed to be fully consistent with binding precedent of the Supreme Court, the Federal Circuit and the Federal Circuit's predecessor courts.

These Guidelines do not constitute substantive rulemaking and hence do not have the force and effect of law. These Guidelines have been designed to assist Office personnel in analyzing claimed subject matter for compliance with substantive law. Rejections will be based upon the substantive law and it is these rejections which are appealable. Consequently, any failure by Office personnel to follow the Guidelines is neither appealable nor petitionable.

The Guidelines alter the procedures Office personnel will follow when examining applications drawn to computer-related inventions and are equally applicable to claimed inventions implemented in either hardware or software. The Guidelines also clarify the Office's position on certain patentability standards related to this field of technology. Office personnel are to rely on these Guidelines in the event of any inconsistent treatment of issues between these Guidelines and any earlier provided guidance from the Office.

Office personnel should no longer rely on the Freeman-Walter-Abele test to determine whether a claimed invention is directed to statutory subject matter. *State Street Bank & Trust Co. v. Signature Financial Group Inc.*, 149 F. 3d 1368, 1374, 47 USPQ2d 1596, 1601-02 (Fed. Cir. 1998) ("After *Diehr* and *Chakrabarty*, the Freeman-Walter-Abele test has little, if any, applicability to determining the presence of statutory subject matter.").

Office personnel have had difficulty in properly treating claims directed to methods of doing business. Claims should not be categorized as methods of doing business. Instead, such claims should be treated like any other process claims, pursuant to these Guidelines when relevant. See, e.g., *State Street*, 149 F.3d at 1374-75, 47 USPQ2d at 1602 (Fed. Cir. 1998); *In re Toma*, 575 F.2d 872, 877-78, 197 USPQ 852, 857 (CCPA 1978); *In re Musgrave*, 431 F.2d 882, 893, 167 USPQ 280, 289-90 (CCPA 1970). See also *In re Schrader*, 22 F.3d 290, 297-98, 30 USPQ2d 1455, 1461-62 (Fed. Cir. 1994) (Newman, J., dissenting); *Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 564 F. Supp. 1358, 1368-69, 218 USPQ 212, 220 (D. Del. 1983).

The appendix which appears at the end of this section includes a flow chart of the process Office personnel will follow in conducting examinations for computer-related inventions.

### II. DETERMINE WHAT APPLICANT HAS INVENTED AND IS SEEKING TO PATENT

It is essential that patent applicants obtain a prompt yet complete examination of their applications. Under the principles of compact prosecution, each claim

should be reviewed for compliance with every statutory requirement for patentability in the initial review of the application, even if one or more claims are found to be deficient with respect to some statutory requirement. Thus, Office personnel should state all reasons and bases for rejecting claims in the first Office action. Deficiencies should be explained clearly, particularly when they serve as a basis for a rejection. Whenever practicable, Office personnel should indicate how rejections may be overcome and how problems may be resolved. A failure to follow this approach can lead to unnecessary delays in the prosecution of the application.

Prior to focusing on specific statutory requirements, Office personnel must begin examination by determining what, precisely, the applicant has invented and is seeking to patent, and how the claims relate to and define that invention. (As the courts have repeatedly reminded the Office: "The goal is to answer the question 'What did applicants invent?' " *In re Abele*, 684 F.2d 902, 907, 214 USPQ 682, 687. Accord, e.g., *Arrhythmia Research Tech. v. Corazonix Corp.*, 958 F.2d 1053, 1059, 22 USPQ2d 1033, 1038 (Fed. Cir. 1992).) Consequently, Office personnel will no longer begin examination by determining if a claim recites a "mathematical algorithm." Rather they will review the complete specification, including the detailed description of the invention, any specific embodiments that have been disclosed, the claims and any specific, substantial, and credible utilities that have been asserted for the invention.

### A.   Identify and Understand Any Practical Application Asserted for the Invention

The claimed invention as a whole must accomplish a practical application. That is, it must produce a "useful, concrete and tangible result." *State Street*, 149 F.3d at 1373, 47 USPQ2d at 1601-02. The purpose of this requirement is to limit patent protection to inventions that possess a certain level of "real world" value, as opposed to subject matter that represents nothing more than an idea or concept, or is simply a starting point for future investigation or research (*Brenner v. Manson*, 383 U.S. 519, 528-36, 148 USPQ 689, 693-96); *In re Ziegler*, 992, F.2d 1197, 1200-03, 26 USPQ2d 1600, 1603-06 (Fed. Cir. 1993)). Accordingly, a complete disclosure should contain some indication of the practical application for the claimed invention, i.e., why the applicant believes the claimed invention is useful.

Apart from the utility requirement of 35 U.S.C. 101, usefulness under the patent eligibility standard requires significant functionality to be present to satisfy the useful result aspect of the practical application requirement. See *Arrhythmia*, 958 F.2d at 1057, 22 USPQ2d at 1036. Merely claiming nonfunctional descriptive material stored in a computer-readable medium does not make the invention eligible for patenting. For example, a claim directed to a word processing file stored on a disk may satisfy the utility requirement of 35 U.S.C. 101 since the information stored may have some "real world" value. However, the mere fact that the claim may satisfy the utility requirement of 35 U.S.C. 101 does not mean that a useful result is achieved under the practical application requirement. The claimed invention as a whole must produce a "useful, concrete <u>and</u> tangible" result to have a practical application.

Although the courts have yet to define the terms useful, concrete, and tangible in the context of the practical application requirement for purposes of these guidelines, the following examples illustrate claimed inventions that have a practical application because they produce useful, concrete, and tangible result:

- Claims drawn to a long-distance telephone billing process containing mathematical algorithms were held to be directed to patentable subject matter because "the claimed process applies the Boolean principle to produce a useful, concrete, tangible result without pre-empting other uses of the mathematical principle." *AT&T Corp. v. Excel Communications, Inc.*, 172 F.3d 1352, 1358, 50 USPQ2d 1447, 1452 (Fed. Cir. 1999);

- "[T]ransformation of data, representing discrete dollar amounts, by a machine through a series of mathematical calculations into a final share price, constitutes a practical application of a mathematical algorithm, formula, or calculation, because it produces 'a useful, concrete and tangible result' -- a final share price momentarily fixed for recording and reporting purposes and even accepted and relied upon by regulatory authorities and in subsequent trades." State Street, 149 F.3d at 1373, 47 USPQ2d at 1601; and

- Claims drawn to a rasterizer for converting discrete waveform data samples into anti-aliased pixel illumination intensity data to be displayed on a display means were held to be directed to patentable subject matter since the claims defined "a specific machine to produce a useful, concrete, and tangible result." *In re Alappat*, 33 F.3d 1526, 1544, 31 USPQ2d 1545, 1557 (Fed. Cir. 1994).

A process that consists solely of the manipulation of an abstract idea is not concrete or tangible. See *In re Warmerdam*, 33 F.3d 1354, 1360, 31 USPQ2d 1754, 1759 (Fed. Cir. 1994). See also *Schrader*, 22 F.3d at 295, 30 USPQ2d at 1459. Office personnel have the burden to establish a *prima facie* case that the claimed invention as a whole is directed to solely an abstract idea or to manipulation of abstract ideas or does not produce a useful result. Only when the claim is devoid of any limitation to a practical application in the technological arts should it be rejected under 35 U.S.C. 101. Compare *Musgrave*, 431 F.2d at 893, 167 USPQ at 289; *In re Foster*, 438 F.2d 1011, 1013, 169 USPQ 99, 101 (CCPA 1971). Further, when such a rejection is made, Office personnel must expressly state how the language of the claims has been interpreted to support the rejection.

The applicant is in the best position to explain why an invention is believed useful. Office personnel should therefore focus their efforts on pointing out statements made in the specification that identify all practical applications for the invention. Office personnel should rely on such statements throughout the examination when assessing the invention for compliance with all statutory criteria. An applicant may assert more than one practical application, but only one is necessary to satisfy the utility requirement. Office personnel should review the entire disclosure to determine the features necessary to accomplish at least one asserted practical application.

**B.    *Review the Detailed Disclosure and Specific Embodiments of the Invention To Determine What the Applicant Has Invented***

The written description will provide the clearest explanation of the applicant's invention, by exemplifying the invention, explaining how it relates to the prior art and explaining the relative significance of various features of the invention. Accordingly, Office personnel should begin their evaluation of a computer-related invention as follows:

— determine what the programmed computer does when it performs the processes dictated by the software (i.e., the functionality of the programmed computer) (*Arrhythmia*, 958 F.2d at 1057, 22 USPQ at 1036, "It is of course true that a modern digital computer manipulates data, usually in binary form, by performing mathematical operations, such as addition, subtraction, multiplication, division, or bit shifting, on the data. But this is only how the computer does what it does. Of importance is the significance of the data and their manipulation in the real world, i.e., what the computer is doing.");

— determine how the computer is to be configured to provide that functionality (i.e., what elements constitute the programmed computer and how those elements are configured and interrelated to provide the specified functionality); and

— if applicable, determine the relationship of the programmed computer to other subject matter outside the computer that constitutes the invention (e.g., machines, devices, materials, or process steps other than those that are part of or performed by the programmed computer). (Many computer-related inventions do not consist solely of a computer. Thus, Office personnel should identify those claimed elements of the computer-related invention that are not part of the programmed computer, and determine how those elements relate to the programmed computer. Office personnel should look for specific information that explains the role of the programmed computer in the overall process or machine and how the programmed computer is to be integrated with the other elements of the apparatus or used in the process.)

Patent applicants can assist the Office by preparing applications that clearly set forth these aspects of a computer-related invention.

**C.    *Review the Claims***

The claims define the property rights provided by a patent, and thus require careful scrutiny. The goal of claim analysis is to identify the boundaries of the protection sought by the applicant and to understand how the claims relate to and define what the applicant has indicated is the invention. Office personnel must first determine the scope of a claim by thoroughly analyzing the language of the claim before determin-

ing if the claim complies with each statutory requirement for patentability. See *In re Hiniker Co.*, 150 F.3d 1362, 1369, 47 USPQ2d 1523, 1529 (Fed. Cir. 1998) ("[T]he name of the game is the claim.").

Office personnel should begin claim analysis by identifying and evaluating each claim limitation. For processes, the claim limitations will define steps or acts to be performed. For products, the claim limitations will define discrete physical structures or materials. Product claims are claims that are directed to either machines, manufactures or compositions of matter. The discrete physical structures or materials may be comprised of hardware or a combination of hardware and software.

Office personnel are to correlate each claim limitation to all portions of the disclosure that describe the claim limitation. This is to be done in all cases, i.e., whether or not the claimed invention is defined using means or step plus function language. The correlation step will ensure that Office personnel correctly interpret each claim limitation.

The subject matter of a properly construed claim is defined by the terms that limit its scope. It is this subject matter that must be examined. As a general matter, the grammar and intended meaning of terms used in a claim will dictate whether the language limits the claim scope. Language that <u>suggests or makes optional</u> but does not require steps to be performed or does not limit a claim to a particular structure does not limit the scope of a claim or claim limitation. The following are examples of language that may raise a question as to the limiting effect of the language in a claim:

   (A) statements of intended use or field of use,
   (B) "adapted to" or "adapted for" clauses,
   (C) "wherein" clauses, or
   (D) "whereby" clauses.

This list of examples is not intended to be exhaustive.

Office personnel must rely on the applicant's disclosure to properly determine the meaning of terms used in the claims. *Markman v. Westview Instruments*, 52 F.3d 967, 980, 34 USPQ2d 1321, 1330 (Fed. Cir.) (*en banc*), *aff'd*, U.S. , 116 S. Ct. 1384 (1996). An applicant is entitled to be his or her own lexicographer, and in many instances will provide an explicit definition for certain terms used in the claims. Where an explicit definition is provided by the applicant for a term, that definition will control interpretation of the term as it is used in the claim. *Toro Co. v. White Consolidated Industries Inc.*, 199 F.3d 1295, 1301, 53 USPQ2d 1065, 1069 (Fed. Cir. 1999) (meaning of words used in a claim is not construed in a "lexicographic vacuum, but in the context of the specification and drawings."). Office personnel should determine if the original disclosure provides a definition consistent with any assertions made by applicant. See, e.g., *In re Paulsen*, 30 F.3d 1475, 1480, 31 USPQ2d 1671, 1674 (Fed. Cir. 1994) (inventor may define specific terms used to describe invention, but must do so "with reasonable clarity, deliberateness, and precision" and, if done, must " 'set out his uncommon definition in some manner within the patent disclosure' so as to give one of ordinary skill in the art notice of the change" in meaning) (quoting *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387-88, 21 USPQ2d 1383, 1386 (Fed. Cir. 1992)). Any special meaning assigned to a term "must be sufficiently clear in the specification that any departure from common usage would be so understood by a person of experience in the field of the invention." *Multiform Desiccants Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477, 45 USPQ2d 1429, 1432 (Fed. Cir. 1998). If an applicant does not define a term in the specification, that term will be given its "common meaning." *Paulsen,* at 30 F. 3d 1480, 31 USPQ2d at 1674.

If the applicant asserts that a term has a meaning that conflicts with the term's art-accepted meaning, Office personnel should encourage the applicant to amend the claim to better reflect what applicant intends to claim as the invention. If the application becomes a patent, it becomes prior art against subsequent applications. Therefore, it is important for later search purposes to have the patentee employ commonly accepted terminology, particularly for searching text-searchable databases.

Office personnel must always remember to use the perspective of one of ordinary skill in the art. Claims and disclosures are not to be evaluated in a vacuum. If elements of an invention are well known in the art, the applicant does not have to provide a disclosure that describes those elements. In such a case the elements will be construed as encompassing any and every art-recognized hardware or combination of hardware and software technique for implementing the defined requisite functionalities.

Office personnel are to give claims their broadest reasonable interpretation in light of the supporting disclosure. *In re Morris*, 127 F.3d 1048, 1054-55, 44 USPQ2d 1023, 1027-28 (Fed. Cir. 1997). Limitations appearing in the specification but not recited in the claim are not read into the claim. *In re Prater*, 415 F.2d 1393, 1404-05, 162 USPQ 541, 550-551 (CCPA 1969). See also *In re Zletz*, 893 F.2d 319, 321-22, 13 USPQ2d 1320, 1322 (Fed. Cir. 1989) ("During patent examination the pending claims must be interpreted as broadly as their terms reasonably allow.... The reason is simply that during patent prosecution when claims can be amended, ambiguities should be recognized, scope and breadth of language explored, and clarification imposed.... An essential purpose of patent examination is to fashion claims that are precise, clear, correct, and unambiguous. Only in this way can uncertainties of claim scope be removed, as much as possible, during the administrative process.").

Where means plus function language is used to define the characteristics of a machine or manufacture invention, claim limitations must be interpreted to read on only the structures or materials disclosed in the specification and "equivalents thereof." (Two *en banc* decisions of the Federal Circuit have made clear that the Office is to interpret means plus function language according to 35 U.S.C. 112, sixth paragraph. In the first, *In re Donaldson*, 16 F.3d 1189, 1193, 29 USPQ2d 1845, 1848 (Fed. Cir. 1994), the court held:

> The plain and unambiguous meaning of paragraph six is that one construing means-plus-function language in a claim must look to the specification and interpret that language in light of the corresponding structure, material, or acts described therein, and equivalents thereof, to the extent that the specification provides such disclosure. Paragraph six does not state or even suggest that the PTO is exempt from this mandate, and there is no legislative history indicating that Congress intended that the PTO should be. Thus, this court must accept the plain and precise language of paragraph six.

Consistent with *Donaldson*, in the second decision, *In re Alappat*, 33 F.3d 1526, 1540, 31 USPQ2d 1545, 1554 (Fed. Cir. 1994) (in banc), the Federal Circuit held:

> Given *Alappat*'s disclosure, it was error for the Board majority to interpret each of the means clauses in claim 15 so broadly as to "read on any and every means for performing the function" recited, as it said it was doing, and then to conclude that claim 15 is nothing more than a process claim wherein each means clause represents a step in that process. Contrary to suggestions by the Commissioner, this court's precedents do not support the Board's view that the particular apparatus claims at issue in this case may be viewed as nothing more than process claims.

Disclosure may be express, implicit or inherent. Thus, at the outset, Office personnel must attempt to correlate claimed means to elements set forth in the written description. The written description includes the original specification and the drawings. Office personnel are to give the claimed means plus function limitations their broadest reasonable interpretation consistent with all corresponding structures or materials described in the specification and their equivalents including the manner in which the claimed functions are performed. See *Kemco Sales, Inc. v. Control Papers Company, Inc.,* 208 F.3d 1352, 54 USPQ2d 1308 (Fed. Cir. 2000). Further guidance in interpreting the scope of equivalents is provided in MPEP § 2181 through § 2186.

While it is appropriate to use the specification to determine what applicant intends a term to mean, a positive limitation from the specification cannot be read into a claim that does not impose that limitation. A broad interpretation of a claim by Office personnel will reduce the possibility that the claim, when issued, will be interpreted more broadly than is justified or intended. An applicant can always amend a claim during prosecution to better reflect the intended scope of the claim.

Finally, when evaluating the scope of a claim, <u>every</u> limitation in the claim must be considered. Office personnel may not dissect a claimed invention into discrete elements and then evaluate the elements <u>in isolation</u>. Instead, the claim as a whole must be considered. See, e.g., *Diamond v. Diehr*, 450 U.S. at 188-89, 209 USPQ at 9 ("In determining the eligibility of respondents' claimed process for patent protection under 101, their claims must be considered as a whole. It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis. This is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made.").

### III. CONDUCT A THOROUGH SEARCH OF THE PRIOR ART

Prior to classifying the claimed invention under 35 U.S.C. 101, Office personnel are expected to conduct a thorough search of the prior art. Generally, a thorough search involves reviewing both U.S. and foreign patents and nonpatent literature. In many cases, the result of such a search will contribute to Office personnel's understanding of the invention. Both claimed and unclaimed aspects of the invention described in the specification should be searched if there is a reasonable expectation that the unclaimed aspects may be later claimed. A search must take into account any structure or material described in the specification and its equivalents which correspond to the claimed means plus function limitation, in accordance with 35 U.S.C. 112, sixth paragraph and MPEP § 2181 through § 2186.

### IV. DETERMINE WHETHER THE CLAIMED INVENTION COMPLIES WITH 35 U.S.C. 101

#### A. *Consider the Breadth of 35 U.S.C. 101 Under Controlling Law*

As the Supreme Court has held, Congress chose the expansive language of 35 U.S.C. 101 so as to include "anything under the sun that is made by man." *Diamond v. Chakrabarty*, 447 U.S. 303, 308-09, 206 USPQ 193, 197 (1980). Accordingly, section 101 of title 35, United States Code, provides:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

In *Chakrabarty*, 447 U.S. at 308-309, 206 USPQ at 197, the court stated:

> In choosing such expansive terms as "manufacture" and "composition of matter," modified by the comprehensive "any," Congress plainly contemplated that the patent laws would be given wide scope. The relevant legislative history also supports a broad construction. The Patent Act of 1793, authored by Thomas Jefferson, defined statutory subject matter as "any new and useful art, machine, manufacture, or composition of matter, or any new or useful improvement [thereof]." Act of Feb. 21, 1793, ch. 11, § 1, 1 Stat. 318. The Act embodied Jefferson's philosophy that "ingenuity should receive a liberal encouragement." V Writings of Thomas Jefferson, at 75-76. See *Graham v. John Deere Co.*, 383 U.S. 1, 7-10 (148 USPQ 459, 462-464) (1966). Subsequent patent statutes in 1836, 1870, and 1874 employed this same broad language. In 1952, when the patent laws were recodified, Congress replaced the word "art" with "process," but otherwise left Jefferson's language intact. The Committee Reports accompanying the 1952 Act inform us that Congress intended statutory subject matter to "include anything under the sun that is made by man." S. Rep. No. 1979, 82d Cong., 2d Sess., 5 (1952); H.R. Rep. No. 1923, 82d Cong., 2d Sess., 6 (1952). [Footnote omitted]

This perspective has been embraced by the Federal Circuit:

> The plain and unambiguous meaning of section 101 is that any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may be patented if it meets the requirements for patentability set forth in Title 35, such as those found in sections 102, 103, and 112. The use of the expansive term "any" in section 101 represents Congress's intent not to place any restrictions on the subject matter for which a patent may be obtained beyond those specifically recited in section 101 and the other parts of Title 35. . . . Thus, it is improper to read into section 101 limitations as to the subject matter that may be patented where the legislative history does not indicate that Congress clearly intended such limitations.

*Alappat*, 33 F.3d at 1542, 31 USPQ2d at 1556.

As cast, 35 U.S.C. 101 defines four categories of inventions that Congress deemed to be the appropriate subject matter of a patent; namely, processes, machines, manufactures and compositions of matter. The latter three categories define "things" while the first category defines "actions" (i.e., inventions that consist of a series of steps or acts to be performed). See 35 U.S.C. 100(b) ("The term 'process' means process, art, or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material.").

Federal courts have held that 35 U.S.C. 101 does have certain limits. First, the phrase "anything under the sun that is made by man" is limited by the text of 35 U.S.C. 101, meaning that one may only patent something that is a machine, manufacture, composition of matter or a process. See, e.g., *Alappat*, 33 F.3d at 1542, 31 USPQ2d at 1556; *Warmerdam*, 33 F.3d at 1358, 31 USPQ2d at 1757 (Fed. Cir. 1994). Second, 35 U.S.C. 101 requires that the subject matter sought to be patented be a "useful" invention. Accordingly, a complete definition of the scope of 35 U.S.C. 101,

reflecting Congressional intent, is that any new and useful process, machine, manufacture or composition of matter under the sun that is made by man is the proper subject matter of a patent.

The subject matter courts have found to be outside the four statutory categories of invention is limited to abstract ideas, laws of nature and natural phenomena. While this is easily stated, determining whether an applicant is seeking to patent an abstract idea, a law of nature or a natural phenomenon has proven to be challenging. These three exclusions recognize that subject matter that is not a practical application or use of an idea, a law of nature or a natural phenomenon is not patentable. See, e.g., *Rubber-Tip Pencil Co. v. Howard*, 87 U.S. (20 Wall.) 498, 507 (1874) ("idea of itself is not patentable, but a new device by which it may be made practically useful is"); *Mackay Radio & Telegraph Co. v. Radio Corp. of America*, 306 U.S. 86, 94, 40 USPQ 199, 202 (1939) ("While a scientific truth, or the mathematical expression of it, is not patentable invention, a novel and useful structure created with the aid of knowledge of scientific truth may be."); *Warmerdam*, 33 F.3d at 1360, 31 USPQ2d at 1759 ("steps of 'locating' a medial axis, and `creating' a bubble hierarchy . . . describe nothing more than the manipulation of basic mathematical constructs, the paradigmatic 'abstract idea' ").

Courts have expressed a concern over "preemption" of ideas, laws of nature or natural phenomena. The concern over preemption was expressed as early as 1852. See *Le Roy v. Tatham*, 55 U.S. 156, 175 (1852) ("A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right."); *Funk Brothers Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 132, 76 USPQ 280, 282 (1948) (combination of six species of bacteria held to be nonstatutory subject matter). The concern over preemption serves to bolster and justify the prohibition against the patenting of such subject matter. In fact, such concerns are only relevant to claiming a scientific truth or principle. Thus, a claim to an "abstract idea" is nonstatutory because it does not represent a practical application of the idea, not because it would preempt the idea.

B.  **Classify the Claimed Invention as to Its Proper Statutory Category**

To properly determine whether a claimed invention complies with the statutory invention requirements of 35 U.S.C. 101, Office personnel should classify each claim into <u>one or more</u> statutory or nonstatutory categories. If the claim falls into a nonstatutory category, that should not preclude complete examination of the application for satisfaction of all other conditions of patentability. This classification is <u>only an initial finding</u> at this point in the examination process that will be again assessed after the examination for compliance with 35 U.S.C. 102, 103, and 112 is completed and before issuance of any Office action on the merits.

If the invention as set forth in the written description is statutory, but the claims define subject matter that is not, the deficiency can be corrected by an appropriate amendment of the claims. In such a case, Office personnel should reject the claims drawn to nonstatutory subject matter under 35 U.S.C. 101, but identify the features of the invention that would render the claimed subject matter statutory if recited in the claim.

1.  **Nonstatutory Subject Matter**

Claims to computer-related inventions that are clearly nonstatutory fall into the same general categories as nonstatutory claims in other arts, namely natural phenomena such as magnetism, and abstract ideas or laws of nature which constitute "descriptive material." Abstract ideas, *Warmerdam*, 33 F.3d at 1360, 31 USPQ2d at 1759, or the mere manipulation of abstract ideas, *Schrader*, 22 F.3d at 292-93, 30 USPQ2d at 1457-58, are not patentable. Descriptive material can be characterized as either "functional descriptive material" or "nonfunctional descriptive material." In this context, "functional descriptive material" consists of data structures and computer programs which impart functionality when employed as a computer component. (The definition of "data structure" is "a physical or logical relationship among data elements, designed to support specific data manipulation functions." The New IEEE Standard Dictionary of Electrical and Electronics Terms 308 (5th ed. 1993).) "Nonfunctional descriptive material" includes but is not limited to music, literary works and a compilation or mere arrangement of data.

Both types of "descriptive material" are nonstatutory when claimed as descriptive material *per se*. *Warmerdam*, 33 F.3d at 1360, 31 USPQ2d at 1759. When functional descriptive material is recorded on some computer-readable medium it becomes structurally and functionally interrelated to the medium and will be statutory in most cases since use of technology permits the function of the descriptive material to be realized. Compare *In re Lowry*, 32 F.3d 1579, 1583-84, 32 USPQ2d 1031, 1035 (Fed. Cir. 1994) (claim to data structure stored on a computer readable medium that increases computer efficiency held statutory) and *Warmerdam*, 33 F.3d at 1360-61, 31 USPQ2d at 1759 (claim to computer having a specific data structure stored in memory held statutory product-by-process claim) with *Warmerdam*, 33 F.3d at 1361, 31 USPQ2d at 1760 (claim to a data structure *per se* held nonstatutory). When nonfunctional descriptive material is recorded on some computer-readable medium, it is not statutory since no requisite functionality is present to satisfy the practical application requirement. Merely claiming nonfunctional descriptive material stored in a computer-readable medium does not make it statutory. Such a result would exalt form over substance. *In re Sarkar*, 588 F.2d 1330, 1333, 200 USPQ 132, 137 (CCPA 1978) ("[E]ach invention must be evaluated as claimed; yet semantogenic considerations preclude a determination based solely on words appearing in the claims. In the final analysis under 101, the claimed invention, as a whole, must be evaluated for what it is.") (quoted with approval in *Abele*, 684 F.2d at 907, 214 USPQ at 687). See also *In re Johnson*, 589 F.2d 1070, 1077, 200 USPQ 199, 206 (CCPA 1978) ("form of the claim is often an exercise in drafting"). Thus, nonstatutory music is not a computer component and it does not become statutory by merely recording it on a compact disk. Protection for this type of work is provided under the copyright law.

Claims to processes that do nothing more than solve mathematical problems or manipulate abstract ideas or concepts are more complex to analyze and are addressed below.

If the "acts" of a claimed process manipulate only numbers, abstract concepts or ideas, or signals representing any of the foregoing, the acts are not being applied to appropriate subject matter. *Schrader*, 22 F.3d at 294-95, 30 USPQ2d at 1458-59. Thus, a process consisting solely of mathematical operations, i.e., converting one set of numbers into another set of numbers, does not manipulate appropriate subject matter and thus cannot constitute a statutory process.

In practical terms, claims define nonstatutory processes if they:

– consist solely of mathematical operations without some claimed practical application (i.e., executing a "mathematical algorithm"); or

– simply manipulate abstract ideas, e.g., a bid (*Schrader*, 22 F.3d at 293-94, 30 USPQ2d at 1458-59) or a bubble hierarchy (*Warmerdam*, 33 F.3d at 1360, 31 USPQ2d at 1759), without some claimed practical application.

Cf. *Alappat*, 33 F.3d at 1543 n.19, 31 USPQ2d at 1556 n.19 in which the Federal Circuit recognized the confusion:

> The Supreme Court has not been clear . . . as to whether such subject matter is excluded from the scope of 101 because it represents laws of nature, natural phenomena, or abstract ideas. See *Diehr*, 450 U.S. at 186 (viewed mathematical algorithm as a law of nature); *Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972) (treated mathematical algorithm as an "idea"). The Supreme Court also has not been clear as to exactly what kind of mathematical subject matter may not be patented. The Supreme Court has used, among others, the terms "mathematical algorithm," "mathematical formula," and "mathematical equation" to describe types of mathematical subject matter not entitled to patent protection standing alone. The Supreme Court has not set forth, however, any consistent or clear explanation of what it intended by such terms or how these terms are related, if at all.

Certain mathematical algorithms have been held to be nonstatutory because they represent a mathematical definition of a law of nature or a natural phenomenon. For example, a mathematical algorithm representing the formula $E = mc^2$ is a "law of nature" — it defines a "fundamental scientific truth" (i.e., the relationship between energy and mass). To comprehend how the law of nature relates to any object, one invariably has to perform certain steps (e.g., multiplying a number representing the mass of an object by the square of a number representing the speed of light). In such a case, a claimed process which consists solely of the steps that one must follow to solve the mathematical representation of $E = mc^2$ is indistinguishable from the law of nature and would "pre-

empt" the law of nature. A patent cannot be granted on such a process.

**(a) Functional Descriptive Material: "Data Structures" Representing Descriptive Material *Per Se* or Computer Programs Representing Computer Listings *Per Se***

Data structures not claimed as embodied in computer-readable media are descriptive material *per se* and are not statutory because they are not capable of causing functional change in the computer. See, e.g., *Warmerdam*, 33 F.3d at 1361, 31 USPQ2d at 1760 (claim to a data structure *per se* held nonstatutory). Such claimed data structures do not define any structural and functional interrelationships between the data structure and other claimed aspects of the invention which permit the data structure's functionality to be realized. In contrast, a claimed computer-readable medium encoded with a data structure defines structural and functional interrelationships between the data structure and the computer software and hardware components which permit the data structure's functionality to be realized, and is thus statutory.

Similarly, computer programs claimed as computer listings *per se*, i.e., the descriptions or expressions of the programs, are not physical "things." They are neither computer components nor statutory processes, as they are not "acts" being performed. Such claimed computer programs do not define any structural and functional interrelationships between the computer program and other claimed elements of a computer which permit the computer program's functionality to be realized. In contrast, a claimed computer-readable medium encoded with a computer program is a computer element which defines structural and functional interrelationships between the computer program and the rest of the computer which permit the computer program's functionality to be realized, and is thus statutory. Accordingly, it is important to distinguish claims that define descriptive material *per se* from claims that define statutory inventions.

Computer programs are often recited as part of a claim. Office personnel should determine whether the computer program is being claimed as part of an otherwise statutory manufacture or machine. In such a case, the claim remains statutory irrespective of the fact that a computer program is included in the claim. The same result occurs when a computer program is used in a computerized process where the computer executes the instructions set forth in the computer program. Only when the claimed invention taken as a whole is directed to a mere program listing, i.e., to only its description or expression, is it descriptive material *per se* and hence nonstatutory.

Since a computer program is merely a set of instructions capable of being executed by a computer, the computer program itself is not a process and Office personnel should treat a claim for a computer program, without the computer-readable medium needed to realize the computer program's functionality, as nonstatutory functional descriptive material. When a computer program is claimed in a process where the computer is executing the computer program's instructions, Office personnel should treat the claim as a process claim. See paragraph IV.B.2(b), below. When a computer program is recited in conjunction with a physical structure, such as a computer memory, Office personnel should treat the claim as a product claim. See paragraph IV.B.2(a), below.

**(b) Nonfunctional Descriptive Material**

Descriptive material that cannot exhibit any functional interrelationship with the way in which computing processes are performed does not constitute a statutory process, machine, manufacture or composition of matter and should be rejected under 35 U.S.C. 101. Thus, Office personnel should consider the claimed invention as a whole to determine whether the necessary functional interrelationship is provided.

Where certain types of descriptive material, such as music, literature, art, photographs and mere arrangements or compilations of facts or data, are merely stored so as to be read or outputted by a computer without creating any functional interrelationship, either as part of the stored data or as part of the computing processes performed by the computer, then such descriptive material alone does not impart functionality either to the data as so structured, or to the computer. Such "descriptive material" is not a process, machine, manufacture or composition of matter. (Data consists of facts, which become information when they are seen in context and convey meaning to people. Computers process data without any understanding of what that data represents. Computer Dictionary 210 (Microsoft Press, 2d ed. 1994).)

The policy that precludes the patenting of nonfunctional descriptive material would be easily frustrated if the same descriptive material could be patented when claimed as an article of manufacture. For example, music is commonly sold to consumers in the format of a compact disc. In such cases, the known compact disc acts as nothing more than a carrier for nonfunctional descriptive material. The purely nonfunctional descriptive material cannot alone provide the practical application for the manufacture.

Office personnel should be prudent in applying the foregoing guidance. Nonfunctional descriptive material may be claimed in combination with other functional descriptive multi-media material on a computer-readable medium to provide the necessary functional and structural interrelationship to satisfy the requirements of 35 U.S.C. 101. The presence of the claimed nonfunctional descriptive material is not necessarily determinative of nonstatutory subject matter. For example, a computer that recognizes a particular grouping of musical notes read from memory and upon recognizing that particular sequence, causes another defined series of notes to be played, defines a functional interrelationship among that data and the computing processes performed when utilizing that data, and as such is statutory because it implements a statutory process.

**(c)  Natural Phenomena Such as Electricity and Magnetism**

Claims that recite nothing but the physical characteristics of a form of energy, such as a frequency, voltage, or the strength of a magnetic field, define energy or magnetism, *per se*, and as such are nonstatutory natural phenomena. *O'Reilly v. Morse,* 56 U.S. (15 How.) 62, 112-14 (1853). However, a signal claim directed to a practical application of electromagnetic energy is statutory regardless of its transitory nature. See *O'Reilly*, 56 U.S. at 114-19; *In re Breslow,* 616 F.2d 516, 519-21, 205 USPQ 221, 225-26 (CCPA 1980).

**2.  Statutory Subject Matter**

For the purposes of a 35 U.S.C. 101 analysis, it is of little relevance whether the claim is directed to a machine or a process. The legal principles are the same. *AT&T Corp. v. Excel Communications, Inc.*, 172 F.3d 1352, 1357, 50 USPQ2d 1447, 1451 (Fed. Cir. 1999).

**(a)  Statutory Product Claims**

Products may be either machines, manufactures, or compositions of matter.

A *machine* is "a concrete thing, consisting of parts or of certain devices and combinations of devices." *Burr v. Duryee*, 68 U.S. (1 Wall.) 531, 570 (1863).

A *manufacture* is "the production of articles for use from raw or prepared materials by giving to these materials new forms, qualities, properties or combinations, whether by hand labor or by machinery." *Chakrabarty*, 447 U.S. at 308, 206 USPQ at 196-97 (quoting *American Fruit Growers, Inc. v. Brogdex Co.*, 283 U.S. 1, 11 (1931)).

A *composition of matter* is "a composition of two or more substances [or] . . . a[] composite article, whether [it] be the result[] of chemical union, or of mechanical mixture, or whether . . . [it] be [a] gas[], fluid[], powder[], or solid[]." *Id.* at 308, 206 USPQ at 197 (quoting *Shell Development Co. v. Watson*, 149 F. Supp. 279, 280, 113 USPQ 265, 266 (D.D.C. 1957), *aff'd per curiam*, 252 F.2d 861, 116 USPQ 428 (D.C. Cir. 1958)).

If a claim defines a useful machine or manufacture by identifying the physical structure of the machine or manufacture in terms of its hardware or hardware and software combination, it defines a statutory product. See, e.g., *Lowry*, 32 F.3d at 1583, 32 USPQ2d at 1034-35; *Warmerdam*, 33 F.3d at 1361-62, 31 USPQ2d at 1760.

Office personnel must treat each claim as a whole. The mere fact that a hardware element is recited in a claim does not necessarily limit the claim to a specific machine or manufacture. Cf. *In re Iwahashi*, 888 F.2d 1370, 1374-75, 12 USPQ2d 1908, 1911-12 (Fed. Cir. 1989), cited with approval in *Alappat*, 33 F.3d at 1544 n.24, 31 USPQ2d at 1558 n.24.

A claim limited to a machine or manufacture, which has a practical application in the technological arts, is statutory. In most cases, a claim to a specific machine or manufacture will have a practical application in the technological arts. See *Alappat*, 33 F.3d at 1544, 31 USPQ2d at 1557 ("the claimed invention as a whole is directed to a combination of interrelated elements which combine to form a machine for converting discrete waveform data samples into anti-

aliased pixel illumination intensity data to be displayed on a display means. This is not a disembodied mathematical concept which may be characterized as an 'abstract idea,' but rather a specific machine to produce a useful, concrete, and tangible result."); and *State Street*, 149 F.3d at 1373, 47 USPQ2d at 1601 ("the transformation of data, representing discrete dollar amounts, by a machine through a series of mathematical calculations into a final share price, constitutes a practical application of a mathematical algorithm, formula, or calculation, because it produces 'a useful, concrete and tangible result' – a final share price momentarily fixed for recording and reporting purposes and even accepted and relied upon by regulatory authorities and in subsequent trades."). Also see *AT&T*, 172 F.3d at 1358, 50 USPQ2d at 1452 (Claims drawn to a long-distance telephone billing process containing mathematical algorithms were held patentable subject matter because the process used the algorithm to produce a useful, concrete, tangible result without preempting other uses of the mathematical principle.).

**(b)   Statutory Process Claims**

A claim that requires one or more acts to be performed defines a process. However, not all processes are statutory under 35 U.S.C. 101. *Schrader*, 22 F.3d at 296, 30 USPQ2d at 1460. To be statutory, a claimed computer-related process must either: (A) result in a physical transformation outside the computer for which a practical application in the technological arts is either disclosed in the specification or would have been known to a skilled artisan (discussed in i) below), or (B) be limited to a practical application within the technological arts (discussed in ii) below). See *Diamond v. Diehr*, 450 U.S. at 183-84, 209 USPQ at 6 (quoting *Cochrane v. Deener*, 94 U.S. 780, 787-88 (1877)) ("A [statutory] process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing.... The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence."). See also *Alappat*, 33 F.3d at 1543, 31 USPQ2d at 1556-57 (quoting *Diamond v. Diehr,* 450 U.S. at 192, 209 USPQ at 10). See also *id.* at 1569, 31 USPQ2d at 1578-79 (New-

man, J., concurring) ("unpatentability of the principle does not defeat patentability of its practical applications") (citing *O'Reilly v. Morse,* 56 U.S. (15 How.) at 114-19). If a physical transformation occurs outside the computer, a disclosure that permits a skilled artisan to practice the claimed invention, i.e., to put it to a practical use, is sufficient. On the other hand, it is necessary for the claimed invention taken as a whole to produce a practical application if there is only a transformation of signals or data inside a computer or if a process merely manipulates concepts or converts one set of numbers into another.

A claimed process is clearly statutory if it results in a physical transformation outside the computer, i.e., falls into one or both of the following specific categories ("safe harbors").

**i)   Safe Harbors**

**-   Independent Physical Acts (Post-Computer Process Activity)**

A process is statutory if it requires physical acts to be performed outside the computer independent of and following the steps to be performed by a programmed computer, where those acts involve the manipulation of tangible physical objects and result in the object having a different physical attribute or structure. *Diamond v. Diehr*, 450 U.S. at 187, 209 USPQ at 8. Thus, if a process claim includes one or more post-computer process steps that result in a physical transformation outside the computer (beyond merely conveying the direct result of the computer operation), the claim is clearly statutory.

Examples of this type of statutory process include the following:

> - A method of curing rubber in a mold which relies upon updating process parameters, using a computer processor to determine a time period for curing the rubber, using the computer processor to determine when the time period has been reached in the curing process and then opening the mold at that stage.
> - A method of controlling a mechanical robot which relies upon storing data in a computer that represents various types of mechanical movements of the robot, using a computer processor to calculate positioning of the robot in relation to given tasks to be performed by the robot, and controlling

the robot's movement and position based on the calculated position.

Examples of claimed processes that do not achieve a practical application include:

- step of "updating alarm limits" found to constitute changing the number value of a variable to represent the result of the calculation (*Parker v. Flook*, 437 U.S. 584, 585, 198 USPQ 193, 195 (1978));
- final step of "equating" the process outputs to the values of the last set of process inputs found to constitute storing the result of calculations (*In re Gelnovatch*, 595 F.2d 32, 41 n.7, 201 USPQ 136, 145 n.7 (CCPA 1979); and
- step of "transmitting electrical signals representing" the result of calculations (*In re De Castelet*, 562 F.2d 1236, 1244, 195 USPQ 439, 446 (CCPA 1977) ("That the computer is instructed to transmit electrical signals, representing the results of its calculations, does not constitute the type of 'post solution activity' found in *Flook*, [437 U.S. 584, 198 USPQ 193 (1978)], and does not transform the claim into one for a process merely using an algorithm. The final transmitting step constitutes nothing more than reading out the result of the calculations.")); and
-step of displaying a calculation as a gray code scale (*In re Abele,* 684 F.2d 902, 908, 214 USPQ 682, 687 (CCPA 1982)).

- **Manipulation of Data Representing Physical Objects or Activities (Pre-Computer Process Activity)**

Another statutory process is one that requires the measurements of physical objects or activities to be transformed outside of the computer into computer data (*In re Gelnovatch*, 595 F.2d 32, 41 n.7, 201 USPQ 136, 145 n.7 (CCPA 1979) (data-gathering step did not measure physical phenomenon)*; Arrhythmia*, 958 F.2d at 1056, 22 USPQ2d at 1036), where the data comprises signals corresponding to physical objects or activities external to the computer system, and where the process causes a physical transformation of the signals which are intangible representations of the physical objects or activities. *Schrader*, 22 F.3d at 294, 30 USPQ2d at 1459 citing with approval *Arrhythmia*, 958 F.2d at 1058-59, 22 USPQ2d at 1037-38; *Abele*, 684 F.2d at 909, 214 USPQ at 688; *In re Taner*, 681 F.2d 787, 790, 214 USPQ 678, 681 (CCPA 1982).

Examples of this type of claimed statutory process include the following:

- A method of using a computer processor to analyze electrical signals and data representative of human cardiac activity by converting the signals to time segments, applying the time segments in reverse order to a high pass filter means, using the computer processor to determine the amplitude of the high pass filter's output, and using the computer processor to compare the value to a predetermined value.  In this example the data is an intangible representation of physical activity, i.e., human cardiac activity.  The transformation occurs when heart activity is measured and an electrical signal is produced.  This process has real world value in predicting vulnerability to ventricular tachycardia immediately after a heart attack.
- A method of using a computer processor to receive data representing Computerized Axial Tomography ("CAT") scan images of a patient, performing a calculation to determine the difference between a local value at a data point and an average value of the data in a region surrounding the point, and displaying the difference as a gray scale for each point in the image, and displaying the resulting image.  In this example the data is an intangible representation of a physical object, i.e., portions of the anatomy of a patient.  The transformation occurs when the condition of the human body is measured with X-rays and the X-rays are converted into electrical digital signals that represent the condition of the human body.  The real world value of the invention lies in creating a new CAT scan image of body tissue without the presence of bones.
- A method of using a computer processor to conduct seismic exploration, by imparting spherical seismic energy waves into the earth from a seismic source, generating a plurality of reflected signals in response to the seismic energy waves at a set of receiver positions in an array, and summing the reflection signals to produce a signal simulating the reflection response of the earth to the seismic energy.  In this example, the electrical signals processed by the computer represent reflected seismic

energy. The transformation occurs by converting the spherical seismic energy waves into electrical signals which provide a geophysical representation of formations below the earth's surface. Geophysical exploration of formations below the surface of the earth has real world value.

Examples of claimed processes that independently limit the claimed invention to safe harbor include:

- a method of conducting seismic exploration which requires generating and manipulating signals from seismic energy waves before "summing" the values represented by the signals (*Taner*, 681 F.2d at 788, 214 USPQ at 679); and

- a method of displaying X-ray attenuation data as a signed gray scale signal in a "field" using a particular algorithm, where the antecedent steps require generating the data using a particular machine (e.g., a computer tomography scanner). *Abele*, 684 F.2d at 908, 214 USPQ at 687 ("The specification indicates that such attenuation data is available only when an X-ray beam is produced by a CAT scanner, passed through an object, and detected upon its exit. Only after these steps have been completed is the algorithm performed, and the resultant modified data displayed in the required format.").

Examples of claimed processes that do not limit the claimed invention to pre-computing safe harbor include:

- "perturbing" the values of a set of process inputs, where the subject matter "perturbed" was a number and the act of "perturbing" consists of substituting the numerical values of variables (*Gelnovatch*, 595 F.2d at 41 n.7, 201 USPQ at 145 n.7 ("Appellants' claimed step of perturbing the values of a set of process inputs (step 3), in addition to being a mathematical operation, appears to be a data-gathering step of the type we have held insufficient to change a nonstatutory method of calculation into a statutory process…. In this instance, the perturbed process inputs are not even measured values of physical phenomena, but are instead derived by numerically changing the values in the previous set of process inputs.")); and

- selecting a set of arbitrary measurement point values (*Sarkar*, 588 F.2d at 1331, 200 USPQ at 135).

If a claim does not clearly fall into one or both of the safe harbors, the claim may still be statutory if it is limited to a practical application in the technological arts.

ii)   **Computer-Related Processes Limited to a Practical Application in the Technological Arts**

There is always some form of physical transformation within a computer because a computer acts on signals and transforms them during its operation and changes the state of its components during the execution of a process. Even though such a physical transformation occurs within a computer, such activity is not determinative of whether the process is statutory because such transformation alone does not distinguish a statutory computer process from a nonstatutory computer process. What is determinative is not how the computer performs the process, but what the computer does to achieve a practical application. See *Arrhythmia*, 958 F.2d at 1057, 22 USPQ2d at 1036.

A process that merely manipulates an abstract idea or performs a purely mathematical algorithm is nonstatutory despite the fact that it might inherently have some usefulness. In *Sarkar*, 588 F.2d at 1335, 200 USPQ at 139, the court explained why this approach must be followed:

> No mathematical equation can be used, as a practical matter, without establishing and substituting values for the variables expressed therein. Substitution of values dictated by the formula has thus been viewed as a form of mathematical step. If the steps of gathering and substituting values were alone sufficient, every mathematical equation, formula, or algorithm having any practical use would be per se subject to patenting as a "process" under 101. Consideration of whether the substitution of specific values is enough to convert the disembodied ideas present in the formula into an embodiment of those ideas, or into an application of the formula, is foreclosed by the current state of the law.

For such subject matter to be statutory, the claimed process must be limited to a practical application of the abstract idea or mathematical algorithm in the technological arts. See *Alappat*, 33 F.3d at 1543, 31 USPQ2d at 1556-57 (quoting *Diamond v. Diehr*, 450 U.S. at 192, 209 USPQ at 10). See also *Alappat*

33 F.3d at 1569, 31 USPQ2d at 1578-79 (Newman, J., concurring) ("unpatentability of the principle does not defeat patentability of its practical applications") (citing *O'Reilly v. Morse*, 56 U.S. (15 How.) at 114-19). A claim is limited to a practical application when the method, as claimed, produces a concrete, tangible and useful result; i.e., the method recites a step or act of producing something that is concrete, tangible and useful. See *AT&T*, 172 F.3d at 1358, 50 USPQ2d at 1452. Likewise, a machine claim is statutory when the machine, as claimed, produces a concrete, tangible and useful result (as in *State Street*, 149 F.3d at 1373, 47 USPQ2d at 1601) and/or when a specific machine is being claimed (as in *Alappat*, 33 F.3d at 1544, 31 USPQ2d at 1557 (in banc). For example, a computer process that simply calculates a mathematical algorithm that models noise is nonstatutory. However, a claimed process for digitally filtering noise employing the mathematical algorithm is statutory.

Examples of this type of claimed statutory process include the following:

– A computerized method of optimally controlling transfer, storage and retrieval of data between cache and hard disk storage devices such that the most frequently used data is readily available.

– A method of controlling parallel processors to accomplish multi-tasking of several computing tasks to maximize computing efficiency. See, e.g., *In re Bernhart,* 417 F.2d 1395, 1400, 163 USPQ 611,616 (CCPA 1969).

– A method of making a word processor by storing an executable word processing application program in a general purpose digital computer's memory, and executing the stored program to impart word processing functionality to the general purpose digital computer by changing the state of the computer's arithmetic logic unit when program instructions of the word processing program are executed.

– A digital filtering process for removing noise from a digital signal comprising the steps of calculating a mathematical algorithm to produce a correction signal and subtracting the correction signal from the digital signal to remove the noise.

## V. EVALUATE APPLICATION FOR COMPLIANCE WITH 35 U.S.C. 112

Office personnel should begin their evaluation of an application's compliance with 35 U.S.C. 112 by considering the requirements of 35 U.S.C. 112, second paragraph. The second paragraph contains two separate and distinct requirements: (A) that the claim(s) set forth the subject matter applicants regard as the invention, and (B) that the claim(s) particularly point out and distinctly claim the invention. An application will be deficient under 35 U.S.C. 112, second paragraph when (A) evidence including admissions, other than in the application as filed, shows applicant has stated that he or she regards the invention to be different from what is claimed, or when (B) the scope of the claims is unclear.

After evaluation of the application for compliance with 35 U.S.C. 112, second paragraph, Office personnel should then evaluate the application for compliance with the requirements of 35 U.S.C. 112, first paragraph. The first paragraph contains three separate and distinct requirements:

(A) adequate written description,

(B) enablement, and

(C) best mode.

An application will be deficient under 35 U.S.C. 112, first paragraph when the written description is not adequate to identify what the applicant has invented, or when the disclosure does not enable one skilled in the art to make and use the invention as claimed without undue experimentation. Deficiencies related to disclosure of the best mode for carrying out the claimed invention are not usually encountered during examination of an application because evidence to support such a deficiency is seldom in the record. *Fonar Corp. v. General Electric Co.*, 107 F.3d 1543, 1548-49, 41 USPQ2d 1801, 1804 (Fed. Cir. 1997).

If deficiencies are discovered with respect to 35 U.S.C. 112, Office personnel must be careful to apply the appropriate paragraph of 35 U.S.C. 112.

### A. *Determine Whether the Claimed Invention Complies with 35 U.S.C. 112, Second Paragraph Requirements*

#### 1. Claims Setting Forth the Subject Matter Applicant Regards as Invention

Applicant's specification must conclude with claim(s) that set forth the subject matter which the applicant regards as the invention. The invention set forth in the claims is presumed to be that which applicant regards as the invention, unless applicant considers the invention to be something different from what has been claimed as shown by evidence, including admissions, outside the application as filed. An applicant may change what he or she regards as the invention during the prosecution of the application.

#### 2. Claims Particularly Pointing Out and Distinctly Claiming the Invention

Office personnel shall determine whether the claims set out and circumscribe the invention with a reasonable degree of precision and particularity. In this regard, the definiteness of the language must be analyzed, not in a vacuum, but always in light of the teachings of the disclosure as it would be interpreted by one of ordinary skill in the art. Applicant's claims, interpreted in light of the disclosure, must reasonably apprise a person of ordinary skill in the art of the invention. However, the applicant need not explicitly recite in the claims every feature of the invention. For example, if an applicant indicates that the invention is a particular computer, the claims do not have to recite every element or feature of the computer. In fact, it is preferable for claims to be drafted in a form that emphasizes what the applicant has invented (i.e., what is new rather than old).  *In re Dossel*, 115 F.3d 942, 946, 42 USPQ2d 1881, 1884 (Fed. Cir. 1997).

A means plus function limitation is distinctly claimed if the description makes it clear that the means corresponds to well-defined structure of a computer or computer component implemented in either hardware or software and its associated hardware platform. *Atmel Corp. v. Information Storage Devices Inc., 198 F.3d 1374, 1380, 53 USPQ2d 1225, 1229 (Fed. Cir. 1999); B. Braun Medical, Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424, 43 USPQ2d 1896, 1899 (Fed. Cir. 1997). Such means may be defined as:

- a programmed computer with a particular functionality implemented in hardware or hardware and software;
- a logic circuit or other component of a programmed computer that performs a series of specifically identified operations dictated by a computer program; or
- a computer memory encoded with executable instructions representing a computer program that can cause a computer to function in a particular fashion.

The scope of a "means" limitation is defined as the corresponding structure or material (e.g., a specific logic circuit) set forth in the written description and equivalents. See MPEP § 2181 through § 2186. Thus, a claim using means plus function limitations without corresponding disclosure of specific structures or materials that are not well-known fails to particularly point out and distinctly claim the invention. *Dossel*, 115 F.3d at 946-47, 42 USPQ2d at 1884-85. For example, if the applicant discloses only the functions to be performed and provides no express, implied or inherent disclosure of hardware or a combination of hardware and software that performs the functions, the application has not disclosed any "structure" which corresponds to the claimed means. Office personnel should reject such claims under 35 U.S.C. 112, second paragraph. *B. Braun Medical*, 124 F.3d at 1424, 43 USPQ2d at 1899. The rejection shifts the burden to the applicant to describe at least one specific structure or material that corresponds to the claimed means in question, and to identify the precise location or locations in the specification where a description of at least one embodiment of that claimed means can be found. In contrast, if the corresponding structure is disclosed to be a memory or logic circuit that has been configured in some manner to perform that function (e.g., using a defined computer program), the application has disclosed "structure" which corresponds to the claimed means.

When a claim or part of a claim is defined in computer program code, whether in source or object code format, a person of skill in the art must be able to ascertain the metes and bounds of the claimed invention. In certain circumstances, as where self-documenting programming code is employed, use of programming language in a claim would be permissible because such program source code presents "suffi-

ciently high-level language and descriptive identifiers" to make it universally understood to others in the art without the programmer having to insert any comments. See Computer Dictionary 353 (Microsoft Press, 2ed. 1994) for a definition of "self-documenting code." Applicants should be encouraged to functionally define the steps the computer will perform rather than simply reciting source or object code instructions.

### B.  *Determine Whether the Claimed Invention Complies with 35 U.S.C. 112, First Paragraph Requirements*

#### 1.  **Adequate Written Description**

The satisfaction of the enablement requirement does not satisfy the written description requirement. See *In re Barker*, 559 F.2d 588, 591, 194 USPQ 470, 472 (CCPA 1977) (a specification may be sufficient to enable one skilled in the art to make and use the invention, but still fail to comply with the written description requirement). See also *In re DiLeone*, 436 F.2d 1404, 1405, 168 USPQ 592, 593 (CCPA 1971). For the written description requirement, an applicant's specification must reasonably convey to those skilled in the art that the applicant was in possession of the claimed invention as of the date of invention. *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568, 43 USPQ2d 1398, 1405 (Fed. Cir. 1997); *Hyatt v. Boone*, 146 F.3d 1348, 1354, 47 USPQ2d 1128, 1132 (Fed. Cir. 1998). The claimed invention subject matter need not be described literally, i.e., using the same terms, in order for the disclosure to satisfy the description requirement. Software aspects of inventions may be described functionally. See *Robotic Vision Sys. v. View Eng'g, Inc.*, 112 F.3d 1163, 1166, 42 USPQ2d 1619, 1622-23 (Fed. Cir. 1997); *Fonar Corp. v. General Electric Co.*, 107 F.3d 1543, 1549, 41 USPQ2d 1801, 1805 (Fed. Cir. 1997); *In re Hayes Microcomputer Prods., Inc.*, 982 F.2d 1527, 1537-38, 25 USPQ2d 1241, 1248-49 (Fed. Cir. 1992).

#### 2.  **Enabling Disclosure**

An applicant's specification must enable a person skilled in the art to make and use the claimed invention without undue experimentation. The fact that experimentation is complex, however, will not make it undue if a person of skill in the art typically engages in such complex experimentation. For a computer-related invention, the disclosure must enable a skilled artisan to configure the computer to possess the requisite functionality, and, where applicable, interrelate the computer with other elements to yield the claimed invention, without the exercise of undue experimentation. The specification should disclose <u>how</u> to configure a computer to possess the requisite functionality or <u>how</u> to integrate the programmed computer with other elements of the invention, unless a skilled artisan would know how to do so without such disclosure. See, e.g., *Dossel*, 115 F.3d at 946-47, 42 USPQ2d at 1884-85; *Northern Telecom v. Datapoint Corp.*, 908 F.2d 931, 941-43, 15 USPQ2d 1321, 1328-30 (Fed. Cir.1990) (judgment of invalidity reversed for clear error where expert testimony on both sides showed that a programmer of reasonable skill could write a satisfactory program with ordinary effort based on the disclosure); *DeGeorge v. Bernier*, 768 F.2d 1318, 1324, 226 USPQ 758, 762-63 (Fed. Cir. 1985) (superseded by statute with respect to issues not relevant here) (invention was adequately disclosed for purposes of enablement even though all of the circuitry of a word processor was not disclosed, since the undisclosed circuitry was deemed inconsequential because it did not pertain to the claimed circuit); *In re Phillips*, 608 F.2d 879, 882-83, 203 USPQ 971, 975 (CCPA 1979) (computerized method of generating printed architectural specifications dependent on use of glossary of predefined standard phrases and error-checking feature enabled by overall disclosure generally defining errors); *In re Donohue*, 550 F.2d 1269, 1271, 193 USPQ 136, 137 (CCPA 1977) ("Employment of block diagrams and descriptions of their functions is not fatal under 35 U.S.C. 112, first paragraph, providing the represented structure is conventional and can be determined without undue experimentation."); *In re Knowlton*, 481 F.2d 1357, 1366-68, 178 USPQ 486, 493-94 (CCPA 1973) (examiner's contention that a software invention needed a detailed description of all the circuitry in the complete hardware system reversed).

For many computer-related inventions, it is not unusual for the claimed invention to involve more than one field of technology. For such inventions, the disclosure must satisfy the enablement standard for each aspect of the invention. See *In re Naquin*, 398

F.2d 863, 866, 158 USPQ 317, 319 CCPA 1968) ("When an invention, in its different aspects, involves distinct arts, that specification is adequate which enables the adepts of each art, those who have the best chance of being enabled, to carry out the aspect proper to their specialty."); *Ex parte Zechnall*, 194 USPQ 461, 461 (Bd. App. 1973) ("appellants' disclosure must be held sufficient if it would enable a person skilled in the electronic computer art, in cooperation with a person skilled in the fuel injection art, to make and use appellants' invention"). As such, the disclosure must teach a person skilled in each art how to make and use the relevant aspect of the invention without undue experimentation. For example, to enable a claim to a programmed computer that determines and displays the three-dimensional structure of a chemical compound, the disclosure must

- enable a person skilled in the art of molecular modeling to understand and practice the underlying molecular modeling processes; and
- enable a person skilled in the art of computer programming to create a program that directs a computer to create and display the image representing the three-dimensional structure of the compound.

In other words, the disclosure corresponding to each aspect of the invention must be enabling to a person skilled in each respective art.

In many instances, an applicant will describe a programmed computer by outlining the significant elements of the programmed computer using a functional block diagram. Office personnel should review the specification to ensure that along with the functional block diagram the disclosure provides information that adequately describes each "element" in hardware or hardware and its associated software and how such elements are interrelated. See *In re Scarbrough*, 500 F.2d 560, 565, 182 USPQ 298, 301-02 (CCPA 1974) ("It is not enough that a person skilled in the art, by carrying on investigations along the line indicated in the instant application, and by a great amount of work eventually might find out how to make and use the instant invention. The statute requires the application itself to inform, not to direct others to find out for themselves (citation omitted)."); *Knowlton*, 481 F.2d at 1367, 178 USPQ at 493 (disclosure must constitute more than a "sketchy explanation of flow diagrams or a bare group of program listings together with a reference to a proprietary computer on which they might be run"). See also *In re Gunn*, 537 F.2d 1123, 1127-28, 190 USPQ 402, 405 (CCPA 1976); *In re Brandstadter*, 484 F.2d 1395, 1406-07, 179 USPQ 286, 294 (CCPA 1973); and *In re Ghiron*, 442 F.2d 985, 991, 169 USPQ 723, 727-28 (CCPA 1971).

## VI. DETERMINE WHETHER THE CLAIMED INVENTION COMPLIES WITH 35 U.S.C. 102 AND 103

As is the case for inventions in any field of technology, assessment of a claimed computer-related invention for compliance with 35 U.S.C. 102 and 103 begins with a comparison of the claimed subject matter to what is known in the prior art. If no differences are found between the claimed invention and the prior art, the claimed invention lacks novelty and is to be rejected by Office personnel under 35 U.S.C. 102. Once distinctions are identified between the claimed invention and the prior art, those distinctions must be assessed and resolved in light of the knowledge possessed by a person of ordinary skill in the art. Against this backdrop, one must determine whether the invention would have been obvious at the time the invention was made. If not, the claimed invention satisfies 35 U.S.C. 103. Factors and considerations dictated by law governing 35 U.S.C. 103 apply without modification to computer-related inventions. Moreover, merely using a computer to automate a known process does not by itself impart nonobviousness to the invention. See *Dann v. Johnston*, 425 U.S. 219, 227-30, 189 USPQ 257, 261 (1976); *In re Venner*, 262 F.2d 91, 95, 120 USPQ 193, 194 (CCPA 1958).

If the difference between the prior art and the claimed invention is limited to descriptive material stored on or employed by a machine, Office personnel must determine whether the descriptive material is functional descriptive material or nonfunctional descriptive material, as described *supra* in paragraphs IV.B.1(a) and IV. B.1(b). Functional descriptive material is a limitation in the claim and must be considered and addressed in assessing patentability under 35 U.S.C. 103. Thus, a rejection of the claim as a whole under 35 U.S.C. 103 is inappropriate unless the functional descriptive material would have been suggested by the prior art. *In re Dembiczak*, 175 F.3d 994, 1000, 50 USPQ2d 1614, 1618 (Fed. Cir. 1999). Nonfunctional descriptive material cannot render nonobvious

an invention that would have otherwise been obvious. Cf. *In re Gulack*, 703 F.2d 1381, 1385, 217 USPQ 401, 404 (Fed. Cir. 1983) (when descriptive material is not functionally related to the substrate, the descriptive material will not distinguish the invention from the prior art in terms of patentability).

Common situations involving nonfunctional descriptive material are:

- a computer-readable storage medium that differs from the prior art solely with respect to nonfunctional descriptive material, such as music or a literary work, encoded on the medium,
- a computer that differs from the prior art solely with respect to nonfunctional descriptive material that cannot alter how the machine functions (i.e., the descriptive material does not reconfigure the computer), or
- a process that differs from the prior art only with respect to nonfunctional descriptive material that cannot alter <u>how</u> the process steps are to be performed to achieve the utility of the invention.

Thus, if the prior art suggests storing a song on a disk, merely choosing a particular song to store on the disk would be presumed to be well within the level of ordinary skill in the art at the time the invention was made. The difference between the prior art and the claimed invention is simply a rearrangement of nonfunctional descriptive material.

### VII. CLEARLY COMMUNICATE FINDINGS, CONCLUSIONS AND THEIR BASES

Once Office personnel have concluded the above analyses of the claimed invention under all the statutory provisions, including 35 U.S.C. 101, 112, 102 and 103, they should review all the proposed rejections and their bases to confirm their correctness. Only then should any rejection be imposed in an Office action. The Office action should clearly communicate the findings, conclusions and reasons which support them.

### Appendix to Examination Guidelines for Computer-Related Inventions

### Computer-Related Inventions

---

**II. Determine What Applicant Has Invented and Is Seeking to Patent**

A. Identify and Understand Any Practical Application Asserted for the Invention

B. Review the Detailed Disclosure and Specific Embodiments of the Invention to Determine What Applicant Has Invented

C. Review the Claims

---

↓

**III. Conduct a Thorough Search of the Prior Art**

↓

**IV. Determine Whether the Claimed Invention Complies with 35 U.S.C. 101**

↓

---

**V. Evaluate Application for Compliance with 35 U.S.C. 112**

A. Determine Whether the Claimed Invention Complies with 35 U.S.C. 112, Second Paragraph

   1. Claims Setting Forth the Subject Matter Applicant Regards as Invention

   2. Claims Particularly Pointing Out and Distinctly Claiming the Invention

B. Determine Whether the Claimed Invention Complies with 35 U.S.C. 112, First Paragraph

   1. Adequate Written Description

   2. Enabling Disclosure

---

↓

**VI. Determine Whether the Claimed Invention Complies with 35 U.S.C. 102 and 103**

↓

**VII. Clearly Communicate Findings, Conclusions and Their Bases**

A-1