Pages 1 – 166

United States District Court

Northern District of California

Before The Honorable William Alsup

```
Oracle America,            )
Incorporated,              )
                           )
         Plaintiff,        )
                           )
  vs.                      )          No. C10-3561 WHA
                           )
Google, Incorporated,      )
                           )
         Defendant:        )
_____)
```

San Francisco, California
Wednesday, December 21, 2011

### Reporter's Transcript Of Proceedings

**Appearances**:

For Plaintiff:          Morrison & Foerster
                        755 Page Mill Road
                        Palo Alto, California  94105
                By:  **Michael A. Jacobs, Esquire**
                     **Kenneth Alexander Kuwayti, Esquire**

                        Morrison & Foerster
                        425 Market Street
                        San Francisco, California  94105
                By:  **Daniel Pierre Muino, Esquire**

                        Oracle Corporation
                        500 Oracle Parkway, 5OP7
                        Redwood Shores, California  94065
                By:  **Matthew M. Sarboraria, Esquire**

(Appearances continued on next page.)

*Reported By:*       ***Sahar Bartlett, RPR, CSR No. 12963***
                     ***Official Reporter, U.S. District Court***
                     ***For the Northern District of California***

(Computerized Transcription By Eclipse)

**Appearances (continued):**

1

2  For Plaintiff:          Boies, Schiller & Flexner, LLP
                           1999 Harrison Street, Suite 900
3                          Oakland, California  94612
                     By:  **William Fred Norton, Jr., Esquire**
4                         **Steven Christopher Holtzman, Esquire**

5  For Defendant:          Keker & Van Nest, LLP
                           633 Battery Street
6                          San Francisco, California  94111
                     By:  **Robert Addy Van Nest, Esquire**
7                         **Christa M. Anderson, Esquire**
                          **Daniel Edward Purcell, Esquire**
8                         **Eugene Morris Paige, Esquire**
                          **Matthias Andreas Kamber, Esquire**
9                         **Reid Patrick Mullen, Esquire**

10                         King and Spalding, LLP
                           1185 Avenue of the Americas
11                         New York, NY  10036
                     By:  **Bruce W. Baber, Esquire**
12                        **Scott T. Weingaertner, Esquire**

13                         Google, Incorporated
                           1600 Amphitheater Parkway
14                         Mountain View, California  94043
                     By:  **Renny F. Hwang, Esquire**
15

    Miscellaneous:          Farella Braun & Martel, LLP
16                         Russ Building, 30th Floor
                           235 Montgomery Street
17                         San Francisco, California  94104
                     By:  **James Morando, Esquire**
18

19

20                         ---o0o---

21

22

23

24

25

```
 1   Wednesday, December 21, 2011                        8:00 a.m.
 2                       P R O C E E D I N G S
 3            THE CLERK:  Calling civil action 10-3561, Oracle
 4   versus Google.
 5            Counsel, please state your appearances for the
 6   record.
 7            MR. JACOBS:  Good morning, Your Honor.
 8            Michael Jacobs from Morrison & Foerster for
 9   plaintiff, Oracle.
10            And with me at counsel table are attorneys from
11   Morrison & Foerster and Boies, Schiller in order:  Dan Muino,
12   David Boies.
13            MR. BOIES:  Good morning, Your Honor.
14            MR. JACOBS:  Ken Kuwayti, Steven Holtzman, and
15   Fred Norton.
16            And then at the back of our table, Matt Sarboraria
17   from -- in-house at Oracle.
18            THE COURT:  Good to have you here.
19            MR. VAN NEST:  Good morning, Your Honor.
20            Bob Van Nest from Keker Van Nest for Google.
21            With me at counsel table from Keker Van Nest are
22   Christa Anderson, Reid Mullen, Eugene Paige, Dan Purcell.  And
23   from King & Spalding we have Scott Weingaertner and
24   Bruce Baber.  And Renny Hwang is here from Google.
25            I would like to just advise the Court that
```

```
1   Mr. Mullen qualifies as a young lawyer under Your Honor's
2   rules, and I've asked him to argue one of our motions in
3   limine.  Thank you.
4             THE COURT:  Good.
5             Okay, we're here for the final pre-trial conference.
6   We don't have a trial date, but we'll eventually get there.  I
7   think it's best to start with the four motions in limine that
8   you have given priority to.  And the others most likely will be
9   decided on the papers.
10            I'd like to start with the motions that are directed
11  at the plaintiff's case because that's the evidence we hear
12  first.  So Mr. Van Nest, which -- which of the ones do you want
13  to lead off with?
14            MR. VAN NEST:  Well, we had -- they had moved to
15  exclude evidence of the re-exams and evidence of the APIs, and
16  Ms. Anderson is going to argue the re-exam motion.
17            THE COURT:  Fine, if that's the one you want to hear
18  first, okay.
19            So whose motion is this?
20            MR. JACOBS:  This is our motion, Your Honor.
21            THE COURT:  Well, then, we ought to start with
22  the -- Oracle, right?  It's their motion.
23            MS. ANDERSON:  Yes, Your Honor.
24            THE COURT:  In other words, I was saying I would
25  normally want to start with a motion in limine that is directed
```

1    at the plaintiff's evidence.

2              *MR. VAN NEST:*  Okay, fair enough.

3              *THE COURT:*  So because it's the plaintiff that goes

4    first in the case.  And it helps me to see how much of the case

5    gets thrown out before we get to your case.

6                        **(Laughter.)**

7              *MR. VAN NEST:*  All right, fair enough, Your Honor.

8              The two that we are arguing are -- the Cockburn

9    motion Mr. Purcell will begin with, and then Mr. Purcell will

10   argue on the Lindholm motion.

11             *THE COURT:*  Which?

12             *MR. VAN NEST:*  On the Lindholm motion, motion to

13   exclude evidence of Mr. Lindholm's --

14             *THE COURT:*  All right, let's hear the one of expert

15   Cockburn.

16             *MR. PURCELL:*  Thank you, Your Honor.

17             Dan Purcell from --

18             *THE COURT:*  May I ask if anyone's here representing

19   the Rule 706 expert?

20             *MR. VAN NEST:*  Yes, Your Honor, James Morando from

21   Farella, Braun, Martell standing in for Mr. Cooper, who

22   couldn't be here today.

23             *THE COURT:*  And then --

24             *MR. MORONDO:*  Dr. Kaerl is here with me as well.

25             *THE COURT:*  All right, I thought I recognized you.

```
 1   Welcome.  Thank you for being here.  I may have a question or
 2   two for you later on about timing but not about substance.
 3            All right, thank you, sir.  Please go ahead.
 4            MR. PURCELL:  Your Honor, Dan Purcell from Keker &
 5   Van Nest for Google.
 6            So the parties, as I'm sure you know, have read,
 7   filed supplemental briefs yesterday on this.  And the main
 8   issue --
 9            THE COURT:  On what issue?
10            MR. PURCELL:  On the -- Dr. Cockburn's report
11   commenting on Your Honor's tentative order.
12            THE COURT:  Oh, yes, those supplements, I read
13   those, yes.
14            MR. PURCELL:  So Oracle's main point on the central
15   issue, which is the apportionment, I think that's the
16   big-ticket item that affects the reasonable royalty analysis,
17   both on the patent side and the copyright side, and their
18   argument is that basically there is no harm to Google because
19   of the way that Dr. Cockburn did the apportionment because he
20   substituted the value of all the other components of Android
21   for all the other components of the Java license bundle that
22   Sun and Google were negotiating in 2006.
23            And what he says is, or what the lawyers say, I
24   should say, is that the value of all of the other components of
25   Android must necessarily be more than the value of all of the
```

```
1    other components of the Java license bundle.  So, therefore, if

2    there was any sort of error here, it operates in Google's

3    favor.

4           The first point on this is really quite simple,

5    which is, this is not Dr. Cockburn talking, this is the lawyers

6    talking.  There isn't anything in Dr. Cockburn's report that

7    states that as an opinion or provides any basis for concluding

8    that it could be true or false.

9           If you look at all of the sections of the Cockburn

10   report that Oracle cited, none of them discussed this issue

11   except for one brief mention in Footnote 327 of the Cockburn

12   report.  And the only thing Dr. Cockburn says in that footnote

13   is, to the extent that that value of the hypothetical license

14   is less than the incremental value of Android, his analysis

15   would be conservative, that's it.

16          He doesn't say that the incremental value of Android

17   would be more.  He doesn't offer any analysis actually

18   explaining why that's so.  So, really, this is a post-hoc

19   rationale that is concocted by the lawyers.  There is no

20   opinion in the report as to the relevant values of those

21   components.

22          Oracle says in their brief, well, Google can't prove

23   that the value of Android is less, but, you know, again, it's

24   not our burden, it's not our report, it's not our damages

25   analysis.  And so, really, what this is is, this is an effort
```

```
 1    to cover up for something that the expert didn't do.

 2              Now, even if that wasn't a problem, you know, we

 3    don't have a report on it, we don't have an analysis of it, we

 4    haven't taken discovery on it, that is reason enough at this

 5    late stage of the case to exclude, you know, that sort of

 6    effort to rehabilitate the report, but the value of Android in

 7    2011 can't be a proxy for the value of the other components of

 8    the Java license bundle in 2006.

 9              As we all know, the law requires that damages be

10    based on a hypothetical negotiation at the time of first

11    infringement.  And both parties generally place that sometime

12    in 2006.  And that's why Your Honor rightly focused the parties

13    in his July 22nd order on the Sun/Google negotiations back in

14    2006.

15              And in particular, Your Honor was interested in that

16    $100 million demand that Sun made to Google, and there were

17    further negotiations.  And that is an issue, what the starting

18    point should be that Your Honor has said should go to the jury,

19    and we're not arguing with that, but in 2006, when those

20    Sun/Google negotiations were going on and Sun was making

21    demands for this broad package of Java rights, there was no

22    Android.

23              And so what Dr. Cockburn was trying to do --

24         THE COURT:  I'm sorry, there was no?

25         MR. PURCELL:  There was no Android --
```

1              *THE COURT:*  All right.

2              *MR. PURCELL:*  -- at that point.  I mean Android was

3    kind of inchoate.  It was still under development.  Certain

4    aspects of it were developed, certain aspects were not, and

5    didn't get developed until later in 2007.  Android wasn't

6    released or wasn't announced until November of 2007.

7              And so what Dr. Cockburn is doing here is trying to

8    conflate the value of Android in 2007 with the value of the

9    Java license bundle -- I'm sorry, the value of Android in 2011,

10   right now, with the value of the Java license bundle in 2006,

11   which is exactly what he tried to do in his first report and

12   exactly what Your Honor rejected in the July order.

13             He is shifting the date of the hypothetical

14   negotiation forward.  He is giving Oracle the benefit of all

15   the work that Google has done in commercializing the product

16   and all of the lock-in that's occurred because all the OEMs

17   have adopted the platform, all the carriers have adopted the

18   platform.  And so it's really -- it's not even apples and

19   oranges, it's apples with some entirely different kind of

20   product.

21             And so that's, I mean, the major problem with why

22   that effort to rehabilitate Dr. Cockburn can't work.  It's not

23   in the report.  It's never been a subject of discovery.  And it

24   just doesn't make sense, logically or under the law.

25             The other thing Oracle says on this point is that,

1    well, Dr. Cockburn looked at the relative contribution of the

2    patents and the copyrights in suit to the success of Android,

3    and that is sort of an alternate basis for establishing a

4    royalty, and again, that's not in the report.  They can say

5    that that logically would make sense and that that basis is out

6    there, but that's not in the report.  There is nothing in the

7    report --

8                    **THE COURT:**  What is the alternate basis?

9                    **MR. PURCELL:**  The alternate basis, I assume, is that

10   you would look at all Android's revenues, and you would say

11   that the patents and the copyrights account for a certain

12   percentage of that, and that would be sort of a royalty

13   calculation.  But he didn't do that calculation.  You know, we

14   don't have tables, we don't have schedules in the report that

15   show what those numbers would be.

16                   The basis that he used --

17                   **THE COURT:**  How does that differ from the value of

18   Android in 2011, then?

19                   **MR. PURCELL:**  I'm not entirely sure.  As I read it

20   from their brief, and again, the brief that the lawyers wrote

21   is the first time we've heard of this, but as I read it, it's

22   not based on the $100 million starting point, it would be based

23   on some other figure.  So instead of taking an apportionment of

24   the $100 million starting point that, you know, was the Sun

25   demand to Google, they would be taking some percentage of some

```
 1   other figure relating to Android revenue.

 2               But, you know, again, he did not do this.  And this

 3   is the first time we're hearing of it now.  And that just can't

 4   be right, I mean, that can't be fair, given the lengthy expert

 5   discovery process we've had, given the fact that Your Honor did

 6   give them a second chance --

 7               THE COURT:  How would you -- if the 100 million

 8   offer is the starting point, how do you propose to apportion

 9   it?

10               MR. PURCELL:  Well, I mean, again, it's not our

11   burden, so I don't know.

12               THE COURT:  Then why don't you have a seat.  If you

13   are not going to help me, just go have a seat.

14               How should it be done?  Come on, you know the

15   answer.

16               MR. PURCELL:  I actually don't know the answer,

17   Your Honor.

18               THE COURT:  Well, then, they are the plaintiff --

19               MR. PURCELL:  Well, okay, all right, here's what we

20   say --

21               THE COURT:  You are going to complain about

22   everything from now until Doom's Day.

23               MR. PURCELL:  Fair enough.

24               THE COURT:  All right, tell me how they should do it

25   right.
```

1          **MR. PURCELL:**  So there was the $100 million starting

2    point that related to this broad range of intellectual property

3    rights --

4          **THE COURT:**  Just a second.  I got myself so upset

5    about the way you wouldn't answer my question I didn't hear

6    what you were saying.

7                    **(Laughter.)**

8          **THE COURT:**  Start all over again and tell me how

9    they should do it.  What is the correct way to do it?

10         **MR. PURCELL:**  Okay.

11         So you have the $100 million, so you got to look at

12   what goes into that $100 million.  We know that in addition to

13   the patents in suit, there was also going to be a license to a

14   much broader patent portfolio.  So you have to understand what

15   those other patents were and what technology they conferred and

16   what benefit they would have conferred.

17         In addition to the copyrights in suit, there was a

18   broader license to a bunch of other copyrights, including

19   copyrighted source code, which basically is --

20                 **(Cell phone rings.)**

21         **MR. PURCELL:**  -- the crown jewels of the Java

22   platform.  So you have to value that.

23           **(Cell phone continues to ring.)**

24         **THE COURT:**  Just a second.

25         Somebody got a telephone call?

```
 1                        (Cell phone silenced.)

 2              THE COURT:  All right, go ahead.

 3              MR. PURCELL:  There is also the value of the Java

 4   trademark, and we know that Oracle considered that -- Sun

 5   considered that very valuable because they --

 6              THE COURT:  All right, okay, I understand that.  So

 7   how do you go about proportioning it among all those items?

 8              MR. PURCELL:  Well, you would need -- Dr. Cockburn

 9   would need to actually undertake an analysis of what those

10   components were and what their value would have been to Google.

11              And in addition to those IP components, as

12   Your Honor recognized in Dr. Cockburn's report, part of that

13   $100 million also was money that Google was giving to Oracle to

14   make up for -- sorry, to Sun to make up for revenue that Sun

15   was purporting to lose because Java would be open source.  So

16   there was a component of that $100 million that was just

17   basically --

18              THE COURT:  Somebody is hacking and coughing, and I

19   didn't hear your sentence.

20              If you need a cough drop I got some up here, but

21   please do not hack and cough while your opponent has the floor.

22              Start over on that last sentence, please.

23              MR. PURCELL:  All right.

24              So part of the $100 million was a straight cash

25   payment from Google to Oracle to make up for lost revenues, so
```

```
 1   you would need, in the first instance, to figure out what that

 2   was and subtract that.  Then you would have the remainder,

 3   which would be the value of the IP license.  And then you would

 4   need to actually take account of what all the components of

 5   that license were.

 6              THE COURT:  Let's assume that's the right way to go:

 7   Are there records from the negotiations that have been produced

 8   in discovery that would help the experts see at the time how

 9   the parties evaluated those various components?

10              MR. PURCELL:  Whether there was any valuation, I

11   don't know.  I think that --

12              THE COURT:  How can you not know that?  Come on, how

13   can you not know if there were such records?

14              MR. PURCELL:  It was not cited in Dr. Cockburn's

15   report.

16              THE COURT:  I understand that part.

17              MR. PURCELL:  This is Sun's information.

18              THE COURT:  Just -- is it because they don't exist

19   or is it because -- well, how did your side evaluate them?

20   Okay, you must have some records.  Do you have e-mails that say

21   this one is important, this one is not important?

22              MR. PURCELL:  I don't know that the parties ever

23   engaged in that sort of granular analysis of exactly --

24              THE COURT:  Why don't you know?

25              MR. PURCELL:  Well, because I don't think they did.
```

```
 1              THE COURT:  Here we are nearly at the trial date and

 2   you don't know?

 3              MR. PURCELL:  Your Honor, I don't believe that they

 4   did.  I don't believe that there is any e-mail records back and

 5   forth --

 6              THE COURT:  Mr. Lindholm sent some e-mails, he was

 7   prolific; he didn't have e-mails back then in 2006 telling us

 8   how important these features were?

 9              MR. PURCELL:  Mr. Lindholm wasn't involved in the

10   negotiations in 2006.

11              THE COURT:  Who was involved?

12              MR. PURCELL:  On the Sun side, it was mostly a

13   gentlemen named Vineet Gupta, on the Google side it was

14   Andy Rubin.

15              THE COURT:  Maybe they have some e-mails.

16              No one bothered to ask for their e-mails; is that

17   what you're telling me?

18              MR. PURCELL:  No, I'm pretty sure that everybody did

19   ask for those e-mails and they were produced.  And I'm pretty

20   sure that there is nothing in those e-mails that specifically

21   values all the components of the intellectual property.

22              You know, this is something -- this is Sun's IP --

23   this is Oracle's IP now because Oracle has acquired Sun, and

24   it's their burden to actually figure out what the components

25   were and value them, and they didn't do it.
```

```
 1              Instead they used a shortcut, and now they are
 2   trying to shortcut the shortcut by sort of making something up
 3   that's not in the report.  That's --
 4              THE COURT:  Well, another way it could be done is,
 5   you take each individual claim -- how many claims, 26 claims?
 6              MR. PURCELL:  Correct.
 7              THE COURT:  And you forget about the 100 million.
 8   You just go out and say, how much -- in a hypothetical
 9   negotiation for this particular claim, what would it have been
10   licensed for and you forget the 100 million -- you know, the
11   100 million was a suggested starting point, but if it's
12   impossible to do -- I'm not saying it's impossible -- but if it
13   were impossible to do, then we could just do it a different
14   way.
15              We could say, let's look at each individual claim,
16   what would that have been licensed for as between reasonable
17   people back in 2006.  And it wouldn't have to be dependent on
18   the 100 million thing.
19              That is why I thought it would be a good starting
20   point, but it's not the only way it could be done --
21              MR. PURCELL:  I don't disagree with --
22              THE COURT:  -- but if it is going to be done, there
23   has to be apportionment.  The 100 million, if that's the
24   starting point it has to be apportioned.  And I explained all
25   of that in the July order.
```

```
1              MR. PURCELL:  And, Your Honor I don't disagree with
2    any of that.  I think there were other ways to do it --
3              THE COURT:  But the other side says you are imposing
4    an impossible burden on them, that if it's going to be the 100
5    million it's impossible to go through a thousand items and do
6    all of that homework.
7              MR. PURCELL:  They chose to use the $100 million
8    starting point, and that $100 million starting point has
9    consequences because you have to look at what the components
10   were that made up that value.  And if they're not able to
11   segregate out the other components that made up that value that
12   aren't the subject of this case, that's a problem with their
13   damages theory.  And the fact of it is is that's the only
14   damages analysis that we have right now.
15             THE COURT:  All right, what other items do you want
16   to discuss on the tentative?  Because I want to break it at
17   logical points because if I get too far into this then I'll
18   forget what you just said about apportionment.
19             So what else do you want to bring up on the
20   tentative ruling?
21             MR. PURCELL:  Just briefly on the other three issues
22   that Oracle --
23             THE COURT:  I'll give you a chance --
24             But what are those other issues?
25             MR. PURCELL:  Okay, there is the requirement of a
```

```
1    claim-by-claim damages analysis.

2               THE COURT:  And in one sentence, what is your

3    position?

4               MR. PURCELL:  Our position is that they say there is

5    no legal requirement to do that, and that may be, but there are

6    legal consequences if you don't do it.  If there is no

7    per-claim calculation, then the jury has no factual basis to

8    understand what the consequences are if one claims

9    infringement --

10              THE COURT:  All right, let's hear what's your next

11   point you want to --

12              MR. PURCELL:  Future damages --

13              THE COURT:  All right I understand.

14              MR. PURCELL:  Your Honor was very clear --

15              THE COURT:  And then what's your last one?

16              MR. PURCELL:  -- that you wanted an analysis, and

17   they didn't do it.

18              And then the Microsoft settlement issue --

19              THE COURT:  All right, we'll come to all of that.

20              MR. PURCELL:  All right.

21              THE COURT:  Let me hear from the other side on

22   apportionment before --

23              MR. PURCELL:  Thank you, Your Honor.

24              THE COURT:  -- I forget what you said.

25              All right, who is going to argue this?
```

1            **MR. JACOBS:**  Mr. Norton will address this one.

2            **THE COURT:**  Very well.

3            Please go ahead.

4            **MR. NORTON:**  Thank you, Your Honor.

5            I want to begin with Mr. Purcell's argument that

6     what we have before the Court in the brief that was filed

7     yesterday is purely lawyer's argument and no Professor

8     Cockburn's analysis and that somehow Google has been prejudiced

9     by the fact that Professor Cockburn's analysis has now been

10    explained in the way that it was explained in our brief.  And

11    that is simply not true.  As Mr. Purcell noted, Professor

12    Cockburn disclosed in his report in Footnote 327 and elsewhere

13    that he had used the value of Android to calculate an upper

14    bound for the value of the 2006 license bundle.  Now, Google

15    chose at the deposition of Professor Cockburn to not ask any

16    questions about what the economic basis for --

17            **THE COURT:**  Please don't do that.  It is your

18    burden.  You can't hide behind a bush and if they don't ask the

19    right question at the deposition say it's their own fault that

20    your expert didn't put it in the report, I'm not going to buy

21    that.  Come on, it's got to be in the report.  So don't blame

22    them because they couldn't figure out where you hid it in the

23    deposition.

24            **MR. NORTON:**  My suggestion is -- and I certainly

25    don't mean to shift the burden that way.

```
 1              What I am arguing is that the opinions are disclosed

 2    in the report:  As with Google's own experts, there are bases

 3    for opinions in the reports that are not fully elucidated, and

 4    the deposition is the opportunity to do that.

 5              But Professor Cockburn did disclose --

 6         THE COURT:  I don't buy that.  I do not buy that.

 7    I've heard that for 12 years now, that every time there is a

 8    disclosure failure, the party that hid the ball says they could

 9    have asked about it in the deposition or they did ask about it

10    in the deposition.  And it's just too hard to go back and try

11    to sort out what happened in a deposition, and I stopped doing

12    that five years ago.

13              So if it's not in the report, too bad for you.

14    That's the answer, too bad for you if it's not in the report,

15    and too bad for them if it's not in their report.  It's got to

16    be in the report.

17              Go ahead.

18         MR. NORTON:  We are in agreement, nonetheless, that

19    the opinion that he can use the total value of Android as an

20    upper bound for the value of the 2006 license, that is in the

21    report.  That is in Footnote 327.

22              And Professor Cockburn does explain why he chose to

23    do that rather than attempt to do what Mr. Purcell has

24    suggested is the correct way, why he didn't try to valuate --

25         THE COURT:  Why didn't he go back and do -- in 2006
```

```
 1    is what matters.  Back in 2006, nobody knew what a fantastic

 2    thing Android was going to be.  And so now, in 2006, they were

 3    just doing an ordinary negotiation:  Why didn't he go back and

 4    say, all right, there were 1500 items on the table, we're

 5    talking about 38 of them, here is the value for those 38 versus

 6    the other 1500.

 7                MR. NORTON:  The reason --

 8                THE COURT:  That's what seems to me would be a very

 9    straightforward way to do the apportionment.

10                MR. NORTON:  The reason that --

11                THE COURT:  Instead you -- you've pushed it forward

12    to 2011 and taken advantage of the after-acquired information.

13                MR. NORTON:  Let me address both of those points in

14    reverse order.

15                Second:  By using the actual value of Android in the

16    real world, we don't gain any advantage by using that larger

17    number; that makes Professor Cockburn's damages estimate

18    smaller.

19                To address the first question, why didn't we --

20                THE COURT:  Smaller compared to what?  It's still

21    over a billion dollars.

22                MR. NORTON:  The patent damages number is not a

23    billion dollars and the copyright damages number is not a

24    billion dollars.

25                THE COURT:  When you add them together they are.
```

1              **MR. NORTON:**  The historical damages through the date

2       of trial are less than $400 million.

3              **THE COURT:**  How about for the year -- 12 months of

4       2012?

5              **MR. NORTON:**  Once we get into 2012, the numbers do

6       go up substantially.  And the net damages for both copyright

7       and for patent would be on the order of close to a billion

8       dollars, yes.

9              **THE COURT:**  Yeah, okay.

10             **MR. NORTON:**  If I can address the Court's point, why

11      did Professor Cockburn not simply take that $100 million

12      starting point and slice it up, and Professor Cockburn, in his

13      report in paragraphs 246 to 251, explains why that is not

14      appropriate as a matter of economics.

15             And Professor Cockburn's reason is that it's well

16      established among experts, it's very difficult to apportion

17      between -- in a large portfolio.  Your Honor asked the

18      question, well, at the time of the negotiations did the parties

19      separately value these pieces?  And they did not.  And they did

20      not because it's a package, and the package, there are

21      complements between the package, there is synergy between the

22      package --

23             **THE COURT:**  But you are not suing on the whole

24      package, you are suing on 26 claims and the -- and two aspects

25      of copyright.

 1             **MR. NORTON:**  That is correct.

 2             **THE COURT:**  So that's only a fraction of what was on

 3     the table in 2006.

 4             **MR. NORTON:**  It is a fraction, but, of course, the

 5     problem confronted by Professor Cockburn is, well, how big of a

 6     fraction is it?

 7             You cannot do what -- it is well accepted among

 8     experts in the field, including Google's own expert,

 9     Dr. Leonard, that it is an exceedingly difficult exercise to

10     simply carve out pieces of a portfolio that has synergies

11     between the different components.  Certainly, the parties in

12     2006 never endeavored to do that because that's not the way

13     parties negotiate patents.

14             So what Professor Cockburn is -- after describing in

15     his report in detail why he believed it was inappropriate to

16     take the $100 million starting point and slice it up, he

17     explained that what he did, had done, and he explains this --

18     what he did.  And he explains why it's conservative in Footnote

19     327.

20             Instead of trying to value the discrete pieces, he

21     doesn't need to know that.  What he needs to know to do his

22     apportionment exercise is, what is the ratio, the relative

23     value -- what is the relative value, what is the relationship

24     between the contribution of these specific patents --

25             **THE COURT:**  I understand what he did.  And what he

1    assumed is, if you just take away that functionality

2    altogether, how would it affect the sales today, all right?   So

3    he takes it away, but he doesn't take into account the fact

4    that there might have been a noninfringing way to achieve close

5    to that same functionality, he just assumes that functionality

6    is gone.

7              *MR. NORTON:*   Well, what he does is, he concludes

8    that the best -- this is in his report in one of his opinions

9    expressed, is that the best alternative to Google is the -- is

10   to go with Android but without that functionality.   And that

11   is --

12             *THE COURT:*   How is that the best?

13             *MR. NORTON:*   Well, because the opinion of the

14   technical expert is that there are not adequate technical

15   alternatives -- this is Professor Mitchell in his opinion on

16   which Professor Cockburn is entitled to rely -- is that Google

17   did not have adequate technical alternatives.

18             Professor Cockburn has also done an economic

19   analysis of some of the alternatives proposed by Google, which

20   is simply not using the Java language or not having a virtual

21   machine, and what that would mean by Google's business model,

22   and he has concluded those alternatives would not have been

23   acceptable.

24             *THE COURT:*   But earlier in the case you told me that

25   there is no patent on the virtual machine.

1          **MR. NORTON:**   There are patents which make the

2     virtual machine fast --

3          **THE COURT:**   But your side didn't invent the virtual

4     machine.

5          **MR. NORTON:**   No.

6          **THE COURT:**   That's been around a long time.

7          So you're saying -- so you go all the way from they

8     have a virtual machine that has features that infringe some of

9     your claims going down to, okay, they won't have a virtual

10    machine at all, those are the only two alternatives.  There are

11    a lot of alternatives in between.

12         **MR. NORTON:**   Indeed, there are.  And the technical

13    experts have evaluated those.  One of the alternatives that

14    Google's experts proposed was that they simply do away with the

15    virtual machine.

16         And Professor Cockburn analyzes that alternative and

17    says, had they gone with that particular alternative, no

18    virtual machine -- and Google's executives have offered similar

19    testimony, well, one solution to this problem would be to have

20    no virtual machine.  My point is that Professor Cockburn

21    considered that alternative proposed by Google and found that

22    it was not one that would have allowed them to achieve what

23    they achieve in the next best alternative that he has

24    calculated.

25         But Your Honor's absolutely correct, what

```
 1    Professor Cockburn does is, he values how much more money

 2    Google earns as a result of the infringement.  Now, there is no

 3    dispute --

 4              THE COURT:  No, that's not what I said.

 5              MR. NORTON:  Well, I'm --

 6              THE COURT:  What I said was, he values how much by

 7    way of the alleged infringement, but he compares that, because

 8    there has to be a delta, he compares to a -- no functionality

 9    at all as opposed to an intermediate, which would be, we have

10    that functionality, but we do it in a noninfringing way such

11    that it may be slower, but not as slow as you presume that it's

12    going to be.  And so there is a vast sea of alternatives in

13    between which he glides over like thin ice.

14              MR. NORTON:  Well, again, Professor Cockburn's

15    opinion that the delta is established by the next best

16    alternative has not been challenged by Google on this motion.

17    And I would suggest that there is good reason for that, but in

18    any event, the measure of that delta has not been challenged.

19              But to the extent that that critique had -- has

20    merit, that is, to the extent that the delta he has calculated

21    is too large, then, again, that would work to Google's favor.

22    Because what Professor Cockburn decided to do is, again, he

23    doesn't need to value every discrete element of the 2006

24    bundle, what he needs to do is establish the ratio between how

25    valuable are these patents to Google in the numerator --
```

```
 1              THE COURT:  It's a claim-by-claim thing.

 2              MR. NORTON:  It --

 3              THE COURT:  Claim-by-claim.

 4              In a hypothetical negotiation, the law only requires

 5     that you license that claim.  You don't have the right to say

 6     you are going to license every single claim in that patent, you

 7     only have the right to force them into licensing the specific

 8     26 claims you assert, assuming you prove infringement.

 9              MR. NORTON:  And --

10              THE COURT:  And if there is no law that addresses

11     this point, I believe that the whole theory -- there is going

12     to be law, I guess, in the case -- at least as long as it's in

13     the District Court that it's going to be claim-by-claim.

14              MR. NORTON:  I understand the Court's --

15              THE COURT:  So when you say they got to license the

16     whole patent, I don't buy that.

17              MR. NORTON:  I understand.  The Court need not

18     accept that proposition to accept my argument here because what

19     Professor Cockburn has valued is the functionality provided by

20     the specific claims.

21              In this particular case, there is no distinction.

22     The functionality provided by every claim in a given patent is

23     the same.

24              THE COURT:  I want to back up and make it clear:  I

25     do believe the other -- when you're dealing with what are the
```

```
 1   noninfringing alternatives that Google would not be free to

 2   say, okay, we get out from under claim 33, we could have

 3   gone -- we could have then infringed claim 32, no.  They

 4   cannot, for purposes of the *Georgia Pacific* factors in what are

 5   the noninfringing alternatives, you have to take off the table

 6   any alternative that would infringe some other claim that is

 7   not asserted.  That I do think is important, but if there was

 8   non -- so for purposes of the reasonable royalty, you might

 9   have to get into what some of these other claims are.

10          However, for purposes of putting a value on the

11   claims that are asserted, it ought to be a claim-by-claim, what

12   would someone have paid back then for the right to practice

13   claim X, the right to practice claim Y.

14          Because it's a forced hypothetical negotiation, the

15   law imposes the duty on both sides to reach -- and they don't

16   have the duty to license anything more than they are found to

17   infringe.  So it's a claim-by-claim deal.  I'm positive that's

18   the right answer because anything else would be inconsistent

19   with the whole theory of reasonable royalty negotiation.

20          Now, that having been said, you're saying, okay, you

21   don't need to worry about that because even under that

22   assumption you win, right?

23          **MR. NORTON:**  That's correct.

24          **THE COURT:**  You're insistent with --

25          **MR. NORTON:**  Yes.  And --
```

1              **THE COURT:**  All right, so explain that point.  I

2      still am having trouble understanding how you can reach forward

3      to 2011 and somehow figure out what the apportionment would

4      have been back in 2006.

5              **MR. NORTON:**  Sure.

6              So, again, Professor Cockburn decided that as --

7      economists and scientists often have this problem:  There is

8      not a good way to measure that thing that you are directly

9      interested in, right, and so you measure some other variable

10     that has a known relationship to the thing you really care

11     about.  So but in order to determine what's the relative value

12     of the patents in suit, the claims in suit to Google compared

13     to the value of the 2006 bundle to Google.  So what is the

14     proportion of those two things?  If you can find out the

15     proportion of those two things, then he can do the allocation

16     of the $100 million starting point.

17             So then the question is, does he need to know

18     precisely the value, or can he get an upper bound that he knows

19     the 2006 bundle would not have been worth more to Google than

20     X.  Because if he knows he can get the upper bound and use the

21     largest possible number as the denominator in his equation,

22     then, as a matter of simple mathematics, by using the largest

23     possible denominator he will have ensured that he has the

24     smallest possible allocation.

25             So is there some way that Professor Cockburn can be

1   confident that the actual value of Android in 2011 is at least

2   as great as the anticipated value of Android in 2006?  And he

3   most certainly can be assured of that.  How does he know that?

4   Well, the 2006 license bundle was one input into what Android

5   would be.  Google -- from Google's perspective at the

6   negotiating table in 2006, the value of the 2006 license

7   bundle, the Java pack, from Google's perspective could never be

8   greater than what Google expected Android to be.

9          Your Honor actually had a nice illustration of this

10  point in your July 22nd order, right?  The wheels on the car

11  are pretty important, they are essential, but the value of the

12  car is greater than the wheels.

13         By the same token, if Google is -- if Java is the

14  wheels and Android is the car, from Google's perspective, the

15  Java wheels can never be as valuable as the finished product of

16  the car.  No one is going to value the inputs as being greater

17  than the total package.  So from Google's perspective, the 2006

18  license can't be worth more than what Google expects to get

19  from Android in 2006.

20         And, in fact, we know that --

21         **THE COURT:**  But what is your overall percentage of

22  the -- I don't have it in front of me now, but it's like

23  30 percent -- is it 30 percent for the copyright and patent

24  combined?

25         **MR. NORTON:**  30 percent for the patents and

1    15 percent for the copyrights.

2              **THE COURT:**  Forty-five percent total.

3              Does it strike you as change that of the thousands

4    and thousands of items on the table in 2006, you are now

5    asserting 26 of those plus copyright, not on the full

6    copyright, but just on selected things, and it happens to add

7    up to 45 percent of the -- those thousands of items?  Does that

8    strike you as amazingly coincidental that there could be such a

9    gargantuan number?

10             **MR. NORTON:**  It does not strike me as strange, given

11   the quantitative analysis, the econometric analysis.

12             **THE COURT:**  By someone who has been paid a lot of

13   money by Oracle.

14             **MR. NORTON:**  To the extent that --

15             **THE COURT:**  These experts are paid a lot of money.

16             **MR. NORTON:**  That analysis --

17             **THE COURT:**  And they -- and all that work product is

18   hidden from view.  And all the communications with you -- you

19   know, the jury might be fooled by these experts, but I am not,

20   I know that they are paid hired guns, bought and paid for.

21             So, yes, the law allows you to present that to the

22   jury, okay, we have to do that, but it's got to at least be --

23   it can't be so speculative as that.  It bothers me that you

24   could -- what you're trying to do here.

25             **MR. NORTON:**  I respect Your Honor's concern on this

 1  issue.  I want to make two particular points.

 2        **THE COURT:**  Just because you start talking big

 3  numbers and you're big companies, it doesn't mean that it

 4  really should be big numbers.  This could be a small potatoes

 5  case.

 6        **MR. NORTON:**  We have --

 7        **THE COURT:**  And even though you are putting a lot of

 8  time and effort into it, it could actually just be a small

 9  potatoes case.  It's 26 claims and a few copyrights items out

10  of thousands of things that were on the table in 2006.  Just

11  because you ask for a lot of money doesn't suddenly mean it's a

12  big case.

13        **MR. NORTON:**  The measure of damages in this case has

14  nothing to do with who the litigants are.  The measure of

15  damages in the case is established by the importance of these

16  patents and these copyrights to what Android does.  And that

17  has been measured objectively by Professor Cockburn, by

18  Dr. Shugan, by Professor Kemerer *(phonetic)*, by Dr. Mitchell.

19        And those estimates, I understand the Court's

20  concern that the experts are part of this adversary process,

21  but not only have those experts documented their work with

22  excruciating detail, there is vastly more backup than the Court

23  has seen.  There are enormous quantities of data that Dr. Kaerl

24  has also seen.  But not only is all that information present,

25  but it's subject to the adversarial process.

```
 1              And notwithstanding --

 2         THE COURT:  Well, I wish it were that simple, but

 3    the Federal Circuit says I have to be -- and the Supreme

 4    Court -- I have to be the gatekeeper.  I just can't let the

 5    adversarial process fight out in front of the jury.  That's the

 6    way -- that's the way unjust verdicts sometimes get rendered,

 7    where the jury gets fooled.

 8         MR. NORTON:  The Court has a gatekeeper role;

 9    however, there is a decision I think from the Second Circuit

10    that says the Court's role is a gatekeeper, not an armed guard.

11    And the reason for that particular observation --

12         THE COURT:  I like that line.

13              (Laughter.)

14         THE COURT:  That's good.  That's the best thing I've

15    heard all day.

16              (Laughter.)

17         MR. NORTON:  Hopefully, I'm warming up.

18         But I make that comment because although Your Honor

19    has concerns about that particular analysis, Google has not

20    filed a Daubert motion saying that anything in that analysis

21    fails the test of Daubert.  That analysis --

22         THE COURT:  Well, the apportionment thing is a

23    Daubert issue.  Come on.

24         MR. NORTON:  Apportionment, yes, but I'm focusing

25    on -- Your Honor stopped me as I explained that we know that
```

1    these particular patents and copyrights are extremely important

2    to the performance of Android.  And we know that based on

3    extensive econometric and technical analyses performed by a

4    number of people which all confirm this.  And it's not

5    surprising because Google itself concluded the critical

6    importance of this type of functionality.

7            But the apportionment, the apportionment issue that

8    we are focused on now is, once Professor Cockburn has

9    identified the contribution of these patents to Google in

10   absolute dollars, how many additional dollars do they get as a

11   result of this infringement, then the question is, what's the

12   relationship between that and Google's estimate of the

13   expectation --

14           *THE COURT:*  Are those -- I want to make sure I focus

15   on that part.

16           Those surveys that you did -- I'm sorry, what was

17   the name of the expert who did the surveys?

18           *MR. NORTON:*  The conjoint analysis survey was

19   performed by Dr. Shugan.

20           *THE COURT:*  All right.

21           Has there been any objection made to that -- to the

22   methodology there?

23           *MR. NORTON:*  No, there has not -- I should say,

24   Google's experts disagree.  There has been no Daubert motion

25   saying that the methodology is not a valid one.  And the

1   conjoint analysis that Professor Shugan used is one that is

2   well accepted in the industry and has been used in courts.

3            **THE COURT:**  What do the opposing experts say on the

4   survey part?  In other words, what was his opinion?

5            **MR. NORTON:**  His opinion is that the survey was

6   conducted in a way that he believes biases some of the results,

7   although both Google's copyright expert -- well, Google's

8   copyright expert, in particular, Dr. Cox, has used consumer

9   surveys of a similar nature and he has written articles in

10  which he says they are a particular good way of valuing

11  intellectual properties rights.

12           So there is certainly a criticism by Google's paid

13  experts of what Oracle's experts have said, but, again, we will

14  have an opportunity to test those critiques before the jury.

15           But there has been no Daubert challenge.  They have

16  not gone so far as to say what Dr. Shugan did or what Professor

17  Cockburn did in his econometrics analysis in any way fails the

18  standard of Daubert.  So that numerator, the contribution of

19  the patents and copyrights to Android's revenues Google did not

20  challenge on Daubert grounds.

21           **THE COURT:**  All right, so I want you to finish up on

22  this apportionment point because some of the things you said I

23  want to go back and ask the other side about.  So I'll try to

24  be quiet for a moment and let you make the rest of your points

25  on the apportionment issue.

1          **MR. NORTON:**  Well, I think that there are two

2     critical points.  First, what Professor Cockburn needs to do is

3     figure out the relative value to Google of the contribution of

4     these patents and copyrights to the value to Google of the 2006

5     bundle.  That's your numerator and that's your denominator.

6     For his denominator, he said, I'm not going to try to figure

7     out precisely what that portfolio was worth in 2006, instead,

8     I'm going to do what an economist is about to do:  I'm going to

9     figure out what I can be confident is an upper bound.

10          What do I use as an upper bound?  The 2011 value of

11     Android.  Can we be confident that is an upper bound?

12     Mr. Purcell stood up here and told you it was an upper bound.

13     He says, it's not fair because it's too big a number.  Making

14     it too big a number doesn't prejudice Google.  If the 2011

15     value of Android is greater than what was expected in 2006,

16     then the denominator is larger than it need be.  That's okay.

17          In the Federal Circuit case, **_I for I Partnership_**

18     **_versus Microsoft_** similar problem:  An expert does a survey, he

19     sends out 988 surveys, only 46 respond.  Of the 19 -- 19 of

20     that 46 give a response to suggest that users are using a

21     software in a way that would infringe.  So what does he do?  He

22     calculates a fraction of 19 over not 46, but 988.

23          Now, he knows that that is a, as a matter of

24     science, that is not an accurate number.  But as a matter of

25     conservatism, he knows that that number must be less than the

1    actual percentage of infringing use.

2              And the Federal Circuit said, that's okay, that's a

3    sound analysis, it's a very consecutive analysis.  And

4    Professor Cockburn has made a similar conservative assumption

5    that allows him to be confident that 2006 -- that the value

6    he's given to the total 2006 bundle is greater than -- I'm

7    sorry, the value that he has given to Android must be greater

8    than the value of the bundle.

9              If that's correct, and Google believes it's correct,

10   their complaint is that 2001 denominator is too big, if that is

11   correct, there can be no prejudice to Google from his analysis.

12   And that's a sound way to approach this problem.

13             This is not like *Medtronic*.  In *Medtronic* -- and I

14   want to be very clear -- in *Medtronic*, the Court did not say

15   that it was necessary for the expert to value the other

16   uninfringed stuff in the portfolio.  In fact, the expert in

17   that case said, I've got some evidence that tells me that these

18   three patents that were part of a $25 million portfolio, that

19   they are really important.  People said they were important,

20   they looked at them, they said they were the flagship, they

21   said that this is the stuff they wanted.

22             And the Court didn't say, well, that doesn't help

23   me, tell me what that rest of the analysis is, or what the

24   analysis of the rest of the stuff is.  The Court did not do

25   that.  It noted he failed to consider that other evidence, but

```
 1    then it went through piece by piece and said, what is your

 2    evidence, the actual evidence that these three patents really

 3    were important?  As it turned out, the expert didn't have any,

 4    he only had a gut feeling.

 5              Professor Cockburn is not operating under a gut

 6    feeling.  He has Professor Mitchell's assessment of the

 7    importance of these patents.  He has benchmark tests which show

 8    precisely the effect -- industry benchmarks -- precisely the

 9    effect of these patents on the performance of Android.

10              He has the conjoint analysis.  He has the

11    econometric analysis.  He has Google's own statements about the

12    importance of this functionality, contemporaneous statements in

13    the context of Android, how important it is to have speed and

14    memory, the very attributes of these patents.

15              THE COURT:  These claims, not these patents, the

16    invention that's allegedly infringed.  And one patent can have

17    many different inventions.

18              MR. NORTON:  That is correct.  And if I were to go

19    back in time and say "claims," it would have no effect on my

20    argument.

21              Professor Cockburn has valued the functionality

22    provided by these claims, these claims.  And there is no

23    variation in the functionality provided by these claims.  So

24    that's why we can be confident that his apportionment analysis

25    is a conservative one.
```

1          But, as Mr. Purcell noted, we have an alternative

2     ground, Professor Cockburn has a separate basis for reaching

3     the conclusion that the relative proportion of the starting

4     point is 30 percent for the patents and 15 percent for the

5     copyrights, and that is, again, this analysis of the various

6     patents.

7          **THE COURT:**  How did it get to be in the earlier --

8     in the earlier things, he attributed almost everything to the

9     patents and then less to the copyright.  Am I wrong about that?

10         **MR. NORTON:**  Respectfully, yes, you are wrong about

11    that.

12         **THE COURT:**  Tell me what he did in his first report.

13         **MR. NORTON:**  In his first report, he used the same

14    hypothetical negotiation framework for the copyrights and for

15    the patents.  And I think the reason that the copyrights were

16    given short shrift in the briefing that followed was that

17    rather than do any sort of separate section of the report

18    devoted to copyright, he got to the section on copyright, and

19    he said that that same hypothetical negotiation factors obtain

20    in a negotiation on a copyright.  And so there wasn't the same

21    attention given to copyright as a stand-alone proposition.

22         **THE COURT:**  How much -- how did he allocate it for

23    Report No. 1?

24         **MR. NORTON:**  Well, in Report No. 1, what the Court

25    faulted us for was a failure to allocate, that we had

 1    attributed the value of Android to the infringement.  And --

 2              **THE COURT:**  He didn't give a number?

 3              **MR. NORTON:**  I confess, I cannot recall what the

 4    number was for the copyright infringement in the first --

 5              **THE COURT:**  Okay.  All right.

 6              **MR. NORTON:**  So there is a second basis, and the

 7    Court actually noted this, I think, in its page 9 of the report

 8    in Finjan *(phonetic)*.  So in Finjan, what we had was an expert

 9    who got on the stand and was able to opine and the jury was

10    able to infer that a substantial fraction of the value of the

11    patents in suit, or the claims in suit in that case, a

12    substantial fraction of the value of the accused product in

13    that case was attributable to the patents in suit there.

14              And the only objective evidence that the expert

15    infringed on, was able to point to in support of that was his

16    own opinion that it was important to acknowledge, the

17    defendant's expert's admission that the technology was

18    important and perceived as new wave, and some internal

19    documents of the defendant that emphasized that the defendant

20    could provide the functionality afforded by these particular

21    patents, that was all.

22              And in response to Microsoft's complaint -- I'm

23    sorry, in response to the defendant, not Microsoft, but the

24    defendant's complaint that that was an arbitrary allocation, to

25    say that a substantial portion of that value was attributable

```
 1   to those patents, the Federal Circuit said, no, it's not
 2   arbitrary.  That's a sufficient basis, not merely a sufficient
 3   basis under Daubert, a sufficient basis to sustain an award of
 4   damages in full.  The jury awarded 95 percent of the damages
 5   sought by the plaintiff in that case.
 6           So in Finjan, the plaintiff's expert was able to say
 7   that these patents are important, a substantial fraction of the
 8   value of the product without valuing all the other stuff that
 9   went into the product.  It was security software, and the
10   patent provided one particular mechanism for security software.
11   So he didn't need to look at the rest of the stuff.
12           Well, Professor Cockburn has evaluated a wealth of
13   evidence which I summarized a moment ago:  The technical data,
14   the quantitative analyses, the qualitative analysis, all of
15   that information, vastly more than what the expert in Finjan
16   had.  And on that basis, he is able to conclude that a
17   substantial fraction -- and he puts numbers on this, 30 percent
18   for patents, 15 percent for copyrights -- the substantial
19   fraction of the value of the portfolio is attributable to those
20   patents.
21           The only logical distinction one can make between
22   Finjan and this case, and I'll submit it's not a logical
23   distinction, would be to say it's one thing to say that patents
24   represent a substantial fraction of the value of a product, but
25   you cannot do such an analysis with respect to a portfolio.
```

1              And there is no principle reason to make that

2     distinction:  If the patents can be evaluated and assessed and

3     determined to be important in the context of a product, they

4     can be assessed and valued and determined to be important in

5     the context of a product -- I'm sorry, of a portfolio.  And

6     Professor Cockburn has done that.  He has done a very detailed

7     and thorough analysis of what these particular patents

8     contribute.

9              And let's not lose sight of the fact that once

10    again, there is a relationship, a compelling relationship

11    between the value of Android, right, the value that these

12    particular patents and copyrights give to Android, and the

13    value that those patents and copyrights have in relation to a

14    patent and copyright portfolio that was intended to be an input

15    to Android.  And again, if Android is worth more to Google than

16    inputs to Android are worth to Google, then anything that's

17    pretty important to Android is going to be pretty important to

18    that portfolio.

19             So his observation that these patents and copyrights

20    are important and his quantification of that importance on a

21    number of objective standards supports his conclusion, that

22    these occupy a substantial fraction of the value of the

23    portfolio.

24             I have, to some extent, bled over into the

25    discussion of claim by claim in response to the Court's

```
 1   question.  I think that's a slightly separate issue, and I'm
 2   prepared to address it, but I understand it's Mr. -- it's
 3   Google's motion, and Mr. Purcell may want to speak to that
 4   first.
 5               THE COURT:  I would like to hear from Mr. Purcell on
 6   a couple of points.
 7               Thank you, Mr. Norton.
 8               What do you say -- is it true that on the issue of
 9   the surveys, the consumer surveys, that there is no motion to
10   knock that out?
11               MR. PURCELL:  It's true that we picked our battles
12   and we did not file a Daubert motion on that.  It is not true
13   that there is no objection to any of the foundation of
14   Dr. Cockburn's analysis.  The benchmarking studies, for
15   instance, is the subject in one of our motions in limine.
16               THE COURT:  Tell me, I don't remember that point,
17   so --
18               MR. PURCELL:  That, basically -- and that is not my
19   motion, so forgive me if I am imprecise, but the basic problem
20   with that is that the benchmarking studies were done by Oracle
21   employees.  They disabled certain functionality.  The person
22   that actually disabled the functionality and then enabled other
23   Oracle employees to do the tests was never disclosed as an
24   expert, was never made available for deposition.  We don't have
25   any idea what he did that formed the basis of the benchmarking
```

```
 1   tests.

 2               THE COURT:  I thought I gave your side three or four

 3   depositions to go figure out what you wanted to figure out on

 4   that.

 5               MR. PURCELL:  I think that might have been the three

 6   or four depositions you gave to Oracle on the basis of the --

 7   the employee interviews that Dr. Leonard --

 8               THE COURT:  Oh, yes.

 9               Well, did you ask for the same relief?

10               This is the spoonfed problem.

11               MR. PURCELL:  No, no, that was the interviews of

12   Google employees that Google's expert did that Oracle has

13   objected to.

14               THE COURT:  All right, but you are blaming them for

15   doing the same thing.

16               MR. PURCELL:  So what happened was --

17               THE COURT:  Why didn't you ask for leave to go take

18   the depositions of whoever did those studies?

19               MR. PURCELL:  Well, we did take the depositions.

20   Oracle made the three deponents available who actually

21   conducted the benchmarking studies.  The person who did the

22   foundational work that went into the studies they refused to

23   make available, and we did not move the Court.

24               THE COURT:  Why not?  How can I give you any relief

25   if you don't make a motion?
```

1          **MR. PURCELL:**  Well, it was after the close of

2     discovery.  We could have moved, I can't say that we couldn't

3     have moved.

4          **THE COURT:**  All right, but in any event, you

5     don't -- right now those are going to go into evidence.

6          **MR. PURCELL:**  They are going to go into evidence and

7     be the subject of lively debate among the experts.

8          **THE COURT:**  All right.  Tell me one -- give me, just

9     out of curiosity, one flaw in those studies.

10         **MR. PURCELL:**  So the conjoint analysis that

11    Dr. Shugan did, basically, what he did is, he self-selected --

12    and he didn't even do this work himself, but he relied on other

13    consultants to do it -- a set of seven product characteristics

14    that he thought was important -- were important or that someone

15    else thought was important to the performance of Smartphones.

16    And that had to do with number of applications, was one of

17    them, application load time was another, ability to multitask

18    was a third.  There were seven product characteristics he

19    selected.  He omitted certain other ones.

20         Then he asked a bunch of people on the Internet how

21    they value each of these product characteristics, and

22    25 percent said, we value application load time most of the

23    seven; then he assumed that if the application load time were

24    reduced, basically, Android's market share would drop by

25    25 percent.

```
 1              THE COURT:  Wait a second.

 2          How did he meet these people on the Internet?

 3              MR. PURCELL:  Well, he had a web survey company, you

 4     know, screen people and collect people --

 5              THE COURT:  All right, so they -- there was at least

 6     a survey intermediary who asked the questions; is that it?

 7              MR. PURCELL:  Correct.  And then he supervised and I

 8     think signed off on the final design of the survey.  But he

 9     wasn't the person who selected all the product criteria.

10          He couldn't even necessarily at deposition vouch for

11     the fact that these were the seven most important factors to

12     consumers.  Several of them were provided to him by

13     Dr. Cockburn.  He said that these were basically determined by

14     the needs of the litigation.

15              THE COURT:  All right, so the factors or features

16     that were put to the survey respondents, there were seven.

17              MR. PURCELL:  Correct.

18              THE COURT:  And those were -- somebody at Oracle

19     came up with those seven.

20              MR. PURCELL:  Broadly speaking, yes.

21          And the other thing I would like to say about a

22     conjoint survey is that it's true that conjoint surveys are

23     used all the time.  What they are used for is in the guesswork

24     of product design, when somebody is developing a product and

25     somebody wants to know what features should this product have,
```

1   what is going to be relatively saleable to people, what is

2   going to make it succeed, and they use a conjoint analysis to

3   survey the consumer population and decide, okay, the color

4   should be green rather than blue.

5           It's not used, conjoint analyses are not used as a

6   reliable basis for establishing damages in litigation.  It's a

7   very, very different and more rigorous methodology.  So that,

8   again, is going to be one of the areas that is going to be in

9   dispute at trial.

10          **THE COURT:**  You said something like, if 25 percent

11  rated feature A as the most important of the seven, then he

12  assumed that deletion of that feature would reduce sales by

13  25 percent?  Did I understand that correctly?

14          **MR. PURCELL:**  Right.  And I think Oracle will

15  probably say I'm oversimplifying, and I may be, but basically

16  what he said was, he drew a fairly direct correlation between

17  consumer preference share.  And again, this is not the universe

18  of product features, these are seven self-selected product

19  features.

20          He drew a fairly direct correlation between consumer

21  preference share and market share, and he basically said, if

22  you don't have this feature, or you have a less desirable

23  version of a feature that 25 percent of consumers like, then

24  those 25 percent of consumers are going to go elsewhere,

25  they're going to buy an iPhone, they're going to buy some other

```
 1   product.
 2              So that's the conjoint analysis in a nutshell.
 3   And --
 4              THE COURT:  What does the word "conjoined" mean?
 5              MR. PURCELL:  It's -- it has to do with the
 6   valuation of a number of product characteristics jointly.  So I
 7   don't know if it's a combination of consumer and joint or
 8   exactly how the word developed, but it's --
 9              THE COURT:  So if you had a -- had a survey and you
10   asked people which is more important for an automobile:  Radio,
11   CD, air conditioning, and 80 percent said air conditioning, so
12   if you didn't have air conditioning in your car you would
13   conclude that manufacturer would loose 80 percent of their
14   sales?
15              MR. PURCELL:  That's essentially what Dr. Shugan
16   did, yes.
17              Your Honor, if I could just respond to a couple of
18   things --
19              THE COURT:  That's assuming that a -- because it's
20   the most of the seven that it is a make-or-break thing.  I
21   don't know if that's true or not.
22              All right, so anyway, the reason I got off onto this
23   is I want to understand -- I want to come to my next question
24   for you.  All right, so what do you say to Oracle's point that
25   the ultimate task is to value the claims in suit, 26 -- is it
```

```
 1    26?

 2              MR. PURCELL:  Yes, sir.

 3              THE COURT:  Twenty-six.  And back at the time of the

 4    negotiation, nobody was actually doing that because there were

 5    thousands of items on the table.  So we need to find some

 6    proxy.  So one proxy might be, let's look and see how important

 7    those features turned out to be compared to the thousands of

 8    others, and that it would be, in Oracle's view, a reasonable --

 9    that would reasonably translate to how the parties would have

10    viewed it at the time.

11              MR. PURCELL:  Well, my first --

12              THE COURT:  So, in other words, the -- it is --

13    admittedly, it's a 2011 versus 2006 problem, but if we don't

14    have the 2006 data, why can't they use the 2011 data?  So why

15    don't you respond to that.

16              MR. PURCELL:  Well, my first response would be that

17    Oracle and Mr. Norton are defending an analysis that

18    Dr. Cockburn didn't do.  If you look at the sections of the

19    report that Mr. Norton cited, he puts a lot of weight on

20    Footnote 327, and in Footnote 327 of the Cockburn report there

21    is no conclusion, much less any factual basis, for stating that

22    the value of Android is greater than the value of the other --

23              THE COURT:  What footnote do you want me to look at?

24              MR. PURCELL:  -- bundle.

25              Footnote 327.  I think it might be paragraph 261,
```

```
 1    I'm not sure about that.

 2              The only thing he says is, to the extent that's so,

 3    then my estimate would be conservative, but that's it.  I mean,

 4    he never did any analysis on that.

 5              THE COURT:  Well, let's see what it says.

 6              I see 261.

 7              MR. PURCELL:  I may have gotten that wrong,

 8    Your Honor.

 9              THE COURT:  I don't know what you're taking about,

10    so I'm going to hand --

11              My law clerk is going to come over here, please, and

12    give this to counsel and let counsel find what he's talking

13    about.

14              MR. NORTON:  If I may, Your Honor?

15              I believe Mr. Purcell is looking for paragraph 272.

16              MR. PURCELL:  Thank you, Counsel.

17              THE COURT:  All right, look at 272.

18              All right, he says,

19              "I then estimate the impact of the shift in market

20    shares under each of those scenarios on Google's advertising

21    revenues.  I focus on advertising revenues as a measurable

22    proxy because from Google's perspective patented technology is

23    more valuable if it has a bigger impact on Google's revenues.

24              "Although Google derives a number of strategic and

25    financial benefits from Android in addition to advertising
```

1   revenues, this provides a useful reference point for

2   apportionment to calculate the apportionment percentage.  I

3   first value the revenue impact to Google of a less desirable

4   Android that avoids the patents in suit."

5              Doesn't say claims in suit.

6              "I then value the revenue impact to Google of not

7   having Java and, as such, no Android."

8              I don't like that word, "Java"; we are not suing

9   over Java, we are suing over 26 claims.

10             "With both of these pieces of information, I am able

11  to calculate a reasonable apportionment."

12             I don't see what you're talking about.  Where is

13  this "to the extent" language?

14             *MR. PURCELL:*  Um --

15             *MR. NORTON:*  The footnote you referred to --

16             *THE COURT:*  Oh, here it is, Footnote 327.

17             "Note that my use of the incremental value of

18  Android as a whole for the denominator of the ratio is

19  conservative.  To the extent" -- that's the phrase you are

20  talking about -- "to the extent that the hypothetical license

21  between Google and Sun provide a Google with less value, that

22  the incremental value" -- that's incomprehensible.  That

23  doesn't even -- that's not even good English.  "Less value that

24  the incremental value" -- does he mean "than"?

25             *MR. PURCELL:*  I think so, Your Honor.

1          **THE COURT:**  "To the extent that the hypothetical

2    license between Google and Sun provided Google with less

3    value" -- than -- "the incremental value of Android, paren," in

4    other words, if Google would have been able to successfully

5    commercialize Android in some form without Sun's intellectual

6    property, "the denominator in my calculation would need to be

7    reduced, and therefore, the apportionment ratio would

8    increase."

9          All right, well.  He does say that, so, you know,

10   maybe one sentence is enough.  Let's -- you were saying it's

11   not in there at all.

12         **MR. PURCELL:**  No, no, I didn't say it wasn't in

13   there at all, what I said was --

14         **THE COURT:**  Why isn't one sentence enough?

15         **MR. PURCELL:**  He doesn't make any sort of conclusion

16   that, in fact, that's the case, he says, "to the extent."  It's

17   a conditional qualified statement.

18         **THE COURT:**  Well, but --

19         **MR. PURCELL:**  He doesn't support it with any

20   analysis.

21         **THE COURT:**  Look, if somebody says -- what he is

22   saying is that if this is off, it's off in a direction that

23   helps you, I think.  So why does he have to say how much it

24   helps you?

25         **MR. PURCELL:**  Well, because the point is that it's

1   speculative, it doesn't have any sort of rational basis that

2   you can test.  That's the entire point of the Daubert function,

3   is to weed out speculative testimony.

4          Another way to think about it, Your Honor, is

5   Mr. Norton is talking a lot about the denominator of the

6   equation, how this is a change in the denominator, it's a

7   change in -- it increases the size of the denominator, any

8   error would benefit Google:  We are not just talking about the

9   denominator here, the 30 percent figure is a fraction, 3 over

10  10, so we are talking about both the numerator and the

11  denominator.

12         And what we are talking about here, and what

13  Dr. Cockburn purported to do was to take the value of these

14  claims in the patents and these copyrights as a proportion of

15  the Java license bundle, but that's not actually wham he did.

16  What he took was the value of these patents, the functionality

17  of these patents and copyrights to the ultimate long-term

18  success of Android.  So we are talking about differences in

19  both the numerator and the denominator.

20         When you are talking about the value of these claims

21  and these copyrights with respect to the bundle, I think

22  Your Honor hit the nail right on the head before when you

23  pointed out the vastness of all the other things in the bundle,

24  including things like source code and the trademark.  And don't

25  forget, a component of that $100 million that wasn't even for

1    an IP license, that was to compensate Sun for lost revenue.

2    You have to deduct that before you can even value the component

3    of the license that goes to the IP.  And he hasn't done any of

4    that.

5          And obviously, Sun has revenue projections,

6    obviously, Sun has an idea of what sort of revenue this $100

7    million was designed to replace, they're perfectly capable of

8    valuing that.

9          Another thing Mr. Norton mentioned, he said that

10   Dr. Cockburn justified this substitution of the value of

11   Android for the value of the items in the IP bundle because he

12   said that it was too difficult to disaggregate all of the

13   different components of that bundle, there are synergies among

14   them, et cetera, et cetera; the section of the report he cited

15   there was paragraphs 246 to 251.  He does talk about synergies

16   in those paragraphs, but there is nothing in those paragraphs

17   that uses that as some sort of rationale for using the value of

18   Android as a proxy for the value of the other items in the

19   bundle.  That is completely invented at this late stage of the

20   case.

21          And moreover, Dr. Cockburn in other contexts was

22   perfectly able to disaggregate different components of

23   synergistic intellectual property.  He valued, as Your Honor

24   directed him to, the seven patents in suit individually.  And

25   if you look at his valuation of those patents, they add up to

1    more than 100 percent.  And why do they add up to more than 100

2    percent?  Well, he explained this at his deposition, he said

3    that it's because they have overlapping functionalities, and it

4    wouldn't be proper --

5              THE COURT:  It wouldn't possibly just be a hedge

6    against the possibility that the PTO might throw out some

7    claims.  That couldn't possibly have been in anybody's mind,

8    could it?

9              MR. PURCELL:  I can't speculate as to that.  But

10   anyway, his methodology disproves this idea that you can't

11   take --

12             THE COURT:  Tell me how much money was -- in the

13   first report was attributed to copyright.

14             MR. PURCELL:  I don't believe there is any clear

15   figure.  The total damages number was 1.4 to 6.1 billion.  And

16   he said, I think, that that was attributable to patent, or, in

17   the alternative, to copyright.

18             That was the problem with the first report, there

19   wasn't a separate copyright analysis at all, it was about two

20   pages, if that.

21             THE COURT:  I have this question for you:  Is it

22   true that you made no objection to the methodology of assuming

23   that the feature would just be gone as opposed to the feature

24   would be there, but it would have to limp along with a

25   noninfringing alternative?

```
 1              MR. PURCELL:  Well, we made an objection in the
 2   sense that we don't think that's the right way to deal with it.
 3              THE COURT:  No, don't say "in the sense that"; did
 4   you bring this squarely --
 5              MR. PURCELL:  In the motion, no, Your Honor.
 6              THE COURT:  Well, does your expert deal with that
 7   problem?
 8              MR. PURCELL:  Yes.
 9              So what Oracle did was, Dr. Mitchell, their
10   technical expert, said there is no good noninfringing
11   alternatives.  And so they conducted their benchmarking
12   studies, we think, by turning off the features entirely.  And
13   then Dr. Cockburn purported to measure the difference in
14   performance between -- with the feature and without the
15   feature.
16              There are other noninfringing alternatives that our
17   employees discussed, that our technical experts discussed, that
18   our damages experts discussed, but there are no studies we
19   conducted that measured the intermediate value of the
20   noninfringing alternative.
21              THE COURT:  Well, give me one example of
22   noninfringing alternatives that would play into critiquing the
23   analysis of Dr. Cockburn.
24              MR. PURCELL:  Sure.
25              The main one would be just not using the Java
```

1   programming language and a Java virtual machine or a Dalvik

2   virtual machine, I should say, at all; programming Android from

3   the get-go in another programming language, such as C, C++,

4   Objective C, the language that the iPhone is programmed in.

5   Google could have gone a completely different direction --

6          **THE COURT:**  Then you would have a problem with the

7   Lindholm e-mail unless the Federal Circuit says that was

8   privileged.

9          **MR. PURCELL:**  Well, but, Your Honor, remember that

10  was in July of 2010, after Android had already been released

11  and adopted and was very locked into the Java language.  We are

12  talking, again, about 2006, four years before, when Google had

13  at its disposal a number of different choices.

14         **THE COURT:**  That's a good point.  Are there e-mails

15  back then that shows that Google was considering other

16  alternatives?

17         **MR. PURCELL:**  There are.

18         **THE COURT:**  Do they say those are bad alternatives?

19         **MR. PURCELL:**  They express in the main a slight

20  preference for Java, which is the decision Google ultimately

21  went with.  They do show that Google was considering other

22  alternatives.

23         There was a presumption back then, I think, that

24  Java was more important than it's proved to be.  Certainly, the

25  iPhone has shown that the Java language isn't essential at all

```
 1   to developing a successful Smartphone platform.  Carriers don't
 2   require it, OEMs don't require it, and developers don't require
 3   it.
 4          But, again, that's going to be a disputed issue at
 5   trial.  Oracle is going to say people thought Java was very
 6   important, and we are going to say that we didn't.
 7          THE COURT:  So your point is that back then there
 8   was a, quote, "slight preference for Java," but after Google
 9   went down the Java road, then it solidified into a much
10   stronger preference.
11          MR. PURCELL:  Well, it solidified into a platform
12   that existed and was in the market.  And you have Smartphone
13   manufacturers writing code for it, you have carriers writing
14   code to support it.  You have a whole downstream ecosystem that
15   is much less flexible after you've made the final decision and
16   released the product into the public.
17          And again, that is the issue with trying to use the
18   2011 value of Android in capturing all these lock-in benefits.
19   That is not what that hypothetical negotiation is supposed to
20   be.  The hypothetical negotiation is supposed to look at the
21   position the parties were in at the time Google initially
22   infringed, what alternatives did Google have then, what would
23   the incremental difference have been if Google had decided to
24   go with --
25          THE COURT:  Well, but you, yourself, are trying to
```

```
 1   leap forward and say that it turned out that Java wasn't

 2   necessary, and that other languages could have worked, and you

 3   point to the iPhone.

 4            MR. PURCELL:  Well, and that's a fair point,

 5   Your Honor.

 6            THE COURT:  So if one side can do it, I guess both

 7   sides can do it.

 8            MR. PURCELL:  Well, I mean, the point that I would

 9   make, Your Honor, is that had Google decided to go with C or

10   C++ or Objective C Android still would have been a success.

11   And the subsequent evidence that other platforms used other

12   languages and succeeded wildly is pretty probative of that.

13            THE COURT:  All right, it's time for the court

14   reporter to have a short break.  And we will pick up with the

15   next -- which is it, just so I'll be thinking about it?  What's

16   our next issue?

17            MR. PURCELL:  The next issue would be the three

18   other issues on this.  I think -- well, claim-by-claim I think

19   Your Honor has addressed.

20            THE COURT:  I don't want to hear about that unless

21   somebody's got some blockbuster point.

22            MR. PURCELL:  I have nothing to say.

23            THE COURT:  If you have a case on point, of course I

24   want to know what the Federal Circuit has said.  If not, I

25   don't want to just have lawyer argument on it.  I know the
```

1    issues back and forth.

2            **MR. PURCELL:**  Neither side, I don't think has --

3            **THE COURT:**  If you have one --

4            **MR. PURCELL:**  I don't think either side has cited

5    any Federal Circuit cases, and I have nothing to add.

6            **THE COURT:**  What else do we have?  We have

7    Microsoft, and then what was --

8            **MR. PURCELL:**  The Microsoft settlement, and then the

9    failure to calculate future damages.

10           **THE COURT:**  All right.

11           Here is the thought I'm going to leave you with, I

12   ask both sides this:  Can it really be that what you have in

13   mind is a long trial in the coming months, and then

14   periodically every year we would have a new trial to calculate

15   the supplemental damages, assuming that there is liability in

16   the first place?  But that's what Google is looking for here,

17   so that there would be a trial for 2012, a trial for 2013, a

18   trial for 2014.

19           Is that what you have in mind for a court that's got

20   hundreds and hundreds of cases, including a very large criminal

21   docket that's got to take priority?  Is that what you have in

22   mind?  I leave that question for you to ponder because I'm

23   going to ask that question when we come back out here.

24           And if the answer is going to be, yes, that's what

25   you have in mind, maybe we should wait for the PTO to run its

1    full course because this is not just -- I got a lot of cases,

2    this is -- it's not just a wholly-owned subsidiary of this

3    litigation.  The idea of trying this case multiple times on

4    future damages every year that goes by, that is a staggering

5    proposition.  All right, so those are the two issues we will

6    take up when we get back.

7              And, you know, we got to keep our eye on the clock.

8    At the absolute latest, about 12:30 is when I need to leave

9    here.  So I'm going to give you all morning plus a little bit,

10   but we need to allocate our time.  So keep that in mind.  We

11   are not even off the first motion yet.  We'll see you back in

12   ten minutes.

13             Thank you.

14             **MR. PURCELL:**  Thank you, Your Honor.

15                       **(Recess taken at 9:24 a.m.)**

16                       **(Proceedings resumed at 9:37 a.m.)**

17             **THE COURT:**  Let's talk about future damages.

18             **MR. JACOBS:**  Your Honor, I'm going to take the part

19   of future damages that is the question you left us with, if

20   that's the agenda.

21             **THE COURT:**  What's the answer?

22             **MR. JACOBS:**  The answer is no.

23             **THE COURT:**  Good.

24             **MR. JACOBS:**  The longer answer is to give you a

25   preview of where we are going because I think it will help

```
 1   frame that discussion of other issues in the case.

 2              We've been talking a lot about damages, but an

 3   important aspect of this case for Oracle is the injunctive

 4   aspect and how an injunction might achieve an undoing of the

 5   harm that Google has caused by development of Android based on

 6   Java but not compliant with Java.

 7              Our plan is to seek injunctive relief to use the

 8   injunctive effect of a prohibition on future infringement of

 9   intellectual property to induce Google to return to the Java

10   fold.  We will have, as we get into the injunction phase, a

11   pretty detailed plan, a reasonable plan, a plan that is

12   consistent with Oracle's role as a steward of Java and as a

13   major player in the computer electronics software industry that

14   allows for a reasonable transition but, in fact, brings

15   Android --

16         THE COURT:  Well, all that sounds good, that sounds

17   almost biblical.

18                      (Laughter.)

19         THE COURT:  But I have to ask this question:  If you

20   don't get the injunction, are you going to be asking for future

21   damages?

22         MR. JACOBS:  We -- if --

23         THE COURT:  You give that up, then that whole

24   problem goes away.  But if you want to gamble everything on an

25   injunction -- I'm not talking about past damages, but for
```

```
 1   future damages.  If you will let it all ride on whether you get

 2   the injunction or not, and I don't know, but you haven't said

 3   that yet.

 4            MR. JACOBS:  Let's divide the question up in the

 5   following way:  There will be a period in which Google would be

 6   infringing but not compensating if all we've gotten is past

 7   damages.  So our proposed injunction, our proposed --

 8            THE COURT:  How about if you got no injunction?  You

 9   don't necessarily get an injunction.

10            MR. JACOBS:  I think we get relief post-trial if the

11   Court --

12            THE COURT:  The Supreme Court said you don't

13   necessarily get an injunction.

14            MR. JACOBS:  I think we get relief post-judgment.  I

15   think with the form of the relief, maybe a coerced royalty, if

16   the Court decides that that is an answer for the future harm.

17   But that's certainly not --

18            THE COURT:  If it's a coerced royalty, do we have to

19   have a new trial every year?

20            MR. JACOBS:  No.

21            THE COURT:  Than how does it work?

22            MR. JACOBS:  The coerced royalty is handled as a

23   matter of the Court's power to enforce post-judgment relief,

24   it's -- if you will, it's a --

25            THE COURT:  Sounds like it's a trial, a trial on how
```

```
1   much was sold, what the percentage is, circumstances changed,

2   right?  How would I -- if it's disputed, wouldn't we have to

3   have a trial?

4            MR. JACOBS:  The Court could decide to take evidence

5   by way of evidentiary hearing.  Typically, I think these are

6   handled on the papers and on motion and with argument.  But if

7   this is an inducement to giving us the injunctive relief we

8   seek, terrific, because there are huge issues with trying to

9   coerce a royalty in a situation like this, not just the

10  substantive issues, but, as the Court is pointing out, the

11  justiciability and administrative issues.

12           So we will be seeking an injunction -- at some point

13  in that injunctive plan that we will propose, the axe will come

14  down, and Google will either have to have expurgated Oracle's,

15  intellectual property from Android, i.e., stop infringing, or

16  it will have had to have come back into the fold in a way that

17  we are going to outline.

18           THE COURT:  All right.  I'm not agreeing to anything

19  you said, but I understand what you said.

20           MR. JACOBS:  Terrific.

21           THE COURT:  All right, does anyone over there want

22  to add anything to this point?

23           MR. PURCELL:  The only thing I would add,

24  Your Honor, is that for purposes of this motion, the only thing

25  we are saying is that Dr. Cockburn hasn't done the future
```

1   damages analysis that this Court required in the July order.

2   And so Oracle --

3          **THE COURT:**  -- does not require -- I have the July

4   order here somewhere; just remind me what I did require.

5          **MR. PURCELL:**  I believe you required Dr. Cockburn to

6   do a future damages analysis that was calculated claim-by-claim

7   and that took account of the varying expiration dates of the

8   patents in suit.  And he didn't do that, he gave a lump sum for

9   future damages.

10         So, the only thing we are saying is that to the

11  extent that future damages are at issue, Oracle can't present

12  testimony through Dr. Cockburn on that issue.

13         I think your concern about trials is relatively well

14  founded:  One of the issues on any future coerced royalty is

15  going to be whether or not Google is still using the

16  intellectual property, whether the patents have been designed

17  around, in addition to, of course, whether the patents have

18  expired and that is something.

19         **THE COURT:**  Let's say --

20         **MR. PURCELL:**  And that's something that I can see

21  the Court taking evidence on.

22         **THE COURT:**  Could we do this:  Let's say that we get

23  the jury to tell us a percentage for each claim, some claims

24  are going to expire earlier than others, some might get

25  designed around, so let's say two years from now, assuming that

```
 1    you lose the main trial, we have to come back in, and, A, is it
 2    a bench trial, or is it a jury trial?
 3              MR. PURCELL:  I think it would be a bench trial.  I
 4    think it would be in the nature of equitable --
 5              THE COURT:  All right.
 6              MR. PURCELL:  -- relief.
 7              THE COURT:  So then you come back in, and let's say
 8    that half of the claims you say we don't even -- we have
 9    designed around those, or they have expired.
10              MR. PURCELL:  Correct.
11              THE COURT:  But let's say the jury has found one
12    percent for this claim, two percent for that claim, one and a
13    half percent for another claim, we don't have to re-litigate
14    that, do we?  Can't we just get them to give us a percentage?
15              MR. PURCELL:  I think I could see that process
16    working.  The only point that we are making on the motion is
17    that that is not work that Dr. Cockburn has done, and he
18    shouldn't be allowed to come back in and do that work now and
19    present testimony to the jury on that question.
20              He hasn't done any claim-by-claim analysis, either
21    as to past or future damages, but that's all I have to say on
22    that issue.
23              THE COURT:  All right.
24              Let's go to Microsoft versus Oracle, or I guess it
25    was the other way around.
```

```
 1              MR. PURCELL:  Sun versus Microsoft.

 2              THE COURT:  Yeah, Sun versus Microsoft.

 3              MR. PURCELL:  So Your Honor recognized in the most

 4    recent order, the December 6th order, the complexity of the

 5    case between Sun and Microsoft.  There is the antitrust case

 6    which Oracle now says, well, we'll carve that off, but there

 7    was also the patent case, which involved a variety of claims, a

 8    variety of issues, a variety of relief.  And what Dr. Cockburn

 9    is proposing to do is say basically $900 million was the

10    settlement amount, fragmentation was an issue in the case, and

11    leave the jury to draw the inference that somehow fragmentation

12    is worth $900 million.

13              THE COURT:  One way to deal with this would be just

14    to say, okay, you can refer to the fact that Sun sued for

15    fragmentation, but leave out the 900 -- leave out all dollar

16    amounts because if it, in fact, is -- are you trying keep the

17    whole thing out of the case or just the 9 -- the dollar

18    numbers?

19              MR. PURCELL:  It's the cleanest way to do it, to

20    keep it all out of the case, because we are talking about a

21    very complex lawsuit that didn't just involve fragmentation.

22              THE COURT:  See, you are going to get up there and

23    say to the jury, oh, fragmentation, this is just something the

24    lawyers made up, they never cared about fragmentation.  And

25    then the other side is going to want to say, that's crazy, we
```

1   sued Microsoft over that very issue.

2           **MR. PURCELL:**  Well, they sued Microsoft because

3   Microsoft was selling a Java-branded virtual machine, which is

4   something that Google has never done.

5           So the concern in that case was not fragmentation in

6   the abstract, it was you are actually representing that your

7   product is Java, you are using the word Java.  So it's very,

8   very different from what is at issue, what is alleged to be at

9   issue here.

10          **THE COURT:**  You're saying that the word

11  fragmentation never came up?

12          **MR. PURCELL:**  The word fragmentation came up, it had

13  a different meaning in the context of that case.  And it also

14  was combined with a whole bunch of other issues, a whole bunch

15  of other claims, a lot of other relief that Sun was seeking.

16          **THE COURT:**  Yeah, but --

17          **MR. PURCELL:**  It's not a comparable license.

18          **THE COURT:**  For -- I'm not saying for purposes of

19  the license.  Maybe you're right for purposes of the license

20  because there are all these other issues there, but for

21  purposes of being able to explain to the jury that

22  fragmentation is a real legitimate concern, and would have been

23  back in 2006, doesn't the Sun versus Microsoft case, which I

24  have a copy of right here, and I can keep you honest, if you

25  want to -- it refers to this whole thing about fragmentation.

```
1   They're not making that up.

2              MR. PURCELL:  No, that's right.

3              THE COURT:  It's a real thing.

4              MR. PURCELL:  Your Honor, the motion that we filed

5   was to prevent Dr. Cockburn from using that as a comparable

6   license for purposes of justifying --

7              THE COURT:  That's a different point.  And I have

8   read enough about these lawsuits to have my own view of how

9   informative and instructive that 900 million number -- so let

10  me hear from the other side on this.

11             MR. PURCELL:  Thank you, Your Honor.

12             THE COURT:  Who is going to argue this?

13             I want to say to you what I think about this,

14  Mr. Norton.  I think it is perfectly legitimate for you to use

15  that complaint to say fragmentation was a real-world

16  consideration, but this is totally apples and oranges.  That

17  900 million number covers so many other things -- it does not

18  translate to this case.

19             And I know the real reason you want to float that

20  number out there, is so you can have an atmospheric of big

21  numbers in this trial, and I'm not going to let you do it.

22  Now, that's the way I feel, tentatively.  You can try to talk

23  me out of it.  And I'll be quiet for a while.

24             MR. NORTON:  Thank you, Your Honor.

25             The $900 million number is important --
```

1          **THE COURT:**  For atmospherics.  I've read the

2    material.  I've gone back and looked at these complaints.  You

3    are just pulling -- you want to float a big number by the jury.

4          **MR. NORTON:**  The reason why it's important is for

5    the same reason -- the reason why the number is important is

6    for the same reason why the fact of the lawsuit is important.

7    As Your Honor said, what Google wants to argue at trial is,

8    what's fragmentation, no one ever cared about fragmentation.

9          **THE COURT:**  That part you can argue, I accept that

10   point, but the 900 million has so little to do with -- that's

11   your problem, you are trying to sweep that in there, too.

12         **MR. NORTON:**  Well, there, the reason why the 900

13   million is important is that Google's argument is, oh, okay, so

14   there was fragmentation, so there was some fragmentation, so

15   Sun cared a little bit about fragmentation, but it wasn't the

16   sort of thing that would have been a big deal.

17              In fact, what their argument is is, oh, well, Java

18   was so badly fragmented by the time Android rolled around that

19   Sun essentially capitulated on fragmentation.  And we know

20   that's just not true.

21              Sun fought to prevent fragmentation, and it fought

22   to prevent fragmentation because, as the $900 million number

23   tells us, that was a really big deal, it wasn't a small issue,

24   it was very important.

25              And although there were certainly other issues in

```
1    the Microsoft litigation, one of which is antitrust --

2            THE COURT:  Yeah, that second lawsuit.  How many of

3    those claims are under the Sherman Act?

4            MR. NORTON:  As we say, there is a separate

5    settlement of the Sherman Act claims.  And we don't need to

6    talk about the antitrust claims, but that second lawsuit, if I

7    may, is from Mr. Lindholm.  And I believe this is part of his

8    confidential testimony, but I think this is in the record, and

9    Google has not asked to seal it:  What did Mr. Lindholm say

10   about the Microsoft lawsuit.  It's not what Mr. Purcell says

11   about the Microsoft lawsuit.

12           Mr. Lindholm, who was at Sun when that lawsuit was

13   going on and testified, as he says, repeatedly in the lawsuit,

14   he said that what that lawsuit was about was that Microsoft

15   tried to "steal Java."  And by "steal Java," he explained what

16   he meant.  What he meant was that they took something that

17   looked a lot like Java and tweaked it in little ways so that it

18   wouldn't actually operate with Java programs.

19           So what Mr. Lindholm understood that Microsoft

20   lawsuit to be about that resulted in the $900 million

21   settlement for patent claims was it was about fragmentation.

22           So absolutely that lawsuit is relevant.  It will be

23   relevant, even leaving aside Professor Cockburn's analysis,

24   it's relevant to show Sun's vigorous protection of its

25   intellectual property rights, including by suing people who
```

```
 1    infringe them.

 2              But the number --

 3              THE COURT:  Look, Sun's first lawsuit was in '97,

 4    that's the one about fragmentation.

 5              MR. NORTON:  We don't believe that --

 6              THE COURT:  Ah, ah, ah, that's the one.

 7              MR. NORTON:  The first one was about fragmentation.

 8              THE COURT:  Yeah, and that one was settled for

 9    $20 million.  My goodness.  And then in 2002, Sun sued

10    Microsoft for $1 billion, claiming antitrust violations.

11              MR. NORTON:  But the resolution of that lawsuit, it

12    was -- the second lawsuit, we contend, was also about

13    fragmentation.  And that was reflected in a separate settlement

14    of antitrust claims and a patent license.

15              THE COURT:  I read the joint press release for that,

16    I didn't see the word fragmentation there.

17              I did see the word patent, but it just says vaguely

18    "patent issues."  It's not the same patents involved in our

19    case, not even any attempt to pretend that.

20              MR. NORTON:  Oh, no, I agree with that, Your Honor,

21    it's not the same patents, but the issue of fragmentation is

22    one that Sun faced on a whole host of infringement issues.

23              But it shouldn't be surprising that a press release

24    announcing the settlement of a long and expensive lawsuit

25    doesn't contain any reference to the damage that the defendant
```

```
1    had been causing to the plaintiff prior to the resolution of

2    the matter.  Of course they don't talk about fragmentation in

3    the press release.

4            THE COURT:  So how much of that settlement was

5    attributable to the antitrust claims as opposed to the other

6    issues?

7            MR. NORTON:  Well, the antitrust claims are

8    separate, and then the patent is the $900 million portion.

9            So again, the $900 million indicates the

10   significance to Sun of protecting its intellectual property,

11   something that Google says Sun never bothered to do.  They

12   didn't sue, they say.

13           THE COURT:  You made no attempt to figure out from

14   that how much of that 900 million was attributable to the

15   claims that our jury is going to hear about.

16           MR. NORTON:  We do not, and we do not argue that it

17   is relevant for that purpose.

18           THE COURT:  Let's not even tell the jury the

19   900 million.  It's just a number you want to throw out to

20   impress to the jury that we're talking about big numbers when,

21   in fact, this could be a $5,000 case.

22           I don't know -- you know, just because we got a lot

23   of lawyers here and a lot of experts, that does not mean it's a

24   big-dollars case.

25           MR. NORTON:  There is --
```

1          **THE COURT:**  We are not going to confuse the jury on

2     that point by putting in that Microsoft case.

3          **MR. NORTON:**  I would submit that the Microsoft case

4     is not the fact that would lead the jury to conclude that this

5     is a case about big numbers.

6          **THE COURT:**  Then we'll leave it out, won't we?

7          You can bring it up for purposes of showing -- not

8     the money part, that fragmentation was a real-world concern,

9     that is legitimate.  And if the Google people go there, they

10    deserve to get hammered with this lawsuit.

11         But what you cannot do is bring up the 900 million.

12    It is not sufficiently related.  It is so prejudicial.  It's

13    just a lawyer gimmick to float a big number by the jury.  The

14    answer is no.

15         **MR. NORTON:**  I understand.

16         **THE COURT:**  That one I'm going to rule on right now.

17         **MR. NORTON:**  Thank you, Your Honor.

18         **THE COURT:**  You are most welcome.

19         **MR. NORTON:**  I did want to make one observation on

20    future damages.

21         **THE COURT:**  Yes, please, I would like to hear what

22    you have to say.

23         **MR. NORTON:**  Thank you, Your Honor.

24         And that is that Mr. Purcell said that Professor

25    Cockburn has not given the Court what it needs to separately

```
1    put a value on individual claims, and I would submit that he

2    has.  He has an analysis where he apportions the value of the

3    patents against the starting point.  He does it patent by

4    patent, not claim by claim, but patent by patent.  And he has a

5    percentage for each discrete patent.  And for each discrete

6    patent there is an expiration date.  Every claim expires at the

7    same time, and Professor Cockburn's analysis is based on his

8    assumption supported by the evidence that the value of each

9    respective claim is the same.

10            Now if that assumption is credited, then looking

11   forward, beyond the date of infringement -- the date of the

12   verdict, the Court could use Professor Cockburn's report, which

13   has a specific apportionment value for each patent to calculate

14   future damages.  And when each patent expires, then the

15   allocation for that particular patent would drop out of that

16   calculation.

17            So the tools are there, Professor Cockburn has done

18   that analysis.  To the extent that there are -- is any

19   calculation of future damages, he has broken it out on a

20   patent-by-patent basis, and we don't think that if you were to

21   divide it further by claim it would have required a different

22   result.  But the information is in the report, he did do it,

23   and it would allow the Court to calculate --

24            THE COURT:  All right, thank you.

25            Now we go to a brand-new motion in limine.  What's
```

```
 1    your other one that you wanted to argue?

 2              MR. VAN NEST:  The other one, Your Honor, had to do

 3    with Mr. Lindholm.  And Mr. Mullen is going to address that

 4    issue.

 5              THE COURT:  Well, look, if the e-mails -- if you win

 6    in the Federal Circuit, then the problem's over, right?

 7              MR. VAN NEST:  Right.

 8              THE COURT:  So this is a contingent argument in case

 9    you lose in the Federal Circuit?

10              MR. VAN NEST:  Yes, that's right, Your Honor.

11              THE COURT:  All right.  I don't see the point in

12    taking up our time now with that because who knows how they

13    will come out, but, all right.

14              You are ready to argue it?  Are you the one that is

15    the young lawyer?

16              MR. MULLEN:  I am.

17              THE COURT:  Then I do want to give you that chance.

18              Go ahead.

19              MR. MULLEN:  Thank you, Your Honor, I appreciate it.

20              Reid Mullen.  And as Mr. Van Nest mentioned, I would

21    like to argue Google's Motion in Limine No. 1, which is the

22    motion to exclude the Lindholm e-mail.

23              And Your Honor has the briefs, I think Your Honor is

24    well aware of the facts underlying the e-mail, so I'll keep my

25    comments relatively brief.  I just want to focus on a few
```

 1   points mostly related to the relevance issue.

 2             Look at the relevance, Your Honor, I think it's

 3   important to consider the two different liability theories that

 4   Oracle's advancing in the case, on the one hand copyright

 5   liability, and on the other hand, patent liability.

 6             Now, it should be clear from the timing of the

 7   e-mail that it simply has nothing to do with the copyright case

 8   at all.  The e-mail follows on a July 20th, 2010 presentation

 9   from Oracle, where the Oracle lawyers came to the Google

10   campus, they prepared a presentation about patents, presented

11   it to Google, told them that they were infringing specific

12   patents.

13             They identified those at the time, seven patents in

14   the presentation.  They included claim charts, comparing

15   aspects of Android to the patents.  And at that point,

16   copyright was an afterthought.  They didn't advance claims of

17   copyright infringement in the presentation.  The presentation

18   didn't identify specific copyright registrations or make that

19   argument.

20             And I don't think Oracle has ever taken the position

21   that the July 20th presentation or Mr. Lindholm's e-mail

22   following that presentation could relate to the copyrights.  In

23   fact, in their opposition to our motion in limine, they say,

24   and I quote,

25             "On July 20th, Oracle's lawyers met with Google

1    representatives and informed them that Android infringed the

2    specific patents at issue in this lawsuit."

3           They then go on to say in their own motion in limine

4    of Mr. Lindholm, quote,

5           "Mr. Lindholm was investigating and reporting on

6    alternatives to the specific patents that Oracle asserted were

7    infringed on July 20, 2010."

8           So with that background in mind, I don't think there

9    is any dispute that Mr. Lindholm's e-mail follows on the

10   presentation, itself.

11          **THE COURT:**  So let's assume you're right, where does

12   that go?  Why is it relevant for the patent part of the case?

13          **MR. MULLEN:**  I would like to address that point

14   next, Your Honor.

15          I think it's not relevant to the patent case because

16   what is clear from the face of the e-mail that what

17   Mr. Lindholm is doing is, he is looking at alternatives to Java

18   for Android.  He is not looking at Java.  He's not looking at

19   Android.  He's not conducting an infringement analysis of any

20   kind.  So it's not relevant -- the existence of alternatives is

21   not relevant at all to patent liability, it has nothing to do

22   with infringing --

23          **THE COURT:**  Well, it may have something to do with

24   damages and whether there are noninfringing alternatives.

25          **MR. MULLEN:**  Marginally so, Your Honor.  As

```
 1    Mr. Purcell pointed out in his argument just now, the e-mail is
 2    in 2010.  The existence of noninfringing alternatives on
 3    August 6, 2010, one week before the lawsuit, is not at all the
 4    sort of inquiry that the Court is looking into when they are
 5    evaluating a hypothetical license at the time of first
 6    infringement, which was four years earlier, in 2006.
 7              So I think the e-mail really doesn't have any
 8    relevance there on the point of noninfringing alternatives,
 9    either.
10              THE COURT:  All right.
11              Is that it?
12              MR. MULLEN:  Those are all the points I have to
13    make, unless Your Honor has questions.
14              THE COURT:  Okay, no, I appreciate -- you succinctly
15    said it.  That was an excellent presentation.
16                   (Laughter.)
17              MR. MULLEN:  Thank you, Your Honor.  I appreciate
18    the opportunity.
19              MR. JACOBS:  Your Honor, Mr. Boies will respond to
20    that argument.
21              THE COURT:  Thank you.  Let's hear from Mr. Boies.
22              MR. BOIES:  May it please the Court, Your Honor, I
23    do not qualify for the young lawyer rule.
24                   (Laughter.)
25              MR. BOIES:  I will also try to be brief.
```

```
1              The meeting on July 20th, just to be clear, involved
2     both copyright claims and patent claims.  The copyrights were
3     not specifically identified, the patents were.  This was not
4     the first time that Mr. Lindholm had been involved in looking
5     at the patent issues and looking at whether or not they require
6     a license.  Back in 2005 and 2006, the documentary evidence is
7     clear that this was looked at, it was determined that it was
8     critical to have a license from Sun.  And what he is saying in
9     this e-mail is simply, we don't have any alternative, or all
10    the alternatives suck to taking a license from Sun.  That is
11    directly relevant to the issues in this case.
12             It's not merely --
13             THE COURT:  What issue is it relevant to?  Given the
14    date of it, what is it relevant to?
15             MR. BOIES:  It's relevant both to liability and to
16    damages, Your Honor.  On the question of damages, obviously, I
17    think they concede that the existence of noninfringing
18    alternatives is something that's important to damages.
19             On the question of liability, this is in 2010, and
20    one of the reasons it's important in 2010 is because in 2010
21    they know what they are doing with Sun's intellectual property.
22             And at that point, what they are saying is, we have
23    no alternative, we have to take this license.  That's exactly
24    what they said five years and four years earlier.  In each case
25    what they're doing is, they are saying there is no alternative
```

```
1    to a license to do what in 2005 and 2006 we planned to do in

2    2010 what we are doing.

3              THE COURT:  Okay.  Thank you.

4              MR. BOIES:  Thank you.

5              THE COURT:  Any rebuttal?

6              Any rebuttal?

7              MR. VAN NEST:  Very brief.

8              THE COURT:  Sure, go ahead.

9              MR. MULLEN:  Your Honor, I would just like to make

10   the point again that at the time between -- 2010, when he is

11   writing this e-mail, noninfringing alternatives is simply not a

12   part of the liability analysis whatsoever.  I mean, he is

13   looking at the viability of alternatives, he is not looking at

14   an infringement analysis, he's not comparing Java to Android.

15             There's -- it's just simply not relevant to the

16   liability issues in the case to comment on the viability of the

17   alternatives, themselves, not on Java, not on Android.

18             THE COURT:  All right, thank you.

19             So have we now covered the motions that you

20   specified for the -- to be heard today, Mr. Van Nest?

21             MR. VAN NEST:  We have, Your Honor.

22             THE COURT:  All right.

23             So let's now turn to the two that the -- Oracle

24   wants to address.

25             MR. JACOBS:  The first motion in limine that we
```

```
 1    advance for oral argument is our Motion in Limine No. 1.  It
 2    has to do with the use at trial before the jury of the record
 3    on re-examination.  And our motion urges that unless a
 4    re-examination has been finally concluded, the fact of the
 5    re-examination, the record of the re-examination, the interim
 6    results of the re-examination not be surfaced in a jury trial.
 7              I think the briefs converge in many respects, but
 8    there is an important point on reply:  The decisions that
 9    Google relies on are all, with one possible exception where you
10    can't quite tell from the reported decision, are all about the
11    Court considering the effect of interim re-examinations on
12    motions, motions to deal with the question of willfulness, for
13    example.
14              In no decision that we have located has a judge
15    affirmatively said, it's a great idea, let's have the jury hear
16    about the re-examinations.  And the reason should be clear:
17    It's a very confusing picture to explain to the jury what is
18    going on in a re-examination, what effect should be given an
19    intermittent result, what effect should be given these very
20    technical terms.
21              THE COURT:  Yeah, but take the '720; isn't that the
22    one where the examiner has now made a final ruling against you?
23              MR. JACOBS:  He -- there is an action closing
24    prosecution, but we have submitted -- I think we submitted
25    today or yesterday our response to that.  Google now has 30
```

1   days to submit another response.

2         **THE COURT:**  All right, well, why -- so you would be

3   seeking to sue on a patent that the examiner has gone through

4   the process.  I understand that they always up front say that

5   they are going to grant the re-examination and there is a

6   substantial question, and ultimately the patentee almost always

7   wins, but in the case of the '720, this is the exception, the

8   examiner is, in fact, coming out against you.  And yet you want

9   to argue to the jury presumption of validity?  I don't know,

10  that troubles me.

11        **MR. JACOBS:**  It's a closer case because of the

12  status of the re-examination, but it is, nonetheless, in the

13  context of the PTO the decision of only a single examiner.  It

14  has not gone to the Board of Patent Appeals and Interferences.

15  The appellate rate on these decisions is very high, that is,

16  many of them are taken up.  We will certainly appeal if the

17  action closing prosecution results in a notice that says you

18  can now appeal.

19        **THE COURT:**  Don't you think it would be -- think

20  about it from the point of view of the poor judge and the jury:

21  I don't like the idea that we would be concealing from the jury

22  the fact that you have lost a big loss in the PTO and you are

23  trying to get millions of dollars, hundreds of millions of

24  dollars from a jury and conceal that from them.

25        Why don't we just wait until the whole thing runs

```
 1   its course in the PTO, and then we won't have that issue?  I

 2   know you don't want to do that, but you are trying to have it

 3   both ways.

 4          MR. JACOBS:  I think we are trying to have our trial

 5   on a reasonable time frame, consistent with the accomplishment

 6   of justice here in this massive taking over of intellectual

 7   property, and that is objective No. 1.

 8          Objective No. 2 is to not have the jury confused

 9   about the status and the meaning of what's going on in a

10   complex administrative procedure.

11          THE COURT:  Which is the one where you won in front

12   of the examiner?

13          MR. JACOBS:  The '520, Your Honor.

14          THE COURT:  So what's the status of that one?

15          MR. JACOBS:  All claims have been confirmed as

16   patentable.

17          THE COURT:  All right, so is the other side going to

18   appeal that?

19          MR. JACOBS:  I don't think they can, it's ex parte.

20          THE COURT:  You would want the jury to know that

21   part.

22                          (Laughter.)

23          MR. JACOBS:  That's a case of -- that I think we

24   could fairly be said to be asking too much.

25          THE COURT:  Why don't we just say to the jury where
```

1   the status is of both of these and not get into status of the

2   others?

3           **MR. JACOBS:**  I think a better alternative would be

4   to say nothing, Your Honor, about re-examinations.

5           **THE COURT:**  All right, let's hear from the other

6   side.

7           **MR. JACOBS:**  Thank you.

8           **MS. ANDERSON:**  Thank you, Your Honor.

9           Christa Anderson for Google.

10          Your Honor, as Your Honor is aware from our filings,

11  of these six patents at issue, all of them were found to have

12  substantial new questions of patentability.  Four out of six

13  have been found by the PTO to be invalid, and one is subject to

14  this final rejection.

15          **THE COURT:**  I know, though, the statistics:  The

16  statistics are that in a hundred percent of the cases they say

17  substantial issue, so let's re-exam it.  And then in almost all

18  of those hundred cases, the claims come through okay.

19          So --

20          **MS. ANDERSON:**  Well --

21          **THE COURT:**  The fact that there is a substantial

22  question, I think that is subject to being misleading to the

23  jury.

24          **MS. ANDERSON:**  Well, collectively, Your Honor, in

25  this case, however, four out of six have gone beyond that.  In

```
1    four out of six of these patents, all of the asserted claims

2    have been found by the PTO -- have been rejected by the PTO.

3             THE COURT:  That's what they do in the first office

4    action, isn't it?

5             MS. ANDERSON:  No.  Actually, in the first instance

6    where the PTO decides to engage in the re-examination process,

7    it's on the basis of a find of substantial new questions of

8    patentability.  That obviously happened for all these patents.

9             Then the next stage, when there was the initial

10   office action of rejection, in four of these patents, that's

11   happened four times, for four out of the six is patents at

12   issue, and one of them we have the final rejection, which is

13   the one Your Honor required at the outset.

14            THE COURT:  That's the '720.

15            MS. ANDERSON:  Absolutely.

16            You are making a good point that I wasn't focusing

17   on, so let me -- what are the statistics in the PTO?

18            MS. ANDERSON:  I --

19            THE COURT:  Let me give you my question.

20            MS. ANDERSON:  Excuse me.

21            THE COURT:  The statistics of all of those claims

22   that reach the stage in a re-exam where this is a rejection,

23   what are the odds, or what's the past history as to whether or

24   not it winds up being finally rejected?

25            MS. ANDERSON:  And I would like to confer with one
```

```
 1   of my colleagues who may know the statistics by heart, but my
 2   understanding is that the statistics are quite high that if
 3   there is an initial rejection, and then even if the final
 4   patent is not entirely rejected, many of the claims are often
 5   revised, the patent itself is changed.  And that would
 6   obviously have huge ramifications --
 7              THE COURT:  What -- that gets into -- what is that
 8   term, vested rights?
 9              MS. ANDERSON:  Intervening rights.
10              THE COURT:  Intervening rights, exactly.
11              Okay, well, then, there would be no damages, and all
12   of that.
13              But what I'm asking about are how many -- if there
14   is a rejection, how many of them come through unscathed at the
15   end?
16              MS. ANDERSON:  Can you give me, Your Honor, one
17   moment?  I know someone who knows.
18              MR. JACOBS:  While she's doing that, Your Honor, I
19   do, in the interest of candor, I do want to mention one very
20   recent development on the re-examination.
21              THE COURT:  Please let her be able to listen to you,
22   though.  She's whispering.
23                        (Attorney Anderson confers with
24                         co-counsel.)
25              THE COURT:  So it's Ms. Anderson, right?
```

1              **MS. ANDERSON:**  Yes, Your Honor.

2              **THE COURT:**  Ms. Anderson, Mr. Jacobs wants to say

3    something.

4              **MS. ANDERSON:**  Oh.  Thank you.

5              Go ahead.

6              **MR. JACOBS:**  I can do it on reply, Your Honor.

7              **THE COURT:**  All right, go ahead, Ms. Anderson.

8              **MS. ANDERSON:**  Great.

9              All right, we were double-checking these statistics,

10   but our understanding is that in request for re-examination,

11   about 87 percent are found to have substantial new questions of

12   patentability, that's that initial step just to start that

13   process.  And by the end, it is correct that 60 to 70 percent

14   of the patents survive the re-exam process, this is the

15   statistic we are double-checking, but in many of those

16   instances, they are subject to amendments, a very significant

17   portion of them are subject to changes, the actual claims.  So

18   they emerge modified, and that creates this intervening right

19   issue.

20             **THE COURT:**  But how about -- you are saying, though,

21   a different point.  You are saying that you have gone beyond

22   the initial and you -- the initial substantial questions, and

23   you have reached a different plateau where they have actually

24   been rejected.

25             **MS. ANDERSON:**  Right, in one of them in our case,

1    yes.  We have gone past that.

2              **THE COURT:**  Just in the '720?

3              **MS. ANDERSON:**  Correct, Your Honor.

4              **THE COURT:**  Wait a minute.  You told me there was

5    four out of six there was a rejection.

6              **MS. ANDERSON:**  The initial rejection -- the initial

7    action --

8              **THE COURT:**  That's the initial office action.

9              **MS. ANDERSON:**  Yes, the initial action has been a

10   rejection, and now we are on to the next stage, and one of them

11   has reached that stage, and it's been a final rejection.

12             **THE COURT:**  All right.

13             **MS. ANDERSON:**  Yes.

14            With those circumstances, we entirely agree this is

15   the kind of information that should not be shielded from the

16   jury.  And Google should be entitled to present this evidence.

17   It is directly relevant to the question of willfulness.

18            As Your Honor is well aware in the **_Seagate_** test, in

19   willfulness plaintiffs will have to overcome the initial

20   threshold of this objective test: **_Seagate_** explained that to

21   prove willfulness, Oracle is going to have to show that an

22   infringer acted despite a high likelihood that its actions

23   constituted infringement.  That is an objective test.

24            The fact that the PTO has looked at these documents,

25   looked at the prior art and at least in four out of six cases

1   has initially concluded that that patent is not patentable, and

2   in one case has finally rejected the patent, is critical

3   evidence to present to a jury on this issue.

4          Oracle has argued in their papers and complained

5   that it is prejudicial to them, that it could cause confusion

6   to the jury, but as Your Honor is well aware, this is exactly

7   that kind of issue that a jury can be carefully instructed on

8   and explain to the jury that -- the effect of the presumption

9   on validity but the fact of a re-examination proceeding and

10  that's what that means.

11         This is something that was considered and referenced

12  in a case that we cited Your Honor in our brief called

13  **_Fresenius_**:  The Court hadn't yet quite reached the point of a

14  jury trial but explained that it could be the case that if this

15  evidence were to come in, this is the kind of evidence that one

16  could address that prejudice issue with an instruction.  And so

17  to the extent that this comes in, if there is any concerns

18  about prejudice it should be addressed with an instruction.

19         **_THE COURT:_**  Is the relevance willfulness?  Is that

20  it?  Is it relevant to anything other than willfulness?

21         **_MS. ANDERSON:_**  It's also relevant to one of the jury

22  instructions, now that it's been submitted by Oracle, this

23  inducement issue.  Oracle has sought a willful blindness

24  instruction in connection with their inducement claim.

25         **_THE COURT:_**  This is on -- okay, okay, I'm just

```
 1    trying to figure out who's being induced.
 2              MS. ANDERSON:   Oracle is alleging that Google is
 3    inducing third parties to utilize the platform in ways they
 4    claim is infringing.
 5              THE COURT:   All right.
 6              MS. ANDERSON:   And they have sought to include in
 7    their jury instructions a willful blindness instruction.  Under
 8    the Global Tech this year, 2011, the Supreme Court's Global
 9    Tech court decision, the standard or test that must be met for
10    willful blindless presents the same kind of issues as the
11    Seagate test:
12              "A willfully blind defendant is one who takes
13    deliberate actions to avoid confirming a," quote, "high
14    probability of wrongdoing," end quote.
15              So, again, if the PTO has determined in some cases
16    through the initial action and in one case through a final
17    action, that this is not a patentable patent this patent
18    shouldn't have issued.  There are invalidity issues with all of
19    them; certainly, Google should be able to present evidence of
20    that fact.  How could there be a high probability of infringing
21    a valid patent when even the PTO has been looking at this, and
22    to date has found initially four out of six to be invalid, and
23    one, finally, rejected as invalid.
24              So with that high relevance, this is information
25    that should come to the jury.  And again, if the Court has any
```

1    concerns about prejudice or confusion, that is exactly the kind

2    of things instructions could take care of.  Or, alternatively,

3    as we referenced in our breach -- excuse me, in our brief, to

4    the extent the Court ends up trifurcating and/or bifurcating

5    this case in some way or another, there will ultimately be some

6    damages phase:  If there is any concern about the ability to

7    give an instruction, of course willfulness issues can be moved

8    to the damages phase.

9          But certainly, Google shouldn't be precluded from

10   presenting important evidence.  The mere fact -- and this is

11   something that Oracle's counsel had referenced in argument --

12   the mere fact that to date there haven't been a lot of

13   decisions applying the **_Seagate_** analysis in the context of

14   evidence presented during a jury trial shouldn't preclude

15   Google from presenting evidence on the questions of willfulness

16   and inducement when the cases we've cited show that is directly

17   relevant to the issue.

18         If the evidence is relevant and important to

19   consider, which the cases we have cited have shown, then the

20   way to address it is through things like instructions or

21   bifurcation, et cetera.

22         **_THE COURT:_**  Is there any aspect of the give and take

23   with the examiner, such as, for example, where Oracle submitted

24   a submission to the PTO examiner on re-exam, which any of the

25   experts wants to rely on for purposes of invalidity or, for

```
1    that matter, for infringement?

2              MS. ANDERSON:  It is my understanding that these are

3    referenced within certain of the defense expert reports in

4    relation to matters that would concern potentially inducement

5    issues because of that, although I don't believe they raise it

6    in the way I think Your Honor may be expressing concern about.

7              THE COURT:  I'm only addressing -- you're not

8    answering my question, so let me try again.

9              MS. ANDERSON:  Thank you.

10             THE COURT:  In almost all cases, somebody claims the

11   patent is invalid, and let's say it is anticipated by some

12   reference, so it's important on occasion to look at the file

13   history and see what was said to the examiner --

14             MS. ANDERSON:  Certainly.

15             THE COURT:  -- about that reference.

16             Possibly Oracle has made admissions in the file

17   history on re-exam that would be useful, I don't know.  And I'm

18   not -- I want to know if that has already occurred.  I don't

19   want you to say what your understanding is, that's just

20   guesswork, I want to know for a fact, and if you don't know,

21   just say you don't know:  Have any of your experts said, for

22   invalidity purposes, that they are relying on something that

23   happened in the re-exam?

24             MS. ANDERSON:  For invalidity purposes I don't

25   believe so, but I would like to take Your Honor up on the
```

```
 1    chance to confirm that with counsel who actually worked

 2    directly on this issue.

 3              THE COURT:  That's fair.

 4              MS. ANDERSON:  Thank you.

 5              THE COURT:  Anything more?

 6              MS. ANDERSON:  No, thank you, Your Honor.

 7              THE COURT:  All right, let's hear from the other

 8    side.

 9              MR. JACOBS:  As I mentioned during the brief hiatus,

10    just this morning, Your Honor, we did get another re-exam

11    result, and it's on the '476, and it moves it into the same

12    category as the '720.  I wanted to be sure --

13              THE COURT:  Thank you.

14              MR. JACOBS:  I don't even think Google's figured

15    that out yet.

16              THE COURT:  That category, again, is what?

17              MR. JACOBS:  The claims have been rejected in an

18    action-closing prosecution.  We now file a response to that.

19    And Google has 30 days after we file our response to file a

20    response to that.

21              And then the next thing that happens, this

22    examiner -- I believe I'm right about this -- well, this is ex

23    parte, so actually, I'm not positive on the procedure that

24    happens next, Your Honor, sorry.

25              THE COURT:  All right.
```

1           **MR. JACOBS:**  But we are not done.

2           **THE COURT:**  Is the '720 ex parte?

3           **MR. JACOBS:**  No, the '720 is --

4           **THE COURT:**  All right.

5           **MR. JACOBS:**  I think our argument really underlines

6    the point here:  For the jury to hear this on the question of

7    willfulness or inducement would be quite misleading to them.

8    Let's understand the chronology:  The decision to move Android

9    in a particular direction occurs in 2005, 2006, 2007.  That's

10   when Google decides, we are going to base Android on Java.

11   That is when they say to themselves, we need a license.  That's

12   when, by all the testimony, nobody goes out and actually looks

13   at Oracle/Sun, now Oracle patents to decide, ooh, now that we

14   don't have a license, what's going to happen next.  That is

15   part of the basis for the willful blindness instruction.

16          Then they are in continued negotiations, the

17   negotiations that occur when Oracle buys Sun.  And those

18   culminate in the Lindholm e-mail in which he says a license is

19   critical.  That is after a presentation on the patents.

20          Then Android is released; there are subsequent

21   releases of Android, new decisions to put new versions of

22   Android in the market that continue to critically need a

23   license from Oracle that don't have a license.

24          In the middle of this lawsuit, not shortly after, as

25   Google said in its opposition, but six months after this

1  lawsuit was filed, they start launching the re-examinations.

2  And the results are only coming in now.

3          We are going to be litigating Google's state of

4  mind, its willfulness, not now, but in 2005, 2006, 2007, 2008,

5  2009, 2010, and into the close of discovery -- and into the

6  discovery cutoff.  That's why it would be wildly misleading for

7  the jury to hear this kind of information about Google's state

8  of mind.

9          And for the Court to have to instruct the jury on

10  the exact patent and trademark office procedures applicable to

11  ex parte re-exams, interparties' re-exams, the rights of

12  appeal, would be to extend a process that I think the Court is

13  already quite concerned about, just how much information about

14  the patent process and patent law is the jury going to be able

15  to absorb.

16          **THE COURT:**  Are you suing for willfulness for any

17  period of time when the re-exams were underway?

18          **MR. JACOBS:**  Underway, yes.

19          **THE COURT:**  Well, then, for that time period at

20  least, why shouldn't Google be able to say, okay, we were just

21  going by the seat of our pants before that, but once we got the

22  re-exams, we now -- we have every reason to rely upon the

23  re-examinations to believe that we were not willfully

24  infringing?

25          So if you are trying to stick them for that time

```
 1   period --

 2            MR. JACOBS:  The first office actions in any of

 3   these were in May, June, June, June, August, just the first

 4   office action.  And I think we've had a fair amount of colloquy

 5   already about the -- the reliability of a first office action

 6   as an indication of likelihood of ultimate success in a

 7   re-examination context.

 8            The -- on the '720, the final office action was

 9   November 18th of this year, so just a month ago.  So if we want

10   to start getting very granular about Google's state of mind on

11   individual patents, you could start with November, you could do

12   this in November; I think that's quite artificial, our damages

13   period ends with this calendar year.

14            So when we are in the enhancement process, when we

15   are asking for enhanced damages because in our view of the

16   world the jury will have found Google a willful infringer, and

17   the Court wants to adjust the enhancement based on the

18   re-examination information available to the Court, that would

19   be a process that could apply.

20            THE COURT:  So you are saying that even for

21   willfulness the re-examination should not be admitted?

22            MR. JACOBS:  I'm saying that that jury should not

23   hear about the re-examinations.  The Court is --

24            THE COURT:  But they have to decide willfulness.

25            MR. JACOBS:  But this willfulness issue has a heavy
```

```
 1   role for the Court, and that is what these decisions that

 2   Google has relied on highlight, that the Court is in a better

 3   position to evaluate all the evidence, including the

 4   re-examinations, because the Court can understand the

 5   significance of re-examination and grant JMOL, or in many of

 6   these cases it's summary judgment --

 7             THE COURT:   So you are saying there is no decision

 8   anywhere that the plain vanilla re-exam can be admitted for

 9   purposes of deciding whether somebody was willful or not?

10             MR. JACOBS:   That's correct.

11             There is one decision in which it was referred to in

12   the JMOL ruling.  It wasn't clear whether it was before the

13   jury or not.  So there was a JMOL about willfulness, the Court

14   referred to the re-exam results in ruling on that JMOL, but it

15   wasn't clear whether it was before the trial, that was the one

16   qualifier.

17             In all the rest of the decisions that both sides are

18   pointing to in this context, the Court is making a decision and

19   deciding whether to give weight or not to the re-examination.

20             So in the Fresenius case, for example, that Google's

21   counsel referred to, that is a summary judgment case, Google

22   filed no summary judgment motion here on willfulness.

23             THE COURT:   All right.  Let me ask Ms. Anderson

24   about that.

25             Ms. Anderson, is that right, there is no decision in
```

```
 1    the history of the universe --

 2                  (Laughter.)

 3                  THE COURT:  -- that allows the jury to hear about

 4    the re-exams?

 5                  MS. ANDERSON:  It is correct that post-Seagate, and

 6    that is a critical turning point here, the Seagate decision is

 7    where this whole test and the relevance of this information

 8    becomes very clear.  Post-Seagate, there aren't a lot of

 9    decisions in this area, and there hasn't been any clearly

10    holding that a jury could hear evidence of re-exam for purposes

11    of the willfulness question or the inducement question which we

12    addressed earlier.  But I think it's important to note that

13    counsel --

14                  THE COURT:  Seagate was five years ago, three years

15    ago?

16                  MS. ANDERSON:  2007.

17                  THE COURT:  2007, all right.

18                  MS. ANDERSON:  It's important to note that counsel

19    to Oracle has made two errors in the analysis that was

20    presented to Your Honor just a moment ago.  First, and most

21    importantly, counsel presented to you a time line about

22    negotiations and knowledge, and things like that; that analysis

23    is relevant to a subjective aspect of the Seagate test that we

24    are not talking about.  In order to establish willfulness,

25    under Seagate, you first have to pass the objective test, the
```

1   threshold to even seek willfulness damages.  And to pass this

2   objective test doesn't have anything to do with what Google

3   knew and when it knew it, it has to do with whether or not

4   there is this objectively high risk that you are infringing a

5   valid patent.

6           And the fact that the PTO is making determinations,

7   whether they're initial determinations or a final one, that

8   this, you know, this is an invalid patent, this is a patent

9   that shouldn't have been issued.  And even if later they change

10  their minds and decide to let it go through, that is very

11  relative, it suggests there is no high risk.  There is no

12  objectively high risk.  The PTO itself is questioning --

13          **THE COURT:**  But if you look at the statistics, there

14  is an objectively high risk because so many of the initial

15  re-exams, you said, yourself, 87 percent, and then a vast

16  majority of those wind up the claims sail through.

17          **MS. ANDERSON:**  Well --

18          **THE COURT:**  So how can somebody -- if that's a true

19  statement and subject to -- maybe you should give me the

20  statistics.

21          **MS. ANDERSON:**  Yes, we actually have them.

22          **THE COURT:**  Let's hear them.

23          **MS. ANDERSON:**  My partner, Matthias Kamber, will

24  come up.

25          **THE COURT:**  All right, come on and give me the

1   statistics.

2          *MR. KAMBER:*   Good morning, Your Honor.

3   Matthias Kamber on behalf of Google.

4          I just looked on the web:  The PTO publishes these

5   statistics on a quarterly basis, and the most recent report is

6   from September 30th of 2011.  There are two separate reports,

7   one on ex parte re-exams and another on inter --

8          *THE COURT:*   Is this just for a quarter, or are you

9   giving me the last ten years, or what?

10         *MR. KAMBER:*   The statistics I'm giving you, I can't

11  tell you if it's the last ten years, but they are not for the

12  quarter, they are the historical average that is being

13  published by the PTO.

14         *THE COURT:*   All right, so let's hear what that

15  number is.

16         *MR. KAMBER:*   With respect to ex parte

17  re-examinations, there are -- 92 percent are found to have a

18  substantial new question of patentability.  Of those that go

19  through the re-examination process, 23 percent of them have all

20  of the claims confirmed; 11 percent have all of the claims

21  canceled; and 66 percent have some of the claims changed.  So,

22  in total, 77 percent of them are either changed and subject to

23  intervening rights or canceled.

24         The statistics are similar but a little different on

25  interparties' re-examinations:  There, 95 percent are found to

1   have a substantial new question of patentability; 11 percent of

2   the claims are confirmed, all confirmed; 44 percent have all of

3   their claims canceled; and 45 percent have some form of claim

4   changes.

5           So in interparties' re-examination, of which there

6   are a few of those types of re-examinations at issue here, in

7   89 percent of the cases the claims are either all canceled or

8   changed and then subject to intervening rights.

9           **THE COURT:**  All right, so the last three numbers you

10  gave me add up to 100 percent, and but that's a hundred percent

11  of the 95 percent.

12          **MR. KAMBER:**  That's correct.

13          **THE COURT:**  Or is it a hundred percent of the

14  hundred?

15          **MR. KAMBER:**  No, it's a hundred percent of the

16  95 percent.

17          **THE COURT:**  Okay.

18          And your source for this is the PTO web site?

19          **MR. KAMBER:**  That's correct, Your Honor.

20          **THE COURT:**  All right, so --

21          **MR. KAMBER:**  I'm happy to provide the URLs, if it

22  helps.

23          **THE COURT:**  No, I can look it up.  But I'm going to

24  just take your word for it.

25          If anybody on the other side thinks that these

1    numbers are incorrect, you need to let me know soon.

2              **MR. JACOBS:**  We'll let you know soon.

3              I would note one, I think a slight overstatement of

4    the significance of the statistics.  In that intermediate

5    category, some claims amended or canceled, there are some

6    claims that survive unscathed.

7              **THE COURT:**  So -- that's a good point.  So like in

8    the ex parte, where it says 23 were confirmed, percent

9    confirmed, and the 66 percent, was that all -- is that on claim

10   by claim or patent by patent?

11             **MR. JACOBS:**  I think it's a patent-by-patent

12   analysis.

13             **MR. KAMBER:**  I think Mr. Jacobs is right:  The way

14   that the PTO publishes it is either all claims confirmed, all

15   claims canceled, or claim changes.

16             **THE COURT:**  So that 66 is some or all changed, but

17   it could be some and not all.

18             **MR. KAMBER:**  Correct.

19             **THE COURT:**  So we don't know the odds on any

20   given -- on a claim-by-claim basis.

21             **MR. KAMBER:**  Not courtesy of the PTO, Your Honor.

22             **THE COURT:**  All right, well, that does make a

23   difference, possibly.

24             Okay, continue on, Ms. Anderson.

25             **MS. ANDERSON:**  Thank you.

1          So -- so to the extent that one considers those

2    statistics even on themselves, they indicate a substantial

3    percent chance that that patent is going to be rejected or

4    changed by the end of those proceedings.  That in no way

5    suggests that the evidence regarding re-examination is somehow

6    irrelevant to this ***Seagate*** objective test because it, again,

7    indicates that someone examining this patent, someone assessing

8    it whose job is to assess this patent believes, at least

9    initially, and in some instances, in our case, finally, that it

10   is not patentable.

11          ***THE COURT:***  Okay, I understand your argument, but

12   how can there not be law on this after five years?

13          ***MS. ANDERSON:***  Your Honor, the decisions that we

14   have cited in our briefs, and there are a number of them, come

15   up in summary judgment context and also come up in preliminary

16   injunction context where the Courts conclude, yes, this is

17   evidence that I'm going to consider, this is evidence relevant

18   to the question of willfulness.

19          It cannot be the case that somehow courts allow

20   people to present this evidence in argument related to

21   preliminary injunctions, which are very serious matters, or in

22   relation to summary judgment, which is a very serious matter,

23   and then once one gets to trial they are completely precluded,

24   no attempt at instruction or bifurcation or otherwise to

25   present very relevant evidence to the jury.  This is important

```
 1   information.  There may be disputed facts in a given case that

 2   may have prevented them from ripening to this point.

 3              THE COURT:  Is there no decision that addresses

 4   whether it goes to the jury or not for willfulness purposes?

 5              MS. ANDERSON:  As I mentioned, Your Honor, there is

 6   the one case that Mr. Jacobs referenced in his argument, which

 7   it's a little unclear; there's another case which we cited, the

 8   Fresenius case, which talks about although trial hadn't

 9   happened and the Court hadn't had to cross that bridge yet, it

10   alludes to the fact that it could give an instruction to

11   address concerns about 403 prejudice with regard to this

12   evidence.

13              So this is expressly contemplated, this is how one

14   would handle it.  And I don't know the circumstances of every

15   case in which this has come up, you know, throughout the

16   country, except for what has come through that we can research

17   that is available to us, but certainly, what is clear in the

18   pattern of cases since Seagate, because the cases Oracle relies

19   on primarily all precede Seagate.

20              The cases that are post-Seagate that grapple with

21   this question, when it comes to willfulness, which is the issue

22   we are talking about here or inducement, which is kind of a

23   related issue now that the Global Tech decision has come down,

24   talk about that this is a factor that one should be able to

25   consider.  It's not determinative, these cases do not hold they
```

1    are the only issue, but it is important.

2           So when one is faced with this kind of issue and

3    there is express concern about confusion, that is exactly where

4    the Court can come in and give clear instructions to resolve

5    this for the jury or, in the alternative, engage in the

6    trifurcation or bifurcation Your Honor has discussed in the

7    past, and push into damages if the Court feels more comfortable

8    handling it that way.

9           **THE COURT:**  All right.

10          Any last word, Mr. Jacobs?

11          **MR. JACOBS:**  Yes, I think I may have slightly

12   understated the record of these decisions.  There are no --

13   there is no decision saying that it comes in to trial before a

14   jury.  There are decisions that say it doesn't come -- the

15   re-examination does not come in for all the reasons we cited:

16   Prejudice outweighs probative value.  And we cited several of

17   those in our opposition.  So there are decisions post-**_Seagate_**

18   dealing with this question, none of them go Google's way.

19          **THE COURT:**  But Ms. Anderson told me that after

20   **_Seagate_** there were no decisions either way.

21          **MR. JACOBS:**  I don't believe that is correct,

22   Your Honor.

23          **MS. ANDERSON:**  I thought -- excuse me.  I thought

24   Your Honor was asking me about cases that could come before the

25   jury.  I apologize.

1        **THE COURT:**  Either way, whether or not -- okay, so

2   you are saying that even after **_Seagate_**, there are decisions

3   even on the subject of willfulness that exclude it?

4        **MR. JACOBS:**  I -- yes, sir.

5        **THE COURT:**  What's that decision?

6        **MR. JACOBS:**  Well, the one that we cited, it's

7   **_Boston Scientific v. Cordis_**:

8        "It's generally not the Court's practice to admit

9   the re-examination record as trial evidence.  Rejections on

10  re-examination are not binding, and such evidence is almost

11  always more prejudicial than probative."

12       Now, I should go back to see whether that was

13  specifically urged in the context of willfulness, or that being

14  a species of the general case the Court cites.

15       **THE COURT:**  What's the citation there?

16       **MR. JACOBS:**  This is **_Boston Scientific v. Cordis_**,

17  2011, U.S. District Lexis 46210, April 20, 2011.

18       And there are other decisions cited in our brief.

19       **THE COURT:**  All right.

20       All right, thank you.

21       **MR. JACOBS:**  Thank you.

22       **THE COURT:**  So what's the next motion that we want

23  to hear on your side?

24       **MR. JACOBS:**  That would be our Motion in Limine

25  No. 4, Your Honor.  And Mr. Boies will argue this.  This is

```
 1    about Oracle/Sun's past actions with respect to application
 2    programming --
 3              THE COURT:  All right, let's hear that.
 4              MR. BOIES:  May it please the Court, this has to do
 5    with two different pieces of evidence.  One piece of evidence
 6    has to do with the use by Sun of other companies' APIs, back in
 7    the late 1970s.
 8              The second piece of evidence has to do with
 9    statements by Sun personnel as to what they thought the law
10    either was or should be with respect to the patentability of
11    APIs.  And this was primarily testimony that Mr. Schmidt gave,
12    Dr. Submit gave in the 1994 commercial hearing.  We think
13    neither of these should be admitted.
14              With respect to the APIs, there is no evidence that
15    suggests that this use was in any way comparable to any issue
16    that is before this Court.  First of all, it took place decades
17    ago.  Second, there is no evidence that the nature of the APIs
18    is anything like the nature of the APIs that are involved here.
19    Each of the three instances that are given by Google involve
20    simply the use of names, it does not go beyond that.
21              Third, there is no suggestion that Sun lacked the
22    authority, lacked permission to use these APIs, even if they
23    were, in fact, something that were validly protected by
24    intellectual property.  So you don't have any evidence --
25              THE COURT:  Whose APIs were they?
```

1          **MR. BOIES:**  They were APIs of Linux, IBM, and a

2    company called Visical *[phonetic]*, if I'm pronouncing it right.

3    The latter has since long gone out of business.  And each of

4    these APIs were used for the purpose of Sun by using names.  It

5    has -- there is no evidence that these APIs were or were not

6    something that the companies were trying to protect.  There is

7    no evidence that the APIs were in any sense comparable to what

8    is being involved in this case.  There is no evidence that even

9    if they were something that the companies that created them

10   were trying to protect, that Sun did not have permission.  So

11   it's simply, there is no connection.

12          And obviously, there is potential prejudice

13   involved, both in terms of possible jury confusion and in terms

14   of what it does to the length and complexity of the trial.  We

15   would have to go back and essentially have a mini-trial on each

16   one of these three instances to try to show why Sun was not

17   doing something that was inconsistent with what it was doing or

18   to try to explain why the difference in time makes a

19   difference.  So you would have a prejudice, both in terms of

20   jury confusion and in terms of the length and complexity of a

21   trial.

22          With respect to the second piece of evidence, we

23   think it is black-letter law that the opinions of --

24   particularly of laypeople as to what the law is or should be is

25   not something that is admissible.

1          **THE COURT:**  What did he say?  This is not coming

2     back to me.

3          **MR. BOIES:**  Well, in 1994, in particular, and the

4     Court will recall that they have cited in various of their

5     papers a number of statements that Dr. Schmidt, who is now, of

6     course, at Google but then was at Sun, made a 1994

7     Congressional hearing.  And in the middle 1990s, there was

8     substantial discussion, even controversy as to whether APIs

9     should or should not be protected; should they be copyrighted,

10    should they be patented, should they be neither.  And

11    Dr. Schmidt was expressing his view that he thought it would be

12    better for the development of the industry if APIs were not

13    subject to intellectual property protection.  There is no

14    question that he made those statements.

15          On the other hand, since that time the law has

16    moved, and it is now clear, we think, that APIs can be

17    protected, and we think that the Sun APIs are protected.  That

18    is a legal question for the Court to decide, that is not a

19    question for the jury to decide.

20          **THE COURT:**  Well, is that the only reason that

21    Google wants it in evidence, or what is their rationale for

22    putting that legal point in evidence?

23          **MR. BOIES:**  Their rationale, as stated in their

24    papers, is that this is somehow relevant to questions of

25    waiver, implied license, or estoppel.

1          Now, we don't see how those kinds of general

2  statements as to what the law is or should be is something that

3  can fall under any of those categories.

4          With respect to the three instances of the use of

5  the APIs back in 1970s, there is no evidence that Google was

6  even aware of that use at any time that was relevant to this --

7  there is nothing in any of the papers or discovery that

8  suggests that they said, we thought we had an implied license

9  because Oracle used names from the IBM APIs in 1979.

10          There is no evidence that they said in 2005 or 2006,

11  we don't need a license from Sun because Sun has testified in

12  Congress that they think APIs should not have been patentable

13  or copyrightable.  So there is none of the nexus in terms of

14  reliance or knowledge.

15          Indeed, the evidence is entirely to the contrary.  I

16  mean, for example, to go to the Lindholm e-mail that we've

17  talked so much about, this is in 2010:  What he writes there is

18  that,

19          "We conclude we need to negotiate a license for Java

20  under the terms we need."  He doesn't say we already have a

21  license because we have an implied license.  He doesn't say

22  they've waived it because they made these statements.  He

23  doesn't say they are estopped.

24          There was no sense in 2010, or going back to 2005

25  and 2006 -- in 2005 they conclude, and there is a presentation,

```
 1   July 26, 2005, that is Plaintiff's Exhibit 517, in which they
 2   conclude not that there is an implied license, but that, quote,
 3   "must take license from Sun," closed quote.  That's at page
 4   780.
 5            So there is no suggestion in any of the papers that
 6   they make, they can or could make out any of the requirements
 7   for implied license, estoppel, or waiver, Your Honor.
 8            Even if they could, this evidence would not for that
 9   point.  There is nothing that suggests that anything that was
10   said by Dr. Schmidt was meant or interpreted by anybody as
11   saying, we are not going to enforce our patents or copyrights.
12            Indeed, after that testimony, Dr. Schmidt sued
13   Microsoft, as the Court just pointed out.  So it is clear that
14   they did not waive it, did not abandon it.  They weren't sort
15   of giving out an implied license for anybody to do anything
16   they want with it.  There is no evidence that is in any way
17   consistent with the use of these events and statements that
18   were far removed in time and circumstance from the
19   circumstances that we have here that have any bearing on the
20   case.  And they would cause substantial prejudice and
21   substantial delay.
22            I mean, even with respect to these statements, if
23   you were to bring in each of these statements about what the
24   law should be, you would have to bring in what the context was
25   and what the context of the law was at that time and how the
```

```
 1    debate was going and how the debate had changed.

 2              What you would have is a discussion in front of the

 3    jury of all of the ways the law has progressed in terms of

 4    protecting APIs.  And while that could have some advantages to

 5    us, it would certainly be very time consuming, and it would be

 6    very confusing, we think to the jury, and prejudicial.

 7              THE COURT:  Mr. Van Nest.

 8              MR. VAN NEST:  Thank you, Your Honor.

 9              On behalf of Google, I think counsel underestimates

10    the breadth of relevance of these statements, so let me try to

11    put it in context because these statements are part of a broad

12    pattern.  We are going to show that from day one through '-7

13    through '-8 through 2009, Sun always took the position

14    publicly, in its words and its deeds, that APIs were not

15    protectable.  The source codes that implements the APIs, that's

16    protectable.  That is why the copyright bug goes on.

17              But they have taken the position from day one right

18    up through 2007, '-8 and '-9, after Android was launched that

19    that APIs are not protectable.  That is why there is no

20    discussion in any document anywhere about an API until this

21    lawsuit was filed.  Not even in the meeting that you heard

22    about in July did anybody say API, the structure, organization,

23    and selection, that we are somehow protecting that.  Baloney.

24              Mr. Schmidt testified to Congress in 1994 that APIs

25    were not protectable, that industry practice was to use them,
```

```
 1    that people were freely using them, and that Sun's policy and

 2    position was, APIs are free to use because they are good to

 3    advance creativity and competition.

 4              THE COURT:  That last sentence, do you have the

 5    exact quote, or is that your spin on it?

 6              MR. VAN NEST:  That's my spin on it, but we can

 7    provide the exact quote.  It's pretty close.

 8              His testimony is that --

 9              THE COURT:  Did he say that that was Sun's policy or

10    his personal view or --

11              MR. VAN NEST:  He was testifying as the chief

12    technology officer of Sun.  And it gets better, Your Honor,

13    because a little bit later on in the decade, Sun formed this

14    committee, the American Committee for Interoperable Systems:

15    One of their stated principles on their web site is that APIs,

16    for interoperability and for functional use, are not

17    protectable, they are free for everybody to use.

18              They not only put on their web site, this was

19    something run out of Sun.  This was one of Sun's lawyers that

20    set it up.  Sun was a member of it.  They filed amicus briefs,

21    which we have referenced in our motion on copyrightability

22    saying, you can't protect APIs because competition will be

23    impeded, and so on.

24              Now, it gets better:  Throughout all this time

25    period, both Sun, and turns out Oracle, too, were using APIs
```

```
 1    from third parties.  Now, Mr. Boies complains, well, it's a
 2    little different situation, oh, maybe they had a license; well,
 3    fine, that all goes to the weight.  That they can cross-examine
 4    Dr. Astrachan on these points.
 5           This is not going to be a lengthy examination, this
 6    is going to be an examination of our expert, who presents this
 7    evidence as part of industry custom, industry practice.  And
 8    it's not just relevant to waiver, it's relevant to
 9    copyrightability.  It's relevant to fair use.  Fair use asks,
10    what is the potential impact of using these features on the
11    marketability of their copyrighted product, right, Java.
12           And if they have been giving it away and they have
13    been indicating that you can use it and they have been using
14    the APIs of others, that all goes to whether Google's use of it
15    was fair and whether Google's use of it had any impact.
16           All this leads up to that statement I mentioned last
17    time, Your Honor:  That's why in 2007, when Google announced
18    Android and posted all the APIs for the whole world to see, the
19    CEO of Sun, the CEO of Sun went on his blog and said to Google,
20    we want to welcome Android to the Java community.  Android has
21    strapped a rocket onto Java.
22           He went on to say, we want to step up, we want to be
23    the first one to support Google.  We want to have our products
24    helping people develop applications.  Why?  Because he is going
25    to testify, and he has testified repeatedly, that their
```

business model spread Java far and wide, let's get as many

people using Javas as we can.  We want Java used in this

country, in Europe, in South America, in Asia.  We want it used

everywhere by developers, by companies making products, by

everybody.

　　　　　　　　**THE COURT:**  Well, but they come back and say, yep,

that's all true, but we thought it was going to be compatible,

and it turned out to be a fragmentation problem.  So we only

learned that later.

　　　　　　　　That's what they say; what do you say to that point?

　　　　　　　**MR. VAN NEST:**  I say to that that I'm not too

worried about that, Your Honor, because, A, they knew from day

one in 2007 which APIs we were using and which we weren't.  And

the CEO of Sun has testified in this case under oath Android

was not a fragmentation of Java, Android was a competitive

alternative to Java that we embraced.  We thought --

　　　　　　　　**THE COURT:**  Who said that?

　　　　　　　**MR. VAN NEST:**  The chief executive officer of the

plaintiff, Jonathan Schwartz.  He testified in deposition

several months ago that he regarded Android as a competitive

alternative, not as fragmentation.  Why?  Because Android was

never called Java.  Nobody was using the trademark Java with

Android.  We have a Dalvik virtual machine, not a Java virtual

machine.  We have an Android platform, not a Java platform.

Are we using the Java programming language?  Of course.

```
 1    They've conceded that that's been open since day one.  And the

 2    APIs really are part of that.

 3              THE COURT:  What was it that Lindholm was talking

 4    about in that e-mail, then?

 5              MR. VAN NEST:  Well, obviously, Your Honor, until

 6    it's resolved, I'm limited somewhat what I can say.

 7              THE COURT:  I don't want to compound any problems

 8    you already have with that one.  But if that gets into trial,

 9    it's inconsistent with what you're telling me.

10              MR. VAN NEST:  I don't think so.  I don't think so

11    at all.  It's what Mr. Purcell said.

12              It's one thing in 2005 and '-6 to say, what

13    alternatives do we have.  It's quite another in 2010 when

14    someone says, okay, if you don't pay us X, we are going to file

15    another lawsuit.  It's quite another thing to say what

16    alternatives do we have now that the OEMs are using it, the

17    carriers are using it, the developers are using it.  The

18    alternatives at that point --

19              THE COURT:  But you told me a minute ago it was not

20    Java, it was Android.

21              MR. VAN NEST:  That's right.

22              THE COURT:  And therefore, Sun had no -- so the

23    question naturally comes up, if it was Android and not Java,

24    why did Lindholm say that to do Android you needed Java?

25              MR. VAN NEST:  What he said in the e-mail,
```

1    Your Honor, pertains to Java programming language, can we

2    change to another programming language now in 2010 when the

3    whole world is using our Android platform.

4              THE COURT:  But everybody knew it doesn't cover the

5    programming language.  He was talking about the programming

6    language?

7              MR. VAN NEST:  Yes, that's correct, Your Honor.

8              THE COURT:  Really?

9              MR. VAN NEST:  Now, nobody is contending that he was

10   talking about APIs.  Not even Oracle is contending that.  APIs

11   didn't become a subject until the lawsuit was filed --

12             THE COURT:  Maybe he was talking about the patents.

13             MR. VAN NEST:  Probably after the lawsuit was filed.

14             THE COURT:  You said a while ago it was after a

15   meeting about the patents.

16             MR. VAN NEST:  That's right.

17             THE COURT:  So maybe he was talking about the

18   patents.

19             MR. VAN NEST:  That's right.  I mean, there was no

20   discussion in the meeting in July about copyright or copyright

21   registrations or APIs, and I think the reason is clear,

22   Your Honor, everyone has assumed -- that is why this evidence

23   is relevant.

24             All I'm saying is, on the question of industry

25   practice, on the question of fair use, on the question of

```
 1   copyrightability, and on the questions of equitable estoppel,

 2   and so on, statement by Sun and actions by Sun with respect to

 3   APIs are highly relevant.

 4           THE COURT:  Does anyone here have the exact words

 5   that Mr. Schmidt said to Congress about what the policy was of

 6   Sun?  I would like to hear that without embellishment, if you

 7   have it handy.

 8           MR. VAN NEST:  We'll check, Your Honor.  It's a

 9   fairly lengthy quote, but we can certainly provide it.

10           THE COURT:  But what you're telling me, it sounds --

11   I can see your point, I see the other side's point, too.  But

12   your point is that at the time period in question, it was taken

13   as a given in the marketplace that APIs were free for anybody

14   to use.  And there was no protection, and no one would claim

15   protection because the industry thought it was for the

16   advancement of the industry as a whole to have them, have APIs

17   open for everyone to use.  And you say these three instances

18   show that, and also the testimony shows that.

19           So I would like to see -- but Mr. Boies said that

20   Mr. Schmidt was talking about issues of law; now, policy is not

21   the same thing as law.  So I would like to hear the part -- you

22   know, he shouldn't be getting into what that law is, but if he

23   was getting into what the Sun policy is, that possibly is

24   different.  So if you had that, I would like to hear it right

25   now.  If not --
```

1            **MR. VAN NEST:**  We're trying to pull it up,

2    Your Honor.  We do have it.

3            **THE COURT:**  All right, well, let's see what you

4    have.

5            **MR. VAN NEST:**  Here they are, Your Honor.  And this

6    is from his testimony.

7            **MR. BABER:**  This is in the record, Your Honor --

8            **THE COURT:**  Wait a minute.

9            There's so much whispering going on over there at

10   the Oracle table that I can't hear.

11           **MR. BABER:**  Bruce Baber from King & Spalding for

12   Google, Your Honor.

13           This document appears in the docket.  It is

14   Exhibit G to Michael Kwun's declaration in support of our

15   copyright motion for summary judgment.  That is the one we put

16   it in.

17           **THE COURT:**  All right.  I just want to hear the one

18   sentence or paragraph -- read it slowly, please -- that deals

19   with policy of Sun regarding APIs.

20           **MR. VAN NEST:**  "When we discuss interfaces, it is

21   important to carefully note the distinction between an

22   interface specification and an actual product, which has

23   interfaces that conform to the specification.

24           "Interface specifications are merely the words that

25   describe the interface and which allows two components to work

1    together or interoperate.  They are not blueprints nor recipes

2    for actual products.  Let me repeat that, interface

3    specifications are not blueprints nor recipes for making

4    knockoffs or clones.

5            "Sun and many other firms in highly competitive

6    industries believe in protection of products but also believe

7    that no one individual or company should own the rights to

8    interface specifications for a public network, such as the

9    NII," paren, "or for other public infrastructure networks.  Can

10   you imagine charging auto makers a fee to let them know the

11   load-bearing capacity of the cement on the interstate," et

12   cetera.

13           He says,

14           "With respect to intellectual property rights, Sun

15   strongly believes in and will defend the rights of intellectual

16   property owners to maximize their returns on product

17   implementations.  At that same time, we believe that interface

18   specifications are not protectable under copyright."

19           And he goes on and cites the **_Computer Associates_**

20   **_versus Altai_** case, and says,

21           "The interface is an element necessary for

22   interoperability, falls into the category of ideas, which the

23   copyright law seeks to disseminate to promote the public good.

24   This in no way curtails the protectability of the code,

25   itself."  And he goes on with some other examples.

1          So he's talking about not only Sun, but many other

2     firms in highly competitive industries that believe this.  So

3     again, he's talking about industry practice, industry custom

4     policy for competition, and how these APIs are being used at

5     this time.

6          And there has never been a retraction of this by

7     Sun.  There has never been a withdrawal of that.  There has

8     never been a, quote, "correction" to this testimony.  They went

9     out and they formed this committee which, again, continued to

10    state publicly the policy outlined here by Mr. Schmidt.  That

11    was the American Committee for Interoperable Systems.  And, as

12    I said, Sun and Oracle acted in conformity with it by using the

13    APIs of others.

14         **THE COURT:**  All right, Mr. Boies, my court reporter

15    is going to need a break in a moment.  If your response is

16    short, we'll do it now; otherwise, we'll wait.

17         **MR. BOIES:**  Let's wait, Your Honor.

18         **THE COURT:**  All right, all right, rather -- I'll

19    just wait on my comments.

20         Okay, we'll take a 15-minute break at this time.

21              **(Recess taken at 11:07 a.m.)**

22              **(Proceedings resumed at 11:20 a.m.)**

23         **THE COURT:**  Mr. Boies, go right ahead.

24         **MR. BOIES:**  Thank you, Your Honor.

25         With respect to the issue of Mr. -- Dr. Schmidt's

```
 1    testimony in 1994, I want to make three points.  First, as he

 2    indicates in that testimony, the issue of what kind of

 3    protection should or should not be given APIs was a matter of

 4    dispute.  Two years later, in **_Lotus against Borland_** the United

 5    States Supreme Court split 4-4 on that issue.  The issue as to

 6    whether or not APIs are or are not copyrightable is an issue

 7    this Court is going to have to decide.  It is a complicated

 8    issue of law and policy; it is not, however, something that is

 9    before the jury.

10          And the fact that the debate was going on says

11    nothing of relevance about whether Sun was or was not giving an

12    implied license, waiving its rights, or being estopped from

13    asserting whatever rights it might have.

14          And, indeed, the idea that after 1990s Sun foreswore

15    any copyright protection about APIs simply is not consistent

16    with the undisputed record in this case.  I mean, for one

17    thing, they put a copyright notice on the APIs.  For another,

18    they've got a license to license the APIs.  For another,

19    Mr. Rubin, who is Google's head of all mobile operations now,

20    including Android, wrote an e-mail in March of 2006, the exact

21    period that's right's relevant here, in which he wrote -- this

22    is Plaintiff's Exhibit 314, quote,

23          "Java.lang APIs are copyrighted" --

24          **THE COURT:**  Who said this?

25          **MR. BOIES:**  This is Mr. Rubin of Google, the head
```

1   executive, the chief executive of all of their mobile

2   operations, including Android, the person who was responsible

3   for putting Android together at Google.

4          March 2006, quote.

5          "Javadat.lang APIs are copyrighted, and Sun gets to

6   say who they license, the TCK," which is technical

7   compatibility kit.

8          And one of the points that he was making, that this

9   forces Google into a position where it's difficult for them to

10  have a clean room implementation of what they want to do.

11         **THE COURT:**  But if you get to use what they said

12  about copyrightability, which is a matter of law, why can't

13  they use the same type of things going the other way that your

14  people said?

15         **MR. BOIES:**  Because what we -- we are talking about

16  two different things, I think, Your Honor.  One is a legal

17  opinion as to what that law is, the other --

18         **THE COURT:**  What you read from Rubin was a legal

19  thing.

20         **MR. BOIES:**  Right.  I think what he's simply saying

21  is, they've copyrighted.  I'm not -- we can argue whether he is

22  assessing whether it's a valid copyright or not, but the point

23  is, there is no doubt, for purposes of waiver -- and I ask the

24  Court to keep in mind that the only way we get into this is

25  because they say, well, yes, ordinarily, you can't argue the

1    law in front of a jury, but here you can because it goes to

2    waiver, estoppel, or implied license.

3              And what I'm saying is that there is no basis in the

4    record for them to argue waiver, estoppel, or implied license.

5              I said in my opening argument, they haven't given

6    you any evidence of any reliance on any of this; in fact, all

7    the evidence is to the contrary.

8              **THE COURT:**  But their argument I think is slightly

9    different, and it's that the industry and custom at the time

10   that they allegedly infringed was that at least APIs, and I'm

11   not talking about the patents right now -- the APIs were open

12   source or free use, and that it was unprotected, and that the

13   industry custom at the time was it was a free-for-all.

14             And that's what -- because of that industry custom,

15   if you had some different -- if Sun had some different view of

16   the matter, they had a duty to speak up, and they didn't.  And

17   so reasonable expectations were that at least the APIs could be

18   used without getting a license.

19             So anticipating that you are going to come back and

20   say that's baloney, they want to go back and say, well, as

21   early as 1970s, that's what you, yourself, were doing.  And

22   here's how Mr. Schmidt testified in Congress, and this is to

23   rebut your own view that the copyrights were, you know, rigidly

24   enforced and that there was no such industry custom.

25             Now, so they don't have to rely upon what IBM did or

```
 1    what -- I'm sorry, what Sun did with IBM and Linux, they only

 2    want to offer that up to show that there was an industry

 3    custom.  I think that's their argument.

 4              MR. BOIES:  Well, let me try to address that.

 5              THE COURT:  So what is -- why can't they do that?

 6              MR. BOIES:  Let me address that.

 7              First, they say it was up to Sun to come forward and

 8    say -- and speak up.

 9              THE COURT:  Um-hmm.

10              MR. BOIES:  In the Court's words; well, let me quote

11    again from Mr. Rubin, okay?

12              THE COURT:  What is the date of the quote?

13              MR. BOIES:  This is Mr. Rubin's deposition in this

14    case.

15              THE COURT:  All right.

16              MR. BOIES:  Now, he is being deposed in I think

17    2011, but he is speaking about a time in 2003 and 2004.

18              THE COURT:  All right.

19              MR. BOIES:  Okay.

20              "Q.   And in particular, you understood

21              that Sun was relying on copyright

22              protection for the APIs, correct?

23              "A.   One of Sun's arguments to me

24              while I was at Danger" -- prior

25              company that he was at in 2003 and
```

1             2004 -- "is that they thought that

2        Java APIs were copyrightable."

3             Sun did speak up.  They also spoke up when they put

4   the copyright notice on the APIs.

5             Now, it's not essential that we demonstrate that

6   copyrights were vigorously and uniformly enforced, what they

7   have to do in order to find waiver, implied license, or

8   estoppel is they must show unambiguous abandonment by Sun of

9   its intellectual property and reliance on their part; they

10  haven't shown either of those.

11            And what I'm saying to the Court is that when you

12  pick up pieces out of context from the 1970s and the middle

13  1990s, 1970s involving acts that there is no evidence has any

14  relationship to the kind of APIs that are involved here, and

15  there is not any evidence that Sun didn't have explicit

16  permission.  There is not even any evidence that any of these

17  things were, in fact, asserted to be protected by the companies

18  whose intellectual property Google says it belonged to.

19            This is something that is so far removed, it is

20  irrelevant.  And the likelihood of prejudice is very high,

21  including, are we now going to -- we can't just let the expert

22  say, Sun used these APIs back in 1979, we've got to now bring

23  in evidence as to what was involved there if we're actually

24  going to allow this kind of --

25            **THE COURT:**  Is there a motion in limine on that, or

```
 1   is that what this motion is?

 2             MR. BOIES:  That's what this motion is.  We're

 3   trying to -- we're trying to keep that testimony out.  It's too

 4   far removed.  It's unrelated.  There is no show of relevance.

 5   And the show of prejudicial and the effect on the trial --

 6             THE COURT:  When was the Lotus against Borland?

 7             MR. BOIES:  1970 -- 1996, Your Honor.

 8             THE COURT:  And what did it hold?

 9             MR. BOIES:  Um, well, it affirmed.

10             THE COURT:  That was the 4-4.

11             MR. BOIES:  4-4.

12             THE COURT:  What was the lower court holding?

13             MR. BOIES:  The lower court held that APIs were not

14   protectable.

15             MR. JACOBS:  That the command structure --

16             MR. BOIES:  That command structure was not

17   protectable.

18             THE COURT:  What court was that?

19             MR. BOIES:  That's First Circuit, I believe.

20             THE COURT:  Not protected?

21             MR. BOIES:  Not protected.

22             THE COURT:  But you are saying they are protected.

23             MR. BOIES:  We are, Your Honor, as the four justices

24   on the Supreme Court said.

25             THE COURT:  But we are in the Ninth Circuit.
```

```
 1                   MR. BOIES:  We are.
 2                   THE COURT:  What does the Ninth Circuit say?
 3                   MR. BOIES:  What?
 4                   THE COURT:  What does the Ninth Circuit say on this
 5      point?
 6                   MR. BOIES:  That is something that I'm not the best
 7      person to try to represent to the Court.
 8                   THE COURT:  All right.
 9                   MR. BOIES:  But I do know that this is a hotly
10      contested legal issue in this case that this Court is going to
11      have to rule on and is going to have to instruct the jury on if
12      we are into the copyright area.
13                   And my only point in terms of the motion in limine
14      is that this is not something that is appropriate for the jury.
15      It doesn't go to any -- it doesn't provide relevant evidence
16      that anything -- that they are supposed to decide.
17                   And it is going to be very prejudicial to us.  And
18      it's going to be very prejudicial to all the parties, including
19      the Court, because you are going to have a whole series of
20      mini-trials about what was meant and what was the context here.
21                   I mean, for example, even in the testimony back in
22      1994 of Dr. Schmidt, which we don't think is a relevant issue,
23      but even there what he's talking about, as is clear from the
24      sentence immediately before and immediately after the section
25      that was read to the Court, is he's talking about something
```

1    called the NII, which is the National Information

2    Infrastructure which was a proposal at the time.

3              And at the end of it, he says, we don't think APIs

4    are copyrightable, but he then goes on to say that there may be

5    some protection for them under the patent laws.

6              And what was happening there is that the law was in

7    flux, it was uncertain as to what the law was or should be in

8    terms of protection.  Should it be copyright?  Should it be

9    patents?  Should it be neither?

10             We believe that the law has now evolved to the point

11   where it should be copyrightable.  And Sun has copyrighted

12   these things.

13             **THE COURT:**  That's what he was saying then?  Is that

14   what you are telling me, or is that what you are saying you

15   believe now?

16             **MR. BOIES:**  No, what I'm saying is, after this

17   period, after 1994, the legal arguments progressed.  And

18   certainly by 2003 and 2004, Sun was taking the position that

19   they thought the Java APIs were copyrightable.  And Mr. Rubin

20   admits that in his sworn deposition in this case.  And he wrote

21   it down in 2006 that he believed they were copyrighted.

22             So this is not a question of reliance, no

23   abandonment, no prerequisites that would make this evidence

24   admissible.

25             **THE COURT:**  Thank you.

1          All right, we are going to go to something else.

2          Mr. Van Nest, if you have a burning point you got to

3    make --

4               **MR. VAN NEST:**  I don't.

5               **THE COURT:**  But it's their motion, so they get to go

6    last.

7          All right, so we've now covered the ones you want to

8    argue; I think we got to change subjects in order to be

9    finished in time today.  So let's -- let's do that.

10         I've read all of your hand-wringing and complaints

11   about the phased trial, and I'm going to do a phased trial.  We

12   don't need to argue that anymore.  I think it will work

13   perfectly fine.

14         One thing I want to warn you about is, there won't

15   be any need for witnesses to testify twice about something

16   because they will only testify once about it.  After they

17   testify once, the jury will remember what they said, and you

18   can remind them in your closing argument further downstream.

19   But we are going to have three phases, and I'm going to get out

20   an order that explains how that's going to work.

21         I think that's the only conceivable way to -- it

22   would just be a free-for-all, otherwise.  The jury needs some

23   help:  I'm going to require the lawyers to direct their

24   attention to specific issues.  We'll get the copyright issues

25   done first; we'll turn our attention to the patent issues; and

1    then we'll -- we're not going to just dump weeks and weeks of

2    undifferentiated testimony on the jury and then give them a

3    mass of instructions with a long closing argument at the end.

4    That is just a recipe for confusion.  We're not going to do

5    that.

6            So I am convinced that the best way to get a just

7    verdict in this case and one that has got some fighting chance

8    of being tied to the actual evidence in the case is close to

9    the way that I laid it out.  And I will send out an order that

10   confirms that later on.  So I've listened to you several times

11   in your paperwork, we don't need to argue that out anymore.

12           Now, as for the trial date, I can't give you the

13   answer on that now.  It's certainly not going to be in January,

14   I don't know where -- I told you before, for the last year and

15   a half, I have been immersed in the MS-13 trial.  The next one

16   starts on January 4th.  It will go two months.

17           I have been overwhelmed by the criminal calendar for

18   the -- I've had this case since 2008, but it finally went to

19   trial.  One trial in '09, two trials in '010 and -- I'm sorry

20   in '11, and now there is going to be one in 2012, and that

21   comes first.

22           So the first time that I will come up for air will

23   be the end of February, and at that point we get into Mr. Jacob

24   cannot try the case because he is busy on another patent case

25   and other people have conflicts.

```
 1              I want to also say, July and August I'm not going to
 2   ruin my vacation.  I don't get much of a vacation, but what I
 3   get I spend hiking in the High Sierra.  That's the only time I
 4   can go, so it's not going to be August and July.
 5              So unless you can find some way to get this case
 6   triable in the springtime, such as March, April, and May, which
 7   is a possibility except that Mr. Jacobs is busy on another
 8   case --
 9                   (Mr. Jacobs shakes head.)
10              THE COURT:  Somebody was busy on your side -- on
11   another side.
12              MR. JACOBS:  No, Your Honor, I think we have cleared
13   our calendar through early June except for the first --
14              THE COURT:  Well, who was it that couldn't do it in
15   the spring?
16              MR. VAN NEST:  I have a number of conflicts,
17   Your Honor, in April.
18              THE COURT:  All right, that was who I'm thinking of.
19              You know, if you got conflicts, I'm going to try to
20   help you out, you are the lead lawyer.  But if that goes away,
21   maybe we could try it in the spring.
22              But there are other problems.  I don't want to --
23   unless you are going to foreswear reliance on the Lindholm
24   e-mail, I am not going to start a trial where you want to put
25   that into evidence unless the Federal Circuit has ruled on the
```

```
 1    petition.  Otherwise, that would be possibly wasting time.

 2              So I don't know when the Federal Circuit will decide

 3    that, but out of respect for their job, I can't just start the

 4    trial until they rule on that motion.  So that's another

 5    problem.

 6              And I'm not even going to get into the issue of the

 7    re-exams and whether it's wise to wait until they have run

 8    their course or not.  Usually, I say no to that, but in this

 9    case it may be that there is more value to that, I don't know.

10              We also have the -- our independent -- you know, if

11    your damages study is thrown out on the plaintiff's side, it's

12    not clear to me that you deserve a third chance.  We're not

13    going to argue that today, you will get an opportunity to at

14    least submit written papers on that later.  But if you do get a

15    further opportunity, then that's going to be another round of

16    delay.

17              And then we have our Rule 706 expert, Dr. Kaerl, who

18    is here today; he is going to have his report done in mid

19    January.  And he is going to have to be deposed.  And you get

20    to bring motions that are directed at his, if you wish,

21    directed at his study.

22              So I can't see this case being ready for trial

23    before the first day of spring, though I won't say never to

24    that.  I don't want to set a trial date because I think it will

25    create false expectations, and we'll just leave it open.  I
```

```
 1   might just send you a notice and say, be ready in three weeks,

 2   we're going to start.

 3            The final thing I need to make you aware of on the

 4   scheduling is, because of the MS-13 trial I have so many civil

 5   things backed up that have been waiting longer than you for

 6   their trial date.  And I feel I owe it to them to get their

 7   case to trial.  And theirs are much shorter.

 8            So at some point, I have to, in fairness, I have to

 9   give them their day in court.  So all of these are problems

10   that weigh on my mind that I have not had in more than 12 years

11   on the bench.  I've been very swift to bring cases to trial,

12   but your poor district judge in this case has had a huge amount

13   to do in the last two and a half years with -- if you look at

14   the number of lawyers out there, I don't have that many.

15            I have two law clerks and one extra helper for the

16   MS-13 case, so we are stretched very thin.  You have to bear

17   with me until I can find a long enough opportunity to try this

18   case.

19            All right, I gave you the hardship -- there won't be

20   any substantive questionnaire, I will not allow that, it's not

21   worth the effort.  But the hardship questionnaire for a long

22   trial is worth the effort, and I sent out to you what that

23   would look like.

24            Does anyone have objections to the hardship

25   questionnaire?
```

1            **MR. VAN NEST:**  No, Your Honor.

2            **MR. JACOBS:**  No, Your Honor.

3            **THE COURT:**  All right, good, I didn't think so.

4            We will select the jury in about two hours.  I will

5     let you ask questions at the end of mine.  If you try to

6     condition the jury, I will cut you off in the presence of the

7     jury.  You must stick to issues for prejudice, preconceived

8     notions, and things like that.  You cannot start asking

9     questions like, well, if we prove to you -- if you were to see

10    this Lindholm e-mail, would you find that he was willful?

11                        **(Laughter.)**

12            **THE COURT:**  Come on.  You would regret that you

13    asked that question.  But I promise you, there are lawyers out

14    there practicing who think that's a legitimate question.  It's

15    not a legitimate question for voir dire.

16            The purpose of voir dire is to find out if someone

17    has had a life experience or formed a fixed opinion that would

18    prevent them from deciding the case based on the evidence and

19    in accordance with the jury instructions.  That's what I want

20    to be focusing on.

21            So as long as you know that's -- I think usually the

22    lawyers do a grand job of asking questions that I should have

23    asked and overlooked, and I want to give you that opportunity.

24            I think we need 12 jurors because of the risk that

25    we would lose some.  We got to go through three phases, which I

```
1    think will take, by the time it's all done, close to two months

2    to try this case.  So that is a lot of time.

3              I'd like to ask you:  Is it still the policy of

4    these two big companies that you only pay your jurors -- your

5    employees for two weeks?  That's the latest information I have

6    from you, is -- I want you all to just think about it.  Go back

7    and say -- because I have Oracle employees come in now and

8    then, I have Google employees come in now for other cases, and

9    they get to be excused from a case over two weeks because you

10   won't pay them.  But here you are wanting us to impose on other

11   people and to pay and to -- unless their employer will do it.

12   It's a point of irritation.

13             I'm not going to hold it against anybody here, but

14   for the good of the order, I wish you two would go back and

15   talk to your human resources departments and get that problem

16   fixed because it's just not right that you would only pay for

17   two weeks, but you expect the Court system to give you a

18   two-month trial where the jury is going to undertake that

19   hardship.  All right, so that's the jury.

20             Each of you can have one corporate representative.

21   You need to be clear, not now, but when the trial starts, who

22   it will be.  There will be time limits.  It's going to be more

23   than I had suggested earlier, but I haven't quite settled on

24   what they should be.

25             You should come up with a single combined method for
```

1    showing the documents on the screen.  Consult with Dawn about

2    how the system works.  With the trials so far, it seems to work

3    okay, but you do need to learn how -- have your IT people up to

4    speed so that they can know how it works.

5            For your opening statements, I think I'm going to

6    give each side one hour.  And you can use it any way you want.

7    You can address the entire case, you can address the first

8    phase, you can use it any way you want.

9            You can put documents up there, you can put diagrams

10   up, but you got to preclear it all in advance with the other

11   side so that -- and not spring it on them the night before so

12   if they have an objection they can bring it to the Court's

13   attention.

14           Once we get underway, I know my court reporters hate

15   me for this, including Sahar, who is one of the best, they hate

16   me, but I like to let the lawyers be advocates:  You do not

17   have to stay at the lecturn, you can walk around the courtroom

18   as long as you don't get within three feet of the jury box.

19   But you got to keep your voice up because if she can't hear

20   you, you won't be on the record.  But I want to give you a lot

21   of flexibility as the advocates.

22           Another thing that we do not tolerate here is

23   hacking and coughing when the other side is up.  When the other

24   side has the floor, they get the floor, and the jury gets their

25   full attention.  And you cannot hack and cough or shuffle

1   papers.

2          I have ways of dealing with that.  It won't

3   embarrass you too much, but it will embarrass you a little if

4   that happens.  So you want to be polite and give them the floor

5   so the jury has -- they have the undivided attention of the

6   jury.  But by the same token, when the other side is up, you

7   are going to get the same privilege.

8          I think the juries are great, they pay close

9   attention.  And you will -- you know, I like to give the

10  advocates a lot of freedom to move around the courtroom, to

11  have the full attention of the jury.

12         There are certain forms of question that I don't

13  like:  I don't like it whenever you assume facts not in

14  evidence, like, "were you aware that," "so and so said X, Y, Z

15  in 1995," well, unless that's already in evidence, you should

16  never do that.  You all are excellent lawyers, I don't have to

17  tell you where the line is, but don't cross the line.  You know

18  the Rules of Evidence.

19         One-page statement:  You got to give me a one-page

20  statement on day one so I can read it to the jury and tell them

21  what that case is about so that they can then tell us if they

22  have a prefixed opinion.

23         And I know you will be able to do this, because the

24  lawyers have done it in every case, including the criminal

25  cases, but it's important so that they will -- I can explain to

1    the jury what the case is.  And somebody might raise their hand

2    and say, I hate patents, they are a monopoly, and it's no good.

3    Or maybe that person shouldn't be on the jury.  So you need to

4    give me that one-page statement.

5           While on cross-examination, a witness, even your

6    client, cannot talk to a lawyer while they are on cross.

7    Mr. Boies will be more familiar with this than most of you; in

8    New York that is the absolute rule.  On the West Coast, it's

9    not as much, but it is my rule.

10          It's a good rule because once they become witnesses

11   they're under my jurisdiction, and it doesn't matter that they

12   are your client.  They can be on the stand for three days, and

13   you cannot talk to them about their testimony.

14          This is a good way to get at the truth because

15   cross-examination will bust some people wide open.  I'm looking

16   forward, because we have such excellent lawyers, I'm expecting

17   at least a dozen people to walk away in tears from that witness

18   stand.

19                        **(Laughter.)**

20          **THE COURT:**  But while they are on cross, you cannot

21   talk to them.  That's just a gimmick of a way to fix up your

22   testimony.  And if we find out you've done that, we'll tell the

23   jury you've done that.  So don't do it.

24          That is the rule in New York, isn't it?

25          **MR. BOIES:**  It is, Your Honor.

```
 1            THE COURT:  All right. I thought so.  And it's a
 2   good rule, too.
 3            So then the FJC video, now, I like that video.  I'm
 4   going to show it in Phase II.  It won't come out of anybody's
 5   time.  We'll have opening statements again, but they won't be
 6   one hour.  It will be directed at that time to the patent
 7   issues, and then we'll show the video to help the jury
 8   understand the context of the patent issues.
 9            We'll be in session from 7:30 in the morning with
10   the lawyers.  The jury comes in at 7:45.  We always start with
11   the evidence by 8:00.  We will end at 1:00 o'clock each day
12   with appropriate breaks in between.
13            The jury gets to go home at 1:00, you get to go home
14   soon thereafter.  But we will do our motions in limine, and
15   usually there is always something we need to sort out, and that
16   is fine, that's why we come in early.
17            And we sort it out -- if the witnesses -- for
18   example, you have just learned some witness is going to testify
19   about something that you think should be excluded, you bring it
20   up and we decide whether it should be excluded or not.
21   Sometimes we'll stay after 1:00 o'clock.
22            Sidebars are okay but very much discouraged.  I hope
23   you will only ask for one once or twice a week because usually
24   the lawyer just wants to keep the lawyer from knowing that they
25   are about to lose an objection, and they don't like that.
```

1              The juries, you know, they will not hold it against

2    you if you object, unless you object too much.  They don't seem

3    to remember who wins and loses objections.  And it doesn't

4    matter.  Most objections, you say hearsay, I know what you're

5    talking about.  Say hearsay, and then I will make a ruling.

6              Or, sometimes Rule 403, that's code.  What's -- the

7    jury asks me, what does 403 mean?  So I understand the

8    trade-off on 403, and I can just make a ruling, sustained under

9    403 or not sustained.  So most of the time a legal objection is

10   plenty.  And if I need to have more detail, then we'll find a

11   way to deal with it out of the presence of the jury, usually.

12             The -- you should -- if you are doing the

13   cross-examination, please give me the deposition up front.  And

14   the way to cross-examine -- the way to impeach with a

15   deposition -- you got to do it my way, and I'll tell you why in

16   a minute, but here's my way:  Let's say in the deposition the

17   witness said, the light was red, the question was, what color

18   was the light, answer, the light was red.  And so your

19   cross-examining them, and they say the light was green.

20             So what you -- same witness.  What you do is say,

21   Your Honor, I want to read from page 37, lines 1 through 3.  I

22   will pause about three seconds because you should be right on

23   it on the other side.  If I hear no objection, I'll say,

24   proceed.

25             And then you just turn to the jury and say, reading

1   from the deposition.  If it hasn't been referenced before, you

2   say the deposition taken such and such date of this witness:

3   Question:  What color was the light?  Answer:  The light was

4   red.  You then close the deposition with a flourish --

5                        **(Laughter.)**

6          ***THE COURT:***  Survey the jury to see if it's

7   registered --

8                        **(Laughter.)**

9          ***THE COURT:***  And move to -- you don't say to the

10  witness, you gave that testimony under oath, didn't you,

11  because I'm going to tell the jury it was all under oath.  That

12  just becomes argument after a while.  So you don't need to

13  argue with them.  You don't give them a chance to explain.

14  That contradiction is laying there right before the jury, and

15  you move on to the next point.

16          Now, here's what I don't like and I found the hard

17  way; the lawyers will, you know, because they are good

18  advocates, they put a little spin on it if I let them do this:

19  They will say without quoting the deposition, in your

20  deposition, didn't you say the light was red?  And the witness

21  won't be able to remember, really, what they said.  And

22  sometimes they will admit they said it, even though they

23  didn't.

24                        **(Laughter.)**

25          ***THE COURT:***  Or, it might be like this:

```
 1              Question:  What color was the light?  I don't
 2    actually know, but the policeman told me it was red.  Well,
 3    that's inadmissible hearsay.  But the lawyer being clever would
 4    like to say, didn't you say in your deposition it was red?
 5    That's truthful enough, but it was really the policeman said it
 6    was red.  So they're trying to get around evidentiary problems.
 7    And sometimes they just put a spin on it.  So to solve the spin
 8    problem, you just read exactly the question, answer, read the
 9    answer, that's the way we deal with it.
10              You should hand it up to me so that I will have it
11    right there, and we won't have to go through the scissors
12    opening routine and spoil the spontaneity of your
13    cross-examination.
14              All right, we will very likely get to the opening
15    statements on day one.  I suspect we won't get to the first
16    witness, but possibly we would, but I kind of doubt it.
17              I sometimes have this problem come up in the trials,
18    and that is, you make an objection, you say, in the discovery
19    they told us they weren't going to be getting into the subject,
20    now they want to get into this subject.
21              And then I say to the other side, is that true, they
22    say, no, that's not true.  So the way to get to the bottom of
23    that is that you if you are going to be -- you ought to have
24    your discovery correspondence and answers here in the
25    courtroom.  Because if somebody is relying upon what happened
```

1    in the discovery, I make them show it to me.  I've learned that

2    one the hard way, too.  I won't take your word for it because

3    it's usually prefaced by "I believe."

4                        **(Laughter.)**

5            **THE COURT:**  "I believe"?  Well, there is a

6    reasonable chance that you are not remembering it right, or

7    there is a qualification to it.  So I want to see it in black

8    and white.  So if you are going to raise an issue based upon

9    discovery and preclusion based upon discovery, okay, but you

10   got to have it in black and white so that I can follow it.

11           Stipulations, how do we deal with stipulations:  You

12   have a lot of flexibility in how you want to do it, but you do

13   need to read it to the jury at whatever time you want.  You may

14   be cross-examining a witness, and here is the perfect time, you

15   think, to read the stipulation about some issue.  And then you

16   say, this would be a good time to read the stipulation in.

17           So then you read it to the jury, that particular

18   paragraph.  I will then turn to the other side and say, is that

19   agreed to?  And of course, you'll say, yes.  I will instruct

20   the jury that that is now evidence they may consider in the

21   case.

22           I will tell the jury many times during the trial

23   that not one word the lawyers say is ever evidence.  I believe

24   this to be the single biggest way juries go wrong, is that

25   lawyers say things in their presence, and they get confused as

 1    to whether it was the lawyer or the witness that said it.  And

 2    I will say to them many times during the trial not one word you

 3    ever say is evidence in the case unless it's a stipulation.

 4            And if you start making little speeches, like

 5    talking lead-ins in your questioning, like, for example, I hear

 6    this every now and then:  The lawyer will say -- you know, the

 7    witness will say something, and then the lawyer will say, well,

 8    your lawyers never produced any documents like that to me,

 9    where did you get that idea?  I will get on you for doing that.

10    That's testifying in front of the jury.  You do not do that,

11    you ask questions.  You do not make talks.  Because then the

12    jury will pick up on your statement that that wasn't produced

13    and treat that as evidence.  You do not do that.

14            You have the right to ask questions, you do not have

15    the right to make speeches during your questioning.  So be

16    careful on that.  But stipulations, you do have the right to do

17    that.  And I will tell them that's an exception to the normal

18    rule, that not one word a lawyer ever says is evidence.

19            So those are some of the ways that we will conduct

20    the trial.  I have to get out an order, which I will do.  I

21    want to give you an opportunity to ask as many questions as you

22    can because this is your chance to figure out how the trial is

23    going to run.

24            Any questions on the plaintiff's side?

25            **MR. JACOBS:**  No, Your Honor.  I think we're familiar

```
 1   with your practices.
 2              THE COURT:  Great.
 3              Mr. Van Nest?
 4              MR. VAN NEST:  Likewise, Your Honor.
 5              THE COURT:  Okay.
 6              MR. VAN NEST:  Thank you.
 7              THE COURT:  So we have a moment or two left:  Are
 8   there other issues that you think we could productively take up
 9   now?
10              MR. JACOBS:  I would like to return to the
11   injunction issue, Your Honor.
12              THE COURT:  Okay.
13              MR. JACOBS:  It relates to our trial pending.
14              THE COURT:  All right, let's hear that.
15              MR. JACOBS:  I think it's a question that is
16   highlighted by the increasing pressure the Federal Circuit is
17   putting on litigants to demonstrate the -- that they have met
18   the standards for an injunction.
19              We would propose that there be an injunction phase
20   to this trial post-verdict, that we not be -- that, in
21   particular, we be allowed to put in our evidence, additional
22   evidence, of harm of the proposed injunction, why the proposed
23   injunction is reasonable, and not actually do that in front of
24   the jury, as this is not a jury issue.
25              And because of the time and the development of that
```

```
 1  evidence is going to be contemporaneous with the injunction we
 2  are seeking then, the record we're developing for trial is to
 3  some degree retrospective.
 4          So in short, we would propose that -- I think the
 5  way this is traditionally to be done here is that the
 6  injunction proceeding be done largely on the motion and on the
 7  papers, and that we put in the evidence we need to meet our
 8  showing on liability and damages before the jury, but not be
 9  held to put in our evidence of irreparable harm.
10          THE COURT:  Well, also, willfulness.
11          MR. JACOBS:  Exactly.
12          THE COURT:  Well, what does Mr. Van Nest say to
13  that?
14          MR. VAN NEST:  Your Honor, I don't see that as a
15  problem.  I think there would be -- should be some reasonable
16  opportunity for discovery, obviously, or exchange of
17  information.  I think it's typical for a court to hear that
18  sort of evidence at the conclusion of the case after there has
19  been a verdict of liability.
20          And typically, then, there would be some brief
21  period for the parties to exchange discovery on that, on those
22  issues, and then present them to the Court.
23          THE COURT:  All right.
24          MR. VAN NEST:  I just don't want to be sandbagged.
25          THE COURT:  We'll work something along those lines
```

```
 1   out.

 2              MR. VAN NEST:  Thank you.

 3              THE COURT:  What other issues can we take up now?

 4              MR. JACOBS:  I think we can click through several of

 5   the additional issues in our second supplemental joint

 6   pre-trial conference statement.

 7              THE COURT:  Let's do that.

 8              MR. JACOBS:  The procedure for equitable defenses is

 9   No. 6 on that agenda.

10              THE COURT:  Why isn't that for the jury?  Why are

11   you trying to get me to decide that?

12              MR. JACOBS:  Google would like you -- would like the

13   jury to render an advisory verdict on the equitable defenses.

14              THE COURT:  Give me just one of them.  Like, laches,

15   is that laches -- give me one of your favorite defenses on this

16   category, Mr. Van Nest, so I can have a real-life example.

17              MR. VAN NEST:  Well, there are so many,

18   Your Honor --

19                        (Laughter.)

20              THE COURT:  All right, not your best, just one of

21   them.

22              MR. VAN NEST:  The problem with this is that the

23   evidence overlaps a lot of different topics.  So, for example,

24   we were talking earlier about testimony from Mr. Schwartz --

25              THE COURT:  How about implied license?
```

**MR. VAN NEST:**   Sure.

**THE COURT:**   Is that equitable or not?

**MR. VAN NEST:**   It's an equitable defense, but that testimony also goes to issues of willfulness.  It also goes to fair use, and also to a number of issues that are legal.  And I don't think this is something that we can scope out today globally, I think that's got to be dealt with as they arise in the case.

But a lot of this evidence that -- custom and practice, for example, was to use APIs:  That goes to fair use, which is a legal defense.  It also goes to willfulness, which the jury will decide whether or not Google acted willfully or not.  And later Your Honor will decide whether that merits some enhancement of damages, if any are awarded.

So a lot of these involve evidence that is relevant to a number of different topics.  And I just don't think that it's amenable to -- they haven't moved for, and there is no way to deal with it in a global basis, we have to deal with it as it comes up in the case and after the parties have made their openings and we understand what the issues are.

There will be different issues in the copyright trial than in the patent trial, obviously.  Some of the issues will overlap on the equitable defenses, but I just don't think that's something that you can -- that is amenable to some kind of global decision-making.

1          **MR. JACOBS:**  I think we didn't join, Your Honor.

2     The specific issue in Item 6 is whether there would be an

3     advisory verdict from the jury on these equitable defenses, and

4     we oppose that request.

5          **THE COURT:**  How would you have it done?

6          **MR. JACOBS:**  By the Court.

7          **THE COURT:**  But the jury would hear all the

8     evidence, anyway?

9          **MR. JACOBS:**  The jury would hear the evidence that

10    is relevant to the issues before the jury.  If there is a

11    relevance objection, if we contend that evidence that Google

12    wants to put in really only goes to an equitable defense and

13    that the Court is going to decide that, we would object to that

14    at that time.

15         **THE COURT:**  Well, it seems -- but I think what

16    you're trying to get me to do is to say that -- then I will

17    have this whole problem of, is it equitable or is it legal.

18    And you know, every equitable point of fairness that works in

19    Google's favor you are going to try to exclude.  I know that's

20    your agenda.

21         I don't blame you, but you want them to not have --

22    they have a story to tell, their story is, we thought -- we

23    thought that Sun wanted us to do this.  They applauded us when

24    it came out, and now we're being sued for something they said

25    was a rocket ship -- I forget whatever you said, a rocket ship.

```
1   And why shouldn't the jury hear that?  That's part of the story

2   here.

3            If we just get into, hey, look at this line of code

4   and this structure and -- I don't know, it wouldn't be a very

5   interesting case, would it?  So Mr. Van Nest is trying to put

6   some pizzazz into this otherwise dull case.

7                         (Laughter.)

8            THE COURT:  And the big-ticket items are the ones

9   that are interesting, not whether claim 32 is infringed.

10           So I don't know, I've been thinking of this whole

11  case as you get these great lawyers, it would be like the

12  Scopes trial --

13                        (Laughter.)

14           THE COURT:  -- high-tech Scopes trial.  And you need

15  to have something of that caliber to fight about.  If you are

16  just fighting about claim construction, it's not going to be

17  interesting.

18           MR. JACOBS:  Okay.

19           THE COURT:  So I'm thinking that an advisory verdict

20  would be a good idea, give the jury an extra role.

21           MR. JACOBS:  Whatever gets --

22           THE COURT:  Is it really my job to decide implied

23  license?

24           MR. JACOBS:  Yes, it is, Your Honor.

25           THE COURT:  And is it really my job to decide
```

```
 1    equitable estoppel, waiver, and laches?  How about waiver?

 2              MR. JACOBS:  It is, Your Honor.

 3              THE COURT:  Even waiver?

 4              MR. JACOBS:  Equitable defense, and decided after --

 5    in federal practice, of course, decided after the jury renders

 6    a verdict on the other issues.

 7              THE COURT:  Yeah, but I think in order to avoid

 8    there being a fight every ten minutes over whether or not the

 9    jury gets to hear something, the jury ought to just hear it all

10    unless it's absolutely clear to me -- I might on occasion say,

11    that we are going to save for a separate proceeding.  But I

12    think, for the most part, the jury is going to get to hear it

13    all.

14              See, the way I see this, I think that the -- see,

15    there are some things that you want the jury to hear the global

16    version.  You want the jury to hear two words, Java and

17    Android, and then sit down.  And you want to somehow get by the

18    tedious part, where you got to actually prove that there was a

19    copyright violation and actually prove there was a patent

20    violation.

21              And the other side, they want to speed by that part,

22    too, but you got to do it, anyway.  And you want to have all

23    the testimony and implied waivers and all the press releases

24    that Sun had and call in the Sun executives.

25              I've heard your speech, Mr. Van Nest, now, four or
```

```
 1    five times in this case, and these are all high-level
 2    arguments, these are not the actual issues in the case, though
 3    are issues in the case.  So both of you want to have some
 4    high-level time with the jury, and I think I'm inclined to let
 5    you have your high-level time.
 6              So most likely we are going to let the jury hear
 7    everything except things that clearly they don't need to hear
 8    and I should hear in kind of a 403 balance.  And most likely
 9    they will give an advisory verdict, but I don't have to decide
10    that now.  So that's what I think about No. 6.
11              Okay, what's your next one?
12         MR. JACOBS:  Let's go to No. 10, "Supplemental Claim
13    Construction."
14              THE COURT:  Oh, yes.
15         MR. JACOBS:  Actually, I think just in terms of the
16    experiential base of the Court, this one's worked out pretty
17    well.  We did six terms reduced to five the first round.  And
18    then we did three more this term -- this round, a total of
19    eight.
20              We each submitted our opening briefs, and what I
21    would suggest, Your Honor, I think we don't need to brief
22    "computer-readable medium" anymore because that one was briefed
23    last spring, and again, so we both knew what each other was
24    going to say about the topic.  And you already have the
25    parties' arguments.
```

```
 1              I would propose on the other two terms that we
 2    submit reply briefs, if you will --
 3              THE COURT:  Go ahead.  When did you want to do that?
 4              MR. JACOBS:  We could do it in two weeks,
 5    Your Honor.
 6              THE COURT:  Does that work, Mr. Van Nest?
 7              Is that simultaneous replies?
 8              MR. VAN NEST:  If we could have a little more time.
 9    We got the holidays coming up.  But I would think with three
10    weeks we ought to be able to do it.
11              THE COURT:  All right, three weeks from today.
12              MR. JACOBS:  I would propose seven pages, two terms.
13              THE COURT:  Total?
14              MR. JACOBS:  Seven pages each, yes.  Seven pages
15    each side.
16              THE COURT:  Take three weeks to do seven pages?
17              MR. VAN NEST:  Per issue or per reply?
18              MR. JACOBS:  Per reply.
19              MR. VAN NEST:  That's fine.
20              THE COURT:  All right, seven pages.
21              Now, the color-coded handouts:  I know you all
22    probably laugh at me behind my back.
23                          (Laughter.)
24              THE COURT:  And I don't blame you, but I want to
25    tell you how well it works.  I've done 11 trials now on the
```

```
 1   patent side:  I'm not sure that any of my colleagues in the
 2   last 12 years have done that many patent trials, but -- and I'm
 3   a little disappointed that you've underlined so much.  So it
 4   kind of defeats the purpose.  But just to give you -- I'll find
 5   one in here where you didn't underline so much.
 6           Here's one -- what does blue mean?  I forgot -- what
 7   does the blue part mean?  Blue means Oracle contends missing
 8   from Palay.  So the way I read this on the '702, claim 12 -- or
 9   claim 11 -- is that it is conceded that claim 11 is completely
10   found within the accused device, and that Oracle contends that
11   the blue language is missing from the prior art reference
12   called Palay.
13           Am I reading --
14           THE COURT:  '702.
15           MR. JACOBS:  Which claim?
16           THE COURT:  Claim number -- it says 12 at the top,
17   but it's 11 and 12.
18           MR. PAIGE:  Your Honor, I think that's correct with
19   one slight correction that all that will be the dependent
20   claim.  And so that will be missing elements in the claim from
21   which it depends.  But as to that particular --
22           THE COURT:  Yeah.  And this is the independent one.
23   And 12 picks it up.
24           So then 12 goes on to have additional items that
25   have prior disputed -- so but it looks like on No. -- looks
```

```
1     like on this one it's conceded that it infringes, and the only
2     issue is validity; is that true?
3               MR. JACOBS:  As to the --
4               MR. PAIGE:  I believe that the independent claim
5     there might not be asserted, Your Honor.  I believe that the
6     dependent claim is actually asserted.
7               THE COURT:  Right, but under No. 12, the dependent
8     claim, it looked like from just reading this, no one is raising
9     an issue of infringement.  It seems to be conceded, right?
10              MR. PAIGE:  That wouldn't be correct, Your Honor.
11    There certainly are noninfringement arguments for all the
12    claims in the '702 patent.
13              THE COURT:  Okay, well, this is a good opportunity,
14    then, to fix this.
15              MR. JACOBS:  I think, Your Honor, the sequence, you
16    have to start with 7.  And then 11 is -- depends from 7, and 23
17    depends from 11.  And so that's how we got to 12.
18              THE COURT:  Okay, so No. 7 I'm holding up now.
19    That's the one it depends from.  It looks like there is red
20    underlining, correct?
21              MR. PAIGE:  Correct.
22              THE COURT:  And the red underlining is what you say
23    is missing from the Android SDK.
24              MR. PAIGE:  That's correct, Your Honor.
25              THE COURT:  I can't tell you how useful this is to
```

 1   the jury because when they are listening to the evidence, they

 2   know that what they got to be listening for is evidence that

 3   goes to the underlined part.  Otherwise, they are hearing a lot

 4   of blather from the experts, they drone on and on.

 5           I know how you are going to do it, you are going to

 6   take each phrase, and you're going to -- most of these phrases

 7   aren't even contested.  And so when the jury gets through with

 8   it, their eyes will have glazed over, and they will not know

 9   which one of those is important.  But by giving them this, they

10   now know, hey, this is the key thing, this is what we have to

11   be focusing on.

12           In fact, in the last patent trial the lawyers were

13   good enough to agree and just stipulate that the other items

14   were there.  In other words, you would stipulate that the other

15   phrases are -- not underlined are there, and what are you

16   really fighting over are the red ones.  And then the other side

17   will stipulate that in the prior art reference called Palay,

18   the ones that don't have any blue, they're there for the Palay,

19   but the blue ones are the ones that they disagree with.

20           That's what you should do here, and I'm going to

21   make you do this.  I hope I can talk you into doing this before

22   we get to that phase.  This tees up for the jury very nicely

23   what it is.  And it helps them understand what it is they got

24   to be listening for in the evidence.  And it will actually

25   speed along the parts where you are trying to prove that it's

```
 1    invalid because of a reference.  And all you got to deal with
 2    are the ones that are highlighted.  Or, in the case of the
 3    plaintiff, they have to just deal with the ones that are
 4    underlined in red.
 5             So I have become a real believer in this system,
 6    which I am applying for a method patent on.
 7                           (Laughter.)
 8             THE COURT:  And I plan on getting this, and no one
 9    else will be allowed to use this.  It will not be an open
10    source thing.
11                           (Laughter.)
12             THE COURT:  All right, so what else can we discuss?
13             MR. JACOBS:  I think the specific question there,
14    Your Honor, is how they are actually used in terms of --
15             THE COURT:  I'm going to give them out to the jury.
16             MR. JACOBS:  Okay.
17             THE COURT:  The jury will have a full set, but in
18    addition -- now, there is a lot of them here:  Usually, we just
19    have one big chart in the room because there is usually just
20    one claim or two claims, but you have so many claims, it may
21    not be practical to put up the big poster board.  But at least
22    we can give them the handout.  And I think the juries like
23    that.
24             MR. JACOBS:  Thank you.
25             THE COURT:  Okay, what else can we go over today?
```

```
 1              MR. MORONDO:  Your Honor, James Morando on behalf of
 2     Dr. Kaerl.
 3              THE COURT:  Come on up here so we can hear you,
 4     please.
 5              MR. MORONDO:  Listening to the discussion about the
 6     scheduling --
 7              THE COURT:  Yes.
 8              MR. MORONDO:  -- it appears that the case won't
 9     start at least until the first of spring.  Dr. Kaerl has no
10     desire to cause any delay or impact, but all things considered,
11     if it has no impact, he would prefer a few additional days to
12     do his report to the end of January.
13              THE COURT:  That's not a few additional days.
14              Why did you a say a few additional when you really
15     meant like 13 or 14 days?
16              MR. MORONDO:  He would like until the end of the
17     month, Your Honor.
18              THE COURT:  All right, I don't know about that.
19     I -- if it was three, four days, I would say okay.  I got to
20     rule on this other motion.  Whatever I decide on the big
21     motion, then I may be in the position to give you the extra
22     time.
23              So but I will keep that in mind.  And, you know, he
24     has to sit for a deposition.  He's got to do all those things
25     that the Federal Circuit requires.
```

```
 1                 MR. MORONDO:  Understood, Your Honor.  And we

 2    appreciate that there could be some potential implications with

 3    regard to future rulings of the Court as well.

 4                 THE COURT:  Um-hmm.  Thank you.

 5                 MR. MORONDO:  Thank you.

 6                 THE COURT:  I want to thank Dr. Kaerl for coming

 7    once again to the hearing.  That was very good of you to do

 8    that.  And also for the Farella law firm.

 9                 What is your name, again?

10                 MR. MORONDO:  James Morando, Your Honor.

11                 THE COURT:  Morando.

12                 Well, John Cooper is normally here.  Your firm is

13    representing Dr. Kaerl pro bono.

14                 MR. MORONDO:  Yes, Your Honor.

15                 THE COURT:  You have the only meter in the courtroom

16    that is not running.

17                          (Laughter.)

18                 THE COURT:  And we thank you for that.  That's very

19    good of you to do.

20                 All right, what else do you have in your statement?

21                 MR. JACOBS:  I don't believe we have any other

22    issues requiring the attention of the Court.

23                 The parties have a disagreement about when some work

24    would be due on our side on the patent marketing question, but

25    understanding that we aren't going to be trying the case in
```

```
 1   January, I think that issue resolves itself.  So I think we

 2   know what we have to do there.

 3          THE COURT:  Let's just try to -- here are some

 4   follow-up things:  One thing I would like for you to do is to

 5   give me a submission on what you say the PTO just did that you

 6   brought up, that would be useful to know.  Both sides could do

 7   that or a joint statement.

 8          But were there other follow-up items from the

 9   hearing today?  I lose track of them, and I can't remember:

10   Were there any things that somebody, like Ms. Anderson, that

11   you were going to get me something -- you did give me the

12   statistics.

13          MS. ANDERSON:  Yes, Your Honor the statistics.

14          THE COURT:  So you don't need to do that, but was

15   there anything like that that you want to submit to me?

16          MR. JACOBS:  There is one thing from us, Your Honor,

17   that I'm aware of, which is we have located a case that on its

18   face deals with the question of re-examinations before the jury

19   on the topic of willfulness.  And so we would just like to do a

20   quick notice of additional authority.

21          THE COURT:  Please do that.  And if you want to

22   respond to that --

23          MS. ANDERSON:  Yes, thank you, Your Honor.

24          THE COURT:  I've lost track again of what would be

25   the soonest two-month period that -- it would have to be like
```

```
 1   full calendar months or mid month or two months later that if

 2   we could get everything squared away that you think both sides

 3   are available to --

 4           MR. VAN NEST:  That's July, Your Honor, the July

 5   time frame.

 6           THE COURT:  What is your other case, Mr. -- are you

 7   the only one that would hold it up for the spring, so what if

 8   that case goes away?

 9           MR. VAN NEST:  If that case goes away, I would be

10   available.

11           THE COURT:  When can we know that?

12           MR. VAN NEST:  I have a two-week trial in February,

13   but if you are talking about spring, I have a three-week trial

14   starting April 2nd in Texas with Judge Davis.  And we have a

15   pre-trial in that case on I believe March 27th.

16           And then I have a two-week trial with your

17   colleague, Judge Koh, starting June 11th in San Jose.

18           THE COURT:  So if the April one, though, went away,

19   could you try this case in April and May?

20           MR. VAN NEST:  I would have to change one other

21   thing, it's not a trial.  My one vacation next year is a trip

22   with a large group of people to Corsica.  That's the end of

23   April through the first two weeks of May.  That is my one

24   scheduled and paid vacation.  But I don't have any trials that

25   would prevent it.
```

1           **THE COURT:**  But it wouldn't be the first vacation

2      you had to give up.

3           **MR. VAN NEST:**  Probably not.  And it won't be the

4      last.

5                          **(Laughter.)**

6           **THE COURT:**  I gave up plenty when I was practicing.

7      I wouldn't ask you to do that unless I felt it was for the

8      clear-cut good of the order.

9           All right, I'm not going to -- you continue on with

10     your plans for now.  And I got a lot of things on my plate,

11     too, so we'll just have to see how it develops.

12          Right now, I would say, reserving the right to try

13     to put this on for April and May, that mid September would be

14     the first time we would be able to try this case.  So I'm going

15     to ask you to keep free September, October, November, and

16     December and give me -- don't box me in on that date without

17     giving me -- there is a good probability we would set the trial

18     in that time period, but I'm not ruling out May and April, all

19     right?

20          **MR. VAN NEST:**  Thank you, Your Honor.

21          **THE COURT:**  Is there anything else that anyone was

22     going to submit?

23          **MR. VAN NEST:**  I don't believe so.

24          **THE COURT:**  Are you going to be able to work out --

25     seems like you've got it down to just one week's difference on

1   your protocol for coming up with when Oracle/Sun had a product

2   method it practiced -- I guess just product -- this is on the

3   failure to mark issue.  Is there anything I can help you with

4   there?

5               MR. VAN NEST:  No, Your Honor.

6               THE COURT:  Seemed like you were very close on that.

7               MR. VAN NEST:  We can work that out.  It's just

8   dates and your indication on trial is all we need to work that

9   out.

10              MR. JACOBS:  Actually, if I could just take the

11  Court's indulgence for a moment?

12              I think the way the Court framed the task, it has

13  turned into something bigger than we need to do.

14              The Court asks for us to identify all the products

15  that practice the patents, and there are so many releases of

16  Java and so many different places, that that has become quite

17  gargantuan.

18              I think what was intended, but we tend to be a

19  little literalist, is sufficient information about which

20  products practice to meet whatever burdens Oracle has to show

21  practicing in Oracle's affirmative case, and also answer

22  Google's question whether there was practicing but not marking,

23  such that they can advance their marking motion.

24              And with that understanding, I think that --

25              THE COURT:  I think you understand the objective

```
1   correctly, I believe.  And if you two have worked out a

2   procedure that satisfies the two of you and it results in

3   admissible admissions, I think from what I read it would,

4   right?  Do you concede --

5              MR. VAN NEST:  Assuming we can agree, sure.  Yes,

6   we've worked out the procedure, as far as I know.

7              THE COURT:  All right, well, please work this one

8   out.

9              MR. JACOBS:  We will, Your Honor.

10             THE COURT:  All right.

11             You know, it will be hard on me, but if the jury has

12  to hear that they are going to in addition have to decide on

13  all this universe of past products, did they fall within the

14  claim language, it would be so hard on them.

15             MR. VAN NEST:  Understood, Your Honor.

16             THE COURT:  Well, I think I've run out of items to

17  take up with you, so I wish you all a happy holiday, and I look

18  forward to the excellent lawyering that will happen in this

19  trial.

20             MR. VAN NEST:  Thank you, Your Honor.

21             MR. JACOBS:  Thank you very much, Your Honor.

22             THE COURT:  All right.  Bye-bye.

23                    (Proceedings adjourned at 12:25 p.m.)

24                           ---o0o---

25
```

## CERTIFICATE OF REPORTER

I, Sahar Bartlett, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


_____
**/s/ Sahar Bartlett**

**Sahar Bartlett, RPR, CSR No. 12963**

**United States Court Reporter**


**Friday, December 30, 2011**