Highly Confidential - Attorneys' Eyes Only

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5    -------------------------

 6    ORACLE AMERICA, INC.,      )

 7            Plaintiff,         )

 8        vs.                    )  No. CV 10-03561 WHA

 9    GOOGLE, INC.,              )

10            Defendant.         )

11    -------------------------

12

13        -- HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY--

14

15        Videotaped Personal Capacity deposition of

16        ANDREW E. RUBIN, taken at the law offices of

17        King & Spalding LLP, 333 Twin Dolphin Drive,

18        Suite 400, Redwood Shores, California,

19        commencing at 8:39 a.m., on Wednesday,

20        July 27, 2011, before Leslie Rockwood, RPR,

21        CSR No. 3462.

22

23

24

25    PAGES 1 - 296
```

                                          Page 1

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

```
 1    know, this -- we call it zero bug balance.  We go to zero

 2    bugs.  It's an iterative process.

 3              So it loops and then -- and then at the point

 4    where we think we're below the threshold of having

 5    catastrophic errors, we make the software available to      08:58:32

 6    the public.

 7         Q.  And when you say -- and so you refer to a

 8    moment, some kind of decision that it's acceptable

 9    from -- given the quality standards you've imposed, to

10    make the release; correct?                                  08:58:44

11         A.  It's like many small decisions that when

12    they're all made, then it's ready to go.

13         Q.  And who does that final signoff?

14         A.  Each lead, each team lead of the various

15    functions, from product management to engineering to QA     08:58:56

16    to documentation to, you know, release engineering, each

17    lead of those teams make their determination whether it's

18    ready to go.

19         Q.  And who looks at the final signoff list to

20    see that all those checkmarks are -- have been              08:59:11

21    introduced?

22         A.  We have an automated tool, an online tool

23    that manages that.

24         Q.  But do you actually make a human decision at

25    the end of this all to say we're ready to go?               08:59:21
```

Page 22

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

```
 1              A.   These are all human decisions, by the way.

 2      There's no machines making decisions for us.  But I'm one

 3      of the team leads, and my bit that I check is the

 4      executive bit.

 5              Q.   And I think you said the executive bit?        08:59:32

 6              A.   Correct.

 7              Q.   What are the inputs to the executive

 8      decision?  Do you literally call it "the executive bit"?

 9      I'm happy to use your terminology.

10              A.   We do call it the executive bit.             08:59:43

11              Q.   Okay.

12              A.   It's basically making sure all the other bits

13      have been set.

14              Q.   Are any of the bits associated with a legal

15      review of the release?                                    08:59:54

16              A.   Yes, as a standard practice, we have a legal

17      team associated with our team that does a review.

18              Q.   And what's the nature of that process?

19                   MS. ANDERSON:  Objection.  Again --

20                   THE WITNESS:  I don't --                     09:00:04

21                   MS. ANDERSON:  Let me just interpose an

22      objection to that question.  Objection.  Form.

23                   Given the nature of the question, I instruct

24      you not to answer in any way that you communicate

25      communications that you've had with counsel because it   09:00:19
```

Page 23

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

1   would be privileged, but otherwise, you may answer.

2          THE WITNESS:   Okay.

3          I don't have a lot of insight to how that

4   team works.   It's not managed by me.

5          Q.   BY MR. JACOBS:   Who manages that team?          09:00:30

6          A.   Well, I believe it reports into our general

7   counsel, Kent Walker.

8          Q.   The -- and how do you -- from -- when you're

9   doing the executive bit, how do you know that the legal

10  bit -- shall we call it the legal bit?                      09:00:44

11         A.   Uh-huh.

12         Q.   When you're doing the executive bit, how do

13  you know that the legal bit has been done?

14         A.   Again, we have an on-line tool that reflects

15  each team leader.   So somebody on the legal team           09:00:55

16  basically, you know, is signaling that they've done the

17  review.

18         Q.   Who has so signaled for Android on the legal

19  bit?

20         A.   I don't know.                                   09:01:06

21         Q.   Could be someone in the general counsel's

22  office?

23         MS. ANDERSON:   Objection.   Form.

24         THE WITNESS:   It needs to be somebody on the

25  legal team.                                                 09:01:14

Page 24

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

```
 1          Q.  BY MR. JACOBS:  Have you interacted with the

 2   legal team in the course of Android's releases over

 3   issues the legal team had that prevented it from signing

 4   off on the legal bit?

 5          MS. ANDERSON:  Objection.  Caution the          09:01:33

 6   witness that you should not -- actually, just give me a

 7   moment, Counsel, and I'll review your question.

 8          I instruct the witness not to answer on

 9   grounds of privilege.  That question calls for privilege.

10   If you want to try again.                              09:01:53

11          Q.  BY MR. JACOBS:  So "yes" or "no"?

12          MS. ANDERSON:  No.

13          Q.  BY MR. JACOBS:  Have you interacted with the

14   legal team over issues associated with the release of

15   Android that prevented it from giving you the legal bit? 09:02:01

16          MS. ANDERSON:  Objection.  Instruct the

17   witness not to answer on grounds of privilege as phrased.

18          Q.  BY MR. JACOBS:  Has the legal team ever

19   conveyed to you we have concerns about a -- an Android

20   release and we can't give you the legal bit?            09:02:16

21          MS. ANDERSON:  Objection.  Instruct the

22   witness not to answer on the grounds of attorney-client

23   privilege as phrased.

24          MR. JACOBS:  And for all those instructions,

25   you're following your counsel's instructions not to      09:02:27
```

Page 25

**EXHIBIT E**

1    answer the question?

2              THE WITNESS:   Yes, I am.

3         Q.  BY MR. JACOBS:   The lawsuit was filed on

4    October 12, 2010 -- excuse me, August -- start over.

5              The lawsuit was filed on August 12, 2010.          09:02:43

6    After the lawsuit was filed, did you conduct any review

7    of Oracle America's patent portfolio in connection with

8    Android development?

9              MS. ANDERSON:   Objection to the extent that

10   responding to this question would cause you to reveal any    09:03:04

11   communications with counsel, I instruct you not to answer

12   on grounds of privilege.   Otherwise, you may answer.

13             THE WITNESS:   I mean, look, all right, you

14   asked the question before whether I have personally done

15   reviews of the legal situation, and I answered no.  It       09:03:18

16   didn't change throughout the release cycles whether I did

17   or not.

18        Q.  BY MR. JACOBS:   So and just to be clear, my

19   earlier question was before the lawsuit, and now I was

20   asking after the lawsuit, and your answer is the same:       09:03:30

21   You have conducted no review?

22        A.  I personally am not responsible for legal

23   reviews for the Android system.

24        Q.  Are you aware of any review that has been

25   conducted of the Android system in view of Oracle            09:03:43

                                                          Page 26

**EXHIBIT E**

1    America's patents?

2            MS. ANDERSON:  Objection.  To the extent that

3    responding to this question would cause you to reveal any

4    communications with counsel, I instruct you not to answer

5    on the grounds of privilege.                          09:03:55

6            THE WITNESS:  Again, we're structured in a

7    way where we have a legal team.  That legal team does

8    their job very well, and I'm not related to it, and I

9    don't have insight into the exact mechanics of how they

10   do their job.                                         09:04:09

11       Q.  BY MR. JACOBS:  Just to narrow the question a

12   little bit, you've been looking at enhancements to

13   Android over time; correct?

14       A.  Correct.

15       Q.  You've been looking at adding new features or   09:04:16

16   functionality; correct?

17       A.  Correct.

18       Q.  You've actually expanded Android's market to

19   tablet computers; correct?

20       A.  Correct.                                      09:04:23

21       Q.  In connection with any of those efforts to

22   expand the functionality or marketing -- market niche

23   with which Android is associated, have you ever said to

24   someone, you know, we'd really better take a look now at

25   the patents that might be implicated by those          09:04:37

                                              Page 27

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

```
 1   enhancements, especially since we've been sued by Oracle
 2   America, before we go off in a particular direction?
 3              MS. ANDERSON:  Objection.  Form.  And
 4   instruct the witness not to answer to the extent it calls
 5   for any communications or would reveal any communications    09:04:48
 6   with any counsel on the grounds of privilege.
 7              THE WITNESS:  I mean, generally speaking, we
 8   see software development as an innovation process so we
 9   don't really second-guess innovation.  We do the
10   innovation -- we do it in a way that, you know, our          09:05:01
11   education and training, you know, teaches us to do, and
12   our goal is just to build great products that consumers
13   love.
14         Q.  BY MR. JACOBS:  So the answer to my question
15   is "no"?                                                     09:05:11
16              MS. ANDERSON:  Objection.  Form.  And the
17   same privilege instruction.
18         Q.  BY MR. JACOBS:  Are you --
19         A.  I don't know.  You can ask that question
20   again.                                                       09:05:21
21         Q.  Okay.  Fair enough.  Let's start over.
22              As you have added functionality to Android
23   over time, have you ever conveyed to anyone at Google, as
24   we're adding enhancements, we should look at Oracle
25   America's patents and decide whether we're going to go       09:05:41
```

Page 28

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

1    off in a particular direction or not?

2              MS. ANDERSON:  Objection and instruct the

3    witness not to answer to the extent it would cause you to

4    reveal any communications with counsel on the grounds of

5    privilege.                                          09:05:54

6              THE WITNESS:  I mean, generally speaking, the

7    way you do innovation isn't you don't go look at somebody

8    else's work.  You just do innovation in your own little

9    world and make sure it's the best it can possibly be.  So

10   the answer would be no.                             09:06:05

11        Q.  BY MR. JACOBS:  Similarly, as you have

12   expanded the markets in which Android is applied, say, to

13   tablets, have you asked or conveyed that any such review

14   should be conducted?

15             MS. ANDERSON:  Objection.  Form.  And also    09:06:17

16   same instruction on grounds of privilege.  You shouldn't

17   disclose communications with counsel.

18             THE WITNESS:  It's true for every Android

19   release, independent of what the form factor it's

20   released in.                                        09:06:27

21        Q.  BY MR. JACOBS:  And by "form factor," you're

22   referring to, for example, tablets as opposed to

23   handsets?

24        A.  Yeah, you know, four-inch screens versus

25   ten-inch screens.  There's no difference, in my mind.  09:06:37

Page 29

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

```
 1              Q.  So this -- I think if I've got the

 2      terminology right, it's a bit review?  No.  Let me start

 3      over.

 4                   What's that check-off that you were referring

 5      to in which there's an executive bit and a legal bit and     09:06:49

 6      a quality assurance bit?

 7                   A.  It's an online tool that allows us to manage

 8      everybody agreeing that it's ready to go.

 9                   Q.  And so if somebody says to you, "Have we made

10      it through that tool," what's the terminology they use?       09:07:01

11                   A.  The tool is called Launch Cal.  It's a launch

12      calendar.

13                   Q.  Launch Cal?

14                   A.  Uh-huh.

15                   Q.  So is there a Launch Cal review associated     09:07:11

16      with each release of Android?  And by "release," I'm

17      using -- I'm going over to one digit to the right of the

18      decimal point.

19                   A.  Sorry, you're talking about minor releases.

20      Major releases are whole numbers; minor releases are the      09:07:25

21      decimal point.

22                   Q.  Perfect.  So for each minor release of

23      Android, is there a Launch Cal review?

24                   A.  Yes, for every -- for every product that

25      leaves the door, there's a review of this type.               09:07:39
```

Veritext National Deposition & Litigation Services
866 299-5127

**EXHIBIT E**

1          Q.   Is there a Launch Cal review associated

2    with -- let me start over.   Actually, I've got to start

3    from the other end of the telescope.

4               We talked about major releases and minor

5    releases.   Is there minor minor in connection with      09:07:59

6    Android?

7               MS. ANDERSON:   Objection.   Form.

8               THE WITNESS:   Well, let's see, there's major

9    releases, minor releases, and occasionally we do

10   maintenance releases.   So far to my knowledge, I don't   09:08:09

11   think we've ever made a maintenance release incremental

12   to a minor release.   So I think everything is just minor

13   releases, to my knowledge.

14          Q.   BY MR. JACOBS:   So this Launch Cal review,

15   this decision making process, is associated -- has been   09:08:26

16   associated so far with each minor release?

17          A.   With each release, every time piece of

18   software, you know, exits Google into the public's -- you

19   know, whether it's through a device or through Open

20   Source or whatever it is, it goes through this review     09:08:39

21   process.

22          Q.   And just to ask you the obvious question, the

23   implication is that you could make a decision for each

24   minor release and say, "No, we're not going to make that

25   release; I'm not happy with it"?                          09:08:50

                                                     Page 31

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

1          A.   Yeah, as the executive bit, I could say it's

2     not good enough, it's not going to delight users the

3     right way, things like that.

4          Q.   Just let me return to the topic of the GPL

5     for a minute.  Android includes -- start over again.          09:09:19

6               Android rests on Linux; correct?

7               MS. ANDERSON:  Objection.  Form.

8               THE WITNESS:  I don't understand "rest."  Can

9     you -- how?

10         Q.   BY MR. JACOBS:  How would you describe the          09:09:35

11    relationship between Android and Linux?

12         A.   Well, Linux is a separate project managed by

13    a separate team not at Google.  Google makes

14    contributions to Linux, drivers, some kernel

15    contributions, and things like that.  And then Android          09:09:49

16    relies on cellular phone manufacturers taking the Linux

17    project, incorporating it into their cell phone designs,

18    and then putting Android on top of those efforts.

19         Q.   So Google itself does not ship Linux -- does

20    not -- does not ship.  Start over.          09:10:10

21              Google itself does not convey the Linux code

22    base to cell phone manufacturers; correct?

23         A.   That I don't know the exact answer to.  Each

24    one of these is stored in a source code repository.

25    There's public repositories and private repositories.          09:10:30

Page 32

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

1    to any review that has been conducted?

2            MS. ANDERSON:  Same objection, same

3    instruction.

4            THE WITNESS:  I have no idea what you're

5    reading from.  I've never seen it so it's hard to verify      09:13:53

6    that it's accurate.

7            Q.  BY MR. JACOBS:  Are you following your

8    counsel's instruction not to answer on grounds of

9    privilege?

10           A.  I'm -- I just have never seen the document      09:14:05

11   that you're referencing.  So I have no way to verify what

12   you're reading to me is in any way relevant to what we're

13   talking about.

14           Q.  But what I've read to you so far doesn't

15   cause you to reconsider any answer you've given so far       09:14:17

16   about Google's review of Sun or Oracle America patents;

17   correct?

18           MS. ANDERSON:  Objection.  Form.  Instruct

19   the witness not to answer on grounds of attorney-client

20   privilege to the extent your answer would reveal            09:14:30

21   communications with counsel.

22           THE WITNESS:  I'll take the advice of my

23   counsel.

24           Q.  BY MR. JACOBS:  In the course of the lawsuit,

25   Oracle -- I'll use Oracle from here on out to refer to      09:14:53

                                                        Page 35

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

```
 1    Oracle America -- Oracle has made specific accusations
 2    about a patent infringement in Android.
 3              Have you reviewed those accusations?
 4              MS. ANDERSON:  Objection.  Form.  Also
 5    caution the witness not to disclose any communications      09:15:08
 6    you had with counsel on the grounds that it's privileged,
 7    and instruct you not to answer to that extent.
 8              THE WITNESS:  I mean, generally speaking,
 9    when -- you know, when something shows up in the press or
10    something, I'll read a newspaper, I'll read a blog, but I   09:15:21
11    don't have detailed knowledge about the actual case
12    claims that Oracle has made against us.  Those usually
13    get delivered directly to the legal team.
14         Q.  BY MR. JACOBS:  So let me ask you this
15    question with the intent of dividing up possible            09:15:40
16    privileged communications from non-privileged activities
17    you may have conducted.
18              Have you actually reviewed what I'll refer to
19    as the infringement contentions in this lawsuit?  It's a
20    very thick document in which Oracle sets forth the claims   09:15:51
21    of the patents-in-suit and the accused functionality.
22              MS. ANDERSON:  Objection.  Instruct the
23    witness not to answer on the grounds of attorney-client
24    privilege to the extent responding would inherently
25    disclose communications you had with counsel.               09:16:06
```

Page 36

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

```
 1              THE WITNESS:  I'll take the instruction of my
 2     counsel.
 3              Q.  BY MR. JACOBS:  Do you have a view, based on
 4     a review of the patents in the litigation, whether
 5     Android is bringing any of those patents?                09:16:28
 6              MS. ANDERSON:  Objection.  Form.  And also
 7     object to the extent the question is seeking to disclose
 8     communications with counsel, on that basis, I would
 9     instruct you not to answer on grounds of privilege,
10     otherwise you may answer.                                09:16:45
11              THE WITNESS:  I will not answer based on the
12     advice of my counsel.
13              Q.  BY MR. JACOBS:  Have you asked anybody on
14     your team to assist counsel in reviewing the allegations?
15              MS. ANDERSON:  Objection.  Instruct the         09:16:57
16     witness not to answer on grounds of attorney-client
17     privilege.
18              THE WITNESS:  I'll take that advice.
19              Q.  BY MR. JACOBS:  Has anybody on your team
20     assisted counsel in reviewing Oracle's patent            09:17:08
21     infringement allegations?
22              MS. ANDERSON:  Objection, and instruct the
23     witness not to answer on the grounds of attorney-client
24     privilege.
25              THE WITNESS:  Again, I'll take that advice.     09:17:17
```

Page 37

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

```
 1            Q.  BY MR. JACOBS:  Has anybody on your team,

 2      aside from assisting counsel, separate from any

 3      interaction with counsel, reviewed the patents-in-suit?

 4            MS. ANDERSON:  Hold on.  Objection.  Form.

 5      And to the extent you understand the question to seek      09:17:39

 6      communications with counsel, I instruct you not to answer

 7      on grounds of attorney-client and work-product privilege.

 8            THE WITNESS:  I'll take the advice of my

 9      counsel.

10            MR. JACOBS:  The form objection was good so          09:17:49

11      let me ask it again.

12            Q.  Has anyone on your team reviewed the patents

13      without being asked to do so in connection with the --

14      something that counsel is doing?

15            MS. ANDERSON:  Objection.  Form.  And also           09:18:01

16      caution the witness not to disclose communications with

17      counsel and would instruct you not to do so on grounds of

18      privilege.

19            THE WITNESS:  Not that I know of.

20            Q.  BY MR. JACOBS:  And again, you have not done     09:18:11

21      so; correct?  You have not sat down with the patents on

22      your own, separate from any request from counsel that you

23      review the patents, and just look and just study the

24      patents; correct?

25            MS. ANDERSON:  Objection.  Form.                     09:18:25
```

Page 38

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

1    question is:  Tim Lindholm is still involved in

2    interactions with you at this stage around the strategy

3    and around the strategy vis-à-vis Sun; correct?

4          A.  Yes, I'm still using Tim as a sounding board

5    for some of my strategic ideas.                        11:12:57

6          Q.  And then he says "I agree that if you're

7    prepared to forego an independent implementation route

8    then in clicking through these licenses probably will not

9    matter, I have no basis for an opinion of whether Google

10   could do an independent implementation, but even if we   11:13:10

11   were to do one, today's spec licenses do grant a fair bit

12   of latitude in downstream licensing."

13              Do you see that?

14          A.  Yes, I do.

15          Q.  What is your understanding about that point    11:13:22

16   of "a fair bit of latitude in downstream licensing"?

17          A.  You know, I take it at face value.  I don't

18   know exactly what Tim was referring to, but I would just

19   take it as its face value from what he wrote.

20          Q.  Did you sit -- did you yourself and I want to   11:13:35

21   ask this in a way that doesn't draw the privilege

22   objection, so let me ask it very precisely:

23              Did you on your own and by "on your own," I

24   mean without the involvement of people in Google's legal

25   department, sit down and study Sun's licenses around      11:13:54

Page 108

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

```
1    JSRs?

2              MS. ANDERSON:  So, again, I caution you to

3    exclude from your answer any information that would

4    inherently reveal communications with counsel for Google

5    but, otherwise, you may answer.                    11:14:09

6              THE WITNESS:  Yeah, so again, those licenses

7    aren't -- those licenses that are available via

8    click-through, I did not go there and, you know, wait to

9    click the "I agree" button and read the text there.  I

10   knew that those click-throughs existed and that's       11:14:24

11   basically the extent of my knowledge.

12            Q.  BY MR. JACOBS:  Did you get -- did you

13   involve Google's counsel in review of the terms of

14   click-through licenses at any point in the development of

15   Android?                                           11:14:41

16            MS. ANDERSON:  Objection.  Instruct the

17   witness not to answer on grounds of attorney-client

18   privilege.

19            THE WITNESS:  I'll take that advice, thank

20   you.                                               11:14:53

21        Q.  BY MR. JACOBS:  Do you believe that what you

22   have done in the development of Android is -- does not

23   represent a violation of any of Sun's click-through

24   licenses?

25            MS. ANDERSON:  Objection.  Form.  Also       11:15:06
```

Page 109

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

1    objection to the extent that responding to this question

2    would require you to reveal communications with counsel,

3    I instruct you not to answer on grounds of

4    attorney-client work product.

5             THE WITNESS:  So keeping the objection in        11:15:21

6    mind, I believe that our clean room process was intact

7    and good enough to protect our procedures and policies.

8         Q.  BY MR. JACOBS:  And why do you believe that

9    specifically with respect to the terms of Sun

10   click-through licenses?                                   11:15:36

11            MS. ANDERSON:  And again, same objection.

12   Form and same instruction as to the prior question.

13            THE WITNESS:  Because I don't believe anybody

14   actually clicked through those licenses.

15        Q.  BY MR. JACOBS:  And when you say "anybody"       11:15:47

16   what do you mean?

17        A.  Anybody that is directly involved in the

18   clean room effort to build a virtual machine within

19   Google.

20        Q.  And what about people outside Google who         11:15:54

21   contributed code to Android?

22        A.  Specifically, if it was code that was

23   contributed to the virtual machine, I do not believe any

24   of those people would have been permitted to click

25   through the license.  My instruction to them was don't    11:16:10

Page 110

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

```
 1     interprets it.

 2            Q.  And that product that you released implements

 3     Java.lang API's, correct?

 4                MS. ANDERSON:  Objection.  Form.

 5                THE WITNESS:  The product that I released     12:11:49

 6     incorporates some Apache Harmony code that implements

 7     Java.lang API's.

 8            Q.  BY MR. JACOBS:  So in making the decision to

 9     release a product that incorporates Apache Harmony code

10     that implements Java.lang API's, were you relying on your   12:12:02

11     belief that Java.lang API's were not copyrightable?

12                MS. ANDERSON:  Objection.  Form.

13                THE WITNESS:  Well, first of all, I didn't

14     write the majority of those, somebody else wrote the

15     majority of those, so I didn't believe that I would be in   12:12:16

16     violation of anybody's copyright.

17                Further, from my personal knowledge, I don't

18     believe that API's are copyrightable.

19            Q.  BY MR. JACOBS:  And did you rely on that

20     personal knowledge in making the development decision to   12:12:26

21     release Android with Apache Harmony code that implemented

22     Java.lang API's?

23                MS. ANDERSON:  Objection.  Form.

24                THE WITNESS:  There were multiple things that

25     I relied on.  One of the things that I relied on was my    12:12:40
```

Page 154

**EXHIBIT E**

```
 1    belief that API's were not copyrightable.
 2            Q.  BY MR. JACOBS:  And in making that decision,
 3    did you consult with counsel?
 4            MS. ANDERSON:  Objection.
 5            Q.  BY MR. JACOBS:  Sorry, let me start over      12:12:51
 6    again.
 7            And in relying on that as one factor in your
 8    release decision, did you consult with counsel?
 9            MS. ANDERSON:  Instruct the witness not to
10    answer on the grounds of attorney-client privilege.      12:13:01
11            THE WITNESS:  I will take the advice of my
12    counsel.
13            Q.  BY MR. JACOBS:  What is your basis for the
14    your personal belief that API's are not copyrightable?
15            MS. ANDERSON:  Objection.  Form.                 12:13:09
16            THE WITNESS:  Industry stories and folklore
17    of what I've heard about various legal cases around
18    Nintendo and the fact that a lot of these things were
19    documented in books that were in the public domain.
20            Q.  BY MR. JACOBS:  Anything else?               12:13:22
21            A.  No.
22            Q.  And in particular, I just have to ask this
23    again:  Did you consult with counsel over your tenure at
24    Google around the question of whether API's were
25    copyrightable as it related to Android?                  12:13:35
```

Page 155

**EXHIBIT E**

```
 1              MS. ANDERSON:  Objection.  Instruct the

 2     witness not to answer on the grounds of attorney-client

 3     privilege.

 4              THE WITNESS:  I'll accept the advice of my

 5     attorney.                                         12:13:44

 6              MS. ANDERSON:  It would be good to take a

 7     lunch break, counsel, whenever you're ready.

 8              MR. JACOBS:  This is a great time.  Thanks.

 9              THE VIDEOGRAPHER:  This marks the end of Tape

10     Number 2 in today's deposition of Andy Rubin.  The time   12:13:54

11     is 12:13 p.m.  We are off the record.

12              (Recess.)

13              THE VIDEOGRAPHER:  This marks the beginning

14     of Tape Number 3 in today's deposition of Andy Rubin.

15     The time is 1:13 p.m., and we are on the record.          13:13:42

16              (Exhibit PX315 was marked for

17              identification.)

18         Q.  BY MR. JACOBS:  Take a look at 315, please.

19         A.  Uh-huh.

20         Q.  The document you're now taking a look at is       13:14:52

21     dated -- is an email dated April 12, 2006, covering a

22     document called "Dalvik Overview," and it's from

23     Mr. Horowitz to you, subject Dalvik Overview PDF.

24              Do you see that?

25         A.  Yes, I do.                                        13:15:08
```

Page 156

**EXHIBIT E**

Highly Confidential - Attorneys' Eyes Only

```
 1            Q.  And it says, "These are the slides we

 2     presented to Nadim and Mark at our meeting last week."

 3            Do you see that?

 4       A.  Yep.

 5       Q.  And Nadim is Nadim Fresko?                  13:15:16

 6       A.  I assume.

 7       Q.  And who is Mark?

 8       A.  I don't know.

 9       Q.  You understood that these were slides that

10     were presented to Sun by Google personnel; correct?  13:15:24

11            MS. ANDERSON:  Objection.  Form.

12            THE WITNESS:  Apparently, yes.

13       Q.  BY MR. JACOBS:  Had you been involved in the

14     run-up to that presentation?

15       A.  What do you mean the run-up?                 13:15:33

16       Q.  In the period leading up to that meeting, had

17     you been involved in preparations for the meeting?

18            MS. ANDERSON:  Objection.  Form.

19            THE WITNESS:  Probably to some extent, but it

20     seems like a technical presentation, so I would -- you  13:15:46

21     know, I probably reviewed it and gave some guidance, but

22     I didn't have a lot of technical contributions to it.

23       Q.  BY MR. JACOBS:  This is the first mention in

24     the documents we've seen today of the word "Dalvik."  And

25     this is dated April 12th, 2006.                   13:16:02
```

Page 157

**EXHIBIT E**

1   STATE OF CALIFORNIA   ) ss:

2   COUNTY OF MARIN       )

3

4         I, LESLIE ROCKWOOD, CSR No. 3462, do hereby

5   certify:

6         That the foregoing deposition testimony was

7   taken before me at the time and place therein set forth

8   and at which time the witness was administered the oath;

9         That testimony of the witness and all

10   objections made by counsel at the time of the examination

11   were recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16         I further certify that I am neither counsel

17   for any party to said action, nor am I related to any

18   party to said action, nor am I in any way interested in

19   the outcome thereof.

20         IN WITNESS WHEREOF, I have subscribed my name

21   this 28th day of July, 2011.

22

23

24                     *Leslie Rockwood*

25              LESLIE ROCKWOOD, CSR. NO. 3462

Page 292

**EXHIBIT E**