Highly Confidential - Attorneys' Eyes Only

```
 1            UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3              SAN FRANCISCO DIVISION
 4
 5   --------------------------
 6   ORACLE AMERICA, INC.,     )
 7              Plaintiff,     )
 8        vs.                  ) No. CV 10-03561
 9   GOOGLE, INC.,             )
10              Defendant.     )
11   --------------------------
12
13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14
15      Videotaped Deposition of TIM LINDHOLM, taken
16      at 333 Twin Dolphin Drive, Redwood Shores,
17      California, commencing at 9:56 a.m., Wednesday,
18      September 7, 2011, before Ashley Soevyn,
19      CSR No. 12019.
20
21
22
23
24
25   PAGES 1 - 115
```

Page 1

**EXHIBIT Q**

Highly Confidential - Attorneys' Eyes Only

```
 1  has a personal counsel as well.
 2       THE WITNESS:  Should I repeat that?
 3       MR. NORTON:  I would like the witness to
 4  answer the questions.
 5       THE WITNESS:  Okay, yes, Ms. Anderson is
 6  my -- is my -- is counsel for Google, and Michael is
 7  my personal lawyer.
 8       MR. NORTON:  Thank you.
 9    Q.  And is Google paying for your personal
10  lawyer?
11       MS. ANDERSON:  Objection to the extent
12  responding to this question would require you to
13  reveal information you only know through
14  communications with counsel, I instruct you not to
15  answer on the grounds of privilege.  Otherwise, you
16  may answer.
17       THE WITNESS:  I only know anything about
18  that through communication with my attorneys.
19       MR. NORTON:  I don't think that's a proper
20  instruction objection, and I'm not going to take up
21  limited time with that today.
22    Q.  Mr. Lindholm, you began working at Sun
23  Microsystems in March 2004; is that right?
24    A.  March 200- at Sun Microsystems?  No, I
25  think it was 1994.
                                                 Page 6
```

```
 1       MS. ANDERSON:  Objection, form.
 2       THE WITNESS:  It's a fairly long list.  But
 3  to start with, I initially worked on -- in the
 4  original Java team, which was involving the original
 5  creation of the Java platform.  I continued working
 6  on that for a number of years, and then at some
 7  point, switched over as Java -- as the Java plat-
 8  --the original technology was broken up into various
 9  subplatforms that are today known as the editions,
10  typically.  I began to work more on the edition
11  being used for mobile and embedded software.
12  BY MR. NORTON:
13    Q.  And is there a name for the edition for
14  mobile embedded software?
15    A.  Yes, typically, Sun would have -- Sun and
16  Oracle and the public would know this as Java Micro
17  Edition.
18    Q.  It was called Java ME, or Java 2 ME?
19    A.  Yeah, it's gone through various -- it went
20  through various abbreviations over time and the "2"
21  was eventually removed.  So I think today, as far as
22  I know, it's Java -- or JME.
23    Q.  One of the aspects of Java that you worked
24  on was the Java Virtual Machine; is that correct?
25    A.  That's correct.
                                                 Page 8
```

```
 1    Q.  I beg your pardon, 1994.  Thank you.
 2    A.  And March sounds approximately correct.  It
 3  was a long time ago, but I'm not sure that I'm
 4  accurate about that.
 5    Q.  But the year was 1994; is that right?
 6    A.  I think that's correct.
 7    Q.  And you continued to work at Sun until what
 8  year?
 9    A.  I believe I went from Sun to Google in
10  2005.
11    Q.  Around July of 2005; is that correct?
12    A.  That's my recollection yes.
13    Q.  And during the time that you were at Sun,
14  did you work on Java?
15       MS. ANDERSON:  Objection, form.
16       MR. LISI:  Join.
17       THE WITNESS:  During the time I was --
18  well, so Java consisted of many things.  There were
19  parts of Java -- parts of the Java technologies that
20  I did work on during that time.  I did not work on
21  all aspects of Java, just selected ones.
22  BY MR. NORTON:
23    Q.  Can you briefly summarize for me the
24  aspects of Java on which you worked during ten years
25  you were employed at Sun Microsystems?
                                                 Page 7
```

```
 1    Q.  What is the Java Virtual Machine?
 2       MS. ANDERSON:  Objection, form.
 3       THE WITNESS:  Well, so, first off, it's a
 4  virtual machine, you wouldn't be surprised by.  It's
 5  the virtual machine that was used by Sun to run the
 6  Java programming language on.  I'm not sure how
 7  deeply you would like me to go into this.
 8  BY MR. NORTON:
 9    Q.  Well, can you describe for me, in brief
10  form, in two sentences, what, in essence, does the
11  Java Virtual Machine do?
12       MS. ANDERSON:  Objection, form.
13       THE WITNESS:  Well, I would rather say   I
14  would rather start with saying what a virtual
15  machine does.
16  BY MR. NORTON:
17    Q.  That's fine.  Why don't you do that
18  first?
19    A.  Okay.  A virtual machine is    is a general
20  concept in computer science in many virtual machines
21  that existed over time.  It's typically    I don't
22  know if there is a crisp, formal definition that
23  people in the field would uniformly agree is the
24  valid one, but in a general sense, a virtual machine
25  is typically described as an abstract computing
                                                 Page 9
```

3 (Pages 6 - 9)

**EXHIBIT Q**

Highly Confidential - Attorneys' Eyes Only

```
 1  you tell me what you meant when wrote that?
 2     A.  No, I'm not sure what I meant by that.
 3     Q.  And you went on to say, "They are only
 4  somewhat aware of new licensing, and JCP
 5  implications are still somewhat worried about
 6  tainting and such stuff."  Can you tell me what you
 7  meant when you wrote, "They are still somewhat
 8  worried about tainting and such stuff"?
 9     A.  I would have to speculate.  I don't recall
10  writing that.
11     Q.  Now, you concluded this e-mail by writing
12  to yourself, "I'm going to get in all possible loops
13  around this project."
14     A.  Yes, I see that there.
15     Q.  Now, subsequent to July 15th, 2005 --
16        THE REPORTER:  Fred, can we take a quick
17  break, my battery is frozen.
18        MR. NORTON:  Sure.
19        THE VIDEOGRAPHER:  The time is now
20  a.m., and we are going off the record.
21        (Recess taken.)
22        THE VIDEOGRAPHER:  The time is now
23  a.m. We are back on the record.  This marks the end
24  of Disk 1 to the deposition of Tim Lindholm.  The
25  time is now 10:52 a.m., and we are going back off
```
Page 46

```
 1  the record.
 2        (Recess taken.)
 3        THE VIDEOGRAPHER:  This marks the beginning
 4  of Disk 2 to the deposition of Tim Lindholm.  The
 5  time is 11:12 a.m.  We are on the record.
 6  BY MR. NORTON:
 7     Q.  So after July 15, 2005, where you had
 8  written in Exhibit 526, you were going to get in all
 9  possible loops on this project.  You said that in
10  that exhibit?
11     A.  I'm looking at that now, yes.
12     Q.  And then that's what you wrote at the end
13  of the e mail to yourself, Exhibit 526?
14     A.  Well, this is   this is an e mail that I
15  don't recall writing, but it's in this e mail which
16  I don't dispute.
17     Q.  All right.  Subsequent to July 15, 2005,
18  you engaged in brainstorming with Mr. Rubin about
19  Android, correct?
20        MS. ANDERSON:  Objection, form.
21        MR. LISI:  Join.
22        THE WITNESS:  After    after July 15, I
23  think I did have some discussions with    with
24  Mr. Rubin.  I don't remember details about them or
25  how many, for instance, but I think there were
```
Page 47

```
 1  some.
 2  BY MR. NORTON:
 3     Q.  And you attended Google Product Strategy
 4  meetings concerning Android, correct?
 5        MS. ANDERSON:  Objection, form.
 6        MR. LISI:  Join.
 7     A.  I attended meetings.  Google Product
 8  Strategy meeting, I'm not -- I don't re- -- I don't
 9  remember what exactly that purpose is.  Google's
10  meetings -- meeting names change over time pretty
11  frequently, and I don't remember exactly what that
12  meeting was about.
13  BY MR. NORTON:
14     Q.  Well, you attended at least one meeting
15  with Sergei Brenn (phonetic), Larry Page, and Mr.
16  Rubin, about Android, correct?
17        MR. LISI:  Object to the form.
18        THE WITNESS:  I -- well, I believe I
19  attended a meeting -- I believe I attended a meeting
20  in roughly this timeframe, 2000 -- late 2005, that
21  Larry and Sergei were present at, and if I remember
22  correctly, Android was discussed.
23  BY MR. NORTON:
24     Q.  And you made suggestions to Mr. Rubin of
25  some employees that you thought would be good
```
Page 48

```
 1  recruits to join the Android team, correct?
 2     A.  I don't remember doing that.
 3     Q.  Did you not suggest to Mr. Rubin that he
 4  should interview Nedim Fresco (phonetic)?
 5     A.  If I remember correctly, Nedim came -- came
 6  to us.  Thinking that maybe -- you know, maybe he
 7  should come to Google.  And I think I -- I think I
 8  recall passing that on to Andy as -- as somebody he
 9  might want to talk to.
10        MR. NORTON:  Let's look at what was
11  previously marked as Exhibit 16.  I'm sorry,
12  Exhibit 308.
13        THE REPORTER:  Okay.
14     (Exhibit 308 previously marked for
15           identification.)
16        MS. ANDERSON:  Thank you.
17  BY MR. NORTON:
18     Q.  Exhibit 308, at the top, is an e-mail from
19  yourself to Mr. Rubin; is that correct?
20     A.  I haven't -- I haven't read this yet.  Just
21  from looking at the addressing, it would appear to
22  be so.
23     Q.  All right.  And it's a somewhat long
24  e-mail, but I just want to look at the last
25  paragraph of the portion from you to Mr. Rubin,
```
Page 49

13 (Pages 46 - 49)

**EXHIBIT Q**

Highly Confidential - Attorneys' Eyes Only

## Page 50

1  begins "On this same line"?
2  A.  Yes.
3  Q.  And the e-mail there states, "On this same
4  line, yesterday or the day before, I had lunch with
5  the guy at Sun, who was the brain behind Sun's
6  little JVM on Linux effort, on the efficient use of
7  multiple proccesses on Linux".  Do you see that?
8  A.  I see those words, yes.
9  Q.  He goes on to say, "He wants to get out of
10 Sun and is extremely interested in Google, even
11 while not knowing anything about Android".  Do you
12 see that?
13 A.  I do see that.
14 Q.  All right.  And then I won't read the
15 entire paragraph, but --
16 A.  Okay.
17 Q.  -- is it correct that you went on in your
18 e-mail to Mr. Rubin on August 5th, 2005, to suggest
19 that this particular person would be someone that
20 could be a key hire for Android?
21     MS. ANDERSON:  Objection, form.
22     MR. LISI:  Join.
23     THE WITNESS:  I think I -- before I can
24 answer that, I need to read the rest of the
25 paragraph because up to the point we discussed, I

## Page 51

1  can't draw the conclusion --
2     MR. NORTON:  Let me ask the question --
3     THE WITNESS:  Okay.
4     MR. NORTON:  -- a little differently.
5     THE WITNESS:  Okay.
6  BY MR. NORTON:
7  Q.  If you go to the second to the last
8  sentence of that paragraph --
9  A.  Uh-huh.
10 Q.  -- you wrote, "This guy could be a key
11 hire".
12 A.  I see that line, yes.
13 Q.  And you wrote that, correct?
14 A.  I don't specifically remember writing it,
15 but it's in this e-mail that I don't dispute I
16 must have written.
17 Q.  And the person that you're talking about
18 here was Nedim Fresco, correct?
19     MS. ANDERSON:  Objection, form.
20     MR. LISI:  Join.
21     THE WITNESS:  I do recall that I -- that I
22 did discuss, in very roughly this timeframe, the
23 possibility that Nedim -- I mean, Nedim was -- Nedim
24 came to me, as I recall, and said he was unhappy
25 with Sun and was interested in coming to Google.

## Page 52

1  So, I think it   and I don't   I don't recall
2  any    any    any such conversations with anyone
3  else.  So I think it is likely this is Nedim, but
4  I'm not 100 percent sure.
5  BY MR. NORTON:
6  Q.  Then you also made recommendations to
7  Mr. Rubin about former Sun employees who had already
8  joined Google who you thought could be of assistance
9  on Android, correct?
10 A.  Are you referring to the third    third
11 paragraph?
12 Q.  I'm not referring to the exhibit at all.
13 I'm just asking you a question.  You can set aside
14 that exhibit.
15 A.  Okay.
16 Q.  My question to you was, and you also made
17 recommendations to Mr. Rubin about other Sun
18 employees that you knew, who were already at Google,
19 and you thought would be helpful on Android,
20 correct?
21 A.  I believe that I    I believe that I
22 identified to Andy, people who had experience doing
23 Java stuff.  Some of them were    well, some of them
24 were ex Sun employees, I'm sure.
25 Q.  And you were a project advisor for Android,

## Page 53

1  correct?
2     MS. ANDERSON:  Objection, form.
3     MR. LISI:  Join.
4     THE WITNESS:  I believe -- I believe that
5  Andy, at one point, called -- wrote something that
6  said he has -- Android has advisors.  I don't think
7  that meant anything formal.  I think it just meant
8  that there was some people who were -- who were
9  occasionally giving him advice.  But it wasn't any
10 sort of formal responsibility, formal ongoing role.
11 I didn't have any such role with Android at this
12 time or any other time.
13     MR. NORTON:  Mark Exhibit 527.
14 (Exhibit 527 was marked for identification.)
15 BY MR. NORTON:
16 Q.  Exhibit 527 is an e-mail exchange between
17 you and Mr. Rubin; is that correct?
18 A.  I have got to scan over this.  Well, so not
19 having read this, this does appear to be an e-mail
20 exchange between Andy and I.
21 Q.  And reading from the bottom --
22 A.  Uh-huh.
23 Q.  -- the first of the three e-mails in this
24 string is from Andy Rubin, correct?
25 A.  That appears to be so.

14 (Pages 50 - 53)

Veritext National Deposition & Litigation Services
866 299-5127

## EXHIBIT Q

```
 1   Q.  And he writes, "Tim, I'm instituting an
 2  idea called Project Advisors for Android".  Do you
 3  see that?
 4   A.  I do.
 5   Q.  And after some further explanation, he
 6  writes, "I was wondering if I could add your name to
 7  the Java advisor team.  You're the first I'm
 8  asking."  Do you see that?
 9   A.  I do see that.
10   Q.  And he goes on; there's some more detail.
11  But you responded to his e-mail on August 9th; is
12  that correct?
13   A.  Yes, I think I responded on August 9th.
14   Q.  And you wrote, "Sure.  Sign me up."  Is
15  that what you wrote?
16   A.  That seems to be what I -- that seems to be
17  what's in here.  I don't recall writing it, but
18  that's -- that's what's in -- what seems to be in
19  that e-mail.
20   Q.  Those are the words on the page?
21   A.  And those are the words on this page, yes.
22   Q.  And you went on and wrote, "I think that
23  this only puts a name on what I've already been
24  doing and hope to keep doing."  You wrote that?
25   A.  Those are the words on this page.  I don't
```
Page 54

```
 1  specifically recall writing it.
 2   Q.  And then you go on in the next paragraph.
 3  And I want to draw your attention to the second to
 4  the last sentence in that paragraph, where you
 5  wrote, "I think my main value would be as a J2ME
 6  run-time generalist, an interpreter of the
 7  engineering business legal ecosystem."
 8   A.  Uh-huh.
 9   Q.  You wrote that?
10   A.  Again, I don't recall writing it, but it's
11  on the page.
12   Q.  And is that a fair characterization of what
13  your main value would be to Android, as of August
14  2005?
15       MS. ANDERSON:  Objection, form.
16       MR. LISI:  Join.
17       THE WITNESS:  I think -- I think what --
18  what, if anything, this reflects is -- is me
19  brainstorming a role at Google, at a time when that
20  was sort of -- when -- when what -- sorry, when what
21  my role in Google was to be was sort of in flux.
22  And I could explain that in more detail, if you'd
23  like.  But I think this was a proposal for -- for a
24  way I might -- I might be able to contribute.  I do
25  not think this is actually what happened.  The
```
Page 55

```
 1  reality was   cannot be extrapolated from that
 2  statement.
 3  BY MR. NORTON:
 4   Q.  Did you believe in August 2005 that your
 5  main value as an Android advisor would be as a J2ME
 6  run time generalist, an interpreter of the
 7  engineering business legal ecosystem?
 8   A.  That   that seems   that's what's written
 9  on this page.  At this point, all I knew about this
10  notion of what a project advisor was going to be was
11  the little bit that Andy had written previously.
12  And, in fact, my recollection is that this
13  this   this idea went nowhere.  I don't recall
14  ever   ever getting together with the project
15  advisors or ever doing anything official.  I
16  think   I think this idea pretty much died on the
17  vine.  At least my participation, as such, never
18  went anywhere.
19   Q.  Again, I ask you to try to focus on my
20  question.
21   A.  Okay.  Okay.  Sorry.
22   Q.  You   you also participated in
23  negotiations with Sun concerning a Java license,
24  correct?
25       MS. ANDERSON:  Objection, form.
```
Page 56

```
 1       MR. NORTON:  You can set aside Exhibit 527.
 2       THE WITNESS:  Okay.
 3  BY MR. NORTON:
 4   Q.  I'm sorry.
 5   A.  Yes, I -- I recall that in the 2005ish
 6  timeframe there were some discussions with Sun, and
 7  I sat in on at least one meeting of that.
 8   Q.  And you also gave Mr. Rubin advice about
 9  how he should negotiate with Sun, correct?
10  Negotiate with Sun concerning a Java license?
11       MS. ANDERSON:  Objection, form.
12       MR. LISI:  Join.
13       THE WITNESS:  At that point, there wasn't a
14  specific discussion of a Java license.  There was
15  discussion of a very broad co-marketing or
16  co-development, co-ownership agreement with Sun
17  that -- that was something that was being
18  brainstormed at the time.  It was a -- but it was a
19  very broad and new thing that would have created a
20  kind of a new -- a new entity that was -- that was
21  the joint -- joint creation of Google and Sun.
22  BY MR. NORTON:
23   Q.  There were discussions of a collaboration,
24  correct?
25   A.  Correct.
```
Page 57

15 (Pages 54 - 57)

Highly Confidential - Attorneys' Eyes Only

```
 1  Mollert, not Allen".
 2     A.  Oh, yes, I see that.
 3     Q.  Seeing that, does that cause you to believe
 4  that Vineet Gupta was, in fact, involved in
 5  negotiations on behalf of Sun over an agreement
 6  concerning Android and Java?
 7     A.  Again, I still don't remember the -- I
 8  don't remember Vineet specifically being involved in
 9  this particular meeting, but -- but that seems to
10  be -- I'm not -- I'm not -- I don't mean to dispute
11  that Vineet was present; I'm just saying I don't
12  remember specifically the details of these
13  meetings.
14     Q.  All right.  And these are your notes; is
15  that correct?
16     A.  I don't recall writing them.  Given that
17  it's an e-mail from me to me, it seems likely that
18  these are my notes.
19     Q.  You can put that one aside for the moment.
20     A.  Is it likely to come up again?
21     Q.  It is.
22     A.  So I should -- okay.  I'll set it aside, so
23  we'll have it.
24     Q.  In 2005-2006 --
25     A.  Uh-huh.
                                                Page 66
```

```
 1     Q.  I want to get some agreement on
 2  terminology.  There was a period of time when you
 3  were involved in discussions of an agreement between
 4  Sun and Google, concerning Java and Android; is that
 5  not correct?
 6     A.  I think that in the period 2005 2006, kind
 7  of July to July, there  there was  there was a
 8  discussion going on about this joint development
 9  agreement that I'd mentioned earlier.  I was
10  involved to some degree in that.
11     Q.  You understood during the  that timeframe
12  that it was critical that Google obtain a license
13  from Sun, correct?
14        MS. ANDERSON:  Objection, form.
15        MR. LISI:  Join.
16        THE WITNESS:  Yeah.  No, I don't   I don't
17  think   I don't think it was critical.  I think
18  I think that Google was looking at one of,
19  potentially, multiple alternatives that it could
20  have used to build what ultimately became Android,
21  but critical implies that it would    well, it would
22  seem to suggest that there's no other choice, and I
23  don't think that is true.
24        MR. NORTON:  Let's look at Exhibit 312.
25        (Exhibit 312 previously marked for
                                                Page 67
```

```
 1          identification.)
 2        THE WITNESS:  Okay.
 3  BY MR. NORTON:
 4     Q.  Exhibit 312 is a February 10, 2006, e-mail
 5  exchange between yourself and Bill Coughran; is that
 6  correct?  Am I saying that correctly?
 7     A.  Coughran.
 8     Q.  Coughran.  Thank you.
 9     A.  It's a tough one, too.  Okay.  Bill -- so I
10  think this is Bill -- as I read this document, I
11  think this is Bill's response to something I'd sent
12  him.
13     Q.  And what appears immediately beneath his
14  response is the thing that you sent to him,
15  correct?
16     A.  That appears -- it appears to be true, what
17  I'm reading on this page.
18     Q.  And what you sent him was an e-mail on
19  Friday, February 10th, with a subject line, "Travel
20  for Android requested", correct?
21     A.  That is -- that's what the subject says,
22  yes.
23     Q.  And was Mr. Coughran your boss in February
24  2006?
25     A.  February 2006?  I think he was, yes.  I
                                                Page 68
```

```
 1  think he was.
 2     Q.  Is that why you were asking him for
 3  permission to travel?
 4     A.  I believe so.  It would be appropriate to
 5  do that, I think.
 6     Q.  And why don't you read out loud for me the
 7  first paragraph of your e-mail to Mr. Coughran after
 8  you wrote, "Hi, Bill".
 9     A.  "As you might be vaguely aware, I've been
10  helping Andy Rubin with some issues associated with
11  his Android platform.  This is mostly taking the
12  form of helping to negotiate with my old team at Sun
13  for a critical license."
14     Q.  And "critical" was the word that you used
15  in your e-mail in February 2006, correct?
16     A.  That is the -- that is the word that's on
17  this page.
18     Q.  And are -- is it your testimony that the
19  license that you were negotiating for February 2006
20  was not a critical license?
21        MR. LISI:  Objection, form.
22        THE WITNESS:  What -- what I would say is,
23  if you take -- if you take this statement out of
24  context, you get a different meaning from the actual
25  context that was intended.
                                                Page 69
```

18 (Pages 66 - 69)

Veritext National Deposition & Litigation Services
866 299-5127

**EXHIBIT Q**

Highly Confidential - Attorneys' Eyes Only

Page 74

```
 1  BY MR. NORTON:
 2     Q.  -- in February 2006.  In February 2006, let
 3  me put this on that, how knowledgeable were you,
 4  personally, about Android technology?
 5         MS. ANDERSON:  Objection, form.
 6         MR. LISI:  Join.
 7         THE WITNESS:  I had had no exposure to it
 8  whatsoever.
 9         MR. NORTON:  Well, that's not true, was it,
10  sir?
11         MS. ANDERSON:  Objection, form.
12         THE WITNESS:  Well, I can't -- what might
13  you mean?  I had -- I had never looked at the source
14  code.  At this point, I'm not even sure what
15  technology was brought in to Google by the Android
16  acquisition.  I'm not sure what they had.  I hadn't
17  had those discussions.  I hadn't been exposed to
18  source code or whatever it was that they had at that
19  time.
20  BY MR. NORTON:
21     Q.  Do you recall in December of 2005 that you
22  got a run-through of the Android technology from the
23  Android team?
24     A.  No.
25     Q.  You don't recall that?
```

Page 75

```
 1     A.  No.
 2     Q.  Is it your testimony it didn't happen?
 3     A.  No, I just don't recall it.
 4     Q.  So in February 2006, how knowledgeable were
 5  you about alternatives to Android for Google?
 6         MS. ANDERSON:  Objection, form.
 7         MR. LISI:  Join.
 8         THE WITNESS:  Was that a correct question?
 9  BY MR. NORTON:
10     Q.  It probably    it probably was not a
11  correct question.  In February 2006, how
12  knowledgeable were you to alternatives to a Sun Java
13  license for Android?
14         MS. ANDERSON:  Objection, form.
15         MR. LISI:  Join.
16         THE WITNESS:  I had    I had    by my    by
17  my past occupation at Sun, I was aware of, for
18  instance, other    other Java technology, such as
19  IBM's J9, I believe they called it.  It was another
20  Java implementation.  There were various open source
21  Java implementations out there.  There were    even
22  if we look at Android as some implementation that
23  relates to any Java technology, there were
24  alternatives to what    to what Sun had out there.
25  And then there were also, potentially, non Java
```

Page 76

```
 1  alternatives that could have been used, too.
 2  BY MR. NORTON:
 3     Q.  On open source alternatives, it was your
 4  opinion, in fall of 2005, that most of the open
 5  source Java virtual machines, at least, were
 6  "complete crap"; that was your term, correct?
 7     A.  I don't know.  Do you have something that
 8  says that?
 9     Q.  Actually, you have Exhibit 308.
10         MS. ANDERSON:  308.
11         THE WITNESS:  Is that this one?
12         MS. ANDERSON:  Yes.
13         THE WITNESS:  Okay.  Okay.
14  BY MR. NORTON:
15     Q.  All right.  If you look at the top of the
16  e-mail string, which was from you to Mr. Rubin; do
17  you see that?
18     A.  Yes.
19     Q.  And you're responding to something that
20  Ryan wrote --
21     A.  Uh-huh.
22     Q.  -- which I think you'll see on the second
23  page --
24     A.  Uh-huh.
25     Q.  -- which, in turn, he was commenting on
```

Page 77

```
 1  what was still yet another Google employee had
 2  written through the course of the other pages.
 3     A.  Okay.  So this is a four page e mail with
 4  lots of inclusions.  Do you want me to read it?
 5     Q.  Well, all I want you to do is tell me
 6  whether or not you wrote the e mail at the top of
 7  the page.
 8     A.  It would appear that I did.  I don't
 9  specifically remember doing it.
10     Q.  And in the second paragraph of Exhibit 308,
11  what you wrote was, "FWIW", which is "for what it's
12  worth"; is that right?
13     A.  Yes, if I wrote that today, that's what it
14  would mean.
15     Q.  "For what it's worth, I largely agree with
16  Ryan.  I think that the guy pointing to the various
17  open source efforts out there is largely clueless.
18  Okay.  Maybe there might be a few odds and ends that
19  would be worth picking up, or would have no value to
20  add, and the license is onerous.  But most of that
21  stuff is complete crap.  The first 30 percent of a
22  Java run time is not nearly as valuable or costly as
23  the last 30 percent or 5 percent of a commercial
24  quality one."  Did you write that?
25     A.  I don't specifically remember writing that.
```

20 (Pages 74 - 77)

**EXHIBIT Q**

Highly Confidential - Attorneys' Eyes Only

**Page 78**

1  It's on this page.
2  Q.  So you can set aside Exhibit 308.
3  A.  Okay.
4  Q.  On February 2006 --
5  A.  Okay.
6  Q.  -- that document in front of you now.  The
7  question is, in February 2006 --
8  A.  Uh-huh.
9  Q.  -- what did you believe to be the best
10 technical alternative to using Java in Android?
11     MS. ANDERSON:  Objection, form.
12     MR. LISI:  Join.
13     THE WITNESS:  I'm not -- I'm not sure I can
14 put my head back at that time and understand what I
15 would have said then.  I mean, there were
16 alternatives -- there were alternatives.  That --
17 that there is no question.  You're asking me to rank
18 them.  And I in -- and I just don't think I can say,
19 back at that time, what the value of each of these
20 alternatives were, whether they even existed back
21 then, as I remember them today.
22 BY MR. NORTON:
23  Q.  Did you have any discussions with Mr. Rubin
24 about what the alternatives were to obtaining a Java
25 license from Sun for Android?

**Page 79**

1      MS. ANDERSON:  Objection, form.
2      MR. NORTON:  Prior to February 2006.
3      THE WITNESS:  I don't -- I don't remember
4  specifically any such thing.  In fact, it's perhaps
5  somewhat unlikely.  I think I was -- I was brought
6  in on request by Andy to talk about the specific Sun
7  Google thing.  I wasn't making the strategy.  I
8  wasn't proposing what Andy ought to do.  I was just
9  more -- more commenting on things that he was
10 driving, he was doing.
11  Q.  Can you tell me what -- without saying
12 which is the best -- tell me which are the three
13 best alternatives for the Sun license for Android in
14 February 2006?
15     MS. ANDERSON:  Objection, form.
16     THE WITNESS:  I don't think that's a
17 reasonable question because it depends on what
18 you're trying to do, how far afield you're trying to
19 do it.  If you're looking for a Java
20 language-oriented solution versus another one, you
21 know, is C# an alternative, at that point.  You have
22 to decide whether -- whether a non-Java language
23 alternative is in the ballpark or not.  I don't
24 think that's a question I could reasonably answer.
25  Q.  Given what Google was trying to do with

**Page 80**

1  Android, as you understood it in February 2006, what
2  were the three best alternatives to a Sun license
3  for Java to be used with Android?
4      MS. ANDERSON:  Objection, form.
5      MR. LISI:  Join.
6      THE WITNESS:  I just don't think I can put
7  myself back in the mindset, nor do I frankly think I
8  was thinking about that at the time.
9  BY MR. NORTON:
10  Q.  You -- you did testify a few minutes ago
11 that there were alternatives to a Sun license in
12 February 2006; is that correct?
13  A.  I think that -- that was my general
14 knowledge.  There were other products on the market
15 that were, at least, if you read the marketing
16 literature, they were -- they were alternatives.
17 That was just a simple fact of the state of the
18 market, at that point.
19  Q.  Can you tell me -- can you tell me any one
20 of the five best alternatives that existed in
21 February of 2006, given what Google wanted to do
22 with Android, at that time?
23     MS. ANDERSON:  Objection, form.
24     MR. LISI:  Join.
25     THE WITNESS:  I have trouble with --

**Page 81**

1  with     with speaking for Google about what Google
2  wanted to do with Android.  As I testified a minute
3  ago, I was brought in to comment on things.  Andy
4  and people around him were    were the ones who were
5  the repository of what Google was trying to do, and
6  they were having a meeting on what the strategy for
7  Android should be.  I was brought in, at sort of
8  point    point times to comment on things that were
9  happening, but I wasn't making the strategy and I
10 wasn't even necessarily aware of the strategy.  I
11 wasn't in the loop on that sort of thing.
12 BY MR. NORTON:
13  Q.  I'm just trying to understand your
14 testimony that there were
15  A.  Okay.
16  Q.     alternatives to a Sun license for Java,
17 for Android, in February of 2006.  And can you tell
18 me what one of the    identify the one specific
19 alternative that Google had in February 2006 that
20 you're thinking of when you tell me there were
21 alternatives.
22  A.  Yeah, because it was the best
23  Q.  I've given up on that.  All right.  Tell me
24 just one.
25  A.  So, so, one    so, so    again, I can't

**EXHIBIT Q**

Highly Confidential - Attorneys' Eyes Only

## Page 82

1  speak to whether this would -- whether, you know, I
2  don't know with the licensing, I don't -- there are
3  all sorts of things I don't know about these
4  technologies.  But, for instance, if I was going to
5  go out -- if I was, at that point, going to go out
6  and look for alternatives, I might look at IBM's J9,
7  which was, in my general understanding, a Java
8  run-time environment that was targeted for small --
9  small devices or embedded systems.  It might have
10 been an appropriate -- it was -- it was a
11 commercially available, relatively mature thing that
12 had been used in commercial products, that would be
13 my general understanding.
14         And so if we were going to say, no -- no,
15 we're not going to -- we're not going to use --
16 we're not going to talk -- talk with Sun about their
17 stuff, we might have gone to IBM and talked about
18 J9.  There -- there -- there are other things that
19 we might have tried as well.  But I'm not -- I'm not
20 saying I have any real deep knowledge of these
21 things or whether -- we could have just -- I -- I
22 --I don't -- I don't know enough about most of these
23 things to say what the conclusion would be, should
24 we have gone down some of these paths.  But at least
25 on the surface of it, there were these

## Page 83

1  alternatives.
2     Q.  Are you aware of any conversation between
3  anybody on behalf of Google approaching    Strike
4  that.  Are you aware of any efforts by Google in the
5  February    in the 2005 2006 timeframe to approach
6  IBM to discuss licensing J9, as opposed to obtaining
7  a license from Sun?
8     A.  I'm not aware of any such conversations.
9     Q.  Did you ever discuss that as an alternative
10 with Mr. Rubin?
11    A.  I don't recall discussing it, but I don't
12 recall having    I don't recall most of these
13 discussions.
14        Is it okay if I went and got a refill?
15 Just right here.
16        (Off record discussion).
17        MR. NORTON:  Go off the record for a
18 second.
19        THE VIDEOGRAPHER:  Time is now 11:55 a.m.,
20 and we are going off the record.
21        (Recess taken).
22        THE VIDEOGRAPHER:  Time is now 11:57 a.m.,
23 and we are back on the record.
24        MS. ANDERSON:  That's good.
25        (Exhibit 307 previously marked for

## Page 84

1            identification.)
2  BY MR. NORTON:
3     Q.  All right.  So let's look at what was
4  previously marked as Exhibit 307.
5     A.  Should I have that already?
6     Q.  No, that one you don't have yet.  And the
7  first page is an e-mail from Mr. Rubin to you; is
8  that correct?
9     A.  That appears to be correct.
10    Q.  Dated July 29, 2005?
11    A.  That appears to be correct, too.
12    Q.  And Mr. Rubin writes, "Tim, the enclosed
13 document starts to memorialize our thinking that was
14 brainstormed in the meeting earlier this week"; do
15 you see that?
16    A.  I see that.
17    Q.  And then if you look at the rest of the
18 exhibit, there is an attached document?
19    A.  Okay.
20    Q.  Now, do you recall a meeting in which there
21 was brainstorming prior to July 29, 2005?
22    A.  No, I think this was the point of my
23 earlier statement that I was surprised -- I didn't
24 recall meetings this early upon my joining.  Again,
25 I'd only been at Google for two, three weeks at the

## Page 85

1  most.
2     Q.  Now, in this document that Mr. Rubin sent
3  to you --
4     A.  Uh-huh.
5     Q.  -- did you review the document?
6     A.  I don't -- I don't recall seeing this
7  document.  I haven't read it, no.
8     Q.  Do you have any reason to think that if
9  Mr. Rubin sent you a document and asked you to take
10 a look and give any thoughts --
11    A.  Uh-huh.
12    Q.  -- do you think you would have done so?
13    A.  I think it's most likely that I would have
14 done so.  I would have at least looked at it,
15 whether I had any thoughts to give to him, whether I
16 had any thoughts on it.
17    Q.  And if you go to the third page of the
18 exhibit, Exhibit 307.
19    A.  I think I'm there.
20    Q.  And you see that there's a section under
21 the heading "Requirements"?
22    A.  Yes, I see that.
23    Q.  And it says, "Google needs a TCK license",
24 in the first bullet?
25    A.  I do see that.

**EXHIBIT Q**

Highly Confidential - Attorneys' Eyes Only

### Page 86

1  Q.  Did you disagree with that statement in
2  July 2005?
3  A.  I don't remember even seeing this document,
4  so I can't say whether I disagreed with it.
5  Q.  Did you have any reason to disagree with
6  this statement in July 2005?
7  A.  I can't -- I think I would need to -- I
8  think I would need to read this document in order to
9  put that -- put that statement in context.  But
10  but, again, I don't recall even receiving this
11  document.  And I'm not sure what I would have
12  thought of that statement back at that time.  It's,
13  you know, six years ago.
14      THE VIDEOGRAPHER:  Excuse me, Chris, do you
15  mind being careful?
16      MS. ANDERSON:  Oh, my microphone.  Sorry
17  about that.
18      THE VIDEOGRAPHER:  That's okay.
19  BY MR. NORTON:
20  Q.  You don't recall this document?
21  A.  No, I don't.
22  Q.  Do you know what Mr. Rubin meant when he
23  wrote, "Google needs a TCK license"?
24      MS. ANDERSON:  Objection, form.
25      MR. LISI:  Join.

### Page 87

1      THE WITNESS:  I -- I -- you need to ask him
2  about that.
3      MR. NORTON:  Let's mark Exhibit 530.
4   (Exhibit 530 marked for identification.)
5      THE WITNESS:  Thank you.
6  BY MR. NORTON:
7  Q.  Do you have Exhibit 530?
8  A.  I am looking at that now.  Is there a
9  question or --
10  Q.  This is an e-mail exchange between you and
11  Mr. Rubin, November 9th, 2005?
12  A.  That appears to be correct.
13  Q.  In the first of the e-mail, chronologically
14  you are explaining to Mr. Rubin different J2ME
15  implementations; is that correct?
16  A.  I need to read this.
17   (Witness peruses document).
18    Okay.  I've read that.  Is there a
19  question?
20  Q.  The question was, in that e-mail you are
21  explaining to Mr. Rubin different J2ME
22  implementations?
23  A.  Yes, I don't remember doing this, but it is
24  true that what is being discussed there are
25  different J2ME implementations.

### Page 88

1  Q.  And then in response, Mr. Rubin asked you,
2  "What is the MVM based on?"  Do you see that?
3  A.  I do see that.
4  Q.  And then you responded again, Mr. Lindholm,
5  on November 9th, at 2:10 p.m.; is that correct?
6  A.  I do see that.
7  Q.  And in that e-mail you also made a
8  distinction between a "Monty CLDC implementation"
9  and then what you described as another that is part
10  of their "CDC implementation", do you see that?
11  A.  Yes, I see that.
12  Q.  And you wrote, "The former, is a
13  single-process model and only provides isolation of
14  Java state".  When you said the "former" you were
15  referring to the Monty CLDC implementation; is that
16  correct?
17  A.  Well, I don't remember writing this.  Just
18  looking at it grammatically, that appears to be --
19  the former seems to refer to the Monty CLDC.
20  Q.  And then the latter -- well, not just
21  relying on your grammar, but relying on your
22  expertise on Java, does it appear to you that that's
23  your characterization of the Monty CLDC is
24  accurate?
25      MS. ANDERSON:  Objection, form.

### Page 89

1      THE WITNESS:  So my recollection of the
2  Monty CLDC is that it was a single-process model.
3  BY MR. NORTON:
4  Q.  All right.  And then the following sentence
5  says, quote, "The latter is a multi-process model
6  that gives isolation of native state".  And the
7  latter there refers to the CDC implementation; is
8  that correct?
9      MS. ANDERSON:  Objection, form.
10      THE WITNESS:  I can -- I can only say
11  grammatically, which is not very satisfying, but
12  it is true the CDC -- the CDC was a multi-process
13  model.
14  BY MR. NORTON:
15  Q.  So it's not just the grammar; it's also
16  your knowledge of what the CDC is, right?
17  A.  Yes, it's not -- it's not what I wrote at
18  this time, just my knowledge of what these things
19  were.
20  Q.  And then Mr. Rubin wrote back to you, of
21  course, "Our guys are implementing that later for
22  the isolation and resource management arguments".
23  Do you conclude that Mr. Rubin intended to write
24  "latter" instead of "later"?
25      MS. ANDERSON:  Objection, form.

**EXHIBIT Q**

Highly Confidential - Attorneys' Eyes Only

```
 1      THE WITNESS:  Yeah, I'm not sure.  I think
 2  both of them are kind of grammatically correct, but
 3  confusing.
 4      Q.  But he says, "Our guys are implementing
 5  that later for the isolation and resource management
 6  arguments", right?
 7      MS. ANDERSON:  Objection, form.
 8      MR. NORTON:  That's what he writes?
 9      THE WITNESS:  That's what he writes.
10  BY MR. NORTON:
11      Q.  And then you responded to that e-mail, and
12  you wrote, quote, "We need to make sure that
13  whatever license Sun proposes still allows you to do
14  that".  Did you write that?
15      A.  Well, apparently, it being on this page.
16      Q.  All right.  And what you expressed to
17  Mr. Rubin was that what Google was doing would
18  require that -- a license from Sun, correct?
19      MS. ANDERSON:  Objection, form.
20      MR. LISI:  Objection, form.
21      THE WITNESS:  The fact is that I can't even
22  see how that -- my apparent response -- I don't even
23  see how that's responsive to what Andy had written.
24  It doesn't make sense to me.
25  BY MR. NORTON:
                                                Page 90
```

```
 1  BY MR. NORTON:
 2      Q.  Sure.  That's not my question.
 3      A.  Okay.
 4      Q.  My question is just, you understood, when
 5  Mr. Rubin uses the words "our guys are
 6  implementing", that those words signify that people
 7  at Google are doing something?
 8      A.  If I were given this statement today, I
 9  would -- I would make that inference.
10      Q.  All right.  I've given you the statement
11  today.  I'm asking you, is that a fair inference of
12  the document?
13      A.  I think -- I think I would have to conclude
14  from reading this that Andy's guys were implementing
15  something.
16      Q.  All right, good.  And then your response on
17  that same day is that, "We need to make sure that
18  whatever license Sun proposes still allows you to do
19  that, correct?
20      MS. ANDERSON:  Objection, form.
21  BY MR. NORTON:
22      Q.  That's what you wrote, right?
23      A.  That's what the word --
24      Q.  Actually, it says --
25      A.  What --
                                                Page 92
```

```
 1      Q.  Well, Mr. Rubin is describing in his -- the
 2  last e mail before yours, he's describing what
 3  Google is doing, correct?
 4      MS. ANDERSON:  Objection to form.
 5      MR. NORTON:  Can we agree on that much?
 6      MS. ANDERSON:  Objection to form.
 7      THE WITNESS:  Andy is -- Andy makes a
 8  statement that he makes here, as far as I can tell.
 9  I mean, I believe this is Andy making a statement
10  that it is.
11  BY MR. NORTON:
12      Q.  And the statement that he's making, these
13  are all words you're familiar with, right?
14      A.  Yes, but it's not the words, but the
15  construction that I'm having trouble with.
16      Q.  So when he says, "Our guys are
17  implementing," you understood that to be something
18  that Google was doing, correct?
19      MS. ANDERSON:  Objection, form.
20      MR. LISI:  Join.
21      THE WITNESS:  At this -- at this point, I
22  wasn't -- I wasn't in the loop on anything that was
23  being implemented by the Android team, so, you know,
24  I'm -- I would take his word for it, but I had no
25  awareness what his guys were implementing.
                                                Page 91
```

```
 1      Q.  "We need" -- I'll read it.  "We need to
 2  make sure that whatever license Sun proposes, still
 3  allows you to that."
 4      A.  Oh, okay.
 5      Q.  Your counsel's pointed out there is a
 6  missing word.
 7      A.  Missing word, yes.
 8      Q.  And what you were expressing to Mr. Rubin
 9  was that Google needed to make sure that the license
10  from Sun allowed Google to do the thing, whatever it
11  was, that Mr. Rubin was describing in the e-mail
12  immediately below, correct?
13      MS. ANDERSON:  Objection, form.
14      MR. LISI:  Join.
15      THE WITNESS:  So, again -- again, I --
16  looking at this today, I don't see what sense it
17  makes.  This strikes me, with my understanding of
18  these technologies, as being -- as being a vacuous
19  statement, so I'm not sure what I meant
20  at this point.  I don't see why a license would
21  prevent what's being discussed here.
22  BY MR. NORTON:
23      Q.  Sitting here today, you don't know what you
24  meant by that statement at the top of the exhibit?
25      A.  Right, I find that statement confusing.
                                                Page 93
```

**EXHIBIT Q**

Highly Confidential - Attorneys' Eyes Only

Page 98

1 preserve TCK implementation revenue" --
2   A.  Uh-huh.
3   Q.  -- "defend franchise against fragmentation,
4 which is the main threat for long-term erosion."
5 Did you write that?
6   A.  I don't remember writing it, but it
7 sounds -- it's in this e-mail.
8   Q.  So that was what you understood to be one
9 of Allen's motivations in the negotiation,
10 correct?
11      MS. ANDERSON:  Objection, form.
12      THE WITNESS:  So I don't remember writing
13 this.  And I will point out that I'm saying, "Allen
14 presumably wants", so I think I was speculating
15 even -- even -- even back then, as to what Allen --
16 what Allen's considerations were.
17 BY MR. NORTON:
18   Q.  But when you wrote an e-mail to Mr. Rubin
19 and Mr. Minor, talking about Sun and things to keep
20 in mind, you would have given your best
21 understanding of Sun's perspective, wouldn't you?
22      MR. LISI:  Objection, form.
23      MS. ANDERSON:  Objection, form.
24      THE WITNESS:  I think what I would write
25 depends on the context on which it was written.  If

Page 99

1 I dashed something off or if I -- and I don't recall
2 the context in which this was written at all, so I
3 can't really vouch for the quality of the opinions.
4 BY MR. NORTON:
5   Q.  But these are the opinions you expressed to
6 Mr. Rubin at the time?
7   A.  This is the e-mail that I apparently
8 wrote.
9   Q.  All right.  And in the e-mail that you
10 wrote, you also wrote in the same paragraph, but
11 towards the end, last sentence reads, "We do not
12 want to turn this into a negotiation for buying the
13 Java franchise itself with Sun, even compensating
14 for the risk of its loss".  While Sun probably --
15   A.  Which paragraph are we?
16   Q.  It's in the same paragraph the way it
17 begins, "Allen, presumably".  But I'm now reading
18 the last two sentences to you.
19   A.  Okay, I'm going to get something to be able
20 to track that.  I write long sentences.  Okay.
21 Okay.  I see that now.  I see --
22   Q.  And you wrote, "We do not want to turn this
23 into a negotiation for buying the Java franchise
24 itself from Sun, even compensating for the risk of
25 loss.  While Sun probably will contemplate that, the

Page 100

1 price would be high."  Did you write that?
2   A.  Again, it's in this e-mail.
3   Q.  Was that your view at the time?
4   A.  I don't -- I don't actually remember what
5 my -- I don't remember the details of my view at the
6 time.
7   Q.  Did you try to figure out what the price
8 would be?
9      MS. ANDERSON:  Objection, form.
10      THE WITNESS:  Definitely not.  I -- I --I
11 don't have any background in doing that sort of
12 thing.  This is an engineer's speculating, if
13 anything.
14      MR. NORTON:  Let's mark Exhibit 532.
15   (Exhibit 532 marked for identification.)
16      MS. ANDERSON:  State on the record that
17 Exhibit 532 is a document with respect to which
18 Google has objected as being privileged on
19 attorney-client, work product grounds.  Objected to
20 its production, but was compelled under court order
21 to produce this document because the Court had
22 concluded that an order of the document was not
23 subject to privilege.  This is an issue that is --
24 that Google continues to object to and reserves all
25 rights on appeal with respect to that ruling.  And,

Page 101

1 therefore, we understand it's being marked in this
2 deposition pursuant to the fact that the Court had
3 issued that order, but we want to restate our
4 objections here, given the importance of this issue
5 to Google.
6      THE WITNESS:  Do I get that note back?
7      MS. ANDERSON:  And while I'm  I also want
8 to say, I just want to make sure, this transcript
9 needs to be designated highly confidential under the
10 terms of the protective order, until we've had a
11 chance to do other designations, that's it.
12      MR. NORTON:  Okay.
13      MS. ANDERSON:  Okay.  That's it.
14 BY MR. NORTON:
15   Q.  Mr. Lindholm
16   A.  Yes.
17   Q.   you've seen Exhibit 532 before?
18   A.  Yes, I have.
19   Q.  It's an e mail from you to Mr. Rubin,
20 Mr. Grove, Mr. Lee, and Mr.   and yourself,
21 correct?
22   A.  Well, specifically, it's to Andy and Ben
23 Lee, cc'd to Dan and myself.
24   Q.  And you see the body of the e mail?
25   A.  I do see the body of the e mail.

**EXHIBIT Q**

Highly Confidential - Attorneys' Eyes Only

**Page 102**

1  Q.  You sent this e-mail on August 6, 2010; is
2  that right?
3     A.  I believe that to be true.
4     Q.  Would you please begin reading at, "Hi,
5  Andy."  And read the entire e-mail out loud for the
6  record.
7        MS. ANDERSON:  Objection.  We state all of
8  our objections and preserve our right on appeal.
9  You may read the face of this e-mail.
10       THE WITNESS:  Okay.  Well, can I begin with
11 "Attorney work product, Google confidential", which
12 is also in the e-mail.  And it goes, "Hi, Andy, this
13 is a short pre-read for the call at 12:30.  In Dan's
14 earlier e-mail, he didn't give you a lot of context
15 for the visceral reaction that we got.  What we have
16 actually been asked to do by Larry and Sergei, is to
17 investigate what technical alternatives exist to
18 Java, or Android and Chrome.  We've been over a
19 bunch of these and think that they all suck.  Think
20 they all suck.  We conclude that we need to
21 negotiate a license for Java under the terms we
22 need.  That said, Allen Eustace said that the threat
23 of moving off Java hit Safra Katz hard.  We think
24 there's value in the negotiation to put forward a
25 most credible alternative, the goal being to get

**Page 103**

1  better terms and price for Java.  It looks to us
2  that Obj C provides the most credible alternative in
3  this context, which should not be confused with us
4  thinking we should make the change.  What we're
5  looking for from you are reasons why you hate this
6  idea, whether you think this is a nonstarter for
7  negotiation purposes and whether you think there is
8  anything we missed in our understanding of the
9  option.  Tim and Dan".
10    Q.  Thank you.  So when you wrote, "We've been
11 asked to investigate what technical alternatives
12 exist for Java and Android and Chrome, can you tell
13 me what technical alternatives you looked at?
14       MS. ANDERSON:  Objection.  Instruct the
15 witness not to answer on the grounds of
16 attorney client privilege or work product to the
17 extent responding to the question requires you to
18 reveal work that you did at the direction of counsel
19 or communications you had with counsel for Google in
20 confidence.
21       THE WITNESS:  So the investigation and the
22 technical alternatives was strictly done on the
23 request of counsel, was done with the understanding
24 of the work product.  So outside of   outside of
25 those things covered by   by that situation, there

**Page 104**

1  were no   there were no investigations.
2  BY MR. NORTON:
3     Q.  For the record, my question was not so
4  limited.  When you wrote, "We've been over a bunch
5  of these and think they all suck".  Who thought
6  "they all sucked"?
7        MS. ANDERSON:  Objection, form.  And also
8  caution the witness and instruct him not to answer
9  to the extent responding to the question would
10 require you to reveal a separate communication with
11 Google counsel or require you to reveal work you did
12 at the direction of Google counsel, as part of the
13 investigation.
14       THE WITNESS:  So   so the we   the going
15 over what we thought about them was entirely done on
16 the direction of Google counsel.  There was no such
17 work being done independently, not being done under
18 the direction of counsel.  So I don't think I can
19 answer anything there.
20 BY MR. NORTON:
21    Q.  What were the specific alternatives that
22 you have investigated for Android?
23       MS. ANDERSON:  Objection, form.  And also
24 objection on the basis of attorney client,
25 work product privilege.  To the extent responding to

**Page 105**

1  this question would require you to reveal
2  communications with Google counsel in confidence or
3  work done under the direction of Google counsel, I
4  instruct you not to answer on the grounds of
5  privilege.
6        THE WITNESS:  Once again, the work we
7  the work we did on this was entirely done under the
8  direction of counsel.  There was no work done
9  outside of that or for any other purpose, so I
10 cannot answer that question either.
11 BY MR. NORTON:
12    Q.  What were the technical alternatives you
13 investigated to Java for Chrome?
14       MS. ANDERSON:  Objection, form.  Also
15 object on the basis attorney client, work product
16 privilege.  Instruct the witness not to answer to
17 the extent responding would require you to reveal
18 communications with Google's counsel in confidence
19 or work that you did at the direction of Google.
20       THE WITNESS:  Again, the work that we did
21 relating to Chrome was entirely done under the
22 direction of counsel and was work product.  We   we
23 did no such work outside of direction of counsel on
24 alternatives to Chrome.
25 BY MR. NORTON:

27 (Pages 102 - 105)

**EXHIBIT Q**

Highly Confidential - Attorneys' Eyes Only

**Page 106**

1  Q.  What did you mean by "technical
2  alternatives"?
3      MS. ANDERSON: Objection. Caution the
4  witness to the extent responding to this question
5  requires you to reveal attorney client
6  communications or work product under the direction
7  of counsel, I instruct you not to answer.
8      THE WITNESS: What we were asked   what we
9  were asked to do
10     MS. ANDERSON: Objection. Caution the
11 witness. You can't respond to the extent it would
12 require you to reveal a communication with Google
13 counsel. And if you can't answer the question
14     THE WITNESS: I can't answer the question
15 in that case.
16     MR. NORTON: When you wrote, "We conclude
17 that we need to negotiate a license for Java under
18 the material we need," what were terms you had in
19 mind?
20     MS. ANDERSON: Objection. Caution the
21 witness that to the extent responding to this
22 question requires you to reveal conversations with
23 Google counsel, I instructed you not to answer on
24 the grounds of privilege.
25     THE WITNESS: This was done by   this was

**Page 107**

1  done on direction of counsel. We did do nothing
2  outside of the direction of counsel that led up to
3  that conclusion or any
4      MS. ANDERSON: I've given   I've given
5  your extra minute back for the minute I spent
6  explaining how face card gets you up to 532 and your
7  two hours are now over.
8      MR. NORTON: Well, I think there was
9  these objections and the witness' answers in
10 response to the objections have both consumed time.
11 Customarily, the witness doesn't   so I would like
12 to ask one more question.
13     MS. ANDERSON: Okay. You can ask one more
14 question.
15 BY MR. NORTON:
16  Q.  Are any of the statements you made in
17 Exhibit 532   any statements of fact or opinion you
18 made on Exhibit 532 false?
19     MS. ANDERSON: Objection, form. Also,
20 objection, caution the witness to the extent it
21 requires you to respond to this question, it
22 requires you to reveal communications you had with
23 Google counsel in confidence, or work that you did
24 at the direction of counsel. I instruct you not to
25 answer those for privilege.

**Page 108**

1      THE WITNESS: I don't think I can answer
2  that. Everything we did that led up to this e-mail
3  was done under the direction of counsel. There was
4  no work done outside of that direction.
5      MR. NORTON: I understand you want to
6  conclude the deposition now, Ms. Anderson?
7      MS. ANDERSON: Deposition is concluded.
8  Well, actually, before -- before I conclude it, I do
9  need to take a brief break and ask the witness if
10 there is anything he needs to clarify, before we go
11 off the record. But your questioning and your two
12 hours you are allowed under order is now over.
13     MR. NORTON: Well, I'll just note for the
14 record that there have been instructions not to
15 answer that were improper, so we don't agree the
16 deposition is concluded.
17     And further that, to the extent the witness
18 offers any further testimony now, I have the right
19 to ask questions.
20     THE VIDEOGRAPHER: The time is now --
21     MS. ANDERSON: We'll take a brief and then
22 we'll come right back.
23     THE VIDEOGRAPHER: The time is now
24 p.m., and we are going off the record.
25     (Recess taken.)

**Page 109**

1      THE VIDEOGRAPHER: Time is now 12:31 p.m.
2  We are on the record.
3      MS. ANDERSON: We don't have any further
4  questions.
5      MR. NORTON: Do I understand then there's
6  nothing Mr. Lindholm wants to clarify?
7      MS. ANDERSON: Not at this point, of
8  course, he will review his transcript. We will make
9  corrections, like all other witnesses do.
10     MR. NORTON: Thank you, Mr. Lindholm.
11     THE VIDEOGRAPHER: This marks the end of
12 Disk 2 of 2 and concludes the deposition of
13 Tim Lindholm. The time is now 12:31 p.m., and we
14 are going off the record. Thank you, counsel.
15     (TIME NOTED: 12:31 P.M.)

28 (Pages 106 - 109)

**EXHIBIT Q**