MORRISON & FOERSTER LLP
MICHAEL A. JACOBS (Bar No. 111664)
mjacobs@mofo.com
MARC DAVID PETERS (Bar No. 211725)
mdpeters@mofo.com
DANIEL P. MUINO (Bar No. 209624)
dmuino@mofo.com
755 Page Mill Road, Palo Alto, CA 94304-1018
Telephone: (650) 813-5600 / Facsimile: (650) 494-0792

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (Admitted *Pro Hac Vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY 10504
Telephone: (914) 749-8200 / Facsimile: (914) 749-8300
STEVEN C. HOLTZMAN (Bar No. 144177)
sholtzman@bsfllp.com
1999 Harrison St., Suite 900, Oakland, CA 94612
Telephone: (510) 874-1000 / Facsimile: (510) 874-1460
ALANNA RUTHERFORD (Admitted *Pro Hac Vice*)
575 Lexington Avenue, 7th Floor, New York, NY 10022
Telephone: (212) 446-2300 / Facsimile: (212) 446-2350 (fax)

ORACLE CORPORATION
DORIAN DALEY (Bar No. 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (Bar No. 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (Bar No. 211600)
matthew.sarboraria@oracle.com
500 Oracle Parkway, Redwood City, CA 94065
Telephone: (650) 506-5200 / Facsimile: (650) 506-7114

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ORACLE AMERICA, INC.<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, INC.<br><br>Defendant. | Case No. CV 10-03561 WHA<br><br>**PLAINTIFF'S OPPOSITION TO GOOGLE'S MOTION IN LIMINE NO. 3 TO EXCLUDE PORTIONS OF COCKBURN REPORT ON DAMAGES**<br><br>Dept.: Courtroom 8, 19th Floor<br>Judge: Honorable William H. Alsup |

I.      PRELIMINARY STATEMENT

Google's motion to exclude "certain aspects" of Prof. Cockburn's damages report rests on grounds that find no support in Prof. Cockburn's report, this Court's Orders, or the law. Google's motion misrepresents Prof. Cockburn's analysis in an undisguised effort to shock the Court into thinking that his damages estimates are just too high.

Google's effort to mislead starts with its description of the bottom-line damages estimates included in Prof. Cockburn's September report. Contrary to Google's suggestion (Google's Motion in Limine #3 ("MIL #3") at 1), nowhere does Prof. Cockburn calculate a damages figure of $2.7 billion in damages. In fact, Google comes up with this fantasy figure by adding together past damages and supposed future royalties—a curious maneuver given that Google elsewhere takes Prof. Cockburn to task for *not* including "future damages" estimates that Google includes in its $2.7 billion figure. Based on numerous misrepresentations of Prof. Cockburn's report and the law, Google's motion fails.

II.     SUMMARY OF PROF. COCKBURN'S ANALYSIS

A.      Past Damages For Patent Infringement

As the Court directed, Prof. Cockburn begins his patent-damages analysis with the formal offer from Sun to Google on February 8, 2006. (*See* Order Granting In Part Motion to Strike Damage Report of Plaintiff Expert Iain Cockburn (Dkt. No. 230) at 14; (hereinafter "*Daubert* Order"); Cockburn Report ¶¶ 17–24.)[1] Consistent with the Court's guidance, Prof. Cockburn then makes adjustments, both upward and downward, to the starting point.

Prof. Cockburn adjusts downward to account for the fact that the patents-in-suit account for only a portion of the value of the starting-point license. (*See Daubert* Order at 14; Cockburn Report ¶¶ 25–34, 96 *et seq*.) Prof. Cockburn's apportionment analysis draws on multiple sources of evidence as well as technical and market analyses that measure the importance of the features provided by the patents-in-suit. First, Prof. Cockburn discusses standardized benchmark-test data provided by Oracle engineers who disabled the patented functionality from Android phones and measured the reduction in application

---

[1] Oracle understands that the Court is currently in possession of Prof. Cockburn's revised report, which Google submitted in camera. (*See* Dkt. No. 456; Agrawal Decl. Ex. 3-1 (9/26/2011 Letter from Christa Anderson).) Accordingly, Oracle has not submitted the Cockburn Report again here. All paragraph numbers refer to the version that the Court currently has in its possession.

1  start time, execution time, boot time, multitasking, battery life, and memory, among others.  Second,
2  Prof. Cockburn uses consumer purchasing data in an econometrics analysis that models demand for
3  specific features in phones.  (Cockburn Report ¶¶ 268–73; *id.* Appendix C.)  Third, working with
4  another expert, Prof. Steven Shugan, Prof. Cockburn analyzes a market survey that tested the relative
5  importance of the patented features to consumers' purchasing decisions.  These analyses help inform
6  Prof. Cockburn's conclusions as to apportionment, which also rest on dozens of Google documents that
7  emphasize, over and over, the critical importance of speed and memory, provided in large measure by
8  the patented inventions, to the viability of Android.  (Cockburn Report ¶¶ 252–63.)

9  Prof. Cockburn also adjusts downward to follow this Court's directive to "apportion worldwide
10 revenue to isolate the part attributable to the features used in the United States."  (*Daubert* Order at 10.)
11 He apportions the starting value by reference to the percentage of Android-enabled advertising revenue
12 that flows from U.S.-based phones.  (Cockburn Report ¶¶ 41–45, 332–42.)

13 Prof. Cockburn concludes that significant upward adjustment is also warranted to compensate
14 "for the use made of the invention by the infringer," 35 U.S.C. § 274, give appropriate weight to the
15 "nature and scope of the license" as compared to the starting point license, account for Sun's
16 "established policy" of "granting licenses under special conditions" designed to preserve its patent
17 monopoly, and consider foregone Sun "derivative or convoyed sales."  *Georgia-Pacific Corp. v. U.S.*
18 *Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  Specifically, Prof. Cockburn adjusts
19 upward (with the adjustment apportioned to correspond only to the intellectual property at issue) to
20 account for the harm to Sun from having to forego expected, projected, and jointly contemplated
21 payments to Sun by third-parties in connection with a compatible, jointly controlled Android that was
22 the subject of the 2005-06 negotiations.  This adjustment is necessary to account for the harms that
23 Google actually propagated through its infringement, including eliminating Sun's ability to offer
24 licenses and services based on Android.  (Cockburn Report ¶¶ 35–38, 282–331.)

25 Prof. Cockburn also discusses, but does not quantify, the fragmentation harms that—particularly
26 looking to the future—are a key issue in this lawsuit, and would have placed substantial upward
27 pressure on even a short-term royalty for the intellectual property at issue.  Finally, to account for the
28 fact that, in 2006, the claims asserted must be deemed valid and infringed (*Daubert* Order at 15), Prof.

Cockburn concludes that a "litigation premium" would have exerted upward pressure on the reasonable royalty. Rather than specifically quantify the premium, Prof. Cockburn concludes that it is "best employed to resolve doubts" about the reasonableness of his calculations. (Cockburn Report ¶¶ 39, 283–85.)

Prof. Cockburn's opinions result in the following calculation for past patent damages:

| (millions) | 2007-2011 |
|---|---|
| **Starting Value** | ≥ $ 98.7 M |
| Adjust Downward for Patent Apportionment | ≤ $ (69.1) M |
| Adjust Upward for Loss of Expected Armstrong Monetization (Seven Patents Only) | ≥ $ 167.2 M |
| Adjust Upward for Litigation Premium (Seven Patents Only) | + upward pressure |
| Adjust Upward Removal of Cap on Revenue Share | ≥ $ 8.4 M |
| Adjust Upward for Fragmentation Harm | + additional upward pressure |
| **Subtotal of Starting Value And Upward Adjustments** | $ 205.1 M |
| Adjust Downward for Portion of Royalty Not Attributable to U.S. Infringement | ≤  $ (3.3) M |
| **Estimated Patent Damages Through Trial** | **≥ $ 201.8 M** |

(Cockburn Report ¶ 47.)

Prof. Cockburn also investigates whether Google, acting as a "prudent licensee" "reasonably and voluntarily trying to reach an agreement" for a license permitting the use it actually made of the patented inventions, *Georgia-Pacific*, 318 F. Supp. at 1120, would have been willing to pay such a hypothetical royalty for the period 2006 through 2011. Based on extensive contemporaneous evidence, he concludes that the absence of viable alternatives, the importance of getting to market quickly, and the myriad revenue streams and strategic benefits Google expected to obtain through Android would have led it to conclude that the royalty was a worthy investment under the conditions set forth under *Georgia-Pacific*. (*Id.* ¶¶ 343–416.)

        **B.**    **Past Damages For Copyright Infringement**

The copyright statute provides that the copyright owner "is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the

infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Consistent with the statute, Prof. Cockburn calculates actual damages based on (in the alternative) Oracle's lost profits or a hypothetical license, and infringer's profits according to Oracle's statutory burden (*Cf.* Cockburn Report ¶ 56).

For the hypothetical license, Prof. Cockburn uses the methodology described above with regard to patent damages, but apportions at least 15% of the portfolio value to the value of the copyrights. For infringer's profits, understanding that the copyright statute requires Google, not Oracle, to prove its deductible costs and profits attributable to factors other than the infringement, Prof. Cockburn notes, "I have therefore not calculated Google's costs or profits attributable to the infringement. If experts retained by Google offer opinions or analysis on either of those matters, I expect that I will be asked to evaluate those opinions or analyses and respond." (Cockburn Report ¶ 468.)

Accordingly, Prof. Cockburn's calculations for past copyright damages are as follows:

| | | |
|---|---|---|
| **Infringer's Profits** (subject to apportionment by Google) | | $ 823.9M |
| **Actual damages** (alternative) | Lost Fair Market Value License Fee | $ 102.6M |
| | Lost Profits | $ 136.2 M |

### C.   Future Royalties

Consistent with the Court's instructions, Prof. Cockburn structured the hypothetical license as a "series of yearly payments *with no additional lump sum up front.*" (*Daubert* Order at 11.) Consistent with the case law, Prof. Cockburn also notes that any future royalties should be adjusted to take into account the parties' changed circumstances, including the fact that Google would "already have been invested in the Android platform and Sun would have been in an advantageous position to renegotiate the terms of the licensing" (Cockburn Report ¶ 419–25), and that many of the factors of the hypothetical negotiation would shift in an upward direction, leading to a higher ongoing royalty. Perhaps more importantly, he also notes that any future royalty payment likely would not be sufficient to compensate Oracle for either the consequences of Google's past infringement or for the future harm from fragmentation of Java caused by the infringement. (*Id.* ¶ 418.)

//

III. **STANDARD OF REVIEW**

Google's motion relies on Rules 401, 403, and 702 of the Federal Rules of Evidence. Expert testimony is admissible under Federal Rule of Evidence 702 if it "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (2003). "[T]he rules of evidence do not demand perfection. Rather, a court need only determine whether the reasoning and methods underlying the expert testimony are reliable, and whether they have been properly applied to the facts." *Gutierrez v. Wells Fargo & Co.*, No. C 07-05923 WHA, 2010 WL 1233810, *11 (N.D. Cal. Mar. 26, 2010). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Fresenius Med. Care Holdings, Inc. v. Baxter, Int'l, Inc.*, No. C03-1431 SBA, 2006 WL 1390416, at *3 (N.D. Cal. May 18, 2006).

Under Federal Rule of Evidence 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "The Rule's basic standard of relevance thus is a liberal one." *Daubert*, 509 U.S. at 587. Under Rule 403, a district judge has wide latitude to make evidentiary rulings, but must appreciate "the offering party's need for evidentiary richness and narrative integrity in presenting a case." *Old Chief v. United States*, 519 U.S. 172, 183 (1997).

IV. **ARGUMENT**

None of Google's arguments provides a basis to exclude or limit Prof. Cockburn's testimony.

   A. **Google Bears The Burden Of Apportioning Its Infringer's Profits**

Google preliminarily attacks Prof. Cockburn's infringer's profits figure, misrepresenting Prof. Cockburn's analysis in an attempt to suggest that his bottom-line opinion is that Oracle is entitled to $2.3 billion in copyright damages. (MIL #3 at 2.) Google's complaint is with the copyright statute, not Prof. Cockburn's analysis. Google obstinately persists in arguing that Prof. Cockburn would award $823.9 million "based on the assumption that every cent of Google's gross Android revenue is attributable to the alleged copyright infringement." (*Id.*) But the statute could not be clearer: it is Google's burden to prove its costs, and prove that part of its profits is attributable to factors other than the copyright infringement. *See* 35 U.S.C. § 502(b); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 712 (9th Cir. 2004) (copyright holder was not required to apportion the gross profit figure); *Taylor*

5

*v. Meirick*, 712 F.2d 1112, 1121–22 (7th Cir.1983) ("It is too much to ask a plaintiff who has proved infringement also to do the defendant's cost accounting.").

Google thus mischaracterizes both the $823.9 million figure and what it calls the "$1.2 billion for future unjust enrichment damages." (MIL #3 at 2.) The former figure is Android gross revenues alone; the latter figure—a market projection of Google's Android revenues for 2012—is not part of Prof. Cockburn's damages estimates at all, as Google itself complains elsewhere in its brief. (*See id.* at 7–9.) Prof. Cockburn considers substantial evidence showing that the infringing acts had a significant causal effect on Google's Android profits, and estimated Google's gross Android revenue figures. Nothing more is required of him. If Google or its expert seeks to meet its burden of apportioning, then Prof. Cockburn may respond. (Cockburn Report ¶ 468.)

**B.     Prof. Cockburn's Choice Of The $100-Million Starting Point Is Correct**

Throughout its motion, Google attacks Prof. Cockburn's use of a $100-million "starting point" in his hypothetical license analysis. (MIL #3 at 2–3, 6.) In its *Daubert* Order, the Court wrote: "Given the presence in this case of a real-world 'comparable' close on point—the last Sun offer in 2006—the Court is strongly of the view that the hypothetical negotiation should take that $100 million offer as a starting point and adjust . . ." (*Daubert* Order at 14.) The Court's reference to $100 million stemmed from ***Google counsel's*** reference to that amount in its argument on the previous Daubert motion. (*See* Agrawal Decl. Ex. 3-2 (July 21, 2011 *Daubert* Hearing Tr. at 9:15–23 ("Mr. VAN NEST: Sun proposed a royalty all in for three years of a hundred million dollars, and that was rejected by Google. . . . THE COURT: Well, what difference does it make? Why does it matter if Google rejected it? Google may have been playing -- they may have just been trying to get it on the cheap, that doesn't mean it was reasonable to reject it.").)

Google now repeatedly argues that a starting point of $28 million is more appropriate than $100 million (MIL #3 at 2–3, 4, 7). Google's insistence on isolating one data point at its absolute lowest level in the bargaining history between the parties reverts to the "Soviet-style negotiation" that the Court has already rejected. (*Daubert* Order at 10.)

Google latches on to a single phrase in the Court's *Daubert* Order to insist that the Court must have actually meant to require Prof. Cockburn to begin with $28 million, despite the Court's clear and

specific language designating the $100-million figure as an appropriate starting point.  (*Compare* MIL # 3 at 4 ("this Court's Order 'strongly' suggested Cockburn use 'the last Sun offer in 2006' as a starting point.") with Daubert Order at 14 ("Given the presence in this case of a real-world 'comparable' close on point – the last Sun offer in 2006 – the Court is strongly of the view that the hypothetical negotiation should take that $100 million offer as the starting point and adjust as follows.")  As Prof. Cockburn makes clear, it is true that the $100-million offer, was included in Sun's first formal offer to Google in February 2006.  (*See* Agrawal Decl. Ex. 3-3 (OAGOOGLE0000357494); Cockburn Report ¶ 196.)  Sun also repeated the demand in April 2006, near the end of the negotiations.  (Cockburn Report ¶ 207; Agrawal Decl. Ex. 3-4 (GOOGLE-01-00065699).)  Contrary to Google's contention that he "ignores" the evidence, Prof. Cockburn considers the entire licensing history between the parties, ***including*** their successive bargaining positions.  (*Compare* MIL #3 at 3 *with* Cockburn Report ¶¶ 170–221 (describing Sun's licensing program and the licensing history between the parties).)

Prof. Cockburn concludes that the $100-million starting point is appropriate in light of numerous factual, economic, and legal considerations, including that:

(1) As contemporaneous Google documents acknowledge, Sun was willing to walk away from a $100-million-***per-year*** Java ME licensing business, and "compensating Sun for *at least* one year of business risk through licensing fees has a clear economic basis" (Cockburn Report ¶ 223);

(2) A revenue share is an economically rational term to include in order to align the parties' incentives, and is consistent with the proposals made both by Sun and internally by Google employee Andy Rubin to Google executives on February 5, 2006, among others (Cockburn Report ¶¶ 222–27);

(3) The $28-million offer, as well as Mr. Schwartz's views at the time, depended on unspecified "to be negotiated" terms that would have shifted if Sun retained certain kinds of control over the ecosystem, which would have guaranteed additional revenue for Sun (*see* Declaration of Daniel Purcell In Support of Google Inc's Motions in Limine ("Purcell Decl.") Ex. 16 (including "to be negotiated" terms of a go-to-market plan and governance model); Cockburn Report ¶¶ 196–218);

(4) The parties' 2006 negotiations occurred in the context of uncertainty regarding the parties' respective rights and responsibilities with regard to Sun's intellectual property, whereas the "litigation

premium" recognized by the Court would alone be an appropriate basis on which to adjust the starting point up to the $100-million level; and

(5) "The test is not what the infringer actually bargained for but what *reasonable* parties would have negotiated." (Daubert Order at 10; *see also Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081 (Fed. Cir. 1983) ("Whether the defendant was never willing to pay a reasonable royalty is irrelevant.  The willing buyer/willing seller concept is employed by the court as a means of arriving at reasonable compensation and its validity does not depend on the actual willingness of the parties to the lawsuit to engage in such negotiations.") (citations omitted.)

Against this backdrop, as Google appears to admit by never formally moving the court to exclude it, the choice of starting point is for the jury to decide.  "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 131 S.Ct. 2238 (2011); *see also United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) ("*Daubert* makes the district court a gatekeeper, not a fact finder.")

### C. Prof. Cockburn's Copyright Hypothetical License Is Legally Correct And Supported By Substantial Evidence

Google's attack on Prof. Cockburn's hypothetical license analysis of "actual damages" for copyright infringement is meritless.  Google does not attack Prof. Cockburn's lost profits analysis.

Google's argument hinges on its assertion (MIL #3 at 3–5) that a copyright hypothetical license is available only if Oracle shows that the parties would have negotiated a license for an incompatible Android.  That is incorrect.  Google relies entirely on an interpretation of an order from Judge Hamilton, citing it five times without acknowledging that Judge Hamilton herself rejected that interpretation in a clarifying order that states:

> The court did not hold as a matter of law . . . that copyright damages based upon the amount a willing buyer would reasonably have paid a willing seller under a hypothetical license are available only if the copyright owner provides evidence of actual licenses it entered into or would have entered into for the infringed works, and/or actual "benchmark" licenses entered into by any party for comparable use of the infringed or comparable works.

8

PLAINTIFF'S OPPOSITION TO GOOGLE'S MOITON IN LIMINE NO. 3
CASE NO. CV 10-03561 WHA

1   *Oracle USA, Inc. v. SAP AG*, No. C07-1658 PJH, at Dkt. No. 1088.  Judge Hamilton thus expressly
2   disclaimed that her Order stands for the proposition that Google says it does.  Even after Oracle pointed
3   out the clarification in its September 22 précis (*see* Dkt. No. 452), Google makes no effort to either
4   explain its repeated reliance on the order or provide other authority in support of its argument.  The law
5   does not require Oracle to "offer . . . evidence of benchmark transactions" (MIL #3 at 4) to recover on a
6   hypothetical license theory.

7   Google's argument is not only wrong on the law; it is wrong on the facts.  Google's assertions
8   that there is no benchmark license in this case because competitors "do not commonly license one
9   another" and "Sun never gave a license to Google for Android" are simply baffling.  Sun *did in fact*
10  offer Google a license.  As discussed above, as ordered by the Court, Prof. Cockburn expressly
11  discusses this license as a starting point, subject to upward and downward adjustments to take account
12  of differences between the starting point and the hypothetical license.  Moreover, Google cites no
13  evidence that precludes the possibility that Sun (or Oracle) would have entered into a license truly
14  comparable to the incompatible hypothetical license at issue, especially for a relatively short period of
15  time leading up to the date of trial.  Google's argument as to the supposed absence of benchmarks rests
16  on a straw man entirely of its own making.

17  Google's next argument is that the upward adjustment, built on Sun's expectations around a
18  jointly controlled Android, is improper because these expectations were "never the subject of any
19  licensing discussion."  (MIL #3 at 4.)  This is contradicted by the evidence.  The actual-world license
20  that the parties negotiated expressly contemplated that Sun would provide a commercial
21  implementation of Android—namely, a version of the stack that Sun would license for a fee to OEMs,
22  thereby generating substantial revenue.  (*See* Cockburn Report ¶¶ 292–93 (citing evidence).)  Sun's
23  expectations are catalogued qualitatively in a variety of documents (*see id.* ¶¶ 297–99), including
24  numerous *Google* documents contemplating that Sun would provide a commercial implementation of
25  Android.  (*See, e.g.*, Agrawal Decl. Ex. 3-6 (GOOGLE-26-00031474 at 481) (Google Android
26  presentation from 2006 that notes: "Sun to provide commercial implementation"); Agrawal Decl. Ex. 3-
27  7 (GOOGLE-01-00017222–227) (Sun presentation to Google explaining commercial implementation);
28

1  Agrawal Decl. Ex. 3-8 GOOGLE-58-00029945 (7/31/2005 e-mail noting that the "current deal will
2  generate quite a bit of revenue for Sun.").)

3  Because Google instead took Sun's intellectual property and used it to make Android
4  incompatible with Java, the infringement deprived Sun of these revenues.  Because the hypothetical
5  license is a proxy to identify the fair market value for the use taken by the infringer, *see On Davis v.*
6  *The Gap, Inc.*, 246 F.3d 152, 167–72  (2d Cir. 2001), it is appropriate for Prof. Cockburn to make an
7  upward adjustment to account for, among other things, derivative or convoyed sales Sun expected to
8  earn from a compatible Android but lost when Google infringed the copyrights on an incompatible
9  basis.  *Cf. Getaped.com, Inc. v. Cangemi*, 188 F.Supp.2d 398, 404, 406 (S.D.N.Y. 2002) ("[T]he value
10 of [the] copyrighted work resides not in its intrinsic value, but rather . . . in its tendency to promote the
11 sales of other products.") (citing Nimmer); *see also Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d
12 700, 707–09 (9th Cir. 2004).  The hypothetical license for copyright infringement is a measure of
13 "actual damages," not a straight re-creation of the license that Google could have (and should have)
14 accepted in 2006.

15 Unable to avoid the substantial evidence that the 2006 license promised additional value to Sun
16 on top of payments to Google, or that Google's incompatible implementation destroyed that value,
17 Google claims that Prof. Cockburn's upward adjustment is too large because it "relies entirely on a
18 'single internal Sun presentation'" that Google says is "rough," subject to change, and therefore
19 unreliable.  (MIL #3 at 5, 8).  First, Google's *ipse dixit* that "rough" means "speculative" is not
20 supported by the words that Ms. Knopoff, the author of the business model presentation, used in the
21 document itself, which was actually delivered to Sun's finance group.  (*See* Purcell Decl. Ex. 19.)
22 Second, Google's argument ignores the substantial other evidence supporting the amount of the upward
23 adjustment.  For example, contemporaneous evidence shows that the business model projections are
24 conservative because they do not include significant revenue streams that Sun anticipated would
25 "dwarf" the included revenue streams.  (*See, e.g.*, Agrawal Decl. Ex. 3-9 (OAGOOGLE0002518850 at
26 852).)  Sun's Java business was in no small part based on licensing Java and then providing products
27 and services to third parties who used the licensed implementation.  The business model presentation
28 Google attacks was a straightforward application of this approach.

1   Google's complaint about the business model presentation also fails because it merely goes to
2   the appropriate weight to be given to the specific numbers included in it.  This complaint is not the
3   proper basis for either a *Daubert* motion or a motion to exclude evidence in limine; it is for the jury to
4   decide.  *i4i*, 598 F.3d at 852 ("disputes about the degree of relevance or accuracy (above this minimum
5   threshold) may go to the testimony's weight, but not its admissibility").

6   Similarly, Google argues (MIL #3 at 5) that "there is no evidence Sun would have been able to
7   establish a viable business to exploit Android" and "it never did so in reality," but the first claim is false
8   and the second is a tautology.  The reason Sun never did so was that there was no viable business to
9   exploit an *incompatible* Android.  The evidence shows, and witnesses will testify, that but for the
10  infringing, incompatible, free version of Android, Sun and now Oracle would have been able to develop
11  a commercially viable smartphone platform of its own.  (*See, e.g.,* Agrawal Decl. Ex. 3-10
12  (OAGOOGLE0000489235 (e-mail describing Sun's 2007 acquisition of SavaJe, a company building a
13  complete stack; indicating that the "turning point" in Sun's complete mobile operating system strategy
14  was "when Google announced the Android operating system for free"); Agrawal Decl. Ex. 3-11
15  Screven 7/29/2011 Depo. Tr. at 71:13–72:4 (testifying that Google has foreclosed Oracle's ability to
16  enter the smartphone market because Android "sucked all of the air out of the room for Java on
17  smartphones").)  There is ample support for Prof. Cockburn's upward adjustment.

18  **D.   Prof. Cockburn's Patent Hypothetical License Is Correct Under The Law**

19  Google's argument (MIL #3 at 6–7) as to Prof. Cockburn's calculation of the upward
20  adjustment to the patent hypothetical license fails for exactly the same reasons as its arguments
21  regarding copyright.  The reasonable royalty determined using a hypothetical-license analysis is a
22  measure of damages that values the use that the infringer ***actually made*** of the invention, *see* 35 U.S.C.
23  § 274, not some other, less harmful use, such as what the "starting point" negotiations between the
24  parties contemplated.  To hold otherwise would not compensate for the infringement, which is what the
25  patent statute requires.  Allowing Google to pay no more for a license than it would have paid had it not
26  infringed would improperly put Google in a "heads-I-win, tails-you-lose" position.  *Panduit Corp. v.*
27  *Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158 (6th Cir. 1978).
28

Google complains that because Prof. Cockburn's upward adjustment tracks "foregone licensing revenues and convoyed sales," and because Prof. Cockburn does not specifically quantify other factors that clearly warrant upward pressure on the reasonable royalty (MIL #3 at 6), the upward adjustment is an attempt to import lost-profits under *Panduit*'s lost-profits four-factor test. Both Google's cavalier dismissal of the unquantified factors and Google's reliance on *Panduit* are misplaced. The *Panduit* lost profits factors do not apply to hypothetical-license analysis, and Google cites no authority supporting its assertion that they do. Indeed, in discussing the assessment of a reasonable royalty (as distinguished from its discussion of lost profits), the *Panduit* court itself approved the exact methodology that Google challenges: in calculating the "future business [the patentee believes] he will lose by licensing a competitor to make the machine," the Court held that "this expectant loss is an element to be considered in retroactively determining a reasonable royalty," even if this expectation was only "reasonably based on established business methods and customs." *Panduit*, 575 F.2d at 1163.

Prof. Cockburn's evaluation of Sun's losses is squarely in line with *Panduit*, as well as *Georgia-Pacific*: the outcome of a hypothetical-license negotiation ***depends*** on such factors as "the anticipated amount of profits that the prospective licensor reasonably thinks he would lose as a result of licensing the patent as compared to the anticipated royalty income." *Georgia-Pacific*, 318 F.Supp. at 1121. Google admits that *Georgia-Pacific* so holds, but complains that Prof. Cockburn's upward adjustment of $176.2 million is just too big. But the evidence at trial will show that it is both a reasonable and conservative adjustment, based on all of the factors that would have created significant upward pressure on the reasonable royalty. And whereas the projections used by Prof. Cockburn to estimate the upward adjustment are conservative, even overly optimistic projections can form the basis for inputs to the hypothetical-negotiation analysis because they show the parties' expectations and state of mind at the time the infringement began. *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384–85 (Fed. Cir. 2001) (infringer's projections); *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) (citing *Interactive Pictures*; patentee's projections).

Google also ignores that the upward adjustment applied by Prof. Cockburn is premised not only on "foregone licensing revenues and convoyed sales" (Factor 6 of the *Georgia-Pacific* test), as Google selectively argues, but also on several other independent *Georgia-Pacific* factors, including the "nature

and scope of the license" as compared to the starting point license (Factor 3), Sun's "established policy" of "granting licenses under special conditions designed to preserve [its patent] monopoly" (Factor 4), and the fact that the incompatibility of Android turned Sun and Google into "competitors in the same territory in the same line of business" rather than "inventor and promoter" (Factor 5). Each factor supports both the fact of the upward adjustment and its amount.

### E.  Prof. Cockburn's Opinions Regarding Future Royalties Are Proper

Google next claims (MIL #3 at 7) that Prof. Cockburn's analysis is flawed because he does not provide a "firm calculation of future damages" for either the copyright or patent claims. In the *Daubert* Order, the Court directed Prof. Cockburn to structure the hypothetical license as a "series of yearly payments," and not to mix past and future royalties by advancing royalties in a lump-sum payment. (*Daubert* Order at 11.) That is what Prof. Cockburn did. The jury can easily drop a curtain as of the date of trial, awarding damages that are firm and exclusively based on the past. (Cockburn Report ¶ 47.)

Google otherwise misapprehends the law governing calculation of future royalties (MIL #3 at 8). When awarding future royalties in lieu of an injunction, courts routinely follow the Federal Circuit and hold that such royalties should be based on a post-verdict assessment of the parties' changed bargaining position and other changed economic factors. Google cites no case holding otherwise.

As the Federal Circuit has held, "in most cases, where the district court determines that a permanent injunction is not warranted, the district court may wish to allow the parties to negotiate a license amongst themselves . . . . Should the parties fail to come to an agreement, the district court could step in to assess a reasonable royalty in light of the ongoing infringement." *Paice LLC v. Toyota Motor Corp.,* 504 F.3d 1293, 1315 (Fed. Cir. 2007). A year later, in *Amado v. Microsoft Corp.*, the Federal Circuit reaffirmed these principles in a different factual context—a royalty during the stay of an injunction pending appeal—extensively citing *Paice*. 517 F.3d 1353, 1361–62 (Fed. Cir. 2008). Because "[t]here is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement[,]" the court remanded, instructing the lower court that "the assessment of damages for infringements taking place after the injunction should take

into account the change in the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability." *Id.* at 1362.

Courts have applied *Paice* and *Amado* to find that the proper procedure for assessing an ongoing future royalty under § 273, if appropriate, is to perform a post-infringement analysis that accounts for changed circumstances since the date of first infringement. In *Boston Scientific Corp. v. Johnson & Johnson*, for example, Judge Illston held that she would "determine an ongoing royalty rate based on the date of the jury verdict as the date of the hypothetical negotiation," and set further evidentiary hearings. 2008 WL 5054955, at *3–5 (N.D. Cal. Nov. 25, 2008). In so doing, she noted that "[t]he Federal Circuit indicated that the trial court should consider 'additional economic factors arising out of the imposition of an ongoing royalty.'" *Id.* at *5 (citing *Paice*). Thus, "the hypothetical negotiation for post-judgment royalties should occur on the date of the verdict, when the determination of liability altered the parties' bargaining positions." *Id.* The parties later participated in an evidentiary hearing, introduced new expert testimony, and the court determined a continuing royalty. *Boston Scientific Corp. v. Johnson & Johnson*, No. C 02-0790 SI, 2009 WL 975424 (N.D. Cal. Apr. 9, 2009). Other courts have followed this methodology. *See, e.g.*, *Affinity Labs of Texas, LLC v. BMW N. Am., LLC*, --- F.Supp.2d ----, 2011 WL 1193207 (E.D. Tex. Mar. 28, 2011); *Presidio Components Inc. v. Am. Technical Ceramics Corp.*, No. 08-CV-335-IEG (NLS), 2010 WL 3070370 (S.D. Cal. Aug. 5, 2010).[2]

Google's argument seems to be that, because the hypothetical negotiation assumes validity, an injunction *always* looms. (MIL #3 at 8 ("***Every*** hypothetical negotiation presumes a finding of infringement and thus the immediate prospect of an injunction.") (emphasis in original).) If Google is conceding that an injunction is warranted in this case, Oracle would of course so stipulate; but barring

---

[2] Google argues that Judge Illston misapplied *Amado*. (MIL #3 at 8 n.2.) She did not. *Boston Scientific* is consistent with both *Paice* and *Amado*, and with the several other courts that have applied this precedent, including the two Eastern District of Texas cases that Google cites, both of which Judge Illston discusses. *Boston Scientific*, 2008 WL 5054955, at *3–*4. Both of those cases considered only whether submission of a future-damages question to a jury would be appropriate, and both discussed the "changed circumstances" that would apply in a post-verdict reasonable royalty, although neither case had occasion to apply the rule. *Cummins-Allison v Corp. v. SBM Co., Ltd.*, 584 F.Supp.2d 916, 919 (E.D. Tex. 2008) ("It is true that some factors such as the relative importance of the technology or the availability of a design-around may have changed since the date of first infringement."); *Ariba, Inc. v. Emptoris, Inc.*, 567 F. Supp. 2d 914, 918 (E.D. Tex. 2008) ("Of course, other factors . . . may have changed by the time of trial.").

that concession, Google's argument that infringement automatically leads to an injunction has been rejected by the Supreme Court. *eBay v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (no presumption of an injunction in patent cases).

Whether a future ongoing royalty should be applied will be up to the Court, as a form of equitable relief—not as a measure of damages. However, imposing a future royalty likely would not be adequate because the most significant harm at issue in this case is the largely unquantifiable and irreparable harm from fragmentation of Java that will occur if Google is permitted to continue infringing. As Prof. Cockburn explains:

> In my opinion, awarding a royalty for future infringing conduct would not be sufficient to compensate Oracle for either the continuing consequences of Google's past infringement or the full value of the infringement if it continues into the future. For example, as discussed above, the future harm from fragmentation (attributable to the infringed patents) of Java caused by the continued presence of an infringing, non-compatible version of Java on the market, both carried forward from the infringement to date and as the likely result of any future infringement, is likely to be irreparable. Carrying forward the structure of the original patent hypothetical negotiation would result in a projected royalty of $203.1 million for 2012 alone. Carrying forward the structure of the original copyright hypothetical negotiation would result in a projected royalty of $102.6 million for 2012 alone. Those sums would not adequately capture the value of the harms Oracle would continue to suffer.

(*Id.* ¶ 59.) Oracle accordingly intends to strenuously pursue injunctive relief to resolve the key issue in this case: whether Google can use Oracle's intellectual property to create an incompatible clone of Java and thereby undermine Oracle's and many others' investments in "write once, run anywhere."

### F. The Date Of Prof. Cockburn's Hypothetical Negotiation Is Appropriate

Google requests that the Court bar Prof. Cockburn from "presenting any evidence or testimony that the date of first infringement of any of the asserted patents postdates the date of first infringement of the first patent infringed." (MIL #3 at 9.) Google has nothing to complain about because Prof. Cockburn does no such thing. Instead, consistent with the guidance of the *Daubert* Order, he explains that the dates of first infringement, based on use (not commercial embodiment and sale) of the patented features, ranges from mid-2006 to mid-2007, and he conservatively chooses July 2006 as the date of the hypothetical negotiation, "immediately prior to the . . . date of first infringement of the first patent." (Cockburn Report ¶ 170.)

In any event, selecting a different date anywhere in the range would have zero effect on the royalty calculation, because Prof. Cockburn is entitled to consider evidence that post-dates the hypothetical negotiation if it is relevant in assessing the reasonableness of the royalty, *Lucent*, 580 F.3d at 1333, and because the calculation includes three years of fixed payments (which would be paid by the date of trial in any event) and a revenue share that is pegged to actual Google Android revenues that do not vary according to the precise date of the negotiation. There is no basis for any assertion that any lower royalty would apply if the negotiation were later than July 2006. Indeed, with regard to Prof. Cockburn's original report, Google complained that an October 2008 hypothetical negotiation was too late. It is unclear what date Google thinks would be just right.

### G.  Prof. Cockburn's Apportionment Analysis Is Conservative And Granular

Google makes no attempt to challenge the reliability of the conjoint analysis, the econometrics analysis, or any other aspect of Prof. Cockburn's apportionment methodology. Instead, it complains that the apportionment analysis focuses on patents rather than claims (MIL #3 at 9) and fails to specifically value the intellectual property that is not at issue in this case. (*Id.* at 6.) But the Court's order instructed Prof. Cockburn to focus on infringing *features*, which is what Prof. Cockburn did by analyzing the effect on market share of an Android with the patented functionality removed. (*Daubert* Order at 6.) Google cites no case in which any court has required an apportionment on a claim-by-claim basis, and Google makes no argument that the various claims of any single patent provide different functionality. Even the cases on the entire market value rule stress the need to measure the importance of the "invention," or the "feature," or the "component" on consumer demand. *Lucent*, 580 F.3d at 1324 (feature), *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (feature); *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287 (N.D.N.Y. 2009) (Rader, J., by designation) (damages calculation should be based on the smallest salable unit).

A patent-specific approach is also consistent with and necessary under the Court's case-management practice. If each claim carried with it an independently determined damages number, then a requirement that Oracle drop claims would deprive Oracle of substantive rights without due process. As Oracle noted in its Case Management Statement (Dkt. No. 471), there is no difference between an economic measurement by claim and one by patent. Oracle has proposed to proceed to trial by

grouping asserted claims that have the same technical substance.  The claims are basically representative of the claimed invention, and vary only as to their type.  Google evidently understands that the claims of the asserted patents are technically substantively the same, because Google has used the same invalidity and non-infringement arguments for the various claims of the patents.  (*See id.*)

### H. Prof. Cockburn's "Other Licenses" Inform But Do Not Figure Into His Damages Calculations

Google's argument about Prof. Cockburn's treatment of other mobile IP agreements (MIL #3 at 9–10) attacks a straw man.  Prof. Cockburn does not, as Google suggests, "inflate his damages estimate by presenting data about licenses for noncomparable technologies or settlements of noncomparable litigation."  (*Id.* at 9.)  Consistent with *Georgia-Pacific*'s mandate to consider "the portion of the profit or of the selling price that may be customary in a particular business or in comparable businesses to allow for the use of the invention or analogous inventions," *Georgia-Pacific*, 318 F. Supp. at 1120, Prof. Cockburn instead simply cites these agreements to underscore the reasonableness of the royalty.  Nothing is "inflated."  Indeed, the royalties paid under the other licenses and the Sun-Microsoft settlement and license do not factor at all into Prof. Cockburn's damages calculations.

The other licenses Prof. Cockburn discusses and the Sun-Microsoft agreement are relevant and instructive here, at least in the broad sense applied by Prof. Cockburn.  For example, the Sun-Microsoft case involved the predecessor in interest to Oracle (Sun), the same technology (Java), and the same overriding concern (fragmentation).  Google's insistence that fragmentation is about brand recognition (MIL #3 at 10) is false, and there is no evidentiary basis for it.  Nothing in the court's opinion in that case tied the harm of an incompatible version of the Java platform solely to Microsoft's trademark violations:

> In the present case, Sun has demonstrated a possibility of irreparable harm, if an injunction re-straining Microsoft's distribution of non-compliant Java Technology is not issued. Microsoft's unauthorized distribution of incompatible implementations of Sun's Java Technology threatens to undermine Sun's goal of cross-platform and cross-implementation compatibility. The threatened fragmentation of the Java programming environment harms Sun's relationship with other licensees who have implemented Java virtual machines.... In addition, Microsoft's unparalleled market power and distribution channels relating to computer operating systems pose a significant risk that an incompatible and unauthorized version of the Java Technology will become the de facto standard. The court further finds that money damages are inadequate to compensate Sun

for the harm resulting from Microsoft's distribution of software products incorporating non-compliant Java Technology as the harm to Sun's revenues and reputation is difficult to quantify.

*Sun Microsystems, Inc. v. Microsoft Corp.*, 87 F.Supp.2d 992, 997–98 (N.D. Cal. 2000).

Google is following in Microsoft's footsteps. Its unauthorized use of Java is undermining "write once, run anywhere" and causing the developer community to migrate away from the community-based Java standard. The Sun-Microsoft agreement is accordingly a reasonable and relevant data point for Prof. Cockburn and the jury to consider.

Google's willful infringement of Oracle's intellectual property has harmed, and continues to harm, the Java platform, which Oracle has publicly stated is the single most valuable software asset that it has ever acquired. Google knew it needed a license in 2005, when the Android team informed management that it "must take license from Sun" and Android head Any Rubin informed Larry Page that the alternative was to "do java anyway and defend our decision, perhaps making enemies along the way," and it knew it needed a license in 2006, when former Sun engineer Tim Lindholm wrote that he was helping the Android team negotiate for a "critical license." And Google knew it in 2010, when Lindholm acknowledged this fact again. Despite repeated entreaties over the course of six years, Google continues to refuse to bring Android into the Java fold, and continues to seek to capture all the benefits of Java for itself without regard for the huge investments that Oracle and many others have made to prevent any one platform vendor from acquiring significant market power.

Google's motion in limine to exclude the testimony of Prof. Cockburn should be denied.

Dated: October 4, 2011　　　　　　　　　　　BOIES, SCHILLER & FLEXNER LLP

　　　　　　　　　　　　　　　　　　　　　By:  */s/ Steven C. Holtzman*
　　　　　　　　　　　　　　　　　　　　　　　　Steven C. Holtzman

　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*
　　　　　　　　　　　　　　　　　　　　　ORACLE AMERICA, INC.