Highly Confidential - Attorneys' Eyes Only

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4
 5   --------------------------
 6   ORACLE AMERICA, INC.,     )
 7              Plaintiff,     )
 8        vs.                  ) No. CV 10-03561
 9   GOOGLE, INC.,             )
10              Defendant.     )
11   --------------------------
12
13      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
14
15      Videotaped Deposition of TIM LINDHOLM, taken
16      at 333 Twin Dolphin Drive, Redwood Shores,
17      California, commencing at 9:56 a.m., Wednesday,
18      September 7, 2011, before Ashley Soevyn,
19      CSR No. 12019.
20
21
22
23
24
25   PAGES 1 - 115
```

Page 1

Highly Confidential - Attorneys' Eyes Only

```
 1  machine that will typically include some sort of
 2  instruction set that is intended to be    well, is
 3  typically implemented as a software program.
 4       This is    I'm meaning to draw the
 5  distinction with a concrete machine, a concrete
 6  processor, such as, say, an Intel chip.  An Intel
 7  central processing unit chip will, itself, have a
 8  set of instructions, but those instructions and the
 9  other aspects of the design of that chip are
10  intended to be    are typically intended to be
11  implemented in silicon
12       THE REPORTER:  In what?
13       THE WITNESS:  In silicon as hardware.
14       So a lot of    there is a bit of a gray
15  area here in that it would be perfectly reasonable
16  for me to do a software implementation of an Intel
17  instruction set and to emulate the Intel instruction
18  set.  In fact, various    various companies have
19  done that sort of thing is my general understanding.
20       For instance, when Apple transitioned from
21  the Power PC platform to the Intel platform, I think
22  that they did an emulator for the Power PC platform
23  so that people who had old applications that were
24  compiled to the Power PC, could be run on the now
25  Intel based, new Macintoshes.
                                         Page 10
```

```
 1       THE WITNESS:  When I joined Sun in 1994,
 2  Java didn't exist.  There was no language by    no
 3  language, no virtual machine named J a v a, or JVM.
 4  The    as is become public now, at that time    at
 5  that time Sun was working on a language that's
 6  called Oak, and Oak had a virtual machine.
 7       Over time, beginning shortly after I
 8  joined, things happened in the project that had led
 9  to the creation of Oak such that    such that the
10  Oak project was basically canceled.  But some of the
11  technology that was developed in the context of Oak
12  was repurposed for the World Wide Web and was
13  renamed Java.
14       So the Oak virtual machine, which predated
15  my presence at Sun, contained a large portion or
16  probably, arguably the majority of the Java Virtual
17  Machine design.  But over the next series of
18  years    and actually, continuing to the current
19  day, the Java Virtual Machine had continued to
20  evolve over time.  But in particular, during the
21  time not long after I joined Sun, the Java Virtual
22  Machine was firmed up, fleshed out
23       Q.  Mr. Lindholm, I don't like to interrupt the
24  witness, but    and I appreciate your    you're
25  extremely knowledgeable about this, but I would like
                                         Page 12
```

```
 1       So to get back to the start, a virtual
 2  machine is an abstract machine typically meant to be
 3  implemented in software versus in silicon or
 4  hardware, like a processing processor specification
 5  that is in silicon.
 6  BY MR. NORTON:
 7    Q.  And you wanted to describe a virtual
 8  machine generally, and then my question to you
 9  previously had been could you tell me in two
10  sentences what a Java Virtual Machine is?
11       MS. ANDERSON:  Objection, form.
12       THE WITNESS:  Well, so    the    there have
13  been a number of    there have been a number
14  versions of the Java Virtual Machine over time.  But
15  generally speaking, a Java Virtual Machine refers to
16  a particular virtual machine architecture that was
17  specified by Sun and implemented    has been
18  implemented by Sun and by others.  But it's a
19  particular virtual machine design that has
20  particular features and particular properties.
21  BY MR. NORTON:
22    Q.  And were you one of the contributors to the
23  original Java Virtual Machine?
24       MS. ANDERSON:  Objection, form.
25       MR. LISI:  Join.
                                         Page 11
```

```
 1  to focus on my questions particularly
 2    A.  Okay.
 3    Q.    since we do have a very limited amount
 4  of time.
 5    A.  Okay, I'm sorry.
 6    Q.  And my question was just a "yes" or "no"
 7  for now
 8    A.  Okay.
 9    Q.    which was, were you a contributor for
10  the original Java machine    Virtual Machine, I
11  should say?
12       MS. ANDERSON:  Objection, form.
13       MR. LISI:  Join.
14       THE WITNESS:  Well, so I can't give a crisp
15  "yes" or "no" in the context of what I was saying.
16  I was a contributor to the early, not the earliest,
17  but in the early days of Java, and the early Java
18  being brought to the public eye, I was a contributor
19  at that point.
20  BY MR. NORTON:
21    Q.  And you are the coauthor of the book, "The
22  Java Virtual Machine Specifications"; is that
23  correct?
24    A.  That's correct.
25    Q.  And what is the purpose for which the Java
                                         Page 13
```

4 (Pages 10 - 13)

Page 14

1 Virtual Machine specification is used?
2     MS. ANDERSON: Objection, form.
3     MR. LISI: Join.
4     THE WITNESS: Well, it's used for a number
5 of purposes. It -- it was intended to be -- it was
6 intended to be the definitive statement of what the
7 Java Virtual Machine -- definitive definition of the
8 Java Virtual Machine. It was also used by people
9 who wanted to implement Java Virtual Machines or who
10 wanted to -- certainly, in the early days, people
11 were just very interested in Java technology. And a
12 lot of people wanted to read the virtual machine
13 specification just to understand how Java technology
14 worked. So it had quite a number of intents, and
15 I'm sure people use it for other purposes, too.
16   Q.  Your coauthor on the Java Virtual Machine
17 Specification was Frank Yellin; is that correct?
18   A.  That's correct.
19   Q.  And Mr. Yellin is also employed by Google;
20 is that correct?
21   A.  As far as I know, he was when I last talked
22 to him.
23   Q.  You were a key contributor to the Java
24 programming language, correct?
25     MS. ANDERSON: Objection, form.

Page 15

1     MR. LISI: Join.
2     THE WITNESS: I don't think I would call
3 myself a key contributor to the Java programming
4 language. I contributed some things, but there were
5 certainly quite a few people who did much more than
6 that I did. I was more focused on the virtual
7 machine.
8 BY MR. NORTON:
9   Q.  You were a key contributor to the Java
10 Runtime, correct?
11     MS. ANDERSON: Objection, form.
12     MR. LISI: Join.
13     THE WITNESS: The virtual machine is part
14 of the Java Runtime, so -- so at least by that,
15 yes.
16 BY MR. NORTON:
17   Q.  And you were an original member of the Java
18 technology project at Sun, correct?
19   A.  Well, yes, I'm not sure if in some official
20 sense there was a Java technology project. Various
21 people used various things to say that they were
22 there at the beginning when Java, as it became known
23 to the public, what was done. So, you know, I
24 what that says is I was present -- I was in the team
25 in '94, '95.

Page 16

1     MR. NORTON: Let's mark our first exhibit
2 of the day, which will be Plaintiff's Exhibit 524.
3 I will hand that to you, Mr. Lindholm. I have
4 copies for counsel.
5     (Exhibit 524 marked for identification.)
6     MS. ANDERSON: Thank you.
7 BY MR. NORTON:
8   Q.  Mr. Lindholm, have you ever seen that
9 before?
10   A.  Yes, I have.
11   Q.  Is that a website biography of you?
12   A.  I believe that it is.
13   Q.  Did you write it?
14   A.  I think that originally I did not write it.
15 I might have commented on it, but -- well, I do not
16 believe I originally wrote it.
17   Q.  But you did comment on it?
18   A.  I had seen it, yes.
19   Q.  Did you see it before it was published,
20 that is, posted on the Internet?
21   A.  I don't remember. This was -- this was
22 originally written quite some time ago.
23   Q.  And have you seen it on the Internet?
24   A.  Yes, I think I have.
25   Q.  Did you ask anybody to change anything in

Page 17

1 the website bio in Exhibit 524?
2   A.  I don't remember. I don't recall. I think
3 that -- I think that there were -- I think that in
4 the past, whether it was -- I think that in the past
5 I have asked people to change -- I think I have
6 asked something to be changed in here, but I don't
7 really remember what or what the context of that
8 was.
9   Q.  You'll see that in the second paragraph of
10 the biography it states, "Prior to Google, Tim was
11 an original member of the Java technology project at
12 Sun Microsystems and a key contributor to the Java
13 programming language and Runtime, both definition
14 and implementation." Do you see that?
15   A.  I do see that.
16   Q.  That was part of the bio that you'd seen
17 before?
18     MS. ANDERSON: Objection, form.
19     THE WITNESS: I don't know. This wasn't
20 something that I've spent a lot of time worrying
21 about. This is a small -- this was something that
22 somebody else wanted to put up about me, and I
23 said -- kind of said, "Okay."
24 BY MR. NORTON:
25   Q.  You haven't changed it, have you?

Highly Confidential - Attorneys' Eyes Only

Page 18

```
 1    A.  I don't have access to this website to
 2  change.
 3    Q.  Did you ask somebody to change that
 4  sentence that I just read?
 5        I don't remember.  I think I had some
 6  correspondence with this, but it wasn't — but I
 7  didn't really spend any time on this.
 8    Q.  Did you ask anyone to change the sentence
 9  that I just read?
10    A.  I don't remember doing so.
11    Q.  Do you recall there was litigation between
12  Sun Microsystems and Microsoft?
13    A.  Yes, I do.
14    Q.  And you were deposed twice in the
15  litigation between Sun and Microsoft, correct?
16    A.  I'm not sure if twice is the right number,
17  but I was deposed repeatedly.  I know it was two or
18  more.
19    Q.  So at least twice?
20    A.  Yes, I think that's correct.
21    Q.  Now, the first lawsuit was because
22  Microsoft tried to steal Java, correct?
23        MS. ANDERSON:  Objection, form.
24        MR. LISI:  Join.
25        THE WITNESS:  I think the — the complaint
```

Page 19

```
 1  is what — was what it was.  I don't think it would
 2  be — I don't think it would be very legitimate for
 3  me to try to paraphrase it.  I'm an engineer, not a
 4  lawyer.
 5  BY MR. NORTON:
 6    Q.  Well, I'm not asking you to paraphrase the
 7  complaint.  I'm asking, did you ever tell anyone the
 8  first Sun lawsuit was because Microsoft tried to
 9  steal Java?
10    A.  I don't recall telling anyone in exactly
11  those words, but I don't think that would be — that
12  sounds like that would be a throwaway remark.  It's
13  not a very precise statement.
14        MR. NORTON:  Let's mark Exhibit 525, and
15  I'll hand a copy of that to you.
16       (Exhibit 525 marked for identification.)
17  BY MR. NORTON:
18    Q.  Exhibit 525 is a November 13th, 2006 e mail
19  exchange between yourself and Matt Frantz; is that
20  correct?
21        MS. ANDERSON:  I'll ask him to take a
22  moment to review the document.
23        THE WITNESS:  Yeah, I think I better take a
24  look at this.  Read it from the bottom, okay.  Okay,
25  I've now read this.  Your question?
```

Page 20

```
 1  BY MR. NORTON:
 2    Q.  And DeWitt Clinton had forwarded the lower
 3  part of the e mail exchange; is that right?
 4        MS. ANDERSON:  Objection, form.
 5        MR. LISI:  Join.
 6        THE WITNESS:  Well, I guess I don't know.
 7  I would — all I can say
 8  BY MR. NORTON:
 9    Q.  I'll ask the question again.
10    A.  Yeah.
11    Q.  You've seen e mails before, right?
12    A.  Yes.
13    Q.  And you know that, as you just indicated,
14  that you read them from the bottom up, right, to
15  read them chronically?
16    A.  Correct.
17        And in this particular e mail, part of the
18  thread is an e mail sent on "11/13/06 from Nicholaus
19  Shupe."  Do you see that?
20    A.  Yes.
21    Q.  And in that, he says, amongst other things,
22  "I also wonder what Microsoft's reaction to this
23  will be given their previous involvement with Java."
24  Do you see that?
25    A.  I see that.
```

Page 21

```
 1    Q.  All right, good.  And then you see that
 2  someone named DeWitt Clinton responds to Mr. Shupe's
 3  e mail.  Do you see that?
 4    A.  Yes, I think I see that.
 5    Q.  Good, all right.  And he responds to
 6  Mr. Shupe's e mail by saying, "You mean like when
 7  Sun sued us," paren.  "I was at Microsoft working on
 8  Visual J++ at the time.  He stopped us from shipping
 9  a nearly finished product."  And he goes on from
10  there.  Do you see that?
11    A.  Yes, I do see that.
12    Q.  And Mr. Frantz forwards the e mail to you
13  and says, "Did you see this thread in Java users?"
14  Do you see that?
15    A.  I do see that.
16    Q.  And you responded to Mr. Frantz, correct?
17    A.  Yes, I think that is probably correct.
18    Q.  And in your e mail to Mr. Frantz, amongst
19  other things, you state, "Of course, if they had
20  just done C# and Dot NET at the time, rather than
21  trying to steal Java, they might well have won."
22  Did you write that?
23    A.  I don't remember specifically writing that,
24  but in the context of this document, it appears that
25  I did.
```

**Page 22**

1  Q. Do you have any reason to believe you did
2  not write and send that e mail?
3  A. No, I think I probably did.
4  Q. And when you refer to "they" in Exhibit
5  525, "If they had just done C# and Dot NET at the
6  time, rather than trying to steal Java, they might
7  have won." "They" refers to Microsoft, correct?
8  A. I think that    I think that must be
9  correct.
10  Q. And what you were referring to in your
11  e mail to Mr. Frantz was that when you said, "rather
12  than trying to steal Java," you were referring to
13  the events that were at issue in the Sun versus
14  Microsoft lawsuit, right?
15      MS. ANDERSON: Objection, form.
16      MR. LISI: Join.
17      THE WITNESS: I didn't actually understand
18  that question.
19  BY MR. NORTON:
20  Q. All right. I'll try again. In your
21  e mail, when you refer to Microsoft trying to steal
22  Java, what you were referring to were the events
23  that were at issue in the lawsuit between Sun and
24  Microsoft?
25      MS. ANDERSON: Objection, form.

**Page 23**

1      MR. LISI: Join.
2      THE WITNESS: I think that in a general
3  in some general sense, that was probably    that was
4  in a general sense what I was referring to, but I
5  don't know specifically what that    I don't know,
6  this is 2006, I'm not sure specifically what I was
7  referring to.
8  BY MR. NORTON:
9  Q. So sitting here today in 2011, can you tell
10  me what you meant by saying that "Microsoft was
11  trying to steal Java"?
12  A. Well, I think that that was a pithy way of
13  referring to what Microsoft was doing    what
14  Microsoft's implementation of J++ and the content of
15  the Sun Microsoft litigation. This was a    an
16  informal e mail. I think that that was    I think
17  that was    I think this was referring to the
18  lawsuit and Microsoft's actions prior to that.
19  Q. Why don't you tell me in your own words
20  what is it that you understood that Microsoft was
21  doing that, in this informal e mail of 2006, you
22  characterize was trying to steal Java?
23  A. Well, this    this would    is properly the
24  topic of the litigation. But my general
25  understanding was that they were trying to    my

**Page 24**

1  general understanding is that Microsoft was making a
2  version of Java that    that they were    that they
3  were telling people was Sun's    was Sun's Java,
4  was, you know, done    done in the way people would
5  expect Java to be. But, in fact, that they were
6  consciously making minor variations to it that would
7  cause people's programs only to work on their
8  implementation.
9      But, again, the real content is that it was
10  a topic of that lawsuit that I was really pointing
11  to, as opposed to being specific about anything in
12  particular.
13  Q. But in that lawsuit, Sun objected to
14  Microsoft having a version of Java that was done in
15  a way that making variations would cause people's
16  programs to only work on Microsoft's implementation;
17  is that right?
18  A. So are you saying in the context of that
19  of the litigation?
20  Q. Correct.
21  A. I'm worrying here that I might be getting a
22  little bit close to stuff I know, at least
23  partially, under privileged things from my time at
24  Sun.
25  Q. Well, I'll address that on behalf of

**Page 25**

1  Oracle. As to Sun, I'm not asking you to divulge
2  anything that is privileged.
3      But if you have your own understanding of
4  what you said to me a moment ago    well, let me
5  a moment ago you testified that one of the things at
6  issue in the lawsuit was that Microsoft had a
7  version of Java that was had    to which they had
8  made variations such that programs would run only on
9  Microsoft's version of Java, did I get that much
10  correct?
11  A. It's close. I mean
12  Q. All right. Your original answer is your
13  answer. I'm just trying to orient it.
14  A. Understood, understood.
15  Q. All right. And then my question was, in
16  the lawsuit, was that one of things that Sun
17  objected to?
18      MR. LISI: I'm going to instruct you along
19  the lines of what counsel just said. If it does
20  if that answer implicates things that you learned
21  solely from Sun's counsel at the time, I instruct
22  you not to answer that. Not to get into privilege
23  areas. If you have other information, that's
24  fine.
25      THE WITNESS: I think I can reasonably say

```
 1  that there is a general understanding that that was
 2  true.  I have a more specific understanding, given
 3  the role I played in that trial, but I don't want to
 4  go there because that should be -- would be at least
 5  partially, if not mostly, privileged topics.
 6  BY MR. NORTON:
 7     Q.  You said you have more specific
 8  information, but the general information you just
 9  gave me, is that information true?
10     A.  Could you restate what -- sorry.
11     Q.  So you told me a moment ago that you could
12  give more specific -- you have a more specific
13  understanding, but that you were concerned that
14  might get into privilege issues.  I don't want you
15  to get into privilege issues.  I just want to know
16  that the answer that you gave me before you said you
17  have a more specific understanding -- is the answer
18  that you gave me before you said you have a more
19  specific answer a correct answer?
20     A.  So maybe the right answer is I forgot
21  what my answer was.  Is it possible to get --
22     Q.  We'll stick with the answer we got.
23     A.  Okay.  Sorry, I just kind of got
24  confused.
25     Q.  We went back and forth a couple times.
                                                Page 26
```

```
 1  That's quite all right.
 2         So you started at Google in July of 2005,
 3  correct?
 4     A.  I think that's correct.
 5         MR. NORTON:  All right.  I'm going to hand
 6  you what previously had been marked as Exhibit 198.
 7  It might not be the best copy, but this is an e mail
 8  string, but at the top, it's an e mail from Andy
 9  Rubin to you; is that correct?
10         (Exhibit 198 previously marked for
11  identification.)
12         THE WITNESS:  Well, like you said, this
13  isn't great, but it looks like -- it looks like
14  that.  I can't read it very well, but I think I can
15  read that much.
16  BY MR. NORTON:
17     Q.  And the date on this e mail, which I think
18  is a little easier to read, is July 15th, 2005; is
19  that right?
20     A.  I think that's correct.  The five is not
21  on my copy, isn't -- is kind of blended into the
22  other grade, but I think it's a five.
23     Q.  And if you look down to the first e mail
24  in the string, which refers to a 12:26 p.m. e mail
25  by Tim Lindholm.  Do you see that?  The other dates
                                                Page 27
```

```
 1  are a little easier to read.
 2     A.  I do see that, yeah.
 3     Q.  It says 2005 e-mail?
 4     A.  That does say 2005 there.
 5     Q.  Okay.  Now, actually, I want to turn back
 6  to the second page of the e-mail, Exhibit 198.
 7     A.  Second page, okay, I'm there.
 8     Q.  And you'll see in the center of the page
 9  there's an e-mail from Bill Lee, dated July 14th,
10  2005?
11     A.  It's about a third of the way down.
12     Q.  About.
13     A.  July 14th, yes.  Yes, I do believe I see
14  that.
15     Q.  Do you recall this particular e-mail?
16         MS. ANDERSON:  Review it.
17         THE WITNESS:  I better check this.  I might
18  have to go back and look at -- when it comes to
19  specific questions, because the changes are so
20  interleaved here, I have trouble keeping track of
21  who saying what.  Okay, I've -- I've scanned this.
22  I think if -- when you ask specific questions, I
23  might want to try and figure out who exactly said
24  what in response to what.
25  BY MR. NORTON:
                                                Page 28
```

```
 1     Q.  Sure, the specific pending question is, do
 2  you remember this e mail?
 3     A.  No, I don't recall this e mail.
 4     Q.  If you can turn back to the second page.
 5     A.  Okay.
 6     Q.  The e mail that I directed you to
 7  previously, the July 14 e mail from Mr. Lee
 8     A.  I do see that.
 9     Q.   it starts off, "Andy, it was nice
10  talking with you today"?
11     A.  Uh huh.
12     Q.  And then I don't have any questions about
13  that one.  I just want to orient so that -- there's
14  was other one above it where Mr. Rubin responds.  Do
15  you see that?
16     A.  Yes.
17     Q.  All right.  And he says, "Thanks, Bill,
18  Josh, and Tim, we love your thoughts.  Have time for
19  coffee?  Andy."  Do you see the P.S.?
20     A.  Uh huh.
21     Q.  It says, "Tim, I owe you an update since
22  our last meeting at Android."  And then there is a
23  smiley face.  What was the last meeting between you
24  and Mr. Rubin at Android?
25     A.  When I was at Sun, I attended a meeting
                                                Page 29
```

8 (Pages 26 - 29)

### Page 30

1  with Android    with Android, the company, which was
2  at this point, a tiny startup, that    where we
3  discussed the possibilities of Android and Sun
4  working together in one form or another.  I don't
5  remember when this meeting was, but I know there
6  was    there was such a meeting.
7      Q.  And you say the possibility of Android and
8  Sun working together, do you have a more specific
9  recollection of what was discussed, what the nature
10 of the two companies working together would be?
11     A.  Again, I run the risk of getting into Sun
12 confidential things.  This was    these were    this
13 is me discussing, as a Sun employee and with some
14 other people, I don't want to tread on some kind of
15 confidential stuff unless you want me to do so.
16     Q.  You may tread on some confidential stuff as
17 distinguished from privileged, but if there's things
18 you consider to be confidential, you may divulge
19 that in the deposition.  (inaudible due to coughing)
20     A.  My recollection was that this was a very
21 that when the meeting with Android was    was a
22 group of people coming from Sun in    a mixed group
23 of people, just a very exploratory discussion with
24 this company that we didn't    that we had just
25 well, I don't actually know.  I had just learned

### Page 31

1  I don't know what we thought, but I believe that I
2  had just learned that this company existed.
3          And it was    the meeting with them was a
4  very typical one where Sun would    where Sun
5  would    where Sun would have a meeting    where Sun
6  would meet with the company and try to figure out if
7  there was potentially any business with them, or
8  anything we can do together.
9      Q.  At the time that you met with    well, when
10 you had this meeting at Android, I assume Mr. Rubin
11 was there, correct?
12     A.  Yes, I think he was there.
13     Q.  And was Rich Miner also there?
14     A.  I don't remember.  I don't know Rich at all
15 well.
16     Q.  And in the context of that meeting, was
17 there any discussion of Android taking the license
18 from Sun?
19     A.  I only    well, I    I only recall in
20 general terms.  I think that there was some
21 discussion about whether the work that Android was
22 doing at that time would benefit by    by a
23 technology agreement with Sun that would allow
24 Android to use Sun's    Sun's code, for instance,
25 for some aspect of the Java technology.

### Page 32

1          So it wasn't    this was not a matter of
2  something specific, like a license.  It was a very
3  exploratory thing about    much more an exploratory
4  thing of trying to figure out whether    whether
5  I think much more to the point was whether
6  whether Android would benefit by using Sun source
7  code in the pursuit of whatever their product plans
8  were at the time.
9      Q.  Okay.  I'm going to ask you try to focus a
10 little more on my questions.
11     A.  Okay, sorry, sorry.
12     Q.  Again, I understand you have information to
13 share, but I do want you to focus on the information
14 I was asking for.  Which is in the context of those
15 conversations    the conversation you had at Android
16 with Mr. Rubin and perhaps others, was there
17 discussion of Android taking a license from Sun, yes
18 or no?
19         MS. ANDERSON:  Objection, form.
20         MR. LISI:  Asked and answered.
21         MS. ANDERSON:  You don't need to accept
22 instructions on how to answer a question.
23         MR. NORTON:  Please limit yourself to
24 proper objections.
25         MS. ANDERSON:  Well, actually, it's

### Page 33

1  improper to instruct a witness how they must answer
2  a question, and so I do have to object to that
3  because you might mislead the witness.
4  BY MR. NORTON:
5      Q.  Mr. Lindholm, do you recall the question?
6      A.  Could you please restate it given the
7  recent discussion?
8  BY MR. NORTON:
9      Q.  I'll do it again.  At the meeting that you
10 attended with Mr. Rubin and perhaps others, was
11 there any discussion of Android taking a license
12 from Sun, yes or no?
13         MS. ANDERSON:  Objection, form.
14         MR. LISI:  Join.
15         THE WITNESS:  I believe that there was a
16 discussion of the possibility that Android might
17 well, that Android might enter into an agreement.  I
18 don't want to say license because that's too
19 specific, but there was discussion that Android
20 might enter into an agreement with Sun so as to able
21 to use Sun's source code in Android products.
22 BY MR. NORTON:
23     Q.  And the agreement that was discussed was a
24 component of the agreement that was being discussed,
25 a license?

Highly Confidential - Attorneys' Eyes Only

**Page 46**

1  you tell me what you meant when wrote that?
2    A.  No, I'm not sure what I meant by that.
3    Q.  And you went on to say, "They are only
4  somewhat aware of new licensing, and JCP
5  implications are still somewhat worried about
6  tainting and such stuff."  Can you tell me what you
7  meant when you wrote, "They are still somewhat
8  worried about tainting and such stuff"?
9    A.  I would have to speculate.  I don't recall
10 writing that.
11   Q.  Now, you concluded this e mail by writing
12 to yourself, "I'm going to get in all possible loops
13 around this project."
14   A.  Yes, I see that there.
15   Q.  Now, subsequent to July 15th, 2005
16       THE REPORTER:  Fred, can we take a quick
17 break, my battery is frozen.
18       MR. NORTON:  Sure.
19       THE VIDEOGRAPHER:  The time is now
20 a m., and we are going off the record.
21       (Recess taken.)
22       THE VIDEOGRAPHER:  The time is now
23 a m.  We are back on the record.  This marks the end
24 of Disk 1 to the deposition of Tim Lindholm.  The
25 time is now 10:52 a m., and we are going back off

**Page 47**

1  the record.
2       (Recess taken.)
3       THE VIDEOGRAPHER:  This marks the beginning
4  of Disk 2 to the deposition of Tim Lindholm.  The
5  time is 11:12 a m.  We are on the record.
6  BY MR. NORTON:
7    Q.  So after July 15, 2005, where you had
8  written in Exhibit 526, you were going to get in all
9  possible loops on this project.  You said that in
10 that exhibit?
11   A.  I'm looking at that now, yes.
12   Q.  And then that's what you wrote at the end
13 of the e mail to yourself, Exhibit 526?
14   A.  Well, this is   this is an e mail that I
15 don't recall writing, but it's in this e mail which
16 I don't dispute.
17   Q.  All right.  Subsequent to July 15, 2005,
18 you engaged in brainstorming with Mr. Rubin about
19 Android, correct?
20       MS. ANDERSON:  Objection, form.
21       MR. LISI:  Join.
22       THE WITNESS:  After   after July 15, I
23 think I did have some discussions with   with
24 Mr. Rubin.  I don't remember details about them or
25 how many, for instance, but I think there were

**Page 48**

1  some.
2  BY MR. NORTON:
3    Q.  And you attended Google Product Strategy
4  meetings concerning Android, correct?
5       MS. ANDERSON:  Objection, form.
6       MR. LISI:  Join.
7    A.  I attended meetings.  Google Product
8  Strategy meeting, I'm not   I don't re   I don't
9  remember what exactly that purpose is.  Google's
10 meetings   meeting names change over time pretty
11 frequently, and I don't remember exactly what that
12 meeting was about.
13 BY MR. NORTON:
14   Q.  Well, you attended at least one meeting
15 with Sergei Brenn (phonetic), Larry Page, and Mr.
16 Rubin, about Android, correct?
17       MR. LISI:  Object to the form.
18       THE WITNESS:  I   well, I believe I
19 attended a meeting   I believe I attended a meeting
20 in roughly this timeframe, 2000   late 2005, that
21 Larry and Sergei were present at, and if I remember
22 correctly, Android was discussed.
23 BY MR. NORTON:
24   Q.  And you made suggestions to Mr. Rubin of
25 some employees that you thought would be good

**Page 49**

1  recruits to join the Android team, correct?
2    A.  I don't remember doing that.
3    Q.  Did you not suggest to Mr. Rubin that he
4  should interview Nedim Fresco (phonetic)?
5    A.  If I remember correctly, Nedim came   came
6  to us.  Thinking that maybe   you know, maybe he
7  should come to Google.  And I think I   I think I
8  recall passing that on to Andy as   as somebody he
9  might want to talk to.
10       MR. NORTON:  Let's look at what was
11 previously marked as Exhibit 16.  I'm sorry,
12 Exhibit 308.
13       THE REPORTER:  Okay.
14       (Exhibit 308 previously marked for
15           identification.)
16       MS. ANDERSON:  Thank you.
17 BY MR. NORTON:
18   Q.  Exhibit 308, at the top, is an e mail from
19 yourself to Mr. Rubin; is that correct?
20   A.  I haven't   I haven't read this yet.  Just
21 from looking at the addressing, it would appear to
22 be so.
23   Q.  All right.  And it's a somewhat long
24 e mail, but I just want to look at the last
25 paragraph of the portion from you to Mr. Rubin,

Highly Confidential - Attorneys' Eyes Only

---

**Page 102**

1  Q.  You sent this e mail on August 6, 2010; is
2  that right?
3  A.  I believe that to be true.
4  Q.  Would you please begin reading at, "Hi,
5  Andy." And read the entire e mail out loud for the
6  record.
7      MS. ANDERSON: Objection. We state all of
8  our objections and preserve our right on appeal.
9  You may read the face of this e mail.
10     THE WITNESS: Okay. Well, can I begin with
11 "Attorney work product, Google confidential", which
12 is also in the e mail. And it goes, "Hi, Andy, this
13 is a short pre read for the call at 12:30. In Dan's
14 earlier e mail, he didn't give you a lot of context
15 for the visceral reaction that we got. What we have
16 actually been asked to do by Larry and Sergei, is to
17 investigate what technical alternatives exist to
18 Java, or Android and Chrome. We've been over a
19 bunch of these and think that they all suck. Think
20 they all suck. We conclude that we need to
21 negotiate a license for Java under the terms we
22 need. That said, Allen Eustace said that the threat
23 of moving off Java hit Safra Katz hard. We think
24 there's value in the negotiation to put forward a
25 most credible alternative, the goal being to get

---

**Page 103**

1  better terms and price for Java. It looks to us
2  that Obj C provides the most credible alternative in
3  this context, which should not be confused with us
4  thinking we should make the change. What we're
5  looking for from you are reasons why you hate this
6  idea, whether you think this is a nonstarter for
7  negotiation purposes and whether you think there is
8  anything we missed in our understanding of the
9  option. Tim and Dan".
10 Q.  Thank you. So when you wrote, "We've been
11 asked to investigate what technical alternatives
12 exist for Java and Android and Chrome, can you tell
13 me what technical alternatives you looked at?
14     MS. ANDERSON: Objection. Instruct the
15 witness not to answer on the grounds of
16 attorney client privilege or work product to the
17 extent responding to the question requires you to
18 reveal work that you did at the direction of counsel
19 or communications you had with counsel for Google in
20 confidence.
21     THE WITNESS: So the investigation and the
22 technical alternatives was strictly done on the
23 request of counsel, was done with the understanding
24 of the work product. So outside of   outside of
25 those things covered by   by that situation, there

---

**Page 104**

1  were no   there were no investigations.
2  BY MR. NORTON:
3  Q.  For the record, my question was not so
4  limited. When you wrote, "We've been over a bunch
5  of these and think they all suck". Who thought
6  "they all sucked"?
7      MS. ANDERSON: Objection, form. And also
8  caution the witness and instruct him not to answer
9  to the extent responding to the question would
10 require you to reveal a separate communication with
11 Google counsel or require you to reveal work you did
12 at the direction of Google counsel, as part of the
13 investigation.
14     THE WITNESS: So   so the we   the going
15 over what we thought about them was entirely done on
16 the direction of Google counsel. There was no such
17 work being done independently, not being done under
18 the direction of counsel. So I don't think I can
19 answer anything there.
20 BY MR. NORTON:
21 Q.  What were the specific alternatives that
22 you have investigated for Android?
23     MS. ANDERSON: Objection, form. And also
24 objection on the basis of attorney client,
25 work product privilege. To the extent responding to

---

**Page 105**

1  this question would require you to reveal
2  communications with Google counsel in confidence or
3  work done under the direction of Google counsel, I
4  instruct you not to answer on the grounds of
5  privilege.
6      THE WITNESS: Once again, the work we
7  the work we did on this was entirely done under the
8  direction of counsel. There was no work done
9  outside of that or for any other purpose, so I
10 cannot answer that question either.
11 BY MR. NORTON:
12 Q.  What were the technical alternatives you
13 investigated to Java for Chrome?
14     MS. ANDERSON: Objection, form. Also
15 object on the basis attorney client, work product
16 privilege. Instruct the witness not to answer to
17 the extent responding would require you to reveal
18 communications with Google's counsel in confidence
19 or work that you did at the direction of Google.
20     THE WITNESS: Again, the work that we did
21 relating to Chrome was entirely done under the
22 direction of counsel and was work product. We   we
23 did no such work outside of direction of counsel on
24 alternatives to Chrome.
25 BY MR. NORTON:

---

27 (Pages 102 - 105)

Veritext National Deposition & Litigation Services
866 299-5127

**EXHIBIT 1-1**