KEKER & VAN NEST LLP
ROBERT A. VAN NEST - #84065
rvannest@kvn.com
CHRISTA M. ANDERSON - #184325
canderson@kvn.com
DANIEL PURCELL - #191424
dpurcell@kvn.com
633 Battery Street
San Francisco, CA  94111-1809
Telephone:     415.391.5400
Facsimile:     415.397.7188

KING & SPALDING LLP
SCOTT T. WEINGAERTNER (*Pro Hac Vice*)
sweingaertner@kslaw.com
BRUCE W. BABER (*Pro Hac Vice*)
bbaber@kslaw.com
1185 Avenue of the Americas
New York, NY  10036
Telephone:     212.556.2100
Facsimile:     212.556.2222

KING & SPALDING LLP
DONALD F. ZIMMER, JR. - #112279
fzimmer@kslaw.com
CHERYL A. SABNIS - #224323
csabnis@kslaw.com
101 Second St., Suite 2300
San Francisco, CA  94105
Telephone:     415.318.1200
Facsimile:     415.318.1300

IAN C. BALLON - #141819
ballon@gtlaw.com
HEATHER MEEKER - #172148
meekerh@gtlaw.com
GREENBERG TRAURIG, LLP
1900 University Avenue
East Palo Alto, CA 94303
Telephone:     650.328.8500
Facsimile:     650.328-8508

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>GOOGLE INC.,<br><br>　　　　　　　　　　Defendant. | Case No. 3:10-cv-03561-WHA<br><br>**GOOGLE'S RESPONSE TO THE COURT'S DECEMBER 27, 2011 REQUEST FOR FURTHER BRIEFING ON DAMAGES EXPERT ISSUES**<br><br>Dept.　　Courtroom 8, 19th Floor<br>Judge:　Hon. William Alsup |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................................1

II. ARGUMENT..........................................................................................................................3

    A. Under clearly established Federal Circuit case law, a reasonable royalty must be based on the parties' reasonable expectations at the time of alleged first infringement, not on subsequently occurring market facts after infringement. ..............................................................................3

    B. The approach in the Order is incompatible with federal statutory and case law. ...................................................................................................................6

    C. Because it was uncertain in 2006 whether Android would succeed or fail, the actual market value of Android in 2008-11 is not a reasonable proxy for the expected market value of Android in 2006. .......................................7

    D. The approach in the Order would not simplify Oracle's apportionment task. ........................................................................................................................8

    E. Using the approach in the Order would lead Oracle to further inflate its damages...................................................................................................................9

    F. Other comments on the Order.................................................................................10

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Fromson v. Western Litho Plate and Supply Co.*
  853 F.2d 1568 (Fed. Cir. 1988) ..................................................................................................5

*Georgia-Pacific Corp. v. United States Plywood Corp.*
  243 F. Supp. 500 (S.D.N.Y. 1965) ........................................................................................ *passim*

*Hanson v. Alpine Valley Ski Area, Inc.*
  718 F.2d 1075 (Fed. Cir. 1983) ..............................................................................................3, 4

*Integra Lifesciences I, Ltd. v. Merck KGaA*
  331 F.3d 860 (Fed. Cir. 2003) ....................................................................................................3

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*
  274 F.3d 1371 (Fed. Cir. 2001) .......................................................................................3, 4, 6, 7

*Lucent Technologies v. Gateway, Inc.*
  580 F.3d 1301 (Fed. Cir. 2009) ...............................................................................................3, 5

*Radio Steel & Mfg. Co. v. MTD Prods. Inc.*
  788 F.2d 1554 (Fed. Cir. 1986) ...............................................................................................4, 6

*Riles v. Shell Exploration & Prod. Co.*
  298 F.3d 1302 (Fed. Cir. 2002) ..................................................................................................3

*Stickle v. Heublein, Inc.*
  716 F.2d 1550 (Fed. Cir. 1983) ..................................................................................................7

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*
  750 F.2d 1552 (Fed. Cir. 1984) ...............................................................................................5, 7

**Federal Statutes**

35 U.S.C. § 284..................................................................................................................................6

> *Congress did not intend to aid a patentee in solving his problem of proving the quantum of his damages by enabling him to substitute the quantum of the infringer's profits … the two concepts are basically different; they cannot be treated as equivalent.*
>
> — *Georgia-Pacific Corp. v. United States Plywood Corp.,* 243 F. Supp. 500, 519 (S.D.N.Y. 1965).

## I. INTRODUCTION

In a December 27, 2011 order ("Order"), the Court asked the parties to submit briefing on a possible approach to calculating a reasonable royalty. That approach would involve:

1. Attempting to calculate the value of certain features of Android (e.g., processing speed) in the 2008-11 market, rather than at the time of alleged first infringement in 2006;

2. Using the 2008-11 value of that feature as a stand-in for the importance of that feature to Google at the time of alleged first infringement in 2006, "so long as the marketplace events, as they eventually unfolded, were reasonably predictable in 2006";

3. Apportioning the 2008-11 value of that feature among all the know-how enabling that feature, including the value of the patent claims and copyrights in suit, in order to calculate the value of the patent claims and copyrights in the 2008-11 market;

4. Using these 2008-11 values of the components of the relevant features to set the parameters of the 2006 hypothetical negotiation; and

5. Limiting the use of the parties' actual 2006 negotiations to Google's defense case, where Google would have the burden of allocating the value of Sun's 2006 demands to Google among the claimed inventions and the other components of Sun's IP portfolio.

Order at 2-3.

After setting forth this possible approach, the Court asked the parties to address the issues whether (1) appellate law allows patent damages to be calculated using this sort of forward-looking approach; (2) Oracle would have the burden to apportion the values of given features between the claimed inventions and other contributions; and (3) Oracle would have no obligation to allocate Sun's actual 2006 demands to Google between the claimed inventions and the other components of Sun's IP portfolio, although Google would be free to do so defensively.

The short answer is Google has found no appellate case law supporting this approach. In particular, there is no basis in appellate law for using the actual market value of the claimed inventions in 2008-11 as a direct proxy for how reasonable parties would have valued those

1  inventions in 2006.  In fact, the Federal Circuit has made clear that, where there is good evidence
2  of what the parties anticipated at the time of the hypothetical negotiation, it is of no moment
3  whether those expectations were actually realized.  To the extent the Federal Circuit has allowed
4  hypothetical negotiators to "peek into the future," it has been as a check on the reasonableness of
5  conclusions reached through other means, not to arrive at those conclusions in the first instance.

6  　　　　In this case in particular it would make no sense to calculate the present values of features
7  as a proxy for their values in 2006.  Unlike in many infringement cases, Google and Sun actually
8  engaged in negotiations around the time of alleged first infringement for a technology
9  partnership that would have included an intellectual property package containing all the asserted
10 patents and copyrights.  Although the parties did not fix a price for any of the individual patent
11 claims or copyrighted material now at issue, Sun must have understood all the components of the
12 package it was offering—its patent portfolio, copyrights, the JAVA trademark, other know-how,
13 and cash payments to replace potential lost revenue—and the general value of those components.
14 As Sun's successor, there is no reason why, in preparing its damages expert reports, Oracle could
15 not have apportioned that package to account for each of its components.

16 　　　　Equally important, the parties' real-world negotiations placed a defined upper limit on the
17 aggregate value of the complete Sun package.  One possible upper limit, which Oracle's expert
18 used in his most recent report, was Sun's $100 million demand to Google in March 2006.
19 Another possible upper limit, as Google has urged, was the subsequent $28 million demand Sun
20 later made in June 2006 for the same package.  But regardless of which figure is used, any upper
21 limit set during the parties' actual negotiations around the time of first infringement—when the
22 success of Android was uncertain—would be significantly lower than the present value of *the*
23 *entire Android platform*, which would be the starting point under the approach contemplated in
24 the Order.  Calculating Oracle's damages as a percentage of the current value of Android would
25 almost certainly have the effect of inflating damages even beyond the "vast sums," Order at 3,
26 Oracle put forth in its previous damages reports.  It would also violate federal law by substituting
27 Google's *profits* for Oracle's *damages*—an approach disavowed by Congress in 1946, when it
28 amended the patent statute specifically to eliminate an infringer's profits as a measure of

damages, and further condemned by *Georgia-Pacific,* the grandfather of reasonable-royalty case law.  *See* 243 F. Supp. at 519, 521-22, 525.  And it would not make the experts' apportionment task any easier, since the myriad types of know-how that enable the relevant features of Android were not a subject of discovery in this case.

The Court's initial instinct in the July 22, 2011 order was right.  The reasonable royalty analysis should be based on the value of the patents and copyrights in suit at the time of the hypothetical negotiation in 2006, and the correct way, both logically and legally, to attack that problem is by taking a close look at the parties' actual 2006 negotiations.

## II.   ARGUMENT

**A.  Under clearly established Federal Circuit case law, a reasonable royalty must be based on the parties' reasonable expectations at the time of alleged first infringement, not on subsequently occurring market facts after infringement.**

For the past decade, the Federal Circuit has consistently ruled that a reasonable royalty in a patent case must be determined based on the parties' "***sales expectations at the time when infringement begins … as opposed to an after-the-fact counting of actual sales***."  *Interactive Pictures Corp. v. Infinite Pictures, Inc.,* 274 F.3d 1371, 1373 (Fed. Cir. 2001) (emphasis added).[1]  Based on this rule, Oracle cannot use the present-day value of Android features—which, after all, can be measured only by calculations akin to "an after-the-fact counting of actual sales"—as a stand-in for the value the parties would have expected from those features in mid-2006.

The Federal Circuit's *Interactive Pictures* decision explains that expectations—not after the fact actual numbers—are what form the basis for a hypothetical negotiation.  There, the plaintiff's damages expert relied on an annual sales projection prepared by the defendant two months before infringement began.  *Id.* at 1384.  The defendant disavowed its own projection as

---

[1] *See also, e.g.*, *Lucent Technologies v. Gateway, Inc.*, 580 F.3d 1301 (2009) ("The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement."); *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 869 (Fed. Cir. 2003) (reversing jury verdict for lack of substantial evidence where royalty determination set at time following first infringement); *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002) (determination of a reasonable royalty "contemplates a hypothetical negotiation between the patentee and the infringer at a time before the infringement began."); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983) (the "key element in setting a reasonable royalty … is the necessity for return to the date when the infringement began").

"speculative," pointing out that its actual sales had fallen short of expectations. *Id.* The Federal Circuit disagreed, rejecting the use of hindsight:

> [We have] endorsed the conceptual framework of a hypothetical negotiation between the patentee and the infringer as a means for determining a reasonable royalty. ***When that framework is employed, the negotiation must be hypothesized as of the time infringement began***. . . . In this case, the 1996 business plan and its projections for future sales were prepared by [defendant] two months before infringement began. Thus, rather than being outdated for purposes of the hypothetical negotiation, those projections would have been available to [defendant] at the time of the hypothetical negotiation. The fact that [defendant] did not subsequently meet those projections is irrelevant to [defendant's] state of mind at the time of the hypothetical negotiation. ***Nor does [defendant's] subsequent failure to meet its projections imply that they were grossly excessive or based only on speculation and guesswork.*** Instead, [defendant's] subsequent failure to meet its projections may simply illustrate the element of approximation and uncertainty inherent in future projections.

*Id.* at 1384-85 (emphases added). *Interactive Pictures* made clear that the controlling evidence for purposes of setting a royalty rate must be the parties' reasonable expectations at the time of first infringement. It explicitly rejected the notion that prior Federal Circuit case law

> require[d] that estimates of sales revenues, as referenced in a hypothetical negotiation at the time infringement began, must later bear a close relation to actual sales revenue. ***Such a proposition would essentially eviscerate the rule that recognizes sales expectations at the time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales***.

*Id.* (emphasis added).

This is consistent with the Federal Circuit's treatment of this question since the court's formation. In *Hanson,* its first case to consider the issue, the defendant appealed a verdict awarding a very large royalty. *See* 718 F.2d 1075, 1077 (Fed. Cir. 1983). The defendant argued that the royalty was too high to be reasonable, because it would make it impossible for the defendant to turn a profit. The Federal Circuit rejected that argument, explaining that the key issue was what the parties would have agreed to at the time of first infringement, regardless of whether that royalty was one the defendant would have agreed to after the fact. A reasonable royalty should "be determined ***not on the basis of a hindsight evaluation of what actually happened***, but on the basis of what the parties to the hypothetical license negotiations would have considered at the time of the negotiation." *Id.* at 1081 (emphasis added); *see also Radio Steel & Mfg. Co. v. MTD Prods. Inc.*, 788 F.2d 1554, 1557 (Fed. Cir. 1986).

Oracle may point to a series of Federal Circuit cases allowing hypothetical negotiators to "peek into the future." But these cases simply affirm the uncontroversial *Georgia-Pacific* principle that post-negotiation information can be used to **support** the reasonableness of a royalty calculation based on facts known at the time. After all, one of the 15 non-exclusive factors in the *Georgia-Pacific* analysis is "[t]he established profitability of the product made under the patent; its commercial success; and its current popularity." 318 F. Supp. at 1120.

For example, in *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552 (Fed. Cir. 1984) the Federal Circuit reversed because the district court had refused to allow plaintiff to introduce any evidence of defendant's actual profits as part of its reasonable royalty case. *See* 750 F.2d at 1566. It cited factor 8 of the *Georgia-Pacific* test, noting that "[e]vidence of the infringer's actual profits generally is admissible as probative of his anticipated profits." *Id.* at 1568. But it also "express[ed] no opinion concerning the weight, if any, to be given such evidence or any conditions that might properly be imposed upon its admission; we indicate only that we do not think the district court should have excluded it." *Id.* Likewise, though *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568 (Fed. Cir. 1988), noted in *dictum* that the reasonable royalty calculation "permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators," *id.* at 1575, the court did not go beyond the limited *Georgia-Pacific* rule allowing consideration of post-negotiation profitability as one of more than a dozen factors bearing on whether a royalty is reasonable. Recently, in its discussion of *Georgia-Pacific* factor 11 concerning "[t]he extent to which the infringer has made use of the patent, *Georgia-Pacific*, 318 F. Supp. at 1120," the Federal Circuit noted that "[c]onsideration of evidence of usage after infringement started can, under appropriate circumstances, be helpful to the jury and the court ***in assessing whether a royalty is reasonable***." *See Lucent,* 580 F.3d at 1333-34 (emphasis added). Again, however, the court emphasized that the goal was to "recreate the *ex ante* licensing negotiation scenario," *id.* at 1325, and that evidence of actual use was only one piece of evidence that could be used to support the reasonableness of a royalty analysis, *id.* at 1334 (noting that evidence of post-infringement usage is one piece of evidence, along with "sales projections

1  based on past sales, consumer surveys, focus group testing, and other sources," that could help to
2  estimate what the hypothetical negotiators would have believed about future usage).
3  But none of these cases hold—and the Federal Circuit has never suggested—that a court
4  could simply substitute post-negotiation market facts for the results of a hypothetical
5  negotiation—or, as here, the parties' valuation during an actual negotiation—as the basis of a
6  royalty determination, as the approach in the Order suggests doing.
7  **B.     The approach in the Order is incompatible with federal statutory and case law.**
8  In addition to the absence of support for the approach in the Order in appellate case law,
9  that approach is also incompatible with both federal statutory and case law in important respects.
10  *First,* by substituting the 2008-11 actual market value of Android features (which necessarily
11  would be measured as a percentage of Google's actual Android profits) for the 2006 hypothetical
12  value of those features, the approach would effectively permit a disgorgement remedy that is
13  unauthorized by law.  In 1946, Congress amended the patent-damages statute, 35 U.S.C. § 284,
14  with the specific purpose of eliminating an infringer's profits as a measure of damages.  *See*
15  *Georgia-Pacific*, 243 F. Supp. at 525-26 (purpose of the 1946 amendments was "eliminating the
16  infringer's profits as an independent measure of the patent owner's recovery").  Accordingly, the
17  *Georgia-Pacific* court noted that "Congress did not intend to aid a patentee in solving his
18  problem of proving the quantum of his damages by enabling him to substitute the quantum of the
19  infringer's profits for the quantum of the patentee's actual damages."  *Id.* at 519.  Similarly, in
20  *Interactive Pictures,* the Federal Circuit explained that basing a reasonable royalty on *post hoc*
21  outcomes "would essentially eviscerate the rule that recognizes sales expectations at the time
22  when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of
23  actual sales." *Interactive Pictures*, 274 F.3d at 1385; *see also Radio Steel,* 788 F.2d 1554 (Fed.
24  Cir. 1986) (holding that a reasonable royalty is based not on the infringer's profit, but on the
25  result of a hypothetical negotiation at the time of infringement).  The proposed approach in the
26  Order would substitute Google's actual 2008-11 results for what was anticipated in 2006, and
27  then shift the burden to Google to persuade the jury not to rely on Google's actual success as the
28  basis for determining a reasonable royalty.  This is exactly what all the above authority rejects.

1  *Second,* the Federal Circuit has never used proof of actual outcomes as an end in itself; it
2  always has used such evidence as a check on experts' claims of reasonableness.  *See Interactive*
3  *Pictures,* 274 F.3d at 1385; *Trans-World*, 750 F.2d at 1568.  Put somewhat differently, the
4  Federal Circuit has made clear that if there is good evidence of what the parties anticipated at the
5  time of the hypothetical negotiation, then it does not matter whether those hopes were realized.
6  *Interactive Pictures* explicitly affirmed the use of "projections [that] would have been available
7  to [defendant] at the time of the hypothetical negotiation," while also holding that "[t]he fact that
8  [defendant] did not subsequently meet those projections is irrelevant to [defendant's] state of
9  mind at the time of the hypothetical negotiation."  274 F.3d at 1384-85.

10  In this case, there is substantial, credible evidence of the parties' expectations at the time
11  of alleged first infringement—namely, the months-long series of back-and-forth negotiations,
12  including the exchange of formal draft contracts, between Sun and Google in 2006.  Those
13  negotiations are the proper basis of a reasonable royalty calculation under Federal Circuit law.
14  *See Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1556-61 (Fed. Cir. 1983) (reversing district court's
15  damages award in part because "notably absent from [the district court's] findings is any
16  consideration of the actual negotiations between the parties").  By contrast, the approach in the
17  Order would use future market facts not as a check on the parties' reasonable expectations, but as
18  the basis for measuring the expectations.  This would be damages based on "an after-the-fact
19  counting of actual sales"—exactly what *Interactive Pictures* prohibits.  274 F.3d at 1385.

20  **C.  Because it was uncertain in 2006 whether Android would succeed or fail, the actual market value of Android in 2008-11 is not a reasonable proxy for the expected**
21  **market value of Android in 2006.**

22  As the Court noted in its Order, even if the approach set forth in that Order were viable as
23  a matter of law, it would not make sense to use the actual 2008-11 value of Android as a proxy
24  for the expected 2006 value of Android unless "the marketplace events, as they eventually
25  unfolded, were reasonably predictable in 2006."  Order at 2.  But the market events of the past
26  three years were far from predictable at the time of the hypothetical negotiation.

27  In 2006, the smartphone market was in its infancy; none of the current dominant players,
28  including Apple's iPhone, had been introduced.  Moreover, prior to developing and releasing

7
GOOGLE'S RESPONSE TO THE COURT'S DECEMBER 27, 2011 REQUEST FOR FURTHER BRIEFING
CASE NO. 3:10-cv-03561-WHA

612421.01

1  Android, Google had no track record in any facet of the smartphone market.  It had never built or
2  released a smartphone operating system or a mobile applications framework, let alone a full-
3  stack operating environment like Android.  Although the parties negotiated and the alleged
4  infringement began in 2006, the actual architecture and feature set of Android was undefined at
5  that point.  Android was not even announced to the public until late 2007, and the first Android
6  phone not released until late 2008—two and a half years after the hypothetical negotiation.

7        During this long lag time, there was no guarantee that Android would succeed at all, and
8  substantial doubt throughout the industry and within Sun in particular.  As Sun's lead negotiator
9  Vineet Gupta admitted at his deposition, "[A] lot of our customers did not expect Android would
10  work, and they wanted to continue working with Java.  So we didn't see it as a threat at all at that
11  time [in 2008]."  July 26, 2011 Gupta Dep. at 136:6-13.  In 2008, Sun's Chief Technology
12  Officer James Gosling disparaged Android as "a bag of code" with "no business plan, no phones,
13  no nothing … nobody is actually doing anything, nobody is actually shipping anything."  Trial
14  Ex. 3104 (http://www.youtube.com/watch?v=thsklMITu0I).  Similarly, even on Android's
15  release, most market analysts expected it to acquire at most 5-10% of the market, not over 40%,
16  as it has done.  Leonard Report at 39 & n.148 (citing analyst reports concluding that "no one is
17  expecting Android to be a major success overnight," with analysts such as J Gold Associates and
18  Gartner respectively predicting that Android would achieve only a 5% or 10% market share in
19  three years).  Even as late as April 2010, Sun employees were dismissing projections of modest
20  success by Android—which projections are now dwarfed by actual adoption of Android—based
21  on initial Android sales.  Trial Ex. 2229.

22  **D.    The approach in the Order would not simplify Oracle's apportionment task.**
23        Adopting the approach in the Order would not simplify the experts' analysis, to the extent
24  it is even possible.  In *Georgia-Pacific*, the court repeatedly explained that Congress's primary
25  reason for abolishing an infringer's profits as a basis for patent damages was that apportioning
26  such profits had proven "insoluble."  243 F. Supp. at 521-22.  As the court observed,
27  > if [damages are] to be measured by the amount of the infringer's profits, it would
28  > require the ascertainment of those profits.  This in turn would necessitate an
> accounting for profits . . . which would be open to all the criticisms which were

1  leveled at such proceedings [including] *the often insuperable problem of apportioning the infringer's total profits on the sale of a product between the patented and nonpatented features.*.

2

3 *Id.* at 525 (emphasis added).

4  Here, using the proposed framework, Oracle first would have to define the total 2008-11

5 value of Android, then isolate the percentage of that value provided by the patented features.

6 Then Oracle would have to separate out "other know how [that] may also be required to practice

7 the feature, such as licenses from other competitors and Google's own independent know-how

8 contribution to developing that feature."  Order at 2.  Critically, unlike in the case of the Sun IP

9 package, Oracle does not necessarily know every piece of Google engineering and know-how

10 that contributed to the relevant Android features.  That know-how was not the subject of

11 discovery in this case.  Further, the present value of Android and its features also reflects many

12 other factors besides enabling intellectual property and Google engineering—at least including

13 the strength of Google's brand, its marketing efforts, and its relationships with its partners and

14 customers—which are also unrelated to the claimed inventions and must be subtracted away.

15  Even after all of these discounts were applied, the end result would be only the maximum

16 possible market value of the claimed inventions—*not* the result of a hypothetical negotiation.

17 Obviously, a party that licenses technology generally does not end up paying the maximum

18 market value of that technology, especially where it has alternative solutions (as Google did).  It

19 is unclear how an expert could account for this negotiating reality, particularly since the Court

20 already rejected Oracle's attempt to do so via the byzantine Nash Bargaining Solution.

21  By contrast, there is no reason Oracle could not have calculated, at least approximately,

22 the value of the various components of the Sun IP package.  Oracle knows what those

23 components are; it understands how Sun valued them, both internally and in licensing; and it

24 understands their functional importance to the various Java technologies.  It cannot claim that it

25 lacked the means to conduct the correct, legally mandated apportionment.

26 **E.  Using the approach in the Order would lead Oracle to further inflate its damages.**

27  As discussed already, during the parties' real-world negotiations in 2006, they exchanged

28 various proposals, each of which set an upper limit for the value of Sun's intellectual property.

1  Oracle prefers Sun's initial demand of $100 million, while Google thinks it makes more sense to
2  use Sun's final demand of $28 million.  Whatever the right baseline might be, both of these
3  numbers account to some extent for the parties' actual 2006 expectations about the success of
4  Android.  Accordingly, either figure is far more realistic as a measure of what a hypothetical
5  negotiation would have produced and thus far more legally sound.  Basing a hypothetical
6  negotiation on the present market value of the Android platform, which would be the starting
7  point for valuing individual Android features under the Order, would only spur Oracle to take yet
8  another shot at posting the biggest possible—and still unsupportable—damages number.

### F.      Other comments on the Order.

*First,* if the Court does adopt the approach set forth in the Order, Google agrees it would be Oracle's burden to separate out the various "know-how inputs" that enabled each of the allegedly patented features.  Order at 2:21-28.  Indeed, this point highlights yet another analytical defect in Dr. Cockburn's analysis, which mistakenly calculated the value of the accused *features* of Android, which are enabled by many components other than the claimed inventions, rather than the value of the allegedly infringed *intellectual property*.  Google believes the evidence will show that the real value of each of the features at issue is the result of Google's work—most obviously the source code written by Google engineers.

*Second,* for the reasons set forth in its brief in response to the Court's December 6, 2011 tentative order, Google reaffirms that the second expert report of Dr. Cockburn should be largely stricken and that Oracle should not get a third chance to draft a plausible damages report.

*Third,* with respect to the econometric and conjoint analyses Oracle used to apportion the current market value of Android, Google did not challenge those analyses under *Daubert* only because Google had a limited number of motions *in limine* available.  Google requests permission to file *Daubert* motions challenging the admissibility of those analyses.

Dated:  January 5, 2012                                         KEKER & VAN NEST LLP

                                        By: */s/ Robert A. Van Nest*
                                            ROBERT A. VAN NEST
                                            Attorneys for Defendant
                                            GOOGLE INC.