MORRISON & FOERSTER LLP
MICHAEL A. JACOBS (Bar No. 111664)
mjacobs@mofo.com
MARC DAVID PETERS (Bar No. 211725)
mdpeters@mofo.com
DANIEL P. MUINO (Bar No. 209624)
dmuino@mofo.com
755 Page Mill Road, Palo Alto, CA 94304-1018
Telephone: (650) 813-5600 / Facsimile: (650) 494-0792

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (Admitted *Pro Hac Vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY 10504
Telephone: (914) 749-8200 / Facsimile: (914) 749-8300
STEVEN C. HOLTZMAN (Bar No. 144177)
sholtzman@bsfllp.com
1999 Harrison St., Suite 900, Oakland, CA 94612
Telephone: (510) 874-1000 / Facsimile: (510) 874-1460
ALANNA RUTHERFORD
575 Lexington Avenue, 7th Floor, New York, NY 10022
Telephone: (212) 446-2300 / Facsimile: (212) 446-2350 (fax)

ORACLE CORPORATION
DORIAN DALEY (Bar No. 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (Bar No. 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (Bar No. 211600)
matthew.sarboraria@oracle.com
500 Oracle Parkway, Redwood City, CA 94065
Telephone: (650) 506-5200 / Facsimile: (650) 506-7114

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, INC.<br><br>Defendant. | Case No. CV 10-03561 WHA<br><br>**ORACLE AMERICA, INC.'S REPLY TO GOOGLE'S JANUARY 5, 2012 RESPONSE TO REQUEST FOR FURTHER BRIEFING ON DAMAGES (DKT. NO. 657)**<br><br>Dept.: Courtroom 8, 19th Floor<br>Judge: Honorable William H. Alsup |

### I. The Actual Value Of Google's Use After Infringement Began Can Be Used To Confirm The Parties' Expectations About The Value Of The Infringement To Google

Google's main objection to the Alternate Approach is that it places too much weight on evidence of the market value of the claimed inventions after infringement began. Google argues that such evidence can only be used as a "check on the reasonableness of conclusions reached through other means, not to arrive at those conclusions in the first instance." (Google Response at 2.)

Google's objection is misplaced. Neither the Alternate Approach nor Prof. Cockburn's analysis would use infringement-period evidence to supplant the parties' contemporaneous expectations. Rather, the actual sales and revenue data from the period of infringement corroborates the evidence of the parties' 2006 expectations as to the importance of the attributes provided by the patents and copyrights in suit. For example, in 2005 and 2006, Google emphasized that "speed matters," Google "should focus on speed first," and Google should measure performance in "milliseconds" (*see* Cockburn Report ¶ 261), and that attracting Java developers through use of the copyrighted library APIs was important to the success of Android (*see id.* ¶¶ 451–60).

Tellingly, Google nowhere argues that the projected value the parties placed on the enhancements enabled by infringement in 2006 was any different than Prof. Cockburn's analysis of the actual data. Instead, Google contends only that it did not have any "predictable" projections of Android success as a whole in 2006. (Google Response at 2, 7–8.) This contention is irrelevant to the key question: whether the *ex post* evidence corroborates *ex ante* evidence of the importance of the patents and copyrights in suit. But even as to the adoption of Android, the evidence contradicts Google's contention.[1] For example, Google expected in 2005 and 2006 that Android would "enable Google to be viewed from 100's of millions of handsets" and be "widely adopted." (*See, e.g.*, Cockburn Report ¶ 347.) Similarly, in its March 2006 Project Armstrong Business Model, Sun projected that 234.5 million

---

[1] Google never addresses Sun's contemporaneous Project Armstrong projections of convoyed sales, which the Tentative Order would approve. It also never offers any of its own projections to support its argument about the revenue expectations in 2006, much less the expectations regarding the importance of the attributes provided by the patents and copyrights in suit. Instead, Google cites James Gosling's statements ***from late 2008*** and its expert's citation to a purported online publication referencing analyst report projections of Android's prospects ***in late 2008*** as purported evidence of what the parties expected in ***2006***. (Google Response at 8.) Google's own supposed *ex ante* evidence is actually not *ex ante* at all.

Android units would be distributed in the third year following Android's release.  (*See id.* ¶ 299.)  In comparison, in March 2011, IDC estimated that approximately 179 million Android units would be distributed in calendar year 2011, approximately the third year following Android's October 2008 release.  (IDC, "Worldwide Smartphone 2011–2015 Forecast and Analysis", #227367, March 2011; *see also* Cockburn 10/10/11 Reply Report to Leonard, ¶ 43(d) (citing Gartner, IDC, and Strategy Analytics forecasts)).  Use of actual results here would provide a conservative check on *ex ante* projections.

Looking to actual *ex post* data to check or give quantitative precision to *ex ante* qualitative considerations is consistent with a wealth of appellate authority.  The Supreme Court and the Federal Circuit have repeatedly and explicitly recognized, and even encouraged, referring to data from the period after infringement began, as Google acknowledges.  (Google Response at 5.)  The proper use of that evidence is not as narrow as Google contends.  The use that an infringer has made of the patented invention and the profits realized through that use are admissible as evidence of the anticipated value of the patents at the time of the hypothetical negotiation.  *See Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 697 (1933) ("The use that has been made of the patented device is a legitimate aid to the appraisal of the value of the patent at the time of the breach."); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333–34 (Fed. Cir. 2009) ("Consideration of evidence of usage after infringement started can, under appropriate circumstances, be helpful to the jury and the court in assessing whether a royalty is reasonable.  Usage (or similar) data may provide information that the parties would frequently have estimated during the negotiation.").  In *Lucent,* the Federal Circuit endorsed use of the type of data Oracle relies on here, such as consumer surveys, to provide a quantitative measure where parties do not have precise data at the time of the hypothetical negotiation.  The court held it is appropriate to rely on evidence such as:

> sales projections based on past sales, consumer surveys, focus group testing, and other sources.  Even though parties to a license negotiation will usually not have precise data about future usage, they often have rough estimates as to the expected frequency of use.  This quantitative information, assuming it meets admissibility requirements, ought to be given its proper weight, as determined by the circumstances of each case.  *Id.* at 1533.

In *Trans-World,* the Federal Circuit held it was *error* for the court to exclude evidence of the infringer's actual profits because they could have been used to show the value of the patented invention:

> Evidence of the infringer's actual profits generally is admissible as probative of his anticipated profits. By supplying the patented racks for displaying the eyeglasses, Nyman used "the patented [invention] in promoting sales of" the nonpatented eyeglasses. Trans-World may be able to prove that Nyman's infringing use of the displays played an important role in the retail sales of Nyman's eyeglasses. Furthermore, the extent of the profits from such sales could be relevant in determining the amount of a reasonable royalty. If, for example, sales were increased because of the infringing use of the displays, that fact could affect the amount of royalties a potential licensee would be willing to pay.

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed Cir. 1984) (citations omitted). Under the Alternate Approach, actual Android revenues similarly show the importance of the patented features. They are also probative of anticipated revenues and are clearly admissible.

Neither *Hanson* nor *Interactive Pictures*, on which Google relies (*see* Google Response at 3, 4, 6, and 7), holds that it is impermissible to consider actual results as part of the reasonable royalty analysis. Google's argument based on *Hanson* is the same argument that Microsoft made unsuccessfully in *Lucent*, in which the Federal Circuit held (after expressly noting *Hanson* and the *ex ante* nature of the hypothetical negotiation) that "neither precedent nor economic logic requires us to ignore information about how often a patented invention has been used by infringers. Nor could they, since frequency of expected use and predicted value are related." *Lucent*, 580 F.3d at 1333. As discussed above, the court then held that the reasonable royalty analysis may properly consider *ex post* consumer surveys and similar evidence. *Id. Interactive Pictures* held only that it was proper to consider the defendants' contemporaneous profit projections, even though actual sales failed to meet them, and declined to reduce the plaintiffs' damages award as a result. *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001). Like *Hanson,* it does not preclude evidence of the actual performance benefits of the infringed inventions at the damages stage. To the contrary, in *Interactive,* the court stated that "an actual infringer's profit margin can be relevant to the determination of a royalty rate in a hypothetical negotiation." *Id.* (citation omitted). Indeed, Google itself relies on *Radio Steel*, where the Federal Circuit approved use of both the forecasted profits at the time (6%) *and* actual profits (10% plus or minus two points) in arriving at a 10% royalty rate. *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 788 F.2d 1554, 1557 (Fed. Cir. 1986).

Seeking to prevent the use of any *ex post* evidence at all, Google argues that the 2006 negotiations "placed a defined upper limit on the aggregate value of the complete Sun package," and

1  that this "upper limit" is either $100 million or $28 million.  (Google Response at 2.)  This argument

2  ignores what this Court has already held regarding upward adjustments to the 2006 offer (*see* Dkt. 230

3  at 8–9, 10, 15 (rejecting "Soviet-style" ceiling on damages and suggesting upward adjustments)), and

4  Google's own experts' use of an upward adjustment of that offer (*see, e.g.,* Leonard Report at 64).  The

5  Federal Circuit has repeatedly rejected artificial caps on damages, including the amount of a portfolio

6  license qualitatively different than the actual infringement.  *Finjan Inc. v. Secure Computing Corp.*, 626

7  F.3d 1197, 1211–12 (Fed. Cir. 2010).  It has held that the infringer's net profit margin is not a cap.

8  *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1338 (Fed. Cir. 2004) ("There is no rule that a

9  royalty be no higher than the infringer's net profit margin.") (quoting *State Indus., Inc. v. Mor-Flo

10 Indus., Inc.*, 883 F.2d 1573, 1580 (Fed. Cir. 1989));  *Monsanto Co. v. Ralph*, 382 F.3d 1374, 1384 (Fed.

11 Cir. 2004).  And most recently, it has held that the patentee's expected profits are not a cap.  *Powell v.

12 Home Depot U.S.A., Inc.*, --- F.3d ----, 2011 WL 5519820, at *11–12 (Fed. Cir. Nov. 14, 2011).

13      Finally, Google asserts that the Alternate Approach would "violate federal law by substituting

14 Google's ***profits*** for Oracle's ***damages.***"  (Google Response at 2, 6.)   But the Alternate Approach uses

15 these profits as only one input into the reasonable royalty analysis, as federal law permits, not as a

16 substitute for damages.  Google itself cites Federal Circuit decisions that explicitly *endorse* use of the

17 defendant's actual profits to inform what its anticipated profits were (*id.* at 5, quoting *Trans-World*),

18 and it is well-settled that the defendant's anticipated profits from the infringing device are a proper

19 input to the damages analysis.  *See, e.g., Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1577 (Fed.

20 Cir. 1995) ("Kelley is not guaranteed a profit, of course, but anticipated profit is a factor in hypothetical

21 negotiations.").  Both the Alternate Approach and Prof. Cockburn's analysis are consistent with these

22 principles.  Moreover, both approaches use ***incremental*** advertising revenues, not, as Google suggests,

23 "the present value of the entire Android platform."  They would not award Oracle Google's profits.

24 **II.    Google's Apportionment Arguments Are Inconsistent With The Facts**

25      Remarkably, Google now argues that apportionment of *infringer's profits* – the very thing that

26 the Tentative Order found has a "reliable basis" (Dkt. 642 at 8) – is "insoluble."  (Google Response at

27 8.)  Google does not explain how this squares with either its blithe insistence that apportionment of the

28 value of a *portfolio* should be routine (despite the fact that its own economic expert says it is

impossible), or its previous complete failure to attack the econometric, performance and conjoint analyses on which Prof. Cockburn's apportionment of Android's incremental value is based. Ironically, Google now asks (Google Response at 10) for another chance to construct a *Daubert* challenge to these analyses.  Google's failure to do so was not the result of any limitation on the number of available motions *in limine*.  Google could have covered whatever issues it felt were important to raise in its initial motion regarding Prof. Cockburn, and it in fact raised multiple issues in that motion. But Google ***expressly declined*** to challenge the analyses, explaining that it would be appropriate to do so "at trial." (Google Supplemental Br. (Dkt. 549) at 5–6 n.1.)

Similarly, Google's suggestion that "there is no reason why, in preparing its damages expert reports, Oracle could not have apportioned [the 2006] package to account for each of its components" (Google Response at 2, 9) ignores that Google's own expert has opined publicly that the apportionment exercises it advocates cannot accurately be done.  (*See* Dkt. 682 at 6 n.3 (quoting Leonard).)

Finally, Google is incorrect in arguing that Oracle must reduce the incremental value attributable to the patents and copyrights in suit to account for "other know how" and then again due to the existence of "alternative solutions." (Google Response at 9.)  Contrary to Google's suggestion, the cost of writing source code that implements protected features and thereby creates the infringing work should not be deducted from a reasonable royalty.  And Google's argument that Prof. Cockburn incorrectly measured the value of "features" rather than the value of the "intellectual property" (*id.* at 10) is wrong on the law and the facts.  Apportionment requires isolation of the economic benefit of the ***patented feature***.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011); *Finjan*, 626 F.3d at 1211; *Lucent*, 580 F.3d at 1327.  Here, the feature ***is*** the precise difference in performance that the patents provide over non-patented alternatives.  As described in Oracle's initial Response, no further apportionment is necessary, appropriate, or workable.

Dated: January 9, 2012

BOIES, SCHILLER & FLEXNER LLP

By: */s/ Steven C. Holtzman*
    Steven C. Holtzman

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.