# EXHIBIT A

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3               SAN FRANCISCO DIVISION

4

5    ORACLE AMERICA, INC.,          )

6            Plaintiff,             )

7        vs.                        )   No. CV 10-03561 WHA

8    GOOGLE, INC.,                  )

9            Defendant.             )

10   _____)

11

12

13       -- HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY--

14

15

16       Videotaped deposition of IAIN M. COCKBURN, PH.D.,

17       taken at the law offices of Boies, Schiller &

18       Flexner LLP, 1999 Harrison Street, Suite 900,

19       Oakland, California, commencing at 9:41 a.m.,

20       on Monday, October 17, 2011, before

21       Leslie Rockwood, RPR, CSR No. 3462.

22

23

24

25   PAGES 1 - 269

                                              Page 1

1    the book scanning issue.  I don't know whether -- I

2    haven't seen the terms of a -- you know, the license

3    under -- you know, the terms under which Google shares

4    revenue from -- from its providing its users the ability

5    to search a whole bunch of copyrighted work.              11:54:00

6              In my mind as an economist, I would interpret

7    that as being a license, you know, which revolves revenue

8    sharing around intellectual property.  Same thing with

9    content distribution deals in which I understand there's

10   revenue sharing, you know.                                11:54:23

11         Q.  BY MR. PURCELL:  But, again, I'm talking

12   purely about a patent license where Google agrees to

13   provide some consideration to something in exchange for

14   rights to practice patents with no exploitation

15   component, no distribution deal.                          11:54:44

16             Are you aware of Google ever agreeing to

17   revenue sharing in that context?

18             MS. RUTHERFORD:  Objection.

19             THE WITNESS:  No.

20         Q.  BY MR. PURCELL:  We've been talking a lot       11:54:53

21   about the starting point, whether 100 million or 28

22   million is better.  I just, sort of, want to understand

23   what's your opinion as to what Google would have been

24   purchasing for that amount of money, whatever it ended up

25   being?                                                    11:55:14

                                                     Page 77

1          A.  Google would have been paying for the right

2     to incorporate Sun's intellectual property and distribute

3     a Linux Java mobile stack under an Open Source license.

4          Q.  Part of that component would have been a

5     license to a portfolio of Sun intellectual property?        11:55:49

6          A.  That's correct.

7          Q.  And that intellectual property portfolio

8     included patents; correct?

9          A.  Yes.  Again, I'd have to refresh my

10    recollection as to the precise terms in the contract, but   11:56:14

11    I understand the payment under such circumstances to be

12    payment for a bundle of -- of intellectual property,

13    including patents owned by Sun.

14         Q.  Do you know how many Sun-owned patents were

15    contained in that bundle of intellectual property?          11:56:30

16         A.  I don't know.

17         Q.  Have you looked at any of the Sun-owned

18    patents contained in that bundle of intellectual property

19    other than the patents asserted in this lawsuit?

20         A.  No.                                                11:56:45

21         Q.  Do you know anything about the other

22    Sun-owned patents in that bundle, as far as what they

23    covered -- what functionality they covered?

24              MS. RUTHERFORD:  Objection.

25              THE WITNESS:  I'm not aware of any list of --     11:56:59

                                                        Page 78

1    of such patents.  I've seen some numbers thrown around.

2    But I have not looked specifically at any patents other

3    than the ones that are in suit in this matter.

4         Q.  BY MR. PURCELL:  Have you made any attempt to

5    calculate the value to Google in the context of the --     11:57:19

6    the April 2006 negotiations of the other Sun-owned

7    patents not at issue in this case?

8         A.  I have not isolated the value of -- of those

9    other patents, no.

10        Q.  What about the other elements of the bundle     11:57:42

11   of intellectual property rights, were there copyrights --

12   strike that.  That's a terrible question.  Let me start

13   again.

14             With respect to the bundle of intellectual

15   property rights that was part of the subject of the     11:58:02

16   negotiation between Sun and Google, did that bundle

17   include the rights to copyrighted Sun material?

18        A.  It's my understanding that it does, yes.

19        Q.  And do you have a sense of the scope of the

20   Sun copyrighted material at issue with respect to that     11:58:15

21   bundle?

22        A.  Amongst other things, I think it includes

23   copyrighted source code.  I understand that Sun claims a

24   copyright in the API's.  You know, there may be -- there

25   may be other copyrighted material encapsulated by the --     11:58:43

Page 79

1      the terms of the proposed agreement.

2           Q.  Have you attempted to value the other

3      copyrighted material included within the bundle that is

4      not asserted in this case?

5           A.  No.  My analysis supports apportioning the          11:59:06

6      value of -- of the entire bundle specifically into --

7      into two components, one of which is -- is that

8      associated with the patents-in-suit.  Another reflects

9      the value of the copyrights, but I have not specifically

10     isolated the value of the other intellectual property.     11:59:36

11          Q.  Are you sufficiently familiar with the

12     content of that other intellectual property that you

13     could estimate its value?

14               MS. RUTHERFORD:  Objection.

15               THE WITNESS:  Not as I sit here today.           11:59:56

16          Q.  BY MR. PURCELL:  If Google had gotten access

17     to Sun's copyrighted source code, that would have had

18     substantial economic value to Google; correct?

19               MS. RUTHERFORD:  Objection.

20               THE WITNESS:  It may have had substantial         12:00:10

21     economic value.  It would depend upon what use they could

22     put it to.

23          Q.  BY MR. PURCELL:  Wouldn't having access to

24     Sun's copyrighted source code potentially have enabled

25     Google and Sun to jointly develop a mobile operating       12:00:25

Page 80

1    platform more quickly?

2                MS. RUTHERFORD:  Objection.

3                THE WITNESS:  That's possible.

4          Q.  BY MR. PURCELL:  It would have avoided the

5    need for Google to write its own code, at least to some          12:00:36

6    extent, potentially; correct?

7                MS. RUTHERFORD:  Objection.

8                THE WITNESS:  It's certainly possible.

9          Q.  BY MR. PURCELL:  It might have allowed Google

10   to get a mobile operating platform to market more          12:00:45

11   quickly; correct?

12         A.  Well, it's possible.  I don't know that

13   it's -- it's guaranteed.  Google may have had existing

14   code with equivalent functionality or the ability to

15   obtain it from a third party.          12:01:03

16         Q.  Do you have any information suggesting that

17   Google did have the ability to obtain equivalent code

18   from a third party?

19                MS. RUTHERFORD:  Objection.

20                THE WITNESS:  I don't know either way.          12:01:19

21         Q.  BY MR. PURCELL:  The bundle of intellectual

22   property rights that was part of the negotiation between

23   Sun and Google, in addition to patents and copyrights, it

24   also included the rights to use Sun's Java trademark;

25   correct?          12:01:47

                                                Page 81

1          A.   Correct.

2          Q.   Have you attempted to calculate the value of

3     the use of Sun's Java trademark with respect to the

4     overall bundle of rights?

5          A.   No.                                        12:01:57

6               MS. RUTHERFORD:   Objection.

7          Q.   BY MR. PURCELL:   Do you see any value in --

8     in a new mobile operating platform having the Java brand

9     over a new entrant that did not?

10               MS. RUTHERFORD:   Objection to form.        12:02:10

11               THE WITNESS:   There may be some value.

12     Whether it's substantial or -- or minimal, I don't know

13     that I can offer an opinion.

14          Q.   BY MR. PURCELL:   Are you familiar with Sun's

15     business practices as far as its efforts to protect the   12:02:31

16     Java trademark?

17               MS. RUTHERFORD:   Objection to form.

18               THE WITNESS:   Generally.

19          Q.   BY MR. PURCELL:   What's your understanding

20     of --                                               12:02:42

21               MS. RUTHERFORD:   Give me a second to object.

22     Okay?

23               THE WITNESS:   Sorry.

24               MR. PURCELL:   Sure.

25          Q.   What's your understanding of Sun's general   12:02:47

Page 82

1    business practices with regard to protecting the Java

2    trademark?

3            A.   Sun does not allow licensees to use the

4    trademark, you know, unless they -- unless they have

5    demonstrated that they're using a compatible version of        12:03:16

6    Java, specifically one which has passed the TCK.

7            Q.   And TCK stands for -- is it technology

8    compatibility test?  I'm not trying to trick you.  I can

9    never remember whether it's technology or testing

10   compatibility kit?                                             12:03:39

11           A.   I'm in the same place that you are,

12   Mr. Purcell.  I believe it is testing and compatibility

13   kit.

14           Q.   Okay.

15           A.   But it may even have changed over time.          12:03:46

16           Q.   But in any event, the TCK is a Sun test

17   designed to measure compatibility between a licensee's

18   implementation of Java and the Sun Java standard;

19   correct?

20           A.   That's my understanding.                         12:03:59

21           Q.   So leaving aside the bundle of intellectual

22   property rights we've been discussing, the patents

23   copyrights and trademark, would the proposed deal between

24   Sun and Google have delivered any other value to Google

25   in exchange for the payment Google was proposing to make      12:04:19

                                                          Page 83

1    to Sun?

2            MS. RUTHERFORD:  Objection to form.

3            THE WITNESS:  I'm sorry, can you restate the

4    question?

5        Q.  BY MR. PURCELL:  Sure.  Maybe I can make it a        12:04:31

6    little more simple.

7            The deal between Google and Sun under

8    negotiating -- negotiation in April of 2006 would have

9    provided Google with additional value beyond just a

10   license to a bundle of intellectual property; correct?    12:04:44

11           A.  Well, the value to Google is, as you have

12   suggested, at least potentially made up of a number of --

13   of factors, one is potentially the right to -- to access

14   certain source code or deploy certain Sun technology, the

15   ability to access the base of developers writing Java      12:05:28

16   code.  To the extent that they saw some value in the

17   trademark, they might have been -- viewed that as part of

18   the considerations under the agreement.

19           I think there is likely to be some value to

20   them in terms of being able to capitalize upon Sun's       12:05:56

21   expertise and -- and many years of investment in

22   developing Java and fine-tuning that technology to work

23   in the mobile environment.  There may well be other

24   benefits that they would receive in exchange for -- for

25   the payments associated with this agreement.               12:06:24

Page 84

1          Q.   In your analysis, do you attempt to value the

2     other benefits that Google would have received apart from

3     the intellectual property license?

4          A.   Independently of -- of the negotiations

5     around this agreement, no.                              12:06:44

6          Q.   What about in the context of the negotiations

7     around this agreement?  In that context, did you attempt

8     to value the other benefits apart from the intellectual

9     property license to Google?

10         A.   I don't know that they're -- they're easily     12:07:00

11    economically separable.  Like many of these agreements,

12    it involves a transfer of technology, which is

13    accomplished by -- by a license to intellectual property.

14         Q.   But a license to intellectual property

15    doesn't necessarily give the licensee the right to         12:07:26

16    leverage the expertise that the licensor has previously

17    gained in -- in implementing the technology previously;

18    correct?

19              MS. RUTHERFORD:  Objection to form.

20              THE WITNESS:  It depends on the terms of the     12:07:41

21    license agreement.

22         Q.   BY MR. PURCELL:  I understand that, but in

23    and of itself, a license to intellectual property doesn't

24    also give the licensee the right to leverage the

25    licensor's expertise in using the licensed technology?     12:07:59

                                                    Page 85

1          A.   I would characterize it as a method of

2     capturing the value to Sun of compatibility and control.

3          Q.   All right.  We'll get to that in a second.

4               Other than those three bases, the litigation

5     premium, fragmentation and then as you put it, the value          14:17:01

6     to Sun as capturing compatibility and control, is there

7     any other basis for the upward adjustment that you make

8     in the patent royalty from just below $30 million to just

9     above 200 million in your initial report?

10         A.   Maybe I misheard your question.  But those           14:17:19

11    would be the -- those would be the three factors which

12    would lead me to an upward adjustment.

13         Q.   Now, looking at the litigation premium first,

14    you state that you're not able to quantify that

15    precisely; correct?                                              14:17:54

16         A.   Correct.

17         Q.   And why is that?

18         A.   Well, I think to make the correct adjustment

19    here, one would have to have a good sense of the ex-ante

20    probability of success in litigation.                           14:18:12

21              The literature on this has -- has focused, if

22    you like, on -- on average -- on average values and the

23    types of the sizable litigation premium, which would be

24    suggested by, for example, the -- the -- what the data

25    would allow you to infer about -- infer for a randomly          14:18:37

                                                      Page 136

1    chosen patent or a randomly chosen litigation, what the

2    probability of -- of the patentee establishing liability

3    would be.

4              Those studies point us to the general

5    magnitude of such adjustments.  I am personally hesitant          14:18:56

6    to apply them in a situation such as this, where I think

7    it's really unclear what the ex-ante probability of a

8    finding of liability would be.

9              Q.  Is it fair to say that you used the

10   litigation premium only as a reasonableness check to             14:19:19

11   support your conclusion that an upward adjustment of the

12   patent royalty is justified?

13             A.  Litigation -- the potential for a litigation

14   premium, which -- you know, which could be significant

15   but which I believe is difficult to reliably -- was             14:19:37

16   difficult for me to reliably assess, is one of the

17   factors that I would take into account within the Georgia

18   Pacific framework as suggesting -- as suggesting upward

19   pressure on a reasonable royalty.  Yeah.

20             Q.  And is that the only way in which you use the      14:20:04

21   litigation premium in your analysis, to suggest upward

22   pressure on the royalty?

23             A.  I believe so.

24             Q.  The next basis for your upward adjustment is

25   fragmentation.  And I believe you say you're not able to         14:20:26

Page 137

1    precisely quantify the impact of fragmentation either;

2    correct?

3           A.  At this point in time, I think it --

4    fragmentation -- fragmentation is something which I

5    believe is a very substantial consideration here and that     14:20:50

6    Oracle is likely to suffer severe economic harm as a

7    result of Google's actions fragmenting the -- the Java

8    ecosystem.

9           I think some parts of this might, in the

10   fullness of time, you know, be possible to quantify with     14:21:18

11   some precision.  But it is a -- the type of phenomenon

12   which is very difficult to quantify with any -- with any

13   precision.

14          Q.  And you haven't attempted to do that here;

15   correct?                                                     14:21:40

16          A.  I have not.

17          Q.  Is it your opinion that Oracle has already

18   suffered damages as the result of fragmentation caused by

19   Android?

20          A.  Yes, it is.  I think the economic processes     14:21:50

21   which lead to the -- the substantial harm caused by

22   fragmentation are already in progress.  The cat's out of

23   the bag, if you like.

24          Everything I think we know in economics about

25   the platform competition and the economic processes which     14:22:14

Page 138

1    drive this, suggest that, you know, the -- the processes

2    in motion, they're very difficult to reverse and will

3    lead to -- to very substantial harm to Oracle's economic

4    interests as the -- as the sponsor of the Java platform.

5         Q.  And how could that harm to Oracle's economic        14:22:47

6    interest be demonstrated?

7         A.  Well, we might in 20 year's time be able to

8    conduct a retrospective study -- I imagine it would make

9    a very good Ph.D. thesis -- to go back and look at

10   what -- you know, what will have happened between 2008     14:23:10

11   and at some point in the future.

12             And, you know, there may be enough data for

13   such a retrospective study to be able to go back and say,

14   "Well, this is -- this is what happened to Java.  You

15   know, this is what happened to Oracle's ability to        14:23:32

16   capture value from the platform.  And this is what led to

17   this, that or the other, business outcome," which I

18   can't, sitting here, predict.

19             But retrospectively, one will be able to

20   reliably attribute to the forking or the fragmentation of  14:23:53

21   the platform by Android.

22        Q.  Do we need to wait 20 years to make that

23   determination?

24        A.  Well, I don't know how many years.  But, you

25   know, at some indeterminate point in the future, when the  14:24:08

Page 139

1    Android network.

2           These examples I -- I referred to earlier

3    strongly point to these processes being almost impossible

4    to reverse.  Once the market is tipped, it's almost

5    impossible to tip it back.                          14:29:44

6           Q.  Other than Exhibit E10, which measures

7    developer activity on message boards, do you rely on any

8    other data in support of a conclusion that developer

9    interest has shifted from Java to Android?

10          A.  I don't rely on any other piece of data    14:30:10

11   specifically.  I rely upon my -- my years of studying

12   this phenomenon, the extensive economic literature which

13   describes these kinds of dynamics, and, you know, the

14   empirical studies which have pointed to these examples of

15   the death of one platform through forking or            14:30:31

16   fragmentation and the emergence of another.

17          Q.  Let's assume that Google had created a

18   non-infringing competing platform.  Wouldn't it still be

19   possible in that circumstance that developers would move

20   from the Java platform to the non-infringing competitive  14:30:49

21   Android platform?

22          A.  Well, it's possible.  It's possible.  But I

23   think it's -- you know, you have to understand the

24   economic forces which would -- which would drive this.

25          If the developers had a reasonable basis to      14:31:07

                                                    Page 143

1    very large numbers of applications being available, and

2    very rapid adoption by consumers.

3         Q.  Have you done anything to investigate the

4    extent to which when Apple launched its mobile iPhone

5    platform, any mobile Java developers migrated over and          14:45:32

6    started writing apps for the iPhone?

7         A.  As I said, I haven't seen any convincing data

8    on that point.

9         Q.  Now, Android includes more functionality than

10   is included in Oracle's Java mobile product; correct?          14:45:49

11        A.  I understand it's, if you like, a superset

12   of -- of Java mobile.

13        Q.  Android is what is referred to as a full

14   stack operating system.  Have you ever heard that term?

15        A.  Yes.                                                  14:46:08

16        Q.  So it includes -- it includes actually an

17   operating system at the bottom level.  It includes

18   middleware.  It includes features that run on the

19   middleware.

20        A.  Yes.                                                  14:46:17

21        Q.  Whereas Java mobile is mostly confined to

22   middleware?  Is that your understanding or --

23        A.  Generally, yes.

24        Q.  So in that sense, Android doesn't -- strike

25   that.                                                          14:46:32

                                                        Page 152

1    would want to assessed the range of choices, market and

2    technology options that were available to the

3    participants.

4            The reason this is something which is very

5    hard to do ex-ante and may not be possible to do          14:52:33

6    ex-post -- that's why I was suggesting it could be a

7    Ph.D. thesis, topic -- is that it may in the end be

8    possible to evaluate all of this data, when it's all

9    finally in and the process -- the economic processes I'm

10   talking about have played out -- and arrive at a          14:52:55

11   definitive conclusion, what we can't do, I think at this

12   moment in time, is -- is come up with a reliable

13   quantification of -- of how for fragmentation.

14           It's very clear to me that it's substantial

15   and likely to be impossible to reverse.  Putting a dollar 14:53:22

16   figure on it today I think is -- is not something that

17   can be done.

18       Q.  How can you be sure that there even is any

19   harm from fragmentation?

20       A.  Listen to the participants in this case.         14:53:39

21   Oracle are very concerned, and I think have a very

22   reasonable basis for being concerned, about the impact of

23   Java on their business.  They're seeing it in their

24   customers jumping ship.  There's -- you know, the record

25   supports, you know, a substantial and ongoing and likely  14:54:06

Page 156

```
 1     accelerating impact of Android on Oracle's Java business.

 2          Q.  Is there anything in particular you can point

 3     me to?  I mean, I'm familiar with Oracle's assertions in

 4     the case, but is there anything in particular you can

 5     point me to as evidence of harm to Oracle currently from      14:54:32

 6     fragmentation?

 7          A.  Well, I cite a number of -- of -- I don't

 8     recall the specific references here.  I think the --

 9     the -- I wish I can add to my previous answers to your

10     questions in this line.                                       14:55:27

11          MR. PURCELL:  All right.  Let's take a break.

12          THE VIDEOGRAPHER:  Going off the record.  The

13     time is 2:55 p.m.

14          (Recess.)

15          THE VIDEOGRAPHER:  Back on the record.  The           15:08:55

16     time is 3:08 p.m.

17          Q.  BY MR. PURCELL:  Dr. Cockburn, staying with

18     the fragmentation issue for a moment, you're familiar

19     with the phrase "write once, run anywhere"?

20          A.  Yes, I am.                                           15:09:06

21          Q.  And what's your understanding of what that

22     phrase means?

23          A.  Well, the phrase refers to the property of

24     the Java platform, and it's built in by design that a

25     great amount of Java code, or indeed, all of the code for    15:09:27
```

Page 157

```
 1    be the only company that could offer a commercial

 2    implementation of Android?

 3              MS. RUTHERFORD:  Objection to form.

 4              THE WITNESS:  There was no agreement.

 5         Q.  BY MR. PURCELL:  Was there ever an agreement    15:39:38

 6    on that term between Sun and Google during negotiations?

 7              MS. RUTHERFORD:  Objection to form.

 8              THE WITNESS:  I don't think so.

 9         Q.  BY MR. PURCELL:  When you say "commercial

10    implementation," are you distinguishing between that and    15:39:49

11    zero price implementations?

12              MS. RUTHERFORD:  Objection to form.

13              THE WITNESS:  I'm referring to -- to an

14    implementation which is licensed under the kind of

15    commercialize which Sun had used and continues to use    15:40:08

16    with its licensing of Java ME.

17         Q.  BY MR. PURCELL:  But there are other

18    companies that are able to offer commercial

19    implementations of Java ME; correct?

20         A.  What do you mean specifically?    15:40:27

21         Q.  Well, OEMs, wireless carriers, there are

22    other companies that offer commercial implementations of

23    Java ME; correct?

24         A.  They do so under license from Sun, is my

25    understanding.  So it's a distinction.  I think maybe    15:40:51
```

Page 175

```
 1    where the issue here is the difference between Java ME as

 2    I think you were describing as a piece of middleware,

 3    Java ME can be implemented on many different platforms,

 4    and certainly it's the case, I think, that OEMs or

 5    carriers may be understood to be distributed -- you know,      15:41:16

 6    distributing a commercial implementation and doing so on

 7    top of that platform.

 8              So I think, for example, Java ME runs on

 9    Blackberry.  There's a big distinction between that and

10    Android, which is a -- what we were describing earlier as      15:41:33

11    a full stack.

12         Q.  I think you said earlier that your only basis

13    for quantifying the upward adjustment of patent royalties

14    is the third upward adjustment, the value to Sun of

15    compatibility and control; is that correct?                    15:42:09

16         A.  Yes.

17              MR. PURCELL:  I'd like to mark these two

18    documents as Exhibits 509 and 510.

19              (Exhibits Google 509 and 510 were marked

20              for identification.)                                 15:42:42

21              MR. PURCELL:  So Exhibit 509 is a March 20,

22    2006 email from Kathleen Knopoff to the Armstrong core

23    email group, Bates-Stamped 0AGoogle 0100166873.

24              And then Exhibit 510 is a presentation with

25    the Bates-Stamp OAGoogle 0100166874 through 66899.             15:43:06
```

Page 176

1          MS. RUTHERFORD:  I think it's important to

2     mention that 509 and 510 were attached to each other.

3          MR. PURCELL:  Right.  I assume that that's

4     the case.

5          Q.  Dr. Cockburn, looking at -- and feel free to      15:43:30

6     look at Exhibit 509 if you want, the email -- but looking

7     at 510, the presentation, is this document the basis for

8     your quantification of the upward adjustment for the

9     value of control and compatibility to Sun?

10         A.  It's the basis for that part of my              15:43:48

11     adjustment, which, if you like, is a lump sum.  I also --

12     I also account for compatibility control as regards of

13     lifting a cap on -- on the revenue sharing part of the

14     agreement.  This is the principal part, yes.

15         Q.  BY MR. PURCELL:  Is there any other basis for      15:44:18

16     that principal part of your upward adjustment, other than

17     this document?

18         A.  No.  Other than -- other than my locating it

19     in the general context of the record and the other

20     evidence I considered, this is the specific document.      15:44:37

21         Q.  Leaving aside your discussions with counsel,

22     which I can't get into, did you discuss this document

23     with anybody at Oracle prior to relying on it in your

24     expert report?

25         A.  No.                                             15:44:49

                                                     Page 177

1    You can infer -- you can infer that from the previous

2    page which talks about, you know, 235 million units in

3    fiscal '09.  You could scale that down to, you know, help

4    you understand how many units were projected and how

5    quickly this product might have ramped up and received        15:57:59

6    acceptance.

7           Q.  BY MR. PURCELL:  Have you seen any other

8    document that would support a conclusion that if Project

9    Armstrong had gone forward, Sun could have got it to

10   market by the end of 2007?                                    15:58:09

11          MS. RUTHERFORD:  Objection to form.

12          THE WITNESS:  I'm not recalling a specific

13   document.

14          Q.  BY MR. PURCELL:  In looking at the numbers

15   for fiscal year 2009, the revenue number is                   15:58:29

16   $462.6 million; correct?

17          A.  Yes.

18          Q.  And the gross margin is $428.0 million?

19          A.  Yes.

20          Q.  That's a profit margin of over 90 percent,        15:58:42

21   isn't it?

22          A.  I'll accept your arithmetic.

23          Q.  Are you aware of any other Sun or Oracle

24   business segment that generates a margin of that nature,

25   90 percent?                                                    15:59:00

Page 185

1    operating platform have required consumer marketing?

2              MS. RUTHERFORD:  Object to the form.

3              THE WITNESS:  Well, the customer here are

4    OEMs and carriers.  In the global marketplace, you know,

5    the serious customers here would be measured in tens or        16:01:16

6    hundreds rather than millions or hundreds of millions.

7    The carriers and the OEMs are going to market to

8    consumers.

9         Q.  BY MR. PURCELL:  Now, looking for a second at

10   Exhibit 509, Kathleen Knopoff's March 20th, 2006 email?        16:01:36

11        A.  Yes.

12        Q.  It's your understanding that this email was

13   attached to and referring to the presentation we've been

14   discussing that's Exhibit 510?

15        A.  Yes, that's my understanding.                         16:01:51

16        Q.  So Ms. Knopoff writes a number of things, but

17   number 3 in her email is the provisos that we gave them

18   are that the numbers will move as the business model is

19   more fully developed and that these numbers have not been

20   vetted bottoms up by customer.                                 16:02:11

21             Do you see that?

22        A.  I see that.

23        Q.  Have you ever seen another document that

24   revised or confirmed these projections in any way after

25   the business model was more fully developed?                   16:02:20

                                                           Page 187

```
 1              A.  No.

 2              Q.  Have you seen any documents that revised or

 3      confirmed these projections after they were vetted

 4      bottoms up by the customer?

 5              A.  No.  It's my understanding the document was      16:02:30

 6      prepared in February 2008 as part of the background for

 7      the negotiations that were being conducted in late March

 8      and early April, and that as those negotiations fell

 9      apart, it doesn't surprise me that there's no subsequent

10      revision of this document.                                  16:02:54

11              Q.  I think you said February of 2008.  I think

12      you might have meant February of 2006?

13              A.  I certainly meant to say 2006.  I apologize

14      for misspeaking.

15              Q.  No problem.                                     16:03:04

16              So just to be clear, you've never seen any

17      other iteration of this document that made projections

18      about potential revenue for Project Armstrong; correct?

19              A.  That's correct.

20              Q.  Let's turn to Exhibit 6 to your reply to the    16:03:29

21      Leonard report, which should be the very last page of the

22      document.

23              A.  Okay.

24              Q.  Now, Exhibit 6 to your reply to the Leonard

25      report, this calculates your current estimates of          16:04:12
```

Page 188

1          Q.  BY MR. PURCELL:  When you're calculating the

2     value of compatibility and control to Sun, why do you use

3     as a proxy for that the projected Project Armstrong

4     profits?

5          A.  Well, these place a lower bound, if you will,        16:13:32

6     on how Sun would, in my view, you know, place a monetary

7     value on compatibility and control provisions, you know,

8     as contemplated in the Project Armstrong negotiations.

9              There's certainly more value, you know, to

10    the extent that the compatibility and control revisions    16:13:54

11    protect other revenue streams or sustain other revenue

12    streams, that was certainly contemplated -- you know, we

13    spoke about the email from Mr. Nachi earlier today.  It

14    was certainly contemplated there were going to be

15    opportunities to -- to -- substantial opportunities to      16:14:18

16    grow and expand these revenues.

17              But these provide, in my view, some concrete

18    evidence as to a minimum amount of money that Sun would

19    have required from the hypothetical license in order to

20    compensate them for loss of compatibility and control.     16:14:36

21         Q.  Now, you calculate a separate damages figure

22    through September of 2011 in Exhibit 6; correct?

23         A.  Correct.

24         Q.  And that total damages figure before

25    adjustments is $120.9 million?                             16:14:56

Page 194

```
 1    it as a window, and it's important to -- to move towards

 2    it if they're to -- to be able to compete.

 3            Q.  BY MR. PURCELL:  During -- strike that.

 4            Between the breakdown of Sun/Google

 5    negotiations in April or May of 2006 and the announcement      17:42:35

 6    of Android in November 2007, what, if anything, did Sun

 7    do to build its own full stack mobile operating platform?

 8            A.  I don't know the extent to which they were

 9    investing or actively engaged in this sort of thing, but

10    I think the record suggests that Android came of              17:42:56

11    something -- it was something of a surprise to Sun,

12    particularly the extent to which it incorporated Sun's

13    intellectual property and -- and, you know, would be a

14    direct competing, you know, product as a substitute for

15    something like Acadia.                                        17:43:20

16            Q.  What's your basis for your statement that

17    Android came as a surprise to Sun?

18            A.  Well, as I -- as I recall, the -- the record,

19    various people at Sun, it took a while for Sun to

20    appreciate how much of -- of Java technology -- how much     17:43:43

21    Java technology, Java ME and specific core libraries,

22    were actually present in the -- in the released version

23    of Android.

24            Q.  Do you have an opinion as to whether Sun ever

25    would have granted a license to Google for an                17:44:06
```

Page 237

1    incompatible version of Android?

2            MS. RUTHERFORD:  Objection.

3            THE WITNESS:  I can see circumstances under

4    which they would have been willing to -- to license an

5    incompatible implementation of Java.  You know, if the          17:44:30

6    price is right.

7            So I wouldn't say never.  I think they would

8    have been reluctant to do so.  But it would depend very

9    much on the terms that were offered.

10           Q.  BY MR. PURCELL:  None of the actual               17:44:49

11   negotiations between Google and Sun in 2006 were for an

12   incompatible implementation of Java; correct?

13           A.  The negotiations, as I understand them,

14   contemplated a compatible implementation.

15           Q.  Neither party ever put an incompatible           17:45:05

16   implementation on the table in those negotiations;

17   correct?

18           A.  Correct.

19           Q.  Are you aware of any other licenses that Sun

20   has ever granted, any third party for an incompatible        17:45:14

21   implementation of Java?

22           A.  Well, we were having a discussion earlier

23   about DoJa, which you were characterizing to me as

24   incompatible.  I think from time to time Sun has been

25   willing to consider licensing its technology under, you       17:45:37

1    know, specific circumstances and allowing a degree of

2    compatibility to the extent it did not threaten the core

3    value proposition.  That would be reasonable from a

4    business perspective.

5         Q.  Other than the example of DoJa, can you think      17:45:53

6    of any other instances where Sun has been willing to

7    consider licensing an incompatible implementation of

8    Java?

9         A.  Not that I recall sitting here.

10        Q.  Are you aware of any instances of any kind         17:46:08

11   where Sun had ever licensed an incompatible

12   implementation of Java to a company that was competing

13   with Sun for customers?

14             MS. RUTHERFORD:  Objection to form.

15             THE WITNESS:  Sorry.  Can you say that again?     17:46:27

16        Q.  BY MR. PURCELL:  Sure.

17             Are you aware of any instance where Sun has

18   ever --

19        A.  Actually, will it be okay with you -- do you

20   mind if I take a quick break?  I'm -- just a few minutes.  17:46:36

21   Or if you feel like there's a line of questioning you'd

22   like to complete, that's fine.

23        Q.  I'm sorry.  I just have a question pending,

24   so I'd like to get an answer to it.

25        A.  Right.  Sorry.                                     17:46:50

                                                    Page 239

1          Q.  No.  I know this is a long day.

2               My question is:  Are you aware of any

3     instances where Sun has ever offered to license or

4     licensed an incompatible implementation of Java to a

5     competitor?                                          17:47:00

6               MS. RUTHERFORD:  Objection to form.

7               THE WITNESS:  What do you mean by

8     "competitor"?

9          Q.  BY MR. PURCELL:  Somebody who's competing

10    with Sun for customers as opposed to a partner like  17:47:08

11    DoCoMo.

12              MS. RUTHERFORD:  I can't think of one.

13              MR. PURCELL:  All right.  We can take a

14    break.

15              THE VIDEOGRAPHER:  Going off the record.  The  17:47:20

16    time is 5:47 p.m.

17              (Recess.)

18              THE VIDEOGRAPHER:  Back on the record.  The

19    time is 5:55 p.m.

20         Q.  BY MR. PURCELL:  Dr. Cockburn, just turning  17:55:21

21    back to Exhibit 510, the Project Armstrong business model

22    document?

23         A.  Yes.  Sorry, 5?

24              MS. RUTHERFORD:  510.

25              THE WITNESS:  510.  Excuse me.  Okay.       17:55:38

Page 240

```
 1    there's the upward adjustment, which is quantified in

 2    Exhibit 510, the Project Armstrong document, and then

 3    there's the apportionment percentage that you have given

 4    to the copyrights based on the facts that you just

 5    described.                                          18:03:31

 6            Is that the complete basis of your copyright

 7    license calculation?

 8            MS. RUTHERFORD:  Objection to form.

 9            THE WITNESS:  My copyright license

10    calculation is based upon my assessment of the value of   18:03:37

11    a -- the hypothetical license -- you know, I think I

12    referred to it in my report as the aggregate hypothetical

13    license to the whole package, and then there's an

14    apportionment percentage applied to that.  And the

15    apportionment percentage is derived from the sources I    18:04:00

16    was -- we were just talking about.

17        Q.  BY MR. PURCELL:  I think you just repeated

18    back to me what I said in different words.  I'm trying

19    to -- I'm trying --

20            MS. RUTHERFORD:  Objection.              18:04:13

21            MR. PURCELL:  Yeah, that's fine.

22        Q.  I'm trying to figure out the complete basis

23    of your copyright license calculation.  You started,

24    correct, with the Sun Google negotiations in 2006; right?

25        A.  Yes.                                      18:04:24
```

Page 246

1          Q.  All right.  And then you apportioned a

2    percentage of your starting point to the value of the

3    copyrights; correct?

4          A.  Well, strictly speaking, I think, I began

5    with the starting point license, which we were referring      18:04:38

6    to as the $100 million license, then I adjusted that

7    upwards to take into account the value of compatibility

8    and control as captured by the projections and financial

9    analysis in Exhibit 510.

10          I further uncap the -- the revenue sharing             18:05:08

11    contemplated in the starting point negotiation from

12    $25 million but use the same 10 percent.  That gives me

13    the value of the aggregate hypothetical license.

14          Q.  And then you take 15 percent of that?

15          A.  To that, I apply apportionment percentage.         18:05:29

16          Q.  Which is 15 percent; correct?

17          A.  Which, in my opinion, is 15 percent.

18          Q.  All right.  Jumping back for just a second to

19    your calculation of lost profits, with respect to the

20    Java ME licensing revenue for 2011, fiscal year 2011, you    18:05:48

21    used a projection for -- to calculate that number;

22    correct?

23          A.  Yes, I rely upon a -- the document in which

24    Sun anticipate a 50-percent decline in Java ME licensing

25    revenues during fiscal 2011.                                 18:06:15

Page 247

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

266

1    STATE OF CALIFORNIA        ) ss:

2    COUNTY OF MARIN            )

3

4             I, LESLIE ROCKWOOD, CSR No. 3462, do hereby

5    certify:

6             That the foregoing deposition testimony was

7    taken before me at the time and place therein set forth

8    and at which time the witness was administered the oath;

9             That testimony of the witness and all

10   objections made by counsel at the time of the examination

11   were recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16             I further certify that I am neither counsel

17   for any party to said action, nor am I related to any

18   party to said action, nor am I in any way interested in

19   the outcome thereof.

20             IN WITNESS WHEREOF, I have subscribed my name

21   this 18th day of October, 2011.

22                                                          

23

24        _Leslie Rockwood_

25        LESLIE ROCKWOOD, CSR. NO. 3462