KEKER & VAN NEST LLP
ROBERT A. VAN NEST - #84065
rvannest@kvn.com
CHRISTA M. ANDERSON - #184325
canderson@kvn.com
DANIEL PURCELL - #191424
dpurcell@kvn.com
633 Battery Street
San Francisco, CA  94111-1809
Telephone:    415.391.5400
Facsimile:    415.397.7188

KING & SPALDING LLP
SCOTT T. WEINGAERTNER (*Pro Hac Vice*)
sweingaertner@kslaw.com
ROBERT F. PERRY
rperry@kslaw.com
BRUCE W. BABER (*Pro Hac Vice*)
1185 Avenue of the Americas
New York, NY  10036
Telephone:    212.556.2100
Facsimile:    212.556.2222

KING & SPALDING LLP
DONALD F. ZIMMER, JR. - #112279
fzimmer@kslaw.com
CHERYL A. SABNIS - #224323
csabnis@kslaw.com
101 Second St., Suite 2300
San Francisco, CA  94105
Telephone:    415.318.1200
Facsimile:    415.318.1300

IAN C. BALLON - #141819
ballon@gtlaw.com
HEATHER MEEKER - #172148
meekerh@gtlaw.com
GREENBERG TRAURIG, LLP
1900 University Avenue
East Palo Alto, CA 94303
Telephone:    650.328.8500
Facsimile:    650.328.8508

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>                                    Plaintiff,<br><br>        v.<br><br>GOOGLE INC.,<br><br>                                   Defendant. | Case No. 3:10-cv-03561-WHA<br><br>**GOOGLE'S NOTICE OF MOTION AND MOTION TO STRIKE PORTIONS OF THIRD EXPERT REPORT BY IAIN COCKBURN AND EXPERT REPORT BY STEVEN SHUGAN; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Dept.:      Courtroom 8, 19th Floor<br>Judge:      Hon. William Alsup |

625343.04

**TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................1

II.     THE THIRD COCKBURN REPORT .........................................................3

III.    ARGUMENT .................................................................................................4

        A.      Dr. Cockburn's "independent significance" approach to patent
                apportionment is based entirely on Dr. Cockburn's say-so and is a
                disguised resurrection of the "25 percent rule" that the Federal Circuit
                struck down in *Uniloc*..................................................................................4

        B.      Dr. Cockburn's "group and value" approach to patent apportionment is
                biased and based on inapposite studies of patent value. ..........................7

        C.      Dr. Cockburn failed to apportion the full value of the copyrights that
                would have been included in the 2006 bundle.........................................11

        D.      Dr. Cockburn failed to conduct a claim-by-claim analysis, and hence
                failed to attribute any value to the unasserted claims. ............................13

        E.      Dr. Shugan's "conjoint" analysis is unreliable, methodologically
                flawed, and the results defy common sense.............................................14

                1.      Conjoint analysis is not an accepted basis for calculating
                        damages.........................................................................................15

                2.      The conjoint survey's methodology was flawed and unreliable................17

                        a.      The design of Dr. Shugan's conjoint survey...................17

                        b.      The conjoint survey's fatal methodological flaws. ........17

        F.      Dr. Cockburn's econometric analysis and calculation of market share
                are based on inapplicable data and unrealistic assumptions. .................20

                1.      Overview of Dr. Cockburn's econometric analysis and market
                        share calculations.........................................................................21

                2.      Dr. Cockburn's econometric analysis is based on
                        unrepresentative data. ..................................................................22

                3.      Dr. Cockburn's calculation of market share is based on
                        unreasonable assumptions about price and consumer choice...................23

IV.     CONCLUSION.............................................................................................25

i

625343.04

1

**TABLE OF AUTHORITIES**

2

**Federal Cases**

3

*Apple, Inc. v. Motorola, Inc.*
  No. 11 C 8540 (N.D. Ill.) ......................................................................................17, 18

4

*Boucher v. U.S. Suzuki Motor Corp.*
  73 F.3d 18 (2d Cir. 1996) ...............................................................................................23

5

*Fractus, S.A. v. Samsung Electronics Co.*
  No. 6:09-cv-0203, Dkt. No. 896 (E.D. Tex. April 29, 2011) ..................................18

6

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*
  103 F. Supp. 2d 268 (S.D.N.Y. 2000) ......................................................................19, 22

7

*McLaughlin v. Am. Tobacco Co.*
  522 F.3d 215 (2d Cir. 2008) ......................................................................................15, 16

8

*Medical Instrumentation and Diagnostics Corp. v. Elekta AB*
  No. 397-CV-00271, 2001 WL 36151641 (S.D. Cal. Dec. 12, 2001) ................................23, 25

9

*Riles v. Shell Exploration and Prod. Co.*
  298 F.3d 1302 (Fed. Cir. 2002) .................................................................................14, 15

10

*Schwab v. Philip Morris USA, Inc.*
  449 F. Supp. 2d 992 (E.D.N.Y. 2006) .........................................................................15

11

*Uniloc USA, Inc. v. Microsoft Corp.*
  632 F.3d 1292 (Fed. Cir. 2011) .............................................................................1, 4, 5, 7, 8

12

**Federal Rules**

13

FED. R. CIV. P. 23(b) ........................................................................................................15

14

Federal Rule of Evidence 702 ..........................................................................................22

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

1

**NOTICE OF MOTION AND MOTION TO STRIKE**

2        PLEASE TAKE NOTICE that Defendant Google Inc. ("Google") hereby moves to

3  exclude portions of the opinions and testimony of Oracle America, Inc.'s ("Oracle") damages

4  experts Dr. Iain M. Cockburn and Dr. Steven Shugan. This Motion is based on the following

5  memorandum of points and authorities in support, the Declaration of David Zimmer ("Zimmer

6  Decl.") and accompanying exhibits, the entire record in this matter, and on such evidence as may

7  be presented at any hearing of this Motion, on a date and at a time to be determined by the Court.

8

9  Dated: February 17, 2012                  KEKER & VAN NEST LLP

10

11

12                             By: s/ Robert A. Van Nest
                                 ROBERT A. VAN NEST
                                 Attorneys for Defendant

13                                 GOOGLE INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Oracle's damages expert Dr. Iain Cockburn's third attempt to formulate a viable damages report remains riddled with fatal errors.  In response to the Court's rejection of his methodology for separating the value of the patents and copyrights at issue in this case from the remainder of the licensing bundle at the heart of the 2006 Sun-Google negotiations, Dr. Cockburn now offers two alternative apportionment methods.  Both are legally improper.

*First,* Dr. Cockburn purports to evaluate the "independent significance" of the patents-in-suit and copyrights to Google, but this "analysis" is smoke and mirrors.  Dr. Cockburn throws into the hopper every piece of evidence he can identify showing that Google considered certain obvious features—speed, memory, and number of applications—important to a smartphone platform and that the inventions at issue improve those features.  Based on this evidence as a whole, and without using any quantitative algorithm or formula, Dr. Cockburn simply concludes that the asserted patents are worth "at least" an even 25% of the total bundle, and the copyrights worth exactly half that much.  This is a subjective guess, not an objective methodology; it is not replicable by anyone other than Dr. Cockburn.  Indeed, Dr. Cockburn's "at least" 25% conclusion effectively tries to resurrect the "25 percent rule" that the Federal Circuit struck down just last year in *Uniloc.*  Further, Dr. Cockburn admitted at deposition that he included the caveat "at least" to preserve his flexibility to argue a much higher percentage to the jury.  He flatly stated that, having calculated the total value of the licensing bundle to be $597.5 million, he might tell the jury that the patents were worth ***at least 50%*** of that total—and that the copyrights might be so important to Android that they could be worth ***100%*** of the bundle.  This is as unformed and speculative as expert testimony can get.  It cannot possibly assist the jury.

*Second,* Dr. Cockburn's alternative apportionment methodology—the "group and value" approach—asked a group of five Oracle engineers to identify all the mobile Java-related patents in Sun's 2006 portfolio, separate those patents into categories, rank the categories in importance, and then rate each patent's value on a three-point scale.  Four of the five Oracle engineers involved in this process conducted infringement analyses of the patents-in-suit in preparation for

1  this lawsuit, and admitted in deposition that they spent next to no time compiling their rankings

2  and were influenced by their prior work on this case.  Further, the engineers did no quantitative

3  testing to confirm their conclusions, and Mark Reinhold, the Oracle engineer who headed up the

4  team, admitted there was no way to translate the engineers' judgment of comparative value into

5  the hard numbers required for a damages analysis.  Dr. Cockburn tries to paper over this gap

6  with three studies finding that, in general, a small percentage of issued patents account for a large

7  percentage of the aggregate value of all patents.  But none of these studies looked at a single

8  company's patent portfolio in a narrow technology area, such as Sun's mobile Java portfolio, and

9  two of the three studies evaluated European patents, not U.S. patents.  The studies are Dr.

10  Cockburn's sole basis for concluding that the top 22 patents in the Sun portfolio account for up

11  to 92% of the total value of the portfolio.  With three of the patents-in-suit—the '104, '205, and

12  '720—placed among the top 22 by the very engineers who selected litigation patents at the

13  outset, Dr. Cockburn calculates the value of the six patents-in-suit as falling in the broad range

14  between 10.2% and 32.7% of the $597.5 million bundle.  Dr. Cockburn has no reasonable basis

15  for this conclusion.  His group and value approach also should be stricken.

16       Dr. Cockburn's newest opinion has other disqualifying flaws as well.  His apportionment

17  analysis as to the copyrights at issue fails because he did not value any of the copyrighted

18  material included in the Sun-Google negotiations other than the remaining 37 API specifications

19  on which Oracle bases its copyright claim.  Dr. Reinhold confirmed at his deposition that Sun

20  and Google were negotiating for a partnership including a license to *all* of Sun's mobile Java

21  related copyrights—among other things, the source code implementing the Java virtual machine

22  and all of the class libraries associated with the APIs.  Yet Dr. Cockburn still has no idea what

23  was included in that universe of copyrights, and made no effort to value any of the other

24  copyrights besides the APIs.  Instead, he simply assumed that the *value* of that *presently existing*

25  Sun intellectual property was subsumed into the *projected cost* of *future* Sun engineering

26  expenses to be incurred during a Sun-Google partnership.  There is no economic basis for using

27  projected future engineering costs as a proxy for fair market value of copyrighted works.

28       Moreover, despite repeated orders from this Court instructing him to do so, Dr. Cockburn

2
NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

1    still refuses to value the patents on a claim-by-claim basis.  This is particularly important here,

2    where Oracle initially sued Google on 132 patent claims.  Presumably Oracle had a Rule 11 basis

3    for asserting all those claims, so all of them must have some value (even leaving aside the

4    potentially valuable other claims of those patents that Oracle never asserted).  Yet Dr. Cockburn

5    never separated out the value of the unasserted—or asserted but abandoned—claims, nor did he

6    deduct the value of the unasserted claims from the value of the patents-in-suit as a whole.

7          Finally, Dr. Cockburn also relies on his own econometric study and a "conjoint" analysis

8    conducted by another Oracle expert, Dr. Steven Shugan.  Both of these analyses are based on

9    unrealistic assumptions and suffer from serious methodological flaws.  They should be stricken.

10   And, because Dr. Cockburn's "independent significance" approach and copyright apportionment

11   rely on the conjoint and econometric analyses, they should be stricken for that reason as well.

## II.    THE THIRD COCKBURN REPORT

13         Dr. Cockburn's third report begins, as his second report did, with the negotiations Google

14   and Sun conducted in early 2006 for a technology partnership to develop a mobile smartphone

15   platform.  As before, Dr. Cockburn uses as his monetary starting point Sun's initial February

16   2006 demand, which he calculates at *$98.7 million*, rather than Sun's final demand in April 2006

17   of $28 million.  February 3, 2012 Cockburn Report ("Cockburn Rep.") ¶¶ 5-6.  He then performs

18   the following adjustments:

19   - He adjusts the starting point upward by $557.2 million to account for convoyed sales
20     Sun projected to make as part of its partnership with Google, resulting in a subtotal of
      *$655.9 million*. *Id.* ¶¶ 37-41.

21   - Although Sun's initial demand contained a cap on Sun's ability to share in Google's
22     revenue from the partnership, he removes that cap to adjust for Sun's loss of
       compatibility and control caused by Google's development of an independent
       platform.  This adjustment adds a further $27.8 million, leaving the subtotal at *$683.7*
23     *million*. *Id.*

24   - He then apportions the value of the patents and copyrights at issue in the suit as a
       percentage of the total.  He uses two alternative apportionment methodologies—the
25     "group and value" and the "independent significance" approaches. *Id.* ¶¶ 42-68.

26        ➤ Under the *group and value* approach, Dr. Cockburn first adjusts downward by
             $86.15 million to account for projected engineering expenses Sun would have
27           incurred as part of a partnership with Google. *Id.* ¶ 48.  He assumes that this
             $86.15 million would have captured the value of (1) all copyrighted materials
28           other than the APIs at issue, including source code and Java mobile class libraries;

3

625343.04

and (2) all Sun engineering know-how and trade secrets. *Id.* ¶ 49. Next, he concludes that the JAVA trademark and Java brand was worth nothing to Google, and performs no further downward adjustment for that intellectual property. He similarly assigns no value to the fact that a partnership with Sun would have given Google access to relationships with OEMs and other Sun partners. *Id.* ¶ 50.

> This leaves him with a total of $597.5 million, which he contends accounts for the value of (1) Sun's Java mobile patent portfolio; and (2) the asserted copyrighted APIs. *Id.* ¶ 51. Based on a qualitative analysis by Oracle engineers, and three studies regarding the distribution of value among patents generally, he concludes that the six patents-in-suit are worth somewhere between 10.2% and 32.7% of the total, or *between $69.5 million and $223.7 million.* *Id.* ¶ 5. Based on Dr. Shugan's conjoint analysis, which suggests that consumers value the availability of applications (the Android feature purportedly enabled by the copyrighted APIs) about half as much as speed (the Android feature allegedly enabled by the asserted patents), he sets the value of the copyrights at exactly half the value of the patents—between 5.1% and 16.4% of the total, or *between $34.7 million and $111.9 million.* *Id.* ¶¶ 6, 54.

> Under the *independent significance* approach, Dr. Cockburn evaluates the totality of the evidence as to the importance of certain performance features to Google and to consumers, and concludes that the patents are worth "at least" 25% of the total, or *at least $170.9 million.* *Id.* ¶¶ 5, 60-68. Again relying on Dr. Shugan, Dr. Cockburn values the copyrights at exactly half the value of the patents, or "at least" 12.5% of the total, or *at least $85.5 million.* *Id.* ¶¶ 6, 60-68.

- Dr. Cockburn then performs further downward adjustments to his alternative patent calculations to exclude damages for extraterritorial infringement, past damages for Sun's and Oracle's failure to mark its products, and damages for non-accused devices. The results are final patent-damages figures of *$17.7 million to $57.1 million* under the group and value approach and *at least $43.7 million* under the independent significance approach. *Id.* ¶ 5.

- Accordingly, Dr. Cockburn's alternative total damages figures for both patent and copyright infringement are (1) between *$52.4 million and $169 million* under the group and value approach (assuming the Court requires all the deductions described above for extraterritorial infringement, marking, and non-accused devices); and (2) *at least $129.2 million* under the independent significance approach.

## III. ARGUMENT

**A.    Dr. Cockburn's "independent significance" approach to patent apportionment is based entirely on Dr. Cockburn's say-so and is a disguised resurrection of the "25 percent rule" that the Federal Circuit struck down in *Uniloc.***

Prior to the Federal Circuit's ruling last year in *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), experts often used, and courts frequently approved, the so-called "25 percent rule," which was "a tool that has been used to approximate the reasonable royalty rate that the manufacturer of a patented product would be willing to offer to pay to the patentee during a hypothetical negotiation." *Id.* at 1312. Under the rule, courts would simply assume, as

4

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

1    a matter of rough justice, that hypothetical negotiators would agree to a royalty rate equal to 25

2    percent of the licensor's expected profits for a product that incorporates the intellectual property

3    at issue. *Id.* at 1312-13. In *Uniloc*, the Federal Circuit sounded the death knell for this sort of

4    subjective approximation, concluding that the "25 percent rule of thumb is a fundamentally

5    flawed tool for determining a baseline royalty rate in a hypothetical negotiation." *Id.* at 1315. It

6    thus held that "[e]vidence relying on the 25 percent rule of thumb is thus inadmissible under

7    *Daubert* and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the

8    facts of the case at issue." *Id.*

9       Unable to rely directly on the 25 percent rule or any similar rule of thumb, Dr. Cockburn

10    surreptitiously resurrects it through what he describes as the "independent significance"

11    approach. Cockburn Rep. ¶¶ 421-459. Under this approach, as he described it in his deposition,

12    Dr. Cockburn ███████████████████████████████████████████████████

13    ███████████████████████████████████████████████████████████████

14    ███████████████ Declaration of David Zimmer in Support of Google's Motion to Strike

15    ("Zimmer Decl.") Ex. A (Cockburn Dep.) at 135:6, 137:17-20.

16       According to his report, the evidence Dr. Cockburn reviewed included contemporaneous

17    documents regarding the importance and value to Google of key performance characteristics,

18    contemporaneous documents regarding the availability of non-infringing alternatives, Oracle's

19    benchmarking studies, the opinions of Oracle technical expert John Mitchell and Google

20    technical expert Owen Astrachan, and the opinions of Oracle's engineers. Cockburn Rep. ¶ 421.

21    Although Dr. Cockburn did not mention them at all in the "independent significance" approach

22    section of his report, Dr. Cockburn stated in his deposition that ████████████████████

23    ████████████████████████████████████████████████████████

24    ██████████████████████████████████████████████████████████████

25    ██████████████████████████████████████████████████████████

26    ████████████████████████████████████████████████████████████████

27    ██████████████████████ Zimmer Decl. Ex. A (Cockburn Dep.) at 135:7-136:21.

28       In his report, Dr. Cockburn offers no explanation as to how he gets from this evidentiary

5

625343.04

1  miscellany of data to his bottom-line 25% figure.  In his deposition, Dr. Cockburn admitted that

2  he had essentially made up that number because it felt right to him:

3

4

5

6

7

8

9

10

11

12  *Id.* at 139:2-18.  Incredibly, Dr. Cockburn also admitted his 25% number was just a floor, and he

13  might well assert an undisclosed higher number once he gets on the witness stand:

14

15

16

17

18

19

20

21

22

23  *Id.* at 142:7-143:3 (emphasis added).  It gets worse—Dr. Cockburn also said that he might advise

24  the jury that the copyrighted APIs could constitute *100%* of the value of the 2006 partnership. *Id.*

25  at 166:12-20.

26

27

28

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

1 ███████████████████████████████████████████████████

2 ███████████████████████████ .

3         Not only is Dr. Cockburn's bottom-line apportionment percentage under the independent

4 significance approach entirely undefined, the only thing connecting that conclusion to its

5 purported evidentiary basis is Dr. Cockburn's subjective judgment, which by definition cannot

6 be replicated or verified by another expert.  This is no different from the guesswork that used to

7 underlie the 25 percent rule, before the Federal Circuit's ruling in *Uniloc*.  The Court should not

8 allow Dr. Cockburn to resurrect the 25 percent rule by ███████████████████████

9 ████████████████████████████████

10 **B.     Dr. Cockburn's "group and value" approach to patent apportionment is biased and based on inapposite studies of patent value.**

11         In conducting his "group and value" approach, Dr. Cockburn relied on Dr. Reinhold and

12 four other Oracle engineers to review Sun's portfolio of 569 mobile Java-related patents.  The

13 four engineers on whom Dr. Reinhold relied had ***all*** been involved in analyzing patents as part of

14 this litigation, and did not recuse themselves from evaluating any of the patents-in-suit on which

15 they had worked.  Zimmer Decl. Ex. H (Rose Dep.) at 79:14-81:23, 84:24-86:8; Zimmer Decl.

16 Ex. I (Wong Dep.) at 83:15-85:21, 88:1-95:6, 132:18-133:11; Zimmer Decl. Ex. J (Kessler Dep.)

17 at 68:5-71:11; Zimmer Decl. Ex. K (Plummer Dep.) at 32:22-38:25, 50:25-52:22.  The engineers

18 first divided the 569 patents into 22 technology groups.  Cockburn Rep. ¶¶ 391-92.  The

19 engineers then identified four metrics for evaluating the usefulness of a technology group to a

20 mobile smartphone platform—operating speed, startup speed, memory footprint, and security—

21 and ranked the 22 groups according to the four metrics.  Then they tallied up those rankings,

22 with the result being an aggregate ranking of the usefulness of the 22 groups.  Finally, they

23 separately rated each individual patent on a scale of 1 to 3 in terms of the benefits each would

24 allegedly provide to a smartphone platform.  *Id.* ¶¶ 393-94.  The rating of the 569 patents was

25 done over just two days.  *See, e.g.*, Zimmer Decl. Ex. J (Kessler Dep.) at 33:12-34:5.  One

26 engineer ███████████████████████████████████████████

27 ████████████████████████████████████████  Zimmer Decl. Ex. K

28

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

(Plummer Dep.) at 37:3-25.  The rating was based solely on a spreadsheet including the title, abstract, inventors and issue or filing date.  *See, e.g.*, Zimmer Decl. Ex. K (Plummer Dep.) at 32:13-21; Zimmer Decl. Ex. J (Kessler Dep.) at 40:6-41:21.  It was therefore inevitable that the engineers would favor the patents they had already analyzed as part of this case.  Christopher Plummer, one of the engineers, admitted he relied on his previous work in rating the patents:

Zimmer Decl. Ex. K (Plummer Dep.) at 101:25-102:14.  The other engineers admitted having similar knowledge, but claimed it didn't influence them.  *See, e.g.*, Zimmer Decl. Ex. I (Wong Dep.) at 94:25-96:2                                    Zimmer Decl. Ex. H (Rose Dep.) at 84:6-13

.

        Dr. Cockburn then synthesized these questionable group rankings and the patent ratings by isolating all the patents in the purportedly top three technology groups with a "1" rating.  The result was a group of 22 patents that he asserted constitute the most valuable 4% of Sun's mobile Java portfolio.  Cockburn Rep. ¶¶ 397, 408.  This group of 22 patents included three of the patents-in-suit—the '720, '205, and '104.  *Id.* ¶ 397.

        But because the engineers' analysis was entirely qualitative, Dr. Cockburn next faced the challenge of translating these value comparisons into the hard numbers required for a damages

8

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

1  calculation.  The Oracle engineers themselves confirm that they had no technical basis for

2  translating their qualitative judgment into quantitative valuations.  Dr. Reinhold confirmed that

3  the engineers did no quantitative assessment, and that such an assessment would require

4  significant and repeated performance testing of each patent's functionality.  Zimmer Decl. Ex. B

5  (Reinhold Dep.) at 40:8-12, 41:20-42:11, 43:12-25, 47:13-20.  Even then, Dr. Reinhold testified,

6  no quantitative assessment of all the various patents would be possible given that some patents

7  were substitutes for, or complements to, others in the portfolio.  *Id.* at 96:7-97:9; *id.* at 105 ███

8  ██████████████████████████████████████████████████████████████████████████████

9  █████████████████████).  In the end, although Dr. Reinhold believed that the patents

10  in the top-ranked group were each more valuable than any of the patents in the second-ranked

11  group, he could not offer even a guess as to the ranking among these top 22 patents.  *Id.*  Dr.

12  Reinhold conveyed this opinion to Dr. Cockburn.  Zimmer Decl. Ex. A (Cockburn Dep.) at 125.

13      Undeterred, Dr. Cockburn tries to bridge the gap between the engineers' vague judgments

14  of quality and a quantitative damages calculation by relying on three surveys of patent value

15  having nothing to do with the Sun portfolio at issue.  Each of these surveys[1] conclude that the

16  distribution of value among patents is highly skewed, with a handful of patents accounting for a

17  large percentage of the value of all patents.  *Id.* ¶ 405.  Dr. Cockburn adopted the distributions of

18  patent value described in these studies and concluded that the top 22 patents in Sun's portfolio

19  are worth 67.9% to 91.9% of the overall value of the portfolio, with the six patents-in-suit being

20  worth between 10.2% and 32.7% of the overall patent portfolio.  *Id.* ¶¶ 408, 412.

21      The problem with this analysis is that there is no relationship between the Sun portfolio at

22  issue in this case and the patents studied in the three surveys.  As the Federal Circuit made clear

23  in *Uniloc*, "[i]f the patentee fails to tie the theory to the facts of the case, the testimony must be

24  excluded."  632 F.3d at 1315.  Here, Dr. Cockburn's survey model is inapposite to the actual Sun

25

26  [1]  The three studies are A. Gambardella, P. Giuri & M. Mariani, *The Value of European Patents - Evidence from a Survey of European Inventors*, Final Report of the PatVal EU Project, January

27  2005, D. Harhoff, F. Scherer & K. Vopel, *Citations, family size, opposition and the value of patent rights*, 32 Research Policy 1343, (September 2003), and J. A. Barney, *A Study of Patent

28  Mortality Rates: Using Statistical Survival Analysis to Rate and Value Patent Assets*, 30 AIPLA Quarterly Journal, Vol. 30, No. 3, Summer 2002.

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

1   portfolio at issue here for the following reasons:

2   •   The Sun portfolio here is owned by a single company.  None of the studies
        looked at single-owner portfolios at all.  *See, e.g.*, Zimmer Decl. Ex. A
3       (Cockburn Dep.) at 94:15-95:7, 104:20-105:6.  As Dr. Cockburn admitted
        about one of the studies ███████████████████████████████████
4       ████████████████  *Id.* at 95:20-21.

5   •   The Sun portfolio at issue here is confined to a relatively narrow technology
        area: mobile smartphone platform software functionality.  None of the studies
6       had any subject-matter limitation; each of them evaluated every type of patent
        in every type of technology area under the sun.  *See, e.g., id.* at 96:5-11,
7       100:24-101:7.

8   •   The 569 patents in the Sun portfolio were selected deliberately for relevance
        to this case by Oracle engineers who also worked on pre-litigation
9       infringement analyses of the patents-in-suit for Oracle.  By contrast, the
        patents evaluated in the studies were randomly selected.

10

11      Each of these critical differences means that the patent populations evaluated in the three

12  studies are likely to have different distributions of value than the Sun portfolio.  Dr. Cockburn

13  offers nothing to support his assumption that the value distribution of industry- and company-

14  wide patents is the same as the value distribution of one software company's portfolio in a

15  specific technology area.

16      Further, two of the surveys in Dr. Cockburn's report—the PatVal and Harhoff studies—

17  looked only at European patents, and one of those two was confined to only German patents.  All

18  569 Sun patents are U.S. patents.  *Id.* at 95:8-12, 102:2-7.  This is not a trivial difference.  The

19  German study recognized that one of its conclusions would be "surprising" to those familiar with

20  U.S. patents.  Zimmer Decl. Ex. C (Harhoff study) at 1355 ("Some of the mean values should be

21  surprising to readers familiar with citation indicators from the US patent system.  As reported in

22  a previous paper (Harhoff et al., 1999), we find that the citation counts, both in the German and

23  the European system, are spectacularly low by USPTO standards.").  Dr. Cockburn again

24  provides no support for his assumption that the value distribution of European patents is the

25  same as that of U.S. patents, and the text of one of his source studies refutes that assumption.

26      The lone study in Dr. Cockburn's report that evaluated U.S. patents—the Barney study—

27  is inapposite because it calculated patent value according to whether the patentee had paid the

28  patent-renewal fees over the life of the patents.  Zimmer Decl. Ex. A (Cockburn Dep.) at 105:14-

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

1   107:19.  Dr. Cockburn did not attempt to tie this methodology to the Sun portfolio by examining

2   whether Sun and Oracle had paid patent renewal fees for the 569 patents in the portfolio at issue.

3   Assuming Sun and Oracle did so for all or nearly all 569 patents—and there is no evidence to the

4   contrary—it would follow, using the logic of the Barney study, that each of those patents had an

5   approximately equal value.

6          Despite the vast differences between the patents examined in these three studies and the

7   569 Sun patents at issue in this case, Dr. Cockburn in his deposition ████████████████

8   ███████████████████████████████████████████████████

9   ███████████████████████████████████████ *Id.* at 107:20-108:2.  Instead,

10  Dr. Cockburn simply ███████████████████████████████████████████

11  ███████████████████████████████████████████████████

12  ███████████████████████████ *Id.* at 99:11-18; *see also id.* at 100:20-23 ████

13  ███████████████████████████████████████████████████

14  ███████████████████████.  This type of *ipse dixit* link between external

15  studies and the facts of this case is inadmissible under *Daubert,* as the Supreme Court made clear

16  in *General Electric Co. v. Joiner*:

17              Trained experts commonly extrapolate from existing data.  But
                nothing in either *Daubert* or the Federal Rules of Evidence
18              requires a district court to admit opinion evidence that is connected
                to existing data only by the *ipse dixit* of the expert.  A court may
19              conclude that there is simply too great an analytical gap between
                the data and the opinion proffered.
20

21  522 U.S. 136, 146 (1997).  In this case, the analytical gap between the three patent value studies

22  and Dr. Cockburn's ultimate conclusions is cavernous.  The Court should strike this analysis.

23  **C.      Dr. Cockburn failed to apportion the full value of the copyrights that would have
            been included in the 2006 bundle.**

24          In addition to using two unreliable patent apportionment methodologies, Dr. Cockburn

25  failed to make any attempt to value all of the copyrights that would have been part of the 2006

26  intellectual property package.  Indeed, Dr. Cockburn had no idea what Java-related copyrights

27  Sun owned at the time of the hypothetical negotiation, let alone what they were worth.

28          The Court stated unequivocally in its January 9, 2012 Order that "[i]f the $100 million in

11

625343.04

1  2006 is used as the starting point . . . then a fair apportionment of the $100 million as between

2  the technology in suit and the remainder of the technology then offered must be made." Jan. 9,

3  2012 Order [Dkt. No. 685] at 8.  In the patent context Dr. Cockburn at least made an attempt to

4  follow the Court's instructions by apportioning the patents included in the 2006 bundle between

5  the patents in suit and the remainder of Sun's Java-related patents.  In the copyright context,

6  however, Dr. Cockburn did not even attempt to undertake this analysis.  Dr. Cockburn admitted

7  in his deposition that he did not even know what Java-related copyrights Sun owned in 2006:

8

9

10

11

12

13

14  Zimmer Decl. Ex. A (Cockburn Dep.) at 153:17-154:3.

15       Without knowing what copyrighted material was at issue, it was of course impossible for

16  Dr. Cockburn to apportion all of that copyrighted material between the 37 APIs at issue and the

17  rest of the material.  As Dr. Cockburn said in his deposition:

18

19            *Id.* at 161:9-12; *see also id.* at 161:22-162:2

20

21                                              .  Yet there is no reason to think

22  that there were not other copyrights being considered.  Most obviously, the source code

23  underlying Sun's implementation of the Java virtual machine is copyrighted, and at least would

24  have been a basis of any new virtual machine jointly developed by Sun and Google.  *See id.* at

25  158:17-159:11

26

27

28  Because he made no effort to consider the scope of the copyrights at issue in the 2006

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

1  negotiations, Dr. Cockburn's analysis does not account for these or other copyrights that Google

2  would have obtained through the hypothetical negotiation.

3      Dr. Cockburn also made no systematic effort to measure the value of the millions of lines

4  of code in the API libraries that would have been part of the 2006 bundle.  Unlike in the patent

5  context, Dr. Cockburn never had anyone from Oracle examine the code libraries to determine

6  their value in relation to the API specifications.  Instead, he simply assumed that, whatever other

7  copyrights were on the table in the Sun-Google negotiations, their value would have been

8  subsumed in the operating and research-and-development expenses Sun projected it would incur

9  as part of its partnership with Google.  Accordingly, Dr. Cockburn avoids any specific valuation

10  of those copyrighted materials at all.  But Dr. Cockburn has no logical basis for using Sun's

11  projected future R&D *costs* (in developing new intellectual property in a mobile smartphone

12  platform partnership with Google) as a proxy for the *value* of Sun's then-existing intellectual

13  property (the copyrighted class libraries and source code).  This analysis falls apart for at least

14  two reasons.  First, Dr. Cockburn confuses cost with value.  Consider the patents-in-suit—it

15  would have *cost* Sun nothing in terms of R&D costs to license those patents to Google in 2006,

16  because those inventions were already developed and patented.  But Dr. Cockburn would

17  contend that the patents have significant *value* to Google.  Second, Dr. Cockburn is again mixing

18  apples and oranges, by comparing two entirely distinct classes of intellectual property—Sun's

19  existing copyrighted materials that were the subject of the licensing negotiation, on the one hand,

20  and material that Sun might have developed during a partnership with Google, on the other.

21      Dr. Cockburn's conflation of projected cost with actual value, and his equal treatment of

22  past copyrighted works and different, future copyrighted works are both efforts to cover up the

23  fact that he has engaged in no rigorous evaluation of the individual values of the copyrights in

24  the 2006 licensing bundle.  Indeed, as already discussed, he cannot even identify the components

25  of that bundle. His copyright apportionment analysis is unreliable and should be excluded.

26  **D.    Dr. Cockburn failed to conduct a claim-by-claim analysis, and hence failed to attribute any value to the unasserted claims.**

27      The court has repeatedly emphasized that Dr. Cockburn is required to calculate Oracle's

28

625343.04

1  purported patent damages on a claim-by-claim basis.  Jan. 9, 2012 Order [Dkt. No. 685] at 9-10.

2  Yet Dr. Cockburn has still failed to do so, asserting that ████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████

4  ████████████████████  Cockburn Rep. ¶ 497.  Thus, as the Court ordered before, Dr. Cockburn

5  should be "precluded from apportioning an asserted patent's value among its claims at trial."

6  Jan. 9, 2012 Order [Dkt. No. 685] at 9.

7        More problematic, however, is that Dr. Cockburn fails to attribute any value to any of the

8  unasserted claims of the patents-in-suit.  In his deposition, Dr. Cockburn ████████████████████

9  ████████████████████████████████████████████████████████████████████████

10 ████████████████████████  Zimmer Decl. Ex. A (Cockburn Dep.) at 90:13-18.

11 This raises the distinct possibility that a portion of the value of some of the patents-in-suit may

12 be located in claims that Google has not infringed.  As the Court noted in its January 9 Order:

13 "An infringer of one claim is compelled by law to pay for a license, via the hypothetical

14 negotiation, for the specific invention represented by that claim but it is not required to pay for a

15 license for the other specific inventions not infringed.  Therefore, the hypothetical negotiation

16 must be focused only on negotiating a compulsory license for each claim infringed, not for the

17 entire patent."  Jan. 9, 2012 Order [Dkt No. 685] at 9.  Indeed the idea that the unasserted claims

18 had no value is belied by Oracle's actions in this case.  At one time, Oracle claimed that Google

19 infringed 132 claims from 7 patents.  *See* May 3, 2011 Order [Dkt. No. 131] at 1.  Oracle has

20 now limited its patent case to 26 claims from 6 patents.  But Oracle must have had a Rule 11

21 basis for asserting infringement of the now-abandoned claims by Google, so it cannot be heard to

22 argue that those claims have no value to Google.  Yet Dr. Cockburn has never tried to isolate the

23 value of those claims—or other claims that Oracle never asserted—and deduct the value of the

24 unasserted claims from the remaining value of the patents-in-suit.  Yet again, he has violated the

25 Court's express instructions and overstated Oracle's damages as a result.

26 **E.   Dr. Shugan's "conjoint" analysis is unreliable, methodologically flawed, and the
         results defy common sense.**

27       In addition to the flaws in his own analysis, Dr. Cockburn relies on a "conjoint" analysis

28

625343.04

1   performed by another Oracle expert, Dr. Steven Shugan.  Dr. Shugan's conjoint study purports to

2   identify a limited number of smartphone features that consumers find important, then determine

3   which of those features consumers value most.  Then Dr. Shugan essentially converts the

4   consumers' preference share into projected market shares—essentially, he concludes that, if 20%

5   of consumers value application start time more than the other tested features, an increase in

6   application start time on Android phones would mean a 20% drop in Android market share.  This

7   simplistic analysis may have some value as a marketing-research tool, but it is not an accepted

8   method of calculating damages.  As far as Google is aware, no court has ever approved the use of

9   conjoint analyses in calculating damages.

10          Even setting aside the problems with conjoint analyses generally, the particular survey in

11  this case had crippling methodological flaws, as is shown by the facially absurd responses it

12  generated.  Dr. Shugan's conjoint analysis is unreliable and would be unhelpful to the jury, and

13  the Court should exclude it.  Similarly, the parts of Dr. Cockburn's report relying on Dr.

14  Shugan's analysis, primarily his "independent significance" and copyright apportionment

15  analyses, *see* Cockburn Rep. ¶ 419; Zimmer Decl. Ex. A (Cockburn Dep.) at 135:12-15; 138:9-

16  18; 140:10-142:3, also should be excluded.

17          **1.      Conjoint analysis is not an accepted basis for calculating damages.**

18          Conjoint analysis is a marketing-research tool, not an accepted method of calculating

19  damages in litigation.  Calculation of reasonable-royalty damages in a patent case "requires

20  sound economic and factual predicates."  *Riles v. Shell Exploration and Prod. Co.*, 298 F.3d

21  1302, 1311 (Fed. Cir. 2002).  Whatever its value may be to marketing research, conjoint analyses

22  like Dr. Shugan's simply lack the reliability required to prove damages with the "reasonable

23  certainty" required in litigation.  See *id.*; N.D. Cal. Model Patent Jury Instruction No. 5.1.

24          Neither Dr. Shugan nor Dr. Cockburn cite to a single instance where a court in any

25  jurisdiction has allowed the parties to rely on "conjoint" analyses to prove damages.  Indeed, in

26  one of the few reported decisions to discuss conjoint analyses, the Second Circuit reversed a trial

27  court decision that relied on conjoint analysis to grant a class certification motion under FED. R.

28  CIV. P. 23(b).  *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 234 (2d Cir. 2008), *rev'ing sub*

15

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

1   *nom Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1056 (E.D.N.Y. 2006).  The

2   plaintiffs in *McLaughlin* offered a conjoint survey to establish that they bought "light" cigarettes

3   because of defendants' misrepresentations that those cigarettes were healthier than "full-

4   flavored" cigarettes.  *Schwab*, 449 F. Supp. 2d at 1167.  According to plaintiffs' conjoint expert,

5   90.1% of class members considered "health concerns" as a factor in purchasing light cigarettes.

6   *Id.* at 1048.  The trial court cited plaintiffs' conjoint analysis in finding class-wide reliance, and

7   the court also noted that the conjoint analysis would "probably be critical in estimation of

8   damages."  *Id.* at 1126, 1147, 1169.  The trial court refused to exclude the conjoint analysis, and

9   certified a nation-wide class of "light" smokers.  *Id.* at 1170, 1278.

10          The Second Circuit reversed.  The court found that the conjoint analysis was insufficient

11  to establish reliance because it failed to take account of the myriad other factors that may have

12  influenced class-members' decision to buy light cigarettes—*e.g.*, taste or "personal style."  *Id.* at

13  223.  The court sharply criticized the use of conjoint analysis to prove reliance, stating:

14          Plaintiffs' expert, Dr. John R. Hauser, claimed that 90.1% of those
            who smoked Lights chose to do so because of Lights' alleged
15          health benefits.  But Dr. Hauser came to this conclusion on the
            basis of a method that determined whether, ***all things being equal,***
16          ***consumers prefer*** a safer cigarette to a less safe cigarette. And as
            plaintiffs conceded at oral argument, ***no one who understood this***
17          ***question would prefer a more dangerous product to a safer one.***

18  *Id.* at 225 n.6 (internal citations omitted) (emphases added).  Accordingly, the Second Circuit

19  concluded that plaintiffs had failed to establish damages with "'sufficient precision to allow a

20  jury award.'"  *Id.* at 232 (quoting and rejecting the district court's conclusion as to damages).

21          *McLaughlin* illustrates the limitations of conjoint analysis.  Conjoint analysis measures

22  consumer preference for product features; it does not capture how consumers actually behave

23  when purchasing a product.  Consumers' stated preference for a given feature may be one of

24  many factors a company considers in designing or launching a new product, but they are not a

25  proxy for market share.  The dearth of opinions discussing use of conjoint analysis in litigation

26  further suggests that conjoint studies cannot provide the "reasonable certainty" needed to support

27  a multi-million dollar damages claim.  *See* July 22, 2011 Order [Dkt. No. 230] at 12 (striking Dr.

28  Cockburn's reliance on the Nash bargaining solution in part because it "has never been approved

16

625343.04

1    by a judge to calculate reasonable royalties in litigation, at least in the face of objection. This is

2    despite the fact that for decades it has been lurking in the field of economics.").

3              2.       **The conjoint survey's methodology was flawed and unreliable.**

4              Even assuming that conjoint analysis is reliable enough for damages calculations—and it

5    is not—Dr. Shugan's survey in this case was methodologically flawed for at least two reasons.

6    First, Dr. Shugan's selection of features was driven by the litigation, and the choice profiles he

7    created do not approximate real-world purchase conditions.  Second, as Dr. Shugan himself

8    concedes, the survey violated the fundamental premise of conjoint analysis: that respondents are

9    able to hold constant all product features other than those tested by the survey.

10             a.       **The design of Dr. Shugan's conjoint survey.**

11             Dr. Shugan used a web-based survey to measure the relative importance to consumers of

12   seven smartphone features:  application multitasking, application startup time, availability of

13   third-party applications, brand, price, screen size, and voice command capabilities.  Shugan Rep.

14   App. D at 5.  The survey asked respondents to choose between side-by-side comparisons of

15   different smartphone "profiles."  Each profile was a written list of varying levels of functionality

16   in each of the seven features—*e.g.*, one phone might be described as (1) an Android phone with

17   (2) a 4.5-inch screen that (3) can run five apps at once (4) with a startup time of 2 seconds, (5)

18   300,000 available apps, and (6) voice dialing and texting (7) available for a sale price of $200.

19   Respondents were instructed to assume that every feature other than the seven listed features was

20   the same for each profile.  Shugan Rep. App. E at E12-E20.2.

21             Dr. Shugan used respondents' selections to rank and measure the relative importance of

22   the seven features to consumers.  He then plugged these ranked values—referred to in conjoint

23   parlance as "partworths"—into a statistical software program in order to assess general consumer

24   preference for an Android phone lacking the application volume, startup time, and multitasking

25   capabilities allegedly provided by the patents- and copyrights-in-suit.

26             b.       **The conjoint survey's fatal methodological flaws.**

27             *First,* Dr. Shugan's selection of allegedly important smartphone features for the conjoint

28   survey was not driven, as one would expect, by which features are actually valuable to

17

625343.04

1  consumers.  Instead, Dr. Shugan selected features that were important to Oracle's needs in this

2  litigation.  He included just seven features in his smartphone "profiles," and five of those seven

3  features—all features other than brand and price—were spoon-fed to him by either Dr. Cockburn

4  or the Analysis Group, Dr. Cockburn's consulting group.  Zimmer Decl. Ex. D (Shugan Dep.) at

5  29:22-30:11.  Indeed, Dr. Shugan's own "market research" identifies *36* other features that real-

6  world consumers actually said they would (or have) considered in purchasing a smartphone,

7  including such obviously important features as the associated cellular network, battery life, and

8  keyboard type and layout.  *See* Shugan Report Ex. 1.  Dr. Shugan made no effort, prior to

9  administering his seven-feature survey, to determine whether any of the 36 other features he

10  chose to omit were actually more important to consumers than the seven he actually tested.

11  Instead, Dr. Shugan's survey ignores those 36 features, and asks consumers to assume that any

12  feature not specifically listed among the seven tested features is the same for all phones.  But all

13  phones are not the same in the real world.  Forcing consumers to operate under this assumption

14  undermines the survey's ability to predict real-world behavior.  As Judge Posner noted in a

15  recent hearing in the *Apple v. Motorola* case, responding to a suggestion from counsel for Apple

16  that Apple could measure the value of a patent through a consumer survey:

17  >I'm not going to ask consumers how they like it.  That is a totally –
   >that is a totally fraudulent way of determining – I mean, look, you
18  >go out and start asking consumers, oh, this device had X and meant
   >that [a certain feature was enabled,] would you pay more for that?
19  >Of course, they'll say yes, right, because you're focusing them on
   >some feature.

20  Zimmer Decl. Ex. E (Transcript of Jan. 23, 2012 Hearing, *Apple, Inc. v. Motorola, Inc.*, No. 11 C

21  8540 (N.D. Ill.)) at 22-23; *see also id.* at 23 ("I'm not going to have competing experts talking

22  about their marketing surveys.  I regard that evidence as totally worthless.").  This flaw in

23  conjoint analysis renders the results unfit for the demanding task of calculating actual damages in

24  a multi-million dollar litigation.

25      *Second*, Dr. Shugan's study includes the same error this Court recognized in striking Dr.

26  Cockburn's second report last month—it measures the value consumers place on certain phone

27  *features* as a whole, rather than the incremental benefit to those features allegedly enabled by the

28

18

625343.04

1   *technology* at issue.  Courts have struck similar consumer surveys for this reason.  *See Fractus,*

2   *S.A. v. Samsung Elecs. Co.*, No. 6:09-cv-0203, Dkt. No. 896 (E.D. Tex. Apr 29, 2011) (excluding

3   consumer survey data, that "do[es] not measure the value of Plaintiff's technology, but merely

4   measure[s] the perceived consumer value of cell phones with any internal antennas" and

5   concluding that "[s]urvey evidence purportedly demonstrating the value of internal antennas not

6   tied directly to Plaintiff's technology confuses the issues and must be excluded").

7       *Third*, the results of the survey clearly show that respondents were *not* in fact holding

8   constant all unnamed features.  Dr. Shugan's failure to control for this fact is fatal, because the

9   ability of conjoint analysis to predict consumer preference for a specified feature requires the

10  consumer to ignore potential differences in any unspecified features.  Dr. Shugan explained this

11  fundamental presumption of conjoint analysis in his deposition:



17  Zimmer Decl. Ex. D (Shugan Dep.) at 38:2-25 (emphases added).

18      But the proof is in the pudding—and here, almost one quarter of all respondents claimed

19  that they would prefer a smartphone costing $200 to *a putatively identical smartphone* costing

20  $100.  Zimmer Dec. Ex. F (Oct. 24, 2011 Leonard Rep.) at 114.[2]  No rational person, much less

21  24% of all rational people, would prefer to pay $200 for a phone they could have for $100.  The

22  explanation for this apparently nonsensical result is obvious—survey respondents were not

23  holding non-specified features constant.  Instead, as Dr. Shugan himself conceded in his reply

24  report, his respondents did the opposite:



28  [2]  Similarly, 26% of the respondents claimed to prefer a phone with an application startup time of 2 seconds to a phone with startup time of 0.2 seconds.  *Id.* at 115.

19

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT; MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

███████████████████████████

Shugan Reply Rep. at 17-18.

Dr. Shugan makes no effort to explain this result other than to say that we cannot assume that consumers behave rationally because the purpose of the conjoint analysis was to study consumer behavior. *Id.* at 17-18. This circular logic ignores the premise of *Daubert* and the Federal Rules of Evidence. The point is not that Dr. Shugan should have excluded a full quarter of his respondents as "irrational," but rather that the conclusion that 24% of survey respondents gave answers that made no sense proves that the survey design is fundamentally flawed. Courts routinely recognize that a "common sense" understanding of real-world consumer behavior is an important check against the reliability of surveys that produce preposterous results. *See Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 286 (S.D.N.Y. 2000) (striking a survey that, "despite its dazzling sheen of erudition and meticulous methodology, reaches a result which any average person could readily recognize as preposterous"). The results of Dr. Shugan's conjoint analysis are equally preposterous—not because consumers are irrational in the real world, but because of glaring flaws in the design of the survey.

Even if conjoint analysis was a recognized and appropriate methodology for calculating damages in litigation, which it is not and never has been, Dr. Shugan has failed to design a conjoint survey that approximates real-world purchase conditions, and further created a survey with such fundamental methodological flaws that it has returned nonsensical results. His survey is too unreliable to be the basis of a multi-million dollar damages claim. Dr. Shugan's report— and Dr. Cockburn's reliance upon that report—should be excluded under *Daubert*.

**F.      Dr. Cockburn's econometric analysis and calculation of market share are based on inapplicable data and unrealistic assumptions.**

Dr. Cockburn's econometric analysis purports to quantify consumer preferences for some smartphone features over others, but it draws its data not from the sales prices of mobile phone carriers who sell the vast majority of mobile phones in the United States, but rather from sales data for largely second-hand phones on the eBay auction website. This error is compounded by two unrealistic assumptions that Dr. Cockburn makes in converting his econometric analysis to

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

1    an estimate of market share in a world in which Google had released a slower version of

2    Android, both of which inflate Oracle's damages.  The Court should exclude this analysis.

### 1.    Overview of Dr. Cockburn's econometric analysis and market share calculations.

Dr. Cockburn began with data he acquired of auctions on eBay for mostly second-hand

smartphones.  This data included, for each auction, both (a) the maximum price each bidder

would have been willing to pay for the phone, which he deemed to be the consumer's

"willingness to pay," and (b) the price for which the phone actually sold.  Cockburn Rep. App. C

¶ 13.  Collecting consumers' willingness to pay is possible because eBay bidders are allowed to

enter their maximum bid, and the computer will only bid the amount necessary to win the

auction.  *Id.* ¶ 5.  Dr. Cockburn also collected data from other sources about the attributes of each

phone being auctioned, such as battery life, storage space, and presence of a camera.  *Id.* ¶ 25.

Based on this data, Dr. Cockburn conducted a regression analysis to attempt to predict the

impact on a consumer's willingness to pay for a given phone from a change in the phone's

features.  *Id.* ¶¶ 29-30.  The most important feature was the phone's "Linpack benchmark,"

which is one way of measuring a phone's operating speed.  *Id.* ¶¶ 26-27.  Oracle's engineers

attempted to measure the impact the patents-in-suit had on smartphone performance by

measuring the change in the Linpack benchmark when the patents were disabled.  *Id.* ¶ 37.

Dr. Cockburn then attempted to convert his regression results into a calculation of

smartphone market shares in the world in which Google released a slower version of Android.

To make that calculation, Dr. Cockburn looked only at eBay bidders who placed bids on multiple

smartphone models.  *Id.* ¶ 39.  For each of these bidders, Dr. Cockburn measured the bidder's so-

called "consumer surplus" for each phone on which each bidder bid.  *Id.*  Consumer surplus is

measured by calculating the difference between the consumer's willingness to pay for each

phone (*i.e.* the consumer's maximum bid on eBay) and the price at which each phone sold.  *Id.*

n.25.  Dr. Cockburn then used his regression results—specifically the coefficient on the Linpack

benchmark that predicts the impact of a change in the Linpack benchmark on the consumer's

willingness to pay—to estimate what each consumer's willingness to pay would have been for

21

625343.04

1   the slower version of Android.  *Id.* ¶ 41.  Dr. Cockburn then measured each bidder's adjusted

2   consumer surplus for the Android phones.  *Id.*

3        Dr. Cockburn concluded that if the bidder's adjusted Android consumer surplus remained

4   higher than the consumer surplus for non-Android phones, that bidder would still buy the

5   Android phone.  If the adjusted Android consumer surplus became lower for the Android phone

6   than for the non-Android phone, then the bidder would buy the non-Android phone.  And if all

7   consumer surpluses were negative—*i.e.* if the consumer's willingness to pay for non-Android

8   phones and adjusted Android willingness to pay are all lower than the price at which the phones

9   eventually sold—then the consumer would not buy a smartphone at all.  *Id.*  Based on his

10  determination of what each consumer would have done if Google had released a slower version

11  of Android, Dr. Cockburn estimated what portion of consumers who in reality bought an

12  Android phone would have switched to some other phone, or no phone at all, then estimated the

13  effect of those lost sales on Google's Android revenue.  *See id.* App. D.

14       **2.      Dr. Cockburn's econometric analysis is based on unrepresentative data.**

15       Dr. Cockburn incorrectly and without any support assumes that the data for smartphone

16  purchases on eBay is representative of the entire market for smartphones.  Courts strike expert

17  testimony when it is based on unrepresentative and unreliable data.  *See, e.g., Johnson Elec.*, 103

18  F. Supp. 2d at 283 ("[E]ven where an expert's methodology is reliable, if the analysis is not

19  based upon relevant and reliable data, the expert's opinion will be inadmissible." (citing *Joiner*,

20  522 U.S. at 146)).

21       The vast majority of cell phones in the United States are sold new, as part of two-year

22  agreements with cell phone carriers like Verizon or AT&T.  Dr. Cockburn makes no effort to

23  show that people buying unlocked, second-hand phones on eBay have the same consumer

24  preferences as consumers buying new cell phones as part of a two-year service agreement.  Dr.

25  Cockburn never explains why he did not attempt to obtain data that measures how most

26  Americans purchase cell phones, nor did he make any argument as to why the Court or the jury

27  should assume that eBay customers' consumer preferences are representative of the general

28  population.  As the *Johnson Electric* court noted in striking an expert's report, although "[i]t can

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

1    be appropriate to utilize market reconstruction to prove damages, particularly in patent cases …

2    if [plaintiff] wishes to reconstruct the micro-motor market, that reconstruction must be grounded

3    on the ***most relevant and reliable data available***." *Johnson Elec.*, 103 F. Supp. 2d at 286

4    (emphasis added).  By contrast, "speculative economic analysis must be rejected." *Id.*  Here,

5    instead of using data from phone carriers, the way nearly all American consumers purchase cell

6    phones, Dr. Cockburn took a shortcut by using non-representative eBay data that he makes no

7    effort to connect to the actual market for smartphones.  *Daubert* does not allow such shortcuts.

8            **3.      Dr. Cockburn's calculation of market share is based on unreasonable
                        assumptions about price and consumer choice.**
9
10           At least as problematic as Dr. Cockburn's econometric analysis, if not more, is his effort

11   to translate that econometric analysis into an estimate for what smartphone market share would

12   have been had Google released a slower version of Android.  Dr. Cockburn's translation into

13   market share is based on two unrealistic assumptions that significantly inflate Oracle's damages.

14   These calculations must be excluded as unreliable.  *See Boucher v. U.S. Suzuki Motor Corp.*, 73

15   F.3d 18, 21 (2d Cir. 1996) ("[A]n expert's testimony should be excluded as speculative if it is

16   based on unrealistic assumptions."); *Medical Instr. & Diagnostics Corp. v. Elekta AB*, No. 397-

17   CV-00271, 2001 WL 36151641 (S.D. Cal. Dec. 12, 2001); *see also* July 22, 2011 Order [Dkt.

18   No. 230] at 13 (Dr. Cockburn's use of the Nash bargaining solution "would invite a miscarriage

19   of justice by clothing a fifty-percent assumption in an impenetrable facade of mathematics").

20           *First,* Dr. Cockburn's market share calculation is based on the incorrect assumption that

21   although every consumer would be willing to pay less for a slower version of Android, the price

22   of Android would remain constant.  This assumption leads Dr. Cockburn to significantly

23   overestimate the number of eBay users who would have chosen not to purchase an Android

24   phone if Google had released a slower version of Android, which in turn leads Dr. Cockburn to

25   overestimate Oracle's damages.  As described above, Dr. Cockburn began with each bidder's

26   actual consumer surplus, measured as the difference between the price that the consumer bid for

27   the phone, and the price at which the phone sold.  He then used his regression results to calculate

28   the maximum price each consumer would have bid for the slower version of Android—a number

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04

1  that is smaller than the maximum price the consumer actually bid.  Dr. Cockburn then took this

2  *adjusted* maximum bid and compared it to the *unadjusted* price at which the phone actually sold

3  to get his adjusted consumer surplus.

4          In doing so, Dr. Cockburn assumed that if Google released this slow version of Android,

5  the price for which it would sell on eBay would be *exactly* the same price as the current version

6  of Android.  Zimmer Decl. Ex. G (Oct. 17, 2011 Cockburn Dep.) at 106 ██████████████

7  ████████████████████████████████████████████████████████████  This

8  assumption makes no sense.  Plainly the eBay price of a slower Android would be lower because

9  an eBay sales price is determined by the second highest bidder, whose willingness to pay would

10  also decrease.  But in measuring the adjusted consumer surplus of a given bidder, Dr. Cockburn

11  adjusts the willingness to pay of that bidder while assuming that price—and hence all other

12  bidders' willingness to pay—would be the same as under the current, much faster version of

13  Android.  If Dr. Cockburn accounted for the fact that other bidders' willingness to pay would

14  have similarly decreased in the world in which Google released a slower Android, he would have

15  found that far fewer people (if any) would have diverted from Android to other platforms.

16          *Second,* Dr. Cockburn assumed each bidder's choices are limited to the specific phones

17  on which the bidder bid during a ten-day window.  This unrealistic assumption again leads Dr.

18  Cockburn to overestimate the number of people who would not have bought the slower Android

19  phones.  In Dr. Cockburn's artificial world, if a bidder bid on two phones—for example, an

20  Android phone and an iPhone—Dr. Cockburn assumes that those are the *only* two phones that

21  consumer would consider purchasing.  If that bidder lost the iPhone auction, and also would have

22  lost the Android auction based on his or her adjusted willingness to pay, Dr. Cockburn concludes

23  that that bidder would *not acquire a smartphone at all.*  Dr. Cockburn ignores the possibility

24  that the bidder might have gone to a Verizon or AT&T store to buy a phone, or waited two

25  weeks and then returned to eBay to try again.  This incorrect assumption leads to bizarre results.

26  According to Dr. Cockburn, out of all the people who bought Android phones in 2010, *over 15%*

27  of all the people who bought Android phones in 2010 would not have acquired a smartphone *at*

28  *all* had Google released Android without the patents in suit.  Cockburn Rep. Ex. C-9 (purporting

625343.04

1   to show that of the 55.4% of actual Android purchasers who would not have purchased an

2   Android in the but-for world, 27.4% would have bought no smartphone).[3]  This unrealistic result

3   significantly inflates Oracle's damages.  According to Dr. Cockburn, Google's revenues decrease

4   somewhat when consumers switch from Android to other platforms because Google still collects

5   downstream revenue, but Google's revenues from consumers who do not purchase smartphones

6   at all go all the way to zero.  Cockburn Rep. App. D ¶¶ 11-23.  Under Dr. Cockburn's model,

7   Google's revenues take a much bigger hit when a consumer decides not to buy a smartphone at

8   all, as compared to when a consumer simply switches to another brand (as would logically be the

9   case in the real world).

10          Both of these erroneous assumptions have an obvious inflationary effect on Oracle's

11   damages numbers.  When Dr. Cockburn's errors are corrected, the results fundamentally

12   undermine his market share calculations and reveal them to be "unhelpful to the trier of fact and

13   inadmissible at trial."  *Medical Instr.*, 2001 WL 36151641.

14                        **IV.    CONCLUSION**

15          For all the reasons set forth above, this Court should strike Dr. Cockburn's third damages

16   report, and further exclude Dr. Cockburn's econometric analysis and Dr. Shugan's conjoint

17   analysis under *Daubert* and its progeny.

18

19   Dated: February 17, 2012                    KEKER & VAN NEST LLP

20

21

22                                    By: s/ Robert A. Van Nest
                                          ROBERT A. VAN NEST
23                                        Attorneys for Defendant
                                          GOOGLE INC.
24

25

26   [3]  Notably, Dr. Shugan's conjoint analysis does not even allow for the possibility that an Android
     user would have purchased no phone if Google released a slower version of Android.
27

28

NOTICE OF MOTION AND MOTION TO STRIKE THIRD COCKBURN REPORT AND SHUGAN REPORT;
MEMORANDUM OF POINTS AND AUTHORITIES
CASE NO. 3:10-cv-03561-WHA

625343.04