# EXHIBIT E

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4                       ---o0o---
 5
 6    ORACLE AMERICA, INC.,          )
 7              Plaintiff,           )
 8      vs.                          )   No. CV 10-03561 WHA
 9    GOOGLE, INC.,                  )
10              Defendant.           )
11    _____ )
12
13
14
15       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
16       VIDEOTAPED DEPOSITION OF CHRISTOPHER PLUMMER
17                THURSDAY, FEBRUARY 16, 2012
18
19
20
21
22
23
24
25    PAGES 1 - 115
```

Page 10

```
 1        A.   No, I did not.
 2        Q.   Have you ever reviewed the expert report of
 3   Dr. Iain Cockburn?
 4        A.   No, I have not.
 5        Q.   Have you ever spoken with Dr. Cockburn?           05:05
 6        A.   No, I have not.
 7        Q.   Have you ever exchanged e-mails with
 8   Dr. Cockburn?
 9        A.   No, I have not.
10        Q.   And you are currently employed by Oracle; is     05:05
11   that correct?
12        A.   Yes.
13        Q.   What is your title?
14        A.   Consulting member of technical staff.
15        Q.   How long have you been with Oracle?              05:05
16        A.   Well, I was at Sun since '97, and then Oracle
17   purchased Sun.  So I've essentially been employed in
18   this role for a bit over 14 years.
19        Q.   What are your primary job responsibilities in
20   your current position?                                     05:05
21        A.   I am a software engineer in the Java Embedded
22   Group, mostly focussed on VMs for embedded devices.  I
23   am the VM tech lead within that group.  And I've been
24   working in that field since I started at Sun in '97.
25        Q.   So do you work with mobile phones               05:06
```

Page 11

1  specifically?

2       A.  Yes, I do.

3       Q.  What specifically do you do?

4       A.  A lot of things.

5       Q.  If you could provide a summary, that's okay    05:06
6  too.

7       A.  I do software development.  I do design, code
8  reviews.  Bug fixing.  Project planning.  You know,
9  the types of things that a tech lead is typically
10 asked to do.  I write patents.  I review patents.      05:06
11          And keep in mind this is just a summary; it's
12 not necessarily everything, just the things that are
13 coming to mind right now.
14          I -- I kind of -- VM tech leads sort of
15 project lead.  I worked with other engineers on the    05:07
16 tasks they have.  It's somewhat a management, but I'm
17 not actually their manager.  I'm just helping them,
18 making sure their tasks are moving along and they
19 understand what they are supposed to do.
20      Q.  And what is your educational background?      05:07
21 Just a brief summary of your --
22      A.  Bachelor's of Science and computer science at
23 the University of Michigan in 1986 and a few classes
24 towards a master's, but I did not complete my
25 master's.                                              05:07

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 16

1  eventually grew -- was sent out to everyone.  And I
2  believe it was Dr. Kessler that gave each of us a
3  numeric range of about 260 patents that we were
4  responsible for filing into buckets or -- I'm sorry.
5  We call them buckets.  Patent categories.                05:13
6       Q.  Okay.  Let me step back and ask a few general
7  questions about the meeting.
8       A.  Sure.
9       Q.  Other than counsel, was there anybody present
10 other than yourself, Dr. Reinhold, Dr. Kessler,          05:13
11 Mr. Wong and Mr. Rose?
12      A.  No.  It was just counsel and those five
13 engineers.
14      Q.  Did counsel provide any input on what
15 technology buckets or groups should be considered?       05:14
16      A.  I don't recall that happening.  It was the
17 engineers who came up with the categories.
18      Q.  And how did the engineers come up with the
19 categories?
20      A.  Just relied on our expertise in the field on   05:14
21 the types of Java technologies and categories that
22 would be relevant to a smartphone.  These types of
23 categories, we're used to dealing with in doing our
24 job.  I just came to the realization last night that
25 when I was looking at the list of categories, that       05:14

Page 17

1   they are very similar to categories we use in our bug
2   filing.
3           So there are types of categories that we
4   think of on a frequent basis, whether it's bug filing,
5   scoping out new ideas, new tasks, reading up on                  05:14
6   literature that might have to do with a certain area
7   of Java technology.  So we mostly relied on our
8   expertise in the field to come up with the
9   comprehensive list.  And understanding of embedded
10  technology and smartphone technologies also.                     05:15
11      Q.  Did you rely on any documents in coming up
12  with the list?
13      A.  Not documents that we used during that time,
14  no.
15      Q.  So --                                                    05:15
16      A.  I'm sorry, I take that back.  I was thinking
17  of documents from previous research.
18          There were -- a PRD was presented that was
19  also used as -- to help us better understand which
20  patents would have been the most relevant.  And that             05:15
21  was the PRD for -- essentially for what would become
22  Android.  And although not provided at the meeting,
23  later would be an e-mail, there was another old e-mail
24  that was passed on that was related to -- to Project
25  Armstrong and estimated amounts of work it would take            05:16

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 35

1          MR. NORTON:  Objection to form.
2          THE WITNESS:  And the --
3          MR. NORTON:  You can answer.
4          THE WITNESS:  So for the other patents -- for
5  all -- so I should add the spreadsheet also included          05:40
6  the authors and either the filing date and/or the
7  issue date.
8  BY MR. MULLEN:
9      Q.  So for all the patents that you reviewed,
10 other than the five to ten patents, you just looked at        05:40
11 a spreadsheet that had the abstract, the title, the
12 author and either the issues date or the filing date
13 of the patent?
14     A.  Yes, that is correct.
15         I should add that a lot of the patents were           05:40
16 familiar to me, so there were some where I quickly
17 understood what the patent was about.
18     Q.  Why were those patents familiar to you?
19     A.  Some of them were from technologies within
20 the group I've been working in; some of them I wrote;         05:40
21 ███████████████████████████████████████████████████
   ██████████████████████████████████████
   █  █████  ████████████████████████████████████████
   █  ██████████████████████████████
   █          ████████████  █████████████████           05:41

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 36





```
24          MR. NORTON:  Objection to form.
25          THE WITNESS:  Describe -- what does          07:13
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 96

1      A.  No.
2      Q.  Now, in -- what in your personal experience
3  allows you to determine what technology groups would
4  have been relevant to a smartphone platform in 2006?
5          MR. MULLEN:  Object to the form.                    07:20
6          THE WITNESS:  I've been working on Java
7  Embedded platforms since 1997.  Many of those
8  platforms have similar characteristics to a
9  smartphone, especially with regard to processor and
10 available memory, operating system.  So I was very    07:20
11 familiar with -- with -- with devices like the Android
12 device that was specified in the PRD.  So based on
13 that alone, I had a good understanding of -- of what
14 the requirements would be for a smartphone.
15         Also, the group I work in did a full Java          07:21
16 stack, that its sole purpose was to run on a
17 smartphone.  And I was involved in the development of
18 that stack.  So, yeah, just experience in the field is
19 a good summary of why.
20     Q.  Now, what was the full Java stack that you         07:21
21 had previously been involved in?
22     A.  ███████████████████████████████████████  █
   ██████████████████████████████████████████████████
   ██████████████████████████████████████████
   █████████████████████████████████████████████ .      █:22

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 97

1 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
2 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
3 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
4 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
5 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  07:22
6     Q.  And when was that work done?  Let me ask:
7 When did you do that work?
8     A.  2009 timeframe, maybe -- it was a long
9 project.  It could have started in 2008.  I'm pretty
10 sure it was done before 2010.  07:22
11     Q.  Now, is there anything in your experience
12 that allows you to look at individual patents and
13 determine whether they should be given a rating of 1,
14 2 or 3, using the scale that you and the other
15 engineers came up with for this exercise?  07:23
16         MR. MULLEN:  Object to the form.
17         THE WITNESS:  I have a lot of experience with
18 patents.  I've authored or co-authored about a dozen
19 patents.  ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
20 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇
21 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
22 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ So I
23 have the ability to read a patent, understand what the
24 patent is talking about, understand the engineering
25 importance of it and combine that with just my  07:24

Page 98

1  understanding of technologies in the field and how
2  that patent would apply to it. And so based on all
3  those things, I can -- I can look at a set of patents
4  and determine if they get a 1, 2, 3 based on our
5  rating scale here.                                    07:24
6       Q.  Now, in the work that you did with the other
7  engineers in this exercise, were you aware of any
8  occasions -- either by your own experience or from
9  information provided by other engineers, occasions on
10 which Oracle or Sun had implemented any of the        07:24
11 inventions described in the patents that you were
12 reviewing?
13          MR. MULLEN:  Object to form.
14          MR. NORTON:  That was awfully long.
15          THE WITNESS:  Yes.  Can you simplify it a    07:24
16 little bit to make sure I'm understanding you right?
17          MR. NORTON:  Sure.
18      Q.  So with respect to the patents that you and
19 the other engineers rated --
20      A.  Okay.                                        07:25
21      Q.  -- based on your own experience, were you
22 aware of occasions in which Sun or Oracle had actually
23 implemented the inventions described in the patents?
24      A.  Yes.
25          MR. MULLEN:  Object to form.                 07:25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 99

1  BY MR. NORTON:
2      Q.  Were there -- with respect to the patents
3  that you and the other engineers rated, were there
4  other engineers who expressed the belief that there
5  had been occasions on which Sun or Oracle actually            07:25
6  implemented the inventions described in the patent?
7          MR. MULLEN:  Object to form.
8          THE WITNESS:  So, make sure I understand you
9  right.  The previous question I answered that I was
10 aware of them being implemented.  For this question, I        07:25
11 was aware that other engineers mentioned them having
12 been implemented, yes.
13 BY MR. NORTON:
14     Q.  And as a result of the experience of the
15 engineers in the group with past implementation of            07:25
16 these inventions, was there any knowledge about the
17 performance effects of any of the inventions described
18 in the patents?
19     A.  Yes.
20         MR. MULLEN:  Object to form.                          07:26
21 BY MR. NORTON:
22     Q.  Can you expand on what you or the other
23 engineers were aware of with respect to performance
24 benefits?
25         MR. MULLEN:  Object to form.                          07:26

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 100

```
 1            THE WITNESS:  I distinctly remember one case
 2   where it was decided that a patent initially looked of
 3   engineering importance until someone familiar with it
 4   said it turned out not to work out as well as we
 5   hoped.  So it got a lower rating because of that.            07:26
 6   There were patents that implemented my group that I
 7   work in, that we had direct knowledge of the
 8   improvements that they provided.
 9            I'm kind of lost on the question here.  Can
10   you ask the question again so I can continue?                07:26
11            MR. NORTON:  Sure.
12       Q.  I just asked you to expand on what you or the
13   other engineers were aware of with respect to
14   performance benefits from specific inventions that
15   were described in those patents?                             07:27
16       A.  Okay.  So for the -- so for the ME task, I'm
17   very familiar with in our group, that's the '720
18   patent.  We've done lots of measurements on that and
19   know its benefit.  For the '205 patent, that, you
20   know, is basically a JIT-enabling technology and we're      07:27
21   aware of -- we've done measurements on how much the
22   JIT helps performance.
23            Quickening, I need to mention privileged
24   information to talk about that one.
25       Q.  I'll ask you not to disclose any privileged          07:27
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 101

1  information.

2      A.  So we were aware, though, of how much the

3  '104 patent would help performance based on previous

4  measurements done.  There are other -- so those are a

5  few examples.  I'm able to recall those because the   07:28

6  patent numbers are listed here.  There were other

7  patents, JIT and garbage collection and boot.  What I

8  remember is there are a few patents related to

9  preloading, or ROMizing, that also comes from the

10 group I work in that helps with both footprint and   07:28

11 start-up time.  We've done measurements on that.  So,

12 yes, there are quite a few examples.

13     Q.  Do those examples of inventions for which you

14 were already aware of performance benefits, do they

15 include patents that have not been asserted by Oracle   07:28

16 in this lawsuit?

17     A.  Yes, definitely.

18     Q.  Mr. Mullen asked you whether you had rated

19 patents before.  Do you recall that question?

20     A.  Yes.   07:28

21     Q.  And he asked whether you had rated patents

22 before on a scale of 1 to 3.  Do you recall that

23 question?

24     A.  Yes.

25     Q.  Leaving aside whether you've rated patents on   07:29

Page 109

```
 1   FURTHER EXAMINATION
 2   BY MR. NORTON:
 3        █   ███████████████████████████████
██  ███████████████████████████████
██  ████████████████████████████████  ██
██  ██████████████████
██        █   ████████████████████████  ████
██  ████████    ██████████████████████████
██  ███████████████████████████████  ██
██  ████████████████████████████              ██
██        █   ███████████  █████████████████
██  ██████████████████████████████████████
██  ██████████████████████████████████
██  ███████████████████████████████
██        █   ██████████  █████████████████  ██
██  ███████████████████████████████████  █
██  ██████████████    ███████    ████████
██  █████████████████████████████████
██  ████████    █████████████████    ███████
██  ████████████████████████████████████  ██
██  █████████████████████
22        Q.   Okay.   Whenever you were -- you personally
23   were aware of some sort of performance testing of a
24   patent you were reviewing, did you give consideration
25   to that performance testing?                            07:40
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 110

```
 1        A.  Yes.
 2        Q.  Regardless of whether the patent had been one
 3   that was asserted or not?
 4        A.  Yes.
 5             MR. NORTON:  Nothing further for me.              07:40
 6             MR. MULLEN:  Just a few more questions.
 7   FURTHER EXAMINATION
 8   BY MR. MULLEN:
 9        Q.  Mr. Plummer, can you name any patent offhand,
10   other than the patents in suit, of which you were           07:40
11   aware that performance testing had been conducted?
12        A.  I don't know the patent numbers, but I
13   mentioned there were patents involved in pre-loading,
14   or ROMizing; we've done measurements of that and the
15   footprint measurement.  That's one that comes to mind.      07:40
16             I know there are others, but they don't --
17   it's been a few weeks, and there's a lot of patents to
18   try to retain in your head, so...
19        Q.  Do you know whether the performance testing
20   on those patents that you just mentioned was as             07:41
21   extensive as the performance testing done on the
22   patents in suit?
23        A.  I'm not too sure what "extensive" means here
24   because usually it's just a matter of building with
25   and without and measuring the size or running some          07:41
```

Page 111

1   standard performance benchmarks.  So I have no reason
2   to think that asserted patents would have been -- been
3   tested any more or less extensively than non-asserted
4   ones.  I wouldn't assume they are all the same.  It
5   kind of depends on what the person doing the work          07:41
6   really felt was necessary.
7           MR. MULLEN:  No further questions.
8           MR. NORTON:  None for me.
9           THE VIDEO OPERATOR:  This concludes the
10  videotaped deposition of Mr. Chris Plummer.  We're off    07:41
11  the record at 7:42 p.m.
12          (Time noted:  7:42 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 112

1    I declare under penalty of perjury
2    under the laws of the State of California
3    that the foregoing is true and correct.
4            Executed on _____, 2012,
5  at _____, _____.
6
7
8
9
10
11           _____
12                SIGNATURE OF THE WITNESS
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 113

1   STATE OF CALIFORNIA   ) ss:

2

3      I, SANDRA LEE HOCKIN, C.S.R. No. 7372, do hereby
4   certify:
5        That the foregoing deposition testimony was
6   taken before me at the time and place therein set
7   forth and at which time the witness was administered
8   the oath;
9        That the testimony of the witness and all
10  objections made by counsel at the time of the
11  examination were recorded stenographically by me,
12  and were thereafter transcribed under my direction
13  and supervision, and that the foregoing pages
14  contain a full, true and accurate record of all
15  proceedings and testimony to the best of my skill
16  and ability.
17       I further certify that I am neither counsel for
18  any party to said action, nor am I related to any
19  party to said action, nor am I in any way interested
20  in the outcome thereof.
21        IN WITNESS WHEREOF, I have subscribed my name
22  this 17th day of February, 2012.
23
24                  _____
25                  SANDRA LEE HOCKIN, C.S.R. No. 7372