# EXHIBIT I



# A Better Consumer Survey For Better Damages



*by Alan J. Cox*

As the Supreme Court's recent ruling in the Victoria's Secret case acknowledged, many IP cases will turn on consumer surveys. Such surveys are often essential to demonstrate trademark dilution (of the sort discussed in the Victoria's Secret case), and they are often the best way to estimate damages in a patent or trademark infringement case.

However, many litigants in IP suits are shortchanged for lack of properly constructed survey - either receiving too little as plaintiffs or paying too much as defendants. A common failing of many surveys is their inability to provide rigorous estimates of how an infringing product can alter market prices and competitors' market shares. But one type of consumer survey, choice modeling, does provide such estimates. It can thus make a significant difference in the amount of damages awarded.

**A Superior Choice**

In a choice modeling exercise, survey respondents compare the features of a product and report their preferences for a particular combination of features. The results can be translated into monetary values - unlike in traditional surveys. For instance, a conventional survey might be able to determine that 75 percent of potential customers value speed in their Internet connection but such information is of little or no use in estimating damages. A choice modeling survey can predict how much more individuals will pay for faster Internet service and how many people would actually purchase the faster service. This willingness-to-pay and predicted market penetration can then be used to develop a damage estimate.

Choice modeling is a relatively new technique, but it was used to good effect in an infringement suit brought in the mid-90s. The plaintiff was a West Coast manufacturing company that was attempting to enter the computer-network cabling market at a particularly propitious time: Computer-networking cable was in short supply and network installers had to wait several weeks to receive cables from the one supplier that dominated the industry. Plaintiff entered into the contract with an East Coast distributor to sell its cable, but the distributor failed to perform, and plaintiff missed the opportunity to establish a foothold in the market during the supply shortage.

There was no circumstantial or other evidence that could provide an estimate of the market share the plaintiff would have achieved but for the defendant-distributor's breach of contract. However, a choice modeling survey showed that the defendant would likely have achieved a very large market share during the shortage and would have continued to hold on to market share once the incumbent firms were able to increase production to end their shortage. Data derived from the choice modeling



NERA Economic Consulting

surveys even allowed for estimates of market share at different prices.

"The survey provided a basis for estimating our damages that would otherwise have been difficult or impossible to estimate," said plaintiff's attorney Gregory Gilchrist, of Legal Strategies Group in Emeryville, California.  The suit was resolved to plaintiff's satisfaction prior to trial.

**How It Works**
A survey concerning trade dress confusion illustrates the methodology of choice modeling.  Approximately 150 recent college graduates and experienced attorneys were surveyed regarding a hypothetical marketplace containing four manufacturers of running shoes: Nike, New Balance, Reebok and an obscure manufacturer offering its shoes under either or both of the brand names, "Lightning" or "Reebeck."

Each brand of running shoe was described by several characteristics:  brand name, weight, availability of width sizing, impact cushioning and shoe upper-body material.  These characteristics can be combined in hundreds of ways to make up a full description of a product.  For instance, a Nike shoe may weigh 10 ounces, have a nylon upper body, EVA mid-sole, and come in varying width sizes and cost $90.

The survey company produced hundreds of different combinations of attributes and printed the descriptions on a large number of product-description cards.  Survey respondents were each given sets of four randomly selected cards and asked to rank the cards in order of their preference for the combinations of attributes.  The results were compiled and statistically analyzed.

The survey provided evidence of consumer confusion when the obscure "Lightning" shoe was sold under the "Reebeck" label.  When that change was made, the relatively unknown shoemaker increased its market share by three percentage points.  In today's running shoe market, that magnitude of change would involve many millions of dollars.

Confusion could be capitalized on by charging a higher price for a product with the "Reebeck" brand rather than the "Lightning" brand.  The survey also allowed for a reasonable estimate of how market share would change in response to changes in prices.

Interestingly, however, increased margins and higher market shares from using the "Reebeck" brand seem to have arisen only under circumstances in which the "Reebeck" brand was available and the "Reebok" brand was not.  In the context of a shopping situation, this means that the overlapping brand names did not have a material impact in the marketplace when the retailer placed both "Reebok" and "Reebeck" side-by-side on the shelf.

Courts are likely to demand rigorous demonstrations of the manner in which markets would have operated, absent some act of intellectual property infringement.  Choice modeling may often be able to provide such data, when other methods cannot.

*Alan Cox is a Senior Vice President in the San Francisco office of National Economic Research Associates, which is headquartered in White Plains, New York.*