Pages 1 - 112

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

```
ORACLE AMERICA, INC.,          )
                               )
            Plaintiff,         )
                               )
  VS.                          )  No. C 10-3561 WHA
                               )
GOOGLE, INC.,                  )
                               )  San Francisco, California
            Defendant.         )  Wednesday
_____)  March 7, 2012
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**          MORRISON & FOERSTER
                            755 Page Mill Road
                            Palo Alto, California  94304
                    **BY:   MICHAEL A. JACOBS, ESQUIRE**

                            BOIES, SCHILLER & FLEXNER
                            1999 Harrison Street, Suite 900
                            Oakland, California  94612
                    **BY:   WILLIAM FRED NORTON, ESQUIRE**
                            **STEVEN C. HOLTZMAN, ESQUIRE**

                            ORACLE AMERICA, INC.
                            500 Oracle Parkway
                            Redwood Shores, California  94065
                    **BY:   ANDREW C. TEMPKIN, CORPORATE COUNSEL**

(Appearances continued on next page)

**Reported By:**    *Katherine Powell Sullivan, CSR #5812, RPR, CRR*
                    *Official Reporter - U.S. District Court*

**APPEARANCES (CONTINUED):**

**For Defendant:**        KEKER & VAN NEST
                    633 Battery Street
                    San Francisco, California  94111-1809
        BY:  **ROBERT ADDY VAN NEST, ESQUIRE**
              **DANIEL PURCELL, ESQUIRE**
              **MICHAEL S. KWUN, ESQUIRE**
              **CHRISTA MARTINE ANDERSON, ESQUIRE**

                    KING & SPALDING LLP
                    1185 Avenue of the Americas
                    New York, New York 10036-4003
        BY:  **BRUCE W. BABER, ESQUIRE**

                    GOOGLE, INC.
                    1600 Amphitheatre Parkway
                    Mountain View, California  94043
        BY:  **RENNY HWANG, LITIGATION COUNSEL**

**For Dr. Kearl:**        FARELLA BRAUN & MARTEL LLP
                    235 Montgomery Street, 30th floor
                    San Francisco, California 94104
        BY:  **JOHN L. COOPER, ESQUIRE**

**P R O C E E D I N G S**

**MARCH 7, 2012**                                              7:30 A.M.


          **THE CLERK:**  Calling civil action 10-3561, Oracle

America, Inc. versus Google, Inc.

          Counsel, can you please state your appearances for

the record.

          **MR. JACOBS:**  Michael Jacobs, Morrison & Foerster, for

Oracle.  Good morning, Your Honor.

          **MR. NORTON:**  Fred Norton of Boies, Schiller & Flexner

for Oracle.  Good morning, Your Honor.

          **THE COURT:**  Good morning.

          **MR. HOLTZMAN:**  Steve Holtzman, Boies, Schiller &

Flexner, for Oracle American.

          **MR. TEMKIN:**  Good morning.  Andrew Temkin with Oracle

America.

          **THE COURT:**  Okay.

          **MR. VAN NEST:**  Good morning, Your Honor.  Bob

Van Nest for Google.  I'm here with Dan Purcell, Michael Kwun,

Christa Anderson.  And we're here, also, with Bruce Baber of

King & Spalding, and Renny Hwang from Google.

          Thank you.

          **THE COURT:**  Good morning.  Welcome.

          **MR. COOPER:**  Good morning, Your Honor.  John Cooper

on behalf of Dr. Kearl.  Dr. Kearl is in the courtroom, as

1    well.

2              **THE COURT:**  Thank you both for coming.

3              Is Dr. Cockburn here?

4         **MR. NORTON:**  Yes, he is, Your Honor.

5         **THE COURT:**  All right.  Thank you.

6              Okay.  We're here for a hearing on whether to exclude

7    Dr. Cockburn's expert damages report.  And I sent out a number

8    of questions.  I hope you've had a chance to study them and be

9    ready on those.

10             Before we turn to other matters, I'd like to

11   understand a bigger-picture item, and that concerns this

12   question:

13             In the original 2006 offer of $100 million by Sun,

14   was that a one time paid-up license, or was that going to be

15   for a limited number of years?  Who knows the answer to that

16   question?

17        **MR. NORTON:**  I believe I know it.

18        **THE COURT:**  You've got to come up here.

19        **MR. NORTON:**  If I can confirm with my colleague for

20   one moment before I answer the Court.

21             (Pause)

22        **MR. NORTON:**  Yes, Your Honor.  It was anticipated to

23   be a 3-year term.  And that would have been paid over the

24   3-year term.

25        **THE COURT:**  So at the end of three years did -- once,

1   let's say Google, had started developing its Android platform,

2   and at the end of three years it had to come back and negotiate

3   a new license, is that the way it was going to work?

4            **MR. NORTON:**  That is where the negotiations would

5   lead you.  The actual draft agreement that was exchanged

6   between the parties, the last one was sent from Google to Sun

7   on April 19, 2006.  And at that point there is not a term in

8   the license.

9            There were still negotiations between the parties

10  even then as to how long -- what the ultimate term of the

11  license would be.  But the term that had been discussed between

12  the parties was a 3-year term, which would, of course, require

13  a renegotiation.

14           **THE COURT:**  All right.  And your name?

15           **MR. PURCELL:**  Your Honor, that's not our

16  understanding.

17           **THE COURT:**  What is your name?

18           **MR. PURCELL:**  I'm sorry.  My name is Dan Purcell.

19  I'm with Keker & Van Nest, representing Google.

20           **THE COURT:**  The court reporter and I don't know who

21  the lawyers you are.  You need to identify yourself for the

22  record.

23           **MR. PURCELL:**  Fair enough.

24           **THE COURT:**  All right.  Say that again.  What was

25  your point?

1          **MR. PURCELL:**  Our understanding is that it was a

2    fully paid-up license.  It was to be paid over --

3          **THE COURT:**  Your understanding?

4          **MR. PURCELL:**  Is that that was the initial --

5          **THE COURT:**  Hand up the proof right now.  Do you have

6    the proof --

7          **MR. PURCELL:**  I do not have the initial draft offer.

8    Neither does, I believe, Oracle.

9          **THE COURT:**  All right.  Tell me what you base your

10   understanding on.

11         **MR. PURCELL:**  The initial offer was a payment term

12   over three years, $20 million per year, total of $60 million

13   plus then some amount of downstream revenue sharing.  That was

14   Sun's initial proposal.  But I don't believe there was anything

15   in the proposal that said the license would go away after three

16   years.

17         **THE COURT:**  All right.  Thank you.

18         Well, I think this is a very important point.  Let me

19   explain why.  If it was a one time paid-up license, then the

20   idea that the plaintiff here could then seek damages for 2012,

21   seek damages for 2013, seek damages for 2014, on a royalty

22   basis doesn't square with what the $100 million offer was.  If

23   that's the case.  Now, I don't know that.  I think it's a

24   matter of proof.

25         In other words, it's an apples and oranges thing.  If

1  the hundred million dollars was meant to go forever, to allow

2  Google to use the technology indefinitely, then you can't turn

3  around and say, okay, this hundred million dollars was only for

4  the first three years, and then we get to tag them with

5  additional damages every single year thereafter.

6         On the other hand, if it really was just for three

7  years, then I guess the plaintiff can do that.

8         Now, that leads to a different question, which is,

9  would it have been savvy and smart for Google to go down a

10  three-year path, get stuck on the technology, get addicted to

11  the technology, only then to find out that the price would go

12  up at the end of three years?  I don't know.  That doesn't

13  sound smart to me.

14         Has anyone looked at this?  Mr. Van Nest, has your

15  side looked into this?

16         **MR. VAN NEST:**  Your Honor, I thought that's what the

17  experts were trying to come to.  In other words, both experts,

18  as I understand it -- and admittedly I haven't been following

19  it as closely as Mr. Purcell -- but they're talking about what

20  would the royalty payment have been for this license?

21         And, as you know, Mr. Cockburn's been up in large

22  numbers coming down, and Dr. Leonard has been in, you know, low

23  eight figures.  But what I understood was this was a three

24  year -- they had three years to pay it, but that it was a fully

25  paid-up license.

1          And what the experts were opining on is, what would

2    the parties have reached as a negotiation, not how many units

3    have you sold times a running rate.

4          So I kind of think the parties are taking that into

5    account in looking at the hypothetical negotiation.  We've been

6    debating a starting point and we've been debating apportionment

7    and all that.  But I really think what they are trying to get

8    to is, what's the value of the license on these asserted

9    claims?

10         **THE COURT:**  Are you saying a fully paid-up license --

11         **MR. VAN NEST:**  Yes.

12         **THE COURT:**  -- or a year-to-year license?

13         **MR. VAN NEST:**  Fully paid up.

14         **THE COURT:**  Did you not hear Mr. -- Mr. Norton or Mr.

15   Holtzman -- who was it that spoke --

16         **MR. NORTON:**  It was Mr. Norton.

17         **THE COURT:**  Mr. Norton.  Didn't you hear what he just

18   said?

19         **MR. VAN NEST:**  I did.

20         **THE COURT:**  He said that come 2012 they are going to

21   be asking for more damages, come 2013, more damages, and it's

22   not a fully paid-up license.

23         This is like the sky isn't dark, the sky is bright.

24   You two are completely apart on this.  This is a major --

25   billions of dollars could be at stake on this question.

1          **MR. VAN NEST:**  Again, what I'm coming back to is the

2     idea that what the experts have been charged with is

3     determining what the value of that license would have been for

4     the asserted claims now.

5          Obviously, they were negotiating, as Your Honor

6     knows, for a much bigger package.  But I know that in

7     Dr. Leonard's case he's asserting a number that would

8     compensate Oracle for the value of these asserted claims on the

9     patent copyright side until the end of the -- until the end of

10    the day.

11         So we may be apart on it, and Your Honor is right to

12    point it out, but I know that our view is it was a fully

13    paid-up deal, payable over a 3-year term.

14         **THE COURT:**  All right.  Let me ask, Mr. Norton -- I

15    want us to be clear.  And maybe I just misunderstand what you

16    say.

17         Are you really saying that the hundred-million-dollar

18    deal was only for a 3-year license, and after that it would be

19    renegotiated?

20         **MR. NORTON:**  Yes.  The hundred-million-dollar offer,

21    when it was made as a hundred-million-dollar offer, had a

22    3-year term attached to it.  The parties continued to

23    negotiate.

24         **THE COURT:**  3-year term to pay the money, or did it

25    expressly say the license will only last for three years?

1        **MR. NORTON:**  It was a 3-year term.  Not just three

2  years to pay, but a 3-year term.

3        Now, at different points of the negotiation the

4  parties continued to talk about the term.  So even after Sun

5  had proposed a hundred-million-dollar offer with a 3-year term,

6  there were, of course, further negotiations.  But starting with

7  the hundred-million-dollar offer, that had a 3-year term.

8        At different points -- and there's testimony from

9  Mr. Gupta that Sun wanted a shorter term.  There are other

10  documents that also -- evidence that would be offered at trial

11  that would show the length of the term as the parties

12  negotiated going forward.

13        But to respond in part to what Mr. Van Nest just

14  said, keep in mind that this is a hypothetical negotiation to

15  determine the reasonable royalty in this case.  Google's

16  infringement, of course, is different and greater than what Sun

17  proposed to license.

18        And it would be inappropriate -- even if there had

19  been a term limit on this license, Sun would not have been

20  prepared to give up all of its rights to these patents and

21  copyrights forever, as Google now claims, if it were only being

22  compensated for a compatible license that --

23        **THE COURT:**  Yes, but if you picked a

24  hundred-million-dollar offer as your starting point, which you

25  have done, and that was a fully paid-up license offer, then

1   you've got to adjust it for all of these variables.  You can't

2   just assume away that it was not a paid-up license.  That ought

3   to be -- maybe that's just a matter of proof.

4           All right.  Has this point been adequately briefed in

5   the existing motion or not?

6           **MR. NORTON:**  I don't believe it's been briefed at all

7   in the existing motion.  The parties have not joined the issue.

8           Professor Cockburn has calculated the damages over

9   approximately a 3-year term, which brings us to the present.

10  And that issue has not been joined by the parties.

11          **THE COURT:**  All right.  Thank you.

12          Now, I have -- my next question for you is to

13  understand whether or not -- I understand that Dr. Cockburn has

14  dropped 2012 from his calculation.  I assume that's without

15  prejudice to asking for 2012 damages in the future.  But with

16  respect to the time period that he does ask for damages, is

17  that number lower or higher, or what, the same as the numbers

18  in report number two?

19          **MR. NORTON:**  The numbers are -- I'm sorry.  The

20  numbers are similar in some respects.  And the reason why I

21  don't say "the same" is that Professor Cockburn, in his

22  February report, has several different approaches.

23          And if you use the lowest bound of his group and

24  value approach, the numbers are smaller.  If you use the upper

25  bound of his group and value approach, the numbers are slightly

```
 1  larger.  But they are comparable.

 2          We did prepare a demonstrative that shows --

 3          THE COURT:  I would be interested to see it.  Thank

 4  you for doing that.

 5          MR. NORTON:  I now have copies.  I previously

 6  provided it to Google, and have copies today.

 7          THE COURT:  Do you have a set -- did my law clerk get

 8  a set?  Okay.  Good.

 9          MR. NORTON:  Yes, Your Honor.

10          THE COURT:  Which chart do you want me to look at?

11          MR. NORTON:  If you turn to tab 1 of the binder

12  that's been handed up to the Court, what we've done is in a

13  single demonstrative tried to answer a couple of questions the

14  Court had.

15          One was to walk through the steps that Professor

16  Cockburn employs to adjust the starting point; and, at the same

17  time, to compare those steps from his September report and

18  reply and his most recent report of February of this year.

19          And so you'll see -- we've done it for both patent

20  and copyright.  Copyright is at the second tab, but I'll start

21  with patent.

22          And you can see that once Professor Cockburn applied

23  the adjustments for marking, and limitation to specific accused

24  devices, his damages as calculated in the fall, including his

25  October reply report, were $46.7 million for patents.  Under
```

1  the group in lower bound, his damages for patents would be

2  $17.7 million.

3          Now, for this demonstrative we have included the '476

4  Patent -- although, we no longer assert it -- just so the Court

5  could actually see these numbers as an apples-to-apples

6  comparison.  Obviously, dropping the '476 Patent would -- I

7  apologize.  These numbers do include the elimination of the

8  '476 Patent.

9          On the group and value upper bound, it's

10 57.1 million.  And the independent significance approach

11 damages are rather close to where they were in October, $43.7

12 million.

13         The steps -- I can walk through, if it would be

14 helpful for the Court to walk through the steps Professor

15 Cockburn has employed to make that adjustment.

16         **THE COURT:**  No, this will do.  Perhaps we'll get into

17 it later.  But your chart is very helpful.  Thank you.

18         **MR. NORTON:**  And if you were to look at tab 2, the

19 steps are the same.  Essentially, there's some patent-specific

20 steps that must be taken that do not apply to copyright, and so

21 this chart is a little bit smaller.

22         But, once again, you will see that the range of

23 damages is smaller for the group and value lower bound, and

24 slightly greater for the group and value upper bound, and very

25 similar for the independent significance approach as the

1   numbers were last fall.

2              **THE COURT:**  Okay.  Good.  Thank you.

3              So while I have you here, yesterday I sent out a

4   request that you check my mathematics, arithmetic really, on

5   the 10 percent line on Exhibit 34.  I was trying to see if I

6   had worked it out correctly.  It would be fine if you say no, I

7   goofed it up.  I just need to -- I'm trying to understand the

8   approach and, also, I'm particularly interested in that line

9   item.

10             So did you work through that 10 percent line item?

11             **MR. NORTON:**  We did, Your Honor.  And, again, we

12  prepared a demonstratives.

13             **THE COURT:**  All right.  Which one is it?

14             **MR. NORTON:**  It is 6 and 7.  One may be easier for

15  the Court than the other.  Why don't I start with 6.

16             The answer to the Court's question is, we did have to

17  make an adjustment to the Court's math.

18             **THE COURT:**  That's fine.

19             **MR. NORTON:**  And we weren't quite able to figure out

20  where we parted ways, but --

21             **THE COURT:**  That's okay.  Just tell me how you did

22  it.

23             **MR. NORTON:**  Sure.  I think it's easier, then, if we

24  looked at slide 7.

25             **THE COURT:**  Okay.

1             **MR. NORTON:**   And there are two calculations on slide

2    7, simply because it wasn't clear to us whether the Court

3    wanted to use the average of the three curves that are provided

4    on Exhibit 34 of Professor Cockburn's report, or just the mid

5    range, which is PatVal.   The two numbers are very similar, and

6    they don't have a significant difference on the ultimate

7    result.

8             But taking the formula from paragraph 414 of

9    Professor Cockburn's report, the formula is described on the

10   upper left-hand quadrant of slide 7 as the value of

11   patents-in-suit plus the variable A times the value of

12   patents-in-suit plus one half times the value of the

13   patents-in-suit should add up to $597.5 million.

14            And then the formula for A, which is 1 minus

15   percentage of the patent portfolio attributable to the

16   patents-in-suit divided by the percentage of patent portfolio

17   attributable to the patents-in-suit.   And that is the formula

18   in paragraph 414.

19            And using the PatVal curve, which is the curve on

20   which Professor Cockburn relies, in that scenario when you

21   solve for A you get 11.85.

22            And then plugging that into the equation on the upper

23   left-hand side, that would tell you that the value of the

24   patents-in-suit, using the assumptions in the Court's order of

25   yesterday, would be $44.8 million.   And applying Professor

 1  Cockburn's formula from paragraph 414, the copyrights would be

 2  half of that, or $22.4 million.

 3       **THE COURT:**  All right.  I don't know how -- I came up

 4  with 32, and you come up with 22.4 or 22.5.  Is that true?

 5       **MR. NORTON:**  Well, no, we come up with 44.8 for the

 6  patents, and 22.4 for the copyrights.

 7       **THE COURT:**  I see.  I see.  All right.  So you come

 8  up with 44.8.  Somehow I came up with 32.  And that's for five,

 9  correct?

10       **MR. NORTON:**  That would be for five patents, applying

11  the Court's assumption that those five patents are of equal

12  value and are all in the top 57.

13       The Court asked that we be prepared to comment on the

14  reasoning of that assumption, as well.  I'm prepared to

15  address --

16       **THE COURT:**  Wait, wait.  No.

17       **MR. NORTON:**  Thank you.

18       **THE COURT:**  I want to make sure that 44.8 is not per

19  patent, but the grand total of all five.

20       **MR. NORTON:**  That is correct.  That 44.8, under those

21  assumptions, would be the value of those five patents-in-suit.

22       **THE COURT:**  All right.  So you wanted to say

23  something, and I interrupted you.  Please go ahead.

24       **MR. NORTON:**  So with respect to the reasoning of

25  that, the quarrel we would have with the logic of those

1  assumptions is that the analysis done by Dr. Reinhold and the

2  other JAVA engineers indicates that three of the asserted

3  patents are not merely in the top 57, not just in the top

4  10 percent, but are, in fact, in the top 3.9 percent.

5          And because this is not -- that the curve is not a

6  linear one -- in fact, it was very far from linear -- by

7  treating patents that are in the top 3.9 percent as though they

8  were in the top 10 percent, you significantly discount the

9  value of those patents.

10         At the same time, you actually probably overstate the

11  value of the '520 Patent because it probably doesn't belong in

12  the top 57.  But we know from the evidence provided by those

13  engineers that three of the patents that are asserted are, in

14  fact, in the top 22.

15         And there is very good reason to think that they are

16  the top three.  But even if you only say they are in the top

17  22, treating them as though they are only in the top 57

18  significantly reduces their value.

19         And so that's not an assumption that we think is

20  warranted by the evidence, and would, in fact, be inconsistent

21  with what the engineers determined based on their assessment of

22  all the patents.

23         I think that's the primary difference we have with

24  the logic of the approach.

25         **THE COURT:**  What is the -- let me tell you what I

```
1   have a fundamental question about.  You have three samples,

2   three sample portfolios from the history of the universe.  Two

3   taken from Europe, and one from the United States.  So it's a

4   sample of three.  I want you to focus on the word "three."  All

5   right.

6           No one doubts that these curves have a

7   disproportionate value at the far end.  It's obvious from just

8   the ordinary application of the everyday 80/20 rule that that

9   would be the case.  But that's not what is at issue here.

10          Your Dr. Cockburn -- am I saying that correct?

11          MR. NORTON:  Cockburn.

12          THE COURT:  -- Cockburn is trying to draw huge

13  conclusions from tiny data points.

14          You have three samples.  Three.  Not hundreds.  You

15  have three samples.  Three portfolios that were sampled.  And

16  you looked at the curves on each one of them.

17          And when you're dealing with the top 20 percent,

18  where you're going to have a lot more data points, the numbers

19  come out fairly close.  94.4, 90.8, and 98.4.  They vary

20  somewhat.

21          So you take three samples, and for that far

22  right-hand side of the distribution curve you're getting

23  somewhat similar results.  When you get down to 1 percent, the

24  results vary widely.  52.6, 42.1, 78.4.  Those aren't even

25  close.
```

```
 1          In some studies you would treat those as outliers,
 2   that top 1 percent, as very few data points under the curve
 3   there.   And some statisticians would treat those as outliers
 4   and not even consider them, and yet that's the basis of your
 5   study.
 6          So let me come back to my main point.   In statistics
 7   when you do a sample of three -- which is what you've done
 8   here.   And how they were selected, I don't know.   That's
 9   another question.   Let's assume they were randomly selected.
10   And you get widely varying results on three samples when we're
11   focusing on the 1 percent now.   That's all I'm focusing on
12   because that's what you wanted to put before the jury.   Three
13   samples that come out with widely varying results.
14          Then you ask the question, what are the odds that a
15   fourth, randomly selected portfolio taken somewhere in the
16   United States is going to be even in that range?   It could be
17   lower than 52, when you get numbers of that -- varying to that
18   extent.
19          So we're not talking about the 20 percent part, which
20   seems pretty consistent.   But as you get down to the 1 percent,
21   and the .5 percent, and even the 3 percent, even the 5 percent,
22   the results start to diverge.   And I think statisticians would
23   ask the question, How many sample portfolios do you need?
24          You have three.   That's all.   Somehow he selected
25   three.   Don't you need ten?   Don't you need a hundred?   Don't
```

1   you need to see a lot more results before you can draw

2   conclusions with any confidence as to that tiny tip of the

3   tail?

4           It's not even the tail.  It's the tip of the tail.

5   It's the outliers that you're basing your whole case on.  That

6   is my most fundamental -- and this is before you even get to

7   the way in which your own people started ranking these things.

8           I'm not even getting to that point.  I'm asking just

9   on -- has -- what conclusions and confidence levels can you

10  place in the very tip-of-the-tail analysis that you have here?

11  I saw zero in this report.  Zero where your Dr. Cockburn

12  analyzed that problem.

13          So I'm going to give you a chance to answer that

14  question.

15          **MR. NORTON:**  There is a fair amount for me to respond

16  to there.  I have some additional materials, if I can --

17  including the studies the Court requested.

18          **THE COURT:**  Yes.  Please, hand those up.

19          **MR. NORTON:**  The Court ordered us to produce all

20  surveys that had patent value distribution curves.  All

21  studies, I should say.  And we've done that.

22          I had my back turned.  Does the Court have a copy of

23  that binder?

24          **THE COURT:**  You gave me this one right here.  Is that

25  it?

1          **MR. NORTON:**  Yes, Your Honor.

2          **THE COURT:**  Yes, I do have it.

3          **MR. NORTON:**  All right.  Thank you.

4          So, again, a number of points to respond to.

5   Dr. Cockburn doesn't rely -- I think it would be more accurate

6   to say that Professor Cockburn relies upon the PatVal survey.

7          **THE COURT:**  Then it's got a sample of one.

8          **MR. NORTON:**  That is the one that he uses.  Just as

9   Dr. Putnam, in the *LG Display* case, relied upon a single study

10  that had a single distribution curve.

11         But Professor Cockburn --

12         **THE COURT:**  Is that a federal circuit case?

13         **MR. NORTON:**  That is a District of Delaware case.

14         **THE COURT:**  Well, that's just a district judge

15  talking.  Did the district judge focus on the point that I'm

16  raising?

17         **MR. NORTON:**  The adequacy of Professor Putnam's

18  analysis was challenged.  It was a bench trial.  The defendant

19  argued that his analysis was too speculative to support an

20  award of damages.  And the Court not only allowed the

21  testimony, it awarded damages based on that testimony.

22         **THE COURT:**  Did the judge raise the point about

23  relying on the tip of the tail, a tiny set of data points to

24  draw huge conclusions of the type you're trying to draw?  Did

25  that point get addressed?  I don't think so.

1           **MR. NORTON:**  That specific point is not addressed.

2           **THE COURT:**  All right.  Well, I'm raising that point.

3           **MR. NORTON:**  Right.

4           **THE COURT:**  And that is, to me, a big problem with

5    your approach.

6           **MR. NORTON:**  So let me --

7           **THE COURT:**  I'm not quarreling with the 20 percent

8    part.  I think -- because the numbers, you know, with three

9    samples are coming out the same pretty close.  But they start

10   to diverge wildly when you get down to the small, tiny tip of

11   the tail thing.  You know good and well if you did a fourth one

12   the number would be different, too.

13          **MR. NORTON:**  So let me address that.  That last

14   observation is probably a helpful place to start.

15              In the binder of demonstratives, if you turn to

16   number 5 --

17          **THE COURT:**  All right.  Wait.  I'm sorry.  The one

18   you just gave me, or the smaller one?

19          **MR. NORTON:**  The small one.  Wherever possible, I'll

20   try to use the small one.

21          **THE COURT:**  Okay.

22          **MR. NORTON:**  So the Court said, if we were to find a

23   fourth one the curve would be radically different.  And what we

24   found, actually, is Professor Cockburn -- who, of course, is

25   here today -- has gathered together all of the studies that he

```
1  can locate that have surveys of patent value, direct evidence
2  of the economic value of patents, and report sufficient
3  information that one can actually see a curve in the study
4  itself.
5          And so these include the PatVal study, which is the
6  one that he relies upon for the purposes of this report, as
7  well as four others.  And what you see -- and the PatVal curve
8  on this one is the blue one.  And you see the curves do
9  intersect at various points --
10         THE COURT:  I'm sorry.  The blue one says here,
11 "Harhoff."  PatVal is the red one in your chart.
12         MR. NORTON:  I'm sorry.  You may be looking at 5.
13         MR. PURCELL:  It's 4.  It's 4.
14         THE COURT:  I'm sorry.  Which one did you want me to
15 look at?
16         MR. NORTON:  Slide 4, which should look like this
17 (indicating).
18         THE COURT:  I am looking at the wrong one.  I see.
19 All right.  Okay.
20         MR. NORTON:  So these are the available curves.  And
21 what you see is there is a fairly tight range here.
22         Now, the Court asked about the confidence interval.
23 And Professor Cockburn is certainly better qualified than I am
24 to speak to this, but to answer the Court's question you
25 wouldn't talk about a confidence interval, normally, for a set
```

1  of studies where you only have five or six observations.

2         For a confidence interval you would need something

3  more like --

4         **THE COURT:**  But the problem is, you have three sample

5  portfolios.  That's it.  You don't have hundreds of samples of

6  different portfolios.

7         But let me look at your -- your tab 4 for a minute.

8  Where is Barney on here?

9         **MR. NORTON:**  So, Barney is not on here because --

10        **THE COURT:**  That's because that number is 91 point --

11 see, you've selected the lines that help you make your point.

12        But look at your Exhibit 34.

13        **MR. NORTON:**  Yes.

14        **THE COURT:**  Look at Exhibit 34.  Let's just take the

15 1 percent number.  PatVal is 52.6.

16        That's not even the way it comes across on your

17 chart.  I don't understand this chart.

18        Okay.  52.6.  And then for Harhoff it's 42.1.  And

19 then for Barney it's 78.4.  But you conveniently left Barney

20 off.

21        **MR. NORTON:**  The reason why Barney is not included on

22 slide 4 is that Barney is not a study -- is not a survey.  And

23 Professor Cockburn will testify that the best evidence of skew

24 distributions comes from surveys.  We have included not just

25 survey articles in the binder --

1          **THE COURT:**  Why did he rely on it in the first place?

2    It looks like when it became inconvenient for him to rely on

3    it, he dropped it like a hot potato and then resorted to some

4    other surveys.

5          **MR. NORTON:**  No, that's not correct, Your Honor.

6    What Professor Cockburn did in his report is he included the

7    Barney study and the Harhoff study as other examples of studies

8    that demonstrate a high degree of skew for patents.

9          And the Barney study happens to discuss U.S. patents,

10   and was helpful to demonstrate the -- anticipate the argument

11   that Google, of course, made, which was that, oh, well, you

12   can't assume that U.S. patents are skewed just because European

13   patents are skewed.

14         But Professor Cockburn never relied upon the Barney

15   study.  He didn't do an average of the curves.  He didn't

16   assimilate the curves.

17         What he said is he said the PatVal study is the

18   single most reliable study, and he explained why that's the

19   case at his deposition.

20         There are 23,000 observations, 23,000 data points in

21   the PatVal study, across several countries, based on extensive

22   survey data.

23         He testified about his familiarity with the study,

24   with the way the study was conducted, his experience with the

25   professional qualifications of the authors, and why he believed

1    that that single study was the best study to rely upon.

2          So -- and other studies that have similarly used

3    surveys to obtain data about the value of patents have very

4    similar curves.

5          But I would -- I have to strongly disagree with the

6    suggestion that he relied upon the Barney study and has done

7    something different.  He has consistently said that the PatVal

8    study is the study that best predicts the distribution of

9    patent value.  That is the only study that he used to actually

10   do the calculations.

11         **THE COURT:**  I don't know what you've been reading.

12   Listen to this.  Paragraph 405 of his report:  "Based on three

13   recent studies of patent value" -- that's him talking, and then

14   at footnote 418 -- "I document distribution curves of that

15   value."

16         So he's relying on those three studies.  He says it

17   right there in paragraph 405.  And then he cites to the Barney

18   study as one of the three in that footnote.

19         **MR. NORTON:**  Oh, absolutely.  He cites that for the

20   proposition that there is a high degree of skew in patent

21   distribution.  And he could cite dozens more articles for the

22   same proposition.

23         But if you then want to take the step of what curve

24   should he use to best predict the extent to which patent values

25   are, in fact, skewed, the only curve that he employed to do

1    that calculation anywhere in the report, anywhere in the

2    exhibits, at any point in his deposition testimony, is the

3    PatVal curve, because that is the one that he believes is the

4    best-conducted study that best predicts that value.

5         So the fact that he uses one study doesn't -- doesn't

6    in and of itself undermine our confidence.

7         **THE COURT:**  He didn't use one study.

8         Listen to paragraph 406, "In each of these studies,

9    the top 1 percent of the patents collectively account for 42 to

10   78 percent of the value of all patents in that study as shown

11   on Exhibit 34."

12        So then you turn to your Exhibit 34, which I tried to

13   do, and read your -- and that's exactly where he gets the 42 to

14   78 percent.  And Barney is 78 percent.

15        I don't see how you can possibly say he did not rely

16   on the Barney study.

17        **MR. NORTON:**  Perhaps I'm not being clear.  Professor

18   Cockburn relies on the Barney study and the wealth of

19   literature in this area.  He specifically cites the Barney

20   study.  He discusses the literature more generally, but he

21   specifically cites the Barney study as evidence of the degree

22   of skew in patent portfolio distributions.

23        But when it comes to the point where he has to do a

24   calculation, the only curve that informs his calculation, the

25   only curve that he uses to calculate damages in this case, is

1    PatVal.

2         **THE COURT:**  So he has got a sample of one.  A sample

3    of one.  And you want to assume that any randomly -- any

4    randomly selected portfolio in the United States will conform

5    to that one at the very tip of the tail.  That's what you -- it

6    comes down to; doesn't it?

7         **MR. NORTON:**  Well, we rely on that survey.  I don't

8    think --

9         **THE COURT:**  What makes you think it's similar to

10   the -- there's nothing to indicate other than Sun had a patent

11   portfolio.  Okay.  But, so does a lot of other companies.

12        So, your proposition has to be that that one PatVal

13   study is identical to or very close to, at the tip of the tail,

14   any other randomly selected patent portfolio in the

15   United States.

16        If you don't accept that proposition, then I don't

17   see how you can apply that one study to any other selected

18   portfolio in the United States, which in this case happens to

19   be Sun, but in some other case would be somebody else.

20        **MR. NORTON:**  So Professor Cockburn has previously

21   explained why he believes that the PatVal study does, in fact,

22   predict the distribution of value in the Sun portfolio.  It is

23   not merely an assumption.

24        **THE COURT:**  Where is that in the report?

25        **MR. NORTON:**  That's in his deposition testimony.

1          THE COURT:  In his deposition.  Where is it in the

2    report?  It doesn't count if it's in the deposition, except for

3    impeachment.  The report is the place where he's supposed to

4    lay it out.  Where is it in the report?

5          MR. NORTON:  In the report he explains that he has

6    used the PatVal survey.  In the report he does not say

7    specifically why he has concluded that the PatVal survey is the

8    best one.

9          THE COURT:  He didn't.  So his analysis in the report

10   has to come down to any randomly selected portfolio anywhere in

11   the United States is going to conform to the PatVal study.

12          Conceivably, the federal circuit could buy that.

13   But, to me, that is a remarkable proposition unless you're

14   saying it's going to, in general, conform.  That's not so

15   remarkable.

16          But when you say the top half percent of the top

17   1 percent is going to conform, that is, to me, a very high

18   confidence that I don't see where you do any confidence level

19   assessment, period.  There's none in there.

20          MR. NORTON:  Let me try to address two of the points

21   that Your Honor just made.  Three, in fact.

22          The first is that the justification for the reliance

23   on the survey must be in the report.  Respectfully, I don't

24   believe that that is the law.

25          THE COURT:  Well, tell me the law that says Rule 26

1  says every single opinion and every single justification has

2  got to be in that report.  You can't fill in the blanks at the

3  deposition.

4          **MR. NORTON:**  It would be an insurmountable burden of

5  disclosure if the reasons why a method are scientifically valid

6  had to be disclosed in the report itself.  One would not demand

7  that a ballistics expert justify the gravitational constant.

8  That's an easy one.

9          Nonetheless, it cannot be the case that the reasons

10 why the methodology is sound have to be disclosed in the report

11 itself.  And, in fact, I would be unable to do so right now,

12 but one can cite any number of Daubert opinions at which part

13 of the analysis at the Daubert hearing is, Well, what is the

14 literature?  What do other people say?  How --

15         **THE COURT:**  I read this literature.  Some of it,

16 anyway.  I agree with you to a point.  I agree that the curve

17 is going to show that at least the top 20 percent will have a

18 very disproportionate percentage of the value.  So let's

19 concede that right off the top.

20         That is -- if you took the example that I sent out

21 and asked you to do, the top 10 percent even, you've come up

22 with some lower numbers than you are asking for.  But the top

23 10 percent will have a disproportionate value.

24         And I think your studies -- your three studies come

25 out pretty close numbers on that.  But once you drop below

1   10 percent, the numbers begin to wildly diverge in the three

2   studies that are in the report and which, contrary to your

3   representation to me, he did say he relied in these paragraphs

4   I quoted to you.

5          And when you have that kind of divergence and only

6   three samples, then you have to ask the question, if we did a

7   fourth sample what are the odds it's even going to fall in that

8   range?

9          To my mind, it cries out for more samples.  And each

10  one of these patent portfolios is a sample.  And you've only

11  got three.  And you're talking about the very tip of the tail.

12  Not the 20 percent.  The half percent of the 1 percent where

13  there are almost no data points.  And many statisticians would

14  call those outliers, and yet you want to build a case on the

15  outliers.  That's the problem.

16         All right.  I'm going to give you a couple more

17  minutes.  You're not convincing me very much.  Maybe I'm just

18  missing.

19         Listen.  What is the point of a Daubert hearing?

20  That your guy can just blow off -- just make an assumption that

21  one study is going to equal every single other patent portfolio

22  in the United States, and somehow that is a scientific

23  principle?  Where do you find that in the literature?  It's not

24  in the literature.  All that is in the literature is the basic

25  proposition that it's going to be disproportionate.  It is

1   not -- there's nowhere in the literature that it says that the

2   tip of the tail is going to be the same in every case.

3          Maybe you can find it.  But I don't see it there.

4          **MR. NORTON:**  We do not assert, nor do I believe we

5   need to assert, that the tip of the tail would be identical in

6   every case.

7          What we assert and what I think is sufficient under

8   *Lucent* -- which says that there's a degree of uncertainty and

9   approximation in this analysis -- and what's sufficient under

10  Daubert in *Kumho Tire* is that the study gives us enough

11  information that it allows an approximation of the

12  apportionment.

13         Now --

14         **THE COURT:**  A reasonable approximation.

15         **MR. NORTON:**  Absolutely, a reasonable approximation.

16         **THE COURT:**  A reasonable approximation.

17         **MR. NORTON:**  So when the Court says if we had another

18  study, well, in response to the Court's question we did

19  identify additional studies.  And those studies are on chart 4.

20  And those studies show that, in fact, there is a fairly tight

21  range for the additional studies even --

22         **THE COURT:**  After you conveniently leave off the

23  one -- you know, I don't know -- I can't imagine you thought I

24  was dumb enough not to realize you had left Barney off your

25  chart.  You know, your new chart.  I can't imagine that you

1    thought I wouldn't pick up on that.

2        **MR. NORTON:**  Your Honor, I fully expected Your Honor

3    to pick up on it.  I am prepared to address it, as is Professor

4    Cockburn.

5        Had we included the Barney study, it would simply

6    suggest the damages should be higher.  And I would expect there

7    would be an argument from Google counsel that that upper bound

8    outlier study should be disregarded.

9        But the point is, is the PatVal study a good

10   predictor of the distribution of patents even at the high end

11   of the range?  And if you look at the other studies which do

12   calculate these values -- they do calculate them, if you don't

13   limit yourself to the PatVal study but look at other studies,

14   you're going to get similar results.

15       Now, Google is free to come in and say, well, there

16   are other studies, and those other studies suggest a range, and

17   how can Professor Cockburn or the jury be confident that this

18   patent portfolio really looks like the others?

19       But it's going to be a dispute within that range.

20   And courts under Daubert have recognized that a certain amount

21   of uncertainty in the studies, variation in the inputs, is not

22   a reason to strike the analysis.  It goes to its weight.

23       Here, there is an argument to be made -- and Google

24   is certainly prepared to make it -- that the analysis suggests

25   a range of results.  But the fact that the analysis suggests a

 1  range of results doesn't make it unsound.

 2         There is a reasonable approximation here, which is --

 3  leads to damages that are a lower bound and upper bound that

 4  are within multiples of each other.  Okay.  And those are

 5  ranges that experts often present to juries.  The damages could

 6  be anywhere between X and 3X.  The fact there is a range

 7  doesn't, in fact, make the methodology itself unsound.

 8         There is a case, it is -- out of the District of

 9  Colorado, *Cook vs. Rockwell International Corporation*, 580

10  F.Supp 2d 1071.  And that really involved a class action trial

11  where the plaintiff class asserted they had been exposed to

12  plutonium from a nuclear plant.  And the Court allowed the

13  plaintiffs' expert to testify at trial about -- it was a dose

14  expert on the effect of radiation doses.

15         And there the challenge made by the plaintiffs, like

16  the argument that's been made by Google here, is that the range

17  implied by all the different studies about what is the safe

18  level of exposure to plutonium, the ranges were too big.

19         And what the Court said is, "It is undisputed that

20  risk assessors commonly deal with such uncertainties in their

21  analyses, and that broad, estimated range of exposure, dose,

22  and risk may result from that.  The existence of such

23  uncertainties and the consequences that flow from them in

24  estimating plutonium exposure, dose, and health risk may affect

25  the weight to be accorded to Dr. Fogel's testimony, but do not

1   provide a basis for finding his work and conclusions unreliable

2   within the meaning of Rule 702."

3           The standard here is not one of perfection.  And the

4   question is, even, you know, where the Court has correctly

5   identified that the top of the range is where there is the most

6   sensitivity, but it is still possible to make a reasonable

7   approximation based on those studies.

8           And it's possible for the adversary to come in and

9   say that reasonable approximation has to be discounted because

10  there are other studies that suggest the numbers should be

11  lower, and those studies are better.

12          They are better for some reason that an expert can

13  point to because, unlike the PatVal study, they don't have

14  23,000 observations, they have 50,000, 60,000.  Whatever

15  reason, they have to say that there is a better study that

16  better predicts patent value.

17          But that's a cross-examination question.  That's a

18  jury question, because we have a narrow enough range here that

19  the jury can make a determination which is the better fit.

20          **THE COURT:**  All right.  I need to let the other side

21  have their say on this point.  So I'll let you make one more

22  point, and then we'll hear from the other side.

23          **MR. NORTON:**  It is not simply Dr. Cockburn coming in

24  and saying that this study is the best study.  He's pointing to

25  the attributes of the study itself, the attributes --

```
 1            THE COURT:  Here's one of the problems I've got now.
 2   It's like you're trying to bring in a brand-new report.
 3   Exhibit 34 is what he said he relied on before.  There were
 4   three studies, including Barney.  All right.
 5            Is it fair now to say, okay, we're going to junk that
 6   and we're not going to rely on Barney; we are throwing that out
 7   and now we've got these other studies?
 8            Yes, it's true that I asked to see the other studies.
 9   I wanted to see what the literature requires here or suggests
10   here.  But in fairness to the other side, don't we have to go
11   back to square one now?  Or do we toss out this report as --
12   you're changing the report.
13            MR. NORTON:  Absolutely not, Your Honor.  Let's say
14   that this were a case where the issue had to do with exposure
15   to some carcinogen.  And the expert came in and said, I have
16   one study.  I have one study that I rely upon that was
17   conducted by the National Institutes of Health.  It was done by
18   the best people.  It went on over a number of years.
19            THE COURT:  And concluded what?
20            MR. NORTON:  And it concluded that there is a
21   correlation between exposure to this carcinogen and cancer.
22   And I, as a result, have a -- can conclude to a reasonable
23   certainty that, in fact, the plaintiff's exposure to this
24   carcinogen could have been the cause of their ultimate cancer.
25   One study.  It is a gold standard study.  It is the best study
```

 1   out there.  I don't know of any better.  All the best people

 2   worked on it.  This is the one I rely on.

 3           And the other side comes in and says, Well, you know,

 4   one study.  How can you rely on one study?

 5           And so then the Daubert challenge is, is it -- is it

 6   reasonable as a matter of science or as technical knowledge, is

 7   it reasonable to draw those conclusions from that single study?

 8           Well, what reasons are there to assume that it is

 9   not?  Are there other studies that come to different results?

10   Is there a methodological flaw in the underlying study on which

11   the expert relied?  Would a cancer researcher not rely upon

12   this particular study in trying to assess carcinogenic effects?

13           Those are the questions that would be asked.  But the

14   fact there is a single study doesn't mean that the study is a

15   bad one, and doesn't mean that you can't draw conclusions from

16   it.

17           So, Your Honor, we're not asking to put in these

18   other surveys.  We are asking that the Court recognize that

19   when one looks to other surveys they tell us that the PatVal

20   survey is an awfully good one.

21           THE COURT:  Let's hear from the other side.

22           I would like for -- and your name is what?

23           MR. PURCELL:  Dan Purcell, Your Honor.

24           THE COURT:  Mr. Purcell, I want you to start by

25   addressing the chart counsel handed up, the chart that leaves

1    off Barney.

2          I understand it leaves off Barney.  Counsel's point

3    is that these other studies have a similar curve, and the range

4    is not as wildly varying as I had suggested earlier.

5          So my question to you is, what's your answer to this

6    tab number 4, that counsel has handed up?

7          **MR. PURCELL:**  Our answer to that is pretty much what

8    was in our brief, which is that these studies are a bad fit for

9    the portfolio that we actually have here.

10         Your Honor was talking about randomly-selected

11   portfolios and how would I know that the PatVal study would map

12   to a randomly selected portfolio.

13         The Sun portfolio here is not randomly selected.

14   Perhaps, if Oracle had looked at the entire 14,000-some patents

15   that Sun had at the time Oracle acquired Sun, that would be

16   randomly selected.

17         What they did, instead, was winnow those 14,000 down

18   to 1300 that might be relevant.

19         **THE COURT:**  I don't want to get into, yet, the way in

20   which they ranked the Sun portfolio.

21         **MR. PURCELL:**  I'm not talking about ranking, Your

22   Honor.  I'm just talking about the winnowing down of a randomly

23   selected group of patents to a narrowly focused group of

24   patents that are specifically relevant to a technology area.

25         And there actually is one study in the binder that

```
 1  Your Honor has, the larger binder.  It's at tab 11.  It's the
 2  Schankerman study.  And I have --
 3          THE COURT:  I don't have any tab 11.
 4          MR. PURCELL:  The larger binder, the thicker binder
 5  with the studies in it.
 6          THE COURT:  This?
 7          MR. PURCELL:  Correct.  And I actually have a loose
 8  copy of it here, if that would be easier, along with --
 9          THE COURT:  No, I have it here.
10          MR. PURCELL:  -- our demonstratives.
11          THE COURT:  I want to make sure I understand what you
12  just said, though.
13          I don't think you're coming to grips -- or maybe I
14  just don't understand it -- with counsel's point.  I'm going to
15  hold up this chart.  You see he's got this chart.
16          MR. PURCELL:  I do.
17          THE COURT:  And the colored lines, they vary somewhat
18  but they vary maybe 20 percent, not 50 percent.
19          And, oddly enough, when they get down to the tiniest
20  numbers, the variation is less than when it's up higher, for
21  some strange reason.
22          But down at the 1 percent level the variation is 52,
23  42, 42, 44, 48.  So what they are suggesting is, all right,
24  that's pretty good proof that if we looked at the Sun portfolio
25  that the top 1 percent of the patents would be in that range of
```

```
1    42 to 52 percent of the overall value.

2            Now, I don't hear you -- what is so special about the

3    Sun portfolio that would distinguish it from these five

4    portfolios?

5            MR. PURCELL:  The answer to that is that they are

6    looking at the wrong portfolio.  They are not looking at the

7    Sun portfolio.  They are not looking at all of the patents that

8    Sun had, which would be equivalent to this randomly selected

9    group of patents that were studied in these studies.

10           What they've done is specifically selected a

11   subcategory of patents that are relevant to this technology

12   area and that are presumptively more valuable to Google during

13   the course of a hypothetical negotiation.

14           THE COURT:  So I see your point.  So Sun actually had

15   more than 597 patents.

16           MR. PURCELL:  Correct.

17           THE COURT:  How many did it have?

18           MR. PURCELL:  In the -- the number that was reported

19   at the time of the Oracle acquisition of Sun was around 14,000

20   total patents.

21           THE COURT:  So what you're saying is if we looked at

22   the 14,000 -- I don't know if you're conceding it or just

23   saying, even if the 14,000 portfolio would be in the range of

24   this multi-color chart, we're not dealing with 14,000, we're

25   dealing with 597 that were specially selected to enable the
```

```
 1  smartphone --
 2          MR. PURCELL:  Right, correct.
 3          THE COURT:  And so, therefore, -- doesn't that
 4  mean -- doesn't that sort of indicate that all of the 597 would
 5  be more valuable?  Or would they be less valuable?  What is
 6  the -- what effect would that self-selection have on the
 7  analysis?
 8          MR. PURCELL:  Well, what they've done, what Google --
 9  sorry, Oracle has done by the methodology Dr. Cockburn has
10  used, they've got rid of all of the chaff.  They have got rid
11  of all the patents that are the least valuable in the context
12  of a hypothetical negotiation.  So you're starting with a pool
13  of patents that are presumptively at least of some value to
14  Google.  And then they winnowed those down and selected the
15  ones that are the most valuable.
16          So what they've done, essentially, is they've gotten
17  rid of the patents that are in the 14,000 pool, that are of the
18  least value.  And so you're starting with a pool of patents
19  that are all presumptively more valuable, which is inflated in
20  number.
21          THE COURT:  So you're saying that of 597, the least
22  of the 597 are of greater value than the least of the 14,000?
23          MR. PURCELL:  Presumably, yeah.
24          I think it's actually 569, Your Honor, that are in
25  the narrowed portfolio, are presumably already in the top
```

 1  10 percent of the 14,000, at least in the context of this

 2  hypothetical negotiation.

 3          **THE COURT:**  Therefore, the value of the hundred

 4  million should be more evenly distributed over the 569 than if

 5  you were distributing it over -- because the hundred million

 6  dealt with the 569, not with 14,000.

 7          **MR. PURCELL:**  Correct.  This is a -- not an argument

 8  about the results of these studies.  I mean, the results of

 9  these studies are accurately captured on the chart.  We're not

10  quarreling with those.  What we're saying is these studies are

11  a bad fit for the portfolio at issue here.

12          And the one point I wanted to make has to do with the

13  Schankerman study, which we passed up a copy to Your Honor.

14  This is the one that's at tab 11.  And the demonstrative slides

15  that we also handed you, slides 2 and 3 in that slim packet,

16  talk about Schankerman.

17          What Schankerman did alone, I believe, among the

18  studies in that binder was actually do what we suggested ought

19  to be done in our brief, which is look at a specific technology

20  area and see if the skew is different or the same in that

21  technology area as it is across the entire spectrum of patents

22  generally.  A better faucet.  A better mousetrap.

23          And what Schankerman did -- and this is slide 3 of

24  the slides that we handed up -- was look at how the skew works

25  in different industries.  And Schankerman looked at four:

1    electronics -- which is the closest thing we have here; this is

2    an electronics product, the smartphone -- pharmaceuticals,

3    chemicals, and mechanical.  And in all those industries there

4    was skew.

5              Again, we're not doubting the existence of skew.

6    Obviously, a lot of patents are really not very valuable at

7    all, and a small number are very valuable.  But the range is

8    different and lower in these industries than any of the studies

9    that are in the binders.

10             And what Schankerman found is in the electronics

11   industry the top 1 percent of patents only account for about

12   24 percent of the value.

13             **THE COURT:**  Where is that in your report?

14             **MR. PURCELL:**  This is the slide 3 of the

15   demonstratives.  And it's Schankerman at 95 and 96.

16             **THE COURT:**  Well, let me -- I'm open to Schankerman

17   now.

18             **MR. VAN NEST:**  We handed up a small set of slides,

19   Your Honor.  They look like this.  I'm sorry --

20             **THE COURT:**  Oh.

21             **MR. PURCELL:**  Right.  So there's a summary chart at

22   slide 3.  The third page of our demonstratives summarize it.

23   But it's at pages 95 and 96 of the Schankerman article.

24             And so what we see from Schankerman is that in the

25   electronics field 24 percent of the value is in the top

```
 1   1 percent, 55 in the top 5 percent.  Which is a significantly

 2   lower value than in the studies that Dr. Cockburn used, which,

 3   again, don't attempt to focus on the technology area at issue

 4   here.

 5           And that was the beef that we raised in our brief,

 6   which was, why did you look at a random sampling of patents

 7   across technology areas, not a single company portfolio?  Why

 8   didn't you focus your inquiry on what exactly was going on

 9   here?

10           Schankerman tried to do that and ended up at a

11   significantly lower number.

12       THE COURT:  All right.  So what other issues do you

13   want to raise before you get to the way in which the company

14   ranked the patents, and just based upon the curves, the tip of

15   the tail and all of that?  What other issues do you want to

16   raise?

17       MR. PURCELL:  Your Honor, I don't have anything

18   further to say about the studies.

19       THE COURT:  Mr. Norton, what is your answer to

20   Schankerman and the point that counsel just made about the

21   14,000 versus 569?

22       MR. NORTON:  So let me start with the 14,000.  First,

23   the number is misleading.  It's 14,000 worldwide patents, which

24   counts every patent issued by a separate country as a unique

25   patent.  So 14,000 --
```

1          **THE COURT:**  How many were in the USA?

2          **MR. NORTON:**  I did not know the answer to how many

3   U.S.-issued patents Sun had in 2006.

4          **THE COURT:**  Was it more than 569?

5          **MR. NORTON:**  Absolutely.

6          So, then, Google counsel's argument was that the 569

7   are disproportionately valuable.

8          There is no basis for that assertion, which is

9   contrary to the testimony of the JAVA engineers.

10          What the JAVA engineers testified they did was they

11   had -- asked for a word search for every patent that had the

12   word "JAVA" in it, "bite code" in it, or had been identified as

13   an inventor, Mr. Gosling or Mr. Fresko, and limited those to

14   the patents that were issued prior to June 2006.

15          Once they had that set of patents, they said, well,

16   which ones are smartphone patents?  Not, which ones are

17   valuable patents?  Just, which ones are smartphone patents?  So

18   it's a portfolio that's limited to a technology area, but it is

19   limited to more valuable patents.

20          And Google's assertion, which they have made

21   repeatedly in the briefs, is somehow these were selected for

22   value to Google is just false.  There is no basis for it

23   whatsoever.

24          And that is their entire argument for why this

25   particular portfolio shouldn't look like the distributions we

1    see in the studies.

2            So with respect to the Schankerman study, the

3    demonstrative Google handed up you will see you have

4    electronics, pharmaceuticals, chemical, and mechanical.  And

5    you will see electronics actually have a higher degree of skew

6    in the Schankerman study than other industries.

7            And that's important because what it suggests is that

8    if we had used, instead of the PatVal study, a study that

9    provided a curve for the electronics industry alone -- because

10   PatVal has lots of different kinds of patents -- that the

11   PatVal study would suggest higher results.

12           And the reason for that is that there is a

13   significant methodological difference between what

14   Mr. Schankerman did -- I'm sure it's Dr. Schankerman -- what

15   Dr. Schankerman did and what the authors of the PatVal study

16   did.

17           And the difference is that the Schankerman study is

18   based on renewals.  And, as Dr. Schankerman explains in the

19   study itself -- and do we have a copy of the binders?  Thank

20   you.

21           The challenge of the renewal survey -- and Professor

22   Cockburn is more than prepared to explain the methodologies of

23   these different surveys.  But the renewal surveys, what they do

24   not do is break down in a granular fashion the patents at the

25   top of the range.

1              So what they tend to do, and what I believe

2    Dr. Schankerman's study does, is it says, well, how many

3    patents are above X?

4              And if you don't make X big enough, then it doesn't

5    allow you to draw very fine conclusions about the value of the

6    patents in the top 1 percent or 5 percent.  It tends to -- all

7    of the renewal surveys, renewal studies, will tend to flatten

8    the curve at the top end of the range.

9              And they do so because there is a systematic bias in

10   every single one of those surveys, because rather than to

11   continue to ask, how much is your most valuable patent worth,

12   they say, how many patents do you have that are worth more than

13   X?  Because that's what they're interested in knowing.

14             That's fine for their purposes.  But what they don't

15   do is go all the way up to figure out, well, where are the most

16   valuable patents?

17             And so the Schankerman study, as one would expect,

18   has a flatter distribution curve than the surveys because

19   surveys test the actual value of the patents that are being

20   measured.

21             But what's interesting about Schankerman is that

22   Schankerman tells us that applying that methodology

23   consistently across industries, we see a higher degree of skew

24   in the electronics industry than in pharmaceuticals, chemicals,

25   and mechanical industries or mechanical patents.

```
 1            And so what that tells us is that if you correct
 2   Dr. Schankerman's methodology, and did it as a survey, one
 3   would expect that electronics patents would be more skewed.
 4            And to the extent that electronics in this context
 5   includes software patents or smartphone patents -- as it likely
 6   would -- I would suggest that the PatVal study is probably a
 7   conservative approach.
 8            I think I have responded to Mr. Purcell's points.
 9            THE COURT:  All right.  Thank you.
10            At this point we are going to change the subject and
11   go to the next step of the analysis, which is the ranking by
12   the in-house engineers.
13            So let's hear from Google on what your arguments are
14   against that and why it would be so unreliable.  And keep in
15   mind that I'll let your side use in-house people.  And you said
16   that was fine, and I agreed with you.  But now it seems like
17   whenever the other side does it you're somehow offended.  So
18   you've got to explain that part.
19            MR. PURCELL:  Let me clarify that, Your Honor.
20            We are not saying that it is improper for Oracle to
21   use in-house people.  We recognize that that's a bias issue for
22   cross.  We're content to leave that for trial.
23            The only point we were making was the point, really,
24   that I just made, which was that what Oracle did was select
25   from a much larger group of patents a group of patents that are
```

1   presumptively more valuable to Google because they relate to

2   the technology Google was trying to commercialize.

3           Google is not building a car here.  Google is not

4   building, you know, a sewer system.  Google is building a

5   smartphone platform.  So when Oracle selects smartphone-related

6   patents, they are necessarily selecting a group of patents more

7   valuable to Google's purpose.

8           And Oracle used engineers not only to do that, just

9   inherently, they used engineers that had a background in

10  preparing the case for litigation.  And they admitted at

11  deposition that they weren't able to put away that experience

12  and they, in fact, did rely on that.

13          So it goes to the selection of the portfolio as a

14  Daubert issue.  Beyond that, it's a point for cross at trial.

15  So I don't know that there's a whole lot to add to the argument

16  that I just made.

17          I do want to point out one other thing, though.

18  Mr. Norton was trying to draw a distinction between surveys and

19  citation -- sorry, renewal studies.

20          The Barney study that Dr. Cockburn relied on was a

21  renewal study, and it had a much, much higher -- higher-sloping

22  curve that had the top 1 percent in the 90 range.  But that's

23  all I have to say, really, about the engineers.

24          **THE COURT:**  Sounds like -- it does sound like that is

25  just a cross-examination point.

1          **MR. PURCELL:**  As I said, Your Honor, it is,

2   primarily.

3          The only relevance it has to Daubert is in the

4   selection of the portfolio and whether or not the studies

5   Dr. Cockburn used are a proper fit for the portfolio that's at

6   issue here, which isn't a random sampling, which was prior

7   vetted by Oracle engineers for value to Google in the context

8   of the hypothetical negotiation.

9          **THE COURT:**  All right.  I'm going to take that as a

10  concession that your point is not very strong, and it's going

11  to be for cross-examination that the in-house people did the

12  ranking.

13         What's your next objection to the report?

14         **MR. PURCELL:**  Really, Your Honor, our objections --

15  the main one, which relates to both the independent

16  significance approach and the group and value approach in

17  Dr. Cockburn's report, is indeterminacy.

18         This is something we've been struggling with from the

19  beginning of the damages proceedings in this case.  The

20  independent significance approach, he says 25 percent of the

21  portfolio at least with respect to the patents, 12 and a half

22  at least with respect to the copyrights.

23         At deposition, when he was asked what does "at least"

24  mean he said, well, the patents could be 50 percent, they could

25  be more; the copyrights could be a hundred percent of the value

1  because it could have been the case that without these APIs

2  Google could not have commercialized Android at all.

3          So we don't want to be in a situation where

4  Dr. Cockburn has the freedom going to trial to say damages

5  could be 17 million; they could be 600 million; they could be

6  the entire value of the portfolio.

7          And that's the objection under the independent

8  significance approach, is that there's absolutely no limit to

9  it.  And there's also absolutely no methodology.  It's just:

10  Here, I looked at all of the evidence in the case.  I

11  synthesized it, and the number that came out of my brain was

12  25 percent.

13          That's not replicable by anyone else.

14  **THE COURT:**  In his report -- let's be clear what you

15  extracted in the deposition on cross-examination versus what's

16  in the report.

17          I want to say to you, at trial you experts will

18  only -- you have to stick to chapter and verse of what's in the

19  report.  You cannot even get into what's in the rebuttal reply

20  report.  You must limit yourself to the conclusions in the

21  original report.

22          And I'll keep it up here, and if somebody says,

23  "Beyond the scope of the report" I sustain that objection.  I

24  turn to you and say, Where are those words in the report?  And

25  if those words are not in the report, or something very close

1  to it, it is stricken.

2          Now, the problem, though, is on cross-examination the

3  lawyers will often go way beyond what's in the report.  They're

4  not -- the expert is not limited to what's in the report, just

5  like you're not limited to what's in the report on

6  cross-examination.

7          So if you want to get into things that he didn't

8  opine on in the report, that's your problem; isn't it?

9          **MR. PURCELL:**  I understand the danger of opening the

10  door, and that would be our problem.

11          But what we are moving on is to try to limit him to

12  what's in the report at least for purposes -- if Your Honor

13  says he can offer --

14          **THE COURT:**  Of course, he's going to be limited.   In

15  the report he doesn't give -- does he give up -- does he say

16  "at least" and then give some number?  I don't think so.

17          **MR. PURCELL:**  He just says "at least."

18          **THE COURT:**  Then that's what he'll say at trial.   And

19  if he tries to go one inch beyond that and you object, I'll

20  sustain the objection because you cannot do that.

21          Now, the problem is, again, though, on

22  cross-examination if you open the door he can walk right

23  through it and say things that are not in the report.

24          **MR. PURCELL:**  The problem with "at least" is that it

25  doesn't give any guidance to the jury.  It gives the jury one

1  number, but then what does "at least" mean?

2      **THE COURT:**  There are many situations where somebody

3  is permitted to say "at least."  They can have a lot of

4  confidence that a number is at least X, and it could be higher.

5  That happens all the time.  What's wrong with that?

6      In other words, they're trying to be conservative.

7  They say the number is at least X.  And they have a lot of

8  confidence that that number can't be attacked.  So that's what

9  they go with.  But then on cross-examination they say, well, I

10  guess if you test me on this, it could be higher.  It could be

11  2X.

12      But you're calling for a level of precision that I

13  don't think the law does require that.  So long as he doesn't

14  go beyond what's in his report, then you have the tough choice

15  how you're going to cross-examine him.

16      Believe me, if you ask the right question or the

17  wrong question I'm going to let him say whatever he wants to

18  say in response.

19      **MR. PURCELL:**  Fair enough, Your Honor.

20      The group and value approach, if I can move on to

21  that.  It has to do -- again, we're talking about a very broad

22  range here of three times, three and a half times as much

23  damages at the high end versus the low end.

24      The problem that we see there is that the upper bound

25  of the report depends on an assumption that the three patents

1  that Dr. Cockburn identified -- or, rather, the Oracle

2  engineers identified as being in the top 22, that's the '104,

3  the '205, and the '720 patents, are, in fact, the three most

4  valuable patents in the entire Sun portfolio.

5      **THE COURT:**  I'm sorry.  Show me where this is in the

6  report so I can -- it's kind of ringing true but -- is that

7  paragraph 409?

8      **MR. PURCELL:**  Your Honor, I'd have to look at the

9  report.  Again, this is something that was further fleshed out

10  at deposition, I think.

11      **THE COURT:**  I want to stick with what's in the report

12  first, and then maybe we get into the deposition.

13      **MR. PURCELL:**  Well, actually, Your Honor, paragraph

14  409 makes my point, the point that I wanted to make, which is

15  that there is no data to distinguish among the top 22 patents.

16  And Dr. Cockburn concedes that.  He said that the Oracle

17  engineers basically told him, no, we can't break it down any

18  further than that.  All those 22 patents are roughly equally

19  valuable.

20      When we asked the engineers about it at their

21  depositions, they said:  We have to do a lot of testing.  We

22  haven't done it, and I'm not even sure you could do it.

23      And so the lower bound of the report assumes,

24  basically, that those 22 patents are equally valuable.

25      **THE COURT:**  Where is the lower bound?

```
 1              MR. PURCELL:  The lower bound is the 17.7 million, I
 2   believe.
 3              THE COURT:  I need to see the report.
 4              MR. PURCELL:  All right.
 5              THE COURT:  I'm sure it's here somewhere.
 6              MR. PURCELL:  I think the easier place to find it
 7   probably is at the front of the report.  And this would be on
 8   page 3, paragraph 5.
 9         So the group and value approach on the patents leads
10   to a range between 17.7 million and 57.1 million.  So when I'm
11   talking about the lower bound, I'm talking about the
12   17.7 million.
13              THE COURT:  I don't see on -- page 2?
14              MR. PURCELL:  Page 3, Your Honor.
15              THE COURT:  Page what?
16              MR. PURCELL:  Page 3.
17              THE COURT:  3.  All right.
18              MR. PURCELL:  Sorry.
19              THE COURT:  And then what paragraph do I look at?
20              MR. PURCELL:  It's line 7 in the chart at the top of
21   page 3.
22              THE COURT:  All right.  Adjust downward to limit
23   damages to accused devices.  17.7 million to 57.1 million.
24         All right.  I see that.  Now, so what accounts for
25   that range?
```

```
 1          MR. PURCELL:  Well, I don't believe this is really

 2   spelled out in the report, to be honest.  And Oracle can

 3   correct me if I'm wrong.

 4          The explanation we got at the deposition is that the

 5   lower bound would be an appropriate jury finding if the jury

 6   concludes that the top 22 patents are roughly equally valuable.

 7          The upper bound would be an appropriate result if the

 8   jury concludes that the '104, '205, and '720 patents are the

 9   three most valuable patents in the portfolio.

10          And our argument here is that there is no support for

11   the upper bound.  The Oracle engineers have said, We can't

12   offer any foundational testimony suggesting that there's any

13   distinction in value among those patents.  We just can't do it.

14          And Dr. Cockburn hasn't cited anything.  There's

15   nothing in the report that would support that conclusion.

16          THE COURT:  All right.  Wait a minute.  I've got my

17   own chart.  I have -- I've got a different question.  Number

18   22.  There were 22 groups, then there were 22 top patents.

19   Those 22 22s have nothing to do with each other --

20          MR. PURCELL:  Correct.

21          THE COURT:  -- it's a coincidence.

22          MR. PURCELL:  It's a coincidence.

23          THE COURT:  This is a good trial point.  You should

24   never have that kind of coincidence.  It's going to confuse the

25   jury to no end.  I spent hours trying to figure that out.  You
```

1    should have 21 or 23.  But to come out with 22, it just sounds

2    like it's the same.  I kept saying, it doesn't sound like it's

3    the same, but why would it be 22?  Do you see the point?

4            MR. PURCELL:  I do.

5            THE COURT:  All right.

6            MR. PURCELL:  It's not our report.

7            (Laughter)

8            THE COURT:  Then you've got this business of the 1s,

9    2s and 3s.

10           MR. PURCELL:  Right.  So the top 22, the way that

11   that was explained that those were selected, those are all of

12   the patents that had a 1 ranking in the three most valuable

13   technology groups.

14           So out of the 22 technology groups, you take the top

15   three.  And then any patent in those three groups that had a 1

16   ranking is in that top range.  And that added up to 22 total

17   patents.

18           THE COURT:  But, wait a second.  I thought the -- all

19   right.  So the 22 top -- of the 22 top categories, there are

20   three.

21           MR. PURCELL:  Right.  The 22 total categories they

22   took the top three.

23           THE COURT:  And then there were 22 patents that were

24   ranked number 1 within those top three categories?

25           MR. PURCELL:  Correct.  And this actually is in the

1   report, Exhibit 33.

2          THE COURT:  All right.  I got that part now, but --

3   so you're saying that the testimony is that those top three

4   categories could not be distinguished among or ranked, I guess

5   is the word, ranked by the engineers?  Is that what you're

6   saying?

7          MR. PURCELL:  Correct.  Dr. --

8          THE COURT:  Read that testimony to me.

9          MR. PURCELL:  I would need to go --

10         THE COURT:  I asked you to come here prepared to do

11  it.  I wanted to hear the testimony without spin.  So I --

12  because if that's true, that's a very good point.

13         You find it.  I don't want to interrupt you while you

14  look for it.

15         MR. PURCELL:  Okay.  I have one cite for you.  This

16  is at paragraph -- page 105 of the Reinhold deposition.  This

17  is a direct quote.  He said:

18              "A quantitative analysis that would somehow

19              rank all of these patents in linear order

20              from 1 to 569 is actually intellectually

21              infeasible."

22         I would need to get the transcripts to read other --

23         THE COURT:  Where did he limit his answer to the 22?

24         MR. PURCELL:  I will need to get the transcript, Your

25  Honor.

1          **THE COURT:**  You said that they could not rank within

2    the 22.  That's what I want to hear.

3          **MR. PURCELL:**  Your Honor, we can pull the transcript.

4    I don't have it at the ready.  This was admitted, though, both

5    by Dr. Cockburn and the Oracle engineers.  The testimony is

6    unanimous on that.

7          **THE COURT:**  Who is going to answer for Oracle on

8    this?

9          Mr. Norton, I just want to hear one sentence.  Do you

10   agree with what counsel just said, that the top 22 could not be

11   ranked within those top 22?

12         **MR. NORTON:**  I have one sentence.  The engineers

13   could not distinguish between the top 22 patents based on their

14   technical significance based on what they would have known in

15   2006.

16         **THE COURT:**  So if that's true, then why do you -- why

17   don't you just assume they are all of average value of the top

18   22?

19         **MR. NORTON:**  Because their economic significance and

20   their technical significance as known to engineers are two

21   different propositions.  And Professor Cockburn is an

22   economist.  Dr. Reinhold is a computer scientist.

23         So what the engineers did is they said, if we were

24   sitting down with Google in spring of 2006, and we didn't know

25   yet what Google was going to do, we just knew that we had a lot

1   of patents, which patents do we think would be most important

2   to a smartphone platform along the lines of what Google said

3   Android would be in 2006.  And so with that information, these

4   are 22 very important patents.  And these would be ones that

5   Google would want to have available to it as the result of the

6   negotiation.

7          **THE COURT:**  Isn't that the way it should be done,

8   though?  We're talking about apportioning a number that was in

9   existence in 2006, to figure out how much of that was

10  attributable to these particular patents.  And the future had

11  not yet unfolded.

12         **MR. NORTON:**  Absolutely.  That is the right way to do

13  it, and that is why they did it that way.  So then the question

14  is, well, but is Professor Cockburn merely apportioning that

15  original 2006 negotiation, or is he doing a hypothetical

16  license negotiation under federal circuit law?  And it's the

17  latter.

18         So he now needs to make an adjustment.  And the

19  adjustment is disclosed in paragraph 410 of the report.  And I

20  have to -- Mr. Purcell said that Professor Cockburn says there

21  is no data, which is a little unfair.

22         What Professor Cockburn says, in the absence of data

23  you can't make a distinction.  Then he goes on in paragraph 410

24  and explains that we do know something.  Right.

25         What we know is that Google chose to use the

1   technology that is comprised by these specific inventions.  We

2   know this because Professor Cockburn is a damages expert and

3   he's going to take the stand at a point in which infringement

4   and validity are established.

5          Now, if this were a case in which Google said, We

6   closely examined the JAVA patents, and we tried to choose ones

7   that weren't necessarily all that great, but at least we

8   thought they were invalid or we thought we had to workaround,

9   you know, and it turns out we were wrong, but we didn't choose

10  these because they were so great, we chose them because we

11  thought we weren't infringing.  But that is not the case.

12         The evidence in this case is that Google maintains

13  that they didn't look at these patents.  They didn't consider

14  that.  So what we know is Google designed Android in the way

15  that Google thought best fit its business needs, its technical

16  and business needs.

17         And when it made those decisions, what technology

18  should we incorporate in Android -- it could have infringed any

19  JAVA patent.  They designed the Android however they want it.

20  They could have infringed any of those 22.  But they chose

21  specific functionality to incorporate into Android that

22  infringes those three patents in the top 22, not any of the

23  others.

24         **THE COURT:**  Doesn't that mean you're allocating more

25  of the 2006 bundle to the ones that they turned out later, in

1  the future, to infringe as opposed to -- to me, that sounds

2  like you're apportioning the original number, more of it, to

3  the ones that happened to be infringed.

4         **MR. NORTON:**  I think the better way to describe it

5  is, no, there are two steps.  The first is an apportionment

6  step, which is in the 2006 negotiation in which Google would

7  have obtained rights to a collection of patents -- and the

8  collection of patents was never specified in the parties'

9  negotiations.  Right.

10         What they said was Google would get the rights to the

11  Sun technology that it ultimately incorporates into Android and

12  releases under an open source license.  So they would have been

13  able to choose the stuff they wanted, but they wouldn't have

14  gotten everything.  They just would have gotten the right to

15  open source the things they actually used.

16         But what we're trying to do is apportion the value --

17  Google is basically buying -- in 2006, they are buying a whole

18  bunch of options.  They are buying options to use a lot of

19  different patents.  And they are going to choose a smaller set.

20         So we are going to apportion the value of that bundle

21  across the patents and other components.  And when we do that,

22  we see that these 22 patents and the patents in general are an

23  important part of that bundle.

24         But then we have to do something different, right?

25  Because Google didn't take that deal.  Google said no to that

1    deal.  Wanted to just go ahead on their own.  And, instead,

2    they infringed, we would say, five patents.

3            So focusing on the three that are in the top 22, now

4    what Professor Cockburn has to do is say, if they had just been

5    negotiating for those -- let's focus on the three in the top

6    22 -- if they had just chosen those three to negotiate for, and

7    said these are the ones we want, well, then that tells us that

8    those three are the most important to Google.

9            We know that these are more important than the others

10   because when Google decided how to design Android free from

11   constraint -- we are just going to make Android the way we

12   want -- they chose to incorporate this technology.

13           And there needs to be an adjustment made in the

14   hypothetical negotiation to account for the fact that Google

15   selected these inventions and not others.  And that's described

16   in paragraph 410 of the report.

17           In his deposition, Professor Cockburn used the term

18   "revealed preference" to describe the same phenomenon.  But

19   that's what it is.  It's Google's revealed preference.  Their

20   actions tell us what they thought was important.  And what they

21   thought was important is what is valuable.

22           So that is an additional piece of information that

23   the engineers lacked for purposes of this apportionment

24   analysis but that Professor Cockburn would be remiss to ignore.

25           And we also -- we know more, frankly.  What the

1   engineers did was they said, well, based on our experience with

2   JAVA and the technology described by these patents, what kind

3   of benefit would we expect this patent to provide to a

4   smartphone platform?

5          And if they thought it would provide a very

6   substantial benefit based on their experience in order of

7   magnitude over leaving it out, then they gave it a 1.

8          But that's what their expectation was.  For the

9   asserted patents, we know -- it's not guesswork.  We now know,

10  and Google would have known at the time of the hypothetical

11  negotiation, that these particular patents are, in fact, very

12  valuable to a smartphone platform, because at the time they

13  commenced to infringe it would have been possible for them to

14  conduct the same kinds of studies that JAVA engineers have

15  conducted in this case, which show enormous benefits from using

16  these patents.

17         So we know that these patents are not just patents

18  that --

19         **THE COURT:**  You said that the engineers could not --

20  thought all 22 patents were important, and could not

21  distinguish among them just based on the engineering, right?

22         **MR. NORTON:**  I did say that, and that is correct.

23         **THE COURT:**  So if we put ourself back in 2006, why

24  would the Google engineers have been able to be more precise

25  than your own engineers are now?

1          **MR. NORTON:**  Well, because it's partly the artifice

2    of the exercise and partly the limitations on what Sun/Oracle

3    engineers know versus what Google engineers know.

4          So the exercise the engineers did was, if we were

5    looking at this in 2006, which patents would you expect to be

6    valuable based on the product requirements document and the

7    other information Google gave Sun back at that time?

8          So not knowing as much as Google, in fact, knew.

9    Because -- and not even knowing as much what Professor Cockburn

10   knows because we have a protective order in this case and I

11   can't show Sun engineers, those JAVA engineers, all the

12   internal documents from Google which explain precisely what

13   Google was going to do.

14         **THE COURT:**  But do you have 2006 e-mails and

15   documents that reveal that these three patents were going to be

16   the ones that they were likely to infringe?

17         **MR. NORTON:**  These three patents, no.  I don't have

18   that and don't need that.

19         What I have is the internal documents and the

20   documents that they actually gave to Sun that say, this is,

21   basically, what Android is going to look like.

22         **THE COURT:**  What year is that?

23         **MR. NORTON:**  2006.  Because they provided a document

24   called the "product requirements document," which they gave it

25   to Sun.  And it sketched out, and here are the things that

1  Android will have, and here is how we want to do it, and this

2  is what the virtual machine will look like, the JAVA virtual

3  machine, and these are the things we need you to do.  And it

4  spelled it out.

5          And there were discussions, and then people at Sun

6  began to create work plans for, How do we to do our part of

7  this job?  What will we need to contribute?  How many engineers

8  will we need?  And so on.

9          So the engineers looked over those documents and

10  said, okay, we have a sense now for back in 2006 what everybody

11  was thinking about.  And that helps us identify which groups of

12  technology, those 22, would have been relevant, and which

13  particular patents would have risen to the top in the parties'

14  discussions.  But we don't have enough information to say, oh,

15  they would have used, you know-- for boot, they would have

16  chosen these particular patents.  They would have used our

17  in-class technology as opposed to some other technology.  They

18  would have had choices.  And the engineers weren't able to say,

19  we could predict, based on what we know, we the engineers know,

20  what Google would do.

21          **THE COURT:**  But are there e-mails internal to Google

22  from 2006 that were not provided to Oracle at that time, but

23  which zero in on these three patents or the technology that

24  were internal to Google, which would lead us to believe that

25  even at the time of the hypothetical negotiation Google knew

```
 1  good and well these are the three patents it was going to

 2  infringe or it was going to need?

 3          MR. NORTON:  Not in the way Your Honor phrased it,

 4  because there's -- there are no documents in which Google says,

 5  We are going to infringe the '104.

 6          THE COURT:  Or that, We need this technology.

 7          MR. NORTON:  What I would say -- but I would answer

 8  Your Honor's question yes, in this sense.  There are the

 9  documents that have been analyzed by the technical experts,

10  which show that by 2006 Google had begun to infringe.

11          So, Google had chosen this technology by 2006.  They

12  had built it into Android.  And that's why they're infringing.

13  So the -- there are e-mails that say, we need --

14          THE COURT:  2006 they were infringing, is that

15  your --

16          MR. NORTON:  It is not the same for every patent

17  but -- and I can't --

18          THE COURT:  These three, were they infringing these

19  three?

20          MR. NORTON:  Not all of these three.  But I believe

21  by 2006 they had already begun to infringe the '104.

22          This is not an issue that is in dispute between the

23  damages experts in the sense that Professor Cockburn has a

24  hypothetical negotiation in spring of 2006, and Google doesn't

25  contest that that is the date on which the negotiations take
```

1   place; although, their experts do assume that Google waited

2   until longer to infringe some patents.  But, there was

3   infringement as early as 2006.

4          So we do have documents from Google at the time that

5   they begin to infringe, that, of course, show that they chose

6   this particular technology to incorporate in Android.  That's

7   how they infringe.

8          **THE COURT:**  I've got to let the other side respond.

9   Thank you.

10          What do you say to that over there, Mr. Purcell, that

11   the -- in the hypothetical negotiation, yes, it's true that the

12   engineers can only give a broader, more crude group of 22, but

13   that Google going into those negotiations would have had better

14   information as to the ones that it needed, and that it's

15   reasonable to presume that it would have known that it needed

16   the ones it was about to infringe?  What's wrong with that

17   analysis?

18          **MR. PURCELL:**  Well, all they have to go on is this

19   product requirements document which shows Google's expectation,

20   which doesn't say anything about specific patents.  It doesn't

21   say anything about specific functionalities.  It talks about

22   the general structure of what Android would be.

23          And, really, their argument is circular.  Their

24   argument is that the three most valuable patents are three of

25   the patents that they chose to accuse Google of infringing in

```
 1  this case.  But if you want to talk about revealed preference,

 2  this case, as Your Honor knows, originally involved seven

 3  patents.  Four of those seven aren't in the top 22.  One of

 4  them, the '520, which is still in the case, is somewhere down

 5  around number 100 among the 569.

 6          So it's obviously not the case and can't be the case

 7  that you can just look at what Oracle alleges Google has done

 8  in the way of infringement, and infer from that that you've got

 9  the most valuable patents.

10      THE COURT:  But you don't want to argue to the jury

11  that you infringe even more and, therefore, your logic is not

12  right.  That would mean you owe more money, not less money.

13      MR. PURCELL:  Well, we obviously don't plan to argue

14  to the jury that we infringe the patents we have been accused

15  of infringing.

16          But even using Oracle's logic, which is that the

17  patents that they've accused us of infringing are necessarily

18  the most valuable to Google because they reveal Google's

19  preference, their own damages report doesn't support that.

20      THE COURT:  But you deny you infringe anything.  So

21  those accusations just cancel each other out.

22      MR. PURCELL:  That's my point, Your Honor.  Their

23  argument is based on the patents they have chose to infringe.

24  So I don't think it has any probative value at all, this

25  business of revealed preference.
```

1        **THE COURT:**  But if they prove that you infringe those

2    three -- that's the assumption we have here.  We don't get to

3    damages otherwise.

4        If they prove that these three have been infringed,

5    then why isn't it a reasonable assumption to presume that the

6    negotiator in 2006, from Google, would have known that in due

7    course Google was going to need a license for those three

8    patents; and, therefore, be willing to pay a little more for

9    those three patents than for the others?

10       **MR. PURCELL:**  There are a couple of reasons why.

11   Number one is that I believe one of the top three -- I think

12   it's the '720 didn't even exist, wasn't issued until 2008.  So

13   it wasn't in a fact at the time of the hypothetical

14   negotiation.

15       **THE COURT:**  I didn't know that.  Say that again.

16       **MR. PURCELL:**  I believe the '720 Patent wasn't issued

17   until 2008.

18       **THE COURT:**  How could there be infringement of that

19   until it's issued?  Right?

20       **MR. PURCELL:**  There isn't.  Both experts have assumed

21   that the proper date for the hypothetical negotiation was in

22   2006 when --

23       **THE COURT:**  That's what you wanted.  Please don't

24   back up.  The other side was willing to go with a much later

25   date, and you argued for 2006.  Right?

1      **MR. PURCELL:**  That was the date of first infringement

2   of one of the patents.

3      **THE COURT:**  So if you want to push the date back so

4   that -- I'm pretty sure you don't want to do that, but if you

5   want to push the date of the hypothetical negotiation back,

6   we'll reopen that subject.

7      **MR. PURCELL:**  There are a bunch of different ways

8   that Google could have gone in 2006.  There are a bunch of

9   different paths that it could have taken.  There's not any

10  evidence that suggests that Google, at the time of the

11  hypothetical negotiation, focused on these specific patents or

12  this specific technology.

13     **THE COURT:**  Maybe the way to deal with this problem

14  is for your experts -- not experts, but your real witnesses,

15  instead of these hired gun experts, your real witnesses will

16  come in and say, I was there at the time.  We didn't even think

17  about this.  We could have designed around all of these

18  problems.

19     **MR. PURCELL:**  And there will be testimony to that

20  effect.

21     **THE COURT:**  The e-mail that Mr. Reinhold came up with

22  will be quite important, at that point.

23     **MR. PURCELL:**  Well, remember that was in 2010.  That

24  was many years later.  That was after a lock-in.

25     **THE COURT:**  All right.  You can maybe make that point

```
 1   to the jury.

 2            MR. PURCELL:  We will.  We will.

 3            The other thing that I should mention regarding the

 4   2006 time frame it -- well, actually, Your Honor, unless you

 5   have any specific questions I think I'll stop there.

 6            THE COURT:  All right.  What is your next objection

 7   to the report?

 8            MR. PURCELL:  Our next --

 9            THE COURT:  My court reporter is looking at me like I

10   need to take a break.  It's time for a break so the court

11   reporter's fingers can rest.

12            You be thinking about what your next point is going

13   to be, and then alert the other side so they can be thinking,

14   too.

15            We'll take 15 minutes.

16            MR. NORTON:  Your Honor, one question.  Your Honor

17   asked me to respond to particular points in Mr. Purcell's

18   presentation, but not to its entirety.  And he has made

19   arguments that I have not yet had a chance to respond to.

20            THE COURT:  We're going to move on to the next point

21   anyway.

22            MR. NORTON:  Thank you, Your Honor.

23            THE COURT:  Save it for the end of the hearing.

24            (Recess taken from 9:10 to 9:28 a.m.)

25            THE COURT:  Let's go back to work.  Please be seated.
```

1              What, Mr. Purcell, is your next objection?

2              **MR. PURCELL:**  So given the comprehensiveness of the

3   briefs, I really think there is only one other issue I want to

4   raise this morning.

5              **THE COURT:**  All right.  What's that?

6              **MR. PURCELL:**  Which has to do with the conjoint

7   survey that Dr. Shugan did.

8              **THE COURT:**  Okay.

9              **MR. PURCELL:**  And we've got four objections to that.

10             Number one is, this is just not a tool for estimating

11  damages in litigation.  There is not case law that approves it.

12  We pointed that out in our brief.

13             Oracle responded with a declaration from Dr. Shugan

14  that's multiple hearsay, where he refers to other industry

15  professionals who purport to opine that conjoint surveys were

16  used for some purpose in other cases.

17             We don't have orders --

18             **THE COURT:**  But there have been surveys in other

19  cases.

20             **MR. PURCELL:**  Consumer surveys, yes.

21             **THE COURT:**  That's what this is, isn't it?

22             **MR. PURCELL:**  Well, there's a big difference, Your

23  Honor, between doing a survey about confusion in the context of

24  a trademark case or surveys about reliance in the context of a

25  consumer fraud case, and this sort of conjoint survey, which

1  purports to map consumer preferences about features to

2  reduction in market share for purposes of estimating damages.

3          Conjoint surveys are market research tools that are

4  commonly used when companies are designing new products.  They

5  are not mathematically precise tools that are used to estimate

6  damages.

7          And there isn't any example we've been able to find

8  in the case law of a court saying, yes, you can use conjoint to

9  map damages in a case like this; or in any case, for that

10 matter.

11         And the only point I wanted to make on that is that

12 Oracle's only response was to say that Dr. Shugan has been

13 informed by other people that conjoint surveys were used in

14 other cases.  That's completely inchoate.  We don't know what

15 those cases were.  We don't have orders.  We don't have

16 transcripts.

17         The second point I wanted to make is that

18 Dr. Shugan's methodology disproves itself.  It proves that it

19 is not sound, just looking at the results that he received.

20         The purpose of a conjoint analysis is to test the

21 value of individual features by varying those features, and it

22 relies on an assumption that the respondent, as that one

23 feature is varying, is able to hold all other features of the

24 product constant.

25         So everything else equal, if you reduce the

1  application load time, if you increase the application load

2  time, how would the consumer preference be affected?

3          And what Dr. Shugan's results show is that consumers

4  in his survey weren't holding all other features constant.

5  They were implying all sorts of other features that varied

6  depending on what they were looking at.

7          And the reason we know this is because 24 percent of

8  respondents in his survey said that they would either prefer or

9  be ambivalent, be indifferent, between a more expensive phone

10 as compared to a cheaper phone, all other features constant.

11         So 24 percent say they would rather buy a $200

12 smartphone instead of a $100 smartphone, all other features

13 constant.  That obviously makes no sense.

14         **THE COURT:**  What percentage said that?

15         **MR. PURCELL:**  24 percent.

16         **THE COURT:**  So 24 percent said, we're indifferent as

17 to spending a hundred dollars more for the same item?

18         **MR. PURCELL:**  They were either indifferent or they

19 preferred to spend the extra hundred dollars.  So either they

20 are completely irrational or they were inferring that the more

21 expensive phone had some additional feature that made it worth

22 the money.  And we don't know.  So, that's point two.

23         Points three and four are illustrated on the fourth

24 and fifth pages, the last two pages of the handout that we

25 passed up to Your Honor earlier.

```
 1          The fourth page, next to last page, is a list of all
 2   of the features that the focus group that Dr. Shugan's
 3   assistant conducted prior to the actual conjoint survey
 4   these -- these are all of the features that respondents in that
 5   focus group mentioned as potentially bearing on their decision.
 6   There's 39 of them.
 7          Dr. Shugan selected seven of these.  He ignored the
 8   other 32.  Among the ones he ignored and didn't test for are
 9   things that are obviously important to consumers, like network.
10   Do you have Verizon?  Do you have AT&T?  What's the coverage
11   like in your area?
12          THE COURT:  If it's highlighted, that means he -- I
13   don't understand your code here.
14          MR. PURCELL:  Your Honor, could I approach?  My copy
15   actually doesn't have highlighting on it.
16          THE COURT:  Why did you give me one that has
17   highlighting?
18          (Laughter)
19          MR. PURCELL:  That's a good question.
20          THE COURT:  Here.  Give me the one you want me to
21   see, and I'll let you just have that copy back.
22          MR. PURCELL:  Oh, no, I'm sorry.  It's not
23   highlighted.  It's just for readability, some of the rows are
24   gray and some are white.
25          THE COURT:  But which ones are -- I thought you were
```

1   highlighting the ones that got ignored, or something.

2              **MR. PURCELL:**  No, Your Honor.  It's not indicated on

3   there.  These are the totality of the features the focus group

4   pointed to.

5              Dr. Shugan selected seven of these.  Among them:

6   Price, screen size, operating system.  I believe application

7   startup time, availability of applications --

8              **THE COURT:**  Help me -- all right.  So I got -- so

9   this list is the full list of features that focus groups talked

10  about --

11             **MR. PURCELL:**  Correct.

12             **THE COURT:**  -- correct?  All right.

13             **MR. PURCELL:**  Of which --

14             **THE COURT:**  Of which what?

15             **MR. PURCELL:**  Of which he selected seven.

16             **THE COURT:**  Which seven did he select?

17             **MR. PURCELL:**  He selected application startup time.

18             **THE COURT:**  Where is that on here?

19             **MR. PURCELL:**  It's the third one in the first column.

20             **THE COURT:**  Okay.

21             **MR. PURCELL:**  Availability of applications.

22             **THE COURT:**  Yes.

23             **MR. PURCELL:**  And then if you go to the next column,

24  he selected multitasking.

25             **THE COURT:**  Yes.

1          **MR. PURCELL:**  He selected operating system.

2          **THE COURT:**  Uh-huh.

3          **MR. PURCELL:**  He selected price.

4          **THE COURT:**  Yes.

5          **MR. PURCELL:**  He selected screen size.

6          **THE COURT:**  Okay.

7          **MR. PURCELL:**  And there's one other that escapes me

8  right now.

9          **THE COURT:**  All right.  I don't know either.  So --

10         **MR. PURCELL:**  So there's 32 that he did not select.

11  And he didn't have any data, that people in the focus group

12  didn't tell him, well, these seven are more important than the

13  other 32.

14         **THE COURT:**  How about availability of wifi?

15         **MR. PURCELL:**  He didn't select availability of wifi.

16  He didn't select the brand of the handset itself, whether it's

17  a Motorola or Samsung, except to the extent that's captured in

18  operating system, because, obviously, only Apple makes the

19  iPhone.

20         He didn't select carrier.  As I said, network,

21  whether it's Verizon or AT&T.

22         **THE COURT:**  Won't his answer to that be, well, I

23  can't select those because the patents that are infringed don't

24  have anything to do with those features?

25         **MR. PURCELL:**  That may well be his answer.  But,

1  again, if you're trying to measure the way consumers actually

2  view the importance of certain features, you can't narrow it

3  down.  You can't cull it down just to the features that are

4  important to the litigation.

5          THE COURT:  Well, why not?  Why is that?

6          MR. PURCELL:  Well, because you're putting your thumb

7  on the scale in a very serious way, Your Honor.  That renders

8  the methodology itself unreliable because you are removing

9  anything that would suggest that these patents are, in fact,

10 less valuable because consumers don't care as much about them,

11 and you're including only the features that implicate the

12 patents, which are going to inflate the value of the patents.

13 A consumer may very well care about network, may very well care

14 about, Do I get coverage?

15          Maybe they live in a rural area, and they may care

16 less about availability of applications because they just don't

17 do that.  And, yet, they are not given the option in the

18 conjoint of stating a preference for network as opposed to

19 availability of applications.

20          THE COURT:  Let me give you an example.  Take

21 something simpler than that.  Say somebody had a patent on a

22 radio, car with radio.

23          MR. PURCELL:  Okay.

24          THE COURT:  Okay.  Car with radio.  And along comes a

25 company that builds a car with a radio and infringes the

1  patent.  So somebody then does a conjoint study that asks the

2  question, would you like to have a car with a radio or a car

3  without a radio?  You would be in here criticizing they didn't

4  ask about what kind of tires are they going to put on the car.

5          In other words, you're raising issues that don't have

6  anything to do with what's being litigated.

7          **MR. PURCELL:**  Well, because without a radio or a car

8  with a radio, I would imagine a hundred percent of people are

9  going to say a car with a radio.  It's an extra feature.

10         And this is exactly -- we cited a quote from Judge

11 Posner, in the Apple-Microsoft case, recently, who rejected a

12 consumer survey on exactly this ground.

13         He said, basically, are you telling me that any

14 consumer is going to say if you have a choice between a product

15 and a product plus, that they are not going to choose the

16 product plus?  Of course, they will; that's meaningless.

17         So here --

18         **THE COURT:**  What if it was a car with a radio, but

19 car without radio and instead you paid a hundred dollars less?

20 So, in other words, there is a real choice there.

21         But my point is, you're asking them to compare

22 features like what kind of tires are on the car, and trade that

23 off.  And maybe that's what the law requires, but --

24         **MR. PURCELL:**  I think it's what logic requires in the

25 sense that, again, the product that Dr. Shugan is testing is a

1    smartphone.  A smartphone is a device with a whole bunch of

2    features.  All of those features may have some impact on

3    whether a consumer buys one phone over another.

4              Those features include things like network, include

5    things like availability of wifi, include things like who made

6    the handset, how attractive is it, what's the styling like?

7    None of that stuff was tested by Dr. Shugan.  He focused only

8    on a few, narrow features.

9              **THE COURT:**  What was the respondent survey group

10   asked to assume with respect to, say, wifi?

11             **MR. PURCELL:**  They were asked to assume -- nothing in

12   particular, just that it was constant among all smartphones.

13   So we don't know what --

14             **THE COURT:**  Let's -- well, if they were asked to

15   assume that it was constant among all options, why wasn't that

16   the right assumption to make, since the -- allegedly, the

17   infringing features are the ones that they did ask about?  You

18   see what I'm getting at?

19             **MR. PURCELL:**  I do.

20             **THE COURT:**  Why do you have to ask about all the

21   things that are not in controversy?

22             **MR. PURCELL:**  Well, there's a couple of reasons.

23   Number one is because you don't know to what extent a

24   consumer's preference is driven by those other features as

25   opposed to the features that are tested.

1            Now, I'm not saying and I don't think we would

2    contend or the law requires them to test every conceivable

3    feature.   What Dr. Shugan could have done is figure out which

4    features are more important to consumers by doing a different

5    test, and then testing that set of features.   He didn't do

6    that.   He didn't ask any of those questions in the focus group.

7            The only thing he did was self-select.   And, as we

8    pointed out in our report, actually, some of the features that

9    he selected were dictated to him by Dr. Cockburn or

10   Dr. Cockburn's assistant.

11           But leaving that aside, he selected seven features

12   with relevance to the litigation.   Well, not all of them.   I

13   mean, a couple of them, like price, I'll concede aren't

14   specifically just relevant to the litigation.   But then he

15   excluded a bunch of other things that are obviously relevant to

16   a consumer-purchasing decision, without any basis for that.

17           So he doesn't have to test everything.   But he has to

18   have some basis for selecting the features that he did, other

19   than they're useful to the litigation, because there may be

20   things that --

21           **THE COURT:**   Well, not just useful.   They are the

22   features that are enabled by the patents-in-suit.

23           **MR. PURCELL:**   I agree that it was appropriate for him

24   to test those.   He absolutely should have.

25           But what he should also have done was test other

1  features that may be equally important to consumers, or more

2  so, along with the features that are at issue in the

3  litigation.   Because what he's purporting to demonstrate is

4  that if these features that are relevant to the case were

5  disabled or if they were less robust, that consumers would stop

6  buying Android, and they would stop buying it in certain

7  percentages.

8          So, we really don't know, based on his consumer

9  preference shares, whether he's accurately measuring anything,

10  because he's excluded a whole bunch of other things that may

11  actually be more important to consumers than the things he

12  tested.

13          **THE COURT:**  Wouldn't they still be more important

14  under all of these scenarios that they were testing?  Let's say

15  wifi is extremely important.   It would be extremely important

16  under every option.   So how would that get somehow traded off

17  on the respondents' answers?

18          **MR. PURCELL:**  Well, we also know that the respondents

19  did not hold all other features constant because of the problem

20  I explained before, where you have 24 percent, almost a quarter

21  of the respondents saying they would rather pay an extra

22  hundred dollars.

23          **THE COURT:**  That's the problem of maybe the

24  instructions weren't clear enough, or the way it was

25  administered it wasn't clear enough.   That's a troubling point.

```
 1  I agree with that.  But that's different from which features
 2  they were asked to test.
 3          Let's be clear.  Go back to the 24 percent.  Is that
 4  just some number that you kind of glued together, or is that a
 5  conceded defect?
 6          MR. PURCELL:  I believe it is conceded in Dr.
 7  Shugan's reply declaration.  Rather, his declaration in support
 8  of Oracle's opposition.
 9          And in Oracle's opposition, Dr. Shugan said that
10  24 percent of survey respondents were either agnostic between
11  the hundred dollar and the $200 phone, or they preferred the
12  $200 phone all other features being equal.  I think the number
13  he gave is actually affirmatively preferring the $200 phone was
14  8.8 percent.
15          THE COURT:  So it was clear that -- in other words,
16  if they had followed the instructions, was it clear that the
17  phone that they were opting for would cost a hundred dollars
18  more without any more features?
19          MR. PURCELL:  Yes.  The price was specified.  And
20  they were instructed to hold all other features constant.  So
21  they were supposed to focus only on the features that were in
22  dispute, and assume that the phones were identical in all other
23  respects.
24          THE COURT:  Did anyone do -- I don't even know if
25  this is possible, but sometimes what they do is they throw out
```

```
1   everyone who has an irrational -- let's say you throw out that
2   24 percent and then did a survey just of the 76 percent that
3   were left over.  Did anyone do that to see how that -- how
4   those numbers would come out?
5            MR. PURCELL:  I think Dr. Shugan did try to
6   rehabilitate his analysis, after we criticized it, by doing
7   that.
8            It doesn't solve the fundamental problem, which is
9   that you have a survey that's designed so that 24 percent of
10   respondents are giving completely irrational answers.  How can
11   the methodology be sound --
12            THE COURT:  That may be, but when he rehabilitated,
13   did the answers and percentages change or did they stay the
14   same?
15            MR. PURCELL:  I would have to leave it to Oracle's
16   counsel to address that.
17            THE COURT:  What's your next criticism of the
18   conjoint --
19            MR. PURCELL:  The final criticism has to do with a
20   question Your Honor asked -- and this is addressed on the last
21   slide in our packet -- which was about confidence intervals.
22            So, initially, Dr. Shugan did not calculate
23   confidence intervals.  And when I asked him the series of
24   questions that's on slide 5 of the deposition, he said that it
25   wasn't possible to do it because he was using a Bayesian
```

1   estimation, and it was not possible to calculate confidence

2   intervals using that.

3           And then in Dr. Leonard's report -- and this is his

4   initial report, not the recent supplemental report -- at page

5   116, Dr. Leonard pointed out that, in fact, Dr. Shugan was

6   wrong; that there was a way of calculating, essentially,

7   confidence intervals using a Bayesian estimation.  This is the

8   Bernstein-Von Mises theorem, which I don't purport to

9   understand.

10          And, lo and behold, in the slides that Oracle

11  prepared for today and Your Honor has in your smaller binder,

12  Dr. Shugan has submitted binders that do purport to have

13  confidence intervals in them.

14          We haven't had an opportunity to test them.  We saw

15  them for the first time around 5 o'clock last night.

16          **THE COURT:**  What tab is that?

17          **MR. PURCELL:**  That I don't know.

18          I believe it's 8, Your Honor.

19          **THE COURT:**  Okay.  All right.  Let's hear from the

20  other side on this, these points from conjoint only.

21          **MR. NORTON:**  Thank you, Your Honor.

22          So, I'll try to address Mr. Purcell's points in the

23  sequence in which he made them.  His first argument is that

24  conjoint is not appropriate for the calculation of damages.

25          That is nonsense.

```
 1          First, Google's copyright expert in this case,
 2  Dr. Alan Cox -- and we cite this in our papers -- has twice
 3  written articles in which he says that choice modeling, which
 4  is conjoint, is an appropriate way to calculate damages in
 5  infringement cases.
 6          And when Google tells you that they are aware of no
 7  case in which conjoint analysis has been used to calculate
 8  damages, they can only say that by not reading the articles
 9  that their own expert has published.  And those are attached as
10  exhibits I and J to the Norton declaration in support of the
11  opposition that we filed on the Daubert.
12          And what Dr. Cox said, in the article attached to
13  Exhibit I, is that choice modeling -- this was in 2003 -- is a
14  relatively new technique, but it was used to good effect in an
15  infringement suit brought in the mid '90s.  And which he then
16  proceeds to describe the lawsuit in which the plaintiff proved
17  its damages by using choice modeling which, again, is conjoint
18  analysis.  And he goes on to explain how choice modeling works
19  and how it presents the consumer with a series of choices and a
20  study that is, in all material respects, identical to the type
21  of study that Professor Shugan did.
22          Exhibit J is the abstract of an article which is
23  available on the Internet and is cited in our brief.  And that
24  is an article by Dr. Cox, Google's copyright damages expert,
25  titled, "Survey Techniques for Rigorous Measurement of Damages
```

1   in Trade Dress Confusion Cases," in which he goes on to explain

2   that choice modeling is a rigorous measurement of damages in

3   infringement cases.

4            Dr. Shugan is a person who is familiar with the

5   literature, cited a number of cases by name, in which conjoint

6   analysis has been used.  It's used over and over again.

7            But even if Google were right that it had not been

8   used specifically to calculate damages, *Lucent* tells us that

9   it's appropriate, for the purpose of doing a hypothetical

10  negotiation, to look at survey data that would have been

11  available to the parties at the time of the negotiation.

12           And this is the type of survey that they could have

13  done.  And it's used in the way -- and the way in which

14  Professor Cockburn uses it is similar to the way in which

15  parties in a negotiation could have used it.  That is, how

16  important is it to our smartphone that applications load

17  quickly?  How important is it to have lots of applications

18  available?  Which things are more important to consumers?

19  Where should we really spend our time?

20           And the conjoint analysis tells you which features

21  consumers think are important, and it's appropriate to consider

22  that under *Lucent*.

23           **THE COURT:**  Which of the seven things measured

24  copyright as opposed to measured the hardware part?

25           **MR. NORTON:**  It is the availability of applications.

1   And the argument is thus:  The reason why it was important to

2   Google to have the API specifications, the API packages that

3   they infringed, was that they are familiar to carriers.  But,

4   also, they are familiar to programmers.

5          And if you wanted to be able to quickly get a large

6   number of applications available for your smartphone platform,

7   it would be very important to have an established developer

8   base that is already familiar with your programming language

9   and the APIs that it requires.

10          And so Google --

11          **THE COURT:**  Not the programming language, because

12   that's -- you've already conceded that away in this case.  But

13   the APIs, is what you're claiming.

14          **MR. NORTON:**  That's right.  Because Dr. Astrachan,

15   who is Google's copyright expert, says that the APIs are

16   essential to -- practically required, he says -- if you're

17   going to be writing applications in the JAVA language.

18          The JAVA language is free to use, but the APIs are

19   copyrighted.  And when Google incorporates the APIs into the

20   Android platform, it infringes.  It wants to do that because

21   the programmers are looking for those APIs.  They don't want

22   different APIs.  They don't want to be confused with some new

23   set of APIs, even if they are written in the JAVA language.

24          So Google decided, we're going to use this collection

25   of specifications, this hierarchy of specifications, these

1  interrelationships between APIs, because these are the ones

2  that the millions of JAVA developers expect to see.

3  And they did that because if they didn't do that, if

4  they went with some other language -- which they thought about

5  and rejected -- if they went with some other language they

6  wouldn't have a developer base.

7  **THE COURT:**  All right.  So in the study that was done

8  here, how did the availability of applications feature rank

9  among consumers?

10  **MR. NORTON:**  So, Professor Shugan calculates how many

11  consumers would switch in the event that the number of

12  applications available on the phone were lower.

13  So what he used was around the time of -- I believe

14  he used 2010 as the example, the number of applications that

15  were available on the Palm platform, the Blackberry platform

16  and the iPhone platform as the choice sets.

17  So 6,000 -- when you're presented with the phone

18  choices, there's a phone that has available to it 6,000

19  applications, 40,000 applications, or a hundred thousand

20  applications.  And how does that affect consumers' choices?

21  And then he's able to determine the relative

22  importance of an application universe to consumers' choices on

23  a smartphone relative to all the other features.  And then he's

24  able to calculate the effect on Android market share as a

25  result of the inability to provide a robust application

1   universe like that.  And that --

2           THE COURT:  The way in which you use this is one step

3   removed from all of that.  Somehow it's used to allocate the

4   original 2006 bundle, by this assumption or conclusion that the

5   copyright API part was worth one half of the patent part,

6   right?

7           MR. NORTON:  That is one of the ways in which it is

8   used.  Let me explain that.

9           THE COURT:  All right.

10          MR. NORTON:  It's -- it seems like a fairly simple

11  syllogism to me.  One of the key virtues or benefits of the

12  copyrighted APIs that are infringed is that they provide

13  applications, as I just discussed.  One of the key benefits of

14  the patents-in-suit is that they provide speed, memory,

15  performance benefits on the smartphone.

16          And those speed benefits have been measured by the

17  technical experts.  And so we know from the work done by the

18  technical experts that if you -- by virtue of Google using

19  these patents, it has improved the performance of the phones by

20  a certain amount.

21          When Dr. Shugan did his conjoint study, he used that

22  incremental benefit.  So how important is that incremental

23  benefit that we attribute to the patents, the performance

24  benefit?  How importance is that performance benefit to the

25  consumers relative to the value of the applications to

1    consumers?

2              And so what we know then is consumers value the

3    incremental speed at about twice what they value the

4    incremental applications.

5              So that tells us that the patents-in-suit, the speed

6    provided by the patents-in-suit, is twice as helpful to your

7    smartphone as to the applications enabled by the copyrights in

8    suit.

9              So by valuing those two attributes relative to one

10   another, you can apportion the 2006 bundle.  So that's the way

11   in which it's used there, is that we know the relative

12   importance of these two things.  An observation which is true

13   even if every argument that Mr. Purcell made were correct about

14   the failure to select features.

15             Now, Dr. Shugan has explained why that argument is

16   completely wrong, and I'm more than ready to address it.  But

17   even if that were true, if all you want to know is the relative

18   value of those two features, then this conjoint would be more

19   than adequate to do that, even taking into consideration, even

20   crediting Google's objections.  So that's how it's used for the

21   allocation process.

22             Professor Cockburn uses it for a second purpose,

23   which is that the conjoint survey establishes that the speed

24   benefits that are provided by these particular patents, and the

25   application benefits provided by these particular copyrights,

1   are important to consumers.

2           And Dr. Shugan has actually measured, in terms of

3   market share, just how important they are.  But what

4   Dr. Cockburn is able to do from that is he can say, well, in

5   addition to all the other evidence I have considered, I've

6   considered the results of the conjoint, which tell us the

7   unsurprising fact -- but still verified by data -- that making

8   the phone perform more quickly makes a difference in terms of

9   sales, and having lots more applications makes a difference in

10  terms of sales.  And the conjoint confirms that.

11          That is something that, for example, Judge Rader, in

12  the Cornell-HP case, said was an important thing for the

13  plaintiff to put forward.  You just don't come in and say,

14  well, you know, it's important.  Consumers like it.  You know,

15  everybody always assumed that consumers liked it.

16          Where are the demand curves?  Where is the consumer

17  survey?  Where is something that tells me that people really do

18  value it?

19          So Professor Cockburn has that additional data point

20  that tells him that not only did Google think it was important,

21  so did consumers.  And that's what the parties would have

22  thought at the time of their negotiation.

23          So those are the two ways in which the conjoint is

24  used to inform Professor Cockburn's calculations in this case.

25  And that is entirely appropriate, both as an apportionment

1   exercise -- it's a good way to apportion between the value of

2   the copyrights and the value of the asserted patents.  It's

3   also a good way to determine the consumer demand for these

4   particular attributes.

5           So turning to chart 4, that Google submitted today,

6   these are the features, of course -- this is Professor Shugan's

7   own slide.  It's his own exhibit.  And these are the things

8   that in the focus group people mentioned.

9           Now, in a conjoint -- I don't believe this is

10  contested in any way.  In a conjoint -- the beauty of a

11  conjoint analysis is that you do not need to test every

12  feature.  If you had to test every feature, it would be very

13  burdensome, and it wouldn't be particularly useful.  And, in

14  fact, that's not required.  And that's why companies use it,

15  the government uses, it's used in litigation, because you can

16  isolate a few features that you care about and only test those.

17          And, so, in his declaration, submitted in support of

18  our opposition brief, at paragraph 25, paragraph 25,

19  Professor Shugan responds directly to this criticism.  He says,

20  "Importantly, it is not necessary in conjoint analysis to test

21  every feature that may matter to consumers because conjoint

22  analysis assesses relative" -- in bold italics by

23  Professor Shugan -- "relative importance."

24          Nonetheless, he explains, he did include features in

25  the survey that are not at issue in the litigation, and he

1  explains why.  Quote, I took this additional step to estimate a

2  well-specified model.

3       Goes on to say, quote, This approach is

4  methodologically sound, as I included the two most critical

5  features that generally derive the greatest value in any

6  estimation and that captured the benefits of Google's

7  reputation."  Those additional two are the operating system,

8  which is called Android, and so it incorporates Google's brand

9  value, and price.

10       Now, what's important in conjoint analysis is not

11  that you test every feature, but that you make sure to include

12  among the most important features as Professor Shugan has

13  explained.  So he's got price and he's got the operating

14  system.  And in his study those are the most important features

15  by a substantial margin.

16       The operating system is considerably more important

17  in consumers' decision than the number of apps.  It's more

18  important than the incremental speed benefits that we claim are

19  provided by the patents.  Price is also more important.  But

20  he's included those.  And he doesn't need to test everything.

21  That's not how you do a conjoint analysis.  He says so in his

22  declaration.

23       There is no declaration from any Google witness that

24  says you're supposed to include 36 features, because you're

25  not.

```
 1          THE COURT:  Well, but for purposes of your second
 2   use, I wonder if that's correct.  You said that the second way
 3   in which Dr. Cockburn uses this is to say that the features
 4   enabled by the patents-in-suit are important to consumers.  But
 5   if you only test those features that are enabled by those
 6   patents, and ignore the other features, like wifi and camera,
 7   maybe you don't get the very good benchmark for comparison.
 8          MR. NORTON:  Well, that's -- if you only tested the
 9   features that are in dispute, then that would cause some
10   complication.
11          THE COURT:  So what, other than operating system and
12   price -- that is true that that's all he tested.
13          MR. NORTON:  No.  Screen size is also not in dispute.
14          But Professor Cockburn has testified and stated in
15   his declaration that he doesn't need to test the others in
16   order to be able to calculate the effect on market share, so
17   long as he's got a significant -- another factor is significant
18   to consumers, brand and price, that he will be able to estimate
19   the effect on market share.  This is how conjoint is done.
20          THE COURT:  That's not the two times part.  That's a
21   different -- market share, that's separate from the ratio of
22   two to one.
23          MR. NORTON:  That is correct.
24          THE COURT:  How does he use market share then?
25          MR. NORTON:  So what he does is by using the conjoint
```

1  analysis he's able to determine how many consumers would choose

2  a different phone.

3          They would not choose the Android phone if the

4  Android phone lacked the attributes that are provided by the

5  patents and copyrights in suit.  Those are called "preference

6  shares" in his analysis.  And there's a very close correlation

7  between preference shares and market shares in the analysis.

8          So what he's able to do is by presenting -- the way

9  the survey works, just to give a little more context, the

10  consumers are shown each of the features.  So this is the thing

11  that we are going to ask you about:  Launch time.  Screen size.

12  They're given a picture of a phone next to a Coca-Cola can so

13  they can actually get a sense of perspective.  They see all

14  these things.

15          And then they are actually given choice sets, four

16  phones with different permutations of features.  And they say,

17  I want the hundred dollar phone with the 4 second startup and

18  the 40,000 applications, that's an Android phone.  They pick

19  that one.

20          Then they are given a new set of choices, and then

21  another set of choices.  And the computer software is able to

22  refine the choices as they make their selections, to really

23  hone in on which variables are the ones that are most important

24  to this consumer.

25          And, as a result of that, Professor Shugan is able to

1     do a statistical analysis that tells him if the phone lacked

2     the attributes that our technical experts say the infringement

3     provides, how many consumers would not have bought their

4     Android phone, they would have switched to something else?

5            And we see a substantial effect on market share as a

6     result of not being able to infringe.

7            Now, in his September report, Professor Shugan

8     actually translated that into dollars.  If Google's market

9     share declined by X, how many dollars would it lose?  And then

10    that was his numerator.  And his denominator was the value of

11    Android over the same period.  Right.  The Court has forbidden

12    that analysis.  He doesn't do it anymore.  But that numerator

13    is still a very important number.

14           If you didn't have these patents, if you didn't have

15    these copyrights, would you lose a lot of market share?  And

16    the consumer survey says you would.  You would lose a lot.

17           And Professor Cockburn considers that as one of the

18    indicators of the value of these particular patents in these

19    particular copyrights.  But it's not necessary -- and, again,

20    this is unrebutted.  It is entirely unrebutted.  It is not

21    necessary, in performing a conjoint analysis, to include every

22    feature.

23           In paragraph 25 of Professor Shugan's declaration, it

24    is -- he testified that way in his deposition.  It's just not

25    how conjoint works.

1          And an argument that shows you 36 features and says

2    the conjoint survey is methodologically flawed because it

3    doesn't have all 36 of these or 18 of these is just a lawyer

4    argument that fails to comprehend what Dr. Shugan's

5    uncontroverted testimony establishes.

6          **THE COURT:**  What do you say to the 24 percent error

7    rate, that 24 percent gave irrational answers?

8          **MR. NORTON:**  Okay.  Well, there is what I say and

9    there is what Professor Shugan says and they are saying.

10          Your Honor asked, is this a number that Google

11   created, or is it actually something Dr. Shugan concedes?  And,

12   inexplicably, that was described as a concession.

13          So Dr. Shugan, in his declaration in support of our

14   opposition -- this is docket 740 -- explains in great detail

15   why that's wrong.  And he did it back in September when we

16   moved to strike the opinion of Dr. Leonard.  He submitted a

17   declaration then.

18          **THE COURT:**  What do you then say is the correct error

19   rate, or however you want to characterize irrational answers?

20   What do you think is the correct rate of error?

21          **MR. NORTON:**  What we are talking about is not a rate

22   of error.  So, the first mistake is that Google says that they

23   have identified --

24          **THE COURT:**  Irrational answer there.

25          **MR. NORTON:**  There are --

1           **THE COURT:**  People don't want to pay a hundred

2   dollars more for nothing.

3           **MR. NORTON:**  Sure.

4           **THE COURT:**  So are you saying there's zero of those

5   instances?

6           **MR. NORTON:**  No.  So, 8.8 percent of the responses

7   indicate that individual consumers said, I will take the $200

8   phone over the hundred-dollar phone that is otherwise

9   identical.

10          So the question is, does that -- what does that

11  8.8 percent mean?  We do see that.  But the problem is that, in

12  Google's critique, is that Professor Shugan -- I'm going to --

13  Mr. Purcell said that there's a mathematical theorem that he's

14  unable to explain.  I'm going to find myself in the same

15  position, shortly, but I can make a little headway.

16          Dr. Shugan uses something called a hierarchal

17  Bayesian approach to probability.  It is -- Bayes was a

18  mathematician in the 18- --

19          **THE COURT:**  I know what Bayesian probabilities are.

20          **MR. NORTON:**  Good.  All right.  So it's Bayesian.

21  It's Bayesian approach.

22          And the Bayesian approach, as Dr. Shugan has

23  explained, I believe, three times now in submissions -- in

24  testimonies and submission to the Court, you don't test a

25  hierarchal Bayesian model by looking at individual responses

1    and saying these appear to be irrational.

2           There are different checks that you use to assess the

3    robustness of the hierarchical Bayesian model.  And he did

4    that.  There is a U squared.  There is a hit rate.  Those are

5    disclosed in his original report.  And those indicate that his

6    survey is very robust and very good at predicting aggregate

7    market share changes.

8           It is incoherent to critique Dr. Shugan's analysis by

9    isolating individual choices and saying some set of individuals

10   gave responses that we would not expect to see.  You cannot

11   critique a Bayesian analysis in that way.

12          There is some useful information about individual

13   choices.  But if you want to know whether this is a good study,

14   this is the wrong way to do it.  If it were what's called a

15   frequentest approach, that might be a more useful critique.

16          So Dr. Shugan, in his declaration, in paragraphs

17   35 -- I should say 34 through 44, deals directly with this

18   criticism and explains why you cannot draw the conclusion that

19   Google insists on drawing, the 8.8 -- it is not 24 percent.

20   The number that they are trying to calculate is 8.8 percent.

21   And the 8.8 percent does not mean what they say it means.

22          And where is the testimony that establishes that

23   Professor Shugan is wrong?  Where is the analysis that says

24   that Professor Shugan, who has a Ph.D. in statistics and does

25   this over and over again, doesn't understand Bayesian

 1  probability?  It doesn't exist because it's just not true.

 2        So in paragraph 42 he explains precisely why this

 3  approach does not -- the approach being the 8.8 percent --

 4  doesn't mean what Google says it means.

 5        In paragraph 40, he points out that what -- what

 6  Google's critique is they say, well, consumers can't be

 7  irrational.  If you do a survey you expect all the consumers to

 8  give rational responses.

 9        And we know from research, which Dr. Shugan quotes,

10  that consumers don't always make rational choices.  In any

11  survey you get some responses that wouldn't make sense.

12        And so Google says, well, those show that the

13  survey's irrational.  But that's not true.  It shows that

14  consumers gave answers that you might not expect.

15        Now, is there a reason why you might think consumers

16  would, in fact, sometimes say they prefer the more expensive

17  phone?  Again, Dr. Shugan says, yeah, that happens.

18        And there's literature on that, as well.  And that is

19  that people sometimes associate a higher price with prestige or

20  durability.  And so they're going to see that higher price and

21  say, well, that's a phone -- I might prefer that phone because

22  I want the more expensive phone.

23        And we all know people who prefer to buy the more

24  expensive thing because they like the status that it confers.

25  And Dr. Shugan addresses that directly.

```
 1          So the fact some people say they would pay for a more
 2   expensive phone doesn't mean that the survey is irrational.  It
 3   means that some people don't behave the way Google claims
 4   people ought to behave.
 5          THE COURT:  All right.  I need to bring your part to
 6   a close.  I'll give you one more point.
 7          MR. NORTON:  The Court asked whether Dr. Shugan had
 8   recalculated his results to address this particular argument.
 9   And he did.  It is the -- the recalculation was in his
10   declaration submitted, again, docket 740.  It's at footnote 44
11   of his declaration.
12          And what it says is that if you were to accept this
13   argument and recalculate the numbers by throwing out those
14   responses, the Android sales, but for the feature enhancements
15   enabled by the patents-in-suit and copyrights in suit, would
16   have been 7.6 percent, at least 7.6 percent lower, as opposed
17   to his earlier calculation, 7.9 percent lower.  So it does not
18   have a substantial effect on the result if it were, in fact, a
19   meritorious criticism.
20          THE COURT:  All right.  Let's hear rebuttal on these
21   points.  Not all the points, but just your main rebuttal.
22          MR. PURCELL:  Thank you, Your Honor.
23          So I understand, of course, why Oracle likes to cite
24   Dr. Cox's articles to us.  But what Dr. Cox has opined as an
25   economist on this issue, it's not the finding of a court.  It's
```

1  not the finding of either the district court, much less the

2  federal circuit, much less any other appeals court, that

3  conjoint analyses are appropriate for estimating damages in a

4  case like this.

5         Oracle hasn't cited any cases, they haven't provided

6  any evidence that there, in fact, is any precedent for using

7  this sort of analysis for this purpose.

8         The next point, just briefly, Oracle is attacking a

9  straw man.  I made very clear in my presentation to you that I

10 was not saying that Dr. Shugan's methodology was reliable

11 because he didn't include everything under the sun, he didn't

12 test 39 features.  That's not what we're talking about.

13        Mr. Norton just admitted that it is important to

14 test, in addition to the features at issue in the litigation,

15 the other features that are most important to consumers.

16        Dr. Shugan didn't do anything to figure out which of

17 the omitted features was, in fact, important to consumers.  He

18 didn't include price.  And, obviously, price is important.  He

19 didn't include operating system.  Obviously, that's important.

20 He didn't include a whole laundry list of other things.  Didn't

21 make any attempt in the focus group to ask respondents what

22 they valued so he could even have an opinion about that

23 question.  He just completely ignored it.

24        And the third point, Mr. Norton harped on the fact

25 that Google's expert supposedly didn't contravene what

1   Dr. Shugan did.  Dr. Leonard did that, in fact, in a

2   declaration that he submitted last year when Oracle moved to

3   strike his rebuttal opinion.

4        But I'd just like to focus you on paragraph 39 of the

5   Shugan declaration that Oracle itself submitted regarding the

6   24 percent number.  This is the declaration Oracle filed on the

7   24th of February.

8        And Dr. Shugan writes, "Second, for the majority of

9   the 24 percent of respondents the estimates for the two

10  prices" -- that is the hundred dollar and $200 prices -- "are

11  so close that a diligent statistician would consider the

12  difference to be zero, rather than representing some form of

13  rationality.  As I explained in my reply report, I excluded

14  respondents with utilities associated with a hundred and $200

15  that are within one standard deviation of the difference in

16  utilities between levels as a sensitivity analysis.  When these

17  respondents with such utility comparisons are excluded from the

18  analysis only 8.8 percent, not 24 percent, prefer a price of

19  $200 over a price of $100."

20       So what he's saying there is that 24 percent are

21  either agnostic between the hundred dollar and the $200 phone,

22  or they prefer the $200 phone.  And that's exactly what we're

23  saying.

24       So when they say we don't have any evidence, we have

25  an admission.  We have it in Dr. Shugan's own words.  That's

1    exactly what he is saying here.  And it affects the entire

2    analysis.  It's a problem with the methodology.

3            That's all I've got.

4            **THE COURT:**  All right.  What's your next criticism?

5            **MR. PURCELL:**  Your Honor, I'm content to rest on the

6    briefs with respect to the other criticisms.  We raised the

7    issue about copyright apportionment, about failure to perform a

8    claim-by-claim analysis.

9            **THE COURT:**  I have a couple of questions.

10           What happens -- I need to preface this by saying

11   Dr. Cockburn's analysis is like an algebra problem.  He has,

12   the copyright part is one half of X.  X is the patents-in-suit.

13   Copyright API is one half X.  And then everything else that is

14   a patent in the 2006 bundle is Y, I guess.  But it is a ratio

15   of the -- you have to go through all of those.  That's why I

16   asked you to check my math because I must have done it wrong

17   somewhere.

18           Now, this formula does not appear anywhere in the

19   history of the universe.  I understand that.  But that doesn't

20   mean you can't use algebra.  Algebra we know about.  And as

21   long as his assumptions are valid, I guess that's okay.

22           Anyway, he uses that formula in the one half of the

23   value of the patents-in-suit equals API value, in getting his

24   apportionment.

25           All right.  Here's my question.  I have trouble

1  figuring out what happens if the federal Patent Office knocks

2  out all but one patent, or the jury knocks out all but one

3  patent.  What then happens to this analysis?

4      So while you're standing there, have you worked your

5  way through that analysis?  I don't want you to guess at it.

6      What happens to the analysis in that algebraic

7  formula, and where does that lead us if -- in other words, the

8  conjoint study is based upon a set of answers that assumes

9  certain features, and those were selected based on what

10 infringed or didn't infringe.

11     But if it turns out those patents are not valid in

12 the first place, then maybe the conjoint falls away, and the

13 one half falls away, and the whole formula falls away, and we

14 have no way to apportion.  That's what I'm worried about.

15     Do you know the answer to that?

16 **MR. PURCELL:**  The answer to that lies in the

17 distinction that Your Honor discussed with Mr. Norton about the

18 two separate uses of the conjoint.

19     One is to measure the relative preference as between

20 number of applications and application speed.  And I think

21 that's a different use of the conjoint than if you're asking to

22 determine a bottom line market share reduction number if a

23 feature doesn't perform as well.

24     And so I think our challenge, our Daubert challenge,

25 is directed at the second problem more than the first problem.

```
1              We were not -- at least, it's not in our brief that

2   we're attacking the conjoint as an idea of measure of relative

3   preference.

4              I think what Dr. Cockburn has done is calculated the

5   value of the five patents-in-suit now, assuming that they are

6   all infringed.  He has calculated subcategories for what each

7   of the individual patents are worth.

8              THE COURT:  Where is that?  Where can I find that?

9              MR. PURCELL:  I believe that is at the very end of

10  his exhibits.  It might be Exhibit 37.  Exhibit 37 has

11  percentages.

12             I think Oracle may have prepared a slide for this,

13  that I can direct you to.  It's slide 3, Your Honor, in the

14  smaller binder Oracle handed up.

15             THE COURT:  All right.

16             MR. PURCELL:  So if that analysis is sustained -- and

17  we haven't challenged it, other than to the extent it relies on

18  things we have challenged, but we haven't challenged that

19  specific apportionment.  If that stands, then that would allow

20  for a patent-by-patent liability determination.

21             THE COURT:  All right.

22             MR. PURCELL:  With the copyright, still, I think

23  being half of what the broader number would have been had all

24  those patents been invalid and infringed.

25             THE COURT:  What does the other side say to that
```

1  question?  Do you agree with what counsel just said?

2          **MR. NORTON:**  It's very close.

3          The value of the copyrights is equal to half the

4  value of speed, as measured by the conjoint.  The value of

5  speed, based on the 2006 deal between the parties that was

6  never consummated, is calculated by Professor Cockburn.

7          So even if the patents are not valid and infringed,

8  we know what a group of patents that gave you an incremental

9  benefit, in terms of performance, would be.  And we know the

10 patents -- the copyrights would be worth half that.

11         So the number is still a meaningful number, even if

12 no infringement were ever proven as to those patents.  So you

13 don't need to prove patent infringement to have a copyright --

14         **THE COURT:**  So let's say the jury determines all of

15 them are invalid, patent-wise, but then your position is that

16 the number for copyright on the apportionment of the original

17 2006, that that copyright API number remains the same

18 regardless, regardless of which patents are valid or not.

19         **MR. NORTON:**  Right.  Because the value of the

20 copyrights is not actually dependent on the value of the

21 patents.

22         We know there is a relationship between the value of

23 the benefits the patents provide and -- let me put it this way.

24 Let's say that the patents were not valid, but they were

25 infringed.  So Google really did do those things.  They really

1    did use the inventions, and they got the benefits from the

2    inventions, and they got the value.   In that event, we would

3    fail to prove our patent infringement case.

4              But all the evidence that we have that shows that the

5    benefits of speed are precisely what we claim they are, all

6    that would still apply.

7              So the copyright's value doesn't actually depend upon

8    the value of the patents.   We've used the value of the patents

9    as a tool to help us measure the value of the copyrights,

10   assuming the patents are valid and infringed.   And even if that

11   assumption were false, the measurement of value would still be

12   useful.

13             **THE COURT:**   Thank you.

14             I have a question for Mr. John Cooper.   That is, if

15   we set a trial for April 16th, which is right now where I've

16   told the lawyers to be ready for, is the expert going to be

17   ready to go before that?

18             In other words, I would like to have his report done

19   and his deposition taken, and all of that, before the trial

20   date starts.

21             **MR. COOPER:**   Yes, Your Honor.

22             **THE COURT:**   And is his report going to include a

23   critique of considerations that were used by both sides'

24   experts?

25             **MR. COOPER:**   Yes.

1          **THE COURT:**  All right.  On the subject of the --

2     thank you.  Have a seat.

3          On the subject of the Daubert, if anyone has one last

4     word you want to put in, now is the time to do it by way of a

5     parting last statement.

6          **MR. NORTON:**  I have certainly endeavored to answer

7     all the Court's questions.

8          If there is anything that the Court remains uncertain

9     about with respect to what Professor Cockburn did, or his

10    reasons for why he did them, he is, of course, here today and

11    is prepared to testify and answer questions directly from the

12    Court or from counsel about why he used the studies, why the

13    studies are appropriate, or anything else that may be of

14    concern to the Court.

15         **THE COURT:**  Let me ask Google, do you want to take

16    this opportunity to cross-examine Dr. Cockburn?  I'll put him

17    on the stand and let you have a free shot at him, if that's

18    what you want.

19         **MR. PURCELL:**  No, Your Honor.

20         **THE COURT:**  All right.  Then I'm going to pass on

21    the -- I'm not going to ask him questions.

22         **MR. NORTON:**  Thank you, Your Honor.

23         **THE COURT:**  Okay.  Do you have anything on your side?

24         **MR. PURCELL:**  No, Your Honor.  That's all.

25         **THE COURT:**  All right.  We will adjourn for now.

1   And, in due course, I will get an order out.

2          I want our 706 expert to be prepared to do your

3   report quickly.  But I want it to be, of course, your best shot

4   at it.  This is now early March.  It may be that you'll be --

5   by the end of this month, you may be in depositions defending

6   your own work.

7          All right.  We're adjourned.  Thank you.

8          (Counsel thank the Court.)

9          (At 10:24 a.m. the proceedings were adjourned.)

10                         -   -   -   -

11

12

13

14              **CERTIFICATE OF REPORTER**

15          I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18   DATE:   Wednesday, March 14, 2012

19

                    s/b Katherine Powell Sullivan
20          _____

21          Katherine Powell Sullivan, CSR #5812, RPR, CRR
                      U.S. Court Reporter
22

23

24

25