# EXHIBIT A

1

1   Deposition of Iain M. Cockburn, Ph.D.

2   Friday, February 10, 2012

3   Oracle America, Inc. v. Google Inc.

4   Offices of Analysis Group

5   in Boston, MA

6

7          THIS IS AN UNCERTIFIED DRAFT TRANSCRIPT!

8          PLEASE DO NOT QUOTE FROM THIS DRAFT IN

9          PLEADINGS OR ELSEWHERE.  THE CERTIFIED

10         TRANSCRIPT IS THE ONLY OFFICIAL RECORD

11         WHICH MAY BE RELIED UPON FOR VERBATIM

12         CITATIONS OF TESTIMONY.

13

14   This realtime transcription has not been proofread.
     It is the court reporter's uncorrected translation,
15   a draft, not the certified transcript.  It contains
     errors and/or mistranslations which may result in
16   nonsensical word combinations.  Page numbers and
     line numbers in this draft will not correspond to
17   those in the final, certified transcript.

18
     This interactive realtime service is provided to you
19   solely as a litigation aid and is in no way an
     official transcript.
20

21   The court reporting agency and the court reporter,
     J. Edward Varallo, are not responsible for the
22   misuse of this realtime draft transcript by anyone.

23

24

90

1  and for these patents as applied to one claim versus

2  another claim?

3          And thirdly, I don't believe Dr. Reinhold

4  was able to conduct the work that he did at the

5  level of considering the contribution of individual

6  claims to the portfolio.  Neither Dr. Reinhold nor

7  I, nor in my opinion persons engaged in a

8  hypothetical negotiation about this specific

9  portfolio of patents would have been thinking about

10  this portfolio as an aggregation of claims; they

11  would have been thinking about it as an aggregation

12  of patents.

13      Q.    Is there anything in your report that

14  attempts to break out the value of the unasserted

15  claims of the patents in suit versus the asserted

16  claims?

17      A.    I don't draw that distinction in this

18  apportionment analysis, no.

19      Q.    Let's move on to paragraph 405 on page

20  152.  I would like to talk a little bit about the

21  studies that you used as your reference for the

22  distribution of the value of the patents within the

23  portfolio.

24          MR. NORTON:  I don't want to get in your

1   points us to.

2           The stylized fact, if you like, if you

3   poked an economist who's worked on these problems

4   and asked them, you know, what share of the value of

5   a portfolio of patents would the top 1 percent

6   likely account for?  I think they would likely say

7   "Well, probably 50 to 75 percent," based upon some

8   synthetic appreciation of all the results in the

9   literature.

10      Q.    The three studies you relied on and that

11  are discussed in Exhibit 34 and Exhibit 35, there's

12  the PatVal study, the Harhoff study and the Barney

13  study?

14      A.    Yes.

15      Q.    Taking them one at a time, with respect to

16  the PatVal study, do you know how that study

17  selected the population of portfolios that it used

18  as its dataset?

19      A.    Well, it didn't use a population of

20  portfolios; they looked at a population, a sample of

21  patents.  The sample of patents was -- I mean, these

22  results come from a broader research project, which

23  was to survey European inventors about a variety of

24  things.  One of the items of interest that the

1    people who conducted this study asked was for these

2    inventors to provide some information about the

3    value of one of their patents.

4            So the selection of that portfolio I think

5    roughly could be understood as a random sample of

6    inventors on patents from a particular application

7    cohort.

8    Q.    The PatVal survey, was the dataset

9    exclusively European patents?

10   A.    Yes.

11   Q.    No U.S. patents?

12   A.    No U.S. patents.

13   Q.    And it was a sampling of patents from a

14   variety of inventors throughout Europe.  Correct?

15   A.    Yes.

16   Q.    It wasn't looking specifically at

17   portfolios, it was constructing a portfolio by

18   aggregating patents taken from various inventors?

19           MR. NORTON:  Objection to form.

20   A.    Well, as I said, it wasn't a study about

21   portfolios; it was a study about patents.  They

22   looked at a sample of patents.

23   Q.    And they concluded that within that sample

24   of patents, the distribution was significantly

1    skewed in terms of the value with a small number of

2    the patents in that sample containing a large

3    percentage of the value?

4         A.    Yes.

5         Q.    What sorts of technology areas were

6    covered by the patents in the PatVal study?

7         A.    Most.

8         Q.    There wasn't any particular focus?

9         A.    There was no particular focus, as I

10   recall.  I mean, it was a broad-based study based on

11   a random sample of inventors.

12        Q.    Okay, let's -- Well, strike that.  Staying

13   with the PatVal study for a minute, how did that

14   study go about estimating the value of the patents

15   within the sample?

16        A.    They asked the inventors to the extent

17   that they had knowledge about the value of their

18   patent to report on this survey instrument their

19   assessment of its value.

20        Q.    Was that all done through self-reporting

21   by the inventors?

22        A.    Yes, self-reporting.

23        Q.    Was there any sort of auditing mechanism

24   that the study authors used to make sure that they

97

1    were getting good information from the inventors?

2        A.    I'd have to check back, look at the paper.

3    I know from conversations with Dr. Gambardella, who

4    was one of the lead authors on this study, that they

5    had done some general and quite careful pretesting

6    and validation of the whole survey questionnaire.

7    I'd need to go back and look at the study report

8    more carefully to be able to answer that

9    definitively yes or no.

10        Q.    In terms of asking the inventors about the

11    value of the patents, did the study for instance ask

12    them whether they licensed the patent for a sum of

13    money?  How were the inventors asked to actually

14    calculate a value?

15            MR. NORTON:  Objection to form.

16        A.    Well, the inventors weren't asked

17    necessarily to calculate a value.  They were asked

18    to report what they knew about the value of these

19    patents.  So it could be that the patent had been

20    sold or reassigned outright, or it could be that

21    they were aware of licensing royalties, or it could

22    be that they used some other kind of data to....

23    I mean, they were assigning the value of a patent to

24    a specific number or a specific range of numbers.

1    Q.    The inventors, was there any sort of

2  consistent valuation methodology that the inventors

3  used?  For instance, did they all refer to revenue

4  that had been generated by the patents through some

5  products or was there some other way that value was

6  reported?

7    A.    I'd need to go back and look at the

8  footnotes to the paper.  I would characterize it

9  generally as self-reporting by inventors of their

10  knowledge or assessment of the value of these

11  patents.

12         MR. PURCELL:  All right, let's take our

13  lunch break.

14         THE VIDEOGRAPHER:  The time is 12:07 p.m.

15  We are going off the record.  This will be the end

16  of tape 2 in the deposition of Dr. Iain Cockburn.

17         (Luncheon recess at 12:08 p.m.)

18  --------------------------------------------------------

19                 AFTERNOON SESSION

20                    12:50 p.m.

21  --------------------------------------------------------

22         THE VIDEOGRAPHER:  We are back on the

23  record.  The time is 12:50 p.m.  This is tape number

24  3 in the deposition of Dr. Iain Cockburn.

1    BY MR. PURCELL:

2        Q.    Dr. Cockburn, before lunch we were

3    discussing the studies that you relied on in

4    assessing the value of the most valuable patents in

5    the Sun portfolio.  Do you recall that?

6        A.    Yes.

7        Q.    And we discussed the PatVal study.

8    I would like to move on to the Harhoff study.  Do

9    you know how the sampling of the patents that were

10   analyzed in that study were selected.

11       A.    Well, again I'm a little bit hesitant to

12   try to recall from memory specific details of these

13   specific studies.  I mean, I can reassure you as I

14   did before lunch that I have looked carefully a at

15   these studies and satisfied myself that their

16   methodology was in my view sound and that the

17   results I could place some reliance upon in

18   performing my analysis.

19       Q.    Do you know if the Harhoff study looked at

20   patent portfolios and the distribution of value

21   within portfolios or did it look at individual

22   patents and their values as the PatVal study had

23   done?

24       A.    I'd prefer if you showed me the document

1    and then I'll refresh my memory.

2         Q.   Well, I don't have the document with me.

3              MR. NORTON:   If the only obstacle is

4    having the document, we can get copies of those for

5    you.

6    BY MR. PURCELL:

7         Q.   Do you recall how the Harhoff study went

8    about selecting the patents that it analyzed?

9         A.   Well, I can't -- I reviewed for my own

10   interest as a referee for peer-reviewed journals

11   that have published this type of stuff and for other

12   purposes dozens of these kinds of papers and I'm

13   afraid that sitting here, I can't recall

14   specifically the answer to the question you're

15   asking with sufficient certainty to testify to it

16   under oath.  I don't want to tell you, give you the

17   wrong answer when I'm referring to a methodology

18   which was in a similar paper by the same author or

19   some other such problem.

20             So I'll just reassure you that I have

21   reviewed the particular studies that I cite quite

22   carefully and I'm satisfied that they use a reliable

23   methodology.

24        Q.   Do you know whether the Harhoff study

1   focused on any particular technology area?

2        A.    As best I recall, it was agnostic with

3   respect to technologies.

4        Q.    So it didn't focus on one specific

5   technology area, for instance, mobile or Java

6   technology as the Sun portfolio is concentrated in?

7        A.    Well, no, it didn't.  And I'll add to that

8   the observation that this literature, which has used

9   a variety of methods, a variety of indicia of patent

10  value, a variety of different samples, some of these

11  studies have done breakdowns by broad technology

12  classes such as biopharmaceutical versus electronic,

13  the finding which emerges with great regularity is

14  the one with which we began this discussion before

15  lunch, which is that there is this highly skewed

16  distribution and typically you would expect the top

17  1 percent of patents in any set of patents to

18  account for 50 to 75 percent, in round numbers, of

19  the economic value of the entire set.

20       Q.    Do you know if the Harhoff study --

21       A.    And that has held up, as I said, to

22  different time periods, different methodologies,

23  different sets of patents in different countries,

24  slicing and dicing by technology area and so forth.

1    I think it's a very robust and reliable result.

2         Q.    Speaking of different countries, do you

3    know if the Harhoff study was looking at U.S.

4    patents or patents from some other geographic area?

5         A.    The Harhoff study was focused, the

6    specific one I cite here I believe was focused on

7    German patents.  I know Dr. Harhoff has done similar

8    research where he's matched the sample of German

9    patents he's used as best he could to their

10   equivalent patents in the United States and has

11   found broadly similar results.

12        Q.    And was that done by Dr. Harhoff in the

13   study that you rely on and cite in this report or

14   some other study?

15        A.    No, I think it was in another study.

16        Q.    And, do you know, is that other study

17   cited anywhere in your report?

18        A.    It's not cited in my report.  It's almost

19   certainly cited, as I suggested to you, in the

20   references, the reference list at the backs of these

21   papers.

22        Q.    And with respect to the Harhoff study, do

23   you know how the estimates of value of patents in

24   that study were derived?  Was it self-reporting by

1   patentee again?

2      A.   I think it's based essentially on self-

3   reporting.  And I know in his work, you asked the

4   question before lunch about validation, and I know

5   Dr. Harhoff has -- whether or not it's in this

6   particular study, I'd have to look at the document.

7   But Dr. Harhoff has certainly, to my knowledge, made

8   efforts to valuate the reported -- to validate the

9   reported values of patents independently.  Now, with

10   respect to the PatVal study, I think that -- I don't

11   know whether it's necessarily reported in the

12   document that I cite here, but I'm pretty sure it's

13   the case that for some subset of the patents in

14   their sample, they not only asked the inventors for

15   their assessment of the value of the patent at the

16   day it was issued, but they also independently asked

17   I think it was the inventors' boss or senior manager

18   or internal counsel or some other independent person

19   at the same organization to provide an independent

20   assessment of the value of the same patent roughly

21   in the same context.

22        So I think it's not the case, as you

23   appear to show suggesting to me, that these studies

24   don't attempt to validate the methodology.

1    Generally speaking they do.  And whether it will be

2    reported in that specific paper that I cite or in

3    another paper which uses the same set of data and

4    performs a related study I can't pin down for you.

5         Q.    Is there any discussion in the literature

6    of whether the distribution of the value of patents

7    within a portfolio is any different in the United

8    States versus other countries?

9         A.    What comes to mind, as I think I just

10   said, the fact which emerges looking at the totality

11   of these studies is that the degree of skewness

12   observed is surprisingly similar across different

13   periods of time, different technologies, different

14   methodologies, you know, different ways of

15   approximating or deriving patent value.

16        Q.    With respect to the Barney survey, I don't

17   know if you recall sitting here, but do you remember

18   how the population of patents analyzed in that

19   survey was determined?

20        A.    Well, as I recall, I think it was about a

21   sample of 76,000 patents.  Again, I think it -- I

22   think it was based on a particular application

23   cohort and not restricted to particular

24   technologies.  But, I mean, that's my recollection

1   of it.  I would want to confirm that by looking at

2   the study.

3       Q.    And when you say application cohort, you

4   mean patents that were applied for during a

5   particular time period?

6       A.    Yes.

7       Q.    Do you recall the length of that time

8   period?

9       A.    No.  I'm thinking -- No, it's relatively

10   early in time, it might well be, although it was

11   applied for in a calendar year.  Again, you know,

12   you're asking me to fish in my memory about

13   something that I can't be certain of.

14      Q.    And the Barney study, that looked at U.S.

15   patents.  Correct?

16      A.    That looked at U.S. patents.

17      Q.    The valuation of the individual patents in

18   the Barney study, how was that determined?

19      A.    Well, the Barney study, I was just

20   speaking about a variety of methods.  So the Barney

21   study is among those which look at whether or not a

22   patent is renewed in the sense of the assignee pace

23   their renewal fee at the Patent Office on the

24   required date and uses that as an indicator of a

106

1    lower bound on the value of the patent.  If the

2    owner of the patent decides it's not worth paying

3    $500 to renew the patent for the next period of its

4    term, then you know it's worth less than $500.

5    Conversely, if they do decide to pay the annual fee,

6    it must be worth at least $500.

7            This is an idea which goes back to some of

8    the very earliest studies on this topic done in the

9    early 1980s by Pakes, P-a-k-e-s, and Schankerman,

10   S-c-h-a-n-k-e-r-m-a-n.

11   Q.    With respect to the population of patents

12   that were renewed and that are worth $500 or more,

13   how did the Barney study go about determining more

14   specific values of those patents?

15   A.    Well, you can back out from these data

16   inferences about the value of patents at different

17   points based upon these lower-bound numbers where

18   you know a fraction dropping out are worth less than

19   some number.

20   Q.    Did the Barney study look at anything

21   other than whether or not patents within the

22   population were renewed in determining value and

23   then drawing conclusions from that fact?

24           MR. NORTON:  Objection to form.

107

1  A.   Well, there's two pieces of information,
2  one of which is:  Was the renewal fee paid?  And
3  secondly with respect to how much is the remaining
4  lifetime of the patent?  So the Barney study is
5  driven off of those two things, which he uses to
6  infer some value.
7      None of these -- So looking at renewal
8  fees is one way people have looked at this.  Other
9  studies have looked at reassignment of patents.
10 Other studies have looked at what we call
11 bibliometric indicators, such as citations or the
12 pattern of citations.  There's a lot of correlates
13 to the economic value of patents which have been
14 looked at in this sense.
15     What I believe I have been able to show
16 here is I've looked at a variety of studies which
17 use a variety of methods and base their conclusions
18 on a variety of indicators of patent value, to show
19 that they all come back to the same conclusion.
20 Q.   What if anything did you do to satisfy
21 yourself that the population of patents that were
22 examined in these studies are comparable to the Sun
23 portfolio that is at issue in this case?
24 A.   I think I didn't -- You know, I wasn't

108

1    able in the time available to conduct my own, if you

2    like, reference study.  I could imagine one might

3    want to try to replicate the methodology of one of

4    these studies but to a sample of patents which was

5    constructed to look like the portfolio in question.

6    One could imagine there's things one could do.  I

7    don't know that they're feasible to do quickly or

8    reliably.

9         What I -- My conclusion here is based on

10   the assumption that this portfolio of patents is

11   similar in the sense -- Let me try to say this more

12   coherently.

13        As I've said a few times, it's striking

14   that these types of studies done for many different

15   sets of patents and in many different contexts using

16   many different methodologies all point to a

17   conclusion which I don't think is controversial,

18   which is that the value distribution is highly

19   skewed.  So based upon that, it is my opinion that I

20   have no reason to believe that the 569 patents of

21   interest here would have a value distribution which

22   is any less skewed than that which has been found so

23   many times in so many different circumstances.

24        Q.    Are you aware of any studies that have

1   are the three most valuable patents in the 569

2   patent portfolio other than Google's revealed

3   preference through its design of Android?

4       A.    Well, of course starting from -- Recognize

5   that those three patents fall in that very select

6   group which Dr. Reinhold's analysis points to as

7   being the most technologically significant and the

8   most important within that group in terms of

9   conveying benefits in speed, memory and security to

10   a smartphone platform.  So that points to them being

11   already amongst the most valuable.  And within that,

12   I think the fact that we know that these patents or

13   are assuming that these patents are valid and

14   infringed is going to push them to the very top of

15   that set of 22.

16       Q.    Dr. Reinhold was unable to provide an

17   opinion that the '104, '205 and '720 patents were

18   the three most valuable patents in the portfolio.

19   Correct?

20       A.    That's correct.  And I understood from my

21   conversation with him, he did not believe he could

22   reliably rank those 22 patents in that set in order

23   of value.

24       Q.    But it is your opinion based on Google's

1    characterize the bases of my independent

2    significance approach using the categories or the

3    labels that you are using.  I base my evaluation of

4    the significance of these patents relative to other

5    patents that might be in the portfolio based upon a

6    variety of evidence.

7       Q.    All right.  Well, why don't you tell me

8    what that evidence is.

9       A.    Which is discussion in the record as to

10   the value that Google itself placed upon this type

11   of functionality; benchmarking studies that I did or

12   engineers at Oracle did; the work that Dr. Shugan

13   did using conjoint analysis to evaluate user

14   preferences or the significance of this

15   functionality as a basis for demand.

16          My qualitative findings from econometric

17   work I would not say were a basis for this

18   determination that I relied upon determinatively but

19   it's certainly something I considered to the extent

20   that I believe my econometric work demonstrates

21   another way of demonstrating the relationship of the

22   patented functionality to consumer demand.  I look

23   also at Dr. Reinhold's work in grouping and ranking

24   these patents in terms of their technical merit or

136

1   significance.

2          So that's the range of evidence that I

3   look to and consider in arriving at my determination

4   as to an apportionment percentage based upon this

5   independent significance approach.

6   Q.    Is there anything else that forms the

7   basis of your independent significance approach

8   other than the things you've just listed?

9   A.    Those are the specific criteria, the

10  specific studies or pieces of evidence or things

11  I've taken into consideration.  I have also relied

12  upon my general knowledge and experience, my

13  participation in and knowledge of the academic

14  researches in this field, the work that I've done

15  with the Licensing Executives Society on

16  understanding licensing practices and related issues

17  which relate to patent valuation; dozens of

18  conversations over the years with people involved in

19  licensing or valuing or managing intellectual

20  property.  All of those things put together inform

21  the basis of my independent significance assessment.

22         MR. NORTON:  Mr. Purcell, before you go on

23  to the next question, do you still need a break?

24         THE WITNESS:  I really would like to take

1    a break, if you don't mind.

2              MR. PURCELL:  Yes, that's fine.

3              THE VIDEOGRAPHER:  The time is 1:57 p.m.

4    We are going off the record.

5              (Short recess taken.)

6              THE VIDEOGRAPHER:  We are back on the

7    record.  The time is 2:09 p.m.

8    BY MR. PURCELL:

9         Q.    Dr. Cockburn, before the break we were

10   talking about the bases of your independent

11   significance approach.  Correct?

12        A.    Correct.

13        Q.    You rely on those bases to reach an

14   apportionment figure of 25 percent for the patents

15   in suit.  Correct?

16        A.    Correct.

17        Q.    How do you get the 25 percent?

18        A.    Well, it's a judgment based on my

19   expertise and my consideration of the evidence that

20   we talked about just before the break.

21        Q.    Is there any quantification in the

22   evidence that we talked about before the break that

23   you can point me to in supporting the 25 percent

24   conclusion?

1      A.      Are you asking about -- ?  I'm sorry.  Did

2  you ask me was there any of the evidence

3  quantitative?

4      Q.      Correct.

5      A.      Well, certainly.  So the results of

6  benchmarking are quantitative evidence.  The factor

7  by which execution speed is affected by disabling

8  the patented functionality, I mean, that's a hard

9  number.  That's 80 percent.  The conjoint analysis,

10  the results of the conjoint analysis have a

11  quantitative expression as to how users' preferences

12  would drive a counterfactual set of market shares in

13  the experiment that Dr. Shugan conducted based upon

14  his conjoint survey.  To the degree that I looked to

15  the dollar implications, these market share impacts,

16  which as I suggested and told you earlier, I think

17  are corroborative or supportive but not

18  determinative of my assessment of 25 percent.

19          I mean, those are numbers, 50 or 75 or 100

20  million dollars in what I call incremental Android

21  revenue to Google will be at stake depending on

22  whether or not you had implemented the patented

23  functionality or not.  So all those are quantitative

24  facts that go into and form part of my assessment,

139

1    my evaluation.

2        Q.    How do you get from those numbers that you

3    just cited in the data to the 25 percent conclusion?

4        A.    Oh, so you're asking me do I have a

5    formula into which I could plug those numbers and

6    that would give an answer which equals 25 percent?

7        Q.    Well, that would be one way of doing it.

8    Have you done it that way?

9        A.    No.

10        Q.    Without having a hard and fast formula

11    that would lead to the 25 percent, is there any line

12    you can draw from any sort of quantitative base

13    figure to the 25 percent?

14            MR. NORTON:  Objection to form.

15        A.    No.  My conclusion that at least 25

16    percent is based upon my synthetic assessment of all

17    of that evidence in light of my knowledge and

18    experience and expertise.

19        Q.    You said in your report at one point, I

20    know we discussed this earlier, that the conjoint

21    analysis was not used in the independent

22    significance approach.  If you want to look at the

23    text, it's in paragraph 423.

24        A.    I hope I was clear in my answer to that

1    question, and maybe I wasn't, that perhaps that is

2    not as well worded as it might be.  What I meant by

3    that sentence was I don't rely upon the application

4    of conjoint analysis in the way that I did in my

5    September report to form my independent significance

6    assessment.

7        Q.    And in what way do you rely on it in

8    forming your independent significance assessment?

9    Strike that.  Let me ask it again.

10            In what way do you rely on Dr. Shugan's

11   conjoint analysis in forming your independent

12   significance assessment?

13       A.    Didn't I -- ?  Didn't you ask me this this

14   morning?

15       Q.    I may have done.

16            MR. NORTON:  I'll object on that ground.

17   But answer the question.

18       A.    Well, I rely on it specifically in coming

19   up with my determination that the patents in suit

20   constitute at least 25 percent of the value of the

21   intellectual property component of the 2006 license

22   bundle.  Qualitatively in the sense it's my judgment

23   looking at the results of Dr. Shugan's analysis that

24   the functionality enabled by the patents or by the

141

1    copyrighted APIs has a substantial and significant

2    impact upon user preferences as translated into the

3    market share predictions of the conjoint model.

4        Q.    Do you rely on the conclusions of the

5    conjoint model -- Strike that.  Do you rely on any

6    of the quantitative conclusions of the conjoint

7    model in developing your independent significance

8    approach?

9        A.    Well, yes.  I think it's both informative

10   qualitatively and quantitatively in that the market

11   share effects are not just statistically

12   significant; they're also pretty large.  The

13   impacts, if you go to Exhibit 5 in my report --

14       Q.    Did you want to point me to something in

15   Exhibit 5?

16       A.    As I was going to go on to say there, I

17   find Dr. Shugan's work, and maybe I think we need to

18   go look at Shugan Exhibits 4A and 4B, in and of

19   themselves looking at those conjoint studies, points

20   me to a substantial value placed by users.

21   Substantial also, as I suggested earlier, translates

22   into significant impacts in terms of dollars or

23   market share.  So I would --

24       Q.    When -- Go ahead.

142

1      A.      That's quantitative information that

2   I take into account in forming my assessment of at

3   least 25 percent.

4      Q.      You keep saying at least 25 percent.

5   What's the upper bound of that range if 25 percent

6   is the lower bound?

7      A.      Focusing on this synthetic evaluation of

8   this range of evidence would lead me to think that

9   these patents are important, they're economically

10  significant, reflecting on the share of portfolio

11  value.  That they are an important or economically

12  significant set of patents would constitute, would

13  suggest to me that something in the range of at

14  least 25, possibly 50 percent, possibly more, of the

15  portfolio value could be attributed to those

16  patents.

17     Q.      Where is the 50 percent or more number

18  mentioned in your report?

19     A.      It isn't.  You just asked me about it.  My

20  opinion is that it's at least 25 percent.

21     Q.      Do you intend to tell the jury that the

22  independent significance approach could result in an

23  apportionment of 50 percent or more?

24              MR. NORTON:  Objection to form.

143

1        A.    50 percent or more?  Well, if you asked me

2    on the witness stand could it be 50 percent or more,

3    then my answer would be yes, it could be.

4        Q.    Based on --

5        A.    I'm comfortable with my opinion as stated,

6    which is at least 25 percent.

7        Q.    But just to be clear, the 50 percent or

8    more figure, we're hearing that for the first time

9    today in this deposition.  Correct?

10             MR. NORTON:  Objection to form.

11       A.    50 percent is not in my report.  I'm just

12   trying to be responsive to your question.

13       Q.    So whether the number is 25 percent or

14   50 percent or more under the independent

15   significance approach, is there any more specific

16   way you can describe how you get to that result

17   other than saying you synthesized all of the various

18   inputs we've discussed and come out with that

19   number?

20       A.    So I have synthesized those inputs and I

21   have put them in the context of my general knowledge

22   and experience and my consideration of the

23   fundamental economics that are at work here, the

24   broader context in which we are considering this

1    dispute or a moot question in my mind because I

2    think that -- I don't think there's any economic

3    basis to believe that the value of a copyright to a

4    larger number of APIs will be any different from the

5    value of a copyright to 37 APIs specifically.

6         Q.    What about copyrighted works other than

7    APIs and code libraries?  Did you take those into

8    account?

9              MR. NORTON:  Objection to form.

10        A.    I'm not aware that there's any other

11   copyrights at stake.

12        Q.    What is your basis for your understanding

13   of which copyrights are at stake?

14        A.    Well, I haven't seen any other specific

15   copyrights identified.  If you can suggest something

16   to me that --

17        Q.    Do you know how many copyrighted works

18   related to Java Sun owned as of mid 2006?

19              MR. NORTON:  Objection to form.

20        A.    Are you asking me about the totality of

21   copyrighted material which has any relation to Java

22   owned by Sun?

23        Q.    Let's start there, sure.

24        A.    Well, I don't know.  If you counted them

154

1   up individually, assuming there's one copyright to

2   one small document, it could run into quite large

3   numbers of specific copyrights.

4           I think what's important here is to focus

5   on what's understood to be licensed within the terms

6   of the agreement --

7   Q.      Which is --

8           MR. NORTON:  I'm sorry.  You're

9   interrupting the witness's answer.

10          MR. PURCELL:  I think he's done.

11          THE WITNESS:  No, I'm not done.

12  A.      Within the terms of the agreements or the

13  draft agreements, which as I recall have clauses

14  which quite specifically limit the intellectual

15  property to be conveyed by Sun to Google.  I can't

16  recall the precise language sitting here, but if you

17  show me the agreement, I'll point you to it.

18  Q.      So it is your understanding that the

19  copyright component of the 2006 bundle in the draft

20  agreements was limited to just API specifications

21  and code libraries?

22  A.      It is limited in the first place to

23  copyright which would meet the limitations of

24  copyrighted material, which would be used to be

158

1    anything specific other than APIs and associated

2    underlying code libraries.

3        Q.    Sun also wrote the source code underlying

4    its implementation of the Java virtual machine.

5    Correct?

6        A.    Correct.

7        Q.    And that source code is copyrighted.

8    Correct?

9        A.    Correct.

10       Q.    What is your basis for thinking that the

11   2006 bundle would have excluded that copyrighted

12   source code?

13            MR. NORTON:  Objection to form.

14       A.    I'm sorry.  Can you repeat the previous

15   question before you asked me what my basis was?  Or

16   just --

17       Q.    The source code underlying Sun's

18   implementation of the Java virtual machine is

19   copyrighted.  Correct?

20            MR. NORTON:  Objection to form.

21       A.    Correct.

22       Q.    So what is your basis for your opinion

23   that the copyright aspect of the 2006 bundle would

24   exclude that copyrighted source code?

1                MR. NORTON:  Objection to form.

2         A.    It's not necessarily clear whether that

3    particular copyright in that particular source code

4    is being conveyed.  Again, we can go back and look

5    at the agreement.  As I understand it, Google and

6    Sun proposed to jointly develop a Linux Java mobile

7    stack which will be released under certain, under

8    some to be agreed open-source licensing framework.

9                Now, some of the copyrights, some of the

10   code that constitutes Sun's virtual machine may go

11   in there line for line; some of it may not.  There

12   may be fresh copyrights created by new and modified

13   code.  It's not clear who owns those.

14               To the extent that such copyrights are

15   being -- Just give me a moment.  (Pause)

16               There are some specific copyrighted

17   materials which can be identified here which are the

18   APIs which in my view are clearly distinguished and

19   have a clearly identified need for Google to license

20   those APIs in order to be able to do a Java

21   implementation which offers these core APIs to the

22   community of developers who expect them to be there.

23   I believe it is reason to believe that they could be

24   an identifiable contribution of their value to the

1    entire value and spot entire amount conveyed to Sun

2    under this 2006 agreement.

3           To the extent that there are other

4    copyrights created or conveyed or incorporated in

5    that agreement, I think that their value is both

6    probably more difficult to distinguish but is going

7    to be picked up in the revenues which Sun would

8    anticipate to realize from its part of the revenue

9    from monetizing this open-source release through its

10   business model.

11   Q.    The value to Google of the additional

12   copyrights would be accounted for in Sun's

13   monetization?

14   A.    No, we're not talking about the value to

15   Google.  We're talking about the value to Sun.

16   Q.    We're talking about the extent to which

17   the 2006 bundle amount includes copyrights that your

18   analysis hasn't accounted for.  Your analysis -- Let

19   me ask a question.  Your analysis doesn't account

20   for the value of any copyrights other than the API

21   specifications and associated code libraries.

22   Correct?

23          MR. NORTON:  Objection to form.

24   A.    I would say my analysis doesn't isolate

161



162



166

1      A.    Well, if the ability to develop a vibrant

2    application developer community is make or break for

3    this platform, as it appears to have been for other

4    attempts to create such ecosystems such as, if you

5    like, the last gasp of Palm as an independent

6    platform, trying to sell a Palm OS or recent efforts

7    to reincarnate WebOS, many of these things seem to

8    be perfectly good technologies in terms of their

9    technical merit.  It is just that they fail in the

10   marketplace because they cannot attract the supply

11   of complementary applications.

12           So if it was indeed the case that not

13   having access to the core Java APIs was going to

14   throw sufficient sand into the gears of the virtuous

15   circle or the positive feedback loop which drives

16   these dynamics, then it might well be the case that

17   Android would have been a complete flop purely on

18   those grounds, in which case you might argue that

19   100 percent of the value of the agreement could be

20   attributed just to the copyrights.

21      Q.    And is that in addition to the 50 percent

22   or more that could be attributed to the patents?

23      A.    That would trump the patents.  That's not

24   going to be additive.  It can't be more than a