# EXHIBIT A

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4

5     _____

6     Oracle America, Inc.

7

8     v.                    Case No. 3:10-cv-03561 WHA

9     Google Inc.

10    _____

11

             HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

12       Video Deposition of Iain M. Cockburn, Ph.D.

13             Friday, February 10, 2012

14                 Analysis Group

15        111 Huntington Avenue - 10th Floor

16            Boston, Massachusetts 02199

17

18

19

20    ----------- J. Edward Varallo, RMR, CRR  ----------

21

22

23

24

25    PAGES 1 - 178

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

89

1    in valuing patents, which is to focus upon the

2    patent as being the object of interest in an

3    economic or commercial sense.  So I am not aware of

4    license negotiations which are conducted at the

5    level of specific claims, nor am I aware of efforts

6    to value patents or portfolios of patents outside of

7    a licensing negotiation which is conducted at the

8    level of distinguishing one claim from another.  Nor

9    do I -- So that was the level at which I was

10   conducting this analysis, which is consistent both

11   with industry practice and what economists believe

12   is measurable in this context.

13          Secondly, I had an eye on, if you like, on

14   the analysis that I wrote in the other part of my

15   report where I asked myself the question:  Is there

16   a meaningful difference for distinguishing or being

17   able to discriminate between damages in this context

18   and for these patents as applied to one claim versus

19   another claim?

20          And thirdly, I don't believe Dr. Reinhold

21   was able to conduct the work that he did at the

22   level of considering the contribution of individual

23   claims to the portfolio.  Neither Dr. Reinhold nor

24   I, nor in my opinion persons engaged in a

25   hypothetical negotiation about this specific

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

90

1      portfolio of patents would have been thinking about

2      this portfolio as an aggregation of claims; they

3      would have been thinking about it as an aggregation

4      of patents.

5           Q.    Is there anything in your report that

6      attempts to break out the value of the unasserted

7      claims of the patents in suit versus the asserted

8      claims?

9           A.    I don't draw that distinction in this

10     apportionment analysis, no.

11          Q.    Let's move on to paragraph 405 on page

12     152.  I would like to talk a little bit about the

13     studies that you used as your reference for the

14     distribution of the value of the patents within the

15     portfolio.

16               MR. NORTON:  I don't want to get in your

17     way.  We're coming up on noon and if we could take a

18     break at some point in the near term, I'd appreciate

19     it.

20               MR. PURCELL:  Yeah, that's fine, that's

21     fine.

22     BY MR. PURCELL:

23          Q.    So in paragraph 405 you mention that you

24     used three recent studies of patent value to

25     document the distribution curves of the value of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

93

1      A.    Yes.

2      Q.    Are you aware of any other similar studies

3   that reached conclusions that the top 1 percent of

4   the patents account for value outside of that 42 to

5   78 percent range?

6      A.    Well, that may be.  There may be some

7   numbers in some of these studies -- If you have

8   looked at them, I think you will appreciate that

9   many of them are complicated analyses that look at

10  different cuts of the data in different ways or use

11  different methodologies or try different

12  experiments.  A range of 42 to 78 percent I think

13  spans in my view the range which the literature

14  points us to.

15           The stylized fact, if you like, if you

16  poked an economist who's worked on these problems

17  and asked them, you know, what share of the value of

18  a portfolio of patents would the top 1 percent

19  likely account for?  I think they would likely say

20  "Well, probably 50 to 75 percent," based upon some

21  synthetic appreciation of all the results in the

22  literature.

23      Q.    The three studies you relied on and that

24  are discussed in Exhibit 34 and Exhibit 35, there's

25  the PatVal study, the Harhoff study and the Barney

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

94

1    study?

2       A.    Yes.

3       Q.    Taking them one at a time, with respect to

4    the PatVal study, do you know how that study

5    selected the population of portfolios that it used

6    as its dataset?

7       A.    Well, it didn't use a population of

8    portfolios; they looked at a population, a sample of

9    patents.  The sample of patents was -- I mean, these

10   results come from a broader research project, which

11   was to survey European inventors about a variety of

12   things.  One of the items of interest that the

13   people who conducted this study asked was for these

14   inventors to provide some information about the

15   value of one of their patents.

16        So the selection of that portfolio I think

17   roughly could be understood as a random sample of

18   inventors on patents from a particular application

19   cohort.

20      Q.    The PatVal survey, was the dataset

21   exclusively European patents?

22      A.    Yes.

23      Q.    No U.S. patents?

24      A.    No U.S. patents.

25      Q.    And it was a sampling of patents from a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

95

1    variety of inventors throughout Europe.   Correct?

2        A.    Yes.

3        Q.    It wasn't looking specifically at

4    portfolios, it was constructing a portfolio by

5    aggregating patents taken from various inventors?

6              MR. NORTON:   Objection to form.

7        A.    Well, as I said, it wasn't a study about

8    portfolios; it was a study about patents.   They

9    looked at a sample of patents.

10       Q.    And they concluded that within that sample

11   of patents the distribution was significantly skewed

12   in terms of the value, with a small number of the

13   patents in that sample containing a large percentage

14   of the value?

15       A.    Yes.

16       Q.    What sorts of technology areas were

17   covered by the patents in the PatVal study?

18       A.    Most.

19       Q.    There wasn't any particular focus?

20       A.    There was no particular focus, as I

21   recall.   I mean, it was a broad-based study based on

22   a random sample of inventors.

23       Q.    Okay, let's -- Well, strike that.   Staying

24   with the PatVal study for a minute, how did that

25   study go about estimating the value of the patents

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

96

1    within the sample?

2         A.    They asked the inventors to the extent

3    that they had knowledge about the value of their

4    patent to report on this survey instrument their

5    assessment of its value.

6         Q.    Was that all done through self-reporting

7    by the inventors?

8         A.    Yes, self-reporting.

9         Q.    Was there any sort of auditing mechanism

10   that the study authors used to make sure that they

11   were getting good information from the inventors?

12        A.    I'd have to check back, look at the paper.

13   I know from conversations with Dr. Gambardella, who

14   was one of the lead authors on this study, that they

15   had done some general and quite careful pretesting

16   and validation of the whole survey questionnaire.

17   I'd need to go back and look at the study report

18   more carefully to be able to answer that

19   definitively yes or no.

20        Q.    In terms of asking the inventors about the

21   value of the patents, did the study for instance ask

22   them whether they licensed the patent for a sum of

23   money?  How were the inventors asked to actually

24   calculate a value?

25             MR. NORTON:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

97

1    A.    Well, the inventors weren't asked

2    necessarily to calculate a value.  They were asked

3    to report what they knew about the value of these

4    patents.  So it could be that the patent had been

5    sold or reassigned outright, or it could be that

6    they were aware of licensing royalties, or it could

7    be that they used some other kind of data to....

8    I mean, they were assigning the value of a patent to

9    a specific number or a specific range of numbers.

10    Q.    The inventors, was there any sort of

11    consistent valuation methodology that the inventors

12    used?  For instance, did they all refer to revenue

13    that had been generated by the patents through some

14    products or was there some other way that value was

15    reported?

16    A.    I'd need to go back and look at the

17    footnotes to the paper.  I would characterize it

18    generally as self-reporting by inventors of their

19    knowledge or assessment of the value of these

20    patents.

21         MR. PURCELL:  All right, let's take our

22    lunch break.

23         THE VIDEOGRAPHER:  The time is 12:07 p.m.

24    We are going off the record.  This will be the end

25    of tape 2 in the deposition of Dr. Iain Cockburn.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

98

1                    (Luncheon recess at 12:08 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

99

```
1      -------------------------------------------------
2                    AFTERNOON SESSION
3                        12:50 p.m.
4      -------------------------------------------------
5            THE VIDEOGRAPHER:  We are back on the
6      record.  The time is 12:50 p.m.  This is tape number
7      3 in the deposition of Dr. Iain Cockburn.
8  BY MR. PURCELL:
9        Q.    Dr. Cockburn, before lunch we were
10     discussing the studies that you relied on in
11     assessing the value of the most valuable patents in
12     the Sun portfolio.  Do you recall that?
13       A.    Yes.
14       Q.    And we discussed the PatVal study.
15     I would like to move on to the Harhoff study.  Do
16     you know how the sampling of the patents that were
17     analyzed in that study were selected?
18       A.    Well, again I'm a little bit hesitant to
19     try to recall from memory specific details of these
20     specific studies.  I mean, I can reassure you as
21     I did before lunch that I have looked carefully at
22     these studies and satisfied myself that their
23     methodology was in my view sound and that the
24     results I could place some reliance upon in
25     performing my analysis.
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

100

1    Q.    Do you know if the Harhoff study looked at

2    patent portfolios and the distribution of value

3    within portfolios or did it look at individual

4    patents and their values as the PatVal study had

5    done?

6    A.    I'd prefer if you showed me the document

7    and then I'll refresh my memory.

8    Q.    Well, I don't have the document with me.

9          MR. NORTON:  If the only obstacle is

10   having the document, we can get copies of those for

11   you.

12   BY MR. PURCELL:

13   Q.    Do you recall how the Harhoff study went

14   about selecting the patents that it analyzed?

15   A.    Well, I can't -- I reviewed for my own

16   interest as a referee for peer-reviewed journals

17   that have published this type of stuff and for other

18   purposes dozens of these kinds of papers; and I'm

19   afraid that, sitting here, I can't recall

20   specifically the answer to the question you're

21   asking with sufficient certainty to testify to it

22   under oath.  I don't want to tell you, give you the

23   wrong answer when I'm referring to a methodology

24   which was in a similar paper by the same author or

25   some other such problem.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

101

1          So I'll just reassure you that I have

2     reviewed the particular studies that I cite quite

3     carefully and I'm satisfied that they use a reliable

4     methodology.

5          Q.     Do you know whether the Harhoff study

6     focused on any particular technology area?

7          A.     As best I recall, it was agnostic with

8     respect to technologies.

9          Q.     So it didn't focus on one specific

10    technology area, for instance, mobile or Java

11    technology as the Sun portfolio is concentrated in?

12         A.     Well, no, it didn't.  And I'll add to that

13    the observation that this literature, which has used

14    a variety of methods, a variety of indicia of patent

15    value, a variety of different samples, some of these

16    studies have done breakdowns by broad technology

17    classes such as biopharmaceutical versus electronic.

18    The finding which emerges with great regularity is

19    the one with which we began this discussion before

20    lunch, which is that there is this highly skewed

21    distribution and typically you would expect the top

22    1 percent of patents in any set of patents to

23    account for 50 to 75 percent, in round numbers, of

24    the economic value of the entire set.

25         Q.     Do you know if the Harhoff study --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

102

1      A.     And that has held up, as I said, to

2   different time periods, different methodologies,

3   different sets of patents in different countries,

4   slicing and dicing by technology area and so forth.

5   I think it's a very robust and reliable result.

6      Q.     Speaking of different countries, do you

7   know if the Harhoff study was looking at U.S.

8   patents or patents from some other geographic area?

9      A.     The Harhoff study was focused, the

10  specific one I cite here I believe was focused on

11  German patents.  I know Dr. Harhoff has done similar

12  research where he's matched the sample of German

13  patents he's used as best he could to their

14  equivalent patents in the United States and has

15  found broadly similar results.

16     Q.     And was that done by Dr. Harhoff in the

17  study that you rely on and cite in this report or

18  some other study?

19     A.     No, I think it was in another study.

20     Q.     And, do you know, is that other study

21  cited anywhere in your report?

22     A.     It's not cited in my report.  It's almost

23  certainly cited, as I suggested to you, in the

24  references, the reference list at the backs of these

25  papers.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

'103

1      Q.    And with respect to the Harhoff study, do

2   you know how the estimates of value of patents in

3   that study were derived?  Was it self-reporting by

4   patentee again?

5      A.    I think it's based essentially on self-

6   reporting.  And I know in his work, you asked the

7   question before lunch about validation, and I know

8   Dr. Harhoff has -- whether or not it's in this

9   particular study, I'd have to look at the document.

10  But Dr. Harhoff has certainly, to my knowledge, made

11  efforts to valuate the reported -- to validate the

12  reported values of patents independently.

13          Now, with respect to the PatVal study, I

14  think that -- I don't know whether it's necessarily

15  reported in the document that I cite here, but I'm

16  pretty sure it's the case that for some subset of

17  the patents in their sample, they not only asked the

18  inventors for their assessment of the value of the

19  patent at the day it was issued, but they also

20  independently asked I think it was the inventor's

21  boss or senior manager or internal counsel or some

22  other independent person at the same organization to

23  provide an independent assessment of the value of

24  the same patent roughly in the same context.

25          So I think it's not the case, as you

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

104

1    appear to be suggesting to me, that these studies

2    don't attempt to validate the methodology.

3    Generally speaking they do.  And whether it will be

4    reported in that specific paper that I cite or in

5    another paper which uses the same set of data and

6    performs a related study I can't pin down for you.

7        Q.    Is there any discussion in the literature

8    of whether the distribution of the value of patents

9    within a portfolio is any different in the United

10   States versus other countries?

11       A.    What comes to mind, as I think I just

12   said, the fact which emerges looking at the totality

13   of these studies is that the degree of skewness

14   observed is surprisingly similar across different

15   periods of time, different technologies, different

16   methodologies, you know, different ways of

17   approximating or deriving patent value.

18       Q.    With respect to the Barney survey, I don't

19   know if you recall sitting here, but do you remember

20   how the population of patents analyzed in that

21   survey was determined?

22       A.    Well, as I recall, I think it was about a

23   sample of 76,000 patents.  Again, I think it -- I

24   think it was based on a particular application

25   cohort and not restricted to particular

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

105

1    technologies.  But, I mean, that's my recollection

2    of it.  I would want to confirm that by looking at

3    the study.

4         Q.    And when you say application cohort, you

5    mean patents that were applied for during a

6    particular time period?

7         A.    Yes.

8         Q.    Do you recall the length of that time

9    period?

10        A.    No.  I'm thinking -- No, it's relatively

11   early in time, it might well be, although it was

12   applied for in a calendar year.  Again, you know,

13   you're asking me to fish in my memory about

14   something that I can't be certain of.

15        Q.    And the Barney study, that looked at U.S.

16   patents.  Correct?

17        A.    That looked at U.S. patents.

18        Q.    The valuation of the individual patents in

19   the Barney study, how was that determined?

20        A.    Well, the Barney study, I was just

21   speaking about a variety of methods.  So the Barney

22   study is among those which look at whether or not a

23   patent is renewed in the sense of the assignee pays

24   their renewal fee at the Patent Office on the

25   required date and uses that as an indicator of a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

106

1    lower bound on the value of the patent.  If the

2    owner of the patent decides it's not worth paying

3    $500 to renew the patent for the next period of its

4    term, then you know it's worth less than $500.

5    Conversely, if they do decide to pay the annual fee,

6    it must be worth at least $500.

7            This is an idea which goes back to some of

8    the very earliest studies on this topic done in the

9    early 1980s by Pakes, P-a-k-e-s, and Schankerman,

10   S-c-h-a-n-k-e-r-m-a-n.

11       Q.    With respect to the population of patents

12   that were renewed and that are worth $500 or more,

13   how did the Barney study go about determining more

14   specific values of those patents?

15       A.    Well, you can back out from these data

16   inferences about the value of patents at different

17   points based upon these lower-bound numbers where

18   you know a fraction dropping out are worth less than

19   some number.

20       Q.    Did the Barney study look at anything

21   other than whether or not patents within the

22   population were renewed in determining value and

23   then drawing conclusions from that fact?

24            MR. NORTON:  Objection to form.

25       A.    Well, there's two pieces of information,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

107

1    one of which is:  Was the renewal fee paid?  And

2    secondly with respect to how much is the remaining

3    lifetime of the patent?  So the Barney study is

4    driven off of those two things, which he uses to

5    infer some value.

6         None of these -- So looking at renewal

7    fees is one way people have looked at this.  Other

8    studies have looked at reassignment of patents.

9    Other studies have looked at what we call

10   bibliometric indicators, such as citations or the

11   pattern of citations.  There's a lot of correlates

12   to the economic value of patents which have been

13   looked at in this sense.

14        What I believe I have been able to show

15   here is I've looked at a variety of studies which

16   use a variety of methods and base their conclusions

17   on a variety of indicators of patent value, to show

18   that they all come back to the same conclusion.

19   Q.   What if anything did you do to satisfy

20   yourself that the population of patents that were

21   examined in these studies are comparable to the Sun

22   portfolio that is at issue in this case?

23   A.   I think I didn't -- You know, I wasn't

24   able in the time available to conduct my own, if you

25   like, reference study.  I could imagine one might

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

108

1    want to try to replicate the methodology of one of

2    these studies but to a sample of patents which was

3    constructed to look like the portfolio in question.

4    One could imagine there's things one could do.  I

5    don't know that they're feasible to do quickly or

6    reliably.

7              What I -- My conclusion here is based on

8    the assumption that this portfolio of patents is

9    similar in the sense -- Let me try to say this more

10   coherently.

11             As I've said a few times, it's striking

12   that these types of studies done for many different

13   sets of patents and in many different contexts using

14   many different methodologies all point to a

15   conclusion which I don't think is controversial,

16   which is that the value distribution is highly

17   skewed.  So based upon that, it is my opinion that I

18   have no reason to believe that the 569 patents of

19   interest here would have a value distribution which

20   is any less skewed than that which has been found so

21   many times in so many different circumstances.

22        Q.    Are you aware of any studies that have

23   looked at a single portfolio of patents -- Strike

24   that.

25             Are you aware of any studies that have

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



124

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

125



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

133

1      Q.    So we've talked about the importance of

2   the functionality, the importance of the patents to

3   improving the functionality, and the lack of good

4   alternatives to the patented technology.  What other

5   bases are there for your independent significance

6   approach besides those?

7      A.    I'm sorry.  Could we maybe take a break?

8   I'm really struggling to hold your questions in my

9   mind as you formulate them.  If you would like to

10  repeat it, I can try to answer it.

11     Q.    Sure.  Would you like to take a break?

12  Well, if it's something that's going to be fixed by

13  taking a break....  I'm happy to repeat the

14  question.

15          We have discussed the importance to Google

16  of certain functionality, the benefits the patents

17  provide in improving that functionality, and the

18  lack of non-infringing alternatives.  And I'm

19  wondering what other bases are there for your

20  independent significance approach other than those

21  things?

22     A.    Well, I don't know that I would

23  characterize the bases of my independent

24  significance approach using the categories or the

25  labels that you are using.  I base my evaluation of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

134

1    the significance of these patents relative to other

2    patents that might be in the portfolio based upon a

3    variety of evidence.

4         Q.    All right.  Well, why don't you tell me

5    what that evidence is.

6         A.    Which is discussion in the record as to

7    the value that Google itself placed upon this type

8    of functionality; benchmarking studies that I did or

9    engineers at Oracle did; the work that Dr. Shugan

10   did using conjoint analysis to evaluate user

11   preferences or the significance of this

12   functionality as a basis for demand.

13        My qualitative findings from econometric

14   work I would not say were a basis for this

15   determination that I relied upon determinatively but

16   it's certainly something I considered to the extent

17   that I believe my econometric work demonstrates

18   another way of demonstrating the relationship of the

19   patented functionality to consumer demand.  I look

20   also at Dr. Reinhold's work in grouping and ranking

21   these patents in terms of their technical merit or

22   significance.

23        So that's the range of evidence that I

24   look to and consider in arriving at my determination

25   as to an apportionment percentage based upon this

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

135

1    independent significance approach.

2        Q.    Is there anything else that forms the

3    basis of your independent significance approach

4    other than the things you've just listed?

5        A.    Those are the specific criteria, the

6    specific studies or pieces of evidence or things

7    I've taken into consideration.  I have also relied

8    upon my general knowledge and experience, my

9    participation in and knowledge of the academic

10   researches in this field, the work that I've done

11   with the Licensing Executives Society on

12   understanding licensing practices and related issues

13   which relate to patent valuation; dozens of

14   conversations over the years with people involved in

15   licensing or valuing or managing intellectual

16   property.  All of those things put together inform

17   the basis of my independent significance assessment.

18            MR. NORTON:  Mr. Purcell, before you go on

19   to the next question, do you still need a break?

20            THE WITNESS:  I really would like to take

21   a break, if you don't mind.

22            MR. PURCELL:  Yes, that's fine.

23            THE VIDEOGRAPHER:  The time is 1:57 p.m.

24   We are going off the record.

25            (Short recess taken.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

136

1          THE VIDEOGRAPHER:  We are back on the

2     record.  The time is 2:09 p.m.

3     BY MR. PURCELL:

4          Q.    Dr. Cockburn, before the break we were

5     talking about the bases of your independent

6     significance approach.  Correct?

7          A.    Correct.

8          Q.    You rely on those bases to reach an

9     apportionment figure of 25 percent for the patents

10    in suit.  Correct?

11         A.    Correct.

12         Q.    How do you get the 25 percent?

13         A.    Well, it's a judgment based on my

14    expertise and my consideration of the evidence that

15    we talked about just before the break.

16         Q.    Is there any quantification in the

17    evidence that we talked about before the break that

18    you can point me to in supporting the 25 percent

19    conclusion?

20         A.    Are you asking about -- ?  I'm sorry.  Did

21    you ask me was there any of the evidence

22    quantitative?

23         Q.    Correct.

24         A.    Well, certainly.  So the results of

25    benchmarking are quantitative evidence.  The factor

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

137

1    by which execution speed is affected by disabling

2    the patented functionality, I mean, that's a hard

3    number.  That's 80 percent.  The conjoint analysis,

4    the results of the conjoint analysis have a

5    quantitative expression as to how users' preferences

6    would drive a counterfactual set of market shares in

7    the experiment that Dr. Shugan conducted based upon

8    his conjoint survey.  To the degree that I looked to

9    the dollar implications, these market share impacts,

10   which as I suggested and told you earlier, I think

11   are corroborative or supportive but not

12   determinative of my assessment of 25 percent.

13            I mean, those are numbers, 50 or 75 or 100

14   million dollars in what I call incremental Android

15   revenue to Google will be at stake depending on

16   whether or not you had implemented the patented

17   functionality or not.  So all those are quantitative

18   facts that go into and form part of my assessment,

19   my evaluation.

20       Q.    How do you get from those numbers that you

21   just cited in the data to the 25 percent conclusion?

22       A.    Oh, so you're asking me do I have a

23   formula into which I could plug those numbers and

24   that would give an answer which equals 25 percent?

25       Q.    Well, that would be one way of doing it.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

138

1    Have you done it that way?

2        A.    No.

3        Q.    Without having a hard and fast formula

4    that would lead to the 25 percent, is there any line

5    you can draw from any sort of quantitative base

6    figure to the 25 percent?

7            MR. NORTON:   Objection to form.

8        A.    No.  My conclusion that at least 25

9    percent is based upon my synthetic assessment of all

10   of that evidence in light of my knowledge and

11   experience and expertise.

12       Q.    You said in your report at one point, I

13   know we discussed this earlier, that the conjoint

14   analysis was not used in the independent

15   significance approach.  If you want to look at the

16   text, it's in paragraph 423.

17       A.    I hope I was clear in my answer to that

18   question, and maybe I wasn't, that perhaps that is

19   not as well worded as it might be.  What I meant by

20   that sentence was I don't rely upon the application

21   of conjoint analysis in the way that I did in my

22   September report to form my independent significance

23   assessment.

24       Q.    And in what way do you rely on it in

25   forming your independent significance assessment?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

139

1    Strike that.  Let me ask it again.

2         In what way do you rely on Dr. Shugan's

3    conjoint analysis in forming your independent

4    significance assessment?

5    A.    Didn't I -- ?  Didn't you ask me this this

6    morning?

7    Q.    I may have done.

8         MR. NORTON:  I'll object on that ground.

9    But answer the question.

10   A.    Well, I rely on it specifically in coming

11   up with my determination that the patents in suit

12   constitute at least 25 percent of the value of the

13   intellectual property component of the 2006 license

14   bundle.  Qualitatively in the sense it's my judgment

15   looking at the results of Dr. Shugan's analysis that

16   the functionality enabled by the patents or by the

17   copyrighted APIs has a substantial and significant

18   impact upon user preferences as translated into the

19   market share predictions of the conjoint model.

20   Q.    Do you rely on the conclusions of the

21   conjoint model -- Strike that.  Do you rely on any

22   of the quantitative conclusions of the conjoint

23   model in developing your independent significance

24   approach?

25   A.    Well, yes.  I think it's both informative

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

140

1     qualitatively and quantitatively in that the market

2     share effects are not just statistically

3     significant; they're also pretty large.  The

4     impacts, if you go to Exhibit 5 in my report --

5          Q.    Did you want to point me to something in

6     Exhibit 5?

7          A.    As I was going to go on to say there, I

8     find Dr. Shugan's work, and maybe I think we need to

9     go look at Shugan Exhibits 4A and 4B, in and of

10    themselves looking at those conjoint studies, points

11    me to a substantial value placed by users.

12    Substantial also, as I suggested earlier, translates

13    into significant impacts in terms of dollars or

14    market share.  So I would --

15         Q.    When -- Go ahead.

16         A.    That's quantitative information that

17    I take into account in forming my assessment of at

18    least 25 percent.

19         Q.    You keep saying at least 25 percent.

20    What's the upper bound of that range if 25 percent

21    is the lower bound?

22         A.    Focusing on this synthetic evaluation of

23    this range of evidence would lead me to think that

24    these patents are important, they're economically

25    significant, reflecting on the share of portfolio

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

141

1    value.  That they are an important or economically

2    significant set of patents would constitute, would

3    suggest to me that something in the range of at

4    least 25, possibly 50 percent, possibly more, of the

5    portfolio value could be attributed to those

6    patents.

7        Q.    Where is the 50 percent or more number

8    mentioned in your report?

9        A.    It isn't.  You just asked me about it.  My

10   opinion is that it's at least 25 percent.

11       Q.    Do you intend to tell the jury that the

12   independent significance approach could result in an

13   apportionment of 50 percent or more?

14            MR. NORTON:  Objection to form.

15       A.    50 percent or more?  Well, if you asked me

16   on the witness stand could it be 50 percent or more,

17   then my answer would be yes, it could be.

18       Q.    Based on --

19       A.    I'm comfortable with my opinion as stated,

20   which is at least 25 percent.

21       Q.    But just to be clear, the 50 percent or

22   more figure, we're hearing that for the first time

23   today in this deposition.  Correct?

24            MR. NORTON:  Objection to form.

25       A.    50 percent is not in my report.  I'm just

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

142

1    trying to be responsive to your question.

2        Q.    So whether the number is 25 percent or

3    50 percent or more under the independent

4    significance approach, is there any more specific

5    way you can describe how you get to that result

6    other than saying you synthesized all of the various

7    inputs we've discussed and come out with that

8    number?

9        A.    So I have synthesized those inputs and I

10   have put them in the context of my general knowledge

11   and experience and my consideration of the

12   fundamental economics that are at work here, the

13   broader context in which we are considering this

14   hypothetical negotiation.  And in light of that and

15   in light of my assessment of the importance of these

16   patents, it is my opinion that at least 25 percent

17   of the portfolio value should be attributed to the

18   patents in suit.  I don't think I can add to that.

19       Q.    Just taking a look at Exhibit 5, which

20   I think you have in front of you.

21       A.    Yes.

22       Q.    Does Exhibit 5, the third column of

23   Exhibit 5, reflect the fact that when the '205

24   patent functionality was disabled, the performance

25   of the e-mail and camera functions actually

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

151

1       certainly involves more APIs and the question is:

2       Would the value conveyed to Sun under this agreement

3       be understood to include copyrights to those and

4       additional APIs other than the 37?

5               I think it's a little bit of a stale

6       dispute or a moot question in my mind because I

7       think that -- I don't think there's any economic

8       basis to believe that the value of a copyright to a

9       larger number of APIs will be any different from the

10      value of a copyright to 37 APIs specifically.

11          Q.    What about copyrighted works other than

12      APIs and code libraries?  Did you take those into

13      account?

14              MR. NORTON:  Objection to form.

15          A.    I'm not aware that there's any other

16      copyrights at stake.

17          Q.    What is your basis for your understanding

18      of which copyrights are at stake?

19          A.    Well, I haven't seen any other specific

20      copyrights identified.  If you can suggest something

21      to me that --

22          Q.    Do you know how many copyrighted works

23      related to Java Sun owned as of mid 2006?

24              MR. NORTON:  Objection to form.

25          A.    Are you asking me about the totality of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

152

1    copyrighted material which has any relation to Java

2    owned by Sun?

3         Q.    Let's start there, sure.

4         A.    Well, I don't know.  If you counted them

5    up individually, assuming there's one copyright to

6    one small document, it could run into quite large

7    numbers of specific copyrights.

8              I think what's important here is to focus

9    on what's understood to be licensed within the terms

10   of the agreement --

11        Q.    Which is --

12             MR. NORTON:  I'm sorry.  You're

13   interrupting the witness's answer.

14             MR. PURCELL:  I think he's done.

15             THE WITNESS:  No, I'm not done.

16        A.    Within the terms of the agreements or the

17   draft agreements, which as I recall have clauses

18   which quite specifically limit the intellectual

19   property to be conveyed by Sun to Google.  I can't

20   recall the precise language sitting here, but if you

21   show me the agreement, I'll point you to it.

22        Q.    So it is your understanding that the

23   copyright component of the 2006 bundle in the draft

24   agreements was limited to just API specifications

25   and code libraries?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

153

1      A.    It is limited in the first place to

2   copyright which would meet the limitations of

3   copyrighted material which would be used to be

4   covered by the limitations in the draft agreements,

5   principally the APIs and the underlying code

6   libraries.

7      Q.    Is there any reference in any of the draft

8   agreements to API libraries or API specifications

9   and code libraries?

10     A.    I don't recall.  You'd have to show me the

11  agreement.

12     Q.    What is your basis for your belief that

13  the copyright component of the 2006 bundle is

14  limited only to copyrighted API specifications and

15  code libraries?

16     A.    Well, I think it's a question of looking

17  at -- It's a question of understanding what the

18  limitations are in the agreements.  One of the

19  important limitations here, as I understand it, is

20  that it refers to technology intellectual property

21  which is limited to the product specifications as

22  laid out in that PRD document.  And I think there's

23  the PRD document; there's communication between the

24  parties.  What these are pointing me to are

25  relatively a small set of copyrights that are to be

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

154

1    conveyed specifically by the agreement.

2           Now, I know there may be other pieces of

3    code floating around in which a copyright may or may

4    not rest, some of which may or may not be in the

5    public domain.  I think the identifiable pieces of

6    copyrighted material are principally the APIs.

7        Q.    What is your basis for suggesting that the

8    parties in 2006 were contemplating a copyright

9    license that would only extend to APIs?

10       A.    That's a limitation in the agreement that

11   Sun is going to convey copyrights as necessary.  As

12   I understand them in broad brush, and again I'm not

13   a lawyer and I don't have an opinion as to the

14   specific legal language here, but Sun is conveying

15   copyrights necessary for Google to implement a

16   product as described in the PRD document.  Sun is

17   not conveying an unlimited copyright to any and all

18   copyrighted materials owned by Sun, and that's

19   ridiculous.

20       Q.    Sun's Java mobile platform -- Strike that.

21   There were additional copyrights associated with

22   Sun's Java mobile platform apart from just API

23   specifications and code libraries.  Correct?

24           MR. NORTON:  Objection to form.

25       A.    I'm not sure what you mean.  Can you be

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

155



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

156

1    anything specific other than APIs and associated

2    underlying code libraries.

3        Q.    Sun also wrote the source code underlying

4    its implementation of the Java virtual machine.

5    Correct?

6        A.    Correct.

7        Q.    And that source code is copyrighted.

8    Correct?

9        A.    Correct.

10        Q.    What is your basis for thinking that the

11    2006 bundle would have excluded that copyrighted

12    source code?

13            MR. NORTON:  Objection to form.

14        A.    I'm sorry.  Can you repeat the previous

15    question before you asked me what my basis was?  Or

16    just --

17        Q.    The source code underlying Sun's

18    implementation of the Java virtual machine is

19    copyrighted.  Correct?

20            MR. NORTON:  Objection to form.

21        A.    Correct.

22        Q.    So what is your basis for your opinion

23    that the copyright aspect of the 2006 bundle would

24    exclude that copyrighted source code?

25            MR. NORTON:  Objection to form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

157



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

158



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

159



10          MR. PURCELL:  Let's change the tape.

11          THE VIDEOGRAPHER:  The time is 2:56 p.m.

12    we are going off the record.  This will be the end

13    of tape 3 in the deposition of Dr. Iain Cockburn.

14          (Short recess taken.)

15          THE VIDEOGRAPHER:  We are back on the

16    record.  This is tape number 4.  The time is 3:05

17    p.m.  This is the deposition of Dr. Iain Cockburn.

18    BY MR. PURCELL:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

160



HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

163

1    complementary products to your platform in ensuring

2    its success and so forth.  It's not just that the

3    APIs are required in order to attract the Java

4    developer community.  It's that the Java developer

5    community, being involved, being engaged in

6    increasing numbers in the Android ecosystem, is a

7    critical part of the business model and generates a

8    substantial amount of the value to Google of

9    Android.

10           So the qualitative evidence in the record,

11   my understanding of the basic economics of the

12   situation and indeed some of the evidence from the

13   conjoint study as to user value of applications all

14   go into my opinion that it is at least 12.5 percent.

15   I think that's a very low number and could be a lot

16   higher.

17        Q.    How high could it be?

18        A.    Well, if the ability to develop a vibrant

19   application developer community is make or break for

20   this platform, as it appears to have been for other

21   attempts to create such ecosystems such as, if you

22   like, the last gasp of Palm as an independent

23   platform, trying to sell a Palm OS or recent efforts

24   to reincarnate WebOS, many of these things seem to

25   be perfectly good technologies in terms of their

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

164

1    technical merit.  It is just that they fail in the

2    marketplace because they cannot attract the supply

3    of complementary applications.

4              So if it was indeed the case that not

5    having access to the core Java APIs was going to

6    throw sufficient sand into the gears of the virtuous

7    circle or the positive feedback loop which drives

8    these dynamics, then it might well be the case that

9    Android would have been a complete flop purely on

10   those grounds, in which case you might argue that

11   100 percent of the value of the agreement could be

12   attributed just to the copyrights.

13        Q.    And is that in addition to the 50 percent

14   or more that could be attributed to the patents?

15        A.    That would trump the patents.  That's not

16   going to be additive.  It can't be more than a

17   hundred percent of the value.

18        Q.    My question was somewhat facetious.

19             So how do you get to the 12-1/2 percent,

20   given those qualitative inputs and Dr. Shugan's

21   conjoint analysis?  Why do you pick 12-1/2 percent

22   rather than some other number?

23        A.    By looking, if you like, for a floor or

24   lower bound on this number, I was certainly guided

25   in my thinking by a recognition that the conjoint

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

178

1               COURT REPORTER'S CERTIFICATE

2               I, J. Edward Varallo, RMR, CRR, Registered

3     Professional Reporter and Notary Public in the

4     Commonwealth of Massachusetts (my commission expires

5     12/24/2015), hereby certify that the deposition of

6     Iain M. Cockburn, Ph.D. taken on February 10, 2012,

7     in the matter of Oracle America, Inc. v. Google Inc.

8     was recorded by me stenographically and transcribed;

9     that before being sworn by me, the deponent provided

10    satisfactory evidence of identification as required

11    by Executive Order 455 (03-13) of the Governor.

12               I certify that the deposition transcript

13    produced by me is true and accurate to the best of

14    my ability.

15               I certify further that I am not counsel,

16    attorney, or relative of any party litigant, and

17    have no interest, financial or otherwise, in the

18    outcome of this suit.

19

20

21

22

23                           _____

24    DATED:  2/20/2012             J. Edward Varallo

25