1   KEKER & VAN NEST LLP
    ROBERT A. VAN NEST - # 84065
2   rvannest@kvn.com
    CHRISTA M. ANDERSON - # 184325
3   canderson@kvn.com
    MICHAEL S. KWUN - # 198945
4   mkwun@kvn.com
    633 Battery Street
5   San Francisco, CA 94111-1809
    Tel:  415.391.5400
6   Fax:  415.397.7188

7   KING & SPALDING  LLP
    SCOTT T. WEINGAERTNER
8   (*Pro Hac Vice*)
    sweingaertner@kslaw.com
9   ROBERT F. PERRY
    rperry@kslaw.com
10  BRUCE W. BABER (Pro Hac Vice)
    1185 Avenue of the Americas
11  New York, NY 10036
    Tel:  212.556.2100
12  Fax: 212.556.2222

13
    Attorneys for Defendant
14  GOOGLE INC.

    KING & SPALDING LLP
    DONALD F. ZIMMER, JR. - #112279
    fzimmer@kslaw.com
    CHERYL A. SABNIS - #224323
    csabnis@kslaw.com
    101 Second Street, Suite 2300
    San Francisco, CA  94105
    Tel:  415.318.1200
    Fax: 415.318.1300

    IAN C. BALLON - #141819
    ballon@gtlaw.com
    HEATHER MEEKER - #172148
    meekerh@gtlaw.com
    GREENBERG TRAURIG, LLP
    1900 University Avenue
    East Palo Alto, CA  94303
    Tel: 650.328.8500
    Fax: 650.328.8508

15              UNITED STATES DISTRICT COURT

16              NORTHERN DISTRICT OF CALIFORNIA

17              SAN FRANCISCO DIVISION

18  ORACLE AMERICA, INC.,                    Case No. 3:10-cv-03651 WHA

19          Plaintiff,                       **GOOGLE'S 4/3/12 COPYRIGHT
                                             LIABILITY TRIAL BRIEF**
20      v.
                                             Dept.:     Courtroom 8, 19th Floor
21  GOOGLE INC.,                             Judge:     Hon. William Alsup

22          Defendant.

23

24

25

26

27

28

643258.03

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    ARGUMENT ........................................................................................................1

    A.     There is no compilation exception to the prohibition against copyrighting ideas, systems and methods of operation. ..................................................1

    B.     The CONTU Report does not directly address the applicability of Section 102(b), but leaves that determination to development through court decisions. ......................................................................................................3

    C.     The accused aspects of the API specifications are an uncopyrightable system or method of operation. .................................................................4

    D.     The merger doctrine is not limited to high levels of abstraction, and bars copyright protection for any arguable expression in the selection, arrangement and structure of the APIs. ....................................................8

    E.     The Java language APIs at issue are deeply intertwined with and integral to the Java programming language. .......................................................11

        1.    More than half of the accused API packages are described by Sun as "fundamental" to the Java programming language. ...........................11

        2.    The other 18 accused API packages relate to features that are standard in modern applications. ..............................................12

        3.    The 37 Java language API packages are all integral to the Java programming language. .....................................................13

    F.     Computer languages are neither copyrightable nor patentable. ...........................14

        1.    Computer languages are not copyrightable. ...............................................14

        2.    Computer languages are not patentable. ....................................................16

    G.     Subject to the requirements of the Patent Act, it may be possible to try to claim the selection of classes for APIs under patent law. ......................................18

    H.     Aside from its "selection, arrangement and structure" argument, Oracle's only argument that Google's *implementation* of the APIs infringes is based on nine lines of mundane code from Arrays.java. ..................................................19

III.   CONCLUSION....................................................................................................20

643258.03

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Allen v. Academic Games League of America, Inc.*
  89 F.3d 614 (9th Cir. 1996) ................................................................................ 9

*Apple Computer, Inc. v. Microsoft Corp.*
  35 F.3d 1435 (9th Cir. 1994) .............................................................................. 3

*ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*
  402 F.3d 700 (6th Cir. 2005) .............................................................................. 2

*Baker v. Selden*
  101 U.S. 99 (1879) ........................................................................................ 18, 19

*Bilski v. Kappos*
  130 S. Ct. 3218 (2010) ...................................................................................... 16

*Engineering Dynamics, Inc. v. Structural Software, Inc. ("EDI I")*
  26 F.3d 1335 (5th Cir. 1994) .............................................................................. 9

*Engineering Dynamics, Inc. v. Structural Software, Inc. ("EDI II")*
  46 F.3d 408 (5th Cir. 1995) ........................................................................... 9, 10

*Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*
  499 U.S. 340 (1991) ........................................................................................ 2, 7

*Gates Rubber Co. v. Bando Chem. Indus., Ltd.*
  9 F.3d 823 (10th Cir. 1993) ................................................................................ 2

*In re Alappat*
  33 F.3d 1526 (Fed. Cir. 1994) (en banc) ........................................................... 17

*In re Comiskey*
  554 F.3d 967 (Fed. Cir. 2009) .......................................................................... 17

*In re Ferguson*
  558 F.3d 1359 (Fed. Cir. 2009) ........................................................................ 17

*Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*
  886 F.2d 1173 (9th Cir. 1989) ............................................................................ 7

*Lotus Dev. Corp. v. Borland Int'l, Inc.*
  49 F.3d 807 (1st Cir. 1995) ................................................................................ 8

*Matthew Bender & Co., Inc. v. West Pub. Co.*
  158 F.3d 674 (2d Cir. 1998) ............................................................................... 2

*Nichols v. Universal Pictures Corp.*
  45 F.2d 119 (2d Cir. 1930) ................................................................................. 2

GOOGLE'S 4/3/12 COPYRIGHT LIABILITY TRIAL BRIEF
Case No. 3:10-CV-03561 WHA

643258.03

*Sega Enters. Ltd. v. Accolade, Inc.*
   977 F.2d 1510 (9th Cir. 1992) ............................................................................ 10

### Other Cases

Advocate General's Opinion, *SAS Institute Inc. v. World Programming Ltd.*
   Case C-406/10 (Nov. 29, 2011) ......................................................................... 16

*SAS Institute, Inc. v. World Programming Ltd.*
   [2010] EWHC (Ch) 1829 (Eng.)................................................................... 14, 15

### Federal Statutes

17 U.S.C. § 101 .................................................................................................... *passim*

17 U.S.C. § 102(a) ..................................................................................................... 1

17 U.S.C. § 102(b) ............................................................................................... *passim*

35 U.S.C. § 102 ...................................................................................................... 18

35 U.S.C. § 103 ...................................................................................................... 18

### Other Authorities

Guy L. Steele, *Growing a Language* (Sun Microsystems, Oct. 1998) .......................................... 13

JONATHAN BAND & MASANOBU KATOH, INTERFACES ON TRIAL 2.0 (MIT Press
   2011) ............................................................................................................... 3

Pamela Samuelson, *Why Copyright Law Excludes Systems and Processes from the
   Scope of Protection*, 85 TEX. L.R. 1921 (2007)................................................ 3, 5, 7

Richard H. Stern, *Copyright in Computer Programming Languages*, 17 RUTGERS
   COMPUTER & TECH L.J. 321 (1991)................................................................. 16

Sebastian Zimmeck, *Patent Eligibility of Programming Languages and Tools*, 13
   TUL. J. TECH. & INTELL. PROP. 133 (2010) .......................................................... 17

643258.03

## I.     INTRODUCTION

Based on the copyright liability trial briefs filed by the parties to date, and in light of the answers given below to the questions posed by the Court in its March 29, 2012 Order, the selection, arrangement and structure of the 37 APIs are not copyrightable.

First, the selection, arrangement and structure of the APIs are part of a medium for expression, not the expression itself, and as such are an uncopyrightable system or method of operation.  Second, the merger doctrine bars copyright protection for any arguable expression in the selection, arrangement and structure of the APIs.  Third, Oracle has repeatedly conceded that it is not asserting copyright over the Java programming language itself, and yet the APIs at issue are integral to that language.  Finally, allowing copyright protection for the selection, arrangement and structure of the APIs would be no different than allowing Oracle to copyright a programming language, which is barred by 17 U.S.C. § 102(b).

## II.     ARGUMENT

### A.     There is no compilation exception to the prohibition against copyrighting ideas, systems and methods of operation.

The Court has asked three questions addressing the role of selection, arrangement and structure in copyright law.  *See* 3/29/12 Order, Questions 1-3.  Selection, arrangement and structure allows for the *possibility* of copyright protection for non-literal elements of a work.  Such possible protection, however, is always subject to Section 102(b) of the Copyright Act.  There is no compilation exception to the prohibition against copyrighting ideas, systems and methods of operation.

Copyright protects "original works of authorship."  17 U.S.C. § 102(a).[1]  However, "*[i]n no case* does copyright protection for an original work of authorship extend to any *idea*, procedure, process, *system*, *method of operation*, concept, principle, or discovery, *regardless of the form* in which it is described, explained, illustrated, or embodied in such work."  *Id.* § 102(b) (emphases added).  Thus, in answer to Question 2 from the Court's March 29, 2012 Order [Dkt.

---

[1] There are other requirements as well.  For example, the work must be fixed, *see id.*, and the copyright owner's rights are expressly limited by numerous sections of the Copyright Act, including fair use, *see id.* § 106 (exclusive rights are "[s]ubject to sections 107 through 122" of the Copyright Act).

838], by the express terms of Section 102(b), there are *no* exceptions to the rule that systems and methods of operation are not copyrightable.  Moreover, Section 102(b) excludes protection for *all* systems and methods of operation, without regard for whether they are original, creative, elegant, life-changing or difficult to develop.[2]

The Court and the parties have referenced the "selection, arrangement and structure" of the elements of the APIs.  Other courts have used the alternative formulation "structure, sequence and organization."  *See, e.g.*, *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 836 (10th Cir. 1993).  The Copyright Act uses similar language to define a "compilation."  Specifically, the Act defines a "compilation" as:

> a work formed by the collection and assembling of preexisting materials or of data that are ***selected, coordinated, or arranged*** in such a way that the resulting work as a whole constitutes an original work of authorship.

17 U.S.C. § 101 (emphasis added).  Thus, as the Court suggests, even where the elements of a work are noncopyrightable, it is *possible* that the selection, coordination and arrangement of those elements can be copyrighted.  *See* 3/29/12 Order, Question 1.  That said, not *every* selection, coordination and arrangement of elements can be copyrighted—it is copyrightable *only if* "the resulting work as a whole constitutes an original work of authorship."  17 U.S.C. § 101.[3]

---

[2] *See Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 122 (2d Cir. 1930) (Learned Hand, J.) ("Even so, granting that the plaintiff's play was wholly original, and assuming that novelty is not essential to a copyright, there is no monopoly in such a background.  Though the plaintiff discovered the vein, she could not keep it to herself; so defined, the theme was too generalized an abstraction from what she wrote.  It was only a part of her 'ideas.'"); *ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 707 (6th Cir. 2005) ("Original and creative *ideas,* however, are not copyrightable, because 17 U.S.C. § 102(b) provides that 'in no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of [its] form.'").

[3] Moreover, to constitute an "original work of authorship" a compilation of otherwise unprotectable elements (such as the API names and elements at issue here) must exhibit creativity in the selection, coordination and arrangement of its elements.  *See Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340 (1991) (rejecting "sweat of the brow" doctrine).  As explained by the Second Circuit, "when it comes to the selection or arrangement of information, creativity inheres in making non-obvious choices from among more than a few options."  *Matthew Bender & Co., Inc. v. West Pub. Co.*, 158 F.3d 674, 682 (2d Cir. 1998).  To the extent that Oracle claims copyright protection in a compilation, the relevant compilation would be the one that Oracle actually originated—the full compilation of J2SE 5.0, which includes among other things 166 APIs, not merely the accused subset of 37 APIs.  Because Oracle has not registered the works as compilations, Oracle bears the burden of proving both that there is sufficient creativity in the selection, arrangement and organization of the entire

2

643258.03

A compilation, like any original work of authorship, is subject to Section 102(b), because "*[i]n no case* does copyright protection for an original work of authorship extend to" ideas, systems or methods of operation. *Id.* § 102(b) (emphasis added).  Thus, if a compilation is itself a system or method of operation, copyright cannot protect it. *See id.*  Not only is this compelled by the language of the statute ("[i]n no case"), but as a matter of logic.  As the Court noted, "original methods and systems" will, by definition, have a "structure, arrangement and selection," and thus if having a structure, arrangement and selection served as an exception to the rule against copyrighting methods or systems, that would render much of Section 102(b) a dead letter. *See* 3/29/12 Order [Dkt. 838], Question 3.  In sum, the exclusion in Section 102(b) is absolute, and applies regardless of whether the system or method of operation is an "original" compilation.

> **B.    The CONTU Report does not directly address the applicability of Section 102(b), but leaves that determination to development through court decisions.**

The Final Report of the Commission on New Technological Uses of Copyrighted Works ("CONTU Report") recommended that Congress "make it explicit that computer programs, to the extent that they embody an author's original creation, are proper subject matter of copyright." CONTU Report at 1.  Congress adopted this recommendation. *See* Pamela Samuelson, *Why Copyright Law Excludes Systems and Processes from the Scope of Protection,* 85 TEX. L.R. 1921, 1954 n.212 (2007) ("*Samuelson*")[4] ("Congress followed CONTU's recommendations by adding a definition of computer programs to the statute and amending § 117").

The CONTU Report, however, had no clear recommendation about the extent to which non-literal aspects of a computer program might be copyrightable.  The Report states that "one is always free to make a machine perform any conceivable process (in the absence of a patent), but

---

compilation of J2SE 5.0 to be entitled to protection, and that the accused subset of 37 APIs reflects the creative portion or is virtually identical to the entire compilation. *See Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1439 (9th Cir. 1994) (where "the range of protectable and unauthorized expression is narrow, the appropriate standard for illicit copying is virtual identity").

[4] In addition to Professor Samuelson's article, Google recommends that the Court consult JONATHAN BAND & MASANOBU KATOH, INTERFACES ON TRIAL 2.0 (MIT Press 2011), *available at* http://mitpress.mit.edu/books/full_pdfs/Interfaces_on_Trial_2.0.pdf (free download).  This book updates a 1995 book by the same authors, and provides a comprehensive overview of domestic and foreign cases addressing interoperability.  Chapters 1 and 2 are particularly relevant to the present case.

643258.03

one is not free to take another's program." CONTU Report at 20.  However, "copyright protection for programs does not threaten to block the use of ideas or program language previously developed by others when that use is necessary to achieve a certain result." *Id.* Statements such as these in the Report merely restate principles of law that were already well established, instead of proposing a new framework for analysis of computer programs.

Ultimately, the Report offers two uncontroversial propositions.  First, photocopying a printed computer program listing is "clearly an infringement." *Id.* at 22.  At the other end of the spectrum, "anyone is free to make a computer carry out any unpatented process, but not to misappropriate another's writing to do so." *Id.*  Beyond these two clear-cut situations, the CONTU Report left the rest to the courts to decide on a case-by-case basis:

> Drawing the line between the copyrightable form of a program and the uncopyrightable process which it implements is simple in the first instance described above.  But the many ways in which programs are now used and the new applications which advancing technology will supply may make drawing the line of demarcation more and more difficult.  To attempt to establish such a line in this report written in 1978 would be futile.  Most infringements, at least in the immediate future, are likely to involve simply copying.  In the event that future technology permits programs to be stated orally for direct input to a computer through auditory sensing devices or permits future infringers to use an author's program without copying, difficult questions will arise.  ***Should a line need to be drawn to exclude certain manifestations of programs from copyright, that line should be drawn on a case-by-case basis by the institution designed to make fine distinctions—the federal judiciary.***

*Id.* at 22-23 (emphasis added).

**C.      The accused aspects of the API specifications are an uncopyrightable system or method of operation.**

The Copyright Act defines a "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result."  17 U.S.C. § 101.  The source code that implements, for example, the max() method that is part of the Math class in the java.lang package meets this definition—it is a set of instructions that is used by a computer to determine which of two numbers provided to it is larger.  The source code that implements the getContent() method that is part of the URL class in the java.net package also meets this definition—it is a set of instructions that is used by a computer to retrieve the content at the website hosted at a given URL.  But, leaving aside the nine-line rangeCheck() utility

1  method that is part of its literal copying claims,[5] Oracle doesn't claim that the source code

2  implementing any of the API elements is copied.

3      Instead, Oracle relies on alleged copying at a higher level of abstraction—the selection,

4  arrangement and structure of the 37 API subset of the 166 J2SE 5.0 APIs.  In many computer

5  programs, the non-literal structure of a program may still fit the statutory definition of a computer

6  program.  For example, a developer might create a flow chart for a video game program that

7  describes, at a high level, the logic flow that the computer will follow when executing the video

8  game application.  Although not the literal instructions that the computer follows, the flow chart

9  could still be thought of as a set of instructions that *indirectly* are used by a computer to bring

10  about a certain result.  Depending on the facts, this logic flow might be so general that it falls on

11  the idea side of the idea/expression dichotomy.  But if it falls on the expression side, it might be

12  protected by copyright.  In making that determination, courts must remember that the term "idea"

13  in the phrase "idea/expression dichotomy" is drawn from Section 102(b), and should be

14  understood to refer to all of the statutorily excluded classes listed in Section 102(b).  *See*

15  *Samuelson*, 85 TEX. L.R. at 1923 ("To be more consistent with § 102(b), courts would be well

16

17  [5] Google has investigated the availability of the files Oracle accuses of literal copying on Google's website.

18  As Google indicated at the recent pre-trial conference, the accused portions of the files have all been deleted from the current release (Ice Cream Sandwich) of Android, starting at version 4.0.

19  The rangeCheck() method is, however, part of versions of Android prior to Ice Cream Sandwich. Google does not believe it has represented otherwise.

20
21  Although Oracle's counsel asserted that the "comments" in two files are still in version 4.0.1, Google believes that claim is in error.  These comments have been removed from Android since version 2.3.3r1 of Android, over a dozen version releases ago.

22
23  Likewise, the other eight test files were removed from Android since version 2.3.3r1, over a dozen version releases ago.  They were, however, part of version 2.2.3r2, which was a subsequent security patch to the "2.2 branch" of the Froyo release of Android.  As of March 30, 2012, this has been superseded by version 2.2.3r2.1, in which the eight test files have been deleted..

24
25  As explained at the pre-trial conference, due to the way the Android source code repository and revision control system operates, it is possible to request old, out-of-date versions of Android from the Google website, and the revision control software can "recreate" these old releases, which may contain the accused portions of the files.

26
27  In any event, Google maintains that any alleged copying in these files is *de minimis* and thus not actionable.  Moreover, aside from rangeCheck(), none of the alleged literal copying affected any code that shipped on any Android phone, because the other files at issue are test files and/or the allegedly copied material was only in comments to code, not code itself.

28

643258.03

1    advised to speak of the 'protectable/unprotectable distinction' in copyright law.").

2         The selection, arrangement and structure of the APIs present a different situation.  At any

3    level of abstraction above the actual implementation (i.e., the source code), the APIs *no longer*

4    *meet the statutory definition of a computer program.*  This is because the APIs are a general-

5    purpose collection of classes, interfaces, methods and fields that can be arranged in whatever

6    order a developer chooses, to bring about whatever particular result that developer desires.

7    Nothing in the structure, sequence and organization of the APIs dictates whether the max()

8    method should be run before or after the getContent() method, or any other method.  One

9    developer may use the elements to create a video game, while another developer might use the

10   elements in a different manner to create a word processor, and yet another developer might

11   instead create a program for electronic banking.

12        The classes, interfaces, methods and fields in the APIs at issue are merely tools waiting to

13   be used by a developer who is writing his or her own application.  Thus, if viewed at a level of

14   abstraction above the source code level, the APIs are not "a set of statements or instructions to be

15   used directly or indirectly in a computer in order *to bring about a certain result.*"  17 U.S.C.

16   § 101 (emphasis added).  In other words, divorced from implementing code, the APIs are not

17   computer programs.  Instead, the APIs are merely the medium through which Java language

18   developers express themselves.  Here, with all due respect to Marshall McLuhan, the medium is

19   not the message.  It is a *system* that can be *used* to express.  And a system, by definition, is

20   outside the realm of copyright protection.  *Id.* § 102(b).

21        This view of Section 102(b) is consistent with the legislative history:

22        Some concern has been expressed **lest copyright in computer programs should**
23        **extend protection to the methodology or processes adopted by the programmer,**
         **rather than merely to the "writing" expressing his ideas.**  Section 102(b) is
         intended, among other things, to make clear that the expression adopted by the
24        programmer is the copyrightable element in a computer program, and that the
         actual processes or methods embodied in the program are not within the scope of
25        the copyright law.

26   *See* H.R. Rep. No. 94-1476, at 57 (1976), *reprinted in* 1976 U.S.C.C.A.N 5659, 5670 (emphasis

27   added).  Section 102(b) is intended "to restate, in the context of the new single Federal system of

28   copyright, that the basic dichotomy between expression and idea remains unchanged."  *Id.*  As

6

643258.03

1    Professor Samuelson has correctly noted, "'[i]dea,' as used in this context, should be understood

2    as shorthand for the eight terms of exclusion set forth in § 102(b)." *Samuelson*, 85 TEX. L.R. at

3    1952.

4            Ninth Circuit law is not to the contrary. Whether, at a given level of abstraction, the

5    "structure, sequence and/or organization" of a computer program "is protected by a copyright

6    depends on whether it qualifies as an 'expression' of an idea, rather than the idea itself." *Johnson*

7    *Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1175 (9th Cir. 1989). In *Johnson*

8    *Controls* the plaintiff's work was software for wastewater treatment plants, and the defendants

9    wrote a similar program. *See id.* at 1174, 1176. The Ninth Circuit held that the district court had

10   not clearly erred in finding that the defendants had copied protectable expression by copying the

11   structure, sequence and organization of the plaintiff's software. *Id.* at 1175-76. The decision

12   offers little insight into what structure, sequence and organization were copied, noting only:

13           We conclude that Johnson met its burden sufficiently to support the preliminary
             injunction. The special master's report sets forth, in detailed form, the various
14           similarities between the programs. These similarities, both in idea and expression,
             would permit a reasonable person to find an unlawful appropriation, a capture by
15           the infringing work of the "total concept and feel" of Johnson's work.

16   *Id.* at 1176 (footnote and citation omitted). Because this was an appeal of a preliminary

17   injunction, the court reviewed the district court's decision only for clear error. *See id.* Similarly,

18   in finding that the district court had not clearly erred in holding that the structure, sequence and

19   organization was expression rather than idea, the court noted,

20           This issue will no doubt be revisited at trial, but ***at this stage of the proceedings***
             we cannot say that the district court clearly erred.
21

22   *Id.* (emphasis added). Given the limited discussion of the facts and the preliminary procedural

23   posture of the case, it is impossible to draw from *Johnson Controls* a general rule governing when

24   a structure, sequence and organization of a computer program (much less the structure, sequence

25   and organization of interfaces used by a computer program) is copyrightable.[6] Finally, if the

26   allegedly copied structure, sequence and organization is a system or method of operation, it is *per*

27   ───────────────
     [6] Moreover, *Johnson Controls* pre-dates *Feist,* so any application of *Johnson Controls* must keep
28   in mind that the structure, sequence and organization of a computer program are copyrightable
     only if the structure, sequence and organization are *creative. See Feist,* 499 U.S. at 350.

1   *se* barred from copyright protection.  *See* 17 U.S.C. § 102(b).

2          On the present facts, Oracle's claim fails.  Programmers cannot use the APIs without

3   relying on the structure, sequence and organization of the APIs.  Whether this means that the

4   APIs are a *system* for expression, or that they are a *method of operation, see Lotus Dev. Corp. v.*

5   *Borland Int'l, Inc.*, 49 F.3d 807, 815 (1st Cir. 1995), *aff'd by an equally divided court,* 516 U.S.

6   233 (1996), the APIs are uncopyrightable.[7]  As Oracle's own expert has opined, "An API

7   specification does not actually run on a computer; rather, it describes *a set of rules* that the code

8   implementing the library must follow."  Mitchell Copyright Report [Dkt. 341-1] ¶ 175 (emphasis

9   added).  As he further has explained:

10         An API consists of ***a set of names that can be used to access features of the***
           ***library, together with specified conventions about their use.***  For example, an API
11         allowing a program to determine the *time* of day might include a function called
           time, together with the convention that a call to this function returns an integer
12         representing the clock time in a particular format.

13  *Id.* ¶ 52 (first emphasis added).  What Dr. Mitchell has described is a system or a method of

14  operation.

15         The structure, sequence and organization at issue here embody concepts too inchoate to

16  qualify as protectable *expression.*  The many design choices Oracle relies upon to show

17  "creativity" all embody *ideas* about how a programming language should be structured.  The

18  accused aspects of the APIs are uncopyrightable.  17 U.S.C. § 102(b).

19         **D.     The merger doctrine is not limited to high levels of abstraction, and bars**
                   **copyright protection for any arguable expression in the selection,**
20                 **arrangement and structure of the APIs.**

21         The Court has asked, "[f]or the merger doctrine, at what level of abstraction should we

22  consider the idea/system?"  3/29/12 Order [Dkt. 838], Question 4.  At a high level of abstraction,

23  such as "the concept of APIs generally," the Court suggests that there are many different ways to

24  select, arrange and structure the APIs.  *Id.*  At the level of the idea/system of the 37 Java APIs,

25  however, "there may be only one way to express the 'selection, arrangement and structure.'"  *Id.*

26  The merger doctrine is not limited to high levels of abstraction.

27  _____
    [7] There also is no evidence that the particular structure, sequence and organization of the *37 API*
28  *subset* of J2SE 5.0's 166 APIs is creative.

643258.03

1    For example, in *Allen v. Academic Games League of America, Inc.*, 89 F.3d 614 (9th Cir.

2   1996), the plaintiff Allen owned the copyright to several games, including to the manuals that he

3   wrote and that accompanied those games.  *Id.* at 615-16.  The defendant game league

4   ("AGLOA") organized tournaments for the playing of these games, and created tournament

5   rulebooks.  *Id.* at 616.  AGLOA's tournament rulebooks included some of the rules described in

6   Allen's game manuals.  *Id.* at 617.  The Ninth Circuit noted that "Allen has not shown that it is

7   possible to distinguish the expression of the rules of his game manuals from the idea of the rules

8   themselves."  *Id.* at 618.  The court held that the merger doctrine barred Allen's claim of

9   infringement:

10          Thus, the doctrine of merger applies and although Allen may be entitled to
            copyright protection for the physical form of his games, he is not afforded
11          protection for the premises or ideas underlying those games.  To hold otherwise
            would give Allen a monopoly on such commonplace ideas as a simple rule on how
12          youngsters should play their games.

13   *Id.*  The Ninth Circuit did not limit the doctrine of merger to deciding whether there is only one

14   way or a limited number of ways to play games.  The Ninth Circuit did not even limit its inquiry

15   to the number of ways to play academic games covering the subject matter of Allen's games.

16   Plainly, had the Ninth Circuit taken either of those approaches, the court would have concluded

17   that AGLOA could have designed its own games, with its own rules, that addressed the same

18   high-level concepts as Allen's games.  Instead, the Ninth Circuit held that the merger doctrine

19   prevented Allen from asserting copyright protection over his expression of *his particular rules* for

20   *his particular games*.  *See id.*

21          In its most recent brief, Oracle cited *Engineering Dynamics, Inc. v. Structural Software,*

22   *Inc.*, 26 F.3d 1335 (5th Cir. 1994) ("*EDI I*"), for the proposition that where input/output formats

23   could have been structured in "numerous ways," an original "selection, sequence and

24   coordination of inputs" can be copyrightable.  Oracle's 3/27/12 Br. [Dkt. 833] at 2 (quoting *EDI*

25   *I*, 26 F.3d at 1344-46).  Oracle neglected, however, to discuss the subsequent order in which the

26   Fifth Circuit limited the reach of its *EDI I* holding.  *See* 46 F.3d 408 (5th Cir. 1995) ("*EDI II*")

27   (order denying petition for rehearing *en banc*).  In this "supplement to the panel opinion to avoid

28   any confusion as to its scope," the court explained:

9

1

> 1. The petition for rehearing and amicus petitions in support of rehearing suggest that our initial opinion held that EDI's user formats are not only protectable but protected by copyright law because there "are numerous ways the input formats could be organized." **_This is an overly simplistic view of the opinion._** The panel adheres to its adoption of the abstraction-filtration-comparison test and to its application of the test on the facts before us. _See e.g._, _Computer Assoc's Int'l Inc. v. Altai, Inc.,_ 982 F.2d 693 (2d Cir. 1992). One of those facts, among many, was that EDI created input/output formats to facilitate the engineering and design of offshore structures and in this context, the formats were more than a "blank form." **_The panel did not say that in any case involving user interface the fact that the "author" has selected from among possible formats is dispositive._**

_Id._ at 409 (emphases added). To the contrary, the court held that "copyright only protects

originality of user interface _to the extent_ that the selection of variable inputs from the universe of

potential inputs reflects non-functional judgments." _Id._ (citing _Gates Rubber Co.,_ 9 F.3d at 838).

The court further cautioned that:

> 2. **_This opinion cannot properly be read_** to extend to the manufacturing of computer hardware so as **_to deter achieving compatibility_** with other models or to the practice employed by users of programs of analyzing application programs to "read" the file formats of other programs.

_EDI II,_ 46 F.3d. at 410 (emphases added) (citing, among other cases, _Sega Enters. Ltd. v._

_Accolade, Inc.,_ 977 F.2d 1510, 1525-27 (9th Cir. 1992)).

Here, the selection, structure and arrangement of the 37 APIs reflect judgments about

what APIs are most useful, what options should be made available to developers, and how best to

organize the APIs. These choices were precisely the types of "functional judgments" the Fifth

Circuit explained _cannot_ be protected by copyright. _See EDI II,_ 46 F.3d at 409. Oracle cannot

seriously claim otherwise. Each of the APIs individually, and all of them collectively, were

selected and coordinated to enhance the capabilities and usability of J2SE, not for any aesthetic or

stylistic purpose. Moreover, these choices dictate precisely the functional requirements for

compatibility that the Ninth Circuit has held cannot be copyrighted in light of Section 102(b). _See_

_Sega,_ 977 F.2d at 1522. Thus, even if the Court were to conclude that some aspects of the

selection, arrangement and structure of the APIs are expressive, there is no way to "express" the

idea of the 37 APIs without repeating that selection, arrangement and structure. The merger

doctrine therefore bars copyright protection for any arguable expression in the selection,

arrangement and structure of the APIs.

10

643258.03

**E.**   **The Java language APIs at issue are deeply intertwined with and integral to the Java programming language.**

It is undisputed that the Java programming language is not protected by copyright. *See* Google Reply Trial Br. [Dkt. 823] at 4-5. The Court has asked whether the APIs are an integral part of Java—whether "programmers write their own programs using the APIs." 3/29/12 Order [Dkt. 838], Question 5. They are integral, and programmers do exactly that.

Sun's own specification for the Java *language* repeatedly references the APIs. *See The Java Language Specification, Third Edition*, Trial Ex. 984 at 6 ("Throughout this book we refer to classes and interfaces drawn from the Java and Java 2 platforms."). For example, when discussing variable types, the language specification notes that "useful constructors, methods, and constants are predefined in the classes Byte, Short, Integer, Long, and Character," *id.* at 36, all of which are classes defined in the java.lang API package.

The language specification further notes that "some classes" from the APIs "have a special relationship with the Java programming language," including "Object, Class, ClassLoader, String, Thread, and the classes and interfaces in package java.lang.reflect, among others." *Id.* at 6. These classes are *required* to behave in certain ways to conform to the *language* specification. *See id.*

In short, there is no way to implement the Java programming language without implementing at least some of the accused APIs. As a purely technical matter, there is no bright line distinction between the Java programming *language* and the Java language *APIs*. Beyond this simple technical fact, however, *all* of the APIs at issue either are fundamental to the language, or so commonly used by developers that they should be treated as part of the language for purposes of Oracle's copyright claims.

**1.**   **More than half of the accused API packages are described by Sun as "fundamental" to the Java programming language.**

Sun's 1996 two-volume series describing one of the first releases of the Java language APIs call the APIs "a standard set of libraries for writing Java programs." Trial Ex. 980 at xvii. Sun explained that it believed the APIs were "useful and [that it] hope[d] to make [them] a *ubiquitous layer, available to all Internet applications*." *Id.* (emphasis added). These books were

11

part of Sun's "Java Series," described by Sun as "the definitive reference documentation for Java programmers and end users."  *Id.* at xvi.  The books do not purport to be a reference only for those who specifically want to use the APIs; they are "reference manuals for Java application and applet programmers," without qualification.  *Id.* at xviii.  "The API[s] documented in this book will remain available to *all Java programs* through future releases."  *Id.* (emphasis added).

In this early release, there were only eight API packages.  Sun described *four* of them (java.lang,[8] java.io, java.util and java.net) as "general-purpose libraries *fundamental to every Java program.*"  *Id.* (back cover) (emphasis added).  As the libraries have grown, those four "fundamental" libraries have expanded to include subpackages, including three accused "lang" subpackages (java.lang.annotation, java.lang.ref and java.lang.reflect[9]), five accused "util" subpackages (java.util.jar, java.util.logging, java.prefs, java.util.regex and java.util.zip), and two extensions to the "net" packages (javax.net and javax.net.ssl).  Five of the other accused packages are the "new input/output" ("nio") package and subpackages (java.nio, java.nio.channels, java.nio.channels.spi, java.nio.charset, and java.nio.charset.spi), which are closely related to the "io" packages.  Collectively, these packages that even Sun described as "fundamental" to the language account for 19 of the 37 accused packages.

### 2. The other 18 accused API packages relate to features that are standard in modern applications.

Three additional accused packages relate to programming vocabulary that is commonplace in the Java language programming community.  First, the java.awt.font package includes basic APIs for fonts (i.e., typefaces).  Second, the java.beans package includes APIs necessary for developing components known as "beans," which have been commonly used by Java language programmers.  Third, the java.text package includes APIs that allow applications to be "localized" more easily—that is, adjusting things like the date and time format, or the (human) language used, based on location.

---

[8] The java.lang package in particular is described by Oracle's specification as "[p]rovid[ing] classes that are fundamental to the design of the Java programming language."  Trial Ex. 3425.

[9] As already noted, the java.lang.reflect package is *required* to be implemented by the language specification.  *See* Trial Ex. 984 at 6.

1       Moreover, many modern applications implement features requiring security (such as

2   secure communications), cryptography (on which the security packages depend) and databases

3   (such as storing data generally).  These features are common for smartphone applications as well.

4   The remaining 15 accused Android API packages implement the API specifications in these areas

5   that Java language programmers are likely to expect to be available for a smartphone platform.

6   This includes ten security API packages and subpackages (java.security, java.security.acl,

7   java.security.cert, java.security.interfaces, java.security.spec, javax.security.auth,

8   javax.security.auth.callback, javax.security.auth.login, javax.security.auth.x500, and

9   javax.security.cert), three cryptography API packages and subpackages (javax.crypto,

10  javax.crypo.interfaces, and javax.crypto.spec), and two database API packages (java.sql and

11  javax.sql).

12          **3.      The 37 Java language API packages are all integral to the Java
                      programming language.**

13      Oracle cannot seriously dispute that Java language programmers *treat* the APIs as part of

14  the language.  Indeed, all 37 of the disputed APIs have long been a part of both GNU Classpath

15  and Apache Harmony, open-source implementations offered by the Free Software Foundation

16  and the Apache Foundation to the Java language programming community.  Neither of these

17  implementations is licensed by Oracle, and yet Oracle has taken no action to prevent others from

18  using either of them.

19      Instead of disputing that Java language programmers treat the APIs as part of the

20  language, Oracle argues that *technically* one could write programs in the Java language without

21  using the APIs (or at least without using some of the APIs).  This is like saying one can write a

22  novel in English without the letter 'e.'  *See* Ernest Vincent Wright, *Gadsby: A Story of Over

23  50,000 Words Without Using the Letter "E"* (Wetzel Publ. Co. 1939).  It technically could be

24  done, but that doesn't mean the letter 'e' isn't integral to the English language.  *Cf.* Guy L. Steele,

25  *Growing a Language* (Sun Microsystems, Oct. 1998) (using no multisyllabic words without first

26  defining them).  By seeking copyright protection over common, everyday vocabulary used by

27  millions of Java language programmers, Oracle ignores the common import of its concession that

28

643258.03

1    it does not assert copyright over the Java programming language.

2        **F.    Computer languages are neither copyrightable nor patentable.**

3        The Court has asked "[t]o what extent are computer languages (not programs, but

4    languages) copyrightable?  Patentable?"  3/29/12 Order [Dkt. 838], Question 6.  Computer

5    languages are neither copyrightable nor patentable, for the reasons given below.

6            **1.    Computer languages are not copyrightable.**

7        As explained above, the APIs are an uncopyrightable system or method of operation.  A

8    computer programing language is equally uncopyrightable, for the same reasons.  *See supra,* Part

9    II.C; 17 U.S.C. § 102(b).  While there is no case under the Copyright Act that is directly on point,

10   the High Court of Justice of England and Wales recently concluded that computer programming

11   languages are not copyrightable.  *SAS Institute, Inc. v. World Programming Ltd.,* [2010] EWHC

12   (Ch) 1829 (Eng.).[10]

13       Although this decision applied English law rather than the Copyright Act, the underlying

14   principles are identical.  The High Court began its analysis by considering several international

15   intellectual property treaties, including the Agreement on Trade-Related Aspects of Intellectual

16   Property Rights ("TRIPs") and the World Intellectual Property Organization Copyright Treaty

17   ("WIPO Copyright Treaty").  *Id.* ¶¶ 150-152.[11]  The High Court recognized that both the TRIPs

18   agreement and the WIPO Copyright Treaty state that copyright protection extends to expressions,

19   but not to "ideas, procedures, methods of operation or mathematical concepts as such."  *See id.*

20   ¶¶ 151-152 (quoting TRIPs, Article 9 and WIPO Copyright Treaty, Article 2).  It also noted that

21   these two treaties specify that both computer programs and compilations of data or other material

22   can be covered by copyright.  *Id.* (quoting TRIPs Article 10, WIPO Copyright Treaty Articles 4,

23   5).  The High Court devoted significant attention to discussing the distinction between ideas and

24   expression,  mainly discussing EU and English law, but also citing 17 U.S.C. § 102(b).  *See id.*

25   ¶¶ 199-207.

26   _____

27   [10] *Available at* http://www.bailii.org/ew/cases/EWHC/Ch/2010/1829.html.

     [11] The United States is also a signatory to both the TRIPs agreement and the WIPO Copyright
28   Treaty.

643258.03

1   The plaintiff in the case, SAS, produces analytical software known as the SAS System

2   that enables users to carry out a wide range of data processing and statistical analysis tasks.  *Id.*

3   ¶ 1.  The core component of the SAS System is Base SAS.  Base SAS allows users to run

4   application programs written in the SAS Language.  *Id.*  The SAS language consists primarily of

5   DATA steps and PROC steps.  *Id.* ¶ 36.  DATA steps are the primary methods for creating or

6   manipulating data.  *Id.*  A PROC is a software tool written by SAS Institute to perform a wide

7   variety of particular types of data analysis and reporting, such as producing statistics, tables,

8   reports, and charts.  *Id.* ¶ 38.  For example, two PROC sets are called LOGISTIC and

9   UNIVARIATE.  *Id.* ¶ 39.  In this sense the PROCs are similar to the APIs at issue in this case.

10   World Programming recognized that there might be a market for alternative platforms that

11   could read applications written in the SAS language.  *Id.* ¶ 3.  It therefore developed the World

12   Programming System, or WPS.  With some exceptions, WPS was written so that it could execute

13   programs written in the SAS language.  *Id.* ¶¶ 3, 68, 73.  In developing WPS, World

14   Programming did not copy any of the SAS source code.  *Id.* ¶¶ 3, 69.  Thus just as Google

15   followed the selection, arrangement and structure of 37 of the Java language API specifications in

16   Android but wrote its own source code, World Programming used the PROC names and structure

17   from SAS, but wrote its own source code.  SAS brought a series of copyright claims against

18   World Programming alleging, among other things, that World Programming violated its

19   copyrights by implementing the SAS Language.  *Id.* ¶ 211.

20   The High Court concluded that the SAS Language constitutes an idea, not expression, and

21   thus is not subject to copyright protection.  Referencing a decision in a prior case, the High Court

22   wrote:

23   I think that the distinction which Pumfrey J drew between a computer program and
     the language it is written in is, despite his hesitancy on the point, perfectly
24   consistent with the distinction between expressions and ideas, procedures, methods
     of operation and mathematical formulae.
25
26   *Id.* ¶ 217.  Thus the High Court concluded that World Programming's reproduction of the SAS

     Language did not violate SAS's copyrights.  *Id.* ¶ 247.
27
28   The High Court also referred the question to the European Court of Justice.  *Id.* ¶ 227.

1    While the ECJ has not yet ruled, an ECJ Advocate General recently agreed with the High Court.[12]

2    Advocate General Bot concluded that under EU law, a computer programming language is not

3    protected by copyright.  Advocate General's Opinion, *SAS Institute Inc. v. World Programming*

4    *Ltd.*, Case C-406/10 (Nov. 29, 2011), ¶ 75.[13]  Also focusing on the distinction between ideas and

5    expression, the Advocate General concluded:

6        It seems to me, therefore, that programming language is a functional element
         which allows instructions to be given to the computer.  As we have seen with SAS
7        language, programming language is made up of words and characters known to
         everyone and lacking any originality.  In my opinion, programming language must
8        be regarded as comparable to the language used by the author of a novel.  ***It is
         therefore the means which permits expression to be given, not the expression***
9        ***itself.***

10   *Id.* ¶ 71 (emphasis added).

11       The decision from the English High Court and the recommendation from the ECJ

12   Advocate General fully support Google's position.  These opinions, while not binding precedent,

13   analyze a set of facts and legal principles that for all intents and purposes are identical to those

14   presented in the case at bar.  *See also* Richard H. Stern, *Copyright in Computer Programming*

15   *Languages*, 17 RUTGERS COMPUTER & TECH L.J. 321 (1991) (concluding that computer

16   programming languages are not copyrightable).

17                **2.       Computer languages are not patentable.**

18       An entire programming language also is not patentable.  The Patent Act "specifies four

19   independent categories of inventions or discoveries that are eligible for protection: processes,

20   machines, manufactures, and compositions of matter."  *Bilski v. Kappos*, 130 S. Ct. 3218, 3225

21   (2010) (discussing 35 U.S.C. § 101).  A programming language is none of these things.

22       A programming language is not a process.  Although the set of steps constituting a

23   program written in that language could arguably be a process, the language itself, from which the

24   steps would be constructed, is not itself a process.  It could at most be a tool by which to create a

25   process.[14]

_____

26   [12] The Advocate General is similar to a special master before the Supreme Court in that he hears
     argument from the parties and gives a legal opinion to the ECJ.

27   [13] *Available at* http://curia.europa.eu/juris/celex.jsf?celex=62010CC0406&lang1=en&type=NOT.

28   [14] Moreover, for purposes of patent law, even a program written in a programming language may

                                    16

1          A programming language is not a machine.  Although a program written in a

2   programming language and installed on a general purpose computer could create a patentable

3   machine,[15] this is only applicable to a specific program that is installed on a given machine, not

4   an entire programming language, which by itself is not designed to perform any particular

5   functions.

6          Finally, a programming language is neither a manufacture nor a composition of matter.  *In*

7   *re Ferguson,* 558 F.3d 1359, 1366 (Fed. Cir. 2009) (manufacture is an "'article' resulting from

8   the process of manufacture." (quoting *In re Nuijten*, 500 F.3d 1346, 1356 (Fed. Cir. 2007)); *In re*

9   *Comiskey*, 554 F.3d 967, 977 n.10 (Fed. Cir. 2009) (quoting *Diamond v. Chakrabarty*, 447 U.S.

10  303, 308 (1980)) (composition of matter includes "all compositions of two or more substances

11  and all composite articles, whether they be results of chemical union, or of mechanical mixture,

12  or whether they be gases, fluids, powders or solids.").

13         Given that a programming language fails even the threshold test for patent eligibility

14  under Section 101, it cannot be patentable.  *See also* Sebastian Zimmeck, *Patent Eligibility of*

15  *Programming Languages and Tools*, 13 TUL. J. TECH. & INTELL. PROP. 133, 152 (2010) ("As

16  grammars are the defining elements of programming languages, it follows that programming

17  languages are not patent-eligible.").  Notably, the reason a computer programming language fails

18  to qualify as patentable subject matter is, in essence, that it lacks the type of determinate steps that

19  are a threshold requirement to qualify it as a process or a machine implementing a particular

20  process.  The fact that a programming language is not patentable subject matter thus further

21  supports the conclusion that it is on the "idea" side of the idea/expression dichotomy.

22

23

---

24  not be a process:  "Since a computer program is merely a set of instructions capable of being
    executed by a computer, the computer program itself is not a process and USPTO personnel
25  should treat a claim for a computer program, without the computer-readable medium needed to
    realize the computer program's functionality, as nonstatutory functional descriptive material."
26  Manual of Patent Examining Procedure § 2106.01.

[15] *In re Alappat,* 33 F.3d 1526, 1545 (Fed. Cir. 1994) (en banc) ("such programming creates a
27  new machine, because a general purpose computer in effect becomes a special purpose computer
    once it is programmed to perform particular functions pursuant to instructions from program
28  software").

GOOGLE'S 4/3/12 COPYRIGHT LIABILITY TRIAL BRIEF
Case No. 3:10-CV-03561 WHA

643258.03

**G.      Subject to the requirements of the Patent Act, it may be possible to try to claim the selection of classes for APIs under patent law.**

The Court has asked whether it would "be possible to claim the selection of classes for APIs under patent law."  3/29/12 Order [Dkt. 838], Question 7.  As the Court notes, Sun and Oracle have tried to claim the structure, hierarchy and arrangement of certain APIs in claim 1 of U.S. Patent No. 6,598,093 B1 (the "'093 patent").

It may be possible to try to claim the selection of classes for APIs as part of a patent-eligible claim.  Presuming that the claim as a whole satisfies 35 U.S.C. § 101 (and the other requirements of the Patent Act), if it relates to a system, method, or computer-readable medium that includes one or more claim elements directed to the selection of classes for APIs, those elements may be protected by patent law.  Sun appears to claim a selection of classes for APIs in claims 4, 5 and 6 of the '093 patent.  In the '093 patent, independent claim 1 relates to a class structure in a computer system, with three sets of classes arranged in three API sets.  Dependent claims 4, 5, and 6 claim, then list, particular classes for inclusion in each API set, respectively.

> 4.   A class structure as recited in claim 3 wherein the ***at least one abstract class includes a BaseEntry class, and the at least one concrete class includes a SystemDatabase class, a Query class, and a PropertyQuery class.***
>
> 5.   A class structure as recited in claim 4 wherein ***the second set of classes includes a SystemEntry class,*** the SystemEntry class being a concrete class.
>
> 6.   A class structure as recited in claim 5 wherein ***the third set of classes includes a SystemAliasEntry class and a PersistentSystemEntry class,*** wherein the SystemAliasEntry class and the PersistentSystemEntry class are concrete classes.

'093 Patent at col. 12, ll. 19-30 (emphases added).

These claims are, of course, subject to challenge in the same manner as are all patent claims.  And the rules applicable to patents are, in many respects, more stringent than those applicable to copyright.  *Compare, e.g.*, 35 U.S.C. §§ 102-103 *with Baker v. Selden,* 101 U.S. 99, 102 (1879) ("The copyright of the book, if not pirated from other works, would be valid without regard to the novelty, or want of novelty, of its subject-matter.").

That is, however, precisely the point.  Allowing copyright protection for a system such as the selection, arrangement and structure of the APIs at issue would allow "exclusive property in

18

643258.03

1   the art described therein, when no examination of its novelty has ever been officially made,"

2   which "would be a surprise and a fraud upon the public." *Baker*, 101 U.S. at 102. "That is the

3   province of letters-patent, not of copyright. The claim to an invention or discovery of an art or

4   manufacture must be subjected to the examination of the Patent Office before an exclusive right

5   therein can be obtained; and it can only be secured by a patent from the government." *Id.*

6   **H.   Aside from its "selection, arrangement and structure" argument, Oracle's**

7   **only argument that Google's *implementation* of the APIs infringes is based on nine lines of mundane code from Arrays.java.**

8   The Court asks, with respect to Google's implementation of the APIs, whether "Oracle is

9   alleging that Google copied something other than the 'selection, arrangement, and structure' of

10  APIs, as fixed in the specification." 3/29/12 Order [Dkt. 878], Question 8.

11  Aside from the nine-line rangeCheck() method in Arrays.java, the answer is "no." At the

12  recent pre-trial conference, the Court asked:

13      Except for rangeCheck, the APIs that you have, the 37 APIs in Android compared

14      to the 37 analogs in Java have different source code. True?

15  3/28/12 Tr. at 38-39. This was quickly followed up with the following exchange:

16      THE COURT: All right. So once you get past the declarations, is your source code different than the Java source code?

17      MR. KWUN: Yes.

18      THE COURT: Is that part agreed to?

19      MR. JACOBS: *Yes, Your Honor.*

20  *Id.* at 41 (emphasis added).

21  Moreover, there is no dispute that the rangeCheck() method is merely nine lines out of

22  over three thousand lines of code in Oracle's Arrays.java file.[16] Qualitatively, the method is

23  trivial. *See id.* at 21 (Court's statement that "even I know enough to know that the concept of

24  rangeCheck is—that's like the first grade, isn't it?").

25

26

---

27  [16] The nine lines are an equally small part of the Android files in which they appear. Measured against the work as a whole, whether that work is J2SE 5.0 or the Android platform, the nine lines

28  are almost vanishingly small.

643258.03

1

## III.     CONCLUSION

2          For the foregoing reasons, Google respectfully requests that the Court hold that the

3  selection, arrangement and structure of the APIs are uncopyrightable.

4  Dated:  April 3, 2012                                      KEKER & VAN NEST LLP

5

                                                                   /s/ Robert A. Van Nest
6                                                        By:        ROBERT A. VAN NEST

7                                                        Attorneys for Defendant
                                                         GOOGLE INC.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

643258.03