MORRISON & FOERSTER LLP
MICHAEL A. JACOBS (Bar No. 111664)
mjacobs@mofo.com
MARC DAVID PETERS (Bar No. 211725)
mdpeters@mofo.com
DANIEL P. MUINO (Bar No. 209624)
dmuino@mofo.com
755 Page Mill Road, Palo Alto, CA 94304-1018
Telephone: (650) 813-5600 / Facsimile: (650) 494-0792

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (Admitted *Pro Hac Vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY 10504
Telephone: (914) 749-8200 / Facsimile: (914) 749-8300
STEVEN C. HOLTZMAN (Bar No. 144177)
sholtzman@bsfllp.com
1999 Harrison St., Suite 900, Oakland, CA 94612
Telephone: (510) 874-1000 / Facsimile: (510) 874-1460
ALANNA RUTHERFORD
575 Lexington Avenue, 7th Floor, New York, NY 10022
Telephone: (212) 446-2300 / Facsimile: (212) 446-2350

ORACLE CORPORATION
DORIAN DALEY (Bar No. 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (Bar No. 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (Bar No. 211600)
matthew.sarboraria@oracle.com
500 Oracle Parkway, Redwood City, CA 94065
Telephone: (650) 506-5200 / Facsimile: (650) 506-7114

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.<br><br>    Plaintiff,<br><br>    v.<br><br>GOOGLE, INC.<br><br>    Defendant. | Case No. CV 10-03561 WHA<br><br>**ORACLE AMERICA, INC.'S OPPOSITION TO GOOGLE'S MOTION TO STRIKE PORTIONS OF DR. JAMES KEARL'S EXPERT REPORT**<br><br>Dept.: Courtroom 8, 19th Floor<br>Judge: Honorable William H. Alsup |

**PUBLIC REDACTED VERSION**

# I. INTRODUCTION

The Court-appointed damages expert, Dr. James Kearl, has concluded that as a matter of economics the "best measure" of the value of the intellectual property in suit (without accounting for fragmentation) is the same amount that Google would have paid for a license to Sun's Java ME intellectual property portfolio in 2006: a ███ royalty on all Android gross advertising revenues, or ███ per Android device. He further concludes that his "best economic advice" is that downward adjustment of that portfolio value is economically inappropriate, would necessarily undervalue the intellectual property that Google infringed, and would necessarily under-compensate Oracle. Nonetheless, Dr. Kearl includes a version of the apportionment analysis that the Court previously ruled admissible, concluding that that approach results in a royalty less than one-twentieth of what his best economic advice indicates is the value of the specific IP in suit.

Without addressing, much less challenging, Dr. Kearl's economic reasoning, Google moves to strike his opinions as a matter of law. According to Google, Dr. Kearl must value the intellectual property in suit. That much is true. But that proposition does not help Google, for Dr. Kearl *does* expressly value the intellectual property in suit based on analysis of the parties' 2006 negotiations, applying several independent rationales laid out in Section K of his report to conclude that that value is the full ███ advertising revenue share or the full ███ per Android device. Dr. Kearl does not simply assume that the parties would have negotiated a portfolio license.

Google argues that Dr. Kearl's "best economic advice" is forbidden by the law of patent damages, as applied by the Court in its July 22, 2011 Order partially excluding the initial report filed by Oracle's expert, Prof. Cockburn. (Dkt. 230.) But as applied to Dr. Kearl's reasoning, Google can find no support for that purported rule of law either in this Court's orders or in the decisions of the Federal Circuit. This Court did not address or anticipate Dr. Kearl's economic reasoning in its July order or any of its other prior orders. The Federal Circuit has never held that it is impossible, as a matter of law, logic, fact, or economics, for a subset of a complex intellectual property portfolio to command the same price as the entire portfolio. Moreover, Google offers no explanation as to how or why its argument is correct as a matter of *copyright* law, as to which this Court's July decision is

inapplicable.[1]  Dr. Kearl's unchallenged economic reasoning on apportionment is legally sound and supported by the record facts in this case.  No principle of law precludes it.

Granting Google's motion would subvert the Court's purpose in appointing an expert under Rule 706.  Instead of hearing the best economic advice of the independent expert, the jury would hear him testify only to the royalty measure that he believes is, in fact, "less than a reasonable royalty for the use made of the invention by the infringer."  That is the exact opposite of what 35 U.S.C. § 284 requires.  Such an opinion serves Google's purposes, but no other.  Oracle respectfully requests that the Court deny Google's motion.

## II.  FACTS

### A. Dr. Kearl's Assessment of the Value of Sun's 2006 Java Portfolio and Android Advertising Revenues

To calculate the reasonable royalty for the IP in suit for this case, Dr. Kearl begins with the 2006 negotiations between the parties.  Consistent with the Court's prior orders, he then makes downward adjustments to exclude all elements of the transaction other than Sun's Java ME intellectual property portfolio.  (Kearl Report ¶¶ 73–80; Kearl Dep. 17:7–21.)[2]  This measurement, combined with Google's forecasts for Android unit sales, allows Dr. Kearl to isolate the value that Sun reasonably would have expected to receive as a result of licensing its patents and copyrights to Google in 2006.  Dr. Kearl concludes that the value of the Java trademark is zero, and if anything warrants upward adjustment of the royalty for Sun's other intellectual property.  (Kearl Report ¶ 75.)

Dr. Kearl discounts the expected value of Sun's copyrights and patents to its net present value in 2006.  Depending on whether one uses ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[1] Although Section K of Dr. Kearl's report is titled "Allocation of the 2006 IP Portfolio Value to the Patents in Suit – Theory" (Kearl Report, p. 37), the section discusses both the patents and the copyrights in suit and applies its rationale to both, including both specific references to the copyrights in suit and general references to the "in suit IP."  (*See, e.g.*, *id.* ¶¶ 100, 101, 103, 103 fn. 59, 104, 105.)

[2] References to the "Kearl Report" and "Kearl Dep." refer to Exhibits E and F to the April 2, 2012 Declaration of Meredith Dearborn In Support Of Oracle America, Inc.'s Motion to Exclude Portions of the Rule 706 Expert Report of Dr. James Kearl.  (Dkt. No. 850-1 (4/2/12 Dearborn Decl.); Dkt. 850-6 (Kearl Report); Dkt. 850-7 (Kearl Dep.).)

1 

2 (Kearl Report ¶ 80, Tables 1, 2.)

3       Dr. Kearl then uses the same internal Google projections for Android to calculate the net
4 present value to Google, also in 2006, of the advertising revenues that Google expected to earn from
5 Android. Depending on which Google projections are used, that 2006 net present value to Google
6 was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Kearl Report ¶ 85, Tables 1, 2.)

### B. Dr. Kearl's Calculation of Portfolio Royalty

      By comparing the expected net present value to each party, Dr. Kearl is able to calculate a royalty rate for the Java ME patents and copyrights. Concluding that the value of Sun's expected benefit is ▮▮▮▮▮▮ of the combined Sun and Google benefit, Dr. Kearl concludes that the bargain the parties would have struck in 2006 for a license to the Java ME portfolio would have been equal to a ▮ royalty on Android advertising revenues, which he equates to ▮ per Android device. (Kearl Report ¶¶ 20, 86.) Notably, because this royalty rate is based on the parties' actual 2006 negotiations, it already factors in the availability and desirability of any non-infringing alternatives. (Kearl Report ¶¶ 177–179; Kearl Dep. 70:17–72:13.)[3]

### C. Dr. Kearl's Explanation of the Relationship Between the Value of the Portfolio and Value of the IP In Suit

      Dr. Kearl then considers the relationship between the value of the intellectual property in suit – a subset of the patents and copyrighted material in the portfolio at issue in 2006 – and the value of the entire portfolio. (Kearl Report ¶¶ 97–105.) Dr. Kearl concludes that, as a matter of economics, it would be inappropriate in this case to distinguish between the value of the portfolio and the value of the intellectual property in suit. (Kearl Dep. 149:3-5; 154:20-155:8.) His report states:



(Kearl Report ¶ 104; *see also id.* ¶ 20.) Dr. Kearl testified that this opinion reflects his "best

---

[3] Although Dr. Kearl agrees that the hypothetical license would have to compensate Sun for the increased risk of fragmentation of the larger Java platform from an incompatible implementation, he also agrees that his ▮ royalty includes no such compensation. (Kearl Dep. 70:2-12.)

1  economic judgment" (Kearl Dep. Tr. 102:5–102:22) and is the "best measure" of the value of the IP
2  in suit:

3
4
5

6  (Kearl Dep. Tr. 107:7–11.)

7   Dr. Kearl explains why it is economically inappropriate to apportion the value of the 2006
8  Sun Java ME portfolio to ascertain the value of the intellectual property in suit in this case.  Initially,
9  Dr. Kearl observes that Sun routinely licensed its intellectual property on a portfolio basis, and that
10 none of the party experts in this case has cited any evidence that Sun ever did otherwise.  (Kearl
11 Report ¶ 99.)  Dr. Kearl makes this observation *not* to argue that the hypothetical negotiation would
12 be for the entire portfolio, as Google implies, but rather to emphasize that there are no licenses to
13 subsets of the portfolio that could be used as benchmarks.  (*Id*.)  Dr. Kearl notes that,
14
15
16 " (*Id.* ¶ 100; *see also id.* ¶ 103.)  A licensee would never expect to use all of the patents and
17 copyrights that it has licensed, and an apportionment approach that attempts to allocate value to every
18 component of the portfolio will undervalue the intellectual property in suit.  (Kearl Dep. 215:23-
19 218:2.)

20  Moving beyond these initial premises, Dr. Kearl provides three specific economic reasons
21 why the value of the in-suit IP is equal to the value of the 2006 license bundle.

22  First, Dr. Kearl explains that
23
24
25
26
27 (*Id.* ¶ 100 (emphasis Dr. Kearl's).)  In his deposition, Dr. Kearl further explained that "
28

4
ORACLE AMERICA'S OPPOSITION TO GOOGLE'S MOTION TO STRIKE KEARL
CASE NO. CV 10-03561 WHA

1

2

3  (Kearl Dep. 103:19–104:2; *see also id.* 155:3–156:4)  As discussed below (*see infra*, sections II.D-E),

4  and contrary to what Google argues in its motion, there are substantial factual foundations for this

5  opinion.

6  Second, Dr. Kearl opines that even if Google did not know what subset of the Java portfolio it

7  needed in 2006,

8

9

10

11  (Kearl Report ¶ 101 (footnote omitted).)  Thus, "

12

13

14  (Kearl Dep. 104:5–11.)

15  To illustrate these first two points, in his deposition Dr. Kearl used the example of a person

16  who subscribes to a 100-page magazine knowing that he intends to read only one page.  To that

17  subscriber, the value of that single page is the same as the price of the entire magazine.  This is true

18  whether the subscriber already knows the specific page he intends to read, or simply knows that once

19  he has the magazine, he will just choose one page to read.  (Kearl Dep. 155:3–157:6.)

20  Third, Dr. Kearl reasons that if Google planned to create Android from the ground up, but

21  written in Java and using, in part, "Java ME-like" technology, Google would have understood that it

22  was likely that Sun, in the past, had encountered and resolved the same problems that Google would

23  encounter as it implemented a Java-based virtual machine.  (Kearl Report ¶ 102; *see also* Kearl Dep.

24  103:15–105:6.)  In that case, a portfolio license would allow Google to design its Java-based platform

25  and virtual machine as it saw fit, without fear of liability for infringing Sun Java technology.  (*Id.*)

26  Again, in that scenario, the value of the IP in suit would be equal to the value of the entire portfolio.

27  Dr. Kearl concludes:

28



(Kearl Report ¶ 105.)

### D. Google's Own Documents, Admissions, and Testimony Support Dr. Kearl's Analysis

Under Dr. Kearl's analysis of the relationship between the value of the IP in suit and the value of the Java ME portfolio, it is not necessary to know whether Google had the specific IP in suit in mind at the time of the 2006 negotiation, or was unaware of what it needed and only later chose to include in Android elements that were protected by Sun's intellectual property rights. In either case, the value of the IP in suit is equal to the value of the portfolio. (Kearl Report ¶¶ 99–105.) Nonetheless, there is substantial evidence that Google *was* aware of the contents of the Sun portfolio and had specific Java technology in mind at the time of the 2006 negotiation. Google's bald assertion that "[t]here is no evidence that Google knew anything specific about the contents of the Sun bundle in 2006" (Dkt. 845, at 1) is plainly false.

As Dr. Kearl observes, the fact of the negotiations alone establishes that Google knew something about the contents of the Sun Java ME bundle in 2006. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" (Kearl Dep. 153:20-154:8.) Indeed, the copyrighted specifications were public and well known, especially to the many former Sun engineers at Google. Google holds a seat in the Executive Committee of the Java Community Process, and beginning in 2005 Android engineer Bob Lee was Google's alternate representative on that committee. (Declaration of Meredith Dearborn In Support Of Oracle America, Inc.'s Opposition To Google's Motion To Strike Portions Of Dr. James Kearl's Expert Report ("4/6/12 Dearborn Decl.") Ex. A (Lee Dep. 16:16-17:3).) Mr.

1   Lee admitted at his deposition that he ▮▮▮▮▮▮▮▮▮▮
2   ▮▮▮▮▮▮▮▮▮▮ having started work on the core libraries for Android "a couple months" after
3   first joining the Android team in 2004. (*Id.* 6:1-18, 7:18-20, 66:1-9.)
4       The facts confirm that Dr. Kearl's analysis is consistent with the actual, real-world
5   negotiations between the parties in this case. Examples of the evidence that, contrary to Google's
6   assertion, Google knew *both* many things that were "specific about the contents of the Sun bundle"
7   (Dkt. 845, at 1) *and* what it wanted from that bundle in 2006 include:

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (4/6/12 Dearborn Decl. Ex. B (Leonard Dep. 56:4-57:5)); *see also* Leonard Report at 9 - 10.

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (4/6/12 Dearborn Decl. Ex. C (Cizek Dep. 195:14–206:21).)

- As a result of his prior dealings with Sun, Mr. Rubin was well aware of both the copyrights in the Java bundle, a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (4/6/12 Dearborn Decl. Ex. D (Rubin 7/27/11 Dep. 149:18-150:13).)

- The Google negotiating team in 2005-2006 included Tim Lindholm. (4/6/12 Dearborn Decl. Ex. E (Trial Exhibit 140, GOOGLE-01-00018836).) Mr. Lindholm had been a Sun employee, worked on the original Java platform, is the co-author of the Java Virtual Machine Specification, described ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and described ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (4/6/12 Dearborn Decl. Ex. F (Lindholm Dep. 7:23-8:11; 13:21-1▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (4/6/12 Dearborn Decl. Ex. C (Cizek Dep. 195:22-196:24).) While he was still at Sun, Mr. Lindholm was regarded as one of the "most technically knowledgeable people regarding the Java Micro Edition." (*Id.* 195:22-196:24.)

- When Sun representatives met with Mr. Rubin in the fall of 2005, Mr. Rubin specifically indicated that Google was interested in a license to Sun's Connected Device Configuration, or CDC (4/6/12 Dearborn Decl. Ex. H (Trial Exhibit 2720, OAGOOGLE0100029446); 4/6/12 Dearborn Decl. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ME profile than the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and which included a subset of the 2006 portfolio (including most of the APIs in suit).

---

[4] For example, CDC 1.1.2 APIs include asserted packages java.io, java.lang, java.lang.ref, java.lang.reflect, java.net, java.security, java.security.cert, java.text, java.util, java.util.jar,

[Footnote continued on next page]

7

- By the time of that fall 2005 meeting, Google had already d␇␇␇␇␇␇ interested in ␇␇␇␇␇␇␇␇␇␇ (4/6/12 Dearborn Decl. Ex. C (Cizek Dep. 98:22-99:14).)

- ␇␇␇␇␇␇␇␇␇␇ (4/6/12 Dearborn Decl. Ex. C (Cizek Dep. 125:10-25; 135:15-136:1).)

- On April 20, 2006, Mr. Rubin sent an "Android Product Requ␇␇␇␇␇␇ ich ␇␇␇␇␇␇ument includes the statement that '␇␇␇␇␇␇ ␇␇␇␇␇␇')." (4/6/12 Dearborn Decl. Ex. I (Trial Exhibit 379, GOOGLE-24-00016590, at p. 12 of 26).)

- ␇␇␇␇␇␇␇␇␇␇ (4/6/12 Dearborn Decl. Ex. J (Trial Exhibit 157, GOOGLE-01-00025523).)

- ␇␇␇␇␇␇␇␇␇␇ (4/6/12 Dearborn Decl. Ex. K (Trial Exhibit 251, GOOGLE-02-00104269).)

The evidence confirms that Google knew what was truly important at the time of the 2006 hypothetical negotiation: the patented technology it had already started to use and the copyrighted APIs and class libraries it was incorporating into its design for Android. Dr. Kearl's analysis of why the value of the IP in suit is appropriately considered equal to the full value of the portfolio is consistent with the actual, real-world negotiations between the parties.

### E. Dr. Kearl's Econometric Analyses Further Corroborate His Conclusions as to the Value of the IP In Suit

Other evidence discussed in Dr. Kearl's report corroborates his conclusion that the value of the intellectual property in suit, separately or together, is equal to the 2006 value of the Java ME

---

[Footnote continued from previous page]
java.util.zip, and javax.microedition.io. (*See* http://docs.oracle.com/javame/config/cdc/ref-impl/cdc1.1.2/jsr218/index.html). Personal Basis Profile APIs from 1.1.2 include asserted packages java.awt.font, java.beans, and more. (*See* http://docs.oracle.com/javame/config/cdc/ref-impl/pbp1.1.2/jsr217/index.html.)

1  portfolio. For example, Dr. Kearl conducted an econometric analysis to determine consumers'
2  willingness to pay for the incremental performance benefits that Oracle claims are associated with the
3  patents in suit, as well as the incremental benefits of additional applications afforded by the
4  copyrighted APIs. (Kearl Report App'x F ¶¶ 334-404.) Dr. Kearl concludes that consumers would
5  be willing to pay ▬▬▬▬ over the average price of an Android phone for the performance
6  benefits of infringing the '104 patent, and that consumers would pay ▬▬▬▬ over
7  the average price of an Android phone for the additional applications afforded by infringing the API
8  specifications. (*Id.* ¶¶ 400, 401; Exhibits F9, F10.) In comparison, Dr. Kearl's royalty for the entire
9  2006 Java ME portfolio is ▬▬▬ per Android phone. The econometric evidence provides
10 additional support for Dr. Kearl's conclusion that apportionment of the 2006 portfolio is
11 inappropriate in this case.

12 **III. ARGUMENT**

13       Google does not quarrel with Dr. Kearl's economic judgment. Google does not dispute that
14 there are "good economic reasons why the value of the in suit IP" is equal to the value of the entire
15 Java ME portfolio. Google does not challenge Dr. Kearl's econometric analyses, nor does it deny
16 that consumers would pay as much as *twenty-five times* Dr. Kearl's ▬▬ per unit royalty just to get
17 the benefits provided by the two patents and the 37 API specifications. Indeed, on all factual and
18 economics issues, Google's brief is silent.

19       Instead, Google appears to make three arguments, all of which rest on the premise that this
20 Court's prior rulings on patent law damages forbid Dr. Kearl's economic reasoning, no matter how
21 sound it may be, and regardless of whether it applies to patents, copyrights, or both.

22       **A. Dr. Kearl Specifically Values The IP in Suit.**

23       Google begins by arguing that Dr. Kearl has set aside the law to conclude that Google "should
24 be charged a royalty for the entire bundle—not merely the intellectual property in suit." (Dkt. 845 at
25 1:15-16.) That is the fundamental premise of Google's brief. It is false.
26       Dr. Kearl expressly *did* value the intellectual property in suit; he *did not* conclude that Google
27 should be charged for any more than this. (Kearl Report ¶ 22 ("▬▬▬▬▬▬▬▬▬▬
28

9
ORACLE AMERICA'S OPPOSITION TO GOOGLE'S MOTION TO STRIKE KEARL
CASE NO. CV 10-03561 WHA

1 █████████████████████████████████████████████████████

2 █████████████████████████████████████████████████████

3 █████████████████████████████████████████████████████

4 █████████████████████████████████████████████████████

5 █████████████████████████████████████████████████████

6 (emphasis added in all).[5]

7 Nowhere in his report or his deposition testimony does Dr. Kearl suggest that damages in this case should be based on anything other than what Google would reasonably have agreed to pay for the specific intellectual property it infringed. Thus, Dr. Kearl testified that, in 2006, "████████████████████████████████████████████████████████" (Kearl Dep. Tr. 107:7–11.) Indeed, the point of the economic analysis that Google would exclude is to demonstrate precisely *why* Google would have agreed to pay as much for the IP in suit as it was prepared to pay for the larger portfolio.

At the same time, Dr. Kearl is quite clear that ██████████████████████████████████████████████████████████████████ (Kearl Report ¶ 105.) When Dr. Kearl's actual opinions are considered, Google's motion to strike takes on an Alice-in-Wonderland quality. Google points out that Dr. Kearl must value the IP in suit. Dr. Kearl says the "best" way to do exactly that is to use the value of the 2006 Java ME portfolio. He says that apportionment will fail to capture the full value of the IP in suit. In response, Google argues that Dr. Kearl must apportion. As a result, Google would essentially compel Dr. Kearl to offer only one opinion as to reasonable royalty—one that he believes is wrong, and one, crucially, that he believes is "less than a reasonable royalty for the use made of the [patented] invention by the infringer" (35 U.S.C. § 284) and less than "the actual damages suffered by him or her as a result of the [copyright] infringement." (17 U.S.C. § 504(b).)

---

[5] Dr. Kearl does not distinguish between and among the patents and copyrights in suit, and there is no need to do so under his analysis. For example, if one of the patents is found invalid or not infringed, it can readily be concluded that the value of that patent is zero, with no effect on the value of any remaining IP found to be valid (or copyrightable) and infringed.

### B. The Court's Prior Orders Do Not Preclude Dr. Kearl's Economic Opinion That The Value of the IP in Suit Is Equal to the Value of the 2006 Java Portfolio.

Google next argues (Dkt. 845 at 2-3) that the Court rejected Dr. Kearl's logic in the July 22, 2011 *Daubert* order. That is not correct, as even Google's quotes from the Order demonstrate.

In his May report, Prof. Cockburn calculated a royalty for the entire Java portfolio based on the assumption that the hypothetical negotiation would have resulted in Google taking a portfolio-wide Java license. Prof. Cockburn explained that he did so because Sun's and Oracle's "practice was to license Java, not to license individual patents." (May 20, 2011 Cockburn Report ¶ 132; *see id.* at 23.) Prof. Cockburn further stated that "my understanding is that Oracle generally offered portfolio licenses, and for practical and legal reasons it is highly likely that Google and Oracle would have entered into a Java portfolio license in order to avoid serial claims and disputes." (*Id.* ¶ 347.) In its July 22 Order, the Court held that Prof. Cockburn's approach was improper as a matter of law: "An opinion that the hypothetical negotiation would have resulted in a Java license simply fights the hypothetical." (Dkt. 230 at 5-6.)

Google argues that the rationale of the July Order forecloses the opinions expressed by Dr. Kearl in paragraphs 97–105 of his report. It does not. In fact, the July Order never considered the analysis that Dr. Kearl employs, either under the patent laws or the copyright laws. In contrast to the opinion in Prof. Cockburn's May report, Dr. Kearl does not assert or assume that the hypothetical negotiation is for the entire portfolio. He concludes that Google would have paid as much for the specific IP in suit as it would have paid for the entire portfolio. He explains why this is so, based on economic analysis that Google, even now, has never challenged.

None of Dr. Kearl's rationales for why the IP in suit, if found valid and infringed, warrant a reasonable royalty equivalent to the royalty for the 2006 portfolio fails to take into account the mandate that a reasonable royalty for patent infringement be limited to a royalty "for the use made of the invention by the infringer." (Dkt. 230 at 5, quoting 35 U.S.C. § 284.) To the contrary, they specifically consider the value of that use. Similarly, none of Dr. Kearl's rationales assumes that "Java was [ ] the invention" (Dkt. 203 at 5), or indeed that anything beyond each patent in suit is the relevant invention. To the contrary, they explicitly consider only the inventions (and the copyrights)

11
ORACLE AMERICA'S OPPOSITION TO GOOGLE'S MOTION TO STRIKE KEARL
CASE NO. CV 10-03561 WHA

1  themselves.  And none of Dr. Kearl's rationales depends on "fighting the hypothetical" negotiation

2  that is relevant to calculation of damages in this case.  (*Id.* at 5-6.)  To the contrary, they envision a

3  hypothetical negotiation permitting and valuing Google's use of the IP at issue in this lawsuit,

4  whether because Google in fact knew, as discussed above, what it wanted; because Google wanted

5  the option to choose what it wanted; or because Google wanted insurance against litigation involving

6  the particular IP it ended up infringing.

7        The three cases that Google cites have nothing to do with the economic reasoning that Google

8  challenges.  Google cites no case, from the Federal Circuit or elsewhere, holding that a portion of a

9  patent portfolio cannot have a value equal to the entire portfolio.  There is a good reason for this: the

10 Federal Circuit has never so held.  Indeed, "[t]he Federal Circuit has never held that, as a matter of

11 law, a reasonable-royalty award cannot ***exceed*** what someone paid to acquire a patent portfolio that

12 includes the patent-in-suit. . . .  [S]uch a rule would make no sense." *Spectralytics, Inc. v. Cordis*

13 *Corp.*, 650 F. Supp. 2d 900, 914 (D. Minn. 2009), *aff'd in part, rev'd in nonpertinent part*, 649 F.3d

14 1336, 1347 (Fed. Cir. 2011) (emphasis added).  If a patent in suit can justify a reasonable royalty that

15 is greater than the royalty paid for the entire portfolio, several components of portfolio can be worth

16 as much as the whole.  Whether that is the case here is a question of fact, not law, that should be

17 decided by the jury after hearing all of the evidence and Dr. Kearl's opinions, as applied to the record

18 facts.  Nothing in Dr. Kearl's opinions is inconsistent with the Federal Circuit's decision in *ResQNet*,

19 because Dr. Kearl finds that "the ***economic*** harm caused by the infringement of the claimed

20 invention" should be considered equal to the portfolio value in this case.  *ResQNet.com v. Lansa,*

21 *Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).  That is quintessentially an economic and factual issue, not a

22 legal one.

23     **C. The Court Has Never Held That "Fair Apportionment" of the 2006 Java Portfolio
        Cannot Be No Apportionment**

24

25       Google argues (Dkt. 845 at 3-4) that this Court has held, as a matter of law, that any approach

26 that starts with the 2006 negotiations ***must*** make a "fair apportionment" between the "technology in

27 suit and the remainder of the technology then offered."  (Dkt. 845 at 3-4, *quoting* Dkt. 685 at 3.)  But

28 the Court has also stated that its orders limiting the testimony of Prof. Cockburn do not prevent other

1    experts, including Dr. Kearl, from offering other approaches to reasonable royalty damages.  (*See,*
2    *e.g.*, Dkt. 791 ("Also, the order for Dr. Ian Cockburn to adjust his valuation of the copyrights in suit
3    and Sun's Java mobile patent portfolio to $561 million does not preclude other experts from using a
4    different valuation or a completely different approach altogether.").)

5    Further, nothing in the Court's orders categorically rejects, as a matter of either law or fact, an
6    economic argument that a "fair apportionment" of the 2006 bundle is no apportionment.  It is of
7    course true that the Court has required that additional adjustments be made to the apportionment
8    analyses that Prof. Cockburn has offered.  But orders addressing *how* apportionment is to be done
9    have no bearing on *whether* apportionment should be done under Dr. Kearl's analysis.

**D. There Is No Proper Basis to Exclude Dr. Kearl's Opinion That Apportionment of the IP in Suit as a Fraction of the Value of the Portfolio Will Underestimate the Value of the IP in Suit.**

In addition to its other defects, Google's motion is overbroad.  In paragraph 105 of his report, Dr. Kearl observes that even if it were impermissible to equate the value of the IP in suit with the value of the portfolio, the opinions that Google seeks to strike "█████████████████████████████████████████████████████████████████████████████████████████████" (Kearl Report ¶ 105.)  That is because apportionment fails to adequately consider the economic relationship between a complex portfolio and its constituent parts, and because apportionment disregards components of value that Google would receive from licensing the IP in suit.  (*Id.*)

If the Court were to strike paragraphs 99-105 of Dr. Kearl's report, as Google's motion seeks, Dr. Kearl would not only be prevented from giving the jury his best economic advice as to the value of the intellectual property in suit; he also would be prevented from informing the jury why the alternative measures of value that the jury will hear are insufficient to compensate Oracle for the harm it has suffered.  That would defeat the very purpose of appointing Dr. Kearl under Rule 706.  (Dkt. 236 at 2 (observing that the Court appointed the Rule 706 expert to "assist the jury by providing a neutral explanation and viewpoint"); Dkt. 610 at 3 ("In light of the parties' extremely divergent views on damages and the unusual complexity of the damages aspect of this case, an independent

1 economic expert was needed to aid the jury.").)

## IV. Conclusion

For all of the reasons stated above, Google's motion should be denied. The Court's independent damages expert should be allowed, consistent with the facts and the law, to offer the jury his "best economic advice" as to the proper measure of damages in this case.

Dated: April 6, 2012                               BOIES, SCHILLER & FLEXNER LLP

By: */s/ Steven C. Holtzman*
      Steven C. Holtzman

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.