IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>GOOGLE INC.,<br><br>    Defendant.<br>                                                  / | No. C 10-03561 WHA<br><br>**ORDER REGARDING**<br>***DAUBERT* MOTIONS**<br>**AGAINST DR. JAMES KEARL** |

## INTRODUCTION

In this patent and copyright infringement action involving Java and Android, both parties move to exclude portions of the report and testimony of the Rule 706 expert Dr. James Kearl. For the reasons stated, the motions are **GRANTED IN PART** and **DENIED IN PART**.

## STATEMENT

The background of this action has been exhaustively set forth in prior orders (Dkt. Nos. 230, 632, 685, 785). Because the damages aspect of this controversy is particularly complex, the parties have advanced extremely divergent views, and the sums in play vast, a Rule 706 expert, Dr. Kearl, was appointed to assist the jury in evaluating the damages issues (Dkt. No. 610). Dr. Kearl issued his report on March 21, 2012. On April 2, both parties moved to exclude portions of the report.

## ANALYSIS

An expert witness may provide opinion testimony "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and

1  (3) the witness has applied the principles and methods reliably to the facts of the case." FRE

2  702. District courts thus "are charged with a 'gatekeeping role,' the objective of which is to

3  ensure that expert testimony admitted into evidence is both reliable and relevant." *Sundance,*

4  *Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed. Cir. 2008).

**1. GOOGLE'S MOTION TO EXCLUDE OPINION THAT THE VALUE OF THE INTELLECTUAL PROPERTY IN SUIT WOULD HAVE BEEN THE VALUE OF THE ENTIRE JAVA MOBILE IP PORTFOLIO.**

To calculate the reasonable royalty for the intellectual property in suit, Dr. Kearl begins with the 2006 negotiations between the parties. He then considers the relationship between the value of the IP in suit (two patents and API copyrights) and Sun's entire Java mobile edition intellectual property portfolio in 2006, which would have included licenses to many patents and copyrights in addition to the IP in suit (Kearl Rpt ¶¶ 97–105). Before conducting an apportionment analysis, Dr. Kearl opines that, as a matter of economics, there are good reasons to not apportion and explains why the value of the IP in suit is equal to the value for the entire portfolio (Rpt ¶¶ 104–05):

> Setting aside what the law may require, my best economic advice is that there are good economic reasons why value of the in suit IP in this matter is the 2006 value of a hypothetical negotiation for the entire Java ME IP portfolio and the reasonable royalty rate is 20%.

Dr. Kearl offers three explanations for this opinion. *First*, he opines that if the parties knew in 2006 that the IP in suit would be the most relevant for Android, then the IP in suit would have "driven the negotiations and the aggregate value of the license in the 2006 negotiations is attributable to this subset" (Rpt. ¶ 100). *Second*, if the parties in 2006 did *not* know which subset of IP in the portfolio would be the most useful, then Google would have licensed an "option" to use any subset, to be decided at a later date. Dr. Kearl explains as follows (Rpt. ¶ 101):

> The reason is that if Google knew that it needed a subset of the Java ME IP portfolio, but didn't know in 2006 which subset it needed, then the 2005/06 negotiations can be thought determining the value of an option to, at some later date, decide which, if any, subset of the Java ME IP portfolio to use and when to use it. In this case, the 2006 value of the in suit IP is also the 2006 value of the Java ME IP portfolio — essentially the aggregate value of the

2

> 2006 Java ME IP license is what Sun was willing to accept for an option for Google to use one, two or as many of the patents and copyrights in the Java ME IP portfolio as it wished and, hence, the amount paid for the option to use what turned out to be the in-suit IP.

To illustrate, Dr. Kearl analogizes the 2006 scenario to a person who subscribes to a 100-page magazine knowing that he intends to read only one page. To that subscriber, the value of that single page is the same as the price of the entire magazine. This is true whether the subscriber already knows the specific page he intends to read, or simply knows that once he has the magazine, he will just choose one page to read. *Third*, Dr. Kearl opines that if Google was interested in writing its own operating system but decided that it needed to be written in Java and based on Java mobile-like technology, then Google would have gotten a license to Sun's entire mobile portfolio as "insurance against litigation if it happened that Google" later infringed unintentionally (Rpt. ¶ 102).

This Court's prior order held that the hypothetical license must be "tailored to the amount and type of infringement that actually occurred" and that "the reasonable royalty must compensate for the infringing features, but not for non-infringing ones" (Dkt. No. 230 at 8). In so holding, the order relied on the Federal Circuit decision of *ResQNet*, which held that "[a]t all times, the damages inquiry must concentrate on compensation for the economic harm caused *by infringement of the claimed invention.*" *ResQNet.com, Inc.. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). This remains true.

Dr. Kearl's second and third explanations for equating the value of the IP in suit to the entire Java ME IP portfolio are inappropriate for the hypothetical negotiation scenario. Significantly, Dr. Kearl fails to take into account that at the end of the hypothetical negotiation, Google gets a license to the IP in suit, *nothing more*. Google would not have a license to the entire portfolio, an option to choose any subset of Java IP to license at a later date, nor insurance against future litigation. Nor can we presume that Google would have made good use of the licensed IP. If Google was liable for the value of the entire IP portfolio each time a single IP in that portfolio was asserted in an infringement action, then Oracle would be overcompensated.

3

Thus, paragraphs 101 and 102 of Dr. Kearl's report are **STRICKEN**. Paragraph 103 is stricken to the extent it suggests that the hypothetical negotiation would have been for a license to the entire portfolio. Paragraph 104 is stricken to the extent that it relies on the above-stricken material.

Dr. Kearl's first explanation, that "*if* Sun and Google understood that the subset of Sun's Java ME IP portfolio *most relevant* to their negotiations was composed of the now in suit patents and copyright, the 2006 value of the Java ME IP portfolio is the value of the in suit IP," does not run into the problems discussed above because this explanation appropriately presumes that Google would receive only a license for the alleged infringement in the hypothetical negotiation (Rpt. ¶ 100). Google has failed to show that this opinion is inappropriate as a matter of law. However, because Dr. Kearl frames his opinion as a conditional, it is unclear whether he actually opines that the IP in suit was understood in 2006 to be the most relevant to the 2006 negotiations. If so, then the parties have not adequately briefed the appropriateness of this opinion and Google's objection to paragraph 100 is **DENIED WITHOUT PREJUDICE**.

### 2.  ORACLE'S MOTION TO EXCLUDE DEDUCTIONS FOR COPYRIGHT DISGORGEMENT.

In his copyright-disgorgement analysis, Dr. Kearl used figures for Android-related expenses from Google's expert Dr. Alan Cox's October 2011 damages report (Kearl Rpt ¶¶ 120–21). Dr. Cox had relied on an "Android Profit-and-Loss Statement" to calculate traffic acquisition costs, operations, and operating expenses, including sales expenses, marketing, product management, and engineering expenses for the Android platform (Cox Rpt Exh. 3b). Dr. Cox did not conduct an independent audit of the P&L statement to determine its reliability. Instead, he relied on interviews of Aditya Agarwal, a senior financial analyst at Google.

Oracle attacks Dr. Cox's reliance on the P&L statements and seeks to preclude both Dr. Kearl *and* Dr. Cox from offering *any* testimony about Google's Android-related expenses in the copyright-disgorgement analysis. This would result in a difference of approximately $700 million for disgorgement damages (*compare* Kearl Rpt ¶ 119 *with* Rpt ¶ 121). Oracle argues the following: *First*, Dr. Cox did not conduct an independent audit on the Android P&L statements. *Second*, Dr. Cox testified in his deposition that he only relied on Mr. Agarwal for the

4

1  foundational fact that all engineering expenses in the Android P&L Statement were appropriately
2  allocated to the Android platform (Dearborn Decl. at 74–76).  *Third*, Mr. Agarwal is *not* on
3  Google's witness list and thus cannot offer foundational testimony at trial (Dkt. Nos. 525-2,
4  840).  In its opposition brief, Google counters that there are other witnesses on its witness list
5  who can lay the proper foundation (authentication and explaining the figures contained therein)
6  for the P&L statements.

Our court of appeals has held that

> [A] deduction for overhead should be allowed only when the infringer can demonstrate that the overhead expense was of actual assistance in the production, distribution or sale of the infringing product.  We do not take this to mean that an infringer must prove his overhead expenses and their relationship to the infringing production in minute detail.  Nonetheless, the defendant bears the burden of explaining, at least in general terms, how claimed overhead actually contributed to the production of the infringing work.

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985) (citations omitted).  In *Frank*, the court held that the defendants did not meet their burden of showing deductible expenses because there was no evidence of what costs were attributable to the infringing movie in MGM's overall "general and administrative expenses."  *Ibid*.  In a prior order, this Court held that Dr. Cox could offer opinions based on interviews with percipient witnesses so long as the interviewees on which he relied can testify to the foundational facts with firsthand knowledge at trial (Dkt. No. 632 at 3).

*First*, Oracle's challenge that Dr. Cox is required to conduct an independent audit of the Android P&L statements is denied without prejudice.  If the proper foundation is laid at trial that the P&L statements were "routinely updated every quarter by Google in the ordinary course of business" and the figures therein accurately "encompass Android financial data" (Opp. at 2), then Dr. Cox can reasonably rely on those figures for calculating Android expenses.  He does not need to conduct an independent audit of the P&L statements.  Oracle may re-raise this issue if Google's witnesses fail to lay the necessary foundation for Dr. Cox's testimony at trial.

5

*Second*, Oracle's assertion that because Mr. Agarwal will not be a witness at trial, no one else can lay the proper foundation for the P&L statements is rejected. This punishment is too harsh for failure to list a witness. The issue is whether the foundational facts must be laid by the *same* individual(s) cited in Dr. Cox's report. Rule 37(c) guides our analysis:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B) may inform the jury of the party's failure; and
>
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Oracle's motion, which seeks to prevent *any* testimony based on the P&L statements, would be highly prejudicial to Google because then the jury would not have any information regarding deductible expenses for Android. These expenses were approximately $700 million. Our court of appeals has specifically cautioned against such an unjust outcome:

> Although the statute imposes upon the infringer the burden of showing "the elements of profit attributable to factors other than the copyrighted work," 17 U.S.C. 504(b), nonetheless where it is clear, as it is in this case, that not all of the profits are attributable to the infringing material, the copyright owner is not entitled to recover all of those profits merely because the infringer fails to establish with certainty the portion attributable to the non-infringing elements. "In cases such as this where an infringer's profits are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard it is the duty of the court to make some apportionment
>
>  . . . . .
>
> But we are resolved to avoid the one certainly unjust course of giving the plaintiffs everything,

6

> because the defendants cannot with certainty compute their own share. In cases where plaintiffs fail to prove their damages exactly, we often make the best estimate we can, even though it is really no more than a guess, and under the guise of resolving all doubts against the defendants we will not deny the one fact that stands undoubted.

*Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 828–29 (9th Cir. 1985) (citations omitted). Here, it is clear that Android's gross revenue through 2011 was not entirely profit attributable to the allegedly infringed material. There were undoubtedly expenses that went into the development and marketing of Android. It would be unjust to hide these expenses from the jury. Moreover, any prejudice to Oracle of allowing another witness to lay the foundation for the P&L statements is minimized because Oracle was on notice that other witnesses on Google's witness list, such as Android project head Andy Rubin, would potentially testify about the costs that went into Android (*see* Dkt. No. 525-3).

The following compromise will be implemented. Oracle's motion is **DENIED WITHOUT PREJUDICE**. Dr. Cox will submit a supplement report revising only the foundational interviewee(s) for the P&L statements by **APRIL 16**. The new interviewee(s) must already be on Google's witness list and their disclosed testimonial topic must be related to Android expenses. Oracle may depose each new foundational interviewee(s) for three hours, to be taken by **APRIL 30**. Google must produce at the deposition any materials used by the deponent in supplying information to Dr. Cox. No other materials need be produced. The questioning shall be limited to the subject of the interviews and the information provided to the expert and its accuracy. Oracle may re-raise its motion if the new foundational interviewee(s) proves inadequate to lay the proper foundation at trial.

**CONCLUSION**

For the reasons stated above, paragraphs 101 and 102 of Dr. Kearl's report are **STRICKEN**. Paragraph 103 is stricken to the extent it suggests that the hypothetical negotiation would have been for a license to the entire portfolio. Paragraph 104 is stricken to the extent that it relies on the above-stricken material.

7

Oracle's motion is **DENIED WITHOUT PREJUDICE**. Dr. Cox will submit a supplement report revising only the foundational interviewee(s) for the P&L statements by **APRIL 16**. Oracle may depose each new interviewee(s) for three hours, to be taken by **APRIL 30**.

**IT IS SO ORDERED.**

Dated:   April 10, 2012.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE