Pages 1 - 148

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,              )
                                   )
            Plaintiff,             )
                                   )
  VS.                              )  No. C 10-3561 WHA
                                   )
GOOGLE, INC.,                      )
                                   )
            Defendant.             )  San Francisco, California
_____)  March 28, 2012


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**         MORRISON & FOERSTER
                           755 Page Mill Road
                           Palo Alto, California  94304
                    BY:  **MICHAEL A. JACOBS, ESQUIRE**
                         **KENNETH A. KUWAYTI, ESQUIRE**
                         **MARC DAVID PETERS, ESQUIRE**
                         **ROMAN A. SWOOPES, ESQUIRE**

                           BOIES, SCHILLER & FLEXNER
                           1999 Harrison Street, Suite 900
                           Oakland, California  94612
                    BY:  **WILLIAM FRED NORTON, ESQUIRE**
                         **STEVEN C. HOLTZMAN, ESQUIRE**

                           ORACLE AMERICA, INC.
                           500 Oracle Parkway
                           Redwood Shores, California  94065
                    BY:  **ANDREW C. TEMKIN, CORPORATE COUNSEL**


(Appearances continued on next page)

**Reported By:**    *Katherine Powell Sullivan, CSR #5812, RPR, CRR*
                    *Official Reporter - U.S. District Court*

**APPEARANCES (CONTINUED):**

**For Defendant:**          KEKER & VAN NEST
                            633 Battery Street
                            San Francisco, California  94111-1809
                  BY:  **ROBERT ADDY VAN NEST, ESQUIRE**
                       **DANIEL PURCELL, ESQUIRE**
                       **MICHAEL S. KWUN, ESQUIRE**
                       **CHRISTA MARTINE ANDERSON, ESQUIRE**

                            KING & SPALDING LLP
                            1185 Avenue of the Americas
                            New York, New York 10036-4003
                  BY:  **SCOTT T. WEINGAERTNER, ESQUIRE**

                            GOOGLE, INC.
                            1600 Amphitheatre Parkway
                            Mountain View, California  94043
                  BY:  **RENNY HWANG, LITIGATION COUNSEL**

**For Dr. Kearl:**          FARELLA BRAUN & MARTEL LLP
                            235 Montgomery Street, 30th floor
                            San Francisco, California 94104
                  BY:  **JOHN L. COOPER, ESQUIRE**

<center># P R O C E E D I N G S</center>

**MARCH 28, 2012**                                              **7:33 A.M.**


 **THE CLERK:**  Calling civil action C 10-3561, it's
Oracle America, Inc. versus Google, Inc.

 Counsel, can you please state your appearances for
the record.

 **MR. JACOBS:**  Michael Jacobs from Morrison & Foerster
for Oracle.  With me at counsel table, in order, is Ken Kuwayti
from Morrison & Foerster, Andrew Temkin from Oracle, Fred
Norton from Boies, Schiller, Steve Holtzman from Boies,
Schiller, Roman Swoopes from Morrison & Foerster, and Marc
Peters from Morrison & Foerster.

 **THE COURT:**  Welcome.

 **MR. VAN NEST:**  Good morning, Your Honor.  Bob
Van Nest, Keker Van Nest, for defendant Google.  I'm here today
with Christa Anderson, Michael Kwun, Dan Purcell from our firm,
and Renny Hwang from Google.  Good morning.

 **THE COURT:**  Good morning.

 **MR. COOPER:**  Good morning, Your Honor.  John Cooper
for Dr. Kearl.

 **THE COURT:**  Is Dr. Kearl here?

 **MR. COOPER:**  Dr. Kearl is not here today.

 **THE COURT:**  He didn't need to be.  Thank you.

 So our trial is definitely on for April 16th, as you

1    already know.  And I wanted to bring you in to help me

2    understand better some of the arguments being made and also to

3    take up a few of the ways to streamline the trial.  I am going

4    to ask you later on, but not right now, for the stipulated

5    timeline that I hope you have been able to agree on.

6             I would like to start, though, with understanding

7    better the copyright part of the case.  And I want to --

8    probably the best way to do this is to let one side answer the

9    question in three sentences or less, and then the other side

10   answer it, because there's so many issues that if I wait until

11   I hear out everything you want to say on all the points then I

12   will have forgotten your answer.

13            So I want to start by asking basic fundamentals.  Are

14   the 11 instances of actual copying part of the 37 API source

15   code?  So let's start with Mr. Jacobs.

16            **MR. JACOBS:**  In certain cases yes, Your Honor.  Three

17   of the 11 files are part of the Java APIs.  Specifically,

18   Google copied from java.util.Arrays.java into two Android

19   files, rangeCheck.  And Google copied from

20   java.security.CodeSource.java the comments into the test file

21   that Intel contributed to Harmony.

22            And Google copied from

23   java.security.CollectionCertStoreParameters.java into the test

24   file that Intel contributed to Harmony.

25            The other eight files are part of the implementation

1  but are not part of the specification.

2          **THE COURT:**  Well, I'm not talking about

3  specification.   I'm talking about the source code.

4          Don't get into the specification.   The specification

5  is the plain English thing that tells the user how to use it,

6  right?   Correct?

7          **MR. JACOBS:**  Yes, that's -- well, I wouldn't say

8  plain English, Your Honor.

9          **THE COURT:**  Well, it's in English.

10         **MR. JACOBS:**  Yes.

11         **THE COURT:**  It's talking to the user, not the

12  computer.   Right now I'm focusing on the part that talks to the

13  computer, i.e. the source code.

14         Were any of those 11 instances of copying part of the

15  37 files?

16         **MR. JACOBS:**  Yes.

17         **THE COURT:**  Okay.   Focus on that part.   How many of

18  those were there?

19         **MR. JACOBS:**  Let me double-check.

20         (Pause)

21         **MR. JACOBS:**  Sorry, Your Honor.

22         Those three that I -- the ones that I referenced are

23  part of the source code of the API, the implementation of the

24  API.

25         **THE COURT:**  I don't want to get into the

1  specifications yet.

2           Three files, source code are part of the 37.  And

3  those three you've already named, called out.

4           **MR. JACOBS:**  That's correct.

5           **THE COURT:**  Since you mentioned it, I need to ask

6  you, you said something about Harmony.  Were they copied from

7  Harmony or were they copied -- what did you mean, Harmony?

8           **MR. JACOBS:**  So, Harmony was a development effort

9  that was the source for Google of some of the files that we

10  allege were copied, and the source of some of the

11  implementations of the API -- forgive me, specifications, that

12  we claim are derivative works.

13           **THE COURT:**  So were all three of these copied from

14  Harmony?

15           **MR. JACOBS:**  RangeCheck was not copied from Harmony.

16           **THE COURT:**  Rain what?

17           **MR. JACOBS:**  RangeCheck.

18           **THE COURT:**  RangeCheck.  And that was copied from

19  where?

20           **MR. JACOBS:**  Was -- that was copied by the Google

21  programmer implementing that code.

22           **THE COURT:**  Copied from what source, though?

23           **MR. JACOBS:**  From Java source code.

24           **THE COURT:**  All right.  And then the other two were

25  copied from Harmony?

1          **MR. JACOBS:**  They were taken by Google from Harmony.

2   Harmony itself, that whoever was the implementer on the Harmony

3   side copied from Java source code.

4          **THE COURT:**  All right.  So while I have you here

5   again, that accounts for three of the -- three of the 11.  Are

6   there any other instances of -- within the 11 where source code

7   itself was copied but not part of the 37?

8          **MR. JACOBS:**  I think -- if I understand your question

9   correctly, all of them.  So the other eight instances are

10  code-to-code copying, regardless -- what I don't have for you

11  right now is which of those came from Harmony and which of

12  those were copied by Google directly.

13         **THE COURT:**  No, I'm not making my question clear.  I

14  need to back up and let you understand why I'm asking these

15  questions.

16         I've read your briefs and the other side's briefs

17  several times.  There is a -- I'm not saying it's intentional,

18  but there's a very confusing aspect where sometimes you slide

19  between specification.  Sometimes -- I can tell its source

20  code, but you don't say it.  Sometimes it's structure,

21  arrangement, and selection.

22         And I never quite know when the claim is for

23  structure, selection, arrangement versus direct copying of

24  source code versus copying the plain English explanation to the

25  user.  That's been very frustrating for me trying to figure

1    that out.

2           So we're going to spend the time today.  It may take

3    an hour.  I want to understand what your claim is, and put the

4    patient, so to speak, on the operating table so we can

5    understand what the body is that we're dealing with.

6           That's what my frustration is.  Now, it's just

7    because you all are experts and I am coming up to speed.  You

8    all know what you're talking about and I don't.  But I need to

9    understand it.

10          So you have said -- there are two things I do get:

11   11 and 37.  11 and 37.  I get that part.  11 things were

12   literally copied.  37 things are APIs.  I'm trying to

13   understand what the relationship is between all of these.

14          So -- and there's also the problem of source code

15   being copied versus specifications being copied.  So I want to

16   understand all of that.

17          Now, with that explanation, you've told me that of

18   the 11, three of those 11 instances of copying were copying of

19   source code that goes along with three of the 37 APIs.

20          **MR. JACOBS:**  Yes.

21          **THE COURT:**  Okay.  Now, what are the other eight,

22   then?

23          **MR. JACOBS:**  The other eight are in other parts of

24   Android.  They aren't in the libraries that implement the 37

25   APIs.

```
 1              THE COURT:  All right.  Not in 37, but in Android.

 2              MR. JACOBS:  Correct.

 3              THE COURT:  And it's literal, not even one iota of a

 4   change?  Or are you waffling on that?

 5              MR. JACOBS:  It's literal copying, but I wouldn't say

 6   "not one iota of a change" because that is --

 7              THE COURT:  How can it not be -- it doesn't have to

 8   be exact to be literal?

 9              MR. JACOBS:  I don't think so, Your Honor.  If you

10   line them up side by side, you might see a spacing

11   difference -- we can show you this -- but you might see a

12   letter change here or there.  But the words and symbols in the

13   Java source code are copied directly into the Android source

14   code.

15              THE COURT:  So that's 3 plus 8 equals 11.

16              All right.  I want to see what the other side says

17   about that.  Do I have it correctly?  Do I have that part down

18   correctly?

19              MR. KWUN:  Your Honor, Michael Kwun for Google.

20              It's very close.  I think there's some slight nuances

21   that I would say slightly different than Mr. Jacobs did.

22              THE COURT:  That's why we're here.  Tell me the way

23   you see it.

24              MR. KWUN:  Let's go through the 11 files.  So the

25   first file is Arrays.java.  And Arrays.java is about --
```

```
 1              THE COURT:  How do you spell that?

 2              MR. KWUN:  That's an Oracle file.

 3              THE COURT:  How do you spell that?

 4              MR. KWUN:  Capital A-r-r-a-y-s period lower case

 5   j-a-v-a.

 6              THE COURT:  Okay.

 7              MR. KWUN:  Arrays.java.  So that's a file in the

 8   Oracle version of J2SE, Java 2 Standard Edition.  And it has

 9   about 3,000 lines of source code.

10              Within that 3,000 lines of source code, there is a

11   9-line method called rangeCheck, which Mr. Jacobs referenced.

12   And that's one word smashed together with a capital C, but

13   otherwise lower case.

14              THE COURT:  Wait.  Is rangeCheck --

15              MR. KWUN:  It's part of Arrays.java.

16              THE COURT:  Is that one of the 37?

17              MR. KWUN:  No.  Arrays.java is a file within the API

18   package called java.util.  So there's -- the 37 API packages

19   that are at issue, each can include multiple files.

20              So inside one of those packages that's accused of

21   infringement -- that package being java.util -- there's a file

22   called Arrays.java.

23              And inside that Arrays.java file, which has about

24   three thousand lines of source code, there's a 9-line method

25   called rangeCheck.
```

1          And that is the part they accuse of copying for

2   Arrays.java.  And that appears -- well, actually, I should say

3   appeared, past tense, in two Android files.  So that's one of

4   the 11 files.

5          He mentioned two others where there are comments, and

6   he said those are part of the API.  So --

7          **THE COURT:**  Comments?  Do you mean by that the

8   specifications, or do you mean --

9          **MR. KWUN:**  No.

10         **THE COURT:**  -- the part of it that is so-called plain

11  English to the user?

12         **MR. KWUN:**  It's in the source code file, but it's not

13  actual source code.  It's commentary --

14         **THE COURT:**  Not compiled.

15         **MR. KWUN:**  Right.  So when you compile it, if you

16  remove that text, it has no effect --

17         **THE COURT:**  Comments don't get compiled, do they?

18         **MR. KWUN:**  They don't.

19         **THE COURT:**  So it's just to help the writer of the

20  source code follow what's being done by the source code.

21         **MR. KWUN:**  Correct.  And those are the comments that,

22  as Mr. Jacobs noted, came from Apache Harmony, and they

23  certainly look the same as comments from Oracle files.

24         **THE COURT:**  All right.  So the other two that

25  Mr. Jacobs mentioned --

1          **MR. KWUN:**  Those are in the java.security package,

2    one of the 37 packages accused of infringement.

3          **THE COURT:**  Java.security?

4          **MR. KWUN:**  Yes.

5          **THE COURT:**  And that -- in that one the source code

6    itself that gets compiled is not copied, but the comments are?

7          **MR. KWUN:**  Correct.  There is a bit of a semantic

8    question of what you call source code.

9          **THE COURT:**  I wanted to distinguish between the two.

10   Comments versus the part that gets compiled.

11         **MR. KWUN:**  Correct.  So these are just comments.

12         **THE COURT:**  Because the part that gets compiled is

13   what instructs the computer what to do.

14         **MR. KWUN:**  Absolutely.

15         **THE COURT:**  The part that's in English, so to speak,

16   tells the reader what is being done.

17         **MR. KWUN:**  Absolutely.  So those comments never had

18   an effect on a single byte in any shipped phone because they

19   don't compile into the compiled version.

20         **THE COURT:**  Let's go back to rangeCheck for a minute.

21         **MR. KWUN:**  Yes, Your Honor.

22         **THE COURT:**  Is that a file or is that one of the

23   APIs?

24         **MR. KWUN:**  It's neither, actually, Your Honor.  It's

25   a method that is used -- it's what's known as a private method

1   that is used within a public method.

2          So the APIs -- I would say that the best way to frame

3   the APIs are they're the public interface, is what we're really

4   talking about in this case.  That's what's discussed in the

5   specification.

6          And the public interface for one of these routines,

7   if you look at the source code implementation, has to make use

8   of certain helper functions that are not exposed to the public.

9   They're its own private work that they do behind the scenes.

10  And one of those is called rangeCheck.  It's a quick utility

11  function that --

12          **THE COURT:**  What does it do?

13          **MR. KWUN:**  When you are sorting an array, you pass to

14  that array the starting point and the end point in the array

15  for which you are trying to sort elements.  So A and B, let's

16  call them.

17          And rangeCheck makes sure that A is less than B so --

18  because it's going to presume that it's sorting things from,

19  say, 2 to 12, instead of from 12 to 2.  So if A is greater than

20  B, it's going to say, that's a problem I don't know how to

21  sort, that's backwards.

22          **THE COURT:**  So it's checking to make sure that each

23  item in the sort, it falls within the range.

24          **MR. KWUN:**  The possible range.  So it checks whether

25  A is less than B.  It checks whether A is zero or greater.  If

```
 1   A is a negative number that's going to refer to an impossible

 2   element of the array.

 3           And it checks to make sure that B is no greater than

 4   the size of the array.  So if there's 12 elements and you say

 5   please sort the third to the fiftieth elements, it's going to

 6   say, I don't know what you're talking about.

 7           That's all rangeCheck does, which --

 8       THE COURT:  There's something like that in the public

 9   domain?

10       MR. KWUN:  That concept is certainly in the public

11   domain.  I don't know that you could go out and find those

12   exact nine lines, but the basic concept of bounds checking is

13   taught in programming classes across the country.

14       THE COURT:  So what do you say about the other eight

15   that are not in the 37, but are in Android somewhere?  What do

16   you say about those instances of copying?

17       MR. KWUN:  A couple of things there.  Your Honor, you

18   talked about specifications versus source code.  I'm afraid I

19   have to introduce another slight wrinkle.

20       THE COURT:  Fine.  Go ahead.

21       MR. KWUN:  Which is, the eight Oracle files they are

22   talking about are compiled files.  I mean, there was source

23   code for them originally somewhere, but there is no allegation

24   that anything was copied from source code.

25           The allegation is that the compiled version of the
```

```
1   Oracle files was decompiled using a program called a
2   decompiler, and that that was copied into the source code for
3   these eight files.
4           These eight files were given to Google by an outside
5   vendor that it used to assist with the Android development
6   process.
7           THE COURT:  Who was that?
8           MR. KWUN:  A company called Noser in -- I believe in
9   Russia.
10          THE COURT:  Noser?
11          MR. KWUN:  Yeah, N-o-s-e-r.
12          THE COURT:  They are in Russia?
13          MR. KWUN:  Yes.
14          THE COURT:  That's not a good fact.
15          MR. KWUN:  But the key fact is that, as Mr. Jacobs
16  said, they are not actually part of the implementation.  They
17  are so-called -- I believe they are so-called unit tests.  When
18  you finish writing a program, you can do a quit sanity check to
19  make sure when you ask it, is the morning -- is the sun up in
20  the morning it says yes.
21          THE COURT:  So this -- these eight, are they still in
22  the program, or are these the ones that you changed?
23          MR. KWUN:  These eight test files and the comments
24  from the other two files, those were removed from the Android
25  code base.
```

```
1           THE COURT:  When did that happen?

2           MR. KWUN:  In response -- I believe that happened in

3    2010.  Excuse me, 2011.  2011.

4           THE COURT:  What month in 2011?

5           MR. KWUN:  I can get that for you, Your Honor.

6    January.

7           THE COURT:  January 2011, all eight were removed?

8           MR. KWUN:  All eight plus the comment file -- well,

9    the comments in the file.  So that covers ten of those files in

10   January of 2011.

11          THE COURT:  So the comments and the Java file were

12   also removed --

13          MR. KWUN:  Yes.  The files remained, but the comments

14   themselves were removed.

15          THE COURT:  But the files, you said, were not the

16   same.  It was the only thing accused, were the comments.

17          MR. KWUN:  That's right.

18          And so -- but to address another question that Your

19   Honor had raised in your order, it is possible to -- because of

20   the way a version control system, which is how you maintain

21   various versions of the software, because of the way version

22   control software works it is possible for someone to, if they

23   try rather hard, to re-create those files from the information

24   that's available on Google's website.

25          THE COURT:  I didn't understand what you're trying to
```

1   say.

2          MR. KWUN:  Frankly, Your Honor, my understanding

3   isn't going to go too far beyond that.  But when you have a --

4   when you do software development you have a system called a

5   version control system that allows you to have, for example,

6   version 1.0.  And then when you do version 1.1, there's some

7   changes.  Those are usually stored in what's known as a diff

8   file.  It just stores the difference between the last version

9   and the new version.

10         So my understanding is that because of that, if you

11  have the current version and then you look at the differences

12  and you go backwards, you can reconstruct the previous version,

13  and you can keep doing that throughout some artifice process

14  which, you know, presumably could be automated.  And you can

15  come up with previous versions.

16         So my understanding is, because of the technical

17  design of the version control system that Google is using, it

18  would be --

19         THE COURT:  Is that something that's sold to the

20  user, or that's still just at the Google mainframe?

21         MR. KWUN:  It's available to the public.  It's not

22  sold.  It's not the -- the user of a phone does not get on the

23  phone this version control software.  It's for developers.

24         THE COURT:  The phone that is sold to the user, is

25  there any possible way that that unit can get -- can now access

1    these ten files that have been removed?

2           MR. KWUN:   These ten files are not on the phone

3    anywhere.   The copied -- the portions that are at issue are not

4    anywhere on the phones.

5           THE COURT:   How about the 11th file, rangeCheck?

6           MR. KWUN:   RangeCheck, the two files that had

7    rangeCheck in them were extensively rewritten.   And that

8    rewriting actually occurred some time ago, I believe in

9    December 2010.

10          The changes were pushed public when Google came out

11   with its most recent version of Android, which is named Ice

12   Cream Sandwich, which was several months ago.

13          So, for example, Your Honor, the phone --

14          THE COURT:   What are you saying?   Are they still --

15   is rangeCheck, in the form that was accused, still being sold

16   to the public or not?

17          MR. KWUN:   The phones that are used in the current

18   operating system, which is version 4.0, such as this one, do

19   not have rangeCheck on them (indicating).

20          THE COURT:   So you're representing to me that all 11

21   instances, even assuming they ever were copying, those are gone

22   now, in history, as far as the units now being sold to the

23   public?

24          MR. KWUN:   There may be -- actually, I'm pretty sure

25   there are phones that are still using old versions of the

1  operating system.

2          The manufacturers of those phones that got those

3  operating systems from Google some time ago could still be

4  shipping phones that have rangeCheck on them.

5          The other ten files never resulted in any -- the

6  allegedly -- the portions of them at issue never resulted in

7  any change in code on the phone.  So, really, all we're talking

8  about is rangeCheck.  But for those older and somewhat outdated

9  phones, yes, those would still have compiled code that came

10 from rangeCheck.

11          **THE COURT:**  All right.  Let me ask Mr. Jacobs to

12 respond to what you just said.

13          **MR. JACOBS:**  Our information is different, Your

14 Honor.  We downloaded what's called -- one of the versions of

15 what's called Froyo.  Maybe I can give you the spectrum here,

16 give you the vocabulary.

17          Android 2.2 is known as Froyo.  Android 2.3 is known

18 as Gingerbread.  And Android 4.0, the version that was just

19 being discussed, is known as Ice Cream Sandwich.

20          Within each of those there are, of course,

21 subreleases, and the like.  And we downloaded what we

22 understand to be the latest release of Froyo, which is 2.2.3

23 release 2, on March 12th.  And all of the copied -- 11 copied

24 code files were present in that version.

25          So, I think I should step back just a minute.  There

1    is a public -- there is an Android public website.  And, from

2    time to time, versions of Android that are being, as was

3    mentioned, pushed out to the handset makers or to developers,

4    or to whoever, are posted to that public website.  This is not

5    a version control issue.  This is a, I want to download this

6    version of the code.

7            So this latest version of 2.2, of Froyo, had all but

8    one of the 11 copied code files still in it.  The one that was

9    deleted by that latest version is one that's called

10   PolicyNodeImpl.java.  All compressed together.

11           So, just to be clear, when you go to the public

12   Android website, one can access the latest version of Android

13   Ice Cream Sandwich.  One can access earlier versions of

14   Android, such as Froyo or Gingerbread.

15           Progressively, more and more has been deleted from

16   the public version.  So if you go to the latest version, for

17   example, of what's called Gingerbread, our last information was

18   that rangeCheck was still present in it on the public website.

19           It is quite possible, more than possible, probable

20   that developers, whether in handset -- in the handset context

21   or other contexts, would be accessing earlier versions of the

22   Android.

23           Not everybody wants to implement the latest version

24   recently.  So the fact that these are still available on the

25   public website means that this isn't just artifactual.  These

1  are versions that are made available for developers to use.

2          Let me segue, for a minute, to give you the full

3  picture of what could be out there, and I'll give you a little

4  more detail on this.

5          Meanwhile, there are handsets in the marketplace that

6  are being iterated -- that are being reproduced, if you will,

7  they are being installed, they are being created, using these

8  earlier versions of Android.

9          If you go down to your local phone store and buy an

10  Android phone, you are not necessarily getting a phone with the

11  latest version, Ice Cream Sandwich, on it.  You may well be

12  getting a version with Gingerbread and Froyo.  And, of course,

13  the vendors need to supply those.

14          Google has done nothing to go out to the vendors and,

15  if you will, delete the infringing code.  So if you got a phone

16  today with Froyo on it, it would still have all -- it would

17  still have rangeCheck in it.

18          **THE COURT:**  Well, all right.  I see your point.  But

19  even I know enough to know that the concept of rangeCheck is --

20  that's like the first grade, isn't it?

21          I mean, how many ways -- if A is greater than X, then

22  alert the user or do something.  If it's less than -- how can

23  that be something that is worthy of copyright protection?

24          **MR. JACOBS:**  The proof here is probably in the

25  pudding, or, to be more particular, in Ice Cream Sandwich, Your

```
1   Honor, because in Ice Cream Sandwich, Google contends that they
2   have rewritten rangeCheck and reexpressed that functionality in
3   a way that is not copied.
4            So there is a -- I'm sorry to be using these words --
5   a range of expression in rangeCheck, as evidenced by Google's
6   own rewriting of it.  And the developer himself commented on
7   striking similarity when we took his deposition and --
8            THE COURT:  How many ways are there to do it?  When
9   you're comparing a given number to the two ends of the range,
10  there's a very limited number of ways to do it.
11           Of course, they are going to be similar.  Now, if
12  they are absolutely identical -- I don't know.  It just
13  seems -- I'm studying this word "thin."
14           If anything was ever thin, that's thin.  Because, A,
15  there is -- there's -- it's simple.  And I hope this case turns
16  on a lot more than just rangeCheck.
17           MR. JACOBS:  It most assuredly does, Your Honor.
18           THE COURT:  All right.  All right.  Let me -- you
19  finish your point, then we're going to hear from the other
20  side.
21           MR. JACOBS:  So, yes, just to complete, then, the
22  picture.  So if we go all the way to Android 4.01, Ice Cream
23  Sandwich, we still see one of the files is the comments.  So
24  we're on comments now.  And we have a common understanding of
25  comments.  I agree with the previous discussion.  The comments
```

1    in CollectionCertStoreParametersTest.java are still present.

2              So, as I indicated, there's been a progressive

3    deletion of the copied elements.  But in the latest version,

4    even in the latest version that was just posted, one of the

5    files, one of the 11 files remains.

6              And if we look at Gingerbread, it depends on what

7    release of Gingerbread.  But even the latest version of

8    Gingerbread, which is 2.3.7r1, at least the latest version

9    we've looked at, has both instances of rangeCheck still in it,

10   on the public website.

11             **THE COURT:**  All right.  How many lines of code are

12   there in the Android system?

13             **MR. JACOBS:**  So --

14             **THE COURT:**  Total Android system that if I went

15   out -- let's say 2.0, I went out and bought a 2.0 Android

16   machine, what would the total number of lines be?

17             **MR. JACOBS:**  I don't know.  But I think we should

18   clarify the question because there's -- there's the part of

19   Android -- I think this was one of the points that Google would

20   make.  There's a part of Android that actually ends up on a

21   phone, and there's the whole developer environment and tools --

22             **THE COURT:**  You can distinguish any way you want.

23   Which would have the fewest number of lines of code?

24             **MR. JACOBS:**  I'm guessing here, but probably what's

25   on the phone.

```
 1              THE COURT:  How many lines would that be?

 2              MR. JACOBS:  I don't know.

 3              THE COURT:  A million?

 4              MR. JACOBS:  I don't know, Your Honor.

 5              THE COURT:  So how many lines of code are accused

 6    here out of what percentage?  Sounds like it's going to be far

 7    less than 1 percent.

 8              MR. JACOBS:  I would be -- I think that's probably

 9    right.

10              THE COURT:  Okay.  Let me hear from the other side.

11    What do you say to the fact that even though you told me these

12    are history that, in fact, you can go on your website and still

13    get 2.0?

14              MR. KWUN:  So, Your Honor, I actually don't know

15    which website they're talking about.  They said the public

16    website.  There are -- this is an open source project.  The

17    source code may be available on other public websites that we

18    don't control.  I don't --

19              THE COURT:  May be or is be?  Is it on the Google

20    site or not?  Come on.

21              MR. KWUN:  It's not on the Google site.

22              THE COURT:  Mr. Jacobs -- Mr. Jacobs, is it on the

23    Google website or not?  The Android website or not?  Come on.

24              MR. JACOBS:  Yes.

25              THE COURT:  All right.  Counsel is telling me in a
```

1   flat out yes, it is.  Is he not being truthful?

2           MR. KWUN:  I don't know exactly what he is referring

3   to, so --

4           THE COURT:  Well, who at your company over there can

5   answer this question?

6           What's your name?

7           MR. HWANG:  Mr. Hwang.

8           THE COURT:  All right.  Come up here.

9           What is the answer to that question?  Is 2.0

10  available on the Android website?

11          MR. HWANG:  Android version 2.0 is available via the

12  Android website.  That's correct.

13          THE COURT:  All right.  That's the answer.  It's

14  still there.

15          MR. KWUN:  Your Honor, 2.0 is available.  My

16  understanding is the files at issue are not.  Or at least the

17  portions that are allegedly copied.

18          And I understand that Mr. Jacobs is saying something

19  that is diametrically opposed to that.  We have not been told

20  exactly what they did, so it's hard for me to investigate to

21  see where the discrepancy comes from.

22          THE COURT:  It's really amazing.  Here we have how

23  many lawyers in the room, and something this important on the

24  eve of trial you don't know the answer.

25          Well, you better find out before the trial starts.

1          **MR. KWUN:**  Yes, Your Honor.

2          **THE COURT:**  Okay.  Thank you, sir.

3          How many lines of code are on the Android cellphone?

4          **MR. KWUN:**  It depends on what you count.  For

5  example, if you include the comments, the number I have readily

6  at hand does include comments.  It's around 10, 15 million.

7          **THE COURT:**  All right.  So how many lines of code are

8  accused?

9          **MR. KWUN:**  Less than five one-thousandths of a

10  percent, is my recollection.

11          **THE COURT:**  Less than what?

12          **MR. KWUN:**  Five one-thousandths of a percent.

13          **THE COURT:**  How many lines does that come down to?

14          **MR. KWUN:**  There's the -- I think it's somewhere on

15  the order of a few hundred, if you include the eight files that

16  don't result in anything on the phone and you include the

17  comments.

18          If you don't --

19          **THE COURT:**  You're including all 11.

20          **MR. KWUN:**  Yes.

21          **THE COURT:**  Even if all 11 were flagrant violations,

22  it's a few hundred lines of code versus 15 million?

23          **MR. KWUN:**  Yes, Your Honor.

24          To be clear, I'm not including every line from those

25  files.  I'm including the lines that are allegedly copied.

1          **THE COURT:**  That's what I mean.

2          **MR. KWUN:**  Yes.

3          **THE COURT:**  The ones that are allegedly copied.

4          **MR. KWUN:**  My recollection is it's somewhere under

5    800.

6          **THE COURT:**  All right.  I have a different question.

7    While you're here, you might as well answer this one.

8          How many APIs are in the Google machine?

9          **MR. KWUN:**  It depends on which version you look at.

10   As of the date of the expert reports last summer, it was 168

11   API packages in Android.

12         **THE COURT:**  And how many are in the Java system?

13         **MR. KWUN:**  In J2SE, version 5.0, there are 166.

14   Those numbers are pretty similar.  It's not because 166 are

15   ultimately in Android.  It's just by happenstance that the two

16   numbers are so close.

17         **THE COURT:**  I want to turn to the structure,

18   selection, and arrangement part of this.  I think I need

19   Mr. Jacobs to do this.

20         I have read the *Lotus* decision.  Now, I know you

21   contend it does not apply here, but the Ninth Circuit has never

22   said it does not apply.  Just has never been addressed by the

23   court of appeals for our Circuit.

24         I'm not saying yet that it should apply, but it is

25   close on point.  And so I wanted to understand the structure,

1   selection, and arrangement.

2          Don't take me wrong.  I'm not saying yet that *Lotus*

3   should apply.  I'm not saying that it should not apply.  But I

4   do note this.  You are -- you cite Judge Easterbrook in the

5   Seventh Circuit.  You cite the Fifth Circuit.  You cite every

6   circuit you want whenever it helps you.  But when it comes to

7   the First Circuit, for some reason you think that they are

8   wrong.  And I don't understand, yet, why.

9          I read the *Lotus* opinion.  It seems a much better job

10  than I could ever do.  And I -- I -- so what's so wrong about

11  the *Lotus* in the -- why -- why isn't the *Lotus* decision correct

12  on -- that at least what was involved in that case, which was

13  those macros and key strokes, not the comments, why isn't that

14  a method of operation at least as applied in the *Lotus* case?

15         And how it would apply here may or may not translate,

16  but are you saying that the First Circuit, even on the facts of

17  that case, got it wrong?

18             **MR. JACOBS:**  Yes.

19             **THE COURT:**  Really?  Okay, explain what.

20             **MR. JACOBS:**  What the First Circuit did -- and this

21  is addressed in the cases in other circuits that have rejected

22  *Lotus*.

23             **THE COURT:**  What courts are those, by the way bay?

24             **MR. JACOBS:**  I believe it's the *Micron* decision.

25             **THE COURT:**  In which court?  Wasn't that a dictum?

1          MR. JACOBS:  It's --

2          THE COURT:  It's a dictum.

3          MR. JACOBS:  It's analysis, I would say, Your Honor.

4    It helps us understand what's going on in *Lotus*.

5          THE COURT:  Is the -- you said that in the plural.

6    What other courts have done that?

7          MR. JACOBS:  That's the explicit rejection of *Lotus*.

8          THE COURT:  Okay.  So, just one.  One Circuit.  And

9    it's a dictum.

10          MR. JACOBS:  And no other circuit has adopted it.

11          THE COURT:  No other has adopted it or rejected it.

12    Maybe this will be the opportunity for the -- well, I guess

13    this case goes to the Federal Circuit.

14          MR. JACOBS:  Applying Ninth Circuit law.

15          THE COURT:  Applying Ninth Circuit law.  So this will

16    be, possibly, an opportunity to do that.  One side or the other

17    is going to raise it.

18          So I need to understand what your argument is as to

19    why, how *Lotus* got it wrong.  Because I'm telling you, when I

20    read it, it reads beautifully.  Now, so do a lot of other

21    decisions.  And, as I say, they are all a lot better than I

22    could do.

23          But explain to me where on the facts of that case the

24    First Circuit went wrong.

25          MR. JACOBS:  The First Circuit went wrong in deciding

1   that the characterization of something as a method of operation

2   trumps the recognition that that thing, that element -- that

3   element, we'll use that for the moment -- is expression.

4           So what happens in *Lotus* is, the Court, depending on

5   which decision you're looking --

6           **THE COURT:**  Isn't that what the statute itself says?

7   I'll get it out here.  I've got the statute here somewhere.

8           The statute itself carves out method of operation and

9   says it's not copyrightable.

10          **MR. JACOBS:**  That's correct.  The proper reading of

11  the statute, the proper reading of copyright principles is that

12  there's a delineation between idea and expression.

13          **THE COURT:**  Right.

14          **MR. JACOBS:**  Between a method of operation and

15  expression.  Not an overlap.

16          And what happens in *Lotus* is the court says, yes,

17  this command structure is expressive.  We see that it embodies

18  the expression of the programmer or the developer.  But because

19  it is a method of operation, we are going to disallow copyright

20  protection for it.

21          That is the specific analytical move that we haven't

22  seen in other decisions.  And it's inconsistent with the idea

23  that computer programs are subject to copyright protection

24  insofar as they represent the expression of the programmer.

25          **THE COURT:**  What is the authority that says a

1   computer program is copyrightable?

2          MR. JACOBS:  The history here is the CONTU Commission

3   in 1976, the amendments to the Copyright Act in 1980, which

4   define computer programs as a sequence of instructions to carry

5   out results, and then the cases in the '80s that held that all

6   forms of computer software, object code, source code, operating

7   system, application program, game, all of those were

8   protectable by copyright.

9          THE COURT:  What's the best decision I can look at on

10  that?

11         MR. JACOBS:  Probably *Apple v. Franklin*, Your Honor.

12  That was a case about the deep level -- deep operating system

13  level code in the Apple computer.

14         THE COURT:  Wait a minute.  Apple versus who?

15         MR. JACOBS:  Franklin.  Ninth Circuit case, I

16  believe.  We'll get you the cite.

17         THE COURT:  Could you get the cite for me?

18         MR. JACOBS:  Sure.

19         THE COURT:  I've got *Apple v. Microsoft* here.

20         MR. JACOBS:  No, in fact -- there's *Apple vs.*

21  *Formula*.  And I believe I'm thinking of the *Formula* case, in

22  fact, Your Honor.  And that's at 725 F.2d 521.

23         THE COURT:  Do we have that?  Let my law clerk run

24  into chambers.

25             Could you bring that book in.  725 F.2d.  We may not

1  have it on the shelf.  If so, we'll have to go somewhere else.

2          So, okay.  So you're saying that *Apple vs. Franklin*

3  holds that all computer programs are copyrightable?

4          **MR. JACOBS:**  Yes.

5          **THE COURT:**  And that's because of a change in the

6  statute in what year?

7          **MR. JACOBS:**  1980 was the amendment.

8          **THE COURT:**  1980.  And what provision of the

9  Copyright Act was amended?

10          **MR. JACOBS:**  I believe it was the definitions, Your

11  Honor.

12          **THE COURT:**  All right.  So I have most of the Act

13  right here, so which definition should I look at?

14          **MR. JACOBS:**  Computer program, I believe.

15          **THE COURT:**  All right.  "A computer program is a set

16  of statements or instruction to be used directly or indirectly

17  in a computer in order to bring about a certain result."

18          **MR. JACOBS:**  Moreover, Section 117 was amended to

19  include the RAM copying exception.  So taken together, those

20  amendments represent the Congressional implementation of the

21  CONTU Commission report, which held that -- which recommended,

22  if you will, that copyright be the vehicle for protecting

23  expression.

24          **THE COURT:**  Which section gives protection now to

25  computer programs?

**MR. JACOBS:** The actual protection would lie in 106, which is the -- you won't find the word "computer program" there, I don't believe. But that is the set of exclusive rights. Computer programs are understood to be literary works. They are registered as such with the Copyright Office.

**THE COURT:** That's what I'm trying to find out, where is it understood in the statutory language? So I can understand how the statute is set up.

**MR. JACOBS:** The way the statute is set up is in Section 106, the grant of exclusive rights, the understanding that computer programs are copyrightable subject matter and, therefore, we're going to apply traditional copyright exclusive rights to the protection of computer programs. You can't distribute. You can't reproduce, et cetera. Can't create derivative work.

**THE COURT:** I don't see computer programs in 106.

**MR. JACOBS:** That's correct. You won't find the words there.

**THE COURT:** Trace through the argument for me so that I can understand how the statute reaches copyright programs, computer programs to be copyrighted.

**MR. JACOBS:** You would begin in section 101.

**THE COURT:** 101. All right.

**MR. JACOBS:** And you would look to derivative -- I'm sorry, to the literary work.

1          THE COURT:  Is that a definition?

2          MR. JACOBS:  That's a definition.

3          THE COURT:  Literary works.  Okay.

4          MR. JACOBS:  Then you would note that the --

5          THE COURT:  It doesn't say anything about computers

6    either.

7          MR. JACOBS:  No, that's correct.

8          And then you would look at the definition of computer

9    program, and you would note that it is there.

10          This is the reason these cases had to be decided in

11    the '80s.  Congress did not explicitly state we are -- in the

12    statute, we are embracing computer programs in literary works.

13    But that is the consistent application or understanding as

14    interpreted by courts.

15          THE COURT:  The *Apple vs. Formula* decision, what page

16    do I look at to find -- just to cut to the bottom line where

17    the Ninth Circuit holds that computer programs are protected?

18          MR. JACOBS:  What I would direct Your Honor to is

19    523-24, which answers a narrower, more granular question, the

20    question about operating system programs.

21          THE COURT:  All right.  So it does say what you -- or

22    close to it, anyway.

23          So, let me hear from the other side as to why *Apple*

24    *Computer vs. Formula International* is -- that's in the Ninth

25    Circuit.  That does seem to say that the Copyright Act now

1   covers computer programs.  So what do you say to that?

2        **MR. KWUN:**  Your Honor, computer programs are

3   definitely copyrightable subject matter, which is to say they

4   can be copyrighted.  In any particular instance, they might not

5   be copyrighted, but they can be copyrighted.

6        And the amendments that Mr. Jacobs referred to which

7   followed the CONTU report, before that there had been some

8   discussion about whether or not computer programs are

9   uncopyrightable under the useful article doctrine.  So you

10  can't copyright the functional design of a chair, for example.

11  And then the question was, isn't this just the same?  It's a

12  useful article and, therefore, uncopyrightable.

13       After the CONTU Commission report recommended that

14  computer programs should be copyrightable, Congress added the

15  definition in Section 101.

16       *Apple Computer v. Formula* is an operating system

17  case.  The important thing about *Apple Computer v. Formula* is

18  that the defendant, Formula, conceded that the code, the

19  implementing code that it used, was substantially similar to

20  Apple's code.  And I would refer you to pages 522 to 523.

21       So the key thing about that is that in the present

22  case what we're talking about is the interfaces, not the

23  implementing code.  So --

24       **THE COURT:**  I don't understand why that would matter.

25       **MR. KWUN:**  It's the specifications versus all of the

1  code that implements it.  In terms of implementing code, the

2  only thing you've heard of from them are those 11 files.  The

3  rest of their discussion, about the selection, structure and

4  arrangement of the API elements, is unaddressed by *Apple*

5  *Computer v. Formula* because in that case they were conceding

6  copying of code throughout.

7          Another point I wanted to address is that while the

8  Copyright Act refers to programs as being copyrightable, or at

9  least copyrightable subject matter, the APIs are not the

10  programs.

11          The libraries that you write to implement the APIs

12  have computer -- even them -- I would say those are actually

13  slightly different from programs because they have subroutines

14  that can be used in programs.  But the APIs themselves, the

15  specifications for the APIs, and the selection structure and

16  arrangement is not code.

17          **THE COURT:**  When you use the word "specification,"

18  how are you using it?

19          **MR. KWUN:**  I'll try to be more precise, Your Honor.

20  I apologize.

21          So the specifications are the written documentation

22  for the APIs themselves.

23          **THE COURT:**  That's the side comments?  That's the

24  plain English to the user, but it's not something that the

25  computer compiles.

1          **MR. KWUN:**  Yes, Your Honor.  So -- and in those

2    plain-English descriptions there is what I would call the

3    descriptions or the definitions, which in the documentation

4    appears on the right side.  And then there's on the left side

5    the thing that is being described.

6          So, for example, there's a method called max, m-a-x,

7    which selects the maximum of two numbers that it's given.  The

8    description will say, Select the maximum of parameters A and B,

9    or something like that.  That would be on the right side.

10          Max is what I would call the API.  Max -- max(a,b), I

11   suppose, would be the API.  And that, that's just an idea.

12   That's the idea that is embodied in code that actually goes out

13   there and takes two parameters and figures out which of those

14   two is greater than the other.

15          And that code, that implementing code in the library

16   itself -- or, actually, in *Apple v. Formula*, in the chip

17   itself, that is what was allegedly copied in *Apple v. Formula*.

18          So Apple wasn't saying, you have written code that is

19   compatible with our operating system that implements the same

20   features as our operating system, that can run programs that

21   were designed to be used with our operating system.  They were

22   saying, you copied the code that actually does that stuff.

23          So they were going one step further.  And that's why

24   *Apple v.* --

25          **THE COURT:**  In the *Lotus* case they didn't copy the

1   underlying code either, did they?

2           MR. KWUN:   Exactly.

3           THE COURT:   It was the hierarchy was copied.

4           MR. KWUN:   Exactly, Your Honor.

5           THE COURT:   But not the underlying code.

6           MR. KWUN:   And the hierarchy was uncopyrightable.

7   That issue is not addressed in *Apple v. Formula*.

8           THE COURT:   All right.   But I -- fair enough.   But

9   Mr. Jacobs was responding to my comment or question as to where

10  does it even say that computer programs are copyrightable, and

11  that it does appear to be that this statute made them

12  copyrightable.

13          But what you're saying is they're still subject to

14  the other exceptions in the Act.

15          MR. KWUN:   Yes, Your Honor.   Computer programs are

16  copyrightable subject matter.   So if I write a computer

17  program, it's possible I can get a copyright on it.

18          If I write a computer program that is so short to

19  have -- qualify as a short phrase, that's not going to be

20  copyrightable.   If I write one that is wholly unoriginal, that

21  is not going to be copyrightable.

22          THE COURT:   Pose to both sides this question.   And

23  you answer it first since you're already here.

24          Except for rangeCheck, the APIs that you have, the 37

25  APIs in Android compared to the 37 analogs in Java, have

1  different source code.   True?

2            MR. KWUN:   Yes, Your Honor.

3            THE COURT:   Let me stop there.   Agreed?

4            MR. JACOBS:   Yes and no, Your Honor.

5            THE COURT:   Okay.   Explain that part.

6            MR. JACOBS:   The part that closely corresponds to the

7  words and symbols that are set forth in a specification aligns

8  word for word.

9            THE COURT:   I'm just talking -- I'm only talking

10  about the source code that gets compiled by the computer --

11            MR. JACOBS:   Yes.

12            THE COURT:   -- at this point.

13            So you're saying it's yes and no.

14            MR. JACOBS:   Because there is some code that

15  literally you can line up word for word in that code, in that

16  source code, the noncomment source code, the compiled source

17  code, you can line up those words with the corresponding words

18  in what we're calling the specification.

19            MR. KWUN:   Your Honor, I think we're actually in

20  agreement.   I could take another stab at explaining that.

21            THE COURT:   All right.   Go ahead.

22            MR. KWUN:   So in the specifications there's a method

23  called max.   I referred to that.   And if you were going to

24  implement that method, what that means is that a developer will

25  then be able to call the max method.   And so in their

1  program -- not Oracle's, not Google's -- in this developer's

2  program they are going to write max open parentheses A comma B

3  close parentheses, to find out what is the maximum between A

4  and B.

5              To implement that method in a library or API package,

6  you write some source code.  And to write that source code you

7  have to first say, what is this method that I'm implementing?

8              So you write -- there's actually a few more words I'm

9  not going to remember, but you write something max open

10  parentheses int -- for integer -- a comma int B close

11  parentheses, and then you have an open curly brace, and then

12  you have a bunch of code.  And that's the code that takes the

13  number A and B and figures out which of those is bigger.  And

14  in the end it returns whichever one is bigger.  Then you have a

15  closing curly brace.

16         **THE COURT:**  Which part is the same?

17         **MR. KWUN:**  What's known as the declaration or the

18  method signature, which is the part at the top.  Actually, in

19  there there might be some very, very slight differences.  But

20  for present purpose we can say they are the same.

21         **THE COURT:**  Let's say on -- pick one of these.  It

22  would be the declaration that would be one line long?

23         **MR. KWUN:**  You could -- if it's a very long

24  declaration, it could spill over on another line, but,

25  generally speaking, yes.

1       **THE COURT:**  And then the source code that makes it

2   work is how many lines long?

3       **MR. KWUN:**  It could be -- in some cases, it could be

4   one line long.  In other cases it could be hundreds of lines

5   long.

6       I should make one clarification on the declaration.

7   There are some declarations that could have multiple lines

8   because sometimes you are defining what fields are available

9   within a class.  And that might be five fields, and it might be

10  convention to have a line break between them.  But the code in

11  some instances could run several pages.

12      **THE COURT:**  All right.  So once you get past the

13  declarations, is your source code different than the Java

14  source code?

15      **MR. KWUN:**  Yes.

16      **THE COURT:**  Is that part agreed to?

17      **MR. JACOBS:**  Yes, Your Honor.

18      **THE COURT:**  All right.  So it's the declarations that

19  are the question mark?

20      **MR. KWUN:**  Yeah.  Those are what I would say is

21  analogous to the vocabulary that is being described by the API

22  packages.

23      When the third-party developers then go out there and

24  want to write a program, they say, I want to calculate the

25  maximum.  And instead of writing a book on how to calculate the

1    maximum, they use this max, this word max(a,b).

2              THE COURT:  *Lotus* was '95.  So that was after the

3    statute was changed.

4              MR. KWUN:  Yes, Your Honor.

5              THE COURT:  Okay.  I interrupted Mr. Jacobs.  I want

6    to go back to him.

7              I understand the computer programs can be

8    copyrighted.  But, still, *Lotus* was in 1995.  That was well

9    after the statutory change.  So they didn't make the mistake I

10   was about to make to say they weren't copyrightable.  They said

11   it was a method of operation.  So why isn't that still correct

12   here?  No, no.  Why was that -- why wasn't that correct on the

13   facts of that case?

14             MR. JACOBS:  I think -- can I change your question

15   slightly?  Which is, why in the Ninth Circuit is that not

16   correct?  Because I think I can read to you from the *Johnson*

17   *Controls* case, and I think it sets the analytical framework for

18   us consistent with the way I articulated it earlier.

19             THE COURT:  Well, does it say *Lotus* is wrong?

20             MR. JACOBS:  No, it's before *Lotus*.

21             THE COURT:  Well, no, I don't want you to change my

22   question.  I want you to answer my question.

23             MR. JACOBS:  Okay.

24             THE COURT:  So what -- given *Lotus*, what was wrong

25   with the way in which the First Circuit analyzed that case on

1  the facts of that case?

2        MR. JACOBS:  The First Circuit was wrong in having

3  Section 102(b) trump the protection for expression.  Having

4  found that it was expression and not idea to begin with, or not

5  having found that it was expression, that should have ended the

6  inquiry.

7        And if I may just add a couple of sentences, that's

8  the way the Ninth Circuit lays out the test in *Johnson*

9  *Controls*.

10       THE COURT:  Write this down.  Okay.  You say

11 expression versus idea, and that if it is expression it is per

12 se copyrightable.  No exceptions.  Or am I missing something?

13       MR. JACOBS:  Yes.

14       THE COURT:  Because if it's an idea it's not

15 copyrightable to begin with.

16       MR. JACOBS:  Precisely.

17       THE COURT:  So where do the exceptions come in?

18       MR. JACOBS:  The exceptions come in in delineating a

19 boundary, not an overlap.

20       THE COURT:  So you're saying that the method of

21 operation never can apply to an expression?

22       MR. JACOBS:  I'm saying that -- yes.  I think that

23 our job is to look at whether on the particular facts of each

24 case the component in question qualifies as an expression of an

25 idea, or an idea itself.  And that's from *Johnson Controls*.

```
 1          THE COURT:  Okay.  Tell me what it is in Johnson
 2   Controls that helps you reach that point, and the page number.
 3          MR. JACOBS:  So I'm looking at 1175 of 886 F.2d 1173.
 4   That's the cite for the case.
 5          The Court says:  A computer program is made up of
 6   several different components, including the source and object
 7   code, the structure, sequence and/or organization of the
 8   program, the user interface, and the function or purpose of the
 9   program.  Whether a particular component of a program is
10   protected by copyright depends on whether it qualifies as an
11   expression of an idea rather than the idea itself."  Citing
12   several cases.  "Where an idea and expression merge are
13   inseparable.  The expressions is not given copyright
14   protection."  That's a different analytical thread.
15          Moving ahead in the text, source and object code --
16   "The literal components of a program are consistently held
17   protected by a copyright on the program."
18          And then here is the key language.  "Whether the
19   nonliteral components of a program, including the structure,
20   sequence, and organization, and user interface are protected
21   depends on whether on the particular facts of each case the
22   component in question qualifies as an expression of an idea, or
23   an idea itself."
24          So the analytical framework that's established there
25   is bucketizing, if you will.  We have to decide whether the
```

1   material in question represents the expression of the

2   programmer.

3           Now, there is -- it's possible to draw factual

4   distinctions between *Lotus* in this case.  Your direct question

5   to me was whether *Lotus* was correctly decided, in that the

6   move -- we believe that the move the *Lotus* case made in having

7   the method of operation characterization trump the expression

8   characterization was incorrect.

9           **THE COURT:**  Okay.  Let's -- let me let the other side

10  respond to what you just said.

11          **MR. KWUN:**  So, Your Honor, *Johnson Controls* doesn't

12  really answer anything.  All it tells us is that there is

13  something called an idea and there is something called

14  expression.  We already know that.  That's in Section 102(b).

15          And "idea," which appears in a lot of these cases, I

16  would suggest, is actually a shorthand for all of the concepts

17  that appear in Section 102(b).  So that's idea, process,

18  system, method of operation.

19          The point that Mr. Jacobs raised is that he says that

20  in *Lotus* they said two things.  They said that the menu

21  structure had some creative expression in it, and they said it

22  was a method of operation.

23          I think that if you ask some scholars, they might say

24  that those are inconsistent statements.

25          But the question -- I don't think you can then jump

```
 1   to the conclusion that, ah, they were wrong; it's not a method
 2   of operation.   The question is, were they wrong that it was
 3   creative expression?
 4           THE COURT:   Whether who was wrong?
 5           MR. KWUN:   Whether the Lotus court, the First
 6   Circuit.
 7           So the point that they made was that in the Lotus
 8   macros you refer to the menu that a command is in by its first
 9   letter, and then the particular command again by its first
10   letter.   And so you have these throughout your macros, and
11   that's how the macro knows what to do.   Tells the computer what
12   to do.
13           And their point was, well, you could have put these
14   commands in a different menu structure.   You could have had
15   different names for these commands.   And that qualifies as
16   creative expression.
17           But the problem is, as soon as they made this part of
18   their macro language, whatever creative expression might once
19   have been there became part of the method of operation.   You
20   cannot perform those macros without those letters.
21           And so Mr. Jacobs glossed over what he called a
22   separate analytical line of thought in Johnson Controls, which
23   is merger.   And what the merger doctrine says is that when
24   creative expression merges into the underlying idea it's not
25   protectable.
```

1            So in *Lotus*, perhaps the court should have either

2   said this is not creative expression --

3            **THE COURT:**  The merger sentence, again?

4            **MR. KWUN:**  The merger doctrine says that when the

5   creative expression in a work merges into the underlying idea,

6   it is not protected by copyright.

7            So in the *Lotus* case, it perhaps would have been

8   useful for the Court to have an additional line.  It could have

9   either said, To the extent that there is creative expression in

10  the menu hierarchy, it is merged into the methods that the

11  menus represent for macros and, therefore, it's unprotected.

12           Or they could have said, While this might appear to

13  be creative expression, because of its functional role in this

14  method of operation it is actually not expression.

15           Either of those analyses would address the so-called

16  flaw that Mr. Jacobs pointed out, tries to point out in the

17  *Lotus* case.

18           I also want to raise one other point, which is the

19  one case that they have mentioned as actually repudiating *Lotus*

20  was *Mitel*.

21           In the *Mitel* case, I would agree, it's dicta.  And

22  the reason I would say that is because, ultimately, the Court

23  there just found another doctrine to conclude that the material

24  at issue was not protected.  And they said it was not protected

25  under *scenes a faire*, which is yet another doctrine that we've

1  advanced as a reason why APIs are not protected here.

2       **THE COURT:**  Nonetheless, even if it was dictum, it

3  does criticize the *Lotus* decision.   True?

4       **MR. KWUN:**  It does criticize the *Lotus* decision.

5       And I would submit there are about five or ten

6  different ways that you can defeat Oracle's claim in this case.

7  And I would suggest that using 102(b) is the one that is most

8  consistent with Ninth Circuit law.   But any of those outcomes

9  would lead to the same result.

10       And I would like to point to the Sega v. Genesis

11  (sic) case, which is a fair use case in the Ninth Circuit.   And

12  it was about the Sega Genesis video game system and reverse

13  engineering that was done by a developer to figure out how to

14  write programs that they could then sell on cartridges for the

15  Sega Genesis system, without having to pay licensing fees to

16  Sega that provided what were effectively the specifications for

17  the interfaces for the Sega system.

18       So when Genesis (sic) did that, they copied Sega's

19  code wholesale.   And they did that internally to figure out how

20  this stuff works.   And then they wrote their own programs on

21  the cartridges that did not use the copied code.

22       And the question before the Court was, was that

23  intermediate copying was that a fair use?   But the important

24  question that they addressed before that was -- they concluded

25  it was.   They said it was a fair use.

```
1          And the reason they said it was a fair use is they
2    said, gaining access to those functional requirements for
3    compatibility, you can copy code in order to do that.
4          And when they said that, they said that functional
5    requirements for compatibility are unprotected.  And they cited
6    Section 102(b).
7          And here, what we are talking about are functional
8    requirements for compatibility with these API packages.  If
9    Google wanted Android developers to be able to write programs
10   that used these Java words, the words that were created, the
11   vocabulary that was created by these libraries, they had to
12   implement these methods.  They had to implement them in the
13   same way.  And they had to have the same selection,
14   arrangement, and structure.
15         Your Honor, in Sega v. -- excuse me.  It's *Sega v.*
16   *Accolade.*  I keep saying "Genesis."  That's the name of their
17   game system.
18         In *Sega v. Accolade* -- the full citation is 977 F.2d
19   1510, 1992.  It's a Ninth Circuit case.  And the particular
20   page where they reference 102(b) and functional requirements
21   for compatibility is 1522.  And that was in our opening brief,
22   on page 6.
23         **THE COURT:**  So, as I understand you, you concede
24   that, at least as to these 37 APIs, you do use the same
25   structure, selection, and arrangement?
```

1              MR. KWUN:  Yes, Your Honor.

2              THE COURT:  But you say that's okay because what?

3              MR. KWUN:  Because those are functional requirements

4    for compatibility.  Let me just give you a slightly larger

5    gloss on that.

6              When programmers learn to program in the Java

7    programming language, they learn the APIs.  Those are taught in

8    any basic Java programming class.  If you look at the Oracle

9    books that tell people how to use Java --

10             THE COURT:  I understand that part.

11             MR. KWUN:  -- they teach the APIs.

12             THE COURT:  I understand that.  It's in all the

13   books.

14             MR. KWUN:  So if you want to be able to use this

15   language over which no copyright claim is made, you have to, at

16   a bare minimum, as a practical matter, and in many instances as

17   an absolute matter, you have to implement these APIs.  And you

18   have to implement the same way because, otherwise, it would be

19   like if I sold you a car that reversed the accelerator and the

20   brake pedal.  That would have, obviously, disastrous

21   consequences and would make my car very unpopular.

22             In order to have that compatibility, Google had to

23   implement the API packages using the same selection,

24   arrangement, and structure.  And, for that reason, those

25   elements are functional requirements for compatibility with

1  those 37 API packages.  And that is precisely what the *Sega*

2  case says is not protected due to Section 102(b).

3           **THE COURT:**  Let me hear what Mr. Jacobs says to that

4  argument.

5           **MR. JACOBS:**  Let me respond, first, about the

6  decisional law and then on the facts.

7           So if you trace the thread in the Ninth Circuit and

8  the District Courts in the Ninth Circuit, one continues to find

9  *Johnson Controls* cited as the relevant authority.  And one

10  doesn't see citation to *Lotus* as the way to think about the

11  idea/expression dichotomy.

12           Perhaps one of the clearest cases is a District Court

13  case out of Arizona.  It's the *Merchant Transaction Systems*

14  case.  It's at 2009 U.S. District LEXIS 2563.  We cited it in

15  our briefing.  And it recites the same kind of delineation,

16  idea, expression, coordination, and arrangement, the nonliteral

17  elements may be protectable.  That brings us to the facts,

18  because the facts here are so dramatically different from the

19  cases that Google relies on.

20           Proceeding backwards through Google counsel's

21  analysis, this case is not about compatibility.  As the very

22  first question the Court asked this morning revealed, only some

23  of the packages, only some of the APIs from the Java

24  specification were implemented in Android.

25           This is a -- this was a commercial tactic.  It's been

```
 1   labeled in the computer industry "embrace and extend."  The
 2   idea is you capture the developer community but bring them over
 3   into your set of interfaces.
 4           And so in the case of Android, I think -- by the way,
 5   I believe our numbers were in agreement with Google's
 6   counsel -- 37 of the APIs in question are copied into Android.
 7   Some more that we're not making claims about because they are
 8   third-party owned or arguably third-party owned are copied into
 9   Android.  And then there are about, roughly, a hundred that are
10   distinct to Android.
11           So Android is not Java compatible.  This was not
12   about making it possible for game cartridges written in -- as
13   against Java to run on Android game consoles.  Or, more
14   particularly, this wasn't about making it possible for games
15   written for Java mobile phones to run on Android mobile phones.
16   So this compatibility is a misnomer.  It's a copying for
17   commercial purpose, not for functional compatibility.
18           Then moving further through the argument, if you look
19   at each of these cases and you look and compare the facts as to
20   what was copied with what was copied here, you see a
21   dramatic -- you see a dramatic difference.
22           And Your Honor asked for some exculpation on this.
23   We've prepared some slides that walk through the kind of
24   relationships and interdependencies.
25           We have statements and admissions from Google
```

1  programmers, from experts that we are talking in the creation

2  of these APIs about creative expression.  It's like writing

3  music.

4          So no one would say that about the particular codes

5  at issue in a remote control case or in the Sega-Accolade case.

6  Those were trivial by comparison.  And so having the scale tilt

7  in favor of compatibility there didn't wreak havoc on the

8  copyright system.

9          But to say here that this elaborate creative effort

10 that went into these 37 APIs is merely idea or merely a method

11 of operation would eviscerate copyright protection for

12 important creative expression.

13         So now we're at the stage where you really need to

14 look at what we're talking about, and then make a judgment as

15 to whether it's correct to characterize these merely as idea or

16 method of operation, or, rather, as protectable selection,

17 coordination, and arrangement, structure, sequence,

18 organization, the designs, the design of the computer program.

19         That's probably the last --

20         **THE COURT:**  What do you say to the *Sega* -- there,

21 they reverse engineered.  Why isn't this like the *Sega* case?

22         **MR. JACOBS:**  Because what was taken there was so

23 trivial.  What was ultimately implemented --

24         **THE COURT:**  Is that word anywhere in the Court of

25 Appeals decision?

```
 1            MR. JACOBS:  I don't believe --

 2            THE COURT:  The word "trivial"?  I didn't see that.

 3            MR. JACOBS:  No.  We would be analyzing the facts,

 4   Your Honor.  What we would note is that Sega made no claim of

 5   copyright infringement in the ultimate product.  Sega's sole

 6   claim was a claim of what was called intermediate copying, that

 7   Accolade, on the way to copying the functional element, created

 8   a literal copy.

 9            And the question was whether absent a claim that the

10   final product was infringing, was the intermediate copying?

11   Permissible.  Really didn't get to the question we're

12   addressing here, which is the scope of copyright protection for

13   nonliteral element.

14            Sega has this language about functional requirements

15   for compatibility.  But one can overread that language like one

16   can overread the language in many decisions.

17            THE COURT:  How long will your slide show take?

18            MR. JACOBS:  About 20 minutes, Your Honor.

19            THE COURT:  Let's do that now, and then we'll take a

20   break.

21            MR. JACOBS:  I'm going to do this -- with Your

22   Honor's permission, because we are going to get a little

23   technical, more technical than I am, I'm going to do this with

24   Mr. Peters.

25            THE COURT:  Sure.
```

```
1              MR. PETERS:  Good morning, Your Honor.
2              THE COURT:  Good morning.
3              MR. PETERS:  Marc Peters for Oracle America.
4         One of the questions I think that the Court has had
5    is, what is in an API specification?
6              THE COURT:  Wait.  Wait.  I want to be very clear.
7    You cannot -- we have to use the word "specification" in at
8    least a consistent way.  And the way I understand specification
9    is the plain English thing that describes to the user what the
10   API does, and is not the source code that gets compiled by the
11   computer.
12        Now, if you want to use it in a different way, you
13   can do that.  But it will be hard for me to understand because
14   in reading these briefs I see a little shifting back and forth,
15   depending on what inference you want to leave with me, the use
16   of the word "specification."
17        So I want you to -- I want you to be very clear that
18   I'm going to be listening for that word.  Please do not use it
19   in a way that I don't understand, unless you tell me you're
20   using it in some other way.
21             MR. PETERS:  Okay.  Your Honor's understanding is
22   correct.  When I use the word "specification," I will be
23   referring to the English language document that explains the
24   software.
25             THE COURT:  All right.
```

1          MR. PETERS:  And what's in it.

2          THE COURT:  Okay.

3          MR. PETERS:  If I may digress, I think one of the

4    reasons for the confusion in the parties' briefings about the

5    two things is that the source code itself contains the

6    documentation of the specification.  A knowledgeable programmer

7    can read the source code and divine the specification, and read

8    the specification for the code that he or she is reading.  So

9    there's -- there is a blending there.  But today, Your Honor, I

10   think that's just an explanation of the origin of the

11   confusion.

12          Specification, absolutely, the English language

13   document.  Such as the book I'm holding, *the Java Application*

14   *Programming Interface, Volume 1 Core Packages*, this is the

15   specification for certain of the packages from 1996

16   (indicating).

17          What Mr. Jacobs has put up here is a poster that was

18   published by Sun Microsystems, entitled, "The Java Class

19   Libraries Java 2 Platform Standard Edition 5.0."

20          This was a poster that Sun sells, and it illustrates

21   about half of the packages that are available in Java SE 5.0.

22          Each one of the red headings shown on that poster is

23   the name of the package.  And below it are -- is shown the

24   hierarchy showing the organization and structure and sum of the

25   interrelationships between the members of those packages, the

1   classes and the interfaces.

2           THE COURT:   Interrelationships within the API, or API

3   to API?

4           MR. PETERS:   This poster shows both, Your Honor.

5           THE COURT:   I'd like for you to take some examples

6   and explain this elaborate system.   Because you keep saying it

7   is elaborate.   So give me an example of an API that has an

8   elaborate interrelationship with a different API.

9           MR. PETERS:   Let me get one for you, Your Honor.   I'm

10  fast forwarding through my presentation.

11          If you look on the screen, this is a blowup of what's

12  on the poster for the package called javax.net.ssl.

13          THE COURT:   Is this one of the 37?

14          MR. KWUN:   Page number from the binder?

15          MR. PETERS:   Page 7.

16          THE COURT:   Is this one of the 37?

17          MR. PETERS:   This is one of the 37, Your Honor.

18          THE COURT:   Great.   Go ahead and make your

19  explanation.

20          MR. PETERS:   Now, what this shows is, it shows the

21  class -- what is shown on the left, in a plain font, are the

22  classes that pertain to this package.   What is shown in the

23  right, in italics, starting with "ManagerFactoryParameters,"

24  are the interfaces that relates to this package.

25          What the poster illustrates graphically is, if there

```
 1   is a small graphic symbol after the name of a class or an
 2   interface, it means that that class or interface is defined in
 3   a different package, not in this package.
 4            So, for example, the class EventObject, that is shown
 5   in the middle left, has an icon on it that, if I recall,
 6   indicates that EventObject is defined in the package java.util.
 7   U-t-i-l.
 8            THE COURT:  I don't follow what line you're referring
 9   to.
10       MR. PETERS:  If you look about halfway down on the
11   left side, in the row of words under the word "Object," there
12   is a line called "EventObject."  It's immediately under the
13   green highlighted line that says "X509ExtendedKeyManager."
14            THE COURT:  Okay.  What I see there is
15   "HandshakeCompletedEvent."
16       MR. PETERS:  That is right.
17            THE COURT:  What is that?
18       MR. PETERS:  What this indicates is that within the
19   package javax.net.ssl there is a class called
20   HandshakeCompletedEvent.  It is a subclass of the class called
21   EventObject.  And the blue icon following the words
22   "EventObject" indicates that that class is defined not in this
23   package but in a different package, java.util.  So --
24            THE COURT:  How do we know that from this page?
25   Java.util?
```

1          MR. PETERS:  The reason we know, if you look on

2   the -- now more broadly on the poster, you can see that some of

3   the larger packages -- I'll approach it.

4          THE COURT:  I can't see that far.

5          MR. PETERS:  This is the challenge of even a poster

6   to show only a portion of the complexity.

7          The icon for java.util is shown right there

8   (indicating).

9          THE COURT:  Okay.  And underneath there somewhere

10  is --

11         MR. PETERS:  Is EventObject.

12         THE COURT:  Is what?

13         MR. PETERS:  Under the description of java.util,

14  under this heading is the class EventObject.

15         In the different package, javax.net.ssl, the class

16  HandshakeCompletedEvent is defined in this package, but it is a

17  subclass of the class EventObject, which is in a different

18  package.

19         So this is a relationship between packages.  There is

20  something defined in this package of javax.net.ssl that depends

21  on something defined in another package.

22         THE COURT:  Okay.  That helps me understand that.

23         Now, give me another example of that.

24         MR. PETERS:  So, another example from this class,

25  from this package, is the class SSLPermission, which is about

1    five down from EventObject.

2          And SSLPermission, which is defined in the package

3    javax.net.SSL, is a subclass of a class called BasicPermission.

4    And the red icon with the keyhole is the icon for the

5    java.security package.  So the class BasicPermission is defined

6    in the java.security package.

7          So this is a relationship between a class defined in

8    this package and a class defined in another package.

9          THE COURT:  When you say "class," what's the

10   difference between a class and an API?

11         MR. PETERS:  A class is something that is part of the

12   API.

13         Where there can be a great deal of confusion, Your

14   Honor, is that the members of a package in the Java programming

15   language are classes and interfaces.  That word, "interface,"

16   doesn't refer to the API and overall interface.  It refers to a

17   particular kind of construct in the Java programming language.

18         THE COURT:  What is a library?  Is that the same

19   thing as an API?

20         MR. PETERS:  Yes, it is.  So sometimes the

21   programmers would refer to this as the javax.net.ssl library.

22   They might say it is the API.  So the -- what the package is,

23   it is a collection of classes and interfaces that the package

24   designer, the library designer, has decided should go together.

25         THE COURT:  When the programmer calls up a library,

1  is it typical that they would only call up one class within the

2  library?  Or is it necessary to run every class within the

3  library?

4      **MR. PETERS:**  It would end up being in between, Your

5  Honor.

6          An application programmer who is, say, writing a word

7  processing application or a game or a spreadsheet application,

8  who wants to rely on the programs that have been prewritten for

9  him or her in the library, may call upon the different aspects

10 of the library that may be helpful to him or her.

11     **THE COURT:**  Well, I know.

12         Let's say there's only one feature in that library

13 that you really care about at that stage in the program.  Can

14 you rifle in on just that one?

15     **MR. PETERS:**  Yes, Your Honor.

16     **THE COURT:**  Or are you required to run every single

17 class in the library in order to get the benefit of the one

18 thing you're interested in?

19     **MR. PETERS:**  In Java, you're allowed to call upon

20 only one class at a time.  If there's only one class that has

21 the program that you need, then you only need to call on the

22 one class.

23     **THE COURT:**  All right.  Okay.  So now you've given me

24 some examples of relationships.  You were referring, though,

25 to, also, relationships within a API.  So give me, I guess, an

1   example of that.

2           MR. PETERS:  Well, an example of the relationship

3   within an API is you can have, just as I've indicated to Your

4   Honor, that one class can be -- a class in one API can be a

5   subclass of a class defined in another API.

6           There are, of course -- and this is much more

7   frequent -- cases where a class in one API is a subclass of a

8   class defined in the same API.

9           So it tends to be that classes are collected in an

10  API precisely because they have a relationship to each other

11  that was defined by the API designer.  And so --

12          THE COURT:  Give me an example more concretely to

13  illustrate that.

14          MR. PETERS:  So an illustration of that, that we just

15  saw before, is in the java.security package, defines a class

16  called "Permission."  The same package, java.security, also

17  defines another class, called "BasicPermission."  And the class

18  BasicPermission is defined to be a subclass of Permission.

19          So an example, another example of that, again,

20  from -- I believe this will be from the class package java.nio.

21  This is on slide 6.  What you have is the class IntBuffer,

22  i-n-t-b-u-f-f-e-r.  And it is defined to be a subclass of the

23  class Buffer, which is defined in the same API.

24          Now, what this means is that the class in Buffer has

25  defined for it quite a number of methods.  These are programs

1  and functions that are available for application programmers to

2  use.  But because ByteBuffer -- I'm sorry, I'm looking at

3  ByteBuffer rather than IntBuffer.

4       Because ByteBuffer is a subclass of the class Buffer,

5  it inherits all of the methods from the class Buffer.  So

6  everything that is defined in class Buffer is available to a --

7  to a ByteBuffer.

8       And, similarly, the class ByteBuffer itself has a

9  subclass called MappedByteBuffer, which inherits everything

10  ByteBuffer can do, but also has some additional functionality

11  and programs available for it.

12       So this is an example of what happens even within a

13  package when you define --

14       **THE COURT:**  All right.  You said you had some

15  deposition testimony from the other side, admitting what a

16  great thing this is.  Give me some examples of that.

17       **MR. PETERS:**  One example of that, Your Honor, is

18  going back to, say, an example of the collections framework.

19  If I can find it here.  Apologize for jumping through the

20  presentation.

21       This is an example of an illustration of how an API

22  designer faces different choices.  One of the useful things or

23  a useful paradigm or a problem that people -- that programmers

24  deal with is how to deal with collections of things.

25       The slide here is slide number 8 in the presentation.

64

1   And what is illustrated here is the different ways in which the

2   API designers for the Java libraries, the Smalltalk libraries,

3   and the C++ libraries approach this problem.

4          So these are the ways in which the API designers for

5   these platforms handled -- basically addressed the same

6   problem.  So that all of these, this organization, represents

7   the same idea, but the expression of the idea, of how to deal

8   with these problems, is different.

9          **THE COURT:**  So you're not claiming a copyright on the

10  idea of an API?

11         **MR. PETERS:**  That's right, Your Honor.

12         **THE COURT:**  You're claiming a copyright on the

13  particular structure, selection, and organization of your --

14  how you arranged your boxes, so to speak.

15         **MR. PETERS:**  Right.

16         So the idea, which is not copyrightable, the idea of

17  having programs that deal with collections is not what's

18  being -- is not what is being claimed here.

19         Rather, what is copyrightable is the particular

20  design, the way to -- the -- where the creative expression

21  comes in is how to solve that problem, what is the right way to

22  solve the problem.  And, in fact, there is no one right way to

23  solve these kinds of problems.  There are often many arguments

24  between programmers over these things.

25         Your Honor asked about the testimony, and where I

```
 1   wanted to add to this here, on slide 8, is Joshua Bloch, who is
 2   a Google chief Java architect, and was the former designer of
 3   Java APIs while at Sun -- Mr. Bloch left Sun to join Google.
 4   Mr. Bloch is one of the designers of the Java Collections
 5   Framework that was illustrated there.  He testified:
 6               "I find it very rewarding to design great
 7               APIs and have people come to me years later
 8               and say, wow, you know, the Collections
 9               Framework changed my life."
10          These are programmers, you know, who are dealing with
11   it.  They found the Collections Framework, they found the
12   design that Mr. Bloch had created for Sun, for Oracle, to be --
13   to be elegant, to be helpful, to be understandable in ways that
14   other collections frameworks, perhaps, were not.
15          MR. JACOBS:  Your Honor, to finish off this 20
16   minutes, if we would turn to slide 3.
17          These are the particular bits of testimony that I was
18   referring to earlier, in which we have characterizations from,
19   again, Mr. Bloch:
20               "API design is an art, not a science."
21          We have Google's own expert, who in his deposition
22   said:
23               "Just as it's hard to find people that are
24               really good at anything that's hard, whether
25               it be, you know, being an artist, a football
```

1           player, a concert violinist, those things are

2           hard.  This is something that's hard in the

3           same way."

4      And then an independent publication:

5           "There seems to be something elusive about

6           API design that, despite years of progress,

7           we have yet to master."

8      So what we're talking about when we talk about these

9 Java APIs is something -- having decided that computer programs

10 are copyrightable, our view is that we decided that the design

11 of the programs are copyrightable.  Just as we decided that

12 architectural plans are copyrightable, we decided that the

13 design of a house is copyrightable.

14      And this is the design of these libraries.  What we

15 call the specification is really -- if you've seen some

16 attempts at word choices, at characterization in our briefing,

17 it's because the word "specification" doesn't, in our view,

18 fully capture what is going on here.

19      We're talking about the design of the libraries by

20 designers who are designing something that is an art, not a

21 science, and that is creative.

22      **THE COURT:**  We're going to take a break in a moment.

23 When we come back, I'm going to let the other side have their

24 reply to your 20-minute thing.

25      So, go ahead and have a seat.

1              **MR. PETERS:**  Thank you, Your Honor.

2              **THE COURT:**  I have a few questions.

3         We're still going to go for a while.  I know some of

4    you want to go back and start your cross-examination

5    preparation.  I don't blame you.  But I need your help here,

6    too.

7         One of these is really a question for Oracle.  One is

8    a question for Google.  And these cut in opposite directions.

9         I want you to know -- I don't have an answer for

10   these.  I ask these questions because -- and you may possibly

11   hit a home run and convince me on one of these today, but I

12   want you to know what I'll be thinking about during the trial.

13        If you were to roll back the clock to 1995, or

14   roughly when Sun finished the first round of Java -- when was

15   that?  I forgot.  It's in the mid '90s, right? -- and it had

16   done all the APIs it had done, I think any ordinary person

17   looking at that body of work would have said this took a lot of

18   time, a lot of creative effort; it certainly deserves either

19   patent protection or copyright protection; and somebody else

20   should just not come along and steal it.  So, that is one

21   point.  A question, really, not a point.

22        On the other hand, we are not in 1995.  We're in

23   2012.  And along the way Oracle has dedicated to the public

24   domain, as far as this case is concerned anyway, the use of the

25   Java programming language.

1              The Court has already ruled that the use of the names

2    is not protectable.  Like "square root" is not protectable.

3    The code within the APIs used by Google is not the same code.

4    The concept of an API cannot be copyrightable.

5              So, so many things that were in -- in 1995, that were

6    in Sun's possession before it revealed to the world what it had

7    done, have now been dedicated to the public domain or couldn't

8    have been copyrighted in the first place.

9              So what we are down to is a question of if you do go

10   to any of these books that teach you how to -- teach you about

11   Java, it's not just the programming language, it's the APIs,

12   the libraries, the classes.

13             And Oracle has stated many times that that is free

14   for anybody to use.  So if it's free for -- at least the

15   programming language.  But is that too fine a distinction?

16             I still am unclear on if it's true, as Mr. Jacobs

17   says, that computer programming languages can be copyrighted,

18   and that is copyrightable under the *Formula International*

19   decision, there must have been some point in time when Sun

20   dedicated it to the public domain and allowed people to use it.

21             By what mechanism did that occur?  And, if so --

22   surely it did occur -- why didn't the APIs go right along with

23   that permission?

24             I want you to know, on the Oracle side, I have never

25   gotten a satisfactory answer from you.  Yes, perhaps you could

```
 1   have glommed on to a copyright on everything way back then, but

 2   along the way you dedicated to the public domain the use of

 3   Java.  Now you say only the Java programming language.  But I

 4   would like to see the document by which it says programming

 5   language only but not the APIs.

 6          So to kind of put a point on it, if we were in 1995,

 7   every lawyer would look at this and say there's got to be some

 8   way for this to be protected.  It was a very creative effort

 9   with a lot of interrelationships and millions of dollars of

10   work.  And there must be some way to protect it, either under

11   the patent law or the copyright law.

12          So that's -- I see that point.  I also see the other

13   point, which is, how come we're in a situation where Oracle has

14   allowed this to be used by the public, and then in some manner

15   there was a dedication to the public for that use.  Why didn't

16   that same dedication pick up the APIs?  I would like to see the

17   document that draws that distinction.

18          So with that, we're going to take a 15-minute break.

19   And we will probably go at least another hour, and maybe longer

20   than that.  So I have several things I want to cover with you.

21   And we're -- you're helping me a lot here.  This is a very

22   useful discussion.

23          The reason I need to understand this is because I

24   think under the law I have to decide protectability.  Agreed?

25          **MR. VAN NEST:**  Agreed.
```

**THE COURT:**  So I have to tell the jury what part of this is protectable.

We also haven't talked about the plain English parts because you're accused over there of having plagiarized the manual.  So I would like to understand that claim, too.

I would like to say one other thing.  I know that the press, at least one newspaper, keeps saying that I don't want you to try your case.

That is not true.  I am looking forward to this case being tried.  And I don't want you to think that I am unwilling or somehow unhappy about this case going to trial.

My view is that if you want your day in court, you're going to get a fair trial.  And I think this is a most interesting problem, and we're going to put our heads together and solve it somehow.

So I don't want you thinking that.  But in this regard I do need to say one thing that's a practical thing.  And that is, if you are going to settle your case you must do so by Friday at noon before the trial starts.

Because, otherwise, a large number of people will be driving from all over this district on Monday morning, to be here, and they disrupt their entire lives in order to come here.

And because of the size of the case -- and, in fact, we're going to have -- there will be a fairly large venire.

```
 1   And it's a shame to have to bring them out only to have you
 2   announce you settled the case on the courthouse steps.  I want
 3   to protect the jury in the venire.  That just should not occur.
 4           You've had two years, almost, to settle -- 18
 5   months -- to resolve this case.  So if you're going to do it,
 6   please do it by the Friday at noon, before the case starts, so
 7   you don't put those people at risk and disrupt their lives.
 8           That's my only comment there.
 9           I want to go back and say, if you want to try the
10   case, I am looking forward to it.  I think it's going to be an
11   interesting case.  One side will lose.  One side will win.
12   Somebody may go away gnashing their teeth in unhappiness.  But
13   that's the way it is when you -- you know, this is the World
14   Series of IP cases.  And only one winner comes out of the World
15   Series.
16           So that's okay with me.  I think that's why we have
17   the U.S. District Court, is to provide as fair a trial as
18   humanly is possible.  And we're going to do that come
19   April 16th -- no extensions -- 7:30.
20           By the way, how is it working out in Texas?
21           MR. VAN NEST:  Still working on it, Your Honor.  I'll
22   be here on the 16th, though.
23           THE COURT:  I understand that progress is being made
24   there to relieve pressure on you.
25           MR. VAN NEST:  Any little bit of help would be good.
```

 1        **THE COURT:**  Well, I am confident that come April 16th

 2   you will be here.  So that's good.

 3        All right.  We have more to do this morning, and I

 4   would like to give you a chance to think about those questions

 5   I posed, and then we're going to come back and pick right up

 6   there.  So, 15 minutes.  Thank you.

 7        (Recess taken from 9:19 to 9:32 a.m.)

 8        **THE COURT:**  Mr. Jacobs, you can go first.

 9        **MR. JACOBS:**  I would like to answer Your Honor's

10   question.

11        **THE COURT:**  Okay.

12        **MR. JACOBS:**  And I'd like to establish some

13   categories, first of all.

14        **THE COURT:**  All right.

15        **MR. JACOBS:**  One category is the distinction between

16   an application programmer who is, as Your Honor's question

17   asked, making particularized calls to functions that are

18   described in the API.

19        That application program is writing a program relying

20   on the services that are provided by the libraries.  That

21   application program is not providing the libraries.  That's

22   just a basic technical distinction.

23        **THE COURT:**  Say that again.  I'm not following your

24   distinction.

25        **MR. JACOBS:**  Maybe I could show you -- so -- can I go

1  over this?

2          **THE COURT:**  Yes.

3          **MR. JACOBS:**  So this is the *Java Application*

4  *Programming Interface* volume that we showed Your Honor earlier.

5          **THE COURT:**  Who wrote that?

6          **MR. JACOBS:**  This is by James Gosling, Frank Yellin,

7  and the Java team.

8          **THE COURT:**  Okay.

9          **MR. JACOBS:**  And at the introduction to the book what

10  is explained is:

11          "These books are reference manuals for Java

12          application and applet programmers.  To make

13          full use of them you should be familiar with

14          the programming language and its core

15          concepts."

16          So what this book is designed for is programmers who

17  are writing Java applications.

18          There are millions and millions of those programmers

19  and of those Java applications.  As a technical matter, what

20  they do is invoke in a particularized basis the services that

21  are available from the Java platform from the libraries and

22  from the runtime environment.

23          If one wants to answer -- so that's that category.

24  The second category is the category of actually providing the

25  libraries.  And here there are not millions, thousands,

1    hundreds, even tens.

2           Our beef is with Google because what Android did is

3    provide the libraries that implement the application

4    programming interface that conform -- for which the API is the

5    design.

6           So what -- if we take the thread of the discussion

7    that we were on before, about the relationship between the

8    library source code and the APIs, one will see the selection,

9    arrangement, coordination, structure, sequence, and

10   organization of the APIs reflected in those libraries.  They

11   will line up with the specification.  It is those libraries

12   that are derived from the specification.

13          So the distinction, again, is between application

14   programmers that use the services of the libraries with the

15   platform and providing the libraries for the platform.  That's

16   a technical point to begin with.

17          Now, there's a business point.  The business point is

18   that the whole point of making Java information available in

19   something like this document, like this book, is to explain to

20   application programmers how to use this programming environment

21   to take advantage of the write once/run anywhere capabilities

22   of the system.

23          That's not something that a vendor would want to

24   restrict.  That's something a vendor would want to encourage.

25   That's precisely the reason that Google adopted the 37 APIs and

1    the libraries that implement them, because they wanted to take

2    advantage of Sun's investment in all of those application

3    programmers.

4            By contrast, Sun licenses the runtime environment,

5    the environment that provides the services that the application

6    programs call, invoke, rely on.  And that's Sun's business.  It

7    licenses the Java ME runtime environment.  It's a complex

8    licensing model designed to get at each market in the best

9    possible way.

10           But that is the license and revenue model.  The

11   license and revenue model isn't directly about licensing

12   application programmers.  The application programmers are what

13   make the underlying platform useful.  Encouraging application

14   programmers as a business matter is important to the utility of

15   the usefulness to the business success of the underlying

16   platform.

17           So that's the business distinction.

18           **THE COURT:**  Let me stop you on that.

19           Is this true or not, that anybody can go online and

20   download the virtual machine, Java virtual machine and

21   programming language and all the APIs?  No?  I guess as part of

22   the runtime environment.  Is that true or not?

23           **MR. JACOBS:**  The runtime environment part, that is

24   correct.  That is something that as a business -- the strategy

25   was to enable people like us, on our desktop PCs, to download

1   the runtime environment for our actual PCs.

2          What is licensed to vendors is a more complete set of

3   code, yes.

4          **THE COURT:**  But, wait.  Just the runtime environment

5   would have the APIs; no or yes?

6          **MR. JACOBS:**  It would -- yes, it would include a

7   runtime version of the libraries.

8          **THE COURT:**  And would it also include the virtual

9   machine?

10          **MR. JACOBS:**  It would include the virtual machine.

11          **THE COURT:**  And I assume, also, the programming

12   language?

13          **MR. JACOBS:**  Probably wouldn't include a compiler for

14   the programming language.  So --

15          **THE COURT:**  But the virtual machine would take care

16   of that, wouldn't it, and convert whatever -- you could program

17   in it, and the virtual machine would translate it to whatever

18   the language is that the computer used.

19          **MR. JACOBS:**  Not quite.  The way it would work is

20   that a distribution of an application program to your computer

21   would be in byte code already.  And then the virtual machine

22   would execute the byte code.

23          The programmer that programmed that application would

24   write in source language, run it through a Java compiler to

25   create a byte code distribution.

1            THE COURT:  So what license does somebody of the type

2    that we just described have to sign or agree to in order to use

3    the -- to get that runtime environment off of the Internet?

4            MR. JACOBS:  So if it's an end user like you or me,

5    we click through the click through agreement, which tells us

6    what we can do with that runtime environment on our machine,

7    which is install it on the machine and use it on the machine.

8    Probably not reverse engineer it, et cetera.

9            THE COURT:  Says "no reverse engineering"?

10           MR. JACOBS:  I actually am not -- I haven't looked at

11   that license recently.

12           Google makes no argument based on that runtime

13   environment license.  That's not where they're going with their

14   defense here.  That is a distributional fact, if you will, that

15   Sun -- like Adobe with PDF Reader.

16           THE COURT:  I promise you, there are going to be

17   people on the jury who when they understand that you have no

18   claim to the Java programming language, that's going to be the

19   end of the line for them.  They're going to say, how can you

20   claim the APIs then?

21           And while what you have just described to me may make

22   sense to you, I don't understand it.  And I tried hard.  So,

23   I'm going to let the other side give me their ten minutes on

24   this.  But you need to come up with something that is more

25   clear-cut or the jury will never get it.

1              **MR. JACOBS:**  So let me just give you one more

2    important point on the licensing aspect of this.

3              So I showed you the documentation and what it says to

4    application programmers.  Here's what it says to someone who

5    wants to create a derivative work from the manual:

6                   "Sun hereby grants you a fully paid

7                   non-exclusive, nontransferable, perpetual

8                   worldwide limited license without the right

9                   to sublicense under Sun's intellectual rights

10                  that are essential to practice this

11                  specification.  This license allows and is

12                  limited to the creation and distribution of

13                  clean room implementations of the

14                  specification that are complete

15                  implementations of the specification that

16                  pass all test suites relating to this

17                  situation that are available from Sun, do not

18                  derive from Sun source code or binary

19                  materials, and do not include Sun binary

20                  materials without an appropriate and separate

21                  license from Sun."

22             So for someone who wanted to create libraries that

23   were built to these specifications, there is a license regime.

24   And that is the license regime that Google refused to enter

25   into for its own business reasons.

1          **THE COURT:**  What does this language say that --

2    translate that for me, how that would apply here.

3          **MR. JACOBS:**  The way that would apply here is that

4    had Google sought to develop a clean room implementation of the

5    Java Application Programming Interface specification, they

6    would have had to pass -- they would have had to do it in its

7    entirety, to protect the compatibility of the Java environment.

8    No what's called supersetting or subsetting.  You can't do it

9    partially or extended.

10         **THE COURT:**  They say they did use a clean room.  I

11   know you disagree with that, but what if the jury believes they

12   did do a clean room?

13         **MR. JACOBS:**  They don't claim that they did it

14   completely.  They only did 37.  Then the rest were their own

15   design.

16         And this requires completeness in order to protect

17   compatibility.  This requires completeness.

18         **THE COURT:**  It's really the completeness point that

19   is your main point.

20         **MR. JACOBS:**  That is one of the points.  The second

21   point is that you have to pass all the test suites.

22         The way the Java business is set up, there's a

23   license to what are called the TCKs, the test kits for

24   compatibility, and the -- in order to get that license, you

25   have to comply with those license restrictions.  And Google

1   hasn't ever taken that license at all, of course.

2           Again, that's all about protecting the underlying

3   intellectual property properly and about protecting

4   compatibility.

5           **THE COURT:**  Before you have a seat, I have a

6   different question.

7           Can you get a copyright on a programming language as

8   opposed to a computer program, but on the language itself?

9   What is the answer to that?

10          **MR. JACOBS:**  I think the answer is it's undecided in

11  any authoritative court decision.

12          If one invented a language, one could probably obtain

13  copyright protection for that invented language.  One would

14  have assembled words and symbols and their syntax and

15  semantics.  Probably one could obtain copyright protection on

16  an invented language.

17          If I can take Your Honor's question back where you

18  started before the break, what happened here is that Google

19  implemented the APIs in libraries, whether their own work, the

20  Noser work, the Apache work, without a license.

21          When it comes to the programming language, that's

22  supported, if you will, or implemented in a compiler, not in

23  these libraries.

24          And the compiler, the way Android works is that

25  Android developers, the developer community is directed to the

```
1   Sun website and told to download a Java compiler.

2           So we just don't have to visit, in this case, the

3   protectability of the programming language, as such.  And

4   that's why we make no claim about the protectability of the

5   programming language.

6           And, of course, just as anyone could write a new

7   novel in the English language, even if the English language was

8   an invented language and protectable, the Java language is free

9   for application programmers, free for them to use.

10          THE COURT:  All right.  Let's hear from the other

11  side.

12          Oracle has had the floor for 30 minutes or so, so

13  I'll give you an opportunity to respond to any and all of the

14  above.

15          MR. KWUN:  Okay.  Let me first hand up a couple of

16  binders that -- one for you and one for your clerk.  It will

17  also be on the screen.

18          Before we even get to the -- that presentation, I

19  wanted to start right where Mr. Jacobs left off, which is, I

20  actually don't think there's even a nonauthoritative opinion on

21  whether an invented language is copyrightable.

22          However, it will probably be no surprise to you that

23  I disagree with him on whether it would be copyrightable.  I

24  think, just from first principles, a language cannot be

25  copyrighted,  --
```

1          THE COURT:  Why is that?

2          MR. KWUN:  -- invented or not.

3          And I would point you to the basic principles behind

4    copyright law.  It is there not just to protect expression, but

5    to promote expression.

6          And if you look at the words and short phrases

7    doctrine, which we've already looked at and Your Honor has

8    looked at, the reason we have the words and short phrases

9    doctrine is because if you allowed someone to claim copyright

10   over words or short phrases it effectively would allow them

11   copyright over a portion of a language.  It would allow them

12   copyright over anyone who wanted to express themselves using

13   those words or short phrases.

14         Copyright on an invented language is the same thing

15   but much more severe.  It would allow them to control anyone's

16   ability to express themselves in that language.  Invented or

17   not, that is simply not allowed.

18         And the statutory basis for that would be 17 U.S.C.

19   102(b).  That is a system -- the language is a system that

20   allows one to express themselves.

21         THE COURT:  So you're saying a medium cannot be

22   copyrighted.  Only the expression can be copyrighted.

23         MR. KWUN:  Yes, Your Honor.

24         The fact that you use the language to create

25   expression -- and we just heard that, that developers can write

1   programs in these languages to express themselves.  And that,

2   of course, can be copyrighted.  That, I think, actually points

3   to the fact that the system they're using to create that

4   expression, their works, should not be copyrightable.

5          But I do not think there is any authoritative or

6   nonauthoritative case law on that.  Matter of fact, I believe

7   there is actually only one case that even discusses it

8   tangentially.  And all that it says is that one of the parties

9   had cited no authority, one way or the other, on whether or not

10  language was copyrightable.  However, like I said, from first

11  principles, I think they are not.

12          **THE COURT:**  So continue on with your --

13          **MR. KWUN:**  Yes, Your Honor.

14          So we've heard that in 1995 Java was released.  I

15  just want to remind the Court -- and this is from our summary

16  judgment motion that we filed sometime back -- that the CTO of

17  Sun in 1994, just one year before Java was announced -- that

18  was Eric Schmidt -- told Congress that interface specifications

19  are not protectable under copyright.

20          If you are looking --

21          **MR. JACOBS:**  Your Honor, I just need to interrupt

22  with an objection that you've ruled on this in your in limine

23  motions.

24          **MR. KWUN:**  Your Honor, we understand we can't present

25  this to the jury.  I'm not seeking to present it to the jury.

1   I'm merely trying to get some background here to answer the

2   question that the Court had.

3           **THE COURT:**  All right.  Go ahead.  Go ahead.

4           **MR. KWUN:**  You asked whether or not there are any

5   statements that explained how one could reserve the APIs.  I

6   would say this statement is exactly the opposite.  It says,

7   "APIs are not copyrightable."  That was sworn testimony to

8   Congress from the chief technical officer of Sun, one year

9   before Java was announced.

10          So the second thing I would point Your Honor to is

11  the brief that we filed yesterday on the field of use

12  restriction issue.

13          And you heard Mr. Jacobs talk about the licensing

14  regime that he said is in place for people who want to

15  implement APIs.  And one of the requirements he said you had to

16  meet is that you have to pass all of the testing suites to show

17  compatibility.  Those are called TCKs, technology compatibility

18  kits.

19          And what Mr. Schwartz said at his deposition -- and

20  he was CEO from 1996 to -- from 2006 to 2010, the relevant time

21  period, he said that, Anybody who wanted to create their own

22  runtime, whether it was Apache Harmony or GNU Classpath, was

23  free to do so; they just couldn't call it Java.

24          Now, crucially, Apache never signed a TCK license.

25  They tried to obtain the TCK license; refused to accept the

1   conditions that Sun wanted to place on that license; never

2   agreed to it.

3          So Apache did not pass the TCK suite.  So when

4   Mr. Jacobs tells you that in order to create an implementation

5   you were required to pass these TCKs, what you have heard from

6   Sun's CEO, from his deposition testimony, is that no matter

7   what that document says, that actually was not the policy at

8   Sun.

9          Anyone, Apache Harmony, GNU Classpath, they both

10  created freely available implementations.  Neither of them met

11  these conditions for API implementations.  Both of them were

12  freely and openly distributing these.

13         There were commercial implementations that used the

14  Apache Harmony implementation of the APIs.  There was no

15  lawsuit by Sun.  There was no effort by Sun to stop this from

16  happening.

17         **THE COURT:**  Did Sun know about it?

18         **MR. KWUN:**  Yes, Your Honor.

19         **THE COURT:**  Was it a publicly -- I mean, was it

20  publicly known that Sun was allowing -- was affirmatively

21  allowing this to happen, or is it just that they were busy on

22  something else and didn't get around to it?

23         **MR. KWUN:**  Mr. Schwartz testified that he was

24  completely aware of what the Apache Harmony was, how it was

25  distributed, what it did.  And what he said is that anyone who

1   wanted to co-create their own runtime, whether it was Apache

2   Harmony, or GNU Classpath, was free to do so.  They just could

3   not call it Java.

4           As far as he was concerned, the issue was one of

5   branding.

6           **THE COURT:**  You call it Java --

7           **MR. KWUN:**  We say that we use the Java programming

8   language.  We do not use the brand name Java.

9           What Mr. Schwartz was referring to is, he said that

10  Apache wanted to call their product, instead of Apache Harmony,

11  Apache Harmony Java.  So they wanted in the name of the product

12  to have the word "Java."

13          **THE COURT:**  Was Mr. Schwartz's testimony clear that

14  he was referring only to the trademark part of it, like Java is

15  a trademark?  How did he word his answer?

16          **MR. KWUN:**  Your Honor, let me see.  I have some

17  testimony here which has been designated confidential by

18  Oracle.

19          **MR. JACOBS:**  We hereby dedesignate what we see in

20  your slide.

21          **THE COURT:**  Go ahead.

22          **MR. KWUN:**  Not in the slide.  I'm talking about in

23  our brief.

24          **MR. JACOBS:**  Same thing.

25          **MR. KWUN:**  So, Mr. Schwartz said that he was

1   generally familiar with how the Harmony product worked.   And

2   was asked:

3               "And based on your understanding, as long as

4               users did not call their products Java they

5               were free to use the source code that Apache

6               Harmony made available?

7               **"ANSWER:  Yes."**

8               That's on pages 1 to 2 of our brief.  He also said:

9               "It's a free world.  If they called it Java,

10              we would be involved.  If they didn't call it

11              Java, they could call it a Linux phone.  They

12              could call it a free phone or an open phone.

13              That's up to them."

14              He doesn't actually say --

15              **THE COURT:**  Did Sun have a trademark on the use of

16  the word Java?

17              **MR. KWUN:**  Pardon me?

18              **THE COURT:**  Was there a trademark registered on Java?

19              **MR. KWUN:**  I believe there is a trademark

20  registration.  There is, however, no trademark infringement

21  count in this case.

22              **THE COURT:**  I understand that part.

23              Okay.  Continue, please.

24              **MR. KWUN:**  And even if there were a trademark

25  infringement count, we would be entitled to use the term "Java"

1    in its nominative sense to describe what Java means, as opposed

2    to using it to brand a product.

3            So I think that there are statements from their CTO

4    in 1994, and their CEO, at all times that are relevant to this

5    lawsuit saying that, actually, these APIs are free and open for

6    people to use.

7            So if I could turn to, in our presentation, if you

8    want to look at it in the hard copy, it's tab 6.

9            But if you could turn to slide 26 please, Nate.

10           I wanted to answer Your Honor's question about what

11   APIs are required for the Java programming language.

12           And in the order you said, both as a theoretical

13   matter as well as in a practical matter.  I'm going to start

14   off by what are actually required.

15           This is a description of Java API libraries.  This

16   comes from Oracle's website.  They are describing java.lang as

17   one of the 37 accused API packages.

18           And what they say is that java.lang provides classes

19   that are fundamental to the design of the Java programming

20   language.  That's pretty clear.  That is absolutely required.

21           Next slide, please, Nate.

22           This is the book you've seen from Oracle's counsel in

23   today's presentation.  It is labeled as being from the source,

24   published by the Java team, and describes -- it's Volume 1 of

25   the book that described the application programming interface.

```
 1              Next slide, please.

 2              This is the back cover, from the back cover of that

 3  book.  It says:

 4              "Volume I, Core Packages" -- that's the book

 5              that you've seen -- "describes the libraries

 6              that are the foundation of the Java language.

 7              These libraries include java.lang, java.io,

 8              java.util, and java.net.  These are

 9              general-purpose libraries fundamental to

10              every Java program."

11              So that's four of the 37 packages at issue in this

12  case.  I also want to point out that there are three other

13  java.lang packages that have been accused, that start with:

14  Java.lang, java.lang.annotation, .ref, and .reflect.

15              There are five more java.util packages:  .jar, et

16  cetera.  There are several more.

17              And there are two that are javax.net, very closely

18  related to the java.net package discussed here.

19              Then there's something called java.nio.  Nio, the "n"

20  in that stands for new, the "io" stands for input/output.  So

21  the nio routines are very closely related to the java.io.

22              If you add those in, you're now talking about 15 of

23  the 37 packages at issue in this case.

24              And then there's the practical question.  And we have

25  discussed that before.  Java programmers expect to be able to
```

```
 1    use the APIs when they program.  Indeed, Oracle's expert said
 2    as much.
 3              So, also, if we could turn to -- this is tab --
 4              THE COURT:  What do you say to the -- okay.  I want
 5    to go back to the thing with the testimony.
 6              MR. KWUN:  Yes, Your Honor.
 7              THE COURT:  What do you say to the contracts and the
 8    licenses?  Mr. Jacobs says that there were clear-cut --
 9    clear-cut things that put you on notice that you could not use
10    those APIs, even if you called it something else.  Even if you
11    wanted to make an intermediate or derivative work, you couldn't
12    do it without permission from Sun.  So, yes, somebody testifies
13    years later that's not true, but that comes later.
14              Are you at trial going to concede that, yes, that's
15    what the document said, but we just didn't believe it?  What's
16    the story there?
17              MR. KWUN:  A few things, Your Honor.
18              First of all, in May 2007 -- so contemporaneous with
19    these facts -- Mr. Schwartz said that, "There is no reason that
20    Apache cannot ship Harmony today."  He said that knowing full
21    well that there had been no TCK license signed.
22              So the conditions that were mentioned by Mr. Jacobs
23    had not been met.
24              THE COURT:  Where did he say that?
25              MR. KWUN:  He said that in a -- that was quoted in an
```

```
 1   article that is trial exhibit 2341, and that Mr. Schwartz
 2   verified at deposition that he had said at the time.  And he
 3   confirmed that that was accurate.
 4            THE COURT:  All right.  Now, help me on this point.
 5   What is Oracle going to say as to why that does not apply to
 6   Google?  Or do they have no answer?
 7            As an officer of the Court you must know what they
 8   are going to say, so tell me what they are going to say, and
 9   then tell me what your response to that is.
10            MR. KWUN:  Your Honor, I think they are going to
11   point to the license agreement and say, well, I don't know what
12   Mr. Schwartz was saying; he must have meant something else.
13            Frankly, I don't know what they are going to say
14   precisely.  But, there is this contemporaneous document, May
15   2007, that was --
16            THE COURT:  Was that in the public domain?
17            MR. KWUN:  That was -- he did not say it was in the
18   public domain.  What he said is that Apache could release
19   Harmony right at that moment and -- that's what he said in the
20   document.
21            THE COURT:  Was his statement in the public domain?
22   Was it a publicly-available statement?
23            MR. KWUN:  Yes, Your Honor.
24            THE COURT:  Where was it published?
25            MR. KWUN:  It was -- I'd have to look at the
```

1    document.  I don't have it immediately --

2         **THE COURT:**  Is somebody from Google going to testify

3    they saw that and relied on it?

4         **MR. KWUN:**  Your Honor, I'd have to go back to our

5    witness outlines to be certain about that.

6         **THE COURT:**  All right.

7         **MR. KWUN:**  Regardless, I think that it shows what

8    Sun's actual policy was.  And Sun's actual policy is that these

9    were freely available.

10        I would also just point to you the fact that it was

11   well-known in the industry that Apache Harmony and GNU

12   Classpath had not entered into TCK license agreements, and that

13   they were freely made available.

14        There was wide participation in the Apache Harmony

15   project by commercial entities.  The two major contributors in

16   the early days were IBM and Intel.  This was well-known to

17   everyone in the industry, including members of the Java

18   community.

19        **THE COURT:**  All right.  Let's say you didn't have any

20   of those statements, and Harmony never existed, and all you had

21   was the license agreements.

22        Would you agree that those license agreements, if

23   they were controlling, would have required Google to get a

24   license to do what it did?

25        **MR. KWUN:**  No, Your Honor.  And I have two points on

1    that.

2             First of all, they can try to impose by license

3    whatever they want.  If they don't actually have rights they

4    are giving you that they -- and a right to exclude, it doesn't

5    matter.  The APIs are not copyrightable --

6             (Simultaneous colloquy between the Court and

7             Counsel.)

8             **THE COURT:**  -- copyrightability.

9             **MR. KWUN:**  That's right.

10            **THE COURT:**  I understand that point.  What's your

11   next point?

12            **MR. KWUN:**  Second point is, if you look in the Java

13   language specification, they have a similar license in there

14   that says that you can implement the license but you have to

15   implement all of the APIs.

16            So when they told -- as you know, the language is

17   free and available for everyone to use.  They have told

18   everyone that when you implement the language you should

19   implement the APIs.  So to the extent that one --

20            **THE COURT:**  You didn't do that.  You only implemented

21   some of the APIs.

22            **MR. KWUN:**  Yes, Your Honor.  But to the extent that

23   they are trying to draw a distinction between the APIs and the

24   language, the fact that they require people to implement the

25   APIs shows there is no distinction.

```
 1              THE COURT:  But the contract said if you -- correct

 2    me if I'm wrong.  Didn't the contract say that if you are going

 3    to use our product, Java, you've got to use it all and not

 4    dilute it?  What was that word?

 5              MR. KWUN:  Subset.

 6              THE COURT:  No, there's a word.

 7              MR. KWUN:  Fragment.

 8              THE COURT:  It starts with D.  Degenerate or --

 9    Fragment.  That if you -- you can use our language all day long

10    for free, including the APIs, but you cannot fragment.  That's

11    what I'm looking for.

12              Do you agree that that's in the language --

13              MR. KWUN:  Not in those words, but their license

14    agreement does say that you shall not superset or subset.

15              THE COURT:  Well, then, that's what you did.

16              MR. KWUN:  Your Honor, yes, we created a subset.

17    And, yes, we had additional -- we had additional libraries.

18              THE COURT:  If the license agreement is the

19    controlling document -- that's a big if -- but if it were the

20    controlling thing, then you would be in violation of that

21    agreement.

22              MR. KWUN:  If we had entered into that license

23    agreement, there would have been an issue.  We never entered

24    into that license agreement.

25              THE COURT:  So then you just stole their product.  I
```

```
 1   mean, if you didn't have -- assuming it's copyrightable, how
 2   did you -- how do you get around the license agreement other
 3   than Harmony?
 4           I understand your Harmony Apache point.  But,
 5   otherwise, if you're stuck with the agreement you don't have a
 6   defense.
 7           MR. KWUN:  If the APIs are copyrightable our -- we
 8   have two principal defenses.  One would be the equitable
 9   defenses.  We've already discussed those.  The other would be
10   fair use.
11           And on fair use, I would point the Court at the Sega
12   v. Accolade case and the Sony v. Connectix case.  Both of
13   those --
14           THE COURT:  Okay.  Possibly those apply.  I'm not
15   saying yes to that.  Tell me if I've got it right.  I'm trying
16   to understand the shape of this trial so it will help me when
17   we get to the trial.
18           Oracle will put on lots of evidence about
19   Mr. Gosling, that he's brilliant, he invented this whole thing,
20   it was renowned, it got accolades from every corner of the
21   earth.  Wrote a book.  Everyone uses it.  It's the end all and
22   be all.
23           And that Google being a -- not Google but Oracle
24   being the good citizen that it is, has dedicated -- not
25   dedicated it fully, but has made it available but on
```

1   conditions.  And the conditions are pretty reasonable, in order

2   to promote consistency.

3          And that Google came along, negotiated for a license,

4   didn't want to pay a hundred million dollars, went off and just

5   violated the license, because they didn't get one.

6          You come back and say, A, it's not protectable in the

7   first place.  All right.  I understand that argument, though I

8   don't know what the answer is.  I think this is a hard

9   question.

10         Number two, you say, well, they didn't really mean

11  it.  When they said that you had to have a license, they were

12  talking Janus-like and they were -- that's what they said on

13  paper, but what they were saying publicly is that Harmony

14  Apache could do it, and that meant the rest of the world could

15  do it and, therefore, we never had -- that was all waived or

16  there's an estoppel.

17         And then your final point is that even if there is --

18  those two fail, and it was protectable, there was fair use.

19         Now, maybe you have other arguments, too, but have I

20  more or less summarized it right?

21         **MR. KWUN:**  Those are definitely the high points.

22         **THE COURT:**  All right.

23         **MR. KWUN:**  So, Your Honor, on this notion, you before

24  our break drew a distinction between what might be true in

25  1995, when Java was first released, and what might be true

1  today.

2          **THE COURT:**  Right, uh-huh.

3          **MR. KWUN:**  So as to what might be true in 1995, it's

4  a couple of points I want to raise.

5          First of all, there is a case that I'm going to cite,

6  *ATC Distribution Group vs. Whatever It Takes Transmissions and*

7  *Parts.*  It's 402 F.3d 700 (6th Cir. 2005).

8          And the point that the *ATC* court made is that

9  creativity does not equate to copyrightable.  And what they

10 said is, "Original and creative ideas are not copyrightable."

11 I have this as a quote with an ellipsis in there.  I don't have

12 the full quote before me.  "Original and creative ideas are not

13 copyrightable."

14         So the point is that under the Copyright Act, what is

15 copyrightable is creative expression.  And, of course, given

16 the idea, the idea/expression dichotomy, even if you have

17 creative ideas, even if they are very creative, even if they

18 required a lot of thought, ideas are still not copyrightable.

19         Second of all, you had asked --

20         **THE COURT:**  But let me test you on that for a moment.

21 That's true.  An idea is not copyrightable.  But here you saw

22 the diagram earlier.  C++ has got one API structure.  The other

23 language had another structure.  And then along comes Java and

24 has its more elegant structure.

25         And the idea of an API is just an idea.  But when it

1  comes down to concrete -- what's the word -- hierarchy or

2  concrete outline, the Java people came up with an elegant

3  solution, and they then expressed that elegant solution in

4  words the computer could understand; and, therefore, that ought

5  to be copyrightable.  That's the argument.

6            So why don't -- what's your answer to that?

7            **MR. KWUN:**  Your Honor, having two different ways of

8  organizing something doesn't mean those are expression.  Just

9  means those are two different ideas.

10            I will submit that if you look at the cases and if

11  you just think about it yourself, the break between idea and

12  expression is a difficult one to determine.  And it's -- it's

13  hard to make bright line distinctions.

14            However, I think that the functional nature of the

15  structure and organization of the APIs here and how that is

16  necessary for programmers to use that structure and

17  organization to express themselves in the Java programming

18  language weighs in favor of this being on the idea side of that

19  dichotomy.

20            If we could turn to slide 33, please.  I wanted to

21  talk a little bit about these interdependencies which you heard

22  about before the break.

23            This is a modified version of a page from the Oracle

24  specifications.  And what has been removed are the

25  descriptions.  This really is what we are talking about when

1  Oracle talks about the structure, selection, and arrangement of

2  its API elements.

3          We have removed all of the text, and you're left with

4  something that, frankly, looks a lot like the blank forms that

5  were at issue in *Baker v. Selden*.

6          And if we could turn to the next slide.  This, slide

7  34, this is taken from their expert's report in opposition to

8  our expert's copyright report.  And this illustrates the class

9  hierarchy for the java.net package.  And this illustrates some

10 of the same concepts that you saw Mr. Peters discussing.

11         And if you look -- you'll see that most of the

12 java.net classes that are listed in here are subclasses of this

13 first one that's listed, Java.lang.Object.

14         So java.lang.Object is the most fundamental class in

15 the Java language.  All other classes are either subclasses of

16 java.lang.Object, or sub subclasses, and so on.  Everything

17 derives from java.lang.Object.  It's the only class that

18 doesn't have a parent class.

19         But most of these you see come from java.lang.Object.

20 Some of the classes, you'll see, are subclasses of other

21 java.net classes.  So you see java.net.SecureCacheResponse is a

22 subclass of CacheResponse.  And that's simply because it's a

23 more specialized version of the CacheResponse class.

24         Now, this notion of cross package relationships,

25 which we've heard discussed a little bit, you can see in the

```
 1  second column, if you look towards the bottom,

 2  java.net.URLConnection.  No, no.  Excuse me.  URL Class Loader.

 3          THE COURT:  I don't see that one.  Where is that?

 4          MR. KWUN:  Well, let's go with java.net. -- well,

 5  that's a good question.  We'll move on to the next point.

 6  We'll move on to java.net.URI.  So java.net.URI -- that's in

 7  the right column.

 8          THE COURT:  Yes.

 9          MR. KWUN:  So URI is a Uniform Resource Identifier.

10  And it's very similar to what everybody knows as a URL when you

11  are going to websites.  So -- conceptually, anyway.

12          So you can see in parentheses it says, "Implement

13  java.lang.Comparable."  So java.lang.Comparable is one of these

14  interfaces that you've heard Mr. Peters talking about where,

15  again, I want to caution the Court, interface there is a

16  special construct in the Java programming language, and it's

17  not the interface in API application programming interface.

18          So the java.net.URI is a subclass of

19  java.lang.Object.  So you could call Object its parent.  So

20  when it says that it implements java.lang.Comparable, that

21  means it also inherits certain characteristics from

22  java.lang.Comparable.  So, in a sense, you could say this it

23  has two parents; whereas, some of these classes only have one.

24          But what does this really mean, the fact that it has

25  this interface java.lang.Comparable?  Java.lang.Comparable is
```

1 an interface that provides a method that allows you to compare

2 two things.  So if you have two URIs, two Uniform Resource

3 Identifiers, you might want to know whether they are equal to

4 each other or whether one of them is less than the other.

5         Now, frankly, I don't actually know what that means

6 for it to be less than another.  But I do know that if it

7 implements Comparable, this interface, it's required to provide

8 an ordering relationship.

9         So all that it means when it says that it has -- that

10 it implements java.lang.Comparable is that when you have a URI,

11 you can ask it whether it is smaller, larger, or equal to

12 another URI.

13         So if you want, you can call that interdependency.  I

14 would just say that's another functional characteristic of the

15 language, of the word that's being defined there.

16         So I just wanted to give a little more of an

17 explanation of what these interdependencies really are.  These

18 are all just different ways to organize the functional aspects

19 of the vocabulary that is defined in the APIs.

20         The other thing I wanted to discuss, the next thing I

21 wanted to discuss is it -- Nate, if we could have slide 14.

22         You had suggested that in 1995, surely, they should

23 have had some protection for this language.  Even assuming

24 that's the case, you had also asked in one of the orders that

25 you issued before the hearing was whether or not APIs can be

1  patentable, and particularly whether the selection,

2  arrangement, and structure of APIs can be patentable.

3         And the answer for any given claimed invention is

4  going to depend on that particular claimed invention.  There's

5  going to be, you know, *Bilski* questions.  There's going to be

6  other questions.

7         But what we have here -- I'm going to show you two

8  patents, one issued to Sun and one issued to Oracle, that

9  certainly do claim aspects of the selection, structure, and

10  arrangement of APIs.

11         So this first one is the '093 Patent issued to Sun.

12         If we could get the next slide please, Nate.

13         Here's Claim 1.  Sun claims a class structure in an

14  object based system, the class structure being arranged to

15  provide application programming interfaces that has a first set

16  of classes that are arranged in a certain, defined manner.  It

17  has a second set of classes that are arranged in a certain

18  manner, and a third set of classes that are arranged in a

19  certain manner.

20         If we could actually go back to the previous slide.

21         The diagram you see at the bottom of the cover page

22  of the patent here, what it shows is the first set is what it

23  calls the core APIs.  The second set in Claim 1 are the client

24  APIs, which include all of the core APIs and then have a few

25  additional ones.  And then the third set is the server APIs,

1  which include all of the four APIs and all of the client APIs,

2  and have some additional APIs.

3         So they're claiming a particular way of structuring a

4  set of APIs in a client server system on an object oriented --

5  for an object oriented programming system.

6         If we can turn to slide 16.

7         **THE COURT:**  Is this one of the patents asserted in

8  this case?

9         **MR. KWUN:**  It is not.  They've asserted no patents

10 against Google based on selection, arrangement, and structure.

11        **THE COURT:**  Is the phrase "structure, arrangement,

12 selection," is that in the specification to this patent, '093?

13        **MR. KWUN:**  Your Honor, I would trust that it is, but

14 I can't tell you for certain.

15        **THE COURT:**  I don't see that language in the claim.

16 I see the word "structure."

17        **MR. KWUN:**  Oh, the structure, selection, and

18 arrangement?  We have "structure" and we have "arranged" here.

19 I don't know that we have "selection."

20        **THE COURT:**  I see "arranged."  I see "structure."

21 All right.

22        **MR. KWUN:**  Yeah.  The second patent -- slide 16,

23 please -- is the '855 Patent assigned to Oracle.  Oracle

24 International Corporation in particular.

25        If we could turn to the next slide, which has Claim

104

```
1   1.  They claim:

2           "A method for integrating an application with

3            a collaboration server, said method

4            comprising: providing an application

5            programming interface that includes a

6            hierarchy of schemas sharing inheritance

7            relationships ..."

8           Now, you've heard today about how classes inherit

9   characteristics from the other classes in the Java programming

10  language.  This would seem very similar.  Schemas would seem

11  very similar to what we've been discussing as interfaces.

12          "... wherein, the personal messaging schema

13           abstracts functionality of the collaboration

14           server as a set of item classes and container

15           classes that contain said item classes."

16          That would seem to be an arrangement of a selection

17  of classes.

18          "... providing, in said API, a plurality of

19           providers that implement hierarchy of

20           schemas" ... and "receiving a selection of at

21           least one of said providers for the

22           application after the application has been

23           compiled," and so on.

24          Neither of these patents are asserted in this case.

25  But the point simply is that Sun and Oracle certainly believe
```

1  that one can patent aspects of the selection, arrangement, and

2  structure of APIs.

3         **THE COURT:**  All right.  Thank you.

4         **MR. KWUN:**  I wanted to turn now to another question

5  that the Court had had -- slide 19, please -- which was the

6  description.  And you said we're also accused of infringement

7  of the description.

8         So what you have before you here, this is a

9  demonstrative of the only description comparison that their

10  expert actually has in the text of his expert report.

11        And this is the documentation.  The description is

12  provided by J2SE 5.0 and Android for the getPrivate method for

13  the KeyPair class.

14        And you can see the two definitions that are provided

15  there, the two descriptions that are provided there.  And I

16  would submit that they don't look much alike.

17        This was the choice that Dr. Mitchell made.  As the

18  only example to give, he decided this was the example --

19        **THE COURT:**  They are not limited to what's in the

20  expert report, are they?  I mean, the expert is, but the direct

21  case, case-in-chief, can just put in the document.  Right?

22        **MR. KWUN:**  Yes, Your Honor.  I would --

23        **THE COURT:**  If they do that are we going to find

24  other examples where the wording is the same?

25        **MR. KWUN:**  You are going to find some examples where

1  the wording is certainly more similar than that.  And I would

2  submit that that's not terribly surprising, and that if you

3  compare it to a dictionary you're going to -- word for word,

4  you're going to find a number of definitions that sound

5  somewhat similar.

6       I would like to go through some of the exhibits that

7  Dr. Mitchell attached to his report.  They are somewhat lengthy

8  and our time is limited.

9       **THE COURT:**  This is on the specification, the plain

10  English part that describes to the user how the -- what the API

11  does.

12       **MR. KWUN:**  Yes, Your Honor.

13       **THE COURT:**  That's what I want -- you say Android

14  documentation.  All right.  So stick -- thank you for moving to

15  that.  I wanted to come to that.

16       So go ahead and tell me what the story there is on

17  how close the language is.

18       **MR. KWUN:**  So these are the exhibits that

19  Dr. Mitchell attached to his report.  It's just the first page

20  from each of those exhibits.

21       But Your Honor obviously will see more than this.

22  But for today's purposes, if you look at the interface

23  descriptions in the -- for the java.lang package, they are

24  provided here -- again, at a mere glance you can see they don't

25  look the same at all.

1          If you turn to the next slide, 21, which is the first

2    page of copyright Exhibit C to Dr. Mitchell's report, interface

3    summary for java.io, if you look at the descriptions, you know,

4    they look pretty different to me.

5          **THE COURT:**  Well, is this the way they are now on all

6    of the -- 2.0, 3.0, or is this just for the most recent

7    version?

8          **MR. KWUN:**  These are the ones -- this compares the

9    standard edition 5.0 from Oracle.

10          And I actually -- I would have to look in the report

11    to see which ones Dr. Mitchell chose to compare them to.  These

12    are a fairly recent, I would assume, version of the Android

13    descriptions.  But, nonetheless, these are the ones that he

14    chose to attach to his report.

15          So this is copyright Exhibit C.  Turn to slide 22.

16    Copyright Exhibit D.  Again, they look remarkably different.

17          If you turn to copyright Exhibit E, slide 23,

18    KeyPair, this is the class where we were discussing the sole

19    example that he actually provided in his report.

20          Here, if you look at the class overview, they look

21    nothing alike.

22          If you look at the constructor summary down below,

23    constructs a KeyPair from the PublicKey and PrivateKey;

24    constructs a new instance of KeyPair with a public key and the

25    corresponding private key.

```
1          I will give you -- those sound a little bit more
2    similar, but, still, given that they're describing the same
3    thing and that they're both written by technical writers, I
4    would say that the descriptions are not terribly similar.
5          And if you turn to slide 24, of copyright Exhibit F,
6    the class runtime, and you look at the class description,
7    again, nothing alike.
8          Down below, if you look at the method summaries, for
9    addShutdownHook and availableProcessors, these actually look a
10   fair bit alike.  But the concepts being expressed are very
11   simple and within the constraints of technical writing.  I,
12   again, would submit that's not very surprising.
13         THE COURT:  One of our earlier hearings, I have a
14   distinct memory of a side by side like this that the other side
15   had presented.  And it looked identical, one item after
16   another.  Almost word for word.
17         This doesn't look identical.  What am I thinking of?
18         MR. KWUN:  Your Honor, what I remember, what may be
19   what you're thinking of, was a slide that showed that the
20   interface listing for an Android class was identical to the
21   interface listing for the equivalent class in J2SE.  So they
22   pulled out --
23         THE COURT:  What is an interface listing?
24         MR. KWUN:  Well, Your Honor, if you could turn to
25   slide 22, for example.
```

109

1          THE COURT:  Okay.

2          MR. KWUN:  They have something that -- I don't know

3    that it was this one, but they had something that pulled out

4    and zoomed in on the left column, and showed that the left

5    column was the same.

6          What that shows is that the -- that the selection,

7    arrangement, and structure of the elements of the API are the

8    same.  And we would agree.

9          I'm not sure if that's what the Court was

10   remembering, but that's what comes to mind to me.

11         THE COURT:  It was not just single words.  It was

12   sentences.

13         I don't want to take your time on my bad memory.

14   What else do you have to say?

15         MR. KWUN:  So, Your Honor, the only other thing I

16   want to point out is just that if you look at the cases that

17   they cite -- which I assume are the cases they believe are the

18   best cases -- in many of those cases, those out-of-circuit

19   cases, even if the Court does not follow, for example, *Lotus*,

20   the Court, nonetheless, either concludes that the material is

21   not copyrightable, as was the case in *Mitel,* or the Court

22   concludes that the material has almost no protection.

23         So, for example, they cited *Engineering Dynamics v.*

24   *Structural Software* in their most recent brief.  A Fifth

25   Circuit case I think you mentioned earlier in the hearing.

```
 1            And if you look at page 1348 in that opinion, the
 2    Fifth Circuit said, "To the extent that" -- excuse me.  Let me
 3    back up.
 4                 "The same cautious approach to protection is
 5                 appropriate for computer user interfaces.  To
 6                 the extent that they are highly functional
 7                 or, like the output formats in this case, to
 8                 the extent that they contain highly
 9                 standardized technical information they may
10                 lie very near the line of
11                 uncopyrightability."
12            And it refers to the relatively narrow scope of
13    property -- excuse me, of copyright protection in instances
14    like this.
15            So even the cases of theirs, that suggest things
16    might be copyrightable would grant, at best, thin copyright
17    protection to something like this, which is going to be
18    relevant both in terms of determining substantial similarity
19    and for purposes of the fair use factors.
20            THE COURT:  Let the other side have a brief response,
21    and then we'll turn to some other subjects.
22            MR. JACOBS:  The first thing I would like to address
23    is Mr. Schwartz and the quote from Mr. Schwartz.  And we'll put
24    the entire passage from the identified exhibit on the screen.
25            Toward the bottom of the screen, Your Honor:
```

1            "Jonathan Schwartz, CEO at Sun, said in a

2            press conference, 'There's no reason that

3            Apache cannot ship Harmony today ...  We're

4            very focused on the GPL community.'"

5      And then the articles goes on:

6            "That is technically true, but Apache

7            officials said that to do so with the TCK

8            restrictions in place would actually go

9            against the Apache software license.

10            Meanwhile, Rich Green, Sun's executive vice

11            president of software, said the TCK issues

12            were being worked out."

13      So this is entirely consistent with our description

14 of a license regime that applies to these APIs.  The Apache

15 dispute was a dispute, and it was resolved.  It was resolved,

16 fortunately, not with litigation.  It was resolved because the

17 vendors in question, including IBM, have now joined Oracle in

18 the OpenJDK project as the vehicle for a GPL-based

19 implementation.

20            **THE COURT:**  What's the evidence going to show as to

21 whether Apache Harmony signed the agreement, the restriction?

22            **MR. JACOBS:**  They never signed it because the dispute

23 was about the TCK restriction that Sun was going to impose.

24 The Apache folks did not like that restriction and so they

25 didn't sign the license.

1          **THE COURT:**  Did they then go ahead with their -- did

2    that stop them dead in their tracks, or what did Apache Harmony

3    then do?

4          **MR. JACOBS:**  But for Android, Apache Harmony is

5    not -- by and large, not a very significant factor in the Java

6    marketplace.

7          Android took the libraries from Apache and made it

8    into their alternative implementation.  But Apache Harmony is

9    now pretty much a dead project.

10          So as to what -- you asked an important follow-up

11    question, which was:  Did Google rely on any statements of

12    Jonathan Schwartz?

13          This is an e-mail from Andy Rubin from 2006.  He was

14    asked about alternative implementations of Java.  And he says

15    back in his e-mail:

16          "Ha.  Wish them luck.  Java.lang APIs are

17          copyrighted.  And Sun gets to say who they

18          license the TCK to, and forces you to take

19          the shared part which taints any clean room

20          implementation.  I don't see how you can open

21          Java without Sun, since they own the brand

22          and IP."

23          And if you'll recall the license at the front of the

24    manual I read earlier, it's under all applicable intellectual

25    property rights.

1          Just a minute Your Honor.

2          And then in 2008, when the Apache dispute is raging,

3   an internal e-mail at Google from a fellow named Bob Lee to

4   Eric Schmidt:

5          "Sun puts field of use restrictions in the

6           Java SE TCK license, which prohibit Java SE

7           implementations from running on anything but

8           a desktop or a server.  These restrictions

9           prevent Apache Harmony from independently

10          implementing Java SE, not to mention

11          Android."

12         Though that's water under the bridge, at this point.

13  And Schmidt, of course, who had been at Sun says, I'm not

14  surprised by Sun's position.

15         So the evidence, we believe, will be quite strong

16  that whatever Mr. Schwartz may say now about his understanding

17  of how the intellectual property restrictions apply to Apache

18  Harmony or to the -- or to a hypothetical project or to

19  Android, that Google well knew at the time exactly what it was

20  doing and how Apache Harmony was not a permitted vehicle for

21  implementing the libraries in Android.

22         That's all I have, Your Honor.

23         **THE COURT:**  All right.  Let's turn to a different

24  subject, and that's more the nuts and bolts of how we will try

25  the case.

```
 1            Before I do that, I would like to give each side
 2    until -- what is today?
 3            MR. VAN NEST:  Wednesday.
 4            THE COURT:  Until Friday, if you can do this.  I'll
 5    give you more time if you really need it.  But it would benefit
 6    me to have it sooner, let's say by 4:00 p.m. on Friday.
 7            I like the concept of High Noon and Gary Cooper.
 8            (Laughter)
 9            THE COURT:  And you can all imagine that you're Gary
10    Cooper.  I like that concept.
11            But being so close, we'll go to 4:00 p.m. on Friday
12    to put in a 10-page brief on anything and everything you wanted
13    to comment on that came up today.
14            You can see what's on my mind.  And I want to put
15    a -- give you this little caveat.  The more that you are candid
16    with me, the more I will believe what you have to say.  Not
17    that I'm not going to check it.  I'm going to try to check
18    everything.
19            But in an area that's this hard to follow, every now
20    and then the light goes off when some lawyer writes a good
21    brief that happens to concede something and then says, even
22    though we concede that, here's why we win anyway.  And a light
23    goes off that hadn't gone off before.
24            And I urge you to keep in mind that I'm not up to
25    speed like you all are, and I think the more you can be candid
```

1   with me the better off I will be.  Maybe you will be, too.  But

2   that's just a word to the wise.

3            I want to give you ten pages to bring to my attention

4   anything that you -- anything and everything that we've gone

5   into today would be fair game.  All right.  So simultaneously

6   4:00 p.m. on Friday.

7            Brand-new topic.  Did you do the stipulated timeline?

8            **MR. JACOBS:**  We're, I would say, a third to half of

9   the way down the path on stipulated timeline, Your Honor.  I

10  think we are making progress.  I think we could do a better job

11  if we had more time, on the stipulated timeline.

12           **THE COURT:**  I will give you more time.

13           Let me explain to you the way it's used.  One thing

14  I've learned in this job -- and I work hard at it -- is that I

15  see the entire trial in kind of a stereo way.

16           One of the tracks that I view the trial on is, how is

17  the jury absorbing the information?  I don't go in there and

18  ask them, of course.  I don't do that.  But I try see the trial

19  from the viewpoint of the jury.

20           Not only as -- you heard me say earlier how much I

21  empathize with the jurors who have to drive from all over the

22  district, but I also see it from the point of view:  Are the

23  lawyers presenting it in a way that the jury will grasp what's

24  going on, and what are the ways in which we can assist the jury

25  to comprehend the evidence?

```
 1            You've already heard me say -- and you've done this,
 2    I think -- those color coded charts will be a godsend for the
 3    jury.
 4            You've done that already, right?
 5            MR. JACOBS:  Yes, Your Honor.
 6            THE COURT:  My hat is off to you.
 7            The other thing that is very useful to the jury is to
 8    have a chart that's not much bigger than the one up there,
 9    maybe twice as big, but can be seen from where the jury box is
10    easily, that has the main, key dates.
11            I'll make some up here.  Like a timeline.  And it
12    says Java released 1995.  Or Google releases Android 2008.  And
13    the specific date, if need be.
14            There will be, probably, eight to 12 dates that are
15    all you need.  Not all you need, but that will be the framework
16    around which the jury will integrate the rest of the evidence.
17            So, for example, when a witness is on the stand
18    testifying about some meeting that occurred in January 2009,
19    the jury can glance up at that timeline and see the place in
20    the overall story where that episode fits in.
21            It is a godsend for them to be able to do that.  It
22    helps them comprehend the evidence.  Otherwise, they are trying
23    to remember, What was the date of that?  And then they get
24    confused on some point and they actually place that meeting at
25    a different point in time.
```

```
 1          Now, if what you want is confusion because you're
 2    afraid you're going to lose the case if the jury understands it
 3    then, of course, you don't want any of this.  You want to be
 4    smokescreen city.
 5          But I don't think you lawyers -- I think you lawyers
 6    genuinely believe that you should win.  Each side.  That's the
 7    way you think.  And maybe -- you know, who knows.  One of you
 8    is not going to win, but we don't know who it is yet.  But if
 9    you believe that the facts and the law are on your side, you
10    ought to want this.
11          What is that noise that I hear?
12          MR. KWUN:  That was me.  I'm sorry, Your Honor.
13          THE COURT:  Okay.  So I urge you to do this simple
14    timeline.  It's nonargumentative.  It should never have
15    something like, in an employment case, employee terminated
16    fraudulently on such and such date, or, employer lied about
17    this.  No.  We don't put argument in there.  It's simply the
18    facts.  And only the key facts.
19          Now, I will tell -- in fact, you ought -- we're going
20    to reduce it to an 8 by 10.  We'll give it to the jury so they
21    can make their own notes on it, so they can fill in.  We will
22    never see what they fill in.  But I promise you, this is a very
23    useful tool for jury comprehension.  And the other is the
24    color-coded charts.
25          All right.  So try to do this within about a week.
```

```
1  By April 9th.  More like 10 days.

2           Now, in addition, of course, you can have your own

3  timelines that you can show in argument and opening statement,

4  that will go beyond the -- you may want to give the jury more

5  detail.  Of course, you can do that.  But the one I'm talking

6  about is a stipulated one that would be available to the jury

7  at all times, to help them understand the framework of the

8  case.

9           All right.  Now we go to a problem that I don't think

10 will come up here but let's make sure of that.  Here's the way

11 I do stipulations.  If you have ten stipulations or a hundred

12 stipulations, you've actually got to read it into the trial

13 record, and then it becomes part of the record.

14          And I will constantly tell the jury that not one word

15 you ever say as a lawyer is evidence.  And you'll hear that

16 speech many times because I've learned that the lawyers will --

17 especially in your questioning, you will try to insinuate

18 things that are not even in the record, and expect that the

19 jury believes that and base a decision on it.

20          I tell them repeatedly not one word that you lawyers

21 say is evidence.  It's what the witnesses say under oath that's

22 the evidence, plus the documents.

23          But a stipulation, I will tell them, is completely

24 different.  That is evidence.  So you will get to read that to

25 the jury and so forth.  Be sure you do that the way that I
```

1  wanted you to do that.

2          But, now I want to address a point that I fear could

3  come up in this case that is beyond that because of the large

4  record here.

5          I have a fear that one side or the other at the end

6  of the case or halfway through the case is going to say,

7  "Judge, they've already conceded that in the papers."  And it's

8  not testified to.  There's no stipulation on it.  And you're

9  asking me to go back and find, out of the hundreds of documents

10  filed, something -- something that you think has been taken out

11  of the case by agreement or by just a concession in a brief.

12          No.  That doesn't work that way.  If you want

13  something like that to be instructed to the jury or for me --

14  for me on the issues I've got to decide, you ought to make a

15  motion that it be deemed accepted, for purposes of the trial,

16  that this is true.

17          Because I cannot be in the position halfway through

18  the trial or at the end of the trial with you saying we -- we

19  relied on some statement in a brief three months ago.  And when

20  I go back and look at it, it maybe hedged, it -- it may not be

21  quite as clear as you think it is.

22          A lot of money turns on this trial, and I'm going to

23  be pretty -- I'm going to make you do it the right way.

24          So, now, of course, anything that is said when the

25  trial is underway, at least for the issues that I've got to

1   decide, if you admit something to me during the trial you're

2   going to be bound by it.  I'm going to hold you to it.  Or if

3   you admitted something to me in the past, I will hold you to

4   it.  But you as the lawyer may not be able to hold the other

5   side to it.

6           There is a difference between you and me on this.  If

7   I think something has been taken out of the case, for

8   example -- I'm not going to give you any examples -- then I

9   might not even on my own motion let you put it back into the

10  case.  But that's me doing it.

11          If you as the lawyer want to keep the other side from

12  doing it, you better bring that motion to have it deemed

13  admitted for purposes of the trial.

14          So I just see it coming.  I want to head it off and

15  give you fair warning that you ought to think through, if there

16  are three or four things you think are critical that have been

17  taken out of the case by admission, you best tee that up and

18  have that briefed quickly, in fact.

19          All right.  When we get to the phase two -- I want to

20  go back to the phase one.  I had asked you to come up with a

21  video that we could play to the jury.  It won't come out of

22  anybody's time.  It will be free time for you.  But it will

23  help the jury.  And a tutorial on whatever you think they need

24  to see.

25          Are you going to be able to do that, or is this a

1  hopeless task?

2          **MR. JACOBS:**  The latter, Your Honor.

3          **THE COURT:**  Hopeless.

4          **MR. JACOBS:**  We've consulted with each other and

5  we've spent a fair amount of time trying to imagine on our side

6  how we could do this in a way that would be acceptable to both

7  sides.

8          **THE COURT:**  That's fine.  But it's going to come out

9  of your time then.  When you're educating the jury with your

10  own witnesses, then it just comes out of your time.

11          **MR. JACOBS:**  Understood.  Thank you, Your Honor.

12          **THE COURT:**  But don't appeal --

13          **MR. JACOBS:**  Sorry.

14          **THE COURT:**  On appeal, I want it to be clear to both

15  sides I was willing to give you free time to do this.  I think

16  it's a reasonable request, and I'm surprised that you lawyers

17  can't take advantage of that.  All right.

18          The FJC video, when we get to phase two, I'm going to

19  show that.  That's -- I assume no one has an objection to it.

20  We don't even need to get into it until phase two.

21          You know what I'm talking about?

22          **MR. VAN NEST:**  We do, Your Honor.

23          **THE COURT:**  Any objection to that?

24          **MR. JACOBS:**  No, Your Honor.

25          **MR. VAN NEST:**  No.

1          **THE COURT:**  All right.  That won't come out of

2     anybody's time.

3          Okay.  I made a very small adjustment to the jury

4     trial guidelines.  I hope you make sure you're reading the

5     current version so that you don't get caught up on that.

6          I want to say, sometimes we judges get criticized

7     because we each have somewhat different ways of doing things,

8     and the lawyers wish everyone was -- came out of a cookie

9     cutter.  And I just want to explain to you why that is an

10    unreasonable expectation on your part.  I know this.

11         Every one of you have tried cases before this.  And

12    the first thing you do when you sit down with the judge is to

13    say, Judge, how do you like to do X?  How do you like to do Y?

14    Right?  You've done that many times.

15         Well, knowing that you're going to ask that question

16    I've just laid it out for you in writing.  So, now, don't have

17    heartburn over the fact that the judge is answering your

18    question in advance.

19         I'm still happy to answer any other questions you

20    have.  But if you don't have some guidelines the trial will

21    become a mess with a lot of finger pointing.  This reduces the

22    finger pointing and helps it go more smoothly.

23         At 7:30 we will convene.  The jury gets here at 7:45

24    every day.  We will start by 8 o'clock.  Please do not have in

25    mind that we will have long-winded motions in limine in that

```
1   time period.  This will be trial.  Things will go quickly.
2              There will be motions in limine, but they may be two
3   or three done in the 30-minute period.  And then, you know, if
4   a lot of money turns on some ruling, that's the way trials are.
5              We start at 7:30.  By 8 o'clock we have rulings.  The
6   jury comes in; we continue with the evidence.
7              Now, I urge you, if you see an important point coming
8   up, that you not wait until the night before.  You ought to see
9   it coming and say, Judge, in three or four days we're going to
10  have this problem.  It's a big, important issue, we want to put
11  a brief in on it sooner.
12             I'm totally open to that.  I encourage it.  So there
13  we are.
14             Now, the last big trial that I had, which was a
15  criminal case, but we would get motions in limine at 1:30 a.m.
16  My law clerk was here.  Not that I made her be here.  She
17  wanted to be here.  But I'm not going to go through that again.
18             So I'm going to have another rule, and that is that
19  you get out of here at 1:00 o'clock each day.  You have notices
20  to give to the other side.  You must be timely.
21             If there's something that must be brought to my
22  attention so that we can rule on it, by 8:00 p.m. that day you
23  should file your motion.  And by 10:00 p.m. the other side
24  should respond.
25             So that way my law clerk -- he's going to be here
```

```
 1   late anyway; and he already knows this; he's over this
 2   smiling -- but he can at least get it ready for me when I come
 3   in here at 5:00 a.m. in order to get ready for the trial day.
 4            And we'll do our best.  Every day there will be some
 5   issues, and that's just the way trials are.  I'm okay with
 6   that.  But you need to realize that we don't -- we can't do
 7   five or six motions a day.  It's more like one or two.
 8            And, you know, it's a wonderful day when I show up
 9   and you say, We're ready to go, we have no issues.  That's what
10   I really want to hear.  But I don't expect that except on rare
11   occasion.
12            So when we get to the trial, the law and motion side
13   recedes a bit, and the excellent trial advocacy of you lawyers
14   begins to shine.  The poor judge recedes into the background,
15   and it's you and the jury and the witness.
16            It's the magic triangle that goes between that
17   lecturn -- which I will let you push down to the end so you
18   will be close to the witness and the jury.  The witness and the
19   jury, that magic triangle.  And I have nothing to do with it
20   except rule on objections.
21            And your witness may be pummeled on
22   cross-examination.  Great.  That's what trials are for.  You
23   just cream the witness on cross-examination.  I am looking
24   forward to seeing many of those examples.
25            And if you try to save your client, too bad.  It will
```

 1   not work.  I'm going to let that witness be beaten up as bad as

 2   possible.

 3           This is not a deposition.  This is the U.S. District

 4   Court.  And we are going to let you good advocates -- and

 5   you're both excellent -- just go to town on these witnesses.

 6           Now, that brings me to this rule.  In New York -- I

 7   think we discussed this, didn't we, the rule of while on

 8   cross-examination you cannot talk with your client -- you

 9   cannot talk with the witness, whether it's your client or not,

10   while they are on cross-examination.

11           Did we go over that?

12           **MR. VAN NEST:**  We did.

13           **THE COURT:**  That's the rule.  So if your client is in

14   the middle of being creamed and there's a break, you just have

15   to say -- you know, give them your best smile, but you cannot

16   try to rehabilitate them in the break.

17           The Court has the ability to control the -- the

18   communications with any witness while they're on the stand

19   under cross or, for that matter, under direct.

20           But I don't care about the direct.  It's the cross

21   that I care about because I think it -- the ability to do a

22   good cross-examination on a witness sometimes turns on whether

23   or not they are being rehabilitated in the hallway.

24           I had some more things I wanted to bring up with you.

25   Oh, one was the reallocation of time.  I read your brief and I

1   very much appreciate it.  I think at least one hour now can be

2   taken from phase two into phase one.

3            So right now I'm just going to say one hour.  And so

4   we'll move -- the phase one can be 17.  To my mind, now that

5   we're down to just two patents, that part will be more

6   straightforward.  And the part that is going to be a little

7   harder is phase one.

8            So I'm going to -- but you don't have to use your

9   time there.  You can bank it and use it later.  But I will

10  allow you to move -- so we'll readjust the time to move one

11  hour from phase two to phase one.

12           MR. JACOBS:  I'm sorry.  Could you restate, Your

13  Honor?  I think I heard two different things.  The phase one is

14  lengthened by an hour?

15           THE COURT:  Yes.

16           MR. JACOBS:  And phase two is shortened by an hour?

17           THE COURT:  It is.  But if you wind up having extra

18  time in phase one, I've already said you can carry it forward

19  and use it in phase two anyway.

20           MR. JACOBS:  Thank you.

21           THE COURT:  Okay.  Well, this may be our last

22  opportunity to meet before 7:30.

23           Very quickly, after 7:30 we'll do a few housekeeping

24  things.  But probably by 8:00 a.m. we will have this room full

25  of the venire.  And we will be getting right down to jury

1   selection and possibly opening statements that very day.  So I

2   want to give you this chance to bring up any other issues that

3   you want to raise with me.

4          How about on the plaintiff's side, any issues?

5          **MR. JACOBS:**  Something that may sound a little

6   detailed has been -- I've been ruminating on, in light of Your

7   Honor's instruction on impeachment.

8          So, as I understand it, if a witness departs from

9   prior testimony --

10         **THE COURT:**  Come up here so the court reporter can

11  hear you.

12         **MR. JACOBS:**  Thank you.

13         If a witness departs from prior testimony, the

14  protocol is to address Your Honor, say -- you'll have the

15  deposition transcript -- "Your Honor, I would like to play the

16  video clip of lines so and so to so and so."

17         Your Honor would look at the transcript, see if it's

18  impeaching prior testimony, and then that is the end of it.

19  The jury hears the contrary testimony.

20         As I understand your direction on this, one is not to

21  engage in a dialogue with the witness about:  Were you under

22  oath?  Did you understand that you were -- that the testimony

23  you were giving then could be used in court?  Et cetera.

24         So that's the predicate to the question I'm going to

25  ask.  So do I have an understanding so far?

1          THE COURT:  It's 99 percent correct.  All right.  So

2   go ahead.  Give me your question.

3          MR. JACOBS:  So the question is this.  Impeachment

4   leaves a factual question on the record.  Is it permissible

5   under Your Honor's trial guidelines to go back to the witness

6   and ask the witness to -- a question that would conform the

7   actual testimony on the record of that witness to the prior

8   testimony?

9          THE COURT:  For the cross-examiner to do that or for

10  the proponent of the witness?

11         MR. JACOBS:  The cross-examiner.

12         THE COURT:  I'm sorry, give me a more -- I don't

13  understand what you're saying.

14         MR. JACOBS:  Sure.

15         THE COURT:  Why would the cross-examiner want to

16  rehabilitate the witness?

17         MR. JACOBS:  The cross-examiner would not.  The

18  cross-examiner would want the witness to conform his testimony

19  to the prior admission.

20         THE COURT:  Prior admission by that same witness.

21         MR. JACOBS:  Exactly.  So the witness testified in

22  his deposition the light was red.  On the stand the witness

23  testifies the light is green.  Your Honor, I would like to show

24  the videotaped testimony of this witness at his deposition,

25  page 34, lines 10 through 15.  We play the videotape.

```
 1              So the witness's testimony on the stand has now been

 2    impeached by the deposition.  Now I would like to ask the

 3    witness, because it's important to me that what was said at the

 4    deposition be on the record as a correction --

 5              THE COURT:  Oh, I see your point.

 6              Okay.  The answer is, yes, you can do that.  I'll

 7    give you a scenario that I approve of, and then give you an

 8    example to the contrary, that I don't approve of, and explain

 9    why.

10              Let's say that at the deposition they said the light

11    was red.  They come in here at trial and say, I believe the

12    light was green.

13              Then you get to cross-examine.  And if you lawyers

14    don't abuse it, I would let you start off by saying,

15    Mr. Witness, you said that the light was red.  Do you remember

16    that?  The witness says, Yes.  That's so the jury will follow

17    what you're doing.  I'll come back to why that can be abused in

18    a minute.

19              But then you say, Your Honor, I would like to read

20    from page X and Y.  And you read from the deposition:

21              "QUESTION:  What color was the light?

22              "ANSWER:  The light was red."

23              All right.  Then you may ask the following question:

24              "Mr. Witness, will you stand by the testimony

25              that I just read from your deposition?"
```

```
 1              "Stand by," that's the key phrase.
 2              And then the witness will say, usually, yes, because
 3    they will be embarrassed to say anything else.  But if they
 4    say, "No, I don't agree with that anymore," then they are free
 5    to do that.
 6              All right.  The reason I am -- I don't like it when a
 7    lawyer says, "I want to refer you to your testimony a few
 8    minutes ago where you said the light was red" -- I'm sorry,
 9    "was green."
10              The lawyers sometimes take liberties, put words in
11    the mouth of the witness that they actually didn't say.  And
12    that's also why I don't like for you to say, "Isn't it true in
13    your deposition you said the light was red?"  Because if you
14    actually go back and read it, they didn't say that.  They say
15    something like, "Somebody told me the light was red."  And the
16    witness cannot remember what they said in 300 pages of
17    deposition.  So it's just best to read it.
18              So I -- you certainly have my permission to say,
19    "Will you stand by the testimony I just read from your
20    deposition?"
21              Now, if you're going to play it, a video of it, you
22    can say, "Will you stand by the testimony we just saw from your
23    deposition?"  Saw and heard, I guess.  You can rephrase it.
24              Remember that for purposes of appeal it becomes a bit
25    of a mess because the court reporter does not take down what is
```

1  played on a video.  The court reporter only takes down the

2  spoken word in the courtroom.  So you have to then put in a

3  clerk's exhibit that is a CD of what you played.  You must keep

4  exact track of that so that it won't be a problem later.  That

5  then becomes a bit of a mess for the Court of Appeals because

6  they don't have the impeaching material right there in the

7  reporter's transcript.

8            So, does that answer the question?

9       **MR. JACOBS:**  Yes.

10      **THE COURT:**  Good.  Now, that's the use of

11 depositions.

12           Now I want to say one other thing about what

13 constitutes impeachment.  Sometimes lawyers think that anything

14 that generally contradicts the general themes of the other side

15 is impeachment for any witness associated with the other side.

16 No.  That's not true.  And I won't allow that.

17           So if you are trying -- let's say the first witness

18 on the stand is somebody who testified to subject X, and you

19 want to get up there and -- to start making your points about

20 the different other things.  You can't start asking him

21 questions like, Did you know that so and so testified to X?

22 Just to start publishing to the jury your -- no.

23           Impeachment almost always has to be a direct

24 contradiction with something they previously said in a

25 deposition, a letter, e-mail, something like that.

1        I won't say that I would never allow -- here's a good

2   example, would be kind of like impeachment, like the videotape

3   of somebody who claims to be disabled when, in fact, the

4   insurance company shows that they are lugging heavy grocery

5   bags up four flights of stairs or out playing tennis.

6        But even there, there's a way to set it up.  "Isn't

7   it true that you lugged four bags of groceries up the stairs?"

8   "No, I never did that."  Then you play the video that shows

9   they did.  It's not a prior statement, but I would allow that.

10       But if you're not going to have a prior statement,

11  there's got to be something close to the video example to be,

12  quote, impeachment.

13       One last thing I need to say on the question.  For a

14  party witness you don't even need -- it can be read for any

15  purpose.  It does not have to be only for impeachment.

16       And when you say that you want to read something, I

17  will pause only briefly to let the other side object.  And I

18  mean two to three seconds.  Because if I give you more than

19  that, it will destroy the effect for the jury.  Meaning the

20  delay.  They will forget what they are waiting for.

21       So if you are on the defending side you need to be

22  Johnny on the spot and have it read -- I mean read it quickly

23  and not say things like, What page was that?  What line number

24  was that?  No.  You say, Page 69, line 1 through 10.  I'm going

25  to pause.  Proceed.  If I don't hear an objection.  So you've

1    got to be very quick on this.  Otherwise, the person doing the

2    impeachment loses the impact of that contradiction.

3              I did try a few cases.  I've seen hundreds of cases.

4    I've seen more than a thousand witness examinations in this

5    job.  I think I've seen every trick.  And -- "trick," I don't

6    mean it in a bad -- what's the word I mean?  Strategy, tactic.

7    And so you don't need more than a couple of seconds.  Maybe,

8    occasionally, I'll give you more than that.  But you've got to

9    be ready to state your objection.

10             And if it's a party -- party testimony, it's almost

11   always going to be overruled.  So you -- okay.  Can I give you

12   one last word on leading, leading a witness?  This comes up all

13   the time.

14             In my book, it's okay to lead a witness.  Both sides

15   can lead all day long.  It actually helps.  Except in one very

16   important case.  If it's a witness affiliated with you and it's

17   something important, you may not lead.

18             But, for example, the USA attorney, when they call

19   witnesses to the stand, they lead them right up to the

20   important meeting.  They'll say, On June 27th, did you have a

21   meeting with so and so?  Yes.  Was so and so present?  Yes.

22   What was said?  And then they stop leading and go to what was

23   said by whom.

24             And that way they stop leading and they just do it

25   automatically.  They are trained to do that.  In most cases

1    they do a great job.  I know you will, too.

2          It's okay with me if you lead to help put the jury in

3    the proper frame of mind.  But as soon as you get to something

4    that's controverted, you should not lead, and you should stop

5    on your own and not wait and see how much you can get away

6    with.  Otherwise, it's okay to lead, and the other side -- the

7    side that's not affiliated with the witness can lead all day

8    long.  It helps get at the truth.  So that's the leading thing.

9          And then the other thing that comes up, even with the

10   best of trial lawyers, is the double negative question.  You

11   know what I mean by that?  And it will go like this:

12          "You didn't give notice, correct?

13          **"ANSWER:**  No."

14          What does that mean?  Does that mean, yes, it's

15   correct I did not give notice, or, no, it's not correct?  It's

16   impossible to know.

17          Maybe from the inflection you could tell, but on a

18   cold record it won't be.  And I promise you even from the

19   inflection it's rare that you can.

20          In my view, the proper form of that question is, if

21   you've got to be leading on it, is, "You didn't give notice,

22   did you?"  And if they say "no" it cures that problem.

23          It's your record.  I will remind you of this because

24   I know it will happen.  It's happened in hundreds of trials

25   now.  And you just won't be able to help yourself.

1    But I urge you to think about whether you're -- you

2  know when you're using the negative in the question it

3  sometimes -- if you say a negative followed by "correct" that's

4  the formula and recipe for disaster.

5    And I bring this to your attention because I've seen

6  excellent lawyers just can't help themselves.  They like the

7  word "correct."  But you should -- when "correct" is connected

8  with a negative, it leads to this problem.

9    Okay.  Those are some of the -- I'm going to bring

10  this to a close unless you've got more to bring up with me.

11    Yes, Mr. Van Nest.

12    **MR. VAN NEST:**  Could I have an opportunity, Your

13  Honor, briefly --

14    **THE COURT:**  Of course, yes.

15    **MR. VAN NEST:**  -- on some mechanical witness issues?

16    **THE COURT:**  Fine.

17    **MR. VAN NEST:**  So we can advise our witnesses.

18    **THE COURT:**  Yes.

19    **MR. VAN NEST:**  I'm assuming under your rules that

20  within a phase -- let's take the copyright phase -- if Oracle

21  calls one of the Google employees adversely, we would be able

22  to put all of their testimony into the record while they're

23  here.

24    **THE COURT:**  No, not if there's an objection.  It

25  would depend on a case-by-case thing.

```
 1            And so if they don't object -- let's say they do

 2    object, and you say, It's only going to take five minutes, can

 3    we please do it?  I would say yes.  If it's going to be 40

 4    minutes the answer is probably going to be no, because it's

 5    interrupting the other side's case.

 6            MR. VAN NEST:  So if an adverse witness is called,

 7    Your Honor's general rule would be the scope of the cross would

 8    be limited to the scope of the direct, and you can't go into

 9    new areas?

10            THE COURT:  No, no.  If you -- it comes up all the

11    time.  And sometimes -- here's many ways to work this out.

12    Let's say you do it strictly by the book.  The answer would be

13    then you tell me how long is it going to be.  If it's five

14    minutes and very short, and it's going to save that witness a

15    second trip, by all means we'll do it.

16            But then if you say to me, well, I just want to bring

17    this up now, but we're going to call him back anyway, then

18    you're just using it for argument.

19            So, I need to know, is he coming back?  And if it's

20    going to be 40 minutes and interrupt the plaintiff's flow of

21    the case, no, we don't do that because the plaintiff has a

22    right not to have their case interrupted at that point.

23            So the other thing is, usually, the lawyers will work

24    this out.  And I've only had one or two of these cases where I

25    have to decide.  That's the practical trial answer.
```

1          When they can't agree, then I do it case by case to

2    see.   And sometimes I go ahead and let them do it to save the

3    witness a second appearances.   And sometimes I don't do it

4    because it's too much of an interruption of the other side's

5    case.

6          **MR. VAN NEST:**  Fair enough.  I'm happy to have that

7    guidance.

8          **THE COURT:**  All right.

9          **MR. VAN NEST:**  The other key question is, your rules

10   require that when giving the other side notice of a witness to

11   be called, you give notice of the exhibits that you're going to

12   use with the witness.

13          I assume that would apply whether you're calling your

14   own witness on direct or whether you're calling an adverse

15   witness.

16          In other words, those rules on giving notice of

17   exhibits ahead of time, as your rules contemplate, would apply

18   if I'm calling Mr. Ellison, for example, as an adverse witness

19   and I give them notice, I've got to give them the exhibits I'm

20   going to use with Mr. Ellison, even though, essentially, I'm

21   cross-examining him.   That's how I understand the rules.

22          **THE COURT:**  If it's solely for impeachment then you

23   don't have to give notice.  But, remember, if you -- if he

24   gives you an answer -- if you want it to go in as a

25   case-in-chief document, you should give notice.

```
1            If you want to be coy and hold it back for

2    impeachment only, the document will probably not go into

3    evidence.  But you can read from it, from the impeaching part.

4            MR. VAN NEST:  Fair enough.

5            THE COURT:  But it has to be impeachment.  It can't

6    be one of these sideswipes where -- and if he were to admit the

7    point, you would not get the document in because there wouldn't

8    be any basis to impeach.

9            MR. VAN NEST:  Understood.  Understood.

10            THE COURT:  I hope it's clear.  I hope I said in my

11    guidelines that impeachment documents do not have to be

12    disclosed.  But the penalty for that is, even if you do it

13    right, you may lose the chance to get a good document in in

14    your case-in-chief.

15            MR. VAN NEST:  You did.  I just wanted to be sure

16    that the disclosure rules outside of impeachment apply whether

17    you're calling someone that's a direct witness that's your own

18    party or an adverse witness.  And they do.

19            THE COURT:  They do.

20            MR. VAN NEST:  They do.  Understood.

21            Both sides have listed a large number of will call

22    witnesses for the copyright phase.  And I'm wondering if Your

23    Honor would entertain some deadlines prior to trial, next week,

24    in which each side exchanges a good faith will call list.

25            I'm thinking about middle of next week --
```

1      **THE COURT:**  I've had this problem in other trials,

2  and I will give you the solution I came up with in the big

3  criminal case where exactly this problem came up.

4      Let's say we pick the number 12, and you have a --

5  the person who is putting on the witnesses, it will be the

6  plaintiff at some point.  But we'll turn to you at some point

7  and you'll be putting on your case, and you have a rolling list

8  of 12 witnesses.

9      You cannot call anyone to the stand unless they have

10  been on that list for 72 hours -- I think it was 37 hours, is

11  what we came up with.  Don't ask me how we got that.  There is

12  a reason for it.  But it works from like 5 o'clock until, you

13  know, a day and a half later.  And that was a list that you

14  updated every day, and you would have 12 people on there.

15      So then the other side would know they've got to

16  prepare for 12 different crosses.  But they know for sure it's

17  not going to be somebody else.  It won't be number 13, who

18  comes out of left field.

19      Now, it doesn't have to be 12.  It could be -- in a

20  criminal case where you have a lot of short witnesses, you

21  needed that much flexibility.  In a case like this, maybe the

22  answer is six, that you -- if that is a problem, I'll tell you,

23  I am going to enforce a rule like that.

24      You cannot have 25 people or 20 people listed as the

25  people you're going to call and just force the other side to do

1    a lot of busywork.  And I will put my foot down on that one and

2    just say -- and then you'll be deemed to have rested if you

3    have nobody on your list that you can call.

4            **MR. VAN NEST:**  Let us work together, and with that

5    guidance I think we will be able to work it out.

6            **THE COURT:**  You let me know.

7            **MR. VAN NEST:**  We will.

8            **THE COURT:**  I think this rule worked pretty well in

9    that other case.  I think it would work okay here.  And you

10   lawyers could agree on what the magic number is.  So I won't

11   order that yet, but I think you two should just agree on some

12   procedure like that to sort this out.

13           **MR. VAN NEST:**  Thank you.  We'll try to do that.

14           Last issue, Your Honor, is -- pertains to the

15   copyright phase.  And that is, in light of what we all know are

16   somewhat complex rules affecting the copyright case, would Your

17   Honor entertain a slightly more elaborate set of

18   preinstructions?

19           I'm not intending that you would preinstruct on the

20   entire set of copyright liability.

21           **THE COURT:**  Sure.  I would be happy to look at what

22   you have to say.  I'm all in favor of giving as much guidance

23   as I can to the jury, without saying something that I regret.

24   Because that could happen.

25           And so if you want to submit some short

1  three-or-four-page proposal -- I'm going to say something, but

2  I would make it general at first.  And then when we instruct

3  the jury, it would be detailed at the end of the evidence.

4          But I'm in favor of what you're proposing.  It's just

5  that I don't want to -- I don't want to regret that I said

6  something about the copyright law that turns out to be wrong.

7          **MR. VAN NEST:**  We'll keep that in mind, of course,

8  Your Honor.

9          **THE COURT:**  So both sides can be happy to receive

10  those proposals.

11          **MR. VAN NEST:**  We'll do it.  That's all I have, Your

12  Honor.  Thank you.

13          **THE COURT:**  Mr. Cooper, please come forward.  You had

14  a question.

15          **MR. COOPER:**  Yes, I do, Your Honor.  On behalf of

16  Dr. Kearl, I have -- I'm in a rather unique situation.  I have

17  a couple of questions.

18          One is, as you know, we have delivered Dr. Kearl's

19  report to you in chambers.  We have not filed it because it

20  contains confidential information.

21          Last night, I delivered a copy -- a draft copy of his

22  deposition.  His deposition was taken Monday.  The rule -- Your

23  Honor's order of September 9th provides that after you have

24  received the report and the deposition, you may direct

25  questions to Dr. Kearl.

```
 1              I've raised this with counsel for the party.  And I

 2   wanted to inquire as to --

 3              THE COURT:  Have both sides now deposed him?

 4              MR. COOPER:  He has been fully deposed.  And they

 5   have until April 2nd to file challenges.

 6              THE COURT:  So the question to me is what?

 7              MR. COOPER:  The question to you is, your order of

 8   September 9th provides that you have an opportunity to ask him

 9   questions based upon his report and his deposition.

10              And my question was when you would intend to do that,

11   if you're going to do it, and would it be in advance of the

12   opportunity for counsel to file their challenges to Dr. Kearl?

13              THE COURT:  Very good question.  I'll have to think

14   about it and try to get out an answer today.  I just don't want

15   to -- I don't know.

16              MR. COOPER:  Okay.

17              THE COURT:  Can I raise one with you?  When we

18   present Dr. Kearl, you're going to do the examination.

19              MR. COOPER:  I will do the direct examination, yes.

20   And one of the questions -- another question I had for the

21   Court is, will there be a time limitation on the amount of time

22   that Dr. Kearl can testify both direct and cross?

23              THE COURT:  It will be in addition to -- it won't

24   come out on -- the direct won't come out of anybody.  The cross

25   might come out of somebody's time, but the direct is going to
```

```
 1  be in addition to.

 2          MR. COOPER:  Okay.

 3          THE COURT:  And I don't know.  When we get closer,

 4  I'd be in a better position to tell you.  But if the -- if the

 5  two other experts, say, each take an hour on direct then,

 6  certainly, he should get at least an hour on direct.

 7          So my thinking is that at least an hour and maybe

 8  more would be in order for the direct examination.  Could be as

 9  much as two hours.  Somewhere in that range.

10          MR. COOPER:  Okay.  And my final question or comment

11  is that the -- Your Honor's order of September 9th leaves open

12  how Dr. Kearl will be presented to the jury.  I've raised this

13  with counsel for the parties.  And this is still an open

14  question.  I'm not sure we're going to resolve it this morning,

15  but how he will be identified to the jury has not been

16  resolved.

17          THE COURT:  What do you all propose?

18          MR. COOPER:  I am indifferent.  I believe that what

19  has happened in other cases is that he is just identified to

20  the jury as an independent expert, and then counsel for the

21  parties are instructed that they cannot question deeper than

22  that.

23          THE COURT:  Well, the jury would have to understand

24  that he has not been retained by either side.

25          MR. COOPER:  Right.
```

1          **THE COURT:**  It might come out that he's being paid,

2   and paid by both sides.  But I think -- I'd like to get the

3   input of the lawyers on what you wanted me to say on this, and

4   what he should say.

5          **MR. COOPER:**  I'm indifferent.

6          **MR. VAN NEST:**  Your Honor, I think something very

7   short.  He's an independent expert who is not retained by the

8   parties, but he's been appointed by the Court.  Just that much.

9          **THE COURT:**  What does Mr. Jacobs say?

10          **MR. JACOBS:**  I think we would like to consider and

11   report back to you on that, Your Honor.

12          **THE COURT:**  Okay.  Can you do that by Friday at

13   4:00 p.m.?

14          **MR. JACOBS:**  Sure.

15          **THE COURT:**  All right.

16          **MR. COOPER:**  That's all I have.  Thank you.

17          **THE COURT:**  Those are great questions.

18          **MR. NORTON:**  Your Honor, I have one further question.

19          **THE COURT:**  Sure.

20          **MR. NORTON:**  Brad Norton.

21          With respect to Dr. Kearl, under Rule 706, the

22   court-appointed expert can be called by any party.  And so if a

23   party were to call Dr. Kearl and examine him directly, would

24   the party's time limits apply, or would that be treated as

25   separate time?

1    **THE COURT:**  If you call him, it's definitely going to

2    come out of your time.  That's for sure.

3    But I didn't realize that anyone could call him.  If

4    that's true -- is that true?  Is that what the rule says,

5    anybody can call him?

6    **MR. NORTON:**  Under Rule 706, either party may call

7    the expert appointed under Rule 706, yes, Your Honor.

8    **THE COURT:**  Even if I'm going to have him called

9    anyhow?  Or is that just an instance where if the judge -- I'm

10   going to have to look into that.

11   But to answer your question, if it's true that you

12   can do that at your own discretion then, of course, it's going

13   to come out of your time.

14   **MR. NORTON:**  Understood.  Thank you, Your Honor.

15   **MR. COOPER:**  My only question in response to that,

16   Your Honor, would be whether Mr. Norton intends to call

17   Dr. Kearl before Dr. Kearl is put on in direct examination by

18   me, or after that.

19   **THE COURT:**  Well, what's the answer to that,

20   Mr. Norton?

21   **MR. NORTON:**  I confess that is a decision we have not

22   yet made.  And if Mr. Cooper is going to -- is certainly going

23   to examine Dr. Kearl, then we'll have to decide whether, with

24   the amount of time that we have at that stage of the case, how

25   we best use it.  It may not make sense for us to use our time

1  to do an examination that Mr. Cooper can do quite well.  We

2  also need to think about what our jury presentation looks like.

3       **THE COURT:**  My own thought was that since he does a

4  critique of both sides, that it would be best for him to show

5  up after the two experts have testified, and that he would be

6  like number three in order.  That's the way I've been thinking

7  about it, but I'm open to other suggestions.

8       **MR. COOPER:**  That's what we had anticipated.  And I

9  anticipate that my direct examination of Dr. Kearl will be to

10  extract whatever his opinions are and then whatever his

11  comments are, whether they are criticisms or comments as to the

12  other experts, which I had anticipated would come after the

13  other experts had testified.

14       **THE COURT:**  That's the way I've been thinking about

15  it, too.  But I won't say -- I've got to look at this question

16  of whether or not someone can jump the gun and bring the --

17  that person in, the 706 expert in, in addition to -- would this

18  be in addition to your own expert?

19       **MR. NORTON:**  Yes, Your Honor.

20       Under Rule 706, a court-appointed expert may be

21  called by any party.  And we would be entitled to call that

22  expert in addition to Professor Cockburn.

23       **THE COURT:**  You may be right.  I'm not going to say

24  you're right yet because that scenario is coming up new.  Let's

25  see.

1          It says:  The witness may be called to testify by the

2     Court or any party.  Further, the witness shall be subject to

3     cross-examination by each party, including a party calling the

4     witness.

5          The way I would read this is that this would be

6     subject to the Court's normal ability to control the sequence

7     and order of proof, and that since -- I think what this means

8     by "or any party" is contemplating a situation where the

9     Court -- the witness is otherwise not going to appear.  But we

10    know he is going to appear and that Mr. Cooper is going to do

11    the examination.

12         And so without the benefit of any research, I would

13    say that you may not call him in your case on account of the

14    fact that he's going to be called by Mr. Cooper after both

15    experts have testified, and that his testimony will make a lot

16    more sense after both of the other experts who he's critiquing

17    have come to the jury and said their peace.

18         So this sounds like a gimmick, Mr. Norton, a gimmick

19    to seize control of the stage and prevent him from having his

20    say.

21         Now, if you come up with some authority that says I'm

22    wrong on this, I will be open to hearing it.  But we're not

23    going to do that.  We're going to -- you put on your expert,

24    Cockburn, and then Van Nest's expert comes, and then

25    Mr. Cooper's expert comes.

1          Unless somebody shows me authority that's wrong,

2    that's the way it's going to be.

3          **MR. NORTON:**  Thank you, Your Honor.

4          **MR. COOPER:**  Thank you, Your Honor.

5          **THE COURT:**  What else do we have today?

6          **MR. VAN NEST:**  Nothing else, Your Honor.

7          **MR. JACOBS:**  Nothing from us, Your Honor.

8          **THE COURT:**  Most interesting trial, it's going to be.

9    World Series.  Game 7.

10         (Laughter)

11         **THE COURT:**  See you then.

12         (At 11:22 a.m. the proceedings were adjourned.)

13                       -  -  -  -

14

15                 **CERTIFICATE OF REPORTER**

16         I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19   DATE:   Monday, April 2, 2012

20

21              s/b Katherine Powell Sullivan
          _____

22         Katherine Powell Sullivan, CSR #5812, RPR, CRR
                     U.S. Court Reporter

23

24

25