Volume 1

Pages 1 - 223

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | | |
|---|---|---|
| ORACLE AMERICA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. C 10-3561 WHA |
| | ) | |
| GOOGLE, INC., | ) | |
| | ) | |
| Defendant. | ) | San Francisco, California |
| _____ | ) | April 16, 2012 |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          MORRISON & FOERSTER
                           755 Page Mill Road
                           Palo Alto, California  94304
                  BY:  **MICHAEL A. JACOBS, ESQUIRE**
                       **KENNETH A. KUWAYTI, ESQUIRE**
                       **MARC D. PETERS. ESQUIRE**
                       **DANIEL P. MUINO, ESQUIRE**

                           BOIES, SCHILLER & FLEXNER
                           1999 Harrison Street, Suite 900
                           Oakland, California  94612
                  BY:  **DAVID BOIES, ESQUIRE**
                       **WILLIAM F. NORTON, ESQUIRE**
                       **STEVEN C. HOLTZMAN, ESQUIRE**

(Appearances continued on next page)

*Reported By:  Katherine Powell Sullivan, RPR, CRR, CSR #5812*
              *Debra L. Pas, RMR, CRR, CSR #11916*
              *Official Reporters - U.S. District Court*

**APPEARANCES (CONTINUED):**

For Plaintiff:            ORACLE AMERICA, INC.
                          500 Oracle Parkway
                          Redwood Shores, California  94065
                    BY:   **ANDREW C. TEMKIN, CORPORATE COUNSEL**
                          **DORIAN DALEY, GENERAL COUNSEL**
                          **SAFRA CATZ, PRESIDENT AND CFO**


For Defendant:            KEKER & VAN NEST
                          633 Battery Street
                          San Francisco, California  94111-1809
                    BY:   **ROBERT ADDY VAN NEST, ESQUIRE**
                          **DANIEL PURCELL, ESQUIRE**
                          **MICHAEL S. KWUN, ESQUIRE**
                          **CHRISTA MARTINE ANDERSON, ESQUIRE**


                          KING & SPALDING LLP
                          1185 Avenue of the Americas
                          New York, New York 10036-4003
                    BY:   **BRUCE W. BABER, ESQUIRE**


ALSO PRESENT:             **CATHY LACAVERA**
                          **Corporate Representative Google**


                          —   —   —

PROCEEDINGS

1

2                    **P R O C E E D I N G S**

3  APRIL 16, 2012                          7:29 a.m.

4

5           THE CLERK:  Civil action C10-3561 WHA, Oracle

6  America, Inc. versus Google, Inc.

7           Counsel, can you please state your appearances for

8  the record?

9           MR. JACOBS:  Good morning, your Honor.  Michael

10 Jacobs, Morrison and Foerster for plaintiff Oracle America.

11          With me at counsel table in clockwise order Dan Muino

12 from Morrison and Foerster.

13          THE COURT:  Say that name again, please?

14          MR. JACOBS:  Dan Muino.

15          THE COURT:  How do you spell that last name?

16          MR. JACOBS:  M-U-I-N-O.

17          THE COURT:  M-U --

18          MR. JACOBS:  -- I-N-O.

19          THE COURT:  Got it.  Okay.

20          And?

21          MR. JACOBS:  Fred Norton from Boise Schiller.

22          THE COURT:  Okay.

23          MR. JACOBS:  Andrew Temkin from Oracle.

24          THE COURT:  Okay.

25          MR. JACOBS:  Safra Catz, the president and chief

```
 1  financial officer of Oracle.

 2            THE COURT:  Say that last name?

 3            MR. JACOBS:  Catz, C-A-T-Z.

 4            THE COURT:  C-a-t-z.  And?

 5            MR. JACOBS:  Ms. Catz will be our corporate

 6  representative, your Honor.

 7            THE COURT:  Thank you.  Welcome.

 8            MR. JACOBS:  And David Boise from Boise Schiller.

 9            THE COURT:  Welcome.

10            MR. JACOBS:  And Dorian Daley, general counsel for

11  Oracle.

12            THE COURT:  Very good.  And welcome to all of you.

13            And?

14            MR. VAN NEST:  Good morning, your Honor.  Bob

15  Van Nest, Keker and Van Nest for Google.

16            Here with me is Christa Anderson.  Dan Purcell.

17  Bruce Baber at the end of the table.  Michael Kwun.  Our

18  corporate representative Cathy Lacavera from Intel.

19            THE COURT:  Lacavera?

20            MR. VAN NEST:  L-A-C-A-V-E-R-A.

21            THE COURT:  All right.  Got it.  Thank you.

22            MR. VAN NEST:  And Michael Titinsky is here.  He's

23  here to help us select a jury.  And that's our crew at the

24  table.

25            THE COURT:  Okay.  Great.  Thank you.
```

PROCEEDINGS                                                         5

```
 1          All right.  Welcome.  Do you need so many people on

 2   that front row?  I just say that because I don't like people

 3   that close to the jury.  I need for you to keep your distance

 4   from the jury.

 5          MR. JACOBS:  Mr. Weinberg will join us during jury

 6   selection, your Honor.  He's our consultant.  Otherwise, we can

 7   move people back over.

 8          THE COURT:  All right.  Welcome to all members of the

 9   public, the press.  We're here for jury selection and opening

10   statements today, possibly the first witness.

11          I have denied your motions in limine.  The order went

12   out earlier.  If you're going to file a motion in limine on

13   that expedited schedule that you came up with -- which is fine,

14   I don't mind the schedule -- you may not rely on anything under

15   seal.  The reason is that if you file something under seal, we

16   don't get it for at least 36 hours.  It goes to a special

17   place.  Armed guards carry the material around.  We don't get

18   it in chambers for a long time.  So if you're sitting there

19   thinking that we get it instantly, it's not true.  We don't.

20   So we can only see the public part.

21          There was one part about a letter from Mr. Ellison

22   which I have not yet ruled on.  That was under seal.

23          That leads me now to a second thing.  This is a

24   public trial.  The press and the public have the right to see

25   these documents.  Now, mechanically I don't know how I'm going
```

PROCEEDINGS

1  to do that unless you put them down there in the press room,

2  but the idea that you can just file things under seal and that

3  the public and press won't have access to it is wrong.  Please

4  read the *Kamakana* case in the Ninth Circuit.  This is a public

5  institution.  You have chosen to litigate this in public and

6  that's what we're going to do.  And unless it's the recipe for

7  Coca Cola, it's going to be out there for public view.

8         The mere fact that it revealed something about your

9  finances, that's nothing.  Come on.  The public can see that

10  all day long.  If it reveals something embarrassing about the

11  way one of these companies works, too bad.  It's going to be

12  out there for the public to see.

13         So only if it really meets the *Kamakana* test in the

14  Ninth Circuit is anything going to be put under seal, and even

15  then we're going to refer to it in open court.  How else can we

16  run a trial?

17         So I'm asking you to put your exhibits, without

18  redaction, in the press room at the end of each day so that

19  members of the press can see what's been going on.

20         Okay.  I would like for you to give me your glossary

21  of the top 40 terms so this can be of assistance to the jury.

22  I still have not received anything like that from the lawyers.

23         Does anyone want to address that point?

24         **MR. JACOBS:**  We have a glossary, your Honor.

25         **THE COURT:**  That's great.  May I see it, please?

PROCEEDINGS

```
1              (Whereupon, document was tendered

2               to the Court.)

3         THE COURT:  Is this agreed to?

4         MR. JACOBS:  Yes, your Honor.

5         THE COURT:  Okay.  What we will do then after the

6   jury is selected, we will give a copy of this to each member of

7   the jury and then it can -- they can use it as they wish and

8   make notes on it and so forth.  So that's great.  Thank you for

9   doing that.

10             All right.  A few things about the trial in general.

11  One of the issues that the judge has got to decide in this case

12  is whether or not the 37 APIs are copyrightable or not.  I

13  think this is the most interesting problem.  I've read all of

14  those briefs that you've submitted, and I requested a lot of

15  those briefs myself because I don't know the answer to this

16  problem yet.

17             But you must remember, as I've said earlier, it's not

18  just a legal question.  It also depends on the facts, and I'm

19  going to decide it based on the facts in the record of the

20  trial.  The record of the trial.  You must remember that.  So

21  if you think some fact is important on copyrightability, you

22  must prove it, okay?

23             Now, that leads to a different issue, which is, I

24  said this to you once before and said if you thought there was

25  something that you wanted to make sure was established for
```

PROCEEDINGS

1  purposes of trial, to make your motions.

2         Now, I believe, Mr. Van Nest, you did make such a

3  motion and I ruled on that, right?

4         **MR. VAN NEST:**  That's correct, your Honor.

5         **THE COURT:**  I denied one and granted two.

6         **MR. VAN NEST:**  That's right.

7         **THE COURT:**  One with a caveat.

8         And then Oracle came back asking for five, I believe.

9         **MR. JACOBS:**  I think that's right.

10        **THE COURT:**  And I have not yet ruled on that, and I

11 will get that out soon.

12        But the issue that I want to raise with you, and we

13 have plenty of time -- not plenty of time, but some time -- is

14 the difference between something coming in as an item of proof

15 versus being conclusively established.  You see the difference?

16 A judicial admission that's conclusive versus an item of proof.

17        I don't care which way we go on that as long as if

18 you both stipulate that these are going to be conclusive, fine.

19 If you stipulate that it's just going to be an item of proof

20 and you can -- each side can put in additional proof and we'll

21 just say to the jury, "For example, at various points in this

22 case Oracle has admitted that Java is free and open for anyone

23 to use," or "the Java programming language," or however that

24 was worded.  And then, but you can put in contrary proof if you

25 want, or modifying proof.  I'm okay with that.

PROCEEDINGS

```
 1            I'm also okay with saying it's been judicially
 2   established and conclusive.
 3            It won't matter so much for my purposes, but I
 4   don't want this to be a point on appeal that somehow the judge
 5   goofed that part of it up.
 6            So I guess what I'm asking you is before I rule on
 7   the pending motion by Oracle, I would like for you both to
 8   submit a brief -- for the moment I would just say this is going
 9   to be items of evidence, but one of those things, one of the
10   items in Mr. Van Nest's motion the Court actually did rule as a
11   matter of law.  That was the one about names, and so that's not
12   really even part of this.
13            But I want you to tell me whether or not the items
14   are conclusive or merely items of proof.  And if you both were
15   to agree on it, that would be fine.  If you don't agree, then
16   give me your points and authorities and let me know how you
17   feel about it.
18            So try to give me that by 5:00 p.m. today.  All
19   right?  Okay?  On both -- not only on the ones that I've
20   already ruled on, but the ones that Oracle has pending.  Okay?
21            MR. VAN NEST:  Okay, your Honor.
22            THE COURT:  Is that enough time?  If you want more
23   time, I will give you more time.
24            MR. VAN NEST:  We'll meet-and-confer when we get a
25   break and go from there.  Thank you.
```

PROCEEDINGS

1        **THE COURT:**  All right.

2            On the terminology of how we -- I want to bring to

3    your attention, I think we need a clear-cut way to use the term

4    "specification."  Does that mean the user manual or does that

5    mean the technical way in which it actually works, which may or

6    may not be in the user manual?  And the lawyers have used the

7    term in multiple ways.

8            This will be a case where it probably benefits

9    everyone to be clear-cut in the way we use those terms.  That's

10   the one that calls out, cries out the most for a clear-cut

11   usage.  At this point I urge you to be clear in what you mean

12   by the word "specification" when we're talking to the jury.

13           All right.  That's all I have on my list.  Any issues

14   for the plaintiff?

15       **MR. JACOBS:**  Your Honor, I think the most urgent

16   would be the few objections we each have with respect to each

17   other's opening statement slides.

18       **THE COURT:**  All right.  I'm all ears.  Go ahead.

19       **MR. JACOBS:**  In our case, your Honor, I'm going to

20   have to link back to the topic you raised, which is the ruling

21   on the -- the deemed admitted ruling on the issue of law as it

22   relates to names.

23           As your Honor indicated, that is in a somewhat

24   different category from a fact which we will be -- as to which

25   we will be briefing the legal status of.  It was a ruling by

PROCEEDINGS

1   your Honor in summary judgment.  It's in the nature of a legal

2   instruction, I think, to the jury.

3          **THE COURT:**  Right.

4          **MR. JACOBS:**  And we've had -- part of our motion to

5   you on that was that for the jury only to hear that the names

6   have been ruled uncopyrightable doesn't tell the whole story

7   and it shows up in the opening slides of Google, because that's

8   now being featured as kind of a dispositive answer.

9          So, may I have the Elmo?

10         **THE COURT:**  Well, okay.  Go ahead.  I don't

11  understand the point yet, but...

12         (Document displayed)

13         **MR. JACOBS:**  So in slide four, for example, of

14  Google's opening presentation Google would like to tell the

15  jury that the names of the various items --

16         **THE COURT:**  This is easy.  We're not going to start

17  showing the jury my orders.  Period.  So that one is out.

18  We're not going to show the jury rulings of law that the judge

19  has made.  No.  Okay.  Stick to the facts.

20         Okay.  What's the next one?

21         **MR. JACOBS:**  So this comes up again.  Just to make

22  sure we're complete.

23         (Document displayed)

24         **THE COURT:**  No.  We're not going to get -- you can

25  say it.  You can say:  We're going to show in this case that

PROCEEDINGS

1  the Java programming language is open and free for anyone to

2  use.  You can say that, Mr. Van Nest, but you're not going to

3  quote from my order.  No.  That's not right.

4          But I'm not saying you can't make the point.  You

5  just can't say the judge has ruled this already as a matter of

6  law.  In due course I will tell them that.

7          **MR. JACOBS:**  I think that will enable us to resolve

8  two-thirds of our concerns with Google's opening.

9          The other is the -- is that your Honor's order this

10 morning leaves open the question of the statements by Jonathan

11 Schwartz and whether they are going to come in.

12          **THE COURT:**  Remind me what those statements were?

13          **MR. JACOBS:**  So Jonathan Schwartz said when Android

14 was launched various statements on a blog posting complimenting

15 Android and welcoming it to the Java community.  And our point

16 here is really just to renew the objection that absent any

17 evidence of reliance by Google on these statements, it's

18 improper, it's irrelevant --

19          **THE COURT:**  No, no.  That's denied.  They can use

20 that.  And if it turns out that they can't prove the whole

21 thing, then too bad for them, but that statement will be

22 allowed.

23          **MR. JACOBS:**  That covers our objections.

24          **THE COURT:**  All right.  Thank you.

25          Mr. Van Nest?

PROCEEDINGS

1          **MR. VAN NEST:**  Your Honor, with respect to the -- to

2   what I'll call the deeming issues, the two deeming issues that

3   Mr. Jacobs addressed.  What I would like to request, I would

4   like to just take off the reference to your Honor's order.  I

5   understood that once we made our motion and it was granted, I

6   could say to the jury the language is free and open --

7          **THE COURT:**  You can say that.

8          **MR. VAN NEST:**  (Continuing) -- and the names are not

9   protectable either.

10          **THE COURT:**  You can say that.

11          **MR. VAN NEST:**  I can say all that?

12          **THE COURT:**  Yes.

13          **MR. VAN NEST:**  Can I present a slide that says that?

14   Just take the reference to your Honor's order off that?

15          **THE COURT:**  You can do that so long as you don't have

16   it in quotes or something.

17          **MR. VAN NEST:**  Fine.

18          **THE COURT:**  Just like as an argument point, you can

19   do that.

20          **MR. VAN NEST:**  We'll do it.  That's what we'll do on

21   those.  Thank you.

22          So I had four issues on their slides.  The first one

23   in Slide 12.  If we could have that up?

24          (Document displayed)

25          They want to tell the jury in opening that Oracle

PROCEEDINGS

1   paid $7.4 billion to buy Sun.

2          Now, as your Honor knows from the various *Daubert*

3   motions, they have been dying to throw big billion dollar

4   numbers around.  That number has no bearing on any issue in the

5   case.  It's not a payment for Java.  It's a payment for the

6   whole company; hardware, software, employees, everything.

7          It's just another attempt on Oracle's part to throw

8   big numbers around.  The experts don't rely on it.  Not even

9   Dr. Goldberg relies on it, nor Dr. Leonard, nor Dr. Kearl.  And

10  I think it would be prejudicial to be throwing around a

11  $7.4 billion number.

12          **THE COURT:**  Let's hear the response.

13          **MR. JACOBS:**  Your Honor, Google at the very least has

14  opened the door to this.  Google will be arguing that Java was

15  degraded by the time of the acquisition; that it wasn't

16  valuable, and that Android is the new big thing.

17          Mr. Ellison will testify and made statements at the

18  time -- this is not a statement being made for the first time

19  in litigation -- that the most important asset Oracle acquired

20  in the Sun acquisition was Java and that it was very valuable

21  and very important to Oracle, worth buying Sun for

22  $7.4 billion.

23          **THE COURT:**  Wait, wait.  But are you saying that the

24  only thing, the only asset that the company had was Java?

25          **MR. JACOBS:**  No.  But Mr. Ellison will testify that

1   Java was the most significant software acquisition Oracle had

2   ever made and that it was the more important aspect driving the

3   acquisition of Sun.

4           THE COURT:  He's going to testify?

5           MR. JACOBS:  I'm sorry?

6           THE COURT:  He's going to testify on this point?

7           MR. JACOBS:  Yes.

8           THE COURT:  Mr. Van Nest, why wouldn't you relish the

9   opportunity to cross examine him on this?

10          MR. VAN NEST:  Well --

11          THE COURT:  Why are you complaining about this?

12          MR. VAN NEST:  I'm certainly relishing the

13  opportunity to cross examine him, your Honor, but why should he

14  -- and he can certainly testify that Java was important and he

15  thought it was a great thing, but to throw a $7.4 billion

16  number in when it has no bearing on any issue, it's certainly

17  not a payment for Java, and it's not been relied on by any

18  expert.  It's not part of the analysis.

19          THE COURT:  All right.  I'm going to allow him to say

20  that because I believe that you will be able to put it in the

21  proper context on cross-examination.

22          Now, I do want to say this to Oracle.  I am sensitive

23  and have ruled against you in the past.  The idea that you can

24  throw big numbers in front of the jury and hope to somehow jack

25  up the damage award, if there is one, by making this seem like

PROCEEDINGS

1  a big case, when maybe it's not really a big case -- I don't

2  know.  It's up to the jury whether it's a big case.  But that

3  is not going to be allowed.

4          So I'll let you put out the number 7.4 as a

5  background fact only, but if it starts to looking to me like

6  you're trying to -- what's the word I'm looking for --

7  springboard that into a large damage award, I'm going to

8  intervene myself.  There is absolutely no proof that Java was

9  worth $7.4 million -- or billion dollars.  So you be very

10  careful on how you proceed with that, because I am suspicious

11  of your motives.

12          **MR. JACOBS:**  Understood, your Honor.  We will give

13  you know cause for further suspicion.

14          **THE COURT:**  Thank you.

15          But I am also confident that Mr. Van Nest will put

16  that in proper context whenever cross-examination of

17  Mr. Ellison occurs.

18          All right.  What's your next point?

19          **MR. VAN NEST:**  Slide 34 contains essentially legal

20  argument on a key issue.  This is a slide --

21          **THE COURT:**  Can you show it to me, please?

22          (Document displayed)

23          **MR. VAN NEST:**  This is the slide they want to show:

24  "When is a Java license necessary?"  That's a legal issue.

25          It's the second box I'm worried about, because that's

1   the key issue for your Honor to decide and this slide assumes

2   it's been decided and is essentially telling the jury what the

3   jury instruction will be before we know it.

4            "Provides class libraries based on Java API" --

5            **THE COURT:**  I'm going to allow this one because it's

6   borderline.  I think it's close to the line.

7            But, you know, I want you to know over there,

8   Mr. Jacobs, if you go out on a limb and I rule against you on

9   copyrightability and all you've got left are seven lines of

10  code, or whatever it was, that's a problem of your own making.

11  So if you want to go out on the limb with this slide, fine, but

12  it's a matter -- I'm not going to say they can't do that.

13           All right.  What's next?

14           **MR. VAN NEST:**  Slide 84 is an exhibit.  It's a

15  document it references Java lawsuits.  This document was never

16  shown to any witness in the case.  The author of it was not

17  working on Android.  There is no mention whatsoever in this

18  entire email about Android and, yet, they are putting it up in

19  an effort to somehow suggest that the folks working on Android

20  were aware of Java lawsuits.  And so this thing is probably not

21  going to make it into evidence.  It ought to be reserved for

22  later.

23           **THE COURT:**  Let's find out.  How are you going to get

24  this one into evidence?

25           **MR. JACOBS:**  Through the recipients, your Honor,

PROCEEDINGS

1  Mr. Lindholm and Mr. Lee will be witnesses at trial.

2          The background to this is there is a discussion along

3  the -- in the thread of an acquisition proposal to actually go

4  out and buy Java from Sun.  And in the rest of the email thread

5  there is a discussion of how that would save Sun litigation

6  fees and how this will resolve lawsuits that are -- and we will

7  argue that this shows that contrary to the idea that Google had

8  been -- was relaxed based on statements by Mr. Schwartz, for

9  example.  We will argue that this shows that Google knew that

10  Sun was still very concerned about Java and that Sun would be

11  asserting its rights.

12          **THE COURT:**  Well, this lawsuit didn't come along

13  until more than a year later.

14          **MR. JACOBS:**  That is the logical step, your Honor.

15  There are no other Java lawsuits pending -- there are no other

16  Java legal issues for Google.  The only legal issues for Google

17  have to do with Java and Android.

18          And so when the word "lawsuits" is being referenced

19  there, we will argue the natural inference is legal issues or

20  lawsuits to come.

21          So just to step back.  Google will argue that Sun was

22  quiet about Android and the Java and Android.  And, in fact,

23  there is lots of evidence that that's not true.  But that will

24  be their argument.

25          And this email thread about the benefits to Google of

1  buying Java shows that they were concerned about their legal

2  risk in February of 2009 and were not put in a state of quiet.

3  They were -- they had no reason to think that Sun was backing

4  away from the assertion of its rights.  And especially when it

5  refers to patents and copyrights relating to Java.  That's

6  exactly what's at issue in this case.

7          THE COURT:  This is before Oracle purchased Sun?

8          MR. JACOBS:  That's correct.

9          THE COURT:  Was there any threat from Sun?

10         MR. JACOBS:  There were a lot of communications from

11  Sun to Google over the years.  Some included threats.

12         THE COURT:  I'm not able to rule on this one now.

13  I'm not going to let you use this til I -- until I can analyze

14  it further.  This is -- this is potentially too prejudicial to

15  show to the jury if it doesn't get into evidence.

16         So I think you can make the general argument in

17  opening that you're going to be able to prove that Google was

18  aware of and knew all about the threat of a lawsuit and so

19  forth, but I don't want you to put this up until it actually

20  gets into evidence and I can understand better the context of

21  what the writer was even talking about here.

22         MR. JACOBS:  Your Honor, we have a copy of it, if it

23  would help to take a look at it.

24         THE COURT:  I will, but -- let me see it.

25         While we're doing that, what's your next point?

PROCEEDINGS

1              MR. VAN NEST:  My last point, your Honor, is Slide 8.

2     They want to show the jury a slide with a bunch of licenses on

3     it.  Now, again, these licenses are not relevant to any issue

4     in the case.  The experts haven't relied on them --

5              THE COURT:  No, no.  You can't do that.  What are you

6     talking about?  You're going to put something up there about

7     licenses the jury is never going to hear about in evidence?

8              MR. JACOBS:  No, they will hear, your Honor.

9              THE COURT:  What did you just say to me,

10    Mr. Van Nest?  You said they won't hear about them.

11             MR. VAN NEST:  I said they are not relevant to

12    anything in the case.  They haven't been relied by any of the

13    experts.  We are in a copyright phase now, so there is no

14    validity challenge to the copyrights.  They've got licenses up

15    here that have nothing to do with smart phones.  They are not

16    relevant to any -- the experts in some cases analyzed the

17    licenses and they come into play, as your Honor knows, in

18    evaluating damages.  No expert is relying on these.

19             And I would point out that -- I'm going to get to a

20    press release in a minute when we talk about jury selection,

21    but I expect them to argue that everybody else in the industry

22    took licenses except for Google, and Google is a bad actor.

23    And they want to put this slide up to show, quote, everybody

24    else that took licenses.

25             THE COURT:  Just a second.  Is this -- why is this

PROCEEDINGS

```
 1  relevant to the copyright part?

 2          MR. JACOBS:  This is relevant to the copyright, your

 3  Honor, because we will -- Mr. Van Nest is right.  We will be

 4  arguing that there is a whole mechanism established to enable

 5  the implementation of compatible versions of Java; that every

 6  other company in the industry is happy with that arrangement

 7  and takes a license from first Sun and now Oracle.  Some of

 8  them make independent implementations of Java, which is what

 9  Google purports to have done here.  And Google is an outlier.

10  And Google is at odds with not only Oracle over its use of Java

11  in Android, but at odds with the industry.

12          Our mission in this lawsuit is to protect the Java

13  ecosystem, the Java environment, and not just --

14          THE COURT:  All right.  I'm going to let Oracle do

15  this because, Mr. Van Nest, I know enough about your argument.

16  You're arguing that Oracle and Sun thought that Android was

17  great and welcome aboard and no problem.

18          I think the counter to that is just what Mr. Jacobs

19  said.  So it's only fair to let him make that point.  So I'm

20  going to let him make that point.

21          But, Mr. Jacobs, you must remember.  I'm going to say

22  to the jury many times in this case:  The issue is not Java.

23  It's not Android.  It's very specific parts about Java that are

24  protected, if at all, by copyrights or patents and very

25  specific parts of Android that are accused.  So if we start
```

PROCEEDINGS

1  getting off onto this is Java versus Android, the judge is

2  going to intervene and say it's not.  So you must be very

3  careful on that.

4       **MR. VAN NEST:**  Your Honor, with one final point on

5  this.  In light of what your Honor just said, I mean, the whole

6  point of this slide is to turn this into Java versus Android.

7  And given that these licenses have not been relied on by any of

8  the experts, even to let them get up with witnesses and talk

9  about all these other folks that are buying products from Sun

10  and now Oracle, it's apples and oranges.  It's prejudicial.

11       **THE COURT:**  No, no.  I'm going to let it -- it's

12  going to happen in the opening statement.  I'm not saying -- it

13  may be that when we start hearing the evidence, I will feel

14  differently and enough is enough, but for opening statement

15  purposes I think this is not that prejudicial.

16       All right.  So can I see that email that you're

17  referring to?

18       Meanwhile, my clerk will call down and get the jury

19  on its way down here.

20       **MR. VAN NEST:**  Your Honor, could I ask one more --

21       **THE COURT:**  May I see the email first?

22       (Document displayed)

23       **MR. JACOBS:**  You have to scroll down through the

24  email please.  Keep on going.

25       Okay.  So there is a discussion about -- you can see

```
 1   there is a discussion about "Sun in trouble."  "Sun is going to
 2   fail sometime soon.  Their only chance of survival is spinning
 3   off their assets."
 4          "Google is heavily invested in Java."  "Who will own
 5   Java once Sun collapses?"
 6          "Proposals.  Google buys the rights to Java from Sun,
 7   the patents and copyrights, et cetera, and what will happen if
 8   they do that?"
 9          Scroll down.
10          "We'll have Sun open source, not just open JDK."
11          I'm sorry.  "Good for Google."  "Are Java lawsuits
12   going away?"
13          "Good for Sun.  Their litigation costs go away."
14          THE COURT:  What does it mean to say "our Java
15   lawsuits go away" when there aren't weren't any Java lawsuits?
16          MR. JACOBS:  They were aware there was the threat of
17   a lawsuit because they were using Java and intellectual
18   property rights in Android.  And they were very conscious of
19   that and we will establish that consciousness beyond --
20          THE COURT:  I'm not going to let you use this in
21   opening.  This is too specific.  Has this even been presented
22   to a deposition witness?
23          MR. JACOBS:  It was not the subject of deposition
24   questioning, your Honor.
25          THE COURT:  I just think it needs some context before
```

PROCEEDINGS

```
 1  we throw this out in front of the jury.  Maybe you will get it
 2  into evidence in due course and it will be fine, but you don't
 3  have to get your whole case into the opening statement.  So
 4  this one I don't want you to use.
 5          MR. JACOBS:  Thank you, your Honor.
 6          THE COURT:  All right.  Now what's your next point,
 7  Mr. Van Nest?
 8          MR. VAN NEST:  Your Honor, I just had one more point.
 9  That's it on the slides.
10          I know your Honor has a standard instruction to
11  jurors about reading newspapers and whatnot.  I was very upset
12  to learn that on Thursday night in time for Fridays news the
13  Boise Schiller firm issued a press release essentially
14  summarizing their opening statement in this case and arguing
15  about injunctions and all that sort of thing.
16          Now, I have a copy here if your Honor is interested
17  in it.  And I don't know if it's going to continue, but I
18  certainly think that we need to take great care with the jurors
19  to remind them that, you know, blogs and the -- you know, the
20  internet and so on are out of bounds.  We're getting enough
21  attention as it is.
22          THE COURT:  Of course, I agree with that totally.
23  You're absolutely right.  That's correct.
24          MR. VAN NEST:  Thank you.
25          THE COURT:  And I'm going to try my best to drill
```

PROCEEDINGS

1    that point home.

2            So I think you, both sides, ought to refrain from

3    press releases for the duration of the trial.

4            **MR. VAN NEST:**  Thank you, your Honor.

5            **MR. JACOBS:**  Your Honor, if I may?  We're not sure

6    what Mr. Van Nest is talking about when he refers to a Boise

7    Schiller press release.  Can I have a copy of that?

8            **MR. VAN NEST:**  Sure.

9            (Whereupon document was tendered

10            to counsel.)

11           **MR. JACOBS:**  Thank you.

12           **THE COURT:**  So let's just get the drill down for the

13   jury selection part.

14           Dawn, can we see if they are on the way down?

15           **THE CLERK:**  They are not quite on their way down and,

16   yes, I have checked.  I'm looking at it online.

17           **THE COURT:**  Okay.  So we need 12.  We will get 18

18   passed for cause.  The normal jury box just holds 14.  Let's

19   just focus on the first row.  Seat No. 1 will be the seat on

20   the outside here, that's outside the jury box closest to me.

21           **MR. JACOBS:**  This one right here (indicating)?

22           **THE COURT:**  Correct.  That will be seat No. 1.  And

23   then it will go down to No. 9, that high seat, high chair seat.

24   And then No. 10 to 18 will be across the top in similar

25   fashion.

PROCEEDINGS

```
 1          MR. JACOBS:  So this chair would be 18 (indicating)?

 2          THE COURT:  It should be, yes.

 3          All right.  And I can't -- Dawn, do we have one

 4  behind seat No. 1?  I don't see it.

 5          THE CLERK:  It's just pushed behind.

 6          THE COURT:  All right.  So we will -- that way we

 7  will get 18.

 8          So when we finally get the 18 passed for cause, each

 9  side gets three peremptories.  And we will do a blind system

10  where you just write out the names and numbers on your sheet of

11  paper, hand it up to me, and then we will excuse those six.

12          Now, let's say you overlapped on one.  Then we would

13  wind up with one extra juror and the way we deal with that is

14  we just seat the ones in the lowest 12 seat numbers.

15          Now, it's the seat number that counts, not the

16  sequence in which they happen to be brought forward.  So, let's

17  say, near the very end we bring someone from the back of the

18  room up to seat No. 1.  They then have the top priority.  They

19  are seat No. 1 even though they came in late in the game.

20          So it's the seat numbers that govern the problem of

21  if you wind up having overlap in who you strike from your jury.

22          MR. JACOBS:  And will your Honor be giving us a few

23  minutes to caucus on our peremptories?

24          THE COURT:  They will all be sitting here waiting for

25  you, so I will give you literally a few minutes to do your
```

PROCEEDINGS

1  caucusing and hand up your strikes, but not more than a few

2  minutes.

3        It will take some time.  This will take probably an

4  hour and a half to do, maybe even longer.  So you should be

5  thinking about it.  I know you will be.  You will be thinking

6  about who you want to strike as you go along.  But, yes, even

7  after that, I will give you that opportunity.

8        Okay.  I will also give you about 15 to 20 minutes

9  for each side to ask follow-up questions after I ask the basic

10 questions.

11       **MR. JACOBS:**  And on that, your Honor, if they -- if

12 we have the sense that there is something that a juror is

13 feeling concerned about on privacy --

14       **THE COURT:**  Sure.  We will do that at the sidebar.

15 Actually, what we will probably do is -- well, I guess with so

16 many members of the press here, there is no such thing as doing

17 it in open court and still being private, but we probably will

18 have to have a sidebar if it's really a matter of embarrassment

19 to the venire person.

20       Do we now the number now?

21       **THE CLERK:**  We have 44.

22       **THE COURT:**  We have 44.  These were prescreened for

23 availability for the time period.  But experience has proven to

24 me that we'll still get a number of people who have hardship

25 issues.

PROCEEDINGS

```
 1              All right.  Our venire is coming in.
 2              (Prospective jurors enter the courtroom at     8:07
 3              a.m.)
 4              THE COURT:  Dawn, will you take the roll?
 5              THE CLERK:  Marilou Abawag.
 6              PROSPECTIVE JUROR ABAWAG:  Abawag.
 7              THE CLERK:  Okay.  Thank you.
 8              Vandana Balakrishnan.
 9              PROSPECTIVE JUROR BALAKRISHNAN:  Here.
10              Okay.  Helen Bellamy.  B-e-l-l-a-m-y?
11              (No response.)
12              THE COURT:  Is there a Helen Bellamy present?
13              (No response.)
14              THE COURT:  Not present I guess.
15              THE CLERK:  Okay.  Chris, can you make a note of
16    that?  I am missing one.  Okay.  Thank you.
17              Cathrin Callas?
18              PROSPECTIVE JUROR CALLAS:  Here.
19              THE CLERK:  Okay, thank you.
20              Jimmy Chau, C-H-A-U?
21              PROSPECTIVE JUROR CHAU:  Here.
22              THE CLERK:  Okay.  Thank you.  Christina Cheng?
23              PROSPECTIVE JUROR CHENG:  Here.
24              THE CLERK:  Julie Chiu, C-H-I-U?
25              PROSPECTIVE JUROR CHIU:  Here.
```

PROCEEDINGS

```
1              THE CLERK:  Aylin Davis?

2              PROSPECTIVE JUROR DAVIS:  Here.

3              THE CLERK:  Marcelina Delgadillo?

4              PROSPECTIVE JUROR DELGADILLO:  Yes.

5              THE CLERK:  Matthew Derwis?

6              PROSPECTIVE JUROR DERWIS:  Here.

7              THE CLERK:  Scott Dimaggio?

8              PROSPECTIVE JUROR DIMAGGIO:  Here.

9              THE CLERK:  Matthew Erickson?

10             PROSPECTIVE JUROR ERICKSON:  Here.

11             THE CLERK:  Brian Fox?

12             PROSPECTIVE JUROR FOX:  Over here.

13             THE CLERK:  Megan Gallo?

14             PROSPECTIVE JUROR GALLO:  Here.

15             THE CLERK:  Margaret Geddes?

16             PROSPECTIVE JUROR GEDDES:  Here.

17             THE CLERK:  Rose Gengler?

18             PROSPECTIVE JUROR GENGLER:  Here.

19             THE CLERK:  Jacqueline Gonzalez?

20             (No response.)

21             THE CLERK:  Jacqueline Gonzalez?

22             (No response.)

23             THE CLERK:  Linbo Guo?

24             PROSPECTIVE JUROR GUO:  Here.

25             THE CLERK:  Kevin Haithcox?
```

PROCEEDINGS

1    **PROSPECTIVE JUROR HAITHCOX:**  Here.

2    **THE CLERK:**  Elisabeth Hostynek?

3    **PROSPECTIVE JUROR HOSTYNEK:**  Here.

4    **THE CLERK:**  H-o-s-t-y -- okay.

5    Steven Hotvedt?

6    **PROSPECTIVE JUROR HOTVEDT:**  Here.

7    **THE CLERK:**  Marilyn Huey?

8    **PROSPECTIVE JUROR HUEY:**  Present.

9    **THE CLERK:**  Fanny Kuang?

10   **PROSPECTIVE JUROR KUANG:**  Here.

11   **THE CLERK:**  Daniel Liu?

12   **PROSPECTIVE JUROR LIU:**  Here.

13   **THE CLERK:**  Rebecca Lorente?

14   **PROSPECTIVE JUROR LORENTE:**  Over here.

15   **THE CLERK:**  Susan Mak?

16   **PROSPECTIVE JUROR MAK:**  Here.

17   **THE CLERK:**  Theresa Mariano?

18   **PROSPECTIVE JUROR MARIANO:**  Here.

19   **THE CLERK:**  Daniel Martella?

20   **PROSPECTIVE JUROR MARTELLA:**  Here.

21   **THE CLERK:**  Jennifer Michals?

22   **PROSPECTIVE JUROR MICHALS:**  Michals, here.

23   **THE CLERK:**  Lupe Morales?

24   **PROSPECTIVE JUROR MORALES:**  Here.

25   **THE CLERK:**  Patricia Pearlman?

PROCEEDINGS

```
1              PROSPECTIVE JUROR PEARLMAN:  Here.

2         THE CLERK:  Eric Pollack?

3              PROSPECTIVE JUROR POLLACK:  Here.

4         THE CLERK:  John Rabold?

5              PROSPECTIVE JUROR RABOLD:  Here.

6         THE CLERK:  Rekha Raman?

7              PROSPECTIVE JUROR RAMAN:  Here.

8         THE CLERK:  Gary Richardson?

9              PROSPECTIVE JUROR RICHARDSON:  Here.

10        THE CLERK:  Christina Rimmer?

11             PROSPECTIVE JUROR RIMMER:  Here.

12        THE CLERK:  Ronald Rutherford?

13             PROSPECTIVE JUROR RUTHERFORD:  Here.

14        THE CLERK:  Christophe Scott?

15             PROSPECTIVE JUROR SCOTT:  Here.

16        THE CLERK:  Deirdre Snyder?

17             PROSPECTIVE JUROR SNYDER:  Here.

18        THE CLERK:  Greg Thompson?

19             PROSPECTIVE JUROR THOMPSON:  Yes.

20        THE CLERK:  Timothy Troy?

21             PROSPECTIVE JUROR TROY:  Here.

22        THE CLERK:  Lauren Wallick?

23             PROSPECTIVE JUROR WALLICK:  Here.

24        THE CLERK:  Trina Woo?

25             PROSPECTIVE JUROR WOO:  Here.
```

```
 1           THE CLERK:  And Samrina Zaidi?

 2           PROSPECTIVE JUROR ZAIDI:  Here.

 3           THE CLERK:  So two out of the 44 are not present.

 4   I'm going to recall them.

 5           THE COURT:  Chris, you are signalling me.

 6           MR. WOLPERT:  I will go get them, Judge.  I think

 7   they may have been in the restroom when we brought the panel

 8   down.

 9           THE COURT:  We will sit here and wait until you are

10   able to do that.

11           Meanwhile I will just pause long enough to say

12   welcome to all of you and bear with us while we track down the

13   two who are missing.

14           (Brief pause.)

15           THE CLERK:  I'm just going to confirm that the two

16   people that just came in are, indeed, the two we were

17   expecting.

18           Helen Bellamy?

19           PROSPECTIVE JUROR BELLAMY:  Yes.

20           THE CLERK:  And Jacqueline Gonzalez?

21           PROSPECTIVE JUROR GONZALEZ:  Yes.

22           THE CLERK:  Okay.  Thank you.

23           THE COURT:  All right.  Thank you.  Welcome.

24           Please administer the oath.

25           THE CLERK:  I would like all the prospective jurors
```

PROCEEDINGS

```
 1  to please stand and raise your right hand.  I'm going to
 2  administer the oath.
 3          (Jury panel placed under oath.)
 4          THE COURT:  All right.  Welcome, again.
 5          Thank you for coming out on this pretty day to
 6  possibly serve as a juror in this case.  We all appreciate it
 7  very much, and I'll tell you that many times before your
 8  service is done.
 9          We will get things started off correctly by
10  officially calling the case, and counsel will make their
11  appearances.
12          THE CLERK:  Calling Civil Action 10-3561 WHA, Oracle
13  America, In. versus Google, Inc.
14          Counsel, please state your appearances.
15          MR. JACOBS:  Good morning, Your Honor, ladies and
16  gentlemen.  Michael Jacobs, Morrison & Foerster, for Oracle.
17          With me at counsel table is David Weinberg, Fred
18  Norton, Andrew Temkin and Safra Catz from Oracle.  David Boise
19  and Dorian Daley from Oracle.
20          THE COURT:  All right.  And?
21          MR. VAN NEST:  Good morning, Your Honor, ladies and
22  gentlemen.  Bob Van Nest from Keker & Van Nest for Google.
23  With me at counsel table, ladies first, Christa Anderson, Dan
24  Purcell, Bruce Baber, Michael Kwun, our representative from
25  Google, Katherine Lacavera, and Michael Titinsky.
```

PROCEEDINGS

```
 1              THE COURT:  All right.  Thank you.

 2              MR. VAN NEST:  Thank you, Your Honor.

 3              THE COURT:  Thank you all, and welcome to you, as

 4   well.

 5              We're here today to get the trial started and select

 6   a jury, hear the opening statements, and be off and running in

 7   a case called Oracle versus Google.

 8              This is a case that will take a number of weeks, at

 9   least eight weeks, I expect.  Could be ten in that length of

10   time.

11              All of you had previously indicated you were able to

12   serve for that length of time.  We sent out that questionnaire

13   and gave you the opportunity to explain that you were not able

14   to do so.  Those of you who are here are the ones who indicated

15   you could serve.  So we appreciate that in advance.

16              Let me give you a brief description of what this case

17   is about.  You, at this point, just know Oracle and know

18   Google.  All right.  So I'm going to give you a brief

19   description.

20              A few years ago Google -- now, Google is on this side

21   of the room; I'm pointing to the right, my right -- Google came

22   out with a mobile platform called Android.  This is used in

23   mobile phones, sometimes called smart phones.

24              In this lawsuit, Oracle America, which is on this

25   side of the room, accuses Google and the Android system of
```

PROCEEDINGS

```
 1  violating certain copyrights and certain patents, and seeks
 2  money damages.
 3          Google, on this side of the room, denies that any
 4  patents or copyrights have been violated.
 5          This trial will go in three phases: part one, part
 6  two, and part three.  We'll have the same jury for all three
 7  parts.
 8          The first part is going to be about the copyrights
 9  and whether or not they were violated.  The second part will be
10  about the patents and whether or not the Android system
11  violates any patents.  And then the third part will be about
12  damages and willfulness.  That is assuming that any liability
13  is found in parts one or two.
14          So at the end of part one we'll have a deliberation
15  and a verdict.  End of part two we'll have deliberation and a
16  verdict.  End of part three, deliberation and a verdict.  And
17  all by the same jury.  So this one jury is going to hear a lot
18  of evidence and a lot of testimony, and so forth, over the next
19  eight to ten weeks.
20          So that's a very short summary of what the case is
21  about.
22          Now, I need to start on a practical question.  This
23  is directed to the potential jurors.  Do any of you have the
24  flu, a bad, bad cold, hacking and coughing, bronchitis,
25  anything that is going to cause the rest of you to feel like
```

1  you're going to get sick if you sit next to that person?  If

2  so, raise your hand and I'm going to have you come down here

3  and tell me what your problem is.

4          So raise your hand if you're in that category.

5  Anybody?  Amazing.

6          (Laughter)

7          **THE COURT:**  So good for you that you are all in such

8  good health.

9          Another thing I need to say is, right off the bat,

10 this is a so-called high profile case.  Most of the people on

11 the other side of the room are from the newspaper business.

12          If you had gone online this morning and looked, you

13 would have seen there were dozens of stories about this case

14 going to trial today.  And there have been many dozens more in

15 the past.

16          Now, it is my duty to give a direct order to each of

17 you on the venire.  You may not look at any website, blog, any

18 news item, no TV item, no radio item, no newspaper item about

19 this case.  If I find out you have done that, we will hold an

20 evidentiary hearing.

21          Why am I saying this?  Well, in a trial the case must

22 be decided based on the evidence at the trial, not what some

23 newspaper person is saying.

24          The person writing the newspaper article may have a

25 point of view, or they may be citing to things you are never

PROCEEDINGS

1   going to hear about in the trial because it's not evidence.

2        The great thing about a trial is you sit back as the

3   jury and make these lawyers do all the work and decide the case

4   based on what is actually presented as evidence here at trial.

5        So I must emphasize this again, you may not look at

6   any website, do any Internet research, do any kind of -- even

7   one minute's worth of looking at anything on the Internet about

8   this case.  You may not listen to a radio story, TV story, or

9   read any newspaper or magazine article about this case.

10        And if I find out you have, I'm obligated to have an

11   evidentiary hearing to find out if it's had any impact on you

12   and so forth.  Not to mention that it would be contempt of

13   court.

14        Now, you being good members of the community, I don't

15   even want to think about such a thing.  I don't want to have to

16   go there.  But please don't make me do that.  Please honor that

17   direct order.  That's number one.

18        Number two is, you can't talk to your family or

19   friends about the case, or each other.  Why is that?  Because,

20   same thing, you've got to decide the case based on the record

21   here.

22        When the case goes to the jury for deliberations it's

23   your duty to talk about the case at that point.  It's your duty

24   to do that then.  But until then, no, no talking about the

25   case.

PROCEEDINGS

```
 1              The reason I bring this up right off the bat is that
 2   I'm sure first thing you would have done, some of you, would be
 3   to pull out your smart phones and go Google this as soon as you
 4   got out of the hallway.  No.  We're not going to do that.  All
 5   right.
 6              So, I think -- I think the thing to do is rather than
 7   to explain to you in detail how this works, you'll just see how
 8   it works.  It's quicker if we just do it that way.
 9              But, in general, I will say this much:  We are going
10   to call forward I think it's 18 of you.  Many of you will be
11   called forward before -- maybe all of you before this is over.
12   But we've got to get started somehow.  And I think you'll see
13   how it works as we march forward.
14              Our basic goal is to seat 12.  We have 44 of you, so
15   we only need 12.  But the great majority of you will be
16   questioned before this is over.  And our goal is to get the;
17   fairest possible jury to decide issues that are important
18   between these two companies.  And we'll take a number of weeks
19   to get there.
20              So, we'll start right now by calling forward 18 of
21   you.  And the clerk will call those names out now.  This is
22   done at random.
23              Please, go ahead, Dawn.
24              **THE CLERK:**  Okay, Judge.
25              Aylin Davis, D-a-v-i-s.
```

PROCEEDINGS

```
1           THE COURT:  Okay.  Please come forward.
2           Ms. Davis, may I ask you to sit in the very first
3  chair that happens to be outside -- happens to be outside the
4  jury box because -- yeah.  Temporary.  It's a temporary chair
5  until we get the jury actually selected.  Welcome.  Thank you.
6           Next.
7           THE CLERK:  Jacqueline Gonzales, G-o-n-z-a-l-e-s.
8           THE COURT:  All right.  Ms. Gonzalez, welcome.
9           How are you today?
10          PROSPECTIVE JUROR MS. GONZALEZ:  Fine.  Thank you.
11          THE COURT:  Wonderful.  Have that next seat, please,
12  right to next to Ms. Davis.
13          THE CLERK:  Scott Dimaggio D-i-m-a-g-g-i-o.
14          THE COURT:  All right.  Welcome.  Please, have that
15  third seat.
16          THE CLERK:  Ronald Rutherford, R-u-t-h-e-r-f-o-r-d.
17          Rekha Raman, R-a-m-a-n.
18          THE COURT:  All right.  Are we saying that right,
19  Raman?
20          PROSPECTIVE JUROR MS. RAMAN:  It's actually Raman.
21          THE COURT:  Raman?
22          PROSPECTIVE JUROR MS. RAMAN:  Uh-huh.
23          THE COURT:  Welcome.  Please, have that next seat.
24          THE CLERK:  Daniel Liu, L-i-u.
25          THE COURT:  Okay.  Welcome.  Mr. Liu, please have
```

PROCEEDINGS

 1  that next seat.

 2         **THE CLERK:**  Christina Cheng, C-h-e-n-g.

 3         Julie Chiu or Chiu, C-h-i-u.

 4         **PROSPECTIVE JUROR MS. CHIU:**  Chiu.

 5         **THE COURT:**  Welcome.

 6         **THE CLERK:**  Kevin Haithcox, H-a-i-t-h-c-o-x.

 7         **THE COURT:**  Now, you see that high chair?  That's it.

 8  That's a temporary chair.  The final jury will all be inside

 9  the jury box.  We need to get 18 of you there, so we set this

10  up temporarily.

11         All right.  Now we go to the second row.

12         **THE CLERK:**  Steven Hotvedt, H-o-t-v-e-d-t.

13         **THE COURT:**  All right.  Let me get you to sit in the

14  chair on that row closest to me, right behind Ms. Davis.

15         Thank you.

16         **THE CLERK:**  Greg Thompson, T-h-o-m-p-s-o-n.

17         Katherine Callas, C-a-l-l-a-s.

18         **THE COURT:**  Are we saying that right, Callas?

19         Please have that third seat.  Thank you.

20         **THE CLERK:**  Gary Richardson, R-i-c-h-a-r-d-s-o-n.

21         Trina Woo, W-o-o.

22         Timothy Troy, T-r-o-y.

23         Daniel Martella, M-a-r-t-e-l-l-a.

24         Samrina Zaidi, Z-a-i-d-i.

25         And Megan Gallo, G-a-l-l-o.

PROCEEDINGS

```
 1            THE COURT:  All right.  Welcome to you 18.

 2            Again, for those of you in the rear, please pay close

 3   attention because many of you will be called forward in due

 4   course, and it will be easier if I can just say, Did you hear

 5   all those questions, and, if so, would you have raised your

 6   hand to any of them, so we don't have to repeat all the

 7   questions.  So, I know you'll pay close attention.

 8            All right.  Welcome to the 18 of you.  So, again, I

 9   ask, do any of you have the flu and so forth?  I will excuse

10   you if you do.  I don't want anyone to be contagious on the

11   jury.  Okay.  Great.

12            Now, do any of you have -- let me explain what the

13   drill is going to be, and then my question will be, Do you have

14   a hardship?  I'm going to give you a second opportunity to

15   raise any hardship issue because it's a long trial and I want

16   to make sure that you're okay with serving in a long trial.

17            Here's the way we will go:  Five days a week from

18   here until probably mid-June is when we think it will be over.

19   But it could go to the end of June.  Five days a week, 7:45 in

20   the morning for the jury until 1:00 o'clock each day.  At

21   1:00 o'clock, you get to go home or back to work as the case

22   may be.

23            So 7:45 to 1:00 we'll have a couple, maybe three

24   depending on the way the evidence comes in, facilities breaks

25   so that you can use the restroom and so forth.
```

PROCEEDINGS

```
 1            And in the mornings, early in the mornings -- back
 2   here behind this wall is the jury room.  That will be your home
 3   away from home.  I will get you coffee and doughnuts and
 4   oranges and bananas, things to eat before we get started.
 5   Sometimes the jurors get here as early as 6:00 a.m.  It's
 6   amazing.  We will have stuff here for you.
 7            But 7:45 will be the deadline to be here.  And then
 8   we'll start with the evidence by 8 o'clock each day, and
 9   sometimes sooner.
10            I meet with the lawyers at 7:30, and from 7:30 to
11   8:00 at the latest we try to sort out and streamline what's
12   going to happen that day.
13            But the jurors get here by 7:45.  And you can't be
14   late.  You've got to be on time because every member of the
15   jury must hear the evidence for themselves.  You can't read
16   somebody else's notes.
17            You know, if you're absent we just sit here and wait
18   for you to come.  We don't -- we don't -- you know, you don't
19   go back and read somebody's notes.  You have to be here to see
20   and hear every single moment of the trial for yourself.  All 12
21   of you.
22            So, it's important to be on time.  It's important and
23   so forth.  And so, for example, if you've got some prepaid
24   vacation in two weeks that would cause you to miss a day, you
25   would not be allowed to go on your vacation unless you --
```

1   unless I know about it now.

2           I mean, this is the time to bring up any legitimate

3   excuse for hardship.  Financial hardship or any other kind of

4   hardship I need to know about it now.

5           So, on the front row, do any of you have a hardship

6   issue you wish to raise?  If so, raise your hand.  Okay.

7   Ms. Cheng?

8           **PROSPECTIVE JUROR MS. CHENG:**  Yes.

9           **THE COURT:**  Let's give the microphone to you.

10          **PROSPECTIVE JUROR MS. CHENG:**  I still have my eye

11  problem that it's not recover yet.  And sometime it's really

12  burning and I need rest my eyes and put some eye drops.

13          **THE COURT:**  I don't remember what the problem is with

14  your eye.

15          **PROSPECTIVE JUROR MS. CHENG:**  Oh, because my -- it's

16  dry eyes.  And because I wore my contact lens too long and then

17  when I try to take it off I scratch my -- the eye skin, my

18  nail.  And then I see things blurry.

19          **THE COURT:**  Have you gone to the doctor --

20          **PROSPECTIVE JUROR MS. CHENG:**  (Nods head.)

21          **THE COURT:**  -- about this?

22          **PROSPECTIVE JUROR MS. CHENG:**  Yeah.

23          And when I fill out my paper I did send in all the

24  information, my doctor slip, everything.  And the clerk call

25  me.  She said she can't excuse me because I might work.

PROCEEDINGS

1              THE COURT:  How many fingers am I holding up?

2              PROSPECTIVE JUROR MS. CHENG:  Three.

3              THE COURT:  Okay.  Are your eyes hurting right now?

4              PROSPECTIVE JUROR MS. CHENG:  It kind of burn a

5  little.

6              THE COURT:  A little?  Well, is it going to interfere

7  with your ability to see and follow the evidence in the case?

8              PROSPECTIVE JUROR MS. CHENG:  Uhm, sometime it just

9  dry, I need to put eye drops in.  Can I just do it in here?

10             THE COURT:  Of course.

11             PROSPECTIVE JUROR MS. CHENG:  Oh.

12             THE COURT:  Would that solve the problem?

13             PROSPECTIVE JUROR MS. CHENG:  Okay.

14             THE COURT:  I mean, I'm asking you, would it solve

15  the problem for you to put eye drops in if it becomes an issue?

16             PROSPECTIVE JUROR MS. CHENG:  Yeah.  And I need to

17  close my eyes to rest.

18             THE COURT:  How long would that be?

19             PROSPECTIVE JUROR MS. CHENG:  For a few minutes.

20             THE COURT:  How often would you need to do this, you

21  think?

22             PROSPECTIVE JUROR MS. CHENG:  It depends.  Whenever I

23  feel dry.

24             THE COURT:  Would it be more than every hour and a

25  half?

PROCEEDINGS

```
 1              PROSPECTIVE JUROR MS. CHENG:  No.  Maybe two or
 2  something.
 3              THE COURT:  Two what?
 4              PROSPECTIVE JUROR MS. CHENG:  Two hours.
 5              THE COURT:  We'll have a break -- we'll have a break
 6  about every hour and a half or hour and 45 minutes.  You could
 7  then do it in the jury room.  Would that work?
 8              PROSPECTIVE JUROR MS. CHENG:  Yeah.
 9              THE COURT:  All right.  I'm going to ask you then to
10  stay on the jury for the time being.  At least I think we can
11  manage that problem.  Okay.
12              PROSPECTIVE JUROR MS. CHENG:  Okay.
13              THE COURT:  Any other hardship issue?
14              PROSPECTIVE JUROR MS. CHENG:  No.
15              THE COURT:  Anyone else on the front row got a
16  hardship issue?
17              I assume you all checked with your employer to make
18  sure you'll get paid for jury service.  Because if you're
19  selected and it turns out you don't get paid, I can't let you
20  off at that point.  So I need -- you need to have checked
21  already.  That's what we said in our statement we sent out some
22  time ago.
23              Second row, any hardship issues?  If so, raise your
24  hand.
25              Now, so this means, good, 18 of you are ready to go.
```

PROCEEDINGS

```
 1   No hardship.  But you've got to be here on time.

 2           I've been amazed in this job, jurors come from all

 3   over the district and they get here on time.  They serve their

 4   country in such an amazing way for almost no pay a day to do

 5   this.  And it's very rewarding for me to see the good citizens

 6   of this district step forward in the way that they do to help

 7   their country decide cases.

 8           All right.  So, again, I ask one last time, if you're

 9   selected to serve it will be -- you'll be liable to be here

10   five days a week all the way through possibly to the end of

11   June.  This is only April.  So we're talking April, May and

12   June.  So I take it that all of you are okay with that

13   schedule.  Right?  Good.

14           Okay.  So now, I'm going to ask this question.  Do

15   any of you know any of the people sitting at the tables here?

16           PROSPECTIVE JUROR MS. DAVIS:  (Raises hand.)

17           THE COURT:  Okay.  Ms. Davis.  We need to let you

18   have the microphone.

19           Who's got the microphone?  Ms. Cheng, please pass it

20   down to Ms. Davis.

21           PROSPECTIVE JUROR MS. DAVIS:  Hi.  I actually work

22   for Oracle.  And I actually used to intern for Dorian in the

23   legal department.

24           (Laughter)

25           THE COURT:  It's a small world.
```

PROCEEDINGS

```
 1              (Laughter)

 2         THE COURT:  You're excused.

 3              (Laughter)

 4         THE COURT:  Please hand the microphone to

 5   Ms. Gonzalez.  And we'll call -- any objection?

 6              (Laughter)

 7         THE COURT:  Hearing none, Ms. Davis, you're free to

 8   go.  Please go back to the jury assembly room and tell them

 9   what happened.  We're going to replace Ms. Davis.

10              Have a great day.

11              (Laughter)

12         THE CLERK:  Jimmy Chau, C-h-a-u.

13         THE COURT:  Mr. Chau, are we saying that right?

14         PROSPECTIVE JUROR MR. CHAU:  Yes.

15         THE COURT:  Are you how today?

16         PROSPECTIVE JUROR MR. CHAU:  Fine.  Thank you.

17         THE COURT:  Do you have any hardship issue?

18         PROSPECTIVE JUROR MR. CHAU:  No, I don't.

19         THE COURT:  Do you know any of the people in the

20   room?

21         PROSPECTIVE JUROR MR. CHAU:  No, I don't.

22         THE COURT:  You don't.

23              Again, I ask all of you, do any of you know anyone in

24   the room at the counsel table?

25              All right.  Let me ask a broader question.  Do you
```

PROCEEDINGS

```
 1  know anybody here anywhere -- do you see anyone in the whole

 2  room, including other potential jurors, that you might know?

 3  If so, raise your hand.

 4          Okay.  Ms. Cheng, did you raise your hand?

 5          PROSPECTIVE JUROR MS. CHENG:  Yeah.

 6          THE COURT:  Let's give the microphone back to you.

 7  Who would you happen to know?

 8          PROSPECTIVE JUROR MS. CHENG:  I know right there

 9  (indicating).

10          (Hand raised.)

11          THE COURT:  Say that name again.

12          PROSPECTIVE JUROR MS. HUEY:  Marilyn Huey.

13          THE COURT:  How do you spell your last name?

14          PROSPECTIVE JUROR MS. HUEY:  H-u-e-y.

15          THE COURT:  How do you two know each other?

16          PROSPECTIVE JUROR MS. CHENG:  We work together in the

17  same company.

18          THE COURT:  The same floor?  How close are friends

19  are you?

20          PROSPECTIVE JUROR MS. CHENG:  We in a different

21  division.

22          THE COURT:  All right.  Are you close friends?

23          PROSPECTIVE JUROR MS. CHENG:  Kind of.

24          (Laughter)

25          THE COURT:  All right.  That's enough on that one.
```

PROCEEDINGS

```
1            All right.  Anyone else?  It doesn't disqualify you
2    from working on the jury.  But I would have to give you some
3    special instructions if you both wind up on the jury.
4            Okay.  Let's see.  So does anyone else know anyone
5    else in the room, anywhere in the room?  I guess not.  All
6    right.
7            I'm going to ask the lawyers to do some of this for
8    me.  Let's start, introduce your law firms and the names of any
9    other individuals who might show up from time to time.
10           Mr. Jacobs, we'll start with you.
11           MR. JACOBS:  I'm with Morrison & Foerster.  You met
12   briefly some -- Mr. Muino, I believe was in the room before.
13   Mr. Muino is part of our team.  Mr. Marc Peters is part of our
14   team.
15           Those, I think, would be the people that might be
16   appearing at the trial, Your Honor.
17           THE COURT:  Let me pause here.  Have any of you ever
18   heard of any of those people, including that law firm?  If so,
19   raise your hands.
20           Someone down at the end.  That's Mr. Haithcox.  We
21   need to give you the microphone.
22           PROSPECTIVE JUROR MR. HAITHCOX:  Just the way you
23   phrased the question, if we had heard of the law firm.  I
24   raised my hand.
25           THE COURT:  Yes.
```

```
 1              PROSPECTIVE JUROR MR. HAITHCOX:  I heard of the law
 2   firm.
 3              THE COURT:  What do you do for a living?
 4              PROSPECTIVE JUROR MR. HAITHCOX:  I'm a lawyer.
 5              THE COURT:  What law firm are you with?
 6              PROSPECTIVE JUROR MR. HAITHCOX:  In-house for CNA
 7   Insurance.
 8              THE COURT:  Have you ever done any business with any
 9   of the law firms here in the courtroom?
10              PROSPECTIVE JUROR MR. HAITHCOX:  Are there three of
11   them or two, in the courtroom?
12              THE COURT:  Well, let's hold the microphone and I'm
13   going to ask the other counsel at the table to identify
14   their -- Mr. Boise, would you do the honors?
15              MR. BOISE:  Yes, Your Honor.  Thank you.
16              My name is David Boise.  I'm with a law firm called
17   Boies, Schiller & Flexner.  With me is Mr. Fred Norton from my
18   firm.  And I think you would also probably see Mr. Steve
19   Holtzman, who is from our firm.
20              I think these would be the people that would be
21   taking an active part, Your Honor.
22              THE COURT:  All right.  Mr. Van Nest, would you
23   reintroduce your side and also both law firms.
24              MR. VAN NEST:  I will, Your Honor.
25              So good morning, everyone.  Bob Van Nest from
```

PROCEEDINGS

```
 1   Keker & Van Nest in San Francisco.  My partners Christa
 2   Anderson, Dan Purcell, Michael Kwun.
 3            You may also be seeing our lead paralegal, Gary
 4   Padilla from our firm, who will be here every day, as well.
 5            We're also working with a second law firm,
 6   King & Spalding.  And Bruce Baber is a lawyer at
 7   King & Spalding.
 8            THE COURT:  Okay.  Great.
 9            MR. VAN NEST:  Thank you.
10            THE COURT:  Back to you, Mr. Haithcox.  How about any
11   and all of those law firm names?
12            PROSPECTIVE JUROR MR. HAITHCOX:  I'm not absolutely
13   positive, but I think that we had some cases with Morrison &
14   Foerster on the other side when I was at my prior firm.
15            THE COURT:  Okay.  And your prior firm, what firm was
16   that?
17            PROSPECTIVE JUROR MR. HAITHCOX:  That was Hancock
18   Rothert & Bunshoft at the time.
19            THE COURT:  That's fine.  Is that going to in any way
20   cause you to be biased one way or the other?
21            PROSPECTIVE JUROR MR. HAITHCOX:  Probably not.
22            THE COURT:  What do you mean "probably"?
23            PROSPECTIVE JUROR MR. HAITHCOX:  I don't think so.
24            THE COURT:  You know yourself better than we do.
25            PROSPECTIVE JUROR MR. HAITHCOX:  I know their
```

PROCEEDINGS

1  reputation.

2          **THE COURT:**  Can you put that aside and decide this

3  case fairly and squarely without regard to the law firm?

4          **PROSPECTIVE JUROR MR. HAITHCOX:**  Yes.

5          **THE COURT:**  That's all that is required.

6          Have you heard of any of these lawyers individually,

7  even if you don't know their law firms?

8          **PROSPECTIVE JUROR MR. HAITHCOX:**  Yes.

9          **THE COURT:**  Who have you heard of?

10          **PROSPECTIVE JUROR MR. HAITHCOX:**  Just heard of

11  Mr. Boise.

12          **THE COURT:**  All right.  So I assume you heard good

13  things about Mr. Boise, like all of us would have.

14          **PROSPECTIVE JUROR MR. HAITHCOX:**  That's correct.

15          **THE COURT:**  As well as of the other lawyers.

16          But will you be able to put aside what you've heard

17  about Mr. Boise and decide this case without any bias one way

18  or the other?

19          **PROSPECTIVE JUROR MR. HAITHCOX:**  Yes.

20          **THE COURT:**  Thank you.

21          So, anyone else?  Have any of the other 18 -- any of

22  you happen to be lawyers?  If so, raise your hand.  Okay.

23  Sometimes I've had three lawyers up there.

24          Okay.  Any of you heard of any of the lawyers or law

25  firms, other than Mr. Haithcox?

PROCEEDINGS

```
 1              All right.  Great.  So now what we're going to do is
 2     I'm going to ask the lawyers to read off the names of the
 3     witnesses.  There are a lot of witnesses.  So I'm going to
 4     ask -- maybe -- who would like to do the honors?
 5              Mr. Jacobs, would you on the plaintiff's side read,
 6     and then I'm going to ask Mr. Van Nest if any of them have been
 7     left off that would be witnesses you plan to call.
 8              All right.  The reason I'm asking is we need to know
 9     if you know any of these witnesses.  For example, if your
10     next-door neighbor showed up as a witness you might be inclined
11     to take what you know about that person into account in
12     evaluating their credibility, and that wouldn't necessarily be
13     a fair thing to do.
14              So, Mr. Jacobs.
15              MR. JACOBS:  Thomas Kurian.  Mark Reinhold.  Edward
16     Screven.  Josh Bloch.  Bob Lee.  Leo Cizek.  Larry Ellison.
17     Dan Morrill.  Brian Swetland.  Patrick Brady.
18              Maybe I should stop with that first group, Your
19     Honor.
20              THE COURT:  Let's stop with the first group.
21              Any of those names, do you know them personally?  If
22     so, raise your hand.
23              All right.  No one knows them personally.
24              Have you heard of any of those individuals?
25              (Show of hands.)
```

PROCEEDINGS

```
 1          THE COURT:  All right.  Raise your hand high enough
 2   that I can see.
 3          All right.  Now, did all of you who raised your hands
 4   are you talking about Mr. Ellison.
 5          (Affirmative responses from jurors.)
 6          THE COURT:  Anyone else you have heard of?  Does
 7   anyone think that the fact that they've heard of Mr. Ellison
 8   would be a factor one way or the other that would cause them to
 9   be biased in this case?  If so, raise your hand.
10          All right.  No one is raising their hands.
11          Okay.  Continue on, please.
12          MR. JACOBS:  Dan Bornstein.  Safra Catz.  Larry Page.
13   Tim Lindholm.  John Mitchell.  Alan Purdy.  Vineet Gupta.
14   James Gosling.  Andy McFadden.  Andy Rubin.
15          THE COURT:  Any of those names?  If you've heard of
16   them, raise your hand.
17          Okay, Mr. Haithcox.  Again, I ask, would it in any
18   way bias you one way or the other?
19          PROSPECTIVE JUROR MR. HAITHCOX:  No.
20          THE COURT:  Thank you.
21          Go ahead.
22          MR. JACOBS:  Owen Astrachan.  Jonathan Schwartz.
23   Scott McNealy.  Noel Poore.  Peter Kessler.  Bob Vandette.
24   Dennis Allison.  David August.  Robert Dewar.  Terence Parr.
25          THE COURT:  Any of you personally know any of those
```

PROCEEDINGS

```
 1   names?

 2           Okay.  In the top it's Mr. Martella?

 3           PROSPECTIVE JUROR MR. MARTELLA:  Yes.

 4           THE COURT:  Do you personally know of those?

 5           PROSPECTIVE JUROR MR. MARTELLA:  Jonathan Schwartz,

 6   but I'm not sure it would be the same Jonathan Schwartz I know.

 7           THE COURT:  Which is the one you know?

 8           PROSPECTIVE JUROR MR. MARTELLA:  He's an educator in

 9   Santa Rosa.

10           MR. JACOBS:  Different person.

11           THE COURT:  Different person.

12           Have any of you heard of any of those names?  Okay.

13   All right.  Raise your hands and keep them up so we can all

14   make a note of it.

15           Now, for the two of you, the fact that you heard of

16   those, would it be something that would cause you to be biased

17   either positively or negatively?  If so, raise your hands.

18           No one is raising their hands.  Okay.  Go ahead.

19   Next.

20           MR. JACOBS:  David Gries.  Ben Goldberg.  Kathleen

21   Knopoff.  Nachi Periakaruppan.  Param Singh.  Eric Schmidt.

22   Ian Cockburn.  Steven Shugan.  Jim Kearl.  Tim Bray.

23           THE COURT:  Any of those names?

24           Again, Mr. Haithcox, do you personally know any of

25   them?
```

PROCEEDINGS

```
 1              PROSPECTIVE JUROR MR. HAITHCOX:  I'm not sure.  I've
 2   heard of Kathleen Knopoff off.  Is that Katie Knopoff, who is a
 3   lawyer.
 4              MR. JACOBS:  I don't believe so, but we'll
 5   double-check.
 6              THE COURT:  Who's calling that witness?  Somebody
 7   ought to know.
 8              MR. VAN NEST:  It's an Oracle witness, Your Honor.
 9              THE COURT:  Mr. Jacobs, who is that person?
10              MR. JACOBS:  We'll get the details and make sure
11   she's not a lawyer.  I believe that's correct.
12              THE COURT:  Give us more information, Mr. Haithcox,
13   about the person you know.
14              PROSPECTIVE JUROR MR. HAITHCOX:  She was a lawyer who
15   worked at Hancock Rothert & Bunshoft back in the day.  I've
16   seen her a few times since, but not recently.
17              THE COURT:  What would her age be?
18              PROSPECTIVE JUROR MR. HAITHCOX:  Probably 45, 47.
19              THE COURT:  Right now?
20              PROSPECTIVE JUROR MR. HAITHCOX:  Yeah.
21              MR. JACOBS:  Different person.
22              THE COURT:  We are pretty sure it's different person.
23   Okay.
24              All right.  Do any of you -- have you heard of any of
25   these people?  If so, raise your hands.
```

PROCEEDINGS

```
1            Okay.  No one raised their hand.  Go ahead.
2            MR. JACOBS:  John Rizzo.  Alan Cox.  Greg Leonard.
3   Jeet Kaul.  Guy Steele.  Hiroshi Lockheimer.  Susan Wojcicki.
4            THE COURT:  Anyone know any of those names?  I mean
5   personally know any of those people.  No hands go up.
6            Have you heard of any of those people?  No hands go
7   up.
8            Next.
9            MR. JACOBS:  Rafael Camargo.  May have mentioned Andy
10  Rubin before.  Andy Rubin.  Eric Schmidt.  Patrick Brady.  Rich
11  Miner.  Vineet Gupta.  Aditya Agarwal.
12           That would be it, Your Honor.
13           THE COURT:  Okay.  Do you know personally any of
14  those names?  If so, raise your hand.  How about heard of?  No
15  hands go up.
16           Okay.  Thank you, Mr. Jacobs.
17           Mr. Van Nest, do you have any add-ons?
18           MR. VAN NEST:  Your Honor, just four.
19           THE COURT:  Okay.
20           MR. VAN NEST:  Christopher Plummer.  Mark Reinhold.
21  John Rose.  Or Hickman Wong.
22           THE COURT:  Christopher Plummer?
23           MR. VAN NEST:  Not the actor.  Sorry about that.
24           (Laughter)
25           MR. VAN NEST:  He won't be here.  We'll get close
```

PROCEEDINGS

1    but --

2            **THE COURT:**  All right.  So anybody know any of those

3    individuals?  Any of you heard of those individuals?  Okay.  No

4    hands go up.

5            Now, the list that Mr. Jacobs read off has witnesses

6    on both sides.  So it's not like there's only four witnesses

7    over there and 42 witnesses over here.

8            (Laughter)

9            **THE COURT:**  Okay.  All right.  Great.  How about any

10   of the court personnel?  Do any of you know anybody who works

11   in the U.S. District Court here in this building?  Myself or

12   Dawn Toland or anyone else?  If so, raise your hand.  Okay.  We

13   have Ms. -- looks like Ms. Woo, right?

14           **PROSPECTIVE JUROR MS. WOO:**  Yes.

15           **THE COURT:**  We'll need to give you the microphone,

16   Ms. Woo.

17           **PROSPECTIVE JUROR MS. WOO:**  My neighbor is Susan

18   Soong.  She is currently in Washington D.C., though, on a

19   year's assignment.

20           **THE COURT:**  Do you know where she works?

21           **PROSPECTIVE JUROR MS. WOO:**  In this building.  Susan

22   Soong, S-o-o-n-g.

23           **THE COURT:**  Does she work in this building or for the

24   U.S. District Court?

25           **PROSPECTIVE JUROR MS. WOO:**  She works for the U.S.

PROCEEDINGS

```
 1  District Court.
 2              THE COURT:  Dawn, do you know that person?
 3              THE CLERK:  I don't.
 4              THE COURT:  Let's assume she works for the court.
 5  You can't let that have any bearing on your decision in the
 6  case.  Do you understand that?
 7              PROSPECTIVE JUROR MS. WOO:  I understand.
 8              THE COURT:  Are you okay with that?
 9              PROSPECTIVE JUROR MS. WOO:  I am.
10              THE COURT:  Okay.  Thank you.
11              Anyone else?  No one else raises their hand.
12              Okay.  Here's what we're going to do now.  We're
13  going to learn something about you.  And we need to pass the
14  microphone down to Mr. Chau.
15              Mr. Chau, can you see that poster board way over
16  there?
17              PROSPECTIVE JUROR MR. CHAU:  Yes.
18              THE COURT:  What you need to do is go down that list
19  of 12 items and give us the information.  Speak into the
20  microphone clearly.
21              PROSPECTIVE JUROR MR. CHAU:  Yes.  My name is Jimmy
22  Chau.  San Francisco resident.  Graduate from high school only.
23              I work for MTA, MUNI.  I don't belong to any club.
24  Hobby, I go to gym a lot.  Single.  No kid.  I haven't served
25  anything.  I'm not military.  And I'm not number 12, not any
```

PROCEEDINGS

1  witnesses in a court.

2          THE COURT:  How about party in court?  Have you ever

3  been a party to a litigation?

4          PROSPECTIVE JUROR MR. CHAU:  I have a case like

5  couple months ago.  I work for the City, and people are suing

6  the City.  I was involved.

7          THE COURT:  Are you a party in the case?

8          PROSPECTIVE JUROR MR. CHAU:  Yeah.

9          THE COURT:  What do you do for the city?

10         PROSPECTIVE JUROR MR. CHAU:  I'm a driver.  And I get

11  into accident, and they sue the city.  I'm the driver.

12         THE COURT:  So were you named as a defendant?

13         PROSPECTIVE JUROR MR. CHAU:  No.

14         THE COURT:  Okay.  And has your case come to court

15  yet?

16         PROSPECTIVE JUROR MR. CHAU:  Yeah.  It finish, the

17  court case is finish.

18         THE COURT:  All right.  How did it come out?

19         PROSPECTIVE JUROR MR. CHAU:  We won.

20         THE COURT:  All right.  Okay.  Thank you.

21         Now, Ms. Gonzalez, your turn.

22         PROSPECTIVE JUROR MS. GONZALEZ:  Good morning,

23  everyone.

24         My name is Jacqueline Gonzales.  I live in Oakland.

25  I graduated from high school and attended Heald College.  I'm

1  graduated from there with an applied science degree in medical

2  office administration.

3        I work for the Oakland Unified School District as a

4  bilingual clerk in Hoover Elementary in West Oakland.

5        I don't belong to any organization.  My hobbies are

6  just spend time with my family.

7        I'm married.  My husband, his name is Raoul Garcia.

8  I have two children.  One, my boy Jonathan, is seven.  And my

9  little one is two, Caleb.

10       I have never served in the jury system before, and

11 I'm never in the military or the law enforcement or party or

12 witnesses in court.

13       **THE COURT:**  What does your husband do?

14       **PROSPECTIVE JUROR MS. GONZALEZ:**  He is a handyman.

15       **THE COURT:**  All right.  Thank you.

16       Now we go to Mr. Dimaggio.

17       **PROSPECTIVE JUROR MR. DIMAGGIO:**  My name is Scott

18 Dimaggio.  I live in Walnut Creek.  I have a high school

19 diploma.  My job right now, I work for Lawrence Berkeley Lab.

20       **THE COURT:**  What do you do for them?

21       **PROSPECTIVE JUROR MR. DIMAGGIO:**  What's that?

22       **THE COURT:**  What do you do for Lawrence Berkeley?

23       **PROSPECTIVE JUROR MR. DIMAGGIO:**  I am a tech,

24 technician.

25       **THE COURT:**  Do you work with computers?

PROCEEDINGS

```
 1              PROSPECTIVE JUROR MR. DIMAGGIO:  I do.

 2              THE COURT:  What do you do on the computers?

 3              PROSPECTIVE JUROR MR. DIMAGGIO:  We do a lot of CAD

 4   work, a lot of drawing and machining parts and manufacturing

 5   stuff for the scientists.

 6              THE COURT:  Good.  Continue on.

 7              PROSPECTIVE JUROR MR. DIMAGGIO:  I don't belong to

 8   any organizations.  Hobbies are camping, fishing, motocross.

 9              I am married.  My wife is an appraiser.  I have no

10   children.

11              I have had no prior jury service.  No military or law

12   enforcement.  I was subpoenaed to court once for a woman who

13   was hit by a car, but they pled guilty and we never -- it never

14   went anywhere.

15              THE COURT:  What was your role in that case?

16              PROSPECTIVE JUROR MR. DIMAGGIO:  I witnessed it.

17              THE COURT:  Okay.  Is that it?

18              PROSPECTIVE JUROR MR. DIMAGGIO:  Yeah.

19              THE COURT:  Thank you.

20              Now we go to Mr. Rutherford.

21              PROSPECTIVE JUROR MR. RUTHERFOD:  My name is Ron

22   Rutherford.  I live in Oakland.  I have an undergraduate in

23   accounting/international business from Penn State.  Masters at

24   LaSalle University in Philadelphia.

25              My current employer is Abbott Diabetes Care.  I work
```

PROCEEDINGS

1   in their finance department.

2          No organizations or clubs.  Hobby, pretty much

3   PlayStation 3 after I get out of work is the only thing I can

4   do.

5          (Laughter)

6          **PROSPECTIVE JUROR MR. RUTHERFOD:**  Marital status,

7   married.  My spouse works as a lawyer at a -- does like ERISA,

8   401(k), executive comp stuff.

9          **THE COURT:**  What firm is she with?

10         **PROSPECTIVE JUROR MR. RUTHERFOD:**  He, yes.

11         **THE COURT:**  Who?

12         **PROSPECTIVE JUROR MR. RUTHERFOD:**  He, yes.

13         **THE COURT:**  He, I mean.  Yes, he.  What law firm?

14         **PROSPECTIVE JUROR MR. RUTHERFOD:**  Truckerhauss.

15         **THE COURT:**  Say that again.

16         **PROSPECTIVE JUROR MR. RUTHERFOD:**  Truckerhauss.  It's

17   in San Francisco.

18         **THE COURT:**  How do you spell that?

19         **PROSPECTIVE JUROR MR. RUTHERFOD:**

20   T-r-u-c-k-e-r-h-a-u-u-s-s.

21         **THE COURT:**  Is that it?  Okay.  Very good.  Please,

22   continue.

23         **PROSPECTIVE JUROR MR. RUTHERFOD:**  No kids.  No jury

24   service.  Never in the military and never a party in court.

25         **THE COURT:**  Right.  Thank you.

PROCEEDINGS

```
 1                Now we go to Ms. Raman.

 2         PROSPECTIVE JUROR MS. RAMAN:  My name is Rekha Raman.

 3         THE COURT:  Closer to the microphone.

 4         PROSPECTIVE JUROR RAMAN:  My name is Rekha Raman.  I

 5  live in Fremont.  I got a bachelor's in medicine from India.

 6  And my most recent job is I'm a special ed para educator at the

 7  Fremont Unified School District.

 8                And I don't belong to any, you know, organizations,

 9  clubs, or unions, as far as I can remember.  Hobbies, I'm a

10  creative writer.  I like to read and listen to music.

11                And I'm married.  My husband is a computer engineer.

12  And I have two children, age -- my son 12, and my daughter is

13  21.  My daughter, she's in -- she's a student at UC Davis.  My

14  son is in junior high.

15                Prior jury service, I've served not exactly.  I

16  appeared at a panel of jurors many, many years ago for the

17  Alameda County, but I didn't serve as a juror.

18                I've not been in the military or law enforcement.

19  And ever a party or a witness in court, no.

20         THE COURT:  May I ask you a question about your

21  husband.  What company does he work for?

22         PROSPECTIVE JUROR MS. RAMAN:  Brocade, Incorporated.

23         THE COURT:  What more can you tell us about his

24  computer work?

25         PROSPECTIVE JUROR MS. RAMAN:  He's a hardware
```

PROCEEDINGS

```
 1  engineer.

 2          THE COURT:  Okay.

 3          PROSPECTIVE JUROR MS. RAMAN:  Yeah.

 4          THE COURT:  I think that helps.  Let me ask all 18 of

 5  you for a moment, I should have asked this earlier.

 6          Do any of you have a spouse or partner who works for

 7  either of these two companies?  If so, raise your hand.

 8          Okay.  No one is raising their hands.

 9          How about a child or close relative, like a mom, a

10  dad, or child who works for one of these two companies?  If so,

11  raise your hand.

12          Any of you have a close relative or spouse or partner

13  who worked for Sun?

14          What was the official name, Sun Microsystems?

15          MR. JACOBS:  Yes.

16          THE COURT:  Sun Microsystems?  You're going to hear a

17  lot about that company in this case.

18          Do any of you have any children, spouse, partner,

19  close relative who worked for Sun Microsystems?  If so, raise

20  your hand.

21          All right.  Any of you -- now, last question on that.

22  Very close friend, any of you have a very close friend who

23  works for any of those companies?

24          Okay.  Mr. Dimaggio, let's hand the microphone back

25  to you.  Tell us that circumstance.
```

PROCEEDINGS

```
 1            PROSPECTIVE JUROR MR. DIMAGGIO:  I have close friends

 2   of our family who worked for PeopleSoft.  And her and her

 3   husband were both laid off from them.

 4            THE COURT:  PeopleSoft?

 5            PROSPECTIVE JUROR MR. DIMAGGIO:  Yeah.  When Oracle

 6   took them over.

 7            THE COURT:  When that was?

 8            PROSPECTIVE JUROR MR. DIMAGGIO:  Probably, what, six

 9   years ago?

10            THE COURT:  Okay.  Well, but they never actually

11   worked for Oracle, did they?  Or did they?  They worked for

12   them and then were laid off?

13            PROSPECTIVE JUROR MR. DIMAGGIO:  One of them was,

14   yes.

15            THE COURT:  Okay.  All right.  So do you hold that

16   against Oracle for some reason?

17            PROSPECTIVE JUROR MR. DIMAGGIO:  No.

18            THE COURT:  Will that be a factor in any of your

19   decisions in this case?

20            PROSPECTIVE JUROR MR. DIMAGGIO:  No.

21            THE COURT:  Okay.  Thank you.

22            All right.  Anyone else?

23            Down there.  Mr. Haithcox, let's go to you

24   temporarily.  I need to -- out of turn.  I need to ask you

25   about -- no, no, all the way to the end.
```

1      **PROSPECTIVE JUROR MR. HAITHCOX:**  My son's friend
2  has -- their father works for Oracle.
3          **THE COURT:**  Son's friend's father.
4          **PROSPECTIVE JUROR MR. HAITHCOX:**  And we hang out with
5  them from time to time.
6          **THE COURT:**  Okay.  Do you know what his job is there
7  and what his name is?
8          **PROSPECTIVE JUROR MR. HAITHCOX:**  Mo.  He goes by
9  Moto.
10          **THE COURT:**  Moto?
11          **PROSPECTIVE JUROR MR. HAITHCOX:**  Yeah, that's it.  I
12  had a relative also who worked for Oracle, but doesn't
13  currently.  You phrased currently works for them.
14          **THE COURT:**  Would that in any way affect your ability
15  to be fair and impartial?
16          **PROSPECTIVE JUROR MR. HAITHCOX:**  She quit because she
17  was dissatisfied.  I don't think it would affect it.
18          **THE COURT:**  Will it affect your ability to be fair
19  and impartial?
20          **PROSPECTIVE JUROR MR. HAITHCOX:**  No.
21          **THE COURT:**  Okay.  Somebody else up there?
22          Yes, Ms. Zaidi?
23          **PROSPECTIVE JUROR MS. ZAIDI:**  Yes.
24          **THE COURT:**  Go ahead.
25          **PROSPECTIVE JUROR MS. ZAIDI:**  I have a close personal

PROCEEDINGS

1  friend who works for Oracle in the Pleasanton office.

2          THE COURT:  What do they do?  What's their job?

3          PROSPECTIVE JUROR MS. ZAIDI:  I don't know his exact

4  title, but he is an engineer of some kind.

5          THE COURT:  How long has he been there?

6          PROSPECTIVE JUROR MS. ZAIDI:  I would say -- he's

7  moved around a bit.  Probably two years.

8          THE COURT:  Okay.  So this is a close personal

9  friend?

10          PROSPECTIVE JUROR MS. ZAIDI:  Yeah.  We have social

11  interaction, so I would see him on and off.

12          THE COURT:  All right.  So if you were on the jury

13  you wouldn't be able to talk to him about this case.  You know

14  that.

15          PROSPECTIVE JUROR MS. ZAIDI:  I understand that.

16          THE COURT:  Now, would that relationship in any way

17  affect your ability to be fair and impartial?

18          PROSPECTIVE JUROR MS. ZAIDI:  Well, I have to be

19  honest.  I'm not sure because in these gatherings the husbands

20  talk about work and whatnot.  And my husband is also an

21  engineer.  He works for Cisco.  And so I don't know if I would

22  be able to, you know-- if I overhear something I don't know if

23  that's going to affect my perspective on things.

24          THE COURT:  Well, but before any of that ever

25  happens, are you biased already?  Do you think you are biased

PROCEEDINGS

1  one way or the other even before you've heard any evidence?

2         **PROSPECTIVE JUROR MS. ZAIDI:**  I can't say.  I don't

3  know.

4         **THE COURT:**  Well, no, I'm asking.  On account of your

5  friend working at Oracle, are you biased either for Oracle or

6  against Oracle just on account of that relationship, without

7  ever having heard the first item of evidence?

8         **PROSPECTIVE JUROR MS. ZAIDI:**  Well, I have to be

9  honest.

10        **THE COURT:**  Yes, of course.

11        **PROSPECTIVE JUROR MS. ZAIDI:**  Maybe I would have a

12  bias towards Oracle just because I know him.

13        **THE COURT:**  I'm going to excuse you unless there is

14  an objection.

15        Any objection?

16        **MR. VAN NEST:**  No, Your Honor.

17        **MR. JACOBS:**  No, Your Honor.

18        **THE COURT:**  Ms. Zaidi, I'm going to let you go.

19        **PROSPECTIVE JUROR MS. ZAIDI:**  I'm sorry, Your Honor.

20  I'm just being honest.

21        **THE COURT:**  No, that's what you're supposed to be.

22  Thank you.

23        Go back to the jury assembly room.  Tell them what

24  happened.  And thank you for bringing it up.  Thank you.

25        All right.  Please give the microphone --

PROCEEDINGS

```
 1            PROSPECTIVE JUROR MS. ZAIDI:  Thank you, everyone.
 2   Sorry.
 3            THE COURT:  -- to ms. Gallo.
 4            Let's replace Ms. Zaidi.
 5            THE CLERK:  Jennifer Michals, M-i-c-h-a-l-s.
 6            THE COURT:  Welcome.  How are you today, Ms. Michals?
 7            PROSPECTIVE JUROR MS. MICHALS:  I'm good.
 8            THE COURT:  Can you -- do you have any hardship
 9   issue?
10            PROSPECTIVE JUROR MS. MICHALS:  No.
11            THE COURT:  Okay.  Let me give you the microphone.
12   Did you know any of those names that we called out, or have you
13   heard of any of those names?
14            PROSPECTIVE JUROR MS. MICHALS:  Other than hearing on
15   the news, but no.
16            THE COURT:  All right.  And can you put all of that
17   out of your mind and decide this case fairly on the merits?
18            PROSPECTIVE JUROR MS. MICHALS:  Yes, I can.
19            THE COURT:  Good.  Do you have any relatives or close
20   friends that work in any of these companies?
21            PROSPECTIVE JUROR MS. MICHALS:  I do not.
22            THE COURT:  All right.  Would you have raised your
23   hand to any of the other questions I asked?
24            PROSPECTIVE JUROR MS. MICHALS:  No.
25            THE COURT:  Great.  Thank you.
```

PROCEEDINGS

```
 1            I'm going to ask you to hand the microphone now back.
 2  I think we got all the way up to Mr. Liu.
 3            Mr. Liu, can you see the poster board?
 4            PROSPECTIVE JUROR MR. LIU:  Yes, sir.
 5            THE COURT:  Please go ahead and give us the
 6  information.
 7            PROSPECTIVE JUROR MR. LIU:  Yes.  My name is Daniel
 8  Liu, L-i-u.  I live in San Francisco.  I have 11 years of
 9  education.  And I'm working for San Francisco Unified School
10  District as a plumber.  And I belong to San Francisco Plumbers
11  Union Local 38.
12            And I like fishing.  And once a while I play the slot
13  machines.  And I am married.  And my wife is not working at
14  all.
15            And I have two boys.  One is 41.  The other one is
16  39.  The oldest son is working for San Francisco Superior Court
17  as a file clerk.  The second boy's off work now.
18            And I did serve as a juror in Superior Court about 15
19  months ago.  Civil case.  And we reached a verdict.  And I was
20  in the U.S. Navy since '68 to '70.  And never been any witness
21  in court.
22            THE COURT:  Thank you.  Have you been a party to any
23  lawsuit?
24            PROSPECTIVE JUROR MR. LIU:  That's negative.
25            THE COURT:  Okay.  Thank you.  Ms. Cheng, your turn.
```

PROCEEDINGS

```
 1          PROSPECTIVE JUROR MS. CHENG:  My name is Christina
 2   Cheng.  I live in San Lorenzo.  I have an AA degree.  I work at
 3   U.S. Environmental Protection Agency, as a secretary.
 4          I don't belong to any organization.  I like to spend
 5   time with my family and shopping.  I am married.  My husband is
 6   mechanic.  I have three daughters.  They are 20, 15, and 12.
 7   They are in school.
 8          No, I didn't serve before.  I'm not in military.
 9   And, no, I'm not a witness in court.
10          THE COURT:  Thank you.
11          Next, Ms. Chiu.
12          PROSPECTIVE JUROR MS. CHIU:  My name is Julie Chiu.
13   I live in South San Francisco.  I have a bachelor's in
14   architecture from U.C. Berkeley.
15          My current job is a store designer for Gap, Inc.
16          I do not belong to any organizations, clubs, or
17   unions.  My hobbies are running and graphic design.
18          I am single.  I have no children.  I have no prior
19   jury service.  And I've never been in the military or law
20   enforcement.  And I've never been a party or a witness in
21   court.
22          THE COURT:  Thank you.
23          All right.  Mr. Haithcox.
24          PROSPECTIVE JUROR MR. HAITHCOX:  My name is Kevin
25   Haithcox.  I live in San Mateo.
```

PROCEEDINGS

1         **THE COURT:**  A little more into the microphone.

2         **PROSPECTIVE JUROR MR. HAITHCOX:**  San Mateo.  I have a

3  J.D.  I am an attorney right now with CNA Insurance Company.

4         No organizations, clubs, or unions.

5         Hobbies, reading, movies, restaurants.

6         Marital status, married.  My wife is a professor of

7  chemistry.  She also teaches math and is the department head.

8         **THE COURT:**  Where does she teach?

9         **PROSPECTIVE JUROR MR. HAITHCOX:**  Notre Dame de Namur

10  in Belmont.

11         I have a son, who's 9.  No prior jury service.  Never

12  in the military or law enforcement, and never a party or a

13  witness.

14         **THE COURT:**  Okay.  Good.

15         If you can't see it, we'll move it around.  Can you

16  see that well enough over there Ms. Gallo?

17         **PROSPECTIVE JUROR MS. GALLO:**  Yes, I can see it.

18         **THE COURT:**  I'll move it if you need to have it moved

19  closer.  Go ahead, Ms. Gallo.

20         **PROSPECTIVE JUROR MS. GALLO:**  I'm Megan Gallo.  I

21  live in Pleasant Hill.  I have a bachelor's in psychology from

22  Berkeley, and a master's in child development from Davis.

23         And I currently work at -- I'm a manager at

24  Nordstrom.  No clubs.  Hobbies, like reading, hiking shopping.

25         I'm married.  My husband is a tennis professional.  I

PROCEEDINGS

1 have no kids, but one on the way in middle of August.

2          I have no prior jury service.  No military.  And have

3 never been a party or a witness in court.

4          **THE COURT:**  Congratulations, by the way.

5          Do you anticipate that if you -- you could be here

6 every single day, all the way through the end of June?

7          **PROSPECTIVE JUROR MS. GALLO:**  Yeah.  You said --

8 yeah.

9          **THE COURT:**  Great.  That's good.

10          (Laughter)

11          **THE COURT:**  Now we go to Ms. Michals.

12          **PROSPECTIVE JUROR MS. MICHALS:**  Hi.  I'm Jenny

13 Michals, and I live in Oakland, California.  I have a B.A. in

14 painting -- well, in painting and print making from San

15 Francisco State.  An M.F.A.  And I have an M.S.N., also.

16          **THE COURT:**  What is an M.S.N.?

17          **PROSPECTIVE JUROR MS. MICHALS:**  Master of science in

18 nursing.

19          Currently, I'm a pediatric nurse at Lucille Packard

20 Children's Hospital.  I belong to the nurse union there, CRONA.

21          Hobbies are painting and drawing, hiking, reading.

22 I'm single.  No kids.

23          I've never been on a jury.  Never been in the

24 military.  And never a party or witness to a court.

25          **THE COURT:**  Thank you.  Mr. Martella, please.

PROCEEDINGS

1              **PROSPECTIVE JUROR MR. MARTELLA:**  My name is Dan

2     Martella.  I live in Windsor.  I have a master's of divinity

3     degree.

4              I am the pastor of the Healdsburg and the Cloverdale

5     Seventh Day Adventist churches.  Two congregations.

6              I am a member of the Healdsburg Ministries

7     Ministerial Associations.

8              Hobbies, gardening, reading, photography.

9              Marital status, married.  My spouse is a secretary

10    and home arts teacher for a parochial high school.

11             My daughter is 29.  She is a communications director.

12    My son is 27.  He is an educator on the East Coast.

13             No prior jury service.  Never been in the military or

14    law enforcement.

15             Number 12, I have been a party.  When I was probably

16    in junior high, my brother and I and my father loaned a man

17    some money.  And he defaulted on the loan, and we took him to

18    court.  I don't remember the verdict.  That was so long ago.

19             **THE COURT:**  Great.  Thank you.

20             Now we go to Mr. Troy.

21             **PROSPECTIVE JUROR TROY:**  MY name is Tim Troy.  I live

22    in Albany, across the bay.  I have a graduate degrees in

23    education, library science, and cultural anthropology.

24             I am currently employed by the San Francisco Public

25    Library.  I'm a member of the American Library Association and

PROCEEDINGS

1  city union.

2          I sail.  That's my major hobby.  I'm married.  My

3  wife is curator of the Bancroft Collection at UC Berkeley.

4          I have two sons.  One a senior at UC Davis, and the

5  other is a senior at Albany High School.

6          I served on juries in Alameda County.  One case,

7  civil case, dismissed.  And previously in New York City on

8  several criminal trials.

9          I was never in the military or law enforcement.  And

10  I was never a witness in a court.

11          **THE COURT:**  Your spouse at Bancroft, is her last name

12  also Troy?

13          **PROSPECTIVE JUROR TROY:**  No.  Her last name is

14  Salazar.

15          **THE COURT:**  Theresa Salazar?

16          **PROSPECTIVE JUROR TROY:**  That's right, yes.

17          **THE COURT:**  Well, I must disclose, I know her pretty

18  well.

19          (Laughter)

20          **THE COURT:**  I don't think it should make any

21  difference, but it might come out when you mention to her what

22  you were doing.

23          **PROSPECTIVE JUROR TROY:**  I won't mention.

24          (Laughter)

25          **PROSPECTIVE JUROR TROY:**  I guess I would not mention

PROCEEDINGS

1   that, in fact.

2           THE COURT:  All right.  Let's assume that it did come

3   out.

4           PROSPECTIVE JUROR TROY:  Yes.

5           THE COURT:  Would that have any bearing?  You would

6   have to be fair and square in this case, and decide it and

7   follow my instructions and all of that regardless of what she

8   thought of me, which I hope is good.

9           (Laughter)

10          THE COURT:  You know, it can't be a factor in the

11  case, is what I'm saying.  Do you understand that?

12          PROSPECTIVE JUROR TROY:  That's for certain, yes.  It

13  won't be a factor in the case.

14          THE COURT:  Very good.  Thank you.

15          Now let's go to Ms. Woo.

16          PROSPECTIVE JUROR MS. WOO:  My name is Trina Woo.

17  I'm from Albany, California.

18          THE COURT:  Little more in the mic phone.

19          PROSPECTIVE JUROR MS. WOO:  My name is Trina Wood.  I

20  live in Albany, California.  I have a bachelor of science in

21  mathematics.  My current position is a data miner/financial

22  analyst at Charles Schwab.

23          No organizations.  Hobbies are decidedly low tech.

24  Cooking and baking and sewing, and that sort of nonsense.

25          Marital status is single.  My partner is a finish

PROCEEDINGS

```
 1  carpenter.  No children.
 2          Prior jury service, County of Alameda.  There was a
 3  criminal case.  We came to a decision.  There was also a civil
 4  case, and that was deadlocked.  No military experience.  And
 5  never a party in a court.
 6          THE COURT:  Thank you.
 7          Now let's go to Mr. Richardson.
 8          PROSPECTIVE JUROR MR. RICHARDSON:  Gary Richardson.
 9  I currently live in Pleasanton.  I have a bachelor of science
10  in computer science.  I'm the director of --
11          THE COURT:  Dawn, would you please go give Mr. Liu
12  one of these cough drops.
13          PROSPECTIVE JUROR MR. LIU:  I have one.
14          THE COURT:  You have one?  Would you like another
15  one?
16          PROSPECTIVE JUROR MR. LIU:  In my pocket.
17          THE COURT:  Okay.  All right.  I interrupted
18  Mr. Richardson.  Please, continue.
19          PROSPECTIVE JUROR MR. RICHARDSON:  My current job is
20  I'm director of engineering at Cisco Systems.
21          No current organization or club memberships.  Lots of
22  hobbies before kids.  Not so much afterwards.
23          Married.  My wife does voice-over work, audio book
24  narration.  Two boys, 18, College freshman, and a 13-year-old.
25          No prior jury service.  No military.  And I am
```

PROCEEDINGS

1    currently a party in a litigation case.

2              THE COURT:  Can you tell us what that is.

3              PROSPECTIVE JUROR MR. RICHARDSON:  There is a patent

4    infringement case between another company and one of our

5    customers, and I am one of the lead technical advisors, I guess

6    you would call it, for that service provider.

7              THE COURT:  Are you one of the inventors on the

8    patent?

9              PROSPECTIVE JUROR MR. RICHARDSON:  No.  The patent

10   was on -- we're on the defendant's side.

11             THE COURT:  So are you a named party, or are you just

12   heavily involved in the case?

13             PROSPECTIVE JUROR MR. RICHARDSON:  You know, I don't

14   know, at this point.  You know, I signed the disclosures.  I'm

15   under discovery rules and things.  Right now it's in an appeal

16   process.  We've done work to work around the patent.  The

17   lawyers said I'll probably end up on the witness stand for that

18   case, if that gets challenged.

19             THE COURT:  All right.  Okay.  Who is the other side

20   in that case?

21             PROSPECTIVE JUROR RICHARDSON:  The other side is

22   Active Video Networks and the defendant is Verizon.

23             THE COURT:  And you're -- I thought you said you work

24   for Cisco.

25             PROSPECTIVE JUROR RICHARDSON:  Yes.  So Verizon

PROCEEDINGS

1  uses a Cisco video-on-demand product for their customers and we

2  provide that video-on-demand product and that's what was being

3  challenged.

4        **THE COURT:**  Now, have you ever heard of Java?

5        **PROSPECTIVE JUROR RICHARDSON:**  Yes.

6        **THE COURT:**  Have you ever heard of Android?

7        **PROSPECTIVE JUROR RICHARDSON:**  Yes.

8        **THE COURT:**  Have you ever heard of this lawsuit that

9  we're talking about here?

10       **PROSPECTIVE JUROR RICHARDSON:**  Umm, slightly, yeah.

11 Not a whole lot.  I haven't paid much attention.

12       **THE COURT:**  All right.  Can you put that, what you've

13 heard about it out of your mind and decide this case on the

14 evidence here at trial?

15       **PROSPECTIVE JUROR RICHARDSON:**  I would hope so.

16       **THE COURT:**  What does "hope so" mean?

17       **PROSPECTIVE JUROR RICHARDSON:**  Well, I mean, being

18 involved in a patent infringement, you tend to, you know, learn

19 a little bit more.  You have a little bit different insight.

20 So I would like to believe I can do that.  So, yes.

21       **THE COURT:**  Well, you just have to forget about what

22 you learned in those other cases and, you know, hold the

23 lawyer, whoever -- here is the way it works.  I'll tell

24 everybody.

25       One side or the other is going to have the burden of

PROCEEDINGS

1  proof on -- one side has the burden of proof on some issues,

2  the other side has the burden of proof on other issues.  When

3  you go into the jury room to deliberate after you've tried your

4  hardest to understand the evidence, if they haven't educated

5  you on it or if they haven't persuaded you, the party with the

6  burden of proof loses.  It's that simple.  You don't have to --

7  you have to make a good faith effort to understand it, but if

8  the party with the burden of proof has failed to do that, the

9  party with the burden of proof loses.  That's the standard.

10 You have to -- you, the jury, decide.

11         Now, what you cannot do is bring to bear something

12 that you've learned in some other case, some other patent case,

13 about how some piece of equipment works or something like that.

14 You can't do that.  It has to be based on the record here.

15         You understand that part?

16         **PROSPECTIVE JUROR RICHARDSON:**  I do.

17         **THE COURT:**  All right.  Can you do that?  Will you do

18 that?

19         **PROSPECTIVE JUROR RICHARDSON:**  Yes.

20         **THE COURT:**  All right.  Do you have any opinions

21 formed -- don't tell me what they are if you have, but do you

22 have any opinions about this case coming in?

23         **PROSPECTIVE JUROR RICHARDSON:**  Not about this case in

24 particular.  About software patents in particular, yes.  You

25 know, I don't know if the software patent aspect of this --

PROCEEDINGS

1    what it's about, but, you know, my -- I do have software

2    patents and this case I'm involved with is about software

3    patents.

4         You know, my opinion is that the patent lawyers write

5    those so vaguely that they are hard to argue one way or the

6    other.  And so it ends up being a very difficult time for a

7    general jury pool to understand what the legal side of things

8    actually are as far as what the patent truly means.

9         So, you know, as far as do I have opinions on this

10   case?  No.  Do I have opinions on, you know, the ability to

11   argue a patent?  Yes.  I think it's very difficult.

12        **THE COURT:**  Have you ever heard of James Gosling?

13        **PROSPECTIVE JUROR RICHARDSON:**  I don't -- I don't

14   know.  I don't think so.

15        **THE COURT:**  All right.  Well, I'm going to leave it

16   there and let the -- the lawyers may come back and ask you some

17   more questions.

18        I need to say to the rest of you.  You've heard some

19   opinions here by this particular juror.  That's not evidence in

20   the case.  And the fact that he has some opinions about

21   software patents, well, good for him.  This is still America

22   and you can have all the opinions you want.

23        But you've got to decide this case based on the

24   evidence here in the courtroom, and you can form your own

25   opinions after all the evidence is in.  That's what your duty

PROCEEDINGS

1  would be.  But you should not be taking what one juror said as

2  evidence in the case.

3          All right.  But nonetheless, thank you,

4  Mr. Richardson.

5          Now we go to Ms. Callas.

6          **PROSPECTIVE JUROR CALLAS:**  Callas, Cathrin Callas.

7  I'm from San Carlos.

8          I have a B.S. in EES from U.C. Berkeley.  My current

9  job is engineering program manager at Hewlett Packard.

10          I belong to lots of organizations, all gardening

11  related.

12          My hobbies are gardening and writing smart phone

13  apps.

14          **THE COURT:**  Are you serious?  Wait.  Are you serious?

15          **PROSPECTIVE JUROR CALLAS:**  I'm serious.

16          **THE COURT:**  You write smart phone apps?

17          **PROSPECTIVE JUROR CALLAS:**  For fun.

18          **THE COURT:**  Have you ever heard of Java or Android?

19          **PROSPECTIVE JUROR CALLAS:**  Yes.

20          **THE COURT:**  Give us an example of smart phone apps

21  you have written.

22          **PROSPECTIVE JUROR CALLAS:**  I've actually written for

23  Web OS.  There's a gardening app that creates a gardening

24  journal and a weather app that tells me when it's going to

25  freeze or get too hot.

PROCEEDINGS

```
 1              THE COURT:  Have you ever heard of this lawsuit
 2   before?
 3              PROSPECTIVE JUROR CALLAS:  Yes.
 4              THE COURT:  You have.  Without telling me what your
 5   opinions are, do you have an opinion about this lawsuit
 6   already?
 7              PROSPECTIVE JUROR CALLAS:  Not about the lawsuit, no.
 8              THE COURT:  Well, continue on.  Maybe we'll come back
 9   to that.  Continue on.
10              PROSPECTIVE JUROR CALLAS:  Okay.  Let's see.
11   Married.  My husband works for a member of Congress.  He's a
12   senior consultant for Jackie Speier.
13              I have a son who is 20.  He's a student at U.C.
14   Santa Cruz in computer science.
15              I served on a jury, I think, more than 10 years ago;
16   criminal jury, criminal trial.  We reached a verdict.
17              I have never been in the military or law enforcement
18   or never been a party or witness in court.
19              THE COURT:  Thank you.
20              Next we go to Mr. Thompson.
21              PROSPECTIVE JUROR THOMPSON:  Hi, I'm Greg Thompson.
22   I live in Fremont.
23              I have a B.A. in business administration from the
24   University of Washington.
25              I work for United Motor Manufacturing.  My job is,
```

PROCEEDINGS

 1   I'm a retirement plan specialist.

 2          I belong to two organizations:  The Sierra Club and

 3   pacific Crest Trail Association.  My hobbies are hiking and

 4   cycling.

 5          I'm married.  My wife is a flight attendant.  I have

 6   one child.  She's 26, I think.  She just graduated from

 7   college, but she's unemployed.

 8          And I have not served on a jury before.  I have not

 9   been in the military or law enforcement.  I have -- I have been

10   called two times as a witness in court to do with my

11   employment, and one time I was a party in small claims court.

12   I represented my homeowner's association.

13          **THE COURT:**  Have you, yourself, done the Pacific

14   Crest Trail?

15          **PROSPECTIVE JUROR THOMPSON:**  I have.  I hiked the

16   entire trail in 2005.

17          **THE COURT:**  From Canada to Mexico?

18          **PROSPECTIVE JUROR THOMPSON:**  Yes.  In fact, that's

19   the direction I hiked.

20          **THE COURT:**  Good for you.  That's a wonderful

21   accomplishment.  Thank you.

22          Now we go to Mr. Hotvedt.

23          **PROSPECTIVE JUROR HOTVEDT:**  Hotvedt, that's right.

24          **THE COURT:**  Please go ahead.

25          **PROSPECTIVE JUROR HOTVEDT:**  My name is Steven Hotvedt

PROCEEDINGS                                    86

1    and I live in Alameda, California.

2              I have an Associate of Fine Arts degree.

3              My last job was HJW, Hammon, Jensen, Wallen.  They

4    are mapmakers and I was an aerial photographer for that

5    company.

6              I'm not a member of any organizations, clubs or

7    unions.  I used to be to the Northern California Newspaper

8    Guild, but I'm no longer there.

9              Hobbies, no.  I have a lot of interests, but I don't

10   have any one that I would call a hobby.

11             Marital status, divorced.  My spouse was a deputy

12   probation officer for the Alameda County.  I have one son.

13   He's 36 years old.  He's working at a laundry.

14             I have had prior jury service.  First time was at

15   Superior Court in Bridgeport, Connecticut, County of Fairfield.

16   And about -- called up about 10 times to Superior Court jury

17   duty in Oakland.  And I had a murder case and we acquitted.  I

18   also was called up when I was living in Albany for Municipal

19   jury duty.  The case was thrown out of court that I was on.

20             Let's see.  I was in the Marine Corps for six years

21   and I had done law enforcement type work there; doing accident

22   investigation, autopsies, that sort of work.

23             I have been sued, but I won that.

24             **THE COURT:**  What was it about?

25             **PROSPECTIVE JUROR HOTVEDT:**  It was a --

PROCEEDINGS

```
1           THE COURT:  What kind of case?

2           PROSPECTIVE JUROR HOTVEDT:  It was an auto accident

3  and they were trying to get more money from my insurance

4  company, and they didn't get it.

5           THE COURT:  All right.

6           PROSPECTIVE JUROR HOTVEDT:  And I have been a witness

7  in court.  It was a court martial, actually, as a photographer;

8  expert witness.

9           THE COURT:  Okay.

10           PROSPECTIVE JUROR HOTVEDT:  And that's it.

11           THE COURT:  I didn't catch what you do now.  What is

12  your occupation.

13           PROSPECTIVE JUROR HOTVEDT:  I'm retired.  I was a

14  photographer.

15           THE COURT:  You were a what?

16           PROSPECTIVE JUROR HOTVEDT:  Photographer.

17           THE COURT:  Photographer, all right.  Very good.

18           All right.  Now, we're going to take a break in a few

19  minutes, but not yet.  Can you go about five more minutes?  Ten

20  more minutes?

21           You need a break?

22           (Prospective Juror Martella nodding affirmatively.)

23           THE COURT:  You do.  Okay.  Well, then, we'll take

24  our break now.

25           I've got to tell you, though, some guidelines here.
```

PROCEEDINGS

1   You remember what I said.  No talking about the case.  No

2   Googling the case.  I guess I shouldn't use that phrase in this

3   trial, but you know what I mean.

4        (Laughter.)

5        **THE COURT:**  No internet research about the case of

6   any type.  No talking with anyone, none of that.

7        And we'll pick it up right there when we come back in

8   about 15 minutes.  Let's make it 20 minutes because there are

9   so many of you.

10       And this also applies to those of you in the back of

11  the room as well.  I need to ask all of you to step outside so

12  that I can have a few words with the lawyers.  So all of the

13  venire -- that means the prospective jurors -- need to be

14  outside while I have this talk.

15       So we'll take our facilities break at this time.

16       (Prospective jurors exit courtroom at 9:34 a.m.)

17       **THE COURT:**  Be seated.

18       So any issues for the Court?

19       **MR. JACOBS:**  There are two jurors who jump out as

20  having potentially problematic views that I would rather not

21  have to develop in front of the rest of the venire.

22       One is Mr. Richardson, with his views on patents and

23  the software arena.  And the other is Ms. Callous, who works as

24  a program manager for HP.

25       There is a separate lawsuit right now between HP and

PROCEEDINGS                                                          89

1  Oracle.  It's quite a bitter dispute.  It's actually on a track
2  to go to trial pretty soon as well.
3          And so both of those, I would think -- ultimately I
4  probably could develop a record for cause, but I would rather
5  not have to get the rest of the jury, the rest of the panel to
6  hear all that.
7          **THE COURT:**  Mr. Van Nest?  What do you say?
8          **MR. VAN NEST:**  I don't have any problem talking to
9  these folks outside the presence of the rest of the venire,
10 your Honor.  And I don't see anyone else that we would need to
11 do that with.
12         **MR. JACOBS:**  Your Honor, if I could -- sorry.
13         **MR. VAN NEST:**  I was just going to say, if
14 Ms. Callous is involved in the litigation, then we should
15 explore that.  But, again, I don't have any problem doing
16 that --
17         **THE COURT:**  Is that the case in front of Judge
18 Hamilton?  What case is that?
19         **MR. JACOBS:**  No.  That's a different case, your
20 Honor.  That would be SAP.
21         **THE COURT:**  All right.  Do you have any problematic
22 areas, Mr. Van Nest?
23         **MR. VAN NEST:**  That would require discussion outside
24 the presence of the rest of the group?  I don't think so, your
25 Honor.

PROCEEDINGS

1          THE COURT:  All right.

2          MR. JACOBS:  The other one, your Honor, would be a

3    slightly lower level of concern, but still concerning is

4    Mr. Dimaggio.  He referred to the layoff by Oracle upon the

5    acquisition of PeopleSoft, and I had the impression that he

6    felt pretty strongly about his close friends who were laid off

7    in the wake of that acquisition.

8          THE COURT:  I'm sorry.  Who was that?

9          MR. JACOBS:  Juror No. 3, your Honor.

10         THE COURT:  Mr. Dimaggio?

11         MR. JACOBS:  Correct.

12         THE COURT:  Well, you can develop that on voir dire.

13   I didn't get the impression that -- you know, just about

14   everyone -- that seems very minor.  You can develop that on

15   voir dire.

16         MR. VAN NEST:  Your Honor, the only other juror that

17   we might consider, Ms. Michals just mentioned when she sat down

18   that she heard about the case on the news.  We obviously don't

19   want to know what the news was she heard.  She might merit some

20   discussion outside the presence of the rest of the group.  It

21   may have been a casual radio mention of it, but it might have

22   been more in depth.  I wouldn't think we would want to be

23   asking about that in front of everyone else.  I think she is

24   the only juror that mentioned hearing it on the news.

25         THE COURT:  Well, possibly you're right.  In due

PROCEEDINGS

```
 1  course I will see what I can do to have us have the opportunity
 2  to quiz these people outside the presence of the others, but,
 3  you know, you don't have any absolute right for that to occur.
 4  I just instruct them to disregard it.  And we're not going to
 5  get bogged down in a bunch of out of the presence of the rest
 6  of the people to do this, but I'm going to consider it and see
 7  how the rest of the voir dire goes.
 8          All right.  I have in mind the three cases that you
 9  brought up and I will see what I can do to accommodate your
10  concerns.  We're going to take a 15-minute break at this time.
11  And I will pick it up where we left off when we come back.
12          MR. JACOBS:  Thank you, your Honor.
13          (Whereupon there was a recess in the proceedings
14           from 9:40 a.m. until 9:56 a.m.)
15          THE COURT:  Chris, do we have all of the venire back?
16          CSO OFFICER:  I lost count.  We have 43 left in here.
17          THE COURT:  Should be 43.
18          THE CLERK:  Forty-two.
19          THE COURT:  Forty-two.  I'm sorry.
20          CSO OFFICER:  I have 42.
21          THE COURT:  Thank you.  If you could close that door,
22  I'd appreciate it.
23          Okay.  Let's continue on.  And, you know, I have to
24  ask you these questions in order to pry enough into your
25  background to figure out if you will be fair and impartial to
```

PROCEEDINGS

1   both sides.  It's very important to get the most fair and

2   impartial jury we can.

3           It doesn't mean you can't have opinions or have some

4   familiarity with somebody in the room or some party in the

5   room, but the important question is whether or not anything

6   you're bringing to bear can be ignored by you and you'll be

7   able to do your job as a fair and impartial juror by ignoring

8   anything else that you might have heard or so forth.

9           Let me ask a different question.  Do any of you read

10  computer magazines?  If so, raise your hand.

11          Okay.  One, two hands go up.

12          Whose got the microphone over there?  Let's go to Ms.

13  Callas.

14          **PROSPECTIVE JUROR CALLAS:**  Callas, yeah.

15          **THE COURT:**  What magazines do you like?

16          **PROSPECTIVE JUROR CALLAS:**  Magazines, not physical

17  magazines, but I read a lot of computer articles on the web.

18  InfoWorld, PC magazine, you know.

19          **THE COURT:**  And what sort of topics do you like to

20  read about?

21          **PROSPECTIVE JUROR CALLAS:**  Umm, anything related to

22  my business.  You know, mobile phones, software development; a

23  lot of different things.

24          **THE COURT:**  Remind me who your employer is.

25          **PROSPECTIVE JUROR CALLAS:**  Hewlett Packard.

PROCEEDINGS

1          THE COURT:  What do you do for them?

2          PROSPECTIVE JUROR CALLAS:  I'm an engineering program

3   manager.  I work in R&D.

4          THE COURT:  And you write apps there?

5          PROSPECTIVE JUROR CALLAS:  No.  I do that for fun.  I

6   do some software development and quality program management for

7   work.

8          THE COURT:  So you, at work, do software development?

9          PROSPECTIVE JUROR CALLAS:  Right.

10          THE COURT:  What does that mean?

11          PROSPECTIVE JUROR CALLAS:  I develop internal tools

12   to help with managing quality in our business.

13          THE COURT:  All right.  Is there some item of

14   software out there in the marketplace that you had something to

15   do with?

16          PROSPECTIVE JUROR CALLAS:  Well, indirectly I'm

17   involved with HPX, which is HP's Unix operating system.

18          THE COURT:  Good.  You've answered my question.

19          Mr. Richardson, what magazines or online things do

20   you read?

21          PROSPECTIVE JUROR RICHARDSON:  Basically the same

22   ones, like InfoWorld.  I typically get forwarded a number of

23   articles pertaining to my industry, which is video-on-demand.

24   So anything that, you know, is related to that I tend to get

25   forwarded from either coworkers or other people within the --

PROCEEDINGS

1   within my organization.

2          **THE COURT:**  All right.  Now, and remind me who do you

3   work for again?

4          **PROSPECTIVE JUROR RICHARDSON:**  Cisco.

5          **THE COURT:**  Cisco.  So this is really going to be

6   directed at both of you, but, you know, you come to the party,

7   so to speak, with some prior training that bears upon the

8   subject matter we're going to be hearing a lot about here.

9   That's okay.  That's not disqualifying, but you -- it's okay to

10  use your common sense when you render a verdict, but you cannot

11  add to the record in court something that you know about the

12  way software programming works that the witnesses didn't

13  actually testify to.  You see what I'm saying?

14         You've got to decide the record -- the case based on

15  the record made here as opposed to adding into it what else you

16  may have known about the way programming and software works.

17         Now, you might -- the answer to that might be, fine,

18  I can do that.  The answer to that may be, no, it would be too

19  hard for me to do that.

20         Tell me in your case, Mr. Richardson, what's the

21  answer to that?

22         **PROSPECTIVE JUROR RICHARDSON:**  Doing this for 24

23  years, it would be pretty difficult to ignore my experience.

24         **THE COURT:**  How about you, Ms. Callas?

25         **PROSPECTIVE JUROR CALLAS:**  I'm in the same boat.  I

 1  have been involved in patents and I think I would have a hard

 2  time not bringing my own thoughts into it.

 3          **THE COURT:**  I'm going to excuse both of you unless

 4  there is an objection.  Any objection?

 5          **MR. JACOBS:**  No objection.

 6          **MR. VAN NEST:**  No objection, your Honor.

 7          **THE COURT:**  All right.  I think it would be too hard

 8  for you to sit in this case and sort out what you knew already

 9  against what is proven or not proven here, and it would not be

10  fair to the parties to have that extra burden even though you

11  two actually know something about the subject.  It's in a way

12  too bad, but it's for the best.  So you two are excused to go

13  back to the jury assembly room.  Thank you.

14          I'm going to excuse Mr. Richardson first and then Ms.

15  Callas next and we will replace them in that order.

16          (Prospective Juror Richardson and Prospective

17           Juror Callas exit the courtroom.)

18          **THE COURT:**  Who will take Mr. Richardson's seat?

19          **THE CLERK:**  Elizabeth Hostynek, H-O-S-T-Y-N-E-K.

20          **THE COURT:**  All right.  Please come up and take

21  Mr. Richardson's seat.

22          And who will replace Ms. Callas?

23          **THE CLERK:**  Patricia Pearlman, P-E-A-R-L-M-A-N.

24          **THE COURT:**  All right.  So, Ms. Pearlman, you take

25  the seat over there by Mr. Thompson, who has done the Pacific

PROCEEDINGS

```
 1  Crest Trail.  You can't get in over there, is that it?

 2              PROSPECTIVE JUROR HOSTYNEK:  I don't see any way to

 3  get in.

 4              THE COURT:  You take the fourth seat -- no, no, no,

 5  no.  Ms. Pearlman is closest to me.  Thank you.

 6              All right.  Welcome.  Any hardship issue you wish to

 7  raise?

 8              PROSPECTIVE JUROR HOSTYNEK:  No.

 9              PROSPECTIVE JUROR PEARLMAN:  No.

10              THE COURT:  Good.

11              And you heard me in my little talk about you've got

12  to be here at 7:45.  You'll stay til 1:00.  Now, when you start

13  to deliberate, usually the juries want to go longer than 1:00

14  o'clock.  They want to go til 4:00, sometimes 7:00 p.m.  Most

15  of the times during this trial you will be out at 1:00 o'clock.

16  The vast majority of the day you will be out at 1:00 o'clock,

17  but you've got to be here the whole time.

18              You understand that part?

19              PROSPECTIVE JUROR HOSTYNEK:  Yes.

20              PROSPECTIVE JUROR PEARLMAN:  Yes.

21              THE COURT:  Would you have raised your hand to any of

22  those questions that I asked?

23              PROSPECTIVE JUROR HOSTYNEK:  No.

24              PROSPECTIVE JUROR PEARLMAN:  No.

25              THE COURT:  Never heard of any of these people?
```

PROCEEDINGS

```
 1              PROSPECTIVE JUROR HOSTYNEK:  No.

 2              PROSPECTIVE JUROR PEARLMAN:  No.

 3              THE COURT:  How about the companies?  Ever heard of

 4    any of these companies?

 5              PROSPECTIVE JUROR HOSTYNEK:  Yes.

 6              PROSPECTIVE JUROR PEARLMAN:  Sure.

 7              THE COURT:  Give me the microphone.  Who has got the

 8    mic?

 9              Ms. Pearlman, you first.  Tell me this:  Anything you

10    know about these companies, would that influence -- would it

11    make you biased one way or the other?

12              PROSPECTIVE JUROR PEARLMAN:  No, it wouldn't.

13              THE COURT:  How about you, Ms. Hostynek?

14              PROSPECTIVE JUROR HOSTYNEK:  No, it wouldn't.

15              THE COURT:  Okay.  So, great.

16              Let's start with Ms. Hostynek.  Ms. Hostynek, can you

17    see that chart up there?

18              PROSPECTIVE JUROR HOSTYNEK:  Yes.

19              THE COURT:  Please give us the information.

20              PROSPECTIVE JUROR HOSTYNEK:  My name is Elizabeth

21    Hostynek.  I live in Lafayette, Contra Costa County.

22              I have a B.A. in psychology English from Skidmore

23    College.

24              My most recent job other than teaching, I'm retired,

25    has been taking people to kidney dialysis and taking care of
```

PROCEEDINGS

1   children after school.

2          Don't belong to any organizations, clubs or unions

3   that I can think of at the moment.

4          Hobbies:  Reading, writing, foreign movies, music.

5          I'm married, 45 years.  My husband is a doctor of

6   chemistry.  He works at U.C.S.F. in the dermatology department.

7          I have two children, two boys; two men, 44 and 43.

8   One is a cinematographer.  He makes movies, snowboarding

9   movies.  And the other is an artist, a musician, performer, a

10  poet.

11         Prior jury service.  Yes, I have served on a jury in

12  Contra Costa County.  That was in Martinez.  It was a criminal

13  case and the verdict was guilty.

14         **THE COURT:**  You don't have to tell us the verdict.

15         **PROSPECTIVE JUROR HOSTYNEK:**  Pardon me?

16         **THE COURT:**  We want to know if you were able to reach

17  a verdict.

18         **PROSPECTIVE JUROR HOSTYNEK:**  Oh, yes.

19         **THE COURT:**  Who is hacking and coughing?  Somebody is

20  hacking and coughing.

21         Would you please hand a cough drop to that table and

22  remind counsel that we don't like hacking and coughing.

23         (Laughter.)

24         **THE COURT:**  It's just like a static crash during the

25  radio.  If you're listening to a radio and a static crash

PROCEEDINGS

```
 1  comes, you can't hear half the sentence.  Thank you.
 2          Now, go back over the part that I missed.
 3          PROSPECTIVE JUROR HOSTYNEK:  Which?  Children or
 4  prior jury service?
 5          THE COURT:  I was telling you, you don't have to tell
 6  us if it was guilty or not, but we do want to know if you were
 7  able to reach a verdict.
 8          PROSPECTIVE JUROR HOSTYNEK:  Yes.
 9          THE COURT:  There is a reason for that, just so
10  everyone will know.  Because if you didn't reach a verdict,
11  that tells the lawyers maybe this person is going to be a
12  hold-out artist and not reach a verdict.  I think that's the
13  reason we ask that question.
14          But we don't need to know whether it was guilty or
15  not guilty.  We want to know if you were ever on a jury where
16  they were able to reach a verdict.
17          PROSPECTIVE JUROR HOSTYNEK:  Yes.
18          THE COURT:  And in your case good for you, you
19  reached a verdict.
20          PROSPECTIVE JUROR HOSTYNEK:  We reached a verdict.
21  Yes, we did.
22          THE COURT:  Go ahead.
23          PROSPECTIVE JUROR HOSTYNEK:  I have never been in the
24  military or law enforcement.
25          And a party or witness in court.  Well, a friend
```

1  asked me to be a witness in her case against someone who was

2  living in her house and would not leave.

3           THE COURT:  All right.  Great.  Thank you.

4           Ms. Pearlman, your turn.

5           PROSPECTIVE JUROR PEARLMAN:  My name is Patricia

6  Pearlman.  I live in Cotati.  I graduated high school.

7           I am a letter carrier for the United States Postal

8  Service.  I belong to the National Association of Letter

9  Carriers.

10          I like camping and gardening.

11          I am married.  My husband is a letter carrier also

12  for the postal service.

13          I have twin girls, 18 years old.  One attends Santa

14  Rosa J.C. and the other attends U.C. Irvine.

15          I have never served on a jury.  I have never been in

16  the military or law enforcement.

17          I did -- I was in a car accident and I did sue the

18  driver, but it was settled in a mediation.  And that's it.

19          THE COURT:  Are you -- you're a letter carrier in

20  Cotati?

21          PROSPECTIVE JUROR PEARLMAN:  Rohnert Park.  Rohnert

22  Park, Cotati.

23          THE COURT:  Okay.  Excellent.

24          Now, for both of you:  Did you hear all those

25  questions that I previously asked?

1        **PROSPECTIVE JUROR PEARLMAN:**  Yes.

2        **PROSPECTIVE JUROR HOSTYNEK:**  Yes.

3        **THE COURT:**  Would you have raised your hand to any of

4   them?

5        **PROSPECTIVE JUROR PEARLMAN:**  No, no.

6        **PROSPECTIVE JUROR HOSTYNEK:**  No.

7        **THE COURT:**  You are both indicating no.  Great.  Just

8   hold onto the microphone then.

9        Let me ask this more general question to all 18 of

10  you.  You know, I know you've heard of Oracle and I know you've

11  heard of Google.  There is no way we would not have heard of

12  those big companies.  And that's fine.

13       You know, like when we had the Barry Bonds case here

14  in this courthouse, everybody in America had heard of the

15  parties in that case, of course.  So it's okay if you've heard

16  of them, but I need to know if there is something particularly

17  good or particularly bad that you have heard about one company

18  or the other.  And then my follow-up question to you is going

19  to be whether or not that would cause you to be biased one way

20  or the other against one of these two companies.

21       Let me give you some examples.  Let's say you that

22  had a neighbor who for some reason had an employment situation

23  with one of these companies and had a terrible time.  Or let's

24  say that one of these companies had done something particularly

25  good, given like a bonus certificate that you felt just like

```
 1  was a gift that you didn't deserve, but you really appreciated

 2  it and it was a nice thing for them to have done.  Maybe you're

 3  a school teacher and they gave something to your school.

 4          Something particularly good or particularly bad.  And

 5  I don't want to know yet what it was, but I would like for you

 6  to raise your hand if there is -- I'm not talking about the

 7  kind of routine things.  I'm talking about particularly good or

 8  particularly bad.  If so, raise your hand?

 9          Okay.  Our lawyer down there, Mr. Haithcox.  Okay,

10  let's go down to you.

11          Now, you're a lawyer, right?

12          PROSPECTIVE JUROR HAITHCOX:  Correct.

13          THE COURT:  You tell me:  Is this something you

14  should tell us in open court or is this something that you want

15  to tell us more privately?

16          PROSPECTIVE JUROR HAITHCOX:  It can be in open court.

17          THE COURT:  All right.  Go ahead.  Tell us what it

18  is.

19          PROSPECTIVE JUROR HAITHCOX:  It's just that one of

20  the companies, my relative was -- their department was

21  reorganized and she was very unhappy with the company and quit.

22          THE COURT:  Okay.  One of your employees?

23          PROSPECTIVE JUROR HAITHCOX:  No, relatives.

24          THE COURT:  How close a relative?

25          PROSPECTIVE JUROR HAITHCOX:  It's one of our closer
```

```
 1  relatives.  I can't trace out exactly how she's related.  We
 2  call her a cousin, but she is not exactly a cousin.
 3          THE COURT:  Without telling us which company it was,
 4  the question I have for you is:  Will that influence your
 5  ability to be fair and impartial here?
 6          PROSPECTIVE JUROR HAITHCOX:  No, I don't think it
 7  will.
 8          THE COURT:  Okay.  Thank you.
 9          Anyone else?
10          (No response.)
11          THE COURT:  All right.  No one else is raising their
12  hand.  All right.  Great.
13          Let's see.  Do any of you have a cell phone or smart
14  phone or tablet that uses the Android system?  If so, raise
15  your hand.
16          Just one of you.  Okay.  That's Ms. Michals.  Let's
17  pass it back to you.
18          Ms. Michals, I hate to be so nosy, but I have to ask
19  this.  Tell me what kind of phone it is.
20          PROSPECTIVE JUROR MICHALS:  It's HGC, Incredible
21  Droid.  Droid Incredible.  How long have you had that?
22          PROSPECTIVE JUROR MICHALS:  I have had it since last
23  September because I was upset with my iPhone.
24          (Laughter.)
25          THE COURT:  Well, fortunately Apple is not a party --
```

```
 1            PROSPECTIVE JUROR MICHALS:  Just letting you know.

 2            THE COURT:  (Continuing) -- in this case.  So good

 3   for you.

 4            All right.  So have you been happy with it so far?

 5            PROSPECTIVE JUROR MICHALS.  Yeah.  It's too many

 6   buttons to push, but it's good.  It's okay.

 7            THE COURT:  Now, in this trial we're going to hear a

 8   lot about the Android system, which you use.  Right?

 9            PROSPECTIVE JUROR MICHALS:  Uh-huh.

10            THE COURT:  So you can't rely upon what you already

11   know.  You have to ignore that and base your decision on the

12   evidence presented here.  You understand that part?

13            PROSPECTIVE JUROR MICHALS:  Got it.

14            THE COURT:  Now, are you able to do that?

15            PROSPECTIVE JUROR MICHALS:  Yes.

16            THE COURT:  Okay.  Do you have any strong -- not just

17   strong.  Do you have any bias whatsoever in favor of or against

18   Android or Google in this case?

19            PROSPECTIVE JUROR MICHALS:  No, I don't.

20            THE COURT:  All right.  So if you were to rule

21   against -- if you thought the evidence really did favor Oracle,

22   you would be willing to rule for Oracle here even though that

23   would hurt Google, the company that came up with Android?

24            PROSPECTIVE JUROR MICHALS:  Of course, yes.

25            THE COURT:  Okay.  Great.
```

PROCEEDINGS

```
 1              Anyone else have an Android type phone?

 2              (No response.)

 3         THE COURT:  Here is another thing.  During the long

 4    course of this trial if you were to go get one, I would have to

 5    hold an evidentiary hearing I think.

 6              (Laughter.)

 7         THE COURT:  So you -- really, I'm serious.  I would

 8    have to ask you the same kind of questions I just asked Ms.

 9    Michals.  So you would need to keep that in -- anyone on the

10    verge of going and buying one or considering it?

11              Reverend Martella.

12         PROSPECTIVE JUROR MARTELLA:  I don't currently have

13    an Android, but I did until a couple of weeks ago.

14         THE COURT:  Okay.  What happened?

15         PROSPECTIVE JUROR MARTELLA:  I didn't want to spend

16    that much money any more.

17         THE COURT:  Okay.

18         PROSPECTIVE JUROR MARTELLA:  So I got a dumb phone.

19         THE COURT:  You got a dumb phone?

20         PROSPECTIVE JUROR MARTELLA:  Yeah.

21         THE COURT:  Ha-ha, okay.  So, good for you.  So you

22    no longer have a smart phone.

23         PROSPECTIVE JUROR MARTELLA:  No.

24         THE COURT:  But did you have a bad experience with

25    that phone, or was it just the expense?
```

PROCEEDINGS                              106

1              **PROSPECTIVE JUROR MARTELLA**:  Not particularly.

2    Mostly the expense.

3              **THE COURT**:  All right.  Now, same question.  If

4    you're on the jury, you've got to forget how that phone worked.

5    You've got to base your decision on what comes out here at

6    trial and forget what you knew personally.  You understand that

7    part?

8              **PROSPECTIVE JUROR MARTELLA**:  I understand.

9              **THE COURT**:  And can you do that and will you do that?

10             **PROSPECTIVE JUROR MARTELLA**:  Yes.

11             **THE COURT**:  Okay.  Good.

12             All right.  Anyone else?

13             (No response.)

14             **THE COURT**:  Anyone in the recent past had an Android

15   phone?

16             (No response.)

17             **THE COURT**:  All right.  No one else has.  Okay.

18             Let's go to the next question.  Okay.  Raise your

19   hand if you have any specialized training in the following

20   areas, and that first one is computer software or hardware

21   development or design?  If you have specialized training or

22   experience in that area, please raise your hand?

23             Okay.  One hand is going up, and that would be

24   Ms. Woo.  And Ms. Michals.

25             Okay.  Ms. Woo, just in a sentence tell us what it

PROCEEDINGS                                                     107

1    is.

2              **PROSPECTIVE JUROR WOO:**  I work against data bases,

3    produce software that does reporting.  And so the various

4    databases, Teradata, Oracle, SQL Server.

5              **THE COURT:**  So do you write the software?

6              **PROSPECTIVE JUROR WOO:**  Yes.

7              **THE COURT:**  You write the software.  Who do you work

8    for again?

9              **PROSPECTIVE JUROR WOO:**  Charles Schwab.

10             **THE COURT:**  And what computer language do you use?

11             **PROSPECTIVE JUROR WOO:**  Using SQL and Linux, and

12   that's about it right now.

13             **THE COURT:**  Okay.

14             **PROSPECTIVE JUROR WOO:**  Oh, various form of Oracle,

15   PLSQL, and Teradata's -- Teradata's version.

16             **THE COURT:**  All right.  So, again I have to ask you:

17   You know some things about software that the ordinary person

18   would not know, right?

19             **PROSPECTIVE JUROR WOO:**  Right.

20             **THE COURT:**  And can even program in a programming

21   language, right?

22             **PROSPECTIVE JUROR WOO:**  Yes.

23             **THE COURT:**  Most people can't do that.

24             **PROSPECTIVE JUROR WOO:**  They could.

25             **THE COURT:**  But you have to put that to one side and

```
 1   if the parties prove it up in court, great.  If they don't

 2   prove it up in court, then you've got to hold it against them.

 3   You can't supplement the record with what you personally know.

 4   Do you understand that?

 5            PROSPECTIVE JUROR WOO:  I do understand.

 6            THE COURT:  All right.  Will you keep straight what

 7   it is you know versus what's been proven and rule just on

 8   what's been proven?

 9            PROSPECTIVE JUROR WOO:  Yes.

10            THE COURT:  Okay.  Let's go back to Ms. Michals.

11            You said that you have some computer

12   software/hardware development or design experience.  What is

13   that?

14            PROSPECTIVE JUROR MICHALS:  It's in the design realm.

15   I worked in the film industry in a broadcast graphics house as

16   a line producer.  I didn't -- I wasn't designing.  And I've

17   work in the web world.  Miscellaneous web administration jobs.

18   Nothing major.

19            THE COURT:  Same question:  Can you put that to one

20   side?  Forget about it and decide this case on the actual

21   evidence here?

22            PROSPECTIVE JUROR MICHALS:  Yes, I can.

23            THE COURT:  Thank you.

24            Anyone else?

25            (No response.)
```

PROCEEDINGS

1          **THE COURT:**  Okay.  Next subject matter is mobile

2    computing technology, including smart phones and tablets.

3          I will repeat that.  Mobile computing technology

4    including smart phones and tablets.  Any specialized knowledge

5    or training there?  If so, raise your hand.

6          (No response.)

7          **THE COURT:**  No hands go up.

8          Next one is patent and copyright law.  Just say,

9    patents and copyrights.  Anybody got any specialized training

10   or experience in patents or copyrights?  If so, raise your

11   hand.

12         (No response.)

13         **THE COURT:**  No hands go up.  Okay.

14         Any of you have any specialized training or knowledge

15   in Java or Android?  If so, raise your hand.

16         (No response.)

17         **THE COURT:**  No hands go up.

18         Finance.  Finance.  No. 4, Mr. Rutherford, right?

19   Mr. Rutherford, I think you told us your job, but let's go back

20   to you.

21         Is there something to add to your experience in

22   finance other than what you've already told us?

23         **PROSPECTIVE JUROR RUTHERFORD:**  No.

24         **THE COURT:**  Okay.  Good.  I don't think we need to

25   ask you to repeat it then.

1              How about electrical engineering?  Any of you have

2     specialized training in electrical engineering?

3              (No response.)

4              **THE COURT:**  Okay.  Nobody does.  Good.

5              I'm just going to do a question that strikes me.  You

6     know, we have two types of people -- maybe there are three or

7     four types, but one type, the geeky types who are really into

8     all this modern technology, and then you have people who are

9     not so into it and might just as soon wish we were back in

10    1989, or you may be in the middle.  I'm not interested if

11    you're in the middle part.

12             But if you think you're way out there on either end

13    of that spectrum, I want you to raise your hand.  Let's first

14    start with the geeky end.  How many of you think they are in

15    the geeky end?

16             (No response.)

17             **THE COURT:**  Nobody is raising their hand.

18             How about the other end?  The not so -- the opposite?

19             Okay.  Ms. Pearlman, you would put yourself at the

20    state of the art 1989?

21             **PROSPECTIVE JUROR PEARLMAN:**  Yeah.  I don't really do

22    anything with computers or anything.  If I want to know

23    anything, I ask my husband or kids.

24             **THE COURT:**  All right.  Do you have a computer at

25    home?

```
 1              PROSPECTIVE JUROR PEARLMAN:  We have a computer.

 2              THE COURT:  Do you have a cell phone?

 3              PROSPECTIVE JUROR PEARLMAN:  I have a cell phone, but

 4  it's just basic.

 5              THE COURT:  It's the basic phone.

 6              PROSPECTIVE JUROR PEARLMAN:  Call and talk to people

 7  or whatever.  No texting.  No anything.

 8              THE COURT:  All right.  Let's do it a different way.

 9  How many of you just have your plain basic cell phone without

10  internet access?  How many of you have that?

11              Ms. Pearlman, I assume that's what you have, right?

12              PROSPECTIVE JUROR PEARLMAN:  Correct.

13              THE COURT:  And how many of you are in that category?

14              Okay.  Keep your hands up.  The lawyers will want to

15  know this.

16              How many of you have a smart phone that has got

17  internet capability?  All right.  We've got several hands that

18  go up there.  Okay, that's good.

19              And then we'll assume the rest of you are somewhere

20  else.  Okay.

21              All right.  Now, we go to some more questions.  Have

22  any of you ever heard the phrase "open source software."  Raise

23  your hand high if you have ever heard that?  "Open source

24  software."

25              Okay.  Now, who has the microphone?  Let go to
```

1   Mr. Dimaggio.

2       Mr. Dimaggio, just in a sentence what do you think

3   that means?

4       **PROSPECTIVE JUROR DIMAGGIO:** I believe that it means

5   that anyone can write to it and make a program for it.

6       **THE COURT:** Okay. Have you ever done that yourself?

7       **PROSPECTIVE JUROR DIMAGGIO:** No, I have not.

8       **THE COURT:** Do you have a close friend or relative

9   that does that?

10       **PROSPECTIVE JUROR DIMAGGIO:** No, I don't.

11       **THE COURT:** Okay. Do you have strong opinions on

12   that subject?

13       **PROSPECTIVE JUROR DIMAGGIO:** I do not.

14       **THE COURT:** Okay. Now, in this case we're going to

15   hear that phrase and we're going to find out what the

16   evidence -- from the evidence what that phrase means.

17       Are you willing to go with the evidence in the case

18   and put aside what you've heard somewhere else about what that

19   means?

20       **PROSPECTIVE JUROR DIMAGGIO:** Yes.

21       **THE COURT:** Okay.

22       All right. Let's go to Ms. Woo. Ms. Woo, same

23   questions. What do you think "open source software" means.

24       **PROSPECTIVE JUROR WOO:** It's a group code that's

25   available openly to other individuals to contribute or to

PROCEEDINGS                                                         113

1   utilize for their own purposes.

2            THE COURT:  All right.  And in this case we're going

3   to hear some of the more technical terms about what that means.

4   You'll be required to set aside what you think of and go based

5   on the evidence in the case.

6            The lawyers and the witnesses will explain more

7   technically what "open source software" means, and will you be

8   able to decide the case based on the record and put aside what

9   you have previously heard?

10           PROSPECTIVE JUROR WOO:  Yes.

11           THE COURT:  All right.  Likewise, Mr. Troy.  Did you

12  raise your hand?

13           PROSPECTIVE JUROR TROY:  No.

14           THE COURT:  All right, Ms. Michals.  You raised your

15  hand.  Same question to you.

16           PROSPECTIVE JUROR MICHALS:  Software that everyone

17  can work on, use bytes.

18           THE COURT:  And would you be willing to put aside

19  what you heard about the way that process works?

20           PROSPECTIVE JUROR MICHALS:  Yes.

21           THE COURT:  All right.  Very good.  Thank you.

22           And who else raised their hand?  Mr. Haithcox.

23           PROSPECTIVE JUROR HAITHCOX:  Yeah.  I just have a

24  layman's understanding, the same as they mentioned.  And, yeah,

25  I can put it aside.

PROCEEDINGS

1          **THE COURT:**  Great.

2          Anyone else that I missed on that?

3          (No response.)

4          **THE COURT:**  Okay.  No one else.

5          Any of you ever applied for a patent?  If so, raise

6    your hand.

7          **THE COURT:**  Okay.  Let's go down to Mr. Dimaggio.

8    What was your patent on?

9          First let me ask:  Is it still pending?

10         **PROSPECTIVE JUROR DIMAGGIO:**  No, it's -- no, it's

11   not.

12         **THE COURT:**  All right.  What was it about?

13         **PROSPECTIVE JUROR DIMAGGIO:**  It was through the

14   laboratory and so it was a laser beam dump and it never got

15   patented.

16         **THE COURT:**  Did the Patent Office turn it down?

17         **PROSPECTIVE JUROR DIMAGGIO:**  I believe the lab turned

18   it down and that leaves me eligible to pursue it and I didn't.

19         **THE COURT:**  Okay.  So the lab you worked for did not

20   apply for a patent, so it never got as far as the Patent

21   Office?

22         **PROSPECTIVE JUROR DIMAGGIO:**  Correct.

23         **THE COURT:**  All right.  Good.

24         And now you're going to hear -- well, never mind.

25   I'll just leave it at that.

PROCEEDINGS

```
 1              Anyone else ever apply for a patent?

 2              (No response.)

 3              THE COURT:  Or come close to applying for a patent?

 4              (No response.)

 5              THE COURT:  How about a copyright?  Anyone?

 6              (No response.)

 7              THE COURT:  Okay.  Nobody.

 8              Any of you ever worked for a company where you had

 9    some special role in connection with their intellectual

10    property?  And if -- you'll know what I mean by intellectual

11    property if the answer to that is yes.

12              Any of you ever worked for a company that -- where

13    you had something to do with their intellectual property?  If

14    so, raise your hand.

15              Ms. Michals, your turn.  Please give her the

16    microphone.

17              PROSPECTIVE JUROR MICHALS:  I worked for a start-up

18    in L.A. that had some thing.  Had to do with securing purchases

19    and stuff, but it went under.

20              THE COURT:  Okay.  You'll hear about some -- about

21    patents and so forth in this case and you need to base your

22    decision on what I tell you the law is, as well as what the

23    evidence here is, but forget about what you learned at some

24    other job.

25              PROSPECTIVE JUROR MICHALS:  Okay.
```

```
 1              THE COURT:  Understand that?

 2              PROSPECTIVE JUROR MICHALS:  Uh-huh.

 3              THE COURT:  Yes, Ms. Woo?

 4              PROSPECTIVE JUROR WOO:  Every employment contract I

 5   sign has a clause about intellectual property.  So the software

 6   I write is intellectual property for the various companies.

 7              THE COURT:  Okay.  All right.  Thank you.

 8              We have a -- I want to tell you what the jury does.

 9   This is very fundamental, and I want you to be thinking to

10   yourself:  Can I do this?

11              And let me preface it with a word or two.  Sometimes

12   the jury, good members of the public like you who haven't been

13   in the courtroom before think, My goodness.  The judge will

14   figure all this out, and you really don't have a good clue as

15   to what the jury does.

16              Before I go any further.  Raise your hand if any of

17   you -- for those of you who this is the very first time ever

18   you have been in a courthouse, raise your hand?

19              Okay.  One.  All right.

20              Well, here is what happens.  Under our Constitution

21   the jury decides the case.  The judge's job is to manage the

22   trial and keep it running on an even keel and smoothly, but the

23   jury is the one that actually decides the case.

24              The judge will tell you what the law is.  That's my

25   job.  I have to tell you what the law is, and that's not always
```

1   easy, but I will on tell you what it is.  But that's only half

2   of the formula.

3          The other half is to apply the law to the facts of

4   the case.  And let's say, to take a simpler case, that the

5   issue is whether the light was red or green in a traffic

6   accident case.  Let's say that was the main issue.  The judge

7   doesn't decide that.  You, the jury, would be listening to the

8   evidence and evaluating the witnesses and their credibility and

9   lining up all the evidence on one side and the evidence on the

10  other side, how credible the sources are, and then make your

11  own judgment as to whether or not the party with the burden of

12  proof has carried the burden of proof.  If the answer is yes,

13  then that party wins.  If the answer is no, that party loses on

14  that issue.

15         So to do that job you must listen carefully, pay

16  close attention, take a lot of notes usually.  It's up to you

17  if you want to take notes, but most jurors do.  When you get

18  into the jury room and deliberate, you look at some of the

19  documents, or all of the documents depending on whether you

20  need to look at them again, try to discuss the testimony with

21  each other and then you decide.  Has the party with the burden

22  of proof carried its burden of proof?

23         And you look -- I will tell you what the party with

24  the burden of proof has to prove, the elements, in the jury

25  instructions.  It's kind of like a checklist.  So in order for

1   the X party to prevail on that issue, they have got to prove A,

2   B and C.  And then you decide:  Have they proven A?  Have they

3   proven B?  Have they proven C?

4          It's kind of a clinical exercise in that respect.

5   You base it only on what's in the trial record, not upon

6   anything else.

7          So you can see how important it is that you

8   understand going in that you are the decision maker on a case

9   of importance between these large companies.  And you would

10  have to pay close attention and do your very best, then follow

11  the law and so forth and not be biased.  So I -- we want to

12  start off with as fair a jury as we can get, and that's our

13  goal here today.

14         So I want to ask you to raise your hand if there is

15  something you think we ought to know that might draw into

16  question your ability to be fair and impartial in this case?

17  Something that you might say, Well, you know -- I'll give you

18  some examples.

19         Let's say that you had been sued once and you thought

20  it was very unfair that you had been sued and you had to spend

21  some money to defend the case.  You won the case and you

22  thought it was very unfair that you had he ever been sued in

23  the first place and that you are prejudiced against anybody who

24  would bring a lawsuit because you had such a bad experience

25  yourself.  You know, you might be able to put that to one side.

1  Fine.  Good for you.  But it still would be fair to tell us

2  about it up front.

3          So is there anything like that that you want to, you

4  know, tell us about?  This is the time to do it, not later.

5  Raise your hand.

6          Okay.  Who all raised their hand?  Reverend Martella

7  and Ms. Michals.  Anybody else?

8          (No response.)

9          **THE COURT:**  Go ahead Reverend Martella.

10          **PROSPECTIVE JUROR MARTELLA:**  My question is this.

11  For the last 10-plus years I have been struggling through sleep

12  issues, both apnea and insomnia issues.  And I think I'm

13  beginning to come out of that, but I don't know if I have the

14  capacity to intellectually process vast amounts of intellectual

15  information and form sound judgments there.  Just a question I

16  have on my part.

17          I can do day-to-day functioning.  I don't know about

18  processing vast amounts of intellectual information.

19          **THE COURT:**  Do you think it's going to be any harder

20  for you than it would be for the average person?

21          **PROSPECTIVE JUROR MARTELLA:**  I'm not qualified to

22  say.  I don't know.

23          **THE COURT:**  Well, do you go to sleep --

24          **PROSPECTIVE JUROR MARTELLA:**  You asked us to raise

25  potential questions here.  I'm laying that out.

1          THE COURT:  I know it sounds like I'm arguing with

2    you, doesn't it?  But you're right to raise it.  Good for you.

3    I want you to raise it, but now I need to probe it to find out:

4    Are you going to go to sleep on us?

5          PROSPECTIVE JUROR MARTELLA:  Not likely, but how

6    alert I will be might be another issue.

7          THE COURT:  I think you will be fine.  I don't think

8    that's going to be a problem.

9               Ms. Michals, your turn.

10         PROSPECTIVE JUROR MICHALS:  I'm single, but I've just

11   started dating a Deputy Attorney General of the State of

12   California, a lawyer.

13         THE COURT:  Started dating what?

14         PROSPECTIVE JUROR MICHALS:  A Deputy Attorney

15   General.  She works in administrative law.

16         THE COURT:  Uh-huh.

17         PROSPECTIVE JUROR MICHALS:  That's it.

18         THE COURT:  Well, why would that be a problem?

19         PROSPECTIVE JUROR MICHALS:  I don't know.  Just, you

20   know, I know a lawyer.

21              (Laughter.)

22         THE COURT:  Well, Deputy Attorney General, she works

23   in administrative law doing what kind of cases?

24         PROSPECTIVE JUROR MICHALS:  Education, teacher

25   credentialing, prosecuting, trying to he take teacher licenses

1   away.

2          **THE COURT:**  I think you will be fine.  I don't think

3   that's an issue, but you're right to raise it.  That's the kind

4   of thing we want to know about.  Okay.

5          So anyone else?

6          (No response.)

7          **THE COURT:**  How about this.  You're going to hear

8   some famous names here.  I will give you two:  Larry Ellison

9   and Larry Page.  They both have the first name Larry.  Larry

10  Ellison and Larry Page.  Kind of like in the Barry Bonds case,

11  everyone would have heard of him.  It doesn't mean your

12  disqualified because you've heard of them.  But if you have a

13  strong opinion one way or the other, we need to know about it.

14         Does anyone have a strong opinion, either very

15  positive or very negative, about either of these two gentlemen?

16  If so, raise your hand?

17         (No response.)

18         **THE COURT:**  Okay.  No one's hand goes up.

19         Does anyone have an opinion at all about either of

20  these two that -- wait, let me finish.  An opinion at all about

21  either of these two which you think you could not put aside in

22  your deliberations?  If so, raise your hand?

23         (No response.)

24         **THE COURT:**  Okay.  No one has raised their hand on

25  that one.  Okay.

```
 1              Okay.  Now, I don't -- it's just an ordinary opinion
 2   right Mr. Haithcox, or is there something special about it?
 3              PROSPECTIVE JUROR HAITHCOX:  Just an ordinary
 4   opinion.
 5              THE COURT:  You can put it to one side, right?
 6              PROSPECTIVE JUROR HAITHCOX:  Yes.
 7              THE COURT:  Great, okay.
 8              So, we're getting close to the end of my questions.
 9   I'm going to let the lawyers ask some questions and then I'm
10   going to come back and I want to give you a heads-up on the
11   question or two that I'm going to have for you, time
12   permitting.
13              I may ask you to tell us a book or movie that you
14   have seen or read in the last three or four months and that you
15   really like, if any.  That's one thing.
16              Another question I may ask you is:  Why would you be
17   a good juror?  We have already heard Reverend Martella tell us
18   he may be such a good juror because possibly he won't follow
19   all of the evidence, which I don't think -- I think you're
20   going to be great.  I think you will follow all of the
21   evidence.  But even if you don't follow all of the evidence --
22   it's impossible to follow every single piece of the evidence in
23   a big case like this, but, you know, the main thing is you'll
24   do your very best to do it.
25              But if there is something that you -- like, you think
```

PROCEEDINGS

1  you would be a good juror because you're good at being fair to

2  both sides, or you're a good juror because you wait until the

3  very end to decide and you're not judgmental, or you're a good

4  juror because you'll take a lot of notes and try to keep it

5  straight and really understand it.  Or you'll be a bad juror

6  because, you know, you think it's a waste of resources to see

7  two big companies fighting with each other.  You know, whatever

8  your opinion is on that subject, if time permits, I'm going to

9  ask you and I'm giving you this heads-up so you will be able to

10 tell us what the answer is.

11         But at this time, I'm going to let the lawyers have a

12 short, brief opportunity to ask follow-up questions.

13         Mr. Jacobs?

14         **MR. JACOBS:**  Thank you, your Honor.

15         Mr. Haithcox, could I ask you about your ordinary

16 opinion?

17         **PROSPECTIVE JUROR HAITHCOX:**  You want me to name

18 names or just talk about?

19         I have heard about Mr. Ellison.  I have heard some

20 things in the media about him and from what I've seen about the

21 way he runs his life, I have gotten sort a negative impression.

22         **MR. JACOBS:**  And do you have an impression about

23 Google?

24         **PROSPECTIVE JUROR HAITHCOX:**  Generally, yes.

25         **MR. JACOBS:**  What's that impression?

```
 1              PROSPECTIVE JUROR HAITHCOX:  Different.  A little
 2   better.
 3              MR. JACOBS:  Okay.  Thank you.
 4              How many you actually post to a blog of any kind?
 5              THE COURT:  Raise your hand higher.
 6              Okay, Ms. Chiu and who else?  That's it -- no, no,
 7   Ms. Raman.
 8              MR. JACOBS:  Ms. Chiu, what kind of blog do you post
 9   to?
10              PROSPECTIVE JUROR CHIU:  Just a design blog, so I
11   actually have a side kind of business doing graphic design for
12   wedding invitations and whatnot.  So I just post recent trends,
13   things that we're doing, things like that.
14              MR. JACOBS:  Is it your own blog?
15              PROSPECTIVE JUROR CHIU:  Yes.
16              MR. JACOBS:  What is it called?
17              PROSPECTIVE JUROR CHIU:  Subtle Glances.  It's a
18   company name.
19              MR. JACOBS:  Thank you.
20              Can you pass the mic down?
21              THE COURT:  Can I interrupt for one second?
22              If you have a blog going, you can't talk about this
23   case.  You can't say, "Okay, today I'm the juror and this is
24   what happened in court today."
25              PROSPECTIVE JUROR CHIU:  Yes, I understand.
```

1          **THE COURT:**  You could not do that.

2          All right.  Good.  All right.

3          Now we go to Ms. Raman.

4          **PROSPECTIVE JUROR RAMAN:**  I used to have a blog on

5   Word Press.  So just writing quotes and stuff like that.

6          **MR. JACOBS:**  Quotes?

7          **PROSPECTIVE JUROR RAMAN:**  Yeah, quotes.

8          **MR. JACOBS:**  Things that appealed to you that you

9   wanted to present to others?

10         **PROSPECTIVE JUROR RAMAN:**  Just to -- not a public

11  profile.  Just some of my friends on the email list.

12         **MR. JACOBS:**  And you used -- Word Press was the

13  vehicle for your blogging?

14         **PROSPECTIVE JUROR RAMAN:**  Yes.

15         **MR. JACOBS:**  Have you heard much in the news about

16  Oracle or Google in the last three months?

17         **PROSPECTIVE JUROR RAMAN:**  No, no.  Nothing at all.

18         **MR. JACOBS:**  How about --

19         **PROSPECTIVE JUROR RAMAN:**  This has nothing to do with

20  software or computers.  It's just quotes.

21         **MR. JACOBS:**  Separately, have you heard much about

22  Oracle or Google in the news?

23         **PROSPECTIVE JUROR RAMAN:**  Umm, not recently, but I'm

24  aware of Oracle and Google.  Yeah.  I mean, I do Google search

25  and stuff like that, yeah.

1          **MR. JACOBS:**  Do you use any other Google services?

2          **PROSPECTIVE JUROR RAMAN:**  Umm, like email.  Yeah.

3          **MR. JACOBS:**  You have a Gmail account?

4          **PROSPECTIVE JUROR RAMAN:**  Yes.

5          **MR. JACOBS:**  Anybody on the jury use Google Docs?

6          **THE COURT:**  Raise your hand high, please.

7          **MR. JACOBS:**  Tell us about your use of Google Docs,

8    Ms. Chiu.

9          **PROSPECTIVE JUROR CHIU:**  It's just a general usage of

10   it.  So I use it for regular spreadsheets.  Like, if I'm

11   planning on trip with friends, we share information there.

12   Generally I just use it over Word, Microsoft.  It's just

13   because it's all in one place.

14         **MR. JACOBS:**  I saw your hand go up when the question

15   came about reading computer magazines.

16         **PROSPECTIVE JUROR CHIU:**  Yeah.  I actually

17   misunderstood the question.  I initially understood it as

18   electronic magazines, but, you know, electronic-based magazines

19   versus computer, about computer electronics.

20         **MR. JACOBS:**  And do you read computer magazines?

21         **PROSPECTIVE JUROR CHIU:**  No, I don't.  No.

22         **MR. JACOBS:**  Any of you have strong favorable

23   opinions about Oracle or Google products as opposed to the

24   companies?  Anybody think that Oracle databases, you've heard

25   about them in your work and you've heard they are great?

PROCEEDINGS

1          (No response.)

2          **MR. JACOBS:**  How about have you heard anything

3   negative about Oracle products?

4          (No response.)

5          **MR. JACOBS:**  Ms. Woo, you actually use an Oracle data

6   base.  Any strong opinions about its capabilities?

7          **PROSPECTIVE JUROR WOO:**  It's not on.

8          **THE COURT:**  Please use that.  It's not on.

9          Yeah, now it's on.

10          **PROSPECTIVE JUROR WOO:**  Is that on?

11          **THE COURT:**  Wait, wait.  A little closer then.  It's

12   my fault.  I'm goofing it up.  This is -- for 13 years this

13   microphone has been a problem.

14          (Laughter.)

15          **THE CLERK:**  The switch got turned off.

16          **PROSPECTIVE JUROR WOO:**  I'm fond of databases in

17   general.

18          **MR. JACOBS:**  You're fond of data bases.  Oracle is a

19   data base and you're fond of the Oracle data base.

20          **PROSPECTIVE JUROR CHIU:**  Yes, yes.

21          **MR. JACOBS:**  Why are you fond of it?

22          **PROSPECTIVE JUROR CHIU:**  It was sort of the leading

23   edge for awhile in terms of allowing various programming

24   facilities.  I think some of the other software vendors have

25   now caught up.

PROCEEDINGS

1          **MR. JACOBS:**  How about Java?  Do you know anything

2     about Java?

3          **PROSPECTIVE JUROR CHIU:**  No.  I do not know about

4     Java.

5          **MR. JACOBS:**  Judge Alsup asked you this, but I want

6     to ask you again just to be sure.

7          Any of you know anything about Java, Java programming

8     language?  Java environment?

9          (No response.)

10         **THE COURT:**  Take those one at a time.  The Java

11    programming language, any of you know that?  Ms. Michals?

12         **PROSPECTIVE JUROR MICHALS:**  You mean, know the

13    language itself or heard of it?

14         **THE COURT:**  Heard of it.

15         **PROSPECTIVE JUROR MICHALS:**  Yes.

16         **THE COURT:**  How much have you heard of it?

17         **PROSPECTIVE JUROR MICHALS:**  Umm, just the way it

18    works that it's -- that it's -- you're able to program a

19    little -- I have a layman's understanding of it.

20         **THE COURT:**  Go head, Mr. Jacobs.

21         **MR. JACOBS:**  And how did you develop that

22    understanding?

23         **PROSPECTIVE JUROR MICHALS.**  Living in the Bay Area

24    for this time, you know, since 1984.

25         **MR. JACOBS:**  Have you ever sat down with one of the

1  programming manuals?

2          **PROSPECTIVE JUROR MICHALS:**  No.  No, no, no, no.  I

3  have friends that, you know...

4          **MR. JACOBS:**  Who told you about their job parameters?

5          **PROSPECTIVE JUROR MICHALS:**  Yes.

6          **MR. JACOBS:**  Mr. Dimaggio, I need to ask you a little

7  bit more about your friends that you mentioned.  I have the

8  impression it left an impression on you that they were laid off

9  during the PeopleSoft acquisition.

10         **PROSPECTIVE JUROR MR. DIMAGGIO:**  Yes, they were.

11         **MR. JACOBS:**  And how did that leave you feeling?

12         **PROSPECTIVE JUROR MR. DIMAGGIO:**  I mean, I guess I

13  thought it was unfair, but in the end they both got laid off.

14         **MR. JACOBS:**  They both got?

15         **PROSPECTIVE JUROR MR. DIMAGGIO:**  Laid off.

16         **MR. JACOBS:**  And what happened to their employment

17  afterwards?

18         **PROSPECTIVE JUROR MR. DIMAGGIO:**  Well, they both have

19  jobs now.  I don't know who they work for.

20         **MR. JACOBS:**  Oracle and Google are in the news

21  periodically.  I asked you a little bit about this before.

22         What have you heard about Oracle in the news aside,

23  Mr. Haithcox, from what you've heard, what you referred to

24  before?

25         When you hear Oracle, do you think of any news

1    articles that have popped up recently?  America's Cup?

2            **THE COURT:**  This is directed to who?

3            **MR. JACOBS:**  To anyone.

4            **THE COURT:**  All right.

5            **MR. JACOBS:**  How about Oracle's involvement,

6    Mr. Ellison's involvement in the America's Cup race, have you

7    heard about that?  And what impression do you have of that

8    Ms. Chiu?

9            **PROSPECTIVE JUROR MS. CHIU:**  No specific.  It was

10   just watching the news and --

11           **THE COURT:**  The microphone.

12           **PROSPECTIVE JUROR MS. CHIU:**  Probably a basic

13   impression.  He's trying to get it here.  He supports it.

14   That's really it.  I don't have an impression either way.

15           **MR. JACOBS:**  And how about Google in the news?

16   Google's a big company here.  It's often in the newspaper.

17   What have you heard about Google in the news?  Anyone?

18           Mr. Haithcox?

19           **PROSPECTIVE JUROR MR. HAITHCOX:**  Something today

20   before I came in here and knew this was about Google, about a

21   different lawsuit or them paying a fine, I think.

22           **MR. JACOBS:**  How many others have heard about that?

23           Ms. Chiu, you heard about that story?

24           **PROSPECTIVE JUROR MS. CHIU:**  Yes.

25           **MR. JACOBS:**  Who else heard about America's Cup and

```
 1   Oracle's involvement in it?

 2            Ms. Michals, what have you heard?

 3            PROSPECTIVE JUROR MS. MICHALS:  Just that he sails.

 4            MR. JACOBS:  What?

 5            PROSPECTIVE JUROR MS. MICHALS:  That he brought it

 6   here and worked really hard at that.  I kind of lost track.

 7            MR. JACOBS:  Who else?

 8            Mr.-- Rev. Martella, other than your concern about

 9   your recovery from the sleep issue that you mentioned, is there

10   anything else on your mind about this case that's worrying you

11   about your ability to serve?

12            PROSPECTIVE JUROR MR. MARTELLA:  Yes.

13            MR. JACOBS:  What is that?

14            PROSPECTIVE JUROR MR. MARTELLA:  Two things.  I have

15   an 85-year-old mother-in-law who lives with us that I'm

16   responsible for her day-care.  That's the concern.

17            The other, is I don't know how I keep two churches

18   going being gone that long.  But, you know, my letter of appeal

19   on that did not register.

20            THE COURT:  Wait, wait, wait a minute.  Why didn't

21   you raise that earlier?  I said if you had any hardship bring

22   it up.

23            PROSPECTIVE JUROR MR. MARTELLA:  I wrote the letter

24   and I was told that doesn't seem to matter in this case; come

25   here today.  And so I didn't think -- but he raised the
```

 1   question and I answered.

 2           THE COURT:  Mr. Jacobs did a good thing to bring that

 3   up.  Continue on.  We may come back to that point.  Or you can

 4   continue with that point.

 5           PROSPECTIVE JUROR MR. MARTELLA:  Those are areas of

 6   concern for me.  I'm happy to serve.  I think I can do a few

 7   days.  I don't know about this kind of duration and maintain

 8   the quality of life that's needed in my situation.

 9           MR. JACOBS:  And you're driving from?

10           PROSPECTIVE JUROR MR. MARTELLA:  Windsor.

11           MR. JACOBS:  How long does that take to get here?

12           PROSPECTIVE JUROR MR. MARTELLA:  To drive, park, get

13   up here, an hour and a half each way.

14           MR. JACOBS:  No further questions.

15           THE COURT:  Mr. Van Nest.

16           MR. VAN NEST:  Thank you, Your Honor.  Good morning,

17   everyone.

18           Ms. Woo, you mentioned Oracle database -- I'm sorry.

19   Do you have anything to do with purchasing or maintaining the

20   Oracle products that you use at work?

21           PROSPECTIVE JUROR WOO:  No, not any longer.  I did in

22   a previous capacity, where I negotiated contracts.

23           MR. VAN NEST:  So you were negotiating with the

24   Oracle reps?

25           PROSPECTIVE JUROR WOO:  Yes.

PROCEEDINGS

 1            **MR. VAN NEST:**  That was on an every six-month basis,

 2    or every nine months?

 3            **PROSPECTIVE JUROR WOO:**  Actually think we were on a

 4    two-year renewal basis.

 5            **MR. VAN NEST:**  Do you maintain any acquaintance OR

 6    relationship with the reps, the Oracle reps that you work with?

 7            **PROSPECTIVE JUROR WOO:**  No.

 8            **MR. VAN NEST:**  Do you get entertained at Oracle

 9    events or anything like that, as a user or a customer?

10            **PROSPECTIVE JUROR WOO:**  No, no.

11            **MR. VAN NEST:**  And how long ago was that that you

12    were actually responsible for --

13            **PROSPECTIVE JUROR WOO:**  That was probably about ten

14    years ago.

15            **MR. VAN NEST:**  Quite a long time ago.

16            **PROSPECTIVE JUROR WOO:**  Quite a while, yes.

17            **MR. VAN NEST:**  Does anybody else on the panel use

18    Oracle database products in their line of work?

19            Anybody have any business relationship with Oracle at

20    all, either way?

21            Okay.  Mr. Troy, did you mention that you were a

22    sailor?

23            **PROSPECTIVE JUROR TROY:**  Yes.

24            **MR. VAN NEST:**  Are you an America's Cup aficionado,

25    or just aware of it?

 1            **PROSPECTIVE JUROR TROY:**  Well, I'm from Rhode Island

 2   where the America's Cup began.  I have not been following it

 3   that closely in recent years.  The high-technology of the sails

 4   kind of turns me off.

 5            **MR. VAN NEST:**  All right.  But it -- you're not

 6   someone that's following it closely.

 7            **PROSPECTIVE JUROR TROY:**  No, not at all.  I'm not

 8   following it at -- I will, but I'm not following it vis-a-vis

 9   any of the issues here.

10            **MR. VAN NEST:**  Okay.  Fair enough.  Thank you.

11            Is it Mr. Hotvedt, you mentioned that you had done

12   aerial photography and had been involved in some fine arts and

13   so on.  Do you actually hold any copyrights yourself?

14            **PROSPECTIVE JUROR MR. HOTVEDT:**  No, I don't.

15            **MR. VAN NEST:**  Have you applied for any copyrights?

16            **PROSPECTIVE JUROR MR. HOTVEDT:**  No, I haven't.

17            **MR. VAN NEST:**  As an artist or photographer, are

18   copyrights something that have any special importance for you

19   one way or the other?

20            **PROSPECTIVE JUROR MR. HOTVEDT:**  No, no.

21            **MR. VAN NEST:**  And have you ever been involved in a

22   dispute over copyrights before, in the past?

23            **PROSPECTIVE JUROR MR. HOTVEDT:**  I haven't.

24            **MR. VAN NEST:**  Okay.  Let me just ask a general

25   question of the panel because we've got some graphic designers

1   and architects, and so on.

2           Does anyone hold any copyrights of their own?

3           Ms. Chiu, I think you've done architectural work and

4   doing store design now.

5           **PROSPECTIVE JUROR MS. CHIU:**  Yes.

6           **MR. VAN NEST:**  Do you have any involvement in

7   copyrights at the Gap?

8           **PROSPECTIVE JUROR MS. CHIU:**  Not at all.

9           **MR. VAN NEST:**  How about your design work, has any of

10  that ever been copyrighted?

11          **PROSPECTIVE JUROR MS. CHIU:**  No.

12          **MR. VAN NEST:**  Does copyright come up much at work?

13          **PROSPECTIVE JUROR MS. CHIU:**  No.

14          **MR. VAN NEST:**  Okay.  Thank you.

15          Ms. Raman, you mentioned creative writing.  Is that

16  an avocation or vocation?  Are you doing that for work, or is

17  that just a hobby?

18          **PROSPECTIVE JUROR MS. RAMAN:**  It's a hobby.  But I've

19  written a book, published by Publish America.  It's a

20  collection of poems.  And I've advertised that on -- you know,

21  through Amazon.  So -- but, you know.

22          **MR. VAN NEST:**  Wonderful.  So it's a book of poetry?

23          **PROSPECTIVE JUROR MS. RAMAN:**  Yes.

24          **MR. VAN NEST:**  And you have a copyright on that?

25          **PROSPECTIVE JUROR MS. RAMAN:**  Yes, yes.

PROCEEDINGS

1          **MR. VAN NEST:**  So have you -- have you been

2   involved -- do you have other copy written works?

3          **PROSPECTIVE JUROR MS. RAMAN:**  No.  This collection of

4   poetry, it's been -- I applied to the Library of Congress, and

5   they had the copyright through them.

6          **MR. VAN NEST:**  Congratulations.

7          Now, this case obviously involves copyrights.  Both

8   Google and Oracle are companies that have a lot of copyrights,

9   obviously.  But in this case Oracle is the one asserting their

10  copyright.

11         And so let me ask you and then I'll ask a general

12  question of the panel, but just for you Ms. Raman, would the

13  fact that Oracle holds a copyright, just that fact standing

14  alone, and is asserting it here in court, would that fact cause

15  you to lean one way or the other before hearing any evidence or

16  hearing any more information about the case?

17         **PROSPECTIVE JUROR MS. RAMAN:**  I really don't know.

18         **MR. VAN NEST:**  In other words, we're interested in

19  making sure that the parties are on a level playing field when

20  we start off, before any evidence.

21         Would the fact that Oracle holds the copyrights that

22  we're talking about in this case give them an advantage, you

23  think, even before you heard what the evidence was?

24         **PROSPECTIVE JUROR MS. RAMAN:**  No, I wouldn't, you

25  know, pass my judgment on that before listening to the

 1  evidence.

 2          MR. VAN NEST:  And let me ask a general question of

 3  the panel, just that same question.  Would anybody -- would

 4  anybody on the panel give an advantage kind of out of the gate

 5  to the person holding the copyrights -- in this case, that's

 6  going to be Oracle -- without having heard any evidence or any

 7  more information?  If you think you would, please give me a

 8  hand up.

 9          Let me ask another, similar question, not about

10  copyrights, but would anybody give an advantage to the

11  plaintiff just because we're here about to start trial, and

12  whatever claim they have has advanced this far, would that

13  cause anybody on the panel to think, well, there must be

14  something wrong if the case has gone this far and we're about

15  to start a trial?

16          Anybody -- would anybody have that conclusion or

17  assumption just based on our being here?  Okay.  Good.  Fair.

18  Good enough.

19          Mr. Haithcox, we've gotten a lot of attention from

20  you this morning.  I understand you're working for a company

21  now, insurance company.

22          PROSPECTIVE JUROR MR. HAITHCOX:  That's correct.

23          MR. VAN NEST:  When you were back in private practice

24  like those of us over here are now, can you just give me a

25  quick sketch of what the nature of your practice was.

```
 1              PROSPECTIVE JUROR MR. HAITHCOX:  Insurance coverage

 2    for mass torts and environmental pollution.

 3              MR. VAN NEST:  So coverage issues, generally, for the

 4    insured or the insurer?  Or was it both?

 5              PROSPECTIVE JUROR MR. HAITHCOX:  I represented the

 6    insurer.

 7              MR. VAN NEST:  The insurer in claims by insureds to

 8    get coverage?

 9              PROSPECTIVE JUROR MR. HAITHCOX:  Correct.

10              MR. VAN NEST:  What about now, you're now at --

11              PROSPECTIVE JUROR MR. HAITHCOX:  Right now we run the

12    gamut of insurance coverage issues.

13              You mentioned patent a lot, and I haven't done any of

14    that in our office, but I've done some trademark coverage work.

15              MR. VAN NEST:  What's the nature of that?

16              PROSPECTIVE JUROR MR. HAITHCOX:  It's a question of

17    whether there's insurance coverage for lawsuits between two

18    companies who are fighting about trademarks.

19              MR. VAN NEST:  Thank you.

20              PROSPECTIVE JUROR MR. HAITHCOX:  Uh-huh.

21              MR. VAN NEST:  Ms. Michals, you mentioned early on, I

22    think, when you just sat down, that you had heard something on

23    the news about our case.

24              Did I get that wrong?

25              PROSPECTIVE JUROR MS. MICHALS:  I didn't say that.
```

PROCEEDINGS

1          **MR. VAN NEST:**  Okay.

2          **PROSPECTIVE JUROR MS. MICHALS:**  But I have heard of

3   it.

4          **MR. VAN NEST:**  But you have, anyway.  Okay.

5          **PROSPECTIVE JUROR MS. MICHALS:**  But I don't follow

6   it.  I can't read online very well.

7          **MR. VAN NEST:**  You can't.

8          **PROSPECTIVE JUROR MS. MICHALS:**  I haven't followed

9   it.

10          **MR. VAN NEST:**  In other words, whatever you heard was

11  more of a passing reference rather than -- you're not following

12  it on the blogs or anywhere else?

13          **PROSPECTIVE JUROR MS. MICHALS:**  Right.

14          **MR. VAN NEST:**  Whatever you heard was minimal?

15          **PROSPECTIVE JUROR MS. MICHALS:**  Right.

16          **MR. VAN NEST:**  Do you remember hearing enough to even

17  recall -- don't tell us what it is, but to recall what it was

18  or what the slant of it was, or anything like that?

19          **PROSPECTIVE JUROR MS. MICHALS:**  (Shakes head.)

20          **THE COURT:**  You need to speak into the mic.

21          **PROSPECTIVE JUROR MS. MICHALS:**  No, I have not heard.

22          **MR. VAN NEST:**  Thank you.

23          Just give me a moment, Your Honor.

24          Oh, obviously both companies are very big, both

25  Oracle and Google.  No big secret there.

PROCEEDINGS                    140

```
 1              Has anybody had a bad experience with a big company
 2   that you think might color your thinking in a case where both
 3   parties are big companies?
 4              Anybody had a run-in with either a big corporation or
 5   a large business that left a bad taste in your mouth and you're
 6   still upset about it?
 7              Has anybody on the panel suffered a really severe
 8   economic loss in the last 18 months?  By that I mean either
 9   losing a job or losing a home or in a situation where you're
10   worried financially about being here for as long as Judge Alsup
11   thought we might be?  Everybody's okay?
12              Thank you.  I don't have any further questions, Your
13   Honor.
14         THE COURT:  May I see Mr. Jacobs and Mr. Van Nest at
15   the sidebar.
16         (The following proceedings were held at sidebar.)
17         THE COURT:  I just want to ask if you two would agree
18   to stipulate to Rev. Martella being excused.  I think it's a
19   close call, but he has enough hardship that I would be willing
20   to let him go.  But if one of you want to leave him on, that's
21   fine, too.
22         MR. JACOBS:  I think he brings a lot of problems to
23   his service, and so I would agree to -- we would agree to let
24   him go.
25         MR. VAN NEST:  Yes, let him go.
```

```
 1              THE COURT:  All right.

 2              Now, on all the others, unless something more comes

 3  up, I don't see any basis to knock anybody off.  But if you

 4  disagree, we can argue about it, I guess, at some point.

 5              Do you agree with me?

 6              MR. JACOBS:  I don't have any for cause challenges at

 7  this time, Your Honor.

 8              MR. VAN NEST:  I don't think so, Your Honor.

 9              THE COURT:  Okay.  Thank you.

10              (Sidebar concluded.)

11              THE COURT:  Rev. Martella, we're going to excuse you

12  on account of hardship.  And I wanted to be clear that just

13  because we denied it beforehand, sometimes a judge has to rule

14  on it.  I think in your case there was enough of a hardship for

15  you to serve this length of time that we're going to excuse

16  you.  All right.

17              PROSPECTIVE JUROR MR. MARTELLA:  Thank you.

18              THE COURT:  Please go back to the jury assembly room

19  and tell them what happened.

20              PROSPECTIVE JUROR MR. MARTELLA:  Thank you.

21              THE COURT:  Let's call a replacement.

22              THE CLERK:  Vandana Balakrishnan,

23  B-a-l-a-k-r-i-s-h-n-a-n.

24              THE COURT:  Welcome.

25              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Hi.
```

```
 1              THE COURT:  How are you today?

 2              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Good.

 3              THE COURT:  Great.  Do you have the microphone?

 4              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Okay.  Got it.

 5   Yes.

 6              THE COURT:  First, any hardship issue?

 7              PROSPECTIVE JUROR MS. BALAKRISHNAN:  No hardships.

 8              THE COURT:  Okay.  All right.  Did you hear all the

 9   questions I asked?

10              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Yes.

11              THE COURT:  Would you have raised your hand to any of

12   those questions?

13              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Yes.  I'm an

14   attorney and I do work in patents.

15              THE COURT:  Do what?

16              PROSPECTIVE JUROR MS. BALAKRISHNAN:  I do work in

17   patents.

18              THE COURT:  Well, first of all, let's -- can you see

19   the chart okay?

20              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Yes.

21              THE COURT:  Let's get your basic biographical

22   information, and then I'll come back to that.  Go ahead.

23              PROSPECTIVE JUROR MS. BALAKRISHNAN:  My name is

24   Vandana Balakrishnan.  I live in Redwood City.  I have a

25   bachelor's of science in biomedical engineering, and a J.D.
```

1          I've been practicing as an attorney for two years

2    now.

3          THE COURT:  Who do you work for?

4          PROSPECTIVE JUROR MS. BALAKRISHNAN:  I work for a

5    small boutique IP firm, Rajrongbing (phonetic) PC in Mountain

6    View.

7          THE COURT:  What city is that?

8          PROSPECTIVE JUROR MS. BALAKRISHNAN:  Mountain View.

9          THE COURT:  Thank you.

10         PROSPECTIVE JUROR MS. BALAKRISHNAN:  So that's my

11   most recent job/employer.  I am a board member at the Salvation

12   Bar Association.  That's for organizational clubs.

13         Hobbies, I like pottery and painting, and

14   artistically inclined.

15         I am not married.  No prior jury service.  I

16   authored -- I'm currently representing a client in the Santa

17   Clara Superior Court.  And I think that's it.

18         THE COURT:  Are you in -- are you representing -- you

19   do litigation, I take it, right?

20         PROSPECTIVE JUROR MS. BALAKRISHNAN:  I do mostly

21   prosecution, but I have one litigation case.

22         THE COURT:  All right.  Have you ever been involved

23   in any litigation involving patents?

24         PROSPECTIVE JUROR MS. BALAKRISHNAN:  No.

25         THE COURT:  Copyrights?

PROCEEDINGS

1            **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  No.

2            **THE COURT:**  Okay.  But you are -- you do prosecutions

3    before the PTO?

4            **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Yes.

5            **THE COURT:**  How long have you been doing that?

6            **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Two years.

7            **THE COURT:**  Okay.  Have you succeeded in getting any

8    patents out of the PTO?

9            **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Yes, just one.

10           **THE COURT:**  What subject matter was that on?

11           **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  It was actually

12   not software, but data mining.

13           **THE COURT:**  All right.  Now, the obvious question in

14   your case is whether or not you will decide the case here based

15   on the record that we make here in the courtroom, and not

16   supplement it with what you know from your own experience

17   working with the PTO and being an attorney, and so forth.

18           You'd have to decide the case based on the record

19   here and the instructions of law I give you.

20           **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  I understand.

21           **THE COURT:**  Would you do that?

22           **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Yes.

23           **THE COURT:**  You will forget about the way in which

24   you prosecute cases before the PTO, right?

25           **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Yes.

```
 1              THE COURT:  Okay.  All right.  So you heard all these
 2  other questions.  Do you have any -- surely, you've heard of
 3  these two companies, right?
 4              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Yes.
 5              THE COURT:  And you've heard of Android and Java, and
 6  all of that, correct?
 7              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Yes.
 8              THE COURT:  Now, do you have -- can you put to one
 9  side anything and everything you've ever heard about all of
10  that and, again, decide the case on the record here in court?
11              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Yes.
12              THE COURT:  Have you raised your hand to anything
13  else?
14              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Not that I
15  recollect, no.
16              THE COURT:  All right.  Do you -- is there anything
17  about you and your history that maybe in your practice that you
18  think we ought to know about that might be even a cause for
19  concern, even if you don't think it's a cause for concern?
20              PROSPECTIVE JUROR MS. BALAKRISHNAN:  No.
21              THE COURT:  All right.  Okay.  So you would be a fair
22  and impartial juror and follow the law in this case?
23              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Yes.
24              THE COURT:  Okay.  Now, what if you -- what if one
25  day the judge in Santa Clara says you've got to come down there
```

PROCEEDINGS

1  when you're supposed to be here in court?  What would you do

2  then?

3         **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  So I have --

4  well, I mean, I'm working with another attorney, as well.  I

5  work at a law firm.  So there's two attorneys on the case.  So

6  I would have to ask the other person to step into my place.  We

7  are about to begin discovery on the case.

8         **THE COURT:**  Have you ever heard of the law firms

9  involved in this case?

10        **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Yes.

11        **THE COURT:**  Did you ever apply for a job to any of

12  them?

13        **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Yes.

14        **THE COURT:**  Did you get turned down?

15        **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Yes.

16        **THE COURT:**  Are you going to hold that against them?

17        **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  No.

18        **THE COURT:**  All right.  And are you -- have you heard

19  of any of the individual lawyers in this case?

20        **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Uhm, no, I have

21  not.

22        **THE COURT:**  All right.  So, okay.  Let me ask the

23  lawyers if you have any follow-up questions for -- I want to

24  make sure I can say your name correctly.  Don't tell me yet.

25  Balakrishnan.

PROCEEDINGS

```
 1              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Balakrishnan.

 2              THE COURT:  Any questions for Ms. Balakrishnan?

 3              MR. JACOBS:  Would you tell us more about what you

 4   know about Java.

 5              PROSPECTIVE JUROR MS. BALAKRISHNAN:  I'm not that

 6   familiar with the software things.  My training is in bio life

 7   sciences.  I know, you know, it's developed by Sun

 8   Microsystems.  I don't know that much more about it, to be

 9   quite honest.

10              MR. JACOBS:  How about Android?

11              PROSPECTIVE JUROR MS. BALAKRISHNAN:  I don't know

12   that much about it either.

13              MR. JACOBS:  Are you doing any patent prosecution in

14   software-related inventions?

15              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Not currently.

16   Not currently.

17              MR. JACOBS:  What's the nature of the lawsuit that

18   you're actually representing somebody in?

19              PROSPECTIVE JUROR MS. BALAKRISHNAN:  It's actually a

20   real estate case.  It's unrelated to IP.

21              MR. JACOBS:  A property dispute?

22              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Property

23   dispute, yes.

24              MR. JACOBS:  You represent the plaintiff?

25              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Plaintiff.
```

 1          MR. JACOBS:  It's in Santa Clara Superior Court?

 2          PROSPECTIVE JUROR MS. BALAKRISHNAN:  Yeah, on First

 3  Street, yeah.

 4          MR. JACOBS:  I have to ask you this, did you apply to

 5  Morrison & Foerster for a job?

 6          PROSPECTIVE JUROR MS. BALAKRISHNAN:  Yes.

 7          MR. JACOBS:  Okay.  No further questions, Your Honor.

 8          THE COURT:  All right.  Mr. Van Nest.

 9          MR. VAN NEST:  How come you didn't apply to our

10  office?

11          (Laughter)

12          THE COURT:  Maybe she did.

13          MR. VAN NEST:  Good morning, Ms. Balakrishnan.

14          I take it -- is most of your time now spent on patent

15  prosecution?

16          PROSPECTIVE JUROR MS. BALAKRISHNAN:  Most of my time,

17  yeah.

18          MR. VAN NEST:  And that's essentially -- what areas?

19  You've got a biomedical degree.  So what areas are you

20  prosecuting patents in?

21          PROSPECTIVE JUROR MS. BALAKRISHNAN:  Right now,

22  medical devices.  Some mechanical devices.  I have done some

23  work with Internet technologies in general, but I'm not -- I'm

24  not comfortable doing software because that's not my training

25  at all.

1          **MR. VAN NEST:**  When you say Internet technologies,

2    can you expand on that little bit.

3          **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Like it would be

4    like maybe the competitor of Groupon.  It's like a business

5    methods patent, I suppose.  And you tie it to a very strong

6    system.  They are very hard to get otherwise.

7          Yeah, along those lines.  And some data mining.  Some

8    database.  But I had to do that with the help of a technical

9    specialist.

10         **MR. VAN NEST:**  Okay.  Are you also -- are you

11   certified to practice in the PTO?

12         **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Yes.

13         **MR. VAN NEST:**  So you passed all the --

14         **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  The Patent Bar,

15   yeah.

16         **MR. VAN NEST:**  The Patent Bar and studied

17   infringement, validity, prior art, and all that?

18         **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Right.

19         **MR. VAN NEST:**  Judge Alsup asked you this question,

20   but I want to probe a little more.

21         You obviously have a lot of specialized knowledge

22   about how the patent system works.  Do you feel as though you

23   could really exclude all that knowledge in terms of interacting

24   with your other jurors in applying the law as Judge Alsup gives

25   it to you to the facts here?

```
 1              PROSPECTIVE JUROR MS. BALAKRISHNAN:  I think I would

 2   be maybe more interested in the case because I have a

 3   background.  But I feel confident that I can be impartial.

 4              MR. VAN NEST:  Thank you.

 5              THE COURT:  So, again, Ms. Balakrishnan, do you

 6   actually know any of these lawyers?  Did I ask you that?

 7              PROSPECTIVE JUROR MS. BALAKRISHNAN:  You did.  I

 8   don't believe that I do.

 9              THE COURT:  All right.  Okay.  So, now, can you --

10   just ask you the general question I've asked everyone else.  I

11   think I have.  If you're selected to serve, will you be fair

12   and impartial to both sides, listen carefully to all of the

13   evidence, ignore all of the specialized training that you have

14   from the past, and decide this case in accordance with the law

15   as I give you the law?

16              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Yes.

17              THE COURT:  Is the same true for the rest of you?

18   Everyone nod your head yes or no.

19              (Jurors respond affirmatively.)

20              THE COURT:  Are you nodding Ms. Raman?  Is that a

21   yes?

22              PROSPECTIVE JUROR MS. RAMAN:  Yes.

23              THE COURT:  Anyone want to say no?  All right.  No

24   one says no.

25              Okay.  Well, let's -- we'll just start with you,
```

1  then, a good book or movie lately?  Talk to the mic.

2          **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  I saw The

3  Descendants.  That I liked a lot.

4          **THE COURT:**  Would you be a good juror or a bad juror,

5  and if so why?

6          **PROSPECTIVE JUROR MS. BALAKRISHNAN:**  Oh, I think I

7  would be a good juror.  I think I have the ability to sort of

8  be patient and listen through the entirety of whatever evidence

9  is presented.  And maybe try to be -- you know, listen to both

10  sides and then deliberate.

11          **THE COURT:**  All right.

12          Now I want to ask a general question to you as well

13  as everyone.  I have already ordered you all not to do any

14  research on the Internet, and so forth.  Not to listen to news

15  stories about this case.  Not to talk with anyone about this

16  case.

17          The most you could do is tell your loved ones you're

18  on a big patent and copyright case that involves these two

19  companies, period, and no more.

20          You could not go on the Internet and do -- see what

21  they're saying on the blogs.

22          I promise you there are a lot of blogs about this

23  very case.  There are a lot of news stories about this very

24  case.  You must make a conscious effort to ignore them and not

25  look at them.

PROCEEDINGS

```
 1              So, let me ask you, I want to get your personal word
 2    on this.  I'll start with you, Ms. Balakrishnan.  Will you
 3    promise me you will not -- you will follow my order to stay
 4    away from all of that?
 5              PROSPECTIVE JUROR MS. BALAKRISHNAN:  Yes, I promise.
 6              THE COURT:  All right.  Let's go to Ms. Michals.
 7    Ms. Michals same question to you, would you follow that order?
 8              PROSPECTIVE JUROR MS. MICHALS:  Yes, I will.
 9              THE COURT:  Okay.  What movie or book?
10              PROSPECTIVE JUROR MS. MICHALS:  I got caught up in
11    The Hunger Games trilogy.
12              THE COURT:  Here's the reason I ask this.  Has
13    nothing to do with whether -- it's just a little tidbit that
14    the lawyers will get an insight into you, and they get to
15    exercise these challenges momentarily.  And this helps them a
16    little bit to know kind of more about your personality.  That's
17    all.
18              Okay.  Now, would you be a -- same reason I'm asking
19    this next question, would you be a good juror, a bad juror;
20    and, if so, why?
21              PROSPECTIVE JUROR MS. MICHALS:  I think I would be a
22    good juror because I'm a pediatric nurse.  So I deal with kids
23    and families and wants of doctors and medical teams and
24    specialists.  So I have a lot of juggling to do, and hearing
25    everybody and executing the best care for the patient.
```

```
 1              THE COURT:  Thank you.  Ms. Gallo, would you follow

 2   my order not to do any research on this case?

 3              PROSPECTIVE JUROR MS. GALLO:  Yes.

 4              THE COURT:  All right.  Movie, book?

 5              PROSPECTIVE JUROR MS. GALLO:  Well, last movie I

 6   watched was The Hunger Games.  And reading --

 7              THE COURT:  Would you be a good juror?

 8              PROSPECTIVE JUROR MS. GALLO:  Yes, I think I would be

 9   a good juror because I'm a very analytical person, and I don't

10   have any existing opinions about these companies other than

11   they're both good companies.

12              THE COURT:  All right.  Thank you.

13              Mr. Haithcox, would you follow my order?

14              PROSPECTIVE JUROR MR. HAITHCOX:  Yes.

15              THE COURT:  All right.  And book or movie?

16              PROSPECTIVE JUROR MR. HAITHCOX:  Karl Marlantes,

17   Matterhorn.  Movie Social Network.

18              THE COURT:  Would you be a good juror?

19              PROSPECTIVE JUROR MR. HAITHCOX:  Probably a little of

20   each.  I think I would do a good job of listening and analyzing

21   the problem.  I might get distracted by critiquing the lawyers

22   or something.

23              THE COURT:  Might get distracted by what?

24              PROSPECTIVE JUROR MR. HAITHCOX:  By the lawyers'

25   performance.  I might be interested in that.
```

```
 1            THE COURT:  You might get wrapped up into the

 2    forensics of it as opposed to the substance of it?

 3            PROSPECTIVE JUROR MR. HAITHCOX:  Could be.

 4            THE COURT:  That's a good answer.  Thank you.

 5            Let's go to Ms. Chiu.

 6            PROSPECTIVE JUROR MS. CHIU:  Recent book, I also got

 7    caught up in The Hunger Games trilogy.  I just finished that.

 8    I think I would be a good juror because I tend to mediate with

 9    my friends and families when they have conflicts.  So they

10    often see me as someone to go to to work those issues out.

11            THE COURT:  And would you follow my orders?

12            PROSPECTIVE JUROR MS. CHIU:  Yes, I would.

13            THE COURT:  Now, your answer -- it's a good answer.

14    I don't want to criticize your answer.  But I need for you to

15    understand that a trial is not a mediation.

16            PROSPECTIVE JUROR MS. CHIU:  Yes, I understand that.

17            THE COURT:  A trial is one -- the party with the

18    burden of proof either proves it or they don't prove it.  That

19    is the question.

20            PROSPECTIVE JUROR MS. CHIU:  Yes.

21            THE COURT:  Not mediation.

22            PROSPECTIVE JUROR MS. CHIU:  Yes.

23            THE COURT:  Thank you.

24            Now we go to Ms.  -- Ms. Cheng.

25            PROSPECTIVE JUROR MS. CHENG:  I don't have time for
```

 1  reading or seeing a movie.

 2          THE COURT:  That's a good answer.  That's fine.

 3  Okay.  And would you follow my order?

 4          PROSPECTIVE JUROR MS. CHENG:  Yes.

 5          THE COURT:  And would you be a good juror or a bad

 6  juror?

 7          PROSPECTIVE JUROR MS. CHENG:  I would be a good one.

 8          THE COURT:  Why is that?

 9          PROSPECTIVE JUROR MS. CHENG:  I'm a good listener.  I

10  have patience.

11          THE COURT:  All right.  Excellent.  Thank you.

12          Let's -- now we go to Mr. Liu.

13          PROSPECTIVE JUROR MR. LIU:  I don't watch any movies

14  at all, and just once in a while watch TV news, and that's all.

15          THE COURT:  What do you like to watch on TV?

16          PROSPECTIVE JUROR MR. LIU:  Chinese channel.

17          THE COURT:  All right.  And do you like fiction -- do

18  you like stories or the news?

19          PROSPECTIVE JUROR MR. LIU:  Just the news and stories

20  mixed.

21          THE COURT:  All right.  Would you be a good juror?

22          PROSPECTIVE JUROR MR. LIU:  Well, I may be just okay.

23  I cannot say good, yeah.

24          THE COURT:  All right.  And will you follow my

25  instruction to not do any research about this case?

```
 1              PROSPECTIVE JUROR MR. LIU:  Definitely yes, I would.

 2              THE COURT:  Thank you.

 3          Ms. Raman, would you follow that same instruction?

 4              PROSPECTIVE JUROR MS. RAMAN:  Yes.

 5              THE COURT:  Okay.  Excellent.  And what movie or book

 6  have you read lately?

 7              PROSPECTIVE JUROR MS. RAMAN:  Recently, I just saw

 8  Mirror Mirror by Julia Roberts.  She was acting in it.  And

 9  then I kind of really liked it because it was kind of like a

10  spoof on Snow White and all that.  I also watch Judge Judy.  I

11  think she's pretty hilarious.

12              (Laughter)

13              PROSPECTIVE JUROR MS. RAMAN:  I like the way she's

14  sparky, and judgment so cool.  I like that.

15              THE COURT:  You know there's no way I could compete.

16              (Laughter)

17              PROSPECTIVE JUROR MS. RAMAN:  Yeah.

18          And recently I read a book by Scott Peck.  It's

19  called The Road Less Traveled.  Very nice.  Very insightful and

20  very helpful, and all that.

21              THE COURT:  Okay.  And would you be a good juror?

22              PROSPECTIVE JUROR MS. RAMAN:  Yeah.

23              THE COURT:  Why is that?

24              PROSPECTIVE JUROR MS. RAMAN:  Because I'm a

25  patient -- patient and a good listener.
```

1        **THE COURT:**  Okay.  Thank you.

2        Mr. Rutherford, go ahead.

3        **PROSPECTIVE JUROR MR. RUTHERFORD:**  The last movie I

4   saw, yesterday, was Pirates of the Caribbean at World's End.

5   Never seen it before, so I'm behind.

6        (Laughter)

7        **THE COURT:**  Did you like it?

8        **PROSPECTIVE JUROR RUTHERFORD:**  I did.  Johnny Depp is

9   a good actor.  You can tell he enjoys the role.

10        **THE COURT:**  And would you be a good juror?

11        **PROSPECTIVE JUROR MR. RUTHERFORD:**  I think I would be

12   a good juror.

13        **THE COURT:**  Why IS that?

14        **PROSPECTIVE JUROR MR. RUTHERFORD:**  I think I'm a good

15   listener.  At work I do a lot of cross-functional stuff, and

16   half of this is learning what's going on and then be trying to

17   get work done as far as my financial role.  So being able to

18   listen and hear what's going on and make a decision based on

19   that.

20        **THE COURT:**  Do you know my direct order to everybody,

21   no research about the case; you understand that?

22        **PROSPECTIVE JUROR RUTHERFORD:**  Yes, sir.

23        **THE COURT:**  No listening to news and so forth about

24   this case.

25        **PROSPECTIVE JUROR RUTHERFORD:**  Won't do a thing.

```
 1              THE COURT:  All right.  Thank you.

 2              Let's go now to Mr. Dimaggio.  Let's start with that

 3   question, would you follow that direct order?

 4              PROSPECTIVE JUROR MR. DIMAGGIO:  I would.

 5              THE COURT:  All right.  And would you be a good

 6   juror?

 7              PROSPECTIVE JUROR MR. DIMAGGIO:  I believe so.

 8              THE COURT:  Why is that?

 9              PROSPECTIVE JUROR MR. DIMAGGIO:  Uhm, I'm a good

10   listener, and I come to a decision pretty easily.

11              THE COURT:  Do you come to a decision too quickly?

12              PROSPECTIVE JUROR MR. DIMAGGIO:  I don't think so.

13              THE COURT:  Okay.  Fine.  And movie or book?

14              PROSPECTIVE JUROR MR. DIMAGGIO:  I just saw The

15   Hunger Games.

16              THE COURT:  Good or bad?

17              PROSPECTIVE JUROR MR. DIMAGGIO:  It was good.

18              THE COURT:  Thank you.

19              Let's go to Ms. Gonzalez, please.

20              PROSPECTIVE JUROR MS. GONZALEZ:  Well, the last movie

21   I saw was Mirror Mirror with my girls from church.  And it was

22   really good.  I think I would be an okay juror.  I'm a good

23   listener, but I'm not very patient so I don't know how that

24   would affect my ability to serve.  But I believe so.

25              THE COURT:  Will you follow my order not to do any
```

1   research or listen to the news, and just insulate yourself from

2   all coverage about this case?

3          **PROSPECTIVE JUROR MS. GONZALEZ:**  Yes, sir.

4          **THE COURT:**  Thank you.  Mr. Chau.

5          **PROSPECTIVE JUROR MS. CHAU:**  Yes, I will follow your

6   order not to listen to any.  I think I'm a good juror.

7   Hopefully I will fully understand all your questions.  You

8   know, my English is limited.

9          So my latest movie, I haven't watched movie lately.

10  I don't spend much time watching movie or reading books.  I

11  don't read books.

12         **THE COURT:**  Well, is English your first language?

13         **PROSPECTIVE JUROR MS. CHAU:**  It will be my fourth.  I

14  speak Cantonese, Mandarin, English and Vietnamese.  Little bit

15  of Vietnamese.

16         **THE COURT:**  How long have you spoken English?

17         **PROSPECTIVE JUROR MS. CHAU:**  20, 30 years.

18         **THE COURT:**  Do you use that in your work?

19         **PROSPECTIVE JUROR MS. CHAU:**  Yes.

20         **THE COURT:**  And have you understood what has happened

21  here today?

22         **PROSPECTIVE JUROR MS. CHAU:**  Yes.

23         **THE COURT:**  All right.  Have you had difficulty

24  understanding any part of today's proceeding?

25         **PROSPECTIVE JUROR MS. CHAU:**  No.

PROCEEDINGS

```
 1          THE COURT:  Okay.  Thank you.  Please pass the
 2   microphone back to Mr. Hotvedt.
 3          Mr. Hotvedt, same question, would you follow the
 4   Court's order?
 5          PROSPECTIVE JUROR MR. HOTVEDT:  Absolutely.
 6          THE COURT:  All right.  And would you be good or bad
 7   as a juror?
 8          PROSPECTIVE JUROR MR. HOTVEDT:  I think very good.
 9          THE COURT:  Why is that?
10          PROSPECTIVE JUROR MR. HOTVEDT:  I think the case
11   sounds very interesting, and it's something that I would pay
12   attention to.
13          THE COURT:  All right.  Something that you would pay
14   attention to?
15          PROSPECTIVE JUROR MR. HOTVEDT:  Right.  Exactly.
16          THE COURT:  And movie or book?
17          PROSPECTIVE JUROR MR. HOTVEDT:  Movie *The*
18   *Descendents*.  Very good.
19          THE COURT:  Thank you.
20          Next to Mr. Thompson.
21          PROSPECTIVE JUROR MR. THOMPSON:  I recently read a
22   nonfiction book the *Selfish Gene*.  And, yes, I feel I would be
23   a good juror.  I am patient.  I am able to weigh both sides.
24   I've served on a board of directors before, and considered
25   issues.  I feel I would be impartial.
```

```
 1              THE COURT:  Would you follow the Court's order about
 2   not doing any research, and immunizing yourself from all news
 3   coverage?
 4              PROSPECTIVE JUROR MR. THOMPSON:  Yes, I would.
 5              THE COURT:  Ms. Pearlman, please.
 6              PROSPECTIVE JUROR PEARLMAN:  Movie I watched recently
 7   was This Means War, with Reese Witherspoon.
 8              I think I would be a good juror.  I've never served
 9   on a jury, but I would listen to all the evidence and make my
10   decision at the end.
11              But I'm not into all the technology.  So I don't know
12   if that hinders me in making decisions or not.
13              THE COURT:  Will you follow the Court's order?
14              PROSPECTIVE JUROR PEARLMAN:  Yes, I would.
15              THE COURT:  Thank you.
16              Now we go to Ms. Hostynek.  Why would you be a good
17   juror?
18              PROSPECTIVE JUROR MS. HOSTYNEK:  I would certainly
19   try.  I -- I can keep an open mind until I hear enough evidence
20   to make me decide one way or the other.
21              THE COURT:  Okay.  Book or movie?
22              PROSPECTIVE JUROR MS. HOSTYNEK:  We've seen a couple
23   lately, very good ones.  A Separation, an Iranian film.  And
24   Footnote, an Israeli film.
25              THE COURT:  Would you follow the Court's order?
```

```
 1              PROSPECTIVE JUROR MS. HOSTYNEK:  Yes.

 2              THE COURT:  Next, Ms. Woo, would you follow the

 3   Court's order?

 4              PROSPECTIVE JUROR WOO:  Yes, I would.

 5              THE COURT:  Book or movie?

 6              PROSPECTIVE JUROR WOO:  I recently saw Page 1, which

 7   is about The New York Times and how they are trying to cope

 8   with the Internet, which was rather interesting.

 9              THE COURT:  Okay.  And would you be a good juror or a

10   bad juror?

11              PROSPECTIVE JUROR WOO:  I believe I would be a good

12   one.  My business involves listening really hard, prioritizing

13   across different factions, and also being analytical.

14              THE COURT:  Thank you.

15              Finally, to Mr. Troy.  Good juror or bad juror?

16              PROSPECTIVE JUROR TROY:  Good juror.

17              THE COURT:  Why is that?

18              PROSPECTIVE JUROR TROY:  I've been a librarian, and I

19   bring objectivity to this whole process.

20              THE COURT:  And book, movie?

21              PROSPECTIVE JUROR TROY:  Collection of Jack London's

22   work, and a movie that probably most of you haven't heard of,

23   which is Salmon Fishing on the Yemen.

24              THE COURT:  Okay.  Would you follow --

25              PROSPECTIVE JUROR TROY:  A British film.
```

```
 1            THE COURT:  Will you follow the Court's order?

 2            PROSPECTIVE JUROR TROY:  Yes, I will.

 3            THE COURT:  Good.  Now, I want to give you all one

 4    last chance.

 5            Let me summarize a few things.  What's about to

 6    happen here, I believe, is that we're going to have the lawyers

 7    winnow you down from 18 to 12.  So most of you are going to

 8    wind up serving on the jury.  Isn't that right?

 9            So two-thirds of you will be sitting there in a few

10    minutes and take an oath to decide this case.  And a few of you

11    will be excused.

12            So let's say you were to be selected.  In two or

13    three days if you came to me and said, oh, I should have told

14    you this, I'm so sorry, I didn't think I would get selected, I

15    cannot tell you what problems that creates.  If it's a

16    hardship, that's too bad.  You should have raised it now.

17            This is the time to raise any hardship issue.  If

18    it's a something like, oh, I just realized that Mr. Ellison is

19    my next-door, neighbor --

20            (Laughter)

21            THE COURT:  -- or something like that, then you

22    should have told us now.

23            So if there's anything that you want to tell us that

24    would go to your qualifications to be fair and impartial, or to

25    you having a hardship or something like that, because you've
```

 1   got to be here every day until -- maybe until the end of June,

 2   except for Memorial Day.  I think we take that day off.

 3          Now is the time I'm going to let you raise your hand,

 4   and we'll start all over again with you.  Don't be bashful

 5   about raising your hand.

 6          Okay.  Ms. Raman, let's give you the microphone,

 7   please.

 8          **PROSPECTIVE JUROR MS. RAMAN:**  Could we make notes?

 9          **THE COURT:**  What?

10          **PROSPECTIVE JUROR MS. RAMAN:**  Could we make notes

11   during the trial?

12          **THE COURT:**  Yes.  I'll give you notepads, and you

13   will be allowed to make all the notes you want, yes.

14          Anything else?

15          Counsel, do we pass for cause?

16          **MR. JACOBS:**  Yes, Your Honor.

17          **MR. VAN NEST:**  Yes, Your Honor, we do.

18          **THE COURT:**  All right.  So what is about now to

19   happen, that means that all 18 of you -- the lawyers agree you

20   are all qualified to serve as jurors in this case.  So that's a

21   milestone.

22          Now, the lawyers will hand up to me the three names

23   each that they would like to excuse.  I'll give you a few

24   moments to consult.

25          And you all must appreciate that the lawyers need to

 1  take -- this is an important decision, so don't hold it against

 2  them just because they are huddling and making a decision.

 3          This is an important decision they need to talk over

 4  with their clients, among themselves.  But it's best if we --

 5  well, let me -- how much time do you need?

 6          MR. JACOBS:  Could we have ten minutes, Your Honor?

 7          THE COURT:  Ten minutes.  Here's what we're going to

 8  do.  It's time for a break anyway.  So what we're going to do

 9  is take a 15-minute break.  But this time wait to come in until

10  I let you come in.  And then resume your normal seats.

11          And that way the lawyers -- unless the lawyers

12  want -- you're entitled to have the venire here if you wanted

13  them here while you select the jury.  I'll do it whichever way

14  you want.

15          MR. JACOBS:  We don't need that, Your Honor.  Thank

16  you.

17          MR. VAN NEST:  That's right, Your Honor.  They can be

18  released.

19          THE COURT:  You all can take a break.  The lawyers

20  don't need to inconvenience you while we're making this

21  decision.  We'll see you back here.  And remember the

22  admonition.

23          (Prospective jurors exit courtroom at 11:32 a.m.)

24          THE COURT:  Everyone be seated.

25          Are all the prospective members of the venire outside

PROCEEDINGS                                                    166

 1    the room?  Okay.  Do the lawyers need me for anything?

 2              MR. VAN NEST:  No, Your Honor.

 3              MR. JACOBS:  No, Your Honor.

 4              THE COURT:  All right.  Then I'll give you, say, ten

 5    minutes or so to make your decisions, all right.

 6              MR. JACOBS:  Thank you.

 7              (Whereupon there was a recess in the proceedings

 8               from 11:33 a.m. until 11:44 a.m.)

 9              (Proceedings held in open court, outside

10               the presence and hearing of the jury panel.)

11              THE COURT:  Thank you.  Be seated.  Back to work.

12              Both sides ready?

13              MR. JACOBS:  Yes, your Honor.

14              THE COURT:  Before I see what you've done, I want to

15    make sure you all understand, we're operating on the same wave

16    length.

17              How this works, I'll look at your two lists.  If

18    you have three different people on your lists, six all

19    together, there's no problem.  If you overlap then, let's say

20    you overlap, five are excused.  Then we have one extra that we

21    don't need and the one who will then be excused will be the

22    one furthest up on the far right -- that would be Ms. Gallo --

23    would be the one most likely to be excused because she's

24    No. 18.  Do you understand that?

25              So then let me have your sheets of paper.

```
 1                    (Whereupon, documents were tendered

 2                 to the Court.)

 3           THE COURT:  All right.  For the record, the plaintiff

 4    strikes No. 3, Mr. Dimaggio.  No. 9, Mr. Haithcox.  No. 15,

 5    Mr. Troy.

 6                And the defendant strikes Ms. Raman, No. 5.  Ms. Woo,

 7    No. 14.  Ms. Balakrishnan, No. 16.

 8                So, no overlap.  Did I read that correctly, counsel?

 9           MR. JACOBS:  Yes, your Honor.

10           THE COURT:  So the remaining ones will be the jury.

11                All right.  So let the jury in at this time.

12                (Prospective Jurors enter courtroom at 11:48 a.m.)

13           THE COURT:  All right.  Welcome back, everyone.

14    Please be seated.

15                So, ladies and gentlemen, we have reached another

16    milestone and the lawyers have made their choices.  So I'm

17    going to read off six names and if your name is called, that

18    means you're not going to serve on the jury.

19                Mr. Dimaggio, you may go back to the jury assembly

20    room and tell them what happened, but you're excused.

21                Ms. Raman, you're excused as well.

22                Mr. Haithcox, you're excused.

23                Ms. Woo, you're excused.

24                Mr. Troy, likewise excused.

25                And Ms. Balakrishnan, you're excused.
```

PROCEEDINGS

```
 1              We thank you you all for your willingness to serve.

 2              Now, interestingly that leaves six and six.  So would

 3  you all scoot down.  Move down one row so that we -- just one

 4  seat.  Right there.  Just make room for Mr. Hotvedt and

 5  Mr. Chau to scoot in.  And then the others of you move down and

 6  close ranks, please.

 7              (Jurors complied.)

 8              Okay.  Congratulations.  You will be the jury to

 9  decide this case.  At this time please stand and raise your

10  right hand and take the oath.

11              (Jury placed under oath.)

12              THE COURT:  Thank you.  Please be seated.

13              So just like I take an oath and the president takes

14  an oath, you have now taken an oath to decide this case.  Your

15  country, this great nation, has delegated to you the decision

16  in this case.  And it's important that you remember the

17  importance of your duty here and that you abide by all of the

18  admonitions that I have given you and will continue to give

19  you.

20              Now, our first order of business will be for you to

21  follow Dawn Toland, who is our Deputy Clerk, into your new home

22  away from home for just a few minutes.  She will give you your

23  credential.  Just like I have a credential, you're going to

24  have a credential that says you're a juror in this case.  She

25  will give you notepads, pencils, and give you some basic
```

1   guidance on things like, you know, filling out the forms with

2   the jury administrator.

3           So, and then we'll come back here in just a few

4   moments and start the trial.

5           So, Dawn, would you please escort the 12 members of

6   the jury back into the jury room?

7           **THE CLERK:**  All right.  Please all rise.

8           (Jury exits the courtroom at 11:51 a.m.)

9           **THE COURT:**  All right.  Please be seated.

10          Now, to the rest of you in the venire, that is the

11  prospective jurors, you can see now that you're not needed any

12  longer, and at this time you're either free to stay here and

13  just be a spectator, an observer, like an ordinary citizen,

14  which is perfectly okay, or you may just walk right back to the

15  jury assembly room, tell them that you were not needed and that

16  the jury has been selected.

17          But at this time you're excused.  Thank you.

18          (Jury panel exits the courtroom at 11:53 a.m.)

19          **THE COURT:**  All right.  Now everyone who wants to go

20  is gone and anyone who used to be a juror is free to stay here

21  if they want because they are no longer going to be serving.

22          Now, to my CSO, the Court Security Officer.  If we

23  have other members of the public who would like to come in, we

24  now have more seats available and you can be my guest if there

25  is anybody out there who would like to come in.

```
 1              (Brief pause.)

 2         THE COURT:  Now, counsel, I cannot give up the time.

 3  Even if it means splitting the opening statement, we'll do

 4  that.

 5              So what will happen is when the jury comes back, I'm

 6  going to give them some preliminary instructions and then if

 7  there is at least 30 minutes, we'll take advantage of it and

 8  we'll start on your opening statement and then finish it

 9  tomorrow on the plaintiff's side.  But I just cannot afford

10  to -- the luxury of waiting until tomorrow to start the

11  openings.

12              So you may as well go ahead and get your materials

13  organized and we'll get as far as we can today.  All right?

14              Okay.  We'll take a short break.

15              (Whereupon there was a recess in the proceedings

16               from 11:54 a.m. until 12:01 p.m.)

17         THE COURT:  Please remain seated and let's go back to

18  work.

19              I will give -- when the jury comes in, I'll give them

20  the preliminary instructions, at least some preliminary

21  instructions.  It won't take more than two or three minutes.

22              (Brief pause.)

23         MR. VAN NEST:  Your Honor, just a quick question.  It

24  seems likely that we're going to get through some or all of the

25  Oracle opening, but not the Google opening.  Could I ask the
```

```
 1   Court to just emphasize to the jurors the importance of keeping

 2   an open mind in light of the fact that they won't have heard

 3   anything from me today before they go home?

 4            THE COURT:  Yes.  But then tomorrow you get the

 5   advantage that they will have forgotten what they heard.

 6            (Laughter.)

 7            MR. VAN NEST:  Let's hope.  Let's hope.

 8            THE COURT:  Sorry we have nothing to talk about until

 9   they are ready to go.  They are almost ready.

10            Who is going to give the opening?

11            MR. JACOBS:  I will, your Honor.

12            THE COURT:  All right.  Do we have -- just so I'll

13   know, do the two sides have teammates out there somewhere in

14   the audience?  In other words, part of your team is out there?

15            MR. JACOBS:  Oh, yes.

16            THE COURT:  Yes?  Okay.

17            How about you?

18            MR. VAN NEST:  Yes, your Honor.

19            THE COURT:  Both sides have -- it's a pretty packed

20   courtroom.

21            If you would like to move the lectern closer to the

22   jury box, I'm okay with that.  It's up to you.  You're the

23   advocate.  You decide where you want to have the lectern and

24   you may vary from the lectern.

25            The court reporters will shoot you if they can
```

PROCEEDINGS

1  because they don't like that, but I like to let the lawyers be

2  advocates.  And you can walk all around the courtroom, but you

3  run the risk the court reporter will interrupt you and say, "I

4  can't hear you."  So if you do vary from the lectern, that's up

5  to you, but you must keep your voice loud and clear.

6          And these court reporters are the best in America.

7  They will likely be able to hear you.

8          **MR. VAN NEST:**  Your Honor, I just want to confirm

9  while we're here that the fact witnesses have been excluded,

10  just to be sure I understand.  The corporate representatives

11  can remain, but I want to be sure there aren't any fact

12  witnesses in the courtroom for the openings.

13          **THE COURT:**  Okay.  We will exclude fact witnesses

14  from the opening statements.  So if any fact witnesses are

15  here, they should step outside during the opening statements.

16          Here is another item that Dawn asked me about.  We

17  notice that on their list, the rolling 10 witnesses, that

18  Mr. Ellison would be testifying in the first 10.  Now, we have

19  a practical problem that if he's going to be testifying, that

20  we may have, once again, a full courtroom and I have to then

21  specially enlist a Court Security Officer to regulate getting

22  in and out.

23          I'm assuming that on days when -- most days we're not

24  going to be having a full courtroom, but on the day that he's

25  likely to be here, probably we will have a full courtroom.  So

PROCEEDINGS

```
 1  you need to let us know in advance far enough that we can make
 2  sure we have a court security officer that day.
 3        MR. JACOBS:  We have advised the other side, your
 4  Honor, that he would be our first live witness.  Depending on
 5  the schedule, we may start with something other than live
 6  testimony and we have so advised the other side.
 7        THE COURT:  What do you mean?  You're going to start
 8  out the trial with videotaped depositions?
 9        MR. JACOBS:  Yes, your Honor.
10        THE COURT:  All right.  There was an issue that we
11  discussed early today that you were going to give me a brief on
12  today.  What was that?  And maybe -- you said you would discuss
13  it.  What was that?
14        MR. JACOBS:  I think it's the -- less a brief, your
15  Honor, than perhaps just an indication to you of our view on
16  whether the deemed admitted admissions are legally conclusive
17  or admitted --
18        THE COURT:  So the ones that you have requested and
19  the ones that I have already ruled on.  Can we just say that
20  they are conclusive?  Is that good enough?
21        MR. JACOBS:  I think you have given us to this
22  afternoon, until 5:00 o'clock to talk to the other side and
23  alert you.
24        THE COURT:  Okay.
25        (Brief pause.)
```

```
 1            THE COURT:  Ready?

 2            THE CLERK:  Yes.

 3            THE COURT:  Everyone is ready here.

 4            THE CLERK:  Okay.

 5            MR. JACOBS:  Would you like to know, your Honor, if

 6   I'm going to be close to finishing, even if it goes a little

 7   over 1:00 o'clock?

 8            THE COURT:  Well, if you could finish in 10 minutes

 9   over, I would ask the jury if they can stay til -- they didn't

10   rely upon the 1:00 o'clock thing.  But if you were -- if it's

11   going to be more than that, I would just say put it over til

12   tomorrow.

13            MR. JACOBS:  Thank you, your Honor.

14            (Brief pause.)

15            (Jury enters courtroom at 12:10 p.m.)

16            THE COURT:  All right.  Welcome back.  Please be

17   seated.
```

### PRELIMINARY JURY INSTRUCTIONS

```
19            THE COURT:  Today is the first day of a long journey

20   together.  You probably don't even know each other's names over

21   there yet, but in due course, soon, you will know each other

22   very well and you'll know who all the lawyers are, and that's

23   the way it always seems to work.  But I know it's all new to

24   you right now.

25            And I need to be careful not to give you too much
```

1   information, so I will -- I want to give you a few key points

2   and as the trial goes along, I will give you some more.

3          So I've already explained to you basically what a

4   trial is.  You decide at the end, based on the record here, the

5   evidence here and under the instructions of law that I will

6   give you at the end.  I may give you some explanatory

7   instructions along the way that help you put it into a

8   framework.  I don't need to do that now and I actually think it

9   would not do any good to give it to you now, but in a few days

10  maybe I will help you with that.

11         So that's your basic duty, to be very mindful of what

12  the facts are and what are in contention, what are the things

13  in contention.  And I think it's best to be very brief on this

14  part.  I will reiterate it later.

15         I'm about to recede from the picture and the lawyers

16  will take over.  And you will be hearing a lot from them and

17  not so much from me, unlike so far.  In fact, there's sort of a

18  triangle that goes on between that lectern where the lawyer

19  will be standing, the witness who will be in the witness box,

20  and you.  It's one of the magic triangle where -- three corners

21  and that's where the evidence gets laid out.  And my job is to

22  sit back and help regulate the process, but, really, it's you

23  who are the ones over there that are absorbing the evidence and

24  hearing what the witnesses say.

25         And this leads me to the number one point that I must

 1  make, and I will say it very bluntly.  Not one word that a

 2  lawyer ever says in the courtroom is evidence.  If it's a

 3  stipulation, that's a little different.  I'll come back to that

 4  later.  But you will hear these lawyers ad infinitum and not

 5  one word they ever say is evidence.

 6         The evidence comes from the witness stand and it's

 7  under oath and subject to cross examination.  So if, for

 8  example, a lawyer were to say to a witness, "Isn't it true that

 9  the light was red?"  And the witness says, "I don't remember."

10  And then you got back in the jury room and you were

11  deliberating and somebody on the jury said, "Hey, I remember

12  somebody out there said the light was red."  You've got to be

13  good enough to remember, no, that was just the lawyer talking.

14  That wasn't evidence at all.  The witness said he didn't

15  remember.  You must, you must keep that straight.

16         I'm a strong believer in the jury system, but this is

17  the single most important way in which a jury goes wrong

18  occasionally, is by confusing what the lawyers say with what

19  the witnesses say.

20         Now, in my example if the lawyer had said, "Isn't it

21  true the light was red?"  And the witness said, "Yes."  Then,

22  of course, that's agreeing with what the lawyer said and that

23  would be evidence that the light was red, of course, in that

24  case.  But when the lawyer says, "I don't know," or "No, it

25  wasn't red."  I mean, it's what the witness says that counts

PRELIMINARY JURY INSTRUCTIONS

1   under oath and subject to cross examination.

2          We have excellent lawyers here.  They are going to do

3   a great job in this trial.  In some ways you're lucky to be

4   able to see a trial where the lawyering will be at the level

5   that it is, but it still doesn't change the fact that not one

6   word they ever say is evidence.  Zero.  So remember that.

7          The only exception to that is when it's a stipulation

8   by both sides, and I will make it very clear on those

9   circumstances that you may consider as evidence what the lawyer

10  says.

11         Okay?  So you're going to hear the opening statement

12  in just a moment.  And the reason I bring this up is because

13  you might be thinking, Oh, my goodness.  Look at this evidence.

14  I promise you, not one word of it is evidence.  Even when they

15  put an email up on the screen, is that evidence?  Not yet.  Not

16  until it gets admitted into evidence.  And if they don't get it

17  into evidence, well, that's their problem because they showed

18  it to you and they couldn't get it into evidence.  It's -- you

19  can only consider things that get into evidence.

20         Now, the other thing that I want you to remember

21  about a trial is that one side is going to have the burden of

22  proof on an issue.  Both sides have the burden of proof on

23  certain issues.  So it works both ways.  But if a party has the

24  burden of proof and you get to the end of the case and it's too

25  complicated and they haven't made it clear enough for you and

1   you just -- as hard as you try, you just cannot figure out what

2   in the world is going on, that party loses.

3            The burden of proof is on one party or the other and

4   you must not -- they lose if you cannot affirmatively say they

5   have met their burden of proof.  So because of that, it's

6   important that you pay close attention.  You try your best.

7            We're going to be dealing with some complicated

8   things here.  You try your very best, but at the end of the day

9   if they haven't carried the burden of proof, too bad for them.

10  They lose.  That's our system.  Both sides will have the burden

11  of proof on certain issues.  I will explain what those issues

12  are later on.

13           I've already told you that during the trial you

14  should not let anyone talk to you and you shouldn't talk to

15  anyone about the case or do any research or listen to news

16  reports or whatever.  You can see, there are a lot of newspaper

17  people out there and reporters, and good for them.  They will

18  be following this case carefully and reporting on it, but you

19  should not read any of their reports.  You can read them after

20  the case is over.  That's fine, but not during the trial

21  itself.

22           It's completely up to you whether you want to take

23  notes.  I recommend it because I think it will help you keep

24  things straight, but it's up to you.  Some people like to take

25  a lot of notes, others few notes.  Completely up to you.  You

1  don't have to take a single note.  It's up to you as to whether

2  to take notes.

3         Now, many of you sitting there will be seeing this

4  excellent court reporter and thinking, "Oh, in the jury room

5  when we deliberate, we will have a transcript of everything

6  that was said."  No.  There won't be any transcript in the jury

7  room.  This is for appeal purposes.  You never get a jury -- a

8  transcript in the jury room.  I've had jurors think -- go all

9  the way to the end of the trial thinking they are going to get

10 a transcript.  No, you will not.  So if you want to remember

11 something, you better make a note of it.  That's why we give

12 you the notepad, okay?  Good.

13        So I'm going to give you more thoughts about trials

14 as we go along, but those are the main points.

15        Now, we're going to turn to the opening statements.

16 Remember, nothing that the lawyers say in the opening

17 statements is evidence.  Nonetheless, these are very important

18 opportunities.  Very important opportunities for the lawyers to

19 give you their heads-up, a road map of where they think the

20 case is going.  And as I say, they are excellent lawyers.  You

21 will get a lot out of these opening statements.  But, remember,

22 that's what they are, is opening statements.

23        Now, this is -- we're starting phase one, which is

24 the so-called copyright phase of this case.  Then there will be

25 a phase two.  We'll have another set of opening statements

1   then.   Then there will be phase three and so forth.   So we are

2   breaking it up into parts so that it will be easier, really,

3   for you and for me to digest and absorb all of this

4   information.   And so we're going to do it by chapters rather

5   than do it all in one fell swoop.

6           So there we go.   We are so pleased to have you as our

7   jury.   We know that you're going to do a great job trying your

8   best to do the best job humanly possible in this important

9   case.

10          So at this time on behalf of Oracle America, Michael

11  Jacobs will give the opening statement.   The floor is yours.

12  And when we get to 1:00 o'clock -- let me ask the jury before

13  you get started, Mr. Jacobs.   You know, the 1:00 o'clock thing

14  you only learned about today.   Could you all stay, say, an

15  hour?   Could you stay an hour before I release you today?

16  Would that work for you or are you counting on 1:00 o'clock

17  already?   Is anyone over there who could not stay the entire

18  time?

19          (No response.)

20          **THE COURT:**   Okay.   I'm going to ask you to stay, and

21  Mr. Jacobs is going to try to finish his opening statement this

22  morning even though that's going to push us a bit past 1:00

23  o'clock.

24          Mr. Jacobs the floor is yourself.

25          **MR. JACOBS:**   Thank you, your Honor.

1                   **OPENING STATEMENT**

2          **MR. JACOBS:**  Good afternoon, ladies and gentlemen.

3   I know I speak for both companies, probably for the last time,

4   when I thank you in advance for your service on this jury.  As

5   Judge Alsup has told you, this is an important case with

6   important issues and you'll be deciding big questions between

7   Oracle and Google.

8          Before I begin, I would like to make sure you know

9   who's sitting at our table from Oracle, because it is a

10  reflection of the importance of the case.  At my far end is

11  Safra Catz.  Ms. Catz is the president and chief financial

12  officer of Oracle Corporation.  Right next to me is Dorian

13  Daley.  Ms. Daley is the general counsel of Oracle.  And down

14  at the end is Andrew Temkin, who is an attorney in the Oracle

15  Legal Department.  They will be with us throughout this trial.

16         This case is about Google's use in Google's business

17  of somebody else's property without permission.  Google's

18  business, you've heard a little bit about.  It's the Android

19  software that runs on mobile phones and tablets.  The somebody

20  else was first Sun Microsystems and then after Oracle bought

21  Sun, Oracle.

22         The property is not the kind of property we may be

23  used to.  It's not land or personal property.  It's

24  intellectual property.  Intellectual property which fuels our

25  dynamic regional economy and is the backstop for the research

1  and development and innovation that great companies engage in.

2  And the permission -- because it's intellectual

3  property, the permission would be called a license.  So whereas

4  if we rent an apartment, we sign a lease.  If we use somebody

5  else's intellectual property, if we use their software, if we

6  use their technology, it's typically called a license.  So this

7  case is about Google's use in Google's Android business of

8  first Sun's and then Oracle's intellectual property without a

9  license.

10  The intellectual property relates to Java, and you've

11  heard a little bit about Java.  Java is also a subset of

12  software technologies.  You'll be hearing over the course of

13  this trial a lot about Android and a lot about Java and you

14  will know all of its constituent parts.

15  So this case is about Google's use in Google's

16  Android business of Oracle's Java-related intellectual property

17  without a license.

18  Now, why are we here?  Are we here because this

19  happened by accident?  Was this some kind of misunderstanding?

20  Were the property boundaries not so clear?

21  On August 6, 2010 a Google software engineer named

22  Tim Lindholm sat down at his computer at Google and started to

23  compose an email.  He wrote it to Andy Rubin, who is the head

24  of Android, the Android mobile software business at Google.

25  And this is what he wrote:

1                    "What we have actually been asked to do by

2                    Larry and Sergey" --

3            Larry and Serge are pictured over there on the right.

4    That would be Larry Page and Sergey Brin, the co-founders of

5    Google, and the two of the three senior executives running the

6    company.

7                    "What we have actually been asked to do by

8                    Larry and Sergey is to investigate what

9                    technical alternatives exist to Java for

10                   Android.  We have been over a bunch of these

11                   and think they all suck.  We conclude that we

12                   need to negotiate a license for Java under

13                   the terms we need."

14           So Mr. Lindholm wrote a message, wrote an email to

15   his boss about a request from his boss's boss -- his boss's

16   bosses to investigate alternatives to Java for Android and

17   concluded that Google needed a license for the Java technology

18   that was in Android.

19           So, ladies and gentlemen, this was not any mistake.

20   This was not inadvertence.  This was not the property boundary

21   being unclear.  The decision to use Java intellectual property

22   in Android was taken at the very highest levels of Google with

23   a lot of consciousness and awareness about exactly what was

24   going on.

25                   So let's understand a little bit more about why this

1  decision was made and what Google got out of this decision to

2  use this property of someone else in Google's Android business.

3          First, what is Java?  Well, this is the familiar --

4  to those in the computer industry, the familiar Java coffee cup

5  symbol for Java.  You will be seeing it a lot through this

6  trial as we represent to you aspects of the Java software

7  platform.

8          And that's also an expression you're going to hear a

9  lot about, the Java software platform or the Java software

10 programming development environment.  And for present purposes

11 I want to break down what Java is into three components.  It's

12 a programming language.  So if you are at your desktop as a

13 coder, as somebody who is writing programs, you can actually

14 write programs in this Java programming language.  So if you're

15 writing a game or you're writing a spreadsheet or word

16 processing program, you might write that in the Java

17 programming language.

18         Java is also a set of what are called Application

19 Program Interfaces, or APIs, and their associated class

20 libraries.  This component is actually going to be the focus of

21 our first phase of the case, these APIs and class libraries.

22         And then there is a very important aspect of the Java

23 software development environment, the Java platform, called the

24 Java virtual machine.  And by the end of my hour today, or at

25 least by the end of phase one of this trial, you will well know

1   what the Java virtual machine is as well.

2           Now, by the time Google was looking at technologies

3   for Android, Java had achieved enormous success in the

4   marketplace.  It was very widely adopted.  Millions of

5   programmers were writing programs using Java programming

6   language and Java Application Program Interfaces.  And it

7   ran -- and it runs today on all sorts of devices.  It runs on

8   what we call the feature phones that many of us have.  So

9   you'll be hearing about smart phones and feature phones.  One

10  of our former venire, member of the venire, you will recall he

11  decided not to go with his Android phone, but went backwards,

12  if you will, to use only what we would call a feature phone.

13  And Java is very widely deployed, if you will, on these kinds

14  of devices and so it's a very successful software development

15  environment, a very successful platform.

16          You may have seen the coffee cup on your desktop

17  computer because Java is also installed on many of our home and

18  work personal computers.  And this is a screen that comes up

19  when it's time for you to update the Java technology that

20  actually sits on our own personal computers and desktops.

21          The world's leading companies license Java for their

22  products.  And it's in all kinds of products; not just phones,

23  but in DVD players, in telephone units that work in the office,

24  even in things like refrigerators.  It is a very successful

25  software development environment and it is licensed by these

 1  companies.  So keep that term in mind.  These companies have

 2  the right kind of permission to use Java in their products.

 3          There's something else that's very interesting about

 4  Java and it's called the Java community process.  And what's

 5  happened with Java when it was launched, the idea was, let's

 6  make sure that it gets very widely used and widely deployed by

 7  giving many people a stake and an opportunity to voice their

 8  views about how Java should evolve.  So this Java community

 9  process was established to set a set of kind of governance

10  bodies, ground rules by which the industry would organize

11  around the use of this new technology.

12          (Document displayed)

13          And what you see in the lower half of the screen are

14  some of the members of the Java community process.  And if you

15  know much about the businesses here, you will know these are

16  companies that are head-to-head, knock-to-knock competitors.

17  They are arch rivals in the marketplace.  But they have come

18  together around Java to make it successful and to make it, as

19  we'll explain, standard for everybody and to further it and

20  move it forward.

21          And this community relies on the components of Java

22  that I have described for you.  So all these companies have an

23  investment in their own programmers who know the Java

24  programming language.  They have an investment in the programs

25  that were written using the Java programming language.

```
 1            And the same is true for Java APIs, the Application

 2    Program Interfaces, and the Java virtual machine.  And, again,

 3    you will know much more about that as this case proceeds.

 4            Where did Java come from?  Well, it was invented at

 5    Sun in the early to mid-1990's.  Sun, of course, was a Silicon

 6    Valley driving start-up for many -- for most of its years.  It

 7    was founded in 1982.  Java was first licensed in 1995, 1996.

 8    And in the course of developing Java, Sun obtained key

 9    intellectual property in Java.  And Sun had this vision of this

10    community process and this kind of ecosystem, if you will, in

11    which lots of people would be invested in and participate in

12    the development and promotion and moving forward of Java.

13            And so Sun created not only the technologies, but

14    invested in the developers, gave training programs, made Java

15    as successful as it was and then created this process for other

16    companies to participate in.

17            Oracle bought Sun in 2010.  Now, Oracle we're

18    familiar with from at least driving down Highway 101 South,

19    those buildings on the left.  It was founded in 1977.  It was

20    founded by -- co-founded by Larry Ellison, who will be

21    testifying in this trial, and he has been with the company ever

22    since as its leader.  It is a leading data base company.

23            So one of its core businesses is providing the big

24    machines that run corporate data centers, but it is now

25    responsible for Java as well.  It's part of the Sun
```

1   acquisition.  It obtained the key intellectual property around

2   Java.  So it now has the responsibility to move Java forward

3   and also to run the Java community process and make sure that

4   that is an effective governance organization.

5          Java was a major reason that Oracle acquired Sun.

6   And you'll hear a lot about this from the Oracle executives.

7   Oracle was a major user of Java before the acquisition.  Many

8   of the Oracle key programs were written using Java.

9          And Oracle had a huge stake in Java moving forward

10  and not falling into the wrong hands, and so Oracle paid a lot

11  of money for Sun.

12         And you'll hear that a major reason for that

13  acquisition was the importance of Java to Oracle and to the --

14  and to the Java community, of which Oracle was a part.

15         Where does Google get into the picture?

16         Need to bring you back to 2005.  So it's before the

17  iPhone and the clever smart phones that we have.  But they're

18  on the horizon.

19         And Google, by 2005, is the dominant search engine on

20  our desktop.  We now all talk about Googling.  And that

21  probably started in the mid 2000s.  That's when we stopped

22  Yahooing and started Googling, because Google became such a

23  dominant search engine provider.

24         Of course, what is Google's business?  Well, Google's

25  business, in terms of making money, is selling advertising.

OPENING STATEMENT / JACOBS

1    Advertising.

2            And if you look at the desktop screen, you can see

3    the advertising on the right hand of the screen in what's

4    called the northwest corner, the top left, underneath the

5    yellow.  That is advertising that people pay for.  So the

6    advertisements will show up on the screen when we run our

7    searches.

8            And Google was the dominant provider of search on the

9    desktop, and was making lots and lots of money from searching

10   on the desktop.  But, they had a worry.  They had a concern.

11   They had a fear.

12           We're all using our desktops for search, so they can

13   make money off of advertising on our desktops.  But what we if

14   we all moved to mobile phones?  What if we used the then

15   emerging smart phones to do our searching?  What if we search

16   Google on our desktop but use some other search on our mobile

17   devices?

18           And Google saw both a huge opportunity and a threat

19   in the smart phones.  And they decided they needed to do

20   something about this.

21           So they bought a company called Android, Inc. --

22   hence, the name Android -- for the software.  And the idea of

23   the acquisition, the reason they bought Android, Inc. was so

24   that they would have an answer to this emerging threat and

25   opportunity.

OPENING STATEMENT / JACOBS

```
 1            And they had some tough requirements because it's
 2    already 2005, and these smart phones are starting to emerge
 3    already from Blackberry or other companies in which we can
 4    search, say, using Microsoft search or somebody else's search
 5    engine.
 6            So, they had some stiff requirements for Android.  It
 7    had to get on a lot of phones, and it had to do so very
 8    quickly.  It had to get to market in just a couple of years
 9    because the market was going to move away from Google.
10            And the key requirement for getting to market quickly
11    was to attract lots of developers who would write apps for
12    Android.  If we didn't have apps for Android, Google realized,
13    then the Android software platform on mobile phones would not
14    be so successful.
15            So how did they meet those requirements?  The answer
16    was aspects of Java, components of Java, because Java was
17    already widely deployed.  It had millions of software
18    developers already.  It had met these requirements.
19            And so Google decided that Android would incorporate
20    components of Java.  But, there was a problem.  Sun had
21    intellectual property in Java.  It owned copyrights and it
22    owned patents.
23            Well, you can't just step on somebody's IP because
24    you have a good business reason for it.  Google had a good
25    business reason for wanting to get into -- onto mobile phones
```

1   with Android, but that doesn't mean they could just infringe

2   Sun's intellectual property, its copyrights and patents.

3          So as they planned their Android strategy -- this is

4   a document, now, from July 26, 2005.

5          Dan, if I could ask you to turn around the timeline.

6          The Google managers and engineers responsible for

7   this strategy said, We must take a license from Sun for Java.

8   And, in fact, we're going to enlist the support of

9   Mr. Lindholm -- who you'll recall from the e-mail that I showed

10  you at the very beginning of this presentation -- to negotiate

11  the first license with Sun.

12         So in 2005 on the timeline, when Google has made the

13  Android acquisition and is planning its Android strategy, the

14  documents from this period will show, like this document does,

15  that Google realized that they had to take a license from Sun

16  in order to get permission to use that property.

17         Now, what if Sun wasn't willing to give the license

18  on the terms that Google wanted?  What if Sun had its own needs

19  with respect to Java, and Java intellectual property that were

20  inconsistent with Google's business plans?

21         On October 11, 2005, Andy Rubin -- recall, he's the

22  head of Android, Inc.  He becomes the head of Android at

23  Google.  And he writes to Larry Page, co-founder of Google.  He

24  says, "If Sun doesn't want to work with us, we have two

25  options.  We could abandon what we are doing already and go

OPENING STATEMENT / JACOBS

1    with Microsoft technology" -- a different programming

2    environment.  C is a different programming language from Java.

3    We could go with C.  -- "or we could do Java anyway and defend

4    our decision, perhaps making enemies along the way."

5           In 2007 it had become clearer to Google executives

6    that what Sun was willing to give Google and what Google needed

7    were two different things.

8           Google wanted rights to Java that would have been

9    inconsistent, as you'll see, with the basic Java community

10   process, the basic Java model.

11          And so Rubin writes now to the third leading

12   executive at Google.  We've seen Mr. Page's name.  We've seen

13   Mr. Brin's name.  Now we are going to see Eric Schmidt's name.

14   Three men who ran and run Google.  And this is Eric Schmidt in

15   2007.

16          Mr. Rubin says, I don't see how we can work together

17   and not have it revert to arguments of control.  I'm done with

18   Sun.  Tail between my legs.  We were right.  They won't be

19   happy when we release our stuff, but now we have a huge

20   alignment with industry and they are just beginning.

21          And, of course, "release our stuff" is the Android

22   software.  So Mr. Rubin was keenly aware, as was Mr. Schmidt,

23   that when Android came out Sun would not be happy.

24          And then, of course, by 2010 Mr. Lindholm writes this

25   message in which he says, "I've looked at what our choices are

OPENING STATEMENT / JACOBS

 1    today.  The alternatives are terrible.  We don't have any

 2    choice.  We have to negotiate a license for Java under the

 3    terms we need."

 4            Now, looking at the timeline, ladies and gentlemen,

 5    we're here.  We're in August 2010.  One week after this e-mail,

 6    Oracle, seeing itself as having no choice but to defend its

 7    intellectual property, filed this lawsuit.

 8            So one week before this lawsuit was filed,

 9    Mr. Lindholm, Mr. Rubin, Mr. Page and Mr. Brin were talking

10    about alternatives to Java and Android, and the need for a Java

11    license.

12            And so the reason we're here is that even as of

13    today, Google does not have permission to use somebody else's

14    property in its Android business.  And, again, that somebody

15    else was Sun.  It is now Oracle.

16            Google doesn't have the license, and that's why we're

17    here.  We're going to ask you at the end of phase one to hold

18    Google liable for infringement in particular of copyrights

19    because of the Java components that they incorporated in

20    Android without a license.

21            Let's learn a little more about Java technology, why

22    it was so successful, and how it was licensed to companies in

23    the computer industry.

24            Java was so successful because it solved a very

25    difficult problem for programmers.  The problem was this:  In

1   the old days when you developed software, you developed it for

2   a particular kind of computer.

3           And you may recall this.  If you went down to the

4   software store and you bought software for your early Mac or

5   your PC, you had to go to the Mac section or you had to go to

6   the PC section.  To some degree, you still have to do that, but

7   you'll see how Java solves this problem if people take

8   advantage of it.  You had to look at the sides of the box, and

9   it said this works on a PC or this works on a Mac.

10          What that meant is that companies that were

11  developing software had to prepare a version of their software

12  for each of these different kinds of computers.

13          It's as if the computers spoke French, German, and

14  Spanish.  And so the software developer had to create a French

15  version, a German version, and a Spanish version of the

16  software for each of those kinds of computers.

17          Well, the folks at Sun had a very interesting take on

18  this problem, and a very interesting solution.  They asked

19  themselves, what if we could write and prepare the application

20  program just once, and run it on any computer?

21          What if we don't have to worry about shipping or

22  distributing a version of this software for each flavor of

23  computer that's out there?  For French, German and Spanish.

24  I've kept my languages straight.  What if we could just do it

25  once and run it on any kind of computer?

1              And the answer was to give the developers tools to

2     write and prepare their application programs in a new language,

3     Java, and then put something called this Java virtual machine

4     on all of the computers to translate from Java into French,

5     German, and Spanish.

6              So the programmers who would write and prepare their

7     applications in a common language, in Java, ship it out

8     whatever way it was going to be shipped.

9              As 1995 came around, the internet is looming large in

10    people's minds.  We are getting software downloaded across the

11    Internet.  We are not looking at the side of the box to see

12    what kind of software we are going to buy.  It has to run

13    anywhere.

14             And we'll put this layer, this translation layer on

15    our PCs and other kinds of computers so that the Java code will

16    run everywhere.

17             So when you're on your PC and that screen comes up

18    and it says you've got to update Java, what you're updating is

19    the Java virtual machine on your computer, so if you get Java

20    programs they will run on your computer.

21             And this became known as write once, run anywhere.

22    And it's like it's the motto, it's the mission statement for

23    Java, for the Java community, for Sun and now Oracle.  We have

24    to protect this ability of Java to be written -- the ability of

25    developers to write once and for the applications to run

1   anywhere.

2         And so this is now, in the Java world, this is the

3   way the world looks.  You have an application programmer

4   preparing a program in Java and sending it out however it gets

5   sent out.  And then it's installed on the local computer, say,

6   in our homes.  And there's this translation layer called the

7   Java virtual machine.  And, lo and behold, a program written

8   once can run anywhere.

9         But there's a huge requirement and challenge, and

10  it's a technical challenge and it's a governance challenge and

11  it's a legal challenge.  You have to maintain the consistency

12  of all ends of this -- of this -- of this system.

13        So what the programmers prepare and call Java, and

14  send out over the Internet, let's say, when it lands in our

15  computers, our computers have to be precisely tuned to

16  understand that Java, the Java virtual machine and Java

17  programs have to mesh perfectly.  Otherwise, we will have

18  translation errors, and the program won't run properly.

19        So a major challenge in the Java world was

20  maintaining Java's consistency or, as the computer folks would

21  say, its compatibility.

22        Now, you can tell what the other challenge here is.

23  How do we get all these people to write in this new language?

24        Maybe some of you know about Esperanto.  The idea

25  about Esperanto was giving everybody a common language so that

OPENING STATEMENT / JACOBS

1  people could talk around countries without having to learn each

2  other's individual language.

3          The same with Java.  How do we get people to learn

4  Java?  And the answer was a huge investment in training and in

5  tools for these developers, and a particular kind of tool that

6  is at issue in this first phase of this lawsuit, and that is

7  these APIs and the associated Class libraries.

8          Now, the basic idea of Application Programming

9  Interfaces and Class libraries is pretty simple.  The idea is,

10  if programmers out there in programming land are writing

11  functions over and over again on their own, why not have

12  somebody like Oracle -- or before it Sun -- write up that code

13  and put it in a little library so that when the programmers

14  need to do that function they can call on the prewritten code

15  rather than having to write it themselves.

16          At that level, it's all pretty simple.  Prewritten

17  code that keeps developers from having to write these program

18  components from scratch themselves.

19          But they have to be described very well, and they

20  have to be designed very well because they, too, need to be

21  rapidly learned and rapidly used by programmers.

22          So, there's these things called APIs, which can be

23  thought of as the blueprints for these libraries.  And in Java

24  because -- you'll see this term "class."  And "class" is all

25  over Java.  But for present purposes, just think of a class as

OPENING STATEMENT / JACOBS

1   a module or a block of code.

2          So we have these Class libraries, these prewritten

3   program components, and then we have their blueprints called

4   these the APIs.

5          And the developer sits down with the blueprints in

6   the form of this book that's on the screen, or here in hard

7   copy form (indicating).  But, in fact, it's now, in 2012

8   it's -- it would be many, many volumes if it were to be put in

9   a book.

10          And these APIs provide the tools for the developer to

11   write into their programs the facilities provided by these

12   prewritten components.

13          APIs are blueprints.  Class libraries are the code.

14   APIs are the blueprints.  You can think of Class libraries as

15   the house.  And it's a house that's kind of difficult to

16   navigate if you're just navigating it on your own.  So the

17   blueprints are a guide.  They tell you how to navigate this

18   complicated structure.

19          So now we have to add another layer to our design

20   here.  So in addition to the Java virtual machine on our

21   computers, we have to provide these Class libraries.  Because,

22   remember, the programmers are going to program using the Java

23   programming language.

24          They're going to write using the information they

25   have about the Java Application Programming Interface.  And

1  then the program is going to be installed on our computers.

2  And that program is going to look for that prewritten module of

3  code so that the programmer didn't have to write it himself.

4       That way, if all of this works, and if the Class

5  libraries and the APIs are consistent, we'll get write once,

6  run anywhere, and it will all be easy to use, and programmers

7  will write lots of applications, and Java will flourish, and

8  we'll have this common programming language, and we'll have

9  write once, run anywhere.

10      This was an amazing success.  I struggle to come up

11  with another example in the computer industry.  Perhaps the

12  iPhone is the only other example I can think of as something

13  that got so successful so quickly.

14      By 2005, a ten-year span, 6 million developers had

15  learned how to program in Java.  And there were billions of

16  dollars of software being sold and developed based on Java.  It

17  was an industry, a community.  It was thriving.  It was going

18  great guns.

19      And this is a presentation that Sun gave to Google in

20  2005, when Google and Sun were talking about Google's need for

21  a license, because Google wanted to take advantage of this huge

22  investment and success.

23      Now, I mentioned that this problem -- that there's

24  this kind of technical problem, and it's kind of a -- it's a

25  legal problem.

```
 1              How do you get everybody to follow the rules and keep
 2   that consistency so that write once, run anywhere works?  And
 3   the answer is, it's a kind of technology all its own.  It's a
 4   set of licenses and a set of rules that Sun developed and now
 5   Oracle administers that have requirements in them that you keep
 6   Java compatible.
 7              And so these are some examples of the kinds of
 8   licenses that were available and are available for Java.  They
 9   let companies do various things to meet their needs, to prepare
10   distribution of code so that they can have their own Java
11   platform.
12              I want to focus on the one at the bottom.  It's
13   called the GPL open source license.  We'll be hearing more
14   about this.  As Judge Alsup indicated, open source is one of
15   the topics we'll be hearing about in the course of this trial.
16              So there are -- the first three categories are what
17   in the Oracle world we think of as commercial licenses, because
18   typically money changes hands for those rights, along with this
19   requirement to keep Java compatible.  And then there's this GPL
20   open source license, in which money doesn't change hands but
21   something else important does.
22              So in the Oracle world, when do you need to get a
23   Java license?  When, per Oracle, did Google need to get a
24   license?
25              If all you're doing -- all you're doing, it's the
```

OPENING STATEMENT / JACOBS

 1  important step, right?  It's writing applications.  What we

 2  care about as users of computers is applications.

 3          So if what you are doing is writing applications, a

 4  cooking program, a wordprocessor, a game, using Java, you don't

 5  need a license.  You just read the book.  You sit down at your

 6  computer and you write code that takes advantage of Java.

 7          On the other hand, in this licensing system that was

 8  set up, if you as a company want to provide your own set of

 9  these prewritten program components called Class libraries

10  based on these Java API designs, then you need to take a

11  license, you need to agree to maintain those Class libraries as

12  consistent, as compatible, and you need to pay some money.

13          It's a commercial endeavor.

14          And each of us, when we download Java on to our

15  computers -- just to kind of finish the picture here -- we

16  click through a license.  So if we're downloading Java software

17  components onto our computers, we click through a license.

18          What Google took and what we're here for in phase one

19  is these API designs, without permission, without a license.

20          Why did they do that?  Well, first, there's the basic

21  rationale behind Android.  And this is -- these are more

22  internal Google documents that you'll see over the course of

23  this litigation.  And I need to explain how they get in front

24  of you in this trial.  Because we're Oracle, and we're

25  presenting to you Google's documents.

```
 1            Well, that's the way the system works.  In the course

 2    of a lawsuit each side exchanges its internal documents with

 3    the other because that helps us find out the truth of what

 4    really happened when businesses make decisions.

 5            And so this is an internal Google document from

 6    April 18th, 2005, that explains Google's rationale for making

 7    this initial decision that Google needs to get a mobile -- set

 8    of mobile software.

 9            So the idea is, let's acquire Android, this company

10    that has this mobile software, and embed Google in the fastest

11    growing segment.  And there are hundreds of millions of mobile

12    phones being shipped, and who knows what's going to happen to

13    desktops.

14            So -- and Google even told all of its investors in

15    its annual report in December of 2005, If we don't get into

16    this business, we are going to be in trouble.  If we are slow

17    to develop products and technologies that are compatible with

18    nonPC communication devices, we will fail to capture a

19    significant share of an increasingly important portion of the

20    market for online services.  And, of course, as you can see,

21    they were talking about mobile telephones.

22            So this is the basic reason why they get into mobile

23    in the first place.

24            Where does Java come into the picture?  So we're

25    still back in 2005 here (indicating), after the acquisition,
```

OPENING STATEMENT / JACOBS

1    but Android development hasn't been launched.

2            And Mr. Rubin sends to Mr. Page an e-mail and he

3    says, "Android is building a Java OS."  OS stands for operating

4    system.  It's another term applied to the software we're

5    dealing with here.

6            And he says, We are making Java central to our

7    solution because Java as a programming language has some

8    advantages.  It's the number one choice for mobile development.

9     There exists documentation and tools.  These APIs are tools.

10   And they are documented.  And then there are other advantages

11   for Java.  So we are going to make Java central to our

12   solution.

13           And one of the important reasons we're going to do

14   that is, we want to harness all those developers out there who

15   will write apps.

16           There are 6 million Java developers worldwide.  Tools

17   and documentation exist to support app development, and we

18   won't need to create our own developer organization.  We can

19   leverage off of the existing base of developers.  We can

20   leverage off of Sun's innovation in Java, and Sun's investment

21   in the developer community.

22           And the APIs were really important.  Here's an

23   internal message explaining the specific link between APIs and

24   leveraging the Java application programmer community.

25           We enable developers who are familiar with

OPENING STATEMENT / JACOBS

1  programming in Java to leverage their skills to quickly build

2  Android apps.  The APIs in Android enable developers to build

3  extremely capable mobile apps that can rival what can be done

4  on a desktop.

5          There is no dispute in this case that there are 37

6  Java API packages.  I will explain what that means, I assure

7  you.  Thirty-seven Java API packages consisting of hundreds and

8  thousands of elements of the APIs in Android.

9          So when Mr. Chu is talking about the APIs in Android,

10  he is talking about the -- among others, he's talking about the

11  37 packages of APIs from Java that are in Android.

12          So this is where Google is.  They're using Java.

13  They're using these APIs.  And they know they need a license.

14          And you don't have to take it from me.  This is an

15  e-mail from Andy Rubin, again to Larry Page, October 11, 2005.

16  He says, My proposal is that we take a license that

17  specifically grants for us the right to open source our

18  product.  He's talking there about Android.  We will pay Sun

19  for the license.  And for another kind of license that you'll

20  be hearing about, called a TCK.

21          So Rubin proposes, let's take a license.  I want to

22  make Java central to Android.  I know that there's property

23  here.  I don't have a right to use that property without

24  permission.  I need to get permission.  Let's take a license.

25          Mr. Lindholm writes to one of his colleagues about

OPENING STATEMENT / JACOBS

1    his work on the project.  He says he's been helping Andy with

2    some issues associated with Android.  This is mostly taking the

3    form of helping negotiate with my old team at Sun for a

4    critical license.

5           Now, Mr. Lindholm had been a Sun software engineer

6    and was very familiar with the way Java was licensed, this kind

7    of structure that I described.  And so Google enlisted him to

8    help work on these negotiations and work with Sun to try and

9    get a license that met Google's needs.

10          In fact, there were several key executives and

11   programmers and others at Google who had come over from Sun at

12   various times and knew the whole setup.  They knew the way the

13   licenses worked.  They knew what the property was.  They knew

14   the kind of permission Google needed.

15          One of those was Eric Schmidt, who was a very senior

16   executive at Sun and, as you know, is, from what I mentioned

17   before, is one of the three top executives at Google.  Was and

18   is.

19          Two others you'll see over the course of this

20   presentation and the trial, Joshua Bloch and Eric Chu, also

21   knew a lot about Java at Sun.

22          In fact, almost a hundred Sun people went to work at

23   Google over the course of the years between 2005 and the

24   present.

25          So Eric Schmidt asks a good question in 2006.  So

1  here's where we are in the timeline.  We're about a year into

2  it now with Android development.

3          And he says, how are we doing on the Sun deal?  If

4  we're not going to get permission maybe we shouldn't be using

5  Java.  Is it time to develop a nonJava solution to avoid

6  dealing with them?

7          So recall that earlier e-mail I showed you in which

8  Andy Rubin said, instead of making enemies his other choice was

9  to go with that other programming language, and Eric Schmidt is

10  asking this question, look, we're not going to get a deal with

11  Sun.  Maybe we ought to go down a different path because we

12  can't use somebody else's property in our business without

13  permission.

14          But that wasn't the decision.  The decision, instead,

15  was that Android would be a Java-based system.  And that

16  decision was final.  And Google took no license.

17          Andy Rubin to Schmidt May 11, 2007.  More talk about

18  negotiating with Sun.  And Andy Rubin says, I don't see how we

19  can work together and not have it revert to arguments about

20  control.

21          Sun was very concerned about protecting its revenue

22  stream from Java and also protecting the consistency of Java.

23          And so Rubin says, I'm done with Sun.  They won't be

24  happy when we release our stuff.  But we're going to go ahead

25  anyway.

1          Now, you're going to hear a lot from Google about

2   some public praise of Android from Sun executives.  But what

3   the evidence in this trial will show is that whatever might

4   have been said publicly, in order to try to create a good

5   atmosphere for a possible deal between Sun and Google, on a

6   private basis Sun was making it very clear to Google that Sun

7   was not happy that Google was using Sun's intellectual property

8   in Android without permission.

9          Let's talk for a minute about open source.  You saw

10  earlier that Mr. Rubin wanted to negotiate an open source

11  license with Sun.  It's very important to understand that open

12  source means a lot of things, and there are different kinds of

13  open source agreements.

14         And the one that Sun released Java under and that

15  Oracle released Java under -- I showed you on that chart with a

16  list of licenses -- is called a GPL or General Public License.

17         And you may hear from Google, well, why is Sun -- why

18  is Oracle making such a big deal about this intellectual

19  property?  They released it under the GPL.  They made it

20  available under an open source basis.

21         So they've made their intellectual property, Google

22  will imply, they made their property available to the world.

23  Why are they coming after us for Google's use of that

24  intellectual property in Android?

25         And the answer is actually very simple.  Google did

1    not agree to the terms of the permission of the license for

2    open source that Sun, now Oracle, developed and applies.  And

3    that license is called the General Public License.

4           And here's the deal:  If you take code under the

5    General Public License, and you write new code on top of that

6    code, you have to give it back to the open source community.

7    You cannot keep it for yourself.  And that's fabulous for open

8    source folks who like to program in a community environment and

9    share their code with each other.

10          But it turned out that Google thought it was not so

11   good for its business plans.  And so they didn't agree to the

12   particular kind of open source license.  They did not want to

13   have this kind of give and give back set of rules applied to

14   it.

15          So they never agreed to the GPL.  They never agreed

16   to take the Java intellectual property on the open source basis

17   that Sun, now Oracle, makes it available under.

18          And, again, you can see this in internal messages at

19   Google.  So this is one from Andy Rubin to his team, August 11,

20   2007.  And he says, "The problem with the GPL is that it's

21   viral."

22          What that means is that very rule, that if I take

23   this code and I add to it, I'm kind of infected with this

24   requirement to give the code that I write back.  And he doesn't

25   want that because he thinks that will slow Android's adoption

OPENING STATEMENT / JACOBS

1   by mobile phone companies.

2           So he rejects the GPL license.  He rejects the open

3   source license that is available for Java.

4           And he notes, look, Sun had good business reasons.

5   You can see at the bottom of this slide, Sun had good business

6   reasons for making this choice.  Wanted companies to have to

7   come back and take a commercial license and pay royalties

8   because the companies would realize that GPL is great for

9   sharing but maybe it's not so great for business.

10          You're going to hear a lot about another open source

11  technology or project in the course of this trial.  It's called

12  Apache Harmony.  Apache Harmony was a project to create an open

13  source version of Java under a different kind of license,

14  called the Apache license.  It doesn't have this rule that when

15  you take and modify you have to give back.

16          And so what Google does is they take the code for the

17  Class libraries from this Apache project and they incorporate

18  it into Android.

19          And their argument, their excuse to you is going to

20  be, well, Apache was out there, and Sun, now Oracle, never took

21  any action against Apache.  You'll hear all about what happened

22  to Apache, believe me.

23          But the important point, at this stage of

24  understanding this case, is that Google knew that Sun

25  restricted Apache Harmony from going onto cell phones.  It

OPENING STATEMENT / JACOBS

 1  never allowed Apache Harmony to go on cell phones.

 2          And Google knew that.  And this message reflects

 3  that.  These restrictions prevent Apache Harmony from

 4  independently implementing Java.  And then he goes on to say,

 5  Not to mention, Android, though that's water under the bridge

 6  at this point.

 7          Why was it water under the bridge?  Because Google

 8  had already made the decision to incorporate Java in Android

 9  without a license.

10          And Schmidt, former Sun executive, says, I'm not

11  surprised, because he understood what Sun's business needs

12  were.

13          Was Google forthright about its use of Java in

14  Android?  You will see a lot of indications of conscious guilt,

15  that Google knew that what it had done was something that would

16  make Sun very agitated and perhaps lead to litigation.

17          So what Google does is it tells its developers not to

18  demonstrate Android to any Sun employees or lawyers at a trade

19  show.  And then they tell the developers to scrub the J word

20  from Android.  "The J word" being Java.

21          Now, Google will argue to you that this use of Java

22  intellectual property in Android is fair.  And you'll get

23  instructions from Judge Alsup at some point about what fair use

24  is all about.

25          The important point to keep in mind is, Android is

 1  not a charity project; that Google makes a lot of money from

 2  Android, and it's money that at least a portion of which we

 3  will argue to you in a later phase of this trial is properly

 4  Oracle's because of their use of Java intellectual property.

 5          (Audio recording was played in open court, and was

 6          not reported by the court reporter.)

 7          **MR. JACOBS:**  So this is Google's pitch.  We don't

 8  make money off of Android.  We give it away for free to the

 9  world, and they put it on their cell phones and their tablets,

10  and isn't that great?

11          But look.  We're talking about businesses.  And, in

12  fact, Android is hugely profitable for Google.  This is Eric

13  Schmidt on an earnings call in October with the investment

14  community, making it clear that the way they make money with

15  Android is the way they make money on any kind of search or

16  other services is through advertising.

17          And the idea is that with Android on cell phones we

18  will click on Google search, and we will get Google-sponsored

19  advertisements, and so Google will make money the way it makes

20  money.

21          So let me briefly explain what exactly the property

22  is that's at issue in phase one, this intellectual property,

23  these copyrights in these Application Programming Interfaces

24  and Class libraries.

25          Should start out with the fact that the Java

OPENING STATEMENT / JACOBS

1   materials in question are copyrighted.  And the way you

2   copyright something is you create it, and then you can kind of

3   amplify or strengthen your copyright protection by putting a

4   copyright notice on what you create.  So you can see this Java

5   documentation with the copyright notice on it.  And then you go

6   to the copyright office and you register your copyrights with

7   the Library of Congress and you get a certificate.

8           All of that is designed to make your copyrights more

9   enforceable, more clear, the world can go to the Copyright

10  Office and check and see what your registration is.

11          And that's exactly what Sun, and now Oracle, does

12  with Java.  So all the materials we're talking about, the

13  copyright has been registered with the United States Copyright.

14          Now, copyright is kind of interesting.  Copyright is

15  actually right in the Constitution.  The founders realized that

16  patents and copyrights could fuel the new economy in the -- as

17  the United States was being formed.

18          And so in an Article 1, Section 8, Clause 8, it says,

19  "To promote the progress of science and the useful arts we're

20  going to secure to authors the exclusive right to their

21  writings."

22          And so copyright is about writings.  And this is

23  referred to as the copyright and patent clause.  Of course, the

24  inventors are the patents, and writings are copyright.  And

25  copyright, among other things, protects writings.

```
 1            Now, Google may try to say to you, well, these aren't

 2  the kinds of writings that copyright is meant to protect

 3  because there is no creativity in these application program

 4  interfaces.  We think of poetry.  We think of literature.

 5  That's what copyright is all about.  These APIs are trivial.

 6  They'll give you some examples of Application Programming

 7  Interfaces that look very tiny.

 8            But, in fact, Google's own expert in this case,

 9  Google's own Application Programming Interface designer has

10  said exactly the opposite, that creating Application

11  Programming Interfaces is very creative, it's very rewarding.

12            And you'll hear from the actual developers of APIs

13  what it takes to actually create a good API.  And Google's own

14  expert said it's like being an artist, a football player, a

15  concert violinist.

16            And Google's API expert, in-house API expert, has

17  given presentations like this, in which he says API design is a

18  noble and rewarding craft, and it's tough.

19            So why wouldn't we want copyright to protect this

20  kind of writing, this kind of creativity?

21            What Google copied is a mix of things.  And to help

22  explain this I want to go back to my blueprints and house

23  analogy.

24            So if the APIs are the blueprints and the code is the

25  house, think about how someone could copy your architectural
```

1  plans.  There are a couple of different ways.  They could take

2  your blueprints and they could copy your blueprints into their

3  blueprints.  They could take your blueprints and they could

4  build a house from it.  Or they -- and they can look at the

5  house that you built from the blueprints and copy from your

6  house into the house that they're building from the blueprints.

7          So you can copy from the blueprints to the plans,

8  blueprints to the house, house to the house.

9          And that's essentially what we will show you here,

10  that Google copied the Java API designs into the Android APIs,

11  and then they based their Class libraries, their houses on the

12  Java API designs, and they even copied from our house into

13  their house.  They copied actual lines of code.

14          Now, these API designs are incredibly complicated and

15  intricate.  They are a writing in the most -- in the most basic

16  sense.  Somebody sits down and painstakingly creates these

17  Application Programming Interfaces.

18          I mentioned 37 packages.  Those are on the left of

19  this slide.  Each of those packages has something called

20  classes.  And you can see the classes in Java on the left and

21  the identical classes in Android on the right, and they do the

22  exact same thing.

23          And this is essentially undisputed.  Google is not

24  going to tell you, We did not implement the API designs in

25  Android.  They're going to try and explain to you why it was

 1  okay to do that, but they are not going to say they didn't do

 2  it.

 3          **THE COURT:**  Mr. Jacobs, you're down to about five

 4  minutes to go.

 5          **MR. JACOBS:**  We will be showing you this copying in

 6  detail over the course of the trial.

 7          We'll be showing you the copying from the

 8  documentation, the paper if you will, into their paper.  We'll

 9  be showing you the copying from the paper into their code.  So

10  from the blueprints into their house.

11          And it will look like this:  It's going to look very

12  technical.  But we'll have our experts and witnesses come in

13  and explain to you what this all means and why it's so

14  significant that Google copied in the way that it copied.

15          And, as I say, this is largely undisputed.  It's

16  right out of their documents.  The Java documentation is on the

17  left.  The Android code that shows the copying into the code is

18  on the right.

19          And there's a lot of it.  We'll bring in boxes to

20  show you just how much was copied.

21          Google is going to say, well, Android is this

22  universe that's so gigantic, and these APIs, these Class

23  libraries, are just a tiny piece of it.

24          They are a very important piece.  And they are

25  voluminous in their own right.  Probably about 11,000 pages, if

 1  you print out the API designs, were copied into Google's code.

 2          And the Google developers will admit that they looked

 3  at the Sun materials, the then Sun materials when they created

 4  these Class libraries.  And they will admit that they saw the

 5  copyright notices when they see them.

 6          Now, Google is going to say to you, well, we didn't

 7  realize, we didn't think these APIs are copyright protected.

 8  But this is Andy Rubin, the head of Android at Google in 2006,

 9  writing an e-mail saying exactly the opposite.  The java.lang

10  APIs are copyrighted.

11          And Sun gets to say, this is Sun's right, it's Sun's

12  prerogative to decide what happens to its intellectual

13  property, they get to say who they license to.

14          So when Google says to you, these APIs are not

15  protectable, think to yourself, well, what about that e-mail

16  that I will see in the course of this trial from Andy Rubin,

17  saying the APIs are copyrighted?

18          Now, I've explained to you, also, that we're not

19  making any claim, a person can use the programming language to

20  their heart's content.

21          Google is going to say, well, Oracle says the

22  programming language is free and available for everyone to use.

23  That embraces the APIs.

24          It's not right.  We'll prove it to you.  But this

25  diagram on this slide is designed to illustrate just how tiny

1    the language is compared to the Application Programming

2    Interfaces.

3           So I told you earlier that if you continue to print

4    the APIs in books it would be many volumes.  But the language

5    fits into one book.

6           Here's the worst of it.  I explained to you earlier

7    how important it is that Java remain consistent, that Java

8    remain compatible.  And there's a special license.  It's the

9    license that Andy Rubin was referring to in the e-mail I showed

10   you a bit earlier, that comes close to what Google claims it

11   did, which is to take the API designs, the specifications, and

12   write their own code on their own.

13          That's what they're going to tell you they did.  They

14   are going to say the code on a line-for-line basis is

15   different.  It's like two houses with the same architecture,

16   and the flooring and the paint and the screws and nails are in

17   different places but the design is the same.

18          And what this license requires you to do, if you're

19   going to do kind of what Google did, but they didn't agree to

20   these terms, is adhere to the Java requirements.  Make sure you

21   keep it consistent.  Don't do less or more of what is in the

22   set of rules to maintain Java's consistency.

23          And you have to do in a clean room.  You can't look

24   at Sun, now Oracle's, stuff.  You can't look at our code when

25   you're writing your code.

OPENING STATEMENT / JACOBS

```
 1              And, in fact, as I said, this is what Andy Rubin
 2    proposed to do, was take that license.
 3              But they didn't make Android compatible.  They made
 4    it incompatible.  They took some of the Java Application
 5    Programming Interfaces and then wrote some that are different.
 6              So we talk about splintering Java or fragmenting
 7    Java.  They broke the basic set of rules governing the Java
 8    community.  If you're going to do Java, you have to do all of
 9    it.  You have to be consistent.
10              And so with their own internal documents they make it
11    clear, does Android support existing Java applications?  No,
12    it's not Java compatible.
13              So if we go back to our slide about what Java brought
14    to the world, this write once, run anywhere, now we see a Tower
15    of Babel forming.  Now we see programmers programming in Java;
16    their programs won't run on Android.  Programmers programming
17    for Android; their programs won't run on Java.
18              We don't have a single language anymore.  We have a
19    dialect.  We have a splintering.  We have a fragmentation.  And
20    this is extremely dangerous for Java because the whole write
21    once, run anywhere proposition depends on consistency.
22              And then Google did not do a clean room because they
23    looked at Sun's code.  And you see portions of Google's Android
24    code -- not a lot, but copying is copying; looking is looking.
25    You will see portions of Android code that are line-for-line
```

1   copied from Java code.

2         And so you can see on this slide that Android is

3   not -- was not done in a clean room.  It was not done without

4   looking at Sun, now Oracle's, stuff.

5         **THE COURT:**  Mr. Jacobs, you're beyond your allotted

6   time.  Why don't you take a minute and finish up.

7         **MR. JACOBS:**  You bet.  Thank you, Your Honor.

8         Sun warned Oracle around the time of the acquisition

9   that this was going to be a big battle.  Jonathan Schwartz, who

10  you will hear a lot about in Google's presentation, sent Larry

11  Ellison, CEO of Oracle, an e-mail saying, We better talk about

12  our battles with Google Android.

13        And we will prove to you that from beginning to end,

14  from 2005 to 2010, Google knew that it was using somebody

15  else's property; that in order to do that it needed a license;

16  and that it didn't have a license.

17        There were many attempts by Sun to bring Google to

18  the table.  There were many attempts by Oracle to bring Google

19  to the table, to get it back into the Java community, to bring

20  it back into the Java fold.  Those were unsuccessful.

21        And, so, over the course of this lawsuit you're going

22  to hear a lot of explanation and excuses from Google.  And what

23  I would like you to do is keep in mind what their own documents

24  say, as Google makes its pitch.

25        Their own documents say we have to take a license

```
 1   from Sun.  We'll pay Sun for the license.  The APIs are

 2   copyrighted.  We're not compatible.  Let's scrub out a few more

 3   Js.  We need to negotiate a license for Java under the terms we

 4   need, because the alternatives suck.

 5           So as Google rolls out its various arguments to you

 6   keep in mind what they said to themselves, and ask yourself are

 7   the lawyers who are advocating in Google, on Google's behalf in

 8   this trial, being true to the evidence and being true to the

 9   facts?

10           Thank you very much.

11           THE COURT:  All right.  Thank you, Mr. Jacobs.

12           All right.  So we, we heard one of the opening

13   statements.  We will hear the next opening statement in the

14   morning.  And you need to remember to keep an open mind until

15   you hear both opening statements, and I know you will do that.

16           Also, keep in mind that nothing that the lawyers say

17   in opening statements is evidence.  Those emails that you just

18   saw and I'm sure emails you're going to see tomorrow morning,

19   none of them are in evidence yet.  You must wait and evaluate

20   the evidence as it comes in item by item.

21           Nonetheless, these opening statements are quite

22   important in order for you to see what it is that the lawyers

23   are saying to you is going to be proven or not proven.

24           Remember the admonition.  What was that?  No research

25   about the case.  No looking at news.  No talking about the case
```

PROCEEDINGS

1   even with your loved ones.  You can tell your loved ones the

2   name of the case, but nothing more.  Please don't get into

3   discussing with them what the case is about.  And you must keep

4   an open mind until the very end of the phase one, and then it

5   will be your duty to deliberate.

6            All right.  7:45, you must be here on time.  If

7   you're not here on time, we have to just wait for you and all

8   the other fellow jurors are inconvenienced.  So please be on

9   time or even early if you would like.  Someone will always be

10  here to let you in when you get here.

11           See you back here tomorrow.  Thank you.

12           (Jury exits courtroom at 1:23 p.m.)

13           **THE COURT:**  All right.  Be seated.  Is this the

14  agreed-upon timeline?  Is that it?

15           **MS. ANDERSON:**  Yes.

16           **MR. JACOBS:**  Yes, your Honor.

17           **THE COURT:**  Can you bring 12 copies to the jury, that

18  we can hand out to the jury tomorrow?

19           **MR. JACOBS:**  We will take care of it, your Honor.

20           **THE COURT:**  Okay.  Anything you want to bring up with

21  me now?

22           **MR. VAN NEST:**  Just briefly, your Honor.

23           I haven't had time to consult with Mr. Jacobs on

24  this, but normally we exchange witness and exhibit information

25  at 2:00.  We assume that lead counsel are going to be able to

PROCEEDINGS

1  get back and look at the finals.  I'm wondering if we could

2  bump it until about 3:00 o'clock today since we have been here

3  a little bit longer than normal.

4          MR. JACOBS:  Fine with us, your Honor.

5          THE COURT:  Bump what?

6          MR. VAN NEST:  The deadline for disclosing witnesses

7  and exhibits for the next day.

8          THE COURT:  All right.  I guess that's okay with me.

9  Anything else?

10          MR. JACOBS:  No, your Honor.

11          THE COURT:  Okay.  7:30.  We'll see you here bright

12  and early.  Thank you.

13          MR. VAN NEST:  Thank you, your Honor.

14          (Whereupon at 1:25 p.m. further proceedings

15           in the above-entitled cause was adjourned

16           until Tuesday, April 17, 2012at 7:30 a.m.)

17

18                        -  -  -  -

19

20

21

22

23

24

25

**I N D E X**

|                                      | <u>PAGE</u> | <u>VOL.</u> |
|--------------------------------------|-------------|-------------|
| Preliminary Jury Instructions        | 174         | 1           |
| Opening Argument by Mr. Jacobs       | 181         | 1           |

—   —   —

*Katherine Powell Sullivan, CSR, CRR, RPR*
*Debra L. Pas, CSR, CRR, RMR*
*Official Reporters - US District Court - 415-794-6659*

## <u>CERTIFICATE OF REPORTERS</u>

We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 10-3561 WHA, **Oracle America, Inc., vs. Google, Inc.,** were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings at the time of filing.


_____
/s/ Katherine Powell Sullivan


Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter



_____
/s/ Debra L. Pas

Debra L. Pas, CSR #11916, RMR CRR



Monday, April 16, 2012