Volume 5

Pages 904 - 1132

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,            )
                                 )
            Plaintiff,           )
                                 )
  VS.                            )   No. C 10-3561 WHA
                                 )
GOOGLE, INC.,                    )
                                 )
            Defendant.           )   San Francisco, California
_____)   April 20, 2012


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          MORRISON & FOERSTER
                            755 Page Mill Road
                            Palo Alto, California  94304
                    BY:  **MICHAEL A. JACOBS, ESQUIRE**
                         **KENNETH A. KUWAYTI, ESQUIRE**
                         **MARC DAVID PETERS, ESQUIRE**
                         **DANIEL P. MUINO, ESQUIRE**

                            BOIES, SCHILLER & FLEXNER
                            333 Main Street
                            Armonk, New York 10504
                    BY:  **DAVID BOIES, ESQUIRE**
                         **ALANNA RUTHERFORD, ESQUIRE**


(Appearances continued on next page)


Reported By: *Katherine Powell Sullivan, RPR, CRR, CSR #5812*
             *Debra L. Pas, RMR, CRR, CSR #11916*
             *Official Reporters - U.S. District Court*

**APPEARANCES (CONTINUED)**:

**For Plaintiff:**          BOIES, SCHILLER & FLEXNER
                           1999 Harrison Street, Suite 900
                           Oakland, California  94612
                    BY:    **WILLIAM FRED NORTON, ESQUIRE**
                           **STEVEN C. HOLTZMAN, ESQUIRE**

                           ORACLE AMERICA, INC.
                           500 Oracle Parkway
                           Redwood Shores, California  94065
                    BY:    **ANDREW C. TEMKIN, CORPORATE COUNSEL**
                           **DORIAN DALEY, GENERAL COUNSEL**


**For Defendant:**         KEKER & VAN NEST
                           633 Battery Street
                           San Francisco, California  94111-1809
                    BY:    **ROBERT ADDY VAN NEST, ESQUIRE**
                           **CHRISTA MARTINE ANDERSON, ESQUIRE**
                           **DANIEL PURCELL, ESQUIRE**
                           **MICHAEL S. KWUN, ESQUIRE**

                           KING & SPALDING LLP
                           1185 Avenue of the Americas
                           New York, New York 10036-4003
                    BY:    **BRUCE W. BABER, ESQUIRE**

                           GOOGLE, INC.
                           1600 Amphitheatre Parkway
                           Mountain View, California  94043
                    BY:    **RENNY HWANG, LITIGATION COUNSEL**


**For Dr. Kearl:**         FARELLA BRAUN & MARTEL LLP
                           235 Montgomery Street, 30th floor
                           San Francisco, California 94104
                    BY:    **JOHN L. COOPER, ESQUIRE**


**Also Present:**          **SAFRA CATZ, President and CFO**
                           Oracle Corporate Representative

                           **CATHERINE LACAVERA**
                           Google Corporate Representative


                           _   _   _

1                    **P R O C E E D I N G S**

2   **APRIL 20, 2012**                                        **7:30 a.m.**

3

4            (Proceedings held in open court, outside

5             the presence and hearing of the jury.)

6            **THE COURT:**  Good morning.  Welcome back, please be

7   seated.

8            You lawyers are staying in good health.  Usually by

9   now somebody is got the flu.  So far so good for you all, huh?

10           So let's pick up with the -- I'd like to get your

11  input on the sheet of paper I gave you yesterday.

12           **MR. JACOBS:**  Your Honor, I've got to confess.  I

13  violated your order in literal terms, but I hope I met the

14  spirit of it.  I declined to give you a handwritten markup

15  because I didn't want to inflict my handwriting on the Court.

16           (Whereupon, document was tendered

17            to the Court.)

18           **MR. BABER:**  Your Honor, I'm happy to say we did abide

19  by your order, but we have both a handwritten and a typed one

20  in case my handwriting is not as decipherable as it could be.

21           (Whereupon, document was tendered

22            to the Court.)

23           **THE COURT:**  Thank you.

24           **MR. JACOBS:**  Just so it's clear on the record, I've

25  given you a mark to show changes.

PROCEEDINGS

```
 1           THE COURT:  Okay.  You gave me two things.

 2           MR. JACOBS:  I gave you two copies, your Honor.

 3           THE COURT:  Oh, it's the same thing.

 4           And the one you gave me a has got the handwritten

 5    things.

 6           MR. BABER:  And we can provide one, like Oracle has,

 7    showing the changes in the typed one if you would like.

 8           THE COURT:  No, no.  This is fine.  We're going to

 9    have a discussion about this in due course, but I think it's

10    better if I read your write-up.

11           Now we go to...  I had a list of things to take up.

12    Here we go.

13           I have this question.  And I need to be precise so if

14    you want me to repeat this question, I will.  But when you use

15    the term "class libraries," "class libraries," do you mean only

16    the already compiled object code or do you mean the already

17    compiled object code and the source code?  And this is when you

18    use the term "class libraries."

19           So who wants to go first?

20           MR. JACOBS:  Your Honor, given the precision of the

21    question, I'd like to check with the folks at -- that are the

22    key person of this vocabulary and make sure we get it exactly

23    right.

24           THE COURT:  All right.

25           MR. BABER:  Your Honor, Brucer Baber for Google.
```

PROCEEDINGS

1          When we've used the term "class libraries," we are

2    referring to both when it's in source code form, as you would

3    get it from Google, if you download it from the, web for

4    example.  That's in source code.  And when we are referring to

5    our -- the programs or the functions, the code for the

6    functions, that is in the implementations of the APIs, the part

7    that actually does the work, the actual computer code, which

8    starts out in source code format when you first get it and then

9    it is compiled into -- it's not object code, but it's compiled

10   code, bytecode.  So it might appear in that other form either

11   in a development environment, on a handset, et cetera.  But

12   it's the same code, basically just in two different forms.

13          So when we talk about the libraries we are referring

14   to the code.

15          **THE COURT:**  No, no, not libraries.  Class libraries.

16          **MR. BABER:**  And I was going to also say, "class

17   libraries," I think we have used that interchangeably;

18   libraries, class libraries, core libraries.  We have used the

19   word "libraries" to really refer to that body of code that

20   performs the functions as opposed to just the name of the API

21   or the English language description of the API.  The libraries

22   are the parts that are in there that actually do the work when

23   you call it.

24          **THE COURT:**  All right.  So does that mean the

25   implementation?

1              MR. BABER:  Yes.

2              THE COURT:  When you use the use the term "class

3   libraries," does that have any different meaning than

4   "implementation"?

5              MR. BABER:  No, your Honor.  If I go back to Dr.

6   Bloch's chart from yesterday.

7              Everything here in his orange box (indicating) where

8   it says implementation, which is actually the code that

9   performs the function once you give it the right input, and

10  there's lots of also blocks of this prewritten code that appear

11  in this very large computer file, those are the libraries that

12  we're referring to.

13             THE COURT:  All right.  So let me give Mr. Jacobs

14  another shot at it.

15             You're free to comment now, if you wish, or if you

16  want to address this after you huddle with your clients, that's

17  fine, too.

18             MR. JACOBS:  Yes, your Honor, I think that would be

19  best.  There's probably a place that one can go to get a formal

20  definition of these terms and given -- again, given the

21  precision of the question, I would like to make sure we get it

22  right.

23             THE COURT:  Sure.

24             All right.  Now, next question is -- I think I asked

25  this yesterday and I think I know the answer.  This is a

PROCEEDINGS

1    question to Google.

2          Does Google admit to factually copying the SSO and

3    declarations of Java API elements from the Java documentation

4    or from the Java implementations?

5          **MR. VAN NEST:**  Could I have that question again, your

6    Honor, please?

7          **THE COURT:**  Yes.  And let me also -- I'll explain, at

8    least in part, why it matters so you'll have that.

9          Does Google admit to factually copying the SSO and

10   declarations of the Java API elements?  Let's say, from just

11   the Java documentation.  I'll leave it there for now.

12         One of the reasons this matters is in doing the jury

13   instructions, if you admit to having used that to copy from,

14   then we don't have to get into substantial similarity.  The

15   test becomes more simple.

16         And, also, I'll point out yesterday I think you said

17   that when the -- in the clean room, Google engineers, in fact,

18   did have the documentation and, in fact, the whole point was to

19   copy the declarations and the SSO.  So that's what I'm trying

20   to get at.

21         **MR. VAN NEST:**  I'm going to let Mr. Baber address

22   that.

23         **MR. BABER:**  Your Honor, if I may.

24         I believe the premise -- I'll answer your question

25   and, also, I want to talk about the premise of it because there

1  are lots of cases that say even some copying is not the end of

2  the day in a copyright case.  There still must be substantial

3  similarity between the works -- or virtual identity between the

4  works as a whole, as a whole, as to protectable elements.  So

5  some copying is not, in fact, the end of the day in terms of

6  the infringement question.

7           In response to your first question, I would say no.

8  Google did not copy the specifications or -- the SSO or the

9  declarations.  What Google -- what Google used were the API

10 specifications, the names that have been chosen for the APIs --

11 which, of course, the name tells you what package it's in, what

12 class it's in, et cetera -- and the specific method signatures

13 that are part of the specifications.

14          So the word "declarations" has been kicked around a

15 fair amount --

16     **THE COURT:**  Then using the chart over there, show me

17 which part you did copy and which part you did not copy.

18     **MR. BABER:**  Your Honor, the first -- the three parts

19 that Dr. Bloch identified as being part of the name.  Basically

20 everything above the implementation (indicating).  In other

21 words, the package it's in, the full method signature of the

22 method, including it's, quote, declaration.

23     **THE COURT:**  Well, but if that was copied -- I thought

24 you said you did not -- I asked you if you copied the

25 declaration, and you said, "No."  Now you're saying, "Yes."

PROCEEDINGS

```
 1        MR. BABER:  I apologize, your Honor, if I wasn't

 2   clear.

 3        Yes.  The declarations and the actual names of each

 4   of the methods in the class libraries, that's information that

 5   dealt with Apache, from Sun, from books, from lots of other

 6   places.  Yes, we used, because we had to use -- as Dr. Bloch

 7   explained yesterday, we had to use those names just as they

 8   have always been used because that's what defines the API as a

 9   functional matter.

10        So, yes, these elements we all used.  They are the

11   same ones that had always been used.

12        THE COURT:  Let me come to the point that you were

13   making which -- the work as a whole.  What do you say was the

14   work as a whole?

15        MR. BABER:  Your Honor, I think it's -- for purposes

16   of this trial there are two works as a whole on the plaintiff's

17   side.  They have accused us of infringing their copyright in

18   the Java Platforms Standard Edition Version 1.4 and Version

19   5.0.  Those are the two different works they have pleaded in

20   their complaint and they have said, "Google, you infringe our

21   copyrights in these two works."

22        So that's it on the plaintiff's side.

23        THE COURT:  All right.  So you fall back on the

24   pleadings and say they are stuck with the pleadings.

25        MR. BABER:  Absolutely, your Honor.  We believe they
```

1  are stuck with the copyright registrations and the works that

2  they asserted in their complaint, just like they are stuck with

3  the same group of patents they asserted.

4      **THE COURT:**  Didn't I rule on summary judgment that

5  they were not stuck with -- what did I say on  -- you raised

6  this point on summary judgment and I did not grant your motion,

7  but I'm fuzzy on why.

8      **MR. BABER:**  You did, your Honor.  It came up in the

9  summary judgment motion on the diminimus argument, whether or

10 not the nine lines in rangeCheck, for example, you compare --

11 what work do you compare it to when you decide it's diminimus?

12 And there was a dispute as to what was the relevant work, but

13 for purposes of infringement analysis, we believe it's pretty

14 clear.

15     There have been some cases that talked about, well,

16 what is a work for purposes of registration?  Okay?  But the

17 Court -- the cases have always started with, it's the

18 plaintiff's job to do two things:  To identify its copyrighted

19 work and to show that it's ridge time period.

20     So in this case, just for example, they have not put

21 anywhere in discovery or anywhere else any registration for

22 just the 37 APIs, or just the file in which rangeCheck appears,

23 or just the files that they say were copied from the source

24 code.  There are no separate registrations for those works.

25     The works they chose to register -- and they could

1  have gotten if they wanted to.  They could have tried to get

2  separate registrations for each of those files claiming each

3  one was a separate work, but there are some cases -- and we can

4  brief it further, if your Honor wants.

5       There are some cases that say, well, if you want to

6  try and even take the approach that those are separate works,

7  you've got to show they have independent merit or value, if you

8  will.  So for purposes of summary judgment you said, Well, what

9  Oracle relies on doesn't really control.  That's a registration

10 process and it doesn't control here.  So I'm going to reserve

11 on that question as to what are the works for purposes of

12 applying diminimus analysis.

13      But it's the same question on --

14      **THE COURT:**  All right.  So hold that thought.

15      Is it the same work for purposes of substantial

16 similarity, fair use and diminimus copying?

17      **MR. BABER:**  Yes, your Honor, I believe so.

18      **THE COURT:**  All of those?

19      **MR. BABER:**  Has to be.

20      **THE COURT:**  Whatever the work is you don't have to

21 have three different or two different.  We have the comparison

22 work is one item, whatever that item is.

23      **MR. BABER:**  That's correct, your Honor.

24      **THE COURT:**  Do you agree with that?

25      **MR. BABER:**  Yes.

PROCEEDINGS

 1          THE COURT:  Let me pause on that.

 2          Mr. Jacobs, do you also agree with that?

 3          MR. JACOBS:  The last piece of it or the starting

 4   point?

 5          THE COURT:  The last piece.  Whatever the work as a

 6   whole is, that we should tell the jury to compare against or --

 7   whatever the -- let me start over.

 8          Whatever the work as a whole is, it's the same for

 9   substantial similarity purposes, fair use purposes and

10   diminimus copying purposes.

11          MR. JACOBS:  I would like to consider that question,

12   your Honor.

13          Where I am able to -- where I'm able to agree with

14   Mr. Baber is that I think we have to define something that has

15   some independent significance.  We have to define an "it."

16   Where I disagree with him is that the relevant starting point

17   is exclusively that which was registered.

18          In this particular case we have class libraries.  We

19   have a code, each -- that has a beginning and end and a

20   copyright notice at the top of it.  And we all know what the

21   beginning and end is.  We have seen it illustrated by Mr.

22   Bloch's chart, for example.

23          So I think we can compare class library to class

24   library reserving on the technical question what we mean by

25   that specific technical concept.

```
 1          Moreover, in looking at all three of the questions --
 2   and this is why I can't give you a "yes" or "no" answer right
 3   away -- there's lots of law that says you don't escape
 4   copyright infringement by what you add.  You look at that which
 5   was taken.  And so if it's a couple hundred lines in a memoir
 6   or a biography of Gerald Ford, even in a lengthy article, you
 7   look at those couple hundred lines and you say:  Does that have
 8   -- is that protected expression?  Is it taken?  Is it
 9   infringing?
10          So we have to mediate between -- as we figure out how
11   to analyze that expression, we have to mediate between that
12   which was registered, that which was a copyright notice on it,
13   that which was a clear beginning and an end, and these
14   doctrines that say you don't escape infringement -- a
15   plagiarist does not escape infringement by what he adds.
16          THE COURT:  I think that must be correct.  I'm
17   willing to accept that you -- if you steal somebody's work and
18   add a lot more to it, that doesn't take away from the fact that
19   you stole their work to begin with.
20          I don't think, though, that anyone is arguing --
21   you're not disagreeing with that, are you?
22          MR. BABER:  No, your Honor.
23          THE COURT:  I think this contest here comes down to
24   how many lines of code are there in these 37, 15 million?
25          MR. BABER:  Well, that's the other issue, is what is
```

 1  the accused work?  The thing is, they accuse Android.  Android

 2  is 15 million lines of code.

 3          **THE COURT:**  About how many lines of code are in the

 4  37 APIs?

 5          **MR. BABER:**  Your Honor, I'm not sure.  They provided

 6  a count last week of 100,000 lines, something like that, out of

 7  15 million.

 8          **THE COURT:**  So let's go with that.  So you've got

 9  100,000 lines and if you counted up the number of lines of

10  declarations, it would probably be 37, but maybe it's -- let's

11  say it's three or four times that many.  It's still going to be

12  a tiny percentage of 100,000.

13          So, but the comparison that I'm trying to get at is,

14  what is the work as a whole?  Is it the 37 APIs?  Is it -- here

15  is the part that -- here is the part that is a little strange

16  about this.  Is this for the judge to decide or the jury to

17  decide?

18          **MR. BABER:**  I believe the question of what is the

19  work at issue is the question for the Court, because otherwise

20  you can't instruct the jury.

21          And I want to go back, because I want to make clear

22  what I said earlier.  We believe absolutely that for purposes

23  of infringement, for purposes of fair use, the two works that

24  are being compared have to be the same.

25          Now, but if, for example -- it sounds like Mr. Jacobs

```
 1  may make an argument that, well, okay, each of these 12 files,

 2  these individual 12 little files that have something that they

 3  say is copied, well, each of those is a separate work.

 4       He's going to try and convince you that, okay, for

 5  infringement purposes you have lots of different works that the

 6  jury has to consider.  You have to consider the copyright in

 7  arrays.java where the rangeCheck code appears.  You have to

 8  consider a separate -- but none of those copyrights exist.

 9       That's why we have a copyright registration system,

10  is that so when the Court is doing this kind of analysis in an

11  infringement case, it's very easy to see.  What is the

12  plaintiff's work?  The plaintiff's work is what the plaintiff

13  decides to take to the copyright office and register the

14  copyright in, because otherwise can they at trial pick and

15  choose and say, well, 37 APIs or all the APIs?

16       THE COURT:  Didn't I reject that argument?

17       MR. BABER:  No, your Honor.  You rejected that

18  argument and said the question was an open question.

19       THE COURT:  Okay.  It seems a little hard on the

20  judge that the complaint could say -- what did it say again?

21  That was the work --

22       MR. BABER:  The complaint said, we have lots and lots

23  of copyrights on Java.  The two that you infringe are attached.

24  They are Version 1.4 of the platform and Version 5.0 of the

25  platform.
```

1        **THE COURT:**  It seems strange that we would get all

2    the way to the end of the trial and the day comes where I have

3    to instruct the jury and that's the point at which I have to

4    decide.   That could be a complicated analysis.

5        Was there a point in the case where an interrogatory

6    was answered where they said, "What do you contend is the work"

7    -- you know, "What are we going to be fighting at trial," or do

8    we have to default all the way back to the complaint?

9        **MR. BABER:**  Your Honor, there were never -- we never

10   served interrogatories about legal questions like that, but the

11   issue did come up.  I mean, it came up in the --

12       Well, I don't know if your Honor will recall, early

13   on we filed the motion to dismiss the copyright claim on the

14   grounds that it hadn't been sufficiently pleaded.   And they

15   came back and said, "Well, sure it is.  We've identified the

16   relevant copyrights in the amended complaint, and here are some

17   exhibits that show what we think is some of the copying."  So

18   that issue went away, but they clearly were relying on the two

19   copyrights that they had asserted.

20       Then at discovery they started saying, "Well, we have

21   got a whole bunch of other copyrights."  And we had some

22   correspondence back and forth.  I wrote a letter to Mr. Jacobs

23   and I said, Michael, I want to make it very clear.  As far as

24   we are concerned, the works for purposes of this case -- we are

25   on an expedited discovery calendar.   The works are the two

1   you've pleaded.  If you want to rely on anything else and claim

2   anything else is infringed, you should have amended your

3   complaint back when you had time to do so.  And as far as we

4   are concerned, those are the works.  That was your choice.  And

5   that was confirmed in the early case management order.

6           **THE COURT:**  All right.  Here is -- it's time to bring

7   the jury in, but I want to give Mr. Jacobs a chance to have a

8   verbal -- take a minute and make your point in response to what

9   I just heard.

10          **MR. JACOBS:**  I think we're mixing two issues.  There

11  is the question of what release of Java was at issue.  And we

12  attached to our complaint the registrations, I believe, for 1.4

13  and 5.0.  That was the best information we had about which

14  particular versions of Java were copied when the copying took

15  place.  So was it 1.7?  1.8?  We attached 1.4 and .5.

16          What they were driving at in that back-and-forth is,

17  well, you're abandoning any rights to intermediate or later

18  versions, which is just wrong.  That was just technically

19  legally wrong.  You know, you're not limited to the specific

20  registrations you attach to the complaint.

21          That is not the relevant question here, which is what

22  really -- driving to the bottom line:  What will we tell the

23  jury they should be comparing?  What is the A to the B?  I

24  think we should brief that to your Honor and give you something

25  more focused and helpful.

 1          **THE COURT:**  I agree you should.  I've already given

 2  you one briefing assignment due Sunday at 3:00 o'clock.  This

 3  is a separate one, also due Sunday at 3:00 o'clock.

 4          **MR. JACOBS:**  Thank you, your Honor.

 5          **THE COURT:**  I want you to understand some of the

 6  points that are on my mind.

 7          One is:  Is it the same standard for substantial

 8  similarity, fair use and diminimus copying?  That is, is the

 9  same body of work, a work as a whole, is it the same for all

10  purposes?  And in even -- when you were comparing the nine

11  lines of code out of 15 million, is it nine versus 15 or is it

12  nine versus something else?

13          There is a different -- a different problem that's

14  lurking here, and it's a procedural one, and that is:  Should

15  the plaintiff be held to what it pleaded in the complaint

16  and/or what the copyrights are on?  In other words, what is the

17  copyrighted work?  And that -- and if you want to get into what

18  the give-and-take was in your correspondence, fine, but I -- I

19  find it strange that we would have -- you know, like on the

20  patent side, we have these rules where you specify what it is

21  that's being infringed so that the -- it's clearly on the table

22  what's infringed, what's not.

23          Now, on the copyright side, we don't have rules like

24  that.  I would have just thought you'd default to look at the

25  complaint and the complaint would tell us.  But I don't know

1   the answer to that and I need the help of the lawyers.

2          It seems strange that I would have to go through an

3   entire trial and only then would it -- would the scales fall

4   from my eyes and I would see clearly what the work as a whole

5   is.  I don't know.  You lawyers are great.  You'll figure this

6   out for me.

7          Yes, Mr. Van Nest.  As soon as I said Sunday at 3:00

8   o'clock, I saw you jump up over there.

9          **MR. VAN NEST:**  I was just going to ask your Honor if

10  we could have 10 pages on that one as well.

11         **THE COURT:**  Yes.

12         **MR. VAN NEST:**  You'll see --

13         **THE COURT:**  And you can have as many -- please don't

14  give me -- you know, I know you'll use good common sense.  The

15  larger and bigger your binders that you submit, your exhibits,

16  the more harder it is.

17         But you can have -- in addition to the 10 page, you

18  can have your backup correspondence and whatever you think I

19  need to see, but, please, minimize rather than maximize.

20         I think by the end of next week we'll be very close

21  to the end of the evidence on this phase.  We probably won't

22  finish it by the end of next week, but we will be very close to

23  it.  And I want to have a good set of draft instructions to

24  give you so that -- that's the timeline that I'm working

25  against.

```
 1              MR. VAN NEST:  Okay.  That makes a lot of sense.  I
 2   think that's right, your Honor.
 3              THE COURT:  Okay.  I have a few minutes, if you have
 4   issues to bring up with me.
 5              MR. JACOBS:  We have some exhibits that we have
 6   agreed on, your Honor.
 7              THE COURT:  All right.  Let me get my list.
 8              MR. JACOBS:  So Google had stipulated to the
 9   admission of the following trial exhibits.  And I'll do it like
10   I did yesterday.  I'll stop at about every eight or nine or so.
11              748, 749 --
12              MR. VAN NEST:  Give me a moment, your Honor, please.
13              THE COURT:  Sure.
14              (Brief pause.)
15              MR. VAN NEST:  I'm ready, your Honor.
16              THE COURT:  Go ahead.
17              MR. JACOBS:  751, 7- --
18              THE COURT:  748.  Start with 748 again.
19              MR. JACOBS:  748, 749, 751, 752, 753, 2800, 2801,
20   2802, 3341, 3342, 3343, 3344, 3345, 3346, 3347, 3348, 3349.
21              MR. VAN NEST:  No objection, your Honor.
22              THE COURT:  All received.
23              (Trial Exhibits 748, 749, 751, 752, 753, 2800, 2801,
24              2802, 3341, 3342, 3343, 3344, 3345, 3346, 3347, 3348,
25              3349 received in evidence)
```

1              **MR. JACOBS:**  45.1, 45.2, 45.3, 46.20, 46.21, 46.22,

2   46.23, 46.24, 46.25, 46.26, 46.27, 46.28.

3              **THE COURT:**  Agreed?

4              **MR. VAN NEST:**  No objection.

5              **THE COURT:**  All of those are received in evidence.

6              (Trial Exhibits 45.1, 45.2, 45.3, 46.20, 46.21,

7              46.22, 46.23, 46.24, 46.25, 46.26, 46.27, 46.28

8              received in evidence)

9              **MR. JACOBS:**  741, 767, 770, 771, 773, 862.

10             **MR. VAN NEST:**  No objection.

11             **THE COURT:**  All received.

12             (Trial Exhibits 741, 767, 770, 771, 773, 862 received

13             in evidence)

14             **MR. JACOBS:**  1030, 1031, 1032, 1033, 1034, 1035,

15   1036, 1037, 1038, 1039, 1040.

16             **MR. VAN NEST:**  No objection, your Honor.

17             **THE COURT:**  Okay.  In.

18             (Trial Exhibits 1030, 1031, 1032, 1033, 1034, 1035,

19             1036, 1037, 1038, 1039, 1040 received

20              in evidence)

21             **THE COURT:**  More?

22             **MR. JACOBS:**  We have some deposition designations in

23   the form of Trial Exhibit 1064 that will be played.

24             (Whereupon, document was tendered

25              to the Clerk.)

PROCEEDINGS

```
 1              THE COURT:  Is that all teed up?  Is there any ruling
 2   needed by me?
 3              MR. JACOBS:  No, your Honor.
 4              THE COURT:  All right.  Great.  Thank you.
 5              Anything more?
 6              MR. JACOBS:  That's it from us, your Honor.  Thank
 7   you.
 8              THE COURT:  Mr. Van Nest?
 9              MR. VAN NEST:  I don't think we have any issues, your
10   Honor.
11              THE COURT:  Did you all do the -- didn't I ask for
12   one page that has the names of the lawyers?  Did I do that?
13              MR. JACOBS:  Names of the lawyers.
14              THE COURT:  Yes, because I -- where is Mr. Boies
15   today?  They don't know how to spell that.  And, you know,
16   they'll like girls and boys.  They will get it wrong.
17              I want the lawyers -- I want them to understand how
18   the names are spelled of the lawyers.
19              MR. VAN NEST:  You hadn't asked us for that, but
20   we'll do it.
21              THE COURT:  Okay.  I'm wrong, but --
22              MR. VAN NEST:  You asked us for Who's Who of
23   witnesses.
24              THE COURT:  Yes, that's right.  Okay.  So add this to
25   it.
```

```
 1              I have another list, so they can have the names

 2   straight of all the lawyers who are performing in court.  I

 3   just think it's a courtesy to you and, but it's also a courtesy

 4   to the jury so they will not write down the wrong name.

 5              MR. VAN NEST:  You want pictures on there, your

 6   Honor?

 7              THE COURT:  You can do a little baseball card, you

 8   know.

 9              (Laughter.)

10              THE COURT:  145 trials.

11              MR. VAN NEST:  My average?  I'm not sure --

12              THE COURT:  Your batting average, yeah.

13              MR. VAN NEST:  My average.

14              Your Honor, are we going to begin the morning with

15   summaries or with our witnesses and do the summaries at the end

16   of the day?  What did you have in mind on that?

17              THE COURT:  Well, I'd like to do it at some point.

18   What do you all think?  Do you want to do it now?

19              MR. JACOBS:  The advantage of doing it now, your

20   Honor, is that we're -- last night we worked with the state of

21   the record as we had it.  Whereas, the state of the record will

22   change during the day.

23              THE COURT:  Let's take -- you've got 10 minutes per

24   side.  How is that?

25              MR. VAN NEST:  That's fine, your Honor.
```

PROCEEDINGS

```
 1          THE COURT:  Are we done with the last witness?
 2          MR. JACOBS:  Yes.
 3          THE COURT:  All right.  This will be a good point to
 4   do that.
 5          I want to come back to one thing.  There is a danger
 6   whenever you have these exhibits come in automatically.  I want
 7   you to be clear on this.  Yesterday you gave me a good example
 8   of this.
 9          It was the downloading of some website.  The fact
10   that something is stipulated into evidence does not necessarily
11   stipulate as to when it was available.  So if the website comes
12   in -- is that one of these items here?
13          MR. JACOBS:  Yes, your Honor.
14          THE COURT:  All right.  That's not proof as to
15   when -- unless it says on the website when it was.  If it says
16   on the website, then, okay, I guess there's some proof as to
17   when it was.
18          But the fact that a -- say, a picture or a photograph
19   or some item is stipulated into evidence does not necessarily
20   say as of the -- the jury would just have to guess at when it
21   was taken.
22          So you all need to be aware that stipulating
23   something into evidence does not necessarily stipulate to
24   something that's outside the four corners of that exhibit.
25          MR. JACOBS:  Understood, your Honor.  We anticipate
```

 1  that it's in the -- within the four corners, but we will double

 2  check.

 3           **THE COURT:**  All right, thank you.

 4           Okay.  Let's bring in the jury.

 5           (Jury enters courtroom at 8:02 a.m.)

 6           **THE COURT:**  Welcome back.  Be seated.  Everyone still

 7  over there in great health?

 8           (Jury nodding affirmatively.)

 9           **THE COURT:**  Good.

10           I see you're smiling because you know it's Friday.

11           (Laughter.)

12           Okay.  We're going to do something that I think is

13  designed to be of extra assistance to you, the jury, and that

14  is in about 20 minutes we're going to go to our next witness.

15           I'm guessing we're a third of the way through the

16  first phase of the evidence, something like that, maybe a

17  little more than that, but we're making good progress.  I

18  promise you that.  The lawyers are working hard to streamline,

19  the case as best as possible, and I we have excellent lawyers

20  in this case.  I'm sure you've recognized that already.

21           Now, what we're going to do for the next 20 minutes

22  is I'm letting the lawyers each have 10 minutes to summarize

23  for you what they think has been proven or not proven so far,

24  or to look forward to the rest of this phase and to say what is

25  about to come or will be coming soon, or to say anything which

1  they think will help put what you've heard so far or about to

2  be heard here into its overall context of the issues that you

3  will be having to decide.

4       This is sort of just like a time-out, a little

5  time-out to give you a heads-up.  Okay?  See what we're doing?

6       Now, remember what I've said so many times?  Is

7  anything that a lawyer ever says evidence?  No.  You know that.

8  But nonetheless, this is a very useful exercise and I ask you

9  to give --

10      Mr. Jacobs, you get to go first.  He gets 10 minutes

11 to address you.  Please go ahead.

12                            **SUMMARY**

13      **MR. JACOBS:**  Thank you, your Honor.

14      Well, we're already deeply steeped into the world of

15 Java.  I'm sure when Google puts on its case, you'll hear a lot

16 of Android.  You will know more about this technology than you

17 ever imagined you would when you came in for jury service

18 perhaps thinking this might be some murder trial.  It's not

19 that dramatic, but I think you get a sense for the drama.

20      You've seen the CEOs of both companies.  You've seen

21 the commitment of the Oracle representatives to this matter

22 and, of course, our total commitment to just trying to make

23 this as clear for you as we possibly can so that at the end

24 when we ask you to render a verdict, you'll have the

25 information you need to do that properly.

1          We have seen early on in the case the basic Java

2    licensing model and the fact that Java is widely licensed by

3    companies across the United States and across the world.  And

4    it's licensed in a variety of ways for a variety of purposes.

5          You've heard that there are these commercial licenses

6    and you've heard that there are these specification and TCK

7    licenses that enable, in the first case, people just to take

8    Java code from Oracle; in the second case, for them to make

9    their own implementations from the specification so they can

10   write their own detailed code.  But with this whole structure

11   in place, the consistency of Java is maintained across vendors

12   and across computers and across computing devices.

13         There are different kinds of Java for different

14   classes of computing devices and Google wants to argue that

15   that is fragmentation.  But, of course, none of us expect to

16   take a credit card out and run big databases on it.  We expect

17   on a credit card to be able to stick it into a machine.  And

18   when we take a cell phone out, we don't expect to run very

19   large programs.  We expect to run cell phone applications.

20         So Java has kind of grades of Java, but across the

21   vendors and across the computers the consistency is maintained

22   because companies follow the rules.  And those are technical

23   rules and those are legal rules in the Java licensing system.

24         And those rules are backed up by intellectual

25   property rights.  The way the licenses and the consistency gets

```
 1    enforced is that Sun, now Oracle, has intellectual property

 2    rights as a backstop.  And that's why this is an intellectual

 3    property case.  That's why this is a copyright case, because

 4    one important backstop is copyright rights.

 5           And you will see copyright notices.  You will see,

 6    when you go back in the jury room, we had admitted into

 7    evidence copyright registration certificates like 476, all of

 8    which go to show two things.

 9           (Document displayed)

10           One, that Oracle did what was needed to confirm its

11    intellectual property rights; and, secondly, how seriously

12    Oracle and Sun took copyright protection by regularly and

13    repeatedly registering their copyrights with the copyright

14    office.

15           And you have heard that Google is an outlier; that

16    Google is the only company today that is using Java APIs

17    created by Oracle or Sun that is not in the licensing model,

18    that has not taken one of these licenses.  And you heard this

19    not only from Larry Ellison.  You heard this from Larry Page,

20    who said he could not name a single company that has done what

21    Google has done.

22           And so, what's this?  What's going on here?  Why

23    should Google be the exception?  Why Google alone, among all

24    the Java licensees or potential licensees, do they play by

25    their own set of rules?
```

```
 1              As we have now proven with evidence that is admitted,
 2    for example Trial Exhibit 1, they knew they needed a license
 3    back in 1995.  "Must take license from Sun."  And that
 4    specifically there was a licensing mechanism that Google had in
 5    mind.  They were going to take the license and the TCK.
 6              Now, they wanted to use it in a way that Sun wasn't
 7    comfortable with.  Sun had business interests to protect, too.
 8    But Google knew they needed a license.
 9              And Larry Page understood this.  The CEO of Google
10    was repeatedly advised about the importance of getting a
11    license from Sun.  And this is what he testified.
12              "You understood that Mr. Rubin was proposing
13              that the Google Java Virtual Machine passed
14              the TCK certification.  That's part of that
15              licensing structure."
16              And you've now seen by another admitted exhibit,
17    Trial Exhibit 7, that Google understood that they had two
18    options:  Go down a path of independent development using
19    technology that had nothing to do with Java, or if Sun wouldn't
20    grant a license, make enemies along the way.
21              I'll say this in closing, I'll say it now.  We don't
22    want to really be suing Google over this.  We want them to be
23    part of the Java community playing by the same set of rules.
24    But when Andy Rubin writes, "We may make enemies along the
25    way," I'm sorry, Oracle has to defend it's intellectual
```

1    property rights.

2              And what Google took, these API designs, this is not

3    trivial stuff.  They are going to try and say, "Android, it's

4    huge.  These API designs are small and trivial."  But you've

5    seen how creatively significant they are and how commercially

6    significant they are.

7              So person after person steeped in Java has explained

8    to you how creative the process is of designing APIs.  You

9    heard from Mr. Screven about API design being a very creative

10   process with insight and thought, and compared to other

11   programming tasks, compared to writing that detailed code

12   underneath the boxes from yesterday's sketch, it's the API part

13   that is the creative design part.

14             And then you heard from Dr. Reinhold, who has been

15   doing this for many years.  He is the Java API guy.  And he

16   told you how creative the design process was for APIs.

17             And then, of course, you saw Mr. Bloch's presentation

18   in which he told the world over and over again -- doing this

19   from Google, mind you.  Mr. Bloch is at Google, saying that API

20   design is a noble and rewarding craft.  And then in his

21   testimony:

22             **"QUESTION:**  API design is tough.

23             **"ANSWER:**  Yes, designing a good API is tough.

24             **"QUESTION:**  Like any work of craftmanship?

25             **"ANSWER:**  I agree with that.

1          "**QUESTION:**  Creating a beautiful painting is

2          tough.

3          "**ANSWER:**  I'm not sure if that's

4          craftsmanship or art, but I guess that's a

5          fine distinction.

6          "**QUESTION:**  And an API design you said, I

7          believe, is a noble and rewarding craft;

8          correct, sir?

9          "**ANSWER:**  Yes, I certainly believe that."

10         And then he even acknowledged that there are

11   aesthetic matters in API design.  "An API that displays good

12   aesthetics will be easy to use."

13         And then you heard -- and this is, for something

14   that's not very, not a big deal just a little bit of copying,

15   Google will say.  You heard from Dr. Reinhold that the java.nio

16   package took two years to develop.  The APIs took two years to

17   design.

18         Now, you've learned a lot more than you ever imagine,

19   more than you could possibly know about how the API and the

20   code and documentation are all related.  And critically you now

21   understand that when we talk about this documentation and the

22   specification, we're talking about something that has its

23   origins in the actual source code file, and that what goes into

24   the documentation by this Documentation Extractor, is a mix of

25   narrative that the programmer wrote with an idea that that

1  would be narrative in the documentation and actual programming

2  statements that are captured by the Documentation Extractor and

3  placed into the paper.

4      And so when we talk about an Application Programming

5  Interface, we're talking about the design of the program and

6  those statements above Dr. Bloch's line, right here

7  (indicating), getting into the specification.  This is a

8  programming language statement that becomes part of the

9  Application Program Interface specification.

10     And you will...

11     **THE COURT:**  Down to about one more minute to go.

12     **MR. JACOBS:**  ...detailed evidence in the coming hours

13  of what the copying actually looks like in Android.

14     Now, you also saw yesterday the line-by-line copying

15  that occurred and that Mr. Bloch apologized for.  You'll see

16  more of that.

17     And you will -- you're getting a better understanding

18  of the problem that Google's particular form of copying has

19  caused because they have fragmented Java.  They have broken the

20  consistency of the Java model, and Andy Rubin and Larry Page

21  understood how important avoiding fragmentation was to Sun and

22  they understand how important avoiding fragmentation is to

23  Oracle.

24     And, you know, you've seen this graphic and now you

25  understand what the worry is, what the concern is that Google

1    will fracture and create a Tower of Babel instead of a

2    consistent Java programming language.

3           They say they are in the Java Community Process.

4    They took offense.  You heard from Google's counsel in his

5    opening that we didn't include them in the list of companies

6    that participate.  Well, are they in or are they out?  Are they

7    helping Java or are they fragmenting Java?  Are they voting yes

8    or are they voting no?

9           You heard from Mr. Bloch yesterday, Google passed the

10   only commercial "no" vote against the next release of Java.

11   There's a slide show about the programming language, the APIs.

12   You've seen the testimony that backs up this slide showing the

13   dramatic difference between the size of language and the little

14   bit of overlap between what's in the language manual and what's

15   in the Application Programming Interfaces.

16          There's questions about Apache Harmony.  It's a

17   complicated subject, but the bottom line is Apache Harmony did

18   not have a license.  They never got a license.  Were they mad

19   about it?  Absolutely.  But they didn't get permission to build

20   and ship commercially their class libraries, and that's what

21   Google has taken in Android.

22          And every document you have seen from Google in this

23   case, including now Trial Exhibit 326, all the way through 2009

24   and 2010, no one will say -- there is no document that will

25   say, "We're okay, because we took from Apache."  There is no

```
 1   such evidence.

 2          THE COURT:  All right.  You're a minute or so over

 3   already.

 4          Thank you, Mr. Jacobs.

 5          All right.  You may have an extra minute as well,

 6   Mr. Van Nest.

 7          MR. VAN NEST:  Thank you, your Honor.

 8                          SUMMARY

 9          MR. VAN NEST:  Good morning, everyone.

10          I want to start by saying thank you.  We have been

11   paying attention to the fact that you're paying attention.  So,

12   you guys have been very attentive and we know it's been a long

13   week and we really appreciate it.  And I'm not sure who is

14   happier that it's Friday, you guys or us over here.

15          And I want to thank Judge Alsup.  It's unusual to get

16   a chance to address the jury before you even start your

17   evidence in your case, but that's the position I'm in.  So I

18   appreciate that.  And I'll try to be helpful and sort of

19   summarize where we are on the key evidence points.

20          Now, I want to start with what's in dispute now that

21   we have had about a week of testimony.

22          Not in dispute, Java programming language free for

23   everybody to use.  That's not in dispute.  You've seen

24   testimony on that.  Judge Alsup gave you a little summary on

25   Wednesday.  Anybody can use the Java programming language.
```

SUMMARY / MR. VAN NEST

```
 1          The names of all these class files and method names
 2   and so on, they are all free to use.  You got a summary from
 3   Judge Alsup on that as well.
 4          The source code, the so-called implementation code
 5   that Dr. Bloch talked about yesterday, that's the code in the
 6   libraries that does the work.  That wasn't -- there's no claim
 7   that that is copied.  That is all original Google work done by
 8   Google engineers and taken from Open Source projects like
 9   Apache.
10          So what we're really down to, the big issue in the
11   case, is whether or not the Structure, Selection and
12   Organization of the APIs.  That's what they are claiming is --
13   has been infringed in this case, and the fact of the matter is
14   that that API structure was in the public domain, used by years
15   along with the language.  Sun was aware that others were using
16   it, like Apache, GNU and others and didn't do a thing.
17          And Google's Android system does the same thing with
18   those APIs that GNU did, that Apache did, that Sun was fully
19   aware of and, as you'll see next week, that Dr. Schwartz,
20   Jonathan Schwartz said was a rocket on Java.
21          So let's put the theme board up.
22          (Document displayed)
23          These are the four things I said we'd prove, and I
24   just want to give a quick recap of where we are on those.
25          Sun gave the Java language to the public.
```

```
 1              Can I have the next slide please?

 2              Mr. Ellison was their first witness.  He moved around

 3  on this issue, but this is a party admission from Mr. Ellison.

 4              "QUESTION:  You understand that nobody owns

 5              the Java programming language?

 6              "ANSWER:  That's right.

 7              "QUESTION:  Anybody can use it without any

 8              royalty at all?

 9              "ANSWER:  That's right."

10              That's established, as you heard, from Judge Alsup on

11  Wednesday.  So the programming language is out there and folks

12  can use it.

13              Next.  So what's left?  Let's go back just a minute.

14  The other part of that first bullet point is that the APIs have

15  been used for years as part of the language.  You've heard some

16  very important testimony about the fact that without the APIs,

17  the language isn't much use.

18              So they are saying the language is free, you can use

19  it, but you can't use the APIs.  As I said, that's like saying

20  you can use English, but don't use the nouns and verbs.

21              Let's have our next slide, please.

22              There were two pieces of testimony on that so far.

23  There will be a lot more.  Dr. Bloch, who was here yesterday:

24              "QUESTION:  If you didn't have any APIs,

25              could you do anything with the language?
```

1          **"ANSWER:**  You could waste time with it, and

2          that's pretty much it.

3          **"QUESTION:**  If there were no APIs, the Java

4          programming language wouldn't be much use."

5          That's Dr. Reinhold said near the very end of his

6    testimony; no APIs, couldn't do much with it.

7          That's item one, and you'll hear a bit more about

8    that.

9          Item two.  Dr. Bloch said yesterday GNU Classpath,

10   which I mentioned in the opening, we actually helped them get

11   going.  GNU was a separate implementation of the same Java

12   libraries and the same APIs that we're talking about here.

13   GNU was out there Open Source.  Dr. Bloch, as a Sun employee,

14   was helping them get that done.  So that's a second piece of

15   importance evidence.

16         Third piece of importance evidence, you know now

17   Apache was out there using these APIs, the same Structure,

18   Selection and Organization they are claiming now, and they have

19   been out there for years.

20         Next slide, please.

21         This was, again, their witness.  Dr. Kurian.

22         "So in '05, '06, '07, '08, Apache was using

23         the same libraries and the same APIs we're

24         talking about without a license from Sun."

25         Apache was out there selling -- now, there's an

```
 1   Apache license that Apache gives.  When Mr. Rubin is here next

 2   week, you'll hear that Google is distributing Android under the

 3   Apache license, which allows you to use all the APIs, some of

 4   the APIs, none of the APIs.  The Apache license is what Google

 5   has been distributing under.

 6          But the key point of Apache is not its license.  The

 7   key point is, Sun was fully aware that here is somebody out

 8   there making these libraries and APIs available and they didn't

 9   do anything about it.  Apache was there.  Mr. Schwartz is going

10   to say, they were free to ship as long as they didn't call

11   their product Java.  If they didn't call it Java, they were

12   free to ship.

13          Last piece of evidence important on this issue, the

14   APIs, is what Mr. Lindholm said.  He testified.  Remember, he

15   was at Sun.  He was our last witness last night.  He was at

16   Sun.  Then he's at Google.  At Sun his understanding was:

17              "The organization of software APIs are free

18              for use by other people."

19          You'll hear a lot more of that, too, but all these

20   engineers believe you can use an API, and they have been using

21   them, and no one has been complaining about that because that's

22   what you need.  It's a system of organization in order to use

23   the language.  If you're going to build these libraries, you've

24   got to have a way to access those.

25          Now, my second bullet point was that Google built
```

 1  Android using Google technology and Open Source.  You haven't

 2  learned a lot about that because the Google witnesses haven't

 3  been here.  We'll touch on that next week.

 4        But you know from Mr. Kurian that he believed that

 5  Google was using Apache technology, and that's exactly right.

 6  That's exactly right.  A lot of the libraries were built from

 7  Apache technology, and you'll hear about that.

 8        My third bullet point was that when Android was

 9  released, Sun approved it.  And Sun said, you're a rocket.  Now

10  we have had a little bit of evidence on that.  You saw the

11  videotape of Mr. Ellison at JavaOne.  Mr. Ellison got up at

12  JavaOne in front of all these developers and said, "We are

13  flattered that Android is using Java" -- flattered -- "and we

14  expect to see more of it from our friends at Google."

15        Now, you'll hear a lot more about that next week when

16  Mr. Schwartz is here, but even Mr. Ellison, when he acquired

17  the company, got up and the first thing he said to the Java

18  community was, "We like Android.  We know we're choosing Java.

19  We're flattered by it and we expect to see a lot more of that

20  in the future.  You will hear from Mr. Schwartz next week on

21  that subject."  You'll hear from Mr. Schwartz next week on that

22  subject.

23        The last point on my set of slides was that Google's

24  use of the Structure, Selection and Organizations of these APIs

25  was absolutely fair.  They transformed Java from something that

SUMMARY / MR. VAN NEST

1  wouldn't work on a smart phone to something that works great on

2  a smart phone.  That's transformation.  They made a fair use of

3  this Structure, Selection and Organization and you know that

4  now, two really key pieces of evidence.  Mr. Ellison told you

5  that he learned when he bought the company that Sun had tried

6  and failed to build a smart phone.  They hadn't been able to

7  fund it.  They bought some technology to try to do it.  They

8  had an effort to do it.  They couldn't do it.

9          You also know that Mr. Ellison tried to do it.

10          Next slide.

11          Mr. Ellison had Project -- no, let's go back.

12          Project Java Phone.  Now, there's two key points

13  about this evidence.  One is, Oracle tried and failed.  They

14  couldn't turn Java into a smart phone using the Java SE

15  Platform.  They also were trying to build on top of Android.

16  Target Android handset manufacturers.  Target single operating

17  system Android.  Run Java ME on Android.

18          If Android was a fragment or Android was hurting

19  Java, why in the world with Mr. Ellison and Oracle try to build

20  a product on top of Java?  That's exactly what they were trying

21  to do.

22          And you heard him say when this failed they

23  considered buying technology to get into the smart phone market

24  from RIM and from Palm.  RIM makes Blackberry.  Palm makes the

25  Treo.

1          When that didn't work you heard him say, "I talked to

2    Google.  I made a business proposal to Google, to work with

3    Google."  "When that didn't work," I asked him, "what was the

4    next thing that happened?"  "This lawsuit."

5          This lawsuit is not about fragmentation.  It's not

6    about their I.P.  Oracle wants to participate in the smart

7    phone market without doing any work.  They want money from

8    Android based on Google's work, not their work.

9          Now, we've heard all this holy talk about, you know,

10   the Holy Grail of fragmentation.  That's baloney and you know

11   it from what Dr. Reinhold said yesterday.  There are how many

12   flavors of Java we now heard?  In the opening it was "write

13   once, run anywhere".  Anywhere.

14         Now, we heard yesterday from Dr. Reinhold.  There is

15   an SE platform, an EE platform, an ME platform and a Card.  And

16   if you write for one of those platforms, your program won't run

17   on any other program.  It's not "write once, run anywhere".

18   Dr. Reinhold admitted that.  He finally backed off.

19         Can I have the last slide, please?

20         **THE COURT:**  This will have to be your next point

21   because you're on the 11 minutes.

22         **MR. VAN NEST:**  Thank you, your Honor.

23         "Write once, run anywhere" was never a promise that

24   if you wrote code for one Java Platform, it would magically

25   work on another.

1              And you know from his testimony yesterday that even

2    from the ME platform, one platform, there are multiple flavors

3    of that.  There is ME, and MIDP, and CLC, and CDLC.  And he

4    said yesterday, none of knows platforms worked together.  It

5    got so bad they had to have a project called One Java.  They

6    created a project to fix their own fragmentation, and Oracle

7    killed that when they bought the company.

8              So this case is not about their intellectual

9    property.  It is about getting a claim on the smart phone

10   market.

11             So I very much look forward to getting back here next

12   week with our witnesses and giving you the story of what was

13   done, why we did what we did, why Android is based on Google

14   technology and Open Source technology, and why I'll be asking

15   you in closing for a finding that there is absolutely no

16   infringement here based on the evidence you will have heard by

17   then.

18             Thank you.

19             **THE COURT:**  Thank you.

20             **MR. VAN NEST:**  Thank you, your Honor.

21             **THE COURT:**  Next witness.

22             **MR. NORTON:**  We call Brian Swetland.

23             **THE COURT:**  All right.  Very well.  Let's bring him

24   forward.

25

1                        **BRIAN SWETLAND**,

2    called as a witness for the Plaintiff herein, having been first

3    duly sworn, was examined and testified as follows:

4              **THE WITNESS:**  I do.

5              **THE CLERK:**  Thank you.

6              **THE COURT:**  Thank you.  Welcome again.

7              See how my microphone -- you've got to be this close.

8              **THE WITNESS:**  Like that?

9              **THE COURT:**  It will move around to make it easier for

10   you, but that's about right.

11             Why don't you say your name?

12             **THE WITNESS:**  Brian Swetland.

13             **THE COURT:**  Everybody hear okay?

14             Say it again.

15             **THE WITNESS:**  Brian Swetland.

16             **THE COURT:**  Great.

17             Go ahead, counsel.

18             **MR. NORTON:**  Thank you, your Honor.

19                        DIRECT EXAMINATION

20   BY MR. NORTON:

21   **Q.**  Good morning, Mr. Swetland.

22   **A.**  Good morning.

23   **Q.**  We've not met.  My name is Fred Norton.

24             You currently are employed at Google, is that

25   correct?

1   A.   That is correct.

2   Q.   And you are a senior staff software engineer?

3   A.   This is correct.

4   Q.   And you work on Android?

5   A.   Yes.

6   Q.   And you've worked on Android since Google acquired Android

7   in 2005, is that right?

8   A.   That is correct.

9   Q.   And you were employed at Android even before Google

10  acquired Android, is that correct?

11  A.   That is correct.

12  Q.   Before you worked at Android, you worked at a company

13  called Danger, Incorporated?

14  A.   That is correct.

15  Q.   And you were there from 2000 to the fall of 2004?

16  A.   That is correct.

17  Q.   Andy Rubin was one of the founders of Danger, is that

18  right?

19  A.   This is right.

20  Q.   He was there at the same time that you were?

21  A.   He left a year, year-and-a-half prior to me, I believe.

22  Q.   Around 2003?

23  A.   I think so.

24  Q.   Now, while you were at Danger, Danger developed a mobile

25  phone called Hiptop, is that right?

1   A.   That is right.

2   Q.   Sometimes called the Sidekick?

3   A.   Yes.

4   Q.   And that Sidekick was released in the fall of 2002?

5   A.   That sounds correct.

6   Q.   And the programming language for applications on the

7   Hiptop was Java, right?

8   A.   That is correct.

9   Q.   And the Hiptop or Sidekick, it had a virtual machine,

10  right?

11  A.   Yes.

12  Q.   Now, at the time the Hiptop was released, it had an

13  incompatible -- that is not compatible -- implementation of the

14  Java specification, correct?

15          MS. ANDERSON:   Objection.   Lacks foundation.

16          THE COURT:   Well, do you know the answer to that

17  question or not?

18          THE WITNESS:   Umm, yes.   I think.

19          THE COURT:   All right.   Objection overruled.   Please

20  answer.

21  A.   Umm, the virtual machine on the Hiptop was not a Java

22  Virtual Machine.   So it was not compatible with Java.

23  BY MR. NORTON:

24  Q.   Now, while you were at Danger, you say you never came into

25  contact with Sun's source code, is that right?

1  **A.**   Umm, to the best of my knowledge, no.  I have not seen

2  Sun's source code while I was at Danger.

3  **Q.**   All right.  And you contend that Danger developed its

4  incompatible Java implementation in a clean and independent

5  way, right?

6  **A.**   All the work I did on the Danger virtual machine was, you

7  know, done in a clean room fashion.

8  **Q.**   Just to sum up here.  Danger had a mobile phone, right?

9  **A.**   Correct.

10 **Q.**   That used Java as the application programming language,

11 right?

12 **A.**   Correct.

13 **Q.**   It was incompatible with Java, with the Java

14 specification?

15 **A.**   Do you mean the Java language specification or the virtual

16 machine specification?

17 **Q.**   Virtual machine specification.

18 **A.**   Because it was not a Java virtual machine.

19 **Q.**   The answer is it was incompatible with the Java virtual

20 machine specification?

21 **A.**   The Danger virtual machine not being a Java virtual

22 machine, yes, it's not compatible with the Java virtual machine

23 specification.

24 **Q.**   And that implementation was developed in what you believe

25 was a clean and independent way?

1   A.    Yes.

2   Q.    All right.  And yet Danger took a license from Sun,

3   correct?

4   A.    That is my understanding.

5   Q.    And Danger took a license from Sun to the TCK, is that

6   correct?

7   A.    I believe so, but, you know, I was not present as part of

8   the license negotiation.

9   Q.    Had.  But you understood that danger had taken a license

10  from Sun and used the TCK?

11  A.    I believe that was the case.

12  Q.    And once Danger took the TCK, it worked to make its

13  implementation compatible with the Java specification, correct?

14  A.    I think that was the case.  I was not involved with that

15  part of the project at that point.

16  Q.    Now, one of the people you met with during discussions

17  between Sun and Danger was Tim Lindholm, wasn't it?

18  A.    I believe he was at a meeting, yes.

19  Q.    And at that time Mr. Lindholm was representing Sun,

20  correct?

21  A.    I believe so, yes.

22  Q.    And he was representing Sun in discussions between Sun and

23  Danger about Danger's Sidekick mobile device, correct?

24  A.    I believe so.

25  Q.    And Mr. Lindholm was one of the people from Sun telling

 1  Danger that Danger needed to take a license from Sun for the

 2  Sidekick, correct?

 3  **A.**   I really wasn't involved in the license side of

 4  discussions, just, you know, their technical issues.

 5  **Q.**   But you did know that it was Sun's position that the

 6  specification itself was copyrighted, correct?

 7  **A.**   Umm, I was not aware of that.

 8  **Q.**   You were aware at that time that Sun's position was that

 9  the method signatures, the specifications, method signatures

10  were copyrighted, correct?

11  **A.**   I do recall mention that Sun claimed copyright on the

12  method signatures.

13          **MR. NORTON:**  So may I approach the witness?

14          **THE COURT:**  Yes.

15              (Whereupon, document was tendered

16               to the witness.)

17  **BY MR. NORTON:**

18  **Q.**   I've handed the witness Exhibit 149.

19          (Document displayed)

20  **Q.**   Mr. Swetland, do you recognize that email?

21  **A.**   I do.

22  **Q.**   That's an email that you sent on May 1st -- I'm sorry,

23  May 31st, 2006?

24  **A.**   Yes.

25  **Q.**   And you sent it to Mr. Rubin, is that right?

1  A.   That is correct.

2  Q.   And you sent it to another person whose email address is

3  danfuzz@google?

4  A.   Yes.

5  Q.   And that's Dan Bornstein, right?

6  A.   Yes.

7  Q.   And Mr. Bornstein, he also worked at Danger before he

8  worked at Android, right?

9  A.   That is correct.

10         MR. NORTON:   I move the admission of Exhibit 149.

11         MS. ANDERSON:   No objection, your Honor.

12         THE COURT:   149 received in evidence.

13         (Trial Exhibit 149 received

14          in evidence)

15  BY MR. NORTON:

16  Q.   Now, you wrote to Mr. Rubin and to Mr. Bornstein about

17  Sun.

18         "Whatever happened to their 'we own copyright

19         on the method signatures' bullshit argument."

20         Right?

21  A.   That is correct.

22  Q.   On May 31, 2006 you knew that Sun still claimed a

23  copyright on the method signatures of the specification, right?

24  A.   I don't know if they still claimed it.  I knew that at one

25  time they made such a claim while I was at Danger.

1  Q.   On May 31st, 2006 you didn't know any differently,

2  correct?

3  A.   That is correct.

4  Q.   Nothing had changed between the time you were at Danger

5  and the time you were at Android, correct?

6  A.   Nothing about since -- very, very broad.

7  Q.   Your knowledge about what Sun claimed about it's copyright

8  and the method signature had not changed?

9  A.   That is correct.

10 Q.   And you did nothing to investigate whether Sun had a valid

11 claim that they owned the copyright on the method signature?

12 A.   Correct.  I was not involved in such an investigation, no.

13 Q.   But whether you were involved in such an investigation or

14 not, you took no steps to determine whether or not that claim

15 was valid?

16 A.   No.

17 Q.   That was just somebody else's job, right?

18 A.   Not my role as an engineer to do that, no.

19 Q.   Now, you worked at Danger and now you work at Android,

20 correct?

21 A.   That is correct.

22 Q.   Mr. Bornstein, also at Danger, now an Android -- or, then

23 an Android engineer, correct?

24 A.   Correct.

25 Q.   And was an Android engineer until sometime in 2011,

1   correct?

2   **A.**   I believe that's correct.

3   **Q.**   Mr. Rubin was at Danger, now Android, correct?

4   **A.**   That is correct.

5   **Q.**   Hiroshi Lockheimer was at Danger, now at Google, and works

6   on Android, correct?

7   **A.**   That is correct.

8           **MR. NORTON:**   May I approach?

9           (Whereupon, document was tendered

10           to the witness.)

11  **BY MR. NORTON:**

12  **Q.**   I've handed the witness Exhibit 13.

13           Is this an email from you to Mathias Agopian?

14  **A.**   It is.

15  **Q.**   And you sent this email on January 3rd, 2006, is that

16  right?

17  **A.**   That appears to be correct.

18  **Q.**   And you sent this to Mr. Rubin, amongst others, is that

19  correct?

20  **A.**   That is correct.

21          **MR. NORTON:**   I move the admission of Exhibit 13.

22          **MS. ANDERSON:**   No objection, your Honor.

23          **THE COURT:**   13 received.

24          (Trial Exhibit 13 received

25           in evidence)

1          MR. NORTON:  Thank you, your Honor.

2          (Document displayed)

3    BY MR. NORTON:

4    Q.   Now, if we go down, there is an email that says, "On

5    January 2, 2006 Brian Swetland wrote"?

6    A.   Yes.

7    Q.   And below that there is a lot of text, but I want to focus

8    on, "Reasons to shift to a primarily Java API."

9    A.   This appears to be some other document though.

10   Q.   I just want you to focus on the words, "Reasons to shift

11   to a primarily Java API."

12          Do you see those words?

13   A.   I see those words.

14   Q.   And as you pointed out, there are lots of words underneath

15   that, right?

16   A.   I believe you pointed that out.

17   Q.   And you think that's some other document?

18   A.   I believe this entire double indented section is some

19   other email or document that I quoted in the single indented

20   section, is what it looks like to me.

21   Q.   All right.  Very good.

22          So then if we can go up, you responded to this email,

23   correct?

24   A.   To Mathias' question?

25   Q.   Yes.

 1  **A.**   And Mathias' question was in response to, "Reasons to

 2  shift to a primarily Java API."

 3          Mr. Agopian wrote:

 4          "Has this decision been taken already or are

 5          we talking/arguing about it?"

 6  **A.**   Yes.

 7  **Q.**   And you responded to that?

 8  **A.**   I did.

 9  **Q.**   And your response was:

10          "I think we're pretty set on it, but are

11          still working on addressing issues people may

12          have with it."

13          Correct?

14  **A.**   Correct.

15  **Q.**   And the reason to shift to a primarily Java API, you said,

16  you were pretty set on it as of January 2006?

17  **A.**   That's in the email, yes.

18          **MR. NORTON:**  May I approach?

19          **THE COURT:**  You may.

20          (Whereupon, document was tendered

21           to the witness.)

22  **BY MR. NORTON:**

23  **Q.**   I've handed the witness Trial Exhibit 23.

24          And this, once again, this is an email from you to

25  three other people who work at Google, correct?

1  **A.**   Correct.

2  **Q.**   And can you identify those three people by names other

3  than email addresses?

4  **A.**   You want their given names?

5  **Q.**   Yes, their names.  The email addresses are fadden@

6  Google.com, ficus@google.com and CJD@google.com.

7  **A.**   That would be Andy McFadden; Ficus, Kirk Patrick and Chris

8  DeSalvo.

9  **Q.**   And did all those people work on Android?

10 **A.**   They did at this time.

11          **MR. NORTON:**  I offer Exhibit 23.

12          **MS. ANDERSON:**  No objection, your Honor.

13          **THE COURT:**  23 received.

14          (Trial Exhibit 23 received

15           in evidence)

16          **MR. NORTON:**  And may I approach?

17          **THE COURT:**  You may.

18           (Whereupon, document was tendered

19            to the witness.)

20 **BY MR. NORTON:**

21 **Q.**   Mr. Swetland, you have Exhibit 314.  And this is an email

22 from Robert Griesemer to you, is that correct?

23 **A.**   That is correct.

24 **Q.**   And it was an email sent on August 5, 2005, is that right?

25 **A.**   That is correct.

1    Q.    And the title of that email is "Re: Java VM for Android,"

2    is that right?

3    A.    That is the title.

4              MR. NORTON:  I move the admission of Exhibit 314.

5              MS. ANDERSON:  No objection, your Honor.

6              THE COURT:  Received.

7              (Trial Exhibit 314 received

8               in evidence)

9              MR. NORTON:  No further questions.

10             THE COURT:  Cross-examination.

11                          **CROSS EXAMINATION**

12   BY MS. ANDERSON:

13   Q.    Good morning, Mr. Swetland.

14   A.    Good morning.

15             THE COURT:  One second.  Mr. Rutherford, would you

16   like a cough drop?

17             JUROR RUTHERFORD:  Yes.

18             THE COURT:  Dawn, would you take this over to

19   Mr. Rutherford.

20             How about some water?  Would you like some water.

21             JUROR RUTHERFORD:  No.

22             THE COURT:  Are you okay?

23             JUROR RUTHERFORD:  Yes.

24             THE COURT:  Okay.

25             Thank you.  You may continue.

1           **MS. ANDERSON:**  Thank you, your Honor.

2           I'll wait for a minute while the witness pours a

3  little water for himself as well.

4  **BY MS. ANDERSON:**

5  **Q.**   Mr. Swetland, before we begin talking about some of these

6  documents, please tell the jury where you live?

7  **A.**   Palo Alto, California.

8  **Q.**   And how long have you lived in northern California?

9  **A.**   I've lived in the Bay Area for about 14 years now.

10 **Q.**   What is your educational background?

11 **A.**   I studied computer engineering at the University of

12 Illinois at Urbana Champaign.

13 **Q.**   And can you tell the jury briefly in order where you've

14 worked over the years, your main places of employment over the

15 years?

16 **A.**   Back in the beginning, a lot of small companies; but when

17 I moved to the Bay Area in 1998, I worked for a company in

18 Menlo Park called Be, Incorporated that operating systems for

19 desktop computers.  Spent two years there.

20          And in spring of 2000, I joined a very small start-up

21 called Danger, Inc. that was building a next generation smart

22 phone; voice and data communication device.  I worked there for

23 roughly four-and-a-half years.

24          And in the -- in late 2004 I left Danger to join

25 another very small start-up called Android that was looking to

1  build a next generation phone operating system.  That start-up

2  was purchased by Google in July of 2005.

3          Since then I have been the systems software architect

4  and lead on the Android project at Google.

5  **Q.**   And during the bulk of your time at Google, what aspect of

6  the Android Platform has been your focus?

7  **A.**   My primary focus has been on the kernel and device

8  drivers, the lowest level software that interacts with the

9  actual hardware that makes the phone work.

10 **Q.**   Now, in the course of the years that you've worked in the

11 computer industry, have you had occasion to learn about the

12 Java programming language?

13 **A.**   Yes, I have.

14 **Q.**   When did you first learn about Java?

15 **A.**   I think I first encountered Java possibly mid to late

16 2005 -- 1995 not 2005.  That wouldn't make any sense.  In 1995

17 when I was at the University of Illinois.

18 **Q.**   And did there come a time when you started to actually use

19 the Java programming language in your work?

20 **A.**   Umm, before I had moved to California in 1997 and '98, I

21 had worked for a company that did web technology servers and

22 such called Neoglyphics and I did some Java programming for

23 them.

24 **Q.**   And, again, what years was that approximately?

25 **A.**   1997 to early 1998.

1   Q.   And did you have occasion to use Java programming language

2   in your work at Danger?

3   A.   Umm, I wrote some of the Danger library code and a little

4   bit of application code in Java.

5   Q.   How did you actually learn how to program in Java?

6   A.   Umm, I think my first encounter with Java again was in

7   1995 when the language was first released by Sun.

8          It was interesting at the time because it was this

9   new programming language.  And I think I mostly learned by, you

10  know, just tinkering with the compiler, writing little programs

11  and reading some tutorials that had been posted online about

12  the language.

13  Q.   Did you ever read any books about Java to help learn how

14  to program in the language?

15  A.   I think at one point I borrowed or purchased a copy of the

16  *Java Programming Language*, which was an introductory book in

17  Java.

18  Q.   All right.  And did those materials you reviewed to learn

19  how to program in Java include discussion of Java APIs?

20          MR. NORTON:   Objection, leading.

21          THE COURT:   What extent, if at all.  Remember magic

22  words.

23  BY MS. ANDERSON:

24  Q.   To what extent, if at all, did the materials you reviewed

25  include discussion of Java APIs?

1  **A.**   Pretty much all examples of how to write programs in the

2  language involved use of sort of standard Java libraries and

3  APIs.

4  **Q.**   As a programmer in Java over the years, have you had an

5  understanding as to whether or not the language is free for

6  use?

7  **A.**   My understanding like all, you know, other similarly --

8  and, actually, I'm not aware of programming languages that

9  aren't free for use.

10  **Q.**   And how about Java APIs?  Have you had an understanding

11  over the years as a Java programmer as to whether Java APIs

12  were free for use?

13  **A.**   My understanding is they would be.  Otherwise, how could

14  you write meaningful programs without, you know...

15  **Q.**   You were asked some questions earlier about the time you

16  spent working at the company called Danger related to

17  development of the Hiptop; do you recall generally those

18  questions?

19  **A.**   I do recall.

20  **Q.**   You also testified that you had learned that Danger took a

21  license from Sun eventually, is that right?

22  **A.**   That was my understanding, yes.

23  **Q.**   Did you have an understanding as a Danger employee as to

24  why it took that license?

25  **A.**   My understanding was that we felt that the company --

 1              **MR. NORTON:**  Objection.

 2              **THE COURT:**  Any question that uses the word

 3     "understanding" almost automatically calls for hearsay.  I

 4     don't like that form of question.  Both sides have used it.

 5     I'm not being critical of you.  The other side has used it,

 6     too, but a question that calls for understanding -- and the

 7     Oracle lawyers will now remember this, because it's your

 8     objection.  I don't like that question.  It calls for hearsay.

 9              Sustained.

10              **MS. ANDERSON:**  Thank you, your Honor.

11              **THE COURT:**  And I'm going to remind the Oracle

12     lawyers of the same ruling if there is an objection going the

13     other way.

14              Any question -- except for experts, of course.  I

15     guess experts can.  But fact witnesses, anything that calls for

16     "what was your understanding," that's a hearsay question.

17              So sustained.

18              **MS. ANDERSON:**  Thank you, your Honor.

19     **BY MS. ANDERSON:**

20     **Q.**   During your time, your years at Google, Mr. Swetland, I

21     believe you testified you always worked on the Android team, is

22     that right?

23     **A.**   I have always worked on Android, yes.

24     **Q.**   All right.  Throughout all the years that you have worked

25     on Android, has Tim Lindholm ever been a member of the Android

```
 1  team at Google, to your knowledge?

 2  A.    No, he was not.

 3  Q.    Have you ever known Mr. Lindholm to contribute any code

 4  whatsoever to the Android project?

 5  A.    I do not believe there is any code from Tim in the

 6  project.

 7  Q.    Do you have any understanding as to what connection, if

 8  any, Mr. Lindholm ever had with regard to Android?

 9  A.    I think he may have been consulted by executive management

10  on sort of business development-type issues.

11  Q.    Thank you.

12         I'd like to turn your attention to Exhibit 149, which

13  you discussed earlier.  Just put that before you, please.

14  A.    Okay.

15  Q.    All right.  In this e-mail you sent along a link that you

16  printed in this particular correspondence.  What is that a link

17  to?

18  A.    I believe this is the home page of the Google Web Toolkit

19  project.

20  Q.    What is that?

21  A.    The Google Web Toolkit was a technology created by a team

22  at Google that allows you to write programs in the Java

23  programming language, and then convert them into JavaScript,

24  which, while the names appear similar, is actually a very

25  different language that runs in Web browsers to allow you to
```

1  write programs in the Java language, but allow them to run in a

2  standard web browser without Java VM attached or included.

3  **Q.**   And in your e-mail you were asked a question about the

4  last sentence of the e-mail, which starts with the word

5  "whatever."  And in it you're asking about what happened to a

6  particular argument from Sun.  Do you see that?

7  **A.**   I see that.

8  **Q.**   What did you mean by that?

9  **A.**   Uhm, as mentioned previously, Sun advanced this argument

10  when approaching Danger about licensing.  And it seemed

11  surprising to me that if they had such concern about this

12  copyright on method signatures that, you know, there were a

13  number of projects that Google Web Toolkit is only one, but

14  most recent, that supported those APIs, and did not appear to

15  be drawing any reaction or, you know, backlash from Sun.

16  **Q.**   What other projects are you referring to?

17  **A.**   Well, there's been a whole number of small Java VMs

18  written by Google.  The common, like, sort of computer science

19  student project.  But there's been a lot of small, medium, and

20  large Java, you know, VM language implementations over the

21  years.

22         There's been some fairly high-profile ones, like the

23  GNU Compiler project, GCJ, which is a GNU compiler for Java,

24  that compiles the Java language to native code, like x86 PC.

25         And the GNU Classpath project, which was a complete

1  implementation of all of these standard Java APIs to enable

2  that, as well as things like the Apache Harmony project, which

3  was another open source, you know, project that provided a Java

4  virtual machine and the standard libraries.

5          None of these projects seemed to fall afoul of, you

6  know, this concern that had been expressed about these APIs.

7  **Q.**   Thank you.

8          Would you turn now to Exhibit 13, which I believe is

9  before you.

10 **A.**   Okay.

11 **Q.**   And you were asked a few questions about this earlier by

12 Oracle's counsel, but I want to draw your attention to the

13 section of this document that has the double carrots, the

14 double indents indicated on it.  Do you see it starts about

15 one-third of the way down the page and continues on?

16 **A.**   I see that.

17 **Q.**   And if I remember correctly, you testified that this is a

18 portion that you do not believe you personally wrote; is that

19 correct?

20 **A.**   That's correct.

21 **Q.**   All right.  Drawing your attention to the fifth paragraph

22 of that section, that starts with the word "the negotiations

23 with Sun."

24 **A.**   I see that.

25          **MS. ANDERSON:**   Okay.  Ben, could we have that

 1  highlighted, please?  Thank you.

 2  **BY MS. ANDERSON:**

 3  **Q.**   There's a reference in here to the word, "Brian."  Do you

 4  see that in this paragraph?

 5  **A.**   I do.

 6  **Q.**   What, if anything, did that indicate to you about whether

 7  or not you wrote this section?

 8  **A.**   It seems unlikely it was authored by me, given the way it

 9  refers to me in the third-party.  It's just kind of a strange

10  way to talk about yourself.

11  **Q.**   And with regard to a reference to someone named Brian

12  being perhaps scarred by a Danger experience, do you see that

13  reference?

14  **A.**   I see that.

15  **Q.**   Is there anything about that that rings true?  Were you in

16  any way scarred by your Danger experience?

17  **A.**   That, you know, I believe is a reference to my unhappiness

18  that Danger ended up taking this Sun license after spending all

19  the time building a clean room implementation, you know, based

20  on an argument that did not seem, you know, valid.

21  **Q.**   Do you have knowledge as to why you believe Danger took

22  that license?

23  **A.**   My recollection --

24          (Mr. Norton stands up from counsel table.)

25          **THE COURT:**  Is this going to be hearsay, or something

1  you know of your own firsthand knowledge?

2           **THE WITNESS:**  Uhm, I guess it would be hearsay

3  because it's --

4           **THE COURT:**  Hearsay means somebody told it to you.

5           **THE WITNESS:**  Yes.

6           **THE COURT:**  Firsthand is you were there and made the

7  decision yourself, or you were in the room when the decision

8  was made.

9           **THE WITNESS:**  I did not make the decision in this

10 case.

11          **THE COURT:**  I don't think he knows the answer to that

12 question.

13          **MS. ANDERSON:**  Thank you, Your Honor.

14          **THE COURT:**  Is that your objection?

15          **MR. NORTON:**  Yes, Your Honor.

16          **THE COURT:**  Sustained.

17 **BY MS. ANDERSON:**

18 **Q.**  Before we move on, do you have Exhibit 314 before you,

19 sir?  I just want to make sure if you have it or not.

20 **A.**  I do.

21 **Q.**  You do.  Okay.  Could you please pull that out.

22 **A.**  All right.

23 **Q.**  I don't believe you asked many, if any, questions about

24 this particular document, so I had a few for you.

25          First of all, is this an e-mail exchange,

 1   Mr. Swetland, that you participated in back in August 2005?

 2   **A.**   It is.

 3   **Q.**   And drawing your attention to the very top e-mail, the one

 4   that's addressed to you directly, do you see that?

 5   **A.**   I see.

 6   **Q.**   All right.  It starts with, "I can't really comment on

 7   your project."  Do you see that?

 8   **A.**   I do.

 9   **Q.**   All right.  So in this particular e-mail there's a

10   reference to a number of people.  And I won't be able to

11   pronounce all these names correctly, but starting with Urs

12   Hölzle, Srdjan Mitrovic.  And then moving down the paragraph a

13   little more, Todd Turnidge, David Stoutamire, and Ben Gomes.

14            Do you see those names?

15   **A.**   I do.

16   **Q.**   And down a little more, Tim Lindholm and Frank Yellin.  Do

17   you see that?

18   **A.**   I do.

19   **Q.**   Did any of those individuals work on the Android project,

20   to your knowledge?

21   **A.**   To my knowledge, none of these people worked on Android.

22   **Q.**   Thank you.

23            And, again, I just want to make sure you have the

24   right folders before you.  Do you have the folder of Exhibit

25   200 before you, sir?

1   A.   200 which?

2   Q.   200.  Do you have 200 before you?

3   A.   I do not see that exhibit here.

4   Q.   I didn't think you had that one.  Okay.  Thank you.

5        And how about Exhibit 419, do you have that one

6   before you?

7   A.   I am not seeing that either.

8   Q.   Okay.  Thank you.

9        All right.  And my last question to you,

10  Mr. Swetland, is whether you have Exhibit 33 before you?

11  A.   Exhibit what?

12  Q.   33.  I just want to make sure we've covered --

13  A.   I don't appear to have a 33 either.

14       MS. ANDERSON:  I have no further questions.  Thank

15  you, Mr. Swetland.

16       THE WITNESS:  Thank you.

17       THE COURT:  Anything more?

18       MR. NORTON:  Yes, Your Honor.

19                    REDIRECT EXAMINATION

20  BY MR. NORTON:

21  Q.   Mr. Swetland, whether you were scarred by the experience

22  or not, you did know that Danger took a license from Sun after

23  all the work that you had done on Danger's clean room

24  implementation, correct?

25  A.   Correct.

1  Q.   And you knew that the reason that Sun gave for why Danger

2  was required to take a license was that Sun held a license on

3  the method signatures, a copyright on the method signatures,

4  correct?

5  A.   Well, I heard that from Andy -- again, my understanding,

6  this hearsay thing --

7           THE COURT:   If you get into hearsay, I'm going to let

8  Ms. Anderson come back and put her hearsay part in, too, to

9  explain why.   It would only be fair to do that.

10          MR. NORTON:   I am seeking the information solely for

11  the purpose of establishing his knowledge.

12          THE COURT:   All right.   You can ask the question.

13          Ms. Anderson, on recross I'm going to let you ask the

14  question that I didn't allow you to.

15          MS. ANDERSON:   Thank you, Your Honor.

16          THE COURT:   Go ahead.

17  BY MR. NORTON:

18  Q.   Now, Android uses those Java API method signatures;

19  doesn't it?

20  A.   That is my understanding.

21  Q.   You made reference to what you called high-profile

22  implementations of the Java virtual machine, in response to

23  questions from Ms. Anderson.   Do you recall that?

24  A.   I do.

25  Q.   You don't know what discussions or agreements there were

1  between any of those companies and Sun; do you?

2  **A.**    I do not.

3  **Q.**    You don't know if those companies took licenses; do you?

4  **A.**    I do not.

5  **Q.**    You don't know if Sun told them to cease and desist what

6  they were doing; do you?

7  **A.**    I do not.

8  **Q.**    With respect to GNU Classpath, you testified that was a

9  complete implementation of the specification?

10  **A.**    That was my understanding.

11  **Q.**    Have you examined it to see if it was a complete

12  implementation?

13  **A.**    I have not.

14  **Q.**    And so you don't know whether it's a complete

15  implementation?

16  **A.**    Not with certainty, no.

17  **Q.**    Apache Harmony, is that a complete implementation?

18  **A.**    I guess by the same terms, I don't know.

19  **Q.**    Android is not a complete implementation of the Java

20  specification; is it?

21  **A.**    I don't know.

22  **Q.**    It's your testimony, sir, that you do not know whether

23  Android is a complete implementation of the Java specification?

24  **A.**    Based on your assertion that without examining it and --

25  which I haven't done, I don't see how I could answer that

1   question.

2   **Q.**   Do you have Exhibit 314 in front of you?

3   **A.**   I do.

4   **Q.**   I just want to clarify one thing.  If we go down to the

5   bottom part of the page.

6              (Document displayed.)

7              **MR. NORTON:**  Thank you.

8              **THE WITNESS:**  The first page?

9   BY MR. NORTON:

10  **Q.**   Yes, sir.  This e-mail states, "On 8/5/2005 Brian Swetland

11  wrote," and then there is a series of paragraphs.  One of them

12  begins "license choice"?

13  **A.**   Yes.

14  **Q.**   You wrote that paragraph, correct?

15  **A.**   I did.  This appears to be an e-mail quoted from me.

16             **MR. NORTON:**  Nothing further.

17             **THE COURT:**  Ms. Anderson, you may ask that question.

18             **MS. ANDERSON:**  Yes, Your Honor.  That one question.

19                     **RECROSS EXAMINATION**

20  BY MS. ANDERSON:

21  **Q.**   Mr. Swetland, why do you understand Danger took a license?

22  **A.**   My understanding was that as a small startup about to ship

23  our first product, being approached by a large company with far

24  more resources, that we did not want to deal with the potential

25  expense of litigation around this issue when we were, you know,

1   focused entirely on trying to get our first product into the

2   market.

3            MS. ANDERSON:  Thank you.  No further questions, Your

4   Honor.

5            THE COURT:  Anything, Mr. Norton, on that last

6   question?

7            MR. NORTON:  Yes, Your Honor.  One moment, please.

8            Nothing further.

9            THE COURT:  May this witness be excused, not subject

10  to recall?

11           Please, you have to answer.  May I excuse the

12  witness, not subject to recall?

13           MS. ANDERSON:  Certainly, in our case, Your Honor, I

14  don't know if there may be a later phase the witness may be

15  needed.  Certainly not this one.  We're releasing him.  He is

16  our employee.

17           THE COURT:  Do you want him on recall or not?

18           MR. NORTON:  No, Your Honor.

19           THE COURT:  You are free to go.  You are not subject

20  to recall.  Thank you, Mr. Swetland.

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  Please leave behind our exhibits.  The

23  lawyers will take care of it.  You have a great day.  Thank

24  you.

25           THE WITNESS:  I will.

```
 1            THE COURT:  Okay.

 2            (Witness excused)

 3            THE COURT:  All right.  Next witness.  We're going to

 4   start with the next witness, and go until about 9:20, 9:30.

 5            Members of the jury, are all of you okay with going a

 6   while longer?  Good.  Let's call the next witness.

 7            MR. JACOBS:  Your Honor, we call Bob Lee.  But before

 8   Mr. Lee actually takes the stand, we would like you to read one

 9   of the deemed admitted.

10            THE COURT:  Have a seat just, for a second.  We'll

11   swear you in.

12            Now, let me -- do you have it handy, or do I need to

13   fish it out somewhere?

14            MR. JACOBS:  Yes, Your Honor.

15            THE COURT:  Hand it up to me.

16            MR. JACOBS:  Circled the items we would like you to

17   read.

18            THE COURT:  Okay.  There are two, right?

19            MR. JACOBS:  Correct.

20            THE COURT:  Okay.  As I told you in the past, over

21   there in the jury box, before the case comes to trial there is

22   a lot of investigation and what we call discovery.  The

23   depositions, the documents are exchanged, and so forth.

24            In addition, there are what we call pleadings, which

25   are more formal documents that state the accusations and
```

1  defenses, and so forth, of the respective parties.

2          And sometimes in the trial something that was

3  admitted in one of these documents becomes important or -- it's

4  up to the jury to decide what's important, but one side or the

5  other wants to remind everyone that the party made that

6  statement in their prior pleading.

7          Let's just take a different case.  Let's say you had

8  a case involving a traffic accident, and at one point in a

9  pleading one side said that the light was red.  Okay.  And then

10 by the time they get to trial, they want to say, well, we're

11 not sure the light was red.  Maybe it was almost red.

12         And so they -- the judge may say to the jury in a

13 case like that, well, in the pleadings the particular party in

14 question actually said that the light was red and admitted

15 that.  Okay.

16         So in this case, we're going -- both sides have

17 identified some things in the pleadings and other proceedings

18 that came before the trial that they would like me to remind --

19 not remind, but say to you, the jury, that the other side made

20 the following statement.  Okay.

21         And right now I'm only going to focus on two.  There

22 are only a handful of these, but two of them I'm going to read

23 to you.  These are ones that Oracle wishes to have admitted

24 against Google.  And so I'm going to read those.

25         And these are statements that have been made in the

PROCEEDINGS                                                977

1    pleadings in this case by Google.  And you may consider it as

2    evidence.  It's not conclusive.  You can consider it along with

3    all the other evidence in the case.  But it is a point that

4    will count as evidence in the case, and you may give it such

5    weight as you think it deserves.

6             I will read the first one, and I will do this slowly.

7    This is the only time you're going to hear this unless it's

8    brought up in the closing arguments.

9             Google has made the following statement prior to

10   trial:

11            "Sun released the specifications for Sun's

12            Java platform, including Sun's Java virtual

13            machine, under a free-of-charge license that

14            allowed developers to create clean room

15            implementations of Sun's Java specifications.

16            If these implementations demonstrate

17            compatibility with the Java specification,

18            then Sun would provide a license for any of

19            its intellectual property needed to practice

20            the specification, including patent rights

21            and copyrights.

22            "The only way to demonstrate compatibility

23            with the Java specification is by meeting all

24            of the requirements of Sun's Technology

25            Compatibility Kit, TCK, for a particular

PROCEEDINGS                                978

```
 1              edition of Sun's Java.

 2              "Importantly, however, TCKs were

 3              available" -- sorry -- "were only available

 4              from Sun; initially were not available as

 5              open source; were provided solely at Sun's

 6              discretion; and included several

 7              restrictions, such as additional licensing

 8              terms and fees.

 9              "In essence, although developers were free to

10              develop a competing Java virtual machine,

11              they could not openly obtain an important

12              component needed to freely benefit from Sun's

13              purported open sourcing of Java."

14         So that's statement number one.  That statement was

15  made by Google before trial.

16         Now, here is the next statement.  It's a little

17  shorter.  Quote:

18              "Although Sun eventually offered to open

19              source the TCK for Java SE, Sun included

20              field of use restrictions that limited the

21              circumstances under which Apache Harmony

22              users could use the software that Apache

23              Software Foundation created, such as

24              preventing the TCK from being executed on

25              mobile devices."
```

PROCEEDINGS                          979

```
 1              Close quote.  That's the second statement.

 2              Again, these statements may be considered by you as

 3   evidence.  It's not conclusive.  It must be -- it should be

 4   considered by you in connection with all of the evidence in the

 5   case, and it's up to you to decide how much weight, if any, to

 6   give to these particular items of evidence.

 7              All right.  That's done.  There will be two or three

 8   more like this before the trial is over.  And Google, for its

 9   part, has some it wishes to use against Oracle, but, right now,

10   Oracle has the floor.

11              Now, thank you for that.  And our witness will now

12   please stand and raise his right hand.

13                              BOB LEE,

14   called as a witness for the Plaintiff herein, having been first

15   duly sworn, was examined and testified as follows:

16         THE WITNESS:  I do.

17         THE CLERK:  Thank you.

18         THE COURT:  All right.  Welcome, again.  Please sit

19   about this close.  You see how close I am?

20         THE WITNESS:  Yeah.

21         THE COURT:  You are too far.  So you need to move it.

22   No, this will move.

23         THE WITNESS:  Oh.

24         THE COURT:  There.  Say your name.

25         THE WITNESS:  My name is Bob Lee.
```

```
 1              THE COURT:  L-e-e?

 2              THE WITNESS:  Yes, sir.

 3              THE COURT:  Thank you.  Welcome, again.

 4              Counsel, please go ahead.

 5              THE WITNESS:  Thank you.
```

### DIRECT EXAMINATION

```
 7   BY MR. JACOBS:

 8   Q.   Good morning, Mr. Lee.  I'm Mike Jacobs.

 9   A.   Good morning.  Nice to meet you.

10   Q.   You worked at Google from October 2004 to January 2010?

11   A.   Yes, sir.

12   Q.   And now you work at another company?

13   A.   Yes, sir, Square.

14   Q.   You joined the Android team early on, when there were only

15   about a dozen people in the project, correct?

16   A.   Yes, sir.

17   Q.   And while you were on the Android team, were you the core

18   library lead --

19   A.   For the majority of the time, yes.

20   Q.   Approximately September 2007, until you left Google,

21   correct?

22   A.   Uhm, October 2007.  It might have been earlier than that,

23   but I'm not sure.  I think I joined probably -- I had to guess,

24   it would be around more like 2006 or early 2007.  And, yes,

25   until I left Google.
```

1    Q.    I want to get the period in which you were the core

2    library lead.

3    A.    I joined the Android team in 2006, I believe.  And I

4    became the core library lead shortly after.  I mean, we're

5    talking like six years ago, so I don't remember exactly how

6    long after.

7    Q.    The Android core libraries are the core libraries that

8    include libraries in the Java namespace, like java.security,

9    java.io, java.lang, et cetera, correct?

10   A.    Those are the names of the packages, yes.

11   Q.    And there are also libraries in the core libraries that

12   are in the javax namespace, correct?

13   A.    Yes.

14   Q.    And such as the package javax.sql?

15   A.    Yes.

16   Q.    And there are lots of libraries in the Android system with

17   the word "Java" in them, correct?

18   A.    Yes, with the word "Java" in their names, yes.

19   Q.    And Android implements part of the Java SE library APIs,

20   and not other parts, correct?

21   A.    Yes.

22   Q.    And the Java APIs Android supports are good stuff from

23   Java?

24   A.    Can you elaborate on that?  Good stuff -- this came up in

25   the deposition.  Good stuff is kind of a vague term.

```
 1          THE COURT:  This sounds like you, in your own
 2   deposition, used that phrase.
 3          MR. JACOBS:  That's absolutely right.
 4          THE COURT:  You didn't use that phrase?
 5          THE WITNESS:  I think that was used -- someone else
 6   used it in an instant message conversation, and then they asked
 7   me --
 8          THE COURT:  I see.  Is that the way it came up?
 9          THE WITNESS:  Yes.
10          THE COURT:  Then you're going to have to do it the
11   hard way, Mr. Jacobs.  Sorry.  I didn't guess right.  Okay.
12          MR. JACOBS:  We'll see, Your Honor.
13          THE COURT:  Ask a fresh question.
14          MR. JACOBS:  I bet you did guess right.
15          Could we play from Mr. Lee's transcript, at 487,
16   line -- page 48, line 7 to 16.  Clip 8.
17          (Video deposition clip played in open court; not
18          reported.)
19   BY MR. JACOBS:
20   Q.   And you stand by that testimony; correct, sir?
21   A.   I do like the Java APIs, yes.
22   Q.   And you're quite familiar with the Java API
23   specifications?
24   A.   Very.
25   Q.   You consulted the Java API specifications to make sure
```

```
 1  that the Android code for the corresponding core libraries

 2  would be consistent with those specifications, correct?

 3  A.    Yes.

 4  Q.    The Java API specifications that you consulted were

 5  available on Sun's website, correct?

 6  A.    Yes.

 7  Q.    And you consulted those Java API specifications while you

 8  were doing work for Google on Android, correct?

 9  A.    Yes.

10  Q.    You saw that there were copyright notices on the Java API

11  specifications when you consulted them, correct?

12  A.    Yes.

13  Q.    You're familiar with the TCK, the Technology Compatibility

14  Kit, correct?

15  A.    Yes.

16  Q.    In fact, you wanted Android to be able to run against the

17  TCK, at one point, correct.

18  A.    Yes.

19  Q.    And you understood --

20  A.    A TCK.  Which TCK would you specify?

21  Q.    Well, it would be a Sun TCK, correct?

22  A.    Yes.  So Java has various platforms, but to kind of

23  simplify, you know, there's, like, the Java SE platform, which

24  is aimed at desktops.  Then there's the Java ME platform, which

25  is another set of APIs aimed at mobiles.  But when I say
```

 1   "mobiles" in that case it's aimed at, like, tiny feature

 2   phones.  Like Nokia --

 3            (Reporter interrupts)

 4            **THE COURT:**  You're talking so fast it's impossible to

 5   follow you.

 6            **THE WITNESS:**  I'm sorry.

 7   **A.**   So Java ME is aimed at feature phones, which have --

 8   you'll remember, I don't know if you've had one like maybe a

 9   Motorola Razor or a Nokia phone with a small screen and big

10   buttons.  As you know, like the apps on those phones aren't

11   very sophisticated compared to an iPhone or an Android phone,

12   for example.

13            So if Android were to, I guess, adhere to a Java

14   platform, it would be more likely some future platform that

15   would be maybe similar to Java SE but aimed at mobiles.

16            So my ultimate goal, because I work a lot on these

17   what I thought were open Java standards, would have been to

18   create a mobile platform that Android could have implemented

19   and other similar mobile devices could have also supported.

20   Like the iPhone could have supported it, theoretically.

21   **BY MR. JACOBS:**

22   **Q.**   And Android has never passed a TCK, to the best of your

23   knowledge; correct, sir?

24   **A.**   No.  We've never tried to run against one.

25   **Q.**   Now, you worked with an outside company called Noser, to

1  implement core libraries according to the Java APIs, correct?

2  A.   Yes, sir.

3  Q.   Noser was an outside contractor hired by Google to

4  implement core libraries according to the Java API

5  specifications, correct?

6  A.   Yes.

7  Q.   And the Noser statement of work, in fact, includes a list

8  of Java libraries that Noser was to develop for Android?

9  A.   So, what was it, again?  I'm sorry.

10  Q.   The Noser statement of work includes a list of Java

11  libraries that Noser was engaged to develop for Android?

12  A.   I think I recall seeing that during the deposition, yes.

13  Q.   And, in fact, the Java class libraries that are included

14  in that statement of work, the statement of work between Google

15  and Noser, were implemented in Android and supported by Android

16  in the very first version of Android, with very few exceptions,

17  correct?

18  A.   Yes.

19  Q.   Show you Exhibit 405, please.

20        MR. JACOBS:  May I approach, Your Honor?

21        THE COURT:  You may.

22  BY MR. JACOBS:

23  Q.   Exhibit 405 is an e-mail exchange between you and Eric

24  Schmidt, dated May 30, 2008, correct?

25  A.   Yes.

 1              **MR. JACOBS:**  Offer 405 in evidence, Your Honor.

 2              **MR. BABER:**  No objection.

 3              **THE COURT:**  Did you say 2405?

 4              **MR. JACOBS:**  Sorry.  405.

 5              **THE COURT:**  405 is received.  Go ahead.

 6              (Trial Exhibit 405 received in evidence.)

 7  BY MR. JACOBS:

 8  **Q.**   Now, Eric Schmidt was one of the three top executives at

 9  Google in 2008, correct?

10  **A.**   Yes, he was the CEO.

11  **Q.**   And you wrote to him on May 30, 2008, about Apache Harmony

12  correct?

13  **A.**   Yes.

14  **Q.**   And the jury has heard about this disagreement between

15  Apache Harmony and Sun, so I want to just focus on a portion of

16  this in my questioning of you.

17              And if you go to the middle of the "I hope"

18  paragraph.  And we'll start with, "Sun puts field of use

19  restrictions."

20              Do you see that there?  It's being highlighted on the

21  screen, if that would aid your examination.

22  **A.**   Yes, I do.

23  **Q.**   And so you wrote to Eric Schmidt, the CEO of the company:

24              "Sun puts field of use restrictions in the

25              Java SE TCK licenses which prohibit Java SE

 1                   implementations from running on anything but

 2                   a desktop or server."

 3   **A.**   Yes.

 4   **Q.**   And you went on:

 5                   "These restrictions prevent Apache Harmony

 6                   from independently implementing Java SE.

 7                   Harmony can't put those restrictions on their

 8                   own users and still Apache license the code."

 9                   Do you see that?

10   **A.**   Yes.

11   **Q.**   And then you went on to say:

12                   "Not to mention Android (though that's water

13                   under the bridge at this point)."

14                   Do you see that?

15   **A.**   Yes.

16   **Q.**   So you were advising Eric Schmidt of this issue between

17   the members of the Java community and Sun over these field of

18   use restrictions, correct?

19   **A.**   Yes.  I think it's important to note here, also --

20   **Q.**   I'm on the clock, as I've said a few times.  So if the

21   answer is "yes," let me move on to the next question.

22   **A.**   Okay.

23   **Q.**   And Google's counsel can ask you for more explanation.

24                   So by "this e-mail" you were informing Eric Schmidt

25   that there was no TCK available for using Apache Harmony in

1   Android and running it on machines other than the desktops or

2   servers, correct?

3   **A.**   No TCK available for using Apache Harmony in Android?

4           No, I would say no to that.  What I was going to say

5   before was that Java SE is a very specific thing.  To say that

6   I'm a Java SE implementation, now you're using kind of a brand

7   name.  For example, to give analogy --

8   **Q.**   Mr. Lee, I'm sorry.

9   **A.**   I was saying that you could not create an implementation

10  that's called Java SE because you would have to have permission

11  to use a brand like that.  It's like I couldn't make a soda

12  that has the exact same ingredients as Coca-Cola and call mine

13  Coca-Cola.

14  **Q.**   Well, Mr. Lee, that's a very interesting point; isn't it?

15          As of May 30, 2008 were you planning on calling

16  Android Java?

17  **A.**   I don't think so.

18  **Q.**   And when you said it's "water under the bridge at this

19  point," you meant you already made the decision to adopt the

20  Apache core libraries into Android under your supervision;

21  correct, sir?

22  **A.**   To -- well, we adopted -- those were actually adopted

23  before I became the core library lead.

24  **Q.**   So that's what "water under the bridge" meant; didn't it,

25  sir?

LEE - DIRECT EXAMINATION / JACOBS

```
 1  A.    I don't exactly recall what -- let me read it again.
 2  Android.  Yes.  I would -- well, I would say that it meant that
 3  we could not call Android Java.
 4  Q.    You don't say that anywhere, do you, in this e-mail; do
 5  you, sir?
 6  A.    Uhm, no, I guess --
 7  Q.    What you say is that:
 8              "These restrictions prevent Apache Harmony
 9              from independently implementing Java SE, not
10              to mention Android."
11              Don't you, sir?
12  A.    Java SE, as in, yeah, like a Java SE compatible
13  implementation, yes.
14  Q.    I would like to show you Exhibit 281.
15              MR. JACOBS:  May I, Your Honor?
16              THE COURT:  Yes, you may.  How much longer do you
17  have?
18              MR. JACOBS:  I have about ten minutes.
19              THE COURT:  All right.  Please continue.
20  BY MR. JACOBS:
21  Q.    Exhibit 281 is an e-mail to you, from one of your group
22  members, Hiroshi Lockheimer.
23              And then on -- sorry.  It's an e-mail exchange, but
24  in the middle there's an e-mail to you from Hiroshi Lockheimer.
25  And at the top is a response from you, correct?
```

 1  A.    Yes.

 2  Q.    And in this --

 3           MR. JACOBS:  I offer this into evidence, Your Honor,

 4  281.

 5           MR. BABER:  No objection.

 6           THE COURT:  Received.

 7           (Trial Exhibit 281 received in evidence.)

 8           THE COURT:  You may publish it.

 9           (Document displayed.)

10  BY MR. JACOBS:

11  Q.    I would like to focus on the message to you from Hiroshi

12  Lockheimer.  Hiroshi Lockheimer was somebody you had worked

13  with for some years; isn't that true?

14  A.    Yes.

15  Q.    At both Danger and at Google, correct?

16  A.    I never worked at Danger.

17  Q.    I'm sorry.  I confused you.

18           How long had you worked with Hiroshi Lockheimer?

19  A.    Just the -- I think he was on the Android project the

20  whole time.  Maybe he joined -- no, he joined shortly after the

21  Android project.  I'm not sure exactly when, but he did

22  eventually become the director of the Android project, which is

23  a type of manager.

24  Q.    And he said to you:

25           "I'm a little nervous about signing Noser up

LEE - DIRECT EXAMINATION / JACOBS

```
1              to do any more work for us - but that's from

2              a purely business perspective.  Those guys,

3              their management team are super shady."

4         Do you see that?

5  A.   Yes, I do.

6  Q.   Now, in implementing the core libraries that support the

7  Java API specifications in Android, one of the things that

8  your -- that you and your colleagues had to do was write

9  comments in the core library code that would eventually find

10 its way in the API documentation for Android, correct?

11 A.   Yes.

12 Q.   And is it your testimony, sir, that that was done in a

13 clean room?

14 A.   That the comments were written in a clean room?

15 Q.   Yes.

16 A.   Uhm, that would be without looking at the other

17 specifications?

18 Q.   Yes.

19 A.   No, I would not say that.

20 Q.   So when writing the comments, the comment writers on the

21 Android team were looking at the comments in the Java

22 documentation, correct?

23 A.   Yes.

24 Q.   And what instructions were they given about how to avoid

25 copyright infringement comment to comment?
```

1  **A.**   Uhm, I guess this would be equivalent to paraphrasing a

2  book or an article, or something like that.  So, obviously, you

3  don't copy it word for word.

4  **Q.**   And you don't paraphrase either; correct, sir?

5  **A.**   Uhm, well, I believe they did paraphrase.

6  **Q.**   That your developers did --

7  **A.**   Paraphrase -- my understanding of the word "paraphrase" is

8  to take something and put it into your own words.

9  **Q.**   As opposed to taking something from someone else and

10 changing a word here or there to make it look like you put it

11 in your own words but not; correct, sir?

12 **A.**   Uhm, I'm not an expert on that.

13 **Q.**   Well, let's take a look at what your developers did.

14         What I'm going to ask you is if you think this is

15 their own words, in your expression, or whether it is, in my

16 expression, taking somebody else's language and changing a word

17 here or there in order to make it look like it's in your own

18 words.

19 **A.**   Right.

20 **Q.**   So let's take a look, first of all, at Trial Exhibit 610.2

21 on the left, and Trial Exhibit 767 on the right.  And we're

22 looking at the documentation from Java on the left and the

23 Android on the right.  And we're looking for the documentation

24 for javax.crypto.CipherInputStream.  Both of these exhibits

25 have been admitted.

```
 1              MR. BABER:  Your Honor, I would like to object.

 2              THE COURT:  What's the objection?

 3              MR. BABER:  These documents were never provided to us

 4   before Mr. Lee's examination.  Last night, late, they

 5   identified to us very large files without any identification

 6   which parts of them they might use with this witness.

 7              THE COURT:  Time for a break.  Fifteen minutes.

 8   Remember the admonition.

 9              THE CLERK:  All rise.

10              (Jury exits courtroom at 9:29 a.m.)

11              THE COURT:  Thank you.  Mr. Lee, you can step

12   outside.  You don't need to be here for this.

13              THE WITNESS:  Here?

14              THE COURT:  No, that way.

15              (Laughter)

16              THE COURT:  All right.  Be seated.

17              Mr. Baber, what's the issue?

18              MR. BABER:  Your Honor, as you know, under your

19   procedures they are required to identify the exhibits they will

20   use on direct.

21              This is a third-party witness on the stand.  They

22   identified documents for Mr. Lee a week ago, or so.  Last

23   night, at 10:00 o'clock or so, for the first time they

24   identified two very large source code files, gigantic files.

25              They didn't identify whatever it is he is now going
```

1  to show the witness.  They didn't identify what parts of these

2  very large files he intended to show the witness.  And, as I

3  say, they didn't identify this to us until 10 o'clock last

4  night, after we had already gone through the process of them

5  identifying experts -- identifying documents.  We

6  counter-designated where appropriate, et cetera.

7           And we've given them a lot of slack on lots of late

8  identifications of things, but this is a whole nother kind of

9  exhibit that they never before, until 10 o'clock last night,

10 indicated they were going to try to use with this third-party

11 witness.

12          THE COURT:  Is that true?

13          MR. JACOBS:  It is true as factually as Mr. Baber

14 recounts, with this exception.  We have identified these

15 exhibits along the way for possible use with witnesses.  It

16 became clear to us that as the core library lead, Mr. Lee is

17 the right person to ask about the creation of the documentation

18 from the core libraries.

19          THE COURT:  Don't the guidelines require more than

20 that?

21          MR. JACOBS:  They do, Your Honor.

22          THE COURT:  All right.  We're going to do the

23 following.  How many days' notice -- here's what we'll do.

24 We'll postpone this witness, bring him back on Monday.  And

25 we'll go to somebody else.  We'll pick it up right there on

1    Monday.

2           Look, Mr. Baber, I'm not going to say to the

3    plaintiff that they cannot get into this ever.  If that's

4    your --

5           **MR. BABER:**  Absolutely not, Your Honor.

6           **THE COURT:**  If you just want an extension until

7    Monday, that's okay.  The jury will -- it's easy to explain to

8    the jury, and we'll move on.

9           **MR. BABER:**  And, Your Honor, might I ask, since these

10   are massive files, whatever parts he wants to show the witness

11   if he's got little side-by-sides, or whatever, I think those

12   are the documents we should get.

13          **THE COURT:**  That's a reasonable request.  You ought

14   to do that by the end of today.

15          **MR. JACOBS:**  Understood, Your Honor.  Thank you.

16          **MR. BABER:**  Thank you, Your Honor.

17          I'm sorry, Your Honor.  Since this happened last

18   night, the witness is now on the stand.  Obviously, I haven't

19   had a chance to talk to Mr. Lee about these documents.  That

20   was the whole point of getting advance notice.

21          How do we want to handle that, given Your Honor's

22   rule about speaking with the witness once he's begun

23   cross-examination?

24          **MR. JACOBS:**  I think it's only fair that he be given

25   a chance to review these documents with the witness, Your

 1   Honor.

 2          **THE COURT:**  All right.  We'll do that.

 3          **MR. BABER:**  Thank you, Your Honor.

 4          **THE COURT:**  Okay.  We're going to take a short,

 5   15-minute break ourselves.

 6          Do you have your next witness ready to go?

 7          **MR. NORTON:**  Mr. Morrill.  Is he here?  We'll make

 8   sure, Your Honor.

 9          **THE COURT:**  All right.  Fifteen minutes.  Thank you.

10          **MR. VAN NEST:**  Excuse me, Your Honor.  Should we

11   bring Mr. Lee back in so you can excuse him?  How do you want

12   to deal with that?  I think we need to tell the jury something.

13          **THE COURT:**  Well, if you promise me that he will be

14   here Monday morning, then he can -- you can just tell him he's

15   excused for now, but he's got to be back at 7:30 on Monday

16   morning.

17          **MR. VAN NEST:**  I don't know that.  He's under

18   subpoena from -- he's not an employee.

19          **THE COURT:**  Is that okay?  Can we handle it that way,

20   or do you want me to order him back?

21          **MR. JACOBS:**  We'll take his assurance, Your Honor.

22          The only point I would make is that in the

23   conversation with Mr. Lee, because he is on cross-examination,

24   the only subject that they should discuss with him are the

25   exhibits we're going to send over.

1          **THE COURT:**  That's understood.

2          Okay.  All right.  Can you assure me he'll be back on

3    Monday morning?

4          **MR. VAN NEST:**  We're going to find out.

5          **THE COURT:**  If he won't, then you bring him back in

6    and I'll order him to come back.  All right.  That's the way it

7    would normally be done.

8          Okay.  So you all have a good 15-minute break.  See

9    you in a few minutes.

10          (Recess taken from 9:33 a.m. to 9:55 a.m.)

11          **THE COURT:**  All right.  Let's go back to work.  Sorry

12    for the short delay.

13          My law clerk is going to give you a draft order.

14    It's not final.  Please, be seated.  Give you a draft order.

15    And this goes to -- you'll see.

16          Before I finalize it, I want to give you a chance to

17    tell me if you have heartburn over any aspect of it.  I don't

18    think you will.  This is sort of routine in cases where there

19    are things the judge has got to find.  But I want to give you

20    your shot at trying to suggest modifications.  You don't have

21    to do that today.  Maybe by Monday you can do that, or maybe --

22    on Sunday, at the same time, you submit another little comment

23    on this, will be fine.

24          Okay.  Let's --

25          **MR. VAN NEST:**  Your Honor, would it be possible to

 1  give us until Monday on this one?  We have the two other

 2  briefs.

 3          THE COURT:  Sure.  Take until Monday at 7:00.

 4          MR. JACOBS:  I'm sorry, Your Honor.  Just to be

 5  clear, the task for us is to comment on this form of order

 6  rather --

 7          THE COURT:  Yeah.  I could just send that out and say

 8  you're stuck with it and too bad for you.  And I don't think

 9  you would even complain about it, because I think it's routine.

10  But if it does give you heartburn in some respect, there's time

11  for you to fly spec it and tell me how you would like to change

12  it.

13          MR. JACOBS:  Thank you, Your Honor.

14          THE COURT:  All right.  Now, I don't have my jury

15  here.  Are you ready with your next witness?

16          MR. NORTON:  Yes, Your Honor.

17          THE COURT:  All right.  Hang on a second.

18          THE CLERK:  All rise.

19          (Jury enters the courtroom at 9:57 a.m.)

20          THE COURT:  All right.  Please be seated.  And let me

21  say, I apologize for the slight delay.  It's my fault.

22          The lawyers have done a good thing.  They have agreed

23  that the witness on the stand, Mr. Bob Lee, will be delayed

24  slightly in order for us to take up another witness and give

25  counsel an opportunity to review some documents that were

 1  provided a little later than they should have been.  Sometimes

 2  this happens in the trial.

 3          But, Mr. Lee will be back.  We're just going to pick

 4  it up Monday morning with Mr. Lee, right where we left it off.

 5  So don't -- don't put him out of your mind.  But he'll come

 6  back.

 7          Meanwhile, we're going to go to the next witness.

 8  And that witness will be?

 9          **MR. NORTON:**  Daniel Morrill.

10          **THE COURT:**  All right.  Let's bring him forward.

11          State your name.

12          **THE WITNESS:**  Dan Morrill.

13          **THE COURT:**  Spell that for me.

14          **MR. NORTON:**  Yes, Dan Morrill.  M-o-r-r-i-l-l.

15          **THE COURT:**  Like in the Morrill Act, 1962.  A famous

16  Act.

17          All right.  Welcome, sir.  Are you okay?

18          **THE WITNESS:**  (Nods head.)

19          **THE COURT:**  Great.  Why don't you stand right there

20  and raise your right hand.  You need to raise your right hand.

21                          **DANIEL MORRILL**,

22  called as a witness for the Plaintiff herein, having been first

23  duly sworn, was examined and testified as follows:

24          **THE WITNESS:**  I do.

25          **THE CLERK:**  Thank you.

 1              **THE COURT:**  Great.  Now, do you see the microphone?
 2   You need to be this close, and it will move around.  Make it
 3   easier on you.  So if you want to pull it closer --
 4              **THE WITNESS:**  Okay.
 5              **THE COURT:**  It needs to be this close, though.  Why
 6   don't you say your name into the mic.
 7              **THE WITNESS:**  Okay.  Is that acceptable?
 8              **THE COURT:**  Good, yes.  Say your name.
 9              **THE WITNESS:**  My name is Daniel Lawrence Morrill.
10              **THE COURT:**  Wonderful.  Go ahead.
11          **MR. NORTON:**  Thank you, Your Honor.
12                   <u>**DIRECT EXAMINATION**</u>
13   **BY MR. NORTON:**
14   **Q.**   Good morning, Mr. Morrill.
15   **A.**   Good morning.
16   **Q.**   We have not met before, but my name is Fred Norton.  I'm
17   counsel for Oracle.
18              **MR. NORTON:**  Your Honor, there are still some
19   exhibits from the prior witness on the stand.  May I take
20   those?
21              **THE COURT:**  Please, take them away.
22   **BY MR. NORTON:**
23   **Q.**   Mr. Morrill, you are employed by Google; is that right?
24   **A.**   That's correct.
25   **Q.**   And you've been at Google since 2006?

1    **A.**    Since 2006, yes.

2    **Q.**    And you joined the Android team in around middle of 2009?

3    **A.**    Uhm, formally, yes.  I was working closely with them

4    since, probably, about mid 2007.

5    **Q.**    All right.  And what did you do beginning mid-2007, with

6    respect to Android?

7    **A.**    Uhm, excuse me.  In -- starting in about mid-2007, I was

8    on the developer relations team, and eventually became the lead

9    of that team.

10   **Q.**    Beginning in mid 2009, you became the technical program

11   manager for Android compatibility; is that correct?

12   **A.**    That's correct.

13   **Q.**    And in that role, one of the things that you did was you

14   were manager of the team that maintains the Compatibility Test

15   Suite; correct?

16   **A.**    Yes, that was one of my responsibilities.

17   **Q.**    And you also oversaw and were the editor for a document

18   called the Compatibility Definition Document; is that also

19   correct?

20   **A.**    Also correct.

21   **Q.**    Is it fair to say that the purpose of -- I'm sorry, the --

22   your role as technical manager for compatibility was, among

23   other things, to make sure that compatible Android devices are

24   capable of running third-party software correctly?

25   **A.**    Uhm, I guess I would say that my role was to define the

1  criteria that, you know-- to define the criteria of a device

2  which can run the applications compatibly.

3  **Q.**   So we are clear, there are devices in the world that run

4  the Android platform, right?

5  **A.**   Yes, that's correct.

6  **Q.**   Those are smart phones, right?

7          And those -- you have to say yes or no, just so our

8  record is clear.

9  **A.**   Yes.

10  **Q.**   And those smart phones are manufactured by companies other

11  than Google, correct?

12  **A.**   That's correct.

13  **Q.**   And Google itself has manufactured an Android smart phone,

14  correct?

15  **A.**   No, not to my understanding.

16  **Q.**   Google released a phone called the Nexus, correct?

17  **A.**   There have been a variety of phones that have Nexus in the

18  name, that have been built by other companies that Google had

19  like a co-branding arrangement with.

20  **Q.**   By Google having "a co-branding arrangement with,"

21  Google's name was put on the phone along with the

22  manufacturers' name, correct?

23  **A.**   That's correct.

24  **Q.**   And part of your job as the technical program manager was

25  to make sure that the version of Android that was on those

1   other companies' Android phones was compatible with the Android

2   software that Google had helped to develop, correct?

3   **A.**   No.  The reason -- the distinction that I'm making is

4   simply that there was another team that worked with OEMs

5   directly, and they made sure that individual devices were

6   compatible.  My job was just to define the technical criteria

7   for that, so that's the distinction I make there.

8   **Q.**   So you would define the technical criteria that would

9   establish whether or not a third-party's phone was compatible?

10  **A.**   Yes.  I would describe myself as like sort of the editor

11  of that, yes.

12  **Q.**   And by those "technical criteria" we're talking about

13  requirements, requirements to be considered compatible,

14  correct?

15  **A.**   Yes.

16  **Q.**   Now, you are familiar with the Java class libraries;

17  aren't you?

18  **A.**   Yes, I'm familiar with the Java class libraries.

19  **Q.**   In fact, you use them, right?

20  **A.**   I do not myself write code on a routine basis anymore, but

21  I have in the past, yes.

22          **MR. NORTON:**  May I approach the witness?

23          **THE COURT:**  Yes.

24  **BY MR. NORTON:**

25  **Q.**   Mr. Morrill, if you would take a look, I've handed you

1   Exhibit 51.  And you recognize Exhibit 51 as the Android API

2   packages, correct?

3   **A.**   Yes.  This appears to be a listing of the APIs that are

4   included in Android 2.1.

5   **Q.**   And Google publishes that list on a website, the Android

6   Developers website, correct?

7   **A.**   Yes, that's correct.

8           **MR. NORTON:**  I offer Exhibit 51 -- I'm sorry, Exhibit

9   51 is already in evidence.  It's published.  Thank you.

10          (Document displayed.)

11  **BY MR. NORTON:**

12  **Q.**   All right.  If you could please turn to page 4 of the

13  document.

14  **A.**   Okay.

15  **Q.**   And you'll see in the left-hand column there's a series of

16  names, correct?

17  **A.**   Yes.

18  **Q.**   And just a little bit more than a quarter of the way down

19  the page, we see java.awt.font?

20  **A.**   Yes, I see those.

21  **Q.**   And as we continue down, there are still more packages

22  that begin with the name "java," right?

23  **A.**   Yes, that's correct.

24  **Q.**   And if you look at the fifth page, there are still more

25  names that begin with "java" and then "javax," correct?

1   **A.**    Yeah.

2   **Q.**    And then if we go all the way to the sixth page, there are

3   still more packages that begin with "javax," correct?

4   **A.**    Yes.

5   **Q.**    Now, all of those packages that begin with "java" or

6   "javax," those are all in Android, correct?

7   **A.**    Uhm, I would say that, yes, they're available on Android

8   devices.

9   **Q.**    And all of those, pursuant to the requirements, the

10   compatibility criteria, all of those packages must be

11   implemented by Android devices to be considered compatible,

12   correct?

13   **A.**    That's correct.

14   **Q.**    Now, Android ships an implementation of the Java APIs --

15   ships an implementation of the APIs that includes

16   implementations of those Java class libraries, right?

17   **A.**    Yes.

18   **Q.**    That implementation includes the names of each of these

19   Java class libraries, correct?

20   **A.**    Yes, that's correct.

21   **Q.**    And each of these -- if we were looking at this on

22   Internet, we could click on each of these names and see

23   subclasses, correct?

24   **A.**    Yes, that's correct.

25   **Q.**    And those names are the same names as those that appear in

1  the Java class libraries, correct?

2  A.   I'm sorry, could you repeat that.

3  Q.   Sure.  The names that are in the implementation, in

4  Android's implementation of the Java class libraries, those are

5  the same names as used by Java, right?

6  A.   Yes.

7  Q.   All right.  And not just the names -- do you need some

8  water, Mr. Morrill?

9  A.   Yeah.  It actually is empty.  I would appreciate it if

10  some is available.

11           MR. NORTON:  Thank you, Mr. -- oh, may I approach?

12           THE COURT:  You may.

13  BY MR. NORTON:

14  Q.   Let me know when you're ready.

15           So not only does the Android implementation of these

16  Java APIs, not only does it use the names but it also uses the

17  form/organization of those APIs in the same way that Java does,

18  right?

19  A.   I don't -- I don't understand what you mean by "form" or

20  "organization" in this context.  Can you elaborate.

21           MR. NORTON:  Can we play, as a party admission,

22  Mr. Morrill's deposition transcript, page 56, line 24, through

23  57, line 12.  That's line 3.

24           (Video deposition clip played in open court; not

25           reported.)

1  BY MR. NORTON:

2  **Q.**  Now, you're familiar with the term "Java SE," right?

3  **A.**  Yeah, the Standard Edition.

4  **Q.**  And you know it's also sometimes called J2SE, correct?

5  **A.**  Uh-huh.

6  **Q.**  Now, the Java packages that are in Android, those are a

7  subset of the packages that are actually in J2SE, correct?

8  **A.**  Yes, that's correct.

9  **Q.**  So Android includes some but not all of the Java packages

10 that are in J2SE, correct?

11 **A.**  That's correct.

12 **Q.**  And what we see on Exhibit 51 is precisely what that

13 subset is, correct?

14 **A.**  Yes, that's correct.

15        **MR. NORTON:**  Can we play, as a party admission,

16 Mr. Morrill's deposition, page 151, lines 1 through 9.

17        (Video deposition clip played in open court; not

18        reported.)

19 BY MR. NORTON:

20 **Q.**  Now, so we're clear --

21        **MR. KWUN:**  Your Honor, we don't object to the playing

22 of the deposition excerpt, but we do object to its admission as

23 a party admission.  Mr. Morrill is not a director or managing

24 agent of the company.

25        **MR. NORTON:**  Under Rule 801, it's a party admission,

1  Your Honor.

2          **THE COURT:**  Under which rule?

3          **MR. NORTON:**  It is a party -- it would satisfy the

4  hearsay exception under 801.  It is a party admission.  He need

5  not be a managing director.  It need only be within the scope

6  of his agency.  And he has already testified as to what his job

7  is.

8          I'll develop it further, if I need.

9          **THE COURT:**  Well, let's be clear.  When we say party

10  admission, I'm usually thinking of it in terms of Rule 32, and

11  whether or not it can be played to the jury for any purpose.

12          There's also the party admission exception to hearsay

13  rule.  And that's a different -- that's a different animal.

14  You're not objecting over there to it being played for the

15  jury, are you?

16          **MR. KWUN:**  No, Your Honor.

17          **THE COURT:**  All right.  So let's just be clear to the

18  jury that when something comes in as evidence and Mr. Norton

19  says it's being played as a party admission, it is not being

20  played as some sort of locked in stone, concrete, it can't be

21  disputed, is forever binding on Google.  No.  If that's what

22  you meant, no.

23          This is just one more item of information that's

24  available to the jury to be weighed in connection with all of

25  the rest of the evidence in the case.  And it should not be

 1  taken as some sort of evidence with extra value or conclusive

 2  value.  I don't think that's what Mr. Norton meant.  I think

 3  what he was referring to, rules of evidence and so forth.

 4          But the jury should not be -- both sides have used

 5  that phrase.  I want to be clear.  There is no extra weight to

 6  be given.  It's up to you to decide how much weight to give to

 7  something.  But there's no extra weight to be given to

 8  something once it comes into evidence.  You consider it along

 9  with all of the other evidence in the case, and decide how much

10  weight to give to it.

11          So since there is no objection to it coming into

12  evidence at all -- right?  Correct?

13          MR. KWUN:  Correct, Your Honor.

14          THE COURT:  Then it's just going to be one more item

15  in the overall mix for the jury to consider.

16          Thank you.  Please proceed.

17          MR. NORTON:  Thank you, Your Honor.

18  BY MR. NORTON:

19  Q.  I want to be clear about compatibility.  What you test in

20  your job or -- I apologize.  What you define the requirements

21  for in your job is whether Android devices will be compatible

22  with Android, correct?

23  A.  Uhm, that seems like kind of a insufficiently precise way

24  to put it.

25  Q.  Tell me the precise way that you would put it.

1  **A.**   What I would say that we do is, the compatibility program,

2  in general, is intended to make sure that compatible Android

3  devices can run applications written to the Android SDK.

4  **Q.**   Now, android does not support Java applications, correct?

5  **A.**   That is correct.

6  **Q.**   And so Android is not Java compatible, correct?

7  **A.**   That's correct.

8  **Q.**   Now, one -- you testified already that one of the

9  documents that Google publishes is -- or that you prepare is

10  the Compatibility Definition Document, correct?

11  **A.**   That's correct.

12  **Q.**   And the Compatibility Definition Document that is, in

13  turn, published by Google, correct?

14  **A.**   That's correct.

15          **MR. NORTON:**  May I approach the witness?

16          **THE COURT:**  You may.

17  **BY MR. NORTON:**

18  **Q.**   Mr. Morrill, you have Trial Exhibit 749 in front of you.

19  And that document is the Compatibility Definition Document, is

20  it not?

21  **A.**   It is the Compatibility Definition Document for Version

22  2.2.

23  **Q.**   And you were the editor of that document, correct?

24  **A.**   Yes, that's correct.

25  **Q.**   And that document defines the requirements for a device to

 1  be considered compatible, right?

 2  **A.**    Some of the terms are optional, but, yes, in general it

 3  defines the requirements.

 4  **Q.**    And the terms that are in the CDD, those are the ones that

 5  are defined as requirements; those are binding requirements

 6  because that's what compatible means, right?

 7  **A.**    That's right.

 8  **Q.**    Google not only publishes requirements for what it takes

 9  to be compatible, but it discourages OEMs, phone manufacturers,

10  from even changing the code in Android, correct?

11  **A.**    We discourage them from making changes to the code that

12  would introduce bugs.  But there's no requirement that they not

13  change the code.

14  **Q.**    But there are requirements that they cannot change certain

15  things, in order to be compatible, correct?

16  **A.**    Uhm --

17  **Q.**    That was poorly phrased.

18  **A.**    That they comply with certain clauses, yes.  I don't know

19  what you mean here by "certain things."

20  **Q.**    Fair enough.  If you turn to Exhibit 749, to page 4 --

21  **A.**    Uh-huh.

22  **Q.**    There's a Section 3.1.

23  **A.**    Yes, I see it.

24  **Q.**    "Manage API Compatibility," correct?

25  **A.**    Yes.

1  Q.   And this is one of the requirements, correct?

2  A.   Yes, this is one of the requirements.

3  Q.   And what the document states is, "Device

4  implementations" -- and device implementations means the

5  version of Android that is installed on the OEM's phone,

6  correct?

7  A.   That's right.

8  Q.   (As read)

9           "Device implementations must not omit any

10          managed APIs, alter API interfaces or

11          signatures, deviate from the documented

12          behavior, or provide no-ops, except where

13          specifically allowed by this compatibility

14          definition."

15          Is that right?

16  A.   That's right.

17  Q.   That is a requirement, right?

18  A.   That is a requirement.

19  Q.   So to be a compatible Android device, that device must

20  satisfy this section -- requirement of Section 3.1?

21  A.   That's correct.

22  Q.   If you'd turn, please, to Section 3.6, which is on page 8.

23          All right.  And starting with the second sentence, it

24  says, "To ensure."

25          "To ensure compatibility with third-party

```
 1                applications, device implementers" --
 2                Now, device implementers, those are the OEMs, again
 3    correct?
 4    A.    That's correct.
 5    Q.    (As read)
 6                "Device implementers MUST NOT make any
 7                prohibited modifications - see below - to
 8                these package namespaces."
 9                So this is a requirement, again, right?
10    A.    That's correct.
11    Q.    "Must not" is all in capital letters; isn't it?
12    A.    (Nods head.)
13    Q.    And the package namespaces, that cannot be changed include
14    "java" and "javax," correct?
15    A.    Yes, those are included.
16    Q.    All right.  And then the prohibited modifications include:
17                "Device implementations must not modify the
18                publicly-exposed APIs on the Android platform
19                by changing any method or class signatures,
20                or by removing classes or class fields."
21                Correct?
22    A.    That's also correct.
23    Q.    That's also a requirement to be compatible, correct?
24    A.    That is also a requirement.
25    Q.    Now, Google not only has these specified requirements,
```

1   Google also has the compatibility test suite, correct?

2   **A.**    That's correct.

3   **Q.**    And so Google not only tells device manufacturers that you

4   must comply with the requirements in the Compatibility

5   Definition Document, it also has its own test to ensure that

6   OEMs are actually following those requirements; is that right?

7   **A.**    Uhm, not all requirements are testable in that manner,

8   but, yes, the CTS tests as many of them as possible.

9   **Q.**    So we have two levels then.  We have a set of

10  requirements, and we have a test that covers as many as

11  possible of the requirements in the Compatibility Definition

12  Document, correct?

13  **A.**    Yes, that's correct.

14  **Q.**    And the test, that's the Compatibility Test Suite, right?

15  **A.**    Yes, that's correct.

16  **Q.**    And one of the things that the compatibility test suite

17  tests is the presence of the APIs; is that right?

18  **A.**    The presence of the listed APIs, yes.

19  **Q.**    The list of APIs are the ones on Trial Exhibit 51, that we

20  discussed near the start of your testimony.  Is that right?

21  **A.**    Yes, that's correct.

22  **Q.**    Now, Google has something called the Android Market; is

23  that right?

24  **A.**    That's correct.

25  **Q.**    And the Android Market -- well, why don't you just tell

1  us, what is the Android Market?

2  **A.**    Uhm, the Android Market, which is now known as Google Play

3  relatively recently, but the Android Market is a store

4  application available on an Android device, that allows users

5  to get applications to run on their Android devices.

6  **Q.**    Now, if an OEM wants the phone that they put out in the

7  world to be able to access that Android market, they must be

8  certified compatible, correct?

9  **A.**    Uhm, I'm not entirely sure on the business side of this,

10  but what I know is that a device must be compatible as a

11  prerequisite to request access to Android Market.

12  **Q.**    So in order to request access to Android Market, the

13  device first must be compatible?

14  **A.**    That's correct.

15  **Q.**    And so in order for an OEM to be able to tell people who

16  buy this phone that you will be able to get the applications

17  available through the Android Market, first they must be

18  certified compatible?

19  **A.**    We don't have a certification program but, yes, they must

20  comply with the Compatibility Definition Document.

21  **Q.**    In order to use the Android brand, they must pass the

22  Compatibility Test Suite and satisfy the definitions, the

23  requirements in the Compatibility Definition Document, correct?

24  **A.**    My understanding is that the trademark is handled the same

25  way as access to Android Market is.

MORRILL - DIRECT EXAMINATION / NORTON          1016

```
 1   Q.   All right.  And Google actually prevents incompatible
 2   implementations of Android from getting access to the Android
 3   Market, correct?
 4   A.   That, I actually don't know.  I'm not sure if we've ever
 5   made exceptions to that.
 6   Q.   Now, there are a number of large companies that make
 7   Android phones; is that right?
 8   A.   Uhm, there's a number of companies.  I don't know if you
 9   call it "large" but, yeah.
10   Q.   Well, Motorola is one of those companies, correct?
11   A.   Motorola is one.
12   Q.   And Motorola makes Android-compliant smart phones?
13   A.   They make Android-compatible smart phones, yeah.
14   Q.   And Samsung makes Android-compatible smart phones,
15   correct?
16   A.   That's correct.
17   Q.   And HTC makes Android-compatible smart phones, correct?
18   A.   Also correct.
19   Q.   And LG makes Android-compatible smart phones, correct?
20   A.   Also correct.
21   Q.   And each of those Android-compatible smart phones from
22   Motorola, from Samsung, from HTC, and from LG, those all have
23   the Android brand, correct?
24   A.   Yeah.  My understanding is that at least one does from
25   each, yeah.
```

1  Q.   Are you aware of any incompatible devices offered by any

2  of those manufacturers?

3  A.   No, I'm not specifically aware of any.

4  Q.   And do you know the number of Android activations,

5  compatible Android activations, how many devices are activated

6  each day?

7  A.   It's been some time since I've looked at the statistics

8  for that, but I believe it's something on the order of -- the

9  last I looked as of about a month or two ago -- something --

10 about 750,000 per day, on average.

11 Q.   750,000 Android-compatible devices every single day?

12 A.   The last time that I checked stats, yes.

13 Q.   Since every one of those devices is Android compatible,

14 every one of those devices has the Java APIs that are listed on

15 Exhibit 51, correct?

16 A.   It has implementations of those APIs, yes.

17           MR. NORTON:  Nothing further.

18           THE COURT:  All right.  Cross-examination.

19           Remind the jury your name.

20           MR. KWUN:  Michael Kwun for Google.

21           THE COURT:  Great.  The floor is yours.

22                      CROSS EXAMINATION

23 BY MR. KWUN:

24 Q.   Mr. Morrill, can you tell the jury a little bit about your

25 educational background.

1  **A.**    Sure.  I have a bachelor's degree in physics and computer

2  science from Clarkson University.  And I have a master's degree

3  in computer science from Western Polytechnic Institute.

4  **Q.**    And are you familiar with the Java programming language?

5  **A.**    Yeah.

6  **Q.**    When did you first learn to program in the Java language?

7  **A.**    First learned as an undergraduate, I believe in the -- my

8  last two years of college, which I think would have been

9  '97-'98.

10 **Q.**    How did you learn to program in the Java language?

11 **A.**    I found a online tutorial like a web page that kind of

12 taught you how to program.  So I sort of self-taught myself

13 from a website.

14 **Q.**    And did that tutorial include any instruction about the

15 Java APIs?

16 **A.**    Yeah, definitely.

17 **Q.**    And in your experience -- so how many years have you been

18 programming in Java?

19 **A.**    Off and on, probably about 10 to 12, I guess.

20 **Q.**    And in your 10 to 12 years of programming in the Java

21 programming language, have you ever written a Java program that

22 didn't use the Java APIs?

23 **A.**    Uhm, no.

24 **Q.**    You testified a little bit about compatibility and in

25 particular about the Compatibility Definition Document and the

```
 1   Compatibility Test Suite.
 2           If somebody wants to use the Android code, are they
 3   required to be -- to pass a Compatibility Test Suite?
 4   A.   Certainly not.
 5   Q.   Are they required to comply with the Compatibility
 6   Definition Document?
 7   A.   No.
 8   Q.   So they can use the Android code without doing either of
 9   those things?
10   A.   That's right.  They can use the Android code whatever they
11   want.
12   Q.   So why then do people comply with the Compatibility
13   Definition Document?
14   A.   Because it's to everyone's advantage to have, you know,
15   what we would call in the industry is like a thriving
16   ecosystem.
17   Q.   And are you aware of companies that use the Android code
18   without having passed the Compatibility Test Suite or complying
19   with the Compatibility Definition Document?
20   A.   I am.
21   Q.   Can you give us some examples?
22   A.   Yeah I can think of two.  Barnes & Noble has a product
23   called a Nook, which at least one model runs the Android
24   software.  And Amazon has a product called the Kindle Fire,
25   which also runs a version of the Android software.
```

1  Q.   And for the jury's benefit, what is the Nook?

2  A.   The Nook is an E-book reader.  It's about this big

3  (indicating) and you can pick books on it and read books on it.

4  Q.   And what is the Kindle Fire?

5  A.   A Kindle Fire is also an E-book reader but is also a

6  tablet computer.

7  Q.   So if somebody passes the CTS -- well, first of all, you

8  said that Google doesn't have a certification program.  What

9  did you mean by that?

10  A.   I just mean that it's possible for an OEM to achieve

11  compatibility regardless of whether they get any kind of

12  official rubber stamp or anything like that from Google.

13  Q.   And when they pass the CTS, is that something they do,

14  that they test for, or something that Google tests for?

15  A.   It's something that the OEMs run on their own devices.

16  Q.   So they self-report certification -- or self-report

17  compatibility, I should say?

18  A.   Yes, exactly.

19  Q.   Okay.  And if a partner passed the CTS, based on that do

20  you know whether or not the partner has changed any Android

21  code?

22  A.   You could usually or at least frequently tell, but you

23  can't necessarily be sure.

24  Q.   So you can usually tell that they have changed the code or

25  haven't changed the code?

1   **A.**   You can usually tell that they have altered the code.

2   **Q.**   Is there any way, based on the results of the CTS, that

3   you could determine that they haven't changed the code?

4   **A.**   Is there a -- just make sure I understand the question

5   you're asking.  Is there a way to make sure that -- can the CTS

6   be used to determine if they have not changed the code?

7   **Q.**   Correct.

8   **A.**   No.

9   **Q.**   Okay.  So, and then -- but you said you can only tell that

10  they have changed the code?

11  **A.**   Yes.

12  **Q.**   How can you tell that?

13  **A.**   Like, I think two ways.  If you pick up a phone for many

14  OEMs, many of us like to customize the user interface.  We'll

15  make it look different, change colors and so on.  To do that,

16  that requires that they have made customizations to the Android

17  source code.

18          So if you pick up a device and it doesn't look like

19  what we call the stock or, you know, original version of

20  Android, you know that they must have made some kind of a code

21  change to it.

22          Similarly, occasionally we will see an OEM ship a

23  device on a new, you know, CPU chip or something like that that

24  Google has never interacted with or seen before and when that

25  happens they, obviously, had to do changes to the code in order

1  to make their -- the software run on this new kind of hardware.

2  Q.   And you testified a moment ago that Android does not

3  support Java applications.  So does Android support

4  applications that are written in the Java language?

5  A.   Yes, that's correct.

6  Q.   So what did you mean when you said it does not support

7  Java applications?

8  A.   "Java" is kind of a big and almost vague term in a way.

9  As an engineer, it's one of those things that it means

10  something to us in kind of a subtle way.  And it's sort of like

11  if you go outside and look at a car, everybody knows what a car

12  looks like.  You know, it might have, you know, some wheels are

13  bigger than others or, you know, some might have a steering

14  while on the right-hand side if you are in the UK, but it's

15  still a car and you know a car when you see it.

16          In a way that's sort of how engineers think of Java.

17  You know, it's the whole laundry list of things.  Like, does it

18  run Java virtual machine?  Does it run Java bytecode?  There's,

19  like, a whole list of things.

20  Q.   So, again, what language do people typically use when they

21  write programs for the Android, for the -- for Android, the

22  Android platform?

23  A.   They typically use the Java programming language.

24          MR. KWUN:  May I approach the witness, your Honor?

25          THE COURT:  You may.

```
 1                  (Whereupon, document was tendered

 2                   to the witness.)

 3   BY MR. KWUN:

 4   Q.   I have handed you what's been marked as Trial Exhibit

 5   2301.  And do you recognize this document?

 6   A.   Yes.  This appears to be a printout of a particular page

 7   on our source.entry.com website.

 8           MR. KWUN:  Offer into evidence, your Honor.

 9           MR. NORTON:  No objection.

10           THE COURT:  2301 is received.

11           (Trial Exhibit 2301 received

12            in evidence)

13   BY MR. KWUN:

14   Q.   Mr. Morrill, can you could turn to Page 4 of Exhibit 2301?

15   You see there is a heading in there that says "Compatibility.

16   What does 'compatibility' mean?"

17   A.   I see that.

18   Q.   Okay.  And then a little further down you see -- just a

19   second.

20           Actually, if you turn to Page 5.

21   A.   Five, okay.

22   Q.   You see where it says right at the top:  "Is compatibility

23   mandatory?"

24   A.   Yes, I do see that.

25   Q.   Can you read the paragraph underneath that?
```

```
 1   A.   Sure.  Quote:
 2             "No.  The Android compatibility program is
 3             optional.  Since the Android source code is
 4             open, anyone can use it to build any kind of
 5             device.  However, if a manufacturer wishes to
 6             use the Android name with their product or
 7             wants access to Android Market, they must
 8             first demonstrate that the device is
 9             compatible."  Unquote.
10   Q.   Then is that basically what you were talking about before
11   in your earlier testimony?
12   A.   Yes, exactly so.
13   Q.   Mr. Morrill, how long have you been on the Android team?
14   A.   Formally since about mid-2009 and closely working with
15   them since 2007.
16   Q.   And so in your informal role working with them since 2007,
17   you were working with the Android team when the -- when Google
18   originally announced, publicly announced Android; is that
19   correct?
20   A.   Oh, yes.  Definitely.
21   Q.   And when did Google publicly announce Android?
22   A.   We announced Android on November 5th, 2007.
23   Q.   And do you remember reading any responses to that
24   announcement from Sun?
25             MR. NORTON:  Objection.  Beyond the scope.
```

Case 3:10-cv-03561-WHA  Document 967  Filed 04/24/12  Page 122 of 230

1          **MR. KWUN:**  Your Honor, it's just one or two

2    questions.

3          **THE COURT:**  All right.  You're allowed -- does this

4    mean you're not going to call him back in your case?

5          **MR. KWUN:**  Yes, your Honor.

6          **THE COURT:**  I will allow you to do that, but I'm not

7    necessarily saying that this is without prejudice to objection

8    to specific questions.

9          But, all right.  Go ahead.

10   **BY MR. KWUN:**

11   **Q.**  So, Mr. Morrill, do you remember hearing any responses out

12   of Sun or learning about any responses out of Sun in response

13   to the public announcement of Android?

14   **A.**  Yeah.  In fact, there was a blog post by the CEO that

15   was -- that we thought was pretty remarkable.

16         **MR. KWUN:**  May I approach the witness, your Honor?

17         **THE COURT:**  Yes.

18         (Whereupon, document was tendered

19          to the witness.)

20   **BY MR. KWUN:**

21   **Q.**  I have handed you Trial Exhibit 2352.  Is this the blog

22   post that you're talking about?

23   **A.**  Yes, it is.

24   **Q.**  And you read this blog post in early November, 2007?

25   **A.**  Yes, I did.

 1  Q.    Where did you -- where was this blog post?

 2  A.    This was posted to Sun's website.

 3        MR. KWUN:  Your Honor, I offer 2352 into evidence.

 4        MR. NORTON:  Objection.

 5        THE COURT:  Objection is?

 6        MR. NORTON:  403, and 401 and 402.

 7        THE COURT:  Those objections are overruled.

 8  Received.  What's the number?

 9        MR. KWUN:  2352.

10        THE COURT:  All right.  Received in evidence.

11        (Trial Exhibit 2352 received

12          in evidence)

13  BY MR. KWUN:

14  Q.    Who was the author of this blog post?

15  A.    The author of this blog post was Jonathan Schwartz.

16  Q.    I think you just said this, but just to be sure, what was

17  his role at Sun at the time?

18  A.    He was the CEO of Sun.

19  Q.    Okay.  Can you read the first two paragraphs of this blog

20  post?

21  A.    Sure.  Title is "Congratulations Google, Red Hat and the

22  Java Community."

23        And then the text reads:

24        "I just wanted to add my voice to the chorus

25        of others from Sun in offering my heartfelt

1          congratulations to Google on the announcement

2          of their new Java/Linux phone platform,

3          Android.  Congratulations."

4          "I'd also like Sun to be the first platform

5          software company to commit to a complete

6          developer environment around the platform as

7          we throw Sun's NetBeans developer platform

8          for mobile devices behind the effort.  You've

9          obviously done a ton of work to support

10         developers on all Java-based platforms and we

11         are pleased to add Google's Android to the

12         list."  End Quote.

13         That's the first two paragraphs.  Did you want me to

14  read more?

15  **Q.**   Could you read the fourth paragraph?  And if you could

16  read a little slower for the benefit of the reporter, that

17  would be great.

18  **A.**   Of course.  Sorry.

19         Fourth.  Quote:

20         "And needless to say, Google and the Open

21         Handset Alliance just strapped another set of

22         rockets to the communities' momentum - and to

23         the vision defining opportunity across ours

24         (and other) planets."

25  **Q.**   So you said this was -- you thought this was a rather

1   remarkable blog post a moment ago.  Why did you think it was

2   remarkable?

3   **A.**   Well, internally the team, we were not privy to the

4   details, but we knew there had been some kind of interaction

5   with Sun around Android.

6           But what particularly struck us was that even though,

7   you know, that was the context, that we still have the CEO of

8   Sun offering congratulations.  And what I, myself, found

9   particularly interesting was more than that, this actual

10  commitment of engineering resources in regards to this NetBeans

11  product.

12  **Q.**   So you're talking about the second paragraph of the blog

13  post there when you say NetBeans?

14  **A.**   Yes, exactly.

15  **Q.**   What is NetBeans?

16  **A.**   NetBeans is what we call an integrated development

17  environment, which is just a -- it's an engineering tool that's

18  kind of the main piece of software that we used to write

19  applications.

20  **Q.**   So when Sun said that they were going to throw NetBeans --

21  the NetBean developer platform for mobile devices behind the

22  effort, that meant that they were supporting?

23          **MR. NORTON:**  Objection.

24  **BY MR. KWUN:**

25  **Q.**   That meant that they were supporting Android?

 1              THE COURT:  The objection is?

 2              MR. NORTON:  Foundation.  Being asked to interpret

 3   what the document meant.

 4              THE COURT:  That's true.  Sustained.

 5   BY MR. KWUN:

 6   Q.   What did you understand that to mean?

 7              MR. NORTON:  Objection.  Relevance, plus 401 and 402.

 8              THE COURT:  Sustained.  We're just calling for a

 9   speech.  This is just a speech.

10              No.  Next question.

11   BY MR. KWUN:

12   Q.   And this blog post, did you discuss this blog post with

13   other members of the Android team?

14              MR. NORTON:  Objection, hearsay.

15              THE COURT:  Sustained.

16              MR. NORTON:  Your Honor, we're well beyond the two or

17   three questions we were promised.

18              THE COURT:  I know.  On my fingers I can count up to

19   10, and we're past 10, and you said two or three.

20              MR. KWUN:  I'm sorry, your Honor.  No more questions.

21              MR. VAN NEST:  Your Honor, may I interpose and

22   request a brief sidebar with the court before this witness

23   leaves?

24              THE COURT:  Sure.

25

1              (Whereupon, the following proceedings

2               were held at side bar.)

3         **THE COURT:**  Go ahead.

4         **MR. VAN NEST:**  The plaintiff has made a big deal out

5    of claiming that Google could not show any reliance on the

6    statements by Mr. Schwartz.

7              Now, we have a number of witnesses who are going to

8    testify that they read it.  They saw it.  They discussed it and

9    they understood various things from it.  And that's the only

10   way I think that we could establish reliance.

11             Reliance is not an element of all our equitable

12   defenses, but it is of some.  And unless we have a little

13   latitude -- we don't need much with this witness, but unless we

14   have a little latitude to allow him to discuss what he read,

15   how he understood it --

16        **THE COURT:**  What's he going to say?  Has he even said

17   that he himself relied on it?

18        **MR. VAN NEST:**  He hasn't yet.

19        **THE COURT:**  No.

20        **MR. VAN NEST:**  Because you haven't allowed -- what

21   he's going to testify to, I believe, is that he read it.  He

22   understood it as an endorsement.  He already said that; that he

23   was impressed that they were going to put engineering resources

24   behind it.

25             He discussed it with others at Google, others in the

1   engineering department, and that his understanding of it was

2   that Sun had approved Android based on statements by the CEO.

3            Now, Michael, is he going to say anything more than

4   that?

5            MR. KWUN:  That's about it.

6            MR. VAN NEST:  So unless I can, unless we have some

7   way of proving that --

8            THE COURT:  Well, what was his decision making

9   authority in this project?

10           MR. VAN NEST:  Michael?

11           MR. KWUN:  He was responsible for the compatibility

12  testing suite and the compatibility definition document.

13           MR. NORTON:  Not at that time.

14           THE COURT:  Well, I think you could ask him this

15  question:  What, if any, influence did this announcement have

16  on your personal course of action in either seeking or not

17  seeking a license from Oracle, or in that case Sun?

18           MR. VAN NEST:  Sun.

19           THE COURT:  Now, probably he will answer he had

20  nothing to do with licensing.  I don't know.  Did he?

21           MR. VAN NEST:  I think that --

22           THE COURT:  But he can -- if he had something to do

23  with licensing and can say, "Based on this, I decided not to

24  seek a license, I thought it was cool with Sun," okay, I can

25  see that.  But the mere fact that people are talking about it

 1   in the hallways, that's not proof of reliance.

 2            There could have been somebody in the legal

 3   department knew good and well that they needed a license or

 4   not.  I don't know.  But that's -- if you're going to try to

 5   prove up reliance just that they are talking about it in the

 6   hallways, that doesn't prove much.

 7            **MR. VAN NEST:**  Well, your Honor, I don't disagree,

 8   but I don't think it can be limited just to those people with

 9   decision making authority.

10            For example, there will be witnesses to say this was

11   known to us.  It was discussed with me.  They may or may not

12   have actually read the blog post, but became aware of it

13   through discussion at Google and relied on it.

14            Now, it's --

15            **THE COURT:**  How -- he can't say they relied on it.

16            **MR. VAN NEST:**  Mr. Morrill is not involved in

17   licensing, but I ought to at least be able to establish that he

18   read it and discussed it with others at Google, within Google,

19   to lay the foundation for other witnesses who will say, "Yeah,

20   we were aware of it.  It was a big topic of discussion and I

21   relied on it in this way."

22            **MR. NORTON:**  Your Honor, the foundation for testimony

23   from other witnesses comes in through those other witnesses

24   with respect to their knowledge and their decision making.  Mr.

25   Morrill can't testify as to what those other witnesses knew,

1   nor what they decided to do, nor what they relied on.

2          **THE COURT:**  They could testify that they knew about

3   it through hallway discussions.

4          **MR. VAN NEST:**  Yes.

5          **MR. NORTON:**  That is not -- excuse me.

6          **THE COURT:**  That's not hearsay.  That would be -- you

7   know, he can testify firsthand as to what he, himself, said or

8   what others said, not their -- not the other people's reliance

9   or reactions.  I could see that distinction being wrong.

10          **MR. VAN NEST:**  That's all we're trying to elicit from

11   this witness.

12          **MR. NORTON:**  Your Honor, it's still hearsay.

13          **THE COURT:**  It wouldn't be hearsay for that limited

14   purpose.

15          **MR. NORTON:**  If I may?

16          Do I understand the limited purpose of the testimony

17   is -- I'm afraid I do not understand.

18          **THE COURT:**  Here is the one question I will allow you

19   to ask, even though you're way beyond two or three.

20          You've got to be honest with me when you tell me -- I

21   would have made you bring this witness back in your case if I

22   had known it was going to be 10 questions.

23          All right.  Here is the question you can ask:  Did

24   you specifically discuss this blog with other people at Google?

25   "Yes" or "no."  That's it.  And he can't say what they said to

1    him in response.  He can't say they relied.  If he starts doing

2    that, I'm going to interrupt him and instruct the jury to

3    disregard what he said.

4           So be careful and don't try to slip something in

5    there.  That's all he can do.  Was it discussed?  Did you,

6    yourself, participate in discussions with other people on this

7    subject?

8           **MR. NORTON:**  Your Honor, I understand the ruling.  I

9    do want to note that we certainly -- we served the

10   interrogatory.  We asked for all the bases for their

11   affirmative defenses and reliance on this blog post by anyone.

12   This was never disclosed as one of the bases.  And if your

13   Honor is going to allow this testimony --

14          **THE COURT:**  This is coming too late for me.  That's

15   an objection that I might have listened to earlier, but it's

16   too late now.

17          All right.  That's the ruling.

18          **MR. VAN NEST:**  We understand it, your Honor.  Thank

19   you.

20          **MR. NORTON:**  Thank you.

21          (Whereupon, the following proceedings were

22           held in open court, in the presence and

23           hearing of the jury.)

24   **BY MR. KWUN:**

25   **Q.**   Mr. Morrill, referring to this blog post, did you,

 1  yourself, personally discuss this blog post with others on the

 2  Android team?

 3          And I just want to know whether you did discuss it,

 4  not what the discussions were.

 5          **THE COURT:**  "Yes" or "no."  Go ahead.

 6  **A.**   Yes.

 7  **BY MR. KWUN:**

 8  **Q.**   Thank you.  No further questions.

 9          **THE COURT:**  All right.  Thank you.

10                  <u>**REDIRECT EXAMINATION**</u>

11  **BY MR. NORTON:**

12  **Q.**   Mr. Morrill, you testified that there are about 750,000

13  Android compatible devices activated every day, correct?

14  **A.**   Yes.

15  **Q.**   And that number does not include the additional devices,

16  like the Kindle Fire and the Barnes and Noble E-Book reader

17  that you described as not defined as compatible, correct?

18  **A.**   That's correct.

19  **Q.**   So the number of devices that are out there that are --

20  actually include the Java packages that are listed on

21  Exhibit 51 is even more than 750,000 activated every day,

22  correct?

23          **MR. KWUN:**  Objection, foundation.

24          **THE COURT:**  Do you know the answer?

25          **THE WITNESS:**  No.

BY MR. NORTON:

Q.   Now, Mr. Kwun showed you Exhibit 2352.

A.   He did.

Q.   Have you ever seen a license agreement before?

A.   I'm sorry.  Say again?

Q.   Have you ever seen a license agreement before?

A.   License agreement?  In what sense, for --

Q.   In any sense.

A.   I'm pretty familiar with copyright license agreements for OEM source software, sure.

Q.   Exhibit 2352.  Is that a license agreement or a blog post?

          MR. KWUN:  Objection.  Calls for a legal conclusion.

          THE COURT:  It's argument.  It's okay to argue, but you've got to wait for the closing argument.  This isn't argument.

          MR. NORTON:  Fair enough.  Thank you, your Honor.

          May I approach the witness?

BY MR. NORTON:

Q.   I'm going to hand the witness Exhibit 245.

               (Whereupon, document was tendered

                to the witness.)

Q.   Mr. Morrill, is this an email that you sent on May 23rd, 2008?

A.   Yes.

Q.   And you sent it to Justin Mattson, is that right?

 1  **A.**    That's correct.

 2  **Q.**    And you sent it to a distribution called Advocates, is

 3  that right?

 4  **A.**    That's correct.

 5  **Q.**    And that's a distribution of people who work for Google?

 6  **A.**    Yes.

 7  **Q.**    And you sent it to a distribution called AndroidPR.

 8  That's another group of people that work at Google, correct?

 9  **A.**    That's correct.

10  **Q.**    This is an email that you sent from your work address?

11  **A.**    I assumed so.

12          **MR. NORTON:**  We offer Exhibit 245.

13          **MR. KWUN:**  Objection, your Honor.  The exhibit was

14  never disclosed to him.

15          **MR. NORTON:**  It is offered in response to the door

16  opening with Exhibit 2352.

17          **THE COURT:**  Is 2352 listed here?

18          **MR. NORTON:**  The defendant disclosed Exhibit 2352.

19  We did not.

20          In response to their questions, I would like to

21  examine Mr. Morrill on the statements that appear in Exhibit

22  245, defendants having opened the door.

23          **MR. KWUN:**  Your Honor, this is a May 2008 email

24  that -- 2352 is a blog post from November of 2007.

25          **MR. NORTON:**  I can connect them.

```
 1              THE COURT:  Go ahead.  I will let you use --
 2              MR. NORTON:  I can direct your Honor --
 3              THE COURT:  Was he at Google when he made this
 4  document?
 5  BY MR. NORTON:
 6  Q.  Mr. Morrill, you were a Google employee on May 23rd, 2008,
 7  were you not?
 8  A.  I was.
 9  Q.  And you were working on Android at that time, correct?
10  A.  I would not have been formally on the team, but, yes, I
11  would have been working in my capacity as developer relations.
12              THE COURT:  I'm going to allow 245 in.  Go ahead.
13              (Trial Exhibit 245 received
14               in evidence)
15  BY MR. NORTON:
16  Q.  Mr. Morrill, if you would turn to -- let me just be quick.
17          This is an email that you sent, correct?  Correct,
18  Mr. Morrill?
19  A.  One moment.  Let me...
20  Q.  Let's just start at the first one, at the very top of the
21  page.
22  A.  Yes.  The block at the top is an email I sent.
23  Q.  And there is a whole chain of emails beneath that,
24  correct?
25  A.  Yes.  My email was a reply to several others.
```

1  Q.   And you -- when you sent this email on May 23rd, 2008, you

2  had all these emails in your in box, correct?

3  A.   Yes, that's correct.

4  Q.   Now, if we turn to the second page, you'll see that

5  there -- the email from the second page on is a news article

6  that appeared on CNET.com; do you see that?  About halfway down

7  the page?

8  A.   Uh-huh.

9  Q.   All right.  And then it says "May 22, 2008, 4:00 a.m.

10 PDT."  Do you see that?

11 A.   Yes.

12 Q.   And from there on the exhibit is this article that

13 appeared on CNET, correct?

14 A.   That's what it -- where it says it appeared, yes.

15 Q.   All right.  Great.

16      And then if you'd turn to Page 4, please.

17      (Witness complied.)

18 Q.   This is an article about Android, is it not?

19 A.   Yes, it is.

20 Q.   And you see about a little than less than halfway down the

21 page it says "Licensing Choices"?

22 A.   Yes, I see that.

23 Q.   All right.  And it states there:

24      "Google has been criticized for not working

25      with existing Open Source projects.  In

 1              addition, Sun Microsystems has expressed

 2              concern that Google's development of Dalvik

 3              could fragment the Java world so that that

 4              Java software for running Android

 5              applications wouldn't work on other Java

 6              phones and vice-versa."

 7              Do you see that?

 8   A.   I do see that.

 9   Q.   So you were aware on May 23rd, 2008 that Sun had expressed

10   concern that Android would fragment Java, correct?

11   A.   I wouldn't say that I was aware of that.

12   Q.   Did you or did you not have this email?

13   A.   I saw that it was a report in my in box, sure.

14   Q.   And you didn't just see it.  You emailed it around to a

15   couple of groups of employees at Google, right?

16   A.   I did not.  I was asked about it.

17   Q.   You forwarded the entire email string to the AndroidPR

18   group, did you not, Mr. Morrill?

19   A.   Yes, that's correct, I did.

20   Q.   The entire email, right?

21   A.   Yes.

22   Q.   Including the article?

23   A.   Uh-huh.

24   Q.   That said Sun is concerned in May 2008 that Android is

25   fragmenting Java, correct?

1   **A.**   I forwarded an email that included that line, yes.

2   **Q.**   Now, when you were shown Exhibit 2352, the date on that is

3   November 5, 2007, is that right?

4   **A.**   I'm sorry.  Say again?

5   **Q.**   Exhibit 2352, do you still have it in front of you?

6   **A.**   Yes.

7   **Q.**   The date on that is what?

8   **A.**   5 November of 2007.

9   **Q.**   5 November, 2007.

10          Now, on that day had Google already written most of

11  the Android platform?

12  **A.**   I don't know actually.  I'm not sure how much of the code

13  got rewritten after that point.

14  **Q.**   But on November 5, 2007 Google had not released the

15  Android SDK, had it?

16  **A.**   That's correct.  The SDK was released a week later.

17  **Q.**   A week later.  So on November 5, 2007 the world had not

18  yet seen the Android SDK, had not yet been released by Google,

19  correct?

20  **A.**   That's correct.

21  **Q.**   All right.  So when Mr. Schwartz wrote his blog post, the

22  SDK had not yet been released, is that right?

23  **A.**   That's correct.

24  **Q.**   But on May 31, 2008, by that time the SDK had been

25  released, correct?

1  **A.**    You said May 31?

2  **Q.**    2008.

3  **A.**    We're referring to an email dated May 23rd, are we not?

4  Am I looking at the right document?

5  **Q.**    Well, you tell me which document you're looking at.

6  **A.**    I'm sorry.  Say again?

7  **Q.**    Just so we're clear.  Mr. Kwun showed you an email dated

8  November 5, 2007.

9  **A.**    Yep.

10  **Q.**    All right.  And you called that an endorsement, right?

11  **A.**    Sure.

12  **Q.**    And that endorsement was made before the SDK had been

13  released, correct?

14  **A.**    That's correct.

15  **Q.**    All right.  And then I showed you -- I showed you

16  Exhibit 245, which showed that Sun expressed concern, correct?

17  **A.**    That somebody said Sun had expressed concern, yes.

18  **Q.**    And that document is dated May 31, 2008, right?

19  **A.**    No --

20  **Q.**    I'm sorry.  Now I understand.  May 23rd, 2008.

21  **A.**    Yes, exactly.

22  **Q.**    I apologize.

23          So May 23rd, 2008 is after the SDK was released,

24  correct?

25  **A.**    That's correct.

1  **Q.**   All right.  So after the SDK was released, you knew that

2  Sun had expressed concern that Android would fragment Java,

3  correct?

4  **A.**   I, again, don't remember.  I would not say that I knew.

5  **Q.**   But you had -- you were on notice from the email --

6  **A.**   Sun didn't tell me that they had concerns.  I just, you

7  know, had seen that other people had reported this.

8  **Q.**   Sure.  Well, you didn't have any conversations with Sun

9  about this at all, did you?

10  **A.**   That's correct.

11  **Q.**   Thank you.  No further questions.

12                       **RECROSS EXAMINATION**

13  **BY MR. KWUN:**

14  **Q.**   Mr. Morrill, looking at Exhibit 245.  When you -- with the

15  email that you wrote, what were you focused on?

16  **A.**   I had been, as I recall, or -- well, I don't really

17  remember this email, but just from the block of text at the

18  top, it looks like I had been specifically asked about a

19  specific claim made about lines of code in the Android source

20  tree.

21  **Q.**   Was your email discussing that statement in the CNET

22  article that you were asked about?

23  **A.**   No.  I was not addressing any of that.

24  **Q.**   And on May 23rd, 2008 what concerns, if any, did you have

25  about Sun's position with respect to Android?

1  A.   I'm sorry.  Repeat the question?

2  Q.   On May 23rd, 2008 what concerns, if any, did you have

3  about Sun's position with respect to fragmentation of Java?

4  A.   I didn't really have an opinion.

5          MR. KWUN:  No further questions.

6          MR. NORTON:  Very briefly, your Honor.

7              **FURTHER REDIRECT EXAMINATION**

8          MR. NORTON:  If we can stick with Exhibit 245?  And

9  stay on the first page, please.

10          (Document displayed)

11 BY MR. NORTON:

12 Q.   Mr. Kwun asked you what you were -- why you were writing

13 about this particular article, correct?

14 A.   I'm sorry.  Why I was writing --

15 Q.   Mr. Kwun asked you why you had forwarded -- what your

16 focus was --

17 A.   Yes, yes.

18 Q.   (Continuing) -- in forwarding this article?

19 A.   Correct.

20 Q.   All right.  And there was a quote attributed to you about

21 lines of code?

22 A.   Yes, that's correct.

23 Q.   Thank you.

24          And you believed you had been -- your quote had been

25 taken out of context, right?

1  A.   I have not read the whole thing, but --

2  Q.   Well, let's just stay on the first page.  There is an

3  email here from Mr. Rubin, right?

4  A.   Yes.

5  Q.   On the first page towards the bottom.

6       So Mr. Rubin also received this email, correct?

7  A.   Yes.

8  Q.   And Mr. Rubin said:

9       "I caught up with Dan at breakfast.  This

10      quote was taken out of context."

11      Right?

12 A.   Yes.  It says that.

13 Q.   And "this quote" refers to your statement about lines of

14 code?

15 A.   Without reading the document, I don't know what it refers

16 to.

17 Q.   All right.

18 A.   I mean, there were a number of quotes in the original

19 article.

20 Q.   Is it fair to say that if you were quoted in an article

21 published on CNET and it got the attention of Mr. Rubin that

22 you had been quoted incorrectly, that you would have read the

23 whole article to make sure that any other statements that are

24 attributed to you or anyone else were right?

25       MR. KWUN:  Objection.  Calls for speculation.

 1           THE COURT:  Would it have been your normal practice

 2   in these circumstances to have read the whole article?  You can

 3   either say "yes" or "no."

 4           THE WITNESS:  Yes.

 5           THE COURT:  End of story.  Let's stop.

 6           MR. NORTON:  Nothing further.  Thank you.

 7           THE COURT:  All right.  We're going to excuse this

 8   witness unless somebody -- you said we're not calling him back?

 9           MR. KWUN:  That's right, your Honor.

10           THE COURT:  Can this witness be excused?

11           MR. NORTON:  Yes, your Honor.

12           THE COURT:  You are excused for good.  You don't have

13   to come back.

14           THE WITNESS:  Thank you.

15           (Witness excused.)

16           THE COURT:  Go to the next witness and go about 20

17   minutes before the next break.

18           Next witness.

19           MR. NORTON:  We will play the videotaped deposition

20   of Rafael Camargo.

21           THE COURT:  How long will it about?

22           MR. NORTON:  I understand it's a 20-minute clip --

23   I'm sorry.  I understand it's much shorter now.  It's eight

24   minutes.

25           THE COURT:  Is it teed up and ready to go?

 1          **MR. JACOBS:**  I'm sorry.  Before we start, there is

 2   one exhibit in the deposition, your Honor, and it's already

 3   been admitted.

 4          **THE COURT:**  Great.  So is it teed up and ready to go?

 5   Yes?

 6          **MR. JACOBS:**  Yes.

 7          **THE COURT:**  All right.  But one second.

 8          I need to say to the members of the public who are

 9   standing back there, I need to ask you to settle down.  If you

10   want to leave, you're welcome to leave, but let's not make a

11   distraction while the evidence is being presented.

12          So if anybody else wants to get up and go, now is the

13   time to do it.

14          (Brief pause.)

15          **THE COURT:**  Thank you.

16          I want to also say, I appreciate the members of the

17   press getting those key boards that don't make noise.  That's

18   been a big improvement.

19          All right.  Roll the tape.

20   **WHEREUPON:**

21                          **RAFAEL CAMARGO**,

22   called as a witness for the Plaintiff herein, testified via

23   videotaped deposition played in open court in the presence and

24   hearing of the jury, not reporter by the court reporter.

25          (Time noted:  10:59 a.m.)

RAFAEL CAMARGO - VIDEOTAPED DEPOSITION          1048

1          **MR. JACOBS:**  That concludes the testimony of

2   Mr. Camargo.

3          **THE COURT:**  All right.  How long will the next

4   witness be?

5          **MR. NORTON:**  Next witness will be Dr. Mitchell, your

6   Honor.  He will be our expert, and so we --

7          **THE COURT:**  Well, this would be a good point to break

8   then.  15 minutes.  Please remember the admonition.

9          **THE CLERK:**  All rise.

10          (Jury exits courtroom at 11:08 a.m.)

11          **THE COURT:**  Be seated.

12          **MR. JACOBS:**  Your Honor, I apologize.  Our next

13   witness will be Mr. Cizek.

14          **THE COURT:**  Mister who?

15          **MR. JACOBS:**  Mr. Cizek, C-I-Z-E-K.

16          **THE COURT:**  How long will he be?

17          **MR. NORTON:**  The direct will be about 25 minutes.

18          **THE COURT:**  All right.  Mitchell, what is Mitchell

19   testifying about?

20          **MR. JACOBS:**  He's testifying about APIs and about

21   what he found on investigating APIs and source code in Android.

22          **THE COURT:**  We will take a 15-minute break ourselves.

23          (Whereupon there was a recess in the proceedings

24           from 11:09 a.m. until 11:25 a.m.)

25          **THE COURT:**  Please be seated.  Back to work.  All

PROCEEDINGS                                                    1049

 1   set?

 2           **MR. JACOBS:**  Your Honor, your deputy advised me that

 3   we had not moved the deposition designations into evidence.

 4           **THE COURT:**  You don't have to move the designations

 5   if it has already been played to the jury.  Designations don't

 6   go into the jury room, but it would be good for the clerk to

 7   have it as part of the record.

 8           **MR. JACOBS:**  Let's be clear that Exhibit 1064 is the

 9   designations of Rafael Camargo that have just been played.

10           **THE COURT:**  Just put it on Dawn's desk and that will

11   be for the Court of Appeals.

12           **MR. JACOBS:**  Thank you, your Honor.

13           (Attorney complied.)

14       **THE COURT:**  All right.  All ready to go now?

15       **MR. NORTON:**  Yes, your Honor.

16       **MR. PURCELL:**  Yes, your Honor.

17       **THE COURT:**  All right.  I will go collect the jury.

18           (Jury enters the courtroom at 11:26 a.m.)

19       **THE COURT:**  All right.  Welcome.  Be seated everyone,

20   except for the witness.

21           Mr. Norton, you may announce or call your next

22   witness.  Who will that be?

23       **MR. NORTON:**  We call Leo Cizek.

24       **THE COURT:**  How do you spell that?

25       **MR. NORTON:**  C-I-Z-E-K.

1          **THE COURT:**  Welcome, Mr. Cizek.  Please raise your

2  right hand.

3                          **LEO CIZEK**,

4  called as a witness for the Plaintiff herein, having been first

5  duly sworn, was examined and testified as follows:

6          **THE WITNESS:**  Yes, I do.

7          **THE COURT:**  Thank you.  Please be seated.

8          You need to sit this close to the microphone to make

9  it work.

10          **THE WITNESS:**  Is this good?

11          **THE COURT:**  Yes, and you can move it around.  You can

12  tilt it back.

13          Why don't you say your name?

14          **THE WITNESS:**  Leo Cizek.

15          **THE COURT:**  Perfect.  Go ahead, counsel.

16                        **DIRECT EXAMINATION**

17  BY MR. NORTON:

18  **Q.**  Good morning, Mr. Cizek.

19  **A.**  Good morning.

20  **Q.**  Where are you currently employed?

21  **A.**  Oracle America.

22  **Q.**  And how long have you been employed there?

23  **A.**  Since January, 2010 when Oracle acquired Sun Microsystems.

24  **Q.**  And prior to that date, where did you work?

25  **A.**  Sun Microsystems.

1   Q.   How long did you work at Sun?

2   A.   Since September, 2000.

3   Q.   All right.  Now, what do you do in your job at Oracle?

4   A.   Java technology and source code licensing.  It's basically

5   sales for the various versions of Java and that -- my title is

6   account manager.

7   Q.   To what extent, if at all, was your job different when you

8   were at Sun?

9   A.   Essentially the same.

10  Q.   And do you work with any particular type of customer in

11  your job in licensing sales?

12  A.   Two types primarily; device manufacturers, and what we

13  call value added providers who develop software, but then they

14  then resell to device manufacturers.

15  Q.   Now, have you ever met Andy Rubin?

16  A.   Yes.

17  Q.   When did you first meet Mr. Rubin?

18  A.   I probably met him late fall, 2001.

19  Q.   And what were the circumstances under which you met Mr.

20  Rubin?

21  A.   Well, we had talked by phone before we met, but I was

22  informed that he worked as CEO and co-founder of a company

23  called Danger, Inc. in Palo Alto and that they had done an

24  implementation of Java for the device they were -- had designed

25  and that they would need commercial use license and to achieve

 1  compatibility before they shipped their product commercially.

 2  **Q.**   Now, do you -- Mr. Rubin's role at Danger, do you know

 3  what that role was?

 4  **A.**   Well, he told me he was president -- at that time

 5  president and CEO and that he was one of the four co-founders.

 6            **MR. NORTON:**  May I approach the witness?

 7            **THE COURT:**  You may.

 8            (Whereupon, document was tendered

 9             to the witness.)

10  **BY MR. NORTON:**

11  **Q.**   I have handed the witness Exhibit 2016.

12            Mr. Cizek, do you recognize that document?

13  **A.**   Yes.

14  **Q.**   And who created this document?

15  **A.**   I did.

16  **Q.**   And what was the purpose for which you created it?

17  **A.**   Basically to summarize some written notes that I had taken

18  over the years to give a chronology of the major events that

19  happened from when I first made contact with Danger to when we

20  closed the licensing deal.

21  **Q.**   How do you use this form in your work, if at all?

22  **A.**   Well, I used the predecessor to this form, which also had

23  the handwritten notes on it.  I just used to keep track of

24  what's going on day-to-day.  The reason I summarize it is once

25  the deal is closed, just I think it makes sense to be able to

 1   recreate the history, go back and remind myself what happened

 2   as things change in the future.

 3            **MR. NORTON:**  We offer Exhibit 2016.

 4            **MS. ANDERSON:**  Objection, your Honor.  Relevance and

 5   403.  This relates to Danger, not to Google.

 6            **THE COURT:**  All right.  Those two objections are

 7   overruled.  What's the number?

 8            **MR. NORTON:**  2016.

 9            **THE COURT:**  2016.

10            Received in evidence.

11            (Trial Exhibit 2016 received

12             in evidence)

13            **MR. NORTON:**  Thank you, your Honor.

14   **BY MR. NORTON:**

15   **Q.**   Now, when you first spoke to Mr. Rubin at this time in

16   2001, what did you tell him?

17   **A.**   Well, I --

18            **MS. ANDERSON:**  Objection, your Honor, hearsay.

19            **THE COURT:**  Well, it depends on what it's being

20   offered for.

21            Is this being offered to prove up notice in a

22   transaction?

23            **MR. NORTON:**  Notice, knowledge, state of mind of the

24   person hearing the statement.

25            **MS. ANDERSON:**  Your Honor, if I may at this time,

 1   there was no Google representative involved in any of these

 2   communications.

 3            THE COURT:  Did Mr. Rubin later become part of

 4   Google?

 5            MS. ANDERSON:  He did later, your Honor, yes, but not

 6   at this time.

 7            THE COURT:  Well, this would go -- depending on how

 8   much weight the jury gives to the testimony, it would go to the

 9   information available to Mr. Rubin that would subsequently have

10   been known to him and possibly have influenced his decision

11   making.

12            So the testimony will be allowed.  The jury will be

13   told that this is -- you may consider this only for -- only for

14   the purpose, it's a limited purpose, of what information was

15   available to the people, if any, who heard the statement the

16   witness is about to testify to.

17            With that limitation, objection overruled.

18            MS. ANDERSON:  Thank you, your Honor.

19            THE COURT:  Please continue.

20   BY MR. NORTON:

21   Q.   The question was:  What did you tell Mr. Rubin when you

22   spoke to him in 2001?

23   A.   Well, I explained to him my role and that the reason I was

24   calling him was that I had been informed that they had done a

25   Java implementation and that there were a couple of

1  requirements that Sun Microsystems had for companies that

2  planned to commercially ship something that incorporated a

3  Java, Java technology.

4          One was that they achieve compatibility, and another

5  was that they enter into a commercial use license with Sun.

6  Q.   Now, how many times did you meet with Mr. Rubin while he

7  was at Danger?

8  A.   Six; six, seven, eight times, something like that.

9  Q.   And did anyone other than yourself from Sun participate in

10 those meetings?

11 A.   Yes, depending on the meeting.  I think Vineet Gupta was

12 with me at virtually all the meetings.  Also, Tim Lindholm and

13 one of the Sun attorneys called in a couple of times.

14 Q.   And at that time who was Mr. Lindholm's employer?

15 A.   Sun, Sun Microsystems.

16 Q.   And what was Mr. Lindholm's role, if any, in the

17 discussions with Danger about a Java license?

18 A.   His title at the time, if I remember correctly, was chief

19 technology officer for the client systems group at Sun.  And

20 the client systems group owned and managed the Java Micro

21 Edition technologies.

22          So Tim was -- because Danger had done something

23 fairly unique in their implementation of Java, we had Tim

24 consulting with us on -- and with them, on how to -- what would

25 be involved in terms of achieving compatibility.  So it was

1   primarily technical advice from Tim.

2   Q.   When did Danger release its implementation of its -- well,

3   I'm sorry.

4        Do you know what Danger called the device on which it

5   had a Java implementation?

6   A.   Once it was released, I learned that -- two names.  The

7   name Hiptop, which was the Danger branded name, and the name

8   Sidekick, which was the T-Mobile branded name.

9   Q.   And when did Danger release its Java implementation, the

10  Sidekick or Hiptop?

11  A.   I believe it was October, 2002.

12  Q.   And if we look at Exhibit 2016, towards the bottom of the

13  page there is a note October 1, 2002.  "Hiptop now available

14  via T-Mobile," under the name Cizek?

15  A.   Yes, I don't know if that was the exact date that it

16  became available.  Maybe that was a few days later that I read

17  a second article talking about the name Sidekick.  I don't

18  recall.

19  Q.   All right.  Now, when Danger released Sidekick, at that

20  time did Danger have a Java commercial use license from Sun?

21  A.   No.

22  Q.   Now, at that time had Danger taken any steps to resolve

23  Sun's concerns that the Sidekick was incompatible?

24  A.   Umm, other than having meetings with us and discussing

25  what would be involved, no.  I mean, they had not -- they had

1  not signed the agreement that would have given them access to

2  the Technology Compatibility Kit.  So there really wasn't much

3  they could do.

4  **Q.**   And the Technology Compatibility Kit, is that sometimes

5  called the TCK?

6  **A.**   Yes.  TCK is the acronym.

7  **Q.**   What was your reaction to learn that the Hiptop Sidekick

8  had been released in the fall of 2002?

9  **A.**   Well, I was surprised and disappointed and, also,

10 concerned that now there was a non-compatible Java

11 implementation on the market.

12 **Q.**   So subsequent to learning that Danger had released the

13 Sidekick, did you have any further meetings with Mr. Rubin?

14 **A.**   Yes.  The meeting that I -- there was a particular meeting

15 where the sole focus -- other than the previous meetings which

16 had been largely technical in nature, we had a meeting that

17 was -- the sole focus of which was the need for them to become

18 a licensee.

19 **Q.**   Where did that meeting take place?

20 **A.**   It was Danger's headquarters, which at that time were in

21 downtown Palo Alto.

22 **Q.**   And who attended from the Sun side at that meeting?

23 **A.**   Vineet Gupta and myself.

24 **Q.**   And who attended from the Danger side?

25 **A.**   There was Andy Rubin, an in-house counsel and an external

1  counsel as well.

2  Q.   Now, did you or Mr. Gupta express Sun's position on the

3  release of the Sidekick at that meeting?

4  A.   Yes.  Mr. Gupta explained that -- you know, what -- they

5  did not yet have the right to do what they had done, i.e.,

6  release that product commercially since they didn't have a

7  commercial use license since, number one, they hadn't achieved

8  compatibility; number two, they didn't have a commercial use

9  license.

10 Q.   And did Mr. Rubin have any response?

11       MS. ANDERSON:  Objection, your Honor, hearsay.

12       THE COURT:  Sustained.  We're getting into this for

13 purposes of the information made known to Mr. Rubin, not what

14 Mr. Rubin made known to others.

15       MR. NORTON:  Thank you, your Honor.

16 BY MR. NORTON:

17 Q.   To what extent, if any, did Mr. Gupta explain why it was

18 that Sun was of the view that Danger required a license?

19       MS. ANDERSON:  Your Honor, may I request the same

20 instruction to the jury on this issue as well?

21       THE COURT:  Yes.  It's all being offered solely to --

22 solely for you to consider what information was made known to

23 Mr. Rubin back in 2002.

24       Please answer the question.

25 A.   Well, during the discussion, at one point Mr. Gupta

1  noticed that there was a book on the table in front of him.

2  That subject of the particular was the particular Java

3  technology that they had implemented called CLDC.  It's part of

4  the Java Micro Edition.  And he opened it to the copyright page

5  and he pointed to the copyright Page which had the

6  specification license for CLDC, specification license

7  agreement.  And he said, "You know, it states right here that

8  if you want to ship a product commercially based on the

9  specification, then you need to contact Sun Microsystems and

10  license any compatibility tests or words -- TCKs that pertain

11  to that technology.

12  **Q.**  Now, after that meeting did Danger, in fact, enter into a

13  license agreement with Sun for Java technology?

14  **A.**  Yes.  Sometime later, but yes.

15          **MR. NORTON:**  May I approach?

16          **THE COURT:**  You may.

17          **MR. NORTON:**  Excuse me, your Honor.  One moment,

18  please.

19          (Brief pause.)

20  **BY MR. NORTON:**

21  **Q.**  At the time that Danger entered into a license with Sun

22  for Java technology, was Mr. Rubin still employed at Danger?

23  **A.**  Yes.  He had told me about a week before they signed the

24  agreement --

25          **MS. ANDERSON:**  Objection, your Honor.  Hearsay again.

1      **THE COURT:**  The question only asked you, "Was he

2  still employed?"  And you said, "Yes."  And that answers the

3  question.

4          Next question.

5      **MR. NORTON:**  Thank you.

6          May I approach?

7      **THE COURT:**  Yes.

8          (Whereupon, document was tendered

9            to the witness.)

10  **BY MR. NORTON:**

11  **Q.**   I handed the witness what was previously marked as Trial

12  Exhibit 1026.

13          Do you recognize that document, Mr. Cizek?

14  **A.**   Yes.

15  **Q.**   And what is it, please?

16  **A.**   It's an internal copy in the sense that part of the

17  material in it is for internal use only.  That is a copy of an

18  executed --

19      **MS. ANDERSON:**  Excuse me.  Excuse me, your Honor.  I

20  apologize for interrupting, but we do not reflect that this has

21  been admitted into evidence based on our list, 1026, as the one

22  that was disclosed to us for use with this witness.

23      **MR. NORTON:**  Correct.  It has not been published.

24  I'm trying to lay the on foundation for it to be moved into

25  evidence.

1          MS. ANDERSON:   My apologies.

2   BY MR. NORTON:

3   Q.   So do you recognize Defendant's Exhibit 1026?

4   A.   Yes.

5   Q.   And what do you recognize it to be?

6   A.   It's an internal document that includes an executed copy

7   of the Sun Community Source License, or SCSL, and including the

8   commercial license for Danger.

9          MR. NORTON:   We move the admission of 1026.

10          MS. ANDERSON:   We object on relevance, 403 and likely

11   to confuse the jury, particularly in this phase of this

12   litigation, your Honor.

13          THE COURT:   May I see the exhibit?

14          MR. NORTON:   Yes, your Honor.

15          (Whereupon, document was tendered

16           to the Court.)

17          (Brief pause.)

18          THE COURT:   Well, possibly counsel is correct.   So

19   we're not going to show this to the jury and it won't be

20   admitted just yet until we can have a further conversation out

21   of the presence of the jury.   So 1026 will be in limbo for

22   awhile.   So don't show that to the jury yet.

23          MS. ANDERSON:   Thank you, your Honor.

24          THE COURT:   It's enough -- it's okay for you to say

25   that a license was entered into and move on to something new,

 1  but to get into these specific details like this, I'm beginning

 2  to see the merit in the 403 objection.

 3       **MR. NORTON:**  Your Honor, may I ask the witness about

 4  a specific part of the agreement that the witness discussed

 5  with Mr. Rubin?

 6       **THE COURT:**  What does that have to do with what --

 7  just give me a phrase that I can focus on.

 8       **MR. NORTON:**  A phrase in the document or a phrase --

 9       **THE COURT:**  Well, I mean, so I'll know what you're

10  talking about.

11       **MR. NORTON:**  Sure.  The subject matter of the

12  testimony would be Mr. Cizek's discussions with Mr. Rubin about

13  what Danger was agreeing to license.

14       **THE COURT:**  All right.  You can ask that.

15  **BY MR. NORTON:**

16  **Q.**   Mr. Cizek, to what extent, if any, did the agreement

17  between Sun and Danger address Danger's rights to Oracle's

18  source code.

19  **A.**   Well, regarding the primary technology being licensed,

20  which was CLDC, at Mr. Rubin's request we entered a section

21  which stated that Danger had not looked at any Sun source code,

22  or as it's called in the document original code, but source

23  code for that Java technology.

24  **Q.**   And who requested that that clause be included in the

25  agreement?

1    **A.**    Andy Rubin.

2           **MS. ANDERSON:**  Objection.  Hearsay, your Honor.

3           **THE COURT:**  Well, it's proving up a transaction.  For

4    that purpose it's not hearsay.  So that -- proving up a

5    transaction is never hearsay.  Overruled.

6           So answer the question.  Did you say Mr. Rubin?

7           **THE WITNESS:**  Yes, Mr. Rubin was -- he was the person

8    that indicated that this was a requirement if we wanted to

9    close the license agreement, yes.

10          **THE COURT:**  All right.  Next question.

11   **BY MR. NORTON:**

12   **Q.**   And to what extent, if any -- I'm sorry.

13          So we can be clear.  Is there a particular part of

14   the agreement that addressed this particular issue?

15   **A.**   Yes.  Section 4 of Attachment F, which is the very last

16   attachment.

17          **MR. NORTON:**  Once again, I move the admission of

18   Exhibit --

19          **THE COURT:**  We're going to postpone that discussion

20   until later.

21          **MR. NORTON:**  I understand, your Honor.  Thank you.

22          **THE COURT:**  It may come in, but I want to hear about

23   this out of the presence of the jury.

24          **MR. NORTON:**  Thank you, your Honor.

25

1  **BY MR. NORTON:**

2  **Q.**   To what extent, if any, did that section address Danger's

3  rights to use Sun's Java specifications?

4  **A.**   That Section 4 did not address that.  Was that your

5  question?

6  **Q.**   It is.  Thank you.

7           To what extent did the agreement between Sun and

8  Danger, if any, to what extent did the agreement between Sun

9  and Danger grant Danger the rights to use Sun's Java

10 specifications?

11 **A.**   Well, that's all that it granted in the sense that since

12 it explicitly left out source code, they were licensing the

13 right to make commercial use of code that they developed that

14 used the specification, CLDC specification.

15 **Q.**   Thank you.

16          Now, after you closed the agreement between Sun and

17 Danger, did you have occasion to speak with Mr. Rubin again?

18 **A.**   Yes.

19 **Q.**   And when you did next speak to Mr. Rubin?

20 **A.**   After he had left Danger.  It was late 2004 or very early

21 2005.

22          **MR. NORTON:**  May I approach?

23          **THE COURT:**  Yes.

24          (Whereupon, document was tendered

25            to the witness.)

1  BY MR. NORTON:

2  Q.   Mr. Cizek, this is Exhibit 2001.  And if I can direct you

3  to the second page of that document?

4  A.   Uh-huh.

5  Q.   Do you see about halfway down there is an email.  It says.

6  "From: Andy Rubin" and "To:  Leo Cizek."

7           Do you see that?

8  A.   "Subject Re: Java JTWI Licensing Issues."

9  Q.   Yes.

10  A.   Yes.

11  Q.   And do you recognize this document?

12  A.   Yes.

13  Q.   And can you tell us what it is, please?  Without quoting

14  anything from it, just tell us what it is?

15  A.   It's the first email I received from Mr. Rubin after he

16  had become an employee of Google.  I had never seen this email

17  address before.  I knew what his previously email address was.

18           This was basically announcing, I guess, to me that he

19  had -- that Google had been the company that his -- he had told

20  me that his company was going to be acquired.

21  Q.   Let me just stop you there, if you don't mind.

22           MR. NORTON:  We would move the admission of

23  Exhibit 2001.

24           MS. ANDERSON:  No objection, your Honor.

25           THE COURT:  Received in evidence.

```
 1              (Trial Exhibit 2001 received

 2               in evidence)

 3   BY MR. NORTON:

 4   Q.   All right.  Would you please read now what Mr. Rubin wrote

 5   to you on August 4, 2005?

 6   A.   Sure.

 7           "Hi Leo.  Thanks for connecting as discussed.

 8            I'd like your help getting a meeting between

 9            the Google people (myself and Tim Lindholm)

10            and Vineet Gupta.

11            "We can talk about our project, our strategy

12            and how it might be mutually beneficial to

13            work together (again).

14            Thanks, Andy."

15   Q.   If we go down a little bit further on that same page,

16   Mr. Rubin was responding to an email from you, is that correct?

17   A.   Yes.

18   Q.   And can you read that email please?

19   A.   The email from me reads:

20            "Hi, Andy.  I believe you said that you had

21            an internal meeting scheduled for July 26th

22            in which you would be discussing how to

23            proceed with licensing JTWI from Sun.  When

24            convenient, could you please give me a call

25            to discuss?  Thanks, Leo."
```

1  Q.    July 26, that would be July 26, 2005?

2  A.    Yes.

3  Q.    Now, there was a reference in this document to JTWI.  Can

4  you explain what JTWI is?

5  A.    It stands for Java Technology for the Wireless Industry.

6  Q.    Now, after you received that email from Mr. Rubin, did

7  you, in fact, meet with him?

8  A.    Yes.

9  Q.    And about how many times -- did you, to an extent, discuss

10 Java licensing with Mr. Rubin in those subsequent meetings?

11 A.    Yes.

12 Q.    And how many meetings did you have with Mr. Rubin to

13 discuss Java licensing; you, yourself?

14 A.    There were three that I personally attended.

15 Q.    When was the first of those three?

16 A.    Not long after the date August 4th when he sent the email

17 requesting a meeting.  I would say a week later.

18 Q.    And who attended that meeting on behalf of Sun?

19 A.    Myself and Vineet Gupta.

20 Q.    And do you recall who attended on behalf of Android?

21 A.    That first meeting, Andy Rubin and Tim Lindholm.

22 Q.    And at that time Mr. Lindholm was employed by whom?

23 A.    By Google.

24 Q.    And to what extent -- well, what did you discuss at that

25 meeting concerning Java licensing for Android?

1  **A.**   There are a couple of things brought up by Mr. Rubin.  One

2  was that the project that he had originally outlined to me when

3  he was at his previous employer, that they now felt that they

4  would want to distribute to device manufacturers -- this is

5  called Project Android by this point.  That they would want to

6  have a distribution agreement with device manufacturers be some

7  sort of Open Source agreement.  That was one, something I had

8  not heard before.

9        And another thing was that they were evaluating which

10  of the two Java Micro Edition technologies would be more

11  appropriate for what they wanted to do for this software

12  platform that was focused or intended for smart phones.

13  **Q.**   And then did you have any further meetings -- you said

14  there were three meetings?

15  **A.**   Yes.

16  **Q.**   When was the second meeting?

17  **A.**   Sometime in November.

18  **Q.**   And do you recall, where was that meeting?  Where did it

19  take place?

20  **A.**   All three meetings were in Google's corporate headquarters

21  building campus, down in Mountain View.

22  **Q.**   Who from Sun attended that second meeting?

23  **A.**   In person?  Vineet Gupta and myself.

24  **Q.**   And then on the Google side, who attended from Google?

25  **A.**   In person, Andy Rubin, Brian Swetland, and a third person

1  whose title was Chief Open Source Officer, I think, with

2  Google.

3  **Q.**   Thank you.

4        To what extent, if any, was there discussion of Java

5  licensing for Google Android at that second meeting?

6  **A.**   Well, there was a discussion, further discussion on

7  whether open source would be something that Sun would

8  countenance as a way of licensing, having Google license to

9  their device manufacturers.

10        There was the reiteration by Sun, Vineet and myself,

11  that they did need a commercial use license to proceed before

12  we could finalize the other topics they wanted to discuss in

13  terms of a partnership.  And, I guess, as far as licensing

14  goes, that's about it.

15  **Q.**   Now, there was a third meeting.  When did that third

16  meeting take place?

17  **A.**   Early December 2005.

18  **Q.**   And who attended that meeting on the Sun side?

19  **A.**   Again, in person, Vineet Gupta and myself.  The most

20  important person that was not there in person but called in was

21  Allen Brenner.

22  **Q.**   And at that time what was Allen Brenner's role at Sun?

23  **A.**   Vice-president and general manager of client systems

24  group.

25  **Q.**   And from the Google side?  Who attended from the Google

1  side?

2  **A.**   Andy Rubin, Brian Swetland and Dan Bornstein in person,

3  and a number of people called in.

4  **Q.**   Now, to what extent did Mr. Brenner participate in the

5  conversations at that meeting by phone?

6  **A.**   Well, he sort of led a large part of the discussion.

7  There were two things that were of concern to him.  One was

8  that he was trying to convince Andy Rubin that they should use

9  the Sun implementation of the particular technology.  This is

10  now CDC, as opposed to the technology used by Danger.  Sun had

11  it's own optimized implementation that Mr. Brenner was trying

12  to convince Andy Rubin to use.  That was one.

13         And then the second topic or issue on which he was

14  trying to change Mr. Rubin's mind, was to try and convince him

15  not to use Open Source for licensing to the proposed Google

16  customers.

17  **Q.**   Okay.  Now, on the first topic, Mr. Brenner's proposal

18  that Google use Sun's optimization of the implementation of the

19  Java technology, did Mr. Rubin -- what, if anything, did Mr.

20  Rubin say in response to that particular proposal?

21  **A.**   Well, he said there was two reasons why that could not

22  happen.  He said, first of all, that his engineers were fairly

23  well advanced in their own implementation, independent

24  implementation of CDC, number one, and basically it was too

25  far -- they were too far ahead to turn back.

1           And the second reason was that there was --

2    technically speaking, Sun's implementation wouldn't fit their

3    requirements.

4    Q.    Now, at that time when you were working in licensing for

5    Sun in 2005, at that time did Sun permit companies to do

6    independent implementations of its specifications?

7    A.    Yes.  As had been done by Danger.

8    Q.    To what extent did Sun impose requirements on those

9    independent implementations of Java technology?

10          **MS. ANDERSON:**  Objection.  Overbroad, your Honor.

11          **THE COURT:**  Overruled.  Please answer.

12   A.    Basically the requirement that Sun stipulated for

13   customers making commercial use of their own independent

14   implementations were the same as for customers that used Sun's

15   source code.  That is, number one, they had to achieve

16   compatibility and, number two, they had to have a commercial

17   use license in place specifying royalties.

18   **BY MR. NORTON:**

19   Q.    Now, after that December meeting, did you continue to have

20   any role in the discussions between Sun and Google concerning

21   Java licensing for Android?

22   A.    No.

23   Q.    After December 2005, did you have any other discussions

24   with anyone from Google regarding Android?

25   A.    Yes.  In, I think, April of 2009, I had a discussion where

1  the person from Google wanted to discuss Java Standard Edition.

2  But I brought up the subject of Android, and we discussed that,

3  as well.

4  **Q.**   So what was the name of the person whom you spoke to, who

5  worked for Google?

6  **A.**   Martin Buccholz.

7  **Q.**   And what was the reason that you found yourself speaking

8  to Mr. Buccholz?

9  **A.**   Mr. Buccholz had contacted a colleague of mine, indicating

10 that he wanted to discuss with the correct person at Sun the

11 possibility of Google's licensing the source code to Java

12 Standard Edition so that they could get access to a particular

13 type of support.  Getting, like, advance notice on security bug

14 fixes.

15 **Q.**   Before you actually spoke to Mr. Buccholz, to what -- what

16 did you do, if anything, to prepare for that call?

17 **A.**   I met with Vineet Gupta, forwarding the e-mail trail that

18 had been forwarded to me, and met with Vineet Gupta to take his

19 advice.

20 **Q.**   And what did you -- what did you decide to do as a result

21 of speaking to Mr. Gupta, with respect to your phone call with

22 Mr. Buccholz?

23 **A.**   When I called Mr. Buccholz -- this was a conference call,

24 by the way -- I had a colleague on that line with me, as well,

25 a systems engineer from Sun.

1          I explained that Sun would be very interested in

2    looking into the possibility of doing a source license

3    agreement covering Java SE and providing just the type of

4    support that they were requesting.

5          But I said that there would be something that would

6    have to be fixed, first, which is the fact that regarding

7    Android there was no commercial use license; and, as we

8    understood it, Android was shipping an incompatible version of

9    Java, commercially.

10   **Q.**   What did Mr. Buccholz say in response?

11   **A.**   Said, well, we don't need a commercial use license

12   agreement.  The Android group didn't use any Sun Java source

13   code.  They just used the Java specifications.  Plural,

14   specifications.

15   **Q.**   And are you certain Mr. Buccholz said the Android

16   engineers had used the specifications?

17   **A.**   Yes, because I immediately summarized the wording in an

18   e-mail to Vineet Gupta.

19          **MR. NORTON:**  No further questions.

20          **THE COURT:**  Cross-examination.

21          **MS. ANDERSON:**  Thank you, Your Honor.

22                        <u>**CROSS EXAMINATION**</u>

23   BY MS. ANDERSON:

24   **Q.**   It's just good afternoon, Mr. Cizek.

25   **A.**   Good afternoon.

1   Q.   I have to check.

2        We met before, once before.  I'm Christa Anderson,

3   counsel for Google.  Good to see you.

4        You testified earlier that you've been with Sun and

5   then Oracle, now, for about 12 years.  Is that right?

6   A.   (No audible response.)

7   Q.   During all the years you have worked at Sun and now

8   Oracle, you have worked in, basically, the same role, as

9   account manager.  True?

10  A.   Yes.

11  Q.   And as an account manager, you have been involved in,

12  primarily, licensing discussions regarding licensing aspects of

13  the Java platform, true?

14  A.   Yes.

15  Q.   Among the platforms that you've licensed over the years

16  are Java ME, as we've been calling it, Java SE, and Java EE; is

17  that correct?

18  A.   Yes.

19  Q.   And Java ME is Java Micro Edition, true?

20  A.   (No audible response.)

21  Q.   And if you would, for the court reporter --

22        (Reporter interrupts.)

23  A.   Oh.  I said yes.

24  Q.   Java ME is the platform that you seek to license for

25  smaller devices, true?

1  **A.**   Yes, it's -- actually, there's two configurations.   One

2  for even smaller devices, and one for small but not so small.

3  **Q.**   Right.   So there's two flavors.   One flavor targeting what

4  we've been calling feature phones, and another flavor targeting

5  smart phones, correct?

6  **A.**   Yes.   The higher-end one targets not only phones, it

7  targets embedded devices, generally.   But to the extent it

8  targets phones it would be smart phones, yes.

9  **Q.**   All right.   And that's referred to as CDC, correct?

10 **A.**   Yes.

11 **Q.**   And in all the years that you have served as a Sun and now

12 Oracle salesman for these Java licenses, you've never had a

13 customer that manufactures smart phones, true?

14 **A.**   Well, I think Danger manufactured a smart phone, with the

15 Sidekick.   To me, it was certainly the first smart phone

16 targeted at consumers, as opposed to the Blackberry, which was

17 not my customer.

18       **MS. ANDERSON:**   May we please play, Your Honor, page

19 32, line 14, through page 33, line 18, of the witness's

20 deposition?

21       **THE COURT:**   Hearing no objection, go ahead.

22       (Video deposition clip played in open court; not

23       reported.)

24       **MR. NORTON:**   Your Honor, for completeness, we ask

25 that the deposition be read through page 35, line 6.

```
 1              THE COURT:  How many lines extra is that?

 2              MR. NORTON:  A long answer, but it's two questions.

 3              THE COURT:  Well, if it's long then you can do it on

 4   redirect.

 5              MR. NORTON:  Thank you, Your Honor.

 6              THE COURT:  Go ahead.

 7   BY MS. ANDERSON:

 8   Q.   Mr. Cizek, I would like you to take before you Exhibit

 9   2001, which I believe your counsel placed in front of you.  Do

10   you have it there?

11   A.   Yes.

12   Q.   This is an e-mail exchange you participated in with

13   Mr. Gupta, correct?

14   A.   Yes.

15   Q.   And you described to the jury the fact that Mr. Rubin, in

16   this e-mail exchange, had asked specifically to set up a

17   meeting with Sun, to talk about working together, right?

18   A.   Yes.

19   Q.   All right.  And, in response, in the internal exchange at

20   Sun about the request from Mr. Rubin, Mr. Gupta explained to

21   you that -- that he and Jonathan Schwartz were in the middle of

22   negotiating a larger Google deal, and discussing that with

23   Google and Jonathan Schwartz regarding a toolbar; is that

24   correct?

25   A.   Yes.
```

1   Q.   All right.  And, specifically, you understood at the time

2   that you got this e-mail, in August of 2005, that people senior

3   to you at Sun wanted to have a broader relationship with

4   Google, right?

5   A.   Yes.

6   Q.   Let's take a look at Exhibit 2013.  I'm going to place it

7   before you.

8        **MS. ANDERSON:**  Your Honor, may I approach?

9   **BY MS. ANDERSON:**

10  Q.   There you go.

11       Exhibit 2013 before you, Mr. Cizek, is a presentation

12  you received via e-mail from Google, correct?

13  A.   Yes.

14       **MR. NORTON:**  Objection.

15       **THE WITNESS:**  I assume that I received it via e-mail.

16  What I had saved was just the document itself.  But since I had

17  it, I assume I received it as an e-mail attachment.

18  **BY MS. ANDERSON:**

19  Q.   And you received it from Google, right?

20  A.   Yes.

21  Q.   Drawing your attention to the first page of this

22  document -- oh, excuse me.

23       **MS. ANDERSON:**  May I move this in evidence?  Your

24  Honor, I would like to move in evidence Exhibit 2013.

25       **MR. NORTON:**  No objection.

 1              THE COURT:  Received in evidence.

 2              (Trial Exhibit 2013 received in evidence.)

 3              MS. ANDERSON:  Thank you.  If it's published to the

 4   jury now.

 5              (Document displayed.)

 6   BY MS. ANDERSON:

 7   Q.   I would like to draw your attention, Mr. Cizek, to this

 8   document.  It's entitled "Monetization Proposal," correct?

 9   A.   Yes.

10   Q.   And the first sentence of this document states, quote:

11              "Google is seeking partnerships with leading

12              wireless technology companies and service

13              providers to collaboratively develop an open

14              source handset platform."

15              Do you see that?

16   A.   Yes.

17   Q.   You understood that's what Google was interested in, in

18   talking with Sun, right?

19   A.   Yes.

20   Q.   Now let's take a look at Exhibit 2002.

21              MS. ANDERSON:  Your Honor, may I approach?

22              THE COURT:  Yes.

23   BY MS. ANDERSON:

24   Q.   You recognize Exhibit 2002, correct?

25   A.   Yes.

 1  Q.   All right.   This, again, is an e-mail exchange you had

 2  with Mr. Gupta and Mr. Persi at Sun, in September 2005,

 3  correct?

 4  A.   Yes.

 5           MS. ANDERSON:   Your Honor, I move in evidence Exhibit

 6  2002.

 7           MR. NORTON:   No objection.

 8           THE COURT:   Received.

 9           (Trial Exhibit 2002 received in evidence.)

10           (Document displayed.)

11  BY MS. ANDERSON:

12  Q.   This is an e-mail exchange, Mr. Cizek, that you engaged in

13  with Mr. Gupta at Sun on the subject of Google's desire to open

14  source a platform for smart phones, right?

15  A.   Yes.

16  Q.   And Mr. Gupta was a person senior to you at Sun, true?

17  A.   Well, he was senior in the sense that his title was

18  director.   And I was an original --

19  Q.   Thank you.

20  A.   But I didn't report to him, so in that sense we were

21  neither senior nor junior to each other.

22  Q.   And it's correct you followed his guidance if he told you

23  to negotiate with someone or not regarding Google, correct?

24  A.   Ultimately, I would take guidance from my direct

25  supervisor.   But if that was not contradicted by my direct

1  supervisor, then I would.

2  **Q.**   Thank you.

3         And in the e-mail exchange you had with Mr. Gupta, in

4  the first paragraph on the first page there, Mr. Gupta

5  explained to you that he wanted to change the plan for what

6  Andy Rubin at Google wanted to do with respect to open

7  sourcing, right?

8  **A.**   Yes.

9  **Q.**   So in that specific paragraph he says, quote:

10          "I want to turn this into my idea of shipping

11          their apps on our J2ME OIs instead of what

12          Andy is trying to do."

13          Right?

14 **A.**   Yes.

15 **Q.**   That's what he said, correct?

16 **A.**   (Nods head.)

17 **Q.**   And that was the effort made by Sun throughout these early

18 negotiations to try to change Google's mind from having an open

19 source platform, right?

20 **A.**   Well, to the extent that they were going to use Java, the

21 idea was that, yes, if they wanted to use Java then they would

22 have to use the standard -- we would hope to convince them to

23 use the standard licensing model for Java.

24 **Q.**   Now, drawing your attention to the first meeting you

25 discussed earlier with your counsel, you had explained that

```
 1  there were a total of three meetings you attended with Google,

 2  right?

 3  A.    Yes.

 4  Q.    All right.  And, in fact, you don't remember much about

 5  that first meeting with Google, right?

 6  A.    I remember pretty much what I just stated under oath here,

 7  but not much more.

 8  Q.    In fact, during that first discussion that you had with

 9  Mr. Rubin at Google, in August of 2005, he explained to you

10  that Google had not decided what technology they wanted to use

11  for Android, right?

12  A.    That's true.  He said they were evaluating CDC versus

13  CLDC, yes.

14  Q.    And others, correct?  They hadn't committed to Sun, right?

15  A.    He didn't say they were evaluating anything else other

16  than those two technologies from Sun.  He didn't say that to

17  me.

18  Q.    All right.  There was discussion during that first meeting

19  that you attended about open sourcing, true?

20  A.    Yes.  Very generally, but, yes.

21  Q.    And at the time you didn't completely understand that

22  concept; is that fair?

23  A.    That's true.  I did not completely understand it.

24  Q.    All right.  Now, let's move on.

25        You spoke about a second meeting that you attended,
```

 1  that occurred sometime in or around October of 2005.  Is that

 2  right?

 3  **A.**   I think it was November, yeah.

 4  **Q.**   Okay.  Let's take a look at Exhibit 2004.

 5          **MS. ANDERSON:**  May I approach, Your Honor?

 6  **BY MS. ANDERSON:**

 7  **Q.**   This is an October 27, 2005, e-mail exchange among

 8  yourself, Mr. Rubin, and Mr. Gupta, correct?

 9  **A.**   Yes.

10          **MS. ANDERSON:**  Your Honor, I move this in evidence,

11  please.

12          **MR. NORTON:**  No objection.

13          **THE COURT:**  Thank you.  Received in evidence.

14          (Trial Exhibit 2004 received in evidence.)

15          (Document displayed.)

16          **MS. ANDERSON:**  Thank you, Your Honor.

17  **BY MS. ANDERSON:**

18  **Q.**   Exhibit 2004 is an e-mail exchange that actually lays out

19  action items that arose from the second meeting that you

20  attended with Mr. Rubin at Google, correct?

21  **A.**   Uhm, I believe that this is summarizing the action items

22  from the second meeting, yes.

23  **Q.**   Right.  So we see there it says, "Action items from last

24  meetings."  Do you see that?

25  **A.**   Yes.

1  Q.   And below it there are three items listed with numbers,

2  and then a few others underneath it, correct?

3  A.   Yes.

4  Q.   And number one on the action items is "open source

5  licensing model," correct?

6  A.   Yes.

7  Q.   And, again, Google wanted an open source licensing model

8  for its new platform, correct?

9  A.   Yes.

10 Q.   And below that you see there's a reference to "CLDC-HI

11 applicability (versus Google internal implementation.)"  Do you

12 see that?

13 A.   Yes.

14 Q.   In fact, what that's a reference to is the fact that Sun

15 wanted to sell to Google its own implementation of an aspect of

16 Java ME, while Google wanted to use an internal implementation

17 that it would develop in a partnership with Sun; is that right?

18          MR. NORTON:  Objection.

19          THE COURT:  Sorry?  Is there an objection?

20          MR. NORTON:  Yes.

21          THE COURT:  What is it?

22          MR. NORTON:  I was unable to follow the question.

23          THE COURT:  What?

24          MR. NORTON:  I was unable to follow the question.

25          THE COURT:  Did you understand the question?

 1          **THE WITNESS:**  I believe I did.

 2          **THE COURT:**  All right.  Please answer.

 3          **THE WITNESS:**  Google had a point of view that was --

 4  that they were leaning towards using open source, and Sun was

 5  trying to convince them otherwise.  Yes, so, in essence, that's

 6  true.

 7          I'm not sure that internally Google had completely

 8  decided that's what they wanted to do.  But, certainly, that's

 9  what Andy Rubin was telling us.

10  **BY MS. ANDERSON:**

11  **Q.**   All right.  Because he had proposed from the very

12  beginning -- and we saw it in that earlier exhibit -- a

13  partnership of developing together a new platform for mobile

14  phones, right?

15  **A.**   Yes.

16  **Q.**   Thank you.  Let's take a look at Exhibit 2006.

17          **MS. ANDERSON:**  May I approach, Your Honor?

18          **THE COURT:**  Yes.

19  **BY MS. ANDERSON:**

20  **Q.**   Do you recognize Exhibit 2006 as an e-mail exchange among

21  yourself, Mr. Rubin, Ms. Cole, Mr. Gupta, Ms. Garcia, and

22  Mr. Fresko, from November of 2005?

23  **A.**   Yes.  Some of those people were not in the meeting, or

24  maybe called in, but, yes.

25          **MS. ANDERSON:**  Your Honor, I move in evidence Exhibit

1   2006.

2              MR. NORTON:  No objection.

3              THE COURT:  Thank you.  Received in evidence.

4              (Trial Exhibit 2006 received in evidence.)

5              (Document displayed.)

6              MS. ANDERSON:  Thank you, Your Honor.

7   BY MS. ANDERSON:

8   Q.   Drawing your attention, Mr. Cizek, to this e-mail

9   exchange.  This is another of the e-mail exchanges regarding

10  the Sun-Google meetings that were occurring in the 2005-2006

11  time frame, right?

12  A.   Yes.

13  Q.   And in this e-mail you're actually setting up some

14  meetings.  The first one was to talk about open source, right?

15  A.   Yes.

16  Q.   That's what it indicates in that first -- second sentence

17  in the paragraph, correct?

18  A.   Yes.

19  Q.   And then later on you said you were trying to schedule the

20  second meeting:

21              "Which will be a presentation/discussion by

22              Sun on the virtues of our CLDC HotSpot

23              implementation and why Google may find it to

24              be preferable to Google's developing its own

25              CLDC implementation."

```
 1              Do you see that?

 2   A.    Yes.

 3   Q.    And, in fact, that's what was being discussed at these

 4   meetings, as well, right?

 5   A.    Yes.

 6   Q.    All right.  I would like to show you Exhibit 2008.

 7              MS. ANDERSON:  Your Honor, may I approach?

 8              THE COURT:  Yes, you may.

 9   BY MS. ANDERSON:

10   Q.    Mr. Cizek, Exhibit 2008 is a contact report that you

11   prepared, ultimately, as an Oracle employee regarding Google.

12   Is that true?

13   A.    Yes.

14              MS. ANDERSON:  Your Honor, I move in evidence Exhibit

15   2008.

16              MR. NORTON:  No objection.

17              THE COURT:  Received.

18              (Trial Exhibit 2008 received in evidence.)

19              (Document displayed.)

20   BY MS. ANDERSON:

21   Q.    Mr. Cizek, Exhibit 2008 is a contact report that you

22   notate on from time to time in the course of your work as an

23   account manager at Sun and then Oracle, right?

24   A.    Yes.

25   Q.    And this has been sort of an ongoing document that has had
```

1  things added to it over the years at Sun and then Oracle?

2  **A.**    Yes.

3  **Q.**    This particular contact report specifically relates to

4  Google, true?

5  **A.**    Yes.

6  **Q.**    And we see here on the top left side a reference to Google

7  and Andy Rubin regarding Android, right?

8  **A.**    Yes.

9  **Q.**    All right.  And then drawing your attention down, in a

10 section that's entitled, "Note/history."

11         **MS. ANDERSON:**  If we could get that up, please.

12 Thank you.

13 **BY MS. ANDERSON:**

14 **Q.**    This is a place where you've made notations by date of

15 various events, right?

16 **A.**    Yes.

17 **Q.**    All right.  And these are notations you've made, from time

18 to time, in the course of your work communicating with Google

19 on behalf of Sun, right?

20 **A.**    Right.  As I stated regarding the Danger notes, I took

21 handwritten notes.  And then, from time to time, when I ran out

22 of paper I would drastically summarize them and print them

23 in -- and type them in and print them out, which is what I did

24 to create this.

25 **Q.**    And then on May 25th, 2006, in the notes history section

1  you have an entry there regarding Android communications.

2  Fair?  Google communications regarding Android, right?

3  **A.**   Yes.

4  **Q.**   All right.  And in this particular entry you stated,

5  quote:

6                "After many meetings, including Alan Brenner,

7                it was agreed that the two companies cannot

8                come to a meeting of minds on how to work

9                together re CDC-HI and open source."

10               Is that right?

11 **A.**   Yes.

12 **Q.**   And that's, in fact, what happened on or about May of

13 2006, right?

14 **A.**   Well, that's what I was told.

15 **Q.**   That's what you understood was the state of Sun-Google

16 discussions at the time?

17 **A.**   Based on what I was told, yes.

18 **Q.**   And you were told that by people that you understood had

19 knowledge at the company, correct?

20 **A.**   Yes.

21 **Q.**   Including Mr. Gupta, right?

22 **A.**   Yes.

23 **Q.**   Let's take a look at Exhibit 2009.

24         **MS. ANDERSON:**  Your Honor, may I approach?

25         **THE COURT:**  Yes, you may.

 1  BY MS. ANDERSON:

 2  Q.   Exhibit 2009 is an e-mail exchange among yourself and

 3  Mr. Gupta, from March of 2007, right?

 4  A.   Yes.

 5          MS. ANDERSON:  Your Honor, I move in evidence Exhibit

 6  2009.

 7          MR. NORTON:  No objection.

 8          THE COURT:  Thank you.  Received.

 9          (Trial Exhibit 2009 received in evidence.)

10          (Document displayed.)

11  BY MS. ANDERSON:

12  Q.   All right.  Mr. Cizek, this e-mail exchange, which goes on

13  from -- for several pages, arises out of a newspaper or press

14  article concerning a statement about Google's plans to design a

15  mobile phone.  Is that right?

16  A.   Yes.

17  Q.   And that's referenced on the fifth page of this 11-page

18  exhibit, correct?

19  A.   Yes.

20          MS. ANDERSON:  It's the second paragraph there, Ben,

21  at the top.

22          THE WITNESS:  Yes.

23  BY MS. ANDERSON:

24  Q.   Thank you.

25          Now, in this e-mail exchange you had discussions

1  internally with Mr. Gupta about the subject, right?

2  **A.**    Yes.

3  **Q.**    And, in fact, you wanted to contact Google, specifically

4  Mr. Rubin, to talk about this development; is that right?

5  **A.**    Yes.

6  **Q.**    And Mr. Gupta told you to hold off; is that right?

7  **A.**    Yes.

8  **Q.**    All right.  He told you to wait and he'd let you know if

9  you had the green light to talk to Google about licensing Java

10  platform; is that right?

11  **A.**    Yes.

12  **Q.**    And in the course of this e-mail exchange -- the very top

13  e-mail, Ben, of the first page here -- we see the first

14  paragraph that Mr. Gupta wrote.  Do you see that?

15  **A.**    Yes.

16  **Q.**    All right.  And in this first paragraph on Exhibit 2009,

17  Mr. Gupta explained, quote:

18          "What we have been discussing will probably

19          lead to bigger SMI stuff - maybe like

20          Armstrong- so we will need to be grounded in

21          our expectations ... but I will try to see

22          how we can manage both, including our

23          commercial interests."

24          Do you see that?

25  **A.**    Yes.

1   Q.   In fact, that's what he told you.  He told you to hold off

2   because they're trying to work on bigger stuff with Google; is

3   that right?

4   A.   Yes.

5   Q.   And you followed Mr. Gupta's instruction, right?

6   A.   Yes.

7   Q.   Take a look at Exhibit 2010.

8        MS. ANDERSON:  Your Honor, apologize.  May I

9   approach?

10        THE COURT:  Yes.

11        MS. ANDERSON:  Sorry.

12        THE COURT:  I'll explain to the jury, at some point,

13   why is it that the lawyers ask to approach.  I bet you're

14   wondering that over there.  I'm going to tell you in due

15   course.

16        (Laughter)

17        THE COURT:  Courthouse secret.

18        But I don't want to interrupt Ms. Anderson, so

19   continue on.

20        MS. ANDERSON:  Thank you, Your Honor.

21   BY MS. ANDERSON:

22   Q.   Exhibit 2010 is an e-mail exchange among yourself,

23   Mr. Gupta, and Mr. Persi, from April of 2007, correct?

24   A.   Yes.

25        MS. ANDERSON:  Your Honor, I move in evidence Exhibit

 1   2010.

 2                MR. NORTON:  No objection.

 3                THE COURT:  It's received.

 4                (Trial Exhibit 2010 received in evidence.)

 5                (Document displayed.)

 6   BY MS. ANDERSON:

 7   Q.   Mr. Cizek, this is a continuation of the e-mail exchange

 8   we were just looking at in the last exhibit; is that right?

 9   A.   Yes.

10   Q.   And drawing your attention on the first page of Exhibit

11   2010, a little past halfway down the middle of that first page,

12   it says "Vineet Gupta," and then below it, it says

13   "April 2007."  Do you see that?

14   A.   Yes.

15   Q.   So you, in fact, followed up with Mr. Gupta in April of

16   2007, to find out if it was okay for you to contact Google

17   about Java licensing; is that right?

18   A.   Yes.  There's no date.  It says "Leo Cizek wrote."

19   Sometime before April 2nd, I wrote an e-mail to Vineet saying,

20   "Any update on this?"  Yes.

21   Q.   And, in response, Mr. Gupta told you, "You need to

22   continue waiting."  Right above there.  There you go.  Isn't

23   that right?

24   A.   Yes.

25   Q.   And, specifically, what you were hoping to talk to Google

1  about was the subject that you wrote about in the paragraph

2  just above there; is that right?

3  A.   Yes.

4  Q.   Okay.  You explained to Mr. Gupta that you had hoped to

5  schedule a meeting with Andy, in order to, quote:

6           "Discuss the advantages to Google of becoming

7           a commercial use licensee of Java ME for the

8           Google phone versus the disadvantages of

9           going open source."

10          Do you see that?

11 A.   Yes.

12 Q.   And you also recognized you thought it was a longshot

13 because you knew Google was intent on developing an open source

14 platform, right?

15 A.   Well, actually, what I was referring to here was the fact

16 that Sun -- yes.  I guess so, yeah.

17 Q.   Thank you.

18          And above that, again, Mr. Gupta told you to hold

19 off, right?

20 A.   Yes.

21 Q.   And that's because there were bigger discussions going on,

22 beyond you, at Sun about the relationship with Google and

23 broadening it, correct?

24 A.   Well, he had said that in a previous e-mail.  That may

25 have still been the case here.  I don't know.

1  Q.   You understood that was still the case, right?

2  A.   I only knew that he was waiting to hear from Rich Green

3  before giving me the green light to go and contact Andy.

4  That's all I know.

5  Q.   Okay.  Now, while Sun executives like Mr. Gupta were

6  telling you to hold off on pursuing discussions with Google

7  about Java licensing, Sun did want you to continue to discuss

8  things with Google on other fronts and other deals, correct?

9  A.   Yes.

10 Q.   And, in fact, in or around 2007-2008, you negotiated with

11 Google the Sun Office deal, where Google would distribute a

12 product called StarOffice, right?

13 A.   Yes.

14 Q.   And that's -- StarOffice is something like Microsoft

15 Office, but a Sun version, correct?

16 A.   Yes.  It's not a Java technology.  It was -- at that time

17 we were also dealing with some other products, and StarOffice

18 was one of them, yes.

19 Q.   All right.  And, in fact, the biggest deal that you ever

20 had negotiated was the toolbar deal with Google, right?

21 A.   Well, there were two toolbar deals, yeah.

22 Q.   Very substantial financially for you, right?

23 A.   Were, indeed, yes.

24 Q.   And they had nothing to do with Android, true?

25 A.   That's true.

1  Q.   They were an arrangement under which when someone

2  downloaded a particular Java-related product, a pop-up bar

3  would show up inviting them to download the Google Toolbar; is

4  that right?

5  A.   Yes.  To the extent that customers were downloading the

6  free version of Java that was available on the Internet, that

7  ad would pop up.

8  Q.   And, again, that went on for several years, that deal with

9  Google, right?

10  A.   Yes.

11  Q.   And throughout your career, that was the single largest

12  deal you had with any of your customers on an annual basis,

13  right?

14  A.   Uhm, yes.

15  Q.   Let's turn, now, to Exhibit 2019.

16       MS. ANDERSON:  Your Honor, may I approach?

17       THE COURT:  You may.

18  BY MS. ANDERSON:

19  Q.   Exhibit 2019 is an e-mail from you to Mr. Lehrbaum, copied

20  to Mr. Harris, dated October 2007, correct?

21  A.   Yes.

22       MS. ANDERSON:  Your Honor, I move in evidence Exhibit

23  2019.

24       MR. NORTON:  No objection.

25       THE COURT:  Received.

```
 1              (Trial Exhibit 2019 received in evidence.)

 2              (Document displayed.)

 3  BY MS. ANDERSON:

 4  Q.   And, so, in the same time period of 2007 and 2008, when

 5  you were discussing other deals with Google, including the

 6  StarOffice deal, you also reached out or sought to reach out to

 7  Google on other fronts, correct?

 8  A.   Yes.

 9  Q.   All right.  And this is an e-mail exchange that you had

10  with a Mr. Lehrbaum.  Who is Mr. Lehrbaum?

11  A.   He is a former employee of Sun Microsystems and Oracle,

12  who at the time was in marketing in the client systems group.

13  So regarding JavaFX as it pertained to mobile.

14  Q.   All right.  And you sent this e-mail to Mr. Lehrbaum

15  because you had a conference call scheduled with Google for the

16  following Monday, correct?

17  A.   Yes.

18  Q.   And in that conference call your goal would be to try to,

19  quote:

20              "Uncover potential revenue opportunities and

21              Adsense for search agreement, for example,

22              around JavaFX mobile."

23              Right?

24  A.   Yes.

25  Q.   This is another example where you, acting on behalf of
```

1  Sun, were reaching out to Google to try to find other ways to

2  generate revenue.  Had nothing to do with licensing Java ME,

3  right?

4  A.   Well, in this case, yes.  Yes.

5  Q.   I would like to show you Exhibit 2021.

6           MS. ANDERSON:  Your Honor, may I approach?

7           THE COURT:  Yes.

8  BY MS. ANDERSON:

9  Q.   Exhibit 2021 is an e-mail exchange among Mr. Zandman,

10  Mr. Harris, Mr. Genewich, and yourself, dated November 2007,

11  correct?

12  A.   Yes.

13          MS. ANDERSON:  Your Honor, I move in evidence Exhibit

14  2021.

15          MR. NORTON:  No objection.

16          THE COURT:  Received in evidence.

17          (Trial Exhibit 2021 received in evidence.)

18          (Document displayed.)

19  BY MS. ANDERSON:

20  Q.   Mr. Cizek, who is Tom Harris?

21  A.   He's a systems engineer now with Oracle, who was at that

22  time with Sun.  Systems engineer in the Java sales group.

23  Q.   Okay. and you sent this e-mail in November of 2007 --

24  excuse me.  Let me strike that.  I apologize.

25          This was an e-mail exchange that you received in

 1  November of 2007, which included a discussion from Mr. Harris,

 2  correct?

 3  **A.**   Yes.

 4  **Q.**   And that starts a little bit past halfway down the first

 5  page of Exhibit 2021, right?

 6  **A.**   Yes.

 7  **Q.**   All right.  Generally speaking, in this discussion

 8  Mr. Harris is talking about APIs in various paragraphs related

 9  to various companies, correct?

10  **A.**   Yes.

11  **Q.**   Drawing your attention to the second page of this exhibit,

12  Mr. Harris proposes some ideas that may work.  Starting about

13  halfway down that second page.  Do you say that?

14  **A.**   Yes.

15  **Q.**   And among the other ideas that Mr. Harris proposed to you

16  was, quote:

17              "Once we fully understand the Android

18              distribution SDK, propose a custom Google WTK

19              incorporating the Android Distro APIs if JME

20              compatible along with OpenSocial APIs."

21              Right?

22  **A.**   Yes.

23  **Q.**   And then Mr. Harris goes on to talk about, in that last

24  bullet, that he -- commenced with the words "discuss

25  internally."  Do you see that?

1  A.   Yes.

2  Q.   Mr. Harris talks about, quote:

3           "If Sun's CSG wants to leverage Google APIs

4           for these specific types of apps it may

5           play."

6           Do you see that?

7  A.   Yes.

8  Q.   All right.   In November of 2007, were you the Google

9  account representative --

10 A.   Yes.

11 Q.   -- for Sun?

12 A.   Yes.

13 Q.   And so --

14 A.   Well, for -- for Java related and, as we've seen, some

15 other products, such as StarOffice, but, yeah.

16 Q.   So it didn't surprise you to have received an e-mail

17 exchange in Exhibit 2021, in light of the fact that it

18 discussed Android, correct?

19 A.   Right, yes, correct.

20          THE COURT:   How much more do you have, Ms. Anderson?

21          MS. ANDERSON:   I'm very close to finished, Your

22 Honor.   Just a few more questions.

23          Your Honor, may I approach?

24          THE COURT:   Yes.

25

1  BY MS. ANDERSON:

2  Q.   I would like to show you Exhibit 2026.

3  A.   Thank you.

4  Q.   Thank you.

5       Mr. Cizek, this is an e-mail from you to

6  Mr. Lehrbaum, copied to Mr. Periakaruppan, Mr. Harris, and

7  Mr. Singh, from May of 2008, correct?

8  A.   Yes.

9  Q.   Who is Mr. Lehrbaum?

10 A.   As I identified before, he was, at that time, an employee

11 of Sun, and was in marketing, in the client systems group.

12 Q.   And, again, you're participating in this exchange because,

13 among other things, you are a Google -- a representative for

14 Google related to Java, right?

15 A.   Yes.

16 Q.   All right.  And then drawing your attention below, in the

17 e-mail exchange, where it says "Jacob Lehrbaum wrote," do you

18 see that?

19 A.   Yes.

20 Q.   Isn't it true that in this e-mail Mr. Lehrbaum expressed

21 to you the view that Google's Android was a potentially

22 dangerous competitor.  Is that right?

23 A.   Yes.

24      **MS. ANDERSON:**  All right.  If I had not done so, Your

25 Honor, I move in evidence Exhibit 2026.

```
 1              MR. NORTON:  No objection.

 2              THE COURT:  2026 is received.

 3              (Trial Exhibit 2026 received in evidence.)

 4              MS. ANDERSON:  Thank you.

 5              (Document displayed.)
```

BY MS. ANDERSON:

Q.   Mr. Cizek, you described during your testimony earlier
that you had a total of three conversations with Google
representatives regarding Android; is that right?

A.   Yes.

Q.   And in each of the conversations you described they were
among business people, not lawyers, correct?

A.   Yes.

Q.   And in each of those conversations there was no
discussion, whatsoever, of copyrights that Sun may claim to
have, correct?

A.   Not in any meeting I was at, correct.

Q.   Thank you.

```
              MS. ANDERSON:  No further questions, Your Honor.

              THE COURT:  Thank you, Ms. Anderson.

              Mr. Norton.
```

## **REDIRECT EXAMINATION**

BY MR. NORTON:

Q.   Mr. Cizek, Ms. Anderson asked you about your personal
smart phone clients.

```
 1            Do you recall that?

 2   A.    Yes.

 3   Q.    Were there Java licensees for smart phones other than your

 4   clients?

 5   A.    Well, yes.

 6   Q.    And can you give us some examples?

 7   A.    The best known one -- I don't think the term smart phone

 8   was used in those days -- was the Blackberry.  Research in

 9   Motion, which became -- is now my account, but I didn't close

10   it.  And they become a licensee in 2000, many years ago.

11   Q.    Now, Ms. Anderson showed you a number of documents dated

12   in the 2007 time period.  Do you recall that?

13   A.    Yes.

14   Q.    All right.  If we can look -- I'm sorry, the timeline

15   disappeared.  Excuse me.

16            MR. JACOBS:  I'll get it.

17   BY MR. NORTON:

18   Q.    Before I do that, then, let's go back to 2005.

19            Would you look at Exhibit 2004, which should be among

20   those that Ms. Anderson gave you.  It's on the screen to your

21   right.

22   A.    Oh, okay.  That's fine.

23   Q.    Now, if we go down to the third paragraph of Mr. Gupta's

24   e-mail, he states:

25            "I have dropped AI's ..."
```

CISEK - REDIRECT / NORTON

```
 1              Those are action items?
 2  A.    Yes.
 3  Q.    (As read:)
 4              "... 4, 5, 6 and 7 as they were either Sun
 5              internal AIs, or they morph into business
 6              model and overall licenses that will need to
 7              be put in place."
 8  A.    Yes.
 9  Q.    What understanding, if any, did you have as to whether
10  whatever decision Google made, a license would still be
11  necessary?
12  A.    Well, that was always my understanding.  And what's
13  written here seems to be consistent with that.  And they seemed
14  to agree, as well, because we went and spent a lot of time
15  discussing how we could get there.
16  Q.    And then Ms. Anderson showed you the action item number 2
17  on this document, which was, "CLDC-HI applicability versus
18  Google internal implementation."
19              What understanding, if any, did you have as to
20  whether one, both, or neither of those two alternatives would
21  require a license?
22  A.    Well, my understanding is that either would require a
23  license.  As I think I stated previously, whether
24  implementation is done independently or with the -- the use of
25  Sun source code, the licensing requirements are essentially the
```

1    same.

2    **Q.**   All right.  Now, at some time -- sorry.  So you also have

3    Exhibit 2021; is that right?

4    **A.**   Up on the screen?

5    **Q.**   It is.

6    **A.**   Okay, yes.

7    **Q.**   All right.  This is another one of the documents Ms.

8    Anderson showed you.  And she noted, as she went through it,

9    there's a reference in there to OpenSocial APIs.

10          Do you see that at the bottom of the -- of the

11   exhibit?  Actually, we need to scroll down a little bit for

12   you.  I'm sorry.

13   **A.**   Yes.

14   **Q.**   All right.  Do OpenSocial APIs, did you understand that to

15   have anything to do with Android?

16   **A.**   I understood that it had nothing to do with Android.  It's

17   something entirely separate.  At least that was my

18   understanding.  I don't -- I don't know much about them.  I

19   just -- the context leads me to believe they are totally

20   separate.

21   **Q.**   All right.  And then this document is dated November 11,

22   2007; is that right?

23   **A.**   Yes.

24   **Q.**   Okay.  If we turn to the second page, which has an e-mail

25   from some date prior -- go down to the middle -- it says,

1  "Ideas that may work."

2  **A.**    Yes.

3  **Q.**    And then it says, "Once we fully understand the Android

4  Distro SDK."

5            What understanding, if any, did you have in

6  November 11, 2007, as to what the Android Distro or SDK was?

7            **MS. ANDERSON:**  Objection.  Foundation.

8            **THE COURT:**  Understanding calls for hearsay.

9  Sustained.

10  **BY MR. NORTON:**

11  **Q.**   Did you have any understanding --

12            **THE COURT:**  Same thing.  Would just be somebody's --

13  this is a witness affiliated with you, so we can't get into

14  hearsay.

15            **MR. NORTON:**  Your Honor --

16            **THE COURT:**  He has to have direct, personal

17  knowledge.

18            **MR. NORTON:**  I'm trying --

19  **BY MR. NORTON:**

20  **Q.**   What did you mean by the phrase, "Once we fully understand

21  the Android Distro SDK"?

22            **MR. VAN NEST:**  Objection.  Foundation.

23  Mischaracterizes the document.

24            **THE COURT:**  Is this something you wrote?

25            **THE WITNESS:**  I believe it was not.  I believe this

1   was wording probably from Tom Harris.  If I had the whole

2   document, I could check.

3            THE COURT:  Sustained.

4            MR. NORTON:  I'll move on.

5            THE COURT:  I would like to finish this witness

6   today.

7            MR. NORTON:  Yes.

8   BY MR. NORTON:

9   Q.   Did you ever tell Mr. Rubin that he could do -- that

10  Google could do an independent implementation of Java

11  technology without a license?

12  A.   Without a commercial use license?  No, I never told him

13  that.

14           MR. NORTON:  No further questions.

15           MS. ANDERSON:  No questions, Your Honor.

16           THE COURT:  May Mr. Cizek be excused?  I'm going

17  to -- I hear no objection.  You are free to go.

18           THE WITNESS:  Okay.

19           THE COURT:  You are not subject to recall.  Thank

20  you.  Have a great weekend.

21           THE WITNESS:  Thank you.  You too.

22           (Witness excused)

23           THE COURT:  Well, I'm going to say this.  It's been a

24  long week.  It's 20 minutes until 1:00.  We're going to give

25  you a few minutes extra off today, and we're not going to start

PROCEEDINGS                                                    1107

 1  a new witness.  You know why?  Because I promise you if we did,

 2  they would just repeat it all on Monday morning because they --

 3  on the theory that you forgot it over the weekend.  So there's

 4  no point in starting a brand-new witness.

 5          And I want to say a few things about, I'm serious

 6  when I say no research about the case.  No research about the

 7  lawyers.  No research about these products.  You must stay away

 8  from all that until the case is over, and then you'll be free

 9  to go back and see what you were missing.

10          No -- no looking at news programs, radio programs,

11  news articles, blogs.  I don't know what I'm leaving out, but

12  you get the general idea.

13          Please don't talk to your loved ones or friends about

14  this case.  Keep an open mind until the very end.

15          I think we're pretty close to being on track.  I

16  don't -- I don't think we've fallen behind.  And so there we

17  go.  Any other admonitions before the break for the weekend?

18          **MR. VAN NEST:**  I don't believe so, Your Honor.  Thank

19  you.

20          **MR. JACOBS:**  No, Your Honor.

21          **THE COURT:**  You all have a great weekend.  We'll see

22  you back here the normal time Monday morning.

23          **THE CLERK:**  All rise.

24          (Jury out at 12:43 p.m.)

25          **THE COURT:**  All right.  Please be seated.

 1            All right.  Timewise, I hope you're all trying to

 2   keep track yourself because if I do a material -- I don't have

 3   a fancy computer.  This is what I have (indicating.)

 4            (Laughter)

 5        **THE COURT:**  This is a pencil.  Pencil and columns.

 6   So if you think I'm off by ten minutes or more, you let me

 7   know.  But I have 560 minutes have been used by plaintiff; 329

 8   minutes used by defendant.

 9            Now, 17 hours of your time, that's what -- you have

10   17 hours for this phase, each side.  So that's 1,020.

11            So that means that, Oracle, you've used now more than

12   half your time and you need to save some time for

13   cross-examination.

14            And at this rate it looks like Google will be putting

15   some time in the bank unless they use up a lot more time.

16            And so Oracle over there don't -- you know, if they

17   wind up getting more time than you in the patent phase or the

18   other phases, then look back.

19            I question what that last witness added to this case.

20   You know, you lawyers have good reasons for what you did, but

21   to my mind that was not a necessary witness.  So don't come

22   back and say to me, oh, that was not a good use of the jury's

23   time.  So if you want to use your time on that when you run out

24   of time, that's going to be the end of it.  There's no more

25   extensions.

```
 1              Now, maybe I'll be surprised and find that there was
 2    some -- some wonderful nugget lurking there that went right by
 3    me.
 4              Okay.  I have a few more -- at least one more
 5    question, and this is for -- a variation of the same question
 6    for both sides.
 7              Let me start with Mr. Van Nest.
 8              I'm confused a bit on -- I have heard two things that
 9    may be inconsistent but may be completely reconcilable, and so
10    something is not registering with me right.
11              Sometimes I hear you say that the source code was all
12    done by Google in a clean room, the implementations -- to use
13    that word.  Other times I hear you say no, it was done by
14    somebody called Apache.
15              And so how can it be in a clean room and you can say
16    that and they -- for all we know, Apache plagiarized it.  So
17    which was it?  Was it done by Apache or it was done by Google?
18              MR. VAN NEST:  Well, no.  What I've said, Your Honor,
19    is both.  What I've said is that the source code and the
20    libraries was either written by -- from scratch by Google or
21    using open source projects and other contributions.
22              Remember when I went through the stack in the
23    opening, that Android platform, and I showed that this came
24    from open GL and this came here?  They did use a lot of other
25    open source and, in connection with the core libraries, a lot
```

 1   of that did come from Apache.  So Apache had an implementation,

 2   their own independent implementation of Java.

 3        **THE COURT:**  How do we know it was independent?  Has

 4   anyone vetted that to see if the lines match up?

 5        **MR. VAN NEST:**  Well, yeah.  I mean, absolutely.

 6   These guys have (indicating).  They hired an expert, whom

 7   you're about to hear from.  And then they hired some other

 8   folks to scrutinize every single line, every line in every file

 9   in the Android libraries.  And they came up with 12 files.

10   You've heard about those before.  Two of them were Timsort and

11   those others.  Those are the other only files that they came up

12   with.

13        And I think their expert -- is he in the room?  I

14   guess I can't ask him to leave, but I think they did a

15   comprehensive review of every line.  And they came up with nine

16   lines of code by Mr. Bloch and a few other hundred lines in

17   these other miscellaneous files that never made it on a phone.

18   So there's no dispute about that.

19        But you're right, Google didn't write every word of

20   the source code from scratch.  Some of it they took from open

21   source and freely available technology, as I've been telling

22   the jury.

23        **THE COURT:**  All right.  Now, that helps me

24   understand.  Thank you.

25        So, Mr. Jacobs, let me ask you.  After your -- we're

PROCEEDINGS                                             1111

1    going to hear from your expert.

2           Is it true what Mr. Van Nest said, that after going

3    through millions of lines of code, that's what it comes down

4    to, in terms of direct copying, putting aside the 37 -- 37

5    declarations and the -- and the structure sequence and

6    organization?

7           **MR. JACOBS:**  Putting aside the 37 packages of

8    application programming interfaces, we have -- what we have

9    accused is in that list we gave you of copying.  What we have

10   accused of copying is what we have in that list we gave you.

11          In addition, we will demonstrate that the

12   documentation is, in many cases, paraphrased, in the sense that

13   I use the word; that is, small substitutions or moving around

14   of text apparently intended to disguise the copying.

15          In addition, the clean room is typically an

16   affirmative put on by the defendant.  The defendant establishes

17   that we set up a set of procedures and guidelines to limit the

18   materials that were used during the development process and,

19   critically, to limit the kinds of people who are employed on

20   the development process.

21          And so when we say they didn't have a clean room,

22   what we're saying is they've never shown, and we can prove that

23   they failed to establish, those kind of guidelines or

24   procedures to develop independently an implementation.

25          **THE COURT:**  But -- okay.  I appreciate the

 1  explanation, but when -- is it Dr. Mitchell?

 2          **MR. JACOBS:**  Dr. Mitchell, yes.

 3          **THE COURT:**  When he testifies on cross-examination,

 4  I'm assuming, I don't know, he will admit that he tried his

 5  best to find as many lines, and the only lines he found were

 6  those nine and those files that were word for word.  Right?

 7          **MR. JACOBS:**  I don't think he will -- I think that is

 8  what he will say, yes.

 9          **THE COURT:**  All right.  So --

10          **MR. JACOBS:**  But I would --

11          **THE COURT:**  -- what difference does it make whether

12  there was a clean room or not a clean room?  That's question

13  number one.

14          Question number two is, even if there was a clean

15  room for the half that didn't come from Apache -- I'm assuming

16  it's half, I don't know what it really was -- if -- I guess I

17  don't understand Google's argument that you could just go

18  out -- if somebody is out there possibly misusing, like Apache

19  possibly was -- I don't know that they were, but if there was a

20  debate over Apache and you just start using what Apache put out

21  there, how can you say that that absolves you of any

22  wrongdoing?

23          You step into their shoes.  If Apache was in the

24  wrong, then you step into their shoes.  I don't get that

25  argument.  And if half of it came from Apache, what good does

```
 1   it do you to put in a clean room?  Because the other half is
 2   already -- if it's infected, it's already infected.
 3            So I don't know why you keep making this big point
 4   out of Apache.  Tell me -- help me out what that.
 5            MR. VAN NEST:  There's a couple points, Your Honor.
 6   Maybe I need to be a little more clear.  One is that
 7   Mr. Mitchell and his crew, they looked at Apache too.  There's
 8   no question that Apache is clearly an independent
 9   implementation just like Google.  They didn't use any source
10   code either.  So that's step one in the analysis.
11            They went out and did their own -- in 2005, did their
12   own independent implementation, and these guys have checked
13   that out and they couldn't find any copying in Apache either.
14            So -- but our primary position on Apache is that,
15   number one, the source code wasn't copied either by Google or
16   by Apache from Java.  And that's not been established.  Except
17   for these few miscellaneous trivial files and Mr. Bloch
18   testified about his nine lines yesterday, that's -- that's all
19   independently done.
20            We, Google, licensed from Apache the right to
21   distribute the Apache code, which they used, in Android under
22   the Apache license.  Our point about Apache is simply that
23   Apache, like GNU, was known to Sun and operating out there in
24   the market -- you know, had this platform available.
25            Sun may or may not have had disputes with them, but
```

1   Apache never took a license.  And they operated for five, six,

2   seven years all the way through 2010, 2011.  And our point is

3   that the Apache fight, whatever it was, it wasn't about whether

4   you can use APIs or not.

5           This API thing is an invented-after-the-fact deal by

6   Oracle.  This is all made up.  None of these people were

7   talking about APIs back then.  Rubin was trying to buy

8   technology from Sun, and that's what they were negotiating as

9   part of an overall partnership.  And when that fell -- that's

10  what you just heard from Cizek.

11          **THE COURT:**  All right.  Did the Apache have the 37

12  APIs?

13          **MR. VAN NEST:**  It had those and more.  And under the

14  Apache license, Apache said you can use all of them, some of

15  them, none of them.

16          **THE COURT:**  What was then the -- at the time that

17  Google acquired those rights under a license with Apache, what

18  I'm somehow understanding is there was a cloud over Apache in

19  the form of a dispute with Sun or with Oracle.  I'm not sure

20  which.

21          **MR. VAN NEST:**  Well, it --

22          **THE COURT:**  But -- wait, wait.  What was that dispute

23  as it was publicly known?

24          **MR. VAN NEST:**  What it was, as I understand and the

25  evidence will develop further, was that Apache wanted to call

```
 1   itself Java compatible.

 2            In other words, they wanted a full license so they

 3   could say, We are Java, rather than, We're Apache using the

 4   Java language.  And there was a fight about whether they could

 5   get it.

 6            And Oracle and Google and the whole industry wrote

 7   Sun and said they ought to get that right.  And Sun, for

 8   whatever reason, said no, we're not going to do that.  And so

 9   Apache kept operating under -- always the way they had.  The

10   source code was out there.

11            And what Mr. Schwartz will say -- has said in his

12   deposition was, the fight with Apache was over the right to

13   call themselves Java.  If they didn't want to use the word

14   "Java" in their product, you know, they didn't want to brand it

15   Java, then fine.  The code was available.  They could

16   distribute the code.  There was no -- no issue about the code.

17            What Mr. Schwartz will say is the beef was, can you

18   call yourself Java compatible?  I'm not going to let you do

19   that.  Just like Android, we don't call ourselves Java

20   compatible either.

21            THE COURT:  Mr. Schwartz was at which company?

22            MR. VAN NEST:  Sun.  He was the CEO of Sun.  And he

23   was fully aware of Apache, fully aware of Android, fully aware

24   of GNU.  And his view was, if you don't want to call yourselves

25   Java, if you don't want our trademark, fine.  That's the point.
```

 1   And we want to work with people.  We don't sue our customers.

 2            As you just heard from Mr. Cizek, Google was a big

 3   customer of Sun.  So Google and Sun were doing business all the

 4   time.  And they were doing business day by day.  And you'll

 5   hear testimony, Your Honor, about Mr. Schwartz talking to

 6   Mr. Schmidt and -- about a lot of things, including Android.

 7            Mr. Schwartz wanted to build some products on top of

 8   Android just like Mr. Ellison tried to do.  And all this was

 9   all out in the open and everybody knew who was using what APIs.

10            And none of this API thing came up til after Oracle

11   bought the company and tried to get into the market and

12   couldn't.  Now, all of a sudden, these APIs are a huge deal.

13            And that's why, Your Honor, this is the fundamental

14   issue.  The problem that we're all having is this copyright

15   claim they have is a little crazy.  It's the selection,

16   structure and organization.  I mean, come on.  None of the

17   engineers talk about that.  None of the business people ever

18   talked about that.  That's a lawyer-made-up argument for this

19   case, because they didn't copyright any such thing.

20            And I'm terribly worried from the verdict forms that,

21   you know, what they want to do is they want to chop down the

22   size of their copyright so it custom fits what they now claim

23   we're using.  Everybody's known what we've been using for

24   years.  They never got a copy on anything like selection,

25   structure and organization.  And Mr. Jacobs admitted that the

1    other day.

2            THE COURT:  Now, I know that's what you argue, and

3    maybe in the long-run you're right, maybe you're not.  I am not

4    going to decide right away this -- whether the copyright

5    extends to protecting the structure.

6            I am going to let that go to the jury without

7    prejudice to taking it away depending on how it comes out.  But

8    I want this case to go up to the Court of Appeals on a record

9    where we don't have to come back and retry it, if I'm wrong or

10   right, depending on which way it were to come out.

11           And I want, also, the Court of Appeals to have the

12   maximum number of options.  So even if you're right -- and I'm

13   not saying that you're right about it, but even if you are

14   right, the jury -- we're going to get a verdict on the

15   structure, sequence, and organization probably in two weeks.

16           MR. VAN NEST:  I'm totally with you.  Your Honor, I'm

17   with you on that.  And I know you wouldn't decide until you've

18   seen our Sunday 3 o'clock briefing on this anyway.  I know

19   that.

20           But my point is --

21           THE COURT:  Even after that.  Even after that.

22           MR. VAN NEST:  I know, Your Honor.

23           THE COURT:  I feel like -- I think we ought to try to

24   create a record -- this is going to go up on appeal.  I would

25   like to have a record for the benefit of the appellate judges

1  that will give them the most information and the most field

2  of -- you know, whichever way they want to go on these issues

3  of SSO, I want to give them the best record I can.

4          **MR. VAN NEST:**  I -- I'm totally with you on that,

5  Your Honor.  My point was directed to the issue that we talked

6  about a little earlier today, which is, what do you compare it

7  to?

8          It can't be that a copyright owner, who gets a

9  copyright on an entire platform, can then later figure out what

10 it is --

11         **THE COURT:**  We're working on that.

12         **MR. VAN NEST:**  Yeah.

13         **THE COURT:**  I'm thinking about it.  I'm doing my own

14 research.  My law clerks are helping me.  But unlike these law

15 firms here, I on have a limited staff.  So Sunday at 3:00, I'll

16 be very interested in it.

17         And that basic issue is, what is the comparison made

18 against?  What is the copyrighted work?

19         **MR. VAN NEST:**  Right.

20         **THE COURT:**  And does Mr. Jacobs have the right to

21 take a pair of scissors and cut out of the copyright the SSO

22 and say this is what they infringe as opposed to the other

23 15 million lines of code?  I don't know the answer to that.

24 That's where you lawyers come in.

25         **MR. VAN NEST:**  Thank you, Your Honor.  I didn't have

PROCEEDINGS 1119

```
 1  anything else.

 2            THE COURT:  Anything else by the other side?

 3            MR. JACOBS:  I think Your Honor's expression was apt.

 4  There was a cloud over Apache.  And this may be an important

 5  aspect of the instructions to work on.  Google took Apache

 6  as -- stepped into their shoes is exactly right.

 7            There's no immunity for Google if Apache code

 8  implements the APIs in the Apache core libraries that Google

 9  adopted, the fact that they got it from Apache has no bearing

10  on this unless there is some affirmative defense to

11  infringement, which we believe they will not be able to prove.

12            THE COURT:  But was the cloud one that had the words

13  API -- 37 APIs floating up there in the sky or was the cloud

14  one that was over, don't use Java, that's our trademark?  I

15  don't know.

16            MR. JACOBS:  It was very much the former, Your Honor.

17  There's absolutely nothing about the trademark.  Jonathan

18  Schwartz will have a very interesting examination and

19  cross-examination or.

20            You may recall that on the examination of Mr. Bloch

21  yesterday, I asked him whether he was aware of the

22  communication from Apache in which they threw in the towel and

23  moved Harmony, which is the project from which these core

24  libraries come, into the attic.

25            And in that message, in that official communication
```

PROCEEDINGS                                                1120

 1  from Apache, they said, We recognize that the specifications

 2  are proprietary.  And that has nothing to do with the

 3  trademark.  That has to do with the API specifications that

 4  Apache based its implementation on.  So Apache, when they threw

 5  in the towel, they knew it was all about these specifications.

 6           And we'll show you an e-mail from Mr. Rubin in which

 7  Mr. Rubin acknowledges that Sun's APIs are copyrighted and you

 8  have to take the TCK.  So this is no new issue.  And that was

 9  the point of the Danger discussion.

10           **THE COURT:**  Well, but when they said the APIs, did

11  they say -- does the phrase "structure, sequence,

12  organization" --

13           **MR. VAN NEST:**  No.

14           **THE COURT:**  -- is that anywhere in there?

15           **MR. JACOBS:**  No.

16           **THE COURT:**  Here's what happened.  They used

17  different implementing code.  And so was the fight over whether

18  you could use the APIs with the original Sun code or was it --

19  or was Sun saying you can't even use our APIs with brand-new

20  code?

21           **MR. JACOBS:**  The latter, Your Honor.  Very much the

22  later, because that was the whole point of the Apache dispute.

23  Apache is a nonprofit, a group of companies come together and

24  they decide to create what they articulate as an independent

25  implementation conforming to the Java specifications.

PROCEEDINGS                                    1121

```
 1              So if Apache's goal had been achieved, there would
 2      have been yet another one of these compatible implementations
 3      out there, which we've heard discussed in the trial, in which
 4      the code is uniquely written -- hold the thought of this, you
 5      know, what this -- what this box means in terms of code
 6      (indicating).  Hold it, separate that issue out.
 7              Apache says, We're going to write an independent
 8      implementation of the Java specification top to bottom.  And
 9      then we are going to get a TCK from Sun and we are going to
10      pass the TCK and we will even be able to say now we are
11      compatible.
12              And Sun says, You can have a TCK, but that TCK is
13      going to have a field of use restriction to desktops and
14      servers.
15              And Apache says, You can't do that.  And the members
16      of the JCP, including, you heard, Oracle at the time, on the
17      buy side instead of the sell side.  When Oracle was trying to
18      protect itself, as you heard from Oracle witnesses, against the
19      decay of Sun, Oracle was backing this independent
20      implementation as well.
21              And these companies went to Sun and said, We think
22      you should grant us a TCK with a broad field of use, take away
23      the field of use restrictions, because we want Apache
24      Harmony -- now, compatible -- fully-compatible Apache Harmony
25      to be able to use -- to be able to be used on all kinds of
```

```
 1  devices.  And Sun said no.  And Sun executives said no.  And
 2  Sun executives publicly said no.
 3           And so Apache Harmony had this ongoing disagreement.
 4  Ultimately, that disagreement gets resolved when Oracle,
 5  exercising more energetic leadership, gets the OpenJDK project
 6  moving along more aggressively, and IBM and other companies
 7  that were backing in part Apache Harmony say, no more Apache
 8  Harmony, we're going to work on OpenJDK, which is under the
 9  GPL.
10           And that's when Apache Harmony throws in the towel --
11  or that's when Apache Foundation throws in the towel, writes
12  the letter to Oracle which says we recognize your
13  specifications are proprietary, and puts the Harmony project in
14  the attic.
15           And we could lay all this out.  It's really all in
16  public documents, Your Honor.
17           THE COURT:  I think -- I hope the evidence does lay
18  it all out on both sides.  I like to hear this.  It helps me
19  absorb the evidence.  But if these points are important in the
20  trial, I hope both sides prove up your respective views.
21           MR. JACOBS:  You bet.
22           THE COURT:  So, Mr. Van Nest, what -- since
23  Mr. Jacobs has -- says that you're totally wrong, I'll give you
24  the last word.  What's your view about what was on the cloud?
25           MR. VAN NEST:  Well, the evidence is going to show,
```

1  Your Honor, that from Mr. Schwartz's perspective he told people

2  you can ship Harmony, you just can't call it Java.

3          This -- what's not particularly relevant and not in

4  the evidence and not in any of the discovery is what Mr. Jacobs

5  just told you.  All that's happened recently.

6          All that stuff with Apache, Oracle has gone over and

7  they want to basically shut down the JCP.  The open source

8  isn't helping them anymore now that they own Java.  Right --

9  open source was great when they were out there as a

10 beneficiary, but now that they're on the other side they're not

11 in favor of open source anymore.  That's all happened in the

12 last year.

13         **THE COURT:**  At the moment that Google took its

14 license, what year was that?  From Apache.

15         **MR. VAN NEST:**  Well, probably 2007 or '8.  Somewhere

16 in there.

17         **THE COURT:**  All right.  At the time that happened,

18 had Mr. Schwartz said it's okay to ship --

19         **MR. VAN NEST:**  Yes.

20         **THE COURT:**  -- and just don't call it Java?

21         **MR. VAN NEST:**  Yes.  Yes.

22         **THE COURT:**  Is that in writing?

23         **MR. VAN NEST:**  Yes.

24         **THE COURT:**  Really?  What exhibit is that?

25         **MR. VAN NEST:**  Well, I showed an excerpt from it in

 1  the opening.  I'd have to go back and make reference.  But I

 2  showed an excerpt from it in the opening.  It's a statement --

 3  what I showed in the opening was an excerpt from a press

 4  release where Mr. Schwartz said you can ship as long as you

 5  don't call it Java.  Harmony can ship today.

 6          THE COURT:  Calling it Java, even your own code

 7  starts off Java.

 8          MR. VAN NEST:  That's different.  I mean branding.

 9  Everybody -- everybody that's using -- as you know, everyone

10  that's implementing a Java-based library has got to use that or

11  you can't run --

12          THE COURT:  So you mean?

13          MR. VAN NEST:  I mean -- yes, I mean -- or, you know,

14  publicizing that you're Java compatible, you have the blessing

15  of Sun and you're Java compatible and you get the brew cup and

16  all that.

17          Now, were there other issues in Apache?  I'm sure

18  there were.  But let me just clarify.  Our main pitch on the

19  Apache point is that people like these engineers have been

20  using these APIs for years without any complaint.

21          You've now heard Mr. Lindholm say it.  You heard, I

22  believe, Mr. Swetland said it.  You're going to hear a lot more

23  people say it, that they all understood that, you know, you

24  could use the APIs, they're part of using the language.

25          And what you can't do is copy the source code in the

 1  libraries.  That's why people are told -- and you're right,

 2  what's the point of clean room one way or the other as long as

 3  now that we know none of the source code is from Sun, now the

 4  job got done.  Maybe it wasn't done perfectly, but it got done.

 5  Because Apache doesn't have any copied code in their libraries

 6  and neither does Google, with, you know, these trivial

 7  exceptions.

 8          So our main point on Apache is not that, you know,

 9  the Apache license absolves us of all -- any guilt that would

10  be there.  That's not the point of that.  The point is that

11  Apache was out there operating, offering this open source

12  license.  Everybody knew what it was.  Everybody knew what the

13  dispute was.

14          Google operated under Apache and operated openly and

15  disclosed what it was doing to Sun.  And as you just heard from

16  Cizek, Sun's attitude was, well, we got to keep dealing with

17  Google, let's find some other ways to make money and maybe

18  eventually Google will buy our device.  They'll buy our -- our

19  virtual machine and they'll buy J2ME and let's find some sales

20  opportunities.

21          Once it was clear that Google didn't want to partner

22  with Sun because they wanted to go open source, Sun said fine.

23  Everybody knew what was happening.  And then periodically,

24  later on, Sun came back and said, hey, how about buying our

25  product instead of using yours?  So Cizek did that.  Others did

 1  that.

 2          That's what Mr. Ellison was doing in 2010 when he

 3  talked to Eric Schmidt.  How about using our virtual machine

 4  and -- you know, boots faster, runs faster, it's all better.

 5  So nothing was hidden or secret.  That's the point.

 6          **THE COURT:**  Let me -- one last question, just about

 7  the drill for next week.

 8          Is Dr. Mitchell your last witness?

 9          **MR. JACOBS:**  No, Your Honor.  We will probably call

10  Andy Rubin.

11          **THE COURT:**  Then will he be your last witness?

12          **MR. JACOBS:**  Probably, Your Honor.  We'll be doing

13  our final notifications this weekend, but I think we'll

14  probably finish with Mr. Rubin and turn the case over to them.

15          **THE COURT:**  On Monday?

16          **MR. JACOBS:**  Yes.  We may have some deposition stuff

17  to do that'll be brief.

18          **THE COURT:**  And Dr. Mitchell, how long will he be?

19          **MR. JACOBS:**  Well, I haven't been doing -- honestly,

20  Your Honor, I haven't been that great at estimating the amount

21  of cross-examination time that's been done.

22          **THE COURT:**  No, on direct.

23          **MR. JACOBS:**  Probably an hour and a half.

24          **THE COURT:**  You'll be ready to go on Monday, I hope?

25          **MR. VAN NEST:**  Your question?

```
 1              THE COURT:  With your -- start your case.

 2              MR. VAN NEST:  That's the first I'm hearing of it,

 3   but we'll be ready to go.  We'll be ready to go.

 4              THE COURT:  Do you think you're going to use all of

 5   your time?

 6              MR. VAN NEST:  I'm not sure.  We're going to be

 7   meeting this afternoon and over the weekend and we'll figure it

 8   out.  But right now we've used about a third of our time.  I

 9   think we're roughly on target, but there's a lot to put in.

10              MR. BABER:  Your Honor, may I just ask on behalf of

11   Bob Lee, remember we interrupted his examination.

12              THE COURT:  You have to bring him back.

13              MR. BABER:  Start with him first thing Monday

14   morning?

15              THE COURT:  We'll start with him first thing Monday.

16              MR. JACOBS:  Yes, thank you for the reminder.

17              THE COURT:  Thank you for reminding me.  That's

18   exactly right, yeah.

19              MR. VAN NEST:  We have some witness issues next week,

20   but I'll try to work those out with Mr. Jacobs.  We may have to

21   shuffle people around a little bit, but we've been pretty good

22   at that.

23              THE COURT:  I have this thought about the case, that

24   about two-thirds of this case should be very close to being

25   stipulated to, though maybe a slight fuzziness on the
```

PROCEEDINGS                                                    1128

1  stipulations.  And about one-third of it is in controversy, on

2  just the copyright part.

3           So I'm not asking you to stipulate to anything.  I'm

4  sure that you wouldn't do that.  But what I can ask you to do

5  is think of ways to help the jury understand what is genuinely

6  controverted.

7           And -- I'll give you an example.  Oracle has made a

8  lot out of the fact that the word we got to get a license or

9  take a license from Sun was used in various e-mails over the

10 last ten years.  And I can understand that and I'm not in any

11 way being critical of Oracle for putting that in.  I think good

12 for you, you got that evidence.  That helps you.

13          But it is -- it's one kettle of fish to say we need a

14 license because we're going to use their source code and their

15 implementation and another when the program is switched to

16 we're not even going to use their implementation, we're going

17 to do our own implementation so we don't have to go and get a

18 license.

19          And I -- so I worry some that the jury may get the

20 impression that these statements about needing a license are

21 not taking those important differences into account.

22          The best I can say on that is that there are good

23 lawyers on both sides.

24          Mr. Van Nest, you'll just have to explain that in

25 your closing.

```
 1              But it does seem to me that this is something that
 2      the lawyers could come closer to presenting in a way where
 3      you're on the same page on that, so that when it does go to the
 4      jury we are teeing up for them the points that are genuinely in
 5      dispute and those that should be conceded or close to conceded
 6      are, you know, conceded.
 7              I can point to examples on both sides.  I am not
 8      picking on Oracle here.  I can definitely point to examples on
 9      both sides on this one.
10              All right.  I find this to be one of the toughest
11      things I've ever had to do.  The law is tough.  It's not like
12      the -- this is harder than a patent case because this copyright
13      part on the computer thing is not settled.  And then the facts
14      are very hard.  So this is a tough problem for the judge.
15              So here's what you should do, this being Friday.
16      After 4 o'clock -- it's not 4 o'clock yet, but you should go
17      back to your hotel and have a double --
18              (Laughter)
19              THE COURT:  -- a double single-malt Scotch.  That's
20      what I'm trying to say.
21              MR. JACOBS:  If you could issue that order, Your
22      Honor, I think it would help.
23              (Laughter)
24              MR. VAN NEST:  I was just about to duck in the face
25      of another briefing assignment.
```

PROCEEDINGS                                    1130

1           THE COURT:  You're so ordered.  So you can do that.

2           (Laughter)

3           THE COURT:  We will break at this point, and see you

4    back here 7:30, Monday morning.

5           MR. VAN NEST:  Thank you, Your Honor.

6           MR. JACOBS:  Thank you very much, Your Honor.

7           (At 1:16 p.m. the proceedings were adjourned until

8           Monday, April 23, 2012, at 7:30 a.m.)

9                          - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                        I  N  D  E  X

2

    PLAINTIFF'S WITNESSES                         PAGE    VOL.
3
    Summary by Mr. Jacobs                         929      5
4   Summary by Mr. Van Nest                       937      5

5

6   SWETLAND, BRIAN
    (SWORN)                                       946      5
7   Direct Examination by Mr. Norton             946      5
    Cross Examination by Ms. Anderson            958      5
8   Redirect Examination by Mr. Norton           970      5
    Recross Examination By Ms. Anderson          973      5

9

10  LEE, BOB
    (SWORN)                                       979      5
11  Direct Examination by Mr. Jacobs             980      5

12

13  MORRILL, DANIEL
    (SWORN)                                       999      5
14  Direct Examination by Mr. Norton            1000      5
    Cross Examination by Mr. Kwun               1017      5
15  Redirect Examination by Mr. Norton          1035      5
    Recross Examination Resumed by Mr. Kwun     1043      5
16  Further Redirect examination by Mr. Norton  1044      5

17

18  CAMARGO, RAFAEL
    Videotaped Deposition Played - Not Reported 1047      5
19

20  CIZEK, LEO
    (SWORN)                                      1050      5
21  Direct Examination by Mr. Norton            1050      5
    Cross Examination by Ms. Anderson           1073      5
22  Redirect Examination by Mr. Norton          1101      5

23

24

25
</pre>

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | VOL | EVID | . |
|---|---|---|---|---|
| 13 | | | 954 | 5 |
| 23 | | | 957 | 5 |
| 45.1, 45.2, 45.3 | | | 924 | 5 |
| 46.20, 46.21, 46.22, 46.23 | | | 924 | 5 |
| 46.24, 46.25, 46.26, 46.27, 46.28 | | | 924 | 5 |
| 149 | | | 952 | 5 |
| 245 | | | 1038 | 5 |
| 281 | | | 990 | 5 |
| 314 | | | 958 | 5 |
| 405 | | | 986 | 5 |
| 741, 767, 770, 771, 773, 862 | | | 924 | 5 |
| 748, 749, 751, 752, 753 | | | 923 | 5 |
| 1030, 1031, 1032, 1033, | | | 924 | 5 |
| 1034, 1035, 1036, 1037 | | | 924 | 5 |
| 1038, 1039, 1040 | | | 924 | 5 |
| 2001 | | | 1066 | 5 |
| 2002 | | | 1079 | 5 |
| 2004 | | | 1082 | 5 |
| 2006 | | | 1085 | 5 |
| 2008 | | | 1086 | 5 |
| 2009 | | | 1089 | 5 |
| 2010 | | | 1092 | 5 |
| 2013 | | | 1078 | 5 |
| 2016 | | | 1053 | 5 |
| 2019 | | | 1096 | 5 |
| 2021 | | | 1097 | 5 |
| 2026 | | | 1101 | 5 |
| 2301 | | | 1023 | 5 |
| 2352 | | | 1026 | 5 |
| 2800, 2801, 2802 | | | 923 | 5 |
| 3341, 3342, 3343, 3344, 3345 | | | 923 | 5 |
| 3346, 3347, 3348, 3349 | | | 923 | 5 |

## <u>CERTIFICATE OF REPORTERS</u>

We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS,

Official Reporters for the United States Court, Northern

District of California, hereby certify that the foregoing

proceedings in C 10-3561 WHA, **Oracle America, Inc., vs. Google,**

**Inc.,** were reported by us, certified shorthand reporters, and

were thereafter transcribed under our direction into

typewriting; that the foregoing is a full, complete and true

record of said proceedings at the time of filing.


_____
/s/ Katherine Powell Sullivan


Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter



_____
/s/ Debra L. Pas


Debra L. Pas, CSR #11916, RMR CRR



Friday, April 20, 2012