Volume 7

Pages 1397 - 1645

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,          )
                               )
          Plaintiff,           )
                               )
  VS.                          )  No. C 10-3561 WHA
                               )
GOOGLE, INC.,                  )
                               )
          Defendant.           )  San Francisco, California
_____)  April 24, 2012


**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          MORRISON & FOERSTER
                           755 Page Mill Road
                           Palo Alto, California  94304
                  BY:  **MICHAEL A. JACOBS, ESQUIRE**
                       **KENNETH A. KUWAYTI, ESQUIRE**
                       **MARC DAVID PETERS, ESQUIRE**
                       **DANIEL P. MUINO, ESQUIRE**

                           BOIES, SCHILLER & FLEXNER
                           333 Main Street
                           Armonk, New York 10504
                  BY:  **DAVID BOIES, ESQUIRE**
                       **ALANNA RUTHERFORD, ESQUIRE**


(Appearances continued on next page)



*Reported By: Katherine Powell Sullivan, RPR, CRR, CSR #5812*
*Debra L. Pas, RMR, CRR, CSR #11916*
*Official Reporters - U.S. District Court*

1398

**APPEARANCES (CONTINUED):**

For Plaintiff:        BOIES, SCHILLER & FLEXNER
                1999 Harrison Street, Suite 900
                Oakland, California  94612
       BY:  **WILLIAM FRED NORTON, ESQUIRE**
           **STEVEN C. HOLTZMAN, ESQUIRE**

                ORACLE AMERICA, INC.
                500 Oracle Parkway
                Redwood Shores, California  94065
       BY:  **ANDREW C. TEMKIN, CORPORATE COUNSEL**
           **DORIAN DALEY, GENERAL COUNSEL**


For Defendant:        KEKER & VAN NEST
                633 Battery Street
                San Francisco, California  94111-1809
       BY:  **ROBERT ADDY VAN NEST, ESQUIRE**
           **CHRISTA MARTINE ANDERSON, ESQUIRE**
           **DANIEL PURCELL, ESQUIRE**
           **MICHAEL S. KWUN, ESQUIRE**

                KING & SPALDING LLP
                1185 Avenue of the Americas
                New York, New York 10036-4003
       BY:  **BRUCE W. BABER, ESQUIRE**

                GOOGLE, INC.
                1600 Amphitheatre Parkway
                Mountain View, California  94043
       BY:  **RENNY HWANG, LITIGATION COUNSEL**


For Dr. Kearl:        FARELLA BRAUN & MARTEL LLP
                235 Montgomery Street, 30th floor
                San Francisco, California 94104
       BY:  **JOHN L. COOPER, ESQUIRE**


Also Present:         **SAFRA CATZ, President and CFO**
                Oracle Corporate Representative

                **CATHERINE LACAVERA**
                Google Corporate Representative

                        —  —  —

PROCEEDINGS

**P R O C E E D I N G S**

APRIL 24, 2012                                                    7:29 a.m.


                (Proceedings held in open court, outside

                 the presence and hearing of the jury.)

                **THE COURT:**  Good morning everyone, please be seated.

                So how can I help you this morning?

                **MR. JACOBS:**  We have some housekeeping items first,

your Honor.

                **THE COURT:**  All right.

                **MR. JACOBS:**  The Court requested a list of witnesses

and attorneys, and we have one that we have agreed to with

Google.

                **THE COURT:**  Wonderful.

                (Whereupon, document was tendered

                 to the Court.)

                **THE COURT:**  Do we have 12 copies we can hand out?

                **MR. JACOBS:**  We do, actually.  That's why there's so

many here.  This is the list of witnesses.

                **THE COURT:**  Are those --

                **MR. JACOBS:**  And the attorneys are on the back, your

Honor.

1          **THE COURT:**  These are the witnesses in the entire

2  case or...

3          **MR. JACOBS:**  Phase 1, your Honor.

4          **THE COURT:**  This is Phase 1 witnesses?

5          **MR. JACOBS:**  Yes.

6          **THE COURT:**  All right.

7          **MR. JACOBS:**  Then the deposition exhibits for --

8  sorry, the deposition excerpts for Daniel Morrill that were

9  played by video during the trial, we're submitting with an

10  exhibit marker on it as 1066.

11          **THE COURT:**  That will be made part of the record.

12          (Trial Exhibit 1066 marked for identification)

13          **MR. JACOBS:**  And for Bob Lee 1067.

14          **THE COURT:**  Same.

15          (Trial Exhibit 1067 marked for identification)

16          **MR. JACOBS:**  And the demonstratives that were used

17  during Dr. Mitchell's testimony we're submitting as 1073.

18          **THE COURT:**  All right.  Those are the ones that were

19  actually used and shown to the jury as opposed to drafts.

20          **MR. JACOBS:**  That's exactly right.  You'll see in the

21  dec there's some potentially left blank to cover those that

22  were not shown and discussed.

23          **THE COURT:**  Thank you.

24          **MR. JACOBS:**  We have some other items.

25          **THE COURT:**  Go ahead.

PROCEEDINGS

1    **MR. BOIES:**  Two things relating to documents, your

2  Honor.

3       First, the Court will recall that in our motion in

4  limine the Court excluded the 1994 testimony by Mr. Schmidt

5  explicitly.

6    **THE COURT:**  Correct.

7    **MR. BOIES:**  And as part of a general ruling that

8  excluded testimony about pre-2006 Sun positions.  I find that

9  in the book that has been given to me in terms of disclosed

10 documents for Mr. Schmidt's examination, so I wanted to raise

11 that outside the presence of the jury.

12      I assume that counsel will, before using an excluded

13 document, raise that outside the presence of the jury so that

14 we can discuss it.  I just wanted to be absolutely certain that

15 I was correct about that.

16   **MR. VAN NEST:**  I certainly will, your Honor.

17   **THE COURT:**  Okay.

18   **MR. BOIES:**  Second, on documents I have a modicum of

19 good news.

20      I gave them 35 documents with respect to Mr. Rubin

21 that I requested stipulation on, and I have agreement as to six

22 of those that I would like to offer at this time.

23   **THE COURT:**  Please go ahead.

24   **MR. BOIES:**  Exhibits 34, 278, 298, 387, 538 and 1048,

25 which I would offer at this time.

PROCEEDINGS

1     **MR. VAN NEST:**  No objection, your Honor.

2     **THE COURT:**  Those are received.

3          (Trial Exhibits 34, 278, 298, 387, 538 and 1048

4          received in evidence)

5     **MR. BOIES:**  Then, last, I would ask the Court's

6  guidance.  That leaves me with 29 exhibits and what I would

7  plan to do is offer those, not using the term "party

8  admission," but as a party admission.  And if there is an

9  objection that is sustained, I would lay a foundation through

10 the witness, but I don't want to, obviously, do that when I

11 don't have to in terms of my time.

12    **THE COURT:**  Well, here is what I suggest.  I'm

13 sympathetic to your problem.  I suppose almost all of these are

14 going to be emails written by the witness?

15    **MR. BOIES:**  Yes, or to the witness.

16    **THE COURT:**  Or to the witness written by somebody

17 else at Google?

18    **MR. BOIES:**  Yes, your Honor.

19    **THE COURT:**  So all you have to do is say, "Is this an

20 email you wrote on or about X?"  He says, "Yes."  And you say,

21 "Offer in evidence," and it's going to sail in.

22    **MR. BOIES:**  I will do that, your Honor.

23    **THE COURT:**  Or, "Is this an email you received from

24 somebody else in Google on or about X?"  Same scenario.

25         So that has the additional advantage of helping the

PROCEEDINGS                                          1403

1  jury understand what it is, so that it's just not a stray

2  document stuck in the jury room.

3          All right?

4          **MR. BOIES:**  Thank you, your Honor.

5          **MR. NORTON:**  Thank you, your Honor.

6          Another matter we wanted to bring up.  On Sunday,

7  February -- or, April 15th, we filed a motion in limine

8  concerning evidence that Google apparently intends to rely upon

9  to satisfy the reliance element of its equitable defenses,

10 including implied license and equitable estoppel.  Among that

11 evidence is Mr. Schwartz's blog post, which is admitted into

12 evidence as Exhibit 2352.

13         Google has disclosed for several of its witnesses

14 that it intends to use in its examination Exhibit 2352, and we

15 renew our objection and move to exclude testimony concerning

16 that document on the grounds that Google did not at any time in

17 discovery disclose anything to suggest that any witness, any

18 employee of Google, relied on any blog post by Mr. Schwartz in

19 deciding to proceed with Android, invest in Android, make any

20 decision with respect to Android.  There is nothing --

21         And this is in Docket 922, which we again filed on

22 Sunday the 15th.  We recounted what they disclosed in discovery

23 and what they did not and we specifically asked them for the

24 bases for their equitable defenses.  And there is no evidence

25 ever disclosed by Google that any employee of theirs ever

1  relied on any such statement and for them to try to offer

2  testimony now at trial that we had no notice of during the

3  entire course of discovery would be unfair and prejudicial and

4  would be entirely inconsistent with the purposes of Rule 26.

5       The only reference they have ever made in their

6  discovery responses, and this is in their opposition, 922, is

7  to say that Oracle was aware of Mr. Schwartz's blog post.  And

8  Oracle's awareness of Mr. Schwartz's blog post does nothing for

9  Google.

10      Google needed to show that its employees were aware

11 of the blog post and that there was some actual reliance.  It's

12 required for each of these equitable defenses.  Nothing in

13 their discovery responses ever says that.

14      **THE COURT:**  All right.  Let's hear the response.

15      **MR. BABER:**  Your Honor, just a few quick points.

16      First, just to be clear, not all of the equitable

17 defenses even require reliance, only some of them do.

18      But the fact is during discovery, your Honor may

19 remember, we had two series of motion to compels, come

20 meet-and-confers in the courthouse.  At those meet-and-confers

21 we worked out some very elaborate procedures for raising issues

22 as to adequacy of interrogatories.

23      In accordance with that, we supplemented our

24 interrogatory responses, as we had agreed.  We included in the

25 supplemental responses Mr. Schwartz's blog post specifically

1  and we said in the response -- we identified the different

2  elements of the equitable defenses.  We said, Google relied on

3  these statements and inactions of Sun.  Google could have made

4  other choices if Sun had complained earlier, and these are the

5  bases for our equitable defenses.

6         At no point in discovery did anyone agree to identify

7  specific granular, "This witness will testify as to X."  "This

8  witness as to Y."  After we did those supplemental responses,

9  after backs-and-forths for weeks, we sent that to them.  We

10  never heard a peep after that.  There were no further issues

11  raised about the requests adequacy of those responses.

12         And what we had agreed, and what we told your Honor

13  at the meet-and-confer in March, was we said we had agreed that

14  we would, as best we could, respond with supplemental responses

15  at sort of equal levels of detail for both parties, but that if

16  either party, after seeing the other's responses, thought that

17  it should be more detailed, all they had to do was raise it.

18         If you remember, we had a procedure where we would

19  have senior counsel meet-and-confers every week to address

20  discovery issues.  Not once ever after the supplemental

21  response that identified the blog post specifically referenced

22  reliance and said how we were going to show reliance did they

23  ever complain again.

24         **THE COURT:**  Is 2352 two in evidence already?

25         **MR. BABER:**  It is, your Honor.  It's already been

PROCEEDINGS                                                    1406

```
 1  admitted.

 2          THE COURT:  Show that to me so I can remember what it

 3  says.

 4          MR. BABER:  It's Jonathan Schwartz, chairman of --

 5  the rockets.  He strapped rockets to Java, blog post.

 6          (Document displayed)

 7          THE COURT:  How could such a colorful document be

 8  kept out of evidence?

 9          (Laughter.)

10          THE COURT:  Mr. Norton, I don't understand.  This is

11  already in evidence.  So what is the problem?

12          MR. NORTON:  The document is in evidence.  You will

13  recall, your Honor, at the sidebar we objected; that when the

14  defendants introduced the document through Mr. Morrill, we

15  objected that Mr. Morrill had not relied on the document and

16  that Google couldn't establish that he had.  Your Honor

17  restricted the questioning of Mr. Morrill on that basis and at

18  the conclusion of the sidebar, I noted that no reliance had

19  ever been disclosed by Google with respect to this document,

20  and your Honor said that that was an objection you might have

21  considered, but that I noted it too late.

22          I hope not to make that mistake twice.  We did move

23  in limine on the 15th.  We did specifically target the blog

24  post.  Google has not disclosed this, any reliance on this

25  document.  The document they disclosed.  Reliance they did not.
```

1           Mr. Baber is arguing that Oracle had an obligation to

2    come back and extract better evidence to support Google's

3    defenses.  That's not how discovery works.  They chose what

4    they wanted to disclose and if their disclosures were

5    inadequate to prove their defenses, we're entitled to say,

6    apparently, they can't prove those defenses.

7           **THE COURT:**  I just heard from Mr. Baber that he did

8    give an interrogatory answer that specifically called this blog

9    out.  Didn't I -- isn't that what you said?

10          **MR. BABER:**  Yes, sir.

11          **THE COURT:**  So I don't get it.  One of you is saying

12   it was disclosed, and one is saying it was not disclosed.

13          **MR. NORTON:**  I agree that the -- as I stated before,

14   their responses do mention the blog post.  They mention the

15   blog post.  And I'm quoting from their opposition to our motion

16   in limine Document 924 at Page 4.

17              "Google further states that Oracle was aware

18              of Android and the Open Handset Alliance at

19              least as early as November 2007 as reflected

20              by Jonathan Schwartz's public comments

21              congratulating Google and the Open Handset

22              Alliance on the announcement of Android."

23          Which I take to be a reference to the blog post.

24   What they don't say in that response is that they were -- they,

25   Google -- was aware or that Google relied.

PROCEEDINGS                                     1408

```
 1         Now, they do have a categorical statement that Google
 2   relied on inaction.  Google.  Not any witness.  Not any person.
 3   Not any decision maker.  But Google relied on Sun's inaction
 4   and statements.
 5         But, again, that's too broad to satisfy their burden
 6   to identify the evidences that supports their defenses to the
 7   extent those defenses require showing of reliance.
 8         And no witness testified that they had relied on this
 9   document in any deposition.  No discovery response says that
10   there was a decision maker at Google who relied on this
11   document.  They can try to show reliance by some other means,
12   but this is not the means by which they disclosed it in
13   discovery.
14              MR. BABER:  Your Honor, if I may?
15              THE COURT:  Well, yes.  Did I understand you
16   correctly to say that you did call out the blog as an item that
17   you relied on?
18              MR. BABER:  Yes, your Honor.  I'll read it to you, if
19   you would like.
20              THE COURT:  Read it to me.
21              MR. BABER:  This is the supplemental responses we
22   provided after the meet-and-confer and we had worked out all
23   these procedures, and it is our response to their interrogatory
24   10, which asks for:
25              "Please explain the factual and legal bases
```

 1              for Google's pleading of its 11th affirmative

 2              defense, copyright and unenforceability

 3              (waiver, estoppel, latches)."

 4         There's a lot of objections and early stuff.  Then it

 5  says:

 6              "First of all, Google expressly incorporates

 7              by reference" --

 8              (Court reporter interruption.)

 9         **THE COURT:**  My goodness.  I never understood why it

10  is that when a lawyer starts to read, they double their speed.

11  They should go half as fast.  It should be -- if it's so

12  important, it ought to go slowly.

13         Come on.  All right.  Start over and read it.

14         **MR. BABER:**  Sorry.  I apologize.

15         This is our response, our supplemental response to

16  their Interrogatory No. 10, which asks for the factual and

17  legal bases for our equitable defenses on the copyright side.

18         We first said that we incorporated by reference our

19  response to Interrogatory No. 4, which was basically the same

20  interrogatory on the patent side, since obviously the equitable

21  defenses relate to both.

22         In that earlier response we had referenced -- I'm

23  trying to scroll all the way up to it, your Honor.  It's a long

24  set of discovery responses.

25         In that interrogatory response to No. 4 we

 1   specifically referenced:

 2              "In fact, former Sun CEO Jonathan Schwartz

 3              congratulated Google when Android was

 4              announced and publicly commented that, quote,

 5              today is an incredible day for the Open

 6              Source Community and a massive endorsement of

 7              two of the industry's most prolific free

 8              software communities," et cetera.

 9         So it was specifically referenced there, and

10   incorporated by reference in No. 10.  And No. 10 --

11              **THE COURT:**  Where was he working when he did this

12   blog?

13              **MR. BABER:**  He was the CEO of Sun.

14              **THE COURT:**  At the time of the blog?

15              **MR. BABER:**  Yes, sir.

16              **THE COURT:**  You said he was the former CEO.

17              **MR. BABER:**  Well, he was.  At the time of the

18   interrogatory answers, he was the former CEO.

19              **THE COURT:**  But at the time he actually wrote this

20   2352, he was the CEO of Sun?

21              **MR. BABER:**  That's correct, your Honor.

22              **THE COURT:**  Had Oracle acquired the company yet?

23              **MR. BABER:**  Not yet.

24         Now, we go on in the interrogatory answer to 10,

25   after incorporating No. 4.  And we say that:

```
 1                "Google further states, as reflected in

 2                Oracle's patent local rule disclosures,

 3                Oracle was aware of Android pursuant to

 4                discussions with Andy Rubin," et cetera.

 5                "On May 26th, 2006 Oracle representatives met

 6                with Andy Rubin to discuss Open Source and

 7                other things.  Google further states that Sun

 8                believed Android to allegedly infringe Sun's

 9                rights at least as early as these

10                discussions, but no later than November 15th,

11                2007."

12           And we cite to Andy Rubin's deposition as a witness

13   who had testified already about this as of the time of the

14   interrogatory answers.

15                We then said:

16                "Google further states Oracle was aware of

17                Android and the Open Handset Alliance at

18                least as early as November 2007, as reflected

19                by Jonathan Schwartz's public comments

20                congratulating Google and the Open Handset

21                Alliance on the announcement of Android."

22                The interrogatory answer continues:

23                "Oracle, nevertheless, delayed several years

24                before bringing suit even though the Android

25                source code was publicly available, while the
```

```
 1                Android market grew and while Google and

 2                numerous handset manufacturers and other

 3                entities made significant investments in the

 4                Android platform."

 5                Google further states that:

 6                "Oracle's actions, including statements and

 7                actions of its predecessor Sun, encouraging

 8                use of the Java programming language and

 9                congratulating Google on the launch of

10                Android" -- that's the blog -- "form the

11                basis of Google's defenses of waiver,

12                estoppel and latches.  Sun/Oracle's delay was

13                unreasonable.  Google reasonably relied on

14                Sun's/Oracle's acquiescence and delay and if

15                Sun or Oracle had asserted claims earlier,

16                Google could have made different choices

17                regarding the inclusion of certain elements

18                in Android.  Sun's/Oracle's delay has been

19                prejudicial to Google in several respects,

20                including that numerous relevant documents,

21                including complete copies of the asserted

22                works themselves, were apparently not

23                maintained by Sun/Oracle.  Memories of

24                witnesses have faded and Google has been

25                required to expend significant resources
```

1      defending Oracle's late claims."

2          It keeps going on.  There's more.

3          **THE COURT:**  All right.  Well, all right.  So it does

4    seem to me that the interrogatory answer called out this very

5    blog and said it was relied upon.

6          **MR. NORTON:**  Well, the -- we have never disputed that

7    they called out the blog.  Our concern is that they are going

8    to put witnesses on the stand to say that they relied upon the

9    blog when they've never identified any witness who did so.

10         And, in fact, at the March 28th hearing before your

11   Honor, March 28th, 2012, your Honor asked counsel for Google,

12   "Who from Google is going to stand up and say they relied on

13   this blog post?"  And the answer was, "I'll have to check."

14         They have never told us.  They have never told you.

15   So at this point they don't have anybody whose ever -- they've

16   never identified anywhere that there is a person who relied.

17   They just have a categorical statement of the legal requirement

18   of reliance and they have disclosed nothing else.

19         And at this point for them to bring out witnesses who

20   will say, "Yes, I read it.  I relied on it.  It was very

21   important to me," when we never had a chance to see that in

22   discovery is unfair.

23         **THE COURT:**  All right.  Here is the answer.

24         You may question about this blog.  It's already in

25   evidence to begin with.  Even if it wasn't in evidence, this is

1  relevant on several fronts.  It may be that no one can say they

2  saw this blog at that time, but it -- it seems to be part of a

3  pattern, arguably, of acquiescence or tolerance of what Google

4  was doing and such that it was only years later after Oracle

5  acquired the company that things changed.

6          Back at this point in time Sun seemed to be a

7  enthusiastic supporter of what Google was doing and from that

8  it could be argued, together with other evidence, that there

9  was a pattern of acquiescence by Sun.  I'm not saying that

10 there was.  I'm just saying that the -- that Google should be

11 given the opportunity to try to prove that.  So that's one way

12 it's relevant.

13         Second way that it's relevant is -- and to just add

14 one more sentence.  It may be that no particular witness can

15 remember reading this and saying they relied on it, though we

16 don't know for sure.  We haven't heard all the witnesses yet.

17 But I am sure they are going to say they did rely upon the

18 apparent acquiescence, a pattern of doing so, and this being

19 part of the pattern I think that ought to come into evidence.

20         But there is a second way in which this is relevant,

21 perhaps, more to Phase 3.  If Sun itself thought that Android

22 was going to strap some rockets to the -- you know, strapping

23 rockets is like the spaceship going into outer space.  Then how

24 can Oracle say it's been damaged?  Maybe there ought to be a

25 counterclaim for unjust enrichment.

1          (Laughter.)

2          **THE COURT:**  I mean, if it's true that it was such a

3    great thing and Sun thought it was such a great thing, it's a

4    good argument that, hey, if this damaged Sun so much, how come

5    he said it would strap rockets to the...

6          So, I can see this being a legitimate item of

7    evidence, and I'm not saying that there were no damages.  This

8    is a matter of proof for the lawyers to argue before the jury.

9    And we have got terrific lawyers here and we will make good

10   points, but this is fair game.

11         So the objection is overruled, and the motion to

12   exclude is overruled.  We're going to allow 2352 to be used to

13   examine Mr. Schwartz.

14         Is he coming today?

15         **MR. VAN NEST:**  No, your Honor.  Mr. Schwartz is the

16   CEO of Sun, but Mr. Schmidt and Mr. Rubin will both be here

17   today.

18         **THE COURT:**  All right.  Well, you can use it with

19   them, I guess.

20         All right.  So what's the next item?  We have got to

21   hurry because the jury is here.  We're ready to go.

22         **MR. VAN NEST:**  I just need a couple minutes, your

23   Honor.

24         I appreciate the guidance that you gave Mr. Boies on

25   the exhibits.  There is one category of documents that they

1   want to use with either Mr. Schmidt or Mr. Rubin, and these are

2   what I call the large number documents.

3           An example here, if I could hand it up, is 431.  I

4   think your Honor has seen 431 before.  I would appreciate it

5   not being displayed in a courtroom necessarily.

6           (Whereupon, document was tendered

7            to the Court.)

8           **MR. VAN NEST:**  But these are just -- these are

9   generally financial documents that are after -- most of them,

10  after the lawsuit started.  This one is in October of 2010.

11          And I've put a couple of handy green tabs on there,

12  your Honor, to show you two or three pages down.  I mean, these

13  are nothing more than getting the same large numbers with a "B"

14  in front of our jurors.

15          They are probably not even relevant to Phase 3.  They

16  are certainly not relevant to Phase 1.

17          I have absolutely no problem with any witness being

18  examined about, you know, how Android was going to be used and

19  how were you going to make money on it, and was it a charitable

20  event or were you planning to monetize it?  But these are

21  obviously -- and some of them are humongous.  I mean, 40 page

22  financial documents just for the purpose of throwing the "B"

23  number up.

24          And I object to those.  That's the main category.

25  There's probably a dozen of them.

1           THE COURT:  Who would this be used with?

2           MR. VAN NEST:  I'm not sure.  Probably either Mr.

3    Rubin or Mr. Schmidt, our CEO, will be here this morning.

4           THE COURT:  Is that in your case or --

5           MR. VAN NEST:  That's in their case, in their case.

6           I'm not going to ask either Mr. Rubin or Mr. Schmidt

7    any questions about these.  But, again, arguably may be

8    relevant to Phase 3, but certainly not today and certainly not

9    throwing the big "B" numbers around in a copyright case where

10   we're in Phase 1.

11          THE COURT:  What do you say, Mr. Boies?

12          MR. BOIES:  Your Honor, if you look at Exhibit 431, I

13   don't think they're throwing around a lot of "B" numbers in

14   there.

15          It's absolutely clear under the law that the more

16   revenue obtained as a result of an infringer's use of a

17   copyrighted work, the less likely the use will be considered

18   fair.

19          Even if we had filled that exhibit with "B" numbers,

20   as long as it relates to their revenue -- and the Court can

21   give whatever instruction the Court thinks is appropriate in

22   terms of the fact that revenue is not profits, it's not

23   damages.  But the law, with respect to fair use, is that the

24   more revenue they obtain as a result of an infringer use of a

25   copyrighted work, the less likely the use will be considered

1   fair.

2        **THE COURT:**  That's a good point.

3        What do you say to that?  That is a factor, isn't it,

4   under fair use?

5        **MR. VAN NEST:**  I don't think the amount of revenue is

6   necessarily a factor.  Whether it's commercial use or not is a

7   factor.

8        And if you'll look at an exhibit like 431, your

9   Honor, these are general statements not just about Android, but

10  about Google in general.  431, for example, is talking about

11  all the business units.  It's talking about not only Android,

12  but another product called Chrome, which isn't even at issue

13  here.  It's talking about revenues from things like search,

14  display, YouTube and so on.

15       I mean, again, the fact that it's a commercial use is

16  not in dispute.  Nobody is claiming that Google created Android

17  as part of a charitable mission.  The evidence is pretty clear

18  that they created it to provide a platform on which other

19  Google product could do better.  And there is nothing wrong

20  with examining about that.

21       In terms of the amount of money -- most of these are

22  projections, first of all, for the future.  So I'm not sure why

23  that would be relevant at all, but in terms of the amount of

24  money, that's not a relevant factor.  It's whether or not --

25       **THE COURT:**  I'm not sure you're right about that.

PROCEEDINGS                                      1419

 1  The way you have pitched it so far to the jury is that what

 2  Google did was in the public interest, and that -- that

 3  Google -- the items that were copied you did in order to take

 4  it to the next level and it was all in the interests of the

 5  public interest and the programming community.

 6          I can't reconstruct how you put it, but it sounded

 7  charitable -- there was a charitable tinge to the argument.

 8  And why wouldn't it be fair for Mr. Boies to come back and say,

 9  "No, it was just Greed.  Greed, Greed, Greed, with a capital

10  G."

11          **MR. VAN NEST:**  Your Honor, Mr. Baber is pointing out

12  the relevant factor here is the purpose and character of the

13  use, the effect upon -- the effect of the use upon the

14  potential market or value of the copyrighted work.

15          So the fact that Google was planning to make money on

16  this is a relevant factor, but I'm talking about the amounts of

17  money.

18          **THE COURT:**  You left something out.

19          I left my copy of the statute back in the room, but

20  it calls out the word "commercial" that you left out when you

21  just read it.  Read me the whole statute.

22          **MR. BABER:**  You want the whole statute or just the

23  four factors?

24          **THE COURT:**  The factor that uses the word

25  "commercial."

PROCEEDINGS                                    1420

```
 1            MR. BABER:  It's factor one, your Honor.

 2            "The purpose and character of the use,

 3            including whether such use is of a commercial

 4            nature or is for non-profit educational

 5            purposes."

 6        THE COURT:  Yeah.  Well, you left that part out.

 7  This is, the amount of money goes to commercial.

 8        MR. VAN NEST:  Your Honor, what I have told the jury

 9  was that -- right from the start, that the whole point of

10  Android was to get a platform out there on which Google

11  products could perform better.  That's what Mr. Page said

12  during his brief appearance here early last week.

13        I'm objecting not to evidence about commercial use.

14  I'm not objecting to evidence about the goal, intent and so on

15  of Android.

16        What I'm objecting to is throwing large numbers out

17  there with a "B" in front of them that are prejudicial, not

18  relevant, certainly not relevant to Phase 1, and add nothing to

19  the point that this was a commercial use.

20        And so that's my objection.  It's 403.  There's a

21  whole dozen of these they want to use, and I don't think -- I

22  don't think it adds anything relevant to the evidence or the

23  factor given that we're only complaining about the amount, and

24  I think it's prejudicial.

25            THE COURT:  All right.  That objection is overruled
```

```
 1  without prejudice to after -- if Mr. Boies overdoes it and goes

 2  through too many of these, at some point it will be diminishing

 3  returns and 403 will come into play.

 4          However, this is unlike the situation where I

 5  excluded Mr. Norton from bringing up how much money was paid

 6  for Sun -- which he should not have done and he was told not to

 7  do that beforehand -- because that is irrelevant and that does

 8  have the prejudicial effect that you're complaining about.

 9          But this is a different kettle of fish.  These are

10  your own documents.  These are Google's own internal documents

11  showing how many billions of dollars they expected to make off

12  of this.  And it's a decent argument to be made, that this was

13  not at all intended for charitable purposes.  This was intended

14  for commercial purposes with large amounts of money at stake

15  and, therefore, it was not fair use.  It was copying.

16          So I think within -- I don't know how many you have

17  of these, but you can use at least two of them.  After that,

18  we'll have to see where it leads.  So that objection is

19  overruled to that extent.

20          All right.  We need to bring in the jury, unless you

21  have something, a burning thing.

22          I never did get a ruling on 207.  Is 207 objected to?

23  That was where we left off yesterday.  207 is one you offered,

24  Mr. Boies, but I don't have it -- I have written down what we

25  decided on it.
```

```
 1            MR. BOIES:  I think Mr. Van Nest has not responded to

 2     that one, your Honor.

 3            MR. VAN NEST:  Can we do that during the course of

 4     the evidence, your Honor?

 5            THE COURT:  All right.  We'll come back to it.

 6            Do we still have a witness on the stand?

 7            MR. BOIES:  Yes.

 8            THE COURT:  Mr. Rubin, isn't it?

 9            MR. BOIES:  Mr. Rubin.

10            THE COURT:  Let's bring him back.

11            (Jury enters courtroom at 8:01 a.m.)

12            THE COURT:  Okay, welcome back.  Please be seated.

13            So they are trying to find the witness.  This will

14     give me an opportunity to -- while we're waiting, I'll explain

15     what I said I would the other day.

16            Why is it that the lawyers ask for permission to

17     approach the witness?  Remember, I told you I would tell you

18     that little secret.

19            Here is the reason.  In the old days, even before I

20     was born, the lawyers would go up there and stand by the

21     witness and kind of put their arm around them and lean over and

22     sort of shout in their ear, and pretty soon they would admit

23     anything just to get rid of the lawyer.  And so we protect the

24     witnesses from that, and you cannot approach the witness

25     without permission of the Court.
```

1          Now, these lawyers are excellent.  They would never

2  do such a thing to a witness, and so there really is no need

3  for them to ask, but out of courtesy to the Court and out of

4  tradition they always ask and I always grant it, don't I?  So I

5  never have said no.

6          But that's the reason.  It's an old tradition.  It's

7  the same reason that we don't let the lawyers get within

8  three feet of the jury box.  Same thing.  These lawyers would

9  never abuse that in this courtroom.  They are terrific lawyers.

10 But nonetheless it's an old traditional.  The jury box and the

11 witness box are safe havens, so to speak, by tradition.

12         Is the witness ready?  Mr. Rubin, please come

13 forward.

14         (Witness steps forward.)

15         **THE COURT:**  How are you today?

16         **THE WITNESS:**  Good.  Thank you.

17         **THE COURT:**  Good.  Please talk into the mic.

18         **THE WITNESS:**  Okay.  How do I sound?

19         **THE COURT:**  And, remember, you're still under oath.

20         **THE WITNESS:**  Yes, okay.

21         **THE COURT:**  And you all remember over there in the

22 jury box, we only got about 15 minutes into the examination --

23 23 minutes, my notes show, into the examination of Mr. Rubin,

24 but we'll pick it up where we left off yesterday.

25         Mr. Boies, you may continue.

1          **MR. BOIES:**  Thank you, your Honor.

2                              <u>**ANDY RUBIN**</u>,

3    called as a witness for the Plaintiff herein, having been

4    previously sworn, resumed the stand and testified further as

5    follows:

6                    <u>**DIRECT EXAMINATION RESUMED**</u>

7    **BY MR. BOIES:**

8    **Q.**   Mr. Rubin, I would like to begin by having you identify

9    some documents that were either sent to you or that you

10   prepared either in whole or in part?

11          **MR. BOIES:**  And may I approach, your Honor?

12          **THE COURT:**  You may.

13             (Whereupon, document was tendered

14              to the witness.)

15          **MR. BOIES:**  In order to expedite this, may I stand

16   here as we go through this document?

17          **THE COURT:**  Yes, you can do that.

18   **BY MR. BOIES:**

19   **Q.**   The first document I want to show you is a document marked

20   as Trial Exhibit 207.

21             (Whereupon, document was tendered

22              to the witness.)

23          **THE COURT:**  A little louder so the jury will hear

24   you.

25

 1  **BY MR. BOIES:**

 2  **Q.**   Trial Exhibit 207.  Is this a document that was sent to

 3  you on or about May 11th, 2007?

 4  **A.**   Let me take a look.

 5          (Brief pause.)

 6  **A.**   Yes, I believe it was.  Yep, May 11th maybe -- yep.

 7          **MR. BOIES:**  Your Honor, I would offer Exhibit 207.

 8          **THE COURT:**  Received in evidence.

 9          (Trial Exhibit 207 received

10           in evidence)

11          **THE COURT:**  Next.

12  **BY MR. BOIES:**

13  **Q.**   Let me ask you to look next at Trial Exhibit 214.

14          Is this an email from Mr. Schmidt to you May 14,

15  2006?

16          (Whereupon, document was tendered

17           to the witness.)

18  **A.**   Yes.  From -- yes, from Eric Schmidt to myself.

19          **MR. BOIES:**  Offer, your Honor.

20          **THE COURT:**  Received in evidence.

21          (Trial Exhibit 214 received

22           in evidence)

23  **BY MR. BOIES:**

24  **Q.**   Let me ask you to look at Exhibit 215.

25

```
 1                    (Whereupon, document was tendered

 2                     to the witness.)

 3   Q.   Is this an email to you June 1st, 2006 on the subject of

 4   Java class libraries?

 5   A.   Yes.  From Chris Desalvo to myself June 1st, 2006.

 6              THE COURT:  Received in evidence.

 7              (Trial Exhibit 215 received in evidence)

 8              THE COURT:  Next.

 9   BY MR. BOIES:

10   Q.   Let me ask you to look next at Trial Exhibit 216.

11                    (Whereupon, document was tendered

12                     to the witness.)

13   Q.   Is this an email to you appear other people from Mr.

14   Schmidt, January 15th, 2007?

15   A.   Yes.  From Eric Schmidt on January 15, 2007 to myself,

16   Jonathan Rosenberg, Larry Page, Sergey, Yael and Alan Eustace.

17              MR. BOIES:  Okay.  Because we're on certain time

18   limits, I would ask you not to repeat the question, if you

19   could.  Just answer "yes" or "no."

20              THE COURT:  216 is in evidence.

21              (Trial Exhibit 216 received

22               in evidence)

23              THE COURT:  Next.

24   BY MR. BOIES:

25   Q.   Let me ask you to look at Trial Exhibit 217.
```

```
 1                (Whereupon, document was tendered

 2                  to the witness.)

 3   Q.   Is this an email to you from Dave Burke, November 21,

 4   2007?

 5   A.   Yes, it is.

 6             THE COURT:  Received in evidence.

 7             (Trial Exhibit 217 received

 8                in evidence)

 9   BY MR. BOIES:

10   Q.   Let me ask you to look next at Trial Exhibit 221.

11                (Whereupon, document was tendered

12                  to the witness.)

13   Q.   Is this an email from you August 18, 2010?

14   A.   It's an email thread originally from Louie, but I'm

15   responding to it.  So it's a reply.

16             THE COURT:  Received in evidence, 221.

17             (Trial Exhibit 221 received in evidence)

18             THE COURT:  Next.

19   BY MR. BOIES:

20   Q.   Exhibit 223.  Is the top email an email from Larry Page to

21   you dated July 17, 2007?

22                (Whereupon, document was tendered

23                  to the witness.)

24   A.   Yes.  The top email is from Larry Page to myself.

25             MR. BOIES:  Offered, your Honor.
```

```
 1              THE COURT:  223 is received.

 2              (Trial Exhibit 223 received

 3               in evidence)

 4   BY MR. BOIES:

 5   Q.   Let me show you Trial Exhibit 230.

 6              (Whereupon, document was tendered

 7               to the witness.)

 8   Q.   Is the top email an email from you August 11th, 2005?

 9   A.   Yes.

10              THE COURT:  I'm sorry.  Have these all been objected

11   to, Mr. Van Nest?

12              MR. VAN NEST:  Some have, but there is no objection.

13   My objection was sponsoring witness objection, but, no, these

14   are not objectionable.  Emails to and from Mr. Rubin are not

15   objected to.

16              THE COURT:  Continue on.

17              MR. BOIES:  In that case, your Honor, I would offer

18   the following exhibits, which are all emails to or from Mr.

19   Rubin.

20              THE COURT:  What are they?

21              MR. BOIES:  Exhibit 273.

22              THE COURT:  Wait.  230 we missed.  I'm going to

23   receive that.

24              (Trial Exhibit 230 received

25               in evidence)
```

```
 1              THE COURT:  273?  What else.

 2              MR. BOIES:  382.

 3              THE COURT:  382.

 4              MR. BOIES:  389.

 5              THE COURT:  389.

 6              MR. BOIES:  431.

 7              THE COURT:  431.

 8              MR. BOIES:  433, 438, 618, 619, 1002, 1044, 1050,

 9    1051, 1060.  And I would offer those exhibits, and Exhibit

10    3443.

11              THE COURT:  3443.  You're representing that all of

12    them are emails to or from Mr. Rubin while he was at Google?

13              MR. BOIES:  Yes, your Honor.  They include some other

14    emails as well in many cases, but they are --

15              THE COURT:  All right.  All of those are received in

16    evidence.  If it turns out that that is untrue, then we'll

17    revisit those.  But to save time, all of those are in evidence.

18              (Trial Exhibits, 273, 382, 389, 431, 433, 438, 618,

19              619, 1002, 1044, 1050, 1051, 1060 and 3443 received

20              in evidence)

21              MR. BOIES:  Thank you, your Honor.

22    BY MR. BOIES:

23    Q.   Now, let me show the witness Exhibit 1061.  This is not an

24    email, at least as I can tell, to or from you, but it attaches

25    a presentation that you participated in preparing, is that
```

RUBIN - DIRECT EXAMINATION / BOIES 1430

1  correct?

2  **A.**   Let me review it, please.

3          (Brief pause.)

4  **A.**   It appears to be a draft presentation.  It's unclear from

5  the date in the email whether I participated in creating it or

6  whether it was later presented for my review after the draft

7  was created.

8          **THE COURT:**  Is your name on there?

9          **THE WITNESS:**  It's on the title page, but I --

10         **THE COURT:**  1061 is received in evidence.

11         **MR. VAN NEST:**   1061 is also subject to my 403

12  objection.

13         **THE COURT:**  Yes, noted.  Overruled.

14         (Trial Exhibit 1061 received

15          in evidence)

16         **THE COURT:**  Next document.

17         **MR. BOIES:**  I think those are the ones, your Honor.

18         **THE COURT:**  Okay.  You can return to the lectern and

19  resume your examination.

20         **MR. BOIES:**  Thank you, your Honor.

21  **BY MR. BOIES:**

22  **Q.**   Mr. Rubin, we were talking about clean room

23  implementations yesterday afternoon.  Do you recall that

24  generally?

25  **A.**   I don't recall specifically talking about clean room

 1  implementations, but I...

 2  Q.   Well, just to refresh your recollection, let's look at

 3  Trial Exhibit 151, Page 9, which is in evidence.

 4           MR. BOIES:   Can we display that?

 5           (Document displayed)

 6  BY MR. BOIES:

 7  Q.   And this is the July 26, 2005 presentation that you

 8  participated in; do you recall that?

 9  A.   Yes.

10  Q.   And do you see where it says:

11           "Developing a clean room implementation of a

12           JVM."

13           Do you see that?

14  A.   Yes, I see that.

15  Q.   And that was a Java virtual machine, correct?

16  A.   Yes, that's correct.

17           MR. BOIES:   And then if we could display Trial

18  Exhibit 12?

19           (Document displayed)

20  BY MR. BOIES:

21  Q.   And this was, in part, an email that you had written,

22  correct?

23  A.   Yes.

24  Q.   And if you look at the paragraph I'm highlighting:

25           "I think a clean room implementation is

```
 1                unlikely because of the team's prior

 2                knowledge."

 3                Do you see that?

 4   A.    Yes, I do.

 5   Q.    And do you recall talking about that yesterday?

 6   A.    Yes, I do.

 7   Q.    Does that refresh your recollection generally about the

 8   subject we were talking about?

 9   A.    Yes.   Thank you.

10   Q.    Okay.   Now, let me ask you to look at Exhibit 147 that I

11   believe is in evidence.

12           MR. BOIES:   Don't display it to the jury yet.

13           (Brief pause.)

14           MR. BOIES:   147 is in evidence.

15           (Document displayed)

16   BY MR. BOIES:

17   Q.    And this is a document that includes an email that you

18   wrote and then a response to that, is that correct?

19   A.    Yes.   I don't -- yes.   I see the partial email that I

20   wrote and then the response.

21   Q.    Where it says "Andy Rubin wrote:"  Do you see that?

22   A.    Yes.

23   Q.    And then if you go down to the bottom, a little farther

24   down.   Right at the bottom it says, "Andy Rubin wrote:"  Do you

25   see that?
```

```
 1  A.   Yes, I do.

 2  Q.   You say:

 3            "Actually it's a clean room implementation

 4            we're buying.  Anyone with specific knowledge

 5            (especially those from Sun) are tainted and

 6            would be bad."

 7            Do you see that?

 8  A.   Yes, I do.

 9  Q.   And then you say:

10            "I interviewed Lars and think he's great, but

11            sadly not for this project."

12            Do you see that?

13  A.   Yes, I do.

14  Q.   Who were you referring to in terms of "Lars"?

15  A.   I'm not sure if it was a then-Google employee or a

16  potential hire.  His name was Lars Bock.

17  Q.   And he was great, but not for this project because he had

18  too much knowledge about Sun and its products; correct, sir?

19  A.   Specific knowledge about Java while he worked at Sun.

20  Q.   Yes.  And then you say:

21            "We were in discussions for eight months with

22            Sun, walked away, and must prove that our

23            internal effort is clean."

24            Do you see that?

25  A.   Yes, I do.
```

1    Q.   And that's what you wrote in July of 2006, correct?

2    A.   Yes, it is.

3    Q.   Let me turn to the subject of fragmentation.

4             And you're familiar with the term "fragmentation;"

5    are you not, sir?

6    A.   Umm, could you help me define it, please?

7    Q.   Suppose we look at Trial Exhibit 7, which is in evidence

8    and which we can display.

9             (Document displayed)

10   Q.   And if you go down to the bottom of the page, you're

11   writing here on October 11th, 2005, correct, sir?

12   A.   Yes.

13   Q.   And you're writing to Mr. Page, correct?

14   A.   That's correct.

15   Q.   One of the founders of Google and one of the top three

16   officers of Google, right?

17   A.   Yes.

18   Q.   One of the top two shareholders of Google, correct?

19   A.   I believe so.

20   Q.   All right.  And what you say to him is:

21             "My proposal is that we take a license that

22             specifically grants the right for us to Open

23             Source our product.  We'll pay Sun for the

24             license and the TCK.  Before we release our

25             product to the open source community we will

1          make sure our JVM passes all TCK

2          certification tests so that we don't create

3          fragmentation."

4          Do you see that?

5   **A.**   Yes, I do.

6   **Q.**   And you knew what "fragmentation" meant when you wrote

7   this email; did you not, sir?

8   **A.**   I used my definition of "fragmentation," yes.

9   **Q.**   And "fragmentation" here, as you are using it, is

10  something that you know Sun does not want to create; correct,

11  sir?

12  **A.**   I'm unclear if my definition of "fragmentation" is the

13  same as Sun's.

14  **Q.**   You're unclear about that?

15  **A.**   Yes.

16  **Q.**   Let's go to Trial Exhibit 125, which is also in evidence.

17          **MR. BOIES:**   And if we go down to the bottom?   Maybe

18  you can highlight where the "fragmentation" appears in here.

19          (Document displayed)

20          **MR. BOIES:**   Wait a minute.   That's not at the bottom.

21  I can't find it.

22          Oh, here we are.   Yes.

23  **BY MR. BOIES:**

24  **Q.**   Do you see down here where it says:

25          "If we don't show strong efforts toward

RUBIN - DIRECT EXAMINATION / BOIES

```
 1              avoiding fragmentation we are also going to
 2              have much more trouble with Sun."
 3  A.   Yes.  I see that.
 4  Q.   Now, does that refresh your recollection that you knew
 5  that your definition of "fragmentation" was something that Sun
 6  did not want?
 7  A.   Sorry.  I'm -- I don't think I wrote this email.
 8  Q.   You didn't have any disagreement with this email; did you,
 9  sir?
10  A.   Again, I was unclear that we were all talking about the
11  same definition of fragmentation.
12  Q.   That's not what you said at the time, right?  You
13  responded to this email, right?
14  A.   I don't know.  Can you show me -- I only have a big,
15  magnified view of it.
16  Q.   This is an email from Mr. Tim Lindholm to you, correct?
17  A.   Yes.
18  Q.   Now, did you ever disagree with what Mr. Lindholm said?
19  A.   I don't recall.
20  Q.   You don't recall.
21              All right.  Sir, let me go to Trial Exhibit 9.
22              (Document displayed)
23  Q.   Now, this is another email from Mr. Lindholm to you and
24  some other people, correct?
25  A.   Yes.
```

1   Q.   And he's talking again about fragmentation, correct?

2   Right here in the second paragraph.

3           "Alan" --

4           And Alan is somebody from Sun, correct, sir?

5   A.   Yes.  I believe he's referring to Alan Brenner.

6   Q.   Right.

7           "Alan from Sun presumably wants this both for

8           tactical reasons (preserve TCK and

9           implementation revenue, defend franchise

10          against fragmentation which is his main

11          threat for long-term erosion)."

12          Do you see that?

13  A.   Yes, I do.

14  Q.   Now, sir, you knew in October of 2005 that Sun wanted to

15  avoid fragmentation in exactly the sense that Mr. Lindholm is

16  writing to you about, correct?

17  A.   Again, I'm unclear that Sun and Mr. Lindholm and myself

18  share the same definition of "fragmentation."

19  Q.   Did you ever try to find out?

20  A.   What Mr. Lindholm's definition was?  What Sun's definition

21  was?

22  Q.   Here you're testifying that you don't know what -- whether

23  your definition of "fragmentation" is the same as Mr.

24  Lindholm's, is the same as Sun.  That's what you're testifying

25  to, here, right?

1  **A.**    Yes.  And I'm unclear whether everybody is talking about

2  the same thing.

3  **Q.**    Did you ever say to anybody back then that you were

4  unclear what "fragmentation" meant?

5  **A.**    I don't recall saying that, no.

6  **Q.**    Did you ever ask, saying, "It's unclear to me what you

7  mean by 'fragmentation'?  What do you mean?"

8            Did you ever can that?

9  **A.**    No I didn't, not that I remember.

10  **Q.**    And the reason you didn't ask that is because you knew

11  perfectly well what "fragmentation" meant; isn't that so, sir?

12  **A.**    I had my own definition of what I thought "fragmentation"

13  meant, yes.

14  **Q.**    And you didn't have any reason to think that anybody else

15  had a different definition.  Everybody knew what

16  "fragmentation" meant in the industry, right?

17  **A.**    It's hard for me to say what other people were thinking.

18  **Q.**    But you knew that "fragmentation" in connection with Java

19  was something that people used in the industry over and over

20  again; right, sir?

21  **A.**    I know that Sun had a definition of "fragmentation" that

22  they used over and over again.

23  **Q.**    And you didn't have any reason to believe that that was

24  any different than your definition of "fragmentation;" did you,

25  sir?

1  **A.**    I don't know how to answer that based on the data that

2  you've given me.  I didn't know what their definition was

3  specifically and I couldn't relate it to my definition.

4  **Q.**    And you never tried to find out, right?

5  **A.**    That's right.

6           **THE COURT:**  Well, counsel asked you a different

7  question.  He said:  Did you back then have any reason to

8  believe that those other people understood the term in a

9  different way than you understood it then?

10          So you can tell us now whether back then you, in

11  fact, had in mind some reason for why there might be a

12  difference.  So you could tell us what that reason -- what

13  reason it might be that there could be a difference.

14          **THE WITNESS:**  There was, you know, some caution on my

15  side in using the term "fragmentation," because I think by

16  Sun's definition if I look -- was looking at them from an

17  outsider and not as part of their company, I think they also

18  have fragmentation, so -- in my definition of the word

19  "fragmentation," which is compatibility.

20          So they had many different versions of Java and one

21  program couldn't run on all the different versions of Java.  So

22  that's my definition of "fragmentation," is it's incompatible

23  implementations of Java.

24          **THE COURT:**  All right.  Go ahead, Mr. Boies.

25

1  **BY MR. BOIES:**

2  **Q.**   Let me go next to Exhibit 21, which is in evidence.

3         (Document displayed)

4  **Q.**   Now, this is an email first from Dan Bornstein to you and

5  then a reply from you; correct, sir?

6  **A.**   Yes.

7  **Q.**   April 13th, 2006; correct, sir?

8  **A.**   Yes.  That was the date of my reply.

9  **Q.**   Now, it's also the date of Mr. Bornstein's email, correct?

10  **A.**   Yes.  Apparently, it is.

11  **Q.**   And Mr. Bornstein writes you and he says:

12         "Java has very little fragmentation."

13         Do you see that?

14  **A.**   Umm, it's -- can we go back to the broad email so I can

15  try to understand the thread?

16         **MR. VAN NEST:**  Your Honor, could the witness be

17  handed the actual exhibits?

18         **MR. BOIES:**  Absolutely.  Absolutely.

19         **THE COURT:**  It's best to show the witness the

20  exhibit.

21         **MR. BOIES:**  May I approach, your Honor?

22         (Whereupon, document was tendered

23          to the witness.)

24         **THE COURT:**  Okay.  Can you reask the question,

25  please?

RUBIN - DIRECT EXAMINATION / BOIES

1  **BY MR. BOIES:**

2  **Q.**   Yes.  You see where Mr. Bornstein says to you:

3          "Java has very little fragmentation."

4  **A.**   I'm not clear.  So there's two indentations in the reply.

5  So it, apparently, has two people replying to it that were not

6  me.  So it's unclear whether Mr. Bornstein said that or maybe

7  Horowitz, who was also cc'd on the message.

8          Do you see where the indentation is?  There's one

9  deep and then there's two deep.

10 **Q.**   Do you see where it says:

11         "On April 13th, 2006 at 3:35 p.m. Dan

12         Bornstein wrote."

13 **A.**   Yeah.  And then it includes --

14 **Q.**   And then you see one, two, three, lines down.  Nothing in

15 between.  Just three lines down.  Do you see that?

16 **A.**   I'm just trying to be precise, Mr. Boies.

17 **Q.**   I am too, sir.  Do you see --

18 **A.**   From this email it's apparent that Dan Bornstein was

19 including a reply from somebody else in that paragraph with the

20 two indentations, and then his actual reply was underneath it.

21 That's what it looks like to me.  But, obviously, I'm not

22 certain.

23 **Q.**   Let me just get your testimony to the jury, all right?

24 You're testifying that you don't know whether the statement

25 "Java has very little fragmentation" was written by

RUBIN - DIRECT EXAMINATION/BOIES

1  Mr. Bornstein?

2  **A.**   That's correct.

3  **Q.**   And you think it may have been written by Mr. Horowitz?

4  **A.**   It's unclear who it was written by.

5  **Q.**   You would agree that it's written, in your interpretation,

6  by one of those two people, correct?

7  **A.**   Most likely.

8  **Q.**   Well, there isn't anybody else listed here, is there?

9  **A.**   It could have been a forwarded email.  I mean, there's

10  lots of ways you can copy and paste stuff in here.  It's --

11  it's just unclear for me and I want to be precise in responding

12  to your questions.

13  **Q.**   You don't think anybody cut and pasted something in here

14  without revealing their name; do you, sir, really?

15  **A.**   It, apparently, is a thread that has multiple responses

16  and not all the responses are on this exhibit.

17  **Q.**   You say not all the responses are here?  Is that what you

18  just said?

19  **A.**   Not all the headers.  I apologize.  Not all the headers.

20  The responses are here.  That's what it appears to me.

21  **Q.**   But it shows you three people, right?  You, Bornstein and

22  Horowitz, right?

23  **A.**   The main header where this thread kind of terminates is

24  the header on the top and that shows three recipients.

25  **Q.**   And there's not another person listed here?

RUBIN - DIRECT EXAMINATION / BOIES     1443

1  **A.**   Not on the main header.

2  **Q.**   And you have no -- have any reason to believe that there

3  is any other header missing; do you, sir?

4  **A.**   I do actually.

5  **Q.**   You do?

6  **A.**   I'm saying there are two indentations and there's only one

7  header in the response, and that signals to me that there's

8  actually a missing header.

9  **Q.**   Sir, there are three people in this, right?

10        I don't want to spend too much time on this, but this

11  ought to be simpler than it is.  There are three people listed

12  here, right?

13  **A.**   On the main header, yes, there are.

14  **Q.**   And as you read it, three sets of comments here, right?

15  One indentation, two indentation and yours that has no

16  indentations, right?

17  **A.**   That's correct.

18  **Q.**   So three responses, three people listed; right?

19  **A.**   Yes.

20  **Q.**   And does that lead you to conclude that what's written

21  here is by one of those three people?

22  **A.**   I couldn't determine that.  Here is an example of that.

23  Do you see at the bottom where it says, "I have cc'd the

24  Android team"?

25  **Q.**   Yes.

 1  **A.**   Where is that on the main header?  Where the Android team

 2  in cc on the main header?

 3  **Q.**   It says right at the bottom, "I have cc'd the Android

 4  team."  Do you see that, Mr. Rubin?

 5  **A.**   That means there's four and many more because the Android

 6  team --

 7  **Q.**   It says right here --

 8  **A.**   And as --

 9  **Q.**   Okay.  Say cc'd.  You know that means sent them a copy,

10  right?

11  **A.**   As Steve Horowitz --

12  **Q.**   Please, please.  Just listen to the question.  You know

13  that means they sent them a copy, right?

14  **A.**   Yes.

15  **Q.**   Okay.  That does not mean that they are writing something,

16  correct?

17  **A.**   It means that they addressed this email to somebody that's

18  not on the header.

19  **Q.**   It was sent to them, not that the person, the Android

20  team, wrote something; correct, sir?  You know that, don't you?

21  **A.**   I'm just --

22  **Q.**   Just "yes" or "no."

23  **A.**   I just don't understand the question.  I'm sorry.

24  **Q.**   Okay.  If you don't understand that question, I'll move

25  on.

```
 1              Somebody at Google wrote:

 2              "Java has very little fragmentation."

 3              Right?

 4   A.   Yes.

 5   Q.   Okay.  And you got a copy of this, right?

 6   A.   Yes, I did.

 7   Q.   And you responded to it, right?

 8   A.   Yes, I did.

 9   Q.   And, in fact, you asked what certain terms meant, correct?

10   A.   Yes.

11   Q.   You didn't ask what "fragmentation" meant; did you, sir?

12   A.   That's correct.

13   Q.   Let me ask you to look next at Trial Exhibit 180.

14              (Document displayed)

15   Q.   Now, this is, again, an email thread, as you call it,

16   correct?

17   A.   Yes.

18   Q.   And this is from November of 2007; in particular, November

19   14th, 2007, correct?

20   A.   Yes.

21   Q.   And if you look down sort of in the middle of the page

22   where it says.

23              "On November 14, 2007 at 11:27 a.m. Barry

24              Schnit wrote:"

25              Do you see that?
```

1  A.    Yes, I do.

2  Q.    And that's an email to you; correct, sir?

3  A.    Apparently responding to me, yes.

4  Q.    And this is an email that discusses certain statements

5  that Sun was making, correct?

6  A.    I believe it was an email about -- with a PR team about

7  our launch messaging.

8  Q.    Let me be sure you've got Trial Exhibit 180 up there.

9              (Whereupon, document was tendered

10              to the witness.)

11  A.    Thank you.  I need bifocals.

12  Q.    I do, too.

13          Now, if you go on to the second page, do you see the

14  email that went from Steven Shankland to Barry Schnit?

15  A.    Yes, I do.

16  Q.    Also on November 14, correct?

17  A.    Yes.

18  Q.    And it's referring to statements that Mr. Green, Sun's

19  executive vice-president of software, had just said; certain

20  statements he had made, correct?

21  A.    Yes.  Mr. Shankland is a reporter that's quoting

22  Mr. Green.

23  Q.    And just to put things in context.  Shortly before

24  November 14th of 2007 Google had made an announcement, correct?

25  A.    That's correct.

RUBIN - DIRECT EXAMINATION / BOIES 1447

1   Q.   Announcement of Android, correct?

2   A.   An announcement of the existing -- existence of the

3   Android project, yes.

4   Q.   And after that various people at Sun made various

5   comments, correct?

6   A.   I don't know.   I suppose so, yes.

7   Q.   Do you remember any of those comments?

8   A.   Vaguely.

9   Q.   Vaguely.   Do you remember these comments by Mr. Green?

10  A.   No.   I didn't recall that comment until I saw this

11  exhibit.

12  Q.   And what Mr. Green says -- Mr. Green of Sun says on or

13  about November 14th, 2007 is, quote:

14          "We're really interested in working with

15          Google to make sure developers don't end up

16          with a fractured environment."

17          Do you see that?

18  A.   I see that, yes.

19  Q.   And the "fractured environment" that's being referred to

20  there is Java, correct?

21  A.   It's -- Java -- I mean, it's hard to -- Java the

22  programming language, or...

23  Q.   Sir, just look at the immediately preceding sentence:

24          "Rich Green, Sun's executive vice-president

25          of software, just said at Oracle OpenWorld

RUBIN - DIRECT EXAMINATION / BOIES

```
 1              news conference that he's concerned about
 2              Google's Java work on Android."
 3              Do you see that?
 4  A.   Yes, I do.
 5  Q.   Then it says:
 6              "We're really interested in working with
 7              Google to make sure that developers don't end
 8              up with a fractured environment."
 9              Do you see that?
10  A.   Yes, I do.
11  Q.   And you saw that at the time in November of 2007; correct,
12  sir?
13  A.   I have a faint recollection of this, yes.
14  Q.   And you knew what they were talking about in terms of
15  "fractured environment;" correct, sir?
16  A.   No, I didn't understand their definition of "fractured."
17  Q.   Did you ever ask anybody?
18  A.   No.
19  Q.   Now, when Mr. Schnit from Google wrote to you about
20  this -- and he was suggesting a revised statement about Google
21  working to help solve fragmentation; correct, sir?  On the
22  first page.
23              (Document displayed)
24  Q.   Do you see where he's talking about -- he's suggesting a
25  revised statement about helping solving fragmentation?
```

1    **A.**   Yes, he's proposing a revised statement there.

2    **Q.**   And is your testimony you didn't know what he was talking

3    about in terms of "fragmentation" either?

4    **A.**   Umm, I think -- I don't know what his -- he was thinking

5    as his definition of "fragmentation."  That would be accurate,

6    that's correct.

7    **Q.**   And you never asked him, is your testimony?

8    **A.**   That's correct.

9    **Q.**   Even though -- is your testimony today that you don't know

10   whether people were talking about fragmentation in the same

11   sense, you knew that none of you thought fragmentation was a

12   good idea; fair?

13   **A.**   Sounds like a bad word.

14   **Q.**   Yes.

15         **MR. BOIES:**  No more questions, your Honor.

16         **THE COURT:**  All right.

17         **MR. VAN NEST:**  And, your Honor, we will reserve our

18   questioning of Mr. Rubin til our case begins just a little bit

19   later this morning.

20         We agree counsel can call the next witness.

21         **THE COURT:**  I'm sorry.  Say what?

22         **MR. VAN NEST:**  Counsel can call their next witness.

23   We will reserve our questions until our case begins, which will

24   be just a little bit later this morning.

25         And as I understand it, Oracle has one more witness

 1  to call, and we'll get him in the courtroom as quickly as we

 2  can.

 3          THE COURT:  All right.  I think the jury understands

 4  that.  That's fine.  We will hear more from this witness in due

 5  course, but not right now.

 6          So, Mr. Rubin, you may step down.  Thank you.  Have a

 7  good day.

 8          MR. VAN NEST:  Your Honor, just a moment before you

 9  leave, Mr. Rubin?

10          (Discussion held off the record

11           amongst defense counsel.)

12          MR. VAN NEST:  Can we ask -- we're not certain

13  whether the next witness is in the building, but we think he

14  is.  Can we pause for a moment and ascertain that, your Honor?

15          THE COURT:  Does that make any difference to whether

16  Mr. Rubin stays?

17          MR. VAN NEST:  I guess not.  I guess not.  But there

18  might be a short delay while we get him in the courtroom.

19          THE COURT:  Mr. Rubin, go ahead.  I think they want

20  you to step down.

21          MR. VAN NEST:  We do.

22          THE COURT:  Have a good day.

23          MR. VAN NEST:  I'm sorry, your Honor.

24          (Witness steps down.)

25          THE COURT:  Your next witness will be?

 1          **MR. BOIES:**  Mr. Eric Schmidt, your Honor.

 2          **THE COURT:**  All right.  Let's bring him in.

 3          And while we're ascertaining his whereabouts, Dawn,

 4   would you please hand out to the jury -- we can use the time,

 5   put the time to good use -- this one-page document that the

 6   lawyers have come up with.

 7          We're going to hand something -- you know how I've

 8   given you these little one-page, one-page guides, the timeline

 9   and so forth?  We're going to give you another one that may be

10   of use to you, and you can use it to make notes on or however

11   you want to use this.  This is a helpful guide to you.

12          The lawyers have both -- on both sides have approved

13   this document.  This is a list of the witnesses and their

14   positions in this first phase, and then on the back side I've

15   asked them to correctly spell their names so that you'll have

16   the cast of characters of the lawyers.

17          (Whereupon, document was tendered

18            to the jury.)

19          **THE COURT:**  So, for example, some of the names are

20   straightforward.  You probably could guess at how they are

21   spelled, but other names are not so clear cut, and I wanted you

22   to have the correct spellings of the lawyers' names.

23          So you can use this as you wish or not.  It's

24   completely up to you.  You know, you can fold it over like this

25   (indicating) and stick it in the back of your steno pad in the

1  same way that you probably have done the others.

2           All right.  Is the witness now here and ready to go?

3           **MR. VAN NEST:**  I don't believe he is, your Honor.

4  We're trying to ascertain where he is.  He was expected here at

5  8:30.  I don't know if traffic was delayed or what.  I

6  apologize and we'll try to ascertain where he is.

7           **THE COURT:**  So is there any other evidence that

8  Oracle wishes to be putting on while we're waiting?

9           **MR. BOIES:**  No, your Honor.

10          **THE COURT:**  How about stipulations?  Interrogatory

11 answers or something?

12          **MR. BOIES:**  I think we've offered those, your Honor.

13          **THE COURT:**  You've done it all.

14          Well, do you have any word as to...

15          **MR. VAN NEST:**  I'm trying to get that right now.  I'm

16 trying to find out.

17          **MR. BOIES:**  Can I suggest, your Honor, that since

18 they are going to examine Mr. Rubin, that they can put Mr.

19 Rubin on the stand and they can start their examination.

20          Indeed, we can put Mr. Schmidt off until they finish

21 their examination, if they don't want to interrupt it, rather

22 than sit here and wait.

23          **THE COURT:**  We're going to do this.  We're going to

24 take our 15-minute break early today.  We'll take a 15-minute

25 break at this time.

 1          Please remember the admonition.  Then we'll sort out

 2   this whereabouts problem while everyone is having some coffee

 3   in the jury room.

 4          Thank you.

 5          **THE CLERK:**  All rise.

 6          (Jury exits courtroom at 8:38 a.m.)

 7          **THE COURT:**  Okay.  Be seated, please.

 8          **MR. VAN NEST:**  Your Honor, I understand he will be

 9   here in five minutes.

10          **THE COURT:**  Okay.

11          **MR. VAN NEST:**  I apologize.

12          **THE COURT:**  Well, it's better to take the break.

13          Any issues for the Court?

14          **MR. JACOBS:**  No, your Honor.

15          **MR. VAN NEST:**  None here, your Honor.

16          **THE COURT:**  All right.  We'll take our break, too.

17          (Whereupon there was a recess in the proceedings

18           from 8:39 a.m. until 8:56 a.m.)

19          **THE COURT:**  Please be seated.  You must be Mr. Eric

20   Schmidt.

21          **THE WITNESS:**  That is correct.

22          **THE COURT:**  Welcome.  Are we ready to go?

23          **MR. BOIES:**  Yes, Your Honor.

24          **MR. VAN NEST:**  Yes, Your Honor.

25          **THE COURT:**  All right.  Let's bring in our jury.

PROCEEDINGS                                                                1454

```
 1                (Jury enters at 8:58 a.m.)

 2          THE COURT:  Okay.  Welcome back.  Please, be seated.

 3   Ready over there?

 4          Our next witness will be?

 5          MR. BOIES:  Mr. Schmidt, Your Honor.

 6          THE COURT:  All right.  Mr. Schmidt, please stand and

 7   raise your right hand.

 8                          ERIC SCHMIDT,

 9   called as a witness for the Plaintiff herein, having been first

10   duly sworn, was examined and testified as follows:

11          THE WITNESS:  I do.

12          THE COURT:  Thank you.  Please be seated.  And you

13   need to sit about this close to the microphone.  Okay.

14          THE WITNESS:  Good?

15          THE COURT:  Very good.  Please, continue.

16          MR. BOIES:  Thank you, Your Honor.

17                       DIRECT EXAMINATION

18   BY MR. BOIES:

19   Q.   Good morning, Mr. Schmidt.

20   A.   Yes, Mr. Boies.

21          MR. BOIES:  May I approach, Your Honor?

22          THE COURT:  You may.

23   BY MR. BOIES:

24   Q.   I would like to hand you Trial Exhibit No. 6, that is

25   already in evidence.  And this is a presentation that was made
```

1    in approximately August of 2005, with respect to project

2    Android; correct, sir?

3    **A.**   I see that.

4    **Q.**   And this was made to the GPS, correct?

5    **A.**   That is correct.

6    **Q.**   And that's the top executives of Google, correct?

7    **A.**   It's actually a group that does Google product strategy,

8    which would include the top executives at Google.

9    **Q.**   And you were present when this presentation was made,

10   correct, sir?

11   **A.**   I believe so.

12   **Q.**   And let me ask you to look at page 8 of the exhibit.  It's

13   page 5 of the presentation.

14            (Document displayed.)

15   **A.**   I have it.

16   **Q.**   And it says there that:

17            "Google benefits by having more control of

18            the user experience and built-in Google

19            apps."

20            Do you see that?

21   **A.**   I do.

22   **Q.**   And that's how Google benefits, at least in part, from the

23   Android project, correct?

24   **A.**   Yes.

25   **Q.**   And when the presentation refers to "built-in Google

1  apps," what did you understand that to mean?

2  A.   I did not write this, but my interpretation would be that

3  these are applications that use Google services that are part

4  of Android.

5  Q.   And the more of those Google apps that are out there, the

6  more advertising revenue Google is likely to earn.  Fair?

7  A.   Uhm, we make our advertising from search.  So it may or

8  may not cause more advertising revenue.  It depends on whether

9  it drives search or not.

10  Q.   Well, you certainly expected Android to result in more

11  search advertising revenue; did you not, sir?

12  A.   Yes.

13  Q.   And, in fact, you have concluded that it does, correct?

14  A.   Yes.  Absolutely.

15  Q.   And, in fact, I think you -- you said that the revenue

16  that you received as a result of the additional search revenue

17  generated by Android paid for Android and, I think you said,

18  and a whole bunch more.  Do you recall that?

19  A.   Yes.

20  Q.   Now, let me go to the next page.  And there are a series

21  of bullet points here.  The first point is, "Disrupt the closed

22  and proprietary nature of the two dominant industry players:

23  MSFT ..." which stands for Microsoft, correct?

24  A.   Yes.

25  Q.   "... and Symbian."  Which was an operating system used by

1  Nokia, correct?

2  **A.**    That is correct.

3  **Q.**    And you understood this was being proposed as one of the

4  reasons why Android would be desirable, correct?

5  **A.**    Yes.

6  **Q.**    And at the bottom it also says:

7          "Eventually build a community force around

8          Google handset APIs and applications."

9          Do you see that?

10  **A.**    I do.

11  **Q.**    And that was viewed as another advantage of Android,

12  correct?

13  **A.**    Yes.

14  **Q.**    And when you referred to the Google handset APIs, those

15  would be the APIs that were in Android, correct?

16  **A.**    Yes.

17  **Q.**    Let me ask you to turn now, to page 24 of this

18  presentation.  It's page 24 of the exhibit.  It's the last --

19  essentially, last page of the presentation.  Where it says:

20          "Plan:  Beat Microsoft and Symbian to volume

21          by offering an open source handset solution."

22          Do you see that?

23  **A.**    I do.

24  **Q.**    And that was a goal that Google had, correct?

25  **A.**    Yes.

1  Q.   And one of the reasons that you were interested in having

2  Android proceed as fast as it could was you wanted to beat

3  Microsoft and Symbian to volume, correct?

4  A.   Yes.

5  Q.   And by beating Microsoft and Symbian to volume, you mean

6  getting your handset out there with a lot of users before they

7  had their handsets out there with a lot of user; is that fair?

8  A.   Yes.  Volume means more users, so serving more customers.

9  Q.   And going back to the question of search, your analysis or

10  the analysis of Google was that people who use Android search

11  more than people who do not use Android, correct?

12  A.   Yes.  The vast majority of Google's revenue at the time

13  and today comes from search revenue.  And so the primary reason

14  to have something like Android is that people will do more

15  searches, and then we'll get more money as a result.  And

16  that's how we, essentially, pay for the strategy of Android.

17  Q.   And not only are there more searches and there are more

18  ads, but those ads are more lucrative because you share less of

19  the revenue; is that fair?

20  A.   Uhm, it depends on who our partner is, but in principle we

21  could end up with a greater share of the revenue on each

22  handset, as well.

23  Q.   And, indeed, that was what you projected, correct, sir?

24  A.   That was certainly our goal.

25  Q.   And after it had been announced and after it had been out

```
 1  for a while, in October of 2010, that's what you believed was
 2  happening, correct, sir?
 3  A.   Yes, that's correct.
 4  Q.   Let me ask you to look, next, at Exhibit 158.
 5          MR. BOIES:  May I approach, Your Honor?
 6          THE COURT:  You may.
 7  BY MR. BOIES:
 8  Q.   Now, Exhibit 158 is an exhibit that you recognize,
 9  correct, sir?
10  A.   I do not particularly.  Please proceed.
11  Q.   I'm sorry?
12  A.   I have 158 in front of me.
13  Q.   And is that a document that you've seen before?
14  A.   Uhm, probably.  I don't really remember it.
15  Q.   That's a -- that's a presentation on Android, correct,
16  sir?
17  A.   It is.
18  Q.   And is that a presentation that you saw at about the time
19  it was produced?
20  A.   Again, I have no specific recollection of it, but there
21  were a number.  And this looks pretty much like what I would
22  have seen.
23  Q.   And I want you to hold that document, but I also want to
24  put in front of you another related document, which is Exhibit
25  251.
```

1              Now, this is a document that I don't have any reason

2     to believe that you personally saw at the time.  But it relates

3     to the same subject matter, and I just would like to ask you

4     whether that is a document that you have seen before?

5     **A.**    I have not seen this before.

6     **Q.**    Okay.  Then let me go back to 158.

7              Is this a presentation that was made by Mr. Rubin?

8     **A.**    Again, I don't -- I don't know the details of where this

9     presentation came from, but it appears to me to be an Andy

10    Rubin presentation.

11    **Q.**    Let me see if I can show you Exhibit 151.

12    **A.**    Okay.

13    **Q.**    This is a document you've seen before; is that correct?

14    **A.**    Uhm, yes.

15            **MR. BOIES:**  If we can display 151.

16            (Document displayed.)

17    **BY MR. BOIES:**

18    **Q.**    These are GPS notes.  That is, these are notes from a GPS

19    presentation, correct, sir?

20    **A.**    Yes.  These would be notes taken during the meeting by

21    some note taker.

22    **Q.**    And just to be clear, this is not the same GPS

23    presentation that we looked at before?

24    **A.**    Okay.  It appears to be dated 2007.

25    **Q.**    Right.  And this is one that you were present at, correct,

1    sir?

2    **A.**    It says I was, yes.

3    **Q.**    And I want to go down to the end of the presentation.    All

4    right.    Next page.

5    **A.**    Okay.

6    **Q.**    Do you see right at the very next to the last page, at the

7    bottom of the page, where there's a statement that's attributed

8    to Mr. Rubin?

9    **A.**    I do.

10   **Q.**    And he says there that they're still shopping for

11   libraries and JVMs.    Do you see that?

12   **A.**    I do.

13   **Q.**    And "libraries" referred to class libraries; is that

14   correct?

15   **A.**    Yes.

16   **Q.**    And "JVMs" referred to Java virtual machines?

17   **A.**    Correct, yes.

18   **Q.**    And this has to do with the Android project, correct?

19   **A.**    Yes.

20   **Q.**    And then at the end it says, "This is still a hotspot."

21   **A.**    Uh-huh.

22   **Q.**    What did you understand Mr. Rubin to be referring to

23   there?

24   **A.**    I don't recognize the term "hotspot," but I would read

25   this as they're still working on a solution as to how to

1  implement the libraries and the JVM.

2  **Q.**   Did there come a time -- even if you don't remember that

3  it was exactly in early 2007 -- but do you recall there came a

4  time when not having class libraries and not having a JVM for

5  Android was slowing Android down?

6  **A.**   I don't remember the specific, but you need a JVM and

7  class libraries in order to have one.  So, of course, you would

8  have to have a solution to that.

9  **Q.**   And do you recall that there was a time not only here but

10  thereafter where you did not have those class libraries and

11  JVMs?

12  **A.**   Well, of course, because we ultimately built them

13  ourselves or used -- used other sources.

14  **Q.**   Now, when you said "use other sources," are you referring

15  to Noser?

16  **A.**   I'm referring to the fact that the team looked -- looked

17  to try to figure out what the best JVM solutions were; and,

18  ultimately, used some Apache software to do so.

19  **Q.**   Now, you mentioned Apache software.  Was that Apache

20  software that related to SE?

21  **A.**   I would have to let the technical people describe exactly

22  where the source of the stuff was from.

23  **Q.**   Did you understand that the Apache software that you used,

24  that Google used, was software that had not been authorized for

25  mobile devices?

1  **A.**   I did not know the technical details of the specific

2  software solution that was ultimately used.

3  **Q.**   But without knowing the technical details did you know, at

4  the layman's level that I'm talking about now, that the Apache

5  software that you were relying on for Android was not

6  authorized to be used for mobile devices?

7  **A.**   Uhm, I did not know any of the details of the licensing of

8  that arrangement, aside from that it was available to us.

9  **Q.**   Did you ever investigate whether the Apache software that

10  you were using was authorized to be used for mobile devices?

11  **A.**   I did not personally.

12  **Q.**   Do you know if anyone at Google did?

13  **A.**   Uhm, I do not know the details of that.

14  **Q.**   Uhm, let me ask you to look at Trial Exhibit 15.

15          **MR. BOIES:**   May I approach, Your Honor?

16          **THE COURT:**   Yes.

17  **BY MR. BOIES:**

18  **Q.**   And this is a presentation to what is referred to as an

19  EMG.  Do you see that?

20  **A.**   Yes.

21  **Q.**   And an EMG stands for what, sir?

22  **A.**   The executive management group.  It was the senior

23  executives of the company.  I was a member.

24  **Q.**   And if you go to page 7 of the exhibit, this is talking

25  about a possible deal between Google and Sun.  Is that correct?

1   **A.**   Uhm, that's correct.

2   **Q.**   And it says, "Why do the deal?"  Do you see that?

3   **A.**   I see.

4   **Q.**   And that's referring to why do the deal with Sun, correct,

5   sir?

6   **A.**   Yes.

7   **Q.**   And it says the first reason is "Critical to our open

8   source handset strategy."  Do you see that?

9   **A.**   Yes.

10  **Q.**   And the second says, "Dramatically accelerates our

11  schedule."  Do you see that?

12  **A.**   Yes.

13  **Q.**   And when this talks about -- because you didn't make this

14  presentation, correct?

15  **A.**   That's right.  I did not write this.

16  **Q.**   It was a presentation that was made to you, correct?

17  **A.**   That is correct.

18  **Q.**   And when this presentation was made to you, did you

19  understand that what the presenter was saying was doing the

20  deal with Sun would dramatically accelerate the schedule for

21  development of Android?

22  **A.**   That was their belief.

23  **Q.**   Now, let me show you a document that has been offered as

24  Trial Exhibit 17.  I'm sorry.  Let me go to Trial Exhibit 10

25  first.

1          **MR. BOIES:**  May I approach, Your Honor?

2          **THE COURT:**  You may.

3    BY MR. BOIES:

4    **Q.**   Now, this is a document that is in evidence.  I do not

5    have any reason to believe that you have personally seen it

6    before, but I want to ask you, first, have you seen this

7    document before?

8    **A.**   Uhm, I have not.

9    **Q.**   I now want to ask you about some statements in here.  And

10   the second paragraph -- this is by Mr. Lindholm.  It says,

11   "What we've actually been asked to do by Larry and Sergey..."

12   and that's Larry Page and Sergey Brin, the two founders of

13   Google, correct?

14   **A.**   That's correct.

15   **Q.**   "What we've actually been asked to do by Larry and Sergey

16   is investigate what technical alternatives exist to Java for

17   Android and Chrome."

18          Do you see that?

19   **A.**   Uh-huh.

20   **Q.**   This is dated August 6, 2010.

21          Were you aware in or about August of 2010 that Larry

22   and Sergey had asked Mr. Lindholm to do this?

23   **A.**   I was aware at the time that we were thinking about what

24   to do.  I think this e-mail is a -- sort of a response to that

25   initiative.  I didn't know the specifics here.

1   Q.   Okay.  Did -- let me just ask, the next sentence says,

2   "We've been over a bunch of these and think they all suck."

3          Did you ever get reported to you that Mr. Lindholm

4   had reached that conclusion?

5   A.   No.

6   Q.   The next sentence says, "We conclude that we need to

7   negotiate a license for Java under the terms we need."

8          Do you see that?

9   A.   I do.

10  Q.   And did you ever get reported to you that Mr. Lindholm

11  concluded that?

12  A.   It was not reported to me.

13  Q.   Now, at the first presentation that you received about

14  Android, in July of 2005, you were told by the people making

15  that presentation that Google was required to take a license

16  from Sun, correct?

17  A.   Uhm, can you tell me which exhibit you're referring to?

18  Q.   Sure.

19          MR. BOIES:   May I approach, Your Honor?

20          THE COURT:   You may.

21  BY MR. BOIES:

22  Q.   This is Trial Exhibit 1.  And this was a presentation that

23  was made July 26, 2005.  Do you see that?

24  A.   I do.

25  Q.   And this was, again, a GPS presentation, correct?

1   **A.**   Yes.

2   **Q.**   And you were at this presentation; were you not, sir?

3   **A.**   I don't know.  I don't recognize this.

4   **Q.**   You normally attend GPS presentations; do you not, sir?

5   **A.**   If I'm in town.  It's perfectly possible on that date I

6   was out of town.

7   **Q.**   And is it your testimony, as you sit here now, you just

8   don't remember one way or another?

9   **A.**   Uhm, I don't -- I do not recognize the document, so.

10  **Q.**   Let me ask you to turn to page 9 of the document, where it

11  talks about current scenario.  And the third line down says,

12  "Must take license from Sun."

13          Do you see that?

14  **A.**   I do.

15  **Q.**   And the heading of this page is "JAVA."  Do you see that?

16  **A.**   I do.

17  **Q.**   Even though you don't recall, as you sit here now, whether

18  you saw this presentation, were you told in 2005 that the

19  people responsible for Android believed that Google must take a

20  license from Sun for Java?

21  **A.**   Uhm, if I -- I do not recall, but given the way that Sun's

22  licensing model works, the statement is not actually correct.

23  So there must be something -- I'm not sure who wrote this

24  document.

25          **MR. BOIES:**  Your Honor, I would move to strike that,

 1  everything after his responsive answer, as nonresponsive and

 2  lacking foundation.

 3          **THE COURT:**  It's not responsive, correct.  That part

 4  will be stricken.

 5  **BY MR. BOIES:**

 6  **Q.**  I want to ask you to look at a document that has been

 7  marked as Trial Exhibit 405.

 8          **MR. BOIES:**  Is this in evidence?

 9          (Document displayed.)

10  **BY MR. BOIES:**

11  **Q.**  Which is in evidence.

12          I want to ask you to look at this document in the

13  context of what we were talking about a moment ago as to

14  Apache, and whether or not they had a field of use restriction.

15          And you told me you had not gotten into the technical

16  details, but I want to ask you just about what's in this e-mail

17  here.  This is dated May 30, 2008, from Mr. Lee to you.  Do you

18  see that?

19  **A.**  I do.

20  **Q.**  And I want to go down to the second paragraph, the -- the

21  third sentence, where it says:

22          "Sun puts field of use restrictions in the

23          Java SE TCK licenses which prohibit Java SE

24          implementations from running on anything but

25          a desktop or server."

1              Do you see that?

2   **A.**    I do.

3   **Q.**    And that would prevent the Apache Java SE work from being

4   used on mobile; is that fair?

5   **A.**    That's what says, yes.

6              **MR. BOIES:**  No more questions, Your Honor.

7              **THE WITNESS:**  Thank you.

8              **THE COURT:**  Any examination now?

9              **MR. VAN NEST:**  Your Honor, we're going to reserve

10  examination until Mr. Schmidt is called in our case, which will

11  be coming up next.

12             **THE COURT:**  So may Mr. Schmidt step down?

13             **MR. VAN NEST:**  I think that's up to Mr. Boies.  He

14  may be our first witness.

15             **MR. BOIES:**  He may step down or stay there.

16             I think I need to formally rest, Your Honor.  And

17  Oracle does rest at this time.

18             **THE COURT:**  All right.  We've reached a milestone in

19  the case.  In phase one, the plaintiff has rested its case.

20             All motions under Rule 50 will be deemed to have been

21  made at this point, but we will hear them later.

22             And in order not to detain the jury we will resume,

23  at this time, with the defense putting on its case.

24             So, at this time, you may call your first witness.

25             **MR. VAN NEST:**  Thank you, Your Honor.  Google calls

 1   Eric Schmidt.

 2                          **ERIC SCHMIDT**,

 3   called as a witness for the Defendant herein, having been

 4   previously duly sworn, was examined and testified as follows:

 5             **THE COURT:**  Mr. Schmidt.

 6             **MR. VAN NEST:**  He's here and warmed up.

 7             (Laughter)

 8             **THE COURT:**  Welcome back.

 9             (Laughter)

10             **THE WITNESS:**  Good morning, Your Honor.

11             **THE COURT:**  I'll remind you, you are still under

12   oath.

13             **THE WITNESS:**  Yes, sir.

14             **THE COURT:**  You may proceed.

15             **MR. VAN NEST:**  Thank you, Your Honor.

16                     **DIRECT EXAMINATION**

17   BY MR. VAN NEST:

18   **Q.**  And good morning, Mr. Schmidt.

19             Would you tell the jury a little bit something about

20   your personal background.  Introduce yourself.

21   **A.**  I'm a computer scientist.  University, and a PC from

22   Berkeley.  Worked at Sun Microsystems for 14 years.  Ultimately

23   became the chief technical officer.  Then went to a company

24   called Novell.  And from Novell joined Google in 2001.

25   **Q.**  And when did you get out of Cal?

1   **A.**   Sorry?

2   **Q.**   When did you graduate from Berkeley?

3   **A.**   In computer science, Ph.D.

4   **Q.**   When?

5   **A.**   1982.

6   **Q.**   And after that, where did you go?

7   **A.**   I went straight to Sun.

8   **Q.**   Okay.  And tell us a little bit about how long you worked

9   at Sun.

10  **A.**   I was there for 14 years.  I started off as an engineering

11  manager.  Was promoted through the ranks.  Ran a set of

12  operating divisions.  And then became chief technical officer,

13  which was my last role at the company.

14          And during that period, it's probably relevant to say

15  that I was the primary executive in charge of Java.

16  **Q.**   So would you just tell the jury, what is a chief

17  technology officer, and what responsibilities did you have in

18  that role at Sun?

19  **A.**   Well, the joke, of course, was that it was the chief

20  traveling officer or the chief talking officer.

21          But I also did new initiatives.  And the idea was to

22  try to do new things that were different from the core

23  businesses of the company.

24  **Q.**   Was Java language developed at Sun while you were the

25  chief technology officer?

1   **A.**   It was.

2   **Q.**   And what role, if any, did you play in that?

3   **A.**   Uhm, Java was founded by a couple of engineers led by a

4   fellow named James Gosling.  An executive in charge was a

5   fellow named Wayne Rosing.

6         At a certain point, the technology was transferred

7   over to me.  And one of the Sun cofounders, Bill Joy, and I,

8   working with James, drove the strategy that ultimately made

9   Java announced, and so forth, in the early '90s.

10  **Q.**   Just tell us -- I know it's a long history, but just tell

11  us, briefly, how was the language itself developed?  Who did

12  that?

13  **A.**   Well, success has many fathers, right?

14        But I think there were a team of three or four

15  people.  The primary architect was James Gosling, with the

16  technical assistance of Bill Joy, who was the technical founder

17  of Sun.

18  **Q.**   And how long did it take to develop the language, at least

19  initially?

20  **A.**   I'd say about six years, perhaps '88, '89 to roughly '93,

21  '94.

22        Computer languages are very hard to develop.  And

23  they occur every decade or two.

24        And Java was more than just a language.  And that's

25  important to state.  It was a language.  It was a platform.  It

SCHMIDT - DIRECT EXAMINATION / VAN NEST

 1  was a strategy.  It was a whole nother way of seeing how Sun

 2  worked.

 3          We used to say that it was an attempt to build a new

 4  religion around a new way of thinking.

 5  **Q.**   Okay.  And were you personally involved in planning for

 6  and launching the language?

 7  **A.**   Yes.  The people in the organization worked for me, and I

 8  was the primary driver of the strategy, along with Bill.

 9  **Q.**   And when and how was the language first released?

10  **A.**   Uhm, in approximately 1994, we announced it here at

11  Moscone Center.

12          We had a very strange talk, where I had strange

13  pictures, and we said all sorts of odd things that no one quite

14  understood.  But it seemed an almost religious moment, in

15  hindsight.

16  **Q.**   How was it made available, initially, back in '94?

17  **A.**   The core strategy of Java was to have licensing partners

18  who would use it and develop it with Sun.

19          Those partners included companies like Netscape,

20  which is the most important decision at the time.  And that was

21  browser manufacturer, the first one.

22          Oracle was also a licensee.  And I did that deal.

23  And eventually, also, Microsoft.

24          It also had an open component, so that you could make

25  your own version, if you will, without our license.

1  **Q.**  And when you say "open component," can you tell our jury

2  what you mean by that.

3  **A.**  It's important to understand the sort of history here,

4  that people would build these software systems, and a company

5  would do it.  And then the other companies wouldn't trust them.

6        And a classic example would be Microsoft would

7  have -- would build their own software, and you couldn't use

8  it, you couldn't extend it, you didn't trust them, or what have

9  you.

10       And so we had who had grown out of Berkeley and

11  something called UNIX had figured out this other way.  And the

12  other way was, basically, to put the software out there and

13  then let people modify it any way they wanted.

14       Put another way, if you're a programmer, do you trust

15  that this other company is going to always have your best

16  interests in heart?  You might be better off if the source is

17  available, if you can modify it.  And that's what open source

18  is all about.  So that was the movement that this was part of.

19       So in order to do this, we came up with sort a

20  multiple way of doing it.  You could use Java under license,

21  but you could also simply make your own version of Java.  You

22  couldn't call it Java, but you could make your own.  And you

23  could then do whatever you wanted to with that.

24  **Q.**  Now, let's stick with the language for a minute.

25       Did Sun make efforts to popularize the language, the

1  Java language?

2  **A.**    Oh, very much so.

3  **Q.**    How did that take place?

4  **A.**    Well, we had developer tools.  We had developer

5  conferences.  We tried to get everybody to use it.

6          At the time -- again, how do you get people to start

7  using a language?  Well, they have to sort of trust that this

8  language is going to be there, right.  So it has to be out

9  there.  There have to be a lot of users, and you have to get a

10  recurring circle, if you will.

11  **Q.**   And you mentioned developer conference.  Was JavaOne

12  started back in that day?

13  **A.**    Yes.  Indeed, it was here.  And it was, indeed, here at

14  Moscone.

15  **Q.**    Tell the jurors what JavaOne is.

16  **A.**    Well, there were a series of conferences for developers.

17  Developers are programmers.  And they are sort of, you know,

18  the stereotypical developer.  And they have conferences where

19  they learn about what the technology is, who -- what their

20  friends are doing, what you can do with this new platform.

21          And we had a few demos of what was great about Java

22  but we didn't really have a lot of developers.  So we organized

23  this conference called JavaOne.

24          And as I remember thinking, oh, my god, I wonder if,

25  you know, 500 people will come.  Well, of course, it was a huge

1  success.   And I remember many, many thousands of people.   And I

2  knew that we had hit a chord.

3            We also had a strategy, by the way --

4            (Reporter interrupts.)

5  **Q.**   You need to slow down a little bit, Mr. Schmidt, for our

6  jurors and for our court reporter.

7  **A.**   Sorry.   I get excited.

8            We also had a strategy to use universities to try --

9  **Q.**   What was that strategy?

10  **A.**   To have -- since universities produce programmers, get the

11  universities to use Java in their courses.

12  **Q.**   How did you go about doing that?

13  **A.**   We made it generally available to them.   We called them,

14  gave it to them.   That sort of thing.

15  **Q.**   Now, when the language was first released, were there --

16            **MR. BOIES:**   Your Honor, I've been relatively patient

17  in terms of this is background, but the Court did rule on the

18  applicability of testimony this far back in time.

19            **MR. VAN NEST:**   This was all gone into by

20  Dr. Reinhold, Your Honor.   I'm about to move on to --

21            **THE COURT:**   Overruled for now.

22            **MR. VAN NEST:**   Yeah.

23            **THE COURT:**   On your representation that you're almost

24  done.

25

1  **BY MR. VAN NEST:**

2  **Q.**    When the language was first released, Mr. Schmidt, were

3  there Java APIs included with the language?

4  **A.**    Yes, of course.

5  **Q.**    And were you involved in the development of those?

6  **A.**    I was the executive in charge of that.  The work was done

7  by the technical team.

8  **Q.**    And what was the purpose for having the Java language

9  APIs?

10 **A.**    The language itself is not useful without an ability to

11 make something happen.  And what an API does is, it allows you

12 to make something happen.  Every language had a standardized

13 such list.

14         We based ours on the experience that occurred in a

15 language called "C," which had a standard sort of APIs.

16 **Q.**    And how would developers -- how did you anticipate

17 developers would use the APIs?

18 **A.**    All the developers would use these APIs along with other

19 APIs that they had also invented.

20 **Q.**    And how were the APIs made available?

21 **A.**    There was a book that specified what the APIs were, that

22 was written by Bill Joy and a few others.  And then there was

23 source code available from Sun.

24 **Q.**    Do you recall approximately how long it took to develop

25 the early APIs along with the language?

1   **A.**   The APIs would have been made in pretty much a similar

2   period as the early language.

3   **Q.**   And how was Sun planning to make money if it was making

4   the language available and the APIs available for free?

5   **A.**   Well, the way the license worked is that you could use the

6   implementation that Sun had done, and you had to pay a set of

7   fees, which were modest.

8           Or you could, again, simply implement your own

9   implementation and not pay Sun.

10  **Q.**   And why was that a good business plan?

11  **A.**   Uhm, because, otherwise, people would believe that we were

12  going to hurt them by -- by making changes that would block

13  them or not making these available to them.

14          By giving them the freedom to make their own

15  implementation, they always had a safety valve, if you will.

16  **Q.**   Now, during the years that you were involved with the Java

17  language and the Java APIs, did you ever hear anybody at Sun

18  call the APIs blueprints?

19  **A.**   I did not.

20  **Q.**   Is that a phrase that you've ever heard spoken in

21  connection with the APIs at Sun?

22  **A.**   Uhm, no.  And I don't think it's technically correct.

23  **Q.**   Why not?

24  **A.**   Because an API is literally a specification for an

25  interface.  What's on the other side of the interface has --

```
 1  can be anything.  It's not a blueprint for anything.

 2  Q.   Mr. Schmidt, when did you leave Sun?

 3  A.   1997.

 4  Q.   Where did you go next?

 5  A.   I went to a company called Novell.

 6  Q.   Where is Novell located?

 7  A.   In Utah.

 8  Q.   What position did you have with Novell?

 9  A.   I was the chief executive officer.

10  Q.   Did you continue, in your position at Novell, to have

11  contact with the folks at Sun?

12  A.   Yes, I did.

13  Q.   Did Novell have a business relationship with Sun?

14  A.   Yes.

15  Q.   And did you continue to stay in touch with the Java folks

16  you had left behind at Sun?

17  A.   Yes, of course.

18  Q.   When did you get to Google?

19  A.   Uhm, March 2001.

20  Q.   What position did you have upon your arrival?

21  A.   Chief executive officer.

22  Q.   And how long did you hold that spot?

23  A.   Until April of last year.

24  Q.   So during this period we're talking about 2005, '6, '7,

25  '8, you were chief executive officer at that time?
```

1  A.    That is correct.

2  Q.    What do you do now, with respect to Google?

3  A.    I'm executive chairman.

4  Q.    And executive chairman of the board?

5  A.    Yes.

6  Q.    What responsibilities do you have today?

7  A.    I travel around, give a lot of speeches, deal with a lot

8  of governments.  That sort of thing.

9  Q.    Now, turning your attention, Mr. Schmidt, to Android, as

10 the CEO were you the one that had the ultimate responsibility

11 for the Android project at Google?

12 A.    Yes.  It's worth saying that Larry and Sergey and I had

13 agreed and did run the company together over the decade quite

14 successfully.  So on anything really important, the three of us

15 would all agree, but I was the primary owner of the strategy.

16 Q.    And as the strategy went forward and Google began to

17 develop the platform, were you the one, sort of the line

18 executive to whom Mr. Rubin was reporting?

19 A.    That is correct.  And also because of my background with

20 Sun, obviously.

21 Q.    Now, tell the jurors, what was the purpose for acquiring

22 Android, the company that Mr. Rubin had in the first place?

23 A.    Larry and Sergey were very interested in mobile and mobile

24 operating systems.  And they had met Andy Rubin.

25        And they acquired Android in 2005, with a relatively,

1  I think, vague idea of what we would do with it.  It was just

2  really interesting technology, interesting people, interesting

3  group.  And that was typical of Google at that period.

4  **Q.**   And once Android came aboard and Mr. Rubin came aboard,

5  was there a business strategy formed about what Android would

6  be and how it worked?

7  **A.**   Yes.

8  **Q.**   Can you tell the jurors about that?  What was it?

9  **A.**   My recollection was that the strategy that evolved over

10  the first year, which would be roughly 2000 and -- 2006, was to

11  build a platform -- which, again, we previously discussed --

12  that would be free and clear of some of the other licensing

13  restrictions that were slowing down the industry, and that

14  would, in fact, create a viable alternative to the then key

15  players at the time.  As you've earlier seen in the documents.

16        So our idea was that if we made something that was

17  generally available, it would provide a lot of customer value;

18  it could be a very large platform; and it would grow very

19  quickly.  All of which has, indeed, occurred.

20  **Q.**   When you say open or alternative to what was out there,

21  tell our jurors what you mean by that.

22  **A.**   Well, at the time, we were quite concerned about

23  Microsoft's products.  It's hard to relate to that now, but at

24  the time we were very concerned that Microsoft's mobile

25  strategy would be successful.

1          It's also true at the time that the primary player in

2     the industry was Nokia, who had an operating system called

3     Symbian, which we were also concerned about.

4          This was before the iPhone was announced and before

5     the whole iPhone revolution occurred.

6     **Q.**   Now, did you see a series of presentations from Mr. Rubin

7     and his team in the early days of putting the strategy

8     together?

9     **A.**   I did.

10    **Q.**   And was it always certain what the best way was to

11    proceed?

12    **A.**   No.  No.  It's a process of discovery.  We did understand

13    the goal.  And the goal was to get as much -- as many users as

14    we could on a powerful new platform that could exploit the Web,

15    exploit all the things that we do today.

16    **Q.**   And in terms of actually building Android or developing

17    the platform, were there also a variety of options for doing

18    that?

19    **A.**   Well, of course.  We had our own team, and we could also

20    license technology.  We could make our own companies, whatever.

21    **Q.**   And were there a series of discussions around that issue,

22    as well?

23    **A.**   Yes.

24          I recall a detailed discussion, just Andy and myself,

25    in -- on a chalkboard sketching out:  These are all of the

 1   components that we need.

 2          He was trying to get me to give him a few million

 3   dollars to buy out some licenses for Codex and other pieces of

 4   the technology that you need, which I ultimately approved.

 5          **MR. VAN NEST:**  Now, do you have Trial Exhibit 1 up

 6   there before you, Mr. Schmidt?  Could I have TX 1 on the

 7   screen, please.

 8          (Document displayed.)

 9          **MR. VAN NEST:**  May I help the witness, Your Honor?

10          **THE COURT:**  Sure.

11          **THE WITNESS:**  That would be this one.

12   **BY MR. VAN NEST:**

13   **Q.**   We're going to show page 9.  Mr. Boies asked you about

14   this.  Let's stay on the first page.

15          July 26, 2005, was that rather early on in the

16   development of Android?

17   **A.**   Yes.

18   **Q.**   Do you think this may have been one of the first meetings

19   you had with Mr. Rubin?

20   **A.**   As I said, I don't actually think I was in this meeting

21   because I don't recognize the slides at all.  But this was very

22   early.

23   **Q.**   Okay.

24          **MR. VAN NEST:**  Could we go to page 9, and blow that

25   first paragraph up.

1               (Document displayed.)

2   BY MR. VAN NEST:

3   Q.   You mentioned -- answered a couple of questions for

4   Mr. Boies on this.

5        The second bullet point, which he didn't call out,

6   says, "Need coffee-cup logo for carrier certifications."

7        Do you understand what that meant in the context of

8   your discussions about Android?

9        **MR. BOIES:**  Objection, Your Honor.  He testified that

10  he didn't think he was at this presentation.

11       **THE COURT:**  Well, that's true.  But, nonetheless, you

12  asked questions about the next line, and even though he wasn't

13  at the meeting perhaps.  And so good for the goose, good for

14  the gander.

15       I'm going to allow you this question.  Please, go

16  ahead.

17  BY MR. VAN NEST:

18  Q.   What did you understand that phrase to mean, "Need

19  coffee-cup logo for carrier certification"?

20       **THE COURT:**  No.  Since he said wasn't there, the way

21  you phrased that question -- I'm just going to let him explain

22  how that phrase, looking at it today, would have related to the

23  next sentence, if at all.

24       Because, he says he never saw this document before,

25  so how could he have understood anything about it?

1    **MR. VAN NEST:**  Your question is a better one, Your

2    Honor.

3    **THE COURT:**  So I'll let him answer the question as I

4    phrased it.

5    **THE WITNESS:**  Judge, the judge wins.

6    (Laughter)

7    **THE WITNESS:**  In 2005, Java had evolved to --

8    2005-2006, to primarily being used by mobile carriers.  And

9    Sun's strategy was to have mobile devices, which were

10   well-suited to Java, use Java, use JVM.  They had a license for

11   that.  And they would get a logo.

12   And the coffee-cup logo is a reference to the Java

13   logo.

14   **BY MR. VAN NEST:**

15   **Q.**  And that's something you had to pay for?

16   **A.**  Yes, you had to pay for that.

17   **Q.**  Now, you said in response to Mr. Boies' question that the

18   next line you thought was wrong, "Must take a license from

19   Sun."  What did you mean by that?

20   **A.**  Well, again, I didn't write this document, but I believe

21   "Must take license from Sun" refers to the previous statement,

22   "Need coffee-cup logo."  You need to have a license in order to

23   use their logo.

24   **Q.**  When you say "logo," what are you talking about?

25   **A.**  The little picture of Java on the coffee cup.

1   Q.   Okay.  Let's move on.  At some point in the various

2   discussions about Android and getting technology, did Android

3   or Google contact Sun for discussions about Android?

4   A.   Many times, yes.

5   Q.   Now, were you aware, was Google contacting a lot of other

6   companies, too, at the time?

7   A.   Well, of course.

8   Q.   And what -- what other companies would Google have been

9   talking to about Android?

10  A.   Well, to start with, hardware partners, other possible

11  sources for software, for example, Qual-Com would be an

12  example, who would make some of the chips that are used.

13        I mentioned earlier some of the other software and

14  hardware components that would have to be integrated, so Sun

15  was certainly one.

16  Q.   So this was an effort to go out and see what was available

17  in the market, pick and choose among various alternative

18  sources; is that right?

19  A.   Yes.

20  Q.   Did you have some communications yourself directly with

21  the folks at Sun?

22  A.   Yes, of course.

23  Q.   Did you have e-mail communications and telephone

24  communications and so on?

25  A.   Yes.

1  Q.   Tell the jurors, what was the purpose, what was your goal

2  in discussions with Sun?  What is it that Google wanted to get

3  out of a relationship with Sun?

4  A.   Well, my going-in position is that you're better off

5  working with everybody else, and so you're always better off

6  talking.  It's also better if they know what you're doing so

7  they cannot be surprised if you do things that don't make sense

8  to them and so forth.

9       Furthermore, Scott McNealy, CEO at the time, was my

10  boss for 14 years and is a good personal friend.  And so for

11  many reasons we would have constant conversations.

12       Scott would call me up and try to sell me large Sun

13  servers, which, of course, we didn't need, and things like

14  that.

15  Q.   Now, you said Scott McNealy was your boss.  Who is Scott

16  McNealy?

17  A.   I'm sorry, Scott McNealy was the CEO of Sun and my mentor

18  and boss for 14 years, so I worked for him before I went to

19  Novell and then to Google.

20  Q.   And at this period of time now, in 2005-2006, he was still

21  at Sun?

22  A.   That is correct.

23  Q.   Okay.  Did you have some communications directly with him?

24  A.   I did.

25       **MR. VAN NEST:**  Could I have Exhibit 2005 on the

 1  screen.  I'm not sure it's in evidence yet.

 2          May I approach the witness, Your Honor?

 3          **THE COURT:**  Sure.

 4  **BY MR. VAN NEST:**

 5  **Q.**   You have before you Exhibit 205.  Do you recognize 205,

 6  Mr. Schmidt?

 7  **A.**   I do.

 8  **Q.**   What is it?

 9  **A.**   This is an e-mail from myself to Scott, and then a

10  response from Scott back to me.  My e-mail is the bottom and

11  his response is the top.

12          **MR. VAN NEST:**  Offer 205 in evidence, Your Honor.

13          **MR. BOIES:**  No objection, Your Honor.

14          **MR. VAN NEST:**  Could we display that?

15          **THE COURT:**  Received.  Go ahead.

16          (Trial Exhibit 205 received in evidence.)

17          (Document displayed.)

18          **MR. VAN NEST:**  Thank you, Your Honor.

19  **BY MR. VAN NEST:**

20  **Q.**   Starting with your e-mail to him, Mr. Schmidt, that first

21  paragraph.

22          **MR. VAN NEST:**  If we could highlight the first --

23  highlight the whole first paragraph.

24  **BY MR. VAN NEST:**

25  **Q.**   Can you read that to the jury, Mr. Schmidt, and tell them

 1  what you were hoping to communicate to Mr. McNealy.

 2  **A.**   So the paragraph says, Scott, I'm in product review and

 3  we're looking at a very interesting partnership proposal with

 4  Sun --

 5  **Q.**   Mr. Schmidt, you need to slow down when you read.  We've

 6  all made that same mistake many times.

 7  **A.**   I apologize.

 8          Basically, Andy Rubin runs our mobile OS/search

 9  engineering group, and he is talking with Alan Brenner, VP

10  consumer and mobile systems group of Sun.

11  **Q.**   Now, when you say "a very interesting partnership

12  proposal," what were you referring to?

13  **A.**   We had had a meeting, and during this meeting we said,

14  let's talk to Sun about can -- does it make sense to work with

15  them to do this, given their Java assets and the things they're

16  trying to do, especially in the mobile space.

17  **Q.**   And under that scenario, what would Sun be providing, what

18  would Google be providing?  What was the general idea here?

19  **A.**   Well, you can see in the second paragraph, if I may --

20  **Q.**   Please.

21  **A.**   -- I say, "Google has engaged with our Java team" --

22  that's code for we're talking with them -- "in an effort to

23  form an alliance around our open handset platform."

24          The open handset platform is this idea that all these

25  carriers and people who make phones could make a more modern

1    phone.

2            "It's an opportunity for our two companies" -- that

3    would be Sun and Google -- "to work together to define a

4    de facto standard software" -- "a de facto standard software

5    stack for mobile phones."

6            "We have adopted" -- Google -- "a completely open

7    source model as a way to spot some intricate distribution

8    dependencies."

9            We should do this together. And it goes on.

10   Q.   Now, did Mr. McNealy respond?

11   A.   He did.  You can see above his response.

12   Q.   Let's get Mr. McNealy's response up.

13           Tell the jurors what you understood from

14   Mr. McNealy's response to your e-mail.

15   A.   His -- it's a typical Sun response.  That's my reaction.

16   A typical Scott response.

17           So Jonathan and the team are on top of this.  The

18   Jonathan would be Jonathan Schwartz.  "I'm worried about how

19   we're going to replace the revenue this is likely going to

20   submarine."

21           So he has an existing revenue, and my interpretation

22   is he's worried about how does he get that revenue if he does a

23   partnership with us.

24   Q.   Was the idea that both of you would contribute your

25   technology and make it all open?

1  **A.**   That was my proposal.  You can see that -- his statement

2  here:  I -- that's Scott, representing Sun -- "I'm very

3  supportive of driving a completely open phone stack" -- which

4  is what I'm proposing -- "and even taking risk with Java to get

5  there" -- that's technical and product risk -- "but I need to

6  understand the economics."

7        And I interpreted this as, We want money from you.

8  **Q.**   And the last sentence says, "We're obviously supportive in

9  helping to fuel the market."

10       What did you understand Mr. McNealy to tell you

11  there?

12  **A.**   He understood the benefit of having a billion users would

13  be good for everyone.

14       You'll notice, by the way, the postscript has, "The

15  team had a chance to try out the new T2000."  That's the piece

16  of software he's trying to sell us.

17  **Q.**   Now, did you continue to have dialogue with the folks at

18  Sun, Mr. Schmidt?

19  **A.**   Yes, I did.

20  **Q.**   And who is Jonathan Schwartz?

21  **A.**   Jonathan was the, I believe, president at the time, but

22  had been in charge of all of the software and was in charge of

23  the -- all the Java work at Sun during those years.

24  **Q.**   Did he work for Mr. McNealy?

25  **A.**   That is correct.

1    Q.   And did you -- did you know Mr. Schwartz?

2    A.   Extremely well.  I hired him into Sun.

3    Q.   And he worked for you at Sun?

4    A.   Way back when, yes.

5    Q.   Way back when.

6         And so did the two of you in this period, '05-'06,

7    did you and Mr. Schwartz talk on a regular basis?

8    A.   Of course, yes.

9         MR. VAN NEST:  Could I have Exhibit 435, please.

10   BY MR. VAN NEST:

11   Q.   Mr. Schmidt, I'm placing before you Exhibit 435.  Ask you

12   if you could identify that, please.

13   A.   Uhm, I see this.

14   Q.   What is it?

15   A.   This is an electronic mail from Jonathan to me, Jonathan

16   Schwartz of Sun, copying Scott and Sergey Brin.

17   Q.   Now, this one's a little bit later.  This is in April of

18   2006, correct?

19   A.   That's correct.

20        MR. VAN NEST:  I'd offer 435 in evidence, Your Honor.

21        MR. BOIES:  No objection, Your Honor.

22        THE COURT:  Thank you.  Received.

23        Go ahead.

24        (Trial Exhibit 435 received in evidence.)

25        (Document displayed.)

1  BY MR. VAN NEST:

2  Q.    And this is an e-mail from Mr. Schwartz to you, correct?

3  A.    Yes.

4        MR. VAN NEST:   And could we highlight that first

5  sentence?  That's looks good.  First two paragraphs.

6  BY MR. VAN NEST:

7  Q.    (As read:)

8            "My team has alerted me that our negotiations

9            to jointly create a Java-Linux mobile

10           platform are at an impasse."

11           First of all, did you understand what he meant by

12  "Java-Linux mobile platform"?

13  A.    Yes.

14  Q.    What was your understanding of that?

15  A.    He's referring to our proposal to combine our activities

16  with their Java licensing model.

17  Q.    And what is Linux?

18  A.    Linux is a version of something called UNIX that was open

19  source.  In other words, anyone could modify it.  It's

20  important to state that Google and many of the other companies

21  that are successful today use Linux as part of their platforms.

22  Q.    And what is Linux?

23  A.    It's an operating system.  It's the basic part of software

24  that's -- that runs the computer itself.

25  Q.    And are you confident that by this point in time, which is

1   April of '06, Mr. Schwartz was well aware of what the various

2   components of Android would be?

3   **A.**   Uhm, yes.

4   **Q.**   Now, he goes on to say:

5           "I believe this effort is an important

6           project for both our companies.  We're at a

7           critical stage in the industry where we still

8           have a chance to successfully create an open

9           platform that can target multiple consumer

10          devices."

11          What did you understand Mr. Schwartz to be saying

12   there?

13   **A.**   He's agreeing with my view, the shared view, that there is

14   an opportunity to build a single platform that would be used by

15   everybody, that has the attributes of openness.  You can modify

16   it, those sorts of things.

17   **Q.**   And the very last sentence closes with, "Let me know how

18   we can move forward."

19          **MR. VAN NEST:**   Can we have that last one at the

20   bottom.

21          **THE WITNESS:**   It says, "Don't hesitate to let me know

22   how Scott or I can move this forward."

23   **BY MR. VAN NEST:**

24   **Q.**   What was the stage of negotiations at this point?

25   **A.**   Again, we have people who work for me and Jonathan doing

1  negotiations, but they were -- you can see in the third

2  paragraph -- so it would be -- Sun is ready to embrace Google's

3  innovation.  So that's a yes.

4              "But we are unwilling to cede complete

5              control of the management hosting authorizing

6              computers for key components of the stack."

7              This is an indication that Sun is unwilling to

8  completely let other people participate in the development of

9  Java at the source code level.  And this is what I expected

10 from Sun, but -- which has always been an issue.

11 Q.   Now, had Google's version of this partnership come to be,

12 would you have needed a license to use the source code that Sun

13 had?

14 A.   Well, Sun's source code, yes, absolutely.

15 Q.   And was that -- at this point that's what you were

16 contemplating doing?

17 A.   Yes.

18 Q.   What products -- what Sun products were you hoping to

19 incorporate in Android?

20 A.   Well, so there's language and APIs, which are the -- the

21 structure, if you will, the way in which you use things.  But

22 you have to have the actual code, the software product.  That

23 code is written and owned by a person or a corporation.  You

24 can't use that without a license or permission to do that.  So

25 you can either build your own or you can license it from

1  somebody else.

2  Q.   And if you use someone else's source code, you need to

3  take a license?

4  A.   Of course.

5  Q.   And was that still -- still in play here in April or so of

6  2006?

7  A.   Yes.

8  Q.   Now, did you respond to Mr. Schwartz' e-mail?

9  A.   I believe so.

10        **MR. VAN NEST:**  Could I have 2375, please.

11        Don't see it in my binder here.  2372, do we have a

12  copy of that?  2372.  Could we put it on the screen for

13  Mr. Schmidt to see?  2372.

14  **BY MR. VAN NEST:**

15  Q.   Do you recognize 2372, Mr. Schmidt?

16        Let's go down a little bit -- a little bit further.

17  A.   I do.

18  Q.   What is it?

19  A.   It's a message from Andy Rubin to Jonathan Schwartz.

20  Q.   All right.  Let's actually go to the second page.  I

21  apologize.  I now have the exhibit.  Let me hand --

22        **MR. VAN NEST:**  May I hand it to the witness, Your

23  Honor?

24        **THE COURT:**  Yes.

25

1   BY MR. VAN NEST:

2   Q.   It's the second page that I want to call your attention

3   to, Mr. Schmidt.   I'm sorry.

4   A.   Thank you.

5   Q.   Do you recognize the e-mail exchange there on the second

6   page?

7   A.   I do.

8           MR. VAN NEST:   I'd offer 2372 in evidence, Your

9   Honor.

10          MR. BOIES:   May I have just one moment, Your Honor?

11          No objection.

12          THE COURT:   Thank you.   Received.

13          (Trial Exhibit 2372 received in evidence.)

14  BY MR. VAN NEST:

15  Q.   Now, the first paragraph, you're congratulating Jonathan.

16  Do you know what that's about?

17  A.   He was promoted to chief executive officer, and Scott

18  McNealy became chairman around this time.

19  Q.   And "this time" is roughly May or so of 2006?

20  A.   That's correct.

21  Q.   Your next paragraph starts off, I got your message about a

22  potential partnership between Google, mobile Android and Sun

23  Java.   Do you see that?

24  A.   I do.

25  Q.   And take a look at that paragraph and tell the jury what

 1  you understood Mr. Schwartz to be telling you about the

 2  potential for a partnership between Google and Sun.

 3  **A.**   This is a message from me to Jonathan.

 4  **Q.**   I'm sorry.

 5  **A.**   Okay.

 6  **Q.**   What were you telling him about the potential for a

 7  partnership?

 8  **A.**   So, first, I'm congratulating him on his promotion, which

 9  was well deserved.  And it was actually my feeling.

10          The second paragraph occurred when Andy and I talked

11  about what are we willing to compromise on this issue of

12  control in a potential partnership?

13          And you can see that I say:

14          "I am okay with each party hosting and

15          managing their own contributions - an obvious

16          compromise."

17  **Q.**   What did you mean by that?

18  **A.**   The hosting and managing contributions is a -- is an issue

19  of how do you allow the changes to occur when everyone's

20  contributing changes in open source.

21          And this is a difference in view between Sun and

22  Google.  I viewed it as a relatively minor issue.  And I

23  thought that if we simply said they could do their part their

24  way and we could do our part our way, then it would be fine and

25  we would still be able to get large numbers of users.

1  Q.   And just a little bit further down on the document,

2  Mr. Schmidt, you say:

3           "However, Google should have the final say as

4           to which Sun technology is contributed since

5           Google is writing the check."

6           What did you mean by that?

7  A.   You'll recall Scott's e-mail to me earlier that he was

8  concerned about replacing revenue.  At this point we've told

9  them that we're willing to pay them money to get access to

10 their source code.

11          And you can see that I've written that we, Google,

12 should have the final say of which part of Sun technology we

13 take in, especially since we're writing them a check.

14 Q.   At that time were you still considering which of Sun's

15 proprietary products might become part of Android?

16 A.   That is correct.  And there are subtle and important

17 differences.  One engineer thinks that their code is better

18 than another.  And the Sun person thinks, well, I invented it.

19 And then Google says, well, I have a better job.  You know, the

20 usual sort of technical discussions to be resolved.

21 Q.   So were you able to reach agreement with Sun on a

22 partnership to build Android?

23 A.   Unfortunately not.

24 Q.   And can you tell the jurors just briefly why the

25 negotiations broke down?  What was the -- what were the

1   differences?

2   **A.**   At the highest level, the core issue had to do with

3   control; that, in a full open source implementation, the

4   contributors have relatively little control over what happens

5   after they put it out.

6          And Sun's view was that they wanted much tighter

7   control, which was their -- which was their view.  It's a

8   difference of viewpoint.

9   **Q.**   Was money the thing that broke the deal down, or no?

10  **A.**   Not really.  They wanted $30- to $50 million kinds of

11  numbers in the negotiation.  We would have paid that simply to

12  resolve it.  The money wasn't as important as this question of

13  making a successful platform.

14  **Q.**   Now, after the negotiations between Google and Sun broke

15  off, did you and the Android team go in a different direction?

16          **THE COURT:**  Can we establish the date of when the

17  negotiations broke off, at least according to the witness?

18  **BY MR. VAN NEST:**

19  **Q.**   Can you give us --

20          **THE COURT:**  So the jury will have that clearly in

21  mind.

22          **MR. VAN NEST:**  That's a good idea, Your Honor.

23  **BY MR. VAN NEST:**

24  **Q.**   With reference to that exhibit, can you give us an

25  estimate, approximately, of when the negotiations concluded?

1  A.    It's sometime in late 2006.

2  Q.    The date of the exhibit you have in your hand, what date

3  is that?

4  A.    May 2006.

5  Q.    May 2006.  It was sometime after?

6  A.    Yeah.  We continued to talk.  And eventually it became

7  clear that we tried and tried and we were unable to come to a

8  satisfactory deal for both parties in 2006.

9  Q.    So at that point, what did you do?

10 A.    Well, as -- we wanted to make sure that we could support

11 the Java language because we thought that Java was the best

12 development environment.  And that was certainly my personal

13 view as well.

14         And so we began a clean-room implementation.  And a

15 clean-room implementation was developed and is -- and it uses a

16 completely different approach to the way Java worked

17 internally.

18 Q.    Okay.  And why don't you tell the jury what you mean by

19 that, "a completely different approach."

20 A.    Well, Java, when it was built had some -- something called

21 byte codes.  And the details are -- we were very proud of

22 ourselves having invented it at Sun, this approach.

23         And a team known as the Dalvik team at Google

24 invented a completely different way of obtaining the same

25 objective, that didn't use the same byte codes.

```
 1              I was surprised that this worked, but it did work.
 2   And it meant that we were not subject to the bytecode
 3   architecture, which is an underlying, how to describe it, way
 4   in which computers work.  We used a different approach.
 5   Q.   And who was in charge of getting the product built?  Who
 6   was --
 7              THE COURT:  Wait a minute.  Google or at Java?
 8              MR. VAN NEST:  We're --
 9              THE COURT:  What you just described happened at --
10   was that at Java or -- I mean Sun or --
11              THE WITNESS:  I'm sorry, Your Honor.  I may have
12   miscommunicated.  I was referring to Google's activity to build
13   after 2006.
14   BY MR. VAN NEST:
15   Q.   So let's actually clarify that, if it's unclear in the
16   Court's mind.
17              So you negotiated for some period of time with Sun?
18   A.   Yes.
19   Q.   And in 2006, you concluded that that wasn't going to work?
20   A.   That's correct.
21   Q.   So then Google and the Android team still wanted to
22   develop the Android platform, correct?
23   A.   Yes.
24   Q.   And just tell us generally, you went a different
25   direction.  Sun was no longer in the picture.  What was the
```

1  plan for building your own Android at Google?

2  A.   Well, as I said, my going-in position in 2006 is that the

3  best approach would have been to do a partnership where we

4  could use the work that had already been done.  But because we

5  were unable to come to that deal, we in the same time invented

6  a different approach to how to achieve the objective.  And this

7  was done by a team that did not come from Sun and did not use

8  Sun's intellectual property, as I was told.  And so it was

9  something that Google owned, that Google could do whatever we

10  thought best with it.

11  Q.   So when you say Google thought it could do best, were you

12  still pursuing an open source approach?

13  A.   Yes.

14  Q.   Why did you think that was the best way to go?

15  A.   We've -- we, Google, have always believed that the best

16  software is the kind of software that's generally open, the

17  source code is made available, programmers can take it and

18  can -- I'm sorry, slow down.

19        Programmers can take it and modify it as they see

20  fit.  This is the basis of Linux.  It's the basis of something

21  called Apache.  And it's mostly how the Web works.

22  Q.   Was the Android platform being built using the Java

23  programming language?

24  A.   Uhm, the platform --

25  Q.   Parts of it?

1  **A.**    The platform was developed -- it implements the language

2  and it implements the APIs, but it does not use the Java source

3  code and it does not use Java development tools.  It uses other

4  things to do the same thing.

5  **Q.**    Okay.  Now, why don't you explain to the jurors, what role

6  was the Java language itself going to play in the Android

7  platform?

8  **A.**    Well, in might be -- perhaps this has already been

9  discussed, but a language is a set of instructions.  So, you

10 know, do this, do that, add these numbers, turn this on, turn

11 this off.  So the language of Java became the -- if you're a

12 programmer, you wrote in this language for Android.

13 **Q.**    And was it your belief that you could use the Java

14 programming language notwithstanding that you weren't in a

15 partnership with Sun?

16 **A.**    Absolutely.

17 **Q.**    Why?

18 **A.**    For many reasons.  The -- in 199 -- well, in 1991 and

19 1992, the strategy that we drove and that I drove allowed it.

20          **MR. BOIES:**  Objection, Your Honor.  It's exactly what

21 the Court --

22          **THE COURT:**  Sustained.  We're not going to go back

23 that far.

24          **MR. VAN NEST:**  I'll rephrase the question, Your

25 Honor.

1  **BY MR. VAN NEST:**

2  **Q.**   As of 2006, when you took Android in a different

3  direction, what was your understanding about your ability to

4  use the language in at least a part of the Android platform?

5  **A.**   It was my understanding that it was completely fine; that

6  Sun had made the language available and was available in 2006.

7  **Q.**   And throughout your discussions with Mr. Schwartz, was he

8  aware that you were using the Java language?

9  **A.**   Absolutely.

10  **Q.**   What about the Java APIs we're been hearing about, was it

11  your plan to use the Java APIs in Android?

12  **A.**   It was.

13  **Q.**   And how were you able to do that?

14  **A.**   A language by itself is not very useful.  Whenever I use

15  the word "language," I also refer to the APIs.

16  **Q.**   Why is that?

17  **A.**   Well, imagine a situation where you have instructions and

18  you go, 1 plus 1 is 2 and 3 plus 4 is 5.  Well, in order to

19  answer that, to do something with, say, the 5, you have to call

20  an interface to publish it, to print it, to show it on a

21  screen.  So Java with no APIs is not very useful.

22  **Q.**   And was it your understanding that anyone was objecting to

23  Google's use of either the language or the APIs in Android?

24  **A.**   There was no such objection.

25  **Q.**   And did anyone at any time ever tell you that you needed a

1  license to use the language or the APIs as part of Android?

2  **A.**    Uhm, they did not.

3  **Q.**    Now, how was the rest of Android built?  Source code?

4  Operating system?  Where did all those other components come

5  from?

6  **A.**    Well, the operating system was based on Linux, which was

7  subject to something called the Linux license, which made it

8  open systems, anybody could modify it.

9         The other components were under a similar license

10  called the Apache license.  And then the components that Google

11  developed we had control over and we put them under the Apache

12  license.

13  **Q.**   And when you say we put our Google technology under the

14  Apache license, what does that mean?

15  **A.**   It meant that you could take the source code and modify it

16  as you saw fit.

17  **Q.**   And by "the source code," you mean the source code that

18  Google developed?

19  **A.**   That is correct.

20  **Q.**   Why did you -- oh, excuse me.

21  **A.**   If I could amplify on the Apache license.

22  **Q.**   Please.

23  **A.**   The Apache license is unusually liberal in that if you

24  make -- if you write code and you let me use it, I can further

25  modify it and I don't have to give it back to you.

1  Q.    Why is that important?

2  A.    Again, we're trying to get as much spread and as many

3  users as possible.  So today, for example, Android has users

4  who we don't know and we don't talk with and who make odd and

5  interesting modifications to it that are surprising to us, and

6  that's permissible.

7  Q.    Are there some fairly well-known commercial products out

8  there that use Android that aren't even under the Apache

9  license?

10 A.    Well, technically, they are under the Apache license, but

11 they are not under some other licenses from Google.  An example

12 would be the Kindle.

13 Q.    Kindle?

14 A.    The Kindle is an example, a very successful one.

15 Q.    Now, do you recall approximately when Google first

16 announced the Android platform to the public, Mr. Schmidt?

17 A.    We announced something called the Open Handset Alliance, I

18 think, in 2005 or 2008.  And then we followed, about a year

19 later, with our first Android phone.

20 Q.    Now, let's come back to that first announcement in 2007.

21 Remind us, what's the Open Handset Alliance?

22 A.    Again, the goal is to get as many partners as we can to

23 create an alternative to Microsoft and Symbian.  So Andy had

24 the idea to call and with a set of people who are also on these

25 e-mails call all of these hardware companies and have them

1  endorse the concept of a software platform like the one we're

2  describing.

3  **Q.**   So the announcement was on behalf of a big group?

4  **A.**   That's correct.

5  **Q.**   Not just Google?

6  **A.**   It was an announcement -- think of it as an alliance of

7  people with a shared vision, and I remember it and I did it

8  with Andy Rubin.

9  **Q.**   And was there a software kit of some kind or a developers

10 kit released at that time?

11 **A.**   So in order to have something to show, we announced a

12 developer kit that, if you started -- if you started developing

13 against this developer kit, your software would run on these

14 hardware devices that were to be developed.

15       In other words, you know, if there's nothing, how do

16 you get started?  Well, you have to start programming.  And

17 then as the phones show up, your stuff will, you know, start to

18 work on it.

19 **Q.**   So what -- where was the developer kit placed?  How did

20 people get access to that?

21 **A.**   Again, the same rule is that you put the source out and

22 then you let people modify it.

23 **Q.**   And that was done around the time of the announcement in

24 '07?

25 **A.**   That is correct.  And it's -- the way you do this is you

1  take the software and you put it on a server and then you let

2  people get it anywhere in the world.

3  Q.    Would anyone that wanted to know what APIs Android was

4  using at that time have been able to find out?

5  A.    Yes, absolutely.

6  Q.    How would they do that?

7  A.    By looking at the developer kit, because the developer kit

8  would state the APIs that were available.

9  Q.    So there would be some Android APIs included?

10 A.    Yes.

11 Q.    And some Java APIs?

12 A.    Yes.

13 Q.    And anyone that wanted to know what was in it, they could

14 look on the website; it would all be there?

15 A.    Absolutely.

16 Q.    Now, around the time of this announcement did you receive

17 a private communication from Mr. Schwartz at Sun?

18 A.    I did.

19 Q.    Was that in the form of an e-mail?

20 A.    Yes, I did.

21 Q.    I'd like to hand you Trial Exhibit 3441, and ask you to

22 identify that, please.

23        What is 3441, Mr. Schmidt?

24 A.    This is an e-mail from myself to -- let's see.  I'm sorry.

25 It's actually three e-mails.  The first e-mail is from Jonathan

1    Schwartz, CEO of Sun, to me, dated November 2007.

2    **Q.**   And then there's a couple of other e-mails to you?

3    **A.**   And then above it, same day, is a response.

4    **Q.**   Are these e-mails that you sent and received with

5    Mr. Schwartz back in 2007?

6    **A.**   On -- yes, on November 9th, 2007.

7             **MR. VAN NEST:**  I'd offer 3441 into evidence, Your

8    Honor.

9             **MR. BOIES:**  No objection, Your Honor.

10            **THE COURT:**  Thank you.  Received.

11            (Trial Exhibit 3441 received in evidence.)

12            (Document displayed.)

13   **BY MR. VAN NEST:**

14   **Q.**   If we could publish that.  Let's start at the bottom of

15   the e-mail, Mr. Schmidt.  And could we blow that up.

16            Could you read the e-mail text and tell us what

17   understood Mr. Schwartz to be telling you?

18   **A.**   It says:  Let us know how we can help support your

19   announcements next week - we're happy to do so.

20   **Q.**   What did he mean?  What was he referring to?

21   **A.**   He's referring to our announcement of the developer kit as

22   part of the Open Handset Alliance.

23   **Q.**   Was he the CEO by this time?

24   **A.**   Yes, he was.

25   **Q.**   Did you respond to the e-mail?

1   **A.**    I did.

2   **Q.**    What did you tell him?

3   **A.**    My response is:

4              "Thanks, Jonathan.  I will review right now.

5              The software developer kit is supposed to

6              release an early look on Monday."

7              That will be its first public release.

8   **Q.**    And when it says "SDK," what are you referring to there?

9   **A.**    That's the developer kit.  Again, as I mentioned, to get

10  things started a programmer needs a kit that they can program

11  against before the actual phones show up so they can determine

12  if their software works.

13  **Q.**    And that's -- that's the kit from which someone could tell

14  what are the APIs and what are we using and all that?

15  **A.**    That's correct.

16  **Q.**    Okay.  And then what does -- what is Mr. Schwartz' final

17  response?

18  **A.**    And then his top response, again, same day:

19              "A few of your Alliance partners have reached

20              out to us to build a separate but equal

21              effort."

22  **Q.**    What does that mean?

23  **A.**    So we have formed an alliance.  So some of them have

24  separately called Sun and said, why don't we do something with

25  Sun instead of with Google.

1  Q.   And what was the gist of his -- of his message to you?

2  A.   He -- he is -- uhm, the gist of his paragraph is he says

3  he would love to have one big tent, which is a combination of

4  the two activities, in some form, rather than having a lot of

5  splintering, as you would call it.

6  Q.   Now, I take it you knew Mr. Schwartz pretty well?

7  A.   Very well.

8  Q.   You two saw each other on a periodic basis?

9  A.   Yes.

10 Q.   Did he have a blog that he was using as CEO of Sun?

11 A.   He did.

12 Q.   Tell the jurors what the blog was or what's a blog and how

13 is Mr. Schwartz using it?

14 A.   Jonathan was one of the early users of web -- Web --

15 publishing or blogging.  And he was one of the CEOs who wrote

16 quite frequently of his thoughts on the industry, what was

17 going on in his company and so forth.  And he was one of the

18 first.

19 Q.   And did his blog become pretty well-known in Silicon

20 Valley?

21 A.   It did.

22 Q.   Yeah.  And did you read it from time to time?

23 A.   I did.

24 Q.   Was there an announcement at Sun by Mr. Schwartz at or

25 about the time of this Open Handset Alliance release and the

 1  release of the SDK?

 2  **A.**    There was.

 3          **MR. VAN NEST:**   Can I display 2352?   It's already in

 4  evidence.   Would you take a look at 2352.   Could we highlight

 5  the first paragraph.   Just above that.

 6          (Document displayed.)

 7  **BY MR. VAN NEST:**

 8  **Q.**    First of all, do you recognize 2352?

 9  **A.**    I do.

10  **Q.**    What is it?

11  **A.**    It's Jonathan's public blog.

12  **Q.**    And this wasn't the only time he blogged, that's a

13  periodic ongoing thing?

14  **A.**    Yes, he was very frequent.

15  **Q.**    Okay.   And what's the message here underneath

16  congratulations, Google, Red Hat and the Java community?

17          Can you read slowly the first paragraph underneath

18  that and tell us what you understood him to be saying?

19  **A.**    "I'd also like Sun"?

20  **Q.**    No, the first one.

21  **A.**    Sorry.

22  **Q.**    "I just wanted."

23  **A.**    (As read:)

24          "I just wanted to add my voice to the chorus

25          of others from Sun in offering my heartfelt

```
 1              congratulations to Google on the announcement

 2              of their new Java/Linux phone platform

 3              Android.  Congratulations."

 4  Q.   What did you understand that to mean?

 5          MR. BOIES:  Objection, Your Honor, foundation.

 6          THE COURT:  Sustained.

 7  BY MR. VAN NEST:

 8  Q.   Well, did you read the blog at the time?

 9  A.   I did.

10  Q.   Okay.  And there's a reference in the second paragraph to

11  a NetBeans developer platform for mobile devices.  What was

12  NetBeans?

13  A.   So remember we talked about a developer kit.  One tool

14  that a programmer can use is a developer environment;

15  essentially, all the pieces that they need to make the code

16  assemble.

17          And NetBeans was Sun's activity in that area.

18  Q.   And he says:

19              "We've obviously done a ton of work to

20              support developers on all Java-based

21              platforms and we're pleased to add Google's

22              Android to the list."

23              Did you know what list he was referring to?

24  A.   He's referring to the list of people who are implementing

25  Java in one place or another as a platform.
```

1  Q.   And what are you -- what is Android being added to?

2  A.   A set of companies that are a part of a global effort

3  around Java.

4  Q.   Okay.

5           MR. VAN NEST:   And could we go down two more

6  paragraphs.

7           (Document displayed.)

8  BY MR. VAN NEST:

9  Q.   Can you read that paragraph, again slowly, and tell us

10 what you understood from that?

11 A.   (As read:)

12           "And, needless to say, Google and the Open

13           Handset Alliance just strapped another set of

14           rockets to the community's momentum and to

15           the vision-defining opportunity across our

16           and other planets."

17 Q.   Now, when he says "community's momentum," did you know

18 what he was talking about?

19 A.   He's referring to the collection of companies which

20 implement Java in one way or the other.

21 Q.   And "strapped another set of rockets to the momentum," did

22 you have any understanding of what that intended to convey?

23           MR. BOIES:   Objection, Your Honor, foundation.

24           THE COURT:   Sustained.

25

1    **BY MR. VAN NEST:**

2    **Q.**   Now, subsequent to the release of Android, did you

3    continue to have discussions with the folks at Sun?

4    **A.**   I did.

5    **Q.**   Did you continue to talk with Mr. Schwartz?

6    **A.**   I did.

7    **Q.**   Continue to talk with Mr. McNealy?

8    **A.**   Yes.

9    **Q.**   By the way, during this period we are talking about was

10   Google a customer of Sun's?

11   **A.**   Yes.

12   **Q.**   What was the business relationship between Google and Sun

13   from a customer standpoint?

14   **A.**   Uhm, Sun -- Google had a product called a toolbar that

15   worked on personal computers.  And as part of the Java

16   distribution that Sun did, our toolbar was included in their

17   Java distribution.  And we paid a fee to Sun to distribute that

18   toolbar.

19   **Q.**   And how did that work?

20   **A.**   Uhm, we would -- this is completely separate from Java

21   itself.

22         We had a toolbar that would sit in your browser, and

23   this browser would allow you, if you were using Internet

24   Explorer, which was the dominant browser at the time on

25   Windows, it would make it very easy to search on Google.

1           And we thought that was a good way to give customers

2    choices for search.  Microsoft had its own search product, and

3    they were making it difficult to get to Google.

4           So by putting this toolbar inside of their browser,

5    we were able to get customers to have more access.  It was good

6    for us.  And we paid Sun a fee to do that.  And whenever a

7    customer would install Java on a PC, they would get this

8    toolbar as an option.

9    Q.   And was that a pretty favorable deal for Sun?

10   A.   It was a very good deal for us and a good deal for Sun.

11   Q.   Was there another product called StarOffice?  Was that

12   a --

13   A.   StarOffice was a product that was owned by Sun, that they

14   also distributed as part of the toolbar.

15   Q.   Okay.  So as a customer, were you in contact with

16   Mr. Schwartz on a regular basis?

17   A.   Yes, quite a bit.  We did a series of announcements

18   together, that sort of thing.

19   Q.   And after Google launched Android and after the SDK was

20   out and after Mr. Schwartz' blog, did you and he continue to

21   discuss Android?

22   A.   Of course.

23   Q.   And did you actually meet, the two of you?

24   A.   Yes.

25   Q.   Can you tell the jury what you and Mr. Schwartz discussed

1  on the subject of Android now after the launch of the SDK?

2  **A.**   Well, Jonathan's sort of core view was to make sure that

3  Java would be successful.  And he was happy to have an

4  additional Java partner to make the language more successful.

5  It benefited Sun and benefited Google.

6  **Q.**   Did you and he discuss Sun's building products on top of

7  Android?

8  **A.**   I'm sure we did.

9          **MR. VAN NEST:**  I would like to hand the witness, Your

10  Honor, Exhibit 3466.

11  **BY MR. VAN NEST:**

12  **Q.**   And ask, Mr. Schmidt, if you recognize Exhibit 3466.

13  **A.**   I do.

14  **Q.**   What is it?

15  **A.**   It's a mail message from me to Jonathan, copying Andy

16  Rubin.

17  **Q.**   What's the date of 3466?

18  **A.**   This would be March 2008.

19  **Q.**   So this is several months after the release of the

20  developer kit?

21  **A.**   Yes.

22          **MR. VAN NEST:**  I'd offer 3466 in evidence, Your

23  Honor.

24          **MR. BOIES:**  Objection, Your Honor.  Hearsay and

25  incomplete.

1          THE COURT:  May I see the exhibit?

2          MR. VAN NEST:  Yes, Your Honor.  Your Honor, this is

3   a fairly routine e-mail sent by Mr. Schmidt to Mr. Schwartz,

4   like the dozens we've been seeing.

5          THE COURT:  Who's writing this?

6          MR. VAN NEST:  Mr. Schmidt is writing it to

7   Mr. Schwartz, who was the CEO of Sun.  And he's copying

8   Mr. Rubin.  And this is in March of 2008.

9          THE COURT:  What is the incomplete objection,

10  Mr. Boies?  You said it was incomplete in some way?

11         MR. BOIES:  It references two other articles or

12  something.  One of them, the license itself is being referred

13  to.  And the other is described in the next to the last subject

14  line of the e-mail, neither of which are attached.

15         MR. VAN NEST:  I think they were attached to the

16  original, Your Honor.  This is how this document was produced.

17  The e-mail is complete.  It references other things, but this

18  is how it was produced.  And it's been on the exhibit list for

19  a long time.

20         MR. BOIES:  It's also, Your Honor, a hearsay

21  document.

22         MR. VAN NEST:  These are links on here.  He's

23  providing links to something that Mr. Schwartz can get on the

24  Web.

25         THE COURT:  Has the witness testified to what

 1  preceded this?

 2          MR. VAN NEST:  He's about to do this.

 3          MR. BOIES:  Your Honor, I don't know this person, but

 4  I'm informed that this was just added to the exhibit list in

 5  the last three days.  So I don't think it's been, as

 6  Mr. Van Nest says, something that's been on the witness list a

 7  long time.  And we've had --

 8          THE COURT:  Has it been on the required amount of

 9  time?

10          MR. BOIES:  Excuse me?

11          THE WITNESS:  Yes.  Has this document been on the

12  list for the required length of time?

13          MR. VAN NEST:  Yes.

14          MR. BOIES:  Two days.  What I'm saying is in terms of

15  completeness.

16          MR. VAN NEST:  Your Honor, the document is completely

17  complete.  It's just a one-page e-mail.  There's no -- he's

18  making reference to some links there, but there's no other --

19  there's no other part of this document that I'm aware of.

20          THE COURT:  Well, why don't, before we admit 3466,

21  lay some more foundation --

22          MR. VAN NEST:  That's fine.

23          THE COURT:  -- with respect to what it was that led

24  up to this e-mail.  And then maybe I'll let it in.

25          But, here, I'll hand it back, 3466.

1              MR. VAN NEST:   Thank you, Your Honor.

2    BY MR. VAN NEST:

3    Q.   Mr. Schmidt, had you met with Mr. Schwartz earlier on the

4    day of March 31?

5    A.   I did.

6    Q.   And the two of you had had a discussion?

7    A.   We did.

8    Q.   And would you tell the jury what you and Mr. Schwartz

9    talked about that morning?

10   A.   I can't remember if Jonathan called me or I called him,

11   but this was after the public announcement and the blog post

12   that we previously discussed.

13            And I went over to, basically, my old buildings and

14   met with Jonathan in the cafeteria.  And we had a strategic

15   chat which talked about the details of their licensing approach

16   and our licensing approach, did it make sense for -- did it

17   make sense for Sun to take some of their software and put it on

18   top of our platform?

19            In other words, what were the strategic choices that

20   they were facing?  And he asked me for more technical details,

21   that they could then make sure that everybody was talking.

22            I was concerned that there was miscommunication

23   between the various teams about what the choices were.

24   Q.   And when you say "taking some Sun technology and putting

25   it on top," can you tell the jurors a little bit more about

1  what -- what he said on that subject?

2  **A.**   Well, uhm, in the Java community, we would end up with

3  a -- what Sun was calling a Linux mobile part of the platform.

4  Something -- because Sun didn't do Linux.  And the idea was, if

5  we're successful, perhaps there's unique technology that Sun

6  has that they could add on top of what we were doing, because

7  we don't have all the software and they don't have all the

8  software.  And under what terms is that permissible, and was it

9  okay with us.  And -- and those were the questions he was

10  asking.

11  **Q.**   And was -- go ahead.

12  **A.**   He was exploring -- he was exploring what their choices

13  were to take advantage of even more Java users in a good way.

14  **Q.**   And was he -- did he ask you for some information during

15  your meeting?

16  **A.**   He did.

17  **Q.**   And was this e-mail an attempt to respond to that request?

18  **A.**   He asked me to respond, and this e-mail is that response.

19          **MR. VAN NEST:**  Your Honor, I would offer 3466.

20          **MR. BOIES:**  Your Honor, it's still hearsay.

21          **THE COURT:**  Well, it is hearsay, but the Court's

22  going to allow it with this admonition to the jury, that it's

23  admitted not for the truth of any of the contents.

24          For example, this document says that something is in

25  the public domain and so forth.  It's not admitted for that

1  purpose.  This is not proof that anything is in the public

2  domain.  But it is allowed for you to consider what the

3  communication was between this witness and Mr. Schwartz at Sun

4  at the time.

5           For that limited purpose, this is admissible.  So the

6  objection is sustained in part and overruled in part.

7           The jury will please remember that this document came

8  in for a limited purpose.

9           All right.  Go ahead.  You may show it to the jury.

10          (Trial Exhibit 3466 received in evidence.)

11          (Document displayed.)

12          **MR. VAN NEST:**  Calling your attention to paragraph 1.

13  If we could highlight that first sentence.  Actually, let's

14  highlight the whole paragraph.

15  **BY MR. VAN NEST:**

16  **Q.**   Mr. Schmidt, the paragraph says:

17          "Our license is Apache v2.  It is essentially

18          public domain with an additional patent

19          non-assert by Google.  Google is in no way

20          forced upon anyone.  If one of our

21          competitors wanted to remove all Google

22          functionality and insert their own, that's

23          fine.  The license doesn't require any

24          give-backs."

25          What did you tell Mr. Schwartz that day on that

1    subject?

2    **A.**    So, as I previously described, the Apache license is

3    particularly liberal.  By liberal, I mean that, as a

4    programmer, you can choose what you like and what you don't

5    like.

6          In this paragraph what I'm saying is it's very

7    liberal, you have a lot of flexibility.  There's also a patent

8    non-assert.  We won't go after you for patent violations with

9    respect to patents that we have.

10          And the second part says that if, for example, a

11   competitor of Google decided to take this, they could take

12   everything that was from Google that was interesting out and

13   they could replace it with, for example, a different search

14   engine, a different e-mail system and so forth.  It's perfectly

15   fine.  It's the liberal nature of this license.

16   **Q.**    Now, the second paragraph says:

17          "As a result, Sun will be able to take

18          Android and, quote, do whatever you like,

19          unquote, to it subject to the license.  This

20          should allow you to, for example, add Java

21          code or anything else on top of Android and

22          make it available."

23          Had you and he discussed that subject earlier that

24   day?

25   **A.**    As I previously explained, Sun was trying to understand

 1  whether some of its Java functionality would also run on our

 2  platform.  And his question was a technical question:  Could

 3  it?  And I didn't know because I'm not -- was not a programmer.

 4  But, also, was it permissible?

 5          And the answer in the second paragraph is, "Yes,

 6  absolutely, if they chose to do that."

 7  **Q.**   Did you come to learn that soon after your discussion with

    Mr. Schwartz Sun actually demonstrated a product running on

 9  Android?

10  **A.**   I heard that, yes.

11  **Q.**   What did you learn about that?

12  **A.**   I just heard that they had --

13          **MR. BOIES:**  Objection, Your Honor.  Foundation.

14          **THE COURT:**  Of course.  That's hearsay.  Disregard

15  that last hearsay.  Come on.

16          **MR. VAN NEST:**  Your Honor, this is -- let me do it

17  with an exhibit.  I have 3521.

18  **BY MR. VAN NEST:**

19  **Q.**   Take a look at 3521, Mr. Schmidt.  Tell us whether you

20  recognize it.

21  **A.**   I do.

22  **Q.**   What is it?

23  **A.**   It's a e-mail message from Andy Rubin to myself.

24  **Q.**   And the date is May of 2008?

25  **A.**   Yes.

```
 1              MR. VAN NEST:  Your Honor, I'd offer 3521 in

 2   evidence.

 3              MR. BOIES:  Objection, Your Honor.  Hearsay.

 4              THE COURT:  May I see the document?

 5              MR. VAN NEST:  Yes, Your Honor.  I'm offering this

 6   again in the same vein, for Mr. Schmidt's state of mind.

 7              THE COURT:  Nothing on here.

 8              MR. VAN NEST:  It's just the top line, Your Honor.

 9   The subject line.  And all I intend to ask him is what he

10   heard.

11              THE COURT:  No.

12              MR. VAN NEST:  And what he learned or not.

13              THE COURT:  This is too much hearsay.  I don't see

14   why that -- his state of mind is that important on this point.

15   So this one, no, the answer is no.  It's hearsay.

16   BY MR. VAN NEST:

17   Q.   Now, did you continue to speak with Mr. Schwartz from time

18   to time following your discussion about the Apache license?

19   A.   I did.

20   Q.   And did you remain a customer of Sun's?

21   A.   Yes, we did.

22   Q.   Approximately how often did you and Mr. Schwartz meet

23   together or talk?

24   A.   We would speak or chat at least every six months.

25   Q.   And in any of those meetings did Mr. Schwartz express
```

1   concerns about what you were doing with Android?

2   **A.**    He did not.

3   **Q.**    In any of those meetings did he in any way suggest that it

4   was wrong for Android to use Java APIs, or the Java language,

5   or anything else?

6   **A.**    He did not.

7   **Q.**    Did he ever express disapproval in any way of Android?

8   **A.**    He did not.

9   **Q.**    Did he complain about anything that Android was doing or

10  any technology that you were using?

11  **A.**    He did not.

12  **Q.**    Did he ever tell you in any of these discussions over this

13  period of time that you needed a license to use the Java APIs

14  in Android?

15  **A.**    He did not.

16  **Q.**    Based on your contacts with Mr. Schwartz, the blog post,

17  the emails and the follow-up, did you feel that you understood

18  what Sun's position was with respect to Android and its use of

19  technology?

20  **A.**    I did.

21  **Q.**    What was that?

22  **A.**    That --

23          **MR. BOIES:**   Objection, your Honor.

24          **THE COURT:**   Well, no.  I can see why this is relevant

25  and it goes to the state of mind of the company, the accused

 1  company.

 2          So the objection is overruled.  Go ahead.

 3          **THE WITNESS:**  Can you repeat your question?

 4          **MR. VAN NEST:**  That was kind of a long one.  Can I

 5  ask that Deb re-read it?

 6          **THE COURT:**  "Did you feel that you understood what

 7  Sun's position was with respect to Android and its use of

 8  technology?"  That was the question.

 9          **THE WITNESS:**  I did.

10  **BY MR. VAN NEST:**

11  **Q.**  Tell the jury.

12  **A.**  I did.

13  **Q.**  Can you tell the jury what you understood?

14  **A.**  My understanding was that what we were doing was

15  permissible.

16  **Q.**  And can you elaborate a little bit more on that?  Why did

17  you feel that way?

18  **A.**  Well, because of the sum of my experiences and

19  interactions, the briefings that I have had, I was very

20  comfortable that what we were doing was both legally correct,

21  permitted by the necessary licenses, or lack of licenses, and

22  consistent with the policies of Sun at the time, as well as

23  obviously Google's.

24  **Q.**  And did Mr. Schwartz ever say anything that contradicted

25  that?

 1  **A.**    He did not.

 2  **Q.**    Now, were you aware at that time of other products or

 3  platforms, implementations out on the market that were also

 4  using the Java language and the Java APIs?

 5  **A.**    Well, there were certainly a number.

 6  **Q.**    And can you recall any of them as you sit here today?

 7  **A.**    IBM had a large Java program.

 8  **Q.**    What do you mean by that?

 9  **A.**    They have a large developer program, they have their own

10  JVM, these sorts of things.

11  **Q.**    As far as you understood, was IBM also using the Java

12  APIs?

13  **A.**    Yes, they were.

14  **Q.**    And was this in much the same way as Android was using

15  them?

16  **A.**    Yes.

17  **Q.**    Were you aware of any objection by Sun to IBM's use of

18  APIs?

19          **MR. BOIES:**  Objection, foundation.

20          **THE COURT:**  Well, were you in a position to know one

21  way or the other on that subject?

22          **THE WITNESS:**  I would have been briefed at some

23  point.

24          **THE COURT:**  I think this is too much hearsay.  So

25  sustained.

1  BY MR. VAN NEST:

2  Q.   Apart from IBM, are you aware of any other commercial

3  products using the Java APIs?

4  A.   Well, again, there were many.

5  Q.   Do any of the others come to mind as you sit here?

6  A.   The mobile phone manufacturers, for example.  The

7  developers.  It's a large ecosystem.

8  Q.   Was it your understanding that the Java APIs were in

9  widespread use?

10 A.   Yes.  Microsoft.

11         MR. VAN NEST:  Your Honor, I wish to make a proffer

12 at this time, but I think I should do it at sidebar.  I would

13 like to approach briefly.

14         THE COURT:  All right.

15         (Whereupon, the following proceedings

16          were held at sidebar.)

17         MR. VAN NEST:  Your Honor, I proffer his testimony

18 and Exhibit 3439, which I'm handing up to your Honor.

19         (Whereupon, document was tendered

20          to the Court.)

21         MR. VAN NEST:  They have opened the door to Mr.

22 Schmidt describing, as he did, and I've got it highlighted on

23 the second page.

24         In 1994, around the time that the Java language was

25 being developed, he told Congress that APIs are not blueprints.

1              **THE COURT:**  Are not what?

2              **MR. VAN NEST:**  Are not blueprints.  APIs are not

3   blueprints.

4              Now, they have been parading the word "blueprint" up

5   and down in front of the jury.  It was spoken a number of times

6   in Mr. Jacobs' opening statement.  It was mentioned 14 times by

7   Mr. Kurian in his examination.  Mr. Reinhold, who was actually

8   at Sun, said these APIs are like blueprints.

9              Now, Mr. Schmidt has testified that he was involved.

10  He was one of the people responsible for the development of

11  Java and the APIs.  And the idea that they would be in here

12  representing this whole system, these APIs as blueprints,

13  knowing that Sun's official position, which according

14  Mr. Schmidt has never changed, is that APIs were not

15  blueprints.  They are not copyrightable.  They should be

16  standards.  They should be out and in use.

17             And this testimony here at the bottom of Page 2, he

18  says in the second sentence:

19             "Interface specifications are merely the

20             words that describe the interface that allows

21             two components to work together or

22             inter-operate.  They are not blueprints, nor

23             recipes for actual products.  Let me repeat

24             that on.  Interface specifications are not

25             blueprints."

1            Now, not only that.  But they have been

2    representing -- they did in the opening -- that one of the

3    things that's wrong, that Android did wrong is it hired people

4    from Sun that knew Sun's licensing policies and knew darn well

5    this was wrong.  And Mr. Schmidt is one of the people whose

6    picture was displayed to the jury in the opening as somebody

7    who was wrong, came to Google, knew what he was doing was

8    wrong.

9            So I think at this point they have opened the door

10   wide to his explaining what everybody at Sun understood and

11   what he understood and what he publicly disclosed to Congress

12   back in 1994 on this issue.  And he's going to say this policy

13   and his position never changed.

14           **THE COURT:**  Yes.

15           **MR. BOIES:**  Your Honor, this was exactly the question

16   that the Court dealt with in limine.  This was a situation in

17   which what the Court said is they can ask what the current

18   policies are even if they haven't changed.  He can ask what the

19   current policies are.  They have done that.  They have

20   established, according to what this witness says he believes

21   the policies were in late 2005, 2006, 2007, 2008, 2009, 2010.

22           What they what they cannot do, for a lot of good

23   reasons, is go back to the 1990's.  What they were saying in

24   the 1990's was said in the context of where they were dealing

25   with Congress.  They were making arguments to Congress what the

1  law should be.  They were not talking about what the law is.

2  They were not talking about what the law is certainly in the

3  current time frame.

4        The Court ruled that it would be prejudicial to try

5  to confuse the record by bringing in all these statements from

6  the past.  I don't think that the description of what we've

7  said about the Sun people is accurate, but what we have been

8  saying is that the Sun people came and they knew what the Sun

9  technology was.  They shouldn't use those people in the clean

10 room.

11       And Mr. Jacobs knows more about what he said in the

12 opening statement than I do, but there has been no objection to

13 anything that's been said in the opening statement --

14       **THE COURT:**  Wait a minute.  Do you have more to go

15 over with this witness or is this your last point?

16       **MR. VAN NEST:**  It's my last point on direct, your

17 Honor.

18       **MR. JACOBS:**  Your Honor, a couple of additional

19 points.

20       This is in 1994.  This is before the Application

21 Programming Interfaces at issue in this lawsuit have even been

22 released.  This is about interface specifications in the

23 context of interoperability.  A very different issue from the

24 issue here which is Google's selective taking of

25 inter-Application Programming Interfaces.  Selective taking

1    which disrupts interoperability.

2            The context is different.  It was a policy-oriented

3    discussion by Mr. Schmidt, and all the original reasons for

4    your ruling very well obtain.

5            MR. VAN NEST:  Your Honor --

6            THE COURT:  Look, I don't want to go back to 1992,

7    but hasn't he already said that they are not blueprints?

8    Didn't he already testify to that?

9            MR. BOIES:  He did, your Honor.

10           MR. VAN NEST:  All he said was that when he was at

11   Sun, the folks at Sun never referred to these as blueprints.

12           If your Honor would allow me to ask him whether or

13   not APIs are blueprints, that's fine, and I can get an

14   explanation out of him; but I didn't feel --

15           THE COURT:  All right.  You can do that.  But I don't

16   want you to -- you can do that, yes.  You can say, "Is it a

17   blueprint?"  He will say, "No."  "Why not?"  He can explain.

18   Says, "How long have you believed that?"  "My entire career."

19   But he cannot mention Congress and testifying and all that.

20   You can ask that much.

21           MR. VAN NEST:  That's great.

22           THE COURT:  But not get into this.

23           MR. VAN NEST:  That's great.

24           MR. BOIES:  Thank you, your Honor.

25           (Whereupon, the following proceedings were

```
 1                  held in open court, in the presence and

 2                  hearing of the jury.)

 3   BY MR. VAN NEST:

 4   Q.   Mr. Schmidt, I just have a few more questions.  Are APIs,

 5   Application Programming Interfaces, blueprints?

 6   A.   They are not.

 7   Q.   And would you tell the jury why not?

 8   A.   Well, an API is the way in which you make something

 9   happen.  So an example of an API, Application Program

10   Interface, would be I want to print something, or I want to

11   print this image, or I want to show this on the screen, or I

12   want to compute something weird like nuclear fusion or

13   something.

14            The way you -- the way you do that is completely up

15   to the other side of the interface.  It's called an interface

16   because think of it as:  I'm here, there is an interface, and

17   there's other work that's over here.  That other work can be

18   implemented in any way and, in fact, in any language that you

19   wish.  So it's not a blueprint for how to do that at all.

20   Q.   How long have you held the belief that APIs are not

21   blueprints?

22   A.   Since I'm a computer scientist, so 40 years.

23            MR. VAN NEST:  We pass the witness, your Honor.

24            THE COURT:  All right.  Let's look how long we have

25   been going.  About time for a break I think.
```

```
 1              So we will take, I think, a 15-minute break at this
 2   time.  Please remember the admonition.
 3              (Jury exits courtroom at 10:44 a.m.)
 4         THE COURT:  Okay.  Be seated.
 5         MR. VAN NEST:  Mr.  Schmidt, you can step down and
 6   stretch your legs.
 7         THE COURT:  Have a 15-minute break, too.  We need to
 8   clear the decks off the witness stand.
 9              Any issues for the Court?
10         MR. BOIES:  No, your Honor.
11         THE COURT:  All right.  Thank you.
12              (Whereupon there was a recess in the proceedings
13               from 10:45 a.m. until 10:58 a.m.)
14         THE CLERK:  Please come to order.
15         THE COURT:  Be seated.
16              Dawn, the jury is lining up ready to come in.
17              Are we ready out here?  Please be seated.  Are we
18   ready out here?
19         MR. VAN NEST:  We are, your Honor.
20              (Jury enters courtroom at 10:59 a.m.)
21         THE COURT:  Okay, welcome back.
22              Mr. Boies, go right ahead.
23         MR. BOIES:  Thank you.
24
25
```

**CROSS EXAMINATION**

BY MR. BOIES:

Q.   In listening to your testimony a few minutes ago, I got
the impression that you were testifying to the jury that you
had many conversations with Mr. Schwartz in which Mr. Schwartz
told you that he was comfortable with what you were doing?

        Did I misunderstand that?

A.   We had -- we certainly had conversations where he said
that he was comfortable with what we did.

Q.   More than a couple, sir?

A.   I think a couple.

Q.   Do you have a firm recollection of when those happened?

A.   They would be around the time of his web post.

Q.   The one in early November of 2007?

A.   Early 2008, 2007.  So, for example, when I was at -- if I
may clarify?  When I met with him in May of 2008, I believe.

Q.   And where did you meet with him?

A.   In the Sun cafeteria in Menlo Park.

Q.   And in the Sun cafeteria at Menlo Park, is that when he
told you, according to your testimony to the jury, that he was
comfortable with what you were doing?

A.   Yes.

Q.   When did this recollection of this meeting in the
cafeteria in Menlo Park come to you, sir?

A.   I'm not sure.

 1  Q.   Well, let me ask you to --

 2          MR. BOIES:  I'd like to offer as a party admission

 3  the following testimony from Lines 24 on Page 146 through 148,

 4  Line 17.

 5          THE COURT:  Is this going to be read?

 6          MR. BOIES:  From his deposition.

 7          THE COURT:  Are you going to read it?

 8          MR. BOIES:  I'm going to read it in the old-fashioned

 9  way, your Honor.

10          THE COURT:  That's perfectly okay, but please

11  remember to say "Question" and "Answer."

12          And this is from the witness's deposition?

13          MR. BOIES:  Yes.

14          THE COURT:  What is the date of the deposition?

15          MR. BOIES:  The date of his deposition...

16          MR. VAN NEST:  August 23rd.

17          MR. BOIES:  August 23rd, your Honor, last year.

18          THE COURT:  All right.  So what you're about to hear

19  is evidence in the case, and it's a verbatim reading of

20  testimony given by the same witness at a deposition last year.

21          Please proceed.

22  BY MR. BOIES:

23  Q.   (As read)

24          "QUESTION:  Was it your view that Sun, before

25          it was acquired by Oracle, thought that what

1          you were doing, what Oracle -- what Google

2          was doing in Android did not infringe any

3          intellectual property of Sun?  Is that what

4          you're saying?

5          **"ANSWER:** It is.  It is my opinion.  It was

6          my opinion at the time and, therefore, it is

7          still my opinion that at the time Sun

8          management was comfortable that we had

9          done -- that what we had done was free and

10         clear of any intellectual property of Sun's.

11         **"QUESTION:**  Now, did any particular person

12         tell you that?

13         **"ANSWER:**  Well, I spoke with Jonathan

14         Schwartz a couple of times in the preceding

15         years.  So it would be Jonathan Schwartz.

16         **"QUESTION:**  Did anyone other than Jonathan

17         Schwartz ever tell you what -- that Sun was,

18         in your words, comfortable that what Google

19         had done in Android was free and clear of any

20         intellectual property of Sun's?

21         **"ANSWER:**  No.  And Jonathan was the CEO

22         during this period.

23         **"QUESTION:**  All right.  Now, when

24         Mr. Schwartz told you, as you say he did,

25         that he was comfortable that what Google had

```
 1          done in Android was free and clear of any
 2          intellectual property of Sun's?  Did he do
 3          that orally or in writing or both?
 4      "ANSWER:  Orally, as I recall.
 5      "QUESTION:  Was anyone else present?
 6      "ANSWER:  Not to my knowledge, no.
 7      "QUESTION:  Where were you when he told you
 8          this?
 9      "ANSWER:  I don't remember the specifics.  I
10          met with him at least once in his office at
11          Sun, and we spoke on the phone a couple of
12          times in the -- in the intervening few years.
13      "QUESTION:  When you met with him in his
14          office at Sun, is that when he told you that
15          he was comfortable that what Google had done
16          in Android was free and clear of any
17          intellectual property of Sun's?
18      "ANSWER:  Again, I -- since I don't remember
19          the specifics, I don't remember his exact
20          phrase nor the exact timing.  I'm describing
21          my impression of the Sun view of what we had
22          done, but I can't recall whether it was the
23          one in his office.  I certainly talked to him
24          on the phone, which is why the subsequent
25          actions were a surprise to me."
```

```
 1              Do you stand by that testimony today, sir?
 2   A.    Umm, yes.
 3   Q.    Now, with respect to the question of the Apache license
 4   that you mentioned, you are not asserting that Google has any
 5   rights to use any Sun intellectual property as the result of
 6   the Apache license; correct, sir?
 7   A.    That is correct.
 8   Q.    When you talk about the Apache license giving rights,
 9   you're talking about the Apache license giving rights to people
10   other than Google, correct?
11   A.    When I say that, I'm referring to anyone who is using the
12   Apache license to distribute software.
13   Q.    But you are not claiming that Google got any rights under
14   the Apache license, correct?
15   A.    The only rights we would get would be from somebody who
16   used the Apache license.
17   Q.    But not Sun, correct?
18   A.    Well, if Sun were to do that, they would.
19   Q.    But you're not in this lawsuit or in any connection what
20   you've just testified on direct examination claiming that any
21   of rights that you say Google has came as the result of the Sun
22   license --
23   A.    That is correct.
24   Q.    (Continuing) -- for use in Apache?
25   A.    That's correct.
```

1   Q.   Now, you mentioned that a number of other companies used

2   Sun APIs; do you recall that?

3   A.   Yes.

4   Q.   Are there any companies, other than Google, who are using

5   Sun APIs today that you know of that do not have a license from

6   Sun?

7   A.   I am not familiar with the licensing terms that others

8   use.

9   Q.   Without necessarily being familiar with the licensing

10  terms others use, are you aware of any company that's using Sun

11  APIs today, other than Google, that does not have a license

12  from Sun?

13  A.   I'm not aware of one either way.

14  Q.   Okay.  You are aware that Google does not have a license

15  from Sun to use Sun's APIs, correct?

16  A.   Did you mean APIs?

17  Q.   Yes.  And I may have misspoke.  If I did, I apologize.

18          What I meant to say was:  You are aware that Google

19  does not have a license from Sun to use Sun's APIs?

20  A.   Java APIs, is that what you mean?

21  Q.   Yes, that is correct.

22  Q.   Okay.  And by "Sun" I mean both Sun in its original

23  formation and Oracle today, you understand that?

24  A.   I do.

25  Q.   Now, there were a number of licenses, different kinds of

1  licenses, different types of licenses that were available to

2  Google for its use of Sun's APIs, correct?  Sun's Java APIs?

3  **A.**  That's correct.

4  **Q.**  There was something calls the GPL license, correct?

5  **A.**  I'm sorry.  The GPL license is a public domain license.

6  It has nothing to do with Sun or Google.

7  **Q.**  But Sun makes the Java APIs available under the GPL

8  license, right?

9  **A.**  Under the terms of the GPL license, yes, that's correct.

10  **Q.**  And so Google could have gotten a license from Sun through

11  the GPL to use the Sun APIs, correct?

12  **A.**  Yes.

13  **Q.**  But Sun -- and Sun was -- Sun had already said that if

14  Google would comply with the terms of the GPL license, they

15  could have that license for the Java APIs, correct?

16  **A.**  No.

17  **Q.**  Are you sure?

18  **A.**  No.  The GPL license is a specific kind of license and the

19  API -- the GPL license largely covers the source code.  You

20  take a source and you say, I'm under this license or that

21  license.  And the GPL license is somewhat different, but

22  similar to the Apache license.

23  **Q.**  But the GPL license would have given -- if Google had

24  taken it and accepted the terms, would have given Google all

25  the rights to use the Sun APIs that are challenged in this

```
 1  lawsuit, correct?
 2  A.   I would have to have a technical expert answer that
 3  question precisely.  It depends on what's included in the
 4  Java -- it includes -- that's a question to ask a Sun person
 5  about what they covered in the GPL license.
 6  Q.   Well, let's take a Google person, Mr. Rubin.
 7       Did you ever ask Mr. Rubin whether the GPL license
 8  would work for Sun or not?
 9  A.   Yes.
10  Q.   And what did he say?
11  A.   I believe the answer is, we chose to use the Apache
12  license instead.
13  Q.   And that's because the GPL license would not work?
14  A.   Again, there are differences -- there are differences in
15  approach that are relatively minor.
16            MR. BOIES:  May I approach, your Honor?
17            THE COURT:  You may.
18            (Whereupon, document was tendered
19              to the witness.)
20  BY MR. BOIES:
21  Q.   I'll hand you several exhibits so I don't have to keep
22  coming back up here.  Let's start with Exhibit 154.
23            MR. BOIES:  Exhibit 154 is already in evidence.
24            (Document displayed)
25
```

 1  **BY MR. BOIES:**

 2  **Q.**   Do you see where Andy Rubin wrote:

 3        "GPL license, Sun's license doesn't work for

 4        us."

 5  **A.**   Yes.

 6  **Q.**   Did he ever tell that you in words or in substance?

 7  **A.**   I'm sure that he did.

 8  **Q.**   Now, with respect to the issue of whether other people,

 9  other than Mr. Schwartz, had ever talked to you about what

10  Google was doing, I'd like to ask you to look at a document

11  that's already in evidence, which is Trial Exhibit 1048.

12        **MR. BOIES:**  May I approach, your Honor?

13        **THE COURT:**  You may.

14        (Whereupon, document was tendered

15         to the witness.)

16  **BY MR. BOIES:**

17  **Q.**   Now, this is a publication on or about November 15th, 2007

18  where it says:

19        "Sun concerned Google's Android will fracture

20        Java."

21        Do you see that?

22  **A.**   I do.

23  **Q.**   Did you see this news report at or about the time it came

24  out?

25  **A.**   I did not.

1   Q.   Did you see any news reports at or about this time that

2   noted that Sun was concerned that Google's Android will

3   fracture Java?

4   A.   I have no recollection of any.

5   Q.   Now, I want to get the chronology straight for the jury.

6   You announced the Android product on -- was it November 5?

7   A.   Uh-huh.

8   Q.   And at that time you did not release the SDK, correct?

9   A.   I thought we released it right thereafter.

10  Q.   Released it later, you're saying?

11  A.   But very soon thereafter.

12  Q.   But not before Mr. Schwartz put his blog up; correct, sir?

13  A.   I'll have to rely on your assertion.

14  Q.   Okay.  And after Google did release the SDK -- and you

15  have to have the SDK to know what APIs are in there, right?

16  A.   Yes, that's roughly correct.

17  Q.   So after they released the SDK, which told people what

18  APIs were out there, then you had this exhibit published in

19  November 15th, correct, where it says:

20            "Sun concerned Google's Android will fracture

21            Java."

22  A.   I see that.

23  Q.   Now, let's talk about the Sun APIs.

24            You said that you need APIs in order to use a

25  language in a meaningful way, correct?

 1  A.    That is correct.

 2  Q.    Now, did Google need to use Sun's APIs in order to use the

 3  Java programming language?

 4  A.    There's no difference between Sun's APIs and the Java APIs

 5  in the way you phrased your question.  The language and the

 6  APIs are the -- that is the interfaces.  You need both in order

 7  to make effective use of a platform.

 8  Q.    Well, let me approach it this way.

 9  A.    Okay.

10  Q.    Are you aware of companies that use the Java programming

11  language, but don't use any of the APIs that Sun developed?

12  A.    I'm not aware of any uses of Java that can do anything

13  interesting without the use of the APIs that Sun developed --

14  Q.    Let me be sure --

15  A.    (Continuing) -- at least some of them.

16  Q.    Let me be sure that we're not missing question/answer on

17  the word "interesting."

18        Are you aware of any company that uses the Java

19  programming language to do useful significant things without

20  relying on the APIs that Sun produced?

21  A.    As far as I know, every use of Java uses APIs that were

22  developed by Sun as part of Java.

23        You may be referring to libraries and their

24  implementation, which can be from other sources.

25  Q.    Are you familiar with a company in the United Kingdom

1  called Spring?  Spring?

2  **A.**    Vaguely.

3  **Q.**    You don't know what they do?

4  **A.**    No, I do not.

5  **Q.**    Did anybody tell you about what Mr. Ellison's testimony

6  was in this Court about what they did?

7  **A.**    He -- no one has spoken with me about any testimony during

8  this trial.

9  **Q.**    Did Google undertake any effort to determine whether it

10  would be possible to use the Java programming language without

11  using Sun's Java APIs?

12  **A.**    I'm not aware of any.

13  **Q.**    From the very beginning of the Android project, you

14  intended to use the Java programming language, correct?

15  **A.**    Yes.

16  **Q.**    Did you also plan to use Sun's Java APIs?

17  **A.**    Again, as I said a couple of times here, the language

18  without the interfaces is not useful in my view, in my

19  understanding, and you need a basic set of APIs in order to

20  make it useful, and that was our plan.

21  **Q.**    And the basic APIs that you planned to use to make the

22  language useful were the Sun Java APIs, correct?

23  **A.**    In the same way that Sun has developed Java, the language.

24  The distinction there is language -- language interface and

25  library.

 1  Q.   And you know what an API is, correct?

 2  A.   Of course.  Absolutely.

 3  Q.   Now, and API is a term that a lot of people use.  Maybe

 4  not people like me, but people like you and people in your

 5  industry.

 6  A.   Yes.  It has a very precise meaning.

 7  Q.   And when I talk about Sun Java APIs, at least in this

 8  context, you know I'm talking about the 37 particular Sun Java

 9  APIs that are used in Android, correct?

10  A.   I understand that's what you're referring to, yes.

11  Q.   Okay.  Now, you're not saying that Google needed all 37 of

12  the Sun Java APIs that Android uses in order to make the Java

13  programming language useful; are you, sir?

14  A.   Well, my understanding of what was needed was a sufficient

15  set to get useful work done, and I was told that this 37 was

16  roughly the right number.

17  Q.   So you were told by somebody that Google had to use all 37

18  of these Sun Java APIs in order to make the Java programming

19  language useful; is that what you're saying?

20  A.   Umm, I don't recall a specific conversation of this level

21  of technical detail.

22  Q.   Who would that conversation have been with?

23  A.   The people inside of Google would have been the technical

24  people under Andy Rubin.

25  Q.   Not Mr. Rubin himself?

1    **A.**    Andy would have been involved was well.

2    **Q.**    Insofar as you're aware, as the chief executive officer,

3    did Google ever make any effort to develop its own APIs instead

4    of using the Sun Java APIs for any of the 37?

5            I understand that you say you need some.  I'm saying,

6    you took 37.  Did you ever make an effort to determine whether

7    you need to take all 37?

8    **A.**    I'm having trouble understanding your question, because I

9    don't agree with the way in which you're using the word

10   interface and I want to answer it truthfully.

11   **Q.**    Okay.  I want you to answer it truthfully.

12           You have 37 June Java APIs that Google took and used

13   in Android, correct?

14   **A.**    An interface is a specification, that's a name.  It's

15   a.b.c, paren, whatever, and there's a collection of those that

16   form the standard that Java uses, the Java language and the

17   libraries.

18           We, Google, implemented those interfaces in our own

19   way, which I've said earlier.

20   **Q.**    Just to be clear, you copied the 37 Sun Java API

21   specifications, correct?

22   **A.**    We used -- we used the interface names, which is how one

23   does this, and then we did our own implementation of those

24   services.

25   **Q.**    You say your own implementation.  Maybe you are, but let

 1  me just ask you directly:  Are you saying that the only thing

 2  that you copied from the Sun Java APIs were just the names?

 3  That's all you copied?

 4  **A.**   Well, again --

 5  **Q.**   Is that what you're saying?

 6  **A.**   My understanding --

 7  **Q.**   Just "yes" or "no" to start, and then you can give the

 8  explanation.

 9  **A.**   Yes.

10  **Q.**   That's what you're saying?

11  **A.**   Yes.

12  **Q.**   And do you want to make an explanation?

13  **A.**   Well, I would.

14  **Q.**   You don't have to, but only if you feel --

15          **THE COURT:**  He's asking, did you want to add an

16  explanation to the word "yes."

17          **THE WITNESS:**  Maybe we should continue with your

18  questions.

19          **THE COURT:**  Okay.  Next question.

20  **BY MR. BOIES:**

21  **Q.**   Okay.  How much of the Sun's specification of these 37

22  Java APIs do you think that Google copied?

23  **A.**   Again, subject to your phrasing, I'm trying to be

24  technically correct.  As I understand it, the implementation

25  used the APIs, the 37 or so, and we did our own implementation.

```
 1  I don't know the technical details beyond that.
 2  Q.   Well, you're familiar with the fact that you went out and
 3  you hired somebody to write code, correct?  Noser?
 4  A.   I'm not.
 5  Q.   You're not?
 6  A.   Noser is a person or a company?
 7  Q.   Let me ask you to look at Trial Exhibit 30.
 8           MR. BOIES:  May I approach, your Honor?
 9           THE COURT:  Yes.
10           (Whereupon, document was tendered
11             to the witness.)
12  BY MR. BOIES:
13  Q.   This may be something that people didn't tell you, but I
14  just want to ask you.
15           This is a statement of work to be done by Noser
16  Engineering for Google.
17           (Document displayed)
18  Q.   It's dated March 28th, 2007.  Do you see that?
19  A.   I do.
20  Q.   Did anyone ever tell you that Google had hired Noser to do
21  this work for Android?
22  A.   I don't recall.
23  Q.   Did you ever hear anybody describe Noser as being super
24  shady?
25  A.   No.
```

1   Q.   Never saw any documents within Google that described them

2   that way; is that your testimony?

3   A.   Not that I can recall, no.

4   Q.   This may not -- if you have never seen this, you may or

5   may not be able to answer this, but let me ask you to look at

6   page six of the exhibit, where it says "Package/Library List,

7   Java Library."  Do you see that?

8   A.   I do.

9   Q.   And it says:

10          "Google is interested in compatibility with

11          J2SE 1.5."

12  A.   Yes.

13  Q.   And did you understand that that's what Google was doing

14  in terms of developing its Android operating system?

15  A.   I was not involved in that level of detail, so the answer

16  is no.

17  Q.   It then goes on to say:

18          "The libraries will support the available

19          implementations for the codecs and other

20          basic libraries of."

21          And then it lists what are probably 37.  I haven't

22  counted them here, but approximately 37.  Do you see that?

23  A.   I do.

24  Q.   And is that your understanding of the way Google was going

25  about developing its Android operating system?

1  A.   As I said, I don't know that -- I was not briefed, nor am

2  I familiar with the technical details at this level.

3  Q.   Let me go to another subject, and this has to do with

4  Trial Exhibit 1 that you have up there.  And you'll recall that

5  Mr. Van Nest asked you about Page 9.

6            (Document displayed)

7  Q.   And you said you hadn't read this before or hadn't seen it

8  before, but you said the way you would understand this when it

9  said, "Must take license from Sun" --

10 A.   Yes.

11 Q.   (Continuing) -- that you were talking about a trademark

12 license; is that what you said, sir?

13 A.   Well, again, I want to be careful not to speculate since I

14 don't recall seeing this document.

15 Q.   I'm just trying to probe what you said to him.

16 A.   What I said to him was I would combine the second and the

17 third sentences.

18 Q.   Let me just see how you come out when you combine it.

19            When it says, "Must take license from Sun," you knew

20 that that was a license for more than just trademarks; correct,

21 sir?

22 A.   No.

23 Q.   You didn't know that?

24 A.   No.

25 Q.   Well, where it says:

1              "Proposal:  Google/Android, with support from

2              Tim Lindholm, negotiates the first OSS, J2ME

3              JVM license with Sun."

4              Do you see that?

5  **A.**   I do.

6  **Q.**   That's not a trademark license, is that, sir?

7  **A.**   Yes, that is not a trademark license.

8  **Q.**   That is not a trademark license.

9              So right after saying, "Must take license from Sun,"

10 they propose what is, at least in part, a copyright license;

11 correct, sir?

12 **A.**   Well, again, the way --

13 **Q.**   Could I start with a "yes" or "no" and then you can

14 explain if you need to?

15 **A.**   I believe the answer is no.

16 **Q.**   Okay.

17 **A.**   They -- the trademark license is -- it was and is possible

18 to license the Java trademark without the code.

19 **Q.**   That's not my question.

20 **A.**   I understand.

21 **Q.**   I'm not talking about whether it's possible to license the

22 trademark without the code.

23 **A.**   Yes.  It is true, which I think is what your question --

24 you're asking me about; is that if you get an OSS J2ME JVM

25 license, you also get a trademark license.

1  Q.   But the OSS J2ME JVM license, that is something that gets

2  you a copyright license; correct, sir?

3  A.   I don't know the details, but it would be -- you would

4  need a -- you would get a copyright license, but you would also

5  get a license to all the source code.

6  Q.   You would get more than a copyright license?

7  A.   Right.  But the copyright is a small component in that

8  deal.  There's a large amount of software that comes with it.

9  Q.   It is -- copyright may be large or small, but it's a lot

10  larger than the trademark license that comes with that

11  particular license; correct, sir?

12       You don't go get an OSS J2ME JVM license if all

13  you're interested in is the trademark.  Would you agree with me

14  at least on that?

15  A.   I think we're -- I would be speculating on the intent of

16  this page on a document I haven't seen.  I can try, if you

17  like.

18  Q.   Have you given me the best answer you can?

19  A.   I'm --

20  Q.   I'm not asking you to speculate.  I'm just trying to probe

21  things that you said to Mr. Van Nest.

22  A.   I'm say yes to your question.

23  Q.   Okay.  Let me talk about -- you know what a TCK license

24  is, don't you?

25  A.   I actually do not.

1   Q.   You do not?

2   A.   Because the TCK term was invented after I was at Sun.

3   Q.   So when you were at Sun, they didn't have TCK licenses;

4   Is that what you are saying?

5   A.   It is a different structure.

6   Q.   It may have been a different structure, but my question

7   is:  Did they have TCK licenses while you were at Sun?

8   A.   What does "TCK" stand for?

9   Q.   Do you know what TCK stands for, sir?

10  A.   I don't recall.  I actually don't.

11  Q.   Okay.

12  A.   Trademark Compatibility License.

13  Q.   Test Compatibility Kit.

14  A.   We're talking over 20 years, things change.

15  Q.   But going more recently than 20 years.  Going to the time

16  that you were at Google, did people talk to you about TCK

17  licenses?

18  A.   Not in a specific enough way for me to know the details.

19  Q.   Let me ask you to look at Exhibit 3, that I think you have

20  up there.

21          (Document displayed)

22  Q.   This is a document that's in evidence.  And if you go to

23  the third page -- and this is a document that Andy Rubin sent

24  to Tim Lindholm.

25          And it says:

1              "Requirements:  Google needs a TCK license."

2         Do you see that?

3  **A.**  I do.

4  **Q.**  Did Mr. Rubin or anybody tell you that?

5  **A.**  I don't recall.

6  **Q.**  Let me go to Trial Exhibit 7.  Do you have that up there?

7  Trial Exhibit 7?

8  **A.**  Go ahead.

9         (Document displayed)

10 **Q.**  And this is down at the bottom, an email from Andy Rubin

11 to Larry Page.

12 **A.**  Yes.

13 **Q.**  October 11th, 2005, where it says:

14             "My proposal is we take a license that

15             specifically grants the right for us to Open

16             Source our product."

17        Do you see that?

18 **A.**  Yes.

19 **Q.**  That's not a trademark license, is it, sir?

20 **A.**  Again, this was not a message or email trail I was on.

21        The TCK license would be a test and compatibility

22 license, which will allow you to state that you're compatible.

23 I don't know whether the TCK includes a copyright license or

24 not.

25 **Q.**  Do you know whether or not -- you know that one of the

1  kinds of licenses that Sun offered was a specification license;

2  did you know that?

3  A.   Again, I'm not familiar with the specific Sun licenses

4  that were available.

5  Q.   Did you know what the requirements of a Sun specification

6  license for Java or Java APIs were?

7  A.   Not in any detail.

8  Q.   Did you know that generally they required that the person

9  getting the license pass a TCK test?

10 A.   No, but I would have assumed that that was one of their

11 licensing requirements.

12 Q.   And you do know that Sun charged people for the TCKs,

13 correct?

14 A.   I don't know the details.

15 Q.   But you know enough about -- even without knowing any of

16 the details, do you know enough about the fact that is one of

17 the way that Sun has made money?

18 A.   Well, the exhibits which I see now imply that, so I'll

19 just say yes.

20 Q.   Now, there came a time when Google was sufficiently

21 worried about being sued that it thought about buying all the

22 rights to Java; correct, sir?

23 A.   Yes.

24 Q.   And this was in 2009, correct?

25 A.   If I could modify that.  I'm not sure what you meant by

1  "Google."  Did you mean the executives?

2  **Q.**   Yes, the executives at Google.

3  **A.**   Did you mean there was a proposal?

4  **Q.**   Well, there was a proposal, including to you as the CEO;

5  correct, sir?

6  **A.**   Yeah.

7  **Q.**   And you thought it was worth pursuing, correct?

8  **A.**   I'm always open to trying anything that -- to make

9  progress.

10 **Q.**   And you certainly didn't want to be sued over your use of

11 Java, correct?

12 **A.**   That's correct.

13 **Q.**   Let me ask you to look at Exhibit 406.

14        **MR. BOIES:**  May I approach, your Honor?

15          (Whereupon, document was tendered

16           to the witness.)

17        **THE WITNESS:**  Thank you.

18 BY MR. BOIES:

19 **Q.**   And this is in evidence.

20          (Document displayed)

21 **Q.**   And this is an email to you from a Brett Slatkin?

22 **A.**   Yes.

23 **Q.**   And this is in January of 2009, correct?

24 **A.**   Uh-huh.  Yes.

25 **Q.**   And it talks about a proposal to buy the full rights to

 1   Java from Sun as a means of solving the lawsuits that Google is

 2   facing.  Do you see that?

 3   **A.**    I do.

 4   **Q.**    And you said in response:

 5            "Certainly, a clever idea.  I'll ask our

 6            people to pursue.  In my experience, Sun

 7            views Java as its identity. (Remember they

 8            renamed their stock symbol), so it's

 9            unlikely, but you never know."

10            What was your response, correct?

11   **A.**    That is correct.

12            **MR. BOIES:**  No more questions, your Honor.

13            I apologize.  Apparently, we're all asleep, your

14   Honor.  I'm told that Exhibit 406 is not in evidence.  If so, I

15   would offer it and I apologize for using it before it was

16   offered.

17            **MR. VAN NEST:**  Objection.  No foundation.

18            **THE COURT:**  May I see 406?

19            (Document displayed)

20            **THE COURT:**  May I see it?

21            (Whereupon, document was tendered

22             to the Court.)

23            **MR. BOIES:**  This is a document from one Google person

24   to another Google person.

25            **THE COURT:**  Is it from the witness on the stand?

1      **MR. BOIES:**  Yes.

2      **THE COURT:**  Objection overruled.  406 is received.

3      (Trial Exhibit 406 received

4       in evidence)

5      **MR. BOIES:**  No more questions, your Honor.

6      **THE COURT:**  So please let's go to the redirect.

7      **MR. VAN NEST:**  May I proceed, your Honor?

8      **THE COURT:**  You may.

9                    **<u>REDIRECT EXAMINATION</u>**

10     BY MR. VAN NEST:

11     **Q.**   Mr. Schmidt, I just want to get some terms clear in

12     everyone's mind.

13          Did Google need a license of any kind to use the Java

14     language?

15     **A.**   Google did not.

16     **Q.**   Why not?

17     **A.**   Well, for many reasons.  In general, languages are usable

18     just because they are under the -- languages are essentially in

19     the public domain or have been released.  In the case of Sun

20     since its beginning, the whole strategy was to have the

21     language used by everybody, so Sun gave permission.  There was

22     never any issue.

23     **Q.**   And with respect to the APIs -- now I want to be precise

24     here.  I'm not talking about the libraries with source code.

25     I'm talking about the APIs.

1      Did Google need a license of any kind from anyone to

2  use the APIs?

3          MR. BOIES:  Objection, your Honor.  Calls for a legal

4  conclusion.  And lack of foundation.

5          THE COURT:  Sustained.

6  BY MR. VAN NEST:

7  Q.   In your view, and based on your understanding, did you at

8  Google need a license from anyone of any kind of any type to

9  use the Java APIs?

10         MR. BOIES:  Lack of foundation, your Honor.

11         THE COURT:  Sustained.

12         MR. VAN NEST:  Your Honor, this witness has testified

13 that he was at Sun, understood the licensing scheme.

14         THE COURT:  We have gone over this, and he's not a

15 lawyer.  We've seen documents in-house saying we need a

16 license.  We have seen -- there has been various explanations,

17 but this is just too raw a legal question and it's not

18 permissible.

19 BY MR. VAN NEST:

20 Q.   Now, Mr. Schmidt, with respect to the code in the

21 libraries, the source code in the libraries, what was your

22 understanding about your ability to use those with or without a

23 license?

24         MR. BOIES:  Objection, your Honor, foundation.

25         THE COURT:  Well --

1          **MR. VAN NEST:**  I think, your Honor, I want to  just

2   clear up what language and what words we're using.  That's what

3   I'm trying to accomplish.

4          **THE COURT:**  Well, I will allow this line of questions

5   if you will do it in a slightly different way, which is as

6   follows.

7          I'm not sure, possibly the jury is not sure, but it

8   sounds like you're drawing a distinction between the

9   declaration that calls up the implementing code that -- of an

10  API.  In other words, you're distinguishing between the

11  implementing code versus the organizational structure.

12         **MR. VAN NEST:**  Absolutely I am.

13         **THE COURT:**  I don't know.  That's possibly right,

14  possibly wrong.

15         **MR. VAN NEST:**  That's exactly right.

16         **THE COURT:**  But I promise you I didn't -- it's just

17  coming into me kind of sideways in my brain that maybe that's

18  the distinction you're drawing, and I'm sure that there is at

19  least one person on the jury that may be as far back as I am on

20  this.  So I think that point ought to be explained and

21  developed, if at all.

22         But there is a related point.  If it is true that

23  nobody's permission was needed to use the APIs, how come they

24  had they had a clean room?  I think that ought to -- this

25  witness said earlier that he didn't need anybody's permission

1 and, yet, there was a clean room. So how do those two get

2 reconciled.

3          I'm going to invite you to ask questions to clear up

4 both of those points.

5          **MR. VAN NEST:** We'll do it, your Honor. Thank you.

6 **BY MR. VAN NEST:**

7 **Q.** Let's talk about making these distinctions, Mr. Schmidt.

8          Let me ask you first to explain to the jury what's

9 the difference between the language and the API and the

10 implementing source code in the library? What are those three

11 things and how are they different?

12 **A.** Again, I apologize for the complexity of some of this.

13 Let me give you the simplest possible answer which is taught in

14 the first -- the first year of computer science. So all

15 computer scientists would all understand this.

16          You have a number and you've calculated it. So

17 the number is 5. Okay? And that's the number that we care

18 about for some, who knows, reason. And we want to print it.

19 So we write, you know, "2 + 3 = X." And then we say, "Print

20 X."

21          Now, the print, when you say "print," you're calling

22 an applications procedure interface -- Applications Program

23 Interface. That's what an API is. So the word "Print,"

24 p-r-i-n-t, is kind of what I'm asking it to do. That's the

25 interface.

1   **Q.**    That's the API?

2   **A.**    That is the API.

3   **Q.**    Okay.

4   **A.**    So my calculations yielded 5.  That's my programming.  I'm

5   the programmer.  And then Print.  And then the Print does

6   something involving a lot of code that causes it to show upon

7   the printer.  That's the implementation.

8   **Q.**    Okay.  When you say "a lot of code," what do you mean?

9   **A.**    That means somebody wrote a large amount of programming

10  that takes the 5 and puts it on little dots on the page and

11  moves the printer around.  It's very complicated.

12           Now, if I, as a programmer, had to do that every time

13  I wanted to print anything, I would spend my entire life

14  learning everything about printers.  But this nice company or

15  nice gentleman or whatever did this as a piece of code and

16  says, All you have to do is tell me to print and I'll take care

17  of the rest.

18           That's maybe the simplest way to understand the

19  distinction.

20  **Q.**    Okay.

21  **A.**    Now -- and that then sets up the answer to the judge's

22  question, I think.

23  **Q.**    And in answer to the judge's question, if the language is

24  free and the APIs are free, what are you doing in a clean room

25  and why do you need a clean room?

1  A.    So using this print example.  Let's say, that I want to

2  print and you guys -- I'm negotiating with you and you want to

3  charge me a lot of money to use your print subsystem that

4  you -- and you love it and so forth.  Well, perhaps, I could

5  make my own.  Hire my own engineers.

6  Q.    And what's your own?  What is this you're making?

7  A.    I'm making my own code to take the 5 and put it on the

8  printer and move the printer around and all that.

9  Q.    And you call that the implementing code?

10  A.    That's called the implementing code.

11  Q.    So, please continue.

12  A.    So I would want to make sure that my team did not use any

13  of your knowledge of printers and things like that.  All I'm

14  doing is saying, "Print."  I say, "Print 5."

15         But then my team is in the clean room and they

16  independently figure out a way to move the ribbon around and

17  put the dots on, so forth and so on.  That's what the term

18  "clean room" refers to.

19  Q.    Which one of these elements, the language, the API or the

20  implementing source code, are the Google engineers creating in

21  the clean room?

22  A.    Google implemented what you are referring to as

23  implementing source code in the clean room, which is Google --

24  it's owned by the Google corporation.

25  Q.    And that is now part of Android?

1  A.    And Google chose to put it under a license which allows it

2  to be very freely used, but we could have chosen not to.

3  Q.    And that's the Apache license?

4  A.    That is correct.

5  Q.    Now, in any of your discussions with Mr. Schwartz, did the

6  subject of Google's use of APIs or language in particular come

7  up?

8          In other words, did anybody say, "Oh, you're using

9  the APIs," or "You're using the language."  Was that even

10 discussed?

11 A.    No.  As I previously said, they were extremely aware of

12 our use of the interfaces.

13 Q.    The interfaces, the APIs, those were published when you

14 put the SDK out in 2007?

15 A.    That's correct.

16 Q.    Now, eventually did you put the source code out?

17 A.    We also did.

18 Q.    When did that happen?

19 A.    I'm not sure of the date, but it's perhaps a year later.

20 Q.    And that -- would that have been a connection with

21 launching a phone, for example?

22 A.    Yes, approximately.

23 Q.    And why do you make the source code that the Google

24 engineers wrote in the clean room, why do you make that public?

25 A.    Well, our strategy was to be as liberal and as open as

1  possible, to get as many people to use our platform.  And if we

2  publish all the source that we independently developed, we

3  think people are more likely to use it.

4         They are, frankly, also likely to find bugs in it.

5  Help us strengthen the community.  Many programmers took that

6  source and then they modified it and so forth.

7  Q.   And companies can take it, too?

8  A.   Anyone on the planet.

9  Q.   Is that what you're referring to when you talked about

10 Kindle in your direct exam?

11 A.   Yes, as an example.

12 Q.   They are using the source code that Google created?

13 A.   Yes, of course.

14 Q.   Along with the APIs and the language as well?

15 A.   Yes.

16 Q.   Now, once the source code is public, anybody can access it

17 and look at it?

18 A.   Yes, that's correct.

19 Q.   It's somewhere on a website?

20 A.   Yes.  It's actually on a series of websites and available

21 globally to everyone in the world.

22 Q.   Did -- in any of your discussions with Mr. Schwartz or

23 Mr. McNealy or any of the folks at Sun, did anyone ever say,

24 "Gee, I think your source code is a copy of our source code"?

25 A.   No.

1  Q.   Has anyone ever made that claim before this lawsuit

2  started?

3  A.   No.

4  Q.   And that source code has been available since at least

5  2008?

6  A.   Yes.  I'd say at least three to four years.

7  Q.   And what is it about your experience that caused you to

8  believe in 2006 that you were free to use both the language and

9  the APIs?

10  A.   Well --

11          MR. BOIES:  Objection, your Honor.

12          THE COURT:  Sustained.  I -- he can't add anything to

13  what he has already said without it sounding like he's giving a

14  legal opinion.  So the objection is sustained.

15          MR. VAN NEST:  Let's put 406 back on the screen,

16  please.

17  BY MR. VAN NEST:

18  Q.   I think you have 406 up this in front of you Mr. Schmidt?

19  A.   I do.

20          (Document displayed)

21  Q.   And let's start with the text from the bottom from

22  Mr. Slatkin.  Do you know who Mr. Slatkin is?

23  A.   I do not.

24  Q.   I take it he's a Google employee?

25  A.   This email would indicate that he is a programmer in the

1    Google app engine team.  That's how I would interpret this.

2    **Q.**   But he's not someone that you know?

3    **A.**   I do not know him.

4    **Q.**   And he makes a reference to buying Java from Sun.  Did

5    Google ever seriously explore that?

6    **A.**   No.

7    **Q.**   You thought that was unrealistic?

8    **A.**   Well, as you see my response above, I asked people to

9    think about it, but I don't think anything happened.

10   **Q.**   Now, the sentence right after the one that is highlighted

11   talks about cost.  And then it says --

12            **MR. VAN NEST:**  Let's do the next one there, Ben,

13   after that.

14            (Document displayed)

15   **BY MR. VAN NEST:**

16   **Q.**   (As read)

17            "We could turn it into an open foundation and

18            solve all these lawsuits we're facing."

19            Did you have any idea what he was talking about?

20   **A.**   I do not -- I did not.

21   **Q.**   Do you have any idea what lawsuits, if any, Google was

22   facing in 2009?

23   **A.**   I'm not -- I was not aware of any in this area.

24   **Q.**   Do you have any idea whether Mr. Slatkin has anything to

25   do with the Android team at Google?

1  **A.**    The Google app engine is -- team is not part of Java,

2  or -- sorry.  To be precise.  The Google app engine team is not

3  part of the Android team at Google.

4         **MR. VAN NEST:**  Your Honor, I have nothing further.

5         Before Mr. Schmidt is excused, however, I would like

6  to make one request of the Court outside the jury's presence.

7         **MR. BOIES:**  I have one area of questioning.  It will

8  be brief.

9         **THE COURT:**  Before you do that, can you put upon the

10  easel that diagram that an earlier witness drew, whose name I

11  now do not recall?

12         (Demonstrative displayed)

13         **MR. VAN NEST:**  Mr. Bloch, your Honor.  Josh Bloch.

14         **THE COURT:**  Is that it?

15         **MR. VAN NEST:**  Yes.

16         **THE COURT:**  Can you see that -- I'm talking now to

17  the witness.

18         Can you see that easel?

19         **THE WITNESS:**  Yes, I can.

20         **THE COURT:**  Before I ask you my question, does that

21  make any sense to you?  In other words, can you figure out what

22  he was trying to draw there?

23         **THE WITNESS:**  Okay.  This is a package using

24  java.lang.  It's a Public class involving Math.  It returns a

25  result which is a comparison of the first and second argument,

1    whichever one is larger.

2              **THE COURT:**  Okay.  Well, good.  You got basically

3    what he said.

4              Now, I just am trying to understand your earlier

5    testimony where you were drawing a distinction in your print

6    example.

7              I understood your print example, but I want you to

8    tell us using this example which part would be the API, which

9    part would be the implementation, and then also tell us what

10   role the declaration plays, because we have -- we didn't hear

11   the word "declaration" in your testimony a minute ago.

12             So please help us on that.

13             **THE WITNESS:**  Yes.  I understand that it's confusing.

14             The print example is one that was, the first one that

15   was used in the 1970's.  This is a more modern version of the

16   same kind of thing.

17             So this page -- and, again, I was not here for his

18   testimony, so he would be more accurate than I -- it's a

19   description of a way to make a comparison of something.  So

20   that's what a package is.  And it's a Math -- it's called Math,

21   right?  So that's the name.  And you can see the word "name"

22   there.  And you can see it says the word "max," m-a-x.  This is

23   a max of something, okay?  So that would be like print.  I want

24   to sort of do print.

25             Now, in order to print, you have to tell it to

 1  compare two things.  So that's the arg1 and arg2, which are

 2  integers, i-n-t.  So the declaration is, in their terms, is

 3  still part of that applications interface because you need

 4  that.  You need to say, "What am I printing?"

 5         So the analogy in print is, I'd say, "Print 5."

 6  Well, "Print 5" is a number.  That's like an integer.  And

 7  everything that's below the word "declaration" there, "If arg1

 8  greater than arg2 return arg1 else return arg2," that's the

 9  implementation.

10         So in the simple example that I used earlier, the

11  bottom part that begins with "If" would be proprietary to

12  whoever wrote it, and the stuff above would be -- that would be

13  the implementing code.  And the stuff above it would be the

14  interface.

15         **THE WITNESS:**  Is that helpful, your Honor?

16         **THE COURT:**  I'm just trying to understand, put this

17  in the context of your earlier testimony.

18         Now, in your example you said you wanted to use the

19  word "Print 5" or "Print X plus Y."  And we all understood that

20  part.

21         But if you were using this example and writing a

22  program that would do this, what command would you put on

23  the -- in your program to make it call up this code?

24         **THE WITNESS:**  The name of this procedure is called

25  max.  You see the m-a-x?  That's like the word "print."

1          **THE COURT:**  Right.  I understand that.

2          **THE WITNESS:**  So in my -- let's say that instead of

3    my print example, I wanted to find the maximum of two numbers.

4    So in my code I would just say, in this case, java.lang.max, or

5    something like that, (1, 2) and it would then return -- I would

6    say equals, you know, the result.

7          **THE COURT:**  All right.  So you would say "X equals

8    java.lang.Math.max(1, 2)" and then X would wind up being 2.

9          **THE WITNESS:**  Again, to be completely precise you

10   would say, the result X equals the maximum, m-a-x, or procedure

11   to max, paren, and then the list of things you wanted to

12   compare.

13         **THE COURT:**  All right.  So your view is the name part

14   you thought you were freely able to use, but the implementation

15   part was proprietary.

16         Did I hear you have say that?

17         **THE WITNESS:**  That is correct.  And in this

18   formulation the declaration would also need to be part of the

19   name because you need to know what -- you need to know what to

20   put with the name.

21         **THE COURT:**  What role does the declaration serve?

22         **THE WITNESS:**  Let me give you an example of the word.

23         The print example.  How do I know what I'm feeding to

24   the print thing?  I have to tell it what I'm giving it.  I told

25   you I was printing the digit 5.  The more general form is I'm

1  printing a variable.  And the variable can vary, can be

2  anything.  So I have to know that it prints an integer or it

3  prints a floating point number, those sorts of things.

4          It may be easier, your Honor, if I said that the "if

5  else," that's this gentleman's way of telling if something is

6  bigger than the other.

7          But let's say I came up with a different way of

8  comparison two numbers.  Well, that would be okay, too.  That

9  would be my invention as opposed to his.  That's why the

10  implementing -- you could have multiple implementations for the

11  same interface.

12          **MR. VAN NEST:**  Can I put that in a little context?

13          **THE COURT:**  I'm done.  Go ahead.  This is coming out

14  of your time, though.

15          **MR. VAN NEST:**  Oh, wait.  Whoa, whoa, whoa, whoa,

16  whoa.

17          (Laughter.)

18          **MR. VAN NEST:**  If you told me that, I would have

19  objected to the question.

20  **BY MR. VAN NEST:**

21  **Q.**   Just to put a point on it, Mr. Schmidt, before we finish

22  up.  It's your understanding, in response to Judge Alsup's

23  questions, the API that you're talking about being in the

24  public domain is the name and the declaration that's part of it

25  that's all above this black line, right?

1  **A.**    That is correct.

2  **Q.**    And that's what -- that's what was, in your view,

3  available and out there in the public domain for anyone to use?

4  **A.**    Yes.  And the way you can see that is that in order to

5  have another implementation, you have to have the name and the

6  declaration to start with.  Without the declaration, you don't

7  know anything about what you're calling.  You have to have

8  both.  And then you can write whatever you want to below, and

9  that's the proprietary work of whoever wrote it.

10 **Q.**    Right.  So when we're talking about a class library or the

11 source code in the class library or the implementation in the

12 class library, that's the stuff down here below the black line

13 in the orange highlighted?

14 **A.**    That's correct.

15 **Q.**    And that's why you would need a clean room to build

16 this --

17 **A.**    Right.

18 **Q.**    (Continuing) -- source code implementation?

19 **A.**    An example to give you.  Let's say I violently disagreed

20 with this formulation for comparison and I decided to build my

21 own clean room.

22         Now that I've seen this, I would be unclean because I

23 would know the implementation.  I'd have to hire somebody

24 completely else to do it in a different way to make sure I

25 don't get that information.

 1  Q.   Now, going back to your negotiations in '05 and first part

 2  of '06 with Sun, would it have been a benefit to Google to be

 3  able to buy the Sun implementation of this library?

 4  A.   Of course.

 5  Q.   Why would that have been a good deal?

 6  A.   Time to market.  We would have gotten to market faster.

 7  Q.   And when you weren't able to reach a deal, what is it that

 8  Google had to do?

 9  A.   We had to make our own using a different approach of the

10  lower part of that chart.

11           **MR. VAN NEST:**  Unless your Honor has further

12  questions, I don't have any.

13           **THE COURT:**  No.

14           Mr. Boies?

15           **MR. BOIES:**  Thank you, your Honor.

16                      <u>**RECROSS EXAMINATION**</u>

17  BY MR. BOIES:

18  Q.   Mr. Schmidt, this is a document that's already in

19  evidence.  And I don't see the exhibit number on it, but I know

20  it's already in evidence?

21           (Demonstrative displayed)

22           **THE COURT:**  It is in evidence and we'll just remember

23  it as the very large poster board.

24           (Laughter.)

25

SCHMIDT - RECROSS EXAMINATION / BOIES          1579

1  **BY MR. BOIES:**

2  **Q.**   The Java class libraries poster board.

3          Now, you can tell, and this is -- and it's on your

4  screen, too.

5          (Document displayed)

6  **Q.**   You can tell this is a list of certain, at least Java

7  class libraries, together with various aspects of it?

8  **A.**   Yes.

9  **Q.**   Now, how much of what's on this chart did Google use or

10 copy in its Android work?

11 **A.**   I'm not familiar with the specifics, but it would not be

12 the entire amount.

13 **Q.**   How much about?  More than half?

14 **A.**   I don't know.

15 **Q.**   Did I give you Exhibit 18 before?

16 **A.**   I have it.

17         (Document displayed)

18 **Q.**   Now, you talked about whether there were discussions about

19 the Java programming language and the Java APIs as being the

20 same or different things; do you recall that generally?

21 **A.**   Yes, yes.

22 **Q.**   Now, this is an email that -- from Andy Rubin, who is in

23 charge of the Android project, March 24th, 2006 where he says:

24         "Java.lang APIs are copyrighted and Sun gets

25         to say who they license the TCK to."

1          Do you see that?

2   **A.**   I see that.

3   **Q.**   Did Mr. Rubin ever tell you that in words or in substance?

4   **A.**   I don't recall.

5   **Q.**   The -- as you understand it, is the Java programming

6   language copyrighted?

7   **A.**   Umm, again, I don't know that the status of these -- of

8   the legal matters here, what's copyrighted and what's not.  I'm

9   sure that it was copyrighted, but it's generally in general use

10  and Sun made it available to everybody.

11  **Q.**   But that was not true with respect to the APIs, according

12  to Mr. Rubin, correct?

13  **A.**   Again, I didn't write these emails.  So, I see what he's

14  saying.

15  **Q.**   I guess what I'm asking you is:  Did he ever say that to

16  you in the course of these many years when he was developing

17  Android and you were the CEO?

18  **A.**   Not that I recall.

19          **MR. BOIES:**  No more questions, your Honor.

20          **THE COURT:**  May the witness step down?

21          **MR. VAN NEST:**  I would like to just make a request of

22  your Honor outside the presence very briefly before Mr. Schmidt

23  is excused.

24          **THE COURT:**  All right.  Let's do that.

25

```
 1              (Whereupon, the following proceedings
 2               were held at sidebar.)
 3         THE COURT:  What's your request?
 4         MR. VAN NEST:  You've said a number of times that we
 5  need to have in the record anything that we think is important
 6  for your decision on copyrightable.
 7         THE COURT:  Correct.
 8         MR. VAN NEST:  Right?  And so I've proffered Trial
 9  Exhibit 3439, and there's a little bit of testimony that goes
10  with that.  I just want to be sure --
11         THE COURT:  What is that document?  I don't remember.
12         MR. VAN NEST:  That's the one that we came to sidebar
13  before.  That's his testimony back in 1994.
14         THE COURT:  Yes.
15         MR. VAN NEST:  And I'd like to be sure that that
16  testimony is in the record.  I understand your Honor is not
17  going to allow it in front of the jury, but will you accept
18  that on a written proffer, or can I describe the testimony now,
19  or how do you want it --
20         THE COURT:  It's already been proffered so many times
21  and I don't think it ought to be laid -- I don't even think it
22  has relevance to the issues in the case.  It has moderate
23  relevance.
24         MR. VAN NEST:  I just --
25         THE COURT:  I'm not going to let you take up time now
```

 1   with that document.

 2          **MR. VAN NEST:**  That's fine, but I just want to be

 3   sure.  Is your Honor's understanding a proffer here at sidebar

 4   of the kind that I made offering the exhibit and the

 5   description of it, that's sufficient?

 6          **THE COURT:**  That's sufficient to preserve your point

 7   for appeal, but that's not sufficient to use it for purposes of

 8   copyrightable.  I don't think that has much probative value at

 9   all.

10          **MR. VAN NEST:**  But, in other words, you may disregard

11   it, but I have it sufficiently in the record so that no one is

12   going to say, "Well, you didn't try to put it in the record, so

13   you can't use it."  That's my only question.

14          **THE COURT:**  No, you cannot use it.  I'm telling you

15   you cannot use it.  But the Court of Appeals may say, "The

16   judge was wrong and he should have let you use it."

17          **MR. VAN NEST:**  Fair enough.

18          **THE COURT:**  But I think it's out.

19          **MR. VAN NEST:**  Fair enough.

20          (Whereupon, the following proceedings were

21            held in open court, in the presence and

22            hearing of the jury.)

23          **MR. VAN NEST:**  Your Honor, Mr. Schmidt can be

24   excused.

25          **THE COURT:**  Both sides agree?

```
 1              MR. BOIES:  Yes, your Honor.

 2              THE COURT:  Mr. Schmidt, you are excused.  Leave our

 3    documents here.  You're free to go.  Have a great day.

 4              THE WITNESS:  All right.  Thank you very much.

 5              (Witness excused.)

 6              THE COURT:  Mr. Van Nest, your next lawyer, please --

 7    next witness, not next lawyer.

 8              MR. VAN NEST:  Our next witness, your Honor, is not a

 9    lawyer.  It's Mr. Rubin, and we'll have him here momentarily.

10              THE COURT:  And for the record, my excellent Deputy

11    Clerk pointed out that the exhibit number for that big chart

12    was 1028.

13              Okay.  Mr. Rubin, welcome.  You know the drill.  Make

14    yourself at home.  I remind you you're still under oath.

15                            ANDY RUBIN,

16    called as a witness for the Defendant herein, having been

17    previously sworn, resumed the stand and testified further as

18    follows:

19              THE COURT:  Counsel may begin when you're ready.

20              THE WITNESS:  Okay.  Thank you.

21                        DIRECT EXAMINATION

22    BY MR. VAN NEST:

23    Q.   Good afternoon, Mr. Rubin.  And we're sorry to keep you

24    waiting.

25              You didn't get a chance to introduce yourself much
```

 1  this morning or last night.  Can you just tell the jury who you

 2  are and provide a little personal information, please?

 3  **A.**    Sure.  My name is Andy Rubin.  I'm in charge of the

 4  Android project at Google.

 5         Before that I studied computer science in university.

 6  Took a job, you know, right out of university working on

 7  computers.  Ended up coming to the Valley to work for Apple.

 8  And then did a couple of -- joined a couple of start-up

 9  companies, General Magic, WebTV.  One of those got sold to

10  Microsoft and after, you know, being at Microsoft for about a

11  year, I decided to go off and try to start my own company.

12  First time I did that as an entrepreneur.  The name of the

13  company was Danger.  We built cell phones and software

14  platforms for cell phones.  And then after about four years I

15  left Danger.  Started another company called Android.  And in

16  July of 2005 Google acquired Android.

17  **Q.**    And here you are today.

18         Let's go back a little bit in time.  When did you

19  first become interested in computers, Mr. Rubin?

20  **A.**    Oh, I remember growing up in New York, in Westchester, New

21  York.  It was, I -- I lived in the same town that Reader's

22  Digest had their headquarters.  And one of my friend's father's

23  worked there and he worked in their computer department.  And

24  back then, you know, this is in the '70s.  This was just

25  amazing technology that normal people didn't have access to.

 1   So he took me to work one day and I really got to love

 2   computers.  And then I begged him and asked my parents to buy

 3   me one of the first personal computers.  I think it was 1976 I

 4   got my first personal computer.

 5   Q.   Now, tell us briefly, what did you come to Apple to work

 6   on?

 7   A.   I was helping them with manufacturing process control.

 8   Basically helping Apple --

 9   Q.   Mr. Rubin, can I just you just to slow down a little bit

10   for our court reporter and our jurors as well.

11   A.   Sorry.  I -- they brought me out to help them with

12   statistical process control.  It's computer software that helps

13   them build better products.  So it's manufacturing software

14   that helps them make sure that when they ship a product from

15   the factory to you, that it is working error free.

16   Q.   Now, you were asked some questions, I think it was

17   yesterday afternoon, about Danger.  That's a company you

18   founded?

19   A.   That's correct.  Myself and two other cofounders.

20   Q.   And what's the product that Danger put together?

21   A.   The brand name, you will probably know it as the T-Mobile

22   Sidekick.  It was one of the first kind of smart phone PDA's

23   that was also a cell phone.

24   Q.   And what was the idea -- what was your idea for the

25   Sidekick?  What were you trying to accomplish?

1   **A.**   Well, at that time, I mean, the majority of the phones

2   people carried around were those flip phones.  They were great

3   at, you know, sending text messages and making and receiving

4   phone calls, but they weren't very good in accessing the

5   internet.  And in the late 90's the internet was all the rage.

6          So you would sit down at your desktop computer, surf

7   the web, send emails, do instant messaging, and we wanted you

8   to be the same things without being tied to your desk.  We

9   wanted you to be able to have you take it with you.

10  **Q.**   Now, i'm holding up in my hand -- it's not an exhibit.

11  It's a demonstrative.  You mentioned flip phones.  Is that what

12  you were talking about (indicating)?

13  **A.**   Yeah.  Phones like that I think were prevalent at the time

14  we started Danger.

15  **Q.**   And how much -- how much additional functionality did you

16  need to get from this to the smart phone that was Sidekick

17  originally?

18  **A.**   Well, I think -- I mean, phones like that that -- industry

19  terminology for those phones are feature phones.  You know,

20  they have a bunch of features, but you know there's differences

21  between each phone and they don't really allow the modern

22  compute-like functionality like you have in your desktop PC.

23          So our goal was to take basically, you know, a new

24  platform and a new piece of hardware and make it like your

25  desktop PC.  Make it like your Windows machine or your

1    MacIntosh where you could go buy a piece of software, put it on

2    it, and then other companies could make money on top of the

3    platform.  Those are what we call smart phones.

4    **Q.**   Did you have to assemble a team of engineers at Danger to

5    actually turn a product into something like a smart phone?

6    **A.**   Yeah.  I mean, we started, you know, with a team of

7    engineers.  And we just began from the basics and just built

8    everything we needed to build to make, you know, the phones

9    into internet devices.

10   **Q.**   Now, you gave some testimony last night about a license

11   you took at Danger from Sun.  Do you recall that?

12   **A.**   Yes.

13   **Q.**   Can you explain to the jury why you took a license?

14   **A.**   Sure.  Well, at Danger when we were building our platform,

15   we wanted the ability for, you know, anybody to be able to

16   program for the platform.  And one of the prevalent, you know,

17   things that you get taught in university in CS-101 was how to

18   program in the Java programming language.

19          So we assumed that kids that were graduating,

20   engineers that were graduating out of these universities knew

21   how to program in the Java programming language and we wanted

22   to take advantage of that training so we wouldn't have to

23   retrain them again.

24          So what we did at Danger is we created a clean room

25   implementation of the Java virtual machine, a clean room

1    implementation of all the Java libraries and, you know, set out

2    to take advantage of the Java programming language.

3              As the development went on, we got approached -- you

4    know, we did some press and, you know, the word got out about

5    what we were working on.  It wasn't, you know, totally in

6    secret.  And then we started getting some inquires from Sun

7    Microsystems.  They were trying to sell us technology that

8    could help us with our effort.  The technology that they were

9    trying to sell us was Java-related technology.

10             We didn't think we needed it, since we had built our

11   own clean room implementation, but as a small company, there

12   were a couple of things that were valuable to us.  One of the

13   things that we wanted was access to their Test Compatibility

14   Kit.  We wanted --

15   **Q.**   Slow down a little bit, Mr. Rubin.  You're getting a

16   little fast.

17             So you wanted access to the Test Compatibility Kit.

18   Why was that important?

19   **A.**   Well, we wanted to make sure that when somebody, when one

20   of those university students who graduated knew how to program

21   in Java wrote a program, we wanted to make sure that that

22   program could run on other devices, too, not only our device.

23   So we wanted to make sure that we were compatible with other

24   devices that happened to be running the Java programming

25   language.

1  Q.   Were there other benefits?

2  A.   I think the other big benefit in my mind as a small

3  company is the Java brand.  I think it was a recognized brand,

4  especially in the industry that I was operating in, which is

5  wireless operators and cell phones.  So I wanted to be able to

6  call my work Java so I could get the lift, the marketing lift

7  off of that brand and trademark.

8  Q.   And still referencing your days at Danger, did you believe

9  that you needed a license to use either the language or the

10  language APIs?

11  A.   No.  I don't -- I don't believe we needed a license.

12  Clean room implementation is, you know, from scratch without

13  any knowledge or using any of the proprietary code that Sun

14  had.

15  Q.   Now, why did you start Android, the company?

16  A.   You know, I'm an entrepreneur.  I enjoy starting

17  companies.  I'm a technologist and I still thought, even after

18  doing Danger, that there was a lot of room for improvement in

19  cell phones.

20       Danger took, you know, the feature phone and turned

21  it into a smart phone, but it -- you know, it had a little

22  keyboard on it and you typed instant messaging and things like

23  that.  It sold a couple million units, but I had a vision where

24  I wanted, you know, my parents and my friends and everybody

25  carrying these things.  So I wanted to make it more mainstream,

1  so we started Android to do that.

2  **Q.**   Did you have a plan for how you would make whatever

3  Android device you could develop available to people?

4  **A.**   We did.  The business strategy was, I think, quite unique

5  for the time.  We knew how hard it was to, you know, build a

6  company like a Microsoft.  We were focused really on software

7  at this time, not building hardware.

8       So what we wanted to do is we wanted to instead of,

9  you know, creating software and then trying to sell it, like

10  Microsoft does or like Sun Microsystems does, we wanted to give

11  the software away for free.  So we made it Open Source.  That

12  was a core part of the business strategy.

13       And the reason we wanted to give it away for free was

14  it's a way to make the adoption of the platform frictionless.

15  Nobody has to sign any contracts.  Nobody has to enter into

16  agreements.  Nobody even has to talk to anybody from our

17  company in order to use our software.  So we made it available

18  to the world.  And making it available to the world, of course,

19  you know, achieves that, you know, goal of the company, which

20  was to have everybody on the planet using our products.

21  **Q.**   And then how -- how were you planning to make any money at

22  Danger if you were giving this software platform away to people

23  for free?

24  **A.**   Well, there was a big assumption.  Assuming we're right

25  and assuming that the world did want to use our software and it

1  was frictionless for them to adopt it, we would then be

2  confident that a lot of people were using our software.  And

3  because a lot of people were using our software and we were,

4  obviously, the experts in developing it, we knew that we could

5  sell services to the industry; like the wireless operators,

6  like AT&T and Verizon and T-Mobile.  We could sell services to

7  that industry that took in account the world was running our

8  software on the cell phones.

9  Q.   Was it an advantage or did you perceive it as an advantage

10 to those customers, the handset makers and the telecom

11 carriers -- was Open Source an advantage from their standpoint?

12 A.   Well, yeah, I believe so.  I think -- you know, again,

13 Open Source means a couple of things.  It's -- you know, it's

14 open and nobody needs to sign a contract for us, but most

15 importantly it's free.  All right?  So people don't have to pay

16 for it.

17         And what we thought would happen is we thought, you

18 know, for end users, for consumers like people like me and you,

19 I think cell phones would get cheaper.  We estimated about

20 20 percent of the cost of cell phones was licensing all the

21 software that people need to have to make these things work.

22         So by making it Open Source and giving it away for

23 free, we thought we would dramatically lower the cost of phones

24 and making them smart phones at the same time.

25 Q.   Did Android ever create a product prior to the time that

1  Google bought the company?

2  **A.**   No.  We were in kind of the exploratory phase.  We had

3  some demos that ended up getting thrown away, but I think it

4  was -- it was a very early time.

5  **Q.**   And how did you make the connections to eventually become

6  part of Google?  How did that happen?

7  **A.**   From my days at Danger I knew Larry Page, who was then the

8  co-founder of Google and president, I believe.  And I just

9  emailed him and I said, "Hey, Larry.  I moved on from Danger.

10  I started another company called Android.  We're going to

11  revolutionize the cell phone space.  You should come check it

12  out."

13  **Q.**   And one thing led to another and soon you were part of

14  Google?

15  **A.**   That's right.  We were in acquisition discussions with

16  Google.

17  **Q.**   Approximately when did Android become part of Google?

18  **A.**   In July, 2005.

19  **Q.**   And did you then have a title at Google?

20  **A.**   Yes.  I was director of engineering.

21  **Q.**   Now, did the -- once you got to Google and got your desk

22  opened up and so on and so forth, did the plan or the idea for

23  the Android product change?

24  **A.**   Not for the Android product, the business strategy.  It

25  was still Open Source.  It was still going to be for smart

1   phones.  You know, our goal was to be a software, you know,

2   platform.

3          What we shifted a little bit was the business

4   strategy.  It was the how we were going to make money part.

5   Q.   How did you shift that?

6   A.   Well, as I mentioned before, we were, you know, going to

7   build services that were -- that we would then license to the

8   industry, like the wireless operators.  We didn't feel like we

9   needed to do that any more.  Google already had services like

10  search and things that like that that were in demand.

11  Q.   So now that you're a Google employee and run the Android

12  team, what was the benefit for Google of this particular

13  strategy; i.e., making a platform available and Open Sourcing

14  it?

15  A.   I mean, you know, Google had a suite of applications.

16  They had services like search and everything else and --

17  Q.   Mr. Rubin, slow down a little bit.

18         When you say "suite of applications," you get past us

19  pretty quick.  What are you talking about?

20  A.   Things like Gmail, Google Maps, the search application,

21  YouTube, those types of applications.  Those already existed.

22         You know, we figured if -- you know, Google's mission

23  is to organize the world's information, make it universally

24  accessible and useful.  So we figured Android was the

25  accessible part.  It's giving people access to the internet

1  wherever they are, not just when they are rolled up to their

2  desk, and allowing them to choose to come to Google to use

3  these services that I just mentioned.

4  **Q.**   Now, with respect to -- actually, putting the business

5  plan aside --

6            **THE WITNESS:**  I've been asked to slow down.

7            **MR. VAN NEST:**  What a surprise.  He'll probably

8  accept it a little better from you, Deb, than from me.

9  **BY MR. VAN NEST:**

10 **Q.**   With respect to -- put the business strategy aside.  Were

11 there different options for how you could actually build the

12 product?

13 **A.**   I mean, there were tens of thousands of little decisions

14 that we made along the way to build the product.  I think, you

15 know, we could have done a number of things.

16 **Q.**   Well, I guess my question is, had you made a decision

17 right from the start that you would develop the product

18 in-house, on your own, or buy components from other vendors,

19 other companies?  Had you made that decision by the time you

20 got to Google?

21 **A.**   No.  I mean, I think those types of decisions are based on

22 schedule and timing and cost, and things like that.

23            And you might make different decisions if you're a

24 small company versus, you know, having the funding and backing

25 of a large company.

1          So those types of decisions kind of evolved during

2   the course of the project.

3   **Q.**   And early on -- and by that I mean in 2005 -- were you, as

4   the head of the Android project, talking to lots of companies

5   about participating or making their products available?

6   **A.**   Yeah, so -- well, yes.  So let me kind of explain a little

7   bit of the background.

8          So part of what we were doing, we knew we were going

9   to create an open platform.  And we were in the process of

10  figuring out what technologies would go to that platform.

11         And we created this thing called the Open Handset

12  Alliance.  It was, basically, a consortium of other companies

13  who kind of had a like-minded vision to make smart phones

14  available to as many people as possible.

15         So, in the course of doing that, we actually sought

16  out contributions from the members of the Open Handset Alliance

17  that could help us accelerate our efforts.

18  **Q.**   Who are some of those people, these people in the Open

19  Handset Alliance?  Who are they?

20  **A.**   Well, there were different categories that are -- you

21  know, the wireless operators, the OEMs.  OEMs like Motorola and

22  Samsung and Sony Ericsson.  These are people that build cell

23  phones, manufacture cell phones.  And, as I mentioned, the

24  wireless operators like AT&T and Verizon.

25         But then there were other sets of companies who are

1 actually technology providers. They were companies that had

2 either software or semiconductors or some piece of equipment

3 that could help us, you know, come to market faster.

4 So in a couple of instances, in more than a handful

5 of instances, we partnered and actually paid companies to

6 contribute their products into the open platform.

7 **Q.** How does that work? You're building a product that you're

8 going to give away. What's the incentive for these other

9 companies to take money and then let the product be given away?

10 **A.** Well, typically, they were -- you know, they were

11 companies that were in -- you know, operating like a lot of

12 companies in this industry, where it's a hypercompetitive

13 industry. And they were, you know, members of that industry,

14 building a very focused piece of technology.

15 And we would come in and we would basically say, hey,

16 why don't you open source your technology? Why don't you make

17 it available for free to the world as part of our platform?

18 And, in return, we'll pay you a little bit of money to do that,

19 so you guys can go and create some derivative of your business

20 model.

21 Again, it's one of those things where if the company

22 knew that their technology was in this platform, and this

23 platform's success was inevitable, then they would be able to

24 figure out what their business was, knowing what their

25 technology was in a lot of handsets.

1   Q.   Now, in the beginning, Mr. Rubin, when you're talking with

2   partners and getting the program kind of off the ground with

3   Google, had you decided for sure that you would use the Java

4   language as part of whatever you built?

5   A.   We were going back and forth.  The engineers were

6   debating.  Everybody had their favorite.

7            (Reporter signals to witness.)

8            **THE WITNESS:**  I notice one walked out.  I'm down to

9   one.

10            **MR. VAN NEST:**  You need to constantly remember to

11  slow down.  It's very hard to keep up.

12  **BY MR. VAN NEST:**

13  Q.   So, let's go back.  At the beginning, had you decided for

14  sure that you would use the Java language as part of whatever

15  you built?

16  A.   No, we hadn't decided for sure.  We were still arguing

17  over what was the best language for us.

18  Q.   Were there other available programming languages that

19  could have worked as part of Android?

20  A.   Each one with, you know -- you know, yes, there were other

21  ones that could have worked for sure.  And I think there were

22  opinions about which one would be best.

23            Python is an example of one that would have worked.

24  Q.   Which one?

25  A.   Python.

1  **Q.**    Python.

2          Can you give the jury just one or two examples of

3  other languages that you considered that might have worked as

4  part of Android?

5  **A.**    Sure.  Our goal was to --

6          (Reporter interrupts.)

7  **A.**    Our goal was to, you know, use languages that were taught

8  in universities.  So people already knew how to program for our

9  platform.

10         So a couple of the other choices were JavaScript.  It

11 was a Web-based technology people learned in college for how to

12 program.  Another one was Python, as I mentioned.  And there

13 were a couple of other ones.  Lua, L-u-a, was one other

14 programming language.

15 **Q.**    Now, you mentioned one in there, JavaScript.  Is

16 JavaScript the same as Java?

17 **A.**    No.  It's just a poor naming choice.

18 **Q.**    Is JavaScript affiliated at all with Sun?

19 **A.**    Not to my knowledge, no.

20 **Q.**    That's just -- it has the same type of name, but it's not

21 a Sun creation.  Okay.

22         Were there some drawbacks to using the Java language

23 in Android?

24 **A.**    Uhm, I think there was some technical drawbacks.  I think

25 that some of the technical drawbacks were it -- it didn't run

1  programs as fast as if -- as the program had been developed

2  under C or under some they call it non-interpreted language, a

3  language that converts directly to the machine's instruction.

4  So there was some technical disadvantages, yes.

5  **Q.**    Now, did there come a time, Mr. Rubin, in the course of

6  the project, that you began discussions with Sun as one of the

7  companies that might provide products or components?

8  **A.**    Yes.  We contacted Sun early on.  They contacted us, as

9  well.

10 **Q.**    And were you directly involved in the discussions with

11 Sun, yourself?

12 **A.**    Yes.  I led the negotiations.

13 **Q.**    Can you tell the jury, from your perspective, what is it

14 that Google was exploring with respect to a relationship with

15 Sun?

16          **THE COURT:**  Can you also establish the time frame.

17          **MR. VAN NEST:**  That's a good point, Your Honor.

18 **BY MR. VAN NEST:**

19 **Q.**    Let's start in 2005.  Is that when the discussions began?

20 **A.**    Yeah.  Preliminary discussions were in 2005.

21 **Q.**    So early on, let's take the early discussions in 2005.

22 What were you and the folks at Sun talking about at that time?

23 **A.**    So we saw this as an opportunity to, you know, open up

24 Java.  And our ask to Sun was to contribute Java to the open

25 source community.

```
 1            We felt it would be good for the community but also
 2   speed up our development effort, make the platform come to
 3   market sooner.
 4   Q.   And we've seen a bunch of exhibits of the early time.  Can
 5   I ask you to look at Trial Exhibit 1.  I think it's actually up
 6   there on your table.  Is it there?
 7   A.   It is.
 8   Q.   Tell the jury, what is Trial Exhibit 1?
 9   A.   This is a presentation that I did to the executives at
10   Google very soon after arriving at Google.
11   Q.   And so this is in July of 2005.  How long had you been at
12   Google by this time?
13   A.   Couple of weeks.  Two weeks, I think.
14   Q.   So this was one of the very earliest presentations?
15   A.   Yes.
16   Q.   Do you recall who the audience would have been for this?
17   A.   It was, well, anybody who was attending this GPS session.
18   But I think there were representatives from engineering and
19   product and business, as well as the leadership team.
20   Q.   And can we turn down to the page -- it's about four pages
21   in -- that says, "What is Android?"
22   A.   Yes.
23            (Document displayed.)
24   Q.   Can you explain to the jury, to our jurors, what you have
25   placed on that page.
```

1   A.    "Project Android is building the world's first open source

2   handset solution with built-in Google applications."

3   Q.    And when you say "the world's first open source handset

4   solution," what did you mean by that?

5   A.    At that time, there were no other open source solutions

6   for handsets, for mobile phones.

7              MR. VAN NEST:  Could we have the next page.

8              (Document displayed.)

9              THE WITNESS:  The model?

10  BY MR. VAN NEST:

11  Q.    The model, yeah.

12  A.    Okay.

13  Q.    Would you explain to the jury what the model was.  And

14  this, again, is in July of '05.  What was the model?

15  A.    At that time in -- you know, I think we were -- we were,

16  you know, starting to get locked in on what our model was.

17             But, basically, working with the industry -- whether

18  it was a wireless operator or an OEM or manufacturer of cell

19  phones -- to basically help them take this open source

20  platform, this open source OS, and integrate it into their cell

21  phones.

22  Q.    And what was the benefit to Google there, noted at the

23  bottom?

24  A.    We just basically get to have a direct connection to the

25  consumer.  We didn't have anybody kind of building the user

1  interface or building the icons or the screens on the cell

2  phone between us and the consumer.   We got to do that, so we

3  could have that direct relationship with the customer.

4  Q.   And let's go down to the page that's marked "JAVA."   It's

5  showing as 9 of 10 in my exhibit, second from the end.   There.

6  A.   I see.

7  Q.   So let me start right at the top.   "Java + JavaScript =

8  key differentiator."   What does that mean?

9  A.   So our platform centered on, basically, three

10  technologies.   It was the clean-room implementation of the Java

11  programming language.   It was JavaScript, which is a Web

12  technology.   And Google as a Web company leveraged it quite a

13  lot.

14  Q.   You say "JavaScript," that's a Web technology.   So that's

15  another component of Android?

16  A.   Yeah, that's correct.

17  Q.   Okay.

18  A.   And then XML, which was a third component.   Those three

19  things had never really been combined like that before.

20  Q.   What is XML?

21  A.   XML is a -- it's a language that represents data.   Like if

22  you have people, as contacts, stored in an address book in your

23  phone, each person would be represented in XML.

24  Q.   So could you have a product like Android using lots of

25  different programming languages for different parts of the

1   platform?

2   **A.**   You technically could, yes.

3   **Q.**   So the first bullet "Current Scenario," can you just walk

4   through the points and tell the jurors what -- what, at this

5   stage, at this early stage, what you were communicating to the

6   folks at Google?

7   **A.**   So it was pretty clear our intention was to develop a

8   clean-room implementation of a Java virtual machine.  We were

9   talking about getting a TCK from sun so we could test it to

10  make sure that it was compatible.  As well as, you know, using

11  the Java trademark so we could call it Java and get the

12  marketing uplift.  Some of the same things that we had done

13  before, at Danger.

14  **Q.**   Okay.  And down below:

15          "Proposal:  Google Android with support from

16          Tin Lindholm negotiates the first OSS J2ME

17          JVM license with Sun."

18          What does that mean?

19  **A.**   So the proposal was to go and actually make contact over

20  at the -- our business colleagues over at Sun Microsystems and

21  negotiate a license that enabled us to open source these Java

22  components.

23  **Q.**   Now, did you begin discussions with the folks at Sun

24  sometime following this e-mail or this proposal, this

25  presentation?

 1  **A.**   Yes, I did.

 2           **MR. VAN NEST:**   And could I have Trial Exhibit 617 up,

 3  please.

 4           May I approach the witness, Your Honor?

 5           **THE COURT:**   Yes.

 6           (Document displayed.)

 7           **THE WITNESS:**   Thank you.

 8  **BY MR. VAN NEST:**

 9  **Q.**   I'd like you to start with the end of the document,

10  Mr. Rubin -- because it's one of these e-mail chains that

11  starts at the bottom and finishes at the top -- and tell us

12  whether or not you recognize Exhibit 617.

13  **A.**   Yes, I recognize the e-mail string here.

14  **Q.**   What is it?

15  **A.**   It's an e-mail between myself and the salesperson over at

16  Sun, responsible for Java.

17  **Q.**   And who was the salesperson at Sun responsible for Java?

18  **A.**   His name was Leo Cizek.

19  **Q.**   Leo Cizek?

20           And is this a collection of e-mails that you and

21  Mr. Cizek exchanged in the fall of 2005?

22  **A.**   Uhm, at the bottom portion it was myself, Leo Cizek, and

23  Tim Lindholm, yes.

24           **MR. VAN NEST:**   I'll offer 617 in evidence, Your

25  Honor.

 1              **MR. BOIES:**  It's already in.

 2              **MR. VAN NEST:**  Already in.  Thank you.

 3              **MR. BOIES:**  That was my assumption when you displayed

 4  it to the jury, anyway.

 5              **MR. VAN NEST:**  Well, thank you.  I wasn't sure.

 6              **THE COURT:**  Take your word for it.

 7  **BY MR. VAN NEST:**

 8  **Q.**   In any event, I would like to call your attention to the

 9  very last page, right there where we are.  "Here are next

10  steps."

11              Let's go above that.  This is an e-mail to you from

12  Mr. Cizek.  Correct?

13  **A.**   That's correct.

14  **Q.**   And the first paragraph says:

15              "I've reviewed the documents.  Looks like

16              there are no roadblocks to us taking a

17              license and then open sourcing our

18              implementation."

19              What does that mean?

20  **A.**   That was a proposal that we had in the early days of the

21  discussion, that we take a license to the TCK from Sun, and

22  take a license to the Java brand, and then open source our

23  implementation of that -- of the Java virtual machine and Java

24  class libraries.

25  **Q.**   And then the next paragraph says:

1              "Right now we are moving ahead with the

2              project and doing an independent

3              implementation.  If Sun would like to get

4              involved, we'd be happy to have you."

5              What did you mean by that?

6    **A.**   I was seeking a partnership with Sun.  I would love to

7    have them as a co-developer on this project.

8    **Q.**   And then you list some next steps, 1, 2, 3.

9              What were the next steps, as you understood them, in

10   your discussions with Sun?

11   **A.**   Well, Sun had to kind of make a philosophical decision

12   whether they wanted to partner with Google on this project.

13   That was my point number one.

14              And, then, if they did, they needed to, you know,

15   kind of throw away their standard license, because it isn't

16   what we're asking for, and they needed to develop a new license

17   that was specifically what we're asking for.

18   **Q.**   And that would be as part of your open source idea?

19   **A.**   That's right.  It would basically, you know, help us open

20   source our implementation of Java.

21   **Q.**   So let's go to the very first page of 617, to the bottom.

22   Is this another e-mail from you back to Mr. Cizek, just a few

23   days later?

24   **A.**   Yes, it is.

25   **Q.**   And you say:

1                    "Leo, sorry I wasn't clear.  I was asking for

2                    you to modify the various agreements to allow

3                    our model, per our discussions with Vineet."

4                    Who's Vineet?

5    **A.**   Vineet is one of the more senior kind of strategic

6    business development people.

7    **Q.**   (As read:)

8                    "I'm really hoping this is the approach Sun

9                    is comfortable with because I think it would

10                   mean a really close partnership.  As

11                   discussed, the two companies are aligned

12                   against a common industry bully."

13                   What was the partnership you were talking about in

14   Exhibit 617?

15   **A.**   Uhm, in this time frame, it was -- it was basically either

16   allowing us to open source our JVM and licensing us this

17   technology like the TCK, or Sun actually contributing

18   technology, the effort, contributing their implementation of

19   the JVM, which would greatly accelerate the effort.

20   **Q.**   When you say "their implementation of the JVM" can you

21   elaborate on that.  What are you talking about?

22   **A.**   So Sun had a -- you know, Java ME, which was Micro

23   Edition.  It was a technology that they had created and they

24   owned the rights to, that we were asking them to contribute

25   into open source as part of this effort.

1  Q.   Now, your last sentence says:

2          "If Sun doesn't want to partner with us to

3          support this initiative, we are fine

4          releasing our work and not calling it Java."

5          What does that mean?

6  A.   Well, we were seeking, you know, a license to the

7  trademark Java.  We thought it was fine if they didn't want to

8  partner with us.  We weren't forcing them to do anything.  But

9  we also felt that we could continue to develop our clean-room

10 implementation because there was nothing wrong with it.

11 Q.   Now, at some point did you put together a proposal, a

12 written proposal, and send it over to Sun?

13 A.   Yeah.  I think it's fair to say there were several

14 proposals, yeah.

15 Q.   Several.  I would like to call your attention to Trial

16 Exhibit 11, and ask you to identify that for us.

17         Take a moment to review it and tell us, what is Trial

18 Exhibit 11?

19 A.   So, this is an e-mail between, you know, myself and a

20 couple of my team members.  And it's a draft of a proposal that

21 I had authored and -- with the help of people on my team, and

22 sent over to Sun on -- on kind of the current state of our

23 project.  This was in March of 2006.

24 Q.   Okay.  This is a little bit later on in time.

25         MR. VAN NEST:  I'd offer Trial Exhibit 11 in

1  evidence, Your Honor.

2          **MR. BOIES:**  Can I have a moment?  I think it's

3  already in, Your Honor.

4          **THE CLERK:**  I have it in as of Thursday.

5          **MR. VAN NEST:**  Okay.  Thank you.  I apologize.

6          So let's go to the first page, the background page.

7  And could we blow up just the first paragraph, please.

8          (Document displayed.)

9  **BY MR. VAN NEST:**

10 **Q.**   And can you tell us -- read the first sentence slowly,

11 Mr. Rubin, and tell the jury what you were proposing to Sun.

12 **A.**   Sure.  So it reads:

13          "Google is seeking partnerships with leading

14          wireless technology companies and service

15          providers to collaboratively develop an open

16          source handset platform."

17          Basically, this is that alliance I was talking about.

18 We were seeking members of this Open Handset Alliance, at this

19 stage.

20 **Q.**   Now, the two sentences following that, it says:

21          "Sun is considering providing a Java

22          implementation as a key component of the

23          platform."

24          Do you see that?

25 **A.**   Yes, I do.

1  Q.   What is that referring to?

2  A.   Now, since the evolution of the conversation since 2005,

3  now what we're discussing isn't just a license to the TCK and a

4  license to the Java trademark.  Rather, Sun is actually

5  interested in providing their implementation of J2ME.

6  Q.   And when you say "their implementation," are you talking

7  about source code, or a product?  Or what are you talking

8  about?

9  A.   Talking about source code and their proprietary -- we're

10 talking proprietary works.

11 Q.   And if Sun had provided their Java implementation, would

12 Google have needed a license to use it?

13 A.   Either way, I don't think we wouldn't -- I'm sorry.  Can

14 you ask that question.

15 Q.   Yeah.  If Sun is providing you their proprietary source

16 code in the form of a Java implementation, would you have

17 needed a license to use that?

18 A.   I think so, yeah.  It's their -- it's their work.

19         MR. VAN NEST:  Can we expand the page a little bit,

20 down to the bottom.

21         (Document displayed.)

22 BY MR. VAN NEST:

23 Q.   What is the diagram at the bottom depicting?

24 A.   A very sophisticated graphic.  It is kind of a view of the

25 ecosystem, all the people in this alliance that we were

1  creating.

2            And if -- you know, there were a bunch of empty

3  spots, but it showed where Sun and Google fit within the

4  alliance, and which technologies they would be providing.

5  Q.   And is there more discussion about that a little later on

6  in the document?

7  A.   I believe so.

8            We start getting into the details about, you know,

9  what's going to be provided.  And, you know, my job with this

10 document was to basically memorialize in writing some of the

11 discussions we had been having.  So it goes, you know, pretty

12 deep on what the technological components are and what the

13 architecture looks like, and things like that.

14           MR. VAN NEST:  Could we go to the last page, where it

15 says "Proposal," and blow up the first paragraph of that.  So I

16 just want the paragraph for now.

17           (Document displayed.)

18 BY MR. VAN NEST:

19 Q.   (As read:)

20           "Sun and Google jointly develop an open

21            handset solution.  Sun's main responsibility

22            is the Java CDC virtual machine, class

23            libraries, MIDP stack and relevant JSRs."

24           Do you see that?

25 A.   Yes, I do.

1    Q.   Well, we're losing power here, so while it's a little

2    faint can you tell the jury, what are you referring to with

3    respect to Sun's main responsibility?

4         What were they going to provide?

5    A.   So, again, this is -- you know, in this joint development

6    effort, this is kind of splitting the work between these two

7    engineering teams.  The engineering team at Google and the

8    engineering team at Sun Microsystems.

9         So the -- you know, that second sentence talks about

10   the existing technology that Sun had, that they were going to

11   contribute to the effort.

12   Q.   And what was that?  What was that technology?

13   A.   It was, essentially, the virtual machine and the Java

14   class libraries, and then a layer on top of the Java class

15   libraries called MIDP, which was a profile for cell phones.

16   Q.   And is that all proprietary Sun technology?

17   A.   Parts of it were proprietary and parts of it were, you

18   know -- like the JSRs, for example, were part of the JCP, which

19   was one of Sun's community.

20   Q.   The virtual machine, the CDC, the class libraries, would

21   Google have needed a license to that technology?

22   A.   Yeah, for Sun's work, yes.

23        MR. VAN NEST:  Now, could we have Trial Exhibit 18 up

24   on the screen.  This is already in evidence.  Let me hand you a

25   copy, Mr. Rubin, because I'm taking it kind of right in the

 1  chronology.  I think it's up on the stand there.  Do you have

 2  it?

 3            **THE WITNESS:**  Potentially, yeah.  Let me see.

 4            (Document displayed.)

 5  **BY MR. VAN NEST:**

 6  **Q.**   This is a document you were asked about last night, by

 7  Mr. Boies.  Is it there?

 8  **A.**   Yes, it is.

 9  **Q.**   Okay.  Open it up.  And let's -- let's start at the

10  bottom, and tell us, who is Greg Stein?  And is he somebody you

11  were working with or not?

12  **A.**   He's -- he's a Google employee.  I didn't know him or work

13  with him before he had sent me this e-mail.

14  **Q.**   And can you tell us, what -- what was he -- in general,

15  what was he talking about in the first paragraph of this

16  e-mail?  At least as you understood it.

17  **A.**   Well, he had, you know, obviously, kind of heard about

18  what we were working on on the Android team.  He wasn't on the

19  team.  And somebody pointed him in my direction, and he was

20  asking questions about J2ME, which was a Sun product.

21  **Q.**   Now, J2ME, is that a proprietary Sun product?

22  **A.**   Yeah.  It's Java 2 Micro Edition.

23  **Q.**   It has their source code and all that?

24  **A.**   Yes, it's their product.

25  **Q.**   And so what was he suggesting or proposing here?

1   A.    I think he was being vague because he said he was under a

2   confidentiality agreement.  And I didn't know what that meant.

3   But I assumed that, you know, I wasn't going to get a lot of

4   information from him.  And he was -- he was -- he was saying

5   that he had a way to open source J2ME.

6   Q.    And what did you think of that?

7   A.    Well, I didn't understand that because J2ME was a Sun

8   product.  So unless his confidentiality agreement was with Sun,

9   I didn't see how he could do that.

10          MR. VAN NEST:  So let's go up the page a little bit

11  further.  Open that up.  Thank you.

12          (Document displayed.)

13  BY MR. VAN NEST:

14  Q.    So your response to him, what was your initial response to

15  him?

16  A.    I told him I don't see how -- he can't open source this

17  product when it belongs to Sun.

18  Q.    What were you referring to?  "Can't open Java without

19  Sun," what does that mean?

20  A.    I was referring to J2ME, which was the topic of the e-mail

21  message.

22  Q.    And then did he respond in kind?

23  A.    He did.  He did.  Apparently, he had a plan for

24  everything.  And he had some scheme for how to do what he was

25  proposing to do.

1   Q.   And then did you respond, again, to that?

2   A.   Yep, I did. I kind of, you know, was tolerating his -- his

3   vagueness, and I told him to wish -- you know, wish him luck,

4   and I think it's going to be hard open sourcing this work.

5   Q.   So when you said java.lang.APIs are copyrighted, can you

6   tell the jury, what were you referring to?

7   A.   Sure.  I was meaning the Java class files that were part

8   of the J2ME implementation.

9   Q.   How do you know that?

10  A.   That they're copyrighted?  They belong to Sun.  They are

11  Sun's work.

12  Q.   You are talking about the libraries.  How do you know

13  you're referring to the libraries?  What's the context of the

14  e-mail that causes you to believe that?

15  A.   I mean, java.lang is the class libraries.  We weren't

16  talking about the virtual machine.

17  Q.   Okay.  Now, could we go on to Exhibit 331.

18       Did you present a series of deals, Mr. Rubin, to the

19  executive management group at Google?  That's a bad question.

20  I'll withdraw it.

21       Along the way of your discussions with Sun, were

22  there various presentations that you made to get approval to

23  make the next offer?

24  A.   Yeah.  I mean, during the course of the discussions with

25  Sun, which lasted, you know, for almost two years, we ebbed and

1  flowed throughout that conversation.  And I would present kind

2  of the status to my -- to my management.

3  Q.   And I want to show you Exhibit 331, and ask you whether

4  you recognize that.

5  A.   Yes, I recognize that.

6  Q.   What is it?

7  A.   This is a template for an agreement that we present to

8  management, that basically seeks approval for large capital

9  expenditures.  If we are going to spend a bunch of money

10 acquiring a technology, this is the form that we use to present

11 it and get approval for it.

12 Q.   And were you involved in preparing Exhibit 331?

13 A.   Yes, I believe myself and my teammates helped prepare

14 this.

15         MR. VAN NEST:  I'll offer 331 in evidence, Your

16 Honor.

17         MR. BOIES:  Objection, Your Honor.  Hearsay.

18         THE COURT:  May I see the document?

19         MR. VAN NEST:  Your Honor, this is a proposal to the

20 EMG.  It's the same as the many, many, many of these we've

21 already seen in evidence.

22         MR. BOIES:  Your Honor, I'm not sure that this is a

23 proposal to the EMG.  This looks, from the first page, to be a

24 draft sent to a variety of people who are not on the EMG.

25         THE COURT:  Well, we will lay more foundation for

 1   this document.  There's a lot of material in here, and I would

 2   rather have the witness testify firsthand to what he can

 3   remember.  And, at the end of that, we'll decide how much of

 4   this, if any, comes into evidence.

 5           I'm speaking about 331.  But I think it's best to

 6   find out from the witness what he remembers firsthand having

 7   occurred, without moving the document into evidence.  Maybe it

 8   will come in eventually.

 9           **MR. VAN NEST:**  Fair enough.

10           **THE COURT:**  For the time being, it's sustained.

11           **MR. VAN NEST:**  Fair enough.

12   BY MR. VAN NEST:

13   Q.   Was there -- were there -- in the spring, say March and

14   April, Mr. Rubin, of 2006, were you still presenting to the

15   EMG, the management group, various proposals with Sun?

16   A.   Yes, I was.

17   Q.   And can you just give us a general description of what the

18   major components of those were by the time of the spring.

19   A.   Sure.  You know, they kind of went in rapid fire

20   succession.  So they are a little blurry which was which.

21           But the general theme was, initially, getting

22   approval for an expenditure to pay Sun to open source their

23   Java technology as part of the Android platform.

24   Q.   And under that scenario, would Sun be providing technology

25   to Google?

1  **A.**   It would be providing technology to Google and then, in

2  turn, this open source community once it got open sourced.

3  **Q.**   And what would Google be providing?  Would Google be

4  providing technology of its own?

5  **A.**   We would also contribute technology into the platform, as

6  well as we would pay Sun money to -- for them to make their

7  contribution.

8  **Q.**   Okay.  And various of these proposals reflect payment of

9  money to Sun.  Why was -- why was Google paying money to Sun if

10  the whole thing was going to be open sourced?

11  **A.**   They -- normally, you know, open source wasn't part of

12  their business.  They hadn't considered it, as far as I could

13  tell, before we started talking to them.

14        So what we're asking them to do is basically change

15  their business model.

16  **Q.**   And what -- what would that have involved?

17  **A.**   That would have involved finding other ways to make money,

18  rather than just licensing Java.

19        So what we were trying to do with the payment was,

20  you know, give them some time to find alternative ways to build

21  a business.

22  **Q.**   Can you recall, approximately, the dollars involved?

23  We're now in the spring of 2006.  How large a payment are we

24  talking about?

25  **A.**   I think it was somewhere between 28 and $34 million.

1   Q.   And did you, at some point, get a approval for a 28- to

2   $34 million proposal to Sun?

3   A.   Yes.  I think I got, you know, a kind of okay to proceed

4   to the next level of negotiation.

5   Q.   If you could take just a minute, now, to look at Exhibit

6   331, does this appear to be one of the presentations that was

7   made along the way to the executive management committee

8   sometime in the spring of 2006?

9   A.   Uhm, yes, this would be one of the those presentations?

10  Q.   Was there a whole series of these?

11  A.   I think we did several iterations of this, yes.

12  Q.   Sure.  As the deal went along, the proposals changed.

13          Does this appear to be your work or the work of your

14  team?

15  A.   Yes, it is.

16          MR. VAN NEST:  I would offer 331 in evidence, Your

17  Honor.

18          MR. BOIES:  I still object to the document.  The

19  witness has testified to his recollection.

20          THE COURT:  Sustain the hearsay objection.  It is

21  hearsay.  Possibly, we'll come back to it later.

22  BY MR. VAN NEST:

23  Q.   Now, Mr. Rubin, did -- were Google and Sun able to reach

24  agreement on this partnership proposal that you had been

25  making?

1  **A.**    Uhm, we were close at times but, ultimately, we weren't

2  able to agree on terms.

3  **Q.**    And what was it that caused the disagreement?  How come

4  you never reached an agreement?

5  **A.**    Well, I mean, we were trying to build this open platform.

6  We were trying to get as many people, you know, into smart

7  phones as possible.  We thought it would be good for the world

8  to do that.

9          What we couldn't agree on is kind of the definition

10  of "open."  If you open something up and give it away for free,

11  you have to kind of let it go.  You can't continue to try to

12  charge money for it and try to, you know, control it.

13          So I think all the areas that we had disagreements

14  were about control.  We wanted to give up control and just have

15  it flourish in the open.  And I think Sun had, you know,

16  mechanisms to exert control.

17  **Q.**    And approximately when in the timeline did the

18  negotiations with Sun end?

19  **A.**    Uhm, I believe it was, you know, sometime in late 2006 or

20  early 2007.

21  **Q.**    And, at that time, at that point, did you have to take the

22  Android project in a different direction?

23  **A.**    Yeah.  I mean, we had always been, you know, developing

24  our clean-room implementation.

25          I was hopeful that we would get to an understanding

1  to do what we wanted to with Sun.  But in the, you know, chance

2  that we didn't, I needed to still come to market.

3           I didn't think there was anything wrong with what we

4  were doing.  So we continued the development of our clean-room

5  implementation.

6  Q.   And let me just step back a minute.  I take it you were

7  the one responsible for getting the Android platform built?

8  A.   Yes.  That was my job.

9  Q.   Head of team.  And you had engineers working on it with

10 you?

11 A.   Yes.

12 Q.   Who are some of the lead engineers that worked on the

13 project?

14 A.   Brian Swetland.  Dan Bornstein.  You know, folks working

15 from applications all the way down to system and operating

16 system.

17 Q.   And did you give them any instructions as to what you

18 wanted them to do in terms of what technology they could use to

19 put into Android?

20 A.   Yes.  I mean, really early on, when we knew we were in

21 discussions with Sun but still, you know, on the business side,

22 but still kind of life had to go on in the advent that we

23 didn't reach a partnership with Sun, you know, the team was

24 creating the clean-room implementation.

25           So we kind of had to separate those two things.  So,

 1    first of all, I led the business discussions while the team

 2    was, you know, in Mountain View, writing the code in the

 3    clean-room implementation.

 4              So we clearly separated who was dealing with Sun and

 5    who was just, you know, creating technology for our clean room.

 6              And, also, we kind of had some rules that we set up.

 7    I told the team specific things that they could do and specific

 8    things they couldn't do.

 9              One of the things they couldn't do is, they couldn't

10    access any Sun proprietary work in order to help them develop

11    the clean-room implementation.  They couldn't download anything

12    from the Sun website that required a click-through license.

13              Those licenses that have a bunch of legalese on the

14    screen, that you click "I agree" at the bottom, I told them

15    they couldn't can't do that.

16              What I told them they could do was use anything that

17    was nonproprietary and already open sourced.

18    Q.   Now, did your team build the Java platform -- excuse me,

19    the Android platform?

20    A.   Uhm, yes, that's what we ended up shipping, is the

21    clean-room implementation of all this.

22    Q.   And does the platform have a whole variety of components

23    to it?

24    A.   Yes.

25    Q.   Is there a visual depiction of that, that's on the Google

1  website today?

2  **A.**    Uhm, yes.  When we open sourced the project, we posted to

3  the website kind of what we call an architectural diagram that

4  reflects all the components of Android.

5  **Q.**    And that Trial Exhibit -- open your book up, if you would;

6  I guess I have to give it to you -- to 2881, and tell me

7  whether you recognize that.

8  **A.**    This exhibit is the architectural diagram that depicts all

9  the components of the Android platform.

10 **Q.**    And was this -- was this created around the time that

11 Android, itself, was launched?

12 **A.**    Yes.

13            **MR. VAN NEST:**  Don't display it to the jury.  I don't

14 think it's in evidence.

15 **BY MR. VAN NEST:**

16 **Q.**    Is it a fairly accurate representation of the Android

17 platform?

18 **A.**    Yes, I believe -- I mean, we wanted it to fit on one page

19 of paper, so there's a lot more to the platform than is

20 depicted here.  But this has all the key components, I would

21 say.

22            **MR. VAN NEST:**  I would offer 2881 in evidence, Your

23 Honor.

24            **MR. BOIES:**  Your Honor, could I ask three or four

25 questions on voir dire?

 1          THE COURT:  Yes.

 2                    DIRECT EXAMINATION

 3  BY MR. BOIES:

 4  Q.   Mr. Rubin, Android was launched in November of 2007,

 5  correct?

 6  A.   We announced in November of 2007.  We didn't make the

 7  product available.

 8  Q.   Was this what was posted in November of 2007?

 9  A.   I believe a version of this was posted at the

10  announcement.

11  Q.   Is this exactly the same as the version that was posted

12  then?

13  A.   I don't know.

14          MR. BOIES:  I would object, Your Honor.

15          MR. VAN NEST:  Well, Your Honor, this is simply to

16  illustrate the elements of the platform.

17          And I'm going to ask the witness to walk through them

18  and just explain what they are and how they work together.

19          I'm not representing that this was identical to what

20  was put on the website in 2007, but it wasn't created for the

21  litigation.  It's been on the website for a long time.  We'll

22  be getting into the dates and times a little bit later.

23          MR. BOIES:  Your Honor, it's hearsay.

24          It may be a demonstrative exhibit, but there's no

25  foundation for this being anything other than something that

PROCEEDINGS 1625

1  was created possibly after the lawsuit was started.

2       **THE COURT:**  It can be used as a demonstrative

3  exhibit.  But if you want to have it in evidence, we need to

4  have more foundation as to when and what it was.  So the

5  objection is sustained until you can figure out better what

6  this document was.

7       **MR. VAN NEST:**  That's fine, Your Honor.  I have it as

8  a demonstrative, and I was going to ask the witness to go

9  through it.  Would this be a good time to start that, or should

10 we take our break?  It's really up to Your Honor.

11      **THE COURT:**  Well, 59 and 53 seconds.

12      (Laughter)

13      **THE COURT:**  So this is not a good time.

14      We're going to break here for the day because I want

15 the jury to know -- because I know by now you already can see

16 how great a deputy clerk, Dawn Toland, is, who sits here

17 quietly keeping this ship running every day.

18      This is her 25th year with the U.S. District Court.

19 And I say this because later on today she's going to be honored

20 at a celebration internally, here at the court.

21      And I just think it's appropriate to say on the

22 record how much we admire her and how lucky the United States

23 is to have such a great employee.

24      So, there we go.

25      (Applause.)

PROCEEDINGS                                          1626

```
 1              THE COURT:  Remember all the admonitions.  We'll see
 2    you back here at 7:30 in the morning.
 3              THE CLERK:  All rise.
 4              (Jury out at 1:00 p.m.)
 5              THE COURT:  All right.  Please be seated.
 6              MR. VAN NEST:  Mr. Rubin, you can step down.  You are
 7    free to go.
 8              THE COURT:  You can step down.
 9              All right.  I have the following time:  Plaintiff has
10    used 780 minutes; defendant 589.  That's my calculation.
11              Another small item of information.  The juror who,
12    Ms. Gallo, who had the issue with her employee now reports that
13    she does not need further assistance.
14              (Laughter)
15              THE COURT:  And that the --
16              MR. BOIES:  Expected that would be the case, Your
17    Honor.
18              (Laughter)
19              THE COURT:  And that she believes this is going to be
20    resolved, but she will get back to us if more is needed.  So,
21    good.
22              And, now, if you have any issues for me I'm all ears.
23    Anything?
24              MR. JACOBS:  Nothing from us, Your Honor.
25              MR. VAN NEST:  Nothing here, Your Honor.
```

```
 1           THE COURT:  Okay.  Who's your next witness going to

 2   be after this?

 3           MR. VAN NEST:  Dan Bornstein.  He's one of the

 4   engineerings that built Dalvik and worked on the platform.

 5           THE COURT:  Are we going to have a witness who -- you

 6   know, we really relied on this thing on the easel.

 7           Are we going to have any more testimony about the

 8   specifics of the name and exactly how someone would write a

 9   program that would call up these words and statements and

10   static and --

11           MR. VAN NEST:  Yes, we are.

12           THE COURT:  -- those things?

13           MR. VAN NEST:  Yes, we are.

14           THE COURT:  Here's the reason I ask, is that

15   Mr. Jacobs has argued very effectively throughout this case

16   that there's this elaborate set of interrelationships in the

17   APIs.  Right?

18           MR. JACOBS:  Oh, yes.  I was going to especially a

19   agree with you "effectively."

20           THE COURT:  I want to hear more about that.  I would

21   like to understand more.  Maybe the jury would.  But for the

22   issues that I have to decide, I would like to hear more about

23   what these interrelationships are and more about how the

24   programmer would actually use the name of the API in calling up

25   where though brackets go.  That kind of thing.
```

PROCEEDINGS                                            1628

```
 1              Are we going to have a witness on that?

 2         MR. BABER:  Absolutely, Your Honor.  Our expert,

 3  Professor Astrachan, who is seated back there -- stand up.  He

 4  will testify towards the end of our case.

 5              That's exactly what he is going to do when he's on

 6  the stand.  He will come down to the easel.  He will actually

 7  write a program.  He will create and write for the jury and for

 8  Your Honor a program, step by step, line by line, starting from

 9  the beginning, where you have to create a class, and how that

10  relates to the language, and how it has to have its own class.

11  And he will walk through it and he will invoke three APIs.

12         THE COURT:  Okay.  And will he do that both for -- in

13  both the Android version and the Java version?

14         MR. BABER:  Well, Your Honor, since the APIs have the

15  same names, it would work in either version.

16         THE COURT:  All right.

17         MR. BABER:  Okay.  When it does the three

18  invocations.

19         THE COURT:  Will he have the declarations in there

20  somewhere?

21         MR. BABER:  The declarations don't go in the code.

22              When you're writing your own program, all he'll put

23  in the code -- for example, here would be "max" and two numbers

24  (indicating).

25         THE COURT:  All right.  At least he will explain why
```

1   you don't need to have the declaration in your own program.

2            MR. BABER:  He absolutely will, Your Honor.

3            THE COURT:  But for the part that's accused here, it

4   does have the declaration.  Right?  I mean, otherwise, my

5   computer wouldn't know what was what.

6            MR. BABER:  Exactly.

7            This is what identifies this as -- this part up here

8   is what identifies this as the implementation of this API So it

9   has to be here so the computer knows, when you ask for this,

10  it's right here (indicating.)

11           THE COURT:  Is there going to be an exhibit that goes

12  with this little writeup?

13           MR. BABER:  Hopefully, Your Honor, Professor

14  Astrachan's handwriting is better than Dr. Bloch's.

15           THE COURT:  His was very good.

16           MR. BABER:  Just like this.

17           THE COURT:  Okay.  What Dr. Bloch did was clear.  I

18  can read it from right here.

19           MR. BABER:  And we will have a whole new set of Magic

20  Markers when Professor Astrachan comes, and a bigger easel so

21  he has more room to write some of the commands.  We'll take

22  care of that.

23           THE COURT:  You'll have to take care of that part of

24  it.

25           MR. BABER:  But there will be an exhibit just like

1  this, when Professor Astrachan is done with it, which will have

2  on it Professor Astrachan's program for -- as you'll find out

3  when he testifies, for performing a specific operation.

4         **THE COURT:**  Great.  Okay.  Mr. Jacobs, I wanted to

5  give you equal time.  What would you like to say?

6         **MR. JACOBS:**  Well, I think your questioning has

7  distilled an important difference, an important technical

8  difference, perhaps of legal significance.

9         When an application programmer is writing an

10  application program, the application programmer needs to use

11  max.

12         When Google implemented the core libraries, they

13  copied in the entire declaration.  That's the first difference.

14         The second difference is that when Google implemented

15  the core libraries, they took the entirety of the structure,

16  sequence and organization illustrated at a very high level by

17  the poster.  Because I don't even think you can find the max

18  method on the poster.  It's down (inaudible) of detail

19  (indicating).

20         When an application programmer writes an application,

21  they don't implement core libraries that follow that structure,

22  sequence and organization.

23         It would be akin -- to go back to my West's keynote

24  analogy, it's akin to a lawyer writing a memo and saying, At

25  keynote 63 you can find the topic of contract formation.

 1   That -- very different from copying that taxonomy into another

 2   book that provides the entire taxonomy and information.

 3            So there are two distinctions I'm drawing.  One is

 4   what words and symbols are necessary for the application

 5   programmer versus what Google copied in creating a set of class

 6   libraries, and how that relates to the structure, sequence and

 7   organization.

 8            And, second, this difference between -- we're using

 9   the terms in a blurry sort of way -- an application programmer

10   may rely on the API.

11            What Google did in copying the class library APIs was

12   copy the class library APIs and implement them and provide

13   class libraries that meet the structure, sequence and

14   organization set forth in the interface definition.

15            **THE COURT:**  Before you respond, I've been working on

16   the jury instructions.  And I always think of something after I

17   leave that I should have asked earlier.

18            And I'm working my way through, trying to figure out,

19   okay, what is it that is the work as a whole?  You know,

20   because both of you say I have to tell the jury what is the

21   work as a whole, right?

22            **MR. BABER:**  Yes, Your Honor.  We believe you do.

23            **MR. JACOBS:**  And we believe you do, as well.

24            **THE COURT:**  So you both want me to figure out what

25   the work as a whole is.

PROCEEDINGS                                              1632

```
 1           And one of the phrases that Mr. Jacobs has used is

 2   "standalone."  And that comes from the decision about the

 3   Hustler Magazine.  And the analogy he gave the other day is,

 4   every advertisement in the magazine is a standalone unit.

 5           So I got to thinking about that.  If it's true that

 6   each API is a standalone unit, then don't we have to analyze

 7   each one of them separately, without regard to how it -- it

 8   ties into the rest of the APIs?

 9           Either they are standalone and work as a whole as the

10   entirety of all the APIs, or they work in a whole as the

11   individual units.  But it seems like you're trying to have it

12   both ways.

13           So you want us to say, the entirety of the 37 and how

14   they fit together in that power -- if you like the West Key

15   system -- is the work.  Right?

16           MR. JACOBS:  Uh-huh.

17           THE COURT:  Okay.

18           MR. JACOBS:  Yes.

19           THE COURT:  But, then, at the same time you want it

20   to say it's each individual page, and each API is also a work.

21   And to me those are a -- a standalone work no less.  So if it

22   stands alone, how can it be tied in with all of these other

23   APIs?

24           I'm sure you've got a great answer for that.  So that

25   occurred to me last night, about 5:00 p.m.  So, what is your
```

```
 1  answer to that?

 2          MR. JACOBS:  First, to state precisely, we're talking

 3  about the 37 packages as a -- as a collection of packages.

 4  That's one definition of the work as a whole.

 5          And then, secondly, each package.  And recall that

 6  each package is itself an extensive set of APIs.  Each package

 7  has multiple methods, interfaces, exceptions, constructors.

 8  And so we're talking about the package level.

 9          So what's happened here, again by analogy, is that

10  Google took several volumes of our West's keynote series, they

11  copied the collection of volumes they chose, which themselves

12  have cross-references to each other.  And when you are in

13  contract formation, go see estoppel.

14          THE COURT:  But then they can't be standalone.  If

15  they don't standalone, then the work as a whole is the larger

16  group if they have all these interrelationships and

17  cross-references.

18          Because how can it standalone if it cross-references?

19          MR. JACOBS:  Because standalone and cross-references

20  are distinct concepts.

21          Standalone means, in this context, can you look at

22  this work and see boundaries around it?  Perhaps from the act

23  of creation.

24          So we know that these packages come from JSRs, and

25  they are created as packages.  That's what happened to
```

PROCEEDINGS                                    1634

 1  java.nio.  We know that the packages themselves have in the

 2  hierarchy a kind of a boundary.

 3          And the fact that within the package there may be

 4  interfaces that are relied on elsewhere, or there may be, if

 5  you will, cross-references between the packages doesn't mean

 6  that they don't have standalone quality.

 7          The same would be true -- I think, actually, the

 8  other analogy that's quite powerful was the document we saw

 9  where -- that Mr. Van Nest sought to put into evidence.

10          And the dispute was whether we are looking at the

11  document and whether the document was there as a whole.  And

12  recall that it had links on it.  And Google is arguing, well,

13  these are just links.  You don't have to go attach the link --

14  attach what you would have found at that date to the document,

15  in order for the document to be a document.

16          And, you know, actually, I think on that case he was

17  probably pretty right.  Because it was just a link.  Had it

18  been an attachment to the original document, then he would have

19  had missing attachments.  But it was just links.

20          The analogy is very close.

21          **MR. BABER:**  Your Honor, may I?

22          Your Honor, just where he ended, I don't see how

23  that's analogous at all because before somebody wrote that

24  e-mail, that e-mail never had been combined with those two

25  links to whatever was on those web pages ever before.  It's a

 1  totally different circumstance.

 2            But back to the Java APIs.

 3        **THE COURT:**  It would be useful on this point, there's

 4  a possible difference between a cross-reference and an

 5  incorporation.

 6        **MR. BABER:**  I agree, Your Honor.  Or dependency.

 7        **THE COURT:**  Westlaw says, for more information on

 8  rule against perpetuities, see volume 2.  That would be one

 9  thing.  But if it said in order to understand, to make this

10  chapter work, you've got to go read another chapter, that's an

11  incorporation.

12            And those are two different things, that it may be

13  that arguably -- I'm going to say arguably in the first case

14  each is standalone.  But in the second case no way it's

15  standalone because you can't understand --

16        **MR. BABER:**  Your Honor --

17        **THE COURT:**  How much evidence is there in the record

18  about the extent -- I'm talking not the lawyer argument -- of

19  the actual witnesses and the documents explaining when a method

20  invokes some other method that -- and requires it to be run?

21            I haven't heard much evidence on that.  I would

22  like -- I'm curious about it.  I've asked about it in the past.

23  I get lawyer argument, but I don't get evidence.  Unless it's

24  in one of these written documents that I -- maybe it's in the

25  book.  You know, that big, thick book.  It's possible it's in

1   that big, thick book and I'll find out about it at the closing

2   argument.

3          **MR. BABER:**  Your honor, our turn is now here, and

4   you're going to hear that from us.  You will get an explanation

5   from Professor Astrachan about all these issues.

6          To go back to the West's analogy, the keynote

7   analogy, imagine, Your Honor, if it was the rule that you

8   couldn't even read the keynotes for estoppel unless you already

9   had open in front of you keynotes for contract.

10         That's how these APIs work.  You cannot use any class

11  in the Java language unless you already have the API for

12  java.lang.class.  You can't do anything on the language without

13  the basic building blocks of the language.

14         Class, object, string.  Those are all in these APIs.

15  And so you literally can't get started, you can't even get to

16  square one without the APIs.

17         And on Mr. Jacobs' point about, well, they are

18  different packages, they come from new JSRs, yes, they do.

19  But, every new JSR builds upon the API packages that are

20  already there, because all the new API packages have to go back

21  to java.lang.

22         If you want to display it on a screen, you have to go

23  back to java.io.  If you want to take it over a network, you

24  have to use what's in java.net.

25         So they are all dependent on the core packages, for

1   sure.

2           So it is not like somebody writes a poem.  A couple

3   of years later they write another poem.  And two years later

4   they write a short story.  And they publish them all together.

5   They are three totally separate works.  They are not related to

6   each other.  That might be a collective work.

7           Here, we have these computer files that all depend on

8   each other and call each other.  And candidly, Your Honor, they

9   not only relate to each other as the API packages, they also

10  relate to the Java compiler, which is part of the work, because

11  the Java compiler has to know these classes so when it comes to

12  it in source code format, it can do the operations and convert

13  it to bytecode.

14          So they act as a whole with the compiler and the Java

15  virtual machine.  The whole thing works together.  You have to

16  have somebody writing in the language, who has access to the

17  APIs, that can then send source code to the compiler, which

18  goes into the virtual machine.  Otherwise, it doesn't work.

19          On the first point that Mr. Jacobs talked to you

20  about, which is, he said, well, Google didn't just take max,

21  Google took the whole thing, java.lang.math.max, with these

22  parameters (indicating).

23          Well, Your Honor, that is the core issue.  If we had

24  taken just max, and we had put it in the package I created

25  yesterday, java.Bruce.math.max, then two things:

```
 1              Anybody who had written any programs in the Java
 2    language in the past, that they wanted to reuse part of, that
 3    called max this wouldn't work.  Because when that program went
 4    to call max, they'd look in java.lang.math.  But we wouldn't
 5    have it there.  We would have it in java.Android.math or
 6    java.Bruce.math.  It would be in the wrong place.  Computer
 7    couldn't find it.
 8              That's number one as to existing code.  It would no
 9    longer be compatible.
10              And as to new code, all these computer scientists and
11    engineers who have been to school and who have memorized many
12    of these APIs, and they're used to writing code, just, boom,
13    max, boom, IO, boom, URL, they know, they have them memorized.
14    It's like the vocabulary words we lawyers use every day.  They
15    would have to go learn a whole new vocabulary.
16              THE COURT:  Well, but the other side would say, in
17    response, yeah, that's what they should -- if you wanted to
18    write your own system, you should have done what these other
19    people did, that use a different -- write your own language and
20    come up with your own code words and names and declarations.
21    And, yeah, people would have to learn it from Java.
22              MR. BABER:  We could have, Your Honor.  But the law
23    gives us the right to use the Java programming language and to
24    use these APIs because they are not protectable.
25              THE COURT:  Well, you say that and maybe you're
```

1 right, but you haven't cited a single decision that says that.

2     **MR. BABER:**  Your Honor, with due respect, I believe

3 the Ninth Circuit law about functional requirements for about

4 compatibility --

5     **THE COURT:**  That's an argument.  That's one step

6 removed.  I understand your argument, but there is no decision

7 on point that says computer languages, not copyrightable.

8     **MR. BABER:**  You are correct.  Absolutely right, your

9 Honor, and I think I know why that is, but...

10     **THE COURT:**  Why is that?

11     **MR. BABER:**  I think, frankly, because in the computer

12 science industry in the United States, it has been accepted

13 since computers began that API specs are open for everyone to

14 use.

15     And something else you'll hear from Professor

16 Astrachan, just to give you a sneak preview, APIs are not

17 unique or new to the Java language.  Every part of your

18 computer has to talk to every other part, which means whoever

19 made the chips, whoever made all the programs, whoever made the

20 hard drive, whoever made the monitor, every component of your

21 computer has APIs that allow it to talk to all the other parts.

22     The only way we have computers nowadays is because

23 everybody knows all these APIs, so that your computer knows how

24 to talk to his monitor and then can talk to his printer and it

25 can all work together.  That's all APIs.

PROCEEDINGS                                               1640

```
 1          APIs are not just a language programming concept.

 2   They are the nuts and bolts of how computer systems work, both

 3   hardware and software.

 4          And the issue of API specs not being available for

 5   others to use and to create their own implementation of,

 6   candidly, would be a substantial departure from the practice in

 7   the engineering industry.  You heard that from Dr. Schmidt this

 8   morning on the stand.  You heard it from others; that this is

 9   how the engineering in the computer science world has worked.

10          And that's why, candidly, I don't think there has

11   been any dispute, because no one has ever tried to protect a

12   programming language.  No one was ever tried to claim, "Well,

13   I own just the specs for the API.  You're not using my source

14   code, but just the specs."

15          Now, there are situations -- and I have been involved

16   in prior litigation -- where companies do have proprietary

17   APIs.  Let's say you're a bank and you want internally, within

18   your system, to have APIs that allow things to talk to each

19   other, but it's very confidential.  Lots of financial

20   information.  You never publish the specs for that API.

21   Employees who have access to it are under confidentiality

22   agreements.  You don't let it go outside the company because

23   once you let it out, anybody else can get their hands on it and

24   write some code that allows them to access your stuff.

25          So unless you keep it proprietary and protect it
```

 1  basically through trade secret law, you cannot through

 2  copyright claim that someone who has just taken the idea that

 3  this path will somehow perform a function for you, that's --

 4  you can't get there on copyright because that's idea versus

 5  expression.

 6          **THE COURT:**  If you had a website and you wrote a poem

 7  and stuck it on the website so the public could see it and put

 8  a little copyright symbol up there, that could be copyrighted.

 9          **MR. BABER:**  Absolutely.

10          **THE COURT:**  So if they want to copyright it -- if

11  they want to put their APIs up and put a symbol on it, why

12  can't that be copyrighted?

13          **MR. BABER:**  Because, first of all, APIs are not

14  poems.  Poems are creative works that are not subject to all

15  of the technical doctrines of copyrightability.  No one would

16  ever claim that a poem is a method of operation.  No one would

17  ever --

18          **THE COURT:**  Okay.  It's your 102(b) argument.

19          **MR. BABER:**  Well, 102(b) on its face, but then also

20  other doctrines we've cited to your Honor that are constrains

21  on copyrightability.

22          The Ninth Circuit, they cited 102(b) when they talked

23  about functional requirements for compatibility, but they

24  didn't say, "Well, we're adding a new category to 102(b)."

25  They said, "This is like 102(b)."  And the same with merger

1    and scenes a faire.

2            **THE COURT:**  The Court of Appeals for our circuit, in

3    the decision that Mr. Jacobs likes -- I've forgotten the name

4    of it.

5            **MR. JACOBS:**  *Johnson Controls.*

6            **THE COURT:**  Yes, *Johnson Controls.*

7            (Continuing) -- does say that the Structure, Sequence

8    and Organization is subject to, of a computer program, at least

9    on the facts of that case and on a preliminary injunction

10   standard was copyrightable.

11           **MR. BABER:**  It did.

12           **THE COURT:**  So 102(b), there's got to be some

13   balancing of that against 102(b).  It's not --

14           **MR. BABER:**  I think there is, your Honor.  I think

15   there is a way to harmonize that.  I'm happy to explain.

16           **THE COURT:**  Let's not do it now.

17           But I need to say to you what I've said to

18   Mr. Jacobs, and that is, you know, you make all these

19   statements about how it works in the industry and proprietary

20   and trade secrets and it could all be completely true, but if

21   that's not in the record, it's not going to count for purposes

22   of making a decision.  So take care to put in the sworn record

23   whatever it is that you need to rely upon.

24           **MR. BABER:**  I understand, your Honor.

25           **THE COURT:**  Okay.

PROCEEDINGS                    1643

1            MR. VAN NEST:  Thank you, your Honor.

2            THE COURT:  See you tomorrow, 7:30.

3            (Whereupon at 1:23 p.m. further proceedings

4             in the above-entitled cause was adjourned

5             until Wednesday, April 25, 2012 7:30 a.m.)

6

7                         -   -   -   -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# E X H I B I T S

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 1066 | 1400 | 7 | | |
| 106 | 1400 | 7 | | |
| 34, 278, 298, 387 | | | 1402 | 7 |
| 538, 1048 | | | 1402 | 7 |
| 207 | | | 1425 | 7 |
| 214 | | | 1425 | 7 |
| 215 | | | 1426 | 7 |
| 216 | | | 1426 | 7 |
| 217 | | | 1427 | 7 |
| 221 | | | 1427 | 7 |
| 223 | | | 1428 | 7 |
| 230 | | | 1428 | 7 |
| 273, 382, 389, 431, 433, 438 | | | 1429 | 7 |
| 618, 619 | | | 1429 | 7 |
| 1002, 1044, 1050, 1051, 1060 | | | 1429 | 7 |
| 3443 | | | 1429 | 7 |
| 1061 | | | 1430 | 7 |
| 205 | | | 1488 | 7 |
| 435 | | | 1492 | 7 |
| 2372 | | | 1497 | 7 |
| 3441 | | | 1510 | 7 |
| 3466 | | | 1523 | 7 |
| 406 | | | 1562 | 7 |

-   -   -

## I N D E X

**PLAINTIFF'S WITNESSES**                          **PAGE**    **VOL.**

**RUBIN, ANDY**
(PREVIOUSLY SWORN)                                 1424       7
Direct Examination Resumed by Mr. Boies            1424       7


**SCHMIDT, ERIC**
(SWORN)                                            1454       7
Direct Examination by Mr. Boies                    1454       7


                       -   -   -


**DEFENDANT'S WITNESSES**                          **PAGE**    **VOL.**

**SCHMIDT, ERIC**
(PREVIOUSLY SWORN)                                 1470       7
Direct Examination by Mr. Van Nest                 1470       7
Cross Examination by Mr. Boies                     1537       7
Redirect Examination by Mr. Van Nest               1562       7
Recross Examination Resumed by Mr. Boies           1578       7



**RUBIN, ANDY**
(PREVIOUSLY SWORN)
Direct Examination by Mr. Van Nest                 1583       7
Voir Dire by Mr. Boies                             1624       7


                       -   -   -   -

### CERTIFICATE OF REPORTERS

We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS,
Official Reporters for the United States Court, Northern
District of California, hereby certify that the foregoing
proceedings in C 10-3561 WHA, **Oracle America, Inc., vs. Google,
Inc.,** were reported by us, certified shorthand reporters, and
were thereafter transcribed under our direction into
typewriting; that the foregoing is a full, complete and true
record of said proceedings at the time of filing.


_____
/s/ Katherine Powell Sullivan


Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter



_____
/s/ Debra L. Pas

Debra L. Pas, CSR #11916, RMR CRR



Tuesday, April 24, 2012