# EXHIBIT B

Attorneys' Eyes Only

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                SAN FRANCISCO DIVISION

 4

 5    ORACLE AMERICA, INC.,          )

 6          Plaintiff,               )

 7       vs.                         )   No. CV 10-03561 WHA

 8    GOOGLE, INC.,                  )

 9          Defendant.               )

10    _____)

11

12

13

14              -- ATTORNEYS' EYES ONLY --

15

16       Videotaped deposition of ADITYA KUMAR AGARWAL,

17       taken at the law offices of King & Spalding LLP,

18       333 Twin Dolphin Drive, Redwood Shores,

19       California, commencing at 9:31 a.m.,

20       Friday, April 8, 2011, before Leslie Rockwood,

21       RPR, CSR No. 3462.

22

23

24

25    PAGES 1 - 117
```

                                              Page 1

1     he had with counsel, he can answer it.

2              MS. RUTHERFORD:  Okay.  All right.

3         Q.  What is your response to the question?

4         A.  I'm agreeing with Bruce.

5         Q.  You don't understand what a 30(b)(6) witness     09:37:20

6     is?

7         A.  Not more than what Bruce has --

8         Q.  You don't understand that you represent the

9     corporation as a whole?

10        A.  I'll only discuss those things which are not     09:37:29

11    discussed with our counsel team.

12        Q.  Are you prepared here today to speak to the

13    topics before us, which is Google's revenues related to

14    Android, including the identity of each person with

15    knowledge regarding such revenues?                       09:37:49

16        A.  Yes, to the best of my understanding.

17        Q.  Are you also prepared to speak to how Google

18    accounts for Android-related revenues and expenses?

19        A.  Uh-huh.  Yes.

20        Q.  Are you also prepared to speak to all            09:38:01

21    profits, losses, revenues, expenses and costs associated

22    with Android, including those associated with Android

23    market and advertising on Android-related enabled

24    devices?

25        A.  Yes.                                             09:38:13

                                                           Page 10

1        Q.   Uh-huh.

2        A.   I don't do engineering productivity, the

3   third bullet point anymore.  I don't do the fourth bullet

4   point, employ costs analysis, anymore.

5        Q.   Who does those things that you no longer do?        09:47:05

6        A.   Other members of product and engineering

7   finance.

8        Q.   And do you have additional responsibilities

9   now that you've ceded those responsibilities to other

10  members?                                                      09:47:18

11       A.   I'm only focusing all my time and energy on

12  Android.

13       Q.   Okay.  Thank you.

14            MS. RUTHERFORD:  I'm going to mark an article

15  from the Motley Fool, entitled "Does Google Have an          09:47:26

16  Android Revenue Model," as Exhibit 13.

17            (Exhibit 13 marked.)

18       Q.   BY MS. RUTHERFORD:  Now, if you look in the

19  third full paragraph, it says, "Google CEO Eric Schmidt

20  was questioned with regard to Android's -- whether there     09:47:55

21  was a way to measure Android's success.  And he said,

22  'Trust me.  We do.'  When asked if the revenue was enough

23  to support an Android project, Schmidt pointed out

24  Google's ad review revenue model, saying, 'Trust me.  The

25  revenue is large enough to pay for all of the Android        09:48:14

                                                         Page 19

1    activities and a whole bunch more.'"

2          Do you see that?

3          A.   Yes.

4          Q.   Do you know what the basis for that statement

5    is?                                                     09:48:23

6          A.   All -- the basis is Google's ad revenues on

7    Android devices.

8          Q.   Could you explain how Google's ad revenues on

9    Android devices is large enough to pay for all of

10   Android's activities?                                   09:48:37

███    ███    ████████████████████████████████████

███    ████████████████████████████████████████████

███    █████████████████████    ████████████████████

███    ████████████████████    ████████████████████

███    ████████                                          09:48:59

16         Q.   Mr. Schmidt indicates that it pays for the

17   cost of Android's activities and, quote, "a whole bunch

18   more."  Is that your understanding?

19         MR. BABER:  Object to the form.

20         THE WITNESS:  I don't understand what is "a      09:49:24

21   whole bunch more."

22         Q.   BY MS. RUTHERFORD:  Do you understand whether

23   the Google ad revenues on Android devices is sufficient

24   enough to cover both the cost of Androids and have enough

25   money left over to pay for other things or exceed the   09:49:41

Page 20

1    costs?

2         A.  I can only speak about Android.

3         Q.  That's what I'm asking you about.  Do you

4    understand that Google's ad revenue on Android devices is

5    sufficient to both cover the costs of Android related        09:49:55

6    activities and more?

7         A.  I don't know what "more" is.

8         Q.  Does the revenue received from Google's ad

9    revenue on Android devices exceed the costs?

10        A.  Costs for Android?                                  09:50:19

11        Q.  That is correct.

12        A.  It covers for -- costs for Android.

13        Q.  You still have not answered the question.

14   Let's try this again.

15             Per your former CEO as of -- until last week,      09:50:35

16   your CEO Eric Schmidt said that Google's ad revenue, it

17   was large enough to pay for all Android activities and a

18   whole bunch more.

19             So my question to you was whether Google's ad

20   revenue on Android devices exceeded its costs.  And your     09:50:56

21   answer is "yes" or "no"?

22        A.  Google's ad revenues on Android cover for a

23   portion of Android's costs.

24        Q.  So it does not exceed its costs?  Is that

25   your answer?                                                 09:51:13

                                                          Page 21

1          A.  When you say "costs," what exactly do you

2     mean?  What exactly do you mean?

3          Q.  Why don't you define costs for me -- your

4     understanding of costs.

5          A.  My understanding of costs is any cost related          09:51:24

6     to serving off those ads on Android devices.  And yes, we

7     do cover for those costs.

8          Q.  All right.  Thank you.

9          Let's talk about how Google makes its revenue

10    on Android.  This article lists a number of potential          09:51:53

11    revenue sources.  I'd like you to identify for me --

12         A.  Can I take some time to read this article?

13         Q.  Well, the questions are not really based on

14    the article.  They're more abstract.  So if you can just

15    listen to my questions.                                         09:52:07

16         A.  Okay.  So then this is not related to the

17    article?

18         Q.  Just listen to the questions, please.

19              MR. BABER:  No.  I object.  If the witness

20    wants to read the article, I believe he has a right to          09:52:13

21    read the article.

22              MS. RUTHERFORD:  Well, the question is not

23    about to the article.  So let me ask the question.

24              MR. BABER:  The witness is still allowed to

25    read the document you put in front of him, if he desires        09:52:23

Page 22

```
 1      its profits on other mobile devices?

 2             A.  I don't know.

 3             Q.  Now, when you say you don't recall, are you

 4      saying you don't remember or you don't know?

 5             A.  I don't recall if I have done it or any other   10:14:36

 6      person has done it.

 7             Q.  What documents or databases would I need to

 8      look at to identify total revenues for Android?
```

██    ██   ████████

██    ██   ██████████

██    ██   ███

██    ██   ████████████

██    ██   ███████     10:16:20

6    Q.  Well, let's mark as Exhibit 16 -- okay.  Hold

7 on a second.

8      MS. RUTHERFORD:  I can't tell if -- these are

9 just loose copies.  I can't tell where one ends and one

10 begins.     10:16:47

11    Q.  While he's doing that, P&L stands for profit

12 and loss; correct?

13    A.  Yes.

14    Q.  Could you also explain what DTC stands for?

15    A.  Direct to consumer.     10:17:04

16    Q.  Other than Nexus One, did you have any direct

17 to consumer products?

18    A.  No.

██      ██████ ████████

██   ████████████████   ██████

██   ██████████

22      (Exhibit 16 marked.)

23    Q.  BY MS. RUTHERFORD:  Now that you have this

24 document in front of you, do you recall what a P&L

25 archive is?     10:18:02

Page 39

Attorneys' Eyes Only

```
 1              Q.   Who is on the central team?

 2              A.   We usually work with a person named

 3      Danielle Romain.

 4              Q.   Could you spell the last name for the court

 5      reporter, please?                                    10:33:59

 6              A.   R-o-m-a-i-n.

 7              Q.   And you said that the central team that

 8      includes Mr. Romain --

 9              A.   Sorry.  Correction, Ms. Romain.

10              Q.   Oh, Miss Romain.  Sorry.               10:34:11
```

█   ████████████████████████████████

█   ████████████████████████   ████████████████████

█   ███████████

█   █   ██████████████████

█   ██████████████████████   ███████████████████████████   ████

█   ██████████████████████████████████

█   ████   █████████████████████████

█   █   ██████████████████████████████

█   ████

█   █   ███████████████   █████████   ████

█   ██████████████████████████

█   ████

█   █   █████████████████████

█   ██████████████████████████████

█   █   ████████████████                          10:34:59

Page 51

Attorneys' Eyes Only



1

25          Q.   What growth rate do you use when you're          10:36:35

Page 52

Attorneys' Eyes Only

```
1      Ms. Danielle Romain.

2           Q.  Ms. Danielle Romain.  Sorry.

3           A.  And that is the data in this form that we

4      get.

5           Q.  So these inputs come from Danielle Romain?        11:17:42

6           A.  That's right.

7           Q.  And you do not know where she obtains that

8      data from?

9           A.  No.
```

Attorneys' Eyes Only



```
18          Q.  If we turn to page 3 of the document, where

19     it says -- the first line is "Revenue Ads."

20          A.  Uh-huh.                                    11:19:39

21          Q.  DIST, is that distribution?

22          A.  That's right.

23          Q.  And it says, "Plus Organic"?

24          A.  Yes.

25          Q.  Could you explain what "organic" means in   11:19:47
```

Page 76

1          Q.   Would you agree with the statement that no

2     revenue is generated by Android?

3          A.   Android OS is Open Source.  It's free.  Yes,

4     no revenue is generated from Android.



22              MS. RUTHERFORD:  Okay.  I think we're done.

23              THE WITNESS:  Okay.

24              MR. BABER:  We have no questions.

25              THE VIDEOGRAPHER:  This is the end of the          12:37:28

                                                        Page 112

1          REPORTER'S CERTIFICATE

2

3          I certify that the proceedings in the

4    within-titled cause were taken at the time and place

5    herein named; that the proceedings were reported by

6    me, a duly Certified Shorthand Reporter of the State of

7    California authorized to administer oaths and

8    affirmations, and said proceedings were thereafter

9    transcribed into typewriting.

10          I further certify that I am not of counsel or

11   Attorney for either or any of the parties to said

12   Proceedings, not in any way interested in the outcome of

13   the cause named in said proceedings.

14          IN WITNESS WHEREOF, I have hereunto set my hand:

15          April 12, 2011

16

17

18

19

            *Leslie Rockwood*

            LESLIE ROCKWOOD, CSR. NO. 3462

20          Certified Shorthand Reporter

            State of California

21

22

23

24

25

# EXHIBIT D

Highly Confidential - Attorneys' Eyes Only

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5   ORACLE AMERICA, INC.,           )

 6           Plaintiff,             )

 7       vs.                        )      No. CV 10-03561 WHA

 8   GOOGLE, INC.,                   )

 9           Defendant.             )

10   _____)

11

12

13

14       -- HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY--

15

16

17       Videotaped deposition of ALAN J. COX, PH.D.,

18       taken at the law offices of Keker & Van Nest LLP,

19       633 Battery Street, San Francisco, California,

20       commencing at 9:24 a.m., on Wednesday, October 26,

21       2011, before Leslie Rockwood, RPR, CSR No. 3462.

22

23

24

25       PAGES 1 - 306
```

Highly Confidential - Attorneys' Eyes Only

1          Q.   Do you recall who that was?

2          A.   No.

3          Q.   How long did the conversation last?

4          A.   It was about 15, 20 minutes at the most.

5          Q.   And based on your conversation with          10:22:11

6     Mr. Agarwal, are you relying on your conversation with

7     Mr. Agarwal on October 24th in support of any of the

8     opinions that you expect to offer in this case?

9               MR. KWUN:  Objection.  Form.

10              THE WITNESS:  Well, it just provides          10:22:32

11    confirmation of -- contamination of what it I was -- let

12    me put it better.

13              It provides further confirmation that I what

14    did in terms of deducting costs from revenues and

15    calculating the wrongful profits was appropriate.       10:22:49

16         Q.   BY MR. NORTON:  And you had, in your

17    background explanation of what Exhibit 669 was, you said

18    that you had done an allocation of expenses based on your

19    prior conversations with Mr. Agarwal, the pertinent

20    deposition testimony, and your review of the Android P&L.   10:23:07

21              Is that right?

22              MR. KWUN:  Objection.  Form.

23              THE WITNESS:  Let me correct one part of the

24    premise.  I didn't do an allocation.  I just took the

25    expenditures that Google had booked on its P&Ls for       10:23:17

Page 46

Highly Confidential - Attorneys' Eyes Only

1    Android, having determined based on the sources that you

2    cited that it was appropriate to do so.

3         Q.  All right.  So you reached an opinion prior

4    to October 3rd that the allocation of expenses on the

5    Android P&L was appropriate?                        10:23:41

6              THE WITNESS:  Objection.  Form.

7              THE WITNESS:  You keep using the word

8    "allocation," and let me just say as a blanket statement

9    that there was no allocation involved, as far as I could

10   tell.  That these were just bookings of expenditures made   10:23:56

11   on the Android platform.

12        Q.  BY MR. NORTON:  And to reach that conclusion,

13   you looked at the Android P&L, the pertinent depositions,

14   and you had a conversation or conversations with

15   Mr. Agarwal?                                        10:24:11

16        A.  That's correct.

17        Q.  All right.  And when you say "pertinent

18   depositions," which depositions are you referring to?

19        A.  Well, his certainly.

20        Q.  Anyone -- anyone other than Mr. Agarwal?    10:24:20

21        A.  Not -- none that I can recall as I sit here.

22              MR. NORTON:  I think it might be expeditious

23   to take a short break because I'm going to mark a bunch

24   of exhibits, and I won't make you sit here and watch me.

25              THE WITNESS:  Okay.                        10:24:46

                                                        Page  47

Highly Confidential - Attorneys' Eyes Only

1    Mr. Schmidt or anything, but I was retained, as I

2    describe in my report, to calculate damages in this

3    matter as an economist, and I believe I have done that.

4    And I can rely on my own professional training and the

5    methodologies of the discipline to do that.          11:06:44

6          Q.  All right.  And one of the things that you

7    have to do in order to calculate wrongful profits is to

8    determine what expenses are attributable to Android;

9    correct?

10         A.  That's correct.                             11:06:56

11         Q.  All right.  And in order to determine what

12   expenses are attributable to Android, you reviewed the

13   Android P&L; right?

14         A.  Yes.

15         Q.  You spoke to Mr. Agarwal?                   11:07:05

16         A.  Yes.

17         Q.  And you reviewed Mr. Agarwal's deposition

18   transcript?

19         A.  That's correct.

20         Q.  All right.  And it's -- using the standards  11:07:12

21   in your discipline, you believe that that is a sufficient

22   basis for you to determine what the appropriate costs are

23   for Android?

24         A.  Yes.

25         Q.  All right.  Now, you have -- in your stack   11:07:27

Page 69

Highly Confidential - Attorneys' Eyes Only

```
1     there of exhibits, one of them is Exhibit 278 -- I'm

2     sorry.  678.  I'm 400 behind.

3                MR. KWUN:  I don't have a copy of that

4     document.

5                MS. DEARBORN:  (Indicating.)              11:07:45

6        Q.  BY MR. NORTON:  And you also have 679.

7        A.  Yes.

8        Q.  All right.  Let me draw you to 679 first.

9        A.  Okay.

10       Q.  I think 679 is the -- yeah.  There we go.    11:07:54

11               MR. KWUN:  Which one is 679?

12               MR. NORTON:  679 should be the --

13               THE WITNESS:  (Indicating.)

14               MR. KWUN:  Okay.

15       Q.  BY MR. NORTON:  So have you ever seen -- do   11:08:04

16    you recognize Exhibit 679 at all?

17       A.  Yes.

18       Q.  All right.  And what do you recognize it to

19    be?

20       A.  The deposition of Mr. Agarwal.              11:08:12

21       Q.  All right.  And did you read that before you

22    submitted your report?

23       A.  I certainly read parts of it, yes.

24       Q.  All right.  Do you know whether you read the

25    parts that I've handed to you?                     11:08:23
```

Page 70

Highly Confidential - Attorneys' Eyes Only

1          A.   I don't -- I don't recall without reading it.

2          Q.   How did you decide which parts of



11:10:48

Highly Confidential - Attorneys' Eyes Only



11:11:48

Page 72

Highly Confidential - Attorneys' Eyes Only



11:12:41

Page 73

Highly Confidential - Attorneys' Eyes Only



11:13:40

Page 74

Highly Confidential - Attorneys' Eyes Only



```
19          Q.  BY MR. NORTON:  And so the only person at

20   Google that you spoke to to determine whether or not the      11:14:28

21   allocation on the P&L was an appropriate one, that is the

22   manner in which the expenses were booked was an

23   appropriate one, was Mr. Agarwal; correct?

24          A.  Yes.  I spoke with Mr. Agarwal.  I think the

25   first time I spoke with Mr. Agarwal there was somebody       11:14:48
```

Page 75

Highly Confidential - Attorneys' Eyes Only

1    else in the room, but, basically, the discussion was

2    through Mr. Agarwal.

3            Q.  All right.  And in your report the only

4    person you cite in support of the allocation of expenses

5    is Mr. Agarwal; right?                              11:15:00

6            A.  That's -- that's correct, yes.

7            Q.  All right.  And when I asked you in your

8    deposition testimony here today the bases for your

9    conclusion that the allocation was appropriate, the only

10   person that you've ever mentioned is Mr. Agarwal;      11:15:14

11   correct?

12           MR. KWUN:  Objection.  Form.

13           THE WITNESS:  That's correct.  Though, as I

14   said in reference to these notes that we talked about

15   earlier, I did do an additional test that determined to  11:15:23

16   my satisfaction that my original conclusion after those

17   discussions was correct.

18           Q.  BY MR. NORTON:  And your test was to go back

19   and to ask Mr. Agarwal again?

20           A.  Well, I went back and asked Mr. Agarwal      11:15:35

21   again, and he provided me with specific numbers that

22   explained a change in expenditures on engineering.

23           Q.  Now, you also have Exhibit 678 in front of

24   you; right?  Should be the handwritten notes.

25           MR. COOPER:  Are the handwritten notes 678 or    11:16:02

                                                    Page 76

Highly Confidential - Attorneys' Eyes Only

```
 1    679?

 2               MR. NORTON:  I apologize.  679.

 3               MR. KWUN:  679 I was told was the

 4    transcript -- the Agarwal transcript.

 5               THE WITNESS:  That is correct.            11:16:13

 6               MR. NORTON:  All right.  I'll do that again

 7    before the day is out.  679 is the transcript.  678, the

 8    witness actually knows best, but should have the sticker

 9    that says 678.

10               THE WITNESS:  678 are the handwritten notes.  11:16:25

11          Q.  BY MR. NORTON:  Okay.  Thank you.

12               And those are your notes?

13          A.  Yes.

14          Q.  And these are notes of your conversations

15    with Google employees?                                11:16:39

16          A.  Yes.

17          Q.  Are these all of your notes of your

18    conversations with Google employees?

19          A.  They're all the ones that I could find, yes.

20    And there were other interviews where I didn't take   11:16:55

21    notes.

22          Q.  How many times did you interview -- before

23    October 3rd did you interview Mr. Agarwal?

24          A.  At least once.  I'm trying to think if there

25    was a second occasion.  It may have been twice.       11:17:26
```

Page 77

Highly Confidential - Attorneys' Eyes Only

```
 1            Q.  And in Exhibit 678, are there any notes of

 2      any of your conversations with Mr. Agarwal?

 3            A.  I don't believe so, no.

 4            Q.  Were your interviews with Mr. Agarwal prior

 5      to October 3rd in person or by telephone?          11:17:46

 6            A.  By telephone.

 7            Q.  Did any members of your staff participate --

 8      NERA staff participate in that phone call or phone calls?

 9            A.  Yes.  They did.

10            Q.  Did they take notes?                       11:18:03

11            A.  They may have.

12            Q.  Did you direct them to?

13            A.  No.

14            Q.  Did you direct them not to?

15            A.  No.                                        11:18:09

16            Q.  Do you know whether any members of your staff

17      have a practice of keeping notes?

18            A.  Generally, they don't.

19            Q.  Do you know was there a particular person on

20      your staff who participated in your conversations with   11:18:20

21      Mr. Agarwal?

22            A.  No.

23            Q.  All right.  So the three things that you

24      relied on to determine whether the allocation or booking

25      of expenses for Android was appropriate were your        11:18:45
```

Page 78

Highly Confidential - Attorneys' Eyes Only

1   interviews with Mr. Agarwal -- or interview, his

2   deposition testimony and the P&L itself?

3                  MR. KWUN:  Objection.  Form.

4                  THE WITNESS:  Well, I also had some

5   discussion with counsel.  But I didn't rely on that.        11:19:08

6            Q.  BY MR. NORTON:  So the only -- let me ask it

7   a little differently, then.

8                  The only bases you're relying upon to reach

9   your opinion that the allocation of expenses that appears

10  on the Android P&L is an appropriate one, those bases        11:19:20

11  that you're relying on are Mr. Agarwal's deposition

12  testimony, your conversation or conversations with

13  Mr. Agarwal before October 3rd, the P&L itself?

14                 MR. KWUN:  Objection.  Form.

15                 THE WITNESS:  That's -- that's -- so far,      11:19:34

16  that's correct.  I mean, before October 3rd, that's

17  correct.

18           Q.  BY MR. NORTON:  And then on October 24th, you

19  went back to Mr. Agarwal and asked some additional

20  questions to test?                                           11:19:48

21                 MR. KWUN:  Objection.  Form.

22                 THE WITNESS:  That's correct.

23           Q.  BY MR. NORTON:  Okay.  Did you ever ask to

24  speak to someone other than Mr. Agarwal in order to

25  determine the accuracy or correctness of the allocation     11:20:03

Page 79

Highly Confidential - Attorneys' Eyes Only

```
 1    of expenses on the Android P&L?

 2          A.  No.

 3          Q.  Now, the Android P&L that you reviewed, where

 4    did you get it?

 5          A.  I don't recall how we got it.  I just asked      11:20:26

 6    my staff to make sure we got it.  And when we got it,

 7    they pointed me to where it was.

 8          Q.  If you would look at your report -- and

 9    again, let's use the most recent version of it.

10          A.  Okay.                                            11:20:59

11          Q.  That's Exhibit 672.

12          A.  Okay.

13          Q.  And if you would turn to your exhibit --

14          MR. KWUN:  Fred, I don't think 672 has the

15    exhibits.  That's the redline.                             11:21:21

16          MR. NORTON:  Oh, is it the redline?  I

17    apologize.  671.  Thank you, Michael.

18          THE WITNESS:  So we're looking at 671?

19          Q.  BY MR. NORTON:  Yes, which has your exhibits.

20    Exhibit 3B.                                                11:21:43

21          A.  Okay.  Okay.  Got it.

22          Q.  All right.  And that's the profit and loss

23    statements of the Android platform?

24          A.  Yes.

25          Q.  And Item 1 -- or Note 1 under your "Notes and   11:21:55
```

Page 80

Highly Confidential - Attorneys' Eyes Only

```
1    Sources," says, "Android P&L through August 20.xls,

2    received from counsel September 29, 2011."

3         A.  Yes.

4         Q.  All right.  So is that correct, you got the

5    P&L from counsel?                                    11:22:11

6         A.  That's correct.  We did have an earlier

7    version of this, of the P&L.  But the version we used for

8    finishing the full report was based on the transmission

9    that is reported in footnote 1.

10        Q.  And are you relying on the earlier version      11:22:33

11   that you had, or are you relying upon the one that's

12   cited in Exhibit 3B?

13        A.  The one that's cited in 3B.

14        Q.  Okay.  And that's the one that you got from

15   counsel?                                             11:22:44

16        A.  Well, I presume we got the other one from

17   counsel, too.  But yes, we did get that one from counsel.

18        Q.  All right.  And the Android P&L through

19   August 20.xls, that document, is that an audited

20   financial statement?                                11:22:56

21        A.  No.  It's based -- as I understand it, it's a

22   printout of their own internal reporting system -- of

23   Android's internal reporting system.

24        Q.  Now, it has historical data going back a few

25   years; right?                                        11:23:08
```

Page 81

Highly Confidential - Attorneys' Eyes Only

1          A.   Yes.

2          Q.   And are any of the numbers audited numbers?

3          A.   No.  Well, I'll say not that I know of.

4          Q.   Did you look at any other financial documents

5     to -- other than the P&L itself, did you look at any          11:23:41

6     other Google financial documents to verify the accuracy

7     of the booking of expenses on the Android P&L?

8               MR. KWUN:  Objection.  Form.

9               THE WITNESS:  I had it in my mind that I did

10    see something else, but I can't remember what it was.  So     11:24:34

11    basically, the P&Ls are all that I can actually visualize

12    or remember looking at.

13              I will say that P&Ls are the sorts of

14    things -- that I saw, were the sorts of things that were

15    consistent with what I've seen in other companies for         11:24:48

16    their internal reporting of their operations.

17          Q.   BY MR. NORTON:  Did you look at P&Ls for

18    any -- P&Ls for any of Google's other lines of business

19    to see if the P&L you were looking at was consistent with

20    the way Google books expenses in other parts of its          11:25:06

21    business?

22          A.   No.  I don't think I did.

23          Q.   Did anybody tell you you could not do that,

24    if you wanted to?

25          A.   No.                                                11:25:17

                                                          Page 82

Highly Confidential - Attorneys' Eyes Only

```
 1              Q.  In your report at page 30 --

 2              A.  Yes.

 3              Q.  -- where you discuss your five-year -- your

 4     decision to use a five-year period; right?

 5              A.  Yes.                                13:17:58

 6              Q.  And you cite the Bureau of Economic Analysis

 7     in Footnote 111; right?

 8              A.  Yes.

 9              Q.  And then the FASB standard that you cite

10     actually doesn't say anything about five years.  It talks   13:18:10

11     about whether it's a straight line or ratio of current

12     year revenue divided by future expected revenue.

13              A.  Yes.  Yes.

14              Q.  So if you're talking about five years, you're

15     relying on the citation of the Bureau of Economic   13:18:23

16     Analysis; right?

17              A.  And my own introspection on the issue.

18              Q.  All right.  And you're not an accountant;

19     right?

20              A.  Well, this is not an accounting issue.  But   13:18:31

21     no, I'm not.

22              Q.  Well, FASB is an accounting standard; right?

23              A.  Yes.

24              Q.  Okay.  The -- when you say that a five-year

25     amortization period is consistent with prevailing   13:18:52
```

Page 145

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

303

1    STATE OF CALIFORNIA    ) ss:

2    COUNTY OF MARIN        )

3

4              I, LESLIE ROCKWOOD, CSR No. 3462, do hereby

5    certify:

6              That the foregoing deposition testimony was

7    taken before me at the time and place therein set forth

8    and at which time the witness was administered the oath;

9              That testimony of the witness and all

10   objections made by counsel at the time of the examination

11   were recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16             I further certify that I am neither counsel

17   for any party to said action, nor am I related to any

18   party to said action, nor am I in any way interested in

19   the outcome thereof.

20             IN WITNESS WHEREOF, I have subscribed my name

21   this 27th day of October, 2011.

22

23

24

25             LESLIE ROCKWOOD, CSR. NO. 3462

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| _____ ) | |
| ORACLE AMERICA, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:10-CV-03561-WHA |
| ) | |
| GOOGLE, INC. ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

EXPERT REPORT OF
PROFESSOR JAMES R. KEARL

March 21, 2012



**Subject to Protective Order – Highly Confidential**

Expert Report of Professor James R. Kearl

March 21, 2012                                                                                   Charles River Associates

# Table of Contents

I.      Qualifications ................................................................................................................. 4

II.     Assignment .................................................................................................................... 4

III.    Materials Relied Upon .................................................................................................. 6

IV.     Foundational Issues ..................................................................................................... 7

V.      Summary of Opinions ................................................................................................... 9

VI.     Bases for Opinions ..................................................................................................... 11

        A.      Treatment of Technical Issues ........................................................................ 11

        B.      Reasonable Royalty: Methodology .................................................................. 13

        C.      Determination of the Reasonable Royalty Rate Structure .............................. 15

        D.      Determination of the Reasonable Royalty - Overview ..................................... 16

        E.      Expectations Regarding Android in 2006 ........................................................ 19

        F.      Determination of the Likely 2006 Agreement Point ........................................ 22

        G.      Converting the "$100 million" Sun Offer to a Certainty Cash Equivalent ....... 26

        H.      Estimating the 2006 Expected Value of Android Revenues ............................ 32

        I.       Calculation of the Equivalent Percentage Royalty Rate of the February Sun Offer ....... 33

        J.       Evaluation of the Implied Royalty from the Danger-Sun license .................... 34

        K.      Allocation of the 2006 IP Portfolio Value to the Patents in Suit - Theory ...... 37

        L.      Allocation of the 2006 IP Portfolio Value to the Patents in Suit ..................... 42

        M.      Calculation of Past Reasonable Royalty Damages ........................................ 44

        N.      Future Royalty ................................................................................................ 44

        O.      Comparison with the Reasonable Royalty Opinions of Prof. Cockburn and Drs. Leonard
                and Cox ........................................................................................................... 45

        P.      Other Copyright Damages .............................................................................. 46

        Q.      Disgorgement of Infringer's Profits ................................................................. 46

        R.      Lost Profits – Java ME ................................................................................... 50

        S.      Lost Profits – Java FX .................................................................................... 57

VII.    Analysis of the Georgia-Pacific Factors .................................................................... 60

        Appendix A: Resume .................................................................................................. 72

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

**Appendix B: Past Testimony** ..................................................................................... 86

**Appendix C: Materials Relied Upon** ........................................................................... 95

**Appendix D: Group and Value Analysis** .................................................................... 160

**Appendix E: Professor Shugan's Conjoint Analysis** ................................................ 166

I.      **Introduction** ................................................................................................... 166

II.     **Verification of Prof. Shugan's Findings** ....................................................... 166

III.    **Omission of Phone Features that Affect Consumer Demand** ...................... 168
        A.      Importance of omitted features in smartphone purchase decisions ............ 168
        B.      Effects of omitted features on Prof. Shugan's analysis ............................... 171
                1.      Estimates of partworths ..................................................................... 172
                2.      Relative importance calculations ...................................................... 172
                3.      Market share simulations .................................................................. 175

IV.     **Reliability of Survey Responses** ................................................................... 176
        A.      Hypothetical Bias ........................................................................................ 178
        B.      Time spent on instructions page ................................................................. 180
        C.      Time spent on choice questions ................................................................. 181
        D.      Time to complete survey ............................................................................. 184

V.      **Preference Estimation** .................................................................................. 187
        A.      Treatment of the "None" option .................................................................. 188
        B.      Simple logit model ...................................................................................... 189
        C.      Model Fit ...................................................................................................... 190
        D.      Respondent Heterogeneity Not Captured by Prof. Shugan's Choice Model ............... 194

VI.     **Inconsistencies with Economic Theory** ........................................................ 195
        A.      Sensitivity Analysis that Addresses Estimated Preferences that are Inconsistent with Economic Theory ............... 197
        B.      Legitimate Explanations for the Apparent Inconsistencies ......................... 197
        C.      Accounting for Noise around Estimated Utilities .......................................... 199

VII.    **Value of Application Availability in Comparison to Value of Application Startup Time** .. 199
        A.      Prof. Shugan's relative importance calculations ......................................... 201

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

  B.    Disconnect between relative importance estimates and values for APIs and patents . 201

  C.    Alternate relative importance calculations ................................................................ 202

VIII. Market Simulation ............................................................................................................ 205

IX.   Conclusion ......................................................................................................................... 206

Appendix F: Econometrics ........................................................................................................ 213

I.    Introduction ...................................................................................................................... 213

II.   Econometric Model Methodology Overview ................................................................. 214

III.  The Econometric Model .................................................................................................. 215

  A.    The Data ....................................................................................................................... 215

  B.    The Model .................................................................................................................... 216

  C.    Model Estimation ......................................................................................................... 217

  D.    The Patents, the Copyrights, and the Data ................................................................... 219

  E.    Data and Model Specification Issues ........................................................................... 221

  F.    An Enhanced Model ..................................................................................................... 234

IV.   Conclusion ......................................................................................................................... 236

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

## I.      Qualifications

1.  I am currently the A.O. Smoot Professor of Economics at Brigham Young University

    (BYU) and a Senior Consultant with Charles River Associates, a firm that provides expert

    analysis, litigation support, and business consulting in sophisticated matters involving

    economics and finance.  I received my Ph.D. in Economics from the Massachusetts Insti-

    tute of Technology in 1975 and completed postdoctoral studies in law and economics at

    the Harvard Law School in 1979.  I have been a member of the Economics Department

    at BYU since 1975.  Prior to that time I was a teaching fellow at Harvard University.  From

    1978 to 1983, I held a joint appointment in the Economics Department and J. Reuben

    Clark Law School at BYU.  Over the past 30 years, I have taught courses in the Princi-

    ples of Economics, Microeconomic Theory, Applied Microeconomics, Industrial Organiza-

    tion, Economics of Antitrust and Regulation, Applied Welfare Economics, International

    Trade, International Trade Policy, and Law and Economics.  I have also team taught

    courses at BYU's J. Reuben Clark Law School in Antitrust Law, Regulatory and Adminis-

    trative Law, and International Trade Law and Regulation.  In addition, I have lectured for

    the U.S. Government in a number of countries on the Economics of U.S. Trade Policy,

    Law and Economics, and the Economics of U.S. Antitrust Laws.  I have also taught

    courses on the same topics at the Republic of China's Professional Training Center and

    at its Land Development Institute.  My curriculum vita is attached to this report as Appen-

    dix A.  A list of testimony provided during the past four years is attached to this report as

    Appendix B.  My hourly billing rate for this assignment is $565 hour.

## II.      Assignment

2.  I have been retained by the Court, per Judge William Alsup's order of September 9, 2011

    to a) independently critique the damages reports submitted by each party, b) provide my

    assessment of any or all issues raised or presented in the damages reports of the par-

Expert Report of Professor James R. Kearl

March 21, 2012                                                              Charles River Associates

___

ties, and c) address each additional issue I believe should be evaluated in order to pro-

vide the jury with a complete and independent view of damages in this case.[1] In carrying

out my assignment, I have reviewed and evaluated the analyses and reports of Profs.

Iain M. Cockburn and Stephen M. Shugan, and Drs. Gregory K. Leonard and Alan J.

Cox.

3.   Prof. Cockburn estimates damages for both patent and copyright infringement.[2] His pa-

tent and copyright infringement damages analysis relies, in part, on work done by Prof.

Shugan.[3] Dr. Leonard has critiqued Prof. Cockburn's patent infringement damages anal-

ysis, but he has also critiqued Professor Shugan's work upon which Prof. Cockburn relies

in estimating copyright infringement damages.[4] Dr. Cox, relying in part on Dr. Leonard's

critique of Prof. Shugan, has critiqued Prof. Cockburn's copyright infringement damages.[5]

---

[1] Order Re Rule 706 Expert, dated September 9, 2011.

[2] Expert Report of Prof. Cockburn 5/20/2011;

Second Expert Report of Prof. Cockburn 9/12/2011, revised 9/15/2011;

Third Expert Report of Prof. Cockburn 2/3/2012, revised 2/8/2012;

Cockburn Reply Report to Dr. Leonard 10/10/2011;

Cockburn Reply Report to Dr. Cox 10/10/2011;

Cockburn Declaration ISO Oracle Motion to Strike Portions of Gregory Leonard Supp 2/24/2012;

Cockburn Declaration ISO Oracle Opposition to Google Motion to Strike 2/24/2012.

[3] Expert Report of Dr Shugan 9/12/2011;

Shugan Reply Report to Dr. Leonard 9/28/2011;

Shugan Declaration ISO Mtn to Exclude Portions of Cox & Leonard 10/21/11;

Shugan Declaration ISO reply ISO Mtn to Strike Leonard & Cox 11/1/2011;

Shugan Declaration ISO Opposition to Google Third Daubert Motion 2/24/2012

[4] Expert Report of Dr. Leonard 10/3/2011, revised 10/24/2011;

Supplemental Expert Report of Dr. Leonard 2/17/2012;

Leonard Declaration 6/14/2011;

Leonard Declaration ISO Google Opp to Mot to Exclude Portions of Cox & Leonard Report 10/28/2011;

Leonard Declaration ISO Google Opp to Mot to Exclude Leonard Supplemental 3/2/2012

[5] Expert Report of Dr. Cox 10/3/2011, revised 10/21/2011, revised 11/28/2011;

Supplemental  Expert Report of Dr. Cox 2/17/2012

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

4.  I assume for purposes of my analyses that Google has been found to have infringed one or more in-suit patents and/or the in-suit copyrights.

5.  I have no expertise in the law, in the engineering and technical aspects of this intellectual property in this case, or in resolving factual disputes. As such, I have tried to be very careful with regard to differences between Profs. Cockburn and Shugan, and Drs. Leonard and Cox that may turn on technical or factual disputes where economic principles or analysis provide little or no insight and have tried, in so far as possible, to focus on those areas where economic analysis provides assistance to the Court.

## III.    Materials Relied Upon

6.  Typically, an expert witness works closely with the counsel for the party who retained him. This is helpful because an expert can rely on the party's counsel to provide evidence, either supportive or not, from the record relevant to his opinions. Since I was retained by the Court and not Google or Oracle, my ability to access the voluminous record in this case is more limited. I have assumed that because of the adversarial nature of litigation, however, all of the material in this voluminous record directly relevant to damages is contained in the experts' original, rebuttal and reply reports, revisions of reports, deposition testimony and deposition exhibits. Hence, the universe of discovery materials with which I've worked is the documents, deposition testimony and evidence cited in the technical and damages expert reports filed in this matter, backup materials for the analyses incorporated in these reports including data collected by the experts, exhibits introduced at the depositions of experts, and the deposition testimony of the experts. I have also had the unusual privilege of holding off-the-record discussions with the parties' damages and technical experts.

7.  I have also relied on data, computer code and Excel worksheets provided by Prof. Cockburn and computer code provided by Dr. Leonard to implement and test their regression

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

and follow-on analyses. Likewise, I have relied on data provided by Prof. Shugan, and

the Sawtooth conjoint analysis computer program on which he relied, to replicate and test

the assumptions in his analysis. Details regarding my work in these areas are in the ap-

pendices of this report

8.   I have also conducted independent research into some economic issues that are relevant

to issues in suit. Appendix C lists the materials available to me from the parties, as well

as the materials I have independently gathered. I have cited to materials specifically re-

lied upon in the footnotes of this report.

## IV.     Foundational Issues

9.   Oracle asserts that the Google Android operating system infringes two Oracle patents

(patents '104 and '520) and certain Oracle copyrights. While there are other copyrights at

issue, I focus my attention on the 37 API copyrights that Oracle alleges to be infringed by

Android.

10.  When patents are infringed, a Plaintiff is entitled to recover damages that are no less

than a reasonable royalty. When copyrights are infringed, a Plaintiff may also be entitled

to recover damages that are no less than a reasonable royalty, although damages for

copyright infringement may also be estimated based on the Defendant's profits and, to

the degree that there is no double counting, the Plaintiff's lost profits.

11.  With regard damages for infringement of one or more of the in-suit patents, Oracle is

seeking a reasonable royalty. With regard to damages for infringement of the in-suit cop-

yrights, Oracle is seeking a lost profits-related measure of damages or, in the alternative,

a lost license fee (essentially a reasonable royalty).  Oracle also claims disgorgement of

infringer's profits.

12.  I understand a reasonable royalty to be the royalty that would have been the outcome of

a licensing negotiation between Sun and Google at the time that infringement began,

Expert Report of Professor James R. Kearl

March 21, 2012                                                                   Charles River Associates

where both are willing participants and both understand that the in-suit patents and copyrights to be licensed are valid and enforceable.

13. The seminal case with regard to a patent infringement reasonable royalty determination in the framework of a hypothetical negotiation is *Georgia-Pacific Corp. v. U.S. Plywood Corp.*[6] I discuss the *Georgia-Pacific* in Section VII.

14. Judge Alsup has indicated that "a reasonable royalty typically is determined from the 'hypothetical results of hypothetical negotiations between the patentee and infringer (both hypothetically willing) at the time infringement began.' *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996). 'This hypothetical construct seeks the percentage of sales or profit likely to have induced the hypothetical negotiators to license use of the invention.' *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir.1996)."

15. He further indicated that "Courts frequently allow experts to calculate a reasonable royalty percentage based on the value of the patents-in-suit to the infringer's revenue from the accused products. But in those cases, the next step is for the expert to calculate a reasonable royalty amount by multiplying the *infringer's revenues* and the reasonable royalty rate. *See, e.g.*, *Finjan Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1208–1211 (Fed. Cir. 2010)"[7]

16. This guidance informs my approach to damages in this matter.

17. I understand that a copyright owner alleging infringement can claim as damages its actual losses, as well as (to the extent not taken into account in an award for actual losses) the infringers wrongful profits.  Actual losses may be calculated as a lost license fee, akin to the reasonable royalty damages for patent infringement damages.  In this matter, Ora-

---

6 318 F. Supp. 1116, 1119-20 (S.D.N.Y. 1970), modified and aff'd, 446 F.2d 295 (2d Cir.); approved by the Federal Circuit in Unisplay, S.A. v. American Electronic Sign Co., Inc., 69 F.3d 512, 517 n.7 (Fed. Cir. 1995).

7 Tentative Order Granting in Part and Denying in Part Google's Motion in Limine #3 to Exclude Portions of Dr. Cockburn's Revised Damages Report 12/6/2011

Expert Report of Professor James R. Kearl

March 21, 2012                                                                Charles River Associates

cle claims a lost license fee based damage for the alleged copyright infringement.  Thus, the guidance above regarding reasonable royalty also guides my copyright damages analysis.

## V.        Summary of Opinions

18.  I conclude that the reasonable royalty negotiated between Sun and Google for use of the in-suit patents and copyrights would be a percentage of revenue royalty (or, equivalently, a per unit royalty), for a perpetual irrevocable license to the Sun Java ME intellectual property.

19.  The reasonably royalty rate to which the parties would likely have agreed can be derived by calculation of the certainty cash equivalent value to both Sun and Google from the joint project that was contemplated in the 2006 negotiations between Sun and Google.

20.  Those 2006 negotiations indicate that Sun expected to receive approximately ▆▆▆ of the joint project benefits, while Google expected to receive approximately ▆▆▆ of the bene-fits.  Thus, I conclude the reasonable royalty for the total "2006 portfolio" of Java ME pa-tents and copyrights is ▆▆▆ of Android advertising revenues, or approximately ▆▆▆ per handset.

21.  

22.  There are good economic reasons that the above royalty rate should apply to the in-suit patents and copyrights, with no apportionment.

23.  To the degree that the above royalty rate needs to be apportioned to the in-suit patents and copyrights, the Group and Value approach proposed by Prof. Cockburn provides a reliable method to accomplish this apportionment.  However, analysis of a broader group of patent value studies indicates that the percentage of total patent portfolio value repre-

Expert Report of Professor James R. Kearl

March 21, 2012                                                              Charles River Associates

sented by the top 3.9% of patents in a portfolio is more likely to be approximately 53%, rather than the 77.1% estimated by Prof. Cockburn.[8]

24. The Shugan Conjoint analysis, as well as my revisions to the Cockburn Econometric analysis indicates the in-suit patents are worth approximately 80% of the value of the in-suit speed patent (the '104 patent).

25. Applying these apportionment ratios I conclude that the apportioned reasonable royalty for the '104 patent is ▮▮▮▮ of Android revenues, the apportioned reasonable royalty for the '520 patent is ▮▮▮▮ of Android revenues, and the apportioned reasonable royalty for the in suit copyrights is ▮▮▮▮ of Android revenues.

26. If apportionment is required then these percentages should be applied to Google's gross Android revenues through the date of trial to determine damages.

27. If apportionment is required then these percentages should be used as the going-forward royalty rates to be applied to Google's future Android revenues.

28. The measure of infringer's profits subject to potential disgorgement is approximately ▮▮▮▮ ▮▮▮▮, through 2011.

29. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

31. The Shugan Conjoint analysis provides generally useful and reliable estimates of the relative value of the smartphone attributes that were included in the survey.  As such, it also provides useful and reliable estimates of the relative value of these included phone attributes.  The survey did not include some apparently important phone attributes.  Thus,

---

[8] Third Cockburn Report, Exhibit 34

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

the market share estimates produced by the Conjoint analysis may be biased.  I am una-
ble to determine the direction and extent of that potential bias.

32. The Cockburn econometric analysis provides generally useful and reliable estimates of
the consumer Willingness to Pay for increased speed and an increased number of appli-
cations.  The estimated Willingness to Pay for these phone characteristics is non-trivial,
and indicates that the values of the in-suit patents and copyrights are non-trivial (assum-
ing that Oracle's contentions about the performance improvements enabled by the in-suit
patents and copyrights are correct).

## VI.      Bases for Opinions

### A.  Treatment of Technical Issues

33. The value of the patents and copyrights in suit is a function of (i) the improved perfor-
mance that the use of the patents and copyrights confers on Android over the next best
available non-infringing substitute; and, (ii) the value that end users of Android place on
these performance improvements. While economists are well equipped to analyze (ii),
they are not generally equipped to analyze, estimate or opine on (i). This is particularly
true in this case where the product (Android), and the technical impacts and performance
effects of the patents/copyrights on the product, are very complex. As an economist, I
have to adopt assumptions about technical issues such as these, and base my opinions
upon those technical assumptions.

34. Oracle has performed tests and offered estimates of the performance improvements
made possible by the use of the patents and copyrights by Android. While Google dis-
putes these estimates, it has not offered tests and estimates of its own. I am not in a po-
sition to evaluate the reliability of the Oracle tests and estimates, or the Google critiques
of the technical aspects of these tests and estimates. Since Google has not offered alter-

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

___

native estimates of the performance impacts, if any, of the in-suit patents and copyrights, however, in what follows I base my analysis on the Oracle's estimates of the performance improvements. If Google presents alternative estimates of performance effects, I may incorporate those estimates into my analysis.

35.  Speaking broadly, Oracle asserts the patents in suit confer large performance advantages (in particular large speed advantages) over the next best non-infringing substitutes. Similarly Oracle asserts that the alleged infringement of the copyrights in suit lead to a large increase in the number of applications available on the Android platform. There appears to be good evidence that consumers and OEMs, as well as Google, placed value on both the speed of the Android operating system and on the number of applications available on the Android platform.[9]  Thus, as a general matter, *if* the jury finds that the in suit patents and/or copyrights allowed Android to be significantly faster and/or to have a greater number of applications than it otherwise would have had, I would advise the jury that these patents and copyrights have a high value. Moreover, as discussed herein, I believe the econometric and conjoint analyses employed by Prof. Cockburn provide useful – although far from perfect – measures of the value to consumers of attributes such as increased speed and increased availability of applications.

36.  Conversely, *if* the jury finds that, absent infringement, Android would have been almost as fast and have almost as many applications (either because the patents and copyrights do not allow significantly increased performance or because good non-infringing substitutes exist), then I would advise the jury that the value of these patents and copyrights is relatively small.[10]   In this instance, I still believe that the measurements of the value con-

___

9 This evidence is discussed in the Georgia-Pacific factor section of this report.

10 To possibly forestall the deposition questions, I do not have a quantitative measure in mind of what is "almost as fast" or "almost as many applications," nor do I have in mind a specific amount when I say "relatively small."  I only intend by these comments to convey the common sense, but important, point that the greater the product improvement made possible by the allegedly infringed patents and copyrights, the greater the value of these patents and copyrights.

Expert Report of Professor James R. Kearl

March 21, 2012                                                  Charles River Associates

sumers place on speed and application availability are relevant, although these values would need to be applied to a smaller performance increment.

37. As discussed in more detail below, a similar issue arises in Prof. Cockburn's "Group and Value" method of estimating reasonable royalty damages. Under that method, the value of the patents is a function of (i) the technical importance of the patents in suit relative to other patents in the portfolio; and (ii) the typical distribution of patent value in a grouping of patents. Question (ii) is an issue that has been the subject of economic study, and on which an economist such as myself can usefully opine. Question (i) however, is a strictly technical issue on which economists have no expertise. Therefore, I limit my opinions to the issue of the likely relative value of the patents in suit, as a percent of the total portfolio value, given that the patents in suit fall within the some percentile of the distribution (in the top 3.9%, for instance).

### B. Reasonable Royalty: Methodology

38. One way to think of the economic value of patents and copyrights is as the marginal (or incremental) value that the use of those patents or copyrights confers on the ultimate product in which they are embedded. This marginal value could come in the form of increased sales and/or higher prices and/or decreased costs. These effects follow from a simple profit function:

Profits = price x quantity – (variable costs x quantity + fixed costs)

39. In this case, the asserted value of the patents and copyrights is to increase the consumer desirability of the product.  Moreover, since the product that is alleged to infringe (Android) is not sold, the value of the patents and copyrights is in any increase in the quantity of Android smartphones that results from use of these patents and copyrights.  Prof. Cockburn has proposed a method to measure the incremental value of the patents and copyrights to the users of smartphones. While Drs. Leonard and Cox make some cri-

Expert Report of Professor James R. Kearl

March 21, 2012                                                                          Charles River Associates

---

tiques and adjustments to Cockburn's valuation, they do not propose an alternative method for determining the contribution of the patents or copyrights to the value that consumers place on smartphones.

40. Prof. Cockburn used econometric estimates of the value that end users place on the increased functionality enabled by the in-suit patents and copyrights to predict changes in Android's market share. While this econometric analysis has been ruled inadmissible for the purpose of showing changes in Android market share, the econometric analysis is still useful to show changes in consumer willingness to pay for smartphones. [11]  As I discuss below, I find Prof. Cockburn's method of valuing the marginal contribution of the patents and copyrights to be reliable and generally well implemented.  Although I agree with some of Dr. Leonard's criticisms of the econometric analysis, these criticisms do not result in a lower estimated marginal value contribution of the patents.

41. The marginal value contribution of the patents and copyrights in suit is substantial.[12] Google would presumably have been willing to pay up to this amount for the in-suit patents and copyrights. Sun, on the other hand, would have accepted much less in a negotiation where the alternative was to lose the possibility of realizing any license revenue and  the possibility of monetizing some version of Android that incorporated the in-suit patents and copyrights.

---

[11] The Court ruled inadmissible Prof. Cockburn's estimates of the change in market share of Android based on the conjoint and econometric studies, although the Court did rule that the conjoint analysis was admissible for the purpose of determining the relative importance between speed and number of applications. See Order Granting in Part and Denying in Part Google's Daubert motion to Exclude Prof. Cockburn's Third Report, 3/13/2012. The Court did not expressly rule on whether the econometric analysis is also admissible to show the consumer value of smartphone attributes. I assume here that the econometric analysis is admissible for this purpose. If my assumption is mistaken, I will of course revise this portion of my opinion.

[12] Although it is a caveat I will not repeat throughout this report, at this early stage I reemphasize that this relatively large marginal value contribution is based on an *assumption* regarding the relatively large performance improvements enabled by one of the patents in suit.

---

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

42. Judge Alsup, in his July 22nd 2011 order[13] instructed the parties to consider starting with an offer made by Sun in February 2006[14] and make appropriate adjustments to that offer to reflect the differences between the scope of the actual negotiation in 2006 for, apparently, more than the in-suit patents and copyrights, and a hypothetical negotiation that is limited to the in-suit patents and copyrights.  This approach has been adopted by all economic experts in this matter. I believe the 2006 negotiations do provide useful evidence on the likely value that each party brought to the table in the negotiations, and provide useful evidence on the likely outcome of a negotiation between Google and Sun for the patents and copyrights alone. Thus, I adopt this general approach, although with certain reservations about the economic justification expressed below. I also corroborate my conclusions from this analysis by reference to Sun's license with Danger, which I also believe to be relevant to the determination of a reasonable royalty in this case.

## C.  Determination of the Reasonable Royalty Rate Structure

43. I first consider the structure of the royalty agreement that the parties would likely reach in the hypothetical negotiation. I conclude that the agreement from that hypothetical negotiation would likely be a royalty based on a specified percentage of Android revenue or (approximately) equivalently, a per unit or per handset payment.[15]  I reach this conclusion based on several considerations.

44. First, percent of revenue royalties are common in practice. These royalty structures efficiently spread the risk and upside potential between the licensor and licensee. Moreover,

---

13 Order Granting in Part Motion to Strike Damage Report of Plaintiff Expert Iain Cockburn 07/22/2011, pages 14-15

14 OAGOOGLE 0100166873

15 If revenues per handset were known with certainty, a per unit payment and a percent of revenue payment could be made to be identical. While future revenues per handset are not known with certainty, these figures are commonly estimated and apparently relied on by Google and others. See Android P&L 3-Year Plan Model (GOOGLE-01-00004621.xls) , Project Armstrong: Business Model (OAGOOGLE 0100166873.PDF), and forecasts made by Strategy Analytics. Thus, I conclude there is no meaningful difference between a "percent of revenue" and a "per unit" royalty. I note that Dr. Leonard explicitly rejects a percent of revenue royalty structure (page 67 of his October 24, 2011 report), but advocates for a per unit royalty (page 117 of his October 24, 2011 report). I am unsure of the distinction he sees in these two royalty structures.

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

a running royalty based on a simple metric like revenues is easier to administer than a
running royalty based on more complex accounting measures such as profits or "incre-
mental revenues."

45.  Second, I note that in its Order of July 22, 2011, the Court cited a case describing the
reasonable royalty from a hypothetical negotiation as "the percentage of sales or profits
likely to have induced the hypothetical negotiators to license use of the invention."[16]

46.  Third, in the actual negotiation between Sun and Google, the discussion included a per-
centage-of-revenue component. I am aware that some of the offers from Google to Sun
omitted the revenue sharing. However, under all offers, Sun was apparently going to
have an opportunity to monetize a commercial version of Android. Thus the majority of
Sun's compensation under the license would have come in the form of a per-unit pay-
ment.



Fi-
nally, Dr. Leonard advocates for a "per handset" approach in determining the future royal-
ty rate.[18]

### D.  Determination of the Reasonable Royalty - Overview

47.  I estimate a reasonable royalty for both the patents and copyrights with the following
method. This method starts with the 2005-2006 actual negotiations between Sun and
Google. The steps in this method are:

---

16 Order Granting in Part Motion to Strike Damage Report of Plaintiff Expert Iain Cockburn 07/22/2011, page 7.

17 Third Expert Report of Prof. Cockburn 2/3/2012, paragraphs 570-571.

18 Expert Report of Dr. Leonard 10/24/2011page 117. Dr. Cox does not appear to offer an opinion on damages from
future infringement.

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

1.  Review the 2005-2006 negotiations between Sun and Google and determine the likely agreement point in those negotiations.

2.  Adjust the agreement point to determine the expected certainty cash equivalent of that agreement point for all patents and copyrights that were at issue in those negotiations. By certainty cash equivalent I mean the 2006 net present expected value to Sun of that agreement.

3.  Estimate the <u>expected</u> 2006 present value of total Android revenues as of the time of the negotiation.

4.  Using the results from (2) and (3) calculate the implied royalty <u>rate</u> – as a percent of Google Android revenues – for a license to use all patents and copyrights under discussion. I then validate this royalty rate by analysis of the Sun Java ME license with Danger.

5.  Apportion the royalty from (4) to reflect a license for only the patents and copyrights in suit.

6.  Apply the royalty rate from (5) to the <u>actual</u> Google Android revenues from 2008 to the date of trial in order to estimate the lump-sum past reasonable royalty patent damages in each of these years.

7.  It is my opinion that the correct going-forward (post trial) royalty rate is the rate determined in (5).[19] If the court requests an annual lump sum figure for future reasonable royalty damages, I would apply the royalty rate from (5) to the most current forecast of

_____

[19] It is unclear whether the issue of a future royalty remains part of my assignment.   I include my opinions regarding future royalties here for completeness.

Expert Report of Professor James R. Kearl

March 21, 2012                                                Charles River Associates

actual Android revenues (as for example, from the Google "Android P&L 3-Year Plan Model[20]).

48. Under the structure discussed in the 2005-2006 negotiations, the development and commercialization of Android would have been a joint effort between Sun and Google. Sun would have contributed certain assets and efforts – including the patents and copyrights in suit, but also other contributions – and would have received certain benefits, including fixed and variable cash payments from Google, as well as an opportunity to monetize a royalty-bearing version of Android and associated value-added services. Google would contribute certain assets and efforts – including financial assets, knowhow, and reputation. The total discounted expected value of Android revenues ranges from ████ ████████████████ depending on the assumption I adopt regarding the 2006 expectations of Android success. The (very) wide variation in these estimates is because the Google business forecast I use has two widely varying estimates of future Android unit shipments. Derivation of this expected value is discussed in Section VI.8.

49. I then convert the non-patent and non-copyright Sun contributions and benefits into a certainty cash equivalent value. These "upward and downward" adjustments are discussed in Section VI.7. I conclude that the certainty cash equivalent value (the amount that Google would have paid Sun in a lump-sum cash payment for rights to use all the patents and copyrights under discussion in 2006) ranges from ████████████████ Again, the wide variance in these estimates is due to the variance in Google forecasts of Android success.

50. This implies a royalty rate of approximately ████ of Google Android revenues, or approximately ████████ per handset. ████████████████

---

[20] GOOGLE-01-00004621.xls. This forecast dates from 2008 and I expect a more recent forecast is available, although I have not identified such a forecast at the time of the writing of this report. In what follows I apply my reasonable royalty percentage to the forecasts from this 2008 Google model, although I would update the calculations to a more recent forecast if one is identified.

Expert Report of Professor James R. Kearl

March 21, 2012                                                              Charles River Associates



51. The hypothetical license would encompass only the two patents in suit as well as the API copyrights in suit. I adjust the total 2006 portfolio royalty rate of ▮▮▮ downward to reflect the more limited scope of the hypothetical license. This adjustment is based on the proportional value of the in-suit patents and copyrights to the value of the entire 2006 portfolio. This proportional valuation is based on Prof. Cockburn's Group and Value analysis. That analysis indicates that the '104 patents represent approximately ▮▮▮ of the value of the 2006 portfolio, the '520 patent represents approximately ▮▮▮ of the value of the 2006 portfolio, while the copyrights represent ▮▮▮.[21] Applying these adjustments, the equivalent apportioned royalty rate for the '104 patent is approximately ▮▮▮▮▮▮ ▮▮▮▮▮) of gross Android revenue, the equivalent apportioned royalty rate for the '520 patent is approximately ▮▮▮▮▮▮ (▮▮▮▮) , while for the copyrights the apportioned royalty rate is approximately ▮▮▮▮▮▮ (▮▮▮).

52. The same royalty rate applies going forward. To the degree the Court wishes an opinion on a lump sum figure for future royalties, I would apply this percentage of the best current forecast of Android advertising revenues.

### E.  Expectations Regarding Android in 2006

53. My method for calculating a reasonable royalty relies on the expectations of Sun and Google as of 2006. This is consistent with theory and common practice. It does, however, present a practical problem in this instance since I do not have good evidence on the quantitative 2006 expectations of Google and Sun regarding the likely success of An-

---

[21] I base the relative value of the copyrights on the results of Prof. Shugan's conjoint analyses, as well as my modifications to Prof. Cockburn's econometric analysis.

Expert Report of Professor James R. Kearl

March 21, 2012                                           Charles River Associates

droid. Prof. Cockburn produces qualitative evidence that Google and Sun expected in 2006 that Android would be a great success. Drs. Leonard and Cox present qualitative evidence that Google and Sun were more pessimistic about the prospects for Android.

54. Typically, an expert would look at the parties' internal business projections and investment analyses in order to understand the parties' expectations. Ideally, the expert would be able to probe the basis for the projections (either through interviews or depositions) and evaluate the reliability and rigor of the projections. However, in this case, few such projections exist. From Sun I am aware of only the Project Armstrong projections. Google asserts that the rigor and support for these projections is unknown, and that they are unreasonably optimistic. The projections for unit shipments of Android phones in this business plan are approximately twice as high as actual shipments have tuned out to be. While this does not mean the projections were *ex ante* unreasonable, it does raise some doubt (although it could be that the projections were too optimistic about the ramp-up period, but not the overall success). Moreover, I am not aware of any evidence of the basis for the projections. Thus, I am unable to evaluate the rigor and reliability of these forecasts.

55. The earliest Google forecast of the Android units and revenue-per-device of which I am aware is from 2008.[22]  Obviously, both the Android project and the smartphone market had evolved in significant ways from 2006 to 2008. Moreover, this Google business plan contains two sets of forecasts, each with three separate cases. While the "cases" within each forecast type anticipate roughly similar business results, the two forecast types (one dubbed an "Internal" forecast, and one dubbed a "Market" forecast) anticipate very differ-

---

22 Android P&L 3-Year Plan Model (GOOGLE-01-00004621.xls).

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

ent outcomes. The differences in these forecasts have been discussed by Prof. Cockburn and illustrated in Exhibit D1 to his September 12, 2011 report.[23]

56. As a result, the evidence I have regarding the expectations of Google and Sun in 2006 for the likely success of Android is sparse and does not point in the same direction. I appreciate the approach of Prof. Cockburn of using actual Android sales as a proxy for the parties' 2006 expectations. Under rational expectations, on average (but not in every instance) expectations should approximate actual results. Moreover, as Prof. Cockburn demonstrates the (widely varying) Google forecasts from 2008 bracket the actual Android sales figures that he uses. Nevertheless, I believe it is more appropriate to attempt to use the earliest Google forecasts available. In doing so, I perform my calculations using both the (more optimistic) Market projections as well as the (less optimistic) Internal projections. In order to be consistent, I use the same two projections of total Android sales (or installed base, converted to sales) to calculate the 2006 expected value of Sun's Project Armstrong.

57. Note that as long as the Sun and Google expectations in 2006 regarding Android were consistent, the level of these expectations is largely irrelevant. The value of the 2006 portfolio to Sun is proportional to the success of Android since the vast majority of the value Sun would have expected to receive under that agreement would have come in the form of profits from offering a commercial version of what became Android. Obviously, the expected value to Google of the Android project is also proportional to the success of

---

[23] The differences in the Internal and Market forecast appear to be even larger than Prof. Cockburn illustrates. The Internal forecast appears to contain a formula error that, when corrected, significantly lowers the estimated US installed base on Android phones.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

Android. Since the royalty rate is the ratio of these two expected values, the market suc-

cess (measured as number of activated Android handsets) drops out of the calculation.[24]

### F.  Determination of the Likely 2006 Agreement Point

58. As noted above, all the economic experts in this matter base their reasonable royalty

damages opinions on the likely terms of agreement from the 2005/2006 negotiations be-

tween Google and Sun. However, the experts disagree on what these likely terms of

agreement would have been. Prof. Cockburn adopts the terms of the February 8, 2006

offer from Sun.[25] ████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████ ██ ████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████

59. The possible agreement being discussed between Sun and Google in 2006 was com-

plex, and terms other than the upfront payment (which is the focus on the dispute be-

tween Prof. Cockburn and Drs. Leonard and Cox) appear to have differed among these

---

[24] This is approximately, but not strictly, correct. Since there were relatively small upfront components to the deal –
      such as the three annual payments to Sun  – that were not proportional to the expected number of Android
      handsets, the calculated royalty rate varies slightly when the estimated number of Android handsets is
      increased or decreased.

[25] February 8, 2006 email to Google, OAGOOGLE0000357494.pdf and April 10, 2006 email to Google, GOOGLE-
      01-00065669.PDF.

[26] April 18, 2006 email, OAGOOGLE0000358127.pdf.

Expert Report of Professor James R. Kearl

March 21, 2012                                                 Charles River Associates

offers as well. Thus, it is not sufficient to simply compare the upfront payment terms, while ignoring other changes in the terms of the potential agreement.

60. To make sense of the offers or partial offers it's helpful to distinguish between simple contracts where the only matter being discussed is the price and complex contracts where terms in addition to the price are at play. A negotiation can focus solely on price. In the haggling that typically accompanies the purchase of an Oriental carpet, for an example, the implicit assumption, presumably held by both the buyer and the seller, is that if the seller lowers his asking price, he's offering the same carpet, and, conversely, if the buyer responds in the back and forth of offer and counter offer by raising her offer price, it's for the carpet that has been, to that point, the subject of the negotiations.

61. By contrast, in many negotiations the parties make offers where price and non-price aspects of a deal change simultaneously. A seller might respond to pressure from a buyer for a better price by offering a lower price but also change some other, non-price, aspect of the deal in ways that are more favorable to the seller. For example, a seller might lower the price but also change credit terms in ways that he finds more favorable. Alternatively, a buyer might respond by conditioning a higher price offer on the seller providing a warranty or service that was not included in the seller's previous price offer. Essentially, in this kind of setting, the parties can trade off non-price provisions against price. Put somewhat differently, a seller may be able to extract value in several ways. A change in one area (a lower price, for example) can be partially or fully offset by a change in another area (for example, a reduced service commitment).  As a consequence, non-price aspects of a deal that are less favorable to the seller can be compensated for, in part or fully, by a higher price and vice versa.

62. Sun's February 2006 offer was just such a "complex contract."

Expert Report of Professor James R. Kearl

March 21, 2012                                        Charles River Associates



63.

64. Second, while Dr. Leonard might argue that Sun's expectations with regard to the money

    coming to category (iii) are too optimistic, this argument is mostly irrelevant: were Sun

    less optimistic about the revenue coming to category (iii), it would presumably expect

    more money to come to categories (i) and (ii).

    . Dr.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                    Charles River Associates

Leonard's adjustments of one source of revenue (adopted by Dr. Cox), without providing

supportive evidence that other terms would not have changed, is inappropriate.[27]

65.  Third, both Drs. Leonard and Cox argue that a Sun offer subsequent to the February

2006 offer with less money in category (i) should be used as the starting point for the hy-

pothetical negotiation. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████  Because the terms of the February 2006 offer

were more explicitly spelled out, I conclude that this offer provides the best representa-

tion of the terms of an agreement between the parties.

66.  In any event, the differences between Prof. Cockburn and Drs. Leonard and Cox on this

issue are largely immaterial. These differences appear material due to the (incorrect, in

my view) way that Prof. Cockburn and Drs. Leonard and Cox treat past reasonable royal-

ties as distinct from future royalties. As discussed below, their approaches have the effect

of "front loading" all of the upfront payment into a few years. However, when the upfront

payments are amortized over the life of the hypothetical license, ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████  Thus, I do not believe the specific amount

of upfront payment under the hypothetical license to be important in the determination of

reasonable royalty damages. In my analysis that follows I adopt the "$100 million" offer

as the likely point of agreement between the parties.

_____

[27] In determining the 2006 value of February 2006 offer, I substitute Google's projected Android sales for Sun's
     projected Android sales in Project Armstrong without adjusting the terms by which money came to
     categories (i) and (ii). While it might appear that this substitution is subject to my criticism of Dr. Leonard's
     adjustment, the effect in my case is to reduce the 2006 value of the February 2006 offer, thereby providing
     a conservative estimate of the reasonable royalty in my methodology.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                Charles River Associates

### G. Converting the "$100 million" Sun Offer to a Certainty Cash Equivalent

67. Having concluded that the "$100 million" Sun offer to Google represents the best esti-
mate of the likely agreement point on the broader agreement between Sun and Google, I
convert that offer to a 2006 certainty cash equivalent for all the in-suit and not-in-suit pa-
tents and trademarks under discussion. Put another way, I consider all other aspects of
the broader agreement and convert them to a 2006 cash value to either Sun or Google in
order to estimate the lump sum cash payment that Google would have likely made to Sun
solely for a license to the all the patents and copyrights under discussion.

68. In my review of the 2005-2006 negotiations, and materials from this lawsuit discussing
those negotiations, I have identified the following deal components that were under dis-
cussion.



Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

█ ██████████████████████████████████████████

69.   I first reduce elements (1) and (2) above to a certainty cash equivalent value. In doing

so, ████████████████████████████████████████████

████  ███████████████████████████████████████

I calculate expected Android revenues based on the earliest forecast of Android revenue

of which I am aware.[29] Consistent with my discussion above, I perform this calculation

using both the (higher) Google "Market" forecast as well as the (lower) Google "Internal"

forecast. In both instances, I use the "Case 1" scenario.[30]   In both instances, the Google

forecasts only forecast Android units and advertising revenue for 3 years. Prof. Cockburn

extends these forecasts using more recent forecasts from Strategy Analytics.  I adopt this

extension of the Google forecasts in my analysis.

70.  In performing this calculation, I do not adopt Prof. Cockburn's suggestion ██████████

██████████████████████  I agree with Prof. Cockburn that the 2006 negotiations per-

tained to a compatible version of Java ME, while the hypothetical negotiation pertains to

an incompatible version. I agree with Prof. Cockburn that the difference between a com-

patible and incompatible license would likely be material to Sun and believe there is evi-

dence that Sun cared about preventing the fragmentation of Java. ███████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

───────────────

[28] Drs. Leonard and Cox propose a discount rate of ████ Leonard's Revised Report dated 10/24/2011 page 87. Dr.
     Cox notes that the 2010 cost of capital for SIC code 737 – which includes Sun– was ████████ Cox's
     Revised Report dated 10/21/2011 page 34 and backup to his exhibit 3c. Thus, I conclude use of a ████
     discount rate is conservative in this instance.

[29]  See GOOGLE-01-00004621.xls "Android P&L 3-Year Plan Model".

[30]  Each of the Internal and Market forecasts have 3 cases: Case 1 (called "Target" or "Base"); Case 2 (called
     "Stretch 1" or 'Optimistic'); and Case 3 (called "Stretch 2" or "Upside Case"). I adopt the Target case for
     my analysis.

Expert Report of Professor James R. Kearl

March 21, 2012                                                 Charles River Associates



71. I next calculate the expected value of the Sun opportunity to provide a commercial im-
plementation of the mobile device operating system (i.e., Project Armstrong). In perform-
ing this calculation I adopt Dr. Leonard's suggestion that the projected Sun profits should
be discounted in order to be brought to an expected present value, and I adopt the ████
discount rate suggested by Dr. Leonard. I also agree with Dr. Leonard that the operating
expenses need to be subtracted from the projected Sun revenues in order to estimate the
cash equivalent of the Sun monetization opportunity. I do not agree with Dr. Leonard that
the projected Sun sales need to be reduced to reflect only the commercial portion of the
mobile stack implementations. As Prof. Cockburn points out, the Sun projections already
account for the commercial/open source split, ████████████████████████
████████████████████████████████████████████████████
██████████████████████████.[32]

72. In converting the Project Armstrong projections to a 2006 certainty cash equivalent. I re-
place the projected total market sales from the Project Armstrong forecast with the pro-
jections from the 2008 Google forecast. Thus, I treat the market expectations consistently
in both the numerator and denominator of my reasonable royalty calculation. I adjust the
projected Sun expenses associated with Project Armstrong proportional to my adjustment
in the total market size. While some of the Sun expenses may be fixed over some range
of potential sales, the variation in projected Android adoption (and thus Sun sales of
commercial implementations) is very large, both across the two forecasts and within the

---

[31] 

[32] See "Project Armstrong: Business Model" dated February 2006, OAGOOGLE 0100166873 at 83.

Expert Report of Professor James R. Kearl

March 21, 2012                                                        Charles River Associates

forecasts through time.  Over this range of commercial activity, it is more reasonable to assume that costs will be roughly proportional to sales units and revenues.

73. I next consider the value to Google of the technical assistance that Sun was anticipated to provide Google in the development of the mobile stack. I believe that Prof. Cockburn, in his recent report (dated February 3, 2012), provides a reasonable estimate ███████ of this amount. In coming to this conclusion, I consider Dr. Leonard's observation that this number is the *cost* to Sun, not the *value* to Google. However, I would not expect the cost to Sun to differ significantly from the value to Google. The value to Google of the Sun technical assistance would be the avoided cost of Google having to do the work itself. In developing a product like Android, both Sun and Google would employ the same assets: experienced software engineers.[33] Both Sun and Google would be expected to pay these engineers about the same productivity-adjusted amount. Thus the cost to Google to do what Sun would otherwise do for it should be approximately equal to the cost to Sun of performing that same work.[34]

74. I make a $37 million additional downward adjustment for the "fact" that the 2006 negotiation included Sun providing to Google the source code for the Java Virtual Machine while the source code would not be a component of the hypothetical negotiation.[35]  This valuation is based on guidance from the Court in its March 13, 2012 Order.

75. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[33] I understand that the Google development team for Android included former Sun engineers.

[34] I note that in his most recent report, Dr. Cox apparently believes that the cost Sun would have incurred under Project Armstrong fully captures the value to Google of Sun's anticipated technical assistance under the 2006 negotiations. (See paragraph 26 and Exhibit 1 [row b]) of the Feb 17, 2012 report of Dr. Cox.)

[35] I do not put the word fact in quotes to indicate I question this as a fact. However, I have not seen this component of the negotiations mentioned in any documents contemporaneous with the negotiations.

Expert Report of Professor James R. Kearl

March 21, 2012                                              Charles River Associates



76.  I do not believe that there is any additional upward or downward adjustment warranted for the compensation to Sun for this short term revenue losses due to the open sourcing of Java ME. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮.[37]  Thus no upward adjustment is needed. Similarly, in the hypothetical negotiation Sun would seek compensation for its revenue losses due to the open sourcing of a close substitute to Java ME. Thus, no downward adjustment is warranted.[38]

77.  I do not make any adjustment for the recruiting of OEMs and service providers. First, this responsibility and assistance appears to have been reciprocal.▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  However,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮.

78.  I do not make any adjustment for the time to market advantage, although I do so with reservations. There is some evidence that Google and Sun expected that the collaboration between the parties would accelerate the development and launch of Android,[40] and time to market appears to have been an important consideration for Google.[41]  However,

---

[36] See paragraphs 50, and 388-389 of the same report.

[37] Dr. Leonard suggests that the upfront payments that were discussed in the 2006 negotiations were compensation for the Sun business risk.  (See page 54 of the Oct 24, 2011 report of Dr. Leonard.)

[38] This is another example of a point I made earlier:  What Sun knew in 2006 about its Java ME business and Sun's expectations with regard to the effects of an agreement with Google for an open-source Java-VM Android on its Java ME business would be fully reflected in its 2006 offer.

[39] Leonard Revised Report 10/24/11 Section III. B. 4. d.; Cox Revised Report 11/28/11 Section IV F. 2. d.

[40] GOOGLE-12-00079180-194 at 186, "Why Do the Deal? ... Dramatically accelerates our schedule."

[41] Third Expert Report of Prof. Cockburn 2/03/12 Section IX. E.

---

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

I do not have sufficient evidence on which to base such an adjustment and note that nei-

ther Dr. Leonard nor Dr. Cox offers a measure of this value to Google. 

Thus, I conclude that omitting this adjustment does not materially bi-

as my conclusion.

79. Finally, I make no adjustments for the provision to Sun by Google of Google-owned

handset technologies. Sun, through Prof. Cockburn, has not asserted this component of

the 2006 deal had significant value, which suggests that it did not. Moreover, the value to

Sun of these technologies would presumably be captured by Sun's participation in the

mobile device market, most likely through Project Armstrong. Thus, this value to Sun has

already been captured in the Project Armstrong calculations above.

80. Based on the analyses above, I conclude the 2006 certainty cash value of the "$

" Sun offer was                                    See Tables 1 and 2.

81. Since this amount is larger than the                    suggested by Prof. Cockburn or put for-

ward by the Court in its March 7, 2012 order, a word of explanation: I have assumed, as I

believe to be correct, that had a royalty been determined in 2006, it would have been for

the life of the patents.  As such, the certainty cash equivalent should account for the ex-

pected Sun revenue over the life of the license, not just the period between the license

negotiations and the date of trial (or any other period less than the life of the license). The

record does not contain Sun or Google projections for the entire life of Android or Sun's

Project Armstrong, but, the valuation of the 2006 offer should include the parties' future

expectations held at or near the time of the 2006 negotiations. These expectations ex-

tend beyond the date of trial and should be considered in determining the 2006 certainty

cash value, even if the Sun business projections for Project Armstrong do not.  The

Google projections – as extended by Prof. Cockburn – extend the furthest into the future,

hence I use those projections to value Project Armstrong and 

82.  I believe Prof. Cockburn errs in arguing that there should be a "to-date-of-trial" royalty for

the period to the date of trial and then a separate negotiation for a "going-forward" royalty

for the remaining life of the patents from the date of trial.[42]  This leads Prof. Cockburn fo-

cus on the value of the 2005 deal to Sun through 2011, and then to apportioning this

amount to the patents and copyrights in suit. Drs. Leonard and Cox adopt and follow

Prof. Cockburn's error, when they also focus on the value of the 2006 deal to Sun

through 2011, and then undertake an apportionment of that value. That this is a mistake

is easy to see. Prof. Cockburn estimates that the lump sum cash value of the total 2006

deal to Sun is▮▮▮▮▮▮▮   He also reports that total Google Android-derived revenues

through 2011 are▮▮▮▮▮▮ [43]  Thus, Prof. Cockburn concludes that Google would

have paid a royalty equal to almost all of its Android revenue for a license (from 2006

through 2011) to the entire portfolio of Sun Java intellectual property. This cannot be cor-

rect.


H.  Estimating the 2006 Expected Value of Android Revenues

83.  I next calculate the 2006 expected value of Android revenues based on the Case 1 (i.e.,

the "Target" case) for both the "Internal" and "Market" Google forecasts.

---

[42] 

[43] See Exhibit 19 to the February 3, 2012 Cockburn report.  Dr. Cox asserts that Google's Android-derived revenues
through 2011 are▮▮▮▮▮▮ (See Exhibit 3b to the October 21, 2011 Cox report.)  This difference is
immaterial to my point here.

Expert Report of Professor James R. Kearl

March 21, 2012                                                   Charles River Associates

84. Note that I calculate total Android revenues, not incremental revenues (Android revenues net of the "re-capture" that Google would experience from revenues gained by Android users switching to other smartphone platforms). As discussed above it is my opinion that, under the hypothetical negotiation Sun and Google would have agreed to a percentage royalty, with this royalty on actual – not incremental – Android revenues. I conclude that the royalty would be based on actual Android revenues – not incremental revenues – because actual revenues are easier to monitor, while incremental revenues require complex calculations and assumptions about "but-for" shares of other smartphone platforms, search intensity and search engine choice on these platforms, and Traffic Acquisition Costs on these platforms.[44]

85. The 2006 expected value of Android revenues ranges from ▮▮▮▮▮▮▮ (using the "Internal" forecast) to ▮▮▮▮▮▮▮▮ (using the "Market" forecast). See Tables 1 & 2.

### I.   Calculation of the Equivalent Percentage Royalty Rate of the February Sun Offer

86. Dividing the 2006 certainty cash equivalent value of Sun's offer into the 2006 expected value of Android revenues results in a ratio of about ▮▮▮ However I believe this overstates the likely royalty that would have been agreed to in the hypothetical negotiation. Taking the "Internal" forecast as an example, the expected present value to Sun is ▮▮▮▮▮▮▮▮ and the expected present value to Google is ▮▮▮▮▮ While the Sun expected benefit is approximately ▮▮▮▮ of the size of the Google expected benefit, one is not at the expense of the other. In other words, under the transaction contemplated in 2006, Google would not pay Sun ▮▮▮ of its revenues in license fees. Rather, most of Sun's expected benefit from Android was in the form of profits from *its* commercialization

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Expert Report of Professor James R. Kearl

March 21, 2012                                    Charles River Associates

of the jointly-created mobile device operating system (i.e., Android). Thus, the total ex-

pected value of the transaction is the sum of the Sun expected benefit 

and the Google expected benefit                 ), or                  Of this total expected bene-

fit, the Sun expected benefit is approximately          . Thus I conclude that the equivalent

royalty percentage from the hypothetical negotiation (as a percent of Android revenues)

would have been          .[45]

## J. Evaluation of the Implied Royalty from the Danger-Sun license

87.



88. In

_____

45

Expert Report of Professor James R. Kearl

March 21, 2012                                              Charles River Associates



89.

90.

91.

_____



92.

51

93.

53

94. Dr. Cox indicates that for the same period of time, "Android Gross Ad Revenues" totaled

54

95.

---

51

52 I note that Dr. Cox adopts Dr. Leonard's reasonable royalty analysis and incorporates Dr. Leonard's Exhibits 3b.1, 3b.2, 3.c and 3.d into his Exhibits 6b.1, 6b.2, 6c and 6d.

53

54 See Exhibit 2.a, Expert Report of Dr. Alan J. Cox, revised October 21, 2011.

Expert Report of Professor James R. Kearl

March 21, 2012                                                  Charles River Associates



96

## K. Allocation of the 2006 IP Portfolio Value to the Patents in Suit - Theory

97. As I understand the matter, the law requires that the reasonable royalty be determined just prior to infringement based on a hypothetical negotiation between the two parties over just the patents in suit, assuming that both are willing participants in the negotiations and that the patents are valid and enforceable.

98. The hypothetical negotiation is, of course, a fiction. Even so, in many cases one can imagine that such a negotiation could have occurred because there are either negotiations over one or more in suit patents in other settings or there are negotiations for patents that are similar to the in suit patents, either of which can be used to benchmark the value of

March 21, 2012                                                        Charles River Associates

the in suit patents. So while the hypothetical negotiation imagined for purposes of deter-mining damages in a specific litigation setting is a fiction, negotiations of the sort envi-sioned by the hypothetical negotiation are not fictitious.

99.   In this case, however, none of the experts has cited to any evidence that Sun ever nego-tiated licenses for individual patents or for small subsets of its IP portfolios. To the contra-ry, it appears that Sun's negotiations with various parties were always for a Java IP port-folio, often only vaguely specified,[55] whose components were useful in specific imple-mentations of Java ME or, more generally, other Java operating systems and products.[56] As a consequence, in this case (and in cases of this sort), there is a double fiction:  a damages expert is asked to imagine a hypothetical negotiation for a subset of an IP port-folio in the face of the fact that there aren't real-world negotiations for subsets of IP port-folios, but only real-world negotiations for the IP portfolios themselves. This puts econo-mists in a precarious position in that they generally look first to market evidence for de-termining or benchmarking valuations and, barring market evidence, to cost-based valua-tions or benchmarks. For subsets of IP portfolios there are neither. Moreover, as is well recognized in economics, when the patents in a portfolio are complements and/or substi-tutes for other patents in the portfolio, there is no unique way to apportion the value of the portfolio to individual patents.

100.   Moreover, note that in 2006 if Sun and Google understood that the subset of Sun's Java ME IP portfolio most relevant to their negotiations was composed of the now in suit

---

[55] See, for example, paragraphs 1.27, 3.1 (d) and (e) in draft agreements from the 2006 negotiations (GOOGLE-01-00062072.PDF).

[56] An IP portfolio could be simply an aggregation of patents and copyright that might be useful to a particular end product which enable various technological components of the end product but are otherwise technologically unrelated. For example, one could think of the patents that enable all of the functionalities – a phone function, a Web browser, a computer for executing applications, a screen interface – of an iPhone as a portfolio. Or an IP portfolio could be a group of patents which enable a particular technology. For example, one could think of the patents tied to the iPhone's iOS operating system as a portfolio. In this report, I use the term "portfolio" in latter sense since the Java ME IP portfolio presumably contained the Sun intellectual property useful for versions of the Java ME operating system, including those for the Java ME virtual machine and the APIs useful to application developers using the Java language.

Expert Report of Professor James R. Kearl

March 21, 2012                                                   Charles River Associates

patents and copyrights, the 2006 value of the Java ME IP portfolio *is* the value of the in suit IP. Put directly: If Sun and Google knew which subset of Sun's Java ME IP would be needed to implement a Java-based VM in Android, then that's what would have driven the negotiations and the aggregate value of the license in the 2006 negotiations is attributable to this subset.

101.    If, however, the subset of Java ME IP useful to Android wasn't known by the parties in 2006, then a hypothetical 2006 negotiation that is based on ex post (2010) information about the subset that "turned out to be" useful undervalues, perhaps substantially, the in-suit IP. The reason is that if Google knew that it needed a subset of the Java ME IP portfolio, but didn't know in 2006 which subset it needed, then the 2005/06 negotiations can be thought determining the value of an option to, at some later date, decide which, if any, subset of the Java ME IP portfolio to use and when to use it.[57]  In this case, the 2006 value of the in suit IP is also the 2006 value of the Java ME IP portfolio – essentially the aggregate value of the 2006 Java ME IP license is what Sun was willing to accept for an option for Google to use one, two or as many of the patents and copyrights in the Java ME IP portfolio as it wished and, hence, the amount paid for the option to use what turned out to be the in-suit IP.

---

[57] For instance, the formerly in-suit '205 patent enabling the JIT functionality, wasn't allegedly infringed until after the other in-suit patents were infringed. A strict interpretation of the "hypothetical negotiation just prior to infringement" means that instead of thinking of all of the in-suit patents as part of the 2005/06 negotiations, the date of the hypothetical negotiation for at least one – the '205 patent – would be separated from the others. While it is my understanding that the value of a patent in a hypothetical negotiation cannot be determined by its "hold up" value, it is also my understanding that a factor to consider in the hypothetical negotiation is the relative bargaining strength of the two parties at the time of infringement. Google's bargaining power at the point of infringement of this particular patent (apparently, in or after 2008) would be quite different than its bargaining power for the other patents in early 2006 for two reasons:  Google had (further) committed to a Java-based VM after 2006 and this commitment narrowed the available options. Both suggest that Google was in a weaker position vis a vis the hypothetical negotiation for the '205 patent than it would have been vis a vis the other in suit patents. An advantage of a portfolio license is that, within the period covered by the license, it allows for timing of patent use without concern for hold up problems of this sort. This is a valuable "option" that should also have been included in a reasonable royalty for the '205 patent if this patent was included in the 2006 hypothetical negotiations or, alternatively, the hypothetical negotiations for the '205 patent should take into account the circumstances just prior to its infringement in 2008 or beyond.

Put somewhat differently, a portfolio license is useful precisely because it eliminates the "hold up" problem for patents implemented after a firm has committed itself to a particular technological path.

---

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

102.    Another approach to a 2006 hypothetical licensing negotiation that gets to the same
outcome assumes that Sun's Java ME IP wasn't directly portable to what Google envi-
sioned it needed for a Java-based operating system for smartphones.[58]  If Google was
interested in writing a from-the-ground-up operating system but decided that it needed it
to be written in Java and based, at least in part, on Java ME "like" technology to appeal to
potential applications developers and OEMs, then since Sun had solved lots of the prob-
lems of implementing a Java-based VM on small devices and had patented these solu-
tions, Google might reasonably have assumed that in the course of its from-the-ground-
up development it would face some of the same problems.  Since it was writing in Java, it
would likely solve some of these problems in the same way that Sun had previously
done, thereby infringing Sun's patents. In this case, the value of 2006 negotiations for
Sun's Java ME IP portfolio can be thought of as insurance against litigation if it happened
to turn out that Google solved the problems it faced in writing Android in the same way
Sun had solved them, thereby infringing Sun's patents.

103.    Finally, to the degree that the patents and copyrights in an IP portfolio are, as ap-
pears to be the case in this matter, useful in implementing a particular technology (e.g., a
Java VM), some elements of the portfolio are likely to be substitutes for one another and
other elements are likely to be complements.  One might expect substitutes to develop
within a portfolio, in part, as a way of enhancing the value of a critical patent—a patent
thought to be critical would have greater value if "best" alternatives to the use of the pa-
tent were also patents within the portfolio.  Put differently, a clever innovation that has
good non-infringing substitutes is worth less than the same innovation when there are
few or no non-infringing substitutes.  Likewise, one might expect complements to develop

---

[58] The behavior of Google and Sun suggest that this is probably true in this the case. That is, as I understand the
record, Google wanted to develop a new operating system for smartphones, albeit it one based (partially)
on Java. That Sun purchased SaveJE as the basis for its separate, but later aborted, development of a
smartphone OS also indicates that the 2006 Java ME IP was not directly useable as a smartphone
platform or virtual machine.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

within a portfolio as inventors find ways to extend the functionality enabled by one or more critical patents through synergies.  The synergies could be substantial and the portfolio valuable precisely because two or more patents, or a patent and copyrighted elements, were together of great value but separate of little value.  As a consequence, both licensee and licensors would insist on portfolio, rather than patent-specific or copyright-specific licensing.[59]

104.    In sum, the Court asked for my best economic advice. Setting aside what the law may require, my best economic advice is that there are good economic reasons why value of the in suit IP in this matter is the 2006 value of a hypothetical negotiation for the entire Java ME IP portfolio and the reasonable royalty rate is ▮▮▮▮.

105.    If, as I understand the matter, valuing the specific in suit IP by considering a hypothetical negotiation for the entire portfolio is not permissible, the above arguments are still useful because they suggest a simple apportionment of the in suit IP as a fraction of the value of the portfolio will underestimate the value of the in suit IP.   Such an apportionment is likely to ignore the option value (in terms of providing Google the choice of which Java ME IP to utilize, and importantly, when to utilize Java ME IP) and/or the value of insurance against litigation should the "independent" development of Android cross the boundaries of one or more Java ME patents. In short, in actual negotiations, a party would have had to pay something for the option that it, in a sense, later exercised and the hypothetical negotiation should account for this.   My apportionment below does not account for this option or insurance value and thus understates the royalty from the apportioned hypothetical license.

_____

[59] The existence of substitutes and complements within a portfolio also makes accurate apportionment to subsets of patents or copyrights within the portfolio difficult, if not impossible without a detailed understanding of which patents and copyrights in a portfolio are substitutes and complements for one another. In particular, the number of patents or copyrights infringed relative to the value of the portfolio is irrelevant in determining the value of the infringed patents or copyrights.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

## L.  Allocation of the 2006 IP Portfolio Value to the Patents in Suit

106.    In order to allocate the 2006 portfolio royalty rate of ▮▮▮ to reflect a royalty rate for

just the patents and copyrights in suit, I rely on the general method employed by Prof.

Cockburn in his Group and Value approach.  I have considered the objections to Prof.

Cockburn's Group and Value method raised by Dr. Leonard, and while those objections

have some merit, I find this general approach to be reliable and to be the best available

method to allocate the total 2006 portfolio royalty to the in-suit patents and copyrights.  I

discuss in Appendix D my evaluation of Dr. Leonard's objections and the modifications I

make to Prof. Cockburn's analysis.

107.    

108.    Based on results from the conjoint analysis, Prof. Cockburn concludes that the copy-

rights in suit are worth approximately half the patents in suit.[61]

109.    Prof. Cockburn then identifies three academic studies of patent value.  Taking the

data on patent value from these studies, he plots the distribution of patent value, fitting a

"Pareto" distribution.   He concludes that in these studies the top 3.9% of the patents rep-

resent 67.9%, 77.1% or 91.9% of the total value of all patents in the study, depending on

---

[60]  Third Cockburn Report 2/3/2012 p.150 (paragraph 397).

[61]  This conclusion applied to the case when there were 6 patents in suit.  There are now 2 patents in suit.  I believe
that the same general ratio will apply.  The 2 to 1 ratio from the conjoint analysis related to the relative
consumer preference for start-up speed versus number of applications.  The former is the effect of
infringement of (some of the) in-suit patents while the latter is the result of infringement of the copyrights.
There were two in-suit patents that were associated with increased start-up speed, and the primary one of
those was the 104 patent.  Due to apparent complementarities, the other speed patent – the 205 patent –
cannot operate in the absence of the 104 patent.  Thus, the 104 patent is essential to obtain the benefit of
the 205 patent.  Since I understand the 205 patent has been rejected by the PTO, its use is free.
Therefore, the value of the 104 patent includes the value of the incremental speed that is enabled by the
(freely available) 205 patent.

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

the study utilized.[62]



110.    As discussed in Appendix D, I believe that analyses of the distribution of patent val-

ues from studies like those referenced by Prof. Cockburn are useful in allocating the val-

ue of a portfolio of patents to the value of individual patents in that portfolio.  I also con-

clude that the conjoint analysis and my revision of Prof. Cockburn's econometric analysis

indicates that the value of the copyrights is approximately 80% of the value of the '104

patent However, after reviewing a larger range of patent valuation studies, I believe that

Prof. Cockburn's conclusion that the top 3.9% of patents in that portfolio represent 77.1%

of the portfolio value is too high.   Based on my analysis, I believe a more reliable esti-

mate is that the top 3.9% of patents in a portfolio represent about 53% of the portfolio

value.   I explain my reasoning and analysis in Appendix D.

111.    If the value of the top ▮▮▮▮▮▮ in the 2006 portfolio represent ▮▮▮ of the value of

the entire portfolio, then the '104 patent represents ▮▮▮ of the value of the 2006 portfo-

lio, and the copyrights represent ▮▮▮ of the value.  Applying these apportionment per-

centages to the ▮▮▮ royalty for the entire 2006 portfolio results in a royalty for the '104

patent of ▮▮▮ and a royalty for the copyrights of ▮▮▮ The royalty rate for the '520

[62] Third Cockburn Report 2/3/2012 exhibit 34

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

patent is ████.[63]  See Table 7. Rounding these royalty rates I conclude the appor-

tioned reasonable royalty on the '104 patent is ████ of gross Android advertising reve-

nues, while the royalty on the copyrights is ████ of gross Android advertising revenues

and the royalty rate for the '520 patent is ████ of Android revenues.

## M. Calculation of Past Reasonable Royalty Damages

112.    Applying the above royalty rates to the actual US Android revenues results in a dam-

age amount of ████ through 2011 for the '104 patent, ████ for the '520

patent and ████ for the copyrights.  See Table 8.  In this calculation, I use data

from Dr. Cox's Exhibit 3b to estimate actual Android advertising revenues to date.  His

data appear through August 2011.  At trial I would anticipate applying the royalty rates to

current to-date US Android revenues.  To the degree needed, I would also restrict the

royalty base to marked or accused products.

## N. Future Royalty

113.    This same analysis allows estimation of the appropriate going forward royalty, should

infringement be found and an injunction not granted. I disagree with Prof. Cockburn that

the going forward royalty rate should be based upon a new hypothetical negotiation as of

the time of trial that incorporates lock-in effects. The 2006 negotiation upon which my

past royalty analysis is based contemplated a license for the life of patents. Thus, in that

agreement Google was in effect paying for the freedom from the cost of lock-in in a sub-

sequent negotiation. Incorporating the lock-in effect into the going forward royalty would

deprive Google this benefit for which it has already paid.

---

[63] I adopt Prof. Cockburn's approach to value the '520 patent; assuming it has the average value of the ████
patents in the 2006 portfolio.  Dr. Leonard argues for a higher valuation of the '520 patent, but as I
understand his suggestion, it relies on results from Prof. Cockburn's Independence Significance Approach
and this part of Prof. Cockburn's report  has been determined to be inadmissible.

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

### O. Comparison with the Reasonable Royalty Opinions of Prof. Cockburn and Drs. Leonard and Cox

114.    My estimate of past reasonable royalty damages is similar in magnitude to that of Drs. Leonard and Cox. ███████████████████████████████

███████████████████████████████████████████████████████

███████████ However, while Drs. Leonard and Cox also arrive at a similar conclusion based on analysis of the "$100 million" offer, I do not believe their analysis in that instance is useful and the similarity in our conclusions appears to be coincidence.

115.    Drs. Leonard and Cox are silent on the appropriate portfolio royalty rate going forward. However, their analyses would imply either a royalty rate of approximately ███ per Android handset, or a royalty of approximately ███ of Android revenue. These amounts are lower, but in the same ball park, as my estimates. If Drs. Leonard and Cox opined that the going forward royalty were significantly lower than these amounts, I would likely disagree (although of course, I would first consider their rationale).

116.    Prof. Cockburn concludes that the likely portfolio royalty payment from Google to Sun for the use through 2011 of all the patents and copyrights under negotiation in 2006 would be ███████. He then apportions this amount to the specific patents and copyrights in suit, based on his Group and Value analysis. As discussed herein, I find the Group and Value approach to reliable, albeit with some revisions. However, as I discuss above, I do not agree with the Prof. Cockburn's apportioned total of ███████ This amount seems far too high, as a payment only for the use-to-date of the 2006 portfolio.

117.    To highlight the difference between my approach and both Prof. Cockburn's approach and Dr. Leonard's approach, I note that that my estimate of damages through 2011 or at the 2012 date of trial – which are determined in my approach by multiplying actual Android revenues by a reasonable royalty rate – are modest because the royalty rate is modest and actual Android revenues are modest.  A going-forward payment, how-

March 21, 2012                                                        Charles River Associates

ever, could be quite different because while the royalty rate is modest, actual or projected

post-trial Android revenues could be larger, perhaps very large.

## P.  Other Copyright Damages

### VI.1.1. Disgorgement of Infringer's Profits

118.      Oracle claims disgorgement of infringer's profits as one measure of its damages un-

der copyright. As I understand the law, the copyright holder is entitled to recover all prof-

its of the infringer that are due to the infringement, so long as these profits are not other-

wise accounted for in other measures of damages awarded to the copyright holder.  I un-

derstand the copyright holder only need prove total revenues from the infringing products,

while the burden is on the infringer to prove costs (thereby reducing revenues to profits)

and what portion of the profits if any are due to factors other than the infringement.

119.      Prof. Cockburn asserts that Android revenues through the end of 2011 total ▮▮▮▮▮

▮▮▮▮▮ [64] Dr. Cox asserts these revenues total only ▮▮▮▮▮▮ [65] I am not in a posi-

tion to adjudicate the dispute between Prof. Cockburn and Dr. Cox on Android actual

revenues. I presume at the time of trial evidence will be presented on the actual total An-

droid revenues to date. In what follows I adopt the revenue figures of Dr. Cox, but do so

for convenience and not as an endorsement of their accuracy.

120.      Dr. Cox takes two alternative approaches to reduce total Android revenues to profits.

First he deducts total Android costs to date from total Android revenues and concludes

that total Android profits to date are negative.[66]  This conclusion appears to be correct

and is undisputed by Prof. Cockburn. Dr. Cox recognizes, however, that the engineering

and development costs of Android are significant, and that these costs are properly char-

---

[64] Third Cockburn Report 2/3/2012, exhibit 19.

[65] Cox Exhibit 2a.

[66] Cox Exhibit 2a.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

___

acterized as investments that should be capitalized and depreciated over the expected life of the product. Dr. Cox chooses to amortize these engineering costs over a 5-year period. Prof. Cockburn argues that five years is too short a period over which to amortize these costs, noting that Google typically depreciates intangible assets over 12 years and property and equipment over up to 25 years, and that platform products, like Android require time before turning a profit.[67]  While I believe Prof. Cockburn's objection has some merit, I conclude that the five year amortization period used by Dr. Cox is appropriate. As Dr. Cox notes, custom software has an average service life of 5 years.[68]  While the expected life of Android certainly exceeds five years, Google continually invests in engineering to develop and release new, upgraded versions of Android. Note for example that Android engineering expenses in 2011 are higher than in any previous year. Thus, while Android may have an expected commercial life of greater than five years, it is not clear that engineering performed in a specific year has an expected life of greater than five years.

121.    Dr. Cox also subtracts from total Android revenues the cost to Google of purchasing Android. Dr. Cox does not amortize these costs over any time period. In this respect, Dr. Cox errs. The purchase cost of Android is a one-time fixed cost. This cost should be amortized, and should be amortized over the expected life of Android. I assume the expected life of Android to be 14 years.[69]  I amortize the purchase cost of Android (both the ███████████ purchase price and the ███████████ in milestone payments) using the interest rate and formula employed by Dr. Cox. The results are shown in Table 9. Through the end of 2011, Android profits total ████████.

___

[67]  Cockburn's Reply to Cox dated October 10,2011 paragraphs 24 and 42.

[68]  Cox Revised Report dated 11/28/11, footnote 111.

[69]  Android P&L 3-Year Plan Model (GOOGLE-01-00004621.xls) and Cockburn Report 5/20/11 exhibit 19.

___

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

122.    Both Prof. Cockburn and Dr. Cox appear to interpret the relevant portion of copyright statue to restrict the infringer's profits subject to disgorgement to be, not all profits from the infringing product, but only those profits *due to* the infringing product. It is unclear to me whose burden it is to show which Android revenues or profits are due to the alleged copyright infringement. However, whoever bears this burden has failed to meet it.  Prof. Cockburn offers an opinion only on gross Android revenues and does not attempt to determine what portion of these revenues are due to the copyright infringement.[70]  Dr. Cox does attempt to apportion total Android revenues between those due to the infringement and those due to other factors. However, his attempt is incorrect and his conclusion unreliable.[71]

123.    Dr. Cox opines that ███ of Android revenues are due to copyright infringement.[72] The ███ figure is based on the lower bound estimate of the value of the patents in suit from Prof. Cockburn's Group and Value analysis, and Prof. Cockburn's  opinion that the value of copyrights in suit are approximately one half the value of the patents in suit. Dr. Cox misinterprets the meaning of Prof. Cockburn's ███ apportionment percentage. This percentage is the value of the patents in suit as a percent of the total value of all patents in the patent portfolio that was the subject of the 2006 Sun / Google licensing negotiations. Moreover, the patent valuation study upon which Prof. Cockburn relies to derive his ███ apportionment percentage appears to base the valuation of the individual patents on a "market value" of the patent.[73]  The value of these patents may not closely correlate

---

[70] The econometric and conjoint analyses contained in Prof. Cockburn's previous reports might serve as a basis for this apportionment, if they were sufficiently reliable and admissible, although Prof. Cockburn did not propose to use these analyses for that purpose.

[71] The Court recently excluded Dr. Cox's opinions regarding the apportionment of Google's unjust enrichment.  As such, my discussion here is likely moot.

[72] Cox Supplemental Expert Report, exhibit 2a

[73] The study, "The Value of European Patents - Evidence from a Survey of European Inventors," Final Report of the PatVal EU Project, uses a self-reported estimate by the inventor of the minimum amount the patent holder would accept to sell the patent. This is an asset value (the amount someone would pay to own the patent) not a licensing value (the amount someone would pay to use a patent).

Expert Report of Professor James R. Kearl

March 21, 2012                                                                        Charles River Associates

with the contribution of the patents to incremental Android revenue.[74]  Also note that the denominator in Prof. Cockburn's ▇▇▇ copyright apportionment percentage is the value of the total Java mobile patent and copyright portfolio, not the total value (i.e., revenue) of Android. As the Court has noted, the value of Android need not equal or bear any relationship to the value of the Java mobile patent and copyright portfolio. Therefore, I do not believe that the results of Prof. Cockburn's Group and Value analysis can be reliably used by Dr. Cox to estimate the percentage of Android revenue that is due to copyright infringement.

124.    Based on the admissible evidence in this matter, I am not aware of a quantitative method to estimate the percent of Android revenue or profit that is due to the alleged copyright infringement. Prof. Cockburn and Drs. Leonard and Cox have marshaled the evidence both for and against the proposition that the use of the Java APIs was important to the success of Android. While I do not have a quantitative estimate to provide the jury, my opinion is this evidence shows the use of the Java APIs was important, but not essential, to the success of Android. Thus, I would not advise the jury to conclude that all Android revenue and profits are due to the alleged copyright infringement, nor would I advise the jury to conclude that none of Android profits are due to infringement.

125.    Finally, in his most recent report Dr. Cox also presents an alternative measure of unjust enrichment damages. Dr. Cox observes that Prof. Cockburn opines that ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇s sufficient to compensate Oracle for Google's use of the entire portfolio of intellectual property, in the way Google used it (an incompatible open source implementation). Dr. Cox then uses this royalty rate to calculate the entire

---

[74] For instance, a patent that has broad application may command a very high market (asset) value, but be of only limited value to an individual licensee (because the patent has a limited impact on increasing that licensees revenues). As another example, if use of a patent allowed a reduction in costs, for instance, the patent may be valuable while not contributing to incremental revenue.

Expert Report of Professor James R. Kearl

March 21, 2012                                                  Charles River Associates

value of the portfolio, and employs apportionment percentages from Prof. Cockburn's work to derive the value of the copyrights.[75]  Dr. Cox is implicitly assuming that all of the value that Sun would have received under the 2006 license would have been in the form of the 10% royalty. As I discuss above, most of the value to Sun from that license would have been in the opportunity for Sun to offer a commercial version of the operating system (Android). The 10% royalty was in addition to, not in replacement of, this commercialization opportunity. Thus, Dr. Cox's analysis here is incorrect.

## VI.1.2. Lost Profits – Java ME

126.     Java ME, the micro edition of Java, is designed to write software for devices with limited memory, and is run on some mobile devices. Sun had an established business of licensing Java ME to mobile phone handset OEMs, as well as for use in other devices such as television set top boxes and soda machines. Oracle argues that the infringement by Android of the Java ME copyrights has led a decrease in Java ME licensing revenue.

127.     Prof. Cockburn calculates Java ME lost profits from 2009 through 2011.  His approach is standard. Using a 2007 Sun strategic forecast of Java ME licensing revenues and data on actual licensing revenues, Prof. Cockburn calculates the amount by which actual Java ME licensing revenues fall short of forecasted revenues. Prof. Cockburn implicitly attributes this entire difference (which he labels "lost revenue") to the copyright infringement by Android. He then calculates the ratio of Cost of Goods Sold to Revenue, and Sales Costs to Revenue, in 2006. ████████████████████████████

████████████████████████████████████████████

████████

---

[75] Although he does not discuss this approach, presumably Dr. Leonard could use the same method to value the patents.

[76] Third Cockburn Report 2/3/2012, exhibit 20

Expert Report of Professor James R. Kearl

March 21, 2012                                            Charles River Associates

128.    Dr. Cox raises several objections to Prof. Cockburn's analysis and conclusions. These include:

1.  Prof. Cockburn uses an incorrect forecast.

2.  Prof. Cockburn includes forecasted revenues from non-mobile phone applications.

3.  Prof. Cockburn uses an incorrect figure for actual 2011 Java ME revenues.

4.  Prof. Cockburn attributes all lost revenues to Android.

5.  Prof. Cockburn attributes all lost revenue to the copyright infringement of Android.

129.    ███████████████████████████████

130.    ███████████████████████████████

_____

[77] Reply Report of Cockburn to Cox paragraph 54.

[78] Reply Report of Cockburn to Cox, paragraph 57.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

131.     Prof. Cockburn's explanation sounds reasonable, although what scenarios the vari-
ous forecasts represent is ultimately a fact issue on which an economist has no special
expertise. For my analysis here, I adopt the "strategic" forecast used by Prof. Cockburn. I
would advise the jury that, if the jury believes the "high" forecast better represents the
"but-for" prospects for Java ME, as of approximately 2007, then the jury should award
damages based on that forecast. I can easily prepare an exhibit that presents my calcula-
tions using this forecast and will do so if asked.



. As

---

[79] Expert Report of Dr. Cox 11/28/2011 page 57.

[80] Cockburn Reply to Cox Exhibit 2

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

such, I am of the opinion that Java TV and other embedded services should be excluded in the calculation. I also note however that the difference in the actual vs. projected revenues for Java in mobile devices (where actual revenues fall well short of projections) compared to the actual vs. projected revenues for Java in other applications (where actual revenues exceed projections) is economic evidence that the shortfall in Java licensing revenues in mobile devices is due to changes in the mobile device market (such as, perhaps, the emergence of Android) and not due to other issues that would affect all Java ME licensing revenues.

135.     Total Java ME revenues in 2011 were not known when Prof. Cockburn prepared his September 2011 report. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████ ██ ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ .[82]  It is my opinion that the damages calculation should utilize the most current and accurate data on actual licensing revenues. As with the issue of actual Google revenue from Android, I am not in a position to adjudicate whose assumption about actual past Java ME licensing revenues is correct. Presumably this is a number that can be known with certainty, and will be known at trial. I will

---

[81] Reply Report of Cockburn to Cox paragraph 68.

[82] Expert Report of Dr. Cox 11/28/2011 fn. 216.

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

use that number in my calculations. For the purposes of this report, I use the revenues

assumed by Prof. Cockburn.[83]

136.    ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████. Dr. Cox uses Strategy Analytics' January

2011 forecasts of global smartphone sales to apportion a part of Java ME's lost revenues

to Apple iOS.  Dr. Cox only apportions lost revenues to iOS – and not other smartphones

– because the iOS (and Apple iPhones) do not use or license Java ME, while most other

smartphones (such as Blackberry) do.

137.    Prof. Cockburn dismisses Dr. Cox's adjustment with two arguments. ████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ █ █████████████████████████████████

██████████████████████████████████

138.    I do not find Prof. Cockburn's arguments persuasive████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████ However, strong growth – especially stronger than

expected growth – of one product might cause actual revenues from a substitute product

to fall short of projections. The key issue is what did Sun expect regarding iPhone share

---

[83] Adopting Prof. Cockburn's assumption is not meant as an endorsement of his assumption over the assumption of
Dr. Cox. However, these are Oracle revenues, so I adopt the data used by the Oracle expert.

[84] Reply Report of Cockburn to Cox paragraphs 71-72.

March 21, 2012                                                                Charles River Associates

and units sold when it prepared its forecast in early 2007. I have not seen any evidence
on this point. However, it is my impression that the actual success of the iPhone has
been surprising to industry participants, relative to expectations in early 2007.[85] ███

████████████████████████████████████████████████████████████

███████████████████████████████    Thus, I believe that Dr. Cox's apportionment step
to be correct.

139.    However, while I agree some apportionment of Java ME lost profits to the iPhone is
appropriate, I do not agree with Dr. Cox's formula for doing so. Dr. Cox's apportionment
is, I believe, unnecessarily complex and leads to an over-allocation of the Java ME lost
profits to the iPhone, and thus an underestimate of damages to Sun. I adopt the straight-
forward approach of taking the total lost Java ME profits in each year and allocating these
to either the iPhone or Android, based on the proportional market share of these two plat-
forms. Note that this likely overstates the impact of the iPhone to Java ME lost profits,
because it allocates Java ME losses to the total iPhone share, not the "unexpected" iPh-
one share. Thus, it is likely that my damage estimate here is biased downward, and,
hence, conservative.

140.    Dr. Cox's final criticism of Prof. Cockburn's analysis is that according to Prof. Cock-
burn's own analysis, only a part of Android's sales can be attributed to the copyright in-
fringement. Dr. Cox argues that absent infringement Android would still have a market
share that would be ████ of the actual Android market share.[86] This was based on Prof.
Cockburn's (and Prof. Shugan's) conjoint analysis. After Prof. Cockburn filed his most re-
cent report (on February 3rd), Dr. Cox revised his calculations to use the ████ copyright

---

[85] http://www.wirelessindustrynews.org/news-aug-2009/1624-081309-win-news.html

[86] Dr. Cox makes a mistake here. He assumes Prof. Cockburn's conjoint analysis showed that, absent copyright
infringement, Android market share would decrease by 13.5%. This is incorrect. Prof. Cockburn's conjoint
analysis showed that, absent copyright infringement, Android market share would decrease by 19.2%.
The 13.5% figure is the net reduction in Android advertising revenues, after considering the mitigating
effects whereby Google re-captures some lost advertising revenue from "lost" Android uses when those
users conduct Google web searches on other types of phones.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

apportionment percentage from Prof. Cockburn's "Group and Value Approach."[87] I understand this revision has been stricken by the court.[88]

141.    While he does not spell it out clearly, Prof. Cockburn appears to argue that smartphones with a non-infringing Android would still require a license from Sun (Oracle) for Java ME, and thus increased market penetration of a non-infringing Android would not decrease Sun Java ME licensing revenues. This appears to be correct. I understand that most smartphone OEMs license Java ME for use on smartphones that use an operating system other than Android or iOS.[89] Dr. Cox appears to implicitly accept this argument, when he only apportions some of the Java ME lost profits to growth in the iPhone and not to other smartphone models using another operating system.

142.   The important economic issue is that Java ME is not a substitute for Android, but rather a complement to a non-infringing Android and an already-incorporated complement in the infringing Android. This is the source of the lost Java ME profits. Increased market share of non-infringing Android does not displace Java ME licensing revenues (since Java ME does not substitute for Android).  It is the lack of a need for a Java ME license by

---

[87] Dr. Cox also makes an error here. He interprets Prof. Cockburn's copyright apportionment percentage as a measure of the incremental market share of Android due to the use of the disputed Java APIs. This is incorrect. The ▇▇▇ copyright apportionment percentage from the Group and Value approach is an estimate of the ▇▇▇ of the copyrights as a percent of the total value of all Java mobile related patents and copyrights. While one might expect that more valuable patents would lead to greater product acceptance in the market, this need not be the case at all, and there certainly does not need to be a tight relationship between the two.

[88] Court Order 3/15/2012 Document 796

[89] http://www.oracle.com/technetwork/java/javame/javamobile/overview/about/index.html

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

the infringing version of Android that displaces Java ME licensing revenues. This dis-

placement occurs for every unit of the infringing Android, not just the incremental units

that are the result of the infringement.[90]   As such I agree with Prof. Cockburn that the

calculated lost Java ME licensing revenues do not need to be apportioned to reflect the

but-for market share of a non-infringing Android.

143.     My calculation of Java ME lost profits damages is presented in Table 10.



### VI.1.3.  Lost Profits – Java FX

144.

As I discuss be-

low, this difference is important in an analysis of Oracle's lost profits claim.

145.

146.

---

[90] My assumption that OEMs using the actual (infringing) Android would not need a Java ME license, while OEMs
     using a non-infringing Android would need a Java ME license, is critical.  If OEMs license Java ME for use
     on the actual (infringing) Android, then my assumption would be incorrect and I would revise my opinion
     here.

Expert Report of Professor James R. Kearl

March 21, 2012                                                            Charles River Associates



147.

148.

91 Expert Report of Ian Cockburn 9/12/2011 Exhibit 21. While Dr. Cox does not raise an objection, I

92 Expert Report of Dr. Cox 11/28/2011 page 55.

93 Expert Report of Dr. Cox, p. 58. As discussed above the ▮▮▮ figure is the incremental Android revenue due to the copyright infringement, not the incremental market share. Dr. Cox should have used the ▮▮▮ incremental market share figure.

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates



149.    Prof. Cockburn again dismisses all of Dr. Cox's arguments,

. However, as I understand Oracle's claim, it is not claiming damages from the existence of Android, but from the copyright infringement of Android. Absent copyright infringement, Android could (and likely would) still exist, although it would likely have a somewhat lower market share.

150.

---

94 Supplemental Expert Report of Dr. Cox 2/17/2012 paragraph 44. This apportionment percentage is based on Prof. Cockburn's "Group and Value" method. As discussed above, however, the apportionment percentage from the Group and Value method is not a measure of the incremental market share of Android due to the copyright infringement. Thus, Dr. Cox's use of this percentage here is incorrect.

95 In the analysis of Java ME lost profits, Prof. Cockburn (and I) assume that absent copyright infringement OEMs using Android would license Java ME from Sun and include Java on their Android handsets. Thus, non-infringing Android phones would be Java compatible.



## VII.        Analysis of the Georgia-Pacific Factors

151.    The seminal case with regard to a reasonable royalty determination in the framework

of a hypothetical negotiation is *Georgia-Pacific Corp. v. U.S. Plywood Corp.*[96]    *Georgia-*

*Pacific* points to those things that ought to considered in bridging to the hypothetical ne-

gotiation from the market and technical environments; information available to, and ex-

pectations of, the parties; and negotiations, if any, between the parties or others who are

similarly situated at or before the time of infringement.

**Factor 1. The royalties received by the patentee for the licensing of the patent in suit,**

**proving or tending to prove an established royalty.**

152.    It is my understanding that there are no Sun licenses for specific Java ME patents

and, hence, no contemporaneous or near contemporaneous licenses for the in suit pa-

tents.

153.    There are Sun licenses for the Java ME IP portfolio. 

---

[96] 318 F. Supp. 1116, 1119-20 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir.); approved by the Federal
Circuit in *Unisplay, S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512, 517 n.7 (Fed. Cir. 1995).

Expert Report of Professor James R. Kearl

March 21, 2012                                                                                    Charles River Associates



**Factor 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.**

154.     It is my understanding that there is nothing in the record with regard to Google licensing patents comparable to the in suit patents.

155.     Dr. Leonard's Exhibit 3c indicates that ███████████████████████ ██████████████████ [97]  As I understand the matter, this wasn't for use in a full-stack operating system comparable to Android, but it does suggest two things:  First, that ███████████████████████████████ ██████████████████████████ ███████████████████████████ ████████████████████████████ ███████████████████████ █████████████████████████████.  Dr. Leonard's Exhibit 3c implies that Google had contracted with Sun for a license extending from January 2008 through at least September 2011.[98]

**Factor 3. The nature and scope of the license, as exclusive or nonexclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

---

[97] Expert Report of Dr. Gregory D. Leonard, October 24, 2011

[98] Dr. Leonard's Exhibit 3e provides information on HTC, Motorola, and Samsung licenses for Java ME.  Curiously, Google's license isn't detailed in this Exhibit although the per unit royalty rate is provided in Exhibit 3c.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

156.     Proposed agreements drafted during the 2006 negotiations suggest that the license
would be non-exclusive, world-wide, perpetual and restricted to Android.[99]

157.     While the hypothetical license would allow for an implementation of Sun's Java ME
patents and copyrights that were "incompatible", open sourcing Java ME IP was clearly
envisioned by both parties and it seems unlikely that a difference in the type of open
source license would change whether the license was nonexclusive, perpetual and world-
wide.

158.     The hypothetical and actual negotiations do differ with regard to incompatibility and
possibilities of fragmentation.  Sun's February 2006 offer would have been made assum-
ing that Android would have a Java VM and open sourced under the GPL.  The hypothet-
ical negotiations would have been for a Dalvik VM and, perhaps, open sourcing under the
Apache license. The royalty that I derive from the February 2006 offer (roughly ███ )
would have accounted for open sourcing, since that was clearly envisioned by both par-
ties in the 2006 negotiations, but it would not have reflected the incompatibilities created
by the differences between the Java VM and the Dalvik VM or between the GPL and the
Apache open source licenses. This suggests a higher portfolio royalty rate than I have

---

[99] While the 2006 negotiations were never consummated, Sun sent a proposed agreement to Google March 16,
     2006, to which Andy Rubin responded on behalf of Google on March 26, 2006 and March 29, 2006 (The
     cover email to the second response indicates that "[e]nclosed is a revised agreement with comments from
     our attorney." (GOOGLE-12-00044940))

Section 1.17 reads, in part: "Intellectual Property Rights" means all worldwide (a) patents, patent applications, and
     patent rights; (b) rights associated with works of authorship including copyrights, copyright applications,
     copyright restrictions . . ."   Section 3.1(b) reads, in part: "License to Google of Sun Technology and Tools
     for Internal Use and Development Purposes.  Sun hereby grants to Google a worldwide, nonexclusive,
     royalty-free (except as provided in Section 15.2) nontransferable license . . . To the extent Sun Technology
     is incorporated into Google Developed Software as agreed in the Project Plan, Sun hereby grants Google
     a perpetual right to use . . ."  And in Section 3.1(e) it reads, in part, ". . . Sun hereby grants, upon the
     successful completion of the Project Plan, that Google and Sun may release . . . the Sun Technology
     specified in the Project Plan under the appropriate Open Source Model" (GOOGLE-12-00044943,
     GOOGLE-12-00044947, GOOGLE-12-00044948, GOOGLE-12-00044953).

The proposed license prepared by Sun and sent to Google March 16, 2006 contains the same language in Sections
     1.1 and 3.1(d) respectively. (GOOGLE-01-00062074; GOOGLE-01-00062079)  It differs with regard to the
     type of open source license – a matter that apparently could not be resolved – in Section 3.1(e), but is
     otherwise the same. (GOOGLE-01-00062079)

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

estimated and, hence, a higher apportioned reasonable royalty rate for the in suit patents and copyrights than the numbers put forward elsewhere in my report.

159. 

160.    The license envisioned in the hypothetical negotiation differs from either what might have been the license in the 2006 negotiations or the hypothetical negotiation for the 2006 portfolio, deriving the value of a license for a specific patent or subset of patents from a portfolio negotiation ignores the option and/or insurance value associated with a portfolio.  As such, an upward adjustment for the value of the option and/or insurance may be warranted.  Put differently, this Factor suggests that the royalty rate I have derived is a lower bound for a reasonable royalty.

161.    I understand that Oracle can recover damages only for infringement within the U.S. There is no reason to believe that this would affect the royalty rate; it would, however, affect the revenue base to which the royalty rate is applied, which I have limited to Android devices sold within the U.S.

162.    Since I have assumed that hypothetical and actual negotiations do not differ with regard to exclusivity, duration or geographic restrictions, no adjustments are warranted with regard to these components.

**Factor 4. The licensor's established policy and marketing program to maintain a patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

163.    Sun was willing to license Java ME IP and did so, generally with "field of use" restrictions. The 2006 negotiations weren't, in kind, different from Sun's other negotiations

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

in this regard except, perhaps, for open sourcing what it believed would be a compatible (i.e., Java VM-based) Android.  But, as noted in my discussion of G-P Factor #3, its February 2006 offer would have reflected this difference.  Hence, beyond the upward adjustments suggested in this earlier discussion, there should not be an adjustment specific to this factor.

164.     This opinion differs from Prof. Cockburn's, who suggests that Factor 4 "warrants an upward adjustment of (the) starting point" and Dr. Leonard's, who suggests that Factor 4 "suggests a slightly lower royalty, all else equal."

165.     If an appropriate adjustment could be made for incompatibility and possible fragmentation, per Factor 3, then no additional adjustment should be made just because Sun was willing to license its Java ME IP widely. Prof. Cockburn is inappropriately arguing for the same adjustment at least twice (in Factor 3 and Factor 4)[100] and Dr. Leonard is simply ignoring the context within which the actual offer was made – it may be that as a general matter, willingness to license anyone would lead to lower royalty rates but that doesn't mean that there should be an adjustment to a royalty rate that already reflects this fact.

**Factor 5.** **The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.**

166.     Under the 2006 February offer, Sun and Google would have been collaborators in developing Android, which Sun would have attempted to monetize.  Sun also had a viable business licensing Java ME to OEMs for mobile phones, where there may have been competitive pressures from a successful compatible Android.  However, Sun's expectations regarding these competitive effects would have been incorporated in its 2006 offer.

---

[100] In fairness, it's unclear whether Prof. Cockburn believes there should be an adjustment for the matters covered by Factor 3 and then an additional adjustment for the matters covered by Factor 4 or simply reemphasizing the need for a single adjustment based on either Factor 3 or Factor 4.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

To the degree that an incompatible Android was a greater competitive threat to Sun's Java ME mobile phone OEM revenues than was a compatible Android, the royalty in the hypothetical negotiation would have been higher than the royalty I have estimated. This would suggest an upward adjustment to the royalty implied by the 2006 negotiation.

167.   There is no evidence that I know of that suggests that Sun was anticipating a parallel development of its own smartphone operating system at the time it was negotiating with Google in 2006 to collaboratively develop Android. As such, Dr. Leonard's discussion of the reasons for Project Arcadia's failure is beside the point with regard to this Factor.

**Factor 6. The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of non-patented items, and the extent of such derivative or convoyed sales.**

168.  Sun presumably understood in 2006 that Google's interest in providing an open source, Java-VM based Android to the market was tied to its revenues from advertising. Sun could easily have inferred that Google's interest was either to protect its existing revenues from erosion due to competition (e.g., a Microsoft platform with something like what came to be Bing) or to expand its revenues with the growth of search from mobile devices. Had a deal been consummated along the lines of the February 2006 offer, it would have incorporated these expectations. There's little reason to believe that an incompatible, Dalvik VM Android would change Google's expectations or interest in this regard. I conclude that since these expectations are already incorporated in the 2006 actual negotiations, that this Factor warrants no adjustment, up or down in my estimated royalty embedded in the 2006 February offer.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

169.    Prof. Cockburn argues for an upward adjustment.  He notes that *Georgia-Pacific* "contemplates that the portion of such benefits (the value of Google of Android) due to the patents-in-suit should be accounted for in the reasonable royalty. . . [e]conomically, it makes sense to consider and account for all of the benefits that Google would have reasonably anticipated from the infringement in determining what Google would have agreed to pay Sun for a license."[101] I agree, but, assuming that Google actually agreed to Sun's February 2006 offer, these benefits are already reflected in the terms of the agreement.

170.    Dr. Leonard argues that putative existence of non-infringing substitutes means that it is "incorrect to attribute to the patents-in-suit any significant amount of revenues. . . (t)his factor suggest a lower royalty. . ."[102]   This too is incorrect if one assumes that Sun's February 2006 offer was essentially the "deal" that would have been made.  There may have been, and probably were, non-infringing substitutes in 2006, but they too would have been reflected in the terms of the February 2006 "deal".

**Factor 7. The duration of the patent and the term of the license.**

171.    As discussed elsewhere, the royalty rate I derive assumes that a deal based on the February 2006 offer and any contemporaneous hypothetical negotiation would have been for the life of the patents.  Since there are no differences between the actual offer and the hypothetical negotiation in this regard, no adjustment is warranted.

**Factor 8. The established profitability of the product made under the patent, its commercial success, and its current popularity.**

172.    Since I have estimated a percentage royalty rate to be applied to Google's actual Android revenues, the amount due Oracle should infringement be found scales automatically with Google's success.  No further adjustment, up or down, is necessary or warranted.

---

[101] Expert Report of Dr. Iain M. Cockburn 9/15/2011 paragraph 88.

[102] Expert Report of Dr. Gregory K. Leonard 10/24/2011 p. 68.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                    Charles River Associates

173.     Dr. Leonard finds that this factor is neutral.  While this is my opinion as well, his rea-
soning is different than mine and implies something different than mine as well.  Specifi-
cally, what he means is that a lump sum royalty determined based on 2006 expectations
should not be adjusted for the subsequent success of Android.[103]  What I mean, by con-
trast, is that a royalty rate determined based on 2006 expectations should not be adjust-
ed, but that since this royalty rate would have been applied to actual Android revenues,
damages based on my royalty estimate will be greater if Android is more successful and
vice versa.

174.     Prof. Cockburn argues that Factor 8 supports an upward adjustment in the royalty.  I
disagree and find his argument a little perplexing.  I do not disagree with his observations
that in 2006 Sun's Java ME was popular, that its licensing business was profitable, that
the Java language was popular and widely used, and that Oracle paid a lot of money
when it acquired Sun and Sun's Java IP in 2010. However, these factors are irrelevant to
any adjustment warranted for Factor 8 for three reasons:  First, the latter is an ex post-to-
2006 valuation.  Second, this Factor deals with the "product made under the patent", i.e.,
a Dalvik VM Android.  Third, Sun made an offer in February 2006 knowing all of these
things (except the amount that Oracle was willing to pay for Sun and Sun's Java IP in
2010), so to the degree that any one or all of them mattered, they were things that would
have been reflected in Sun's offer.  Elsewhere I have indicated that I believe that an up-
ward adjustment is warranted for incompatibility and possible fragmentation, but there
shouldn't be an additional, or independent, adjustment based on Factor 8.

**Factor 9. The utility and advantages of the patent property over the old modes or devic-
es, if any, that had been used for working out similar results.**

---

[103] Dr. Leonard argues that Android's revenues would have been the same with and without the in-suit patents.  I
believe this to be wrong, for reasons discussed elsewhere, including in Factor 6.  He also argues that a
reasonable royalty should be determined by Google's expectations in 2006.  I agree with regard to
determining the royalty rate; I disagree in terms of determining damages at the date of trial.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

175.    There is no serious disagreement that the availability of applications and the speed

with which a smartphone boots and its applications loads are important to end users and,

hence, to OEMs.  Likewise, there isn't disagreement that Google wants Android to be

widely used. It follows that to the degree that the in suit patents were expected to en-

hance speed and the in suit copyrights were expected to make possible more applica-

tions, and in particular, more Java-language-based applications sooner than would have

otherwise been the case, the in suit patents and copyrights were in 2006, and are in

2012, valuable to Google.

176.    A review of the consumer and trade press confirms that end users value speed and

they value applications.[104] The Enhanced Econometric Model developed in Appendix F

also confirms this observation.  As detailed in Appendix F, Section 3(f), an 80% reduction

in the *linpack* score reduces the willingness to pay between $8 and $38 with an average

of $21 – these amounts represents a reduction in willingness to pay of 6.2% for the re-

spective Android phones.  Limiting the number of applications available on the phone be-

tween 6,000 and 40,000 results in a reduction in willingness to pay between, on average,

$12 and $22.  These averages imply percentage changes in willingness to pay of be-

tween 2% and 7% with an average of 5%.

---

104 Regarding speed, see for instance, Gargi, Neha. "How to Buy a Cellphone (Smartphone) Running Android
      OS." Cell Phone Beat. http://www.cellphonebeat.com/buy-cellphone-smartphone-running-android-os.html;
      Rahimi, David. "How Important Are Specs In A Smartphone?" Cell Phone News, Reviews, and How Tos.
      Phone Buff, 21 Jan. 2012. http://www.phonebuff.com/2012/01/important-specs-smartphone/; Gordon,
      Whitson. "How to Pick Your Next Android Phone: The Specs That Matter (and the Ones That
      Don't)." Lifehacker, Tips and Downloads for Getting Things Done. 19 Jan. 2011.
      http://lifehacker.com/5737659/how-to-pick-your-next-android-phone-the-specs-that-matter-and-the-ones-
      that-dont; Mies, Ginny. "The Phone Specs That Matter." Reviews and News on Tech Products, Software
      and Downloads. PC World, 10 June 2011.
      http://www.pcworld.com/article/230109/the_phone_specs_that_matter.html.

Regarding the number of available applications, see "Mplayit Analysis Shows IPhone Losing Its Edge in Apps."
      Mplayit, 13 Jan. 2010. http://www.prnewswire.com/news-releases/mplayit-analysis-shows-iphone-losing-
      its-edge-in-apps-81311677.html; Appsfire Team. "APPtrition – or Why App Store Size Does Not Matter
      That Much…."Appsfire On App Discovery. 8 June 2011. http://blog.appsfire.com/56242179/; Grothaus,
      Michael. "Android Market Could Surpass App Store in Size This Year, Research Suggests." TUAW Beta. 5
      May 2011. http://www.tuaw.com/2011/05/05/android-market-could-surpass-app-store-in-size-this-year-
      resear/; Wauters, Robin. "Android To Surpass Apple's App Store In Size By August 2011: Report
      (Exclusive)." Tech Crunch. 5 May 2011. http://techcrunch.com/2011/05/05/android-to-surpass-apples-app-
      store-in-size-in-august-2011-report-exclusive/.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

177.    Dr. Leonard suggests that in 2006, Google could have used a Java language compil-

er in Android in lieu of the Dalvik VM.  As I understand the matter, he is arguing that An-

droid could have forfeited the benefits of a virtual machine without much cost.  He also

argues that Google could have readily used another programming language instead of

Java, again without much cost.  Finally, he argues that Google could have replaced the in

suit patents, presumably within the Dalvik VM and the copyrights without much cost.

Whether any of this could have been done technically is certainly beyond my expertise

and, I suspect, his, Dr. Cox's and Prof. Cockburn's as well.  With regard to cost, the issue

really is the opportunity cost in terms of what Google would have lost with an Android

without the benefits of a virtual machine and an Android that could not be as easily mar-

keted to OEMs and developers who were interested in platforms where the Java lan-

guage could be used.

178.    There is some indirect evidence of Google's opportunity costs.  As noted elsewhere,

Google was negotiating with Sun for a license to Java ME IP.  It did so knowing all of the

"non-infringing" options Ds. Leonard and Cox cite.  That there was serious discussion for

a license that would have required Google to pay Sun tens of millions of dollars and given

Sun the opportunity to try to monetize Android is evidence that the alternatives suggested

by Drs. Leonard and Cox were not low opportunity cost options.  In addition, when the

negotiations broke down in 2006, Google *did not pursue any* of these options, but instead

pushed forward with a Java-based product and Android *does* have a virtual machine and

*was* designed to appeal to Java-language programmers.

179.    Based on this "revealed preference" evidence, the royalty rate derived from the Feb-

ruary 2006 offer is a reasonable estimate of the lower bound of the marginal benefit to

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

Google of Sun's Java ME IP portfolio given the (opportunity) cost of all non-infringing

substitutes available to Google in 2006.[105]

**Factor 10.        The nature of the patented invention, the character of the commercial**

**embodiment of it as owned and produced by the licensor, and the benefits to those**

**who have used the invention.**

180.    As noted in my discussion of Factors 6 and 9, the evidence suggests that consumers

value the functionality enabled by the in suit patents and copyrights – assuming, of

course, that there is a technical nexus between the in suit patents and copyrights and the

speed and applications available to consumers.  And, again as noted in Factor 9, the ne-

gotiations between Google and Sun, per se, suggest that Google expected that Sun's Ja-

va ME IP would provide direct benefits to users of Android and indirect benefits to

Google.  However, these expectations were known at the time of the 2006 negotiations.

Therefore, this Factor does not warrant any adjustment to the royalty rate derived from

those negotiations.

**Factor 11.        The extent to which the infringer has made use of the invention and any**

**evidence probative of the value of that use.**

181.    See discussion of Factors 9 and 10.

**Factor 12.        The portion of the profit or of the selling price that may be customary in**

**the particular business or in comparable businesses to allow for the use of the in-**

**vention or analogous inventions.**

182.    I know of no evidence in the record available to me that would be useful in address-

ing this Factor.

---

[105] Dr. Leonard's opinion that this factor suggests a "lower royalty" is puzzling.  Surely it cannot be the case that in 2006 Google believed that it was negotiating for something that would reduce the value of the smartphone operating system it intended to build.  See page 70 of Expert Report of Dr. Gregory K. Leonard 10/24/2011.

**Factor 13.        The portion of the realizable profit that should be credited to the inven-
tion as distinguished from non-patented elements, the manufacturing process, busi-
ness risks, or significant features or improvements added by the infringer.**

183.        As I have discussed above, with regard to the Java ME IP portfolio, the 2006 negotia-
tions themselves provide the evidence:  Google would not have been willing to enter into
negotiations with Sun for Java ME IP if it did not believe (in 2006) that the use of Java
ME IP would increase its revenues from the use of Android and the license amount, and
the royalty rate that I derive from the February 2006 offer, is itself a best estimate of
Google's willingness to pay for the in suit patents and copyrights.

**Factor 14.        The opinion testimony of qualified experts.**

**Factor 15.        The amount that a licensor (such as the patentee) and a licensee (such
as the infringer) would have agreed upon at the time the infringement began if both
had been reasonably and voluntarily trying to reach an agreement, that is, the
amount which a prudent licensee -- who desired, as a business proposition, to ob-
tain a license to manufacture and sell a particular article embodying the patented in-
vention—would have been willing to pay as a royalty and yet be able to make a rea-
sonable profit; which amount would have been acceptable to a prudent patentee
who was willing to grant a license.**

Respectfully submitted this 21st day of March, 2012.

James R. Kearl

Expert Report of Professor James R. Kearl

March 21, 2012                                          Charles River Associates

# Appendix A: Curriculum Vita

## J.R. Kearl

Senior Consultant

Post Doctoral Economics and Law
Harvard University

PhD Economics
Massachusetts Institute of Technology

BA Mathematics and Economics
Utah State University

Dr. J.R. Kearl is a senior consultant to CRA with the Antitrust & Competition Economics Practice and the A.O. Smoot Professor of Economics at Brigham Young University. He specializes in applied microeconomics, industrial organization, and public policy. His areas of expertise include public policy analysis, the economics of antitrust, regulation, intellectual property, economic damages, and trade policy. While a White House fellow, he served as a special assistant to the secretary of defense and to the US trade representative. He has also served on the US Census Advisory Committee on Population Statistics.

## Professional experience

| | |
|---|---|
| 2000–Present | *Senior Consultant*, Charles River Associates |
| 1996–Present | *A.O. Smoot Professor of Economics*, Brigham Young University |
| 1991–Present | *Assistant to the President for the Jerusalem Center for Near Eastern Studies*, Brigham Young University |
| 1996–2000 | *Director and Senior Economist,* LECG, Inc. |
| 1993–1996 | *Chair, University Strategic Planning Initiative and Reaccreditation Self-Study,* Brigham Young University |
| 1989–1991 | *Associate Academic Vice President*, Brigham Young University |
| 1986–1997 | *Professor, Economics,* Brigham Young University |
| 1986–1989 | *Dean of General and Honors Education,* Brigham Young University |
| 1984–1986 | *Professor, Economics and Law,* Brigham Young University |
| 1984 | *Special Assistant*, United States Trade Representative |
| 1983–1984 | *Special Assistant*, US Secretary of Defense |
| 1981–1983 | *Chair*, University Library Council |
| 1979–1991 | *Research Associate*, National Bureau of Economic Research |
| 1979–1982 | *Member*, University Graduate Council |
| 1978–1983 | *Associate Professor, Economics and Law*, Brigham Young University |
| 1975–1978 | *Assistant Professor, Economics*, Brigham Young University |

Expert Report of Professor James R. Kearl

March 21, 2012                                                                                    Charles River Associates

| 1973–1974 | *Teaching Fellow*, Harvard University |
| 1973 | *Visiting Instructor*, Brigham Young University (Summer) |
| 1971–1974 | *Research Assistant*, National Bureau of Economic Research |
| 1970–1971 | *Teaching Assistant*, Utah State University |

## Community service

Chair, Food and Care Coalition Board, 2005–2007

Member, Food and Care Coalition Executive Committee, 2003–Present

Member, Food and Care Coalition Board, 2002–2003

Member, Ouelessebougou/Utah Alliance Executive Committee, 2001

Member, Ouelessebougou/Utah Alliance Board, 1997–2000

Member, US Census Advisory Committee on Population Statistics, 1991–1994

Member, Governor's Task Force for Education and Economic Development, 1989

Member, State of Utah Task Force on Concurrent Enrollment, 1988

## Honors and fellowships

A.O. Smoot Professorship in Economics, 1996–Present

Maeser Distinguished Teaching Award, 1992

White House Fellow, 1983–1984

Liberal Arts Fellow in Law and Economics, Harvard University, 1977–1978

Fellow, Legal Institute for Economists, 1977

SSRC Postdoctoral Award, 1975

Danforth Graduate Fellow, 1971–1975

BA, magna cum laude, 1971

Elected Blue Key, 1970

Elected Phi Kappa Phi, 1970

First Security Foundation Scholarship, 1970

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

## Publications

### Books

*Economics and Public Policy: An Analytical Approach, 6th Edition* (Pearson, 2010).

*Principles of Economics* (Simon and Schuster, 1998).

*Principles of Economics* (DC Heath, 1993).

*Principles of Microeconomics* (DC Heath, 1993).

*Principles of Macroeconomics* (DC Heath, 1993).

*Contemporary Economics: Markets and Public Policy* (Scott Foresman, 1989).

### Chapters in books

"Aggregate Production Functions." With F. Fisher and R. M. Solow, *Aggregation: Aggregate Production Functions and Related Topics* (MIT Press), 1993 (reprint of journal article).

"Choices, Rents and the Economic Mobility of Households," With C. Pope, *NBER Studies in Income and Wealth* (University of Chicago Press, 1986).

### Journal articles

"The Economics and Curious Law of Prejudgment Interest," With M. Glick and C. Sinclair, *University of Utah Law Review,* forthcoming

"Is There a Consensus Among Economists in the 1990s?" With R. Alston and M. Vaughan. *American Economic Review*, May 1992.

"The Covariance Structure of Earnings and Income, Compensation Behavior, and On-the-Job Investment." *Review of Economics and Statistics*, May 1988.

"Economics and Antitrust Litigation." With S. Wood. *The American Journal of Comparative Law,* 34, Summer 1986.

"Unobservable Family and Individual Contributions to the Distributions of Income and Wealth." With C. Pope. *Journal of Labor Economics*, July 1986.

"Mobility and Distribution." With C. Pope. *Review of Economics and Statistics*, 1984.

"Rules, Rule Intermediaries and the Complexity and Stability of Regulation." *Journal of Public Economics*, 1984.

"The Life Cycle in Economic History." With C. Pope. *Journal of Economic History*, March 1983.

"Wealth Mobility: The Missing Element." With C. Pope. *Journal of Interdisciplinary History*, March 1983.

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

"Deposit Rate Ceiling De-Regulation and Mortgage Innovation." *Empirical Economics*, Vol. 5, 1980.

"Household Wealth in Utah: 1850–1870." With C. Pope and L. Wimmer. *Journal of Economic History*, September 1980.

"Piecemeal De-Regulation: The Problems of Deposit Interest Rate Regulation and Mortgage Innovation." *Journal of Economics and Business*, Fall 1980.

"Inflation, Mortgages and Housing." *Journal of Political Economy*, September 1979.

"A Confusion of Economists?" With C. Pope, G. Whiting, and L. Wimmer. *American Economic Review*, May 1979. Reprinted in the *Kindai Keizagaku Series*, October 1979.

"Mortgages and Housing: The Issues and Some Evidence." *Journal of Consumer Credit Management*, Spring 1979.

"Inflation and Relative Price Distortions: The Case of Housing." *The Review of Economics and Statistics*, November 1978.

"Legal Impediments to Mortgage Innovation." With M. Hyer. *Real Estate Law Review*, Winter 1978.

"Illiquidity, the Demand for Residential Housing and Monetary Policy." With F. Mishkin. *Journal of Finance*, December 1977.

"The Housing Market and Alternative Mortgage Instruments." In Kaplan (ed.), *Alternative Mortgage Instruments*, Vol. III, D., (Washington, DC: FHLBB, Nov. 1977).

"Do Entitlements Imply that Taxation is Theft?" *Philosophy and Public Affairs*, Fall 1977.

"Aggregate Production Functions: Some CES Experiments." With F. Fisher and R. Solow. *Review of Economic Studies*, June 1977.

"Macroeconomic Simulations of Alternative Mortgage Instruments." With D. Jaffee. In F. Modigliani (ed.), *New Mortgage Designs for Stable Housing in an Inflationary Environment* (Boston, Mass.: Federal Reserve Bank of Boston, Conference Series No. 14, 1976).

"Financial Determinants of Housing Demand." With C. Swan and K. Rosen. In F. Modigliani, (ed.), *New Mortgage Designs for Stable Housing in an Inflationary Environment* (Boston, Mass.: Federal Reserve Bank of Boston, Conference Series No. 14, 1976).

## Other publications

*Workbook* to accompany *Economics and Public Policy: An Analytical Approach*, 2003.

"Is Microsoft Above the (Antitrust) Law?" *Utah Bar Association Journal*, September 1998.

*Principles of Economics: Instructor's Guide*, 1993.

Editor, *A Freshman's Guide to the University,* 1991.

*A Parents' Guide to the University*, 1991.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                    Charles River Associates

*Contemporary Economics: Instructor's Guide*, 1989.

Co-Editor, July 1986 special issue of *The Journal of Labor Economics*.

"The Family and the Distribution of Economic Rewards: An Introduction." *The Journal of Labor Economics*, July 1986.

"Protectionism: The Myths." *BYU TODAY*, 40, No. 2, pp. 24–37, April 1986.

"Comments." *Symposium on Countercyclical Stimulus Proposals for Single Family Housing* (Washington, DC: GAO, 1982).

"Inflation and the Price of Housing: Comment." *House Prices and Inflation*, (Washington, DC: The Urban Institute, June 1982).

*Index to the 1850, 1860 & 1870 Censuses of Utah*. With C. Pope and L. Wimmer. (Baltimore: Genealogical Publishing, Inc., 1981).

"A Dialogue on 'The Market' Economy," *Century 2*. BYU, Fall 1980.

"Freedom, Economic Efficiency, and Equality." With C. Pope. In L. Tullis (ed.), *Mormonism: A Faith For All Cultures*, (Provo, Utah: BYU Press, 1978).

"Econometric Forecasting—The Dismal Science Redux?" *Intermountain Economic Review*, Spring 1977.

"Capitalism and Freedom—A (Critical) Reader's Guide." *Monday Magazine*, Brigham Young University, February 1976.

## Professional activities

### Presentations at professional meetings and workshops

"Antitrust Law and the Economics of Bundled Prices," Utah Bar Association and CLE Workshop, San Diego, July 2011 (with G. Adams)

"Antitrust Law and the Economics of Aftermarket Monopolization," Utah Bar Association and CLE Workshop, San Diego, July 2011 (with G. Adams)

"Working with Damages Experts in Light of Recent Changes in the Federal Rules," CLE Workshop, Provo, August 2011

"Expert Depositions," Utah Bar Association, Salt Lake City, November 2010.

"Working with Economic Expert Witnesses," CLE Workshop, Provo, August 2009.

"The Economic Approach to Law," CLE Workshop, Provo, August 2008.

"Valuing IP: An Economic Perspective," CLE Workshop, San Diego, January 2004.

"Valuing IP: An Economic Perspective," CLE Workshop, Seattle, July 2003.

"Causality and Damages: An Economic Perspective," CLE Workshop, Phoenix, March 2003.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                                    Charles River Associates

"Switching, Adding, or Shifting: Network Effects, Compatibility and Lock-In," 8th International Conference of The Society for Computational Economics, July 2002.

"Shifting, Adding, Replacing: Network Effects and Market Behavior," World Congress of Network Economics, Aix en Provence, July 2002.

"IP Damages and Markets," CLE Workshop, San Francisco, 2002.

"A Skeptical Look at the Use of Network Effects Arguments in Antitrust Litigation," Charles River Associates Conference on New Directions in Antitrust, April 2001.

"Prejudgment Interest and Post-Event Information." Utah Bar Association Meetings, July 1999.

"Microsoft and the Antitrust Laws." Utah Bar Association Meetings, July 1998.

"Partnerships and Incentives." American Economic Association Meetings, January 1995.

"Cohort Effects and Consensus Among Economists." Western Economic Association Meetings, July 1992.

"Is There a Consensus Among Economists in the 1990s?" American Economic Association Meetings, January 1992.

"Do Individuals Dissave as They Age?" World Congress of the Econometric Society, August 1990.

"The Use of Economic Evidence in Antitrust Litigation." The International Academy of Comparative Law (12th Congress), August 1986.

"The Covariance Structure of Income." WEA Meetings, July 1986.

"The Covariance Structure of Income." Econometric Society Meetings, June 1986.

"The Covariance Structure of Earnings and Income." World Congress of the Econometric Society, August 1985.

"Unobservable Individual and Family Effects." Public Choice Society Meetings, February 1985.

"Unobservable Family and Individual Contributions to the Distributions of Income and Wealth." Conference on the Family and the Distribution of Economic Rewards, 1984.

"Economic Mobility," NBER Conference on Income and Wealth, March 1984.

"Economic Mobility." NBER Working Conference, January 1983.

"Historical Aspects of Life-Cycle Behavior." Economic History Association Meetings, September 1982.

"Life-Cycles in Income and Wealth." WEA Meetings, July 1982.

"Life-Cycles in Income and Wealth." Econometric Society Meetings, June 1982.

Expert Report of Professor James R. Kearl

March 21, 2012                                                            Charles River Associates

"Rules, Rule Intermediaries and the Complexity and Stability of Regulation." Public Choice Society Meetings, March 1982.

"Choice Elements in the Distribution of Wealth." Econometric Society Meetings, December 1981.

"Choice and Ricardian Elements in the Distribution of Wealth," "Dollar Auctions and Rent-Seeking Activity," and "The Economic Structure of a 19th-Century Economy." Invited paper WEA Meetings, July 1981.

"Panel Data and Historical and Contemporary Issues in the Distribution and Acquisition of Economic Rewards." Utah Academy of Science, Arts and Letters, Plenary Session, April 1981.

"Intergenerational Effects on the Distribution of Income and Wealth." IUSSP Conference, April 1981.

"Choice and Ricardian Elements in the Distribution of Wealth." Public Choice Society Meetings, March 1981.

"Wealth Distribution and Economic Mobility." Social History Meetings, November 1980.

"Full Employment Output in a Model with Transactions Costs." World Conference of Econometric Society, August 1980.

"Long Run Output in a Model with Transactions Costs." WEA Meetings, June 1979.

"Household Wealth in a Settlement Economy." WSSA Meetings, May 1979.

"Wealth in Nineteenth Century Utah: Determinants and Distribution." Organization of American Historians, April 1979.

"Household Wealth in a Settlement Economy." Economic History Workshop, Harvard University, February 1979.

"Innovations in the Mortgage Contract." American Finance Association Meetings, August 1978.

"A Confusion of Economists?" American Economic Association Meetings, August 1978.

"Wealth in Utah, 1850–1870." Economic History Workshop, University of Chicago, February 1978.

"Inflation and Housing." SSRC—FED Research Conference, June 1977.

"Wealth in Utah, 1850–1870." WSSA Meetings, April 1977.

"Illiquidity, the Demand for Residential Housing and Monetary Policy." Federal Reserve Bank of St. Louis, Research Workshop, June 1976.

"Inflation and Relative Price Distortions." WEA Meetings, June 1976.

"Financial Determinants of Housing Demand," "Macroeconomic Simulations of Mortgage Innovations." HUD-FHLBB-FED Conference on Mortgage Innovation, January 1975.

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

## Other participation at professional meetings

Discussant, "The State," Liberty Fund Conference, June 1986.

Discussant, Public Choice Society, February 1985.

Discussant, "Constitutionalism and Rights," BYU, January 1985.

Discussant, Liberty Fund Conference on "Art and the State," June 1983.

Discussant, WEA Meetings, July 1982.

Discussant, OMB Conference on Housing, July 1982.

Discussant, WEA Meetings, July 1981.

Discussant, Liberty Fund Conference on "Constitutional Constraints," June 1981.

Discussant, Liberty Fund Conference on "Takings and a Theory of the State," June 1980.

Discussant, Urban Institute Conference on "Housing Price Inflation," April 1980.

Fellow, Legal Institute for Economists, University of Miami Law Center, June 1977.

Discussant, WEA Meetings, June 1976.

## Lectureships

Presenter, Seminar on Teaching Large Section Classes, Brigham Young University, 2007.

Presenter, Seminar on Large Section Classes, Brigham Young University, June 2003.

Faculty Member, Land Reform Institute, Republic of China, 1997.

Faculty Member, Professional Development Center, MOEA, Republic of China, 1987–1992.

USIA Lectureship on Economics (Malaysia, Thailand, Indonesia, Philippines), June 1991.

USIA Lectureship on Economics (Hong Kong), June 1990.

USIA Lectureship on Economics (Austria, Switzerland, East Berlin, France), December 1988.

USIA Lectureship on Economics (Nepal, India), June 1988.

USIA Lectureship on Economics (Hong Kong, Pakistan), June 1987.

USIA Lectureship on Economics (Korea, Thailand, Japan, Taiwan), June 1986.

Presenter, GE Seminar on Undergraduate Education, June 1986.

USIA Lectureship on Economics (Germany, Italy), December 1984.

Presenter, Seminar on Defense Organization and Budgeting, 1983–1984.

Presenter, Seminar on Economic Journalism, July 1977.

Presenter, Seminar on Real Estate Finance, USU, December 1976.

Presenter, Seminar on Applied Econometrics, SIU, June 1976.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

### Consulting—research grants

Consultant, ETS, 1986–1987.

J. Fish and Lillian F. Smith Family Conference Grant, 1984.

National Science Foundation Grant SES-8218799, May 1983–October 1985.

Consultant, OMB, 1982.

Research Associate, National Bureau of Economic Research, 1981–1991.

Consultant, The Urban Institute, Mortgage Design Project, 1980.

Principal Investigator, Impacts of Retroactive Regulation, (ACUS), 1979–1980.

Principal Investigator, AMIR's Project (FHLBB), 1977–1978.

Consultant, Scale and Cost in Buildings, The Church of Jesus Christ of Latter-Day Saints, 1977.

Principal Investigator, Mortgage Innovation Study, (HUD), 1975–1977.

Consultant, Optimal Control Project, (NBER), 1975.

Consultant, US Department of Labor, 1975.

Consultant, FHLBB on Variable Rate Mortgages, 1975.

Research Associate, MIT Mortgage Study Group, 1974–1975.

HUD-FHLBB Research Grant, 1974–1975.

Consultant and Bibliographer, Xerox, *XIP Readings in Economics*, 1972–1974.

Research Assistant, NBER Project on Capital Aggregation, 1971–1974.

Consultant, FCC Licensing Petition, 1972.

### Reviews

#### Referee

*The American Economic Review,* 1981, 1982, 1992, 2002, 2003, 2005.

*Journal of Law and Economics*, 2004.

*Review of Economics and Statistics*, 1978, 1979, 1980, 1981, 1982, 1983, 1987, 1989.

*Journal of Human Resources*, 1989.

*AREUEA Journal*, 1985, 1987.

*Journal of Public Economics*, 1981.

*National Science Foundation*, 1980, 1984, 1986, 1987, 1991.

*International Economic Review*, 1982, 1987.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

*Southern Economic Journal*, 1980, 1984, 1985.

*The Review of Economic Studies*, 1980.

*Quarterly Journal of Economics*, 1980.

*Management Science*, 1979.

*Journal of Economic Dynamics and Control*, 1978.

*Journal of Money, Credit and Banking*, 1978.

*Econometrica,* 1978.

### Manuscript review

Prentice Hall, 1997.

Scott-Foresman, 1983.

West, 1983.

McGraw-Hill, 1982, 1983, 1984.

Addison-Wesley, 1981.

Wiley-Hamilton, 1977.

Cummings, 1975.

## Legal work

### Economic expert

Rule 706 patent and copyright damages expert, software, 2011–Present

Gaming devices patent damages analysis, 2011–Present

Condemnation damages analysis, construction supply industry, 2010

Arbitration damages analysis in re auction rate securities, 2010–Present

Non-compete contract and tortuous interference damages analysis, construction industry, 2010–Present

Patent damages, retail computer products, 2010–2011

Aftermarket antitrust liability and damages, 2010

Delayed payment of insurance damages issues, 2010

Antitrust claims by medical supply Group Purchasing Organizations, 2009–2010

Real estate contract damages issues, 2009–2010

Dialysis clinic antitrust liability and damages issues, 2009–2010

Expert Report of Professor James R. Kearl

March 21, 2012                                                   Charles River Associates

Online auction damages analysis, 2008–2010

Software market compensation and valuation issues, 2007–2009

Software implementation contract damages issues, 2008–2009

Credit card market antitrust damages issues, 2008

Medical devices antitrust and contract damages issues, 2007–2008

Software IP and contract damages issues, 2007

Hospital merger issues, 2007–2008

Hardware contract damages issues, 2006–2007

Leisure services (golf) antitrust liability and damages issues, 2007

Water distribution antitrust liability and damages issues, 2007–Present

Dental products IP and contract damages issues, 2006–2007

Gaming devices antitrust liability and damages issues, 2006–2008

Molybdenum antitrust liability and damages issues, 2006–2007

Financial market fraud and misrepresentation issues, 2007

Insurance market unfair competition and contract damages issues, 2006–2008

Software product IP and antitrust issues, 2006–2007

Snowmobile IP liability and damages issues, 2006

Truck stop antitrust issues, 2006–2009

Coal fines processing IP damages issues, 2005

Care facility valuation issues, 2005

Pharmaceutical/health care products patent and tort issues, 2005

Auto parts RP matter, 2005–2006

Methods and device patent issues in potato sprout inhibitors, 2002–2004

Trucking credit card contract (settlement) issues, 2004

Health care facilities, providers and insurance competition issues, 2005

Personal services contract damages issues, 2003–2004

Health care facilities antitrust issues, 2005–Present

Medical waste disposal antitrust issues, 2002–2006

Computer security software patent issues, 2004–2005

Computer operating system patent, copyright and contract issues, 2003–2005

Telecommunications switch antitrust and contract issues, 2004

Expert Report of Professor James R. Kearl

March 21, 2012                                                                          Charles River Associates

Managed care physician panel antitrust issues, 2003–2005

Sulfur contracting antitrust issues, 2003–2004

Futures markets antitrust issues, 2003

Software patent infringement damages issues, 2003–Present

Radio advertising antitrust issues, 2002–2004

Dialysis clinic contract and antitrust issues, 2002–2003

Coal processing patent infringement damages issues, 2002-2005

Hospital antitrust damages issues, 2001–2005

Software contract damages issues, 2001–Present

Engineering software antitrust issues, 2000–2002

Cellular telephone antitrust issues, 2001–2002

Newspaper mismanagement damages analysis, 2002–2004

Employee class action, credit card business, 2000

Consulting services contract issues, 2000

Physician services and defamation damages issues, 2000

Hospital antitrust issues, 2000

Medical devices patent infringement and reasonable royalty issues, 2000–2001

Explosives merger, 2000

Chemical products antitrust issues, 2000

Propane market antitrust issues, 2000

Retail gasoline market fair trade issues (Idaho), 2000

Grocery distribution antitrust issues, 2000

Trade show market antitrust issues, 2000–2003

Taxation of intellectual property issues, 1999–2000

Construction supply damage issues, 1999–2000

Bank merger antitrust issues, 1999–2000

Construction supply non-compete damage issues, 1999–2000

Health supplement trade dress infringement issues, 1999–2000

Lightning protection market antitrust issues, 1999–2003

Phosphate market antitrust issues, 1998–2000

Products liability damages issues, 1998

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

Retail floral market antitrust issues, 1998

High-end women's fashions antitrust issues, 1998–1999

Book distribution antitrust issues, 1998

Medical devices patent infringement issues, 1998

Aquaculture feed production patent infringement issues, 1998

Trucking credit card antitrust issues, 1998–2001

Valuation of wastewater collector and treatment facilities, 1997

Chemical market antitrust and contract issues, 1996–1997

Computer software market antitrust issues, 1996–2000

EPA regulation of municipal waste combustors and Clean Air Act issues, 1995–1996

Explosives market class actions and antitrust issues, 1995–1999

Computer software market contract and antitrust issues, 1995–2001

Computer software market antitrust issues, 1995–1996

Foam insulation market antitrust and contract issues, 1990–1995

Retail gasoline market antitrust issues (Utah), 1993–1994

Retail gasoline market antitrust issues (nationwide), 1993–1994

Credit card antitrust issues, 1991–1994

Retail grocery market antitrust issues, 1990–1991

Retail gasoline/diesel market antitrust issues (Utah), 1990–1991

## Courses taught

| | |
|---|---|
| Principles of Economics | Applied Welfare Economics |
| Principles of Economics, Honors | Law and Economics (Economics Students) |
| Principles of Economics, Independent Study | Law and Economics (Law Students) |
| Economic Principles and Public Policy | Economics of Antitrust Law and Regulation |
| Applied Introductory Microeconomics | International Trade Theory |
| Applied Microeconomics | International Trade Policy |
| Advanced Applied Microeconomics | Seminar on Distribution and Mobility |
| Applied Econometrics | Seminar on Applied Microeconomics |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

### Joint or team taught courses

Seminar on the Economics of Family (with C. Pope)

Honors Colloquium: Modeling Human Behavior (with S. Condie, H. Miller, M. Myers)

Antitrust Law (with R. Lee, then D. Floyd)

Administrative Law (with S. Wood)

International Trade Law (with S. Wood)

Seminar on the History of Jerusalem (with K. Belnap)

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

# Appendix B: Past Testimony

Sears v. Visa

    United States District Court; District of Utah, Central Division

    Case No. 2: 91CV 47B

    Client:  Sears

    Deposition 1992, Trial Testimony 1992

Utah Foam Company v. The Upjohn Company

    United States District Court; District of Utah, Central Division

    Case No. C87-955G

    Client:  The Upjohn Company

    Deposition 1995, Trial Testimony 1996

Novell v. NTC

    United States District Court; District of Utah, Central Division

    Case No. 95CV 523G

    Client:  Novell

    Deposition 1997

Lantec, Inc., a Utah corporation, et al.; Lancompany Informatica LTDA., a Brazil cor-
poration; Lantec Informatica LTDA., a Brazil corporation; Lantraining Informatica
LTDA., a Brazil corporation v. Novell, Inc., a Delaware corporation

    United States District Court; District of Utah, Central Division

    Case No. 95 C 97 S

    Client:  Novell, Inc.

    Deposition 1998

Subject to Protective Order - Highly Confidential

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

Caldera, Inc. v. Microsoft, Inc.

    United States District Court; District of Utah, Central Division

    Case No. 2:96CV 0645B

    Client:  Caldera, Inc.

    Deposition 1999


Simon S. Goe and Ocean Star International Inc. v. Sanders Brine Shrimp et al.

    United States District Court; District of Utah, Northern Division

    Case No. CV0065B

    Client:  Sanders Brine Shrimp, et al.

    Deposition 1998


L.A. Roses, Al Nachom v. Lucky Stores Inc., Larry Cox, and DOES 1 through 100, inclusive

    Superior Court of the State of California, Orange County

    Case No. 775728

    Client:  Lucky Stores Inc., et al.

    Deposition 1998


Helen's of Course Corp., a Washington corporation; Helen's of Beaverton, Inc., a Washington corporation; and Helen's, Inc., an Oregon corporation v. Escada (USA), Incorporated, a Delaware corporation; and Escada AG, a Foreign corporation

    United States District Court; Western District of Washington, Seattle

    Case No. C98-0489Z

    Client:  Helen's Of Course Corp., et al.

    Deposition 1999

Expert Report of Professor James R. Kearl

March 21, 2012                                                                    Charles River Associates

Heary Bros. Lightning Protection Co., Inc., Lightning Preventor of America, Inc., and National Lightning Protection Corporation v. National Fire Protection Association, Inc., Lightning Protection Inst., Allan P. Steffes, Thompson Lightning Protection Co. Inc., and East Coast Lightning Equipment, Inc.

> United States District Court; District of Arizona
>
> Case No. CIV 96-2796 PHX/ROS
>
> Client: National Fire Protection Association, Inc, et al.
>
> Deposition 1999

Transwest, Inc. v. Mark Larsen and Wholesale Metal Products, II, Inc. fka Wholesale Metal Products, Inc. and Mark Larsen, Third Party Plaintiff v. Shawn Reeves, Third Party Defendant

> Fourth Judicial District Court; Utah County, State of Utah
>
> Case No. 9804003728
>
> Client: Mark Larsen and Wholesale Metal Products, II, Inc., et al.
>
> Deposition 2000, Trial Testimony 2000

LANCO v. Director, Division of Taxation

> Tax Court of New Jersey
>
> Docket No. 005329-1997
>
> Client: Director, Division of Taxation
>
> Deposition 2000, Trial Testimony 2000

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

Nevada Independent Service Contractors Association ("NISCA"), CB Display Service Inc., Czarnowski Exhibit Service Specialists, Exhibit Installations Inc., Nth Degree Inc., Renaissance Management Inc., Sho-Aids Inc., Zenith Labornet Inc. v. Pack Expo West, Packaging Machinery Manufacturers Institute Inc. (PMMI); World Gaming Congress and Expo; California Grocers Convention Management Group; Bonnie E. Kilduff, Director of Expositions, Packaging Machinery Manufacturers Institute Inc (PMMI); Freeman Companies; Greyhound Exposition Services Inc. ("GES"); Specialty Equipment Manufacturers Association ("SEMA"); Epic Enterprises; United Brotherhood of Teamsters Union, Local 631

> United States District Court, District of Nevada
>
> Case No. CV-S-97-01492-LDG (JBR)
>
> Client: Greyhound Exposition Services, Inc.
>
> Deposition 2000, Trial Testimony 2003

Michael Jensen, M.D. v. Mary Sawyers and United Television, Inc., a.k.a. KTVX

> Fourth Judicial District Court of Utah County, State of Utah
>
> Case No. 970400512CV
>
> Client: KTVX
>
> Deposition 2000, Trial Testimony 2000

Flying J, Inc., a Utah corporation; TCH, Inc., a Utah corporation v. Comdata Network, Inc., a Maryland corporation; Trendar Corporation, a Tennessee Corporation and DOES 1 through 10

> United States District Court, District of Utah, Northern Division
>
> Case No. 1:96CV0066K
>
> Client: Comdata
>
> Deposition 2001

Expert Report of Professor James R. Kearl

March 21, 2012                                          Charles River Associates

U.S. West NewVector Group, a Delaware corporation v. Cellexis International, Inc.,
an Arizona corporation; and Cellexis International, Inc., an Arizona corporation v.
U.S. West NewVector Group, a Delaware corporation (counterclaim)

> Arizona State Superior Court, Maricopa County
>
> Case No. CV2000-000972
>
> Client:  US West NVG
>
> Deposition 2002

Salt Lake Tribune Publishing Company, LLC v. MediaNews Group Inc., et al.

> United States District Court, District of Utah, Central Division
>
> Case No. 2:00-CV-936-ST
>
> Client: MediaNews Group
>
> Deposition 2002

In the Matter of MSC.Software Corporation

> United States of America before Federal Trade Commission
>
> FTC Docket No. 9299
>
> Client: MSC.Software Corporation
>
> Deposition 2002

The Canopy Group, Inc., a Utah corporation; and Center 7, Inc., a Utah corporation
v. Computer Associates International, Inc., a Delaware corporation

> United States District Court, District of Utah, Central Division
>
> Case No. 2:01CV00237C
>
> Client: Canopy Group and Center 7
>
> Deposition 2003

Expert Report of Professor James R. Kearl

March 21, 2012                                                            Charles River Associates

Rocky Mountain Medical Center, Inc, a Delaware corporation v. Northern Utah
Healthcare Corporation, d/b/a St. Mark's Hospital, a Utah corporation, HCA Inc., a
Delaware corporation and Columbia Ogden Medical Center, Inc., d/b/a MountainStar
Healthcare Network, a Utah corporation

    Third Judicial District Court of Salt Lake County, State of Utah

    Case No. 000906627

    Client: Rocky Mountain Medical Center

    Deposition 2003

James M. Abraham, O.D., et al. v. Intermountain Health Care, Inc., et al.

    United States District Court, District of Utah, Central Division

    Case No. 2:01CV-919J

    Client: Intermountain Health Care

    Deposition 2003, Pretrial Testimony 2004

Headwaters Incorporated v. AJG Financial Services, Inc.

    Fourth Judicial District Court of Utah County, State of Utah

    Case No. 000403381

    Client:  AJG Financial Services, Inc.

    Deposition 2004

Darol Forsythe, an individual, John Forsythe, an individual, 1, 4Group, Inc., an Idaho
corporation v. Tri-River Chemical Company, Inc., a Washington corporation, d/b/a
UAP Northwest; Aceto Agricultural Chemicals, Corp., a New York corporation; and
United Agri Products, a Colorado corporation

    United States District Court, District of Idaho

    Case No.  99-0482-S-ECR

    Client:  United Agri Products

    Deposition 2005

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

General Auto Parts Company, an Idaho corporation v. General Parts Company, a
Georgia corporation, and Dynaparts, LLC, a Georgia Limited Liability Company

    United States District Court, District of Idaho

    Case No. CV 04-379-S-EJL

    Client: General Parts Company and Dynaparts, LLC

    Deposition 2006

The SCO Group, Inc. v. International Business Machines Corporation

    United States District Court, District of Utah, Central Division

    Case No. 2:03CV-0294 DAK

    Client: International Business Machines

    Deposition 2006

Boss Industries, Inc. v. Yamaha Motor Corporation, USA

    United States District Court, District of Utah, Central Division

    Case No. 2:05CV-00422 DAK

    Client: Yamaha Motor Corporation, USA

    Deposition 2006

Farm Bureau Insurance Companies v. American National Insurance Company, et al.

    United States District Court, District of Utah, Central Division

    Case No. 2:03CV00646TC

    Client: American National Insurance Company

    Deposition 2007, Trial Testimony 2008

Lance DeStwolinski v. Citigroup Global Markets, Inc.

    Arbitration

    Client: Citigroup Global Markets

    Testimony October 2007

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

Climax Monlybdenum Company v. Molychem v. Phelps Dodge Corporation

    United States District Court, District of Colorado

    Case No. 1:02-CV-00311 RPM

    Client: Phelps Dodge Climax

    Deposition 2007, Trial Testimony October 2007

IGT v. Bally Technologies, Inc. and Bally Gaming International, Inc.

    United States District Court, District of Nevada

    Case No. CV-S-04-1676-RCJ-RJJ

    Client: Bally Technologies, Inc.

    Deposition 2007

Smile, Inc. Asia PTE Ltd v. Britesmile Management, Inc. and Britesmile, Inc.

    Third Judical District Court Salt Lake County, State of Utah

    Case No. 020903521

    Client: Britesmile, Inc.

    Deposition 2007, Pretrial Testimony June 2007

Tee Time Arrangers, Inc. v. Vistoso Gold Partners, LLC

    Supreme Court State of Arizona, County of Maricopa

    Case No. CV2004-013105

    Client: Tee Time

    Deposition 2007

Arthur Benjamin v. eCollege.com and Datamark, Inc.

    United States District Court, District of Utah, Central Division

    Case No. 2:05CV01033 JTG

    Client: eCollege.com

    Deposition 2007, Arbitration Testimony May 2008

Expert Report of Professor James R. Kearl

March 21, 2012                                                                              Charles River Associates

Cliff Butler et al v. Access Microsystems, Inc. et al

    United States District Court, District of Utah

    Case No. 97-0905242

    Client: Technology Integration Group

    Deposition/Trial 2006

InSyst Ltd. v. Applied Materials, Inc., et al

    California Superior Court

    Case No. 104CV024251

    Client: Applied Materials, Inc.

    Deposition March 2008

Summit Electric Supply Company, Inc. v. International Business Machines Corporation

    United States District Court, District of New Mexico

    Case No. CIV 07-431 MCA/DJS

    Client: International Business Machines Corporation

    Deposition February 2009, Deposition August 2009

American Renal Associates, LLC v. Davita, Inc. and Total Renal Care, Inc.

    United States District Court, District of Colorado

    Case No. 08-cv-00513-CMA-KMT

    Client: American Renal Associates, LLC

    Deposition July 2009

PrizeWise, Inc. v. Oppenheimer & Co., Inc.

    United States District Court, District of Utah, Central Division

    Case No. 2:07CV00792 TC

    Deposition November 2009

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

## Appendix D: Group and Value Analysis

184.     Prof. Cockburn utilizes a Group and Value method to allocate the value of the entire

2006 portfolio to the patents and copyrights in suit.  His method consists of:

1)   Identification of the patents that would likely have been included in the 2006

portfolio. ████████████████████████████████

████████████████████

2)  ████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

██████████████████████

3)   Determination of the typical distribution of the value of individual patents in a

portfolio of patents.  Prof. Cockburn identifies three academic studies regarding

the distribution of patent values.[106]  He applies his own analysis to these stud-

ies (fitting a Pareto distribution), and concludes that in these studies the top

3.9% of the patents represent 67.9%, 77.1% or  91.9% of the  total value of all

patents in the study, depending on the study utilized.[107]

4)   Prof. Cockburn assumes that each patent in the group would have equal ex-

pected value.[108]  Professor takes the "middle" of the three percentages in step

---

[106] Gambardella A., P. Giuri, and M. Mariani, "The Value of European Patents - Evidence from a Survey of European Inventors," Final Report of the PatVal EU Project, January 2005.

Harhoff D., F. Scherer, K. Vopel, "Citations, family size, opposition and the value of patent rights" Research Policy 32, October, 2002, pp. 1343-1363.

Barney, J. A., "A Study of Patent Mortality Rates: Using Statistical Survival Analysis to Rate and Value Patent Assets," AIPLA Quarterly Journal, Vol. 30, No. 3, Summer 2002.

[107] Third Expert Report of Prof. Cockburn 2/3/2012 paragraphs 405 – 408 and his exhibit 34.

[108] Third Expert Report of Prof. Cockburn 2/3/2012 paragraph 409.

Expert Report of Professor James R. Kearl

March 21, 2012                                    Charles River Associates

(3), and 

185.    Dr. Leonard, Google and the Court make several criticisms of Prof. Cockburn's
Group and Value analysis.  These include:

1)    Prof. Cockburn assumes the ▮▮▮▮▮▮ will follow the same distribution as pa-
tents in the three studies.  This assumption may not be valid because: (a) ▮▮▮▮
▮▮▮▮▮▮ are owned by a single firm, while the groups of patents in the three pa-
tent studies are owned by numerous companies; (b) two of the three patent studies
analyze patents in Europe, not the US; (c) The one study that analyses US patent
values does so on the basis of management fees; (d) the three patent studies ana-
lyze patents from a wide range of industries, not just software patents; (e) the studies
examine patents issued at different time periods.

2)    The distribution of patent values in the three studies differ significantly from each oth-
er;

---

[109] 4.5% = 1 / 22.

[110] Third Expert Report of Prof. Cockburn 2/3/2012 paragraph 420.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                                    Charles River Associates

3) 

I find that while some of Dr. Leonard's criticisms do have some validity in my opinion, they do not render Prof. Cockburn's Group and Value analysis economically unreliable. Dr. Leonard is correct that the ███████████ owned by a single firm, while the patents in all the patent value studies are owned by different firms and/or individuals. However, I do not see any reason that patents owned by a single firm should have a different distribution of value than a large group of patents selected by another neutral selection method.[111] Thus, I am not persuaded that this difference between the Sun portfolio and the synthetic portfolios leads to any systematic bias.

187.     I also do not believe that reliance on European patents would bias Prof. Cockburn's results upward.  If anything, the patent valuation studies that focus on US patents tend to show a higher percent of the total portfolio value is represented by the top patents (though the number of US studies is small).  See Exhibit D1.

188.     I also do not believe it to be material that the studies Prof. Cockburn relies upon study patents in all industries, rather than focusing on software.  As shown in Exhibit D1, studies of patents in different industries do not show systematic differences in skew, and studies that look at the Electronics industry patents tend to finds a more skewed distribution than studies that look at all industries (although this is a weak conclusion). [112]  Final-

---

[111] By neutral I mean any method that does not explicitly seek to sample only high value or low value (or perhaps middle value) patents.

[112] The single study that specifically examines "computer-related" patents (Lanjouw 1998) finds a lower-than-average skew.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

ly Exhibit D1 does not indicate that the skewness of patent distributions has decreased over time.

189.     I also disagree with Dr. Leonard that, because renewal fees are small relative to the value of the patents in question, one cannot infer the values of patents by looking at renewal decisions.  In these studies, the extreme tail of the distribution is estimated from multiple observations at all other points in the distribution.  For example, suppose it costs $4,000 to renew a patent in the 20th year of its life.  To get to that point, the patentee had to pay all the previous renewal fees, and (on average) experienced all of the years of depreciation (which, for patents, is estimated to be very high – typically in the 15% per year range).  This means that a patent that is worth at least $4,000 in year 20 was originally worth at least $4,000 / $0.85^{19}$ = $88,000.  Since these studies typically obtain very good fits to the renewal decisions made prior to the final year, it is reasonable to conclude this shape continues into the extreme tail as well ((where a small fraction of the most valuable patents – typically less than 10% of the total – are renewed to the statutory maximum patent length).  The same observation is even more true for studies based on an inventor's international patent application decisions in which the cost of filing is much higher than the cost of renewal, and the unobserved tail probability (and thus the share of the value distribution obtained by extrapolation) is much smaller.

190.     Dr. Leonard (and the Court) is also concerned that the value of the top patents from the three studies Prof. Cockburn cites vary widely.  This is obviously of some concern.  However, my review of the studies in Exhibit D1 and the analysis in Putnam (2011), indicate that the skewness of patent value distributions is fairly stable across most studies.[113]  As Dr. Putnam shows, under the assumption of a log-normal distribution every patent's share depends only on the value of sigma (which would be the standard devia-

---

[113] Putnam, Jonathan, "Patent Portfolios, Apportionment, and the Adding-Up Constraint," December 2011.

Expert Report of Professor James R. Kearl

March 21, 2012                                                        Charles River Associates

tion if we were using a normal distribution).[114]  Exhibit D1 shows the variation in sigma for published large-sample studies, which focus on a variety of countries, industries, time periods and use a variety of estimation methods.  The value of sigma varies somewhat from study to study, but is typically found to be about 1.7.  As is discussed in Putnam 2011, for any given study, the value of sigma tends to be smallest in the very upper tail.  However, for most points of the distribution, the value of sigma does not have much influence on any patent's share.  We are concerned here with the top 3.9% point of the distribution, for which the variation in sigma will have at most a moderate impact on the value of the average patent located within the top 3.9% of the portfolio.

191.      Dr. Leonard also worries that there may be sample selection bias in Oracle's selection of the ███████ that would have comprised the 2006 portfolio.  I am not able to evaluate whether the sample was selected in a manner than induced bias, but note that the effect on Prof. Cockburn's results from any such selection bias is ambiguous and likely to be small.  For instance, if Oracle was over-inclusive (by "stuffing the ballot box" with irrelevant patents), this could artificially inflate  the rank of a valuable patent (for instance advancing a patent that ranks in the top 10% of all relevant patents to the top 5% of all [relevant + irrelevant] patents).  However, this procedure also lowers the value of the mean patent in the distribution, against which the value of the subject patents is defined, partially offsetting the effects of that distortion.[115]   More generally, it is unclear that any such selection systematically alters sigma, and if so in what direction.  Dr. Leonard offers no reason to think that the selection of patents by Oracle would lead to biased estimates of sigma.

---

[114] The intuitive way to think about sigma is that it captures the degree of inequality of the shares.  If sigma is 0, the shares are perfectly equal.

[115] Putnam (2011) provides a formula for undoing the effects of such "inflation," depending on the form it takes and its effect on the ranking of the patents of interest.

Expert Report of Professor James R. Kearl

March 21, 2012                                           Charles River Associates

192.    With regard to step 5, I believe that the results of the conjoint analysis are reliable

evidence, supported by the results from the expanded econometric analysis, ██████████

████████████████████████████████████████████████████████

My discussion of the conjoint analysis is in Appendix E.  Also, as discussed in Appendix

F, I modify Prof. Cockburn's econometric analysis to include the number of applications

available on each phone model.  The results of that model also indicate that the value of

an increased number of applications is approximately equal to the value of increased

speed.

193.    However, it is my opinion that Prof. Cockburn arrives a value for the top 3.9% of the

2006 portfolio that is too high.  Evaluated at the median value of sigma reported in the 20

patent valuation studies reviewed in Putnam (2011) (*i.e.,* sigma = 1.67), the top 3.9% of

patents accounts for approximately 45.7% of total portfolio value.  If I consider the sole

study of US patents, having a sigma of 1.85, the value of the top 3.9% of patents is

52.9%.  Looking at the two studies of patents in the Electronics industry (there are no

studies of software patents; the closest industry classification to software appears to be

"Electronics"), with an average sigma of 2.355, the value of the top 3.9% of patents is

71.8%.[116]  Based on these studies, I conservatively conclude that the value of the top

3.9% of the patents in the 2006 portfolio would likely represent at least half the value of

that portfolio.

---

[116] This calculation omits Lanjouw (1998) which analyses patents for computers.  Including the results from
      Lanjouw, the mean sigma of the 3 studies (Lanjouw, Schankerman and Deng) is 1.83.  Note that Lanjouw
      find uniformly low sigma in all industries analyzed.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

## Appendix E: Professor Shugan's Conjoint Analysis

## I.   Introduction

194.    Prof. Shugan presents results from an online survey study ("2011 Smartphone Survey") that "employed conjoint analysis to evaluate the effect of specific features (e.g., product price, operating system) and feature enhancements on consumer preferences, choices, and consumer purchasing behavior."[117]

195.    Based on results from the 2011 Smartphone Survey, Prof. Shugan estimates the contribution of each feature to the total worth or utility of a smartphone product (i.e., "partworth").[118]  Prof. Shugan assesses the relative importance of the features included in the survey "by examining the ranges of partworths."[119]  Prof. Cockburn then uses "the relative importance to consumers of having a smartphone for which there are a large number of applications, in comparison to the importance to consumers of having a smartphone that launches applications quickly" to support his assumption that "the value of APIs that enable the development of applications….is approximately half the value of technology that ensures that applications launch within one second, the benefit [he] assume[s] is afforded by the infringed speed and memory patents."[120]  The partworth estimates are also used to "simulate the effect of each feature enhancement enabled by specific patents and copyrights individually and in the aggregate on Android sales and preference shares."[121]

196.    Dr. Leonard criticizes the 2011 Smartphone Survey for being "susceptible to serious biases as a result of the hypothetical and artificial nature of the exercise that survey re-

---

117 Expert Report of Prof. Steven M. Shugan, September 12, 2011. ("Shugan Report"), pp. 5-6.

118 Shugan Report, Appendix D, p. 15.

119 Shugan Report, Appendix D, p. 15.

120 Expert Report of Dr. Iain  M. Cockburn, February 3, 2012. ("Third Cockburn Report"), p. 156.

121 Shugan Report, p. 13.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

spondents are asked to complete" and claims that "respondents' stated preferences are inconsistent with economic preferences and display properties that are implausible."[122] Further, he points out certain aspects of the survey design that he views as problematic, including the omission of important attributes that may affect consumer demand.[123] He concludes that "the Shugan survey results do not form a reliable basis for calculating damages in this case."[124]

197.    In this appendix, I present my analysis of the validity and reliability of the 2011 Smartphone Survey and Prof. Shugan's analysis of the survey data.  I address the main criticisms raised by Dr. Leonard and additional issues I have identified regarding Prof. Shugan's conjoint analysis.

198.    My analysis is organized as follows.  In Section II., I discuss my effort to verify the accuracy of Prof. Shugan's results.  In Section III., I investigate whether important phone features are omitted from the 2011 Smartphone Survey and assess the implications of such omissions on Prof. Shugan's results.  In Section IV., I comment on the hypothetical bias issue raised by Dr. Leonard and provide an indirect evaluation of the survey response quality through the analysis of the time respondents spent on the survey.  I evaluate the validity of Prof. Shugan's partworth estimates in Section V. and discuss the apparent inconsistencies between these estimates and predictions by economic theory as pointed out by Dr. Leonard in Section VI.  In Section VII., I investigate the use of the relative importance between enhanced application availability and faster application launch to estimate the value of copyrighted APIs compared to the value of infringed patents.  In Section VIII. I assess the validity of Prof. Shugan's market simulation exercise, assuming that the partworth estimates of his model are valid. Finally, I conclude in Section IX.

---

122 Expert Report of Dr. Gregory K. Leonard, Revised October 24, 2011 ("Leonard Revised Report"), p. 108.

123 Leonard Revised Report, pp. 111-113.

124 Leonard Revised Report, p. 108.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

## II.    Verification of Prof. Shugan's Findings

199.    To provide an evaluation of Prof. Shugan's conjoint analysis, I begin by verifying Prof.

Shugan's findings as described in his reports.  In addition to reviewing the reports filed by

Prof. Shugan and his deposition testimony, I have reviewed  the backup materials pro-

vided by Prof. Shugan, including source documents, survey data, computer programs,

and program output.  I have also studied the Sawtooth Software that Prof. Shugan uses

for his analysis.

200.    Using the survey data and the Sawtooth Software, I am able to replicate the part-

worth, relative importance, and market share estimates presented by Prof. Shugan. I con-

firm that Prof. Shugan's analysis is conducted as described in his testimony, and that

there are no arithmetic errors in his calculations.[125] By replicating Prof. Shugan's results,

I have also obtained more detailed information on his choice model, the estimation tech-

nique, and the simulation procedure.[126]  Prof. Shugan's model and methodologies are

within the norm of estimation approaches used in the marketing field.[127]

## III.    Omission of Phone Features that Affect Consumer Demand

201.    Prof. Shugan's 2011 Smartphone Survey identifies seven features that he believes

may drive smartphone demand: application multitasking, application startup time, availa-

bility of third-party applications, mobile operating system brand, price, screen size, and

---

[125] While I have not identified any arithmetic errors in Prof. Shugan's analysis, I have identified several potential flaws of Prof. Shugan's analysis in relation to his assumptions and methodologies.  I discuss these potential flaws in later sections of this appendix.

[126] I use the same Sawtooth Software products employed by Prof. Shugan to estimate partworths for the selected feature (CBC/HB 5.2.8) and simulate preference shares for the actual and but-for scenarios (SMRT 4.20.2).

[127] According to Sawtooth Software, choice-based conjoint (CBC) "is the most popular conjoint-related technique in use today."  Further, "[b]ecause having individual-level utility data is so helpful for improving the general results of CBC studies, especially the validity of market simulators, most CBC users also employ CBC/HB [Hierarchical Bayes] analysis." (http://www.sawtoothsoftware.com/products/cbc/; http://www.sawtoothsoftware.com/products/cbc/cbchb).

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

voice command capabilities.[128,129] Dr. Leonard criticizes the design of the 2011
Smartphone Survey for omitting "attributes of a handset that are thought to affect con-
sumer demand" and suggests that the survey approach is subject to hypothetical bias.[130]

202.    In this section, I evaluate whether features that significantly affect consumer demand
are indeed omitted from the 2011 Smartphone Survey. I also discuss the potential effects
of such omission on Prof. Shugan's analysis.

203.    I find smartphone features that are determinants of consumer demand omitted from
the 2011 Smartphone Survey. However, the direction of bias on Prof. Shugan's results
caused by these omitted features is ambiguous, and can only be fully assessed if a new
survey were conducted that included the omitted features.

## A.  Importance of omitted features in smartphone purchase decisions

204.    According to Prof. Shugan, the seven features included in his survey "were selected
based on qualitative interviews and industry research."[131] He refers to interviews and fo-
cus groups conducted in relation to the 2011 Smartphone Survey, as well as six third-
party sources that describe smartphone features that are valued by consumers. In addi-
tion to these sources, I have conducted my own industry research and identified seven
other third-party sources that discuss important smartphone features. Exhibit E1 summa-
rizes the features listed in each of these sources.

205.    Exhibit E1 reveals that the 2011 Smartphone Survey has excluded many phone fea-
tures that are described as important features more frequently than features that are part

---

[128] Shugan Report, p. 10.

[129] Only some of these features are used by Prof. Cockburn in his analysis of eBay bid data. Prof. Cockburn does
not use application multitasking, availability of third-party applications, or voice command capabilities.
(*Expert Report of Dr. Iain M. Cockburn*, Revised September 15, 2011 ("Revised Cockburn Report"),
Appendix C, Exhibit C2.)

[130] Leonard Revised Report, p. 112.

[131] Shugan Report, p. 5.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

of the survey.  This is true even if I consider only the sources relied upon by Prof.

Shugan. Omitted features that are most frequently cited as key smartphone features in-

clude appearance or physical design, battery life, brand, browser speed, camera, ease of

operation, email interface or access, media integration, network carrier, and touch screen

capability.

206.      It is unclear why the 2011 Smartphone Survey includes the voice command feature in

lieu of other more influential phone features. Each of the remaining six features included

in the 2011 Smartphone Survey is either frequently cited as an important feature (availa-

bility of applications, operating system, price, and screen size) and/or is considered as a

feature affected by the alleged infringements (application startup time, availability of ap-

plications, and multitasking).

207.      Prof. Shugan testified in his deposition that "the voice command features…came

up…through a discussion…with Analysis Group about what to include in the analysis and

what not to include in the analysis,"[132] but he did not provide details of that discussion. In

his report, Prof. Shugan cites the qualitative interviews and a *PC World* article in discuss-

ing the importance of the voice commands functionality.[133]

208.      The *PC World* article describes "best voice recognition apps" that can be used on

multiple operating systems.[134] The app "Vlingo," which allows voice texting, can be

downloaded for free on all four operating systems considered by Prof. Shugan.[135] There-

fore, voice commands functionality does not appear to be a differentiating feature among

the phones on the four operating systems.  The inclusion of voice command functionality

---

[132] Videotaped Deposition of Steven M. Shugan, September 26, 2011 ("Shugan Deposition"), 30:4-8

[133] Shugan Report, Appendix D, p. 12.

[134] Cassavoy, Liane. "Best Voice Recognition Apps for Your Smartphone," PCWorld, July 17, 2011
       (http://www.pcworld.com/article/235848/best voice recognition apps for your smartphone.html).

[135] According to Vlingo's website, the full-featured Vlingo for Blackberry is free only for a limited time and is normally
       charged $19.99.  (http://www.vlingo.com.)

Expert Report of Professor James R. Kearl

March 21, 2012                                                        Charles River Associates

appears to contradict Prof. Shugan's testimony that non-differentiating features that are

not involved in the infringement dispute need not be included in the survey:[136]

> Q. Why did you decide not to include whether or not the smartphone
> had a camera in the conjoint?
>
> A. There's a variety of reasons why that would be common among
> many of the features that are not included in the analysis. The major
> reason it wasn't necessary, there was no reason to include a cam-
> era. The -- we weren't trying to design a new smartphone. So we
> weren't really concerned about whether or not the camera would be
> helpful for better selling a smartphone.
>
> Another reason is that most of the smartphones that were on the
> market already had cameras, and so it wasn't a differentiating attrib-
> ute in the sense that you couldn't -- if you were concerned about, as
> a consumer which product to purchase, they all had the cameras,
> and so that wouldn't -- even if it was very important to you to have a
> camera, it wouldn't influence the choice decision. It wouldn't influ-
> ence the market share.
>
> The camera also was not something that was involved in the dis-
> pute, according to what I understood the dispute on the copyright in-
> fringements, and so it wasn't something that was related to the
> case."

209.    In the deposition testimony cited above, Prof. Shugan describes camera as a non-

differentiating attribute because "if you were concerned about, as a consumer which

product to purchase, they all had the cameras."  However, camera appears to be a more

differentiated feature than voice commands functionality.  Industry sources that provide

phone specifications list several camera-related features that often vary across different

smartphones (resolution, auto-focus, and flash).[137]  On the other hand, all smartphones

that have the voice dialing feature with the exception of the newest iPhone 4S share the

same description for voice dialing.[138]  Voice-texting is not even among the features de-

scribed by industry sources, perhaps because voice-texting can be obtained through an

---

[136] Shugan Deposition, 33:8-34:4.

[137] See Exhibit E3 for a list of the industry sources considered.  Exhibit E3 also summarizes the feature descriptions
provided by these industry sources.

[138] See Exhibit E3.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                Charles River Associates

app download instead of a phone purchase.  Therefore, the decision to include voice

commands functionality but not camera features in the 2011 Smartphone Survey appears

to be inappropriate.

### B.  Effects of omitted features on Prof. Shugan's analysis

210.    Given that the 2011 Smartphone Survey does appear to have omitted certain

smartphone features that are important in determining consumer demand, the next ques-

tion is how the omissions may affect Prof. Shugan's analysis and his conclusions.  I con-

clude that the omissions likely lead to bias in Prof. Shugan's estimates of partworth, rela-

tive importance, and Android share loss, but the direction of bias is ambiguous.

#### 1.  Estimates of partworths

211.    The survey instructed respondents to "[a]ssume any features not listed are the same

for all alternatives."[139] To the extent that this instruction is followed, the estimates of

partworths for the features included in the survey should be unbiased even when other

features that affect consumer preferences are omitted from the survey.[140]

---

[139] Shugan Report, Exhibit E-1, p. E-19.

[140] In Prof. Shugan's choice model, the choice probability for each alternative is not affected by features that are constant across all alternatives.  The choice probability is calculated as the exponent of the sum of partworths for the alternative divided by the sum of that exponential function across all alternatives.  Any feature that is constant across alternatives can be factored out from the exponential functions of partworths and canceled between the numerator and the denominator.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

212.    However, both Dr. Leonard and Prof. Shugan suggest that respondents may not be holding the omitted features constant across the alternatives, but rather that the effects of variations in these features are captured by some of the included features.[141]

213.    Dr. Leonard states, "Survey respondents may have imputed to the platform name or other variables (e.g., price) undescribed attributes like phone design. For example, survey respondents may have assumed (contrary to what the survey wanted them to assume) that a higher priced phone was lighter or smaller than a lower priced phone that had the same values of other described attributes."[142]

214.    Prof. Shugan states that "many of the specific design characteristics that Dr. Leonard argued were missing from the 2011 Smartphone Survey are correlated with screen size – which [he] did include in the study – and are thus incorporated into the survey."[143] He also states that "respondents will tend to implicitly attribute to the brand name any excluded attributes."[144]

215.    While Dr. Leonard and Prof. Shugan agree on respondents' attribution of omitted features to included features, they disagree about the effects of such attribution.  Dr. Leon-

---

[141] Prof. Shugan states that he "never 'conceded' that the survey respondents did not hold levels constant" for features that are not part of the 2011 Smartphone Survey.  While he suggests that "respondents will tend to implicitly attribute to the brand name any excluded attributes," he argues that this statement should not be characterized "as a concession that, contrary to the survey instructions, participants in [his] survey did not hold constant the non-included features that might be relevant to a smartphone purchase."  He explains, "When respondents implicitly attribute aspects of other attributes to brand name it is not inconsistent with holding constant all other variables that are not included in the conjoint study." (Declaration of Steven M. Shugan in Support of Opposition to Google's Third Daubert Motion, pp. 14-15.) I disagree with Prof. Shugan.  To the extent that respondents implicitly attribute to the brand name any excluded attributes, it is highly unlikely that they attribute the same levels of excluded attributes to all brand names.  It is more reasonable to assume that respondents attribute to each brand name the levels of excluded attributes that are observed in the actual marketplace, which often vary across brand names according to my analysis.  (See Exhibit E3.)

[142] Leonard Revised Report, p. 112.

[143] *Expert Reply Report of Professor Steven M. Shugan,* October 10, 2011. ("Shugan Reply Report"), p. 16.

[144] Shugan Reply Report, p. 17.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                      Charles River Associates

ard argues that "[t]he survey design can contribute to hypothetical bias."[145] He states that "[d]ue to the propensity for a survey to 'construct' preferences, the omission of other attributes and, particularly the important attributes, likely caused respondents to attach excessive preference weights to the attributes related to the patents-in-suit."[146]  On the other hand, Prof. Shugan argues that the tendency of respondents to implicitly attribute any excluded attributes to the brand name "would increase the value of the Android brand name, and so such biases would reduce the value of the relevant features."[147]

216.    Contrary to Prof. Shugan's opinion, the partworths of the features relevant to the allegedly infringed copyrights and patents are more likely to be overestimated than underestimated by the omissions of important smartphone features.  This follows because it seems unlikely that all of the effects of the excluded attributes were attributed to features unrelated to the infringements such as brand name.  For example, respondents may view phones with faster application startup time as a "faster phone" with faster browsing speeds, or even more broadly as a "better phone" with better phone features in general.  While it is likely that consumers in the real marketplace largely associate phone attributes with brand, such an association is probably weakened in a hypothetical survey setting where respondents encounter phone options with unrealistic combinations of brand and other phone features.  To the extent that some of the effects of the excluded features were attributed to the infringed features, the value of those infringed features would be overestimated as well.

217.    Moreover, even if it were to be assumed that all of the effects of the excluded features were attributed to non-infringed features such as brand, the resulting estimate for the value of the infringed features would be an unbiased rather than an underestimated

---

[145] Leonard Revised Report, p. 111.

[146] Leonard Revised Report, p. 111.

[147] Shugan Reply Report, p. 17.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

number.  To result in an underestimation of the value of the infringed features, the posi-

tive correlation between the excluded features and non-infringed features has to be ac-

companied by a negative correlation between the excluded features and the infringed

features.  Prof. Shugan has not provided any evidence in this regard.

218.     I note that the discussion so far is based on the assumption that all infringed features

are included in the 2011 Smartphone Survey.  To the extent that certain infringed fea-

tures are excluded,[148] there are countervailing effects from these excluded but relevant

features.  As a consequence, the direction of the overall bias is ambiguous and hard to

assess.[149]

### 2.   Relative importance calculations

219.     The relative importance of a phone feature is calculated as the range of partworths

for that feature divided by the sum of ranges of partworths across all features.[150]  It

measures the utility from improving the feature from the least preferred to the most pre-

ferred level as a percentage of the utility from improving all features from the least pre-

ferred to the most preferred levels.

220.     While unbiased partworth estimates necessarily lead to unbiased relative importance

estimates, biased partworth estimates can still produce unbiased relative importance es-

timates.  To the extent that the partworth ranges are biased by a similar factor across

smartphone feature, the relative importance of the features remains the same.  However,

---

[148] Prof. Shugan states in his report, "I have not considered all of the feature enhancements that are enabled by the patents-in-suit. Specifically, I have not considered improvements in phone boot time (i.e., the time it takes to turn on one's Smartphone) or the improvements to battery life enabled by the patents-in-suit." (Shugan Report, p. 5.)

[149] To fully assess the overall direction of bias, one requires information on whether each omitted feature is related to the alleged infringements, the assumptions that respondents make regarding the omitted feature, and the interactions or correlations between the omitted feature and the included features.  Since there are opposing effects, quantitative rather than qualitative information of the various effects are required.  Such quantitative information probably requires a new survey of its own.

[150] "Interpreting the Results of Conjoint Analysis," reprinted from Orme, B. (2010) *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research.* Second Edition, Madison, Wis.: Research Publishers LLC, pp. 79-80. (http://www.sawtoothsoftware.com/download/techpap/interpca.pdf)

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

if the partworth range for a feature is biased to a larger (smaller) extent compared to the

partworth range for other features, the relative importance of the feature will be overesti-

mated (underestimated).

221.    Prof. Cockburn uses "the relative importance to consumers of having a smartphone

for which there are a large number of applications, in comparison to the importance to

consumers of having a smartphone that launches applications quickly" to assess the val-

ue of copyrighted APIs as a fraction of the value of infringed patents.[151]  Since the ratio

of the relative importance of application availability (7.85%) to the relative importance of

application startup time (11.17%) is 0.70,[152] it appears that Prof. Cockburn rounds this

number down to 0.5 and concludes that "the value of the copyrighted API specifications

in the 2006 Bundle was half the value of the patent claims in suit."[153]

222.    To the extent that my understanding of Prof. Cockburn's calculations is correct, his

use of Prof. Shugan's relative importance estimates to compute the patents-to-copyrights

conversion factor only depends on the ratio of the partworth range for availability of appli-

cations to the partworth range for application startup time.  Therefore, Prof. Cockburn's

conversion factor is unbiased as long as the two partworth ranges are biased by the

same percentage.

### 3. Market share simulations

223.    In addition to measuring relative importance of smartphone features, the partworth

estimates are also used to measure the effect of infringement on Android sales through

---

[151] Third Cockburn Report, p. 156.

[152] Shugan Report, Table 1.  The relative importance ratio of 0.70 is quite different from the patents-to-copyrights
conversion factor assumed by Prof. Cockburn of 0.5.  I note that Prof. Cockburn provides very limited
descriptions of how Prof. Shugan's results are used to reach his conversion factor.  I may amend my
opinions if Prof. Cockburn's conversion factor is based on inputs other than the relative importance
percentages.

[153] Third Cockburn Report, p. 22.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

market share simulations.[154]  Even if the choice model produces unbiased estimates of
the partworths for features included in the survey (for example, when all respondents did
what they were supposed to do and held all omitted features constant across phone op-
tions), omitted features can still render Prof. Shugan's market share simulations invalid.

224.    To accurately evaluate the market share of each smartphone, it is necessary to com-
pare the total utility individuals obtain from all product features. A feature can only be ig-
nored for two reasons—either it has a minimal effect on utility, or it is a non-differentiating
feature that is identical across all smartphones.  An excluded feature with minimal effect
on utility also has minimal effect on market shares.  A non-differentiating feature that is
identical across all smartphones does not affect consumers' relative ranking of the
smartphones, and therefore does not affect phone choice and market shares.

225.    Exhibit E2 lists various leading smartphones identified by industry sources and Exhib-
it E2 presents the product attributes of these smartphones.  Phone features that are iden-
tified by multiple sources as important determinants of smartphone demand (such as bat-
tery life, carrier, and touch screen capability) do vary across smartphones. Since Prof.
Shugan's market share simulations do not consider these features, the resulting esti-
mates of market shares and percentage change in Android sales are likely to be biased.

226.    Due to the multiple ways that the omitted features can affect the estimated percent-
age loss in Android share, the direction of the bias caused by the omitted features is am-
biguous, and can only be fully assessed when partworth estimates for these omitted but
important features are available.[155]  To obtain partworth estimates for these omitted fea-
tures, a survey that includes these omitted features would have to be conducted.  There-

---

[154] Shugan Report, pp. 13-15.

[155] The estimated percentage loss in Android share is calculated as the difference between actual and but-for
Android shares, divided by actual Android shares.  The omitted features affect both the numerator and the
denominator by affecting both actual and but-for Android shares.  While it is possible to assess the
separate effects on the numerator and the denominator, the overall effect on the ratio is difficult to
determine.

March 21, 2012                                                    Charles River Associates

fore, even just to understand the effect of the omitted features problem requires the elim-

ination of the problem itself.

## IV.   Reliability of Survey Responses

227.     In this section, I discuss various issues that may affect the quality and reliability of the

responses in Prof. Shugan's 2011 Smartphone Survey.  I first discuss the potential bias

that may be caused by the hypothetical nature of the survey.  Neither Dr. Leonard nor

Prof. Shugan provides an analysis to establish the existence or extent of hypothetical bi-

as in the 2011 Smartphone Survey.  I then discuss an indirect evaluation of the survey

response quality through the analysis of the time respondents spent on the survey.  While

it appears that respondents only spent a short amount of time on the survey, sensitivity

analysis indicates that Prof. Shugan's results are robust to the exclusion of responses

that are most likely to be unreliable.

### A.  Hypothetical Bias

228.     Dr. Leonard argues that "stated preference surveys, such as the Shugan survey, are

susceptible to serious biases as a result of the hypothetical and artificial nature of the ex-

ercise that survey respondents are asked to complete."[156]  The analysis of page time

discussed below also raises concern regarding bias due to the hypothetical nature of the

survey, since consumers spend substantially more time in their actual phone purchase

decisions than the time that they spent on answering the survey choice tasks.

229.     As pointed out by Prof. Shugan, "Dr. Leonard does not prove the existence of any

purported bias or attempt to evaluate the extent or direction of any purported bias in the

results of the 2011 Smartphone Survey."[157]  Dr. Leonard has discussed various reasons

---

[156] Leonard Revised Report, p. 108.

[157] Shugan Reply Report, p. 2.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

why hypothetical surveys may be subject to various biases that can render the results un-reliable,[158] but he has not conducted any analysis to assess whether those biases exist in the 2011 Smartphone Survey.[159]  While Dr. Leonard has referenced studies that eval-uate the extent of hypothetical bias in the estimation of willingness-to-pay, it is unclear if the findings from those studies can be applied to the 2011 Smartphone Survey because of differences in survey design and goods valued.  More importantly, it is unclear if the di-rection and extent of hypothetical bias on willingness-to-pay is similar to the direction and extent of hypothetical bias on market simulation results.

230.      The extent or direction of any hypothetical bias on estimated change in market share can be assessed, for example, by conducting a split-sample experiment that is similar to the experiments described in the hypothetical bias literature.[160]  Respondents are ran-domly assigned to one of two groups, with half of the respondents receiving a hypothet-ical version similar to Prof. Shugan's 2011 Smartphone Survey.  The other half of the re-spondents receives a survey that is identical to the hypothetical version, except that the respondent is obligated to purchase the phone at the end of the survey.[161]  Neither Dr. Leonard nor Prof. Shugan has presented results from this type of experiment.

---

[158] Leonard Revised Report, pp. 109-110.

[159] Dr. Leonard has discussed "signs that the stated preferences [in the 2011 Smartphone Survey] are inconsistent with the economic preferences that would be associated with actual purchasing behavior." (Leonard Revised Report, pp. 113-115.)  However, it is unclear if these inconsistencies are caused by the hypothetical nature of the survey.

[160] See, e.g., Glenn W. Harrison and E. Elisabeth Rutstrom, "Experimental Evidence on the Existence of Hypothetical Bias in Value Elicitation Methods," in *Handbook of Experimental Economics Results*, Volume I, 2008, pp. 752-767.

[161] In order for an actual purchase to take place, the combinations of phone features have to be limited to those available in the actual marketplace.  While this may be an issue for the purpose of estimating changes in Android shares in the but-for world, limiting survey feature levels to levels in the marketplace can still provide useful information on the direction and size of any hypothetical bias.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

231.    In rebutting the concern of hypothetical bias, Prof. Shugan instead argues the follow-

ing:[162]

> …even if there were such a thing as hypothetical bias with respect to
> consumer good decision-making, the hypothetical bias discussed by
> Dr. Leonard would lead [his] results to understate the value of the
> functionality enabled by the patents-in-suit and Java copyrights. As
> the article by Ding concludes, any so-called hypothetical bias would
> lead to an undervaluation of recognizable physical features. Ding
> (2007) hypothesizes that '[i]t is conjectured that under hypothetical
> conditions, on average, participants tend to understate their valuation
> for physical features they are likely to use (e.g., speakers, the power
> adapter) and to overstate their valuation for physical features they
> are unlikely to use (cassette adapter).' Hence, even accepting Dr.
> Leonard's criticism as valid (which it is not), it would have meant that
> respondents in the 2011 Smartphone Survey likely underestimated
> the importance of application startup time because some applica-
> tions are likely used on their existing devices and startup time is ob-
> viously observed, and it would render my results overly conservative.

232.    Even assuming Prof. Shugan is correct that respondents likely underestimated the

importance of application startup time because it is "obviously observed," Prof. Shugan

cannot conclude that his results are overly conservative.  Features unrelated to the al-

leged infringements, such as screen size, are also "obviously observed" by the respond-

ents.  Therefore, Ding's reasoning would conclude that respondents also likely underes-

timated the importance of non-infringed features.  Whether Prof. Shugan's results are

conservative or aggressive depends on the relative extent of underestimation between in-

fringement-related features and other features.  Prof. Shugan has not provided such as-

sessment.  Thus, I cannot conclude whether hypothetical bias would make Prof.

Shugan's estimated importance of the infringed features conservative or aggressive.

## B.  Time spent on instructions page

233.    One of the screen shots of the 2011 Smartphone Survey can be characterized as an

instructions page that lays out most of the assumptions that the respondents are required

to make while answering the choice questions:[163]

---

[162] Shugan Reply Report, p. 12.

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

*A Comment on "Choice"*

*You will now select one smartphone from different, alternative smartphones based on YOUR OWN PREFERENCES.*

*Alternatives vary on the previously described features. Assume any features not listed are the same for all alternatives. For example, if weight is not listed, assume each alternative has the same weight.*

*Select the smartphone you would choose for yourself. Please ignore your employer's preferences. Choose the "none" option if no alternative is appealing.*

*ASSUME that the feature descriptions are ACCURATE.*

*For example, even if you believe a brand allows multitasking, if the description says a model of the brand does not allow multitasking ASSUME that this particular model does not have multitasking.*

*Even if you believe some brand has many apps, if the description says this model of the brand has few apps, ASSUME that this particular model of the brand has few apps.*

*Even if you believe a brand has a high price, if the description says it does not, ASSUME that this model does not.*

234.    These assumptions are crucial in ensuring the reliability of survey responses as well as the validity of Prof. Shugan's data analysis.

235.    Prof. Shugan uses the first assumption that "any features not listed are the same for all alternatives" as a defense against the criticism that the survey omits phone attributes that affect consumer demand. Prof. Shugan explains that "relatively less important features need not be included in the conjoint analysis because these features are held constant and there is no need to make predictions about how changes in those attributes would influence market shares in my analysis."[164]

---

[163] Shugan Report, Appendix E-1, p. E-19.

[164] Shugan Reply Report, fn. 8, p. 5.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

236.    The second assumption that respondents "ignore…employers' preferences" is an assumption underlying Prof. Shugan's choice model, where each individual's trade-off among attributes is unconstrained.[165,166]

237.    The assumption that respondents accept the feature descriptions to be accurate is required to allow proper interpretation of the survey responses.

238.    An analysis of the time respondents spent on the instruction page indicates that many respondents spent very little time reviewing the page, which contains as many as 167 words.  As shown in Exhibit E4, over 40% of the respondents spent less than 10 seconds on the instruction page, which would imply a reading speed of at least 16.7 words per second to read through the entire page. Around 75% spent less than half-a-minute, implying a reading speed of at least 5.6 words per second.

239.    It appears that most respondents did not thoroughly read through the instructions. However, given that respondents are recruited from a standing internet panel,[167] they may be familiar with this type of consumer survey and know what assumptions to make without carefully reviewing the instructions.

240.    To evaluate whether choices made by respondents who spent a minimal amount of time on the instruction page are systematically different from the choices made by other respondents, and the effects of such differences on Prof. Shugan's findings, I re-estimate Prof. Shugan's choice model using only responses from the 450 (out of 784) respondents who spent at least 10 seconds on the instruction page.

---

[165] See, for example, Sawtooth Software's manual for a description of Prof. Shugan's HB model. (CBC/HB5 v5 Software for Hierarchicals Bayes Estimation for CBC Data, Updated August 20, 2009, p. 12.)

[166] I note that the violation of such assumption would render Prof. Shugan's analysis conservative.  If respondents were indeed constrained by their employers' preferences, they may be less responsive to changes in feature enhancements, therefore leading to smaller changes in Android shares when feature enhancements enabled by the alleged infringements are removed from the Android phones.

[167] Respondents were recruited from the Knowledge Networks panel.  See Shugan Report, p. 11.

Subject to Protective Order - Highly Confidential

Expert Report of Professor James R. Kearl

March 21, 2012                                                           Charles River Associates

241.     Exhibit E7 presents mean partworth estimates based on the re-estimated model. Ex-
cept for the peculiar result that the mean partworth for 300,000 applications is estimated
to be less than the mean partworth for 100,000 applications, the re-estimation results are
in line with Prof. Shugan's finding that consumers generally place higher value on better
smartphone features.[168]

242.     Using estimates from the model that excludes respondents who spent less than 10
seconds on the instruction page, I re-calculate Prof. Shugan's relative importance esti-
mates and the ratio of relative importance of availability of applications to relative im-
portance of application startup time.  As shown in Exhibit E8a, the ratio remains similar
after the exclusion.

243.     I also re-run Prof. Shugan's market simulation exercise.  As shown in Exhibits E9 and
E9a, the re-estimated model produces a larger reduction in Android sales but-for the al-
leged patent and copyright infringements. The re-estimated model that excludes re-
spondents who spent less than ten seconds on the instruction page predicts but-for An-
droid sales to be 10.9 percent (instead of 7.9 percent) lower if availability of applications
is reduced, 28.2 (instead of 19.9) percent lower if application of startup time is increased,
and 34.8 (instead of 25.7) percent lower but-for both alleged infringements.

244.     While it remains unclear if responses from individuals spending little time on the in-
structions page are indeed unreliable, the removal of these individuals results in an in-
crease in Prof. Shugan's preference share calculations.

---

[168] The mean partworth estimates from the re-estimated model cannot be compared directly to similar estimates
from Prof. Shugan's original model.  The choice model employed by Prof. Shugan is a standard
multinomial logit model utilizing Hierarchical Bayes ("HB") estimation. In a logit regression, a scaling factor
that is inversely proportional to the variance of the disturbance term is applied to all coefficients to
normalize the variance of the disturbance term so that the standard formula on choice probabilities can be
applied. To the extent that the variance of the random noise unexplained by the choice model differs
between the two models, the partworth estimates are expected to be larger for the model with a smaller
variance in random noise.  Moreover, the HB model provides information on the entire distribution of
partworths, not just the mean values.  Comparison of two models requires information in addition to the
mean partworths.

Subject to Protective Order - Highly Confidential

Expert Report of Professor James R. Kearl

March 21, 2012                                          Charles River Associates

## C. Time spent on choice questions

245.    The 2011 Smartphone Survey is a cognitively demanding consumer survey. Re-

spondents were asked to answer 16 choice questions, with each question describing four

phones with seven attributes. Therefore, a respondent had to compare 28 pieces of in-

formation, and to make such comparison 16 times. According to a research paper cited

by Prof. Shugan to support his use of 16 choice questions, "[t]he number of attributes

ranged from three to six, and the number of choice tasks ranged from 8 to 20" in 21

commercial choice-based conjoint studies collected by Sawtooth Software.[169] The num-

ber of attributes in the 2011 Smartphone Survey exceeds the maximum among those

conjoint studies, and the number of choice tasks is at the upper end of the distribution.

246.    Analysis of the time respondents spent on each of the 16 questions indicate that

most respondents do not seem to be spending enough time to process all 28 pieces of in-

formation, particularly for the later choice tasks.  Exhibit E5 shows the 10th, 25th, 50th,

75th, and 90th percentiles for time spent on each choice task. Even for the first choice

task, half of the respondents spent less than 35 seconds on the task, leaving them with a

little over one second to process each of the 28 pieces of information. The amount of

time respondents spent on each choice task declines dramatically as the survey pro-

ceeds. The median time spent on the choice task declines to only 10 seconds towards

the end of the survey.

247.    I have also estimated a regression model to assess whether the variation in time

spent on choice questions can be explained by the complexity of the question.  Re-

spondents are expected to spend more time on difficult questions if they are seriously

considering the trade-offs presented in the questions.  Using the partworth estimates

produced by Prof. Shugan, I calculate the estimated utility levels from the four phone op-

---

[169] Johnson, Richard M., and Bryan K. Orme, "How Many Questions Should You Ask in Choice-Based Conjoint
    Studies?" *Sawtooth Software Research Paper Series*, 1996, p. 3.

Expert Report of Professor James R. Kearl

March 21, 2012                                                              Charles River Associates

tions and compute various measures of the difficulty of choice for each choice question. A choice question is considered more difficult if the utility difference between the most preferred and second most preferred options is smaller, the utility difference between the most and least preferred options is smaller, or the variance in utility among all four options is smaller.

248.    As shown in Exhibit E6, there is a statistically significant relationship between various measures of utility difference or variance and the time spent on the question, suggesting that respondents did spend more time on more difficult questions.  However, the various measures of difficulty of choice only explain a small fraction of the variation in page time. The fit of the regression model improves significantly when question fixed effects are included, and even more so when respondent fixed effects are also included.  The question fixed effects confirm the trend presented in Exhibit E5, with a steep decline in page time followed by a stable level starting around the eighth question.  The significance of the respondent fixed effects indicates a high degree of heterogeneity in the response time across individuals.  Some respondents tend to spend substantially more time on the questions than others.

249.    There are at least four possible explanations for the small amount of time respondents spent on the choice questions.  First, respondents may not need to process all 28 pieces of information to make a choice. Consumers may only need to evaluate a few features that are important to them. For example, consumers who are extremely loyal to an operating system brand may simply look at the operating system attribute and pick their favorite phone within a split second.  Indeed, I find that 101 (12.9 percent) of the 784 respondents selected the same operating system in all choice tasks.[170]

---

[170] I do not find a similar percentage of respondents always choosing the same level for the other six features that are included in the survey.  The number of respondents picking the same level for price, voice command, application startup time, and screen size is 21, 9, 4, and 1, respectively.  None of the respondents picked the same level for number of applications and multitasking.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

250.    Second, the dramatic decline in response time may reflect a learning effect.  Respondents may become more familiar with the choice task and make choices more efficiently over time. As they see more alternative phone options, respondents may also learn more about their preferences, making the choices easier.

251.    Third, respondents may simply be trying to go through the survey quickly because they are tired, bored, or impatient.

252.    Fourth, respondents may think that their responses are of little value because they are not satisfied with certain aspects of the survey design.  The omission of important phone features and the use of unrealistic feature combinations may lead respondents to believe that the survey is flawed.

253.    While the first two explanations imply that the survey responses are still valid despite the short amount of time spent on the choice tasks, the last two can render the survey responses unreliable.  Respondents in the last two scenarios may make a choice randomly or rely on simplified rules that they do not use in actual purchase decisions.  It is likely that the explanations differ across different respondents, and it is hard to differentiate one explanation from another.  For example, while some respondents may pick the same operating system brand in all choice tasks because of brand loyalty, others may do so to finish the survey quickly.

254.    Given that the amount of time spent on each choice question may be an indication of the quality of survey responses, I re-estimate Prof. Shugan's choice model by eliminating responses that are most likely to be unreliable based on the time the respondent spent on the page. I eliminate a choice task from the estimation if the respondent spent less than 5 or 10 seconds on the choice task.  The number of observations declines by 14 and 40 percent for the 5-second and 10-second cutoff, respectively.  Exhibit E7 presents the mean partworths for the re-estimated models, Exhibit E8a presents the relative importance estimates, and Exhibits E9b and E9c reports the market simulation results.

Expert Report of Professor James R. Kearl

March 21, 2012                                                         Charles River Associates

255.     The effects of excluding responses based on page time for choice tasks are very sim-

ilar to the effects of excluding responses based on page time for the instruction page as

discussed above. The estimated mean partworths are substantially larger in the re-

estimated models, indicating a reduction in variance of the random noise. Except for the

finding that the estimated mean partworth for 300,000 applications is less than the esti-

mated mean partworth for 100,000 applications, the re-estimation results are in line with

Prof. Shugan's finding that consumers generally value enhancements in smartphone fea-

tures.

256.     The relative importance estimates based on the re-estimated models reflect a shift of

relative importance from operating system brand to other features.  However, the ratio of

relative importance of application availability to relative importance of application startup

time remains similar to the ratio based on Prof. Shugan's original estimate.

257.     Finally, the market simulation exercise based on the re-estimated models produces a

similar, if not larger, reduction in Android sales but-for the alleged patent and copyright in-

fringements. Using results from the model that eliminates choice tasks that were consid-

ered in less than 5 seconds, the re-estimated model predicts but-for Android sales to be

7.4 (instead of 7.9) percent lower if availability of applications was reduced, 22.0 (instead

of 19.9) percent lower if application startup time was increased, and 27.9 (instead of

25.7) percent lower but-for both alleged infringements. Using the re-estimated model that

is based on the 10-second cutoff, the reduction in Android sales is predicted to be 6.6,

27.0, and 33.6 percent for the three scenarios, respectively.

## D.  Time to complete survey

258.     While Prof. Shugan has not presented any analysis of the page time for the instruc-

tions and the choice questions, he has conducted sensitivity analyses based on the time

respondents took to complete the entire survey.  In particular, he presents market simula-

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

tion results after excluding respondents who took less than three minutes to complete the

survey and concludes that his results are robust.

259.    As an alternative sensitivity analysis, I increase Prof. Shugan's three-minute thresh-

old to five minutes, and also exclude respondents who entered the survey more than

once.  As presented in Exhibit E9d, the predicted loss of Android sales increases to 8.3

percent (instead of 7.9 percent) lower if availability of applications is reduced, 25.0 (in-

stead of 19.9) percent lower if application of startup time is increased, and 31.1 (instead

of 25.7) percent lower but-for both alleged infringements.

260.    Using partworth estimates from the re-estimated models described above, I have al-

so re-calculated the ratio of the relative importance of application availability to the rela-

tive importance of application startup time.  In all cases, the ratio remains similar to the

ratio calculated in Prof. Shugan's original model.[171]

## V.    Preference Estimation

261.    In this section, I address several issues related to Prof. Shugan's estimation of part-

worths.  I discuss sensitivity analyses regarding the estimation methodologies and model

assumptions.  I also evaluate the goodness-of-fit of Prof. Shugan's model in predicting

actual survey responses, and the stability of the estimated preferences over the course of

the survey.  I conclude that Prof. Shugan's preference estimation is robust and provides a

good fit for the data.

---

[171] See Exhibit E8a.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

## A. Treatment of the "None" option

262.    The 2011 Smartphone Survey provides a "None" option in each choice task, and re-
spondents are asked to choose that option if "no alternative is appealing."[172] Prof.
Shugan excludes from his analysis any choice task where the respondent chose the
"None" option.[173]

263.    While it is useful to restrict the respondents to be those involved in actual phone pur-
chase decisions since they are "expect[ed] to have formed preferences for Smartphone
features based on experience and/or research,"[174] it is not necessary to restrict the anal-
ysis to include only choice tasks where a hypothetical purchase is selected.  Since the
hypothetical smartphone options differ from the actual feature options observed in the
marketplace, it is possible that a respondent who likes an actual phone does not like any
of the four phone options presented in a choice task.

264.    To the extent a respondent chooses the "None" option when none of the four phone
options provides a positive utility gain, such a response still provides useful information
on consumer preferences.  Exclusion of choice tasks where the "None" option is chosen
may result in selection bias, since it is more likely for individuals placing smaller value on
phone features to choose the "None" option.

265.    However, there is ambiguity in the interpretation of the "None" option.  While the in-
struction is to choose the option if "no alternative is appealing," it is unclear if the re-
spondent actually read the instruction or how the respondent interprets the word "appeal-
ing."  Moreover, given that there are omitted features that are important in consumer de-
mand, it is unclear what assumptions each respondent makes regarding those omitted

---

[172] Shugan Report, Appendix E-19.

[173] There are 14 respondents who chose the "None" option in all 16 choice tasks.  (Shugan Report, Exhibit 2.)  For
the remaining 784 respondents, 12.6 percent of data are excluded because the "None" option was
selected.

[174] Shugan Report, p. 9.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

features.  Respondents who assume better levels for the omitted features are less likely to choose the "None" option.

266.     Therefore, Prof. Shugan's decision to exclude choice tasks where the respondent selected the "None" option can be a reasonable one. To ensure that his results are robust with respect to the exclusion, I re-conduct Prof. Shugan's analysis by including all choice tasks.  As shown in Exhibits E7, E8a, E9, and E9e, the partworth, relative importance, and market share estimates remain similar to Prof. Shugan's original estimates.

### B.  Simple logit model

267.     In estimating the contribution of each feature to the total worth or utility of a smartphone product (i.e., "partworth"), Prof. Shugan employs "a standard multinomial logit model utilizing widely employed Hierarchical Bayes ('HB') estimation."[175] The HB model has two levels: at the higher level, individuals' partworths are assumed to follow a multivariate normal distribution; at the lower level, given each individual's partworths, the probability of the individual choosing a particular alternative is governed by a multinomial logit model.[176]

268.     I estimate a simple logit model that constitutes the lower level of the HB model.  Instead of allowing partworths to vary across individuals, the simple logit model assumes that all individuals share the same partworths. Any variation in choices unexplained by the fixed partworths is assumed to be part of random noise.

269.     The HB model is, in principal, superior to the simple logit model because it accounts for heterogeneity in preference across individuals. By imposing homogeneity, the simple logit model attributes the systematic preference heterogeneity to random noise that is independently distributed across choices.

---

[175] Shugan Report, Appendix D, p. 15.

[176] Sawtooth HB Estimation Software Manual, p. 12.

Expert Report of Professor James R. Kearl

March 21, 2012                                                   Charles River Associates

270.    The simple logit model relies on the assumption of Independent of Irrelevant Alternative (IIA), where the relative odds between two alternatives are not affected by changes in the remaining alternatives. Such an assumption is often violated in choice decisions.[177] For example, according to the IIA assumption, changes in Android phone features but-for the alleged infringements would divert sales to other brands in proportion to current market shares.  On the other hand, the HB model predicts a larger diversion towards phones with features that are more similar to Android phones.

271.    Despite the superiority of the HB model over the simple logit model in accounting for preference heterogeneity, it is still a useful exercise to estimate the simple logit model. In modeling preference heterogeneity, the HB model imposes assumptions on consumers' preference structure; the simple logit model permits an assessment of the validity of some of those assumptions.

272.    The ability of the HB model to estimate individual-level partworths hinges on the assumptions that the partworths follow a multivariate normal distribution across individuals, and that consumer preference is stable across choice questions (i.e., the same set of partworths is used to determine all 16 choices of each individual). Given that the simple logit model is less demanding on the data and can be estimated using a single choice question, estimation of the model question by question allows for an evaluation of whether consumer preference appears to be stable across choice questions, as assumed by the HB model.

---

[177] Many examples can be constructed to illustrate the problematic nature of the IIA property, one of which is the red bus/blue bus example.  Consider the choice of commuters between taking a car and a blue bus to work. Suppose the odds ratio is 1:1 between the two modes of transportation, so that commuters have a 50 percent probability of choosing either one of the transportation modes. Now suppose a red bus is also introduced to the market. Further assume that people do not care about the color of the bus, so that commuters have an equal probability between picking the blue bus and the red bus.  Under the IIA assumption of the simple logit model, the odds ratio between the car and the blue bus has to be maintained at 1:1.  Consequently, the odds ratio among the three transportation modes ought to be 1:1:1, and the probability of a commuter picking each of the three transportation modes is one-third.  The introduction of a red bus therefore artificially increases the probability of taking a bus from one-half to two-thirds.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                    Charles River Associates

273.    Further, as discussed above, it appears that respondents are spending little time on the later choice questions as compared to the earlier questions. The question-by-question estimation can provide insight on whether data quality suffers as a result of the reduction in page time.

274.    Finally, estimation of the simple logit model provides a sensitivity check on the robustness of Prof. Shugan's results with respect to estimation method.

275.    The first column in Exhibit E10a presents estimation results of the simple logit model using the same data that Prof. Shugan uses for his HB estimation.[178] Most of the estimated coefficients are statistically significant, confirming Prof. Shugan's finding that consumers value the feature enhancements selected for his analysis.[179]

276.    As shown in Exhibit E8a, the relative importance estimates from the simple logit model produces a ratio of relative importance of application availability to relative importance of application startup time that is smaller than the ratio found in Prof. Shugan's HB model.  However, the ratio from the simple logit model (0.58) is closer to the 0.5 value adopted by Prof. Cockburn when compared to the ratio from the HB model (0.70).

277.    The logit model predicts percentage changes in Android sales but-for Google's alleged patent and copyright infringements that are similar to those reported by Prof. Shugan. I calculate smartphone preference shares for the base case scenario and the

---

[178] The logit estimates in Exhibit E10a cannot be directly compared to Prof. Shugan's HB estimates reported in Exhibit E7 for two reasons.  First, I use dummy coding instead of effects coding of the feature levels to allow for an easy assessment of whether the partworths for different levels of the same feature are statistically different from one another.  Second, the coefficients in the simple logit model are subject to a different scaling factor as compared to coefficients in the HB model. In a logit regression, a scaling factor that is inversely proportional to the variance of the disturbance term is applied to all coefficients to normalize the variance of the disturbance term so that the standard formula on choice probabilities can be applied. Given that the disturbance term of the logit equation captures also preference heterogeneity across individuals, the variance of the disturbance term is expected to be larger in the simple logit model. The scaling factor for the simple logit model is therefore smaller, resulting in smaller estimated coefficients. The simple logit estimates reported in Exhibit E7 are based on effects-coded variables to allow for easier comparisons with the HB estimates reported in the same exhibit.  The simple logit estimates in Exhibit E7 are indeed smaller than the HB estimates.

[179] Other than the coefficients for the operating system dummies, the omitted level for each feature is the most enhanced level.  Since the coefficients for the dummy-coded variables reflect the partworths relative to the omitted levels, they are negative when consumers place higher values for enhanced features.

---

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

three but-for scenarios that Prof. Shugan put forward in his report. As shown in Exhibit E9f, the simple logit model predicts but-for Android sales to be 6.9 (instead of 7.9) percent lower if availability of applications was reduced, 18.4 (instead of 19.9) percent lower if application of startup time was increased, and 24.6 (instead of 25.7) percent lower but-for both alleged infringements.

278.    To assess the reliability of survey responses and the stability of reported consumer preference, I also estimate separate logit models for each of the 16 choice questions and report the results in Exhibit E10a.  In most cases, both the logit estimates of the part-worths and the standard error of these point estimates remain similar across choice questions.

279.    Exhibit E11 presents results of formal statistical testing of the hypothesis that part-worths are identical across choice questions. Comparing estimates from the pooled logit model using all data and estimates from question-by-question logit estimation, a likelihood ratio test fails to reject the null hypothesis that the partworths are identical across all 16 choice questions (p-value=0.9317).

280.    I have also conducted hypothesis testing on whether partworths from each choice question are identical to the partworths implied by the remaining 15 choice questions as a group.  I compare logit estimates from each choice question with pooled logit estimates based on data from the remaining 15 questions.  The null hypothesis of identical part-worths is only rejected once (the first question) at the 5 percent level and twice (the first and the fifteenth questions) at the 10 percent level.

281.    Finally, I divide the 16 questions into four groups based on question order and estimate four separate simple logit models with pooled data from four choice tasks.[180]  By pooling data from four choice questions, the partworth estimates are more precise com-

_____

[180] The likelihood ratio test fails to reject the restrictions placed by pooling the data in each of the four groups.

Expert Report of Professor James R. Kearl

March 21, 2012                                                       Charles River Associates

pared to the single-question simple logit models.  The null hypothesis of identical part-worths across the four groups cannot be rejected.

282.     Based on the estimation results of simple logit models, I conclude that Prof. Shugan's analytical framework is robust with respect to estimation method.  Further, there is evidence that consumer preference implied by the data is stable across choice questions.  Despite the fact that respondents tend to spend substantially less time on the later questions, the reliability of survey responses for the later choice questions is comparable to those for the earlier questions.

### C.  Model Fit

283.     In his report, Prof. Shugan presents results on two goodness-of-fit measures—the "hit rate," which measures "the percentage of hold-out choices that are predicted correctly with the HB estimates"; and "$U^2$," which is a standard statistic for measuring the amount of explained variation in the data."[181]  With hit rates of over 0.7 and a $U^2$ statistic of 726.3 (indicating that the model explains 72.63 percent of the variation in the data), Prof. Shugan concludes that "the model has a good fit."[182]

284.     I further assess the goodness-of-fit of Prof. Shugan's model by comparing the chosen phone options predicted by Prof. Shugan's HB model with the phone options actually chosen by the respondent as well as the phone options predicted by the simple logit model.

285.     I first evaluate how well Prof. Shugan's HB model can predict the average behavior of the respondents.  Exhibit E12 presents the percentage of time each feature level is chosen based on either actual survey responses or model predictions.  The percentages

---

[181] Shugan Report, Appendix D, pp. 20-21.

[182] Shugan Report, Appendix D, pp. 20-21.

Expert Report of Professor James R. Kearl

March 21, 2012                                                        Charles River Associates

based on predictions from Prof. Shugan's HB model are very similar to the percentages based on actual survey responses.[183]

286.     I then evaluate how well Prof. Shugan's HB model can capture the heterogeneity in consumer preferences by comparing the percentage of respondents choosing the same feature level at least 50 percent or 75 percent of the time.  As indicated in Exhibit E13, Prof. Shugan's HB model provides a significant improvement in capturing consumer heterogeneity over the simple logit model, particularly for the predictions regarding choosing the same feature level at least 75 percent of the time.

### D.  Respondent Heterogeneity Not Captured by Prof. Shugan's Choice Model

287.     As discussed above, Prof. Shugan's choice model allows for respondent heterogeneity by assuming individuals' partworths follow a multivariate normal distribution.  Such a normality assumption can be violated when there are distinct groups of subpopulations and the partworths follow a bimodal (or multimodal) distribution rather than a unimodal distribution such as the normal distribution.  In these cases, estimation results based on subsamples may produce results that are substantially different from results based on the entire sample.

288.     I have independently assessed the sensitivity of Prof. Shugan's results, augmenting Prof. Shugan's own sensitivity analysis, with respect to the exclusion of three subsamples that may have a preference structure that is substantially different from that of the remaining respondents: respondents whose choices were most likely to be influenced by the employer's preferences, respondents who chose the same operating system brand in all choice tasks, and respondents who intended to purchase a smartphone in the next six months at the time of the survey.  Results from sensitivity analyses on market share sim-

---

[183] Predicted sample averages based on the simple logit model are equal to actual sample averages by construction.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

ulations, as reported in Exhibits 3c-3e of Prof. Shugan's report and Exhibits E9g and E9h of this report, indicate that Prof. Shugan's market simulation results are robust to these data exclusions. Results from sensitivity analyses on the relative importance estimates, as presented in Exhibit E8a, show that the ratio of relative importance of application availability to the relative importance of application startup time remains close to the original estimate in all but one sensitivity scenario. Either these respondents have a similar underlying preference structure as the remaining population, or the difference in the underlying preferences does not translate into a significant effect on the final estimates.

## VI.   Inconsistencies with Economic Theory

289.   Dr. Leonard criticizes Prof. Shugan's survey results for inconsistencies with "economic preferences associated with actual purchasing behavior:"[184]

> First, a substantial number of the survey respondents exhibited stated preferences (demand) for handsets with higher prices, all else equal – an outcome contrary to the basic economic principle that demand curves slope downward, i.e., decrease with price. An examination of the individual part-worths for the survey respondents shows that, according to their stated preferences, 24% valued a handset priced at $200 more than an otherwise equivalent handset priced at $100….Similarly, according to their stated preferences, 7% of the respondents valued a handset priced at $300 more than an otherwise equivalent handset priced at $200….

> Second, in the aggregate over the population, market demand for Android handsets (i.e., the market share function for Android handsets) increases as price increases from $100 to $200…While market demand decreases as price increases from $200 to $300, the size of the decrease is implausibly small….

> Third, with respect to speed, 26% of the respondents valued a handset with a speed of 0.2 seconds less than an otherwise equivalent handset with a speed of 2 seconds....

> In all, 49% of respondents valued higher priced handsets more than otherwise equivalent lower priced handsets, or valued slower handsets more than otherwise equivalent faster handsets, or both…

---

184 Expert Report of Dr. Leonard  10/24/2011 pages 114-115.

Expert Report of Professor James R. Kearl

March 21, 2012                                                 Charles River Associates

290.     Prof. Shugan's response to the criticism is three-pronged. First, he shows that his results remain stable after addressing Dr. Leonard's criticisms. Second, he suggests that the preferences estimated from the survey data can indeed exist in the real world.  Third, he criticizes Dr. Leonard for ignoring the noise around the utility estimates and exaggerating the share of respondents that exhibit preferences that are allegedly inconsistent with economic theory.  I discuss each of Prof. Shugan's responses below.

## A.  Sensitivity Analysis that Addresses Estimated Preferences that are Inconsistent with Economic Theory

291.     Prof. Shugan's strongest rebuttal is the claim that "[e]ven if the issues [Dr. Leonard] raises were relevant, an experiment that adopts [Dr. Leonard's] critique further underscores the conservativeness of [the conjoint] analyses."[185]  Prof. Shugan re-estimates his choice model by excluding respondents that Dr. Leonard claims have inconsistent economic preferences for price and application startup time.  He also imposes monotonic preferences on price.  Results from the re-estimated models show similar or larger percentage of loss in Android shares if the enhancements enabled by the alleged infringements were removed from Android phones.[186]

292.     I have extended Prof. Shugan's sensitivity analyses by estimating four additional models.  Three of these models involve excluding respondents that have estimated preferences for application availability, multitasking, and voice command functionality that are inconsistent with economic theory.  The last model involves imposing monotonic preferences on price, application startup time, application availability, multitasking, and voice

---

[185] Shugan Reply Report, pp. 20-21.

[186] Shugan Reply Report, pp. 19-21.

Expert Report of Professor James R. Kearl

March 21, 2012                                                              Charles River Associates

command functionality.[187]  As shown in Exhibits E9 and E9i through E9l, the estimated

percentages of loss in Android shares remain similar to Prof. Shugan's original estimates.

293.     While simulated market shares remain stable in the re-estimated models that address

inconsistencies with economic theory, the ratio of the relative importance of application

availability to the relative importance of application start up time fluctuates between 0.47

and 1.16 among all re-estimated models conducted by either Prof. Shugan or me.[188]

Relative importance of a feature increases when inconsistent preferences for the feature

are addressed.  The ratio increases when inconsistent preferences are eliminated for

availability of applications but not application startup time, decreases when inconsistent

preferences are eliminated for application startup time but not availability of applications,

and remains similar otherwise.

## B.  Legitimate Explanations for the Apparent Inconsistencies

294.     Prof. Shugan also argues that the preferences described by Dr. Leonard as incon-

sistencies with actual purchasing behavior "are likely to be exhibited in real world pur-

chases."[189]  For example, some consumers may indeed prefer higher prices because

"[t]hey prefer a more prestigious Smartphone, often implied by the phone having a higher

price," or that "some consumers may use price as a surrogate measure of unobserved

qualities (e.g., durability) and focus only on Smartphones in a particular price range and

not consider cheap Smartphones."[190]

295.     While it is plausible that a certain fraction of the population indeed prefers high price

for reasons such as prestige and recognition, it is hard to imagine why as many as 26%

---

[187] Monotonic preference is not imposed on brand and screen size.

[188] See column [h] of Exhibit E8a.

[189] Shugan Reply Report, p. 19.

[190] Shugan Reply Report, p. 18.

March 21, 2012                                                    Charles River Associates

of the respondents value phones with slower application startup time.  The apparent in-consistencies likely reflect effects from unobserved or excluded product features rather than actual consumer preferences. This line of argument highlights the existence of omit-ted features in Prof. Shugan's conjoint analysis, which may lead to biased estimates of partworths, relative importance, and Android share loss as discussed above.[191]

### C.  Accounting for Noise around Estimated Utilities

296.    Finally, Prof. Shugan indicates that "Dr. Leonard does not account for the minimal amount of noise around the estimated utilities that is to be expected from any estimation technique."[192]  He claims that after excluding "respondents with utilities associated with $100 and $200 that are within one standard deviation of the difference in utilities between levels…only 8.8 percent of respondents, not 24 percent as claimed by Dr. Leonard, pre-fer a price of $200 over a price of $100."[193]

297.    Prof. Shugan is correct in pointing out the need to address the statistical noise around the utility estimates.  While the mean utility estimate for a handset priced at $200 is higher than the mean utility estimate for a handset priced at $100 for 24 percent of the respondents, the difference may be explained by the impreciseness of the estimation technique.  Therefore, a more relevant measure is the fraction of respondents for which the difference in utility is statistically significant (i.e., the difference is larger than what can be explained by statistical noise).

298.    However, Prof. Shugan's standard deviation estimate may not be an appropriate benchmark in establishing statistical significance of the difference in utilities between the

---

[191] In discussing the potential explanations for the inconsistencies, Dr. Leonard also suggests that  "some respondents may have ascribed attribute to the handsets in the choice set in addition to those described by the survey instrument." (Leonard Revised Report, p. 115.)

[192] Shugan Reply Report, p. 19.

[193] Shugan Reply Report, p. 19.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

two price levels.  I note that Prof. Shugan's choice model provides 10,000 sets of utility estimates for each respondent.[194]  The utility difference discussed by Dr. Leonard and Prof. Shugan is the mean utility difference calculated as an average across these 10,000 estimates.  To assess the statistical significance of the mean difference for each respondent, a within-respondent standard deviation can be calculated based on the 10,000 estimates of that respondent.  Instead, Prof. Shugan calculates a single standard deviation estimate that applies to all respondents by taking a single data point of mean utility difference from each respondent.  Hence, his standard deviation is a between-respondent standard deviation that measures the variability in mean utility difference across respondents.  The more heterogeneous the respondents, the larger Prof. Shugan's between-respondent standard deviation estimate, even when the preciseness of each respondent's mean utility difference remains unchanged.

299.    In excluding respondents whose mean utility difference is within one between-respondent standard deviation, Prof. Shugan could have incorrectly excluded respondents with mean utility difference that is precisely estimated (i.e., with small within-respondent standard deviation) and incorrectly included respondents with mean utility difference that is imprecisely estimated (i.e., with large within-respondent standard deviation).

300.    Further, Prof. Shugan's standard deviation measure is calculated only from individuals with a mean utility for the $200 price level that is larger than the mean utility level for the $100 price level.  It is unclear why Prof. Shugan limits his calculation to estimates that fall on one side of the distribution, particularly since he speaks against interpreting the sign of the difference without accounting for noise around the estimates.

---

[194] Based on the backup materials provided by Prof. Shugan (specifically, the file FonKN_A.log), his estimation procedure employs 10,000 preliminary iterations, followed by 10,000 draws per respondent.

Expert Report of Professor James R. Kearl

March 21, 2012                                                Charles River Associates

## VII.    Value of Application Availability in Comparison to Value of Application Startup Time

301.    In Prof. Cockburn's "group and value approach" for calculating reasonable royalty, he relies on Prof. Shugan's conjoint analysis to support his assumption that "the value of the copyrighted API specifications in the 2006 Bundle was half the value of the patent claims in suit."[195]  In this section, I discuss my understanding of how Prof. Cockburn reaches the "half" value from Prof. Shugan's conjoint analysis.  I also discuss two potential flaws of Prof. Shugan and Prof. Cockburn's analysis.

### A.  Prof. Shugan's relative importance calculations

302.    Prof. Cockburn provides very limited descriptions of how he uses Prof. Shugan's conjoint analysis to reach the conversion factor of 0.5 for transforming the value of allegedly infringed patents into the value of copyrighted APIs.  Given that he points to "the relative importance to consumers of having a smartphone for which there are a large number of applications, in comparison to the importance to consumers of having a smartphone that launches applications quickly" right before his claim that "Prof. Shugan's conjoint survey indicates that the value of APIs that enable the development of applications is signifi-cant…[and] is approximately half the value of technology that ensures that applications launch within one second,"[196] I assume that Prof. Cockburn's 0.5 value is derived from the relative importance estimates presented by Prof. Shugan.

303.    Prof. Shugan reports relative importance estimates of 7.85 percent and 11.17 percent for availability of applications and application startup time, respectively.[197]  The ratio of the two estimates is 0.7, which Prof. Cockburn apparently rounds to 0.5.[198]

---

[195] Third Cockburn Report, p. 22.

[196] Third Cockburn Report, p. 156.

[197] Shugan Report, Table 1.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

304.     Prof. Shugan's relative importance estimates are obtained "by examining the ranges

of partworths."[199]  My replication of Prof. Shugan's estimates reveals that Prof. Shugan

first calculates, at the respondent level, the partworth range (difference between maxi-

mum and minimum) for each smartphone feature included in the survey.  The partworth

ranges for each feature are then averaged across all respondents to obtain an average

partworth range for the feature.  Finally, the ratio of each feature's average partworth

range to the sum of averages across all features becomes the feature's relative im-

portance.

305.     As discussed in Section III.B.2., Prof. Shugan's relative importance ratio is unbiased

if the partworth estimates are unbiased or the partworth ranges for different attributes are

biased by the same percentage.  I now discuss two additional issues concerning the va-

lidity of Prof. Cockburn's use of Prof. Shugan's relative importance estimates, based on

my understanding of Prof. Cockburn's analysis.

## B.  Disconnect between relative importance estimates and values for APIs and patents

306.     Prof. Shugan's relative importance estimates do not constitute proper measures for

evaluating the value of the copyrighted APIs in comparison to the value of the patent

claims in suit.

307.     As explained above, relative importance estimates are based on the differences in

utility between the most preferred and the least preferred feature levels (i.e., partworth

ranges) for each consumer.  Given that the partworth estimates are not necessarily con-

sistent with the monotonic preference structure predicted by economic theory, the most

---

[198] The discrepancy between 0.7 and 0.5 can also be due to my misunderstanding of how Prof. Cockburn reaches the 0.5 value given the limited amount of information he provides.  I reserve the right to amend my opinions if additional information becomes available.

[199] Shugan Report, Appendix D, p. 15.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

preferred or the least preferred level for an attribute varies across respondents.  For example, while economic theory predicts the most preferred level of application startup time to be 0.2 second and the least preferred level of application startup time to be 4 seconds, 26% of the respondents valued a handset with an application startup time of 0.2 seconds less than an otherwise equivalent handset with a startup time of 2 seconds.[200]

308.     On the other hand, the relevant measures to assess the value of the copyrighted APIs and the value of the allegedly infringed patents are differences in utilities between the actual levels of the relevant attributes and the levels of these attributes but-for the alleged copyright and patent infringements.  The actual and but-for attribute levels are held constant across individuals.

309.     Prof. Cockburn's conversion factor should be based on relative importance estimates that are evaluated at the actual and but-for attribute levels (hereafter "relevant relative importance") instead of Prof. Shugan's relative importance estimates, which are evaluated at the most and least preferred attribute levels allowed by the survey design, regardless of the relevance of those levels to the copyrighted APIs and the allegedly infringed patents.

310.     Columns [i] through [k] of Exhibit E8a present relevant relative importance estimates that are based on the actual and but-for attribute levels for availability of applications and application startup time proposed by Prof. Shugan in his base model.[201]  Prof. Shugan assumes that Android phones have 100,000 applications and an application startup time of 2 seconds under the base case scenario.  Android phones in the but-for scenarios are assumed to have 40,000 applications and an application startup time of 4 seconds.[202]

---

[200] Leonard Revised Report, pp. 114-115.

[201] Prof. Shugan refers to the model reported in Exhibit 3a of his report as his "base case" model. (Shugan Report, Appendix D, p. 18.)

[202] Shugan Report, Exhibit 3a.

Expert Report of Professor James R. Kearl

March 21, 2012                                                           Charles River Associates

The ratio of relevant relative importance percentages reported in column [k] is substantially smaller than the ratio of relative importance percentages reported in column [h]. However, the ratio remains close, in most cases, to the 0.5 conversion factor adopted by Prof. Cockburn.

311.     It appears that Prof. Cockburn's assumptions on the actual and but-for Android phone features may be different from those adopted by Prof. Shugan in his base model. In assessing the value attributable to copyrights through number of applications available, it appears that Prof. Cockburn relies on a model that is different from Prof. Shugan's base model.  While the but-for availability of applications is assumed to be 40,000 applications in Prof. Shugan's base model, the model adopted by Prof. Cockburn in his damages calculation assumes a but-for level of 6,000 applications.[203]

312.     In regard to application startup time, Prof. Cockburn refers to "applications launch within one second" as "the benefit [he] assume[s] is afforded by the infringed speed and memory patents."[204]  Application startup time of 0.2 second is the only attribute level included in the 2011 Smartphone Survey that is within one second.[205]  Combining but-for startup time of 0.2 second with his indication that one of the allegedly infringed patents reduces camera launch time by 3.33 seconds and email launch time by 3.99 seconds,[206] but-for application startup time of 4 seconds is the only attribute level included in the 2011 Smartphone Survey that is consistent with these improvements.[207]  Therefore, Prof.

---

203 In evaluating the value of the copyrights, Prof. Cockburn assumes an  "incremental effect of applications" of -19.2%, which matches the loss of preference share for Android under a market simulation model that assumes availability of 6,000 applications for Android phones in the but-for scenario.  (Revised Cockburn Report, p. 190 and Exhibit 27; Shugan Report, Exhibit 4a.)

204 Third Cockburn Report, p. 156.

205 The levels of application startup time included in the 2011 Smartphone Surveys are 0.2, 2, and 4 seconds.  (Shugan Report, Appendix D, p. 8.)

206 Expert Report of Iain Cockburn, September 12, 2011, Exhibit  6.

207 As noted above, the levels of application startup time included in the 2011 Smartphone Surveys are 0.2, 2, and 4 seconds.  (Shugan Report, Appendix D, p. 8.)

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

Cockburn seems to agree with a but-for launch time of 4 seconds, but assumes an actual launch time of 0.2 second instead of 2 seconds as in Prof. Shugan's base model.

313.     I report results based on Prof. Cockburn's apparent assumptions of actual and but-for attribute levels in columns [l] through [n] of Exhibit E8a.  The relevant relative importance ratio based on these assumptions (column [n]) is generally bounded by the ratio based on Prof. Shugan's relative importance estimates (column [h]) and the relevant relative importance ratio based on the actual and but-for attribute levels assumed in Prof. Shugan's base model (column [k]).  In most cases, the ratio remains close to the 0.5 value adopted by Prof. Cockburn in his "group and value approach" for calculating reasonable royalty.

## C.  Alternate relative importance calculations

314.     Prof. Shugan calculates the relative importance percentages based on average part-worth ranges across all respondents.  An alternative approach is to calculate relative importance percentages at the individual level, then average across respondents to obtain average relative importance percentages for the group.

315.     Prof. Shugan's approach differs from the alternative approach in that his approach effectively takes a weighted average of individual-level relative importance percentages, using sum of partworth ranges across all attributes as weights.  It seems more reasonable to allow all respondents to carry equal weights in determining the overall relative importance of smartphone attributes, as assumed in this alternative approach.  A technical paper posted by Sawtooth Software on its website also suggests that "[w]hen summarizing attribute importances for groups, it is best to compute importances for respondents individually and then average them."[208]

---

[208] "Interpreting the Results of Conjoint Analysis," reprinted from Orme, B. (2010) *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research.* Second Edition, Madison, Wis.: Research Publishers LLC, p. 80. (http://www.sawtoothsoftware.com/download/techpap/interpca.pdf).

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

316.     Exhibit E8b presents results similar to those reported in Exhibit E8a, but uses the

alternative approach instead of Prof. Shugan's approach to compute relative importance

percentages.  The estimated ratio of the relative importance of application availability to

the relative importance for application startup time based on the alternative approach is

generally larger than, but remains very close to, the estimated ratio from Prof. Shugan's

approach.

## VIII.   Market Simulation

317.     To measure the effect of infringement on Android sales, Prof. Shugan conducts a

series of market simulations and compares Android shares under a base scenario that

reflects actual product characteristics and several but-for scenarios where feature en-

hancements enabled by the alleged infringements are removed.209  This section evalu-

ates the validity of Prof. Shugan's market simulation exercise, assuming that the part-

worth estimates of his model are valid.

318.     As discussed above, the omission of important smartphone features can render the

market share simulations invalid, even with unbiased estimates of the partworths for the

features included in the survey.  The direction of the bias on the estimated percentage

change in Android sales is ambiguous.

319.     The validity of Prof. Shugan's simulation analysis also hinges largely upon the accu-

racy of the product attributes he feeds into the analysis. Prof. Shugan designs the base

case "to reflect the features available on Smartphone models for each of the operating

system brands used in the choice exercises: Android, iOS, BlackBerry, and Win-

dows."210 The "leading smartphones" identified by Prof. Shugan are "the HTC Incredible

---

209 Shugan Report, pp. 13-15.

210 Shugan Report, Appendix D, p. 18.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

(Android), iPhone 4 (Apple), BlackBerry Curve (BlackBerry), HTC HD7 (Windows Phone 7)."211

320.    Upon reviewing the sources cited by Prof. Shugan and other industry sources identified by my independent research, I conclude that Prof. Shugan's characterization of "leading smartphones" may be subject to several flaws.

321.    First, I find errors in Prof. Shugan's characterization of the four phones he uses in his analysis.  Prof. Shugan specifies the screen size of the Android HTC Incredible as 4.0 inches.212  The source cited by Prof. Shugan indicates a screen size of 3.7 inches for the phone, which is not among the three screen sizes included in the 2011 Smartphone Survey (3.5 inches, 4.0 inches, and 4.5 inches).213  Based on the convention of rounding to the nearest attribute level included in the survey, which Prof. Shugan apparently adopts to define the screen size of other phones, the Android phone should have assumed a screen size of 3.5 rather than 4.0 inches since 3.7 is closer to 3.5 than 4.0.214

322.    Further, it is unclear how Prof. Shugan determines the number of applications available on each of the four phones.215  Prof. Shugan has referenced three documents that contain information on availability of applications for October 2010, January 2011, March

---

211 Shugan Report, Appendix D, p. 18, fn. 44.

212 Shugan Report, Exhibit 3a.

213 See "Best Android Phones," Android Central, June 17, 2011 (http://www.androidcentral.com/best-android-phones-june-2011); and the specification page for HTC Incredible accessed through the hyperlink in the article (http://www.androidcentral.com/htc-droid-incredible-specs).

214 Prof. Shugan assumes a screen size of 4.5 inches for Windows HD7, whose actual screen size is 4.3 inches. He assumes a screen size of 3.5 inches (smallest screen size used in the survey) for Blackberry 9300, whose actual screen size is 2.4 inches. (Exhibit 3; Shugan Report, Exhibit 3a.)

215 While Prof. Shugan discusses application availability based on sources dated April 27 and August 30 of 2011 in a footnote of his market share simulation exhibits, some of the numbers in the footnote are inconsistent with the assumptions he makes in the market share simulations. (Shugan Report, Exhibits 3a-3f.)

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

2011, and August 2011.216  I have also collected application availability information for November and December of 2010.217  As shown in Exhibit E14, application availability for each operating system has grown over time, and it appears that Prof. Shugan's base-case assumptions on application availability correspond to different time periods for different phones.  While the number of applications Prof. Shugan assumes for Android and Apple phones appears to be from late 2010, the number of applications for Blackberry and Windows phones appears to reflect availability in the second half of 2011.  To make an apples-to-apples comparison, I propose changing the number of applications for Blackberry and Windows from 40,000 to 6,000 in order to reflect application availability in late 2010.218

323.    Second, the voice commands functionality defined for the phones ignores the voice texting functionality enabled by free apps.  Prof. Shugan defines the voice commands functionality based on the built-in capabilities of each phone.219  Android is the only device with built-in voice-to-text capabilities, and is assigned "voice dialing and texting" as the voice commands feature.  The remaining phones are assigned "voice dialing" despite Prof. Shugan's recognition that "voice texting is available through the download of a third-party application" for all these other devices.220  Since consumers have easy access to enhanced voice commands functionality on a phones at no additional cost, it may be more appropriate to use the enhanced level as the phone attribute.

---

216 Wauters, Robin, "There Are Now More Free Apps for Android than for the iPhone Distimo," *TechCrunch*, April 27, 2011 (http://techcrunch.com/2011/04/27/there-are-now-more-free-apps-for-android-than-for-the-ios-platform-distimo/); McDougall, Paul, "Windows Phone 7 Apps Hit 30,000 Mark," *InformationWeek*, August 30, 2011 (http://www.informationweek.com/news/windows/microsoft_news/231600493); Albanesius, Chloe, "Android Market Hits 100,000 Apps," PCMag, October 25, 2010 (http://www.pcmag.com/article2/0,2817,2371436,00.asp).

217 Distimo Report, November 2010; Distimo Report, Full Year 2010 (available for download at http://www.distimo.com/publications/).

218 Among the application availability levels of 6,000, 40,000, 100,000, and 300,000, the 6,000 level is closest to the actual levels for Windows and Blackberry phones in late 2010.

219 Shugan Report, Exhibit 3a.

220 Shugan Report, Exhibit 3a.

Expert Report of Professor James R. Kearl

March 21, 2012                                                        Charles River Associates

324.    Finally, the four phones selected by Prof. Shugan are not the only "leading smartphones" in the market.  There are many Android phones in the market, many of which are more frequently mentioned as top-ranking Android phones by industry sources, or are ranked higher than the HTC Incredible.221  In fact, a source cited by Prof. Shugan to support his leading smartphone selection ranks the HTC ThunderBolt and the HTC EVO 4G as having higher popularity than the HTC Incredible.222  Moreover, these other Android phones often have features that are different from HTC Incredible.223  While only four phone options are included in the 2011 Smartphone Survey, there is no reason to limit the number of phones to four in the market simulation exercise.  Given the estimates of partworths, one can evaluate the choice probabilities for any number of choice options. Therefore, it seems appropriate to include additional smartphone options that capture features of other "leading smartphones" recognized by industry sources.

325.    To evaluate the significance of the issues identified in Prof. Shugan's characterization of smartphone product attributes, I re-run Prof. Shugan's share simulation several ways. First, I keep the four phones identified by Shugan, but correct for his errors.  Second, I change the voice commands functionality to include voice texting in all phones.  Third, I add additional smartphones that are identified as top-selling smartphones into the analysis.  Fourth, I make all three changes described above.

326.    As demonstrated in Exhibits E9 and E9m through E9p, Prof. Shugan's estimates of the reduction in Android preference shares under the various but-for scenarios are robust with respect to the changes in phone specifications described above. The estimated percentage reductions in Android sales are either higher than or close to Prof. Shugan's original estimates.

---

221 See Exhibit E2.

222 "Best Android Phones," Android Central, June 17, 2011 (http://www.androidcentral.com/best-android-phones-june-2011).

223 See Exhibit E3.

Expert Report of Professor James R. Kearl

March 21, 2012                                              Charles River Associates

## IX.  Conclusion

327.     I am able to replicate Prof. Shugan's partworth, relative importance, and market share estimates to confirm that his analysis is conducted as described in his testimony.  I have also confirmed that Prof. Shugan's model and methodologies are within the norm of estimation approaches used in the marketing field.

328.     However, my analysis reveals a critical issue regarding Prof. Shugan's survey design. It is apparent that phone attributes that are important in consumers' smartphone purchase decisions are omitted from Prof. Shugan's 2011 Smartphone Survey.  My analysis shows that such omissions likely cause bias in Prof. Shugan's results, but there is no way of determining the direction of the bias without conducting additional survey work that involves the omitted features.

329.     The bias caused by omitted attributes is likely to be more severe for Prof. Shugan's market share estimates than his relative importance estimates.  Prof. Shugan's relative importance estimates may be unbiased even when the partworth estimates are biased biased, provided that the partworth estimates for application availability and the partworth estimates for application startup time are biased by the same percentage.  On the other hand, his market share estimates may be biased even when the partworth estimates are unbiased.

330.     Putting aside the omitted attributes issue and assuming the 2011 Smartphone Survey to be a valid source for evaluating consumer preferences for smartphone features, Prof. Shugan's analysis of the survey data appears to be largely robust with respect to the exclusion of potentially unreliable survey responses, the adoption of alternative estimation techniques, the exclusion of respondents with potentially different underlying preferences, the elimination of estimated preferences that are inconsistent with economic preferences as alleged by Dr. Leonard, and changes in product attribute assumptions adopted by the market simulation exercise.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

331.    Exhibit E8a presents results from 21 sensitivity runs I have performed to evaluate the effect of alternative methodologies and data exclusions on the relative importance of application availability in relation to application startup time.  It also summarizes estimates of relevant relative importance based on actual and but-for levels of application availability and application launch time.  Exhibit E8b summarizes results from an alternative approach of calculating relative importance that puts equal weights on all respondents. These sensitivity analyses indicate that the estimated ratio of relative importance or relevant relative importance often remains similar to the ratio based on Prof. Shugan's original estimate of 0.7.  To the extent that the re-calculated ratio differs substantively from Prof. Shugan's ratio, the re-calculated ratio often remains close to the 0.5 value assumed by Prof. Cockburn.

332.    Exhibit E9 summarizes results from the nine sensitivity runs performed by Prof. Shugan and the 16 sensitivity runs I conducted to evaluate the effects of alternative methodologies and data exclusions on the market share simulation exercise.  In most cases, the estimated percentage of reduction in Android sales in the but-for world remains similar between Prof. Shugan's original model and the re-estimated model.  In fact, there is a slight tendency for the re-estimated models to produce larger estimates of reduction in Android sales.  Estimates from re-estimated models that deviate most from Prof. Shugan's original estimates tend to be larger, rather than smaller, than the original estimates.  Also, cases where the re-estimated model produces an estimated reduction in Android sales that is smaller than that from Prof. Shugan's original model are less frequently observed than cases where the re-estimated model produces a larger estimate in two of the three but-for scenarios.

333.    In summary, due to the uncertainty surrounding the effects of the omitted features, I cannot assess the overall reliability of Prof. Shugan's conjoint analysis and Prof. Cockburn's apparent use of the conjoint analysis.  However, all the sensitivity tests I have per-

Expert Report of Professor James R. Kearl

March 21, 2012                                                        Charles River Associates

formed indicate that that their results are reasonably robust with respect to the factors

that I can test.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                                    Charles River Associates

# Appendix F: Econometrics

## I.   Introduction

334.     Prof. Cockburn's estimate of the change in Android market shares from his econo-
metric analysis was stricken in the Court's order of March 13, 2012 (Doc. 785).  The
Court states that the market share calculation stemming from the econometric analysis
was "unreliable" and "questionable" because it adjusted consumer's willingness to pay for
removing the patented features of Android phones while not simultaneously adjusting the
sales price of the phone.[224]

335.     The market share calculation from Prof. Cockburn's econometric analysis is the last
step in a multi-step process.  In the prior steps of his econometric analysis, Prof. Cock-
burn estimates a statistical model of consumers' willingness to pay for mobile phones.
While the Court takes issue with how willingness to pay is used to estimate changes in
market share, I do not read the Court's order as having taken issue with the methodology
of calculating willingness to pay.  Willingness to pay estimates may be useful in demon-
strating that consumers value the impact of the patent and copyright matters still at issue
in this suit.

336.     In his Third Report, Prof. Cockburn reworks some of his econometric analysis in re-
sponse, at least in part, to Dr. Leonard's criticisms of his work in this area. In this appen-
dix I address the econometric analysis as developed in Prof. Cockburn's Second Report,
Dr. Leonard's response to that report, and Prof. Cockburn's reply and supporting anal-
yses put forward in his Third Report.

---

[224] Court Order, Doc. 785, March 13, 2012, pp. 17-18.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

## II.        Econometric Model Methodology Overview

337.    Qualitative evidence suggests there are a number of highly valued functionalities
considered in the purchase of a smartphone including such features as the phone's
speed, the presence of a camera, Wi-Fi connectivity, gps capability, the screen size, and
the amount of memory.[225]  Because the patents and copyrights in suit have an effect on
some of these functionalities, Prof. Cockburn seeks to value smartphone features in or-
der to estimate the value of the relevant functionalities..

338.    Prof. Cockburn's approach to determining the value to Google of the functionality en-
abled by Oracle's patents and copyrights is to examine the incremental market share at-
tributable to the enabled functionality.  Prof. Cockburn's approach can be thought of as a
five-step process:

  1) Estimate a statistical model of the value of smartphones using data from ac-
  tual purchases

  2) Identify how the patents and copyrights in suit affect Android smartphone
  features included in the statistical model

  3) Predict the change in Android smartphone value from the estimated change
  in the phones' functionalities enabled by Oracle's patents and copyrights

  4) Predict the change in Android market share due to the change in Android
  smartphone value

  5) Estimate the change in Google revenues from the change in Android market
  share

---

225 http://www.smartphonebasics.com/what-features-to-look-for-in-a-smartphone  (last accessed 3/5/2012),
     http://www.consumerreports.org/cro/cell-phones-services/buying-guide.htm?pn=2  (last accessed
     3/5/2012), Leonard Supplemental Report, p.11. See also Exhibit E1 in Appendix E of this report.

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

339.    The Court's order clearly strikes step four and, by extension, step five from Prof.

Cockburn's report(s).  However, the first step of this five-step process is the foundation of

Prof. Cockburn's Econometric Model analysis and includes the actual econometrics – the

remaining steps of the analysis rely upon what is done in step 1.  In this first step, the

value of a smartphone (as measured by willingness to pay) is broken down by the

phone's characteristics.  Nearly all of Google's criticisms regarding Prof. Cockburn's

econometric model rest on how he implemented this first step.  The following sections

provide the details behind this first step of Prof. Cockburn's Econometric Model, Google's

criticisms of the model, and several model adjustments and sensitivity analyses that I

have undertaken.

## III.      The Econometric Model

340.    Prof. Cockburn's econometric analysis serves as a basis for his calculation of con-

sumer willingness to pay for smartphone features.  The approach used by Prof. Cockburn

is referred to in the economics discipline as hedonic analysis and, specific to economet-

rics, hedonic regression.  Hedonic analysis uses the characteristics of a product to pre-

dict the value of the product overall (as a sum of its characteristics) as well as the value

of each characteristic. Hedonic analysis is well accepted within the professional econom-

ics peer-reviewed literature and Dr. Leonard does not criticize Prof. Cockburn for his use

of the methodology.  Rather, Dr. Leonard's criticisms are directed at how the methodolo-

gy is employed.

### A.  The Data

341.    Prof. Cockburn's econometric model uses data from 913,556 eBay auctions for cell

phones.  The data he gleans from these auctions have 7,095,721 observations, where an

observation represents a bidder in an auction and includes information on the bidder's

Expert Report of Professor James R. Kearl

March 21, 2012                                           Charles River Associates

last or highest bid.[226] There are on average 7.77 bidders per auction. His data set in-
cludes auctions from 2009 through 2011 although his model is focused exclusively on da-
ta for 2010 and 2011.

342.    The mix of phones auctioned on eBay is not proportional to the phone shares seen in
the retail phone market. For example, there are many more auctions for iPhones as a
fraction of the total number of auctions on eBay than iPhone sales as a share of the retail
cell phone market.  This means that the eBay data are skewed relative to the share of
iPhones in the market.  To adjust for this, Prof. Cockburn uses stratified random samples
of auctions from the eBay data in proportion to the 2010 and 2011 smartphone market
shares as identified by Strategy Analytics.  Each sample is based on 20,000 auctions
(10,000 each for the years 2010 and 2011). On average each sample is made up of
77,670 bids within each year.

343.    Prof. Cockburn estimates his econometric model using data from these 20,000 auc-
tions but, recognizing that his results could be an artifact of the specific sample that he
drew from the larger set of eBay data, he repeats the process until he has estimated ap-
proximately 1,200 samples of 20,000 auctions.  He uses the results from the 1,200 sam-
ples to identify the distribution of the model estimates.  This distribution allows him to
provide the 5th and 95th percentiles as confidence intervals.

### B.  The Model

344.    Prof. Cockburn's initial (BASE) model predicts the auction bid (also referred to as "the
bidder's willingness to pay" and/or "the price") as a function of the phones' characteris-
tics, or features.  Prof. Cockburn uses the 23 phone characteristics identified in Exhibit F1
to predict the auction bid.  In contrast, Prof. Shugan's Conjoint Analysis is based on sev-

---

226  October Supplement to the Expert Report of Prof. Cockburn, Appendix C-1.

Expert Report of Professor James R. Kearl

March 21, 2012                                                   Charles River Associates

en phone characteristics (including price) – three of which are not part of Prof. Cock-

burn's analysis.[227]

345.     I have estimated Prof. Cockburn's BASE model incorporating two additional charac-

teristics; the number of applications that can run on a given phone at a given point in time

and the availability of voice commands.  The results from this analysis will be discussed

below in the Section entitled "An Enhanced Model."

## C. Model Estimation

346.     Prof. Cockburn estimates his model by programming his own likelihood function as-

suming the error structure on the auction bids is a log-normal distribution.  In evaluating

Prof. Cockburn's work, Dr. Leonard estimated a model using a routine in SAS (a comput-

er program for implementing regression analyses) assuming that the error structure of the

log of the auction bids is a normal distribution.[228]  Both Prof. Cockburn and Dr. Leonard

estimate their respective models with the same variables (those identified in Exhibit

F1).[229]  These two estimation routines produce slightly different results.  In my opinion,

the differences between the two routines have little or no economic significance with re-

gard to the issues in this case.

---

[227] In addition to price, the characteristics in the Conjoint Analysis are operating system brand, screen size, application startup time, application multitasking, availability of third-party applications, and voice command capabilities.  Only the first three of these are related to the variables in Prof. Cockburn's Econometric Analysis.

[228] Prof. Cockburn cites C. P. Adams paper "Estimating Demand from eBay Prices" published in 2007 for support of his log-normal distributional assumption (see p. 1223 of that paper).  C. P. Adams *assumes* a log-normal distribution and states later in the paper that "[i]t would be straightforward but more cumbersome to allow alternative parameterizations including the Poisson distribution." (see footnote 22 on p. 1224 of the Adams paper)

[229] Dr. Leonard's criticisms of the variables used in the model are addressed later.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

347.    Dr. Leonard argues that the likelihood function in the SAS routine he employs is iden-

tical to that programmed by Prof. Cockburn.[230]  There are three parts to Prof. Cockburn's

likelihood function that are algebraically different from that employed by Dr. Leonard.

1.  A fudge factor:          $1 \times 10^{-10}$
2.  An additive factor:      $WPij \; * \ln \; n_j!$
3.  A multiplicative factor: $\frac{1}{exp \; y_{ij}}$

**Notation:**
$WP_{ij}$ = the winning price if the bidder $i$ wins auction $j$ (zero otherwise)
$n_j$    = the number of bidders in auction $j$
$y_{ij}$ = the bid of bidder $i$ in auction $j$

348.    The first two items identified above – the fudge factor and the additive factor – are

both additive to the likelihood function and have no direct interaction with the parameter

vector being used to maximize the likelihood function.  The third item – the multiplicative

factor – does not contain the parameter vector but is multiplied onto the part of the likeli-

hood function that does.  Exhibit F2 to this report provides the likelihood functions used

by Prof. Cockburn and Dr. Leonard and shows their theoretical differences.

349.    The likelihood function employed by Dr. Leonard removes all three of the items noted

above.  While Dr. Leonard is correct that none of these three items is directly relevant for

estimating the parameters (coefficients) of the model,[231] their presence in the likelihood

function does cause the coefficients being estimated by Prof. Cockburn and Dr. Leonard

to be slightly different.

---

[230] Leonard Deposition, 10/28/2011, p.319

[231] *Read Me.doc* received on 12/22/2011 from Dr. Leonard. The document came with a Gauss program showing
the differences in the log likelihood functions.  The additive item noted in the text is associated with having
an unbalanced number of bidders, i.e., a different number of bidders in each auction.  However, it is
interesting to note that the Adams paper cited by Prof. Cockburn (noted in footnote 228 above) simplified
the estimated model "by assuming that there are either 5 or 12 potential bidders … in order to make the
implementation and estimation simpler." (see Adams, p. 1224).  It is understood that such simplifications
can lead to less accurate estimates. This cost / accuracy tradeoff is not unusual in the published literature.
In other words, Dr. Leonard's assumptions in estimation and approach have support in the literature cited
by Prof. Cockburn.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                Charles River Associates

350.    From a practical standpoint, the major difference between the two estimation proce-
dures is the substantial difference in the amount of computing time necessary to com-
plete the two analyses.  Prof. Cockburn's model takes upward of 240 hours of computer
time to produce the final estimates of the coefficients.  In contrast, using the likelihood
function put forward by Dr. Leonard allows the model to run in approximately one-tenth
the time.

351.    I am not going to weigh in on the theoretical arguments for these apparently minor
differences in the likelihood functions employed by Prof. Cockburn and Dr. Leonard.  Ra-
ther, I note that it is not uncommon for econometricians to impose simplifying assump-
tions on a model in order to operationalize the analysis (while testing the effects of the
assumptions on the end result) and that both approaches produce comparable results.
Given the length of time it takes to run Prof. Cockburn's model, I have used the routine in
SAS as per Dr. Leonard's approach for the majority of models that I estimate.  Exhibit F3
shows the differences in the estimated coefficients from the two approaches.[232]  As illus-
trated in this table, the differences between the estimated coefficients are often at the
third decimal place and the difference is just as likely to be positive as negative.

### D.  The Patents, the Copyrights, and the Data

352.    The patents-in-suit addressed in the Prof. Cockburn's Econometric Model are '104,
'205, '702, and '720.  I understand that patents '205, '702, and '720 have been withdrawn
with prejudice.[233]  I discuss how each of the patents were used in Prof. Cockburn's mod-
el but adjust my analysis to only include the '104 that is still in suit.

---

[232] While I have recreated this table, it is available as Exhibit 3 to Prof. Cockburn's Reply to Dr. Leonard's Report
October 10, 2011.

[233] Court Order, 3/13/2012, Doc. 786.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

353.    Patents '104 and '205 address speed (how fast operations are executed on the phone) and patents '702 and '720 address RAM (how much random access memory is available for the phone).  In order for the Econometric Model to provide input into the value of the patents, the model needs variables that provide a measure of speed and RAM – the *linpack* and RAM variables provide these measures, respectively.

354.    The *linpack* score is a benchmark used by Oracle engineers to test the speed of an Android phone.  *Linpack* measures how fast a computer solves a system of linear equations and provides a score by which to  evaluate how fast applications, such as a camera, will operate.[234]  .

355.    The *linpack* test was run 50 times on three separate Android phones.  One phone had the full Android operating system.  A second phone had the '205 patent disabled. The third phone had both the '104 and '205 patents disabled. I understand that it is not possible to separately disable the '104 patent.[235]   The phone with the '205 patent disabled demonstrated a decrease in the *linpack* score of 79%.  When both the '104 and '205 patents were disabled the *linpack* score decreased a total of 80%.[236]  These impacts are summarized in the following table:

*Table F1:  Patents and the Econometric Variables*

| Patents | Effect on Econometric Variables |
|---|---|
| '205 | 79.4563% Reduction in *Linpack* |
| '104 and '205 | 80.1165% Reduction in *Linpack* |

234 Kemerer Declaration p. 3

235 Expert Report of Prof. Cockburn 9/15/2011 Exhibit 6.

236 Kemerer Declaration, p.3

Expert Report of Professor James R. Kearl

March 21, 2012                                                                    Charles River Associates

356.    Since the *'205 patent alone* and the *'205 and '104 patents together* reduce the *linpack* score by about 80%, I use an 80% reduction in the *linpack* score as the measure of impact for the *'104 patent alone* analysis I put forward.[237]

357.    The '702 and '720 patents affect the amount of RAM available on the Android phone. Since the '702 and '720 patents have been withdrawn, I do not calculate a change in willingness to pay for a phone with more RAM available.

358.    The copyright issues in this case allegedly affect the number of applications that would have been available for the Android operating system. Prof. Cockburn's econometric analysis did not include an *applications* variable in the model, relying instead on Prof. Shugan's conjoint analysis for this assessment. As will be discussed in Section F below, I have incorporated the number of applications into the econometric analysis allowing me to identify the relative value between speed (*linpack* score) and the number of applications.

### E.  Data and Model Specification Issues

*Data Issues*

359.    Dr. Leonard criticizes Prof. Cockburn's use of eBay data in his econometric analysis. Dr. Leonard asserts that because eBay data primarily shows bids on *used* phones that the results are suspect. It is often the case that the ideal data one would like to use are unavailable and a proxy for those data is required in order to proceed with the analysis. In this case, it would have been ideal if the data on new phone purchases were available and transparent. However, new phone purchases are typically bundled with one/two-year service agreements making it difficult to disentangle even the price of the phone from the service agreement let alone the value of new phone characteristics.

---

237 It is inappropriate to consider the impact of the '104 patent to be the 1% additional decrease in the linpack score when adding it to the impact of the '205 patent. Since the phone will not run with the '104 patent disabled, using an 80% reduction in the linpack score for the '104 patent alone is actually conservative.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                                 Charles River Associates

360.     When new phones are bundled with a service agreement, the full price of the phone

is generally not observed since individuals receive the phone for a subsidized price.  The

subsidy on a phone varies from service provider to service provider and from phone

model to phone model.  In fact, estimates of the true price of a phone would require cus-

tomer-by-customer information on service plans.  Since the price a customer pays for a

new phone is difficult to observe, Prof. Cockburn has used a proxy for that price, namely,

the maximum bids on phones – many used – offered for sale on eBay.

361.     Inherent in Prof. Cockburn's analysis is an implicit assumption that the value eBay

participants place on speed, memory, cameras, and other phone features is comparable

to how new phone purchasers at service providers value those same features.  Given

how Prof. Cockburn's model is estimated, it identifies the value of the phone characteris-

tics in percentage terms.[238]  This is helpful since it means that Prof. Cockburn's analysis

using eBay data assumes not that the actual dollar value that an eBay participant places

on a phone feature is the same dollar amount a new phone buyer would place on the

same phone feature, but rather that the percentage of an eBay phone's value attributed

to the feature is the same percentage as that of the new phone's value.

362.     Prof. Cockburn notes in his February 24, 2012 Declaration that there is a rich eco-

nomic literature surrounding the use of online data.  Numerous economic theories have

been tested using online data with the results appearing in peer-reviewed journals, text-

books, popular news outlets (such as *The Atlantic* and *Financial Times*), and even a *New

York Times* article by Google's Chief Economist, Dr. Hal Varian, extolling online auctions

as offering "a wonderful laboratory" for economists to understand participants who are

"spending real money."[239]  The studies using online data range from a focus on new

products to combinations of new and used products to a focus on used products.  In

---

238 The coefficients that address the patent and copyright in suit are elasticity estimates.

239 See pp. 5-8 of Cockburn's Declaration dated February 24, 2012.  The NY Times article can be found at
       http://people.ischool.berkeley.edu/~hal/people/hal/NYTimes/2000-11-16.html (last accessed 2/25/2012).

Expert Report of Professor James R. Kearl

March 21, 2012                                              Charles River Associates

many of the studies, the online data are serving as a proxy for data that are not otherwise available. The question before the court is the one that researchers regularly face of whether the proxy is sufficient for the purposes at hand.   There is nothing that I have seen in the instant record or in the economic literature to suggest that the eBay data being used in this matter is an inappropriate proxy for the issues in this case.[240]


*Modeling Issues*

363.     Moving from a criticism of Prof. Cockburn's reliance on eBay data, Dr. Leonard turns to Cockburn's model specification, where Dr. Leonard's principal criticisms involve the omission of certain variables.

*Omitted Variable Bias*

364.     Dr. Leonard suggests that Cockburn's BASE model is biased because of variables not included in the model.  Central to this criticism are two variables, *RAM* and *Processor Speed*.  Prof. Cockburn omits *RAM* and *Processor Speed* from his model specification on the grounds that these variables are collinear with each other and with the *linpack* variable.

365.     Collinearity (sometimes referred to as multicollinearity) occurs when two variables move in tandem with one another other.  For example, if one variable always increases at the same time as second variable, then the two variables are said to be collinear and a statistical model has difficulty parsing out how much of the effect of an increase in the variables to attribute to each variable individually.  Perfect collinearity occurs when the two variables move exactly together (think of two parallel lines).

---

240 Interestingly, the *New York Times* article by Dr. Varian addresses an assumption that Prof. Cockburn imposes on the eBay data, namely that the bids put in by individuals represent their maximum willingness to pay. Dr. Varian writes that individuals should report their maximum bid but the evidence shows that some individuals put in "late bids."  If an individual put in a low bid but then – for whatever reason – chose to not provide a "late bid," then the low bid would appear as the person's maximum willingness to pay.  However, to the extent that this occurs, the eBay data would tend to understate the true willingness to pay and Prof. Cockburn's analysis of the data is likely to err on the side of Google.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

366.     In regression analysis, collinearity is always a matter of degree not a matter of pres-

ence/absence. A standard measure for determining the degree of collinearity is the Vari-

ance Inflation Factor (VIF).  Prof. Cockburn mentioned the VIF in his deposition[241] and

states in footnote 2 of Exhibit C-2 (of his February 2012 submission) that the VIF

"measures how multicollinearity has increased the instability of the coefficient estimates."

While there is no theoretical rule as to what VIF level signifies too much collinearity, a

general rule of thumb is that a VIF above 10 indicates significant correlation between ex-

planatory variables.[242]  Prior to including *RAM* and *Processor Speed* in the Android-only

regression, the VIF associated with *linpack* is 44.[243]   Including *RAM* and *Processor*

*Speed* causes the *linpack* VIF to increase from 44 to over 70,000.

367.     One piece of evidence that collinearity is an issue can be a change in the sign of es-

timated coefficients such as the switch from positive to negative with the inclusion of a

collinear variable or a change in the sample.[244]   This is evident in Dr. Leonard's Exhibits

6c and 6e from his October 3, 2011 Expert Report.  In Exhibit 6c he examines a subset of

the data by limiting his regression analysis to an Android-only sample and finds that the

coefficient on the *linpack* variable jumps from being positive and significant to negative

and significant.[245]  This can suggest a high degree of collinearity between the variables

in the model and the *linpack* score.  Likewise, in Exhibit 6e, Dr. Leonard includes *RAM*

and *Processor Speed* and the *linpack* coefficient and the *RAM* coefficient take the wrong

theoretical sign.  This could be an indication of the expected outcome of the regression

analysis not conforming to theory (Dr. Leonard's interpretation) or it could be an indica-

---

241 See Cockburn Deposition, October 17, 2011, p. 123.

242 Kennedy, Peter. A Guide to Econometrics,2nd ed., MIT Press, Cambridge, MA, 1985, p. 153.

243 See Prof. Cockburn's February 2012 Submission, Exhibit C-2.

244 Greene, William H. (2003): Econometric Analysis, 5th edition, New Jersey, Prentice Hall, p. 57, states that
          symptoms of collinearity include wide swings in parameter estimates, high R2 values with low significance,
          and coefficients with the wrong sign.

245 There are other variables that switch signs as will be noted later in this report.

Expert Report of Professor James R. Kearl

March 21, 2012                                                        Charles River Associates

tion of a high degree of collinearity (Prof. Cockburn's interpretation that is supported by the VIF scores).

368.     Prof. Cockburn needed to include a model in his analysis that incorporated *RAM* because he the '702 and '720 patents affected the amount of available RAM in the phone. Even though these two patents have been withdrawn, I provide the following critique his methodology.  As noted above, it is not possible to have *linpack* and *RAM* in the same model as the coefficients become unstable.  Prof. Cockburn provided an alternative to excluding both *RAM* and *Processor Speed* from the analysis in his Exhibit C-4.  This specification includes *RAM* but substitutes the *linpack* residual in the Econometric Model after calculating the residual from an auxiliary regression of *linpack* on *RAM* and *Processor Speed*.  The results of this auxiliary regression are not presented in Prof. Cockburn's exhibits; rather, the residuals are immediately incorporated into the larger Econometric Model.

369.     I have provided the results of Prof. Cockburn's auxiliary regression in Exhibit F4. This regression did not have the strong statistical relationship that might be expected between *linpack*, *RAM*, and *Processor Speed*.  As can be seen in Exhibit F4, the $R^2$ term is 0.53 (the adjusted $R^2$ is 0.44) and the *Processor Speed* coefficient is statistically insignificant and of the wrong sign.  The simple correlation for Android phones between RAM and Processor Speed is 0.71 and, as noted previously, when two variables are highly correlated it is not uncommon for coefficients to have the wrong sign in a regression model.  Prof. Cockburn's alternative model employing the auxiliary regression is further weakened because he fails to account for endogeneity between the *RAM* variable and the *linpack* residual variable both in his main regression and as he estimates the reduced value of an Android.  While the auxiliary regression is key in Prof. Cockburn's analysis to estimate a value for the '702 and '720 patents, it is weak.

Expert Report of Professor James R. Kearl

March 21, 2012                                                           Charles River Associates

370.     Prof. Cockburn's alternative specification that uses the residual from his auxiliary re-

gression shows the *linpack* coefficient increasing from the base specification.  Prof.

Cockburn argues that the estimates of this alternative specification are "very consistent"

with the estimates from his BASE model even though the coefficient increases by over

25%.[246]

371.     While Prof. Cockburn's alternative specification is no longer relevant given the with-

drawal of the '702 and '720 patents, it is worth noting that I had not seen a comparable

use of the residuals from an auxiliary regression as a fix to collinearity.[247]

372.     Dr. Leonard argues that multicollinearity is not a generally accepted reason for omit-

ting a variable in an econometric model.[248]  This criticism goes too far, however, as near-

ly all econometric textbooks mention dropping variables as a strategy for coping with mul-

ticollinearity.  For example:

> *Several strategies have been proposed for finding and coping with multicollinearity. … The obvious practical remedy (and surely the most frequently used) is to drop variables suspected of causing the problem from the regression. … On the other hand, overfitting – that is, trying to estimate a model that is too large – is a common error, and dropping variables from an excessively specified model might have some virtue.*[249]

373.     The author of the textbook just quoted notes that dropping variables comes at a cost

in that the estimated effects of the remaining variables can be biased.  The reference to

bias in the coefficients rests on an assumption that all variables should be included in a

model.  The flip-side of dropping variables is including variables that shouldn't be in the

---

[246] See Prof. Cockburn's Reply to Dr. Leonard's Report October 10, 2011 paragraph 74.

[247] I had prepared an approach using the Enhance Model discussed below to estimate the value of changes in *RAM* from the '702 and '720 patents.  Briefly, this approach used an alternative auxiliary regression that predicted *linpack* from *RAM* and a set of other variables.  I then used the predicted changes in *linpack* from changes in *RAM* in the auxiliary regression to estimate the change in willingness to pay from the Enhanced Model.  As the '702 and '720 patents have been withdrawn, I have removed this analysis from my report.

[248] See Expert Report of Dr. Leonard 10/24/2011 pages 102-103.

[249] Green, William H., Econometric Analysis, 5th ed., 2003, p. 58.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

analysis; and, correlation between variables is not an *a priori* reason to include variables in the analysis.  In Prof. Cockburn's econometric analysis, one could argue that all three variables need not be in the model.  If speed is what customers are actually valuing and *linpack*, *RAM*, and *Processor Speed* are each proxies for speed then only one of them needs to be included in the model.  Under this rationale, because *linpack* can be directly linked to the patents-in-suit, it becomes the preferred variable to include in the regression.

374.    Neither Prof. Cockburn nor Dr. Leonard suggests a theoretical reason for the inclusion or exclusion of a particular variable.  In so far as I know, there isn't a theoretically correct measure of speed or a best proxy.  While Oracle and Google may have different views about the importance of speed to consumers, either overall or relative to other smartphone attributes, there is no disagreement that speed matters.  The question is how much does speed matter?

375.    Prof. Cockburn suggests an engineering proxy for the speed that consumers care about (*linpack*).  Dr. Leonard suggests other measures of speed (*RAM* and *Processor Speed*).  Presumably, consumers care about neither the engineering proxy nor *RAM* or *Processor Speed*, at least in a direct sense.  Rather, consumers care only about the speed with which their phone boots up or brings up an application. There may be a disagreement among experts about whether a particular proxy is the best among the alternative proxies for the speed that consumers care about, but this doesn't mean that Prof. Cockburn needs to include every proxy for speed – he just needs to include one.  Given the purposes for which the econometrics is being used, it is my opinion that *linpack* is a useful proxy for the speed that consumers care about.

*Product-Specific Indicator Variables*

376.    Dr. Leonard also suggests that Prof. Cockburn's econometric model needs to include product-specific indicator variables.  These proposed variables would ostensibly capture

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

the effects of unobserved phone attributes.  However, the inclusion of these variables al-

most completely eliminates the reason for estimating a hedonic model.  The product-

specific indicator variables proposed by Dr. Leonard are perfectly collinear with the de-

sign characteristics of each specific phone.  As a result, Dr. Leonard's analysis with the

product-specific indicator variables automatically drops all phone characteristics that are

unique to a phone model.  In other words, Dr. Leonard's proposed specification renders

the hedonic regression completely useless since the *linpack* variable is no longer in the

model.

377.     In addition, Prof. Cockburn's BASE model estimates the value of an auction bid as a

function of 23 variables.  The product-specific indicator variables that Dr. Leonard sug-

gests using are perfectly collinear with 20 of the 23 variables in Prof. Cockburn's model,

resulting in these 20 variables being dropped from the analysis.  The three variables left

in Dr. Leonard's model are the non-design phone specs, namely:

- *new*            whether the phone was new
- *unlocked*       whether the phone was unlocked
- *tom*            time on market

378.     Dr. Leonard tests his hypothesis that product-specific indicator variables should be in

the model with the Hausman Specification Test.

379.     The Hausman Test is used to test the efficiency and consistency of different regres-

sion specifications.  In this case, Dr. Leonard is testing two regression specifications –

one without the proposed product-specific indicator variables (Prof. Cockburn's model)

and one with the product-specific indicator variables.[250]  Dr. Leonard interprets his re-

---

[250] "The test is based on the idea that under the hypothesis of no correlation, both [estimators] are consistent, but [the second] is inefficient, whereas under the alternative, [the second] is consistent, but [the first] is not." William H. Greene, *Econometric Analysis,* 2003. 5th Edition - p.301. A consistent estimator is one that converges to the true value of the parameter being estimated as the sample size gets larger. An efficient estimator is one that is in some manner "best." The most common comparison of efficient estimators is based on variance where an efficient estimator would have the lowest possible variance of all estimators. In this context, an inefficient estimator is one that has a higher variance.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

sults as providing evidence that Prof. Cockburn's model estimates are not consistent.[251]

Specifically, Dr. Leonard's interpretation of the Hausman Test is that since the three re-

maining variables in the model are not consistently estimated, the twenty other variables

are not consistently estimated.[252]   However, since none of the design-specific phone

characteristics are in Dr. Leonard's proposed model, his specification test does not pro-

vide direct evidence of the consistency of the coefficients associated with these  charac-

teristics.

380.     I am of the opinion that this particular application of the Hausman Test has compared

two models that are sufficiently different as to make the comparison unhelpful.  By drop-

ping all design-specific phone characteristics (camera, battery life, etc.) and including a

catch-all indicator variable for each phone in their place, Dr. Leonard has suggested a

model specification that may consistently estimate the eBay bid value but cannot provide

information about the value of the phone characteristics.  Prof. Cockburn's modeling ap-

proach provides estimates of the willingness to pay for relevant phone characteristics.

*Other Omitted Variables*

381.     Dr. Leonard criticizes Prof. Cockburn further by suggesting that he has not accounted

for the fact that bidders might change their bidding behavior on previous phone versions

when new models come out.  As such, Dr. Leonard includes two variables to account for

what he terms obsolescence, namely, a variable identifying whether a new version of the

phone has been introduced (*next_generation*) and a variable measuring the amount of

time since the introduction of a new version of the phone (*next_gen_out*).Dr. Leonard

---

[251] Dr. Leonard's Hausman test results in a p-value less than .001 implying that one can reject the hypothesis that
the three variables (new, unlocked, tom) in Cockburn's model are consistently estimated.

[252] See Supplemental Expert Report of Dr.Leonard2/17/2012 page 13

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

notes that including these two variables into Prof. Cockburn's BASE model "substantially" decreases the *linpack* coefficient from 0.0756 to 0.0550.[253]

382.    Prof. Cockburn responds by asserting that he has accounted for obsolescence through the variables *new* (whether the phone is new) and *tom* (time on market).

383.    There are two issues:  The first turns on whether some or all consumers want "the latest thing."  If so, then the second issue is whether Prof. Cockburn's *new* and *tom* variables are adequate proxies for the fact that individuals may have an independent interest in "the latest thing."  Dr. Leonard argues that an indicator whether a phone model is the latest generation (*next_generation*) and an indicator of how long a latest generation model has been on the market (*next_gen_out*) are superior to Prof. Cockburn's proxies.

384.    In this regard, Dr. Leonard's analysis potentially confounds the effects he hopes to estimate by including all four "latest thing"-related variables in his model.  If the model is run using just Dr. Leonard's proxies for "the latest thing," the estimated linpack coefficient increases from 0.0756 to 0.131.  I have estimated alternative specifications of the model using different combinations of Prof. Cockburn's two variables (new and tom) and Dr. Leonard's two variables (next_generation and next_gen_out).  In each of these alternative specifications, I find that the estimated linpack coefficient increases vis-à-vis Prof. Cockburn's BASE model as can be seen in Exhibit F5.

*The linpack Score Stability over Time*

385.    Dr. Leonard implements a regression that suggests that the *linpack* coefficient is not stable over time (month by month) and that the values of that coefficient range from -6.41 to +1.41.[254]  However, as noted by Prof. Cockburn, Dr. Leonard did not estimate his models with sampling that is consistent with the market shares of the different operating

---

[253]Expert Report of Dr. Leonard 10/24/2011 page 104.

254 Expert Report of Dr. Leonard 10/24/2011 page 105.

Expert Report of Professor James R. Kearl

March 21, 2012                                              Charles River Associates

systems.  As such, the instability asserted by Dr. Leonard is an inappropriate statistical

comparison with the analysis put forward by Prof. Cockburn.

386.     In Exhibit C-5 of his February 2012 submission, Prof. Cockburn shows that when the

model is estimated using data sampled to reflect actual market shares as is done in his

BASE model, the *linpack* coefficients range from 0.064 to 0.285 with a simple average

between them of 0.169.  Prof. Cockburn's rebuttal analysis still demonstrates instability of

the *linpack* coefficient, however, but this instability is in a much tighter range and the

*linpack* coefficient never takes a negative sign.  Further, it appears that had Prof. Cock-

burn allowed the *linpack* coefficient to vary month to month, the estimated changes in

willingness to pay would have been greater that what is estimated in his BASE analysis.

387.     Dr. Leonard rejects Prof. Cockburn's sensitivity analysis of the monthly variation in

the *linpack* coefficients on the grounds that the other variables in the model should be al-

lowed to vary by month as well.  However, Dr. Leonard's assertions are subject to the

same criticism as that associated with the monthly *linpack* coefficients, namely, his anal-

ysis is estimated month by month on data that are not stratified to reflect actual market

shares.  As such, he provides a statistical test that is an apples-to-oranges comparison

with Prof. Cockburn's methodology.[255]

388.     Prof. Cockburn's restriction of the model coefficients not varying over time produces

estimates of the average affect over the time period.  If the purpose of the model were to

estimate the willingness to pay for a specific month, then Prof. Cockburn's restriction

could potentially affect the specific month's estimate.  As it is, Prof. Cockburn is estimat-

ing the change in willingness to pay over the time period and by restricting the coeffi-

---

[255] Allowing every coefficient to vary over time would invariably result in various stratified samples not having
sufficient variation in the data to estimate all coefficients.  As a result, each sample would have a different
set of variables for which coefficients would be estimated and it would not be possible to make a
meaningful comparison across the samples.  This is seen in a small scale when viewing Dr. Leonard's
Exhibit 6g in which he is unable to estimate a linpack coefficient for the first five months of data.

Expert Report of Professor James R. Kearl

March 21, 2012                                          Charles River Associates

cients to be the same across months, he has estimated an average affect over the entire time period.

*Pooling Android Phones with Other Phones*

389.    Dr. Leonard estimates a hedonic model on the subset of Android-phone only eBay auctions. Doing so produces a negative estimate for the *linpack* score (-0.4427). Dr. Leonard concludes that the coefficients aren't the same across operating systems and might even suggest that bidders aren't willing to pay more for speed (i.e., for a higher *linpack* score).

390.    Dr. Leonard's analysis in this case accepts several practices for which he criticizes Prof. Cockburn in other places. For example, Dr. Leonard's Android-only analysis has dropped several variables from the model including *Wi-Fi*, *camera*, *gps*, *touch screen, j2me* presumably because of collinearity – a practice he dismisses elsewhere as inappropriate. Moreover, and in response, Prof. Cockburn notes that since there are only 13 Android phone models, it is not possible to estimate coefficients on 18 different phone characteristics. Dr. Leonard has not described how he determined which phone characteristics to drop from his analysis; Prof. Cockburn suggests that Dr. Leonard merely allowed the software program to "arbitrarily" drop variables.[256]

391.    Prof. Cockburn also notes that Dr. Leonard's Android-only model produces perverse signs on the estimated coefficients of several variables such as better screen resolution and ability to act as a mobile hotspot. The coefficients on these variables have gone from being positive (meaning that they increase the amount a person is willing to pay for the feature) to negative (meaning that they decrease the amount a person is willing to pay for the feature). As noted previously, switching signs and instability in coefficient es-

---

[256] See p. 13, Cockburn's Declaration of February 24, 2012 Doc 739.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

timates as the sample changes (in this case focusing only on Android phones) is a poten-
tial sign of collinearity in the model.

392.     Dr. Leonard responds that the perverse signs are not a function of "his" model since
he is merely running Prof. Cockburn's model.  But he is not running Prof. Cockburn's
model.  Prof. Cockburn's model allows substitution across operating systems by having
all phones in the analysis and Dr. Leonard has restricted his analysis to Android-only
phones thereby imposing an implicit assumption – that buyers of Android phones would
not substitute across operating systems.

393.     A model that is estimated separately for each operating system cannot estimate the
cross-operating system substitution that bidders make.  It is clear from the data that auc-
tion participants bid on multiple operating systems, hence they are making comparisons
of phone characteristics across operating systems.  Estimating an Android-only model bi-
ases the estimated coefficients by not including the relevant and observable substitution
contained in the data – another plausible reason for the perverse signs of Dr. Leonard's
model.  Even individuals who buy new phones with a two-year service agreement from a
specific carrier generally have a choice of phones with different operating systems.

*Prof. Cockburn uses all bids, not just the winning bid*

394.     A concern not raised by Dr. Leonard but one that I explored involves Prof. Cock-
burn's model including all bidders in an auction and not just the winning bid.  Prof. Cock-
burn states that using all bidders in an auction helps identify the entire demand curve and
not just a point on the demand curve. Implicit in Prof. Cockburn's approach is an assump-
tion that each bid represents each participant's maximum bid (reservation price), i.e.,
maximum willingness to pay.  The critical assumption, however, is whether the bids for
non-winning auction participants represent their respective maximum willingness to pay.
If a participant bid a low value just to see if she might be lucky and win the auction, for

Expert Report of Professor James R. Kearl

March 21, 2012                                                  Charles River Associates

example, then including such a bid would bias downward the estimate of the true willing-ness to pay.[257]

395.     One way of indirectly testing the hypothesis that non-winning bids are low-ball values, is to restrict the regression analysis to winning bids and see if there is an impact on the estimated coefficients.  I present the results of this analysis in in Exhibit F6.  Since the coefficient of interest in the model is that associated with the linpack score, I highlight it here.  Using Prof. Cockburn's BASE model with a linpack coefficient of 0.077 as the benchmark , estimating the model on winning bids only produces a linpack coefficient in of 0.159 – a 107% increase over the BASE estimate.  Since restricting the econometrics to winning bids only increases the estimated value of speed, Prof. Cockburn's use of all eBay bids in an auction results in a conservative measure of willingness to pay.

### F.  An Enhanced Model

396.     Prof. Cockburn's BASE model includes the 23 phone characteristics identified in Exhibit F1 above.  Two characteristics not in that table but that are employed in the Conjoint Analysis are the number of applications that can run on a phone and the ability of the phone to carry out voice commands.

397.     As I noted in Section III.B it is important to get as full of a specification of model characteristics as possible given the practical limitations that can arise in the estimation.  In this case, the number of applications that can run on the operating system and the presence of voice commands seem likely to be among the smart-phone characteristics that consumers care about and should be included in a regression analysis if possible.

---

[257] I address a variation on this point above in footnote 240.

Expert Report of Professor James R. Kearl

March 21, 2012                                                           Charles River Associates

398.    I collected data on the number of applications (*apps*) available at a given point in time by operating system.  I also identified which phones in the analysis could respond to voice commands (*voice*).[258]

399.    I have estimated the equivalent of Prof. Cockburn's BASE model as shown in his Exhibit C-4 but with the *apps* and *voice* variables in the analysis. The results are presented in Exhibit F8.

400.    The inclusion of the *apps* and *voice* variables does not change the value of the *linpack* coefficient (0.077 in both Cockburn's BASE estimate and the Enhanced Model). Exhibit F9 presents the change in WTP associated with an 80% reduction in the *linpack* score for each Android phone for both 2010 and 2011 using the *linpack* coefficient from the Enhanced Model.  This exhibit shows that relative to the average price of a particular Android phone, an 80% reduction in the *linpack* score reduces the willingness to pay between $8 and $38 with an average of $21 – these amounts represents a reduction in willingness to pay of 6.2% for the respective Android phones.

401.    An advantage of this Enhanced Model is that it is possible to estimate the willingness to pay for the applications.  To the degree that the in-suit copyrights enable more applications, as Prof. Cockburn has asserted, then I can use the Enhanced Model to derive an independent (of the conjoint analysis) estimate of the relative importance of speed and applications.  Exhibit F10 presents the change in willingness to pay for varying limiting levels of applications on the Android operating system.  This exhibit shows that relative to the average price of a particular Android phone, limiting the number of applications available on the phone between 6,000 and 40,000 results in a reduction in willingness to pay between, on average, $12 and $22.  These averages include percentage changes in willingness to pay of between 2% and 7% with an average of 5%.

---

[258] The *voice command* variable was created from the "voice dial" characteristic pulled by Prof. Cockburn from phonescoop.com. See Exhibit F7 for details relating to number of applications.

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

402.    The relative value of speed to applications from the Enhanced Model is 1.1 to 1.0

which means that applications are estimated to be worth 90% of the value of speed.

## IV.       Conclusion

403.    It is my opinion that the BASE Econometric Model put forward by Prof. Cockburn is

sufficiently robust as to provide meaningful evidence of the value of the characteristics of

smartphones though I believe there are modifications to the model that are preferred.

For purposes of determining whether the '104 patent is valuable to consumers because

of the functionality that it enables, the key variable in Prof. Cockburn's model is the

*linpack* score.  In many of the sensitivity analyses put forward by Dr. Leonard and Prof.

Cockburn – as well as the sensitivity analyses I've performed – the value of the coeffi-

cient on the *linpack* variable increases in alternative specifications which would increase

the estimated willingness to pay for speed.

404.    I have estimated an Enhanced Model by including the number of applications that

can run on an operating system and the presence of voice commands in the equivalent of

Prof. Cockburn's BASE model.  With this Enhanced Model it is possible to estimate the

value that consumers place on the number of applications (as measured by predicted

willingness to pay) and to obtain an estimate of the relative importance of speed and

number of applications.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                 Charles River Associates

---

# Appendix C: Materials Relied Upon

| | |
|---|---|
| 2011-03-10 OA 30b6 Dep Ntc re Google.pdf | Exhibit 153.PDF |
| 2011-04-01 Oracle 30b6 Ntc of Google - Topic 3.pdf | Exhibit 154.PDF |
| 2011-06-21 Oracle 30b6 Dep Ntc of Google topics 4-9.pdf | Exhibit 155.PDF |
| | Exhibit 156.PDF |
| 2011-07-13 Oracle 30b6 Ntc of Depo to Google Topics 10-13.pdf | Exhibit 157.PDF |
| | Exhibit 158.PDF |
| Bornstein 11-21-11.pdf | Exhibit 159.PDF |
| Bornstein depo Exhibit (MAYBE).PDF | Exhibit 160.PDF |
| Bray Timothy (2011-11-30) HC-AEO mini.pdf | Exhibit 161.PDF |
| 2011.7.22 Leo Cizek depo - MINI.pdf | Exhibit 162.PDF |
| 2011.7.22 Cizek Errata Sheet - signed.pdf | Exhibit 163.PDF |
| 2011.7.22. Cizek depo Exhibits.pdf | Exhibit 164.PDF |
| 2011.7.25 Cizek depo sig page.pdf | Exhibit 165.PDF |
| 2011-10-17 Cockburn Iain Depo Transcript w_o | Exhibit 166.PDF |
| Word Index - MINI.pdf | Exhibit 167.PDF |
| 2011.10.17 Cockburn depo exhibits 503-511.pdf | Exhibit 168.PDF |
| 2011.10.17 Cockburn Depo.pdf | Exhibit 169.PDF |
| 2011.10.17 Cockburn, Iain HC-AEO.cert.pdf | Exhibit 170.PDF |
| Cockburn 0210 DRAFT.txt | Exhibit 171.PDF |
| Iain Cockburn 0210 DRAFT.pdf | Exhibit 172.PDF |
| 2011.10.26 Cox depo Exhibits.pdf | Exhibit 173.PDF |
| 2011.10.26 Cox Deposition Transcript.pdf | Exhibit 174.PDF |
| 2011.9.13 Dewar depo Exhibits 645-651.pdf | Exhibit 175.PDF |
| 2011.9.13 DEWAR FINAL Errata.pdf | Exhibit 176.PDF |
| 2011.9.13 DEWAR FINAL Sig Page.pdf | Exhibit 177.PDF |
| 2011.9.13 Dewar, Robert Depo HC-AEO mini.pdf | Exhibit 178.PDF |
| Kessler, Peter (2012-02-16) HC-AEO.mini.pdf | Exhibit 179.PDF |
| Kessler, Peter (2012-02-16) HC-AEO.pdf | Exhibit 180.PDF |
| Kessler, Peter (2012-02-16) HC-AEO.ptx | Exhibit 181.PDF |
| Kessler, Peter (2012-02-16) HC-AEO.txt | Exhibit 182.PDF |
| Leonard depo MINI 10.28.2011.pdf | Exhibit PX320.PDF |
| Plummer, Chris (2012-02-16) HC-AEO.mini.pdf | Cockburn, Iain Ph.D. (2011-10-17) HC-AEO.cert.pdf |
| Plummer, Chris (2012-02-16) HC-AEO.pdf | Cockburn, Iain Ph.D. (2011-10-17) HC-AEO.mini.pdf |
| Plummer, Chris (2012-02-16) HC-AEO.ptx | Cockburn, Iain Ph.D. (2011-10-17) HC-AEO.pdf |
| Plummer, Chris (2012-02-16) HC-AEO.txt | Cockburn, Iain Ph.D. (2011-10-17) HC-AEO.ptx |
| Reinhold.pdf | Cockburn, Iain Ph.D. (2011-10-17) HC-AEO.txt |
| Reinhold.PTX | 86711-Exhibit#-503-Iain Cockburn_ Ph_D_.PDF |
| Rizzo John (2011-11-30) HC-AEO mini.pdf | 86711-Exhibit#-504-Iain Cockburn_ Ph_D_.PDF |
| Rose.ptx | 86711-Exhibit#-505-Iain Cockburn_ Ph_D_.PDF |
| Shugan FINAL MINI.pdf | 86711-Exhibit#-506-Iain Cockburn_ Ph_D_.PDF |
| Shugan Errata Sheet 9 26 11.pdf | 86711-Exhibit#-507-Iain Cockburn_ Ph_D_.PDF |
| Wong, Hinkmond (2012-02-16) HC-AEO.mini.pdf | 86711-Exhibit#-508-Iain Cockburn_ Ph_D_.PDF |
| Wong, Hinkmond (2012-02-16) HC-AEO.pdf | 86711-Exhibit#-509-Iain Cockburn_ Ph_D_.PDF |
| Wong, Hinkmond (2012-02-16) HC-AEO.ptx | 86711-Exhibit#-510-Iain Cockburn_ Ph_D_.PDF |
| Wong, Hinkmond (2012-02-16) HC-AEO.txt | 86711-Exhibit#-511-Iain Cockburn_ Ph_D_.PDF |
| Cizek, Leo (2011-07-22) HC-AEO.mini.pdf | 86711-Iain Cockburn_ Ph_D_-1-Lef.LEF |
| Cizek, Leo (2011-07-22) HC-AEO.pdf | Cox, Alan J. Ph.D. (2011-10-26) HC-AEO.cert.pdf |
| Cizek, Leo (2011-07-22) HC-AEO.ptx | Cox, Alan J. Ph.D. (2011-10-26) HC-AEO.mini.pdf |
| Cizek, Leo (2011-07-22) HC-AEO.txt | Cox, Alan J. Ph.D. (2011-10-26) HC-AEO.pdf |
| Errata Sheet (Cizek)-completed-signed.pdf | Cox, Alan J. Ph.D. (2011-10-26) HC-AEO.ptx |
| sig page.PDF | Cox, Alan J. Ph.D. (2011-10-26) HC-AEO.txt |
| CIZEK81111.LEF | 86805-Exhibit#-PX669-Alan J_ Cox_ Ph_D_.PDF |
| Exhibit 150.PDF | 86805-Exhibit#-PX670-Alan J_ Cox_ Ph_D_.PDF |
| Exhibit 151.PDF | 86805-Exhibit#-PX671-Alan J_ Cox_ Ph_D_.PDF |
| Exhibit 152.PDF | 86805-Exhibit#-PX672-Alan J_ Cox_ Ph_D_.PDF |

---

Expert Report of Professor James R. Kearl

March 21, 2012                                          Charles River Associates

| | |
|---|---|
| 86805-Exhibit#-PX673-Alan J_ Cox_ Ph_D_.PDF | exhibit 403.pdf |
| 86805-Exhibit#-PX674-Alan J_ Cox_ Ph_D_.PDF | Fresko, Nedim HC-AEO (2011-05-10) mini.pdf |
| 86805-Exhibit#-PX675-Alan J_ Cox_ Ph_D_.PDF | Fresko, Nedim HC-AEO (2011-05-10).pdf |
| 86805-Exhibit#-PX677-Alan J_ Cox_ Ph_D_.PDF | Fresko, Nedim HC-AEO (2011-05-10).ptx |
| 86805-Exhibit#-PX678-Alan J_ Cox_ Ph_D_.PDF | Fresko, Nedim HC-AEO (2011-05-10).txt |
| 86805-Exhibit#-PX679-Alan J_ Cox_ Ph_D_.PDF | DX016_Fresko.pdf |
| 86805-Exhibit#-PX680-Alan J_ Cox_ Ph_D_.PDF | DX017_Fresko.pdf |
| 86805-Exhibit#-PX681-Alan J_ Cox_ Ph_D_.PDF | DX018_Fresko.pdf |
| 86805-Exhibit#-PX682-Alan J_ Cox_ Ph_D_.PDF | DX019_Fresko.pdf |
| 86805-Exhibit#-PX683-Alan J_ Cox_ Ph_D_.PDF | DX020_Fresko.pdf |
| 86805-Exhibit#-PX684-Alan J_ Cox_ Ph_D_.PDF | DX021_Fresko.pdf |
| Cox, Alan J. Ph.D. (2011-10-26) HC-AEO.lef | DX022_Fresko.pdf |
| 11 09 13 DEWAR - FINAL - Signature Page.pdf | DX023_Fresko.pdf |
| 11 09 13 DEWAR - FINAL Errata.pdf | DX024_Fresko.pdf |
| Dewar, Robert (2011-09-13) HC-AEO.court reporter | DX025_Fresko.pdf |
| sig.pdf | DX026_Fresko.pdf |
| Dewar, Robert (2011-09-13) HC-AEO.mini.pdf | DX027_Fresko.pdf |
| Dewar, Robert (2011-09-13) HC-AEO.pdf | DX028_Fresko.pdf |
| Dewar, Robert (2011-09-13) HC-AEO.ptx | DX029_Fresko.pdf |
| Dewar, Robert (2011-09-13) HC-AEO.txt | DX030_Fresko.pdf |
| 84073-Exhibit#-PX645-Robert B_K_ Dewar.PDF | DX031_Fresko.pdf |
| 84073-Exhibit#-PX646-Robert B_K_ Dewar.PDF | DX032_Fresko.pdf |
| 84073-Exhibit#-PX647-Robert B_K_ Dewar.PDF | DX033_Fresko.pdf |
| 84073-Exhibit#-PX648-Robert B_K_ Dewar.PDF | NF051011.lef |
| 84073-Exhibit#-PX649-Robert B_K_ Dewar.PDF | PX093_Fresko.pdf |
| 84073-Exhibit#-PX650-Robert B_K_ Dewar.PDF | PX094_Fresko.pdf |
| 84073-Exhibit#-PX651-Robert B_K_ Dewar.PDF | PX095_Fresko.pdf |
| 84073-Robert B_K_ Dewar-1-Lef.LEF | PX096_Fresko.pdf |
| 84073-Robert B_K_ Dewar-1-PTZ.PTZ | PX097_Fresko.pdf |
| 84073-Robert B_K_ Dewar-1-XMEF.XMEF | PX098_Fresko.pdf |
| ex.pdf | Gering, Craig (2011-07-20) HC-AEO.mini.pdf |
| 2011-08-24 Ballinger to Van Nest re Ellison depo | Gering, Craig (2011-07-20) HC-AEO.pdf |
| designations.pdf | Gering, Craig (2011-07-20) HC-AEO.ptx |
| 2011-09-12 Ellison Deposition Errata.pdf | Gering, Craig (2011-07-20) HC-AEO.txt |
| Ellison, Lawrence J. (2011-08-12) HC-AEO.mini.pdf | Exhibit 100.PDF |
| Ellison, Lawrence J. (2011-08-12) HC-AEO.pdf | Exhibit 101.PDF |
| Ellison, Lawrence J. (2011-08-12) HC-AEO.ptx | Exhibit 102.PDF |
| Ellison, Lawrence J. (2011-08-12) HC-AEO.sig | Exhibit 103.PDF |
| page.pdf | Exhibit 104.PDF |
| Ellison, Lawrence J. (2011-08-12) HC-AEO.txt | Exhibit 105.PDF |
| Ellison, Lawrence J. (2011-08-12) HC-AEO.lef | Exhibit 106.PDF |
| exhibit 035.pdf | Exhibit 107.PDF |
| exhibit 117.pdf | Exhibit 108.PDF |
| exhibit 192.pdf | Exhibit 109.PDF |
| exhibit 255.pdf | Exhibit 110.PDF |
| exhibit 390.pdf | Exhibit 111.PDF |
| exhibit 391.pdf | Exhibit 112.PDF |
| exhibit 392.pdf | Exhibit 113.PDF |
| exhibit 393.pdf | Exhibit 114.PDF |
| exhibit 394.pdf | Exhibit 115.PDF |
| exhibit 395.pdf | Exhibit 116.PDF |
| exhibit 396.pdf | Exhibit 117.PDF |
| exhibit 397.pdf | Exhibit 118.PDF |
| exhibit 398.pdf | Exhibit 119.PDF |
| exhibit 399.pdf | Exhibit 120.PDF |
| exhibit 400.pdf | GERING81014.LEF |
| exhibit 401.pdf | 2011-09-13 Ben Goldberg Errata & Signature.pdf |
| exhibit 402.pdf | Goldberg, Benjamin (2011-09-13) HC-AEO.court |

Expert Report of Professor James R. Kearl

March 21, 2012                                                                    Charles River Associates

reporter sig.pdf
Goldberg, Benjamin (2011-09-13) HC-AEO.mini.pdf
Goldberg, Benjamin (2011-09-13) HC-AEO.pdf
Goldberg, Benjamin (2011-09-13) HC-AEO.ptx
Goldberg, Benjamin (2011-09-13) HC-AEO.txt
84641-Benjamin F_ Goldberg-1-Lef.LEF
84641-Exhibit#-477-Benjamin F_ Goldberg.PDF
84641-Exhibit#-478-Benjamin F_ Goldberg.PDF
84641-Exhibit#-479-Benjamin F_ Goldberg.PDF
84641-Exhibit#-480-Benjamin F_ Goldberg.PDF
84641-Exhibit#-481-Benjamin F_ Goldberg.PDF
84641-Exhibit#-482-Benjamin F_ Goldberg.PDF
84641-Exhibit#-483-Benjamin F_ Goldberg.PDF
84641-Exhibit#-484-Benjamin F_ Goldberg.PDF
84641-Exhibit#-485-Benjamin F_ Goldberg.PDF
84641-Exhibit#-486-Benjamin F_ Goldberg.PDF
84641-Exhibit#-487-Benjamin F_ Goldberg.PDF
ct rptr sig page GUPTA.PDF
Gupta, Vineet (2011-07-26) HC-AEO.mini.pdf
Gupta, Vineet (2011-07-26) HC-AEO.pdf
Gupta, Vineet (2011-07-26) HC-AEO.ptx
Gupta, Vineet (2011-07-26) HC-AEO.txt
Exhibit 162.PDF
Exhibit 183.PDF
Exhibit 184.PDF
Exhibit 185.PDF
Exhibit 186.PDF
Exhibit 187.PDF
Exhibit 188.PDF
Exhibit 189.PDF
Exhibit 250.pdf
Exhibit 34.PDF
Exhibit 48.PDF
Exhibit 73.pdf
Exhibit PM35 Google.PDF
Exhibit PM35 Oracle.PDF
Exhibit PX10.PDF
Exhibit PX289.PDF
Exhibit PX290.PDF
Exhibit PX291.PDF
Exhibit PX292.PDF
Exhibit PX293.PDF
Exhibit PX294.PDF
Exhibit PX295.PDF
Exhibit PX296.PDF
Exhibit PX297.PDF
Exhibit PX298.PDF
Exhibit PX299.PDF
Exhibit PX300.PDF
Exhibit PX301.PDF
Exhibit PX302.PDF
Exhibit PX303.PDF
Exhibit PX38.PDF
Exhibit PX7.PDF
Exhibit PX8.PDF
Exhibit PX9.PDF
GUPTA81324.LEF
2011-08-09 Steve Harris Transcript Designation.pdf

2011-08-18 Harris Errata.pdf
Harris sig page.pdf
Harris, Steve 30(b)(6) topic 8 (2011-07-28) HC-AEO.mini.pdf
Harris, Steve 30(b)(6) topic 8 (2011-07-28) HC-AEO.pdf
Harris, Steve 30(b)(6) topic 8 (2011-07-28) HC-AEO.ptx
Harris, Steve 30(b)(6) topic 8 (2011-07-28) HC-AEO.txt
exhibit 122.pdf
exhibit 123.pdf
exhibit 126.pdf
exhibit 130.pdf
exhibit 136.pdf
exhibit 220.pdf
exhibit 221.pdf
exhibit 222.pdf
exhibit 223.pdf
exhibit 224.pdf
exhibit 225.pdf
exhibit 226.pdf
exhibit 227.pdf
exhibit 228.pdf
exhibit 81.pdf
exhibit 82.pdf
exhibit 83.pdf
exhibit 85.pdf
exhibit 86.pdf
exhibit 88.pdf
exhibit 89.pdf
exhibit 90.pdf
exhibit 91.pdf
exhibit 93.pdf
exhibit 94.pdf
HARRIS81474.LEF
KAUL sig page.PDF
Kaul, Jeet 30(B)(6) (2011-08-05) HC-AEO.mini.pdf
Kaul, Jeet 30(B)(6) (2011-08-05) HC-AEO.pdf
Kaul, Jeet 30(B)(6) (2011-08-05) HC-AEO.ptx
Kaul, Jeet 30(B)(6) (2011-08-05) HC-AEO.txt
82022-JeetKaulOracle30(b)(6)-1.LEF
exhibit 118.pdf
exhibit 190.pdf
exhibit 381.pdf
exhibit 382.pdf
exhibit 383.pdf
exhibit 384.pdf
exhibit 385.pdf
exhibit 386.pdf
exhibit 387.pdf
exhibit 388.pdf
exhibit 389.pdf
exhibit px400.pdf
PX401_Kaul.PDF
Errata Sheet (Kehring).pdf
Kehring, Doug (2011-07-28) HC-AEO.mini.pdf
Kehring, Doug (2011-07-28) HC-AEO.pdf

Expert Report of Professor James R. Kearl

March 21, 2012                                         Charles River Associates

Kehring, Doug (2011-07-28) HC-AEO.ptx
Kehring, Doug (2011-07-28) HC-AEO.txt
khering sig page.PDF
exhibit 250.pdf
exhibit 251.pdf
exhibit 252.pdf
exhibit 253.pdf
exhibit 254.pdf
exhibit 255.pdf
exhibit 256.pdf
exhibit 257.pdf
exhibit 258.pdf
exhibit 259.pdf
exhibit 260.pdf
exhibit 261.pdf
exhibit 262.pdf
exhibit 263.pdf
KEHRING81472.LEF
kessler sig page.PDF
Kessler, Peter B. Ph.D. (2011-08-05).mini.pdf
Kessler, Peter B. Ph.D. (2011-08-05).pdf
Kessler, Peter B. Ph.D. (2011-08-05).ptx
Kessler, Peter B. Ph.D. (2011-08-05).txt
DX317_Kessler.pdf
DX318_Kessler.pdf
DX319_Kessler.pdf
DX320_Kessler.pdf
DX321_Kessler.pdf
DX322_Kessler.pdf
DX323_Kessler.pdf
DX324_Kessler.pdf
DX325_Kessler.pdf
DX326_Kessler.pdf
DX327_Kessler.pdf
DX328_Kessler.pdf
DX329_Kessler.pdf
KESSLER81690.LEF
2011-09-23 Peters ltr re Landau Depo Designa-
tions.pdf
2011-10-10 Landau Errata & Signature.PDF
Landau, Erez (2011-09-14) HC-AEO.cert.pdf
Landau, Erez (2011-09-14) HC-AEO.mini.pdf
Landau, Erez (2011-09-14) HC-AEO.pdf
Landau, Erez (2011-09-14) HC-AEO.ptx
Landau, Erez (2011-09-14) HC-AEO.txt
84381-Erez Landau-1-Lef.LEF
84381-Exhibit#-488-Erez Landau.PDF
84381-Exhibit#-489-Erez Landau.PDF
84381-Exhibit#-490-Erez Landau.PDF
84381-Exhibit#-491-Erez Landau.PDF
84381-Exhibit#-492-Erez Landau.PDF
84381-Exhibit#-493-Erez Landau.PDF
84381-Exhibit#-494-Erez Landau.PDF
84381-Exhibit#-495-Erez Landau.PDF
84381-Exhibit#-496-Erez Landau.PDF
84381-Exhibit#-497-Erez Landau.PDF
84381-Exhibit#-498-Erez Landau.PDF
84381-Exhibit#-499-Erez Landau.PDF

84381-Exhibit#-500-Erez Landau.PDF
Leonard, Gregory K., Ph.D. (2011-10-28) HC-
AEO.cert.pdf
Leonard, Gregory K., Ph.D. (2011-10-28) HC-
AEO.mini.pdf
Leonard, Gregory K., Ph.D. (2011-10-28) HC-
AEO.pdf
Leonard, Gregory K., Ph.D. (2011-10-28) HC-
AEO.ptx
Leonard, Gregory K., Ph.D. (2011-10-28) HC-
AEO.txt
86806-Exhibit#-289-Gregory K_ Leonard_
Ph_D_.PDF
86806-Exhibit#-673-Gregory K_ Leonard_
Ph_D_.PDF
86806-Exhibit#-674-Gregory K_ Leonard_
Ph_D_.PDF
86806-Exhibit#-675-Gregory K_ Leonard_
Ph_D_.PDF
86806-Exhibit#-PX685-Gregory K_ Leonard_
Ph_D_.PDF
86806-Exhibit#-PX686-Gregory K_ Leonard_
Ph_D_.PDF
86806-Exhibit#-PX687-Gregory K_ Leonard_
Ph_D_.PDF
86806-Exhibit#-PX688-Gregory K_ Leonard_
Ph_D_.PDF
86806-Gregory K_ Leonard_ Ph_D_-1-Lef.LEF
Levine, John Ph.D. (2011-09-15) HC-AEO.cert.pdf
Levine, John Ph.D. (2011-09-15) HC-AEO.mini.pdf
Levine, John Ph.D. (2011-09-15) HC-AEO.pdf
Levine, John Ph.D. (2011-09-15) HC-AEO.ptx
Levine, John Ph.D. (2011-09-15) HC-AEO.txt
84702-John Levine_ Ph_D_-1-Lef.LEF
exhibit px652.pdf
exhibit px653.pdf
exhibit px654.pdf
exhibit px655.pdf
exhibit px656.pdf
exhibit px657.pdf
exhibit px658.pdf
exhibit px659.pdf
Lord SIG PAGE.PDF
Lord, Peter (2011-07-22) HC-AEO.mini.pdf
Lord, Peter (2011-07-22) HC-AEO.pdf
Lord, Peter (2011-07-22) HC-AEO.ptx
Lord, Peter (2011-07-22) HC-AEO.txt
Exhibit 121.PDF
Exhibit 122.PDF
Exhibit 123.PDF
Exhibit 124.PDF
Exhibit 125.PDF
Exhibit 126.PDF
Exhibit 127.PDF
Exhibit 128.PDF
Exhibit 129.PDF
Exhibit 130.PDF
Exhibit 131.PDF

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

| | |
|---|---|
| Exhibit 132.PDF | HC-AEO.mini.pdf |
| Exhibit 133.PDF | Mitchell, John Ph.D Copyright Issues (2011-09-02) |
| Exhibit 134.PDF | HC-AEO.pdf |
| Exhibit 135.PDF | Mitchell, John Ph.D Copyright Issues (2011-09-02) |
| Exhibit 136.PDF | HC-AEO.ptx |
| Exhibit 137.PDF | Mitchell, John Ph.D Copyright Issues (2011-09-02) |
| Exhibit 138.PDF | HC-AEO.sig page.pdf |
| Exhibit 139.PDF | Mitchell, John Ph.D Copyright Issues (2011-09-02) |
| Exhibit 140.PDF | HC-AEO.txt |
| Exhibit 141.PDF | Mitchell Patent Depo Errata.pdf |
| Exhibit 77.PDF | Mitchell, John Ph.D Patent Issues VOL 1 (2011-09- |
| Exhibit 78.PDF | 06) HC-AEO.court reporter sig.pdf |
| Exhibit 79.PDF | Mitchell, John Ph.D Patent Issues VOL 1 (2011-09- |
| Exhibit 80.PDF | 06) HC-AEO.mini.pdf |
| Exhibit 81.PDF | Mitchell, John Ph.D Patent Issues VOL 1 (2011-09- |
| Exhibit 82.PDF | 06) HC-AEO.pdf |
| Exhibit 83.PDF | Mitchell, John Ph.D Patent Issues VOL 1 (2011-09- |
| Exhibit 84.PDF | 06) HC-AEO.ptx |
| Exhibit 85.PDF | Mitchell, John Ph.D Patent Issues VOL 1 (2011-09- |
| Exhibit 86.PDF | 06) HC-AEO.txt |
| Exhibit 87.PDF | Exhibit 418.PDF |
| Exhibit 88.PDF | Exhibit 419.PDF |
| Exhibit 89.PDF | Exhibit 420.PDF |
| Exhibit 90.PDF | Exhibit 421.PDF |
| Exhibit 91.PDF | Exhibit 422.PDF |
| Exhibit 92.PDF | Exhibit 423.PDF |
| Exhibit 93.PDF | Exhibit 424.PDF |
| Exhibit 94.PDF | Exhibit 425.PDF |
| Exhibit 95.PDF | Exhibit 426.PDF |
| Exhibit 96.PDF | Exhibit 427.PDF |
| Exhibit 97.PDF | Exhibit 428.PDF |
| Exhibit 98.PDF | Exhibit 429.PDF |
| Exhibit 99.PDF | Exhibit 430.PDF |
| LORD81135.LEF | Mitchell, John Ph.D Patent Issues VOL 1 (2011-09- |
| 11 09 08 MAZIERES - FINAL Errata.pdf | 06) HC-AEO.lef |
| 11 09 08 MAZIERES - FINAL Signature Page.pdf | Mitchell Patent Depo Errata.pdf |
| 84068-Exhibit#-cert page-David Mazieres.PDF | Mitchell, John Ph.D Patent Issues VOL 2 (2011-09- |
| Mazieres, David Ph.D (2011-09-08) HC- | 07) HC-AEO |
| AEO.mini.pdf | Mitchell, John Ph.D Patent Issues VOL 2 (2011-09- |
| Mazieres, David Ph.D (2011-09-08) HC-AEO.pdf | 07) HC-AEO.court reporter sig.pdf |
| Mazieres, David Ph.D (2011-09-08) HC-AEO.ptx | Mitchell, John Ph.D Patent Issues VOL 2 (2011-09- |
| Mazieres, David Ph.D (2011-09-08) HC-AEO.txt | 07) HC-AEO.mini.pdf |
| 84068-David Mazieres-1-Lef.LEF | Mitchell, John Ph.D Patent Issues VOL 2 (2011-09- |
| 84068-David Mazieres-1-PTZ.PTZ | 07) HC-AEO.pdf |
| 84068-David Mazieres-1-XMEF.XMEF | Mitchell, John Ph.D Patent Issues VOL 2 (2011-09- |
| 84068-Exhibit#-PX548-David Mazieres.PDF | 07) HC-AEO.ptx |
| 84068-Exhibit#-PX549-David Mazieres.PDF | Mitchell, John Ph.D Patent Issues VOL 2 (2011-09- |
| 84068-Exhibit#-PX550A-David Mazieres.PDF | 07) HC-AEO.txt |
| 84068-Exhibit#-PX551A-David Mazieres.PDF | Morton, Geoffrey (HC-AEO) (2011-06-07) |
| 84068-Exhibit#-PX552A-David Mazieres.PDF | ERRATA.pdf |
| 84068-Exhibit#-PX600-David Mazieres.PDF | Morton, Geoffrey (HC-AEO) (2011-06-07) mini.pdf |
| 84068-Exhibit#-PX601-David Mazieres.PDF | Morton, Geoffrey (HC-AEO) (2011-06-07).pdf |
| 84068-Exhibit#-PX602-David Mazieres.PDF | Morton, Geoffrey (HC-AEO) (2011-06-07).ptx |
| 84068-Exhibit#-PX603-David Mazieres.PDF | Morton, Geoffrey (HC-AEO) (2011-06-07).txt |
| Mitchell Copyright Depo Errata.pdf | 2011-06-07 Geoffrey Morton.LEF |
| Mitchell, John Ph.D Copyright Issues (2011-09-02) | DX034_Morton.pdf |
| HC-AEO | DX035_Morton.pdf |
| Mitchell, John Ph.D Copyright Issues (2011-09-02) | DX036_Morton.pdf |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

DX037_Morton.pdf
DX038_Morton.pdf
DX039_Morton.pdf
DX040_Morton.pdf
2011-08-11 Pampuch 30b6 Depo Transcript Designations.pdf
2011-08-25 Pampuch Errata.pdf
Pampuch sig page.pdf
Pampuch, John (2011-07-29) HC-AEO.mini.pdf
Pampuch, John (2011-07-29) HC-AEO.pdf
Pampuch, John (2011-07-29) HC-AEO.ptx
Pampuch, John (2011-07-29) HC-AEO.txt
81500.XMEF
exhibit 264.pdf
exhibit 265.pdf
exhibit 266.pdf
exhibit 267.pdf
exhibit 268.pdf
exhibit 269.pdf
exhibit 270.pdf
exhibit 271.pdf
exhibit 272.pdf
exhibit 273.pdf
exhibit 274.pdf
exhibit 275.pdf
exhibit 276.pdf
exhibit 277.pdf
exhibit 278.pdf
exhibit 279.pdf
exhibit 280.pdf
exhibit 281.pdf
exhibit 282.pdf
exhibit 283.pdf
exhibit 284.pdf
exhibit 285.pdf
exhibit 286.pdf
exhibit 287.pdf
exhibit 288.pdf
exhibit 289.pdf
exhibit 290.pdf
PAMPUCH81500.LEF
PAMPUCH81500.PTZ
PampuchIndex.txt
PampuchRough.txt
11 09 15 PARR - FINAL ERRATA and SIGNATURE pages.pdf
Parr, Terence Ph.D. (2011-09-15) HC-AEO.court reporter sig.pdf
Parr, Terence Ph.D. (2011-09-15) HC-AEO.mini.pdf
Parr, Terence Ph.D. (2011-09-15) HC-AEO.pdf
Parr, Terence Ph.D. (2011-09-15) HC-AEO.ptx
Parr, Terence Ph.D. (2011-09-15) HC-AEO.txt
DX018.PDF
DX419.PDF
Parr, Terence Ph.D. (2011-09-15) HC-AEO.lef
PX288.PDF
PX662.PDF
PX663.PDF

PX664.PDF
PX665.PDF
2011-10-17 Poore Errata & Signature.pdf
Poore, Noel (2011-09-07) HC-AEO.court reporter sig.pdf
Poore, Noel (2011-09-07) HC-AEO.mini.pdf
Poore, Noel (2011-09-07) HC-AEO.pdf
Poore, Noel (2011-09-07) HC-AEO.ptx
Poore, Noel (2011-09-07) HC-AEO.txt
Exhibit 472.pdf
Exhibit 473.PDF
Exhibit 474.PDF
Exhibit 475.PDF
Exhibit 476.PDF
Poore, Noel (2011-09-07) HC-AEO.lef
2011-08-16 Mark Reinhold Transcript Designation.pdf
Reinhold sig page.PDF
Reinhold, Mark 30(b)(6) (2011-08-05) HC-AEO.mini.pdf
Reinhold, Mark 30(b)(6) (2011-08-05) HC-AEO.pdf
Reinhold, Mark 30(b)(6) (2011-08-05) HC-AEO.ptx
Reinhold, Mark 30(b)(6) (2011-08-05) HC-AEO.txt
exhibit 330.pdf
exhibit 331.pdf
exhibit 332.pdf
exhibit 333.pdf
exhibit 334.pdf
exhibit 335.pdf
exhibit 336.pdf
exhibit 337.pdf
exhibit 338.pdf
exhibit 339.pdf
exhibit 340.pdf
exhibit 341.pdf
exhibit 342.pdf
exhibit 47.pdf
exhibit 59.pdf
exhibit 61.pdf
REINHOLD81706.LEF
2011-05-17 Tipton to Splaine fwdg Ripley orig transcript, exhs, sig pg and errata.pdf
RIPLEY Veritext Letter and Signature Page.pdf
Ripley, Lisa J. (2011-04-14) HC-AEO (mini).pdf
Ripley, Lisa J. (2011-04-14) HC-AEO - Rough.txt
Ripley, Lisa J. (2011-04-14) HC-AEO.pdf
Ripley, Lisa J. (2011-04-14) HC-AEO.ptx
Ripley, Lisa J. (2011-04-14) HC-AEO.txt
DX001_Ripley.pdf
DX002_Ripley.pdf
DX003_Ripley.pdf
DX004_Ripley.pdf
DX005_Ripley.pdf
DX006_Ripley.pdf
DX007_Ripley.pdf
DX008_Ripley.pdf
DX009_Ripley.pdf
DX010_Ripley.pdf

Expert Report of Professor James R. Kearl

March 21, 2012                                                                    Charles River Associates

| | |
|---|---|
| DX011_Ripley.pdf | Exhibit 74.PDF |
| DX012_Ripley.pdf | Exhibit 75.PDF |
| DX013_Ripley.pdf | Exhibit 76.PDF |
| DX014_Ripley.pdf | Exhibit PX246.PDF |
| DX015_Ripley.pdf | Exhibit PX247.PDF |
| 2011-08-10 FN Ltr to Purcell re Rizvi depo designa-tions.pdf | Exhibit PX248.PDF |
| | Exhibit PX249.PDF |
| Rizvi errata.pdf | Exhibit PX250.PDF |
| Rizvi, Hasan (2011-07-28) HC-AEO.mini.pdf | Exhibit PX251.PDF |
| Rizvi, Hasan (2011-07-28) HC-AEO.pdf | Exhibit PX252.PDF |
| Rizvi, Hasan (2011-07-28) HC-AEO.ptx | Exhibit PX253.PDF |
| Rizvi, Hasan (2011-07-28) HC-AEO.sig.pdf | Exhibit PX254.PDF |
| Rizvi, Hasan (2011-07-28) HC-AEO.txt | Exhibit PX255.PDF |
| exhibit 190.pdf | SCHWARTZ80630.LEF |
| exhibit 191.pdf | Screven, Edward 30(b)(6) Topic 4 (2011-07-29) erra-tra.pdf |
| exhibit 192.pdf | |
| exhibit 193.pdf | Screven, Edward 30(b)(6) Topic 4 (2011-07-29) HC-AEO.mini.pdf |
| exhibit 194.pdf | |
| exhibit 195.pdf | Screven, Edward 30(b)(6) Topic 4 (2011-07-29) HC-AEO.pdf |
| exhibit 196.pdf | |
| exhibit 197.pdf | Screven, Edward 30(b)(6) Topic 4 (2011-07-29) HC-AEO.ptx |
| exhibit 198.pdf | |
| exhibit 199.pdf | Screven, Edward 30(b)(6) Topic 4 (2011-07-29) HC-AEO.txt |
| exhibit 200.pdf | |
| exhibit 201.pdf | sig page2.pdf |
| exhibit 202.pdf | exhibit 250.pdf |
| exhibit 203.pdf | exhibit 314.pdf |
| exhibit 43.pdf | exhibit 315.pdf |
| RIZVII81499.LEF | exhibit 316.pdf |
| 2011-08-16 TL to Francis re Schwartz depo designa-tions.pdf | SCREVEN81501B.LEF |
| | 2011-08-10 FN Ltr to Weingaertner re Screven depo transcript.pdf |
| Schwartz sig page.PDF | Screven, Edward Individual (2011-07-29) errata.pdf |
| Schwartz, Jonathan (2011-07-20) HC-AEO.mini.pdf | Screven, Edward Individual (2011-07-29) HC-AEO.mini.pdf |
| Schwartz, Jonathan (2011-07-20) HC-AEO.txt | |
| Schwartz, Jonathan (2011-07-202) HC-AEO.pdf | Screven, Edward Individual (2011-07-29) HC-AEO.pdf |
| Schwartz, Jonathan (2011-07-202) HC-AEO.ptx | |
| Exhibit 52.PDF | Screven, Edward Individual (2011-07-29) HC-AEO.ptx |
| Exhibit 53.PDF | |
| Exhibit 54.PDF | Screven, Edward Individual (2011-07-29) HC-AEO.txt |
| Exhibit 55.PDF | |
| Exhibit 56.PDF | sig page individual.PDF |
| Exhibit 57.PDF | exhibit 060.pdf |
| Exhibit 58.PDF | exhibit 299.pdf |
| Exhibit 59.PDF | exhibit 300.pdf |
| Exhibit 60.PDF | exhibit 301.pdf |
| Exhibit 61.PDF | exhibit 302.pdf |
| Exhibit 62.PDF | exhibit 303.pdf |
| Exhibit 63.PDF | exhibit 304.pdf |
| Exhibit 64.PDF | exhibit 305.pdf |
| Exhibit 65.PDF | exhibit 306.pdf |
| Exhibit 66.PDF | exhibit 307.pdf |
| Exhibit 67.PDF | exhibit 308.pdf |
| Exhibit 68.PDF | exhibit 309.pdf |
| Exhibit 69.PDF | exhibit 310.pdf |
| Exhibit 70.PDF | exhibit 311.pdf |
| Exhibit 71.PDF | exhibit 312.pdf |
| Exhibit 72.PDF | exhibit 313.pdf |
| Exhibit 73.PDF | |

Expert Report of Professor James R. Kearl

March 21, 2012                                                Charles River Associates

Screven, Edward Individual (2011-07-29) HC-AEO.lef
Errata Sheet Shugan deposition.pdf
Shugan, Steven Ph.D. (2011-09-26) HC-AEO.cert.pdf
Shugan, Steven Ph.D. (2011-09-26) HC-AEO.mini.pdf
Shugan, Steven Ph.D. (2011-09-26) HC-AEO.pdf
Shugan, Steven Ph.D. (2011-09-26) HC-AEO.ptx
Shugan, Steven Ph.D. (2011-09-26) HC-AEO.txt
85328-Exhibit#-PX501-Steven Shugan_ Ph_D_.PDF
85328-Exhibit#-PX502-Steven Shugan_ Ph_D_.PDF
Shugan, Steven Ph.D. (2011-09-26) HC-AEO.lef
2011-07-05 Oracle v Google - BR Ltr re Singh depo desig.pdf
court reporter sig page.pdf
Singh, Param (2011-06-23) HC-AEO (mini).pdf
Singh, Param (2011-06-23) HC-AEO.pdf
Singh, Param (2011-06-23) HC-AEO.ptx
Singh, Param (2011-06-23) HC-AEO.txt
78102-ParamSingh-1.LEF
DX041_Singh.pdf
DX042_Singh.pdf
DX043_Singh.pdf
DX044_Singh.pdf
DX045_Singh.pdf
DX046_Singh.pdf
DX047_Singh.pdf
DX048_Singh.pdf
DX049_Singh.pdf
DX050_Singh.pdf
DX051_Singh.pdf
DepositionErrata.pdf
Vandette, Robert (2011-09-07) HC-AEO.court reporter sig.pdf
Vandette, Robert (2011-09-07) HC-AEO.mini.pdf
Vandette, Robert (2011-09-07) HC-AEO.pdf
Vandette, Robert (2011-09-07) HC-AEO.ptx
Vandette, Robert (2011-09-07) HC-AEO.txt
83979-Robert Vandette-2-Lef.LEF
Exhibit 460.PDF
Exhibit 461.PDF
Exhibit 462.PDF
Exhibit 463.PDF
Exhibit 464.PDF
Exhibit 465.PDF
Exhibit 466.PDF
Exhibit 467.PDF
Exhibit 468.PDF
Exhibit 469.PDF
Exhibit 470.PDF
Exhibit 471.PDF
Chu, Eric (HC-AEO) mini.pdf
Gupta, Vineet (2011-07-26) HC-AEO.mini.pdf
Lindholm, Tim (2011-09-07) HC-AEO.mini.pdf
Reinhold, Mark 30(b)(6) (2011-08-05) HC-AEO.mini.pdf
Rubin, Andrew E. (individual) HC-AEO (2011-07-

27).mini.pdf
Rubin, Andrew E. 30(b)(6) (2011-04-05).mini HC-AEO.pdf
Rubin, Andrew E. 30(b)(6) topic 12 HC-AEO (2011-08-18).mini.pdf
Rubin, Andrew E. 30(b)(6) topics 8 & 10 HC-AEO (2011-07-27).mini.pdf
Schmidt, Eric (2011-08-23) HC-AEO.mini.pdf
Schwartz, Jonathan (2011-07-20) HC-AEO.mini.pdf
Allison - 104 Invalidity Report - Ex. A (CV).pdf
Allison - 104 Invalidity Report - Ex. B (Documents Considered) (Revised).pdf
Allison - 104 Invalidity Report - Ex. C-1 (Gries).pdf
Allison - 104 Invalidity Report - Ex. C-2 (Chaitin).pdf
Allison - 104 Invalidity Report - Ex. C-3 (Gabriel).pdf
Allison - 104 Invalidity Report - Ex. D-1 (Tafvelin).pdf
Allison - 104 Invalidity Report - Ex. D-2 (Rau).pdf
Allison - 104 Invalidity Report - Ex. D-3 (Gries Rau).pdf
Allison - 104 Invalidity Report - Ex. D-4 (Davidson).pdf
Allison - 104 Invalidity Report.pdf
2011.08.08 Allison - 720 Invalidity Report.pdf
Allison - 720 Invalidity Report - Ex. A (CV).pdf
Allison - 720 Invalidity Report - Ex. B (Documents Considered) (Revised).pdf
Allison - 720 Invalidity Report - Ex. C (Bryant - GOOGLE-00342101).pdf
Allison - 720 Invalidity Report - Ex. D (Traut - GOOGLE-00342318).pdf
Allison - 720 Invalidity Report - Ex. E (Webb - GOOGLE-00342870).pdf
Allison - 720 Invalidity Report - Ex. F (Kuck - GOOGLE-00342856).pdf
Allison - 720 Invalidity Report - Ex. G (Bach - GOOGLE-00325057).pdf
Allison - 720 Invalidity Report - Ex. H (Srinivasan - GOOGLE-00393962).pdf
Allison - 720 Invalidity Report - Ex. I (Bryant and Traut).pdf
Allison - 720 Invalidity Report - Ex. J (Webb and Kuck and Bach).pdf
Allison - 720 Invalidity Report - Ex. K (Srinivasan and Bach).pdf
Allison Reply Report - 104 (Part 1).pdf
Allison Reply Report - 104 (Part 2) Ex (Gries).pdf
Allison Reply Report - 104 (Part 3) Ex (Aho).pdf
Allison Reply Report - 720.pdf
2011.07.29 Owen Astrachan Opening Report With Fixed Signature.pdf
2011.08.12 Rebuttal Expert Report of Astrachan.pdf
2011.08.19 Owen Astrachan Reply Report.pdf
August - Expert Rebuttal Report on Noninfringement of the 104 Patent.pdf
Ex. _A - ORACLE Amended Complaint (Part 6) - EX E.pdf
Ex. _B - August CV.pdf
Ex. _C - Materials Considered.pdf

Expert Report of Professor James R. Kearl

March 21, 2012                                                              Charles River Associates

Ex. _D - Android Code.pdf
Ex. _E - Websters.pdf
Ex. _F - Barber, Best of Interface Age (1979).pdf
Ex. _G - D. Gries, Compiler Construction for Digital Computers - GOOGLE-00329643.pdf
Ex. _H - GCJ_ The GNU Compiler for Java - GNU Project (FSF).pdf
Ex. _I - picoJava Technology FAQ.pdf
Ex. _J - Lindholm, Java Virtual Machine Specification - GOOGLE-00376043.pdf
Ex. _K - Gosling, Java Language Specification - GOOGLE-00328687.pdf
Ex. _L - 11 07 21 BRADY - TOPIC 9 - Min-U-Script - FINAL.PDF
Ex. _M - Dalvik Optimization and Verification.pdf
Ex. _N - 11 07 22 BORNSTEIN - Min-U-Script-FINAL.PDF
Ex. _O -
Bill_s_random_thoughts_on_a_Dalvik_JI_.pdf
August -Expert Rebuttal Report on Noninfringement of the 205 patent.pdf
Ex. AA - dex-format.pdf
Ex. AB - Dalvik VM Instruction Formats.pdf
Ex. AC - Dalvik Technical Information _ Android Open Source.pdf
Ex. AD - Licenses _ Android Open Source.pdf
Ex. AE - About the Android Open Source Project _ Android Open Source.pdf
Ex. AF - Philosophy and Goals _ Android Open Source.pdf
Ex. AG - Dalvik Optimization and Verification.pdf
Ex. AH - android-jit-compiler-androids-dalvik-vm.pdf
Ex. AI - QRC0001_UAL.pdf
Ex. AJ - 11 07 22 BORNSTEIN - Min-U-Script-FINAL.PDF
Ex. AK - TIOBE Software_ Tiobe Index.pdf
Ex. AL - TIOBE Software_ The Coding Standards Company.pdf
Ex. AM - iOS Overview.pdf
Ex. AN - InternetNews.pdf
Ex. AO - Why the iPhone is a success • The Register.pdf
Ex. AP - Gartner predicts Windows 7 will be top 2011 operating system -- Government Computer News.pdf
Ex. AQ - 1030-1115seminar-0302-Tom.pdf
Ex. AR - _ Nielsen Wire.pdf
Ex. AS - Apple App Store_ Its rapid success - Telegraph.pdf
Ex. AT - Reasons Why Developers Choose to Make Apps for iOS _ Top Tech Reviews.pdf
Ex. AU - jw-0329-idgns-rim.pdf
Ex. AV - RIM Device Java Library.pdf
Ex. AW - Comscore Shows RIM Market Share Sliding Further -- Trefis.pdf
Ex. AX - 11 04 01 -000 ORACLE 2d Supp PICs (w Exhibits).pdf
Ex. AY - EMAIL FROM ORACLE.pdf
Ex. AZ - JAVASOFT SHIPS JAVA 1.pdf

Ex. BA - GOOGLE-00296372 (Bills Random Thoughts).pdf
Ex. _A - ORACLE Amended Complaint (Part 7) - EX F - 205 patent.pdf
Ex. _B - August CV.pdf
Ex. _C - List of materials.pdf
Ex. _D - Android Code.pdf
Ex. _E - Websters.pdf
Ex. _F - D. Gries, Compiler Construction for Digital Computers - GOOGLE-00329643.pdf
Ex. _G - GCJ_ The GNU Compiler for Java - GNU Project (FSF).pdf
Ex. _H - picoJava Technology FAQ.pdf
Ex. _I - Lindholm, Java Virtual Machine Specification - GOOGLE-00376043.pdf
Ex. _J - Gosling, Java Language Specification - GOOGLE-00328687.pdf
Ex. _K - GOOGLE-00324970 (Aycock).pdf
Ex. _L - Hsieh et al, Java Bytecode to Native Code Translation- The Caffeine Prototype Prelim Results.pdf
Ex. _M - 6349377_Processing_device_for_executing.pdf
Ex. _N - 6332216_Hybrid_just_in_time_compiler_tha.pdf
Ex. _O - 6292883_Converting_program_specific_virt.pdf
Ex. _P - OAGOOGLE0000052602 - 205 prosecution.pdf
Ex. _Q - 5768593_Dynamic_cross_compilation_system.pdf
Ex. _R - Yellin - GOOGLE-00343029.pdf
Ex. _S - Deutsch, Efficient Implementation of the Smalltalk-80 System - GOOGLE-00327009.pdf
Ex. _T - 5761477_Methods_for_safe_and_efficient_i.pdf
Ex. _U - 11 02 22 -091 JOINT Claim Construction and Pre-Hearing Statement.pdf
Ex. _V - 11 02 18 GOOGLE First Supp PR 4-2 Preliminary Claim Constructions and Extrinisic Evidence.pdf
Ex. _W - 11 02 17 ORACLE Updated Proposed Constructions And Supporting Evidence.pdf
Ex. _X - 11 07 21 BRADY - TOPIC 9 - Min-U-Script - FINAL.PDF
Ex. _Y - Android Developers.pdf
Ex. _Z - Bytecode for the Dalvik VM.pdf
2011-09-12 Summary of Investigation of Seeon Birger.pdf
2011.10.10 Cockburn - Leonard Rebuttal.pdf
2011.10.10 Cockburn Reply to Cox FINAL (w Exhs Appx).pdf
2011.10.10 Cockburn Reply to Leonard Exhibits.pdf
2011.10.17 Cockburn Errata.pdf
2011.9.15 Cockburn Revised Report.pdf
2011.9.27 Cockburn Report-Exhibits and Appendices.pdf
2012-02-03 Cockburn Appendix C - Compare to Sept

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

version.pdf
2012-02-03 Cockburn Appendix F - Compare to Sept version.pdf
2012-02-03 POS re 3rd Cockburn report.pdf
2012-02-03 Third Cockburn Report-HC-AEO.pdf
2012-02-03 Third Cockburn Report-REDLINE COMPARE new.pdf
2012-02-08 Appendix C - Econometric Analysis.pdf
2012-02-08 Appendix F - Documents Considered.pdf
2012-02-08 Exhibit 24 - Feb 8.pdf
2012-02-08 Exhibit 27 - Feb 8.pdf
2012-02-08 Exhibit 30 - Feb 8.pdf
2012-02-08 Exhibit 33 - Feb 8.pdf
2012-02-08 Exhibit 36 - Feb 8.pdf
2012-02-08 Exhibits 18a-c - Feb 8.pdf
2012-02-08 Exhibits 31-32 - IP Impact.pdf
Ex B - Under Seal Cover Sheet (reply report of Cockburn to Leonard).pdf
Ex E - Under Seal Cover Sheet (reply report of Cockburn to Cox).pdf
Exhibits 1-37.pdf
Sept report backup - GOOGLE-01-00004621.xls
Backup for Exhibit 1.xlsx
Exhibit 1.xlsx
Exhibit 2.xlsx
Exhibit 1.xlsx
Exhibit 3.xlsx
Exhibit 4a.xlsx
Exhibit 4b.xlsx
Exhibit 5.xlsx
Exhibits 2, 6.xlsx
Android Only Colinearity Tests.sas
Android Only Colinearity.xls
Android Only Models.xls
Android Only QLIM Models.sas
Agg Monthly Model.sas
Monthly Model.xls
Frequency Counts.xlsx
Frequency Tables.sas
Appendix C.xlsx
Econometric Backup.xlsx
Patent Contribution - Econometrics.xlsm
Revised Patent Exhibits.xlsx
0.40 Adding Covariates -- FIXED.sas
0.61 Demand (BASE)--FIXED.sas
0.62 Demand (SENS) -- FIXED.sas
2012-02-03 Appendix C - Compare to Sept version.pdf
2012-02-03 Appendix F - Compare to Sept version.pdf
2012-02-03 POS re 3rd Cockburn report.pdf
2012-02-03 Third Cockburn Report-HC-AEO.pdf
2012-02-03 Third Cockburn Report-REDLINE COMPARE.new.pdf
2012-02-08 POS re Errata on 3rd Cockburn report.pdf
2012-02-08 Third Cockburn Report Errata.pdf
2012-02-08 Third Cockburn Report FINAL HC-

AEO.CLEAN.pdf
2012-02-08 Third Cockburn Report FINAL HC-AEO.REDLINE.pdf
Appendix C - Econometric Analysis.pdf
Appendix C - Econometric Exhibits.pdf
Appendix F - Documents Considered.pdf
Exhibits 1-37.pdf
2012-02-08 Appendix C - Econometric Analysis.pdf
2012-02-08 Appendix F - Documents Considered.pdf
2012-02-08 Exhibit 24 - Feb 8.pdf
2012-02-08 Exhibit 27 - Feb 8.pdf
2012-02-08 Exhibit 30 - Feb 8.pdf
2012-02-08 Exhibit 33 - Feb 8.pdf
2012-02-08 Exhibit 36 - Feb 8.pdf
2012-02-08 Exhibits 18a-c - Feb 8.pdf
2012-02-08 Exhibits 31-32 - IP Impact.pdf
2012-02-08 POS re Errata on 3rd Cockburn report.pdf
2012-02-08 Third Cockburn Report Errata.pdf
2012-02-08 Third Cockburn Report FINAL HC-AEO.CLEAN.pdf
2012-02-08 Third Cockburn Report FINAL HC-AEO.REDLINE.pdf
Appendix C.xlsx
Appendix D (US exhibits).xlsx
Appendix D (WW exhibits).xlsx
Appendix E.xlsx
Backup of Econometric Backup.xlk
Econometric Backup.xlsx
Exhibits 1-18 -- Patents.xlsx
Exhibits 19-25 -- Copyright.xlsx
Exhibits 26, 27 -- Copyright Conjoint.xlsx
Patent Contribution - Conjoint.xlsm
Patent Contribution - Econometrics.xlsm
Android OC Quarterly Review - Q1 2011 - GOOGLE-77-00053555.pdf
Android OC Quarterly Review - Q4 2010 - GOOGLE-01-00053552.pdf
OAGOOGLE0005039944.pdf
OAGOOGLE0100166899.pdf
001_0.7.35.522032.2.ods
GLOBAL~1.XLS
GOOGLE~1.CSV
GOOGLE~2.CSV
Java_Billings_Costs_v4.xls
AdMob Mobile Metrics May-2010.pdf
1.xlsx
2a-b Updated.xlsx
4a Updated.xls
6a Updated.xls
Cox Expert Report (Second Revision) 11-28-11.pdf
Cox Supplemental Expert Report.pdf
Exhibit 1.xls
Exhibit 3d.xls
Exhibit 5.xls
Exhibit 7.xls
Exhibits 2a-b, 3a-c.xls
Exhibits 4a, b.xls

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

Exhibits 6a-6c.xls
Exhibits 6d-6e.xls
Davidson - Expert Rebuttal Report on Noninfringe-
ment of the 720 patent.pdf
Ex. A - U.S. Pat. No. 7426720.pdf
Ex. B - Davidson CV.pdf
Ex. C - Patent Litigation Cases.pdf
Ex. D - List of Materials Relied Upon.pdf
Ex. E - Nori et al. -
The_Pascal_P_Compiler_implementation_notes.pdf
Ex. F - Davidson & Gresh.pdf
Ex. G - JOINT Claim Construction and Pre-Hearing
Statement.pdf
Ex. H - preloaded-classes.pdf
Ex. I - Smith-maquire-cw-fork.pdf
Ex. J - Dabrowski.pdf
Ex. K - Bornstein Depo Excerpts.pdf
Dewar - 520 Invalidity Report - Ex. A (CV).pdf
Dewar - 520 Invalidity Report - Ex. B (Documents
Considered).pdf
Dewar - 520 Invalidity Report - Ex. C (Lewis
Chart).pdf
Dewar - 520 Invalidity Report - Ex. D (Cierniak . Ci-
erniak, Lindholm Chart).pdf
Dewar - 520 Invalidity Report - Ex. E (Lewis, Proeb-
sting, Dyer Chart).pdf
Dewar - 520 Invalidity Report - Ex. F (Lewis, Gosling,
Sun Chart).pdf
Dewar - 520 Invalidity Report.pdf
2011.09.01 Dewar Reply Report - 520.pdf
Ex. 1 - Goldberg CV.pdf
Goldberg Expert Invalidity Rebuttal Report.pdf
2011-09-12 C Kemerer Decl.pdf
2011-09-12 Supp Summary Rept of Erez Laudau.pdf
2011-09-12 Supp Summary & Rept of Erez Lan-
dau.pdf
Erez_Landau_Perf_Benchmark_Summary_and_Rep
ort.pdf
2011.10.24 Leonard revised report.pdf
Android Only QLIM Models_Corrected.sas
Apple - iPhone 4S - See all the amazing new things
iPhone can do..pdf
chow_test_for_android_only_vars.sas
Chow-Test for Monthly Regression.sas
Count New Bids and Auctions.sas
Droid Motorola.pdf
Leonard Supplemental Expert Report.pdf
Patent Citations.xlsx
Top Patents.xls
Levine - 205 Invalidity Report - Ex. A (CV).pdf
Levine - 205 Invalidity Report - Ex. B (References
Considered).pdf
Levine - 205 Invalidity Report - Ex. C (Tarau
Chart).pdf
Levine - 205 Invalidity Report - Ex. D (Magnusson
Chart).pdf
Levine - 205 Invalidity Report - Ex. E (Hookway
Chart).pdf

Levine - 205 Invalidity Report - Ex. F (Wakeling and
Magnusson Chart).pdf
Levine - 205 Invalidity Report - Ex. G (Lewis and
Magnusson Chart).pdf
Levine - 205 Invalidity Report - Ex. H (Deutsch and
Magnusson Chart).pdf
Levine - 205 Invalidity Report - Ex. I (Tarau -
GOOGLE-00380428).pdf
Levine - 205 Invalidity Report - Ex. J (Magnusson -
GOOGLE-00337401).pdf
Levine - 205 Invalidity Report - Ex. K (Hookway -
GOOGLE-00341655).pdf
Levine - 205 Invalidity Report - Ex. L (Wakeling -
GOOGLE-00342436).pdf
Levine - 205 Invalidity Report - Ex. M (Lewis -
GOOGLE-00337218).pdf
Levine - 205 Invalidity Report - Ex. N (Deutsch -
GOOGLE-00327009).pdf
Levine - 205 Invalidity Report.pdf
Levine - 702 Invalidity Report - Ex. A (CV).pdf
Levine - 702 Invalidity Report - Ex. B (Documents
Considered).pdf
Levine - 702 Invalidity Report - Ex. C (Tock).pdf
Levine - 702 Invalidity Report - Ex. D (Palay).pdf
Levine - 702 Invalidity Report - Ex. E (Tock -
GOOGLE-00341635).pdf
Levine - 702 Invalidity Report - Ex. F (Palay -
GOOGLE-00341557).pdf
Levine - 702 Invalidity Report.pdf
Levine Reply Report - 702 and 205 (Part 1).pdf
Levine Reply Report - 702 and 205 (Part 2) Ex. G.pdf
Levine Reply Report - 702 and 205 (Part 3) Ex. H.pdf
Mazieres - 447 Invalidity Report - Ex. A (CV).pdf
Mazieres - 447 Invalidity Report - Ex. B (References
Considered) (Revised).pdf
Mazieres - 447 Invalidity Report - Ex. C (Griffin).pdf
Mazieres - 447 Invalidity Report - Ex. D (Griffin -
GOOGLE-00380244).pdf
Mazieres - 447 Invalidity Report.pdf
Mazieres - 476 Invalidity Report - Ex. A (CV).pdf
Mazieres - 476 Invalidity Report - Ex. B (References
Considered) (Revised).pdf
Mazieres - 476 Invalidity Report - Ex. C (Fischer).pdf
Mazieres - 476 Invalidity Report - Ex. D (Fischer -
GOOGLE-00341507).pdf
Mazieres - 476 Invalidity Report.pdf
Ex. A - 6192476.pdf
Ex. B - 6125447.pdf
Ex. C - CV.pdf
Ex. D - Materials Considered.pdf
Ex. E - Excerpts 11 07 22 BORNSTEIN.PDF
Mazieres - Expert Rebuttal Report on Noninfringe-
ment of the 447 and 476 patents.pdf
Mazieres Reply Report - 447 and 476 (Part 1).pdf
Mazieres Reply Report - 447 and 476 (Part 2) Ex.
E.pdf
Mazieres Reply Report - 447 and 476 (Part 3) Ex.
F.pdf

Expert Report of Professor James R. Kearl

March 21, 2012                                                  Charles River Associates

2011.06.28 Norton Decl ISO Daubert Opp FINAL.pdf
2011.06.28 Norton Exhs A-M (CDKM UNDER SEAL).pdf
Ex. C - Parr Slides JVM-Summit-2009.pdf
Appendix A.pdf
Ex. A - CV of Terence Parr.pdf
Ex. B - References considered.pdf
Ex. C - 6,061,520 patent.pdf
Ex. D - Source Code Excerpts.pdf
Ex. E - Excerpts from 11 07 22 Bornstein depo.PDF
Ex. F - Presentation-Of-Dalvik-VM-Internals.pdf
Parr - Expert Rebuttal Report on Noninfringement of the 520 Patent.pdf
Ex. A - CV of Terence Parr.pdf
Ex. B - References considered.pdf
Ex. C - 702 Patent.pdf
Ex. D - Source Code Excerpts.pdf
Ex. E - Fresko - public transcript from USPTO fil-ing.pdf
Ex. F - Nedim Fresko Deposition Ex. 16.PDF
Ex. G - Nedim Fresko Deposition Ex. 17.PDF
Ex. H - OAGOOGLE0016895927.pdf
Ex. I - OAGOOGLE0016895922.pdf
Ex. J - PCWorld.pdf
Ex. K - Akamai White Paper.pdf
Ex. L - The State of Mobile Apps _ Nielsen Wire.pdf
Ex. M - List of open source Android applications - Wikipedia, the free encyclopedia.pdf
Parr - Expert Rebuttal Report on Noninfringement of the 702 Patent.pdf
Peters Decl - Ex. 01.pdf
Peters Decl - Ex. 02.pdf
Peters Decl - Ex. 03.pdf
Peters Decl - Ex. 04.pdf
Peters Decl - Ex. 05.pdf
Peters Decl - Ex. 06 (Gosling '104 decl).pdf
Peters Decl - Ex. 07.pdf
Peters Decl - Ex. 08.pdf
Peters Decl - Ex. 09.pdf
Peters Decl - Ex. 10.pdf
Peters Decl - Ex. 11.pdf
2011-08-06 Noel Poore Perf Benchmark Summary and Report - SIGNED.pdf
Ex A Noel Poore (Jul 2011) Resume.pdf
2011-07-29 JLI Purdy Expert Report (copyright).pdf
2011-08-19 Purdy Copyright Reply Report.pdf
2011-08-19 Purdy Ex A-JLI Purdy Opening Expert Report.pdf
2011-08-19 Purdy Ex B-Revised JLI_Purdy_Revised_Opening_Expert_Report.pdf
2011-08-19 Purdy Ex C-Copyright_Reply_Expert_Report_Purdy.pdf
2011-10-10 Serwin Rebuttal Report_Cox (w Exhs Appx).pdf
2011-10-10 Serwin Rebuttal Report_Leonard (w Exhs Appx).pdf
2011-10-10 Serwin Rebuttal Report_Leonard.pdf
Cox Rebuttal_Exhibit 1.xlsx

Leonard Rebuttal_Exhibit 1.xlsx
2011-09-12 Expert Report of Dr Shugan.pdf
2011-09-28 Shugan Reply Report (w Exhs Appen-dix).pdf
2011-08-20 [P344] Swoopes Decl Exhibits 17 & 18.pdf
2011-08-20 [P345] Swoopes Decl Exhibits 19 & 20.pdf
2011-09-12 Summary of Investigation of G Tenney.pdf
Bob_Vandette_Perf_Benchmark_Summary_and_Report.pdf
2011-07-29 JLI Visnick Expert Report.pdf
171_2011.06.14 Google Brief ISO Daubert Mot (UNREDACTED).pdf
172_2011.06.14 Decl of Weingaertner ISO Google Daubert Mot w- exhibits (UNREDACTED).pdf
173_2011.06.14 Decl of Gregory Leonard (UNREDACTED and REMOVED from DOCKET).pdf
2011-05-20 Cockburn Damages Exhibits (Final).pdf
2011-05-20 Cockburn Report (Final).pdf
2011-05-20 Cockburn Report Appendices (Final).pdf
2011-07-29 Mitchell Expert Copyright Report GOOG AEO.pdf
2011-08-08 Mitchell Expert Report -- HIGHLY CONFIDENTIAL-- AEO.pdf
2011-08-08 Mitch-ell_Opening_Patent_Expert_Report_Appendix_A.pdf
2011-08-08 Mitch-ell_Opening_Patent_Expert_Report_Exhibit B Sup-plement.pdf
2011-08-12 Mitchell Exhibit Copyright-Opposition-A HC-AEO.pdf
2011-08-19 Mitchell Copyright Reply Report.pdf
2011-08-19 Mitchell Decl ISO Oracle Opp To MSJ On Count VIII.pdf
2011-08-19 Owen Astrachan Reply Report.pdf
2011-09-01 Mitchell Infringement Reply Report GOOGLE AEO.pdf
2011.08.12 Rebuttal Expert Report of Astrachan.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report-EX A.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report-EX B.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report-EX C.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report-EX D.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report-EX E.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report-EX F.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report.pdf
2011.09.08 Google MTS Portions of Mitchell Patent Report.pdf
2011.10.11 Order re striking portions of Mitchell re-port.pdf

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

2011.9.29 Google 2nd MTS portions of Mitchell Patent Report.pdf
464_2011 09 26 Order re MTS Portions of Mitchell Report.pdf
Astrachan FINAL MINI.pdf
Copyright Exs A-S - Mitchell Expert Copyright Report (2).pdf
Mitchell Copyright Depo Errata.pdf
Mitchell Depo Copyright Issues HC-AEO.pdf
Mitchell Depo Patent Issues (2011-09-06) HC-AEO.pdf
Mitchell Patent Depo Errata.pdf
Mitchell, Depo 2 Patent Issues (2011-09-07)HC-AEO.pdf
2011-09-27 Cockburn Report-Exhibits & Appendices.pdf
2011-09-27 Cockburn Report-Exhibits & Appendices.zip
2011-10-10 Cockburn report backup.zip
2011-10-10 Serwin reports backup.zip
2011-10-10 Shugan Reply Report Backup.zip
2011-09-27%20Cockburn%20Report-Exhibits%20&%20Appendices.pdf
Appendix C.xlsx
Appendix D (US exhibits).xlsx
Appendix D (WW exhibits).xlsx
Appendix E.xlsx
Econometric Backup.xlsx
Exhibits 1-18 -- Patents.xlsx
Exhibits 19-25 -- Copyright.xlsx
Exhibits 26, 27 -- Copyright Conjoint.xlsx
translation.sas7bdat
data.zip
data.zip
Additional Specs Data.xlsx
Anandtech Linpack Data.xlsx
Android_versions.xlsx
com.greenecomputing.linpack.apk
Consumer Reports Smartphone Ratings.txt
Consumer Reports Smartphone Specs.txt
PDADB All Devices.txt
PhoneScoop to clean_name Crosswalk.xlsx
Phone Scoop (Ratings Specs and ID).xlsx
Phone Scoop Ratings and Specs.xlsx
Phones List (09.14.11).xlsx
1. List models (Phone Scoop).sas
2. Get source code (Phone Scoop).sas
3. Variable Details (Phone Scoop).sas
4. Cleaning (Phone Scoop).sas
5. Match to URL ID.sas
6a. Regressions Prep - Variables.sas
6b. Regressions Prep - Cleaning.sas
0.00 Set File Paths.sas
0.10 Construct Directory File Listing for Import.sas
0.20 Import Auction, Bids & Features data (Cell Phone Report).sas
0.21 Generate Yearly Frequency Counts.sas
0.30 Preliminary Data Cleanup.sas

0.40 Adding Covariates.sas
0.51 Set-up Estimation (BASE).sas
0.52 Set-up Estimation (SENS).sas
0.61 Demand (BASE).sas
0.62 Demand (SENS).sas
0.70 Parameter Estimates.sas
0.80 Identify X-OS Bidders.sas
0.91 Scenarios (BASE).sas
0.92 Scenarios (SENS).sas
1.00 Summary Statistics.sas
1.10 WTP.sas
1.20 X-OS Bid Summary.sas
0.0 data macros.sas
0.0 dummy.sas
sort v4.sas
consolidated_specs_benchmarks.sas7bdat
Strategy Analytics Sales Shares.xlsx
translation.sas7bdat
Patent Contribution - Conjoint.xlsm
Patent Contribution - Econometrics.xlsm
Android OC Quarterly Review - Q1 2011 - GOOGLE-77-00053555.pdf
Android OC Quarterly Review - Q4 2010 - GOOGLE-01-00053552.pdf
OAGOOGLE0005039944.pdf
OAGOOGLE0100166899.pdf
001_0.7.35.522032.2.ods
GLOBAL~1.XLS
GOOGLE~1.CSV
GOOGLE~2.CSV
Java_Billings_Costs_v4.xls
AdMob Mobile Metrics May-2010.pdf
Shugan Reply Report Exhibits.xlsx
fonkn_CBC.att
fonkn_CBC.cho
Fonkn_desc.csv
Backup of PR_Data.xlk
PR_Data.xlsx
1.0 Choice Data - Choice and Attribute Files.sas
1.5 Choice Data - Choice and Attribute Files - Preference Reversals.sas
2.0 Preference Reversal Calculations.sas
base.sas7bdat
FonKN_A.att
FonKN_A.cbchb
FonKN_A.cho
FonKN_A.hbu
FonKN_A.log
FonKN_A.restart
FonKN_A_alpha.csv
FonKN_A_covariances.csv
FonKN_A_meanbeta.csv
FonKN_A_priorcovariances.csv
FonKN_A_stddev.csv
FonKN_A_summary.txt
FonKN_A_utilities.csv
FonKN_A_utillayout.xml
FonKN.att

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| FonKN_P.att | FonKN_A.hbu |
| FonKN_P.cbchb | fonkn_A.idx |
| FonKN_P.cho | fonkn_A.qnr |
| FonKN_P.hbu | fonkn_A.smt |
| FonKN_P.log | fonkn_A.ucs |
| FonKN_P.restart | fonkn_A_EI Simulation1.xls |
| FonKN_P_alpha.csv | fonkn_A_EI.dat |
| FonKN_P_covariances.csv | FonKN_A_EI.hbu |
| FonKN_P_meanbeta.csv | fonkn_A_EI.idx |
| FonKN_P_priorcovariances.csv | fonkn_A_EI.qnr |
| FonKN_P_stddev.csv | fonkn_A_EI.smt |
| FonKN_P_summary.txt | fonkn_A_EI.ucs |
| FonKN_P_utilities.csv | fonkn_P Simulation1.xls |
| FonKN_P_utillayout.xml | fonkn_P.dat |
| FonKN_PRAST.att | FonKN_P.hbu |
| FonKN_PRAST.cbchb | fonkn_P.idx |
| FonKN_PRAST.cho | fonkn_P.qnr |
| FonKN_PRAST.hbu | fonkn_P.smt |
| FonKN_PRAST.log | fonkn_P.ucs |
| FonKN_PRAST.restart | fonkn_PRAST Simulation1.xls |
| FonKN_PRAST_alpha.csv | fonkn_PRAST.dat |
| FonKN_PRAST_covariances.csv | FonKN_PRAST.hbu |
| FonKN_PRAST_meanbeta.csv | fonkn_PRAST.idx |
| FonKN_PRAST_priorcovariances.csv | fonkn_PRAST.qnr |
| FonKN_PRAST_stddev.csv | fonkn_PRAST.smt |
| FonKN_PRAST_summary.txt | fonkn_PRAST.ucs |
| FonKN_PRAST_utilities.csv | fonkn_PRB Simulation1.xls |
| FonKN_PRAST_utillayout.xml | fonkn_PRB.dat |
| FonKN_PRB.att | FonKN_PRB.hbu |
| FonKN_PRB.cbchb | fonkn_PRB.idx |
| FonKN_PRB.cho | fonkn_PRB.qnr |
| FonKN_PRB.hbu | fonkn_PRB.smt |
| FonKN_PRB.log | fonkn_PRB.ucs |
| FonKN_PRB.restart | fonkn_PRP Simulation1.xls |
| FonKN_PRB_alpha.csv | fonkn_PRP.dat |
| FonKN_PRB_covariances.csv | FonKN_PRP.hbu |
| FonKN_PRB_meanbeta.csv | fonkn_PRP.idx |
| FonKN_PRB_priorcovariances.csv | fonkn_PRP.qnr |
| FonKN_PRB_stddev.csv | fonkn_PRP.smt |
| FonKN_PRB_summary.txt | fonkn_PRP.ucs |
| FonKN_PRB_utilities.csv | Backup for Exhibit 1.xlsx |
| FonKN_PRB_utillayout.xml | Exhibit 1.xlsx |
| FonKN_PRP.att | Exhibit 2.xlsx |
| FonKN_PRP.cbchb | Exhibit 1.xlsx |
| FonKN_PRP.cho | Exhibit 3.xlsx |
| FonKN_PRP.hbu | Exhibit 4a.xlsx |
| FonKN_PRP.log | Exhibit 4b.xlsx |
| FonKN_PRP.restart | Exhibit 5.xlsx |
| FonKN_PRP_alpha.csv | Exhibits 2, 6.xlsx |
| FonKN_PRP_covariances.csv | Android Only Colinearity.xls |
| FonKN_PRP_meanbeta.csv | Android Only Models.xls |
| FonKN_PRP_priorcovariances.csv | Android Only QLIM Models.sas |
| FonKN_PRP_stddev.csv | Agg Monthly Model.sas |
| FonKN_PRP_summary.txt | Monthly Model.xls |
| FonKN_PRP_utilities.csv | Frequency Counts.xlsx |
| FonKN_PRP_utillayout.xml | Frequency Tables.sas |
| fonkn_A Simulation1_RFC.xls | Appendix C.xlsx |
| fonkn_A.dat | Backup of Econometric Backup.xlk |

Expert Report of Professor James R. Kearl

March 21, 2012                                                                 Charles River Associates

Econometric Backup.xlsx
Patent Contribution - Econometrics.xlsm
Revised Patent Exhibits.xlsx
0.40 Adding Covariates -- FIXED.sas
0.61 Demand (BASE)--FIXED.sas
0.62 Demand (SENS) -- FIXED.sas
Cox Rebuttal_Exhibit 1.xlsx
Leonard Rebuttal_Exhibit 1.xlsx
Appendix_C_Backup.zip
Exhibits 1-37.pdf
Exhibits_1-18_-_Patents.xlsx
Exhibits_19-25_-_Copyright.xlsx
Exhibits_26-27_-_Copyright_Conjoint.xlsx
Exhibits_28-30_-_API,_Line_Count.xlsx
Exhibits_31-32_-_IP_Impact.xlsx
Exhibits_33-34_-_Patent_Value_Distribution.xlsx
Exhibits_35-37_-_Apportionment.xlsx
~$Exhibits_33-34_-_Patent_Value_Distribution.xlsx
Appendix_D_(US_exhibits).xlsx
Appendix_D_(WW_exhibits).xlsx
Appendix_E.xlsx
Econometric Exhibits.pdf
Frequency Counts.sas
0.0 data macros.sas
0.0 dummy.sas
addstring.sas
sort v4.sas
Appendix C - Econometric Exhibits.xlsx
Collinearity Diagnostics.sas
Collinearity Diagnostics.xlsx
Econometric Backup.xlsx
0.00 Set File Paths.sas
0.01 Adding Covariates - Monthly.sas
0.02 Set-up Estimation (BASE) - Monthly.sas
0.03 Monthly Demand Model (BASE).sas
0.04 Parameter Estimates.sas
Exhibit C5 - Monthly Linpack Model.xlsx
raw_sa_weights.sas7bdat
reg_demand_m.sas7bdat
sample_source.sas7bdat
sa_weights.sas7bdat
d_parameters_1.sas7bdat
d_parameters_10.sas7bdat
d_parameters_100.sas7bdat
d_parameters_101.sas7bdat
d_parameters_102.sas7bdat
d_parameters_103.sas7bdat
d_parameters_104.sas7bdat
d_parameters_105.sas7bdat
d_parameters_106.sas7bdat
d_parameters_107.sas7bdat
d_parameters_108.sas7bdat
d_parameters_109.sas7bdat
d_parameters_11.sas7bdat
d_parameters_110.sas7bdat
d_parameters_111.sas7bdat
d_parameters_112.sas7bdat
d_parameters_113.sas7bdat

d_parameters_114.sas7bdat
d_parameters_115.sas7bdat
d_parameters_116.sas7bdat
d_parameters_117.sas7bdat
d_parameters_118.sas7bdat
d_parameters_119.sas7bdat
d_parameters_12.sas7bdat
d_parameters_120.sas7bdat
d_parameters_121.sas7bdat
d_parameters_122.sas7bdat
d_parameters_123.sas7bdat
d_parameters_124.sas7bdat
d_parameters_125.sas7bdat
d_parameters_126.sas7bdat
d_parameters_127.sas7bdat
d_parameters_128.sas7bdat
d_parameters_129.sas7bdat
d_parameters_13.sas7bdat
d_parameters_130.sas7bdat
d_parameters_131.sas7bdat
d_parameters_132.sas7bdat
d_parameters_133.sas7bdat
d_parameters_134.sas7bdat
d_parameters_135.sas7bdat
d_parameters_136.sas7bdat
d_parameters_137.sas7bdat
d_parameters_138.sas7bdat
d_parameters_139.sas7bdat
d_parameters_14.sas7bdat
d_parameters_140.sas7bdat
d_parameters_141.sas7bdat
d_parameters_142.sas7bdat
d_parameters_143.sas7bdat
d_parameters_144.sas7bdat
d_parameters_145.sas7bdat
d_parameters_146.sas7bdat
d_parameters_147.sas7bdat
d_parameters_148.sas7bdat
d_parameters_149.sas7bdat
d_parameters_15.sas7bdat
d_parameters_150.sas7bdat
d_parameters_151.sas7bdat
d_parameters_152.sas7bdat
d_parameters_153.sas7bdat
d_parameters_154.sas7bdat
d_parameters_155.sas7bdat
d_parameters_156.sas7bdat
d_parameters_157.sas7bdat
d_parameters_158.sas7bdat
d_parameters_159.sas7bdat
d_parameters_16.sas7bdat
d_parameters_160.sas7bdat
d_parameters_161.sas7bdat
d_parameters_162.sas7bdat
d_parameters_163.sas7bdat
d_parameters_164.sas7bdat
d_parameters_165.sas7bdat
d_parameters_166.sas7bdat

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| d_parameters_167.sas7bdat | d_parameters_219.sas7bdat |
| d_parameters_168.sas7bdat | d_parameters_22.sas7bdat |
| d_parameters_169.sas7bdat | d_parameters_220.sas7bdat |
| d_parameters_17.sas7bdat | d_parameters_221.sas7bdat |
| d_parameters_170.sas7bdat | d_parameters_222.sas7bdat |
| d_parameters_171.sas7bdat | d_parameters_223.sas7bdat |
| d_parameters_172.sas7bdat | d_parameters_224.sas7bdat |
| d_parameters_173.sas7bdat | d_parameters_225.sas7bdat |
| d_parameters_174.sas7bdat | d_parameters_226.sas7bdat |
| d_parameters_175.sas7bdat | d_parameters_227.sas7bdat |
| d_parameters_176.sas7bdat | d_parameters_228.sas7bdat |
| d_parameters_177.sas7bdat | d_parameters_229.sas7bdat |
| d_parameters_178.sas7bdat | d_parameters_23.sas7bdat |
| d_parameters_179.sas7bdat | d_parameters_230.sas7bdat |
| d_parameters_18.sas7bdat | d_parameters_231.sas7bdat |
| d_parameters_180.sas7bdat | d_parameters_232.sas7bdat |
| d_parameters_181.sas7bdat | d_parameters_233.sas7bdat |
| d_parameters_182.sas7bdat | d_parameters_234.sas7bdat |
| d_parameters_183.sas7bdat | d_parameters_235.sas7bdat |
| d_parameters_184.sas7bdat | d_parameters_236.sas7bdat |
| d_parameters_185.sas7bdat | d_parameters_237.sas7bdat |
| d_parameters_186.sas7bdat | d_parameters_238.sas7bdat |
| d_parameters_187.sas7bdat | d_parameters_239.sas7bdat |
| d_parameters_188.sas7bdat | d_parameters_24.sas7bdat |
| d_parameters_189.sas7bdat | d_parameters_240.sas7bdat |
| d_parameters_19.sas7bdat | d_parameters_241.sas7bdat |
| d_parameters_190.sas7bdat | d_parameters_242.sas7bdat |
| d_parameters_191.sas7bdat | d_parameters_243.sas7bdat |
| d_parameters_192.sas7bdat | d_parameters_244.sas7bdat |
| d_parameters_193.sas7bdat | d_parameters_245.sas7bdat |
| d_parameters_194.sas7bdat | d_parameters_246.sas7bdat |
| d_parameters_195.sas7bdat | d_parameters_247.sas7bdat |
| d_parameters_196.sas7bdat | d_parameters_248.sas7bdat |
| d_parameters_197.sas7bdat | d_parameters_249.sas7bdat |
| d_parameters_198.sas7bdat | d_parameters_25.sas7bdat |
| d_parameters_199.sas7bdat | d_parameters_250.sas7bdat |
| d_parameters_2.sas7bdat | d_parameters_251.sas7bdat |
| d_parameters_20.sas7bdat | d_parameters_252.sas7bdat |
| d_parameters_200.sas7bdat | d_parameters_253.sas7bdat |
| d_parameters_201.sas7bdat | d_parameters_254.sas7bdat |
| d_parameters_202.sas7bdat | d_parameters_255.sas7bdat |
| d_parameters_203.sas7bdat | d_parameters_256.sas7bdat |
| d_parameters_204.sas7bdat | d_parameters_257.sas7bdat |
| d_parameters_205.sas7bdat | d_parameters_26.sas7bdat |
| d_parameters_206.sas7bdat | d_parameters_27.sas7bdat |
| d_parameters_207.sas7bdat | d_parameters_28.sas7bdat |
| d_parameters_208.sas7bdat | d_parameters_29.sas7bdat |
| d_parameters_209.sas7bdat | d_parameters_3.sas7bdat |
| d_parameters_21.sas7bdat | d_parameters_30.sas7bdat |
| d_parameters_210.sas7bdat | d_parameters_31.sas7bdat |
| d_parameters_211.sas7bdat | d_parameters_32.sas7bdat |
| d_parameters_212.sas7bdat | d_parameters_33.sas7bdat |
| d_parameters_213.sas7bdat | d_parameters_34.sas7bdat |
| d_parameters_214.sas7bdat | d_parameters_35.sas7bdat |
| d_parameters_215.sas7bdat | d_parameters_36.sas7bdat |
| d_parameters_216.sas7bdat | d_parameters_37.sas7bdat |
| d_parameters_217.sas7bdat | d_parameters_38.sas7bdat |
| d_parameters_218.sas7bdat | d_parameters_39.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| d_parameters_4.sas7bdat | d_parameters_92.sas7bdat |
| d_parameters_40.sas7bdat | d_parameters_93.sas7bdat |
| d_parameters_41.sas7bdat | d_parameters_94.sas7bdat |
| d_parameters_42.sas7bdat | d_parameters_95.sas7bdat |
| d_parameters_43.sas7bdat | d_parameters_96.sas7bdat |
| d_parameters_44.sas7bdat | d_parameters_97.sas7bdat |
| d_parameters_45.sas7bdat | d_parameters_98.sas7bdat |
| d_parameters_46.sas7bdat | d_parameters_99.sas7bdat |
| d_parameters_47.sas7bdat | d_parameters_1.sas7bdat |
| d_parameters_48.sas7bdat | d_parameters_10.sas7bdat |
| d_parameters_49.sas7bdat | d_parameters_100.sas7bdat |
| d_parameters_5.sas7bdat | d_parameters_101.sas7bdat |
| d_parameters_50.sas7bdat | d_parameters_102.sas7bdat |
| d_parameters_51.sas7bdat | d_parameters_103.sas7bdat |
| d_parameters_52.sas7bdat | d_parameters_104.sas7bdat |
| d_parameters_53.sas7bdat | d_parameters_105.sas7bdat |
| d_parameters_54.sas7bdat | d_parameters_106.sas7bdat |
| d_parameters_55.sas7bdat | d_parameters_107.sas7bdat |
| d_parameters_56.sas7bdat | d_parameters_108.sas7bdat |
| d_parameters_57.sas7bdat | d_parameters_109.sas7bdat |
| d_parameters_58.sas7bdat | d_parameters_11.sas7bdat |
| d_parameters_59.sas7bdat | d_parameters_110.sas7bdat |
| d_parameters_6.sas7bdat | d_parameters_111.sas7bdat |
| d_parameters_60.sas7bdat | d_parameters_112.sas7bdat |
| d_parameters_61.sas7bdat | d_parameters_113.sas7bdat |
| d_parameters_62.sas7bdat | d_parameters_114.sas7bdat |
| d_parameters_63.sas7bdat | d_parameters_115.sas7bdat |
| d_parameters_64.sas7bdat | d_parameters_116.sas7bdat |
| d_parameters_65.sas7bdat | d_parameters_117.sas7bdat |
| d_parameters_66.sas7bdat | d_parameters_118.sas7bdat |
| d_parameters_67.sas7bdat | d_parameters_119.sas7bdat |
| d_parameters_68.sas7bdat | d_parameters_12.sas7bdat |
| d_parameters_69.sas7bdat | d_parameters_120.sas7bdat |
| d_parameters_7.sas7bdat | d_parameters_121.sas7bdat |
| d_parameters_70.sas7bdat | d_parameters_122.sas7bdat |
| d_parameters_71.sas7bdat | d_parameters_123.sas7bdat |
| d_parameters_72.sas7bdat | d_parameters_124.sas7bdat |
| d_parameters_73.sas7bdat | d_parameters_125.sas7bdat |
| d_parameters_74.sas7bdat | d_parameters_126.sas7bdat |
| d_parameters_75.sas7bdat | d_parameters_127.sas7bdat |
| d_parameters_76.sas7bdat | d_parameters_128.sas7bdat |
| d_parameters_77.sas7bdat | d_parameters_129.sas7bdat |
| d_parameters_78.sas7bdat | d_parameters_13.sas7bdat |
| d_parameters_79.sas7bdat | d_parameters_130.sas7bdat |
| d_parameters_8.sas7bdat | d_parameters_131.sas7bdat |
| d_parameters_80.sas7bdat | d_parameters_132.sas7bdat |
| d_parameters_81.sas7bdat | d_parameters_133.sas7bdat |
| d_parameters_82.sas7bdat | d_parameters_134.sas7bdat |
| d_parameters_83.sas7bdat | d_parameters_135.sas7bdat |
| d_parameters_84.sas7bdat | d_parameters_136.sas7bdat |
| d_parameters_85.sas7bdat | d_parameters_137.sas7bdat |
| d_parameters_86.sas7bdat | d_parameters_138.sas7bdat |
| d_parameters_87.sas7bdat | d_parameters_139.sas7bdat |
| d_parameters_88.sas7bdat | d_parameters_14.sas7bdat |
| d_parameters_89.sas7bdat | d_parameters_140.sas7bdat |
| d_parameters_9.sas7bdat | d_parameters_141.sas7bdat |
| d_parameters_90.sas7bdat | d_parameters_142.sas7bdat |
| d_parameters_91.sas7bdat | d_parameters_143.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

d_parameters_144.sas7bdat          d_parameters_197.sas7bdat
d_parameters_145.sas7bdat          d_parameters_198.sas7bdat
d_parameters_146.sas7bdat          d_parameters_199.sas7bdat
d_parameters_147.sas7bdat          d_parameters_2.sas7bdat
d_parameters_148.sas7bdat          d_parameters_20.sas7bdat
d_parameters_149.sas7bdat          d_parameters_200.sas7bdat
d_parameters_15.sas7bdat           d_parameters_201.sas7bdat
d_parameters_150.sas7bdat          d_parameters_202.sas7bdat
d_parameters_151.sas7bdat          d_parameters_203.sas7bdat
d_parameters_152.sas7bdat          d_parameters_204.sas7bdat
d_parameters_153.sas7bdat          d_parameters_205.sas7bdat
d_parameters_154.sas7bdat          d_parameters_206.sas7bdat
d_parameters_155.sas7bdat          d_parameters_207.sas7bdat
d_parameters_156.sas7bdat          d_parameters_208.sas7bdat
d_parameters_157.sas7bdat          d_parameters_209.sas7bdat
d_parameters_158.sas7bdat          d_parameters_21.sas7bdat
d_parameters_159.sas7bdat          d_parameters_210.sas7bdat
d_parameters_16.sas7bdat           d_parameters_211.sas7bdat
d_parameters_160.sas7bdat          d_parameters_212.sas7bdat
d_parameters_161.sas7bdat          d_parameters_213.sas7bdat
d_parameters_162.sas7bdat          d_parameters_214.sas7bdat
d_parameters_163.sas7bdat          d_parameters_215.sas7bdat
d_parameters_164.sas7bdat          d_parameters_216.sas7bdat
d_parameters_165.sas7bdat          d_parameters_217.sas7bdat
d_parameters_166.sas7bdat          d_parameters_218.sas7bdat
d_parameters_167.sas7bdat          d_parameters_219.sas7bdat
d_parameters_168.sas7bdat          d_parameters_22.sas7bdat
d_parameters_169.sas7bdat          d_parameters_220.sas7bdat
d_parameters_17.sas7bdat           d_parameters_221.sas7bdat
d_parameters_170.sas7bdat          d_parameters_222.sas7bdat
d_parameters_171.sas7bdat          d_parameters_223.sas7bdat
d_parameters_172.sas7bdat          d_parameters_224.sas7bdat
d_parameters_173.sas7bdat          d_parameters_225.sas7bdat
d_parameters_174.sas7bdat          d_parameters_226.sas7bdat
d_parameters_175.sas7bdat          d_parameters_227.sas7bdat
d_parameters_176.sas7bdat          d_parameters_228.sas7bdat
d_parameters_177.sas7bdat          d_parameters_229.sas7bdat
d_parameters_178.sas7bdat          d_parameters_23.sas7bdat
d_parameters_179.sas7bdat          d_parameters_230.sas7bdat
d_parameters_18.sas7bdat           d_parameters_231.sas7bdat
d_parameters_180.sas7bdat          d_parameters_232.sas7bdat
d_parameters_181.sas7bdat          d_parameters_233.sas7bdat
d_parameters_182.sas7bdat          d_parameters_234.sas7bdat
d_parameters_183.sas7bdat          d_parameters_235.sas7bdat
d_parameters_184.sas7bdat          d_parameters_236.sas7bdat
d_parameters_185.sas7bdat          d_parameters_237.sas7bdat
d_parameters_186.sas7bdat          d_parameters_238.sas7bdat
d_parameters_187.sas7bdat          d_parameters_239.sas7bdat
d_parameters_188.sas7bdat          d_parameters_24.sas7bdat
d_parameters_189.sas7bdat          d_parameters_240.sas7bdat
d_parameters_19.sas7bdat           d_parameters_241.sas7bdat
d_parameters_190.sas7bdat          d_parameters_242.sas7bdat
d_parameters_191.sas7bdat          d_parameters_243.sas7bdat
d_parameters_192.sas7bdat          d_parameters_244.sas7bdat
d_parameters_193.sas7bdat          d_parameters_245.sas7bdat
d_parameters_194.sas7bdat          d_parameters_246.sas7bdat
d_parameters_195.sas7bdat          d_parameters_247.sas7bdat
d_parameters_196.sas7bdat          d_parameters_248.sas7bdat

Expert Report of Professor James R. Kearl

March 21, 2012                                                                    Charles River Associates

| | |
|---|---|
| d_parameters_249.sas7bdat | d_parameters_300.sas7bdat |
| d_parameters_25.sas7bdat | d_parameters_31.sas7bdat |
| d_parameters_250.sas7bdat | d_parameters_32.sas7bdat |
| d_parameters_251.sas7bdat | d_parameters_33.sas7bdat |
| d_parameters_252.sas7bdat | d_parameters_34.sas7bdat |
| d_parameters_253.sas7bdat | d_parameters_35.sas7bdat |
| d_parameters_254.sas7bdat | d_parameters_36.sas7bdat |
| d_parameters_255.sas7bdat | d_parameters_37.sas7bdat |
| d_parameters_256.sas7bdat | d_parameters_38.sas7bdat |
| d_parameters_257.sas7bdat | d_parameters_39.sas7bdat |
| d_parameters_258.sas7bdat | d_parameters_4.sas7bdat |
| d_parameters_259.sas7bdat | d_parameters_40.sas7bdat |
| d_parameters_26.sas7bdat | d_parameters_41.sas7bdat |
| d_parameters_260.sas7bdat | d_parameters_42.sas7bdat |
| d_parameters_261.sas7bdat | d_parameters_43.sas7bdat |
| d_parameters_262.sas7bdat | d_parameters_44.sas7bdat |
| d_parameters_263.sas7bdat | d_parameters_45.sas7bdat |
| d_parameters_264.sas7bdat | d_parameters_46.sas7bdat |
| d_parameters_265.sas7bdat | d_parameters_47.sas7bdat |
| d_parameters_266.sas7bdat | d_parameters_48.sas7bdat |
| d_parameters_267.sas7bdat | d_parameters_49.sas7bdat |
| d_parameters_268.sas7bdat | d_parameters_5.sas7bdat |
| d_parameters_269.sas7bdat | d_parameters_50.sas7bdat |
| d_parameters_27.sas7bdat | d_parameters_51.sas7bdat |
| d_parameters_270.sas7bdat | d_parameters_52.sas7bdat |
| d_parameters_271.sas7bdat | d_parameters_53.sas7bdat |
| d_parameters_272.sas7bdat | d_parameters_54.sas7bdat |
| d_parameters_273.sas7bdat | d_parameters_55.sas7bdat |
| d_parameters_274.sas7bdat | d_parameters_56.sas7bdat |
| d_parameters_275.sas7bdat | d_parameters_57.sas7bdat |
| d_parameters_276.sas7bdat | d_parameters_58.sas7bdat |
| d_parameters_277.sas7bdat | d_parameters_59.sas7bdat |
| d_parameters_278.sas7bdat | d_parameters_6.sas7bdat |
| d_parameters_279.sas7bdat | d_parameters_60.sas7bdat |
| d_parameters_28.sas7bdat | d_parameters_61.sas7bdat |
| d_parameters_280.sas7bdat | d_parameters_62.sas7bdat |
| d_parameters_281.sas7bdat | d_parameters_63.sas7bdat |
| d_parameters_282.sas7bdat | d_parameters_64.sas7bdat |
| d_parameters_283.sas7bdat | d_parameters_65.sas7bdat |
| d_parameters_284.sas7bdat | d_parameters_66.sas7bdat |
| d_parameters_285.sas7bdat | d_parameters_67.sas7bdat |
| d_parameters_286.sas7bdat | d_parameters_68.sas7bdat |
| d_parameters_287.sas7bdat | d_parameters_69.sas7bdat |
| d_parameters_288.sas7bdat | d_parameters_7.sas7bdat |
| d_parameters_289.sas7bdat | d_parameters_70.sas7bdat |
| d_parameters_29.sas7bdat | d_parameters_71.sas7bdat |
| d_parameters_290.sas7bdat | d_parameters_72.sas7bdat |
| d_parameters_291.sas7bdat | d_parameters_73.sas7bdat |
| d_parameters_292.sas7bdat | d_parameters_74.sas7bdat |
| d_parameters_293.sas7bdat | d_parameters_75.sas7bdat |
| d_parameters_294.sas7bdat | d_parameters_76.sas7bdat |
| d_parameters_295.sas7bdat | d_parameters_77.sas7bdat |
| d_parameters_296.sas7bdat | d_parameters_78.sas7bdat |
| d_parameters_297.sas7bdat | d_parameters_79.sas7bdat |
| d_parameters_298.sas7bdat | d_parameters_8.sas7bdat |
| d_parameters_299.sas7bdat | d_parameters_80.sas7bdat |
| d_parameters_3.sas7bdat | d_parameters_81.sas7bdat |
| d_parameters_30.sas7bdat | d_parameters_82.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                                 Charles River Associates

d_parameters_83.sas7bdat
d_parameters_84.sas7bdat
d_parameters_85.sas7bdat
d_parameters_86.sas7bdat
d_parameters_87.sas7bdat
d_parameters_88.sas7bdat
d_parameters_89.sas7bdat
d_parameters_9.sas7bdat
d_parameters_90.sas7bdat
d_parameters_91.sas7bdat
d_parameters_92.sas7bdat
d_parameters_93.sas7bdat
d_parameters_94.sas7bdat
d_parameters_95.sas7bdat
d_parameters_96.sas7bdat
d_parameters_97.sas7bdat
d_parameters_98.sas7bdat
d_parameters_99.sas7bdat
d_parameters_1.sas7bdat
d_parameters_10.sas7bdat
d_parameters_100.sas7bdat
d_parameters_101.sas7bdat
d_parameters_102.sas7bdat
d_parameters_103.sas7bdat
d_parameters_104.sas7bdat
d_parameters_105.sas7bdat
d_parameters_106.sas7bdat
d_parameters_107.sas7bdat
d_parameters_108.sas7bdat
d_parameters_109.sas7bdat
d_parameters_11.sas7bdat
d_parameters_110.sas7bdat
d_parameters_111.sas7bdat
d_parameters_112.sas7bdat
d_parameters_113.sas7bdat
d_parameters_114.sas7bdat
d_parameters_115.sas7bdat
d_parameters_116.sas7bdat
d_parameters_117.sas7bdat
d_parameters_118.sas7bdat
d_parameters_119.sas7bdat
d_parameters_12.sas7bdat
d_parameters_120.sas7bdat
d_parameters_121.sas7bdat
d_parameters_122.sas7bdat
d_parameters_123.sas7bdat
d_parameters_124.sas7bdat
d_parameters_125.sas7bdat
d_parameters_126.sas7bdat
d_parameters_127.sas7bdat
d_parameters_128.sas7bdat
d_parameters_129.sas7bdat
d_parameters_13.sas7bdat
d_parameters_130.sas7bdat
d_parameters_131.sas7bdat
d_parameters_132.sas7bdat
d_parameters_133.sas7bdat
d_parameters_134.sas7bdat

d_parameters_135.sas7bdat
d_parameters_136.sas7bdat
d_parameters_137.sas7bdat
d_parameters_138.sas7bdat
d_parameters_139.sas7bdat
d_parameters_14.sas7bdat
d_parameters_140.sas7bdat
d_parameters_141.sas7bdat
d_parameters_142.sas7bdat
d_parameters_143.sas7bdat
d_parameters_144.sas7bdat
d_parameters_145.sas7bdat
d_parameters_146.sas7bdat
d_parameters_147.sas7bdat
d_parameters_148.sas7bdat
d_parameters_149.sas7bdat
d_parameters_15.sas7bdat
d_parameters_150.sas7bdat
d_parameters_151.sas7bdat
d_parameters_152.sas7bdat
d_parameters_153.sas7bdat
d_parameters_154.sas7bdat
d_parameters_155.sas7bdat
d_parameters_156.sas7bdat
d_parameters_157.sas7bdat
d_parameters_158.sas7bdat
d_parameters_159.sas7bdat
d_parameters_16.sas7bdat
d_parameters_160.sas7bdat
d_parameters_161.sas7bdat
d_parameters_162.sas7bdat
d_parameters_163.sas7bdat
d_parameters_164.sas7bdat
d_parameters_165.sas7bdat
d_parameters_166.sas7bdat
d_parameters_167.sas7bdat
d_parameters_168.sas7bdat
d_parameters_169.sas7bdat
d_parameters_17.sas7bdat
d_parameters_170.sas7bdat
d_parameters_171.sas7bdat
d_parameters_172.sas7bdat
d_parameters_173.sas7bdat
d_parameters_174.sas7bdat
d_parameters_175.sas7bdat
d_parameters_176.sas7bdat
d_parameters_177.sas7bdat
d_parameters_178.sas7bdat
d_parameters_179.sas7bdat
d_parameters_18.sas7bdat
d_parameters_180.sas7bdat
d_parameters_181.sas7bdat
d_parameters_182.sas7bdat
d_parameters_183.sas7bdat
d_parameters_184.sas7bdat
d_parameters_185.sas7bdat
d_parameters_186.sas7bdat
d_parameters_187.sas7bdat

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

d_parameters_188.sas7bdat
d_parameters_189.sas7bdat
d_parameters_19.sas7bdat
d_parameters_190.sas7bdat
d_parameters_191.sas7bdat
d_parameters_192.sas7bdat
d_parameters_193.sas7bdat
d_parameters_194.sas7bdat
d_parameters_195.sas7bdat
d_parameters_196.sas7bdat
d_parameters_197.sas7bdat
d_parameters_198.sas7bdat
d_parameters_199.sas7bdat
d_parameters_2.sas7bdat
d_parameters_20.sas7bdat
d_parameters_200.sas7bdat
d_parameters_201.sas7bdat
d_parameters_202.sas7bdat
d_parameters_203.sas7bdat
d_parameters_204.sas7bdat
d_parameters_205.sas7bdat
d_parameters_206.sas7bdat
d_parameters_207.sas7bdat
d_parameters_208.sas7bdat
d_parameters_209.sas7bdat
d_parameters_21.sas7bdat
d_parameters_210.sas7bdat
d_parameters_211.sas7bdat
d_parameters_212.sas7bdat
d_parameters_213.sas7bdat
d_parameters_214.sas7bdat
d_parameters_215.sas7bdat
d_parameters_216.sas7bdat
d_parameters_217.sas7bdat
d_parameters_218.sas7bdat
d_parameters_219.sas7bdat
d_parameters_22.sas7bdat
d_parameters_220.sas7bdat
d_parameters_221.sas7bdat
d_parameters_222.sas7bdat
d_parameters_223.sas7bdat
d_parameters_224.sas7bdat
d_parameters_225.sas7bdat
d_parameters_226.sas7bdat
d_parameters_227.sas7bdat
d_parameters_228.sas7bdat
d_parameters_229.sas7bdat
d_parameters_23.sas7bdat
d_parameters_230.sas7bdat
d_parameters_231.sas7bdat
d_parameters_232.sas7bdat
d_parameters_233.sas7bdat
d_parameters_234.sas7bdat
d_parameters_235.sas7bdat
d_parameters_236.sas7bdat
d_parameters_237.sas7bdat
d_parameters_238.sas7bdat
d_parameters_239.sas7bdat

d_parameters_24.sas7bdat
d_parameters_240.sas7bdat
d_parameters_241.sas7bdat
d_parameters_242.sas7bdat
d_parameters_243.sas7bdat
d_parameters_244.sas7bdat
d_parameters_245.sas7bdat
d_parameters_246.sas7bdat
d_parameters_247.sas7bdat
d_parameters_248.sas7bdat
d_parameters_249.sas7bdat
d_parameters_25.sas7bdat
d_parameters_250.sas7bdat
d_parameters_251.sas7bdat
d_parameters_252.sas7bdat
d_parameters_253.sas7bdat
d_parameters_254.sas7bdat
d_parameters_255.sas7bdat
d_parameters_256.sas7bdat
d_parameters_257.sas7bdat
d_parameters_258.sas7bdat
d_parameters_259.sas7bdat
d_parameters_26.sas7bdat
d_parameters_260.sas7bdat
d_parameters_261.sas7bdat
d_parameters_262.sas7bdat
d_parameters_263.sas7bdat
d_parameters_264.sas7bdat
d_parameters_265.sas7bdat
d_parameters_266.sas7bdat
d_parameters_267.sas7bdat
d_parameters_268.sas7bdat
d_parameters_269.sas7bdat
d_parameters_27.sas7bdat
d_parameters_270.sas7bdat
d_parameters_271.sas7bdat
d_parameters_272.sas7bdat
d_parameters_273.sas7bdat
d_parameters_274.sas7bdat
d_parameters_275.sas7bdat
d_parameters_276.sas7bdat
d_parameters_277.sas7bdat
d_parameters_278.sas7bdat
d_parameters_279.sas7bdat
d_parameters_28.sas7bdat
d_parameters_280.sas7bdat
d_parameters_281.sas7bdat
d_parameters_282.sas7bdat
d_parameters_283.sas7bdat
d_parameters_284.sas7bdat
d_parameters_285.sas7bdat
d_parameters_286.sas7bdat
d_parameters_287.sas7bdat
d_parameters_288.sas7bdat
d_parameters_289.sas7bdat
d_parameters_29.sas7bdat
d_parameters_290.sas7bdat
d_parameters_291.sas7bdat

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| d_parameters_292.sas7bdat | d_parameters_74.sas7bdat |
| d_parameters_293.sas7bdat | d_parameters_75.sas7bdat |
| d_parameters_294.sas7bdat | d_parameters_76.sas7bdat |
| d_parameters_295.sas7bdat | d_parameters_77.sas7bdat |
| d_parameters_296.sas7bdat | d_parameters_78.sas7bdat |
| d_parameters_297.sas7bdat | d_parameters_79.sas7bdat |
| d_parameters_298.sas7bdat | d_parameters_8.sas7bdat |
| d_parameters_299.sas7bdat | d_parameters_80.sas7bdat |
| d_parameters_3.sas7bdat | d_parameters_81.sas7bdat |
| d_parameters_30.sas7bdat | d_parameters_82.sas7bdat |
| d_parameters_300.sas7bdat | d_parameters_83.sas7bdat |
| d_parameters_31.sas7bdat | d_parameters_84.sas7bdat |
| d_parameters_32.sas7bdat | d_parameters_85.sas7bdat |
| d_parameters_33.sas7bdat | d_parameters_86.sas7bdat |
| d_parameters_34.sas7bdat | d_parameters_87.sas7bdat |
| d_parameters_35.sas7bdat | d_parameters_88.sas7bdat |
| d_parameters_36.sas7bdat | d_parameters_89.sas7bdat |
| d_parameters_37.sas7bdat | d_parameters_9.sas7bdat |
| d_parameters_38.sas7bdat | d_parameters_90.sas7bdat |
| d_parameters_39.sas7bdat | d_parameters_91.sas7bdat |
| d_parameters_4.sas7bdat | d_parameters_92.sas7bdat |
| d_parameters_40.sas7bdat | d_parameters_93.sas7bdat |
| d_parameters_41.sas7bdat | d_parameters_94.sas7bdat |
| d_parameters_42.sas7bdat | d_parameters_95.sas7bdat |
| d_parameters_43.sas7bdat | d_parameters_96.sas7bdat |
| d_parameters_44.sas7bdat | d_parameters_97.sas7bdat |
| d_parameters_45.sas7bdat | d_parameters_98.sas7bdat |
| d_parameters_46.sas7bdat | d_parameters_99.sas7bdat |
| d_parameters_47.sas7bdat | d_parameters_1.sas7bdat |
| d_parameters_48.sas7bdat | d_parameters_10.sas7bdat |
| d_parameters_49.sas7bdat | d_parameters_100.sas7bdat |
| d_parameters_5.sas7bdat | d_parameters_101.sas7bdat |
| d_parameters_50.sas7bdat | d_parameters_102.sas7bdat |
| d_parameters_51.sas7bdat | d_parameters_103.sas7bdat |
| d_parameters_52.sas7bdat | d_parameters_104.sas7bdat |
| d_parameters_53.sas7bdat | d_parameters_105.sas7bdat |
| d_parameters_54.sas7bdat | d_parameters_106.sas7bdat |
| d_parameters_55.sas7bdat | d_parameters_107.sas7bdat |
| d_parameters_56.sas7bdat | d_parameters_108.sas7bdat |
| d_parameters_57.sas7bdat | d_parameters_109.sas7bdat |
| d_parameters_58.sas7bdat | d_parameters_11.sas7bdat |
| d_parameters_59.sas7bdat | d_parameters_110.sas7bdat |
| d_parameters_6.sas7bdat | d_parameters_111.sas7bdat |
| d_parameters_60.sas7bdat | d_parameters_112.sas7bdat |
| d_parameters_61.sas7bdat | d_parameters_113.sas7bdat |
| d_parameters_62.sas7bdat | d_parameters_114.sas7bdat |
| d_parameters_63.sas7bdat | d_parameters_115.sas7bdat |
| d_parameters_64.sas7bdat | d_parameters_116.sas7bdat |
| d_parameters_65.sas7bdat | d_parameters_117.sas7bdat |
| d_parameters_66.sas7bdat | d_parameters_118.sas7bdat |
| d_parameters_67.sas7bdat | d_parameters_119.sas7bdat |
| d_parameters_68.sas7bdat | d_parameters_12.sas7bdat |
| d_parameters_69.sas7bdat | d_parameters_120.sas7bdat |
| d_parameters_7.sas7bdat | d_parameters_121.sas7bdat |
| d_parameters_70.sas7bdat | d_parameters_122.sas7bdat |
| d_parameters_71.sas7bdat | d_parameters_123.sas7bdat |
| d_parameters_72.sas7bdat | d_parameters_124.sas7bdat |
| d_parameters_73.sas7bdat | d_parameters_125.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| d_parameters_126.sas7bdat | d_parameters_179.sas7bdat |
| d_parameters_127.sas7bdat | d_parameters_18.sas7bdat |
| d_parameters_128.sas7bdat | d_parameters_180.sas7bdat |
| d_parameters_129.sas7bdat | d_parameters_181.sas7bdat |
| d_parameters_13.sas7bdat | d_parameters_182.sas7bdat |
| d_parameters_130.sas7bdat | d_parameters_183.sas7bdat |
| d_parameters_131.sas7bdat | d_parameters_184.sas7bdat |
| d_parameters_132.sas7bdat | d_parameters_185.sas7bdat |
| d_parameters_133.sas7bdat | d_parameters_186.sas7bdat |
| d_parameters_134.sas7bdat | d_parameters_187.sas7bdat |
| d_parameters_135.sas7bdat | d_parameters_188.sas7bdat |
| d_parameters_136.sas7bdat | d_parameters_189.sas7bdat |
| d_parameters_137.sas7bdat | d_parameters_19.sas7bdat |
| d_parameters_138.sas7bdat | d_parameters_190.sas7bdat |
| d_parameters_139.sas7bdat | d_parameters_191.sas7bdat |
| d_parameters_14.sas7bdat | d_parameters_192.sas7bdat |
| d_parameters_140.sas7bdat | d_parameters_193.sas7bdat |
| d_parameters_141.sas7bdat | d_parameters_194.sas7bdat |
| d_parameters_142.sas7bdat | d_parameters_2.sas7bdat |
| d_parameters_143.sas7bdat | d_parameters_20.sas7bdat |
| d_parameters_144.sas7bdat | d_parameters_21.sas7bdat |
| d_parameters_145.sas7bdat | d_parameters_22.sas7bdat |
| d_parameters_146.sas7bdat | d_parameters_23.sas7bdat |
| d_parameters_147.sas7bdat | d_parameters_24.sas7bdat |
| d_parameters_148.sas7bdat | d_parameters_25.sas7bdat |
| d_parameters_149.sas7bdat | d_parameters_26.sas7bdat |
| d_parameters_15.sas7bdat | d_parameters_27.sas7bdat |
| d_parameters_150.sas7bdat | d_parameters_28.sas7bdat |
| d_parameters_151.sas7bdat | d_parameters_29.sas7bdat |
| d_parameters_152.sas7bdat | d_parameters_3.sas7bdat |
| d_parameters_153.sas7bdat | d_parameters_30.sas7bdat |
| d_parameters_154.sas7bdat | d_parameters_31.sas7bdat |
| d_parameters_155.sas7bdat | d_parameters_32.sas7bdat |
| d_parameters_156.sas7bdat | d_parameters_33.sas7bdat |
| d_parameters_157.sas7bdat | d_parameters_34.sas7bdat |
| d_parameters_158.sas7bdat | d_parameters_35.sas7bdat |
| d_parameters_159.sas7bdat | d_parameters_36.sas7bdat |
| d_parameters_16.sas7bdat | d_parameters_37.sas7bdat |
| d_parameters_160.sas7bdat | d_parameters_38.sas7bdat |
| d_parameters_161.sas7bdat | d_parameters_39.sas7bdat |
| d_parameters_162.sas7bdat | d_parameters_4.sas7bdat |
| d_parameters_163.sas7bdat | d_parameters_40.sas7bdat |
| d_parameters_164.sas7bdat | d_parameters_41.sas7bdat |
| d_parameters_165.sas7bdat | d_parameters_42.sas7bdat |
| d_parameters_166.sas7bdat | d_parameters_43.sas7bdat |
| d_parameters_167.sas7bdat | d_parameters_44.sas7bdat |
| d_parameters_168.sas7bdat | d_parameters_45.sas7bdat |
| d_parameters_169.sas7bdat | d_parameters_46.sas7bdat |
| d_parameters_17.sas7bdat | d_parameters_47.sas7bdat |
| d_parameters_170.sas7bdat | d_parameters_48.sas7bdat |
| d_parameters_171.sas7bdat | d_parameters_49.sas7bdat |
| d_parameters_172.sas7bdat | d_parameters_5.sas7bdat |
| d_parameters_173.sas7bdat | d_parameters_50.sas7bdat |
| d_parameters_174.sas7bdat | d_parameters_51.sas7bdat |
| d_parameters_175.sas7bdat | d_parameters_52.sas7bdat |
| d_parameters_176.sas7bdat | d_parameters_53.sas7bdat |
| d_parameters_177.sas7bdat | d_parameters_54.sas7bdat |
| d_parameters_178.sas7bdat | d_parameters_55.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                         Charles River Associates

| | |
|---|---|
| d_parameters_56.sas7bdat | d_parameters_102.sas7bdat |
| d_parameters_57.sas7bdat | d_parameters_103.sas7bdat |
| d_parameters_58.sas7bdat | d_parameters_104.sas7bdat |
| d_parameters_59.sas7bdat | d_parameters_105.sas7bdat |
| d_parameters_6.sas7bdat | d_parameters_106.sas7bdat |
| d_parameters_60.sas7bdat | d_parameters_107.sas7bdat |
| d_parameters_61.sas7bdat | d_parameters_108.sas7bdat |
| d_parameters_62.sas7bdat | d_parameters_109.sas7bdat |
| d_parameters_63.sas7bdat | d_parameters_11.sas7bdat |
| d_parameters_64.sas7bdat | d_parameters_110.sas7bdat |
| d_parameters_65.sas7bdat | d_parameters_111.sas7bdat |
| d_parameters_66.sas7bdat | d_parameters_112.sas7bdat |
| d_parameters_67.sas7bdat | d_parameters_113.sas7bdat |
| d_parameters_68.sas7bdat | d_parameters_114.sas7bdat |
| d_parameters_69.sas7bdat | d_parameters_115.sas7bdat |
| d_parameters_7.sas7bdat | d_parameters_116.sas7bdat |
| d_parameters_70.sas7bdat | d_parameters_117.sas7bdat |
| d_parameters_71.sas7bdat | d_parameters_118.sas7bdat |
| d_parameters_72.sas7bdat | d_parameters_119.sas7bdat |
| d_parameters_73.sas7bdat | d_parameters_12.sas7bdat |
| d_parameters_74.sas7bdat | d_parameters_120.sas7bdat |
| d_parameters_75.sas7bdat | d_parameters_121.sas7bdat |
| d_parameters_76.sas7bdat | d_parameters_122.sas7bdat |
| d_parameters_77.sas7bdat | d_parameters_123.sas7bdat |
| d_parameters_78.sas7bdat | d_parameters_124.sas7bdat |
| d_parameters_79.sas7bdat | d_parameters_125.sas7bdat |
| d_parameters_8.sas7bdat | d_parameters_126.sas7bdat |
| d_parameters_80.sas7bdat | d_parameters_127.sas7bdat |
| d_parameters_81.sas7bdat | d_parameters_128.sas7bdat |
| d_parameters_82.sas7bdat | d_parameters_129.sas7bdat |
| d_parameters_83.sas7bdat | d_parameters_13.sas7bdat |
| d_parameters_84.sas7bdat | d_parameters_130.sas7bdat |
| d_parameters_85.sas7bdat | d_parameters_131.sas7bdat |
| d_parameters_86.sas7bdat | d_parameters_132.sas7bdat |
| d_parameters_87.sas7bdat | d_parameters_133.sas7bdat |
| d_parameters_88.sas7bdat | d_parameters_134.sas7bdat |
| d_parameters_89.sas7bdat | d_parameters_135.sas7bdat |
| d_parameters_9.sas7bdat | d_parameters_136.sas7bdat |
| d_parameters_90.sas7bdat | d_parameters_137.sas7bdat |
| d_parameters_91.sas7bdat | d_parameters_138.sas7bdat |
| d_parameters_92.sas7bdat | d_parameters_139.sas7bdat |
| d_parameters_93.sas7bdat | d_parameters_14.sas7bdat |
| d_parameters_94.sas7bdat | d_parameters_140.sas7bdat |
| d_parameters_95.sas7bdat | d_parameters_141.sas7bdat |
| d_parameters_96.sas7bdat | d_parameters_142.sas7bdat |
| d_parameters_97.sas7bdat | d_parameters_143.sas7bdat |
| d_parameters_98.sas7bdat | d_parameters_144.sas7bdat |
| d_parameters_99.sas7bdat | d_parameters_145.sas7bdat |
| 0.01 Identify Resellers.sas | d_parameters_146.sas7bdat |
| 0.51RS Set-up Estimation.sas | d_parameters_147.sas7bdat |
| 0.61RS Demand.sas | d_parameters_148.sas7bdat |
| 0.7RS Parameter Estimates.sas | d_parameters_149.sas7bdat |
| Reseller Model.xlsx | d_parameters_15.sas7bdat |
| regdemandrsl.sas7bdat | d_parameters_150.sas7bdat |
| d_parameters_1.sas7bdat | d_parameters_151.sas7bdat |
| d_parameters_10.sas7bdat | d_parameters_152.sas7bdat |
| d_parameters_100.sas7bdat | d_parameters_153.sas7bdat |
| d_parameters_101.sas7bdat | d_parameters_154.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

d_parameters_155.sas7bdat          d_parameters_207.sas7bdat
d_parameters_156.sas7bdat          d_parameters_208.sas7bdat
d_parameters_157.sas7bdat          d_parameters_209.sas7bdat
d_parameters_158.sas7bdat          d_parameters_21.sas7bdat
d_parameters_159.sas7bdat          d_parameters_210.sas7bdat
d_parameters_16.sas7bdat           d_parameters_211.sas7bdat
d_parameters_160.sas7bdat          d_parameters_212.sas7bdat
d_parameters_161.sas7bdat          d_parameters_213.sas7bdat
d_parameters_162.sas7bdat          d_parameters_214.sas7bdat
d_parameters_163.sas7bdat          d_parameters_215.sas7bdat
d_parameters_164.sas7bdat          d_parameters_216.sas7bdat
d_parameters_165.sas7bdat          d_parameters_217.sas7bdat
d_parameters_166.sas7bdat          d_parameters_218.sas7bdat
d_parameters_167.sas7bdat          d_parameters_219.sas7bdat
d_parameters_168.sas7bdat          d_parameters_22.sas7bdat
d_parameters_169.sas7bdat          d_parameters_220.sas7bdat
d_parameters_17.sas7bdat           d_parameters_221.sas7bdat
d_parameters_170.sas7bdat          d_parameters_222.sas7bdat
d_parameters_171.sas7bdat          d_parameters_223.sas7bdat
d_parameters_172.sas7bdat          d_parameters_224.sas7bdat
d_parameters_173.sas7bdat          d_parameters_225.sas7bdat
d_parameters_174.sas7bdat          d_parameters_226.sas7bdat
d_parameters_175.sas7bdat          d_parameters_227.sas7bdat
d_parameters_176.sas7bdat          d_parameters_228.sas7bdat
d_parameters_177.sas7bdat          d_parameters_229.sas7bdat
d_parameters_178.sas7bdat          d_parameters_23.sas7bdat
d_parameters_179.sas7bdat          d_parameters_230.sas7bdat
d_parameters_18.sas7bdat           d_parameters_231.sas7bdat
d_parameters_180.sas7bdat          d_parameters_232.sas7bdat
d_parameters_181.sas7bdat          d_parameters_233.sas7bdat
d_parameters_182.sas7bdat          d_parameters_234.sas7bdat
d_parameters_183.sas7bdat          d_parameters_235.sas7bdat
d_parameters_184.sas7bdat          d_parameters_236.sas7bdat
d_parameters_185.sas7bdat          d_parameters_237.sas7bdat
d_parameters_186.sas7bdat          d_parameters_238.sas7bdat
d_parameters_187.sas7bdat          d_parameters_239.sas7bdat
d_parameters_188.sas7bdat          d_parameters_24.sas7bdat
d_parameters_189.sas7bdat          d_parameters_240.sas7bdat
d_parameters_19.sas7bdat           d_parameters_241.sas7bdat
d_parameters_190.sas7bdat          d_parameters_242.sas7bdat
d_parameters_191.sas7bdat          d_parameters_243.sas7bdat
d_parameters_192.sas7bdat          d_parameters_244.sas7bdat
d_parameters_193.sas7bdat          d_parameters_245.sas7bdat
d_parameters_194.sas7bdat          d_parameters_246.sas7bdat
d_parameters_195.sas7bdat          d_parameters_247.sas7bdat
d_parameters_196.sas7bdat          d_parameters_248.sas7bdat
d_parameters_197.sas7bdat          d_parameters_249.sas7bdat
d_parameters_198.sas7bdat          d_parameters_25.sas7bdat
d_parameters_199.sas7bdat          d_parameters_250.sas7bdat
d_parameters_2.sas7bdat            d_parameters_251.sas7bdat
d_parameters_20.sas7bdat           d_parameters_252.sas7bdat
d_parameters_200.sas7bdat          d_parameters_253.sas7bdat
d_parameters_201.sas7bdat          d_parameters_254.sas7bdat
d_parameters_202.sas7bdat          d_parameters_255.sas7bdat
d_parameters_203.sas7bdat          d_parameters_256.sas7bdat
d_parameters_204.sas7bdat          d_parameters_257.sas7bdat
d_parameters_205.sas7bdat          d_parameters_258.sas7bdat
d_parameters_206.sas7bdat          d_parameters_259.sas7bdat

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

d_parameters_26.sas7bdat          d_parameters_41.sas7bdat
d_parameters_260.sas7bdat         d_parameters_42.sas7bdat
d_parameters_261.sas7bdat         d_parameters_43.sas7bdat
d_parameters_262.sas7bdat         d_parameters_44.sas7bdat
d_parameters_263.sas7bdat         d_parameters_45.sas7bdat
d_parameters_264.sas7bdat         d_parameters_46.sas7bdat
d_parameters_265.sas7bdat         d_parameters_47.sas7bdat
d_parameters_266.sas7bdat         d_parameters_48.sas7bdat
d_parameters_267.sas7bdat         d_parameters_49.sas7bdat
d_parameters_268.sas7bdat         d_parameters_5.sas7bdat
d_parameters_269.sas7bdat         d_parameters_50.sas7bdat
d_parameters_27.sas7bdat          d_parameters_51.sas7bdat
d_parameters_270.sas7bdat         d_parameters_52.sas7bdat
d_parameters_271.sas7bdat         d_parameters_53.sas7bdat
d_parameters_272.sas7bdat         d_parameters_54.sas7bdat
d_parameters_273.sas7bdat         d_parameters_55.sas7bdat
d_parameters_274.sas7bdat         d_parameters_56.sas7bdat
d_parameters_275.sas7bdat         d_parameters_57.sas7bdat
d_parameters_276.sas7bdat         d_parameters_58.sas7bdat
d_parameters_277.sas7bdat         d_parameters_59.sas7bdat
d_parameters_278.sas7bdat         d_parameters_6.sas7bdat
d_parameters_279.sas7bdat         d_parameters_60.sas7bdat
d_parameters_28.sas7bdat          d_parameters_61.sas7bdat
d_parameters_280.sas7bdat         d_parameters_62.sas7bdat
d_parameters_281.sas7bdat         d_parameters_63.sas7bdat
d_parameters_282.sas7bdat         d_parameters_64.sas7bdat
d_parameters_283.sas7bdat         d_parameters_65.sas7bdat
d_parameters_284.sas7bdat         d_parameters_66.sas7bdat
d_parameters_285.sas7bdat         d_parameters_67.sas7bdat
d_parameters_286.sas7bdat         d_parameters_68.sas7bdat
d_parameters_287.sas7bdat         d_parameters_69.sas7bdat
d_parameters_288.sas7bdat         d_parameters_7.sas7bdat
d_parameters_289.sas7bdat         d_parameters_70.sas7bdat
d_parameters_29.sas7bdat          d_parameters_71.sas7bdat
d_parameters_290.sas7bdat         d_parameters_72.sas7bdat
d_parameters_291.sas7bdat         d_parameters_73.sas7bdat
d_parameters_292.sas7bdat         d_parameters_74.sas7bdat
d_parameters_293.sas7bdat         d_parameters_75.sas7bdat
d_parameters_294.sas7bdat         d_parameters_76.sas7bdat
d_parameters_295.sas7bdat         d_parameters_77.sas7bdat
d_parameters_296.sas7bdat         d_parameters_78.sas7bdat
d_parameters_297.sas7bdat         d_parameters_79.sas7bdat
d_parameters_298.sas7bdat         d_parameters_8.sas7bdat
d_parameters_299.sas7bdat         d_parameters_80.sas7bdat
d_parameters_3.sas7bdat           d_parameters_81.sas7bdat
d_parameters_30.sas7bdat          d_parameters_82.sas7bdat
d_parameters_300.sas7bdat         d_parameters_83.sas7bdat
d_parameters_31.sas7bdat          d_parameters_84.sas7bdat
d_parameters_32.sas7bdat          d_parameters_85.sas7bdat
d_parameters_33.sas7bdat          d_parameters_86.sas7bdat
d_parameters_34.sas7bdat          d_parameters_87.sas7bdat
d_parameters_35.sas7bdat          d_parameters_88.sas7bdat
d_parameters_36.sas7bdat          d_parameters_89.sas7bdat
d_parameters_37.sas7bdat          d_parameters_9.sas7bdat
d_parameters_38.sas7bdat          d_parameters_90.sas7bdat
d_parameters_39.sas7bdat          d_parameters_91.sas7bdat
d_parameters_4.sas7bdat           d_parameters_92.sas7bdat
d_parameters_40.sas7bdat          d_parameters_93.sas7bdat

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

| | |
|---|---|
| d_parameters_94.sas7bdat | d_parameters_146.sas7bdat |
| d_parameters_95.sas7bdat | d_parameters_147.sas7bdat |
| d_parameters_96.sas7bdat | d_parameters_148.sas7bdat |
| d_parameters_97.sas7bdat | d_parameters_149.sas7bdat |
| d_parameters_98.sas7bdat | d_parameters_15.sas7bdat |
| d_parameters_99.sas7bdat | d_parameters_150.sas7bdat |
| d_parameters_1.sas7bdat | d_parameters_151.sas7bdat |
| d_parameters_10.sas7bdat | d_parameters_152.sas7bdat |
| d_parameters_100.sas7bdat | d_parameters_153.sas7bdat |
| d_parameters_101.sas7bdat | d_parameters_154.sas7bdat |
| d_parameters_102.sas7bdat | d_parameters_155.sas7bdat |
| d_parameters_103.sas7bdat | d_parameters_156.sas7bdat |
| d_parameters_104.sas7bdat | d_parameters_157.sas7bdat |
| d_parameters_105.sas7bdat | d_parameters_158.sas7bdat |
| d_parameters_106.sas7bdat | d_parameters_159.sas7bdat |
| d_parameters_107.sas7bdat | d_parameters_16.sas7bdat |
| d_parameters_108.sas7bdat | d_parameters_160.sas7bdat |
| d_parameters_109.sas7bdat | d_parameters_161.sas7bdat |
| d_parameters_11.sas7bdat | d_parameters_162.sas7bdat |
| d_parameters_110.sas7bdat | d_parameters_163.sas7bdat |
| d_parameters_111.sas7bdat | d_parameters_164.sas7bdat |
| d_parameters_112.sas7bdat | d_parameters_165.sas7bdat |
| d_parameters_113.sas7bdat | d_parameters_166.sas7bdat |
| d_parameters_114.sas7bdat | d_parameters_167.sas7bdat |
| d_parameters_115.sas7bdat | d_parameters_168.sas7bdat |
| d_parameters_116.sas7bdat | d_parameters_169.sas7bdat |
| d_parameters_117.sas7bdat | d_parameters_17.sas7bdat |
| d_parameters_118.sas7bdat | d_parameters_170.sas7bdat |
| d_parameters_119.sas7bdat | d_parameters_171.sas7bdat |
| d_parameters_12.sas7bdat | d_parameters_172.sas7bdat |
| d_parameters_120.sas7bdat | d_parameters_173.sas7bdat |
| d_parameters_121.sas7bdat | d_parameters_174.sas7bdat |
| d_parameters_122.sas7bdat | d_parameters_175.sas7bdat |
| d_parameters_123.sas7bdat | d_parameters_176.sas7bdat |
| d_parameters_124.sas7bdat | d_parameters_177.sas7bdat |
| d_parameters_125.sas7bdat | d_parameters_178.sas7bdat |
| d_parameters_126.sas7bdat | d_parameters_179.sas7bdat |
| d_parameters_127.sas7bdat | d_parameters_18.sas7bdat |
| d_parameters_128.sas7bdat | d_parameters_180.sas7bdat |
| d_parameters_129.sas7bdat | d_parameters_181.sas7bdat |
| d_parameters_13.sas7bdat | d_parameters_182.sas7bdat |
| d_parameters_130.sas7bdat | d_parameters_183.sas7bdat |
| d_parameters_131.sas7bdat | d_parameters_184.sas7bdat |
| d_parameters_132.sas7bdat | d_parameters_185.sas7bdat |
| d_parameters_133.sas7bdat | d_parameters_186.sas7bdat |
| d_parameters_134.sas7bdat | d_parameters_187.sas7bdat |
| d_parameters_135.sas7bdat | d_parameters_188.sas7bdat |
| d_parameters_136.sas7bdat | d_parameters_189.sas7bdat |
| d_parameters_137.sas7bdat | d_parameters_19.sas7bdat |
| d_parameters_138.sas7bdat | d_parameters_190.sas7bdat |
| d_parameters_139.sas7bdat | d_parameters_191.sas7bdat |
| d_parameters_14.sas7bdat | d_parameters_192.sas7bdat |
| d_parameters_140.sas7bdat | d_parameters_193.sas7bdat |
| d_parameters_141.sas7bdat | d_parameters_194.sas7bdat |
| d_parameters_142.sas7bdat | d_parameters_195.sas7bdat |
| d_parameters_143.sas7bdat | d_parameters_196.sas7bdat |
| d_parameters_144.sas7bdat | d_parameters_197.sas7bdat |
| d_parameters_145.sas7bdat | d_parameters_198.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| d_parameters_199.sas7bdat | d_parameters_250.sas7bdat |
| d_parameters_2.sas7bdat | d_parameters_251.sas7bdat |
| d_parameters_20.sas7bdat | d_parameters_252.sas7bdat |
| d_parameters_200.sas7bdat | d_parameters_253.sas7bdat |
| d_parameters_201.sas7bdat | d_parameters_254.sas7bdat |
| d_parameters_202.sas7bdat | d_parameters_255.sas7bdat |
| d_parameters_203.sas7bdat | d_parameters_256.sas7bdat |
| d_parameters_204.sas7bdat | d_parameters_257.sas7bdat |
| d_parameters_205.sas7bdat | d_parameters_258.sas7bdat |
| d_parameters_206.sas7bdat | d_parameters_259.sas7bdat |
| d_parameters_207.sas7bdat | d_parameters_26.sas7bdat |
| d_parameters_208.sas7bdat | d_parameters_260.sas7bdat |
| d_parameters_209.sas7bdat | d_parameters_261.sas7bdat |
| d_parameters_21.sas7bdat | d_parameters_262.sas7bdat |
| d_parameters_210.sas7bdat | d_parameters_263.sas7bdat |
| d_parameters_211.sas7bdat | d_parameters_264.sas7bdat |
| d_parameters_212.sas7bdat | d_parameters_265.sas7bdat |
| d_parameters_213.sas7bdat | d_parameters_266.sas7bdat |
| d_parameters_214.sas7bdat | d_parameters_267.sas7bdat |
| d_parameters_215.sas7bdat | d_parameters_268.sas7bdat |
| d_parameters_216.sas7bdat | d_parameters_269.sas7bdat |
| d_parameters_217.sas7bdat | d_parameters_27.sas7bdat |
| d_parameters_218.sas7bdat | d_parameters_270.sas7bdat |
| d_parameters_219.sas7bdat | d_parameters_271.sas7bdat |
| d_parameters_22.sas7bdat | d_parameters_272.sas7bdat |
| d_parameters_220.sas7bdat | d_parameters_273.sas7bdat |
| d_parameters_221.sas7bdat | d_parameters_274.sas7bdat |
| d_parameters_222.sas7bdat | d_parameters_275.sas7bdat |
| d_parameters_223.sas7bdat | d_parameters_276.sas7bdat |
| d_parameters_224.sas7bdat | d_parameters_277.sas7bdat |
| d_parameters_225.sas7bdat | d_parameters_278.sas7bdat |
| d_parameters_226.sas7bdat | d_parameters_279.sas7bdat |
| d_parameters_227.sas7bdat | d_parameters_28.sas7bdat |
| d_parameters_228.sas7bdat | d_parameters_280.sas7bdat |
| d_parameters_229.sas7bdat | d_parameters_281.sas7bdat |
| d_parameters_23.sas7bdat | d_parameters_282.sas7bdat |
| d_parameters_230.sas7bdat | d_parameters_283.sas7bdat |
| d_parameters_231.sas7bdat | d_parameters_284.sas7bdat |
| d_parameters_232.sas7bdat | d_parameters_285.sas7bdat |
| d_parameters_233.sas7bdat | d_parameters_286.sas7bdat |
| d_parameters_234.sas7bdat | d_parameters_287.sas7bdat |
| d_parameters_235.sas7bdat | d_parameters_288.sas7bdat |
| d_parameters_236.sas7bdat | d_parameters_289.sas7bdat |
| d_parameters_237.sas7bdat | d_parameters_29.sas7bdat |
| d_parameters_238.sas7bdat | d_parameters_290.sas7bdat |
| d_parameters_239.sas7bdat | d_parameters_291.sas7bdat |
| d_parameters_24.sas7bdat | d_parameters_292.sas7bdat |
| d_parameters_240.sas7bdat | d_parameters_293.sas7bdat |
| d_parameters_241.sas7bdat | d_parameters_294.sas7bdat |
| d_parameters_242.sas7bdat | d_parameters_295.sas7bdat |
| d_parameters_243.sas7bdat | d_parameters_296.sas7bdat |
| d_parameters_244.sas7bdat | d_parameters_297.sas7bdat |
| d_parameters_245.sas7bdat | d_parameters_298.sas7bdat |
| d_parameters_246.sas7bdat | d_parameters_299.sas7bdat |
| d_parameters_247.sas7bdat | d_parameters_3.sas7bdat |
| d_parameters_248.sas7bdat | d_parameters_30.sas7bdat |
| d_parameters_249.sas7bdat | d_parameters_300.sas7bdat |
| d_parameters_25.sas7bdat | d_parameters_31.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                                    Charles River Associates

| | |
|---|---|
| d_parameters_32.sas7bdat | d_parameters_85.sas7bdat |
| d_parameters_33.sas7bdat | d_parameters_86.sas7bdat |
| d_parameters_34.sas7bdat | d_parameters_87.sas7bdat |
| d_parameters_35.sas7bdat | d_parameters_88.sas7bdat |
| d_parameters_36.sas7bdat | d_parameters_89.sas7bdat |
| d_parameters_37.sas7bdat | d_parameters_9.sas7bdat |
| d_parameters_38.sas7bdat | d_parameters_90.sas7bdat |
| d_parameters_39.sas7bdat | d_parameters_91.sas7bdat |
| d_parameters_4.sas7bdat | d_parameters_92.sas7bdat |
| d_parameters_40.sas7bdat | d_parameters_93.sas7bdat |
| d_parameters_41.sas7bdat | d_parameters_94.sas7bdat |
| d_parameters_42.sas7bdat | d_parameters_95.sas7bdat |
| d_parameters_43.sas7bdat | d_parameters_96.sas7bdat |
| d_parameters_44.sas7bdat | d_parameters_97.sas7bdat |
| d_parameters_45.sas7bdat | d_parameters_98.sas7bdat |
| d_parameters_46.sas7bdat | d_parameters_99.sas7bdat |
| d_parameters_47.sas7bdat | reg_demand.sas7bdat |
| d_parameters_48.sas7bdat | sample_source.sas7bdat |
| d_parameters_49.sas7bdat | sa_weights.sas7bdat |
| d_parameters_5.sas7bdat | Barney. A Study of Patent Mortality Rates.pdf |
| d_parameters_50.sas7bdat | Deng. Private value of European patents.pdf |
| d_parameters_51.sas7bdat | Deng. Renewal Study of European Patents.pdf |
| d_parameters_52.sas7bdat | Exhibits.xlsx |
| d_parameters_53.sas7bdat | Gambardella et al. The Value of European Patents.pdf |
| d_parameters_54.sas7bdat | |
| d_parameters_55.sas7bdat | Giummo. German employee inventors.pdf |
| d_parameters_56.sas7bdat | Gronqvist. The private value of patents.pdf |
| d_parameters_57.sas7bdat | Harhoff, Hoisl. Institutionalized incentives for ingenuity.pdf |
| d_parameters_58.sas7bdat | |
| d_parameters_59.sas7bdat | Harhoff, Scherer, Vopel. Citations, family size.pdf |
| d_parameters_6.sas7bdat | Harhoff, Scherer, Vopel. Exploring the Tail.pdf |
| d_parameters_60.sas7bdat | Lanjouw, Pakes, Putnam. How to Count Patents.pdf |
| d_parameters_61.sas7bdat | Lanjouw. Patent Protection.pdf |
| d_parameters_62.sas7bdat | Pakes. Patents as Options.pdf |
| d_parameters_63.sas7bdat | Putnam. Patent Portfolios, Apportionment, and the Adding-Up Constraint.pdf |
| d_parameters_64.sas7bdat | |
| d_parameters_65.sas7bdat | Schankerman. How Valuable is Patent Protection.pdf |
| d_parameters_66.sas7bdat | Scherer and Harhoff. Technology policy for a world.pdf |
| d_parameters_67.sas7bdat | |
| d_parameters_68.sas7bdat | Sullivan. Estimates of the Value of Patent.pdf |
| d_parameters_69.sas7bdat | Adams, C. P. "Estimating Demand from eBay Prices" 2007. |
| d_parameters_7.sas7bdat | |
| d_parameters_70.sas7bdat | Greene, William H. (2003): Econometric Analysis, 5th edition, New Jersey, Prentice Hall |
| d_parameters_71.sas7bdat | |
| d_parameters_72.sas7bdat | Kennedy, Peter.  (1985): A Guide to Econometrics, 2nd Edition, Massachusetts, MIT University Press |
| d_parameters_73.sas7bdat | |
| d_parameters_74.sas7bdat | 10-19-11 Order re Hearing 706 Expert.pdf |
| d_parameters_75.sas7bdat | 10.28.11 Letter re Kearl expert report extension request.pdf |
| d_parameters_76.sas7bdat | |
| d_parameters_77.sas7bdat | 2011-11-09 Memorandum Opinion re Rule 706 Expert (610).pdf |
| d_parameters_78.sas7bdat | |
| d_parameters_79.sas7bdat | 2011-12-27 Order Granting Dr Kearls Request for Extension (658).pdf |
| d_parameters_8.sas7bdat | |
| d_parameters_80.sas7bdat | 2011.9.8 Order-706 Expert.pdf |
| d_parameters_81.sas7bdat | 2012-03-13 Request and Notice re Dr. James Kearl (787).PDF |
| d_parameters_82.sas7bdat | |
| d_parameters_83.sas7bdat | 374_2011 08 30 Order Appointing Rule 706 Expert and Counsel.pdf |
| d_parameters_84.sas7bdat | |

Directive to Rule 706 Expert 1-9-12 (2).pdf
Directive to Rule 706 Expert 1-9-12.pdf
Final Pretrial Conf set for 12-21-11.pdf
Notice to Dr. Kearl 3-14-12.pdf
Order extending to 1.19.12.pdf
Order Kearl report due 3-14-12.pdf
10-14-11 Order granting Daubert as to Leonard Cox.pdf
171_2011.06.14 Google Brief ISO Daubert Mot (UNREDACTED).pdf
173_2011.06.14 Decl of Gregory Leonard (UNREDACTED and REMOVED from DOCKET).pdf
198_2011.07.05 Google Reply Brief ISO Daubert Motion UNREDACTED.PDF
199_2011.07.05 Reply Decl of Purcell ISO Google Reply Brief re Daubert Motion-Ex. A.PDF
199_2011.07.05 Reply Decl of Purcell ISO Google Reply Brief re Daubert Motion-Ex. B.PDF
199_2011.07.05 Reply Decl of Purcell ISO Google Reply Brief re Daubert Motion-Ex. C.PDF
199_2011.07.05 Reply Decl of Purcell ISO Google Reply Brief re Daubert Motion-Ex. D.PDF
199_2011.07.05 Reply Decl of Purcell ISO Google Reply Brief re Daubert Motion.pdf
2011 10 28 Google's Opp to Motion to Exclude UNDER SEAL.pdf
2011-05-20 Cockburn Damages Exhibits (Final).pdf
2011-05-20 Cockburn Report (Final).pdf
2011-05-20 Cockburn Report Appendices (Final).pdf
2011-06-28 Daubert Opp FINAL-UNDER SEAL.pdf
2011-06-28 Norton Decl ISO Daubert Opp FINAL.pdf
2011-07-22 230_ Order re MTS Damage Report of Cockburn (DAUBERT).pdf
2011-09-22 Oracle opposition to Google request Daubert re Cockburn report.pdf
2011-10-04 Opp to Google MIL 3 (Final).pdf
2011-10-21 560 Shugan decl ISO Mtn to Exclude Portions of Cox Leonard.pdf
2011-10-31 Oracle America Incs Motion to Exclude Portions of the Expert Reports of Gregory K Leonar.pdf
2011-11-01 Declaration of Fred Norton ISO Oracle America Incs Reply to Google Incs Opposition to Mo.pdf
2011-11-01 Declaration of Steven M Shugan ISO Oracle America Incs Reply to Google Incs Opposition .pdf
2011-11-01 Oracle America Incs Reply to Google Incs Opposition to Motion to Exclude Portions of the.pdf
2011-11-01 Reply re Daubert Cox Leonard FINAL UNDER SEAL-MARKED FOR REDACTION.pdf
Copy of Oracle mtn exclude Leonard Cox 10-31-11.pdf
Dearborn decl opp to Cockburn Daubers.pdf
Oracle mtn exclude Leonard Cox 10-31-11.pdf
Hearing transcript.txt
2011 10 28 Google's Opp to Motion to Exclude

UNDER SEAL.pdf
2011-10-21 560 Shugan decl ISO Mtn to Exclude Portions of Cox Leonard.pdf
2011-10-27 Resp to Suppl Brief re Cockburn Daubert.UNDER SEAL-MARKED FOR REDACTIONS.pdf
2011-10-31 Oracle America Incs Motion to Exclude Portions of the Expert Reports of Gregory K Leonar.pdf
2011-10-31 Oracle America Incs Motion to Exclude Portions of the Expert Reports of Gregory K. Leonar.PDF
2011-11-01 Declaration of Fred Norton ISO Oracle America Incs Reply to Google Incs Opposition to Mo.pdf
2011-11-01 Declaration of Steven M Shugan ISO Oracle America Incs Reply to Google Incs Opposition .pdf
2011-11-01 Oracle America Incs Administrative Motion to File Under Seal Portions of Its Reply to Go.pdf
2011-11-01 Oracle America Incs Reply to Google Incs Opposition to Motion to Exclude Portions of the.pdf
2011-11-01 Reply ISO Deft Google Incs Motion to Retain Confidentiality Designations (590).pdf
2011-11-01 Reply ISO Motion for Partial Summary Judgment That Google Is Not Liable for Damages for .pdf
2011-11-01 Reply re Daubert Cox Leonard FINAL UNDER SEAL-MARKED FOR REDACTION.pdf
2012-01-03 Google Purcell Declaration ISO Motions in Limine (673).pdf
2012-01-03 Oracle Agrawal Declaration in Opposition to Google Motions in Limine (674).pdf
2012-02-24 Declaration of Andrew Temkin re Google Administrative Motion to File (Dkt No. 717) and Or.PDF
2012-02-24 Declaration of Iain Cockburn ISO Oracle Motion to Strike Portions of Gregory Leonard Supp.PDF
2012-02-24 Declaration of Iain Cockburn ISO Oracle Opposition to Google Motion to Strike (739).pdf
2012-02-24 Declaration of Steven Shugan ISO Opposition to Google Thrid Daubert Motion (740).pdf
2012-02-24 Oracle Motion to Strike Portions of Gregory Leonard Supplemental Report (729).PDF
2012-03-06 OA Reply re Leonard Daubert HC-AEO MARKED FOR REDACTION.pdf
433_2011 09 15 Order re Google MSJ on Copyright.pdf
464_2011 09 26 Order re MTS Portions of Mitchell Report.pdf
Dearborn decl opp to Cockburn Daubers.pdf
Google MSJ re damages before 7-20-10 10-21-11 (2).pdf
Google MSJ re damages before 7-20-10 10-21-11.pdf
Google mtn continue trial 3-15-12.pdf
Google mtn strike portions Cockburn 3rd report 1-17-

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

12.pdf
Google Mtn Strike Serwin rebuttal 10-21-11.pdf
Google Opp to Mtn to Exclude Leonard 11-8-11.pdf
Google reply ISO mtn strike Serwin 11-1-11.pdf
Google reply to Oracle response MIL 3 1-19-12.pdf
Google Response to Tentative Order Striking Cock-
burn Report.pdf
Oracle mtn exclude Leonard Cox 10-31-11.pdf
Oracle Opp to Google mtn Strike Serwin 10-28-
11.pdf
Oracle Opp to MSJ damages prior to 7-20-10.pdf
Oracle reply ISO exclude Leonard Cox 11-9-11.pdf
Oracle reply ISO mtn strike portions of Cox 3-6-
12.pdf
Oracle Response to Tentative Order on Google Mo-
tion to Exclude Cockburn Report.pdf
Oracle responsive supplemental briefing 1-11-12.pdf
Oracle's reply to Google response MIL 3 1-19-12.pdf
Purcell Decl ISO Mtn Strike Serwin 10-21-11.pdf
2012-3-19 Decl Leonard ISO calculation royalties.pdf
2012-3-19 Google brief re calculation of reasonable
royalties.pdf
2012-3-19 Oracle statement re Order re Cockburn
3rd report.pdf
2011-10-21 560 Shugan decl ISO Mtn to Exclude
Portions of Cox Leonard.pdf
2011-10-21 [557] Adm mtn to seal.pdf
2011-10-21 [558-1] [Prop] Ord re Mtn to Exclude
Portions of Cox & Leonard.pdf
2011-10-21 [558] Mtn to Exclude Portions of Cox &
Leonard.pdf
2011-10-21 [559-1] (Exhs 1-9) Dearborn decl ISO
Mtn to Exclude Portions of Cox & Leonard.pdf
2011-10-21 [559] Dearborn decl ISO Mtn to Exclude
Portions of Cox & Leonard.pdf
2011-10-21 [560] Shugan decl ISO Mtn to Exclude
Portions of Cox & Leonard.pdf
2011-11-01 Declaration of Steven M Shugan ISO
Oracle America Incs Reply to Google Incs Opposition
.pdf
2011-11-01 [592] Admin mtn to seal reply re Leonard
& Cox.pdf
2011-11-01 [593] OA reply ISO mtn to strike Leonard
& Cox.pdf
2011-11-01 [594-1] Norton decl Exs. A-D ISO reply
ISO mtn to strike Leonard & Cox.pdf
2011-11-01 [594] Norton decl ISO reply ISO mtn to
strike Leonard & Cox.pdf
2011-11-01 [595] Shugan decl ISO reply ISO mtn to
strike Leonard & Cox.pdf
581_2011.10.28 Decl of Zimmer ISO Opp to Mot to
Exclude Portions of Cox & Leonard Reports-EX A.pdf
581_2011.10.28 Decl of Zimmer ISO Opp to Mot to
Exclude Portions of Cox & Leonard Reports-EX B.pdf
581_2011.10.28 Decl of Zimmer ISO Opp to Mot to
Exclude Portions of Cox & Leonard Reports-EX
C.pdf
581_2011.10.28 Decl of Zimmer ISO Opp to Mot to

Exclude Portions of Cox & Leonard Reports-EX
D.pdf
581_2011.10.28 Decl of Zimmer ISO Opp to Mot to
Exclude Portions of Cox & Leonard Reports-EX E.pdf
581_2011.10.28 Decl of Zimmer ISO Opp to Mot to
Exclude Portions of Cox & Leonard Reports-EX F.pdf
581_2011.10.28 Decl of Zimmer ISO Opp to Mot to
Exclude Portions of Cox & Leonard Reports-EX
G.pdf
581_2011.10.28 Decl of Zimmer ISO Opp to Mot to
Exclude Portions of Cox & Leonard Reports-EX
H.pdf
581_2011.10.28 Decl of Zimmer ISO Opp to Mot to
Exclude Portions of Cox & Leonard Reports-EX I.pdf
581_2011.10.28 Decl of Zimmer ISO Opp to Mot to
Exclude Portions of Cox & Leonard Reports-EX J.pdf
581_2011.10.28 Decl of Zimmer ISO Opp to Mot to
Exclude Portions of Cox & Leonard Reports-EX K.pdf
581_2011.10.28 Decl of Zimmer ISO Opp to Mot to
Exclude Portions of Cox & Leonard Reports.pdf
581_2011.10.28 Decl of Leonard ISO Google Opp to
Mot to Exclude Portions of Cox & Leonard Report.pdf
581_2011.10.28 Google Opp to Mot to Exclude Por-
tions of Leonard & Cox Expert Reports
(UNREDACTED).pdf
2011-11-01 [592] Admin mtn to seal reply re Leonard
& Cox.pdf
2011-11-01 [593] OA reply ISO mtn to strike Leonard
& Cox.pdf
2011-11-01 [594-1] Norton decl Exs. A-D ISO reply
ISO mtn to strike Leonard & Cox.pdf
2011-11-01 [594] Norton decl ISO reply ISO mtn to
strike Leonard & Cox.pdf
2011-11-01 [595] Shugan decl ISO reply ISO mtn to
strike Leonard & Cox.pdf
Google opp to mtn strike portions of Cox 3-2-12.pdf
Mullen decl ISO opp mtn strike Cox 3-2-12.pdf
Mullen Ex A 3-2-12.pdf
Ex F - Estimation selections.pdf
Opposition - SCAN GREY REDACT.pdf
Ex F - Estimation selections.pdf
Leonard Decl ISO Opp 3-2-12.pdf
Ex A.pdf
Ex B.pdf
Ex c.pdf
Ex D.pdf
Ex E(1).pdf
Ex E.pdf
Ex F.pdf
Ex G.pdf
Zimmer Decl 3-2-12.pdf
Ex A 3-15-12.pdf
Ex B 3-15-12.pdf
Ex D 3-15-12.pdf
Ex F 3-15-12.pdf
Ex G 3-15-12.pdf
Exhibit A.pdf
Exhibit B.pdf

Expert Report of Professor James R. Kearl

March 21, 2012                                                        Charles River Associates

Exhibit C.pdf
Exhibit D.pdf
Exhibit E.pdf
Exhibit F.pdf
Exhibit G.pdf
Exhibit H.pdf
Exhibit I.pdf
Exhibit J.pdf
Exhibit K.pdf
Google mtn strike portions Cockburn 3rd report 3-15-12.pdf
Notice of Motion and Motion Memo of Points and Authorities.pdf
Zimmer Declaration.pdf
Exhibit A-Cockburn.pdf
Exhibit B-Plummer.pdf
Exhibit C-Rose.pdf
Exhibit D-Wong.pdf
Exhibit E-Kessler.pdf
Mullen Decl .pdf
Reply Brief - Grey Redact - Scan.pdf
Ex A 3-15-12.pdf
Ex B 3-15-12.pdf
Oracle mtn exclude portions of Cox 3-15-12.pdf
Ex A 3-15-12.pdf
Ex C 3-15-12.pdf
Oracle mtn strike portions of Leonard 3-15-12.pdf
10-19-11 Order re Hearing 706 Expert.pdf
10.28.11 Letter re Kearl expert report extension request.pdf
2011-11-09 Memorandum Opinion re Rule 706 Expert (610).pdf
2011-12-27 Order Granting Dr Kearls Request for Extension (658).pdf
2011-12-27 Request for Further Briefing (657).pdf
2011.9.8 Order-706 Expert.pdf
2012-01-04 Final Pretrial Order (675).pdf
2012-01-04 Omnibus Order on Motions in Limine for Pretrial Conference (676).pdf
2012-01-20 Order Conditionally Allowing Dr Cockburn a 3rd Damages Report (702).pdf
2012-02-02 Order Requesting Copies of Expert Reports (709).pdf
2012-03-01 Supplemental Order Regarding Statement on Reexaminations (757).pdf
2012-03-07 Notice to Dr James Kearl (776).pdf
2012-03-13 Order re Google Daubert Motion to Exclude Dr. Cockburn Third Report (785).PDF
2012-03-13 Order Setting Trial Date of 2012-04-16 (786).PDF
374_2011 08 30 Order Appointing Rule 706 Expert and Counsel.pdf
Claim Construction Order-Supplemental 1-25-12.pdf
Final Pretrial Conf set for 12-21-11.pdf
Google brief--Cockburn permitted 3rd report 1-17-12.pdf
Google reply 1-9-12.pdf
Google response to 12-27-11 order re damages

2.pdf
Google response to 12-27-11 order re damages.pdf
Google Response to Tentative Order Striking Cockburn Report.pdf
Oracle brief--Cockburn permitted 3rd report 1-17-12.pdf
Oracle ltr to Ct--mtn amend ICs 2-29-12.pdf
Oracle reply 1-9-12.pdf
Oracle respone to 1-20-12 Order.pdf
Oracle response to 12-27-11 Order re damages 2.pdf
Oracle response to 12-27-11 Order re damages.pdf
Oracle Response to Tentative Order on Google Motion to Exclude Cockburn Report.pdf
Order 11-15-11 Striking Serwin Reports.pdf
Order denying continuance of trial 3-14-12.pdf
Order extending to 1.19.12.pdf
Order MIL strike portions of Cockburn report 1-9-12.pdf
Order re 3-7-12 hearing 3-2-12.pdf
Order re 3-7-12 hearing 3-5-12.pdf
Order re costs for 3rd damage study 1-25-12.pdf
Order re depositions of Google witnesses 11-14-11.pdf
Order re discussion on 3-7-12--3-6-12.pdf
Order re Mtn Strike Leonard Cox 11-28-11.pdf
Order--address copyrightability 2-29-12.pdf
Order--Expert Compensation 2-23-12.pdf
Order--Experts address reexaminations 2-29-12.pdf
Order--hrg on 3-7 mtn exclude Cockburn 3-1-12.pdf
Order--Mtn exclude Cockburn 3rd 3-13-12.pdf
Order--Oracle mtn strike Google damage experts 3-15-12.pdf
Order-Furhter Ruling re Pretrial Order 1-12-12.pdf
2011-07-22 230_ Order re MTS Damage Report of Cockburn (DAUBERT).pdf
Tentative Order MIL re Cockburn 12-6-11.pdf
2012-03-09 Google Opening Copyright Liability Trial Brief (778).pdf
2012-03-09 Oracle Brief Regarding Copyright Issues (780).pdf
Oracle Trial Brief 10-27-11.pdf
2010-12-17 066 Jt Prop Stip Protective Ord1 (2).pdf
2011-10-10 POS re Reply-Rebuttal Expert Reports.pdf
2011-12-07 Supplemental Joint Pretrial Conference Statement (644).pdf
2011.09.12 POS re Expert Reports.pdf
2011.10.5 Notice re Final Pretrial Conference.pdf
2011.8.19 Transcript status conference.pdf
A-Oracle v Google depo listv.xls
Check LLF.zip
Copy of Document Production Log for Oracle v Google - 2011-09-19 (final).xls
Copy of Non-custodial Production Log (2).xls
From FTP Site 10.12.11.zip
GOOGLE-01-00004621.xls
GOOGLE_CUSTODIAN_LIST.DOC
Joint Statement re Supp Order re Patent Marking.pdf

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

Other docs.docx
REVISED 2011-11-01 Oracle v Google-
depositions.xls
Second Supp Joint Pretrial Conf Statement.pdf
ag_corrected_parameters.txt
llf3.prg
Read Me.doc
_sample_gkl.txt
2011.10.26 Cox depo Exhibits.pdf
2011.10.26 Cox Deposition Transcript.pdf
2011-10-10 Serwin Rebuttal Report_Cox (w Exhs
Appx).pdf
2011.10.10 Cockburn Reply to Cox FINAL (w Exhs
Appx).pdf
Cox report revised w Exhibits attached 10.21.11.pdf
2011-10-21 560 Shugan decl ISO Mtn to Exclude
Portions of Cox Leonard.pdf
2011-11-01 Declaration of Steven M Shugan ISO
Oracle America Incs Reply to Google Incs Opposition
.pdf
581_2011.10.28 Decl of Leonard ISO Google Opp to
Mot to Exclude Portions of Cox & Leonard Report.pdf
581_2011.10.28 Google Opp to Mot to Exclude Por-
tions of Leonard & Cox Expert Reports
(UNREDACTED).pdf
2011-09-28 Shugan Reply Report (w Exhs Appen-
dix).pdf
2011-10-10 Cockburn - Leonard Rebuttal.pdf
2011-10-10 Serwin Rebuttal Report_Leonard (w
Exhs Appx).pdf
2011.10.24 Leonard revised report.pdf
Cockburn Errata 10 17 11.pdf
Cockburn Report-Exhibits and Appendices
9.27.11.pdf
Cockburn Revised Report 9.15.11.pdf
Shugan Report 9.12.11.pdf
Shugan Errata Sheet 9.26.11.pdf
2011.10.17 Cockburn depo exhibits 503-511.pdf
2011.10.17 Cockburn Depo.pdf
Leonard depo MINI 10.28.2011.pdf
Shugan FINAL MINI.pdf
2011-10-10 Excerpts from Cockburn's reply report to
Leonard.pdf
2011-10-21 [560] Shugan decl ISO Mtn to Exclude
Portions of Cox & Leonard.pdf
2011-10-24 Excerpts from Leonard's revised re-
port.pdf
2011-11-01 Declaration of Steven M Shugan ISO
Oracle America Incs Reply to Google Incs Opposition
.pdf
2011-9-15 Excerpts from Cockburn's revised re-
port.pdf
2011.10.24 Leonard revised report.pdf
581_2011 10 28 Decl of Leonard ISO Google Opp to
Mot to Exclude Portions of Cox Leonard Report.pdf
GOOGLE-12-00079167-169.pdf
GOOGLE-12-00079180-194.pdf
GOOGLE-12-00080355-367.pdf

GOOGLE-12-10000001-011.pdf
GOOGLE-14-00042244-254.pdf
GOOGLE-24-00152087.pdf
GOOGLE-24-00198138.pdf
GOOGLE-26-00007930.pdf
GOOGLE-26-00008340-364.pdf
GOOGLE-26-00031474-497.pdf
GOOGLE-29-00004478.pdf
GOOGLE-58-00048925.pdf
GOOGLE-66-00000274.pdf
OAGOOGLE 0100166873.PDF
OAGOOGLE0000014038-41.pdf
OAGOOGLE0000140295.pdf
OAGOOGLE0000293784.pdf
OAGOOGLE0000357191.pdf
OAGOOGLE0000357426-441.pdf
OAGOOGLE0000357468.pdf
OAGOOGLE0000357494.pdf
OAGOOGLE0000358110-112.pdf
OAGOOGLE0000358127.pdf
OAGOOGLE0000358175.pdf
OAGOOGLE0000358250.pdf
OAGOOGLE0000358297.PDF
OAGOOGLE0000609167.pdf
OAGOOGLE0001338191.pdf
OAGOOGLE0001816993.pdf
OAGOOGLE0001817379.pdf
OAGOOGLE0002518835.pdf
OAGOOGLE0005384449.PDF
OAGOOGLE0013996761.pdf
OAGOOGLE0016737281-82.pdf
OAGOOGLE0100072596-597.pdf
OAGOOGLE0100165875-876.pdf
OAGOOGLE0100166177-196.pdf
OAGOOGLE0100167795-798.pdf
OAGOOGLE0100168441-459.pdf
OAGOOGLE0100168460-478.pdf
GOOGLE-00-00000031.PDF
GOOGLE-00-00000037.PDF
GOOGLE-00-00000049.PDF
GOOGLE-00-00000693.PDF
GOOGLE-00-00000721.PDF
GOOGLE-00-00000731.PDF
GOOGLE-00-00001772.PDF
GOOGLE-01-00017143.PDF
GOOGLE-01-00017154.PDF
GOOGLE-01-00017221.PDF
GOOGLE-01-00017222.PDF
GOOGLE-01-00018240.PDF
GOOGLE-01-00018538.PDF
GOOGLE-01-00018539.PDF
GOOGLE-01-00018836.PDF
GOOGLE-01-00019511.PDF
GOOGLE-01-00019527.PDF
GOOGLE-01-00019536.PDF
GOOGLE-01-00019537.PDF
GOOGLE-01-00019561.PDF
GOOGLE-01-00020132.PDF

Expert Report of Professor James R. Kearl

March 21, 2012                                                                 Charles River Associates

| | |
|---|---|
| GOOGLE-01-00024669.PDF | Contingent Valuation Is Some Number Better Than |
| GOOGLE-01-00024672.PDF | No.pdf |
| GOOGLE-01-00024675.PDF | CostHelper - How Much Does a Smartphone |
| GOOGLE-01-00025329.PDF | Cost.pdf |
| GOOGLE-01-00025330.PDF | Droid Charge.pdf |
| GOOGLE-01-00025699.PDF | Excerpted Leonard Report.pdf |
| GOOGLE-01-00056539.PDF | Expert Report of Dr. Shugan (complete).pdf |
| GOOGLE-01-00056540.PDF | FindTheBest - Best Smartphones. Compare, reviews |
| GOOGLE-01-00056695.PDF | & ratings.pdf |
| GOOGLE-01-00062071.PDF | Getting Things Done With Froyo Voice Actions _ |
| GOOGLE-01-00062072.PDF | PCWorld Business Center.pdf |
| GOOGLE-01-00062453.PDF | Goett, et al. (2000) - Customers' Choice Among Re- |
| GOOGLE-01-00062454.PDF | tail Energy Suppliers.pdf |
| GOOGLE-01-00065655.PDF | How Should Consumers Willingness to Pay Be |
| GOOGLE-01-00065669.PDF | Measured.pdf |
| GOOGLE-01-00065722.PDF | HTC HD7S.pdf |
| GOOGLE-01-00066909.PDF | HTC Sensation.pdf |
| GOOGLE-01-00075935.PDF | HTC Trophy.pdf |
| GOOGLE-01-00082999.PDF | Incentive-Aligned Conjoint AnalysisAuthor.pdf |
| GOOGLE-02-00077799.PDF | iPhone 4 16GB.pdf |
| GOOGLE-02-00111218.PDF | iPhone 4 32GB.pdf |
| GOOGLE-03-00069155.PDF | Kellogg, D. - Nielson - In US Market, New |
| GOOGLE-03-00069156.PDF | Smartphone Buyers.pdf |
| GOOGLE-04-00055169.PDF | Market Watch- Apple Unveils Latest Software Up- |
| GOOGLE-11-00000921.PDF | grade.pdf |
| GOOGLE-12-00000472.PDF | Mohr, et al. - 2010 - Marketing of High-Technology |
| GOOGLE-12-00000473.PDF | Products and Innovations.pdf |
| GOOGLE-12-00000537.PDF | Nielson Wire - In U.S. Smartphone Market, Android |
| GOOGLE-12-00006964.PDF | is Top Operating System, Apple is Top Manufactur- |
| GOOGLE-12-00044478.PDF | er.pdf |
| GOOGLE-12-00044479.PDF | Orme - 2010 - Getting Started with Conjoint Analysis |
| GOOGLE-12-00044480.PDF | (2nd Edition) .pdf |
| GOOGLE-12-00044903.PDF | PreCentral net - App Gallery App Catalog.pdf |
| GOOGLE-12-00044940.PDF | Shugan (1984) - Price-Quality Relationships.pdf |
| GOOGLE-12-00044941.PDF | Shugan, Steven Ph.D. (2011-09-26) HC-AEO.PDF |
| GOOGLE-01-00017221.PDF | Superslim LG Optimus 3D 2 set for world domination |
| GOOGLE-01-00017222.PDF | in 2012 - Pocket-lint.pdf |
| OAGOOGLE0000357218.pdf | The NPD Group_ Larger Smartphone Screens Gain |
| 2010 - WDSGlobabl - Smartphones, Building Profita- | in Popularity.pdf |
| bility and Loyalty in the Mass-Market.pdf | There Are Now More Free Apps For Android Than |
| 2011.09.01 - What do smartphone users really | For The iPhone_ Distimo _ Tech.pdf |
| want.pdf | Verizon iPhone Look-A-Likes.pdf |
| A Meta-Analysis of Hypothetical Bias in Stated.pdf | Windows Phone 7_ Mango Update _ .pdf |
| Active Apps _ Task Manager - Android Market.pdf | Windows Phone Mango to Support Hands-Free |
| An Incentive-Aligned Mechanism for Conjoint.pdf | Communication _ Anythingbutiphone.pdf |
| Android Market Hits 100,000 Apps _ News & Opinion | Codes.zip |
| _ PCMag.pdf | October Rebuttal (Leonard).zip |
| Apple iOS 4 review _ iPhone Atlas - CNET Re- | README.txt |
| views.pdf | Macros.zip |
| BlackBerry - Available voice commands - User Guide | Excel.zip |
| - BlackBerry Curve 9300 Smartphone - 5.pdf | Freq.zip |
| Blackberry Bold 9780.pdf | In.zip |
| BlackBerry Bold 9900.pdf | Data.zip |
| Buying Time Real and Hypothetical Offers.pdf | Epsbase.zip |
| comScore Reports March 2011 U.S.pdf | Epssens.zip |
| Conlon - 01.2010 - A Dynamic Model of Costs and | flxosbids.zip |
| Margins in the LCD TV Industry.pdf | Out.zip |
| Constructive Consumer Choice Processes.pdf | data.z01 |

Expert Report of Professor James R. Kearl

March 21, 2012                                                     Charles River Associates

data.z02
data.z03
data.z04
data.zip
10-15-11 Google's Trial Brief.pdf
2011.10.4 Google Case Mgt Stmt.pdf
GOOGLE Docs.docx
10.28.11 Leonard deposition.pdf
Agarwal - MINI.pdf
Allison FINAL MINI.pdf
Astrachan FINAL MINI.pdf
Bloch - Mini.pdf
BRADY FINAL TOPIC 7 MINI.PDF
BRADY FINAL TOPIC 9 MINI.PDF
Chu - MINI.PDF
Claflin - MINI.pdf
Davidson FINAL MINI.pdf
Ex. 01 - 2011-07-08 Joshua Bloch (EXCERPT).PDF
Ex. 03 - 2011-08-03 Bob Lee (EXCERPT).PDF
Ex. 05 - 2011-04-05 Andy Rubin - Topic 1
(EXCERPT).PDF
GRIESMER - Min-U-Script - FINAL.pdf
LEE FINAL MINI.PDF
Lindholm FINAL MINI.pdf
McFADDEN - MINI.pdf
Morrill - MINI.pdf
Nishar FINAL MINI.pdf
Page MINI.PDF
RUBIN - MINI 2011.04.05.pdf
RUBIN 2011.07.27 .PDF
Rubin FINAL MINI TOPIC 8 & 10 - Vol III
2011.07.27.PDF
RUBIN FINAL MINI 2011.08.18 .pdf
RUBIN FINAL MINI TOPIC 8 & 10 - VOL II
2011.07.27 .PDF
Schmidt FINAL MINI.pdf
Swetland - Mini.PDF
Wojcicki FINAL MINI.PDF
~ LIST OF DEPOSITIONS - GOOGLE 30(B)(6)
WITNESSES.pdf
~ LIST OF DEPOSITIONS - GOOGLE
WITNESSES.pdf
173_2011.06.14 Decl of Gregory Leonard
(UNREDACTED and REMOVED from DOCKET).pdf
Allison - 104 Invalidity Report - Ex. A (CV).pdf
Allison - 104 Invalidity Report - Ex. B (Documents
Considered) (Revised).pdf
Allison - 104 Invalidity Report - Ex. C-1 (Gries).pdf
Allison - 104 Invalidity Report - Ex. C-2 (Chaitin).pdf
Allison - 104 Invalidity Report - Ex. C-3 (Gabriel).pdf
Allison - 104 Invalidity Report - Ex. D-1 (Tafvelin).pdf
Allison - 104 Invalidity Report - Ex. D-2 (Rau).pdf
Allison - 104 Invalidity Report - Ex. D-3 (Gries
Rau).pdf
Allison - 104 Invalidity Report - Ex. D-4 (Da-
vidson).pdf
Allison - 104 Invalidity Report.pdf
2011.08.08 Allison - 720 Invalidity Report.pdf

Allison - 720 Invalidity Report - Ex. A (CV).pdf
Allison - 720 Invalidity Report - Ex. B (Documents
Considered) (Revised).pdf
Allison - 720 Invalidity Report - Ex. C (Bryant -
GOOGLE-00342101).pdf
Allison - 720 Invalidity Report - Ex. D (Traut -
GOOGLE-00342318).pdf
Allison - 720 Invalidity Report - Ex. E (Webb -
GOOGLE-00342870).pdf
Allison - 720 Invalidity Report - Ex. F (Kuck -
GOOGLE-00342856).pdf
Allison - 720 Invalidity Report - Ex. G (Bach -
GOOGLE-00325057).pdf
Allison - 720 Invalidity Report - Ex. H (Srinivasan -
GOOGLE-00393962).pdf
Allison - 720 Invalidity Report - Ex. I (Bryant and
Traut).pdf
Allison - 720 Invalidity Report - Ex. J (Webb and
Kuck and Bach).pdf
Allison - 720 Invalidity Report - Ex. K (Srinivasan and
Bach).pdf
Allison Reply Report - 104 (Part 1).pdf
Allison Reply Report - 104 (Part 2) Ex (Gries).pdf
Allison Reply Report - 104 (Part 3) Ex (Aho).pdf
Allison Reply Report - 720.pdf
2011-08-19 Owen Astrachan Reply Report.pdf
2011.07.29 Owen Astrachan Opening Report With
Fixed Signature.pdf
2011.08.12 Rebuttal Expert Report of Astrachan.pdf
August - Expert Rebuttal Report on Noninfringement
of the 104 Patent.pdf
Ex. _A - ORACLE Amended Complaint (Part 6) - EX
E.pdf
Ex. _B - August CV.pdf
Ex. _C - Materials Considered.pdf
Ex. _D - Android Code.pdf
Ex. _E - Websters.pdf
Ex. _F - Barber, Best of Interface Age (1979).pdf
Ex. _G - D. Gries, Compiler Construction for Digital
Computers - GOOGLE-00329643.pdf
Ex. _H - GCJ_ The GNU Compiler for Java - GNU
Project (FSF).pdf
Ex. _I - picoJava Technology FAQ.pdf
Ex. _J - Lindholm, Java Virtual Machine Specification
- GOOGLE-00376043.pdf
Ex. _K - Gosling, Java Language Specification -
GOOGLE-00328687.pdf
Ex. _L - 11 07 21 BRADY - TOPIC 9 - Min-U-Script -
FINAL.PDF
Ex. _M - Dalvik Optimization and Verification.pdf
Ex. _N - 11 07 22 BORNSTEIN - Min-U-Script-
FINAL.PDF
Ex. _O -
Bill_s_random_thoughts_on_a_Dalvik_JI_.pdf
August -Expert Rebuttal Report on Noninfringement
of the 205 patent.pdf
Ex. AA - dex-format.pdf
Ex. AB - Dalvik VM Instruction Formats.pdf

Expert Report of Professor James R. Kearl

March 21, 2012                                                                Charles River Associates

Ex. AC - Dalvik Technical Information _ Android Open Source.pdf
Ex. AD - Licenses _ Android Open Source.pdf
Ex. AE - About the Android Open Source Project _ Android Open Source.pdf
Ex. AF - Philosophy and Goals _ Android Open Source.pdf
Ex. AG - Dalvik Optimization and Verification.pdf
Ex. AH - android-jit-compiler-androids-dalvik-vm.pdf
Ex. AI - QRC0001_UAL.pdf
Ex. AJ - 11 07 22 BORNSTEIN - Min-U-Script-FINAL.PDF
Ex. AK - TIOBE Software_ Tiobe Index.pdf
Ex. AL - TIOBE Software_ The Coding Standards Company.pdf
Ex. AM - iOS Overview.pdf
Ex. AN - InternetNews.pdf
Ex. AO - Why the iPhone is a success • The Register.pdf
Ex. AP - Gartner predicts Windows 7 will be top 2011 operating system -- Government Computer News.pdf
Ex. AQ - 1030-1115seminar-0302-Tom.pdf
Ex. AR - _ Nielsen Wire.pdf
Ex. AS - Apple App Store_ Its rapid success - Telegraph.pdf
Ex. AT - Reasons Why Developers Choose to Make Apps for iOS _ Top Tech Reviews.pdf
Ex. AU - jw-0329-idgns-rim.pdf
Ex. AV - RIM Device Java Library.pdf
Ex. AW - Comscore Shows RIM Market Share Sliding Further -- Trefis.pdf
Ex. AX - 11 04 01 -000 ORACLE 2d Supp PICs (w Exhibits).pdf
Ex. AY - EMAIL FROM ORACLE.pdf
Ex. AZ - JAVASOFT SHIPS JAVA 1.pdf
Ex. BA - GOOGLE-00296372 (Bills Random Thoughts).pdf
Ex. _A - ORACLE Amended Complaint (Part 7) - EX F - 205 patent.pdf
Ex. _B - August CV.pdf
Ex. _C - List of materials.pdf
Ex. _D - Android Code.pdf
Ex. _E - Websters.pdf
Ex. _F - D. Gries, Compiler Construction for Digital Computers - GOOGLE-00329643.pdf
Ex. _G - GCJ_ The GNU Compiler for Java - GNU Project (FSF).pdf
Ex. _H - picoJava Technology FAQ.pdf
Ex. _I - Lindholm, Java Virtual Machine Specification - GOOGLE-00376043.pdf
Ex. _J - Gosling, Java Language Specification - GOOGLE-00328687.pdf
Ex. _K - GOOGLE-00324970 (Aycock).pdf
Ex. _L - Hsieh et al, Java Bytecode to Native Code Translation- The Caffeine Prototype Prelim Results.pdf
Ex. _M - 6349377_Processing_device_for_executing.pdf

Ex. _N - 6332216_Hybrid_just_in_time_compiler_tha.pdf
Ex. _O - 6292883_Converting_program_specific_virt.pdf
Ex. _P - OAGOOGLE0000052602 - 205 prosecution.pdf
Ex. _Q - 5768593_Dynamic_cross_compilation_system.pdf
Ex. _R - Yellin - GOOGLE-00343029.pdf
Ex. _S - Deutsch, Efficient Implementation of the Smalltalk-80 System - GOOGLE-00327009.pdf
Ex. _T - 5761477_Methods_for_safe_and_efficient_i.pdf
Ex. _U - 11 02 22 -091 JOINT Claim Construction and Pre-Hearing Statement.pdf
Ex. _V - 11 02 18 GOOGLE First Supp PR 4-2 Preliminary Claim Constructions and Extrinisic Evidence.pdf
Ex. _W - 11 02 17 ORACLE Updated Proposed Constructions And Supporting Evidence.pdf
Ex. _X - 11 07 21 BRADY - TOPIC 9 - Min-U-Script - FINAL.PDF
Ex. _Y - Android Developers.pdf
Ex. _Z - Bytecode for the Dalvik VM.pdf
02 2011-10-03 Cox Expert Report re damages (copyright) EXHIBIT 2.pdf
2011.10.21 Cox Expert Report Revised_Clean.pdf
2011.10.21 Cox Expert Report Revised_Redline.pdf
2011.10.3 Cox Expert Report.pdf
Cox report revised w Exhibits attached 10.21.11.pdf
Exhibit 1.xls
Exhibit 3d.xls
Exhibit 5.xls
Exhibit 7.xls
Exhibits 2a-b, 3a-c.xls
Exhibits 4a, b.xls
Exhibits 6a-6c.xls
Exhibits 6d-6e.xls
Davidson - Expert Rebuttal Report on Noninfringement of the 720 patent.pdf
Ex. A - U.S. Pat. No. 7426720.pdf
Ex. B - Davidson CV.pdf
Ex. C - Patent Litigation Cases.pdf
Ex. D - List of Materials Relied Upon.pdf
Ex. E - Nori et al. - The_Pascal_P_Compiler_implementation_notes.pdf
Ex. F - Davidson & Gresh.pdf
Ex. G - JOINT Claim Construction and Pre-Hearing Statement.pdf
Ex. H - preloaded-classes.pdf
Ex. I - Smith-maquire-cw-fork.pdf
Ex. J - Dabrowski.pdf
Ex. K - Bornstein Depo Excerpts.pdf
Dewar - 520 Invalidity Report - Ex. A (CV).pdf
Dewar - 520 Invalidity Report - Ex. B (Documents Considered).pdf
Dewar - 520 Invalidity Report - Ex. C (Lewis Chart).pdf

Expert Report of Professor James R. Kearl

March 21, 2012                                                                                   Charles River Associates

Dewar - 520 Invalidity Report - Ex. D (Cierniak . Cierniak, Lindholm Chart).pdf
Dewar - 520 Invalidity Report - Ex. E (Lewis, Proebsting, Dyer Chart).pdf
Dewar - 520 Invalidity Report - Ex. F (Lewis, Gosling, Sun Chart).pdf
Dewar - 520 Invalidity Report.pdf
2011.09.01 Dewar Reply Report - 520.pdf
01 2011-10-03 Leonard Report re damages (patents) EXHIBIT 1.pdf
2011.10.3 Leonard Report.pdf
Appendix A _Leonard_.pdf
Exhibit 1.xls
Exhibit 2.xls
Exhibit 4.xls
Exhibit 5a.xls
Exhibit 5b.xls
Exhibit 6.xls
Exhibit 7.xls
Exhibit 8.xls
Exhibit 9.xls
Exhibits 3a-3c.xls
Exhibits 3d-3e.xls
next_generation.sas7bdat
Next Gen Intro Date - by Product.xls
cross_bids.sas7bdat
num_times_prcp.sas7bdat
num_times_won.sas7bdat
Estimates.xls
0.1 Set Directory.sas
0.40 Adding Covariates_Corrected_for_H_BID_nera.sas
0.61 Demand (BASE)_NERA_Version1.sas
0.61 Demand (BASE)_NERA_Version2.sas
0.61 Demand (BASE)_NERA_Version3.sas
0.61 Demand (BASE)_NERA_Version4.sas
0.61 Demand (BASE)_NERA_Version5.sas
0.61 Demand (BASE)_NERA_Version6.sas
0.61 Demand (BASE)_NERA_Version7.sas
0.61 Demand (BASE)_NERA_Version8.sas
0.70 Parameter Estimates_model_dummies.sas
0.70 Parameter Estimates_NERA.sas
Android Bidders.sas
Frequency_bidders.sas
F_test_for_version2.sas
Model Dummy Comparasion.sas
Monthly_Regression_Export.sas
pr_sim_A.out
analysis_A_SIM.txt
FonKN_fill_ID_A.txt
FonKN_fill_ID_A_v2.txt
pr_simulations.txt
data A check.m
data A sim1.m
data A.m
data prep A.m
fonkn_CBC.att
fonkn_CBC.cho

fonkn_desc.csv
1.0 Choice Data - Choice and Attribute Files_nera.sas
Levine - 205 Invalidity Report - Ex. A (CV).pdf
Levine - 205 Invalidity Report - Ex. B (References Considered).pdf
Levine - 205 Invalidity Report - Ex. C (Tarau Chart).pdf
Levine - 205 Invalidity Report - Ex. D (Magnuson Chart).pdf
Levine - 205 Invalidity Report - Ex. E (Hookway Chart).pdf
Levine - 205 Invalidity Report - Ex. F (Wakeling and Magnusson Chart).pdf
Levine - 205 Invalidity Report - Ex. G (Lewis and Magnusson Chart).pdf
Levine - 205 Invalidity Report - Ex. H (Deutsch and Magnusson Chart).pdf
Levine - 205 Invalidity Report - Ex. I (Tarau - GOOGLE-00380428).pdf
Levine - 205 Invalidity Report - Ex. J (Magnusson - GOOGLE-00337401).pdf
Levine - 205 Invalidity Report - Ex. K (Hookway - GOOGLE-00341655).pdf
Levine - 205 Invalidity Report - Ex. L (Wakeling - GOOGLE-00342436).pdf
Levine - 205 Invalidity Report - Ex. M (Lewis - GOOGLE-00337218).pdf
Levine - 205 Invalidity Report - Ex. N (Deutsch - GOOGLE-00327009).pdf
Levine - 205 Invalidity Report.pdf
Levine - 702 Invalidity Report - Ex. A (CV).pdf
Levine - 702 Invalidity Report - Ex. B (Documents Considered).pdf
Levine - 702 Invalidity Report - Ex. C (Tock).pdf
Levine - 702 Invalidity Report - Ex. D (Palay).pdf
Levine - 702 Invalidity Report - Ex. E (Tock - GOOGLE-00341635).pdf
Levine - 702 Invalidity Report - Ex. F (Palay - GOOGLE-00341557).pdf
Levine - 702 Invalidity Report.pdf
Levine Reply Report - 702 and 205 (Part 1).pdf
Levine Reply Report - 702 and 205 (Part 2) Ex. G.pdf
Levine Reply Report - 702 and 205 (Part 3) Ex. H.pdf
Mazieres - 447 Invalidity Report - Ex. A (CV).pdf
Mazieres - 447 Invalidity Report - Ex. B (References Considered) (Revised).pdf
Mazieres - 447 Invalidity Report - Ex. C (Griffin).pdf
Mazieres - 447 Invalidity Report - Ex. D (Griffin - GOOGLE-00380244).pdf
Mazieres - 447 Invalidity Report.pdf
Mazieres - 476 Invalidity Report - Ex. A (CV).pdf
Mazieres - 476 Invalidity Report - Ex. B (References Considered) (Revised).pdf
Mazieres - 476 Invalidity Report - Ex. C (Fischer).pdf
Mazieres - 476 Invalidity Report - Ex. D (Fischer - GOOGLE-00341507).pdf
Mazieres - 476 Invalidity Report.pdf

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

Ex. A - 6192476.pdf
Ex. B - 6125447.pdf
Ex. C - CV.pdf
Ex. D - Materials Considered.pdf
Ex. E - Excerpts 11 07 22 BORNSTEIN.PDF
Mazieres - Expert Rebuttal Report on Noninfringe-
ment of the 447 and 476 patents.pdf
Mazieres Reply Report - 447 and 476 (Part 1).pdf
Mazieres Reply Report - 447 and 476 (Part 2) Ex.
E.pdf
Mazieres Reply Report - 447 and 476 (Part 3) Ex.
F.pdf
Ex. C - Parr Slides JVM-Summit-2009.pdf
Appendix A.pdf
Ex. A - CV of Terence Parr.pdf
Ex. B - References considered.pdf
Ex. C - 6,061,520 patent.pdf
Ex. D - Source Code Excerpts.pdf
Ex. E - Excerpts from 11 07 22 Bornstein depo.PDF
Ex. F - Presentation-Of-Dalvik-VM-Internals.pdf
Parr - Expert Rebuttal Report on Noninfringement of
the 520 Patent.pdf
Ex. A - CV of Terence Parr.pdf
Ex. B - References considered.pdf
Ex. C - 702 Patent.pdf
Ex. D - Source Code Excerpts.pdf
Ex. E - Fresko - public transcript from USPTO fil-
ing.pdf
Ex. F - Nedim Fresko Deposition Ex. 16.PDF
Ex. G - Nedim Fresko Deposition Ex. 17.PDF
Ex. H - OAGOOGLE0016895927.pdf
Ex. I - OAGOOGLE0016895922.pdf
Ex. J - PCWorld.pdf
Ex. K - Akamai White Paper.pdf
Ex. L - The State of Mobile Apps _ Nielsen Wire.pdf
Ex. M - List of open source Android applications -
Wikipedia, the free encyclopedia.pdf
Parr - Expert Rebuttal Report on Noninfringement of
the 702 Patent.pdf
102_2011.03.31 Google Responsive Claim Con-
struction Brief.pdf
103_2011.03.31 Suppl Decl of Fenton ISO Google
Resp Claim Construction Brief.pdf
2011.04.06 GOOGLE Technical Tutorial
(v20_Final).pdf
96_2011.03.17 Google Opening Markman Brief.pdf
97_2011.03.17 Decl of Fenton ISO Google Claim
Contruction Brief.pdf
2005-10-11 EMAIL TO ANDY RUBIN GOOGLE-01-
00019527 EXHIBIT 4.pdf
Ex. 08 - GOOGLE-01-00019527-528 (GOOG
AEO).pdf
Ex. 09 - GOOGLE-01-00019529-532 (GOOG
AEO).pdf
Ex. 10 - GOOGLE-01-00025376-433 (GOOG
AEO).pdf
Ex. 11 - GOOGLE-02-00111218 (GOOG AEO).pdf
Ex. 12 - GOOGLE-14-00042244-254 (GOOG

AEO).pdf
Ex. 13 - GOOGLE-26-00007930 (GOOG AEO).pdf
Ex. 14 - GOOGLE-40-00034698-703 (GOOG
AEO).pdf
Ex. 15 - GOOGLE-00392183-194 (GOOG AEO).pdf
Ex. 16 - GOOGLE-00392204-212 (GOOG AEO).pdf
Ex. 19 - httpwww.infoq.comarticlesAPI-Design-
Joshua-Bloch.pdf
Ex. 23 - http-
code.google.comapisadsenseterms.html.pdf
Ex. 24 - http-
code.google.comapisyoutubeterms.html.pdf
Ex. 25 - http-
code.google.comapisoapsearchapi_terms.html.pdf
20.10.2010 Google's Supp Brief ISO MIL No 3
(UNDERSEAL).pdf
20.10.2010 Purcell Decl ISO Google's Supp Brief
ISO MIL No 3.pdf
297_2011.08.12 Google Notice & MPA to Redact &
Seal Portion of hrg transcript.pdf
Google's MIL No 1.pdf
Google's MIL No 2.pdf
Google's MIL No 4.pdf
Google's MIL No 5.pdf
214_2011.07.13 Google Amended Mot to Suppl
Invalidity Contentions.pdf
268_2011.08.03 Reply ISO Google Amended Mot to
Suppl Invalidity Contentions.pdf
268_2011.08.03 Decl of Francis ISO Amended
Mot to Suppl Invalidity Contentions.pdf
171_2011.06.14 Google Brief ISO Daubert Mot
(UNREDACTED).pdf
172_2011.06.14 Decl of Weingaertner ISO Google
Daubert Mot w- exhibits (UNREDACTED).pdf
173_2011.06.14 Decl of Gregory Leonard
(UNREDACTED and REMOVED from DOCKET).pdf
198_2011.07.05 Google Reply Brief ISO Daubert
Motion UNREDACTED.pdf
199_2011.07.05 Reply Decl of Purcell ISO Google
Reply Brief re Daubert Motion-Ex. A.pdf
199_2011.07.05 Reply Decl of Purcell ISO Google
Reply Brief re Daubert Motion-Ex. B.pdf
199_2011.07.05 Reply Decl of Purcell ISO Google
Reply Brief re Daubert Motion-Ex. C.pdf
199_2011.07.05 Reply Decl of Purcell ISO Google
Reply Brief re Daubert Motion-Ex. D.pdf
199_2011.07.05 Reply Decl of Purcell ISO Google
Reply Brief re Daubert Motion.pdf
Google MIL #3 Exclude portions of Cockburn 10-7-
11.pdf
Google MIL #4 Exclude portions of Goldberg 10-7-
11.pdf
Google's MIL No 3.pdf
409_2011.09.08 Decl of Brady ISO Google MSJ re
Google Non-liability.pdf
409_2011.09.08 Mot for Partial Summary Judgment
re Google Nonliability.pdf
260_2011.08.01 Google Notice of Mot & MSJ re

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

Count VIII of Complaint.pdf
261_2011.08.01 Decl of Bornstein ISO Google MSJ-EX A.pdf
261_2011.08.01 Decl of Bornstein ISO Google MSJ.pdf
262_2011.08.01 Decl of Astrachan ISO Google MSJ-EX 1.pdf
262_2011.08.01 Decl of Astrachan ISO Google MSJ-EX 2.pdf
262_2011.08.01 Decl of Astrachan ISO Google MSJ.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX A.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX B.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX C.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX D.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX E.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX F.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX G.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX H.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX I.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX J.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX K.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX L.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX M.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX N.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ-EX O.pdf
263_2011.08.01 Decl of Kwun ISO Google MSJ.pdf
368_2011.08.29 Google Reply ISO MSJ.pdf
369_2011.08.29 Reply Decl of Kwun ISO Google MSJ-EX EE.pdf
369_2011.08.29 Reply Decl of Kwun ISO Google MSJ-EX FF.pdf
369_2011.08.29 Reply Decl of Kwun ISO Google MSJ-EX GG.pdf
369_2011.08.29 Reply Decl of Kwun ISO Google MSJ.pdf
370_2011.08.29 Reply Decl of Bornstein ISO Google MSJ.pdf
371_2011.08.29 Reply Decl of Astrachan ISO Google MSJ-EX 3.pdf
371_2011.08.29 Reply Decl of Astrachan ISO Google MSJ.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell

Patent Report-EX A.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report-EX B.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report-EX C.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report-EX D.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report-EX E.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report-EX F.pdf
2011.09.08 Decl of Francis ISO Google MTS Mitchell Patent Report.pdf
2011.09.08 Google MTS Portions of Mitchell Patent Report.pdf
2011.10.11 Order re striking portions of Mitchell report.pdf
2011.9.29 Google 2nd MTS portions of Mitchell Patent Report.pdf
10.12.11 Letter re MTS - Serwin.pdf
Decl Exhibits re MIL Opps.zip
Google Opp to Oracle MIL No. 1.pdf
Google Opp to Oracle MIL No. 2.pdf
Google Opp to Oracle MIL No. 3.pdf
Google Opp to Oracle MIL No. 4.pdf
Google Opp to Oracle MIL No. 5.pdf
Mullen Decl ISO Google Opps to Oracle MILs.pdf
10.12.11 Letter re Oracle's MTS-Leonard and Cox.pdf
52_2010.11.10 Google Opp to MTD & MTS-Ex. A.pdf
52_2010.11.10 Google Opp to MTD & MTS-Ex. B.pdf
52_2010.11.10 Google Opp to MTD & MTS-Ex. C.pdf
52_2010.11.10 Google Opp to MTD & MTS-Ex. D.pdf
52_2010.11.10 Google Opp to MTD & MTS.pdf
2011-08-04 GOOGLE Response to ORACLE RFAs (1-244).pdf
2011.08.04 GOOGLE Resp to ORACLE RFAs (1-244).pdf
Ex. 07 - 2011-08-04 Google Resp to Oracle 1st RFA No. 168 (EXCERPT).pdf
2011.01.06 Google Resp to ORACLE 1st ROGS (1-16).pdf
2011.02.04 Google 1st Supp Resp to Oracle 1st ROGS (1 and 3).pdf
2011.02.18 Google 2nd Supp Resp to Oracle 1st ROGS (3).pdf
2011.04.01 Google's 3d Suppl Resp to Oracle's 1st Set of ROG (3).pdf
2011.04.14 Google's Resp to 2nd Set of ROG (17).pdf
2011.04.25 Google 3rd Supp Response to Oracle's 1st Set of ROGS (4-16).pdf
2011.04.27 Google's 4th Supp Resp to Oracle's 1st Set of ROGS (3).pdf
2011.05.02 Google's Supp Resp to 2nd Set of ROGS (17).pdf

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

2011.05.23 Google's Resp to Oracle's 3d Set ROGS (18-19).pdf
2011.06.01 Google's 2nd Suppl Resp to 2nd Set of ROGS (17).pdf
2011.07.26 GOOGLE 4th Supp Resp to ORACLE ROG set 1 No 3.pdf
2011.07.29 GOOGLE Resp to ORACLE 4th ROGs (Nos 20-25).pdf
2011.07.29 GOOGLE Suppl Response to ORACLE 3rd ROGs (No 18).pdf
2011.08 01 GOOGLE Suppl Resp to ORACLE 1st ROGs (No 2).pdf
2011.08.01 GOOGLE 3rd Suppl Resp to ORACLE 2nd ROGs (No 17).pdf
2011.08.01 GOOGLE 5th Suppl Resp to ORACLE 1st ROGs (No 3).pdf
10-14-11 Oracle's Trial Brief.pdf
2011.10.3 Oracles letter of Requests.pdf
2011.10.4 Oracle Case Mgt Stmt.pdf
2011.9.29 Oracle CMC Stmt.pdf
List of docs.xlsx
Oracle Docs.docx
Oracle Trial Brief 10-27-11.pdf
Table of Contents 2.docx
Table of Contents.docx
17.10.11 Cockburn depo.pdf
2011-03-10 OA 30b6 Dep Ntc re Google.pdf
2011-04-01 Oracle 30b6 Ntc of Google - Topic 3.pdf
2011-06-21 Oracle 30b6 Dep Ntc of Google topics 4-9.pdf
2011-07-13 Oracle 30b6 Ntc of Depo to Google Topics 10-13.pdf
A-Oracle v Google depo listv.xls
Ex A - Under Seal Cover Sheet (Cockburn Depo).pdf
Ex. 04 - 2011-05-26 Richard Miner (EXCERPT).PDF
Ex. 06 - 2011-07-29 Edward Screven-Individual (EXCERPT).PDF
Ex. 27 - 2011-08-05 Mark Reinhold (EXCERPT).PDF
MINER - MINI.pdf
Shugan FINAL MINI.pdf
2011-09-12 Summary of Investigation of Seeon Birger.pdf
2011-05-20 Cockburn Damages Exhibits (Final).pdf
2011-05-20 Cockburn Report (Final).pdf
2011-05-20 Cockburn Report Appendices (Final).pdf
2011-09-12 Cockburn Report-Exhibits & Appendices.pdf
2011-09-12 Cockburn Report.pdf
2011-09-15 Cockburn Report-Exhibits & Appendices - Sept 15 2011.pdf
2011-09-15 Cockburn Report-Exhibits & Appendices REVISED.pdf
2011-09-15 Cockburn Report.CLEAN.pdf
2011-09-15 Cockburn Report.REDLINE.pdf
2011-09-15 Errata letter.pdf
2011-09-15 POS re Revised Cockburn Report.pdf
2011-09-27 Cockburn Report-Exhibits and Appendices.pdf

2011-10-10 Cockburn - Leonard Rebuttal.pdf
2011-10-10 Cockburn Reply to Cox FINAL (w Exhs Appx).pdf
Cockburn Reply to Leonard Exhibits.pdf
Ex B - Under Seal Cover Sheet (reply report of Cockburn to Leonard).pdf
Ex E - Under Seal Cover Sheet (reply report of Cockburn to Cox).pdf
Ex. 1 - Goldberg CV.pdf
Goldberg Expert Invalidity Rebuttal Report.pdf
2011-09-12 C Kemerer Decl.pdf
2011-09-12 Supp Summary & Rept of Erez Landau.pdf
Erez_Landau_Perf_Benchmark_Summary_and_Report.pdf
2011-07-29 Mitchell Expert Copyright Report GOOG AEO.pdf
2011-08-08 Mitchell Expert Report -- HIGHLY CONFIDENTIAL-- AEO (OEM REDACTED).pdf
2011-08-08 Mitchell Expert Report -- HIGHLY CONFIDENTIAL-- AEO (REDACTED).pdf
2011-08-08 Mitchell Expert Report -- HIGHLY CONFIDENTIAL-- AEO.pdf
2011-08-08 Mitch-ell_Opening_Patent_Expert_Report_Appendix_A.pdf
2011-08-08 Mitch-ell_Opening_Patent_Expert_Report_Exhibit B Supplement.pdf
2011-08-11 Mitchell summary - cheat sheet re patents.doc
2011-08-12 Mitchell Exhibit Copyright-Opposition-A HC-AEO.pdf
2011-08-12 Mitchell Opposition Report HC-AEO.pdf
2011-08-19 Mitchell Copyright Reply Report.pdf
2011-09-01 Mitchell Infringement Reply Report GOOGLE AEO.pdf
2011-09-01 Mitchell Reply Infringement Report REDACTED.pdf
Copyright Exs A-S - Mitchell Expert Copyright Report (2).pdf
Ex A - John C Mitchell CV 01-11-2011 (2).pdf
Ex B - List of Materials Considered (Mitchell Report) (2).pdf
Ex 01 Mitchell Decl Ex.1-Mitchell Expert Copyright Report (GOOG AEO).pdf
Ex 02 Mitchell Opposition Report (GOOG AEO).pdf
Ex 03 - 2011-08-19 Mitchell Copyright Reply Report.pdf
2011.06.28 Norton Decl ISO Daubert Opp FINAL.pdf
2011.06.28 Norton Exhs A-M (CDKM UNDER SEAL).pdf
Peters Decl - Ex. 01.pdf
Peters Decl - Ex. 02.pdf
Peters Decl - Ex. 03.pdf
Peters Decl - Ex. 04.pdf
Peters Decl - Ex. 05.pdf
Peters Decl - Ex. 06 (Gosling '104 decl).pdf
Peters Decl - Ex. 07.pdf

Expert Report of Professor James R. Kearl

March 21, 2012                                          Charles River Associates

Peters Decl - Ex. 08.pdf
Peters Decl - Ex. 09.pdf
Peters Decl - Ex. 10.pdf
Peters Decl - Ex. 11.pdf
2011-08-06 Noel Poore Perf Benchmark Summary
and Report - SIGNED.pdf
Ex A Noel Poore (Jul 2011) Resume.pdf
2011-07-29 JLI Purdy Expert Report (copyright).pdf
2011-08-19 Purdy Copyright Reply Report.pdf
2011-08-19 Purdy Ex A-JLI Purdy Opening Expert
Report.pdf
2011-08-19 Purdy Ex B-Revised
JLI_Purdy_Revised_Opening_Expert_Report.pdf
2011-08-19 Purdy Ex C-
Copyright_Reply_Expert_Report_Purdy.pdf
2011-10-10 Serwin Rebuttal Report_Cox (w Exhs
Appx).pdf
2011-10-10 Serwin Rebuttal Report_Leonard (w
Exhs Appx).pdf
2011-10-10 Serwin Rebuttal Report_Leonard.pdf
2011-09-12 Expert Report of Dr Shugan.pdf
2011-09-28 Shugan Reply Report (w Exhs Appen-
dix).pdf
2011-08-20 [P344] Swoopes Decl Exhibits 17 &
18.pdf
2011-08-20 [P345] Swoopes Decl Exhibits 19 &
20.pdf
2011-09-12 Summary of Investigation of G Ten-
ney.pdf
Bob_Vandette_Perf_Benchmark_Summary_and_Re
port.pdf
2011-07-29 JLI Visnick Expert Report.pdf
2011-03-17 Peters Decl ISO Oracle Opening Claim
Const Brief.pdf
2011-03-17 [P094]Oracle Opening Claim Construc-
tion Brief.pdf
2011-03-31 Supp Peters Decl ISO Oracle Respon-
sive Claim Construction Brief.pdf
2011-03-31 [P100] Oracle Responsive Claim Con-
struction Brief.pdf
2011-04-29 [129] P's Memo Re Its Plan for Stream-
ling Case for Trial.pdf
2011-05-06 [132] P's Resp to Tentative Claim Con-
struc Ord & Req for Critique.pdf
2011-05-06 [133] P's Resp to Ord re Narrowing Is-
sues for Trial.pdf
2011-09-12 Summary of Investigation of G Ten-
ney.pdf
2011-09-12 Summary of Investigation of Seeon Bir-
ger.pdf
Copy of Ex A android copy-on-write stats.xlsx
Ex. 18 Part 1 of 2.pdf
Ex. 18 Part 2 of 2.pdf
Ex. 20 - http_www.java.pdf
Ex. 22 - httpja-
ja-
va.sun.comdocsbooksjlsfirst_editionhtmljcopyright.do
c.html.pdf

Ex. 26 - httpdeveloper.android.comguidebasicswhat-
is-android.html.pdf
OAGOOGLE0000052023-52059 ('702 patent).pdf
OAGOOGLE0000052060-52077 ('447 patent).pdf
OAGOOGLE0000052078-52096 ('476 patent).pdf
OAGOOGLE0000052097-52109 ('520 patent).pdf
OAGOOGLE0000052110-52130 ('720 patent).pdf
OAGOOGLE0000052131-52143 ('685 patent).pdf
OAGOOGLE0000052144-52169 ('156 patent).pdf
OAGOOGLE0000052194-52209 ('204 patent).pdf
OAGOOGLE0000052210-52234 ('205 patent).pdf
OAGOOGLE0000052235-52253 ('104 patent).pdf
OAGOOGLE0000052270-52424 ('720 FH).pdf
OAGOOGLE0000052602-52859 ('205 FH).pdf
OAGOOGLE0000102583-105959 ('104 FH).pdf
OAGOOGLE0000111357-111936 ('476 FH).pdf
OAGOOGLE0000111937-112639 ('447 FH).pdf
OAGOOGLE0000112640-113099 ('520 FH).pdf
OAGOOGLE0000113100-113508 ('156 FH).pdf
OAGOOGLE0000113509-113600 ('685 FH).pdf
OAGOOGLE0000113601-113788 ('702 FH).pdf
OAGOOGLE0000113789-114304 ('204 FH).pdf
10-14-11 Order granting Daubert as to Leonard
Cox.pdf
10-14-11 Order granting leave to file motion re reply
reports.pdf
10.14.11 Oracle letter to Judge Alsup.pdf
2010-10-26 [035] Oracle's MTD Counterclaims & to
Strike Defenses.pdf
2010-10-28 [040] P's Opp to D's MTD Count VIII of
P's Compl.pdf
2010-11-16 [054] P's Reply ISO Oracle MTD &
Strike.pdf
2011-06-28 Daubert Opp FINAL-UNDER SEAL.pdf
2011-06-28 Norton Decl ISO Daubert Opp FINAL.pdf
2011-07-22 230_ Order re MTS Damage Report of
Cockburn (DAUBERT).pdf
2011-07-27 [240] P's Opp to D's Amended Mtn for
Leave to Supp Invalidity Contentions.pdf
2011-08-19 Mitchell Decl ISO Oracle Opp To MSJ
On Count VIII.pdf
2011-08-19 Oracle Opp to Copyright MSJ (GOOG
AEO).pdf
2011-08-19
Purdy_decl_ISO_opp_to_MSJ_on_Count_VIII.pdf
2011-08-
19_Swoopes_decl_ISO_opp_to_MSJ_on_Count_VIII
.pdf
2011-09-22 Oracle opposition to Google request
Daubert re Cockburn report.pdf
2011-10-04 Opp to Google MIL 1 (Final).pdf
2011-10-04 Opp to Google MIL 2 (Final).pdf
2011-10-04 Opp to Google MIL 3 (Final).pdf
2011-10-04 Opp to Google MIL 4 (Final).pdf
2011-10-04 Opp to Google MIL 5 (Final).pdf
2011-10-10 Oracle letter requesting Daubert mtn
Leonard Cox.pdf
2011-10-11 Order re striking portions of Mitchell

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

report.pdf
Oracle MIL 1 - Reexaminations.pdf
Oracle MIL 2 - Exclude Google's Reliance on Legal
Advice.pdf
Oracle MIL 3 - OEM Changes to Android.pdf
Oracle MIL 4 - Past Actions with APIs.pdf
Oracle MIL 5 - Exclude Evidence Contrary to State-
ments in Lindholm email.pdf
2011-08-04 Oracle Resp & Objec to Google 1st
RFAs.pdf
2011-04-08 Oracle Supplemental Response to
Google RFP No. 22.pdf
2011-01-06 Oracle Resp to Google Rogs (Set 1) (w
Exhs).pdf
2011-03-30 OA Resp to Google 3d Rogs No.13.pdf
2011-04-25 Oracle Supp Response to Rog 13.pdf
2011-04-25 Oracle Supp Responses To Rogs 1-10
Google HIGHLY CONFIDENTIAL ATTORNEYS
EYES ONLY.pdf
2011-07-14 Oracle Obj & Resp to Google 4th Rogs
14-17 contains CONFIDENTIAL info.pdf
2011-07-22 Oracle Resp To Google Amended Rog
15.pdf
2011-07-28 Oracle Resp to Google 5th Rogs Nos 18-
20.pdf
2011-07-28 P's Resp to Def's 5th Set of Rogs Nos
18-20.pdf
2011-07-29 Oracle Supp Resp to Rogs 1-10
(GOOGLE HIGHLY CONFIDENTIAL AEO).pdf
2011-08-01 Oracle 3d Supp Resp To Google Rog
13.pdf
2011-08-01 Oracle 3rd Supp Resp to 3rd Rogs (No.
13).pdf
2011-08-01 Oracle Supp Resp to 5th Rogs (Nos. 18-
20).pdf
2011-08-01 Oracle Supp Resp To Google 5th Rogs
18-20.pdf
Appendix C.xlsx
Appendix D (US exhibits).xlsx
Appendix D (WW exhibits).xlsx
Appendix E.xlsx
Econometric Backup.xlsx
Exhibits 1-18 -- Patents.xlsx
Exhibits 19-25 -- Copyright.xlsx
Exhibits 26, 27 -- Copyright Conjoint.xlsx
README.txt
0.00 Set File Paths.sas
0.10 Construct Directory File Listing for Import.sas
0.20 Import Auction, Bids & Features data (Cell
Phone Report).sas
0.21 Generate Yearly Frequency Counts.sas
0.30 Preliminary Data Cleanup.sas
0.40 Adding Covariates.sas
0.51 Set-up Estimation (BASE).sas
0.52 Set-up Estimation (SENS).sas
0.61 Demand (BASE).sas
0.62 Demand (SENS).sas
0.70 Parameter Estimates.sas

0.80 Identify X-OS Bidders.sas
0.91 Scenarios (BASE).sas
0.92 Scenarios (SENS).sas
1.00 Summary Statistics.sas
1.10 WTP.sas
1.20 X-OS Bid Summary.sas
0.0 data macros.sas
0.0 dummy.sas
sort v4.sas
Appendix C - Econometric Exhibits.xlsx
Econometric Backup.xlsx
f_2009.sas7bdat
f_2010.sas7bdat
f_2011.sas7bdat
consolidated_specs_benchmarks.sas7bdat
Strategy Analytics Sales Shares.xlsx
translation.sas7bdat
auction_bids_cell_2009_1.zip
auction_bids_cell_2009_10.zip
auction_bids_cell_2009_11.zip
auction_bids_cell_2009_12.zip
auction_bids_cell_2009_2.zip
auction_bids_cell_2009_3.zip
auction_bids_cell_2009_4.zip
auction_bids_cell_2009_5.zip
auction_bids_cell_2009_6.zip
auction_bids_cell_2009_7.zip
auction_bids_cell_2009_8.zip
auction_bids_cell_2009_9.zip
auction_bids_cell_2010_1.zip
auction_bids_cell_2010_10.zip
auction_bids_cell_2010_11.zip
auction_bids_cell_2010_12.zip
auction_bids_cell_2010_2.zip
auction_bids_cell_2010_3.zip
auction_bids_cell_2010_4.zip
auction_bids_cell_2010_5.zip
auction_bids_cell_2010_6.zip
auction_bids_cell_2010_7.zip
auction_bids_cell_2010_8.zip
auction_bids_cell_2010_9.zip
auction_bids_cell_2011_1.zip
auction_bids_cell_2011_2.zip
auction_bids_cell_2011_3.zip
auction_bids_cell_2011_4.zip
auction_bids_cell_2011_5.zip
auction_bids_cell_2011_6.zip
cov.sas7bdat
bs_prmbase.sas7bdat
d_parameters_1.sas7bdat
d_parameters_10.sas7bdat
d_parameters_100.sas7bdat
d_parameters_101.sas7bdat
d_parameters_102.sas7bdat
d_parameters_103.sas7bdat
d_parameters_104.sas7bdat
d_parameters_105.sas7bdat
d_parameters_106.sas7bdat

Expert Report of Professor James R. Kearl

March 21, 2012                                                                              Charles River Associates

d_parameters_107.sas7bdat          d_parameters_16.sas7bdat
d_parameters_108.sas7bdat          d_parameters_160.sas7bdat
d_parameters_109.sas7bdat          d_parameters_161.sas7bdat
d_parameters_11.sas7bdat           d_parameters_162.sas7bdat
d_parameters_110.sas7bdat          d_parameters_163.sas7bdat
d_parameters_111.sas7bdat          d_parameters_164.sas7bdat
d_parameters_112.sas7bdat          d_parameters_165.sas7bdat
d_parameters_113.sas7bdat          d_parameters_166.sas7bdat
d_parameters_114.sas7bdat          d_parameters_167.sas7bdat
d_parameters_115.sas7bdat          d_parameters_168.sas7bdat
d_parameters_116.sas7bdat          d_parameters_169.sas7bdat
d_parameters_117.sas7bdat          d_parameters_17.sas7bdat
d_parameters_118.sas7bdat          d_parameters_170.sas7bdat
d_parameters_119.sas7bdat          d_parameters_171.sas7bdat
d_parameters_12.sas7bdat           d_parameters_172.sas7bdat
d_parameters_120.sas7bdat          d_parameters_173.sas7bdat
d_parameters_121.sas7bdat          d_parameters_174.sas7bdat
d_parameters_122.sas7bdat          d_parameters_175.sas7bdat
d_parameters_123.sas7bdat          d_parameters_176.sas7bdat
d_parameters_124.sas7bdat          d_parameters_177.sas7bdat
d_parameters_125.sas7bdat          d_parameters_178.sas7bdat
d_parameters_126.sas7bdat          d_parameters_179.sas7bdat
d_parameters_127.sas7bdat          d_parameters_18.sas7bdat
d_parameters_128.sas7bdat          d_parameters_180.sas7bdat
d_parameters_129.sas7bdat          d_parameters_181.sas7bdat
d_parameters_13.sas7bdat           d_parameters_182.sas7bdat
d_parameters_130.sas7bdat          d_parameters_183.sas7bdat
d_parameters_131.sas7bdat          d_parameters_184.sas7bdat
d_parameters_132.sas7bdat          d_parameters_185.sas7bdat
d_parameters_133.sas7bdat          d_parameters_186.sas7bdat
d_parameters_134.sas7bdat          d_parameters_187.sas7bdat
d_parameters_135.sas7bdat          d_parameters_188.sas7bdat
d_parameters_136.sas7bdat          d_parameters_189.sas7bdat
d_parameters_137.sas7bdat          d_parameters_19.sas7bdat
d_parameters_138.sas7bdat          d_parameters_190.sas7bdat
d_parameters_139.sas7bdat          d_parameters_191.sas7bdat
d_parameters_14.sas7bdat           d_parameters_192.sas7bdat
d_parameters_140.sas7bdat          d_parameters_193.sas7bdat
d_parameters_141.sas7bdat          d_parameters_194.sas7bdat
d_parameters_142.sas7bdat          d_parameters_195.sas7bdat
d_parameters_143.sas7bdat          d_parameters_196.sas7bdat
d_parameters_144.sas7bdat          d_parameters_197.sas7bdat
d_parameters_145.sas7bdat          d_parameters_198.sas7bdat
d_parameters_146.sas7bdat          d_parameters_199.sas7bdat
d_parameters_147.sas7bdat          d_parameters_2.sas7bdat
d_parameters_148.sas7bdat          d_parameters_20.sas7bdat
d_parameters_149.sas7bdat          d_parameters_200.sas7bdat
d_parameters_15.sas7bdat           d_parameters_201.sas7bdat
d_parameters_150.sas7bdat          d_parameters_202.sas7bdat
d_parameters_151.sas7bdat          d_parameters_203.sas7bdat
d_parameters_152.sas7bdat          d_parameters_204.sas7bdat
d_parameters_153.sas7bdat          d_parameters_205.sas7bdat
d_parameters_154.sas7bdat          d_parameters_206.sas7bdat
d_parameters_155.sas7bdat          d_parameters_207.sas7bdat
d_parameters_156.sas7bdat          d_parameters_208.sas7bdat
d_parameters_157.sas7bdat          d_parameters_209.sas7bdat
d_parameters_158.sas7bdat          d_parameters_21.sas7bdat
d_parameters_159.sas7bdat          d_parameters_210.sas7bdat

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

d_parameters_211.sas7bdat
d_parameters_212.sas7bdat
d_parameters_213.sas7bdat
d_parameters_214.sas7bdat
d_parameters_215.sas7bdat
d_parameters_216.sas7bdat
d_parameters_217.sas7bdat
d_parameters_218.sas7bdat
d_parameters_219.sas7bdat
d_parameters_22.sas7bdat
d_parameters_220.sas7bdat
d_parameters_221.sas7bdat
d_parameters_222.sas7bdat
d_parameters_223.sas7bdat
d_parameters_224.sas7bdat
d_parameters_225.sas7bdat
d_parameters_226.sas7bdat
d_parameters_227.sas7bdat
d_parameters_228.sas7bdat
d_parameters_229.sas7bdat
d_parameters_23.sas7bdat
d_parameters_230.sas7bdat
d_parameters_231.sas7bdat
d_parameters_232.sas7bdat
d_parameters_233.sas7bdat
d_parameters_234.sas7bdat
d_parameters_235.sas7bdat
d_parameters_236.sas7bdat
d_parameters_237.sas7bdat
d_parameters_238.sas7bdat
d_parameters_239.sas7bdat
d_parameters_24.sas7bdat
d_parameters_240.sas7bdat
d_parameters_241.sas7bdat
d_parameters_242.sas7bdat
d_parameters_243.sas7bdat
d_parameters_244.sas7bdat
d_parameters_245.sas7bdat
d_parameters_246.sas7bdat
d_parameters_247.sas7bdat
d_parameters_248.sas7bdat
d_parameters_249.sas7bdat
d_parameters_25.sas7bdat
d_parameters_250.sas7bdat
d_parameters_251.sas7bdat
d_parameters_252.sas7bdat
d_parameters_253.sas7bdat
d_parameters_254.sas7bdat
d_parameters_255.sas7bdat
d_parameters_256.sas7bdat
d_parameters_257.sas7bdat
d_parameters_258.sas7bdat
d_parameters_259.sas7bdat
d_parameters_26.sas7bdat
d_parameters_260.sas7bdat
d_parameters_261.sas7bdat
d_parameters_262.sas7bdat
d_parameters_263.sas7bdat

d_parameters_264.sas7bdat
d_parameters_265.sas7bdat
d_parameters_266.sas7bdat
d_parameters_267.sas7bdat
d_parameters_268.sas7bdat
d_parameters_269.sas7bdat
d_parameters_27.sas7bdat
d_parameters_270.sas7bdat
d_parameters_271.sas7bdat
d_parameters_272.sas7bdat
d_parameters_273.sas7bdat
d_parameters_274.sas7bdat
d_parameters_275.sas7bdat
d_parameters_276.sas7bdat
d_parameters_277.sas7bdat
d_parameters_278.sas7bdat
d_parameters_279.sas7bdat
d_parameters_28.sas7bdat
d_parameters_280.sas7bdat
d_parameters_281.sas7bdat
d_parameters_282.sas7bdat
d_parameters_283.sas7bdat
d_parameters_284.sas7bdat
d_parameters_285.sas7bdat
d_parameters_286.sas7bdat
d_parameters_287.sas7bdat
d_parameters_288.sas7bdat
d_parameters_289.sas7bdat
d_parameters_29.sas7bdat
d_parameters_290.sas7bdat
d_parameters_291.sas7bdat
d_parameters_292.sas7bdat
d_parameters_293.sas7bdat
d_parameters_294.sas7bdat
d_parameters_295.sas7bdat
d_parameters_296.sas7bdat
d_parameters_297.sas7bdat
d_parameters_298.sas7bdat
d_parameters_299.sas7bdat
d_parameters_3.sas7bdat
d_parameters_30.sas7bdat
d_parameters_300.sas7bdat
d_parameters_31.sas7bdat
d_parameters_32.sas7bdat
d_parameters_33.sas7bdat
d_parameters_34.sas7bdat
d_parameters_35.sas7bdat
d_parameters_36.sas7bdat
d_parameters_37.sas7bdat
d_parameters_38.sas7bdat
d_parameters_39.sas7bdat
d_parameters_4.sas7bdat
d_parameters_40.sas7bdat
d_parameters_41.sas7bdat
d_parameters_42.sas7bdat
d_parameters_43.sas7bdat
d_parameters_44.sas7bdat
d_parameters_45.sas7bdat

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| d_parameters_46.sas7bdat | d_parameters_99.sas7bdat |
| d_parameters_47.sas7bdat | d_parameters_1.sas7bdat |
| d_parameters_48.sas7bdat | d_parameters_10.sas7bdat |
| d_parameters_49.sas7bdat | d_parameters_100.sas7bdat |
| d_parameters_5.sas7bdat | d_parameters_101.sas7bdat |
| d_parameters_50.sas7bdat | d_parameters_102.sas7bdat |
| d_parameters_51.sas7bdat | d_parameters_103.sas7bdat |
| d_parameters_52.sas7bdat | d_parameters_104.sas7bdat |
| d_parameters_53.sas7bdat | d_parameters_105.sas7bdat |
| d_parameters_54.sas7bdat | d_parameters_106.sas7bdat |
| d_parameters_55.sas7bdat | d_parameters_107.sas7bdat |
| d_parameters_56.sas7bdat | d_parameters_108.sas7bdat |
| d_parameters_57.sas7bdat | d_parameters_109.sas7bdat |
| d_parameters_58.sas7bdat | d_parameters_11.sas7bdat |
| d_parameters_59.sas7bdat | d_parameters_110.sas7bdat |
| d_parameters_6.sas7bdat | d_parameters_111.sas7bdat |
| d_parameters_60.sas7bdat | d_parameters_112.sas7bdat |
| d_parameters_61.sas7bdat | d_parameters_113.sas7bdat |
| d_parameters_62.sas7bdat | d_parameters_114.sas7bdat |
| d_parameters_63.sas7bdat | d_parameters_115.sas7bdat |
| d_parameters_64.sas7bdat | d_parameters_116.sas7bdat |
| d_parameters_65.sas7bdat | d_parameters_117.sas7bdat |
| d_parameters_66.sas7bdat | d_parameters_118.sas7bdat |
| d_parameters_67.sas7bdat | d_parameters_119.sas7bdat |
| d_parameters_68.sas7bdat | d_parameters_12.sas7bdat |
| d_parameters_69.sas7bdat | d_parameters_120.sas7bdat |
| d_parameters_7.sas7bdat | d_parameters_121.sas7bdat |
| d_parameters_70.sas7bdat | d_parameters_122.sas7bdat |
| d_parameters_71.sas7bdat | d_parameters_123.sas7bdat |
| d_parameters_72.sas7bdat | d_parameters_124.sas7bdat |
| d_parameters_73.sas7bdat | d_parameters_125.sas7bdat |
| d_parameters_74.sas7bdat | d_parameters_126.sas7bdat |
| d_parameters_75.sas7bdat | d_parameters_127.sas7bdat |
| d_parameters_76.sas7bdat | d_parameters_128.sas7bdat |
| d_parameters_77.sas7bdat | d_parameters_129.sas7bdat |
| d_parameters_78.sas7bdat | d_parameters_13.sas7bdat |
| d_parameters_79.sas7bdat | d_parameters_130.sas7bdat |
| d_parameters_8.sas7bdat | d_parameters_131.sas7bdat |
| d_parameters_80.sas7bdat | d_parameters_132.sas7bdat |
| d_parameters_81.sas7bdat | d_parameters_133.sas7bdat |
| d_parameters_82.sas7bdat | d_parameters_134.sas7bdat |
| d_parameters_83.sas7bdat | d_parameters_135.sas7bdat |
| d_parameters_84.sas7bdat | d_parameters_136.sas7bdat |
| d_parameters_85.sas7bdat | d_parameters_137.sas7bdat |
| d_parameters_86.sas7bdat | d_parameters_138.sas7bdat |
| d_parameters_87.sas7bdat | d_parameters_139.sas7bdat |
| d_parameters_88.sas7bdat | d_parameters_14.sas7bdat |
| d_parameters_89.sas7bdat | d_parameters_140.sas7bdat |
| d_parameters_9.sas7bdat | d_parameters_141.sas7bdat |
| d_parameters_90.sas7bdat | d_parameters_142.sas7bdat |
| d_parameters_91.sas7bdat | d_parameters_143.sas7bdat |
| d_parameters_92.sas7bdat | d_parameters_144.sas7bdat |
| d_parameters_93.sas7bdat | d_parameters_145.sas7bdat |
| d_parameters_94.sas7bdat | d_parameters_146.sas7bdat |
| d_parameters_95.sas7bdat | d_parameters_147.sas7bdat |
| d_parameters_96.sas7bdat | d_parameters_148.sas7bdat |
| d_parameters_97.sas7bdat | d_parameters_149.sas7bdat |
| d_parameters_98.sas7bdat | d_parameters_15.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                        Charles River Associates

d_parameters_150.sas7bdat          d_parameters_202.sas7bdat
d_parameters_151.sas7bdat          d_parameters_203.sas7bdat
d_parameters_152.sas7bdat          d_parameters_204.sas7bdat
d_parameters_153.sas7bdat          d_parameters_205.sas7bdat
d_parameters_154.sas7bdat          d_parameters_206.sas7bdat
d_parameters_155.sas7bdat          d_parameters_207.sas7bdat
d_parameters_156.sas7bdat          d_parameters_208.sas7bdat
d_parameters_157.sas7bdat          d_parameters_209.sas7bdat
d_parameters_158.sas7bdat          d_parameters_21.sas7bdat
d_parameters_159.sas7bdat          d_parameters_210.sas7bdat
d_parameters_16.sas7bdat           d_parameters_211.sas7bdat
d_parameters_160.sas7bdat          d_parameters_212.sas7bdat
d_parameters_161.sas7bdat          d_parameters_213.sas7bdat
d_parameters_162.sas7bdat          d_parameters_214.sas7bdat
d_parameters_163.sas7bdat          d_parameters_215.sas7bdat
d_parameters_164.sas7bdat          d_parameters_216.sas7bdat
d_parameters_165.sas7bdat          d_parameters_217.sas7bdat
d_parameters_166.sas7bdat          d_parameters_218.sas7bdat
d_parameters_167.sas7bdat          d_parameters_219.sas7bdat
d_parameters_168.sas7bdat          d_parameters_22.sas7bdat
d_parameters_169.sas7bdat          d_parameters_220.sas7bdat
d_parameters_17.sas7bdat           d_parameters_221.sas7bdat
d_parameters_170.sas7bdat          d_parameters_222.sas7bdat
d_parameters_171.sas7bdat          d_parameters_223.sas7bdat
d_parameters_172.sas7bdat          d_parameters_224.sas7bdat
d_parameters_173.sas7bdat          d_parameters_225.sas7bdat
d_parameters_174.sas7bdat          d_parameters_226.sas7bdat
d_parameters_175.sas7bdat          d_parameters_227.sas7bdat
d_parameters_176.sas7bdat          d_parameters_228.sas7bdat
d_parameters_177.sas7bdat          d_parameters_229.sas7bdat
d_parameters_178.sas7bdat          d_parameters_23.sas7bdat
d_parameters_179.sas7bdat          d_parameters_230.sas7bdat
d_parameters_18.sas7bdat           d_parameters_231.sas7bdat
d_parameters_180.sas7bdat          d_parameters_232.sas7bdat
d_parameters_181.sas7bdat          d_parameters_233.sas7bdat
d_parameters_182.sas7bdat          d_parameters_234.sas7bdat
d_parameters_183.sas7bdat          d_parameters_235.sas7bdat
d_parameters_184.sas7bdat          d_parameters_236.sas7bdat
d_parameters_185.sas7bdat          d_parameters_237.sas7bdat
d_parameters_186.sas7bdat          d_parameters_238.sas7bdat
d_parameters_187.sas7bdat          d_parameters_239.sas7bdat
d_parameters_188.sas7bdat          d_parameters_24.sas7bdat
d_parameters_189.sas7bdat          d_parameters_240.sas7bdat
d_parameters_19.sas7bdat           d_parameters_241.sas7bdat
d_parameters_190.sas7bdat          d_parameters_242.sas7bdat
d_parameters_191.sas7bdat          d_parameters_243.sas7bdat
d_parameters_192.sas7bdat          d_parameters_244.sas7bdat
d_parameters_193.sas7bdat          d_parameters_245.sas7bdat
d_parameters_194.sas7bdat          d_parameters_246.sas7bdat
d_parameters_195.sas7bdat          d_parameters_247.sas7bdat
d_parameters_196.sas7bdat          d_parameters_248.sas7bdat
d_parameters_197.sas7bdat          d_parameters_249.sas7bdat
d_parameters_198.sas7bdat          d_parameters_25.sas7bdat
d_parameters_199.sas7bdat          d_parameters_250.sas7bdat
d_parameters_2.sas7bdat            d_parameters_251.sas7bdat
d_parameters_20.sas7bdat           d_parameters_252.sas7bdat
d_parameters_200.sas7bdat          d_parameters_253.sas7bdat
d_parameters_201.sas7bdat          d_parameters_254.sas7bdat

Subject to Protective Order - Highly Confidential

Expert Report of Professor James R. Kearl

March 21, 2012                                                           Charles River Associates

| | |
|---|---|
| d_parameters_255.sas7bdat | d_parameters_37.sas7bdat |
| d_parameters_256.sas7bdat | d_parameters_38.sas7bdat |
| d_parameters_257.sas7bdat | d_parameters_39.sas7bdat |
| d_parameters_258.sas7bdat | d_parameters_4.sas7bdat |
| d_parameters_259.sas7bdat | d_parameters_40.sas7bdat |
| d_parameters_26.sas7bdat | d_parameters_41.sas7bdat |
| d_parameters_260.sas7bdat | d_parameters_42.sas7bdat |
| d_parameters_261.sas7bdat | d_parameters_43.sas7bdat |
| d_parameters_262.sas7bdat | d_parameters_44.sas7bdat |
| d_parameters_263.sas7bdat | d_parameters_45.sas7bdat |
| d_parameters_264.sas7bdat | d_parameters_46.sas7bdat |
| d_parameters_265.sas7bdat | d_parameters_47.sas7bdat |
| d_parameters_266.sas7bdat | d_parameters_48.sas7bdat |
| d_parameters_267.sas7bdat | d_parameters_49.sas7bdat |
| d_parameters_268.sas7bdat | d_parameters_5.sas7bdat |
| d_parameters_269.sas7bdat | d_parameters_50.sas7bdat |
| d_parameters_27.sas7bdat | d_parameters_51.sas7bdat |
| d_parameters_270.sas7bdat | d_parameters_52.sas7bdat |
| d_parameters_271.sas7bdat | d_parameters_53.sas7bdat |
| d_parameters_272.sas7bdat | d_parameters_54.sas7bdat |
| d_parameters_273.sas7bdat | d_parameters_55.sas7bdat |
| d_parameters_274.sas7bdat | d_parameters_56.sas7bdat |
| d_parameters_275.sas7bdat | d_parameters_57.sas7bdat |
| d_parameters_276.sas7bdat | d_parameters_58.sas7bdat |
| d_parameters_277.sas7bdat | d_parameters_59.sas7bdat |
| d_parameters_278.sas7bdat | d_parameters_6.sas7bdat |
| d_parameters_279.sas7bdat | d_parameters_60.sas7bdat |
| d_parameters_28.sas7bdat | d_parameters_61.sas7bdat |
| d_parameters_280.sas7bdat | d_parameters_62.sas7bdat |
| d_parameters_281.sas7bdat | d_parameters_63.sas7bdat |
| d_parameters_282.sas7bdat | d_parameters_64.sas7bdat |
| d_parameters_283.sas7bdat | d_parameters_65.sas7bdat |
| d_parameters_284.sas7bdat | d_parameters_66.sas7bdat |
| d_parameters_285.sas7bdat | d_parameters_67.sas7bdat |
| d_parameters_286.sas7bdat | d_parameters_68.sas7bdat |
| d_parameters_287.sas7bdat | d_parameters_69.sas7bdat |
| d_parameters_288.sas7bdat | d_parameters_7.sas7bdat |
| d_parameters_289.sas7bdat | d_parameters_70.sas7bdat |
| d_parameters_29.sas7bdat | d_parameters_71.sas7bdat |
| d_parameters_290.sas7bdat | d_parameters_72.sas7bdat |
| d_parameters_291.sas7bdat | d_parameters_73.sas7bdat |
| d_parameters_292.sas7bdat | d_parameters_74.sas7bdat |
| d_parameters_293.sas7bdat | d_parameters_75.sas7bdat |
| d_parameters_294.sas7bdat | d_parameters_76.sas7bdat |
| d_parameters_295.sas7bdat | d_parameters_77.sas7bdat |
| d_parameters_296.sas7bdat | d_parameters_78.sas7bdat |
| d_parameters_297.sas7bdat | d_parameters_79.sas7bdat |
| d_parameters_298.sas7bdat | d_parameters_8.sas7bdat |
| d_parameters_299.sas7bdat | d_parameters_80.sas7bdat |
| d_parameters_3.sas7bdat | d_parameters_81.sas7bdat |
| d_parameters_30.sas7bdat | d_parameters_82.sas7bdat |
| d_parameters_300.sas7bdat | d_parameters_83.sas7bdat |
| d_parameters_31.sas7bdat | d_parameters_84.sas7bdat |
| d_parameters_32.sas7bdat | d_parameters_85.sas7bdat |
| d_parameters_33.sas7bdat | d_parameters_86.sas7bdat |
| d_parameters_34.sas7bdat | d_parameters_87.sas7bdat |
| d_parameters_35.sas7bdat | d_parameters_88.sas7bdat |
| d_parameters_36.sas7bdat | d_parameters_89.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                Charles River Associates

| | |
|---|---|
| d_parameters_9.sas7bdat | d_parameters_141.sas7bdat |
| d_parameters_90.sas7bdat | d_parameters_142.sas7bdat |
| d_parameters_91.sas7bdat | d_parameters_143.sas7bdat |
| d_parameters_92.sas7bdat | d_parameters_144.sas7bdat |
| d_parameters_93.sas7bdat | d_parameters_145.sas7bdat |
| d_parameters_94.sas7bdat | d_parameters_146.sas7bdat |
| d_parameters_95.sas7bdat | d_parameters_147.sas7bdat |
| d_parameters_96.sas7bdat | d_parameters_148.sas7bdat |
| d_parameters_97.sas7bdat | d_parameters_149.sas7bdat |
| d_parameters_98.sas7bdat | d_parameters_15.sas7bdat |
| d_parameters_99.sas7bdat | d_parameters_150.sas7bdat |
| d_parameters_1.sas7bdat | d_parameters_151.sas7bdat |
| d_parameters_10.sas7bdat | d_parameters_152.sas7bdat |
| d_parameters_100.sas7bdat | d_parameters_153.sas7bdat |
| d_parameters_101.sas7bdat | d_parameters_154.sas7bdat |
| d_parameters_102.sas7bdat | d_parameters_155.sas7bdat |
| d_parameters_103.sas7bdat | d_parameters_156.sas7bdat |
| d_parameters_104.sas7bdat | d_parameters_157.sas7bdat |
| d_parameters_105.sas7bdat | d_parameters_158.sas7bdat |
| d_parameters_106.sas7bdat | d_parameters_159.sas7bdat |
| d_parameters_107.sas7bdat | d_parameters_16.sas7bdat |
| d_parameters_108.sas7bdat | d_parameters_160.sas7bdat |
| d_parameters_109.sas7bdat | d_parameters_161.sas7bdat |
| d_parameters_11.sas7bdat | d_parameters_162.sas7bdat |
| d_parameters_110.sas7bdat | d_parameters_163.sas7bdat |
| d_parameters_111.sas7bdat | d_parameters_164.sas7bdat |
| d_parameters_112.sas7bdat | d_parameters_165.sas7bdat |
| d_parameters_113.sas7bdat | d_parameters_166.sas7bdat |
| d_parameters_114.sas7bdat | d_parameters_167.sas7bdat |
| d_parameters_115.sas7bdat | d_parameters_168.sas7bdat |
| d_parameters_116.sas7bdat | d_parameters_169.sas7bdat |
| d_parameters_117.sas7bdat | d_parameters_17.sas7bdat |
| d_parameters_118.sas7bdat | d_parameters_170.sas7bdat |
| d_parameters_119.sas7bdat | d_parameters_171.sas7bdat |
| d_parameters_12.sas7bdat | d_parameters_172.sas7bdat |
| d_parameters_120.sas7bdat | d_parameters_173.sas7bdat |
| d_parameters_121.sas7bdat | d_parameters_174.sas7bdat |
| d_parameters_122.sas7bdat | d_parameters_175.sas7bdat |
| d_parameters_123.sas7bdat | d_parameters_176.sas7bdat |
| d_parameters_124.sas7bdat | d_parameters_177.sas7bdat |
| d_parameters_125.sas7bdat | d_parameters_178.sas7bdat |
| d_parameters_126.sas7bdat | d_parameters_179.sas7bdat |
| d_parameters_127.sas7bdat | d_parameters_18.sas7bdat |
| d_parameters_128.sas7bdat | d_parameters_180.sas7bdat |
| d_parameters_129.sas7bdat | d_parameters_181.sas7bdat |
| d_parameters_13.sas7bdat | d_parameters_182.sas7bdat |
| d_parameters_130.sas7bdat | d_parameters_183.sas7bdat |
| d_parameters_131.sas7bdat | d_parameters_184.sas7bdat |
| d_parameters_132.sas7bdat | d_parameters_185.sas7bdat |
| d_parameters_133.sas7bdat | d_parameters_186.sas7bdat |
| d_parameters_134.sas7bdat | d_parameters_187.sas7bdat |
| d_parameters_135.sas7bdat | d_parameters_188.sas7bdat |
| d_parameters_136.sas7bdat | d_parameters_189.sas7bdat |
| d_parameters_137.sas7bdat | d_parameters_19.sas7bdat |
| d_parameters_138.sas7bdat | d_parameters_190.sas7bdat |
| d_parameters_139.sas7bdat | d_parameters_191.sas7bdat |
| d_parameters_14.sas7bdat | d_parameters_192.sas7bdat |
| d_parameters_140.sas7bdat | d_parameters_193.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| d_parameters_194.sas7bdat | d_parameters_246.sas7bdat |
| d_parameters_195.sas7bdat | d_parameters_247.sas7bdat |
| d_parameters_196.sas7bdat | d_parameters_248.sas7bdat |
| d_parameters_197.sas7bdat | d_parameters_249.sas7bdat |
| d_parameters_198.sas7bdat | d_parameters_25.sas7bdat |
| d_parameters_199.sas7bdat | d_parameters_250.sas7bdat |
| d_parameters_2.sas7bdat | d_parameters_251.sas7bdat |
| d_parameters_20.sas7bdat | d_parameters_252.sas7bdat |
| d_parameters_200.sas7bdat | d_parameters_253.sas7bdat |
| d_parameters_201.sas7bdat | d_parameters_254.sas7bdat |
| d_parameters_202.sas7bdat | d_parameters_255.sas7bdat |
| d_parameters_203.sas7bdat | d_parameters_256.sas7bdat |
| d_parameters_204.sas7bdat | d_parameters_257.sas7bdat |
| d_parameters_205.sas7bdat | d_parameters_258.sas7bdat |
| d_parameters_206.sas7bdat | d_parameters_259.sas7bdat |
| d_parameters_207.sas7bdat | d_parameters_26.sas7bdat |
| d_parameters_208.sas7bdat | d_parameters_260.sas7bdat |
| d_parameters_209.sas7bdat | d_parameters_261.sas7bdat |
| d_parameters_21.sas7bdat | d_parameters_262.sas7bdat |
| d_parameters_210.sas7bdat | d_parameters_263.sas7bdat |
| d_parameters_211.sas7bdat | d_parameters_264.sas7bdat |
| d_parameters_212.sas7bdat | d_parameters_265.sas7bdat |
| d_parameters_213.sas7bdat | d_parameters_266.sas7bdat |
| d_parameters_214.sas7bdat | d_parameters_267.sas7bdat |
| d_parameters_215.sas7bdat | d_parameters_268.sas7bdat |
| d_parameters_216.sas7bdat | d_parameters_269.sas7bdat |
| d_parameters_217.sas7bdat | d_parameters_27.sas7bdat |
| d_parameters_218.sas7bdat | d_parameters_270.sas7bdat |
| d_parameters_219.sas7bdat | d_parameters_271.sas7bdat |
| d_parameters_22.sas7bdat | d_parameters_272.sas7bdat |
| d_parameters_220.sas7bdat | d_parameters_273.sas7bdat |
| d_parameters_221.sas7bdat | d_parameters_274.sas7bdat |
| d_parameters_222.sas7bdat | d_parameters_275.sas7bdat |
| d_parameters_223.sas7bdat | d_parameters_276.sas7bdat |
| d_parameters_224.sas7bdat | d_parameters_277.sas7bdat |
| d_parameters_225.sas7bdat | d_parameters_278.sas7bdat |
| d_parameters_226.sas7bdat | d_parameters_279.sas7bdat |
| d_parameters_227.sas7bdat | d_parameters_28.sas7bdat |
| d_parameters_228.sas7bdat | d_parameters_280.sas7bdat |
| d_parameters_229.sas7bdat | d_parameters_281.sas7bdat |
| d_parameters_23.sas7bdat | d_parameters_282.sas7bdat |
| d_parameters_230.sas7bdat | d_parameters_283.sas7bdat |
| d_parameters_231.sas7bdat | d_parameters_284.sas7bdat |
| d_parameters_232.sas7bdat | d_parameters_285.sas7bdat |
| d_parameters_233.sas7bdat | d_parameters_286.sas7bdat |
| d_parameters_234.sas7bdat | d_parameters_287.sas7bdat |
| d_parameters_235.sas7bdat | d_parameters_288.sas7bdat |
| d_parameters_236.sas7bdat | d_parameters_289.sas7bdat |
| d_parameters_237.sas7bdat | d_parameters_29.sas7bdat |
| d_parameters_238.sas7bdat | d_parameters_290.sas7bdat |
| d_parameters_239.sas7bdat | d_parameters_291.sas7bdat |
| d_parameters_24.sas7bdat | d_parameters_292.sas7bdat |
| d_parameters_240.sas7bdat | d_parameters_293.sas7bdat |
| d_parameters_241.sas7bdat | d_parameters_294.sas7bdat |
| d_parameters_242.sas7bdat | d_parameters_295.sas7bdat |
| d_parameters_243.sas7bdat | d_parameters_296.sas7bdat |
| d_parameters_244.sas7bdat | d_parameters_297.sas7bdat |
| d_parameters_245.sas7bdat | d_parameters_298.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

| | |
|---|---|
| d_parameters_299.sas7bdat | d_parameters_80.sas7bdat |
| d_parameters_3.sas7bdat | d_parameters_81.sas7bdat |
| d_parameters_30.sas7bdat | d_parameters_82.sas7bdat |
| d_parameters_300.sas7bdat | d_parameters_83.sas7bdat |
| d_parameters_31.sas7bdat | d_parameters_84.sas7bdat |
| d_parameters_32.sas7bdat | d_parameters_85.sas7bdat |
| d_parameters_33.sas7bdat | d_parameters_86.sas7bdat |
| d_parameters_34.sas7bdat | d_parameters_87.sas7bdat |
| d_parameters_35.sas7bdat | d_parameters_88.sas7bdat |
| d_parameters_36.sas7bdat | d_parameters_89.sas7bdat |
| d_parameters_37.sas7bdat | d_parameters_9.sas7bdat |
| d_parameters_38.sas7bdat | d_parameters_90.sas7bdat |
| d_parameters_39.sas7bdat | d_parameters_91.sas7bdat |
| d_parameters_4.sas7bdat | d_parameters_92.sas7bdat |
| d_parameters_40.sas7bdat | d_parameters_93.sas7bdat |
| d_parameters_41.sas7bdat | d_parameters_94.sas7bdat |
| d_parameters_42.sas7bdat | d_parameters_95.sas7bdat |
| d_parameters_43.sas7bdat | d_parameters_96.sas7bdat |
| d_parameters_44.sas7bdat | d_parameters_97.sas7bdat |
| d_parameters_45.sas7bdat | d_parameters_98.sas7bdat |
| d_parameters_46.sas7bdat | d_parameters_99.sas7bdat |
| d_parameters_47.sas7bdat | d_parameters_1.sas7bdat |
| d_parameters_48.sas7bdat | d_parameters_10.sas7bdat |
| d_parameters_49.sas7bdat | d_parameters_100.sas7bdat |
| d_parameters_5.sas7bdat | d_parameters_101.sas7bdat |
| d_parameters_50.sas7bdat | d_parameters_102.sas7bdat |
| d_parameters_51.sas7bdat | d_parameters_103.sas7bdat |
| d_parameters_52.sas7bdat | d_parameters_104.sas7bdat |
| d_parameters_53.sas7bdat | d_parameters_105.sas7bdat |
| d_parameters_54.sas7bdat | d_parameters_106.sas7bdat |
| d_parameters_55.sas7bdat | d_parameters_107.sas7bdat |
| d_parameters_56.sas7bdat | d_parameters_108.sas7bdat |
| d_parameters_57.sas7bdat | d_parameters_109.sas7bdat |
| d_parameters_58.sas7bdat | d_parameters_11.sas7bdat |
| d_parameters_59.sas7bdat | d_parameters_110.sas7bdat |
| d_parameters_6.sas7bdat | d_parameters_111.sas7bdat |
| d_parameters_60.sas7bdat | d_parameters_112.sas7bdat |
| d_parameters_61.sas7bdat | d_parameters_113.sas7bdat |
| d_parameters_62.sas7bdat | d_parameters_114.sas7bdat |
| d_parameters_63.sas7bdat | d_parameters_115.sas7bdat |
| d_parameters_64.sas7bdat | d_parameters_116.sas7bdat |
| d_parameters_65.sas7bdat | d_parameters_117.sas7bdat |
| d_parameters_66.sas7bdat | d_parameters_118.sas7bdat |
| d_parameters_67.sas7bdat | d_parameters_119.sas7bdat |
| d_parameters_68.sas7bdat | d_parameters_12.sas7bdat |
| d_parameters_69.sas7bdat | d_parameters_120.sas7bdat |
| d_parameters_7.sas7bdat | d_parameters_121.sas7bdat |
| d_parameters_70.sas7bdat | d_parameters_122.sas7bdat |
| d_parameters_71.sas7bdat | d_parameters_123.sas7bdat |
| d_parameters_72.sas7bdat | d_parameters_124.sas7bdat |
| d_parameters_73.sas7bdat | d_parameters_125.sas7bdat |
| d_parameters_74.sas7bdat | d_parameters_126.sas7bdat |
| d_parameters_75.sas7bdat | d_parameters_127.sas7bdat |
| d_parameters_76.sas7bdat | d_parameters_128.sas7bdat |
| d_parameters_77.sas7bdat | d_parameters_129.sas7bdat |
| d_parameters_78.sas7bdat | d_parameters_13.sas7bdat |
| d_parameters_79.sas7bdat | d_parameters_130.sas7bdat |
| d_parameters_8.sas7bdat | d_parameters_131.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

| | |
|---|---|
| d_parameters_132.sas7bdat | d_parameters_185.sas7bdat |
| d_parameters_133.sas7bdat | d_parameters_186.sas7bdat |
| d_parameters_134.sas7bdat | d_parameters_187.sas7bdat |
| d_parameters_135.sas7bdat | d_parameters_188.sas7bdat |
| d_parameters_136.sas7bdat | d_parameters_189.sas7bdat |
| d_parameters_137.sas7bdat | d_parameters_19.sas7bdat |
| d_parameters_138.sas7bdat | d_parameters_190.sas7bdat |
| d_parameters_139.sas7bdat | d_parameters_191.sas7bdat |
| d_parameters_14.sas7bdat | d_parameters_192.sas7bdat |
| d_parameters_140.sas7bdat | d_parameters_193.sas7bdat |
| d_parameters_141.sas7bdat | d_parameters_194.sas7bdat |
| d_parameters_142.sas7bdat | d_parameters_195.sas7bdat |
| d_parameters_143.sas7bdat | d_parameters_196.sas7bdat |
| d_parameters_144.sas7bdat | d_parameters_197.sas7bdat |
| d_parameters_145.sas7bdat | d_parameters_198.sas7bdat |
| d_parameters_146.sas7bdat | d_parameters_199.sas7bdat |
| d_parameters_147.sas7bdat | d_parameters_2.sas7bdat |
| d_parameters_148.sas7bdat | d_parameters_20.sas7bdat |
| d_parameters_149.sas7bdat | d_parameters_200.sas7bdat |
| d_parameters_15.sas7bdat | d_parameters_201.sas7bdat |
| d_parameters_150.sas7bdat | d_parameters_202.sas7bdat |
| d_parameters_151.sas7bdat | d_parameters_203.sas7bdat |
| d_parameters_152.sas7bdat | d_parameters_204.sas7bdat |
| d_parameters_153.sas7bdat | d_parameters_205.sas7bdat |
| d_parameters_154.sas7bdat | d_parameters_206.sas7bdat |
| d_parameters_155.sas7bdat | d_parameters_207.sas7bdat |
| d_parameters_156.sas7bdat | d_parameters_208.sas7bdat |
| d_parameters_157.sas7bdat | d_parameters_209.sas7bdat |
| d_parameters_158.sas7bdat | d_parameters_21.sas7bdat |
| d_parameters_159.sas7bdat | d_parameters_210.sas7bdat |
| d_parameters_16.sas7bdat | d_parameters_211.sas7bdat |
| d_parameters_160.sas7bdat | d_parameters_212.sas7bdat |
| d_parameters_161.sas7bdat | d_parameters_213.sas7bdat |
| d_parameters_162.sas7bdat | d_parameters_214.sas7bdat |
| d_parameters_163.sas7bdat | d_parameters_215.sas7bdat |
| d_parameters_164.sas7bdat | d_parameters_216.sas7bdat |
| d_parameters_165.sas7bdat | d_parameters_217.sas7bdat |
| d_parameters_166.sas7bdat | d_parameters_218.sas7bdat |
| d_parameters_167.sas7bdat | d_parameters_219.sas7bdat |
| d_parameters_168.sas7bdat | d_parameters_22.sas7bdat |
| d_parameters_169.sas7bdat | d_parameters_220.sas7bdat |
| d_parameters_17.sas7bdat | d_parameters_221.sas7bdat |
| d_parameters_170.sas7bdat | d_parameters_222.sas7bdat |
| d_parameters_171.sas7bdat | d_parameters_223.sas7bdat |
| d_parameters_172.sas7bdat | d_parameters_224.sas7bdat |
| d_parameters_173.sas7bdat | d_parameters_225.sas7bdat |
| d_parameters_174.sas7bdat | d_parameters_226.sas7bdat |
| d_parameters_175.sas7bdat | d_parameters_227.sas7bdat |
| d_parameters_176.sas7bdat | d_parameters_228.sas7bdat |
| d_parameters_177.sas7bdat | d_parameters_229.sas7bdat |
| d_parameters_178.sas7bdat | d_parameters_23.sas7bdat |
| d_parameters_179.sas7bdat | d_parameters_230.sas7bdat |
| d_parameters_18.sas7bdat | d_parameters_231.sas7bdat |
| d_parameters_180.sas7bdat | d_parameters_232.sas7bdat |
| d_parameters_181.sas7bdat | d_parameters_233.sas7bdat |
| d_parameters_182.sas7bdat | d_parameters_234.sas7bdat |
| d_parameters_183.sas7bdat | d_parameters_235.sas7bdat |
| d_parameters_184.sas7bdat | d_parameters_236.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

d_parameters_237.sas7bdat
d_parameters_238.sas7bdat
d_parameters_239.sas7bdat
d_parameters_24.sas7bdat
d_parameters_240.sas7bdat
d_parameters_241.sas7bdat
d_parameters_242.sas7bdat
d_parameters_243.sas7bdat
d_parameters_244.sas7bdat
d_parameters_245.sas7bdat
d_parameters_246.sas7bdat
d_parameters_247.sas7bdat
d_parameters_248.sas7bdat
d_parameters_249.sas7bdat
d_parameters_25.sas7bdat
d_parameters_250.sas7bdat
d_parameters_251.sas7bdat
d_parameters_252.sas7bdat
d_parameters_253.sas7bdat
d_parameters_254.sas7bdat
d_parameters_255.sas7bdat
d_parameters_256.sas7bdat
d_parameters_257.sas7bdat
d_parameters_258.sas7bdat
d_parameters_259.sas7bdat
d_parameters_26.sas7bdat
d_parameters_260.sas7bdat
d_parameters_261.sas7bdat
d_parameters_262.sas7bdat
d_parameters_263.sas7bdat
d_parameters_264.sas7bdat
d_parameters_265.sas7bdat
d_parameters_266.sas7bdat
d_parameters_267.sas7bdat
d_parameters_268.sas7bdat
d_parameters_269.sas7bdat
d_parameters_27.sas7bdat
d_parameters_270.sas7bdat
d_parameters_271.sas7bdat
d_parameters_272.sas7bdat
d_parameters_273.sas7bdat
d_parameters_274.sas7bdat
d_parameters_275.sas7bdat
d_parameters_276.sas7bdat
d_parameters_277.sas7bdat
d_parameters_278.sas7bdat
d_parameters_279.sas7bdat
d_parameters_28.sas7bdat
d_parameters_280.sas7bdat
d_parameters_281.sas7bdat
d_parameters_282.sas7bdat
d_parameters_283.sas7bdat
d_parameters_284.sas7bdat
d_parameters_285.sas7bdat
d_parameters_286.sas7bdat
d_parameters_287.sas7bdat
d_parameters_288.sas7bdat
d_parameters_289.sas7bdat

d_parameters_29.sas7bdat
d_parameters_290.sas7bdat
d_parameters_291.sas7bdat
d_parameters_292.sas7bdat
d_parameters_293.sas7bdat
d_parameters_294.sas7bdat
d_parameters_295.sas7bdat
d_parameters_296.sas7bdat
d_parameters_297.sas7bdat
d_parameters_298.sas7bdat
d_parameters_299.sas7bdat
d_parameters_3.sas7bdat
d_parameters_30.sas7bdat
d_parameters_300.sas7bdat
d_parameters_31.sas7bdat
d_parameters_32.sas7bdat
d_parameters_33.sas7bdat
d_parameters_34.sas7bdat
d_parameters_35.sas7bdat
d_parameters_36.sas7bdat
d_parameters_37.sas7bdat
d_parameters_38.sas7bdat
d_parameters_39.sas7bdat
d_parameters_4.sas7bdat
d_parameters_40.sas7bdat
d_parameters_41.sas7bdat
d_parameters_42.sas7bdat
d_parameters_43.sas7bdat
d_parameters_44.sas7bdat
d_parameters_45.sas7bdat
d_parameters_46.sas7bdat
d_parameters_47.sas7bdat
d_parameters_48.sas7bdat
d_parameters_49.sas7bdat
d_parameters_5.sas7bdat
d_parameters_50.sas7bdat
d_parameters_51.sas7bdat
d_parameters_52.sas7bdat
d_parameters_53.sas7bdat
d_parameters_54.sas7bdat
d_parameters_55.sas7bdat
d_parameters_56.sas7bdat
d_parameters_57.sas7bdat
d_parameters_58.sas7bdat
d_parameters_59.sas7bdat
d_parameters_6.sas7bdat
d_parameters_60.sas7bdat
d_parameters_61.sas7bdat
d_parameters_62.sas7bdat
d_parameters_63.sas7bdat
d_parameters_64.sas7bdat
d_parameters_65.sas7bdat
d_parameters_66.sas7bdat
d_parameters_67.sas7bdat
d_parameters_68.sas7bdat
d_parameters_69.sas7bdat
d_parameters_7.sas7bdat
d_parameters_70.sas7bdat

Expert Report of Professor James R. Kearl

March 21, 2012                                                          Charles River Associates

| | |
|---|---|
| d_parameters_71.sas7bdat | d_parameters_123.sas7bdat |
| d_parameters_72.sas7bdat | d_parameters_124.sas7bdat |
| d_parameters_73.sas7bdat | d_parameters_125.sas7bdat |
| d_parameters_74.sas7bdat | d_parameters_126.sas7bdat |
| d_parameters_75.sas7bdat | d_parameters_127.sas7bdat |
| d_parameters_76.sas7bdat | d_parameters_128.sas7bdat |
| d_parameters_77.sas7bdat | d_parameters_129.sas7bdat |
| d_parameters_78.sas7bdat | d_parameters_13.sas7bdat |
| d_parameters_79.sas7bdat | d_parameters_130.sas7bdat |
| d_parameters_8.sas7bdat | d_parameters_131.sas7bdat |
| d_parameters_80.sas7bdat | d_parameters_132.sas7bdat |
| d_parameters_81.sas7bdat | d_parameters_133.sas7bdat |
| d_parameters_82.sas7bdat | d_parameters_134.sas7bdat |
| d_parameters_83.sas7bdat | d_parameters_135.sas7bdat |
| d_parameters_84.sas7bdat | d_parameters_136.sas7bdat |
| d_parameters_85.sas7bdat | d_parameters_137.sas7bdat |
| d_parameters_86.sas7bdat | d_parameters_138.sas7bdat |
| d_parameters_87.sas7bdat | d_parameters_139.sas7bdat |
| d_parameters_88.sas7bdat | d_parameters_14.sas7bdat |
| d_parameters_89.sas7bdat | d_parameters_140.sas7bdat |
| d_parameters_9.sas7bdat | d_parameters_141.sas7bdat |
| d_parameters_90.sas7bdat | d_parameters_142.sas7bdat |
| d_parameters_91.sas7bdat | d_parameters_143.sas7bdat |
| d_parameters_92.sas7bdat | d_parameters_144.sas7bdat |
| d_parameters_93.sas7bdat | d_parameters_145.sas7bdat |
| d_parameters_94.sas7bdat | d_parameters_146.sas7bdat |
| d_parameters_95.sas7bdat | d_parameters_147.sas7bdat |
| d_parameters_96.sas7bdat | d_parameters_148.sas7bdat |
| d_parameters_97.sas7bdat | d_parameters_149.sas7bdat |
| d_parameters_98.sas7bdat | d_parameters_15.sas7bdat |
| d_parameters_99.sas7bdat | d_parameters_150.sas7bdat |
| d_parameters_1.sas7bdat | d_parameters_151.sas7bdat |
| d_parameters_10.sas7bdat | d_parameters_152.sas7bdat |
| d_parameters_100.sas7bdat | d_parameters_153.sas7bdat |
| d_parameters_101.sas7bdat | d_parameters_154.sas7bdat |
| d_parameters_102.sas7bdat | d_parameters_155.sas7bdat |
| d_parameters_103.sas7bdat | d_parameters_156.sas7bdat |
| d_parameters_104.sas7bdat | d_parameters_157.sas7bdat |
| d_parameters_105.sas7bdat | d_parameters_158.sas7bdat |
| d_parameters_106.sas7bdat | d_parameters_159.sas7bdat |
| d_parameters_107.sas7bdat | d_parameters_16.sas7bdat |
| d_parameters_108.sas7bdat | d_parameters_160.sas7bdat |
| d_parameters_109.sas7bdat | d_parameters_161.sas7bdat |
| d_parameters_11.sas7bdat | d_parameters_162.sas7bdat |
| d_parameters_110.sas7bdat | d_parameters_163.sas7bdat |
| d_parameters_111.sas7bdat | d_parameters_164.sas7bdat |
| d_parameters_112.sas7bdat | d_parameters_165.sas7bdat |
| d_parameters_113.sas7bdat | d_parameters_166.sas7bdat |
| d_parameters_114.sas7bdat | d_parameters_167.sas7bdat |
| d_parameters_115.sas7bdat | d_parameters_168.sas7bdat |
| d_parameters_116.sas7bdat | d_parameters_169.sas7bdat |
| d_parameters_117.sas7bdat | d_parameters_17.sas7bdat |
| d_parameters_118.sas7bdat | d_parameters_170.sas7bdat |
| d_parameters_119.sas7bdat | d_parameters_171.sas7bdat |
| d_parameters_12.sas7bdat | d_parameters_172.sas7bdat |
| d_parameters_120.sas7bdat | d_parameters_173.sas7bdat |
| d_parameters_121.sas7bdat | d_parameters_174.sas7bdat |
| d_parameters_122.sas7bdat | d_parameters_175.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                                Charles River Associates

| | |
|---|---|
| d_parameters_176.sas7bdat | d_parameters_48.sas7bdat |
| d_parameters_177.sas7bdat | d_parameters_49.sas7bdat |
| d_parameters_178.sas7bdat | d_parameters_5.sas7bdat |
| d_parameters_179.sas7bdat | d_parameters_50.sas7bdat |
| d_parameters_18.sas7bdat | d_parameters_51.sas7bdat |
| d_parameters_180.sas7bdat | d_parameters_52.sas7bdat |
| d_parameters_181.sas7bdat | d_parameters_53.sas7bdat |
| d_parameters_182.sas7bdat | d_parameters_54.sas7bdat |
| d_parameters_183.sas7bdat | d_parameters_55.sas7bdat |
| d_parameters_184.sas7bdat | d_parameters_56.sas7bdat |
| d_parameters_185.sas7bdat | d_parameters_57.sas7bdat |
| d_parameters_186.sas7bdat | d_parameters_58.sas7bdat |
| d_parameters_187.sas7bdat | d_parameters_59.sas7bdat |
| d_parameters_188.sas7bdat | d_parameters_6.sas7bdat |
| d_parameters_189.sas7bdat | d_parameters_60.sas7bdat |
| d_parameters_19.sas7bdat | d_parameters_61.sas7bdat |
| d_parameters_190.sas7bdat | d_parameters_62.sas7bdat |
| d_parameters_191.sas7bdat | d_parameters_63.sas7bdat |
| d_parameters_192.sas7bdat | d_parameters_64.sas7bdat |
| d_parameters_193.sas7bdat | d_parameters_65.sas7bdat |
| d_parameters_194.sas7bdat | d_parameters_66.sas7bdat |
| d_parameters_195.sas7bdat | d_parameters_67.sas7bdat |
| d_parameters_196.sas7bdat | d_parameters_68.sas7bdat |
| d_parameters_197.sas7bdat | d_parameters_69.sas7bdat |
| d_parameters_198.sas7bdat | d_parameters_7.sas7bdat |
| d_parameters_199.sas7bdat | d_parameters_70.sas7bdat |
| d_parameters_2.sas7bdat | d_parameters_71.sas7bdat |
| d_parameters_20.sas7bdat | d_parameters_72.sas7bdat |
| d_parameters_200.sas7bdat | d_parameters_73.sas7bdat |
| d_parameters_21.sas7bdat | d_parameters_74.sas7bdat |
| d_parameters_22.sas7bdat | d_parameters_75.sas7bdat |
| d_parameters_23.sas7bdat | d_parameters_76.sas7bdat |
| d_parameters_24.sas7bdat | d_parameters_77.sas7bdat |
| d_parameters_25.sas7bdat | d_parameters_78.sas7bdat |
| d_parameters_26.sas7bdat | d_parameters_79.sas7bdat |
| d_parameters_27.sas7bdat | d_parameters_8.sas7bdat |
| d_parameters_28.sas7bdat | d_parameters_80.sas7bdat |
| d_parameters_29.sas7bdat | d_parameters_81.sas7bdat |
| d_parameters_3.sas7bdat | d_parameters_82.sas7bdat |
| d_parameters_30.sas7bdat | d_parameters_83.sas7bdat |
| d_parameters_31.sas7bdat | d_parameters_84.sas7bdat |
| d_parameters_32.sas7bdat | d_parameters_85.sas7bdat |
| d_parameters_33.sas7bdat | d_parameters_86.sas7bdat |
| d_parameters_34.sas7bdat | d_parameters_87.sas7bdat |
| d_parameters_35.sas7bdat | d_parameters_88.sas7bdat |
| d_parameters_36.sas7bdat | d_parameters_89.sas7bdat |
| d_parameters_37.sas7bdat | d_parameters_9.sas7bdat |
| d_parameters_38.sas7bdat | d_parameters_90.sas7bdat |
| d_parameters_39.sas7bdat | d_parameters_91.sas7bdat |
| d_parameters_4.sas7bdat | d_parameters_92.sas7bdat |
| d_parameters_40.sas7bdat | d_parameters_93.sas7bdat |
| d_parameters_41.sas7bdat | d_parameters_94.sas7bdat |
| d_parameters_42.sas7bdat | d_parameters_95.sas7bdat |
| d_parameters_43.sas7bdat | d_parameters_96.sas7bdat |
| d_parameters_44.sas7bdat | d_parameters_97.sas7bdat |
| d_parameters_45.sas7bdat | d_parameters_98.sas7bdat |
| d_parameters_46.sas7bdat | d_parameters_99.sas7bdat |
| d_parameters_47.sas7bdat | d_parameters_1.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

| | |
|---|---|
| d_parameters_10.sas7bdat | d_parameters_152.sas7bdat |
| d_parameters_100.sas7bdat | d_parameters_153.sas7bdat |
| d_parameters_101.sas7bdat | d_parameters_154.sas7bdat |
| d_parameters_102.sas7bdat | d_parameters_155.sas7bdat |
| d_parameters_103.sas7bdat | d_parameters_156.sas7bdat |
| d_parameters_104.sas7bdat | d_parameters_157.sas7bdat |
| d_parameters_105.sas7bdat | d_parameters_158.sas7bdat |
| d_parameters_106.sas7bdat | d_parameters_159.sas7bdat |
| d_parameters_107.sas7bdat | d_parameters_16.sas7bdat |
| d_parameters_108.sas7bdat | d_parameters_160.sas7bdat |
| d_parameters_109.sas7bdat | d_parameters_161.sas7bdat |
| d_parameters_11.sas7bdat | d_parameters_162.sas7bdat |
| d_parameters_110.sas7bdat | d_parameters_163.sas7bdat |
| d_parameters_111.sas7bdat | d_parameters_164.sas7bdat |
| d_parameters_112.sas7bdat | d_parameters_165.sas7bdat |
| d_parameters_113.sas7bdat | d_parameters_166.sas7bdat |
| d_parameters_114.sas7bdat | d_parameters_167.sas7bdat |
| d_parameters_115.sas7bdat | d_parameters_168.sas7bdat |
| d_parameters_116.sas7bdat | d_parameters_169.sas7bdat |
| d_parameters_117.sas7bdat | d_parameters_17.sas7bdat |
| d_parameters_118.sas7bdat | d_parameters_170.sas7bdat |
| d_parameters_119.sas7bdat | d_parameters_171.sas7bdat |
| d_parameters_12.sas7bdat | d_parameters_172.sas7bdat |
| d_parameters_120.sas7bdat | d_parameters_173.sas7bdat |
| d_parameters_121.sas7bdat | d_parameters_174.sas7bdat |
| d_parameters_122.sas7bdat | d_parameters_175.sas7bdat |
| d_parameters_123.sas7bdat | d_parameters_176.sas7bdat |
| d_parameters_124.sas7bdat | d_parameters_177.sas7bdat |
| d_parameters_125.sas7bdat | d_parameters_178.sas7bdat |
| d_parameters_126.sas7bdat | d_parameters_179.sas7bdat |
| d_parameters_127.sas7bdat | d_parameters_18.sas7bdat |
| d_parameters_128.sas7bdat | d_parameters_180.sas7bdat |
| d_parameters_129.sas7bdat | d_parameters_181.sas7bdat |
| d_parameters_13.sas7bdat | d_parameters_182.sas7bdat |
| d_parameters_130.sas7bdat | d_parameters_183.sas7bdat |
| d_parameters_131.sas7bdat | d_parameters_184.sas7bdat |
| d_parameters_132.sas7bdat | d_parameters_185.sas7bdat |
| d_parameters_133.sas7bdat | d_parameters_186.sas7bdat |
| d_parameters_134.sas7bdat | d_parameters_187.sas7bdat |
| d_parameters_135.sas7bdat | d_parameters_188.sas7bdat |
| d_parameters_136.sas7bdat | d_parameters_189.sas7bdat |
| d_parameters_137.sas7bdat | d_parameters_19.sas7bdat |
| d_parameters_138.sas7bdat | d_parameters_190.sas7bdat |
| d_parameters_139.sas7bdat | d_parameters_191.sas7bdat |
| d_parameters_14.sas7bdat | d_parameters_192.sas7bdat |
| d_parameters_140.sas7bdat | d_parameters_193.sas7bdat |
| d_parameters_141.sas7bdat | d_parameters_194.sas7bdat |
| d_parameters_142.sas7bdat | d_parameters_195.sas7bdat |
| d_parameters_143.sas7bdat | d_parameters_196.sas7bdat |
| d_parameters_144.sas7bdat | d_parameters_197.sas7bdat |
| d_parameters_145.sas7bdat | d_parameters_198.sas7bdat |
| d_parameters_146.sas7bdat | d_parameters_199.sas7bdat |
| d_parameters_147.sas7bdat | d_parameters_2.sas7bdat |
| d_parameters_148.sas7bdat | d_parameters_20.sas7bdat |
| d_parameters_149.sas7bdat | d_parameters_200.sas7bdat |
| d_parameters_15.sas7bdat | d_parameters_21.sas7bdat |
| d_parameters_150.sas7bdat | d_parameters_22.sas7bdat |
| d_parameters_151.sas7bdat | d_parameters_23.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| d_parameters_24.sas7bdat | d_parameters_77.sas7bdat |
| d_parameters_25.sas7bdat | d_parameters_78.sas7bdat |
| d_parameters_26.sas7bdat | d_parameters_79.sas7bdat |
| d_parameters_27.sas7bdat | d_parameters_8.sas7bdat |
| d_parameters_28.sas7bdat | d_parameters_80.sas7bdat |
| d_parameters_29.sas7bdat | d_parameters_81.sas7bdat |
| d_parameters_3.sas7bdat | d_parameters_82.sas7bdat |
| d_parameters_30.sas7bdat | d_parameters_83.sas7bdat |
| d_parameters_31.sas7bdat | d_parameters_84.sas7bdat |
| d_parameters_32.sas7bdat | d_parameters_85.sas7bdat |
| d_parameters_33.sas7bdat | d_parameters_86.sas7bdat |
| d_parameters_34.sas7bdat | d_parameters_87.sas7bdat |
| d_parameters_35.sas7bdat | d_parameters_88.sas7bdat |
| d_parameters_36.sas7bdat | d_parameters_89.sas7bdat |
| d_parameters_37.sas7bdat | d_parameters_9.sas7bdat |
| d_parameters_38.sas7bdat | d_parameters_90.sas7bdat |
| d_parameters_39.sas7bdat | d_parameters_91.sas7bdat |
| d_parameters_4.sas7bdat | d_parameters_92.sas7bdat |
| d_parameters_40.sas7bdat | d_parameters_93.sas7bdat |
| d_parameters_41.sas7bdat | d_parameters_94.sas7bdat |
| d_parameters_42.sas7bdat | d_parameters_95.sas7bdat |
| d_parameters_43.sas7bdat | d_parameters_96.sas7bdat |
| d_parameters_44.sas7bdat | d_parameters_97.sas7bdat |
| d_parameters_45.sas7bdat | d_parameters_98.sas7bdat |
| d_parameters_46.sas7bdat | d_parameters_99.sas7bdat |
| d_parameters_47.sas7bdat | d_parameters_1.sas7bdat |
| d_parameters_48.sas7bdat | d_parameters_10.sas7bdat |
| d_parameters_49.sas7bdat | d_parameters_100.sas7bdat |
| d_parameters_5.sas7bdat | d_parameters_101.sas7bdat |
| d_parameters_50.sas7bdat | d_parameters_102.sas7bdat |
| d_parameters_51.sas7bdat | d_parameters_103.sas7bdat |
| d_parameters_52.sas7bdat | d_parameters_104.sas7bdat |
| d_parameters_53.sas7bdat | d_parameters_105.sas7bdat |
| d_parameters_54.sas7bdat | d_parameters_106.sas7bdat |
| d_parameters_55.sas7bdat | d_parameters_107.sas7bdat |
| d_parameters_56.sas7bdat | d_parameters_108.sas7bdat |
| d_parameters_57.sas7bdat | d_parameters_109.sas7bdat |
| d_parameters_58.sas7bdat | d_parameters_11.sas7bdat |
| d_parameters_59.sas7bdat | d_parameters_110.sas7bdat |
| d_parameters_6.sas7bdat | d_parameters_111.sas7bdat |
| d_parameters_60.sas7bdat | d_parameters_112.sas7bdat |
| d_parameters_61.sas7bdat | d_parameters_113.sas7bdat |
| d_parameters_62.sas7bdat | d_parameters_114.sas7bdat |
| d_parameters_63.sas7bdat | d_parameters_115.sas7bdat |
| d_parameters_64.sas7bdat | d_parameters_116.sas7bdat |
| d_parameters_65.sas7bdat | d_parameters_117.sas7bdat |
| d_parameters_66.sas7bdat | d_parameters_118.sas7bdat |
| d_parameters_67.sas7bdat | d_parameters_119.sas7bdat |
| d_parameters_68.sas7bdat | d_parameters_12.sas7bdat |
| d_parameters_69.sas7bdat | d_parameters_120.sas7bdat |
| d_parameters_7.sas7bdat | d_parameters_121.sas7bdat |
| d_parameters_70.sas7bdat | d_parameters_122.sas7bdat |
| d_parameters_71.sas7bdat | d_parameters_123.sas7bdat |
| d_parameters_72.sas7bdat | d_parameters_124.sas7bdat |
| d_parameters_73.sas7bdat | d_parameters_125.sas7bdat |
| d_parameters_74.sas7bdat | d_parameters_126.sas7bdat |
| d_parameters_75.sas7bdat | d_parameters_127.sas7bdat |
| d_parameters_76.sas7bdat | d_parameters_128.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| d_parameters_129.sas7bdat | d_parameters_181.sas7bdat |
| d_parameters_13.sas7bdat | d_parameters_182.sas7bdat |
| d_parameters_130.sas7bdat | d_parameters_183.sas7bdat |
| d_parameters_131.sas7bdat | d_parameters_184.sas7bdat |
| d_parameters_132.sas7bdat | d_parameters_185.sas7bdat |
| d_parameters_133.sas7bdat | d_parameters_186.sas7bdat |
| d_parameters_134.sas7bdat | d_parameters_187.sas7bdat |
| d_parameters_135.sas7bdat | d_parameters_188.sas7bdat |
| d_parameters_136.sas7bdat | d_parameters_189.sas7bdat |
| d_parameters_137.sas7bdat | d_parameters_19.sas7bdat |
| d_parameters_138.sas7bdat | d_parameters_190.sas7bdat |
| d_parameters_139.sas7bdat | d_parameters_191.sas7bdat |
| d_parameters_14.sas7bdat | d_parameters_192.sas7bdat |
| d_parameters_140.sas7bdat | d_parameters_193.sas7bdat |
| d_parameters_141.sas7bdat | d_parameters_194.sas7bdat |
| d_parameters_142.sas7bdat | d_parameters_195.sas7bdat |
| d_parameters_143.sas7bdat | d_parameters_196.sas7bdat |
| d_parameters_144.sas7bdat | d_parameters_197.sas7bdat |
| d_parameters_145.sas7bdat | d_parameters_198.sas7bdat |
| d_parameters_146.sas7bdat | d_parameters_199.sas7bdat |
| d_parameters_147.sas7bdat | d_parameters_2.sas7bdat |
| d_parameters_148.sas7bdat | d_parameters_20.sas7bdat |
| d_parameters_149.sas7bdat | d_parameters_200.sas7bdat |
| d_parameters_15.sas7bdat | d_parameters_21.sas7bdat |
| d_parameters_150.sas7bdat | d_parameters_22.sas7bdat |
| d_parameters_151.sas7bdat | d_parameters_23.sas7bdat |
| d_parameters_152.sas7bdat | d_parameters_24.sas7bdat |
| d_parameters_153.sas7bdat | d_parameters_25.sas7bdat |
| d_parameters_154.sas7bdat | d_parameters_26.sas7bdat |
| d_parameters_155.sas7bdat | d_parameters_27.sas7bdat |
| d_parameters_156.sas7bdat | d_parameters_28.sas7bdat |
| d_parameters_157.sas7bdat | d_parameters_29.sas7bdat |
| d_parameters_158.sas7bdat | d_parameters_3.sas7bdat |
| d_parameters_159.sas7bdat | d_parameters_30.sas7bdat |
| d_parameters_16.sas7bdat | d_parameters_31.sas7bdat |
| d_parameters_160.sas7bdat | d_parameters_32.sas7bdat |
| d_parameters_161.sas7bdat | d_parameters_33.sas7bdat |
| d_parameters_162.sas7bdat | d_parameters_34.sas7bdat |
| d_parameters_163.sas7bdat | d_parameters_35.sas7bdat |
| d_parameters_164.sas7bdat | d_parameters_36.sas7bdat |
| d_parameters_165.sas7bdat | d_parameters_37.sas7bdat |
| d_parameters_166.sas7bdat | d_parameters_38.sas7bdat |
| d_parameters_167.sas7bdat | d_parameters_39.sas7bdat |
| d_parameters_168.sas7bdat | d_parameters_4.sas7bdat |
| d_parameters_169.sas7bdat | d_parameters_40.sas7bdat |
| d_parameters_17.sas7bdat | d_parameters_41.sas7bdat |
| d_parameters_170.sas7bdat | d_parameters_42.sas7bdat |
| d_parameters_171.sas7bdat | d_parameters_43.sas7bdat |
| d_parameters_172.sas7bdat | d_parameters_44.sas7bdat |
| d_parameters_173.sas7bdat | d_parameters_45.sas7bdat |
| d_parameters_174.sas7bdat | d_parameters_46.sas7bdat |
| d_parameters_175.sas7bdat | d_parameters_47.sas7bdat |
| d_parameters_176.sas7bdat | d_parameters_48.sas7bdat |
| d_parameters_177.sas7bdat | d_parameters_49.sas7bdat |
| d_parameters_178.sas7bdat | d_parameters_5.sas7bdat |
| d_parameters_179.sas7bdat | d_parameters_50.sas7bdat |
| d_parameters_18.sas7bdat | d_parameters_51.sas7bdat |
| d_parameters_180.sas7bdat | d_parameters_52.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| d_parameters_53.sas7bdat | d_parameters_105.sas7bdat |
| d_parameters_54.sas7bdat | d_parameters_106.sas7bdat |
| d_parameters_55.sas7bdat | d_parameters_107.sas7bdat |
| d_parameters_56.sas7bdat | d_parameters_108.sas7bdat |
| d_parameters_57.sas7bdat | d_parameters_109.sas7bdat |
| d_parameters_58.sas7bdat | d_parameters_11.sas7bdat |
| d_parameters_59.sas7bdat | d_parameters_110.sas7bdat |
| d_parameters_6.sas7bdat | d_parameters_111.sas7bdat |
| d_parameters_60.sas7bdat | d_parameters_112.sas7bdat |
| d_parameters_61.sas7bdat | d_parameters_113.sas7bdat |
| d_parameters_62.sas7bdat | d_parameters_114.sas7bdat |
| d_parameters_63.sas7bdat | d_parameters_115.sas7bdat |
| d_parameters_64.sas7bdat | d_parameters_116.sas7bdat |
| d_parameters_65.sas7bdat | d_parameters_117.sas7bdat |
| d_parameters_66.sas7bdat | d_parameters_118.sas7bdat |
| d_parameters_67.sas7bdat | d_parameters_119.sas7bdat |
| d_parameters_68.sas7bdat | d_parameters_12.sas7bdat |
| d_parameters_69.sas7bdat | d_parameters_120.sas7bdat |
| d_parameters_7.sas7bdat | d_parameters_121.sas7bdat |
| d_parameters_70.sas7bdat | d_parameters_122.sas7bdat |
| d_parameters_71.sas7bdat | d_parameters_123.sas7bdat |
| d_parameters_72.sas7bdat | d_parameters_124.sas7bdat |
| d_parameters_73.sas7bdat | d_parameters_125.sas7bdat |
| d_parameters_74.sas7bdat | d_parameters_126.sas7bdat |
| d_parameters_75.sas7bdat | d_parameters_127.sas7bdat |
| d_parameters_76.sas7bdat | d_parameters_128.sas7bdat |
| d_parameters_77.sas7bdat | d_parameters_129.sas7bdat |
| d_parameters_78.sas7bdat | d_parameters_13.sas7bdat |
| d_parameters_79.sas7bdat | d_parameters_130.sas7bdat |
| d_parameters_8.sas7bdat | d_parameters_131.sas7bdat |
| d_parameters_80.sas7bdat | d_parameters_132.sas7bdat |
| d_parameters_81.sas7bdat | d_parameters_133.sas7bdat |
| d_parameters_82.sas7bdat | d_parameters_134.sas7bdat |
| d_parameters_83.sas7bdat | d_parameters_135.sas7bdat |
| d_parameters_84.sas7bdat | d_parameters_136.sas7bdat |
| d_parameters_85.sas7bdat | d_parameters_137.sas7bdat |
| d_parameters_86.sas7bdat | d_parameters_138.sas7bdat |
| d_parameters_87.sas7bdat | d_parameters_139.sas7bdat |
| d_parameters_88.sas7bdat | d_parameters_14.sas7bdat |
| d_parameters_89.sas7bdat | d_parameters_140.sas7bdat |
| d_parameters_9.sas7bdat | d_parameters_141.sas7bdat |
| d_parameters_90.sas7bdat | d_parameters_142.sas7bdat |
| d_parameters_91.sas7bdat | d_parameters_143.sas7bdat |
| d_parameters_92.sas7bdat | d_parameters_144.sas7bdat |
| d_parameters_93.sas7bdat | d_parameters_145.sas7bdat |
| d_parameters_94.sas7bdat | d_parameters_146.sas7bdat |
| d_parameters_95.sas7bdat | d_parameters_147.sas7bdat |
| d_parameters_96.sas7bdat | d_parameters_148.sas7bdat |
| d_parameters_97.sas7bdat | d_parameters_149.sas7bdat |
| d_parameters_98.sas7bdat | d_parameters_15.sas7bdat |
| d_parameters_99.sas7bdat | d_parameters_150.sas7bdat |
| d_parameters_1.sas7bdat | d_parameters_151.sas7bdat |
| d_parameters_10.sas7bdat | d_parameters_152.sas7bdat |
| d_parameters_100.sas7bdat | d_parameters_153.sas7bdat |
| d_parameters_101.sas7bdat | d_parameters_154.sas7bdat |
| d_parameters_102.sas7bdat | d_parameters_155.sas7bdat |
| d_parameters_103.sas7bdat | d_parameters_156.sas7bdat |
| d_parameters_104.sas7bdat | d_parameters_157.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

d_parameters_158.sas7bdat          d_parameters_3.sas7bdat
d_parameters_159.sas7bdat          d_parameters_30.sas7bdat
d_parameters_16.sas7bdat           d_parameters_31.sas7bdat
d_parameters_160.sas7bdat          d_parameters_32.sas7bdat
d_parameters_161.sas7bdat          d_parameters_33.sas7bdat
d_parameters_162.sas7bdat          d_parameters_34.sas7bdat
d_parameters_163.sas7bdat          d_parameters_35.sas7bdat
d_parameters_164.sas7bdat          d_parameters_36.sas7bdat
d_parameters_165.sas7bdat          d_parameters_37.sas7bdat
d_parameters_166.sas7bdat          d_parameters_38.sas7bdat
d_parameters_167.sas7bdat          d_parameters_39.sas7bdat
d_parameters_168.sas7bdat          d_parameters_4.sas7bdat
d_parameters_169.sas7bdat          d_parameters_40.sas7bdat
d_parameters_17.sas7bdat           d_parameters_41.sas7bdat
d_parameters_170.sas7bdat          d_parameters_42.sas7bdat
d_parameters_171.sas7bdat          d_parameters_43.sas7bdat
d_parameters_172.sas7bdat          d_parameters_44.sas7bdat
d_parameters_173.sas7bdat          d_parameters_45.sas7bdat
d_parameters_174.sas7bdat          d_parameters_46.sas7bdat
d_parameters_175.sas7bdat          d_parameters_47.sas7bdat
d_parameters_176.sas7bdat          d_parameters_48.sas7bdat
d_parameters_177.sas7bdat          d_parameters_49.sas7bdat
d_parameters_178.sas7bdat          d_parameters_5.sas7bdat
d_parameters_179.sas7bdat          d_parameters_50.sas7bdat
d_parameters_18.sas7bdat           d_parameters_51.sas7bdat
d_parameters_180.sas7bdat          d_parameters_52.sas7bdat
d_parameters_181.sas7bdat          d_parameters_53.sas7bdat
d_parameters_182.sas7bdat          d_parameters_54.sas7bdat
d_parameters_183.sas7bdat          d_parameters_55.sas7bdat
d_parameters_184.sas7bdat          d_parameters_56.sas7bdat
d_parameters_185.sas7bdat          d_parameters_57.sas7bdat
d_parameters_186.sas7bdat          d_parameters_58.sas7bdat
d_parameters_187.sas7bdat          d_parameters_59.sas7bdat
d_parameters_188.sas7bdat          d_parameters_6.sas7bdat
d_parameters_189.sas7bdat          d_parameters_60.sas7bdat
d_parameters_19.sas7bdat           d_parameters_61.sas7bdat
d_parameters_190.sas7bdat          d_parameters_62.sas7bdat
d_parameters_191.sas7bdat          d_parameters_63.sas7bdat
d_parameters_192.sas7bdat          d_parameters_64.sas7bdat
d_parameters_193.sas7bdat          d_parameters_65.sas7bdat
d_parameters_194.sas7bdat          d_parameters_66.sas7bdat
d_parameters_195.sas7bdat          d_parameters_67.sas7bdat
d_parameters_196.sas7bdat          d_parameters_68.sas7bdat
d_parameters_197.sas7bdat          d_parameters_69.sas7bdat
d_parameters_198.sas7bdat          d_parameters_7.sas7bdat
d_parameters_199.sas7bdat          d_parameters_70.sas7bdat
d_parameters_2.sas7bdat            d_parameters_71.sas7bdat
d_parameters_20.sas7bdat           d_parameters_72.sas7bdat
d_parameters_200.sas7bdat          d_parameters_73.sas7bdat
d_parameters_21.sas7bdat           d_parameters_74.sas7bdat
d_parameters_22.sas7bdat           d_parameters_75.sas7bdat
d_parameters_23.sas7bdat           d_parameters_76.sas7bdat
d_parameters_24.sas7bdat           d_parameters_77.sas7bdat
d_parameters_25.sas7bdat           d_parameters_78.sas7bdat
d_parameters_26.sas7bdat           d_parameters_79.sas7bdat
d_parameters_27.sas7bdat           d_parameters_8.sas7bdat
d_parameters_28.sas7bdat           d_parameters_80.sas7bdat
d_parameters_29.sas7bdat           d_parameters_81.sas7bdat

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| d_parameters_82.sas7bdat | d_parameters_134.sas7bdat |
| d_parameters_83.sas7bdat | d_parameters_135.sas7bdat |
| d_parameters_84.sas7bdat | d_parameters_136.sas7bdat |
| d_parameters_85.sas7bdat | d_parameters_137.sas7bdat |
| d_parameters_86.sas7bdat | d_parameters_138.sas7bdat |
| d_parameters_87.sas7bdat | d_parameters_139.sas7bdat |
| d_parameters_88.sas7bdat | d_parameters_14.sas7bdat |
| d_parameters_89.sas7bdat | d_parameters_140.sas7bdat |
| d_parameters_9.sas7bdat | d_parameters_141.sas7bdat |
| d_parameters_90.sas7bdat | d_parameters_142.sas7bdat |
| d_parameters_91.sas7bdat | d_parameters_143.sas7bdat |
| d_parameters_92.sas7bdat | d_parameters_144.sas7bdat |
| d_parameters_93.sas7bdat | d_parameters_145.sas7bdat |
| d_parameters_94.sas7bdat | d_parameters_146.sas7bdat |
| d_parameters_95.sas7bdat | d_parameters_147.sas7bdat |
| d_parameters_96.sas7bdat | d_parameters_148.sas7bdat |
| d_parameters_97.sas7bdat | d_parameters_149.sas7bdat |
| d_parameters_98.sas7bdat | d_parameters_15.sas7bdat |
| d_parameters_99.sas7bdat | d_parameters_150.sas7bdat |
| d_parameters_1.sas7bdat | d_parameters_151.sas7bdat |
| d_parameters_10.sas7bdat | d_parameters_152.sas7bdat |
| d_parameters_100.sas7bdat | d_parameters_153.sas7bdat |
| d_parameters_101.sas7bdat | d_parameters_154.sas7bdat |
| d_parameters_102.sas7bdat | d_parameters_155.sas7bdat |
| d_parameters_103.sas7bdat | d_parameters_156.sas7bdat |
| d_parameters_104.sas7bdat | d_parameters_157.sas7bdat |
| d_parameters_105.sas7bdat | d_parameters_158.sas7bdat |
| d_parameters_106.sas7bdat | d_parameters_159.sas7bdat |
| d_parameters_107.sas7bdat | d_parameters_16.sas7bdat |
| d_parameters_108.sas7bdat | d_parameters_160.sas7bdat |
| d_parameters_109.sas7bdat | d_parameters_161.sas7bdat |
| d_parameters_11.sas7bdat | d_parameters_162.sas7bdat |
| d_parameters_110.sas7bdat | d_parameters_163.sas7bdat |
| d_parameters_111.sas7bdat | d_parameters_164.sas7bdat |
| d_parameters_112.sas7bdat | d_parameters_165.sas7bdat |
| d_parameters_113.sas7bdat | d_parameters_166.sas7bdat |
| d_parameters_114.sas7bdat | d_parameters_167.sas7bdat |
| d_parameters_115.sas7bdat | d_parameters_168.sas7bdat |
| d_parameters_116.sas7bdat | d_parameters_169.sas7bdat |
| d_parameters_117.sas7bdat | d_parameters_17.sas7bdat |
| d_parameters_118.sas7bdat | d_parameters_170.sas7bdat |
| d_parameters_119.sas7bdat | d_parameters_171.sas7bdat |
| d_parameters_12.sas7bdat | d_parameters_172.sas7bdat |
| d_parameters_120.sas7bdat | d_parameters_173.sas7bdat |
| d_parameters_121.sas7bdat | d_parameters_174.sas7bdat |
| d_parameters_122.sas7bdat | d_parameters_175.sas7bdat |
| d_parameters_123.sas7bdat | d_parameters_176.sas7bdat |
| d_parameters_124.sas7bdat | d_parameters_177.sas7bdat |
| d_parameters_125.sas7bdat | d_parameters_178.sas7bdat |
| d_parameters_126.sas7bdat | d_parameters_179.sas7bdat |
| d_parameters_127.sas7bdat | d_parameters_18.sas7bdat |
| d_parameters_128.sas7bdat | d_parameters_180.sas7bdat |
| d_parameters_129.sas7bdat | d_parameters_181.sas7bdat |
| d_parameters_13.sas7bdat | d_parameters_182.sas7bdat |
| d_parameters_130.sas7bdat | d_parameters_183.sas7bdat |
| d_parameters_131.sas7bdat | d_parameters_184.sas7bdat |
| d_parameters_132.sas7bdat | d_parameters_185.sas7bdat |
| d_parameters_133.sas7bdat | d_parameters_186.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

| | |
|---|---|
| d_parameters_187.sas7bdat | d_parameters_59.sas7bdat |
| d_parameters_188.sas7bdat | d_parameters_6.sas7bdat |
| d_parameters_189.sas7bdat | d_parameters_60.sas7bdat |
| d_parameters_19.sas7bdat | d_parameters_61.sas7bdat |
| d_parameters_190.sas7bdat | d_parameters_62.sas7bdat |
| d_parameters_191.sas7bdat | d_parameters_63.sas7bdat |
| d_parameters_192.sas7bdat | d_parameters_64.sas7bdat |
| d_parameters_193.sas7bdat | d_parameters_65.sas7bdat |
| d_parameters_194.sas7bdat | d_parameters_66.sas7bdat |
| d_parameters_195.sas7bdat | d_parameters_67.sas7bdat |
| d_parameters_196.sas7bdat | d_parameters_68.sas7bdat |
| d_parameters_197.sas7bdat | d_parameters_69.sas7bdat |
| d_parameters_198.sas7bdat | d_parameters_7.sas7bdat |
| d_parameters_199.sas7bdat | d_parameters_70.sas7bdat |
| d_parameters_2.sas7bdat | d_parameters_71.sas7bdat |
| d_parameters_20.sas7bdat | d_parameters_72.sas7bdat |
| d_parameters_200.sas7bdat | d_parameters_73.sas7bdat |
| d_parameters_21.sas7bdat | d_parameters_74.sas7bdat |
| d_parameters_22.sas7bdat | d_parameters_75.sas7bdat |
| d_parameters_23.sas7bdat | d_parameters_76.sas7bdat |
| d_parameters_24.sas7bdat | d_parameters_77.sas7bdat |
| d_parameters_25.sas7bdat | d_parameters_78.sas7bdat |
| d_parameters_26.sas7bdat | d_parameters_79.sas7bdat |
| d_parameters_27.sas7bdat | d_parameters_8.sas7bdat |
| d_parameters_28.sas7bdat | d_parameters_80.sas7bdat |
| d_parameters_29.sas7bdat | d_parameters_81.sas7bdat |
| d_parameters_3.sas7bdat | d_parameters_82.sas7bdat |
| d_parameters_30.sas7bdat | d_parameters_83.sas7bdat |
| d_parameters_31.sas7bdat | d_parameters_84.sas7bdat |
| d_parameters_32.sas7bdat | d_parameters_85.sas7bdat |
| d_parameters_33.sas7bdat | d_parameters_86.sas7bdat |
| d_parameters_34.sas7bdat | d_parameters_87.sas7bdat |
| d_parameters_35.sas7bdat | d_parameters_88.sas7bdat |
| d_parameters_36.sas7bdat | d_parameters_89.sas7bdat |
| d_parameters_37.sas7bdat | d_parameters_9.sas7bdat |
| d_parameters_38.sas7bdat | d_parameters_90.sas7bdat |
| d_parameters_39.sas7bdat | d_parameters_91.sas7bdat |
| d_parameters_4.sas7bdat | d_parameters_92.sas7bdat |
| d_parameters_40.sas7bdat | d_parameters_93.sas7bdat |
| d_parameters_41.sas7bdat | d_parameters_94.sas7bdat |
| d_parameters_42.sas7bdat | d_parameters_95.sas7bdat |
| d_parameters_43.sas7bdat | d_parameters_96.sas7bdat |
| d_parameters_44.sas7bdat | d_parameters_97.sas7bdat |
| d_parameters_45.sas7bdat | d_parameters_98.sas7bdat |
| d_parameters_46.sas7bdat | d_parameters_99.sas7bdat |
| d_parameters_47.sas7bdat | d_parameters_1.sas7bdat |
| d_parameters_48.sas7bdat | d_parameters_10.sas7bdat |
| d_parameters_49.sas7bdat | d_parameters_100.sas7bdat |
| d_parameters_5.sas7bdat | d_parameters_101.sas7bdat |
| d_parameters_50.sas7bdat | d_parameters_102.sas7bdat |
| d_parameters_51.sas7bdat | d_parameters_103.sas7bdat |
| d_parameters_52.sas7bdat | d_parameters_104.sas7bdat |
| d_parameters_53.sas7bdat | d_parameters_105.sas7bdat |
| d_parameters_54.sas7bdat | d_parameters_106.sas7bdat |
| d_parameters_55.sas7bdat | d_parameters_107.sas7bdat |
| d_parameters_56.sas7bdat | d_parameters_108.sas7bdat |
| d_parameters_57.sas7bdat | d_parameters_109.sas7bdat |
| d_parameters_58.sas7bdat | d_parameters_11.sas7bdat |

Expert Report of Professor James R. Kearl

March 21, 2012                                                        Charles River Associates

d_parameters_110.sas7bdat          d_parameters_163.sas7bdat
d_parameters_111.sas7bdat          d_parameters_164.sas7bdat
d_parameters_112.sas7bdat          d_parameters_165.sas7bdat
d_parameters_113.sas7bdat          d_parameters_166.sas7bdat
d_parameters_114.sas7bdat          d_parameters_167.sas7bdat
d_parameters_115.sas7bdat          d_parameters_168.sas7bdat
d_parameters_116.sas7bdat          d_parameters_169.sas7bdat
d_parameters_117.sas7bdat          d_parameters_17.sas7bdat
d_parameters_118.sas7bdat          d_parameters_170.sas7bdat
d_parameters_119.sas7bdat          d_parameters_171.sas7bdat
d_parameters_12.sas7bdat           d_parameters_172.sas7bdat
d_parameters_120.sas7bdat          d_parameters_173.sas7bdat
d_parameters_121.sas7bdat          d_parameters_174.sas7bdat
d_parameters_122.sas7bdat          d_parameters_175.sas7bdat
d_parameters_123.sas7bdat          d_parameters_176.sas7bdat
d_parameters_124.sas7bdat          d_parameters_177.sas7bdat
d_parameters_125.sas7bdat          d_parameters_178.sas7bdat
d_parameters_126.sas7bdat          d_parameters_179.sas7bdat
d_parameters_127.sas7bdat          d_parameters_18.sas7bdat
d_parameters_128.sas7bdat          d_parameters_180.sas7bdat
d_parameters_129.sas7bdat          d_parameters_181.sas7bdat
d_parameters_13.sas7bdat           d_parameters_182.sas7bdat
d_parameters_130.sas7bdat          d_parameters_183.sas7bdat
d_parameters_131.sas7bdat          d_parameters_184.sas7bdat
d_parameters_132.sas7bdat          d_parameters_185.sas7bdat
d_parameters_133.sas7bdat          d_parameters_186.sas7bdat
d_parameters_134.sas7bdat          d_parameters_187.sas7bdat
d_parameters_135.sas7bdat          d_parameters_188.sas7bdat
d_parameters_136.sas7bdat          d_parameters_189.sas7bdat
d_parameters_137.sas7bdat          d_parameters_19.sas7bdat
d_parameters_138.sas7bdat          d_parameters_190.sas7bdat
d_parameters_139.sas7bdat          d_parameters_191.sas7bdat
d_parameters_14.sas7bdat           d_parameters_192.sas7bdat
d_parameters_140.sas7bdat          d_parameters_193.sas7bdat
d_parameters_141.sas7bdat          d_parameters_194.sas7bdat
d_parameters_142.sas7bdat          d_parameters_195.sas7bdat
d_parameters_143.sas7bdat          d_parameters_196.sas7bdat
d_parameters_144.sas7bdat          d_parameters_197.sas7bdat
d_parameters_145.sas7bdat          d_parameters_198.sas7bdat
d_parameters_146.sas7bdat          d_parameters_199.sas7bdat
d_parameters_147.sas7bdat          d_parameters_2.sas7bdat
d_parameters_148.sas7bdat          d_parameters_20.sas7bdat
d_parameters_149.sas7bdat          d_parameters_200.sas7bdat
d_parameters_15.sas7bdat           d_parameters_21.sas7bdat
d_parameters_150.sas7bdat          d_parameters_22.sas7bdat
d_parameters_151.sas7bdat          d_parameters_23.sas7bdat
d_parameters_152.sas7bdat          d_parameters_24.sas7bdat
d_parameters_153.sas7bdat          d_parameters_25.sas7bdat
d_parameters_154.sas7bdat          d_parameters_26.sas7bdat
d_parameters_155.sas7bdat          d_parameters_27.sas7bdat
d_parameters_156.sas7bdat          d_parameters_28.sas7bdat
d_parameters_157.sas7bdat          d_parameters_29.sas7bdat
d_parameters_158.sas7bdat          d_parameters_3.sas7bdat
d_parameters_159.sas7bdat          d_parameters_30.sas7bdat
d_parameters_16.sas7bdat           d_parameters_31.sas7bdat
d_parameters_160.sas7bdat          d_parameters_32.sas7bdat
d_parameters_161.sas7bdat          d_parameters_33.sas7bdat
d_parameters_162.sas7bdat          d_parameters_34.sas7bdat

Expert Report of Professor James R. Kearl

March 21, 2012                                                      Charles River Associates

| | |
|---|---|
| d_parameters_35.sas7bdat | d_parameters_88.sas7bdat |
| d_parameters_36.sas7bdat | d_parameters_89.sas7bdat |
| d_parameters_37.sas7bdat | d_parameters_9.sas7bdat |
| d_parameters_38.sas7bdat | d_parameters_90.sas7bdat |
| d_parameters_39.sas7bdat | d_parameters_91.sas7bdat |
| d_parameters_4.sas7bdat | d_parameters_92.sas7bdat |
| d_parameters_40.sas7bdat | d_parameters_93.sas7bdat |
| d_parameters_41.sas7bdat | d_parameters_94.sas7bdat |
| d_parameters_42.sas7bdat | d_parameters_95.sas7bdat |
| d_parameters_43.sas7bdat | d_parameters_96.sas7bdat |
| d_parameters_44.sas7bdat | d_parameters_97.sas7bdat |
| d_parameters_45.sas7bdat | d_parameters_98.sas7bdat |
| d_parameters_46.sas7bdat | d_parameters_99.sas7bdat |
| d_parameters_47.sas7bdat | bs_prmsens.sas7bdat |
| d_parameters_48.sas7bdat | data.z01 |
| d_parameters_49.sas7bdat | data.z02 |
| d_parameters_5.sas7bdat | data.z03 |
| d_parameters_50.sas7bdat | data.z04 |
| d_parameters_51.sas7bdat | data.zip |
| d_parameters_52.sas7bdat | eps1.zip |
| d_parameters_53.sas7bdat | eps2.zip |
| d_parameters_54.sas7bdat | eps4.zip |
| d_parameters_55.sas7bdat | eps5.zip |
| d_parameters_56.sas7bdat | eps_sample.zip |
| d_parameters_57.sas7bdat | xossample1.zip |
| d_parameters_58.sas7bdat | images-as-of-110908.zip |
| d_parameters_59.sas7bdat | Sens.zip |
| d_parameters_6.sas7bdat | Patent Contribution - Conjoint.xlsm |
| d_parameters_60.sas7bdat | Patent Contribution - Econometrics.xlsm |
| d_parameters_61.sas7bdat | Android OC Quarterly Review - Q1 2011 - GOOGLE- |
| d_parameters_62.sas7bdat | 77-00053555.pdf |
| d_parameters_63.sas7bdat | Android OC Quarterly Review - Q4 2010 - GOOGLE- |
| d_parameters_64.sas7bdat | 01-00053552.pdf |
| d_parameters_65.sas7bdat | OAGOOGLE0005039944.pdf |
| d_parameters_66.sas7bdat | OAGOOGLE0100166899.pdf |
| d_parameters_67.sas7bdat | 001_0.7.35.522032.2.ods |
| d_parameters_68.sas7bdat | Global Smartphone Sales Forecast by Operating |
| d_parameters_69.sas7bdat | System and Region_Jan 11.xls |
| d_parameters_7.sas7bdat | GOOGLE-03173364 [AEO] Android - Android Rev - |
| d_parameters_70.sas7bdat | Ads Rev by Category - US Only.csv |
| d_parameters_71.sas7bdat | GOOGLE-03173365 [AEO] Android - Android Rev - |
| d_parameters_72.sas7bdat | Android Rev Run Rate by Category.csv |
| d_parameters_73.sas7bdat | Java_Billings_Costs_v4.xls |
| d_parameters_74.sas7bdat | AdMob Mobile Metrics May-2010.pdf |
| d_parameters_75.sas7bdat | 10-19-11 Order re Hearing 706 Expert.pdf |
| d_parameters_76.sas7bdat | 10.28.11 Letter re Kearl expert report extension re- |
| d_parameters_77.sas7bdat | quest.pdf |
| d_parameters_78.sas7bdat | 2011-11-09 Memorandum Opinion re Rule 706 Ex- |
| d_parameters_79.sas7bdat | pert (610).pdf |
| d_parameters_8.sas7bdat | 2011.9.8 Order-706 Expert.pdf |
| d_parameters_80.sas7bdat | 374_2011 08 30 Order Appointing Rule 706 Expert |
| d_parameters_81.sas7bdat | and Counsel.pdf |
| d_parameters_82.sas7bdat | Final Pretrial Conf set for 12-21-11.pdf |
| d_parameters_83.sas7bdat | Order extending to 1.19.12.pdf |
| d_parameters_84.sas7bdat | 3 16 Agreement - OAGOOGLE0100168443 at |
| d_parameters_85.sas7bdat | OAGOOGLE0100168451.pdf |
| d_parameters_86.sas7bdat | Ex C - Under Seal Cover Sheet.pdf |
| d_parameters_87.sas7bdat | Ex D - Under Seal Cover Sheet (email).pdf |

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

Ex D.pdf
Ex E.pdf
Ex F.pdf
Ex G.pdf
Ex J.pdf
Ex K.pdf
Ex A Leonard Gregory K Ph D (2011-10-28) HC-AEO mini UNDER SEAL.pdf
Ex B Cox Alan J Ph D (2011-10-26) HC-AEO mini UNDER SEAL.pdf
Ex B Patent 702 Experiment 1 Results.xls
EX C GOOGLE-01-00025575 UNDER SEAL.pdf
EX C GOOGLE-03403114.pdf
Ex C Patent 702 Experiment 2 Results.xls
EX D GOOGLE-10-00045447.pdf
Ex E Benchmark-Data-104-Patent.xls
EX E GOOGLE-59-00030150.pdf
Ex F Benchmark-Data-205-Patent.xls
EX F GOOGLE-01-00062072.pdf
Ex F Patent 702 Experiment 3 Results.xls
Ex G Patent 520 Results.xls
EX H Cockburn, Iain Ph.D. (2011-10-17) HC-AEO.mini.pdf
EX J Leonard revised Report excerpts.pdf
EX L GOOGLE-12-00044903.pdf
EX M GOOGLE-26-00007930.pdf
Ex. 02 - 2011-05-16 Dan Bornstein (EXCERPT).PDF
Ex. 17 - OAGOOGLE0102490254-API Design for C++ (EXCERPT).PDF
Ex. 2 - List of materials considered.pdf
Ex. 3 - Comparison_Fischer591-Fischer717.pdf
Ex. B - 2nd Suppl List of Materials Considered.pdf
Ex. E - pat6026485.pdf
Exhibits_Errata.pdf
Statement re color claim presentation 11-18-11.pdf
UNDER SEAL EXHS.zip
Ex 04_Collections_Frameworks.pdf
Ex A android copy-on-write stats.xlsx
Ex B Patent 702 Experiment 1 Results.xls
Ex C Patent 702 Experiment 2 Results.xls
Ex E Benchmark-Data-104-Patent.xls
Ex F Benchmark-Data-205-Patent.xls
Ex F Patent 702 Experiment 3 Results.xls
Ex G Patent 520 Results.xls
Ex. 02 - 2011-05-16 Dan Bornstein (EXCERPT).PDF
Ex. 17 - OAGOOGLE0102490254-API Design for C++ (EXCERPT).PDF
Ex. 2 - List of materials considered.pdf
Ex. 21 - Henning, API Design Matters.pdf
Ex. 3 - Comparison_Fischer591-Fischer717.pdf
Ex. B - 2nd Suppl List of Materials Considered.pdf
Ex. D - Liang - Dynamic Class Loading in the JVM.pdf
Ex. E - pat6026485.pdf
111221OracleWHAF.pdf
2012-02-07 OA 26(a)(2)(c) Expert Disclosure (Final).pdf
2012-03-13 Notice re Trial Materials (788).PDF

Google v Oracle - Gauss program info.doc
Guidelines.pdf
Jt Statement Oracle products practicing patents 1-27-12.pdf
Order re Van Nest 2-24-12 Order.pdf
Transcript 10-19-11 invoice.pdf
Albanesius, Chloe, "Android Market Hits 100,000 Apps," PCMag, October 25, 2010. http://www.pcmag.com/article2/0,2817,2371436,00.asp
Distimo, "Distimo Report Full Year 2010", 2011.
Distimo, "Distimo Report November 2010", 2010.
McDougall, Paul, "Windows Phone 7 Apps Hit 30,000 Mark," InformationWeek, August 30, 2011. http://www.informationweek.com/news/windows/microsoft_news/231600493
Wauters, Robin, "There Are Now More Free Apps for Android than for the iPhone Distimo," TechCrunch, April 27, 2011. http://techcrunch.com/2011/04/27/there-are-now-more-free-apps-for-android-than-for-the-ios-platform-distimo/
2011-09-12 Cockburn Report-Exhibits & Appendices.pdf
2011-09-12 Expert Report of Dr Shugan.pdf
2011-09-28 Shugan Reply Report (w Exhs Appendix).pdf
2011.10.24 Leonard revised report.pdf
2011.9.15 Cockburn Revised Report.pdf
2012-02-03 Third Cockburn Report-HC-AEO.pdf
2012-02-23 Shugan Dec on Pleading (final).pdf
Appendix C.xlsx
Best Android Phones June 2011 _ Android Central.pdf
Cannacord-dec 6month channel checks.png
CareAce Smartphone Survey_What do Smartphone Users Want.pdf
Cassavoy, Liane - Best Voice Recognition Apps for Your Smartphone.pdf
CBCHB_Manual.pdf
Enterprise Mobility 10 Essential Smartphone features for 2011 models.xlsx
FonKN_A.log
Harrison Rutstrom - Experimental Evidence on the Existence of Hypothetical Bias in Valuation Elicitation Methods.pdf
howmanyq.pdf
HTC droid incredible specs -android central.pdf
Hudson Securities - Handset Survey 2011-05-13.pdf
Hudson Securities - Handset Survey 2011-01-12.pdf
IRP_Company_List_2010.pdf
J.D. Power and Associates (Volume 1 Mar2011).pdf
J.D. Power and Associates (Volume 2 Sept2011).pdf
JD Power and Associates 2010 Vol 1.pdf
JD Power and Associates 2010 Vol 2 (shugan source).pdf
Johnson, Richard M., and Bryan K. Orme (1996) - How Many Questions Should You Ask in Choice-

Expert Report of Professor James R. Kearl

March 21, 2012                                                    Charles River Associates

Based Conjoint Studies_noPW.pdf

Nielsen-Top-10s-2010.pdf

Nielsen_ Top Reasons for Choosing Device - Smartphone vs (shugan source).pdf

NPD Group - CES 2012 Media Fact Sheet.pdf

NPD Group - Q3 2011 Top 5 Handsets.pdf

NPD Q1 2011.pdf

Orme - Interpreting the Results of Conjoing Analysis.pdf

PC World- The Best Android Smartphones Out Now.pdf

Rodman & Renshaw - May US Cellular Handset Survey.pdf

Sawtooth Software Products CBC.pdf

Sawtooth Software Products CBChb.pdf

Shugan deposition FINAL MINI.pdf

SMARTPHONE SURVEY_ Why People Choose Android vs iPhone.pdf

smartphonesurveyreport2010.pdf

Vlingo.pdf

10.28.11 Letter re Kearl expert report extension request.pdf

2011-10-30 Letter from Robert Van Nest in Response to Oracles Precis re Originality (582).pdf

2011-11-04 Letter from Robert Van Nest re Copyrightability (601).pdf

2011-11-11 Oracle Holtzman Letter to Court re Depositions (614).pdf

2012-02-17 Plff Oracle Letter re Google Precis Letter re Claim 14 of 476 Patent (716).pdf

Google letter to judge 10.25.11.pdf

Google ltr opposing depositions 11-13-11.pdf

Letter to Court re Kearl report 3-13-12.pdf

Oracle letter 11-11-11 re depositions.pdf

Joint Statement-Oracle products practicing patents 2-21-12.pdf

http://allaboutwindowsphone.com/news/item/13913_Windows_Phone_Marketplace_pass.php

http://allthingsd.com/20100715/googles-q2-may-not-wow-investors-revenue-in-line-eps-light/

http://androinica.com/2009/09/android-market-has-10000-apps-many-of-which-dont-appeal-to-users/

http://appadvice.com/appnn/2010/05/ipadbigsales

http://crackberry.com/blackberry-app-world-

surpasses-10-000-apps-we-head-devcon

http://freshinfos.com/2012/01/23/windows-market-hits-60000-apps-milestone/

http://mashable.com/2009/08/05/flurry-iphone-apps/

http://mashable.com/2009/10/27/iphone-100000-apps/

http://mobilesyrup.com/2011/01/18/blackberry-app-word-seeing-2-millions-apps-downloaded-every-day/

http://mobilesyrup.com/2011/02/14/rim-there-are-over-20000-blackberry-apps-available-today/

http://nerdberry.net/2011/10/06/new-milestone-for-blackberry-app-world/

http://techcrunch.com/2009/12/15/android-market-20000-apps/

http://techcrunch.com/2010/03/16/google-android-market-now-serving-30000-apps/

http://www.148apps.com/news/app-store-total-tops-10000/

http://www.148apps.com/news/wowza-30000-apps-itunes-app-store/

http://www.androidcentral.com/150k-apps-android-market-tripled-9-months

http://www.androidpolice.com/2010/10/25/android-market-officially-reaches-100000-applications/

http://www.b2bsocialmediaguide.com/category/social-stats/apps-social-stats/

http://www.berryreview.com/2009/07/08/blackberry-app-world-hits-2000-apps-opening-up-soon-in-more-countries/

http://www.distimo.com/blog/2012_01_google-android-market-tops-400000-applications/

http://www.padgadget.com/2010/05/01/how-many-ipad-apps-are-there/

http://www.zdnet.com/blog/btl/rims-growing-app-collection-bolsters-my-opinion-of-blackberry/30933

http://www.wirelessindustrynews.org/news-aug-2009/1624-081309-win-news.html

http://www.smartphonebasics.com/what-features-to-look-for-in-a-smartphone

http://www.consumerreports.org/cro/cell-phones-services/buying-guide.htm?pn=2

http://people.ischool.berkeley.edu/~hal/people/hal/NYTimes/2000-11-16.html

Expert Report of Professor James R. Kearl,
March 21, 2012

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

Privileged and Highly Confidential
Subject to Protective Order



Privileged and Highly Confidential
Subject to Protective Order

*Expert Report of Professor James R. Kearl,*
*March 21, 2012*



Privileged and Highly Confidential
Subject to Protective Order



Privileged and Highly Confidential
Subject to Protective Order

*Expert Report of Professor James R. Kearl,*
*March 21, 2012*

**Table 10. Java ME Lost Profits**



**Exhibit D1. Patent Value as Proportion of Total Portfolio**

Expert Report of Professor James R. Kearl, March 21, 2012

| | Patent renewal models | | | | | | | | | | | | | | | | Patent application models | | | | | |
| | Schankerman and Pakes (1986) | | | Pakes (1986) | | | Sullivan (1994) | Lanjouw (1998) | | | | Schankerman (1998) | | | | Bessen (2008) | Putnam (1996) | | Deng (2011) | | | |
| Study | | | | | | | | | | | | | | | | | | | | | | |
| Country | Germany | France | U.K. | Germany | France | U.K. | U.K. | German | | | | France | | | | U.S. | Germany | World | Europe | | | |
| Year | 1952-78 | 1951-79 | 1950-76 | 1952-72 | 1951-79 | 1950-74 | 1852-76 | 1953-80 | | | | 1969-82 | | | | 1991 | 1974 | 1974 | 1978-96 | | | |
| Technology | All | All | All | All | All | All | All | Comp | Textile | Engines | Pharma | Pharma | Chem | Mech | Elec | All | All | All | Pharma | Elec | | |
| Returns evolution[1] | D | D | D | S | S | S | D | S | S | S | S | D | D | D | D | D | D | D | S | S | | |
| | | | | | | | | | | | | | | | | | | | | | Median | Mean |
| Sigma for the top 5% | 1.46 | 1.92 | 1.56 | 0.86 | 1.09 | 0.92 | 1.67 | 0.80 | 0.87 | 0.71 | 0.82 | 1.41 | 1.55 | 1.97 | 2.37 | 1.85 | 1.98 | 1.74 | 2.24 | 2.34 | 1.67 | 1.54 |
| Value of the top 3.9% patents as a proportion of the value of the total portfolio | 37.56% | 55.69% | 41.41% | 17.96% | 24.61% | 19.58% | 45.74% | 16.43% | 18.22% | 14.31% | 16.93% | 35.68% | 41.02% | 57.65% | 72.34% | 52.91% | 58.05% | 48.53% | 67.83% | 71.33% | 45.74% | 40.63% |

**Notes:**
1. "Returns evolution" refers to the deterministic (D) or stochastic (S) process described in the text of the Putnam paper.A17

**Source:**
Putnam, Jonathan. "Patent Portfolios, Apportionment, and the Adding-Up Constraint", December 20, 2011.

Privileged and Highly Confidential
Subject to Protective Order

**Exhibit E1. Features Determining Smartphone Choices***

| Smartphone Features | Features Included in 2011 Smartphone Survey | Focus Group/ Interviews [1] | Third-Party Sources Cited By Prof. Shugan | | | | | | | | Other Third-Party Sources | | | | | | | Source Count |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | [2] | [3]' | [3]'' | [3]''' | [4] | [5] | [6] | [7] | [8] | [9]' | [9]'' | [10] | [11] | [12] | [13] | |
| 4G | | | | | | | | | | x | | | | | | | | 1 |
| "Bloatware" | | x | | | | | | | | | | | | | | | | 1 |
| Appearance/physical design/form/shape | | | 6 | | | | 3 | 3 | 7, 17** | | | | | 4 | 3 | 3 | 5 | 8 |
| Application security concerns | | x | | | | | | | | | | | | | | | | 1 |
| Application startup time | 5 | x | | | | | | | | | | | | | | | | 1 |
| Availability of applications | 6 | x | 1 | 9 | 10 | 9 | | 2 | 19 | x | 6 | 3 | 2 | | | | 6*** | 10 |
| Availability of Bluetooth | | x | | | | | | | 3 | | | | | | | | 6*** | 3 |
| Availability of Wi-Fi | | x | | | | | | 5 | 15 | | | | | | 5 | 5 | | 3 |
| Battery life while using phone/ drain by apps | | x | 3 | | | | | | 3 | | 7 | | | | | 5 | | 6 |
| BBM (BlackBerry Messenger) | | x | | | | | | | | | | | | | | | | 1 |
| Brand/ "Anti"-brand | | x | 9 | 2 | 3 | 1 | 5 | | 9 | | | | | | | | 4 | 5 |
| Browser speed | | | | 1 | 1 | | | | | | | | | | | | 9 | 5 |
| Camera | | x | 1 | 1 | | | | | 11 | | | | | | | | | 5 |
| Design of graphic user interface ("GUI") | | x | | | | | | | | | | | | | | | | 1 |
| Display resolution, quality, "Retina display" | | x | | | | | | | | | | 6 | 5 | | | | | 1 |
| Ease of data migration | | | 2 | | | | | | 5 | | | | | | | | | 2 |
| Ease of typing | | | 5 | | | | 1 | | | | | | | | | | | 1 |
| Ease of operation/use | | | 5 | 4 | 2 | 2 | | | 6 | | | | | 2 | 1 | 1 | | 7 |
| Email interface/access | | x | 4 | 2 | 2 | | | 4 | | | | | | 3 | 4 | | 4 | 6 |
| Exchangeability of battery | | x | | | | | | | | | | | | | | | | 1 |
| Familiarity with technology | | x | | | | | | | | | | | | | | | | 1 |
| Features | | x | | | | | | 4 | | | | | | 3 | 4 | 4 | | 7 |
| Future features such as RFID | | | 8 | | | | | | | x | | | | | | | | 1 |
| GPS/navigation/maps | | | | 8 | 7 | 6 | | | | | | 2 | 1 | 3 | 4 | | 10 | 4 |
| Google integration | | x | | | | | | | | | | | | | | | | 1 |
| Hardware speed | | x | | | | | | | | | | 4 | 4 | | | | | 4 |
| Keyboard type/ layout | | x | | | | | | | | | | | | | | | | 1 |
| Keyboard and touchscreen capabilities | | | | | | | | | 8 | x | | | | | | | | 3 |
| Instant Messaging | | | 6 | 6 | 6 | 5 | | | | | | 5 | | 2 | | | | 5 |
| Media integration | | x | 7 | 7 | 8 | 10 | | | 14 | | | | | | | | | 3 |
| Memory/Storage capacity | | | | | | | | | 18 | | 8 | | | | | | | 2 |
| MMS | | | 3 | 3 | 5 | 7 | | | | | | | | | | | | 5 |
| Multi-tasking | 4 | x | | | | | | | | | | | | | | | | 1 |
| Network (Verizon, Sprint, etc.) | | x | | | | | | | | | 4 | 4 | | | | | 3 | 1 |
| Network effect – popular models are discussed online and offer more insights/ tricks | | x | | | | | | | 16 | | 6 | 5 | | | | | 8 | 2 |
| New message LED light indicator | | x | | | | | | | | | | 5 | 7 | | | | | 5 |
| "Other" | | | 8 | | | | | | | x | 8 | | | | | | | 1 |
| Online/Critic's reviews | | x | | | | | | | | | 9 | | | | | | | 1 |
| OEM applications | | | | | | | | | | | | | | | | | | 2 |
| Operating system | 1 | x | 2 | 3 | 9 | 8 | | | | x | 2 | 1 | 3 | | 2 | 2 | 2 | 11 |

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E1. Features Determining Smartphone Choices***

|  |  |  | Third-Party Sources Cited By Prof. Shugan |  |  |  |  |  |  |  | Other Third-Party Sources |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Smartphone Features | Features Included in 2011 Smartphone Survey | Focus Group/ Interviews [1] | [2] | [3][1] | [3][2] | [3][3] | [4] | [5] | [6] | [7] | [8] | [9][4] | [9][5] | [10] | [11] | [12] | [13] | Source Count |
| Performance |  | x |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 1 |
| Practical user interface, e.g. intuitive zooming |  |  |  |  |  |  |  |  |  |  |  |  |  | 1 |  |  |  | 1 |
| Price | 2 | x | 7 |  |  |  |  | 4 |  |  | 5 | 7 | 4 |  |  |  |  | 6 |
| Programmable shortcuts |  | x |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 1 |
| Programmable shortcuts / positioning of apps on home screen |  | x |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 1 |
| Quality of hardware, including glitches and haptics |  | x |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 1 |
| Recommendations |  |  | 10 |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 1 |
| Screen size | 7 |  | 4 |  |  |  |  | 12 | x |  |  | 7 |  |  |  |  | 7 | 5 |
| Security |  | x |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 1 |
| Social influence |  | x |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 1 |
| Speed of multitasking |  | x |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 1 |
| Sync capabilities |  | x |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 1 |
| Threat of malware |  |  |  |  |  |  |  | 10 |  |  |  |  |  |  |  |  |  | 1 |
| Touch screen |  | x |  | 5 | 4 | 4 |  | 1 | x |  |  |  |  |  |  |  |  | 6 |
| Video capability |  |  |  |  |  |  |  | 20 |  |  |  |  |  |  |  |  |  | 1 |
| Video conferencing |  |  |  |  |  |  |  |  | x |  |  |  |  |  |  |  |  | 1 |
| Voice commands |  | x |  |  |  |  |  |  |  | x |  |  |  |  |  |  |  | 2 |
| Weight | 3 | x |  |  |  |  |  | 13 |  |  |  |  |  |  |  |  |  | 2 |

**Notes:**
*Number represents importance ranking provided by the source. Shaded rows correspond to features included in the Smartphone Survey.
**Listed twice by survey as both "Form/Shape" and "Design/Style".
***Indicated in survey as "Wi-Fi/Bluetooth enabled"
1. Used likelihood that feature was listed as "Essential" as mechanism for determining importance.
2. Responses for ages 16-34.
3. Responses for ages 35-54.
4. Responses for ages 55+.
5. Q: "What is the MOST IMPORTANT factor to you in choosing a particular smartphone?" -- used most answered features to determine preference order.
6. Q: "What are OTHER factors that are important to you in choosing a smartphone? (Check all that apply)" -- used most answered features to determine preference order.

**Sources:**
[1] Shugan Expert Report, Exhibit 1.
[2] Swiftkey X, "What do smartphone users really want?", September 1, 2011.
[3] webglobal, "Smartphones: Building profitability and loyalty in the mass-market", 2010.
[4] J.D. Power and Associates 2010 U.S. Wireless Smartphone Customer Satisfaction Study - Volume 2.
[5] The Nielsen Company, "Top Reasons for Choosing Device -- Smartphone vs. Feature Phone: Who Were the Top 3 Reasons for Selecting Your Current Cell Phone?", 2011.
[6] Don Reisinger, "Enterprise Mobility: 10 Essential Smartphone Features for 2011 Models", December 29, 2010.
[7] Cassavoy, Liane. "Best Voice Recognition Apps for Your Smartphone," PCWorld, July 17, 2011.
[8] TecGus Software, Carascat Smartphone Survey, "What do smartphone users want?", April 2011.
[9] Business Insider, "The Truth about Smartphones: Our Exclusive Survey (iPhone vs Android)", April 18, 2011.
[10] J.D. Power and Associates 2011 U.S. Wireless Smartphone Customer Satisfaction Study - Volume 2.
[11] J.D. Power and Associates 2011 U.S. Wireless Smartphone Customer Satisfaction Study - Volume 1.
[12] J.D. Power and Associates 2010 Wireless Smartphone Customer Satisfaction Study - Volume 1.
[13] Realtor, Smartphone Survey Report, 2010.

**Exhibit E2. Top Smartphones Identified by Industry Sources**

| Smartphone | Shugan Report | Sources Cited By Prof. Shugan | | | Other Third-Party Sources | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] | [6] | [7] | [8] | [9] | [10] | [11] |
| **Apple** | | | | | | | | | | | |
| iPhone 3G | | | | | | | | | 5 | | |
| iPhone 3GS | | | | 2 | | 2 | | 3 | 1 | | |
| iPhone 4 | x | | | 1 | 1 | 1 | x | 2 | 4 | 1 | 1 |
| iPhone 4S | | | | | | | x | 1 | | | |
| **Android** | | | | | | | | | | | |
| Google Nexus One | | | x | | | | | | | | |
| HTC Amaze 4G | | | | | | | x | | | | |
| HTC Droid Eris | | | x | | | | | | | | |
| HTC Droid Incredible | x | 3 | x | 5 | | | | | | | |
| HTC Droid Incredible 2 | | 6 | | | | | | | | | |
| HTC EVO 4G | | 2 | | 4 | 3 | 3 | | 8 | | 3 | 3 |
| HTC EVO Shift 4G | | 8 | | | | | | | | | |
| HTC Hero | | | x | | | | | | | | |
| HTC Inspire 4G | | 4 | | | | | | 6 | | | |
| HTC myTouch 3G | | | x | | | | | | | | |
| HTC MyTouch 4G | | | | | | | | | | | 4 |
| HTC Thunderbolt | | 1 | | | | | | | 4 | | |
| LG G2 X 4G | | | | | 2 | | | | 2 | | |
| Motorola Cliq | | | x | | | | | | | | |
| Motorola Devour | | | x | | | | | | | | |
| Motorola Droid | | 7 | x | | | | | | 2 | | |
| Motorola Droid 2 Global | | | | | | | | | | | 5 |
| Motorola Droid 3 | | | | | | 4 | | | | | |
| Motorola Droid Bionic | | | | | | | | 7 | | | |
| Motorola Droid Razr | | | | | | | x | | | | |
| Motorola Droid X | | 5 | | 3 | | | | | | | 2 |
| Samsung Behold II | | | x | | | | | | | | |
| Samsung Droid Charge | | 9 | | | | | | | | | |
| Samsung Epic 4G | | 10 | | | | | x | 9 | | 5 | |
| Samsung Galaxy Nexus | | | | | | | x | | | | |
| Samsung Galaxy S 4G | | | | | | | | 4 | | | |
| Samsung Galaxy S II (AT&T) | | | | | | | x | 5** | | | |
| Samsung Galaxy S II (T-Mobile) | | | | | | | x | 5** | | | |
| Samsung Infuse 4G | | | | | 4 | | | | | | |
| Samsung Moment | | | x | | | | | | | | |
| Samsung Nexus S | | | | | 5 | | | | | | |
| **Blackberry** | | | | | | | | | | | |
| 8300 Series (Curve, 8310, 8320, 8330, 8350i) | | | | | | | | | 6 | | |
| 8500 Series  (Curve 8520, 8530) | | | | | | | | | 3 | | |
| Bold 9700 | | | | | | | | | 7 | | |
| Curve 9300 3G | x | | | | | | | | | | |
| **Windows** | | | | | | | | | | | |
| HTC HD 7 | x | | | | | | | | | | |
| HTC Radar 4G | | | | | | | x | | | | |

Privileged and Highly Confidential
Subject to Protective Order

**Exhibit E2. Top Smartphones Identified by Industry Sources**

**Notes:**

Sources cited by Shugan, include only top *Android* phones.

\*\*Unable to distinguish which version of Samsung Galaxy S II is being indicated by source.

When feature phones were listed among top selling phones these were skipped.

**Sources:**

[1] Shugan Expert Report.

[2] Android Central, *Best Android Phones June 2011*, June 17, 2011.

[3] PC World, *The Best Android Smartphones Out Now*, May 21, 2010.

[4] The NPD Group, Mobile Phone Track, Q1 2011.

[5] Rodman & Renshaw, May U.S. Cellular Handset Survey, May 2011.

[6] The NPD Group, Consumer Tracking Service, Mobile Phone Track, Q3 2011 Top 5 Handsets, Q3 2011.

[7] Cannaccord Genuity, *Monthly Channel Checks*, December 2011.

[8] The NPD Group/Retail Tracking Service, *CES 2012 Media Fact Sheet*, 2012.

[9] Nielsen, *The Top Trends for 2010*, December 22, 2010.

[10] Hudson Securities, *April U.S. Cellular Handset Survey*, April 2011.

[11] Hudson Securities, *December 2010 U.S. Cellular Survey,* December 2010.

Exhibit E3. Top Smartphones Feature Comparison

| | Phones Identified by Shugan | | | | Phones Identified by Other Sources | |
|---|---|---|---|---|---|---|
| | iPhone 4[1,2,3,4,5,6,7,8,9] | BlackBerry Curve 9300 3G[1] | HTC HD 7[1] | HTC Incredible[8,9] | Apple iPhone 3G[6] | Apple iPhone 3GS[3,6,9] |
| Platform | Apple | BlackBerry | Windows | Android | Apple | Apple |
| Carrier(s) | Sprint, Verizon, AT&T | AT&T | AT&T | AT&T discontinued | AT&T | AT&T |
| Weight | 4.8 oz | 3.7 oz | 5.71 oz | 4.6 oz | 4.7 oz | 4.76 oz |
| Dimensions | 4.5" x 2.31" x 0.37" | 4.29" x 2.36" x 0.55" | 4.8" x 2.7" x 0.44" | 4.6" x 2.3" x 0.47" | 4.52" x 2.44" x 0.49" | 4.55" x 2.44" x 0.48" |
| Battery (max) | Talk: 7 hrs Standby: 300 hrs | Talk: 5.5 hrs Standby: 348 hrs | Talk: 6.5 hrs Standby: 348 hrs | Talk: 5.2 hrs Standby: 144 hrs | Talk: 5 hrs Standby: 300 hrs | Talk: 5 hrs Standby: 300 hrs |
| Display Type | LCD | LCD | LCD | OLED | LCD | LCD |
| Display Resolution | 640x960 | 320x240 | 480x800 | 480x800 | 320x480 | 320x480 |
| Screen Size (diagonal) | 3.5 inches | 2.4 inches | 4.3 inches | 3.7 inches | 3.5 inches | 3.5 inches |
| Colors | 16.7 million (24-bit) | 65,536 (16-bit) | 16 million | 65,536 (16-bit) | 16.7 million | 16.7 million (24-bit) |
| Processor | 1000 MHz | 624 MHz | 1000 MHz | 1000 MHz | 412 MHz | 600 MHz |
| Internal Storage | 16 GB | 256 MB | 16 GB | 6.4 GB | 16 GB | 16 GB |
| GPS/Location | Type: A-GPS supports LBS, navigation/photo, video geo-tagging | Type: A-GPS supports LBS, navigation | Type: A-GPS turn-by-turn navigation from TeleNav, supports LBS | Type: A-GPS | Type: A-GPS supports LBS, photo geo-tagging | Type: A-GPS photo and video geo-tagging |
| Multiple Languages | Yes | Yes | Yes | Yes | Yes | Yes |
| Vibrate | Yes | Yes | Yes | Yes | Yes | Yes |
| Bluetooth | Yes | Yes | Yes | Yes | Yes | Yes |
| Mobile Hotspot capable | Yes | No | No | Yes | No | No |
| Computer Sync | iTunes | Yes | Yes | Yes | iTunes | iTunes |
| USB port type | supports charging | micro-USB connector | micro-USB connector | micro-USB connector | supports charging | supports charging |
| Wi-Fi | Yes | Yes | Yes | Yes | Yes | Yes |
| Picture ID | Yes | Yes | Yes | Yes | Yes | Yes |
| Ringer ID | Yes | Yes | Yes | Yes | Yes | Yes |
| Voice Dialing Type | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | No | speaker-independent (automatic) |
| Custom Graphics | Yes | Yes | Yes | Yes | Yes | Yes |
| Custom Ringtones | via iTunes only | Yes | Yes | Yes | via iTunes only | via iTunes only |
| Real-Music Ringers | via iTunes only | Yes | Yes | MP3 | No | via iTunes only |
| Data Tethering capable | Yes | Yes | No | Yes | No | No |
| Predictive Text Entry | Yes | Yes | Yes | Yes | Yes | Yes |
| Touch Screen Type | Capacitive multi-touch | No | Capacitive multi-touch | Capacitive multi-touch | Capacitive multi-touch | Capacitive multi-touch |
| Email Client protocols supported | POP, IMAP, Exchange built in attachment viewer (Microsoft Office, PDF) | POP, IMAP, Exchange supports push, HTML, attachments | POP, IMAP, Exchange | Exchange, POP3, IMAP | POP, IMAP, Exchange, built-in attachment viewer (Office, PDF) | POP, IMAP, Exchange, built-in attachment viewer (Microsoft Office, PDF) |
| MMS | Yes | Yes | Yes | Yes | No | Yes |
| Music Player Supported Formats | MP3, Protected AAC, AAC, Audible, Apple Lossless, AIFF, WAV | MP3, eAAC+, AAC+, AAC, AMR-WB, AMR, WMA, WAV, OGG | MP3, WMA, MA | MP3, eAAC+, AAC+, AAC, WMA | MP3, Protected AAC, AAC, Audible, Apple Lossless, AIFF, WAV | MP3, Protected AAC, AAC, Audible, Apple Lossless, AIFF, WAV |
| Camera Resolution (megapixels) | 5+ | 2+ | 5+ | 8+ | 2+ | 3+ |
| Auto-focus | Yes | No | Yes | Yes | No | Yes |
| Flash (type) | Yes (LED) | No | Yes (dual LED) | Yes (dual LED) | No | No |
| Touch-to-focus | Yes | No | No | Yes | No | No |
| Streaming Video | Yes | No | No | Yes | No | Yes |
| TV Output | Yes | No | Yes | Yes | No | Yes |
| Video Capture | 720p HD | 720p | 720p HD | 720p HD | No | VGA (640x480) |
| 4G | No | No | No | No | No | No |
| Expandable Memory | No | Yes | No | No | No | No |
| Front Facing Camera | Yes | No | No | No | No | No |
| Keyboard | No | Yes | No | No | No | No |
| Speakerphone | Yes | Yes | Yes | Yes | Yes | Yes |
| NFC Capable | No | No | No | No | No | No |
| Dual Core processor | No | No | No | No | No | No |

Expert Report of James R. Kearl, March 21, 2012

Expert Report of Professor James R. Kearl, March 21, 2012

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of James R. Kearl, March 21, 2012

**Exhibit E3: Top Smartphones**

| | Apple iPhone 4S[4,5] | BlackBerry 8500 series (Curve 8520, 8530)[6] | BlackBerry 8300 Series (Curve 8310*, 8320, 8330, 8350i)[6] | BlackBerry Bold 9700[6] | HTC Amaze 4G[7] | HTC EVO 4G[2,5,6,8,9] | HTC Inspire 4G[5] | HTC myTouch 4G[5] |
|---|---|---|---|---|---|---|---|---|
| | | | | | *Phones Identified by Other Sources* | | | |
| **Platform** | Apple | BlackBerry | BlackBerry | BlackBerry | Android | Android | Android | Android |
| **Carrier(s)** | Sprint, Verizon, AT&T | discontinued | discontinued | discontinued | T-Mobile | Sprint | AT&T | T-Mobile |
| **Weight** | 4.9 oz | 3.73 oz | 3.9 oz | 4.3 oz | 6.1 oz | 5.78 oz | 6 oz | 5 oz |
| **Dimensions** | 4.5" x 2.31" x 0.37" | 4.29" x 2.36" x 0.54" | 4.2" x 2.4" x 0.6" | 4.29" x 2.36" x 0.56" | 5.12" x 2.58" x 0.46" | 4.8" x 2.6" x 0.5" | 4.8" x 2.68" x 0.46" | 4.8" x 2.44" x 0.43" |
| **Battery (max)** | Talk- 8 hrs, Standby- 200 hrs | Talk- 4.5 hrs, Standby- 408 hrs | Talk- 4 hrs, Standby- 408 hrs | Talk- 6 hrs, Standby- 408 hrs | Talk- 6 hrs, Standby- 264 hrs | Talk- 6 hrs, Standby- 146 hrs | Talk- 6 hrs, Standby- 372 hrs | Talk- 6 hrs, Standby- 373 hrs |
| **Display Type** | LCD | LCD | LCD | LCD | LCD | LCD | LCD | LCD |
| **Display Resolution** | 640x960 | 320x240 | 320x240 | 480x360 | 540x960 | 480x800 | 480x800 | 480x800 |
| **Screen Size (diagonal)** | 3.5 inches | 2.6 inches | 2.5 inches | 2.4 inches | 4.3 inches | 4.3 inches | 4.3 inches | 3.8 inches |
| **Colors** | 16.7 million (24-bit) | 65,536 | 65,536 | 65,536 | 16 million | 65,536 (16-bit) | 16.7 million | 65,536 (16-bit) |
| **Processor** | 1000 MHz | 512 MHz | 312 MHz | 624 MHz | 1500 MHz | 1000 MHz | 1000 MHz | 1000 MHz |
| **Internal Storage** | 16 GB | 133 MB | 64 MB | 128 MB | 16 GB | 440 MB | 1 GB | 1.2 GB |
| **GPS/Location** | Type: A-GPS supports LBS, navigation/plus compass/photo, video geo-tagging | No | Type: standalone GPS | Type: A-GPS supports LBS/includes BlackBerry Maps | Type: A-GPS w/LBS, navigation/plus compass | Type: A-GPS supports LBS | Type: A-GPS | Type: A-GPS w/LBS, navigation |
| **Multiple Languages** | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Vibrate** | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Bluetooth** | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Mobile Hotspot capable** | Yes | No | No | No | Yes | Yes | Yes | No |
| **Computer Sync** | iTunes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **USB port type** | supports charging | | | micro-USB connector | micro-USB connector | micro-USB connector | micro-USB connector | micro-USB connector |
| **WiFi** | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes |
| **Picture ID** | Yes | No | Yes | Yes | Yes | Yes | Yes | Yes |
| **Ringer ID** | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Voice Dialing Type** | speaker-independent (automatic) plus voice-controlled assistant and full dictation | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) |
| **Custom Graphics** | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Custom Ringtones** | via iTunes only | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Real-Music Ringers** | via iTunes only | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Data Tethering capable** | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Predictive Text Entry** | Yes | Yes | Yes | Yes | Yes (T9 Trace) | Yes (Swype) | Yes (T9) | Yes (Swype) |
| **Touch Screen Type** | Capacitive multi-touch | No | No | No | Capacitive | Capacitive | Capacitive multi-touch | Capacitive |
| **Email Client protocols supported** | POP, IMAP, Exchange built-in attachment viewer (Microsoft Office, PDF) | push, attachments | POP3, IMAP, SMTP, Exchange, Lotus Domino, BlackBerry Connect | POP3, IMAP Exchange, push/supports attachments (Word, Excel, PowerPoint, PDF) and secure email | POP, IMAP, Gmail, Exchange | POP, IMAP, Exchange, Gmail | POP, IMAP, Gmail, Exchange | POP, IMAP, Gmail, Exchange |
| **MMS** | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Music Player Supported Formats** | MP3, Protected AAC, AAC, Audible, Apple Lossless, AIFF, WAV | MP3, eAAC+, AAC+, AAC, AMR, WMA, WAV | MP3, eAAC+, AAC+, AAC, AMR, WMA, WAV | MIDI, MP3, eAAC+, AAC+, AAC, AMR, WMA Pro, WMA | MIDI, MP3, AAC, AMR, WMA, AAC+, WMA, WAV, M4A, OGG | MIDI, MP3, AAC, AMR, WMA, MIDI, MP3, AAC+, AAC, WMA, WAV, OGG | MIDI, MP3, AAC, AMR, WMA, AAC+, WMA, WAV, M4A, OGG | MIDI, MP3, AAC, AMR, WMA, WAV, OGG |
| **Camera Resolution (megapixels)** | 8+ | 2+ | 2+ | 3+ | 8+ | 8+ | 8+ | 5+ |
| **Auto-focus** | Yes | No | No | Yes | Yes | Yes | Yes | Yes |
| **Flash (type)** | Yes (LED) | No | Yes (LED) | Yes (LED) | Yes (LED) | Yes (dual LED) | Yes (LED) | Yes (LED) |
| **Touch-to-focus** | Yes | No | No | No | Yes | No | No | No |
| **Streaming Video** | Yes | Yes | No | Yes | Yes | Yes | Yes | Yes |
| **TV Output** | Yes | No | No | No | Yes (HDMI via MHL) | Yes (HDMI) | No | No |
| **Video Capture** | 1080p HD | QVGA (320x240) | QVGA (320x240) | 480x360 | 1080p HD | 720p HD | 720p HD | 720p HD |
| **4G** | No | No | No | No | Yes | Yes | Yes | Yes |
| **Expandable Memory** | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Front Facing Camera** | Yes | No | No | No | Yes | Yes | No | Yes |
| **Keyboard** | No | Yes | Yes | Yes | No | No | No | No |
| **Speakerphone** | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **NFC Capable** | No | No | No | No | Yes | No | No | No |
| **Dual Core processor** | Yes | No | No | No | Yes | No | No | No |

Privileged and Highly Confidential
Subject to Protective Order

**Exhibit E3. Top Smartphones**

*Phones Identified by Other Sources*

| | HTC Radar 4G[4] | HTC Thunderbolt[7] | LG G2 X 4G[17] | Motorola Droid[6] | Motorola Droid 2 Global[8] | Motorola Droid 3[3] | Motorola Droid Bionic[5] | Motorola Droid Razr[4] |
|---|---|---|---|---|---|---|---|---|
| Platform | Windows | Android | Android | Android | Android | Android | Android | Android |
| Carrier(s) | T-Mobile | Verizon | T-Mobile | discontinued | discontinued | Verizon Wireless | Verizon | Verizon |
| Weight | 4.83 oz | 5.78 oz | 5 oz | 6.4 oz | 6.1 oz | 6.49 oz | 5.6 oz | 4.48 oz |
| Dimensions | 4.7" x 2.4" x 0.43" | 4.8" x 2.6" x 0.52" | 4.88" x 2.48" x 0.43" | 4.55" x 2.35" x 0.55" | 4.58" x 2.38" x 0.54" | 4.85" x 2.52" x 0.51" | 5" x 2.63" x 0.43" | 5.15" x 2.71" x 0.28" |
| Battery (max) | Talk 6.3 hrs, Standby 575 hrs | Talk 6.3 hrs, Standby 312 hrs | Talk 7 hrs, Standby 288 hrs | Talk 6.4 hrs, Standby 270 hrs | Talk 8.3 hrs, Standby 270 hrs | Talk 9.2 hrs, Standby 200 hrs | Talk 10.8 hrs, Standby 200 hrs | Talk 12.5 hrs, Standby 204 hrs |
| Display Type | LCD | LCD | LCD | LCD | LCD | LCD | LCD | OLED |
| Display Resolution | 480x800 | 480x800 | 480x800 | 480x854 | 480x854 | 540x960 | 540x960 | 540x960 |
| Screen Size (diagonal) | 3.8 inches | 4.3 inches | 4 inches | 3.7 inches | 3.7 inches | 4 inches | 4.3 inches | 4.3 inches |
| Colors | 16 million | 16 million | 16.7 million (24-bit) | 16.7 million | 16.7 million (24-bit) | 16 million | 16.7 million | 16.7 million |
| Processor | 1000 MHz | 1000 MHz | 1000 MHz | 550 MHz | 1200 MHz | 1000 MHz | 1000 MHz | 1200 MHz |
| Internal Storage | 8 GB | 8 GB | 5.4 GB | 256 MB | 8 GB | 16 GB | 12 GB | 16 GB |
| GPS/Location | Type: A-GPS w/ LBS, navigation | Type: A-GPS w/ LBS, navigation | Type: A-GPS | Type: A-GPS supports LBS/navigation w/ turn-by-turn driving directions | Type: A-GPS, navigation plus compass | Type: A-GPS, S-GPS | Type: A-GPS, navigation plus compass | Type: A-GPS |
| Multiple Languages | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Vibrate | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Bluetooth | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Mobile Hotspot capable | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes |
| Computer Sync | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| USB port type | micro-USB connector | micro-USB connector | micro-USB connector | micro-USB connector | micro-USB connector | micro-USB connector | micro-USB connector | micro-USB connector |
| Wi-Fi | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Picture ID | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes |
| Ringer ID | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes |
| Voice Dialing Type | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) |
| Custom Graphics | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Custom Ringtones | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Real-Music Ringers | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes |
| Data Tethering capable | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes |
| Predictive Text Entry | Yes | Yes | Yes (Swype) | Yes | Yes (Swype) | Yes (Swype) | Yes (Swype) | Yes (Swype) |
| Touch Screen Type | Capacitive multi-touch | Capacitive multi-touch, haptics | Capacitive | Capacitive | Capacitive multi-touch | Capacitive | Capacitive | Capacitive |
| Email Client protocols supported | POP, IMAP, Exchange, Push | POP, IMAP, Gmail, Exchange | POP, IMAP, Gmail, Exchange | IMAP, POP, SMTP, Exchange, unified inbox plus Gmail client | POP, IMAP, Gmail, Exchange | POP, IMAP/IP, Gmail, Exchange | POP, IMAP, Gmail, Exchange | POP, IMAP, Gmail, Exchange |
| MMS | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Music Player Supported Formats | MP3, WMA, MAA | MIDI, MP3, AAC, AMR, WMA, WAV, MAA, OGG | MIDI, MP3, AAC+, AAC, WMA, WAV | MP3, AAC+, AAC, WMA, eAAC, AAC+, AAC, AAC, OGG | | MIDI, MP3, eAAC+, AAC+, AAC, WAV, OGP | MIDI, MP3, eAAC+, AAC+, AAC, WAV | MIDI, MP3, eAAC+, AAC+, AAC, AMR, WMA, WAV |
| Camera Resolution (megapixels) | 5+ | 8+ | 8+ | 5+ | 5+ | 8+ | 8+ | 8+ |
| Auto-focus | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Flash (type) | Yes (dual LED) | Yes (dual-LED) | Yes (LED) | Yes (LED) | Yes (dual-LED) | Yes (LED) | Yes (LED) | Yes (LED) |
| Touch-to-focus | No | Yes | No | No | No | No | No | No |
| Streaming Video | Yes | Yes | Yes | No | No | Yes | Yes | Yes |
| TV Output | No | Yes (HDMI) | Yes (HDMI) | No | No | Yes (HDMI) | Yes (HDMI) | Yes (HDMI) |
| Video Capture | 720p HD | 720p HD | 1080p HD | WVGA/480p | WVGA/480p | 1080p HD | 1080p HD | 1080p HD |
| 4G | Yes | Yes | Yes | No | No | No | Yes | Yes |
| Expandable Memory | No | Yes | Yes | No | Yes | Yes | Yes | Yes |
| Front Facing Camera | Yes | Yes | Yes | No | No | Yes | Yes | Yes |
| Keyboard | No | No | No | Yes | Yes | Yes | No | No |
| Speakerphone | Yes | Yes | Yes | Yes | Yes | No | No | No |
| NFC Capable | No | No | No | No | No | No | No | Yes |
| Dual Core processor | No | No | Yes | No | No | Yes | Yes | Yes |

Privileged and Highly Confidential
Subject to Protective Order

Exhibit E3. Top Smartphones

## Phones Identified by Other Sources

| | Motorola Droid X[8,9] | Samsung Epic 4G[6,7] | Samsung Galaxy Nexus[4] | Samsung Galaxy S 4G[3] | Samsung Galaxy S II (AT&T)[1,note 4] | Samsung Galaxy S II (T-Mobile)[note 4, note 5] | Samsung Infuse 4G[2] | Samsung Nexus S[5] |
|---|---|---|---|---|---|---|---|---|
| Platform | Android | Android | Android | Android | Android | Android | Android | Android |
| Carrier(s) | discontinued | Sprint | Verizon | T-Mobile | AT&T | T-Mobile | AT&T | T-Mobile, AT&T |
| Weight | 5.47 oz | 5.46 oz | 5.13 oz | 4.16 oz | 4.3 oz | 4.3 oz | 4.9 oz | 4.55 oz |
| Dimensions | 5" x 2.6" x 0.4" | | 5.33" x 2.67" x 0.37" | 4.82" x 2.54" x 0.39" | 4.96" x 2.6" x 0.35" | 5.11" x 2.71" x 0.37" | 5.2" x 2.8" x 0.35" | 4.88" x 2.48" x 0.43" |
| Battery (max) | Talk: 8 hrs / Standby: 220 hrs | Talk: 8 hrs / Standby: 300 hrs | Talk: 12 hrs / Standby: 150 hrs | Talk: 6.5 hrs / Standby: 400 hrs | Talk: 6.5 hrs / Standby: 400 hrs | Talk: 7 hrs / Standby: 187 hrs | Talk: 7 hrs / Standby: 400 hrs | Talk: 6.7 hrs / Standby: 427 oz |
| Display Type | LCD | OLED | OLED | OLED | OLED | OLED | OLED | OLED |
| Display Resolution | 480x854 | 480x800 | 720x1280 | 480x800 | 480x800 | 480x800 | 480x800 | 480x800 |
| Screen Size (diagonal) | 4.3 inches | 4 inches | 4.7 inches | 4 inches | 4.3 inches | 4.5 inches | 4.5 inches | 4 inches |
| Colors | 16.7 million | 16.7 million | 16.7 million | 16.7 million | 16.7 million (24-bit) | 16.7 million | 16.7 million (24-bit) | 16.7 million |
| Processor | 1000 MHz | 1200 MHz | 1200 MHz | 1000 MHz | 1200 MHz | 1500 MHz | 1200 MHz | 1000 MHz |
| Internal Storage | 8 GB | 16 GB | 32 GB | 16 GB | 16 GB | 16 GB | 13 GB | 16 GB |
| GPS/Location | Type: A-GPS w/LBS, navigation | Type: A-GPS supports LBS / navigation | Type: A-GPS w/LBS, turn-by-turn navigation | Type: A-GPS w/LBS, turn-by-turn navigation | Type: A-GPS | Type: A-GPS | Type: A-GPS supports LBS, navigation | Type: A-GPS supports LBS, navigation, turn-by-turn directions |
| Multiple Languages | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Vibrate | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Bluetooth | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Mobile Hotspot capable | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Computer Sync | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| USB port type | micro-USB connector | micro-USB connector | micro-USB connector | micro-USB connector | micro-USB connector | micro-USB connector | micro-USB connector | micro-USB connector |
| WiFi | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Picture ID | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Ringer ID | Yes | Yes | Yes | No | Yes | Yes | Yes | Yes |
| Voice Dialing Type | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) | speaker-independent (automatic) |
| Custom Graphics | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Custom Ringtones | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Real-Music Ringers | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Streaming Video | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Data Tethering capable | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Predictive Text Entry | Yes (Swype) | Yes (Swype) | Yes | Yes (Swype) | Yes (Swype) | Yes (Swype) | Yes (Swype) | Yes |
| Touch Screen Type | Capacitive | Capacitive | Capacitive | Capacitive | Capacitive | Capacitive | Capacitive multi-touch | Capacitive |
| Email Client protocols supported | IMAP4, POP3, SMTP, Gmail | POP, IMAP, POP, Gmail, Exchange | POP, IMAP, POP, Gmail, Exchange | POP, IMAP, Gmail, Exchange | Exchange, Gmail, IMAP, Gmail, Exchange | Exchange, Gmail, IMAP, Gmail, Exchange | Exchange, Gmail, IMAP, Exchange, Gmail | POP, IMAP, Exchange, Gmail |
| MMS | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Music Player Supported Formats | MP3, AAC+, AAC, WMA, WAV | MIDI, MP3, AAC+, AAC, AMR, WMA | MP3, eAAC+, AAC+, AAC | MIDI, MP3, eAAC+, AAC+, AAC, WMA, WAV, OGG | MP3, MP4, AAC, AMR-WB, WMA, WAV, AMR-NB | MP3, MP4, eAAC+, WAV | MIDI, MP3, AAC+, AAC, WMA, WAV, OGG | MIDI, MP3, AAC+, AAC, AMR, WMA, WAV, OGG |
| Camera Resolution (megapixels) | 8+ | 5+ | 5+ | 5+ | 8+ | 8+ | 8+ | 5+ |
| Auto-focus | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Flash (type) | Yes (dual-LED) | Yes (LED) | Yes (LED) | Yes | Yes (LED) | Yes (LED) | Yes (LED) | Yes (LED) |
| Touch-to-focus | Yes | No | No | Yes | Yes | Yes | No | No |
| Streaming Video | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| TV Output | Yes (HDMI) | Yes (HDMI) | Yes (HDMI) | No | Yes (HDMI) | Yes (HDMI plus DLNA) | Yes (HDMI via MHL) | No |
| Video Capture | 720p HD | 720p HD | 1080p HD | 720p HD | 1080p HD | 1080p HD | 720p HD | WVGA480p |
| 4G | No | Yes | Yes | Yes | Yes | Yes | Yes | No |
| Expandable Memory | Yes | Yes | No | Yes | Yes | No | Yes | No |
| Front Facing Camera | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Keyboard | No | Yes | No | No | No | No | No | No |
| Speakerphone | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| NFC Capable | No | No | Yes | No | Yes | Yes | No | Yes |
| Dual Core processor | No | No | Yes | No | Yes | No | No | No |

**Exhibit E3. Top Smartphones Feature Comparison**

**Notes/Assumptions:**

When not explicitly stated otherwise, used 16 GB iPhone to match Shogun.

When not explicitly stated, "iPhone" assumed to be iPhone 4.

Carrier information found using http://www.phonescoop.com.

Blackberry Curve specifications used for the model Curve 8520.

Certain features not included due to congruency across all phones (including but not limited to: camera, flight mode, SMS text messaging, headphone jack, alarm, calculator, calendar, games).

Certain features not included due to lack of weight on purchase decision (including but not limited to: hearing aid compatibility, adjustable text size, spectrum modes, slide keys, browser type).

Price not included as metric due to variations that arise for phones depending on carrier and/or contract duration.

Source [4] used to find all music-player supported format information.

**Sources Used to Identify Phones:**

[1] Shugart Expert Report.

[2] The NPD Group, Consumer Tracking Service, Mobile Phone Track, Q3 2011 Top 5 Handsets, Q3 2011.

[3] Rodman & Renshaw, May U.S. Cellular Handset Survey, May 2011.

[4] Carmacord Genuity, Monthly Channel Checks, December 2011.

[5] The NPD Group/Retail Tracking Service, CES 2012 Media Fast Sheet, 2012.

[6] Nielsen, The Top Trends for 2010, December 22, 2010.

[7] Hudson Securities, April U.S. Cellular Handset Survey, April 2011.

[8] Hudson Securities, December 2010 U.S. Cellular Survey, December 2010.

[9] The NPD Group, Mobile Phone Track, Q1 2011.

**Sources Used to Identify Phone Attributes:**

http://www.phonescoop.com

http://www.phonearena.com

http://www.dahsema.com

http://www.cellphones.ca/

http://cellphoneforums.net

http://www.mobilenap.com/2010/09/24/review-blackberry-curve-3g-9300/

Privileged and Highly Confidential
Subject to Protective Order

*Expert Report of James R. Kearl, March 21, 2012*

**Exhibit E4. Distribution of Time Spent on Instructions Page**

| Time Spent on Instructions Page (in seconds) | Percentage of Respondents | Cumulative Percentage |
|---|---|---|
| <5 | 20.7% | 20.7% |
| 5-10 | 21.9% | 42.6% |
| 10-15 | 11.2% | 53.8% |
| 15-20 | 8.7% | 62.5% |
| 20-25 | 7.0% | 69.5% |
| 25-30 | 5.5% | 75.0% |
| 30-35 | 3.2% | 78.2% |
| 35-40 | 5.6% | 83.8% |
| 40-45 | 3.6% | 87.4% |
| 45-50 | 2.3% | 89.7% |
| 50-55 | 1.9% | 91.6% |
| 55-60 | 0.6% | 92.2% |
| >60 | 7.8% | 100.0% |



# Exhibit E5
## Percentiles for Distribution of Time Spent by Choice Task

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E6. Determinants of Time Spent on Choice Question, Ordinary Least Squares Regression**

| Explanatory Variable | [1] | [2] | [3] | [4] | [5] |
|---|---|---|---|---|---|
| Difference in utility between most preferred and second most preferred options | -0.991 [0.078]* | -0.955 [0.075]* | -0.491 [0.106]* | | |
| Difference in utility between most preferred and least preferred options | | | | -0.378 [0.079]* | |
| Variance in utility across all options | | | | | -0.083 [0.020]* |
| Constant | 23.202 [0.425]* | 18.354 [0.973]* | 16.377 [0.926]* | 17.708 [1.081]* | 15.820 [0.892]* |
| **Question Fixed Effects** | | | | | |
| Task 1 | | 30.570 [1.282]* | 30.408 [1.123]* | 30.367 [1.123]* | 30.393 [1.123]* |
| Task 2 | | 12.793 [1.286]* | 12.620 [1.125]* | 12.575 [1.125]* | 12.600 [1.125]* |
| Task 3 | | 7.629 [1.294]* | 7.726 [1.131]* | 7.607 [1.131]* | 7.612 [1.131]* |
| Task 4 | | 5.783 [1.289]* | 5.680 [1.127]* | 5.626 [1.126]* | 5.642 [1.127]* |
| Task 5 | | 3.839 [1.287]* | 3.770 [1.126]* | 3.626 [1.126]* | 3.660 [1.126]* |
| Task 6 | | 2.961 [1.293]* | 2.865 [1.129]* | 2.815 [1.129]* | 2.815 [1.130]* |
| Task 7 | | 3.190 [1.290]* | 2.988 [1.127]* | 2.851 [1.127]* | 2.847 [1.127]* |
| Task 8 | | 2.045 [1.287] | 1.872 [1.125]+ | 1.704 [1.125] | 1.727 [1.125] |
| Task 9 | | 1.179 [1.290] | 0.739 [1.129] | 0.586 [1.129] | 0.569 [1.129] |
| Task 10 | | 0.589 [1.286] | 0.385 [1.124] | 0.212 [1.124] | 0.236 [1.124] |
| Task 11 | | 1.219 [1.286] | 1.120 [1.123] | 0.987 [1.123] | 1.004 [1.123] |
| Task 12 | | 1.529 [1.296] | 1.338 [1.132] | 1.249 [1.132] | 1.275 [1.133] |
| Task 13 | | 0.573 [1.300] | 0.406 [1.136] | 0.350 [1.136] | 0.355 [1.136] |
| Task 14 | | -0.008 [1.289] | 0.085 [1.127] | -0.059 [1.126] | -0.077 [1.127] |
| Task 15 | | 0.172 [1.296] | 0.326 [1.132] | 0.210 [1.132] | 0.231 [1.132] |
| Respondent Fixed Effects | No | No | Yes | Yes | Yes |
| R squared | 0.010 | 0.100 | 0.370 | 0.370 | 0.370 |

**Notes:**
1. In all regressions, page time for a choice question is the dependent variable.
2. All regressions have 12500 observations, excluding 28 observations with a page time that is over 500 seconds.
3. Standard errors are in brackets. + and * denote statistical significance at the 10% and 5% level, respectively.

Exhibit E7. Sensitivity Analysis of Preference Estimation, Estimated Mean Partworths

| | Operating System Brand | | | | Screen Size (inch) | | | Price ($) | | | Voice Commands | | | Multitasking (# apps) | | | Application Availability (# apps) | | | | App Startup Time (sec) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Android | Apple | BB | Windows | 3.5 | 4.0 | 4.5 | 300 | 200 | 100 | None | Dialing | Texting | 1 | Up to 5 | Up to 9 | 6,000 | 40,000 | 100,000 | 300,000 | 4 | 2 | 0.2 |
| **Prof. Shugan's Base Case** | 0.718 | 0.861 | -1.048 | -0.531 | -0.593 | 0.154 | 0.439 | -1.734 | 0.295 | 1.439 | -0.806 | -0.181 | 0.987 | -1.087 | 0.531 | 0.556 | -0.620 | -0.078 | 0.307 | 0.390 | -0.942 | 0.218 | 0.724 |
| **Excluding Potentially Unreliable Responses** | | | | | | | | | | | | | | | | | | | | | | | |
| Page time on instructions < 10 seconds | 0.743 | 0.973 | -1.065 | -0.652 | -0.867 | 0.212 | 0.655 | -2.520 | 0.409 | 2.111 | -1.168 | -0.063 | 1.231 | -1.704 | 0.854 | 0.850 | -0.819 | -0.063 | 0.475 | 0.408 | -1.433 | 0.388 | 1.065 |
| Page time on choice task < 5 seconds | 0.810 | 0.843 | -1.098 | -0.555 | -0.653 | 0.159 | 0.494 | -1.911 | 0.353 | 1.558 | -0.878 | -0.183 | 1.061 | -1.223 | 0.583 | 0.640 | -0.667 | -0.053 | 0.346 | 0.374 | -1.094 | 0.244 | 0.849 |
| Page time on choice task < 10 seconds | 0.866 | 0.710 | -1.050 | -0.525 | -0.813 | 0.253 | 0.560 | -2.142 | 0.442 | 1.700 | -0.998 | -0.188 | 1.186 | -1.437 | 0.681 | 0.757 | -0.753 | 0.008 | 0.380 | 0.365 | -1.237 | 0.290 | 0.947 |
| < 3 minutes to complete survey | 0.730 | 0.841 | -1.037 | -0.534 | -0.608 | 0.144 | 0.464 | -1.816 | 0.312 | 1.504 | -0.843 | -0.185 | 1.028 | -1.146 | 0.559 | 0.587 | -0.624 | -0.091 | 0.314 | 0.402 | -0.995 | 0.225 | 0.770 |
| Entered survey more than once[a] | 0.781 | 0.862 | -1.126 | -0.516 | -0.581 | 0.153 | 0.428 | -1.777 | 0.326 | 1.451 | -0.798 | -0.172 | 0.970 | -1.132 | 0.547 | 0.585 | -0.610 | -0.089 | 0.296 | 0.402 | -0.953 | 0.211 | 0.742 |
| < 5 minutes to complete survey or entered survey more than once | 0.827 | 0.651 | -1.020 | -0.458 | -0.697 | 0.163 | 0.534 | -2.126 | 0.417 | 1.709 | -0.995 | -0.113 | 1.108 | -1.430 | 0.703 | 0.726 | -0.746 | -0.055 | 0.363 | 0.438 | -1.185 | 0.282 | 0.903 |
| **Alternative Estimation Techniques** | | | | | | | | | | | | | | | | | | | | | | | |
| Including Choice Tasks with "None" Option Selected | 0.751 | 0.850 | -1.082 | -0.519 | -0.617 | 0.163 | 0.454 | -1.732 | 0.312 | 1.420 | -0.783 | -0.231 | 1.014 | -1.157 | 0.542 | 0.615 | -0.568 | -0.071 | 0.259 | 0.380 | -0.984 | 0.256 | 0.728 |
| Simple Logit[a] | 0.292 | 0.413 | -0.365 | -0.340 | -0.181 | 0.034 | 0.146 | -0.502 | 0.035 | 0.467 | -0.239 | -0.089 | 0.329 | -0.327 | 0.154 | 0.173 | -0.171 | -0.030 | 0.084 | 0.117 | -0.271 | 0.045 | 0.227 |
| **Excluding Respondents with Potentially Different Underlying Preferences** | | | | | | | | | | | | | | | | | | | | | | | |
| **Possibly employer-constrained** | | | | | | | | | | | | | | | | | | | | | | | |
| Phone provided by employer[b] | 0.776 | 0.874 | -1.145 | -0.504 | -0.613 | 0.180 | 0.433 | -1.742 | 0.279 | 1.463 | -0.821 | -0.171 | 0.992 | -1.085 | 0.526 | 0.558 | -0.611 | -0.056 | 0.303 | 0.364 | -0.912 | 0.222 | 0.690 |
| Phone options constrained by employer[c] | 0.800 | 0.882 | -1.137 | -0.545 | -0.625 | 0.161 | 0.463 | -1.798 | 0.312 | 1.486 | -0.830 | -0.184 | 1.014 | -1.094 | 0.528 | 0.565 | -0.631 | -0.064 | 0.300 | 0.395 | -0.936 | 0.219 | 0.718 |
| Any of the above, or phone used for work | 0.763 | 1.209 | -1.242 | -0.729 | -0.763 | 0.152 | 0.610 | -2.256 | 0.372 | 1.884 | -0.936 | -0.360 | 1.296 | -1.267 | 0.698 | 0.569 | -0.784 | 0.028 | 0.394 | 0.362 | -1.053 | 0.330 | 0.723 |
| Choose same operating system brand in all choice tasks | 0.773 | 0.348 | -0.776 | -0.344 | -0.638 | 0.188 | 0.469 | -1.914 | 0.318 | 1.596 | -0.893 | -0.181 | 1.074 | -1.202 | 0.583 | 0.619 | -0.622 | -0.078 | 0.317 | 0.383 | -1.012 | 0.226 | 0.786 |
| Intend to purchase smartphone within next six months | 0.851 | 0.850 | -1.130 | -0.571 | -0.701 | 0.155 | 0.546 | -1.911 | 0.298 | 1.614 | -0.863 | -0.247 | 1.110 | -1.227 | 0.587 | 0.640 | -0.640 | -0.093 | 0.310 | 0.423 | -0.989 | 0.172 | 0.817 |
| **Eliminating Inconsistent Economic Preferences** | | | | | | | | | | | | | | | | | | | | | | | |
| **Excluding respondents who prefer…** | | | | | | | | | | | | | | | | | | | | | | | |
| a higher price[d] | 0.715 | 0.980 | -1.142 | -0.553 | -0.712 | 0.192 | 0.519 | -2.667 | 0.231 | 2.436 | -0.754 | -0.180 | 0.934 | -1.174 | 0.577 | 0.597 | -0.645 | -0.098 | 0.360 | 0.383 | -1.066 | 0.259 | 0.808 |
| a slower application startup time[e] | 0.821 | 1.445 | -1.425 | -0.840 | -0.887 | 0.184 | 0.704 | -2.016 | 0.368 | 1.648 | -1.047 | -0.057 | 1.104 | -1.472 | 0.675 | 0.798 | -0.756 | -0.133 | 0.306 | 0.583 | -1.873 | 0.201 | 1.672 |
| a higher price or a slower app startup time[f] | 0.715 | 1.586 | -1.456 | -0.846 | -0.955 | 0.128 | 0.827 | -2.953 | 0.259 | 2.659 | -0.987 | -0.129 | 1.116 | -0.874 | 0.669 | 0.828 | -0.874 | -0.090 | 0.361 | 0.604 | -1.948 | 0.187 | 1.730 |
| less application availability | 0.680 | 3.417 | -2.563 | -1.535 | -0.766 | 0.230 | 0.536 | -1.887 | 0.412 | 1.475 | -0.764 | 0.064 | 0.701 | -1.706 | 0.647 | 1.059 | -1.824 | -0.712 | 0.563 | 1.974 | -1.566 | 0.119 | 1.437 |
| less multitasking | 0.722 | 0.334 | -0.633 | -0.423 | -0.758 | 0.275 | 0.484 | -2.271 | 0.318 | 1.953 | -1.308 | -0.331 | 1.639 | -2.072 | 0.379 | 1.693 | -0.882 | -0.304 | 0.567 | 0.619 | -1.288 | 0.220 | 1.078 |
| less voice command functionality | 0.621 | 1.434 | -1.406 | -0.650 | -0.741 | 0.173 | 0.568 | -1.928 | 0.391 | 1.538 | -2.010 | -0.063 | 2.073 | -1.379 | 0.654 | 0.726 | -0.688 | -0.082 | 0.493 | 0.277 | -1.019 | 0.210 | 0.809 |
| **Modeling monotonic preferences in…** | | | | | | | | | | | | | | | | | | | | | | | |
| price[g] | 0.686 | 0.822 | -1.011 | -0.497 | -0.597 | 0.153 | 0.444 | -1.043 | 1.806 | -0.763 | -0.767 | -0.178 | 0.945 | -1.079 | 0.521 | 0.559 | -0.575 | -0.078 | 0.288 | 0.365 | -0.938 | 0.221 | 0.717 |
| all attitudes except brand and screen size | 0.619 | 0.605 | -0.800 | -0.424 | -0.501 | 0.151 | 0.370 | -0.974 | 1.258 | -0.284 | 2.271 | -0.041 | -2.230 | 0.684 | 0.831 | -1.515 | -0.129 | 0.262 | 1.348 | -1.481 | 2.298 | 0.432 | -2.729 |

Note:
[a] The simple logit results reported in this exhibit differ from the results reported in Exhibits [10a] through [10c] because the variables in this exhibit are effects-coded, while the variables in Exhibits [8a] through [8c] are dummy-coded.

Sources:
[1] Shugan Expert Report, ForKN_B_summary.txt.
[2] Shugan Expert Report, ForKN_RPS_summary.txt.
[3] Shugan Expert Report, ForKN_C_summary.txt.
[4] Shugan Expert Report, ForKN_D_summary.txt.
[5] Shugan Expert Report, ForKN_PRB_summary.txt.
[6] Shugan Expert Report, ForKN_PRAST_summary.txt.
[7] Shugan Expert Report, ForKN_PRB_summary.txt.
[8] Shugan Expert Report, ForKN_P_summary.txt.

Privileged and Highly Confidential
Subject to Protective Order

Exhibit E8a. Sensitivity Analysis of Relative Value between Availability of Applications and Application Startup Time
Averaging Partworth Ranges/Differences Across Respondents Before Calculating Relative Percentages

| | Operating System Brand [a] | Price [b] | Voice Commands [c] | Multi-tasking [d] | Application Startup Time [e] | Application Availability [f] | Screen Size [g] | Ratio of App. Avail. to App. Startup Time [h]÷[e] | Application Startup Time [i] | Application Availability [j] | Ratio of App. Avail. to App. Startup Time [k]÷[i] | Application Startup Time [l] | Application Availability [m] | Ratio of App. Avail. to App. Startup Time [n]÷[l] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Prof. Shugan's Relative Importance Estimates Based on Partworth Ranges | | | | | | | | Prof. Shugan's Relative Importance Based on Partworth Differences between Actual and But-For Levels Per Shugan | | | Relevant Relative Importance Based on Partworth Differences between Actual and But-For Levels Per Cockburn | | |
| **Prof. Shugan's Base Case** | 29.16% | 19.98% | 13.13% | 11.47% | 11.17% | 7.85% | 7.24% | 0.70 | 69.67% | 30.33% | 0.44 | 64.48% | 35.52% | 0.55 |
| **Excluding Potentially Unreliable Responses** | | | | | | | | | | | | | | |
| Page time on instructions < 10 seconds | 22.91% | 21.95% | 13.63% | 13.21% | 12.32% | 7.99% | 7.68% | 0.65 | 71.80% | 28.20% | 0.39 | 65.36% | 34.64% | 0.53 |
| Page time on choice task < 5 seconds | 26.71% | 20.38% | 13.74% | 11.96% | 11.92% | 7.78% | 7.53% | 0.65 | 71.51% | 28.49% | 0.40 | 65.50% | 34.50% | 0.53 |
| Page time on choice task < 10 seconds | 21.48% | 21.37% | 14.41% | 13.56% | 12.54% | 8.11% | 8.52% | 0.65 | 74.99% | 25.01% | 0.33 | 65.32% | 34.68% | 0.53 |
| < 3 minutes to complete survey[a] | 28.08% | 20.31% | 13.40% | 11.77% | 11.40% | 7.69% | 7.35% | 0.67 | 70.50% | 29.50% | 0.42 | 65.37% | 34.63% | 0.53 |
| Entered survey more than once[a] | 29.66% | 20.03% | 12.92% | 11.67% | 11.06% | 7.68% | 6.98% | 0.69 | 69.75% | 30.25% | 0.43 | 65.18% | 34.82% | 0.53 |
| < 5 minutes to complete survey or entered survey more than once | 24.25% | 21.22% | 13.94% | 13.10% | 12.10% | 7.97% | 7.42% | 0.66 | 72.16% | 27.84% | 0.39 | 100.00% | 53.76% | 0.54 |
| **Alternative Estimation Techniques** | | | | | | | | | | | | | | |
| Including Choice Tasks with "None" Option Selected | 28.39% | 19.82% | 13.49% | 11.95% | 11.47% | 7.47% | 7.41% | 0.65 | 71.68% | 28.32% | 0.40 | 66.81% | 33.19% | 0.50 |
| Simple Logit[a] | 19.81% | 24.67% | 14.46% | 12.73% | 12.68% | 7.32% | 8.33% | 0.58 | 73.43% | 26.57% | 0.36 | 66.12% | 33.88% | 0.51 |
| **Excluding Respondents with Potentially Different Underlying Preferences** | | | | | | | | | | | | | | |
| **Possibly employer-constrained** | | | | | | | | | | | | | | |
| Phone provided by employer[a] | 29.75% | 19.99% | 13.26% | 11.41% | 10.73% | 7.61% | 7.25% | 0.71 | 70.21% | 29.79% | 0.42 | 64.33% | 35.67% | 0.55 |
| Phone options constrained by employee[a] | 29.48% | 20.06% | 13.26% | 11.36% | 10.88% | 7.68% | 7.28% | 0.71 | 70.48% | 29.52% | 0.42 | 64.58% | 35.42% | 0.55 |
| Any of the above, or phone used for work | 26.64% | 21.32% | 14.38% | 11.38% | 9.88% | 8.47% | 7.94% | 0.86 | 68.67% | 31.33% | 0.46 | 60.35% | 39.65% | 0.66 |
| Choose same operating system brand in all choice tasks | 21.03% | 22.56% | 14.97% | 12.90% | 12.34% | 8.17% | 8.03% | 0.66 | 70.05% | 29.95% | 0.43 | 65.78% | 34.22% | 0.52 |
| Intend to purchase smartphone within next six months | 27.87% | 20.20% | 13.37% | 11.95% | 10.74% | 7.88% | 8.01% | 0.73 | 65.51% | 34.49% | 0.53 | 64.15% | 35.85% | 0.56 |
| **Eliminating Inconsistent Economic Preferences** | | | | | | | | | | | | | | |
| **Excluding respondents who prefer…** | | | | | | | | | | | | | | |
| a higher price[a] | 28.73% | 25.23% | 11.04% | 10.66% | 10.33% | 6.92% | 7.09% | 0.67 | 69.71% | 30.29% | 0.43 | 64.47% | 35.53% | 0.55 |
| a slower application startup time[a] | 28.71% | 17.16% | 11.91% | 11.51% | 15.65% | 7.32% | 7.73% | 0.47 | 76.11% | 23.89% | 0.31 | 75.36% | 24.64% | 0.33 |
| a higher price or a slower app startup time[a] | 28.18% | 21.88% | 10.38% | 10.59% | 14.33% | 7.11% | 7.52% | 0.50 | 75.69% | 24.31% | 0.32 | 73.46% | 26.54% | 0.36 |
| less application availability | 41.28% | 12.09% | 6.86% | 10.37% | 11.17% | 12.97% | 5.14% | 1.16 | 60.69% | 39.31% | 0.66 | 57.16% | 42.84% | 0.75 |
| less multitasking | 20.16% | 19.85% | 15.27% | 16.57% | 12.28% | 8.63% | 7.24% | 0.70 | 64.86% | 35.14% | 0.54 | 64.18% | 35.82% | 0.56 |
| less voice command functionality | 31.05% | 16.64% | 18.19% | 11.04% | 9.29% | 6.92% | 6.87% | 0.75 | 63.58% | 36.42% | 0.57 | 61.40% | 38.60% | 0.63 |
| Modelling monotonic preferences in… | | | | | | | | | | | | | | |
| price[a] | 28.12% | 21.80% | 12.76% | 11.41% | 11.12% | 7.53% | 7.26% | 0.68 | 70.40% | 29.60% | 0.42 | 65.62% | 34.38% | 0.52 |
| all attributes except brand and screen size | 25.00% | 21.18% | 14.31% | 12.72% | 12.29% | 7.49% | 7.01% | 0.61 | 76.44% | 23.56% | 0.31 | 68.48% | 31.52% | 0.46 |
| **Summary Statistics** | | | | | | | | | | | | | | |
| Minimum | 19.81% | 12.09% | 6.86% | 10.37% | 9.29% | 6.92% | 5.14% | 0.47 | 60.09% | 23.56% | 0.31 | 57.16% | 24.64% | 0.33 |
| Maximum | 41.28% | 25.23% | 18.19% | 16.57% | 15.65% | 12.97% | 8.52% | 1.16 | 76.44% | 39.91% | 0.66 | 100.00% | 53.76% | 0.75 |
| Median | 28.10% | 20.35% | 13.44% | 11.72% | 11.43% | 7.38% | 7.38% | 0.67 | 70.44% | 29.56% | 0.42 | 65.34% | 34.75% | 0.53 |
| Mean | 27.11% | 20.44% | 13.34% | 12.06% | 11.71% | 7.93% | 7.40% | 0.69 | 70.33% | 29.67% | 0.43 | 66.98% | 35.47% | 0.53 |
| Standard Deviation | 4.63% | 2.68% | 2.10% | 1.33% | 1.40% | 1.21% | 0.67% | 0.13 | 4.07% | 4.07% | 0.09 | 8.27% | 5.53% | 0.09 |

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

Exhibit E8b. Sensitivity Analysis of Relative Value between Availability of Applications and Application Startup Time
Averaging Relative Percentages Across Respondents

| | Prof. Shugan's Relative Importance Estimates Based on Partworth Ranges | | | | | | | | Relevant Relative Importance Based on Partworth Differences between Actual and But-For Levels Per Prof. Shugan | | | Relevant Relative Importance Based on Partworth Differences between Actual and But-For Levels Per Cockburn | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Operating System Brand [a] | Price [b] | Voice Commands [c] | Multi-tasking [d] | Application Startup Time [e] | Application Availability [f] | Screen Size [g] | Ratio of App. Avail. to App. Startup Time [h]=[f]/[e] | Application Startup Time [i] | Application Availability [j] | Ratio of App. Avail. to App. Startup Time [k]=[j]/[i] | Application Startup Time [l] | Application Availability [m] | Ratio of App. Avail. to App. Startup Time [n]=[m]/[l] |
| **Prof. Shugan's Base Case** | 30.10% | 19.28% | 13.21% | 11.12% | 10.93% | 8.01% | 7.36% | 0.73 | 65.57% | 34.43% | 0.53 | 59.03% | 40.97% | 0.69 |
| **Excluding Potentially Unreliable Responses** | | | | | | | | | | | | | | |
| Page time on instructions < 10 seconds | 23.99% | 21.15% | 14.13% | 12.79% | 12.20% | 8.04% | 7.69% | 0.66 | 67.67% | 32.33% | 0.48 | 60.66% | 39.34% | 0.65 |
| Page time on choice task < 5 seconds | 27.73% | 19.71% | 13.85% | 11.62% | 11.67% | 7.84% | 7.68% | 0.67 | 66.42% | 33.58% | 0.48 | 60.94% | 39.06% | 0.64 |
| Page time on choice task < 10 seconds | 22.70% | 20.75% | 14.35% | 13.16% | 12.37% | 8.10% | 7.84% | 0.66 | 70.94% | 29.06% | 0.41 | 61.51% | 38.49% | 0.63 |
| < 3 minutes to complete survey[i] | 29.09% | 19.59% | 13.53% | 11.39% | 11.12% | 7.61% | 7.47% | 0.70 | 65.73% | 34.27% | 0.52 | 60.02% | 39.98% | 0.67 |
| Entered survey more than once[i] | 30.51% | 19.33% | 13.04% | 11.29% | 10.87% | 7.85% | 7.12% | 0.72 | 65.70% | 34.30% | 0.52 | 60.25% | 39.75% | 0.66 |
| < 5 minutes to complete survey or entered survey more than once | 25.47% | 20.39% | 14.03% | 12.66% | 11.83% | 8.10% | 7.51% | 0.68 | 67.52% | 32.48% | 0.48 | 60.05% | 39.95% | 0.67 |
| **Alternative Estimation Techniques** | | | | | | | | | | | | | | |
| Including Choice Tasks with "None" Option Selected | 29.49% | 19.20% | 13.51% | 11.42% | 11.19% | 7.68% | 7.50% | 0.69 | 66.18% | 33.82% | 0.51 | 60.36% | 39.64% | 0.66 |
| Simple Logit[i] | 19.81% | 24.67% | 14.46% | 12.73% | 12.68% | 7.32% | 8.33% | 0.58 | 73.43% | 26.57% | 0.36 | 66.12% | 33.88% | 0.51 |
| **Excluding Respondents with Potentially Different Underlying Preferences** | | | | | | | | | | | | | | |
| Possibly employer-constrained | | | | | | | | | | | | | | |
| Phone provided by employer[i] | 30.49% | 19.39% | 13.42% | 11.08% | 10.53% | 7.77% | 7.32% | 0.74 | 66.09% | 33.91% | 0.51 | 59.52% | 40.48% | 0.68 |
| Phone options constrained by employer[i] | 30.20% | 19.52% | 13.37% | 11.08% | 10.62% | 7.88% | 7.36% | 0.74 | 66.14% | 33.86% | 0.51 | 59.41% | 40.59% | 0.68 |
| Any of the above, or phone used for work | 27.63% | 20.47% | 14.55% | 10.96% | 9.83% | 8.66% | 7.90% | 0.88 | 66.17% | 33.83% | 0.51 | 57.78% | 42.22% | 0.73 |
| Choose same operating system brand in all choice tasks | 21.91% | 21.76% | 15.15% | 12.54% | 12.08% | 8.37% | 8.19% | 0.69 | 64.94% | 35.06% | 0.54 | 59.68% | 40.32% | 0.68 |
| Intend to purchase smartphone within next six months | 28.64% | 19.58% | 13.45% | 11.57% | 10.59% | 8.03% | 8.15% | 0.76 | 60.86% | 39.14% | 0.64 | 59.97% | 40.03% | 0.67 |
| **Eliminating Inconsistent Economic Preferences** | | | | | | | | | | | | | | |
| Excluding respondents who prefer... | | | | | | | | | | | | | | |
| a higher price[i] | 29.47% | 24.89% | 11.08% | 10.23% | 10.16% | 7.02% | 7.15% | 0.69 | 65.09% | 34.91% | 0.54 | 60.36% | 39.64% | 0.66 |
| a slower application startup time[i] | 29.18% | 16.79% | 11.85% | 11.10% | 15.73% | 7.46% | 7.79% | 0.47 | 74.44% | 25.56% | 0.34 | 75.03% | 24.97% | 0.33 |
| a higher price or a slower app startup time[i] | 28.55% | 21.71% | 10.53% | 10.20% | 14.32% | 7.19% | 7.50% | 0.50 | 74.22% | 25.78% | 0.35 | 73.28% | 26.72% | 0.36 |
| less application availability | 38.65% | 12.87% | 7.46% | 10.68% | 11.41% | 13.43% | 5.50% | 1.18 | 53.12% | 46.88% | 0.88 | 50.73% | 49.27% | 0.97 |
| less multitasking | 21.32% | 19.01% | 15.40% | 16.26% | 11.94% | 8.82% | 7.25% | 0.74 | 58.80% | 41.20% | 0.70 | 58.73% | 41.27% | 0.70 |
| less voice command functionality | 30.97% | 16.28% | 18.60% | 16.85% | 9.21% | 7.07% | 7.02% | 0.77 | 60.19% | 39.81% | 0.66 | 56.08% | 43.92% | 0.78 |
| Modeling monotonic preferences in... | | | | | | | | | | | | | | |
| price[i] | 29.95% | 19.26% | 13.24% | 11.16% | 11.05% | 7.83% | 7.51% | 0.71 | 66.48% | 33.52% | 0.50 | 60.98% | 39.02% | 0.64 |
| all attributes except brand and screen size | 29.28% | 19.62% | 12.96% | 11.47% | 10.83% | 8.15% | | 0.75 | 64.93% | 35.07% | 0.54 | 58.74% | 41.26% | 0.70 |
| **Summary Statistics** | | | | | | | | | | | | | | |
| Minimum | 19.81% | 12.87% | 7.46% | 10.20% | 9.21% | 7.02% | 5.50% | 0.47 | 53.12% | 25.56% | 0.34 | 50.73% | 24.97% | 0.33 |
| Maximum | 38.65% | 24.89% | 18.60% | 16.26% | 15.73% | 13.43% | 8.50% | 1.18 | 74.44% | 46.88% | 0.88 | 75.03% | 49.27% | 0.97 |
| Median | 29.13% | 19.58% | 13.48% | 11.34% | 11.15% | 7.85% | 7.50% | 0.71 | 66.12% | 33.88% | 0.51 | 60.03% | 39.97% | 0.67 |
| Mean | 27.96% | 19.78% | 13.42% | 11.70% | 11.51% | 8.11% | 7.50% | 0.71 | 65.94% | 34.06% | 0.53 | 60.87% | 39.13% | 0.65 |
| Standard Deviation | 4.12% | 2.51% | 2.07% | 1.30% | 1.43% | 1.27% | 0.68% | 0.13 | 4.90% | 4.90% | 0.12 | 5.07% | 5.07% | 0.13 |

**Exhibit E9. Sensitivity Analysis of Preference Share Simulations**
**Android Preference Shares With and Without Select Feature Infringement**

| | Shugan Exhibit* | Kearl Exhibit | Base Case Preference Shares | | | | Reduction in Android Preference Share | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Apple | Blackberry | Windows | Android | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features | Ratio of Scenario 1 to Scenario 2 |
| **Prof. Shugan's Base Case** | E3a | | 28.4% | 15.0% | 12.4% | 44.3% | 19.9% | 7.9% | 25.7% | 2.50 |
| **Excluding Potentially Unreliable Responses** | | | | | | | | | | |
| Page time on instructions < 10 seconds | | E9a | 28.2% | 16.0% | 13.2% | 42.5% | 28.2% | 10.9% | 34.8% | 2.60 |
| Page time on choice task < 5 seconds | | E9b | 28.2% | 13.9% | 12.8% | 45.1% | 22.0% | 7.4% | 27.9% | 2.97 |
| Page time on choice task < 10 seconds | | E9c | 25.6% | 11.4% | 12.5% | 50.6% | 27.0% | 6.6% | 33.6% | 4.08 |
| < 3 minutes to complete survey | E3b | | 27.9% | 15.2% | 13.0% | 43.9% | 20.9% | 7.5% | 26.4% | 2.79 |
| Entered survey more than once | E3f | | 28.6% | 15.0% | 12.3% | 44.1% | 19.4% | 7.8% | 25.4% | 2.49 |
| < 5 minutes to complete survey or entered survey more than once | | E9d | 26.3% | 14.6% | 13.6% | 45.5% | 25.0% | 8.3% | 31.1% | 3.00 |
| **Alternative Estimation Techniques** | | | | | | | | | | |
| Including Choice Tasks with "None" Option Selected | | E9e | 27.5% | 15.4% | 12.4% | 44.7% | 21.0% | 6.8% | 26.1% | 3.10 |
| Simple Logit | | E9f | 29.3% | 14.9% | 16.5% | 39.4% | 18.4% | 6.9% | 24.6% | 2.67 |
| **Excluding Respondents with Potentially Different Underlying Preferences** | | | | | | | | | | |
| **Possibly employer-constrained** | | | | | | | | | | |
| Phone provided by employer | E3c | | 27.7% | 15.2% | 11.8% | 45.3% | 19.7% | 7.0% | 25.2% | 2.81 |
| Phone options constrained by employer | E3d | | 27.9% | 14.8% | 12.0% | 45.3% | 19.4% | 7.1% | 24.9% | 2.73 |
| Any of the above, or phone used for work | | E9g | 28.6% | 14.5% | 10.3% | 46.6% | 21.4% | 5.4% | 24.9% | 3.95 |
| Choose same operating system brand in all choice tasks | | E9h | 21.3% | 16.7% | 14.5% | 47.5% | 22.9% | 9.0% | 29.3% | 2.55 |
| Intend to purchase smartphone within next six months | E3e | | 26.3% | 15.1% | 13.0% | 45.6% | 19.6% | 6.6% | 24.8% | 2.97 |
| **Eliminating Inconsistent Economic Preferences** | | | | | | | | | | |
| **Excluding respondents who prefer…** | | | | | | | | | | |
| a higher price | RE1b | | 27.6% | 19.9% | 11.6% | 40.8% | 22.7% | 9.6% | 29.9% | 2.36 |
| a slower application startup time | RE1c | | 35.1% | 9.5% | 17.4% | 38.1% | 31.7% | 9.1% | 38.0% | 3.48 |
| a higher price or a slower app startup time | RE1d | | 33.9% | 12.5% | 15.9% | 37.8% | 33.9% | 10.3% | 41.3% | 3.29 |
| less application availability | | E9i | 51.4% | 6.8% | 8.0% | 33.8% | 14.1% | 15.4% | 24.4% | 0.91 |
| less multitasking | | E9j | 24.3% | 16.5% | 8.3% | 50.9% | 22.1% | 14.2% | 32.3% | 1.56 |
| less voice command functionality | | E9k | 27.4% | 10.3% | 11.0% | 51.3% | 16.9% | 6.6% | 22.7% | 2.55 |
| **Modeling monotonic preferences in…** | | | | | | | | | | |
| price | RE1e | | 28.4% | 15.5% | 12.4% | 43.7% | 20.0% | 7.6% | 25.7% | 2.63 |
| all attributes except brand and screen size | | E9l | 29.3% | 15.8% | 11.6% | 43.3% | 20.7% | 9.5% | 28.0% | 2.17 |
| **Changing Product Attribute Assumptions for Market Simulation** | | | | | | | | | | |
| Change assumptions on screen size and application availability | | E9m | 31.9% | 14.9% | 13.1% | 40.1% | 18.4% | 8.3% | 24.4% | 2.22 |
| Assume all phones have voice texting | | E9n | 27.9% | 18.5% | 17.6% | 31.4% | 23.6% | 12.8% | 32.4% | 1.84 |
| Include additional smartphones | | E9o | 36.1% | 8.4% | 10.1% | 45.4% | 19.3% | 6.9% | 25.0% | 2.78 |
| All of the above | | E9p | 42.9% | 9.5% | 11.8% | 36.0% | 24.3% | 10.1% | 31.3% | 2.40 |
| **Summary Statistics** | | | | | | | | | | |
| Minimum | | | 21.3% | 6.8% | 8.0% | 31.4% | 14.1% | 5.4% | 22.7% | 0.91 |
| Maximum | | | 51.4% | 19.9% | 17.6% | 51.3% | 33.9% | 15.4% | 41.3% | 4.08 |
| Median | | | 28.3% | 15.0% | 12.4% | 44.2% | 20.9% | 7.9% | 26.2% | 2.65 |
| Mean | | | 30.1% | 14.1% | 12.7% | 43.2% | 22.0% | 8.7% | 28.5% | 2.67 |
| Standard Deviation | | | 6.1% | 3.1% | 2.3% | 4.9% | 4.4% | 2.4% | 4.7% | 0.66 |

**Notes:**
* Exhibit numbers starting with "E" and "RE" correspond to exhibits referenced in Prof. Shugan's original and reply report, respectively.

**Exhibit E9a. Android Preference Shares With and Without Select Feature Infringement**
**Excluding Respondents Who Spent Less Than 10 seconds on Instructions**
**Respondents (N = 450)**

| | Apple | BlackBerry | Windows | Android | | | |
|---|---|---|---|---|---|---|---|
| | | All Scenarios | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| **Features** | | | | | | | |
| Screen size (inch) | 3.5 | 3.5 | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time (seconds) | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] (number of applications) | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking (number of applications)[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| | | | | | | | |
| **Preference shares** | | | | | | | |
| Base case: | 28.2% | 16.0% | 13.2% | 42.5% | | | |
| Scenario 1: | 32.0% | 19.3% | 18.2% | | 30.5% | | |
| Scenario 2: | 30.5% | 17.6% | 14.0% | | | 37.9% | |
| Scenario 3: | 33.3% | 20.3% | 18.7% | | | | 27.7% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | **28.2%** | **10.9%** | **34.8%** |

**Source:** instrct gt10s Simulation1.xls

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E9b. Android Preference Shares With and Without Select Feature Infringement**
**Excluding Respondent-Choice Task Pairs Where Page Time Is Less Than 5 Seconds**
**Respondents (N = 783)**

| | Apple | BlackBerry | Windows | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
|---|---|---|---|---|---|---|---|
| | | All Scenarios | | | Android | | |
| **Features** | | | | | | | |
| Screen size (inch) | 3.5 | 3.5 | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time (seconds) | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] (number of applications) | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking (number of applications)[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| | | | | | | | |
| **Preference shares** | | | | | | | |
| Base case: | 28.2% | 13.9% | 12.8% | 45.1% | | | |
| Scenario 1: | 31.4% | 16.3% | 17.1% | | 35.2% | | |
| Scenario 2: | 30.1% | 14.8% | 13.3% | | | 41.8% | |
| Scenario 3: | 32.8% | 17.0% | 17.7% | | | | 32.5% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | 22.0% | 7.4% | 27.9% |

**Source:** qt5s  q Simulation1.xls

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

Exhibit E9c. Android Preference Shares With and Without Select Feature Infringement
Excluding Respondent-Choice Task Pairs Where Page Time Is Less Than 10 Seconds
Respondents (N = 771)

| | Apple | BlackBerry | Windows | Android | | | |
|---|---|---|---|---|---|---|---|
| | | All Scenarios | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| **Features** | | | | | | | |
| Screen size (inch) | 3.5 | 3.5 | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time (seconds) | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] (number of applications) | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking (number of applications)[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| | | | | | | | |
| **Preference shares** | | | | | | | |
| Base case: | 25.6% | 11.4% | 12.5% | 50.6% | | | |
| Scenario 1: | 30.1% | 15.0% | 18.0% | | 36.9% | | |
| Scenario 2: | 27.5% | 12.2% | 13.1% | | | 47.2% | |
| Scenario 3: | 31.7% | 15.9% | 18.8% | | | | 33.6% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | 27.0% | 6.6% | 33.6% |

**Source:** qt10s q Simulation1.xls

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E9d. Android Preference Shares With and Without Select Feature Infringement**

**Excluding Respondents with Elapsed Time Less than 5 minutes and Respondents who Entered the Survey More than Once**

**Respondents (N = 591)**

| | Apple | BlackBerry | Windows | Android | | | |
|---|---|---|---|---|---|---|---|
| | | | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| | | All Scenarios | | | | | |
| **Features** | | | | | | | |
| Screen size (inch) | 3.5 | 3.5 | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time (seconds) | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] (number of applications) | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking (number of applications)[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| | | | | | | | |
| **Preference shares** | | | | | | | |
| Base case: | 26.3% | 14.6% | 13.6% | 45.5% | | | |
| Scenario 1: | 30.1% | 17.1% | 18.7% | | 34.1% | | |
| Scenario 2: | 28.5% | 15.7% | 14.1% | | | 41.7% | |
| Scenario 3: | 31.4% | 18.0% | 19.2% | | | | 31.3% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | 25.0% | 8.3% | 31.1% |

**Source:** excl_elapse5m Simulation1.xls

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

Exhibit E9e. Android Preference Shares With and Without Select Feature Infringement
Including the None Option in Estimation
Respondents (N = 784)

| | Apple | BlackBerry | Windows | Android | | | |
|---|---|---|---|---|---|---|---|
| | | All Scenarios | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| **Features** | | | | | | | |
| Screen size (inch) | 3.5 | 3.5 | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time (seconds) | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] (number of applications) | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking (number of applications)[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| | | | | | | | |
| **Preference shares** | | | | | | | |
| Base case: | 27.5% | 15.4% | 12.4% | 44.7% | | | |
| Scenario 1: | 30.7% | 17.4% | 16.6% | | 35.3% | | |
| Scenario 2: | 29.3% | 16.3% | 12.8% | | | 41.6% | |
| Scenario 3: | 31.9% | 18.1% | 17.0% | | | | 33.0% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | **21.0%** | **6.8%** | **26.1%** |

Source: Sim A none Simulation1.xls

Expert Report of Professor James R. Kearl, March 21, 2012

Privileged and Highly Confidential
Subject to Protective Order

**Exhibit E9f. Android Preference Shares With and Without Select Feature Infringement**
**Hierarchical Bayesian Model vs. Simple Logit Model**
**All Respondents (N = 784)**

| | Apple | BlackBerry | Windows | Android | | | |
|---|---|---|---|---|---|---|---|
| | | All Scenarios | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| **Features[1]** | | | | | | | |
| Screen size *(inch)* | 3.5 | 3.5 | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time *(seconds)* | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications *(number of applications)* | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking *(number of applications)* | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| **Hierarchical Bayesian Model Preference Shares[1]** | | | | | | | |
| Base case: | 28.4% | 15.0% | 12.4% | 44.3% | | | |
| Scenario 1: | 31.2% | 17.2% | 16.1% | | 35.5% | | |
| Scenario 2: | 30.2% | 16.1% | 12.9% | | | 40.8% | |
| Scenario 3: | 32.5% | 18.1% | 16.5% | | | | 32.9% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | 19.9% | 7.9% | 25.7% |
| **Simple Logit Model Preference Shares** | | | | | | | |
| Base case: | 29.3% | 14.9% | 16.5% | 39.4% | | | |
| Scenario 1: | 32.7% | 16.7% | 18.4% | | 32.1% | | |
| Scenario 2: | 30.6% | 15.6% | 17.2% | | | 36.7% | |
| Scenario 3: | 33.9% | 17.3% | 19.1% | | | | 29.7% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | 18.4% | 6.9% | 24.6% |

**Sources:** Shugan Report, Exhibit 3a.; Exhibit 10a.

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E9g. Android Preference Shares With and Without Select Feature Infringement**
**Excluding Respondents Indicating Work Use**
**Respondents (N = 337)**

| | Apple | BlackBerry | Windows | Android | | | |
|---|---|---|---|---|---|---|---|
| | | All Scenarios | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| **Features** | | | | | | | |
| Screen size *(inch)* | 3.5 | 3.5 | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time *(seconds)* | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] *(number of applications)* | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking *(number of applications)*[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| | | | | | | | |
| **Preference shares** | | | | | | | |
| Base case: | 28.6% | 14.5% | 10.3% | 46.6% | | | |
| Scenario 1: | 31.3% | 17.9% | 14.2% | | 36.6% | | |
| Scenario 2: | 30.2% | 15.6% | 10.2% | | | 44.1% | |
| Scenario 3: | 32.2% | 18.7% | 14.1% | | | | 35.0% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | 21.4% | 5.4% | 24.9% |

**Source:** excl_work Simulation1.xls

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E9h. Android Preference Shares With and Without Select Feature Infringement**
Excluding Respondents Choosing the Same Operating System Brand in All Choice Tasks
Respondents (N = 683)

| | Apple | BlackBerry | Windows | | Android | | | |
|---|---|---|---|---|---|---|---|---|
| | | All Scenarios | | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| **Features** | | | | | | | | |
| Screen size (inch) | 3.5 | 3.5 | 4.5 | | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time (seconds) | 0.2 | 2 | 0.2 | | 2 | 4 | 2 | 4 |
| Availability of applications[3] (number of applications) | 300,000 | 40,000 | 40,000 | | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking (number of applications)[4] | Up to 5 | Up to 5 | Up to 5 | | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| | | | | | | | | |
| **Preference shares** | | | | | | | | |
| Base case: | 21.3% | 16.7% | 14.5% | | 47.5% | | | |
| Scenario 1: | 24.9% | 19.4% | 19.1% | | | 36.6% | | |
| Scenario 2: | 23.7% | 18.0% | 15.1% | | | | 43.2% | |
| Scenario 3: | 26.6% | 20.3% | 19.6% | | | | | 33.6% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | 22.9% | 9.0% | 29.3% | |

**Source:** excl_loyl Simulation1.xls

Privileged and Highly Confidential
Subject to Protective Order

**Exhibit E9i. Android Preference Shares With and Without Select Feature Infringement**
**Excluding Respondents Preferring a Smaller Number of Applications**
**Respondents (N = 309)**

| | Apple | BlackBerry | Windows | Android | | | |
|---|---|---|---|---|---|---|---|
| | | All Scenarios | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| **Features** | | | | | | | |
| Screen size (inch) | 3.5 | 3.5 | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time (seconds) | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] (number of applications) | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking (number of applications)[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| **Preference shares** | | | | | | | |
| Base case: | 51.4% | 6.8% | 8.0% | 33.8% | | | |
| Scenario 1: | 54.1% | 7.9% | 9.0% | | 29.0% | | |
| Scenario 2: | 54.7% | 7.5% | 9.2% | | | 28.6% | |
| Scenario 3: | 56.3% | 8.2% | 10.0% | | | | 25.5% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | **14.1%** | **15.4%** | **24.4%** |

**Source:** A_PRNApp Simulation1.xls

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

Exhibit E9j, Android Preference Shares With and Without Select Feature Infringement
Excluding Respondents Preferring Less Multitasking
Respondents (N = 326)

| | Apple | BlackBerry | Windows | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
|---|---|---|---|---|---|---|---|
| | | All Scenarios | | | | | |
| **Features** | | | | | | | |
| Screen size *(inch)* | 3.5 | 3.5 | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time *(seconds)* | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] *(number of applications)* | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking *(number of applications)*[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| | | | | | | | |
| **Preference shares** | | | | | | | |
| Base case: | 24.3% | 16.5% | 8.3% | 50.9% | | | |
| Scenario 1: | 28.2% | 19.5% | 12.7% | | 39.6% | | |
| Scenario 2: | 27.4% | 19.0% | 9.9% | | | 43.6% | |
| Scenario 3: | 30.0% | 21.4% | 14.2% | | | | 34.4% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | **22.1%** | **14.2%** | **32.3%** |

**Source:** A_PRMtsk_Simulation1.xls

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E9k. Android Preference Shares With and Without Select Feature Infringement**
**Excluding Respondents Preferring Less Voice Command Functionality**
**Respondents (N = 497)**

| | Apple | BlackBerry | Windows | Android | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | All Scenarios | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| **Features** | | | | | | | |
| Screen size (inch) | 3.5 | 3.5 | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time (seconds) | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] (number of applications) | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking (number of applications)[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| | | | | | | | |
| **Preference shares** | | | | | | | |
| Base case: | 27.4% | 10.3% | 11.0% | 51.3% | | | |
| Scenario 1: | 30.0% | 12.3% | 15.1% | | 42.6% | | |
| Scenario 2: | 29.3% | 11.2% | 11.6% | | | 47.9% | |
| Scenario 3: | 31.5% | 13.0% | 15.8% | | | | 39.6% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | **16.9%** | **6.6%** | **22.7%** |

**Source:** A_PRVC Simulation1.xls

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E9I. Android Preference Shares With and Without Select Feature Infringement**
Constraining Mean Partworths to be Monotonically Inreasing With Improvement in Attribute Level (Except Brand and Screen Size)
Respondents (N = 784)

| Features | Apple | BlackBerry | Windows | Android | | | |
|---|---|---|---|---|---|---|---|
| | | All Scenarios | | Base case:<br>Android infringement | Scenario 1:<br>Infringing but for<br>application startup time | Scenario 2:<br>Infringing but for<br>availability of applications | Scenario 3:<br>Not infringing both select<br>features |
| Screen size *(inch)* | 3.5 | 3.5 | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time *(seconds)* | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3]<br>*(number of applications)* | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking *(number of applications)*[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| **Preference shares** | | | | | | | |
| Base case: | 29.3% | 15.8% | 11.6% | 43.3% | | | |
| Scenario 1: | 32.2% | 18.0% | 15.5% | | 34.3% | | |
| Scenario 2: | 31.3% | 16.8% | 12.7% | | | 39.1% | |
| Scenario 3: | 33.7% | 18.8% | 16.4% | | | | 31.2% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | 20.7% | 9.5% | 28.0% |

**Source:** Cnstrn Simulation1.xls

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E9m. Android Preference Shares With and Without Select Feature Infringement**
**Changing Assumptions on Screen Size and Application Availability**
**All Respondents (N = 784)**

| | Apple | BlackBerry | Windows | Android | | | |
|---|---|---|---|---|---|---|---|
| | | All Scenarios | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| **Features** | | | | | | | |
| Screen size *(inch)* | 3.5 | 3.5 | 4.5 | 3.5 | 3.5 | 3.5 | 3.5 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time *(seconds)* | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] *(number of applications)* | 300,000 | 6000 | 6000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking *(number of applications)*[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| **Preference shares** | | | | | | | |
| Base case: | 31.9% | 14.9% | 13.1% | 40.1% | | | |
| Scenario 1: | 35.1% | 16.6% | 15.6% | | 32.7% | | |
| Scenario 2: | 33.7% | 15.9% | 13.7% | | | 36.7% | |
| Scenario 3: | 36.1% | 17.5% | 16.1% | | | | 30.3% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | **18.4%** | **8.3%** | **24.4%** |

**Source:** Sim_A Simulation ChngShgn.xls

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E9n. Android Preference Shares With and Without Select Feature Infringement**
Assuming All Phones Have Voice Texting
All Respondents (N = 784)

| | Apple | BlackBerry | Windows | Android | | | |
|---|---|---|---|---|---|---|---|
| | | All Scenarios | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| **Features** | | | | | | | |
| Screen size *(inch)* | 3.5 | 3.5 | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 |
| Price | $200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time *(seconds)* | 0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] *(number of applications)* | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking *(number of applications)*[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| **Preference shares** | | | | | | | |
| Base case: | 32.5% | 18.5% | 17.6% | 31.4% | | | |
| Scenario 1: | 34.8% | 20.5% | 20.8% | | 23.9% | | |
| Scenario 2: | 34.5% | 19.6% | 18.6% | | | 27.3% | |
| Scenario 3: | 36.0% | 21.2% | 21.6% | | | | 21.2% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | **23.6%** | **12.8%** | **32.4%** |

**Source:** Sim_A Simulation V txt AllPhn.xls

Expert Report of Professor James R. Kearl,
March 21, 2012

Privileged and Highly Confidential
Subject to Protective Order

**Exhibit E9o. Android Preference Shares With and Without Select Feature Infringement**
**Including Additional Smartphones**
**All Respondents (N = 784)**

| | Apple | BlackBerry | Windows | Android | | | |
|---|---|---|---|---|---|---|---|
| | | All Scenarios | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| **Features** | | | | | | | |
| Screen size *(inch)* | 3.5 | 3.5 | 4.0/4.5 | 3.5-4.5 | 3.5-4.5 | 3.5-4.5 | 3.5-4.5 |
| Price | $100/$200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing | Voice dialing | Voice dialing | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time *(seconds)* | 2/0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] *(number of applications)* | 300,000 | 40,000 | 40,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking *(number of applications)*[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| | | | | | | | |
| **Preference shares** | | | | | | | |
| Base case: | 36.1% | 8.4% | 10.1% | 45.4% | | | |
| Scenario 1: | 39.8% | 9.6% | 13.9% | | 36.7% | | |
| Scenario 2: | 38.5% | 8.8% | 10.4% | | | 42.3% | |
| Scenario 3: | 41.4% | 10.1% | 14.4% | | | | 34.1% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | **19.3%** | **6.9%** | **25.0%** |

**Note:**
Additional smartphones include: (1) an Apple phone with application startup time of 2 seconds and price of $100; (2) a Windows 7 phone with screen size of 4 inches; (3) an Android phone with screen size of 3.5 inches; and (4) an Android phone with screen size of 4.5 inches.

**Source:** Sim_A Simulation AddPhn.xls

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E9p. Android Preference Shares With and Without Select Feature Infringement**
**Changing Shugan's Assumptions on Screen Size and Application Availability, Assuming All Phones Have Voice-Texting, and Including Additional Smartphones**
**All Respondents (N = 784)**

| | Apple | BlackBerry | Windows | Android | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | All Scenarios | | Base case: Android infringement | Scenario 1: Infringing but for application startup time | Scenario 2: Infringing but for availability of applications | Scenario 3: Not infringing both select features |
| **Features** | | | | | | | |
| Screen size *(inch)* | 3.5 | 3.5 | 4.0/4.5 | 3.5-4.5 | 3.5-4.5 | 3.5-4.5 | 3.5-4.5 |
| Price | $100/$200 | $100 | $200 | $200 | $200 | $200 | $200 |
| Voice commands[2] | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting | Voice dialing & texting |
| App startup time *(seconds)* | 2/0.2 | 2 | 0.2 | 2 | 4 | 2 | 4 |
| Availability of applications[3] *(number of applications)* | 300,000 | 6,000 | 6,000 | 100,000 | 100,000 | 40,000 | 40,000 |
| Multitasking *(number of applications)*[4] | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 | Up to 5 |
| | | | | | | | |
| **Preference shares** | | | | | | | |
| Base case: | 42.9% | 9.5% | 11.6% | 36.0% | | | |
| Scenario 1: | 47.1% | 10.6% | 15.1% | | 27.3% | | |
| Scenario 2: | 45.0% | 10.1% | 12.5% | | | 32.4% | |
| Scenario 3: | 48.4% | 11.0% | 15.8% | | | | 24.8% |
| **Loss of preference share for Android between base case and infringing/non-infringing scenarios:** | | | | | 24.3% | 10.1% | 31.3% |

Note:
Additional smartphones include: (1) an Apple phone with application startup time of 2 seconds and price of $100; (2) a Windows 7 phone with screen size of 4 inches; (3) an Android phone with screen size of 3.5 inches; and (4) an Android phone with screen size of 4.5 inches.

**Source:** Sim_A Simulation CumSim.xls

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E10a. Simple Logit Model Estimation Results**
**Pooled and Question-by-Question Estimations**

| Dummy Variables | All Questions Pooled | Q1 | Q2 | Q3 | Q4 | Q5 | Q6 | Q7 | Q8 | Q9 | Q10 | Q11 | Q12 | Q13 | Q14 | Q15 | Q16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Single Choice Question | | | | | | | | | | |
| *Operating System* | | | | | | | | | | | | | | | | | |
| Android | 0.632 [0.030]* | 0.601 [0.114]* | 0.621 [0.122]* | 0.722 [0.122]* | 0.631 [0.123]* | 0.699 [0.122]* | 0.710 [0.126]* | 0.718 [0.127]* | 0.796 [0.126]* | 0.573 [0.116]* | 0.512 [0.118]* | 0.487 [0.115]* | 0.596 [0.123]* | 0.590 [0.123]* | 0.676 [0.124]* | 0.668 [0.122]* | 0.648 [0.124]* |
| Apple | 0.754 [0.030]* | 0.692 [0.114]* | 0.795 [0.117]* | 0.747 [0.122]* | 0.786 [0.121]* | 0.815 [0.122]* | 0.804 [0.121]* | 0.884 [0.124]* | 0.887 [0.126]* | 0.678 [0.116]* | 0.613 [0.114]* | 0.593 [0.111]* | 0.768 [0.119]* | 0.771 [0.123]* | 0.869 [0.121]* | 0.803 [0.122]* | 0.774 [0.122]* |
| Blackberry | -0.024 [0.034] | -0.236 [0.136]+ | -0.001 [0.134] | 0.017 [0.141] | 0.038 [0.133] | 0.001 [0.137] | 0.074 [0.138] | 0.064 [0.141] | 0.231 [0.139]+ | -0.231 [0.140]+ | -0.130 [0.132] | -0.282 [0.134]* | -0.142 [0.139] | -0.066 [0.142] | 0.061 [0.138] | 0.201 [0.132] | 0.110 [0.137] |
| *Screen Size* | | | | | | | | | | | | | | | | | |
| 3.5 inch | -0.327 [0.026]* | -0.380 [0.106]* | -0.354 [0.104]* | -0.403 [0.106]* | -0.330 [0.105]* | -0.198 [0.107]+ | -0.386 [0.110]* | -0.418 [0.110]* | -0.382 [0.107]* | -0.333 [0.107]* | -0.287 [0.104]* | -0.228 [0.105]* | -0.334 [0.105]* | -0.377 [0.108]* | -0.391 [0.107]* | -0.197 [0.105]+ | -0.264 [0.109]* |
| 4.0 inch | -0.112 [0.025]* | -0.040 [0.096] | -0.036 [0.101] | -0.132 [0.101] | -0.183 [0.103]+ | 0.030 [0.103] | -0.258 [0.102]* | -0.187 [0.102]+ | -0.156 [0.100] | 0.055 [0.100] | -0.108 [0.100] | -0.124 [0.103] | -0.226 [0.105]* | -0.145 [0.106] | -0.215 [0.102]* | -0.045 [0.102] | -0.041 [0.101] |
| *Price* | | | | | | | | | | | | | | | | | |
| 300 | -0.968 [0.027]* | -0.620 [0.105]* | -1.005 [0.113]* | -0.986 [0.110]* | -1.063 [0.115]* | -0.979 [0.110]* | -0.839 [0.111]* | -1.048 [0.112]* | -1.056 [0.110]* | -0.877 [0.109]* | -0.863 [0.111]* | -1.046 [0.110]* | -0.912 [0.110]* | -1.150 [0.112]* | -1.100 [0.112]* | -0.970 [0.112]* | -1.052 [0.097]* |
| 200 | -0.432 [0.024]* | -0.173 [0.095]+ | -0.392 [0.095]* | -0.523 [0.099]* | -0.407 [0.095]* | -0.488 [0.099]* | -0.314 [0.096]* | -0.603 [0.099]* | -0.618 [0.098]* | -0.323 [0.096]* | -0.292 [0.097]* | -0.382 [0.094]* | -0.539 [0.099]* | -0.603 [0.095]* | -0.462 [0.095]* | -0.286 [0.102]* | -0.540 [0.097]* |
| *Voice Commands* | | | | | | | | | | | | | | | | | |
| None | -0.568 [0.026]* | -0.402 [0.099]* | -0.550 [0.102]* | -0.597 [0.106]* | -0.606 [0.104]* | -0.602 [0.104]* | -0.425 [0.103]* | -0.707 [0.106]* | -0.666 [0.106]* | -0.504 [0.105]* | -0.714 [0.107]* | -0.563 [0.104]* | -0.554 [0.107]* | -0.673 [0.110]* | -0.501 [0.104]* | -0.560 [0.103]* | -0.551 [0.108]* |
| Dialing only | -0.418 [0.025]* | -0.33 [0.099]* | -0.547 [0.101]* | -0.452 [0.102]* | -0.469 [0.101]* | -0.399 [0.101]* | -0.423 [0.101]* | -0.591 [0.105]* | -0.407 [0.100]* | -0.281 [0.101]* | -0.409 [0.098]* | -0.469 [0.101]* | -0.386 [0.101]* | -0.37 [0.102]* | -0.44 [0.102]* | -0.422 [0.101]* | -0.32 [0.101]* |
| *Multitasking* | | | | | | | | | | | | | | | | | |
| 1 app at a time | -0.500 [0.027]* | -0.323 [0.103]* | -0.327 [0.109]* | -0.661 [0.111]* | -0.569 [0.112]* | -0.542 [0.112]* | -0.672 [0.109]* | -0.508 [0.109]* | -0.471 [0.114]* | -0.565 [0.109]* | -0.538 [0.109]* | -0.409 [0.107]* | -0.637 [0.112]* | -0.462 [0.115]* | -0.416 [0.108]* | -0.400 [0.108]* | -0.546 [0.108]* |
| Up to 5 apps | -0.019 [0.024] | -0.050 [0.098] | 0.178 [0.100]+ | -0.132 [0.098] | -0.112 [0.099] | 0.067 [0.099] | -0.112 [0.096]+ | 0.180 [0.099] | -0.028 [0.099]+ | 0.065 [0.099] | -0.098 [0.098] | -0.017 [0.099] | 0.118 [0.100] | -0.022 [0.101] | -0.025 [0.100] | -0.117 [0.099] | |
| *Availability of Applications* | | | | | | | | | | | | | | | | | |
| 6,000 apps | -0.287 [0.029]* | -0.244 [0.114]* | -0.279 [0.117]* | -0.203 [0.124]+ | -0.330 [0.116]* | -0.230 [0.119]+ | -0.234 [0.118]+ | -0.315 [0.122]* | -0.460 [0.119]* | -0.337 [0.117]* | -0.459 [0.121]* | -0.163 [0.119] | -0.381 [0.122]* | -0.340 [0.127]* | -0.229 [0.119]+ | -0.162 [0.116] | -0.363 [0.119]* |
| 40,000 apps | -0.147 [0.028]* | -0.067 [0.112] | -0.148 [0.114] | 0.002 [0.117] | -0.210 [0.115]+ | -0.131 [0.115] | -0.094 [0.116] | -0.154 [0.116] | -0.275 [0.114]* | -0.128 [0.112] | -0.247 [0.115]* | -0.096 [0.116] | -0.177 [0.117] | -0.078 [0.119] | -0.086 [0.113] | -0.341 [0.121]* | -0.234 [0.114]+ |
| 100,000 apps | -0.032 [0.028] | -0.159 [0.112] | -0.020 [0.111] | 0.032 [0.116] | -0.109 [0.111] | -0.076 [0.112] | -0.018 [0.111] | 0.000 [0.113] | -0.134 [0.113] | -0.144 [0.112] | 0.109 [0.108] | 0.116 [0.113] | -0.028 [0.111] | 0.106 [0.115] | -0.077 [0.115] | 0.001 [0.112] | -0.167 [0.114] |
| *Application Startup Time* | | | | | | | | | | | | | | | | | |
| 4 seconds | -0.498 [0.026]* | -0.459 [0.103]* | -0.535 [0.106]* | -0.460 [0.107]* | -0.435 [0.108]* | -0.710 [0.112]* | -0.461 [0.107]* | -0.635 [0.110]* | -0.548 [0.104]* | -0.442 [0.104]* | -0.663 [0.109]* | -0.446 [0.106]* | -0.679 [0.109]* | -0.348 [0.105]* | -0.570 [0.110]* | -0.234 [0.105]* | -0.416 [0.109]* |
| 2 seconds | -0.182 [0.025]* | -0.314 [0.098]* | -0.222 [0.100]* | -0.135 [0.100] | 0.030 [0.099] | -0.262 [0.100]* | -0.100 [0.101]* | -0.255 [0.101]* | -0.178 [0.099]+ | -0.242 [0.100]* | -0.256 [0.098]* | -0.200 [0.100]* | -0.232 [0.100]* | -0.102 [0.100] | -0.261 [0.100]* | -0.022 [0.101] | -0.138 [0.101] |
| Log likelihood | -13,176.86 | -878.36 | -838.09 | -797.05 | -818.18 | -818.69 | -822.84 | -797.77 | -805.64 | -822.64 | -828.40 | -844.97 | -791.15 | -768.11 | -812.57 | -824.47 | -803.81 |
| # Observations | 43,864 | 2,820 | 2,792 | 2,708 | 2,768 | 2,732 | 2,756 | 2,768 | 2,776 | 2,772 | 2,776 | 2,692 | 2,660 | 2,748 | 2,748 | 2,688 | 2,700 |

**Notes:**
[1] Variables listed are dummy variables that carry the value of 1 for the feature level specified, and 0 otherwise.  The omitted feature level is Windows for operating system, and the most preferred level, as predicted by economic theory, for the remaining features (4.5 inch screen size, price of $100, voice commands for dialing and texting, multitasking of up to 9 apps at a time, 300000 apps, and 0.2 second delay in application startup time).
[2] Results reported under "All Questions Pooled" differ from the simple logit results reported in Exhibit [[7]] because effects-coded variables instead of dummy variables are used in Exhibit [[7]].
[3] Standard errors in brackets. + and * denote statistical significance at the 10% and 5% level, respectively.

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E10b. Simple Logit Model Estimation Results**
**Pooling All Questions Except One**

| Dummy Variables | All Questions Pooled | All Questions Pooled Except: | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | Q5 | Q6 | Q7 | Q8 | Q9 | Q10 | Q11 | Q12 | Q13 | Q14 | Q15 | Q16 |
| *Operating System* | | | | | | | | | | | | | | | | | |
| Android | 0.632 [0.030]* | 0.637 [0.031]* | 0.633 [0.031]* | 0.626 [0.031]* | 0.633 [0.031]* | 0.627 [0.031]* | 0.627 [0.031]* | 0.626 [0.031]* | 0.621 [0.031]* | 0.636 [0.031]* | 0.641 [0.031]* | 0.642 [0.031]* | 0.634 [0.031]* | 0.635 [0.031]* | 0.629 [0.031]* | 0.630 [0.031]* | 0.632 [0.031]* |
| Apple | 0.754 [0.030]* | 0.760 [0.031]* | 0.751 [0.031]* | 0.754 [0.030]* | 0.752 [0.030]* | 0.750 [0.030]* | 0.752 [0.030]* | 0.746 [0.030]* | 0.745 [0.030]* | 0.761 [0.031]* | 0.765 [0.031]* | 0.766 [0.031]* | 0.753 [0.030]* | 0.754 [0.030]* | 0.746 [0.030]* | 0.751 [0.030]* | 0.753 [0.030]* |
| Blackberry | -0.024 [0.034] | -0.009 [0.035] | -0.026 [0.035] | -0.026 [0.035] | -0.027 [0.035] | -0.026 [0.035] | -0.030 [0.035] | -0.030 [0.035] | -0.029 [0.035] | -0.041 [0.035] | -0.010 [0.035] | -0.017 [0.035] | -0.007 [0.035] | -0.018 [0.035] | -0.020 [0.035] | -0.039 [0.035] | -0.032 [0.035] |
| *Screen Size* | | | | | | | | | | | | | | | | | |
| 3.5 inch | -0.327 [0.026]* | -0.323 [0.027]* | -0.325 [0.027]* | -0.323 [0.027]* | -0.327 [0.027]* | -0.335 [0.027]* | -0.322 [0.027]* | -0.321 [0.027]* | -0.323 [0.027]* | -0.326 [0.027]* | -0.330 [0.027]* | -0.335 [0.027]* | -0.327 [0.027]* | -0.325 [0.027]* | -0.323 [0.027]* | -0.336 [0.027]* | -0.331 [0.027]* |
| 4.0 inch | -0.112 [0.025]* | -0.116 [0.026]* | -0.116 [0.026]* | -0.110 [0.026]* | -0.107 [0.026]* | -0.121 [0.026]* | -0.102 [0.026]* | -0.108 [0.026]* | -0.109 [0.026]* | -0.123 [0.026]* | -0.112 [0.026]* | -0.111 [0.026]* | -0.107 [0.026]* | -0.111 [0.026]* | -0.106 [0.026]* | -0.117 [0.026]* | -0.116 [0.026]* |
| *Price* | | | | | | | | | | | | | | | | | |
| 300 | -0.968 [0.027]* | -0.994 [0.029]* | -0.967 [0.028]* | -0.966 [0.028]* | -0.962 [0.028]* | -0.969 [0.028]* | -0.976 [0.028]* | -0.964 [0.028]* | -0.963 [0.028]* | -0.973 [0.028]* | -0.975 [0.028]* | -0.962 [0.028]* | -0.972 [0.028]* | -0.958 [0.028]* | -0.960 [0.028]* | -0.968 [0.028]* | -0.964 [0.028]* |
| 200 | -0.432 [0.024]* | -0.450 [0.025]* | -0.435 [0.025]* | -0.426 [0.025]* | -0.434 [0.025]* | -0.429 [0.025]* | -0.440 [0.025]* | -0.423 [0.025]* | -0.420 [0.025]* | -0.439 [0.025]* | -0.442 [0.025]* | -0.435 [0.025]* | -0.426 [0.025]* | -0.422 [0.025]* | -0.431 [0.025]* | -0.443 [0.025]* | -0.425 [0.025]* |
| *Voice Commands* | | | | | | | | | | | | | | | | | |
| None | -0.568 [0.026]* | -0.580 [0.027]* | -0.569 [0.027]* | -0.566 [0.027]* | -0.565 [0.027]* | -0.565 [0.027]* | -0.576 [0.027]* | -0.560 [0.027]* | -0.562 [0.027]* | -0.572 [0.027]* | -0.558 [0.027]* | -0.569 [0.027]* | -0.568 [0.027]* | -0.562 [0.027]* | -0.573 [0.027]* | -0.569 [0.027]* | -0.567 [0.027]* |
| Dialing only | -0.418 [0.025]* | -0.425 [0.026]* | -0.408 [0.026]* | -0.416 [0.026]* | -0.415 [0.026]* | -0.418 [0.026]* | -0.418 [0.026]* | -0.407 [0.026]* | -0.418 [0.026]* | -0.427 [0.026]* | -0.418 [0.026]* | -0.415 [0.026]* | -0.42 [0.026]* | -0.421 [0.026]* | -0.417 [0.026]* | -0.419 [0.026]* | -0.425 [0.026]* |
| *Multitasking* | | | | | | | | | | | | | | | | | |
| 1 app at a time | -0.500 [0.027]* | -0.514 [0.028]* | -0.488 [0.028]* | -0.489 [0.028]* | -0.495 [0.028]* | -0.496 [0.028]* | -0.489 [0.028]* | -0.499 [0.028]* | -0.501 [0.028]* | -0.496 [0.028]* | -0.497 [0.028]* | -0.505 [0.028]* | -0.493 [0.028]* | -0.502 [0.028]* | -0.505 [0.028]* | -0.509 [0.028]* | -0.497 [0.028]* |
| Up to 5 apps | -0.019 [0.024] | -0.016 [0.025] | -0.032 [0.025] | -0.012 [0.025] | -0.014 [0.025] | -0.024 [0.025] | -0.006 [0.025] | -0.013 [0.025] | -0.033 [0.025] | -0.018 [0.025] | -0.026 [0.025] | -0.013 [0.025] | -0.021 [0.025] | -0.028 [0.025] | -0.020 [0.025] | -0.021 [0.025] | -0.013 [0.025] |
| *Availability of Applications* | | | | | | | | | | | | | | | | | |
| 6,000 apps | -0.287 [0.029]* | -0.291 [0.031]* | -0.288 [0.030]* | -0.293 [0.030]* | -0.285 [0.030]* | -0.291 [0.030]* | -0.292 [0.030]* | -0.286 [0.030]* | -0.278 [0.030]* | -0.284 [0.030]* | -0.277 [0.030]* | -0.296 [0.030]* | -0.282 [0.030]* | -0.285 [0.030]* | -0.291 [0.030]* | -0.299 [0.030]* | -0.281 [0.030]* |
| 40,000 apps | -0.147 [0.028]* | -0.153 [0.029]* | -0.147 [0.029]* | -0.156 [0.029]* | -0.142 [0.029]* | -0.148 [0.029]* | -0.152 [0.029]* | -0.146 [0.029]* | -0.141 [0.029]* | -0.148 [0.029]* | -0.140 [0.029]* | -0.150 [0.029]* | -0.146 [0.029]* | -0.153 [0.029]* | -0.151 [0.029]* | -0.135 [0.029]* | -0.141 [0.029]* |
| 100,000 apps | -0.032 [0.028] | -0.024 [0.029] | -0.034 [0.029] | -0.037 [0.029] | -0.028 [0.029] | -0.030 [0.029] | -0.034 [0.029] | -0.035 [0.029] | -0.025 [0.029] | -0.025 [0.029] | -0.042 [0.029] | -0.043 [0.029] | -0.033 [0.029] | -0.042 [0.029] | -0.029 [0.029] | -0.035 [0.029] | -0.023 [0.029] |
| *Application Startup Time* | | | | | | | | | | | | | | | | | |
| 4 seconds | -0.498 [0.026]* | -0.500 [0.027]* | -0.495 [0.027]* | -0.500 [0.027]* | -0.502 [0.027]* | -0.485 [0.027]* | -0.501 [0.027]* | -0.490 [0.027]* | -0.494 [0.027]* | -0.502 [0.027]* | -0.488 [0.027]* | -0.501 [0.027]* | -0.486 [0.027]* | -0.508 [0.027]* | -0.494 [0.027]* | -0.517 [0.027]* | -0.502 [0.027]* |
| 2 seconds | -0.182 [0.025]* | -0.172 [0.026]* | -0.179 [0.026]* | -0.185 [0.026]* | -0.196 [0.026]* | -0.177 [0.026]* | -0.188 [0.026]* | -0.178 [0.026]* | -0.182 [0.026]* | -0.178 [0.026]* | -0.175 [0.026]* | -0.180 [0.026]* | -0.179 [0.026]* | -0.187 [0.026]* | -0.177 [0.026]* | -0.192 [0.026]* | -0.184 [0.026]* |
| Log likelihood | -13,176.86 | -12,281.44 | -12,334.01 | -12,376.20 | -12,354.24 | -12,353.35 | -12,347.22 | -12,373.98 | -12,362.88 | -12,347.45 | -12,338.27 | -12,325.38 | -12,380.60 | -12,401.78 | -12,360.70 | -12,339.27 | -12,369.15 |
| # Observations | 43,864 | 41,044 | 41,072 | 41,156 | 41,116 | 41,096 | 41,132 | 41,108 | 41,096 | 41,128 | 41,088 | 41,092 | 41,172 | 41,204 | 41,116 | 41,176 | 41,164 |

**Notes:**
[1] Variables listed are dummy variables that carry the value 1 for the feature level specified, and 0 otherwise.  The omitted feature level is Windows for operating system, and the most preferred level, as predicted by economic theory, for the remaining features (4.5 inch screen size, price of $100, voice commands for dialing and texting, multitasking of up to 9 apps at a time, 300000 apps, and 0.2 second delay in application startup time).
[2] Results reported under "All Questions Pooled" differ from the simple logit results reported in Exhibit [[7]] because effects-coded variables instead of dummy variables are used in Exhibit [[7]].
[3] Standard errors in brackets. + and * denote statistical significance at the 10% and 5% level, respectively.

**Exhibit E10c. Simple Logit Model Estimation Results**
  Pooling Four Questions

| Dummy Variables | All Questions Pooled | Questions Pooled | | | |
|---|---|---|---|---|---|
| | | Q1-4 | Q5-8 | Q9-12 | Q13-16 |
| *Operating System* | | | | | |
| Android | 0.632 | 0.628 | 0.733 | 0.542 | 0.640 |
| | [0.030]* | [0.060]* | [0.062]* | [0.058]* | [0.061]* |
| Apple | 0.754 | 0.742 | 0.839 | 0.653 | 0.795 |
| | [0.030]* | [0.059]* | [0.061]* | [0.057]* | [0.060]* |
| Blackberry | -0.024 | -0.056 | 0.090 | -0.189 | 0.067 |
| | [0.034] | [0.067] | [0.069] | [0.068]* | [0.068] |
| *Screen Size* | | | | | |
| 3.5 inch | -0.327 | -0.365 | -0.353 | -0.286 | -0.301 |
| | [0.026]* | [0.052]* | [0.053]* | [0.052]* | [0.053]* |
| 4.0 inch | -0.112 | -0.106 | -0.146 | -0.094 | -0.106 |
| | [0.025]* | [0.050]* | [0.051]* | [0.050]+ | [0.051]* |
| *Price* | | | | | |
| 300 | -0.968 | -0.910 | -0.971 | -0.931 | -1.071 |
| | [0.027]* | [0.055]* | [0.055]* | [0.055]* | [0.056]* |
| 200 | -0.432 | -0.379 | -0.499 | -0.385 | -0.472 |
| | [0.024]* | [0.047]* | [0.048]* | [0.048]* | [0.048]* |
| *Voice Commands* | | | | | |
| None | -0.568 | -0.534 | -0.596 | -0.581 | -0.561 |
| | [0.026]* | [0.051]* | [0.052]* | [0.052]* | [0.053]* |
| Dialing only | -0.418 | -0.447 | -0.456 | -0.384 | -0.379 |
| | [0.025]* | [0.050]* | [0.051]* | [0.050]* | [0.050]* |
| *Multitasking* | | | | | |
| 1 app at a time | -0.500 | -0.462 | -0.552 | -0.537 | -0.450 |
| | [0.027]* | [0.053]* | [0.055]* | [0.054]* | [0.054]* |
| Up to 5 apps | -0.019 | -0.031 | -0.023 | -0.023 | -0.005 |
| | [0.024] | [0.049] | [0.049] | [0.049] | [0.050] |
| *Availability of Applications* | | | | | |
| 6,000 apps | -0.287 | -0.257 | -0.301 | -0.330 | -0.266 |
| | [0.029]* | [0.058]* | [0.059]* | [0.059]* | [0.059]* |
| 40,000 apps | -0.147 | -0.103 | -0.149 | -0.160 | -0.182 |
| | [0.028]* | [0.056]+ | [0.057]* | [0.057]* | [0.058]* |
| 100,000 apps | -0.032 | -0.058 | -0.052 | 0.015 | -0.034 |
| | [0.028] | [0.056] | [0.056] | [0.055] | [0.056] |
| *Application Startup Time* | | | | | |
| 4 seconds | -0.498 | -0.476 | -0.575 | -0.550 | -0.382 |
| | [0.026]* | [0.052]* | [0.054]* | [0.053]* | [0.053]* |
| 2 seconds | -0.182 | -0.164 | -0.190 | -0.232 | -0.132 |
| | [0.025]* | [0.049]* | [0.049]* | [0.049]* | [0.050]* |
| Log likelihood | -13,176.86 | -3,356.19 | -3,263.37 | -3,307.26 | -3,228.08 |
| # Observations | 43,864 | 11,068 | 11,024 | 10,976 | 10,796 |

Notes:
[1] Variables listed are dummy variables that carry the value of 1 for the feature level specified, and 0 otherwise.  The ommited feature level is Windows for operating system, and the most preferred level, as predicted by economic theory, for the remaining features (4.5 inch screen size, price of $100, voice commands for dialing and texting, multitasking of up to 9 apps at a time, 300000 apps, and 0.2 second delay in application startup time).
[2] Results reported under "All Questions Pooled" differ from the simple logit results reported in Exhibit [[7]] because effects-coded variables instead of dummy variables are used in Exhibit [[7]].

Privileged and Highly Confidential
Subject to Protective Order

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit E11. Likelihood Ratio Tests of Identical Consumer Preference Across Choice Questions**

| Null Hypothesis | Unrestricted Log Likelihood | Restricted Log Likelihood | Chi-Squared Statistic | Degrees of Freedom (# Restrictions) | P-Value |
|---|---|---|---|---|---|
| ***Partworths identical across all 16 questions*** [1] | -13,072.74 | -13,176.86 | 208.24 | 240 | 0.9317 |
| ***Partworths for single question = Partworths for remaining questions pooled*** [2] | | | | | |
| Q1 | -13,159.80 | -13,176.86 | 34.12 | 16 | 0.0052 |
| Q2 | -13,172.10 | -13,176.86 | 9.52 | 16 | 0.8905 |
| Q3 | -13,173.25 | -13,176.86 | 7.22 | 16 | 0.9688 |
| Q4 | -13,172.42 | -13,176.86 | 8.88 | 16 | 0.9183 |
| Q5 | -13,172.04 | -13,176.86 | 9.64 | 16 | 0.8847 |
| Q6 | -13,170.06 | -13,176.86 | 13.60 | 16 | 0.6285 |
| Q7 | -13,171.75 | -13,176.86 | 10.22 | 16 | 0.8549 |
| Q8 | -13,168.52 | -13,176.86 | 16.68 | 16 | 0.4066 |
| Q9 | -13,170.09 | -13,176.86 | 13.54 | 16 | 0.6329 |
| Q10 | -13,166.67 | -13,176.86 | 20.38 | 16 | 0.2036 |
| Q11 | -13,170.35 | -13,176.86 | 13.02 | 16 | 0.6713 |
| Q12 | -13,171.75 | -13,176.86 | 10.22 | 16 | 0.8549 |
| Q13 | -13,169.89 | -13,176.86 | 13.94 | 16 | 0.6032 |
| Q14 | -13,173.27 | -13,176.86 | 7.18 | 16 | 0.9696 |
| Q15 | -13,163.74 | -13,176.86 | 26.24 | 16 | 0.0507 |
| Q16 | -13,172.96 | -13,176.86 | 7.80 | 16 | 0.9546 |
| ***Partworths for single questions identical within Group*** [3] | | | | | |
| Q1-4 | -3,331.68 | -3,356.19 | 49.02 | 48 | 0.4320 |
| Q5-8 | -3,244.94 | -3,263.37 | 36.86 | 48 | 0.8789 |
| Q9-12 | -3,287.16 | -3,307.26 | 40.20 | 48 | 0.7808 |
| Q13-16 | -3,208.96 | -3,228.08 | 38.24 | 48 | 0.8422 |
| ***Partworths identical across four groups*** [4] | -13,154.90 | -13,176.86 | 43.92 | 48 | 0.6407 |

**Notes:**
[1] Unrestricted log likelihood is the sum of log likelihood across the 16 single-question models.  Restricted log likelihood is the log likelihood for the model pooling all 16 questions.
[2] Unrestricted log likelihood is the sum of log likelihood for the single-question model and the log likelihood for the model pooling all questions except that single question.  Restricted log likelihood is the log likelihood for the model pooling all 16 questions.
[3] Unrestricted log likelihood is the sum of log likelihood across the four single-question models.  Restricted log likelihood is the log likelihood for the model pooling all four questions.
[4] Unrestricted log likelihood is the sum of log likelihood across the four pooled models pooling four questions.  Restricted log likelihood is the log likelihood for the model pooling all 16 questions.

**Exhibit E12. Distribution of Feature Levels Associated with the Chosen Phone Options**

| | Actual Phone Choice | Phone Choice Predicted by HB Model* | Phone Choice Predicted by Simple Logit Model** |
|---|---|---|---|
| **Price** | | | |
| $300 | 20.2% | 19.7% | 20.2% |
| $200 | 32.7% | 32.4% | 32.7% |
| $100 | 47.1% | 47.9% | 47.1% |
| **Operating system brand** | | | |
| Android | 31.0% | 31.5% | 31.0% |
| Apple | 34.6% | 35.0% | 34.6% |
| BlackBerry | 17.0% | 16.6% | 17.0% |
| Windows | 17.4% | 16.9% | 17.4% |
| **Screen size** | | | |
| 3.5" | 28.4% | 28.2% | 28.4% |
| 4" | 34.1% | 34.2% | 34.1% |
| 4.5" | 37.5% | 37.6% | 37.5% |
| **Voice commands** | | | |
| No voice commands | 26.6% | 26.2% | 26.6% |
| Voice dialing only | 30.1% | 29.8% | 30.1% |
| Voice dialing & texting | 43.3% | 44.0% | 43.3% |
| **Multitasking** | | | |
| 1 app at a time | 24.6% | 24.1% | 24.6% |
| Up to 5 apps at a time | 37.4% | 37.6% | 37.4% |
| Up to 9 apps at a time | 38.0% | 38.3% | 38.0% |
| **Availability of applications** | | | |
| 6,000 | 21.2% | 21.1% | 21.2% |
| 40,000 | 24.3% | 24.3% | 24.3% |
| 100,000 | 26.9% | 26.9% | 26.9% |
| 300,000 | 27.6% | 27.7% | 27.6% |
| **Application Startup Time** | | | |
| 4 seconds | 26.0% | 25.8% | 26.0% |
| 2 seconds | 34.1% | 34.1% | 34.1% |
| .2 seconds | 39.9% | 40.1% | 39.9% |

**Notes:**

* Expected probability of choosing each option within each choice set is calculated using the estimated individual-level mean partworths provided by Prof. Shugan (FonKN_A_utilities.csv).  The expected probability of choosing each attribute level within each choice set is then calculated by summing the expected probabilities of options offering the same attribute level.  Numbers reported report averages of such probability across all choice sets.

** Expected probability of choosing each option within each choice set is calculated using partworth estimates from the simple logit model (Exhibit 10a, all questions pooled).  The expected probability of choosing each attribute level within each choice set is then calculated by summing the expected probabilities of options offering the same attribute level.  Numbers reported report averages of such probability across all choice sets.

**Exhibit E13. Percentage of Respondents who Frequently Choose the Same Feature Level**

| | Same level chosen at least 50% of the time | | | Same level chosen at least 75% of the time | | |
|---|---|---|---|---|---|---|
| | Actual Survey Responses | Predictions by HB Model* | Predictions by Simple Logit Model** | Actual Survey Responses | Predictions by HB Model* | Predictions by Simple Logit Model** |
| **Price** | | | | | | |
| $300 | 3.6% | 1.0% | 0.0% | 0.1% | 0.1% | 0.0% |
| $200 | 12.6% | 7.8% | 0.4% | 0.5% | 0.5% | 0.0% |
| $100 | 41.5% | 39.4% | 20.0% | 14.5% | 13.6% | 0.1% |
| **Operating system brand** | | | | | | |
| Android | 20.4% | 19.5% | 0.4% | 10.2% | 10.1% | 0.0% |
| Apple | 23.3% | 22.6% | 0.4% | 14.0% | 14.4% | 0.0% |
| BlackBerry | 5.1% | 4.1% | 0.0% | 1.8% | 1.9% | 0.0% |
| Windows | 4.3% | 2.9% | 0.0% | 1.0% | 0.9% | 0.0% |
| **Screen size** | | | | | | |
| 3.5" | 4.3% | 1.4% | 0.1% | 0.4% | 0.4% | 0.0% |
| 4" | 10.8% | 5.2% | 0.4% | 0.4% | 0.1% | 0.0% |
| 4.5" | 19.8% | 13.1% | 1.1% | 2.0% | 1.4% | 0.0% |
| **Voice commands** | | | | | | |
| No voice commands | 6.8% | 3.6% | 0.0% | 1.3% | 1.0% | 0.0% |
| Voice dialing only | 9.6% | 5.5% | 0.1% | 0.5% | 0.1% | 0.0% |
| Voice dialing & texting | 33.5% | 30.9% | 5.2% | 13.0% | 11.9% | 0.3% |
| **Multitasking** | | | | | | |
| 1 app at a time | 4.7% | 2.3% | 0.1% | 0.3% | 0.1% | 0.0% |
| Up to 5 apps at a time | 19.9% | 13.8% | 1.1% | 1.0% | 0.6% | 0.0% |
| Up to 9 apps at a time | 22.4% | 17.0% | 1.1% | 1.4% | 0.6% | 0.0% |
| **Availability of applications** | | | | | | |
| 6,000 | 1.4% | 0.5% | 0.1% | 0.1% | 0.1% | 0.0% |
| 40,000 | 2.8% | 0.8% | 0.0% | 0.3% | 0.1% | 0.0% |
| 100,000 | 3.3% | 1.4% | 0.1% | 0.4% | 0.4% | 0.0% |
| 300,000 | 6.1% | 2.6% | 0.1% | 0.3% | 0.1% | 0.0% |
| **Application Startup Time** | | | | | | |
| 4 seconds | 4.1% | 2.6% | 0.1% | 0.0% | 0.0% | 0.0% |
| 2 seconds | 14.2% | 6.9% | 0.5% | 0.8% | 0.6% | 0.0% |
| .2 seconds | 26.3% | 21.3% | 1.9% | 5.2% | 3.4% | 0.0% |

**Notes:**
* Expected probability of choosing each option within each choice set is calculated using the estimated individual-level mean partworth provided by Prof. Shugan (FonKN_A_utilities.csv). The expected probability of choosing each attribute level within each choice set is then calculated by summing the expected probabilities of options offering the same attribute level. Such probabilities are further summed across the choice sets of each respondent to calculate the expected number of times that the respondent is expected to choose each attribute level.
** Expected probability of choosing each option within each choice set is calculated using partworth estimates from the simple logit model (Exhibit 10a, all questions pooled). The expected probability of choosing each attribute level within each choice set is then calculated by summing the expected probabilities of options offering the same attribute level. Such probabilities are further summed across the choice sets of each respondent to calculate the number of times that the respondent is expected to choose each attribute level.

Privileged and Highly Confidential
Subject to Protective Order

**Exhibit E14. Smartphone Application Availability by Operating System Brand**

| Operating System | October 2010[1] | November 2010[2] | December 2010[3] | January 2011[4] | March 2011[4] | August 2011[5] | Shugan's Base Case[6] | Amended Base Case |
|---|---|---|---|---|---|---|---|---|
| **Android** | 100,000 | | 130,000 | 151,036 | 206,143 | 250,000 | 100,000 | 100,000 |
| **Apple** | 300,000 | | 300,000 | 303,113 | 333,214 | 425,000 | 300,000 | 300,000 |
| **Blackberry** | | | 18,000 | 19,439 | 26,771 | | 40,000 | 6,000 |
| **Windows Phone 7** | | 2,674 | | 6,856 | 11,731 | 30,000 | 40,000 | 6,000 |

**Notes and Sources:**
1. Albanesius, Chloe, "Android Market Hits 100,000 Apps," PCMag, October 25, 2010
(http://www.pcmag.com/article2/0,2817,2371436,00.asp)
2. Distimo Report, November 2010.
3. Distimo Report, Full Year 2010.
4. Wauters, Robin, "There Are Now More Free Apps for Android than for the iPhone Distimo," TechCrunch, April 27, 2011
(http://techcrunch.com/2011/04/27/there-are-now-more-free-apps-for-android-than-for-the-ios-platform-distimo/).
5. McDougall, Paul, "Windows Phone 7 Apps Hit 30,000 Mark," InformationWeek, August 30, 2011
(http://www.informationweek.com/news/windows/microsoft_news/231600493)
6. Shugan Report, Exhibit 3a.

**Exhibit F1. 23 Variables Used in Cockburn's Econometric Analysis**

| Variable | Description |
|---|---|
| ***Operating System (4)*** | |
| o_android | Operating System: Android |
| o_blackberry | Operating System: Blackberry |
| o_ios | Operating System: Apple |
| o_windows | Operating System: Windows |
| | |
| ***Design Phone Specs (15)*** | |
| battery_standby* | Battery life in standby mode |
| battery_talk* | Battery life in talk mode |
| linpack* | Linpack score (only for Android phones) |
| mem* | Memory (internal storage) |
| ttl_pixels* | Total number of pixels (effectively, screen size) |
| camera_autofocus | Camera with autofocus |
| data_tethering | Data tethering capable (connects phone to laptop for internet access) |
| dlna | Digital Living Network Alliance: enables media sharing over a home network |
| g4 | 4G phone |
| gps | GPS enabled |
| j2me | Uses J2ME (Java 2 Micro Edition) |
| mobile_hotspot | Mobile hotspot capable |
| touch_screen | Phone has a touch screen |
| oled | Organic LED (display type) |
| wifi | WI-FI capability |
| | |
| ***Non-Design Phone Specs (3)*** | |
| new | Whether the phone is new |
| unlocked | Whether the phone is unlocked |
| tom* | Time on the market (measured in months) |
| | |
| ***Market Characteristics (1)*** | |
| time | A monthly variable capturing market variations over time |

**Notes:**

*variables marked with an asterisk are logged

# Exhibit F2. Comparison of Likelihood Functions

## Notation

$Bidder\ i$

$Auction\ j$

$y_{ij} = bid\ of\ bidder\ i\ at\ auction\ j$

$x_{ij} = explanatory\ variables\ associated\ with\ bidder\ i$

$n_j = number\ of\ bidders\ at\ auction\ j$

$m = number\ of\ auctions$

$z = number\ of\ bidders\ in\ dataset$

$SP_j = reservation\ price\ at\ auction\ j$

$WP_{ij} = winning\ price, equal\ to\ 1\ if\ bidder\ i\ wins\ auction\ j, 0\ otherwise$

$\sigma = standard\ deviation$

$b = vector\ of\ parameters\ that\ maximize\ Cockburn\ log\ likelihood\ function$

## Set Up

$$U_{ij} = \frac{y_{ij} - x_{ij} * b}{\sigma} \qquad UR_{ij} = \frac{SP_{ij} - x_{ij} * b}{\sigma}$$

### 1. Cockburn's Original Log Likelihood Function

$$\sum_{j=1}^{m} \sum_{i=1}^{n_j} \left[ \ln\left( PDFN(U_{ij}) * \left(\frac{1}{\sigma}\right) * \left(\frac{1}{exp(y_{ij})}\right) + (1*10^{-10}) \right) + WP_{ij} * \ln(n_j!) - WP_{ij} * \ln\left( \left(1 - CDFN(UR_{ij})\right)^{n_j} + (1*10^{-10}) \right) \right]$$

### 2. Leonard's Correction of Cockburn's Log Likelihood Function

$$\sum_{j=1}^{m} \sum_{i=1}^{n_j} \left[ \ln\left( PDFN(U_{ij}) * \left(\frac{1}{\sigma}\right) \right) - WP_{ij} * \ln\left( \left(1 - CDFN(UR_{ij})\right)^{n_j} \right) \right]$$

### 3. Leonard's Truncated Regression Log Likelihood Function

$$\sum_{j=1}^{m} \sum_{i=1}^{n_j} \left[ \ln\left( PDFN(U_{ij}) * \left(\frac{1}{\sigma}\right) \right) - \ln\left( 1 - CDFN(UR_{ij}) \right) \right]$$

Items in red identify differences between Dr. Cockburn's likelihood function and that employed by Dr. Leonard.  Equation 2 drops the fudge factor ($1*10^{-10}$) and the factors unrelated to the parameter estimates from Equation 1.  Equation 3 is what Dr. Leonard actually estimates and he claims that Equations 2 and 3 produce identical results.

**Exhibit F3. Estimated Coefficients from Competing Likelihood Functions**

| Variable | Cockburn (Proc IML) | Leonard (Proc QLIM) |
|---|---|---|
| | [1] | [2] |
| **Operating System** | | |
| o_android | 0.165 | 0.157 |
| o_blackberry | 0.276 | 0.29 |
| o_ios | 0.883 | 0.841 |
| o_windows | 0.072 | 0.055 |
| **Design Phone Specs** | | |
| battery_standby* | 0.033 | 0.054 |
| battery_talk* | 0.145 | 0.121 |
| linpack* | 0.077 | 0.076 |
| mem* | 0.041 | 0.043 |
| ttl_pixels* | 0.26 | 0.3 |
| camera_autofocus | 0.245 | 0.237 |
| data_tethering | -0.049 | -0.043 |
| dlna | 0.097 | 0.099 |
| g4 | 0.166 | 0.175 |
| gps | 0.231 | 0.224 |
| j2me | 0.504 | 0.494 |
| mobile_hotspot | 0.04 | 0.038 |
| touch_screen | 0.068 | 0.059 |
| oled | 0.193 | 0.2 |
| wifi | 0.581 | 0.578 |
| **Non-Design Phone Specs** | | |
| new | 0.242 | 0.249 |
| unlocked | 0.206 | 0.224 |
| tom* | -0.209 | -0.194 |
| **Market Characteristics** | | |
| time | -0.037 | -0.037 |

**Notes:**

*variables marked with an asterisk are logged

**Sources:**

[1] Cockburn "econometric backup.xlsx"
[2] Leonard "exhibit 6.xlsx"

Privileged and Highly Confidential
Subject to Protective Order

## Exhibit F4. Cockburn's Auxiliary Regression Output
**Results from a regression of linpack on RAM and processor speed.**

**Dependent Variable:** ln_linpack
**Number of Obs. Used:**      13

**Analysis of Variance**

| Source | DF | Sum of Squares | Mean Square | F Value | Pr > F |
|---|---|---|---|---|---|
| Model | 2 | 3.8891 | 1.94455 | 5.64 | 0.023 |
| Error | 10 | 3.45057 | 0.34506 | | |
| Corrected Total | 12 | 7.33967 | | | |

| | |
|---|---|
| **Root MSE:** | 0.58742 |
| **Dependent Mean:** | 2.55778 |
| **Coeff Var:** | 22.96586 |
| **R-Square:** | 0.5299 |
| **Adj R-Sq:** | 0.4358 |

**Parameter Estimates**

| Variable | DF | Parameter Estimate | Standard Error | t Value | Pr > |t| |
|---|---|---|---|---|---|
| Intercept | 1 | 1.09411 | 7.11529 | 0.15 | 0.8809 |
| ln_ram | 1 | 2.24781 | 0.72235 | 3.11 | 0.011 |
| ln_processor | 1 | -1.8656 | 1.40286 | -1.33 | 0.2131 |

**Notes:**
Regression uses data on 13 Android phone models.

*Expert Report of Professor James R. Kearl,*
*March 21, 2012*

**Exhibit F5. Alternative Specifications Including Leonard's Next Generation Variables**

| | Dr. Leonard's Next Generation Model [1] | | Alternative 1 [2] | | Alternative 2 [3] | | Alternative 3 [4] | |
|---|---|---|---|---|---|---|---|---|
| *Operating System* | | | | | | | | |
| o_android | 0.194 | *** | -0.080 | | 0.058 | | 0.050 | |
| o_blackberry | 0.310 | *** | 0.371 | *** | 0.361 | *** | 0.348 | *** |
| o_ios | 0.848 | *** | 0.743 | *** | 0.796 | *** | 0.783 | *** |
| o_windows | 0.054 | | 0.047 | | 0.052 | | 0.061 | |
| *Design Phone Specs* | | | | | | | | |
| battery_standby* | 0.048 | | -0.003 | | 0.023 | | 0.005 | |
| battery_talk* | 0.193 | *** | 0.276 | *** | 0.292 | *** | 0.235 | *** |
| linpack* | 0.055 | ** | 0.131 | *** | 0.093 | *** | 0.108 | *** |
| mem* | 0.049 | *** | 0.056 | *** | 0.057 | *** | 0.058 | *** |
| ttl_pixels* | 0.291 | *** | 0.382 | *** | 0.349 | *** | 0.366 | *** |
| camera_autofocus | 0.215 | *** | 0.260 | *** | 0.241 | *** | 0.276 | *** |
| data_tethering | -0.041 | | -0.103 | *** | -0.068 | * | -0.064 | * |
| dlna | 0.082 | *** | 0.065 | *** | 0.068 | *** | 0.075 | *** |
| g4 | 0.221 | *** | 0.278 | *** | 0.275 | *** | 0.251 | *** |
| gps | 0.255 | *** | 0.353 | *** | 0.369 | *** | 0.379 | *** |
| j2me | 0.475 | *** | 0.488 | *** | 0.472 | *** | 0.504 | *** |
| mobile_hotspot | -0.015 | | 0.068 | * | 0.001 | | 0.042 | |
| touch_screen | 0.081 | *** | 0.082 | *** | 0.081 | *** | 0.057 | ** |
| oled | 0.204 | *** | 0.215 | *** | 0.242 | *** | 0.231 | *** |
| wifi | 0.564 | *** | 0.673 | *** | 0.639 | *** | 0.675 | *** |
| *Non-Design Phone Specs* | | | | | | | | |
| new | 0.251 | *** | | | 0.277 | *** | 0.276 | *** |
| next_gen | 0.170 | *** | 0.118 | *** | 0.171 | *** | -0.124 | *** |
| unlocked | 0.224 | *** | 0.241 | *** | 0.219 | *** | 0.218 | *** |
| next_gen_out* | -0.050 | *** | -0.062 | *** | -0.063 | *** | | |
| tom* | -0.151 | *** | | | | | | |
| *Market Characteristics* | | | | | | | | |
| time | -0.035 | *** | -0.046 | *** | -0.042 | *** | -0.046 | *** |
| *Regression Specific* | | | | | | | | |
| intercept | -0.281 | | -1.989 | *** | -1.951 | *** | -1.978 | *** |
| schwartz criterion | 381954.089 | *** | 383116.489 | *** | 382125.275 | *** | 382271.426 | *** |

**Notes:**
*variables marked with an asterisk are logged
[1] Dr. Leonard's model includes next_generation, ln_next_gen_out, ln_tom, and new variables
[2] Alternative 1 includes next_generation and ln_next_gen_out
[3]. Alternative 2 includes next_generation, ln_next_gen_out, and new
[4] Alternative 3 includes next_generation and new

**Source:**
Leonard "exhibit6.xls"

Privileged and Highly Confidential
Subject to Protective Order

**Exhibit F6. Estimated Coefficients Using Only Winning Bids**

| Variable | Cockburn (Proc IML) | Winning Bid (Proc QLIM) |
|---|---|---|
| ***Operating System*** | | |
| o_android | 0.165 | 0.111 |
| o_blackberry | 0.276 | 0.340 |
| o_ios | 0.883 | 1.085 |
| o_windows | 0.072 | 0.119 |
| ***Design Phone Specs*** | | |
| battery_standby* | 0.033 | 0.061 |
| battery_talk* | 0.145 | 0.096 |
| linpack* | 0.077 | 0.159 |
| mem* | 0.041 | 0.038 |
| ttl_pixels* | 0.260 | 0.364 |
| camera_autofocus | 0.245 | 0.274 |
| data_tethering | -0.049 | -0.060 |
| dlna | 0.097 | 0.153 |
| g4 | 0.166 | 0.028 |
| gps | 0.231 | 0.283 |
| j2me | 0.504 | 0.573 |
| mobile_hotspot | 0.040 | 0.040 |
| touch_screen | 0.068 | 0.065 |
| oled | 0.193 | 0.208 |
| wifi | 0.581 | 0.630 |
| ***Non-Design Phone Specs*** | | |
| new | 0.242 | 0.259 |
| unlocked | 0.206 | 0.187 |
| tom* | -0.209 | -0.146 |
| ***Market Characteristics*** | | |
| time | -0.037 | -0.046 |
| ***Model Characteristics*** | | |
| intercept | 0.697 | 0.025 |

**Notes:**
*variables marked with an asterisk are logged

**Source:**
Cockburn "econometric backup.xlsx"

Privileged and Highly Confidential
Subject to Protective Order

**Exhibit F7. Number of Applications Available by Operating System**

| Operating System | Date | Number of Apps Available | Source |
|---|---|---|---|
| Android | May 1, 2009 | 5,000 | http://androinica.com/2009/09/android-market-has-10000-apps-many-of-which-dont-appeal-to-users/ |
| Android | September 7, 2009 | 10,000 | http://androinica.com/2009/09/android-market-has-10000-apps-many-of-which-dont-appeal-to-users/ |
| Android | December 15, 2009 | 20,000 | http://techcrunch.com/2009/12/15/android-market-20000-apps/ |
| Android | March 16, 2010 | 30,000 | http://techcrunch.com/2010/03/16/google-android-market-now-serving-30000-apps/ |
| Android | July 15, 2010 | 70,000 | http://allthingsd.com/20100715/googles-q2-may-not-wow-investors-revenue-in-line-eps-light/ |
| Android | October 25, 2010 | 100,000 | http://www.androidpolice.com/2010/10/25/android-market-officially-reaches-100000-applications/ |
| Android | February 15, 2011 | 150,000 | http://www.androidcentral.com/150k-apps-android-market-tripled-9-months |
| Android | April 1, 2011 | 200,000 | http://www.distimo.com/blog/2012_01_google-android-market-tops-400000-applications/ |
| Android | August 1, 2011 | 300,000 | http://www.distimo.com/blog/2012_01_google-android-market-tops-400000-applications/ |
| Android | January 3, 2012 | 400,000 | http://www.distimo.com/blog/2012_01_google-android-market-tops-400000-applications/ |
| iOS | September 9, 2008 | 3,000 | http://www.padgadget.com/2010/05/01/how-many-ipad-apps-are-there/ |
| iOS | February 28, 2008 | 6,000 | http://www.148apps.com/news/wowza-30000-apps-itunes-app-store/ |
| iOS | November 29, 2008 | 10,000 | http://www.148apps.com/news/app-store-total-tops-10000/ |
| iOS | March 26, 2009 | 30,000 | http://www.148apps.com/news/wowza-30000-apps-itunes-app-store/ |
| iOS | August 5, 2009 | 65,000 | http://mashable.com/2009/08/05/flurry-iphone-apps/ |
| iOS | October 27, 2009 | 100,000 | http://mashable.com/2009/10/27/iphone-100000-apps/ |
| iOS | May 3, 2010 | 200,000 | http://appadvice.com/appnm/2010/05/ipadbigsales |
| iOS | November 22, 2010 | 300,000 | http://www.apple.com/pr/library/2010/11/22Apples-iOS-4-2-Available-Today-for-iPad-iPhone-iPod-touch.html |
| iOS | March 15, 2011 | 350,000 | http://148apps.biz/app-store-metrics/?mpage=appcount |
| iOS | July 1, 2011 | 400,000 | http://148apps.biz/app-store-metrics/?mpage=appcount |
| Windows | December 1, 2010 | 5,000 | http://allaboutwindowsphone.com/news/item/13913_Windows_Phone_Marketplace_pass.php |
| Windows | February 1, 2011 | 10,000 | http://allaboutwindowsphone.com/news/item/13913_Windows_Phone_Marketplace_pass.php |
| Windows | May 1, 2011 | 20,000 | http://allaboutwindowsphone.com/news/item/13913_Windows_Phone_Marketplace_pass.php |
| Windows | August 1, 2011 | 30,000 | http://allaboutwindowsphone.com/news/item/13913_Windows_Phone_Marketplace_pass.php |
| Windows | November 16, 2011 | 40,000 | http://allaboutwindowsphone.com/news/item/13913_Windows_Phone_Marketplace_pass.php |
| Windows | December 27, 2011 | 50,000 | http://allaboutwindowsphone.com/news/item/13913_Windows_Phone_Marketplace_pass.php |
| Windows | January 23, 2012 | 60,000 | http://freshinfos.com/2012/01/23/windows-market-hits-60000-apps-milestone/ |
| BlackBerry | July 8, 2009 | 2,000 | http://www.berryreview.com/2009/07/08/blackberry-app-world-hits-2000-apps-opening-up-soon-in-more-countries/ |
| BlackBerry | February 18, 2010 | 5,000 | http://www.zdnet.com/blog/btl/rims-growing-app-collection-bolsters-my-opinion-of-blackberry/30933 |
| BlackBerry | September 7, 2010 | 10,000 | http://crackberry.com/blackberry-app-world-surpasses-10-000-apps-we-head-devcon |
| BlackBerry | January 18, 2011 | 17,000 | http://mobilesyrup.com/2011/01/18/blackberry-app-word-seeing-2-millions-apps-downloaded-every-day/ |
| BlackBerry | February 14, 2011 | 20,000 | http://mobilesyrup.com/2011/02/14/rim-there-are-over-20000-blackberry-apps-available-today/ |
| BlackBerry | October 6, 2011 | 28,761 | http://nerdberry.net/2011/10/06/new-milestone-for-blackberry-app-world/ |

**Notes:**
Number of Applications is set to 100 for time period before first available date and for phones categorized as "Other_OS".

Privileged and Highly Confidential
Subject to Protective Order

**Exhibit F8. Enhanced Model Including Application and Voice Control Variables**

| | Estimate | 95% Confidence Interval | | Significance Level |
|---|---|---|---|---|
| **Operating System** | | | | |
| o_android | -0.437 | -0.635 | -0.241 | *** |
| o_blackberry | -0.133 | -0.274 | -0.004 | ** |
| o_ios | 0.220 | 0.045 | 0.400 | ** |
| o_windows | -0.236 | -0.334 | -0.145 | *** |
| **Design Phone Specs** | | | | |
| battery_standby* | 0.045 | -0.010 | 0.095 | |
| battery_talk* | 0.207 | 0.117 | 0.299 | *** |
| linpack* | 0.077 | 0.028 | 0.127 | *** |
| mem* | 0.049 | 0.039 | 0.059 | *** |
| ttl_pixels* | 0.315 | 0.271 | 0.357 | *** |
| camera_autofocus | 0.143 | 0.102 | 0.186 | *** |
| data_tethering | -0.067 | -0.138 | 0.005 | * |
| dlna | 0.108 | 0.064 | 0.150 | *** |
| g4 | 0.202 | 0.137 | 0.271 | *** |
| gps | 0.252 | 0.192 | 0.313 | *** |
| j2me | 0.487 | 0.409 | 0.560 | *** |
| mobile_hotspot | 0.028 | -0.047 | 0.104 | |
| touch_screen | 0.074 | 0.027 | 0.120 | *** |
| oled | 0.237 | 0.191 | 0.283 | *** |
| voice | 0.190 | 0.135 | 0.248 | *** |
| wifi | 0.577 | 0.536 | 0.618 | *** |
| **Non-Design Phone Specs** | | | | |
| new | 0.253 | 0.227 | 0.278 | *** |
| unlocked | 0.224 | 0.195 | 0.250 | *** |
| tom* | -0.162 | -0.193 | -0.133 | *** |
| **Market Characteristics** | | | | |
| time | -0.049 | -0.053 | -0.045 | *** |
| apps* | 0.069 | 0.048 | 0.091 | *** |
| **Regression Specific** | | | | |
| intercept | -0.574 | -1.261 | 0.091 | * |
| schwartz_criterion | 381,883 | 376,309 | 387,401 | *** |

**Notes:**

*variables marked with an asterisk are logged

See Exhibit F7 for sources of number of applications

Privileged and Highly Confidential
Subject to Protective Order

*Expert Report of Professor James R. Kearl,
March 21, 2012*

**Exhibit F9. Change in Willingness-to-Pay from Reduction in Linpack Score**
**Enhanced Model**

| Android Phone Model | Average Price ($) | | Reduction in Linpack Score (%) | Change of Willingness-to-Pay ($) | |
|---|---|---|---|---|---|
| | 2010 | 2011 | | 2010 | 2011 |
| HTC Droid Incredible | $338.44 | $191.82 | 80% | -$20.82 | -$11.80 |
| HTC Evo 4G | $357.90 | $292.79 | 80% | -$22.02 | -$18.01 |
| HTC G2 | $396.53 | $311.28 | 80% | -$24.40 | -$19.15 |
| HTC My Touch 4G | $388.77 | $340.12 | 80% | -$23.92 | -$20.93 |
| HTC Nexus One | $479.36 | $322.33 | 80% | -$29.49 | -$19.83 |
| HTC Thunderbolt | - | $460.64 | 80% | - | -$28.34 |
| Motorola Atrix 4G | - | $547.78 | 80% | - | -$33.70 |
| Motorola Droid | $238.13 | $124.87 | 80% | -$14.65 | -$7.68 |
| Motorola Droid 2 | $331.25 | $253.13 | 80% | -$20.38 | -$15.57 |
| Motorola Droid X | $397.74 | $290.51 | 80% | -$24.47 | -$17.87 |
| Samsung Epic 4G | $341.24 | $280.60 | 80% | -$20.99 | -$17.26 |
| Samsung Fascinate | $328.01 | $228.64 | 80% | -$20.18 | -$14.07 |
| Samsung Nexus S | $614.95 | $519.94 | 80% | -$37.83 | -$31.99 |

**Notes:**
1. Reduction in willingness to pay for each Android phone is determined based on an 80% shock of the Linpack score, calculated as [Coefficient on Linpack score * Percentage Reduction in Linpack score * Average selling price for the smartphone].

2. An 80% drop in the Linpack score leads to roughly a 6% drop in the willingness to pay for each phone.

**Sources:**
Average Price from Cockburn Exhibit C-7

Smartphone auction data from eBay.

Phone characteristics data from Phone Scoop (http://www.phonescoop.com), and where unavailable from Phone Scoop, manufacturer websites, phone reviews, http://pdadb.net/index.php?m=search and http://www.phonearena.com/phones.

**Exhibit F10. Change in Willingness-to-Pay from Reduction in Number of Apps Available**
**Enhanced Model**

| Android Phone Model | Average Price ($) | | 6,000 Apps Scenario | | | | 10,000 Apps Scenario | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Reduction in Applications (%) | | Change of WTP ($) | | Reduction in Applications (%) | | Change of WTP ($) | |
| | 2010 | 2011 | 2010 | 2011 | 2010 | 2011 | 2010 | 2011 | 2010 | 2011 |
| HTC Droid Incredible | 338.44 | 191.82 | 84% | 96% | -19.63 | -12.78 | 73% | 93% | -17.06 | -12.42 |
| HTC Evo 4G | 357.90 | 292.79 | 84% | 96% | -20.76 | -19.51 | 73% | 93% | -18.04 | -18.97 |
| HTC G2 | 396.53 | 311.28 | 84% | 96% | -23.00 | -20.74 | 73% | 93% | -19.99 | -20.16 |
| HTC My Touch 4G | 388.77 | 340.12 | 84% | 96% | -22.55 | -22.66 | 73% | 93% | -19.60 | -22.03 |
| HTC Nexus One | 479.36 | 322.33 | 84% | 96% | -27.81 | -21.47 | 73% | 93% | -24.17 | -20.88 |
| HTC Thunderbolt | - | 460.64 | 84% | 96% | - | -30.69 | 73% | 93% | - | -29.84 |
| Motorola Atrix 4G | - | 547.78 | 84% | 96% | - | -36.50 | 73% | 93% | - | -35.48 |
| Motorola Droid | 238.13 | 124.87 | 84% | 96% | -13.81 | -8.32 | 73% | 93% | -12.00 | -8.09 |
| Motorola Droid 2 | 331.25 | 253.13 | 84% | 96% | -19.21 | -16.86 | 73% | 93% | -16.70 | -16.40 |
| Motorola Droid X | 397.74 | 290.51 | 84% | 96% | -23.07 | -19.35 | 73% | 93% | -20.05 | -18.82 |
| Samsung Epic 4G | 341.24 | 280.60 | 84% | 96% | -19.79 | -18.70 | 73% | 93% | -17.20 | -18.18 |
| Samsung Fascinate | 328.01 | 228.64 | 84% | 96% | -19.03 | -15.23 | 73% | 93% | -16.54 | -14.81 |
| Samsung Nexus S | 614.95 | 519.94 | 84% | 96% | -35.67 | -34.64 | 73% | 93% | -31.00 | -33.68 |

**Notes:**

1. Average Price from Cockburn Exhibit C-7

2. Reduction in willingness to pay for each Android phone is determined based on the average percent reduction in number of applications based on caps at 6,000, 10,000, 20,000, and 40,000 apps, calculated as [Coefficient on *ln_apps* Variable * Percentage Reduction in Number of Applications * Average selling price for the smartphone].

**Sources:**

See Exhibit F-7 for Applications data

Smartphone auction data from eBay.

Phone characteristics data from Phone Scoop (http://www.phonescoop.com), and where unavailable from Phone Scoop, manufacturer websites, phone reviews, http://pdadb.net/index.php?m=search and http://www.phonearena.com/phones.

Expert Report of Professor James R. Kearl,
March 21, 2012

**Exhibit F10. Change in Willingness-to-Pay from Reduction in Number of Apps Available**
Enhanced Model

| 20,000 Apps Scenario | | | | 40,000 Apps Scenario | | | |
|---|---|---|---|---|---|---|---|
| Reduction in Applications (%) | | Change of WTP ($) | | Reduction in Applications (%) | | Change of WTP ($) | |
| 2010 | 2011 | 2010 | 2011 | 2010 | 2011 | 2010 | 2011 |
| 45% | 87% | -10.63 | -11.54 | 23% | 73% | -5.28 | -9.76 |
| 45% | 87% | -11.25 | -17.61 | 23% | 73% | -5.59 | -14.90 |
| 45% | 87% | -12.46 | -18.72 | 23% | 73% | -6.19 | -15.84 |
| 45% | 87% | -12.22 | -20.46 | 23% | 73% | -6.07 | -17.31 |
| 45% | 87% | -15.06 | -19.39 | 23% | 73% | -7.49 | -16.40 |
| 45% | 87% | - | -27.71 | 23% | 73% | - | -23.44 |
| 45% | 87% | - | -32.95 | 23% | 73% | - | -27.88 |
| 45% | 87% | -7.48 | -7.51 | 23% | 73% | -3.72 | -6.35 |
| 45% | 87% | -10.41 | -15.22 | 23% | 73% | -5.17 | -12.88 |
| 45% | 87% | -12.50 | -17.47 | 23% | 73% | -6.21 | -14.78 |
| 45% | 87% | -10.72 | -16.88 | 23% | 73% | -5.33 | -14.28 |
| 45% | 87% | -10.31 | -13.75 | 23% | 73% | -5.12 | -11.64 |
| 45% | 87% | -19.32 | -31.27 | 23% | 73% | -9.60 | -26.46 |

Expert Report of Professor James R. Kearl,
March 21, 2012

Privileged and Highly Confidential
Subject to Protective Order