1  MORRISON & FOERSTER LLP
   MICHAEL A. JACOBS (Bar No. 111664)
2  mjacobs@mofo.com
   MARC DAVID PETERS (Bar No. 211725)
3  mdpeters@mofo.com
   DANIEL P. MUINO (Bar No. 209624)
4  dmuino@mofo.com
   755 Page Mill Road, Palo Alto, CA  94304-1018
5  Telephone: (650) 813-5600 / Facsimile: (650) 494-0792

6  BOIES, SCHILLER & FLEXNER LLP
   DAVID BOIES (Admitted *Pro Hac Vice*)
7  dboies@bsfllp.com
   333 Main Street, Armonk, NY  10504
8  Telephone: (914) 749-8200 / Facsimile: (914) 749-8300
   STEVEN C. HOLTZMAN (Bar No. 144177)
9  sholtzman@bsfllp.com
   1999 Harrison St., Suite 900, Oakland, CA  94612
10 Telephone: (510) 874-1000 / Facsimile: (510) 874-1460
   ALANNA RUTHERFORD
11 575 Lexington Avenue, 7th Floor, New York, NY 10022
   Telephone: (212) 446-2300 / Facsimile: (212) 446-2350
12
   ORACLE CORPORATION
13 DORIAN DALEY (Bar No. 129049)
   dorian.daley@oracle.com
14 DEBORAH K. MILLER (Bar No. 95527)
   deborah.miller@oracle.com
15 MATTHEW M. SARBORARIA (Bar No. 211600)
   matthew.sarboraria@oracle.com
16 500 Oracle Parkway, Redwood City, CA  94065
   Telephone: (650) 506-5200 / Facsimile: (650) 506-7114
17
18 *Attorneys for Plaintiff*
   ORACLE AMERICA, INC.

19                          **UNITED STATES DISTRICT COURT**

20                         **NORTHERN DISTRICT OF CALIFORNIA**

21                               **SAN FRANCISCO DIVISION**

| | |
|---|---|
| ORACLE AMERICA, INC. | Case No. CV 10-03561 WHA |
| Plaintiff, | **ORACLE AMERICA, INC.'S OPPOSITION TO GOOGLE'S MOTION TO STRIKE PORTIONS OF DR. JAMES KEARL'S EXPERT REPORT [REDACTED]** |
| v. | |
| GOOGLE, INC. | |
| Defendant. | Dept.: Courtroom 8, 19th Floor<br>Judge: Honorable William H. Alsup |

## I. INTRODUCTION

The Court-appointed damages expert, Dr. James Kearl, has concluded that as a matter of economics the "best measure" of the value of the intellectual property in suit (without accounting for fragmentation) is the same amount that Google would have paid for a license to Sun's Java ME intellectual property portfolio in 2006: a ▇ royalty on all Android gross advertising revenues, or ▇ per Android device.  He further concludes that his "best economic advice" is that downward adjustment of that portfolio value is economically inappropriate, would necessarily undervalue the intellectual property that Google infringed, and would necessarily under-compensate Oracle. Nonetheless, Dr. Kearl includes a version of the apportionment analysis that the Court previously ruled admissible, concluding that that approach results in a royalty less than one-twentieth of what his best economic advice indicates is the value of the specific IP in suit.

Without addressing, much less challenging, Dr. Kearl's economic reasoning, Google moves to strike his opinions as a matter of law.  According to Google, Dr. Kearl must value the intellectual property in suit.  That much is true.  But that proposition does not help Google, for Dr. Kearl *does* expressly value the intellectual property in suit based on analysis of the parties' 2006 negotiations, applying several independent rationales laid out in Section K of his report to conclude that that value is the full ▇ advertising revenue share or the full ▇ per Android device.  Dr. Kearl does not simply assume that the parties would have negotiated a portfolio license.

 Google argues that Dr. Kearl's "best economic advice" is forbidden by the law of patent damages, as applied by the Court in its July 22, 2011 Order partially excluding the initial report filed by Oracle's expert, Prof. Cockburn.  (Dkt. 230.)  But as applied to Dr. Kearl's reasoning, Google can find no support for that purported rule of law either in this Court's orders or in the decisions of the Federal Circuit.  This Court did not address or anticipate Dr. Kearl's economic reasoning in its July order or any of its other prior orders.  The Federal Circuit has never held that it is impossible, as a matter of law, logic, fact, or economics, for a subset of a complex intellectual property portfolio to command the same price as the entire portfolio.  Moreover, Google offers no explanation as to how or why its argument is correct as a matter of *copyright* law, as to which this Court's July decision is

inapplicable.[1]  Dr. Kearl's unchallenged economic reasoning on apportionment is legally sound and supported by the record facts in this case.  No principle of law precludes it.

Granting Google's motion would subvert the Court's purpose in appointing an expert under Rule 706.  Instead of hearing the best economic advice of the independent expert, the jury would hear him testify only to the royalty measure that he believes is, in fact, "less than a reasonable royalty for the use made of the invention by the infringer."  That is the exact opposite of what 35 U.S.C. § 284 requires.  Such an opinion serves Google's purposes, but no other.  Oracle respectfully requests that the Court deny Google's motion.

## II. FACTS

### A. Dr. Kearl's Assessment of the Value of Sun's 2006 Java Portfolio and Android Advertising Revenues

To calculate the reasonable royalty for the IP in suit for this case, Dr. Kearl begins with the 2006 negotiations between the parties.  Consistent with the Court's prior orders, he then makes downward adjustments to exclude all elements of the transaction other than Sun's Java ME intellectual property portfolio.  (Kearl Report ¶¶ 73–80; Kearl Dep. 17:7–21.)[2]  This measurement, combined with Google's forecasts for Android unit sales, allows Dr. Kearl to isolate the value that Sun reasonably would have expected to receive as a result of licensing its patents and copyrights to Google in 2006.  Dr. Kearl concludes that the value of the Java trademark is zero, and if anything warrants upward adjustment of the royalty for Sun's other intellectual property.  (Kearl Report ¶ 75.)

Dr. Kearl discounts the expected value of Sun's copyrights and patents to its net present value in 2006.  Depending on whether one uses ███████████████████████████

---

[1] Although Section K of Dr. Kearl's report is titled "Allocation of the 2006 IP Portfolio Value to the Patents in Suit – Theory" (Kearl Report, p. 37), the section discusses both the patents and the copyrights in suit and applies its rationale to both, including both specific references to the copyrights in suit and general references to the "in suit IP."  (*See, e.g.*, *id.* ¶¶ 100, 101, 103, 103 fn. 59, 104, 105.)

[2] References to the "Kearl Report" and "Kearl Dep." refer to Exhibits E and F to the April 2, 2012 Declaration of Meredith Dearborn In Support Of Oracle America, Inc.'s Motion to Exclude Portions of the Rule 706 Expert Report of Dr. James Kearl.  (Dkt. No. 850-1 (4/2/12 Dearborn Decl.); Dkt. 850-6 (Kearl Report); Dkt. 850-7 (Kearl Dep.).)

1  ▮

2  (Kearl Report ¶ 80, Tables 1, 2.)

3      Dr. Kearl then uses the same internal Google projections for Android to calculate the net

4  present value to Google, also in 2006, of the advertising revenues that Google expected to earn from

5  Android.  Depending on which Google projections are used, that 2006 net present value to Google

6  was ▮.  (Kearl Report ¶ 85, Tables 1, 2.)

### B. Dr. Kearl's Calculation of Portfolio Royalty

    By comparing the expected net present value to each party, Dr. Kearl is able to calculate a royalty rate for the Java ME patents and copyrights.  Concluding that the value of Sun's expected benefit is ▮ of the combined Sun and Google benefit, Dr. Kearl concludes that the bargain the parties would have struck in 2006 for a license to the Java ME portfolio would have been equal to a ▮ royalty on Android advertising revenues, which he equates to ▮ per Android device.  (Kearl Report ¶¶ 20, 86.)  Notably, because this royalty rate is based on the parties' actual 2006 negotiations, it already factors in the availability and desirability of any non-infringing alternatives.  (Kearl Report ¶¶ 177–179; Kearl Dep. 70:17–72:13.)[3]

### C. Dr. Kearl's Explanation of the Relationship Between the Value of the Portfolio and Value of the IP In Suit

    Dr. Kearl then considers the relationship between the value of the intellectual property in suit – a subset of the patents and copyrighted material in the portfolio at issue in 2006 – and the value of the entire portfolio.  (Kearl Report ¶¶ 97–105.)  Dr. Kearl concludes that, as a matter of economics, it would be inappropriate in this case to distinguish between the value of the portfolio and the value of the intellectual property in suit.  (Kearl Dep. 149:3-5; 154:20-155:8.)  His report states:



(Kearl Report ¶ 104; *see also id.* ¶ 20.)  Dr. Kearl testified that this opinion reflects his "best

---

[3] Although Dr. Kearl agrees that the hypothetical license would have to compensate Sun for the increased risk of fragmentation of the larger Java platform from an incompatible implementation, he also agrees that his ▮ royalty includes no such compensation.  (Kearl Dep. 70:2-12.)

economic judgment" (Kearl Dep. Tr. 102:5–102:22) and is the "best measure" of the value of the IP in suit:

[REDACTED]

(Kearl Dep. Tr. 107:7–11.)

Dr. Kearl explains why it is economically inappropriate to apportion the value of the 2006 Sun Java ME portfolio to ascertain the value of the intellectual property in suit in this case.  Initially, Dr. Kearl observes that Sun routinely licensed its intellectual property on a portfolio basis, and that none of the party experts in this case has cited any evidence that Sun ever did otherwise.  (Kearl Report ¶ 99.)  Dr. Kearl makes this observation *not* to argue that the hypothetical negotiation would be for the entire portfolio, as Google implies, but rather to emphasize that there are no licenses to subsets of the portfolio that could be used as benchmarks.  (*Id*.)  Dr. Kearl notes that, "as is well recognized in economics, when the patents in a portfolio are complements and/or substitutes for other patents in the portfolio, there is no unique way to apportion the value of the portfolio to individual patents."  (*Id.* ¶ 100; *see also id.* ¶ 103.)  A licensee would never expect to use all of the patents and copyrights that it has licensed, and an apportionment approach that attempts to allocate value to every component of the portfolio will undervalue the intellectual property in suit.  (Kearl Dep. 215:23-218:2.)

Moving beyond these initial premises, Dr. Kearl provides three specific economic reasons why the value of the in-suit IP is equal to the value of the 2006 license bundle.

First, Dr. Kearl explains that

> if Sun and Google understood that the subset of Sun's Java ME IP portfolio most relevant to their negotiations was composed of the now in suit patents and copyrights, the 2006 value of the Java ME IP portfolio *is* the value of the in suit IP.  Put directly: If Sun and Google knew which subset of Sun's Java ME IP would be needed to implement a Java-based VM in Android, then that's what would have driven the negotiations and the aggregate value of the license in the 2006 negotiations is attributable to this subset.

(*Id.* ¶ 100 (emphasis Dr. Kearl's).)  In his deposition, Dr. Kearl further explained that "if you think of the hypothetical negotiation as the parties knowing in 2006 what intellectual property they needed,

4

ORACLE AMERICA'S OPPOSITION TO GOOGLE'S MOTION TO STRIKE KEARL
CASE NO. CV 10-03561 WHA

Google knew what it needed, it needed these two patents and it needed the 37 copyrights, then whatever the agreement was in 2006 was the agreement for the bundle of intellectual property." (Kearl Dep. 103:19–104:2; *see also id.* 155:3–156:4)  As discussed below (*see infra*, sections II.D-E), and contrary to what Google argues in its motion, there are substantial factual foundations for this opinion.

Second, Dr. Kearl opines that even if Google did not know what subset of the Java portfolio it needed in 2006,

> then the 2005/06 negotiations can be thought [of as] determining the value of an option to, at some later date, decide which, if any, subset of the Java ME IP portfolio to use and when to use it.  In this case, the 2006 value of the in suit IP is also the 2006 value of the Java ME IP portfolio[.]

(Kearl Report ¶ 101 (footnote omitted).)  Thus, "you can think of it as – as an option to use some, all or none of the intellectual property, and what's the option value for being able to choose both what you want to use and the timing in which you use it.  And the option value, I think, would be the portfolio value."  (Kearl Dep. 104:5–11.)

To illustrate these first two points, in his deposition Dr. Kearl used the example of a person who subscribes to a 100-page magazine knowing that he intends to read only one page.  To that subscriber, the value of that single page is the same as the price of the entire magazine.  This is true whether the subscriber already knows the specific page he intends to read, or simply knows that once he has the magazine, he will just choose one page to read.  (Kearl Dep. 155:3–157:6.)

Third, Dr. Kearl reasons that if Google planned to create Android from the ground up, but written in Java and using, in part, "Java ME-like" technology, Google would have understood that it was likely that Sun, in the past, had encountered and resolved the same problems that Google would encounter as it implemented a Java-based virtual machine.  (Kearl Report ¶ 102; *see also* Kearl Dep. 103:15–105:6.)  In that case, a portfolio license would allow Google to design its Java-based platform and virtual machine as it saw fit, without fear of liability for infringing Sun Java technology.  (*Id.*)  Again, in that scenario, the value of the IP in suit would be equal to the value of the entire portfolio.

Dr. Kearl concludes:

> If, as I understand the matter, valuing the specific in suit IP by considering a hypothetical negotiation for the entire portfolio is not permissible, the above

> arguments are still useful because they suggest a simple apportionment of the in suit IP as a fraction of the value of the portfolio will underestimate the value of the in suit IP. Such an apportionment is likely to ignore the option value (in terms of providing Google the choice of which Java ME IP to utilize, and importantly, when to utilize Java ME IP) and/or the value of insurance against litigation should the "independent" development of Android cross the boundaries of one or more Java ME patents. In short, in actual negotiations, a party would have had to pay something for the option that it, in a sense, later exercised and the hypothetical negotiation should account for this. My apportionment below does not account for this option or insurance value and thus understates the royalty from the apportioned hypothetical license.

(Kearl Report ¶ 105.)

### D. Google's Own Documents, Admissions, and Testimony Support Dr. Kearl's Analysis

Under Dr. Kearl's analysis of the relationship between the value of the IP in suit and the value of the Java ME portfolio, it is not necessary to know whether Google had the specific IP in suit in mind at the time of the 2006 negotiation, or was unaware of what it needed and only later chose to include in Android elements that were protected by Sun's intellectual property rights. In either case, the value of the IP in suit is equal to the value of the portfolio. (Kearl Report ¶¶ 99–105.) Nonetheless, there is substantial evidence that Google *was* aware of the contents of the Sun portfolio and had specific Java technology in mind at the time of the 2006 negotiation. Google's bald assertion that "[t]here is no evidence that Google knew anything specific about the contents of the Sun bundle in 2006" (Dkt. 845, at 1) is plainly false.

As Dr. Kearl observes, the fact of the negotiations alone establishes that Google knew something about the contents of the Sun Java ME bundle in 2006. "They entered into a negotiation. They were willing to pay tens of millions of dollars, so this suggests they believe this intellectual property was worth something. And Andy Rubin, who was negotiating, had negotiated an earlier license in which he found the property—the intellectual property worth arguably $1.07, or something, per handset, you know." (Kearl Dep. 153:20-154:8.) Indeed, the copyrighted specifications were public and well known, especially to the many former Sun engineers at Google. Google holds a seat in the Executive Committee of the Java Community Process, and beginning in 2005 Android engineer Bob Lee was Google's alternate representative on that committee. (Declaration of Meredith Dearborn In Support Of Oracle America, Inc.'s Opposition To Google's Motion To Strike Portions Of Dr. James Kearl's Expert Report ("4/6/12 Dearborn Decl.") Ex. A (Lee Dep. 16:16-17:3).) Mr.

Lee admitted at his deposition that he "consulted Sun's website for the API specifications when doing the work for Google," having started work on the core libraries for Android "a couple months" after first joining the Android team in 2004. (*Id.* 6:1-18, 7:18-20, 66:1-9.)

The facts confirm that Dr. Kearl's analysis is consistent with the actual, real-world negotiations between the parties in this case.  Examples of the evidence that, contrary to Google's assertion, Google knew ***both*** many things that were "specific about the contents of the Sun bundle" (Dkt. 845, at 1) ***and*** what it wanted from that bundle in 2006 include:

- Google Android engineer Dan Bornstein admitted that Google first began using the Android functionality accused of infringing the '104 patent in "early 2006."  (4/6/12 Dearborn Decl. Ex. B (Leonard Dep. 56:4-57:5)); *see also* Leonard Report at 9 - 10.

- The Google negotiating team in 2005–2006 included Andy Rubin.  Mr. Rubin's prior company, Danger Inc., had released an incompatible Java implementation, was approached by Sun, and then agreed to pay Sun for a Java ME license and to bring the Danger implementation into compliance with the specifications.  (4/6/12 Dearborn Decl. Ex. C (Cizek Dep. 195:14–206:21).)

- As a result of his prior dealings with Sun, Mr. Rubin was well aware of both the copyrights in the Java bundle, and Sun's position that they required a license.  For example, he wrote in March 2006 that "***Java.lang apis*** are copyrighted. And sun gets to say who they license the tck to, and forces you to take the 'shared part' which taints any cleanroom implementation." (4/6/12 Dearborn Decl. Ex. D (Rubin 7/27/11 Dep. 149:18-150:13).)

- The Google negotiating team in 2005-2006 included Tim Lindholm.  (4/6/12 Dearborn Decl. Ex. E (Trial Exhibit 140, GOOGLE-01-00018836).)  Mr. Lindholm had been a Sun employee, worked on the original Java platform, is the co-author of the Java Virtual Machine Specification, described himself as a "key contributor" to the Java Runtime, and described himself to Andy Rubin as a "J2ME runtime generalist and interpreter of the engineering/business/legal ecosystem." (4/6/12 Dearborn Decl. Ex. F (Lindholm Dep. 7:23-8:11; 13:21-14:15; 15:9-15); 4/6/12 Dearborn Decl. Ex. G (Trial Exhibit 321, GOOGLE-12-00000656).)  Mr. Lindholm was also part of the Sun team in 2002 that convinced Andy Rubin that his prior company, Danger Inc., was required to pay Sun for a Java license and make his implementation compatible.  (4/6/12 Dearborn Decl. Ex. C (Cizek Dep. 195:22-196:24).)  While he was still at Sun, Mr. Lindholm was regarded as one of the "most technically knowledgeable people regarding the Java Micro Edition."  (*Id.* 195:22-196:24.)

- When Sun representatives met with Mr. Rubin in the fall of 2005, Mr. Rubin specifically indicated that Google was interested in a license to Sun's Connected Device Configuration, or CDC (4/6/12 Dearborn Decl. Ex. H (Trial Exhibit 2720, OAGOOGLE0100029446); 4/6/12 Dearborn Decl. Ex. C (Cizek Dep. 98:22-99:14)), which was a more advanced Java ME profile than the Connected Limited Device Rubin had licensed on behalf of Danger, and which included a subset of the 2006 portfolio (including most of the APIs in suit).[4]

---

[4] For example, CDC 1.1.2 APIs include asserted packages java.io, java.lang, java.lang.ref, java.lang.reflect, java.net, java.security, java.security.cert, java.text, java.util, java.util.jar,
[Footnote continued on next page]

7

- By the time of that fall 2005 meeting, Google had already decided that it was not interested in licensing Sun's code implementation of the specifications. Mr. Rubin told Sun's representatives that Google was "interested in doing their own implementations writing to the specifications, their own implementations of CDC and foundation profile." (4/6/12 Dearborn Decl. Ex. C (Cizek Dep. 98:22-99:14).)

- By December 2005, when Sun representatives met with Mr. Rubin to discuss the Android Java license, Mr. Rubin stated that Android's engineers were "already fairly advanced" in their development, that Android's engineers, "as they did at Danger, were already writing to the specification," and that it was "too late to change now." (4/6/12 Dearborn Decl. Ex. C (Cizek Dep. 125:10-25; 135:15-136:1).)

- On April 20, 2006, Mr. Rubin sent an "Android Product Requirements" document to Rich Miner of Google. The document includes the statement that "The JVM is compliant to CDC/FP 1.1 (JSR 36 / 218)." (4/6/12 Dearborn Decl. Ex. I (Trial Exhibit 379, GOOGLE-24-00016590, at p. 12 of 26).)

- On June 12, 2006, Mr. Bornstein sent an email to the Android engineering group, stating that "As for what set of java.* classes we're aiming for, that's still somewhat of an open question, the resolution of which will undoubtedly hinge on what happens (or fails to happen) with Sun. That being said, I think CLDC compliance is a reasonable baseline, and if we could hit the CDC foundation, that would be awesome." (4/6/12 Dearborn Decl. Ex. J (Trial Exhibit 157, GOOGLE-01-00025523).)

- Mr. Bornstein elaborated on June 25, 2006: "Our nominal goal is to achieve approximate parity with CDC Personal Basis Profile, which has *most of the classes from SE that one could reasonably expect to be useful on a high-end mobile device* of recent (or soon to-be) vintage." (4/6/12 Dearborn Decl. Ex. K (Trial Exhibit 251, GOOGLE-02-00104269).)

The evidence confirms that Google knew what was truly important at the time of the 2006 hypothetical negotiation: the patented technology it had already started to use and the copyrighted APIs and class libraries it was incorporating into its design for Android. Dr. Kearl's analysis of why the value of the IP in suit is appropriately considered equal to the full value of the portfolio is consistent with the actual, real-world negotiations between the parties.

### E. Dr. Kearl's Econometric Analyses Further Corroborate His Conclusions as to the Value of the IP In Suit

Other evidence discussed in Dr. Kearl's report corroborates his conclusion that the value of the intellectual property in suit, separately or together, is equal to the 2006 value of the Java ME

---

[Footnote continued from previous page]
java.util.zip, and javax.microedition.io. (*See* http://docs.oracle.com/javame/config/cdc/ref-impl/cdc1.1.2/jsr218/index.html). Personal Basis Profile APIs from 1.1.2 include asserted packages java.awt.font, java.beans, and more. (*See* http://docs.oracle.com/javame/config/cdc/ref-impl/pbp1.1.2/jsr217/index.html.)

1  portfolio.  For example, Dr. Kearl conducted an econometric analysis to determine consumers'
2  willingness to pay for the incremental performance benefits that Oracle claims are associated with the
3  patents in suit, as well as the incremental benefits of additional applications afforded by the
4  copyrighted APIs.  (Kearl Report App'x F ¶¶ 334-404.)  Dr. Kearl concludes that consumers would
5  be willing to pay <u>an additional $21</u> over the average price of an Android phone for the performance
6  benefits of infringing the '104 patent, and that consumers would pay <u>an additional $12 to $22</u> over
7  the average price of an Android phone for the additional applications afforded by infringing the API
8  specifications.  (*Id.* ¶¶ 400, 401; Exhibits F9, F10.)  In comparison, Dr. Kearl's royalty for the entire
9  2006 Java ME portfolio is ▮▮▮▮▮▮ per Android phone.  The econometric evidence provides
10 additional support for Dr. Kearl's conclusion that apportionment of the 2006 portfolio is
11 inappropriate in this case.

## III. ARGUMENT

13  Google does not quarrel with Dr. Kearl's economic judgment.  Google does not dispute that
14 there are "good economic reasons why the value of the in suit IP" is equal to the value of the entire
15 Java ME portfolio.  Google does not challenge Dr. Kearl's econometric analyses, nor does it deny
16 that consumers would pay as much as ***twenty-five times*** Dr. Kearl's ▮▮▮ per unit royalty just to get
17 the benefits provided by the two patents and the 37 API specifications.  Indeed, on all factual and
18 economics issues, Google's brief is silent.
19  Instead, Google appears to make three arguments, all of which rest on the premise that this
20 Court's prior rulings on patent law damages forbid Dr. Kearl's economic reasoning, no matter how
21 sound it may be, and regardless of whether it applies to patents, copyrights, or both.

### A. Dr. Kearl Specifically Values The IP in Suit.

23  Google begins by arguing that Dr. Kearl has set aside the law to conclude that Google "should
24 be charged a royalty for the entire bundle—not merely the intellectual property in suit."  (Dkt. 845 at
25 1:15-16.)  That is the fundamental premise of Google's brief.  It is false.
26  Dr. Kearl expressly *did* value the intellectual property in suit; he *did not* conclude that Google
27 should be charged for any more than this.  (Kearl Report ¶ 22 ("There are good economic reasons that

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1  the above royalty rate should apply to the ***in-suit patents and copyrights***, with no apportionment.");

2  *id.* ¶ 100 (reasoning that if Google knew what it wanted from the 2006 portfolio, "the 2006 value of

3  the Java ME IP portfolio *is **the value of the in suit IP***"); *id.* ¶ 104 ("my best economic advice is that

4  there are good economic reasons why ***value of the in suit IP in this matter*** is the 2006 value of a

5  hypothetical negotiation for the entire Java ME IP portfolio and the reasonable royalty rate is ▬▬ ")

6  (emphasis added in all).[5]

7      Nowhere in his report or his deposition testimony does Dr. Kearl suggest that damages in this

8  case should be based on anything other than what Google would reasonably have agreed to pay for

9  the specific intellectual property it infringed.  Thus, Dr. Kearl testified that, in 2006, ▬▬▬▬▬

10  ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬" (Kearl Dep. Tr. 107:7–11.)

11  Indeed, the point of the economic analysis that Google would exclude is to demonstrate precisely

12  *why* Google would have agreed to pay as much for the IP in suit as it was prepared to pay for the

13  larger portfolio.

14      At the same time, Dr. Kearl is quite clear that "simple apportionment of the in suit IP as a

15  fraction of the value of the portfolio will underestimate the value of the in suit IP." (Kearl Report ¶

16  105.)  When Dr. Kearl's actual opinions are considered, Google's motion to strike takes on an Alice-

17  in-Wonderland quality.  Google points out that Dr. Kearl must value the IP in suit.  Dr. Kearl says the

18  "best" way to do exactly that is to use the value of the 2006 Java ME portfolio.  He says that

19  apportionment will fail to capture the full value of the IP in suit.  In response, Google argues that Dr.

20  Kearl must apportion.  As a result, Google would essentially compel Dr. Kearl to offer only one

21  opinion as to reasonable royalty—one that he believes is wrong, and one, crucially, that he believes is

22  "less than a reasonable royalty for the use made of the [patented] invention by the infringer" (35

23  U.S.C. § 284) and less than "the actual damages suffered by him or her as a result of the [copyright]

24  infringement."  (17 U.S.C. § 504(b).)

---

[5] Dr. Kearl does not distinguish between and among the patents and copyrights in suit, and there is no need to do so under his analysis.  For example, if one of the patents is found invalid or not infringed, it can readily be concluded that the value of that patent is zero, with no effect on the value of any remaining IP found to be valid (or copyrightable) and infringed.

### B. The Court's Prior Orders Do Not Preclude Dr. Kearl's Economic Opinion That The Value of the IP in Suit Is Equal to the Value of the 2006 Java Portfolio.

Google next argues (Dkt. 845 at 2-3) that the Court rejected Dr. Kearl's logic in the July 22, 2011 *Daubert* order.  That is not correct, as even Google's quotes from the Order demonstrate.

In his May report, Prof. Cockburn calculated a royalty for the entire Java portfolio based on the assumption that the hypothetical negotiation would have resulted in Google taking a portfolio-wide Java license.  Prof. Cockburn explained that he did so because Sun's and Oracle's "practice was to license Java, not to license individual patents."  (May 20, 2011 Cockburn Report ¶ 132; *see id.* at 23.)  Prof. Cockburn further stated that "my understanding is that Oracle generally offered portfolio licenses, and for practical and legal reasons it is highly likely that Google and Oracle would have entered into a Java portfolio license in order to avoid serial claims and disputes." (*Id.* ¶ 347.)  In its July 22 Order, the Court held that Prof. Cockburn's approach was improper as a matter of law:  "An opinion that the hypothetical negotiation would have resulted in a Java license simply fights the hypothetical."  (Dkt. 230 at 5-6.)

Google argues that the rationale of the July Order forecloses the opinions expressed by Dr. Kearl in paragraphs 97–105 of his report.  It does not.  In fact, the July Order never considered the analysis that Dr. Kearl employs, either under the patent laws or the copyright laws.  In contrast to the opinion in Prof. Cockburn's May report, Dr. Kearl does not assert or assume that the hypothetical negotiation is for the entire portfolio.  He concludes that Google would have paid as much for the specific IP in suit as it would have paid for the entire portfolio.  He explains why this is so, based on economic analysis that Google, even now, has never challenged.

None of Dr. Kearl's rationales for why the IP in suit, if found valid and infringed, warrant a reasonable royalty equivalent to the royalty for the 2006 portfolio fails to take into account the mandate that a reasonable royalty for patent infringement be limited to a royalty "for the use made of the invention by the infringer."  (Dkt. 230 at 5, quoting 35 U.S.C. § 284.)  To the contrary, they specifically consider the value of that use.  Similarly, none of Dr. Kearl's rationales assumes that "Java was [ ] the invention" (Dkt. 203 at 5), or indeed that anything beyond each patent in suit is the relevant invention.  To the contrary, they explicitly consider only the inventions (and the copyrights)

1  themselves.  And none of Dr. Kearl's rationales depends on "fighting the hypothetical" negotiation
2  that is relevant to calculation of damages in this case.  (*Id.* at 5-6.)  To the contrary, they envision a
3  hypothetical negotiation permitting and valuing Google's use of the IP at issue in this lawsuit,
4  whether because Google in fact knew, as discussed above, what it wanted; because Google wanted
5  the option to choose what it wanted; or because Google wanted insurance against litigation involving
6  the particular IP it ended up infringing.

The three cases that Google cites have nothing to do with the economic reasoning that Google challenges.  Google cites no case, from the Federal Circuit or elsewhere, holding that a portion of a patent portfolio cannot have a value equal to the entire portfolio.  There is a good reason for this: the Federal Circuit has never so held.  Indeed, "[t]he Federal Circuit has never held that, as a matter of law, a reasonable-royalty award cannot ***exceed*** what someone paid to acquire a patent portfolio that includes the patent-in-suit. . . .  [S]uch a rule would make no sense." *Spectralytics, Inc. v. Cordis Corp.*, 650 F. Supp. 2d 900, 914 (D. Minn. 2009), *aff'd in part, rev'd in nonpertinent part*, 649 F.3d 1336, 1347 (Fed. Cir. 2011) (emphasis added).  If a patent in suit can justify a reasonable royalty that is greater than the royalty paid for the entire portfolio, several components of portfolio can be worth as much as the whole.  Whether that is the case here is a question of fact, not law, that should be decided by the jury after hearing all of the evidence and Dr. Kearl's opinions, as applied to the record facts.  Nothing in Dr. Kearl's opinions is inconsistent with the Federal Circuit's decision in *ResQNet*, because Dr. Kearl finds that "the ***economic*** harm caused by the infringement of the claimed invention" should be considered equal to the portfolio value in this case.  *ResQNet.com v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).  That is quintessentially an economic and factual issue, not a legal one.

### C. The Court Has Never Held That "Fair Apportionment" of the 2006 Java Portfolio Cannot Be No Apportionment

Google argues (Dkt. 845 at 3-4) that this Court has held, as a matter of law, that any approach that starts with the 2006 negotiations ***must*** make a "fair apportionment" between the "technology in suit and the remainder of the technology then offered."  (Dkt. 845 at 3-4, *quoting* Dkt. 685 at 3.)  But the Court has also stated that its orders limiting the testimony of Prof. Cockburn do not prevent other

12

ORACLE AMERICA'S OPPOSITION TO GOOGLE'S MOTION TO STRIKE KEARL
CASE NO. CV 10-03561 WHA

experts, including Dr. Kearl, from offering other approaches to reasonable royalty damages.  (*See, e.g.*, Dkt. 791 ("Also, the order for Dr. Ian Cockburn to adjust his valuation of the copyrights in suit and Sun's Java mobile patent portfolio to $561 million does not preclude other experts from using a different valuation or a completely different approach altogether.").)

Further, nothing in the Court's orders categorically rejects, as a matter of either law or fact, an economic argument that a "fair apportionment" of the 2006 bundle is no apportionment.  It is of course true that the Court has required that additional adjustments be made to the apportionment analyses that Prof. Cockburn has offered.  But orders addressing *how* apportionment is to be done have no bearing on *whether* apportionment should be done under Dr. Kearl's analysis.

### D. There Is No Proper Basis to Exclude Dr. Kearl's Opinion That Apportionment of the IP in Suit as a Fraction of the Value of the Portfolio Will Underestimate the Value of the IP in Suit.

In addition to its other defects, Google's motion is overbroad.  In paragraph 105 of his report, Dr. Kearl observes that even if it were impermissible to equate the value of the IP in suit with the value of the portfolio, the opinions that Google seeks to strike "are still useful because they suggest a simple apportionment of the in suit IP as a fraction of the value of the portfolio will underestimate the value of the in suit IP."  (Kearl Report ¶ 105.)  That is because apportionment fails to adequately consider the economic relationship between a complex portfolio and its constituent parts, and because apportionment disregards components of value that Google would receive from licensing the IP in suit.  (*Id.*)

If the Court were to strike paragraphs 99-105 of Dr. Kearl's report, as Google's motion seeks, Dr. Kearl would not only be prevented from giving the jury his best economic advice as to the value of the intellectual property in suit; he also would be prevented from informing the jury why the alternative measures of value that the jury will hear are insufficient to compensate Oracle for the harm it has suffered.  That would defeat the very purpose of appointing Dr. Kearl under Rule 706.  (Dkt. 236 at 2 (observing that the Court appointed the Rule 706 expert to "assist the jury by providing a neutral explanation and viewpoint"); Dkt. 610 at 3 ("In light of the parties' extremely divergent views on damages and the unusual complexity of the damages aspect of this case, an independent

1 economic expert was needed to aid the jury.").)

2 **IV. Conclusion**

3 For all of the reasons stated above, Google's motion should be denied. The Court's independent damages expert should be allowed, consistent with the facts and the law, to offer the jury his "best economic advice" as to the proper measure of damages in this case.

Dated: April 6, 2012                         BOIES, SCHILLER & FLEXNER LLP

By: */s/ Steven C. Holtzman*
    Steven C. Holtzman

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.