```
                                        Volume 12

                                        Pages 2450 - 2611

                 UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

            BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,                 )
                                      )
            Plaintiff,                )
                                      )
  VS.                                 ) No. C 10-3561 WHA
                                      )
GOOGLE, INC.,                         )
                                      )
            Defendant.                ) San Francisco, California
_____) April 30, 2012
```

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          MORRISON & FOERSTER
                            755 Page Mill Road
                            Palo Alto, California  94304
                    BY:  **MICHAEL A. JACOBS, ESQUIRE**
                         **KENNETH A. KUWAYTI, ESQUIRE**
                         **MARC DAVID PETERS, ESQUIRE**
                         **DANIEL P. MUINO, ESQUIRE**

                            BOIES, SCHILLER & FLEXNER
                            333 Main Street
                            Armonk, New York 10504
                    BY:  **DAVID BOIES, ESQUIRE**
                         **ALANNA RUTHERFORD, ESQUIRE**


(Appearances continued on next page)

*Reported By:  Katherine Powell Sullivan, RPR, CRR, CSR #5812*
              *Debra L. Pas, RMR, CRR, CSR #11916*
                 *Official Reporters - U.S. District Court*

*Katherine Powell Sullivan, CSR, CRR, RPR*
*Debra L. Pas, CSR, CRR, RMR*
*Official Reporters - US District Court - 415-794-6659*

**APPEARANCES (CONTINUED)**:

**For Plaintiff:**          BOIES, SCHILLER & FLEXNER
                           1999 Harrison Street, Suite 900
                           Oakland, California  94612
                    BY:  **WILLIAM FRED NORTON, ESQUIRE**
                         **STEVEN C. HOLTZMAN, ESQUIRE**


                           ORACLE AMERICA, INC.
                           500 Oracle Parkway
                           Redwood Shores, California  94065
                    BY:  **ANDREW C. TEMKIN, CORPORATE COUNSEL**
                         **DORIAN DALEY, GENERAL COUNSEL**


**For Defendant:**          KEKER & VAN NEST
                           633 Battery Street
                           San Francisco, California  94111-1809
                    BY:  **ROBERT ADDY VAN NEST, ESQUIRE**
                         **CHRISTA MARTINE ANDERSON, ESQUIRE**
                         **DANIEL PURCELL, ESQUIRE**
                         **MICHAEL S. KWUN, ESQUIRE**


                           KING & SPALDING LLP
                           1185 Avenue of the Americas
                           New York, New York 10036-4003
                    BY:  **BRUCE W. BABER, ESQUIRE**


                           GOOGLE, INC.
                           1600 Amphitheatre Parkway
                           Mountain View, California  94043
                    BY:  **RENNY HWANG, LITIGATION COUNSEL**


**For Dr. Kearl:**          FARELLA BRAUN & MARTEL LLP
                           235 Montgomery Street, 30th floor
                           San Francisco, California 94104
                    BY:  **JOHN L. COOPER, ESQUIRE**


**Also Present:**           **SAFRA CATZ, President and CFO**
                           Oracle Corporate Representative

                           **CATHERINE LACAVERA**
                           Google Corporate Representative


                           —   —   —

<u>**P R O C E E D I N G S**</u>

**APRIL 30, 2012**                                          **7:30 a.m.**


                (Proceedings held in open court, outside

                 the presence and hearing of the jury.)

                **THE COURT:**  So good morning again.  I received your

comments on the final version of the jury instructions.  So

here is what -- the best way to go through this is, I will go

through some, I would call them minor edits that I'm going to

make, but most of these are denied.  Most of your objections

are denied and we're not even going to argue them this morning

unless I make a change, then I'll let you argue against the

change.

                But all good things must come to an end.  So we're

just going to get started.

                So on page -- there are a few very minor things that

I am going to change, but -- well, possibly I guess I should go

over it.  I'm going to make minor changes to No. 25, but it

won't change -- it's just for grammatical corrections.  So I'm

not going to give you those now.  I'll give it to you in

writing.

                No. 26 I'm changing the phrase "the public" to

"anyone," which I had meant to do but neglected to do.

                On No. 27, I'm going to add this sentence:

                "To be clear, with respect to a different

PROCEEDINGS                                          2453

1            issue.  The parties are in agreement that the

2            Structure, Sequence and Organization of the

3            API packages is more than diminimus."

4            I think you all agree with that, don't you?

5       **MR. JACOBS:**  Yes, your Honor.

6       **MR. VAN NEST:**  Yes, your Honor.

7       **THE COURT:**  All right.

8            Next on 29 I had italicized the word "all," but I

9   guess I'm not going to italicize that now, so that will go back

10  to normal font.

11           Paragraph 30, around Line 18 I'm going to change it

12  to read -- instead of saying, "There is no issue for you to

13  decide," I'm going to say, "but the parties agree that the

14  issue is for me to decide."

15           And then take out the sentence that starts, "Again

16  Google makes no contention," et cetera, et cetera.  And simply

17  say, "This statement of law regarding licenses is simply to put

18  some of the evidence you heard in context."

19           I forgot who asked for that, but that was a good

20  change.

21      **MR. VAN NEST:**  Excuse me, your Honor.  Can you read

22  the --

23      **THE COURT:**  I will.  I will read it to you the way it

24  will -- I will start at Line 18 in the middle of the

25  sentence -- or 17 in the middle of the sentence:

PROCEEDINGS                                          2454

```
 1              "The burden would be on Google to prove such

 2              a public dedications, but the parties agree

 3              that the issue is for me to decide.  This

 4              statement of the law regarding licenses is

 5              simply to put some of the evidence you heard

 6              in context."

 7         Then on the special verdict form on question three

 8   under the word "Yes," I'll put in parentheses "Infringing."

 9   Under the word "no," "Not infringing" just for clarity.

10         And then under the special interrogatory, the very

11   last sentence -- two sentences would read:

12              "Your answers to questions 4-A and     4-B

13              will be used by the judge with issues he must

14              decide.  Questions 4-A and 4-B do not bear on

15              the issues you must decide on questions 1 to

16              3."

17         All right?  If anyone has extreme heartburn over

18   anything I've just said, please let me know.

19         MR. VAN NEST:  None here, your Honor.

20         THE COURT:  And I'm going to try to give you a --

21         MR. JACOBS:  No, your Honor.

22         THE COURT:  Thank you.

23         I'm going to give you a cleaned up copy with these

24   changes so you can use them in your close.

25         MR. VAN NEST:  Your Honor, could we possibly get
```

PROCEEDINGS

 1  that, as we have been, in electronic form so we can put them

 2  into the slides?  Is that possible?

 3          THE COURT:  All right.

 4          MR. VAN NEST:  Thank you so much.

 5          THE COURT:  All right.  Now, Dawn, can you -- Dawn

 6  has told me that -- who it is that's a juror?

 7          THE CLERK:  Jennifer Michals.

 8          THE COURT:  Ms. Michals, who sits in the back row, is

 9  anxious and wants to stop jury service and it's, apparently,

10  complicating her life.  I think we ought to bring her out and

11  ask her some questions.  She's here now.

12          Any objection?

13          MR. JACOBS:  No, your Honor.  I just -- it may be, if

14  we could adopt our sidebar approach that we did with the other

15  juror who had some personal issues, it may make it easier for

16  her to speak freely.

17          THE COURT:  Well, let me see.  If she wants to do

18  that, I'll let her do that, but I need -- I'm going to let her

19  ask for that, first.

20          All right.  Let's bring Ms. Michals out.

21          MR. KWUN:  Your Honor, before we do that.  There is

22  one small matter in the transcript that I would like to address

23  your Honor on, which is that on day three of the transcript,

24  April 18th, the transcript reflects that Trial Exhibit 1041,

25  which is the designation of Larry Page's deposition excerpts

1  that were played on the 17th, the transcript reflects that it

2  was received into evidence, although the parties are in

3  agreement that the marked depo excerpts shouldn't be received

4  into evidence and they weren't actually moved into evidence.

5  So I would just to clarify for the record that they are not in

6  evidence.

7            **THE COURT:**  Both sides agree to that?

8            **MR. JACOBS:**  That's the procedure you had directed,

9  your Honor.

10           **THE COURT:**  All right.  So what's the exhibit number?

11           **MR. KWUN:**  It's Exhibit 1041, which was marked for

12  identification.  It's the deposition excerpts of Larry Page

13  that were played on April 17th.  The correction would be that

14  the transcript at Page 434, Line 16 where it notes in a

15  parenthetical that it was received into evidence.

16           **THE COURT:**  The way to do this, I think, is we have

17  to leave the record as it is on the court reporters'

18  transcript, but we will now have a subsequent record on the

19  court reporters' transcript that says that Exhibit No. 1041 is

20  not received in evidence, but only marked for purposes of the

21  record for purposes of appeal.

22           So my Deputy Clerk will correct our clerk's record,

23  1041 not in evidence.

24           All right?  Does that suit you?

25           **MR. KWUN:**  Thank you, your Honor.

```
 1              THE COURT:  Okay.  I did have a few more questions I
 2     wanted to ask you, but let's bring Ms. Michals out.  Is she
 3     here?
 4              (Juror Michals enters the courtroom.)
 5              THE COURT:  Ms. Michals, welcome.  We need to give
 6     her the microphone.
 7              JUROR MICHALS:  There is an audience.
 8              THE COURT:  Yes.  This is a public trial.
 9              JUROR MICHALS:  Okay.
10              THE COURT:  Do you want to do this privately at the
11     sidebar?
12              JUROR MICHALS:  Yes.
13              THE COURT:  All right.  We will do that.
14              (Whereupon, the following proceedings
15               were held at side bar.)
16              THE COURT:  Ms. Michals, I need to let you know this
17     is a public transcript, so everyone in the world can read this,
18     but the public won't hear it right now.
19              JUROR MICHALS:  Okay.
20              THE COURT:  What is the issue?
21              JUROR MICHALS:  Okay, so I'm a nurse.  I'm a new
22     nurse.  I don't know if you know that.  I just got this job in
23     September.  I entered into a training program and I'm on my own
24     since the end of January.  So when I got called I thought, this
25     would be a great opportunity to see how the whole system works.
```

 1   I really thought about it a lot.

 2          And then by -- it's proven to be difficult to keep up

 3   my skills and work, come here five days a week and work one

 4   day, a 12-hour shift on a weekend.  And I feel like I'm not

 5   paying attention here and I'm not paying attention there.

 6          But -- I don't know if you know, but at Stanford

 7   where I work, at the Stanford Hospital, we have the sickest

 8   children in the country.  We have -- our floor unit is intense

 9   as a PICU, an intensive care unit in another hospital.  So I'm

10   new at this.

11          I have been on my own for, I don't know, since the

12   end of January.  I'm just having anxiety about my job basically

13   and I know -- I just don't want to set a precedent for letting

14   people go.  I understand that.  But I just am having a real

15   hard time in general.

16          And that's my thoughts.  And I know it puts everyone

17   out.  But I just, it just can't make -- it is not like I go sit

18   down at a desk.  I can't make a mistake with these kids.  This

19   is not an option.

20          **THE COURT:**  Well, who says that you have to work on

21   weekends to --

22          **JUROR MICHALS:**  Nobody says I do, but the thing is,

23   is that because I'm new at this, if I don't work on the

24   weekends and keep my skills up, I'm going to be back where I

25   started in September.  And this program that I entered into at

 1  Stanford, it's like there are 900 applicants.  I was one of 20.

 2  They put all this money into training me.  I just feel like --

 3          **THE COURT:**  Are they threatening to fire you or

 4  something?

 5          **JUROR MICHALS:**  No, no, no, no.

 6          **THE COURT:**  Do you want me to have the head of the

 7  company come in?  I will be happy to bring them in and explain

 8  your duty.

 9          **JUROR MICHALS:**  No, no.  No, not at all.

10          **THE COURT:**  Why didn't you think of this before you

11  signed up?  You could have told me that this would interfere

12  with your ability to serve as a juror.  The lawyers relied upon

13  your ability to serve.

14          **JUROR MICHALS:**  I thought about it a lot.  And I

15  thought my perception was that it would be okay, that that

16  would be enough; that one day extra a week would be sufficient,

17  but what I'm saying is it's not.

18          **THE COURT:**  Well, who should that burden fall on?

19  You or the system?  The U.S. District Court has relied upon

20  your availability.  You had ample opportunity to bring all this

21  up.

22          **JUROR MICHALS:**  Yeah.  I know that.

23          **THE COURT:**  And if you had, maybe you would have been

24  excused, but you didn't bring it up.  We have relied upon your

25  availability.

```
 1          JUROR MICHALS:  I don't -- I don't come to you and

 2   make loosely and flippantly.  I've thought about this a lot and

 3   it's -- and I realize it is -- you're right, whose burden is

 4   it?  And it's totally mine.  Misperception of what I'm capable.

 5   And that's my fault, I agree.

 6          THE COURT:  Let me ask you this:  Are you able to

 7   complete the first phase of this trial and participate with the

 8   jury on deciding the first phase of this trial?  And I'm not

 9   saying I would let you off after the first phase, but that

10   means going through --

11          JUROR MICHALS:  Deciding phase.

12          THE COURT:  (Continuing) -- deciding this first

13   phase?

14          JUROR MICHALS:  Yeah.

15          THE COURT:  I'm sorry?

16          JUROR MICHALS:  Yes.

17          And I understand you're not letting me off and that

18   you -- you are probably thinking about it.  And I -- I'm not --

19   you know, I don't take it lightly.  I understand this is a big,

20   huge deal for everyone involved and everyone's lives.  And I --

21   I have to do what's best for my job at this point.

22          THE COURT:  Well --

23          JUROR MICHALS:  And I --

24          THE COURT:  Yes, you have to do what's best for you,

25   except for the fact that you have made some commitments that we
```

PROCEEDINGS                          2461

1    must ask you to honor.  You know, it's like when somebody gets

2    drafted into the Army.  They don't get to go to the coffee shop

3    and say, "Gee, wouldn't it be better if I was back working at

4    my old job?"  You know, they are in for the duration.

5              MR. KWUN:  I hear you.  I hear you.

6              THE COURT:  So this is like being drafted into the

7    Army, so to speak.

8              JUROR MICHALS:  Hmm-hmm.

9              THE COURT:  Here is what -- it is important for me to

10   know that you will pay attention and do your duty as a juror.

11             JUROR MICHALS:  Uh-huh.

12             THE COURT:  At least through the end of the verdict

13   on the first phase of this trial.

14             JUROR MICHALS:  Yes, I will.

15             THE COURT:  All right.  I will take it up after the

16   first phase of this trial.

17             JUROR MICHALS:  Okay.  Fair enough.

18             THE COURT:  Let me ask counsel, do they have any

19   questions?

20             MR. JACOBS:  No.

21             MR. VAN NEST:  No, your Honor.

22             THE COURT:  Don't talk about the other jurors about

23   this.  I don't want them to even know it is an issue.  And we

24   will take it up, if you feel the same way, at the end of the

25   verdict, we will revisit this.

1           JUROR MICHALS:  Okay.

2           THE COURT:  And I will keep an open mind about it,

3    but you must keep an open mind about it, too.  And I'm not

4    saying that I would let you off, but I'm not saying I won't

5    either.  I want to look at it at that point, all right.

6           JUROR MICHALS:  All right.  Fair enough.

7           THE COURT:  Okay.

8           JUROR MICHALS:  Thanks guys.

9           (Whereupon, the following proceedings were

10             held in open court, in the presence and

11             hearing of the jury.)

12          THE COURT:  All right.  I am going to read the first

13   third of the instructions before the close and then save the

14   two-thirds of it for after the close, but the part about

15   burdens of proof and weighing the evidence, I want do that

16   before you start your close.

17          I have a question that occurred to me in drafting the

18   special verdict form.  On those Impl files, is it true that the

19   entire file was copied.  Yes?

20          Mr. Baber, you know everything.  Isn't it true that

21   the entire file was copied?

22          MR. BABER:  I believe the evidence shows, your Honor,

23   that the source code files appear to have been derived from

24   decompiled versions of the bytecode which would have been

25   included the source code from those files, but not the

 1  comments.  So depending on your compilable code definition.

 2          **THE COURT:**  But wouldn't 100 percent of the

 3  compilable code have been reconstructed from the object code?

 4          **MR. BABER:**  I believe that's what the evidence shows.

 5          **THE COURT:**  So isn't that a hard argument for you to

 6  make that it's diminimus?

 7          **MR. BABER:**  It's a qualitative argument, your Honor,

 8  but Mr. Van Nest will --

 9          **MR. VAN NEST:**  The argument would be qualitative,

10  your Honor.

11          Those files, as Dr. Mitchell admitted, he couldn't

12  find any evidence they had ever appeared on a handset.  It's

13  similar to the source code comments.  Yes, they are -- appear

14  to be copies, but they are qualitatively minimal.  It's not

15  strictly a numbers count.  It's qualitative and quantitative.

16          **THE COURT:**  But I told the jury that they must make a

17  comparison against the entire file from which they were copied,

18  but in this case it is the entire file.

19          I just want you to know I'm going to listen carefully

20  to how you pitch the argument and I may revise the instructions

21  if I feel that you're trying to escape what seems to me to be

22  something that we maybe ought to direct a verdict on.

23          **MR. VAN NEST:**  You have warned us of that and I'm

24  well aware of it, your Honor.

25          **THE COURT:**  All right.  That is one of the most minor

```
1   issues in any trial I have ever seen.  I don't know why those

2   issues -- those items are even still in play, but both sides, I

3   guess, want them in play.

4            All right.  I've run out of things.  I'm ready to

5   proceed.

6            MR. JACOBS:  Your Honor, a few housekeeping items.

7            THE COURT:  Yes, please.  What is the housekeeping

8   matter?

9            MR. JACOBS:  We have a joint list of admitted trial

10  exhibits that the parties have prepared.

11           THE COURT:  This is for the jury's use?

12           MR. JACOBS:  Yes.

13           THE COURT:  Thank you.  Is this agreed to,

14  Mr. Van Nest?

15           MR. VAN NEST:  Yes, it is, your Honor.

16           THE COURT:  Wonderful.  We will take that into the

17  jury room when the exhibits go in.

18           MR. JACOBS:  The next document, your Honor, is an

19  agreed list of translating from the deposition exhibits to the

20  trial exhibits.

21           THE COURT:  That's also good.

22           Can I see that?  We might want -- let me see what the

23  form of that is.

24           (Whereupon, document was tendered

25             to the Court.)
```

PROCEEDINGS                                          2465

 1          **THE COURT:**  Can we just send this in without

 2   explanation along with the joint list?  Is that all right with

 3   both sides?

 4          **MR. JACOBS:**  Yes, your Honor.

 5          **MR. VAN NEST:**  That's fine, your Honor.

 6          **THE COURT:**  All right.  I think it's satisfactorily

 7   explanatory, so Dawn will do that.  Okay?

 8          **MR. JACOBS:**  And then for the record, TX 1090 is our

 9   clips of Dr. Astrachan's deposition.  TX 1091 is for Agarwal.

10   TX 1092 is for Bloch, and TX 1093 are demonstratives that were

11   used with Dr. Mitchell.

12          **THE COURT:**  All right.  Are all the jurors present,

13   Dawn?

14          **THE CLERK:**  I don't.  Let me go check.

15          **THE COURT:**  While we have a moment, I want to thank

16   you, the members of the public and press out there.  I think

17   you have been pretty good about remaining as quiet as possible.

18          It's very important that the lawyers have the

19   attention of the jury, meaning that when they are performing or

20   asking questions or, in this case, giving their closing

21   arguments, it's very important that there be no distractions so

22   that the precious minutes that they have are used effectively

23   with the jury.  So I ask for your continued cooperation on that

24   point.

25          Now, I have noticed over the years that sometimes

 1  members of the public don't like to sit through jury

 2  instructions.  That's fine.  But, when I'm reading them, you've

 3  got to either get up and leave or sit there and listen, but you

 4  can't leave during the jury instructions.  Some judges in this

 5  courthouse lock the door so no one can come in and no one goes

 6  out, because this is the one moment that the jury learns the

 7  law and you don't want distractions there either.

 8          So if you want to get up and leave, I'm going to ask

 9  you to do that very quickly before we get started with reading

10  these instructions.  It will probably take about 10 to 12

11  minutes for this part.  So it's not that long.  Nonetheless,

12  if -- there are so many of you that if even 10 of you started

13  to get up and leave, you can see what a disturbance that would

14  make.

15          Dawn, are we ready?

16          **THE CLERK:**  Yes.

17          **THE COURT:**  All right.  The jury is ready so we will

18  proceed.

19          (Jury enters courtroom at 7:54 a.m.)

20          **THE COURT:**  Welcome back.  Please be seated.  Hope

21  you all had a great weekend and are recharged and ready to go.

22          So here is our plan for the day.  I'm going to start

23  out by reading to you 10 to 12 minutes of jury instructions

24  that deal with issues of burden of proof and what is evidence,

25  what is not evidence.  And these are part of the jury

PROCEEDINGS                    2467

 1  instructions, about one-third of the jury instructions, and
 2  then I will stop that.  I will get right up to the point where
 3  I'm about to tell you what the law is that governs these
 4  substantive claims and defenses, but I will stop short of that,
 5  turn it over to the lawyers for several hours.  You will then
 6  hear their closing arguments, and then I will finish the jury
 7  instructions, then it will go to you for decision.

 8        And it's up to you how long you want to deliberate or
 9  need to deliberate.  Remember now, your verdict must be
10  unanimous, meaning 100 percent.

11        So in that connection, are you all able to stay past
12  1:00 o'clock today?  Is there anyone who cannot?

13        (Some jurors respond negatively.)

14        **THE COURT:**  Okay.  So we will break at 1:00 o'clock,
15  just as normal.  If you cannot stay past 1:00 o'clock, then it
16  may take longer.  It may take more days for you to deliberate,
17  but that's okay.  We understand and we will -- we'll stop at
18  1:00 o'clock today.

19        So I will start now with these, the reading of the
20  instructions.  And, again, this part will take about 10 to 12
21  minutes.

22                **<u>PRELIMINARY JURY INSTRUCTIONS</u>**

23        **THE COURT:**  Members of the jury, it is now time for
24  me to give you the final instructions, including instructions
25  on the law that governs this case.  A copy of these

1   instructions will be available in the jury room for you to

2   consult as necessary.

3          It is your duty to find the facts from all the

4   evidence and to decide whether the side with the burden of

5   proof has carried that burden, applying the elements of proof

6   required by the law, the elements I will provide you in a

7   moment.

8          In following my instructions, you must follow all of

9   them and not single out some and ignore others.  You must not

10  read into these instructions or into anything the Court may

11  have said or done as suggesting what verdict you should return.

12  That is a matter entirely up to you.

13         Now, the evidence from which you are to decide what

14  the facts are consists of:

15         First, The sworn testimony of witnesses, whether

16  presented in person or by depositions;

17         Secondly, The exhibits received into evidence; and

18         Third, Any stipulated facts or facts I've told you

19  were deemed to be evidence.

20         Certain things, however, are not evidence and you may

21  not consider them in deciding what the facts are.  I will list

22  those for you.

23         Arguments, statements and objections by lawyers are

24  not evidence.  I will repeat that.  Arguments, statements and

25  objections by lawyers are not evidence.  The lawyers are not

1  witnesses.  What they have said in their opening statements,

2  closing arguments and at other times is intended to help you

3  interpret the evidence, but it is not evidence itself.  If the

4  facts as you remember them differ from the way the lawyers have

5  stated them, your memory of them controls.

6          A suggestion in a question by counsel or the Court is

7  not evidence, unless it is adopted by the answer.  A question

8  by itself is not evidence.  Consider it only to the extent it

9  is adopted by the answer.

10          Testimony or exhibits that have been excluded or

11  stricken or that you have been instructed to disregard are not

12  evidence and you must not -- and must not be considered.

13          In addition, some testimony and exhibits have been

14  received only for a limited purpose.  Where I have given a

15  limiting instruction, you must follow it.

16          Anything you may have seen or heard when the Court

17  was not in session is not evidence.

18          Now, evidence may be direct or circumstantial.

19  Direct evidence is direct proof of a fact, such as testimony by

20  a witness about what that witness personally saw, or heard, or

21  did.  Circumstantial evidence is proof of one or more facts

22  from which you could find another fact.  By way of example, if

23  you wake up in the morning and see that the sidewalk is wet,

24  you may find from that fact that it rained during the night.

25  However, other evidence, such as a turned-on garden hose, may

1  explain the presence of water on the sidewalk.  Therefore,

2  before you decide that a fact has been proved by circumstantial

3  evidence, you must consider all of the evidence in light of

4  reason, experience and common sense.  You should consider both

5  kinds of evidence.  The law makes no distinction between the

6  weight to be given to either direct or circumstantial evidence.

7  It is for you to decide how much weight to give any evidence.

8         In deciding the facts in this case, you may have to

9  decide which testimony to believe and which testimony not to

10  believe.  You may believe everything a witness says, or part of

11  it, or none of it.  In considering the testimony of any

12  witnesses, you may take into account:

13         The opportunity and ability of the witness to see or

14  hear or know the things testified to;

15         The witness' memory;

16         The witness' manner while testifying;

17         The witness' interest in the outcome of the case and

18  any bias or prejudice;

19         Whether other evidence contradicted the witness'

20  testimony;

21         The reasonableness of the witness' testimony in light

22  of all the evidence;

23         And any other factors that you think bear on

24  believability.

25         You are not required to decide any issue according to

1    the testimony of a number of witnesses, which does not convince

2    you, as the testimony of a smaller number or other evidence

3    which is more convincing to you.  The testimony of one witness

4    worthy of belief is sufficient to prove any fact.  This does

5    not mean that you are free to disregard the testimony of any

6    witness merely from caprice or prejudice, or from a desire to

7    favor either side.  It does mean that you must not decide

8    anything by simply counting the number of witnesses who have

9    testified on the opposing sides.  The test is not the number of

10   witnesses, but is the convincing force of the evidence.  You

11   should base your decision on all the evidence regardless of

12   which party presented it.

13        A witness may be discredited or impeached by

14   contradictory evidence or by evidence that at some time, other

15   time the witness has said or done something or failed to say or

16   do something that is inconsistent with the witness' present

17   testimony.  If you believe that any witness has been impeached

18   and thus discredited, you may give the testimony of that

19   witness such credibility, if any, you think it deserves.

20        Discrepancies in a witness' testimony or between a

21   witness' testimony and that of other witnesses do not

22   necessarily mean that such witness should be discredited.

23   Inability to recall and innocent misrecollection are common.

24   Two persons witnessing an incident or transaction sometimes

25   will see or hear it differently.  Whether a discrepancy

1  pertains to an important matter or only to something trivial

2  should be considered by you.

3         However, a witness wilfully false in one part of his

4  or her testimony is to be distrusted in others.  You may reject

5  the entire testimony of a witness who willfully has testified

6  falsely on a material point, unless from all the evidence, you

7  believe that the probability of truth favors his or her

8  testimony in other particulars.

9         In determining what inferences to draw from evidence

10 you may consider, among other things, a party's failure to

11 explain or deny such evidence.

12        Now, certain charts and summaries have been received

13 into evidence.  Charts and summaries are only as good as the

14 underlying supporting testimony or material.  You should,

15 therefore, give them only such weight as you think the

16 underlying material deserves.

17        Now, I will address the burden of proof.  In this

18 case the preponderance of the evidence standard applies on all

19 sides.  So whoever has the burden of proof on an issue must

20 carry that issue by a preponderance of the evidence.  I'm going

21 to repeat that phrase.  Preponderance of the evidence.

22        When a party has the burden of proof on any claim by

23 a preponderance of the evidence, it means you must be persuaded

24 by the evidence that the claim is more probably true than not

25 true.  To put it differently, if you were to put the evidence

1  favoring a plaintiff and the evidence favoring a defendant on

2  opposite sides of the scale, the party with the burden of proof

3  on the issue would have to make the scale tip somewhat toward

4  its side.  Somewhat toward its side.  If the party fails to

5  meet this burden, then the party with the burden of proof loses

6  on the issue.  Preponderance of the evidence basically means

7  more likely than not.

8        On any claim if you find that plaintiff carried its

9  burden as to each element of a particular claim, your verdict

10  should be for the plaintiff on that claim.  If you find that

11  plaintiff did not carry its burden of proof as to each element,

12  you must find against plaintiff on that claim.  The same

13  principle also applies to defendants on claims or defenses for

14  which it has the burden of proof.

15        All right.  So that is where we will pause in the

16  reading of the instructions.

17        And I remind you how these closing arguments are

18  structured.  The burden of proof being on the plaintiff, the

19  plaintiff has the right to open and close the summations;

20  meaning counsel for plaintiff gets to go first.  And then after

21  the defense puts on its entire closing argument, the plaintiff

22  counsel gets to come back and to rebut, and then that is the

23  end of the close.  But both sides have the same amount of

24  overall time, which is 90 minutes per side.  And then at the

25  end of all of that, I will give you the final, the rest of the

 1 | instructions.

 2 |         Please remember that nothing that is said by counsel

 3 | in these closing arguments constitutes evidence at all, but it

 4 | is an important opportunity for the lawyers to try to explain

 5 | to you what they think has or has not been proven in the case.

 6 | So I know you will give them your closest possible attention.

 7 |         So who will begin?  All right.  On behalf of Oracle

 8 | America, the plaintiff in the case, Mr. Jacobs will now give

 9 | the closing summation.  The floor is yours.

10 | **CLOSING ARGUMENT**

11 |         **MR. JACOBS:**  Good morning.  I want to begin again by

12 | thanking you for your service on this jury.  We, of course,

13 | have been keeping an eye on you during the trial.  We know you

14 | have been paying very close attention and we appreciate that.

15 | The evidence has sometimes been complex, technical.  We know

16 | you have been taking notes and being thoughtful and preparing

17 | for this moment, for the close and then for your deliberations.

18 |         But I want to thank you for another reason.  This is

19 | a trial between large companies over really important business

20 | issues.  Sometimes the numbers have been staggering, whether

21 | it's the number of lines of code, or the number of Android

22 | devices activated today, or even the dollar amounts involved.

23 | And it can seem a little remote from our everyday lives to be

24 | thinking about these enterprises and their intellectual

25 | property conflicts.

```
 1              But the way the system works is we gather people from
 2     all walks of life, from all backgrounds, regardless of gender,
 3     age, where you came from, whether you speak English as a first
 4     language or as a fourth language, and under the Constitution
 5     people like us decide these Titanic questions.  And so as you
 6     have been watching this trial and have been sitting there
 7     thinking big companies and great issues, and I just want to
 8     thank you again for how careful you have been following along
 9     on this kind of important dispute.
10              And when I began the trial I said, actually the issue
11     is pretty simple, and it is pretty simple.  It's something that
12     all of us can relate to.  The basic question is:  Can somebody
13     use another company's property, another person's property
14     without permission because it suits them?  And that's pretty
15     basic.  We can all relate to that.  That's about whether
16     someone could camp on our land without our permission, or use
17     our bathrooms without our permission.  It's kind of a very
18     basing fundamental question.  Notwithstanding the technology,
19     notwithstanding the fact that we're talking about copyrights in
20     this phase.  It's a pretty straightforward question that
21     ordinary citizens who may not be close to -- may not have
22     executive experience in large corporations are fully equipped
23     to address.
24              And what I want to do today in this summation or
25     closing statement is walking through the evidence, give you the
```

1  tools that you will need when you go back to the jury room to

2  deliberate.

3          Now, as I said, the case is about one company

4  deciding to use another company's property without permission.

5  And we heard early on in the trial what the basic -- how the

6  dispute basically arose.  And the way it arose was that there

7  were negotiations between Sun and Google, and Google wanted to

8  use Java intellectual property in Android, and Google wanted to

9  use it in a way that Sun was not willing to agree to, and

10 Google pressed.

11         And Mr. Rubin's testimony was quite clear on the

12 point.  What did Google want Sun to do?  Google wanted Sun to

13 throw away their standard license, because it isn't what Google

14 was asking for, and they needed to develop a new license that

15 was specifically what we're asking for.  And he acknowledged

16 that what Google was asking Sun to do was basically change

17 their business model.  And he had an idea to open source in a

18 way that Sun wasn't going to open source.  You now know so much

19 about open source licensing.

20         And he said, "We asked them, 'Why don't you make it

21 available for free to the world as part of our Android platform

22 and in return we will pay you a little bit of money to do that,

23 so you guys can go and create some derivative of your business

24 model.'"  A little pat on the head.

25         So now we know how this dispute evolved, because Sun

CLOSING ARGUMENT / JACOBS

1    said no.   Sun said, We want to stick with our business model.

2    It's important to us.   Java is important to us.   "Write once,

3    run anywhere" is important to us and you're going to disturb

4    that model.   And so Sun said no, and the disagreement

5    persisted, and here we are.

6         As a result of the trial, we now know a great deal

7    more about the property that's in question.   We know that we're

8    talking about copyrights.   We talked at the beginning about how

9    important copyrights are and how copyrights are in the

10   Constitution.

11        And now, again, back to our everyday lives.   We know

12   how important it is to reward authors for their creations,

13   because who would sit down and write a good book or compose a

14   beautiful song or write a great API if somebody could just rip

15   it off?

16        And so we know that this is about the Structure,

17   Sequence and Organization in Java 2 Standard Edition, which may

18   not be a symphony, but we heard from the witnesses it's kind of

19   like creating a symphony or other kind of creative work.

20        We know that Google decided to copy the Application

21   Programming Interfaces leading to the copy of the Structure,

22   Sequence and Organization for a commercial reason.   It wasn't a

23   requirement of anything.   They wanted to get Android quickly on

24   the market.

25        We know that there are also a dozen files that are

1    copied word-for-word, line-for-line all the way through because

2    the clean room was not clean.  The clean room was very dirty.

3         And Google concedes all this copying.  They -- Google

4    has to concede this copying because either it jumps out when

5    you look at it or because it was part of their plan.  It was

6    their plan to change the business model, even though Sun, later

7    Oracle, disagreed.

8         We know that the copying is in Android.  750,000

9    activations a day, a staggering number.  At bottom, another way

10   to express what this dispute is about, Oracle's Application

11   Programming Interfaces as represented by the Structure,

12   Sequence and Organization of the Android code gets turned on

13   750,000 times a day without any acknowledgment by Google that

14   that is Oracle's property without ever taking a license.

15        And that's the next thing we know a lot more about.

16   We know a lot more about the permission that Google should have

17   gotten from Sun, now Oracle, to do what they are doing, because

18   as I said, you now know a ton more about licensing and about

19   the various forms of licenses and about the requirements of the

20   Sun, now Oracle, licenses designed to protect compatibility and

21   "write once, run anywhere."

22        I promised you in my opening that we would prove that

23   from top to bottom, beginning to end, Google executives knew

24   what they were doing.  They knew that they needed a license.

25   They knew they didn't have a license.  They knew this day would

 1   come because they predicted lawsuits.  And the evidence at

 2   trial showed that.

 3           When you go back to the jury room and sift through

 4   all the emails -- this new world that we live in in which

 5   people don't talk, they write each other emails so we know

 6   exactly what they are saying to each other -- you will see

 7   email after email in which the Google executives knew this day

 8   would come.

 9           So what this trial was mostly about was Google's

10   excuses.  They took the property.  They acknowledge they took

11   the property.  Do they get off?  Is it a, quote, fair use,

12   which we'll spend a fair amount of time explaining and

13   understanding.

14           Part of the theme of Google's presentation was Sun,

15   later Oracle, didn't sue everyone.  So why are they suing us?

16   It's kind of like, "My sister gets away with it, why are you

17   blaming me?"  But you don't have to sue everybody in order to

18   enforce your rights against the party that is taking commercial

19   advantage of your intellectual property, and it was

20   acknowledged that that was Google's unique role in this

21   business.

22           And then it comes down to a blog post.  Jonathan

23   Schwartz posted on his blog how excited he was about the launch

24   of Android.  A blog post is not permission.  A blog post is not

25   a license.

1           The judge has been very clear about what this case is

2    about.  It's about the law.  It's about the instructions and

3    about the jury, your role applying the facts, the evidence to

4    the law.

5           And so what we're going to do in the next 60 minutes

6    or so is walk through the form of the verdict that you're going

7    to see and some of the instructions that Judge Alsup will read

8    to you at the end of this part of the trial and explain how the

9    evidence that you've seen fits into those instructions and what

10   we're asking you to do on the verdict form.

11          So we started with the fact that this case is a

12   copyright case, and you saw the registrations.  You saw some

13   testimony toward the end of the trial about what was sent to

14   the Copyright Office.  When you go back and deliberate and you

15   look at Exhibits 450 through 455, and 460 through 464 and all

16   these exhibits that are on this screen, you will see that Sun

17   registered its copyrights for version after version, release

18   after release, because copyrights were critical to its

19   business.  They are an important kind of property, an important

20   kind of intellectual property.

21          You may have wondered what the testimony was about,

22   about what was sent to the Copyright Office and what was going

23   on there.  When you look at the instructions, you will see that

24   there is no issue about the registrations covering the software

25   that was copied.  You will see that there is no issue about any

CLOSING ARGUMENT / JACOBS

1  ownership in the case.  There is no question that Oracle owns

2  the property that we are suing on and there is no question that

3  the registrations cover that property.

4          The first question you're going to get asked on the

5  verdict form is:

6              "As to the compilable code" -- which the

7              judge will explain to you -- "for the 37 Java

8              API packages in question taken as a group,

9              has Oracle proven that Google has infringed

10             the overall structure, sequence and

11             organization of the code?"

12         Now, let's go back a little bit and understand where

13 this question is coming from.

14         And, Mr. Lee, if you could give us Instruction 17,

15 the line that begins "I instruct."

16             (Document displayed)

17         So you will hear from Judge Alsup and you will see

18 instructions that instruct you on this question you may have

19 sensed was lurking through the trial, which is:  What is

20 protectable in the Java software.  And you will be instructed

21 that the copyrights in question cover the Structure, Sequence

22 and Organization of the code.  And you'll hear that the

23 compilable code is the code less the English language comments.

24 It's the code in programmer's language that gets run through

25 the compiler and turns into the bits and bytes that actually

 1    run the computer.

 2             And you will also hear and see in the instructions --

 3             Mr. Lee, can I have Instruction 19, please, with

 4    "Google agrees."  Go down to the next "Google agrees."

 5             (Document displayed)

 6             That:

 7             "Google agrees that the Structure, Sequence

 8             and Organization of the 37 accused API

 9             packages in Android is substantially the same

10             as the Structure, Sequence and Organization

11             of the corresponding 37 API packages in

12             Java."

13             So we have the bookends here.  We have the

14    instruction that Structure, Sequence and Organization is that

15    stuff in the software that is at issue and is protectable by

16    copyright, and we have Google's agreement that the Structure,

17    Sequence and Organization was taken and is substantially

18    similar.

19             But you heard all that through the trial because this

20    is the big excuse that Google has to offer you.  They had to

21    explain first that they did take it and then try to get off the

22    hook.

23             So when we actually went through the evidence at

24    trial, you heard first Judge Alsup read an admission from

25    Google that the 37 accused packages have substantially the same

1  selection, arrangement and structure.  And then you heard

2  Google's expert say, "Not just substantially the same, but that

3  the Structure, Sequence and Organization of the API elements is

4  virtually identical across those 37 packages."

5          And, Mr. Lee, can I have the instruction on names,

6  which is Paragraph 20 of the instructions?

7          (Document displayed)

8          And the last sentence:

9          "While individual names are not protectable

10         on a stand-alone basis, names must

11         necessarily be used as part of the Structure,

12         Sequence and Organization and are to that

13         extent protectable by copyright."

14         Now, you may remember Google's opening statement in

15  which Google's counsel stood about here and said, "Names are

16  not protectable."  Here is the instruction.  An individual name

17  is not protectable, but the names as part of the Structure,

18  Sequence and Organization are protectable by copyright.

19         And you saw when you saw the various exhibits how the

20  names were the same and then you heard admissions on this point

21  in this case on this slide by Mr. Bornstein, who said the names

22  and the declarations are the same.  So Structure, Sequence and

23  Organization is the same.  The names are the same.

24         And then we had an even more detailed admission from

25  Dr. Astrachan, Google's expert who was asked:

1            "QUESTION:  Are there similarities between

2            the two?"

3        And he started off by saying no and then he had to

4   admit all the similarities:

5            "ANSWER:  The Package names, the Class names,

6            the Method names for the 37 packages are the

7            same."

8        And then he said:

9            "ANSWER:  Of course, the structure of the

10            names of the classes, packages and methods

11            needs to be the same."

12        Now, Google's argument is that this implementing code

13   is different, but what Judge Alsup will instruct you is that

14   the Structure, Sequence and Organization is protectable and

15   what Google is acknowledging is whether it's just the structure

16   on its own, or the structure with its names.  All of that is

17   protectable and all of that Google took.

18        And you actually saw source code in this trial that

19   showed what this means.  What does it mean when you compare the

20   code to the code for the Structure, Sequence and Organization

21   to be the same?  So, in this package called java.security you

22   can see the names are identical between Java and Android.  They

23   are in the exact same structural position in the code.  The

24   Structure, Sequence and Organization is quite visible.  If you

25   look at these declarations, these method signatures, these

CLOSING ARGUMENT / JACOBS

1  method names, they are identical because that's what Google

2  intended to do; was to copy the Application Programming

3  Interfaces and, hence, create an identical Structure, Sequence

4  and Organization.

5          And this copying was not trivial.  Google will try to

6  minimize the extent of it.  They will try to minimize it in

7  several ways.  In the trial you heard about 15 million lines of

8  code for all of Android.

9          Judge Alsup will instruct you that we've got to focus

10 very clearly on what we're comparing.  We're not comparing

11 against the 15 million lines.  You'll get an instruction that

12 says, along the lines of you don't escape infringement by

13 adding.  You look at what was taken and you look at what was

14 taken against the body of material, the work as a whole from

15 which that material was taken.

16         And so this copying was extensive; 400 classes, 4,500

17 methods, 7,000 declarations.  And it printed out what amounts

18 to 11,000 pages of Application Programming Interface

19 specifications.  11,000 pages representing the property that

20 was taken by Google.

21         Now, we saw a lot about Math.max, and in some ways it

22 was helpful.  I think we all learned a lot from Math.max, but

23 let's not got confused about Math.max.  It is not a

24 representative Application Programming Interface specification.

25 You may recall that it doesn't even show up on our Java

1    Application Programming Interface poster because it's down too

2    fine a detail to actually appear on the poster.

3              (Demonstrative displayed)

4              Now, what we have done with this version of the

5    poster that's before you -- so the poster is Trial Exhibit

6    1028.  What we have illustrated on this slide is the 37

7    packages and how they exactly overlap with the poster.  The

8    yellow starred packages are in the 37.  You'll see that some

9    aren't yellow starred.  And then on the right we created the

10   four -- we listed the four packages that aren't on the poster,

11   but are in the 37.

12             So you can get a sense of the extensiveness and the

13   importance of what Google took by looking at this poster and

14   how many of the packages that made it onto the poster years

15   ago, well before this litigation, have this star.

16             It's a very complex structure.  Blueprints don't do

17   it justice.  It's more like a very detailed wiring diagram or

18   plumbing outline because we're talking about all these

19   connection points, all these interrelationships.

20             And so you heard about java.io or java.nio and

21   java.util and you saw how complicated these packages are when

22   you drill down.  And, in particular, java.nio that Dr. Reinhold

23   spent two years with his colleagues working on, it has levels

24   under levels under levels.  .max is trivial.  Application

25   Programming Interfaces are complex, creative, artful.

```
 1              And then if we're going to hear arguments from Google

 2   about how this copying is not substantial, we asked

 3   Dr. Astrachan:

 4              "QUESTION:  These 7,000 lines that represent

 5              the declarations that are copied

 6              word-for-word, symbol-for-symbol, what

 7              happened if you took them out?"

 8              Well, if you took them out, Android would not work as

 9   it's designed.  He said:

10              "ANSWER:  They need to be there for Android

11              to work as it's been designed."

12              So this is not trivial.  This is very substantial

13   copying that Google engaged in, very substantial copying that

14   we're asking you to hold them liable for.

15              And so on the verdict form:

16              "As to the compilable code for the 37 API

17              packages in question taken as a group, has

18              Oracle proven that Google has infringed the

19              overall structure?"

20              It's essentially conceded, and it's important, and

21   it's substantial, and so we're going to ask you to vote and

22   decide on the verdict form "Yes."

23              So we're onto Google's excuses.  And the first excuse

24   is called fair use.  And there's is a question on the verdict

25   form, as you can see, that speaks to what fair use -- speaks to
```

1    the fair use question.

2          And you're going to get a very lengthy instruction on

3    what fair use is.  And I'm going to try to break it down a

4    little bit into its parts and walk you through the evidence

5    that applies to each of those parts.

6          Fair use is a concept in copyright law that's very

7    important.  Not everybody licenses their material for all sorts

8    of purposes.  And so the law allows people to make what's

9    called fair use, which is not the same as making uses that we

10   might think are fair, but a very -- very concrete concept, fair

11   use.

12         The law allows us to use other people's copyrighted

13   materials for fair use.  And the instruction that you'll see

14   begins by giving some examples of what fair use in copyright

15   law can be.

16         So, for example, if I'm writing a criticism of a film

17   and I think there was a particularly elegant turn phrase in the

18   film script, I might be able to write in my criticism, in my

19   film review that line and say, "Wow, that was great."  Because

20   it's a film review and a film review, it's a film review.  It

21   doesn't take away from the market for the film.  It might

22   criticize the film, but it doesn't take away from the film

23   maker's right to show the movie, put it in theaters, put it on

24   TV, et cetera.

25         The same is true for comment, news reporting,

 1   teaching and scholarship.  There is room in the law for us to

 2   use these materials as we've used them in this Court.  We have

 3   reproduced things on boards to teach the jury about the

 4   Application Programming Interfaces in question.  And, of

 5   course, that's fair use.  That doesn't harm Oracle's business

 6   to do that, to make that kind of use of it.  And similarly for

 7   research.

 8          So these are the examples that the statute gives to

 9   try and give us a sense of what the drafters of the Copyright

10   Act meant when they said fair use is permissible.

11          Now, of course, none of these are what Google did.

12   Google did not engage in criticism of Java.  That's not the

13   issue here.  It didn't engage in comment, news reporting,

14   teaching, scholarship or research.  What Google did is take the

15   APIs, the Structure, Sequence and Organization from our code

16   and put it in their code.  None of the examples fit what Google

17   did.  And of equal importance, what Google did doesn't even fit

18   within the spirit of those examples.

19          Now, the instruction that you'll see on fair use

20   breaks down -- after it goes through the examples, it says here

21   are four facts for you to apply.  And the instruction will give

22   you some guidance when you're applying the factor on whether

23   it's in Oracle's favor or Google's favor.

24          And so the first instruction is -- the first factor

25   is the:  "Purpose and character of the use."  What kind of use

1  did Google make of the Structure, Sequence and Organization of

2  Java?  Is it of a commercial nature, or is it for non-profit

3  educational purposes?  Well, you can see from the examples

4  which way this factor cuts because many of the examples were

5  non-profit educational purpose kind of examples.  So had Google

6  actually done Android for charitable purposes because it was

7  good for humanity, then that might favor Google on the fair use

8  analysis.

9          But, of course, that isn't why Google made Android.

10  Google made Android.  Google used the Java APIs to make money.

11  That's fine in and of itself, but it doesn't amount to an

12  excuse for the copying.  It was a commercial purpose and

13  commercial use cuts against Google on fair use, cuts in favor

14  of Oracle on denying Google this excuse, denying Google this

15  out.

16          And, of course, you heard this from several witnesses

17  on the Google side.  From Eric Schmidt.  He said:

18          "The primary reason to have something like

19          Android is that people will do more searches,

20          and then we'll get more money as a result."

21          Well, again, this case is about business, so we're

22  not criticizing Google for trying to make money.  But they

23  don't get an out from infringement when their purpose was

24  commercial.  They don't get off the hook.

25          And then, of course, it's not a little bit of money

CLOSING ARGUMENT / JACOBS

1    that Android is making.  It's not money on the side.  Public

2    benefit is the primary reason for Android.  That's not the

3    situation.  Because you heard from other witnesses -- again,

4    Eric Schmidt, or a witness you heard a very brief deposition

5    clip, Mr. Agarwal -- Android is hugely profitable.

6            So on the first factor, so far we have talked about

7    commercial non-profit.  It's not -- it's not non-profit.  It's

8    commercial and, therefore, the factor cuts against Google.

9            Now, there is another element in the factor that's a

10   little tricky.  It's a little hard to penetrate.  The question

11   is:  Whether the work is transformative, meaning whether

12   Google's use added something new with a different purpose or

13   different character, altering the copied work with new

14   expression, meaning or message.

15           I expect you will hear a lot about transformative

16   from Google's counsel in his closing because that word has a

17   lot of potential meanings.  We have to go back to those

18   examples to understand what transformative is really all about.

19           If you're writing a criticism of a film, it's

20   transformative.  You've taken a film.  You've taken a little

21   bit of the film.  You've put it in a review that's going in a

22   newspaper.  That's transformative.

23           What Google did is not transformative.  What Google

24   did was just take the 37 APIs that it wanted, took them out of

25   the Java code and put them in the Android code.  The Java

 1   Platform was copied for the Android Platform.  The Java

 2   software was copied into the Android software.  It's a direct

 3   taking from software into software, platform into platform, API

 4   into API for exactly the business purpose that we can't allow

 5   transformative to excuse.

 6           Why did they take the APIs?  They took the APIs

 7   because Java developers, trained by Sun, educated by the Java

 8   Java Community, part of the Java Community process, those

 9   developers understood and knew those APIs and Google wanted to

10   leverage those APIs.  You heard that from witness after

11   witness.  That can't be transformative.  That's just copying,

12   copying for a business purpose.

13           So when you think about transformative, think really

14   hard about what that language is in the instruction and what

15   Google did.

16           Now, there was another little piece of

17   transformative.  You heard Google say over and over again in

18   argument, "Why is what we did so magical in Android?"  Google

19   said, "We were the first smart phone platform.  We took Android

20   and we put it in smart phones."  My Blackberry is a Java

21   Blackberry and it's a smart phone.  And witness after witness

22   told you that Java was powering the Nokia or other Blackberry

23   devices.

24           And, of course, Danger, the company that Andy Rubin

25   started this mobile business was, was a smart phone platform

 1   licensed to Java APIs.  So on the record in this trial what's

 2   the first smart phone platform?  It's a Java license

 3   smart phone platform created by Danger with permission, with

 4   agreement, with compatibility, with compensation then to Sun.

 5              So is Android kind of cool and is it the hot new

 6   thing?  Of course it is.  But is it transformative within the

 7   meaning of the law?  All they did was copy Java APIs, which had

 8   been used in smart phones, into Android APIs used in smart

 9   phones.  That was all Factor 1 in the four factors of the fair

10   use analysis.

11              Let's turn to Factor 2.  Factor 2 is:  The nature of

12   the copyrighted work, including whether the work is creative,

13   which cuts against Google, cuts against fair use; functional,

14   which supports fair use; or factual, which also supports fair

15   use.

16              You can understand, especially the factual part.  If

17   I'm -- I will fantasize.  If I'm John Stewart and I'm putting

18   together the *Daily Show* and I want to do a little news clip of

19   something factual that happened during the day, that might well

20   be fair use.  Especially because I'm creating comedy out of it

21   and so I am transforming it from what it was into something

22   different.

23              Creative, on the other hand, cuts against fair use

24   because if you take a lot of a poem, even only a 10 line poem

25   and you publish it, you've taken the whole poem and it's a very

CLOSING ARGUMENT / JACOBS

1    creative poem, even though it's only 10 lines.

2         Now, this is a little -- this one is a little tricky

3    to apply here because, obviously, we're talking about computer

4    programs and computer programs in some sense are functional.

5    But we're talking about the Structure, Sequence and

6    Organization of the Application Programming Interfaces.  And

7    you heard witness after witness from both companies talk about

8    how creative API design is.  How much freedom there is for the

9    architects of Application Program Interfaces to create

10   something new and different, to create something expressive, to

11   create something that is not just pedestrian and not just

12   functional.

13        And so you heard from Larry Ellison about how it's

14   the most experienced and talented software engineers.  You

15   heard from Mark Reinhold how it took a keep of engineers just

16   to develop java.nio, it took them two years.  You heard from

17   Eric Screven that it's a very creative process, especially

18   compared to other programming tasks.  It's the most creative.

19   You heard from Dr. Reinhold again about how, except for

20   something trivial like Math.max, there are an infinite number

21   of choices.  You can't even count them.

22        And then even from Google's expert you heard that

23   it's hard to find people who are really good at anything hard,

24   and APIs are hard, and it's hard in the way that being an

25   artist or a football player or a concert violinist is hard.

CLOSING ARGUMENT / JACOBS

1           And then, of course, there was Josh Bloch, who I

2    think we all found somewhat entertaining as a witness, but who

3    was very clear; that API design is a highly creative activity,

4    and it's even an aesthetic matter.  It's magical.  It's like

5    painting.

6           And so Google's own witnesses reinforced that on this

7    creative to functional to factual scale, we're over on the

8    creative side.  Maybe slightly in between, because computer

9    programs have a functional aspect to them.  But the Structure,

10   Sequence and Organization is a highly creative activity.

11          On fair use Factor 3 -- so we've got two more to

12   go -- the amount and substantiality of the portion used in

13   relation to the copyrighted work as a whole.  The more that's

14   taken, the less it's likely to be fair use.

15          Go back to my John Stewart example.  If he takes just

16   take a five second clip, it's more likely to be fair use than

17   if he takes a full 45 seconds of a news broadcast.

18          What did Google take here?  I mentioned earlier that

19   you will get an instruction on the work -- on this question

20   lurking in this factor of what the work as a whole is.  What

21   are we comparing when we look at how much was taken out of Java

22   to decide this fair use factor?  And what you'll hear in the

23   instruction is that we are to compare the 37 packages that were

24   taken with the 166 API packages that are in Java SE Version 5,

25   which is the specific version at issue.  And so 37 packages out

CLOSING ARGUMENT / JACOBS

1   of 166.

2          I think you can see already, we're talking about a

3   lot.  If we had five or six chapter book, you're talking about

4   a whole chapter.  But we know that what was taken is highly,

5   highly important and not trivial and not small; very

6   substantial and very important qualitatively.

7          Because, of course, these weren't randomly selected

8   packages.  We heard that there is particular importance to

9   these packages because they are the ones that are especially

10  well known to Java developers.  These are the ones that are

11  popular.  These are the songs that everybody recognizes.

12         And so Google's argument is going to be, Well, that

13  excuses our copying because what we did is we wanted to get the

14  APIs that were in people's heads so they wouldn't have to be

15  retrained.  That may have been their commercial objective, but

16  from the fair use standard that's precisely why what they did

17  was not fair use.  They took the popular ones.  They took the

18  valuable ones.  They took the crown jewels of the packages in

19  Java Standard Edition, the 37 that they thought were the most

20  valuable.

21         And you heard this from both experts.  So

22  Dr. Mitchell told you that the 37 packages are highly useful.

23  Dr. Astrachan said this was how Android was designed, was

24  around these 37 packages.  So if you ripped out the code, the

25  declarations, Android would not work as designed.

CLOSING ARGUMENT / JACOBS

1          And then the actual developers explained how they

2   chose the 37 packages.  So Dan Bornstein said:

3          **"QUESTION:**  Did your determination of which

4          packages would be implemented in the core

5          library have anything to do with what you

6          thought were the expectations of Java

7          language programmers?

8          **"ANSWER:**  Yes, absolutely."

9          And there are certain of these APIs, he said, which

10  are just sort of fundamentally part of the system.  The core of

11  the core, in essence, is what he was saying.  And his job, he

12  said, was to come up with a nice consistent set of APIs.

13          And then Bob Lee said.

14          "This is the good stuff from Java that the

15          Android developers took."

16          **THE COURT:**  Mr. Jacobs, you're coming up on about 40

17  minutes so far.

18          **MR. JACOBS:**  Factor 4 is:  The effect of the use upon

19  the potential market for or value of the copyrighted work.  And

20  if you impair the value of the copyrighted work, that cuts

21  against fair use.

22          So the question to ask yourself on Factor 4 is:  What

23  is Android's use due to Java?  And this in some ways was the

24  heart of the trial.  Because you heard lots of evidence about

25  how Java is licensed to many, many companies who follow the

 1  rules, participate in the Java Community process, contribute to

 2  Java's development, pay license fees where appropriate.

 3         And you heard about a case from Oracle's witnesses

 4  where Android is now invading into Java's old space, such as

 5  the Kindle.  And you heard that the Kindle Fire is now an

 6  Android device, even though the Kindle Kindle was a Java

 7  device.

 8         So we have head-to-head competition where Android is

 9  taking over customers, licensees, from Java.  And the harm is

10  very concrete.  We have a Java licensing businesses.  It has

11  its structure.  You've heard a lot about commercial licenses,

12  and spec licenses and a GPL.  And if Android can just take the

13  APIs, if Google can just take the APIs and be forgiven under

14  fair use, that licensing falls apart.  Why would I sign a

15  license if I can take for free, and take without any kind of

16  restriction or control to ensure compatibility?

17         And that, of course, is the deep threat that Android

18  represents to the whole Java Community, because you now know a

19  lot about "write once, run anywhere" and how important it is to

20  keep Java consistent.  So when Java ME is on this phone and

21  another company's Java ME is on that phone, the applications

22  will work.  And the same with Java SE to SE or Java Card to

23  Java Card.

24         That is the consistency that Sun, now Oracle, have

25  struggled with.  It's a huge challenge to keep everybody moving

1  in the same direction.  But there is a process and a set of

2  rules and that's what Google is breaking.

3        You heard some testimony from Google witnesses that

4  this was all about compatibility.  Listen to what they said

5  before the lawsuit.  Here is their frequently asked questions

6  about compatibility when Android was launched.

7        "**QUESTION:**  Does Android support existing

8        Java apps?

9        "**ANSWER:**  No.

10        "**QUESTION:**  Is Android Java compatible?

11        "**ANSWER:**  No."

12        And so Android has fragmented the developer

13  community.  And what was a world before in which everybody was

14  speaking the standard version of Java, we now have a

15  non-standard version, Android Java.  Keeping the developers

16  together and knowing the same language is part of the struggle

17  of maintaining this Java Community.  Android is a direct threat

18  because of its fragmentation.

19        Now, what's so interesting about this particular form

20  of harm to Java and the particular threat that Android poses is

21  that this, too, was known from top to bottom at Google.

22        So on October 11th in Trial Exhibit 7 Andy Rubin said

23  to Larry Page, "In the original version of Android let's avoid

24  fragmentation.  We don't want to create fragmentation, so we're

25  going to pay Sun for the license and for the Technology

1  Compatibility Kit."

2      On October 26, Trial Exhibit 125, Tim Lindholm tells

3  Andy Rubin, "Let's make sure we're showing strong efforts at

4  avoiding fragmentation so we don't have trouble with Sun."

5      All the way through, November 14, 2007, Rubin on

6  fragmentation responding to a press article.  "This is touchy,

7  because we're not compatible."

8      And then there is this whole claim by Google that

9  they have advanced Android into the kind of advanced

10 smart phone platforms and that Sun and Oracle never made a full

11 smart phone platform.  And you heard some very concrete and

12 direct testimony on why that is so.

13     "Android has foreclosed the market, has blocked the

14 opportunity for Java to move into smart phones."  And you heard

15 that from Ed Screven.

16     And then in very simple terms from Safra Catz:

17         "It's really hard to compete with free.

18         Android took the Java IP.  Google takes the

19         Java IP, puts it into Android and gives it

20         away for free.  How do you compete with free

21         in the smart phone world?"

22     And so this, this harm to Java is on all levels.

23 It's on the licensing model, it's on fragmentation, and it's on

24 opportunities for the future.

25         So this cuts against fair use under Factor 4.  And so

 1  if you go through each of the factors and look at them against

 2  the evidence at this trial, we think you'll conclude that

 3  Google's use is not fair use.  It's not any of those

 4  categories, teaching, scholarship, et cetera.  It's a

 5  commercial use.  It's not transformative.  It's just software

 6  to software.  These are creative works. What they took is

 7  really important and valuable, as well as large in quantity.

 8  And then there's a direct harm to Java from what Google did.

 9            And so we ask that when you get to the fair use

10  question, "Has Google proven ..." -- because you'll be

11  instructed on this issue, Google bears the burden of proof;

12  they have to persuade you that what they did was fair -- we ask

13  that you check the "No" box.

14            That brings us to question 2 on the verdict form.

15  And that is the question of the documentation.

16            And you heard from the developer of the documentation

17  what he did.  He acknowledged that the Java developers were

18  looking -- sorry, the Android developers were looking at the

19  Java documentation when they were writing the Android manuals,

20  the Android documentation.

21            And so we asked him, well, how did you prevent them

22  from copying?  He said, well, I told them to paraphrase.

23            Well, what is paraphrasing?  Here we know what

24  paraphrasing is because we gave you examples of paraphrasing.

25  Paraphrasing is you substitute in one word here and there to

CLOSING ARGUMENT / JACOBS

1    try and make it look a little bit different.

2           What we've done with this text is highlight in yellow

3    the words that are identical, and in -- and in a red box

4    highlighted the words in the sentences that are different.  And

5    you can see that word for word it's very, very similar.

6           Now, the instruction you are going to get on

7    documentation is going to be different from the compilable

8    code.

9           Compilable code, structure, sequence and organization

10   is protectable.  They agree they copied the structure,

11   sequence, and organization.  It's kind of a lay down.

12          On the documentation you are going to be told that

13   the standard is virtual identity.  So you're going to have to

14   think about this example, and you're going to have to decide

15   for yourself, does this look virtually identical?

16          We submit that when you look at that example or you

17   look at this example from class CipherInputStream, you will

18   conclude that it is virtually identical.

19          And then you're going to get the fair use question,

20   again, on the documentation.  And we think you will go through

21   the same factors for the same analysis and the same reasoning.

22   But there was one little bit of testimony -- two little bits of

23   testimony I want to highlight for you.

24          So, first of all, were we just talking about these

25   examples in this trial, Google is going to argue all they

1  showed you was one or two examples.

2          And, in fact, what Mr. Lee acknowledged was that when

3  we showed those examples to him in the trial, they were

4  representative.  He said he would expect to see the same level

5  of similarity across the documentation for the 37 packages.

6          And it's an immense quantity here.  We're talking

7  about thousands and thousands of pages.

8          But then he said something very interesting.  He

9  said:  You know, actually, I wasn't even a big fan of including

10 these.  Referring to the Java APIs.  I would have preferred we

11 just point people to Sun's site for this specific

12 documentation, because you shouldn't really be rewriting a

13 contract.  Recall that their analogy for the APIs is it's like

14 a contract.  And in doing so, they are going to be

15 substantially similar.

16          So he even felt uncomfortable creating the Android

17 documentation, and thought that the way to have handled this

18 was to send people to the Java documentation, the Sun

19 documentation.

20          So in thinking about whether did Google really do

21 anything to the Java documentation, copying it into Android,

22 that is in some way beneficial?  We submit, no, because even

23 Mr. Lee said you could go to the Sun site.

24          And so has Google proven that its use of Java

25 documentation constituted fair use?  No.

 1          This brings us to the copied code files.  And, again,

 2   Google has conceded that the use of these files -- that they

 3   used these files and that they copied them.

 4          And it's not exactly clear what the defense is going

 5   to be.  This is the list of files in 1072.  They fall into a

 6   couple of different categories.  You may recall the most

 7   interesting category was this decompilation.  Why was it

 8   interesting?  Because, as you heard in the trial, you don't

 9   decompile by accident.

10          Josh Bloch, you know, he wasn't sure how rangeCheck

11   got in there.  But nobody came before you and told you, oh, I

12   decompiled by accident.

13          You don't decompile by accident.  It's an overt,

14   deliberate act for copying.

15          And there are eight files that are copied as a whole.

16   And you'll hear from Judge Alsup that you compare here the

17   amount that was taken is against the file.  The file was taken

18   as a whole here.  And, therefore, the copying is infringement.

19          There were the examples of comments.  When you look

20   at the instruction, you'll see that what you need to decide

21   here is whether if you looked at the copying you would

22   recognize that it was copied.

23          And if you look at this slide, which shows the copied

24   comments, you can see it's not so fragmentary and isolated that

25   you don't realize what's going on.  There's plain copying of

1    comments.

2              And while in this case it is actually small in

3    relationship to the whole file size, the copying still jumps

4    out.

5              Then there was rangeCheck, which is only nine lines

6    of code.  And you'll hear that a lot.

7              But you also heard testimony about how important that

8    rangeCheck is, and how, from Dr. Mitchell, he concluded that

9    rangeCheck is called 2600 times just in powering on the device

10   or starting the emulator.  So it's important nine lines of

11   code.

12             So the question is a little -- you have to parse it a

13   little carefully here.

14             Has Oracle proven that Google's conceded use of the

15   following was infringing?  The only issue being whether such

16   use was de minimus.  Meaning really, really tiny so you don't

17   recognize it.

18             And the answer in all cases should be "Yes" because

19   even laypeople like us, when we see the copying we can

20   recognize the copying.  It is not so isolated and fragmentary.

21             And, extraordinarily, these files are still on the

22   public website.  These copied files, these decompiled files.

23             And that's what Dan Bornstein told you in his

24   testimony.  It took several questions, including, finally, a

25   question from the Court.  Yes, these files are still available

1    to the public.

2             So there's some other -- there's some other issues in

3    the trial that are kind of off to the side.  You won't see them

4    directly reflected in the instructions, but I want to go

5    through them briefly, just to summarize the trial testimony.

6             There was a lot of back and forth on these issues,

7    and so let's just take a moment.  Are the APIs part of the

8    language?  The language Oracle has acknowledged.  The language

9    is free for everybody to use, so can use the APIs freely.

10            Experts agreed that except for a small number of

11   classes, the APIs are not required by the language.  And you

12   heard this from Dr. Astrachan, who said it is not a requirement

13   of the Java programming language to take the 37 packages.

14            You heard a lot about the brand issue.  What is

15   the -- Jonathan Schwartz testified, well, you only need a

16   license if you're using the brand.

17            And then I confronted him with the specification

18   license.  And, you may recall, I was shocked when he said, no,

19   I don't know the license.  And he said, oh, I wasn't giving you

20   legal advice.  I wasn't talking about legal issues; I was just

21   talking about the business strategy.  After spending all this

22   time in his direct examination saying, Under our licensing

23   scheme, you only need to take a license if you use the Java

24   brand.

25            And then he ran away from it.  Well, he had to

1   because the specification license, which you heard explained

2   line-by-line detail, by Thomas Kurian, applies even if you

3   don't use the brand, even if you don't call what you did Java.

4            And, of course, Google knew that the APIs were

5   copyrighted and required a license.  This is Trial Exhibit 18.

6            If you have any doubt on the -- how the trademark

7   relates to the APIs and what's copyrighted, take a look at

8   Trial Exhibit 18.  Andy Rubin explains exactly what we've been

9   explaining to you in this trial.

10            "The APIs are copyrighted and Sun gets to say

11            who they license to."

12            The Google developers tried to claim that Android was

13   developed in a clean room.  But you know the clean room is

14   dirty.  There's copied code.  There's decompiled code.

15            You heard that the contractors that they used at

16   Noser were super shady.

17            And then you heard a clean admission that Josh Bloch

18   had prior Java knowledge, but was put on the Android team; and,

19   of course, he copied rangeCheck.

20            There's a lot of back and forth about whether this

21   negotiations between Sun and Google were really about a

22   partnership instead of a license.

23            It was a sideshow because, of course, even if there

24   had been a partnership, there would have been a license.  And

25   if there wasn't a partnership, there would have been a license.

```
 1              So partnership license doesn't really matter.  You
 2   can look at Trial Exhibit 12, from Andy Rubin to Tim Lindholm.
 3   Here are our choices:  We'll partner or we'll take a license.
 4              There was no partnership.  They didn't take a
 5   license.  That's why we're here.
 6              Now, the judge has asked you for some help.  The
 7   question on the verdict form you will get is slightly different
 8   from the poster, but the substance is the same.
 9              He's asked you for some help on the whole issue
10   around Jonathan Schwartz's blog, and whether what Oracle did
11   gives Google an excuse because Sun said certain things, Oracle
12   said certain things.
13              And the question is divided into two parts.  It's,
14   first, whether Google proved that Sun or Oracle did something
15   that Sun or Oracle should have known would lead Google to think
16   that Android was okay.
17              And then the second part is whether Google proved
18   that it reasonably relied on what -- on what -- on Sun or
19   Oracle's conduct.
20              So let's break that down a little bit and go through
21   the evidence.
22              Did Sun do anything to lead Google to think Android
23   would be off the hook?
24              And we start with the very basics.  The copyright
25   notice is on the documentation.  And the license agreement is a
```

 1  click-through.  So copyright, now Oracle or its affiliates all

 2  rights reserved, use is subject to license terms.

 3          And the developers of Android acknowledged that they

 4  consulted the Java specifications on Sun's website and they saw

 5  the copyright notice.  And, of course, we have Andy Rubin

 6  acknowledging that the APIs are copyrighted.

 7          And then there was this whole Apache Harmony fight.

 8  Now, remember that Android takes some of the core library code

 9  from Apache Harmony.

10          So their pitch to you is, because Sun didn't sue

11  Apache Harmony, Sun engaged in conduct that would lead Google

12  to believe that it didn't need a license to the structure,

13  sequence and organization of the code.

14          But you heard witness after witness, saw exhibit

15  after exhibit on this issue, too.  This was a huge dispute.

16          There was nothing quiet about the fact that Sun and

17  Apache were in a big disagreement over Harmony.  And, in fact,

18  on April 10th, the Apache Software Foundation writes a letter

19  to Sun and says, We don't like your approach here.  We think

20  you should give us this all for free without any restrictions.

21          And, of course, there was acknowledgment by witness

22  after witness that there never was a license granted to Apache

23  for Apache Harmony.

24          Which brings us to the blog post, which, you'll

25  recall, there was a lot of testimony about exactly when the

1   blog post comes, what Jonathan Schwartz knew when he made his

2   "rockets on Java" exclamation.

3         But it's very simple.  These are big companies,

4   sophisticated companies that engage in licensing all the time.

5   Their business is intellectual property and software.

6         A blog post is not a license.  If Google thought the

7   blog post was permission, why wouldn't they have gone to Sun

8   and nailed it down and said, you seem to be very happy, after

9   all, with Android.  Let's document it in a written agreement

10  that we sign.

11        The blog post you heard from Mr. McNealy, Jonathan

12  Schwartz's boss, was not an official statement of Son's

13  position.  And Google knows better than to claim that a blog

14  post is official permission.

15        Now, besides the public statement, there was a lot of

16  back and forth between Sun and Google throughout this period.

17        And we know that the private communications were much

18  less positive about Android than what was said publicly.  And

19  we know that, in part, because of what Jonathan Schwartz

20  admitted about how he felt about the situation.

21        He felt he didn't have a lot of leverage.  He felt

22  that he didn't have a lot of strength in the situation.  And so

23  he said, We grit our teeth and we made the best of an

24  uncomfortable situation.

25        And you know that Sun was in a weakened position

CLOSING ARGUMENT / JACOBS

1   around this time, and you know that there were questions about

2   its viability and the viability of Java.  And so Jonathan

3   Schwartz was trying to make the best of a bad situation.

4          And one week after the blog post, an executive vice

5   president of Sun publishes a statement that also circulates

6   within Google and says, "We're really interested in working

7   with Google to make sure we don't end up in a fractured

8   environment."  This is exhibit 1048.

9          And so while we have the blog post before the

10  announcement saying "rockets on Java," then the announcement

11  and the SDK is actually released and Sun expresses official

12  concern.  Official concern.

13         And then there's exhibit after exhibit of back and

14  forth between the companies in 2008, 2009, 2010.  This is 2070.

15         There was Mr. Cizek's testimony about how he went to

16  Google in 2009 and said, You guys need to be licensed.

17         There was Jonathan's Schwartz warning Larry Ellison

18  on the eve -- on the wake of the transaction closing, "I need

19  to talk to you about our battles with Google Android."  So

20  publicly he was trying to make the best of a bad situation.

21         Privately, the situation remained unresolved, and he

22  was warning Oracle, You're going to have a big issue on your

23  hands.

24         And then Larry Page said, we've had discussions

25  throughout.  The CEO of Google, the senior -- the founder with

 1  high percentage of the company stock, we continue to have

 2  discussions to this day.  There's never been a breakoff.

 3          So did Sun, now Oracle, ever say in a way that

 4  Sun/Oracle should have expected Google to rely on, You guys are

 5  off the hook?  Of course not.  Nonsense.

 6          That brings us to B.  What do we know about what

 7  Google was thinking?  There is no single document, not a single

 8  document, none, none, in which Google says to itself:  Wow,

 9  that was great what Jonathan Schwartz said.  I guess we don't

10  have anything to worry about.

11          No e-mail.  No -- no text messaging back and forth.

12  Nothing like that.  And only the weakest of testimony in this

13  courtroom about Google relying on what Jonathan Schwartz said.

14          And, of course, it didn't really matter because

15  Google had decided early on, Trial Exhibit 7, that, If Sun

16  didn't want to work with us, Google was going to do Java anyway

17  and defend our decision, perhaps making enemies along the way.

18          That was the attitude at Google.  It didn't matter

19  what Sun or Oracle said.  Google was bent on its Android

20  strategy and incorporating Java technology.

21          Dan Bornstein, who is the guy, again, who picked the

22  37 packages, said he made the selection.  He said that decision

23  for Android before the blog post.

24          So there was no reliance during the development

25  process on anything Jonathan Schwartz or anybody else said.

```
 1            And then you have these internal discussions at
 2    Google, in which they're worried about what's going to happen.
 3    This is Trial Exhibit 180, in which Andy Rubin says to one of
 4    his colleagues, This is touchy, even after the blog post.
 5            Recall Trial Exhibit 29 -- again, after the blog
 6    post -- in which Google says, Don't demonstrate Android to any
 7    Sun employees or lawyers.
 8            There's Google's understanding that Apache Harmony
 9    was still in dispute.  This is Trial Exhibit 405, in which Bob
10    Lee says, Apache Harmony, there are restrictions.  We can't use
11    it on mobile devices, even though that's water under the bridge
12    at this point.
13            Google's decisions were made by Google without regard
14    to anything Sun or Oracle said.
15            Trial Exhibit 326, they're worried about Java
16    lawsuits.  If we buy Java, the lawsuits will go away.
17            Eric Schmidt acknowledged in testimony that he was
18    worried that Google was going to be sued, and so had thought
19    about buying all the rights to Java.
20            Trial Exhibit 1029.  We don't want to stir anything
21    up for Android.  I suspect we should step away and only respond
22    further if Sun chases after us.
23            So they're hoping that they can get away with it.
24    And this is the chronology after the SDK announcement, when it
25    becomes clear what exactly Android is about, e-mail after
```

```
 1  e-mail on this timeline, showing that Google did not rely on

 2  the blog post.

 3          And then Oracle steps into the picture.  There's a

 4  new sheriff in town.  Strong company.  Willing and able to

 5  stand up to Google and defend the intellectual property rights

 6  at issue in ways that Jonathan Schwartz maybe just wasn't

 7  capable of doing.

 8          And so Oracle goes to Google and says, You guys need

 9  to get licensed.  And did Google ever said -- Google ever say,

10  oh, we relied on Jonathan Schwartz?  He said we were okay.

11          No.

12          Both negotiators, Safra Catz and Hasan Rizvi, said in

13  all their discussions with Google, Goolge never said, oh, we

14  thought we were off the hook; Jonathan told us we were fine.

15          It was never said.

16          And you will recall an instruction you just heard

17  from Judge Alsup on this.  If something was not done -- if

18  there's no evidence that something was done, that is evidence

19  it was not done.

20          There is no evidence that Google ever said to Sun or

21  Oracle, We relied on Jonathan Schwartz.

22          THE COURT:  Mr. Jacobs, you're past the 60 minutes,

23  at this point.

24          MR. JACOBS:  Yes.  We have 90; right, Your Honor?

25          THE COURT:  You do, yes.
```

1          **MR. JACOBS:**  And so what that brings us to is one of

2   the e-mails we started this trial with.

3          August 6, 2010.  Tim Lindholm writes to Andy Rubin:

4          "What we've been actually asked to do by

5          Larry and Sergey is to investigate what

6          technical alternatives exist to Java for

7          Android and Chrome.  We've been over a bunch

8          of these, and think they all suck.  We

9          conclude that we need to negotiate a license

10         for Java under the terms we need."

11         One week before the lawsuit was filed.  Did

12  Mr. Lindholm say, we think we're off the hook here, anyway,

13  because of what the blog post said?  Of course not.  Google's a

14  big company.  They know business isn't done by blog posts.

15         And, instead, what Mr. Lindholm told Andy Rubin was,

16  We need to negotiate a license.

17         And you actually heard from Eric Schmidt, Google's

18  chairman and CEO, about this e-mail.

19         **"QUESTION:**  Were you aware in or about August

20         of 2010 that Larry and Sergey had asked

21         Mr. Lindholm to do this?

22         **"ANSWER:**  I was aware at the time that we

23         were thinking about what to do."

24         So here we are, 2012.  Google still doesn't have a

25  license.  They're using the Java intellectual property.

1   They're using it without permission.  They're using it for a

2   business purpose.  Not for charity or education or research.

3           They took the Java intellectual property, the 37

4   packages, and they put it in Android because it suited them to

5   get to market faster, to capture the developer community, to

6   leverage off of Sun, now Oracle's, investment in Java.

7           And this system of ours calls upon us to ask you for

8   help in resolving this matter.  It calls upon us to ask you to

9   tick various boxes on this verdict form.

10          And on this question, 4.A. and 4.B., we ask that you

11  tick "No."  The blog post is not a license.

12          And when it comes to infringement, we ask that you

13  tick "Yes," in order to hold Google accountable for its use of

14  this Java intellectual property in Android without permission.

15          Give it to you.

16      **THE COURT:**  Thank you, Mr. Jacobs.

17          We will -- I think it's best to -- not to interrupt

18  the next closing, so it's best to take our 15-minute break at

19  this time.

20          Now, you've heard part of the closings.  You may not

21  talk about the closings.  You may not talk about the case or

22  the evidence.  Very soon, it's going to be your duty to do

23  that, but not yet, please.

24          So we'll see you back here in 15 minutes.

25      **THE CLERK:**  All rise.

PROCEEDINGS

```
 1                  (Jury out at 9:14 a.m.)

 2            THE COURT:  All right.  Please be seated.  Any issues

 3   for the Court?

 4            MR. VAN NEST:  No, Your Honor.

 5            THE COURT:  All right.  Great.  So you are free to

 6   set up the courtroom any way you want.  And we will go -- push

 7   all the way through your entire 90 minutes, and take the next

 8   break.

 9            MR. VAN NEST:  Perfect.  Thank you, Your Honor.

10            THE COURT:  Thank you.

11                  (Recess taken from 9:15 to 9:30 a.m.)

12            THE COURT:  Are we ready?

13            MR. VAN NEST:  We're ready, Your Honor.

14            THE COURT:  Are there any issues before we resume?

15            MR. VAN NEST:  I don't believe so.

16            THE COURT:  Just so the public will know -- it's

17   pretty full out there -- the court security officers will not

18   let anyone in once we start with the closings.  I just don't

19   want there to be any distraction.

20            So is there anyone out there waiting to get in?

21            COUR SECURITY OFFICER:  No, Your Honor.

22            THE COURT:  Once we start, they'll just have to wait

23   90 minutes, I guess.

24            And if anybody needs to leave, now is the time to do

25   it.  I can't say never.  If you have to get up and leave in the
```

```
 1  middle of the closing, you can; but, it is a distraction when

 2  that occurs.  And I want the lawyers to have the benefit of

 3  every second of the attention of the jury.

 4          All right.  So let's bring the jury in.

 5          (Jury enters at 9:32 a.m.)

 6          THE COURT:  Please be seated.

 7          Someone is coughing over there.  Would you like a

 8  cough drop?

 9          UNIDENTIFIED SPEAKER:  I have one.  Thank you.

10          THE COURT:  You have one.

11          Please, no distractions.

12          Are you all ready over there?  Pay full attention

13  now.

14          At this time, on behalf of Google, Inc., Mr. Van Nest

15  will give the closing summation.

16          The floor is yours.

17                      CLOSING ARGUMENT

18          MR. VAN NEST:  Thank you very much, Your Honor.

19          Good morning, everyone.

20          JURORS:  (Responding simultaneously) Good morning.

21          MR. VAN NEST:  Welcome back from the weekend.

22          And I want to say it's been a great privilege for me

23  to represent Google during our Phase One trial.  And especially

24  with a group that's being paying as close attention as you

25  have.  And we do really appreciate that.
```

1          And that's a good thing because the evidence that

2    you've seen and heard in the courtroom will only support one

3    verdict.  And that's a verdict in favor of Google.

4          Now, last Thursday the chief executive officer of

5    Sun -- remember, Sun is the plaintiff in this case -- he came

6    into the courtroom and told you that he was running the company

7    in 07, '08, '09, 2010, the whole time that we're concerned

8    about in this lawsuit.  And he testified that he didn't see

9    anything wrong with what Google was doing in Android.

10         Now, Mr. Schwartz, he obviously knew that Google was

11   using the Java Language in Android.  And he knew that Google

12   was using the 37 Java APIs that we've been spending so much

13   time on.  He knew that.

14         He knew Google didn't have a license from Sun.  He

15   knew Google hadn't passed any of these so-called compatibility

16   tests or anything of the like.  And yet back then, at the time,

17   he chose to put Sun's support behind Android and he went

18   public.  He said it on a public website, sponsored by Sun.

19         And then he came in here and testified under oath

20   that we didn't have grounds to sue.  That's what you heard

21   Thursday, from the chief executive officer of Sun.

22         Now, the evidence that you've seen and heard, in all

23   of it, backs up the fact that Mr. Schwartz was exactly right.

24   There is no copyright infringement here, and Oracle didn't

25   prove a thing.

1          Android was an independent implementation, in which

2    Google engineers using their own ingenuity and open source

3    products like Apache Harmony, built Android from scratch.

4          And your job is going to be to compare the structure,

5    selection and organization of those 37 API packages to a much

6    bigger thing, to the entirety of the Java SE 5.0 platform.  A

7    comparison that they didn't even talk about in 65 minutes that

8    Mr. Jacobs was up here before you.

9          Android is custom-built for smart phone.  Java SE 5.0

10   is built for desktops.  It's a totally different thing.

11         And Android took those 37 APIs and transformed them

12   into the only working version of a complete software stack, to

13   provide all the functionality that we now enjoy.

14         So that's point one.  There is no infringement.

15   There was no copying.  Google played it by the book.  And we'll

16   prove that through the witnesses and the trial exhibits.

17         Two, Google didn't need a license from Sun.

18         Ask yourselves this:  We're now down to talking about

19   something called structure, sequence and organization.  Did you

20   see a word of that in any of the communication back and forth

21   between Google and Sun?  Not a word.

22         They didn't even talk about Java APIs, let alone

23   something called structure, sequence and organization.

24         They were negotiating for Google to take Sun

25   proprietary products, implementing code, their class libraries,

CLOSING ARGUMENT / VAN NEST

 1   their virtual machine, and make that public as part of an open

 2   source platform.  That is something you need a license for.

 3        But once it was clear that Google and Sun couldn't

 4   reach agreement, Google went forward on its own, using code

 5   from Apache Harmony and its own engineers, and built Android.

 6   And when it was released, Sun said, no problem, welcome,

 7   congratulations, welcome to the Java community.

 8        Third point.  Google's use of these 37 Java APIs in

 9   Android was open, known by everyone, completely fair.

10        For years, Sun had been promoting the use of the Java

11   programming language.  That was their whole business plan.  You

12   heard that from every single executive at Sun, that testified.

13   Schwartz said it.  Schmidt's said it.  Everybody said it.  Even

14   the engineers said it.  They were making the language

15   available.

16        Well, what is Android?  Android is an open source

17   platform.  Google doesn't license it or sell it or charge money

18   for it.  Anybody can use it.  Including Sun.  Including Oracle.

19        No one was excluded from the platform.  It was

20   available for everyone to work on that chose to do so.

21        And, Android is a brand-new thing.  It is

22   transformative.  It's a brand-new thing.

23        We'll talk in some detail about Sun's efforts to

24   build a smart phone stack.  They were a failure.  Using the

25   same APIs.  And they were the experts.

1          Java has been transformed in Android, just like

2     Jonathan Schwartz said it would be.  That's what he meant when

3     he said Android has strapped a set of rockets onto Java.

4     That's the whole point.

5          And, finally -- this is equally important -- you

6     haven't heard a scrap of evidence that there was any injury to

7     Sun or Oracle or Java.

8          Come on.  Profits are up.  Profit on Java are up at

9     Oracle.  That's what the evidence is.

10         And Java Language is still the most popular language

11    in the world.  More and more people are using Java than ever,

12    and partly because of Android.  Android has made Java even more

13    popular than it was before.

14         So, despite all the buildup for this case, I don't

15    think it's even close.  They haven't shown anywhere near what

16    they need to show to prove infringement or to rebut fair use or

17    to establish any of the other claims that you heard about in

18    Mr. Jacobs' opening statement.  And, as a result of that,

19    Google deserves your verdict.

20         Now, what I'm going to do is walk through each of the

21    verdict questions that you have, and I'm going to summarize the

22    evidence on each one.  But I'm going to start with the slide

23    that I used at the beginning of the opening because I think the

24    points that we made there have all been proven and they're all

25    relevant to these questions that you have to decide.

 1          So the first point that I led off with was that Sun

 2   gave the Java Language to the public.  Right?

 3          We now know that for sure.  And Mr. Schwartz,

 4   Mr. Schmidt and all the witnesses pointed out that along with

 5   the language, the APIs were given, too.  Those were part of

 6   what Sun was promoting for widespread use of Java Language.

 7          Two, Google built Android independently.  They used

 8   free and open technologies.

 9          I heard a lot about copying.  There is no evidence of

10   copying.  Once it was clear that Sun would not agree to sell

11   its technology, Mr. Rubin, Mr. Bornstein, and the rest of the

12   guys went to work and built Android from scratch.

13          They talk about a dirty clean room.

14          Nine lines of code out of 15 million.  They scoured

15   Android up and down.

16          Don't you remember Dr. Mitchell's testimony?  They

17   got a special device, a code comparison tool, and they scoured

18   this thing up and down.  And they found nine lines of code that

19   were the same out of 15 million.

20          So don't talk to me about a dirty clean room.  That's

21   a pretty darn good job, because the evidence is the outcome.

22   The outcome of Android is it's a separate implementation done

23   by Google engineers.

24          Next point.  Google made fair use of the Java

25   Language APIs.  Fair use means we can use some copyrighted work

```
 1  in certain circumstances to promote transformation, promote
 2  innovation, and promote the public good.  And that's exactly
 3  what Android is all about.  And we'll talk about that in some
 4  detail.
 5          And, finally, -- and this one is pretty darn clear
 6  from last week -- Sun publicly approved Android's use of Java.
 7          They publicly approved it.  And I'm not just talking
 8  about Mr. Schwartz' blog.  I'm talking about meetings with
 9  Mr. Schmidt, meetings with Mr. Rubin, featuring Android at
10  developer conferences and all the rest of it.
11          Both Sun and Oracle were trying to use Android to
12  build their own products.  And it isn't until after they failed
13  that they brought this lawsuit here.
14          All right.  Sun gave the Java Language to the public.
15  The Java Language is open and free for everybody to use.  And
16  that's critical because there is no claim that Google's use of
17  Java Language is protectable, whatsoever.  And it's not.
18          The language has been out there.  Every single
19  witness said that.  Mr. Schwartz said it.  Mr. Schmidt said it.
20  The engineers said it.
21          And in Mr. Jacobs' opening statement he said, We
22  don't care about the language.  You can use the language to
23  your heart's content.
24          And that's an important point because that's why --
25  we'll come to in a minute -- that's why all they can accuse in
```

1   Android is this so-called structure, sequence and organization.

2   They are not accusing the whole thing because they can't.

3           The language is free for anyone to use.

4           Next.

5           The APIs were marketed along with the language.  In

6   other words, free and available for everyone.

7               "Yes.  Absolutely.  We talked about open

8               APIs, and then you compete on

9               implementations."

10          What does that mean?  That means everybody can use

11  the standard.  Everybody can use the standard.  And we compete

12  by implementing source code.

13          This is just what Josh Bloch told you when he was

14  here.  This is the standard.  These are the names and the

15  declarations (indicating) that everybody has to use when

16  they're writing in the Java Language.  This is the

17  implementation (indicating).

18          And I'm not going to apologize that it's only three

19  lines long.  Did you expect Mr. Bloch to write a 40-pager in

20  here?  He certainly could have.

21          The point of this is, this is the declaration that

22  everybody must use when they're writing in Java.  The

23  implementation.  That's what people compete on.  And that's

24  what is completely different in Android.

25          So these APIs were promoted.  They were put into

 1  books.  They were taught in the universities.  They were

 2  featured at developer conferences.  They were out there for

 3  everybody to use.

 4          And the engineers told us, both Mr. Bloch and

 5  Mr. Lindholm -- these are long-time Java guys.  They started

 6  their careers at Sun.  They're at Google now, but they started

 7  their careers at Sun.  And they both said, I never realized

 8  somebody could protect an API.  I thought anybody could use an

 9  API.  And that's what I've been doing, and that's what the

10  whole developer world has been doing, is using these APIs as a

11  standard and building their own.

12          There were lots of examples of this, that Sun

13  encouraged.

14          Next slide, please.

15          Apache Harmony.  What is Apache Harmony?  Apache

16  Harmony is independent from Sun.  And they produced a set of

17  class libraries using the same APIs that are being criticized

18  here.

19          They didn't have a license from Sun.  They were

20  allowed to publish.  And the best authority on that, again, is

21  Schwartz, because he was the guy running the company.  And this

22  is something he said back in the day.  Not here.  Back in the

23  day.  He said:

24          "There is no reason that Apache cannot ship

25          Harmony today."

```
 1              That's an example of what I mean when I say

 2    independent implementation.  They were out there.  Now, they

 3    made a big deal, Oh, this was limited, you couldn't use it in

 4    mobile.  Not so.

 5              Mr. Schwartz testified last week.

 6              See our next slide, please.

 7              They had a full chance to examine him on this, and

 8    they asked him:  Your testimony is that if they -- that's

 9    Apache -- didn't want to call it Java, this fight didn't exist?

10              I made the statement time and time again in the

11    media.  They are more than happy to ship -- or we're more than

12    happy for them to ship their code.  They just can't call it

13    Java.

14              Including on mobile devices, sir?

15              Absolutely.  Absolutely.

16              Apache didn't take a license from Sun.  There was no

17    restriction.  And so when the negotiations between Google and

18    Sun failed, there was not one thing wrong with Google using

19    open source technology from Apache or GNU or Bouncy Castle or

20    any of these other open source projects you've heard about.

21              Now, Apache was not the only example.  There's

22    another big example:  GNU Classpath.  That's the same type of

23    thing, but it happened in the '90s.  That happened in the '90s.

24    And in the '90s, GNU created a whole set of Java libraries,

25    Java API libraries.
```

 1              They created a whole virtual machine.  They did the

 2     source code independently, just like Android is, just like

 3     Apache is.  And guess what?  Remember Josh Bloch's testimony?

 4     When he was at Sun, he helped GNU get off the ground.

 5              With the full knowledge of his boss, people at Sun

 6     were helping these independent folks develop their own

 7     independent implementations.  Why?  It was part of the business

 8     plan.  Let's spread Java all over the world.  Let's have lots

 9     of people using Java.  Let's get everybody out there using Java

10     and we will sell them services, support and the like.

11              So just to set the table, nobody came to this with a

12     blank slate.  The history was the language was free; the APIs

13     were promoted with the language; and there were lots of

14     examples of people doing it with Sun's blessing before Android

15     even came along.

16              Okay.  Let's talk about copyright infringement.

17     That's the big issue in this case, and it relates to the second

18     point I made in the opening.  Google built Android using free

19     and open technologies and its own engineering.

20              Copyright infringement requires that you copy

21     something.  And there was no copying here because Google knew

22     they couldn't use the Sun Java source code.  That's what it

23     meant to say we're going to design from open source.

24              Here's their first verdict form, your first verdict

25     question.  And let me just make one point right up front.  The

1   most important question on the whole verdict form is

2   Question 1.  Question 2 relates to the users manual.

3   Question 3 is nine lines of code.  And Question 4 is, was

4   Mr. Schwartz and Sun approving?

5           So Question 1 is the one I'm going to spend most of

6   my time on.  There's two parts to it.  There's copyright

7   infringement and there's fair use.  And we're going to talk

8   about those one at a time.

9           Now, on this first one you can see Oracle has the

10  burden of proof.  They have to prove their case.  So if it's

11  too confusing or if they didn't make it clear enough, or if

12  they mucked it up so that the evidence is ambiguous, they lose.

13  That's what it means to have the burden of proof.

14          They have to prove that it's more likely than not

15  that copyright infringement occurred.

16          Now, you'll get a very important set of instructions

17  from Judge Alsup just a little bit later this morning.  But

18  here's probably one of the most important ones.  This is Jury

19  Instruction No. 25.

20          No. 25:  "To determine whether the copyrighted

21  work" -- that's Java SE 5.0 -- "and the accused work" -- that's

22  Android -- "are substantially similar, you must compare to the

23  works as whole."  I think that should say "works as a whole."

24  "I will define the works as a whole in a moment."

25          What does that mean?  What you're comparing is the

1  structure, sequence and organization in the 37 Android Java

2  APIs to the work as a whole, Java SE.  The work as a whole is

3  all 166 class libraries, all the compilable code, the names,

4  the declarations, the parameters, the fields, the implementing

5  code, everything.  It's a total of 2.8 million code lines in

6  the Java 5.0 SE.  It's huge.

7        And you're going to compare that to not all of the

8  Java 37 APIs, just the structure, sequence and organization.

9        Next slide.  So here we go.  This is the comparison.

10 It's Java 2 SE on the left.  That's the Oracle copyrighted

11 work.  By the way, built for desktops; never successful on a

12 smart phone.  And Android on the right.  And a very particular

13 part of Android, which we're going to look at in a minute.

14       So you remember the Android platform.  This is the

15 platform that Mr. Rubin, Mr. Bornstein and all the engineers

16 built.  And as I showed you in the opening, these 37 Java APIs

17 are a very, very small part of that.  Where are they?  They're

18 in the core library.  There's 37 Java API packages.

19       And all we're talking about is structure, sequence

20 and organization.  Why?  Why are those not shaded in and filled

21 in?  Why are they just an outline?  Because the source code,

22 the code that does the work, the implementing code, they can't

23 accuse that of infringement because it's all completely

24 different in Android than it is in Sun's copyrighted work.

25 That's what Dr. Mitchell admitted, finally, on the stand on

CLOSING ARGUMENT / VAN NEST

1  Friday.

2          We got some help from Judge Alsup pressing the point.

3  Other than the nine lines of code in rangeCheck, everything in

4  Android is original, done either by Google, done by Apache,

5  done by open source.

6          So we're only talking about structure, sequence and

7  organization.  It's not the use of the language.  It's not the

8  use of the names.  You'll get Jury Instruction 20.  Judge Alsup

9  will tell you point blank, the names standing alone are not

10  protectable.  Anyone can use "max."  Anyone can use "lang."

11  Anyone can use "java.max.lang."  Those aren't protectable.  So

12  it's just structure, sequence and organization.

13          Now, you might be asking yourself, what the heck is

14  that?  Well, what the heck is that?

15          It's a darn good question.  Because you won't get the

16  answer to that looking at anything that was actually discussed

17  by the parties in the day.  This is something made up for the

18  lawsuit because there is not a word in anything that was

19  exchanged between Sun and Google that says we want to protect

20  structure, sequence and organization.

21          You're going to see a lot of trial exhibit numbers.

22  And I invite you to write them all down.  I'm going to show you

23  a bunch in a minute.  There's nothing in there.  Nobody was

24  talking about Java APIs.  Everybody assumed they were free to

25  use.  They're part of the language.  None of this.

CLOSING ARGUMENT / VAN NEST

```
 1          So it's not there.  It's not the language.  It's not
 2  the names.  It's not the implementing code, because that's
 3  original, as Dr. Mitchell admitted finally on Friday.
 4          So what is it?  It's only the system of organization.
 5  That's what they're trying to protect.  The system of
 6  organization.  And, yes, what's that?  My file cabinet.  My
 7  file cabinet.  I'm not going to apologize one minute for this
 8  because it's the only way I can understand what structure,
 9  sequence and organization are.
10          You know now from hearing from Astrachan and Mitchell
11  and all the engineers that when you write in Java, methods are
12  organized into classes.  Classes are organized into packages.
13  That's how it works.
14          And so if I have a package, I might want to call it
15  java.lang.  And my package is my cabinet.  I have classes
16  within java.lang.  They're the drawers.  There are methods
17  within each class.  They're the file folders inside, including
18  max and everything else in between.
19          And what's inside the file folders?  The source code,
20  the implementing source code, every line of which was written
21  by Google or taken from open source subjects.  So this
22  structure, sequence and organization is only a method of
23  organization.  That's what it is.  And you're going to compare
24  that, according to Judge Alsup's instructions, against the
25  entirety of the Java SE.
```

```
1              Now, let me pause a minute.  There is some
2    similarity, yes, between the 37 API packages in Android and the
3    37 packages in Java SE.  But that's not the comparison.  You're
4    to compare to the work as a whole, the whole thing.
5              So all this talk about 37 and 37, that is wrong.
6    That is wrong legally and it is not the consideration, it is
7    not the instruction you'll be given by Judge Alsup.
8              And guess what?  The similarity comes from the fact
9    that if you're writing in the Java Language and you want Java
10   code to run on your platform, as you now know from Astrachan,
11   Mitchell, Bloch and every other engineer that addressed it, you
12   must use the fully-qualified name.
13             If you don't use java.lang.math.max, all that code
14   written by application programmers that's out there will not
15   run.
16             So there's similarity.  The similarity comes from the
17   fact that if you're using the language, you must use qualified
18   names in order to allow the code to run.
19             Okay.  So let's talk about work as a whole.  This is
20   a really critical point.  Judge Alsup is going to define it for
21   you.  Work as a whole means all of the compilable code
22   associated with all of the 166 API packages.  Not just the 37.
23   That's what I'm talking about.  It's all 166.
24             Now, I don't have it on the screen here, but
25   Instruction No. 18 tells you what's in the compilable code.  It
```

1    includes method names, class names, declarations, organization

2    and all of the implementing source code.  That's all in

3    Instruction 18.  That's everything here:  The names, the

4    declarations, the implementing code, the whole nine yards.

5            There's my glasses.

6            (Laughter)

7            **MR. VAN NEST:**  Wondered where those went.

8            So what is that?  That's all 166 packages including

9    the source code.  Let's see it.  It's a big one.  This is Java

10   SE 5.0.  This is built for desktops.  It's got a lot of

11   functionality that you would never use in a smart phone.

12   Never.  And it is 2.8 million lines of code.  Because the work

13   as a whole includes all the libraries, all the code, all the

14   names, all the declarations, every single thing you'll see in

15   Instruction 18 and Instruction 29.

16           All right.  Now, what are we going to compare that

17   to?  We're going to compare that to the structure, sequence and

18   organization of these 37 API packages.  What is that?  Why are

19   those not filled in?

20           Because they can't accuse the implementing source

21   code.  That's why we're only talking about structure and

22   sequence and organization.

23           The code in Android was not copied, and they now

24   admit that.  And Judge Alsup's instructions are going to tell

25   you that, too.

CLOSING ARGUMENT / VAN NEST

1    All we're talking about is the lines of names and

2 declarations.  That's all that makes up the structure.  It's

3 the names and declarations.  It's the structure of the file

4 cabinet.  They're right up here (indicating).  That's what

5 we're talking about.

6    They have to prove that the thing on the right is

7 substantially similar to the thing on the left.  And they

8 haven't proven a thing when it comes to that, not one thing.

9 Those things aren't substantially similar.  They're not even in

10 the ballpark.

11    What do I mean when I say the source code --

12 implementing source code is different?

13    Could I have my next slide.

14    You saw this.  This is source code.  On the left is

15 what's in the copyrighted work, 5.0, and on the right is

16 Android.

17    Let's see the source code.  The source code is

18 totally different.  And Dr. Mitchell admitted that finally on

19 Friday.  The source code implementing Android is different.

20    The first line of each of these is the same.  That's

21 the method declaration that you must use to implement the code.

22 That first line is the same.  That's part of the structure,

23 sequence and organization.  The code is different.  All of it.

24    Let's go on to the next slide.  What are the numbers?

25 What are the numbers?  Now, it's not just about numbers, but

1   numbers are important too.

2          You saw this chart.  Mr. Baber and Mr. Astrachan

3   talked about it Friday.  It has a lot of comparisons, some of

4   which are no longer relevant given the job you have to do.  So

5   let's look on the left.

6          All API packages in Oracle's JDK 1.5.  That's the SE

7   5.0 copyright.  2.8 million lines of code.  How much code in

8   the 37 API packages for Android?  287,000.  That's a lot.

9          But, guess what, that includes all of the

10  implementing source code, which doesn't count because that is

11  different in Android.

12         Let's go down to what there is that makes up the

13  skeletal structure, sequence and organization.  It's 10,000

14  lines of code.

15         How do you know that?  Dr. Astrachan testified about

16  it.  And Dr. Reinhold and Dr. Mitchell both said that's about

17  right.  Astrachan said 7,000 lines.  And Reinhold and Mitchell,

18  they weren't quite sure, but they said 7- to 10,000, that's

19  about right.

20         So 10,000 lines.  What is that?  That's these method

21  declarations and names -- and that's all it is -- that make up

22  the 37 API packages.

23         Next slide.  So here's a comparison.  You're

24  comparing all the functionality, including the source code, in

25  the Java 2 SE.  All of it.  2.8 million lines of code against

 1  only the structure, sequence and organization in Android.

 2           It's 10,000 -- 10,000 lines of code.  That is less

 3  than one half of 1 percent.  Less than one half of 1 percent.

 4  And it doesn't provide any of the functionality.  The

 5  functionality in Android is provided by the source code, which

 6  the Google engineers wrote or used from Apache.

 7           So these things are completely separate things.  And

 8  you are comparing the entire functionality of Java 2 SE against

 9  only the structure, sequence and organization.  There is no way

10  in the world that those could be found substantially similar.

11           And the burden of proof is on Oracle.  It's their

12  burdens to prove that it is more probable than not, more likely

13  than not that those are similar.

14           Now, you have one very important piece of testimony

15  from Dr. Astrachan on this.  He was probably the only expert

16  that was asked this question.  Dr. Mitchell wasn't asked.

17           He got up.  Dr. Mitchell said, well, I think they

18  copied; I think they copied; I think they copied.  But he

19  hadn't heard from Rubin or Bornstein or the engineers.

20           This is what Dr. Astrachan said.

21           He said, Have you formed an opinion as to whether

22  these things are substantially similar or not?

23           Those are very different.

24           Why?  He said two things.  He said the numbers are

25  totally different.  The copyrighted work is huge.  And the

 1  amount of code we're talking about in the structure, sequence,

 2  and organization in Android is small.

 3          And the other big reason was that the implementing

 4  code is completely different.  Again, Astrachan and Mitchell

 5  are on the same page with respect to that.  They both concede

 6  that the implementing code is completely different.

 7          Now, you're going to hear, I'm sure, when Mr. Jacobs

 8  gets back up, this is all irrelevant because they copied.  This

 9  is all irrelevant.

10          Well, what's the evidence on that?  Okay.  The

11  evidence on that is that poor old Josh Bloch used nine lines of

12  code in 2009 that got into the Android platform.  But apart

13  from that, the source code implementation in Android completely

14  different.

15          Rubin testified.  Bornstein testified.  You saw the

16  contract with Noser.  They told Noser, you can't use anybody's

17  proprietary code.  You've got to use open source.  Apache?

18  Okay.  Bouncy Castle?  Okay.  Classpath?  Okay.  You can use

19  open source.  And that's all the Google guys did.

20          And the proof of that is that the implementing code

21  in Android is completely different.  And the similarities arise

22  simply from the fact that the declarations have to be the same.

23          Now, I want to comment on one tactic that, I think,

24  has been repeatedly imposed on all of us.  And that is,

25  Oracle's whole strategy here is to say, this is so complicated,

 1   none of us can ever understand it.  These APIs, these

 2   interfaces, they're so complex.

 3            Let's see our next slide.

 4            This is one of the slides from Dr. Mitchell.  Boy,

 5   that clears things up; doesn't it?  I mean, their whole point

 6   is nobody can ever understand this, it's so sophisticated.

 7            Well, guess what?  All this is, is a list of methods,

 8   classes and packages.  So this happens to be the package for

 9   Buffer.  So if I put a file cabinet next to Buffer, my file

10   cabinet is my path.  What is below Buffer?  Everything along

11   the top line there, those are all classes.  They're classes

12   organized within Buffer.  And I've got classes in my cabinet,

13   too:  Math, number, object, process.

14            What else is there?  A bunch of methods.  There's a

15   bunch of methods, and there's methods in each class.  Those

16   methods are the folders inside.

17            And the only criticism I got from Mitchell on this

18   was, oh, this doesn't take into account the complexity of it

19   because there's all these interfaces.  Well, yes, there's

20   interfaces.  Some of these classes are related to classes in

21   other packages.

22            But you know what?  That's not too complicated

23   either, because the only thing that they ever do -- that they

24   ever do in the source code is they say this class extends

25   another class.  That's it.  That's what the interfaces are.

1           So the math class extends object.  There's your

2    label.  The process class extends object and implements

3    Serializable.  That's what this class does.  So they label

4    them.  And the labels in the source code look just like that.

5           The biggest label I could find in any of the source

6    code had five lines on it.  It's kind of like in a cookbook.

7    If you have a bunch of recipes and a bunch of them call for

8    chicken stock, you wouldn't repeat the recipe for chicken stock

9    over and over.  You'd say, see chicken stock, page 30.

10          These interfaces work in very much the same way.

11   They coordinate with each other.  They're interfaces for each

12   other.  And that's all that they are.  They're not too

13   complicated.

14          And so on Question 1, infringement, we'll ask you to

15   check "No."  Why?  They had the burden of proof.  The relevant

16   comparison is 37 structure, sequence and organization to the

17   entirety of the Java SE 5.0.  And Oracle has failed to meet

18   their burden of proof.

19          Now, I want to comment on one other point that

20   they've made a lot of, you saw a lot of it in their opening.

21   And that is their licensing story.  Their licensing story isn't

22   even relevant to infringement, but they've been parading all

23   these e-mails around.

24          Now, you now know what the licensing story amounts

25   to.  Google tried to negotiate with Sun for a license, for a

 1   partnership and for Sun technology.

 2          Could I have our first slide?

 3          The Sun technology that Rubin was negotiating over is

 4   right here.  This is Trial Exhibit 11.  This is right near the

 5   last page of the exhibit.

 6          Sun's main responsibility is the Java CDC virtual

 7   machine, class libraries, MIDP stack.  Those are all source

 8   code implementations.  Everybody agrees you need a license for

 9   those.  That's what they were negotiating.

10          Next slide.

11          You need a license for the Coffee Cup, that little

12   Java Coffee Cup.  That's a brand license.

13          This is Trial Exhibit 1, one of their favorite

14   exhibits.  You need a Coffee Cup Logo for carrier

15   certifications.

16          All of the discussions that you've seen fall into a

17   period when Rubin and the folks at Sun were negotiating over

18   the purchase of property.

19          Okay.  Here's my timeline.  And I want to put all

20   these in context, because remember what Rubin said, and

21   Schwartz backed him up.  It was this period of time in '05 and

22   '06, when they were negotiating for a partnership which would

23   have required a license.

24          But once it was clear that they couldn't agree,

25   that's when Google went forward with Bornstein and the

1    engineers and did a completely independent implementation.

2              So what do we have?  We have all of their exhibits.

3    Let's throw them up one at a time here.

4              We've got, Must take a license.

5              Trial Exhibit 1:  My proposal is we take a license.

6              Trial Exhibit 7:  We'll take a license.

7              Trial Exhibit 12:  Critical license.

8              How many times have we heard that?  It's not even

9    relevant to infringement.  They don't want to talk about the

10   relevant comparison.  They want to walk around and say, you

11   guys at Google knew you needed a license.

12             Well, the guys at Google knew they needed a license

13   if they were going to buy Sun technology.  Look at the dates on

14   these.  They're all right here in this period of time.  They're

15   all right here (indicating).  Everything.  All the trial

16   exhibits that deal with this negotiation are in '05 and early

17   '06, and that's it.

18             Now, there's one exception, and that's the e-mail

19   Mr. Lindholm sent.  That wasn't sent until about a week before

20   the lawsuit was filed.  That has nothing to do with the

21   negotiations that Sun and Google were engaged in.

22             You heard from Mr. Lindholm.  He's an engineer.  He

23   wasn't even part of the Android team.  He didn't write any code

24   for Android.  And he was asked to do something back there in

25   2010, after Sun had been purchased by Oracle, after Oracle had

 1   threatened litigation.

 2        And there isn't a scrap of evidence that his e-mail

 3   has anything to do with copyrights or copyright protection or

 4   anything of the like.  Anything of the like.  All of these

 5   e-mails were in there that earlier period of time, and they all

 6   relate to a time at which everybody agreed that you would need

 7   a license.

 8        What's the best evidence that Google didn't need a

 9   license?  Right here.  Jonathan Schwartz knew that Google

10   didn't have a license.  And he knew that Google was using the

11   language and the APIs.  They'd been real clear on that.

12        Nothing was done in secret here.  This was all out in

13   the open.  And what he testified to was we didn't feel we had

14   any grounds.  Google had made an independent implementation.

15   There's nothing wrong with using the Java Language.  And

16   everybody was aware, at the time, that Google was using the

17   Java APIs.

18        Okay.  I think that is Question 1.A. to a T.  Google

19   didn't need a license.  Sun knew it.  The comparison is clear.

20   These aren't substantially similar.

21        You know from the testimony that Google used Apache

22   Harmony code -- which was available for anyone to use -- and

23   their own ingenuity.  And there was no copying, and, therefore,

24   no copyright infringement, because the two comparisons side by

25   side are not substantially similar.

1             Now, fair use is an important concept.  I talked

2     about this in the opening.  Google made fair use of the Java

3     Language APIs in Android.  You're going to be asked a second

4     question.  Now, you may not get to it because if you find no

5     copyright infringement --

6             -- Could we have the next slide --

7             -- then you don't even go on to fair use.  It only

8     comes into play if you find copyright infringement in the first

9     place.

10            So why am I talking about it?  I can't afford to

11    leave any stone unturned on behalf of Google.  No lawyer would.

12    I can't leave any stone unturned.

13            So even though I believe the evidence supports a "No"

14    on Question 1.A., I want to talk about Question 1.B.

15            Google has the burden to prove that its use of the

16    structure, sequence and organization constituted fair use.

17            Now, we're not talking about using source code,

18    because Google didn't.  We're not talking about the language.

19    We're not talking about names.  We're only talking about this

20    thing called structure, sequence and organization.

21            The law allows for some use of a copyrighted work

22    even if the owner doesn't consent.  I'll show you the

23    instruction in a minute.

24            The idea here is we want to balance the rights of a

25    copyright owner against the rights of the public to innovation,

1   advancement, and a lot of other things; free speech, criticism,

2   news reporting, and all that.

3           So we're balancing innovation against the rights of

4   the copyright holder.  And in that situation the law says the

5   copyright owner cannot prevent someone from making a fair use.

6   Even if they have a copyright, they can't prevent someone from

7   making a fair use.  And the law gives you a bunch of factors to

8   evaluate.

9           Let's look at the first instruction on fair use.

10  This is the instruction that Judge Alsup will give you when

11  we're done talking.

12          Anyone may use any copyrighted work in a reasonable

13  way under the circumstances, without the consent of the owner

14  if it would advance the public interest.  Such use of a

15  copyright work is called "fair use."  Just what I said.  The

16  owner of a copyright cannot prevent others from making fair use

17  of the copyright owner's work.

18          Now, Google made fair use that was fully known to Sun

19  by making Android an open platform that anyone could use, by

20  making it available for free, by not licensing and charging it,

21  and because it was a huge innovation.  It transformed what

22  these 37 Java APIs had been.

23          Sun hadn't been able to use these in anything like a

24  smart phone stack.  There may be a few uses of Java in

25  Blackberry, but it is not the Blackberry stack.  And nobody

1    proved that to you, anyway.

2              Java was something that Sun was trying to get to work

3    as a smart phone platform so they could compete with Apple and

4    so on.  But that didn't happen until Android came along and

5    transformed these APIs as part of a phenomenal new product that

6    was different and brand-new.  That's the point on fair use.

7              So let's look at the factors.  There are four

8    factors.  And, by the way, what you do is you balance these all

9    together and use your common sense.  No one of these factors is

10   more important than the others.  They are all to be balanced

11   and weighed together.

12             So let's look at the first one:

13             Purpose and character of the use.  This is common

14   sense.  How are you using it?  How are you using it?  Android

15   is used as part of an open source platform that's available to

16   everybody.

17             Two.  Nature of the copyrighted work.  We're going to

18   protect works like Shakespeare more than we will a user's

19   manual.  So we look at the nature of the copyrighted work and

20   we determine how much protection should it have.

21             We'll talk about that.

22             The third one is amount and substantiality of the

23   portion used in relation to the copyrighted work as a whole.

24   Did you use the whole thing or part of the thing?

25             And here we'll talk, again, about 2.8 million lines

 1   of code in Java SE, and these 10,000 lines of code that form

 2   the structure, sequence and organization in Android.

 3          And, finally, the effect of the use upon the

 4   potential market.  And that's why I say it's critical to know

 5   that they didn't prove anything about market harm.  Not a

 6   thing.

 7          We'll talk about the so-called threat of

 8   fragmentation and, oh, they're not compatible, and all that

 9   stuff.  But when it comes down to what facts they proved, the

10   only fact is Java business is up 10 percent year over year at

11   Oracle.

12          Can we look at the next one here, Ben?

13          This is important too.  All the factors should be

14   weighed together to decide whether Google's use was fair or

15   not.  It's up to you.  It's up to you to decide how much

16   weight.

17          Jury Instruction No. 26.  If you find that Google is

18   transformative and that the open source nature of it is a fair

19   use, that's what these instructions are -- will allow you to

20   do.

21          Okay.  Let's talk about purpose and character of use.

22   Factor one, I've said it.  It's clear.  Everybody knows it.

23   Android was always intended to be open source.  From Trial

24   Exhibit 1 --

25          Next slide.

1          From Trial Exhibit 1 on, the whole plan was, let's

2   put this product together, let's make a brand-new product, and

3   let's give it away.

4          Now, yes, it's definitely true that Google makes

5   money selling ads on Android.  They make money in the same way

6   that Google makes money on all of its other products, desktops

7   and so on and so forth.  That's what they do.

8          The point is Google doesn't make any money by

9   licensing or selling Android.  They decided to make it open.

10  So open that Sun could use it, that Oracle could use it, that

11  all these handset makers could use it to foster innovation and

12  get widespread use.  That was the whole point of it, not to

13  make it a proprietary product but to make it available for

14  everybody.

15          Next slide.

16          And here was -- this is Trial Exhibit 11.  You won't

17  have these graphics, by the way, in the jury room.  That's why

18  I'm encouraging folks to write down trial exhibit numbers.

19  These graphics you won't have.  You'll have the trial exhibits.

20          Google wanted to collaboratively develop an open

21  source handset platform.  Collaboratively develop an open

22  source platform.

23          Now, get guess what?  They invited Sun.  They invited

24  Sun both before Android launched and after.

25          Our next slide shows correspondence in the day

1  between Mr. Schwartz and Mr. Schmidt.  And remember after

2  Android launched, Mr. Schwartz and Mr. Schmidt sat down at Sun

3  and they talked about Android.  And Mr. Schwartz wanted to

4  know, can I build my own products, our own Sun products on top

5  of Android?

6          Here's the answer from Schmidt:  As a result, Sun

7  will be able to take Android and do whatever you like to it,

8  subject to the license.

9          What's the license?  That's the Apache license.  The

10 Apache license lets you use the Apache code any way you want

11 and to develop further on top of that.

12         So Sun had an opportunity on Android.  And guess

13 what?  They took them up on it.  Remember -- I think we'll play

14 a little clip from this.  Remember that after the meeting

15 Schwartz and Schmidt had, Sun went ahead and developed their

16 own product running on Android.

17         This thing they now claim is such a hideous copyright

18 violation, they used it to develop their own product, and they

19 showed it off at JavaOne in 2008.

20         Let's run this.

21         (Video deposition clip played in open court; not

22         reported.)

23         **MR. VAN NEST:**  Connected life.  That's a Java Sun FX

24 product running on Android.  What's the point of that?  The

25 point of that is that Android was open for anybody.  Anybody

1  had an opportunity on it.  And Sun was well aware of it and

2  tried to use it.  So did Oracle.

3         You'll remember the slide from Mr. Ellison's

4  testimony.  Oracle -- right after Oracle acquired Sun, they

5  looked at working with Android.  They ended up not being able

6  to do it.  They talk here about, let's target the Android

7  handset manufacturer.  Let's target single operating systems

8  only, Android Linux.  Let's run Java ME on Android.

9         So Oracle knew this was open source.  Oracle knew

10  they had an opportunity to compete.  They ended up not

11  competing.

12         And you heard a couple times, well, you can't compete

13  with free.  Well, the Sun Java version is now free, also.  So

14  they could compete.  They're free, too.  They haven't been able

15  to do it because Android is a transformative product.

16         Why?  Look at all the folks using it.  This is what I

17  mean by open source.  None of these people are paying a license

18  fee to Google for using Android.  Handset makers, Kindle,

19  Barnes & Noble, anybody can build on it.  And you didn't

20  hear -- and -- and it's built up a huge community of developers

21  writing for Android.  It's a whole new business.

22         Okay.  Second factor.  Let's do this one.  Ah, such

23  work is transformative.  A big part of fair use is promulgating

24  innovation, transformative use.  If you're just using the same

25  thing in the same old way, that tends to cut against fair use.

 1   If you're transformative, that is the very essence of fair use.

 2         **MR. VAN NEST:**  Well, let's take a look at Android

 3   versus Java, Java 5.0, very successful for desktops; very

 4   unsuccessful, completely unsuccessful for smart phones.

 5         What's the smart phone platform that Android built?

 6   It's this phenomenal thing that you saw during Mr. Rubin's

 7   testimony.  Remember, he talked about the fact the applications

 8   give you phone, give you web browsing, give you home page.  You

 9   can use it for playing games, high end graphics.  You can go on

10   the web and shop to your heart's content.  You can display

11   videos on it.  It's a whole platform.  It's a whole platform

12   that didn't exist before and transformed the use of Java for a

13   smart phone stack.

14         Now, let's look at what Java was able to do with

15   Java.  These are internal Sun documents that we got in

16   discovery.

17         "Java is perceived as stagnant and legacy."

18         That's the problem.  It's not that they are trying to

19   compete with free.  It's that you had to transform it to make

20   it something people would like.  They tried.

21         Next slide shows that.

22         (Document displayed)

23         Remember, Mr. Gering was here this week and he talked

24   about the Acadia project.  They bought some technology, Daneel

25   and Sundroid.  What do you think Sundroid is?  Sun on Android,

CLOSING ARGUMENT / VAN NEST

 1  Sundroid.  That's what Sundroid is.  They tried to build a

 2  smart phone, they couldn't do it.

 3          Okay, next slide.

 4          (Document displayed)

 5          Now, talked about the nature and extent of the use

 6  and the transformative nature of Android.  You also look at the

 7  nature of the copyrighted work, whether it's creative, which

 8  cuts against fair use, or is it functional or factual.

 9          Now, we're not saying that it took a lot of hard work

10  to develop the APIs in the first place.  That's true.  But

11  that's not the key point.  The key point is what are these

12  things?  They are functional.  They are programming interfaces

13  that allow folks developing programs to access source code.

14  That's what they are.  And there's plenty of testimony on that.

15          Could we have Mr. Ellison, first witness for Oracle?

16          (Document displayed)

17          "The APIs are a command structure you give to

18          the program."

19          (Document displayed)

20          So did Dr. Mitchell:

21          "The method is an operation that does

22          something."

23          Obviously, in order to perform it, the programmer

24  needs to supply data and then the data comes back.  These

25  things are not an opera.  It's not a book.  It's not a play.

CLOSING ARGUMENT / VAN NEST

```
 1   It's not a song.  It's not a poem.  It's something that was
 2   made to be functional and that cuts in favor of using it in a
 3   transformative way to foster fair use.
 4        Third factor is:  How much did you use?  Did you take
 5   the whole thing and just knock it off or did you use a
 6   relatively small part of it?
 7        Let's have the next slide.
 8        (Document displayed)
 9        You know my position on that is clear as a bell.
10   10,000 lines of code in the Structure, Sequence and
11   Organization versus 2.8 million in Java SE 5.
12        The last factor in applying common sense is what
13   was -- what's the effect of it been?  Good or bad on the
14   copyrighted work?  We don't have a scrap of evidence that there
15   has been any harm whatsoever to Java.
16        (Document displayed)
17        Our next slide shows Java profits at Sun -- oops, let
18   me back up.
19        They never were able to bring an operating stack to
20   the market.  So that is something that -- they are not
21   competing because they tried and couldn't do it.
22        Next slide.
23        (Document displayed)
24        Never had a full stack on the market.
25        Next slide.
```

Case 3:10-cv-03561-WHA   Document 1067   Filed 05/04/12   Page 105 of 163

1                    (Document displayed)

2              What's the Java business doing?  They still have a

3    licensing business.  They talked about oh, boy, all these guys,

4    they are not taking licenses any more.  The evidence is, the

5    only evidence on business performance, Java up 10 percent year

6    over year at Oracle.  That was Mr. Risvi, just on Thursday.

7    The Java business growing at a 10 percent rate.

8              What else?  Schwartz.

9                    (Document displayed)

10             Schwartz said, "We welcome Android.  It's going to

11   strap a rocket onto Java."  "We welcome it."

12             Why?  What he said was:

13             "I'd rather have Android using Java, which

14             we, Sun, can sell to.  If there is folks

15             using Android and using Java, we're relevant.

16             If Android had gone off and used another

17             language like C# that Microsoft uses, Sun

18             becomes irrelevant."

19             That's what Schwartz said on Thursday.  I didn't want

20   to be irrelevant.  The reason that I embraced it was it was

21   good for my business, not bad for my business.  Better that

22   they are Java than that they are some other language.  And that

23   was the whole point of Schwartz and the rocket.

24             Now, the only even argument that I have heard from

25   the Oracle folks is this repeated drumbeat of fragmentation,

1    fragmentation, fragmentation.  Okay?  You actually haven't

2    heard a single developer come in here and say, "Gee, I'm

3    unhappy about Java because Android fragmented."  There is no

4    evidence of that.  It's the business folks at Sun that came in

5    here and testified.  Right?  They're people that are trying to

6    sell.  But Java fragmented itself.  Android had nothing to do

7    with it and the evidence on that is just overwhelming.

8                Next slide.

9                (Document displayed)

10               Here is internal email.  It's Trial Exhibit 3508.

11   Internal from Sun.  Java is fragmented between Java SE and Java

12   ME and between Java ME Mobile and TV and within mobile and TV.

13               Fragmentation, their definition of fragmentation at

14   the start of the trial was "write once, run anywhere."  Pretty

15   soon we heard that didn't work.  Then they said, "write once,

16   run only on the same platform."  Remember that?  Now we are

17   down to "write once, run on any Samsung 5.0 phone."  That's

18   about what it is.

19               Look at the next slide.  This is the evidence that

20   you heard from Dr. Reinhold.  Fragmentation?  Come on.  Every

21   single product on here uses a different number of APIs.  Okay.

22   So Enterprise is different from Standard is different from

23   Mobile is different from Card.  They all have different numbers

24   of APIs.

25               And then within Mobile, you've got a bunch of

```
 1   flavors.  CDC is different from CLDC.  CLDC, that's the limited
 2   version.  And with the limited version, there's three or four
 3   or five versions of those and they all have their own separate
 4   APIs.  It got so bad, it got so bad that the following slide
 5   deck is the one that they tried to keep out of evidence, but
 6   Dr. Jonathan Schwartz put it in.
 7               (Document displayed)
 8               "Compatibility is Optional."  That was the order of
 9   the day.  They knew it.  And this doesn't have anything to do
10   with Android, not one thing.
11               Let's look at the next slide.  Just put the icing on
12   it.
13               (Document displayed)
14               This is them in October of 2008.  In an open source
15   world, there are many incompatible implementations making it
16   more difficult for us to justify strict rules for our
17   commercial and independent licensees.
18               They fragmented Java themselves and they recognized
19   it.  So, so what I'm asking, based on all the evidence that
20   you've heard on fair use, is that you apply your common sense,
21   evaluate the open nature, the free nature, the available
22   nature, no one is excluded, and the transformative nature of
23   Android and find that Google used Android and its use of --
24   excuse me.
25               Google's use of the 37 Java APIs, their Structure,
```

1   Sequence and Organization was a fair use.  And in measuring

2   that you can also take into account the testimony from

3   Astrachan, Bloch, Mitchell and everyone else that if you're

4   trying to achieve compatibility, you must use the same method

5   declarations and names or the code will not work.  That is the

6   testimony of all the engineers, and you can take that into

7   account in evaluating fair use, too.

8           Okay.  Let's go on to question two.  And we're not

9   going to spend nearly as much time on question two because

10  there has been an absolutely massive failure of proof here.

11  I mean, I'm not sure they even tried to prove this one, but

12  let's focus on what it.

13          This is the User's Manual.  We're no longer talking

14  about Structure, Sequence and Organization.  That's not it.

15  Judge Alsup has been using the phrase, "You mean, the plain

16  English description of the method?"  That's the phrase he's

17  using and that's exactly what we're talking about here; the

18  plain English description.  And their claim is, Well, Google

19  copied all those and the User's Manual and so on.

20          So here is the question.  Oracle has the burden of

21  proof.  If they fail, if the evidence is ambiguous, the

22  verdicts falls to Google.

23          So, let's look at some of the language.  Just to get

24  you focused on what this is, this is from the copyrighted work.

25  And what we're talking about, for example, CharSequence is an

1    interface.  CharSequence.  And you see the written description

2    there on the right.  It's a readable sequence with Char values.

3    That's what it is.  We're talking about infringement of those.

4              Now, here we're not talking about substantial

5    similarity any more.  We're talking about virtual identity.

6    Virtually identical.  They have to be virtually identical.  Why

7    is that?  Because as Judge Alsup will explain in his

8    instructions, when you're writing in a technical field and

9    you're both trying to describe the same thing -- a wrench, a

10   hammer, an API -- you're likely to be using a lot of the same

11   words.  Technical writers write in a technical way.  We all

12   know that.  And, therefore, in order to prove infringement,

13   it's not good enough to show substantial similarity.  You have

14   to show virtual identity.

15             (Document displayed)

16             Here it is.  Here it is.  Here is jury instruction

17   No. 24.  "Has to be virtually identical."  Why?  Because the

18   subject under consideration is a narrow one; namely, these

19   method names like Math, Number, Object, Process, that's narrow

20   technical stuff and so we would expect there to be plenty of

21   similarity.  You have to prove virtually identical.

22             Now, did they do that?  Did they come even close to

23   proving that in the thousands of pages of documentation the

24   Google version is virtually identical?  You've got to be

25   kidding me.  We spent maybe 10 minutes on that.  Maybe less in

1   the trial.

2          Here is the one example that I got out of Mitchell.

3   They didn't even ask Mitchell about this.  They didn't even ask

4   him.  He had this example in his report, and I had him --

5   remember, we had the trial director, Ben pulled up the version

6   from Oracle and the version from Android.  They are right here.

7          (Document displayed)

8          The Oracle overview for the term "KeyPair" is on the

9   left, and the Android version for "KeyPair" is on the right.

10         Now, on the left we see 12 words, including the words

11  "reference," "component" and "pair."  On the right we see four

12  simple words, "Returns the private key."

13         Those aren't even substantially similar.  I was

14  pointing out that Dr. Mitchell had failed to meet the

15  substantial similarity test.  I mean, he didn't even get to bat

16  on virtual identity.  I mean, come on.  That's crazy.

17         Look at the next one.

18         (Document displayed)

19         They showed Bob Lee one or two examples.  Are you

20  telling me that these are virtually identical?  Sure, they use

21  a lot of the same words, but that's the whole point.  You're

22  describing something that's well known as a technical thing.

23  These aren't virtually identical.  They are probably not even

24  substantially similar.  And that's all you saw, a couple

25  examples for Lee and one example with -- that I brought out

 1   from Mitchell.  And they already told you there's 11,000 pages

 2   of this.  And is that -- presumably they went out and picked

 3   their best examples.

 4          So I don't think that you should need much time on

 5   verdict question two.  That's a "No."  That's just a massive

 6   failure of proof all way around on the User's Manual.

 7          Okay.  Question three.  Now we're going into nine

 8   lines of code.  Josh Bloch.  Let me pause a minute and remind

 9   you of what Dr. Bloch testified about.  First of all, he was

10   never part of the Android team.  Android launched in '07.  He

11   wasn't on the team.  The first handsets came out, as you

12   remember, in '08.  And Josh Bloch didn't join the team til

13   sometime after '09.  He had been at Sun and he had written a

14   file there called java.arrays.  It's a file of 3,000 lines of

15   code.

16          When he got to Google, before he got on the Android

17   team, he wrote -- he rewrote that file and he called it

18   TimSort.  And, remember, he gave TimSort to Sun to be part of

19   the Java project.  He gave it to them originally.  That's where

20   it came from.  And within it were nine lines of code called

21   rangeCheck, which he said a high school programmer could write.

22   And they went along with it to Sun, and Sun had it.  Sun was

23   using it and they put it in Java and they said, "This is really

24   great.  It's a great program, Josh.  Wonderful."

25          Well, unfortunately, Josh made a mistake, which he

```
 1   apologized for right here in front of you.  I'm not sure he had

 2   to do that.  You're going to drag somebody in here over nine

 3   lines of code?  Okay.  But he put that TimSort file in Android

 4   and that file had the nine lines of code that had been in one

 5   of the Sun files, and that was unfortunate.  We've taken it

 6   out.  It's been taken out of all current versions, all current

 7   versions of Android.  You can find it, if you go back through

 8   history.  It hasn't been ripped out of every file in the past,

 9   but the current versions have all removed it.  And it is

10   inconsequential.  It's trivial.

11           You'll get an instruction from Judge Alsup about

12   diminimus and what's diminimus.  You look at quantity.  You

13   look at quality.  Josh Bloch has testified that he's the author

14   of it.  It's a simple piece of code.  It's a short piece of

15   code.  It is not a big deal whatsoever.

16           Let's actually skip forward two slides to show the --

17   this one.

18           (Document displayed)

19           Okay.  Nine lines of code in 3,109 [sic] of code in

20   the relevant Java file.  That is the definition of diminimus.

21           Now, let's go back for just a minute to the previous

22   one.

23           (Document displayed)

24           The other testimony you have is on the other 10

25   files, okay?  The first two are files where the source code
```

1  comments are involved.  These came from Noser, not from Google

2  engineers.  Remember, Noser signed a contract agreeing not to

3  use anything that wasn't open source, but these two files came.

4  And the source code comments are not compiled.  They are not

5  compiled into the code.  They never make it on a handset.

6          These Impl test files, there's also no evidence that

7  they ever made it on a handset either.  No testimony to that

8  effect.  Mitchell said he didn't know.  He couldn't demonstrate

9  it.

10         The only files that made it onto a handset are

11  TimSort and those are the files that Josh Bloch created, as he

12  testified.  And they are clearly diminimus and that's why we're

13  asking for a "No" vote on the line-by-line source code.

14         This is the only place in the verdict form where

15  you're being asked to evaluate line-by-line copying.  That's

16  it.  Line-by-line copying.

17         And, remember, they scoured the whole platform.  Dr.

18  Mitchell said:  I used Dr. Visnick's work and his computer

19  tool.  It did a literal match.  We checked all the lines.  Then

20  we checked parts of the lines.  Then we checked some words

21  within the lines, and what we came up with were the nine lines

22  of code.

23         Okay.  Let's go on to the next one.

24         (Document displayed)

25         We have one more verdict question, which is kind of

1    like extra credit.  This is sort of an extra credit question.

2    That's a pretty simple question, too.

3            The question here is:

4            "Has Google proven that Sun and/or Oracle

5            engaged in conduct that Sun and Oracle knew

6            or should have known would reasonably lead

7            Google to believe that it would not need a

8            license."

9            Okay.  This is the pattern of conduct, words and

10   statements, led by Mr. Schwartz, but engaged in by others at

11   Sun throughout the period of time after Android was launched.

12   All we're talking about is what happened after Sun -- after Sun

13   knew that Android was launched.

14           First point is, that it was never a secret to Sun

15   what Android was doing.

16           Let's look at the next slide.

17           (Document displayed)

18           From the very beginning in the negotiations between

19   the parties -- this is Trial Exhibit 617.  It's one of the

20   communications between Mr. Rubin and Mr. Cizek in the fall of

21   '05.

22           Again, none of these mention APIs.  None of these

23   mention any of that, but it's crystal clear that Google is

24   using the Java Language and the guys at Sun know that when

25   you're using the Java Language you're using the Java APIs, too.

 1          He says:

 2          "If Sun doesn't want to partner with us to

 3          support the initiative, we are fine releasing

 4          our work and not calling it Java."

 5          That was what he understood was the order of the day.

 6 If I'm not going to take the brand and the coffee cup, I'm not

 7 going to call it Java, then I'm fine.  That's what he said

 8 point blank.

 9          Now, the release is a big deal.  Google makes a big

10 deal out of Android's release in November of '07.  And right

11 around that time, before there's anything public, before

12 there's a big blog post or anything like that, Schwartz writes

13 to Schmidt confidentially on this next email.

14          (Document displayed)

15          This is a confidential CEO-to-CEO communication

16 between Schmidt and Schwartz after Android is known.

17          And you heard Schwartz testify:  I knew.  I knew that

18 the APIs would be in there and that they were using the Java

19 Language.  That was clear to me.

20          "Let us know how we can help support your

21          announcements next week.  We're happy to do

22          so."

23          "We're happy to do so."

24          And then what?  Then we've got this on the website.

25          (Document displayed)

1            Now, Mr. Schwartz, who was running the company,

2     testified:

3            "I considered my statements on this website

4            to be the corporate policy of Sun.  This was

5            hosted on a Sun website.  It was corporate

6            policy.  That's what I -- I wanted to

7            communicate with customers, with competitors,

8            with the market.

9            "Instead of holding a press conference," he

10           said, "I communicate on this blog."

11           And he was the CEO at the time.

12           Now, there's two key points here; not just the rocket

13    and we strapped here another of rockets, but look at the second

14    bullet.

15           "We're going to commit resources to Android.

16           We've honestly done a ton of work to support

17           developers on all Java-based platforms and

18           we're pleased to add Google's Android to the

19           list."

20           That means a lot more than just congratulations and

21    welcome.  That means, we, Sun, are going to commit to

22    supporting Android by helping make some of our products

23    available for people to use with Android.  That's what this

24    NetBeans developer product is all about.

25           And so it's not just the rocket.

```
 1              (Document displayed)

 2              It's the fact that they were going to commit

 3   resources.  Everybody had the rocket anyway.  There it goes.

 4   We strapped the rocket to Java.  You knew that was coming.  You

 5   knew that was coming.

 6              (Laughter.)

 7              And the whole point of that was that Mr. Schwartz

 8   determined, and the guys at Sun determined -- and I'm sure

 9   Mr. McNealy wasn't in the dark, I mean, he was there, too --

10   that Android would be a good thing, not a bad thing for Java

11   and it's turned out to be the case.  Java profits are up at

12   Oracle.  More people are using the language.  More people are

13   writing code in Java because of Android.

14              Now, what else happened?  After the rockets, after

15   committing resources, there is this meeting.

16              (Document displayed)

17              You saw this earlier.  The meeting between Schmidt

18   and Schwartz.  They are meeting privately.  It's a personal

19   meeting and the subject of it is Android.  Schwartz didn't

20   complain.  Schwartz didn't say, "This is wrong."  Schwartz

21   didn't say, "You need a license."  Schwartz didn't, "You're

22   ripping me off."  Schwartz didn't say, "This is copyright

23   infringement."  Schwartz said, "How can we benefit from

24   Android?  Can we use it, too?"

25              Come on.  If that isn't an affirmative endorsement of
```

1    a product, I don't know what is.  And he wasn't out in public.

2    He was in a private personal meet with Schmidt.  And Schmidt

3    came away from that meeting with the impression that we had

4    steered clear.

5              (Document displayed)

6              This is what he said.

7              "We had steered clear of their intellectual

8              property."

9              And who wouldn't?  Who wouldn't?  If you're sitting

10   down in a meeting where no one else is present and these guys

11   can say anything they want to one another, anything in the

12   world.  There's nobody there to watch.

13             And Schwartz doesn't dispute that.  Schwartz got this

14   email and even then went ahead with Schmidt's permission, which

15   he didn't need in the first place because Android is an open

16   platform, and put JavaFX on Android.

17             I'm not going to play the video again, but you get

18   the point.  They weren't saying, "It's wrong."  "It's bad."

19   "You've stolen."  They're saying, "How can we benefit from

20   Android, too?  It's open source.  It's out there.  We want to

21   use it."

22             And then there is Mr. Ellison, who came in here, I

23   think, hoping to say, "I can take the Java language back."  "I

24   can take the Java Language back."  My first question to him

25   was, "Isn't the Java programming language free for anyone to

1    use?"  He couldn't answer.  He couldn't answer it.  "I don't

2    know."  "I don't know."  He said point blank, point blank in

3    his deposition, "It's free for anyone to use."

4              And what did he do when he acquired -- when Oracle

5    acquired Sun?  Almost the very first thing he did; two things.

6              One, let's billed a Java Phone.  Project Java Phone.

7              And, two, he went on stage with his friend McNealy at

8    JavaOne in 2008 -- excuse me, 2009, after they acquired the

9    company, and said:

10             "We're excited.  Android is using Java.

11             We're flattered.  And I think we can see lots

12             and lots of Java devices, some coming from

13             our friends at Google."

14             Come on.  If that isn't an affirmative endorsement of

15   something, I'm not sure what else there would be.

16             What's the reliance?  The reliance is simple, and you

17   heard it from Rubin.  They were told in '07:  Welcome to the

18   party.  We're happy to have you in the Java Community.

19             They kept on going without looking at any other

20   alternatives.  Nobody looked at an alternative to Java in '07.

21   Because in '08, that was at JavaOne, Sun said, "We'd like to

22   use FX on Java, on Android."  Then they launched a phone.  Then

23   they helped HTC launch a phone.  Then they helped Samsung

24   launch a phone.  Motorola launch a phone.

25             And you heard from Mr. Rubin.  All these things

1  require effort and money and time.  He increased the size of

2  the Android team.  He increased the money they were putting

3  into Android.  He never looked to see another alternative

4  because, according to Mr. Schwartz and Mr. Gupta -- remember

5  the meeting at which Mr. Gupta came to Google and met with

6  Rubin and said, "Congratulations.  It looks like Android is

7  pretty great.  We'd like to build a product of our own."

8  That's JavaFX.  He came to show that off.

9          And so the point of question 4-B is:  Did Google

10 rely?  You bet they did.  We haven't totaled up the money, but

11 that doesn't matter.  You heard the testimony from Rubin about

12 all the steps they took and all the support they gave and all

13 the work they did after Sun said, "You are welcome to be in the

14 Java family and the Java Community."

15          So the evidence supports a verdict for Google on

16 every single question on the form that you're about to start

17 filling out after we're done.  And maybe the best evidence of

18 that is what the folks at Sun did and thought at the time.  And

19 Mr. Schwartz told you in point blank terms that he was the one

20 that put APIs out in the public, and used them to promote the

21 language, and used them to promote the widespread adoption of

22 Java, and used them for Sun to make money, and used them as

23 part of the basic Sun business plan.  So he is the one in the

24 best position to judge what's happening.  And his judgment was

25 given in this courtroom on Thursday.  And that judgment was,

 1   "We didn't have grounds to sue."  And he is the one person that

 2   knew everything that was to know about what Android was, what

 3   it had in it, what it was using, and why it was -- why it was

 4   there.

 5            And so based on all of this, two things are

 6   definitely true.  They haven't met the burden to prove

 7   copyright infringement in the first place, because Android is

 8   not a copy of the Java 5.0 copyrighted work.  It is not.  It is

 9   a substantially different work with 100 percent different

10   source code, with a different platform, different

11   functionality, and different success in the market, as you now

12   know.

13            And the other thing that's true is the evidence makes

14   clear as a bell that this kind of use of APIs in this way,

15   where you use the minimum you need to be compatible, is a fair

16   use.  When you're using it to foster innovation, competition.

17   When you're making it available on an open platform that

18   everyone can compete on, you are fostering the kinds of values

19   that fair use was intended to promote.  And we all know in

20   northern California that is absolutely critical to our future

21   and our prosperity.

22            Now, I have to ask one more favor before I sit down,

23   and that's because I don't get a chance to talk again.  Many of

24   you will find that a relief.

25            (Laughter.)

```
 1            But I don't, because I know I've forgotten something
 2   and I know I've left something out.  And I know there is
 3   something that Mr. Jacobs is going to say that maybe I didn't
 4   cover.  And so I'm going to ask you guys who have heard the
 5   evidence and heard our witnesses and seen our exhibits to think
 6   about, what is it that Google would say?  What would Google say
 7   in response to that argument?
 8            You've heard enough to know that I would have a
 9   response and I think you've heard enough to know what that
10   response would be.
11            And so, again, on behalf of Google, I thank you for
12   your time and attention and good luck in your deliberations.
13            THE COURT:  Thank you, Mr. Van Nest.
14            Let's take our next 15-minute break now and then at
15   the end of the next session, the case will go to you for
16   decision.  But not yet.
17            Please, don't talk about the case during the break
18   and we'll see you back here in 15 minutes.
19            (Jury exits courtroom at 10:49 a.m.)
20            THE COURT:  Please be seated.
21            Any issues for the Court?
22            MR. JACOBS:  None from us, your Honor.
23            MR. VAN NEST:  No, your Honor.
24            THE COURT:  All right.  You may use the next 15
25   minutes to set up.
```

1          Mr. Jacobs, are you giving the final final?

2          **MR. JACOBS:**  Yes, sir.

3          **THE COURT:**  You have 25 minute.

4          **MR. JACOBS:**  Thank you very much.

5          (Whereupon there was a recess in the proceedings

6           from 10:49 until 11:07 a.m.)

7          **THE COURT:**  All right.  Please have a seat.  Thank

8    you.  Let's go back to work.

9          May we bring in the jury?

10          **MR. JACOBS:**  Yes, Your Honor.

11          **THE COURT:**  Dawn, may we do that.

12          (Jury enters at 11:09 a.m.)

13          **THE COURT:**  So, welcome back.  Please be seated.

14          Every one over there ready?  Good.

15          Mr. Jacobs, the floor is yours.

16                         **REBUTTAL ARGUMENT**

17          **MR. JACOBS:**  Let's start with the instructions you're

18   going to get on structure, sequence and organization.

19          The implication of Google's argument to you is that

20   this is something off to the side; it's not really what is

21   protected by copyright; and the fact that their structure,

22   sequence and organization is identical is dwarfed by the number

23   of lines of code that are different.

24          But if we look closely at the instructions, we have a

25   very specific and direct answer to that question.

```
 1              So let's look at Instruction No. 17.

 2              Now, if you were listening carefully, you heard

 3    Google's counsel say that the Application Programming

 4    Interfaces are a system -- he was trying to put it into a

 5    bucket that you'll see in the instruction about limitations on

 6    the scope of copyright, because copyright doesn't protect a

 7    system.

 8              So if we look at the bottom paragraph here, we see

 9    that there's a limitation that systems are not protectable.

10              But then in the last time -- in the last line, your

11    instructions will read:

12              "I instruct that the copyrights in question

13              do cover the structure, sequence and

14              organization of the compilable code."

15              And that's what we started calling the SSO of the

16    code, the structure, sequence and organization of the

17    compilable code.

18              And then if we look at Instruction 19, we read in

19    line 22 -- sorry.  Can I have the Elmo for a second.

20              We read in Instruction 19 that Google agrees that the

21    structure, sequence and organization of the 37 accused API

22    packages in Android is substantially the same as the structure,

23    sequence and organization of the corresponding 37 API packages.

24              And then in Instruction 20 we will learn that while

25    individual names are not protectable on a standalone basis,
```

1    names must necessarily be used as part of the structure,

2    sequence and organization, and are, to that extent, protectable

3    by copyright.

4           What Google is saying to you is throw all that out,

5    this structure, sequence and organization; nobody has ever

6    heard of that before.

7           This is the law for this case, that the structure,

8    sequence and organization is protectable.  And this is not

9    something trivial or insubstantial in this case.

10           So let's put up the java.nio slide.  And I would

11    actually -- I wish I had Google's counsel's attempt to convert

12    this slide into the file cabinet analogy, because it got pretty

13    complicated with lots and lots of files.

14           And then Google's counsel had to stop, in talking

15    about the interrelationships and the hierarchies and

16    interdependencies because it would have started to look like a

17    spider web.

18           Now, what the instructions are saying when they say

19    the structure, sequence and organization is protectable, this

20    structure is what is protectable.  None of this is implementing

21    code.  All of this is Application Program Interface elements.

22    And you know that from the testimony of all the experts and all

23    of the developers.  This is the structure, sequence and

24    organization.

25           So let's -- let's take Google's counsel's analogy one

 1    step further.  What is Google saying when they say this is not

 2    substantial, this NIO is not substantial, all the implementing

 3    code is what matters?

 4           What they're saying is, imagine you actually had a

 5    filing system with all the cross-references and

 6    interrelationships that are on this slide.  What you should

 7    count are the number of pieces of paper in the files because we

 8    put, we, Google, put the pieces of paper in the files on our

 9    own; we wrote the code, the implementing code on our own.

10    Forget that the judge is telling you that the whole filing

11    system, the whole structure, sequence and organization, is

12    protectable; count the folders as if they're just another piece

13    of paper.

14           But that completely misses the forest for the trees

15    or the structure, sequence and organization for the pieces of

16    paper.

17           So when Google says to you, Our code is entirely

18    different, what they're saying is the pieces of paper are

19    different.

20           But, of course, the pieces of paper are organized,

21    structured and sequenced in exactly the same way, with exactly

22    the same kinds of paper, in exactly the same file in this now

23    huge, gimongous filing system that gets created.  And this is

24    just one package.  Java.nio is just one package.

25           So the instructions tell us that this is protectable

1    material.  The testimony tells you that this is the important

2    material because this is what Android developers decided to

3    take in order to offer this kind of what's in developers' heads

4    sort of benefit and get on the market more quickly.

5              Now, there's one very important additional

6    instruction that we haven't focused on, and that's 28.  And the

7    last sentence of instruction 28 is very important.

8              It tells you that, in essence, that an infringer does

9    not escape liability by adding new material of the infringer's.

10             We know this has to be common sense.  If the

11   infringer takes one half of my song and adds material -- and

12   adds five songs to it and puts it on an album, of course, the

13   infringer didn't escape liability for infringing half of my

14   song and adding five and a half of his own.

15             And so what this instruction says, if an infringing

16   excerpt is copied from a book, it is not excused from

17   infringement merely because the infringer includes the excerpt

18   in a much larger work of its own.

19             And that is what Google's counsel is trying to argue

20   to you:  We wrote all this additional material ourselves.  We

21   wrote this implementing code ourselves.  Ignore that we took

22   the protected structure, sequence and organization.

23             That is not the law.  It's not the law generally.

24   it's not the law for this case.  You should reject Google's

25   argument.

1           Now, I want, also, just to remind you of the

2    testimony of Google's expert on similarity, because there was a

3    claim by Google's counsel that we didn't show copying.

4           What Google's expert told you, in the material I had

5    a few minutes ago, is that it's word-for-word, symbol-by-symbol

6    identical.

7           And so if we go to closing slide 6.

8           Now, recall that this is -- that what the expert is

9    answering here is Google's counsel's question about

10   differences.  And so Google's counsel says -- he asks it, are

11   there any similarities, hoping that he is going to get an

12   answer from his own expert about all the differences.  And,

13   instead, what his own expert says is:

14              "The package names, class names, and method

15              names for the 37 packages are the same."

16          And then he points out:

17              "The structure of the names of the classes,

18              packages and methods needs to be the same."

19          It had to be the same.  There was no question of

20   copying here.  It's all a question of excuses.

21          So when you look at the structure, sequence and

22   organization, keep in mind that this is the essence of what an

23   architect of software does.  These are the blueprints for the

24   core libraries.  They tell the core library implementer what

25   the structure is, what needs to go in, what needs to go out.

REBUTTAL ARGUMENT / JACOBS                    2578

1         Implementation you saw on the posters.  Coders can

2    implement.  But API designers, that's the creative, that's the

3    heavy-lifting part of writing an effective software package.

4         Let me address, next, the question of damaging --

5    whether there's damage here, whether there's harm here.  This

6    comes up in the fair use factors.

7         I think it would be pretty obvious, again, just very

8    simple terms, if somebody takes my intellectual property and

9    puts it in his own product and gives it away for free, the harm

10   is pretty obvious.  Took my IP.  Gave it away for free to

11   somebody else.

12        But there's real hard evidence in the e-mails of the

13   threat that Sun, and now Oracle, is concerned with and was

14   concerned with.  Let's take a look at Exhibit 205.

15        Now, recall the players here.  This is Scott McNealy,

16   who you heard testify.  He's the chairman of Sun at this point.

17   Jonathan Schwartz is the CEO.  Jonathan Schwartz reports to

18   Scott McNealy as the chairman of the board.

19        The board of Sun is who is in charge.  Not the CEO.

20   The CEO is accountable to the board.  And Scott McNealy is

21   writing to Eric Schmidt and copying Jonathan Schwartz.  And he

22   says, in responding to this business proposal for collaboration

23   on Android:

24        "I'm worried about how we're going to replace

25             the revenue this is likely going to

1           submarine.  I'm supportive of driving a

2           completely open stack, but I just need to

3           understand the economics."

4      And he testified, needing to understand the

5  economics, that means you've really got to show me how we're

6  not just going to take a bath here, because you're going to be

7  giving this away for free and we have a licensing model.

8      So at the very top of the company Sun was concerned

9  about how Android would affect its revenues.

10     And on fragmentation, let's look at one of Google's

11 favorite exhibits.  Let's take a look at page -- at Exhibit --

12 I think it's Exhibit 147.

13         I'm sorry.  It's slide 147, Mr. Lee.

14         Let's go to exhibit -- oh, there we are.  Great.

15         Now, this is a portion of the compatibility is

16 optional presentation that Google's counsel showed you.  And

17 this is -- on the front part there was a debate going on at

18 Sun, How do we deal with compatibility going forward, because

19 we do have these open source models ourselves under the GPL.

20         But this very presentation reminds the reader that

21 here is the state of play before we change our policy.  And it

22 says:

23           "For independent implementation our

24           specification licenses grant IP rights only

25           for implementations that satisfy the

1          compatibility requirements."

2          And the debate at Sun was whether to continue to

3   enforce that.  But they did continue to enforce that.  And they

4   continued to enforce the restrictions on Apache, as well.

5          Now, this Apache issue, it continues to pop up even

6   though it seems like it's been well established that Apache

7   doesn't give -- doesn't give Google any rights.

8          You're going to see an instruction that says that

9   for -- that unless a third party has permission from a

10  licensor -- here from Sun or Oracle -- that you don't get any

11  benefit from the third party.  This will be Instruction No. 30.

12         And Instruction No. 30, starting at around line 23 --

13  or 21:

14              "... Google had no right to copy any elements

15              of the Java platform protected by copyright

16              unless it had a written license to do so from

17              Sun or Oracle, or had a written sub-license

18              from a third party who had a license from Sun

19              or Oracle conferring the right to grant such

20              sub-licenses.

21              "The burden would be on Google to prove it

22              had any such express license or sublicense

23              rights.  But in this trial it makes no such

24              contention."

25         So what this instruction is saying is that unless

1   Apache had a license from Sun, the fact that Google took from

2   Apache is legally irrelevant.

3           And you heard that from witness after witness in this

4   trial, who said on the Google side, no, no, no, we're not

5   claiming any license rights from Apache.

6           So the first question about Apache is, does it give

7   Google any affirmative grant?  Does it constitute a license

8   from Sun through Apache to Google?  And the answer is no.

9           But there's much, much more we can learn about the

10  whole Apache debate.  Let's go to Exhibit 1045, please.

11          You'll recall this exhibit.  This is the exhibit in

12  which Apache says, we give up.  We're not going to argue about

13  this anymore.

14          You'll recall the testimony that Apache Harmony goes

15  in the attic, which means that it's kind of retired from any

16  further work.  And you'll recall that this was accomplished

17  without litigation.  Oracle negotiated with the other players

18  in the industry, such as IBM, and they agreed to collaborate,

19  instead, with Oracle on Oracle's GPL version of Java OpenJDK.

20          But along the way, Apache said very interesting and

21  important things that are completely inconsistent with what

22  Google has told you.  Let's go to the next page.  The third

23  paragraph up, the Apache Software Foundation.

24          Now, you'll recall the testimony, this was a bitter

25  disagreement.  There were people who were very upset with Sun

1   and later with Oracle.  But they had to acknowledge Sun and

2   Oracle's rights to say no.  Just as Sun told Google no when

3   Google wanted Sun to change its business model.

4           The Apache Software Foundation concludes that, the

5   JCP is not an open specification process.

6           Pause there for a minute.

7           Jonathan Schwartz told you, Google's counsel cited

8   it, that Sun made these APIs open.  And you heard a lot of

9   testimony about what "open" can mean.

10          And you heard Scott McNealy say, open does not mean

11  throw it over the transom and give it to someone else with all

12  rights of ownership.

13          Open can mean lots of things.  And here what open

14  means is that you can implement these specifications under a

15  specification license, so long as you are fully compatible.

16  But Sun has a veto.

17          They are published.  They are on the website.  They

18  are open in that sense.  But they are still copyrighted.

19          The Apache Software Foundation concludes that the JCP

20  is not an open spec process.  The Java specifications are

21  proprietary technology that must be licensed directly from the

22  spec lead under whatever terms the spec lead chooses.  That the

23  commercial concerns of a single entity, Oracle, will continue

24  to seriously interfere.  So they are not happy with this.

25          But they say it is impossible to distribute

 1   independent implementations of JSRs -- you remember what those

 2   are -- under open source licenses such that users are protected

 3   from IP litigation from the spec lead.

 4           These are proprietary specifications.  Even though

 5   Sun made them open in one sense, they are proprietary in

 6   another sense.  And Sun gets to say who they license to.

 7           And that brings me to the exhibit I suggested you

 8   keep in mind an hour and a half or so ago, and that's Exhibit

 9   18.

10           So recall Exhibit 18.  This is a back and forth in

11   which one of Andy Rubin's colleagues tells him that somebody

12   else has come up with an independent implementation of the Java

13   specifications and they're not going to -- they don't need the

14   brand --

15           **MR. VAN NEST:**  Excuse me, Your Honor.  I think this

16   is outside the scope of the argument.

17           **THE COURT:**  No.  Overruled.  Please continue.

18           **MR. JACOBS:**  And Andy Rubin writes, right in the

19   middle of the e-mail:

20           "Wish them luck.  The Java.lang APIs are

21           copyrighted.  Sun gets to say who they

22           license the TCK to."

23           So in the absence of an agreement from Sun, you

24   cannot go off and claim you're making this independent

25   implementation and you don't have to take a license.

 1           That was Andy Rubin in 2006.  Very different from
 2  what Google's counsel is arguing to you today.
 3           That was the Apache Software Foundation a minute ago,
 4  in 2010.  Very different from what Google's counsel is arguing
 5  with you today.
 6           And that brings me, finally, to the specification
 7  license, which is the license that Android is most directly in
 8  conflict with, and in which Google's fair use argument most
 9  seriously disrupts.
10           The specification license, you heard it discussed at
11  some length by Thomas Kurian.  The specification license has
12  several requirements.
13           It requires that you not superset and subset.  It
14  requires, in effect, that you have a clean room, because it
15  must be an independent implementation.  And it requires that
16  you fully implement the specification, including all of its
17  required interfaces and functionality.
18           So let's just hit the i, ii, and iii in that
19  paragraph.  So note in the beginning that:
20           "Under this license Sun grants you a license
21            under copyrights or patent rights if you
22            fully implement the spec."
23           Now, recall that Android doesn't do that.  So if
24  Android can get away -- if Google can get away with a partial
25  implementation of the specification and not be forced -- it was

```
 1   a fascinating interchange with Jonathan Schwartz.  You may
 2   recall this.  I said, What's the GPL?  It's give and get back.
 3   He said the GPL is give and force back.  You force back with
 4   copyright.
 5            And here, in this spec license, this -- the
 6   enforcement of copyrights is how Oracle enforces compliance
 7   with this license, enforces Java compatibility.  And so you
 8   have to fully implement the spec.  You can't superset, subset.
 9   You can't pick and choose from the Java APIs the way Android
10   did.  That's ii.
11            And then, of course, you have to pass the TCK.  And
12   Android never did that.  And all of those are interrelated.
13   All of them designed to preserve "write once, run anywhere."
14            And Google would destroy Oracle's ability to enforce
15   the terms of the specification license if Google's fair use
16   argument were adopted.
17            So is there harm to Oracle?  Revenues are increasing.
18   But you heard how the revenues are increasing.  This is --
19   Oracle is a very well-managed company.  And they have figured
20   out places to deploy Java in devices and in cards and in things
21   where Android is not yet present.
22            But on the smart phone, where there is a big
23   opportunity, it's very difficult to compete with free.
24   Impossible.  I don't know how one would compete with free.
25            And so when Google says, How are we harming Java when
```

1   Java revenues are increasing, they are not discussing and not

2   explaining the missed opportunities for Java.

3          And, of course, they can't explain because they would

4   destroy it, the effect on Oracle's efforts to license Java in a

5   compatible and a consistent way.  And, yes, even to address

6   some of the fragmentation issues that arose in the future.

7          You heard about those plans from the Oracle

8   developers.  There is a new sheriff in town.  Java compliance

9   and consistency is being improved.  There is more investment in

10  Java.  There are greater resources being developed.  The

11  layoffs have stopped.

12         We need the help of the justice system to enforce our

13  intellectual property rights so that investment is not for

14  naught.

15         Again, thank you very much for your attention.

16                   **FINAL JURY INSTRUCTIONS**

17         **THE COURT:**  Thank you, Mr. Jacobs.

18         I'm about to start reading the instructions.  And I

19  am sure there are members of the public who would like to

20  excuse themselves, because once we start, I don't want you to

21  distract us by coming and going.  So, please, take this

22  opportunity, if you would like, to excuse yourselves.

23         While the members of the public are excusing

24  themselves, one thing I think I can safely say to you is, I am

25  going to read these instructions, and there are very slight

1    editing changes that I have made, also, on the verdict form,

2    but from what you saw with counsel.  But it's not their fault.

3    They worked with the most recent draft, which I told them was

4    final.  But I've edited it very slightly since then.

5           So if you see some difference from what the lawyers

6    showed you, it's inconsequential, and it's only for editing

7    purposes.  And that discrepancy is my fault and not the fault

8    of the lawyers.

9           All right.  So everyone has left that wants to leave.

10   Great.

11          So just to give you a heads up, this will take,

12   probably, 45 minutes to go through.

13          You know, most of us went to law school for three

14   years.  You get to go to law school for 45 minutes.

15          (Laughter)

16   **THE COURT:**  But you do get this huge benefit, and

17   that is that we have worked hard to summarize for you what the

18   relevant law is so that you don't have to learn three years'

19   worth.  You get to learn the part that bears directly on this

20   case.

21          And we have worked hard to put this in the clearest

22   terms we can so that you will understand it.

23          The part of the case that is completely in your

24   discretion is the fact part.  You know, the "what happened"

25   part.

*FINAL JURY INSTRUCTIONS* 2588

```
 1              But the part that you are duty bound to follow is the

 2    law part as I give it to you, because it's my job to tell you

 3    what the law is, and it's your job, having sworn to do so, to

 4    follow the law in reaching your decision.

 5              So, I am going to pick up where I left off, but I

 6    will repeat the last short paragraph for context, and then

 7    we'll continue on.

 8              You will remember that I had said this:  On any

 9    claim, if you find that plaintiff carried its burden of proof

10    as to each element of a particular claim, your verdict should

11    be for plaintiff on that claim.

12              If you find that plaintiff did not carry its burden

13    of proof as to each element, you must find against plaintiff on

14    that claim.  The same principle also applies to defendants on

15    claims or defenses for which it has the burden of proof.

16              That's the paragraph I read before.  And you will

17    remember, from having seen the Special Verdict Form, that it

18    just tells you flat out who has the burden of proof.  It says

19    "Has Oracle proven," or, as the case may be, "Has Google

20    proven."  So it will be very clear to you in the special

21    verdict form who has the burden of proof.

22              Continuing:

23              I will now turn to the law that applies to this case.

24    Oracle seeks relief against Google for alleged copyright

25    infringement.  Google denies infringing any such copyrighted
```

 1  material and asserts that any use by it of copyrighted material

 2  was protected, among other things, by a defense called "fair

 3  use," which will be explained below.  If you find liability in

 4  this phase, we will consider the extent of damages in the third

 5  phase of the trial.

 6          Now, I will give you an overview of copyright law in

 7  general.  Then I will give you a summary of the claims and

 8  defenses at issue in this case.  After that I will give you a

 9  further statement of copyright law to help you in resolving the

10  claims and defenses.

11          By federal statute, copyright includes exclusive

12  rights to copy a work, rights that last for 95 years from the

13  date of publication.  The rights include the exclusive rights

14  to:

15          Make additional copies or otherwise reproduce the

16  copyrighted work or to license others to do so; recast,

17  transform, or adapt the work, that is, prepare derivative works

18  based on the copyrighted work; distribute copies of the

19  copyrighted work to the public by sale; and display publicly a

20  copyrighted work.

21          It is the owner of the copyright who may exercise

22  these exclusive rights to copy.  Even though someone may

23  acquire a copy of the copyrighted work, such as a book from a

24  bookstore, for example, the copyright owner retains rights to

25  control the making of copies of the work.

1          Copyright automatically exists in a work the moment

2     it is fixed in any tangible medium of expression, such as

3     putting pen to paper.  The owner of the copyright may then

4     register the copyright by delivering to the Copyright Office in

5     the Library of Congress a copy of the copyrighted work and

6     applying via a registration form, after which the Copyright

7     Office will either allow or disallow the application.

8          By way of examples, copyrighted works can include

9     literary works like books, periodicals and, of particular

10    interest here, operating manuals; 2, musical works; 3,

11    photographs and drawings; 4 motion pictures; 5, computer

12    programs, also of particular interest here.

13         Only that part of the work comprised of original

14    works of authorship fixed in any tangible medium of expression

15    from which it can be perceived, reproduced or otherwise

16    communicated, either directly or with the aid of a machine or

17    device can be protected by copyright.  To take examples, words

18    can be fixed on paper, and a computer program can be fixed in

19    the memory of a mobile phone.

20         As stated, the owner of a copyright has the exclusive

21    right to make copies of all or more than a de minimus part of

22    the copyrighted work, subject only to the right of anyone to

23    make fair use of all or a part of any copyrighted material, all

24    as will be explained below.

25         The copyright confers ownership over the particular

*FINAL JURY INSTRUCTIONS* 2591

1  expression of ideas -- expression of ideas -- in a work, but it

2  never confers ownership over ideas themselves.

3          For example, if a book describes a strategy for

4  playing a card game, the copyright prevents anyone but the

5  owner from duplicating the book itself, but everyone is still

6  free to read the book and to use the strategy, for the idea set

7  forth in the book, that is the strategy, is not protected by

8  copyright.  And, everyone is entitled to write their own book

9  about the same game and the same strategy so long as they do

10 not plagiarize the earlier work -- the earlier book.  Again,

11 the main point is that copyright protects the particular

12 expression composed by the author.

13         Another statutory limitation on the scope of a

14 copyright is that copyright never protects any procedure,

15 process, system, method of operation, concept, principle, or

16 discovery.  Possibly such things can be claimed under the

17 patent system or by trade secret laws but they may not be

18 claimed by copyright.  For purposes of your deliberations,

19 however, I instruct you that the copyrights in question do

20 cover the structure, sequence and organization of the

21 compilable code.

22         I'm going to repeat that because it's been alluded to

23 by both sides.  For purposes of your deliberations, however, I

24 instruct you that the copyrights in question do cover the

25 structure, sequence and organization of the compilable code.

*FINAL JURY INSTRUCTIONS*                                    2592

```
 1              I will now turn to the claims in this case.  Oracle

 2    claims Google has infringed its copyrights in two registered

 3    works, namely, quote, Java 2, Standard Edition, Version 1.4,

 4    closed quote, Trial Exhibit 464 and, quote, Java 2, Standard

 5    Edition, Version 5.0, closed quote, Trial Exhibit 475, and the

 6    applications leading to those registrations appear at Trial

 7    Exhibits 3529 and 3530.

 8              Among other things, the registered copyrights

 9    generally include the compilable code and documentation for the

10    Java API packages.  The main issues you must decide concern

11    these two general types of material contained therein, namely

12    "compilable code" and "documentation."

13              As used in these instructions and the Special Verdict

14    Form, the term API, quote, compilable code, closed quote,

15    refers to method names and class names, declarations,

16    definitions, parameters, organization, and implementation

17    (whether in the form of source code or object code)

18    implementing the various API functions.

19              The "compilable code" does not include the

20    English-language comments you have heard about.  I will repeat

21    that sentence.  The compilable code does not include the

22    English-language comments you have heard about.  Even though

23    such comments are embedded in the software program, these

24    English-language comments do not get compiled and are not used

25    by the computer to perform API functions.
```

*FINAL JURY INSTRUCTIONS*                    2593

 1          Instead, the English-language comments are part of

 2    what I will call the API "documentation," sometimes referred to

 3    as the "specification," a term that encompasses all of the

 4    English-language comments.

 5          The term "API documentation" includes all content

 6    including English-language comments as well as method names and

 7    class names, declarations, definitions, parameters, and

 8    organization - in the reference document for programmers.

 9    Again, please remember that although these English-language

10    comments appear in the software program listing, they can be

11    extracted for handy reference in the guides made available to

12    programmers.  So, I will be referring to the "API compilable

13    code" and to the "API documentation."

14          The copyrighted Java platform has more than 37 API

15    packages, and so does the accused Android platform.  As for the

16    37 API packages that overlap, Google agrees that it uses the

17    same names and declarations but contends that its line-by-line

18    implementations are different (with the exception of the

19    rangeCheck lines), a contention not disputed by Oracle.

20    Instead, Oracle contends that Google copied the structure,

21    sequence and organization of the compilable code for the 367

22    API packages as a group.

23          Google agrees that the structure, sequence and

24    organization of the 37 accused API packages in Android is

25    substantially the same as the structure, sequence and

*FINAL JURY INSTRUCTIONS*

1  organization of the corresponding 37 API packages in Java.

2  Google states, however, that the elements it has used are not

3  infringing and, in any event, its use was protected by a

4  statutory rule permitting anyone to make "fair use" of

5  copyrighted works.

6          Now, let me tell you the law about names.  The

7  copyrights do not cover the names, such as those given to

8  files, packages, classes, and methods, because under the law,

9  names cannot be copyrighted.  This applies to the name "java"

10  as well.  Although "Java" has been registered as a trademark,

11  there is no trademark claim in this lawsuit.  The name java

12  cannot be copyrighted, nor can any other name, whether one or

13  two words or longer in length.  While individual names are not

14  protectable on a standalone basis, names must necessarily be

15  used as part of the structure, sequence and organization and

16  to -- and are to that extent protectable by copyright.

17          With respect to the API documentation, Oracle

18  contends Google copied the English-language comments in the

19  registered copyrighted work and moved them over to the

20  documentation for the 37 API packages in Android.  Google

21  agrees that there are similarities in the wording but, pointing

22  to differences as well, denies that its documentation is a

23  copy.

24          Google further asserts that the similarities are

25  largely the result of the fact that each API carries out the

*FINAL JURY INSTRUCTIONS*                                    2595

1    same function in both systems.  Google again asserts the

2    statutory defense of fair use.

3           The issues just discussed center on the API packages.

4    Apart from the API packages -- issues -- apart from the API

5    issues, I will now describe a list of specific items that

6    Oracle contends were copied verbatim by Google.

7           Specifically, Oracle contends that Google copied

8    verbatim certain lines of compilable code, namely the

9    rangeCheck method in two files, other source code as compiled

10   into object code in seven "Impl.Java" files and one other file

11   and, finally, certain English-language comments in two other

12   files.  Google responds that any verbatim copying by it was

13   excusable under the law as "de minimus."  "De minimus."

14          For purposes of this group of infringement

15   contentions, the structure, sequence and organization is

16   irrelevant and the comparison must be made to the work as a

17   whole as defined in a moment.

18          Now, I will turn to the more detailed law.  In order

19   to prove infringement, Oracle must first prove that Oracle's

20   work is original and that it is the owner of the part of the

21   work allegedly copied.  For your purposes, the parties agree

22   that there are no issues of ownership or originality for you to

23   decide.

24          Oracle must also prove that Google copied all or a

25   protected part of a copyrighted work owned by Oracle and that

*FINAL JURY INSTRUCTIONS*
2596

1  the amount of copying was more than de minimus.

2      So there are two elements Oracle must prove to carry

3  its burden on infringement, namely copying of a protected part,

4  and that the part copied was more than de minimus when compared

5  to the work as a whole.  These are issues for you to decide.

6  I'll repeat that.  These are issues for you to decide.

7      There are two ways to prove copying.  One is by proof

8  of direct copying, as where the copyrighted work itself is used

9  to duplicate or restate the same words and symbols on a fresh

10  page.

11      The second way is via circumstantial evidence by

12  showing the accused had access to the copyrighted passages in

13  question and that there are substantial similarities or, in

14  certain instances, virtual identity between the copyrighted

15  work and the accused work.

16      The virtual identity test is used when the subject

17  under consideration is a narrow one and we would expect certain

18  terms and phrases to be used.  This is in contrast to, for

19  example, a fictional work in which there will be a broad range

20  of creativity, in which case it is necessary only to prove

21  substantial similarity.

22      In this trial, you should use the substantial

23  similarity test for all such comparisons except for those

24  involving the API documentation, in which case you should use

25  the virtual identity test.  This is because the documentation

*FINAL JURY INSTRUCTIONS* 2597

 1  for the API packages describe narrow technical functions and it

 2  is to be expected that some of the same words and phrases would

 3  likely be used.

 4          To determine whether the copyrighted work and the

 5  accused work are substantially similar, or where appropriate,

 6  virtually identical, you must compare the works as a whole.  I

 7  will define the works as a whole in a moment.

 8          I'm sorry.  I should have said the "work" as a whole.

 9          However, in comparing the works as a whole, you

10  cannot consider similarities to the unprotectable elements of

11  Oracle's works.  I have instructed you about the protectable

12  and unprotectable elements of Oracle's work.

13          Now, I will explain the law governing Google's

14  defense based upon the statutory right of anyone to make "fair

15  use" of copyrighted works.

16          Anyone may use any copyrighted work in a reasonable

17  way under the circumstances without the consent of the

18  copyright owner if it would advance the public interest.  Such

19  a use of a copyrighted work is called "fair use."

20          The owner of a copyright cannot prevent others from

21  making a fair using of the owner's copyrighted work.  For

22  example, "fair use" may include use for criticism, comment,

23  news reporting, teaching (including multiple copies for

24  classroom use), scholarship, or research.

25          Google has the burden of proving this defense by a

*FINAL JURY INSTRUCTIONS*                                    2598

1   preponderance of the evidence.

2           In determining whether the use made of the work was

3   fair you should consider the following factors:

4           1.  The purpose and character of the use, including

5   whether such use is of a commercial nature, for nonprofit

6   educational purposes, and whether such work is transformative

7   (meaning whether Google's use added something new, with a

8   further purpose or different character, altering the copied

9   work with new expression, meaning or message).  Commercial use

10  cuts against fair use while transformative use supports fair

11  use;

12          2.  The nature of the copyrighted work, including

13  whether the work is creative (which cuts against fair use),

14  functional (which supports fair use), or factual (which also

15  supports fair use);

16          3.  The amount and substantiality of the portion used

17  in relation to the copyrighted work as a whole.  The greater

18  the quantity and quality of the work taken, the less that fair

19  use applies; and

20          4.  The effect of the use upon the potential market

21  for or value of the copyrighted work.  Impairment of the

22  copyrighted work cuts against fair use.

23          All of the factors should be weighed together to

24  decide whether Google's use was fair use or not.  It is up to

25  you to decide how much weight to give each factor but you must

*FINAL JURY INSTRUCTIONS*

1  consider all factors.  If you find that Google proved by a

2  preponderance of the evidence that Google made fair use of

3  Oracle's work, your verdict should be for Google on that

4  question in the Special Verdict Form.

5          With respect to the infringement issues concerning

6  the rangeCheck and other similar files, Google agrees that the

7  accused lines of code and comments came from the copyrighted

8  material, but contends that the amounts involved were so

9  negligible as to be de minimus and thus should be excused.  To

10 be clear with respect to a different issue.  The parties are in

11 agreement that the structure, sequence and organization of the

12 API packages is more than de minimus.

13         Copying that is considered "de minimus" is not

14 infringing.  Copying is "de minimus" only if it is so meager

15 and fragmentary that compared to the work as a whole the

16 average audience would not recognize the appropriation.

17         You must consider the qualitative and quantitative

18 significance of the copied portions in relation to the work as

19 a whole.  The burden is on Oracle to prove that the copied

20 material was more than de minimus.

21         The relevant comparison is the copied portion

22 contrasted to the work as a whole, as drawn from the

23 copyrighted work, not contrasted to the accused infringer's

24 work as a whole.  For example, if an infringing excerpt is

25 copied from a book, it is not excused from infringement merely

1  because the infringer includes the excerpt in a much larger

2  work of its own.

3         In your deliberations, you will need to make certain

4  comparisons to the "work as a whole."  It is my job to isolate

5  and identify for you the "work as a whole."  You must take my

6  identification as controlling if and when this issue comes up

7  in your deliberations.

8         The issue arises when (1) comparing Oracle's work and

9  Google's work for similarity under both a substantial

10  similarity and virtual identity standards, (2) deciding where

11  Google copied only a de minimis amount of Oracle's work, and

12  (3) evaluating the third factor of fair use: the amount and

13  substan- -- substantiality of the portion used in relation to

14  the copyrighted work as a whole.

15         Although you have seen that the copyright

16  registrations cover a large volume of work, the entire

17  registered work is not the work as a whole for these purposes.

18  I'm going to repeat that sentence.

19         Although you have seen the copyrighted registrations

20  cover a large volume of work, the entire registered work is not

21  the work as a whole for these purposes.  This may seem odd to

22  you, so let me give you an example.  An entire magazine issue

23  may be copyrighted, but a specific article or advertisement or

24  photograph may be the relevant work as a whole, depending on

25  what was allegedly copied.

*FINAL JURY INSTRUCTIONS* 2601

 1         For purposes of this case, I have determined that the

 2    "work as a whole" means the following:  For purposes of

 3    Question 1 in the Special Verdict Form the "work as a whole"

 4    constitutes all of the compilable code associated with all of

 5    the 166 API packages (not just the 37) in the registered work.

 6    This excludes the virtual machine.

 7         Similarly, for purposes of Question 2 in the Special

 8    Verdict Form, the "work as a whole" means the contents

 9    (including names, declarations and English-language comments)

10    of the documentation for all of the 166 API packages, again not

11    just the 37 in the registered work.

12         For purposes of Question 3, the -- for purposes of

13    Question 3 the "work as a whole" is the compilable code for the

14    individual file except for the last two files listed in

15    Question 3, in which case the "work as a whole" is the

16    compilable code and all of the English-language comments in the

17    same file.

18         Unless you find fair use, de minimus, or

19    non-infringement in Google's favor, Google had no right to copy

20    any elements of the Java platform protected by copyright unless

21    it had a written license to do so from Sun or Oracle or had a

22    written sub-license to do so from a third party who had a

23    license from Sun or Oracle conferring the right to grant such

24    sub-licenses.  The burden would be on Google to prove it had

25    any such express license or sub-license rights.  But in this

*FINAL JURY INSTRUCTIONS*

2602

1    trial it makes no such contention.

2          Put differently, if Google claims a license from a

3    third party, Google has the burden to prove that the third

4    party itself had the proper right and authority from Sun or

5    Oracle as to any of the copyrights owned by Sun or Oracle and

6    used by Google, for Google could acquire from the third party

7    no greater right than the third party itself had in the first

8    place.

9          Similarly, if Google contends that Oracle or Sun had

10   dedicated elements protected by the copyright to the public

11   domain for free and open use, the burden would be on Google to

12   prove such a public dedication.  But the parties agree that

13   that issue is for me to decide.  Me as the judge.  Not for you

14   as the jury to decide.  This statement of the law regarding

15   licenses is simply to put some of the evidence you have heard

16   in context.

17         I wanted to stop here just to give you a heads up.  I

18   have now finished the statement of the law.  I am coming to

19   what we call the concluding instructions.

20         When you begin your deliberations, you should elect

21   one member of your jury as the foreperson.  That person will

22   preside over the deliberations and speak for you here in court.

23   I recommend that you select a foreperson who will be good at

24   leading a fair and balanced discussion of the evidence and the

25   issues.

*FINAL JURY INSTRUCTIONS*

1      You will then discuss the case with your fellow

2   jurors to reach agreement if you can do so.  Your verdict as to

3   each claim and as -- your verdict as to each claim and as to

4   each defense, if any, must be unanimous.

5      Each of you must decide the case for yourself, but

6   you should do so only after you have considered all the

7   evidence, discussed it fully with the other jurors, and

8   listened to the views of your fellow jurors.

9      Do not be afraid to change your opinion if the

10  discussion persuades you that you should.  Do not come to a

11  decision simply because other jurors think it is right.  It is

12  important that you attempt to reach a unanimous verdict but, of

13  course, only if each of you can do so after having made your

14  own conscientious decision.  Do not change an honest belief

15  about the weight and effect of the evidence simply to reach a

16  verdict.

17      I will give you a Special Verdict Form to guide your

18  deliberations.

19      Some of you have taken notes during the trial.

20  Whether you took notes, you should rely on your own memory of

21  what was said.  Notes should only assist your memory.  Do not

22  be overly influenced by the notes.

23      When you go into the jury room, the clerk will bring

24  in to you the trial exhibits received into evidence to be

25  available for your deliberations.  The clerk will also provide

1    you with an index to them.

2            As I noted before the trial began, when you retire to

3    the jury room to deliberate, you will have with you the

4    following:

5            All of the exhibits, as I just said, that were

6    received into evidence.  An index of the exhibits.  The lawyers

7    here, I should pause and say, in order to make it easier for

8    you, agreed upon a stipulated index of the exhibits.  So that

9    will help you find materials.  A work copy of these

10   instructions for each of you.  A work copy of the verdict form

11   for each of you.  And then, of course, an official verdict

12   form.

13           When you recess at the end of each day, please place

14   your work materials in the brown envelope provided and cover up

15   any easels with your work notes so that if my staff needs to go

16   into the jury room, they will not even inadvertently see any of

17   your work in progress.

18           Just one moment.  Dawn, do we have the marshal ready?

19           **THE CLERK:**  Yeah, I assume it would be Chris, who is

20   standing back there.

21           **THE COURT:**  Chris, would you like to come forward.

22           A United States marshal will be outside the jury room

23   door during your deliberations.  If it becomes necessary during

24   your deliberations to communicate with me, you may send a note

25   through the marshal, signed by your foreperson or by one or

1    more members of the jury.

2         No member of the jury should ever attempt to

3    communicate with me except by a signed writing.  And I will

4    respond to the jury concerning the case only in writing or here

5    in open court.

6         If you send out a question, I will consult with the

7    lawyers before answering it, which may take some time.  I want

8    to repeat that.  If you send out a question, I will consult

9    with the lawyers before answering it, which may take some time.

10   You may continue your deliberations while waiting for the

11   answer to any question.

12        Remember that you are not to tell anyone, including

13   me, how the jury stands, numerically or otherwise, until after

14   you have reached a verdict -- unanimous verdict or have been

15   discharged.  Do not disclose any vote count in any note to the

16   Court.  Again, do not disclose any vote count in any note to

17   the Court.

18        Now that you are going to begin your deliberations --

19   oh, now you are going to begin your deliberations.  As

20   mentioned earlier, you must stay until 1:00 o'clock today.  But

21   if you don't reach a verdict by the end of today then you will

22   resume your deliberations tomorrow and thereafter.

23        The Court recommends that you deliberate from at

24   least 8:00 a.m. to 4:00 p.m. tomorrow and thereafter, but that

25   your schedule is up to you.  You don't have to stay past 1:00,

1   unless you're available.  And if you do stay past 1:00, we will

2   arrange for a lunch to be provided to you.

3           It is very important that you let the clerk know in

4   advance what hours you will be deliberating.  That will be

5   through a note through the marshal.  It is very important that

6   you let us know in advance what hours you will be deliberating

7   so that the lawyers may be present in the courthouse at any

8   time you are deliberating.

9           And I'll just pause and say the reason for that is

10  that if you were to send out a note, we would all want to be

11  standing at the ready to get right on it and try to answer it

12  for you.  But we need to let the lawyers have a lunch break or

13  other breaks.  So we need to know your schedule so we can

14  conform ours accordingly.

15          You may only deliberate when all of you are together.

16  I want to repeat that because that may not seem -- that will be

17  easy to do something different.

18          So you may only deliberate when all of you are

19  together.  This means, for instance, that in the mornings

20  before everyone has arrived or when someone steps out of the

21  jury room to go to the restroom you may not discuss the case.

22          As well, the admonition that you are not to speak to

23  anyone outside the jury room about this case still applies

24  during your deliberations.

25          I'm almost done.

*FINAL JURY INSTRUCTIONS*                                                2607

1          At this time, the marshal will identify herself.

2   Chris, what is your name?

3          **DEPUTY MARSHAL HADDAD:**  Christine Haddad.

4          **THE COURT:**  All right.  Please raise your right hand

5   and take the oath.

6          (Deputy marshal sworn to take charge of the jury.)

7          **THE CLERK:**  Okay.

8          **THE COURT:**  Thank you, Chris.

9          My final paragraph to you:  After you have reached a

10  unanimous agreement on your verdict, your foreperson will fill

11  in, date and sign the verdict form, and advise the Court

12  through the marshal that you have reached a verdict.

13         The foreperson should hold on to the filled-in

14  verdict form and bring it into the courtroom when the jury

15  returns the verdict.

16         Thank you for your careful attention.  The case is

17  now in your hands.  You may now retire to the jury room and

18  begin your deliberations.

19         **MR. VAN NEST:**  Your Honor.

20         **THE COURT:**  Yes.

21         **MR. VAN NEST:**  Before our jurors are excused, may we

22  approach sidebar, very briefly?

23         **THE COURT:**  All right.  Bear with us for one moment.

24         (The following proceedings were held at sidebar.)

25         **MR. VAN NEST:**  I spoke briefly about this with

1   Mr. Jacobs, but I just want to alert the Court to the

2   following:

3          I know you haven't made a decision on Ms. Michals,

4   but I want to be sure that if she deliberates for Phase One

5   that no one is later going to claim -- and then if you decide

6   to release her for Phase Two, that no one is going to claim a

7   Seventh Amendment problem that could affect the verdict in

8   Phase One.

9          In other words, there are some issues in Phase One

10  that would be interrelated with Phase Three.  Speaking on

11  behalf of Google, we would waive any such objection that would

12  allow her to -- so we would agree not to raise such an

13  objection even if she deliberates for Phase One and then you

14  released her.

15         **THE COURT:**  Do you agree to that, Mr. Jacobs?

16         **MR. JACOBS:**  Yes.

17         **THE COURT:**  All right.  So does that satisfy you?

18         **MR. VAN NEST:**  It does.

19         **THE COURT:**  Thank you.

20         (Sidebar concluded.)

21         **THE COURT:**  All right.  You may now retire to the

22  jury room and begin your deliberations.

23         (At the hour of 12:12 p.m. the jury retired to begin

24         deliberations, and did not return to the courtroom on

25         this day.)

```
 1              THE COURT:  All right.  Please, be seated.

 2              Are there any issues by counsel?

 3         MR. JACOBS:  Not from us, Your Honor.

 4         MR. VAN NEST:  I don't believe so, Your Honor.

 5         THE COURT:  All right.

 6              Here is the drill, at this point.  You need to be

 7  working with Dawn to make sure that the exhibits and the things

 8  that go into the jury room are in good order.  That will go in

 9  quite quickly.

10              I am going to go back into chambers and get the

11  slightly-conformed set of jury instructions ready to go into

12  the jury room, along with the verdict form.

13              And I'll make sure you get copies of that, but I

14  don't think there's any need to get you to vet that once again.

15  You will just be given copies of what's going to go into the

16  jury room.

17              And, then, as soon as we know the schedule, we will

18  let you have the schedule so you can conform your own to the

19  schedule of the jury.

20              So is all that clear, or do I need any further

21  explanation on that?

22         MR. VAN NEST:  I don't think so, Your Honor.  I

23  assume that you expect counsel to be present throughout

24  deliberations.  At least some counsel.

25         THE COURT:  At least one of you have got to be in the
```

```
 1  building.  And Dawn should have your cell phone number so we

 2  can reach you at any time.

 3           MR. VAN NEST:  We'll do it.

 4           THE COURT:  And if there is a note, we'll call you

 5  immediately and reconvene.

 6           I do have a 2 o'clock hearing in a different case

 7  that I need to -- but I will interrupt that.  At any moment we

 8  get a note, I will interrupt that hearing and deal with the

 9  note.

10           All right.  Anything else?

11           MR. VAN NEST:  No, Your Honor.

12           MR. JACOBS:  Nothing from us, Your Honor.  Thank you.

13           THE COURT:  All right.  Okay.  Thank you.

14           (At 12:13 p.m. the proceedings were adjourned for

15           jury deliberations.)

16                             - - - - -

17

18

19

20

21

22

23

24

25
```

**I N D E X**

|                                    | PAGE | VOL. |
|------------------------------------|------|------|
| Preliminary Jury Instructions      | 2467 | 12   |
| Closing Argument by Mr. Jacobs     | 2474 | 12   |
| Closing Argument by Mr. Van Nest   | 2518 | 12   |
| Rebuttal Argument by Mr. Jacobs    | 2572 | 12   |
| Final Instructions                 | 2586 | 12   |

- - - -

## CERTIFICATE OF REPORTERS

We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 10-3561 WHA, **Oracle America, Inc., vs. Google, Inc.,** were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings at the time of filing.


_____
/s/ Katherine Powell Sullivan


Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter


_____
/s/ Debra L. Pas


Debra L. Pas, CSR #11916, RMR CRR


Monday, April 30, 2012