Volume 15

Pages 2680 - 2738

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,           )
                                )
            Plaintiff,          )
                                )
   VS.                          )  No. C 10-3561 WHA
                                )
GOOGLE, INC.,                   )
                                )
            Defendant.          )  San Francisco, California
_____)  May 3, 2012


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          MORRISON & FOERSTER
                            755 Page Mill Road
                            Palo Alto, California  94304
                  BY:  **MICHAEL A. JACOBS, ESQUIRE**
                       **KENNETH A. KUWAYTI, ESQUIRE**
                       **MARC DAVID PETERS, ESQUIRE**
                       **DANIEL P. MUINO, ESQUIRE**

                            BOIES, SCHILLER & FLEXNER
                            333 Main Street
                            Armonk, New York 10504
                  BY:  **DAVID BOIES, ESQUIRE**
                       **ALANNA RUTHERFORD, ESQUIRE**


(Appearances continued on next page)



Reported By:  Katherine Powell Sullivan, RPR, CRR, CSR #5812

**APPEARANCES (CONTINUED):**

For Plaintiff:

BOIES, SCHILLER & FLEXNER
1999 Harrison Street, Suite 900
Oakland, California  94612
BY: **WILLIAM FRED NORTON, ESQUIRE**
**STEVEN C. HOLTZMAN, ESQUIRE**

ORACLE AMERICA, INC.
500 Oracle Parkway
Redwood Shores, California  94065
BY: **ANDREW C. TEMKIN, CORPORATE COUNSEL**
**DORIAN DALEY, GENERAL COUNSEL**

For Defendant:

KEKER & VAN NEST
633 Battery Street
San Francisco, California  94111-1809
BY: **ROBERT ADDY VAN NEST, ESQUIRE**
**CHRISTA MARTINE ANDERSON, ESQUIRE**
**DANIEL PURCELL, ESQUIRE**
**MICHAEL S. KWUN, ESQUIRE**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036-4003
BY: **BRUCE W. BABER, ESQUIRE**

GOOGLE, INC.
1600 Amphitheatre Parkway
Mountain View, California  94043
BY: **RENNY HWANG, LITIGATION COUNSEL**

Also Present:

**SAFRA CATZ, President and CFO**
Oracle Corporate Representative

**CATHERINE LACAVERA**
Google Corporate Representative

PROCEEDINGS

1                    **P R O C E E D I N G S**

2   **MAY 3, 2012**                                          **10:58 A.M.**

3

4              (The following proceedings were held in open court,

5              outside the presence of the jury.)

6              (Today's Vol. 15 immediately follows Vol. 14, page

7              2675; nothing omitted nor deleted in pages 2676

8              through 2679.)

9              **THE COURT:**  All right.  Please, be seated.  Thank

10  you.

11             How is everybody?

12             **MR. VAN NEST:**  Fine, Your Honor.  Good morning.

13             **THE COURT:**  I want to start by saying, yesterday I

14  sent out a short request to the lawyers saying that if we were

15  to get a verdict today I would like to give the jury tomorrow

16  off, and would that create any problems for you.

17             Of course, you lawyers know that that was just

18  intended for your eyes, and the jury had no idea that that was

19  in the works.  But then members of the press picked it up like

20  I was telling the jury they get a day off if they come back

21  with the verdict today.

22             Of course, I never would have done that.  The jury

23  has no idea that that was a possibility.  I just wanted to make

24  that clear in case someone takes an appeal based on what's in

25  the newspapers.

PROCEEDINGS

```
 1          The newspapers had that one totally wrong.  And I ask

 2   the members of the press to correct that, because I don't want

 3   the verdict in this case, the public not to have confidence in

 4   it.

 5          I think some people in the public might draw the

 6   wrong impression if they thought the judge was trying to induce

 7   the jury to speed it up.  I would never do that.

 8          All right.  Enough said on that.  It was just a

 9   misunderstanding of what I had said.

10          We have a new note.  Have you read the new note?

11          MR. PURCELL:  We have.

12          THE COURT:  Well, we will now deal with that.  This

13   is from Ms. Jennifer Michals.  Ms. Michals says:

14          "In paragraph 28, when referring to 'average

15          audience,' is the average audience the

16          general public or the audience of programmers

17          using the code?"

18          Let's see what paragraph 28 says.  This is on

19   de minimus.

20          Oh, I see, the second sentence:

21          "Copying is de minimus only if it is so

22          meager and fragmentary that compared to the

23          work as a whole the average audience would

24          not recognize the appropriation."

25          Okay.  What would you like to say on this subject?
```

1          **MR. VAN NEST:**  Your Honor, we'd like a few minutes.

2    We're checking to see if there's any law on it.  If we could

3    have a few minutes to do that, we would like to follow that up.

4    We're just checking to see whether anyone has interpreted that

5    language.  And, if so, we would bring that to Your Honor's

6    attention right away.

7          I don't know the answer off the top of my head.

8    Maybe Mr. Baber does, and here he is.

9          **THE COURT:**  Mr. Baber has elbowed his way to the

10   lectern.

11         (Laughter)

12         **MR. VAN NEST:**  He didn't have to elbow me, Your

13   Honor.

14         **MR. BABER:**  I think, Your Honor --

15         **THE COURT:**  I'm teasing.  Go ahead, please.

16         **MR. BABER:**  I'm not sure that there is any specific

17   authority making it clearer, but the language about "average

18   audience" comes directly out of *Newton vs. Diamond*, which is

19   one of the cases we rely on for the de minimus doctrine.

20         And in *Newton vs. Diamond*, the Ninth Circuit said

21   that the -- "this relates to the test for substantial

22   similarity which, quote, also looks to the response of the

23   average audience, or ordinary observer."

24         And that language about "ordinary observer" has been

25   in copyright cases for decades.  Off the top of my head, I

1   don't know of any case where a court has said it's anything

2   less than, you know, the average, quote, ordinary observer.

3          **MR. JACOBS:**  There is a fair amount of law on this,

4   Your Honor.  I have not located Ninth Circuit authority yet.

5          There is a fair amount of law that says that,

6   particularly in technical cases or in cases involving distinct

7   subject matter, the standpoint of the observer is measured from

8   the standpoint of an observer in that field, rather than from

9   the lay observer.

10         I'm not sure, at this stage, what to do because

11  neither of us really briefed this in the context of the

12  instruction.

13         So the question is whether the Court would want to

14  elaborate, at this stage.  If so, I think we probably should

15  hustle and get you the right authority to look at very quickly.

16         **THE COURT:**  Unless you both agree.  If you both agree

17  the law of the case would be whatever you agree to.

18         **MR. JACOBS:**  I think Mr. Baber just suggested it's an

19  ordinary observer.  And I suggest that it's an observer in the

20  relevant -- who is knowledgeable in the relevant subject area.

21         **THE COURT:**  Well, may I make an observation and --

22  without it being deemed to be a ruling?

23         Shouldn't the average audience be the audience of

24  people who would read this sort of thing, as opposed to the

25  general public?

PROCEEDINGS

1           I rather suspect the general public would not be able

2   to read source code.  And, from that point of view, they would

3   need expert guidance to decide, I suppose.  I'm not sure.

4           But from the point of view of people who read

5   software programs, that's the audience that these works are

6   directed to.  And, to me, it seems like we should be defining

7   "average audience" to be the group of people who would be

8   reading this kind of thing.

9           Now, that's just my observation.  I'm not making that

10  ruling yet.  But I can see all kinds of mischief if we were to

11  come up with a different standard.

12          **MR. JACOBS:**  One of my colleagues handed me a note

13  that I do think crystallizes the question, which is:  What if

14  the defendant plagiarized a book in French?  Plainly, you would

15  want to evaluate the similarity from the standpoint of a French

16  speaker, albeit before an American jury.

17          They would be aided by the expert testimony, who

18  would say to any French reader these words, this structure,

19  whatever the relevant copyrightable material, this looks

20  identical.

21          **MR. BABER:**  Your Honor, just in terms of the history

22  here, looking back at the instructions that the parties

23  proposed, the language about "average audience" actually comes

24  from Oracle's proposed instruction, rather than ours.

25          Oracle asked for an instruction that said, in the

 1  copyright infringement context, copying is considered

 2  de minimus only if it is so meager and fragmentary that the

 3  average audience would not recognize the appropriation.  And

 4  they didn't address anything about being more specific.

 5          Our proposed instruction on de minimus didn't use

 6  that language out of *Newton vs. Diamond* that I just cited to

 7  you.

 8          **THE COURT:**  Perhaps, but that doesn't get us

 9  anywhere.  The jury is asking a question about the -- or at

10  least one member of the jury is asking a question about the

11  instruction as it was given.  So --

12          **MR. VAN NEST:**  Could we have just a moment to caucus,

13  Your Honor, or handle this at the end of the hearing, either

14  one?

15          **THE COURT:**  I think we ought to deal with the jury's

16  note first.  I will sit here in stoney silence --

17          **MR. VAN NEST:**  Thank you.

18          **THE COURT:**  -- and wait for you to caucus.

19          (Pause)

20          **MR. VAN NEST:**  Your Honor, what about -- something, I

21  think, along the lines of what Your Honor suggested -- the

22  average audience is essentially the audience for the works.  In

23  other words, it's a copyrighted work.  The average audience

24  would be the audience for the works.  That's who -- that's who

25  is really the intended audience.

1          I don't think it would be limited to just people

2   writing in this code or just people using it, but the average

3   audience probably is narrower than the general public.  It

4   would be the intended audience for the works.

5          **THE COURT:**  What does that mean, people who are --

6          **MR. VAN NEST:**  People --

7          **THE COURT:**  A teenager in high school who has an

8   Apple on her phone --

9          **MR. VAN NEST:**  No.

10         **THE COURT:**  -- and she is punching the button and

11  using that?  What does that mean?

12         **MR. VAN NEST:**  No, no, no.  The average audience that

13  can read and understand code.  It would include programmers and

14  app developers.

15         **THE COURT:**  All right.  How about the "average

16  audience" means those who would be expected to read the work?

17         **MR. VAN NEST:**  Copyrighted works.

18         **THE COURT:**  Copyrighted works.

19         **MR. JACOBS:**  I think that's fine, Your Honor.

20         **THE COURT:**  "'Average audience' means those who would

21  be expected to read the copyrighted works."

22         Agreed?

23         **MR. VAN NEST:**  That's fine, Your Honor.

24         **THE COURT:**  Is this one I can just send back in

25  without bringing the jury back?

```
 1              MR. VAN NEST:  Sure.

 2              THE COURT:  Here's what I'm going to do.  I'm going

 3    to say, "answer."  Why don't you take a look at this, to see if

 4    you think I'm okay.  What is today?  May 3rd, 11:10.  Look at

 5    it and see if I wrote it down correctly.

 6              (Pause)

 7              MR. JACOBS:  Yes, Your Honor.

 8              MR. VAN NEST:  That's fine, Your Honor.

 9              THE COURT:  Do I have your permission now to send

10    that into the jury room?

11              MR. JACOBS:  Yes, Your Honor.

12              MR. VAN NEST:  Yes.

13              THE COURT:  Great.  Dawn will do that now.

14              Now we can turn to the other event.  I've lost my

15    train of thought; didn't I?

16              Oh, yes, we want to go over your motion to exclude,

17    so who's going to argue that and bring me up to speed on this?

18              MR. PURCELL:  Well, it's their motion, Your Honor.  I

19    don't know if you wanted them to start.  I'm happy to provide

20    some background on it.

21              There's one, actually, important development that

22    just happened in the past couple of days.  If you recall, this

23    motion started off as a motion to strike based on the fact that

24    we didn't have the foundational interviewee on our witness

25    list, Aditya Agarwal, so Your Honor gave us leave to substitute
```

PROCEEDINGS                                                    2690

```
 1  Mr. Rubin.

 2          They have now subpoenaed Mr. Argarwal to testify at

 3  trial.  We have accepted service of the subpoena, so it seems

 4  like that problem should be solved, and we should be able to

 5  put Mr. Agarwal on the stand, put Mr. Rubin on the stand, lay

 6  the foundation to the documents through them, and then proceed

 7  from there.  If they have any objections, we can deal with

 8  those as they make them.

 9          That's how I would suggest to proceed.

10          THE COURT:  Well, that would be great if it's that

11  simple.

12          Mr. Norton, does that solve the problem?

13          MR. NORTON:  It does not.

14          THE COURT:  Okay.

15          MR. NORTON:  The problem is not whether Aditya

16  Agarwal testifies at trial, and it never was.

17          The problem is that Mr. Argarwal testified, as the

18  30(b)(6) representative of Google, that he didn't know how the

19  P&L was generated; he didn't know how Android costs were

20  allocated.  He didn't know anything about that P&L.

21          That was the basis for our motion to strike, was that

22  Dr. Kearl assumed that Dr. Cox had correctly allocated costs

23  for Android under 504(b).  Dr. Cox assumed that the P&L

24  correctly allocated costs.  Dr. Cox's only basis for making

25  that assumption was that he believed that Mr. Argarwal said so.
```

1    And Mr. Argarwal testified he didn't have the faintest idea how

2    those numbers were generated.

3           **THE COURT:**  So you know-- okay.  Interrupt you for a

4    second.  Show me the numbers we're arguing over.

5           I would have thought that we had -- this is a public

6    company.  We would be dealing with audited financials, and that

7    there would be no issue here.  So why --

8           **MR. PURCELL:**  We are, Your Honor.

9           **THE COURT:**  No, Mr. Purcell --

10          **MR. PURCELL:**  Fair enough.

11          **THE COURT:**  It's his motion.  Stop interrupting him.

12          **MR. PURCELL:**  Fair enough.

13          **MR. NORTON:**  I can hand up Exhibit 1069, which was

14   the document produced by Google before Mr. Rubin's deposition

15   and is the P&L for Android.

16          **THE COURT:**  Is that this one?

17          **MR. NORTON:**  You have an easier-to-read copy than I

18   do.

19          **THE COURT:**  What kind of document is this?

20          **MR. NORTON:**  It is a document that was -- Mr. Rubin

21   testified he received from the Google lawyers.  And he

22   testified that it appeared to be similar to the types of

23   documents he received --

24          **THE COURT:**  Is it ginned up just for this case, or a

25   real document used in the ordinary course of business?

1           **MR. NORTON:**  This document, I'll have to defer to

2    Google on that.  This is not a document that anyone has

3    testified about, other than Mr. Rubin, who said that he

4    received this document from the lawyers.

5           Dr. Cox cited a P&L statement in his report, and he,

6    too, cited a document that he said he received from Google

7    lawyers.

8           Google, in its discovery response, did direct us to

9    other P&L statements, but not the ones that Dr. Cox relied upon

10   and not the one that Mr. Rubin produced for his deposition.

11          So this document, so far as we can tell, so far as

12   the testimony so far establishes, is not a document that is

13   maintained in the ordinary course of business.  It may be, but

14   no one has ever testified to that.

15          **THE COURT:**  All right.  Help me understand the

16   significance of the document.

17          How does this fit into the issues in the case on

18   damages?

19          **MR. NORTON:**  Sure.  So we're solely focused on the

20   question of infringer's profits right here.  And for

21   infringer's profits, we need only show their revenues for

22   Android.  And then they are required to prove their deductible

23   expenses that are attributable to the copyright infringement.

24          Now, this issue right now is solely focused on what

25   are the deductible expenses.  And under Ninth Circuit law, the

PROCEEDINGS                                    2693

```
1   only expenses they are entitled to deduct are those expenses

2   that actually contributed to the sales of the infringing work.

3   That's Frank Music.  We cited that in our papers both on this

4   motion and the prior motion.  I don't think there is any actual

5   dispute about that.

6          So this argument is not about whether or not Exhibit

7   1079 is admissible; although, it very well may not be.  The

8   argument is about whether or not Dr. Cox, and by extension

9   Dr. Kearl, has any basis to conclude that the numbers that

10  appear in Exhibit 1079 reflect expenses that actually

11  contributed to the sales of the infringing work.

12         The problem is that Mr. Rubin has testified now -- we

13  have good reason to think it's not.  So, one, no Google witness

14  has been able to explain --

15         THE COURT:  I don't even understand the document,

16  though.

17         MR. NORTON:  Sure.

18         THE COURT:  Help me understand the basics, how the

19  Google side says that it shows those expenses.

20         MR. NORTON:  Sure.  So on the first page -- and I

21  think that, really, Dr. Cox only uses the first page -- we have

22  the revenues, and we have them by period.

23         This includes a forecast when we get all the way to

24  the right side.  But Your Honor will see -- mine is very small,

25  but there are 2010 actual revenues by quarter.  There's 2011.
```

```
 1              THE COURT:  I don't see that -- oh I see it over

 2   here.  2010 actual by quarter revenues.

 3              MR. NORTON:  Okay.

 4              THE COURT:  So just stick with that part.

 5              MR. NORTON:  Sure.

 6              THE COURT:  Where are the deducts?

 7              MR. NORTON:  So then we have -- beneath that you'll

 8   see that there's a series of indented revenue figures:  "Ads

 9   (AFMS)," "Ads (AFMA)," and so on.  And then you'll see,

10   "TAC:Dist/Organic."  And, at that point, I understand we are

11   deducting costs.

12              THE COURT:  What is "TAC"?

13              MR. NORTON:  I've seen it referred to both as "total

14   acquisition cost" and "traffic acquisition cost."

15              At his deposition on the 27th, Mr. Rubin described it

16   as total acquisition cost.

17              THE COURT:  Just stick with one column, quarter 1.

18   It says "Revenue, 97.66."  Is that 97 million?

19              MR. NORTON:  Yes.

20              THE COURT:  And then those subparts underneath

21   there --

22              MR. NORTON:  Then there will be deductions for sales,

23   marketing.  You'll see under the bolded "Gross Margin":

24   "sales, Marketing, Co-Marketing, PM, Engineering."  And

25   engineering is consistently the greatest expense claimed.
```

PROCEEDINGS

```
 1              And then, as a result of those deductions, we get a
 2   number at the bottom, "Product Contribution," which I
 3   understand Google would contend represents the profit or loss
 4   for Android for that particular reporting period.
 5              THE COURT:  I'm sorry -- okay.  Bear with me here.
 6              MR. NORTON:  Yes, Your Honor.
 7              THE COURT:  At the very top it says 97.66 million
 8   revenue.
 9              MR. NORTON:  For Q2010, yes, Your Honor.
10              THE COURT:  Let's just stick with one column.  The
11   next one says, Revenue Ads distant -- d-i-s-t and organic.
12   What does that mean?
13              MR. NORTON:  That's advertising revenue, distribution
14   and organic.  And I don't know, offhand, right now what the
15   distinction is between those two.
16              THE COURT:  All right.  Do those other non-bolded
17   numbers supposedly add up to the one at the top?  Is that the
18   way it works?
19              MR. NORTON:  Yes, Your Honor.
20              THE COURT:  It's not like the total is at the bottom.
21   The total is at the top.
22              MR. NORTON:  That's correct.
23              THE COURT:  Okay.  I got that part.  So now we go to
24   "Est. TAC 3.74."  What does that column, that -- that row
25   represent?
```

```
 1              MR. NORTON:  I'm trying to find the column.  I'm

 2   sorry, Your Honor.

 3              THE COURT:  About this far down (indicating).

 4              MR. NORTON:  All right.  "Est. TAC."

 5              THE COURT:  Yes.

 6              MR. MUINO:  Those are additional costs incurred by

 7   Google.  They are claimed to have been incurred by Google with

 8   respect to Android in that period.

 9              THE COURT:  All right.  Is that where the costs are

10   to be shown?

11              MR. NORTON:  Yes.

12              THE COURT:  All right.  So that's the first cost

13   item.

14              MR. NORTON:  And then they continue to be cost

15   items -- I believe that the gross margin number reflects the

16   adjustments that come above it.  And then they continued to

17   deduct sales, marketing, co-marketing --

18              THE COURT:  All right.  So gross margin is the

19   18 million.

20              MR. NORTON:  Yes, on that column, yes.

21              THE COURT:  18.88.  And that's gross.  And then there

22   is a -- then, yet, more deductions; is that right?  So it comes

23   out to they are losing money.

24              MR. NORTON:  So they claim.

25              THE COURT:  They are losing money.  Well, that would
```

1    mean there would be no disgorgement.

2          **MR. NORTON:**  Well, no, it would not.  But the

3    standard -- this is disputed in the instructions, but the

4    standard is not straight losses, but if the losses were

5    avoided.  Avoidable losses are considered profits.

6          That is, if you would have lost $10 million but as a

7    result of the infringement you only lost $1 million, that's a

8    $9 million differential, and those are actually profits.

9          But for present purposes, in that particular quarter,

10   they do claim a loss.

11         **THE COURT:**  Okay.  So we have loss quarter 1, loss

12   quarter 2, loss quarter 3, loss quarter 4.  That adds up to a

13   big loss for the whole year.

14         Then we come to -- we come to, I guess, year -- Have

15   we got all the years?  We got a lot of months here for 2011.

16   Looks like each one of these months -- no, here's a profit.

17   June.  Profit July --

18         **MR. NORTON:**  And in May, Your Honor, yes.

19         **THE COURT:**  Yes, I see.

20         So there are big losses but small profits from the

21   second half of 2011.  Okay.  Now I understand the general

22   format of this document.

23         **MR. NORTON:**  Right.

24         **THE COURT:**  And what is your problem with it?

25         **MR. NORTON:**  Okay.  So this is a P&L, purportedly,

1  just for Android.  Your Honor asked, Google is a public

2  company, surely there's information out there.

3        They don't publicly report Android as a distinct

4  business unit.  So it's not like we can go to their SEC filings

5  and see, okay, here's the profit and loss for Android.  So this

6  is the document that we have.

7        Now, the problem is that not -- there has to be some

8  step along the way where there are expenses incurred partly for

9  Android and partly for other business units.  So we asked

10 Mr. Agarwal, how does Google do that?  And he did not know.

11        So we asked -- and that was the basis, in part, for

12 our prior motion, was, Mr. Argarwal couldn't explain how Google

13 actually allocated its expenses to Android.  Which engineers

14 are actually working on Android, and which are the hundreds of

15 other engineers at Google working on other projects, how are

16 these numbers actually generated?

17        And Mr. Argarwal cannot answer that question.

18 Mr. Rubin does not know the answer to that question.

19        **THE COURT:**  Well, let me stop.  Are you questioning

20 the revenue side of this, or the expense side of this?

21        **MR. NORTON:**  We are questioning the expense side of

22 this.

23        **THE COURT:**  All right.  So the big number on here is

24 that engineering.

25        **MR. NORTON:**  That is the biggest portion of it, yes.

PROCEEDINGS                                                2699

1   So here's the problem is, first, we know from Mr. Rubin, for

2   example -- he testified to this on the 27th -- one of the

3   things that's included in engineering costs is the cost of

4   developing the Gmail app.

5           **THE COURT:**  The what?

6           **MR. NORTON:**  The Gmail, the e-mail app for Google.

7           **THE COURT:**  Yes.

8           **MR. NORTON:**  Now, the Gmail app is not just for

9   Android.  The Gmail app is the one they use on all the

10  different phones, whether it's an Android phone or not.  But it

11  appears that, based on his testimony, that a hundred percent of

12  the cost of the Gmail application has been allocated to

13  Android.

14          Now, that may be appropriate in some accounting

15  sense.  It may or may not.  It doesn't really matter for our

16  purposes.  Our purposes here are, are these expenses that

17  actually contributed -- that's the standard -- actually

18  contributed to the sales of the infringing work?

19          And the development of an application for use on

20  non-Android phones doesn't fit the bill.  So that's one.

21          Another problem is that Mr. Rubin testified that

22  there are costs here to investigate options/alternatives to

23  Android as far back as 2008.  So Mr. Rubin testified -- and

24  this is at page 11 of his deposition -- that there were

25  additional costs that they incurred to look at other ways,

```
 1   alternative ways to develop Android.

 2            Well, those, again -- for example, the Court will

 3   hear testimony, has already heard testimony, that Google

 4   considered not using Java, and explored those alternatives.

 5   Well, apparently, they are claiming those cost, as well.  But

 6   those two are not costs that actually contributed to the sales

 7   of the infringing work.

 8            So then Mr. Rubin also says, in his deposition, that

 9   when he spoke to Dr. Cox -- he says, "When we reviewed the

10   costs" -- I'm quoting from his deposition:

11            "ANSWER:  When we reviewed the costs, I

12            indicated there were a couple of -- you know,

13            there was a couple of pieces of background

14            information that were important to consider.

15            One was, we didn't start any of the

16            accounting until 2008.  So there's a bunch of

17            costs associated with Android that weren't

18            tracked before 2008.

19            "I also talked to him briefly, that although

20            the spreadsheets in these reports

21            represent -- should certainly represent costs

22            that were part of developing Android, the

23            spreadsheets also could include costs in

24            other areas that weren't Android.  And those

25            were -- we tried our best to -- you know, the
```

1                    accounting system tries its best to sort

2                    those out.  But, you know, there's some odd

3                    chance that other data would be in there."

4             So Mr. Rubin -- who doesn't really know how these

5    things are created -- believes that there are other costs that

6    are not Android, that are reflected in Exhibit 1079.

7             **THE COURT:**  Let me ask you this, on just that

8    engineering item that is the big one, 28 million.

9             **MR. NORTON:**  Yes, Your Honor -- yes, Your Honor.

10            **THE COURT:**  Is there a spreadsheet that backs the

11   detail that goes behind that number?  Were can I find that?

12            **MR. NORTON:**  It's not a document on which Dr. Cox

13   relied.  Dr. Cox only uses this front -- this first piece of

14   paper (indicating).  This is the entirety of Dr. Cox's

15   analysis, is what's here.  And Dr. Cox doesn't know what this

16   is.

17            Dr. Cox, by the way, is not an accountant.  He's an

18   economist.

19            **THE COURT:**  That may be a good enough point, but I

20   want to understand it better than that.

21            Is there a backup detail sheet for that 28 million?

22            **MR. NORTON:**  There is some detail, but it would

23   not -- the additional detail, which appears in the additional

24   pages behind Exhibit 1079, does not answer our question.

25            **THE COURT:**  Well, show me where that -- is there a

1   place where I can look and see the 28-plus million, and it has

2   some line items that add up to 28 million?

3          **MR. NORTON:**  I believe the answer to that is in

4   Exhibit 1079 the answer is no, but I want to be certain of

5   that.

6          On the second page of the document they break things

7   down by headcount, but they do not appear to ever break things

8   down by cost.

9          **THE COURT:**  All right.  Let's look at the second

10  page.

11         It has the months.  It has all of 2010.  And it has

12  engineering.  These are quite large numbers.  I'm not quite

13  sure what to make of those numbers.  But do they -- is there a

14  line item that adds -- that ties to the engineering line on the

15  main page, 2878?  2878.

16         **MR. NORTON:**  Your Honor, we have not been able to

17  find any such line in the spreadsheet.  Again, there is a

18  headcount breakdown.  There is not a number that relates back

19  to that --

20         **THE COURT:**  What is the headcount breakdown?

21         **MR. NORTON:**  The head count breakdown is page 2 of

22  Exhibit 1079.

23         **THE COURT:**  Right.  I see that.

24         **MR. NORTON:**  And so there are subcategories here for

25  engineering.  Of course, these are -- the cost for this

1  particular sheet start more recently, June 11.  So to find the

2  period that would correspond to the number Your Honor is

3  interested in, first quarter of 2010, you would actually have

4  to sum the three months, January, February and March of 2010,

5  that are in the right most third of the page.  But that would

6  only tell you how many engineers were working.  It wouldn't

7  actually tell you a cost.

8          **THE COURT:**  So "headcount" refers to number of

9  engineers?

10          **MR. NORTON:**  That is what I understand it to mean and

11  what I believe Mr. Rubin indicated at his deposition.

12          **THE COURT:**  So he says engineering is Dev.  There's

13  quite a number of categories.  "Dev" means what?

14          **MR. NORTON:**  I believe "Dev" is development.  Yes.

15          **THE COURT:**  Skip "Other."  "PM" means what?

16          **MR. NORTON:**  I'm going to need some help here, Your

17  Honor.

18          I believe that one is product management.  I think

19  that Mr. Rubin's testimony on this was that he was familiar

20  with the categories but not necessarily all the acronyms.

21          **THE COURT:**  Well, the -- far and away the biggest one

22  of these categories is "Dev."

23          **MR. NORTON:**  "Dev" is the most substantial one.

24          **THE COURT:**  All right.  May I let you sit down for a

25  moment.

```
 1              MR. NORTON:  If I could make one last point, Your

 2   Honor.

 3              THE COURT:  All right.  What is that?

 4              MR. NORTON:  The other problem with relying on this

 5   particular document, or any other similar such document, is

 6   that when we asked Google point blank what their revenues were

 7   by way of an interrogatory, what they answered was -- and this

 8   is Google's Third Supplemental Response to Plaintiff's

 9   Interrogatory No. 17.  And Google specifically said -- this is

10   on page 7 and 8:

11              "Google states that any financial data

12              relating to mobile platforms from prior to

13              January 2009 that it may have maintained are

14              inaccurate and unreliable."

15              So they want us to take on faith -- because no one

16   has been able to actually explain how this document was

17   created -- that this document is entirely accurate;

18   notwithstanding a lot of testimony that suggests that it isn't,

19   and notwithstanding the fact that they themselves concede that

20   their financial documentation up until January 2009 is

21   inaccurate and unreliable.

22              So neither we nor Dr. Cox nor Dr. Kearl has any basis

23   to be able to say that there's any line on Exhibit 1079 that

24   you could say is a cost that was actually incurred by Android

25   and actually contributed to the sales of the infringing work.
```

PROCEEDINGS                                          2705

```
 1            THE COURT:  In what context was that interrogatory
 2   made?  What was the question?
 3            MR. NORTON:  The question was:
 4            "Please state the total amount of your actual
 5            and (as applicable) projected unit sales,
 6            revenues, gross profits, and operating
 7            profits, separately for each month
 8            January 2005 through December 2011, relating
 9            to or derived from each of (i) Android
10            application developers' registration fees,
11            (ii) Android application transaction fees
12            (regardless of whether application downloads
13            or transactions were conducted using Android
14            Market), (iii) Android Market application
15            downloads or other transactions, (iv) in-app
16            billing on Android devices, (v) advertising
17            on or through Android devices, (vi) any other
18            product or service sold, licensed,
19            downloaded, or otherwise offered in
20            connection with Android, (vii) advertising on
21            or through each mobile platform other than
22            Android, and (viii) any other product or
23            service sold, licensed, downloaded, or
24            otherwise offered in connection with any
25            mobile platform other than Android."
```

1          And then there's a request that documents on which

2   the answer is based be produced.  And they gave an answer,

3   which provides some information.  But what is most relevant

4   here is their statement that their financial data up until

5   prior 2009 -- prior to 2009, is inaccurate and unreliable, and

6   yet they want us to rely upon a document that no one can

7   actually explain.

8          **THE COURT:**  Well, but that statement about being

9   unreliable prior to 2009, the dates that you've got for me here

10  are all after that.

11         **MR. NORTON:**  Well, the dates -- that's actually true

12  and interesting.  The dates on this document are all after

13  that.  But it's not clear to us whether the numbers that appear

14  for fiscal year 2009 include costs incurred in the prior

15  period.  But --

16         **THE COURT:**  When did Google go public?

17         **MR. NORTON:**  Google has been public since -- they'll

18  know better than I, but well before this.  Around 2000, 2001, I

19  think.

20         But they do have on this sheet numbers for fiscal

21  year 2008.  This document, the very first column of the

22  document says fiscal year 2008, the very year on which they say

23  they don't have accurate or reliable numbers.

24         But it's not just a question of whether they have

25  accurate numbers for the period prior to 2009.  The question

PROCEEDINGS                                                    2707

1   is, in conjunction with all of the other evidence, how are

2   we -- how is Dr. Cox -- and this is a motion directed at

3   Dr. Cox and Dr. Kearl, really, not this particular document

4   exclusively -- but how can Dr. Cox offer an opinion that

5   Google's expenses that actually contributed to the sales of the

6   infringing work, what those are?

7           **THE COURT:**  All right.  Let me hear from Mr. Purcell.

8           **MR. PURCELL:**  So a couple of basic things, Your

9   Honor.  This document was not ginned up for the litigation.

10          If I could step back, Mr. Argarwal is the accountant

11  for Android, who actually takes the inputs that are reported to

12  him and creates these spreadsheets.

13          And then Mr. Rubin, of course, is the business head

14  who reviews these every quarter, every time they are released

15  to him, and uses them as a basis for running the business.

16          Both of them testified that these documents are

17  created in the ordinary course of Google's business.  They are

18  reviewed regularly.  They are checked.

19          Mr. Rubin said the financials are audited and they're

20  relied on for purposes of product planning.

21          **THE COURT:**  Mr. Rubin said these spreadsheets are

22  audited?

23          I do understand auditing, Mr. Purcell, so you're not

24  going to slip something by me.  These are clearly not audited.

25          **MR. PURCELL:**  Well, he said Google financials are

```
 1   audited.  He did not say the spreadsheets are audited.  That's
 2   right.
 3              THE COURT:  Show me, then, if these were audited --
 4              MR. PURCELL:  I don't believe that we know whether
 5   these were audited.  I don't believe Oracle asked that
 6   question.  I can't represent that they are.
 7              THE COURT:  I'm sure they weren't.
 8              What is the -- the backup to the 28.78 that we have
 9   been looking --
10              MR. PURCELL:  The backup for the engineering costs
11   for quarter 1, 2010?
12              THE COURT:  Right.
13              MR. PURCELL:  I don't believe it's shown on this
14   spreadsheet.  What's shown is headcount.
15              THE COURT:  Did that number just get pulled out of
16   thin air?
17              MR. PURCELL:  No.  That number was calculated by
18   Google in the ordinary course of its business, and incorporated
19   on the spreadsheet.
20              THE COURT:  I don't think that's good enough.
21              I just don't get this.  You're telling me this
22   document is used in the ordinary course of business?
23              MR. PURCELL:  This is an executive summary financial
24   spreadsheet that is used by Andy Rubin every time he gets
25   reports on how Android is doing; every month, every quarter.
```

 1   This is the format in which he gets it, the format in which he

 2   reviews it, receives it, and makes decisions based on it.

 3          And it doesn't include specific line item breakdowns

 4   for each individual line item.  Those documents do exist.  I'm

 5   sure they could be generated.  That was not something we

 6   provided to Dr. Cox.  That was not something that we provided

 7   to Oracle.  That's something that we could provide, certainly.

 8          I have no doubt that that 28.78-million-dollar number

 9   is accounted for somewhere in a more specific form than this.

10          **THE COURT:**  But you're saying that a -- that this

11   very document that I'm holding is one that sometime in the

12   past -- I don't mean it was drawn and compiled together from

13   someone -- I mean this very document that somebody gave me this

14   morning, there was a time in the past when Mr. Rubin looked at

15   this for business purposes and it was exactly the same

16   document?

17          **MR. PURCELL:**  What Mr. Rubin said at his deposition

18   is that this document is in the format that he is given

19   financials on a monthly and a quarterly basis.

20          **THE COURT:**  That is a much different proposition.

21          **MR. PURCELL:**  I believe that this was -- I mean, this

22   looks to me, just based on the numbers, that this is the

23   financial statement for August of 2011.  That's the last actual

24   month.  And I believe in that context this would have been

25   reviewed by Mr. Rubin.

1          THE COURT:  Have you produced the real documents that

2     he looked at on an ongoing basis going back to 2008?

3          MR. PURCELL:  We haven't produced them for every

4     month.  We could.  This is --

5          THE COURT:  Would they track these numbers?

6          MR. PURCELL:  I believe they would, Your Honor.  I

7     don't believe the numbers have changed.

8          This should be the document that Andy Rubin received

9     after August 2011.  That's the last actual month that's

10    reported on this.  He testified that this is the document in

11    the format that he received it.

12         THE COURT:  But "format," you have to forgive me

13    because -- go ahead.

14         MR. PURCELL:  I'm informed that we actually have

15    produced every single Android profit and loss statement that we

16    have.  They should have those.

17         THE COURT:  And it's in this format?

18         MR. PURCELL:  I believe so.

19         THE COURT:  Okay.  Mr. Norton, is that true?

20         MR. PURCELL:  Hold on.  If I could, I would like to

21    respond to a couple of the other things that Mr. Norton said

22    that aren't right.

23         Number one, he raises this issue that there's costs

24    in here about non-Android apps, apps that were developed -- the

25    Gmail app he mentioned specifically -- for other platforms.

PROCEEDINGS                              2711

1   And he thinks we allocated all of those costs for the iPhone

2   Gmail app, and the -- you know, Symbian Gmail app, just to the

3   Android P&L.  That's not right.  That's not what Mr. Rubin

4   said.

5             The question by Ms. Rutherford at the deposition was:

6             "Are the costs of the apps that Google

7             develops that are specific to Android

8             included?"

9             Mr. Rubin said yes.  And then he said Gmail is a good

10  example of the application.  And then he also mentioned GMaps.

11            As Your Honor knows, Google has to design separate

12  versions of the Gmail app for Android versus for iPhone versus

13  for other platforms.  These platforms use different programming

14  languages.

15            All Mr. Rubin said is that Android-specific apps,

16  like Gmail on Android, are included in the P&Ls.

17            The other thing I would like to reference is the

18  interrogatory response that Mr. Norton referenced about data

19  before 2009.

20            If you listen to the categories that he mentioned,

21  the categories he mentioned are all products, services,

22  advertising related to Android.

23            Android didn't launch until October/November of 2008,

24  with these platforms, these projects, these services.  There

25  wouldn't be any costs, really, for 2008.

 1           And if you look at the P&L, what's represented on the

 2    P&L for 2008 is engineering, predominantly, which makes sense

 3    because in 2008 Android was being developed.  There were huge

 4    engineering costs going into actually getting the first release

 5    of the software out there, which happened at the very end of

 6    the year?

 7           **THE COURT:**  Wait.  Let me -- I want to get to the

 8    bottom of whether or not the financial statements in the

 9    ordinary course of business, that were in this format, were

10    produced to Mr. Norton.

11           Mr. Norton, what is the answer to that?

12           **MR. NORTON:**  The answer is, they were not.

13           So what we got, Google identified P&L statements in

14    its interrogatory response, and -- in the interrogatory

15    response I just read to the Court.

16           And I didn't bring everything.  But I can show it to

17    counsel.  These are examples of the documents that are cited

18    specifically in the interrogatory response.

19           You might want to show this to --

20           **MR. PURCELL:**  These are also -- documents in that

21    format are also attached to this, which is another one of the

22    documents Mr. Rubin testified about at his deposition, and that

23    we produced to Oracle recently, as supporting Mr. Rubin's

24    discussion with Dr. Cox.

25           **THE COURT:**  Well, I -- I would like to know whether

 1  or not the very documents that Mr. Rubin would have looked at

 2  at the end of each quarter, for 2010, 2011, earlier, the ones

 3  done in the ordinary course of business without any massaging

 4  at all, the historical actual thing that he held in his hand,

 5  was that produced?

 6          **MR. NORTON:**  No.  We are confident that they were

 7  not.  Let me explain why I am so confidence.

 8          **THE COURT:**  This is an opinion you are about to give

 9  me?

10          **MR. NORTON:**  I don't think so.

11          **THE COURT:**  You don't actually know, you're just

12  giving me an opinion.  You're confident -- anyone who is

13  confident means it's an opinion.

14          **MR. NORTON:**  I'm going to explain the evidence.

15          We don't have spreadsheets that look like 1079, that

16  first page.  Those were not produced to us.

17          Secondly, Mr. Rubin testified at his deposition on

18  the 27th.  He was shown Exhibit 1079, the document that Your

19  Honor has.  And Ms. Rutherford asked:

20          "All right.  You have before you Exhibit

21          1079.  Would you just verify that that's the

22          spreadsheet you've been discussing, that you

23          reviewed with Dr. Cox.

24          **"ANSWER:**  This is -- well, let's see.

25          There's many pages here, and I think there's

1              actually different spreadsheets here.  So

2              let's review it for a second.

3              **"QUESTION:**  Okay.

4              **"ANSWER:**  It's an eye chart.  This is -- I

5              mean, it seems to be kind of some of the same

6              data, but it's not in the exact form,

7              probably just because of the way it was

8              printed.  For example, my spreadsheet had the

9              names of tabs for one of these reports, and

10             this doesn't have it.

11             **"QUESTION:**  You are looking at a spreadsheet

12             on a computer; is that correct?"

13             Objection to form.

14             **"ANSWER:**  I looked at a version of this

15             spreadsheet that was projected on the screen

16             from a computer because the numbers are

17             really small.  And I'm trying to figure out

18             if this is just one spreadsheet or more than

19             one spreadsheet.  I don't -- I don't know if

20             this is the identical document that I

21             reviewed.  I guess that's my conclusion."

22             The point of that --

23             **THE COURT:**  All right.  That's a good point.

24             It would be okay -- it would be perfectly okay if

25   these numbers were drawn from the same columns on some other

1   document that was produced in the ordinary course of business,

2   and this just happens to be a summary sheet, so long as we

3   could go back to the original documents.  And if there was a

4   big number, we could go behind it and find out what it was

5   based on.

6            That's what we ought to be asking here is, where are

7   the original documents that he held in his hand, so that you

8   could sit down at a desk, put on your green eyeshade like Bob

9   Cratchit, and then go to work seeing if you could reverse

10  engineer this thing to see if the numbers add up, or whether

11  it's been ginned up for litigation.

12           It wouldn't be the first time something had been

13  ginned up for litigation.  So that's what we ought to be trying

14  to get to the bottom of.  And then if -- a big number like

15  28 million, you ought to be entitled to see the detail behind

16  that.

17           **MR. NORTON:**  I don't think there is any dispute here

18  that we did not get that level of detail.

19           **THE COURT:**  Well, then, maybe you should get the

20  detail.

21           **MR. NORTON:**  So -- but even with, you know, the

22  challenge -- although, the document would need to be

23  authenticated at trial.  Our motion is not focused exclusively

24  on the document.  Right.

25           **THE COURT:**  Well, if there was -- if I'm satisfied

1  that this -- these numbers are in the ballpark of reasonable,

2  then I would let him testify to it, and put the burden on you

3  to show that it was bogus.  But I am concerned that he

4  doesn't -- somebody just gave him a document.  And Mr. Rubin

5  can't -- can't vouch for it.

6          **MR. NORTON:**  We absolutely share --

7          **THE COURT:**  Somebody has got to be able to vouch for

8  this document and where the numbers came from.

9          **MR. NORTON:**  Well, that's exactly right.  And we did

10  take the deposition of a 30(b)(6) witness on Android finances.

11  That was Mr. Argarwal.

12          And our original motion on this issue was not that

13  Mr. Argarwal was not a trial witness.  It was that Mr. Argarwal

14  had testified, as the 30(b)(6) witness that, he did not know

15  how these numbers were generated.

16          So now what they want to do is put up Mr. Rubin, who

17  also doesn't know.  And then, failing that, they want to

18  produce some more documents to us that might justify these

19  numbers.  But we've been through several iterations of this,

20  and, at the end of the day, they have a burden to produce the

21  evidence that will allow them to prove their allocable costs.

22          **THE COURT:**  Yes, that's their burden.

23          **MR. NORTON:**  And we don't have that.  And their

24  expert can't offer an opinion in the absence of that evidence.

25          **THE COURT:**  Dawn, can I have some water, please.

```
 1                What would you like to say, Mr. Purcell?

 2        MR. PURCELL:  Very briefly, Your Honor.

 3         I can't represent to you that I'm a hundred percent

 4   sure.  And maybe that means that isn't good enough, but I

 5   believe that we produced to them our entire Android financial

 6   site, basically all of the data on that, which includes

 7   quarterly reports in greater detail than what they have, going

 8   back to 2009.  So that's one point.

 9         The other point is, I think their last motion was

10   based entirely on Mr. Argarwal not being on the witness list.

11   To the extent they felt his 30(b)(6) testimony was inadequate,

12   they never moved to compel on that.

13         And, in fact, Mr. Argarwal did testify at his

14   deposition that although he hadn't personally vetted every

15   single input to his analysis, that he was the one who prepared

16   these charts; he did so regularly; and he vouched for his

17   accuracy.

18         And he certainly vouched for the fact that they

19   weren't concocted for the litigation.  He certainly vouched for

20   the fact that this how Google does business, litigation or no

21   litigation.

22        THE COURT:  Who prepared this spreadsheet?

23        MR. PURCELL:  That spreadsheet, I believe, is an

24   output from Google's financial system, that I believe was

25   created -- I think Mr. Argarwal did produce it in preparation
```

1   to give to Dr. Cox in about August of 2011.  It was the most

2   recent financial data that was available then.  Dr. Cox's

3   expert report was due on October 3rd.  And it was the most

4   recent monthly --

5           **THE COURT:**  Do you have any workpapers that would

6   help us reconstruct how he -- the original source for some of

7   these numbers?

8           **MR. PURCELL:**  I'm sure he does.  I'm sure that that

9   information is all in Google's accounting system and could be

10  generated fairly quickly.

11          **THE COURT:**  Look.  I am going to tell you what should

12  be done here.  And I'm going to skip over the niceties of what

13  this exact motion is all about.

14          We're talking about huge numbers here.  If there

15  is -- if the jury finds liability, $600 million can turn on

16  whether or not these numbers are any good, this spreadsheet is

17  any good.  And no one seems to know much about the pedigree of

18  this thing.

19          So here's what should be done:  Mr. Purcell, it is

20  your burden to produce, again, in hard copy form, the actual

21  documents that Mr. -- that were given to Mr. Rubin.  Not these

22  things that are constructed for the expert, but the actual

23  documents that were given on a quarterly basis for 2010 and

24  2011.  Just those two years would be good enough.  And to

25  produce the backup of how the big number, which is the

PROCEEDINGS                                    2719

```
 1  engineering number, just that one number, how that was
 2  calculated, and the source for that information.
 3           MR. PURCELL:  We'll do it.
 4           THE COURT:  And then Mr. -- is it Agarwal, is his
 5  name?
 6           MR. PURCELL:  Yes, Your Honor.
 7           THE COURT:  He should be deposed again.
 8           MR. PURCELL:  We'll do that, too.
 9           THE COURT:  This should be done promptly.  Let's say
10  you produce the documents by Monday, and he gets deposed by the
11  end of next week.
12           MR. PURCELL:  We can do that.
13           THE COURT:  Then if there's anything to fight over --
14           MR. PURCELL:  I suspect there might be.
15           THE COURT:  -- we can fight over it again later.
16           But my general view of it is that if the
17  $28.78 million is actually the way it was accounted for, for
18  Android only, and allocated to Android, and there was some kind
19  of reasonable method for allocation, that was the way it was
20  done in the actual course of business, fine, then that can go
21  before the jury and Mr. Norton can -- can argue over whether or
22  not the allocation method was proper or not.
23           But, right now, it's unclear to me that anyone can
24  vouch for any of these numbers, as to how they got put
25  together.  So this is the -- that's what we ought to do.
```

PROCEEDINGS

1        **MR. PURCELL:**  Thank you, Your Honor.

2        **THE COURT:**  Thank you.

3        All right.  Any other items to take up right now?

4        **MR. VAN NEST:**  I don't believe so, Your Honor.  We

5  understand, all of us, that the patent phase will begin Monday

6  morning.  That's what we understood from Your Honor's order

7  last night.

8        **THE COURT:**  That really is the way it has to be,

9  because if they are deliberating tomorrow, then they will be

10  deliberating and we won't be able to start.  And if they reach

11  a verdict today, then we'll all take Friday off and start on

12  Monday.

13        So I think, basically, I've in effect said we will

14  start on Monday unless they are still deliberating.

15        **MR. VAN NEST:**  That's what we all understood, and

16  that's what we're planning for.  Thank you.

17        **THE COURT:**  Anything more?

18        **MR. JACOBS:**  Thanks, Your Honor.  Nothing from us.

19        **THE COURT:**  Well, please stand by.

20        Dawn, are they going to be here until 4:00 today?

21        **THE CLERK:**  Correct.

22        **THE COURT:**  Remember the note said they would be here

23  until 4:00 today.

24        As soon as we know anything, any more notes, we'll

25  let you know right away.

PROCEEDINGS                                    2721

```
 1              All right.  We are in recess.

 2              (Proceedings in recess from 11:53 to 2:27 p.m.)

 3         THE COURT:  Are we set and ready to go?

 4         MR. VAN NEST:  We are, Your Honor.

 5         THE COURT:  Mr. Jacobs.

 6         MR. JACOBS:  Just a minute, Your Honor.  Yes.

 7         THE COURT:  Ready?

 8         MR. JACOBS:  Yes.

 9         THE COURT:  All right.  We have note No. 7 from the

10    jury.  This one is from Megan Gallo.  She says:

11              "To determine the transformative value of the

12              copyrighted work, can we consider the

13              non-copyrighted elements (the elements that

14              Google added to make the Android platform) in

15              deciding the 'purpose & character of the use'

16              of the SSO of the 37 APIs?"

17              Okay.  Views by the lawyers.

18         MR. KWUN:  Your Honor, we would -- we would request

19    that you tell the jury:

20              "Yes, you can consider the material Google

21              added, and you should give it the weight you

22              decide it deserves."

23              And the reason for that is that Jury Instruction 26,

24    in the discussion of the first factor, states that the jury

25    should consider whether the:
```

PROCEEDINGS                                    2722

```
 1                "... work is transformative, meaning whether

 2                Google's use added something new, with a

 3                further purpose or different character,

 4                altering the copied work with new expression,

 5                meaning, or message."

 6         Moreover, if you look at fair use cases generally,

 7    when considering the first factor, the courts regularly look at

 8    material that was added.

 9         So, for example, if you consider whether a piece of

10    news criticism is transformative, you don't just look at the

11    material they quoted.  You look at what they said about it.

12    That's obviously material that was added.

13         If you look at the Campbell case, in the Supreme

14    Court, and you consider what use was made of Pretty Woman, you

15    don't just look at what words were taken from the original

16    work.  You look at what additional expression was added by 2

17    Live Crew that made it a parity.

18         So I think, just as a general matter, the first

19    factor will almost always look at what material was added by

20    the defendant.

21         MR. JACOBS:  The answer is "no" to this question.

22    The reason the answer is no lies in the instruction that was

23    given.

24         We had problems and objected to the -- to providing

25    an instruction on transformative use.  But having crossed that
```

PROCEEDINGS                                     2723

1    bridge, the language of the instruction is:

2                "... whether such work is transformative,

3                meaning whether Google's use added something

4                new, with a further purpose or a different

5                character, altering the copied work with new

6                expression, meaning, or message."

7                The purport of that language, in light of the cases

8    that fall in favor of fair use on transformational grounds, is

9    that it's not merely the non-copyrighted elements, the elements

10   that Google added to make the Android platform, within the

11   meaning of Question No. 7, that are to be considered but,

12   rather, new elements that added something new, with a further

13   purpose or different character, altering the copied work with

14   new expression, meaning or message.

15               So transformative use is not merely take the first

16   three stanzas of a song, and then add new expression to the

17   remaining seven stanzas out of a ten-stanza song.  That's not

18   transformational even though, in that scenario, non-copyrighted

19   elements, non- -- on a stanza-by-stanza basis, non-infringing

20   elements would have been added to alter the song.  That is not

21   the addition of new expression that alters the copied work with

22   a further purpose or a different character within the meaning

23   of the instruction or within the meaning of the law of

24   transformational fair use.

25               **MR. KWUN:**  Your Honor, just a couple of points in

 1   response.

 2          First of all, if you look at *Kelly v. Arriba Soft* in

 3   the Ninth Circuit, that was a case involving thumbnail images

 4   that were used on an Internet search engine.  That was held to

 5   be a fair use.  The thumbnail images were smaller versions of

 6   the original image.  But what was held to be transformative was

 7   the fact that the search engine as allowing people to find

 8   these images.  So it was material that was added, that was

 9   not -- other than making the image smaller, there was not a

10   transformation to the image itself.

11          Moreover, even under Mr. Jacobs' example, it is

12   proper for the jury to consider material that was added.  What

13   Mr. Jacobs is suggesting is his read on what is required to be

14   done with that material that's added.  But that is adequately

15   covered by the instruction.

16          The answer to the question, which is whether you

17   consider material added, is clearly yes, even under the example

18   given by Mr. Jacobs.

19          And, Your Honor, the material that's in the -- in the

20   jury instruction comes from *Sony v. Connectix*, which itself

21   gets the -- looks like it's a quote, actually, in *Sony v.*

22   *Connectix*, from *Campbell v. Acuff-Rose*.  So it's binding

23   Supreme Court authority and Ninth Circuit authority.

24          **THE COURT:**  All right.  Anything more that anyone

25   wishes to say?

1          **MR. JACOBS:**  In the alternative, Your Honor, if you

2    don't agree that the answer is "no," this may be a case where

3    the best thing to do is say the existing instruction provides

4    all the guidance on this topic that the Court is able to

5    provide.

6          **MR. KWUN:**  Your Honor --

7          **MR. JACOBS:**  I fear that anything more in the

8    direction that Google urges will only aggravate the potential

9    for error lurking in giving a transformational instruction in

10   the first place.

11         **MR. KWUN:**  Your Honor, yesterday there was a question

12   from the jury about another aspect of the first factor, on

13   commerciality.  And there, the Court provided the jury with a

14   direct answer to their direct question.

15         And it's only appropriate that the Court, once again,

16   give a direct answer to a direct question about the first

17   factor, as it did yesterday, which is why we ask that the Court

18   say that, yes, the jury can consider added material, and that

19   they should give it whatever weight they determine is

20   appropriate.

21         **THE COURT:**  All right.  Here's what I propose to say:

22              "In evaluating the transformative value, you

23              may consider the non-copyrighted elements,

24              but only insofar as they shed light on" --

25              Someone coughed and I have to start over.  It's just

1   hard to follow whenever we have hacking and coughing.

2            Would you like a cough drop?

3            **MR. KWUN:**  I would, Your Honor.

4            **THE COURT:**  All right.  Right here.

5            "In evaluating the transformative value, you

6            may consider the non-copyrighted elements,

7            but only insofar as they shed light on the

8            actual purpose and use of the copied part of

9            the copyrighted work as used in the accused

10           work.  Of course, please remember to consider

11           all of the factors set forth in paragraph

12           26."

13           **MR. BABER:**  The only one-word tweak, Your Honor, you

14   said something about the copied parts.

15           **THE COURT:**  Yes.

16           **MR. BABER:**  And that's telling the jury something was

17   or wasn't copied.  You say "the parts of the copyrighted work

18   that are used in Android."

19           **THE COURT:**  I'll say the "accused part."

20           **MR. BABER:**  That's fine.

21           **MR. JACOBS:**  Your existing instruction says "altering

22   the copied work."  So that language comes straight from

23   paragraph 1.

24           **THE COURT:**  I'm sorry, I don't get your point.

25           **MR. JACOBS:**  So referring to "copied work" links back

1  to the way you expressed this thought in -- in paragraph 1 of

2  the fair use instructions.

3        **THE COURT:**  I see that.  But, you know, I think

4  "accused part of the copyrighted" -- let's see.  The actual

5  purpose and use of the -- no, I do think "copied" is best here.

6  So we're going to say "copied part."

7        They don't reach this unless they've decided that

8  it's been copied.

9        **MR. VAN NEST:**  "Copied work," Your Honor, I think is

10  what you're talking about.  Copied work.  Copied work is what

11  the instruction says.

12        **THE COURT:**  All right.  I'll say:

13              "But only insofar as they shed light on the

14              actual purpose and use of the part of the

15              copyrighted work used in the accused work."

16        **MR. BABER:**  "Purpose and character of the use," Your

17  Honor, in the preamble.

18        **THE COURT:**  Oh, "purpose and character," yes.  That's

19  what it should say.

20        **MR. BABER:**  Otherwise, I think that's fine with us.

21        **THE COURT:**  Purpose and character of the use.  Of the

22  part of the copyrighted work used in the accused work.

23        **MR. BABER:**  Yes, Your Honor.

24        **THE COURT:**  Now, I could either write that out and

25  send it in, or we could have the jury come back out.  Whatever

PROCEEDINGS

```
 1  you prefer.
 2          MR. VAN NEST:  Whatever Your Honor prefers.  I'm
 3  happy to have them come out.
 4          MR. JACOBS:  Fine, Your Honor.
 5          MR. VAN NEST:  Or send it in.  What do you prefer,
 6  Your Honor?
 7          THE COURT:  I'm going to write it out.
 8          MR. VAN NEST:  Fine.
 9          THE COURT:  Because I've got another hearing
10  underway.  But --
11          MR. VAN NEST:  That's fine.
12          (Pause)
13          THE COURT:  May I ask you to look at what I've
14  written here.
15          Dawn, could you show this to counsel.
16          THE CLERK:  Okay.
17          (Pause)
18          MR. JACOBS:  Approved as to form, Your Honor.
19          MR. KWUN:  Yes, Your Honor.
20          THE COURT:  All right.
21          MR. BABER:  I think, again, a tweak --
22          THE COURT:  No.  I don't want --
23          MR. BABER:  I thought it was supposed to be "nature
24  and character," but you wrote "purpose and character."
25          THE COURT:  That's what's in the -- "purpose and
```

PROCEEDINGS

1    character" is in paragraph 1.

2              **MR. BABER:**  Fine.

3              **THE COURT:**  You're trying to tweak me into an error.

4              Dawn, you may take that in -- please make a copy in

5    case -- we may not be able to retrieve the original.  So make a

6    copy for the file.  But let me just read it out loud into the

7    record, so we'll at least have it there.  Here's what's going

8    in:

9              "In evaluating the transformative value, you

10             may consider the non-copyrighted elements but

11             only insofar as they shed light on the actual

12             purpose and character of the use of the part

13             of the copyrighted work used in the accused

14             work.  Of course, please remember to consider

15             all the factors set forth in paragraph 26.

16             The Judge.  May 3rd, 2:40 p.m."

17             All right.  That problem solved for now, subject to

18   all of your appeals.

19             Thank you.  Stand by for more notes.

20             (Counsel simultaneously thank the Court.)

21             (Proceedings in recess from 2:44 to 3:42 p.m. )

22             **THE COURT:**  Back to work.

23             Next note says, signed by Ms. Gallo:

24             "What happens if we can't reach a unanimous

25             decision and people are not budging?"

1          All right.  Suggestions.

2          **MR. VAN NEST:**  Your Honor, you have a very good

3     instruction on this.  It's instruction 31.  I think you could

4     read the second and third paragraphs of that or point them to

5     it.

6          The first paragraph just talks about electing a

7     foreperson.  And maybe then say you guys -- you jurors are free

8     to continue deliberating this evening, in the time you have

9     left, or feel free to return in the morning.

10         But paragraph 31 is actually -- that's one of your

11     standard instructions, and talks about discussing the case with

12     your fellow jurors.  Each of you has to decide for yourself.

13     You should all consider all the evidence.  Don't be afraid to

14     change your opinion.  Don't come to a decision just because

15     other jurors think it's right.  Et cetera.

16         My recommendation would be either send them home

17     tonight -- read that to them and have them come back in the

18     morning, or give them the choice whether they want to

19     deliberate further tonight.  But something like that is

20     appropriate with this question, I think.

21          **THE COURT:**  Mr. Jacobs.

22          **MR. JACOBS:**  Your Honor has vastly more experience in

23     this situation than we do.  I would be most interested in what

24     your proposed -- I imagine it's something like an Allen charge

25     you would give them in this situation.

| | |
|---|---|
| 1 | **THE COURT:**  Well, I have a few observations.  First, |
| 2 | this is not the foreperson who is writing it.  And, second, it |
| 3 | doesn't say that they are deadlocked.  It says, "What happens |
| 4 | if ...?" |
| 5 | We don't know yet that -- the jury is not writing us |
| 6 | that they're deadlocked.  It could be -- the meaning, it's |
| 7 | possible that that's a -- that that's what's going on, but, |
| 8 | read literally, it's not what the question -- the question by |
| 9 | one juror is, "What happens if ...?" |
| 10 | Well, let me ask you a few other things, to look |
| 11 | forward for a moment. |
| 12 | Let's assume, for the sake of argument, that we do |
| 13 | get a note that says they're deadlocked and can't reach a |
| 14 | verdict.  Then I would like to get your views on -- before we |
| 15 | know anything more than that -- whether or not anyone is going |
| 16 | to say, "Oh, we need a mistrial," or, "Oh, no, we can't take a |
| 17 | partial verdict," or, "We would be wrong to continue with the |
| 18 | patent part of the case." |
| 19 | I'm not agreeing with any of that.  But I think it's |
| 20 | best to get your views on that before you know which way they |
| 21 | come out.  Then whoever is unhappy about which way they come |
| 22 | out on a partial verdict might want to raise all sorts of |
| 23 | issues.  Now is the time for me to hear your views on that. |
| 24 | Mr. Jacobs. |
| 25 | **MR. JACOBS:**  May I have a moment, Your Honor? |

 1          **THE COURT:**  Yeah.

 2          Let me make it easy for you, so that there will be --

 3   my view of this, but I could be talked out of it, but my

 4   tentative view of it is if they have reached a partial verdict,

 5   we should get as much benefit as we can from the work that

 6   they've done and then move then to the second phase.

 7          So let's say that they found, yes, infringement, no

 8   or they can't agree on something else, or maybe they got

 9   answers to some of the questions but not all of the questions.

10   I think, my view would be take what we can get and move on to

11   the patent phase.  That would be my view, but that's just a

12   suggestion to you.  And I'm not making that as a ruling.

13          All right.  So go ahead and tell me what you think.

14          **MR. VAN NEST:**  Your Honor, I would want to give that

15   a little consideration.  I think a lot depends on what it is.

16   But I note that we've got Seventh Amendment issues that would

17   certainly come into play.

18          **THE COURT:**  There's no Seventh Amendment issue.  What

19   is the issue?  Come on.

20          **MR. VAN NEST:**  Well, if we believe that one jury has

21   to hear all phases, which is what we are operating under, I

22   think the fact they couldn't reach a verdict on one phase would

23   be -- may be fatal to the rest of it.

24          I would want to find out a little more and do

25   research on it.  For example, the question -- Question 1 is one

1  question.  It's got part A and part B.  I think if they can't

2  resolve fair use, if that were the -- if that were the

3  situation, then Question 1 hasn't been resolved because if

4  there's -- we have an absolute right to fair use, and if that

5  issue hasn't been resolved, then I don't think 1 has been

6  resolved.  It's possible that 2 and 3 are severable, and

7  possibly 4.

8          But without doing any research, I really would prefer

9  not to speculate on it, and give a little research tonight.  As

10 Your Honor points out, we are not there, and I don't want to

11 answer off the top of my --

12         **THE COURT:**  I'm not going to force the other side to

13 answer that.  Both of you ought to be prepared to answer at the

14 same time.

15         Another thing that, in my experience, could happen --

16 although I haven't had this precise scenario, but I know enough

17 about human nature -- that is, we could take a partial verdict,

18 go to the patent phase.  The scales will fall from someone's

19 eyes on the jury and they will resolve all the issues.  They'll

20 go back and be able to decide the copyright issues that they

21 previously weren't because something that they've seen in the

22 course of it has caused them to reevaluate the evidence that

23 they heard in Phase One.  Could easily happen.

24         Frankly, I wouldn't see anything wrong with that.  So

25 I think what you need to be -- have in mind is the proposal

 1  that I have given you to consider and to react to.

 2          So what do you want me to do about this immediate

 3  note?

 4          **MR. VAN NEST:**  Your Honor, I think either nothing, or

 5  I think my original suggestion of just pointing them to

 6  Instruction 31 is appropriate, too.

 7          **MR. JACOBS:**  I suspect Your Honor has a form of

 8  guidance to give to a jury in this situation.  And even though

 9  they haven't yet reported this is the result, that is, that

10  they can't reach a unanimous decision and people are not

11  budging, I think it's close enough to that that you could say

12  to them what you would say if that was the result they would

13  report.  I would -- something along the lines of, I would urge

14  you to continue to deliberate, listen, et cetera.

15          I think the instruction that Mr. Van Nest is pointing

16  to is not directly responsive to this question, I think.

17          **MR. VAN NEST:**  And we would object to that.  I mean,

18  we're a long way from Allen charge territory, or anything like

19  that, given this note that we have from our juror.  A long way

20  from that.

21          **THE COURT:**  All right.  I have an idea in mind.

22  Let's bring in the jury, and I will -- it's close to the end of

23  the day.  They are probably ready to go home for the day.

24  Let's catch them before they go.

25          (Jury enters at 3:52 p.m.)

```
 1              THE COURT:  Okay.  Welcome back and have a seat.

 2              So you're all working very hard in there.

 3              UNIDENTIFIED JUROR:  Oh.

 4              THE COURT:  We know that.  And I know you were going

 5    to leave at 4:00 today, so I wanted to catch you before you

 6    leave because I got a note from Ms. Gallo.

 7              And just in case you all don't know, she didn't have

 8    to share it with you before she sent out the note.  So here's

 9    what it says:

10              "What happens if we can't reach a unanimous

11              decision & people are not budging?"

12              All right.  So I've got a few things to say about

13    this.  But you remember a few weeks back or a few days back

14    somebody sent out a note, What happens if one of us gets hit by

15    a car or a truck?  I think it was.

16              Well, that was an iffy question.  President Roosevelt

17    used to say he wouldn't answer iffy questions.  I'm not old

18    enough to remember President Roosevelt.  I shouldn't suggest

19    that.  But I read about it.  And he just didn't like to answer

20    hypothetical questions.

21              Now, in your case, you're saying, "What happens

22    if ...?"  But nobody has actually said you're not able to reach

23    a unanimous decision.  And so this is -- it sort of smacks of

24    "what if" as opposed to you think you are in the position where

25    you're not going to be able to reach a decision.
```

```
 1          So I need to be careful not to presume upon your

 2   deliberations and assume that you've reached some deadlock when

 3   you haven't actually told me that.  And so I will be -- I will

 4   make my comments brief, at this point.

 5          If you were to tell me that you were deadlocked,

 6   there are admonitions that I could give to you that I would

 7   talk with the lawyers about first, and we would consult about

 8   what is the best course to pursue.  If that were to occur.

 9          In all event, if you eventually were unable to reach

10   any decision, even a partial decision on what you have been

11   deliberating on, nonetheless, we would go to Phase Two, all of

12   us.  All of you.  All of us.

13          We would put aside the copyright part of the case.

14   That would have to be retried with a different jury at some

15   point in the future.  At least parts of it would have to be,

16   whatever you cannot decide.

17          But, we would go ahead with the patent part of the

18   case and then to the damages part of the case.  So we would

19   just have some unfinished business, if that ever were to occur.

20          We don't -- you know, you are dealing with some many

21   hundreds of exhibits and many witnesses over a pretty long

22   period of time.  It's not unusual for people to disagree.  And,

23   you know, then if you discuss it long enough sometimes you

24   begin to see a point of view that the other side -- other

25   person has.  And maybe in the middle of the night you wake
```

```
 1   up -- like I do -- and you think of something that hadn't
 2   occurred to you before.  You see things in a different light.
 3            So it may be that it's a bit premature for you to
 4   panic and think that you're not going to be able to reach a
 5   unanimous verdict if you continue to work hard and in good
 6   faith, and to see each other's point of view.
 7            Don't give up a point of view that you genuinely hold
 8   just to reach agreement.  That would be wrong.  But this is not
 9   as simple as who ran the red light.  There's a lot of exhibits
10   here and a lot of history that takes some time for a jury.
11            And you're doing a good job getting in there and
12   rolling up your sleeves and working hard.  So don't be mad at
13   yourself for -- and no one is telling me that you are.  You're
14   just saying, "What if?"  "What if?"
15            So I've already said more than President Roosevelt
16   would have said.
17            Here's what I suggest you do.  You go home, get a
18   good night's rest, come back and start fresh in the morning and
19   continue to do your work.
20            And we very much appreciate your hard efforts in this
21   case.
22            So, counsel, can I send the jury home for the
23   evening?  Is there anything more you want me to say?
24            MR. VAN NEST:  You certainly may, Your Honor.
25            MR. JACOBS:  Yes, Your Honor.
```

1          **THE COURT:**  Okay.  Have a good evening.  See you

2    tomorrow.

3          **THE CLERK:**  All rise.

4          (Jury out at 3:57 p.m.)

5          **THE COURT:**  All right.  So you all should do your

6    homework on those issues.  We will confer tomorrow.  I guess

7    nobody will get any 3-day weekend, will they?

8          (Laughter)

9          **THE COURT:**  Too bad, but here we are.

10          Anything else I can help you with today?

11          **MR. VAN NEST:**  I don't believe so, Your Honor.  Thank

12    you.

13          **MR. JACOBS:**  Nothing from us, Your Honor.

14          **THE COURT:**  See you tomorrow.

15          (At 3:58 p.m. the proceedings were adjourned until

16          Friday, May 4, 2012, for further jury deliberations.)

17                         -   -   -   -

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTERS

I, KATHERINE POWELL SULLIVAN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 10-3561 WHA, **Oracle America, Inc., vs. Google, Inc.,** was reported by me, certified shorthand reporter, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings at the time of filing.


_____ /s/ Katherine Powell Sullivan _____


Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter


Thursday, May 3, 2012