Volume 16

Pages 2739 - 2794

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,            )
                                 )
            Plaintiff,           )
                                 )
  VS.                            )  No. C 10-3561 WHA
                                 )
GOOGLE, INC.,                    )
                                 )
            Defendant.           )  San Francisco, California
_____)  May 4, 2012


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          MORRISON & FOERSTER
                            755 Page Mill Road
                            Palo Alto, California  94304
                   BY:  **MICHAEL A. JACOBS, ESQUIRE**
                        **KENNETH A. KUWAYTI, ESQUIRE**
                        **MARC DAVID PETERS, ESQUIRE**
                        **DANIEL P. MUINO, ESQUIRE**

                            BOIES, SCHILLER & FLEXNER
                            333 Main Street
                            Armonk, New York 10504
                   BY:  **DAVID BOIES, ESQUIRE**
                        **ALANNA RUTHERFORD, ESQUIRE**


(Appearances continued on next page)


Reported By:  Katherine Powell Sullivan, RPR, CRR, CSR #5812

**APPEARANCES (CONTINUED)**:

**For Plaintiff:**
          BOIES, SCHILLER & FLEXNER
          1999 Harrison Street, Suite 900
          Oakland, California  94612
          BY:  **WILLIAM FRED NORTON, ESQUIRE**
              **STEVEN C. HOLTZMAN, ESQUIRE**

          ORACLE AMERICA, INC.
          500 Oracle Parkway
          Redwood Shores, California  94065
          BY:  **ANDREW C. TEMKIN, CORPORATE COUNSEL**
              **DORIAN DALEY, GENERAL COUNSEL**

**For Defendant:**
          KEKER & VAN NEST
          633 Battery Street
          San Francisco, California  94111-1809
          BY:  **ROBERT ADDY VAN NEST, ESQUIRE**
              **CHRISTA MARTINE ANDERSON, ESQUIRE**
              **DANIEL PURCELL, ESQUIRE**
              **MICHAEL S. KWUN, ESQUIRE**

          KING & SPALDING LLP
          1185 Avenue of the Americas
          New York, New York 10036-4003
          BY:  **BRUCE W. BABER, ESQUIRE**

          GOOGLE, INC.
          1600 Amphitheatre Parkway
          Mountain View, California  94043
          BY:  **RENNY HWANG, LITIGATION COUNSEL**

**Also Present:**
          **SAFRA CATZ, President and CFO**
          Oracle Corporate Representative

          **CATHERINE LACAVERA**
          Google Corporate Representative

PROCEEDINGS

1                      **P R O C E E D I N G S**

2   **MAY 4, 2012**                                    **8:03 A.M.**

3

4              (The following proceedings were held in open court,

5          outside the presence of the jury.)

6          **MR. VAN NEST:**  Good morning, Your Honor.

7          **MR. BOIES:**  Good morning, Your Honor.

8          **MR. JACOBS:**  Good morning, Your Honor.

9          **THE COURT:**  Good morning.

10         Let's hope for the best and plan for the worst.  So

11  I'm wondering if you had any more thoughts on in the event the

12  jury tells us they are hopelessly deadlocked.  What are your

13  thoughts?

14         **MR. JACOBS:**  We've located two cases that represent

15  roadmaps.  I suspect the Court has these, as well.

16         The first is the *Altus* case, Posner v. Altus (sic)

17  540 F.3d 992.  In the *Altus* case, there was a reliance on a

18  misrepresentation special verdict question, so-called Verdict

19  Form 7.

20         And the jury, while finding other elements of

21  liability, was unable to reach a verdict on Form 7.  And the

22  Court laid out what happens in that -- in those circumstances,

23  what the options are to a trial court.

24         More explicitly, even in terms of laying out the

25  options for a trial court, is a Federal Circuit case, *Baxter*

1    *Healthcare v. Spectramed*, at 49 F.3d 1575.

2            And what -- because Baxter is so crisp, I thought if

3    the Court didn't have that, I thought it might be helpful just

4    to walk through what the options are that are stated there.

5            "Initially, we note that when a jury, which

6            is charged with returning special

7            interrogatories pursuant to F.R.C.P. 49(a),

8            fails to unanimously agree on some of the

9            answers ... a trial judge has several

10           different procedural actions prior to

11           dismissing the jury.

12           "First, the trial judge could simply resubmit

13           the issues to the jury for further

14           deliberations, in hope of obtaining unanimous

15           verdict."  Citations follow.

16           "Second, the trial judge could ask the

17           parties if they would be willing to forgo the

18           requirement of unanimity and accept a

19           majority verdict."  Citation follows.

20           "Third, the trial judge could enter judgment

21           on the basis of the unanimous verdicts if

22           they are dispositive of the case."  Citations

23           follow.

24           "Fourth, the trial judge could declare the

25           entire case a mistrial and order the case

```
 1                    reheard in its entirety with a different

 2                    jury.

 3                    "Finally, the trial judge could, in certain

 4                    situations, order a partial retrial only as

 5                    to those issues which were not unanimously

 6                    agreed upon by the jury."  Citations follow.

 7                    Reading Baxter and Altus together, it seems clear to
```
us that the trial could proceed into Phase Two and into Phase
Three, even if the jury were to leave some questions on the
verdict form for Phase One unresolved.

           The Court, yesterday, proposed --

           **THE COURT:**  Go back over -- you did a good job and I
just didn't jot it down.  The Baxter decision and all the
options, go through those again.

           **MR. JACOBS:**  The option -- the first option is
characterized as simply resubmit the issues to the jury for
further deliberations, in hope of obtaining unanimous verdict.

           The second is, ask the parties if they're willing to
forego unanimity.

           The third is, enter judgment on the basis of
unanimous verdicts if they are dispositive.

           The fourth is, declare the entire case a mistrial.

           And then the fifth is order a partial retrial only as
to those issues which were not unanimously agreed upon by the
jury.

PROCEEDINGS

```
 1              And that's the scenario that the Altus Ninth Circuit
 2   case also contemplates.
 3              THE COURT:  What was the fourth one?
 4              MR. JACOBS:  Declare the entire case a mistrial.
 5              THE COURT:  So what happened in Altus?
 6              MR. JACOBS:  In Altus, the trial court granted a JMOL
 7   on the unresolved -- in effect, granted JMOL on the unresolved
 8   issue and then proceeded to the damages phase.
 9              That wasn't procedurally erroneous, but the Court of
10   Appeals disagreed that the -- on substantive grounds that that
11   was proper.
12              THE COURT:  Was that Ninth Circuit?
13              MR. JACOBS:  Ninth Circuit case, yes.
14              THE COURT:  Did the Ninth Circuit say that the
15   procedure used was okay, or did the Ninth Circuit just not
16   address that?
17              MR. JACOBS:  It's -- there's some explicit language
18   and some implicit language.  The interesting -- one of the
19   interesting paragraphs is -- is at footnote 17.  Let me -- let
20   me give you some of the surrounding text.
21              So by way of background, the question that the jury
22   couldn't resolve was a reliance question.  The jury was unable
23   to answer Form 7, which posed what's called in the decision the
24   NOLHGA premise.
25              "Did the commissioner prove that but for the
```

PROCEEDINGS                                                    2745

```
 1              misrepresentation, concealment, or conspiracy

 2              that led to your answers to previous

 3              questions, he probably would have entered

 4              into a transaction with NOLHGA for the

 5              benefit of the ELIC estate."

 6         This is a -- the case involved Posner, the insurance

 7   commissioner, taking over -- it was Equitable Life.

 8         And the important aspect of this particular question,

 9   so-called Form 7, was that, unlike other questions, Form 7

10   presented a theory of damages that would have permitted the

11   commissioner to recover lost profits as compensatory damages in

12   the second phase of the trial.

13         So what's interesting about this is we got a lot of

14   special verdict questions in a phase trial.

15         So then what happens is, the jury cannot reach a

16   verdict on Form 7, and the trial court -- I think I slightly

17   misstated it before.

18         The trial court considered the jury verdict to be

19   inconsistent but reconcilable.  And the trial court reconciled

20   the verdict by way of saying there was no -- insufficient

21   evidence on the Form 7 question.

22         So the Court says:

23              "The District Court improperly construed the

24              unanswered Form 7 as a failure of proof on

25              this NOLHGA premise.  The cases are clear
```

PROCEEDINGS

```
 1              that no legal significance attached to the

 2              jury's failure to answer Form 7 and the

 3              District Court should not have considered

 4              Form 7 when reconciling the answered verdict

 5              forms.  It was error on the face of the

 6              unanswered question for the trial court to

 7              thereafter go it alone and dispose of the

 8              issue."

 9         So that was the error.

10         Now, what happens then in the -- when they get to the

11  damages phase, it's described as follows:

12              "The NOLHGA premise" -- that's that Form 7

13              issue -- "was the commissioner's principal

14              damages theory and a vital issue in the

15              trial.  The jury's failure to answer Form 7,

16              quote, left a gaping hole in the special

17              verdict, closed quote."  Citation.

18              "To do other than send the case back for new

19              trial when decision on a vital issue by the

20              jury is missing would deprive the parties of

21              the jury trial to which they are entitled

22              constitutionally."  Citation.

23         And then this footnote.  This is the part that I

24  think, in the Court's rendering yesterday, is the most -- is

25  one that bears the most further discussion:
```

PROCEEDINGS                                                           2747

```
 1              "Artimus (phonetic) argues that resubmission
 2          of Form 7 to the jury in the damages phase,
 3          after delivery of an Allen charge in the
 4          liabilities phase, would have resulted in
 5          impermissible compulsion."  Citation.
 6              "On remand, the NOLHGA premise will be posed
 7          to a new jury.  As a result, the question of
 8          whether resubmission of Form 7 to the same
 9          jury after delivery of an Allen charge would
10          have constituted impermissible compulsion is
11          not before us."
12              And the reason I focus on that footnote is that
13  yesterday the Court said the jury could deliberate further on
14  its inconsistent -- on the issue on which it divides and answer
15  that question later on in the trial.
16              We have some trial management concerns with that.
17  But, more importantly, it seems as if the way that these two
18  cases set up the issue it is framed as a, quote, re-submittal,
19  unquote, of the issue to the jury.  And that re-submittal under
20  this footnote, there's -- we found very little law on the
21  re-submittal option, and we're concerned that it may lead to --
22  to error.
23              So in answering the Court's questions from yesterday,
24  it seems clear to us that if the jury reaches answers on some
25  of the questions, that on the questions it doesn't reach an
```

1  answer on, to the extent that interferes with a liability

2  finding on the cause of action, that's where we are.

3          We will be moving for judgment as a matter of law, in

4  any case.  And we think, based on the trial record, we have a

5  very strong --

6          THE COURT:  Those motions should have already been

7  made.

8          MR. JACOBS:  Sorry?

9          THE COURT:  Any Rule 50 should have already been

10 made, right?

11         MR. JACOBS:  I'm sorry, yes.

12         THE COURT:  So you meant to say you have --

13         MR. JACOBS:  We have moved.  Yes.  Thank you, Your

14 Honor.  I apologize.

15         We have moved.  We think we have strong JMOL grounds,

16 based on the trial record, on what the jury may be hung up on,

17 which is fair use in particular.  We have strong grounds across

18 the board.

19         And so what I think we would be urging is that the

20 Court, if this happens, decide the Phase One JMOL issues in

21 time for us to continue on into Phase Three, with damages on

22 all theories.

23         The alternative will be to -- if we don't have a

24 copyright liability verdict that is consistent with our -- that

25 supports our damages theories, we would go through the patent

PROCEEDINGS                                2749

1  trial.  Assume we find liability on the patents, we'll have a

2  patent damages phase.  Then we would have to have a retrial on

3  the unresolved issue and a new damages trial on the copyright

4  theory.  And that seems like it would be quite a -- quite a

5  journey.

6          I hope that answered the questions the Court posed to

7  us.

8          **THE COURT:**  That's helpful.  Thank you.

9          Let's hear from Google.

10         **MR. VAN NEST:**  Good morning, Your Honor.

11         **THE COURT:**  Good morning.

12         **MR. VAN NEST:**  I think this is why President

13 Roosevelt refused to answer those iffy questions.  It's kind of

14 a "what if" question.

15         I want to add one case to the mix.  I think the

16 conclusion is probably right.  And that is the *Jazzabi* case,

17 J-a-z-z-a-b-i, Ninth Circuit.  It's 278 F.3d 979.

18         And it essentially holds that the elements of a claim

19 and affirmative defenses are co-equal components of the

20 liability, and that you can't have liability until all jurors

21 have agreed unanimously both on the elements of the claim and

22 the affirmative defenses.  So here that would apply to

23 Questions 1 or 2.  1 and 2.

24         So let me -- let me start by saying, let's assume we

25 treat these three questions as divisible.  I'm not really sure

1  they are.  They are all part of one cause of action.  But I

2  think we've posed them in a way that they at least are --

3  appear divisible to jurors.

4          I think if you got a dispositive ruling on a

5  question, and we determine that that question is divisible from

6  the others, you could enter a verdict on that.

7          What do I mean by "dispositive"?  Well, on a question

8  like Question 1, the SSO, if the jury found on Question 1A

9  "No," well, that's dispositive.  You could enter a verdict.

10          If they found on 1B "yes," it's fair use, then that's

11  dispositive.  You could enter a verdict on that.

12          But if they found yes on 1A but they're hung on 1B,

13  then you couldn't enter a partial verdict on that one under

14  *Jazzabi*.  And there's a couple of other Ninth Circuit cases

15  behind that.

16          **THE COURT:**  Let's pause over that.  You might not be

17  able to enter a judgment.  Of course, you could not enter a

18  judgment if you had a yes and unresolved on Question 1.

19          But why couldn't you enter the 1A yes and then simply

20  retry the -- shouldn't say "simply" because it wouldn't be

21  simple -- but retry 1B?

22          **MR. VAN NEST:**  I think *Altus* and *Jazzabi* would both

23  prevent that.

24          **THE COURT:**  Read to me the language that says that.

25          **MR. VAN NEST:**  Well, what *Jazzabi* says is that the

1  elements in affirmative defenses are co-equal components of the

2  jury's liability determination.

3       Liability cannot be established until after jurors

4  unanimously agree that the elements are satisfied and they

5  unanimously reject the affirmative defenses.

6       **THE COURT:**  So why couldn't you have one jury decide

7  1 and say yes?  Next jury decides no on -- does it say you

8  can't have two different juries as long as they are unanimous?

9       **MR. VAN NEST:**  I think that would run afoul of the

10  Seventh Amendment, Your Honor.  I think we recognize that the

11  issues within a question --

12       **THE COURT:**  But does that decision say that?  I know

13  you said yesterday that you thought the Seventh Amendment might

14  be lurking here.  That's why you were supposed to do some

15  homework.

16       Give me the Seventh Amendment decision that

17  specifically says you can't do it.

18       **MR. VAN NEST:**  I'll have to take a look at *Jazzabi*,

19  Your Honor, but I think *Jazzabi* is sort of grounded in the

20  Seventh Amendment.

21       There, the judge went ahead and entered judgment.  So

22  it's a little bit different.  He accepted a verdict of

23  liability even though they hadn't resolved the affirmative

24  defense.

25       **THE COURT:**  Of course.  I see -- procedurally, I can

```
 1   see why it didn't work there.  If the judge is wrong on the
 2   JMOL, then that's a different problem.
 3           MR. VAN NEST:  I mean, I guess -- Mr. Baber is
 4   pointing out a Union Pacific Railroad case, Ninth Circuit,
 5   1955, that says:
 6               "To do other than send the case back for a
 7               new trial when decision on a vital issue by
 8               the jury is missing would deprive the parties
 9               of the jury trial to which they are entitled
10               constitutionally."
11           That is cited in Altus.  This is similar to what I
12   think Mr. Jacobs just said.
13           I think that when the issues are so closely
14   intertwined, as they would be in questions 1A and 1B, and,
15   similarly, 2A and 2B, you would have to enter a mistrial on
16   that count, which is what you said to the jury last evening.  I
17   think that was correct.
18           THE COURT:  Whoa.  I did not say that to the jury.  I
19   didn't say we would immediately enter any kind of a mistrial.
20           What I intended to say was a subsequent -- if they
21   can't reach a verdict on it, then a subsequent jury will have
22   to decide it.
23           MR. VAN NEST:  Fair enough.
24           THE COURT:  All right.
25           MR. VAN NEST:  That's what you said.  That's what you
```

```
 1  said.

 2          THE COURT:  But I didn't mean to say, necessarily, if

 3  they can reach an answer on 1A that we don't take 1A.  And,

 4  also, the -- I don't need to reach this point right now, but it

 5  seems to me that -- let's say that they say yes on 1A.  It

 6  doesn't matter if they say no, then you don't have this

 7  problem.

 8          If they say yes on 1A and unresolved on 1B.  So then

 9  we say okay.  We're going to -- no more deliberations for now

10  on that.  But then when we get to the patent deliberations, I

11  could then resubmit both the patent liability as well as the

12  copyright part, and maybe something clicked in somebody's mind

13  and they have now changed their mind.  It could be resubmitted.

14          And I know that Mr. Jacobs says he doesn't like that

15  approach, but he didn't give me any case law that says you

16  can't do that.

17          MR. VAN NEST:  I think he's right on that, Your

18  Honor.  I don't think you could do that for a couple of

19  reasons.

20          THE COURT:  Okay.  Let's hear them.

21          MR. VAN NEST:  I think -- the Ninth Circuit -- what

22  you'd essentially be doing there is reopen the evidence after

23  the evidence closed.

24          THE COURT:  The evidence on patent is a separate body

25  of evidence.
```

1           MR. VAN NEST:  That's right.  And so -- so -- let me

2   give you a couple of cases.

3           THE COURT:  I'll tell them to ignore the patent

4   evidence on the copyright.  Not take that into account.

5           MR. VAN NEST:  Well, there would be a number of

6   problems with that, I think.

7           First of all, the cases in the Ninth Circuit say

8   reopening a case for the purpose of putting more evidence in is

9   done only very, very reluctantly.  And usually the trial court

10  refuses that, and that's usually upheld.  *Epson vs. U.S.*, 28

11  F.2d 818, stands for that.

12          And there's a Second Circuit case where the evidence

13  was reopened and the trial judge let it happen, and the Second

14  Circuit reversed.  That's *Crawford*, 533 F.3d.

15          There's also cases -- separate point, Your Honor, is,

16  I think -- the cases do not encourage sort of rolling

17  deliberations.  If you were to recess this deliberation for a

18  week or two weeks, that's considered to be unduly coercive,

19  where, basically, a jury has told you they are deadlocked and

20  you bring them back a week or two weeks later.

21          We have a case called *Witco*, where that was done and

22  the verdict was eventually reversed.  *Witco* is not a Ninth

23  Circuit case.  It's a Federal Circuit case.  But it would

24  apply, I think, here.  *Witco Chemical vs. Peachtree*.

25          So I think both parties are in agreement that we

1    don't want -- we don't think you could allow further

2    deliberations on the copyright phase if the jury is unable to

3    reach a verdict here while they're deliberating now.

4              I don't think anyone disagrees that if there are

5    divisible questions that are disposed of that you couldn't

6    enter a verdict on that.

7              And I don't think anyone disagrees that we can't go

8    on to the patent phase on Monday or whenever that's

9    appropriate.  I think that we could.  And no one is -- I don't

10   think there's anything that would prevent that.

11             But I do think we need to be very careful what -- you

12   know, what we get, and look at it carefully and decide whether

13   the questions are divisible or not.

14             And I think if the jury fails to resolve an issue,

15   then the -- the only correct result there is a mistrial on that

16   divisible question.  And then we go on to the patent phase and

17   see what happens there.

18             Ah, and Mr. Baber is pointing out *Jazzabi* does say

19   it's a Seventh Amendment issue.  So Seventh Amendment is cited

20   in *Jazzabi*, which is Ninth Circuit case law, civil case.

21             That's a case very much like this.  It was an

22   insurance case, where there was an arson defense.  And the jury

23   resolved the contract claim but didn't fully resolve the

24   insurance defense.  And the Court said --

25             **THE COURT:**  Well, we could -- if it came to this, we

```
 1   could receive the 1A verdict, assuming it's a yes, and go to

 2   the patent phase.  And, then, weeks from now we would decide

 3   how much of the case would have to be retried.

 4           That would not rule on your immediate point, but I

 5   don't see -- I don't see the reason for not taking a partial

 6   verdict.

 7           MR. VAN NEST:  I don't think Jazzabi would allow

 8   that.

 9           THE COURT:  Well --

10           MR. VAN NEST:  It's a liability determination, and

11   it's --

12           THE COURT:  I disagree with your reading of that

13   decision.

14           MR. VAN NEST:  Fair enough, Your Honor.

15           THE COURT:  I'm going to receive a partial verdict.

16   I'm not going to let this work go to waste.

17           Now, if it turns out to be of no moment because you

18   convince me that we should have a retrial on everything, that's

19   a different question.  But we're not going -- if they have

20   reached a verdict on some issues, we're going to receive that,

21   then move on.

22           Later on it may be that the -- that we retry the

23   entire liability issue.  It may be that we wouldn't.  That's an

24   issue --

25           MR. VAN NEST:  Hopefully, we won't have to reach any
```

PROCEEDINGS                                    2757

 1  of this, Your Honor.  Those are our views, in any event.

 2          THE COURT:  All right.  Well, we haven't received a

 3  note and they've been in there for a while.  I don't know what

 4  to make of that.

 5          All right.  Anything else you want to bring up right

 6  now?

 7          MR. JACOBS:  Your Honor --

 8          THE COURT:  I want to say, I appreciate very much the

 9  info you've given me.  And even though I've said that I'm going

10  to do a partial verdict, I'm going to read these before I make

11  that a final ruling.  I'm not going to -- that's my strong

12  inclination.  I'll put it that way.  But I could change my mind

13  after I go back and read some of these decisions.

14          Yes, go ahead, Mr. Jacobs.

15          MR. JACOBS:  We filed a motion pretty late last

16  night.  We thought it was important to get it to the Court and

17  get it to --

18          THE COURT:  That was the one filed at midnight.  It

19  was not just pretty late.  It was after midnight.

20          MR. JACOBS:  Yes.  So we wanted to get it on file.

21  We wanted to get the issue raised as quickly as --

22          THE COURT:  What is the issue?

23          MR. JACOBS:  I'm sorry?

24          THE COURT:  Just tell me the issue.

25          MR. JACOBS:  The issue is, what is Google going to do

```
 1   in Phase Two with the Jonathan Schwartz or Jonathan

 2   Schwartz-style testimony regarding any decisions that Sun made

 3   not to proceed with legal action against Google?

 4           You may recall his testimony, that he was asked

 5   whether he had made a decision not to -- not to sue --

 6           MR. VAN NEST:  I haven't even seen this motion, Your

 7   Honor.  I apologize.  But they expressly said last night it

 8   wouldn't be on the morning docket so I didn't look at it.

 9           THE COURT:  Well, let's not argue it out now then.

10   But you've given me the heads up.  And so when will the answer

11   be, the response to this be due?

12           MR. JACOBS:  I think that would be up to --

13           THE COURT:  I guess we would have to argue this out

14   Monday.

15           MR. VAN NEST:  We'll get it in over the weekend, Your

16   Honor.  And it will be argued Monday morning.

17           MR. JACOBS:  I think if we had -- if we give them

18   notice at 3:00 p.m. of a 6:00 p.m. filing that we made this

19   morning at midnight, then their opposition would be due at

20   10:00 p.m. tonight.

21           MR. VAN NEST:  You expressly said you weren't doing

22   that.  That's why I didn't pay attention to it.

23           They expressly said they wouldn't be doing that.

24           MR. JACOBS:  That's incorrect.

25           THE COURT:  You didn't make the deadline.
```

1         **MR. JACOBS:**  We didn't make the deadline for them to

2   file an opposition last night at 10:00 p.m.  It but if we deem

3   this filed as of 6:00 p.m. tonight, then their opposition would

4   be due at 10:00 p.m. tonight.

5         **THE COURT:**  We've got a weekend here.  So how about

6   this:  We split the difference and the opposition is due

7   6:00 p.m. Saturday.

8         **MR. JACOBS:**  That would be fine with us, Your Honor.

9         **MR. VAN NEST:**  Thank you, Your Honor.  That's fine.

10        **THE COURT:**  Okay.

11        **MR. VAN NEST:**  We don't have anything further, Your

12  Honor.

13        **MR. JACOBS:**  Nor do we.

14        **THE COURT:**  I had a question for you.  And I only

15  want you to answer with respect to what is in the actual trial

16  record, not what's on websites, not pie in the sky, but what's

17  in the actual trial record.

18        This concept of inheritance, am I correct that that

19  applies at the class level and not at the package level?  And

20  if the answer is the record doesn't tell us, then that's the

21  answer.  The trial record.

22        **MR. BABER:**  Your Honor, I want to check the record to

23  be certain of this, but I believe the trial record indicates

24  that inheritance is a characteristic of what's called a

25  subclass, which when it is created takes the characteristics of

PROCEEDINGS                                      2760

1  the parent class of which it is a sub.

2          And I believe one or more of Dr. Reinhold,

3  Dr. Mitchell, and perhaps Dr. Astrachan, testified about that.

4  I know they talked about it.  But whether or not there's a

5  clean definition in the record of inheritance I would have to

6  check the testimony.

7          **THE COURT:**  Okay.  Mr. Jacobs.

8          **MR. JACOBS:**  The same, Your Honor.  I would like to

9  check and make sure we give you a precise answer.

10         **THE COURT:**  I may send out a question 14 then --

11         (Laughter)

12         **THE COURT:**  -- for you to add in.

13         Now, the mechanism -- here's a related question.  The

14  mechanism by which the inheritance occurs, I'm assuming that

15  that's just part of the Java operating system, as opposed to

16  some special code you've got to write on your own.

17         **MR. BABER:**  No, Your Honor.  And I believe there is

18  specific testimony on that.

19         **THE COURT:**  What does it say?

20         **MR. BABER:**  Professor Astrachan.  He said that

21  characteristics of a class, such as inheritance and what

22  interfaces it implements, et cetera, that has to be put in the

23  class when the class is created.

24         When you first write, you know, new class such and

25  such, you have to write, in accordance with the language

1  specification, code that says "implements serialization" or

2  "extends the parent class."

3         Remember he talked about those 7,000 lines of code

4  that actually implement the SSO.

5         **THE COURT:**  Let's take the "extends" one.  Is that a

6  keyword?

7         **MR. BABER:**  I believe it is in the language but --

8  yes, it is.

9         **THE COURT:**  All right.  But the form of the

10 declaration would either have that keyword in there or not.

11 And if it says "extends," then, again, I ask, is it the

12 operating system that recognizes that word "extends" and sets

13 up the computer to impose the inheritance feature, or --

14        **MR. BABER:**  Well, I believe --

15        **THE COURT:**  How does that work?

16        **MR. BABER:**  Well, I don't know that there's evidence

17 in the record about that.  My understanding, though, is that it

18 would be the compiler that would recognize it and say this

19 comes from a class -- Mr. Kwun may be better able to answer.

20        **MR. KWUN:**  I do believe it's the compiler.  And I

21 think there's no testimony, as far as I know, in the record on

22 this.  But --

23        **THE COURT:**  It could be one of those books.

24        **MR. KWUN:**  Yes, Your Honor, exactly.  The *Java*

25 *Language Specification* is in evidence, and likely either

1  answers this or at least comes very close.  And we could look

2  up the appropriate cites for you.

3          **THE COURT:**  Mr. Jacobs was --

4          **MR. JACOBS:**  We'll do the same, Your Honor.

5          Some of it happens at compilation time and some of it

6  happens at runtime in conjunction with the virtual machine.

7  Because what has to happen is the class libraries have to be

8  loaded in, and they have to be associated in a way that -- with

9  the Java bytecode, that has been presented to the Java virtual

10 machine by the compiler.

11         **THE COURT:**  What is the difference, then, between the

12 operating system and the keywords?  I know -- you know, like

13 "if" and "extend" I know those are keywords.  But is it the

14 operating system that recognizes those words?  Or is there some

15 intermediate thing called the Java Programming Language that

16 then, in turn, communicates to the operating system?

17         **MR. JACOBS:**  So when we talk about the operating

18 system here at the Java level, we would be talking about the

19 Java virtual machine running on top of an operating system.

20         The Java virtual machine would receive bytecodes that

21 have been translated by the compiler, which recognizes the

22 language keywords.  So it has translated "if then else,"

23 hypothetically, into bytecode representation of those

24 instructions.

25         And then the virtual machine interprets the bytecode

1  representations of those instructions into native machine code

2  representations of those instructions, probably having made

3  them much more granular along the way to meet the hardware

4  architecture.

5          **MR. BABER:**  Your Honor, perhaps just to clarify a

6  bit, I agree, generally, with what Mr. Jacobs said.  But to put

7  it in more context, "operating system" in the context we've

8  been talking about are things like Windows, the Apple operating

9  system, Linux, et cetera.  They are way down in the stack.

10  They are what actually runs the computer.  That's how these

11  folks talk about the operating system.

12          **THE COURT:**  I've seen reference in the materials in

13  the record to Java operating system.

14          **MR. BABER:**  And where you see those references, as

15  Mr. Jacobs said, that's higher up.  That's the Java virtual

16  machine, which takes the compiled code, and it either is

17  compiled correctly and it can speak to the virtual machine and

18  be executed, or not.

19          So we're one level up from the -- in our case, with

20  Android, the operating system is down there in that red level,

21  in the Linux kernel (indicating).  It's a Linux operating

22  system.

23          So what happens, this is -- this is sort of the idea

24  with a language like Java, which is managed code.  It doesn't

25  go straight to the operating system.  It first gets packaged in

 1  some intermediate program like the Java virtual machine or the

 2  Dalvik virtual machine, and that's what talks to the system,

 3  the operating system for the device.  I don't know if that

 4  helps or not.

 5          But to the extent there is a Java operating system,

 6  that would be the virtual machine.

 7          **THE COURT:**  Is that right?

 8          **MR. JACOBS:**  I think that's -- I think that's right.

 9  I would like to look carefully at the actual words that are

10  chosen.

11          We will actually be getting more into this in Phase

12  Two, because we'll be talking about the virtual machine in

13  Dalvik.  In Phase Two, the infringement occurs in the virtual

14  machine and in the dex code converter.  So we'll be learning

15  more about the technology at the bytecode level in -- in Phase

16  Two.

17          The -- to unpack this one more -- with one more

18  layer, when you write programs in source code form, you include

19  a mix of language primitives, which are part of the language

20  specification.  And then, setting aside our disagreement that I

21  think was resolved toward the end of the trial about what API

22  constructs are required by the language, you make your API

23  calls.  Those are compiled and tested by the compiler.

24  Bytecode is output by the Java compiler.

25          In Android, interesting fact you'll learn in Phase

1    Two, the actual -- although it's not shown on here, the actual

2    compiler that is used in Android is a Java compiler downloaded

3    from the Oracle website as a developer tool.

4           So the output of that is -- the output of that is

5    Java bytecode.  In the Java world, that Java bytecode is

6    executed on the Java virtual machine.  The class libraries are

7    available in bytecode format at that stage, and they are

8    linked.

9           There's a linking process to get the class libraries

10   together with the code that has literally been emitted by the

11   compiler.  And then that combined bunch of code runs on the

12   virtual machine.

13          The virtual machine is an interpreter.  The virtual

14   machine interprets the bytecode into a mix of machine code --

15   into the machine language which includes extensions that

16   actually make operating system calls.

17          So if the instruction is one that can be executed

18   directly by the microprocessor, that's what happens if it's --

19   like in the UFH band, then the calls actually result in

20   operating system routines running to carry out that function.

21          In the Android world, it's slightly -- it's different

22   in this respect:  After the code is output by the Java

23   compiler, it's converted by -- it's in Java bytecode.  It's now

24   going to be converted to something called dex code, which

25   executes on Dalvik.  And that's by a DX converter, a little

PROCEEDINGS                                                2766

1   bolt-on, that takes the Java bytecode output by the Java

2   compiler that the Android developer is working with, and

3   converts it into Android bytecode, called dex.

4            And then the same thing happens.  It links the class

5   libraries, which in the Android world would be the 37 Java

6   packages.  And then the Android distinct packages in those

7   class libraries it runs -- on the Android Dalvik virtual

8   machine it's interpreted, and the same steps occur where the

9   output is -- of the interpreter, if you will, is native

10  language instructions, which either are executed directly by

11  the processor or executed by the processor in a way that calls

12  on operating system functions.

13           How much of this is actually in the record yet is

14  unclear, but I'll have to go back and check the documentation

15  you've been provided.  But Phase Two we'll be getting into

16  this.

17           **THE COURT:**  Yes, Mr. Baber.

18           **MR. BABER:**  Your Honor, back to your original

19  question about possible references to a, quote, Java operating

20  system, I am reminded that there are documents in evidence that

21  talk about some of the attempts that Sun made to build a

22  full-stack platform.  And if they are in there that would have

23  been another product that never got to market.

24           There may be references in there to a Java operating

25  system, which would be more like Android.  It wouldn't be just

```
 1  the middleware that typically is the virtual machine the way

 2  Sun sold it.  It would have been the full stack.

 3          So, again, without knowing where Your Honor saw those

 4  references, that could be what that was referring to was their

 5  attempt to build a full operating system.

 6          THE COURT:  Well, all right.

 7          On the patent phase, what did we agree to for opening

 8  statement?  How much time do you need for opening statement?

 9          MR. JACOBS:  Forty-five minutes, Your Honor.

10          THE COURT:  Is that going to be enough?

11          MR. JACOBS:  Yes.

12          THE COURT:  Is that enough for you?

13          MR. VAN NEST:  I think it will be, Your Honor.  Do

14  you want to give more?

15          THE COURT:  No, I don't.

16          MR. VAN NEST:  You are in a giving mood.

17          THE COURT:  If you need more, I will give it to you.

18  If 45 minutes is enough, good.

19          And what will the plaintiff's case look like?  In

20  other words, what kind of witnesses -- is Mr. Ellison going to

21  return and testify about the claim limitations?

22          (Laughter)

23          MR. JACOBS:  I don't think so, Your Honor.  It will

24  be a mix of Google witnesses who -- as adverse witnesses, who

25  we believe will admit to essential facts both on the technical
```

1  side of what Android contains and on the indirect infringement

2  side, in terms of how Google induces or contributes to the

3  infringement by others.

4           And then it will be our technical expert, John

5  Mitchell, who will walk through the disputed claim limitations.

6           And then it will be some Java engineers who did some

7  performance testing that also goes to the inducement and

8  contributory infringement issue.

9           **THE COURT:**  Is the issue both validity and

10  infringement, or is it just infringement?

11           **MR. JACOBS:**  There are no remaining validity

12  challenges to the two patents-in-suit.  Google has informed us

13  they are not proceeding on invalidity.

14           **THE COURT:**  So we'll just have, then, the color codes

15  that go one way.

16           **MR. JACOBS:**  Exactly.

17           **THE COURT:**  All right.  That makes it even easier for

18  the jury.

19           Give me one example of three sentences or less,

20  please, of the claim limitation that the jury is going to have

21  to resolve.

22           **MR. JACOBS:**  So in the '104 patent, the limitation

23  relates to resolving symbolic references into numeric

24  references.

25           The evidence that we will submit will show that

PROCEEDINGS                                          2769

1   Google, both in its code and in its characterization of that --

2   of the relevant feature of Android, refers to resolving

3   symbolic references.

4          Google will contest that those symbolic references

5   are symbolic references.  And that will be one of the issues

6   the jury will have to resolve.

7          **THE COURT:**  Okay.  Mr. Van Nest, what's your take on

8   an issue that the jury is going to have to resolve on the

9   patent phase?

10         **MR. VAN NEST:**  I think -- just to comment generally,

11  Your Honor, I think the patent phase will go a lot quicker.

12         They are not going to call either of the inventors on

13  either of the patents.  So it will largely be Google witnesses,

14  the engineers that built Dalvik, and experts.

15         They're going to have Mr. Mitchell, Dr. Mitchell

16  again.  And we'll have an expert on each of our -- each of the

17  two patents.

18         So the one patent Mr. Jacobs mentioned was resolving

19  symbolic references.  The other patent is something really,

20  really deep in the system called "play execution."

21         Sometimes the system has to initialize an array.  An

22  array is a collection of numbers or collection of values.  And

23  the patent calls for doing that by simulating the execution.

24  Kind of a dry run.

25         And it's -- it's undisputed that in the Dalvik we

1   don't do a dry run.  We do something called pattern matching,

2   which is different.

3          Everybody has to resolve arrays.  That's part of

4   running a system like this.  We do it in a different way.  And

5   we have an expert from USF who has analyzed the system, tested

6   it, run some code on it, and away we go.

7          I think there will be some motion in limine issues,

8   as Mr. Jacobs mentioned.  One I know that we are going to raise

9   is, apparently, they have their witness order set up so they

10  want to call Dr. Mitchell before the benchmarking guys that

11  spoonfed him the benchmarking stuff are called.

12         So we're going to -- we're going to have some issues

13  on that.  I would much rather see the benchmarking guys called

14  first, before Dr. Mitchell, so we can examine them and

15  establish whatever impeachment we can before Dr. Mitchell gets

16  up and waxes eloquent about these benchmark tests.

17         **THE COURT:**  Was there any prior ruling on that?

18         **MR. VAN NEST:**  There was a ruling that they could

19  present in Phase Two.  But I understood you couldn't present

20  facts through another expert until those facts were in

21  evidence.  This is kind of a backwards --

22         **THE COURT:**  That is a problem; isn't it, Mr. Jacobs?

23  Don't you need to have the foundation laid before the ultimate

24  witness gets up and relies on that?

25         **MR. JACOBS:**  I think the -- I don't -- I think the

1    short answer is no, but we'll take a look at Mr. Van Nest's

2    objection and figure out whether there is some merit in it, and

3    whether we should reshuffle a little bit.

4         **THE COURT:**  I think, ordinarily, if there is a

5    question about foundation and an expert is relying on a sub

6    expert, the sub expert ought to come on first.  Because if that

7    winds up being so inadequate that -- then a motion to knock out

8    Mitchell on that ground would be in order.  The cat's out of

9    the bag if you do it in the reverse order.

10        Now, if there is a problem like the witness is in

11   Austria and can't be here, that's a witness problem that we

12   would possibly adjust the schedule for.  Maybe not.

13        But, ordinarily, I think the foundational witnesses

14   for an expert should come first.  So I would commend that to

15   you to think about it.

16        **MR. JACOBS:**  We will, Your Honor.

17        To answer one of your earlier questions, the Court

18   actually not just -- ruled not only that this material could

19   come in in Phase Two, but overruled a Daubert objection to the

20   testing evidence; found that the methodology was sufficient to

21   enable it to come in.

22        We'll go back, nonetheless -- this is just to set the

23   stage for this.  We'll go back and look at the order.

24        **THE COURT:**  All right.

25        **MR. VAN NEST:**  The other -- the other issue has to do

 1   with Mr. Lindholm.  They want to bring Mr. Lindholm back on a

 2   rather far-fetched theory, which we would like to address with

 3   Your Honor Monday morning.

 4            The far-fetched theory is that when Mr. Lindholm was

 5   at Sun years ago, they say he became aware of a patent.  And

 6   then he came to Google.

 7            Remember, Your Honor already knows that they claim

 8   there are thousands of patents at Sun, that affect Java.

 9            He came to Google.  He did not write any code for any

10   of the accused features we're talking about here.  He wasn't

11   involved in any of the actual creation of Android or of the

12   Dalvik.

13            But they want to parade him around as having, quote,

14   prior knowledge; this is willful blindness; he was aware of

15   this patent; and, oh, boy, everybody here for Google was aware

16   of it.

17            And I think what we're going to ask Your Honor is to

18   either simply rule that out of bounds, or at least give us a

19   short hearing outside the jury's presence where you can hear

20   for yourself how, quote, relevant, unquote, this is.  It's

21   really not.

22            But they are going to get up, otherwise, in opening

23   and parade Mr. Lindholm around, and we'll probably see the

24   Lindholm e-mail again.  And it's kind of ridiculous in a case

25   where -- where they didn't even disclose the patents to us

1    until maybe a week before the trial -- before the lawsuit

2    started.

3            So we're going to raise that in a motion, as well,

4    and I think that will be another issue for Monday.

5            **THE COURT:**  Raise it timely enough that the other

6    side can respond, and we'll talk about it on Monday morning.

7            **MR. VAN NEST:**  I'll do it.  Otherwise, I think -- I

8    do think the patent phase will be a lot shorter.  I don't think

9    we are going to see any celebrities.  Possibly Mr. Schwartz, if

10   you consider him a celebrity.  I don't think Mr. Ellison or

11   Mr. Page.

12           **THE COURT:**  What could he be testifying to?

13           **MR. VAN NEST:**  Well, he testified in Phase One, as

14   Your Honor knows, that he made a conscious decision not to

15   pursue litigation against Google over Android.

16           It turns out that in his deposition he was even more

17   specific.  He said that he made a conscious decision not to

18   pursue patent litigation against Google.

19           So I think it's relevant to all our ongoing equitable

20   defenses.  Those would apply in Phase Two as well as they would

21   in Phase One.  And here's the CEO of the company making a

22   conscious decision not to pursue patent litigation.

23           **THE COURT:**  Is that a judge decision?

24           **MR. VAN NEST:**  I think waiver is an equitable

25   defense, so, yes, I think it would be.  I also think, though,

PROCEEDINGS                                                    2774

```
 1  that it could go to non-infringement.

 2          If the company itself that's the plaintiff made the

 3  decision not to proceed with patent litigation, which is what

 4  he said in his deposition, surely that would -- that would have

 5  some bearing on whether or not the Dalvik is an infringing

 6  device.

 7          Certainly, if they can come in here and parade around

 8  Mr. Lindholm and claim that some knowledge he had at Sun is

 9  relevant, then I think, certainly, Mr. Schwartz is relevant as

10  the chief executive officer making a conscious choice not to

11  proceed with patent litigation, which is what he said point

12  blank in his deposition.  So --

13          THE COURT:  Why don't you two consider the

14  possibility of each agreeing not to call those witnesses that

15  are kind of peripheral, in order to get at the core issues.

16          MR. VAN NEST:  I would certainly be open to that.

17          THE COURT:  Maybe you two could make a deal on that.

18          MR. VAN NEST:  We'll try to do it.

19          But, otherwise, I think, as I said, Phase Two will be

20  maybe a little bit less dramatic than Phase One.

21          THE COURT:  Now, if we wind up not having a verdict

22  on copyright, then the experts need to be prepared to excise

23  that part of it from their damages.  I'm talking about Phase

24  Three now.  Because I don't think -- if the jury does not

25  decide liability -- let's say they say yes on 1, but they are
```

PROCEEDINGS                                    2775

```
 1  unresolved on 1B, and same on 2 and 3, then the copyright
 2  part -- there's no point in giving the jury the copyright
 3  damages.
 4          MR. VAN NEST:  Right.  We would be in the --
 5          THE COURT:  Do you agree with that, Mr. Jacobs?
 6  Unless the Court were to enter a Rule 50 in your favor.  I
 7  guess that's a theoretical possibility.  That could happen.
 8          MR. JACOBS:  That was the theoretical possibility we
 9  hoped would become a practical reality in that circumstance,
10  Your Honor.
11          THE COURT:  Does your expert distinguish damages
12  between the SSO of the code versus the paperwork?  I don't
13  think he does.
14          MR. VAN NEST:  Huh-uh.
15          THE COURT:  And -- Mr. Purcell is the expert on that.
16          MR. PURCELL:  Their only damages theory on copyright
17  is based on the SSO.  There is not any type of damages
18  allocated to the literal copying, alleged literal copying, or
19  the documentation.
20          THE COURT:  So what if the only damages -- let's say
21  the jury were to come back and say no liability on 1 and 2, but
22  liability on 3.
23          Do you have a damages study that's tied into that?  I
24  think the answer is no, but let me make sure.
25          MR. BOIES:  Your Honor, that, I believe, would only
```

1  be statutory damages on 3.

2          THE COURT:  All right.  But does that require any

3  jury findings?  For example, is it like a thousand dollars a

4  day or is it just a set fine?

5          MR. BOIES:  It can vary, Your Honor, and it can also

6  vary with a finding of willfulness.

7          THE COURT:  So does the jury have to consider that?

8  I guess it would if willfulness is an issue.

9          MR. BOIES:  I think that's right, Your Honor.

10         THE COURT:  I'm looking ahead to Phase Three, to see

11 permutations here in light of where we are in Phase One.

12         MR. BABER:  Your Honor, to respond to the question

13 you just asked about statutory damages, statutory damages

14 are -- it's pretty clear that a plaintiff who elects an award

15 of statutory damages is entitled to a single award of statutory

16 damages for all infringements of a single work involved in the

17 action.

18         So even if you print a million copies of a book, you

19 only get one statutory damage award.  That's Section 504 --

20         THE COURT:  What is the dollar amount of that?

21         MR. BABER:  In the normal case, it is not more than

22 $150,000.  If the Court or the jury finds it had no reason to

23 believe that it was an infringement, it can be reduced down to

24 not less than $200.

25         And if it is found to be willful, it can be increased

PROCEEDINGS                                              2777

```
 1  up to -- that's the part I'm trying to find.  I believe it's --
 2  I'm sorry.  I misspoke.  The range normally is $750 to 30,000
 3  per work.  Per work infringed.  If it's found to be willful,
 4  you get up to 150,000.  If it's innocent or justified, you go
 5  down to 200.  So the range is 200 to $150,000.
 6            THE COURT:  $200?
 7            MR. BABER:  $200, yes, Your Honor.  That's 504(c)(2)
 8  of the Copyright Act.
 9            THE COURT:  You've got a very strong wrist.
10            (Laughter)
11            THE COURT:  I'm just waiting for it to fall and bust
12  open.
13            MR. BABER:  I'm in big trouble if that thing falls.
14            THE COURT:  So 200 to 150,000?
15            MR. BABER:  Yes, Your Honor.
16            THE COURT:  Depending on willful.
17            Who decides where you go in that range?
18            MR. BABER:  Well, the Supreme Court said some years
19  ago in the Feldman case, I think it is, that there's right to a
20  trial by jury for statutory damages.  So the jury would have to
21  decide whether it was willful or whether the party had a right
22  to --
23            THE COURT:  Let's say they decide that it's not
24  willful.  What is the -- what -- is there guidelines in the
25  statute?
```

PROCEEDINGS                                                    2778

```
 1              MR. BABER:  Oh, as between the 750 and the 30,000?

 2              THE COURT:  Yes.

 3              MR. BABER:  There's no statutory guidelines, no.

 4              THE COURT:  The jury picks a number.

 5              MR. BABER:  Whatever they think is fair given the

 6   facts about the infringement.  It's pretty much discretionary

 7   on the part of whoever is awarding the damages.

 8              THE COURT:  It will cost more in one day of trial --

 9              MR. BABER:  One hour, Your Honor.

10              THE COURT:  -- one hour of trial than to -- but, on

11   the other hand, there is -- for purposes of an injunction, a

12   willfulness finding could be important.  So that has greater

13   significance there than it may have for dollar amounts for

14   damages.

15              Is the statutory damages the only thing that -- let's

16   say that there's no liability on number 1, but liability on

17   number 2, concerning the documentation.  Is that the same

18   answer, that we're looking only at statutory?

19              MR. BABER:  Yes, Your Honor, I believe so, based on

20   the expert reports.  There is no analysis of actual damages for

21   just infringement of the documentation, I believe.

22              THE COURT:  All right.  I've run out of questions for

23   you.

24              MR. VAN NEST:  Thank you, Your Honor.

25              MR. JACOBS:  Thank you, Your Honor.
```

PROCEEDINGS                                                     2779

```
 1            THE COURT:  See you at the next note.
 2            (Proceedings in recess from 8:57 to 12:34 p.m.)
 3            THE COURT:  Welcome.  We have a new note.  It reads:
 4            "After extensive and thorough review of all
 5            evidence and input from fellow jurors, we
 6            have reached verdicts (unanimous) for all
 7            questions on the Special Verdict Form, except
 8            for one.  As to this remaining question, the
 9            jury appears to be at impasse, unable to
10            unanimously agree on the answer.  Please
11            advise of next step.  (We are done for today)
12            Greg Thompson."
13            I believe Dawn asked the jury to wait and not leave
14   yet.  All right.  Comments.
15            MR. JACOBS:  One thing we did not explore with Your
16   Honor is the possibility that they have split on Question 4,
17   which would be of less significance.  So I just note that
18   that's out there as a possibility.
19            I think we're -- our view is they have tried hard.
20   They have asked good questions.  And if they are still at an
21   impasse, we should take the partial verdict that can be had at
22   this point, and move on.
23            THE COURT:  Mr. Van Nest.
24            MR. VAN NEST:  We concur in that, Your Honor.  I made
25   my comments about partial verdict this morning.  But with
```

PROCEEDINGS                                          2780

1  respect to what we should do next, I agree with Mr. Jacobs.

2          **THE COURT:**  So we will bring the jury in.  And I may

3  have a preliminary question or two of foreperson, but my

4  inclination is to do what you both recommend.  So let's bring

5  the jury in.

6          (Pause)

7          (The courtroom deputy enters the courtroom and

8          confers with the judge off the record.)

9          **THE COURT:**  The clerk has told me -- everyone have a

10 seat -- the jury had not filled out the form.  I guess they

11 were waiting for us to tell them what to do.  So she told them

12 to go ahead and fill out the form, and sign and date it.  So

13 that's what they're doing right now.

14         (Pause)

15         **THE COURT:**  While we're waiting, let me ask the

16 lawyers a question.  How many days next week do you think we

17 will need to get the evidence in?  Counting both sides now.  Or

18 your side.

19         **MR. VAN NEST:**  Three to four.

20         **MR. JACOBS:**  Four to four-plus, depending on how much

21 time we each take with each other's witnesses and the like.

22         **MR. VAN NEST:**  I was going to say three to four.

23 There's quite a bit of overlap in terms of the witnesses they

24 are calling and the witnesses we are calling.

25         **THE COURT:**  Here's what I would be willing to do if

1  you all told me, we could take Monday off, possibly.  If we

2  could finish all the evidence by Friday, then come back on the

3  following Monday to do the closings.  But I wouldn't want to do

4  that if you thought there was a risk we'd go over until Monday.

5        **MR. VAN NEST:**  I'm pretty sure we can handle that,

6  Your Honor.  I think that will work.

7        **THE COURT:**  Let's see if you've got any witness

8  problems.

9              (Counsel confer off the record.)

10       **THE COURT:**  I'm told that on Friday next week I would

11 need to leave slightly early for a commitment.  Like an hour

12 early.  So that Friday it would be a somewhat truncated day.

13       **MR. VAN NEST:**  Like at noon, Your Honor?  Talking

14 about leaving at noon on Friday?

15       **THE COURT:**  Yes.

16       **MR. JACOBS:**  I like the idea of a day off after what

17 they've been through, as much out of respect, because I think

18 they will be in a better frame of mind to hear the patent case

19 starting on Tuesday.  But I can't promise you that we'll be

20 done by Friday at noon, particularly since I think we'll have a

21 rebuttal case.

22       **MR. VAN NEST:**  I think --

23       **THE CLERK:**  The jurors are ready.

24       **MR. VAN NEST:**  I think it's likely we would be, but

25 it's hard to guarantee.

PROCEEDINGS

```
1              THE COURT:  All right.  Let's bring in the jury.

2              THE CLERK:  All rise.

3              (Jury enters at 12:45 p.m.)

4              THE COURT:  All right.  Please be seated.

5              We have your note.  And it says on this, I'll just

6    paraphrase, that you have answered all but one question

7    unanimously.  And on the remaining question you are at an

8    impasse.

9              So, Mr. Thompson, are you the foreperson?

10             FOREMAN THOMPSON:  I've been asked to say that not

11   all of the jury was in agreement to send that note at this

12   time, with the others believing Monday would be acceptable to

13   send it.

14             THE COURT:  Okay.  So, now ...

15             (Laughter)

16             THE COURT:  I feel I must ask you this question.  So

17   from that comment it sounds like some of you believe that

18   further deliberation would be productive.

19             FOREMAN THOMPSON:  The majority agreed to send the

20   note at this time.

21             THE COURT:  All right.  Well, does everyone agree

22   that the -- with what's stated in the note?

23             FOREMAN THOMPSON:  I believe the issue is the timing

24   of sending the note.

25             THE COURT:  Well, that's not quite answering my
```

PROCEEDINGS                                          2783

1    question.

2            **FOREMAN THOMPSON:**  I will elaborate.

3            **THE COURT:**  Yes, go ahead.  Don't tell us any vote

4    count.

5            **FOREMAN THOMPSON:**  Right.

6            **THE COURT:**  We don't want to know that.  We don't

7    want to know how the jury stands on anything.  But we would

8    like to know if -- what the chances are for reaching agreement

9    on everything if you continue to deliberate.

10           If there is a reasonable chance that that would

11   happen, then you're not really at an impasse.  On the other

12   hand, if there's no reasonable chance that you will reach

13   agreement on all the questions, then you can see that there are

14   two different scenarios.

15           And I don't know what you mean by sending this note

16   on Monday versus sending it today.  So please elaborate with

17   those caveats.

18           **FOREMAN THOMPSON:**  All right.  The majority believe

19   that sending the note now, indicating impasse, is appropriate.

20   The others see that we're at impasse but believe waiting over

21   the weekend and coming back Monday would be worthwhile, to see

22   if anyone has come up with a new perspective or a reason to

23   continue deliberations.

24           **THE COURT:**  Let me say one other thing.  That last

25   question on the verdict form is an advisory question only.  It

PROCEEDINGS                                              2784

```
 1  pertains to something I have to decide.

 2          Counsel, do you mind if I ask this question?

 3          I think whether or not -- in other words, you don't

 4  have to reach an agreement on the very last question, No. 4.

 5  That's something I have to decide anyway.  That's an advisory

 6  one.

 7          So is your -- the question that you're at an impasse

 8  one of the first three?

 9          FOREMAN THOMPSON:  Yes, it's one of the first three.

10          THE COURT:  All right.  We didn't -- okay.  That

11  clarifies things.

12          All right.  And is it -- is this note that you -- you

13  still haven't told me.  Is what you said in this note correct,

14  that you've reached agreement on everything except one

15  question?

16          FOREMAN THOMPSON:  I believe that's correct.

17          THE COURT:  So let me say to everyone.  If we took

18  the verdict now, or whenever we take it, what we do is read it

19  in open court; every question, the answer you have given.  And

20  then at the end we go down with each person and we ask you

21  individually whether or not that's your verdict.

22          If it turns out that somebody doesn't stand by what

23  was read in open court -- in other words, one of you says, "No,

24  that's not my verdict," then we go back to square one.  It's

25  not unanimous.
```

PROCEEDINGS                                                    2785

```
 1              So whenever you say to me you have reached a
 2   unanimous verdict on all questions but one, then, you know, I
 3   take you at your word that that's what you have done and you
 4   all will stand by that.
 5              So you as the foreperson, when you -- you have the
 6   verdict form there.  You're in a position to tell me whether or
 7   not this note is correct.
 8              It's just that you're saying -- you're saying the
 9   note is correct, but not everyone was in agreement that the
10   note should be sent at this time.
11              FOREMAN THOMPSON:  My understanding is that the
12   verdict form that has been filled out with answers for all
13   questions but one, the unanimity, the consensus on all the
14   questions we answered was not the subject of some of us
15   thinking a delay in sending the note could be useful.
16              In other words, the remaining question that we were
17   unable to decide was the focus of the question --
18              THE COURT:  Wait, wait.  Don't tell me which one it
19   is, if you did not answer yet.
20              On the issue of -- is it like 11 to 1?  On this one
21   you can tell me.  Is it a close like five of you want to wait
22   over the weekend, or is it just one person that wants to wait?
23              Counsel, can I ask that question?
24              MR. VAN NEST:  I prefer that you not, Your Honor.
25              THE COURT:  All right.  I can't -- I can do it, but
```

PROCEEDINGS                                             2786

 1  out of deference to counsel, I'm not going to ask you that

 2  question.

 3          I need to ask you to -- I'll let counsel, do you have

 4  any questions that you want to ask?  Because whenever they go,

 5  I'm going to ask you whether you want to receive the verdict

 6  now or not.  And because you've gotten some more information

 7  that we didn't have earlier, I want to make sure that I have

 8  the benefit of your input before we receive the verdict.

 9          **MR. VAN NEST:**  Can we have just a moment, Your Honor?

10          **THE COURT:**  Yes.  And then I'll see you at the

11  sidebar.

12          (Counsel confer off the record.)

13          **THE COURT:**  All right.  We are at the sidebar.

14          **MR. VAN NEST:**  Your Honor, the one question that I

15  would ask Your Honor to ask is that the foreperson said

16  something about unanimity and consensus.

17          I do think it would be appropriate to ask, as to the

18  questions they have answered is their answer unanimous or not.

19  Because when he said "consensus," I wasn't quite sure what he

20  was talking about.

21          I think that would be an appropriate question.  And

22  then just make sure that of the ones that they've done, those

23  are unanimous.

24          **MR. JACOBS:**  I think that's unnecessary based on the

25  way the question came out from them.  I also thought it would

1   be useful to ask how many of them thought further deliberations

2   would be useful.

3        **THE COURT:**  I can just ask for a show of hands on

4   that.  That's done all the time.  What's wrong with that,

5   Mr. Van Nest?

6        **MR. VAN NEST:**  I think -- I think it -- I don't think

7   it's appropriate to be calling out how many people.  All he

8   said was a majority felt it was appropriate to send the note

9   today.  And why are we going to ask how many people are in the

10  maj- -- are in the minority of this group?  I don't think

11  that's appropriate.

12       **THE COURT:**  I'm going to let them come back on

13  Monday.  I'm not going to receive the verdict now.

14       The foreperson seems to think there's hope to reach a

15  unanimous verdict.  And it's worth one more day, I believe.

16       This is -- you know, they're not at an impasse, in my

17  judgment.  So I'm going to ask them to come back one more day.

18       **MR. JACOBS:**  Understood, Your Honor.

19       **MR. VAN NEST:**  We would object, Your Honor.  I think

20  we should take the verdict that they do have today.

21       **THE COURT:**  Of course you would, because a deadlock

22  means that they can't -- on at least the one issue they are not

23  going to rule against you.

24       But I disagree with that.  I think that this is a

25  huge case.  And the resources that are going into this are

**SIDEBAR**

```
 1  enormous.  One more day we can live with.

 2        MR. VAN NEST:  My only comment, Your Honor, is I

 3  think you gave a fairly vigorous instruction to them last

 4  night.  They deliberated all morning this morning, almost five

 5  hours.  They've been in deliberations almost 26 hours, which

 6  is, you know, contrasted with 34 hours of evidence, roughly.

 7  That's a very long deliberation for a case of that length.

 8        I think it would be more appropriate to find out if

 9  their answers are unanimous on the questions they have

10  answered.  I think we ought to take the verdict today.

11        THE COURT:  I will ask that question.  But I am

12  inclined to send them back for one more day.  And I'm willing

13  to ask for a show of hands.  And I think I can legitimately do

14  that.

15        But the -- based on what's come out here today, I

16  think there's hope that they could -- look how much progress

17  they made since yesterday.  They've answered all but one

18  question.  With a little bit more effort, maybe they can

19  answer -- let them think about it over the weekend.

20        MR. VAN NEST:  Again, Your Honor, in light of the

21  instruction you gave them last night, the length of time

22  overall they have deliberated, the fact they deliberated

23  another four and a half, four and three-quarters hours today, I

24  think that's sufficient.  And I think you ought to take the

25  verdict today.
```

1           **THE COURT:**  All right.  I disagree.

2           **MR. JACOBS:**  Thank you, Your Honor.

3           (Sidebar concluded.)

4           **THE COURT:**  I have one brief question, just to

5     clarify, Mr. Thompson, what you said a moment ago.

6           You used the word "consensus" at one point, as well

7     as "unanimous."  And maybe you meant nothing different by that.

8     But on the questions that you have been able to answer, is it

9     100 percent?

10          **FOREMAN THOMPSON:**  Yes.

11          **THE COURT:**  All right.  Now, in the Court's -- in my

12    judgment, it's worth you spending -- going home over the

13    weekend.  Not rendering your verdict today.  Letting you go

14    home over the weekend, think about it, and come back on Monday.

15          And over the course of this morning, I -- one thought

16    occurred to me that I'm pretty sure was not in your mind.  But

17    when the trial started, I told you that you should take notes

18    because the transcript would not be in the jury room.  And

19    maybe some of you think that you're not entitled to what's

20    called a read-back of testimony.

21          So, you are entitled to a read-back.  For example, if

22    you wanted to hear somebody's testimony that had testified from

23    the witness stand about some subject, and you couldn't remember

24    what it was, it occurred to me that maybe you thought when I

25    told you you wouldn't have a transcript, that you had no way to

1    hear that testimony again.

2         You do have a way.  It's a little cumbersome.  The

3    way that works is the court reporter takes her notes.  It takes

4    her a while to find the right passage.  And under some

5    circumstances we have to read all of the testimony of that

6    witness.  But we can do that.

7         If that is something that would benefit you in your

8    deliberations, you just tell us.  Describe what it is you would

9    like to hear, and we would do our best to find it.

10        I did not tell you that earlier, really, just through

11   oversight.  It's something that I kind of take for granted that

12   jurors know, but sometimes they don't.  Anyway, that's a

13   possibility.

14        The main thing is that since you have told me that

15   there is hope for reaching a verdict on all of the questions,

16   we should take advantage of that hope, and spend one more day

17   deliberating.  So what I'm going to do is ask you to do

18   exactly -- do exactly that.

19        Now, I want to return to something that I haven't

20   mentioned in a while.  I must tell you that you are obligated

21   to follow my admonitions.  And that means no research of any

22   kind.  No going on the Internet to see what the newspaper

23   people are saying about this case.

24        I will tell you, you're in the newspapers every day.

25   Every one of your notes, somebody -- one of those reporters

PROCEEDINGS                                      2791

1  back there is picking them up, and you're being published.  You

2  are being followed very carefully.

3          And I know the temptation by you would be great to

4  see what they're saying about you and about this trial.  But I

5  have given you a strict order not to do that.

6          If I found out one of you was looking at some of

7  these blogs and all these commentators, it's like the -- you

8  know, the republicans and the democrats, the CNNs and

9  everything else, they're talking about this case, as I told you

10 at the outset of this case.  And they all have a point of view.

11         Your job is to decide this case based on the evidence

12 here in the courtroom, under the law, and only that.  So if any

13 of you have violated my admonition, I need to know about it.

14         And you shouldn't be talking to anyone else.  You

15 shouldn't be looking up anything on the Internet or consulting

16 the court docket, or anything else.

17         After the trial is over and you are released, you

18 will have a good time going back and looking at all of that.  I

19 assure you.  But for now, you cannot do that.

20         Sometimes jurors think that the judge is just saying

21 this in order to -- for the record.  No.  It's a real thing.

22 And I urge you to remember the admonition.

23         We're going to now send you home for the weekend.  I

24 hope you have a great time.  We'll come back on Monday.

25         We will be into this second phase of the case very

PROCEEDINGS                                                2792

1    promptly.  The lawyers and I have been discussing how it's

2    going to come.  They are finding ways to shorten even that up.

3    So we have been putting the time to good use while you're

4    deliberating, for the next part of the case.

5           And so as soon as you are at the point where you can

6    tell us there's not any hope for reaching a verdict on the --

7    you know, all of the questions, that's fine.  We will -- we'll

8    take your verdict.  We will then respect that and move to the

9    second phase of the case.

10          But, in my judgment, weighing all the considerations,

11   the best course of action now is to ask you to do what was

12   suggested from the jury box, which is to think about it over

13   the weekend.  Come back on a fresh, bright Monday morning and

14   see if anyone has thought of a different angle, which in a

15   complicated case like this could easily happen.

16          So you all have a great weekend.  We'll see you back

17   here on Monday morning at the normal time.

18          **THE CLERK:**  All rise.

19          (Jury out at 1:04 p.m.)

20          **THE COURT:**  All right.  Please be seated.

21          Well, I'm sorry I brought up the idea of a three-day

22   weekend.

23          (Laughter)

24          **THE COURT:**  I guess that's out.

25          Okay.  Anything else you want to bring up?

PROCEEDINGS                              2793

```
 1          MR. VAN NEST:  Just one thing, Your Honor, in light
 2  of the timing.
 3          Our teams are working very, very hard to give you the
 4  best counter-findings we possibly can, and the best oppositions
 5  to JMOL.
 6          I'm wondering if we could have a slight bump in the
 7  schedule.  Those are now due, I believe, at noon and 3:00 on
 8  Saturday.
 9          THE COURT:  You want 24 more hours, until Sunday?
10          MR. VAN NEST:  At least.  I was going to ask, if I
11  had the courage, to bump it to Monday.
12          (Laughter)
13          THE COURT:  No, no, no.  I give you until Monday on
14  the JMOL, but I would like to have the findings part by Sunday
15  evening, say 2 o'clock.
16          MR. VAN NEST:  6 o'clock Sunday on the findings, and
17  5 o'clock Monday on the JMOL?
18          THE COURT:  All right.  I'll go with that.
19          MR. BOIES:  We appreciate that very much, Your Honor.
20          THE COURT:  How about over there?
21          (Laughter)
22          MR. JACOBS:  We're fine, Your Honor.
23          (Laughter)
24          THE COURT:  Okay.  I'll let you all go home and
25  speculate.
```

1          (Laughter)

2          (At 1:05 p.m. the proceedings were adjourned until

3      Monday, May 7, 2012, at 7:30 a.m.)

4                          -   -   -   -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF REPORTERS

I, KATHERINE POWELL SULLIVAN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 10-3561 WHA, **Oracle America, Inc., vs. Google, Inc.,** was reported by me, certified shorthand reporter, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings at the time of filing.


_____
/s/ Katherine Powell Sullivan


Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter


Friday, May 4, 2012