KEKER & VAN NEST LLP
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
CHRISTA M. ANDERSON - # 184325
canderson@kvn.com
DANIEL PURCELL - # 191424
dpurcell@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:      415 391 5400
Facsimile:      415 397 7188

KING & SPALDING  LLP
SCOTT T. WEINGAERTNER
(*Pro Hac Vice*)
sweingaertner@kslaw.com
ROBERT F. PERRY
rperry@kslaw.com
BRUCE W. BABER (Pro Hac Vice)
1185 Avenue of the Americas
New York, NY 10036
Tel: 212.556.2100
Fax: 212.556.2222

KING & SPALDING LLP
DONALD F. ZIMMER, JR. - #112279
fzimmer@kslaw.com
CHERYL A. SABNIS - #224323
csabnis@kslaw.com
101 Second Street, Suite 2300
San Francisco, CA  94105
Tel:  415.318.1200
Fax: 415.318.1300

IAN C. BALLON - #141819
ballon@gtlaw.com
HEATHER MEEKER - #172148
meekerh@gtlaw.com
GREENBERG TRAURIG, LLP
1900 University Avenue
East Palo Alto, CA  94303
Tel: 650.328.8500
Fax: 650.328.8508

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>              Plaintiff,<br><br>      v.<br><br>GOOGLE INC.,<br><br>              Defendant. | Case No. 3:10-cv-03561 WHA<br><br>**GOOGLE'S RESPONSES TO ORACLE'S CORRECTED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Dept.:      Courtroom 8, 19th Floor<br>Judge:      Hon. William Alsup |

Defendant Google hereby submits the following responses to Plaintiff Oracle's Corrected Proposed Findings of Fact and Conclusions of Law [Dkt. 1049].

Google responds below to each of Oracle's proposed findings of fact ("OFOF") and conclusions of law ("OCOL") below.  Where appropriate, Google cross-references its own Proposed Findings of Fact ("GFOF") and Conclusions of Law ("GCOL" [Dkt. 1047).  Google also makes three general objections to Oracle's proposed findings, as described below.

First, several of Oracle's proposed findings argue that "no credible" evidence supports a given statement.  *See*, *e.g.*, OFOF 104-105, 121, and 136-138.  But Oracle never identifies what evidence it finds to be not credible, or why any evidence that contradicts Oracle's unsupported statements is not credible.  Oracle's failure to explain the basis of its attack, is, standing alone, a sufficient reason to reject those proposed findings.

Second, Oracle repeatedly mischaracterizes as "facts" isolated statements from exhibits that were never discussed by either party at trial.  *See*, *e.g.*, OFOF 63, 98, 103, 123, 129, 131.  Attorney argument is not evidence and cannot change the meaning of the documents in evidence.  At trial, Oracle insisted that Google stipulate to the admission of over 150 exhibits.  Oracle failed to question even a single witness about many of those exhibits.  Oracle's after-the-fact gloss on an exhibit that played no role in the trial should be afforded no weight.

Third, many of Oracle's proposed findings are not cited in support of any of its proposed conclusions of law.  *See, e.g.*, OFOF 9-10, 12, 17, 22-23, 27-28, 40, 44, 49, 53-54, 56, 75-80, 134-135.  These proposed findings are therefore irrelevant and should be disregarded.

# I.     [ORACLE'S] PROPOSED FINDINGS OF FACT REGARDING OWNERSHIP

1.     Sun Microsystems, Inc. ("Sun") obtained copyright registrations on the Java platform and the JDK from the Copyright Office, including copyrights in J2SE 1.2 Beta 2, 1.2, 1.3, 1.4, 5.0, and 6.0 Platforms, and the "Java Application Programming Interface, Volume 1 Core Packages" book.

> TX 475, 450, 451, 452, 453, 454, 455, 460, 461, 462, 463, 464, 476, 509, 513, 518, 520, 521, 523, 524, 526, 598, 599, 601, 602, 603, 659 (registration certificates)

661479.02

1    ECF No. 525 (Stipulated Facts 15-16 (J2SE 1.4 and 5.0))

2    **Google's Response**:  Disagree.  The only copyright registrations pleaded in Oracle's Amended

3    Complaint are the three registrations introduced as TX 464, TX 475 and TX 476 (the "Asserted

4    Registrations"), one of which (TX 476) is a "supplementary registration" that supplements TX

5    475 by providing additional alternative titles of the work.  The Asserted Registrations are for

6    copyrights in works entitled "Java 2 Standard Edition 1.4" (TX 464) and "Java 2 Standard

7    Edition, Version 5.0" (TX 475, TX 476).  No copyrights in any works other than the two that are

8    the subject of the Asserted Registrations are at issue.  For purposes of this response to Oracle's

9    proposed findings, Google shall refer to the complete work covered by TX 464 as "the 1.4 Work"

10   and the complete work covered by TX 475 and TX 476 as "the 5.0 Work."  A more accurate

11   finding that correctly addresses the issue addressed in Oracle's FOF 1 would be:

> Sun Microsystems, Inc. ("Sun") obtained from the Copyright Office numerous
> copyright registrations on works relating to the Java platform, including the
> twenty-seven registrations admitted into evidence.  Of the registrations introduced
> into evidence, only three are at issue:  (1) TX 464, which is Registration No. TX
> 6-196-514, for a work entitled "Java 2 Standard Edition 1.4" (the "1.4 Work"); and
> (2) TX 475 and TX 476, which are Registrations Nos. TX 6-066-538 and TX
> 6-143-306, both for a work entitled "Java 2 Standard Edition, Version 5.0" (the
> "5.0 Work").

> 2.     J2SE 1.4 and J2SE 5.0 were both registered as derivative works, and both the
>
copyright registrations incorporate by reference Sun's copyright registrations for prior versions.

> TX 3529 (J2SE 5.0)
> TX 3530 (J2SE 1.4)
> Reinhold at RT 2233:6-2234:20
> Reinhold at RT 2234:20

21   **Google's Response**: Disagree.  The Asserted Registrations indicate that both the 1.4 Work and

22   the 5.0 Work were derivative works, i.e., that they were works that included preexisting material.

23   Oracle's FOF 2 mischaracterizes the references to prior registrations in the Asserted

24   Registrations.  The references do not "incorporate by reference" any registrations for prior

25   versions of the works; they simply *identify*, by registration number and year of registration, prior

26   registrations of the works or earlier versions of the works, in accordance with the applicable

27   Copyright Office regulations and forms.  TX 464 at 2, space 5; TX 475 at 2, space 5.

28

2

661479.02

3.     Under the heading "Materials Added to this Work," the copyright registration for J2SE 1.4 lists "New and revised computer code and accompanying documentation and manuals." The registration was accompanied by a hard copy partially redacted excerpt of source code for java.nio and included a CD-ROM entitled Java ™ 2 SDK Standard Edition Documentation 1.4.0.

> TX 3530
> Reinhold at RT 2233:6-2234:20

**Google's Response**: Agree in part.  The first sentence of Oracle's FOF 3 is accurate; no objection.  Disagree with the second sentence.  The application for the registration was accompanied by fifty pages of heavily redacted source code from the package java.nio, and a computer disc bearing the legend "Java(TM) 2 SDK, Standard Edition Documentation 1.4.0."

4.     Similarly, under the heading "Materials Added to this Work," the copyright registration for J2SE 5.0 lists "New and revised computer code and accompanying documentation and manuals."  The registration was accompanied by a hard copy excerpt of source code from the J2SE 5.0, and included a CD-ROM containing the binary code and documentation for J2SE 5.0.

> TX 3529
> Reinhold at RT 2234:20-2238:19
> Dare at RT 2257:5-2266:25
> TX 1076, 1077, 1078, 1081

**Google's Response**: Agree in part.  The first sentence of Oracle's FOF 3 is accurate; no objection.  Disagree with the second sentence.  The application for the registration was accompanied by fifty pages of heavily redacted source code, which appears to be from numerous different files included within J2SE 5.0.  The certified records of the Copyright Office relating to TX 475, namely TX 3529, do not reflect that any disc was submitted with the application.

5.     The individual code files from which Google copied are all part of the source code for J2SE version 5.0.

> Reinhold at RT 693:1-695:9
> TX 623.1-10

**Google's Response**: Oracle's FOF 5 is argumentative and therefore an improper proposed finding of fact.  Oracle's FOF 5 also is unduly general and vague, and does not identify the "individual code files" to which Oracle is referring.  Based on the exhibits and testimony cited by

3

661479.02

Oracle, Google agrees that the individual files that comprise exhibits TX 623.1 through 623.10 are all contained in exhibit TX 623.

6.      Sun changed its name to "Oracle America, Inc." when Oracle Corporation purchased Sun.  Oracle America is the plaintiff in this action.

ECF No. 525 at 8 (Stipulated Fact 3)

**Google's Response**: Agree.

7.      Google has submitted no evidence showing that the registrations cover anything other than what they purport to claim.

**Google's Response:** Disagree.  Oracle's FOF 7 misstates the burden of proof as to what the 1.4 Work and the 5.0 Work consisted of and which party has the burden of proving what the Asserted Registrations cover.  Because the Copyright Office regulations allowed the deposit of "identifying material" (such as the redacted source code) rather than a complete copy of the work, it is Oracle's burden to produce and authenticate a complete copy of each Work as it existed as of the date the applications for the Asserted Registrations were filed.  *See Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 413 (S.D.N.Y. 1999).  Under 17 U.S.C. 103(b), it is also Oracle's burden to show that Oracle owns the copyright rights to any individual component parts of the 1.4 and 5.0 Works and, therefore, whether the Asserted Registrations "cover" or "extend to" anything other than the work as a whole, i.e., the entire derivative work.  *See Boisson v. Banian Ltd.*, 273 F.3d 262, 268 (2d Cir. 2001) ("Simply because a work is copyrighted does not mean every element of that work is protected.").  Oracle's FOF 7 is therefore both incorrect and irrelevant.

8.      Google has submitted no evidence that the registered code differs from what was identified at trial.

**Google's Response:**  Disagree.  Like Oracle's FOF 7, Oracle's FOF 8 misstates the burden of proof as to what the 1.4 Work and the 5.0 Work consisted of and which party has the burden of proving what the Asserted Registrations cover.  Because the Copyright Office regulations allowed the deposit of "identifying material" (such as the redacted source code) rather than a complete copy of the work, it is Oracle's burden to produce and authenticate a complete copy of each Work

661479.02

as it existed as of the date the applications for the Asserted Registrations were filed. *See Tradescape.com v. Shivaram,* 77 F. Supp.2d 408, 413 (S.D.N.Y. 1999); Copyright Office Compendium II of Copyright Office Practices, Section 108.04 ("the coverage of a registration cannot, subject to certain exceptions, extend beyond the material deposited to make that registration.").  Under 17 U.S.C. 103(b), it is also Oracle's burden to show that Oracle owns the copyright rights to any individual component parts of the 1.4 and 5.0 Works.  Oracle's FOF 8 is therefore both incorrect and irrelevant.  Oracle's FOF 8 also uses the phrase "registered code," which is ambiguous.  The Asserted Registrations register Sun's (now Oracle's) claim of copyright in the 1.4 Work and the 5.0 Work; it is the claim to the copyright in the identified work (not any body of "registered code") that is registered.

## II.   [ORACLE'S] PROPOSED FINDINGS OF FACT REGARDING COPYRIGHTABILITY

9.   Class libraries in Java are software libraries of prewritten code that can be reused by software developers in a wide variety of different programs.  There are over 400 classes containing prewritten code segments, contained in the 37 accused API packages of the class libraries for J2SE Version 5.0.

Reinhold at RT 584:10-585:15
Mitchell at RT 1248:13

**Google's Response:**  Agree.  This finding is not cited by Oracle's COL.

10.   Java Application Programming Interfaces ("APIs") are documentation, sometimes referred to as specifications, that describe the many elements that make up the class libraries and the relationships among them.

Reinhold at RT 585:16-586:6

**Google's Response**:  Disagree.  The APIs are distinct from the documentation.  The APIs are the names, words, and set of rules a programmer uses to communicate with a library and access the prewritten code contained in that library.  The documentation (i.e., the specifications) is the English-language explanation that describes what the APIs do.  Copyright MSJ Order [Dkt. No. 433] at 10-11.  This finding is not cited by Oracle's COL.

661479.02

1

Bloch at RT 763:21-24
Mitchell at RT 1297:23-1298:7
GFOF 2
Copyright MSJ Order [Dkt No. 433] at 1, 3, 4

2

3

4      11.    The Java API packages describe the structure of the class libraries, the names of all

5   the elements, and include English prose that describes how every element is expected to work.

    The class libraries contain the compiled code.

6

7                          Reinhold at RT 592:18-593:13

8   **Google's Response**: Disagree.  The cited testimony does not support the proposed finding of fact.

9   Dr. Reinhold did not testify that the Java API packages "describe" anything.  The cited testimony

10  also does not support the finding that the API packages "include English prose that describes how

11  every element is expected to work."  This finding is not cited by Oracle's COL.

12     12.    The 37 API packages asserted in this lawsuit are java.awt.font, java.beans, java.io,

13  java.lang, java.lang.annotation, java.lang.ref, java.lang.reflect, java.net, java.nio,

14  java.nio.channels, java.nio.channels.spi, java.nio.charset, java.nio.charset.spi, java.security,

15  java.security.acl. java.security.cert, java.security.interfaces, java.security.spec, java.sql, java.text,

16  java.util, java.util.jar, java.util.logging, java.util.prefs, java.util.regex, java.util.zip, javax.crypto,

17  javax.crypto.interfaces, javax.crypto.spec, javax.net, javax.net.ssl, javax.security.auth,

18  javax.security.auth.callback, javax.security.auth.login, javax.security.auth.x500,

19  javax.security.cert, and javax.sql.

20                               TX 1072

21  **Google's Response**: Agree.  Not cited by Oracle's COL.

22     13.    The java.net.ssl API package is used for creating secure transactions over the

23  internet.  The package java.sql is used for accessing a wide variety of relational databases.

24                          Reinhold at RT at 6:16:2-24

25  **Google's Response**: Agree.

26     14.    Android incorporates APIs for the 37 Java packages asserted in this lawsuit.

27                                TX 51

28  **Google's Response**: Agree that Android implements the 37 API packages that are substantially

                                      6

661479.02

the same in regard to the elements required for compatibility with those APIs, but disagree that Android "incorporates" the API packages, which is not supported by TX 51.  This finding is not cited by Oracle's COL.

15.     The Java APIs for the 37 packages at issue include thousands of individual elements, organized into packages, classes, interfaces, exceptions, constructors, methods, and fields.  The designers of the Java APIs for these packages selected the elements and arranged them into a complex structure, sequence and organization.

> Reinhold at RT 589:2-18, 628:22-629:6, 585:16-586:6, 621:7-622:5, 634:1-25
> TX 1028
> Mitchell at RT 1238:13-1239:12, 1248:11-1249-1, 2283:9-20
> TX 624 at 23-26

**Google's Response**: Agree that there are thousands of elements that are organized as indicated, and that the designers (who were not all employed by Sun) generally selected these elements and arranged them, although the arrangement typically was driven at least in part by industry custom and practice, the requirements of the Java programming language, and other external constraints.

> Reinhold at RT 709:11-711:9
> Reinhold at RT 623:7-16
> Bloch at RT 748:17-22

16.     There is an intricate relationship of hierarchies and dependencies among Java API elements within and across packages.  These are illustrated in part in the Java API package poster used by developers when programming for J2SE version 5.0.

> Mitchell at RT 2283:6-20
> Reinhold at RT 586:7-603:6
> TX 1028

**Google's Response**: Agree to the extent that this finding repeats the facts Google has agreed to above.  Disagree as to "intricate."  Agree that TX 1028 illustrates at least some of these relationships, many of which (including any hierarchical structure) reflect compliance with the requirements of the Java programming language, for at least some of the API packages.

17.     The intricate structure of the API packages poster reflects only the high level class and interface relationships for some of the API packages in version 5.0, because it would be

impossible to fit a description of all the relationships even on a large poster with extremely small print.

Reinhold at RT 599:11-600:3

**Google's Response**: Disagree to the extent that Oracle characterizes the "structure" as "intricate." Moreover, Dr. Reinhold testified in the cited testimony that it *would* be possible to describe these relationships with a large enough poster or small enough print.  This finding is not cited in Oracle's COLs.

18.     There is a hierarchical relationship among classes.  Classes can have one or more subclasses, each of which inherits the characteristics of the classes above it in the hierarchy.

Reinhold at RT 588:5-11<br>Mitchell at RT 1218:15-19, 1225:10-16

**Google's Response**: Agree.

19.     There are many other types of relationships among classes, interfaces, and packages that include connections within and across packages.  Interfaces, for example, can be used to relate different classes that share common characteristics that are located in different packages.

Reinhold at RT 589:13-18<br>Reinhold at RT 590:5-23<br>Reinhold at RT 601:22-25

**Google's Response**: Agree as to interfaces, but disagree that there are "many other" such relationships.  The index to the third edition of the Java Language Specification discusses "inheritance" of fields, members and methods *only* in the context of classes and interfaces, suggesting that there are *not* "many" similar types of relationships.

TX 984 at 615-665

20.     Methods can contain parameters that are defined in other classes located within, or outside, the package in which the method is found.  Methods can also return members of other classes.

Reinhold at RT 602:4-603:6

**Google's Response**: Agree.

8

661479.02

21.     Classes and subclasses can be contained within the hierarchy of one package but defined in another.

> Reinhold at RT 601:14-21
> Mitchell at RT 1221:24-1222:2

**Google's Response**: Agree.

22.     Interfaces themselves are often arranged hierarchically in a manner similar to classes.

> Mitchell at RT 1219:14-23, 1236:19-1237:2

**Google's Response**: Agree, except for the term "often," which is not supported by the cited evidence.

23.     The structure, sequence and organization ("SSO") of the 37 Java API packages are expressed in both their specifications and the implementations.  The specifications describe the SSO of the Java API implementations, and are used by developers to understand and use the implementation.

> Reinhold at RT 619:16-620:6
> Mitchell at RT 1236:3-1237:8; 1234:9-17
> Bornstein at RT 1843:3-1844:1

**Google's Response**: Disagree that the SSO is "expressed" anywhere.  As the testimony cited by Oracle makes clear, the specifications describe the API packages, and in that sense disclose various functional relationships between the elements of the APIs.  The source code for the API packages includes declarations reflecting those functional relationships.  Agree that specifications are, at least sometimes, used by developers to understand and use the API packages.

24.     In Java, the SSO is the same for the API specifications and the implementations because both are derived from the same source code.  The English language comments and declarations are extracted from the source code using a tool called javadoc.  The source code is also compiled into executable byte code for the implementation by a compiler.

> Reinhold at RT 607:2-608:3
> Reinhold at RT 613:3-614:10
> Mitchell at RT 1228:2-9
> Mitchell at RT 1332:14-1333:8
> Mitchell at RT 1257:3-13

9

661479.02

Mitchell at RT 1236:19-1237:2

**Google's Response**: Disagree that "derived," which is a legal term of art, is supported by the testimony.  Disagree that the "implementations" include the SSO at issue, because several witnesses testified that the "implementing code" excludes the declarations.

> Bloch at RT 789:19-790:23
> Schmidt at RT 1565:7-1567:10
> Astrachan at RT 2186:11-12

Disagree that the testimony supports a finding that the SSO is the "same" for the API specifications and the compilable code in the API packages, because the evidence does not establish that the SSO of the API packages is the *only* SSO in the specifications and the compilable code in the API packages, or that any additional SSO is the same in the specifications and the compilable code in the API packages.  The compilable code for any given method, for example, can have its own SSO, which would not be part of the SSO of the API specifications. Agree that English-language comments and declarations are extracted from the source code using a tool called javadoc, and that source code is also compiled into executable byte code by a compiler.

25.    Similarly, in Android, the Android specifications have the same SSO as the implementations because both are derived from the same source code.

> Lee at RT 1169:8-15
> Bornstein at RT 1841:11-15

**Google's Response**:  Agree in part.  Disagree that "derived," which is a legal term of art, is supported by the testimony.  Disagree that the "implementations" include the SSO at issue, because several witnesses testified that the "implementing code" excludes the declarations. Disagree that the testimony supports a finding that the SSO is the "same" for the API specifications and the compilable code in the API packages.  *See* Google Resp. 24.

26.    The source code and documentation for the 37 accused Android API packages have the same SSO described in the documentation and source code for the 37 Java API packages at issue.

Astrachan at RT 2214:22-2215:5 (SSO of the method declarations are the

10

same in Java and Android)
        Astrachan at RT 2215:24-2216:2 (method signatures are in the same
location within the SSO in both Java and Android)
        Reinhold at RT 606:14-16 (the structure of the Java APIs is "exactly the
same" as the structure of the Java class libraries)
        Reinhold at RT 606:18-608:3 (structure of names is same as structure of
source code because the Java Documentation Extractor pulls names from source
code)
        Mitchell at RT 2282:17-24
        Mitchell at RT 2286:9-16

**Google's Response**: Agree that the specifications (i.e., documentation) describe the API

packages, and in that sense disclose various functional relationships between the elements of the

APIs.  Agree that the compilable code for the Android versions of the 37 packages include

declarations that reflect those functional relationships.  Agree that these functional relationships

are substantially the same as those described by the J2SE documentation for the 37 API packages,

and reflected in the compilable code for the 37 J2SE API packages.

        27.     The printed copy of the documentation for the 37 Java API packages in suit would

span 11,000 pages, filling three and a quarter banker's boxes.

                        Reinhold at RT 617:2-15

**Google's Response**: Google does not dispute that this could be true, for some undisclosed print

and formatting settings.  This finding is not cited in Oracle's COL.

        28.     The individual elements included in the Android source code and described in the

Android documentation perform the same functions as their corresponding elements in the Java

source code that are described in the Java documentation.

                        Astrachan at RT 2219:7-18 ("I would write source code based on the
                specification.")
                        Mitchell at RT 1253:16-18 (the "narrative" of the documentation is
                reflected in the source code)
                        Mitchell at RT 2282:17-2283:2 ("The declarations on the left are literally
                copied into the code, and that represents not just the names, but where they related
                as far as the hierarchy")
                        Bornstein at RT 1836:19-1837:2 (Android team looked at Java
                specifications to derive information from them to write code)

**Google's Response**:  Agree that this generally is true.

        29.     Designing APIs is an activity that requires significant creativity and skill.

                        Astrachan at RT 2209:7-8

11

1                    Mitchell at RT 1238:13-18
                       Reinhold at 627:21-629:5

2                    Screven at RT 513:14-18; *see also* 516:24-517:3
                       Bloch at 751:14-18

3                    TX 624 at 47

4    **Google's Response**:  Agree that designing at least some APIs requires creativity and skill, but the

5    evidence does not support a finding that the resulting tangible works that express the ideas of the

6    APIs are creative *expression*.  Rather, designing APIs consists of creating a *system for expression*.

7                      Bloch at RT 746:24-747:9
                     Bloch at RT 747:25-748:6

8                    GFOF 14, 15

9        30.     No witness testified at trial that API design is not creative.

10    **Google's Response**:  Agree, but Google additionally notes that no witness testified that the APIs

11    themselves are creative *expression*.  Instead, various witnesses testified that the *process* of

12    designing APIs can be a creative process.

13                      Screven at RT 513:14-18

14                    Mitchell at RT 1238:11-16

15        31.     "Designing a good API is tough" "[l]ike any work of craftsmanship."

16                    Bloch at RT 751:14-18; *see also* 830:18-19; 831:7-12

17    **Google's Response**: Agree.  Google notes, however, that Dr. Bloch testified that craftsmanship is

18    different from art, and that the aesthetics of the craft of API design are driven by the goal of

19    creating APIs that are "easy to use"—i.e. that are highly *functional.*

20                      Bloch at RT 751:19-21
                     Bloch at RT 752:7-11

21                    Reinhold at RT 623:7-16 (describing part of craft of API design as

22                        identifying bugs—i.e. ensuring correct functionality)

23        32.     APIs are works of authorship.

24                    Bloch at RT 741:23-742:3, 743:1-3, 743:12-18, 746:9-16; 748:17-22

25    **Google's Response**: This is not a *finding of fact,* because whether something qualifies as a work

26    of "authorship" is a *conclusion of law* that requires interpretation of 17 U.S.C. § 102(b).

27    Moreover, in each cited piece of Dr. Bloch's testimony, the word "author" or "authoring" was

28

661479.02

1  *used by Mr. Jacobs in questioning Dr. Bloch, not by Dr. Bloch himself.*  Dr. Bloch never used the

2  word "author," "authoring," or "authorship" in describing his work designing APIs, nor did his

3  answers suggest that he agreed with the use of those words in describing the process of API

4  design.  Certainly nothing in Dr. Bloch's testimony suggests he intended to adopt the term

5  "authorship" in its legal sense.

6      33.    "In anything except the most trivial API design, there are so many choices to be

7  made" that an engineer "wouldn't even know how to start counting them."

8                          Reinhold at RT 627:21-628:23

9  **Google's Response**: Disagree, insofar as Oracle contends that any meaningful conclusions can be

10  drawn from this testimony.  Dr. Reinhold did not testify about what qualifies as a "trivial" API

11  design.  Moreover, Dr. Reinhold testified that *he* lacked knowledge about how to start counting

12  the choices and that "an engineer" would lack such knowledge.  In addition, Dr. Reinhold

13  testified that choosing the "right" name requires a lot of thought, implying that there is a "right"

14  name, rather than an unconstrained universe of choices.  He further testified that for many

15  elements, short names are important, imposing another external constraint on the available

16  choices.

17      34.    [Omitted.]

18      35.    Java API design is a task that is often assigned to a company's "most senior

19  experienced and talented software engineers."

20                          Ellison at RT 291:11-16

21  **Google's Response**: Agree that Mr. Ellison testified that this is the case at Oracle.  Mr. Ellison

22  was not offered as an expert on API design, or custom and practice in assigning API design at

23  companies generally.

24      36.    The selection, structure, sequence and organization of the elements of the APIs for

25  the 37 packages at issue represent years of original and creative design.

26              Screven at RT 516:24-517:3 (the API for the 37 packages "reflect creative
            design")

27              Reinhold at RT 687:25-688:13 (Sun has been developing APIs since 1996;
            APIs for the 37 packages have "evolved over time")

28

GOOGLE'S RESPONSE TO ORACLE'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW
Case No. 3:10-cv-03561

661479.02

Mitchell at 1243:4-1244:16 (evolution of java.util)

**Google's Response**: Agree that the API packages have evolved over a period of many years for purposes such as adding "little bits of missing functionality or little bugs in the API."  Agree that at least some aspects of the design *process* were creative, without any implication about whether the APIs are creative *expression*.  Disagree as to the use of the word "original," which is not supported by the cited testimony.  Disagree that Dr. Mitchell's testimony is relevant to this finding, because no foundation was laid about Dr. Mitchell's personal knowledge of the development of the java.util package, and Dr. Mitchell was not qualified as an expert on the history of the J2SE API packages.

37.     It took almost two years for Chief Java Architect Mark Reinhold, working with other engineers, to develop the APIs for java.nio and its related sub-packages when he was at Sun.

Reinhold at RT 623:17-624:1; 627:21-629:6

**Google's Response**: Disagree in part.  Dr. Reinhold testified that he was not working full-time on this effort during those two years, and also testified that it took two years to work on the design *and implementation* of java.nio and related sub-packages.

38.     The collections framework, which is in the asserted Java API package java.util, is a set of APIs that developers said "changed their life."

Bloch at RT 750:5-21
Bloch at RT 772:25-773:6

**Google's Response**: Not disputed that this was said, but this evidence is not admissible to prove the truth of the matter asserted by these developers.  Fed. R. Evid. 802.

39.     The collections APIs in other development environments such as C++ and Smalltalk are structured very differently.

Mitchell at RT 1240:23-1244:16

**Google's Response**:  Not disputed.

40.     Third parties have created totally different APIs for Java that accomplish similar things to Oracle's Java APIs.

14

1

                    Reinhold at RT 518:4-519:15; 630:11-631:18
                    Screven at RT 290:15-291:6

2

**Google's Response**: Not disputed that this is true for at least some APIs.  This finding is not cited

3

in Oracle's COL.

4

        41.    The Java API packages have grown dramatically, from the seven API packages

5

that were included in the first release, to the 166 packages included with version 5.0, to 209

6

packages included with version 7.0.

7

                    Reinhold at RT 631:19-25

8

**Google's Response**:  Not disputed.  This finding is not cited by Oracle's COL.

9

        42.    The complex structure of the Java APIs for the 37 packages at issue and their

10

associated implementations is not required in order for the Java APIs or their implementations to

11

operate with the virtual machine or computer.  A primary purpose of the SSO of the APIs is to

12

make them easier for programmers to learn and use.

13

                    Reinhold at RT 597:9-17
                    Reinhold at RT 595:20-596:18

14

                    Reinhold at RT 606:14-21
                    Bloch at RT 741:2-742:3

15

                    TX 624 at 4

16

**Google's Response**: Disagree that the evidence supports a finding that the structure of the APIs is

17

"complex."  Object to the remainder of the first sentence as unintelligible.  Agree, that, among

18

other functional purposes, the SSO of the APIs is intended to serve the functional purpose of

19

making them easier for programmers to use.

20

        43.    Writing Java APIs involves multiple design choices and requires attention to

21

aesthetic considerations, not just function.

22

                    Reinhold at RT 627:21-628:1 ("so many choices to be made I wouldn't
                    know how to start")

23

                    Reinhold at RT 597:9-13 (java.nio "could have had many alternative

24

structures.  As we worked on this design, many different ideas were suggested and
evaluated.")

25

                    Reinhold at RT 628:22-629:6
                    Bloch at RT 746:9-16

26

                    TX 624
                    Reinhold at RT 68:21-629:6

27

28

15

661479.02

**Google's Response**: Agree, except that none of the cited testimony suggests aesthetic considerations that are distinct from functional considerations.

> Bloch at RT 752:10-11 ("Generally, an API that displays good aesthetics will be easy to use.")

44.     The "aesthetics of an API design are part of this noble and rewarding craft" of designing a Java API.

> Bloch at RT 752:5-11

**Google's Response**: Agree, but Dr. Bloch used "aesthetics" to refer to functional considerations, and distinguished craftsmanship from art.

> Bloch at RT 752:10-11 (equating "good aesthetics" for APIs with ease of use)
> Bloch at RT 751:19-21

45.     When designing an API, the engineer must consider not only the functionality that is required by the potentially large number of users, but also a "complex web of classes [to] lay out and design" and "the implication[s] for the underlying implementation."

> Screven at RT 513:21-514:12; *see also* 515:14-23 (need to understand what is required to implement, otherwise the API may be unimplementable, very slow, or cumbersome to build)

**Google's Response**: Agree that API design choices are constrained by the functional needs of the users of the APIs, and by the functional concerns of those who will implement the APIs. Disagree to the extent that any other implicit findings are intended, because they would be unsupported by the testimony.

46.     Oracle and Sun had many choices for what elements to include in the 37 Java API packages and how to structure them.  It was not required to structure them in any particular way.

> Reinhold at RT 630:11-631-18 (different structures for logging packages)
> Mitchell at RT 1240:23-1244:16 (different structures for collections and java.util)

**Google's Response**: Disagree to the extent that the finding ignores constraints imposed by the Java language, the functional needs of the users of the APIs, and functional concerns of those who will implement the APIs, such as efficiency.  Agreed, however, that at the time that Sun designed the APIs, it could have made at least some different choices.

Astrachan at RT 2187:18-2188:4, 2190:16-23
Mitchell at RT 1274:16-24
Schwartz at RT 1961:13-19
Schmidt at RT 1477:2-1478:9
Bornstein at RT 1782:6-17
GFOF 5, 6, 16, 17, 22, 31

47.     The SSO of the Java API packages is not commonplace, and was not an indispensable or standard way of expressing any idea.

Reinhold at RT 630:11-631:18
Mitchell at RT 1240:23-1242:25, 1243:6-1244:16

**Google's Response**: Disagree.  The SSO of the J2SE APIs is commonplace, in that it is relied upon by millions of Java language developers, and by the code they have written.

Reinhold at RT 685:5-20 ("If people are designing their own APIs for Java, then they are building on top of the Java programming language.  *They are building typically on top of all of the standard Java APIs*." (emphasis added))
Bornstein at RT 1782:6-17
Astrachan at RT 2195:10-2201:17, 2202:6-11, 2203:11-15
GFOF 27, 28, 30, 31

48.     Functionality did not dictate the organization of the API packages in suit.  If function were the only concern, all of the classes could have been placed in a one large package.

Reinhold at RT 619:13-23

**Google's Response**: Disagree.  Functional concerns of the users of the APIs constrained the design choices.  *See* GFOF 21-32.  For example, if all classes were placed in one large package, it would be more difficult for developers to find math functions when they needed to use those functions than if they were in a class called "Math."

Reinhold at RT 619:16-23

49.     The choice of names is significant, and the Java API designers thoughtfully selected thousands of names for aesthetic purposes and consistency.

Reinhold at RT 628:2-21
TX 624 (Bloch presentation) at 7 ("Code should read like prose.")
Bloch at RT 746:20-748:13
Mitchell at RT 1248:14-20

17

661479.02

**Google's Response**: Agree that testimony shows that names chosen have strong functional implications, and that aesthetics in this functional sense are important when choosing names.  Of course whatever importance attaches to individual names, those individual names are not protected by copyright.  Copyright MSJ Order [Dkt. No. 433] at 13.

50.     The Java API packages are distinct from the Java programming language.  The programming language is described in the Java Language Specification ("JLS").   Only about 60 classes are required by the programming language, and, except Object, none are specified in detail in the JLS.

> TX 1062 at 1-2
> Reinhold at RT 676:14-678:13
> Reinhold at RT 684:16-685:2
> Astrachan at RT 2196:1-4
> TX 984

**Google's Response**: Disagee.  *See* GFOF 11-32.

51.     Google did not need to copy Oracle's Java APIs for these 37 packages to make use of the Java programming language.  Google designed many of its own API packages for Android and could have designed its own APIs for these packages as well.

> Mitchell at RT 2288:6-12
> Astrachan at RT 2212:25-2213:19
> Astrachan at RT 2220:1-7
> Reinhold at RT 518:4-519:15
> Reinhold at RT 630:11-631:18

**Google's Response**: Disagree.  *See* GFOF 11-36.

52.     Android is not compatible with Java.  Google "supersetted" and "subsetted" the Java APIs—adding in its own APIs for other packages that are not included in Java and failing to include APIs for other packages that are present in Java.  As a result, many applications written for Java will not run on Android, and many applications written for Android will not run on Java.

> Mitchell at RT 1331:16-1332:2, 2287:23-2288:5
> Morrill at RT 1007:6-11
> TX 383 at 8

**Google's Response**: Agree that Android is not fully compatible with all of the APIs in Java SE, but Android is compatible with the APIs in the 37 packages.  *See* GFOF 33-36*See* GFOF 33-36.

1   This finding is not cited by Oracle's COL.

2       53.    Oracle and Sun did not dedicate the APIs to the public domain.  They consistently

3   included copyright notices on the Java API specifications.  These copyright notices were included

4   in the books that published early versions of the specifications and are prominently featured on

5   the website that contains them.  Copyright notices are also included in the source code for the

6   class libraries.

7              TX 610.1 at 1 (Specification license)
               TX 610.2 (Java API web documentation with copyright notice)
8              TX 980 at 6 (The Java Programming Interface Volume I)
               TX 981 at 6 (The Java Programming Interface Voume II)
9              TX 18 at 1, 3/24/2006 email from Andy Rubin to Greg Stein
               TX 623 at lines 151-152 (Java Source Code)
10             Reinhold at RT 695:11-697:19

11  **Google's Response**: Disagree.  *See* GFOF 11-32.

12      54.    Sun, and now Oracle, only make the APIs available through licenses.  One type of

13  license is a specification license that allows for independent implementations of the APIs, but

14  only if the specification meets certain requirements.

15             Ellison at RT 293:16-295:6
               Kurian at RT 370:6-381:25
16             TX 610.1
               Cizek at RT 1071:4-17
17             TX 1026

18  **Google's Response**: Disagree.  *See* GFOF 11-32.

19      55.    The specification license was included in the books that published the API

20  specifications on the same page as the copyright notice.

21             TX 980 at 6
               TX 981 at 6
22
   **Google's Response**: Agree that a form license agreement appears along with the "front matter" in
23
   the cited exhibits.
24
       56.    A link to the specification license is included next to the copyright notices on the
25
   web pages that describe the API specifications.
26
               Lee at RT 982:22-983:12
27             Reinhold at RT 671:9-25
               Reinhold at RT 697:2-10
28                                               19

1          TX 610.2 (Java web documentation)

2  **Google's Response**: The Lee testimony does not support this finding.  Google has filed a

3  statement about the relevance of the "specification license."  *See* Dkt. 1052.

4          57.     Google deliberately chose to base the 37 accused packages in Android on the

5  corresponding design, including the SSO, of the 37 Java API packages set forth in the Java API

6  documentation and source code.

7          TX 30
           Bornstein at RT 1827:19-1828:14; 1836:19-1837:7
8          Lee at RT 981:7-21; 984:25-985:18; 1174:2-16
           Astrachan at RT 2214:22-2215:5; 2215:24-2216:2

9  **Google's Response**: Agree that Google implemented the APIs in the 37 packages at issue for

10 reasons of interoperability and compatibility.  *See* GFOF 33-36.

11 **III.     [ORACLE'S] PROPOSED FINDINGS OF FACT REGARDING GOOGLE'S
12           EQUITABLE DEFENSES**

13         **A.     Google's Knowledge Of Sun Intellectual Property**

14         58.     Sun posted a notice of copyright on its Java specifications both online and in

15 books.

16         TX 984
           TX 2564
17         TX 610.1
           TX 610.2

18 **Google's Response**:  Disagree.  The cited exhibits do not support the finding, and the finding is

19 irrelevant because none of the exhibits address the SSO of API packages.  TX 984 and TX 2564

20 are books that describe the Java language specification.  TX 610.1 and 610.2 are, according to Dr.

21 Reinhold, subsets of the "JDK documentation," not specifically the API specification.  RT

22 672:16-18.

23         59.     Google executives and engineers responsible for Android knew that Sun

24 copyrighted, among other things, the method signatures, the specifications for the APIs, and the

25 code.

26         Swetland at RT 951:8-953:9 (Sun claimed copyright on method signatures)
27         TX 149 (5/31/2006: "Whatever happened to their 'we own copyright on the
           method signatures' bullshit argument?")

28                                         20

Bloch at RT 756:9-18 (Bloch was aware, while at Sun, that Sun regularly and routinely attached copyright notices to both code and documentation)

Lee at RT 983:4-15 (Lee copied despite seeing copyright notices on the Java API specifications when he consulted them)

**Google's Response**: Disagree.  The cited evidence does not support the finding, and the finding is irrelevant because it does not address the SSO of API packages.  That Sun affixed copyright notices to the documentation or code as a whole is beside the point, as is the fact that a Google engineer was aware of a Sun claim that it owned the copyright to method signatures, especially to the extent that the engineer regarded this claim as "bullshit."

60.    The head of Android, Andy Rubin, knew that Sun copyrighted the Java APIs:  He wrote that "java.lang apis are copyrighted" and that "[S]un gets to say who they license the [TCK] to."

TX 18 at 1 (java.lang apis are copyrighted)

Rubin at RT 1356:6-19

**Google's Response**:  Agree that TX 18 includes the quoted language.  Disagree that the evidence supports a finding that Sun copyrighted the Java APIs.  Mr. Rubin testified that when he wrote the statements in TX 18, he was referring to the class libraries (implementations), not the SSO of the API package itself.  RT 1615:5-16.  As Oracle itself points out in OFOF 61, Mr. Rubin did not believe that the Java API packages themselves were copyrighted.

61.    Andy Rubin believed that APIs are not copyrightable, and admitted that his belief was based on "folklore."

Rubin at RT 1746:13-1747:8 (folklore)

**Google's Response**:  Agree that Mr. Rubin believed that APIs are not copyrightable.  Disagree that Mr. Rubin's belief was based solely on "folklore."  Rubin at RT 1746:13-1747:8.

62.    Andy Rubin and other Android team members knew Sun's license requirements from their prior work at Danger, Inc.  Danger created an implementation of the Java specification, using no Sun source code.  Danger complied with Sun's requirement to take a Java license and conform to the Java standard.

Swetland at RT 948:24-950:15 (Swetland had no contact with Sun source code, but Danger took a license and achieved compatibility)

21

661479.02

1  Swetland at RT 952:22-953:9 ("I knew that at one time [Sun claimed that
the method signatures were copyrighted] while I was at Danger")
2  Swetland at RT 953:19-954:7 (identifying Danger employees at Android)
Rubin at RT 1587:10-1588:2 (Danger took license and had clean room
3  implementation)
TX 1026 (Sun-Danger license)
4  Cizek at RT 1054:21-1059:14, 1062:16-1064:14, 1071:4-17 (Rubin had
been told about Sun's requirements about all Java implementations and that
5  Danger eventually entered into a license)
TX 610.1 (J2SE 5.0 Specification License)
6
**Google's Response**:  Agree that Danger created an independent implementation of a virtual
7
machine and that Danger eventually took a license from Sun, which provided trademark rights
8
and access to proprietary technology such as source code and the TCK.  Disagree that the license
9
Danger took is related to TX 610.1, which did not even exist when Mr. Rubin worked at Danger.
10
63.      Andy Rubin in particular had been informed of Sun's licensing requirements
11
multiple times by Sun employees, through his negotiations both at Danger and at Google.
12
TX 565 at 2 (8/2/07: Gupta: "Andy cannot say he was not aware of the
13  licensing requirements - as he had to go thru this at Danger - and we discussed this
during Project Android Phase, and then during the Sun/Google collaboration
14  attempt as well.")
15  **Google's Response**:  Disagree.  TX 565 is hearsay and should be afforded no weight.  Mr. Rubin
16  testified that Mr. Gupta never told him the statements attributed to Mr. Gupta in TX 565.  RT
17  1726:11-1729:13.  Oracle did not ask Mr. Gupta (called by video) to confirm the statements, and
18  TX 565 contains no explanation of what Mr. Gupta believed to be Sun's "license requirements"
19  64.      In 2005 and 2006, Sun and Google negotiated for a license that would have
20  permitted Google to use Sun technology, including the APIs in suit.
21  TX 1 at 9 (7/26/2005: "Must take license from Sun")
TX 3 at 3 (7/29/2005: Google needs "a TCK license")
22  TX 7 at 1 (10/11/2005: "My proposal is that we take a license")
TX 12 at 1 (12/20/2005: "Either a) we'll partner with Sun as contemplated
23  in our recent discussions or b) we'll take a license")
TX 17 at 1 (2/10/2006: "critical license")
24  **Google's Response**:  Agree that Sun and Google negotiated for a partnership that would have
25  involved Google taking a license to Sun technology, like source code implementations and brand
26  rights.  Disagree that Google ever needed or negotiated for a license to "the APIs in suit."
27
28
22

661479.02

65.     Google knew that it needed a license even if it did not partner with Sun and developed a "clean room" implementation instead, i.e. without Sun code.

> TX 1 (7/26/2005: "Developing a clean-room implementation of a JVM . . . Must take license from Sun.")
> TX 12 (12/20/2005: Rubin: "My reasoning is that either a) we'll partner with Sun as contemplated in our recent discussions or b) we'll take a license.")
> TX 10 (8/6/2010: Long after 'clean room' completed, "We conclude that we need to negotiate a license for Java")
> TX 610.1 (specification license; available on all specifications)

**Google's Response**:  Disagree.  The evidence does not support this finding.  As reflected in the cited evidence, Google considered several options for developing Android.  TX 1 and TX 12 address options like a clean room implementation, a partnership, a license to source code, and use of Sun's TCK.  The evidence does not state or imply that a license would be needed if Google developed a clean room implementation and made no use of the Java logo or the TCK. TX 10 was written after Oracle threatened to sue Google (TX 1074), and addresses the viability of Google switching to a Java-alternative in response to Oracle's threats.  As Mr. Lindholm testified, TX 10 has nothing to do with whether Google would need a license in the first instance to independently implement Java API packages in Android.  RT 856:6-857:21

66.     The evidence shows that all other companies that developed an independent implementation of the Java technology took a license.

> Ellison at RT 293:8-294:21
> Kurian at RT 385:20-386:8

**Google's Response**:  Disagree.  Apache (Harmony) and GNU (Classpath) developed and distributed independent implementations of the Java API package specifications and did not take licenses.  Schwartz at RT 1972:8-1974:12; Kurian at RT 396:8-398:4; Screven at RT 561:2-5.

67.     In 2005, Google and Sun specifically negotiated for a license to Sun's APIs.

> TX 2 at 1 (7/26/2005: "sergey: Application delivery part of APIs? (Yes, but actual delivery is a negotiation)")
> Page at RT 500:23-501:2 ("And in that conversation that you participated in and is memorialized in this e-mail that you got a copy of in 2005, what Sergey was talking about was a negotiation with Sun about APIs. That's clear; isn't it, sir? A. Yeah.")

**Google's Response**:  Disagree.  The evidence does not support this finding.  TX 2 notes that, as

23

661479.02

of July 26, 2005, the method of *application delivery*, *i.e.*, how to deliver applications (which would be performed via APIs), was "a negotiation." Indeed, Mr. Page testified that TX 2 referred "[n]ot [to] actual delivery of the APIs, but application delivery, and the actual delivery of those"—*i.e.*, it was a "technical negotiation," not a *license* negotiation. RT 499:11-25.

68.    In 2005 and 2006, Sun expressed concern about the potential for fragmentation and informed Google of the requirement of platform and API compatibility in its licenses.

> TX 9 (10/13/2005: "Alan presumably wants this both for tactical reasons (preserve TCK and implementation revenue, defend franchise against fragmentation which is his main threat for long-term erosion" "He just needs to be compensated for collateral short-term revenue loss and get comfortable that this won't allow Google or anyone else to run away with the platform")
> TX 125 at 1 (10/26/05 Lindholm: "If we don't show strong efforts toward avoiding fragmentation we are also going to have much more trouble from Sun")
> TX 612 at 2 (11/21/2005: "Had a quick call with Andy Rubin . . . there are three key pillars we care about: 1) Compatibility – we want to be sure we are minimizing fragmentation)
> TX 7 at 1 (10/11/2005: "My proposal is that we take a license . . . We'll pay Sun for the license and the TCK. Before we release our product to the open source community we'll make sure the JVM passes all TCK certification tests so that we don't create fragmentation.")
> TX 213 (4/5/2006: Lindholm comments on draft license agreement, and states, "The fact that the definition of Commercial Stack includes the words 'subsetted and/or supersetted' is significant in that these are special words for Sun, some of the key things that they have historically resisted going open to prevent.'")

**Google's Response**:  Agree that Sun claimed it wanted to ensure that *licensees* of its proprietary Java technology or the Java brand met Sun's standards for compatibility.  Google is not a Sun licensee and does not use the Java brand.  None of the cited exhibits contain even a single mention of "APIs," let alone any reference to licensing requirements for "API compatibility."

69.    Google knew that compatibility was a core proposition of Java and that Sun worked actively to prevent fragmentation.

> TX 7
> TX 9
> TX 125
> TX 612
> TX 1048
> Page at RT 471:6-18
> Ellison at RT 296:2-4
> Kurian at RT 381:15-25

**Google's Response**:  Agree that Google knew Sun claimed it wanted to ensure that licensees of

24

its proprietary Java technology or the Java brand met Sun's standards for compatibility.  Disagree
that Sun's feelings about "fragmentation" or "compatibility for its licensees are relevant.

70.     Google knew that "Java had very little fragmentation."

TX 21

**Google's Response**:  Disagree.  An isolated statement from an unknown person in TX 21 is
insufficient to support this finding, particularly in light of all the trial evidence showing that Java
was badly "fragmented."  TX 3508; Reinhold at RT 724:24-725:20.  Irrelevant in any event.

71.     Google hired numerous former Sun engineers, including Tim Lindholm, who
represented to Andy Rubin in 2005 that he should be a "project advisor" for Android because he
was familiar with the "legal ecosystem."

> TX 321 (8/9/2005: Lindholm to Rubin: "I think my main value would be as
> J2ME runtime generalist and interpreter of the engineering/business/legal
> ecosystem.")
> TX 1 (7/26/2005: "Google/Android, with support from Tim Lindholm,
> negotiates the first OSS J2ME JVM license with Sun")

**Google's Response**:  Agree that Google hired Mr. Lindholm in July 2005.  Agree that in late-July
and early August 2005, Mr. Lindholm and Mr. Rubin discussed Mr. Lindholm becoming a
"Project Advisor" for Android.  This proposed finding is irrelevant, however, as Mr. Lindholm
was not involved in the design or development of Android.  Lindholm at RT 862:19-863:16.

72.     Additionally, Google executives and engineers responsible for Android knew
about the requirements of Sun's specification license, because Google was a member of the JCP,
and participated directly in Sun's dispute with Apache.

> Lee at RT 1186:2-16 (Apache never got license, never accepted FOU
> restriction)
> Rubin at RT 1689:19-25 (knew Apache didn't have a license from Sun)
> Schmidt at RT 1541:3-7 (no right to use Sun IP as result of Apache license)
> TX 273 at 1 (Rubin to Bornstein: Apache forbidden from ME versions)
> TX 405 at 1 (Lee to Schmidt:  Harmony "water under the bridge" for
> Android)
> TX 1051 at 1 (Rubin agreeing to sign letter to Sun regarding Harmony)
> TX 2347 (Letter to Schwartz regarding Harmony signed by Google
> representative)
> Deemed Admission at RT 978:16-979:1 (FOU prevents TCK from being
> run on mobile devices)

**Google's Response**:  Agree that Google employees were well aware that Sun publicly endorsed

25

Apache's independent implementation of the Java API packagess (Harmony), and that Sun and Apache had a dispute about whether Apache could use the Java brand in mobile phones.  TX 234; Schwartz at RT 2010:5-12; Rubin at RT 1688:16-23; Lee at RT1186:2-16; Swetland at RT 965:22-966:4; GFOF 37, 52.  None of the cited exhibits references a "specification license."

73.     Google knew that Apache Harmony could not be used in mobile devices because Android's Core Library Lead, Mr. Lee, told Mr. Schmidt that Sun prevented

> "Apache Harmony from independently implementing Java SE (Harmony can't put those restrictions on their own users and still Apache license the code) not to mention Android (though that's water under the bridge at this point)."

> TX 405
> Lee at RT 986:5-987:19 (describing TX 405)

**Google's Response**:  Disagree.  The uncontradicted evidence shows that Harmony could be used in mobile phones so long as Apache and its licensees (*e.g.*, Google) did not use the Java brand.  Google Resp. 72; GFOF 46.  TX 405 itself address restrictions on the TCK license—the license necessary for those who wished to use the Java brand or claim to be "Java-compatible."  TX 405.

74.     Google also knew that Sun permitted open source projects only for "non-mobile areas – areas where they don't have a well defined revenue stream.  Apache is an example."

> TX 7

**Google's Response**:  Agree that Sun did nothing to stop Apache from implementing the Java API packages in Android.  RT 1863:20-1864:2.  Disagree that Sun's inaction was limited to non-mobile areas."  To the contrary, Sun took the public position that Apache could ship Harmony in mobile so long as it did not use the Java brand.  Google Resp. 72-73; GFOF 46.

75.     Apache had no license from Sun that would it allow it to distribute the Java APIs commercially under the Apache license.

> Kurian at RT 393:23-394:18; 396:3-9; 399:10-33
> Screven at RT 523:25-525:3; 527:18-20

**Google's Response**:  Agree that Apache never took a license from Sun.  Disagree that Apache needed a license of any kind to distribute Harmony.  Google Resp. 72-74; GFOF 45-46.  This finding is not cited by Oracle's COL.

26

76.     On April 10, 2007, Apache posted on its website a letter to Sun and acknowledged on its website that Apache needed a TCK "to demonstrate compatibility with the Java SE 5 specification, as required by Sun specification license for Java SE 5."

TX 917 at 1

**Google's Response**:  Agree.  As the letter states, Apache wanted access to the TCK to show that its code was Java-compatible.  TX 917 at 2 ("Our intention has always been to produce a certified compatible implementation of Java SE distributed under the Apache License.").  This finding is not cited by Oracle's COL.

77.     In a "FAQ" accompanying the letter to Sun, Apache publicly stated that users of Apache Harmony "wouldn't be assured that they had all necessary IP rights from the spec's contributors."  On December 9, 2010, Apache again publicly stated "that Java specifications are proprietary technology that must be licensed directly from the spec lead."

TX 1045 at 2 (Apache statement resigning from JCP)
TX 1047 at 6 (Apache open letter FAQ)
Lee at RT 1207:9-1209:20 (admitting he saw Apache resignation at the time)

**Google's Response**:  Agree that TX 1047 and TX 1045 include the quoted language.  TX 1047 reflects Apache's desire to use the Java brand for Harmony and to provide patent protection to its licensees.  (TX 1047 at 3 (defining "necessary IP")).  TX 1047 is Apache's reaction to this lawsuit—posted after Oracle sued Google for incorporating Harmony implementation—and to Oracle's false assertion that a license is needed to implement the SSO of an API package.  This finding is not cited by Oracle's COL.

78.     The evidence shows that no other companies use Apache Harmony in commercial devices other than Google.

Kurian at RT 401:25-403:11
Screven at RT 530:11-24
Rubin at RT 1761:25-1762:6

**Google's Response**:  Disagree.  The evidence shows that Motorola, Samsung, Sony Ericsson, HTC, LG, ZTE, Huawei, Amazon, Barnes & Noble, and IBM use (or used) Apache Harmony code in commercial devices.  Rubin at RT 1762:19-1763:1; Morrill at RT 1019:17-1020:6;

27

661479.02

Schwartz 1977:21-1978:4.  This finding is not cited by Oracle's COL.

79.  Google nonetheless used Harmony code in Android.

Bornstein 1837:21-1838 ("an awful lot of stuff came from Apache Harmony")

**Google's Response**:  Agree.

80.  According to Google's Executive Chairman Eric Schmidt, Google does not assert that it has any rights to use any Sun intellectual property as the result of the Apache license.

Schmidt at RT 1541:3-25

**Google's Response**:  Agree.  This finding is not cited by Oracle's COL.

81.  Eric Schmidt, then CEO of Google, "would have assumed" the TCK "was one of the licensing requirements" of a Sun specification license for Java APIs.

Schmidt at RT 1559:5-11

**Google's Response**:  Agree that Mr. Schmidt assumed Sun would require its licensees to pass a TCK test to be certified as Java-compatible and use the Java brand.  Google is not a Sun licensee and does not use the Java brand.

82.  Google conducted no dependable investigation into whether it was infringing Sun's and then Oracle's copyrights.

Swetland at RT 952:22-953:18 (did no investigation if method signatures still copyrighted)
Schmidt at RT 1463:9-13 (no investigation about using Harmony for mobile)
Page at RT 466:3-6 (Page never asked anyone to investigate whether Google's engineers had copied)
Lee at RT 1209:21-1210:14 (Lee did not rely on the advice of legal counsel in determining the legal permissibility of reimplimenting APIs)

**Google's Response**:  Disagree.  This "finding" is argument.  That Google engineers and high-level executives were unaware of an investigation into copyrights that don't exist is irrelevant.

**B.     Sun's Actions**

83.  It was not Sun's practice to permit incompatible implementations of the Java specification, even if those implementations did not bear the Java brand.

TX 610.1 (J2SE 5.0 Specification License)
McNealy at RT 2055:22–2056:4 ("Was there ever a time, when you were

28

1  chairman of Sun, when it was Sun's policy or practice to permit someone to
   incompatibly implement API specifications, so long as they did not call it Java?
2  A.  Uhm, our API licenses were all about compatibility for Java. So in the Java
   space I – I don't recall that that was ever a – a strategy that we pursued nor
3  allowed in the marketplace.")
       Cizek at RT 1071:4-7 (Sun's practice was to require compatibility and
4  commercial use licenses)
       Gupta at RT 2306:6-2307:14 ("QUESTION:  A licensee was required to
5  pass the TCK, even if they didn't want to use the Java brand; is that right?
   ANSWER: Yes.")

6  **Google's Response**:  Disagree.  Sun never considered the Java APIs to be proprietary, and Sun

7  knew it could not limit the use of or enforce restrictions on APIs it did not own.  Schwartz at RT

8  1966:1-12, 1973:24:1974:8; 2010:5-12; GFOF 23.  Mr. Gupta's statement about requirements

9  imposed on Sun "licensees" is irrelevant, because Google was not a licensee and did not need a

10 license to use the SSO of the API packages.  Mr. Cizek—a salesman—did not set corporate

11 policy.  Mr. McNealy's testimony about a "strategy" he could not "recall" is insufficient to

12 support this finding in light of Mr. Schwartz's detailed testimony about Sun's corporate policies

13 and practices.

14     84.     Sun would contact companies that had released incompatible implementations in

15 commercial products and require them to take a license and make the implementation compatible.

16     Cizek at RT 1054:21-1059:14
17     Cizek at RT 1071:4-17
       TX 1026 (Sun-Danger license)
18
   **Google's Response**:  Agree only that Mr. Cizek attempted to (and did) sell a license to Danger.
19
20     85.     From 2005 up through the time of trial, Sun and now Oracle had ongoing

   discussions with Google regarding Java licensing for Android.
21
22     TX 565
       TX 1002
       Cizek at RT 1071:23-1073:18
23     TX 1029 (Buchholz email reporting conversation with Cizek, Lindholm
   responds)
24     McNealy at RT 2065:14-2066:14 (ongoing discussions with Google)
       TX 1074 (2010 Eustace email to Catz)
25     Catz at RT 2313:23-2314:7 (6/2010: Oracle told Android they needed a
   license)
26     Rizvi at RT 1941:20-1942:12 (3 mtgs with Rubin re: license for Java in
   Android)
27
   **Google's Response**:  Disagree that discussions were "ongoing."  Sun and Google discussed a
28

29

661479.02

partnership in 2005-06.  GFOF 54.  After that, Sun would periodically contact Google to try to sell Sun products to Google, or to encourage Google to take a license to Sun's TCK and Java brand.  TX 565, TX 1029, TX 1074.  Post-lawsuit "discussions" are irrelevant.

      86.     In fact, the Sun-Google negotiations never broke off.

> Page at RT 492:18-22 ("But I also say I'm not sure they've ever broken off. Continue to have discussions to this day.")

**Google's Response**:  Disagree.  Mr. Page's testimony references irrelevant post-litigation talks.

      87.     In 2007, before Google announced Android, Sun repeatedly tried to engage Google in discussions on Java licensing for Android.

> TX 538 (emails from Gupta to Rubin)
> TX 565 at 3

**Google's Response**:  Disagree.  The evidence does not support this finding.  TX 538 says nothing about a license; TX 565 is an internal Sun email that is hearsay and should be afforded no weight.

      88.     By 2007, Sun had released its technology under a particular open source license, the GNU General Public License (GPL), a "give and force back" license that requires users to open source certain portions of their own code if they used the GPL-licensed code.

> Schwartz at RT 2021:16-23 (GPL is a "give and force back" license)
> Ellison at RT 292:2-293:4

**Google's Response**:  Agree in part.  After Google had begun to develop Android, Sun released to the public for free under the specific terms of a particular version of the GPL all of the "technology" for which it now claims protection.  Rubin at RT 1757:2-25.

      89.     The GPL is not a business-friendly license, and most companies accordingly will not take the GPL license to use the open-sourced version of the Java APIs, called OpenJDK.

> Kurian at RT 387:13-388:3
> Screven at RT 531:3-20

**Google's Response**:  Disagree.  Many components of Android are licensed under the GPL, and this has not hindered Android's adoption.  Further, the cited Screven testimony states that "commercial use" of GNU Classpath became unnecessary when Sun released OpenJDK.

661479.02

1    90.    The GPL did not suit Google's business needs for Android and Android did not

2    use GPL-licensed open source code.

3                        TX 230
                         TX 154
4                        Rubin at RT 1754:9-21

5    **Google's Response**:  Agree that Google used the Apache license instead of the GPL for many

6    parts of Android.  Disagree that GPL did not suit Google's business needs at all.  Significant

7    components of Android, including the Linux kernel, are licensed under the GPL.  Also, Sun did

8    not release Java under the GPL until a few months before Android was released.

9    91.    Before Google announced Android, Sun did not know what Google would do with

10   Android, or whether Google would require a commercial Java license for Android, or whether it

11   would use GPL code.

12                       TX 565 at 3 (describing Google's options and Sun's strategy around each)
                         Schwartz at RT 2023:2-9 ("prior to the release of Android, we were
13                       presuming they were going to be using GPL code")

14   **Google's Response**:  Disagree.  By at least April 27, 2006 (seven months before Android was

15   announced) Sun knew Google would be implementing Java API packages in Android.  Schwartz

16   at RT at 1983:22-1984:25 (discussing TX 435); Schwartz at RT 1989:2-7, 2024:1-5; GFOF 53-

17   59.

18   92.    On November 5, 2007, when Sun's CEO responded to the announcement of

19   Android in a blog post, Google had not yet released the Android Software Development Kit

20   ("SDK"), and Sun therefore did not know the facts regarding Google's infringement.

21                       Morrill at RT 1041:14-16 (" Q. But on November 5, 2007 Google had not
                         released the Android SDK, had it?  A.  That's correct.  The SDK was released a
22                       week later.")

23   **Google's Response**:  Agree that Google had not yet released the SDK.  Disagree that Sun did not

24   know that Google would be implementing the Java API packages in Android.  *See* Google Resp.

25   91.

26   93.    Google released the SDK on November 12, 2007.  This was the first time that

27   Google identified the APIs to be used in Android publicly.

28

                                        31

1    Morrill at RT 1041:14-16 ("a week later" after November 5)
2    Schmidt at RT 1546:14-16 ("roughly correct" that you'd have to have the
     SDK to know the APIs were in Android)
3    Rubin at RT 1702:22-1704:9 (eight days after Android announced, SDK
     released; APIs were in the SDK)

4    **Google's Response**:  Agree that Google released the SDK on November 12, 2007 and that the

5    SDK included the APIs packages.  Disagree that Google's use of the Java APIs was unknown

6    until the SDK release.  As Mr. Schwartz testified, "everyone in the industry knew" of Google's

7    use of the API packages before the SDK was released.  RT at 1989:2-7; Google Resp. 92-93.

8    94.    As of November 12, 2007, Sun's CEO understood that Google might still agree to

9    certify Android as compliant with the Java specification.

10    TX 1055

11    **Google's Response**:  Agree that Mr. Schwartz hoped that Google *might* one day decide to certify

12    Android as compatible with Java, thereby giving Google rights to the Java brand and potentially

13    provide Sun with additional revenue-generating possibilities.

14    95.    On November 15, 2007, three days after Google released the Android SDK, Rich

15    Green, Executive Vice President of Software at Sun, publicly expressed concern regarding

16    Android and the incompatible set of APIs. He is quoted as stating:

17    "Anything that creates a more diverse or fractured platform is not in
      (developers') best interests."
18
      "The feedback from developers is, 'Help us fix this.'"
19
20    "We're really interested in working with Google to make sure developers
      don't end up with a fractured environment. We're reaching out to Google and
      assuming they'll be reaching out to us to ensure these platforms and APIs will be
21    compatible so deployment on a wide variety of platforms will be possible."

22    TX 1048 ("Sun concerned Google's Android will fracture Java")
      Rubin at RT 1725:23-1726:10 (acknowledging article; acknowledging that
23    he saw it at the time of Android's release)

24    **Google's Response**:  Agree.  But Sun's purported "concerns" about "fragmentation" are a

25    product marketing issue for Sun, not an assertion of legal rights in the SSO of API packages.

26    Those "concerns" are irrelevant.  Mr. Green said nothing about the need for Google to take a

27    license from Sun, alleged copyrights in the SSO of API packages, or the possibility of litigation.

28

32

661479.02

96.     When asked to comment on Mr. Green's comments, Rubin responded to Google internally that "[t]his is a very touchy subject."

> TX 180
> Rubin at RT 1725:23-1726:10

**Google's Response**:  Agree.  *See* Google Resp. 95.

97.     On May 23, 2008, Google Android employees received, circulated, and commented on an article that reported on Sun's continuing concern regarding Android:
> "Sun Microsystems has expressed concern that Google's development of Dalvik could fragment the Java world so that Java software for running Android applications wouldn't work on other Java phones and vice-versa."
>
> TX 245

**Google's Response**:  Agree.  *See* Google Resp. 95.

98.     In September through November 2008, prior to Google's release of the Android platform, Sun engaged in another round of discussions with Google.

> TX 1002 (November 24, 2008 email from Rubin in which he wrote that Sun had asked Google "to certify Android through the Java process and become licensees of Java")

**Google's Response**:  Agree that Sun approached Google in 2008 to try to sell Google a license to brand Android Java.  TX 1002.  Oracle never questioned a single witness about TX 1002.  There is no evidence Sun never told Google (in November 2008 or at any other time) that it claimed copyrights in the SSO of API packages, or that Sun could sue Google over Android.  GFOF 60, 87.

99.     In April 2009, Sun communicated to Google that Google needed a license for Android, and that Google needed to make Android compatible.

> Cizek at RT 1071:23-1073:18 (conversation with Martin Buchholz at Google)
> TX 1029

**Google's Response**:  Agree that a Sun salesman—Mr. Cizek—tried to sell Google a license for Android.  There is no evidence Mr. Cizek (or anyone else from Sun) told Google it was infringing Sun copyrights or that Google was *legally required* to take a license from Sun at all, let alone for the SSO of the Java API packages.  TX 1029; GFOF 60, 87.

661479.02

100.   Oracle has continued to express concern regarding Google's use of Oracle's intellectual property in Android.

> Kurian at RT 391:15-395:1
> Rizvi at RT 1942:20-1943:1
> Ellison at RT 304:23-305:8
> Catz at RT 2309:15-2310:11
> TX 2237 (Form CO, submitted to the EU, that notes that "Harmony project (financed by IBM, Intel, Microsoft, Google, and others) and Google's Android OS are examples of Java's fracturing.")

**Google's Response**:  Disagree.  Oracle attempts to equate its purported desire for "compatibility" and concerns about "fragmentation" with its legal rights in unspecified "intellectual property."  There is no evidence that Oracle ever suggested to Google that Google could not implement in Android the SSO of Java API packages.  GFOF 92.  Oracle's purported desire for "compatibility" or concerns about "fragmentation" are product marketing issues, not an assertion of legal rights.

101.   Sun's words and actions in response to the Android announcement in November 2007 were neither intended to be, nor reasonably could be understood to be, an endorsement of an Android that used only some of the Java SE APIs and that failed to comply with Sun's licenses.

> Schwartz at RT 1991:9-14
> McNealy at RT 2059:2-2060:13 (Sun practice to require compatibility)

**Google's Response**:  Disagree.  There is no other reasonable way to interpret a public statement of congratulations and pledge of support posted on Sun's official corporate website by Sun's Chief Executive Officer.  Schwartz at RT 1968:11-15 (blog post was "equivalent to me of holding a press conference").  Every witness questioned about Mr. Schwartz's blog post confirmed that they interpreted it as an endorsement of Android.  Rubin at RT 1706:4-15; Morrill at RT 1027:25-1028:11; Bornstein at RT 1824:22-1825:7; GFOF 72, 75, 82.

102.   From 2006 to the present, Sun's actions in continuing a strategy of negotiation, rather than litigation, were reasonable and consistent with its historical interactions with Google.

*See cites for 63, 64, and 85-87 above.*

**Google's Response**:  Disagree.  *See* Google Resps. 63, 64, 67, 85-87, 101.

103.   Sun did not intend to relinquish any rights with regard to its copyrights or Android.

34

661479.02

TX 563 (3/8/2007: "The Google thing is really a pain.  They are immune to copyright laws, good citizenship, they don't share.")
TX 565 (9/19/2007: "It will end up in a discussion around compatibility and licensing around Java")
TX 2371 (11/6/2007: "As for how they avoid these licenses, I don't know")
TX 1056 (3/26/2008: "take Java for Android, without attribution or contribution… scroogle")
TX 2070 (10/23/2008: "IP/patents hammer")
TX 2362 (4/20/2009 "battles" with Android)
McNealy at RT 2065:14-2066:14 (ongoing discussions with Google)

**Google's Response**:  Disagree.  Mr. Schwartz testified that Sun made an affirmative decision not to sue Google.  RT 2002:5-7.  All of the contemporaneous documentary evidence supports Mr. Schwartz's trial testimony.  TX 2352, TX 3441, TX 3466.  Oracle attempts in this proposed finding to misconstrue internal Sun emails, none of which were ever communicated to Google or any other third party, to make it appear as though Sun intended to one day sue Google over Android.  Oracle's gloss on these exhibits is not evidence.  Oracle did not question even one of the email authors—Mr. McNealy (TX 563), Mr. Gupta (TX 565, TX 2070), and Mr. Schwartz (TX 2371, TX 1056, TX 2362)—about the statements in these exhibits.

The only witness questioned about any of the statements quoted above was Jonathan Schwartz.  Regarding Mr. Gupta's statements in TX 2070, Mr. Schwartz testified:  "Q. So Sun, as October 23rd, 2008, was considering using the IP patents hammer to bring Google into Java compliance; correct, sir?  A. No. I think Vineet was considering that." Schwartz at RT 2030:6-9; GFOF 63-87.

104.    No credible evidence shows that Sun ever communicated to Google, expressly or implicitly, that Sun was giving up any rights to assert legal claims against Google based on Google's use of the asserted Java APIs for Android.

**Google's Response**:  Disagree.  Sun CEO Jonathan Schwartz (and other Sun employees) publicly and privately approved of and endorsed Android.  GFOF 64, 68, 73-74, 76-81, 88-89.

105.    No credible evidence shows that Sun intended or expected that Google would interpret Sun's statements or conduct – including Sun's repeated efforts to negotiate with Google to take a Java license for Android – to mean that Google did not need such a license.

**Google's Response**:  Disagree.  Every Google witness who testified at trial confirmed that they understood Sun's statements and conduct to mean that Sun approved of and endorsed Android.

661479.02

1  Schmidt at RT 1514:8-9; Rubin at RT 1706:4-15; Morrill at RT; 1027:25-1028:11; Bornstein at RT

2  1824:22-1825:7; GFOF 66, 67, 75, 82.

3      106.    Sun never unequivocally or intentionally relinquished any known right to assert its

4  copyrights in the Java APIs against Google.

5  **Google's Response**:  Disagree.  This "finding" is a legal conclusion without any factual support.

6  Sun never considered APIs to be proprietary in the first place, Schwartz at RT 1966:1-12, and,

7  even if it did, it intentionally relinquished its right to sue Google over them.  Google Resp. 103-

8  104; GFOF 23, 72; GCOL 40-44.

9      107.    Sun's words and conduct were consistent with intent to enforce its rights to the

10  intellectual property at issue.

11  **Google's Response**:  Disagree.  This "finding" is a legal conclusion without any factual support.

12  Sun's words and conduct were inconsistent with an intent to enforce copyrights in the SSO of the

13  API packages, for all the reasons stated in Google Resp. 103, 105 and GCOL 31, 38, 42.

14      108.    The credible evidence cited above, as well as Sun's financial difficulties in 2007 to

15  2009, explain any period of Sun's delay in filing suit against Google.

16          Schwartz at RT 2033:12-24 (Sun was struggling due to the financial crisis
           before Schwartz resigned)
17          McNealy at RT 2048:9-14 (Sun was struggling during the last years that
           McNealy was chairman of the company)
18
19  **Google's Response**:  Disagree.  There is no evidence—particularly not the cited testimony—that

20  Sun's delay in filing suit against Google had anything to do with Sun's "financial difficulties."

21      **C.    Reliance**

22      109.    Android was a "critical asset" for Google that is "hugely profitable."

23          TX 431
          TX 1091 (RT 2226:20-23 (Agarwal Dep.)

24  **Google's Response**:  Agree that the presentation in TX 431 describes Android, along with other

25  Google products, as a "critical asset."  Mr. Agarwal's statement reflects current profit margins,

26  which do not take account of costs incurred in initially developing the platform.

27

28

661479.02

110.   In 2005, Google was concerned about the growing number of individuals using mobile phones to search the internet and its ability to attract and retain those users.  Android would give Google more control of the user experience and built-in Google applications on mobile phones.

> TX 3215
> TX 1
> TX 10

**Google's Response**:  Agree.

111.   The vast majority of Google's revenue at that time and today comes from search revenue.  A primary reason to have Android is that people will do more searches and Google would get more money as a result.

> Schmidt at RT 1458:12-16

**Google's Response**:  Agree.

112.   In 2005, 2006, and 2007 Google was under tremendous time pressure to beat others, such as Microsoft, Symbian and Apple, into the smartphone market.

> TX 6
> Schmidt at RT 1-11
> Bornstein at RT 1844:15 -1847:1

**Google's Response**:  Agree that Google wanted to beat potential competitors to market.

113.   Google knew that the time to market was crucial and using Java dramatically accelerated their schedule, with other alternatives being suboptimal.

> TX 15
> TX 7
> Page at RT 490:1-7
> Schmidt at RT 1462:2-13

**Google's Response**:  Agree in part.  Time to market was important, but "using Java" did not "dramatically accelerate" the schedule.  The cited documents show that *a partnership with Sun in which Google obtained Sun's source code* would have accelerated the schedule.  Disagree that the alternatives to Java were "suboptimal."  TX 7 notes alternatives to a partnership with Sun; those alternatives were viewed as suboptimal as compared only to the possibility of a partnership with Sun, not to an independent implementation of original code written in the Java language.

114.    In 2005 and 2006, Google stated in internal emails and presentations that Google needed a license from Sun for Android.

> TX 1 (7/26/2005:  "Must take license from Sun")
> TX 3 (7/29/2005: "Google needs a TCK license")
> TX 7 (7/15/2005: "My proposal is that we take a license."; License would require passing TCK to go commercial")

**Google's Response**:  Agree in part.  Google discussed the need to take a license from Sun based upon the assumption that it would use Sun proprietary technology in Android.  The cited exhibits clearly discuss proprietary Sun technology for which a license would be needed: TX 1 ("Need coffee-cup logo for carrier certifications" and "convince[s] Sun to Open Source their MVM implementation"); TX 3 ("Google desires to be able to call the resulting work Java"); TX 7 ("We'll pay Sun for the license and the TCK"); GFOF 54.

115.    However, Google did not want the obligations that the GPL and specifications license imposed.  The GPL terms required Google's licensees to contribute back any additions to Google's code.  The specification license required Google to create a compatible version of Java.

> Schmidt at RT 2021:16-23
> TX 610.1
> *See also* cites in 88-90 above.

**Google's Response**:  Agree that, before Sun made Java available under the GPL, Google chose a different open source license (the Apache Software License version 2) as the primary license for Android.  Disagree that Sun's so-called "specification license" imposed any obligations on Google.  There is no evidence that Google ever saw that license, much less accepted its terms.

116.    Google announced Android on November 5, 2007.

> Schmidt at RT 1546:5-7

**Google's Response**:  Agree.

117.    Prior to Google's public announcement of Android in November 2007, Android executives and engineers acknowledged internally that launching Android without a license, as an incompatible implementation, would place Google in an adversarial stance against Sun.

> TX 7 at 2 (10/11/2005: "Do Java anyway and defend our decision, perhaps making enemies along the way")
> TX 125 at 1 (10/26/05: Lindholm: "If we don't show strong efforts toward

38

avoiding fragmentation we are also going to have much more trouble from Sun")

TX 12 (12/20/2005: Rubin: "My reasoning is that either a) we'll partner with Sun as contemplated in our recent discussions or b) we'll take a license. I think a clean-room implementation is unlikely because of the teams prior knowledge, and it would be uncharacteristically aggressive of us to position ourselves against the industry.")

TX 22 at 12 (4/21/2006: "What if we don't do this deal?" … "Adversarial Approach" or "Take a lesser license")

TX 207 (5/11/2007: "They won't be happy when we release our stuff")

TX 565 at 3 (8/2/2007: Gupta: have sent emails to Andy re: need for Java licensing)

**Google's Response**: Agree that Google understood Sun might view Android as a competitive threat, particularly after Google and Sun tried but failed to reach a co-development deal.

118. Android was not and is not compatible with Java.

Mitchell at RT 1331:16-20 (Google's Android is not really compatible with Java because they supersetted and subsetted APIs)

TX 383 at 8 (11/6/2007: "Is Android Java compatible? No.")

Morrill at RT 1010:4-7 ("Now, [A]ndroid does not support Java applications, correct? A. That is correct. Q. And so Android is not Java compatible, correct? A. That's correct.")

**Google's Response**: Agree that Android is not fully compatible with all of the APIs in Java SE, but Android is compatible with the APIs in the 37 packages. *See* GFOF 33-36

119. Google decided to use the APIs in mid-2006 to early 2007—before Jonathan Schwartz's blog post on November 5, 2007.

Bornstein at RT 1850:4-1851:2

**Google's Response**: Agree. Google decided to implement Java API packages when it decided to use the free Java language, as the API packages are necessary to use the language effectively; GFOF 22.

120. Android head Andy Rubin only "vaguely" remembers any comments by Sun after the announcement of Android.

Rubin at RT 1446:23-1447:8

**Google's Response**: Agree in part. Mr. Rubin "vaguely" remembered "comments," which he defined as "something that you hear, you know, from somebody in passing, maybe in the hallway or something." RT 1722:2-1723:19. Mr. Rubin clearly remembered personal conversations with Sun and a public blog post by Sun CEO Jonathan Schwartz RT 1706:4-15, 1708:6-1709:2. This

39

661479.02

1   finding is not cited by Oracle's COL.

2      121.   No credible testimony shows that before November 5, 2007, Google relied on any

3   statement by Sun in making any decision regarding the technology to include in Android.

4   **Google's Response**:  Disagree.  While there is no testimony about specific statements Sun made

5   before November 5, 2007, there is, plenty of evidence that Google relied on Sun's actions and

6   inactions pre-November 5, 2007.  Sun had allowed and publicly encouraged GNU and Apache to

7   implement Java API packages before that time, and Google knew that Sun was well aware

8   Google intended to do the same thing.  TX 617; Schwartz at RT 1983:22-1985:2, 1989:2-7,

9   2024:1-5, Schmidt at RT 1505:22-1506:2.

10     122.   After November 2007, Google knew Sun had expressed concern regarding

11  Android, and in particular Google's use of a subset of the Java APIs for Android.

12          Rubin at RT 1725:21-1726:10 (discussing press article on November 15,
          2007, after the SDK was announced: "Sun concerned Android will fracture Java")
13          TX 180 (11/15/2007: re: article, Sun's concerns are a "touchy subject")

14

15  **Google's Response**:  Agree that Google was aware that Sun had expressed business concerns

16  about "fragmentation."  *See* Google Resp. 95.

17     123.   Shortly before releasing the Android SDK and afterwards, Google attempted to

18  hide its infringement by removing the word "Java," which it called the "j word," from Android.

19          TX 26 at 1 (11/17/2007 "Scrub out a few more j's)
          TX 104 (5/12/08 Remove j word from everywhere)
20          TX 233 at 1 (8/5/2009 "How aggressive do we scrub the j word?")

21  **Google's Response**:  Disagree.  <u>First</u>, Dan Bornstein testified that documents like these were

22  based on routine code scans to ensure that the word "Java" was not used in a way that violated

23  Sun/Oracle's trademark in the Java brand.  Oracle never showed these specific exhibits to any

24  witness, and there is no testimony (other than Mr. Bornstein's) concerning these types of

25  documents.  <u>Second</u>, the idea that Google could or would "hide" its use of the 37 Java API

26  packages is unsupportable  given that each of the APIs in each of the API packages begins with

27  either "java" or "javax."  <u>Third</u>, the cited exhibits clearly show that the purpose of "scrubbing"

28  was to remove inaccurate or inappropriate uses of the word Java (and other trademarked or

40

661479.02

1   inappropriate words), not to hide anything that Google had done.  For example:

2           TX 1072 (every accused API package begins with java or javax)
3           TX 233 (email from Bornstein to Jesse Wilson writing that the purpose of
                changing "JVM" references to "VM" was to "make our docs more
4               consistent" and that it would be "safe to ignore it" and leave as JVM if
                Jesse is not "sufficiently motivated to make the change")
5           TX 104 (specifically notes that "we can't just find and replace java with
                dalvik" and includes no suggestion that the purpose of the activity was
6               to "hide" anything)
7           TX 26 (no suggestion that the purpose was to "hide" anything)
            Bornstein at RT 1819:18-1822:9

8       124.    In November 2007, Google took steps to limit public discussions regarding
9   Android to certain authorized individuals and avoid references to Java.

10              TX 382
11              TX 165
                TX 217
12
    **Google's Response**: Agree in part.  Google limited who at Google could speak about Android,
13
    and it was careful not to use Sun's "Java" in its trademark or create any impression that Sun had
14
    certified Android as Java-compatible.
15
        125.    In January 2008, Google made public presentations that included a graphic that
16
    described the Android core libraries as "Core Java libraries."  Google later changed this graphic
17
    to delete the word "java."
18
                TX 34
19              TX 43.1
20  **Google's Response**:  Agree that TX 34 includes a graphical representation of the Android system
21  that is different (in many ways) from the graphical representation in TX 43.1, one of which is that
22  it describes the core libraries (all of which are in the "java" or "javax" namespace) as "Core Java
23  libraries" instead of "Core libraries."  Disagree that this has any relevance whatsoever to any of
24  the issues in this case. *See* Google Resp. 123-125.
25      126.    In March 2008, Google took steps to prevent its employees from demonstrating
26  Android to any Sun employees or lawyers.
27              TX 29 at 1 (3/24/08: don't demonstrate to any sun employees or lawyers)
28
                                            41

661479.02

1    **Google's Response**: Agree that Mr. Rubin advised Google representatives not to demonstrate the

2    tooling, emulator, or developer environment to Sun employees or lawyers.  Disagree that this is

3    relevant to this case or evidences any effort to hide Google's use of the Java API packages, which

4    was known by everyone in the industry long before Google announced Android.  RT at 1989:2-7.

5          127.   On May 23, 2008, Google Android employees received, circulated, and

6    commented on an article that reported on Sun's continuing concern regarding Android.  That

7    article stated:

8              "Sun Microsystems has expressed concern that Google's development of
               Dalvik could fragment the Java world so that Java software for running Android
9              applications wouldn't work on other Java phones and vice-versa."

10             TX 245
               Morrill at RT 1043:1-10 (saw that others had reported that Sun had
11         concerns; had no conversations with Sun at all)

12   **Google's Response**:  Agree.  *See* Google Resp. 97.

13         128.   In May 2008, Google employee Bob Lee informed Google CEO Eric Schmidt

14   about the dispute regarding Sun licensing for Apache's Harmony project, but wrote that was

15   "water under the bridge" for Android.

16             TX 405

17   **Google's Response**: Agree that Bob Lee wrote to Eric Schmidt about the Apache dispute, and

18   that he used the phrase "water under the bridge" to describe the fact that Android had decided to

19   implement the Java API packages and not to use the Java brand in connection with Android.  Lee

20   at RT 987:24-989:3; TX 405.

21         129.   In September through November 2008, Google engaged in additional negotiation

22   with Sun regarding Android, and that discussion included the possibility of buying Java from

23   Sun.

24             TX 203
               TX 183
25             TX 1002

26   **Google's Response**:  Agree that in late-2008 Google and Sun engaged in discussions over a

27   "toolbar deal" in which Google paid Sun in order to distribute the Google toolbar, and agree that

28

42

661479.02

those discussions sometimes touched on Android and sometimes involved Sun attempting to convince Google to buy Sun.  None of these exhibits were discussed with any trial witness.

130.    In January and February 2009, Google considered the possibility of buying Java from Sun, including Sun's Java copyrights, in part because it would prevent lawsuits.

> Schmidt at RT 1559:20-23; 1560:10-12
> TX 406 (1/29/09 buying full rights – solve all of these lawsuits we're facing)
> TX 326 (2/20/2009: Lindholm has a good basis to answer questions about buying Java, but "would rather do it in person than in email")

**Google's Response**:  Agree that in TX 326 and 406 a programmer in the Google Apps team (not on the Android team) named Brett Slatkin emailed several Google executives suggesting that Google consider buying Java, and that he also noted that this would make unspecified "Java lawsuits" go away.  Disagree that that there were in fact any "Java lawsuits," Schmidt at RT 1571:21-23, or that this evidence is connected to Android in any way.  None of the cited exhibits, nor Mr. Schmidt's trial testimony, mentions "Java lawsuits" regarding Android.

131.    In April 2009, Google sought to avoid discussions with Sun and to instead see if Sun would sue Google before engaging in further discussions.

> TX 1029 (4/29/2009: "we really don't want to inadvertently stir anything up for Android"... "we should step away, and only respond further if Sun chases after us")

**Google's Response**:  Disagree.  TX 1029 involves business discussions between Sun and Google unrelated to Android.  Mr. Lindholm recommended stepping away from *business negotiations* and only responding further if Sun "chases after us," *i.e.* took steps to reopen these business negotiations.  Nothing in TX 1029 suggests that Google feared a lawsuit from Sun.  Oracle never showed TX 1029 to a single witness; its argumentative gloss on the exhibit is not evidence.

132.    As late as August 2010, despite its claims that it had used only Sun's API specifications, Google internally acknowledged that it needed a Java license for Android.

> TX 10 at 1 (8/6/10 "we need to negotiate a license for Java")

**Google's Response**:  Disagree.  At the time of the so-called "Lindholm email" Oracle had not even informed Google that it was asserting copyrights in the Java API packages (let alone the

43

1   SSO of those packages).  TX 1074 (email from Alan Eustace to Safra Catz: "We will not pay for

2   code that we are not using, or license IP that we strongly believe we are not violating, and that

3   you refuse to enumerate.").  TX 10 therefore could not possibly relate to the need to license

4   "Sun's API specifications."  Indeed, Mr. Lindholm testified that he has always believed APIs

5   were free and open for anyone to use, even during his days at Sun.  RT 861:9-23.

6           133.    After November 2007, Google continued to discuss a license with Sun, and

7   negotiations continued up to and beyond the date this lawsuit was filed.

                        Page at RT 492:18-22 (continue to have discussions to this day)
8                       Catz at RT 2313:23-2314:7 (6/2010 told Google it needed a license for
9                       Android)
                        Rizvi at RT 1941:20-1942:12 (3 mtgs with Rubin re: license for Java in
10                      Android)
                        TX 1002 at 1. (11/24/08 certify Android through Java process & become
11                      licensee)
                        *See also cites for 85 above.*
12

**Google's Response**:  Agree that Google and Sun have discussed Android several times since it

13  was released.  Disagree that there has been one continuous negotiation, or that any negotiations

14  after 2006 involved any sort of "partnership" concerning Android, as opposed to Sun's efforts to

15  sell products to Google or persuade Google to license its compatibility tests and Java brand.  TX

16  2008 (Cizek contact report from 5/26/06: "After many meetings incl. Alan Brenner, it was agreed

17  that the two companies cannot come to a meeting of minds on how to work together re CDC-HI

18  and open source.").  After May 2006, Sun's overtures to Google were limited to attempts to sell

19  Google Sun products or a TCK license.  *See*, *e.g.*, TX 1002.

20          134.    In all of its licensing discussions with Sun and with Oracle, Google never asserted

21  that it had believed that Sun had approved of its use of Java in Android, or that it had relied on

22  any such belief.

                        Catz at RT 2315:22-2316:14
23                      Rizvi at RT 1941:20-1943:1

24  **Google's Response**:  Agree that Mr. Rizvi and Ms. Catz testified Google did not suggest in 2010

25  discussions with Oracle that it did not need a license because Sun had failed to object to Android.

26  The cited testimony does not address Sun in any way.  The fact that Google did not mention this

27

28                                          44

661479.02

1    issue at the 2010 meeting is irrelevant to the case, as evidenced by the fact that Oracle does not

2    rely on it for any of its conclusions of law.

3           135.    It is unreasonable to treat a blog post as if it is a license.

4    **Google's Response**:  This is not a fact, it is an argument.  In any event, Google has never argued

5    that a blog post is a license.  Mr. Schwartz's blog post, along with other statements and conduct

6    of Sun support Google's equitable defenses of estoppel, waiver, laches, and implied license.  This

7    finding is not cited by Oracle's COL.

8           136.    No credible evidence shows that Google relied on any statements by Sun in

9    continuing to use Java in Android.

10   **Google's Response**: Disagree.  Mr. Rubin, head of the Android project, testified that he relied on

11   Sun's public and private statements of support and encouragement for Android, Sun's failure to

12   assert at any time that the SSO of API packages was proprietary, and Sun's efforts to build

13   products to work with Android in deciding to invest additional time, money, and resources into

14   developing the Android platform.  RT 1715:2-1717:25.  Google CEO Eric Schmidt likewise

15   testified that, based on public and private communications from Sun, he believed that Sun

16   approved of Android.  RT 1528:13-1529:1.  Oracle does not cite a single piece of evidence in

17   support of this "finding" and provides no reason why Google's evidence is not "credible."

18          137.    No credible testimony shows that Google believed that Sun or Oracle did not

19   intend to enforce any intellectual property rights in connection with Android.

20   **Google's Response**:  Disagree.  Nearly every Google engineer or executive who testified

21   explained that they did not think they needed a license to use the 37 Java API packages in

22   Android.  Oracle does not cite a single piece of evidence in support of this "finding" and provides

23   no reason why the testimony cited below was not credible.

                        Google Proposed Finding of Fact 61
24
                        Rubin at RT 1691:15-21
25                      Schmidt at RT 1505:22-1506:2
                        Bornstein at RT 1857:20-1858:6
26                      Lindholm at RT 861:9-23

27

28
                                              45

661479.02

1    138.    No credible evidence shows that, but for any statement or conduct by Sun or

2    Oracle, Google would have done anything differently in connection with Android.

3    **Google's Response**:  Disagree.  While no Google witness speculated as to actions Google would

4    have taken in response to statements Sun never made or actions Sun never took, the evidence

5    supports a finding that Google would have taken different actions had Sun ever asserted that the

6    SSO of the Java API packages was protected by copyright.

7        Google knew that GNU Classpath and Apache Harmony independently implemented the

8    37 API packages, and that Sun had never taken the position—publicly or privately—that the SSO

9    of API packages was proprietary.  *E.g.*, Rubin at RT 1688:16-23; Swetland at RT 965:22-966:6.

10   With this background in mind, Google decided to independently implement Java API packages in

11   Android.   After Google announced Android Sun publicly and privately congratulated Google and

12   committed to support the Android platform.  TX 2352; TX 3441; GFOF 69, 73-74, 76-78, 88.

13   Mr. Rubin, head of the Android project, relied on these statements in not investigating

14   alternatives to Java and in continuing to invest significantly in Android's development.  RT

15   1715:2-1717:25.  Oracle does not cite a single piece of evidence in support of this "finding" and

16   provides no reason why Google's evidence is not credible.  The totality of the evidence is more

17   than sufficient to support the inference that Google would have acted differently but for Sun's

18   statements and conduct before and after November 5, 2007.  *See* GFOF 55, 61, 66-67, 75, 82;

19   GCOL 21-44.

20       139.    No documents and no testimony in the record suggest that anyone at Google relied

21   on Sun's actions toward GNU Classpath in creating or distributing Android.

22   **Google's Response**:  Disagree.  *See* Google Resp. 138.  It is true that no Google witness

23   speculated as to actions they would have taken seven years ago had Sun ever suggested that GNU

24   Classpath was violating its copyright in the SSO of the 37 Java API packages.  Additionally, Dr.

25   Bloch testified that he helped GNU implement Classpath *while he was at Sun and with full*

26   *knowledge of his boss*.  RT at 805:10-807:15.  Oracle does not cite a single piece of evidence in

27   support of this "finding" and provides no reason why the cited testimony is not credible.  This

28

GOOGLE'S RESPONSE TO ORACLE'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW
Case No. 3:10-cv-03561

661479.02

1  evidence and the evidence cited in Google Resp. 138 is more than sufficient to support the

2  inference that Google relied on Sun's actions towards GNU.  *See* GFOF 55, 61, 66-67, 75, 82;

3  GCOL 21-44.

4        140.    No documents and no testimony in the record suggest that anyone at Google relied

5  on Sun's actions toward Apache in creating or distributing Android.

6  **Google's Response**:  *See* Google Resp. 138-139.  Agree that no Google witness speculated as to

7  actions they would have taken seven years ago had Sun ever suggested that Apache Harmony

8  violated Sun copyrights by using the SSO of the 37 Java API packages.  The evidenced cited in

9  Google Resp. 138-139 is more than sufficient to support the inference that Google relied on Sun's

10  actions towards Apache—indeed, Android used the Apache Harmony code in Android.  *See*

11  GFOF 55, 61, 66-67, 75, 82; GCOL 21-44.

12        141.    Google did not change its position with respect to Android as a result of any act or

13  statement by Sun or Oracle; rather, Google at all times continued with the same strategy.

14  **Google's Response**: Disagree.  Google planned to and did implement the 37 Java API packages

15  at issue in this lawsuit because, until this lawsuit was filed, neither Sun nor Oracle ever suggested

16  that Google's use of the SSO of the 37 Java API packages violated Sun or Oracle's copyrights.

17  Sun and Oracle's actions consistently suggested that Google was permitted to use the 37 Java API

18  packages, so there was no reason for Google to alter its consistent and transparent strategy.  *See*

19  GFOF 55, 61, 66-67, 75, 82; GCOL 21-44.

20  **IV.    PROPOSED CONCLUSIONS OF LAW**

21        **A.    Ownership**

22        142.    The Certificate of registration constitutes "prima facie evidence of the validity of

23  the copyrights and of the facts stated in the certificate."  17 U.S.C. § 410(c).

24  **Google's Response**: Disagree.  Oracle's COL 142 is irrelevant and, as worded, misleading.  The

25  prima facie evidentiary effect of a registration under 17 U.S.C. § 410(c) is, at best, of limited

26  scope in a situation such as this where a complete copy of the work is not available from the

27  Copyright Office and individual elements or components of the complete work (including but not

28

1  limited to the SSO of any packages and any individual files) were not referenced or claimed in the

2  applications for registration.  *See Tradescape.com v. Shivaram*, 77 F.Supp.2d 408, 413 (S.D.N.Y.

3  1999); *see also Boisson v. Banian, Ltd.*, 273 F.3d 262, 268 (2d Cir. 2008) ("Simply because a

4  work is copyrighted does not mean every element of that work is protected.").  The prima facie

5  effect of Section 410(c) makes no sense when, as here, the Copyright Office cannot examine the

6  material for which copyright is claimed because the applicant did not provide it to the Office to

7  examine.  Google incorporates by reference its response to Oracle's FOF 7-8, *supra*.

8      143.   Google "has the burden of rebutting the facts set forth in the copyright certificate."

9  *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011).  Google failed

10  to meet that burden.

11  **Google's Response**: Disagree.  Oracle's COL 143 is irrelevant, misleading and, in part, incorrect.

12  Google does not dispute the first sentence of COL 143; the prima facie effect, however, is narrow

13  and limited, and relates only to the validity of the copyright and the facts stated in the registration.

14  17 U.S.C. § 410(c); *see Universal Furniture International Inc. v. Collezione Europa USA, Inc.*,

15  618 F.3d 417, 430 (4th Cir. 2010) (presumption "fairly easy to rebut because the Copyright

16  Office tends toward cursory issuance of registrations"); *Sapon v. DC Comics*, 2002 WL 485730

17  (S.D. N.Y. 2002).  Google does not dispute that Oracle owns a valid copyright in the works as

18  registered, as a whole.  Nor does Google dispute any of *the facts* stated in the Asserted

19  Registrations (such as, e.g., the dates on which the works were first published, whether the works

20  included preexisting material or whether the identified earlier registrations were for earlier

21  versions of the works).  Google incorporates by reference its response to Oracle's COL 142,

22  *supra*.  Google further states that the issue of what the Asserted Registrations cover or "extend to"

23  under 17 U.S.C. § 103(b) is a question of law for the Court, as to which Oracle has the burden of

24  proving the underlying facts, including Oracle's ownership of any individual components of the

25  1.4 Work or the 5.0 Work in which Oracle seeks to assert rights as standalone works.

26      144.   Under 37 C.F.R. 202.3(b)(4)(i)(A), "when a single published unit contains

27  multiple elements 'that are otherwise recognizable as self-contained works,' the unit is considered

28

GOOGLE'S RESPONSE TO ORACLE'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW
Case No. 3:10-cv-03561

661479.02

a single work *for the limited purpose of* registration, while its elements may be recognized as separate works for other purposes."  (ECF No. 433 at 6 (emphasis in original).)  *See Tattoo Art, Inc. v. TAT Int'l, LLC*, 794 F. Supp. 2d 634, 651 (E.D. Va. 2011) (interpreting 202.3(b)(4)(i)(A).).

**Google's Response**: Disagree.  Oracle's COL 144 is irrelevant and misleading.  Section 202.3 of the Copyright Office regulations relates only to administrative processing of applications for registration.  *See* 37 C.F.R. § 202.3(b) (entitled "Administrative classification and application forms").  The regulation does not purport to and could not change or override the plain language of section 103(b) of the Copyright Act regarding the elements of a derivative work to which a copyright in that work extends.  *See* 17 U.S.C. § 408(c)(1) (administrative classifications have "no significance with respect to the subject matter of copyright or the exclusive rights provided by" the Copyright Act).

145.    Oracle owns the copyrights to the documentation, source code and compiled code of the 37 API packages and the 11 source code files at issue, including to the structure, sequence and organization of the 37 API packages.  (FOF 1-8.)

**Google's Response**: Disagree.  Oracle's COL 145 is incorrect as a matter of law.  Under 17 U.S.C. § 103(b), absent proof by Oracle that it owns all rights to any of the separate files or elements included in the works that are the subject of the Asserted Registrations, Oracle's copyright rights extend only to materials that were original in the works and were owned by Oracle.  Section 103(b) makes clear that the copyrights in the 1.4 Work and the 5.0 Work do "not imply any exclusive right in the preexisting material."  Oracle introduced no evidence regarding which parts of the 1.4 Work or the 5.0 Work were original with those version of the Java platform, or regarding whether Sun or Oracle owned all rights to any individual files or other materials that were included in the works.  The only copyright rights that Oracle can rely on are therefore its rights in the copyright in the works as a whole and not any rights in any individual portions or elements of the works.

661479.02

B.      **Copyrightability**

146.    Copyright protection subsists in literary works.  17 U.S.C. § 102(a)(1).  The English language Java API documentation is an original, literary work and is thus copyrightable under section 102(a).

**Google's Response**: Literary works are copyrightable subject matter, subject to many limiting doctrines.  *See, e.g.,* 17 U.S.C. § 102(b).  Oracle's J2SE documentation as a whole is copyrightable, but this does not mean that all elements of that documentation are copyrightable, and Oracle cites no evidence to support its contrary assertion.

147.    "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345(1991).  The selection, structure, sequence and organization of the 37 API packages in suit constitute original, creative expression.  (FOF 29-40, 42-44, 47-48.)

**Google's Response**: Google does not dispute that the API packages as a whole are original, but disputes the copyrightability of the SSO of the 37 API packages for all the reasons stated in Google's findings of fact and conclusions of law, and its prior briefs on copyrightability.

148.    Google has admitted that the Java APIs as a whole meet the low threshold for originality required by the Constitution."  (*See* ECF No. 938 at 1.)

**Google's Response**: Agree.

149.    "[C]opyright protection extends not only to the 'literal' elements of computer software – the source and object code – but also to a program's nonliteral elements, including its structure, sequence, organization, user interface, screen displays and menu structures."  *Merch. Transaction Sys., Inc. v. Nelcela, Inc.*, 2009 U.S. Dist. LEXIS 25663, at *29 (D. Ariz. Mar. 17, 2009) (citation omitted).  The structure, sequence, and organization of the 37 API packages in suit is copyrightable subject matter.

**Google's Response**: Under Ninth Circuit law, the SSO of an executable computer program having an execution sequence and elements such as a user interface and screen displays is

661479.02

1   *potentially* copyrightable, depending on the facts.  Google disputes the copyrightability of the

2   SSO of the 37 API packages for all the reasons stated in Google's findings of fact and

3   conclusions of law, and its prior briefs on copyrightability.

4        150.   "Whether the nonliteral components of a program, including the structure,

5   sequence and organization and user interface, are protected depends on whether, on the particular

6   facts of each case, the component in question qualifies as the expression of an idea, or an idea

7   itself." *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.,* 886 F.2d 1173, 1175 (9th Cir. 1989).

8   **Google's Response**: Under Ninth Circuit law, the SSO of an executable computer program is

9   *potentially* copyrightable, depending on the facts.  On the facts of this case, the SSO of the 37

10  API packages is not copyrightable for all the reasons stated in Google's findings of fact and

11  conclusions of law, and its prior briefs on copyrightability.

12       151.   The structure, sequence, and organization of the 37 API packages in suit is the

13  detailed expression of an idea, not an idea itself.  (FOF 29-40, 42-44, 46-48.)  The idea for an API

14  package may be to have a library of pre-written computer code relevant to the area of

15  programming to which the package relates.  For example, the idea for java.net.ssl is to have a

16  library of pre-written code relating to secure network transactions.  (FOF 13.)  The selection,

17  structure, sequence and organization of the methods, fields, classes and other elements in the

18  java.net.ssl package, and the relationships among those elements is the expression of that idea.

19  **Google's Response**: Disagree.  The fact that there are "ideas" at levels of generality above the

20  APIs does not mean the APIs themselves are not ideas, as well.  For example, "love story" is an

21  unprotectable story idea.  That does not mean that "boy meets girl," which is more specific than

22  "love story," is automatically protectable.  The SSO of the 37 API packages is not copyrightable

23  for all the reasons stated in Google's findings of fact and conclusions of law, and its prior briefs

24  on copyrightability.

25       152.   The detailed, creative expression of the API packages is not a method of operation

26  or system or otherwise barred by section 102(b).  *Johnson Controls,* 886 F.2d at 1175.  *See also*

27  *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1370 ("We conclude that although an element of a work

28

GOOGLE'S RESPONSE TO ORACLE'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW
Case No. 3:10-cv-03561

may be characterized as a method of operation, that element may nevertheless contain expression that is eligible for copyright protection."); *Toro Co. v. R&R Prods. Co.*, 787 F.2d 1208, 1211-12 (8th Cir. 1986) (section 102(b) did not bar copyright protection for parts number system: question is whether particular expression is copyrightable); 1-2 *Nimmer on Copyright* § 2.03[D].

**Google's Response**: Disagree.  The SSO of the 37 API packages is not copyrightable for all the reasons stated in Google's findings of fact and conclusions of law, and its prior briefs on copyrightability.

153.    "Under the merger doctrine, courts will not protect a copyrighted work from infringement if the idea underlying the copyrighted work can be expressed in only one way, lest there be a monopoly on the underlying idea."  *Satava v. Lowry*, 323 F.3d 805, 812 n.5 (9th Cir. 2003).  The structure, sequence, and organization of the 37 Java API packages in suit have not merged with the underlying ideas because there are multiple ways to express an API with the same or similar functionality.  (FOF 33, 38-40, 43, 45-49.)

**Google's Response**: Disagree.  *See* GFOF 1-9, 11-36 & COL 13-17, 20.

154.    "Under the scenes a faire doctrine, when certain commonplace expressions are indispensable and naturally associated with the treatment of a given idea, those expressions are treated like ideas and therefore not protected by copyright."  *Swirsky v. Carey*, 376 F.3d 841, 850 (9th Cir. 2004).  The SSO of the 37 Java API packages in suit are not scenes a faire because these elements are not commonplace, nor are they indispensable or standard to expressing any idea. (FOF 33, 39-40, 42-43, 45-48.)

**Google's Response**: Disagree.  *See* GFOF 1-9, 11-36 & COL 13-16, 18-20.

155.    The SSO of the 37 API packages is not dictated by function since very little structure is required for the code to operate with the virtual machine and computer.  (FOF 43, 45-48.)

**Google's Response**: Disagree.  *See* GFOF 1-9, 16-22, 33-36 & COL 6-9.

52

661479.02

156.    Google was not required to copy the 37 API packages for compatibility with the Java programming language.  (FOF 40, 42, 50-51.)  Google could have designed its own APIs, and did in other areas for Android.  (FOF 40, 50, 51.)

**Google's Response**: Disagree.  See GFOF 1-9, 16-22, 33-36 & COL 6-9.

157.    "Words and short phrases such as names, titles, and slogans" are "not subject to copyright."  37 C.F.R. § 202.1(a).  "[A] combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship."  *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003).  In this case, the original combination of the thousands names of the elements in the 37 Java API packages in suit is copyrightable.  (FOF 15, 16, 18-23, 29-39, 42-49.)

**Google's Response**: Disagree.  The SSO of the 37 API packages, including the selection of the names therein, is not copyrightable for all the reasons stated in Google's findings of fact and conclusions of law, and its prior briefs on copyrightability.

158.    The structure described in written documentation is copyrightable when it reflects creative expression.  *See, e.g., Situation Mgmt. Sys., Inc. v. ASP Consulting Group*, 560 F.3d 53, 61 (1st Cir. 2009) (overall arrangement and structure of training manuals found to be subject to copyright protection even though they described uncopyrightable system); *Jacobsen v. Katzer*, 2009 U.S. Dist. LEXIS 115204, at *9-10 (N.D. Cal. Dec. 10, 2009) (selection and arrangement of data reflecting information obtained from model railroad manufacturers entitled to copyright protection).

**Google's Response**: The SSO of the 37 API packages is not copyrightable for all the reasons stated in Google's findings of fact and conclusions of law, and its prior briefs on copyrightability.  For the same reason, that SSO is not copyrightable to the extent it also is reflected in the documentation.

159.    The structure, sequence, and organization of the documentation for the 37 Java API packages  is the same as the structure, sequence, and organization of the class libraries to

GOOGLE'S RESPONSE TO ORACLE'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW
Case No. 3:10-cv-03561

661479.02

which they relate since both are generated from the same source code. (FOF 23-24.) These aspects of the documentation are copyrightable for the same reasons that the structure, sequence, and organization of the code are copyrightable.

**Google's Response**: The SSO of the 37 API packages is not copyrightable for all the reasons stated in Google's findings of fact and conclusions of law, and its prior briefs on copyrightability. For the same reason, that SSO is not copyrightable to the extent it also is reflected in the documentation.

160.    Google copied the structure, sequence and organization for the 37 Java API packages into the Android documentation. (FOF 14, 25-26, 28, 57.)

**Google's Response**: This is not a proper conclusion of law. First, whether Google "copied" is a question of fact for the jury. Second, to the extent that Oracle is arguing it is entitled to judgment as a matter of law of copying, the proper vehicle for that argument was Oracle's Rule 50(a) motion.

### C.    Derivative Works

161.    A copyright owner has the exclusive right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). "A 'derivative work' is a work based upon one or more preexisting works, such as a translation." 17 U.S.C. § 101.

**Google's Response**: Agree, however that exclusive right is subject to limitations on the scope of copyright protection, including but not limited to 17 U.S.C. §§ 102(b) (idea/expression), 107 (fair use), and the *scenes a faire* and merger doctrines. In order to be an infringing derivative work, moreover, an accused work must include protectable elements of the underlying work.

162.    Because Google based the code for the Android core libraries on the Java API specifications' SSO, as well as the English prose descriptions contained therein, Google infringed Oracle's copyright by creating a derivative work. (FOF 23-26, 57.)

**Google's Response**: This is not a proper conclusion of law. First, whether Google created a derivative work would be a question of fact for a jury. Second, the Court declined to instruct the jury on this theory. Third, to the extent that Oracle is arguing it is entitled to judgment as a matter

661479.02

1  of law on its derivative work theory, the proper vehicle for that argument was Oracle's Rule 50(a)

2  motion.

3  163.    In *Sheldon v. Metro-Goldwyn Pictures Corp.*, Judge Learned Hand found

4  copyright infringement when the defendant created a movie that copied much of the detailed plot

5  outline of the plaintiff's play, although it included none of the dialogue and changed many of the

6  specifics: "The play is the sequence of the confluents of all these means, bound together in an

7  inseparable unity; ***it may often be most effectively pirated by leaving out the speech, for which a***

8  ***substitute can be found, which keeps the whole dramatic meaning.***  That as it appears to us is

9  exactly what the defendants have done here, the dramatic significance of the scenes we have

10  recited is the same, almost to the letter."  81 F.2d 49, 50-56 (2nd Cir. 1936) (emphasis added).

11  *See also eScholar LLC v. Otis Educational Sys., Inc.*, 2005 U.S. Dist. LEXIS 40727, at *25

12  (S.D.N.Y. Nov. 3, 2005) (citing *Sheldon* and stating "[c]opyright protection of the non-literal

13  elements of a computer program is analogous to protection that has been extended in other areas

14  in this circuit"); *Twin Peaks Prods. V. Pul'n Int'l Ltd.*, 996 F.2d 1366, 1373-74 (2nd Cir. 1993)

15  (detailed recounting of plot outline of TV series held to be infringement).

16  **Google's Response**: Agree that the cited cases include the quoted passages.  Disagree that this is

17  analogous to the facts in the present case.  The SSO of the 37 API packages is not copyrightable

18  for all the reasons stated in Google's findings of fact and conclusions of law, and its prior briefs

19  on copyrightability.

20  164.    While the ideas behind particular individual elements described in the

21  documentation for the 37 API packages that Google copied may not be copyrightable, Google

22  chose to copy the protectable selection, structure, sequence and organization for the thousands of

23  elements expressed in that documentation, almost in its entirety, and to effectively give all of

24  these elements the same "dramatic meaning" within that copied structure.  *Sheldon*, 81 F.2d at 56.

25  **Google's Response**: The SSO of the 37 API packages is not copyrightable for all the reasons

26  stated in Google's findings of fact and conclusions of law, and its prior briefs on copyrightability.

27  Moreover, the issue of "copying" is a question of fact for the jury, not an issue of law for the

28

1  Court.

2      165.    In *SAS Institute, Inc. v. S&H Computer Sys. Inc.*, 605 F. Supp. 816, 830 (M.D. TN.

3  1985), the court held defendant created an infringing derivative work that was "based on" the

4  SAS statistical analysis software by copying its structure.  The court rejected the defendant's

5  attempt to downplay the 44 examples of copying specific lines of code: "In addition, the copying

6  proven at trial does not affect only the specific lines of code cited by Dr. Peterson in his

7  testimony.  Rather, to ***the extent that it represents copying of the organizational and structural***

8  ***details of SAS, such copying pervades the entire S&H product***." *Id.* (emphasis added).

9  Similarly, in *Meredith v. Harper & Row, Publishers, Inc.*, the court found copyright infringement

10 based on the defendants copying of 11% of a book along with its structure: "Thus I conclude

11 while the Meredith text contains *some* independent ideas of the author, *some* independent

12 research, *some* additional topics and *some* differing structure, the topic selection and arrangement

13 of the Meredith book are in substantial part the result of copying of the Mussen book not

14 attributable to independent effort by Meredith or the necessary result of limited possibilities for

15 organizing and presenting the material to be covered."  413 F. Supp. 385, 387 (S.D.N.Y. 1975)

16 (emphasis in original). Google's deliberate copying of the structure, sequence and organization of

17 the 37 Java APIs pervades all of the 37 accused Android API packages, notwithstanding Google's

18 claim that it wrote the implementing source code itself.

19 **Google's Response**: The SSO of the 37 API packages is not copyrightable for all the reasons

20 stated in Google's findings of fact and conclusions of law, and its prior briefs on copyrightability.

21 Moreover, the issue of "copying" is a question of fact for the jury, not an issue of law for the

22 Court.

23      **D.    Waiver**

24      166.    To show waiver, Google must prove Sun/Oracle had an intent to relinquish its

25 known rights to its copyrights in the 37 API packages and code and that Sun/Oracle manifested

26 that intent in an unequivocal manner.  *United States v. King Features Entm't, Inc.*, 843 F.2d 394,

27 399 (9th Cir. 1988); *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1074

28

1  (D. Or. 2008) ("waiver must be manifested in an unequivocal manner" (internal citations

2  omitted)); *see Novell, Inc. v. Weird Stuff, Inc.*, 1993 U.S. Dist. LEXIS 6674, at *54 (N.D. Cal.

3  May 14, 1993).

4  **Google's Response**: Agree that intentional relinquishment of a known right is the touchstone of

5  waiver, but disagree that a defendant must prove that that intent was "manifested in an

6  unequivocal manner."  It is enough that the abandonment of right is "'manifested by some overt

7  act indicating an intention to abandon that right.'"  *Propet USA, Inc. v. Shugart*, 2007 WL

8  3125275 at *1 (W.D. Wash. Oct. 24, 2007) (quoting *Micro Star v. Formgen, Inc.*, 154 F.3d 1107,

9  1114 (9th Cir.1998)).  For instance, direct evidence of intent, such as Jonathan Schwartz's

10 testimony that he had decided that Sun would not pursue litigation against Google, coupled with

11 statements and actions consistent with that intent, are enough to satisfy the waiver standard.

12      167.    "An implied waiver of rights will be found where there is 'clear, decisive and

13 unequivocal' conduct which indicates a purpose to waive the legal rights involved." *Adidas*,

14 546 F. Supp. 2d at 1074 (*quoting Groves v. Prickett, 420 F.2d 1119, 1126* (9th Cir. 1970)).

15 **Google's Response**:  Agree that a finding of waiver is appropriate in those circumstances, but

16 disagree that such findings are necessary to establish waiver.  *See* Google Resp. 166.

17      168.    In light of all the credible evidence, Sun/Oracle did not unequivocally intend to

18 relinquish its intellectual property rights.  (FOF 83-85, 95-101, 103-107.)

19 **Google's Response**:  Disagree.  *See* GCOL 42.

20      169.    The fact that Sun and Oracle expressed continued concern and engaged in repeated

21 negotiations with Google to persuade it to take a license negates any inference from blog posts or

22 otherwise that Oracle had an unequivocal intent to relinquish its rights to the 37 Java API

23 packages.  *King*, 843 F.2d at 399; Adidas, 546 F. Supp. 2d at 1074.  (FOF 85-87, 98-99, 102.)

24 **Google's Response**:  Disagree.  Sun/Oracle expressed concerns about Android as a potential

25 competitive threat, not concern that Android's use of the 37 Java API packages infringed their

26 copyright.  *See* Google Resp. 95, 117, 122.  Sun/Oracle's negotiations with Google focused on

27 attempts by Sun to sell Google Sun products like virtual machine implementations or Sun

28

57

661479.02

branding rights.  *See* Google Resp. 85-87, 98-99, 102.  There is no evidence that Sun/Oracle

suggested in any of those negotiations that Android's use of the 37 Java API packages infringed

its copyright, or even that the negotiations were an attempt to solve an unidentified legal problem

(as opposed to addressing a business opportunity).  And nothing in the cited authority supports

the argument that business concerns and negotiations unrelated to the asserted intellectual

property precludes or even undermines a finding of waiver.

170.    Whether Sun/Oracle failed to prevent third parties, such as Apache or GNU

Classpath, from infringing is not sufficient to prove Sun/Oracle's express and affirmative intent to

relinquish its copyrights against Google.  *Adidas*, 546 F. Supp. 2d at 1074-75 (citing *Novell*, 0094

WL 16458729, at *13 ([E]ven if [plaintiff] failed to take preventative measures to stop

[defendant's infringement-related activities, failure to act, without more is insufficient evidence

of the trademark owner's intent to waive its right to claim infringement.")).

**Google's Response**: Agree that inaction alone is insufficient to prove waiver.  But Google relies

on Sun's inaction in addition to significant actions taken by Sun/Oracle.  *See* GCOL 42.  In

*Adidas*, the defendant's waiver argument was based on plaintiff's failure to take action against

some companies even though the plaintiff *had* enforced its rights against other companies.

*Adidas*, 546 F. Supp. 2d at 1074.  It concluded that plaintiff's "failure to prevent *all* third parties

from selling" infringing products was insufficient to prove waiver.  *Id.* (emphasis in original).

Unlike in *Adidas*, there is no evidence that Sun enforced its alleged rights in the SSO of the 37

Java API packages against *anyone*.  And there is plenty of evidence showing that Sun took

affirmative actions to approve of and endorse Android.  *See* GFOFs.

171.    Because Google has not proved that Sun/Oracle manifested an unequivocal intent

to relinquish its rights, Google's defense of waiver fails.

**Google's Response**: Disagree.  Google has proven that Sun/Oracle's conduct was so inconsistent

with the intent to enforce any rights in the 37 Java API packages as to induce in Google a

reasonable belief that Sun/Oracle had relinquished any rights it may have had in those API

packages, and thus has proven waiver.  *See* GCOL 43-44.

58

661479.02

1

### E.     Estoppel

2     172.     "Estoppel arises only when a party's conduct misleads another to believe that a

3     right will not be enforced and causes him to act to his detriment in reliance upon this belief."

4     *Novell*, 1993 U.S. Dist. LEXIS 6674, at *41; *Adidas*, 564 F. Supp. 2d at 1075.

5     **Google's Response**:  Agree, except that to require estoppel conduct does not need to be

6     intentionally "misleading," but can consist of conduct such that "the party asserting the estoppel

7     has a right to believe" the other party's actions were intentional.  *See* OFOF 173.

8     173.     Four elements must be present to establish the defense of estoppel: (1) The party to

9     be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so

10    act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must

11    be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

12    *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960); *Novell*, 1993 U.S.

13    Dist. LEXIS 6674, at *42, 54-55 (N.D. Cal. May 14, 1993).

14    **Google's Response**:  Agree.

15    174.     Google had the burden of establishing each of the four elements of estoppel. .

16    *Adidas*, 546 F. Supp. 2d at 1075 ("Because Payless cannot prove each element of equitable

17    estoppel, the defense must fail.").

18    **Google's Response**:  Agree.

19    175.     Google's defense relied heavily upon a November 5, 2007 blog post by Jonathan

20    Schwartz and a statement made by Larry Ellison in April 2009, but Google failed to prove that

21    Sun or Oracle knew of Google's infringement when it made those two public statements, or any

22    other statements or conduct by Sun or Oracle.  (FOF 91-94.)  As such, Google failed to establish

23    the facts necessary for the first element of this defense.

24    **Google's Response**: Disagree.  Jonathan Schwartz unequivocally testified that he knew that

25    Google used the 37 API packages before November 5, 2007.  Schwartz at RT 1989:2-7.  And by

26    April 2009, Google's use of the 37 API packages was publicly known.  GFOF 71.  Further, there

27    was no change in Sun's public course of conduct before or after November 5, 2007.

28

661479.02

176.    Google also failed to prove that Sun or Oracle intended its conduct to give Google a reason to believe that Sun or Oracle would not seek to enforce any intellectual property rights against Google in connection with Android.  (FOF 94-95, 98-101.)  Sun continued to pursue discussions with Google regarding Android, and Sun and then Oracle told Google that it needed a license for Android.  These facts undermine Google's defense.  (FOF 85-86.)

**Google's Response**:  Disagree.  Jonathan Schwartz testified that Sun believed it had no grounds to pursue litigation against Google.  Schwartz at RT 2002:5-7.  Further, Google does not need to prove that Sun/Oracle actually intended its conduct to lead Google to believe it would not enforce any intellectual property rights against Google.  Google only needs to prove that Sun/Oracle acted such that Google reasonably believed that Sun/Oracle intended not to enforce any rights in the 37 Java API packages.  *See* OCOL 173; *Aukerman*, 960 F.2d at 1043 ("Properly focused, the issue here is whether Aukerman's course of conduct reasonably gave rise to an inference in Chaides that Aukerman was not going to enforce the '133 and '633 patents against Chaides.").  Google has made this showing.  *See* GCOL 31.  Indeed, Oracle fails even to propose a conclusion of law disputing that Google made this showing.

177.    Google also failed to prove that it was ignorant of any facts, including Sun's assertions of its copyrights in connection with the Java API or Google's use of Sun's intellectual property for Android.  (FOF 53-56, 58-60, 62-65, 67-74, 81-82.)  This element cannot be established given Google's knowing use of Sun's copyrighted APIs without any license and Google's recognition, in its internal documents, that Google faced potential legal action by Sun in connection with Android.

**Google's Response**: Disagree.  Google witnesses repeatedly testified that they did not believe Google needed a license to implement the 37 Java API packages.  *See* GFOF 61; Rubin at RT 1691:15-21; Schmidt at RT 1505:22-1506:2; Bornstein at RT 1857:20-1858:6; Lindholm at RT 861:9-23.  There is no evidence that Google was concerned about potential legal action by Sun in connection with Android, and certainly none that suggests that Google faced potential legal action *relating to the 37 Java API packages*.

661479.02

178.     Google also failed to prove reliance on any conduct by Sun or Oracle in connection with Android.  Google's documents demonstrated that Google was acutely aware of Sun's concerns in connection with Android, and Sun sought to have Google take a license and make Android compatible.  (FOF 60, 62-63, 65-72, 85-86, 95-96, 98, 114, 117, 121-122, 132.)  In response, Google took steps to conceal its conduct from Sun and to avoid further discussions with Sun.  Such evidence bars application of this defense.  (FOF 123-126.)

**Google's Response**: Disagree.  Google's awareness of Sun's *business* concerns with Android and its *business-based* desire that Google make Android Java-compatible and adopt the Java brand are irrelevant.  Google never concealed its use of the 37 Java API packages from Sun and Sun never raised the issue of Google's use of those API packages.  *See* Google Resp. 123.  Google proved significant reliance on Sun/Oracle's conduct.  *See* GCOL 31, 33.

179.     Google was never "lulled into a sense of security" by Sun or Oracle.  *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1043 (9th Cir. 1992) ("to show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead").  To the contrary, Google was acutely aware of Sun's concerns over Android, and at one point considered approaching Sun with a proposal to buy Java for hundreds of millions of dollars, including the Java copyrights and patents, and in doing so make Google's "Java lawsuits go away."  (FOF 129-130.)

**Google's Response**: Disagree.  Google's awareness of Sun's *business* concerns with Android is irrelevant.  Google never seriously considered buying Java from Sun and any discussion of buying Java was not tied to Android, let alone the 37 Java API packages.  *See* Google Resp. 129-130.

180.     Google's defense also fails because Google did not change its position in reliance on any conduct of Sun or Oracle to its detriment.  (FOF 136-141.)  It had chosen to use Sun's copyrighted Java APIs long before it announced Android, and before the statements by Mr. Schwartz and Mr. Ellison.  (FOF 119.)  *See Hampton*, 279 F.2d at 105 (finding no estoppel where "any change of position by [infringer] was in reliance upon the representations of the third

661479.02

1   parties and despite the notice conveyed to him by [copyright holder's] assertion of right printed

2   on each film."); *Novell*, 1993 U.S. Dist. LEXIS 6674, at *54-55; *Adidas*, 546 F. Supp. 2d at 1075

3   ("[T]here is no evidence that Payless actually relied on Adidas' alleged inaction.  Because Payless

4   cannot prove each element of equitable estoppel, the defense must fail.").  (FOF 109-115, 119,

5   123.)

6   **Google's Response**: Disagree.  *See* GCOL 31, 33; *see also Whitman v. Walt Disney Prods., Inc.*,

7   263 F.2d 229, 231 (9th Cir. 1958) ("It is the general rule that one cannot have knowledge of the

8   alleged infringement, and then stand idly by while the infringer embarks on a costly expansion

9   program.").

10       181.    Because Google has not proven each element of estoppel, the defense fails.

11  **Google's Response**: Disagree.  *See* GCOL 27-34.

12       **F.    Implied License**

13       182.    For the equitable defense of implied license, Google must prove that Oracle/Sun

14  affirmatively granted permission to Google to use the 37 API packages at issue and that the entire

15  course of conduct between the parties over the relevant time period led Google to reasonably infer

16  Oracle/Sun's consent.  *Effects Assocs. v. Cohen*, 908 F.2d 555, 558-559 (9th Cir. 1990) Implied

17  licenses exist "only in 'narrow' circumstances where one party 'created a work at [the other's]

18  request and handed it over, intending that [the other] copy and distribute it."  *A&M Records,*

19  *Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001) (citing *Effects Assocs.*, 908 F.2d at 558)

20  (alterations in original); *Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984) (in a partnership to

21  create and publish a book, plaintiff handed copyrighted manuscript to defendant for publication,

22  thus court found plaintiff "impliedly gave the partnership a license to use the articles insofar as

23  they were incorporated in the manuscript"); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster,*

24  *Ltd.*, 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) (rejecting implied license defense where

25  "[o]bviously, Plaintiffs did not create their copyrighted works at StreamCast's request or for

26  StreamCast's benefit").

27  **Google's Response**:  Agree that for the defense of implied license Google must prove that the

28

GOOGLE'S RESPONSE TO ORACLE'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW
Case No. 3:10-cv-03561

661479.02

entire course of conduct between the parties over the relevant time period led Google to

reasonably infer Oracle/Sun's consent.  Disagree as to all other statements.  *A&M* provided one

example of an implied license, however district courts have not interpreted *A&M* as overturning

the "course of conduct" test from *Effects Associates*.  In *Field v. Google Inc.*, 412 F. Supp. 2d

1106 (D. Nev. 2006), decided after *A&M*, the court wrote: "An implied license can be found

where the copyright holder engages in conduct from which the other party may properly infer that

the owner consents to his use.  Consent to use the copyrighted work need not be manifested

verbally and may be inferred based on silence where the copyright holder knows of the use and

encourages it."  *Id.* at 1115-16.  The court concluded that "with knowledge of how Google would

use the copyrighted works [plaintiff] placed on those [web] pages, and with knowledge that he

could prevent such use, [plaintiff] instead made a conscious decision to permit it.  His conduct is

reasonably interpreted as the grant of a license to Google for that use."  *Id.* at 1116; *see also*

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580-81 (Fed. Cir. 1997)

(analyzing the range of legal theories and fact scenarios that can give rise to an implied license).

183.    Sun/Oracle did not affirmatively grant permission to Google to use the 37 API

packages or code at issue here without a license; in fact the record shows the contrary.  (FOF 66,

83-84, 98-99, 107, 133.)

**Google's Response**: Agree that Sun/Oracle did not specifically and affirmatively grant

permission to Google to use the SSO of the 37 API packages, but this was only because no one

believed Google needed Sun's permission.  *See* GFOF 61, 72.  The entire course of conduct

between the parties reasonably led Google to infer that Sun/Oracle consented to its use of the 37

Java APIs.  *See* GFOF 21-23, 37-50, 52-61, 64-66, 68-83, 87-92.

184.    It was not reasonable for Google to infer consent to use the 37 Java APIs without a

license because the entire course of conduct between the parties demonstrated Sun/Oracle's

assertion of its IP rights.  (FOF 83-108.)

**Google's Response**:  Disagree.  *See* GCOL 38.

G.    **Laches**

185.    For the equitable defense of laches, Google must prove that (1) Oracle/Sun unreasonably delayed filing the lawsuit; (2) the delay was inexcusable, and (3) that Google has suffered material prejudice due to Oracle/Sun's delay.  *Danjaq LLC v. Sony Corp.*, 263 F.3d 942 (9th Cir. 2001) (three-part analysis of "delay," "reasonableness of the delay," and "prejudice").

**Google's Response**:  Agree.

186.    First, "the relevant delay is the period from when the plaintiff knew (or should have known) of the allegedly infringing conduct, until the initiation of the lawsuit in which the defendant seeks to counterpose the laches defense."  *Danjaq*, 263 F.3d at 952.

**Google's Response**:  Agree.

187.    Oracle filed suit in August 2010, within three years of the first time that the APIs and the code in Android were made available to the public (in November 2007).  (FOF 93.)

**Google's Response**: Agree.  However, Jonathan Schwartz, Sun's CEO, knew that Google planned to use the APIs as far back as 2006, more than three years before Oracle filed suit. Schwartz at RT 1983:22-24 (Q. So you knew from [as of April 27, 2006, the date on TX 435] that Android would be based on the Java language and the Java APIs? A. Yes.).

188.    Courts recognize negotiations with the accused as an excuse for delay.  *In re Katz Interactive Call* Processing *Patent Litig.*, 712 F. Supp. 2d 1080, 1110 (C.D. Cal. 2010) ("the negotiation must 'ordinarily be continuous and bilaterally progressing, with a fair chance of success, so as to justify significant delays'"); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F. Supp. 2d 1016, 1053 (S.D. Cal. 2008); *A.C. Aukerman Co.*, 960 F.2d at 1033.

**Google's Response**: Agree, so long as the negotiations specifically concern the allegedly infringing technology, as they did in all cases cited by Oracle, and which is not the case here.

189.    Courts have found delay reasonable or excusable where evidence shows that for several years leading up to the start of litigation, plaintiff engaged in efforts to sell a license to defendant or engaged in bilateral negotiations with a fair chance of success.  *Lucent*, 580 F. Supp. 2d at 105; *In re Katz*, 712 F. Supp. 2d at, 1110-11.

64

661479.02

1    **Google's Response**: Agree.  In those cases the negotiations were for a license for the specific

2    technology at issue, which is not the case here.

3          190.    Since Sun/Oracle's continued discussions and negotiations with Google regarding

4    licensing options were bilateral and had a fair chance of success, including through the time of

5    Google's CEO Larry Page's testimony at trial, Sun/Oracle's delay in bringing suit is excusable.

6    *In re Katz*, 712 F. Supp. 2d at 1110-11 (rejecting argument that correspondence between parties

7    were "sporadic" and futile and holding that their 6 year correspondence, up until defendant

8    conclusively communicated that it does not need a license, constituted rebuttal of presumption of

9    laches and raised genuine issue of excuse); Lucent Techs., 580 F. Supp. 2d at 1053 ("Court

10   concludes that any delay was reasonable or excusable since Lucent attempted to seek

11   compensation for its patent through the computer manufacturers").  (FOF 85, 86, 98-100, 102,

12   133.)

13   **Google's Response**: Disagree.  The partnership discussions between Google and Sun ended in

14   2006.  *See* GFOF 57.  After that, the evidence cited by Oracle shows that discussions were merely

15   "sporadic" and Google did not seriously consider taking a license.  Further, to the extent there

16   were discussions between Google and Sun after 2006, none of the discussions involved licensing

17   the 37 Java API packages.  *See* GFOF 59, 60, 74.

18         191.    Third, Google has failed to demonstrate prejudice by showing that it took actions

19   or suffered consequences that it would not have, had Sun/Oracle brought suit promptly.  *Danjaq*,

20   263 F.3d at 955.  (FOF 141.)

21   **Google's Response**: Disagree. *See* GCOL 31, 33; *see also Whitman v. Walt Disney Prods., Inc.*,

22   263 F.2d 229, 231 (9th Cir. 1958) ("It is the general rule that one cannot have knowledge of the

23   alleged infringement, and then stand idly by while the infringer embarks on a costly expansion

24   program.").

25         192.    Indeed, "[t]he very purpose of laches as an equitable doctrine – and the reason that

26   it differs from a statute of limitations – is that the claim is barred because the plaintiff's delay

27   occasioned the defendant's prejudice. *Danjaq*, 263 F.3d at 955 (quoting *Telink Inc. v. U.S.*, 24

28

661479.02

F.3d 42, 45 (9th Cir. 1994)); *A.C. Aukerman Co.*, 960 F.2d 1020, 1033 (9th Cir. 1992) ("Material prejudice to adverse parties resulting from the plaintiff's delay is essential to the laches defense.").

**Google's Response**: Agree that laches requires a showing of prejudice.

193.    Google's policy was to push forward and develop Android with the infringing Java APIs, "making enemies along the way," and thus did not change its position in reliance on Oracle's inaction.  (FOF 58-65, 71-74, 82, 109-119.)

**Google's Response**: Agree that Google's consistent strategy was to include its independent implementation of the 37 Java API packages in Android.  Because Sun/Oracle never suggested that it claimed a copyright in the SSO of those packages before this lawsuit, Google never had reason to change this strategy.  This in no way undermines Google's reliance on Sun/Oracle's action and inaction in developing and continuing to implement this strategy.

194.    Moreover, "laches is not available in a case of willful infringement, when the infringing conduct occurs 'with knowledge that the defendant's conduct constitutes copyright infringement."  *Winn v. Opryland Music Group, Inc.*, 22 Fed. Appx. 728, 729 (9th Cir. 2001) (internal citations omitted).

**Google's Response**: Agree, although there is no evidence in the record that Google ever believed the SSO of Sun API packages was a copyrighted work, or that Sun had ever claimed that it was.

195.    As the evidence indicates that Google's infringement was willful, Google is ineligible to assert the defense of laches.  (FOF 57-65, 69-74, 79, 109-119, 122-132.)

**Google's Response**: Disagree.  Google's infringement was not willful because Google did not believe—and still contests—that the SSO of the 37 Java API packages was protected by copyright.  *See* GFOF 61.  Indeed, Oracle itself (Sun) did not believe that APIs were proprietary until it decided to file this lawsuit.  Schwartz at RT 1966:1-12. "

Dated:  May 6, 2012                                    KEKER & VAN NEST LLP
                                                       /s/ Robert A. Van Nest

                                      By:        ROBERT A. VAN NEST

                                                 Attorneys for Defendant
                                                 GOOGLE INC.

GOOGLE'S RESPONSE TO ORACLE'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW
Case No. 3:10-cv-03561

661479.02