1   MORRISON & FOERSTER LLP
    MICHAEL A. JACOBS (Bar No. 111664)
2   mjacobs@mofo.com
    KENNETH A. KUWAYTI (Bar No. 145384)
3   kkuwayti@mofo.com
    MARC DAVID PETERS (Bar No. 211725)
4   mdpeters@mofo.com
    DANIEL P. MUINO (Bar No. 209624)
5   dmuino@mofo.com
    755 Page Mill Road, Palo Alto, CA  94304-1018
6   Telephone: (650) 813-5600 / Facsimile: (650) 494-0792

7   BOIES, SCHILLER & FLEXNER LLP
    DAVID BOIES (Admitted *Pro Hac Vice*)
8   dboies@bsfllp.com
    333 Main Street, Armonk, NY  10504
9   Telephone: (914) 749-8200 / Facsimile: (914) 749-8300
    STEVEN C. HOLTZMAN (Bar No. 144177)
10  sholtzman@bsfllp.com
    1999 Harrison St., Suite 900, Oakland, CA  94612
11  Telephone: (510) 874-1000 / Facsimile: (510) 874-1460

12  ORACLE CORPORATION
    DORIAN DALEY (Bar No. 129049)
13  dorian.daley@oracle.com
    DEBORAH K. MILLER (Bar No. 95527)
14  deborah.miller@oracle.com
    MATTHEW M. SARBORARIA (Bar No. 211600)
15  matthew.sarboraria@oracle.com
    500 Oracle Parkway, Redwood City, CA  94065
16  Telephone: (650) 506-5200 / Facsimile: (650) 506-7114

17  *Attorneys for Plaintiff*
    ORACLE AMERICA, INC.
18

19              UNITED STATES DISTRICT COURT

20              NORTHERN DISTRICT OF CALIFORNIA

21                 SAN FRANCISCO DIVISION

22  ORACLE AMERICA, INC.              Case No. CV 10-03561 WHA

23              Plaintiff,            **ORACLE'S RESPONSES TO
                                      GOOGLE'S PROPOSED FINDINGS
24      v.                            OF FACT AND CONCLUSIONS OF
                                      LAW**
25  GOOGLE INC.
                                      Dept.:  Courtroom 8, 19th Floor
26              Defendant.            Judge:  Honorable William H. Alsup

27

28

1  **I.     FINDINGS OF FACT**

2        **A.     Copyrightability**

3             **1.     API Structure, Sequence, and Organization**

4        *1.     When programmers write programs using the Java programming language,*
   *they access libraries of prewritten code to perform programming functions.*

5
        Agree that programmers may access libraries but disagree to the extent Google is arguing

6   that more than a small number of classes are required to use the Java programming language.

7
                    Reinhold at RT 684:16-685:2
8                   TX 1062
                    TX 984
9                   *See* Oracle Response to Finding of Fact ("FOF") __, *infra*.

10       *2.     An application programming interface ("API") is the names, words, and the*
    *set of rules that a programmer uses to communicate with a library and access the*
11  *prewritten code contained in that library.*

12       Disagree.  Dr. Bloch so testified; however, his description is incomplete.  Dr. Reinhold

13  testified that "The API is a specification of the class library.  It's a description of it.  It tells you

14  what – what its structure is, what the names of all the elements are, and it includes English prose

15  that describes how every element is expected to work.  It also defines all of the relationships

16  between the different elements."  Edward Screven testified that "APIs in Java are actually directly

17  embedded [in library program code] and … [g]ive a program structure."

18       None of the other citations offered by Google endorse its proposed definition.  Google's

19  first citation to Dr. Mitchell is a response to a questions about a particular method,

20  java.lang.Math.max and does not define what an API is.  (*See* Mitchell at RT 1300:21-1301:6.)

21  The second citation describes how an API is used and is not a definition either.  (*See* Mitchell at

22  RT 1297:23-1298:7.)  Dr. Mitchell did define an API elsewhere as described below.  Mr. Kurian

23  indicates that programmers call library logic through a "well-specified interface," not a set of

24  names, words, and rules.  Mr. Ellison's testimony is discussed in response to FOF 9 below.

25                  Reinhold at RT 585:17-586:6
                    Screven at RT 511:9-10, 513:10-11
26                  Kurian at RT 364:3-10
                    See Response to FOF 9, *infra*
27                  Mitchell at 1237:11-25

28

API can refer to the API of a full library or it could talk about the API of a single package or the API of the class.  Generally, we're using API to refer to the interapplication program interface, all of these characteristics of a group of packages.
…
There's the declaration, which is included in an API.  API also has relationships between different classes and interfaces and packages.  There's some picture of this partially represented on the easel.
API also includes a description of how these things work, what the names mean, how the methods are used

**3.      The prewritten code in the Java class libraries is divided into units known as methods, each of which provides a specified functionality.**

Disagree.  Agree that methods are part of the Java class libraries and that they provide functionality.  However, methods are only one of many elements included in the complex structure and organization of the Java class libraries.  Other elements include packages, classes, interfaces, exceptions, constructors, and fields.

> Reinhold at RT 589:2-18, 628:22-629:6, 634:17-22
> TX 1028
> Mitchell at RT 1238:22-1239:12, 1248:11-1249-1, 2283:9-20
> TX 624 at 23-26

**4.      The Java language requires that methods be grouped into "classes," which are then grouped into "packages."**

Agree that Java-language methods can be grouped into classes and that classes are grouped into packages.  Methods can also be grouped into interfaces.  Disagree with the suggestion that the Java language requires grouping any particular methods into particular classes or any particular classes into particular packages.

> Reinhold at RT 590:9-23; 619:13-23; 634:10-25

**5.      To the extent the "structure, sequence and organization" ("SSO") of the API packages have a "hierarchical structure," that structure is dictated and required by the Java programming language, which requires that the fully-qualified name of any API method, constructor or other API element must consist of the package name, the class name, and the method name.**

Disagree.  Agree that Java APIs have a structure that is in part hierarchical, but no *particular* structure is "dictated" or "required" by the Java programming language.  The constructs of the programming language provide an opportunity for designing a rich and complex structure but do not require it.  Google's citations do not support the argument that API design is

1   constrained due to the Java language.  Dr. Astrachan states only that the language constructs

2   include packages, classes and methods.  He does not state that any particular packages, classes or

3   methods are required.  (Astrachan at RT 2187:18-2188:4).  The quote from Dr. Bloch states only

4   that, once an API organization has been selected, the fully qualified method name tells you where

5   you can find the method.  (Bloch at RT 774:4-775:5).  It does not state that the API's *choice* of

6   structure is constrained in any way.

7        Reinhold at RT 619:13-23:

8        So very little organization or structure is required for the virtual machine
    and the computer running it to understand code that be written.

9

10       In the Java Platform APIs, for example, we could have put all of the classes
    into one giant package. We could have given classes packages, interfaces,
    methods, fields. We could have given them completely random names and

11  they would still run just fine on the computer. They would be really hard to
    use from the developer's, the software developer's standpoint, but in a

12  certain sense the computer doesn't care. They are just names.

13       Reinhold at RT 634:10-25

14       Screven at 565:3-16 ("there is nothing in the Java language specification
    that requires that there be a class named tree, but there is a class named tree

15  within—within the standard APIs.")

16       Bloch at RT 786:16-18 ("The fully qualified name I can't tell you without
    knowing the class and package that this method is in.")

17

18       Mitchell at RT at 1238:11-1240:20 (describing the many choices available
    in constructing the API and how designer starts with a "clean slate")

19       TX 984

20      **6.    The means by which the SSO is stated in tangible form in the code must use
    and follow strictly the rules of the Java programming language.  This means that any**

21  **possible expression of the ideas that result from "design choices" made in designing an API
    or API package—the ideas regarding which methods should be put in which classes, which**

22  **classes should be put in which packages, which classes should extend which other classes,
    and which classes should implement which interfaces—is constrained by the rules of the**

23  **Java language.**

24      Disagree for the reasons stated in response to FOF 5 above.  Google's citations do not

25  support the argument that API design choices are an idea and they say nothing about constraint

26  due to the Java language.  API design choices such as "which methods should be put in which

27  classes, which classes should be put in which packages, which classes should extend which other

28  classes, and which classes should implement which interfaces" are not constrained by the rules of

3

1   the Java language at all.  Additionally, Dr. Astrachan is wrong in stating that class declarations

2   take up one line of code.  Complex class declarations may take up as much as five lines of code,

3   and that does not fully reflect the structure of the class.

4         *See* Response to FOF 5
        Reinhold at RT 612:15-613:11, 596:4-10; 2241:3-2243:11
5         Mitchell at RT 1250:24-1251:13
        TX 623 at \jdk-1_5_0-fcs-src-b64-windows-
6         15_sep_2004.zip\j2se\src\share\classes\java\util\Haashtable.java lines 105-
        107 (declaration for class "Hashtable: takes 3 lines):
7         105 public class Hashtable<K,V>
        106 extends Dictionary<K,V>
8         107 implements Map<K,V>, Cloneable, java.io.Serializable {

9         **7.      All of the elements of the SSO for any given class or method are expressed in
    either a single line of code or a small number of lines of code (five or fewer) for that class or
10    method, which must be written in accordance with the requirements of the Java language.**

11        Disagree. The testimony that Google cites from Dr. Reinhold directly contradicts

12   Google's position.  While a class *declaration* normally takes up a limited number of lines, to fully

13   express the SSO for any class will require far more lines because the methods and fields within

14   that class must also be declared, as well as the package.  Parameter lists provide additional SSO.

15        Reinhold at RT 2241:3-2243:11
        Mitchell at RT 2284:18-2286:2
16        *See* Response to FOF 6

17        **8.      The SSO for an API or API package are a system for identifying the location
    of the prewritten code in the library analogous to how street addresses are a system for
18    identifying the location of a given building.**

19        Disagree.  Dr. Bloch's quote does not mention "SSO" or "system" and he admits this is

20   "not a great analogy."  Dr. Bloch was responding to a request to "help us understand what more

21   you need to put up there so that we know what API is versus package, or whether they are the

22   same."  He ends the quoted testimony with a question that does not have a clear answer.  A better

23   analogy is to compare the API to a blueprint to the class library.

24        Bloch at RT 772:13-773:24
        Reinhold at RT 585:16-586:6, 607:18-608:3, 2239:2-2240:4
25

26        **9.      Similarly, the SSO for an API or API package represents a command
    structure to access prewritten computer code contained in the Java class libraries.**

27        Agree that APIs are used to access prewritten computer code contained in libraries.

28   Disagree that the *SSO* for an API is a "command structure."  The only one of Google's citations

that refers to "command structure" is the citation to Mr. Ellison's testimony.  This term is inconsistent with how every other witness on both sides described the APIs.  Mr. Ellison clarified on cross-examination that the APIs are not actually a command structure and explained that he "was using the expression 'command' in layman's terms."  Mr. Kurian describes the APIs as a "blueprint or design interface."  A blueprint is a better analogy.

> Ellison at RT 308:17-309:15
> Kurian at RT 364:3-10
> Reinhold at RT 585:16-586:6, 607:18-608:3; 2241:3-2242:4
> *See* Response to FOF 10
> TX 25, The Java Virtual Machine Specification, at preface page xv, TX page 14:  "The Java Virtual Machine is an abstract design.  This book serves as documentation for a concrete implementation of Java (including Sun's) only as a blueprint documents a house."

**10.    The SSO of an API or API package is not like a blueprint.  While blueprints tell you how to build something, the SSO of an API or API package does not tell you how write the implementing code.  The SSO of an API or API package provides only the functional requirements describing what the thing you are building—the implementing code—must do.**

Disagree.  The API is very much like a blueprint.  It describes the structure of the API and is used as a roadmap to build implementations of the API.  It's almost always easier to implement an existing API design than to design the API in the first place because "You've already got a map worked out of what you need to do.  You follow that map.  You fill in the details." (Reinhold at RT 2230:1-3.)  Google in fact used the Java APIs for the 37 packages as a blueprint to build the Android APIs.  Bob Lee, the core libraries lead for Android admitted that he consulted the Java API specifications when developing the implementing code to make sure it would be consistent with the specifications.  Former Google engineer Dan Bornstein similarly testified that the development team looked at the Java APIs "in order to derive from these specifications" at least some of the information the team needed to write the code.  And the statement of work that Google provided to its outside contractor, Noser, expressly required Noser to implement packages for Android in accordance with the API packages included in J2SE 1.5.

> Reinhold at RT 585:16-586:6, 607:18-608:3
> Kurian at RT 364:3-10, 367:14-19, 371:24-372:6, 380:10-16, 398:21-399:4
> Lee at RT 981:7-21; 982:25-983:3
> Bornstein at RT 1836:19-1837:2
> TX 30 (Noser statement of work)
> Reinhold at RT 2229:3-2230:4:

So when you already have a good API designed, it already has an established gone-through hierarchy of Packages and Classes and Methods and fields, together with English language descriptions of how everything is supposed to work together.

Once you've got that, to do an implementation from scratch is a relatively easier job. You start by copying the declarations from the API into your source code. And then you fill in the methods with actual instruction code that will go at runtime. And you might need to write some subsidiary internal Classes, but those are strictly not part of the API.

## 2. The Java programming language.

**11.    The Java programming language, without any API packages and class libraries, consists only of the language's grammar or syntax without a vocabulary.**

Agree that the language provides syntax, but it also provides certain semantics. Disagree with any implication that the APIs are part of the language.

TX 984, Java Language Specification 3d Ed at xxi ("This book attempts a complete specification of the syntax and semantics of the language.")
*Id.* at 21 (listing keywords)
Screven at RT 564:15-565:5

**12.    Because it consists only of grammar and no vocabulary, the Java programming language has almost no functionality without API packages and their class libraries.**

Agree that the presence of APIs in general greatly expands what a programmer can do. Disagree with the premise that the Java programming language consists only of grammar (*see* Response to FOF No. 11), or the implication that the Java programming language is somehow more limited than other computer programming languages and required APIs for that reason. Although C is a more limited language, for example, the Java platform has far more libraries than the C platform. Disagree further to the extent Google is arguing that all of the APIs for the 37 packages in suit are necessary to use the language or are required to provide rich functionality, or that it needed to use Oracle's APIs. Only a small number of classes are even mentioned in the Java Language Specification, and none of those classes are fully specified: for most of those classes, the language specification only requires that a class by that name exist. Many of the packages in suit did not exist until later versions of the Java platform. The first release of Java, which was extremely popular and allowed for very useful programming, had only 7 API

1   packages, only four of which are included in the 37 at issue in this lawsuit.  And some of those

2   packages have grown dramatically since the first release.

3           TX 1062 at 1-2 (list of 61 classes)
            Reinhold at RT 676:14-678:13 (requirement of Java Language
4           Specification)
            Reinhold at RT 684:16-685:24 (no need to use Oracle's APIs)
5           Reinhold at RT 640:5-24 (comparing Java and C programming languages)
            Reinhold at RT 632:7-633:14 (comparing APIs for different platforms)
6           Reinhold at RT 685:21-687:20 (first release of Java and growth of packages
            over time)
7           Mitchell at RT 1243:4-1244:16 (evolution of java.util);
            Mitchell at RT 1335:9-24 (no need to use Oracle's APIs)
8           Mitchell at RT 2288:6-12 (same)
            Reinhold at RT 630:11-631:18 (example of different structure for
9           java.util.logging API)
            Astrachan at RT 2212:19-2213:19 (Google could have written own APIs)
10          Ellison at RT 290:15-291:9 (no need to use Oracle's APIs)
            Screven at RT 518:4-519:15 (no need to use Oracle's APIs)
11

12          **13.    Without API packages and class libraries, a Java program could not
     communicate with a computer monitor so a user could read the output, could not
13   communicate with a printer so a user could print the output, and could only do computation
     with primitive data types.**

14          Agree that some limited number of input/output API elements would be required to allow

15   a Java program to perform these functions.  Disagree to the extent Google is arguing that this

16   suggests the APIs for the 37 packages in suit are necessary to use the language, or that Google

17   needed to use Oracle's APIs.

18          *See* Response to FOF 12.
            Mitchell at RT 1277:18-1278:1 ("Printing is an IO feature, so I believe that
19          requires some elements of java.io, *but a program could do something
            else*.")
20

21          **14.    The API packages provide the names and vocabulary used in the Java
     programming language.**

22          Disagree.  The APIs are separate from the language.  Apart from the 61 classes referenced

23   in the Java Language Specification, the programming language does not require that any of the

24   classes use any particular names.  Dr. Astrachan acknowledged that the Java APIs and the Java

25   programming language are "very different things."  (Astrachan at RT 2208:22-2209:6.)  Google's

26   citations also do not support its proposed finding.  Dr. Bloch testified that "you don't want to be

27   confined to the small set of words that are the so-called key words of the language,"

28   acknowledging that the language includes vocabulary separate from the APIs.  (Bloch at RT

784:9-21.)  Professor Mitchell testified that "you form an API using various parts of speech," not that the APIs provide the names and vocabulary for the language.  (Mitchell at RT 1304:5-20 (From TX 3542).)  Edward Screven testified about "Java language" API elements to distinguish them from English language comments, not to imply that particular declarations are *part of* the language. (Screven at RT 541:21-542:3).

>           Astrachan at RT 2208:22-2209:6
>           *See* Response to FOFs 5, 12

**15.     By providing names and a vocabulary for the Java programming language, API packages and their SSO provide a system of expression in the Java programming language.**

Disagree for the reasons set forth in response to FOFs 5, 12 and 14 above.  In addition, Dr. Bloch's cited testimony neither mentions nor describes a "system of expression," and it says nothing about SSO.  (Bloch at RT 764:24-765:9; 747:25-748:6)

See Response to FOFs 5, 12 and 14.

### 3.     Some of the 37 Java API packages, or their elements, are essential to use the Java language.

**16.     Several classes and methods in the 37 API packages at issue in this case are literally essential to any use of the Java programming language.**

Agree that there are about 60 classes and a small number of methods referenced in the Java Language Specification.  None of those classes are fully specified: for most of those classes, the language specification only requires that a class by that name exist.  "There is no mention of what methods might be in them, what fields they might have.  They could have anything, as far as the language is concerned."  (Reinhold at RT 678:11-13.)  The API designer chooses this content independently.

>           TX 1062 at 1-2
>           Reinhold at RT 676:14-678:13, 684:16-685:2
>           Astrachan at RT 2196:1-4
>           TX 984 (*see, e.g.* p. 6: "The language definition constrains the behavior of these classes and interfaces, but this document does not provide a complete specification for them. The reader is referred to other parts of the Java platform specification for such detailed API specifications.")

**17.     The 60 or 61 classes required to implement the Java language specification and make any use of the Java language reference over 170 other classes consisting of over 2,000 public methods and fields spread across ten packages.**

Disagree.  For most of the 60 or 61 classes that are referenced in the Java Language Specification there is no requirement that the class include any particular methods or fields at all. (*See, e.g.*, TX 984 at 335 (Java Language Specification page mentioning classes ClassCircularityError, ClassFormatError, and NoClassDefFoundError, without specifiying any methods, constructors or fields).)  To the extent that the 60 or 61 classes as implemented in the API, or their methods and fields, reference other classes, methods and fields, these references are due to the unconstrained choices of the authors of the API specifications, and are not required at all by the Language Specification.  Finally, the phase "make any use of" does not appear anywhere in the cited materials.

See Response to FOF 16.

**18.     The First Edition of the Java Language Specification included a specification for the java.lang, java.io, and java.util API packages.**

Agree that the specifications for these three API packages were included in the book, but disagree to the extent Google is claiming that this somehow makes these three packages part of the language. The Java Language Specification itself does not state that these three packages are part of the language.  Even Google's JLS quotation distinguishes between "the syntax and semantics of the Java language *and* the core packages." TX 2564 at xxiii. Dr. Bloch's testimony draws a similar distinction: "Actually, *in addition to those that were directly required to implement kind of the formal language*, it contained the full specifications for all of what were the core packages at the time."  Bloch at RT 781:14-17.  These package specifications were removed from subsequent JLS editions, and the packages in question have expanded significantly over time.

See Response to FOFs 12, 16
TX 2564 (JLS 1st Ed.)
TX 984 (JLS 3d Ed.)

**19.     The First Edition of the Java Language Specification stated that java.lang, java.io, and java.util packages "must be included in all general purpose Java systems."**

Agree that the introduction to the First Edition states this, but disagree to the extent that Google is claiming that means these packages were part of the language.  To the contrary, the immediately preceding sentence draws a distinction between the API specifications and the language, stating that, "Chapters 20 through 22 are the reference manual for the core of the standard Java Application Programming Interface."  The language specification itself does not require that these entire packages be included, but instead only requires the existence of about 60 classes.  These package specifications were removed from subsequent JLS editions, and the packages in question have evolved over time such that the statement, from 1996, is no longer relevant.

> TX 2564 at 5 (JLS 1st Ed.)
> TX 984 (JLS 3d Ed.)
> Reinhold at RT 687:25-688:13 (APIs have "evolved over that time")
> Mitchell at RT 1243:4-1244:16 (evolution of java.util)
> *See* Response to FOF 12

**20.     Volume 1 of the Java Application Programming Interface described the java.lang, java.io, and java.util packages as "the foundation of the Java language" and as "the general purpose libraries fundamental to every Java program."**

Agree that this is stated on the back cover of the Java Application Programming Interface book issued with the first release.  Disagree to the extent that Google claims that this makes these packages part of the Java language.  The witnesses and experts for both parties agree that only 60 or 61 classes are required by the Java programming language.  In addition, the packages in question have expanded greatly over time such that the statement, from 1996, is no longer relevant.  The API specifications for Java 2 Standard Edition version 5 contain no such statement.

> TX 610.2
> TX 1076 at \contents\jdk\jdk-1_5_0-doc.zip
> Reinhold at RT 687:25-688:13 (APIs have "evolved over time")
> Mitchell at RT 1243:4-1244:16 (evolution of java.util)
> *See* Response to FOF 12
> Bloch at RT 781:25-782:4

> Q. Are you familiar today, nowadays, with a separate book that's published regarding those four core libraries?
> A. Yeah, but it's kind of obsolete.
> Q. And why is it obsolete?
> A. Because we have added so many more libraries since then.

1

### 4.    The 37 Java API packages and their SSO provide functionality relied on by Java programmers.

2

**21.    When Sun released the Java programming language, its goal was to encourage widespread use of the language by encouraging as many people as possible to use the language.**

3

4

Agree that the evidence cited states Sun encouraged widespread use of the Java

5

programming language, in the same way that any business encourages widespread use of its

6

product.  This is entirely irrelevant to the issue of whether the SSO of the API packages is

7

copyrightable.  In addition, Mr. Schwartz testified that Java's inception was before his arrival at

8

Sun.  He has no personal knowledge of such prior events so his description is entitled to little

9

weight on this point.

10

Schwartz at RT 1957:4-5

11

**22.    Because the functionality provided by the API packages (as accessed through the packages' SSO) was necessary to make any meaningful use of the Java programming language, Sun promoted the free use of the Java API packages developed as part of the free use of the Java programming language.**

12

13

14

Disagree.  The record is replete with contrary evidence establishing that Sun and Oracle

15

did not dedicate the Java APIs to the public domain, but instead consistently placed copyright

16

notices on the Java APIs and only made them available through licenses.

17

*See* Oracle's FOF Nos. 53, 54, 55, 56
McNealy at RT 2051:22-2053:16, 2066:15-19

18

**23.    Sun did not consider the Java API packages or their SSO proprietary, and it worked hard to dispel any suggestion that the API packages were proprietary.**

19

20

Disagree.  Mr. Schwartz later admitted that his testimony did not represent Sun's legal

21

position or his understanding of Sun's specification license.  Moreover, the record is replete with

22

contrary evidence that Sun and Oracle considered the Java API packages and their SSO to be

23

proprietary.  Mr. Schwartz literally stands alone in his testimony on this issue.

24

Schwartz at RT 2013:22-2015:7
McNealy at RT 2051:22-2053:16, 2066:15-19
*See* Oracle's FOF Nos. 53, 54, 55, 56

25

26

27

28

1

***24.   Part of Sun's active promotion of the Java programming language was to encourage its adoption by young programmers through teaching of the language in colleges and universities.***

2

3   Agree.  This is also entirely irrelevant to the issue of whether the SSO of the API

4   packages is copyrightable or to Google's infringement.  This lawsuit is not about an individual

5   developer using the Java APIs to develop an application program.  This case is about Google

6   developing its own implementation of the APIs to attract individual developers to its platform,

7   without taking one of the licenses that is required to do that.  *See* Oracle FOF Nos. 54-56.

8

***25.   Because the Java programming language lacks basic functionality unless the API packages and associated libraries are present, Sun actively promoted teaching and use of the Java API packages as part of courses in the language.***

9

10   Disagree with Google's rationale for teaching.  The evidence cited by Google —

11   testimony from Professor Astrachan about what he teaches in his courses, does not support, or

12   even attempt to assert, the proposed finding that Sun actively promoted teaching API packages

13   and associated libraries "because the programming language lacks basic functionality."  (*See*

14   Astrachan at RT 2091:3-15, 2093:14-17.)

15

***26.   Because Sun actively promoted teaching and use of the Java API packages with the Java programming language, developers who are learning to program in the Java programming language learn how to use the Java API packages, including their SSO, when they learn the language itself.***

16

17

18   Disagree.  None of the evidence cited supports the proposition that Sun "actively

19   promoted teaching and use of the Java API packages with the Java programming language."

20   Uniformly, the cited evidence from Bloch, Swetland, Morrill, and Bornstein is limited to each

21   witness stating that the reference material each person consulted to learn the Java programming

22   language also included a discussion of Java APIs.  Agree only that developers typically learn the

23   basics of some small subset of APIs as they learn the language.

24

***27.   Because developers are taught the Java API packages together with the language, developers expect and depend on the presence of the Java API packages, including their SSO, to enable them to write programs in the Java programming language.***

25

26   Agree only that developers are familiar with the Java API packages and like them, and

27   that it was a real benefit to Google to copy them.  None of Google's citations discuss the

28   packages' SSO, however, nor do they discuss what developers "are taught."  In addition,

Professor Astrachan has no credibility to discuss industry expectations as he has never worked in industry in any capacity.  His testimony was allowed over Oracle's objection but is entitled to no weight – he stated it was based on the fact that "Companies actually come and say, 'How come your students don't learn this and do learn that?"  (Astrachan at RT 2202:6-2203:9.)  Google failed to lay any further foundation.  Google's proposed finding is also incomplete in that it fails to note that Google designed many of its own API packages for Android and could have designed its own APIs for the packages in suit as well.

> TX 2524 (Astrachan CV)
> Astrachan at RT 2212:25-2213:19 (Google could have written own APIs)
> Astrachan at RT 2220:1-7 (37 API packages not required by Java language)
> Mitchell at RT 2288:6-12 (Google not required to use Oracle APIs)
> Reinhold at RT 630:11-631:18 (example of different structure for java.util.logging)
> *See* Response to FOF 12

**28.    Because they are a part of the language, programmers often know by heart the fully-qualified method names, which reflect the SSO of the API packages.**

Agree only that programmers may know some method *signatures*, though nowhere near the thousands included in these 37 API packages.  Disagree that fully-qualified method names (or signatures) in the API packages are part of the Java programming language.  None of the cited testimony states this.  Google's citations refer to "method signatures," not "fully-qualified method names."  Method names (or signatures) do not reflect the packages' SSO.

*See* Response to FOFs 5, 12, 16

**29.    Books that instruct developers how to write in the Java programming language, including Josh Bloch's award-winning book Effective Java, include instruction and discussion about the Java API packages and their SSO.**

Agree with respect to the three books cited in the evidence: *Effective Java, Java in a Nutshell*, and *Java Programming Language*.  Disagree that this somehow means that the API packages are part of the language.

*See* Response to FOF 12

**30.     When companies build their own API packages, they typically rely on and build on top of the standard Java API packages.**

Agree that companies typically build their own API packages on top of the standard Java API packages.  The cited evidence does not state that companies "typically rely on" these packages.  However, many companies and individuals also design their own APIs without building them on top of all of the standard API packages, and Google could have done so here just as it did for the original API packages it developed.

*See* Response to FOF 12

**31.     The functionalities provided by the 37 API packages at issue are all required to make practical use of the Java programming language.**

Disagree.  Many of the packages in suit did not exist until later versions of the Java platform.  The first release of Java, which was extremely popular and allowed for very useful programming, had only seven API packages, only four of which are included in the 37 at issue in this lawsuit.  And some of those packages have grown dramatically since the first release.

The evidence cited also does not support the proposed finding.  Mr. Bornstein never states that the 37 packages "are all required to make practical use of the Java programming language." (*See* Bornstein at RT 1782:6-17.)  Dr. Astrachan was asked to opine as to the need for the "functionalities provided by those 37 packages," and when asked by the Court at the conclusion of his testimony on this issue, confirmed that this was what he had opined on.  (*See* Astrachan at RT 2195:10-14, 2201:24-2202:2 ("The Court: So when you're saying that these were necessary, you're referring to which piece is necessary? A. The functionality provided by those packages is necessary.").)  Everyone who was asked the question on both sides—including Dr. Astrachan—agreed that Google could have designed its own APIs to provide this functionality.

> *See* Oracle's FOF Nos. 50, 51
> *See* Response to FOF 12

**32.     Java language programmers and developers have always understood that the Java API packages, along with the Java programming language, were free to use.**

Disagree.  The record is replete with contrary evidence establishing that Sun and Oracle did not dedicate the Java APIs to the public domain, but instead consistently marked them with

copyright notices and only made the APIs available through licenses. The evidence cited does not

establish the proposed finding. Mr. Bornstein never states that the Java API packages were free

to use. (*See* Bornstein at RT 1769:14-1770:1.) Mr. Swetland and Mr. Lindholm only testified as

to their own understanding, and not the broad understanding of "Java language programmers and

developers," nor would they have been qualified to do so. (*See* Swetland at RT 962:4-14;

Lindholm at RT 861:9-23.)

> *See* Oracle's FOF Nos. 53, 54, 55, 56

> **5.    In order to provide the functionality expected by Java language programmers, the SSO of the Java API packages must be the same.**

**33.    *Two platforms are "compatible" if they have common APIs and API packages such that a program written using those APIs and API packages would be understood by and work on both platforms.***

Disagree. The evidence cited does not support this proposed finding. It was limited to

one specific three line exemplar. As Google's own witnesses and documents acknowledge,

Android is not compatible with Java even though Android copied the 37 disputed Java API

packages.

> Morrill at RT 1007:6-11 (Android included some but not all Java API packages)
> Bornstein at RT 1783:15-22 (wasn't even a goal of Android to provide all Java API packages)
> TX 383 at 8 (Nov. 2007 Android Press Q &A) ("Q48. Does Android support existing Java apps? A. No.  Q49. Is Android Java compatible? A. No.")
> Mitchell at RT 1331:16-1332:2, 2287:23-2288:5 (Android not compatible with Java)

**34.    *The 37 Java API packages at issue here, including their SSO, are required for compatibility between implementations of the API packages—including the Android and Java platforms—and to enable preexisting programs written using the methods defined by the API packages to run on new implementations.***

Disagree. Google's proposal, as written, is circular: "packages . . . are required for

compatibility between implementations of the API packages." To achieve compatibility, all Java

SE packages, classes, and constituent elements would need to be present in Android. But

Android is not compatible with Java. Instead Google just took the parts of Java it wanted.

Mr. Bornstein testified that it was not even a goal of Android to implement all of the API

packages in a particular Java platform.

1

*See* Response to FOF Nos. 33, 54-56
TX 610.1

2

**35.     If a Java programmer does not use the exact name that reflects the SSO of an**

3

**API package, the programmer's code will not be able to access the prewritten implementing**
**code associated with the relevant method or other element defined in the API package.**

4

Agree that a programmer must use the names of methods to access prewritten

5

implementing code associated with those names.  Disagree that the method name reflects the SSO

6

of an API package.  All the declarations collectively reflect that structure.

7

*See* response to FOF 5

8

**36.     Java and Android are compatible as to the 37 API packages in this case.**

9

Disagree.  Not only does Android implement only an incompatible subset of the Java API

10

packages, it also implements only a subset of the classes in two of the 37 packages, java.beans

11

and java.awt.font, and has minor differences among others, so Android and Java are not

12

compatible even as to the 37 packages.  This breaks compatibility and violates the express terms

13

of the Java API specification license.  (*See* TX 610.1 at 1.)  Additionally, the citation to Professor

14

Mitchell's testimony is specific only "as to those four method signatures that Professor Astrachan

15

used in his program," not all 37 packages in suit.  (Mitchell at RT 2293:9-14; s*ee* response to FOF

16

34 and testimony cited therein.)

17

18

Mitchell at RT 1245:23-1246:3 (differences among 37 packages)
Compare TX 610.2 at /docs/api/java/awt/font/package-summary.html with
TX 767 at /java/awt/font/package-summary.html (Android implements

19

only 2 of 16 java.awt.font classes)
Compare TX 610.2 at /docs/api/java/beans/package-summary.html with

20

TX 767 at /java/beans/package-summary.html (Android implements only 4
of 26 java.beans classes)

21

*See* Response to FOF Nos. 33, 54-56

22

**B.     Equitable Defenses**

23

**1.     Sun knew about and approved unlicensed, open source**
**implementations of the Java API packages as long as the**

24

**implementation did not use the Java brand.**

25

Disagree.  *See* Responses to Google's Proposed Findings of Fact (FOF) Nos. 37-52.

26

27

28

**37.     Before Google began developing Android, the GNU project publicly distributed an independent implementation of Sun's Java platform known as "Classpath."**

Agree that the GNU Classpath project was an effort to create a version of the Java class libraries that are part of J2SE.  The cited evidence does not establish that GNU Classpath was an independent implementation.  Edward Screven testified that Classpath was "always incomplete" and was never used for any commercial implementations.  Classpath was licensed under the GPL, a license that was considered by Google and others to be less suitable for commercial uses.

> Screven at RT 530:25-531:18
> Kurian at RT 387:15-388:3
> TX 154 (Google e-mail:  "GPL license (sun's license) doesn't work for us")
> *See also* Schwartz at 1975:7-10 ("You know, you should abide by a common set of restrictions that forces everybody to deliver their code, and that was the GNU approach.  And the Apache approach was a little bit more business friendly. . . .")

**38.     GNU Classpath used the Java programming language and implemented the specifications of the Java API packages at issue in this case, but GNU did not call its implementation Java.**

Agree that GNU Classpath used the Java programming language and used certain Java APIs, but the evidence cited by Google does not establish either that GNU Classpath used all of the 37 Java API packages at issue in this lawsuit or that GNU Classpath "did not call its implementation Java."  While Jonathan Schwartz agreed when asked if GNU Classpath "used the Java APIs we are talking about," he was not asked if Classpath specifically used the 37 API packages at issue.  Mr. Screven testified with respect to GNU Classpath:  "It was always incomplete.  They never implemented the full J2SE API."  Similarly, while Jonathan Schwartz testified that "to the best of my knowledge" GNU did not try to call Classpath Java, no evidence in the record establishes this as a fact.  Much as Mr. Schwartz testified that prior to the release of Android (which he also testified was not called Java) "everyone in the industry knew" that Android would use the Java programming language and a bunch of the Java APIs, whether an implementation is literally "called" Java is of little or no relevance.

> Schwartz at RT 1973:2-3, 9-10; 1989:2-7
> Screven at 531:3-13.

**39.     *Sun was aware of GNU Classpath.***

Agree.

**40.     *GNU never took a license from Sun for Classpath.***

Agree.  Like everyone else who used Sun's copyrighted API specifications, GNU's use of the specifications was subject to the terms and conditions of the Specification License that Sun published in its books and on the internet.  To the extent GNU may not have complied with the terms and conditions of the license, it did not have a license to Sun's copyrights.  However, the record does not contain evidence establishing whether this was the case.

**41.     *Sun never publicly suggested that GNU had done anything wrong by developing and publicly distributing GNU Classpath, much less pursued legal action against GNU.***

Agree that Sun never publicly pursued legal action against GNU Classpath, but disagree that the cited evidence establishes that Sun never publicly suggested that GNU had done something wrong.  Mr. Schwartz testified that Sun was unhappy with GNU Classpath.  The evidence regarding GNU Classpath is also irrelevant because there is no evidence that Classpath was ever used in any commercial products, and Google does not claim that it used Classpath in Android.

Schwartz at 1973:24-1974:6

**42.     *Beginning in 2005, the Apache Software Foundation ("Apache") publicly distributed an independent implementation of Sun's Java SE platform known as "Harmony."***

Agree that Apache made available on its website an implementation of Sun's Java SE platform named Harmony beginning in approximately 2005.  The cited evidence does not establish that Apache Harmony was an independent implementation.

**43.     *Apache Harmony included an independent implementation of the specifications of the Java API packages at issue in this case, including their SSO.***

Agree that Apache Harmony included an implementation of the 37 Java API packages at issue in this case.  The cited evidence does not establish that Apache Harmony was an independent implementation.

1       **44.    *Apache never took a license from Sun for Harmony.***

2       Agree, and therefore Apache never had a license from Sun for Harmony.  Like everyone

3   else who used Sun's copyrighted API specifications, Apache's use of the specifications was

4   subject to the terms and conditions of the Specification License that Sun published in its books

5   and on the internet.  To the extent Apache did not comply with the terms and conditions of the

6   license, it did not have a license to Sun's copyrights.

7       **45.    *Sun was aware of Apache Harmony but never publicly suggested that Apache**
    *had done anything wrong by developing and publicly distributing Harmony, much less*
8       *pursued legal action against Apache for Harmony.***

9       Agree that Sun was aware of Apache Harmony and that Sun did not file a lawsuit against

10  Apache for Harmony, but otherwise disagree.  The evidence establishes that there was a very

11  public ongoing dispute between Sun and Apache concerning Harmony, and that Apache publicly

12  recognized its need for a license from Sun.  In an April 10, 2007 letter, which was posted on

13  Apache's website, Apache stated that it needed a TCK from Sun "to demonstrate compatibility

14  with the Java SE 5 specification, as required by the Sun specification license for Java SE 5,"

15  before it publicly distributed Harmony.  Apache made Harmony code available but warned on its

16  website that "users wouldn't be assured that they had all necessary IP rights from the spec's

17  contributors."  In December 2010, Apache resigned from the JCP in protest based on its inability

18  to obtain that license (then from Oracle), and stated in its resignation that the "Java specifications

19  are proprietary technology that must be licensed directly from the spec lead under whatever terms

20  the spec lead chooses."  Google was aware of the Apache dispute with Sun.  In June 2007,

21  Google signed a letter to Sun asking it to grant Apache an unencumbered TCK license for

22  Harmony.  Internal communications at Google reveal that Google knew Sun had imposed

23  restrictions on Java TCK licenses such that Apache could not independently implement Java SE

24  for mobile devices.  In November 2007, Sun Executive Vice President Rich Green publicly

25  expressed concern about the potential for Google's Android (which incorporated Apache

26  Harmony code) to fragment Java into incompatible versions.

27          TX 405 (5/30/08 e-mail from Lee to Schmidt)
        TX 917 (Apache's 4/10/07 Open Letter to Sun)
28          TX 1045 (Apache's 12/9/10 resignation blog post)

1

TX 1047 (Apache FAQ)
TX 1048 (Article re Rich Green statements)

2

TX 2347 (6/22/07 Letter to Sun from Oracle, Google, et al. re Apache Harmony)

3

Screven at RT 523:25-524:25, 527:18-20, 528:20-530:5
Kurian at RT 397:19-398:4

4

Lee at RT 985:23-987:15

5       **46.     Sun's public position about Apache Harmony was that as long as Apache did**

6   **not call its product Java, it could ship Harmony for any purpose, including for use in mobile devices.**

7          Disagree.  The evidence cited does not support a finding that Sun's public position on

8   Apache Harmony was that it could be shipped for any purpose so long as it was not called Java.

9   The quotation from Mr. Schwartz in TX 2341 makes no reference to using the Java brand.  Mr.

10  Schwartz actually misread the document while he was on the stand, inserting a sentence about the

11  Java brand that the document does not contain.  Mr. Schwartz's testimony is not credible because

12  there are no public statements in the record  in which Sun states that Apache could use the Java

13  API specifications as long as Apache did not call its Harmony implementation "Java."  Sun's

14  publicly-available specification license (TX 610.1) has no exception for unbranded

15  implementations.  Mr. Schwartz's testimony is also inconsistent with Apache's own

16  acknowledgement that it needed a license from Sun for the necessary IP rights, without any

17  mention of the Java brand.  It is also contradicted by testimony from Sun's founder and Board

18  Chairman during the relevant time period, Scott McNealy, who testified that Sun did not permit

19  incompatible implementations of Java, even if they were not called "Java."  Mr. Schwartz's

20  testimony is also contradicted by Vineet Gupta, who was in charge of Java licensing, and who

21  testified in deposition (read into the record):

22          Q:  A licensee was required to pass the TCK even if they didn't want to use the Java brand; is that right?

23          A:  Yes.

24  Mr. Schwartz's testimony is also inconsistent with public statements by Sun's Executive Vice

25  President, Mr. Green, that Sun was concerned about Android fragmenting Java.

26

TX 610.1
TX 1047

27

TX 1045
TX 1048 (Article re Rich Green statements)

28

Schwartz at RT 2034:25-2036:15

1

> McNealy at RT 2055:22-2056:4
> Gupta at RT 2306:9-2307:14

2

**47.    The Google executives and engineers responsible for Android were aware of the GNU Classpath and Apache Harmony projects at the time they were developing Android.**

3

4

Agree that the cited testimony indicates that Mr. Rubin and Mr. Swetland each had some

5

awareness of GNU Classpath and/or Apache Harmony, but the testimony does not establish

6

exactly when they learned of GNU Classpath and/or Apache Harmony.  The transcript citation for

7

Mr. Bornstein actually refers to testimony by Mr. Schwartz.

8

**48.    IBM incorporated Apache Harmony code—including implementations of the API packages at issue in this case—into its commercial products.**

9

10

Disagree, as the proffered evidence does not support the proposed finding.  Google did not

11

call any witness from IBM, or any witness who would have first-hand knowledge of whether

12

IBM used Harmony code in any of its products.  Google cites testimony by Mr. Schwartz and

13

Mr. Rubin as establishing this fact, but Mr. Schwartz did not actually testify that IBM was using

14

Harmony code, and Google failed to establish a foundation that Mr. Rubin knew whether IBM

15

was in fact using Harmony code as opposed to other Apache software.  Regardless, IBM had a

16

Java license from Sun and, thus was not depending on obtaining any necessary IP rights for Java

17

from Apache (which publicly acknowledged it did not have the ability to give its users the

18

necessary IP rights).

19

> Schwartz at RT 1977:23-1978:1 ("IBM, who was among our largest
> customer in paying Sun for rights to use the brand Java").

20

> TX 389 (Rubin: "IBM is a Java licensee, so they can't open source their
> implementation")

21

> Catz at RT 2038:18-24

22

**49.    Sun never publicly suggested that IBM had done anything wrong by incorporating Harmony code into its commercial products, much less pursued any legal action against IBM.**

23

24

*See* Response to Google's FOF No. 48.

25

26

27

28

**50.     At the time Google was developing Android, Google was aware that IBM was using Apache Harmony code in its commercial products.**

*See* Response to Google's FOF No. 48.  Further, the cited testimony does not establish when Mr. Rubin formed his opinion that IBM was using Harmony.  Mr. Rubin was also aware that IBM was a Java licensee.

TX 389

**51.     During the discussions in the Java Community Process concerning whether Sun should grant Apache a license so that Apache could use the Java trademark, no one from Sun or Oracle ever said that Apache Harmony was infringing copyrights of Sun or Oracle.**

Disagree.  Google seeks a finding framed in the negative ("no one from Sun or Oracle ever said") and the cited testimony from Mr. Lee and Mr. Bloch does not prove that negative.  Further, the record evidence establishes that the ongoing and very public dispute between Sun and Apache concerned IP rights other than the Java trademark.  Apache publicly recognized that it needed a license to run the TCK to demonstrate compatibility and obtain a grant from Sun of necessary IP rights.  When Apache did not get a license from Sun, it shut down the Harmony project and resigned from the JCP, publicly stating that "Java specifications are proprietary technology that must be licensed directly from the spec lead under whatever terms the spec lead chooses."  Thus, Apache publicly acknowledged that it would infringe the IP rights of Sun or Oracle if it distributed Harmony without a license.

TX 1045
TX 1047

**52.     Google obtained Harmony code implementing the API packages at issue from Apache, subject to the Apache license, for use in the Android core libraries.**

Agree that Google used Apache Harmony code to implement some part of the 37 Java API packages at issue, and that Google took the Harmony code under an Apache license from Apache.  However, as confirmed by Eric Schmidt, the Apache license used by Google in distributing Android did not grant Google any rights from Sun or Oracle.  Mr. Schmidt acknowledged that Google does not assert it obtained any rights to Sun's IP through the Apache license from Apache.  Jury Instruction No. 30 provides that "if Google claims a license from a third party, Google has the burden to prove that the third party itself had the proper right and

authority from Sun or Oracle as to any of the copyrights owned by Sun or Oracle and used by Google, for Google could acquire from the third party no greater right than the third party itself had in the first place." Apache publicly disclaimed that it was able to pass any necessary IP rights to users of Harmony and it shut down the project. Google's citation to Mr. Bornstein is actually the testimony of Mr. Schwartz and does not support the proposed finding of fact.

> TX 1045
> TX 1047
> Schmidt at RT 1541:3-7
> Final Charge to Jury Phase I [Dkt. No. 1018]

**2.     As early as 2005, Sun knew Google intended to implement Java API packages in Android, and Sun never told Google it needed a license to do so.**

Disagree. *See* Responses to Google's FOFs 53-61.

*53.     As early as September 19, 2005, Sun knew that Google intended to build a Java-based smartphone, regardless of whether Sun and Google worked together on the project.*

Disagree. The evidence cited shows that as of September 19, 2005, Sun and Google discussed Google building a Java-based smartphone with a license from Sun. Sun could not know at that time that Google would use the 37 Java API packages at issue even *without* a license from Sun. Google did not decide to include those 37 Java API packages in Android until mid-2006 or early 2007. The earliest that Sun could have known that Google was using any of the Java APIs was on November 12, 2007, when Google released the Android Software Development Kit ("SDK"). Sun did not know what APIs or libraries Android contained until the SDK was released.

> Bornstein at RT 1850:8-21
> TX 30
> Schmidt at RT 1546:5-16
> Rubin at RT 1718:1-24
> TX 1053
> TX 2354
> TX 578

1

2

3

**54.     The top management of both Google (Eric Schmidt and Andy Rubin) and Sun (Scott McNealy and Jonathan Schwartz) participated in discussions about a potential partnership between Sun and Google to develop an open-sourced Java-based platform (Android).**

Agree that Google and Sun had discussions about the development of an open-sourced

Java-based platform, but those discussions always included the understanding that Google would

take a license from Sun.

> TX 1 (7/26/2005: "Must take license from Sun – Cost isn't the issue, open source JVM is the issue – Proposal: - Google/Android, with support from Tim Lindholm, negotiates the first OSS [Open Source Software] J2ME JVM license with Sun.")
> TX 12 (12/20/05, Rubin: "either (a) we'll partner with Sun as contemplated in our recent discussions or (b) we'll take a license")
> TX 14 (1/13/2006, Rubin: "When Android first arrived I did a GPS that explained the importance of Java in our solution.  Since then I've been working with Sun and pushing them to open source Java.")
> TX 213 (4/4/06, Lindholm: "It's sort of to whom it may concern responses to Sun collab agreement and license")
> Cizek at RT 1067:12-1070:16
> TX 2001 (8/3/05, Cizek to Rubin: "how to proceed with licensing JTWI from Sun")
> TX 7 at page 1 (10/11/05, Rubin: "Pay Sun for the license take the TCK")
> McNealy at RT 2065:14-2066:14
> TX 1029 (4/29/09, Buchholz (Google) reporting conversation with Lindholm about Sun's licensing model)
> TX 1074 (6/28/10, Alan Eustace (Google) responding to Sun about licensing from Sun)

**55.     At no point during the 2005-06 partnership negotiations between Sun and Google did Sun ever assert to Google that Google needed a license to implement the Java API packages.**

Disagree.  The discussions between Sun and Google in 2005 and 2006 included

discussions that Google would take a license from Sun for Google's use of Sun's intellectual

property.  Indeed, Google acknowledges in its own Proposed Finding of Fact No. 59 that there

were, at a minimum, licensing negotiations between Sun and Google before 2007.  Those

discussions continued beyond 2006 all the way into 2010.  Additionally, key Android team

members, including Andy Rubin, knew that Google needed a license to implement the Java API

packages because of their prior experience doing exactly that at Danger.

> *See* Response to Google's FOF No. 54
> TX 1026
> TX 18
> *See also* Oracle's FOF Nos. 62-66 (ECF 1049 at 12)
> Page at 492:18-22

**56.     As a result of the discussions between Sun and Google, Sun knew that Google intended to implement the Java API packages in Android.**

Disagree that Sun knew Google intended to implement the Java API packages in Android regardless of whether Google had a license from Sun.

*See* Response to Google's FOF No. 53

**57.     The partnership negotiations between Sun and Google about the Android platform broke down in mid- to late-2006.**

Agree that discussions between Sun and Google about Android broke down in mid- to late-2006.  However, discussions resumed in 2007 before Google announced Android and continue to the present.  Among other things, the parties discussed Google taking a license for Android's use of the Java technology.

> TX 538
> TX 565 at page 3
> TX 1002
> TX 1029
> TX 1074
> Rizvi at RT 1941:20-1943:1
> Page at RT 492:18-22 (continue to have discussions to this day)

**58.     After the negotiations between Google and Sun for an Android partnership broke down, Sun still was aware that Google intended to implement the Java APIs in Android.**

Disagree as to the negotiations between Sun and Google in 2005-2006.

*See* Response to Google's FOF No. 53

**59.     In 2007, Sun intentionally elected not to pursue further licensing discussions with Google concerning Android.**

Disagree.  Sun continued to have discussions with Google concerning Android, including discussions about licensing, in 2005, 2006, 2007, 2008, 2009, and 2010.  After the SDK was released, Google tried to conceal from Sun its use of Java in Android and intentionally avoided discussions with Sun.

> *See* Response to Google's FOF No. 54
> TX 34
> TX 43.1
> TX 538
> TX 565 at page 3
> TX 29 (3/4/08: "don't demonstrate to any sun employees or lawyers")
> TX 26 (11/17/07: "Scrub out a few more j's)
> TX 104 (5/12/08: "Remove j from everywhere)

TX 233 (8/5/09: "How aggressive do we scrub the j word?")
TX 382
TX 165
TX 217
TX 1029 (4/29/09: "we really don't want to inadvertently stir anything up for Android" ... "we should step away, and only respond further if Sun chases after us")
*See also* Oracle's FOF No. 124 (ECF 1049)

**60.** ***Sun never told Google it could not release Android without a license to the Java API packages, much less threatened Google with legal action.***

Disagree. Sun had continuing discussions with Google from 2005 to the present regarding Java licensing for Android. Sun told Google that Google needed a license for Android. Leo Cizek at Sun had several conversations with Mr. Rubin and other members of the Android team about licensing for Android, first in 2005 and again in 2009. Internally, Google was concerned about possible legal action by Sun against Google related to Android.

See Response to Google's FOF No. 59
Cizek at RT 1064:15-1073:18
TX 7 at 2
TX 125
TX 12
TX 22
TX 326 (2/19/09 Google idea to buy Java; "Our Java lawsuits go away")
TX 207
TX 565

**61.** ***Based on Sun's actions and inactions, Google reasonably believed that it did not need a license from Sun to implement the Java API packages (or their SSO) in Android.***

Disagree. The evidence shows the opposite. In addition to the Google documents recognizing that Google needed and still needs a Java license for Android, the evidence demonstrates that Google knew Sun had concerns regarding Android and that Google sought to conceal its conduct from Sun and avoid discussions. That evidence shows Google's consciousness of guilt and Google's awareness that it needed a license.

*See* Responses to Google's FOF Nos. 45, 54-55, 59-60

**3.** **After Google publicly announced Android, Sun congratulated Google and welcomed Google to the Java community.**

Disagree with the characterization. *See* Responses to Google's FOFs 62-72.

**62.** ***Google announced the Android platform to the public on November 5, 2007.***

Agree, but Oracle notes that Google did not at that time release the SDK or any code.

Rubin at RT 1702:22-1704:9 (eight days after Android announced, SDK released; APIs were in the SDK)
*See also* Oracle's FOFs 92-93 (Dkt. No. 1049 at 18)

**63.     Jonathan Schwartz, Sun's CEO from 2006-2010, maintained a blog on the Sun web site that contained official statements of Sun itself.**

Agree that Jonathan Schwartz maintained a blog on the Sun website, but disagree that the blog contained official Sun statements.  Sun's policy was that statements made in blogs represented the personal views of the author and not the official position of the company.

McNealy at RT 2056:24-2057:4

**64.     On November 5, 2007, the day Google announced Android, Mr. Schwartz published a post on his official Sun blog congratulating Google on the release of Android and praising Android for "strapp[ing] another set of rockets" onto the Java community's momentum.**

Agree that Mr. Schwartz published a post on his blog regarding Google's announcement of Android.  Mr. Schwartz testified that Android was a "competitive product" that would bypass Sun's "licensing restrictions."  At the time of his blog, Mr. Schwartz believed that Android would be subject to the GPL.

Schmidt at RT 1546:5-16
Rubin at RT 1702:22-1704:9
Bornstein at RT 1850:8-21
Morrill at RT 1041:14-16
Schwartz at RT 2023:2-9 ("Prior to the release of Android, we were presuming they were going to be using GPL code")
Schwartz at RT 1991:6-14

**65.     As Sun's CEO, Jonathan Schwartz was responsible for all decision-making at Sun during this time, including Sun's licensing and use of its intellectual property.**

Agree that Mr. Schwartz, subject to restrictions imposed by the Sun Board of Directors, had decision-making responsibilities at Sun, but disagree that Mr. Schwartz was in charge of licensing.  Mr. Schwartz disclaimed detailed knowledge of Sun's licenses.

Schwartz at RT 2013:23-2015:7  ("And you were familiar with Sun's specification license? A. Somewhat, yes.  Q. Just somewhat, sir? A. Just somewhat.  Q. But your testimony about what Sun required for an independent implementation of the specifications is based on a somewhat understanding of the license? A. It's based on a understanding of open source realities and  trying to find ways for our products to be successful in the marketplace, and not for our legal contracts. . . .I'm there to define our business strategy.  I'm not there to write our contracts.")

McNealy at RT 2076:6-9 ("Q. And he had authority to enter into licenses or not to do so as he chose, right?  A. He had certain signature authority policies and restrictions that the Board of Directors had.")

**66.     *Google's top management (CEO Eric Schmidt and Android project head Andy Rubin) read Mr. Schwartz's blog post at the time it was published, and understood it to mean that Sun approved of Android and would support the platform.***

Disagree.  The evidence cited does not establish that Mr. Schmidt understood the blog post to mean that Sun approved of Android and would support the platform.  Both Mr. Schmidt and Mr. Rubin acknowledge that at the time of Mr. Schwartz's blog post, the SDK had not been released.  There is no evidence that Mr. Schwartz or anyone else at Sun knew at that time exactly what was in Android, or whether Android would be abiding by the open-source license of Sun's choice, the GPL.  After the Android SDK release, Sun continued to attempt to engage Google in discussions about taking a Java license for Android.  Mr. Rubin also knew of Rich Green's press conference at the JavaOne Developers Conference announcing Sun's concern over Android and the fragmentation of the Java community immediately after the SDK was released.  Mr. Rubin told others at Google that Mr. Green's comments were a "touchy" subject.  Google also tried to conceal from Sun the usage of Java in Android.

Schmidt at RT 1546:5-16
Rubin at RT 1722:23-1723:6
TX 538 (Gupta emails to Rubin re: Java in Android)
TX 565 at page 3
TX 1048 (Green Article)
TX 29 (3/4/08: "don't demonstrate to any sun employees or lawyers")
Rubin at RT 1725:23-1726:10
TX 180
See also Response to Google's FOF 59

**67.     *Members of Google's Android engineering staff read Mr. Schwartz's blog post at the time it was published and understood it to mean that Sun approved of Android and would commit its engineering resources to support the platform.***

Disagree.  There is no credible evidence in the record to show that Google relied on Jonathan Schwartz's blog post.  Moreover, Google employees were also aware of Sun's continuing concern over Android and the fragmentation of the Java community after Mr. Schwartz's post.  In addition, many of them were aware of Sun's licensing policies because of their prior work at Danger or their involvement with the Java Community Process.

TX 245

Swetland at RT 948:24-950:15 (Danger took a license for independent implementation of Java)
Swetland at RT 352:22-953:9 ("Knew at one time [Sun claimed that the method signatures were copyrighted] while I was at Danger")
Swetland at RT 953:19-954:7 (identifying Danger employees at Android)
TX 405 at 1 (Lee to Schmidt: "Harmony "water under the bridge for" Android)

**68.    On November 9, 2007, Sun CEO Jonathan Schwartz sent an email message to Google CEO Eric Schmidt congratulating Google on the release of Android and offering Sun's support for the upcoming announcement of the Android Software Development Kit ("SDK").**

Agree that Mr. Schwartz sent Mr. Schmidt an email about Google's announcement of Android.  At that time, Google had not released the Android SDK, which Mr. Schmidt acknowledged in his reply to Mr. Schwartz's email.  As of November 9, 2007, there is no evidence that anyone at Sun, including Mr. Schwartz, knew what that Android used the 37 Java APIs.  Mr. Schwartz believed at that time that Google would take a GPL from Sun for the use of Java in Android.

*See supra* cites in Response to Google's Proposed FOF No. 6

**69.    Before the time he wrote the November 9, 2007 email [TX 3441], Mr. Schwartz knew that Google would use in Android the Java language and the Java API packages.**

Disagree.  Google did not release the Android SDK until November 12, 2007, and other Android source code approximately a year later.  Even in the days leading up to and after the announcement of Android, executives at Sun continued to speculate internally as to what Android would contain.

TX 916
TX 1053
TX 2354
TX 578
TX 1054

**70.    After Google's announcement of Android and Sun CEO Jonathan Schwartz's blog post, Mr. Schwartz continued to make supportive comments in the market about Android.**

Agree that Mr. Schwartz made supportive comments in the market about Android, but also note that Sun and Google continued to have discussions about licensing for Google's use of Java, and Sun made public statements that it was concerned about Android fragmenting Java.

*See supra* cites in Responses to Google's Proposed FOF Nos. 54, 57, 59-60

**71.     On November 12, 2007, one week after the initial announcement of Android, Google released the Android SDK, which included the Java API packages at issue, and their SSO.**

Agree that Google released the Android SDK for the first time on November 12, 2007, which included at least some of the 37 Java API packages at issue.

**72.     As Sun's CEO, Mr. Schwartz made an affirmative decision not to pursue litigation against Google over Android.**

Disagree.  This statement is the subject of a pending motion *in limine*.  (*See* Dkt. No. 1061.)  Mr. Schwartz's statement at trial revealed privileged information.  It is also discredited by evidence (1) that Sun and Google continued to negotiate for a Java license for Android from 2006 to the present; and (2) Google was sufficiently concerned about litigation that it considered, in 2009, buying Java in order to make its "Java lawsuits go away."

There is no evidence in the record that Sun ever informed Google that it would not sue Google for infringing Sun's IP.  Mr. Schwartz's decision is not binding on Sun's Board of Directors or Oracle.

> TX 2371
> TX 1056
> TX 2362
> TX 326
> TX 406
> TX 1029
> Page at RT 492:18-22 (negotiations never broke off)
> Schmidt at RT 1516:13-1517:11 (Schmidt concerned that Sun would sue)

**4.     After Google's announcement of Android and release of the SDK, Sun continued to talk with Google and publicly support Android.**

Disagree.  *See* Responses to Google's Proposed FOF Nos. 73-81.

**73.     In the spring of 2008, Sun CEO Jonathan Schwartz met personally with Google CEO Eric Schmidt at Sun's headquarters to discuss opportunities for Sun to get involved with Android.**

Agree that Mr. Schmidt testified that he met with Mr. Schwartz on March 31, 2008.  However, Mr. Schmidt had no memory of this conversation in his deposition and described no particular meeting, only characterizing his "impression" of Sun's views.  Mr. Schwartz testified that the conversation was "after the release of Android" but could not say when.  In contrast to his

1  trial testimony that Mr. Schwartz said he was comfortable with what Google was doing during a

2  meeting in the cafeteria at Sun in May 2008, at deposition Mr. Schmidt had stated that "I don't

3  remember the specifics, I don't remember his exact phrase nor the exact timing," that "I met with

4  him at least once in his office at Sun, and we spoke on the phone a couple of times in the

5  intervening few years," and that "I'm describing my impression of the Sun view of what we had

6  done, but I can't recall whether it was the one I his office."

7      Disagree that the topic was limited to "opportunities for Sun to get involved with

8  Android."  Schmidt testified that they discussed "the details of their licensing approach and our

9  licensing approach."  Schwartz testified that the topics of discussion included Sun's licensing

10  approach, and that Schwartz was attempting to make sure that Sun was able to "influence the

11  choices they made further downstream" and Sun was "continuing to try to motivate Google to be

12  a Java licensee."

13      Schmidt at RT 1521:3-18
        Schmidt at RT 1537:23:1541:2.
14      Schwartz at RT 1993:25-1994:20; 1995:11-1996:1

15      **74.    Mr. Schwartz did not suggest to Mr. Schmidt at the spring 2008 meeting, or
   at any other time, that Google had done anything wrong through its implementation of the
16  37 Java API packages in Android (including its use of the SSO of those Java API packages).**

17      Disagree.  The evidence does not support a finding that Mr. Schwartz never suggested to

18  Google that it was wrong for Google to use the 37 Java API packages without taking a license.

19  Moreover, nothing in the record suggests that Mr. Schwartz told Mr. Schmidt in any conversation

20  or meeting that Sun would not sue; Mr. Schwartz testified that Sun was "continuing to try to

21  motivate Google to be a Java licensee."

22      Schwartz at RT 1995:11-1996:1

23      **75.    Based on Sun's public reaction to the Android announcements, and
   Mr. Schmidt's meetings with Mr. Schwartz, Google reasonably believed that Sun approved
24  of Android.**

25      Disagree.  It was not reasonable for Google, a large corporation with a sophisticated legal

26  team, to believe that Sun formally approved of Android based on Mr. Schwartz's blog post and

27  his subsequent meeting with Mr. Schmidt.  There is no evidence in the record of any unequivocal

28  statement by any Sun representative to any Google representative disclaiming the right to sue

1    over copyright violations.  Moreover, during this same period of time, Google internally

2    acknowledged its potential liability to Sun, tried to conceal from Sun its use of Java in Android,

3    and intentionally avoided discussions with Sun.

> *See supra*, cites in Response to Google's FOFs 45, 54-55, 59-60.
> TX 203
> TX 183
> TX 1002
> Schmidt at RT 1559:20-23; 1560:10-12
> TX 406
> TX 326

**76.     A few months after Google announced Android, Sun (Vineet Gupta) met with Google (Andy Rubin) to offer Sun's congratulations on and support for Android.**

Agree that the cited testimony is that Mr. Rubin met with Mr. Gupta sometime after

Google announced Android, but Mr. Rubin's testimony regarding the substance of his

conversation with Mr. Gupta is not credible.  Prior to giving this testimony on direct examination,

Mr. Rubin had testified the day before that he only "vaguely" remembered any comments made

by Sun after the announcement of Android and he made no reference to his meeting with Mr.

Gupta or the comments made by Mr. Gupta.  This testimony is also not credible given Mr.

Gupta's email to Mr. Schwartz reporting that he had told Mr. Rubin, prior to the announcement of

Android, that if Google did not get a license, then Sun "will need to go deal with them or their

handset vendor for IP issues" or Google will need to follow the GPL rules.

> Rubin at RT 1446:23-1447:8
> TX 565 at page 2-3

**77.     While congratulating Google on Android Mr. Gupta also told Mr. Rubin that Sun had designed a product (named "Flex" or "FX") to run on top of the Android platform.**

Agree that Mr. Gupta discussed Sun's Java FX Mobile with Mr. Rubin.

> TX 565

**78.     In May 2008, at Sun's annual Java One conference for Java developers and partners, Sun publicly demonstrated its JavaFX product running on Android.**

Agree that Sun demonstrated its Java FX product running on an Android emulator at the

2008 annual Java One conference, but the demonstration was created by a member of the Java

community and not by Sun, according to the announcement in the video itself.  At that time,

Google had still not released the Android platform.

**79.   Mr. Rubin was aware that Sun demonstrated a Java FX application running on top of Android at the 2008 JavaOne developer conference.**

Agree.

**80.   Sun's public position at the time of the May 2008 JavaOne developer conference was to praise Android for its positive effect on the Java community.**

Disagree.  Sun had publicly expressed concern about Android in November 2007, and there is nothing in the record establishing that Sun had any less concern as of May 2008.  Indeed, the record shows that, in May 2008, Sun publicly "expressed concern that Google's development of Dalvik could fragment the Java world so that Java software for running Android applications wouldn't work on other Java phones and vice versa."  Google employees received emails containing those public statements in May 2008.

> TX 1048 (Green Article)
> TX 245
> Morrill at RT 1036:19-1043:10

**81.   Sun and Google were business partners before Google announced Android, and continued to work together after Google announced Android.**

Agree that, before 2008, Google and Sun were partners on technology deals unrelated to Android, such as the "toolbar" deal in which links to Google services were distributed with Sun's Java SE implementation.  However, in 2008, Sun withdrew the toolbar deal after Google refused to take a license for Android.

> TX 1002 (11/24/2008: Rubin: "Sun recently came to us to renew the toolbar deal and requested two things: double the guaranty (from $50M to $100M) and for us to certify Android through the Java process and become licensees of Java.  We made the decision to say no, greatly affecting our search business, and Sun gave the distribution deal to MSFT.")

**5.   Google was aware of and relied on Sun's public statements of approval and acts of support for the Android platform.**

Disagree.  See Responses to Google's Proposed FOF Nos. 82-87.

**82.   Andy Rubin, the Google executive in charge of Android, relied on Sun's inaction and affirmative statements of approval by hiring engineers, creating Google applications for Android, and investing time and money to help Google and its partners bring phones to market.**

Disagree.  The evidence does not support that Google's decisions regarding Android were in any way made in reliance on Mr. Schwartz's blog posting of November 5, 2010, or any other

1   subsequent action or inaction by Sun.  Google decided to include the SSO of the 37 Java API

2   packages in Android *long before* any Sun public statement about Android.  There is no evidence

3   that Google would have removed the 37 Java API packages from Android or otherwise changed

4   Android in any way if not for Mr. Schwartz's statements.  Nor is there evidence that Google

5   would have pursued a different course with the Android business had it not been for

6   Mr. Schwartz's statements.  Google internally acknowledged that its alternatives to using Java

7   were suboptimal.  From 2005 up to the present, Sun engaged in licensing discussions with Google

8   about Android.  Google knew about Sun's licensing policies and knew that it would be adverse to

9   Sun if Google continued with Android without obtaining a Java license.  Additionally, Rubin

10  testified that he only "vaguely" remembered any comments made by Sun after the announcement

11  of Android, and thus there is no credible testimony that he relied on any Sun statement.

12          Bornstein at RT 1850:4-1851:2.
            Rubin at RT 1446:23-1447:8
13          TX 10
            *See supra,* Responses to Proposed FOF Nos. 45, 54, 59-60, 75
14

15      **83.    Google further relied on Sun's inaction and affirmative statements of
        approval for Android by "doubl[ing] down" on Java and declining to investigate any
        alternatives to the Java programming language.**
16

17          Disagree.  There is no evidence that Google "doubled down" or took any actions in

18  reasonable reliance of any alleged statements, actions, or inactions by Sun.

19          *See* Response to Google's FOF No. 82.

20      **84.    In October 2008, during the time period of Sun's inaction and affirmative
        statements of approval for Android, Google publicly released the full source code for the
        Android platform, including the implementation of the Java API packages at issue and their
21      SSO.**

22          Agree that the cited evidence indicates that Google publicly released the full source code

23  for the Android platform in October 2008.  However, there is no evidence that Google's actions

24  were in reliance, reasonable or otherwise, on any alleged actions, inaction, or statements by Sun..

25          *See* Response to Google's FOF No. 82

26

27

28

1

2

**85.     During the time period of Sun's inaction and affirmative statements of approval for Android, Google increased the number of engineers on the Android team from 5 to 90.**

3

4

5

6

Agree that the cited testimony states that from 2005 to 2008, Google increased the number of engineers from approximately 4 or 5 to 85 or 90.  However, there is no evidence that Google's actions were in reliance, reasonable or otherwise, on any alleged actions, inaction, or statements by Sun.

7

*See* Response to Google's FOF No. 82

8

9

**86.     During the time period of Sun's inaction and affirmative statements of approval for Android, Google and its partners brought several smartphones to market, and continue to do so today.**

10

11

12

Agree that the cited testimony indicates that Google brought several smartphones to market.  However, there is no evidence that Google's actions were in reliance, reasonable or otherwise, on any alleged actions, inaction, or statements by Sun.

13

*See* Response to Google's FOF No. 82

14

15

16

**87.     Even after the public release of the Android source code in October 2008 and launch of several Android-based phones, Sun never suggested to Google or in any public forum that Google did not have the right to use in Android the Java API packages at issue in this case.**

17

18

19

20

21

22

23

Disagree.  Sun publicly stated that it was concerned that Android's use of Java would fragment the Java community and that Android needed to be compatible.  Sun also had a public dispute with Apache over a TCK license for Apache's use of Java in Harmony.  As Android incorporates some code from Harmony, the dispute between Apache and Sun put Google on notice that use of the unlicensed Harmony implementation in Android was problematic.  Also, Sun continued to negotiate with Google, from 2006 to the present, for Google to take a Java license for Android.

24

TX 1048
TX 245
*See* Response to Google's FOF No. 72

25

26

**6.     Oracle initially encouraged Android and tried to partner with Google.**

Disagree.  *See* Responses to Google's Proposed FOF Nos. 88-92.

27

28

**88.     In June 2009, after Oracle Corporation announced it was acquiring Sun, Oracle CEO Larry Ellison appeared onstage at the 2009 Java One conference with Sun's**

1   ***Chairman Scott McNealy, and announced that Oracle planned to keep the Java ecosystem
    open, was "flattered" by Google's use of Java in Android, and expected to see many more
2   Android products in the future from "our friends at Google."***

3       Agree that the cited evidence indicates that Mr. Ellison made those statements at the 2009

4   JavaOne conference, but Mr. Ellison made those statements under the assumption that Google

5   would make Android Java-compatible.

6           Ellison at RT 346:23-347:4

7       **89.     In early and mid-2010, Mr. Ellison met with Eric Schmidt and Larry Page
    *about potential partnerships between Google and Oracle related to Android, and he tried to*
8   *sell Oracle's Java virtual machine to Google for use in Android in place of Google's Dalvik*
    *virtual machine.*

9       Agree that Mr. Ellison met with Mr. Schmidt and Mr. Page, but disagree with the

10  characterization that "he tried to sell Oracle's Java virtual machine to Google."  Among the topics

11  of discussion between Mr. Ellison and Messrs. Schmidt and Page was "[Google] taking [Sun's]

12  Java and putting it in Android rather than their version of Java."

13          Ellison at RT 340:18-22

14      ***90.     In his meetings with Mr. Schmidt and Mr. Page, Mr. Ellison never suggested
15  that Google needed a license to use the Java API packages or their SSO.***

16      Disagree, as the evidence does not support this proposed finding.  Mr. Ellison did not

17  testify as to whether or not he talked to Google about a license.

18      ***91.     In June 2010, Oracle President Safra Catz met with Google to discuss
    Google's allegedly improper use of Java in Android, but Ms. Catz did not suggest to Google
19  that Google needed a license to implement the Java API packages or their SSO.***

20      Disagree.  Ms. Catz testified that she told Mr. Eustace "that Android needed to be licensed

21  because of our intellectual property, and that they needed to become compatible."  She went on to

22  say that Oracle's attorneys would contact Google's attorneys to discuss the specific intellectual

23  property issues.

24          Catz at RT 2313:23-2314:12

25

26

27

28

1    ***92. Prior to filing this lawsuit, neither Sun nor Oracle ever suggested to Google that Google had violated any Sun or Oracle copyrights by implementing the API packages or using the SSO of the Java API packages in Android, or that the SSO of the Java API packages was either protectable or protected under copyright law.***

Disagree.  Sun and Oracle had numerous discussions with Google, from 2005 through 2010, in which they discussed Google's need for a Java license for Android.  Those licensing negotiations included discussions specifically about APIs.

> TX 2
> Page at RT 492:18-22, 500:23-501:2
> *See supra,* Responses to Google's FOF 72

## II. CONCLUSIONS OF LAW

### A. Copyrightability

#### 1. Section 102(b) of the Copyright Act

* 1. Oracle bears the burden of proving infringement, and proving its assertion that the structure, sequence and organization of the 37 API packages ("API SSO") is copyrightable (and thus protectable) is part of that burden of proof.*

Agree only that "a plaintiff bringing a claim for copyright infringement must demonstrate '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'"  *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006).

Disagree that Oracle has the burden of proving copyrightability.  Oracle's copyright registration entitles it to a presumption of validity, shifting the burden to Google to demonstrate that the works are not copyrightable.  The presumption is rebuttable.  Courts in the Ninth Circuit have expressed the effect of this presumption differently as a burden of proof or burden of production, but at a minimum require the defendant to "demonstrate why the item in question is not copyrightable."  The Court should follow *Lanard Toys* and hold that Google has the burden of proving that the elements it copied are not copyrightable.

> "Accordingly, the district court did not err by instructing the jury that appellants bore the burden of proving that any functional elements of Lanard's toys were not subject to copyright protection, and that any similarity between their products and Lanard's works were limited to such functional elements."  *Lanard Toys Ltd. v. Novelty, Inc.*, 375 Fed. Appx. 705, 711 (9th Cir. 2010) (emphasis added)
>
> *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1019 (9th Cir. 1985) *overruled on other grounds in Bellevue Manor Assoc. v. U.S.*,

165 F.3d 1259, 1256 (9th Cir. 1999) ("This *presumption shifts the burden of proof to the challenging party to demonstrate why the item in question is not copyrightable*.") (emphasis added)

*Maljack Prods., Inc. v. UAV Corp.*, 964 F. Supp. 1416, 1426 (C.D. Cal. 1997) ("The burden of proving invalidity lies with the party making the invalidity claim")

17 U.S.C. §410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certificate.")

A "certificate of copyright registration constitutes prima facie evidence of copyrightability and *shifts the burden to the defendant* to demonstrate why the copyright is not valid." *Bibbero Sys., Inc. v. Colwell Sys., Inc.,* 893 F.2d 1104, 1106 (9th Cir. 1990) (emphasis added);

"'To rebut the presumption, an infringement defendant must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement.'" *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1076 (9th Cir. 2000) (citation omitted). *See id.* ("In short, to overcome the presumption of validity, defendants must demonstrate why the photographs are not copyrightable.")

**2.      The copyright registrations in evidence do not raise a presumption regarding the copyrightability of any elements of the works that are not identified on the face of the registrations.  Because the API SSO is not identified on the face of the registrations at issue, Oracle is not entitled to a presumption of copyrightability of the API SSO.**

Disagree.  The presumption that a work is entitled to copyright protection also extends to constituent elements of the work.  Google has not cited a single case to support its proposition, and the weight of authority is to the contrary.  Google is required to overcome the presumption of copyrightability as to each element it is challenging.  In *Swirsky v. Carey,* for example, the Ninth Circuit held the defendant bore the burden of overcoming the presumption of originality as to the first measure of the chorus of a copyrighted song.  376 F.3d 841, 851 (9th Cir. 2004).  Similarly, In *Lanard Toys*, the Ninth Circuit approved use of a jury instruction that placed the burden on the defendant of proving the functional elements were not subject to copyright protection.

*Swirsky*, 376 F.3d at 851 ("Carey can overcome this presumption only by demonstrating that Swirsky's chorus is not original.")

*Lanard Toys*, 375 Fed. Appx. at 711 ("Accordingly, the district court did not err by instructing the jury that appellants bore the burden of proving that any functional elements of Lanard's toys were not subject to copyright protection, and that any similarity between their products and Lanard's works were limited to such functional elements.")

*Straughter v. Raymond*, 2011 U.S. Dist. LEXIS 93068, at *22-24 (C.D. Cal. Aug. 19, 2011) (applying *Swirsky* to find defendants failed to carry burden)*:*

As an initial matter, defendants misapprehend the burden of proof based on their faulty argument that plaintiff is not entitled to a presumption of copyright validity. *See, e.g.*, Songwriters' Supp. Mem. at 6 ("Plaintiff does not enjoy a presumption of copyright validity or originality, and therefore, must demonstrate that the 18 elements at issue are original to him."). As discussed above, it is defendants' burden to rebut the statutory presumption of validity.

*Merchant Transaction Systems v. Nelcela*, 2009 U.S. Dist. LEXIS 25663, at *26-27 (citing *Bibbero*, 893 F.2d at 1106) (emphasis added):

Th[e] presumption extends to the Court's use of analytic dissection under the extrinsic test to determine whether any of the allegedly similar features are protected by copyright. *See Apple Computer*, 35 F.3d at 1443. **Because Lexcel satisfied its prima facie burden and was determined to possess a valid copyright, Lexcel is entitled to a presumption that the common features and elements in the Lexcel and Nelcela software are copyrightable**. *See Swirsky,* 376 F.3d at 851. As such, contrary to Nelcela's assertion that "it is Lexcel's burden to prove the significance of the elements copied" (Dkt. # 603, p.4), the burden in fact shifts to Nelcela to demonstrate why those common features and elements are not protected by copyright.

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2011 U.S. Dist. LEXIS 91384, at *7 (N.D. Cal. Aug. 16, 2011) ("[I]t is also true that if Brocade registered its software within 5 years of publication, this entitles Brocade to a presumption of validity, and *shifts the burden to A10 to rebut that the allegedly copied elements are not protectable expression.*") (citing *Merch. Transaction*) (emphasis added).

> ***3.    Even if Oracle were entitled to a presumption of copyrightability, which it is not, the copyright registrations in evidence do not shift the burden of persuasion to Google, and Google has come forward with evidence sufficient to satisfy any burden of production.***

Disagree.  Google has not come forward with sufficient evidence under the standard of any of the decisions in the Ninth Circuit.  Even cases that have held that the burden is only one of production have required the defendant to demonstrate why the works in question are not copyrightable.  *See Ets-Hokin.*, 225 F.3d at 1076 ("In short, to overcome the presumption of validity, defendants must demonstrate why the photographs are not copyrightable.")

> *See* Response to Findings of Fact 1-35
> Response to Conclusions of Law ("COLs") 1-2

> ***4.    Section 102(b) of the Copyright Act provides that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." Thus, ideas,***

1    *systems and methods of operation are unprotected, even if they are part of "an original*
     *work of authorship."  This means, for example, that even if a larger work is copyrightable*
2    *(e.g., a book about the Java programming language or methods of operating prewritten*
     *code libraries described in the book), the copyright for that book does not extend to the*
3    *ideas, systems or methods of operation that are part of that book (e.g., the Java*
     *programming language).  Plaintiff must prove that each element it claims was infringed is,*
4    *by itself, copyrightable.*

5          Oracle of course does not disagree with the text of section 102(b), but as noted above,

6    does disagree with Google's assertion that plaintiff must prove that each element it claims was

7    infringed is, by iteself, copyrightable (COL No.3).  Further, Oracle disagrees with Google's

8    argument that the SSO of the API packages is unprotectable under section 102(b).  The structure,

9    sequence and organization of the 37 API packages is expression and not a system or method of

10   operation.  Google's argument that the API packages are unprotectable "methods of operation"

11   again relies on the First Circuit's decision in *Lotus v. Borland*.  But *Lotus* is not the law in the

12   Ninth Circuit: "Whether the non-literal components of a program, including the structure,

13   sequence and organization and user interface, are protected depends on whether, on the particular

14   facts of each case, the component in question qualifies as the expression of an idea, or an idea

15   itself."  *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1175 (9th Cir.

16   1989); *Merch. Transaction Sys., Inc. v. Nelcela, Inc.*, 2009 U.S. Dist. LEXIS 25663, at *38 (D.

17   Ariz. Mar. 17, 2009) (following *Johnson Controls* and finding that "the selection, coordination,

18   and arrangement of the information contained in the Lexcel software's database schema"

19   constituted copyrightable subject matter).  The SSO of the API specifications are part of the

20   documentation of a computer program, which is expressly subject to protection under the

21   Copyright Act.  17 U.S.C. § 101.  They describe the structure of that computer program in great

22   detail, and the Ninth Circuit has held that the structure of a computer program is copyrightable.

23   *Johnson Controls, Inc. v. Phoenix Control Sys., Inc.*, 886 F.2d 1173, 1175 (9th Cir. 1989)

24         The SSO of the APIs is not a "system," as Google argues.  In *Am. Dental Ass'n v. Delta*

25   *Dental Plans Ass'n*, Judge Easterbrook rejected the notion that a code for dental procedures was a

26   system: "A dictionary cannot be called a 'system' just because new novels are written using

27   words, all of which appear in the dictionary.  Nor is word-processing software a 'system' just

28   because it has a command structure for producing paragraphs."  126 F.3d 977, 980 (7th Cir.

1   1997).  The court found the dental code copyrightable, after discussing *Baker v. Selden*.  *See id.* at

2   981.  But regardless of how Google labels it, the SSO of the APIs is copyrightable because of its

3   expressive content.

4          Many cases have found that interface or structural aspects of computer programs much

5   simpler than the Java APIs warrant copyright protection:

6          *Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1492, 1495
       n.23 (10th Cir. 1993) ("organization, structure and sequence" and "keying
7       procedure" of computer program to teach reading skills)

8          *Consul Tec, Inc. v. Interface Sys., Inc.*, 1991 U.S. Dist. LEXIS 20528, at *2
       (E.D. Mich. Oct. 23, 1991) ("commands, command phrases, and other
9       aspects" of user interface)

10         *Control Data Sys., Inc. v. Infoware, Inc.*, 903 F. Supp. 1316, 1321-24 (D.
       Minn. 1995) (input/output formats, file layouts, commands)
11

12         *CMAX/Cleveland, Inc. v. UCR, Inc.*, 804 F. Supp. 337, 355 (M.D. Ga.
       1992) (file structures).

13         Further, *Lotus* is inapposite.  The consumer menu command hierarchy at issue in *Lotus*

14   was far simpler than that of the Java API packages, which are comprised of thousands of

15   elements, layers of complex interdepencies, and data structures.  Google's expert and employees

16   concede the creativity and skill required to design them.  In the 17 years since *Lotus* was decided,

17   no other circuit court has adopted its reasoning, and several have rejected it.  The Tenth Circuit,

18   for example, has expressly disagreed with *Lotus*:

19         We conclude that although an element of a work may be characterized as a method
       of operation, that element may nevertheless contain expression that is eligible for
20       copyright protection.  Section 102(b) does not extinguish the protection accorded a
       particular expression of an idea merely because that expression is embodied in a
21       method of operation at a higher level of abstraction.

22   *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1372 (10th Cir. 1997).  (*See also* ECF No. 339 at 9-11.)

23         Lastly, the copyrightability of works that embody systems depends on the facts.  Some

24   works do not pass muster, but not necessarily because they are "systems."  In *Toro Co. v. R&R*

25   *Prods. Co.*, for example, the court found the plaintiff's parts numbering system was unprotectible

26   because it was unoriginal, not because it was a system under § 102(b).  787 F.2d 1208, 1212 (8th

27

28

1    Cir. 1986) ("the district court's literal application of the section's language – that appellant's parts

2    numbering system is not copyrightable because it is a 'system' – cannot stand.")

3        **5.    The API SSO is part of the medium through which Java language developers**
     **express themselves, and is therefore part of an uncopyrightable system or method of**
4    **operation.**

5        Disagree.  The SSO is not simply a "medium" through which language developers express

6    themselves, and even if it were, that would not affect its copyrightability.  The detailed, highly

7    creative expression in the SSO is entitled to copyright protection.

8            *See* Response to COL No. 4 above
            *See* Oracle FOF Nos. 29-40, 42-44, 46-48
9

10       **6.    "Computer programs are, in essence, utilitarian articles—articles that**
     **accomplish tasks.  As such, they contain many logical, structural, and visual display**
11   **elements that are dictated by the function to be performed, by considerations of efficiency,**
     **or by external factors such as compatibility requirements and industry demands."**

12       Agree that this quotation comes from *Sega*, but Google has misleadingly included only the

13   negative half of the debate.  The sentences immediately preceding Google's quote states:

14   "Computer programs pose unique problems for the application of the 'idea/expression distinction'

15   that determines the extent of copyright protection.  To the extent that there are many possible

16   ways of accomplishing a given task or fulfilling a particular market demand, the programmer's

17   choice of program structure and design may be highly creative."  *Sega*, 977 F.2d at 1524.  The

18   evidence at trial proved that the structure and design of the APIs for the 37 packages was highly

19   creative and therefore worthy of strong copyright protection.

20           *See* Oracle FOF Nos. 29-40, 42-44, 46-48

21       **7.    Copyright does not protect functional requirements for compatibility.**

22       Disagree.  Except for *Sega*, none of Google's citations support Google's proposal, and the

23   rationale of *Sega* does not apply here.  *Computer Associates* and *Engineering Dynamics* indicate

24   that courts should determine whether functional requirements constrain available expression in

25   the *plaintiff's* work, not the defendant's.  Google's claim that it was trying to achieve

26   compatibility is baseless since Android is *not* compatible with Java.  (*See* response to FOF

27   No. 33.)  Further, Google cites no evidence that functional requirements for compatibility

28   constrained *Sun's* expression in the API design.  Additionally, Google omits part of a sentence

1    from *Engineering Dynamics* that limits the scope of its compatibility language to hardware.

2    *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 46 F.3d 408, 410 (5th Cir. 1995).

3         Two of Google's other citations do not even discuss compatibility requirements.  *CMM*

4    *Cable Rep, Inc. v. Ocean Coast Props.*, 97 F.3d 1504 (1st Cir. 1996) covers materials for a radio

5    contest, not a complex software product like the Java API packages.  Computer programs are

6    expressly subject to copyright protection. 17 U.S.C. § 101.  The "functional feature" under

7    consideration on the page Google cites from *Incredible Techs* is a trackball, not software: "the

8    elements of our two games, which are most significant and most clearly similar, are not before us.

9    The trackball system of operating the game is not subject to copyright protection." *Incredible*

10   *Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1012 (7th Cir. 2005).

11        *SAS Inst., Inc. v. World Programming Ltd.*, Case C-406/10 (E.U. Ct. Justice May 2, 2012)

12   is, of course, not decided under U.S. law.  But the case supports Oracle's position, not Google's.

13   Oracle will discuss this decision in response to the Court's requested briefing on Thursday, May

14   10.  For now, Oracle notes simply that the case holds that copying expression from a user manual

15   into a computer program—much as Google has done with Oracle's  API specifications—may

16   constitute copyright infringement.  *See id.* at ¶ 70.

17        Finally, the parties have briefed *Sega* many times.  *Sega* is a reverse engineering case that

18   has nothing to do with the facts here.  In *Sega,* the only way the defendant could determine the

19   functional requirements of the plaintiff's program was to reverse engineer it.  *Sega Enters. Ltd. v.*

20   *Accolade, Inc.*, 977 F.2d 1510, 1524-28 (9th Cir. 1992).  Here, the Java APIs were available on

21   Sun and Oracle's websites, subject to copyright notices.  The *Sega* case also did not address a

22   situation like this one, where the final product is accused of infringement.  *See id.*at 1528 ("Our

23   conclusion does not, of course, insulate Accolade from a claim of infringement with respect to

24   finished products.")

25        Moreover, unlike *Sega*, where defendants' program would not function on plaintiff's

26   system without copying a 4 letter code (*id.* at 1515), in this case, Google's own expert has

27   testified that Google could have used the Java language without copying Oracle's extensively

28   detailed APIs.  With the exception of a very few classes, the Java APIs are not required to use

1    Java at all.  Google could have written its own APIs that provided similar functionality, and often

2    did.  Google derived its libraries from Oracle's API specifications by choice, not to achieve

3    compatibility as in *Sega*.

4            *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 710 (2d Cir. 1992)
             ("Building upon this existing case law, we conclude that a court must also
5            examine the structural content *of an allegedly infringed program* for
             elements that might have been dictated by external factors.") (emphasis
6            added).

7            *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 46 F.3d 408, 410
             (5th Cir. 1995) ("Consequently, as our opinion explains, the district court
8            will inquire on remand whether *EDI* exercised any judgment in formulating
             the input cards or merely reflected the industry standards and laws of
9            engineering.") (emphasis added)

10           *Id.* ("This opinion cannot properly be read to extend *to the manufacturing
             of computer hardware so as to deter achieving compatibility* with other
11           models or to the practice employed by users of programs of analyzing
             application programs to "read" the file formats of other programs.")
12           (emphasis added)

13           *SAS Inst., Inc. v. World Programming Ltd.*, Case C-406/10 (E.U. Ct.
             Justice May 2, 2012) ("[T]he reproduction, in a computer program or a
14           user manual for that program, of certain elements described in the user
             manual for another computer program protected by copyright is capable of
15           constituting an infringement of the copyright in the latter manual if – this
             being a matter for the national court to ascertain – that reproduction
16           constitutes the expression of the intellectual creation of the author.")

17           Astrachan at RT at 2212:19-2213:19
             Reinhold at RT at 684:16-685:24
18

19      **8.    The API SSO is functionally required for compatibility with the 37 API
     packages, and copyright protection therefore does not extend to the structure, sequence and
20   organization of the 37 API packages.**

21           Disagree.  Google cites no additional legal or factual authority linking SSO to functional

22   requirements for compatibility, and so its proposal fails.  Oracle renews its disagreement with

23   Google's proposed FOF Nos. 1-9, 16-22, and 33-36 and COL No. 7.  Compatibility is a red

24   herring.  This is not an instance where Google needed to copy these APIs in order to be

25   compatible with the Java language.  Every witness who addressed this issue for both parties

26   agreed that Google could have designed its own APIs to serve these same purposes.  Moreover,

27   Android is not compatible with Java, so the factual predicate for Google's conclusion fails.

28   Google took only the parts it wanted.  Mr. Bornstein testified that it was not even a goal of

1   Android to implement all of the API packages in a particular Java platform.  Led by Sun, and now

2   Oracle, there is a community of companies who have worked for years to maintain Java's

3   compatibility and write once run anywhere promise.  Deeming the API SSO uncopyrightable

4   would undermine compatibility, not further it.

> *See* Response to FOF Nos. 1-9, 16-22, 33-36
> *See* Response to COL No. 7
> TX 610.1 (Specification License prohibits subsetting and supersetting and
> requires passing TCK)
> Kurian at RT 381:15-389:17 (importance of compatibility)
> Ellison at RT 293:11-296:4, 298:4-299:10 (write once run anywhere)
> Ellison at RT 302:8-303:6 (Java Community Process)
> Ellison at RT 301:2-6 (only company using Java APIs without license is
> Google)

**9.    *Functional requirements for compatibility are unprotected whether the defendant's work is fully compatible or only partially compatible.***

Disagree.  The cases Google cites for this proposition are inapposite.  In *Lotus*, the First

Circuit did not decide whether partial or full compatibility made a difference to copyrightability;

it found that the consumer menu hierarchy at issue was an uncopyrightable method of operation.

*Lotus Development Corp. v. Borland Int'l., Inc.*, 49 F.3d 807, 815 (1st Cir. 1995).  No other

circuit has adopted *Lotus*' approach.  The *Lotus* court's definition of an unprotectable "method of

operation" is perilously close to the definition of a computer program under the Copyright Act,

which "is a set of statements or instructions to be used directly or indirectly in a computer in

order to bring about a certain result." 17 U.S.C. § 101. The exception *Lotus* proposes threatens to

swallow the rule whole that computer programs are copyrightable.

The detailed, creative expression of the API packages is not a method of operation or

system or otherwise barred by section 102(b).  *Johnson Controls*, 886 F.2d at 1175.  *See also*

*Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1370 ("We conclude that although an element of a work

may be characterized as a method of operation, that element may nevertheless contain expression

that is eligible for copyright protection."); *Toro Co. v. R&R Prods. Co.*, 787 F.2d 1208, 1211-12

(8th Cir. 1986) (section 102(b) did not bar copyright protection for parts number system: question

is whether particular expression is copyrightable); 1-2 *Nimmer on Copyright* § 2.03[D]  ("It

would, then, be a misreading of Section 102(b) to interpret it to deny copyright protection to 'the

expression' of a work, even if that work happens to consist of an 'idea, procedure, process, etc.' Thus, if a given 'procedure' is reduced to written form, this will constitute a protectible work of authorship, so as to preclude the unlicensed copying of 'the expression' of the procedure, even if the procedure per se constitutes an unprotectible 'idea.'")

*Feist*, the only other case Google cites, concerned the telephone white pages.  The word "compatible" does not appear in any form within the opinion, and the word "functions" appears only within a discussion of how a statute functions  499 U.S. at 352 ("Indeed, it expressly disclaimed any such function, pointing out that 'the subject-matter of copyright [i]s defined in section four.'").

Google cites no facts in support of its conclusion.  However, the facts show that Google's selective copying is destroying the efforts of an entire community at preserving compatibility and Java's write once, run anywhere compatibility.  (*See* Response to COL No. 8.)

**10.    *Regardless of whether the process of designing the API packages required "creativity," the API SSO is not creative expression—it is a system for expression, and the form of expression that can be used to express the design ideas is limited and dictated by the Java programming language.***

Disagree.  Google's FOF Nos. 6, 7, and 10 do not address systems of expression at all; they deal with the alleged constraints of expressing an idea in the Java language and whether Oracle's blueprint analogy is appropriate.  As Oracle explained in response to those FOFs, the language does not dictate the API designers' choice of the structure, any more than principles of grammar can be considered to dictate an author's choices in writing a novel.  Oracle renews its disagreement with Google's COL Nos. 5 and 8.  Google's citation to *ATC Distribution Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700 (6th Cir. 2005) is inapposite. That case concerned part numbers in a transmission parts catalog, a subject in which the court found there was a limited range of expression: "For almost all of the types of creativity claimed by ATC, there is only one reasonable way to express the underlying idea."  402 F.3d at 707. Google has not proved that here.  To the contrary, every witness from both sides who testified on this issue acknowledged that designing APIs requires creativity and skill, and the uncontraverted evidence is that the API designer has multiple choices in determining how to structure the API.

1    Courts in this Circuit have repeatedly extended copyright protection to structure expressed

2    in written documentation, even when far less creative than the structure expressed here. *See*, e.g.,

3    *CDN Inc. v. Kapes*, 197 F.3d 1256, 1262 (9th Cir. 1999) (prices in guide for collectible coins);

4    *Practice Mmgt. Info. Corp. v. Am. Med. Ass'n*, 877 F. Supp. 1386, 1390-92 (C.D. Cal. 1994),

5    aff'd in relevant part, 121 F.3d 516 (9th Cir. 1997) (numerical codes for medical procedures);

6    Jacobsen v. Katzer, 2009 U.S. Dist. LEXIS 115204, at *9-10 (N.D. Cal. Dec. 10, 2009) (text files

7    reflecting decoder information from model railroad manufacturers).

8    Google did not adopt only the ideas underlying the 37 Java API packages, it painstakingly

9    copied element by element, relationship by relationship, until it had replicated several thousand

10   expressive elements.

11           *See* Response to FOF Nos. 6, 7, 10
             *See* Response to COL Nos. 5, 8
12           *See* Oracle FOF Nos. 29-43, 46-48

13   **11.    The API SSO is thus on the unprotectable "idea" side of the idea/expression**
     **dichotomy.  Section 102(b) of the Copyright Act therefore precludes copyright protection**
14   **for the API SSO, without regard for its alleged originality, creativity, elegance, "life-**
     **changing" nature, or the amount effort it took to develop.**
15
     The structure, sequence, and organization of the 37 API packages in suit is the detailed
16
     expression of an idea, not an idea itself.  (Oracle FOFs 29-40, 42-44, 46-48.)  The idea for an API
17
     package may be to have a library of pre-written computer code relevant to the area of
18
     programming to which the package relates.  For example, the idea for java.net.ssl is to have a
19
     library of pre-written code relating to secure network transactions.  (FOF 13.)  The selection,
20
     structure, sequence and organization of the methods, fields, classes and other elements in the
21
     java.net.ssl package, and the relationships among those elements is the expression of that idea.
22
             *See* Oracle FOF Nos. 29-40, 42-44, 46-48
23           *See* Response to COL Nos. 4-10

24   **12.    The number of elements in the API SSO and their interrelationships, no**
     **matter how complex or how long it took to combine those elements, do not render them**
25   **copyrightable, because section 102(b) provides that "[i]n no case" can ideas, systems or**
     **methods of operation be protected by copyright.  Sweat of the brow, effort in creating or**
26   **compiling elements, cannot form the basis for copyright protection.**

27   Agree that sweat of the brow cannot form the basis for copyright protection but disagree

28   that the doctrine applies to this case.  The Supreme Court in *Feist* held that "originality requires

1  only that the author make the selection or arrangement independently (i.e., without copying that

2  selection or arrangement from another work), and that it display some minimal level of

3  creativity." *Feist Pubs., Inc. v. Rural Telephone Service Co.*, Inc.,  499 U.S. at 340, 358 (1991).

4  Here, the facts overwhelmingly established the originality of the SSO of the Java API packages

5  and Google did not mount a challenge to originality at trial.  In fact, Google specifically admits

6  that the works as a whole meet the low threshold for originality required by the Constitution.

7  (*See* ECF No. 938 at 1.)

8       Moreover, the API elements in question and their interrelationships do not constitute

9  ideas, systems, or methods of operation.  Google cannot decide whether the APIs are ideas,

10  systems, or methods of operation, so it argues all three.  Yet it still never offers the Court a

11  definition of "system" or says that it wants the Court to adopt the *Lotus* definition of "method of

12  operation."  Further, as discussed in Oracle's Response to COL No. 9, even if an element can be

13  categorized as a system, idea or method of operation, the expression of that element may still be

14  copyrightable.  And finally, even if these individual elements or relationships are not protectable

15  by copyright, their combination still would be: "a combination of unprotectable elements is

16  eligible for copyright protection only if those elements are numerous enough and their selection

17  and arrangement original enough that their combination constitutes an original work of

18  authorship."  *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003).  In this case, the highly original

19  combination of the thousands of elements in the 37 Java API packages in suit is copyrightable.

20  Google has cited no factual findings in support of its contrary position.

21       TX 980 & 981 (listing only four of the asserted classes: Java.lang,
            Java.util, Java.io, Java.net)
22       *See* Oracle Response to COL No. 9
         *See* Oracle FOF Nos. 29-40, 42-44, 46-48
23

24       **2.       Merger and *scenes a faire***

       **13.       While Google bears the burden of raising the issues of merger and scenes a
25  faire, Oracle bears the burden of proof, because the material in question is not protected if
    these doctrines apply, and Oracle bears the burden of proving protectability as part of its
26  burden to prove infringement.**

27       Disagree that Oracle bears the burden of proof on merger and *scenes a faire*.  In the Ninth

28  Circuit, merger and *scenes a faire* are treated as defenses to infringement, and Google has the

1    burden of proof. *See Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000)

2    ("[merger and *scenes a faire*] are defenses to infringement"); *Satava v. Lowry*, 323 F.3d 805, 810

3    (9th Cir. 2003) ("The Ninth Circuit treats scenes a faire as a defense to infringement rather than as

4    a barrier to copyrightability"); *Merch. Transaction Sys., Inc. v. Nelcela, Inc.*, 2009 U.S. Dist.

5    LEXIS 25663 at *27-28 (D. Ariz. Mar. 17, 2009) (defendant has burden of proof on merger and

6    *scenes a faire*).

7        The authorities cited by Google do not support its argument. *Jada Toys v. Mattel* and

8    *Sega Enterprises v. Accolade* do not specifically mention merger and *scenes a faire* at all and say

9    nothing about the burden of proof on those defenses. The language Google quotes from *Jada*

10   *Toys* merely recites the general standard for proving copyright infringement – plaintiff must show

11   ownership and copying of protected (i.e., original) elements. Google asks the Court to infer that

12   the Ninth Circuit placed the burden on the plaintiff in *Sega*, supposedly because "there was no

13   evidence that *defendant* had alternatives to using plaintiff's 'unlock' code." (Google COL No. 14

14   at 28). This is not true. *Sega* was not decided on an absence of evidence. The court discusses the

15   evidence in detail and concludes, "In summary, the record clearly establishes that disassembly of

16   the object code in Sega's video game cartridges was necessary in order to understand the

17   functional requirements for Genesis compatibility." *Sega*, 977 F.2d at 1525-26. This case is

18   nothing like *Allen v. Academic Games*, where the court found the rules of a game were not

19   copyrightable because, "[t]o hold otherwise would give Allen a monopoly on such commonplace

20   ideas as a simple rule on how youngsters should play their games." 89 F.3d 614, 618 (9th Cir.

21   1996). The case does refer to plaintiff's failure to make a showing regarding merger, but does not

22   specifically address whether it was plaintiff's burden in the first place. *Allen* does not address

23   *scenes a faire*.

24       **14.    Applicability of the merger and scenes a faire doctrines should be assessed
         based on the constraints on Google at the time of the alleged unauthorized use.**

25       Disagree. The proper test under the merger and *scenes a faire* doctrines is whether *Sun's*

26   choices were constrained when it designed the 37 Java API packages, not whether Google's

27   choices were constrained after it chose to base Android on Java. *See Mitel, Inc. v. Iqtel, Inc.*, 124

28

F.3d 1366, 1375 (10th Cir. 1997) ("analytical focus should have remained upon the external

factors that dictated *Mitel's selection* of registers, descriptions, and values," as opposed to

"whether external factors such as market forces and efficiency considerations justified *Iqtel's*

*copying*") (emphasis in original); *Control Data Sys., Inc. v. Infoware, Inc.*, 903 F. Supp 1316,

1323 (D. Minn. 1995) ("question to be examined is whether external factors limited the choices

available to [plaintiff's] programmers, not whether external factors may somehow limit the

choices of [defendant's] programmers").  The merger doctrine provides that when there are so

few ways of expressing an idea that the "idea and its expression are indistinguishable, or

'merged,' the expression will only be protected against nearly identical copying." *Apple*

*Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994).  The "closely related"

*scenes a faire* doctrine provides that when certain expressions are "as a practical matter

indispensable, or at least standard, in the treatment of a given [idea], they are treated like ideas

and are therefore not protected by copyright." *Id.*  Both doctrines are aimed at preventing

copyrights from effectively conferring "a monopoly on the underlying idea" where the idea can

only be expressed in one way.  *See Satava*, 323 F.3d at 812 n.5.  The evidence at trial

conclusively demonstrated that the APIs for these 37 packages could have been designed in many

different ways and that they did not simply adopt commonplace, stock concepts.

Google again cites *Sega*, but *Sega* is not a merger case.  It is a reverse engineering case

and the holding was that it was permissible for the defendant to copy in order to determine

functional requirements for compatibility when there was no infringement in the final product.

*Sega*, 977 F.2d at 1525-26 ("disassembly of the object code in Sega's video game cartridges was

necessary in order to understand the functional requirements for Genesis compatibility.")  There

were no comparable considerations here, when Sun and Oracle's specifications were available on

their websites, subject to copyright notice, and Google could have created its own APIs if it

wished, and did in other areas.  Oracle has addressed *Lotus* and *Baystate*, a district court case

from the First Circuit, many times in other briefing.  *See, e.g.,* ECF Nos. 339 at 9-10, 16-17; 853

at 11, 14, 15.

*See* Oracle FOF Nos. 29-40, 42-44, 46-48

**15.     *The merger doctrine is not limited to high levels of abstraction, and indeed can apply even to the literal words of an author's expression for the specific ideas he or she has chosen to express.***

Agree that the merger doctrine is not limited to any particular level of abstraction.  In this case, Oracle does not claim protection for the idea of APIs generally, but for the specific structure, sequence, and organization of the 37 Java API packages that Google copied into Android.  That is the level of abstraction that should be evaluated for purposes of the merger doctrine.  The Ninth Circuit explained how the line between idea and expression should be drawn in protecting the collectable coin pricing guide in *CDN Inc. v. Kapes*:

> As Judge Hand noted, the difference between idea and expression is one of degree. This circuit has held that "*[t]he guiding consideration in drawing the line is the preservation of the balance between competition and protection reflected in the patent and copyright laws." Rosenthal*, 446 F.2d at 742.  In this case, the prices fall on the expression side of the line. *CDN does not, nor could it, claim protection for its idea of creating a wholesale price guide, but it can use the copyright laws to protect its idea of what those prices are*.  *See id.* at 742 (denying protection to the idea of creating a jeweled bee pin where there was no indication that the alleged infringer had copied the pin in question).  Drawing this line preserves the balance between competition and protection: it allows CDN's competitors to create their own price guides and thus furthers competition, but protects CDN's creation, thus giving it an incentive to create such a guide.

197 F.3d 1256, 1262 (9th Cir. 1999) (emphasis added).  The 37 API packages are far more expressive than *CDN*'s coin pricing guide, but the same principle applies.  While Oracle cannot claim protection for the idea of an API or a type of API package, it can for the detailed structure it created.  This preserves the incentive for companies to invest in developing APIs, but allows competitors to create their own.

**16.     *"In some circumstances, even the exact set of commands used by the programmer is deemed functional rather than creative for purposes of copyright.  '[W]hen specific instructions, even though previously copyrighted, are the only and essential means of accomplishing a given task, their later use by another will not amount to infringement.'"***

Agree that this is a quote from *Sega*, but disagree that it has any applicability to the present case.  The *Sega* court concluded that Sega's short unlocking code was not protectable, because "[t]here is no showing that there is a multitude of different ways to unlock the Genesis III console" and the "de minimis length" of the code meant "that it is probably unprotected under the words and short phrases doctrine."  *Sega*, 977 F.2d at 1524 n. 7.  *Sega* acknowledged that more

complicated unlocking codes, with multiple forms of expression, were protectable. *Id*. (citing *Atari v. Nintendo*, 975 F.2d 832, 839 (Fed. Cir. 1992)).  In the present case, the evidence shows that the 37 Java API packages could have been expressed in many different ways.  Other cases that Google cites are also factually distinguishable, as they dealt with simple forms of expression that could not be separated from the underlying ideas.  *See Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir. 1971) (jeweled bee pin); *Baker v. Selden*, 101 U.S. 99, 107 (blank account-books); *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 208 (9th Cir. 1988) (standard karate moves depicted in videogame); *Allen*, 89 F.3d at 618 (simple rules for playing student games); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 529, 537-541 (6th Cir. 2004) (small program to determine amount of toner left in a printer cartridge); *Matthew Bender & Co. v. West Pub. Co.*, 158 F.3d 674, 684-686 (arrangement of basic information in West's case reports, such as date, court, and attorney name).

**17.    At the time Google implemented the API packages at issue, its choices were constrained by the requirements of the Java language, requirements for compatibility with the 37 API packages as they existed in J2SE, the expectations and demands of the Java language development community, and widely accepted programming practices within the computer industry generally and specifically among industry users of the Java language. Once these constraints are taken into account, Google was left with no room for creativity, and thus any arguable expression merged with the underlying ideas—which means that copyright cannot protect any arguable expression in the SSO of the API packages.**

Disagree.  As previously discussed, the proper test in evaluating merger is whether *Sun's* design choices were constrained, not Google's.  *See Mitel*, 124 F.3d at 1375; *Control Data*, 903 F. Supp at 1323.  The evidence demonstrates that there were countless ways to design and express the 37 Java API packages.  Numerous witnesses on both sides acknowledged that designing APIs requires significant creativity and skill.  ECF 1049, Oracle's FOFs 29-34.  The 37 API packages at issue are highly complex and took years to develop.  *Id*. at FOFs 15-22, 36-37.  Sun had many choices for what elements to include in the 37 Java API packages and how to structure them.  *Id*. at FOF Nos. 39, 40, 46.  Because the 37 API packages resulted from creative design choices among numerous possibilities, the merger doctrine does not apply.  *See Atari*, 975 F.2d at 840 ("Nintendo's 10NES program contains more than an idea or expression necessarily incident to an idea.  Nintendo incorporated within the 10NES program creative organization and

1   sequencing unnecessary to the lock and key function. . . . Nintendo may protect this creative

2   element of the 10NES under copyright.").

3          Moreover, the Court previously rejected Google's broad merger and *scenes a faire*

4   argument and warned that Google would have to specify and provide evidentiary support for

5   whatever particular API elements it believed were subject to the doctrines.  (ECF No. 433 at 9).

6   At trial, Google submitted *no evidence* that any particular method declaration or other API

7   element had only one way it could be expressed.  As discussed in detail above, Google's copying

8   was not necessary to achieve compatibility with the Java language.  Except for about 60 classes,

9   none of the rest of the 37 API packages are required to support the Java language.  Oracle's FOF

10  No. 50.

11         Finally, and critically, even if the 37 Java API packages were indistiguishable from their

12  underlying idea (which they are not), the doctrines of merger and *scenes a faire* are not a free

13  pass: Google's *identical copying* of the API packages would still render it liable for copyright

14  infringement.  *Apple*, 35 F.3d at 1444 (if "[an] idea and its expression are indistinguishable, or

15  'merged,' the expression will only be protected against nearly identical copying"); Oracle's FOF

16  No. 57.  Google's expert conceded that the SSO of the 37 API packages in Android is "virtually

17  identical" to the SSO of the 37 API packages in Java.  Astrachan at RT 2214:6-9.  This renders

18  Google's merger and *scenes a faire* defenses moot.

19                          Oracle FOF Nos. 15-22, 29-34, 36-40, 46, 50
                            Astrachan at RT 2214:6-9
20

21         **18.    "Under the scenes a faire doctrine, when certain commonplace expressions
       are indispensable and naturally associated with the treatment of a given idea, those
22     expressions are treated like ideas and therefore not protected by copyright."**

23         Agree that this is a quote from *Swirsky*, but disagree that it has any applicability to the

24  present case.  The *Swirsky* court reversed a summary judgment ruling that two measures of a song

25  were *scenes a faire*, because the proferred evidence did not establish that the musical measures

26  were commonplace.  *Swirsky v. Carey*, 376 F.3d 841, 850 (9th Cir. 2004).  Google has not offered

27  any evidence to show that the SSO structure of the APIs for these 37 packages was commonplace

28  or stock.  All the evidence was to the contrary.

1    Google cites to the district court's decision in *Mitel* stating that certain command codes

2    were unprotectable because defendant Iqtel's technicians were accustomed to using plaintiff

3    Mitel's code.  ECF 1047, Google's COL 18.  But in upholding the lower's court decision for

4    other reasons, the Tenth Circuit chastised the court for incorrectly applying the law, stating that

5    the proper "analytical focus should have remained upon the external factors that dictated *Mitel's*

6    *selection* of registers, descriptions, and values," as opposed to "whether external factors such as

7    market forces and efficiency considerations justified *Iqtel's copying*").  *Mitel*, 124 F.3d at 1375.

8    The *Computer Associates* case similarly only stated that the court should consider external factors

9    constraining the copyright holder's design.  *Computer Associates v. Altai*, Inc., 982 F.2d 693, 710

10   (2nd Cir. 1992) ("Building upon this existing case law, we conclude that a court must also

11   examine the structural content *of an allegedly infringed program* for elements that might have

12   been dictated by external factors.") (emphasis added).  Finally, *Bateman* refused to find that

13   interface specifications are not copyrightable as a matter of law and stated that whether external

14   factors are found to dictate the expression of a copyrighted work "will depend on the particular

15   facts of a case."  *See Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1547 (11th Cir. 1996) ("It is an

16   incorrect statement of the law that interface specifications are not copyrightable as a matter of

17   law")

18       Other cases cited by Google are factually distinguishable from the present case, as they

19   involved simple forms of expression the creation of which was dictated by external factors.  *See*

20   *Baystate Techs. v. Bentley Sys.*, 946 F. Supp. 1079, 1088 (D. Mass. 1996) (simple data translator

21   between different file formats); *Lexmark*, 387 F.3d at 529, 537-541 (small program to determine

22   amount of toner left in a printer cartridge); *Matthew Bender*, 158 F.3d at 684-686 (arrangement of

23   basic information in West's case reports).

24       Oracle FOF Nos. 15-22, 29-34, 36-40, 46, 50

25       **19.    At the time Google implemented the APIs at issue, the package, class and**
     **method names defined in the 37 API packages had become commonplace expressions that**
26   **were indispensable and naturally associated with the functionality provided by those API**
     **packages in the Java language development community.  Google's freedom of choice was**
27   **constrained by the requirements of the Java language, requirements for compatibility with**
     **the 37 API packages as they existed in J2SE, the expectations and demands of the Java**
28   **language development community, and widely accepted programming practices within the**

*computer industry generally and specifically within the Java language industry.  For these reasons, the API SSO is unprotectable under the scenes a faire doctrine.*

Disagree.  Google is again arguing for the "sweeping ruling" on *scenes a faire* that the Court previously rejected.  ECF 433 at 9 (Order on Summary Judgment Motion) ("Google has not justified the sweeping ruling it requests.  Google has not even identified which categories of specification elements it deems unprotectable under these doctrines.").  Google submitted no evidence at trial that any particular package, class, or method name, or the design of the 37 API packages as a whole, were commonplace expressions at the time that Sun created them.  *See Mitel*, 124 F.3d at 1375.  The evidence established that Sun's design of the 37 API packages was not a commonplace expression, but a creative work designed from numerous possible alternatives.  The fact that the Java APIs became popular over time does not mean that the design was an unprotectable *scene a faire*, and does not justify Google's unlicensed copying.

Moreover, Google's copying of the 37 API packages was not required for compatibility with the language (only a small subset of the API packages are needed) and for compatibility with J2SE (Android is not Java-compatible).

> *See* Oracle FOF Nos. 15-22, 36-37, 39, 40-46
> *See* Oracle Response to COL Nos. 13-18
> *See* Oracle Response to FOF Nos. 1-9, 11-36

**20.     For these reasons, any arguable expression in the SSO of the API packages has merged into the underlying ideas, or in the alternative the expression API SSO is unprotectable under the scenes a faire doctrine.**

Disagree, for the reasons stated in the foregoing responses.

> *See* Responses to Google's COL Nos. 13-19

**B.     Equitable Defenses**

**1.     Laches**

**21.     To prove laches, Google must show by a preponderance of the evidence that (1) Sun and/or Oracle delayed filing a lawsuit concerning the 37 Java API packages for an unreasonably long and inexcusable period of time; and (2) Google has been or will be prejudiced in a significant way due to Sun and/or Oracle's delay in filing the lawsuit.**

Agree that Google must show by a preponderance of the evidence that (1) Sun and/or Oracle unreasonably delayed filing a lawsuit concerning the 37 Java API packages, (2) for an unreasonably long and inexcusable period of time, and (3) Google has been prejudiced in a

1    significant way due to the Sun and/or Oracle's delay.  *Danjaq LLC v. Sony Corp.*, 263 F.3d 942,

2    952-57 (9th Cir. 2001) (three-part analysis of "delay," "unreasonableness of delay," and

3    "prejudice").  Disagree that future prejudice, as suggested by Google's statement that it "will be

4    prejudiced," constitutes one of the elements of the laches defense.  None of the cases cited by

5    Google support this proposition because the law looks to past prejudice only:

6        "A defendant may also demonstrate prejudice by showing that *it took
7        actions or suffered consequences that it would not have*, had the plaintiff
         brought suit promptly."  *Danjaq*, 263 F.23 at 955 (emphasis added)
8        (explaining expectations-based prejudice alternative to evidentiary
         prejudice).

9        "Here Appellees have shown that circumstances have changed in a way
         that would not have occurred had Plaintiff sued earlier."  *Jackson v. Axton*,
10       25 F.3d 884, 889 (9th Cir. 1994) (emphasis added) (suit filed 20 years after
         alleged infringement).
11

12       "A defendant may also demonstrate prejudice by showing that it took
         actions or suffered consequences that it would not have, had the plaintiff
         brought suit promptly."  *CollegeNET, Inc. v. XAP Corp.*, 483 F. Supp. 2d
13       1058, 1062-1063 (D. Or. 2007).

14       **22.     The relevant period of delay is the period from when Sun/Oracle knew or
     should have known of the allegedly infringing conduct until the initiation of the lawsuit.**
15
         Agree.
16

17       **23.     Economic prejudice exists if Google made significant investments in the
     allegedly infringing product during the period of unreasonable delay.**

18       Disagree that economic prejudice exists solely by Google making "significant investments

19   in the infringing product."  To support a finding of laches, Google's significant investment in the

20   infringing product must constitute *a change in position* "*because of and as a result of the delay*,

21   not simply a business decision to capitalize on a market opportunity," as explained below:

22       However, we note that the record reflects that CES had expenditures of over $23
         million on research and development, $6.5 million on direct marketing costs, and
23       $20 million to expand or consolidate manufacturing facilities.  But *these
         expenditures have no explicitly proven nexus to the patentee's delay in filing suit,
24       as Aukerman requires for a finding of prejudice.*  It is not enough that the alleged
         infringer changes his position – i.e., invested in production of the allegedly
25       infringing device.  *The change must be because of and as a result of the delay, not
         simply a business decision to capitalize on a market opportunity.*
26

27   *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992) (emphasis added).

28   Many cases in this Circuit have adopted this definition of economic prejudice:

1     *Russell v. Price*, 612 F.2d 1123, 1126 (9th Cir. 1979) ("Defendants at no
time *changed* their film distribution activities *in reliance on* [plaintiff's]
2     conduct.") (emphasis added)

3     *Jackson*, 25 F.3d at 890 (prejudice shown where "numerous business
transactions have been made *in reliance on* Axton's sole ownership of the
4     Song") (emphasis added)

5     *A.C. Aukerman*, 960 F.2d 1020, 1033 (Fed. Cir. 1992) ("The courts must
look for a change in the economic position of the alleged infringer during
6     the period of delay")

7     *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 775 (Fed. Cir.
1995) ("Indeed, the court correctly noted that prejudice must result from
8     the plaintiff's delay and *not from a business decision or gamble that the
patent owner would not sue*. . . . Moreover, the evidence of record showed
9     that Infanti was *indifferent to whether Gasser would sue because of his
personal belief that the patent was invalid*.  Even a considerable investment
10    during a delay period is not *a result of the delay if it was "a deliberate
business decision to ignore [a] warning, and to proceed as if nothing had
11    occurred*") (emphasis added)

12    *James River Corp.*, 915 F. Supp. at 978 ("Where no evidence shows the
infringer stopped selling the allegedly infringing product even after the
13    patentee filed the complaint, a court may draw the inference that the
infringer would have continued to sell the infringing product even if the
14    patentee had brought suit earlier").

15    *Meyers v. Brooks Shoe*, 912 F.2d at 1463 ("Brooks has not shown any
connection between its activities during the laches period and Meyers'
16    silence.  From all that appears, Brooks would have followed the same
course regardless of what Meyers did or did not do.").

17
        Google cites to *Danjaq*, in which the court found economic prejudice where the infringer
18
made a significant investment in developing and producing allegedly infringing films during an
19
*unjustified forty year* delay.  263 F.3d at 956 (finding "no viable justification for the delay" before
20
moving on to consider whether there was prejudice).  Here, Google did not make investments in
21
Android, incorporating the 37 Java API packages for Android, as a result of Sun's alleged delay
22
in filing suit.  Rather, Google decided to use the 37 Java API packages in Android before Sun
23
could have been aware of any infringement.  Once Android was launched and Sun became aware
24
of the infringement, Google continued to use the 37 API packages in Android despite Sun's
25
repeated efforts to persuade Google to take a license.  Google's conduct was consistent
26
throughout – it used the 37 Java API packages without a license, "making enemies along the
27

28

way."  Google did not change its position in reliance on Sun/Oracle's alleged delay, rather it

pursued "a business decision to capitalize on a market opportunity."

> See Oracle FOFs 109-117, 119, 121-134
> TX 7 ("Do Java anyway . . . making enemies along the way")

Google cites to *Haas v. Feist* for the proposition that it would be inequitable "to stand

inactive while the proposed infringer spends large sums of money" exploiting the copyright.

234 F. 105, 108 (S.D.N.Y. 1916).  First, this holding does not apply to Sun/Oracle, since

Sun/Oracle has not "stood inactive" during Google's exploitation.  Oracle has engaged Google in

numerous discussions from 2005 up to the time of trial to try to persuade Google to take a Java

license for Android.  Google's CEO, Larry Page, explained that the parties "[c]ontinue to have

discussions to this day."

> Page at TX 492:18-22
> See Response to Google's FOF Nos. 54-55

Second, the *Haas* case actually originated the willfulness exception to laches in the

Second Circuit, stating: "If the defendant be a deliberate pirate, this consideration might be

irrelevant, and I think it such as to [infringer]."  *Id.* at 108.  The Ninth Circuit has adopted the

willfulness exception (also called the "piracy" exception):

> *Danjaq*, 263 F.3d at 956-57 (the willfulness exception "remains the law of
> this circuit") (citing *Haas*)
>
> *Winn v. Opryland Music Corp., Inc.*, 22 Fed. Appx. 728, 729 (9th Cir.
> 2001) ("Laches is not available in a case of willful infringement, when the
> infringing conduct occurs 'with knowledge that the defendant's conduct
> constitutes copyright infringement'")
>
> *Competition Specialties, Inc. v. Competition Specialties, Inc.*, 87 Fed.
> Appx. 38, 40 (9th Cir. Wash. 2004) ("After trial, the jury found that CSI-
> FL had intentionally used the CSI mark/name knowing that it constituted
> an infringement. . . . under our precedent, *laches is unavailable as a
> defense to a party who intentionally infringes*")
>
> *Nat'l Lead Co. v. Wolfe*, 223 F.2d 195, 202 (9th Cir. 1955) ("In light of the
> intentional and fraudulent use of appellant's trade mark, the defense [of
> laches] here is a frivolous one") (cited by *Danjaq*, 263 F.3d at 957)
>
> *A.C. Aukerman*, 960 F.2d at 1033 ("*Conscious copying may be such a
> factor weighing against the defendant*, whereas ignorance or a good faith
> belief in the merits of a defense may tilt matters in its favor")

The evidence demonstrates that Google knew that Sun's Java API packages were copyrighted, knew that a license was required to implement the APIs from Sun's specifications, and knew that such a license was required for Android, yet deliberately chose to proceed with Android anyway. *See* Oracle's FOF Nos. 58-82, 85-87, 95-100. Google's willful infringement of Sun/Oracle's copyrights negates the laches defense.

**24.    *Sun and Oracle delayed filing this lawsuit for an unreasonable amount of time.***

Disagree that the alleged delay in filing this lawsuit was unreasonable. There were ongoing discussions between Sun and Google after Google's announcement of Android in November 2007, and those discussions continued after Oracle acquired Sun in 2010. The tenor of the discussions was such that Mr. Schmidt testified he was sufficiently concerned about Sun suing Google that he considered buying all the rights to Java from Sun. Others at Google expressed similar concerns.

> TX 2371
> TX 1056
> TX 2070
> TX 2362
> Page at RT at 492:18-22 ("Continue to have discussions to this day" with Sun)
> Cizek at RT 1071:23-1073:9 (Sun expressed infringement concerns in April 2009))
> Schmidt at RT 1560:13-1561:11
> TX 326
> TX 406
> TX 1029

Sun/Oracle's continued discussions and negotiations with Google regarding licensing options excuse the alleged delay in bringing suit.

> *In re Katz Interactive Call Processing Patent Litig.*, 712 F. Supp. 2d 1080, 1110-11 (C.D. Cal. 2010) (stating "courts have recognized both litigation and negotiations with the accused as an excuse for the delay," and holding that six-year correspondence between the parties, up until defendant conclusively communicated that it does not need a license, constituted rebuttal of presumption of laches);
>
> *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F. Supp. 2d 1016, 1053 (S.D. Cal. 2008) ("Court concludes that any delay was reasonable or excusable since Lucent attempted to seek compensation for its patent through the computer manufacturers");

1

*A.C. Aukerman Co.*, 960 F.2d at 1033 ("A court must also consider and weigh any justification offered by the plaintiff for its delay.  Excuses which have been recognized in some instances, and we do not mean this list to be exhaustive, include: other litigation; *negotiations with the accused . . .*") (internal citations omitted).

2

3

4

*See also* Oracle's FOFs 85, 86, 98-100, 102, 133 (ECF 1049)

5

**25.     Google suffered economic prejudice by investing further in the development of Android during the period of Sun's unreasonable delay in initiating this lawsuit.**

6

Disagree that Google's investment in Android constitutes "economic prejudice" as it

7

relates to a laches defense.  *See* Response to Google's COL 23.

8

**26.     For these reasons, Oracle's claim is barred by the affirmative defense of laches.**

9

10

Disagree that Oracle's claim is barred by the affirmative defense of laches.  Google has

11

failed to prove the elements of the defense of laches because it did not prove that any delay by

12

Sun/Oracle was unreasonable; that Google changed its position in reliance on Sun/Oracle's delay,

13

resulting in prejudice; and that Google's infringement was not willful.  See Responses to

14

Google's COLs 21-25.

15

**2.     Equitable Estoppel**

16

**27.     To prove equitable estoppel, Google must show by a preponderance of the evidence that (1) Sun and/or Oracle knew of the infringement; (2) Sun and/or Oracle intended that its conduct or communication be acted on, or acted so that Google has a right to believe that Sun and/or Oracle intended that its conduct or communications to be acted on, (3) Google was ignorant of the true facts; and (4) Google relied on Sun and/or Oracle's conduct or communication to Google's injury or material harm.**

17

18

19

Agree.

20

**28.     The conduct in the second prong of the equitable estoppel test can be accomplished by Sun/Oracle's silence and inaction.**

21

22

Disagree.  First, Oracle disagrees that silence or inaction alone would satisfy the second

23

prong of the estoppel test, unless there was a clear duty on Sun/Oracle's part to speak.

24

*Plumley v. Mockett*, 2010 U.S. Dist. LEXIS 57254 at *57(C.D. Cal. May 26, 2010) (ellipses in original) (quoting *Aukerman*, 960 F.2d at 1043-44) ("Silence alone will not create an estoppel unless there was a clear duty to speak . . . or somehow the patentee's continued silence reinforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested") (ellipses in original).

25

26

27

*Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1295 (Fed. Cir. 1992) ("Mere silence must be accompanied by some other factor which

28

1    indicates that the silence was sufficiently misleading as to amount to bad
     faith.")

2    *Hynix Semiconductor*, 609 F. Supp. 2d 988, 1025 (N.D. Cal. 2009)
3    ("Silence alone will not create an estoppel unless there is a clear duty to
     speak or somehow the patentee's continued silence reinforces the
4    defendant's belief that the defendant will not be molested.")

5    Second, Oracle disagrees that it was silent or inactive.  *Hampton v. Paramount Pictures*

6    *Corp.* held that printing a copyright notice on plaintiff's films defeated any allegation of "holding

7    out."  279 F. 2d 100, 104 (9th Cir. 1960).  Here, because Sun/Oracle printed its copyright notices

8    on its Java specifications both online and in books, and in the source code for the libraries, there

9    was no "holding out" by Oracle.

10   *Hampton v. Paramount Pictures Corp.*, 279 F. 2d 100, 104 (9th Cir. 1960)
     ("A holding out may be accomplished by silence and inaction.  *But*
11   *Paramount's assertion of copyright was clearly printed on the film in*
     *question* in strict accordance with statutory requirements.  *Paramount had*
12   *the right to assume that this printed assertion of right, which was flashed*
     *on the screen every time the film was shown, provided ample notice to*
13   *Hampton of Paramount's interest in the film.*  Being charged with this
     notice, Hampton could easily have ascertained the facts by making inquiry
14   of Paramount.") (emphasis added)
     TX 984
15   TX 2564
     TX 610.2 (Java API web documentation with copyright notice)
16   TX 610.1 at 1 (Specification license)
     TX 980 at 6 (The Java Programming Interface Volume I)
17   TX 981 at 6 (The Java Programming Interface Volume II)
     TX 18 at 1 (3/24/2006 email from Andy Rubin to Greg Stein)
18   TX 623 at lines 151-152 (Java Source Code)

19   Furthermore, as discussed above, Sun/Oracle did much more than post copyright notices

20   on the Java specifications and code.  Sun/Oracle engaged in multiple rounds of negotiations with

21   Google in which the parties discussed the prospect of Google taking a Java license for Android.

22   Sun also publicly expressed its concerns that Android was fragmenting Java.
     *See* Oracle's FOF 85-87, 94, 96, 98, 99, 102 (ECF 1049)
23   TX 1048 (Article re Rich Green statements)

24   **29.    Sun/Oracle's inaction and apparent acquiescence, particularly after its**
     **affirmative statements of support, can provide the basis for estopping it from bringing an**
25   **infringement claim against Google.**

26   Disagree that Sun/Oracle's alleged inaction provides the basis for estopping it from

27   bringing an infringement claim against Google.  Element 2 requires that Sun/Oracle must have

28   intended that its conduct would be acted on or acted so that Google had a right to believe it was

1   so intended.  *See U.S. v. King Features Entmt., Inc.*, 843 F.2d 394, 399 (9th Cir. 1988) ("there is

2   no evidence to show [plaintiff] intended [defendant] to rely on its subsequent failure to rescind or

3   return the down payment").  As previously discussed, Sun/Oracle was not inactive and did not

4   acquiesce in Google's incompatible implementation of Java, using the Java API packages in

5   Android.  Sun/Oracle engaged Google in multiple rounds of negotiations over Google's usage of

6   Java in Android, spanning from 2005 through 2010 and beyond.  Furthermore, any alleged

7   statements "of support" for Android from Mr. Schwartz have no bearing on when Google itself

8   knew – through negotiations with Sun/Oracle, through its own engineers and executives raising

9   this concern internally, and through Sun/Oracle's public and private statements – that Sun/Oracle

10  wanted Google to pay for a license in order to use the Java API packages.

> *See* Response to Google's COL 28.
> *See* Oracle FOFs 58-60, 62-65, 67-77, 81-82 (ECF 1049)
> *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1043 (9th
> Cir. 1992) ("to show reliance, the infringer must have had a relationship or
> communication with the plaintiff which lulls the infringer into a sense of
> security in going ahead").

**30.    *Sun and Oracle knew of Google's use of the Java API packages as early as 2005.***

Disagree that Google has proved that Sun/Oracle knew of Google's infringement as early

as 2005.  To the contrary, Sun/Oracle did not know that Google was using the 37 API packages at

issue until Google publicly released the Android SDK in November 12, 2007.  Before Google

announced Android, Sun did not know what Android would contain, or what type of Java license

Google would obtain for Android.  Even on November 5, 2007, when Sun's CEO responded to

the announcement of Android in a blog post, Google still had not released the Android SDK, and

Sun did not know the facts regarding Google's infringement.  Google only publicly released the

full source code for the Android platform, including the implementation of the Java API packages

at issue and their SSO, in October 2008.

> *See* Oracle's FOFs 91-94 (ECF 1049)
> *See* Responses to Google's FOF 21-23, 32, 53, 56, 58, 62-64, 69, 84

**31.    *By allowing GNU to distribute its code, publicly endorsing Apache Harmony,
posting an official blog approving of Android, congratulating Google's executives privately
about Android, demonstrating Sun products on Android devices at public events, and
maintaining an ongoing business relationship with Google without ever suggesting to***

1    *Google that Google's implementation of the Java API packages and use of their SSO*
2    *infringed Sun's copyrights or that Sun could or would sue Google, Sun acted so that Google had a right to believe that Sun intended its conduct and communication to be acted upon.*

3    Disagree, as set forth in responses to Google's FOFs 21-23, 32, 37-52, 64-65, 68-70, 72-

4    78, 77-81, 87-92, and responses to Google's COLs 28-30.

5    **32.    Google did not know that Sun/Oracle did not intend that its conduct be acted**
6    **on.**

         Disagree.  Google had abundant knowledge and notice of Sun's assertions of its

7    copyrights in connection with the Java API packages and Google's use of Sun's intellectual

8    property for Android.  Google recognized in its internal documents that it faced potential legal

9    action by Sun in connection with Android.

10               *See* Responses to Google FOF Nos. 21-23, 32, 37-52, 61, 66-68, 74-75, 79-
                 82, 91
11               *See* Oracle FOF Nos. 53-56, 58-60, 62-65, 67-74, 81-82

12   **33.    Google relied on Sun and/or Oracle's conduct or communication to Google's**
13   **material harm by investing further in Android development, hiring more Android**
     **engineers, further developing the Android code, and entering into agreements with handset**
14   **partners.**

15       Disagree.  Google has failed to prove reliance on any conduct by Sun or Oracle in

16   connection with Android.  Google's documents demonstrated that Google was acutely aware of

17   Sun's concerns in connection with Android, and Sun repeated requested that Google take a

18   license and make Android compatible.  In response, Google took steps to conceal its conduct

19   from Sun and to avoid further discussions with Sun.  Such evidence shows that there was no

20   reliance and it also bars application of this defense.

21               *See* Responses to Google FOF Nos. 21-23, 32, 37-50, 52, 61, 66-67, 71,
                 75-76, 79, 82-86
22               *See* Response to Google COL No. 23 (lack of economic prejudice)
                 *See* Oracle FOF Nos. 60, 62-63, 65-72, 85-86, 95-96, 98, 114, 117, 121-
23               122, 132

24   **34.    For these reasons, Oracle's claim is barred by the affirmative defense of**
     **equitable estoppel.**
25
         Disagree.  For the reasons stated above, Google has failed to prove the elements of its
26
     equitable estoppel defense.
27

28

### 3.  **Implied License**

*35.    To prove implied license, Google must show by a preponderance of the evidence that the totality of the parties' conduct indicates an intent by Sun/Oracle to grant permission to Google to use the SSO of the Java API packages.*

Disagree in several respects.  First, Oracle disagrees to the extent that Google has omitted the important caveat that "[t]he Ninth Circuit has explained that the implied license doctrine in copyright cases is to be very narrowly construed."  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) (citing *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001)).  Those circumstances are limited to "where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'"  *Napster*, 239 F.3d at 1026 (citing *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000) (quoting *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990))).

Courts have refused to find implied licenses where the plaintiff did not create the copyrighted work for the defendant.

> *Effects Assocs. v. Cohen*, 908 F.2d 555, 558-559 (9th Cir. 1990) ("*Oddo* controls here.  Like the plaintiff in *Oddo*, Effects created a work at defendant's request and handed it over, intending that defendant copy and distribute it")

> *Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984) (in a partnership to create and publish a book, plaintiff handed copyrighted manuscript to defendant for publication; thus court found plaintiff "impliedly gave the partnership a license to use the articles insofar as they were incorporated in the manuscript, for without such a license, Oddo's contribution to the partnership venture would have been of minimal value")

> *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) (rejecting implied license defense where "[o]bviously, Plaintiffs did not create their copyrighted works at StreamCast's request or for StreamCast's benefit")

> *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425 F. Supp. 2d 756, 773 (N.D. Tex. 2006) (rejecting defense where "Interactive points to no evidence showing that it requested Objectspace to create Voyager")

> *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 328 (S.D.N.Y. 2003) (rejecting defense because plaintiff did not "commission" the work)

> *See McCoy v. Mitsuboshi Cutlery*, 67 F.3d 917, 920 (Fed. Cir. 1995) (where parties had a long-standing business relationship whereby

1
2
3

Mitsuboshi manufactured McCoy's patented knives, "an implied license properly enforces McCoy's contractual promise to pay for the knives, reflects Mitsuboshi's commercial efforts to resolve the matter, and recognizes Mitsuboshi's rights to mitigate under the Texas UCC")

4
5
6

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001) (the record supports district court's conclusion that "no evidence exists to support this defense: 'indeed, the RIAA gave defendant express notice that it objected to the availability of its members' copyrighted music on Napster'")

7
8
9
10
11
12
13
14
15

Second, Google has also omitted the requirement that it must be *reasonable in inferring* that the entire course of conduct between the parties showed that Oracle/Sun intended to *affirmatively* grant consent or permission to Google to use the Java API packages and code at issue here.  Even the block quote that Google includes states that the defendant must "*properly infer*" that the owner consents to his use.  *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (9th Cir. 1995).  *See also Grokster*, 518 F.3d at 1225 ("An implied license can be found were the copyright holder engages in conduct from which the other party may *properly infer* that the owner consents to his use.") (emphasis added).  Google has failed to prove the entire course of conduct between the parties showed that Oracle/Sun affirmatively granted consent to Google's use of the 37 API packages.

16
17
18
19
20

Third, the *Wang* case to which Google cites also makes clear that "[t]he primary difference between the estoppel analysis in implied license cases and the analysis in equitable estoppel cases is that *implied license looks for an **affirmative grant of consent** or permission* to make, use, or sell: i.e., a license."  *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1581 (Fed. Cir. 1997) (emphasis added).

21
22
23
24
25
26
27
28

Finally, the court must look at "the entire course of conduct between the parties."  The Ninth Circuit in *Effects* noted that the district court found that "every objective fact concerning the transaction at issue supports a finding that an implied license existed."  908 F.2d at 559 n.6 (plaintiff's "copyright registration certificate states that the footage is to be used in [defendant's movie] "The Stuff," so does the letter agreement . . . and [plaintiff's president] at his deposition agreed that this was his understanding. Also [plaintiff] delivered the film negatives to [defendant], never warning him that cutting the negatives into the film would constitute copyright

infringement.") (emphasis added).  The facts here are entirely distinguishable because Sun and then Oracle repeatedly asked Google to properly license Sun/Oracle's intellectual property.

**36.    An implied license may be granted orally, or even implied from the conduct of the party that owns the rights to be licensed.**

Agree, with the important qualification that courts have rejected the implied license defense where there is no evidence that the plaintiff created a work at the defendant's request. *See Napster*, 239 F.3d at 1026 (affirming rejection of implied license defense); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd*., 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) (rejecting implied license defense where "[o]bviously, Plaintiffs did not create their copyrighted works at StreamCast's request or for StreamCast's benefit"); *Recursion Software, Inc. v. Interactive Intelligence, Inc*., 425 F. Supp. 2d 756, 773 (N.D. Tex. 2006) (rejecting defense where "Interactive points to no evidence showing that it requested Objectspace to create Voyager"); *Country Rd. Music, Inc. v. MP3.com, Inc*., 279 F. Supp. 2d 325, 328 (S.D.N.Y. 2003) (rejecting defense because plaintiff did not "commission" the work).

See Oracle's Response to Google's COL No. 35

**37.    The conduct that grants the license may include acts of acquiescence or acts of misrepresentation by Sun and/or Oracle.**

Agree, with the important caveat that "[t]he Ninth Circuit has explained that the implied license doctrine in copyright cases is to be very narrowly construed."  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) (citing *Napster*, 239 F.3d at 1026).  Those circumstances are limited to "where one party 'created a work at [the other's] request and handed it over, intending that [the other] copy and distribute it.'"  *Napster*, 239 F.3d at 1026.

**38.    The entire course of conduct between Sun and/or Oracle and Google over the relevant time period led Google reasonably to infer consent by Sun and/or Oracle to Google's making, using, or selling the products that Oracle now claims infringe Oracle's copyright.**

Disagree.  As previously explained, the course of conduct between Sun/Oracle and Google from 2005 to 2010 does not indicate that Sun/Oracle consented to Google's unlicensed use of Java API packages in Android.  To the contrary, Sun/Oracle pressed Google to take a Java

license for Android in numerous discussions from 2005 to 2010, and publicly stated its concerns that Android was fragmenting Java.  Internally, Google was aware of Sun's concerns in connection with Android, and sought to conceal its conduct from Sun and avoid further discussions.  The overwhelming evidence shows that Sun/Oracle never consented to Google's unlicensed use of Java technology in Android.

*See* Oracle's FOF Nos. 58-82, 85-87, 95-100 (ECF 1049)

**39.   For these reasons, Oracle's claim is barred by the affirmative defense of implied license.**

Disagree, for the reasons stated in response to Google's COLs 35-38.  Sun/Oracle certainly did not create the 37 Java API packages at Google's behest for use in Android.  That alone dooms Google's implied license defense.  Furthermore, the course of conduct between the parties does not indicate that Sun/Oracle consented to Google's unlicensed use of Java technology in Android.

### 4.   Waiver

**40.   To prove waiver, Google must show by a preponderance of the evidence that Sun/Oracle, with full knowledge of the material facts, intentionally relinquished its rights to enforce the copyrights it asserts.**

Agree, with the caveat that intentional relinquishment of rights must be "manifested in an unequivocal manner" and can occur only through affirmative statements by Sun/Oracle to Google, or through silence where there was an affirmative duty to speak.  *Adidas-America, Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1074 (D. Or. 2008).

**41.   A waiver may also be implied based on conduct so inconsistent with the intent to enforce a right as to induce a reasonable belief that such right has been relinquished.**

Disagree.  Google cites two cases, *Hynix* and *Qualcomm*, both of which arise in the context of standard-setting organizations.  In both cases, the patentee had an affirmative duty to disclose its intellectual property to the standard-setting body.  *See Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1342 (Fed. Cir. 2011) ("As of 1993, JEDEC policy 'required members to disclose patents and patent applications 'related to' the standardization work of the committees"); *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1022 (Fed. Cir. 2008) ("JVT participants understood the policies as imposing a disclosure duty").  In that specific

1  circumstance, silence could be a waiver if (1) the plaintiff had a "duty of disclosure to the

2  standard-setting organization" and (1) "the [plaintiff] breached that duty." *Hynix*, 645 F.3d at

3  1348.  Here, Google has identified no legal or contractual duty upon Sun/Oracle to disclose its

4  intellectual property, and there is none.

5      Outside of situations where there is a duty to speak, it is not sufficient merely to find

6  conduct "inconsistent" with the intent to enforce a right.  Instead, conduct must be so "clear,

7  decisive and unequivocal" as to indicate a purpose to waive the legal rights involved.  *Adidas-*

8  *Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1074 (D. Or. 2008) (quoting

9  *Groves v. Prickett*, 420 F.2d1119, 1125 (9th Cir. 1970).  Silence is not waiver.  *McKinney v.*

10  *United States*, 403 F.2d 57, 59 (5th Cir. 1968) (waiver of a federal right must be clearly

11  established); *Kahn v. Lumbermens Mutual Casualty Co.*, 293 F.Supp. 985, 989 (E.D.N.Y.1968)

12  ("cases are legion to the effect that silence does not constitute a waiver"); see also 92 C.J.S.

13  Waiver 1065 (1955) (silence is never a waiver where there is no duty to speak.)

14       **42.     Sun, with full knowledge of Google's actions, intentionally relinquished its**
   **rights to enforce the copyrights it asserts in the SSO of the 37 Java API packages.**
15

16      Disagree.  First, Oracle disagrees that Sun ever disclaimed rights in the Java API

17  specifications.  Instead, Sun consistently and openly copyrighted its Java platform and put

18  copyright notices on its API specifications—copyright notices that Google employees

19  acknowledge seeing, and discussed in internal emails.

20          TX 610.1
           Lee at RT 982:25-983:12
21          *See also* Oracle's FOF Nos. 50-51, 53, 54-56, 58-60.

22      Other members of the JCP, including Apache, acknowledged Oracle's rights in the Java

23  specifications at issue.  In fact, Google is alone among many companies in *not* taking a license to

24  create an independent implementation of Java based on Oracle's specifications.  Sun/Oracle has

25  never manifested an intent to waive its rights to the API specifications at issue.

26          *See* Oracle's FOF Nos. 72, 76-78.

27      Second, Google may not rely on Oracle's conduct toward third parties, such as Apache

28  and GNU, to infer waiver of rights as to *Google*:

1

2

3

4

> Plaintiffs' actions with respect to other companies operating peer-to-peer networks are irrelevant. The Court knows of no rule in copyright, and StreamCast has cited no authority for the proposition, that a copyright holder is bound to pursue either all infringers or none at all.  The waiver analysis should ordinarily be limited to evaluating the conduct and/or communications that occur between a plaintiff and a defendant claiming the waiver defense.

5

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1225 (C.D. Cal.

6

2007); *see also Adidas-Am., Inc. v. Payless Shoesource, Inc.*, 546 F. Supp. 2d 1029, 1074 (D. Or.

7

2008) ("Adidas' failure to prevent *all* third parties from selling *any* two– and four-striped shoes is

8

not sufficient to prove adidas' express and affirmative intent to relinquish its rights . . . Payless

9

neither cites, nor is the court aware of any authority to support the proposition that adidas waived

10

its trademark rights against Payless simply by agreeing not to sue K–Swiss, or its licensees for

11

using four stripes on shoes.") (emphasis in original).

12

Third, none of Sun's/Oracle's actions—congratulating Google on the launch of Android,

13

designing products to run on Android, or calling Google "friends" at a conference— manifested a

14

"clear, decisive, and unequivocal" intent to relinquish Sun/Oracle's legal rights.  It is permissible

15

for the intellectual property holder to continue to protect its interests while simultaneously

16

encouraging an infringer to take a license, as Sun/Oracle did.  *See, e.g.*, *CBS Broad. v. Primetime*

17

*24 Joint Venture*, 48 F. Supp. 2d 1342, 1360 (S.D. Fla. 1998) ("the mere receipt of monthly

18

benefits [from the infringer] is far from the type of clear, decisive, and unequivocal conduct that

19

is necessary to find an intent to waiver a legal right").

20

Fourth, Oracle disputes that the Sun's Board of Directors ever decided not to sue Android.

21

The evidence shows that Sun and now Oracle continually expressed concern about Android and

22

continually pursued Google to license Android.

23

*See* Oracle's FOF Nos. 85-87, 95-103.

24

There is no evidence in the record that Sun ever informed Google that it would not sue Google for

25

infringing Sun's IP.  *See MGM*, 518 F. Supp. 2d at 1225 ("The waiver analysis should ordinarily

26

be limited to evaluating the conduct and/or communications that occur between a plaintiff and a

27

defendant claiming the waiver defense.").

28

1      Fifth, Mr. Schwartz's statements and actions do not constitute relinquishment of a

2  "known" legal right, because Mr. Schwartz disavowed any knowledge of the specification license

3  governing independent implementations of the Java API packages, and Mr. Schwartz's blog post

4  was made before Sun understood that Google would not be taking Java's open-sourced GPL-ed

5  code.

6              Schwartz at RT 2013:23-2014:20  ("And you were familiar with Sun's
               specification license?  A. Somewhat, yes.  Q. Just somewhat, sir? A. Just
7              somewhat.  Q. But your testimony about what Sun required for an
               independent implementation of the specifications is based on a somewhat
8              understanding of the license?  A. It's based on a understanding of open
               source realities and trying to find ways for our products to be successful in
9              the marketplace, and not for our legal contracts.")

10             *See* Oracle's FOFs 88-94

11     Finally, the evidence shows that Google took action inconsistent with its alleged belief

12  that Oracle had relinquished its rights, including internally acknowledging that it had legal issues

13  vis-à-vis Sun, attempting to conceal Android's use of Java from Sun, and trying to avoid further

14  discussions with Sun.  *See SQL Solutions, Inc. v. Oracle Corp.*, C-91-1079 MHP, 1991 WL

15  626458 (N.D. Cal. Dec. 18, 1991) (finding no waiver in part because the claimant "took action

16  inconsistent with their alleged belief" in waiver).

17             *See* Oracle's FOFs at 123-134

18     ***43.    Sun/Oracle's conduct was so inconsistent with the intent to enforce any rights
       in the 37 API packages as to induce in Google a reasonable belief that Sun/Oracle had***
19     ***relinquished any rights it may have had in those APIs packages.***

20             Disagree, for the reasons explained in response to Google's COLs 41 and
               42.
21
22     ***44.    For these reasons, Oracle's claim is barred by the affirmative defense of
       waiver.***

23             Disagree, for the reasons explained in response to Google's COLs 41 and 42.

24

25

26

27

28

1   Dated: May 5, 2012

2                                                   MORRISON & FOERSTER LLP

3                                                   By:  /s/ *Michael A. Jacobs*
                                                              Michael A. Jacobs
4
                                                         *Attorneys for Plaintiff*
5                                                        ORACLE AMERICA, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28