MORRISON & FOERSTER LLP
MICHAEL A. JACOBS (Bar No. 111664)
mjacobs@mofo.com
KENNETH A. KUWAYTI (Bar No. 145384)
kkuwayti@mofo.com
MARC DAVID PETERS (Bar No. 211725)
mdpeters@mofo.com
DANIEL P. MUINO (Bar No. 209624)
dmuino@mofo.com
755 Page Mill Road, Palo Alto, CA  94304-1018
Telephone: (650) 813-5600 / Facsimile: (650) 494-0792

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (Admitted *Pro Hac Vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY  10504
Telephone: (914) 749-8200 / Facsimile: (914) 749-8300
STEVEN C. HOLTZMAN (Bar No. 144177)
sholtzman@bsfllp.com
1999 Harrison St., Suite 900, Oakland, CA  94612
Telephone: (510) 874-1000 / Facsimile: (510) 874-1460

ORACLE CORPORATION
DORIAN DALEY (Bar No. 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (Bar No. 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (Bar No. 211600)
matthew.sarboraria@oracle.com
500 Oracle Parkway, Redwood City, CA  94065
Telephone: (650) 506-5200 / Facsimile: (650) 506-7114

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC. | Case No. CV 10-03561 WHA |
| Plaintiff, | **ORACLE AMERICA, INC'S OPPOSITION TO GOOGLE'S MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING COMPATIBILITY TESTING SUITE** |
| v. | |
| GOOGLE INC. | |
| Defendant. | |
| | Dept.:  Courtroom 8, 19th Floor<br>Judge:  Honorable William H. Alsup |

Oracle opposes Google's motion to exclude evidence regarding the Android Compatibility Test Suite ("CTS").

## I.     THE CTS PROVIDES PROOF OF INFRINGEMENT OF THE '104 PATENT

Google's Compatibility Definition Document (TX 2802) requires Android devices to meet certain performance characteristics in order to be certified as Android-compatible: "Compatible implementations must ensure not only that applications simply run correctly on the device, but that they do so with reasonable performance and overall good user experience. Device implementations MUST meet the key performance metrics of an Android 2.3 compatible device," as specified in the document.  (TX 2802 at 122; *see also* Brady Topic 9 Dep. 121:6-128:1, attached as Exhibit A; Morrill Dep. 167:3-169:20, attached as Exhibit B.)

The CTS ensures that devices meet these characteristics through testing.  Some CTS tests test the performance of Android phones—these tests are highly relevant to Oracle's infringement claims. The fact that OEM device manufacturers must pass these tests before calling their phone "Android" suggests that they have not changed Android's symbolic reference resolution functions, which would significantly and negatively affect performance.  The Android Gingerbread source code (TX 47) includes a number of CTS performance tests:

- 0047\gingerbread23 - GOOGLE-00-00000527\cts\tests\tests\performance\src\android\performance\cts\MultiAppStartupTest.java (Tests that restart of calculator takes less time than start of calculator)

- 0047\gingerbread23 - GOOGLE-00-00000527\cts\tests\tests\performance2\src\android\performance2\cts\AppStartup.java (Tests for average MusicBrowserActivity in com.android.music startup time of less than 500 milliseconds)

- 0047\gingerbread23 - GOOGLE-00-00000527\cts\tests\tests\performance3\src\android\performance3\cts\AppStartup.java (Tests for average BrowserActivity in com.android.browser startup time of less than 1300 milliseconds)

- 0047\gingerbread23 - GOOGLE-00-00000527\cts\tests\tests\performance4\src\android\performance4\cts\AppStartup.java (Tests for average ui.ConversationList in com.android.mms startup time of less than 700 milliseconds)

- 0047\gingerbread23 - GOOGLE-00-00000527\cts\tests\tests\performance5\src\android\performance5\cts\AppStartup.java (Tests for average AlarmClock in com.android.alarmclock startup time of less than 650 milliseconds)

The CTS thus provides circumstantial evidence that OEMs include on their devices the infringing functionality that Google provides to them.

## II.    THE CTS PROVIDES PROOF OF INFRINGEMENT OF THE '520 PATENT

The Court should allow Oracle to present evidence regarding the Android CTS for the '520 patent because the CTS directly tests the accused behavior in Android.  Specifically, the CTS includes a test for the fill-array-data instruction that the Android code accused of infringement creates.  (*See* TX 47 at 0047\gingerbread23 - GOOGLE-00-00000527\cts\tools\vm-tests\src\dot\junit\opcodes\fill_array_data\Test_fill_array_data.java.)  That OEMs pass these tests suggests that they do not change Dalvik's ability to execute the fill-array-data instruction, a Dalvik instruction used for array initialization.  Indeed, the final step in claim 1 of the '520 patent is "interpreting the instruction by a virtual machine to perform the static initialization of the array."  By requiring OEMs to pass the CTS to certify their devices as Android-compatible, Google actually requires them to perform a step of the patented method (a step that Google has refused to admit that its licensees perform, the Court may recall).  This evidence is highly probative, and the jury should hear it.

Google's only argument to exclude CTS evidence for the '520 patent is that "the CTS includes no tests directed at the Android Software Development Kit."  That is flat wrong.  The CTS includes tests directed to confirm the proper functioning of dx tool's simulation of Java bytecodes that participate in static array initialization.  (*See, e.g.*, bytecode tests in 0047\gingerbread23 - GOOGLE-00-00000527\cts\tools\dx-tests\src\dxc\junit\opcodes (opcodes newarray, iastore, lastore, fastore, dastore, aastore, bastore, and sastore).)  The dx tool is part of the Android SDK, and is part of the software accused of infringing the '520 patent.  If any developer or OEM were to change the dx tool, speculation for which there is no evidence, the CTS tests suggest that the manner of creating the fill-new-array instruction would not be changed.

1

### III.   GOOGLE'S OBJECTIONS ARE INSUFFICIENT TO EXCLUDE THIS EVIDENCE

2

3

Google claims that Professor Mitchell did not utilize performance tests to prove

infringement.  In fact, Professor Mitchell refers to the performance tests of the CTS in paragraph

4

188 of his opening report, which Google attached to its motion as Exhibit C.

5

6

Google's argument that testimony in this area would duplicate Phase I testimony (ECF

No. 1080 at 5) is false.  Mr. Morrill's testimony during Phase I did not cover tests for the Dalvik

7

Virtual Machine, let alone performance tests.  Oracle expects Mr. Morrill's and Mr. Brady's

8

testimony to confirm the presence of the patented technology.

9

### IV.   CONCLUSION

10

For the reasons stated above, the Court should deny Google's motion to exclude the CTS

11

evidence from trial.

12

13

Dated: May 6, 2012                         MORRISON & FOERSTER LLP

14

15

By:  /s/ Marc David Peters

16

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

```
 1            UNITED STATES DISTRICT COURT

 2           NORTHERN DISTRICT OF CALIFORNIA

 3              SAN FRANCISCO DIVISION

 4

 5     _____

 6  ORACLE AMERICA, INC.,   )

 7          Plaintiff,      )

 8      vs.                 ) No. CV 10-03561 WHA

 9  GOOGLE, INC.,           )

10          Defendant.      )

11  _____)

12

13

14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15

16

17      Videotaped Deposition of DANIEL MORRILL,

18      taken at 333 Twin Dolphin Drive, Suite

19      400, Redwood Shores, California, commencing

20      at 9:43 a.m., Tuesday, July 12, 2011,

21      before Leslie Rockwood, RPR, CSR No. 3462.

22

23

24

25  PAGES 1 - 248

                                          Page 1
```

Highly Confidential - Attorneys' Eyes Only

```
1              MS. TERAGUCHI:  Yuka Teraguchi of Morrison &

2      Foerster for plaintiff Oracle America.

3              MR. WEINGAERTNER:  Scott Weingaertner of

4      King & Spalding for Google.

5              MR. KAMBER:  Matthias Kamber of Keker & Van    09:41:11

6      Nest for Google.

7              MR. HWANG:  Renny Hwang of Google.

8              THE VIDEOGRAPHER:  Thank you, Counsel.

9              The witness will be sworn in and we may

10     proceed.                                                09:41:21

11             THE REPORTER:  Would you raise your right

12     hand, please, Mr. Morrill.

13             You do solemnly state that the evidence you

14     shall give in this matter shall be the truth, the whole

15     truth and nothing but the truth, so help you God.

16             THE WITNESS:  I do.

17             THE REPORTER:  Thank you.

18                         EXAMINATION

19     BY MR. MUINO:

20         Q.  Good morning, Mr. Morrill.                      09:41:34

21         A.  Good morning.

22         Q.  Can you please state your full name for the

23     record.

24         A.  My full name is Daniel Lawrence Morrill.

25         Q.  And what is your home address?                 09:41:43
```

Page 5

Highly Confidential - Attorneys' Eyes Only

1    do you know if one of the optimizations performed by the

2    dexopt tool is to change symbolic references in the DEX

3    bytecode to the memory location of the data referred to

4    by those references?

5         A.  I don't know either way.                    15:33:39

6         Q.  Okay.  With respect to the dexopt tool, do

7    you know if one of the optimizations that it makes is to

8    change certain bytecode instructions into in-line native

9    code?

10        A.  I don't know either way.                    15:33:54

11            MR. WEINGAERTNER:  Object to the form.

12        Q.  BY MR. MUINO:  Okay.  Let's go back to the

13   Android 2.2 compatibility definition.

14        A.  Uh-huh.

15        Q.  And take a look at page 10, Section 5.  And    15:34:06

16   this is the application packaging compatibility.  It's

17   entitled "Application Packaging Compatibility."  The

18   first sentence says:  "Device implementations must

19   install and run Android.APK files as generated by the

20   AAPT tool included in the official Android SDK."        15:34:28

21            Do you see that?

22        A.  I do.

23        Q.  Second paragraph says:  "Device

24   implementations must not extend either the .APK, Android

25   manifest, the Dalvik bytecode formats in such a way that    15:34:42

Page 165

Highly Confidential - Attorneys' Eyes Only

1    would prevent those files from installing and running

2    correctly on other compatible devices.  Device

3    implementers should use the reference upstream

4    implementation of Dalvik and the reference

5    implementations package management system."          15:34:56

6              Do you see that?

7         A.  I do.

8         Q.  Did you author this -- those two paragraphs?

9         A.  In this form, yes, but I did not originate

10   this section.                                        15:35:14

11        Q.  Okay.  The last sentence that I read there

12   with respect to the reference upstream implementation of

13   Dalvik, does that refer to the Dalvik virtual machine?

14        A.  It would refer to the source code of the

15   Dalvik virtual machine, yes.                         15:35:27

16        Q.  Okay.  And pursuant to the CDD, Google is

17   instructing the device implementers should use the Dalvik

18   source code; is that correct?

19        A.  Device as it is written, device

20   implemented -- -- device implementers should use the    15:35:47

21   reference upstream implementation.

22        Q.  Okay.

23        A.  It's probably worth noting that this is

24   merely a reinforcement of the language in section --

25   well, in Section 1 in the introduction where we refer to,  15:36:06

Veritext National Deposition & Litigation Services
866 299-5127

Highly Confidential - Attorneys' Eyes Only

```
1    again, the reference implementation and the upstream

2    Android Open Source Project.

3            Q.  Okay.  Let's refer to Section 10 now.  This

4    is on page -- page 18.  I'm sorry, I misspoke.  Let's

5    look at Section 9 on page 17.  It's the bottom of          15:36:35

6    page 17.

7                And the first paragraph, the first sentence

8    there says:  "One of the goals of the Android

9    compatibility program is to enable consistent application

10   experience to consumers.  Compatible implementations must   15:36:49

11   ensure not only that applications simply run correctly on

12   the device, but that they do so with reasonable

13   performance and overall good user experience."

14               Do you see that?

15           A.  I do see that.                                   15:37:03

16           Q.  Did you write that portion?

17           A.  I actually think I did not, but I don't

18   recall clearly.

19           Q.  Okay.  Do you have an understanding of what

20   "reasonable performance" means here?                        15:37:23

21           A.  In context it would refer to the contents of

22   the table immediately following, but I do not have a

23   precise answer for what "reasonable performance" would

24   be meant -- or would mean here.

25           Q.  Okay.  Is it a requirement of the CDD that      15:37:48
```

Page 167

Highly Confidential - Attorneys' Eyes Only

```
 1    Android devices meet the performance thresholds that are

 2    shown in the chart below in this Section 9?

 3           A.   Section 9 is included in the CDD, and the CDD

 4    is the definition of a compatible device, yes.

 5    Compatible devices must meet the performance            15:38:08

 6    specifications in the table -- or in Section 9.

 7           Q.   Okay.  And if you look at the table there,

 8    the first row of the table, well, second row, the first

 9    row of data is application -- says "application launch

10    time."  And the second column there says:  "The following  15:38:24

11    applications should launch within the specified time:

12    Browser less than 1300 milliseconds, MMS-SMS less

13    than 700 milliseconds, alarm clock less than

14    650 milliseconds."

15              Do you see that?                               15:38:46

16           A.   I do.

17           Q.   Okay.  It's required for an

18    Android-compatible device that these applications launch

19    in these specified times in order to be compatible under

20    the CDD; is that right?                                  15:38:59

21           A.   That is correct.

22           Q.   Why is -- why is speed important to Google

23    for the launch of applications?

24           A.   Because an end-user might obtain a phone and

25    unknowingly purchase a, you know, poor quality phone,    15:39:23
```

Page 168

Highly Confidential - Attorneys' Eyes Only

```
 1    such as it might have an obsolete processor in it or it

 2    might have a, you know -- excuse me -- a poor driver

 3    implementation or some other defect that makes it

 4    unreasonably slow or at least slower than its competitors

 5    in its class.                                        15:39:43

 6              This user would then install applications on

 7    it, you know, such as from Android market and then judge

 8    the quality of those applications in a negative light

 9    because the device is slow.  In other words, the device's

10    poor performance would reflect -- in the user's eyes,    15:40:00

11    would reflect poorly on the application.  Whereas if the

12    user were more informed and knowledgeable, they would

13    know that the blame should properly be placed on the OEM.

14              The intent of this section in the CDD is to

15    make sure that Android devices meet a minimal threshold    15:40:17

16    of performance to rule out the scenario that I just

17    described.  So that we can rely on the fact that

18    applications will launch in a reasonable amount of time

19    and that the user will not blame third-party developers

20    for the errors or implementation issues of an OEM.      15:40:36

21         Q.  Is the launch speed of applications something

22    that's important to consumers?

23         A.  In the way I just described, yes.

24         Q.  Okay.  And are you aware of portions of

25    Android or elements of Android that are designed to     15:41:01
```

Page 169

Highly Confidential - Attorneys' Eyes Only

1     increase the speed of the launch of applications?

2          MR. WEINGAERTNER:  Objection to form.

3          THE WITNESS:  Yes.  We have several

4     performance optimization avenues that we routinely pursue

5     in launching a device.                              15:41:21

6          Q.  BY MR. MUINO:  Okay.  And tell me the ones

7     that you're aware of.

8          A.  Sure.  One example is the specific type and

9     nature of the -- you know, would we call the flash part

10    or the storage chip.  Some models are faster than others;   15:41:40

11    some storage types or classes are faster than others.

12          Another example is the -- the file system in

13    use on that partition.  In some cases, the -- for

14    example, I believe today we use the X4 -- EXT 4 file

15    system because it tends to be faster and more reliable    15:42:08

16    than the file systems we've used previously.

17          We have a variety of deferred loading, you

18    know, and load-on-demand techniques that we use in the

19    software, and we have a variety of pre-caching or

20    pre-loading techniques that we use, one of which is the   15:42:31

21    dexopt tool that you referred to previously, and another

22    is the Zygote technique that you also referred to

23    previously.

24          Q.  Okay.

25          A.  There are others, but those are two of the    15:42:43

                                                      Page 170

Highly Confidential - Attorneys' Eyes Only

```
 1            I declare under the penalty of perjury
 2    under the laws of the State of California that the
 3    foregoing is true and correct.
 4            Executed on 15 August, 2011, 2011,
 5    at  Mountain View , California .
 6
 7
 8
 9    _____
10            SIGNATURE OF THE WITNESS
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 244

Highly Confidential - Attorneys' Eyes Only

```
1   STATE OF CALIFORNIA      ) ss:

2   COUNTY OF MARIN          )

3

4           I, LESLIE ROCKWOOD, CSR No. 3462, do hereby

5   certify:

6           That the foregoing deposition testimony was

7   taken before me at the time and place therein set forth

8   and at which time the witness was administered the oath;

9           That testimony of the witness and all

10  objections made by counsel at the time of the examination

11  were recorded stenographically by me, and were thereafter

12  transcribed under my direction and supervision, and that

13  the foregoing pages contain a full, true and accurate

14  record of all proceedings and testimony to the best of my

15  skill and ability.

16          I further certify that I am neither counsel

17  for any party to said action, nor am I related to any

18  party to said action, nor am I in any way interested in

19  the outcome thereof.

20          IN WITNESS WHEREOF, I have subscribed my name

21  this 15th day of July, 2011.

22

23

24          _____

25          LESLIE ROCKWOOD, CSR. NO. 3462
```

Page 245

# EXHIBIT B

Highly Confidential - Attorneys' Eyes Only

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4

 5    -------------------------

 6    ORACLE AMERICA, INC.,      )

 7            Plaintiff,         )

 8        vs.                    )   No. CV 10-03561 WHA

 9    GOOGLE, INC.,              )

10            Defendant.         )

11    -------------------------

12

13

14        -- HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY --

15

16        Videotaped Federal Rule 30(b)(6), Topic 9,

17        deposition of PATRICK BRADY, taken at the law

18        offices of King & Spalding LLP, 333 Twin Dolphin

19        Drive, Redwood Shores, California, commencing at

20        2:24 p.m., Thursday, July 21, 2011, before

21        Leslie Rockwood, RPR, CSR No. 3462.

22

23

24

25    PAGES 1 - 149
```

Veritext National Deposition & Litigation Services
866 299-5127

Highly Confidential - Attorneys' Eyes Only

```
1    Flexner for plaintiff Oracle America.

2              MR. KAMBER:  Matthas Kamber of Keker & Van

3    Nest for Google, Inc.

4              THE VIDEOGRAPHER:  Thank you.

5              Will the reporter please swear the witness.    14:26:21

6              THE REPORTER:  Raise your right hand, please.

7              You do solemnly state that the evidence you

8    shall give in this matter shall be the truth, the whole

9    truth and nothing but the truth so help you God --

10             THE WITNESS:  I do.                           09:38:38

11             THE REPORTER:  Thank you.

12             THE VIDEOGRAPHER:  -- thank you.

13             Please proceed.

14                        EXAMINATION

15   BY MR. NORTON:                                          14:26:39

16        Q.  Good afternoon.

17        A.  Good afternoon.

18        Q.  As you heard, my name's Fred Norton.  I

19   represent Oracle.  As I mentioned before we went on the

20   record, obviously you were already deposed on another   14:26:48

21   subject matter earlier today, and so I'm going to try not

22   to go over things that were already covered.  But from

23   time to time I'll have to ask you a question just to set

24   up the context.  But I'll try to be as respectful of your

25   time as I can be and get out of here as quickly as we can  14:27:07
```

Page 4

Highly Confidential - Attorneys' Eyes Only

```
 1          Q.  And do you recall when this was?

 2          A.  I want to say that these conversations came

 3     up.  Things with Vodafone move slow at times.  So this --

 4     I want to say it spanned the second half of 2009 and

 5     2010.                                              17:53:48

 6          Q.  Okay.  And if you turn to the prior page,

 7     still in Exhibit 230, there's a Section 9 called

 8     "Performance Compatibility."

 9          A.  Yep.

10          Q.  Would you just read aloud the three sentences  17:54:06

11     that appear there?

12               MR. KAMBER:  Object to the form.

13               THE WITNESS:  The three sentences that appear

14     directly underneath 9 -- the section heading?

15          Q.  BY MR. NORTON:  Yes.  Just read it out loud    17:54:22

16     please.

17               MR. KAMBER:  Same objection.

18               THE WITNESS:  As the document reads:  "One of

19     the goals of the Android compatibility program -- of the

20     Android compatibility program is to enable consistent    17:54:30

21     application experience to consumers.  Compatible

22     implementations must ensure not only that applications

23     simply run correctly on the device but that they do so

24     with reasonable performance and overall good user

25     experience.  Device implementations must meet the key    17:54:50
```

Page 121

Highly Confidential - Attorneys' Eyes Only

```
 1   performance metrics of the Android 2.2 compatible device

 2   defined in the table below."

 3        Q.  BY MR. NORTON:  And then there's a table that

 4   has criteria set forth there; right?

 5        A.  Yeah.                                      17:55:04

 6        Q.  Now, is there any testing that Google does to

 7   ensure -- and does the CTS test to see whether devices

 8   satisfy the criteria set forth in Section 9?

 9        A.  I believe it does test some of these, yeah.

10        Q.  All right.  And the specific criteria that    17:55:25

11   are set out here are application launch time and then

12   simultaneous applications?

13        A.  Yes.

14        Q.  And under application time, the standard is

15   that the following applications should launch within the  17:55:37

16   specified time, the browser less than 1300 milliseconds

17   MMS/SMS less than 700 milliseconds and alarm and clock

18   less than 650 milliseconds; is that right?

19        A.  Alarm clock is a single application here.

20        Q.  Oh, thank you.                              17:55:58

21            And so that's -- in the case of the browser,

22   1.3 seconds to connect, 1300 milliseconds?

23        A.  If my math is correct, yes.

24        Q.  And why does Google care how quickly these

25   things launch?                                       17:56:15
```

Page 122

Highly Confidential - Attorneys' Eyes Only

```
 1              A.  Well, when -- one of the things that we found

 2       when we had the OEMs making Android devices -- porting

 3       the Android platform to their devices and running this is

 4       sometimes the -- the -- this talks about user experience.

 5       But it's also developer experience.                        17:56:38

 6              So Rovio, for example, is very upset when

 7       their app runs very slowly.  And they get complaints.  Or

 8       they'll get returns, if it's a paid app.  Or their app

 9       will be rated poorly.  And, you know, the app developer

10       has basically, you know, nothing much they can do; right,   17:56:57

11       if the device is just too slow?

12              And so here we're trying to put some, you

13       know, we think fairly conservative and not onerous

14       requirements on OEMs to maintain some minimum level of

15       performance for users and application developers so that    17:57:20

16       it's a reasonable experience.

17              Q.  Okay.  Other than the concern that developers

18       will have a bad experience because they might get

19       complaints or returns, are there other reasons why Google

20       wants to -- has as a goal to enable consistent             17:57:41

21       application experience to consumers?

22              A.  It's really -- from a compatibility

23       standpoint, it's really about developers.  So I'll

24       state -- you know, consumers indirectly drive, you know,

25       the developer experience, I guess I should say.  The       17:58:02
```

Page 123

Highly Confidential - Attorneys' Eyes Only

1    consumer experience drives the developer experience, if

2    that makes sense.

3              So when a device -- you know, an application

4    developer creates an application that -- a great

5    application, but the device executes that application          17:58:18

6    poorly, the developer has a bad experience, because they

7    may get rated poorly.  They may suffer returns.  They

8    may, you know, have upset users.  And so that's generally

9    what we're trying to ensure doesn't happen here.

10         Q.  All right.  And at the risk of pushing too          17:58:37

11   hard on the obvious, why does Google care about whether

12   or not the developers have bad experiences with their

13   applications running on a given device?

14         A.  Because, I mean, generally, any ecosystem

15   needs developers -- an app ecosystem needs developers.        17:58:55

16   And developers who have a bad experience leave.

17         Q.  The other performance criterion here is

18   simultaneous applications.

19         A.  Yep.

20         Q.  And the standard there in the compatibility         17:59:10

21   definitions is that when multiple applications have been

22   launched, relaunching an already running application

23   after it has been launched must take less than the

24   original launch time.

25         A.  This is an interesting metric.  Yes.                17:59:24

                                                        Page 124

Highly Confidential - Attorneys' Eyes Only

1      Q.  So in other words, when you relaunch it, it

2   will start faster than it did the first time?

3      A.  Yes.  I think maybe relaunching it isn't -- I

4   don't know -- an exact term here.  One of the things that

5   Android does -- or that Android developers do in Android      17:59:43

6   is, you know, launch one application from another.

7           So I may have an application that I can

8   launch out to send an email or do something, and then I

9   hit "back."  And Android has this notion of an affordance

10  for the user to go back.  And you'll go back to the          18:00:03

11  application you were in.  So it's kind of integration

12  between applications.

13          In this case, what we're trying to say is if

14  I open whatever application it may be, and it has an

15  option to email someone, and I hit the email button and     18:00:19

16  it launches the email application, when I go back, I

17  don't want that -- you know, that old application to take

18  longer than it initially took to launch.  Does that make

19  sense?

20      Q.  So I'm in the browser, and I click on an            18:00:33

21  email address.  It opens the email program.  I don't want

22  to send an email right now, and I want to go back to the

23  browser.  So I go back to the browser.  And I don't want

24  to wait for the browser to take launch as long as it took

25  the first time; right?                                      18:00:50

Page 125

Highly Confidential - Attorneys' Eyes Only

1           A.   Right.

2           Q.   Okay.  So again, this is about -- it's a

3    particular application of speed, but it's about speed?

4           A.   Yes.

5           Q.   And, in fact, both of these criteria for          18:00:58

6    performance are about -- I'm sorry.  Go ahead.  Sorry.

7           A.   Well, I'd say it's about speed, but it's

8    really -- here, I mean, it's about the ability to run

9    multiple applications at once.

10          Q.   Okay.                                               18:01:11

11          A.   So a big part of Android is multitasking.

12   And, you know, when trying to define that, what we're

13   trying to figure out is, well, okay, do you need to be

14   able to run -- you know, in defining the requirements,

15   able to run multiple applications at once?  Well, the    18:01:32

16   default user experience in Android is a single foreground

17   application.  And so the way we're trying to codify that

18   here is, say, well, when you go back to a previously open

19   application, it should launch faster than if it was from

20   a cold start.  It's perhaps a -- but yes, that's what      18:01:49

21   it's about, performance.

22          Q.   And strictly speaking, what Section 9 is

23   doing with it is not compatibility, per se, but just how

24   well the device performs when consumers have them.

25          MR. KAMBER:  Objection to form.                    18:02:14

                                                               Page 126

Highly Confidential - Attorneys' Eyes Only

1            THE WITNESS:  No.  I think it is

2     compatibility.  And this is something that we've debated

3     for a long time.  From an application developer

4     perspective, you can have two devices that may be

5     technically able -- you know, one device that runs an            18:02:30

6     application well and one device that technically executes

7     the byte code but does it extremely slowly.

8            And, you know -- and we need, you know, from

9     an application developer's perspective, they maybe, you

10    know, don't consider those two devices to be compatible,          18:02:45

11    because they can't write their applications the same

12    way -- they can't use the same application on both

13    devices.

14            And so what we're doing here is putting, in

15    all honesty, a very low bar on -- on, you know, the              18:02:59

16    minimum performance requirements you must have.

17            So, I mean, from our sense, it really is

18    about compatibility here.

19            And, you know, we constantly get complaints

20    from the developer that, "Hey, when I -- when I want to          18:03:19

21    play a sound on this given device, sometimes there's a

22    2-second lag before the song gets played," you know, "and

23    on this other device, there's no lag."  That's, you know,

24    the same -- the same application is executing on both

25    devices, but they're incompatible from a user experience        18:03:36

                                                          Page 127

Highly Confidential - Attorneys' Eyes Only

1    perspective.  And that's a problem for developers.

2            Q.  All right.  So stepping back a little bit,

3    this -- the OEM is free to customize Android in various

4    ways, but one of the things that they have to do is make

5    sure that when they customize Android, they do not impair    18:03:58

6    the performance of the platform with respect to its

7    ability to launch programs quickly and multi-task?

8            A.  According to these specific provisions, yes,

9    they need to meet those.

10           Q.  And these particular applications that are      18:04:15

11   called out here, the browser, MMS and the alarm clock,

12   those are just proxies for the general ability of the

13   platform to meet overall speed expectations.  Is that

14   fair?

15           A.  Yes.  And I believe those applications would    18:04:38

16   have been adjusted over time.  But yes, I mean, we're

17   trying to establish some standard reference that we can

18   use to have an objective, you know, assessment across

19   different devices.

20           Q.  So the idea is if it can launch the browser     18:04:52

21   as fast as we need to launch the browser, it will

22   probably run Angry Birds okay?

23           A.  I wish that was a valid assertion.  But, you

24   know, I mean, at some point you have to be realistic;

25   right?  And we're not going to be able to test these two    18:05:08

Page 128

Highly Confidential - Attorneys' Eyes Only

```
1   STATE OF CALIFORNIA      ) ss:

2   COUNTY OF MARIN          )

3

4            I, LESLIE ROCKWOOD, CSR No. 3462, do hereby

5   certify:

6            That the foregoing deposition testimony was

7   taken before me at the time and place therein set forth

8   and at which time the witness was administered the oath;

9            That testimony of the witness and all

10  objections made by counsel at the time of the examination

11  were recorded stenographically by me, and were thereafter

12  transcribed under my direction and supervision, and that

13  the foregoing pages contain a full, true and accurate

14  record of all proceedings and testimony to the best of my

15  skill and ability.

16           I further certify that I am neither counsel

17  for any party to said action, nor am I related to any

18  party to said action, nor am I in any way interested in

19  the outcome thereof.

20           IN WITNESS WHEREOF, I have subscribed my name

21  this 26th day of July, 2011.

22

23

24   _____Leslie Rockwood_____

25           LESLIE ROCKWOOD, CSR. NO. 3462
```

Page 146