# Exhibit  A

Volume 15

Pages 2680 - 2738

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,                    )
                                         )
            Plaintiff,                   )
                                         )
  VS.                                    )  No. C 10-3561 WHA
                                         )
GOOGLE, INC.,                            )
                                         )
            Defendant.                   )  San Francisco, California
_____)  May 3, 2012


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          MORRISON & FOERSTER
                            755 Page Mill Road
                            Palo Alto, California  94304
                    BY:  **MICHAEL A. JACOBS, ESQUIRE**
                         **KENNETH A. KUWAYTI, ESQUIRE**
                         **MARC DAVID PETERS, ESQUIRE**
                         **DANIEL P. MUINO, ESQUIRE**

                            BOIES, SCHILLER & FLEXNER
                            333 Main Street
                            Armonk, New York 10504
                    BY:  **DAVID BOIES, ESQUIRE**
                         **ALANNA RUTHERFORD, ESQUIRE**


(Appearances continued on next page)



Reported By:  Katherine Powell Sullivan, RPR, CRR, CSR #5812

**APPEARANCES (CONTINUED)**:

**For Plaintiff:**          BOIES, SCHILLER & FLEXNER
                           1999 Harrison Street, Suite 900
                           Oakland, California  94612
                    BY:    **WILLIAM FRED NORTON, ESQUIRE**
                           **STEVEN C. HOLTZMAN, ESQUIRE**

                           ORACLE AMERICA, INC.
                           500 Oracle Parkway
                           Redwood Shores, California  94065
                    BY:    **ANDREW C. TEMKIN, CORPORATE COUNSEL**
                           **DORIAN DALEY, GENERAL COUNSEL**

**For Defendant:**         KEKER & VAN NEST
                           633 Battery Street
                           San Francisco, California  94111-1809
                    BY:    **ROBERT ADDY VAN NEST, ESQUIRE**
                           **CHRISTA MARTINE ANDERSON, ESQUIRE**
                           **DANIEL PURCELL, ESQUIRE**
                           **MICHAEL S. KWUN, ESQUIRE**

                           KING & SPALDING LLP
                           1185 Avenue of the Americas
                           New York, New York 10036-4003
                    BY:    **BRUCE W. BABER, ESQUIRE**

                           GOOGLE, INC.
                           1600 Amphitheatre Parkway
                           Mountain View, California  94043
                    BY:    **RENNY HWANG, LITIGATION COUNSEL**

**Also Present:**          **SAFRA CATZ, President and CFO**
                           Oracle Corporate Representative

                           **CATHERINE LACAVERA**
                           Google Corporate Representative

PROCEEDINGS                                     2689

 1              **MR. VAN NEST:**  Sure.

 2              **THE COURT:**  Here's what I'm going to do.  I'm going

 3    to say, "answer."  Why don't you take a look at this, to see if

 4    you think I'm okay.  What is today?  May 3rd, 11:10.  Look at

 5    it and see if I wrote it down correctly.

 6              (Pause)

 7              **MR. JACOBS:**  Yes, Your Honor.

 8              **MR. VAN NEST:**  That's fine, Your Honor.

 9              **THE COURT:**  Do I have your permission now to send

10    that into the jury room?

11              **MR. JACOBS:**  Yes, Your Honor.

12              **MR. VAN NEST:**  Yes.

13              **THE COURT:**  Great.  Dawn will do that now.

14              Now we can turn to the other event.  I've lost my

15    train of thought; didn't I?

16              Oh, yes, we want to go over your motion to exclude,

17    so who's going to argue that and bring me up to speed on this?

18              **MR. PURCELL:**  Well, it's their motion, Your Honor.  I

19    don't know if you wanted them to start.  I'm happy to provide

20    some background on it.

21              There's one, actually, important development that

22    just happened in the past couple of days.  If you recall, this

23    motion started off as a motion to strike based on the fact that

24    we didn't have the foundational interviewee on our witness

25    list, Aditya Agarwal, so Your Honor gave us leave to substitute

PROCEEDINGS

1  Mr. Rubin.

2          They have now subpoenaed Mr. Argarwal to testify at

3  trial.  We have accepted service of the subpoena, so it seems

4  like that problem should be solved, and we should be able to

5  put Mr. Agarwal on the stand, put Mr. Rubin on the stand, lay

6  the foundation to the documents through them, and then proceed

7  from there.  If they have any objections, we can deal with

8  those as they make them.

9          That's how I would suggest to proceed.

10          **THE COURT:**  Well, that would be great if it's that

11  simple.

12          Mr. Norton, does that solve the problem?

13          **MR. NORTON:**  It does not.

14          **THE COURT:**  Okay.

15          **MR. NORTON:**  The problem is not whether Aditya

16  Agarwal testifies at trial, and it never was.

17          The problem is that Mr. Argarwal testified, as the

18  30(b)(6) representative of Google, that he didn't know how the

19  P&L was generated; he didn't know how Android costs were

20  allocated.  He didn't know anything about that P&L.

21          That was the basis for our motion to strike, was that

22  Dr. Kearl assumed that Dr. Cox had correctly allocated costs

23  for Android under 504(b).  Dr. Cox assumed that the P&L

24  correctly allocated costs.  Dr. Cox's only basis for making

25  that assumption was that he believed that Mr. Argarwal said so.

1   And Mr. Argarwal testified he didn't have the faintest idea how

2   those numbers were generated.

3         **THE COURT:**  So you know-- okay.  Interrupt you for a

4   second.  Show me the numbers we're arguing over.

5         I would have thought that we had -- this is a public

6   company.  We would be dealing with audited financials, and that

7   there would be no issue here.  So why --

8         **MR. PURCELL:**  We are, Your Honor.

9         **THE COURT:**  No, Mr. Purcell --

10        **MR. PURCELL:**  Fair enough.

11        **THE COURT:**  It's his motion.  Stop interrupting him.

12        **MR. PURCELL:**  Fair enough.

13        **MR. NORTON:**  I can hand up Exhibit 1069, which was

14  the document produced by Google before Mr. Rubin's deposition

15  and is the P&L for Android.

16        **THE COURT:**  Is that this one?

17        **MR. NORTON:**  You have an easier-to-read copy than I

18  do.

19        **THE COURT:**  What kind of document is this?

20        **MR. NORTON:**  It is a document that was -- Mr. Rubin

21  testified he received from the Google lawyers.  And he

22  testified that it appeared to be similar to the types of

23  documents he received --

24        **THE COURT:**  Is it ginned up just for this case, or a

25  real document used in the ordinary course of business?

1        **MR. NORTON:**  This document, I'll have to defer to

2   Google on that.  This is not a document that anyone has

3   testified about, other than Mr. Rubin, who said that he

4   received this document from the lawyers.

5        Dr. Cox cited a P&L statement in his report, and he,

6   too, cited a document that he said he received from Google

7   lawyers.

8        Google, in its discovery response, did direct us to

9   other P&L statements, but not the ones that Dr. Cox relied upon

10  and not the one that Mr. Rubin produced for his deposition.

11       So this document, so far as we can tell, so far as

12  the testimony so far establishes, is not a document that is

13  maintained in the ordinary course of business.  It may be, but

14  no one has ever testified to that.

15       **THE COURT:**  All right.  Help me understand the

16  significance of the document.

17       How does this fit into the issues in the case on

18  damages?

19       **MR. NORTON:**  Sure.  So we're solely focused on the

20  question of infringer's profits right here.  And for

21  infringer's profits, we need only show their revenues for

22  Android.  And then they are required to prove their deductible

23  expenses that are attributable to the copyright infringement.

24       Now, this issue right now is solely focused on what

25  are the deductible expenses.  And under Ninth Circuit law, the

```
1  only expenses they are entitled to deduct are those expenses
2  that actually contributed to the sales of the infringing work.
3  That's Frank Music.  We cited that in our papers both on this
4  motion and the prior motion.  I don't think there is any actual
5  dispute about that.
6          So this argument is not about whether or not Exhibit
7  1079 is admissible; although, it very well may not be.  The
8  argument is about whether or not Dr. Cox, and by extension
9  Dr. Kearl, has any basis to conclude that the numbers that
10 appear in Exhibit 1079 reflect expenses that actually
11 contributed to the sales of the infringing work.
12         The problem is that Mr. Rubin has testified now -- we
13 have good reason to think it's not.  So, one, no Google witness
14 has been able to explain --
15         THE COURT:  I don't even understand the document,
16 though.
17         MR. NORTON:  Sure.
18         THE COURT:  Help me understand the basics, how the
19 Google side says that it shows those expenses.
20         MR. NORTON:  Sure.  So on the first page -- and I
21 think that, really, Dr. Cox only uses the first page -- we have
22 the revenues, and we have them by period.
23         This includes a forecast when we get all the way to
24 the right side.  But Your Honor will see -- mine is very small,
25 but there are 2010 actual revenues by quarter.  There's 2011.
```

1            THE COURT:  I don't see that -- oh I see it over

2    here.   2010 actual by quarter revenues.

3            MR. NORTON:  Okay.

4            THE COURT:  So just stick with that part.

5            MR. NORTON:  Sure.

6            THE COURT:  Where are the deducts?

7            MR. NORTON:  So then we have -- beneath that you'll

8    see that there's a series of indented revenue figures:  "Ads

9    (AFMS)," "Ads (AFMA)," and so on.  And then you'll see,

10   "TAC:Dist/Organic."  And, at that point, I understand we are

11   deducting costs.

12           THE COURT:  What is "TAC"?

13           MR. NORTON:  I've seen it referred to both as "total

14   acquisition cost" and "traffic acquisition cost."

15           At his deposition on the 27th, Mr. Rubin described it

16   as total acquisition cost.

17           THE COURT:  Just stick with one column, quarter 1.

18   It says "Revenue, 97.66."  Is that 97 million?

19           MR. NORTON:  Yes.

20           THE COURT:  And then those subparts underneath

21   there --

22           MR. NORTON:  Then there will be deductions for sales,

23   marketing.  You'll see under the bolded "Gross Margin":

24   "sales, Marketing, Co-Marketing, PM, Engineering."  And

25   engineering is consistently the greatest expense claimed.

```
 1                And then, as a result of those deductions, we get a
 2   number at the bottom, "Product Contribution," which I
 3   understand Google would contend represents the profit or loss
 4   for Android for that particular reporting period.
 5                THE COURT:  I'm sorry -- okay.  Bear with me here.
 6                MR. NORTON:  Yes, Your Honor.
 7                THE COURT:  At the very top it says 97.66 million
 8   revenue.
 9                MR. NORTON:  For Q2010, yes, Your Honor.
10                THE COURT:  Let's just stick with one column.  The
11   next one says, Revenue Ads distant -- d-i-s-t and organic.
12   What does that mean?
13                MR. NORTON:  That's advertising revenue, distribution
14   and organic.  And I don't know, offhand, right now what the
15   distinction is between those two.
16                THE COURT:  All right.  Do those other non-bolded
17   numbers supposedly add up to the one at the top?  Is that the
18   way it works?
19                MR. NORTON:  Yes, Your Honor.
20                THE COURT:  It's not like the total is at the bottom.
21   The total is at the top.
22                MR. NORTON:  That's correct.
23                THE COURT:  Okay.  I got that part.  So now we go to
24   "Est. TAC 3.74."  What does that column, that -- that row
25   represent?
```

1          **MR. NORTON:**  I'm trying to find the column.  I'm

2   sorry, Your Honor.

3          **THE COURT:**  About this far down (indicating).

4          **MR. NORTON:**  All right.  "Est. TAC."

5          **THE COURT:**  Yes.

6          **MR. MUINO:**  Those are additional costs incurred by

7   Google.  They are claimed to have been incurred by Google with

8   respect to Android in that period.

9          **THE COURT:**  All right.  Is that where the costs are

10  to be shown?

11         **MR. NORTON:**  Yes.

12         **THE COURT:**  All right.  So that's the first cost

13  item.

14         **MR. NORTON:**  And then they continue to be cost

15  items -- I believe that the gross margin number reflects the

16  adjustments that come above it.  And then they continued to

17  deduct sales, marketing, co-marketing --

18         **THE COURT:**  All right.  So gross margin is the

19  18 million.

20         **MR. NORTON:**  Yes, on that column, yes.

21         **THE COURT:**  18.88.  And that's gross.  And then there

22  is a -- then, yet, more deductions; is that right?  So it comes

23  out to they are losing money.

24         **MR. NORTON:**  So they claim.

25         **THE COURT:**  They are losing money.  Well, that would

PROCEEDINGS                                    2697

1  mean there would be no disgorgement.

2          **MR. NORTON:**  Well, no, it would not.  But the

3  standard -- this is disputed in the instructions, but the

4  standard is not straight losses, but if the losses were

5  avoided.  Avoidable losses are considered profits.

6          That is, if you would have lost $10 million but as a

7  result of the infringement you only lost $1 million, that's a

8  $9 million differential, and those are actually profits.

9          But for present purposes, in that particular quarter,

10 they do claim a loss.

11         **THE COURT:**  Okay.  So we have loss quarter 1, loss

12 quarter 2, loss quarter 3, loss quarter 4.  That adds up to a

13 big loss for the whole year.

14         Then we come to -- we come to, I guess, year -- Have

15 we got all the years?  We got a lot of months here for 2011.

16 Looks like each one of these months -- no, here's a profit.

17 June.  Profit July --

18         **MR. NORTON:**  And in May, Your Honor, yes.

19         **THE COURT:**  Yes, I see.

20         So there are big losses but small profits from the

21 second half of 2011.  Okay.  Now I understand the general

22 format of this document.

23         **MR. NORTON:**  Right.

24         **THE COURT:**  And what is your problem with it?

25         **MR. NORTON:**  Okay.  So this is a P&L, purportedly,

 1  just for Android.  Your Honor asked, Google is a public

 2  company, surely there's information out there.

 3          They don't publicly report Android as a distinct

 4  business unit.  So it's not like we can go to their SEC filings

 5  and see, okay, here's the profit and loss for Android.  So this

 6  is the document that we have.

 7          Now, the problem is that not -- there has to be some

 8  step along the way where there are expenses incurred partly for

 9  Android and partly for other business units.  So we asked

10  Mr. Agarwal, how does Google do that?  And he did not know.

11          So we asked -- and that was the basis, in part, for

12  our prior motion, was, Mr. Argarwal couldn't explain how Google

13  actually allocated its expenses to Android.  Which engineers

14  are actually working on Android, and which are the hundreds of

15  other engineers at Google working on other projects, how are

16  these numbers actually generated?

17          And Mr. Argarwal cannot answer that question.

18  Mr. Rubin does not know the answer to that question.

19          **THE COURT:**  Well, let me stop.  Are you questioning

20  the revenue side of this, or the expense side of this?

21          **MR. NORTON:**  We are questioning the expense side of

22  this.

23          **THE COURT:**  All right.  So the big number on here is

24  that engineering.

25          **MR. NORTON:**  That is the biggest portion of it, yes.

1   So here's the problem is, first, we know from Mr. Rubin, for

2   example -- he testified to this on the 27th -- one of the

3   things that's included in engineering costs is the cost of

4   developing the Gmail app.

5            **THE COURT:**  The what?

6            **MR. NORTON:**  The Gmail, the e-mail app for Google.

7            **THE COURT:**  Yes.

8            **MR. NORTON:**  Now, the Gmail app is not just for

9   Android.  The Gmail app is the one they use on all the

10  different phones, whether it's an Android phone or not.  But it

11  appears that, based on his testimony, that a hundred percent of

12  the cost of the Gmail application has been allocated to

13  Android.

14           Now, that may be appropriate in some accounting

15  sense.  It may or may not.  It doesn't really matter for our

16  purposes.  Our purposes here are, are these expenses that

17  actually contributed -- that's the standard -- actually

18  contributed to the sales of the infringing work?

19           And the development of an application for use on

20  non-Android phones doesn't fit the bill.  So that's one.

21           Another problem is that Mr. Rubin testified that

22  there are costs here to investigate options/alternatives to

23  Android as far back as 2008.  So Mr. Rubin testified -- and

24  this is at page 11 of his deposition -- that there were

25  additional costs that they incurred to look at other ways,

1 | alternative ways to develop Android.

2 |      Well, those, again -- for example, the Court will

3 | hear testimony, has already heard testimony, that Google

4 | considered not using Java, and explored those alternatives.

5 | Well, apparently, they are claiming those cost, as well.  But

6 | those two are not costs that actually contributed to the sales

7 | of the infringing work.

8 |      So then Mr. Rubin also says, in his deposition, that

9 | when he spoke to Dr. Cox -- he says, "When we reviewed the

10 | costs" -- I'm quoting from his deposition:

11 |      **"ANSWER:**  When we reviewed the costs, I

12 |      indicated there were a couple of -- you know,

13 |      there was a couple of pieces of background

14 |      information that were important to consider.

15 |      One was, we didn't start any of the

16 |      accounting until 2008.  So there's a bunch of

17 |      costs associated with Android that weren't

18 |      tracked before 2008.

19 |      "I also talked to him briefly, that although

20 |      the spreadsheets in these reports

21 |      represent -- should certainly represent costs

22 |      that were part of developing Android, the

23 |      spreadsheets also could include costs in

24 |      other areas that weren't Android.  And those

25 |      were -- we tried our best to -- you know, the

1            accounting system tries its best to sort

2            those out.  But, you know, there's some odd

3            chance that other data would be in there."

4        So Mr. Rubin -- who doesn't really know how these

5   things are created -- believes that there are other costs that

6   are not Android, that are reflected in Exhibit 1079.

7        **THE COURT:**  Let me ask you this, on just that

8   engineering item that is the big one, 28 million.

9        **MR. NORTON:**  Yes, Your Honor -- yes, Your Honor.

10       **THE COURT:**  Is there a spreadsheet that backs the

11   detail that goes behind that number?  Were can I find that?

12       **MR. NORTON:**  It's not a document on which Dr. Cox

13   relied.  Dr. Cox only uses this front -- this first piece of

14   paper (indicating).  This is the entirety of Dr. Cox's

15   analysis, is what's here.  And Dr. Cox doesn't know what this

16   is.

17        Dr. Cox, by the way, is not an accountant.  He's an

18   economist.

19       **THE COURT:**  That may be a good enough point, but I

20   want to understand it better than that.

21        Is there a backup detail sheet for that 28 million?

22       **MR. NORTON:**  There is some detail, but it would

23   not -- the additional detail, which appears in the additional

24   pages behind Exhibit 1079, does not answer our question.

25       **THE COURT:**  Well, show me where that -- is there a

1   place where I can look and see the 28-plus million, and it has

2   some line items that add up to 28 million?

3          **MR. NORTON:**  I believe the answer to that is in

4   Exhibit 1079 the answer is no, but I want to be certain of

5   that.

6          On the second page of the document they break things

7   down by headcount, but they do not appear to ever break things

8   down by cost.

9          **THE COURT:**  All right.  Let's look at the second

10  page.

11         It has the months.  It has all of 2010.  And it has

12  engineering.  These are quite large numbers.  I'm not quite

13  sure what to make of those numbers.  But do they -- is there a

14  line item that adds -- that ties to the engineering line on the

15  main page, 2878?  2878.

16         **MR. NORTON:**  Your Honor, we have not been able to

17  find any such line in the spreadsheet.  Again, there is a

18  headcount breakdown.  There is not a number that relates back

19  to that --

20         **THE COURT:**  What is the headcount breakdown?

21         **MR. NORTON:**  The head count breakdown is page 2 of

22  Exhibit 1079.

23         **THE COURT:**  Right.  I see that.

24         **MR. NORTON:**  And so there are subcategories here for

25  engineering.  Of course, these are -- the cost for this

1  particular sheet start more recently, June 11.  So to find the

2  period that would correspond to the number Your Honor is

3  interested in, first quarter of 2010, you would actually have

4  to sum the three months, January, February and March of 2010,

5  that are in the right most third of the page.  But that would

6  only tell you how many engineers were working.  It wouldn't

7  actually tell you a cost.

8          THE COURT:  So "headcount" refers to number of

9  engineers?

10          MR. NORTON:  That is what I understand it to mean and

11  what I believe Mr. Rubin indicated at his deposition.

12          THE COURT:  So he says engineering is Dev.  There's

13  quite a number of categories.  "Dev" means what?

14          MR. NORTON:  I believe "Dev" is development.  Yes.

15          THE COURT:  Skip "Other."  "PM" means what?

16          MR. NORTON:  I'm going to need some help here, Your

17  Honor.

18          I believe that one is product management.  I think

19  that Mr. Rubin's testimony on this was that he was familiar

20  with the categories but not necessarily all the acronyms.

21          THE COURT:  Well, the -- far and away the biggest one

22  of these categories is "Dev."

23          MR. NORTON:  "Dev" is the most substantial one.

24          THE COURT:  All right.  May I let you sit down for a

25  moment.

 1            **MR. NORTON:**  If I could make one last point, Your

 2   Honor.

 3            **THE COURT:**  All right.  What is that?

 4            **MR. NORTON:**  The other problem with relying on this

 5   particular document, or any other similar such document, is

 6   that when we asked Google point blank what their revenues were

 7   by way of an interrogatory, what they answered was -- and this

 8   is Google's Third Supplemental Response to Plaintiff's

 9   Interrogatory No. 17.  And Google specifically said -- this is

10   on page 7 and 8:

11            "Google states that any financial data

12            relating to mobile platforms from prior to

13            January 2009 that it may have maintained are

14            inaccurate and unreliable."

15            So they want us to take on faith -- because no one

16   has been able to actually explain how this document was

17   created -- that this document is entirely accurate;

18   notwithstanding a lot of testimony that suggests that it isn't,

19   and notwithstanding the fact that they themselves concede that

20   their financial documentation up until January 2009 is

21   inaccurate and unreliable.

22            So neither we nor Dr. Cox nor Dr. Kearl has any basis

23   to be able to say that there's any line on Exhibit 1079 that

24   you could say is a cost that was actually incurred by Android

25   and actually contributed to the sales of the infringing work.

PROCEEDINGS                                    2705

1            **THE COURT:**  In what context was that interrogatory

2    made?  What was the question?

3            **MR. NORTON:**  The question was:

4            "Please state the total amount of your actual

5            and (as applicable) projected unit sales,

6            revenues, gross profits, and operating

7            profits, separately for each month

8            January 2005 through December 2011, relating

9            to or derived from each of (i) Android

10           application developers' registration fees,

11           (ii) Android application transaction fees

12           (regardless of whether application downloads

13           or transactions were conducted using Android

14           Market), (iii) Android Market application

15           downloads or other transactions, (iv) in-app

16           billing on Android devices, (v) advertising

17           on or through Android devices, (vi) any other

18           product or service sold, licensed,

19           downloaded, or otherwise offered in

20           connection with Android, (vii) advertising on

21           or through each mobile platform other than

22           Android, and (viii) any other product or

23           service sold, licensed, downloaded, or

24           otherwise offered in connection with any

25           mobile platform other than Android."

PROCEEDINGS                                                    2706

1          And then there's a request that documents on which

2    the answer is based be produced.  And they gave an answer,

3    which provides some information.  But what is most relevant

4    here is their statement that their financial data up until

5    prior 2009 -- prior to 2009, is inaccurate and unreliable, and

6    yet they want us to rely upon a document that no one can

7    actually explain.

8          **THE COURT:**  Well, but that statement about being

9    unreliable prior to 2009, the dates that you've got for me here

10   are all after that.

11         **MR. NORTON:**  Well, the dates -- that's actually true

12   and interesting.  The dates on this document are all after

13   that.  But it's not clear to us whether the numbers that appear

14   for fiscal year 2009 include costs incurred in the prior

15   period.  But --

16         **THE COURT:**  When did Google go public?

17         **MR. NORTON:**  Google has been public since -- they'll

18   know better than I, but well before this.  Around 2000, 2001, I

19   think.

20         But they do have on this sheet numbers for fiscal

21   year 2008.  This document, the very first column of the

22   document says fiscal year 2008, the very year on which they say

23   they don't have accurate or reliable numbers.

24         But it's not just a question of whether they have

25   accurate numbers for the period prior to 2009.  The question

1  is, in conjunction with all of the other evidence, how are

2  we -- how is Dr. Cox -- and this is a motion directed at

3  Dr. Cox and Dr. Kearl, really, not this particular document

4  exclusively -- but how can Dr. Cox offer an opinion that

5  Google's expenses that actually contributed to the sales of the

6  infringing work, what those are?

7           **THE COURT:**  All right.  Let me hear from Mr. Purcell.

8           **MR. PURCELL:**  So a couple of basic things, Your

9  Honor.  This document was not ginned up for the litigation.

10          If I could step back, Mr. Argarwal is the accountant

11 for Android, who actually takes the inputs that are reported to

12 him and creates these spreadsheets.

13          And then Mr. Rubin, of course, is the business head

14 who reviews these every quarter, every time they are released

15 to him, and uses them as a basis for running the business.

16          Both of them testified that these documents are

17 created in the ordinary course of Google's business.  They are

18 reviewed regularly.  They are checked.

19          Mr. Rubin said the financials are audited and they're

20 relied on for purposes of product planning.

21          **THE COURT:**  Mr. Rubin said these spreadsheets are

22 audited?

23          I do understand auditing, Mr. Purcell, so you're not

24 going to slip something by me.  These are clearly not audited.

25          **MR. PURCELL:**  Well, he said Google financials are

1    audited.  He did not say the spreadsheets are audited.  That's

2    right.

3              THE COURT:  Show me, then, if these were audited --

4              MR. PURCELL:  I don't believe that we know whether

5    these were audited.  I don't believe Oracle asked that

6    question.  I can't represent that they are.

7              THE COURT:  I'm sure they weren't.

8              What is the -- the backup to the 28.78 that we have

9    been looking --

10             MR. PURCELL:  The backup for the engineering costs

11   for quarter 1, 2010?

12             THE COURT:  Right.

13             MR. PURCELL:  I don't believe it's shown on this

14   spreadsheet.  What's shown is headcount.

15             THE COURT:  Did that number just get pulled out of

16   thin air?

17             MR. PURCELL:  No.  That number was calculated by

18   Google in the ordinary course of its business, and incorporated

19   on the spreadsheet.

20             THE COURT:  I don't think that's good enough.

21             I just don't get this.  You're telling me this

22   document is used in the ordinary course of business?

23             MR. PURCELL:  This is an executive summary financial

24   spreadsheet that is used by Andy Rubin every time he gets

25   reports on how Android is doing; every month, every quarter.

 1  This is the format in which he gets it, the format in which he

 2  reviews it, receives it, and makes decisions based on it.

 3       And it doesn't include specific line item breakdowns

 4  for each individual line item.  Those documents do exist.  I'm

 5  sure they could be generated.  That was not something we

 6  provided to Dr. Cox.  That was not something that we provided

 7  to Oracle.  That's something that we could provide, certainly.

 8       I have no doubt that that 28.78-million-dollar number

 9  is accounted for somewhere in a more specific form than this.

10       **THE COURT:**  But you're saying that a -- that this

11  very document that I'm holding is one that sometime in the

12  past -- I don't mean it was drawn and compiled together from

13  someone -- I mean this very document that somebody gave me this

14  morning, there was a time in the past when Mr. Rubin looked at

15  this for business purposes and it was exactly the same

16  document?

17       **MR. PURCELL:**  What Mr. Rubin said at his deposition

18  is that this document is in the format that he is given

19  financials on a monthly and a quarterly basis.

20       **THE COURT:**  That is a much different proposition.

21       **MR. PURCELL:**  I believe that this was -- I mean, this

22  looks to me, just based on the numbers, that this is the

23  financial statement for August of 2011.  That's the last actual

24  month.  And I believe in that context this would have been

25  reviewed by Mr. Rubin.

PROCEEDINGS                                    2710

1           **THE COURT:**  Have you produced the real documents that

2    he looked at on an ongoing basis going back to 2008?

3           **MR. PURCELL:**  We haven't produced them for every

4    month.  We could.  This is --

5           **THE COURT:**  Would they track these numbers?

6           **MR. PURCELL:**  I believe they would, Your Honor.  I

7    don't believe the numbers have changed.

8           This should be the document that Andy Rubin received

9    after August 2011.  That's the last actual month that's

10   reported on this.  He testified that this is the document in

11   the format that he received it.

12          **THE COURT:**  But "format," you have to forgive me

13   because -- go ahead.

14          **MR. PURCELL:**  I'm informed that we actually have

15   produced every single Android profit and loss statement that we

16   have.  They should have those.

17          **THE COURT:**  And it's in this format?

18          **MR. PURCELL:**  I believe so.

19          **THE COURT:**  Okay.  Mr. Norton, is that true?

20          **MR. PURCELL:**  Hold on.  If I could, I would like to

21   respond to a couple of the other things that Mr. Norton said

22   that aren't right.

23          Number one, he raises this issue that there's costs

24   in here about non-Android apps, apps that were developed -- the

25   Gmail app he mentioned specifically -- for other platforms.

```
 1   And he thinks we allocated all of those costs for the iPhone

 2   Gmail app, and the -- you know, Symbian Gmail app, just to the

 3   Android P&L.  That's not right.  That's not what Mr. Rubin

 4   said.

 5              The question by Ms. Rutherford at the deposition was:

 6              "Are the costs of the apps that Google

 7              develops that are specific to Android

 8              included?"

 9              Mr. Rubin said yes.  And then he said Gmail is a good

10   example of the application.  And then he also mentioned GMaps.

11              As Your Honor knows, Google has to design separate

12   versions of the Gmail app for Android versus for iPhone versus

13   for other platforms.  These platforms use different programming

14   languages.

15              All Mr. Rubin said is that Android-specific apps,

16   like Gmail on Android, are included in the P&Ls.

17              The other thing I would like to reference is the

18   interrogatory response that Mr. Norton referenced about data

19   before 2009.

20              If you listen to the categories that he mentioned,

21   the categories he mentioned are all products, services,

22   advertising related to Android.

23              Android didn't launch until October/November of 2008,

24   with these platforms, these projects, these services.  There

25   wouldn't be any costs, really, for 2008.
```

1          And if you look at the P&L, what's represented on the

2    P&L for 2008 is engineering, predominantly, which makes sense

3    because in 2008 Android was being developed.  There were huge

4    engineering costs going into actually getting the first release

5    of the software out there, which happened at the very end of

6    the year?

7          **THE COURT:**  Wait.  Let me -- I want to get to the

8    bottom of whether or not the financial statements in the

9    ordinary course of business, that were in this format, were

10   produced to Mr. Norton.

11         Mr. Norton, what is the answer to that?

12         **MR. NORTON:**  The answer is, they were not.

13         So what we got, Google identified P&L statements in

14   its interrogatory response, and -- in the interrogatory

15   response I just read to the Court.

16         And I didn't bring everything.  But I can show it to

17   counsel.  These are examples of the documents that are cited

18   specifically in the interrogatory response.

19         You might want to show this to --

20         **MR. PURCELL:**  These are also -- documents in that

21   format are also attached to this, which is another one of the

22   documents Mr. Rubin testified about at his deposition, and that

23   we produced to Oracle recently, as supporting Mr. Rubin's

24   discussion with Dr. Cox.

25         **THE COURT:**  Well, I -- I would like to know whether

1   or not the very documents that Mr. Rubin would have looked at

2   at the end of each quarter, for 2010, 2011, earlier, the ones

3   done in the ordinary course of business without any massaging

4   at all, the historical actual thing that he held in his hand,

5   was that produced?

6           **MR. NORTON:**  No.  We are confident that they were

7   not.  Let me explain why I am so confidence.

8           **THE COURT:**  This is an opinion you are about to give

9   me?

10          **MR. NORTON:**  I don't think so.

11          **THE COURT:**  You don't actually know, you're just

12  giving me an opinion.  You're confident -- anyone who is

13  confident means it's an opinion.

14          **MR. NORTON:**  I'm going to explain the evidence.

15          We don't have spreadsheets that look like 1079, that

16  first page.  Those were not produced to us.

17          Secondly, Mr. Rubin testified at his deposition on

18  the 27th.  He was shown Exhibit 1079, the document that Your

19  Honor has.  And Ms. Rutherford asked:

20          "All right.  You have before you Exhibit

21          1079.  Would you just verify that that's the

22          spreadsheet you've been discussing, that you

23          reviewed with Dr. Cox.

24          **"ANSWER:**  This is -- well, let's see.

25          There's many pages here, and I think there's

1          actually different spreadsheets here.  So

2          let's review it for a second.

3          **"QUESTION:**  Okay.

4          **"ANSWER:**  It's an eye chart.  This is -- I

5          mean, it seems to be kind of some of the same

6          data, but it's not in the exact form,

7          probably just because of the way it was

8          printed.  For example, my spreadsheet had the

9          names of tabs for one of these reports, and

10         this doesn't have it.

11         **"QUESTION:**  You are looking at a spreadsheet

12         on a computer; is that correct?"

13         Objection to form.

14         **"ANSWER:**  I looked at a version of this

15         spreadsheet that was projected on the screen

16         from a computer because the numbers are

17         really small.  And I'm trying to figure out

18         if this is just one spreadsheet or more than

19         one spreadsheet.  I don't -- I don't know if

20         this is the identical document that I

21         reviewed.  I guess that's my conclusion."

22         The point of that --

23         **THE COURT:**  All right.  That's a good point.

24         It would be okay -- it would be perfectly okay if

25  these numbers were drawn from the same columns on some other

1  document that was produced in the ordinary course of business,

2  and this just happens to be a summary sheet, so long as we

3  could go back to the original documents.  And if there was a

4  big number, we could go behind it and find out what it was

5  based on.

6          That's what we ought to be asking here is, where are

7  the original documents that he held in his hand, so that you

8  could sit down at a desk, put on your green eyeshade like Bob

9  Cratchit, and then go to work seeing if you could reverse

10 engineer this thing to see if the numbers add up, or whether

11 it's been ginned up for litigation.

12         It wouldn't be the first time something had been

13 ginned up for litigation.  So that's what we ought to be trying

14 to get to the bottom of.  And then if -- a big number like

15 28 million, you ought to be entitled to see the detail behind

16 that.

17         MR. NORTON:  I don't think there is any dispute here

18 that we did not get that level of detail.

19         THE COURT:  Well, then, maybe you should get the

20 detail.

21         MR. NORTON:  So -- but even with, you know, the

22 challenge -- although, the document would need to be

23 authenticated at trial.  Our motion is not focused exclusively

24 on the document.  Right.

25         THE COURT:  Well, if there was -- if I'm satisfied

1  that this -- these numbers are in the ballpark of reasonable,

2  then I would let him testify to it, and put the burden on you

3  to show that it was bogus.  But I am concerned that he

4  doesn't -- somebody just gave him a document.  And Mr. Rubin

5  can't -- can't vouch for it.

6          **MR. NORTON:**  We absolutely share --

7          **THE COURT:**  Somebody has got to be able to vouch for

8  this document and where the numbers came from.

9          **MR. NORTON:**  Well, that's exactly right.  And we did

10 take the deposition of a 30(b)(6) witness on Android finances.

11 That was Mr. Argarwal.

12         And our original motion on this issue was not that

13 Mr. Argarwal was not a trial witness.  It was that Mr. Argarwal

14 had testified, as the 30(b)(6) witness that, he did not know

15 how these numbers were generated.

16         So now what they want to do is put up Mr. Rubin, who

17 also doesn't know.  And then, failing that, they want to

18 produce some more documents to us that might justify these

19 numbers.  But we've been through several iterations of this,

20 and, at the end of the day, they have a burden to produce the

21 evidence that will allow them to prove their allocable costs.

22         **THE COURT:**  Yes, that's their burden.

23         **MR. NORTON:**  And we don't have that.  And their

24 expert can't offer an opinion in the absence of that evidence.

25         **THE COURT:**  Dawn, can I have some water, please.

1          What would you like to say, Mr. Purcell?

2          **MR. PURCELL:**  Very briefly, Your Honor.

3          I can't represent to you that I'm a hundred percent

4   sure.  And maybe that means that isn't good enough, but I

5   believe that we produced to them our entire Android financial

6   site, basically all of the data on that, which includes

7   quarterly reports in greater detail than what they have, going

8   back to 2009.  So that's one point.

9          The other point is, I think their last motion was

10  based entirely on Mr. Argarwal not being on the witness list.

11  To the extent they felt his 30(b)(6) testimony was inadequate,

12  they never moved to compel on that.

13         And, in fact, Mr. Argarwal did testify at his

14  deposition that although he hadn't personally vetted every

15  single input to his analysis, that he was the one who prepared

16  these charts; he did so regularly; and he vouched for his

17  accuracy.

18         And he certainly vouched for the fact that they

19  weren't concocted for the litigation.  He certainly vouched for

20  the fact that this how Google does business, litigation or no

21  litigation.

22         **THE COURT:**  Who prepared this spreadsheet?

23         **MR. PURCELL:**  That spreadsheet, I believe, is an

24  output from Google's financial system, that I believe was

25  created -- I think Mr. Argarwal did produce it in preparation

```
 1  to give to Dr. Cox in about August of 2011.  It was the most

 2  recent financial data that was available then.  Dr. Cox's

 3  expert report was due on October 3rd.  And it was the most

 4  recent monthly --

 5          THE COURT:  Do you have any workpapers that would

 6  help us reconstruct how he -- the original source for some of

 7  these numbers?

 8          MR. PURCELL:  I'm sure he does.  I'm sure that that

 9  information is all in Google's accounting system and could be

10  generated fairly quickly.

11          THE COURT:  Look.  I am going to tell you what should

12  be done here.  And I'm going to skip over the niceties of what

13  this exact motion is all about.

14          We're talking about huge numbers here.  If there

15  is -- if the jury finds liability, $600 million can turn on

16  whether or not these numbers are any good, this spreadsheet is

17  any good.  And no one seems to know much about the pedigree of

18  this thing.

19          So here's what should be done:  Mr. Purcell, it is

20  your burden to produce, again, in hard copy form, the actual

21  documents that Mr. -- that were given to Mr. Rubin.  Not these

22  things that are constructed for the expert, but the actual

23  documents that were given on a quarterly basis for 2010 and

24  2011.  Just those two years would be good enough.  And to

25  produce the backup of how the big number, which is the
```

```
 1  engineering number, just that one number, how that was

 2  calculated, and the source for that information.

 3          MR. PURCELL:  We'll do it.

 4          THE COURT:  And then Mr. -- is it Agarwal, is his

 5  name?

 6          MR. PURCELL:  Yes, Your Honor.

 7          THE COURT:  He should be deposed again.

 8          MR. PURCELL:  We'll do that, too.

 9          THE COURT:  This should be done promptly.  Let's say

10  you produce the documents by Monday, and he gets deposed by the

11  end of next week.

12          MR. PURCELL:  We can do that.

13          THE COURT:  Then if there's anything to fight over --

14          MR. PURCELL:  I suspect there might be.

15          THE COURT:  -- we can fight over it again later.

16          But my general view of it is that if the

17  $28.78 million is actually the way it was accounted for, for

18  Android only, and allocated to Android, and there was some kind

19  of reasonable method for allocation, that was the way it was

20  done in the actual course of business, fine, then that can go

21  before the jury and Mr. Norton can -- can argue over whether or

22  not the allocation method was proper or not.

23          But, right now, it's unclear to me that anyone can

24  vouch for any of these numbers, as to how they got put

25  together.  So this is the -- that's what we ought to do.
```

 1          **MR. PURCELL:**  Thank you, Your Honor.

 2          **THE COURT:**  Thank you.

 3          All right.  Any other items to take up right now?

 4          **MR. VAN NEST:**  I don't believe so, Your Honor.  We

 5  understand, all of us, that the patent phase will begin Monday

 6  morning.  That's what we understood from Your Honor's order

 7  last night.

 8          **THE COURT:**  That really is the way it has to be,

 9  because if they are deliberating tomorrow, then they will be

10  deliberating and we won't be able to start.  And if they reach

11  a verdict today, then we'll all take Friday off and start on

12  Monday.

13          So I think, basically, I've in effect said we will

14  start on Monday unless they are still deliberating.

15          **MR. VAN NEST:**  That's what we all understood, and

16  that's what we're planning for.  Thank you.

17          **THE COURT:**  Anything more?

18          **MR. JACOBS:**  Thanks, Your Honor.  Nothing from us.

19          **THE COURT:**  Well, please stand by.

20          Dawn, are they going to be here until 4:00 today?

21          **THE CLERK:**  Correct.

22          **THE COURT:**  Remember the note said they would be here

23  until 4:00 today.

24          As soon as we know anything, any more notes, we'll

25  let you know right away.