# ATTACHMENT A

JUDGMENT OF THE COURT (Fourth Chamber)

16 July 2009 ([*](#))

(Copyright – Information society – Directive 2001/29/EC – Articles 2 and 5 – Literary and artistic works – Concept of 'reproduction' – Reproduction 'in part' – Reproduction of short extracts of literary works – Newspaper articles – Temporary and transient reproductions – Technological process consisting in scanning of articles followed by conversion into text file, electronic processing of the reproduction, storage of part of that reproduction and printing out)

In Case C‑5/08,

REFERENCE for a preliminary ruling under Article 234 EC from the Højesteret (Denmark), made by decision of 21 December 2007, received at the Court on 4 January 2008, in the proceedings

**Infopaq International A/S**

v

**Danske Dagblades Forening,**

THE COURT (Fourth Chamber),

composed of K. Lenaerts, President of the Chamber, T. von Danwitz, R. Silva de Lapuerta, G. Arestis and J. Malenovský (Rapporteur), Judges,

Advocate General: V. Trstenjak,

Registrar: C. Strömholm, Administrator,

having regard to the written procedure and further to the hearing on 20 November 2008,

after considering the observations submitted on behalf of:

– Infopaq International A/S, by A. Jensen, advokat,

– Danske Dagblades Forening, by M. Dahl Pedersen, advokat,

– the Austrian Government, by E. Riedl, acting as Agent,

– the Commission of the European Communities, by H. Krämer and H. Støvlbæk, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 12 February 2009,

gives the following

**Judgment**

1    This reference for a preliminary ruling concerns, first, the interpretation of Article 2(a) of Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonisation of certain aspects of copyright and related rights in the information society (OJ 2001 L 167, p. 10) and, secondly, the conditions for exemption of temporary acts of reproduction within the meaning of Article 5 of that directive.

2    The reference was made in the context of proceedings between Infopaq International A/S ('Infopaq') and Danske Dagblades Forening ('DDF') concerning the dismissal of its application for a declaration that it was not required to obtain the consent of the rightholders for acts of reproduction of newspaper articles using an automated process consisting in the scanning and then conversion into digital files followed by electronic processing of that file.

**Legal context**

*International law*

3    Under Article 9(1) of the Agreement on Trade-Related Aspects of Intellectual Property Rights ('the TRIPs Agreement'), as set out in Annex 1C to the Marrakesh Agreement establishing the World Trade Organisation, which was approved by Council Decision 94/800/EC of 22 December 1994 concerning the conclusion on behalf of the European Community, as regards matters within its competence, of the agreements reached in the Uruguay Round multilateral negotiations (1986-1994) (OJ 1994 L 336, p. 1):

'Members shall comply with Articles 1 through 21 of the Berne Convention (1971) and the Appendix thereto. …'

4    Article 2 of the Berne Convention for the Protection of Literary and Artistic Works (Paris Act of 24 July 1971), as amended on 28 September 1979 ('the Berne Convention') reads as follows:

'(1)    The expression "literary and artistic works" shall include every production in the literary, scientific and artistic domain, whatever may be the mode or form of its expression, such as books, pamphlets and other writings; …

…

(5)    Collections of literary or artistic works such as encyclopaedias and anthologies which, by reason of the selection and arrangement of their contents, constitute intellectual creations shall be protected as such, without prejudice to the copyright in each of the works forming part of such collections.

…

(8)    The protection of this Convention shall not apply to news of the day or to miscellaneous facts having the character of mere items of press information.'

5    Under Article 9(1) of the Berne Convention, authors of literary and artistic works protected by that convention are to have the exclusive right of authorising the reproduction of those works, in any manner or form.

   *Community law*

6    Article 1 of Council Directive 91/250/EEC of 14 May 1991 on the legal protection of computer programs (OJ 1991 L 122, p. 42) provided:

   '1.    In accordance with the provisions of this Directive, Member States shall protect computer programs, by copyright, as literary works within the meaning of the Berne Convention for the Protection of Literary and Artistic Works. …

   …

   3.    A computer program shall be protected if it is original in the sense that it is the author's own intellectual creation. No other criteria shall be applied to determine its eligibility for protection.'

7    Article 3(1) of Directive 96/9/EC of the European Parliament and of the Council of 11 March 1996 on the legal protection of databases (OJ 1996 L 77, p. 20) provides:

   'In accordance with this Directive, databases which, by reason of the selection or arrangement of their contents, constitute the author's own intellectual creation shall be protected as such by copyright. No other criteria shall be applied to determine their eligibility for that protection.'

8    Directive 2001/29 states the following in recitals 4, 6, 9 to 11, 20 to 22, 31 and 33 in the preamble thereto:

   '(4)    A harmonised legal framework on copyright and related rights, through increased legal certainty and while providing for a high level of protection of intellectual property, will foster substantial investment in creativity and innovation, including network infrastructure ...

   (6)    Without harmonisation at Community level, legislative activities at national level which have already been initiated in a number of Member States in order to respond to the technological challenges might result in significant differences in protection and thereby in restrictions on the free movement of services and products incorporating, or based on, intellectual property, leading to a refragmentation of the internal market and legislative inconsistency. The impact of such legislative differences and uncertainties will become more significant with the further development of the information society, which has already greatly increased transborder exploitation of intellectual property. This development will and should further increase. Significant legal differences and uncertainties in protection may hinder economies of scale for new products and services containing copyright and related rights.

   …

   (9)    Any harmonisation of copyright and related rights must take as a basis a high level of protection, since such rights are crucial to intellectual creation. …

(10)   If authors or performers are to continue their creative and artistic work, they have to receive an appropriate reward for the use of their work …

(11)   A rigorous, effective system for the protection of copyright and related rights is one of the main ways of ensuring that European cultural creativity and production receive the necessary resources and of safeguarding the independence and dignity of artistic creators and performers.

…

(20)   This Directive is based on principles and rules already laid down in the Directives currently in force in this area, in particular Directives [91/250] … and [96/9], and it develops those principles and rules and places them in the context of the information society. The provisions of this Directive should be without prejudice to the provisions of those Directives, unless otherwise provided in this Directive.

(21)   This Directive should define the scope of the acts covered by the reproduction right with regard to the different beneficiaries. This should be done in conformity with the acquis communautaire. A broad definition of these acts is needed to ensure legal certainty within the internal market.

(22)   The objective of proper support for the dissemination of culture must not be achieved by sacrificing strict protection of rights or by tolerating illegal forms of distribution of counterfeited or pirated works.

…

(31)   A fair balance of rights and interests between the different categories of rightholders, as well as between the different categories of rightholders and users of protected subject-matter must be safeguarded. …

…

(33)   The exclusive right of reproduction should be subject to an exception to allow certain acts of temporary reproduction, which are transient or incidental reproductions, forming an integral and essential part of a technological process and carried out for the sole purpose of enabling either efficient transmission in a network between third parties by an intermediary, or a lawful use of a work or other subject-matter to be made. The acts of reproduction concerned should have no separate economic value on their own. To the extent that they meet these conditions, this exception should include acts which enable browsing as well as acts of caching to take place, including those which enable transmission systems to function efficiently, provided that the intermediary does not modify the information and does not interfere with the lawful use of technology, widely recognised and used by industry, to obtain data on the use of the information. A use should be considered lawful where it is authorised by the rightholder or not restricted by law.'

9   According to Article 2(a) of Directive 2001/29:

'Member States shall provide for the exclusive right to authorise or prohibit direct or indirect, temporary or permanent reproduction by any means and in any form, in whole or in part:

(a)     for authors, of their works.'

10     Article 5 of the same directive provides:

'(1)     Temporary acts of reproduction referred to in Article 2, which are transient or incidental [and] an integral and essential part of a technological process and whose sole purpose is to enable:

(a)     a transmission in a network between third parties by an intermediary, or

(b)     a lawful use

of a work or other subject-matter to be made, and which have no independent economic significance, shall be exempted from the reproduction right provided for in Article 2.

…

5.     The exceptions and limitations provided for in paragraphs 1, 2, 3 and 4 shall only be applied in certain special cases which do not conflict with a normal exploitation of the work or other subject-matter and do not unreasonably prejudice the legitimate interests of the rightholder.'

11     According to Article 6 of Directive 2006/116/EC of the European Parliament and of the Council of 12 December 2006 on the term of protection of copyright and certain related rights (OJ 2006 L 372, p. 12):

'Photographs which are original in the sense that they are the author's own intellectual creation shall be protected in accordance with Article 1 [which specifies the duration of the rights of an author of a literary or artistic work within the meaning of Article 2 of the Berne Convention]. No other criteria shall be applied to determine their eligibility for protection. Member States may provide for the protection of other photographs.'

 *National law*

12     Articles 2 and 5(1) of Directive 2001/29 were transposed into Danish law by paragraphs 2 and 11a(1) of Law No 395 on copyright (lov n°395 om ophavsret) of 14 June 1995 (*Lovtidende* 1995 A, p. 1796), as amended and consolidated by, inter alia, Law No 1051 (lov n°1051 om ændring af ophavsretsloven) of 17 December 2002 (*Lovtidende* 2002 A, p. 7881).

**The dispute in the main proceedings and the questions referred for a preliminary ruling**

13     Infopaq operates a media monitoring and analysis business which consists primarily in drawing up summaries of selected articles from Danish daily newspapers and other periodicals. The articles are selected on the basis of certain subject criteria agreed with customers and the selection is made by means of a 'data capture process'. The summaries are sent to customers by email.

14     DDF is a professional association of Danish daily newspaper publishers, whose function is inter alia to assist its members with copyright issues.

15    In 2005 DDF became aware that Infopaq was scanning newspaper articles for commercial purposes without authorisation from the relevant rightholders. Taking the view that such consent was necessary for processing articles using the process in question, DDF complained to Infopaq about this procedure.

16    The data capture process comprises the five phases described below which, according to DDF, lead to four acts of reproduction of newspaper articles.

17    First, the relevant publications are registered manually by Infopaq employees in an electronic registration database.

18    Secondly, once the spines are cut off the publications so that all the pages consist of loose sheets, the publications are scanned. The section to be scanned is selected from the registration database before the publication is put into the scanner. Scanning allows a TIFF ('Tagged Image File Format') file to be created for each page of the publication. When scanning is completed, the TIFF file is transferred to an OCR ('Optical Character Recognition') server.

19    Thirdly, the OCR server translates the TIFF file into data that can be processed digitally. During that process, the image of each letter is translated into a character code which tells the computer what type of letter it is. For instance, the image of the letters 'TDC' is translated into something the computer can treat as the letters 'TDC' and put in a text format which can be recognised by the computer's system. These data are saved as a text file which can be understood by any text processing program. The OCR process is completed by deleting the TIFF file.

20    Fourthly, the text file is processed to find a search word defined beforehand. Each time a match for a search word is found, data is generated giving the publication, section and page number on which the match was found, together with a value expressed as a percentage between 0 and 100 indicating how far into the text it is to be found, in order to make it easier to read the article. Also in order to make it easier to find the search word when reading the article, the five words which come before and after the search word are captured ('extract of 11 words'). At the end of the process the text file is deleted.

21    Fifthly, at the end of the data capture process a cover sheet is printed out in respect of all the pages where the relevant search word was found. The following is an example of the text of a cover sheet:

'4 November 2005 – *Dagbladet Arbejderen*, page 3:

TDC: 73% "a forthcoming sale of the telecommunications group TDC which is expected to be bought"'.

22    Infopaq disputed the claim that the procedure required consent from the rightholders and brought an action against DDF before the Østre Landsret (Eastern Regional Court), claiming that DDF should be ordered to acknowledge that Infopaq is entitled in Denmark to apply the abovementioned procedure without the consent of DDF or of its members. After the Østre Landsret dismissed that action, Infopaq brought an appeal before the referring court.

23    According to the Højesteret, it is not disputed in this case that consent from the rightholders is not required to engage in press monitoring activity and the writing of summaries consisting in

manual reading of each publication, selection of the relevant articles on the basis of predetermined search words, and production of a manually prepared cover sheet for the summary writers, giving an identified search word in an article and its position in the newspaper. Similarly, the parties in the main proceedings do not dispute that genuinely independent summary writing per se is lawful and does not require consent from the rightholders.

24   Nor is it disputed in this case that the data capture process described above involves two acts of reproduction: the creation of a TIFF file when the printed articles are scanned and the conversion of the TIFF file into a text file. In addition, it is common ground that this procedure entails the reproduction of parts of the scanned printed articles since the extract of 11 words is stored and those 11 words are printed out on paper.

25   There is, however, disagreement between the parties as to whether there is reproduction as contemplated by Article 2 of Directive 2001/29. Likewise, they disagree as to whether, if there is reproduction, the acts in question, taken as a whole, are covered by the exemption from the right of reproduction provided for in Article 5(1) of that directive.

26   In those circumstances, the Højesteret a decided to stay the proceedings and to refer the following questions to the Court of Justice for a preliminary ruling:

'(1)   Can the storing and subsequent printing out of a text extract from an article in a daily newspaper, consisting of a search word and the five preceding and five subsequent words, be regarded as acts of reproduction which are protected (see Article 2 of [Directive 2001/29]?

(2)   Is the context in which temporary acts of reproduction take place relevant to whether they can be regarded as "transient" (see Article 5(1) of Directive 2001/29)?

(3)   Can a temporary act of reproduction be regarded as "transient" where the reproduction is processed, for example, by the creation of a text file on the basis of an image file or by a search for text strings on the basis of a text file?

(4)   Can a temporary act of reproduction be regarded as "transient" where part of the reproduction, consisting of one or more text extracts of 11 words, is stored?

(5)   Can a temporary act of reproduction be regarded as "transient" where part of the reproduction, consisting of one or more text extracts of 11 words, is printed out?

(6)   Is the stage of the technological process at which temporary acts of reproduction take place relevant to whether they constitute "an integral and essential part of a technological process" (see Article 5(1) of Directive 2001/29)?

(7)   Can temporary acts of reproduction be an "integral and essential part of a technological process" if they consist of manual scanning of entire newspaper articles whereby the latter are transformed from a printed medium into a digital medium?

(8)   Can temporary acts of reproduction constitute an "integral and essential part of a technological process" where they consist of printing out part of the reproduction, comprising one or more text extracts of 11 words?

(9) Does "lawful use" (see Article 5(1) of Directive 2001/29) include any form of use which does not require the rightholder's consent?

(10) Does "lawful use" (see Article 5(1) of Directive 2001/29) include the scanning by a commercial business of entire newspaper articles, subsequent processing of the reproduction, and the storing and possible printing out of part of the reproduction, consisting of one or more text extracts of 11 words, for use in the business's summary writing, even where the rightholder has not given consent to those acts?

(11) What criteria should be used to assess whether temporary acts of reproduction have "independent economic significance" (see Article 5(1) of Directive 2001/29) if the other conditions laid down in the provision are satisfied?

(12) Can the user's efficiency gains from temporary acts of reproduction be taken into account in assessing whether the acts have "independent economic significance" (see Article 5(1) of Directive 2001/29)?

(13) Can the scanning by a commercial business of entire newspaper articles, subsequent processing of the reproduction, and the storing and possible printing out of part of the reproduction, consisting of one or more text extracts of 11 words, without the rightholder's consent be regarded as constituting "certain special cases which do not conflict with a normal exploitation" of the newspaper articles and "not unreasonably [prejudicing] the legitimate interests of the rightholder" (see Article 5(5) of Directive 2001/29)?'

**The questions referred for a preliminary ruling**

*Preliminary observation*

27  It should be noted as a preliminary point that the need for uniform application of Community law and the principle of equality require that where provisions of Community law make no express reference to the law of the Member States for the purpose of determining their meaning and scope, as is the case with Article 2 of Directive 2001/29, they must normally be given an autonomous and uniform interpretation throughout the Community (see, in particular, Case C‑245/00 *SENA* [2003] ECR I‑1251, paragraph 23, and Case C-306/05 *SGAE* [2006] ECR I‑11519, paragraph 31).

28  Those considerations are of particular importance with respect to Directive 2001/29, in the light of the wording of recitals 6 and 21 in the preamble to that directive.

29  Consequently, the Austrian Government cannot successfully contend that it is for the Member States to provide the definition of the concept of 'reproduction in part' in Article 2 of Directive 2001/29 (see, to that effect, with respect to the concept of 'public' as referred to in Article 3 of the same directive, *SGAE*, paragraph 31).

*The first question*

30  By its first question, the national court asks, essentially, whether the concept of 'reproduction in part' within the meaning of Directive 2001/29 is to be interpreted as meaning that it

Case 3:10-cv-03561-WHA   Document 1118-1   Filed 05/10/12   Page 10 of 15

encompasses the storing and subsequent printing out on paper of a text extract consisting of 11 words.

31   It is clear that Directive 2001/29 does not define the concept of either 'reproduction' or 'reproduction in part'.

32   In those circumstances, those concepts must be defined having regard to the wording and context of Article 2 of Directive 2001/29, where the reference to them is to be found and in the light of both the overall objectives of that directive and international law (see, to that effect, *SGAE*, paragraphs 34 and 35 and case-law cited).

33   Article 2(a) of Directive 2001/29 provides that authors have the exclusive right to authorise or prohibit reproduction, in whole or in part, of their works. It follows that protection of the author's right to authorise or prohibit reproduction is intended to cover 'work'.

34   It is, moreover, apparent from the general scheme of the Berne Convention, in particular Article 2(5) and (8), that the protection of certain subject-matters as artistic or literary works presupposes that they are intellectual creations.

35   Similarly, under Articles 1(3) of Directive 91/250, 3(1) of Directive 96/9 and 6 of Directive 2006/116, works such as computer programs, databases or photographs are protected by copyright only if they are original in the sense that they are their author's own intellectual creation.

36   In establishing a harmonised legal framework for copyright, Directive 2001/29 is based on the same principle, as evidenced by recitals 4, 9 to 11 and 20 in the preamble thereto.

37   In those circumstances, copyright within the meaning of Article 2(a) of Directive 2001/29 is liable to apply only in relation to a subject-matter which is original in the sense that it is its author's own intellectual creation.

38   As regards the parts of a work, it should be borne in mind that there is nothing in Directive 2001/29 or any other relevant directive indicating that those parts are to be treated any differently from the work as a whole. It follows that they are protected by copyright since, as such, they share the originality of the whole work.

39   In the light of the considerations referred to in paragraph 37 of this judgment, the various parts of a work thus enjoy protection under Article 2(a) of Directive 2001/29, provided that they contain elements which are the expression of the intellectual creation of the author of the work.

40   With respect to the scope of such protection of a work, it follows from recitals 9 to 11 in the preamble to Directive 2001/29 that its main objective is to introduce a high level of protection, in particular for authors to enable them to receive an appropriate reward for the use of their works, including at the time of reproduction of those works, in order to be able to pursue their creative and artistic work.

41   Similarly, recital 21 in the preamble to Directive 2001/29 requires that the acts covered by the right of reproduction be construed broadly.

42   That requirement of a broad definition of those acts is, moreover, also to be found in the wording of Article 2 of that directive, which uses expressions such as 'direct or indirect', 'temporary or permanent', 'by any means' and 'in any form'.

43   Consequently, the protection conferred by Article 2 of Directive 2001/29 must be given a broad interpretation.

44   As regards newspaper articles, their author's own intellectual creation, referred to in paragraph 37 of this judgment, is evidenced clearly from the form, the manner in which the subject is presented and the linguistic expression. In the main proceedings, moreover, it is common ground that newspaper articles, as such, are literary works covered by Directive 2001/29.

45   Regarding the elements of such works covered by the protection, it should be observed that they consist of words which, considered in isolation, are not as such an intellectual creation of the author who employs them. It is only through the choice, sequence and combination of those words that the author may express his creativity in an original manner and achieve a result which is an intellectual creation.

46   Words as such do not, therefore, constitute elements covered by the protection.

47   That being so, given the requirement of a broad interpretation of the scope of the protection conferred by Article 2 of Directive 2001/29, the possibility may not be ruled out that certain isolated sentences, or even certain parts of sentences in the text in question, may be suitable for conveying to the reader the originality of a publication such as a newspaper article, by communicating to that reader an element which is, in itself, the expression of the intellectual creation of the author of that article. Such sentences or parts of sentences are, therefore, liable to come within the scope of the protection provided for in Article 2(a) of that directive.

48   In the light of those considerations, the reproduction of an extract of a protected work which, like those at issue in the main proceedings, comprises 11 consecutive words thereof, is such as to constitute reproduction in part within the meaning of Article 2 of Directive 2001/29, if that extract contains an element of the work which, as such, expresses the author's own intellectual creation; it is for the national court to make this determination.

49   It must be remembered also that the data capture process used by Infopaq allows for the reproduction of multiple extracts of protected works. That process reproduces an extract of 11 words each time a search word appears in the relevant work and, moreover, often operates using a number of search words because some clients ask Infopaq to draw up summaries based on a number of criteria.

50   In so doing, that process increases the likelihood that Infopaq will make reproductions in part within the meaning of Article 2(a) of Directive 2001/29 because the cumulative effect of those extracts may lead to the reconstitution of lengthy fragments which are liable to reflect the originality of the work in question, with the result that they contain a number of elements which are such as to express the intellectual creation of the author of that work.

51   In the light of the foregoing, the answer to the first question is that an act occurring during a data capture process, which consists of storing an extract of a protected work comprising 11 words and printing out that extract, is such as to come within the concept of reproduction in part within the meaning of Article 2 of Directive 2001/29, if the elements thus reproduced are the

expression of the intellectual creation of their author; it is for the national court to make this determination.

*Questions 2 to 12*

52  If the acts at issue in the main proceedings do come within the concept of reproduction in part of a protected work within the meaning of Article 2 of Directive 2001/29, Articles 2 and 5 of that directive make it clear that such reproduction may not be made without the consent of the relevant author, unless that reproduction satisfies the conditions laid down in Article 5 of that directive.

53  In that context, by questions 2 to 12, the referring court asks, essentially, whether acts of reproduction occurring during a data capture process, such as that at issue in the main proceedings, satisfy the conditions laid down in Article 5(1) of Directive 2001/29 and, therefore, whether that process may be carried out without the consent of the relevant rightholders, since it is used to draw up summaries of newspaper articles and consists of scanning those articles in their entirety to produce a digital file, storing an extract of 11 words and then printing out that extract.

54  Under Article 5(1) of Directive 2001/29, an act of reproduction may be exempted from the reproduction right provided for in Article 2 thereof only if it fulfils five conditions, that is, where

– the act is temporary;

– it is transient or incidental;

– it is an integral and essential part of a technological process;

– the sole purpose of that process is to enable a transmission in a network between third parties by an intermediary of a lawful use of a work or protected subject-matter; and

– the act has no independent economic significance.

55  It must be borne in mind that those conditions are cumulative in the sense that non-compliance with any one of them will lead to the act of reproduction not being exempted pursuant to Article 5(1) of Directive 2001/29 from the reproduction right provided for in Article 2 of that directive.

56  For the interpretation of each of those conditions in turn, it should be borne in mind that, according to settled case-law, the provisions of a directive which derogate from a general principle established by that directive must be interpreted strictly (Case C-476/01 *Kapper* [2004] ECR I-5205, paragraph 72, and Case C−36/05 *Commission* v *Spain* [2006] ECR I−10313, paragraph 31).

57  This holds true for the exemption provided for in Article 5(1) of Directive 2001/29, which is a derogation from the general principle established by that directive, namely the requirement of authorisation from the rightholder for any reproduction of a protected work.

58  This is all the more so given that the exemption must be interpreted in the light of Article 5(5) of Directive 2001/29, under which that exemption is to be applied only in certain special cases

which do not conflict with a normal exploitation of the work or other subject-matter and do not unreasonably prejudice the legitimate interests of the rightholder.

59  In accordance with recitals 4, 6 and 21 in the preamble to Directive 2001/29, the conditions laid down in Article 5(1) thereof must also be interpreted in the light of the need for legal certainty for authors with regard to the protection of their works.

60  In the present case, Infopaq claims, first, that the acts of reproduction at issue in the main proceedings fulfil the condition relating to transient nature, since they are deleted at the end of the electronic search process.

61  The Court finds, in the light of the third condition referred to in paragraph 54 of this judgment, that a temporary and transient act of reproduction is intended to enable the completion of a technological process of which it forms an integral and essential part. In those circumstances, given the principles set out in paragraphs 57 and 58 of this judgment, those acts of reproduction must not exceed what is necessary for the proper completion of that technological process.

62  Legal certainty for rightholders further requires that the storage and deletion of the reproduction not be dependent on discretionary human intervention, particularly by the user of protected works. There is no guarantee that in such cases the person concerned will actually delete the reproduction created or, in any event, that he will delete it once its existence is no longer justified by its function of enabling the completion of a technological process.

63  This finding is supported by recital 33 in the preamble to Directive 2001/29 which lists, as examples of the characteristics of the acts referred to in Article 5(1) thereof, acts which enable browsing as well as acts of caching to take place, including those which enable transmission systems to function efficiently. Such acts are, by definition, created and deleted automatically and without human intervention.

64  In the light of the foregoing, the Court finds that an act can be held to be 'transient' within the meaning of the second condition laid down in Article 5(1) of Directive 2001/29 only if its duration is limited to what is necessary for the proper completion of the technological process in question, it being understood that that process must be automated so that it deletes that act automatically, without human intervention, once its function of enabling the completion of such a process has come to an end.

65  In the main proceedings, the possibility cannot be ruled out at the outset that in the first two acts of reproduction at issue in those proceedings, namely the creation of TIFF files and text files resulting from the conversion of TIFF files, may be held to be transient as long as they are deleted automatically from the computer memory.

66  Regarding the third act of reproduction, namely the storing of a text extract of 11 words, the evidence submitted to the Court does not permit an assessment of whether the technological process is automated with the result that that file is deleted promptly and without human intervention from the computer memory. It is for the national court to ascertain whether the deletion of that file is dependent on the will of the user of the reproduction and whether there is a risk that the file might remain stored once the function of enabling completion of the technological process has come to an end.

67   It is common ground, however, that, by the last act of reproduction in the data capture process, Infopaq is making a reproduction outside the sphere of computer technology. It is printing out files containing the extracts of 11 words and thus reproduces those extracts on a paper medium.

68   Once the reproduction has been affixed onto such a medium, it disappears only when the paper itself is destroyed.

69   Moreover, since the data capture process is apparently not likely itself to destroy that medium, the deletion of that reproduction is entirely dependent on the will of the user of that process. It is not at all certain that he will want to dispose of the reproduction, which means that there is a risk that the reproduction will remain in existence for a longer period, according to the user's needs.

70   In those circumstances, the Court finds that the last act in the data capture process at issue in the main proceedings, during which Infopaq prints out the extracts of 11 words, is not a transient act within the meaning of Article 5(1) of Directive 2001/29.

71   There is, moreover, nothing in the case-file submitted to the Court – and nor has it been pleaded – that such an act is liable to be incidental in nature.

72   It follows from the foregoing that that act does not fulfil the second condition laid down in Article 5(1) of Directive 2001/29; accordingly, such an act cannot be exempted from the reproduction right provided for in Article 2 thereof.

73   It follows that the data capture process at issue in the main proceedings cannot be carried out without the consent of the rightholders and, consequently, it is not necessary to consider whether the four acts which make up that process fulfil the other conditions laid down in Article 5(1).

74   Consequently, the answer to questions 2 to 12 is that the act of printing out an extract of 11 words, during a data capture process such as that at issue in the main proceedings, does not fulfil the condition of being transient in nature as required by Article 5(1) of Directive 2001/29 and, therefore, that process cannot be carried out without the consent of the relevant rightholders.

*Question 13*

75   In the light of the answer given to questions 2 to 12, it is not necessary to answer question 13.

**Costs**

76   Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (Fourth Chamber) hereby rules:

1.   **An act occurring during a data capture process, which consists of storing an extract of a protected work comprising 11 words and printing out that extract, is such as to**

    come within the concept of reproduction in part within the meaning of Article 2 of Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonisation of certain aspects of copyright and related rights in the information society, if the elements thus reproduced are the expression of the intellectual creation of their author; it is for the national court to make this determination.

2.     The act of printing out an extract of 11 words, during a data capture process such as that at issue in the main proceedings, does not fulfil the condition of being transient in nature as required by Article 5(1) of Directive 2001/29 and, therefore, that process cannot be carried out without the consent of the relevant rightholders.

[Signatures]

---

[*] Language of the case: Danish.