# Exhibit F

| | |
|---|---|
| 1 | MORRISON & FOERSTER LLP |
|   | MICHAEL A. JACOBS (Bar No. 111664) |
| 2 | mjacobs@mofo.com |
|   | MARC DAVID PETERS (Bar No. 211725) |
| 3 | mdpeters@mofo.com |
|   | DANIEL P. MUINO (Bar No. 209624) |
| 4 | dmuino@mofo.com |
|   | 755 Page Mill Road |
| 5 | Palo Alto, CA  94304-1018 |
|   | Telephone: (650) 813-5600 / Facsimile: (650) 494-0792 |
| 6 | |
|   | BOIES, SCHILLER & FLEXNER LLP |
| 7 | DAVID BOIES (Admitted *Pro Hac Vice*) |
|   | dboies@bsfllp.com |
| 8 | 333 Main Street |
|   | Armonk, NY  10504 |
| 9 | Telephone: (914) 749-8200 / Facsimile: (914) 749-8300 |
|   | STEVEN C. HOLTZMAN (Bar No. 144177) |
| 10 | sholtzman@bsfllp.com |
|   | 1999 Harrison St., Suite 900 |
| 11 | Oakland, CA  94612 |
|   | Telephone: (510) 874-1000 / Facsimile: (510) 874-1460 |
| 12 | |
|   | ORACLE CORPORATION |
| 13 | DORIAN DALEY (Bar No. 129049) |
|   | dorian.daley@oracle.com |
| 14 | DEBORAH K. MILLER (Bar No. 95527) |
|   | deborah.miller@oracle.com |
| 15 | MATTHEW M. SARBORARIA (Bar No. 211600) |
|   | matthew.sarboraria@oracle.com |
| 16 | 500 Oracle Parkway |
|   | Redwood City, CA  94065 |
| 17 | Telephone: (650) 506-5200 / Facsimile: (650) 506-7114 |
| 18 | *Attorneys for Plaintiff* |
|   | ORACLE AMERICA, INC. |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC. | Case No. CV 10-03561 WHA |
| Plaintiff, | **PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANT'S INTERROGATORIES, SET NO. 1 (INTERROGATORY NOS. 1-10)** |
| v. | |
| GOOGLE INC. | |
| Defendant. | **MAY CONTAIN GOOGLE HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY INFORMATION** |

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANT'S INTERROGATORY NOS. 1-10
CASE NO. CV 10-03561 WHA
pa- 1457069

PROPOUNDING PARTY:   Defendant Google Inc.

RESPONDING PARTY:   Plaintiff Oracle America, Inc.

SET NO.:   One (Interrogatories 1-10)

Pursuant to Rules 26 and 33 of Federal Rules of Civil Procedure, Plaintiff Oracle America, Inc. ("Oracle") hereby submits the following supplemental responses and objections to Defendant Google Inc.'s ("Google") First Set of Interrogatories.

**INTERROGATORY NO. 1:**

State in detail Oracle's factual bases for each allegation of damage or harm that Oracle claims to have suffered as a result of any act or omission of Google.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 1:**

As Oracle's damages and harm contentions are subject to ongoing discovery and expert analysis, Oracle objects to this interrogatory as premature. Oracle has not yet completed its investigation of the documents and facts relevant to the claims and defenses asserted in this action, and has not received all relevant documents and information from Google or third parties. Accordingly, Oracle's responses are based on the information reasonably available at this time and Oracle will supplement this response as appropriate under the Federal Rules of Civil Procedure. Subject to these objections, Oracle responds as follows:

Oracle is entitled to all legal, statutory, and equitable remedies available. This potentially includes, for example, damages in the form of lost profits Oracle would have made without the infringement, the value of or a reasonable royalty for a license for the rights infringed, and disgorgement of profits made by Google that are attributable to the infringement. The relevant factual inquiries are with respect to past and future damages on a worldwide basis. In addition, because Google's infringement has been willful and intentional, Oracle is entitled to recover treble damages, pursuant to 35 U.S.C. § 284. Oracle is also entitled to recover the costs of suit, prejudgment interest, and attorney's fees under 35 U.S.C. § 285. Oracle also seeks injunctive relief.

The factual basis for recovery of the value of the infringed intellectual property includes evidence that a reasonable royalty a willing buyer would have been reasonably required to pay a

willing seller in a hypothetical negotiation for a license to the infringed property at the time of the infringement would have been substantial.  These facts include, for example:

- A significant licensing history for Java and other patents and software showed that substantial royalties were necessary to protect Oracle's and Sun's business model and marketing program for Java, including the importance of preventing fragmentation of Java, and Google was aware of Java licensing practices and the importance of preventing fragmentation to Sun and Oracle;

- Oracle and/or Sun invested significant sums to obtain, develop and improve the intellectual property at issue as well as Java more generally;

- Java technologies, including notably the patents and copyrights in suit, had substantial value, as reflected, for example, by Oracle's proposal in March 2009 to buy Java and other software assets from Sun for more than $2 billion and Oracle's eventual acquisition of Sun for $7.4 billion;

- Protecting Java and related or ancillary products and services from fragmentation was extremely valuable to Sun and Oracle;

- Java and the patented technologies represented and represent significant advantages over alternative development platforms and technologies and therefore had tremendous value to Oracle and Sun, including in the mobile space;

- Google recognized the value of Java and the patented and copyrighted technologies at issue, both independently and as part of Android, and recognized the need for a license to use the Java technologies in any mobile platform;

- Launching Android was of significant strategic and financial value to Google, including by enabling Google to respond to the threat posed by other mobile platforms to Google's existing and anticipated revenues;

- Java and the infringed technologies were extremely important to Google in terms of meeting its strategic goals of quickly developing and launching a mobile platform and building a broad base of developers for that platform;

- Google expected that Android would be widely adopted, and used of the infringing technology to ensure widespread distribution of Google ad and application services;
- Google expected to earn and has earned large amounts as a consequence of using the infringed intellectual property in Android, including by planning to use using Android (and the infringed intellectual property) to promote sales and licensing of other Google products, such as search and advertising, and reap revenue from third-party development and other sources;
- Google avoided paying and expects to avoid paying substantial amounts to manufacturers and others as a consequence of using the infringed intellectual property in Android, such as any revenue sharing payments that would otherwise have been made by Google to handset manufacturers but for Android;
- Using the infringed intellectual property in Android provided strategic benefits to Google, including the benefit of obtaining control over Google's own destiny in mobile-based advertising and other applications and services and the reinforcement of Google's dominant position in online advertising across platforms and computing environments;
- Significant network effects resulted and were expected from the infringement for both Oracle and Google, including the adverse impact of Android (and the infringement) on the Java brand, the perceived and actual value of Java technology, and the Java ecosystem, and the positive impact of Android on reinforcement of the value of Google's existing position in search, advertising and other markets;
- Google would have earned significantly less in the absence of the infringement, including but not limited to the mobile space, as compared to the amounts that Google expected to earn and currently earns in connection with and as a result of the infringement;
- Google has obtained licenses for other intellectual property;
- Reasonable non-infringing alternatives were unavailable, not viable, and/or extremely costly to Google;

PLAINTIFF'S SUPPLEMENTAL RESPONSES TO DEFENDANT'S INTERROGATORY NOS. 1-10
CASE NO. CV 10-03561 WHA
pa- 1457069

3

- Google avoided significant costs as a consequence of the infringement;
- The patented technologies and copyrighted materials were extremely important to Google as compared to any reasonable non-infringing alternatives;
- Oracle and Google were and could be expected to be competitors in the provision of platform software for mobile and other devices;
- Sun and Oracle extensively and repeatedly discussed financial and other terms of a license and terms for development of a compatible mobile platform or Android, including terms relating to the payment of royalties;
- Sun expected that it would earn substantial revenues in connection with a compatible mobile platform, particularly as compared to the incompatible Android platform;
- Sun expected that it would lose substantial revenues from the distribution of a mobile platform incorporating the infringed technologies, and these losses would be particularly high if the platform was incompatible with Java;
- Oracle and Sun made clear to Google that Android, even if compatible with Java, would put Java revenue at risk;
- Google knowingly infringed the Sun/Oracle IP, and therefore put its entire investment in Android and its reputation on the line;
- The value (both absolutely and as a portion or component of Android) of the intellectual property at issue was significant, and that property has a substantial remaining economic life;
- Oracle and Google both had strategies for realizing economic return, including licenses, relating to the infringement;
- Sun and Oracle expected substantial losses, and have in fact incurred losses, as a consequence of the infringement, and Google understood the likelihood of those expected and actual losses, including loss of Java licensing and ancillary revenue opportunities, price or royalty erosion, reduction in market opportunities in markets for Oracle's Java-related products, and other losses as a direct or indirect consequence of demand for and Google's distribution of Android; and

- There was significant actual and expected demand for mobile and other devices using Android.

A variety of documents showing the facts above have been produced in discovery or are publicly available.[1] Google's initial deposition testimony also supports a number of these facts.[2] Others will be the subject of testimony by Oracle witnesses disclosed in Oracle's initial disclosures, and still others may be the subject of third party testimony. Some of the evidence of these facts, as well as evidence of other relevant factors about which Oracle does not yet know, is uniquely within Google's and others' possession. Google has made public statements regarding some of these facts, including for example the success of distribution of Android, Google's expectation of revenue therefrom, and the profitability thereof.[3]

---

[1] *See, e.g.*, GOOGLE-01-00017250; GOOGLE-14-00001233; GOOGLE-01-00017299; GOOGLE-01-00017315; GOOGLE-01-00019529; GOOGLE-01-00019527; GOOGLE-01-00025576; GOOGLE-01-00023102; GOOGLE-01-00053552; OAGOOGLE0000357494; OAGOOGLE0000140115; OAGOOGLE0000139561; Java licenses produced at OAGOOGLE0000052860-OAGOOGLE0000053749; OAGOOGLE0000059579-OAGOOGLE0000061487; OAGOOGLE0000083003-OAGOOGLE0000102539; OAGOOGLE0000126592-OAGOOGLE0000139444; OAGOOGLE0100000000-OAGOOGLE0100017894; and OAGOOGLE0100031141-OAGOOGLE0100062854; Sun-Microsoft agreements available at http://www.sec.gov/Archives/edgar/data/709519/000119312504155723/0001193125-04-155723-index.htm.

[2] *See, e.g.,* April 5, 2011 Rule 30(b)(6) Deposition.

[3] For example:

- Google CEO Eric Schmidt was recently reported to note that "Google is positioning itself to earn $10 billion or more per year in the mobile device business, thanks to its Android operating system," *see Wall Street Journal*, July 28, 2010 (available at http://blogs.wsj.com/digits/2010/07/28/eric-schmidt-on-google%E2%80%99s-next-tricks/);
- Google's Andy Rubin recently stated that activation of Android devices has reached 300,000 per day, *see Wall Street Journal*, December 9, 2010 (available at http://blogs.wsj.com/digits/2010/12/09/google-more-than-300000-android-phones-activated-each-day/);
- It was reported in December 2010 that "Google executives said the company was on track to generate $1 billion annually in mobile-related revenue," *see Wall Street Journal*, "Google to Release new 'Nexus' Phone," December 7, 2010 (available at http://online.wsj.com/article/SB10001424052748704156304576003454213544140.html);
- Google's CEO Eric Schmidt has been reported as stating that "Android-based phones already generate enough new advertising revenue to cover the cost of the software's development"; *Newsweek*, "Android Invasion," October 3, 2010 , at 3 (available at http://www.newsweek.com/2010/10/03/how-android-is-transforming-mobile-computing.html)
- Mr. Schmidt has also been reported as stating: "Trust me that revenue is large enough to pay for all of the Android activities and a whole bunch more." *International Business Times,*, "Does Google Have an Android Revenue-Model?," August 10, 2010 (available at http://www.fool.com/investing/general/2010/08/10/does-google-have-an-android-revenue-model.aspx).

The factual basis for a claim for recovery of Google's profits attributable to the infringement also includes, for example: (1) the fact that Google has a business model for realizing substantial revenue from Android, including, at a minimum, revenue and gross profits from the sale or licensing of Android-compatible applications,[4] developer access to Google resources or accounts,[5] and Google mobile search, location services, advertising, and other services[6] (in addition to other Android-related revenue and profit streams obtained by third-party application developers, device manufacturers and others); (2) the fact that Google has realized substantial revenue as a result of the infringement; (3) the fact that that Google has a strategic goal of ensuring that it is not dependent on third party (particularly competitor) platforms for success in the mobile environment, including losses or reductions in revenue Google did and does not incur because it was able to avoid certain challenges to its core businesses;[7] (4) the fact that Google has experienced significant benefits in its preexisting application and service businesses as a result of the success of Android and because of the infringement; and (5) the fact that Google avoided costs as a consequence of the infringement, including costs of developing or acquiring non-infringing alternatives (to the extent they existed or exist), either within or outside the Java context, that would have enabled Google to achieve its revenue and strategic objectives. Much of the evidence of these facts, as well as evidence of other relevant factors about which Oracle does not yet know, is uniquely within Google's possession.

---

[4] *See, e.g.*, *Mobile Entertainment*, "Mobile Entertainment's Guide to Android," May 2010 (available at http://www.androidtapp.com/android-growth-statistics-projections/) (presenting projections and assumptions on growth and average pricing of, and revenue from, Android applications).

[5] *See, e.g.*, Pocketnow.com, "How Does Google Make Money with Android?," October 3, 2010 (available at http://pocketnow.com/android/how-does-google-make-money-with-android).

[6] *See, e.g.*, *Wall Street Journal*, "Google Executive Says Local Advertising Is Top Focus," December 7, 2010 (available at http://blogs.wsj.com/digits/2010/12/07/google-executive-says-local-advertising-is-top-focus/) (statements regarding success and growth of Google's mobile advertising business).

[7] For example, as Google reported in a recent public filing, "More individuals are using devices other than personal computers to access the internet. If users of these devices do not widely adopt versions of our web search technology, products, or operating systems developed for these devices, our business could be adversely affected." Google Form 10Q for the period ended September 30, 2010, p. 46 (available at http://investor.google.com/documents/20100930_google_10Q.html).

In addition to the above, the factual basis for a claim for recovery of Oracle's lost profits (both with respect to diverted or lost revenues and profits and loss of ancillary, convoyed or other opportunities) includes, for example: (1) the fact that Sun and Oracle have had business plans for Java that are and have been premised in significant part on preventing or minimizing "forks" in Java and developing and maintaining a wide base of use by both programmers and end users; (2) the fact that Sun and Oracle have lost and will lose significant Java licensing opportunities, suffered and will suffer price and royalty erosion, experienced and will experience reduction in market opportunities in markets for Oracle's Java-related products and services, and have suffered and will suffer other losses as a direct or indirect consequence of demand for and Google's distribution of Android; (3) the fact that the infringement has had and will have significant adverse impact on the Java brand, on the perceived and actual value of the Java technology, and the Java development community; (4) the fact that Sun and Oracle have lost and will lose cross-sell and up-sell opportunities based on the ability to use either Java or a mobile platform to promote other Oracle products and services; (5) the fact that Sun and Oracle have incurred and will incur additional costs to undo the damage caused by the infringement; and (6) Sun and Oracle have suffered and will suffer harm to their reputation and goodwill, including loss in value to the reputation and brand value of Java. Google itself recognizes the value and importance of avoiding fragmentation of software platforms, including Android.[8] Oracle's Java technology has generated significant revenue for Sun and Oracle, much of it related to high-margin licensing, application sales, and other revenue opportunities in the mobile environment and elsewhere that have been and continue to be diminished by Google's infringement of Oracle's Java patents and copyrights.

---

[8] *See, e.g.*, Ars Tecnica, "Google: carriers should give Android users freedom to unlock bootloader," December 2010 (available at http://arstechnica.com/gadgets/news/2010/12/google-carriers-should-give-android-users-freedom-to-unlock-bootloader.ars) ("Google has very effectively used its exclusive control over the Android Market and Google-branded applications as a means of forcing most of the carriers and handset makers to refrain from fragmenting the platform . . . ."); *Newsweek*, "Android Invasion," October 3, 2010, at 4 (available at http://www.newsweek.com/2010/10/03/how-android-is-transforming-mobile-computing.html) ("Such fragmentation has been the Achilles' heel of every open-source project. To counter it, Rubin and his team have created a compatibility test suite, a list of things a phone must have in order to carry the Android brand and to run applications like Google Maps.").

In addition to many of the items described above, the factual basis for Oracle's claim of irreparable harm includes, for example:

- Oracle practices the copyrights and patents in suit in its own Java-related products and authorizes others to practice them through its Java licensing program.
- Google has violated Oracle's exclusive rights to practice and to authorize others to practice the copyrights and patents.
- Google's infringement depresses the market for Oracle's Java-related products and causes Oracle customers to question the value of their Java licenses, damaging the goodwill associated with Oracle's Java products and brand.
- Google's infringement has caused fragmentation, including through the fact that Android runs an unauthorized version of various Java libraries (Apache Harmony), thereby causing confusion among software developers. Particularly in light of Android's popularity, Oracle is irreparably harmed each time a programmer learns and practices Android over Java.
- Google's infringement impedes the growth of a Java applications market that would fuel demand for authorized Java and Java-related products, causing further loss of market share.

The foregoing answer supplements Oracle's initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1) and its previous response to this interrogatory. The information provided in this supplemental response is subject to theories and additional factual support to be set forth in any expert reports. In light of the date specified by the Court for disclosure of affirmative expert reports on damages, Oracle notes that because significant evidence relating to Oracle's damages claims—including, for example, disgorgement of Google's profits from the infringement, Google's expectations as to the value of the infringed intellectual property, and the appropriate amount of damages corresponding to Google's willful infringement—is in Google's possession, timely production of information and documents relating to damages by Google will be necessary in order for Oracle's experts to be able to provide detailed quantifications of Oracle's damages in their initial reports.

responses are based on the information reasonably available at this time and Oracle will supplement this response as appropriate under the Federal Rules of Civil Procedure.

Dated: July 29, 2011

MICHAEL A. JACOBS
MARC DAVID PETERS
DANIEL P. MUINO
MORRISON & FOERSTER LLP

By:  /s/ Marc David Peters

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.