MORRISON & FOERSTER LLP
MICHAEL A. JACOBS (Bar No. 111664)
mjacobs@mofo.com
MARC DAVID PETERS (Bar No. 211725)
mdpeters@mofo.com
DANIEL P. MUINO (Bar No. 209624)
dmuino@mofo.com
755 Page Mill Road, Palo Alto, CA  94304-1018
Telephone: (650) 813-5600 / Facsimile: (650) 494-0792

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (Admitted *Pro Hac Vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY  10504
Telephone: (914) 749-8200 / Facsimile: (914) 749-8300
STEVEN C. HOLTZMAN (Bar No. 144177)
sholtzman@bsfllp.com
1999 Harrison St., Suite 900, Oakland, CA  94612
Telephone: (510) 874-1000 / Facsimile: (510) 874-1460
ALANNA RUTHERFORD (Admitted *Pro Hac Vice*)
arutherford@bsfllp.com
575 Lexington Avenue, 7th Floor, New York, NY 10022
Telephone: (212) 446-2300 / Facsimile: (212) 446-2350

ORACLE CORPORATION
DORIAN DALEY (Bar No. 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (Bar No. 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (Bar No. 211600)
matthew.sarboraria@oracle.com
500 Oracle Parkway, Redwood City, CA  94065
Telephone: (650) 506-5200 / Facsimile: (650) 506-7114

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.<br><br>            Plaintiff,<br><br>     v.<br><br>GOOGLE, INC.<br><br>            Defendant. | Case No. CV 10-03561 WHA<br><br>**ORACLE AMERICA, INC.'S OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT RE: COPYRIGHT DAMAGES**<br><br>Dept.:  Courtroom 8, 19th Floor<br>Judge:  Honorable William H. Alsup |

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................... 2

III.  ARGUMENT....................................................................................................... 4

     A.    Google misapprehends its burden under the Copyright Act ................... 4

          i.     Established case law demonstrates that Oracle need only show a causal  nexus between the infringing work—Android—and Android revenues ...................................................................... 4

          ii.    Google ignores other benefits, which must be accounted for in any infringer's profits award................................................... 12

     B.    The evidence already in the record shows that Oracle can and has met its burden, although it need not have already done so in Phases One and Two................................................................................................. 14

          1.     The literally copied files in TimSort have a role in Android's functioning ........................................................................... 15

          2.     The decompiled Impl files have a role in Android's functioning ............ 16

     C.    Oracle should not be precluded, in Phase Three, from either seeking infringer's profits on the existing record or offering additional evidence on the causal nexus ........................................................................... 18

IV.   CONCLUSION.................................................................................................. 19

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Agosto v. Immigration & Naturalization Serv.*,
    436 U.S. 748 (1978) ................................................................................................ 15

*Andreas v. Volkswagen of Am., Inc.*,
    336 F.3d 789 (8th Cir. 2003) ................................................................... 10, 11, 12

*Associated Residential Design, LLC v. Molotky*,
    226 F. Supp. 2d 1251 (D. Nev. 2002) ........................................................... 12, 13

*Berry v. Hawaii Exp. Service, Inc.*,
    No. 03-00385 SOM/LEK, 2006 WL 1519996 (D. Hawai'i May 24, 2006) ......................... 13

*Bourns, Inc. v. Raychem Corp.*,
    331 F.3d 704 (9th Cir. 2003) ......................................................................... 13, 14

*Browne v. San Francisco Sheriff's Dept.*,
    616 F. Supp. 2d 975 (N.D. Cal. 2009) ........................................................... 13, 14

*Bucklew v. Hawkins, Ash, Baptie & Co.*,
    LLP., 329 F.3d 923 (7th Cir. 2003) ...................................................................... 14

*Cream Records, Inc. v. Joseph Schlitz Brewing Co.*,
    864 F.2d 668, 669 (9th Cir. 1989) ........................................................................ 6, 7

*Davis v. The Gap, Inc.*,
    246 F.3d 152 (2nd Cir. 2001) ...................................................................... 5, 6, 11

*DSPT Int'l, Inc. v. Nahum*,
    624 F.3d 1213 (9th Cir. 2010) ............................................................................. 18

*F.C. Bloxom Co. v. Fireman's Fund Ins. Co.*,
    No. C10–1603RAJ, 2012 WL 1631967 (W.D. Wash. May 9, 2012) ..................................... 19

*F.W. Woolworth Co. v. Contemporary Arts*,
    193 F.2d 162 (1st Cir. 1952) ............................................................................... 18

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
    772 F.2d 505 (9th Cir. 1985) ("*Frank Music I*") ........................................... *passim*

*Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*,
    886 F.2d 1545 (9th Cir. 1989) ("*Frank Music II*") (1909 Act) ........................... 7, 8

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

ii

*Intermountain Fair Hous. Council v. Boise Rescue Mission Ministries*,
    717 F. Supp. 2d 1101 (D. Idaho 2010), *aff'd on other grounds*,
    657 F.3d 988 (9th Cir. 2011)........................................................................ 15

*Nike, Inc. v. Wal-Mart Stores, Inc.*,
    138 F.3d 1437 (Fed. Cir. 1998)..................................................................... 18

*Polar Bear Prods., Inc. v. Timex Corp.*,
    394 F.3d 700 (9th Cir. 2004).................................................................. *passim*

*Roeslin v. District of Columbia*,
    921 F. Supp. 793 (D.D.C. 1995) ................................................................... 13

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*,
    562 F.2d 1157 (9th Cir. 1977), *superseded on other grounds by statute* .............................. 18


**STATUTES**

17 U.S.C. § 504(b) ......................................................................................... *passim*

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

iii

## I.    INTRODUCTION

The copyright violations that the jury and Court have determined form a very small part of the overall copyright violations for which Google is liable.  That is why Oracle has separately urged that the remedy phase for the unlawful copying that has thus far been established should await the completion of the liability phase of the case.

However, if there is to be a copyright remedy trial at this time, there is simply no basis for Google's argument that this Court should, as a matter of law, eliminate Oracle's claim for infringer's profits.  Google's motion for summary judgment recklessly misstates the record, interprets settled precedent as no court ever has before, and ignores the clear statutory command of 17 U.S.C. § 504(b).

The copyright statute could not be clearer that once a copyright owner presents "proof only of the infringer's gross revenue . . . the infringer is required to prove  . . . the elements of profit attributable to factors other than the copyrighted work."  17 U.S.C. § 504(b); *accord Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 518 (9th Cir. 1985) ("*Frank Music I*").  Google's argument confuses cases where there is no proof that an infringing product resulted in revenue with a case like this one, where the infringing product (Android) admittedly generates "huge" revenues and profits, and the only question is how much of those revenues and profits should be allocated to factors other than the copyrighted work.

Google cites no case, and we are aware of none, which holds that where a copyright owner has proven (i) that a product (in this case Android) infringes because it illegally includes copyrighted material (e.g., rangeCheck and the decompiled files), and (ii) that that product generates substantial revenue, the plaintiff has the further burden of proving (iii) what portion of those revenues, if any, is attributable to the included copyrighted work as opposed to "other factors."  Such an additional requirement would be flatly inconsistent with the plain language of § 504(b).

Each of Google's cases turns on what  the term "gross revenues" means.  And in each case, the court holds that "gross revenues" means gross revenues from the infringing product which incorporates the copyrighted work.  No case holds that the "gross revenues" must be from the use of the copyrighted work itself; to so hold, as Google asks this Court to hold, would be inconsistent with

1

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

the plain language of § 504(b) and the many cases discussed below.

Oracle has never claimed that all, most, or even a large percentage of Android's profits are attributable to rangeCheck and the decompiled files.  Oracle does assert that an infringer who deliberately copies a copyrighted work into a highly profitable product cannot completely avoid an award of any infringer's profits, and that the burden of proving what portions of the infringer's profits should be allocated to the copyrighted work is on the infringer.

Perhaps recognizing the weakness of its legal argument, Google misstates the record to suggest that Oracle somehow gave up its infringer's profits claim.  As Google well knows, a successful copyright plaintiff is entitled to <u>both</u> of two separate monetary remedies—the plaintiff's <u>damages</u> and the infringer's <u>profits</u>.  As Google also well knows, Oracle's reference to statutory damages on May 4, 2012 related to whether Oracle's expert calculated <u>damages</u> separately for non-SSO infringement (RT at 2755:11–13); whether, as Google's counsel put it, there was any "type of <u>damages</u> allocated to the literal copying" (RT at 2775:16–19); and whether, as the Court asked, Oracle had "a <u>damages</u> study that's tied into that" (RT at 2775:20–24) (emphasis added in all).  Google's assertion based on that exchange that "Oracle conceded it had no <u>remedy</u> for any of its literal copying claims besides statutory damages (Mot. at 13) might be excused as overzealous advocacy if Oracle's counsel had not made clear the distinction the very next court day.  (RT at 2890:17–23.)

Google's motion for summary judgment should be denied.

## II.   STATEMENT OF FACTS

The jury found that Google's inclusion of TimSort and ComparableTimSort in Android violated Oracle's copyright on rangeCheck and that Google's infringement was not *de minimis*.  The unrebutted evidence is that rangeCheck plays a significant role in Android's functioning.  For example, Dr. Mitchell conducted an analysis into the significance of rangeCheck to other code in the same class file.  (Mitchell at RT 1329:5–11.)  He found that several other source code files called on rangeCheck.  He also did an experiment in which he counted the number of times that rangeCheck was called in booting up a phone, and found that the function was called 2,600 times just in powering on the device or starting the emulator: "a pretty big number for the number of calls to this function."

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

(*Id.* at 1329:5–21.)[1]  Whereas Google states that it has removed rangeCheck from the latest release of Android, Google has admitted that the previous releases of Android that include rangeCheck are still available on Google's website, and the evidence in Phase 3 will show that these releases (including the infringing rangeCheck code) continue to be used by Android handset manufacturers.  (See March 28, 2012, Hearing Tr. 24:10–25:17; Bornstein at RT 1832:3–10.)

The Court granted Oracle's motion for judgment as a matter of law that Google's use of seven Impl.java files and one ACL file violated Oracle's copyrights and that such use was not *de minimis*. As Dr. Mitchell's unrebutted testimony shows, even if the files are "test" files, this does not mean they are unimportant: "testing is a very important part of the software development.  It's expensive. And software companies want to do it correctly so that the code they ship is bug free and usable to their customers."  (Mitchell at RT 1330:15–24.)  Google developers would have benefitted from these decompiled files because, if indeed they are test files, "if this helped them test other code they were developing, and speed up and lessen the cost of testing and quality assurance, then that would have a big value to them."  (Mitchell at RT 1330:25–1331:5.)

Google's gross revenues from Android as reported by Google itself are included in trial exhibits, and require no expert testimony or analysis to establish.  As noted above, there is no dispute that Android included rangeCheck and was at least facilitated by seven Impl.java files and one ACL file.

Google could have written software to perform the rangeCheck function itself, and in fact did so in the latest release of Android.  However, the record shows that Google initially did not do so, and that from approximately mid-2009 through mid-2011, Android included rangeCheck.  (*See* Bloch at RT 822:4–5, Bloch at RT 825:16–19.)

//

//

---

[1] In its motion, Google argues with the significance of Dr. Mitchell's testimony.  It is, of course, free to present its arguments to the jury, or introduce conflicting evidence.  It is not entitled to have this Court accept its arguments and ignore the evidentiary record, and rule in Google's favor as a matter of law.

3

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

### III.   ARGUMENT

**A.  Google misapprehends its burden under the Copyright Act.**

    **i.   Established case law demonstrates that Oracle need only show a causal nexus between the infringing work—Android—and Android revenues.**

In insisting that it must not have the burden that the Copyright Act expressly places on it, Google again fails to deal with the cases that Oracle cited in its May 8, 2012 brief on this issue. Those cases, and the district court cases that apply them, demonstrate that it is not Oracle's burden to show what revenue, if any, is allocable to the portion of Android that represents the copyrighted work. Instead, Oracle satisfies its causal burden by showing that Android infringes and that Android generates revenue (both of which it has already proven, the only remaining proof being how much revenue, exactly, Android has generated). It is Google's burden to prove that the included copyrighted work did <u>not</u> have any effect on revenues.

The Copyright Act provides:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b). The statute could not be clearer that the burden of apportionment of infringer's profits to "factors other than the copyrighted work" is on the defendant. *See also Frank Music I*, 772 F.2d at 518 ("The burden of proving apportionment, (i.e., the contribution to profits of other elements other than the infringed property), is the defendant's.").

In its attempt to persuade the Court to ignore the clear statutory provisions of § 504(b) that place the burden of proof on it, Google relies on indirect-profits cases that hold that the plaintiff bears the burden of proving a causal nexus between the infringing product and the gross revenues on which plaintiff relies. In indirect profits cases, where the infringing product does not itself generate revenue but is merely an advertisement or promotion for a product that generates revenue, the courts require "a causal nexus between the infringement and the gross revenue." *Polar Bear Prods., Inc. v. Timex*

ORACLE'S OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT ON COPYRIGHT DAMAGES
CASE NO. CV 10-03561 WHA

*Corp.*, 384 F.3d 700, 711 (9th Cir. 2004).[2]

Even in indirect-profits cases, the causal nexus is met by proof that the product which includes the copyrighted work generates revenues and what those revenues are.  In all of the cases upon which Google relies, proof of one, and usually both, of these elements was missing.

For example, Google claims that *Davis* supports its position, but the case actually shows the opposite.  In  *Davis*, an advertisement for clothing from The Gap included a photograph of a man wearing eye jewelry covered by copyrights.  *Davis v. The Gap, Inc.*, 246 F.3d 152, 157 (2nd Cir. 2001).  The copyrighted eye jewelry was a minute portion of the advertisement, which depicted a group of seven young people in their twenties standing in a loose V formation and "staring at the camera with a sultry, pouty, provocative look.  The group projects the image of funky intimates of a lively after-hours rock music club.  They are dressed primarily in black, exhibiting bare arms and partly bare chests, goatees (accompanied in one case by bleached, streaked hair), large-brimmed, Western-style hats, and distinctive eye shades, worn either over their eyes, on their hats, or cocked over the top of their heads."  *Id.* at 157.  Only one of these young people was wearing the copyrighted eye jewelry.

Davis submitted one piece of evidence to show the profits he claimed he was entitled to recover: that "during and shortly after The Gap's advertising campaign featuring the 'fast' ad, the corporate parent of the Gap stores realized net sales of $1.668 billion, an increase of $146 million over the revenues earned in the same period of the preceding year."  *Id.* at 159.  He claimed <u>all $1.668 billion</u>.  *Id.* at 161.  This $1.668 billion represented not just sales from The Gap label stores (which was the label promoted by the infringing ad), but revenues from the parent company that included that label, as well as sales from other stores in The Gap, Inc.'s corporate family that were "in no way promoted by the advertisement."  *Id.*  In other words, Davis was claiming that because one of seven people in a single advertisement for The Gap's clothing label was wearing his eye

_____

[2] Google's assertion that this may be an indirect-profits case is contrary to the undisputed record that Android generates "huge" revenues and profits.  The fact that much, but by no means all, of that revenue comes from advertising is irrelevant.  The issue is whether Oracle has proven that the product or service that includes the copyrighted work generates revenue, an issue that is not here in dispute.

jewelry, he was entitled to <u>all</u> of the revenues of not only the eye jewelry featured in the ad, not only the apparel featured in the ad, and not only even The Gap as a whole, but The Gap's corporate parent and all of its other labels. *Id.* The court held that Davis was required simply to tailor the revenue he was seeking to only the particular business unit—The Gap:

> Because the ad infringed only with respect to Gap label stores and eyewear, we agree with the district court that it was incumbent on Davis to submit evidence at least limited to the gross revenues of the Gap label stores, and perhaps also limited to eyewear or accessories. Had he done so, the burden would then have shifted to the defendant under the terms of § 504(b) to prove its deductible expenses and elements of profits from those revenues attributable to factors other than the copyrighted work.

*Id.* at 160.

Oracle, of course, is not seeking all of Google's gross revenues, despite Google's alarmist rhetoric. (Mot. at 6.) Google's aggregate gross revenues from 2006 to 2010 alone totaled over $100 billion. That number does not appear in Oracle's evidence, and Oracle will not try to put it before the jury. Instead, Oracle has sought revenues tailored particularly to the infringing product: Android. Oracle has thus done more than what the Second Circuit in *Davis* said would be sufficient to shift the burden to Google: to submit revenues limited to the business unit connected to the infringement. *Davis*, 249 F.3d at 160.

Nor did *Davis* hold that the copyright holder had to show that anyone, anywhere, bought any item of Gap clothing because one figure in the ad wore the copyrighted eye jewelry. Customers might have bought an item of Gap clothing for myriad reasons that had nothing to do with the advertisement at all (for example, because they liked the fit, color, price, or material). Customers might have been enticed by the advertisement for myriad reasons that had nothing to do with one person's eye jewelry—the figure's looks, the Western hats, the bleached hair. *Davis* imposes no requirement that the infringing eye jewelry be shown to move one penny of Gap revenue; instead, it was up to The Gap to disprove this premise so long as the plaintiff established the revenues of The Gap label stores, as opposed to the total revenues of the corporate parent. *Id.* at 160.

In *Cream Records, Inc. v. Joseph Schlitz Brewing Co.*, the defendant copied <u>ten notes</u> from a song, "The Theme From Shaft," and used those ten notes without permission in a beer commercial. The plaintiff provided proof of the total fees that the advertising company, Benton & Bowles, was

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

paid for producing the infringing commercial, and sought those fees as an infringer's profits award. In *Cream II*, which Google continues to ignore, the Ninth Circuit observed that "Cream met its burden" when it provided that proof; it was then up to the defendant to provide evidence of its deductible expenses or the elements of profit attributable to factors other than the infringement. 864 F.2d 668, 669 (9th Cir. 1989) ("*Cream II*"). The Court of Appeals held it was clear error for the district court to award one percent of the fees figure based only on its opinion that the infringement was minimal. *Id.* at 669–70. Contrary to Google's argument, Cream was not required to show that the <u>reason</u> Benton & Bowles received the commission to make the ad was the fact that it decided to use the infringing ten notes. (*Compare* Mot. at 3 (claiming that Oracle "must prove that Google made an identifiable amount of revenue from the infringing work) (emphasis removed).) To the contrary: *Cream II* demonstrates that the fact that those notes were in the ad at all was sufficient to shift the burden to the defendants to apportion down their profits.

*Frank Music*, which Google also continues to ignore, likewise demonstrates that the "causal nexus" is not what Google claims it is. In *Frank Music*, the plaintiffs owned the copyrights on a play called *Kismet*. Twenty years after the play was first copyrighted, the defendant, the Las Vegas MGM Grand Hotel, premiered a musical revue called *Hallelujah Hollywood* in its theater. *Frank Music I*, 772 F.2d at 510. *Hallelujah Hollywood* featured ten acts of singing, dancing, and variety performances; it featured a live tiger, jugglers, and the magicians Siegfried and Roy. One of the ten acts included a "tribute" to *Kismet*, with six minutes of selected musical numbers. *Id.* at 510. Notwithstanding the fact that the infringement was just a few minutes of both the copyrighted play and a much longer revue including numerous elements beyond the copyrighted material, the Court of Appeals found that the plaintiffs were entitled not just to profits on ticket sales, but also to indirect profits amounting to a percent of "the hotel's guest accommodations, restaurants, cocktail lounges . . . the casino itself, conventions and banquet facilities, tennis courts, swimming pools, [and the] gym and sauna," all because *Hallelujah Hollywood* had some promotional value for the hotel as a whole. *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1550 & n.4 (9th Cir. 1989) ("*Frank Music II*") (1909 Act).

Google claims that Oracle must show that the infringing files "caused any consumer to buy a

7

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

phone," but that is simply not the law under any case—not *Davis*, not *Cream*, and not *Frank Music*. In *Frank Music*, there were obviously many, many reasons why people ate in the casino's restaurants, stayed at the hotel's rooms, used the hotel's spa services, and gambled in the hotel's casinos unrelated to the revue at all, let alone the six minutes of musical numbers.  That did not, however, mean the plaintiff was entitled to zero infringer's profits or that the tiny influence of the six minutes of musical numbers somehow excused the infringer from its statutory burden.  Instead, the plaintiff was entitled to a fraction of all of those indirectly generated revenues <u>regardless</u> of the fact that consumers of those other services may have had no connection to *Kismet* at all.  It was up to the defendant to show that its revenues were due to other things.

Moreover, the Ninth Circuit <u>rejected</u> the defendant's argument that

the relative unimportance of the *Kismet* music was proved by its omission and the show's continued success thereafter.  *Hallelujah Hollywood* was a revue, comprised of many different entertainment elements.  Each element contributed significantly to the show's success, but no one element was the sole or overriding reason for that success.  <u>Just because one element could be omitted and the show goes on does not prove that the element was not important in the first instance and did not contribute to establishing the show's initial popularity.</u>

*Frank Music I*, 772 F.2d at 518 (emphasis added).

In *Polar Bear*, Timex included Polar Bear's copyrighted material in a larger promotional video shown at a trade show and in a larger joint promotional booklet prepared with Mountain Dew. 384 F.3d at 704. Timex did not record any revenue from either promotion.  Polar Bear claimed three types of indirect infringer's profits—profits based on revenues from watches sold at the trade show where the infringing video played in the background, profits based on revenues from watches sold as part of the Mountain Dew promotion, and profits based on revenue from price increases in Timex watches over a four-year period, which Polar Bear attributed to the use of the promotional videos at trade shows.  *Id.* at 712.  The *Polar Bear* court held that plaintiff was entitled to receive infringer's profits based on the first two categories, but not the third.  Google latches onto isolated phrases in *Polar Bear* that the nexus is between "infringement and the profits sought" to claim that Oracle must show that rangeCheck and the decompiled files generated revenue.  (*See* Mot. at 4.)  But if one reads both the holding <u>and the facts</u> of *Polar Bear*, the Court of Appeals' decision makes clear that Google

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

is profoundly mistaken: the nexus must exist between the work that <u>contains</u> the infringing lines and the revenues, not the infringing lines themselves and the revenues.

For the first category of revenues (trade show profits), all that Polar Bear needed to show to establish the causal nexus was that the infringing video was played at trade shows and Timex yielded $360,000 in gross revenue from the trade shows. *Polar Bear*, 384 F.3d at 712. Polar Bear was "not required to separate the gross profits resulting from the infringement from the profits resulting from other sources"—that was Timex's burden. *Id.* Contrary to Google's interpretation, Polar Bear was not required to show that the infringing video actually generated sales, that customers bought watches at trade shows because the video was playing, or that the infringing part of the video was in any way related to the sales. Instead, the nexus was between the materials themselves that <u>included</u> the infringing work and the revenues.

Similarly, for the second category (Mountain Dew promotion profits), Polar Bear did not have to show that the copyrighted ("PaddleQuest") images themselves generated any revenue as a result of the promotional effort with Mountain Dew. Instead, Polar Bear merely introduced "evidence that the Mountain Dew booklet contained an advertisement featuring the infringing material, that customers who ordered Timex Expedition watches through the Mountain Dew promotion would have seen the advertisement, and that Timex profited from the promotion." *Id.* at 712. Contrary to Google's interpretation, Polar Bear was not required to show that the PaddleQuest images were important in driving any purchaser's decision at all, or that the PaddleQuest images, as distinguished from the infringing booklet in which the images were incorporated, had any nexus to the infringement. Instead, "Polar Bear satisfied its burden of establishing the infringer's relevant gross revenue, as required by § 504(b), by presenting sales figures from Timex's press releases stating that the Mountain Dew promotion generated $564,000 in sales." *Id.* at 712–13. As with the trade show images, the nexus that Polar Bear had to establish was simply that the infringing product was in a larger product that had some connection to the revenues. There is no requirement to show profits on a more granular nexus than this.

By contrast, Polar Bear sought revenues that were much more attenuated to the infringement by claiming revenues with no connection at all to any material containing PaddleQuest images. Polar

9

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1   Bear claimed indirect profits derived from "enhanced prestige" of Timex watches due to the brand's

2   association with the entire sport of extreme kayaking. *Id.* at 712–13.  This was too far removed.

3   "Actual retail purchasers were never exposed to the infringing image from the trade shows, nor did

4   the evidence link retail consumers to the trade show promotion.  Nor was there evidence that vendors

5   at the trade shows somehow transmitted enthusiasm to retail customers." *Id.* at 715.  In other words,

6   there was no evidence that the revenues were driven by anything containing the infringing work at

7   all.

8           In discussing the plaintiff's burden under the Copyright Act, *Polar Bear* extensively cites the

9   Eighth Circuit's decision in *Andreas v. Volkswagen of America*.  In *Andreas*, the Eighth Circuit held

10  that a copyright plaintiff adequately established the causal nexus between an automobile

11  manufacturer's use of infringing material in a widely aired commercial and a portion of profits from

12  the sale of the automobile.  Andreas, an artist, had created a drawing titled "Angels of Mercy," which

13  he paired with the phrase: "Most people don't know there are angels whose only job is to make sure

14  you don't get too comfortable & fall asleep & miss your life." *Andreas v. Volkswagen of Am., Inc.*,

15  336 F.3d 789, 791 (8th Cir. 2003).  The infringing advertisement, featuring the Audi TT coupe,

16  displayed a car in a garden surrounded by statues, accompanied by a voice-over which says, in its

17  entirety: "I think I just had a wake-up call, and it was disguised as a car, and it was screaming at me

18  not to get too comfortable and fall asleep and miss my life." *Id.* at 792. The jury awarded 10% of

19  Audi's after-tax profits on the TT coupe sales during the time that the commercial aired as profits for

20  the car company's improper use of the infringing phrase. *Id.* at 795.  After the district court found

21  there was an insufficient causal connection, the Eighth Circuit reversed and reinstated the jury's

22  verdict, concluding that "Andreas introduced more than mere speculation that the Wake Up

23  commercial contributed to sales of the TT coupe." *Id.* at 796.

24          The Eighth Circuit did not require a nexus between the <u>infringing words</u> and the revenues; it

25  required only a nexus between the <u>advertisement</u> and the revenues.  In fact, it was error for the

26  district court to require Andreas to establish that the infringing words drove revenues, because to do

27  so was to improperly shift the burden of proof and "plac[e] the detriment of any speculation on

28  Andreas rather than Audi," *id.* at 797, contravening the general rule that "Any doubt as to the

ORACLE'S OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT ON COPYRIGHT DAMAGES
CASE NO. CV 10-03561 WHA

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

computation of costs or profits is to be resolved in favor of the plaintiff." *Id.* at 796 (citing *Frank Music I*, 772 F.2d at 514).  Andreas was required only to introduce "more than mere speculation that the <u>Wake Up commercial</u>" – not the words themselves – "contributed to the sales of the TT coupe." *Id.* at 797–98 (emphasis added).  Because "the jury had enough circumstantial evidence to find that the commercial contributed to the profitable introduction of the TT coupe," that "shifted the burden to Audi of showing what effect other factors had on its profits." *Id.* at 798.  Audi's burden—not Andreas's—included "establishing that its profit was attributable to factors other than the infringing words: the other two commercials that did not contain the infringed words, <u>other parts of the Wake Up commercial</u>, customer loyalty, brand recognition, etc." *Id.* at 797 (emphasis added).

Both *Polar Bear* and *Andreas* expressly reject the idea that Google now claims must be the law.  Both refuse to hold that a plaintiff must put customers on the stand to testify that they purchased the product "because of" the infringing portion of the work.  *Polar Bear*, 384 F.3d at 715 ("there is no requirement that Polar Bear put Timex customers on the witness stand to testify that they purchased watches because of Timex's use of 'PaddleQuest' images."); *Andreas*, 336 F.3d at 797 (rejecting notion that copyright plaintiff was required to have a customer testify that infringement caused its purchase decision).  There is simply no support for Google's claim that Oracle must show that any dollar of Google's revenue was generated "because of" the copied files.  That is Google's burden, not Oracle's.

Contrary to Google's insistence, in none of these cases was the plaintiff required to show that the minute infringing <u>portion</u> of its infringing work generated an "identifiable amount of revenue." (Mot. at 3.)  Instead, the causal nexus standard required the plaintiff to show only that the work <u>containing</u> the infringement generated revenue:

- The plaintiff in *Polar Bear* was not required to show that the infringed kayaking video had any effect on consumers at all.  Instead, the plaintiff had to show only that the entire infringing advertisement may have been seen by the purchasers.

- The plaintiff in *Cream Records* was not required to show that the advertising company was paid because it used the ten infringed notes.  Instead, the plaintiff had to show only that the advertising company was paid for the entire infringing ad.

- The plaintiff in *On Davis* was not required to show that the eye jewelry in the infringing

11

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

ad had any effect on consumers whatsoever.  Instead, the plaintiff had to show only revenues from the subsidiary actually labeled in the advertisement.

- The plaintiff in *Frank Music* was not required to show that the portions of *Kismet* had any relationship to, for example, gambling revenues at all.  Instead, it had to show only that *Kismet* was shown in the casino.

- The plaintiff in *Andreas* was not required to show that the infringed words generated any additional sales of the Audi TT Coupe.  Instead, it had to show only that the infringing advertisement generated revenues.

Any further apportionment is for to the defendant to disprove.  In none of these cases was the plaintiff required to produce evidence that the minute portion of infringing work contained in the larger work had any effect on revenues.  In other words, no case holds that Oracle must demonstrate a nexus between rangeCheck and revenues or the decompiled Java code files and revenues before the burden shifts to Google to apportion.  It only must (at most) demonstrate a nexus between Android and the revenues.  If Google wants to insist that rangeCheck and the decompiled files had no effect on revenues, it may argue that with its own witnesses.

### ii.   Google ignores other benefits, which must be accounted for in any infringer's profits award.

The award of infringer's profits is a remedy of disgorgement.  The legislative history behind section 504(b) of the Copyright Act makes clear that the purpose of awarding infringer's profits is "to take away incentives for would-be infringers and 'to prevent the infringer from unfairly benefitting from a wrongful act.'"  *Polar Bear*, 384 F.3d at 708 (quoting H.R. Rep.. No. 94-1476, § 504, at 161 (1976)).  Thus, if the copying of any or all of the nine infringed files saved Google time to market, Oracle may recover the profits Google earned from that savings.

Even where an infringer has not sold or advertised the infringing product, it can unfairly benefit from the infringement, entitling the plaintiff to infringer's profits.  *Associated Residential Design, LLC v. Molotky*, 226 F. Supp. 2d 1251, 1256 (D. Nev. 2002).  In *Molotky*, the plaintiff prepared a set of architectural plans which were used to construct a home in Reno.  After the defendants obtained a set of the plans and used them to design their own home in the same subdivision, the plaintiff sued for copyright infringement.  The defendant moved for partial summary

1    judgment on the issue of damages, arguing that § 504(b) requires the infringing item to be sold before

2    a prevailing copyright holder can collect infringer's profits.  The court disagreed, emphasizing the

3    Copyright Act's focus on disgorging the benefit from infringement.  *Id.* at 1254–56 (relying on H.R.

4    Rep. No. 94-1476, § 504, at 161).  The court concluded the defendants unfairly benefitted from

5    infringing architectural plans they otherwise would have had to buy, and also from the value of the

6    house (which they still owned) to the extent it exceeded the cost of construction.  *Id.* at 1254–56;

7    *accord Berry v. Hawaii Exp. Service, Inc.*, No. 03-00385 SOM/LEK, 2006 WL 1519996, at *5 (D.

8    Hawai'i May 24, 2006) (copyrighted software – while neither sold nor advertised – unfairly

9    benefitted infringer by allowing it efficiency gains in its distribution operation).

10         Google unfairly benefitted from directly copying Oracle's nine code files rather than taking

11   the time to develop its own code or hire someone else to do so without copying or decompiling.

12   Whatever time Google saved allowed it to bring Android to market faster and begin earning revenues

13   sooner.  Thus, Google unfairly benefitted from additional period of sales that it would not have

14   enjoyed without infringement.  *See Berry*, 2006 WL 1519996 at *5.  The Copyright Act provides

15   that, to eliminate the incentive to infringe, the court must disgorge the incremental revenue Google

16   earned from Android's early release.  17 U.S.C. § 504(b).

17         Moreover, if the direct copying saved Google development costs, Oracle may recover those

18   saved costs as infringer's profits.  This is true regardless of Android's profitability, and regardless of

19   the nexus between infringement and sales.  "Costs that the defendant did not incur because it

20   infringed a copyright are considered profits for this purpose" of calculating infringer's profits.

21   *Roeslin v. District of Columbia*, 921 F. Supp. 793, 799 (D.D.C. 1995).  In *Roeslin*, the plaintiff

22   developed a software program, which the defendant school district copied.  By copying the software,

23   the district saved the amount it would have otherwise had to spend purchasing a substitute system.

24   *Id.* at 800.  The court awarded those savings to the plaintiff.  *Id.*; *see Molotky*, 226 F. Supp. 2d at

25   1254 (commenting that the parties did not dispute that plaintiff would be entitled to the fair market

26   value of the architectural plans).

27         Here, if decompiling the Impl test files saved even one day of Noser engineers' work, then

28   Oracle is entitled to recover the costs Google saved.  *See, e.g., Bourns, Inc. v. Raychem Corp.*, 331

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1    F.3d 704, 709-10 (9th Cir. 2003) (affirming an award of saved development costs under a theory of

2    unjust enrichment where the defendant was found to have misappropriated trade secrets).  At the very

3    least, those saved costs demonstrate a direct connection between the infringement and Google's

4    profits.  *See also Bucklew v. Hawkins, Ash, Baptie & Co*., LLP., 329 F.3d 923, 933 (7th Cir. 2003)

5    ("Remember that the purpose of allowing suit for the infringer's lost profits is to make infringement

6    worthless to the infringer. . . .  Suppose a defendant had copied a copyrighted book verbatim and he

7    then offered to sell copies of the book for nothing to anyone who would pay him $25 for a bookmark

8    that had cost him 10 cents and had a market value of 50 cents. To hold in such a case that the

9    defendant's profits from infringement were zero would approve a formula for evading copyright

10   law.") Google's infringement will not be "worthless" unless and until the development costs it saved

11   and the incremental revenue it earned from being able to bring Android to market faster are

12   disgorged.

13         **B.   Google is not entitled to judgment as a matter of law before Phase 3 even begins, and
14               Google is wrong about what the evidence shows.**

15         Google insists that the evidence in the record supports a Court-ordered determination, prior to

16   any presentation of evidence in the damages phase, that Oracle is entitled to <u>no</u> infringer's profits for

17   rangeCheck or the decompiled code files at all.  In other words, Google seeks judgment before Phase

18   3 even begins, based only on its own favorable interpretation of the evidence from Phase 1.  Google

19   is wrong.  There is no legal or factual basis to take this issue away from the jury.

20         Because Google misunderstands its burden, it misapplies the summary-judgment standard.

21   Google does not cite any summary-judgment cases or even Rule 56 <u>once</u> in its motion.  Oracle's

22   burden is only to show that Android generates revenues, something that cannot reasonably be

23   disputed.  Google therefore has the burden of proof to demonstrate the relative value of the

24   copyrighted work within Android.  To obtain judgment, and an order denying Oracle any and all

25   profits, Google must "affirmatively demonstrate that no reasonable trier of fact could find other than

26   for [Google]."  *Browne v. San Francisco Sheriff's Dept.,* 616 F. Supp. 2d 975, 982 (N.D. Cal. 2009).

27         Google cannot possibly meet this burden.  Granting summary judgment based on Google's

28   gloss on the value of the code files and the causal nexus between Android and profits would be

14

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1    inappropriate, particularly before the phase of this trial even begins.  This phase is meant to address

2    exactly this issue, where Google can try to meet its burden.  It is for the jury to draw inferences about

3    the value of the code files and their importance, not Google.

4         Even if it were appropriate to assess the value of the code files on summary judgment (which

5    it is not), summary judgment is not appropriate here.  It is axiomatic that summary judgment cannot

6    be granted over a material dispute of fact, including a credibility determination, *Agosto v.*

7    *Immigration & Naturalization Serv.*, 436 U.S. 748, 756 (1978), or the weight the jury may choose to

8    afford to circumstantial evidence.  "[A]t the summary judgment stage the judge's function is not

9    himself to weigh the evidence and determine the truth of the matter but to determine whether there is

10   a genuine issue for trial." *Intermountain Fair Hous. Council v. Boise Rescue Mission Ministries*, 717

11   F. Supp. 2d 1101, 1109 (D. Idaho 2010), *aff'd on other grounds*, 657 F.3d 988 (9th Cir. 2011).

12        Google's insistence that these code files have no value is not a substitute for proof.  A

13   reasonable jury could determine that some quantum of Android's profits is attributable to the literally

14   copied code files on the current record.  Google's motion must be denied.

15        **1. The literally copied files in TimSort contribute to Android's functioning.**

16        The jury found that TimSort and ComparableTimSort infringed Oracle's copyrights.  Dr.

17   Mitchell analyzed the significance of rangeCheck.  (Mitchell at RT 1329:5–11.)  He found that

18   several other source code files in other files called on rangeCheck.  He also did an experiment in

19   which he counted the number of times that rangeCheck was called in booting up a phone, and found

20   that the function was called 2,600 times just in powering on the device or starting the emulator.

21   Although Google insists that 2,600 calls "could be a low number relative to other functions," (Mot. at

22   9–10 (emphasis removed)), Dr. Mitchell testified the opposite: that 2,600 was "a pretty big number

23   for the number of calls to this function." (Mitchell at RT 1329:5–21.)  Google insists that Dr.

24   Mitchell's testimony was "barely intelligible," (Mot. at 9 n.1), and quibbles with the conclusions that

25   the jury should draw from Dr. Mitchell's testimony, (*id.* at 9–10), but it never cross-examined Dr.

26   Mitchell on this topic.  Google cannot substitute its argument in a brief for either proffering evidence

27   to the contrary or the jury's own determination of the weight of the evidence.

28        Google also insists that the rangeCheck code was "simple" and that a high-school

ORACLE'S OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT ON COPYRIGHT DAMAGES
CASE NO. CV 10-03561 WHA

programmer could write it.  But Dr. Mitchell noted that rangeCheck was a "useful" component of the library it was in, and that there was some "subtlety" to the code.  (Mitchell at RT 1316:12-1317:5.) Again, the determination of rangeCheck's importance is for the jury to decide.

The jury should also be able to draw an inference of the code's importance from Google's willful infringement.  Bloch admitted that he was perfectly willing to believe that he copied, notwithstanding the fact that he understood that Sun asserted copyright protection over its programs. Bloch at RT 756:9-18.  In fact, Bloch copied because he thought it would be "good engineering" to do so.  Bloch at RT 754:9-16; Bloch at RT 753:23-25.  He did so knowing that it was wrong, and even apologized for it on the stand.  Bloch at RT 827:5-17.  Indeed, Bloch's entire presence on the Android team, and his job writing code libraries, reveals the falsity of Google's claims that Android was developed in a clean room; even the contemporaneous documentary evidence shows that the Android team, including chief Andy Rubin, knew that Bloch's involvement in Android was a "conflict."  (TX 1060.)  The jury should be able to infer that the Android team placed him on the code-libraries team in order to take advantage of either his prior knowledge or his access to Sun code, and that there was some value to Google as a result.

Finally, the jury should be able to draw an inference from the fact that Google continues to make the infringing code available on its website.  Although Google says it has removed rangeCheck from the latest release of Android, Google has also admitted that all of the previous releases of Android are still available on Google's website.  The evidence will show that these releases (including the infringing rangeCheck code) continue to be used by Android handset manufacturers. (*See* March 28, 2012, Hearing Tr. 24:10–25:17; Bornstein at RT 1832:1–10.)  And Dr. Mitchell's unrebutted testimony confirms that the code is actually still available on millions of phones, including Samsung phones.  (Mitchell at RT 1255:22-1256:4; 1263:11-1264:23.)

**2. The decompiled Impl files also have some value to Android.**

Google's contractors reverse-engineered Sun's class files and put the "decompiled" files in Android.  (Mitchell at RT 1260:11–1261:3.)  They could have written that code themselves, but instead they took Sun's code.  Google says these are just "test" files, but on the Java side, these files are not test files; they are the default implementation of the security functions in Java.  (Mitchell at

16

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

RT 1329:22–1330:14.)  Even if they are test files in Android, Dr. Mitchell explained why this does not mean they are unimportant: "testing is a very important part of the software development.  It's expensive.  And software companies want to do it correctly so that the code they ship is bug free and usable to their customers." (Mitchell at RT 1330:15–24.)  Google developers would have benefitted from these decompiled files because, if indeed they are test files, "if this helped them test other code they were developing, and speed up and lessen the cost of testing and quality assurance, then that would have a big value to them."  (Mitchell at RT 1330:25-1331:5.) Google has proffered no evidence to the contrary.

Once again, the jury should also be able to infer value from willfulness.  All of the decompiled Java code files included the following statement:  "Copyright 2004 Sun Microsystems, Inc.  All rights reserved.  SUN PROPRIETARY/CONFIDENTIAL.  Use is subject to license terms." (TX 623.2 (PolicyNodeImpl.java); TX 623.3 (AclEntryImpl.java); TX 623.4 (AclImpl.java); TX 623.5 (GroupImpl.java); TX 623.6 (OwnerImpl.java); TX 623.7 (PermissionImpl.java); TX 623.8 (PrincipalImpl.java); TX 623.9 (CodeSource.java).)   The Noser developers "had access and used the Oracle installation and copied from it, in this case by using a decompiler to produce source code by this quick and easy method." Mitchell at RT 1260:8–1261:3.  Google claims that its subcontractors decompiled Sun code in violation of their contract with Google, as if this was a surprise, but the evidence shows that Google employees thought the Noser engineers were "super shady" at the time (TX 281), but did nothing about it.

Finally, the jury should be able to draw an inference from the fact that Google has not removed the infringing files from all versions of Android.  (Bornstein at RT 1832:3-10 ("THE COURT: Isn't it true that within recent months you could still go on the Google website and find these very files with the same code in there?  True or not?  THE WITNESS: You can look at the history and see those files.  THE COURT: So it's there, available to the public. True? THE WITNESS: Fair enough.").)  And the jury should be able to determine that Google saved time and cost when the Noser engineers took a shortcut and decompiled Sun files.  As described above, if Android got to market even one day faster or if Google paid the Noser engineers even one day's less work, the jury could award one day's profits, or one day's Noser costs, to Oracle.

17

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

### C.  Oracle should <u>not</u> be precluded, in Phase Three, from either seeking infringer's profits on the existing record or offering additional evidence on the causal nexus.

Google's final argument is that it is entitled to a judgment awarding Oracle no profits based on (1) the Court's prior ruling on the scope of Prof. Cockburn's testimony and (2) Oracle's prior disclosures.  But neither the Court's prior order on the scope of Prof. Cockburn's testimony nor Oracle's prior disclosures provide any basis for Google's motion.

Google claims that this Court precluded Oracle from seeking infringer's profits for rangeCheck based on the fact that the Court restricted the testimony of its damages expert on this subject in a prior *Daubert* orders.  (Mot. at 11 (citing Dkt. No. 685 at 10).)  Not so.  It is true that Prof. Cockburn did not offer a separate hypothetical license and lost-profits damages methodology tailored to the code files as opposed to the APIs.  Infringer's profits, however, are not "damages"— they are a separate disgorgement remedy more akin to equitable relief than to damages.  *See, e.g.*, *F.W. Woolworth Co. v. Contemporary Arts*, 193 F.2d 162, 167–68 (1st Cir. 1952) ("an infringer's profits from his wrongful act are awarded to the copyright proprietor, not to inflict punishment on the infringer, but as appropriate equitable relief incident to a decree of injunction in order to prevent the infringer's unjust enrichment") (citations omitted); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1175 (9th Cir. 1977), *superseded on other grounds by statute*, Copyright Act of 1976, 17 U.S.C. § 504(b) (calling infringer's profits "a creature of equity"); *Nike, Inc. v. Wal-Mart Stores, Inc*., 138 F.3d 1437, 1442 (Fed. Cir. 1998) (noting that Congress removed the "equitable remedy of the infringer's profits" from the Patent Act).

Additionally, it is nonsense to contend that a party may not seek relief such as infringer's profits without expert testimony.  "The law does not require expert testimony to establish damages[.]"  *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1223 (9th Cir. 2010).  Infringer's profits are a classic example of a damages theory where the expert's testimony is not necessary.  Oracle can show Google's Android revenues with reference either to documents from Google's files (such as Profit & Loss statements and OC Quarterly Reviews) or through Google's own witnesses.  No expert testimony is necessary to put those documents before the jury.

Google also complains about the sufficiency of Oracle's discovery responses, claiming that

18

1    Oracle did not disclose an infringer's profits theory.  That, too, is nonsense.  Google's own brief

2    shows that Oracle has consistently put Google on notice that it was seeking infringer's profits, and

3    described the contours of its theory consistently, including the only evidence Oracle needs to carry its

4    burden: proof of Android revenues.  (*See* Zimmer Decl. Ex. A at 6–7 ("Oracle seeks . . .

5    disgorgement of profits made by Google that are attributable to the infringement," explaining

6    Google's burden to show "the elements of profit attributable to factors other than the infringed

7    work"), Ex. B at 6–7 (incorporating initial disclosures by reference); Ex. C at 7–8 (same); Ex. D at 1–

8    6 (describing facts that would establish infringer's profits, including costs avoided); Ex. E at 1–8

9    (same); Ex. F at 1–8 (same).)  Google has been on notice since the earliest days of this litigation that

10   Oracle would seek a copyright remedy of infringer's profits.  Nothing more specific was required to

11   meet Oracle's discovery obligations, and the onus is and has always been on Google to provide

12   evidence of the profits attributable to factors other than the infringing work—and to disclose the

13   bases for this theory.  Google, not Oracle, has consistently refused to produce competent evidence on

14   the deductions it will seek from infringer's profits.  (*See* Dkt. No. 1032 (motion to exclude Kearl's

15   cost deductions.)   There is no requirement that Oracle tie specifically the factual bases for its

16   entitlement to disgorgement of profits to each of Google's infringing acts (copying of rangeCheck,

17   the test files, and the 37 APIs at issue).  *F.C. Bloxom Co. v. Fireman's Fund Ins. Co.*, No. C10–

18   1603RAJ, 2012 WL 1631967, at *3 (W.D. Wash. May 9, 2012) (denying motion to exclude evidence

19   of damages where plaintiff "merely [ ] did not disclose them in the way that [the defendant]

20   preferred).

21       **IV.    CONCLUSION**

22          Google's motion for summary judgment should be denied.

23

24   Dated: May 13, 2012                    BOIES, SCHILLER & FLEXNER LLP

25                                          By: *Steven C. Holtzman*
                                               Steven C. Holtzman

26                                          *Attorneys for Plaintiff*
27                                          ORACLE AMERICA, INC.

28

ORACLE'S OPPOSITION TO GOOGLE'S MOTION FOR SUMMARY JUDGMENT ON COPYRIGHT DAMAGES
CASE NO. CV 10-03561 WHA