Volume 17

Pages 2795 - 2936

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | |
|---|---|
| ORACLE AMERICA, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) No. C 10-3561 WHA |
| | ) |
| GOOGLE, INC., | ) |
| | ) |
| Defendant. | ) San Francisco, California |
| _____ | ) May 7, 2012 |

**TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          MORRISON & FOERSTER
                                    755 Page Mill Road
                                    Palo Alto, California  94304
                          BY:  **MICHAEL A. JACOBS, ESQUIRE**
                                    **KENNETH A. KUWAYTI, ESQUIRE**
                                    **MARC DAVID PETERS, ESQUIRE**
                                    **DANIEL P. MUINO, ESQUIRE**

                                    BOIES, SCHILLER & FLEXNER
                                    333 Main Street
                                    Armonk, New York 10504
                          BY:  **DAVID BOIES, ESQUIRE**
                                    **ALANNA RUTHERFORD, ESQUIRE**

(Appearances continued on next page)

Reported By: Katherine Powell Sullivan, RPR, CRR, CSR #5812
                    Debra L. Pas, RMR, CRR, CSR #11916
                    Official Reporters - U.S. District Court

**APPEARANCES (CONTINUED)**:

**For Plaintiff:**          BOIES, SCHILLER & FLEXNER
                            1999 Harrison Street, Suite 900
                            Oakland, California  94612
                    BY:  **WILLIAM FRED NORTON, ESQUIRE**
                         **STEVEN C. HOLTZMAN, ESQUIRE**

                            ORACLE AMERICA, INC.
                            500 Oracle Parkway
                            Redwood Shores, California  94065
                    BY:  **ANDREW C. TEMKIN, CORPORATE COUNSEL**
                         **DORIAN DALEY, GENERAL COUNSEL**


**For Defendant:**          KEKER & VAN NEST
                            633 Battery Street
                            San Francisco, California  94111-1809
                    BY:  **ROBERT ADDY VAN NEST, ESQUIRE**
                         **CHRISTA MARTINE ANDERSON, ESQUIRE**
                         **DANIEL PURCELL, ESQUIRE**
                         **MICHAEL S. KWUN, ESQUIRE**
                         **MATTHIAS KAMBER, ESQUIRE**

                            KING & SPALDING LLP
                            1185 Avenue of the Americas
                            New York, New York 10036-4003
                    BY:  **BRUCE W. BABER, ESQUIRE**
                         **SCOTT WEINGAERTNER, ESQUIRE**

                            GOOGLE, INC.
                            1600 Amphitheatre Parkway
                            Mountain View, California  94043
                    BY:  **RENNY HWANG, LITIGATION COUNSEL**


**Also Present:**           **SAFRA CATZ, President and CFO**
                            Oracle Corporate Representative

                            **CATHERINE LACAVERA**
                            Google Corporate Representative
                                —   —   —

**P R O C E E D I N G S**

1

2    **MAY 7, 2012**                                           **7:46 A.M.**

3

4              (Proceedings held in open court, outside

5               the presence and hearing of the jury.)

6          **THE COURT:**  Good morning.  Have a seat please.  Back

7    to work.

8          So the jury is still assembling.  We can do some work

9    though until we hear from them.

10         So a number of motions have been made concerning the

11   patent phase, so let's go first to the Oracle motion concerning

12   Mr. Schwartz.

13         **MR. JACOBS:**  The heart of this motion, your Honor, is

14   a question to all of us, which is whether we're going to

15   continue the Schwartz testimonial struggle in Phase 2 or

16   whether we're going to leave that behind into Phase 1.

17         Google has answered that with its response to the

18   motion; that they believe Mr. Schwartz's testimony about not

19   having -- concluding that there were not grounds to sue Google

20   is relevant to Phase 2.  Although looking closely at their

21   opposition, it's not apparent to what jury issue it is

22   relevant.

23         The opposition says laches.  The opposition says,

24   then of course, that's an issue for the bench.  But the

25   opposition goes on and say maybe this goes to wilfulness

1   because how could Google have had -- or even the intense

2   standard on inducement, because how could Google meet that

3   intense standard if Sun's own CEO had testified as he did in

4   court.

5          So I fear, based on that opposition, that that issue

6   is going to arise again in Phase 2 and so we have to be

7   prepared to address it.  We will do so.

8          We have -- unless the Court rules or Google withdraws

9   its stated intention, we have evidence and witnesses lined up

10  to establish that the testimony Mr. Schwartz gave in Phase 1

11  was false and that, in fact, we -- quote, unquote, we -- had

12  never made such a determination both with respect to a decision

13  not to sue Google and with respect to whether such a lawsuit

14  would have had -- would have been meritorious.

15         So that's where we are.  In a sense, we accomplished

16  our purpose by finding out from Google whether this is all

17  going to occur.

18         I would like to emphasize that because of the way the

19  trial is structured, any ruling on this question needs to cover

20  opening, evidence, and closing.  So if the Court were to decree

21  or Google were to commit that this was not going to occur --

22  that this issue was not going to arise in Phase 2, we need to

23  be covered all the way through.  If it could pop up in closing

24  by way of reference to testimony in Phase 1, then we need to be

25  prepared to meet it with evidence in Phase 2.

1          THE COURT:  Mr. Van Nest.

2          MR. VAN NEST:  Good morning, your Honor.

3          THE COURT:  Good morning.

4          MR. VAN NEST:  This may be a little premature.  I

5   certainly don't have any plans to mention Mr. Schwartz in my

6   opening in the patent phase, and I'm taking your Honor's

7   guidance to heart.  I mean, I think Phase 2 we ought to really

8   be focused on the technology and the key infringement questions

9   and that's what I would like to do.

10          I propose the trade that your Honor recommended on

11  Friday; that I would not call Mr. Schwartz if they didn't

12  parade Mr. Lindholm and all that stuff through and that was not

13  accepted.

14          So my view is that with respect to Mr. Schwartz, I

15  don't plan to mention him in the opening.  I haven't made a

16  decision.  I would prefer not to call him in Phase 2, but,

17  obviously, if they are going to be in here with Lindholm and

18  Mr. Rubin, parading a bunch of emails around and making a big

19  deal about the fact that, Oh, everybody knew about patents and

20  this and that, I feel as though I have to leave him on the list

21  to protect myself.  Obviously, his testimony is already in

22  evidence.  I understand from your Honor that I can't repeat

23  testimony in Phase 2 that was given in Phase 1.

24          I sort of took their motion as a motion to strike,

25  but maybe that's not the case.  Certainly, that's not timely.

PROCEEDINGS                                                2800

1  They cross examined Mr. Schwartz on all this.  They didn't

2  object when I mentioned him in my closing.  They argued

3  extensively about him in their closing.

4         So at the end of the a day I think he is relevant to

5  waiver and laches and infringement certainly, and probably

6  damages.  But, again, I would rather not call him in Phase 2 if

7  I don't have to, but I'm worried that if they get up and want

8  to talk about all the good old days at Sun and all the patents

9  that people knew about, then I need to be able to call him to

10 say we always used patents defensively.  They publicly stated

11 they never asserted patents offensively.  There were

12 instructions to Sun folks not to look at patents and to do

13 their own work independently of every one else, which is the

14 same thing that Google engineers are told.

15        So, really, I have him on my list as a defensive

16 measure.  I would rather not call him, but his testimony is in

17 the record.  He's still relevant and I don't think their motion

18 is well taken.

19        **THE COURT:**  Did you have more to say?

20        **MR. JACOBS:**  Briefly, your Honor.

21        Some of these motions overlap, so Mr. Van Nest and I

22 did discuss the question of the trade that your Honor proposed.

23        We do have a burden on indirect infringement in

24 Phase 2.  Recall in Phase 1 we had a burden on indirect

25 infringement and by the time of the verdict, the issue was

1  stipulated to for Phase 1 purposes; but in Phase 2 we have no

2  such stipulation.

3        And our burden on Phase 2 is to meet the intent

4  standard required for indirect infringement and that's a

5  combination of knowledge and intent to cause infringement.  And

6  it is for those purposes that we will be relying on people like

7  Mr. Lindholm, who published a book chapter on one of the --

8  essentially on the '104 patent.

9        So that's why this issue is not as pristine in a

10 sense, not merely technical.  Of course, if Google would

11 stipulate to indirect infringement of the phone models that are

12 in the case, then the indirect infringement issue would go away

13 and the trial could be trimmed in that regard, but I don't

14 anticipate such a stipulation.

15       So the overlap here is between how they might -- how

16 Google might perceive a need to use Schwartz defensively as we

17 meet our offensive burden in Phase 2 to establish knowledge and

18 intent.

19       THE COURT:  Let me hear everything else on Lindholm

20 before I make a ruling.  There's a Google motion on Lindholm.

21       MR. VAN NEST:  There is, your Honor.

22       THE COURT:  Go ahead.

23       MR. VAN NEST:  Again, this is more to the point of

24 preventing Phase 2 from becoming a battle of sort of sideshows.

25       They have now -- after your Honor's comments Friday,

1  now Lindholm has moved up to be their lead-off witness.  He's

2  No. 1 on their list.  And you heard Mr. Jacobs say he's

3  important to establish knowledge of patents.

4          Well, let me tell you what the evidence is on it and

5  why it really doesn't bear on Phase 2.

6          They do have to show knowledge of the patents-in-suit

7  as part of their showing of indirect infringement in Phase 2.

8  Mr. Lindholm co-authored a book back in 1997 that your Honor

9  has seen.  It's one of the *Java Specification* books.  It's the

10 virtue machine spec book.  There is one line in it that makes a

11 reference to the '685 patent which is not a patent-in-suit.

12 The '685 was a predecessor to the '104 which is in suit, but

13 the '104 -- '685 was abandoned in '99 and the '104 issued

14 sometime after that.

15          **THE COURT:**  Wasn't the '104 some -- didn't it in some

16 way descend from the '685?

17          **MR. VAN NEST:**  It did.  It did.  But the way it

18 works, the '685 is essentially retired in '99 and the '104 is

19 applied for.  The claims are different in the '104 from the

20 '685.

21          Now, Mr. Lindholm -- remember, this is all back in

22 the '90s.  So his second edition of the book came out in '99.

23 There is no mention of any patents in it.  The '685 or '104 are

24 not in it.  So the only thing they have got is one line in a

25 book in '97.  Mr. Lindholm came over to Google.  He didn't play

PROCEEDINGS                                           2803

1    any role in designing.

2            In this phase we're going to be talking about the

3    Dalvik Virtual Machine and some of the developer tools that are

4    used with it.  He didn't play any role in designing either of

5    those.  He wasn't on the design team.  He didn't contribute any

6    ideas.  He didn't work on the Dalvik Virtual Machine.  He

7    didn't work on the Java language at Google.  He's worked on

8    other things.

9            And there is no evidence from anybody in Phase 1 or

10   in any deposition.  There is no document.  There's nothing to

11   show that Mr. Lindholm spoke with anyone about any patents at

12   Sun, including the '104 or the '520.  There is no documents

13   showing that.  They have deposed Mr. Rubin five or six times.

14   There is no evidence that he ever spoke to Mr. Lindholm.  They

15   have deposed Mr. Lindholm a couple of times.  There is simply

16   no evidence.

17           So this is a situation where what they want to do is

18   create a big sideshow and this will spill over onto Mr. Rubin.

19   We have a second motion which Mr. Anderson is going to discuss.

20   This huge sideshow where, since they can't talk about licensing

21   like they did in Phase 1, they want to talk about, Oh, these

22   guys were at Sun, or they knew Sun had patents, or Sun had a

23   big portfolio and this and that.  And unless they can show that

24   these patents were known among the thousands of Sun patents out

25   there or were disclosed or somebody said, "Yeah, you're

1  infringing these," or somebody called them to their attention,

2  it's all irrelevant.  It's all a bunch of hand waving.

3          That's why I have Mr. Schwartz on my list and that's

4  why we are prepared to go down this road.  Although I agree

5  with your Honor, Phase 2 will be a lot more focused for our

6  jurors if we focus on, okay, what are the claims in the patent,

7  and what does the Dalvik do, and does the Dalvik technology

8  infringe these claims?

9          But, again, the Lindholm stuff and the Rubin stuff,

10 which Ms. Anderson will discuss, is a piece.

11         **THE COURT:**  Mr. Rubin is a different story.  We're

12 not going to talk about Rubin right now.  We're talking about

13 Lindholm.

14         **MR. VAN NEST:**  Fair enough.

15         So with respect to Mr. Lindholm:  A, it's

16 prejudicial.  B, it's irrelevant.  C, it's a sideshow.  And, D,

17 it opens up the prospect that I then have to call Mr. Schwartz

18 and all that to say Sun always used patents defensively not

19 offensively and Sun engineers were told, "Don't look at

20 patents, focus on your own work."

21         So, again, I don't think it has any relevance and I

22 don't think it ought to be allowed in Phase 2.

23         **THE COURT:**  Let me ask Mr. Jacobs:  Is it true that

24 that was Sun's stated policy; that they didn't sue?

25         **MR. JACOBS:**  Actually, first I've -- I'm sorry.

PROCEEDINGS                                              2805

1    Which part, your Honor?

2              THE COURT:  I just heard that the stated policy of

3    Sun was not to sue on patents.

4              MR. JACOBS:  There's a reference in one of the

5    documents to a comment by Mr. Schwartz about using patents

6    defensively.  And so the question will be if that's dispositive

7    of Sun policy, there's all sorts of evidence that Google was

8    worried about Sun patents, notwithstanding another Mr. Schwartz

9    statement.  What does "defensive" mean in this context when

10   this is a business assault, if you will, on the Java business.

11             So, yes, there some a comment to that effect, but it

12   is, we will argue, not highly probative.

13             THE COURT:  A public comment or was it an internal

14   comment?

15             MR. JACOBS:  I believe it's a public comment.

16             THE COURT:  When did he make that comment?

17             MR. JACOBS:  I think it's 2000- -- it's 2006, but I'm

18   not positive.

19             And, of course, Sun did sue on patents in the

20   Microsoft litigation when someone forked Java.

21             So, in any case on Mister --

22             THE COURT:  Was that a counterclaim or was that a

23   direct suit?  Who sued first in --

24             MR. JACOBS:  Sun did.

25             THE COURT:  Sun did.  On patents or on copyright?

1          **MR. JACOBS:**  You know, your Honor, I would like to

2   make sure I'm really precise in answering these questions and I

3   haven't looked at that litigation file in preparation for this

4   motion.

5          You will recall in the damages context there was a

6   patent cross license that was executed between Sun and

7   Microsoft that resulted in a very substantial payment to Sun.

8          **THE COURT:**  What do you say to Mr. Van Nest's point

9   that the '685 was forfeited or abandoned and new claims were

10  made and that Mr. Lindholm never said a word about '104 or the

11  claims in '104?

12         **MR. JACOBS:**  I don't think that's highly probative

13  here.  The '104 is a reissue of the '685.  You look at the

14  front piece of the '104, the '685 is right there.

15         The question is:  As Mr. Lindholm was giving all of

16  his advise that we've seen in document after document about the

17  need for a license, can the jury draw a reasonable inference

18  that one of the reasons he was concerned about the need for a

19  license, whether it was in 2005 or 2006 or even 2010, with Sun

20  patents was with the '104, one of those patents, was the -- and

21  was Google willfully blind to the Sun patents?

22         So one of the issues that Google's argument on this

23  could whole cluster of motions leaves out is the willful

24  blindness standard.  The willful blindness standard applies

25  very well here because in the leading case that led to willful

1    blindness being articulated by the Supreme Court, the case

2    there was of a defendant who had copied the plaintiff's product

3    and didn't tell its counsel it had copied the product when the

4    counsel was doing an opinion.  The defendant wanted to rely on

5    that opinion, even had an opinion, and the Court said, no, this

6    was a whole pattern of willful blindness to the risks of patent

7    infringement.

8            And that's our case here.  In the case of the -- of

9    Dalvik, in particular, it starts out as a Java Virtual Machine.

10   We see document after document that says we're going -- there

11   is a critical license that's needed for the Java Virtual

12   Machine.  They download and install in their developer

13   environment for Android the Java compiler.  They bolt on its

14   dx converter.  Dalvik had a different bytecode, but it's the

15   same basic architecture in terms of it being the virtual

16   machine facing the same basic performance challenges as the

17   Java developers did.  And all the testimony will be that Google

18   never looked to see whether that might infringe any of the

19   patents, but particularly including the '104 patent that Mr.

20   Lindholm wrote a whole chapter about in this book and

21   prefigured by dropping a footnote, it's extraordinary.  I've

22   never -- it's so unusual to see a note in a book that says

23   something like, "The technology in this chapter is covered by

24   U.S. Patent No. '685 patent."

25           So I think we've got a pretty good case for the jury

1   on willful blindness.  The facts line up quite closely with the

2   Supreme Court's decision.  And to try -- and then to exclude

3   all of that and say, no, none of that comes in is a matter of

4   law.

5            In essence, what Google is arguing to your Honor is a

6   summary judgment motion.  As a matter of law, there is no

7   willful blindness case here.  And Oracle cannot put on a

8   willful blindness case.  That would be quite extraordinary

9   given the facts.

10           **THE COURT:**  Yes, Mr. Van Nest.

11           **MR. VAN NEST:**  Let me start with Mr. Schwartz.

12           He repeatedly said we used patents defensively, not

13   offensively.  There is a famous statement in one of his blog

14   posts that says, "We at Sun innovate, not litigate."  Innovate,

15   not litigate.

16           **THE COURT:**  Then why did they sue Microsoft?

17           **MR. VAN NEST:**  I will check.  I don't think that's a

18   patent case.  I think that was a -- I think that was antitrust

19   case and possibly copyright, but in any event it's a public

20   statement, as Mr. Jacobs acknowledged.  It's made repeatedly

21   over time.  There are statements in the day that back it up.

22           And by the way, since Mr. McNealy was here saying

23   that the blog post was some sort of a personal thing, we

24   noticed it's actually filed with the SEC.  There's SEC notices

25   typically on Mr. Schwartz blog post.  So just like when Mr.

 1   Ellison speaks at JavaOne, they file a SEC disclosure.  The

 2   same is true when Mr. Schwartz speaks.

 3          But coming back to Mr. Lindholm, it's absolutely the

 4   case that he doesn't say anything anywhere about the '104.  He

 5   doesn't say anything anywhere about these claims of the '104.

 6   They've got one line in a 1997 treatise -- not treatise, but a

 7   textbook.  In the second edition in '99 there isn't a word

 8   about either one of these patents.  And, again, whatever the

 9   willful blindness standard is, you can't meet it by putting

10   testimony in about one line in a book in 1997 on a patent

11   that's not even in issue.

12          And, again, I'm not the one wanting to open the door

13   to the sideshow, but if we're going to have them ignoring the

14   technology and basically saying, "You needed a license.  You

15   needed a license.  You needed a license," I need to have the

16   ability to defend myself and my client.  And I don't think any

17   of this is relevant.

18          And, again, as I said, I would rather not call Mr.

19   Schwartz if I don't have to, but I really don't think Mr.

20   Lindholm's testimony adds a thing.  It's just another sideshow.

21          **THE COURT:**  Well, is it true that there was an entire

22   chapter and the footnote said everything in this chapter is

23   covered by the '685 patent?

24          **MR. VAN NEST:**  I haven't studied the footnote, your

25   Honor, but it's certainly true that there is a one-line

1  statement in the text that says the '685 patent is relevant to

2  what is discussed here in the virtual machine.

3          Now, in the second edition the whole chapter drops

4  out.  The second edition in '99, which is at the time that the

5  '685 goes away, that whole chapter drops out of the book.  So

6  the chapter is gone.  Any reference to patents is gone.

7          And, again, there is no evidence linking it up with

8  anything that happened at Google.  It would be one thing if he

9  was the critical lead designer on Dalvik, or if he was involved

10 in designing the pattern matching that is accused with respect

11 to the '520, or the symbolic to numeric reference resolution,

12 which is the subject of the '104.  There is no evidence of

13 that.

14         He testified in Phase 1 that he had no role in any

15 design activities.  He wasn't involved in the Dalvik.  He

16 wasn't involved in any of this.  And, again, they have had all

17 this discovery, as your Honor is well aware.  I don't know how

18 many days of Rubin and how many days of Lindholm.  There is not

19 a single document anywhere, not an email, not a memo, nothing

20 to show that there was any discussion by Mr. Lindholm about any

21 of these patents-in-suit or any others with anyone at Google.

22         He had a non-disclose at Sun, like all these

23 engineers do.  He respected it.  That's it.

24         The testimony is that early on he, was in a couple of

25 meetings to introduce the Google folks to his colleagues at Sun

1   and that was pretty much it until he wrote the Lindholm email

2   in 2010.

3          So, again, if there is any conceivable relevance, it

4   is minimal.  And it certainly doesn't justify the sort of

5   sideshow they want to invite by putting him on as their first

6   witness and waiving the book around and maybe reminding jurors

7   about his email.  I don't even know what.  That's really not

8   what we should be focused on in Phase 2.  And I think it would

9   be improper to do it.

10         **THE COURT:**  What do you say, Mr. Jacobs, about the

11  fact that the subsequent edition of the book did not have that

12  chapter?

13         **MR. JACOBS:**  Well, I think it actually proves that as

14  they were writing the subsequent edition, he was refocused on

15  the first edition and making a decision whether to include this

16  chapter.  The chapter isn't included because the documentation

17  gets more and more focused on exactly what a programmer needs

18  to know.  And this is an internal function.  The '104 patent is

19  an optimization technique.  And so as the documentation gets

20  refined, a decision is made by the editors this isn't

21  necessary, but a decision was made.

22         So the first edition is in front of him in 1999 and

23  he's thinking, "Do I need this chapter at all?"  And they

24  decided no, we don't need to cover this technique.

25         I think all of this back and forth, your Honor,

1  proves how factual this is.

2          THE COURT:  Well, wait, wait.  In his deposition -- I

3  assume he was deposed, right?

4          MR. JACOBS:  He was deposed.  But you may recall that

5  the deposition of Mr. Lindholm was a very short deposition

6  ordered by the magistrate judge late in the process, and it was

7  focused on the Lindholm email.  There are --

8          THE COURT:  Well, did he admit that he knew the '104

9  was the '685?

10         MR. JACOBS:  I don't think he was asked that

11 question, your Honor.

12         THE COURT:  Is he here right now?  Is he out in the

13 hallway?

14         MR. VAN NEST:  He is in San Francisco, but not here

15 in the courthouse, your Honor.

16         MR. JACOBS:  What Google is rendering and this topic

17 leaves out is all of the emails from Mr. Lindholm advising Mr.

18 Rubin on licensing issues associated with Android, and even on

19 technology choices.

20         So he makes very specific recommendations.  We should

21 go with CDC, not CLDC.  Lindholm is not remote from Android.

22 Lindholm is deeply embedded in the Android project.  The fact

23 that he was focused on intellectual property issues, on

24 licensing issues, only reinforces the relevance of his

25 testimony.  He is not just a mere implementer or a mere coder.

 1   He's the guy helping out on the, quote, critical negotiation

 2   with Sun.

 3          So to exclude him on the grounds that wasn't a coder

 4   is to miss the essential relevance of what Lindholm was up to.

 5   He knew all about Sun's licensing, and he knew about Sun's

 6   intellectual property.  And we will establish that through his

 7   testimony.

 8          And Google proceeded with Android willfully blind of

 9   the patent risks they were facing, including very specifically

10   on the '104 patent.  That's what we will ask the jury to

11   conclude.  And I don't think that that can be ruled out as a

12   matter of law at this stage through motions in limine.

13          **MR. VAN NEST:**  Your Honor?

14          **THE COURT:**  Yes.

15          **MR. VAN NEST:**  I do think -- I do think if your Honor

16   is inclined to do it, this would be something that should be

17   explored, at least initially, outside the presence.  And we can

18   get Mr. Lindholm here.  I can assure you that --

19          **THE COURT:**  Well, if he was here, I would do that,

20   but he's not here.  He's probably at your law office.  He

21   should be here.

22          So, I'm sorry, but I -- I was going to let you do

23   that if he had been out in the hallway, like he should be,

24   ready to go.

25          **MR. VAN NEST:**  I apologize.  I wasn't sure what this

1    morning's agenda would be.

2            But certainly, certainly there is nothing significant

3    about any of this.  And I don't think that the first time we go

4    through this drill it ought to be in front of the jury.  I

5    think it ought to be here in court.

6            **THE COURT:**  I disagree.  We're going to let Lindholm

7    testify.  Here is the reason.  Willfulness is an issue for

8    indirect infringement.  So the plaintiff has the burden to

9    prove willfulness.

10           Now, one way to meet that -- I don't know.  I'm not

11   sure it would be enough to stipulate to that, so I'm not going

12   to suggest that.

13           Now, what troubles me the most about it is that while

14   he wrote about the '685, he did not write about the '104.  And

15   it's a gap in the plaintiff's logic to say that because he knew

16   about the '685, he must have known about the '104.

17           So I am going to order this:  That you cannot show

18   that email again until after you have established in front of

19   the jury that there is enough evidence that he had on his mind

20   '104 equals '685.  If you don't cover that gap, then we're not

21   going to get back to that email, which I know is the real

22   reason you want to bring him forward.

23           So you must start with that book and do it the hard

24   way, which is show that he knew about the '685.  The whole

25   chapter was there.  He explained what it meant.  The '104,

```
 1   somehow make that equation.  Now, I will give you a lot of
 2   latitude on that.
 3        I'm not saying he's got to admit it in so many words
 4   because I know enough about the way this case has been prepared
 5   that no witness favorable to any side is going to admit
 6   anything in unless they've got to.  So I will give you have
 7   some latitude on '685 equals '104, but if you don't come close
 8   to that mark, there is no point in getting back into that
 9   email, which I know is the real reason you want to put him on
10   the stand.  So that is the ruling on Lindholm.
11        With respect to Mr. Schwartz, I'm not going to make a
12   final ruling on this yet.  I have a number of things I want to
13   say about that.
14        No. 1.  In litigation, I have practiced law enough to
15   recognize a spring gun when I see one.  That witness seemed to
16   me -- he was asked this question, something like:  Did Sun ever
17   make a decision whether to sue?  That could have been answered
18   "yes" or "no."  But he then says, "No, we didn't think we had
19   grounds to."  Now, in that one sentence, if you think it
20   through -- which I know all the lawyers have -- that implicates
21   so much attorney-client material, so ambiguous.
22        For estoppel purposes the only thing, moreover, that
23   would have mattered was what was communicated publicly or to
24   Google, not what their private thinking was.  No one can rely
25   upon the private thinking of another company because by
```

 1  definition it is private and you don't know it.

 2         So the fact that they didn't -- even if it's true,

 3  that they felt they had no grounds to sue on, unless that was

 4  communicated to Google, Google had no basis on which to rely on

 5  that.  That was a completely volunteered statement that was not

 6  responsive to the question.  However, no motion to strike was

 7  made.  I would have granted it immediately.  No motion to

 8  strike was made.  And instead counsel chose to cross examine

 9  that and did an effective job on cross examining it, but there

10  it is.  It was in the record.  Not objected to.  It was cross

11  examined.

12         It should not have been uttered in the first place.

13  The witness should have told not to utter statements like that

14  and, nonetheless, it came out.

15         So insofar as this has anything -- if Mr. Schwartz is

16  going to testify on this point again for an issue that has only

17  to do with an issue that the judge has got to decide, it will

18  be only in front of the judge.  That much I am positive of.  So

19  he can -- he can volunteer all he wants in front of me because

20  I can sort out what is attorney-client and not attorney-client

21  and what he should and should not be saying.  It will not be

22  allowed in front of the jury.

23         Now, if there is some issue that is a jury issue,

24  then I would let him testify to that sort of thing in the

25  presence of the jury.

```
 1              But let's think about willfulness for a minute.

 2    Would it have anything to do with willfulness?  Well, remotely,

 3    except for this.  It opens up the attorney-client privilege.

 4    What were the real conversations that went on to which Mr.

 5    Schwartz might have been a party?  I know enough about how

 6    those kind of conversations would have worked.  It could have

 7    been anything from, "We have strong grounds to sue on, but in

 8    order to keep corporate peace, we're not going to do that."

 9    That could have been one ground.  That could have been one

10    version of that attorney-client conversation.

11              So this -- this vague statement, this broad

12    pronouncement by Mr. Schwartz that he didn't think they had

13    grounds to sue on is probative of nothing, unless we open up

14    the attorney-client privilege.  So I don't even think it has

15    much to do with willfulness.

16              Now, there is another part of this motion, whether

17    the judge should instruct the jury that -- to disregard the

18    previous testimony.  I have that in mind and I'm not going to

19    rule on that yet.  But remember this, the issue here, the

20    reason we are here is to find out whether or not there are

21    grounds to sue on under the law as the judge gives it to the

22    jury.  The jury is going to make the decision whether there are

23    grounds to sue on, not Mr. Schwartz.

24              So if there had been a motion, I would have had -- I

25    would have -- I would have excluded that sentence in a
```

1  heartbeat.  I think I would have heard you out on that, but I

2  believe that that should have never come in in the presence of

3  the jury.

4           I don't want to fault Mr. Jacobs for not objecting

5  because he made a choice that he would cross examine it.  He

6  did a good job on that.  So lawyers can go both ways on that.

7  Sometimes it's better not to object.  But you did -- you did

8  let it go by.  You did not ask to strike it at the time and I'm

9  not going to strike it out of the record at this late date.

10          The only question that I am considering is whether or

11 not in the closings to -- before the closings is to instruct

12 the jury that it's to them to decide whether there are grounds

13 to sue on, not up to Mr. Schwartz.

14          I will order you not to make reference to Mr.

15 Schwartz in the opening statement.  There is no basis on which

16 to bring him up again, as far as I can see, in the opening

17 statement.

18          Now, as the evidence unfolds in the patent part,

19 I'm -- I may be able to see some angle at which his testimony

20 has relevance, in which case you could use it in the closing;

21 but I don't see it and you said you don't plan to bring it up

22 anyway.

23          Now, to circle back to Lindholm.  I think there is

24 a -- it's not the same kettle of fish.  There is -- it's not

25 quite the same analysis.  I've already gone through that.  But

PROCEEDINGS                                    2819

```
 1  there is an important caveat, and that is:  You may not get

 2  back into that email.  I don't even want you to use it in your

 3  opening statement.  Don't use that email in the opening

 4  statement again unless you -- no, because you haven't connected

 5  up that Lindholm had something to do with that -- with willful

 6  and '685 equals '104.  That's what you've got to prove and you

 7  can try to prove that in front of the jury.

 8          All right.  So that's the ruling on Lindholm and

 9  Schwartz for the time being.

10          Now we go to -- we will go to the Andy Rubin, Andy

11  Rubin motion, which is related to this.

12          Go head, Ms. Anderson.

13          MS. ANDERSON:  Thank you, your Honor.  Good morning.

14  Christa Anderson for Google.

15          Your Honor, this is the motion that focuses on

16  exclusion of testimony that Oracle has designated to play

17  before the jury in this case that they -- questioning in which

18  Oracle asked Mr. Rubin about -- generally about what Google did

19  or didn't do to investigation the scope of Sun's patent

20  portfolio.  Some of the questions were directed at Mr. Rubin

21  individually, some generally at Google.  But the thrust of this

22  questioning all surrounds what investigation was made into

23  Sun's patent portfolio.

24          All of these questions focused on the multi-year

25  period preceding suit during which it's undisputed that Sun and
```

1   Oracle had not disclosed the specific patent numbers at issue

2   in this case to Google.  Because of this, letting this

3   testimony go before the jury will violate both Rule 402 and 403

4   because it will confuse the jury and mislead them to thinking

5   there is some affirmative duty to investigate another company's

6   patent portfolio.

7           Just to back up for a moment --

8           **THE COURT:**  But why isn't there?

9           **MS. ANDERSON:**  There isn't --

10          **THE COURT:**  If you know that you're going to be using

11  Java and Java has some patents that protect.  I thought that

12  was the law, that you had to do some investigation.

13          **MS. ANDERSON:**  Actually no, your Honor.  And under

14  the law regarding indirect infringement, obviously, generally

15  speaking, plaintiff is required to prove actual knowledge of

16  the patent.

17          Here Oracle wants to show willful blindness which was

18  a standard allowed in the *Global-Tech* decision.  It's a narrow

19  standard that allows satisfying of the scienter requirement

20  only where the plaintiff is able to show the defendant

21  subjectively believed there is a high probability that a fact

22  exists and took a deliberate act to avoid learning of that

23  fact.

24          That standard is higher than recklessness.  Higher

25  than reckless indifference.  Higher than negligence.  And under

 1  cases like the *Apeldyn* case, which we cited to your Honor, it

 2  is not satisfying of that standard simply to show that a

 3  defendant company knew about the possibility that there were

 4  patents out there, made an affirmative decision not to go

 5  investigate the scope of another company's patent portfolio,

 6  that is not enough.

 7          In the *Apeldyn* case that we cited to your Honor from

 8  2011, which post dated *Global-Tech*, in that company the

 9  defendant had made the decision it would not initiate a

10  collection of patents that had been issued to other companies

11  in the very field that it was working in, unless there had been

12  a specific request from an internal lawyer to do specifically

13  that thing.  And it had tried -- it had not tried to gain

14  knowledge other companies' patents.

15          This is -- that particular fact pattern, the Court

16  said, that's not enough to show willful blindness.  You have to

17  have a situation like you had at *Global-Tech* where you had a

18  defendant that actually decided to take an affirmative act --

19  in that case they took and copied a particular fryer.  They

20  asked for a use, approval from their own attorneys, and didn't

21  tell their attorneys that they had actually taken the fryer

22  from the market and where they had bought it.

23          So they had taken an affirmative act to conceal what

24  had happened, and they had made an affirmative decision not to

25  tell their lawyers what they had done.  That was a step beyond.

1  For the Court that was enough to satisfy willful blindness.

2           Where you have a general situation of a company that

3  does not take an action to investigate another company's

4  Sun patent -- patent portfolio, that certainly doesn't satisfy

5  willful blindness.  Especially in a case like this where you

6  know that Sun has claimed and Oracle has claimed thousands of

7  patents that potentially cover Java.  That is not the kind of

8  scienter and deliberate act not to learn of a specific patent.

9           And in this case, your Honor, it is undisputed from

10  Ms. Catz, who testified in the first phase, from the documents

11  at issue in this case, from the documents that were submitted

12  in evidence during Ms. Catz's testimony that Sun and Oracle

13  didn't talk patents.  They didn't -- and Mr. Cizek's testimony

14  who testified that he participated in the negotiations with

15  Mr. Rubin before and after Android was acquired by Google, he

16  testified, no, I didn't talk about patents with Mr. Rubin.

17  That wasn't the subject.

18           And, in fact, it wasn't until Mr. Eustace of Google

19  sent an email to Ms. Catz in the summer of 2010, just before

20  this lawsuit was filed, where he said:  We're not going to pay

21  for IP we're not using and for IP you refuse to disclose to us.

22           Sun and Oracle made a decision not to disclose

23  whatever patents they claimed supposedly covered Android.  And

24  under that scenario, they certainly can't suggest to a jury

25  that Google had an affirmative duty to go out and investigate

1  potentially thousands of patents to try to figure out if maybe

2  Sun might one day claim that that covered their particular

3  product.

4          That would be putting on Google an affirmative duty

5  to investigate a patent portfolio that the law does not support

6  and none of the cases cited by Oracle support the notion

7  there's such an affirmative duty.

8          **THE COURT:**  All right.  Let's hear from Mr. Jacobs.

9          **MS. ANDERSON:**  Thank you, your Honor.

10         **MR. JACOBS:**  We assembled in our opposition to this

11  motion much of the evidence that we will be relying on to show

12  that, in fact, Google was willfully blind to patent risks.

13         There are a series of emails in which patents are

14  explicitly discussed.  Rubin writes in one email from 2006,

15  "Sun threatened to sue us over patent violations so we walked

16  away from the negotiations."

17         There is ample evidence of awareness and concern over

18  patents at Google, and ample evidence, undisputed evidence that

19  Java, the Java ecosystem, was the target of the Android

20  development effort; that components of Java are adopted in

21  Android.

22         This is not -- Google would paint this issue as

23  kind of a laboratory, a pristine case in which Company A and

24  Company B are remote.  They have no contact.  They have no

25  interactions.  Company B isn't targeting Company A's products

1    or market, and Company B is sued for patent infringement and

2    says, "Well, we didn't know about your patents."

3              Well, but that's not this case.  This is a case of

4    intense interactions between the two companies, a commercial

5    strategy of Google that targets a particular -- a particular

6    product of Sun.  Relies on components of that product for its

7    own product, including the Java Language Compiler, which sets

8    up the need for these technologies, adopts a virtual machine

9    architecture that is very similar to the Java virtual machine

10   architecture, and then deliberately, according to Mr. Rubin,

11   made no effort to find out whether Sun was protected by patents

12   as against what Google was doing.

13             Now, Google's argument is, Well, Sun had many

14   patents, so how could we have possibly searched and analyzed?

15   Well, that gets the -- that gets the whole analysis backwards.

16   That demonstrates that Google was aware of the extensivity of

17   Sun's patent protection and nonetheless decided not to identify

18   whether there are patents -- whether any of those patents were

19   likely to be infringed by Google through the course of Android

20   development.

21             It shouldn't be the case that someone escapes willful

22   blindness liability because the right-holder has lots of

23   intellectual property protection.  To the contrary, that should

24   up the ante on the defendant to go through those patents and

25   decide and make an affirmative decision.

1          Now, part of what's going on here, of course, is that

2    Google has asserted the attorney-client privilege over all of

3    its legal analysis of these patents.  So we're left with Mr.

4    Rubin's non-privileged testimony and the non-privileged record

5    here.  But the non-privileged record on the Google side is a

6    record that supports willful blindness.  And to rule out

7    willful blindness as a basis for Oracle establishing intent,

8    we're back again to a summary judgment or judgment as a matter

9    of law standard, and the cases just don't support that.

10          *Apeldyn* is not this case for the reason I cited.

11   It's not the A and B who never had any contact or no

12   significant commercial targeting by B of A.  This case really

13   is like *Global-Tech* in which copying occurred and in which the

14   defendant avoided giving counsel the information that counsel

15   would have needed to evaluate the patent risk.

16          So I think we should be allowed to put on our willful

17   blindness case.  As of, I believe, it's July 20th, 2010

18   parentheses, before the Lindholm email, close parentheses,

19   Google is on notice of the '104 and '520 patents specifically.

20   They turn out they are the first two patents in the

21   presentation.

22          So when Mr. Lindholm writes his email, it is

23   specifically after the '104 patent has been communicated to

24   Google as a patent that Oracle believes Google is violating.

25          So as of July 20th, we have specific notice, but we

PROCEEDINGS                                    2826

1  have an intent standard to meet here and we think we need to

2  meet it on the basis of all the facts and circumstances.

3          Of course, nobody ever admits on the stand, "I

4  intended to cause somebody else to infringe."  It's got to be

5  circumstantial evidence and that's why we have to be able to

6  put on this record of intense interaction, of negotiation, of

7  worry about patents, of failure to investigate, and then, of

8  course, putting Android out there for the OEMs to install on

9  their phones having been willful blindness to the patent risks.

10         If Google would stipulate to indirect infringement, a

11 lot of this goes away.  They're actually are going in the other

12 direction.  You will recall the other day that the charts are

13 no longer deemed admission as to indirect infringement.  They

14 want us to have to prove that each element of the patents is on

15 the phones.

16         **MS. ANDERSON:**  Thank you, your Honor.

17         With regard to the evidence that Mr. Jacobs described

18 to support its opposition to this motion, all of that evidence

19 is beside the point of the testimony that we're seeking to

20 exclude here.

21         The testimony that we're talking about in this

22 motion, specifically questions asking Mr. Rubin or Google what

23 did it do to investigate the extent of Sun's patent portfolio.

24 That's a different question and a lot of what Mr. Jacobs cited

25 to.

PROCEEDINGS                                           2827

1           Clearly, there is in the record already from Phase 1

2    the fact that during these early negotiations between Sun and

3    Google, there were discussions about whether or not there would

4    be a co-development and a partnership and a cross licensing.

5    And, clearly, in these documents there is a reflecting of a

6    respect for the fact that there would need to be licenses were

7    we to take proprietary technology from Sun as part of a

8    co-development partnership.

9           That's not the issue in this motion.  The issue in

10   this motion is:  Can Oracle put before the jury questions

11   designed to ask whether or not -- the extent to which Google

12   had an investigation into the scope of Sun's patent portfolio.

13   That asks the jury to infer that there was a duty to go out,

14   hunt up the thousands of Sun Java patents and figure out if any

15   of them might affect Android.  There is no such legal duty.

16   And putting that evidence before the jury will suggest to them

17   that there is and that could be sufficient for willful

18   blindness and it is not.

19           With respect to the point that was made about the

20   '104 patent, Mr. Jacobs stated his intention to try to tie up

21   the Lindholm email with the disclosure in July of 2010 for the

22   first time when Oracle told Google that it thought that the

23   '104 patent was infringed.  However, there are declarations

24   before this Court where Mr. Lindholm made clear several times

25   that he had never engaged in a patent infringement analysis

PROCEEDINGS 2828

1  with respect to the Android platform ever with regard to any

2  patent.  So that would be highly misleading, if that is the

3  point that is intended by Oracle's motion.

4           And that was a question that your Honor upheld

5  Oracle's objection to during Phase 1, but that would -- if they

6  were seeking to do that again, that would again become a big

7  problem in terms of misleading the jury.

8           **THE COURT:**  Thank you.

9           **MS. ANDERSON:**  Thank you, your Honor.

10          **THE COURT:**  All right.  Here is the ruling.

11          This motion is denied.  The reason is it may be true

12  that this item of testimony from Mr. Rubin will not in and of

13  itself prove what is needed to prove willfulness.  But the

14  party with the burden of proof has to proceed one step at a

15  time and to put forth a body of evidence.  It's not a proper

16  objection to a single item of that body of evidence to say it

17  alone is not enough.

18          And, yes, I agree that one item of testimony alone is

19  not enough to carry the burden that Oracle has in this case as

20  to willfulness, but that in combination with the rest of the

21  evidence might be.

22          This is an easy problem to solve because I'm going to

23  tell the jury what the correct standard is at the end.  If the

24  evidence doesn't measure up, the jury will toss out that claim

25  by Oracle.

1        So Oracle will be allowed to use the Andy Rubin

2  testimony.  That motion is denied.

3        Now we go to the motion to exclude Peter Kessler.

4  Let's hear about that one.

5        **MR. KAMBER:**  Good morning, your Honor.  Matthias

6  Kamber for Google.

7        The motion to deny Peter Kessler is actually pretty

8  straightforward.  The issue has been narrowed at this point as

9  well.  We've moved on the alleged use of the '104 patent in

10 Android as well as the modifications to the Android code.

11       Dr. Peters, Oracle's counsel, has let us know that

12 they do not intend to present evidence regarding alleged use of

13 the '104 patent by Android through Dr. Kessler, just the

14 modifications to the code.

15       But they don't address the crux of the motion which

16 we filed, which is that Mr. Vandette was the person that Oracle

17 disclosed to testify about, quote, the steps he took to turn

18 off the patented features to measure the performance hits to

19 Android, end quote.  That was from the Rule 26(a)(2)(C)

20 disclosure of last year at the end of July.  I believe it was

21 July 29th of 2011.

22       They didn't disclose Dr. Kessler for this purpose,

23 which begs the question:  Why do they need to do this through

24 Dr. Kessler instead of Mr. Vandette, who they also have on

25 their witness list?

1           THE COURT:  How do you spell Vandette?

2           MR. KAMBER:  Excuse me?

3           THE COURT:  Vandette, how do you spell that?

4           MR. KAMBER:  V-A-N-D-E-T-T-E.

5           THE COURT:  All right.  Thank you.

6           Go ahead.

7           MR. KAMBER:  And the answer turned out to be that

8    Mr. Vandette did not do the code modifications either.  We know

9    from a declaration from another Oracle employee, Mr. Birger,

10   that he did the modifications.  We know that he submitted a

11   declaration in connection with the report, one of the reports

12   submitted by Dr. Cockburn.

13          I think the reason we're having this fight is Oracle

14   has a foundation problem.  They sort of have this sort of

15   classic employee spoon feeding problem here where Mr. Vandette

16   didn't do the code modifications.  Somebody else did.  It

17   wasn't Mr. Kessler -- Dr. Kessler, excuse me -- but they want

18   to put those code modifications in through Dr. Kessler despite

19   having never disclosed him as an expert on those topics.

20          Now, the one other thing --

21          THE COURT:  Let's be clear.  He works for the

22   company, right?

23          MR. KAMBER:  Correct.  All of these guys do.

24          THE COURT:  So Rule 26 only requires that he be

25   listed as someone who is going to be giving expert testimony.

1    He doesn't have to do a report.

2              MR. KAMBER:  Correct.

3              THE COURT:  Only retained people have to do reports.

4              MR. KAMBER:  Correct.

5              THE COURT:  Isn't that the end of the story?  Let

6    me -- let me just stop right there.

7              He wasn't closed.  Who is going to argue this?  Mr.

8    Norton?  He wasn't disclosed.  Why are you trying to bring in

9    Kessler when you didn't disclose him under Rule 26?

10             MR. NORTON:  We're going to rely on Mr. Vandette for

11   the modifications that were in the code that went to the

12   performance testing for the '104.

13             Mr. Kamber is mistaken when he says that Mr. Birger

14   did the changes.  This was already briefed by Google in its

15   motion in limine No. 2 that they filed last October.  And we

16   explained why they were mistaken and, yet, they persist in

17   claiming, contrary to the record, that Mr. Birger made the

18   changes and not Mr. Vandette.

19             However, Mr. Kessler was involved in the discussions

20   with Dr. Mitchell and Mr. Vandette about the changes to the

21   codes for the performance testing.  And to the extent that

22   Google now wants to raise some sort of foundational challenge,

23   we're entitled to bring Mr. Kessler on, not as an expert

24   witness, but simply as an fact witness to say, "I observed

25   those changes and saw how they were made."  That's not expert

1  witness testimony.  It's percipient witness testified.

2          **THE COURT:**  You said earlier that would be Vandette.

3          **MR. JACOBS:**  Mr. Vandette will do it.  Apparently,

4  Google wants to challenge Mr. Vandette and claim that he lied

5  at his deposition and in his report when he said that he made

6  the changes to the code and explains what he did.  They want to

7  say another employee, Mr. Birger, made the changes.

8          So long as they are making that argument, let me just

9  explain.  Mr. Vandette did performance testing.  He made

10 modifications to the code for the '104, to test the performance

11 of the '104, and he gave a report.  He showed the code that he

12 had used.  He disclosed everything he had done.  He sat for

13 deposition.

14         Subsequent to that, Mr. Birger took the work that

15 Mr. Vandette had done and repeated that work, but actually

16 loaded it onto an Android phone and provided that phone to

17 Professor Cockburn so Professor Cockburn could do additional

18 work in connection with Dr. Shugan and the conjoint analysis.

19         For some reason Google insists on saying that the

20 fact that Mr. Birger subsequently that code of Mr. Vandette's

21 to do additional work somehow proves that Mr. Vandette never

22 did anything.  And so they want to make this argument.  They

23 disclosed Mr. Birger's report to cross examine Mr. Vandette and

24 they want to make that argument that somehow there's a chain of

25 custody or foundation issue.

PROCEEDINGS                                    2833

```
 1           If they want to make that argument, then we reserve
 2    the right to call Mr. Kessler -- Dr. Kessler I should say --
 3    just to show the foundational point.  That's the only reason we
 4    have him on the list still.
 5           Google disclosed Dr. Kessler on its witness list to
 6    testify about performance testing of the '104.  So, they
 7    disclosed him for that purpose and under both parties'
 8    interpretation of your Honor's rules, we're entitled to call
 9    the witnesses on the other party's list for that disclosure.
10           THE COURT:  Read that part of my rule to me.
11           MR. NORTON:  I would have to find it.  I should say
12    both parties have -- on their witness lists have said:  In
13    addition to the parties named, we reserve the right to call the
14    people on your list.  So --
15           THE COURT:  Well, that's not my -- that's not my
16    rule.  That's just --
17           MR. JACOBS:  I --
18           THE COURT:  That's each side's own say-so.  But tell
19    me what my rule says.
20           MR. NORTON:  I don't have that in front of me.  I
21    said that's our interpretation of your rules and it may be a
22    loose one.
23           We don't need to ask Mr. Kessler about the
24    performance testing.  We don't need to rely on Google's
25    disclosure and we don't.
```

PROCEEDINGS                                    2834

1          Mr. Kessler is just on our witness list to the extent

2     that they persist in making this foundational argument.  He

3     would be testifying as a percipient witness, not an expert one,

4     and doesn't require any additional disclosure.

5          **THE COURT:**  Vandette is a no foundation witness for

6     who?

7          **MR. NORTON:**  For Dr. Mitchell.  This came up on

8     Friday.  I believe it was Friday.  There are engineers who did

9     performance testing, that's Mr. Vandette than Mr. Poore,

10    P-O-O-R-E.  And those two witnesses did performance testing

11    that Dr. Mitchell relies upon, in part, in his own report.

12         And so I understand from the discussion last week

13    that we need to put on those engineers and establish what they

14    did before Dr. Mitchell will be allowed to testify to it, and

15    that's what we intend to do.

16         **MR. KAMBER:**  Your Honor, let me just briefly address

17    two points.

18         First is just this issue about, Oh, we're just going

19    to use Mr. Kessler as a fact witness.  It's not a fact witness

20    about something that he's done during the course of his duties

21    in working at Sun or Oracle or virtual machines or anything

22    along those lines.  The duties that we're talking about here,

23    the facts that we're talking about here are his analysis of

24    Android code.

25         So you could just as easily say, well, Dr. Mitchell

 1  or Dr. Astrachan were fact witness to the extent that they're

 2  talking about their analysis.  I think that's -- that's not

 3  really a correct -- or accurate portrayal of what Mr. Kessler

 4  did in this situation.

 5          They disclosed somebody else.  They disclosed

 6  Mr. Vandette about modifications to the code.

 7          **THE COURT:**  They are going to call Vandette.

 8          **MR. KAMBER:**  Excuse me?

 9          **THE COURT:**  They say they will call Vandette.

10          **MR. KAMBER:**  And I think they should and could try to

11  get the information in through there.

12          The other issue I do want to address briefly, though,

13  counsel's suggestion that we're misrepresenting the record as

14  to the foundational problem with Mr. Vandette.  Mr. Vandette's

15  report says "Modifications" -- this is Paragraph 29 of

16  Mr. Vandette's report:

17              "Modifications were made to the source in the

18              copies to implement the experiments."

19          He didn't say he did it.  He just said,

20  "Modifications were made."  It's one of those famous

21  statements.

22          And what's interesting is that Mr. Birger's report at

23  Paragraph 5 says:

24              "I discussed the steps I took to create

25              software builds that represent images of the

```
 1                    Android VM that selectively disabled the

 2                    patents at issue below.  It is my

 3                    understanding that performance benchmark

 4                    testing was conducted on these images."

 5              In other words, Mr. Birger did the changes and

 6    Mr. Vandette ran his performance tests on those changes that

 7    were made, not that he made.

 8              THE COURT:  Well, is Birger listed as a witness?

 9              MR. KAMBER:  He is not.  They refused to provide him

10    for a deposition during discovery.

11              THE COURT:  Did I rule on that?

12              MR. KAMBER:  We didn't bring it to your Honor's

13    attention.  They said that he wouldn't be -- they agreed that

14    he would not testify at trial and so we just left the issue

15    alone because we didn't think we needed his testimony if he

16    wasn't going to be here in court.

17              THE COURT:  Well, all right.  Anything more anyone

18    wants to say on this subject?

19              MR. KAMBER:  No, your Honor.

20              MR. NORTON:  Just two points, your Honor.

21              We do not intend to call Dr. Kessler to do any

22    analysis.  Again, the only thing we would intend to call him

23    for would be the foundational point to the extent that Google

24    pursues this in its examination of Mr. Vandette.

25              THE COURT:  Did Birger do the changes?
```

1          **MR. NORTON:**  No.  Mr. Birger was disclosed --

2          **THE COURT:**  He read to me what was -- it said he made

3    some exchanges.

4          **MR. NORTON:**  No.  What he read to you was Mr.

5    Birger's report submitted after Mr. Vandette had done his work.

6          And so Mr. Birger did builds.  He created images that

7    were then loaded onto phones by yet another person, Mr. Kenny.

8    That was work that we did.  After the performance testing had

9    been done, we decided it would be really useful to have actual

10   phones that we could observe in addition to the benchmark

11   tests, and we enlisted Mr. Birger to do that work and Mr.

12   Birger described everything he had done in his report.

13         Because Mr. Birger's name also appears in the

14   discussions of what Mr. Vandette had done previously, Google

15   has become confused and Google's confusion is that they think

16   Mr. Birger did the original work that Mr. Vandette described in

17   his report.  And, you know --

18         **THE COURT:**  Does Dr. Mitchell -- is that it?  Does

19   Dr. Mitchell in any way rely upon what Birger did?

20         **MR. NORTON:**  No, he does not.  That was, again,

21   Professor Cockburn using that as, again, the -- once this is

22   loaded on the phones, observing the degradation and performance

23   and using that to assess its effect on consumer demand, but

24   it's not relied on by purchase.

25         **THE COURT:**  How about Dr. Cockburn?  Does Cockburn

 1  rely upon Birger?

 2          **MR. NORTON:**  Yes.  Mr. Birger's report says it is

 3  covered.  It is a report prepared for the damages expert.

 4  That's the purpose of it.  That's a Phase 3 issue.

 5          **THE COURT:**  How come you wouldn't produce Birger for

 6  deposition then?

 7          We did not believe it was necessary because we

 8  thought that the evidence that we had was sufficient for

 9  Professor Cockburn and Dr. Camargo to rely on.  And Dr. Camargo

10  is an additional -- is a performance testing expert.  We

11  submitted his report as well.  But they relied on what Mr.

12  Birger had done, which was a fairly straightforward task of

13  loading these images?

14          But the colloquy between the Court and Mr. Kamber was

15  almost verbatim the colloquy between the Court and Mr. Purcell

16  back in December when the Court ruled on Google's motion in

17  limine No. 2.  And in that motion Google had also argued that

18  the performance testing by Mr. Vandette was, in fact, done by a

19  different witness, Mr. Birger, whom they had not deposed and

20  that --

21          **THE COURT:**  But that's because you won't let them

22  depose him.

23          **MR. NORTON:**  And the Court asked, "Did you move?"

24  And Mr. Purcell answered, "No, we did not."

25          And the Court asked, "Was there any reason why you

PROCEEDINGS

```
 1   couldn't?"  And Mr. Purcell answered, "No, there was not."  And

 2   that was the end of the matter and motion in limine No. 2 was

 3   denied.

 4           But none of this needs to be decided today, frankly,

 5   your Honor, because Mr. Birger -- Dr. Mitchell doesn't rely on

 6   Mr. Birger.  Mr. Vandette doesn't rely on Mr. Birger.  If there

 7   is any foundational question that's raised in the course of

 8   Mr. Vandette's testimony or Dr. Mitchell's testimony, then the

 9   Court can rule at that time whether we need to put Mr. Kessler

10   on or have the right to put Mr. Kessler on to address that

11   issue.

12           But the Birger issue is going to go away because they

13   are just mistaken.  But your Honor has reminded me in clear

14   words before that my opinion about what the evidence will show

15   is trumped by what the evidence shows.

16           The witnesses are going to testify.  Mr. Vandette is

17   going to testify.  And this Birger issue is going to go away.

18   It's not an issue.

19           And I think the Kessler issue is going to go away.

20   But so long as they continue to make these arguments,

21   Mr. Kessler is on our witness list and he can testify to things

22   he observed, not analysis.  And that's the purpose for putting

23   him on the list.

24           I don't think that -- the issues presented by

25   Google's motion are not the issues presented by Dr. Kessler's
```

```
 1   testimony.

 2              THE COURT:  Is Birger an employee of Oracle?

 3              MR. NORTON:  He is.

 4              THE COURT:  All right.  Here is the answer.  On

 5   Kessler we're going to wait on a ruling until we hear how

 6   Vandette comes out, and then the scales will fall from my eyes

 7   and I will see how much we need or don't need Kessler and

 8   whether or not there should be Rule 37(c) sanction preclusion

 9   on account of failure to have disclosed him.

10              Now, with respect to Birger, I'm going to just order

11   this, even though I know this is not part of the motion.  I

12   want him to be made available for a half-day deposition by

13   Thursday of this week, because I don't want there to be

14   unfairness when Cockburn comes in to testify.

15              What's wrong with that?

16              MR. NORTON:  Mr. Birger lives and works in Israel.

17              THE COURT:  Really?

18              MR. NORTON:  An Oracle employee, but he lives and

19   works in Israel.  And so I understand the Court's order, but

20   Thursday may be very challenging.

21              Your Honor, he is not on our --

22              THE COURT:  How did he even get involved in this case

23   if he is in Israel?

24              MR. NORTON:  He is an engineer who had the expertise

25   that we needed.  You will recall, your Honor, that we had a
```

1  very short amount of time in which to produce the second

2  damages report and we enlisted the resources that we had within

3  the company to do the work that would assist Dr. Shugan.  And

4  this was important to Dr. Shugan and Dr. Camargo and so we --

5          **THE COURT:**  I will give you a little bit more time,

6  but you all know -- I'm not going to get into the way I

7  practiced law whenever I was practicing, but I had noticed that

8  these days on both sides and, also, in other litigation the

9  lawyers cannot help themselves.  They want to spoon feed every

10 single expert with handcrafted information done in -- not

11 independently, but done within each company so that the company

12 has total control over what goes to the expert.  Then that's

13 held out as fact, as opposed to something that's carefully

14 crafted.  I think that it is -- this spoonfeeding of experts is

15 a bad trend.  I don't like it.  And both of you have done it.

16 So, you know, there we are.

17         But you have got to bring Mr. Birger back in time for

18 him to be deposed sufficiently before Cockburn testifies.  Now

19 that's in Phase 3.  That's several days away, maybe even a

20 couple three weeks away, but he ought to be over here.  Say,

21 you get Mr. Birger over here by next weekend and that he stands

22 for a deposition, half-day deposition.

23         Now, if you over there on the Google side don't want

24 that, then that's fine, but be aware that when the time comes

25 if there is a parallel situation, I will, time permitting,

PROCEEDINGS                                                    2842

```
 1   require you to do the same thing on the Google side.
 2            So do you want -- do you want him to come or not?
 3            MR. KAMBER:  Your Honor, I think we would want Mr.
 4   Birger to come.
 5            THE COURT:  You think you would.  That is an iffy
 6   thing.  Do you want him or not?  "Yes" or "no."
 7            MR. KAMBER:  We do want him.  And the one thing I
 8   would add is I would like to be able to test whether or not Mr.
 9   Birger did these changes instead of Mr. Vandette.  And so it's
10   something that --
11            THE COURT:  I'm not -- no, no.  You're talking
12   yourself out of it.  They're going to go forward with
13   Mr. Vandette right away.  He will be the first witness, as far
14   as I'm concerned, in Phase Two.
15            I'm looking ahead to Phase Three.  So you are going
16   to talk me out of even letting you have that opportunity.  Do
17   you want him for Phase Three?
18            MR. KAMBER:  Yes.
19            THE COURT:  All right.  Then I'm going to require
20   Mr. Birger to be here by this coming weekend, and be deposed by
21   Monday or Tuesday of next week.  All right.  So that's the
22   ruling on that motion.
23            Now, we go to -- there's one to exclude something
24   called the CTS -- exclude evidence regarding Android
25   compatibility suite.
```

1            **MR. VAN NEST:**  That's right, Your Honor.

2            Mr. Weingaertner is going to handle that.

3            **THE COURT:**  Let me hear about that one.

4            **MR. WEINGAERTNER:**  Good morning, Your Honor.  Scott

5     Weingaertner for Google.

6            **THE COURT:**  Welcome back.

7            **MR. WEINGAERTNER:**  What Oracle hopes to do is to

8     overcome a failure to prove its indirect infringement case by

9     relying on a Compatibility Test Suite to draw inferences about

10    infringement.

11           Oracle took almost no discovery, or very little

12    discovery, on what was on actual handsets out there.  A little

13    bit from Motorola.  And now what they're hoping to do is have

14    this Compatibility Test Suite somehow create an impression in

15    the jury's mind that this tests for anything to do with

16    infringement.

17           The problem, though, is that the compatibility

18    testing tests for compatibility of applications that run.  It's

19    a black box test.  You don't find out what's happening inside

20    the black box.

21           Just like a bathroom scale can't distinguish between

22    the types of diets a person might be on and their kind of

23    exercise, the Compatibility Test Suite doesn't tell you what's

24    going on.  Doesn't tell you what the innards do.

25           So with respect to the '104 Patent, Oracle is trying

1   to say that some kind of speed tests will permit an inference

2   that the patented technology is used.  But by that logic, the

3   CTS would be probative of infringement of any

4   performance-related patent.

5          Speed is a function of all different kinds of things,

6   including processors, which are not at issue in this case.  The

7   jury will probably mistake that.

8          With respect to the '520 Patent, Oracle makes a

9   curious argument.  The '520 Patent is directed at development

10  kit, not the actual virtual machine.  Their argument is that

11  somehow the Compatibility Test Suite reveals the presence of

12  one of the claim limitations.

13         And Your Honor's color charts actually have come in

14  handy, as Your Honor said at the beginning of the case, because

15  the element they are pointing to is just the presence of an

16  array.  It's not even a disputed element.  The issue in that

17  patent is how you create it, which is done on the development

18  suite.  So that is a complete red herring.

19         So the problem here is that the jury is very likely

20  to think that the Compatibility Test Suite is somehow probative

21  of the presence -- as they've indicated in their brief, of the

22  presence of specific detailed functionality that the claims go

23  to, and just isn't the case.

24         We believe it's going to be prejudicial for the jury

25  to hear that testimony, Your Honor.

```
 1              THE COURT:  All right.

 2              MR. JACOBS:  Google's theory on this leg of the

 3    indirect infringement analysis is that, notwithstanding the

 4    fact that Android is posted on a public website or made

 5    available to OEMs by contract, notwithstanding that Android is

 6    then activated and Google finds out about Android activations,

 7    notwithstanding that the contracts impose requirements that

 8    Android meet various standards, including performance

 9    standards, and notwithstanding the fact that one of those

10    requirements is that the Android devices that are going to be

11    activated as Android devices and eligible to download

12    applications from the app store, Google should in no way be

13    responsible for -- in both a legal sense and in a factual

14    sense, for the content of what is on the phones of the OEMs for

15    the phones that are in dispute in this phase.

16              We are going to rely on a mix of direct evidence,

17    testing evidence, and circumstantial evidence to rebut that

18    argument.

19              It's an argument that is -- we're going to be proving

20    the stunningly obvious, that Android is Android, and that

21    there's no reason any OEM would alter the functioning that's

22    embodied by the '104 Patent or the '520 Patent.

23              And part of the proof is going to be Google's

24    requirements, which include requirements that you meet

25    performance standards, and the performance testing and
```

1   performance admissions by Google's own engineers, the

2   performance sales pitch that Google's engineers have made about

3   the very functionality that's in dispute.

4          The jury should be entitled to hear, again, that mix

5   of evidence, that body of evidence, to conclude that Google's

6   attempts to run away from the fact that it posts Android for

7   this very purpose: that OEMs will implement Android without

8   change to the innards, to the internals, so that Android will

9   perform well, so that users will have a satisfactory

10  application experience.

11         The jury should be entitled to hear that body of

12  evidence, including the CTS and its requirements, one of which

13  is specifically directed to the '520 Patent -- it's an issue of

14  proof; we'll have to prove it, but it is one of the

15  requirements of the CTS -- before deciding whether or not

16  Google has indirectly infringed.

17         So this is yet another effort by Google to pull out

18  one little piece of evidence that's part of the mix of evidence

19  that goes to our proof of indirect infringement.

20         **MR. WEINGAERTNER:**  Your Honor, Oracle's counsel might

21  have had a point if the CTS had anything to do with what's in

22  the claims.  It simply doesn't.

23         They can put up testimony about whether Google wanted

24  people out there in the world to use the same code or not.

25  We're not arguing about that.

PROCEEDINGS                                                    2847

```
 1          What counsel said just now -- and I'm going to refer
 2  to the color claim chart, if I can find the one for the '520.
 3  Again, they're pointing to what is not in dispute.  It's this.
 4  And it's Claim 18.
 5          Your Honor doesn't have this in front of you yet, but
 6  it has to do -- I'm sorry, I don't have the right one in front
 7  of me -- has to do with simply the presence of an array.
 8          And that's not what the claim is about.  The part
 9  that -- of course, any computer has an array.  That's not in
10  dispute.  The issue is how you make it.  Has to do with whether
11  you simulate or whether you do pattern matching.  And Your
12  Honor will hear lots about that.  That happens on the
13  development kit.
14          So the fact that counsel has now just said that he's
15  somehow making proof of the presence of infringement claims is
16  the very danger we're concerned about.
17          Even Dr. Mitchell, even he hasn't said that the
18  Compatibility Test Suite is probative of anything to do with
19  infringement at all.
20          So we're not saying that they can't talk about or put
21  people up and talk about how, you know, there's an interest in
22  having people use Android code, whether it's modified or not.
23          It's this Compatibility Test Suite that's the danger
24  because it's going to be misunderstood as somehow being
25  probative, and Mr. Jacobs just said, of the presence of claim
```

1  elements, which is simply not true.  Certainly not disputed

2  claim elements.

3        **THE COURT:**  Mr. Jacobs, what do you say to the point

4  that you said it checks for the '520, but counsel is saying it

5  doesn't check for the '520, it just checks for the array, and

6  the array is not the entire claim.

7        **MR. JACOBS:**  It isn't the entire claim, Your Honor.

8  It is the last step of the claim, which is the performing the

9  static initialization step.  But you've got to get there.

10        And so this is part of the -- part of the body of

11  evidence we will rely on to show that Google knows very well

12  and, in fact, imposes requirements on its OEMs that limit their

13  flexibility.

14        I should step back a little bit.  When I introduced

15  the issue, I left out a step in Google's logic.

16        Google's logic is:  We put Android out there.  We put

17  it out there under the Apache license.  Anybody can modify to

18  their heart's content.  We don't know what is on the OEM

19  phones, and we have no knowledge of any changes; therefore, we

20  cannot be liable for incorrect infringement.

21        What this body of evidence shows is the tight web of

22  interrelationship between Google and its handset makers; that

23  the handset makers that adopt Android and put Android on the

24  phone so that it can take advantage of the Android ecosystem

25  and Google are interrelated.

1        We will put on evidence through the person who runs

2   the compatibility testing program that he inspects phones and

3   that he has never seen changes in this area.  The CTS is part

4   of his work, part of his responsibility.

5        I think we have a factual dispute about the

6   significance of the CTS.  I think it's yet another case where

7   the proof will be in the testimony, the proof will be in the

8   documents.  And we will make our showing that the CTS is

9   relevant to what's on the handsets, even as to these

10  performance-related features.

11        **THE COURT:**  Let me ask defense counsel, isn't that

12  correct, that the claim chart with the color coding only goes

13  to the Android as it exists at Google?  It does not go to what

14  Motorola and someone else would be doing.

15        So even if it only proves up one element or one

16  limitation of the '520, it does tend to show that that element

17  resides in the handsets.  A point that you won't concede.

18        So why shouldn't counsel be allowed to use it for

19  that purpose?

20        **MR. WEINGAERTNER:**  Well, Your Honor, nobody has ever

21  disputed that there's an array on handset.  It's just not even

22  in dispute.

23        **THE COURT:**  You haven't --

24        **MR. WEINGAERTNER:**  No.

25        **THE COURT:**  That's another thing I've learned.  "No

1  one ever having disputed" does not no equal "stipulated."

2       **MR. WEINGAERTNER:**  I think we would have to check

3  with counsel, but I think we would possibly stipulate that

4  there is an array on handset.

5       **THE COURT:**  Not good enough.  Motion is denied.

6  Motion is denied --

7       **MR. WEINGAERTNER:**  Thank you, Your Honor.

8       **THE COURT:**  -- for the reason that, this not

9  prejudicial testimony, it is not strong testimony, but it is

10 one step in a long chain of evidence.  And plaintiff has the

11 burden of proof.  They've got to do it one step at a time.

12 This proves at least a tiny little piece of their overall case.

13 It hasn't been stipulated to.  I'm going to let it in.  So this

14 motion is denied.

15      All right.  So we are now out of motions in limine.

16 I guess it's close to time for a short break, but is there

17 anything else -- can I ask you a question?

18      What is the difference between ecosystem and a

19 platform?  You keep using the word "ecosystem."  We're getting

20 into higher and higher platitudes.

21      (Laughter)

22      **THE COURT:**  What is the ecosystem and what is the

23 platform?  Or do you really just mean the same thing?

24      **MR. JACOBS:**  As the word tumbled out, Your Honor, I

25 thought to myself, we're getting into higher and higher

PROCEEDINGS                                                         2851

1  platitudes.  I'll try not to use it.

2          **THE COURT:**  Pretty soon this will be the Clean Water

3  Act case.

4          (Laughter)

5          **MR. JACOBS:**  The platform defines the environ-  --

6  it's going to sound like an abstraction again.

7          The platform defines the programming environment.

8  The programmers program to that programming environment and

9  become -- they and their applications become part of an

10 ecosystem built around the platform.

11         So in the case of the iPhone, we have an iPhone

12 ecosystem defined by the iPhone in its IOS operating system and

13 programmers who create applications for the iPhone.

14         In the case of Android, we have the Android platform

15 and the Android programmers who program to the Android

16 platform.  They created an Android ecosystem.

17         In Java, we have the Java platform and all the

18 millions of Java programmers who write to that platform and

19 who -- and the applications and other associated businesses

20 around that platform.

21         **THE COURT:**  All right.  Anything else I can do for

22 you before we -- you know, you need to be prepared -- as soon

23 as we get the verdict, we'll have a short break.  We'll set up.

24 We'll go forward with our opening statements.

25         **MR. JACOBS:**  We have some exhibits we've stipulated

PROCEEDINGS                                    2852

```
 1   to, we could move into evidence right after the break, Your

 2   Honor.  We'll get set up.

 3           THE COURT:  Yes, sir.

 4           MR. VAN NEST:  Your Honor, I have a couple of

 5   objections to their opening statement.

 6           THE COURT:  All right.

 7           MR. VAN NEST:  I probably would benefit from

 8   conferring with counsel before we bring this up.

 9           THE COURT:  All right.  We'll let you do that.  We'll

10   take a 15-minute break.

11           (Recess taken from 9:03 to 9:31 a.m.)

12           THE COURT:  Okay.  Please, be seated.

13           And what issue may I help you with?

14           MR. VAN NEST:  We had two disputed slides from the

15   plaintiff's opening, Your Honor, which I think most of the

16   disputes were -- have been resolved by Your Honor's rulings.

17   But there is one.

18           If I could show on the screen slide 34 from the

19   plaintiff's opening.  Ben has it.  I have hard copies here,

20   too, Your Honor.

21           I just assumed this would go out with Your Honor's

22   ruling this morning.  This is another Lindholm e-mail.  And I

23   understood Your Honor to say that until they linked up

24   Mr. Lindholm to the '104, they wouldn't be waiving e-mails

25   around.
```

PROCEEDINGS                2853

```
 1           This one was briefly testified to in Phase One.
 2  Mr. Lindholm said that he wasn't -- he didn't know Mr. Sobota,
 3  and wasn't sure what he was talking about.  I just assumed this
 4  would go out with your ruling.
 5           THE COURT:  I need to see the e-mail.  I don't
 6  remember this one.  So could I have a copy of the e-mail?
 7           MR. VAN NEST:  Yes.  Can we have TX 326.  Can we put
 8  it on the screen.  This is a long e-mail that he's on part of.
 9           THE COURT:  Let me ask the plaintiff, what is the
10  part that is relevant?
11           MR. JACOBS:  The part that's relevant is the part
12  that was highlighted, which I believe is in the -- on the
13  second or third page of the exhibit.
14           So, actually, if we go back to the slide, Your Honor,
15  I'll be able to tie this up.
16           MR. VAN NEST:  Page 2, it says.
17           MR. JACOBS:  So this is not -- this is to
18  Mr. Lindholm, not from Mr. Lindholm.  And this is a further
19  indication that as Google was developing Android, they were
20  concerned about patent risks relating to Java.
21           THE COURT:  Who wrote the words "Proposal:  Google
22  buys the rights to Java from Sun (patents, copyrights).  Good
23  for Google:  Our Java lawsuits go away"?  Who wrote that?
24           MR. VAN NEST:  That was written by Mr. Sobota, who
25  Mr. Lindholm said he did not know was part of the Android team.
```

 1  And Mr. Lindholm said he didn't know what he was talking about

 2  in this e-mail.

 3          **THE COURT:**  But it's not the Lindholm e-mail.  This

 4  is to Mr. Lindholm from somebody else.

 5          **MR. VAN NEST:**  I'm mistaken.  It's not even

 6  Mr. Sobota.  Someone else wrote it to Mr. Sobota, and that's

 7  being passed on here to Mr. Lindholm.

 8          **THE COURT:**  Who is the someone else?

 9          **MR. VAN NEST:**  His name is Brett Slatkin.  And that's

10  the person that Mr. Lindholm said he didn't know and didn't

11  know what he was talking about.

12          And he's on the chain, Mr. Lindholm is.  But, again,

13  until there's something linking Mr. Lindholm up, this wouldn't

14  seem appropriate any more than the Lindholm e-mail itself.  He

15  didn't even write this one.  This was written by someone to

16  someone else, who passes it on to him.

17          And he's already said in Phase One that he's not sure

18  what they're talking about, and he doesn't know the author.

19  And he wasn't aware of what -- any Java lawsuits pending at

20  Google at that time.  This was in 2009.

21          **MR. JACOBS:**  At the end of the string, Your Honor,

22  Mr. Schmidt endorses the idea of making this -- looking at this

23  possibility.

24          **MR. VAN NEST:**  So all I'm asking, Your Honor, is that

25  this not be referenced in the opening.  If they get into it in

PROCEEDINGS                                          2855

1  the testimony and it links up to something, fine.  But I don't

2  think it's appropriate for the opening statement.

3           **THE COURT:**  Isn't this already in evidence?

4           **MR. JACOBS:**  Yes, Your Honor.

5           **MR. VAN NEST:**  It is.  As is the Lindholm e-mail.

6           **THE COURT:**  Yes.  Well, I don't see these as quite

7  the same thing.  This -- the e-mail on the screen that you want

8  to keep out, I'm not going to keep out because it uses the word

9  "patents" and "our Java lawsuits go away" if you buy the rights

10 to Java.

11          And that's probative to show that somebody --

12 somebody who will not come forward and own up to it, is saying

13 within Google that we're worried about those patents at Sun.

14 And just because Mr. Lindholm now cannot remember anything does

15 not mean that this is not good evidence.

16          I disagree with you, Mr. Van Nest.  In fact, you're

17 talking me into letting them use the other e-mail.  I'm not

18 going to go back on that.  But this is perfectly okay to use in

19 the opening.

20          So that motion is denied.

21          **MR. VAN NEST:**  The other one, Your Honor, is 39.  If

22 we could display that.

23          **THE COURT:**  All right.  Let's see it.

24          **MR. VAN NEST:**  This is simply more on the subject of

25 how many Android activations there are a day.  That may well be

PROCEEDINGS                                    2856

1  relevant to Phase Three.  It's not relevant to Phase Two.

2          There's no dispute that Android is being activated

3  and that handsets using the Android platform are being

4  activated.  But why we're featuring the amount of activations

5  or the number of activations in this phase I just don't see the

6  relevance of it.  If there is any relevance, it's outweighed by

7  the prejudice.

8          **THE COURT:**  What is the relevance of this?

9          **MR. JACOBS:**  The relevance is highlighted by the

10 heading in the slide, Your Honor, "Google Induces Patent

11 Infringement by Phone Makers."

12          They induce it to the extent of 750,000 per day.

13 They know that because ET phones home and says, I am an Android

14 device.  And Google tallies that and benefits from it.

15          And that is why it induces people to use Android.

16 That is why it induces people -- induces OEMs to install

17 Android.  And that is why -- and that ties up with the CTS and

18 all the other evidence that Android is Android, the Android

19 that Google puts on its website is the Android that's on the

20 devices, and working very successfully because it performs

21 well.  And it performs well on account of the patents that

22 we're asserting in this phases.

23          **MR. VAN NEST:**  Your Honor, this doesn't go to any of

24 that, point one.  And point two --

25          **THE COURT:**  Why doesn't it go to inducement, that

1   there was an incentive that -- that Google had a strong

2   incentive to forge ahead, given the large number of activations

3   every single day, such that it was willing to be -- this is the

4   argument.  I'm not saying I agree with it.  But the argument is

5   they were willing to look the other way on patents because, in

6   the meantime, they were making so much money off of it.

7            **MR. VAN NEST:**  Motivation is not an element, Your

8   Honor, of willful infringement.  Number one.  And, number two,

9   in Phase Two we're limited to eight phone models.  This number

10  is based on all models that are sold, presumably.  And in Phase

11  Two we're only talking about eight.  Your Honor limited their

12  claim in Phase Two to the eight models for which they disclose

13  infringement contentions.

14           So, the fact that Android is being activated doesn't

15  go to inducement.  Inducement requires a showing of awareness

16  of a patent and an intent to infringe it.

17           The fact that Android phones are being activated

18  isn't even tangentially relevant to that.  It might be relevant

19  in Phase Three, if they can tie this up to any proof they have

20  that these reflect certain models that are at issue here in

21  Phase Two.

22           So, again, we're talking about all activations, not

23  activations on any particular handset at issue in Phase Two.

24  And it's simply not an element of their proof.

25           **THE COURT:**  Well, motivation has -- you know, in a

1    criminal case -- to take a different area of the law --

2    motivation is rarely an element of a crime.  But the government

3    is always entitled to prove motive in order to prove

4    circumstantial evidence of the items that are the elements.

5            So I don't think that's a good argument to say that

6    motivation is the -- is the motivation relevant.  The

7    motivation has some relevance.

8            The motion is denied, and I'm going to let them use

9    that slide for opening.

10           **MR. VAN NEST:**  Thank you, Your Honor.

11           **THE COURT:**  You're most welcome.

12           Anything else I can help you with?

13           **MR. JACOBS:**  Yes, Your Honor, a couple of

14   housekeeping items.

15           We have some deposition designations for the Court to

16   rule on.

17           **THE COURT:**  Please hand them up, and I'll get right

18   to them.

19           **MR. JACOBS:**  Great.  I'm handing the designations for

20   Mr. Camargo and Mr. Morrill.

21           **THE COURT:**  All right.

22           **MR. JACOBS:**  And then I have a lengthy list of

23   exhibits that are stipulated to.

24           We are doing a good job, Your Honor, on working

25   together in getting these exhibits in.

1          **THE COURT:**  Remember the ones that are already in

2     evidence, you don't have to move them in again.

3          Okay.  I'm all ears.  Go ahead.

4          **MR. JACOBS:**  32.  46.16.  46.17.  46.18.  46.19.

5          **MR. VAN NEST:**  No objection, Your Honor.

6          **THE COURT:**  All received.

7          (Trial Exhibits 32, 46.16, 46.17, 46.18, and 46.19

8          received in evidence.)

9          **MR. JACOBS:**  46.102.  46.103.  46.104.

10         **MR. VAN NEST:**  No objection.

11         **THE COURT:**  Received.

12         (Trial Exhibits 46.102, 46.103, and 46.104 received

13         in evidence.)

14         **MR. JACOBS:**  47.16.  47.17.  47.18.  47.19.  47.20.

15         **MR. VAN NEST:**  No objection, Your Honor.

16         **THE COURT:**  Received.

17         (Trial Exhibits 47.16, 47.17, 47.18, 47.19, and 47.20

18         received in evidence.)

19         **MR. JACOBS:**  106.  107.  225.  262.  816.  1095.

20         **MR. VAN NEST:**  No objection.

21         **THE COURT:**  All received.

22         (Trial Exhibits 106, 107, 225, 262, 816, and 1095

23         received in evidence.)

24         **MR. JACOBS:**  46.1.  46.2.  46.3.  46.4.  46.5.  46.6.

25     46.7.  46.8.  46.9.

PROCEEDINGS                          2860

```
1              MR. VAN NEST:  No objection.

2              THE COURT:  All in.

3              (Trial Exhibits 46.1, 46.2, 46.3, 46.4, 46.5, 46.6,

4              46.7, 46.8, and 46.9 received in evidence.)

5              MR. JACOBS:  46.11.  46.12.  46.13.  46.14.  46.15.

6              MR. VAN NEST:  No objection.

7              THE COURT:  Received.

8              (Trial Exhibits 46.11, 46.12, 46.13, 46.14, and 46.15

9              received in evidence.)

10             MR. JACOBS:  46.29.

11             MR. VAN NEST:  No objection.

12             THE COURT:  Received.

13             (Trial Exhibit 46.29 received in evidence.)

14             MR. JACOBS:  47.1.  47.2.  47.3.  47.4.  47.5.  47.6.

15   47.7.  47.8.  47.9.  47.10.  47.11.  47.12.  47.13.

16             MR. VAN NEST:  No, objection.

17             THE COURT:  Received.

18             (Trial Exhibits 47.1, 47.2, 47.3, 47.4, 47.5, 47.6,

19             47.7, 47.8, 47.9, 47.10, 47.11, 47.12, and 47.13

20             received in evidence.)

21             MR. JACOBS:  47.15.  47.21.  47.22.

22             MR. VAN NEST:  No objection.

23             THE COURT:  Received.

24             (Trial Exhibits 47.15, 47.21, and 47.22. received in

25             evidence.)
```

PROCEEDINGS                        2861

1              MR. JACOBS:  48.  57.  105.  112 -- let me start

2    over.  112.  113.  735.  736.  737.  738.  739.

3              MR. VAN NEST:  No objection.

4              THE COURT:  All received.

5              (Trial Exhibits 48, 57, 105, 112, 113, 735, 736, 737,

6              738, and 739 received in evidence.)

7              MR. JACOBS:  755.  756.  757.  758.

8              MR. VAN NEST:  No objection.

9              THE COURT:  All received.

10             (Trial Exhibits 755, 756, 757, and 758 received in

11             evidence.)

12             MR. JACOBS:  835.

13             MR. VAN NEST:  No objection.

14             MR. JACOBS:  443, 458, 459.

15             MR. VAN NEST:  Objection.

16             THE COURT:  Received in evidence.

17             (Trial Exhibits 835, 443, 458, and 459 received in

18             evidence.)

19             MR. JACOBS:  4011.  4013.  4015.  4018.  4021.

20             MR. VAN NEST:  No objection, Your Honor.

21             THE COURT:  Wait a minute.  4015.  40 --

22             MR. JACOBS:  18.

23             THE COURT:  And then?

24             MR. JACOBS:  4021.

25             THE COURT:  4021.  All right.  All received.

```
1                (Trial Exhibits 4011, 4013, 4015, 4018, 4021,

2                received in evidence.)

3           MR. JACOBS:  Thank you, Your Honor.

4           THE COURT:  Is that it?

5           MR. JACOBS:  Yes.

6           THE COURT:  Thank you.  Anything more?

7           MR. PURCELL:  One brief thing, Your Honor.  You

8  ordered us to make Mr. Aditya Agarwal available for a

9  deposition this week, which we are going to do.

10          Mr. Rubin's deposition, that took place a couple of

11 weeks ago, was limited to three hours.  And I was wondering if

12 we could have that same time limitation for Mr. Agarwal's

13 deposition this week.

14          THE COURT:  Isn't three hours enough?

15          MR. BOIES:  Your Honor, three hours will be enough.

16          THE COURT:  Done.

17          MR. PURCELL:  Thank you, Your Honor.

18          THE COURT:  What else?

19          MR. VAN NEST:  That's all we have, Your Honor.

20          THE COURT:  Great.

21          Well, I guess we will take a break and wait on the

22 jury.  We've received no further notes.

23          When I left the bench a moment ago, they were out on

24 a break.  So they, I guess, had been at work and took a break.

25 Now, I'm not sure if they are back.  I think they are back in
```

 1  the jury room, at this point.  So we'll let you know as soon as

 2  we hear anything.

 3            We'll be in recess for a while.

 4            **MR. VAN NEST:**  Thank you, Your Honor.

 5            (Proceedings in recess from 9:44 to 10:08 a.m.)

 6            **THE COURT:**  Be seated.  We have a note from

 7  Mr. Rutherford, who says:

 8            "One of the jurors has indicated that he/she

 9            has had conversations regarding this trial

10            (patents/copyrights) over the weekend."

11            All right.  Comments.  What would you like to do

12  about this?

13            **MR. VAN NEST:**  Well, Your Honor, I think we should

14  find out, number one, what's the extent of the conversations.

15  Number two, were they disclosed to other jurors?  And, if so,

16  what was disclosed.

17            And I think, obviously, that's something that we'd

18  have to be sort of a step at a time on it.  We don't want to

19  have more disclosure now than there's been.  If the juror

20  didn't disclose anything to others, that's one thing.  But I

21  think a lot would depend on what the conversations were, and

22  how significant they were, and what was the nature of them,

23  which I would ask the Court to determine at the sidebar,

24  probably from the juror involved.

25            And I think we need to find out from our panel

```
 1  whether any of these discussions were actually discussed with

 2  them in the jury room, before we make any decision about what

 3  we could do.

 4        MR. JACOBS:  I don't see much choice, Your Honor, but

 5  to find out whether and how substantial these conversations

 6  were.

 7        THE COURT:  Why should this be done at the sidebar?

 8        MR. VAN NEST:  Well, I think it would depend, Your

 9  Honor.  If we're concerned -- if not much has been disclosed to

10  other jurors, we wouldn't want more to be disclosed to them now

11  about this conversation.  That's --

12        THE COURT:  I'm thinking that we would bring back

13  Mr. Rutherford only, have Dawn tell the other 11 jurors to stop

14  deliberating.  Bring back Mr. Rutherford and find out who we're

15  talking about here.  And then bring that person in here and

16  find out more.

17        I don't know how many inquiries we will have to make,

18  but I think it ought to be done in open court, unless there's

19  something sensitive about the -- what the juror did.

20        MR. VAN NEST:  I think that's logical.  If you're

21  going to have them one at a time, and the other jurors are not

22  present, that's fine with me.

23        THE COURT:  Let's bring in Mr. Rutherford.

24        Please tell the other jurors to stop deliberating

25  while Mr. Rutherford is out here.
```

PROCEEDINGS                          2865

```
 1                  (Juror Ronald Rutherford enters the courtroom.)

 2              THE COURT:  Mr. Rutherford, welcome back.  Good

 3   morning to you.

 4              JUROR MR. RUTHERFORD:  Good morning.

 5              THE COURT:  Hope you had a good weekend.

 6              JUROR MR. RUTHERFORD:  Yes, sir.

 7              THE COURT:  Please let Mr. Rutherford have the

 8   microphone.

 9              THE CLERK:  Yes.  I'm just turning it on, Judge.

10              THE COURT:  So, again, good morning.

11              Mr. Rutherford, we have your note.  I'll just read it

12   to make sure you know what it said.

13                  "One of the jurors has indicated he/she has

14                  had conversations regarding this trial

15                  (patents/copyrights) over the weekend."

16              So you must tell me what you're talking about in this

17   note.

18              JUROR MR. RUTHERFORD:  How much detail -- can I just

19   go into the details of it?  Or -- I've never done this before.

20              THE COURT:  I think I need to know who it was.

21              JUROR MR. RUTHERFORD:  Yes.

22              THE COURT:  Who was it?

23              JUROR MR. RUTHERFORD:  It's Betsy.

24              THE COURT:  Who?

25              JUROR MR. RUTHERFORD:  Betsy.  I don't know her last
```

PROCEEDINGS

```
 1   name.  I apologize.

 2               THE COURT:  Is that Ms. Hostynek?

 3               JUROR MR. RUTHERFORD:  I think --

 4               THE COURT:  Elisabeth?

 5               JUROR MR. RUTHERFORD:  Elisabeth, probably, yes.

 6               THE COURT:  All right.  Now, counsel, if you think

 7   that I'm inquiring too much, you must stand up and immediately

 8   object.  Do not sit back and say later that I'm inquiring too

 9   much into the deliberative process.  So if you object to one of

10   my questions, it's fine to do that.  But you must object right

11   away.

12               All right.  I'm going to ask you, unless there's an

13   objection, what is it on that very limited subject -- I don't

14   want to get into deliberations, but I need to know what is it

15   that she said about this subject of what happened over the

16   weekend.  Go ahead.

17               JUROR MR. RUTHERFORD:  During the internal questions

18   and answers that we're going through, during one of her answers

19   she gave her answer.  And we had indicated that we didn't think

20   that that had answered the question that we had put out there.

21   And she had indicated that it did because her husband has

22   experience in patents and, therefore, was applicable.

23               I don't know if I should keep going.  Sorry.

24               And we said no, that's not part of that.

25               THE COURT:  Pause right there.
```

1          Again, Counsel, if you think we're getting into

2    something we should not get into, you need to stand up and be

3    heard.

4          Okay.  No one.  Continue on.

5          **JUROR MR. RUTHERFORD:**  So we had said that that

6    didn't have anything to do with what we were discussing.  And

7    she said it did because her husband had a lot of experience

8    with patents, and when she was talking with him this weekend

9    that he had indicated that, you know, there's a lot of -- can I

10   go into specifics of what she said?

11         **THE COURT:**  All right.  Just a moment.  It's okay

12   with me, unless there's an objection.

13         **MR. VAN NEST:**  I think so long as we don't have

14   revealed what question this is related to, it's fine with

15   continuing.

16         **JUROR MR. RUTHERFORD:**  I have a feeling if I keep

17   saying what I'm about to say, that that may become apparent.

18   Sorry.  That's why I stopped.

19         **THE COURT:**  Is this the only comment that's been made

20   in the jury room, that has to do with this, that would be in

21   violation of the admonition?

22         **JUROR MR. RUTHERFORD:**  We then proceeded to talk

23   about we weren't supposed to -- allowed to do that, and several

24   of us have said we're a little uncomfortable that we're having

25   conversations of this nature.

```
 1          And she indicated she now understands what the second
 2   part of this trial is going to be about, and she now has more
 3   information on that and she can exclude it.  And a couple of us
 4   have expressed some concern.
 5          THE COURT:  All right.  But let me go back to
 6   something she said, that her husband had something to do with
 7   patents.  But what you're discussing in the jury room has to do
 8   with copyrights, not patents.
 9          JUROR MR. RUTHERFORD:  Understood.
10          THE COURT:  All right.
11          JUROR MR. RUTHERFORD:  It sounds like she's taking
12   what she knows and bringing it over to this question.  And some
13   of us have indicated that that's not answering this question.
14   And she's saying that it may to her.
15          THE COURT:  All right.  Have you given me the essence
16   of is it already, or is there more that you can give me without
17   revealing your deliberative process?
18          JUROR MR. RUTHERFORD:  Uhm, I think that's the
19   essence of it.  I think.
20          THE COURT:  Anything more that the lawyers want me to
21   ask?
22          MR. JACOBS:  No, Your Honor.
23          MR. VAN NEST:  The only thing I would ask, Your
24   Honor, is, was there anything else said of substance about
25   whatever it is the juror discussed?
```

1          THE COURT:  All right.  Can you answer that question.

2          JUROR MR. RUTHERFORD:  I'm not sure I understood the

3   question.  I apologize.

4          THE COURT:  Please repeat it.

5          MR. VAN NEST:  With respect to what the juror said to

6   other jurors in the jury room, did she say anything else about

7   her conversation with her husband that you haven't already

8   discussed with us?

9          JUROR MR. RUTHERFORD:  I don't think so, no.

10         THE COURT:  Well, let me ask this.  Was the point she

11  was trying to make, as you understood it, was that she was

12  disagreeing with one of the instructions of law that I had

13  given the jury?

14         JUROR MR. RUTHERFORD:  I think that in terms of what

15  we're deliberating, there is distinction in your guidance.  And

16  it's one of, you know, this or this, this or this.  And it's

17  influencing one side, if not both sides, of an "or."

18         THE COURT:  You're saying the word "or"; is that it?

19         JUROR MR. RUTHERFORD:  It's what's on each side of

20  the "or."

21         THE COURT:  Oh.

22         JUROR MR. RUTHERFORD:  You know, the sky is either

23  blue or cloudy.  And this conversation is sort of -- the

24  conversation she had sounded like it was a validation of the

25  sky was blue.

PROCEEDINGS                    2870

```
 1              THE COURT:  All right.  Well, I don't understand
 2   exactly how that would screw into the instructions, but maybe
 3   it's best to keep it at a higher level.  I think I understand
 4   your general point.
 5              Anything more you want me to ask?
 6              MR. JACOBS:  No, Your Honor.
 7              THE COURT:  All right.  Mr. Rutherford, Dawn will
 8   take you back to the jury room.  Please don't deliberate any
 9   longer.  Just keep everything on hold as if you were in a
10   break.  And we will -- Dawn, would you please instruct the
11   entire jury not to deliberate further until I get to the bottom
12   of this.  All right?
13              THE CLERK:  Uh-huh.
14              THE COURT:  All right.  Thank you.
15              Thank you, Mr. Rutherford.
16              JUROR MR. RUTHERFORD:  Thank you.
17              (Juror exits courtroom.)
18              THE COURT:  I propose now to bring in Ms. Hostynek.
19   Any objections?
20              MR. JACOBS:  No, Your Honor.
21              THE COURT:  John, would you please ask Dawn to bring
22   her in.
23              THE CLERK:  You can please come to order.  You don't
24   have to stand.
25              (Juror Elisabeth Hostynek enters the courtroom.)
```

PROCEEDINGS                                    2871

1             THE COURT:  Good morning, Ms. Hostynek.  How are you

2   today?

3             JUROR MS. HOSTYNEK:  I'm fine.

4             THE COURT:  It has been reported -- you're Betsy; is

5   that right?

6             JUROR MS. HOSTYNEK:  Yes.

7             THE COURT:  It has been reported that you have said

8   in deliberations that you consulted with your husband, who is a

9   patent attorney, and made comments about what you learned over

10  the weekend.

11            JUROR MS. HOSTYNEK:  No.  No.  No.  He's not a patent

12  attorney.

13            He has three patents.  And yesterday was his

14  birthday.  And we were talking about his past.  And I asked

15  him, how long do patents last?  Because we have learned here

16  that copyrights last 95 years.  And he told me 17 years.  And

17  that was it.

18            THE COURT:  Is that the extent of what you said in

19  the jury room?

20            JUROR MS. HOSTYNEK:  What did you say?

21            THE COURT:  In the jury room, is that the extent of

22  what you said to the other jurors?

23            JUROR MS. HOSTYNEK:  Yes, it is.

24            THE COURT:  Did your husband say anything more on the

25  subject of patents, to you?

1                **JUROR MS. HOSTYNEK:**  No, because our dinner arrived.

2                **THE COURT:**  And at any time during the pendency of

3    this trial, have you had any discussions with your husband on

4    anything else having to do with this case?

5                **JUROR MS. HOSTYNEK:**  No.

6                **THE COURT:**  With anyone else?

7                **JUROR MS. HOSTYNEK:**  No.

8                **THE COURT:**  What did your husband say was the answer

9    to how long patents last?

10               **JUROR MS. HOSTYNEK:**  He said for him it was 17 years.

11               **THE COURT:**  Any more questions at the -- is that what

12   you repeated in the jury room?

13               **JUROR MS. HOSTYNEK:**  Yes, that's what I said.

14               **THE COURT:**  Anything more that the lawyers wish me to

15   ask?

16               **MR. JACOBS:**  No, Your Honor.

17               **MR. VAN NEST:**  Just one, Your Honor.  And that is

18   whether or not the information that Ms. Hostynek received from

19   her husband has influenced her thinking in any way on her

20   deliberations.

21               **JUROR MS. HOSTYNEK:**  Should I answer that?

22               **THE COURT:**  I'm thinking.

23               **JUROR MS. HOSTYNEK:**  Pardon me?

24               **THE COURT:**  Just a moment.  I'm thinking.

25               Well, up to this moment, has that influenced your

1   thinking about the case?  Just say yes or no.

2          **JUROR MS. HOSTYNEK:**  No, no, no, it hasn't.  I made

3   up my mind last week.  And it hasn't in any way, uhm,

4   influenced me at all.

5          **THE COURT:**  Any more questions?

6          **MR. VAN NEST:**  No, Your Honor.

7          **THE COURT:**  All right.

8          **MR. JACOBS:**  No.

9          **THE COURT:**  All right, Ms. Hostynek.  Thank you.  You

10  can go back to the jury room.

11         Dawn, please tell the jurors not to deliberate until

12  I give them the green light to go ahead.  All right.

13         (Juror exits courtroom.)

14         **THE COURT:**  All right.  Counsel, let's have your

15  views.  Does anyone want me to bring in more jurors?

16         **MR. JACOBS:**  No, Your Honor.

17         **MR. VAN NEST:**  Your Honor, I think it might be good

18  to have one more juror asked whether or not anything she said

19  has influenced his or her thinking.  And I don't really care

20  who it is.  But I do think we should get some sense -- there is

21  sort of a conflict in what we've heard.

22         I understood from Mr. Rutherford that somewhat more

23  had been disclosed than what Ms. Hostynek indicated.  But I'm

24  not sure it's that clear.

25         I think it would be desirable to find out from at

1   least one other juror whether anything she said has influenced

2   his or her thinking in the jury room.  And maybe the foreperson

3   would be a good candidate for that.  That way the other jurors

4   would see it as less random.

5            **THE COURT:**  I don't see my copy of the jury

6   instructions that I gave.  Here they are.

7            All right.  What is the answer to how long the

8   patents in question at the time of all this, was 17 years

9   correct back then?

10           **MR. JACOBS:**  One is 17, Your Honor.  And the other --

11  17 from issuance.  The other is 20 from filing.

12           **THE COURT:**  Well, but back at the time java was

13  copyrighted, what was the answer?  Is it 20 from the time of

14  filing?

15           **MR. JACOBS:**  The law switched right in the middle

16  there, Your Honor, so the -- to give you the specifics, the

17  '104 initial filing date is 1992.  So that's 17 years from

18  issuance.  The '520 was filed in 1998.  By then the law had

19  changed to 20 years from filing.

20           And, of course, the copyrights in question probably

21  span the relevant period.  We had a copyright registration for

22  1.4 and for 5.0.

23           **THE COURT:**  Mr. Baber.

24           **MR. BABER:**  On that last point, Your Honor, the

25  copyright registrations on 1.4 and 5.0 were not applied for and

PROCEEDINGS                                        2875

1    didn't issue until 2004 and 2005.

2           THE COURT:  So do any of you object if I say to the

3    jury that the term of a patent is either 17 or 20 years,

4    depending on when it was applied for?

5           MR. JACOBS:  No, Your Honor.

6           THE COURT:  Do what?

7           MR. JACOBS:  We don't object.

8           THE COURT:  Do not?

9           MR. JACOBS:  Correct.

10          THE COURT:  Mr. Van Nest.

11          MR. VAN NEST:  As long as Your Honor says "at most,"

12   or "at most 20 years."  That's fine.

13          THE COURT:  Well, I don't need -- that sounds

14   argumentative.  Why can't I just say 17 or 20, depending on

15   when it was applied for?

16          MR. BABER:  Only because, Your Honor, unless the

17   patent is issued immediately, the 20 years from the original

18   date of application, not the date of issue.  So you lose all

19   the prosecution time.

20          THE COURT:  So I can say 20 years from application or

21   17 years from issuance, and it depends on when it was applied

22   for.

23          MR. VAN NEST:  Your Honor, if you're going to say

24   anything, shouldn't you also say that's not relevant to this

25   phase of the case, the length of the patent?

1          THE COURT:  I did say to them how long a copyright

2    lasts.

3          MR. VAN NEST:  Right.

4          THE COURT:  I put that in there.  I can imagine

5    scenarios by which somebody would be arguing over the 95 --

6    natural question would come up, how long does a patent last,

7    because I do -- I do say in paragraph -- paragraph 17, I say

8    possibly such things can be claimed under the patent system or

9    by trade secret, but they may not be claimed by copyright.  And

10   then in a separate paragraph, which is 14, I did say how long

11   copyright lasts.  So I can -- I can imagine the temptation for

12   someone in a long deliberation to make that comparison.  So --

13         MR. VAN NEST:  But my point is simply, it's not a

14   relevant factor for Phase One.

15         THE COURT:  Well, I'm happy to say that, too.

16         Agreed on your side?

17         MR. JACOBS:  Yes, Your Honor.

18         THE COURT:  What I propose to do is bring back all of

19   the jury, ask them the question whether or not what she has

20   said is going to influence them -- first of all, say --

21   describe the problem.  Tell them what the law is on this point

22   about 20 and 17.

23         I'll say it has been brought to my attention that a

24   member of the jury has made statements in the jury room about

25   how long a patent lasts, and that's why I'm telling them what

1   the law on that is.  Tell them it's not relevant.

2          Further then inquire whether or not the statement

3   made by the juror will -- whether anyone on the jury is going

4   to be unable to disregard it.

5          Is that fair?

6          **MR. VAN NEST:**  That's fair, Your Honor.

7          **MR. JACOBS:**  Yes, Your Honor.

8          **THE COURT:**  All right.  Let's bring in all 12 members

9   of the jury.

10         (Jury enters at 10:31 a.m.)

11         **THE COURT:**  Okay.  Welcome back.  Have a seat,

12  please.

13         I hope you've all had a good weekend.  And I'm sorry

14  to interrupt your deliberations.  We'll only do so for a brief

15  period.

16         It's come to the Court's attention that one member of

17  the jury made a comment during deliberations about something

18  that her husband had told her about how long patents last, and

19  to the effect that it would be 17 years.

20         And this was not part of the jury instructions.  It's

21  not something that you should be considering.  And I remind

22  you, again, that the -- you must be very careful not to discuss

23  with anyone, including your loved ones, the subject matter of

24  this case.  And that includes the law of patents and the law on

25  copyrights.  You must decide the case based on the law that I

PROCEEDINGS                                    2878

1    give to you.

2            Now, I want to say, since the subject came up, the

3    lawyers and I are all in agreement that I can tell you this

4    much more.  This is a statement of the law with respect to

5    patents and how long they last.  It's either 17 years from the

6    date the patent was issued by the Patent Office, or 20 years

7    from the date of the application for the patent.  And it

8    depends -- which one it is depends upon the time period in

9    which the patent was applied for because in recent years

10   Congress has made a change on that.  So 17 years from

11   issuance -- that means approval by the Patent Office -- or 20

12   years from the application.

13           Now, I must say that this is irrelevant to your

14   decision-making.  And I -- I can understand ways in which it

15   might have come up, because I did describe in the jury

16   instructions how long a copyright lasts for.  So I can imagine

17   how this issue might have come up in your deliberations.  And I

18   want to give you the correct information on it.  But I want to

19   underscore that it should not be a factor in your decision on

20   what the -- how to come out with the other instructions that

21   I've given to you.

22           Of course, it's always up to you to decide how you

23   want to come out, but please do so based on the instructions

24   that I've given you.

25           Now, is there anyone over there who thinks that they

1  have heard something from any member of the jury on this

2  subject that is going to prevent them from being able to reach

3  a verdict based on the evidence in this case and on the

4  instructions that I've given?

5          In other words, has something -- has the comment that

6  has been made, based on information from outside the trial, so

7  infected your ability to think straight that you will not be

8  able to render a fair verdict based on the evidence and the

9  law?  If so, raise your hand.

10         Nobody is raising their hand.

11         I take it from that that you will be able to

12 disregard what it is that the juror said, and you will go

13 forward and deliberate based on the evidence in the case and

14 the instructions of law that I've given you.

15         Correct?  Everybody nod if that's correct.

16         (Jurors nod.)

17         **THE COURT:**  How about number one over there, are you

18 nodding?

19         **JUROR MR. CHAU:**  Yes.

20         **THE COURT:**  All right.  Now, I'm prepared to let the

21 jury resume deliberating unless the lawyers have another

22 question for me.  Anything more?

23         **MR. JACOBS:**  No.

24         **MR. VAN NEST:**  Nothing here, Your Honor.

25         **THE COURT:**  You all continue on.  Remember all of my

PROCEEDINGS                                      2880

```
 1   admonitions.  Please continue with your deliberations.

 2            THE CLERK:  All rise.

 3            (At 10:37 a.m. the jurors retired to resume

 4            deliberations.)

 5            THE COURT:  All right.  Anything more?

 6            MR. VAN NEST:  No, Your Honor.

 7            MR. JACOBS:  No.

 8            THE COURT:  All right.  I'll keep you posted as soon

 9   as anything else comes up.

10            MR. VAN NEST:  Thank you.

11            (Proceedings in recess from 10:38 to 11:10 a.m.)

12            THE COURT:  Mr. Baber, are you prepared?  I guess

13   you'll have to stand in for your team.  They are not present.

14            MR. BABER:  I believe they are on their way, Your

15   Honor.

16            THE COURT:  Have both sides seen the latest note?

17            MR. JACOBS:  Yes, Your Honor.

18            MR. BABER:  Here comes Mr. Van Nest.

19            THE COURT:  We've received a note from the jury

20   saying -- or at least from Mr. Thompson, foreperson, who says:

21            "Impasse has been reached on the one issue

22            that cannot be decided."

23            Now, they don't say what they said last week, which

24   was they otherwise have a unanimous verdict.  But I think

25   that's what they mean.
```

```
 1              Don't you all agree?

 2              MR. VAN NEST:  That would be -- that seems right,

 3  Your Honor.

 4              THE COURT:  Mr. Jacobs?

 5              MR. JACOBS:  Yes, Your Honor.

 6              THE COURT:  So what I do -- what I'm going to propose

 7  is that we bring the jury in and receive the verdict.  That we

 8  receive the verdict to the extent that they have one.  All

 9  right?

10              MR. VAN NEST:  That's fine, Your Honor.

11              MR. JACOBS:  Yes, Your Honor.

12              THE COURT:  Wait a minute.  Where is Dawn?

13              (Pause)

14              (Jury enters at 11:13 a.m.)

15              THE COURT:  Please, be seated.

16              Mr. Thompson, we received your note that says:

17              "Impasse has been reached on the one issue

18              that cannot be decided."

19              And we take it from that, that you have otherwise

20  reached a unanimous verdict.  Is that correct?

21              FOREMAN THOMPSON:  That is correct, Your Honor.

22              THE COURT:  Are you prepared to render the verdict

23  now, or do you want more time to deliberate?

24              FOREMAN THOMPSON:  We are ready to render it now.

25              THE COURT:  Very well.  Has it been signed and dated?
```

PROCEEDINGS                                    2882

```
 1              FOREMAN THOMPSON:  Yes, it has.

 2              THE COURT:  All right.  Please, hand it to the

 3   marshal, who will hand it to me.  I will check it to see if

 4   it's in proper form.

 5              Thank you.

 6              (Pause)

 7              THE COURT:  All right.  Here's what we need to do.

 8   The clerk will read the verdict form with your answers.  Each

 9   of you must listen carefully.  And at the end we will ask you

10   whether or not it is unanimous.

11              Now, when you get to the one which you were unable to

12   answer, then Dawn will skip over that.  And so she will only

13   read out the ones where you have checked a box.  Then she will

14   ask each of you whether or not the verdict as read is your

15   verdict, your individual verdict.  We do that so that we make

16   sure that it's unanimous.  Okay.

17              So, please, listen carefully, as the clerk will now

18   read the verdict.

19              THE CLERK:  Ladies and gentlemen of the jury, listen

20   to your verdict as it will stand recorded.

21              In the case of Oracle America versus Google, Inc.

22   Question 1:

23              "As to the compilable code for the 37 Java

24              API packages in question taken as a group:

25              "A.  Has Oracle proven that Google has
```

PROCEEDINGS                                                2883

```
 1              infringed the overall structure, sequence and

 2              organization of copyrighted works?"

 3              Answer:  "Yes."

 4         THE COURT:  I will note, for the record, that

 5   Question 1B went unanswered, and is evidently the question on

 6   which the jury was unable to reach a verdict.

 7              So proceed to question 2.

 8         THE CLERK:  Thank you, Your Honor.

 9              Question 2:

10              "As to the documentation for the 37 JAVA API

11              packages in question, taken as a group:

12              "A.  Has Oracle proven that Google has

13              infringed?"

14              Answer:  "No."

15              Question 3:

16              "Has Oracle proven that Google's conceded use

17              of the following was infringing, the only

18              issue being whether such use was de minimus:

19              "A.  The rangeCheck method in Timsort.java

20              and ComparableTimSort.java."

21              Answer:  "Yes (Infringing)."

22              "B.  Source code in seven 'Impl.java' files

23              and the one 'ACL' file."

24              Answer:  "No (Not infringing)."

25              "C.  The English-language comments in
```

1          CodeSourceTest.java and

2          CollectionCertStoreParametersTest.java."

3          Answer:  "No (Not infringing)."

4          Question 4:

5          "Answer the following special interrogatories

6          only if you answer 'yes' to Question 1A.

7          "A.  Has Google proven that Sun and/or Oracle

8          engaged in conduct Sun and/or Oracle knew or

9          should have known would reasonably lead

10         Google to believe that it would not need a

11         license to use the structure, sequence, and

12         organization of the copyrighted compilable

13         code?"

14         Answer:  "Yes."

15         "B.  If so, has Google proven that it, in

16         fact, reasonably relied on such conduct by

17         Sun and/or Oracle in deciding to use the

18         structure, sequence, and organization of the

19         copyrighted compilable code without obtaining

20         a license?"

21         Answer:  "No."

22         Signed and dated by the foreperson, Greg Thompson, on

23    May 7, 2012.

24         **THE COURT:**  Please poll the jury now.

25         **THE CLERK:**  Jimmy Chau, is the verdict read your

1   verdict?

2            JUROR MR. CHAU:  Yes.

3            THE CLERK:  Jacqueline Gonzalez, is the verdict read

4   your verdict?

5            JUROR MS. GONZALEZ:  Yes.

6            THE CLERK:  Ronald Rutherford, is the verdict read

7   your verdict?

8            JUROR MR. RUTHERFORD:  Yes.

9            THE CLERK:  Daniel Liu, is the verdict --

10           JUROR MR. LIU:  Yes.

11           THE CLERK:  -- read your verdict?

12           Christina Cheng, is the verdict read your verdict?

13           JUROR MS. CHENG:  Yes.

14           THE CLERK:  Julie Chiu, is the verdict read your

15   verdict?

16           JUROR MS. CHIU:  Yes.

17           THE CLERK:  Steven Hotvedt, is the verdict read your

18   verdict?

19           JUROR MR. HOTVEDT:  Yes.

20           THE CLERK:  Greg Thompson, is the verdict read your

21   verdict?

22           FOREMAN THOMPSON:  Yes.

23           THE CLERK:  Patricia Pearlman, is the verdict read

24   your verdict?

25           JUROR MS. PEARLMAN:  Yes.

PROCEEDINGS                                                          2886

 1            THE CLERK:  Elisabeth Hostynek, is the verdict read

 2   your verdict?

 3            JUROR MS. HOSTYNEK:  Yes.

 4            THE CLERK:  Megan Gallo, is the verdict read your

 5   verdict?

 6            JUROR MS. GALLO:  Yes.

 7            THE CLERK:  And, Jennifer Michals, is the verdict

 8   read your verdict?

 9            JUROR MS. MICHALS:  Yes.

10            THE COURT:  All right.

11            THE CLERK:  Your Honor, the verdict is unanimous.

12            THE COURT:  All right.  The Special Verdict Form and

13   the verdict of the jury, with respect to the questions

14   answered, will be made of record in the files of the U.S.

15   District Court.

16            The one question which was not answered, Question 1B,

17   will be withdrawn from you for your consideration, officially,

18   at this point.

19            So, we thank you for your service so far and for your

20   continued service as we now go to the next phase of the case.

21            And I just want to have a few words for you, which is

22   that your admonition still continues.  All of the evidence that

23   you've heard so far can be considered unless I tell you

24   otherwise, can be considered as we go on through the rest of

25   the case.

```
 1              But you are about to start on a phase of the case

 2   that has a lot to do with patents and almost nothing to do with

 3   copyrights, since we intentionally designed it that way.

 4              But, nonetheless, you have learned a lot about these

 5   systems, so in some ways this is very useful information for

 6   you to have in mind as we go into the next phase of the case.

 7              It is important that you not talk with each other

 8   now.  We're back to the mode where you can't talk with each

 9   other, even among yourselves, about the evidence you are

10   hearing.

11              In a few days, it will be your duty to do that and to

12   deliberate, once again, about the patent phase.  But not yet.

13              So we're back to no talking among yourselves.  No

14   doing any homework.  Of course, that's always been the rule.

15   No talking with anyone else on the outside.  No looking at news

16   reports.  No going online to see what orders or notices or

17   briefs are being filed by the lawyers in this case.  That would

18   be wrong to do that.

19              Instead, your job is a lot easier than that, in some

20   respects.  And that is, you sit back, make the lawyers do all

21   the work.  Make the lawyers present the evidence here in court.

22              And then at the end you decide whether or not the

23   party with the burden of proof has carried its burden of proof.

24   And I'll tell you, once again, at the end of the patent phase

25   what the law there will be.
```

1          So, we know you're working very hard.  We know you're

2     extremely diligent.  We thank you for all of that.  And we ask

3     for your continued diligence and attention to the case.

4          So what I think we're going to do here is give you --

5     unless the lawyers can think of another admonition, I'm going

6     to give you a few minutes to go back into the jury room.

7          I need to talk with the lawyers and let them set up.

8     We're going to go straight into the closing -- I mean, to the

9     opening statements for the next phase of the case, so that your

10    mind is going to be shifting gears pretty quickly.

11         We're going to go into patents.  Patents.  I think

12    you're going to start hearing a lot about the virtual machine

13    part that you've heard about, but you're now going to hear a

14    lot more about.

15         So, Dawn, is there something more I should do?

16         **THE CLERK:**  No, there isn't, Your Honor.

17         **THE COURT:**  How about the lawyers, anything more you

18    want me to say before we give a break to the jury?

19         **MR. JACOBS:**  No, Your Honor.

20         **MR. VAN NEST:**  No, Your Honor.

21         **THE COURT:**  All right.  Very well.  Please go back

22    into the jury room.  We'll call you back in just a few minutes.

23         **THE CLERK:**  All rise.

24         (Jury out at 11:22 a.m.)

25         **THE COURT:**  All right.  Be seated.

1             I'm prepared to go forward in the patent part of the

2    case, but in case there's something I'm overlooking based on

3    the verdict, I ask the lawyers if there's something we need to

4    do here and now?

5             **MR. VAN NEST:**  Your Honor, I'm not sure we need to do

6    it here and now, but just to preserve it based on my comments

7    last week, Google would move for a mistrial on Question 1,

8    based on the *Jazzabi* case and the *Altus* case.

9             As I argued last week, I think the law in the Ninth

10   Circuit is clear that where you have a claim and an affirmative

11   defense that would avoid the claim, those are considered,

12   essentially, one equal issue on the question of liability.

13            And I think, in this circumstance, given the way the

14   case was presented and given the law that fair use is an

15   affirmative defense, you could not receive a partial verdict on

16   Question 1.  You would have to declare a mistrial.  Both of

17   those questions would have to be retried to a new jury.

18            And so I move at this time.

19            **THE COURT:**  All right.  Thank you for your motion.

20            Any response at this time, or do you want to brief

21   that?

22            **MR. JACOBS:**  I think it had best be briefed, Your

23   Honor.

24            **THE COURT:**  All right.

25            **MR. JACOBS:**  We would so propose.

1          **THE COURT:**  Well, let's -- I think the thing to do,

2    Mr. Van Nest, is for you to make a formal motion in writing.

3    Can you do that today?  Is that too soon?

4          **MR. VAN NEST:**  I probably could present it tomorrow,

5    Your Honor.

6          **THE COURT:**  All right.  By tomorrow.  And then by

7    Thursday at noon the opposition will be due.  Does that give

8    you enough time?

9          **MR. JACOBS:**  Thank you, Your Honor.

10         **THE COURT:**  You're most welcome.  All right.

11   Anything else you want to bring up about the verdict?

12         One thing that I think you need to be thinking about

13   is, does this mean then that that simplifies Phase Three for

14   the -- on the damages, since the -- looks like rangeCheck is

15   the only thing of which there is a clear-cut finding of --

16   that's statutory damages, right, as I understand it?

17         **MR. BOIES:**  Your Honor, in terms of the damage side,

18   that's correct.  We don't have a separate damage calculation

19   for rangeCheck.

20         With respect to infringer's profits, that still is an

21   issue.  And that is something that we'll have to probably brief

22   to the Court, at some point, and then depending on the Court's

23   decision either try or not try.

24         **THE COURT:**  I had thought you had said last week that

25   on the rangeCheck you would only be asking for statutory

PROCEEDINGS                2891

```
 1  damages.

 2            MR. BOIES:  In terms of the damage side.  In other

 3  words, in terms of copyright -- unlike patent, of course -- we

 4  have both the damage to the --

 5            (Deputy marshal enters courtroom.)

 6            THE COURT:  Just a moment.  You have a note?  May I

 7  see it?

 8            This is a note to Dawn:  "Please provide more

 9  notebooks for Phase Two."

10            (Laughter)

11            THE COURT:  Very good question.  I'll give you that

12  note.

13            MR. BOIES:  They're settling in, Your Honor.

14            THE COURT:  All right.  So -- all right.  Say that

15  again.  I thought you told me the other day that for Phase

16  Three it came out this way you would only be asking for

17  statutory damages.

18            What am I hearing about --

19            MR. BOIES:  I've interpreted the Court's question

20  perhaps incorrectly.  That you had asked whether there was a

21  separate damage calculation, whether we had a damage

22  calculation for the three literal copying issues.

23            And we do not have a separate damage calculation.  We

24  have not attempted to do a damage calculation that relates just

25  to those.  And with respect to that, the only thing we would
```

 1  claim would be statutory damages.

 2          But, of course, in copyright you get both your

 3  damages plus you get infringer's profits.

 4          **THE COURT:**  What is the basis for asking for profits?

 5          **MR. BOIES:**  Well --

 6          **THE COURT:**  Nine lines of rangeCheck out of

 7  15 million lines of code, you want all their profits?

 8          **MR. BOIES:**  No, we don't want all their profits, Your

 9  Honor.  But they bear the burden on that issue.

10          **THE COURT:**  I don't think so.  I think you better

11  brief this.

12          **MR. BOIES:**  Fair enough.

13          **THE COURT:**  I believe it borders on the ridiculous to

14  say that nine lines of code you are going to get even a

15  percentage of their profits.  You told me the other day this

16  would be statutory damages.  Now you're changing your tune.

17          Well, maybe I misunderstood what you were saying.

18  But if you're now saying that you get some kind of disgorgement

19  on account of nine lines of code being copied, you're going to

20  have to brief that.  That would be -- that would be a big, big

21  stretch.

22          So, I'll let you brief it.  But you might as well be

23  on notice, I think that would be way out there for you to ask

24  for that.  And then we have time to have it briefed.  Right now

25  my inclination is this:  The only thing that would go to the

PROCEEDINGS                          2893

```
 1  damages would be statutory damages on copyright, plus the

 2  patent part.

 3          MR. BOIES:  Your Honor, may I inquire?

 4          THE COURT:  Sure.

 5          MR. BOIES:  If the Court concluded that we were

 6  entitled to judgment as a matter of law --

 7          THE COURT:  On the -- yes.

 8          MR. BOIES:  -- on the fair use --

 9          THE COURT:  Yes.

10          MR. BOIES:  -- would you then send that --

11          THE COURT:  Yes.  If I could do that in time.  But

12  I'm not there yet.  I may not ever get there.  I think there

13  are arguments that go both ways on that.  I would have to read

14  your brief on it.

15          Has that brief already been filed?

16          MR. BOIES:  Yes, it is, Your Honor.

17          THE COURT:  When did that get filed?

18          MR. JACOBS:  That was filed with our JMOL motions,

19  Your Honor.  And so the -- the oppositions are due today, I

20  believe, at 6:00 p.m.  And the motion itself was filed last

21  week.

22          THE COURT:  All right.  I will consider that

23  possibility.  I recognize that if you, as a matter of law, were

24  entitled to verdict on Question 1B, then that would put the --

25  put all those disgorgement issues back in play.  That's a very
```

PROCEEDINGS                                               2894

```
 1   legitimate point.
 2            MR. KWUN:  Your Honor, just one point on that, since
 3   Mr. Jacobs just said JMOL oppositions are due at 6:00 p.m.  You
 4   had actually said 5:00 p.m.  We should all be in agreement on
 5   that.  I think it's 5:00 p.m.
 6            THE COURT:  I don't remember.
 7            MR. JACOBS:  What he said, Your Honor, is fine.
 8            THE COURT:  Okay.  Excellent.  So anything more on
 9   the aftermath of the verdict that you want to bring up right
10   now?  If so, I'm all ears.
11            MR. VAN NEST:  The -- just a question on the
12   briefing.  I understand the mistrial briefing would be tomorrow
13   and Thursday.  What does Your Honor contemplate in terms of the
14   Phase Three briefing we discussed?
15            THE COURT:  Well, no.  Let's do it on exactly the
16   same schedule.
17            Here's my thought.  Unless the Court can give a
18   verdict, required verdict JMOL under Rule 50 in favor of Oracle
19   on Question 1B, my view of it is that there is almost
20   nothing -- in fact, nothing really; one line item of statutory
21   damages -- to go to the jury.  And that's on the nine lines on
22   rangeCheck.  Because there has been zero finding of liability
23   on any copyright so far.  The -- because the issue on the
24   affirmative defense of fair use is still in play.
25            However, if the Court were to say, no, Google has
```

```
 1   failed to prove that, and no reasonable jury could find on that
 2   issue, then Oracle would be correct that it should go to the
 3   jury.  And we will get that sorted out by Thursday.
 4           So we're going to use the same briefing schedule that
 5   I came up with for your other issue.  We'll say tomorrow --
 6   brief due tomorrow, responsive brief due Thursday.
 7           Okay.  Anything more?
 8           MR. JACOBS:  Your Honor, I think we covered this, but
 9   I wanted to be sure.  Will you be playing the patent video
10   before openings?  I would so request.
11           THE COURT:  Yes.  We have it ready to go?
12           THE CLERK:  Actually, I believe the IT person is
13   going to play that back for us, or play it for the jury.
14           THE COURT:  Who is?
15           THE CLERK:  Thomas.
16           THE COURT:  Are you ready to go with that?  Do we
17   have the model instruction -- I mean the patent handout?
18           THE CLERK:  I have it.
19           THE COURT:  Can I see what it is we're handing out?
20           Has everyone seen this sample patent --
21           MR. VAN NEST:  I haven't seen it in a while, Your
22   Honor.  Is it the one with the stool?
23           THE COURT:  Yes.
24           MR. VAN NEST:  That's fine.
25           THE COURT:  All right.  So that will be -- that will
```

```
 1  be handed out.  So we'll do that.

 2          And we're unlikely to get all the way through until

 3  1:00 o'clock today, with both openings, but that's just the way

 4  it's going to be.  We'll get as far as we can and pick it up

 5  tomorrow.

 6          And do we have the -- I think I'm going to wait on

 7  handing out the -- are any of you going to be referring to the

 8  color-coded thing?

 9          MR. VAN NEST:  I will be, Your Honor, but I have a

10  slide on it, so I think --

11          THE COURT:  I tell you what, do we have it ready to

12  hand out?

13          MR. JACOBS:  We do, Your Honor.

14          THE COURT:  So let's hand out the color-coded thing

15  and the stool, three-legged stool at the same time, to save a

16  little time.

17          All right.  Dawn, I think we're ready in here.  You

18  can give them the notepads, and we'll get started.

19          (Jury enters at 11:40 a.m.)

20          THE COURT:  All right.  Please be seated.

21          And so now patents.  Patents.

22          You're going to hear in a moment about what patents

23  are, but patents are something that Congress has authorized.

24  It's actually in the Constitution that Congress can do so.

25          And patents are issued by the Patent Office in
```

1   Washington, D.C.  And they give a right to -- exclusive right

2   to the holder of the patent to make, use, or sell the method or

3   apparatus that's described in the claims at the end of the

4   patent.

5          Now, because we have lots of patent cases in our

6   country, the Federal Judicial Center in Washington, D.C. --

7   which is an adjunct of the court system -- has come up with a

8   short video that is very good at explaining how the patent

9   system works.  So we're going to play it for you right now.

10  But before we play that, we're going to give you two handouts.

11         Are we ready to do the handouts?

12         MR. JACOBS:  Yes, Your Honor.

13         THE COURT:  So these handouts will be -- one of them

14  gets referenced in the middle of the video.  And we think it

15  would be useful for you to have this handout so when it comes

16  up in the video you can look at it and see what we're talking

17  about.

18         So, Dawn will hand those out to you.  Okay.  And now

19  we want to hand out -- did you also hand out these color-coded

20  things?

21         THE CLERK:  I did.

22         THE COURT:  So Dawn was one step ahead of me.  She

23  has also handed out a color-coded item that will make a lot

24  more sense to you if I explain that to you later.  So just put

25  the color-coded item to one side.

```
 1              And the one you are going to need during the video is
 2    the one that says An Introduction to the Patent System.  That's
 3    the one that will come up in this video, which lasts about 15
 4    minutes.  So this is not a long video, but it is very good.
 5              It's one that's created not by any lawyers in the
 6    case.  It's created by the Federal Judicial Center, Washington,
 7    D.C.  And it is evenly balanced to be a -- just kind of a
 8    straight description of how the system works.
 9              So, at this time, are we ready to play the video?
10    So, please, it should show up on your screen and have audio at
11    the same time.  Roll the tape, please.
12              (An Introduction to the Patent System video played in
13              open court.)
14         THE COURT:  Very well.  I hope you all enjoyed that.
15    That's an excellent summary of the patent system.
16              Counsel, do you want me to take up the handout?  Did
17    any of you over there make any notes on the handout?  Yes?  No?
18              (Jurors responding negatively.)
19         THE COURT:  Should I take that up?  I think I
20    probably should take up the -- so, please, pass back down to
21    the end the little handout on the introduction to the patent
22    system.
23              And, Dawn, will collect those please.
24              (Whereupon, handouts was passed to
25               the clerk.)
```

1        **THE COURT:**  Now, you should still have in your hands

2   the other one which has the red underlining.

3        Okay.  I'm going to give you a word about the red

4   underlining and the lawyers will explain this -- these claims

5   in much more detail in a moment.  I'll just say for now that

6   the red underlining represents the items that are in dispute,

7   and the things that are not underlined are not in dispute and

8   are conceded.

9        Is that correct, counsel?

10       **MR. VAN NEST:**  That's right, your Honor.

11       **THE COURT:**  All right.  Correct?

12       **MR. JACOBS:**  Yes, your Honor.

13       **THE COURT:**  So this is a device that your judge has

14   come up with and the lawyers have graciously agreed to go along

15   with to help simplify for you the issues that you need to be

16   focusing on.  It's mainly the underlined material because those

17   are the ones that are in play.  The non-underlined parts are

18   not in play and are conceded.

19       And what you will find is that whenever infringement

20   is accused, the owner of the patent has got to prove that the

21   accused device has every single one of the limitations; not

22   just three out of four, but if there are four, all four.  So

23   the limitations have to be proven completely in order to prove

24   infringement.  Again, it's not enough to prove three out of

25   four or even three-and-a-half out of four.  It's got to be four

```
 1   out of four, to use a simple example.

 2          So this, this underlining helps focus your attention

 3   on the parts that are in play.

 4          Now, of course, you're going to want to know and

 5   understand the technology well enough that by the time this

 6   phase is over, you will, in fact, understand the rest of the --

 7   the part that's not underlined.  I'm sure that that will occur.

 8   But you need to pay particular attention to the parts that are

 9   underlined.

10          Okay.  Now, what I would recommend you do is put the

11   handout to one side.

12          And for the record, the handout looks like it's been

13   marked as Exhibit 1106.

14          And this is -- this underlining does represent

15   evidence that you are able to take into account; meaning, that

16   if it's not underlined, it's conceded.  This is like a

17   stipulation.  Both sides agree to that.

18          So we are now going to have the opening statements.

19   Each opening statement will be about 45 minutes.  It looks like

20   from the hour we will probably just get the plaintiff's opening

21   statement today, then we'll go to the other.  It will be 45

22   minutes.

23          Remember what I said many times, what the lawyers say

24   in opening statement is not evidence.  It's a forecast of what

25   the lawyers expect or hope that they will be able to prove.
```

1   They will show you emails and things on the screen.  Some of

2   them are in evidence.  Others may not be in evidence already.

3          But remember if it's not ultimately -- if it doesn't

4   ultimately come into evidence, then the fact that the lawyer

5   referred to it in the opening statement doesn't matter, because

6   what the lawyers say in the opening statement is not evidence.

7   This applies to both of the opening statements.  But then right

8   after that, we're going to get down to putting on witnesses and

9   so forth, getting the evidence before you.

10          So at this time on behalf of Oracle America,

11  Mr. Jacobs, you may give the opening statement.

12          MR. JACOBS:  Mr. Jacobs.

13                        **OPENING STATEMENT**

14          MR. JACOBS:  So we're going to talk about patents and

15  you've seen the patent video and you spent a lot of time in

16  Phase 1 on copyright and so it's worth just spending a minute

17  on the difference between the two.

18          In Phase 1 we talked about copyright and the creative

19  expression that copyright protected and that had to do with the

20  Structure, Sequence and Organization, the Application

21  Programming Interfaces.

22          You may recall that I elicited testimony from Mr.

23  Bloch about all the authoring, all the writing that went on

24  when he was creating those Application Programming Interfaces,

25  because that's what copyright protects, protects the expression

1  of the author.

2          But patents protect inventions.  So there's no

3  requirement -- unlike copyright there is no requirement of

4  copying.  There is no requirement of creativity or expression.

5  It's all about the invention.

6          And you saw from the patent video that the invention

7  is described, its claim in the patent itself, and the principal

8  question that you will be facing in this trial is whether the

9  claims of the two patents that we have asserted against Google

10 and Android, whether those claims are, in fact, present in

11 devices that are running Android or that have been developed

12 using the Android developer kit.

13         So we're going to be looking at the claims.  We're

14 going to be look at Android.  We're going to be looking for a

15 match-up.  And if the match-up is there, then we win.

16         I think you will be pleased to know that fair use is

17 not an issue in the patent case.  So, in some ways it's a

18 simpler analysis.  You just look at the claims.  You look at

19 the accused device and you see that there's that match-up.

20         And as Judge Alsup indicated, he has come up with

21 this very helpful technique of having us underline where the

22 dispute is, so when we get to the claims, you'll see what

23 Google is claiming is not present in their devices running

24 Android and we say is present.  And that's what the -- part of

25 the dispute will be about.

1          (Document displayed)

2          Now, in Phase 1 we spent a lot of time talking about

3   the Application Programming Interfaces and the core libraries.

4   We're going to leave that behind for Phase 2 and we're going to

5   be talking about another aspect of the Java environment and the

6   Android environment.

7          And this slide that's on the screen now will be

8   familiar to you.  This is the basic illustration we used in

9   Phase 1 to describe how Java creates "write once, run

10  anywhere," the Java Virtual Machine is running on all the

11  computing devices and how Android fragmented that because it's

12  different from Java.

13         And what is going to be important in Phase 2 is not

14  so much those differences, but the basic similarities between

15  Android and Java when it comes to this basic architecture or

16  design of a system.

17         (Document displayed)

18         So let's look a little bit more closely at how the

19  Java world looks and what the problems that the inventors of

20  these patents had to solve.

21         This is a different kind of depiction of a stack of

22  what a Java developer today is working with.  So at the top you

23  have somebody writing code, and he writes it in source code and

24  that's the blue box.  That source code is put through a tool

25  that you heard about in Phase 1 called a compiler.  And what

OPENING STATEMENT / JACOBS

1    the compiler does is take the English language statements of

2    the programmer -- sorry, the high level language statements of

3    the programmer, in this case let's say in Java, and compiles

4    them to something that is more close, that is closer to what

5    the computer needs in order to actually run the program.

6            And in the Java world, what that is called is

7    bytecode.  Java bytecode.  And I'll show you a picture of Java

8    bytecode in a minute.  Right now what one needs to understand

9    is that Java bytecode looks a lot more like the code that will

10   actually cause the computer to run.

11           If you spend any time around computers, you know that

12   computers basically respond to ones and zeros, not to words

13   like "if" and "else."  So we have to ultimately get to ones and

14   zeros in this bytecode.  The words of one of the patents is

15   kind of an intermediate code.

16           That bytecode runs on something called, in the yellow

17   box, the Java Virtual Machine.  The Java Virtual Machine is

18   that layer of software that's on all of the computers that

19   support Java and the Java Virtual Machine actually interprets

20   the Java bytecode.  So this is a new detail on how "write once,

21   run anywhere" works, because we're talking now about this

22   intermediate code called bytecode and how it runs on something

23   called the Java Virtual Machine.

24           Now, "virtual," what does that mean?  Well, it kind

25   of means -- it's sort of like pretend.  What the Java Virtual

1   Machine does is it looks to the bytecode and says:  Ignore

2   what's down in the black box.  Ignore what's down in the

3   computing device.  I'm going to face up to you the code and I'm

4   going to present a layer that you can run on.  And it's virtual

5   in that it's not real, it's not physical.  It's in some sense

6   an artificial machine.  It sort of looks like a machine, but

7   it's a software layer.

8           Now, let's look at the stack on the Android side

9   built around the same basic design motif, if you will.  And

10  recall that in Android somebody -- the application programmer

11  writes in the Java programming language.  And I've colored it

12  green and blue here because -- just to remind you in Phase 1 we

13  talked about the difference at the API level, and that there

14  was this -- it wasn't all pure blue because Java is fragmented

15  by Android at the Application Programming Interface level.  But

16  for present purposes, the programmer is writing in the Java

17  programming language and that programming language is also

18  going to go through the Java compiler.

19          Now, let me pause there for a minute.  Let me just

20  say that again.  If you're on the Android side and you're

21  writing programs for Android, your source code is going to go

22  through a Java compiler.  And the way that works is that

23  Android tells the people programming for Android, it says:  Go

24  to the -- it says to them:  Go to the Oracle website and

25  download onto your computer a Java compiler.

1            So the Java compiler on the left side is the same

2    compiler as the Java compiler on the right side.  And that will

3    become important in the case of one of the patents that we're

4    dealing with here.

5            Now, you heard a little bit about this in Phase 1,

6    how at some point in the development of Android the Android

7    team decided they weren't going to adopt a pure Java virtual

8    machine.  Instead they departed from the Java Virtual Machine

9    specification and they adopted something called Dalvik.

10           And here is how this basic mechanism works.

11           (Document displayed)

12           On the developer's computer -- so looking at the blue

13   box, the orange box and that bolted on green box called "dx

14   tool," on a programmer's computer, the person who is writing an

15   application programmer now, there is an additional feature

16   created by Google for Android called the dx tool.  And the dx

17   tool converts the Java bytecode which comes out of the Java

18   compiler into something called dex code.  So what is then sent

19   to the user's computer from the developer's side, whether it's

20   over the internet or by a disc that's being installed in the

21   old days -- say, if they were installing, like, a DVD, that's

22   how we were installing the application -- the dex code is the

23   code that is actually sent to the user's computer to run on

24   that computer.

25           And then there's something called the Dalvik Virtual

1  Machine, which presents that layer upwards that says, "Look for

2  me.  Don't look for the underlying black computing device."

3  And in the Dalvik Virtual Machine there are two functions that

4  we'll be talking about in this patent case.  One is called

5  dexopt.  Opt stands for optimization, which stands for making

6  better.  And the other is the bytecode interpreter, which takes

7  the dex code and interprets it much like the Java Virtual

8  Machine interprets Java bytecode.

9            That was a series of mouthfuls.  What you need to

10  keep in mind for present purposes is that there is this dx tool

11  on the developer's side and on then the machine side is the

12  Dalvik Virtual Machine there's something called dexopt and the

13  bytecode interpreter.

14            (Document displayed)

15            Now, just to give you a peek of what this code looks

16  like, you may recall from Phase 1, I think somebody wrote the

17  code on the left side.  It's a famous piece of code called

18  Hello World, and its function is to run and print out on the

19  screen "Hello World."

20            And in the middle column of the screen we've printed

21  out for you what the Java bytecode looks like.  You can see

22  it's very hard to understand to a layperson.  Very hard to

23  understand for a programmer.  You really need to be expert in

24  Java bytecode to understand it.

25            And then on the right side we've printed out what the

1    Android dex code looks like.  And you can see that they are

2    very different.  But they are both intermediate kinds of code

3    running on virtual machines.  And that essential similarity is

4    what drives the -- drives this case, this patent phase of this

5    case for reasons that I will explain.

6              These patents, the two patents in this case are about

7    making phones run fast.  They are about making phones run fast.

8    Now, if you think about this a little -- think about this for a

9    moment.  This is kind of obvious.  We all want -- when we turn

10   on our phone, we want it to be there in an instant.  And if

11   you're like me, we've become very impatient with any kind of

12   delay in any kind of computing device.  That's the first point.

13   We're impatient.

14             The second point is that phones are small computers

15   and they don't have big memories or big processors or very

16   large power supplies plugged into the wall.  They are running

17   on batteries.  They have -- typically they have smaller

18   processors and less memory than a full computer.  So getting a

19   phone to run fast is a challenge.

20             Back in the 90's when Java was being developed,

21   getting computers to run fast was a challenge, especially with

22   the interpreter in the way.

23             So let's remind ourselves what's going on.  On both

24   the Java side and the Android side we have this virtual

25   machine; Java Virtual Machine, the Dalvik Virtual Machine.

1    You may remember from Phase 1 this analogy I drew to speaking

2    to someone through an interpreter.  If I'm speaking to you

3    through an interpreter, my speed is going to have to go down

4    because somebody is in the middle translating every word I say

5    and then you have to pick up the translation.  And so we all

6    slow down if we're talking through interpreters.

7              And the same thing is true with a virtual machine.

8    The virtual machine is a software layer.  This slide

9    illustrates what the virtual machine has to do.  It has to go

10   out and get the bytecode instruction.  It has to decode it,

11   translate it into the native language.  Then it has to execute

12   it and it has to go through that cycle.  And so just like a

13   human interpreter or human translator, the virtual machine adds

14   what's called overhead and slows things down.

15             Now, there is one other way the analogy works here.

16   If you were taking notes as I speak, you're using up a certain

17   amount of paper.  If there is an interpreter who is taking

18   notes as I speak to interpret for you, the paper is doubled.

19   And the same is true when we're talking about an interpreter on

20   a machine.  The amount of memory that is going to be used,

21   where computer memory is now analogous to your paper memory, is

22   going to increase.  So the use of an interpreter actually

23   creates two problems for a Java developer or for Android

24   developer.

25             Problem number one, we've got to run fast.  Problem

```
 1   number two, we can't use up too much memory.

 2            (Document displayed)

 3            When the Google developers were developing Android --

 4   and recall from Phase 1 they are trying to get this thing to

 5   market.  They are trying to get there before -- at the

 6   Microsoft and the iPhone comes out, so they are really trying

 7   to get lots of Android on lots of devices quickly in order to

 8   capture the developer community.  So all of this is happening

 9   in a very compressed period and they realize that they faced

10   this technical challenge.

11            And so we have this email, TX 23, in which one of the

12   developers says to another:

13            "If the device is not fast and stable, we

14            fail."

15            It's really got to work quickly.  And back in 2007,

16   2008 the devices were even smaller with less memory than they

17   are today.  So this was a very serious challenge.

18            And then in another email from the same developer,

19   TX 218, Mr. Swetland, he says:

20            "This really isn't a debate.  This system is

21            too slow.  The system uses too much memory.

22            Smaller, simpler, faster, more reliable wins

23            across the whole system."

24            So that Android developers realized that they faced

25   these kinds of technical challenges.  They had to get the
```

 1   device to run fast and they couldn't use too much memory.  And

 2   they were very worried.

 3            You can see from this, from TX 218 how worried the

 4   developers are about achieving this.  And at the beginning of

 5   this email, the contrast is drawn with the desktop computer:

 6            "We're building an embedded system."

 7            That is what Android is going to be an embedded

 8   system.

 9            "It is massively slower and has massively

10            less memory than a modern desktop or server

11            computer."

12            So we're building this for phones, for other kinds of

13   embedded systems.  They don't have a lot of capability.  We

14   have to solve these problems.

15            (Document displayed)

16            You saw in the video the red ribbon version of the

17   patents.  When a patent goes through the Patent Office, it

18   comes out -- it looks like this (indicating), because it's

19   quite a process to get a patent.  It's expensive and it's time

20   consuming and it's important.

21            So we have two patents that are in this phase of the

22   lawsuit.  One is going to be called the '104 patent, and the

23   other is going to be called the '520 patent.  And you will be

24   getting photocopies of these as exhibits.

25            These patents are patents that were developed by Java

1   developers back in the 90's to solve the problem of performance

2   and memory that the developers faced in those days.  Of course,

3   Java in those days wasn't aimed at phones.  It was just aimed

4   at computers.

5          But the same problem was present.  We were going to

6   be running this interpreter.  We're going to be using this

7   intermediate form of code.  We've got to make sure that things

8   perform well and that we don't use too much memory.  So these

9   two patents solve those problems -- or address those problems.

10         (Document displayed)

11         So let's talk first about the so-called -- what we're

12  going to be call the '104 patent.  The title of the patent

13  starts to give us a clue of what it's about.  It's called

14  "Method and Apparatus for Resolving Data References in

15  Generated Code."

16         What's the generated code?  That's the code that

17  comes out of -- in the Java world, comes out of the Java

18  compiler.  In the Android world, comes out of the Java compiler

19  and then the dx tool.  That code is generated on the

20  developer's side and then it's going to be installed on the

21  user computer and it's going to run.  And it's going to have

22  data references in it -- we will explain what we mean by

23  that -- and those are going to be, quote, resolved.

24         And the inventor on this patent, you've heard his

25  name was James Gosling.  He is kind of the father of Java.

```
 1   And, of course, it was assigned to Sun Microsystems as the

 2   owner when he prepared it and when it was granted.  And it

 3   dates back into are the 1990's.

 4           Now, when you study this patent, you will see that it

 5   has some history to it because it was actually -- the invention

 6   described in that patent was examined a couple of times by the

 7   Patent Office and the actual '104 patent is called a reissue

 8   patent, because the original patent, which was numbered here as

 9   you can see on the slide with 5,367,685, went through yet

10   another procedure in the Patent Office like the one you saw in

11   the video to evaluate it and decide whether it was properly

12   granted and what the scope of the claims would be.

13           So this patent was thoroughly examined in the Patent

14   Office.  And the upshot is that in this trial, you will be

15   pleased to know, you only have issues of infringement.  The

16   only defense Google is offering to these two patents is "we

17   don't infringe."

18           Now, let's try to get a sense in my few minutes of

19   what this patent is about.  You'll be hearing much more about

20   it over the course of the next few days.

21           The basic idea of this patent is to resolve data

22   references.  You can see that in the underlining of this

23   abstract.

24           (Document displayed)

25           And provide execution performance -- meaning good
```

1    performance when executing the code -- that's substantially

2    similar to the traditional compiled approach.  Meaning, we want

3    to get performance here as if there is no virtual machine

4    running on the computer and we just wrote code directly for

5    that computer in the first place.  And so that's what the basic

6    goal of the invention of the '104 patent is.  We want to get

7    performance that's just as if there was no interpreter between

8    us.  I want to be able to talk as fast to you through an

9    interpreter as I could if there was no interpreter present.

10                (Document displayed)

11              Now, in your packet you have Claim 11 with its

12    underlining.  We're going to be talking about several claims of

13    the '104 patent.  But here is the basic -- here is the claim,

14    which is the property boundaries, and this is what we assert

15    Google infringes.

16              So we have got an apparatus, that will be the cell

17    phone.  We have got memory that contains the intermediate form

18    code.  We talked about that a few minutes ago.  And some of the

19    instructions in that intermediate form code contain something

20    called a symbolic reference.  A symbol.  And that is going to

21    be the heart of the dispute about this patent, is what is a

22    symbolic reference or, more precisely, is what Google has done

23    in Android taken care of something called symbolic references?

24              Now, the words itself suggest the meaning.  A

25    symbolic reference is reference by way of a symbol.  And we all

1  know in our daily life what kind of symbols we use.  We use our

2  Social Security number, that's a symbol for us.  We use juror

3  number.  That's become a symbol for us.  But the best analogy

4  for this particular patent is the following.

5          When you were summoned here for jury duty you, were

6  summoned to Courtroom 8, and you probably thought to yourself,

7  "How am I guessing to get to Courtroom 8?"  And so maybe you

8  arrived at the courthouse and you looked at the board

9  downstairs.  You asked a guard, said, "Where a is "Courtroom

10  8?"  And you were pointed to the 19th floor and then you walked

11  down the corridor and you found yourself in Courtroom 8.

12          Courtroom 8 is an symbolic reference.  It doesn't

13  tell you exactly where this courtroom is.  You now know exactly

14  where this courtroom is in this building and space, if you

15  will.  When you get off the elevator, you turn left and you

16  walk past three doors and then you're at Courtroom 8.  You now

17  know the actual location of the courtroom; three doors down,

18  turn left.

19          And so what this claim is saying is that we've got

20  instructions containing one or more symbolic references and

21  we've got a processor that's going to execute those

22  instructions containing symbolic references by determining a

23  numerical reference corresponding to the symbolic reference

24  storing the numerical reference and obtaining data in

25  accordance with the numerical reference.

1              Now, let's just play out my courtroom analogy here.

2    Let's suppose that you cannot remember the next time you come

3    where Courtroom 8 is.  What are you going to do?  Well, you're

4    going to go to the board again, or you're going to ask a guard

5    again.  You're going to say, "Where is Courtroom 8?"  And they

6    will direct you to the 19th floor and you're going to hunt your

7    way down the corridor.  And, believe me, I do this from time to

8    time.  Courtroom 8 is very familiar to me now, but I often have

9    to check the board.

10             And so if I can't remember, I have to go through

11   these steps of looking up the symbolic reference in some kind

12   of table, what a computer would do, and then finding the actual

13   location, third door down on the left.  And this patent claim

14   is about doing this in a computer and remembering it.  So that

15   the second time around you encounter Courtroom 8, you don't

16   have to go back to the beginning and start over.

17             Now, one of the things you will learn in the course

18   of this lawsuit is when the parties disagree about what claim

19   language means, Judge Alsup decides that question and you get

20   instructions at the end in which this meaning of the claim term

21   was given to you.

22             So symbolic reference -- which is, again, the focus

23   of the dispute -- has been given a definition.  It is a

24   reference that identifies data by a name other than the numeric

25   memory location of the data and that is resolved dynamically

 1   rather than statistically.

 2          So back to my Courtroom 8 analogy.  The symbolic

 3   reference identifies this courtroom by name, Courtroom 8.

 4   Until you know the layout of the courtroom in detail, you know

 5   nothing about Courtroom 8; just that there is a Courtroom 8 and

 6   you're going to have to find it somewhere.

 7          Now what you're going to end up putting in your head

 8   is the numeric memory location; third door down on the left.

 9   And what the computer ends up putting in its memory is a

10   numeric memory location so that, again, the next time around it

11   doesn't have to start all over again and look up where

12   Courtroom 8 is.

13          Now, I told you that this is the heart of the

14   dispute.  What is the evidence of infringement in a lawsuit

15   like this where Google has prepared a set of programs that

16   makes available on its website, it then installs on its own

17   phones, and it makes available for third parties, the Samsung's

18   the Motorolas the world, to install on their phones and on

19   their computers for their developers.  The evidence is the

20   code.  The evidence is the source code.  And the evidence is

21   what their developers have said about the source code.  Because

22   the Google Android developers have given presentations that

23   describe how they achieved high performance and how they

24   achieved good satisfactory memory usage.

25          And right in the Android code is a description of a

1  routine that does exactly what this claim language discusses.

2  And you'll note the word that's been highlighted here "symbolic

3  references."  So the Android developers when they were writing

4  comments for themselves said, "What we are going to do is

5  convert symbolic references into pointers."  Pointers meaning

6  locations in memory.  Third door down on the left.  Courtroom

7  8, third door down on the left.

8          Now, Google is going to argue to you that symbolic

9  references, as discussed in this code, are not symbolic

10 references.  And their argument is going to be based on the

11 fact that the symbols they have chosen have numbers in them.

12 And so they are going to say that's not a symbolic reference.

13 That's a numeric reference.

14         But let's go back and look at the definition of a

15 symbolic reference.

16         (Document displayed)

17         A symbolic reference identifies data by a name other

18 than the numeric memory location of the data.

19         And, again, we know very well from every day life,

20 and computer scientists will tell you this is completely -- the

21 idea that Google is offering that a symbol cannot include

22 numbers in it makes no sense from the computer science

23 standpoint.  But we know symbolic references that have numbers

24 in them all the time.  Again, our Social Security number.  A

25 speed dial on a phone.  These are all symbolic references with

OPENING STATEMENT / JACOBS

1  reference in them.

2         When Google argues that they don't have symbolic

3  references in their intermediate code that need to be resolved

4  into pointers in accordance with the claims of the '104 patent,

5  please remember this source code, which says we resolve

6  symbolic references.

7         Again, this is Android source code, written by

8  Android developers, talking technical language before this

9  litigation began and, again, the word -- the lineup of the

10  words is very close.  Symbolic references in the code in 2008,

11  2009 and 2010.  Symbolic references in the claim language

12  dating back from the 90's.

13         Now, if you've had any doubt that I accurately

14  described the Android code, then I hope you will pay close

15  attention when we introduce TX 816.

16         (Document displayed)

17         Because TX 816 is a presentation by Mr. Bornstein,

18  who you saw in Phase 1, and we will be bringing him back.  And

19  Mr. Bornstein describes in almost word-for-word, little more

20  technical, what I described for you a few minutes ago.  So

21  let's just take it word-for-word.

22         We do optimization.  What's optimization?  That's

23  making things run better.  And so the first time that a dex

24  file, a data-dex file lands on a device.  So we call it the dex

25  file.  Comes out of the developer's computer, and it lands on a

 1   phone.  We do that verification work.  We also augment that

 2   file.  If we have to, we will do bite swapping and pad -- pad

 3   out structures.  That's all tangential.

 4          And, in addition, we have a bunch of other things

 5   that we do, such that when it comes time to run, we can run it

 6   much faster.

 7          So as an example of static linking.  Before when a

 8   dex file arrives on a device, it will have symbolic methods to

 9   methods and fields; symbolic methods.  Let me say that one more

10   time, symbolic methods.  But afterwards it might just be a

11   simple integer v-table offset.  Integer v-table offset.  That's

12   the numeric reference.  Integer v-table offset.  It's an offset

13   in a table.  Third door down on the left.

14          So that when for invoking a method, instead of having

15   to do, say, a string based lookup -- that is, look at the

16   memory map and figure out where Courtroom 8 is -- it can just

17   simply index into a v-table.  It can go directly, third door

18   down on the left without having to do that look up and run much

19   faster.

20          So, again, the heart of the dispute on the '104

21   patent and its various claims is going to be this word

22   "symbolic reference."

23          And, again, outside of the context of this lawsuit

24   when Mr. Bornstein was describing what they do, he said, "We

25   convert symbolic references."  And he essentially said in

1  slightly different language, "We convert it into a numeric

2  reference within the meaning of the claim language."

3        (Document displayed)

4        Now, it happens that this an important patent for

5  Android.  Google is going to argue that they don't really know

6  what happens out in the field when Android is downloaded.  And

7  we're going to be presenting to you a range of evidence to

8  establish by a preponderance of the evidence that this

9  function, which is present in Android as delivered by Google on

10  its website, is also present on the phones from the companies

11  like Motorola or Samsung that install Android on their phones.

12        And one piece of evidence will be the performance

13  improvement that our experts, both in-house and outside at

14  Stanford, observed when they tested what happens if you take

15  out the '104 patent from Android.  And what you can see is that

16  with the '104 patent, we're at 100 percent.  When it's removed,

17  under two benchmarks you get performance worse than one-tenth

18  as fast.  And on the third benchmark you get it about

19  80 percent as fast.  These benchmarks are standard industry

20  ways of testing the performance of software solutions.

21        So the idea that somebody out in the field will take

22  out the '104 patent when it's so important to the performance

23  of the device, we hope you will conclude is absurd.

24        (Document displayed)

25        And, of course, once again, speed is really

1   important.  And this is a message from Eric Schmidt, who you

2   saw in Phase 1, one of the three leaders of Google, that he

3   sent out.  He sent out various versions of this.

4               "Milliseconds matter to users.  We are all

5               really impatient."

6               And so for Android to work well, it needs features

7   such as that embodied and claimed by the '104 patent.

8               Let me bring you to the second patent, which is the

9   '520.  You will hear these numbers '104 and '520.

10              So the '520 is addressed to memory usage and its

11  inventor's were named Yellin, whose name you saw on some of the

12  books in Phase 1 and a fellow named Tuck.  And, again, it was

13  assigned to Sun Microsystems.

14              And, again, it went through a second examination.  So

15  you will recall that the '104 went through something called

16  reissue.  The '520 went through something -- through something

17  called reexamination.  And, again, the upshot is that the only

18  issue you will have to decide is infringement.

19              Here is the abstract from the '520 patent.  It gives

20  us a little clue about what this patent is about.

21              (Document displayed)

22              But I think the analogy I'll give you in a minute

23  will help you understand even better.

24              The disclosed system represents an improvement over

25  conventional systems for doing something called "initializing

1  static arrays," by reducing the amount of code executed by the

2  virtual machine to statistically initialize an array.

3          So static initialization of an array is a feature of

4  the Java compiler.  The Java compiler you saw emits code in

5  bytecode format.  And it turns out that the Java compiler

6  itself does this thing called static initialization of an array

7  a bit inefficiently, and that inefficiency has to be overcome.

8          Let me illustrate for you the inefficiency.  Imagine

9  that the way we grocery shop is we start at the outside of the

10 store with our list.  And we see "milk," and so we go inside

11 the store, hunt for the milk, go to the cash register, buy the

12 milk, go outside the store, look at the second item, "eggs," go

13 inside the store find the eggs, go to the cash register, buy

14 the eggs, go outside the store, et cetera.

15         That would be a pretty silly way to buy groceries.

16 But it's an approximation of just this feature or artifact, if

17 you will, of the Java compiler, that that's the way these

18 arrays or matrixes of numbers are created.

19         How do we actually shop?  The way we actually shop is

20 we look at our shopping list.  And if I'm not doing the aisles,

21 you know, going up and down the aisles, I look at the shopping

22 list and I go, okay, milk, that's over there in the store,

23 eggs, that's over there, vegetables, flowers, cash register.

24 And we simulate in our heads what it's actually going to look

25 like when we go in the store so we can create the most

1  efficient route through the grocery store to buy our groceries.

2  And we actually do -- I think we do this.  We do a kind of

3  simulation.  As we look at each item on the list, we think

4  where is it, how can I go, how can I do this efficiently?

5        This '520 Patent takes an array that is going to be

6  created on the device by this in-and-out approach that I

7  described and, instead, simulates how that array will be

8  created on the device; and in a very short, concise statement

9  creates a sequence of instructions that will create the array

10 and not use nearly as much memory as the original input.

11       And so here is the key claim language of the '520

12 Patent.  You also have this chart in your stack.  We simulate

13 execution of the byte codes -- that's something called the

14 clinit method -- against the memory without actually executing

15 the byte codes to identify the static initialization of the

16 array.

17       So, by analogy to the grocery list, we're going to

18 simulate our shopping trip through the grocery store without

19 actually doing it.  We're going to do it in our heads.  And

20 then we're going to identify a correct path through the grocery

21 store, and we're going to do -- actually, then, create an

22 instruction to ourself in our head: go do the correct path; go

23 do the short path; go do the efficient path.

24       The dispute between Google and Oracle on this patent

25 is over this expression "simulating execution."  Because Google

OPENING STATEMENT / JACOBS

1   claims that what they do is something called parse, not

2   simulate.  Parse not simulate.

3          Now, with respect to the grocery list, if you think

4   about it, you actually go through the list as you're simulating

5   the route through the grocery store.  You're looking at the

6   first item and, in a sense, you're parsing the list.  You're

7   thinking eggs over here, milk over here.  And you're kind of

8   doing a parsing as part of the simulation.

9          And that's exactly what is done in Android.  There is

10  something called a parser.  It's in a larger box called a

11  simulator.  And we know that because we looked at the Android

12  code.  And the Android code describes a class which knows how

13  to simulate the effects of executing the bytecode.  And that

14  class is called "Simulator."

15         So Google's expert will get on the stand, and he will

16  say, We parse; we don't simulate.

17         And I hope you will remember TX 47.16 or 46.16, which

18  are the exhibits for the source code in question, which the

19  Google developers writing the code describe what they were

20  doing as simulation.  We simulate the effects of executing the

21  bytecode.

22         And then Mr. Bornstein, again, described this

23  function.  And he described it, again, very similar to the way

24  I've just described it to you:  Sometimes you really need just

25  to have a big array of data.  And if you've ever looked at what

1  something like this looks like in a class file, it's not

2  pretty.  And each time you add another element, it adds more

3  elements.

4          He goes on to describe the problem that's created and

5  that needs to be solved.  And he says, We only have to

6  interpret one opcode to do that entire initialization, and

7  that's the third one down, the fill array data.

8          He's talking about the simulate function and what it

9  accomplishes.  And then he says, This is both a speed and space

10 efficiency win.  Measured on our system libraries it saves us

11 something like a 100K.

12         So the code says "simulate."  Bornstein describes the

13 function and effect in ways that line up very closely with the

14 claims of the '520 Patent.

15         Now, we have one additional layer that we need to

16 prove besides the one I described so far.  So what I've

17 described so far is, you look at the claims, you look at their

18 source code, you listen to the experts.  Hopefully, you

19 conclude with us that when they said "simulate," they meant

20 simulate; when they said "symbolic reference," they meant

21 symbolic reference.  We win on infringement; you reject their

22 arguments.

23         The additional layer is that we are suing Google not

24 only for Google's own infringement at Google, but for putting

25 Android on the public website for others to download and then

 1   to use as a set of developer tools and to install on phones.

 2          And so this is called induced infringement or

 3   indirect infringement, because we're holding them liable for

 4   infringement by somebody else.

 5          And there's some additional hurdles that we have to

 6   overcome.  So we have to show that Google knew about the

 7   patents or was, in the words of the law, willfully blind to the

 8   existence of these patents, and that they would be infringing.

 9          And so that's an additional aspect of the case that

10   you'll be hearing in this phase.  This will look a little

11   similar to some of the evidence you saw in Phase One.  Let me

12   walk through it with you, briefly.

13          There is a book that Mr. Lindholm -- who you may

14   recall from Phase One -- published.  And in that book he

15   described the '685 Patent, which you'll see on your '104 Patent

16   is that first version of the '104 Patent.  And then some years

17   later he goes to Google and is advising on licensing.

18          So we have Mr. Lindholm tied directly to the

19   predecessor of the '104 Patent.  And they're the same.  You'll

20   see when you look at the documents they have the exact same

21   specification.  The claims are slightly different.  So

22   Mr. Lindholm was plainly aware, as advising the Android team on

23   licensing from Sun, of the '104 Patent.

24          But then there's e-mail after e-mail.  And, again, I

25   know you've probably saw enough of internal e-mails in Phase

1    One, but we have to meet our burden and so we have to go

2    through these with you and show you them again, and persuade

3    you that Google knew about Sun's patents, and they deliberately

4    closed their eyes and didn't investigate, even as they were

5    cloning Java.

6          So TX 155 is an e-mail from Andy Rubin, reminding

7    colleagues that they maybe have solved some of the problems,

8    but Sun has patents.  And, indeed, Sun had many patents.

9          And so I asked Mr. Rubin at his deposition:  When you

10   wrote "they still have patents and trademarks" what was in your

11   mind about what patents Sun had?

12         And he said:  Look, I assume they are running a

13   business, they are inventing intellectual property, they are

14   protecting it through the patent system.  Through GPL, I didn't

15   know what they were, but I knew it was dangerous to use the

16   stuff without knowing exactly what it was.

17         So he knew that Sun had patents.  And he knew that it

18   could be dangerous if you didn't know exactly what it was.

19         In 2007, Rubin writes to Bob Lee:  We negotiated nine

20   months with Sun, and decided to walk away after they threatened

21   to sue us over patent violations.

22         So, again, 2007, Google was aware that Sun has

23   patents and that Sun could assert them against Google, and that

24   Google was running a lot of risk by not looking into those

25   patents, studying them, and figuring out how to avoid

1    infringement.

2          You'll recall this e-mail from Phase One.  This is an

3    e-mail, TX 326, in which one of the Google executives writes

4    that it would be good for Google to buy Java from Sun because

5    the Java lawsuits go away.  And he's talking there about

6    patents.  In Phase One we showed you this and highlighted the

7    copyrights.

8          So what did Google do?  Did Google look at the Sun

9    patents and figure out how to avoid infringement?  Did Google

10   study the Sun Java-related patents, saying to itself, you know

11   what, we're getting pretty close to Java; yeah, we're creating

12   Dalvik and we're fragmenting, so it's a little different, but,

13   there's still some risk here?  And did they study those

14   patents?

15         The only evidence you will hear in this trial is that

16   Google did nothing to study and examine the Sun patents in

17   order to try to avoid infringing them.

18         And so Mr. Rubin -- I asked him this question:  Did

19   Google ever investigate Sun's, later Oracle Americas', patent

20   portfolio as it might relate to Android?

21         And he said, Yeah, the parts of Google that I manage

22   and I operate -- he's in charge of Android -- there was no

23   instruction to go investigate the breadth of Sun's patent

24   portfolio.

25         So Google puts Android out there.  It's on a public

1  website for download by the world.  They also enter into

2  contracts -- you'll be seeing those -- with various phone

3  makers, with the idea that people like Samsung, Motorola, LG,

4  these phone companies will install Android.

5          And Google is going to argue with you, well, we don't

6  know what they do.  Maybe they modify the code.  We don't know.

7  We just put it out there for free, for other people to use.

8          And we're going to present a lot of evidence that

9  that is just not simply so; although, it strikes one that if

10 you put something out there for people to use, it's reasonable

11 to expect that people will use it in the way that you put it

12 out there.

13         But we know that there are a lot of activations of

14 Android.  From Phase One you saw 750,000 a day now.  That

15 Google knows about those activations.  They know that it's an

16 Android phone.

17         And you know how important it was, what kind of

18 interest Google had in getting out there quickly so that

19 Android could proliferate in the market and so that they could

20 get 750,000 activations per day.

21         You heard a lot in Phase One about clean rooms.  You

22 recall I said at the outset, the basic question on infringement

23 you look at the claims, you look at the -- look at Android.

24 You'll see that the claims are in Android.  If so we win.

25         No clean room issue here.  It's a matter of law.

```
1    And, of course, Mr. Rubin knows this.  So I asked him whether a

2    clean room has any bearing at all on patent infringement.

3    You're going to hear from Google that they independently

4    developed Dalvik, and it's all so different so there's no

5    reason to think we infringed.

6          Independent development is not a defense to patent

7    infringement.  If the claims match what the defendant does,

8    then the defendant infringes.  And Mr. Rubin acknowledged a

9    clean room approach doesn't protect against patents.

10         So unlike Phase One, where we had to tackle a lot of

11   Google's -- what we said were Google's excuses, in which there

12   was a disagreement about one of those excuses among you, in

13   Phase Two their excuses -- there just isn't a list of excuses

14   like we had to tackle in Phase One.

15         You look at the claims.  You look at Android.  You

16   look at the -- Android, you'll see symbolic references.  You'll

17   see simulation right in the source code.  And that will answer

18   the questions that are presented to you about whether Google

19   infringes.

20         There is no fair use defense to patent infringement.

21         The truth is in their own materials.  What they said

22   when they were writing the code is what should guide the jury

23   in its decision-making.

24         And, once again, we are where we were at the

25   beginning of the end of Phase One.  They're doing all of this
```

```
 1   without a license.  They knew they needed a license.  They know

 2   to this very day they need a license.  And we're asking you for

 3   help in holding them accountable.

 4            Thank you very much.

 5            THE COURT:  All right.  Thank you, Mr. Jacobs.

 6            I think we will not require the other side to start

 7   now because it's only 15 minutes until 1:00, and it will be

 8   best, I think, to start fresh in morning.

 9            MR. VAN NEST:  I think that would be a lot better,

10   Your Honor.  Thank you.

11            THE COURT:  That's what we'll do then.  We'll give

12   you the rest of the day off a little early today.  Please

13   remember to be on time tomorrow.  We thank you for your

14   continued diligence in paying such close attention.  See you

15   here in the morning.  Remember the admonition.

16            THE CLERK:  All rise.

17            (Jury out at 12:48 p.m.)

18            THE COURT:  Be seated, please.  Any issues for the

19   Court?

20            MR. JACOBS:  None from us, Your Honor.

21            MR. VAN NEST:  I don't believe so, Your Honor.

22            THE COURT:  All right.  So we'll resume at 7:30 in

23   the morning.  Have a good day.

24            MR. VAN NEST:  Thank you.

25
```

```
1              (At 12:48 p.m. the proceedings were adjourned until

2         Tuesday, May 8, 2012, at 7:30 a.m.)

3                         - - - - -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

|                                        | Page | Vol. |
|----------------------------------------|------|------|
| Opening Argument by Mr. Jacobs         | 2901 | 17   |

—   —   —

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 32 | | | 2859 | 17 |
| 46.16 | | | 2859 | 17 |
| 46.17 | | | 2859 | 17 |
| 46.18 | | | 2859 | 17 |
| 46.19 | | | 2859 | 17 |
| 46.102 | | | 2859 | 17 |
| 46.103 | | | 2859 | 17 |
| 46.104 | | | 2859 | 17 |
| 46.1 | | | 2860 | 17 |
| 46.2 | | | 2860 | 17 |
| 46.3 | | | 2860 | 17 |
| 46.4 | | | 2860 | 17 |
| 46.5 | | | 2860 | 17 |
| 46.6 | | | 2860 | 17 |
| 46.7 | | | 2860 | 17 |
| 46.8 | | | 2860 | 17 |
| 46.9 | | | 2860 | 17 |
| 46.11 | | | 2860 | 17 |
| 46.12 | | | 2860 | 17 |
| 46.13 | | | 2860 | 17 |
| 46.14 | | | 2860 | 17 |
| 46.15 | | | 2860 | 17 |
| 46.29 | | | 2860 | 17 |
| 47.16 | | | 2859 | 17 |
| 47.17 | | | 2859 | 17 |
| 47.18 | | | 2859 | 17 |
| 47.19 | | | 2859 | 17 |
| 47.20 | | | 2859 | 17 |
| 47.1 | | | 2860 | 17 |
| 47.2 | | | 2860 | 17 |
| 47.3 | | | 2860 | 17 |
| 47.4 | | | 2860 | 17 |
| 47.5 | | | 2860 | 17 |
| 47.6 | | | 2860 | 17 |
| 47.7 | | | 2860 | 17 |
| 47.8 | | | 2860 | 17 |
| 47.9 | | | 2860 | 17 |
| 47.10 | | | 2860 | 17 |
| 47.11 | | | 2860 | 17 |
| 47.12 | | | 2860 | 17 |

1

## E X H I B I T S

2

3  **TRIAL EXHIBITS**                        **IDEN**   **VOL.**   **EVID**   **VOL.**

| TRIAL EXHIBITS | IDEN | VOL. | EVID | VOL. |
|---|---|---|---|---|
| 47.13 | | | 2860 | 17 |
| 47.15 | | | 2860 | 17 |
| 47.21 | | | 2860 | 17 |
| 47.22 | | | 2860 | 17 |
| 48 | | | 2861 | 17 |
| 57 | | | 2861 | 17 |
| 105 | | | 2861 | 17 |
| 106 | | | 2859 | 17 |
| 107 | | | 2859 | 17 |
| 112 | | | 2861 | 17 |
| 113 | | | 2861 | 17 |
| 225 | | | 2859 | 17 |
| 262 | | | 2859 | 17 |
| 443 | | | 2861 | 17 |
| 458 | | | 2861 | 17 |
| 459 | | | 2861 | 17 |
| 735 | | | 2861 | 17 |
| 736 | | | 2861 | 17 |
| 737 | | | 2861 | 17 |
| 738 | | | 2861 | 17 |
| 739 | | | 2861 | 17 |
| 755 | | | 2861 | 17 |
| 756 | | | 2861 | 17 |
| 757 | | | 2861 | 17 |
| 758 | | | 2861 | 17 |
| 816 | | | 2859 | 17 |
| 835 | | | 2861 | 17 |
| 1095 | | | 2859 | 17 |
| 4011 | | | 2862 | 17 |
| 4013 | | | 2862 | 17 |
| 4015 | | | 2862 | 17 |
| 4018 | | | 2862 | 17 |
| 4021 | | | 2862 | 17 |

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

21

22                              —   —   —

23

24

25

## CERTIFICATE OF REPORTERS

We, KATHERINE POWELL SULLIVAN and DEBRA L. PAS, Official Reporters for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 10-3561 WHA, **Oracle America, Inc., vs. Google, Inc.,** were reported by us, certified shorthand reporters, and were thereafter transcribed under our direction into typewriting; that the foregoing is a full, complete and true record of said proceedings at the time of filing.


_____
/s/ Katherine Powell Sullivan


Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter



_____
/s/ Debra L. Pas

Debra L. Pas, CSR #11916, RMR CRR



Monday, May 7, 2012