KEKER & VAN NEST LLP
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
CHRISTA M. ANDERSON - # 184325
canderson@kvn.com
DANIEL PURCELL - # 191424
dpurcell@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:     415 397 7188

KING & SPALDING LLP
DONALD F. ZIMMER, JR. - #112279
fzimmer@kslaw.com
CHERYL A. SABNIS - #224323
csabnis@kslaw.com
101 Second Street, Suite 2300
San Francisco, CA 94105
Tel:  415.318.1200
Fax: 415.318.1300

KING & SPALDING  LLP
SCOTT T. WEINGAERTNER
(*Pro Hac Vice*)
sweingaertner@kslaw.com
ROBERT F. PERRY
rperry@kslaw.com
BRUCE W. BABER (Pro Hac Vice)
1185 Avenue of the Americas
New York, NY 10036
Tel:  212.556.2100
Fax: 212.556.2222

IAN C. BALLON - #141819
ballon@gtlaw.com
HEATHER MEEKER - #172148
meekerh@gtlaw.com
GREENBERG TRAURIG, LLP
1900 University Avenue
East Palo Alto, CA  94303
Tel: 650.328.8500
Fax: 650.328.8508

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE INC.,<br><br>Defendant. | Case No. 3:10-cv-03561 WHA<br><br>**BRIEF IN SUPPORT OF GOOGLE'S MOTION FOR JUDGMENT AS A MATTER OF LAW ON COUNTS V AND VII OF ORACLE'S AMENDED COMPLAINT**<br><br>Dept.:       Courtroom 8, 19th Floor<br>Judge:      Hon. William Alsup |

## I. INTRODUCTION

In accordance with Rule 50 of the Federal Rules of Civil Procedure, as previously set forth in open court on May 10, 2012 (RT 3707-3709), and as outlined on May 15, 2012 (Dkt. 1151) Google hereby files this brief in support of Google's motion for judgment as a matter of law on Counts V and VII of Oracle's Amended Complaint.

## II. LEGAL STANDARDS

Judgment as a matter of law is proper when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). Rule 50 "allows the trial court to remove . . . issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result." *Weisgram v. Marley Co.,* 528 U.S. 440, 448 (2000) (internal quotations omitted). The standard for granting judgment as a matter of law, in practice, mirrors the standard for granting summary judgment, and "the inquiry under each is the same." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986).

## III. AS TO COUNT V OF ORACLE'S AMENDED COMPLAINT: GOOGLE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

To prove patent infringement, Oracle must show that Android devices meet "each and every" element of the asserted claims. *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1378 (Fed. Cir. 2011). Oracle presented two theories of infringement based on (1) the Resolve.c code in the Dalvik virtual machine and (2) the dexopt tool. Oracle has not carried its burden to show that either of these Android features meets each and every element of any of the asserted claims. Google is therefore entitled to judgment as a matter of law that it has not infringed the '104 patent.

### A. Because Dalvik bytecode instructions do not contain symbolic references, Google is entitled to judgment as a matter of law that it does not infringe any of the asserted claims of the '104 patent.

There is no evidence that either Resolve.c or the dexopt tool operate on "instructions containing one or more symbolic references," as required by asserted Claims 11, 27, 29, 39, 40,

and 41 of the '104 patent. The Court has construed the term "symbolic reference" to mean

> a reference that identifies data by a name other than the numeric memory location of the data, and that is resolved dynamically rather than statically

[Dkt. No. 137 at 22.] As Dr. Mitchell conceded, this construction makes a distinction between using names to represent data (i.e., symbolic references) and using numeric memory locations. [RT 3480:12-15 (Mitchell).] There is no limitation regarding the type of data being referenced.

It is undisputed, that each of the asserted claims of the '104 patent requires that there be a symbolic reference in the instructions themselves. Even Dr. Mitchell, Oracle's expert admits this. [RT 3477:6-12 ("Q. Because every claim that you've analyzed requires that the symbolic reference be in the instructions, right? A. The wording varies across the claims. Q. But, essentially, either contained in or in each one of the limitations requires that there be a symbolic reference in the instructions themselves, right? A. Yes."); RT 3487:13-16 ("But you would agree with me that whether you're talking about Resolve.c or dexopt, you've got to find a symbolic reference in the instructions? A. Yes.").] The requirement is also clear from the plain language of the claims. *See* TX 4015 at col. 13 (claim 11 reciting "instructions containing one or more symbolic references"), at col. 14 (claims 27 and 29 reciting "symbolic data references in the set of original instructions"), at col. 15 (claims 39-41 reciting "instruction contains a symbolic field reference."). Thus, to prove infringement, Oracle bore the burden of showing that Resolve.c and the dexopt tool operate on instructions that contain "a reference that identifies data by a name other than the numeric memory location of the data."

Because Dalvik bytecode instructions—the instructions evaluated by both Resolve.c and the dexopt tool—contain references to numeric memory locations of data, they cannot satisfy all of the limitations of the asserted claims. Dalvik bytecode instructions consist of an opcode and operand. [TX 737 ("Each instruction starts with the named opcode and is optionally followed by one or more arguments."); RT 3590:23-3591:25 (Bornstein); RT 3844:14-3855:12, 3925:4-18 (August).] In Android, the accused operands are indexes that take the form "field@CCCC" and reference locations in tables. [*See* TX 46.106; TX 735 ("There are separately enumerated and indexed constant pools for references to strings, types, fields, and methods."); TX 737; RT

3732:15-19, 3736:16-23, 3755:8-9, 3765:9-12 (McFadden); 3858:5-12, 3858:21-359:11, 3918:13-23, 3923:20-24, 3925:19-3926-9 (August).]   Dr. Mitchell agrees.  [RT 3488:6-8, 3488:19-23, 3489:10-12 (Dr. Mitchell) (the "classIdx" index in Dalvik instructions provides information "to a location in another table"); RT 3496:12-3497:6 (Dr. Mitchell) (the "field Idx" in Dalvik instructions is "an index to a specific location in the field table").]  Applying the Court's claim construction, these indexes do not qualify as symbolic references.

As Dr. Mitchell confirmed via testimony, his report refers to indexes as numeric rather than symbolic references.  [RT 3490:7-10, 3528:9-22, 3529:1-10, 4037:9-4038:3, 4038:10-4039:11, 4039:14-4040:9 (Mitchell).]  This is not surprising in light of the fact that indexes point to locations in tables.  To try to circumvent his prior statements, Dr. Mitchell has conjured up a re-interpretation of the term "symbolic reference" that does not conform with the Court's construction.  Specifically, Dr. Mitchell bases his opinion on a meta claim construction argument about what "data" means in the context of the Court's construction:

> As far as I can tell, the only contested issue here is whether the field indexes and instructions are symbolic references or not. *And that in the end just seems to turn on what we mean by data*, according to the last bit of testimony from Professor August.

[RT 4019:3-7 (Mitchell) (emphasis added).]  Dr. Mitchell explains that his opinion is based on the theory that "data" in the Court's construction is something much more restrictive than what the ordinary meaning of the word "data" implies.  According to Dr. Mitchell, the "data" must be the actual field data in the instance object, as opposed to any data in the .dex file, including the data in the constant pool tables.  [RT 4025:6-21 (Mitchell) ("So in order for that to happen, we have to find where that actual data is in the object using this symbolic reference. . . .").]  In other words, to turn an index, which is a numeric reference to a location in a table, into a symbolic reference, Dr. Mitchell has re-defined "symbolic reference" to mean "a reference that identifies *the actual field* data *in the instance object* by a name other than the numeric memory location of the *actual field* data *in the instance object*" (emphasis indicating Dr. Mitchell's apparent changes to Court's construction).

Oracle's overly-restrictive, re-definition of the term "data" was again highlighted in

3

closing arguments when Mr. Jacobs argued:

> Now, there was another potential source of confusion which we clarified also through Dr. August and through Professor Mitchell. What's the data that this claim is talking about? Is it talking about what Google wanted to focus on, which is the constant pool information (indicating), or is it talking about the data in the data object, the actual field value, the actual data?
>
> . . .
>
> So the whole goal of this exercise is to obtain meaningful data, the actual data. . . .
>
> . . .
>
> Now, Mr. Van Nest agreed that the distinction between this is at least the distinction between meaningful data and unmeaningful data. We're relying on meaningful data. Google is relying on unmeaningful data.

[RT 4111:5-11, 4200:7-10 (Jacobs).] This simply does not conform to the Court's ruling on claim construction, which simply distinguishes between a reference to data—any data—by a name rather than location. *See* Claim Construction Order (Dkt. No. 137) at 20-22.

Oracle never requested clarification of the meaning of the term "data" during the *Markman* process. It also declined the Court's offer to seek additional claim constructions in December 2011, months after Dr. Mitchell changed his opinion in response to Dr. August's report. [Dkt. Nos. 603, 637.] Most relevant to this motion, neither Dr. Mitchell nor any other evidence offered by Oracle suggested that "data" is a term of art that is understood by those skilled in the art to correspond to or encompass only "actual field data in the instance object." In fact, there is no such suggestion anywhere in the record. Accordingly, no reasonable jury could conclude, based on the evidence and expert testimony, that there is a basis for such a meaning.

As is clear on its face, the Court's construction of "symbolic reference" does not incorporate the restrictive meaning of "data" advanced by Oracle and Dr. Mitchell. *See* Claim Construction Order (Dkt. No. 137) at 20-22. As such, Dr. Mitchell's testimony cannot be credited. [RT 4206:18-21 (Court) ("If a witness has based his view on meanings of the terms contrary to my stated definitions, you should discount that part of his testimony accordingly.").]

Without Dr. Mitchell's testimony, Oracle cannot prove that Dalvik bytecode instructions

contain symbolic references, which each of the asserted claims requires. To the contrary, the wealth of evidence presented at trial confirms that Dalvik bytecode instructions contain only numeric references in the form of indexes to locations in memory where constant pool data is stored in the dex files. [*See* TX 46.106; TX 735 ("There are separately enumerated and indexed constant pools for references to strings, types, fields, and methods."); TX 737; RT 3732:15-19, 3736:16-23, 3755:8-9, 3765:9-12 (McFadden); 3858:5-12, 3858:21-359:11, 3918:13-23, 3923:20-24, 3925:19-3926-9 (August).] Thus, no reasonable jury could conclude that either the Resolve.c code or the dexopt tool in Android infringe the asserted claims of the '104 patent.

**B.  Google is also entitled to judgment as a matter of law that the dexopt functionality does not infringe Claims 27 and 29 of the '104 patent because dexopt resolves symbolic references statically rather than dynamically.**

Android's dexopt functionality performs static—not dynamic—optimizations.[1] The Court's claim construction requires that symbolic references be "resolved dynamically rather than statically." In light of that requirement, there is no dispute that if dexopt performs functions statically, then dexopt doesn't infringe. [RT 3509:16-18 (Mitchell).] Dr. Mitchell's infringement opinion at trial was that dexopt is a dynamic process because it relies on information about the runtime environment and that is available at runtime. [RT 4028:14-25 (Mitchell).] But Dr. Mitchell's conclusory statements do not provide an adequate basis for a reasonable jury to reach a verdict of literal patent infringement. Indeed, there is no evidence to support Dr. Mitchell's opinion that an optimization (e.g., resolution) based on information about a runtime environment is "dynamic" and not "static." To the contrary, there is a wealth of documentary evidence, fact testimony, and expert testimony that directly contradicts Dr. Mitchell's opinion. [RT 3730:16-22 (McFadden); RT 3940:17-20 (August); RT 3595:21-24 (Bornstein); TX 32 at 35, TX 816 at 24:05; TX 735 (defining opcodes that "are reasonable candidates for static linking"); TX 737 (defining "statically linked" instruction formats); TX 739 (dexopt performs optimizations that "can be inferred statically").] Accordingly, no reasonable jury could conclude that the dexopt tool infringes claims 27 and 29 of the '104 patent.

---

[1] Only claims 27 and 29 are asserted against dexopt.

### C. There is no legal basis for the jury to conclude that Android infringes the '104 patent where Oracle only presented a literal infringement theory.

To the extent Oracle now contends that certain claim elements are effectively present in Android under the doctrine of equivalents, Google is entitled to a judgment as a matter of law. First, having failed to disclose such a theory in its Rule 3-1 Patent Disclosures under the Patent Local Rules, Oracle may not now assert an infringement theory under the doctrine of equivalents. Second, even if Oracle were not barred from asserting such a theory, Dr. Mitchell's testimony would not support a conclusion of infringement under the doctrine of equivalents. The record contains no evidence that the accused Dalvik bytecode instructions, which contain symbolic references not in the instructions themselves but in a shared constant pool reached (directly or indirectly) via various tables, are substantially similar to instructions that literally contain symbolic references. *See TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1376-77 (Fed. Cir. 2008) (infringement under doctrine of equivalents may only be found where the accused device contains an "insubstantial" change from the claimed invention or where the accused device functions in substantially the same way as the claimed invention) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 610 (1950)). Here, Dr. Mitchell has testified that strings are stored in the string data table of the dex file. [RT 3290:2-3291:18 (Mitchell).] These strings, which are the names of the fields, classes, methods, and strings used in a program, are not stored in the Dalvik bytecode instructions themselves. The Resolve.c code and the dexopt tool use a series of numeric references (indexes) to eventually obtain a symbolic reference (name) from the string data table, and then resolve that name to find a numeric reference corresponding to that symbolic reference. In contrast, the asserted claims of the '104 patent require resolving a symbolic reference contained *in the instruction*; they do not have to follow a series of numeric references to obtain the symbolic reference (name). The way in which symbolic resolution is performed in Resolve.c and dexopt is advantageous compared to the process disclosed in the '104 patent in that it allows the Dalvik VM to operate with fixed-width instructions, which make processing virtual machine instructions easier. [RT 3592:4-3593:4 (Bornstein), 3263:7-3264:8 (McFadden), 3878:3-3879:9 (August).]

### III. AS TO COUNT VII OF ORACLE'S AMENDED COMPLAINT:  GOOGLE IS ENTITLED TO JUDGMENT OF NON-INFRINGEMENT OF THE '520 PATENT AS A MATTER OF LAW

To prove patent infringement, Oracle must show that the accused functionality meets "each and every" element of an asserted claim.  *Star Scientific*, 655 F.3d at 1378.  Oracle has not carried that burden for either of the asserted claims of the '520 patent.  In particular, Oracle has not shown that the code it accuses of infringement ever simulates execution to identify the static initialization of arrays because, as the undisputed evidence at trial showed, that is not how the dx tool works.  The requirement that identification of the initialization of static arrays be performed through "simulating execution" is found in both asserted claims, Claim 1 and Claim 20.  TX 4011.

The dx tool does not simulate execution in order to identify the static initialization of an array.  Instead of going through the steps required to produce output showing what the static array would look like if the Java byte code instructions were performed, the dx tool uses a ***pattern-matching*** algorithm to determine what the static array would look like when initialized.  The pattern matcher (a method known as parseNewarray found in class bytecodeArray) looks for a repeating sequence of instructions used to initialize static arrays.  [RT 3800:2-3801:3 (Parr).]  Although the pattern matcher code is called by code in the class file Simulator.java, the pattern matcher itself does not simulate *execution* of the bytecode, e.g., by manipulating a stack.  [RT 3802:25-3804:1 (Parr).]  Instead, it returns the operands associated with the appropriate instructions in the pattern.  [RT 3343:3-16 (Mitchell).]  Moreover, the pattern matcher code will not work properly when a useless instruction is injected into the Java bytecode.  As would be expected, the dx tool, when confronted with revised code that breaks the pattern, returns the Dalvik byte code equivalents of the Java byte code that performs the steps required to statically initialize the array rather than an efficient instruction that initializes a static array.  [RT 3808:18-3809:6; 3809:20-3810-3 (Parr).]  A process using simulated execution would simulate the execution of each instruction, including the useless instruction, and the useless instruction would end up having no effect on the eventual result.  [RT 3810:4-13 (Parr).]

To prevail on literal infringement of the '520 patent, Oracle needed to prove that the

7

pattern matching code used in Android literally simulates execution, as required by the asserted claims.  Dr. Mitchell's infringement opinion at trial was that the "simulation" (not "simulating execution") carried out by the parseNewarray method fell within the claims.  [RT 4032:7-22 (Mitchell).]  But a conclusory statement equating pattern matching to simulation (and not even "simulating execution") does not provide an adequate basis for a reasonable jury to reach a verdict of literal patent infringement.

The dx tool source code confirms the absence of any literal correspondence between the "simulating execution" claim limitation and the pattern matching code.  Dr. Mitchell testified that the identification of the static initialization of the array was performed by the parseNewarray code, and agreed that code was distinct from the Simulator.java class.  [RT 3343:3-16; 4061:21-4062:3 (Mitchell).]  Both Mr. Bornstein and Dr. Parr testified that the dx tool includes code that actually performs simulated execution by manipulating a stack; however, the simulated execution is not used for identifying the initialization of arrays.  [RT 3589:11-17; 3589:25-3590:6; 3611:22-3612:10 (Bornstein); RT 3798:2-8; 3798:22-3799:3 (Parr); TX 46.16, 46.17.]  The presence of the word "simulates" in code comments thus do not show that the dx tool simulates execution for purposes of identifying the static initialization of an array; instead, simulated execution in the dx tool is used only *for reasons other than identifying the initialization of static arrays.*  [RT 3611:22-3612:10 (Bornstein); 3798:3-8 (Parr).]  And it is undisputed that the '520 patent does not include *any* mention of simulating execution through the use of pattern matching.  [TX 4011; RT 3521:10-19 (Mitchell).]

Oracle never requested a construction of the phrase "simulating execution" during the *Markman* process, taking the position that it should be construed in accordance with its "plain meaning."  [*See* Dkt. No. 91 (parties' joint claim construction and prehearing statement).]  Oracle did not suggest that simulating execution is a term of art that is understood by those skilled in the art to correspond to or encompass pattern matching.  No reasonable jury could conclude, based on the evidence and expert testimony, that there is a basis for such a construction of simulating execution, nor that there is an understanding in the field of computer science as to either of these terms that supports an assertion that pattern matching is literally simulating execution.  Such a

8
BRIEF IN SUPPORT OF GOOGLE'S MOTION FOR JMOL ON COUNTS V AND VII
Case No. 3:10-cv-03561 WHA

1    construction was never sought by Oracle, even after the Court permitted the parties to seek
2    additional claim constructions earlier this year. [Dkt. Nos. 603, 637.]  Because of Oracle's failure
3    of proof and its inability to construe its claims to cover pattern matching, there is no basis for a
4    finding of literal infringement of the '520 patent by the Android dx tool.  The fact that the
5    Android code actually does perform simulated execution for some functions is irrelevant—the
6    key issue, as proven by the record, is that the dx tool does not simulate execution for *the purpose*
7    of identifying the initialization of static arrays.

8          Oracle's position, as articulated by Dr. Mitchell, depends on an implied theory of
9    equivalent infringement, that "pattern matching" achieves a *result similar to that of simulated*
10   *execution*—i.e., identifying the initialization of a static array without actual execution of the byte
11   code. [RT 4032:11-22 (Mitchell)]  But even assuming, without conceding, that the two different
12   processes provide similar results, that is not a basis for a finding of infringement.  To begin with,
13   Oracle may not assert an infringement theory under the doctrine of equivalents, having failed to
14   disclose such a theory in its Rule 3-1 Patent Disclosures under the Patent Local Rules.  But even if
15   Oracle were not barred from asserting a belated theory of infringement under the doctrine of
16   equivalents, Dr. Mitchell's testimony would not support a conclusion of infringement under the
17   doctrine of equivalents because the recited claim limitation of "simulating execution" does not
18   work in a way substantially similar to the accused pattern matching mechanism.  *See TIP Sys.,*
19   *LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1376-77 (Fed. Cir. 2008) (infringement
20   under doctrine of equivalents may only be found where the accused device contains an
21   "insubstantial" change from the claimed invention or where the accused device functions in
22   substantially the same way as the claimed invention) (citing *Graver Tank & Mfg. Co. v. Linde Air*
23   *Prods. Co.*, 339 U.S. 605, 610 (1950)).  An argument based on a theory of infringement under the
24   doctrine of equivalents, not disclosed at the proper time, is also ripe for judgment as a matter of
25   law.

26         In order to support its literal infringement claims, Oracle needed to link up the accused
27   code with the claimed functionality and, if it could, with the other language it considered helpful.
28   Oracle could not do so.  Unable to prove actual simulated execution, Oracle has tried to

reconstrue "simulating execution" to cover pattern matching with no legal basis to do so. Therefore, no reasonable jury could find that the dx tool infringes the '520 Patent.

## IV.     THE PATENT ACT DOES NOT DEFINE INFRINGEMENT TO INCLUDE MAKING A PRODUCT AVAILABLE FOR FREE.

The evidence shows that Google does not charge a fee for Android source code. [RT 3079:6-13 (Poore).] As such, Google cannot, as a legal matter, infringe under the applicable statutory language.

The Patent Act defines patent infringement to include only certain discrete acts: "Except as otherwise provided in this title, whoever without authority *makes, uses, offers to sell, or sells* any patented invention, within the United States, or *imports* into the United States any patented invention during the term of the patent therefore, infringes the patent." 35 U.S.C. § 271(a) (emphases added). These terms take their well-known, ordinary meanings. *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1319 (Fed. Cir. 2005); *see also Med. Sol'ns, Inc. v. C Change Surgical LLC*, 541 F.3d 1136, 1141 (Fed. Cir. 2008); *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1255 (Fed. Cir. 2000). None of the categories covers the free distribution of source code via the Internet.

Labeling free distribution of a product as a "sale" would turn that term on its head. As the Federal Circuit has held, "[t]he definition of 'sale' is: '1. The transfer of property or title *for a price*.'" *NTP*, 418 F.3d at 1319 (quoting *Black's Law Dictionary* 1337 (7th ed. 1999)) (emphasis added). And one of the "four elements" of a sale is "'*a price* in money paid or promised.'" *NTP*, 418 F.3d at 1319 (quoting *Black's Law Dictionary* 1337 (7th Cir. 1999)) (emphasis added). "Plainly, the common, or usual meaning of the term sale includes those situations in which a contract has been made between two parties who agree to transfer title and possession of specific property *for a price*." *Enercon GmbH v. ITC*, 151 F.3d 1376, 1382 (Fed. Cir. 1998) (emphasis added).

By definition, distribution of a product for *free* does not constitute a transfer for *a price*. Thus, in a case involving patents for collecting and using newborn umbilical cord blood, the Federal Circuit found no "sale" where "[t]he defendants simply transferred the cord blood units to

1  designated transplanters upon direction from the families.  Such a transaction does not constitute
2  a 'sale' to a transplanter under any definition of the term 'sale.'"  *PharmaStem Therapeutics, Inc.*
3  *v. Viacell, Inc.*, 491 F.3d 1342, 1359 (Fed. Cir. 2007).  Similarly, district courts have concluded
4  that distributing free samples does not qualify as a sale within the meaning of section 271(a).  *See*
5  *Cabot Corp. v. WGM Safety Corp.*, 562 F. Supp. 891, 892 (D. Mass. 1983).

6  If free distribution is not a sale, then offering to distribute something for free cannot be an
7  offer for sale.  *See Rotec*, 215 F.3d at 1255; *HollyAnne Corp. v. TFT, Inc.*, 199 F.3d 1304, 1309-
8  10 (Fed. Cir. 1999).  "If, as in this case, the offer included none of the hallmarks of a potential
9  commercial transaction (i.e., a quotation of a price and a product description, or a communication
10 that the item was available for purchase by the intended donee), it cannot be considered an offer
11 for sale."  *HollyAnne*, 199 F.3d at 1310.  Applied to the facts of this case, Google does not "offer"
12 Android for sale.  Rather, it places the Android source code on a website from which others can
13 download it free of charge.

14 Oracle has also argued that Google "uses" Android within the meaning of the statute when
15 it makes Android available for free download.  That requires a strained reading of the term.  "The
16 ordinary meaning of 'use' is 'to put into action or service.'"  *Med. Sol'ns, Inc. v. C Change*
17 *Surgical LLC*, 541 F.3d 1136, 1141 (Fed. Cir. 2008) (quoting *NTP*, 418 F.3d at 1317).  The
18 Federal Circuit has held that displaying a product and distributing brochures were not "uses"
19 because neither act put the product into service.  *See Med. Sol'ns*, 541 F.3d at 1141 ("Much more
20 would be needed to qualify as an infringing use, including that the device was used to heat
21 medical items at the show.").  And other courts have held that "using a device means using it *to*
22 *perform its actual function or service*, not using it as a demonstrative display."  *Id.* at 1141 n.4
23 (citing *Union Asbestos & Rubber Co. v. Evans Prods. Co.*, 328 F.2d 949, 951 (7th Cir. 1964);
24 *Advanced Semiconductor Materials Am., Inc. v. Applied Materials, Inc.*, No. 93-20853, 1995 WL
25 419747, at *6 (N.D. Cal. July 10, 1995)) (emphasis added).  Simply making source code available
26 on a website—whether for a price or for free—does not, under that definition, put the product into
27 service.  While stored on a network server and available via a website, the Android source code
28 does not "perform its actual function or service."  *Id.*  To do that, it must first be downloaded and

compiled by a developer.  To adopt Oracle's contrary position would make the term "use" so broad that it would render the other statutory terms superfluous.

In short, there is no evidence that Google performs any infringing acts.  Judgment as a matter of law is therefore appropriate.

## V.   THE '104 PATENT IS INVALID FOR  LATE BROADENING OF REISSUE CLAIMS UNDER 35 U.S.C. § 251.

The '104 patent is invalid for failure to comply with 35 U.S.C. § 251, which requires broadening reissue applications to be filed within two years of the date the original patent issued. There is no dispute that the claims of the '104 patent are broader than the claims of the patent from which it reissued, U.S. Patent No. 5,367,685 ("the '685 patent").  *See* TX 4015 (reflecting that reissued claims 11-41 are not limited to a hybrid-compiler-interpreter, unlike original claims 1-10, which require a compiler).  Nor is there any dispute that the '104 patent resulted from a continuing application that was filed more than two years after the '685 patent issued.  *See id.* at [22], [64] (reflecting Mar. 3, 1999 as filing date of '104 patent application, and Nov. 22, 1994 as issue date of '685 patent).  The patent statute requires that broadening reissue applications be filed within two years of issuance of the original patent.  35 U.S.C. § 251.  Although the U.S. Court of Appeals for the Federal Circuit has recently concluded that broadening claims filed more than two years after the issue date of the original patent may be valid if the reissue matures out of a continuation of a timely-filed broadening application, *In re Staats*, 671 F.3d 1350, 1356 (Fed. Cir. 2012), the Court essentially invited a petition for rehearing en banc.  *Id.* at 1356.  Google believes that the case will be reheard and the decision will be reversed, requiring the invalidation of the claims of the '104 patent under the plain terms of the statute.  Google therefore moves for judgment as a matter of law to preserve this issue for appeal.

Notably, while the claims of the '104 patent are narrower than those of the '685 patent because they all include the limitation that symbolic references be contained in the instructions, the claims of the '104 patent are also broader in that they eliminate the requirement of generating executable code and compilation means.  *See* TX 4015.  Thus, though narrower in one respect, the claims of the '104 patent have nevertheless been broadened for purposes of 35 U.S.C. § 251.

> A claim of a reissue application is broader in scope than the original claims if it contains within its scope any conceivable apparatus or process which would not have infringed the original patent. A reissue claim that is broader in any respect is considered to be broader than the original claims ***even though it may be narrower in other respects***.

*See Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033, 1037 n.2 (Fed. Cir. 1987) (emphasis added).

For these reasons, Google is entitled to judgment as a matter of law that the claims of the '104 patent are invalid.

### VI. AS TO COUNTS V AND VII, GOOGLE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW OF NO WILLFUL INFRINGEMENT

It is undisputed that Google did not receive actual notice of the '104 patent or the '520 patent—a prerequisite for a finding of willful infringement—until July 20, 2010, only twenty-three days before this lawsuit was filed on August 12, 2010.  RT 3100:10-3101:2.  *See In re Seagate Technology, LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007); *see also Gustafson, Inc. v. Intersystems Industrial Prods., Inc.*, 897 F.2d 508, 511 (Fed. Cir. 1990) ("[A] party cannot be found to have 'willfully' infringed a patent of which the party had no knowledge.").

To establish willful infringement, Oracle must first show by clear and convincing evidence that Google acted "despite an objectively high likelihood that its actions constituted infringement of a valid patent."  *Seagate*, 497 F.3d at 1371.  Three weeks of total pre-suit exposure to and awareness of each of the original seven patents-in-suit is *per se* insufficient to support a finding of objective recklessness as required under *Seagate*.  *See Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1339 (Fed. Cir. 2008) (finding no willful infringement even where accused infringer did not obtain opinion of counsel until *over one year* after it received a notice letter from patentee); *see also Gustafson*, 897 F.2d at 511 ("Nor is there a universal rule that to avoid willfulness one must cease manufacture of a product immediately upon learning of a patent, or upon receipt of a patentee's charge of infringement, or upon the filing of suit."). Objective recklessness cannot be established by any action taken by, or inaction by, Google during the three weeks following notice of seven complex patents.[2]  Following actual notice of

---

[2] As ordered by the Court on May 14, 2012, Oracle may not rely on any post-filing activity to prove willful patent infringement by Google:

13
BRIEF IN SUPPORT OF GOOGLE'S MOTION FOR JMOL ON COUNTS V AND VII
Case No. 3:10-cv-03561 WHA

1   the patents-in-suit, Google promptly studied the patents, investigated the merits of Oracle's patent

2   infringement allegations and developed sound legal defenses to those allegations.  *See, e.g.,*

3   Answer to Plaintiff's Complaint (Dkt. No. 32); *see also Gustafson*, 897 F.2d at 511 ("Exercising

4   due care, a party may continue to manufacture and may present what in good faith it believes to

5   be a legitimate defense without risk of being found on that basis alone a willful infringer.  That

6   such a defense proves unsuccessful does not establish that infringement was willful.") (citation

7   omitted).

8          No evidence at trial suggested that Google received actual notice of the '104 patent or the

9   '520 patent at any point in time prior to July 20, 2010.  [*See, e.g.,* RT 3771:20-:25 (Gupta Dep.

10  Tr. (July 26, 2011) 133:2-:15, 239:9-:20) (explaining that Java-related patents never came up

11  during the partnership negotiations between Google and Sun).]  Oracle attempts to base Google's

12  actual notice on a book co-authored by Tim Lindholm in 1997, which refers to U.S. Patent No.

13  5,367,685 ("the '685 patent"), the original patent that eventually reissued as the '104 patent.  TX

14  25, TX 4015.  This book alone is insufficient to establish that Google had actual notice of the

15  '104 patent prior to July 20, 2010.  First, the reference to the '685 patent in the book predates Mr.

16  Lindholm's arrival at Google in 2005 by eight years [RT 3033:5-6] and his August 6, 2010 email

17  to Andy Rubin and Ben Lee regarding a Java license by thirteen years.  [TX 10.]  Since joining

18  Google, he has had no technical involvement with Android or Java.  [RT 3033:5-3035:1.]

19  Second, Mr. Lindholm testified that he was personally unfamiliar with the '685 patent and did not

20  recall who included it in the book.  [RT 3022:17-3023:13.]  Indeed, in the second version of the

21  book, published in 1999, the entire chapter referring to the '685 patent was removed.  [TX 987.]

22  Third, even if Mr. Lindholm had actual notice of the '685 patent, such notice is insufficient

---

> Here is the answer.  This is going to be a mess if we get into post complaint.  So no post complaint.  Period.  We're going to go with the ordinary rule under *Seagate* and we will craft a sentence in the jury instruction that tells them not to speculate about events that occurred after the filing of the complaint and that the period for proving willfulness is up to the date of the complaint. . . .  So the ruling is going to be, we measure things up to the date of the filing of the complaint.

[RT 3902:15-3903:17 (Court).]

1  grounds to infer that he also had actual notice of a subsequent reissue patent.  *See Anascape, Ltd.*
2  *V. Microsoft Corp.*, Civil Action No. 9:06-CV-158, 2008 WL 7182476, *2-3 (E.D. Tex. Apr. 25,
3  2008) (finding pre-suit notice of parent patents to the patent-in-suit insufficient to establish actual
4  notice of the patent-in-suit and therefore insufficient as a matter of law to establish willful
5  infringement).  Finally, as described in section V above, the claims of the '104 patent are very
6  different from the claims of the '685 patent—being both broader and narrower in scope.

7  Furthermore, even assuming Google had some general awareness that Sun had a patent
8  portfolio, general knowledge of a patent portfolio is insufficient to support a finding of that
9  Google acted in an objectively reckless manner specifically with respect to the patents-in-suit in
10 the years leading up to this lawsuit.  This is particularly true in light of the fact that Oracle, and its
11 predecessor Sun Microsystems, actively encouraged and promoted Google's development and
12 release of the Android platform.  [*See, e.g.,* TX 2352 (Sun CEO Jonathan Schwartz's official
13 corporate blog post, dated Nov. 5, 2007, stating, "I just want to add my voice to the chorus of
14 others from Sun in offering my heartfelt congratulations to Google on the announcement of their
15 new Java/Linux phone platform, Android.  Congratulations! . . . Google and the Open Handset
16 Alliance just strapped another set of rockets to the community's momentum . . . . With friends
17 like Google and Red Hat, it sure seems like the momentum behind Java's on the rise…");[3] TX
18 2939 (Larry Ellison's public statement at JavaOne 2009, "We're flattered by Android.  We're
19 flattered.  Android is very exciting.  Everyone should be flattered.  I think we can see lots of Java
20 devices.  Some coming from our friends at Google."); TX 3103 (Eric Klein's public
21 demonstration of Java FX running on Android at JavaOne 2008).]  In light of these public
22 statements, it is unsurprising—and entirely reasonable—for Google to have believed that it had
23 no reason to investigate the thousands of patents in Sun's portfolio.[4]  [*See, e.g.,* RT 1538:24-
24 1539:15 (Schmidt) ("Sun management was comfortable that we had done -- that what we had

---

[3] The record demonstrates that Mr. Schwartz's blog reflected the official corporate opinions of Sun Microsystems rather than merely his own personal views.  *See* TX 971 (referring to "CEO blogs" as a source of Sun's "notifications" of its "material news" in its 2008 Form 10-K annual report to the SEC).

[4] Oracle's Chief Corporate Architect, Edward Screven, testified that Sun had thousands of patents related to Java.  RT 549:12-:14 (Screven).

15
BRIEF IN SUPPORT OF GOOGLE'S MOTION FOR JMOL ON COUNTS V AND VII
Case No. 3:10-cv-03561 WHA

1   done was free and clear of any intellectual property of Sun's."); TX 1128 (Rubin Dep. Tr. (July
2   27, 2011) 14:10-:12, 14:14-15:07, 15:09-:13) (explaining that it was "not feasible to look at all
3   the patents out there in the patent system").]  In the face of such overwhelming evidence of public
4   support by Oracle and Sun—and the *lack* of any evidence of actual notice of the specific patents
5   at issue prior to July 20, 2010—no reasonable jury could find that Google acted in an objectively
6   reckless manner.
7       Moreover, following the July 20, 2010 notice of the patents-in-suit and the filing of Oracle
8   complaint, Google developed a series of legitimate defenses to Oracle's patent infringement
9   allegations following its analysis of the patents-in-suit.  [*See, e.g.,* Answer to Plaintiff's
10  Complaint Dkt. No. 32 (asserting legal defenses of non-infringement, invalidity, unenforceability,
11  etc.).]  Nothing in the record suggests that Google's defenses were made frivolously or in bad
12  faith.  Google's good faith assertion of legitimate defenses to Oracle's allegations of patent
13  infringement cannot by itself serve as a basis for finding Google a willful infringer.  *Gustafson*,
14  897 F.2d at 511; *see also Advanced Fiber Technologies (AFT) Trust v. J&L Fiber Services, Inc.*,
15  674 F.3d 1365, 1377 (Fed. Cir. 2012) (affirming summary judgment of no willful infringement
16  based in part on defendant's presentation of "compelling non-infringement and invalidity
17  arguments"); *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319
18  (Fed. Cir. 2010) (The objective prong "tends not to be met where an accused infringer relies on a
19  reasonable defense to a charge of infringement.").
20      Finally, where the threshold objective prong of *Seagate* is met, "the patentee must also
21  demonstrate that this objectively-defined risk (determined by the record developed in the
22  infringement proceeding) was either known or so obvious that it should have been known to the
23  accused infringer." *Seagate*, 497 F.3d at 1371.  Because Oracle failed to carry its burden of proof
24  by clear and convincing evidence that the objective prong has been met based on the record, there
25  can be no finding of willfulness and the Court need not consider the subjective prong.  *See*
26  *Accentra Inc. v. Staples, Inc.*, Case No. CV 07-5862 ABC (RZx), 2011 WL 7563039, *23 (C.D.
27  Cal. Dec. 19, 2011) (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1311 (Fed. Cir.
28  2011); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1337 (Fed. Cir.

2009)).  In any event, even if Oracle had been able to meet the clear and convincing standard required by the first, objective prong, Oracle failed to introduce any evidence sufficient to meet the requirements of the second, subjective prong.

For the foregoing reasons, Google is entitled to judgment as a matter of law that Oracle has not proven that Google willfully infringed the '104 Patent or the '520 Patent.

*   *   *

Google's Rule 50 motion is based on Google's Motion (Dkt. 1151), Google's May 10, 2012 oral motion for judgment as a matter of law [RT 3707-09], this brief in support and the evidence and authorities cited therein, the entire trial record, and such argument as the Court allows on this Motion.

Dated:  May 16, 2012                                         KEKER & VAN NEST LLP

                                                        By:  /s/ Robert A. Van Nest
                                                             ROBERT A. VAN NEST

                                                             Attorneys for Defendant
                                                             GOOGLE INC.

**ATTESTATION**

I, Bruce W. Baber, am the ECF User whose ID and password are being used to file this Google's Brief In Support Of Motion For Judgment As A Matter Of Law On Counts V And VII of Oracle's Amended Complaint.  In compliance with General Order 45, X.B., I hereby attest that Robert A. Van Nest has concurred in this filing.

Date:  May 16, 2012                         /s/ Bruce W. Baber
                                            BRUCE W. BABER