KEKER & VAN NEST LLP
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
CHRISTA M. ANDERSON - # 184325
canderson@kvn.com
DANIEL PURCELL - # 191424
dpurcell@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

KING & SPALDING  LLP
SCOTT T. WEINGAERTNER
(*Pro Hac Vice*)
sweingaertner@kslaw.com
ROBERT F. PERRY
rperry@kslaw.com
BRUCE W. BABER (Pro Hac Vice)
1185 Avenue of the Americas
New York, NY 10036
Tel: 212.556.2100
Fax: 212.556.2222

KING & SPALDING LLP
DONALD F. ZIMMER, JR. - #112279
fzimmer@kslaw.com
CHERYL A. SABNIS - #224323
csabnis@kslaw.com
101 Second Street, Suite 2300
San Francisco, CA  94105
Tel:  415.318.1200
Fax: 415.318.1300

IAN C. BALLON - #141819
ballon@gtlaw.com
HEATHER MEEKER - #172148
meekerh@gtlaw.com
GREENBERG TRAURIG, LLP
1900 University Avenue
East Palo Alto, CA  94303
Tel: 650.328.8500
Fax: 650.328.8508

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE INC.,<br><br>Defendant. | Case No. 3:10-cv-03561 WHA<br><br>**GOOGLE INC.'S OPPOSITION TO ORACLE AMERICA, INC.'S RULE 50(A) MOTION AT THE CLOSE OF ALL EVIDENCE FOR PHASE II**<br><br>Dept.:     Courtroom 8, 19th Floor<br>Judge:     Hon. William Alsup |

# TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................................1

II.     A REASONABLE JURY COULD *ONLY* FIND THAT GOOGLE DID NOT
        INFRINGE THE ASSERTED CLAIMS OF THE 104 PATENT.....................................2

        ......................................................................................................2

        A.      Dalvik bytecode instructions only contain indexes, which are not
                "symbolic references" because they refer to numeric memory locations................2

                1.      Field indexes are not symbolic references. ..................................3

                2.      The Court's claim construction applies to data in the constant pool
                        tables as well as the actual field data in an instance object. .......................5

                3.      Indexes are not symbolic references because they are not resolved. ...........8

        B.      Dexopt does not infringe the '104 patent...................................................9

        C.      The Court should reject Oracle's post-trial attempt to re-construe the term
                "symbolic reference." .........................................................................10

III.    A REASONABLE JURY COULD ONLY FIND THAT GOOGLE DOES NOT
        INFRINGE THE ASSERTED CLAIMS OF THE '520 PATENT. ................................11

        A.      The jury is entitled to credit Professor Parr's testimony explaining why
                pattern matching differs from simulating execution ...............................12

        B.      Simulating execution, properly understood, involves the simulation of
                actual Java virtual machine operations. ...............................................13

IV.     ORACLE'S PATENT INFRINGEMENT CLAIMS ARE BARRED BY
        GOOGLE'S EQUITABLE DEFENSES. ...................................................................14

        A.      Oracle's "additional facts" are contradicted by the evidence ...............................15

        B.      Oracle's patent infringement claims are barred by equitable estoppel. ................16

        C.      Oracle's patent infringement claims are barred by laches. ...............................16

        D.      Oracle's patent infringement claims are barred by waiver. ................................17

        E.      Oracle's patent infringement claims are barred by implied license......................18

V.      GOOGLE CHOSE NOT TO PRESENT ITS DEFENSES OF PATENT MISUSE,
        USE BY THE UNITED STATES, UNCLEAN HANDS, AND EXPRESS
        LICENSE, AND THEREFORE DOES NOT OPPOSE ORACLE'S MOTION ON
        THESE DEFENSES. ..............................................................................................18

VI.     CONCLUSION..........................................................................................................19

666096.01

**TABLE OF AUTHORITIES**

<u>Federal Cases</u>

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*
  960 F.2d 1020 (Fed. Cir. 1992)................................................................. 15, 16

*De Forest Radio Tel. Co. v. United States*
  273 U.S. 236 (1927)................................................................................. 17

*Eon-Net LP v. Flagstar Bancorp*
  653 F.3d 1314 (Fed. Cir. 2011)............................................................... 13

*In re Katz Interactive Call Processing Patent Litigation*
  712 F. Supp. 2d 1080 (C.D. Cal. 2010) ................................................... 16

*Lucent Technologies, Inc. v. Gateway, Inc.*
  580 F. Supp. 2d 1016 (S.D. Cal. 2008) *aff'd in part, vacated in part, remanded,*
  580 F.3d 1301 (Fed. Cir. 2009).............................................................. 16

*McCoy v. Mitsuboshi Cutlery, Inc.*
  67 F.3d 917 (Fed. Cir. 1995)................................................................... 18

*Wang Laboratories, Inc. v. Mitsubishi Electronics Am., Inc.*
  103 F.3d 1571 (Fed. Cir. 1997)............................................................... 17

666096.01

## I.     Introduction

The Court should deny Oracle's motion for judgment as a matter of law.  Under the Court's claim construction, no reasonable jury could find that Android infringes Claims 11, 27, 29, 39, 40, and 41 of U.S. Patent No. RE38,104 (the '104 patent).  The construction of "symbolic references" does not, as Oracle suggests, limit the term "data" to "the actual field data in an instance object."  Moreover, the terms "dynamically" and "statically" do not take on the tortured meanings Oracle now ascribes to them in yet another attempt to modify the Court's claim construction.

Likewise, Oracle's request for judgment as a matter of law that Google infringes the '520 patent is based on no more than the view of Oracle's counsel as to its desired claim construction for the term "simulating execution."  Yet neither Oracle's own expert, nor even Oracle itself in its brief, focuses on the actual claim language at issue.  Oracle is also incorrect that the disputed claim language necessarily encompasses pattern matching.  As Google explained at trial, a pattern matcher will produce outcomes different than what results from simulating execution, and Google's dx tool proves the point, as it does not return identical results when it is applied to bytecode that would be indistinguishable for purposes of simulating execution.  As explained in Google's own motion for judgment as a matter of law, Oracle's current theory is in essence a belated doctrine of equivalents argument.  It should be rejected.

Oracle's motion as to Google's equitable defenses also fails.  The evidence at trial established that Sun publicly and privately applauded Android for years.  From the time of Mr. Schwartz's blog post in 2007 through Mr. Ellison's efforts to form an Oracle-Google partnership in 2010, Sun (and later Oracle) never once raised the issue of alleged patent infringement.  The fact that, during that time, Sun still desired to work with Google and hoped to convince Google to buy a TCK license does not undermine Google's equitable defenses because the parties never discussed any patents, let alone a license for the patents-in-suit.  To the contrary, Sun actively encouraged Google and even built products to run on Android.  During this time, Google invested money, time, and resources in developing Android and bringing a smart phone to market.  This undisputed evidence is more than sufficient to grant judgment in Google's favor on its affirmative

1

1    defenses of equitable estoppel, laches, waiver, and implied license.

2        For all of these reasons, Oracle's motion should be denied.

3    **II.    A reasonable jury could *only* find that Google did not infringe the asserted claims of the 104 patent.**

4

5            "When *I* use a word," Humpty Dumpty said,
         in rather a scornful tone, "it means just what I
6        choose it to mean—neither more nor less."
             "The question is," said Alice, "whether you
7        *can* make words mean so many different things."
             "The question is," said Humpty Dumpty,
8        "which is to be master—that's all."

9

10                    —Lewis Carroll, *Through the Looking Glass*

11   TX 2564 at 5/852 ("The Java Language Specification").

12

13       **A.    Dalvik bytecode instructions only contain indexes, which are not "symbolic references" because they refer to numeric memory locations.**

14       Oracle's theory has morphed yet again.  In his opening report, Dr. Mitchell called the

15   indexes in the Dalvik bytecode instructions "numeric references," acknowledging the undisputed

16   fact that they identify locations in constant pool tables.  Then, in his trial testimony, Dr. Mitchell

17   called the indexes symbolic references, claiming that those indexes are names.  Now, in its

18   motion, Oracle argues that indexes qualify as *both* numeric and symbolic references.  This

19   schizophrenic theory permeates its motion for judgment as a matter of law:

20       • "A field index—also called field@CCCC generally or '01' in specific examples of
           field indices in the trial testimony—is a reference to data to be obtained in
21         accordance with a corresponding numerical reference, and identifies that data by a
           name other than the numeric memory location of the data."   [Oracle Mot. for
22         JMOL at 2.]

23       • "For the field index in the IGET instruction to be a symbolic reference, it is
           enough that it identifies—'specifies,' in Mr. McFadden's words—*some* data to be
24         obtained, by something other than the data's location." (*Id.* at 3.)

25       • "That indexes such as the '01' in '52 01' (the bytecode for IGET field@0001) may
           ***also*** indicate the location of information in the dex file's constant pool is ***not***
26         ***relevant***.  The claims do not require that a reference ***exclusively*** identify data
           symbolically to qualify as a symbolic reference." ( *Id.* at 4.)

27       • "Thus, even if a field index were a numeric memory location in the Field ID table,
28         it would still nevertheless be a symbolic reference, because it ***also*** identifies the

                                            2

value of a field in an instance object—the only data that is relevant to the claims—by a name other than its location." ( *Id.* at 6.)

As discussed below, not only should these new—and illogical—theories be rejected as a matter of law, they highlight the fact that the indexes in Dalvik bytecode instructions are indeed numeric rather than symbolic references. Accordingly, judgment as a matter of law should be entered in favor of Google, not Oracle.

## 1. Field indexes are not symbolic references.

There is no dispute that Dalvik bytecode instructions—the instructions evaluated by both Resolve.c and the dexopt tool—consist of an opcode and operand. [TX 737 ("Each instruction starts with the named opcode and is optionally followed by one or more arguments."); RT 3221:8-10, 3234:4-7 (McFadden); RT 3590:23-3591:25 (Bornstein); RT 3844:14-3855:12, 3925:4-18 (August).] Nor is there any dispute that the accused operands are indexes that take the form "field@CCCC" and reference locations in tables. [*See* Oracle Mot. for JMOL at 2-3; TX 46.106; TX 735 ("There are separately enumerated and indexed constant pools for references to strings, types, fields, and methods."); TX 737; RT 3732:15-19, 3736:16-23, 3755:8-9, 3765:9-12 (McFadden); 3858:5-12, 3858:21-359:11, 3918:13-23, 3923:20-24, 3925:19-3926-9 (August).] Even Dr. Mitchell agrees. [RT 3488:6-8, 3488:19-23, 3489:10-12 (Dr. Mitchell) (the "classIdx" index in Dalvik instructions provides information "to a location in another table"); RT 3496:12-3497:6 (the "field Idx" in Dalvik instructions is "an index to a specific location in the field table").] These indexes refer to locations in the constant pool tables, which are data in the .dex file; for example, "field@0001" refers to the entry 1 in the Field IDs table. [*See* Oracle Mot. for JMOL at 4.]

Oracle focuses its analysis on the IGET instruction in Dalvik bytecode. [*See id.* at 3.] It argues that the IGET instruction corresponds to the "LOAD 'y'" instruction in Figure 1B of the '104 patent. [*Id.*] That is the wrong example. As Oracle notes, "[t]he IGET instruction contains three operands—vA, vB, and field@CCCC—where the third operand field@CCCC is the field index." [*Id.* at 3 (citing TX 735 at 6; RT 3221:8-10 (McFadden)).] That index identifies an entry

3

in the Field ID table.  As such, the IGET instruction in the Dalvik bytecode instructions actually corresponds to the "LOAD 2" instruction depicted in Figure 1A the '104 patent.



**Figure 1A**
**Prior Art**

The instruction, LOAD 2, directs the computer to go to Slot 2 in the table, much like the IGET instruction 52 01 instructs the computer to go to entry 01 in the Field ID table.  Even Oracle concedes this is how the IGET instruction works.  [*Id.* at 4.]  As such, the operands for IGET instructions in Dalvik bytecode—the indexes—qualify as numeric references rather than symbolic references.  Because those indexes refer to data by a numeric memory location—entry 01 in the Field IDs table—they do not meet the Court's construction of "symbolic references."

In light of all the evidence presented at trial, Oracle now concedes that indexes in the instruction stream indicate the location of information in the constant pool tables, making them numeric references in at least that respect.  "That indexes such as the '01' in '52 01' (the bytecode for IGET field@0001) may also indicate the location of information in the dex file's constant pool is not relevant."  [*See* Oracle Mot. for JMOL at 4 (emphases removed).]  Oracle's new argument that this is not relevant, however, is insincere—indeed, the whole issue is whether the indexes qualify as symbolic or numeric references.  Oracle continues, "[t]he claims do not require that a reference ***exclusively*** identify data symbolically to qualify as a symbolic reference."  [*Id.*]  Along those same lines, Oracle argues that "even if a field index were a numeric memory location in the Field ID table, it would still nevertheless be a symbolic reference, because it ***also*** identifies

4

1    the value of a field in an instance object—the only data that is relevant to the claims—by a name

2    other than its location."  [*Id.* at 6 (emphasis in original).]  This is the first time that Oracle has

3    posited the idea of "hybrid" numeric-symbolic references, which conflicts with the patent and the

4    Court's Claim Construction Order.  [*See* Dkt. No. 137 at 20 ("The '104 patent teaches two

5    different types of data references: numeric references and symbolic references."); *see also* TX

6    4015.]  And, tellingly, neither Dr. Mitchell nor any other witness testified that indexes could

7    simultaneously qualify as *both* numeric and symbolic references.  In fact, Oracle cites nothing

8    from the record evidence in support of those new-found "dual-status" references.  They are

9    simply an after-the-fact argument developed by Oracle's counsel to try to salvage its case.

10       **2.    The Court's claim construction applies to data in the constant pool
                 tables as well as the actual field data in an instance object.**

12       Oracle's tortured re-interpretation of the Court's claim construction provides no basis for

13   judgment as a matter of law.  As is clear on its face, the Court's construction distinguishes

14   between using names to represent data (i.e., symbolic references) and using numeric memory

15   locations:

16          a reference that identifies data by a name other than the numeric memory location
            of the data, and that is resolved dynamically rather than statically

18   [Dkt. No. 137 at 22.]  Dr. Mitchell agrees.  [RT 3480:12-15.]  There is no limitation regarding the

19   type of data being referenced.

20       Regardless, Oracle postulates that "the 'data' in the Court's construction of symbolic

21   reference is the actual field data 'obtained' by Dalvik—the value of a field in an 'instance

22   object'—rather than the constant pool information in the Android dex file that is the focus of

23   Google's arguments."   [Oracle Mot. for JMOL at 5 (parenthetical with claim construction

24   omitted); *see also* RT 4019:3-7 (Mitchell).]  This reading is much more restrictive than what the

25   ordinary meaning of the word "data" implies.  According to Dr. Mitchell, the "data" must be the

26   actual field data in the instance object, as opposed to any data in the .dex file, including the data

27   in the constant pool tables.  [RT 4025:6-21 (Mitchell) ("So in order for that to happen, we have to

28   find where that actual data is in the object using this symbolic reference. . . .").]  As explained in

1    Google's motion for judgment as a matter of law, to turn an index—which is a numeric reference

2    to a location in a table—into a symbolic reference, Dr. Mitchell must resort to improperly re-

3    defining "symbolic reference" to mean "a reference that identifies *the actual field* data *in the*

4    *instance object* by a name other than the numeric memory location of the *actual field* data *in the*

5    *instance object.*"   [Google Mot. for JMOL at 3 (emphases indicating Dr. Mitchell's apparent

6    changes to Court's construction).]   This does not conform to the Court's ruling on claim

7    construction, which simply distinguishes between a reference to data—any data—by a name

8    rather than location.  [*See* Claim Construction Order (Dkt. No. 137) at 20-22; RT 3480:12-15

9    (Mitchell).]

10        Oracle misplaces much emphasis on the fact that the figures in the '104 patent show that

11   the symbolic reference refers to data that is "obtained."  [Oracle Mot. for JMOL at 5.]  It further

12   emphasizes that the experts agree that the purpose of the LOAD instruction described in the

13   patent is to obtain the value from the data object.  [*Id.*]  But there are two problems with these

14   arguments.  First, the fact that an instruction loads a particular piece of data does not mean that

15   the intervening data structures—in the case of Android, the constant pool tables—do not also

16   qualify as data.  It's all data, as explained by Dr. August on cross-examination.  [3955:22-24 ("Q.

17   Now, just to clean up a few other things.  You labeled this 'data,' but this is actually the constant

18   pool; true, sir?  A.  Constant pool is data.").] The simple figures of the '104 patent, which contain

19   only instructions and the ultimate data object, do not prove otherwise.  Put another way, the fact

20   that Figures 1A, 1B, and 8 in the '104 patent reflect entries in a "Data Object" does not mean that

21   other data cannot also meet the construction of "symbolic references."  Indeed, if this is the only

22   "data" that the claim construction refers to, then every other reference in the system must be

23   deemed "symbolic."   Then Oracle's interpretation becomes a self-fulfilling prophecy:  by

24   identifying a single piece of data as "the data" for purposes of the claim construction, Oracle's

25   interpretation means that every other piece of data is a symbolic reference.  This is simply not

26   consistent with the patent or the Claim Construction Order.  [*See* TX 4015; Dkt. No. 137 at 20-

27   22.]

28

Second, as Dr. August explained in his testimony, the actual field data in the instance object may itself be a reference to other data; for example, another string in the string data table.

> Q.  What can be in this instance object by way of data?
>
> A.  Well, it could be a symbolic reference.  It could be a numeric reference.  Or it could be other non-reference data.
>
> ***
>
> Q.  Let's talk about in Dalvik.  Is the data at these entries always non-reference data, as we talked about in your technical tutorial?
>
> A.  No, it's not.
>
> Q.  How do you know that?
>
> A.  Because I write programs.  And you can write programs that contain references in instances of objects.

[RT 4002:14-16; 4003:11-17.]  Thus Oracle's characterization of the value of the actual field data in the instance object as some form of "ultimate" or "meaningful" data in Android is a false premise, unsupported by any evidence.

By claiming that data in the constant pool tables does not count, and that only the value of the actual field data in an instance object qualifies as the data, Oracle's motion turns the claim construction on its head.  [Oracle Mot. for JMOL at 6 ("The Field ID table and the other parts of the dex file constant pool information are not 'data' within the meaning of the claims.").]  As discussed above, Oracle's new argument would mean that all references in the instruction stream qualify as symbolic references, because, despite the fact that those references are indexes that point to the location of data (in constant pool tables), they ultimately lead to the loading of other data once the symbolic reference—the name in the string table—is determined and thereafter resolved.  This is an illogical reading of the '104 patent, which clearly provides for an instruction stream that contains *both* symbolic and numeric references as separate and distinct elements.  [*See, e.g.,* TX 4015 at Claim 11.]

3.      **Indexes are not symbolic references because they are not resolved.**

Oracle contends that field indices are resolved to pointers; therefore, they must be symbolic references.  [Oracle Mot. for JMOL at 7.]  Oracle has it backwards.  Field indices are *not* resolved.  As Mr. McFadden explained in the context of discussing Resolve.c:

> Q.  And are indexes in this process being resolved?
>
> A.  No.
>
> Q.  Why do you say no?
>
> A.  Well, resolution implies something is unknown, something is ambiguous.  If you have an index, you know exactly where you're going.  You have the location.
>     For symbols, you don't know where you're going and you won't know until you have resolved the ambiguity.  So it doesn't really make sense to say that you "resolve an index."

[RT 3650:18-3651:1.]  The record confirms that indexes are numeric rather than symbolic references.

Indexes in Dalvik bytecode instructions always point to the numeric memory location of data, both before and after resolution of the symbolic references in the .dex file string data.  In Resolve.c, the instruction stream does not change; the index field@CCCC is used both before and after resolution.  It is simply used to look at entries in the Resolved Fields Table and the Field ID table.  [RT 3636:13-3637:20 (McFadden).]  In dexopt, although the bytecode instruction operand is rewritten, it is simply changed from one numeric reference to another numeric reference.  [RT 3746:22-3747:14 (McFadden); 3933:5-3934:19 (August).]  Specifically, the index value "field@CCCC" is replaced with another numeric memory location—the offset "fieldoff@CCCC."  [RT 3746:22-3747:14 (McFadden); 3933:5-3934:19 (August); TX 737 at 3; TX 46.106 (showing instruction format kFmt22c uses the data at location "field@CCCC" and instruction format kFmt 22cs uses the data at location "field offset CCCC"); see also TX 737 at 1 ("Suggested static linking formats have an additional 's' suffix, . . . ").]  This is made clear in the dexopt documentation, which notes that dexopt is simply replacing one location with another: "For virtual method calls, replace the method index with a vtable index" and "For instance field get/put, replace the field index with a byte offset."  [TX 739.]  In sum, either the index in the

8

1    instruction stream stays the same, as in the case of Resolve.c, or it gets rewritten by an index or

2    offset to another location.

3            True symbolic references—names in the string table—require real resolution.  These types

4    of references do not tell the computer where to go next; they require a search, i.e., a "resolution."

5    [RT 3646:1-23, 3766:18-3767:4 (McFadden); 3848:20-3849:17 (August).]  In contrast, indexes

6    do not require any searching (or "resolving") because they tell the computer exactly which

7    location in memory to access next.

8

9            THE COURT:  The premise being that the certain of said instructions containing
             one or more symbolic references.

10           And you're saying that -- well, what is "01"?  Is that, in your view, a symbolic
             reference?

11

12           THE WITNESS:  No.  "01" is a numeric reference because it gives you an actual
             numeric memory location.  Right here (indicating).  This is the location, 01.

13           There's no resolution, no search.  Nothing – nothing expensive about figuring out
             what that instruction is referring to when it goes to the field ID table.

14

15   [RT 3865:11-20 (August).]  This is precisely the distinction recognized in the Court's Claim

16   Construction Order.  [Dkt. No. 137 at 21 (noting that for symbolic references "[t]he claimed

17   invention would use a dynamic subroutine to interpret this symbolic reference—it would have to

18   figure out that 'y' means '17' or that 'y' means 'the data stored in memory slot 2,' and *then* get

19   the data called y (col. 5:13–19).").]

20        **B.     Dexopt does not infringe the '104 patent.**

21           Oracle's request for judgment as a matter of law on infringement of claims 27 and 29

22   should also be denied.  Oracle's claim that the Android dexopt tool resolves symbolic references

23   dynamically rather than statically rests on Dr. Mitchell's erroneous opinion that an optimization

24   (e.g., resolution) based on information *about* a runtime environment is "dynamic."  But there is a

25   wealth of documentary evidence and fact and expert testimony testimony that proves dexopt is a

26   static optimization.  [RT 3730:16-22 (McFadden); RT 3940:17-20 (August); RT 3595:21-24

27   (Bornstein); TX 32 at 35, TX 816 at 24:05; TX 735 (defining opcodes that "are reasonable

28   candidates for static linking"); TX 737 (defining "statically linked" instruction formats); TX 739

                                                    9

(dexopt performs optimizations that "can be inferred statically").]  Meanwhile, Oracle's reliance

on TX 1094 is specious.  As is clear from the document, it was an incomplete cut-and-paste job

from TX 739 (also TX 105).  And the copied reference to runtime information, as explained by

Andy McFadden, does not refer to optimization performed by dexopt.  [*See* RT 3734:20-3735:7.]

Accordingly, no reasonable jury could conclude that dexopt infringes claims 27 and 29 of the

'104 patent.

### C.     The Court should reject Oracle's post-trial attempt to re-construe the term "symbolic reference."

Oracle seeks judgment as a matter of law on infringement of claims 27 and 29 of the '104

patent based on yet another request that the Court's construction of "symbolic reference" be re-

construed.  [Dkt. 1168 at 9-11 (Section III.C).]  This latest attempt to change the meaning of a

claim construction that the parties have relied on for over a year and through the close of evidence

at trial represents Oracle's third bite.  [*See* Dkt. 132, 1128.]  Google has previously explained

why this request should be rejected as both highly prejudicial and as waived by Oracle.  [*See* Dkt.

1134 at 1-2 (incorporated by reference herein).]  In addition, there is no basis to conclude, as

Oracle has, that the term "dynamic" is given a special meaning in the '104 patent.  Indeed, the

record at trial proves just the opposite.

For example, Oracle's expert commended the Court's construction of "symbolic

reference," stating that "this is a *great, clear statement* from the Court about what symbolic

reference means."  [RT 3302:23-3303:1 (Mitchell) (emphasis added).]   Dr. Mitchell also testified

that "dynamic" resolution, as used in the Court's construction of symbolic reference, is resolution

that is done at runtime:

> Q.  So resolution from -- if there were a symbolic reference that was
>      resolved to a numeric reference, even if that were so, you would also
>      need to show that that was done dynamically; correct?
> A.  Yes.
> Q.  And you said that that means done at runtime essentially, right?
> A.  Yes, that's one way that it can be done dynamically.

[RT 3502:25-3503:7.]  In light of this clear testimony from Oracle's own expert, Oracle cannot

1   now be heard to complain that "dynamic," as that term is used in the context of the Court's

2   definition of "symbolic reference," is ambiguous.

3   Further, Oracle's request, while couched as seeking clarification of the meaning of the

4   term dynamic in the context of the '104 patent, is nothing more than another attempt to eliminate

5   the "dynamic" nature of the symbolic resolution disclosed and claimed by the '104 patent.  Oracle

6   posits that the '104 patents requirement of dynamic resolution is satisfied when symbolic

7   references are "resolved to identify the memory location of the underlying data based on memory

8   conditions that exist *at whatever time the resolution occurs*."  [Dkt. 1168 at 11 (emphasis added).]

9   By definition, symbolic references must be resolved; thus, Oracle's definition of dynamic would

10  apply to every symbolic reference, because resolution must happen at some time.

11  The '104 patent is clear, however, that the claimed symbolic references are resolved

12  during execution—i.e., at runtime.  For example, the '104 patent discloses that the main

13  interpretation routine determines if the reference is symbolic, invokes the dynamic field reference

14  routine that resolves the symbolic reference, and then re-executes the instruction.  [TX 4015 at

15  5:10-23.]  This passage clearly defines the dynamic nature of the '104 patent's symbolic

16  resolution.  It is performed by the interpretation routine—i.e., while interpreting the instruction

17  containing a symbolic reference.  After this runtime resolution occurs, the resolved instruction is

18  re-executed.  Indeed, the fact that the patent describes the second pass as "reexecution" confirms

19  that the symbolic reference resolution occurs during execution.

20  Given the testimony of Oracle's own expert and the clear import of the '104 patent

21  disclosure as captured in the Court's construction of "symbolic reference," Oracle has provided

22  no basis for its belated request to redo the claim construction.  More importantly, applying the

23  current construction, no reasonable jury could find that claims 27 and 29 are infringed by dexopt.

**III.    A reasonable jury could only find that Google does not infringe the asserted claims
24        of the '520 patent.**

25  Oracle asks for judgment as a matter of law of infringement based on its argument that

26  "simulating execution" does not require any actual operations on a Java virtual machine to be

27  simulated, and that the term also encompasses the distinct method (which results in different

28

11

1   outcomes in certain circumstances) of pattern matching.  Neither of these contentions are

2   supportable, and Oracle's arguments should be rejected.

3

    **A.     The jury is entitled to credit Professor Parr's testimony explaining why**

4               **pattern matching differs from simulating execution**

5       To reach his opinion on non-infringement, Professor Parr not only looked at the source

6   code, but also performed multiple experiments to confirm his understanding.  His second

7   experiment showed beyond any doubt that the dx tool is not simulating execution as required by

8   the '520 patent.  He inserted an extra piece of bytecode that put a zero into the zeroth entry in an

9   array—where a zero already existed at the inception of the array.  Such an extraneous piece of

10  code, when run through a program that simulated execution of byte code instructions, would

11  create an efficient instruction with no problem.  [RT 3810:4-13 (Parr).]  However, the dx tool

12  failed to create a proper static array initialization instruction when it was fed that code.  [RT

13  3809:20-3810:3 (Parr).]  As Professor Parr explained, the code was set up to "punt" when it did

14  not find the pattern it sought.  [RT3801:7-18 (Parr).]  Hence, Professor Parr concluded that the dx

15  tool code could not be simulating execution of the byte code.  Dr. Mitchell's so-called

16  "experiment," referenced in Oracle's JMOL brief at 14:23-15:2, in no way contradicts or even

17  addresses Professor Parr's findings.  Dr. Mitchell's work consisted of running the dx tool on a

18  standard Java byte code pattern and confirming that it created a single instruction to initialize a

19  static array.  [RT 3345:8-3346:1 (Mitchell).]  But the fact that the byte code started in one form

20  and ended in another does not tell how it got there; and Dr. Mitchell admitted that, for a method

21  claim, it is not enough simply to show that "with the same input you'd get the same output from a

22  piece of code."  [RT 4054:24-4055:4 (Mitchell).]  Accordingly, Dr. Mitchell's experiment is

23  insufficient to show that pattern matching infringes the '520 patent.

24      Oracle's contention that simulated execution includes the far different process of pattern

25  matching because the claims "do not exclude pattern matching" is incorrect.  The burden is on

26  Oracle to show infringement of the claims as properly construed—not on Google to prove that the

27  claims do not cover what the dx tool does.  Oracle never requested construction of "simulating

28  execution" in the '520 patent; its position was that the phrase takes its plain meaning.  Yet

1   nothing in the plain meaning of that phrase shows that pattern matching is covered.  Indeed, it is

2   undisputed that the '520 patent makes no mention of pattern matching.  [RT 3521:10-12

3   (Mitchell); TX 4011.]  Oracle continues to highlight the source code comments from the class

4   simulator.java in an attempt to prove its case.  But both experts agree that the code that identifies

5   the static initialization of arrays is *not* found in that class; it is in the separate BytecodeArray

6   class.  [RT 3799:14-3800:7 (Parr); 3519:19-3520:3 (Mitchell); 4061:9-4062:3 (Mitchell).]  And

7   BytecodeArray, in which Oracle concedes both the parseInstruction and parseNewarray methods

8   are found, Mot. at 14:17-19, is the class that identifies static initialization through pattern

9   matching rather than through simulated execution.  [RT 3799:14-3801:18 (Parr).]  Oracle cannot

10  show that, as a matter of law, pattern matching must be encompassed within "simulating

11  execution."  At most, this is a doctrine of equivalents argument that Oracle never made, and

12  Google (not Oracle) is entitled to judgment on it.  [*See* Brief in Support of Google's Motion for

13  Judgment as a Matter of Law on Counts V and VII of Oracle's Amended Complaint (ECF No.

14  1166) at 8:21-9:25.]

15
16  **B.      Simulating execution, properly understood, involves the simulation of actual
            Java virtual machine operations.**

17          At trial, Professor Parr, who has been programming in Java for nearly two decades now,

18  explained that "there is no meaningful definition of simulating execution of a stack machine

19  without manipulation of a stack.  That means pushing, popping, things like that."  [RT 3794:17-

20  19 (Parr).]  Oracle's own expert, Dr. Mitchell, did not disagree—far from it.  He agreed that "in a

21  Java bytecode system, instructions operate by pushing and popping and replacing values from the

22  top of an operand stack."  [RT 4058:3-6 (Mitchell).]  Google is not attempting to read language

23  from the specification into the claims—it is explaining how the claim language would be

24  understood by those of skill in the art in light of the specification, which is to require simulating

25  execution of the actions set forth in the byte code instructions in order to obtain the initial values

26  of the static array.  [TX 4011 at Fig. 3, 5:52-54.]

27          In contrast to Professor Parr's thoughtful explanation of what the relevant claim language

28  would mean to one of ordinary skill in the art, Dr. Mitchell seldom used the actual language of

13

1  "simulating execution" in his testimony, eschewing that phrase for the use of the more general

2  word "simulation."  [*See, e.g.*, RT 4032 ("is properly called simulation or not"; "dx tool simulates

3  bytecode"; "pattern matching as a portion of simulation"; "the process is properly called

4  simulation") (Mitchell).]  Indeed, Oracle's counsel repeatedly uses other words in its JMOL

5  motion to describe what the dx tool does.  [Oracle Mot. for JMOL at 12:11-12 ("the dx tool

6  *examines* the bytecodes"); *id.* at 14:20 ("bytecode instructions are *examined* without being

7  executed"); *id.* at 15:5-7 (dx tool "*examining*" the byte codes) (emphases added).]  Yet the claim

8  language of the '520 patent is clear that what is required is not "simulating" or "examining," but

9  rather "simulating execution."  TX 4011 at 9:54-57, 12:7-8.  Given that Oracle itself repeatedly

10  describes what the dx tool does in terms other than simulating execution, a reasonable jury plainly

11  could find that the claim language is not satisfied by the dx tool.[1]

12  **IV.    Oracle's patent infringement claims are barred by Google's equitable defenses.**

13         For the reasons stated in Google's Proposed Findings of Fact and Conclusions of Law

14  submitted after Phase I (Dkt. 1047), Google, not Oracle, is entitled to judgment on its equitable

15  defenses.[2]  Just as it did in post-trial briefing following Phase I, Oracle's Motion simply recites its

16  own gloss on disputed evidence and utterly fails to address the evidence favoring Google.  Oracle

17  also argues that "additional facts" elicited in Phase II support its made-for-litigation story that

18  both Sun and Google always believed that Google needed a license for Android—a license that

19  Oracle now opportunistically claims in this phase was a primarily about patents, not copyrights.

20  _____

[1] Oracle also trots out a claim differentiation argument that was neither found in Dr. Mitchell's
expert report, nor testified to by any witness at trial.  It is therefore inappropriate to make the
argument on this record and at this point in the case.  However, had Oracle attempted to make the
argument at trial, there is an simple response: Unasserted claim 3 of the '520 patent requires that
three separate steps (allocating a stack, reading a bytecode that manipulates the stack, and
performing stack manipulation on the stack) be included within the third step (the play executing
step) of claim 1.  A method that allocated a stack as part of the second step of claim 1 ("receiving
the class into a preloader") would not infringe claim 3, as it would not have the stack allocation
step as part of the play executing step, but it would still infringe claim 1.  Thus, even if claim
differentiation were an iron-clad rule (and it is not, *see Eon-Net LP v. Flagstar Bancorp*, 653 F.3d
1314, 1323 (Fed. Cir. 2011)), claim differentiation does not mean that claim 1 does not include
stack manipulation.

[2] The jury already has found that Google proved that "Sun and/or Oracle engaged in conduct Sun
and/or Oracle knew or should have known would reasonably lead Google to believe that it would
not need a license to use the structure, sequence, and organization of the copyrighted compilable
code."  Dkt. 1089 (Answer to Special Interrogatory 4A).

1   [Oracle Mot. for JMOL at 16.]  Oracle is wrong.  Indeed, in most instances, Oracle's gloss on the

2   evidence is expressly contradicted by other evidence in the record—evidence it pretends doesn't

3   exist.  Oracle's motion should be denied.

4   **A.     Oracle's "additional facts" are contradicted by the evidence**

5   In Phase I, the evidence established that (1) Sun was well aware of Google's plans for

6   Android at least as early as April 2006, (2) Sun publicly encouraged Android after it was

7   announced and the SDK was released in November 2007, (3) Sun never once told Google that

8   Android infringed Sun's copyrights or patents, and (4) Google relied on Sun's active

9   encouragement and failure to assert its rights by investing time, money, and resources into

10  Android.  [*See* GFOF 37-92.]  This evidence is equally relevant to Phase II, but Oracle ignores it.

11  Instead, Oracle tries to make hay out of "additional facts" elicited in Phase II.  Oracle's "facts"

12  are not facts at all; they are attorney argument, and they are contradicted by the evidence.

13  For example, Oracle states "[o]ne of Google's primary goals in these negotiations was to

14  obtain a license to Sun's patents."  [Oracle Mot. for JMOL at 16:25-26 (citing TX 2714, TX 22,

15  and TX 618).]  But Andy Rubin, the head of the Android project at Google, testified that the

16  documents Oracle cites in support of this "fact" addressed Google's desire to develop an open

17  source license with patent protection for downstream licensees, not a desire to license specific

18  patents from Sun.  [*See*, *e.g.*, RT 3190:25-3192:21.]  Vineet Gupta, Sun's lead negotiator during

19  the Sun-Google partnership discussions, confirmed that Sun and Google did not specifically

20  negotiate for a patent license, and that he never presented any Java-related patents to Google

21  during the negotiations.  [RT 3771:21-24; TX 3542.]  Nothing in the Phase II (or Phase I)

22  evidence supports Oracle's position that Sun and Google were negotiating for a license to specific

23  Java-related patents.

24  Oracle also states as an "additional fact" that Tim Lindholm "was aware of the '104 patent

25  in particular."  [Oracle Mot. for JMOL at 17.]  This is plainly incorrect.  Mr. Lindholm testified

26  that he had never even read the '685 patent, let alone the '104 patent, which has entirely different

27

28

15

666096.01

1   claims than the '685 patent.  [RT 3023:9-13; TX 4015.[3]]  Nor is there any evidence that any

2   member of the Android team had ever seen either of the two patents-in-suit.  Oracle's vague

3   assertions about Google's awareness of unidentified "Sun patents," Mot. at 17, is irrelevant to

4   Google's equitable defenses.

5       In short, none of the "additional facts" cited by Oracle in its Motion overcome the

6   overwhelming evidence in support of Google's equitable defenses.  [*See* GFOF at 37-92.]

7       **B.    Oracle's patent infringement claims are barred by equitable estoppel.**

8       For the reasons explained in Google's Proposed Findings of Fact and Conclusions of Law,

9   and its Response to Oracle's proposed findings and conclusions, Google has proven each of the

10  elements of its equitable estoppel defense.  [Dkt. 1047 at GCOL 32-33, 1079 at 59-62; *see also*

11  *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1042 (Fed. Cir. 1992) (listing

12  elements).]  Rather than address these facts, Oracle's motion makes much of the fact that Sun

13  and Google discussed Android-related opportunities after Google launched Android.  [Oracle

14  Mot. for JMOL at 20-21.]  Not even Oracle's own gloss on those discussions supports its motion

15  here.

16      That Sun attempted to convince Google to buy a TCK license and make Android Java-

17  compatible, Mot. at 20-21, is irrelevant to Google's estoppel defense.  What is relevant is that Sun

18  never informed Google that it was violating either the '104 or '520 patent, until July 20, 2010,

19  less than three weeks before the lawsuit was filed.  [RT 3181:25-3182:10 (Rubin); *see also* TX

20  1074.]  Indeed, Sun and Google never even discussed a license to any specific patents, let alone

21  the patents-in-suit.  [RT 3190:25-3192:21 (Rubin); RT 3181:25-3182:10 (Gupta).]  Discussions

22  about a potential license unrelated to the patents-in-suit are simply irrelevant to Google's

23  affirmative defense of equitable estoppels.  [*See* Dkt. 1047 at GCOL 32-34.]

24      **C.    Oracle's patent infringement claims are barred by laches.**

25      For the reasons stated in Google's Proposed Findings of Fact and Conclusions of Law,

26  and its Response to Oracle's proposed findings and conclusions, Google has proven each element

27  ───────────────
[3] In any event, Mr. Lindholm was not involved at any point with the design or development of the
28  Dalvik virtual machine specifically or even Android generally.  [RT 3033:22-3035:1.]

1    of laches.  [Dkt. 1047 at 31-32, 1079 at 64-66; *see also Aukerman*, 960 F.2d at 1032.]

2           That Sun occasionally tried to convince Google to buy a license for Android—but did not

3    identify or even allude to the patents-in-suit—does not excuse Oracle's delay in filing suit.  Each

4    of the cases Oracle cites for the proposition that negotiations are an excuse for unreasonable delay

5    involve negotiations focused on the specific patents at issue.  *See Lucent Techs., Inc. v. Gateway,*

6    *Inc.*, 580 F. Supp. 2d 1016, 1053 (S.D. Cal. 2008) *aff'd in part, vacated in part on other grounds,*

7    *remanded*, 580 F.3d 1301 (Fed. Cir. 2009) ("The evidence showed that for several years leading

8    up to the start of the litigation underlying this case, beginning around 1998 through 2002 and

9    2003, Lucent engaged in efforts to sell a license for the '226 to computer manufacturers Gateway

10   and Dell."); *In re Katz Interactive Call Processing Patent Litig.*, 712 F. Supp. 2d 1080, 1110

11   (C.D. Cal. 2010) (patentee contacted alleged infringer "regarding its patent portfolio," patentee

12   "asked for additional information regarding any potential infringement," and alleged infringer

13   considered taking a license for the specific patent portfolio).  In this case, however, the record is

14   clear that Sun and Google never negotiated over the patents-in-suit, or any specific patents for

15   that matter.  [RT 3190:25-3192:21 (Rubin); RT 3181:25-3182:10 (Gupta).]

16          Oracle also ignores Mr. Rubin's testimony that, during the time of Sun's and Oracle's

17   delay in filing suit, Google invested in Android by hiring engineers, creating Google applications

18   for Android, and spending time and money to help Google and its partners bring phones to

19   market.  [RT 1715:2-1717:25; Dkt. 1047 at GFOF 82-86.]  Oracle cites no case suggesting that

20   the "prejudice" requirement for laches cannot be met where the defendant invests time, money,

21   and resources in a still-developing product in reliance upon the plaintiff's delay and at a time

22   when the defendant could have changed course had the plaintiff filed suit earlier.

23          **D.      Oracle's patent infringement claims are barred by waiver.**

24          For the reasons stated in Google's Proposed Findings of Fact and Conclusions of Law,

25   and its Response to Oracle's proposed findings and conclusions, Google has proven that Sun

26   waived its rights to enforce the '104 and '520 patents.  [Dkt. 1047 at GCOL 35, 1079 at 56-

27   58.]  For the reasons explained above, Oracle's desire to sell Google a license does not contradict

28   the evidence establishing that Oracle waived its right to pursue legal action against Google.

17

**E.      Oracle's patent infringement claims are barred by implied license**

For the reasons stated in Google's Proposed Findings of Fact and Conclusions of Law, and its Response to Oracle's proposed findings and conclusions, Google has proven that the entire course of conduct between Sun and Google over the relevant time period created an implied license for Google to use the '104 and '520 patents in Android.  [Dkt. 1047 at GCOL 34-35, 1079 at 62-63.]  Oracle's attempt to limit the doctrine of implied license to a specific factual situation unlike the situation here is unavailing.

Oracle cites two cases that address a specific situation in which an implied license can arise.  [Oracle Mot. for JMOL at 23-24 (citing *Zenith Elecs. Corp. v. PDI Comm'n Sys., Inc.*, 522 F.3d 1348, 1360 (Fed. Cir. 2008); *Jacobs v. Nintendo of Am, Inc.*, 370 F.3d 1097, 1100 (Fed. Cir. 2004)).]  But these cases are not the *only* situations where an implied license can arise.  Indeed, the Federal Circuit, relying on *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236 (1927), has recognized there are "different categories of conduct" which can give rise to implied license:

> Since *De Forest*, this court and others have attempted to identify and isolate ***various avenues to an implied license***. As a result, courts and commentators relate that implied licenses arise by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel. These labels describe not different kinds of licenses, but rather ***different categories of conduct which lead to the same conclusion: an implied license***.

*Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997) (internal citations omitted) (emphases added).

Contrary to Oracle's attempt to limit the doctrine, the general test for whether there is an implied license is whether "the entire course of conduct between a patent or trademark owner and an accused infringer" creates such an implied license.  *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995).  The evidence here supports a finding of implied license.

**V.      Google chose not to present its defenses of patent misuse, use by the United States, unclean hands, and express license, and therefore does not oppose Oracle's motion on these defenses.**

In Section VI of its Motion, Oracle moves for judgment as a matter of law as to Google's Sixth (patent misuse), Eighth (use by the U.S.) and Nineteenth (unclean hands) defenses, as well as Google's defense of express license.  Although Google believes these defenses have merit,

18

1    Google chose not to present these defenses at trial.  Google therefore does not oppose Section VI

2    of Oracle's Motion.

3    **VI.      Conclusion**

4           For the foregoing reasons, Google requests that the Court deny Oracle's Rule 50 Motion

5    at the close of all the Phase II evidence.

6

7    Dated:  May 17, 2012                                   KEKER & VAN NEST LLP

8                                                           /s/ Robert A. Van Nest
                                               By:      ROBERT A. VAN NEST

9                                                         Attorneys for Defendant
10                                                        GOOGLE INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOOGLE'S OPPOSITION TO ORACLE'S RULE 50(A) MOTION FOR PHASE II
Case No. 3:10-CV-03561 WHA

666096.01