| | |
|---|---|
| KEKER & VAN NEST LLP | KING & SPALDING LLP |
| ROBERT A. VAN NEST - # 84065 | DONALD F. ZIMMER, JR. - #112279 |
| rvannest@kvn.com | fzimmer@kslaw.com |
| CHRISTA M. ANDERSON - # 184325 | CHERYL A. SABNIS - #224323 |
| canderson@kvn.com | csabnis@kslaw.com |
| DANIEL PURCELL - # 191424 | 101 Second Street, Suite 2300 |
| dpurcell@kvn.com | San Francisco, CA 94105 |
| 633 Battery Street | Tel: 415.318.1200 |
| San Francisco, CA 94111-1809 | Fax: 415.318.1300 |
| Telephone: 415 391 5400 | |
| Facsimile: 415 397 7188 | |
| | |
| KING & SPALDING LLP | IAN C. BALLON - #141819 |
| SCOTT T. WEINGAERTNER | ballon@gtlaw.com |
| (*Pro Hac Vice*) | HEATHER MEEKER - #172148 |
| sweingaertner@kslaw.com | meekerh@gtlaw.com |
| ROBERT F. PERRY | GREENBERG TRAURIG, LLP |
| rperry@kslaw.com | 1900 University Avenue |
| BRUCE W. BABER (Pro Hac Vice) | East Palo Alto, CA 94303 |
| 1185 Avenue of the Americas | Tel: 650.328.8500 |
| New York, NY 10036 | Fax: 650.328.8508 |
| Tel: 212.556.2100 | |
| Fax: 212.556.2222 | |

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC., | Case No. 3:10-cv-03561 WHA |
| Plaintiff, | |
| v. | STATEMENT OF RECENT DECISION REGARDING COSTS |
| GOOGLE INC., | |
| Defendant. | Dept.: Courtroom 8, 19th Floor |
| | Judge: Hon. William Alsup |

Pursuant to Civil Local Rule 7-3(d)(2), Google directs the Court's attention to the discussion regarding the recoverability of costs in the decision filed last Friday in *Cambridge University Press v. Becker*, No. 1:08-CV-1425-ODE (N.D. Ga. Aug. 10, 2012), attached hereto as Exhibit A. *See* Exh. A at 12-14.

Dated: August 14, 2012                                       KEKER & VAN NEST LLP


                                                   /s/ Robert A. Van Nest
                                           By:     ROBERT A. VAN NEST

                                           Attorneys for Defendant
                                           GOOGLE INC.

# EXHIBIT A

FILED IN CHAMBERS
U.S.D.C. - Atlanta

AUG 10 2012

By: James N. Hatten, Clerk

Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAMBRIDGE UNIVERSITY PRESS;
OXFORD UNIVERSITY PRESS, INC.;
SAGE PUBLICATIONS, INC.,

        Plaintiffs,

v.

MARK P. BECKER, in his official
capacity as President of Georgia
State University; RISA PALM, in
her official capacity as Senior
Vice President for Academic
Affairs and Provost of Georgia
State University; J.L. ALBERT,
in his official capacity as
Georgia State University
Associate Provost for
Information Systems and
Technology; NANCY SEAMANS, in
her official capacity as Dean of
Libraries at Georgia State
University; ROBERT F. HATCHER,
in his official capacity as Vice
Chair of the Board of Regents of
the University System of
Georgia; KENNETH R. BERNARD,
JR., LARRY R. ELLIS, W.
MANSFIELD JENNINGS, JR., JAMES
R. JOLLY, DONALD M. LEEBERN,
JR., WILLIAM NESMITH, JR.,
DOREEN STILES POITEVINT, WILLIS
J. POTTS, JR., C. DEAN ALFORD,
KESSEL STELLING, JR., BENJAMIN
J. TARBUTTON, III, RICHARD L.
TUCKER, LARRY WALKER, RUTLEDGE
A. GRIFFIN, JR., C. THOMAS
HOPKINS, JR., NEIL L. PRUITT,
JR., and PHILIP A. WILHEIT, SR.,
in their official capacities as
members of the Board of Regents
of the University System of
Georgia,

        Defendants.

CIVIL ACTION NO.
1:08-CV-1425-ODE

**ORDER**

This copyright infringement case is currently before the Court for a determination of injunctive and declaratory relief following this Court's May 11, 2012 Order which found, after a review of each of Plaintiffs' infringement claims, that Plaintiffs were entitled to prevail on five claims [Doc. 423]. As discussed in Part II of the May 11, 2012 Order, this Court does have the power to grant injunctive and declaratory relief against Defendants under the doctrine of <u>Ex Parte Young</u>, an exception to Eleventh Amendment immunity which otherwise would bar such relief.

This Order will first address declaratory relief and then consider the need for injunctive relief. In discussing what relief is appropriate, the facts pertaining to the five successful claims will frame the discussion.

**I. Declaratory Relief**

The Court enters the following declaratory relief. Each principle is explained in the context of the infringements found in the May 11 Order.

    **A. The requirement that excerpts be "decidedly small" to tip factor three in Defendants' favor applies to the aggregate of all excerpts from a book which are assigned during the term of the course.**

        1. <u>Professor Kaufmann</u>

The first three infringements are for Professor Kaufmann's unpaid use of excerpts from *The Sage Handbook of Qualitative Research (Third Edition)* and *The Sage Handbook of Qualitative Research (Second*

-2-

*Edition)*. These excerpts were available through ERES to Georgia State students enrolled in three classes in qualitative research taught by Professor Kaufmann in 2009. These classes were predominantly for Ph.D. candidates, but probably included other graduate students.

The students enrolled in each of these courses were required to purchase three required texts, two of which were published by Sage [Pls. Ex. 516 at 1; Pls. Ex. 517 at 2; Pls. Ex. 518 at 1]. They were also required to read designated excerpts from other books for various class sessions as listed on the syllabi. The infringement claims presented in this case aggregated the excerpts from each book for the entire class term. Thus, the first successful infringement claim aggregated four one-chapter excerpts from *The Sage Handbook of Qualitative Research (Third Edition)* which were assigned for reading at various times during the Maymester 2009 session of EPRS 8500. The infringement claim was based on a four chapter excerpt, totaling 8.38 percent of the pages in the book.

With respect to the infringement claim for use of unpaid excerpts from *The Sage Handbook of Qualitative Research (Second Edition)* in EPRS 8510 during summer session 2009, there were two assigned excerpts during the term of the course which added up to two chapters and 3.01 percent of the pages in the book. The infringement found by the Court was based on the aggregate amount.

With respect to the infringement claim for use of unpaid excerpts from *The Sage Handbook of Qualitative Research (Third Edition)* in EPRS 8500 during fall semester 2009, there were a total of seven chapters assigned over the course term. This was 12.29

percent of the total work. The infringement claim was based on the aggregate amount.

### 2. Professor Harvey

The fourth infringement is for unpaid use of an excerpt from *The Power Elite*, an Oxford publication. This assignment was by Professor Adia Harvey who taught SOCI 8030 (Social Theory I) in the fall of 2009. This is a course for sociology graduate students. The goal of the course is "to present students with graduate-level knowledge of classical social theory, and to be able to use theory as a tool that facilitates the developments of insightful sociological research." [Pls. Ex. 530].

The students were required to purchase two texts, one of which is published by Oxford. In addition, the students were required to read certain excerpts from other books which had been posted on ERES. For one class session the assigned excerpt was chapters twelve and thirteen, which together total 12.5 percent of the pages in *The Power Elite*.

### 3. Professor Ohmer

The fifth infringement is for unpaid use of an excerpt from *Utilization-Focused Evaluation: The New Century Text (Third Edition)*, a Sage book. This assignment was by Professor Mary Ohmer who taught SW 8200 (Evaluation & Technology) in the fall of 2009. This is a course for graduate students in Georgia State's School of Social Work. The syllabus states: "The course develops students' skills in

-4-

the formative and summative evaluation of community service delivery systems." [Pls. Ex. 522].

The syllabus assigned two required texts. The syllabus also assigned two excerpts from *Utilization-Focused Evaluation (Third Edition)* which were posted to ERES. These excerpts aggregated to two chapters, which was 3.01 percent of the book. The infringement claim was based on the aggregate amount.

Thus, "an excerpt" for purposes of the Court's May 11 Order includes all protected material used from a book during a course.

### B. The holdings of this case do not address fair use of books intended solely for instruction of students enrolled in a class.

In their Memorandum of Law filed May 31, 2012 [Doc. 426] Plaintiffs request that any injunction define the term "work" to mean a book "other than a textbook." This appears to be an effort to exempt from the holdings of the May 11, 2012 Order the sorts of conventional textbooks which normally are used to teach undergraduates in lower level college courses.[1] Sample copies of these books presumably would be supplied to college professors or instructors with a view toward getting them to require purchase of the book by the students in the class. But these would be books which are not calculated to educate the professor or instructor; they are simply a vehicle for class instruction. The books involved in

---

[1] The Court agrees with the thrust of Plaintiffs' request. This does not automatically mean that there could never be fair use protection for any use of these books; it simply limits the Court's holdings in this case.

-5-

this case do not fall into that category because they have a broader set of users, even though they obviously have been used as material for class instruction.

On reflection, the Court believes that the term "textbook" is best avoided. During the trial and indeed in the May 11, 2012 Order, there were numerous references to various books as texts or textbooks. This is a convenient shorthand; however, the terms are ambiguous. The books assigned for purchase by students on the course syllabi are invariably referred to as "required texts." But none of the books are in the record, and it is unstated whether they differ in kind from the books which are the subject of the assigned excerpts. Also, the term "textbook" can be understood to imply an academic book which is scholarly and authoritative, but which is not necessarily designed for classroom instruction. In the context of this case, what is important is the intended readership because of its relationship to the value of the book's copyright when unpaid use of excerpts occurs.

The Court finds that none of the books from which excerpts were assigned are books intended exclusively for use by students enrolled in a class. This is demonstrated by the books involved in the five successful infringement claims. All of these books are of academic interest (obviously, because they were used in academic classes in this case). Some, possibly all, of the books can be classified as scholarly, but none of them are solely for the use of students enrolled in a class.

This is most obvious as to *The Power Elite*, a general readership book which because of its subject matter may be of interest in a

sociology class. The other three books which are the source of excerpts found to constitute infringements in this case are not as easily classified. There was no evidence at trial from the authors of these books nor any trial testimony by professors which is helpful on this issue. With respect to *The Sage Handbook of Qualitative Research (Second Edition and Third Edition)*, Sage's representative, Carol Richman, testified that she considered this book to be a "seminal textbook." [Tr. Vol. 2 at 110]. She was certainly a credible witness, with expertise in her field. However, she did not state what she meant by the term "textbook." She probably meant that the book is authoritative and informative. The Court does not infer that she meant it is intended solely for the use of students enrolled in classes, which for purposes of this Order the Court elects as the relevant definition. Accordingly, the Court looks to the books themselves, including the prefaces of the books, to glean the intended readership for each book.

With respect to *The Sage Handbook of Qualitative Research (Second Edition)*, the preface states in part:

> There were, and continue to be, three social science and humanities audiences for the *Handbook*: graduate students who want to learn how to do qualitative research, interested faculty hoping to become better informed about the field, and faculty who are experts in one or more of the areas discussed in the *Handbook* but who want to be informed about the latest developments in the field. We never imagined this audience would be so large. Nor did we imagine that the *Handbook* would become a text to be used in undergraduate and graduate research methods courses, but it did. In 1998, we created three paperback volumes based on the first edition of the *Handbook* for classroom use: *The Landscape of Qualitative Research, Strategies of Qualitative Inquiry,* and *Collecting and Interpreting Qualitative Materials*.

[Pls. Ex. 265 at ix].

-7-

*The Sage Handbook of Qualitative Research (Third Edition)* states the following in its preface:

> There continue to be multiple social science and humanities audiences for this *Handbook*: graduate students who want to learn how to do qualitative research, interested faculty hoping to become better informed about the field, individuals working in policy settings who understand the value of qualitative research methodologies and want to learn about the latest developments in the field, and faculty who are experts in one or more areas covered by the *Handbook* but who also want to be informed about the most recent developments in the field. We never imagined these audiences would be so large. Nor did we imagine that the *Handbook* would become a text used in undergraduate and graduate research methods courses, but it did. In 2003, we created from the *Handbook's* second edition three new paperback volumes for classroom use: *The Landscape of Qualitative Research, Strategies of Qualitative Inquiry,* and *Collecting and Interpreting Qualitative Materials.*

[Pls. Ex. 267 at ix-x]. These statements demonstrate that the *Sage Handbooks of Qualitative Research* are not intended solely for use by students in a course.

*Utilization-Focused Evaluation (Third Edition)* is a book which "tells readers how to conduct program evaluations and why to conduct them in the manner prescribed." [Pls. Ex. 316 at xv]. The book advocates the evaluation of government and institutional programs by users of the programs. It also offers suggestions for designing and implementing user-based evaluations. Based on the content of the book, and comments in the preface by the author, the Court infers that this is a book intended for persons in "the evaluation profession" which would include, but by no means is limited to, students enrolled in social work classes. It is also a resource for professional evaluators, particularly beginners. For example, the preface states in part:

-8-

> The evaluation profession has developed dramatically since the last edition of this book ten years ago. . . . As a field of professional practice, we have reached a level where we know what we're doing and have a track record of important contributions to show. . . . Minnesota provides a thriving evaluation community in which to work and an active local chapter of the American Evaluation Association where friends and colleagues share experiences . . . .

[Pls. Ex. 316 at xiv-xv]. Based on these considerations, the Court finds that *Utilization-Focused Evaluation (Third Edition)* is not a book intended only for students enrolled in a course.

The factor four analysis and outcomes, as articulated in the May 11 Order, apply to works that are directed not only to college and university students but also to the broader academic community and sometimes beyond [see May 11 Order, Doc. 423 at 21-22 and n.15]. Therefore, the fair use analysis and holdings of the May 11 Order, and the relief in this Order, are limited to Plaintiffs' works with an intended readership broader than students enrolled in courses.

### C. Fair use protection is conditioned on strict reliance with measures calculated to protect copyrighted excerpts from unwarranted distribution.

Protection under the fair use doctrine is conditioned on strict observance of the following requirements. Access to excerpts shall be limited by a passcode or password to only the students enrolled in the course, and then only for the term of the course. Students must be prohibited by stated policy from distributing copies to others. They must be reminded of the limitations of the copyright laws each time they access excerpts on ERES. Each chapter or the excerpt must fill a demonstrated, legitimate purpose in the course curriculum and must be narrowly tailored to accomplish that purpose.

### D. Cautionary note

Because fair use involves consideration of numerous fact-intensive elements, the infringement claims evaluated in this case do not include all possible fact combinations or potential outcomes. One such instance is a case where digital permissions are unavailable and the unpaid excerpt significantly exceeds the "decidedly small" amount which would tip factor three in a defendant's favor. Assuming that factor one weighs heavily in defendant's favor for the reasons discussed in the May 11 Order, and factor two weighs in defendant's favor (because the material is informational), how much material may be used without losing fair use protection? In an instance where Professor Orr used 18.52 percent of the pages in *Liszt: Sonata in B Minor* and electronic permissions were not available, fair use was found. The Court elects not to select an exact upper range number, but notes that the 18.52 percent amount likely is close to loss of fair use protection.

## II. Injunctive Relief

Next, the Court turns to the issue of injunctive relief. Four factors influence the Court to reject the highly regimented type of injunctive relief Plaintiffs propose in their May 31, 2012 filing [Doc. 426].[2] The first is that the fair use analysis is quite fact

---

[2] Plaintiffs' proposed injunctive relief seeks to enjoin Defendants and all Georgia State agents, employees, and students from violating the Court's May 11 Order. Plaintiffs seek to have the Court require Defendants to implement a program that keeps extensive records and provides Plaintiffs with access to monitor Defendants' compliance. Plaintiffs' proposed injunction requires, inter alia,

-10-

intensive and specific to each individual case. There is no single formulation which would cover all cases. Second, the Court is convinced that Defendants did try to comply with the copyright laws; this is demonstrated by the fact that there were only five successful infringement claims. Third, Defendants are state officials or officers with oversight responsibility, not line responsibility for individual fair use choices. Fourth, Defendants and Georgia State's officers and employees work at taxpayer expense to carry out their duties. There is insufficient reason to impose a burdensome and expensive regimen of record-keeping and report-making based on the totality of the circumstances. Accordingly, the Court sets injunctive relief as follows: Defendants are hereby ORDERED AND DIRECTED to maintain copyright policies for Georgia State University which are not inconsistent with the Court's Order of May 11, 2012 and this Order. Defendants are also ORDERED AND DIRECTED to disseminate to faculty and relevant staff at Georgia State the essential points of this Court's rulings. The Court will retain jurisdiction for the sole purpose of enforcing these Orders.

---

that Defendants keep extensive records for three years as to each excerpt posted on ERES along with all information pertaining to the investigation done as to its fair use status; that Defendants comply with a reporting procedure to Plaintiffs for three years as to Georgia State's provost's attempts to monitor and enforce compliance; and that Defendants provide Plaintiffs with monthly access to ERES, uLearn, and similar programs where excerpts may be accessed [Doc. 426-1].

-11-

III. **Costs and Attorneys' Fees**

Both sides have sought an award of their attorneys' fees in this litigation. Section 505 of the Copyright Act provides:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

17 U.S.C. § 505. In order to make an award of attorneys' fees, the Court must first determine which side is the prevailing party. The Copyright Act does not define the term "prevailing party." In Hensley v. Eckerhart, 461 U.S. 424 (1983), the Supreme Court held that the following definition of prevailing party applies in a civil rights case: "[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the party sought in bringing suit." Id. at 433 (citation and internal quotation marks omitted). The United States Court of Appeals for the Eleventh Circuit has applied that definition in a copyright case where plaintiffs were the prevailing party. See, e.g., Cable/Home Commc'n Corp. v. Network Prods., Inc., 902 F.2d 829, 853 (11th Cir. 1990). Both sides succeeded as to certain of their objectives. The Court does believe that Georgia State's changes in its copyright policy were triggered primarily by the filing of the instant lawsuit. In that respect, Plaintiffs were successful. On the other hand, Defendants prevailed on all but five of the 99 copyright claims which were at issue when the trial of the case began. In that respect,

-12-

Defendants were highly successful. On balance, the Court finds that Defendants are the prevailing party in this case.

The Copyright Act leaves the awarding of costs and attorneys' fees to the Court's discretion. Fogerty v. Fantasy, Inc., 510 U.S. 517, 523 (1994). The Supreme Court has held that for purposes of the Copyright Act, "[p]revailing plaintiffs and prevailing defendants are to be treated alike, but attorney's fees are to be awarded to prevailing parties only as a matter of the court's discretion. 'There is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised 'in light of the considerations we have identified.'" Id. at 534 (quoting Hensley v. Eckerhart, 461 U.S. 424, 436-37 (1983)). In Fogerty, the Court noted several nonexclusive factors[3] that may guide a court's discretion in making an attorneys' fees award, concluding that any application of such factors must be "faithful to the purposes of the Copyright Act." Id. at 535 n.19.

The United States Court of Appeals for the Eleventh Circuit has held that in copyright cases, "the only precondition to the award of attorney's fees is that the party be a prevailing one." Sherry Mfg. Co. v. Towel King of Fla., Inc., 822 F.2d 1031, 1034 (11th Cir. 1987). In Towel King, the Court of Appeals noted that a prevailing party is not required to show that the losing party acted in bad

---

[3]These factors include: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." Fogerty, 510 U.S. at 535 n.19 (citing Lieb v. Topstone Indus., Inc., 788 F.2d 151, 156 (3d Cir. 1986)).

-13-

faith or attempted to maintain a frivolous claim. <u>Id.</u> at 1035 (holding that a district court's finding that the plaintiff "initiated a predatory lawsuit for commercial gain . . . [would] support the award of fees" to the defendant).

In this litigation, the Court limited Plaintiffs to claims arising in three semesters in 2009 but did not require Plaintiffs to pursue all claims. When the trial began, Plaintiffs chose to pursue 99 claims out of 126. They then dropped 25 claims (and added one) during the trial. As to the remaining 75 claims, no prima facie case was proven in 26 instances. Digital permissions were unavailable in 33 instances. Neither digital nor hard copy permissions were available in 18 cases. Although the Court does not doubt Plaintiffs' good faith in bringing this suit, and there was no controlling authority governing fair use in a nonprofit educational setting, Plaintiffs' failure to narrow their individual infringement claims significantly increased the cost of defending the suit.

For these reasons, the Court exercises its discretion to award to Defendants their reasonable attorneys' fees. Other costs will also be taxed in favor of Defendants and against Plaintiffs to the extent permitted by statute.

### IV. <u>Conclusion</u>

Defendants are DIRECTED to file a detailed request for an award of attorneys' fees and other costs no later than August 24, 2012. Plaintiffs may file any objections no later than September 10, 2012. The parties are encouraged to confer to determine if objections can

-14-

be mutually resolved, either in whole or in part. A hearing to resolve objections is hereby set for September 14, 2012 at 11:00 a.m.

The Clerk is DIRECTED to resubmit the file on September 11, 2012.

SO ORDERED, this  10  day of August, 2012.

                                                            */s/ Orinda D. Evans*
                                                          ORINDA D. EVANS
                                                          UNITED STATES DISTRICT JUDGE