Pages 1 - 73

                        UNITED STATES DISTRICT COURT

                      NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

ORACLE AMERICA, INC.,              )
                                   )
            Plaintiff,             )
                                   ) NO. C 10-03561 WHA
  vs.                              )
                                   )
GOOGLE INC.,                       )
                                   )
            Defendant.             )
_____)

                              San Francisco, California
                              Thursday, July 30, 2015

                    **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiff Oracle America, Inc.:
                        Orrick, Herrington & Sutcliffe, LLP
                        51 West 52nd Street
                        New York, NY  10019
                        (212) 506-5000
                   BY:  **PETER A. BICKS**
                        **LISA T. SIMPSON**


For Plaintiff Oracle America, Inc.:
                        Orrick, Herrington & Sutcliffe, LLP
                        The Orrick Building
                        405 Howard Street
                        San Francisco, CA  94105
                        1 (415) 773-5700
                        1 (415) 773-5759 (fax)
                   BY:  **ANNETTE L. HURST**
                        **KAREN G. JOHNSON-MCKEWAN**


Reported By:  Lydia Zinn, CSR No. 9223, Official Reporter

**APPEARANCES CONTINUED**

For Plaintiff Oracle America, Inc.:
                        Orrick, Herrington & Sutcliffe, LLP
                        1000 Marsh Road
                        Menlo Park, CA 94025-1015
                        1 (650) 614-7400
                        1 (650) 614-7401
                BY:  **GABRIEL M. RAMSEY**

For Plaintiff Oracle America, Inc.:
                        Boies Schiller & Flexner, LLP
                        1999 Harrison Street, Suite 900
                        Oakland, CA  94612
                        (510) 874-1000
                        (510) 874-1460 (fax)
                BY:  **STEVEN CHRISTOPHER HOLTZMAN**

For Plaintiff Oracle America, Inc.:
                        Morrison & Foerster LLP
                        755 Page Mill Road
                        Palo Alto, California  94304-1018
                        1 (650) 813-5600
                        1 (650) 494-0792 (fax)
                BY:  **MICHAEL A. JACOBS**

For Plaintiff Oracle America, Inc.:
                        Oracle Corporation
                        500 Oracle Parkway M/S 50P7
                        Redwood Shores, CA  94065
                        1 (650) 506-4846
                        1 (650) 633-1813 (fax)
                BY:  **DORIAN DALEY**

For Defendant Google, Inc.:
                        Keker & Van Nest, LLP
                        633 Battery Street
                        San Francisco, California  94111-1809
                        (415) 391-5400
                        (415) 397-7188 (fax)
                BY:  **CHRISTA M. ANDERSON**
                     **EDWARD BAYLEY**
                     **REID PATRICK MULLEN**
                     **EUGENE MORRIS PAIGE**
                     **DANIEL EDWARD PURCELL**
                     **ROBERT ADDY VAN NEST**

```
 1   APPEARANCES CONTINUED
     For Defendant Google, Inc.:
 2                           Google, Inc.
                             1600 Amphitheatre Parkway
 3                           Mountain View, CA  94043
                             (650) 253-2551
 4                   BY:  RENNY F. HWANG

 5   For Rule 706 Expert, James R. Kearl:
                             Farella, Braun & Martel, LLP
 6                           Russ Building
                             235 Montgomery Street, 30th Floor
 7                           San Francisco, CA  94104
                             (415) 954-4400
 8                           (415) 954-4480 (fax)
                     BY:  JAMES L. DAY
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1  Thursday - July 30, 2015                          11:11 a.m.

 2                    P R O C E E D I N G S

 3        THE COURT:  So now we go to Oracle v. Google, Case

 4  Number 10-3561.  Okay.  Appearances, please.

 5        MR BICKS:  Good morning, Your Honor.  My name's

 6  Peter Bicks.  I'm from Orrick, and I'm here for Oracle.  And,

 7  with your permission, I'd like to introduce some of my

 8  colleagues.

 9        THE COURT:  Of course.  Go ahead.

10        MR BICKS:  Ms. Annette Hurst.

11        MS. HURST:  Good morning, Your Honor.

12        MR BICKS:  Karen Johnson-McKewan.

13        MS. JOHNSON-MC KEWAN:  Good morning, Your Honor.

14        MR BICKS:  Lisa Simpson.

15        MR. SIMPSON:  Good morning, Your Honor.

16        MR BICKS:  And we also have over here the

17  General Counsel, Dorian Daley --

18        MS. DALEY:  Good morning.

19        MR. BICKS:  -- who's sitting at counsel table.  And

20  I'll ask Mr. Holtzman to introduce himself.

21        MR. HOLTZMAN:  Steve Holtzman, Boies, Schiller &

22  Flexner, for Oracle.

23        MR. JACOBS:  Michael Jacobs, Morrison & Foerster, for

24  Oracle.

25        THE COURT:  Okay.  Some new and some old.  Welcome
```

1  back to all of you.

2      Okay.  And over here.

3          **MR. VAN NEST:**  Good morning, Your Honor.

4  Bob Van Nest --

5          **THE COURT:**  You can all be seated there.

6          **MR. VAN NEST:**  -- from Keker & Van Nest, for Google.

7  And I'm here with Christa Anderson --

8          **MS. ANDERSON:**  Good morning, Your Honor.

9          **MR. VAN NEST:**  -- and Reid Mullen --

10         **MR. MULLEN:**  Good morning, Your Honor.

11         **MR. VAN NEST:**  -- Ed Bayley, Dan Purcell --

12         **MR. PURCELL:**  Good morning, Your Honor.

13         **MR. VAN NEST:**  -- and, from Google, Renny Hwang.

14         **THE COURT:**  I'm sorry.  What was that last name?

15         **MR. VAN NEST:**  Renny Hwang.

16         **THE COURT:**  Could you spell that?

17         **MR. VAN NEST:**  H-w-a-n-g.

18         **THE COURT:**  Okay.

19         **MR. DAY:**  Good morning, Your Honor.  James Day,

20  Farella, Braun & Martel, on behalf of the Court-appointed

21  expert, Dr. Kearl.

22         **THE COURT:**  Thank you for coming today.  Is Dr. Kearl

23  present?

24         **MR. DAY:**  He is not.

25         **THE COURT:**  All right.  He wasn't required to be, but

1    I just curious.  All right.

2        All right.  So I have read your materials.  And I have a

3    number of things we need to discuss with you.  Let's start with

4    maybe an unusual question, but what do you see the Jury Verdict

5    Form -- Special Verdict Form looking like in this case?  So

6    that will help me frame the issues in my mind.

7        So you're the plaintiff.  You get to go first.

8            **MR BICKS:**  I think, Your Honor, we'd be focusing on

9    three questions.  We'd be asking whether Google Corporation has

10   met its burden on fair use.  We'd be asking whether Oracle has

11   met its burden on willfulness.  And we'd be asking third

12   question going to damages.  Those would be the three areas that

13   would be the focus of the Verdict Form.

14           **THE COURT:**  Okay.  And what does Mr. Van Nest say?

15           **MR. VAN NEST:**  Your Honor, I think two of those three

16   are winners.  Fair use would certainly be on the Verdict Form,

17   and damages.

18       If fair use is not demonstrated, then we go to damages.

19       We have a disagreement, as I think Your Honor knows, as to

20   whether or not willfulness would be on the Verdict Form, at

21   all.  And our view of that I'm happy to elucidate a little bit,

22   if Your Honor wishes.

23           **THE COURT:**  All right.  Let's outline that issue.

24           **MR. VAN NEST:**  Yeah.  The -- at this point, as

25   Your Honor knows, there are no patent claims left in the case.

1    We prevailed on those, and they were not appealed.

2         In a copyright case, willfulness is only relevant if the

3    plaintiff --

4              **THE COURT:**  Well, that's true.  How did it get to the

5    Federal Circuit?

6              **MR. VAN NEST:**  Well, because there were patents in

7    the case originally, the Federal Circuit takes the appeal, even

8    if there's no appeal of a patent claims.  And that's what

9    happened in this case.  We got to the Federal Circuit because

10   there were patents asserted originally.

11             **THE COURT:**  So I understood that, the way it got to

12   the Federal Circuit was that there was an appeal on the

13   patents; but then after it got into it, it was docketed there,

14   then those were abandoned?

15             **MR. VAN NEST:**  No.

16             **THE COURT:**  That's not what happened?

17             **MR. VAN NEST:**  No.  They were not appealed.

18             **THE COURT:**  So that's the way the statute works, is

19   that you can have the word "patent" in the Complaint someplace,

20   and that gets to the Federal Circuit?

21             **MR. VAN NEST:**  Crazy, but true.  Crazy, but true.

22   Yes, that's the way it works.

23             **THE COURT:**  And that's what the -- that's what --

24   there's no doubt on that, or is there?

25             **MR. VAN NEST:**  I don't think so.

```
 1            THE COURT:  Okay.

 2            MR. VAN NEST:  At least, not according to the

 3   Federal Circuit -- ha, ha -- but that's the way it has worked,

 4   Your Honor.  If there's a patent case claimed at all in the

 5   Complaint, even if it's lost and not appealed, which is what

 6   happened here, it goes to the Federal Circuit.

 7            THE COURT:  All right.

 8            MR. VAN NEST:  But now we're back.  And the issue

 9   now -- there's no patents in the case.  It's just copyrights.

10   And willfulness is not relevant to a copyright claim.

11            THE COURT:  You're saying that nevertheless, any

12   appeal on this round still goes to the Federal Circuit?

13            MR. VAN NEST:  I'm not sure about that, Your Honor.

14   I think that might be a different issue.  There are no patents

15   left, so there will probably be a fight about appellate

16   jurisdiction this time around; but that's not something

17   Your Honor has to resolve.

18            THE COURT:  All right.  So tell me what your view on

19   willfulness is.

20            MR. VAN NEST:  The view on willfulness is that in a

21   copyright case, damages can be enhanced based on willfulness

22   only if they are statutory damages.  The statute is very clear

23   that the only place in which the Court has any discretion to

24   enhance damages is if statutory damages are claimed; not if, as

25   in this case, actual damages for infringers' profits are being
```

1   sought.

2      Now, in the first trial they didn't elect statutory

3   damage.  They have given us a Supplemental Complaint that

4   doesn't plead for statutory damages.

5      And now the statutory damages in this case, Your Honor, if

6   they were proven, and if willfulness were shown, would be about

7   $300,000; so a maximum of 150,000 per copyrighted work.  So

8   it's really a fiction completely that they would ever elect

9   statutory damages.  They didn't before.  And if they don't,

10  then willfulness is not relevant.  There's no jury issue of

11  willfulness for the jury to deliberate over or resolve.

12     They're arguing that willfulness is relevant to an actual

13  damages case or an infringer's profits case, because

14  willfulness cuts off the defendant's right to deduct its costs

15  and expenses; but Judge Hamilton -- Chief Judge Hamilton

16  resolved that precise issue against Oracle, in *Oracle v. SAP*;

17  and Judge Lasnik, up in Seattle, to the same effect.

18     The statute's very clear.  One leg of it involves

19  willfulness and enhancement.  That's the statutory-damage

20  portion of 504(c).  The other leg of it, which is actual

21  damages and infringer's profits -- 504(b) -- doesn't say

22  anything about willfulness.  And so, in our view, willfulness

23  is out.

24     The only other issues they say willfulness is relevant to

25  are equitable issues for Your Honor to decide, should be there

1   an injunction.  Now, we don't concede that willfulness is

2   relevant to that.  That's obviously something you would decide

3   post trial on your own.

4        Attorneys' fees.  Again, we don't concede willfulness

5   would be relevant to that, but that's not for the jury, anyway.

6        And the other issue they contend it's relevant to is

7   laches.  That's for Your Honor to decide, as well.  It's an

8   equitable issue.

9        So in our view, the only two issues on the Verdict Form

10  would be, A, whether Google has shown by a preponderance that

11  the use was fair; and if not, a damages question of some kind.

12            **THE COURT:**  So what is your response to that?

13            **MR BICKS:**  Your Honor, Ms. Hurst will speak to that

14  topic.

15            **THE COURT:**  Sure.  Ms. Hurst, go ahead.

16            **MS. HURST:**  Thank you, Your Honor.

17        Your Honor, we are entitled to a verdict on willfulness,

18  because it limits the scope of fixed expenses that can be

19  deducted in the infringer's profit calculation.

20        Judge Hamilton did not address the argument that we

21  present here regarding the long history of taking willfulness

22  into account in the infringer's profits calculation.  This is

23  settled, Ninth Circuit law, Your Honor.  The Supreme Court has

24  held this in the past, in the *Sheldon versus MGM* case.

25        It's clear that willfulness does limit the scope of

1  fixed-expense deductions.  Indeed, Google's in-house copyright

2  lawyer, Patry, has a provision in his treatise describing the

3  salutary public policy behind this rule.  It is to avoid

4  allowing the infringement to subsidize the other operations of

5  the firm.  Therefore, we are entitled to a verdict on it, on

6  the infringer's profits calculation.

7      In addition, Your Honor, we are still entitled to press

8  forward with the claim of statutory damages.  However unlikely

9  that may be at this point, we have not elected permanently on

10 behalf of Oracle to forgo that.  And willfulness remains

11 relevant to enhancement in that context.

12     Your Honor, Mr. Van Nest omitted the discussion of how the

13 willfulness evidence overlaps with the bad-faith aspects of

14 fair use.  The same evidence will be needed to presented to the

15 jury as part of the fair-use evaluation, because, under *Harper*

16 *& Row* and other cases, Google's bad faith and deliberately

17 infringing on the Java API package copyrights is directly

18 relevant, and supports a finding that there should be no fair

19 use.

20     Because this same --

21     And indeed this Court has previously recognized that that

22 evidence was heard in the prior trial during the fair-use

23 phase, and questioned at one point whether or not the jury

24 might simply be presented with the willfulness-verdict question

25 then, as well.

1    So, Your Honor, there's an overlap.  Efficiency dictates

2    that the evidence is going to be heard by the jury.  We are

3    entitled to a verdict on willfulness both because of the

4    infringer's profits, and the statutory-damages issues.  And,

5    Your Honor, the Court should take the view of the jury into

6    account on this issue in considering later equitable

7    proceedings regarding injunctive relief and attorneys' fees.

8         So, Your Honor, for all of those reasons, Oracle is

9    entitled to a verdict question regarding willfulness.

10            **THE COURT:**  All right.

11            **MR. VAN NEST:**  May I respond briefly, Your Honor?

12            **THE COURT:**  Of course.

13            **MR. VAN NEST:**  First of all, the Ninth Circuit hasn't

14   resolved this issue.  Judge Hamilton noted and the Ninth

15   Circuit has noted that the cases that Oracle's relying on here

16   are cases in which the underlying facts were different.  There

17   was no willfulness finding to begin with, so there's no

18   Ninth Circuit precedent on this.

19        The only precedent we found in this District was from

20   Chief Judge Hamilton, and Judge Lasnik up in Seattle, both of

21   whom said the statute doesn't turn on willfulness when you're

22   seeking actual damage.

23            **THE COURT:**  Well, but Ms. Hurst just told me that

24   Judge Hamilton didn't reach that issue.

25            **MR. VAN NEST:**  She did.  She reached it squarely.  It

1  was exactly the same issue that's presented here.

2      I think what Ms. Hurst may have said is there's one

3  argument they're making that she didn't resolve.  But she

4  squarely resolved that in that case, the alleged infringer

5  would be allowed to deduct their costs, whether or not they

6  were willful.  So that's point one.  She squarely reached it.

7  There is no Ninth Circuit precedent on it.

8      Point two:  Mr. Patry's treatise is simply a review of

9  cases in this Circuit and others as to how this has been

10  handled.  He doesn't express an opinion, himself, one way or

11  the other.  He's talking about what the underlying views are of

12  various Courts.

13      And third, Your Honor, I think we're jumping ahead a

14  little bit to talk about what evidence is admissible, and

15  what's not.  That's something that Your Honor would be

16  determining, I think, closer to the trial.  Our point is:

17  There is no basis for a willfulness verdict question or any

18  deliberation or decision by a jury on willfulness.

19      There may certainly be evidence relevant to willfulness

20  that would be also relevant to other issues for both sides.

21  I'm not saying that that's not the case; but for our purposes

22  in responding to your question "Should there be a willfulness

23  question on the Verdict Form?" the answer is "No," unless they

24  were to seek statutory damages, which, as we all know, is -- is

25  a sheer fiction in this situation.

1    **THE COURT:**  What do you say, though, to the statute

2    that seems to give a right to elect statutory damages up until

3    the time of judgment?

4    **MR. VAN NEST:**  I think, Your Honor, you could easily

5    rule that if and when they elect statutory damages, you will

6    then allow them, in either the same trial or a bifurcated

7    second phase, to present their willfulness evidence.  Right?

8    We all know that it's fictional, since the cap on

9    statutory damages is $300,000.  We all know that's fictional

10    here; but I think Your Honor could rule, consistent with the

11    statute, that they've got to make that election.  And once they

12    make it, then they get to present their evidence of

13    willfulness.

14    And it can be done in a second phase following the first

15    jury verdict, if you wish, or however you want to do it, but I

16    think the point is unless and until they elect it, they're not

17    entitled to have a willfulness form on the verdict, especially

18    here, where it's a retrial.  They didn't elect it the first

19    time.  It's not even demanded in the Supplemental Complaint

20    they sent us.  The Supplemental Complaint demands only actual

21    damages; not statutory damages.

22    So if and when they make the --

23    **THE COURT:**  The Supplemental Complaint has not been

24    allowed yet.

25    **MR. VAN NEST:**  That's true.

1        **THE COURT:**  So what did the original Complaint ask

2   for?

3        **MR. VAN NEST:**  The original Complaint asked for both;

4   but as we all know, the damage reports -- the expert reports,

5   which, obviously, never made it into trial, were all based on

6   actual damages and infringers' profits.  That's what they were

7   based on.

8        And Your Honor heard three versions of them, as you

9   remember.  They were *Daubert*-ed three times before trial, but

10  they were all based on actual damages.  And there never was,

11  all of the way through to judgment in the first trial -- never

12  an election of statutory damages.

13       And I think, again, it's fantasy to think that will ever

14  happen here.  If it is, it's a $300,000 case, in which case

15  there probably would be no trial.

16       **THE COURT:**  Well, it could be -- it could be an

17  injunction.  That's worth more than $300,000.

18       **MR. VAN NEST:**  Pretty late in the day for that,

19  Your Honor; but of course, that's still an available remedy,

20  even though we're years out from the launch of Android.

21       As I said, if they elect statutory damages, this case

22  would be over.

23       **MS. HURST:**  May I respond, Your Honor?

24       **THE COURT:**  Sure.

25       **MS. HURST:**  Thank you.

1          Your Honor, first of all, both parties have agreed that

2     there is not -- this case should all be tried as a single trial

3     this time around.  And the idea of bifurcation --

4               **THE COURT:**  I haven't agreed to that.

5               **MS. HURST:**  Thank you, Your Honor.

6               **THE COURT:**  I get to run the trial.  And I get to

7     protect the jury, not the lawyers.  And the protection of the

8     jury and their convenience counts for a lot.  So probably there

9     will be a bifurcation this time.

10              **MS. HURST:**  Thank you, Your Honor.

11         Regarding statutory damages, as the Court has noted, the

12    Supplemental Complaint is not before it.  I have a draft for

13    the Court, if it would like to review it.

14              **THE COURT:**  No.  I don't need that.

15         Let's talk about that a minute.  I'm going to ask you to

16    just bring a formal motion for leave to supplement.  And I'm

17    not going to decide that today, but you do need to understand

18    this.  If you overreach, I will deny the whole thing.  So

19    Mr. Van Nest said you overreached, and you were trying to slip

20    things in there that had nothing to do with the rule for

21    supplementation.

22         I don't know if that's true, or not.  That's why I want to

23    have a full-blown hearing on it.

24         If it turns out that Mr. Van Nest is right, it will just

25    be denied, and we'll stick with the existing pleadings.  So I

```
 1  want to give you a chance to do it right.  I don't want you to
 2  lose out because you overreached.  I want you to do it the
 3  right way, and not try to slip things in there that have
 4  nothing to do with supplementation.  So that's an easy one.
 5  We're going to have a briefing schedule on that.
 6          MS. HURST:  Thank you, Your Honor.
 7          THE COURT:  But you were trying to make a different
 8  point about supplementation, and I cut you off.  So let's go
 9  back to the point you were trying to make.
10          MS. HURST:  Of course, Your Honor.  We did not repeat
11  the demand for statutory damages in the Supplemental Complaint,
12  as Mr. Van Nest has identified, because that would be
13  duplicative of the original Complaint.  No new work is
14  identified in the proposed Supplemental Complaint.
15          THE COURT:  You could change it to any way you want.
16  You could add it in there again, if you feel that that would --
17  to just take that issue off the table --
18          MS. HURST:  Thank you, Your Honor.
19          THE COURT:  -- when you bring your motion to
20  supplement.
21          MS. HURST:  Let me just address a couple of other --
22  if I may, a couple of other points made by Mr. Van Nest.
23      The election is still available for statutory damages.
24      Judge Hamilton addressed the infringers' expense
25  deduction.
```

1      Judge Hamilton's Order on a motion *in limine* did not

2  address or explain *Sheldon versus MGM* and the Supreme Court

3  case, or the long history of taking willfulness into account in

4  the infringers' profits calculation.  And this has always been

5  done in IP cases, Your Honor.  There are multiple Supreme Court

6  cases describing the importance of willfulness, and limiting

7  fixed expense deductions.

8      Judge Hamilton's Order said, "I don't see that on the face

9  of 504."  And that is correct, because 504 does not specify how

10  to make the infringer's profits calculation.  That's always

11  been a subject of the case law.  And there's no evidence, at

12  all, that Congress intended to disturb that settled rule when

13  it adopted Section 504 in the 1976 Copyright Act.

14      And so, Your Honor, there's this long history, including

15  settled Ninth Circuit authority, limiting the deductions.  For

16  example, in the *Three Boys versus Bolton* case, Your Honor, the

17  income-tax deduction was, in fact, limited in that case.  And

18  so it is -- it would not be correct to say that this is just

19  dicta or, you know, not settled Ninth Circuit law, or even

20  settled Supreme Court law, Your Honor.

21      So there will be some argument later, undoubtedly, about

22  which categories of expenses would be limited in this fashion,

23  which should be on this side of the willful line, and which are

24  not.  That would be a bit premature at this point; but clearly,

25  the law allows for this in the infringers' profits calculation.

1 And therefore, the Verdict Form should reflect that,

2 Your honor.

3          **MR. VAN NEST:**  Your Honor, if I might --

4          **THE COURT:**  Okay.

5          **MR. VAN NEST:**  -- I'm miffed.  You can read

6 Chief Judge Hamilton's Order, yourself.  She cites the

7 Ninth Circuit law.  Oracle was the one that briefed this in

8 front of Judge Hamilton, so they were there.  If they didn't

9 cite the right authority, that's not Judge Hamilton's problem.

10 I have no reason to think they didn't, but she certainly

11 addresses the Ninth Circuit law.

12          **THE COURT:**  What I understand Ms. Hurst to say is

13 that they -- Oracle -- did make the argument, but that

14 Judge Hamilton brushed it aside, and did not deal with it in

15 the Order.  I don't know.  I haven't read the Order before, but

16 you tell me.  Is that what happened?

17          **MR. VAN NEST:**  No, I don't think so.

18     She discusses the Ninth Circuit law.  She discusses the

19 Ninth Circuit Model Jury Instructions.  She discusses the

20 statute.

21     And furthermore, in the *Bolton* case that Ms. Hurst just

22 cited, he was found to be not willful.  That's a totally

23 different point.  There was no willfulness finding in the

24 *Bolton* case, or any of the cases they're citing for authority.

25     The cases they're citing are all cases where the Courts

made various dicta statements, because the underlying finding

was the defendant wasn't willful.

     So again, this is not something that Your Honor

necessarily has to resolve today, but I'm quite certain based

on the current state of the law that the only basis for a jury

question on willfulness is a statutory-damage election, which

we know won't happen in this case.

          THE COURT:  All right.  Now here's what.  We're not

going to decide this now.  I'm going to ask for a motion.  One

of you needs to make a motion to knock willfulness out of the

case, or include it in the case.  Who wants to go first on this

issue?

          MR. VAN NEST:  I think we do.  Yeah, we do,

Your Honor.

          THE COURT:  All right.  So you get to go first.

     And the issue is whether willfulness has any role on

damages --

     Right?

          MR. VAN NEST:  Right.

          THE COURT:  -- other than statutory damages.  And

then you all can brief this, but I have a couple of issues I

want you to put in there, and that is:  Does the Judge have the

case-management authority to give a deadline for making an

election?

     And you might phrase it one of two ways.  It could be

1  election for statutory damages, or it could be election for

2  actual damages.  I'm not sure.  But to me, it would be a

3  difficult thing to be hanging fire on this as we go into the

4  trial, not knowing which way this is going to come out.  So put

5  in there that case-management issue.

6          **MR. VAN NEST:**  We certainly agree.

7          **THE COURT:**  And what I have in mind, maybe -- I'm not

8  going to promise anything on this, but it could be that this is

9  an important-enough issue that we will do a 1292(b), and just

10  wait, and put everything on hold until the Court of Appeals can

11  deal with the issue, and ask them to weigh in on it, but I can

12  see that this is important to both sides.

13      All right.  So you get to go first.  Then you get to go

14  second.  And you can have a reply.  And then we'll have a

15  hearing on that.  That will probably be the same day we have

16  the hearing on supplementation.

17      Okay.  Let's go to the equitable defenses.  It seemed --

18  is this a correct statement:  That the only equitable defenses

19  left are equitable estoppel and laches?

20      And then on the laches, we've got the *Petrella* Decision by

21  the Supreme Court.

22          **MS. ANDERSON:**  You are correct, Your Honor.

23      This is Christa Anderson for Google.

24      You're correct, Your Honor.

25          **THE COURT:**  So is that true?  Is that -- on the

1  equitable defenses?

2         **MR. BICKS:**  Yes.  Yes, Your Honor.

3         **THE COURT:**  All right.  So we've got those two.

4     So how does that work?  Do I just wait and hear all of the

5  evidence, and then decide at the end of the -- do I decide at

6  the end of the first case?  I mean, we all -- I've already

7  heard a lot of evidence, but I'm going to hear more now.

8         **MS. ANDERSON:**  Correct.

9         **THE COURT:**  And so do I decide those at the end of

10 the second phase of the case?

11        **MS. ANDERSON:**  Yes, Your Honor.  We believe that it

12 would make the most sense here for the Court to wait until it's

13 heard the evidence in the second trial.  Much of the evidence

14 I'll discuss in a moment is going to overlap on these issues.

15 It may be at the end of this trial, if Google prevails on fair

16 use, the Court may decide it doesn't need to reach those

17 defenses ultimately; but these are two equitable defenses that

18 are squarely in the Court's ballpark to decide.

19     And the issues that will be addressed on the fair-use

20 defense during the retrial before the jury will overlap

21 significantly with the issues that concern these equitable

22 defenses.

23        **THE COURT:**  Well, take willfulness for a minute.  Do

24 I get to take willfulness into account on equitable estoppel?

25 Let's say that Google was willful.  Surely, I ought to be able

1  to take that into account.

2         MS. ANDERSON:  Well, Your Honor, there may be facts

3  that would be relevant to equitable estoppel that Oracle would

4  be -- would argue would be relevant to an argument of

5  willfulness, were the Court to decide that still was in play in

6  this case; but those are --

7         THE COURT:  Maybe I wasn't clear.  Let's say that

8  you're right; that Judge Hamilton got it right, and that

9  willfulness is not something for the jury.

10        But still if equitable estoppel is for the Judge, and

11 there's been willfulness, shouldn't the Judge know that, and be

12 able to take that into account?

13        MS. ANDERSON:  Well, Your Honor, the elements of

14 equitable estoppel are distinct from the elements of

15 willfulness.

16        So the elements that Your Honor would be addressing when

17 it comes to equitable estoppel are specific about whether or

18 not Sun or Oracle knew of the infringement; whether Sun or

19 Oracle intended that the conduct and communication by it -- or

20 conducted itself in a way that Google had a right to believe

21 that its conduct was approved; and that Sun or Oracle intended

22 that the conduct or communications be acted upon.

23        Another factor of equitable estoppel is whether Google was

24 ignorant of true facts, and whether or not Google relied on Sun

25 or Oracle's communications.

1      It's a broad equitable consideration, where you will both

2  be looking at the conduct of Sun or Oracle.  And, as Your Honor

3  saw in the last trial, there will be a lot of evidence about

4  how Sun and Oracle publicly and to the world embraced Google

5  and Android, and said that it was enhancing the value of Java

6  to the world, and took those actions repeatedly over the course

7  of years.

8      So with those facts before the Court, the Court may well

9  conclude that equitable estoppel applies here, because of the

10 very conduct of Sun and Oracle.

11     That's a distinct inquiry, Your Honor, to the question of

12 whether there was a willfulness finding, which, again, we don't

13 think is appropriate here, because of what was just discussed;

14 but it's a separate inquiry from what is at issue for equitable

15 estoppel, which can be decided and -- and very heavily

16 influenced by what is the actual conduct of Sun and Oracle

17 here.

18     So given -- given that we are going to have a trial on

19 fair use, and that trial is going to consider heavily factors

20 related to how Sun and Oracle conducted itself, whether it held

21 itself out to the world as a company that applauded and was

22 grateful for and was flattered by the introduction of Google's

23 Android to the market, whether Google's conduct was fair use --

24 that information will be highly relevant to the Court in

25 deciding whether equitable estoppel would apply here, given

what Sun and Oracle has done.  And at the end of trial, the
Court may decide that it has to render an opinion on those, or
it may become moot, depending on how the fair-use defense comes
out.

    **THE COURT:**  All right.  Let's hear from Oracle.

    **MR. BICKS:**  Your Honor, you talked about the goal of
protecting the jury.  If there's any way to confuse a jury in a
context like this, it's to allow this equitable claim to be
running parallel with claims that the jury would have to
decide.

    All the stuff that you just heard from Google's counsel, I
hope, sounds familiar to the Court, because it was the exact
same evidence that was already presented.  There is no new
evidence to be presented on the issues of equitable estoppel
and laches.  It's a blog post, and it's a couple of statements
that people made in public.

    Those are the facts that were already presented in the
last trial.  Your Honor will recall that you had an advisory
jury to decide the question of reliance.  The jury found there
was no reliance, which is an element of equitable estoppel.
And in the instructions that you provided to that jury, you
told the jury to answer that question, because it was going to
inform the Court as to areas that were in the Court's
bailiwick.  So you had an advisory verdict that already
disposed of an element of the equitable-estoppel claim.

1    And what is going on here, obviously, is an effort to have

2 an equitable claim floating around, so that evidence can be

3 bootstrapped to -- allegedly in support of an equitable claim,

4 when it may not come in on the issues that are going to be

5 before the jury on the fair-use question.

6    So in light of the fact that Your Honor, in your Order on

7 the equitable defenses, said that you would likely decide it

8 based on the existing trial record, I think for purposes of the

9 jury, if we cleared out the underbrush, including equitable

10 estoppel, which -- as I said, the jury already gave an advisory

11 verdict on a key element.  And, together with laches, which --

12 there cannot be a good-faith argument about laches under the

13 facts and the law -- that the Court should decide those now.

14    Your Honor will remember you have findings of fact and

15 conclusions of law before you that have the exact same

16 information that was just recited to the Court as the basis for

17 those defenses.  So the question is:  Can the Court look at the

18 evidence right now, as Your Honor already did, in issuing your

19 Order and rejecting the other equitable defenses, which, in

20 substance, were very similar to these other defenses in their

21 substance?

22    Your Honor rejected waiver.  Your Honor rejected implied

23 license.  Your Honor rejected this whole, quote, "course of

24 conduct theory," which is very akin to what underlies the

25 equitable estoppel and the laches.  You rejected that.  You

1  said there was no nexus between any of this conduct, and any of

2  the infringement in the case.

3      And I appreciate that laches is a little bit different,

4  because it involves delay; but your Honor, we know what the

5  facts are here.  We know that this lawsuit got commenced seven

6  months after Oracle bought Sun.  And we know that this lawsuit

7  got commenced -- it was 2010.  It was August -- that it got

8  commenced two years after Android was released.  So it was

9  within the statute of limitations.

10     There's no good-faith argument about any delay under the

11 doctrine of laches under those facts.  And I think we should

12 clear out that underbrush, and not create the possibility that

13 we're going to be fighting in a context where -- depending on

14 how the trial shapes up, where there's going to be evidence

15 that arguably would only come in that would be relevant to an

16 equitable issue, but would not be relevant to a jury issue.

17 And it's going to be a tough case, anyway, but to have that

18 uncertainty and confusion out there -- I don't think is right.

19 And I think the time is to clear the underbrush, and let's

20 focus on what the issues are.

21         THE COURT:  All right.

22         MS. ANDERSON:  May I briefly respond, Your Honor?

23         THE COURT:  Yes.  Please respond.

24         MS. ANDERSON:  Thank you.

25     First of all, the Court has already found in its rulings

1  at the end of the last trial that these defenses are still

2  alive.  And the Court has not yet ruled on them, so it's not

3  the case that the Court has already found that these defenses

4  do not apply.

5          **THE COURT:**  Yes, but part of that was because I had

6  ruled in your favor on a dispositive issue which has now been

7  reversed.  And so -- but I said they were still in the case,

8  because it was unnecessary to reach them.

9          **MS. ANDERSON:**  Absolutely, Your Honor.

10         **THE COURT:**  But now maybe it is necessary to reach

11 them.

12         **MS. ANDERSON:**  Well, Your Honor may end up needing to

13 reach these defenses, or possibly may not need to reach these

14 defenses, depending on how the fair-use defense ends up at the

15 end of this trial; but what's important to know here is this is

16 not a situation where Your Honor, awaiting to here the evidence

17 at this retrial -- evidence that will substantially and largely

18 be the same as the evidence you're going to be hearing on fair

19 use, with only small differences at the edges -- it's not going

20 to cause any confusion for the jury.  The jury isn't deciding

21 these issues, but it gives Your Honor the chance to hear from

22 witnesses who are going to be testifying about these same facts

23 on all of these issues again.

24         **THE COURT:**  What are the new facts that will come out

25 at the next trial?

1        **MS. ANDERSON:**  Well, what the parties have been

2   discussing is a period of reopening of some discovery, because

3   we understand Oracle wishes to submit a supplemental damages

4   report that's going to require some additional discovery.  And

5   the parties have proposed to the Court that schedule, but we

6   anticipate taking further discovery about facts that have come

7   out since the time of the last trial and since that last

8   pleading that relates to, among other things, activities that

9   Sun and Oracle have taken which support our position that what

10  Google has done here and what Android is doing in the market in

11  no way harms Java; and this is a fiction that Oracle and Sun

12  have put forth when they, in fact, are taking actions on their

13  own accord to take advantage of fragmentation and other

14  activities they use to market their own products.

15        So the activities that Sun and Oracle have been engaged in

16  since the time of the last trial will be part of discovery.  We

17  haven't taken that discovery yet, but there may be additional

18  information that Your Honor is going to find very informative

19  when you are trying to assess the factors that relate to things

20  like equitable estoppel and laches, because it supports the

21  arguments that Google has been making about the fact that the

22  notion that Oracle and Sun have been harmed by Android is a

23  fiction.  And this is information that will be helpful to the

24  Court.

25        And again, there is no reason for the Court to make these

1    decisions before this trial, before the new evidence is before

2    the Court, before the Court has heard these witnesses testify

3    at the retrial, when ultimately at the end of this trial, the

4    Court may decide it doesn't need to reach those defenses.

5        I also just wanted to mention the comment that Oracle's

6    counsel made related to the *Petrella* case and laches.  We do

7    acknowledge that the *Petrella* case did address the issue of the

8    application of laches when it comes to a question of the legal

9    causes of action, but not when it comes to equitable issues

10   like injunctive relief and other equitable relief the Court

11   could issue, such as disgorgement of profits.

12       **THE COURT:**  But do you agree that laches could not

13   bar the damages in this case?

14       **MS. ANDERSON:**  For an action brought within the

15   three-year period, yes, we acknowledge that for the damages

16   claim; but not for injunctive relief or equitable relief, which

17   includes disgorgement of profits, according to *Petrella's*

18   Decision.  So the issues that relate to laches are still highly

19   relevant, given that Oracle is still seeking, according to what

20   they have said, both injunctive relief, and things like

21   disgorgement of the profits.

22       **THE COURT:**  Well, okay.  Help me understand this,

23   then.  I thought that the actual damages formula in the statute

24   was based on disgorgement.  No?

25       **MS. ANDERSON:**  Well, the statute does include

1    language about profits received by the infringer.  That is

2    correct.

3         But the *Petrella* Decision -- and again, it's a recent one,

4    of course -- talks about the fact that when you're talking

5    about whether laches is still applicable here, it is a relevant

6    defense when you're addressing things that are equitable in

7    nature, such as a claim for disgorgement of profits.  So that

8    is still at play here.

9         And again, because of the recent nature of the *Petrella*

10   Decision, there's not been a lot of law addressing this issue;

11   but when it comes to whether or not laches is still at issue in

12   this case, it certainly is, because injunctive relief is sought

13   by Oracle.  And it is, to the extent that the disgorgement of

14   profits that Oracle is seeking here is equitable in nature,

15   such as that referred to by the *Petrella* Decision.

16             **THE COURT:**  Well, so you're saying that the

17   Supreme Court has held in *Petrella* that laches can still apply

18   to disgorgement of profits under the actual damages prong of

19   504?

20             **MS. ANDERSON:**  Yeah.

21        Just to direct the Court to some pages to look at --

22        And we'd be happy to provide additional cites.

23             **THE COURT:**  Please read it to me slowly.

24             **MS. ANDERSON:**  Yeah.  Both at pages 1978 and page

25   1967, Note 1, the Court talks about the fact that unreasonable

1  delay could limit a plaintiff's ability to recover disgorgement

2  of unjust gains, which the Court characterized as equitable

3  relief.  So, you know, this is a Decision --

4          **THE COURT:**  What was the damages theory that was

5  being used by the plaintiff in that case?

6          **MS. ANDERSON:**  Let me check that for Your Honor.

7  Yeah.  So one moment, Your Honor.

8      Certainly in this case, the damages that were being sought

9  by the plaintiff here addressed the actual damages prong,

10  because the whole point of this ruling was to find that it was

11  not barred, because it was brought within the three-year

12  period.  But I'll have to double-check for Your Honor -- and I

13  will during this hearing -- to make sure that there isn't --

14          **THE COURT:**  All right.  Let's hear what Oracle's

15  counsel says on this.

16          **MR BICKS:**  Well, so, Judge, I think we've got a time

17  kind of phase problem here.  Your Honor asked the question:

18  What new evidence was going to be presented on these equitable

19  defenses?

20      The question, for example, on laches, is:  Did Oracle or

21  Sun delay filing the case?  That's the question on laches.  Did

22  we delay?  We filed the case five years ago.  So the question

23  is:  Did we delay when we filed a case in 2010?

24      We're not going to fuss with things that happened in 2014

25  when we go back and look at that particular issue.  The purpose

1   of the Supplemental Complaint is on market harm and damages,

2   because, as the Court probably is aware, the world has changed

3   since we were last here -- or some folks; not myself, but the

4   group, colloquially speaking.

5        Android is dominating the market.  Today, by the time we

6   leave, 1.5 million new handheld devices will be activated with

7   our client's technology in them.  It's taken off.  The

8   revenues, all of that stuff -- completely different ball game

9   than three years ago.

10        That's what the purpose of the Supplemental Complaint is.

11  Supplemental Complaint has nothing do with evidence that

12  Your Honor already heard that bears on the timing of the

13  initial filing of this lawsuit and those equitable defenses.

14  Those equitable defenses do not stand.  And the evidence is

15  already before the Court.  And if we rolled forward, you'd be

16  hearing the exact same evidence that you heard the first time.

17  So what's happening now does not bear on a blog statement that

18  was made in the year 2008, or a public statement somebody made

19  in the year 2009.  That's not what these equitable defenses are

20  all about.

21        And I will say on this profit question:  Infringers'

22  profits -- it's a form of damages.  It's not equitable relief.

23  And the *Petrella* case doesn't change anything along those

24  lines.

25             THE COURT:  Wait, wait.  Say that again.

 1        **MR. BICKS:**  I said infringers' profits is a form of

 2 damages.  It has nothing do with equitable relief.

 3        **THE COURT:**  Ms. Anderson read from the Supreme Court

 4 Decision where it sounded like the Supreme Court characterized

 5 it as equitable relief.

 6        **MR. BICKS:**  *Petrella* has not changed that basic

 7 concept that I just said, Your Honor.  Go back and look at that

 8 case real carefully.

 9        That was a case where, dealing with an injunction, the

10 question before the Court was:  Was there extraordinary

11 circumstances in that case to invoke the laches doctrine?

12 Because somebody had delayed, I think, 27 years before they

13 brought a case.  And that was the focus of that case.  It was

14 on injunctive relief, and whether or not it was extraordinary.

15        And we don't have any of those facts here.  It's not even

16 close to that, and so we should clear that out.

17        **THE COURT:**  Well --

18        **MS. ANDERSON:**  Also, Your Honor, if I could just

19 supplement a little bit my answer before with regard to the

20 Decision in *Petrella*, the Court explained that, "The courts

21 below erred in treating laches as a complete bar to Petrella's

22 copyright-infringement suit."  And I'm reading from page 1978.

23 "The action was commenced within the bounds of 507(b)"-- dot,

24 dot, dot -- "and does not present extraordinary circumstances

25 of the kind involved in the *Chirco* and *New Era* cases."  And so

1   in that Decision, the Court did not believe that the kind of

2   extraordinary circumstances that would allow laches to proceed

3   to address issues related to injunctive relief or unjust

4   enrichment and disgorgement of profits -- the facts in *Petrella*

5   did not support that finding.

6       But here, Your Honor, we believe the facts are very

7   important for the Court to hear and evaluate with the live

8   witness testimony, because we do believe extraordinary

9   circumstances are present here.  We have Sun and Oracle -- and

10   Oracle's bound by Sun's actions here -- who publicly praised,

11   and applauded, and thanked, and was flattered by the release of

12   Android, and repeated those statements for years.

13       And to now turn around and delay for years, after all of

14   the investment in Android, and suddenly claim that it's

15   wrongful, and infringement -- that's the kind of

16   unreasonable-delay part of laches; that's the kind of evidence

17   the Court is going to be hearing anyway in this retrial.  And

18   therefore, we submit it makes sense for the Court to await

19   hearing that evidence.

20       There may be additional evidence supporting these

21   equitable defenses based on discovery that we think may be

22   helpful to the Court in evaluating it.  And the Court can

23   resolve those, if necessary, at the end of retrial.

24           **THE COURT:**  Do you have a copy of the *Petrella*

25   Decision?

1          **MS. ANDERSON:**  I do.  It's highlighted, Your Honor.

2          **MR. VAN NEST:**  I think I have a clean one,

3  Your Honor.

4          **THE COURT:**  May I see the part that you referred to?

5          **MS. ANDERSON:**  Just now, the one I read?

6          **THE COURT:**  The one where you read that it was

7  equitable.

8          **MS. ANDERSON:**  Okay.

9          **THE COURT:**  I'd like to read that for myself.

10          **MS. ANDERSON:**  1967, Footnote 1, is part of what we

11  quoted.  And there is additional language in here, Your Honor.

12  That isn't the extent of it.  Let me -- Footnote 1.

13          **MR. VAN NEST:**  I apologize, Your Honor.  I don't have

14  my clean copy here.  I --

15          **THE COURT:**  Well, what --

16          **MR. VAN NEST:**  We have highlighted copies, but --

17          **THE COURT:**  Well, show -- is there --

18          **MS. ANDERSON:**  I can read it.

19          **THE COURT:**  Show Counsel what you are going to hand

20  up, so that I can --

21      Is there handwritten notes on there?

22          **MR BICKS:**  I have it, Judge.  I've got the Decision.

23          **THE COURT:**  One of you hand it to me.

24  (Whereupon a document was tendered to the Court.)

25          **MR. BICKS:**  Here.  Mine doesn't have writing on it,

1   if you want to see this one.

2           **THE COURT:**  Let me have yours.

3       What page do you want me to look at?

4           **MR BICKS:**  I turned it to the footnote.

5           **MS. ANDERSON:**  You want to look with me?  We're on

6   Footnote 1, page 1967 Your Honor.

7           **MR. VAN NEST:**  This page, too.

8           **MS. ANDERSON:**  Yeah.  So in Footnote 1, Your Honor,

9   the Court's talking about, "As infringement remedies, the

10  Copyright Act provides" --

11      Do you see that?

12          **THE COURT:**  Yes.

13          **MS. ANDERSON:**  And it goes on to discuss, "Like other

14  restitutional remedies, recovery of profits 'is not easily

15  characterized as legal or equitable,' for it is an

16  'amalgamation of rights and remedies drawn from both systems.'

17  Given the 'protean character' of the profits recovered in

18  remedy, we regard as appropriate its treatment as 'equitable'

19  in this case."  So that's Footnote 1.

20      And then on page 1978, there's language from the Court in

21  which the Court states, "In sum, the Courts below erred in

22  treating laches as complete bar to Petrella's

23  copyright-infringement suit.  The action was commenced within

24  the bounds of 507(b), the Act's time-to-pursue prescription,

25  and does not present extraordinary circumstances of the kind

```
 1  involved in Chirco and New Era.  Petrella notified MGM of her

 2  copyright claims before MGM invested millions of dollars in

 3  creating a new edition of Raging Bull.  And the equitable

 4  relief Petrella seeks -- e.g., disgorgement of unjust gains,

 5  and an injunction against future infringement -- would not

 6  result in total destruction of the film, or anything close to

 7  it."  So that's some of the language that we also cited, I

 8  believe, in our submission to the Court.

 9          THE COURT:  I'm sorry.  I couldn't find that page.

10          MS. ANDERSON:  No problem.  It's page 1978.  And it

11  looks like that page starts with a reference to the Chirco

12  versus Crosswinds Decision.

13          THE COURT:  I have a different pagination system

14  here.  So I'm going to hand this to you.  And you find the part

15  you want me to read.

16          MS. ANDERSON:  Sure thing.

17          MR. VAN NEST:  Hand it up.

18          MS. ANDERSON:  I'm going to put a blue line atop the

19  part that says "17."  It's in the second column on the right,

20  Your Honor.

21  (Whereupon a document was tendered to the Court.)

22          MS. ANDERSON:  And it's right under the blue line, is

23  where it starts.  The "In sum, the courts" --

24          THE COURT:  Oh, that blue line.  All right.

25  (Pause in proceedings.)
```

1     **THE COURT:**  So where it says, "and the equitable" --

2     Oh, I see.  They refer to it as "equitable relief."

3     **MS. ANDERSON:**  Correct, Your Honor.

4     **THE COURT:**  Let's make sure I understand how that

5     ties in to what you were saying earlier.

6     **MS. ANDERSON:**  Certainly.

7     **THE COURT:**  I'm still confused --

8     **MS. ANDERSON:**  Sure.

9     **THE COURT:**  -- on how that affects what -- whether

10    equitable estoppel -- or the what issue does this go to?

11    **MS. ANDERSON:**  Sure.  Well, I believe it was a point

12    that was raised by Oracle's counsel in response to my comments;

13    but essentially what Oracle has claimed is that, well, somehow

14    laches as a defense to claims for disgorgement of profits has

15    been wiped out by *Petrella*.

16    And we're saying, no, it has not.

17    *Petrella*, yes, has acknowledged that laches is not a

18    defense to a -- to, you know, a damages claim, or legal damages

19    claim here; but that -- but laches is still in place when it

20    comes to claims for injunctive relief or equitable relief.  And

21    disgorgement of profits is a form of equitable relief that the

22    Supreme Court expressly acknowledges in the *Petrella* Decision

23    as something that is outside the scope of what is now barred as

24    a laches defense under *Petrella*.

25    **THE COURT:**  But in *Petrella* the Supreme Court said

1    that laches did not apply.  Right?

2              MS. ANDERSON:  In that case -- well, in that case.

3              THE COURT:  But they waited 27 years.  So in this

4    case, they didn't wait 27 years --

5              MS. ANDERSON:  Totally.

6              THE COURT:  -- in our case.  So how do you get around

7    the 27-year thing?

8              MS. ANDERSON:  Your Honor, again, the facts of

9    *Petrella* aren't even remotely related to the facts that are at

10   issue in this case.

11        Here we're talking about the launching of the Android

12   platform; something that a very large company -- Sun/Oracle --

13   publicly applauded repeatedly; said it was flattered by its

14   launching; embraced it over and over again, while Google was

15   investing in the development, making significant investments in

16   the development of this platform.  That --

17             THE COURT:  That reminds me.  Give me that time line

18   again.  I thought that it was something like this; that there

19   were negotiations including both sides.  And there were some

20   bad e-mails on your side; things like, "We're going to make

21   enemies," and "Maybe we need a license."  I don't remember for

22   sure anymore, but it was some bad e-mails on your side.

23        And then, yes, it's true that once the product was

24   released, there were some laudatory comments from Sun.  That's

25   all I remember.

1           MS. ANDERSON:   There were.

2           THE COURT:   But then how long did that go -- so how

3    long did that go -- how long was it before somebody sent a

4    letter saying you're infringing?

5           MS. ANDERSON:   It was years before Oracle elected to

6    sue.

7           THE COURT:   Years?

8           MS. ANDERSON:   Years.

9           THE COURT:   Two years?  What do you mean when you say

10   "years"?  Usually to me, that's like a dozen years; but maybe

11   it's just two.

12          MS. ANDERSON:   Yeah.  It was two to three years, I'm

13   being told.  I'm have to double-check our time line,

14   Your Honor.  Your Honor may recall that we had a time line that

15   I think Your Honor asked for that we'll pull up, to make sure

16   we get all of these facts for you.

17          THE COURT:   It could be as few as two years.  So is

18   that long enough for laches to set in?

19          MS. ANDERSON:   It certainly is, Your Honor, because

20   the question is whether the delay in the actions of Sun/Oracle

21   was unreasonable in delaying.  And here it's utterly

22   unreasonable.

23       And this is the kind of information that we hope to

24   provide to the Court as part of the evidence in the case, which

25   is already going to come in on issues of fair use.  This is

1  all --

2        **THE COURT:**  That evidence you should already have,

3  because we -- that was already discovered.  Right?

4        **MS. ANDERSON:**  There will be --

5        **THE COURT:**  You should know what you're going to say

6  on that point already.

7        **MS. ANDERSON:**  We certainly do, unless there are

8  additional things that we learn in discovery post -- that we

9  have proposed for reopening discovery in this case, should

10  Your Honor adopt our schedule; but the reality here is that we

11  certainly believe that the delay that Sun/Oracle engaged in was

12  utterly unreasonable in these circumstances.  And that's the

13  kind of place where the Court has the ability to issue

14  equitable relief, and apply a defense like laches.

15      And given that Your Honor is going to have to hear this

16  evidence as part of the retrial, and given that if -- if Google

17  prevails on fair use, the Court may not even need to address

18  the issue of laches, it makes -- we believe it makes sense for

19  the Court to wait, and not try to adjudicate this issue on the

20  cold record, before we've completed discovery and had this

21  retrial.  And it makes sense, both from a judicial-resources

22  perspective and also from a perspective of fairness, to ensure

23  that Your Honor has all of the evidence before the Court for

24  resolving this issue if it becomes necessary to resolve.

25        **THE COURT:**  All right.  Let's hear from Oracle.

1          **MR BICKS:**  Well, Your Honor, just -- so, first of

2     all, you were exactly right on the time line for the *Petrella*

3     case.  It's 27 years.

4          We're talking about a span of 2 years where these comments

5     are made.  And some of the comments that they're talking about

6     were even made less than 2 years before this case being filed.

7          And Your Honor was exactly right about the evidence that

8     you recall, including the evidence that we need a license.

9     We're going to make enemies.  You know.  We're worried about

10    fragmentation.  All of the alternatives are terrible.

11         They wouldn't have been engaging in all of these

12    discussions to get a license if there wasn't any legal

13    requirement here to get a license.  And Your Honor knows all of

14    that evidence.

15         What I'm saying is all of that evidence that you already

16    have before you -- and you already heard it.

17         And it was based on all of that evidence that you then

18    ruled that the course-of-conduct argument didn't apply to all

19    of the other defenses.  And it's -- there's no way that a

20    laches case could survive, when our client sued within eight

21    months or seven months of buying the Sun Corporation.  Oracle

22    couldn't have sued before it got the rights.

23              **THE COURT:**  Yeah, but don't you step into the shoes

24    of Sun for laches purposes?

25         **MR. BICKS:**  You know, I heard that --

1          **THE COURT:**  If Sun was guilty of laches, then surely

2     it can't be revived just because Oracle buys the company.

3          **MR BICKS:**  Well, I don't know if it spills over into

4     Oracle.  I heard that said.

5          And -- and I'd also hear what you're saying about the

6     going back and starting the clock again; but whether that's

7     true or not, even if that could be the case, we're talking

8     about a two-year period of time.

9          And what I also know, based on the facts --

10          And again, this is all laid out for the Court in proposed

11    findings that both parties submitted to you.  All that evidence

12    is there.  And it actually was the evidence and the facts that

13    Google decided to go ahead with taking our client's property

14    well before any of these comments were made.  And so that

15    decision had already been made.  And that's, again, all in the

16    record.

17          And now we're just saying, Judge, you're going to hear the

18    same thing again.  And then you'll decide it down the road, as

19    opposed to deciding it now.

20          And there weren't credibility --

21          **THE COURT:**  Here's the deal, though.  I vaguely

22    remember the facts of the case.  I've had hundreds of other

23    cases since then, and many trials.  And I would -- I would have

24    to be deeply into it, in order to do what you're asking me to

25    do.  And I'm going to have to get deeply into it at the time of

the trial, but you're asking me to do that twice; to go back

and --

    I don't know.  That's not too practical.

    I understand what you're asking, and why you're asking it.

    Okay.  If I had nothing else to do, maybe I would, but --

        **MR. BICKS:**  Well, I wasn't suggesting that.

        **THE COURT:**  -- that's a hard -- you're really asking

the poor Judge to go back and look at an old, cold transcript.

And I don't know.

    Let me change the subject for a second.  I'm not giving

you -- I don't have an answer for you on this one.  I don't

even know whether I should ask you to brief something on this,

or not.  I want to come back to that.

    My Rule 706 expert that I appointed -- Dr. Kearl -- you

have raised an issue about conflict of interest.  And I'd like

to hear what you have to say on that, and also hear from

Farella on that issue.  So please go ahead.  What is the

conflict?

        **MS. HURST:**  Your Honor, we understand -- we don't

know whether it's a conflict or not, but we understand that

Dr. Kearl has served as an expert for Samsung in the *Apple v.*

*Samsung* matter.  And, as the Court may know, Samsung is the

largest purveyor of Android phones.  If Dr. Kearl's work in

that matter involved valuation or other economic analysis

related to the sales of Android-based phones, then that could

1  bear directly on the matters in this case.  And we just don't

2  know what the facts are, but we're concerned --

3          **THE COURT:**  Was he a testifying expert in that case?

4          **MS. HURST:**  We're concerned about it.

5      I believe he was testifying.  I'm not sure he testified at

6  trial, but he submitted reports and was deposed, Your Honor.

7          **THE COURT:**  All right.  So what can Farella tell me

8  about this problem?

9          **MR. DAY:**  Well, Your Honor, Dr. Kearl was actually an

10 independent expert in that case, but paid by Samsung on patents

11 that he looked at.

12         **THE COURT:**  What do you mean:  Independent?

13         **MR. DAY:**  I don't believe that.

14         **THE COURT:**  Was he Court appointed, or --

15         **MR. DAY:**  I believe he was Court appointed, but

16 Samsung was paying the bills.

17         **THE COURT:**  Why wouldn't both sides pay the bills, if

18 he's Court appointed?

19         **MR. DAY:**  I don't know the answer to that,

20 Your Honor.  I just know that he was independent, but paid by

21 Samsung.

22     The patent --

23         **THE COURT:**  So he was not your ordinary expert.  He

24 was somehow --

25         **MR. DAY:**  That's right.

1        THE COURT:  Well, all right.

2      But nevertheless, what do you say on the conflict point?

3        MR. DAY:  So the patents that he looked at in that

4  engagement were unrelated to Android.  So, in his opinion and

5  our opinion, there is no conflict or appearance of impropriety.

6      That said, Dr. Kearl is perfectly willing to disclose his

7  reports and his deposition testimony.  We just need to jump

8  through the appropriate hoops, based on the Protective Order in

9  the other case, and potentially whatever Protective Order there

10  is in this case.

11        THE COURT:  I thought we did have a Protective Order

12  already in our case.  Surely we do.  So --

13        MR. DAY:  But if the question, though, is making sure

14  we satisfy the Protective Order in the case where he gave the

15  testimony, Your Honor.

16        THE COURT:  Well, was that before Judge Koh?  Was

17  that the case?

18        MR. PURCELL:  (Nods.)

19        MR. DAY:  I believe so.

20        THE COURT:  Why don't you do what you've got to do in

21  order to turn that information over to both sides?  And then

22  we'll have a deadline by which to make a motion to recuse him.

23      Do you need other information beyond that?

24        MS. HURST:  That was the only matter that had come to

25  our attention, Your Honor.

1          **THE COURT:**  All right.  So when can you turn that

2    information over?

3          **MR. DAY:**  Your Honor, because we may need coöperation

4    from the parties in the other case, I'm a bit reluctant to set

5    a hard deadline that we could commit to.  I'll tell you that I

6    can look into this today, and let the parties know the status.

7          **THE COURT:**  Here.  Let's see.  I'm going to just ask

8    you to get it done by August 21.

9          **MR. DAY:**  Fair enough.

10          **THE COURT:**  Do whatever you've got to do.  And then

11    if you need my help, I will try to help.  But August 21.

12        And then any motion to recuse [sic] him has got to be on

13    file by September 10.  If -- I guess it would be "disqualify"

14    him.

15        But all right?  Is that schedule okay with everyone?

16          **MS. HURST:**  (Nods.)

17          **MR. PURCELL:**  Yes, Your Honor.

18          **MR. DAY:**  Yes.

19          **THE COURT:**  All right.  Good.

20        Now, Oracle raised an issue of whether or not we should

21    even have a Rule 706 expert.

22        And I -- based on what I saw in the prior go-around, I

23    would say "Yes," but I appreciate that the patent issues have

24    now fallen away.  And I think the thing to do is to, subject to

25    the motion to disqualify, is to keep him on board, but make a

1 final decision on whether or not he testifies after we go

2 through the whole process.

3     If I were to dispense with him right now, and say we're

4 not going to do it, then I wouldn't even have the option.  And

5 then it may turn out that the lawyers have ginned up reports

6 that are so complicated, that an expert really is needed to

7 come in and do an independent job.  And that was certainly my

8 view last time.  And if the reports are anywhere near as

9 complicated as the ones that you presented before, then we're

10 going to have another Rule 706 expert.

11     But if somehow simplicity has taken over, and it's

12 something that the jury would not need the assistance of an

13 independent expert, then we will ask -- we'll thank and excuse

14 Dr. Kearl; but I don't want to decide that -- make that final

15 decision -- until after I see how the reports play out, and we

16 go through some, I guess, *Daubert* motions, and whatever else

17 you have.  Then it will be clearer to me whether we need to.

18 We'll make the final decision then; but in the meantime, we've

19 got to proceed as if he's going to testify.  Otherwise, we

20 won't have the option.  So that's the way I feel on Rule 706.

21     Anyone want to argue with me on that?

22         **MR BICKS:**  I don't want to argue with you on it,

23 Judge, other than to say I think your instinct was right that

24 this is a different case.  This isn't a patent case.

25     And the focus last time on -- on all of the back and forth

on the damages -- it had a spillover a little into the

copyright stuff, but the focus was really the patent issues.

And when this case got teed up to go to trial, the Court, I

think, was pretty -- in decent shape on where things stood on

the copyright front, but I understand what Your Honor is

saying.

        **THE COURT:**  Well, I thought the copyright part on

damages was also pretty tough and hard to understand.  So --

and my memory of it is that there was some dramatic shifts, I

think, on your side.  If my memory is right, as time went on,

the copyright part became a huge part of the damages study, but

it started out as being a small part.  Am I remembering this

right?

        **MR. PURCELL:**  You are, Your Honor.

        **MR. BICKS:**  Judge, I wasn't a part of that case.

(Laughter throughout the courtroom.)

        **THE COURT:**  So anyway, we'll just -- we'll make a

final decision on 706 later.

        **MR BICKS:**  Got it.

        **THE COURT:**  All right.  Now let's turn to discovery.

Give me a rough idea of what kinds of new discovery you all

want to take.

    And also, you're going to have to update your expert

reports.  There's no point in going with the old reports.  I

think you ought to do that:  New expert reports.  Is that what

1    you all want to do:  New expert reports?

2           **MR BICKS:**  I think, Your Honor, maybe both will be in

3    order here.  I mean, the case, as I've alluded to, is a

4    different case with what's happened over the last three years.

5           **THE COURT:**  I think you should do -- you should just

6    go forth and have all of your experts do new reports, if you

7    want them to.

8           **MR. VAN NEST:**  Yes, Your Honor.

9           **MR. BICKS:**  Yes.

10          **THE COURT:**  And then do a reasonable amount of expert

11   discovery to not just update, but --

12      You know, the Federal Circuit gave us the test that we're

13   going to apply for fair use.  Maybe you haven't done your

14   homework yet, and you need to do some additional discovery on

15   that.  So I'm okay with giving you more discovery, but give me

16   a rough idea of how much you want there.

17          **MR BICKS:**  Well, on our side, Your Honor, we've

18   got -- as I alluded to, you know, multiple versions of Android

19   are now out in the marketplace.  Unless Google's counsel will

20   tell the Court now and stipulate that our client's computer

21   code is in all of those versions, which I doubt he'll do, we've

22   got to now determine of all of the new Android technology.

23   We've got to get into determining and confirming our client's

24   property is in that technology.  And we've got to get it all

25   over, and figure out what the revenues are for purposes of the

1   disgorgement theory.

2        And I believe, based on what I know or have reason to

3   know, that, you know, there's a lot of statements by Google on

4   the problems with fragmentation that their strategy has caused.

5   And we're going to be wanting to see that, because I think it's

6   going to be very probative on all of the fair-use issues.

7        So the real focus is going to be on what's happened over

8   the three years on that front, but it has dramatically changed

9   the scope of the case in terms of the market-harm issues, and

10  in terms of damages, and in terms of on fair use.  And it

11  really goes to the question that Your Honor was talking about

12  when we started to talk about bifurcation.  I don't want to get

13  into that now, you know, until when the Court wants to; but

14  when we look at the fair-use factors, and is it commercial,

15  that's Factor 1.  And we're going to be looking at just how

16  commercial it is.

17       And to look at how commercial it is, we're going to get

18  discovery on that, but that's all going to be about the

19  revenues.  That's going to be about the sales.  And that

20  answers the question of the balancing and fair use.  We're

21  going to have to look at that for Factor 4 on market harm.

22       We're going to get into and have to really get our arms

23  around all of the -- you know, the market-domination position,

24  and how that's impacted our client's business.  And that's what

25  will be the focus over the last three years.

1    So when we think about what will practically happen -- and

2   it happened at the first trial.  And I know Your Honor had seen

3   it.  The scope of the case -- the size of the revenues and

4   what's at stake -- came into that first part of the case,

5   because it had to on some of those factors; but now that it's

6   getting to the point where we are now, that kind of evidence is

7   squarely within the issues of fair use.  And so the jury's

8   going to have to hear it, and we can't keep that away from

9   them.  And there's just no denying the fact that the

10   infringement here is of huge magnitude.  And that's just the

11   reality of what the case is about.

12          **THE COURT:**  All right.

13          **MR BICKS:**  I'd heard Your Honor's comment about

14   shielding the jury, but we can't shield them about the basic

15   facts of the case.

16          **THE COURT:**  All right.  Well, whatever relates to

17   fair use -- of course, the jury's going to hear that on round

18   one.

19          And if you convince me that there's no point in having

20   round two, then maybe we just have one round, but --

21          **MR BICKS:**  I mean, I think the parties are coming at

22   it from the same point.  I'm just saying that, having studied

23   as best I could what happened the first time in trying to --

24   and I was mindful of what Your Honor was saying about

25   protecting the jury.  And I know Your Honor was concerned about

1  big numbers being thrown around.  And what eventually happened

2  in the case is they came out, particularly on the question of

3  how commercial this is, because it's --

4      As the Federal Circuit has said, the key factors are:  How

5  commercial is this?  And also:  What's the market harm?

6      And you can't talk about market harm to a jury without

7  them knowing what the markets are, knowing what the scope is,

8  and knowing what's involved.  And it's all going to be coming

9  out.

10     And that's why I think, you know, we were of the view of:

11 To streamline this, you know, that -- let's do it all in.

12 Let's get it done, and -- and have this jury decide the case.

13     But those are some of the points on discovery that we're

14 going to want to focus on.

15         THE COURT:  So how about your discovery?

16         MR. VAN NEST:  Your Honor, I --

17         THE COURT:  Do you have any problem with what I just

18 heard, in terms of discovery from you?

19         MR. VAN NEST:  I don't think so.  I mean --

20         THE COURT:  Great.

21         MR. VAN NEST:  I don't agree with some of the remarks

22 about the outcome, of course, Your Honor.

23     I kind of agree with what you said.  New expert reports --

24 there's a lot of water under the bridge since the last trial.

25 We want to know what Oracle's been doing.  Have they made

1   further efforts to get into the smartphone market?

2      They claim that Java's been somehow harmed by the great

3   success of Android.  I doubt that's true.

4      We want to know how Java's doing.

5      We want to know how their licensing efforts are going.

6      We want to know what they're doing to prevent

7   fragmentation.

8      Obviously, if they're talking about other products, like

9   wearables, that's a different issue on the transformative use,

10   too.  No doubt, Google Glass is very different than anything

11   Oracle's ever come up with, or anyone that had Java.  So, you

12   know --

13         **THE COURT:**  What are you going to say to the jury

14   about why you should win on fair use?  It's your burden.

15   Right?

16         **MR. VAN NEST:**  It's my burden.  It's my burden.  I'm

17   going to say -- I'm going to say that when this thing came out,

18   the people that had created it --

19         **THE COURT:**  Which thing came out?

20         **MR. VAN NEST:**  I'm sorry.  When Android was announced

21   in 2007, these -- the folks that developed Java said Android

22   has strapped another set of rockets onto Java.  And everything

23   that Mr. Schwartz and his colleagues at Sun did, including

24   Mr. Schmidt, had been to promote Java by getting as many people

25   out there using Java and using the APIs.  And for years the

1  mantra was, "Use them.  Use them.  Use them.  Use them."  They

2  were taught in schools; taught in universities; taught in spots

3  all over the world.  The whole effort was to open-source Java,

4  open-source the APIs, get them out there.  And that's the way

5  it was.

6      And, in fact, Android's success, we think, has lifted

7  Java, and it's made Java more popular than it would have been.

8  It was dying.  At the time that Oracle bought Sun, Java was

9  dying.  And now Java has life again, in large part because

10 Android's been successful.

11     So that's not all I'm going to say, but the thing that I

12 think is key is that these folks, for years, made a business

13 out of pushing APIs out there, putting them in the public.  And

14 Mr. Ellison, when he bought the company, stood up at Java

15 one -- you'll remember, Your Honor.  He stood up in that video

16 and said, We're flattered by folks like Google using Java.  And

17 we expect a lot more of this from our friends at Google."

18 That's something we had in the videotape for the jurors in the

19 first trial.

20     So I don't think there's any question that --

21         THE COURT:  I don't remember that.  I remember the

22 video, and him standing there; but is that an exact quote, or

23 is that --

24         MR. VAN NEST:  Pretty close.  Yeah, pretty close,

25 pretty close.  Our friends -- we expect more of this from our

1  friends Google, and we're flattered by the use of Java in

2  Android.

3           **THE COURT:**  He used that word:  Flattered?

4           **MR. VAN NEST:**  I think so.  I'm pretty sure,

5  Your Honor; but like you I've had a few cases since then, as

6  well.

7           **THE COURT:**  Sometimes I remember it more favorably

8  than it was, I mean, in my own experience.  Maybe that's what

9  you're doing there.

10           **MR. VAN NEST:**  That's possible, Your Honor.  I've

11  been accused of that.

12       I will say the other big issue for discovery for us is

13  going to be:  What have Sun and Oracle been doing?  What has

14  Oracle been doing with Java?

15       I think it's been very successful.  I think Java's grown.

16  I think they have done very well with it, thanks to us.  And I

17  think it's another thing that's a key factor.

18       But I basically agree with what you've said.  We've got

19  a -- we've got a new case to try.  That's always exciting.

20  We've got a set of factors that we've got to apply.  We need a

21  little bit of discovery on that.

22       And I honestly think the schedule the parties proposed is

23  pretty reasonable.  We've worked that out in meet-and-confer,

24  which gives us each in enough time to do it, and then do our

25  reports, and then have the *Daubert* series of stuff, and then

1  have our pretrial and trial.  And that points to a trial next

2  spring, which the parties, I think, are united in saying is a

3  reasonable schedule.

4          **THE COURT:**  Well, next spring is not good for me.

5      So I've got, once again -- we had this problem before,

6  which was I've got a big RICO criminal case that takes priority

7  over your case.  And it's already -- one trial is in February,

8  and one trial is in May.  And they're going to be kind of back

9  to back.  So if that case goes forward as scheduled, that's not

10  even counting all of the civil trials that I have already set

11  for the spring.  I just can't bump everybody else, and help out

12  Google and Oracle.

13      So I don't know.  I'm not inclined to tell you what the

14  trial date's going to be yet.  I -- I think I want to see how

15  the lawyers behave, and how the parties behave, and how

16  problematic you are, and then maybe set a trial date later in

17  the year.  And it could wind up being in the spring.

18      I will -- I may have a better schedule in November for,

19  say, April or March; somewhere in there.  But I can't -- I just

20  don't want to give you a date today.

21          **MR. VAN NEST:**  So I'll hold off on any vacation

22  planning, Your Honor, in the meantime.

23          **THE COURT:**  I have no sympathy for you lawyers and

24  your vacation plans.  I'm sorry.  That is what you've got to

25  do.

1              **MR. VAN NEST:**  I'm well aware of that, Your Honor.

2              **THE COURT:**  No vacation.  You lawyers have

3    compensating benefits in your profession, and so a little

4    uncertainty here is the way it's going to have to be.

5         However, on your -- what was your deadline for getting the

6    discovery done and the expert reports?  Seems like that part of

7    it, I could go ahead and approve now.  What do you want to do

8    there?

9              **MR. VAN NEST:**  I think there was a slight difference,

10   but not a big one.  The --

11             **MR BICKS:**  The expert discovery cutoff, Your Honor --

12   we were proposing January 21st, 2016.  And they were saying

13   February 16th, 2016.  So we were off, you know, three weeks or

14   so.  We were --

15             **THE COURT:**  Who had the earlier date?

16             **MR. BICKS:**  Ours was the earlier date.

17             **THE COURT:**  What date did you want?

18             **MR BICKS:**  We said expert discovery cutoff is going

19   to be Thursday, January 21st, 2016.

20             **THE COURT:**  What's wrong with that?

21             **MR. VAN NEST:**  Well, Your Honor, just given -- given

22   the complexity of the issues -- and I think Your Honor

23   remembers pretty well how complex they were last time -- we

24   suggested a couple of additional weeks to February 16th, but if

25   Your Honor felt that, you know, February 1 or February 5 was a

1  better date, that's fine.  I mean, this is --

2          THE COURT:  Well, I want to hear from Farella and

3  Dr. Kearl's lawyer.  You know, he's going to have to be able --

4  he's going to have to read their reports, and do his piece of

5  this, too.  So how does his schedule look for next year?

6          MR. DAY:  His schedule is okay for next year, but he

7  did make the exact same point, Your Honor; that if you're going

8  to have new reports, he will need some time to analyze and, you

9  know, provide the value that he can to you, Your Honor.

10         THE COURT:  All right.  So the date you gave me was

11  for new reports, or was that for the end of discovery?

12         MR. BICKS:  That was expert discovery cutoff.  And we

13  had dates leading up to that for the reports.  We had --

14         THE COURT:  What were those dates?

15         MR BICKS:  It was -- Tuesday, December 8th, 2015, was

16  the deadline for the opening expert reports.  And then we built

17  in a month -- January 7th, 2016 -- to submit opposition expert

18  reports.  And then what I gave you was the discovery cutoff

19  date, which was the 21st.  So that would be the two weeks

20  between the 7th and the 21st that -- we were thinking you'd

21  have, you know, the depositions of the experts.

22         THE COURT:  And have you read the way I do my opening

23  report; the opposition?  This is tying into my system?

24         MR BICKS:  Yes.  Not only did I read it, I heard you

25  say it earlier today to the other folks here.

```
 1            MR. VAN NEST:  Your Honor, we were similar.  We were
 2   staggered a little bit off that.  We had the opening expert
 3   reports due on the 22nd of December, and the expert discovery
 4   cutoff due not quite two months later, but February 16th, in
 5   part because we understand the possibility that Dr. Kearl would
 6   be involved, and that he'll need time to participate.
 7        He was, I believe, deposed last time, too.  I mean, he did
 8   a report.  And then we took his deposition, I believe.  And he
 9   needs a little extra time.
10            THE COURT:  When did you have the fact discovery
11   cutoff?
12            MR BICKS:  It was December 4th, 2015, for us;
13   December 15th, 2015, for them.
14            MR. VAN NEST:  Yeah, that's right.
15            MR BICKS:  Give or take.  Nine days' difference.
16            THE COURT:  Well, I like the Oracle schedule better.
17   December 4, fact discovery cutoff.  December 8th, opening
18   reports.  January 7th.
19        Now, I usually just give 14 days.  You've got a whole
20   month in there.
21            MR. VAN NEST:  We've got the holidays in there.
22   Your Honor, and that --
23            THE COURT:  Well.
24            MR. VAN NEST:  That's cutting it pretty tight.
25            THE COURT:  Yes, holidays.  But 14 plus 8 is 22.
```

```
 1   Holidays come after that.  Nevertheless, okay.  I go with

 2   January 7th.  All right.  That's the schedule.  It's okay with

 3   me, if I understand it right.  December 4.  December 8th.

 4   January 7.  January 21.  What was that date again?  The end of

 5   fact discovery -- the end of expert discovery?

 6            MR BICKS:  Right.  January 21.

 7            THE COURT:  All right.  So I need to piggyback on

 8   with this Dr. Kearl.

 9       Can I get -- I'm sorry.  I've forgotten your name, and I

10   am embarrassed.  What --

11            MR. DAY:  James Day, Your Honor.

12            THE COURT:  Day, D-a-y?

13            MR. DAY:  Day.  D-a-y.

14            THE COURT:  All right.  Mr. Day, would you get with

15   Mr. Kearl, and submit to me a schedule that would piggyback on

16   January -- on what we just heard here?

17            MR. DAY:  You mean piggyback how long after the 21st?

18            THE COURT:  Right.  Well, he -- he would start

19   getting the reports, himself, on December 8th.  And then he

20   would go start doing his work.  So at some point, he would

21   trail somewhat; but I don't think we would wait all the way

22   until January 21 for him to do --

23            MR. DAY:  No, Your Honor, but he may -- likely would

24   want to see the deposition testimony of other experts.

25            THE COURT:  Yeah.  That's a fair point, but can you
```

1  get with him and propose to me a schedule that would be most

2  compressed that he could live with, that would piggyback on

3  this schedule?

4          **MR. DAY:**  Absolutely, Your Honor.

5          **THE COURT:**  All right.  Thank you.  Okay.  All right.

6  So that much of your schedule, I'm all right with.

7      It's the trial part that I'm not sure about.  I want to

8  come back to the --

9          **MR. VAN NEST:**  Briefing on the other issues,

10  Your Honor.

11          **THE COURT:**  On some of the other issues.

12      Now, I've asked you.  I want Oracle to move to supplement.

13  Don't overreach.

14      Then, I want -- we have the willfulness issue that you're

15  going to take the lead on.

16          **MR. VAN NEST:**  That's right.

17          **THE COURT:**  And work in there the case-management

18  issue about the deadline.

19      I've given you a procedure for dealing with potential

20  conflict of interest of Dr. Kearl.

21      I said I didn't know what the answer was on the equitable

22  defenses.

23          **MR. VAN NEST:**  Want to put these motions on the Kearl

24  schedule, Your Honor?

25          **THE COURT:**  I'm sorry.  What motions?

1          **MR. VAN NEST:**  Do you want -- well, their motion for

2    leave to supplement, and our motion to strike willfulness.  Do

3    you want to put those briefing schedules on the same schedule

4    you put the Kearl briefing?

5          **THE COURT:**  Ah, I think we should make -- do the

6    supplement.  I think the supplementation should be done

7    quickly.

8          **MR. VAN NEST:**  Okay.

9          **THE COURT:**  So how soon can you make that motion?

10         **MS. HURST:**  Tomorrow, Your Honor.

11         **THE COURT:**  Well, how about -- that's great, but I

12   don't -- I want you to -- I don't want you to overreach.  So I

13   want you to have time to contemplate that.  How about a week

14   from today?

15         **MS. HURST:**  That would be fine.

16         **THE COURT:**  How about a week from today?

17         **MS. HURST:**  Thank you.

18         **THE COURT:**  All right.  And then the other one on the

19   willfulness -- when can you -- when can you file that?

20         **MR. VAN NEST:**  That's fine, Your Honor.  A week from

21   today is fine.

22         **THE COURT:**  All right.  We can do that.

23      Now I'm not going to give you a schedule on the equitable

24   defenses, because I want to think about that, and *Petrella*, and

25   laches.  And I'll just let you know in due course where we're

1   going to come out there.

2           MR. VAN NEST:  Shall we handle oppositions and

3   replies just on the Local Rules on these motions?  Is that what

4   you --

5           THE COURT:  Yeah.  Please do it on a 35-day track,

6   unless you feel --

7           MR. VAN NEST:  Okay.  That's fine.

8           THE COURT:  -- that we need a more compressed

9   schedule.

10          MR. VAN NEST:  That's fine.

11          THE COURT:  All right.

12          MR. VAN NEST:  Thank you, Your Honor.

13          THE COURT:  Is there anything else that you are dying

14  to bring up?

15          MR BICKS:  I wasn't dying to bring up, Judge, but I

16  was just keeping a list of the issues.  And I had as my last

17  issues the parties disagreed on who was going to go first in

18  the trial.  We've got a lot of balls up in the air.  Maybe we

19  don't deal with that, but just because I kept a list of the

20  issues that we had different views on, that happened to be one

21  of them.  Obviously, that's impacted by what the case is going

22  to be about, but --

23          THE COURT:  Well, if the only issue is fair use, it's

24  their burden.  They would go first.  That's the way it works;

25  isn't it?

1          **MR BICKS:**  Well --

2          **THE COURT:**  The party with the burden of proof.  And

3  then, of course, I say to the jury, "They've got the burden of

4  proof.  And if they get the 50 percent, that's not good

5  enough."

6          **MR BICKS:**  Yeah.

7          **THE COURT:**  "It's got to be 51."  And so it's not

8  always good to go first.

9          **MR. BICKS:**  Right.

10          **THE COURT:**  Sometimes it's better to have the last

11  word; not the first word.

12          **MR BICKS:**  Yeah.  Well --

13          **THE COURT:**  But what do you have the burden of proof

14  on?

15          **MR BICKS:**  Well, we've got the burden of proof to

16  show damages.  We've got the burden of proof to show

17  willfulness.  And we've got the burden of proof to show

18  copyright infringement.

19      And we've already met the burden on copyright

20  infringement.  And we'll be working with the Court, no doubt,

21  when we roll forward for probably detailed preinstructions of

22  what we would tell the jury.

23          **THE COURT:**  Seems to me -- doesn't everyone agree

24  that infringement is off the table?  That's a forgone

25  conclusion; isn't it?

1          **MR. VAN NEST:**  Well, as to what was accused last

2     time, it certainly is, based on the Federal Circuit.

3        But now they want to accuse a bunch of new products.  I'm

4     not sure yet.  You said, "Don't overreach."  So far, they want

5     to accuse --

6          **THE COURT:**  All right.  So possibly for the new

7     products, okay, that's possible; but if it turns out that they

8     do have the burden of proof on if infringement on some line of

9     products, then probably they do get to go first.

10          **MR. VAN NEST:**  That's right.  Yeah, that's right.

11          **THE COURT:**  So --

12          **MR. VAN NEST:**  I think it's --

13          **THE COURT:**  I can't -- I don't know how this is going

14     to shape up yet.

15          **MR. VAN NEST:**  Right.

16          **THE COURT:**  I don't know the shape of the trial yet.

17          **MR. VAN NEST:**  You're right.  If it's an infringement

18     trial, they'll have the burden.  And if it's a fair-use trial,

19     we'll have the burden and we'll go first.

20        And, I think as Counsel mentioned, there are a lot of

21     balls in the air, so I don't think we need to resolve this

22     today.  The Court has our positions and the statement.  And

23     we've got a lot of work to do.

24        But again, if it's a fair-use trial, we have the burden,

25     and we accept that.  Then we would expect to go first.

1          THE COURT:  Isn't that right?

2          MR BICKS:  It's an interesting issue, Judge, because

3   as the plaintiff, typically the plaintiff goes first.  The

4   plaintiff has the right to tell the plaintiff's story.  The

5   plaintiff has the right to tell the jury about the technology.

6      And it's an interesting situation, because if this case

7   was tried without the unusual situation of a -- now a

8   Federal Circuit direction to instruct the jury that there's a

9   copyright infringement, we would be kind of telling our story

10  first.  We're still the plaintiff.

11          THE COURT:  Well, you get to do an opening statement.

12          MR BICKS:  Yeah.

13          THE COURT:  I mean, don't you like being in the

14  position of -- we have to say to the jury, "Ladies and

15  gentlemen, Google has already lost on infringement.  They are

16  an infringer, unless you find that there has been fair use.

17  And they've already lost on copyrightability."

18          MR BICKS:  Yeah.

19          THE COURT:  And all of those have been ruled against

20  them.  And now they're down to the last trench.

21          MR BICKS:  Yeah.  I don't mind that.

22          THE COURT:  I'm exaggerating, for you lawyers' sake.

23          MR BICKS:  Yep.

24          THE COURT:  But I mean there's an advantage to you.

25  And therefore, they get to go.  It's their burden to prove fair

1  use.  In a way, that helps you.  I don't know.

2        **MR BICKS:**  Yeah.

3        **THE COURT:**  But for you to have all of the those

4  benefits plus get to go first, when it's their burden -- I'm

5  not sure that's fair.

6        **MR BICKS:**  Well, I think we've got to figure out

7  what's in the case, but I -- you know, we'd like -- I'm not

8  upset about telling the jury the story you just said.  That's

9  all right.

10        **THE COURT:**  Isn't that the way it is?

11        **MR. VAN NEST:**  I wish you'd quit giving him help,

12  Your Honor, but we'll -- I'm sure we'll have a robust debate on

13  what the jury's told.

14        **THE COURT:**  To me, that's kind of where we are.

15  Maybe you've got a great argument on fair use, but it is a

16  commercial thing, you know.  It's not like you're a private

17  institution like University of California, or some small --

18  some small charitable institution.  It's one of the biggest

19  companies in the world.

20        **MR. VAN NEST:**  No.  We never claimed --

21        **THE COURT:**  It's Factor Number 1.  There are four

22  factors.  So --

23        **MR. VAN NEST:**  That's right.  That's right.  We -- we

24  appreciate Your Honor's comments.

25        I think that we'll have a robust debate, of course, about

1  what the jury's told in a preinstruction; but in general, yes.

2  If it's a fair-use trial, then we've got the burden, and we

3  expect to go first and explain to the jury why it's a fair use.

4       **THE COURT:**  Well, I have one last thing for you.  Why

5  shouldn't I make you go back to see Judge Paul Grewal for

6  mediation?  It's -- you know, we've got a new landscape here.

7  At the old landscape, you said you had to try the case.  And

8  now some things have changed, and maybe there's room for --

9  (Discussion off the record.)

10       **MR. VAN NEST:**  I think it might be premature for

11  that, Your Honor.  We've got some additional discovery to do.

12  There's quite a bit that the parties don't know about what's

13  happened in either camp since last time.  So we're never averse

14  to mediation, of course, but I think now is a little premature

15  for that type of activity.

16       **THE COURT:**  Well, you could just say to him, "Wait a

17  few months."  At least get on his calendar for later.  He can

18  deal with that.

19      How about the Oracle side?

20       **MR BICKS:**  Judge, let me -- we should talk about

21  that.  I got folks who are in here I would want to confer with.

22      My recollection from what I've read of the last time

23  that -- it was that Judge who said, you know, some cases just

24  got to get tried.

25       **THE COURT:**  I know that was then.  This is now.

1          **MR. BICKS:**  The problem is our case got so much

2     stronger, Judge.  Now we've got a copyright violation and, you

3     know, technology all over the marketplace with our stuff on it.

4     It's a -- but we'll --

5          **THE COURT:**  Perfect.  Perfect formula for a

6     settlement.

7          **MR BICKS:**  Ha, ha.

8          **THE COURT:**  So maybe that's where -- you know, those

9     issues no longer --

10         Those were the issues that -- I think he said, "You've got

11    to go try those issues."

12         All right.  Those issues have now been tried and decided

13    by the Federal Circuit.

14         Okay.  So now maybe the issues that remain to be tried

15    could be settled.  I don't know.

16         **MR BICKS:**  Understood.

17         **THE COURT:**  I think you're going to spend millions

18    and millions and millions on defense and prosecution.  So I'm

19    going to refer to you Judge Grewal, whether you like it or not.

20    You can deal with him.  And if he wants to say again, "Okay.

21    It's got to be tired," then that's fine.

22         And in the meantime, I'm going to proceed on that

23    assumption; that it does have to be tried.

24         Okay.  Is there anything more you need from me today?

25         **MR. VAN NEST:**  Nothing, Your Honor.

1          THE COURT:  And how about Mr. Day?  Mr. Day, where

2   did you go?  Anything more that I can help you or Dr. Kearl

3   with?

4          MR. DAY:  No, Your Honor.

5          THE COURT:  So I don't -- are we going to have issues

6   like one side wants to get rid of their old expert and bring in

7   a new expert, or have you agreed that's okay?

8          MR BICKS:  I think we've agreed new experts are in

9   the -- are fair game.

10          MR. VAN NEST:  I think that's right, Your Honor.

11          THE COURT:  All right.  I'm okay with that.  So

12   great.

13      And have you agreed on things like how many

14   interrogatories, or how many requests for admissions?

15          MR. VAN NEST:  I think we're pretty close.  We've

16   been meeting and conferring.  And we put some of the limits in

17   the CMC, but I think we can work the rest of those out.

18   There's not a bunch of debate there.

19          THE COURT:  I wish you would work all of that out --

20          MR. VAN NEST:  We'll try to do that, Your Honor.

21          THE COURT:  -- and save me from the discovery

22   problems.

23      The fewer experts, the better.  And please don't do this

24   to me again.  I don't remember who was the guilty party last

25   time, but somebody tried to spoon feed the experts, which I

1   don't like.  I don't like some ginned-up thing that an expert,

2   you know, from one side, who gives it to the -- and it's got

3   all got to be tested, and subject to discovery and

4   cross-examination.  And I don't like the spoon-fed thing.

5        So that's the only memory I have from your experts that

6   persists right now, other than they were huge and complicated.

7   All right.

8              MR. VAN NEST:  Thank you, Your Honor.

9              THE COURT:  I will try to get out a short order.  And

10  we will be back here in a few weeks for your motions.  Thank

11  you very much.

12             MR. VAN NEST:  Thank you, Your Honor.

13             MR BICKS:  Thank you.

14  (At 12:45 p.m. the proceedings were adjourned.)

15  I certify that the foregoing is a correct transcript from the

16  record of proceedings in the above-entitled matter.

17

18  *Lydia Zinn*

19  _____  July 31, 2015
    Signature of Court Reporter/Transcriber   Date

20  Lydia Zinn

21

22

23

24

25