# EXHIBIT Q
# Part 3 of 3
# Pages 160 - 214

**SCHEDULE A**

Members, Percentage Interests and Membership Interests

| Name | Percentage Interest | Membership Interests |
|---|---|---|
| Time Warner Inc.<br>One Time Warner Center<br>New York, NY 10019<br>Attention: General Counsel<br>          SVP Mergers and Acquisitions<br>Fax: (212) 484-7167 | 2.5% | 2.5 |
| TW AOL Holdings Inc.<br>c/o Time Warner Inc.<br>New York, NY 10019<br>Attention: General Counsel<br>          SVP Mergers and Acquisitions<br>Fax: (212) 484-7167 | 92.5% | 92.5 |
| Google Inc.<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043<br>Attention: General Counsel<br>Fax: 650-963-3257 | 5% | 5 |

41

**EXHIBIT A**

<u>Form of Adoption Agreement</u>

This ADOPTION AGREEMENT (this "<u>Adoption Agreement</u>") is executed pursuant to the terms of the Limited Liability Company Agreement of AOL Holdings LLC (the "<u>Company</u>") dated as of [ ], 2006, a copy of which is attached hereto and is incorporated herein by reference (the "<u>LLC Agreement</u>"), by the undersigned (the "<u>Additional Member</u>"). By execution and delivery of this Adoption Agreement, the Additional Member agrees as follows:

SECTION 1. <u>Acknowledgment</u>. The Additional Member acknowledges that such Additional Member is acquiring Membership Interests (as defined in the LLC Agreement) in the Company subject to the terms and conditions of the LLC Agreement.

SECTION 2. <u>Agreement</u>. The Additional Member (a) agrees that all Membership Interests in the Company acquired by such Additional Member shall be bound by and subject to the terms of the LLC Agreement and (b) hereby adopts the LLC Agreement with the same force and effect as if it were originally a party thereto.

SECTION 3. <u>Notice</u>. Any notice required to be provided by the LLC Agreement shall be given to the Additional Member at the address listed beside such Additional Member's signature below.

SECTION 4. <u>Governing Law</u>. This Adoption Agreement and the rights of the parties hereto shall be interpreted in accordance with the laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws.

Executed and dated this        day of                    ,

Additional Member:

_____

Address for Notices:

_____

_____

**EXHIBIT B**

[Representations and Warranties]

(a) The common stock of Time Warner issued to the Google Entities (the "TW Common Stock") is validly issued, fully paid and nonassessable.

(b) The TW Common Stock is free of any liens or encumbrances, other than any liens or encumbrances created by or imposed upon the Google Entities.

(c) All corporate action on the part of the Time Warner and its directors, officers and stockholders necessary for the authorization, sale, issuance and delivery of the TW Common Stock has been taken.

(d) A registration statement (the "Registration Statement") in respect of the TW Common Stock has been filed with the Securities and Exchange Commission (the "Commission") and declared effective by the Commission; and no stop order suspending the effectiveness of the Registration Statement has been issued and no proceeding for that purpose has been initiated or threatened by the Commission. The Registration Statement, and the prospectus contained therein, conform in all material respects to the requirements of the Securities Act of 1933 and the rules and regulations of the Commission thereunder and do not, as of the effective date, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; provided, however, that this representation and warranty shall not apply to any statements or omissions made in reliance upon and in conformity with information furnished in writing by the Google Entities.

EX-10.21 3 dex1021.htm CONTRIBUTION AGREEMENT

**Exhibit 10.21**

CONTRIBUTION AGREEMENT

AMONG

TIME WARNER INC.

GOOGLE INC.

and

AMERICA ONLINE, INC.

Oracle America v. Google
3:10-cv-03561-WHA

GOOGLE-03170174

# TABLE OF CONTENTS

**Page**

## ARTICLE I
### Pre-Closing Actions

| | | |
|---|---|---|
| SECTION 1.01. | Formation of NewCo | 1 |
| SECTION 1.02. | Contribution of AOL to NewCo | 1 |
| SECTION 1.03. | Conversion of AOL | 1 |
| SECTION 1.04. | Formation of HoldCo | 1 |
| SECTION 1.05. | AOL Transfers to NewCo | 2 |

## ARTICLE II
### Closing Date Actions

| | | |
|---|---|---|
| SECTION 2.01. | NewCo Borrowing | 3 |
| SECTION 2.02. | Closing | 4 |
| SECTION 2.03. | Time and Place of Closing | 5 |

## ARTICLE III
### General Representations and Warranties of Time Warner

| | | |
|---|---|---|
| SECTION 3.01. | Organization, Standing and Power | 5 |
| SECTION 3.02. | Authority; Execution and Delivery; Enforceability | 5 |
| SECTION 3.03. | No Conflicts; Consents | 6 |
| SECTION 3.04. | Membership Interests | 7 |
| SECTION 3.05. | Equity Interests in AOL | 7 |

## ARTICLE IV
### Specified Representations and Warranties of Time Warner

| | | |
|---|---|---|
| SECTION 4.01. | AOL Subsidiaries | 7 |
| SECTION 4.02. | SEC Documents | 8 |
| SECTION 4.03. | Absence of Certain Changes or Events | 8 |
| SECTION 4.04. | Compliance with Applicable Laws | 9 |
| SECTION 4.05. | Ownership of Permits; Title to Assets | 9 |
| SECTION 4.06. | Adequacy of Internal Controls | 9 |

i

## ARTICLE V

### Representations and Warranties of Google

SECTION 5.01.   Organization, Standing and Power                          9
SECTION 5.02.   Authority; Execution and Delivery; Enforceability        10
SECTION 5.03.   No Conflicts; Consents                                   10
SECTION 5.04.   Accredited Investor                                      10

## ARTICLE VI

### Pre-Closing Covenants

SECTION 6.01.   Best Efforts                                             11
SECTION 6.02.   Regulatory Filings                                       11

## ARTICLE VII

### Additional Covenants

SECTION 7.01.   Contribution of AOLA Assets                              11
SECTION 7.02.   Cash Contribution                                        11
SECTION 7.03.   Tax Characterization                                     12

## ARTICLE VIII

### Conditions Precedent

SECTION 8.01.   Conditions to each Party's Obligations                   12
SECTION 8.02.   Conditions to Obligations of Google                      12
SECTION 8.03.   Conditions to Obligations of Time Warner, Etc.           13

## ARTICLE IX

### Termination; Waiver

SECTION 9.01.   Termination                                             13
SECTION 9.02.   Extension; Waiver                                       15

## ARTICLE X

### Miscellaneous

SECTION 10.01.   Survival of Representations and Warranties             15
SECTION 10.02.   Definitions                                            15
SECTION 10.03.   Notices                                                16
SECTION 10.04.   Failure to Pursue Remedies                             17

ii

| | | |
|---|---|---|
| SECTION 10.05. | Cumulative Remedies | 17 |
| SECTION 10.06. | Parties in Interest | 17 |
| SECTION 10.07. | Headings | 18 |
| SECTION 10.08. | Severability | 18 |
| SECTION 10.09. | Counterparts | 18 |
| SECTION 10.10. | Entire Agreement | 18 |
| SECTION 10.11. | Governing Law; Waiver of Jury Trial | 18 |
| SECTION 10.12. | Absence of Presumption | 18 |

iii

Oracle America v. Google
3:10-cv-03561-WHA

GOOGLE-03170177

SCHEDULES

Schedule A     Initial Members and Membership Interests
Schedule B     Minority and Non-AOL Investments
Schedule C     HoldCo Adjusted Balance Sheet
Schedule D     AOL Guarantees

EXHIBITS

Exhibit A     Form of Adoption Agreement
Exhibit B     Form of Limited Liability Company Agreement of AOL
Exhibit C     Form of Amended and Restated Limited Liability Company Agreement of HoldCo
Exhibit D     Form of Tax Matters Agreement
Exhibit E     Form of Google Registration Rights Agreement
Exhibit F     Form of Time Warner Registration Rights Agreement

iv

This Contribution Agreement and Plan of Reorganization (this "Agreement"), dated as of March [    ], 2006, is entered into among TIME WARNER INC., a Delaware corporation ("Time Warner"), GOOGLE INC., a Delaware corporation ("Google"), and AMERICA ONLINE, INC., a Delaware corporation ("AOL").

WHEREAS the parties hereto have entered into a letter agreement (and attached term sheets) (the "Letter Agreement"), dated as of December 20, 2005, whereby the parties have agreed to use their best efforts to consummate the transactions described in the Letter Agreement.

NOW, THEREFORE, in consideration of the agreements, representations and warranties, covenants and other provisions contained in this Agreement, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
### Pre-Closing Actions

SECTION 1.01. Formation of NewCo. (a) Prior to the Closing (as defined in Section 2.03), Time Warner shall form a Virginia corporation ("NewCo") pursuant to and in accordance with the Virginia Stock Corporation Act.

(b) Promptly thereafter, Time Warner shall cause NewCo to become a party to this Agreement and adopt this Agreement with the same force and effect as if it were originally a party hereto by executing the form of Adoption Agreement attached as Exhibit A.

SECTION 1.02. Contribution of AOL to NewCo. As soon as practicable following the formation of NewCo and in any event prior to the Closing, Time Warner shall contribute all of the outstanding equity interests of AOL to NewCo in exchange for all the equity interests in NewCo.

SECTION 1.03. Conversion of AOL. Following the contribution pursuant to Section 1.02 and in any event prior to the Closing, NewCo shall cause AOL to convert to a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act. The limited liability company agreement of AOL shall be in the form of Exhibit B. The transactions described in Sections 1.01, 1.02 and 1.03 of this Agreement, in the aggregate, shall be the "AOL Reorganization."

SECTION 1.04. Formation of HoldCo. (a) Prior to the Closing, Time Warner shall form a Delaware limited liability company ("HoldCo") pursuant to and in accordance with the Delaware Limited Liability Company Act. In connection therewith, HoldCo shall issue to Time Warner 100% of the limited liability company interests ("Membership Interests") in HoldCo.

(b) Promptly thereafter and in any event prior to the Closing, Time Warner shall cause HoldCo to become a party to this Agreement and adopt this Agreement with the same force and effect as if it were originally a party hereto by executing the form of Adoption Agreement attached as Exhibit A.

(c) Prior to the Closing Date (as defined in Section 2.03), HoldCo shall not carry on any business or conduct any operations other than the execution of this Agreement, the performance of its obligations hereunder and matters ancillary thereto.

SECTION 1.05. AOL Transfers to NewCo. Following the conversion of AOL pursuant to Section 1.03, but in any event prior to the contribution of AOL to HoldCo pursuant to Section 2.02 and the Closing:

(a) AOL shall transfer to NewCo all of the minority and non-AOL investments set forth on Schedule B (the "Schedule B Investments"). If any transfer of a Schedule B Investment requires the consent or other action of a third party, then such transfer shall be made subject to such consent being obtained or action being taken. AOL shall use commercially reasonable efforts to secure any such consent or other action on or prior to the Closing Date. If any such consent is not obtained or action not taken prior to the Closing, the Closing shall nonetheless take place on the terms set forth herein and, thereafter, AOL shall continue to use commercially reasonable efforts to secure such consent or other action as promptly as practicable after the Closing. With respect to such Schedule B Investments, the parties to this Agreement hereby agree that, as of the close of business on the business day immediately preceding the Closing Date, NewCo shall (i) have (without infringing upon the legal rights of such third party or violating any applicable Law (as defined in Section 3.03(a)) the economic claims, rights and benefits under such Schedule B Investment and all other rights (including voting rights) resulting from or incidental to ownership of such Schedule B Investment and (ii) assume any related economic burden with respect to such Schedule B Investment. The parties hereto intend to treat each such arrangement as if NewCo is the owner of such Schedule B Investment as of the close of business on the business day immediately preceding the Closing Date for U.S. Federal income tax purposes. None of Time Warner, Google, AOL, NewCo or HoldCo or any of their respective affiliates shall take any position inconsistent with such characterization on any return or filing or otherwise with any taxing authority unless otherwise required by applicable Law.

(b) AOL shall transfer to NewCo all cash and cash equivalents held by AOL or any of its U.S. subsidiaries as of the close of business on the business day immediately preceding the Closing Date.

(c) Time Warner shall cause all indebtedness (including all accrued and unpaid interest) outstanding at AOL or any of its subsidiaries as of the close of business on the business day immediately preceding the Closing Date that is not owed by or to Time Warner or any affiliate of Time Warner to be discharged or assumed by Time Warner or any affiliate of Time Warner (other than HoldCo, AOL or any subsidiary of HoldCo or AOL). This Section 1.05(c) shall not apply to (i) the indebtedness outstanding as of the close of business on the business day immediately preceding the Closing Date described

2

as "Current Portion of Long Term Notes Payable and Capital Leases", "Long Term Notes Payable" and "Other Long Term Liabilities" of AOL, each as set forth on the consolidated balance sheet of AOL as of January 31, 2006, attached to the letter, dated as of the date of this Agreement, from Time Warner to Google (the "Disclosure Letter") and (ii) any guarantees by AOL of indebtedness of affiliates of AOL listed on Schedule D (in the applicable maximum principal amount of indebtedness set forth on Schedule D, such guarantees of indebtedness in the principal amount set forth on Schedule D being hereinafter referred to as the "Affiliate Guarantees").

(d) Time Warner shall cause (i) all receivables and payables (including all accrued and unpaid expenses) of AOL or any of its subsidiaries owed by or to Time Warner or any affiliate of Time Warner (other than HoldCo, AOL or any subsidiary of HoldCo or AOL) outstanding as of the close of business on the business day immediately preceding the Closing Date to be distributed to or assumed by Time Warner or any affiliate of Time Warner (other than HoldCo, AOL or any subsidiary of HoldCo or AOL) and (ii) all indebtedness (including all accrued and unpaid interest) outstanding at AOL or any of its subsidiaries as of the close of business on the business day immediately preceding the Closing Date that is owed by or to Time Warner or any affiliate of Time Warner (other than HoldCo, AOL or any subsidiary of HoldCo or AOL) to be discharged or assumed by Time Warner or any affiliate of Time Warner (other than HoldCo, AOL or any subsidiary of HoldCo or AOL). This Section 1.05(d) shall not apply to (i) any outstanding operational intercompany trade receivable or trade payable incurred in the ordinary course of business, (ii) any International Debt and (iii) any non-operational intercompany receivables (including all accrued and unpaid expenses) that are owed by Time Warner or any affiliate of Time Warner (other than HoldCo, AOL or any subsidiary of HoldCo or AOL) to any non-U.S. subsidiary of AOL.

(e) For purposes of Sections 1.05(b), 1.05(c) and 1.05(d), and the definitions of "International Debt" and "Net International Debt", (i) AOL Europe Sarl and its subsidiaries shall be deemed subsidiaries of AOL and (ii) America Online Latin America, Inc. and its subsidiaries, Africana.com, Inc. and any entity listed on Schedule B shall be deemed not to be a subsidiary of AOL.

(f) By way of illustration, if the several transactions contemplated by this Section 1.05 were effected as of January 31, 2006, the adjusted balance sheet of HoldCo would be as set forth in Schedule C.

ARTICLE II

Closing Date Actions

SECTION 2.01. NewCo Borrowing. (a) On the Closing Date but prior to the Closing, NewCo shall borrow from third party lenders an amount (the "Loan") equal to $1,000,000,000 less the amount of Estimated Net International Debt (calculated in accordance with Section 2.01(b)).

3

GOOGLE-03170181

(b) On the Closing Date, Time Warner shall estimate the amount of the Net International Debt outstanding as of the close of business on the business day immediately preceding the Closing Date. The amount of that estimate, minus $50,000,000, shall be the "Estimated Net International Debt".

SECTION 2.02. Closing. At the Closing, the following transactions shall occur simultaneously:

(a) Cancellation of Membership Interests. The initial Membership Interests issued to Time Warner upon the formation of HoldCo (as described under Section 1.04(a)) shall be canceled.

(b) Time Warner Contribution. Time Warner shall unconditionally and irrevocably contribute to HoldCo, and HoldCo shall unconditionally and irrevocably accept from Time Warner, all of Time Warner's right, title and interest to all of the outstanding equity interests of AOL Europe Sarl held by Time Warner or any of its subsidiaries other than any interests held by AOL or any of its subsidiaries.

(c) NewCo Contribution. NewCo shall unconditionally and irrevocably contribute to HoldCo, and HoldCo shall unconditionally and irrevocably accept from NewCo, all of NewCo's right, title and interest to AOL. In connection with such contribution, NewCo shall assign and HoldCo shall assume all of NewCo's rights and obligations in connection with the Loan.

(d) Google Contribution. Google shall unconditionally and irrevocably contribute to HoldCo, and HoldCo shall unconditionally and irrevocably accept from Google, cash in the amount of $1,000,000,000.

(e) Issue of Membership Interests. In connection with the contributions described in Sections 2.02(b), 2.02(c) and 2.02(d), HoldCo shall issue to each of Time Warner, NewCo and Google the total number of Membership Interests set forth next to such party's name on Schedule A. The contributions, assumptions and issuances described in Section 2.02(b), Section 2.02(c), Section 2.02(d) and this Section 2.02(e), in the aggregate, shall be the "HoldCo Contribution".

(f) Amended and Restated LLC Agreement. Time Warner, NewCo and Google shall execute the amended and restated limited liability company agreement of HoldCo substantially in the form attached as Exhibit C (the "HoldCo Operating Agreement").

(g) Tax Matters Agreement. Time Warner and HoldCo shall execute the tax matters agreement substantially in the form attached as Exhibit D.

(h) Registration Rights Agreements. Time Warner, Google and HoldCo shall execute the registration rights agreement substantially in the form attached as Exhibit E (the "Google Registration Rights Agreement"). Time Warner, NewCo and HoldCo shall execute the registration rights agreement substantially in the form attached as Exhibit

4

GOOGLE-03170182

F (the "Time Warner Registration Rights Agreement" and, together with the Google Registration Rights Agreement, the "Registration Rights Agreements").

SECTION 2.03. *Time and Place of Closing.* The closing (the "Closing") of the transactions set forth in Section 2.02 shall take place at the offices of Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, New York 10019 15 business days after the date hereof provided that the conditions set forth in Article VIII have been satisfied (or, to the extent permitted by Law, waived by the party or parties entitled to the benefits thereof) or as soon thereafter as is practicable after the conditions set forth in Article VIII have been satisfied (or, to the extent permitted by Law, waived by the party or parties entitled to the benefits thereof), or at such other place, time and date as shall be agreed in writing between Time Warner and Google. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date".

ARTICLE III

General Representations and Warranties of Time Warner

Time Warner represents and warrants to Google that:

SECTION 3.01. *Organization, Standing and Power.* (a) Each of Time Warner and AOL is validly existing and in good standing under the laws of Delaware and has full corporate power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold its properties and assets, and to conduct its businesses as presently conducted, other than such franchises, licenses, permits, authorizations and approvals the lack of which, individually or in the aggregate, have not had and could not reasonably be expected to have a material adverse effect on Time Warner or AOL, as the case may be.

(b) Upon formation, each of NewCo and HoldCo will be validly existing and in good standing under the laws of Virginia and Delaware, respectively, and will have all requisite power and authority and possess all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold its properties and assets, and to conduct its businesses as then conducted, other than such franchises, licenses, permits, authorizations and approvals the lack of which, individually or in the aggregate, have not had and could not reasonably be expected to have a material adverse effect on NewCo or HoldCo, as the case may be.

SECTION 3.02. *Authority; Execution and Delivery; Enforceability.* (a) Each of Time Warner and AOL has all requisite corporate power and authority to execute and deliver this Agreement, the Time Warner Registration Rights Agreement and the HoldCo Operating Agreement (in each case, to the extent a party thereto), to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Time Warner and AOL of this Agreement, the Time Warner Registration Rights Agreement and the HoldCo Operating Agreement (in each case, to the extent a party thereto), the performance of their obligations hereunder and thereunder and the consummation by Time Warner and AOL of

5

Trial Exhibit 3215 Page 172 of 214

the transactions contemplated hereby and thereby have been or will be duly authorized by all necessary corporate action on the part of Time Warner, NewCo, HoldCo and AOL (in each case, to the extent a party thereto). Each of Time Warner and AOL has duly executed and delivered this Agreement, and this Agreement constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms.

(b) Upon formation of NewCo and HoldCo and execution by them of an Adoption Agreement: each of NewCo and HoldCo will have all requisite power and authority to execute and deliver its respective Adoption Agreement, its respective Registration Rights Agreement, the HoldCo Operating Agreement (by NewCo) and the AOL Operating Agreement (by HoldCo), to perform their respective obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby; the execution and delivery by NewCo and HoldCo of its respective Adoption Agreement, its respective Registration Rights Agreement, the HoldCo Operating Agreement (by NewCo) and the AOL Operating Agreement (by HoldCo), the performance by NewCo and HoldCo of their respective obligations hereunder and thereunder and the consummation by NewCo and HoldCo of the transactions contemplated hereby and thereby will have been duly authorized by all necessary corporate action on the part of NewCo and HoldCo; each of NewCo and HoldCo will have duly executed its respective Adoption Agreement, its respective Registration Rights Agreement, the HoldCo Operating Agreement (by NewCo) and the AOL Operating Agreement (by HoldCo); and their respective Adoption Agreements, this Agreement, their respective Registration Rights Agreements, the HoldCo Operating Agreement (for NewCo) and the AOL Operating Agreement (for HoldCo) will constitute the legal, valid and binding obligation of each of NewCo and HoldCo, enforceable against NewCo and HoldCo in accordance with its terms.

SECTION 3.03. No Conflicts; Consents. (a) The execution and delivery by Time Warner, AOL, NewCo and HoldCo of the Transaction Agreements to which they are respectively parties do not, and the performance of their respective obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby and compliance with the terms hereof and thereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancelation or acceleration of any obligation or to loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, or result in the creation of any lien upon any of the respective properties or assets of AOL or HoldCo under, any provision of (i) the certificate of incorporation, by-laws or other constitutive documents of Time Warner, AOL, NewCo or HoldCo, (ii) any contract, lease, license, indenture, note, bond, agreement, permit, concession, franchise or other instrument (a "Contract") to which Time Warner, AOL, NewCo or HoldCo is a party or by which any of its respective properties or assets is bound or (iii) any material judgment, order or decree ("Judgment") or material statute, law (including common law), ordinance, rule or regulation ("Law") applicable to Time Warner, AOL, NewCo or HoldCo or its respective properties or assets, other than, in the case of clauses (ii) and (iii) above, any such items that, individually or in the aggregate, have not had and could not reasonably be expected to have a material adverse effect on AOL or HoldCo, as the case may be.

6

(b) No material consent, approval, license, permit, order or authorization ("Consent") of, or registration, declaration or filing with, or permit from, any Federal, state, local or foreign government or any court of competent jurisdiction, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign (a "Governmental Entity") is required to be obtained or made by or with respect to Time Warner, AOL, NewCo or HoldCo in connection with the execution, delivery and performance of the Transaction Agreements to which they are respectively parties or the consummation of the transactions contemplated hereby and thereby.

SECTION 3.04. Membership Interests. (a) Prior to the Closing, all issued and outstanding Membership Interests of HoldCo shall be held by Time Warner. As of the Closing Date, HoldCo shall not be subject to any Contract requiring it to issue any Membership Interests or any security convertible into or exchangeable for Membership Interests, other than this Agreement.

(b) All Membership Interests of HoldCo to be issued at the Closing shall be duly authorized, validly issued, fully paid and nonassessable, and shall be issued in compliance with all applicable Federal, state, foreign, or local statutes, laws, rules, or regulations, including federal and state securities laws, and shall not be issued in violation of any applicable preemptive or similar rights.

(c) Schedule A reflects all of the Membership Interests of HoldCo issued and outstanding as of immediately following the Closing.

SECTION 3.05. Equity Interests in AOL. As of the Closing, all of the outstanding limited liability company interests of AOL shall be validly issued and fully paid and nonassessable and shall be owned by HoldCo free and clear of all liens. AOL is not subject to any Contract requiring it to issue any equity security or any security convertible into or exchangeable for any equity security.

ARTICLE IV

Specified Representations and Warranties of Time Warner

Time Warner represents and warrants to Google as of December 20, 2005 (or as of December 31, 2005, in the case of the December 31, 2005 financial statements described in Sections 4.02(b) and 4.02(c)), that, except as disclosed in writing by Time Warner to Google on or prior to December 20, 2005:

SECTION 4.01. AOL Subsidiaries. (a) Except as, individually or in the aggregate, has not had and could not reasonably be expected to have a material adverse effect on AOL, each subsidiary of AOL is validly existing and in good standing under the laws of the jurisdiction in which it is organized and has full corporate power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold its properties and assets, and to conduct its businesses as presently conducted.

7

(b) Except as, individually or in the aggregate, has not had and could not reasonably be expected to have a material adverse effect on AOL, all the outstanding shares of capital stock of each subsidiary of AOL have been validly issued and are fully paid and nonassessable and are owned by AOL free and clear of all liens.

SECTION 4.02. SEC Documents. (a) The information pertaining to AOL in each of the reports, schedules, forms, statements and other documents required to be filed by Time Warner with the SEC since January 1, 2005 (the "SEC Documents"), complied in all material respects with the then applicable requirements of the United States Securities Exchange Act of 1934 (the "Exchange Act") and the applicable rules and regulations of the SEC promulgated thereunder, and, at the time of filing, did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The AOL segment financial information included in the SEC Documents complied as to form in all material respects with the then applicable accounting requirements and the published rules and regulations of the SEC with respect thereto and fairly presented the results of operations and financial position of the AOL business segment of Time Warner as of the dates and for the periods indicated therein, subject to the absence of line items and notes.

(b) The separate unaudited balance sheet and statements of income and cash flows of AOL at and as of September 30, 2005 and December 31, 2005 (the "AOL Financials") that are attached to the Disclosure Letter, have been prepared in accordance with U.S. generally acceptable accounting principles ("GAAP") applied on a consistent basis throughout the periods indicated (except that the AOL Financials do not contain footnotes that may be required by GAAP) . The AOL Financials are true and correct in all material respects and present fairly AOL's financial condition, operating results and cash flows as of the dates and during the periods indicated therein, subject to the absence of footnotes.

(c) A true and accurate reconciliation of the AOL Financials to the AOL business segment disclosures contained in the Time Warner Quarterly Report on Form 10-Q for the period ended September 30, 2005 and the Annual Report on Form 10-K for the period ended December 31, 2005 is attached to the Disclosure Letter.

(d) Except as set forth in the Disclosure Letter, the assets that form the basis of the operating results reflected in the AOL Financials that are owned by Time Warner and its subsidiaries are owned by AOL and its subsidiaries.

SECTION 4.03. Absence of Certain Changes or Events. (a) Between September 30, 2005 and December 20, 2005, there has not been any event, change, effect or development that, individually or in the aggregate, has had or could reasonably be expected to have a material adverse effect on AOL, other than events, changes, effects and developments relating to the economy in general or to AOL's industry in general and not specifically relating to AOL or adversely affecting AOL in a manner disproportionate to the effect on other participants in AOL's industry.

8

(b) Except as set forth in the Disclosure Letter or as specifically contemplated by this Agreement, between September 30, 2005 and the date of this Agreement, the AOL Business has been operated in the ordinary course of business consistent with past practice in all material respects.

(c) Except as set forth in the Disclosure Letter, between September 30, 2005 and the date of this Agreement, there has not been any Prohibited Action.

SECTION 4.04. Compliance with Applicable Laws. AOL is in compliance with all applicable Laws, except for instances of noncompliance that, individually or in the aggregate, have not had and could not reasonably be expected to have a material adverse effect on AOL.

SECTION 4.05. Ownership of Permits; Title to Assets. AOL possesses all permits necessary for the conduct of its business except for such permits the absence of which, individually or in the aggregate, has not had and could not reasonably be expected to have a material adverse effect on AOL. AOL has good and marketable title to all its assets except (a) for such assets as are no longer used or useful in the ordinary course of business and (b) where the failure to have such good and marketable title, individually or in the aggregate, has not had and could not reasonably be expected to have a material adverse effect on AOL.

SECTION 4.06. Adequacy of Internal Controls. AOL has established and maintains effective internal control over financial reporting, which internal control over financial reporting includes those policies and procedures that (a) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of AOL; (b) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles; and (c) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of AOL's assets that could have a material effect on AOL's financial statements. AOL maintains sufficient documentation to provide reasonable support for its assessment of effective internal control over financial reporting. Internal control over financial reporting includes self-monitoring mechanisms, and actions taken to correct deficiencies as they are identified. AOL assesses its internal control over financial reporting based on criteria for effective internal control over financial reporting described in "Internal Control-Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission.

## ARTICLE V

### Representations and Warranties of Google

Google represents and warrants to Time Warner that:

SECTION 5.01. Organization, Standing and Power. Google is validly existing and in good standing under the laws of Delaware and has full corporate power and

9

authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold its properties and assets, and to conduct its businesses as presently conducted, other than such franchises, licenses, permits, authorizations and approvals the lack of which, individually or in the aggregate, have not had and could not reasonably be expected to have a material adverse effect on Google's ability to perform its obligations under the Transaction Agreements to which Google is a party.

SECTION 5.02. Authority; Execution and Delivery; Enforceability. Google has all requisite corporate power and authority to execute and deliver the Transaction Agreements to which Google is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Google of the Transaction Agreements to which it is a party, the performance by Google of its obligations hereunder and thereunder and the consummation by Google of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of Google. Google has duly executed and delivered the Transaction Agreements to which Google is a party, and such Transaction Agreements constitute its legal, valid and binding obligation, enforceable against it in accordance with their terms.

SECTION 5.03. No Conflicts; Consents. (a) The execution and delivery by Google of the Transaction Agreements to which Google is a party do not, the performance by Google of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby and compliance with the terms hereof and thereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancelation or acceleration of any obligation or to loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, or result in the creation of any lien upon any of the properties or assets of Google under, any provision of (i) its certificate of incorporation or by-laws, (ii) any material Contract to which Google is a party or by which any of its properties or assets is bound or (iii) any material Judgment or material Law applicable to Google or its properties or assets, other than, in the case of clauses (ii) and (iii) above, any such items that, individually or in the aggregate, have not had and could not reasonably be expected to have a material adverse effect on Google's ability to consummate the transactions contemplated hereby and thereby.

(b) No material Consent of, or registration, declaration or filing with, or permit from, any Federal, state, local or foreign government or any court of competent jurisdiction, administrative agency or commission or other Governmental Entity is required to be obtained or made by or with respect to Google in connection with the execution, delivery and performance of the Transaction Agreements to which Google is a party, the performance by Google of its obligations hereunder and thereunder or the consummation of the transactions contemplated hereby and thereby.

SECTION 5.04. Accredited Investor. Google hereby acknowledges and confirms that (a) the issuance of Membership Interests by HoldCo pursuant to this Agreement has not been and will not be registered under the United States Securities Act of 1933 (the

10

GOOGLE-03170188

"Securities Act"), and is being made in reliance upon Federal and state exemptions for transactions not involving a public offering, (b) it is an institutional "accredited investor" (as defined in Regulation D under the Securities Act) and (c) it has such knowledge and experience in financial and business matters so that Google is capable of evaluating the merits and risks of its investment in HoldCo.

## ARTICLE VI

### Pre-Closing Covenants

SECTION 6.01. Best Efforts. Each of the parties shall use their best efforts to cause the consummation of the transactions contemplated by this Agreement to occur. In connection therewith, each of the parties shall take any and all steps necessary to avoid or eliminate each and every impediment under any competition or other Law that may be asserted by any Governmental Entity or other party (including defending any claim through litigation) unless any such step could reasonably be expected to have a material adverse effect on any of the parties hereto.

SECTION 6.02. Regulatory Filings. Each of the parties shall make all regulatory filings required in connection with the transactions contemplated by this Agreement as soon as practicable following the date hereof.

## ARTICLE VII

### Additional Covenants

SECTION 7.01. Contribution of AOLA Assets. As soon as practicable following the Closing and following the effective date of America Online Latin America, Inc.'s Joint Plan of Reorganization of and Liquidation pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan"), Time Warner shall contribute, or cause to be contributed, to NewCo all of the assets, including any and all real or personal property of any nature, of America Online Caribbean Basin, Inc. and AOL Puerto Rico Management Services, Inc. (collectively, "AOL Puerto Rico") received by Time Warner pursuant to the Plan (the "AOL Puerto Rico Assets") . Immediately thereafter, NewCo shall contribute the AOL Puerto Rico Assets to HoldCo and HoldCo shall contribute the AOL Puerto Rico Assets to AOL. None of Time Warner, NewCo or HoldCo shall be entitled to any additional Membership Interests or other consideration for such contribution. The parties hereto intend to treat the contributions described in this Section 7.01 of the AOL Puerto Rico Assets by Time Warner to NewCo and by NewCo to HoldCo as transactions described under Section 351 of the Code. None of Time Warner, Google, AOL, NewCo or HoldCo or any of their respective affiliates shall take any position inconsistent with such characterizations on any return or filing or otherwise with any taxing authority unless otherwise required by applicable Law.

SECTION 7.02. Cash Contribution. As soon as practicable following the Closing, Time Warner shall (a) calculate the total amount of Net International Debt outstanding as of the close of business on the business day immediately preceding the Closing Date and

11

(b) contribute (or cause to be contributed) to HoldCo cash in an amount equal to the excess of (i) the amount of such Net International Debt over (ii) the amount of Estimated Net International Debt. The amount due from Time Warner under this Section 7.02 shall bear interest from and including the Closing Date to but excluding the date of payment thereof at the rates from time to time prevailing under the Loan. No additional Membership Interests or other consideration shall be issued to Time Warner or NewCo in exchange for such contribution. The parties hereto intend to treat any contribution of cash to HoldCo pursuant to this Section 7.02 as pursuant to the HoldCo Contribution and, therefore, as a transaction described under Section 351 of the Code. None of Time Warner, Google, AOL, NewCo or HoldCo or any of their respective affiliates shall take any position inconsistent with such characterization on any return or filing or otherwise with any taxing authority unless otherwise required by applicable Law.

SECTION 7.03. Tax Characterization. Each of Time Warner, Google, AOL, NewCo and HoldCo intends that (a) the AOL Reorganization constitute a reorganization described in Section 368(a)(1)(F) of the Internal Revenue Code of 1986, as amended from time to time (the "Code"), and (b) the HoldCo Contribution constitute a transaction described under Section 351 of the Code. None of Time Warner, Google, AOL, NewCo or HoldCo or any of their respective affiliates shall take any position inconsistent with such characterizations on any return or filing or otherwise with any taxing authority unless otherwise required by applicable Law.

ARTICLE VIII

Conditions Precedent

SECTION 8.01. Conditions to each Party's Obligations. The respective obligation of each party to effect the transactions set forth in Section 2.02 is subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

(a) Definitive Agreements. Each Definitive Agreement (as such term is defined in the Letter Agreement), other than the Definitive Agreements with respect to the Content Availability Term Sheet, the Video Term Sheet and the WiFi Term Sheet (as such terms are defined in the Letter Agreement), shall have been executed by the parties thereto and be in full force and effect.

(b) Legal Restraints. No Governmental Entity shall have issued any order, decree or ruling, and no law shall be in effect, enjoining, restraining or otherwise prohibiting any transaction contemplated by this Agreement.

SECTION 8.02. Conditions to Obligations of Google. The obligation of Google to effect the transactions set forth in Section 2.02 is subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

(a) Representations and Warranties. The representations and warranties of Time Warner in this Agreement that are qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case at

12

and as of the Closing Date, with the same force and effect as if made as of the Closing Date (other than the representations and warranties contained in Article IV, which need be true and correct only as of December 20, 2005, or December 31, 2005, as applicable).

(b) Performance of Obligations of Time Warner, Etc. Each of Time Warner, AOL, NewCo and HoldCo shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing.

(c) Absence of Prohibited Actions. There shall not have been taken since December 20, 2005 any Prohibited Action which has not been cured by the Closing.

SECTION 8.03. Conditions to Obligations of Time Warner, Etc. The obligation of each of Time Warner, AOL, NewCo and HoldCo to effect the transactions set forth in Section 2.02 is subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

(a) Representations and Warranties. The representations and warranties of Google in this Agreement that are qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case at and as of the Closing Date, with the same force and effect as if made as of the Closing Date.

(b) Performance of Obligations of Google. Google shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing.

ARTICLE IX

Termination; Waiver

SECTION 9.01. Termination. This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written consent of Time Warner and Google;

(b) by either Time Warner or Google:

(i) if the Closing shall not have occurred by December 31, 2006;

(ii) if any Governmental Entity issues an order, decree or ruling or taken any other action permanently enjoining, restraining or otherwise prohibiting any transaction contemplated by this Agreement or any Definitive Agreement and such order, decree, ruling or other action shall have become final or nonappealable; or

(iii) if there is (A) a Change of Control (as defined in Section 10.02) of Time Warner, AOL, NewCo or HoldCo to a Specified Purchaser and (B) as a result thereof Time Warner or Google terminates any Definitive Agreement or any term sheet attached to the Letter Agreement;

13

GOOGLE-03170191

(c) by Google:

(i) if Google is not in material breach of its obligations under this Agreement and there has been a breach of any representation, warranty, covenant or agreement of Time Warner contained in this Agreement such that the conditions set forth in Section 8.02(a) or 8.02(b) would not be satisfied and such breach has not been cured within 30 calendar days after written notice thereof to Time Warner; provided, however, that no cure period shall be required for a breach which by its nature cannot be cured; or

(ii) unless cured within 30 calendar days of notice thereof from Google to Time Warner (or, if earlier, by the Closing Date), if any of the following actions is taken (or since December 20, 2005 has been taken) without the prior written consent of Google (each of the following, a "Prohibited Action"):

(A) distributions to any members or stockholders of HoldCo or AOL, other than as contemplated by this Agreement;

(B) HoldCo or AOL, on the one hand, and Time Warner or any affiliate of Time Warner (other than HoldCo, AOL or any entity controlled by HoldCo or AOL), on the other hand, entering into any agreement or other transaction except (i) as contemplated by this Agreement or any Definitive Agreement, (ii) for de minimis transactions in the ordinary course of business consistent with past practice and (iii) for agreements and transactions on terms no less favorable than could be obtained from unaffiliated third parties of HoldCo or AOL, as the case may be, on an arm's-length basis;

(C) any issuance of equity capital (or securities convertible into or exercisable for equity capital) in AOL, HoldCo or any direct or indirect subsidiary of HoldCo that has a direct or indirect interest in AOL, other than as contemplated by this Agreement;

(D) any bankruptcy, liquidation or dissolution of HoldCo or AOL;

(E) any disposition by AOL of assets outside the ordinary course of business consistent with past practice in excess of $100,000,000 (individually or in the aggregate in the case of a series of related dispositions) that is not for fair market value;

(F) the incurrence by HoldCo, AOL or any of their direct or indirect subsidiaries of indebtedness (other than the Affiliate Guarantees) that would require a "Google Consent" under Section 4.03(h) of the amended and restated limited liability company agreement of HoldCo (as attached as Exhibit C) if that agreement were in effect and AOL were a subsidiary of HoldCo at the time of

14

incurrence; or

(G) any Transfer (as defined in the HoldCo Operating Agreement) of the Audience Business of AOL; or

(d) by Time Warner if Time Warner is not in material breach of its obligations under this Agreement and there has been a breach of any representation, warranty, covenant or agreement of Google contained in this Agreement such that the conditions set forth in Section 8.03(a) or 8.03(b) would not be satisfied and such breach has not been cured within 30 calendar days after written notice thereof to Google; provided, however, that no cure period shall be required for a breach which by its nature cannot be cured.

SECTION 9.02. Extension; Waiver. At any time on or prior to the Closing Date, the parties may (a) extend the time for performance of any of the obligations or other acts of the other parties, (b) waive any inaccuracies in the representations and warranties contained in this Agreement or (c) waive compliance with any of the covenants, agreements or conditions contained in this Agreement. Any agreement on the part of a party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

## ARTICLE X
### Miscellaneous

SECTION 10.01. Survival of Representations and Warranties. The representations and warranties of the parties hereto contained in this Agreement shall survive indefinitely; provided, however, that none of the representations and warranties of Time Warner contained in Article IV shall survive the Closing.

SECTION 10.02. Definitions. For purposes of this Agreement:

"AOL Business" shall mean the business that generated the operating results reflected in the AOL Financials.

"AOL Operating Agreement" shall mean the Limited Liability Company Agreement of AOL LLC entered into among the members of AOL in the form attached hereto as Exhibit B.

"Audience Business" shall mean the business unit of AOL that develops, programs and markets content, tools and services for users of the web sites, portals and services comprising the AOL Network and earns revenue primarily through selling online advertising on the AOL Network as well as from selling advertisements on third party web sites through Advertising.com's network and through other relationships with third party web sites. The AOL Network is an online network that is comprised of a variety of websites, portals and services including the AOL service, low cost ISP services, AOL.com, AIM, Moviefone, MapQuest, ICQ and Netscape.com.

15

GOOGLE-03170193

A "Change of Control" of an entity shall mean (a) the sale or other disposition of more than 40% of the economic interest in or voting power of that entity in a transaction or series of related transactions or (b) the sale of all or substantially all the assets of that entity.

"HoldCo Operating Agreement" shall mean the Amended and Restated Limited Liability Company Agreement of AOL Holdings LLC entered into among the members of HoldCo in the form attached hereto as Exhibit C.

"International Debt" shall mean non-operational intercompany payables (including all accrued and unpaid expenses) that are owed by any non-U.S. subsidiary of AOL to Time Warner or any affiliate of Time Warner (other than HoldCo, AOL or any subsidiary of HoldCo or AOL).

A "material adverse effect" on a party shall mean a material adverse effect on the business, assets, condition (financial or otherwise) or results of operations of such party and its subsidiaries, taken as a whole.

"Net International Debt" shall mean (a) the amount of the International Debt minus (b)(i) the amount of all cash and cash equivalents held by non-U.S. subsidiaries of AOL and minus (ii) the amount of all non-operational intercompany receivables (including all accrued and unpaid expenses) that are owed by Time Warner or any affiliate of Time Warner (other than HoldCo, AOL or any subsidiary of HoldCo or AOL) to any non-U.S. subsidiary of AOL, in each case calculated as of the close of business on the business day immediately preceding the Closing Date. The amount of Net International Debt shall be expressed in U.S. dollars assuming the conversion of all International Debt, cash and cash equivalents into U.S. dollars at the exchange rates prevailing on the Closing Date.

"Specified Purchaser" shall mean any "Named Competitor" as defined in any relevant Definitive Agreement.

"Transaction Agreements" shall mean this Agreement, the Registration Rights Agreements, the Adoption Agreements, the HoldCo Operating Agreement and the AOL Operating Agreement.

SECTION 10.03. Notices. All notices provided for in this Agreement shall be in writing, duly signed by the party giving such notice, and shall be delivered as follows:

16

(a) if given to Time Warner, AOL, NewCo or HoldCo, to the following address (and fax number):

Time Warner Inc.
One Time Warner Center
New York, NY 10019
Attention: General Counsel
          SVP Mergers and Acquisitions
Fax: (212) 484-7167

(b) if given to Google, to the following address (and fax number):

Google Inc.
1600 Amphitheater Parkway
Mountain View, CA 94043
Attention: David C. Drummond
          Senior Vice President, Corporate Development
Fax: (650) 963-3257

with a copy to (which shall not constitute notice):

Donald Harrison
Corporate Counsel, M&A and Securities
Fax: (650) 649-1920

All such notices shall be deemed to have been delivered and given for all purposes (i) on the delivery date if delivered by confirmed facsimile, (ii) on the delivery date if delivered personally to the party to whom the same is directed, (iii) one (1) business day after deposit with a commercial overnight carrier, with written verification of receipt, or (iv) five (5) business days after the mailing date, whether or not actually received, if sent by U.S. mail, return receipt requested, postage and charges prepaid, or any other means of rapid mail delivery for which a receipt is available addressed to the receiving party as specified on the signature page of this Agreement. Changes of the person to receive notices or the place of notification shall be effectuated pursuant to a notice given under this Section 10.03.

SECTION 10.04. Failure to Pursue Remedies. The failure of any party to seek redress for breach of, or to insist upon the strict performance of, any provision of this Agreement shall not prevent a subsequent act, which would have originally constituted a breach, from having the effect of an original breach.

SECTION 10.05. Cumulative Remedies. The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

SECTION 10.06. Parties in Interest. This Agreement shall be binding upon and inure to the benefit of all the parties hereto and, to the extent provided by this Agreement, their affiliates, their permitted successors and assigns, and their legal representatives. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties hereto or their respective permitted successors or assigns or, to the extent

17

provided by this Agreement, their affiliates, any rights or remedies under or by reason of this Agreement.

SECTION 10.07. Headings. The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

SECTION 10.08. Severability. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

SECTION 10.09. Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one instrument.

SECTION 10.10. Entire Agreement. This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

SECTION 10.11. Governing Law. This Agreement and the rights of the parties hereto shall be interpreted in accordance with the laws of the State of New York, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws. Each of the parties hereto irrevocably agrees that any legal action or proceeding arising out of this Agreement or any transaction contemplated hereby shall be brought only in the State or United States Federal courts located in the State of New York. Each party hereto irrevocably consents to the service of process outside the territorial jurisdiction of such courts in any such action or proceeding by the mailing of such documents by registered United States mail, postage prepaid, to the respective address set forth in Section 10.03.

SECTION 10.12. Absence of Presumption. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by such parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

18

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first stated above.

TIME WARNER INC.

by _____
     Name:
     Title:

GOOGLE INC.

by _____
     Name:
     Title:

AMERICA ONLINE, INC.

by _____
     Name:
     Title:

19

**SCHEDULE A**

Initial Members and Membership Interests

| Initial Member | Membership Interests |
|---|---|
| Time Warner | 2.5 |
| NewCo | 92.5 |
| Google | 5 |

20

**EXHIBIT A**

[Form of Adoption Agreement]

This ADOPTION AGREEMENT (this "Adoption Agreement") is executed pursuant to the terms of the Contribution Agreement, dated as of March [ ], 2006, a copy of which is attached hereto and is incorporated herein by reference (the "Contribution Agreement"), by the undersigned. By execution and delivery of this Adoption Agreement, the undersigned agrees as follows:

SECTION 1. Acknowledgment. The undersigned acknowledges that it is becoming a party to the Contribution Agreement.

SECTION 2. Agreement. The undersigned (a) agrees that it shall be bound by and subject to the terms of the Contribution Agreement and (b) hereby adopts the Contribution Agreement with the same force and effect as if it were originally a party thereto.

Executed and dated this        day of

[HoldCo] [NewCo]:

_____

EX-10.22 4 dex1022.htm GOOGLE REGISTRATION RIGHTS AGREEMENT

**Exhibit 10.22**

**GOOGLE REGISTRATION RIGHTS AGREEMENT**

**MARCH __, 2006**

Oracle America v. Google
3:10-cv-03561-WHA

GOOGLE-03170200

Trial Exhibit 3215 Page 189 of 214

TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|
| Section 1 Definitions |  | 1 |
| 1.1 | Certain Definitions | 1 |
| Section 2 Registration Rights |  | 4 |
| 2.1 | Request for Registration. | 4 |
| 2.2 | Company Registration. | 7 |
| 2.3 | Registration Procedures | 9 |
| 2.4 | Indemnification and Contribution. | 12 |
| 2.5 | Information by Holder | 14 |
| 2.6 | Rule 144 Reporting and Administration | 14 |
| 2.7 | Market Stand-Off Agreement | 15 |
| 2.8 | Transfer or Assignment of Registration Rights | 15 |
| 2.9 | Limitations on Subsequent Registration Rights | 15 |
| 2.10 | Termination of Registration Rights | 15 |
| Section 3 Miscellaneous |  | 15 |
| 3.1 | Amendment | 15 |
| 3.2 | Notices | 15 |
| 3.3 | Governing Law; Waiver of Jury Trial | 17 |
| 3.4 | Successors and Assigns | 17 |
| 3.5 | Entire Agreement | 17 |
| 3.6 | Delays or Omissions | 17 |
| 3.7 | Severability | 17 |
| 3.8 | Titles and Subtitles | 17 |
| 3.9 | Counterparts | 18 |
| 3.10 | Telecopy Execution and Delivery | 18 |
| 3.11 | No Impairment | 18 |
| 3.12 | Confidentiality | 18 |

Oracle America v. Google
3:10-cv-03561-WHA

GOOGLE-03170201

Trial Exhibit 3215 Page 190 of 214

# REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (this "**Agreement**") is made as of March __, 2006, by and among Time Warner Inc., a Delaware corporation, AOL Holdings LLC, a Delaware limited liability company ("**Holdco**"), and Google Inc., a Delaware corporation ("**Google**"). Unless otherwise defined herein, capitalized terms used in this Agreement have the meanings ascribed to them in **Section 1** hereof.

## RECITALS

**WHEREAS**, Google, Time Warner Inc. and America Online, Inc. have entered into a Contribution Agreement, dated as of [              ] (the "**Contribution Agreement**").

**WHEREAS**, pursuant to the Contribution Agreement Google will be issued limited liability company interests in Holdco (the "**Securities**") in exchange for one billion dollars ($1,000,000,000) in cash.

**WHEREAS**, it is a condition to the closing of the sale of the Securities to Google pursuant to the Contribution Agreement that Holdco and Google execute and deliver this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual promises and covenants set forth herein and in the Contribution Agreement, and other consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

## Section 1
## Definitions

1.1 Certain Definitions. As used in this Agreement, the following terms shall have the meanings set forth below:

(a) "**business day**" shall mean any day other than a Saturday or Sunday or a day on which banks in New York, New York are closed.

(b) "**Commission**" shall mean the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

(c) "**Company**" shall mean Holdco; provided that following the Entity Conversion, "Company" shall mean the Conversion Entity.

(d) "**Contribution Agreement**" shall have the meaning set forth in the Recitals.

(e) "**Conversion Entity**" shall mean the corporation resulting from the Entity Conversion.

(f) "**Conversion Stock**" shall mean the Common Stock of the Conversion Entity issued in exchange for the membership interests of Holdco upon the Entity Conversion.

(g) "**Distribution**" shall mean a distribution (by pro rata distribution or dividend, by exchange offer/"split-off" or by any comparable means) of direct or indirect equity interests of Holdco or Conversion Stock to the holders of TW Common Stock or the holders of capital stock of any parent entity of TW; provided that such equity interests or Conversion Stock are (immediately

following such distribution) registered under the Exchange Act and registered on or listed for trading on, as applicable, an Eligible Exchange.

(h) "**Eligible Exchange**" shall mean either the New York Stock Exchange or the Nasdaq National Market.

(i) "**Entity Conversion**" shall mean the conversion of Holdco from a limited liability company to a corporation pursuant to Section 9.01 of the Operating Agreement.

(j) "**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(k) "**Google**" shall mean Google Inc., a Delaware corporation.

(l) "**Holder**" shall mean any Google Entity (as such term is defined in the Operating Agreement) that is a holder of Registrable Securities.

(m) "**Indemnified Party**" shall have the meaning set forth in **Section 2.4(c)**.

(n) "**Indemnifying Party**" shall have the meaning set forth in **Section 2.4(c)**.

(o) "**Initial Public Offering**" shall mean the closing of the Conversion Entity's first public offering of its common stock pursuant to an effective registration statement under the Securities Act.

(p) "**Initiating Holder**" shall mean any Holder making a Demand Registration Request pursuant to **Section 2.1**.

(q) "**Inspectors**" shall have the meaning set forth in **Section 2.3(k)**.

(r) "**IPO Demand**" shall mean a request for registration pursuant to **Section 2.1** which registration would constitute the Initial Public Offering of the Company.

(s) "**Material Adverse Effect**" on the Company shall mean a material adverse effect on the business, assets, condition (financial or otherwise) or results of operations of the Company and its subsidiaries, taken as a whole.

(t) "**Minimum Amount**" shall mean (i) if in connection with an IPO Demand, the lesser of: (x) an amount of Registrable Securities the aggregate market value of which is equal to $200 million or more, as determined and certified in writing by the proposed managing underwriter of the Initial Public Offering, and (y) 40% of the Registrable Securities then held by the Holders and (ii) if in connection with a Demand Registration Request made after the Initial Public Offering or the Distribution, as the case may be, the lesser of: (x) an amount of Registrable Securities the aggregate value of which is equal to $100 million or more based on the closing sale prices of Conversion Stock on an Eligible Exchange, as reported in The Wall Street Journal, Northeastern edition, for each of the twenty (20) consecutive Trading Days immediately preceding such Demand Registration Request and (y) 20% of the Registrable Securities then held by the Holders.

(u) "**Operating Agreement**" shall mean the Amended and Restated Limited Liability Company Agreement of Holdco, as such may be amended from time to time in accordance with the provisions thereof.

-2-

(v) **"Other Selling Stockholders"** shall mean persons other than Holders (including any Time Warner Entity (as such term is defined in the Operating Agreement)) who either: (i) by virtue of agreements with the Company, are entitled to include their Other Shares in any registration subject to this Agreement or (ii) hold Other Shares sought to be included in a registration subject to this Agreement.

(w) **"Other Shares"** shall mean shares of common stock or other equity interests of the Company, other than Registrable Securities, with respect to which registration rights have been granted or are otherwise sought to be included in a registration subject to this Agreement.

(x) The terms **"register," "registered"** and **"registration"** refer to a registration effected by preparing and filing a registration statement in compliance with the Securities Act or the Exchange Act, and the declaration or ordering of the effectiveness of such registration statement by the Commission.

(y) **"Registrable Securities"** shall mean (i) shares of Conversion Stock issued or issuable pursuant to the conversion of the Securities upon the Entity Conversion; (ii) any Conversion Stock otherwise acquired by the Holders after the date hereof in a manner that is not in violation of the Operating Agreement; and (iii) any common stock issued as a dividend or other distribution with respect to or in exchange for or in replacement of the shares referenced in clause (i) or (ii) above; provided, however, that Registrable Securities shall not include any securities described in clause (i), (ii) or (iii) above which (A) have previously been registered under the Securities Act, (B) have been sold to the public either pursuant to an effective registration statement or Rule 144 under the Securities Act or (C) have been sold in a private transaction in which the transferor's rights under this Agreement are not validly assigned pursuant to **Section 2.8.**

(z) **"Registration Expenses"** shall mean all expenses incurred in effecting any registration pursuant to this Agreement, including, without limitation, all registration, qualification, and filing fees, printing expenses, escrow fees, fees and disbursements of counsel for the Company and one special counsel for the Holders, blue sky fees and expenses, and expenses of any regular or special audits incident to or required by any such registration, but shall not include Selling Expenses and fees and disbursements of additional counsel for the Holders.

(aa) **"Rule 144"** shall mean Rule 144 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(bb) **"Rule 145"** shall mean Rule 145 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(cc) **"Rule 415"** shall mean Rule 415 as promulgated by the Commission under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the Commission.

(dd) **"Securities"** shall have the meaning set forth in the Recitals.

(ee) **"Securities Act"** shall mean the Securities Act of 1933, as amended, or any similar successor federal statute and the rules and regulations thereunder, all as the same shall be in effect from time to time.

(ff) **"Selling Expenses"** shall mean all underwriting discounts, brokers or other selling commissions and stock transfer taxes applicable to the sale of Registrable Securities, and fees

-3-

and disbursements of counsel for any Holder (other than the fees and disbursements of one special counsel to the Holders included in Registration Expenses).

(gg) "**Shelf Registration**" shall mean a registration on Form S-3 (or any successor thereto) or any other appropriate form pursuant to Rule 415 under the Securities Act (or any successor rule that may be adopted by the Commission) providing for the sale of securities on a delayed or continuous basis.

(hh) "**Suspension Period**" shall have the meaning set forth in **Section 2.3(d)**.

(ii) "**Trading Day**" shall mean, for a particular equity security, a day on which trading prices for such equity security are quoted on the Eligible Exchange on which such equity security is traded.

(jj) "**TW**" shall mean Time Warner Inc., a Delaware corporation, unless and until any of the following events occur: (i) any person the common stock of which is registered under Section 12 of the Exchange Act becomes the beneficial owner of more than 50% of the total outstanding equity interests of Time Warner Inc. and Time Warner Inc. ceases to have its common stock registered under the Exchange Act and listed on a national securities exchange, in which case "TW" shall mean such person, (ii) Time Warner Inc. consolidates with or merges with or into, or transfers all or substantially all its assets to, any person the common stock of which is registered under Section 12 of the Exchange Act, in which case "TW" shall mean such person, or (iii) Time Warner Inc. transfers all (but not less than all) of its equity interests in the Company, directly or indirectly, to any person the common stock of which is registered under Section 12 of the Exchange Act, in which case "TW" shall mean such person.

(kk) "**TW Common Stock**" shall mean the common stock of TW.

(ll) "**Withdrawn Registration**" shall have the meaning set forth in **Section 2.1(f)**.

**Section 2**
**Registration Rights**

2.1 Request for Registration.

(a) Request for Registration. Subject to the conditions set forth in this **Section 2.1**, if the Company shall receive from Initiating Holders a written request (a "**Demand Registration Request**") signed by such Initiating Holders that the Company effect any registration with respect to not less than a Minimum Amount of the Registrable Securities (such request shall state the number of shares of Registrable Securities to be disposed of and the intended methods of disposition of such shares by such Initiating Holders, including the proposed managing underwriters, if any), the Company will as soon as practicable (but in any event within sixty (60) calendar days of the Demand Registration Request), file such registration and use its reasonable best efforts to cause such registration to become effective (including, without limitation, filing pre-effective and post-effective amendments, appropriate qualifications under applicable blue sky or other state securities laws, and appropriate compliance with the Securities Act and/or Exchange Act and any other governmental regulations or requirements) and to permit or facilitate the sale and distribution of such Registrable Securities. Upon receipt of such request, the Company shall promptly deliver notice of such request to all other Holders who each shall then have twenty (20) calendar days to notify the Company in writing of their desire to be included in such registration. If the request for registration contemplates an underwritten public offering, the Company shall state such in the written notice and, in such event, the right of any such other Holder to participate in such registration shall be conditioned upon such

-4-

GOOGLE-03170205

Holder's participation in such underwritten public offering and the inclusion of such Holder's Registrable Securities in the underwritten public offering to the extent provided herein.

(b) Limitations on Requested Registration. No Holder shall make (or be deemed to have made) a Demand Registration Request (and, with respect to **Section 2.1(b)(iv)**, the Company shall not be obligated to file a preliminary registration statement) pursuant to this **Section 2.1**:

(i) prior to the earlier of: (A) July 1, 2008, (B) one hundred eighty (180) calendar days following the effective date of the Company's Initial Public Offering and (C) ninety (90) calendar days following a Distribution;

(ii) after the Company has effected three (3) such registrations pursuant to this **Section 2.1**; provided, however, that the Company shall only be required to effect two (2) such registrations pursuant to this **Section 2.1** following the Initial Public Offering or Distribution (counting for all purposes of this **Section 2.1(b) (ii)** only registrations which have been declared or ordered effective and pursuant to which either: (A) all securities registered thereunder have been sold, or (B) the registration statement relating thereto has been effective and not suspended for the applicable period set forth in **Section 2.3(a)**);

(iii) during the period starting with the date thirty (30) calendar days (sixty (60) calendar days in the case of an IPO Demand) prior to the Company's reasonably estimated date of filing of, and ending on the date ninety (90) calendar days (one hundred eighty (180) calendar days in the case of an IPO Demand or such shorter period to which any officer or director of the Company or holder of at least five percent (5%) of the Company's outstanding securities is subject pursuant to a lockup restriction similar to that described in **Section 2.7**) immediately following the effective date of, any registration statement pertaining to securities offered by the Company (other than a registration of securities on Form S-8 (as promulgated under the Securities Act), a registration of securities on Form S-4 (as promulgated under the Securities Act), a registration of securities in a Rule 145 transaction, or a registration of securities with respect to an employee benefit plan (including in each case pursuant to successor forms and rules)), provided that the Company is actively employing in good faith its reasonable best efforts to cause such registration statement to be filed (if not already filed) and to become effective and the managing underwriter(s) of such offering certifies in writing that the registration of Registrable Securities would have, in its reasonable estimation, a material adverse effect on the marketability of the offering for which such registration statement was filed; or

(iv) if the Company shall furnish to the Holders a certificate signed by any executive officer of the Company stating that in the good faith judgment of the Board of Directors of the Company, by majority vote, it would be materially detrimental to the Company for such registration statement to be filed in the near future and that it is, therefore, in the best interests of the Company to defer the filing of such registration statement, then the Company shall have the right to defer such filing for a period of not more than ninety (90) calendar days after receipt of the Demand Registration Request; provided, however, that the Company shall not defer its obligation in this manner for more than an aggregate of one hundred twenty (120) calendar days in any consecutive twelve-month period; or

(c) Other Shares. The registration statement filed pursuant to the request of the Initiating Holders may, subject to the provisions of **Sections 2.1(d)** and **2.9**, include Other Shares, and may include securities of the Company being sold for the account of the Company.

(d) Form of Registration; Underwriting.

(i) The Initiating Holders shall determine the method of distribution of the Registrable Securities covered by a Demand Registration Request pursuant to this **Section 2.1**, whether

-5-

by means of an underwritten offering or any other lawful means, and the Initiating Holders shall determine the form of the registration statement to be used in connection therewith, whether an underwritten or non-underwritten offering on Form S-1 or Form S-3, or a Shelf Registration, subject to the Company's eligibility to utilize such form of registration statement under the Securities Act; provided, however, that (A) any such method of distribution (other than a firm commitment underwritten public offering or an offering from time to time through the facilities of an Eligible Exchange (including so-called "block trades") pursuant to a Shelf Registration)) shall be reasonably acceptable to the Company, (B) the IPO Demand must be for a firm commitment underwritten public offering, (C) the Company shall not be required to file a Shelf Registration until after the first anniversary of an Initial Public Offering and (D) if the Company is selling securities for its own account in an Initial Public Offering, any such method of distribution shall be mutually agreed between the Company and the Initiating Holders. The right of any Holder to include all or any portion of its Registrable Securities in such registration pursuant to this **Section 2.1** shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities to the extent provided herein. If the Company shall request inclusion in any registration pursuant to **Section 2.1** of securities being sold for its own account, or if Other Selling Stockholders shall request inclusion in any registration pursuant to **Section 2.1**, the Initiating Holders shall, on behalf of all Holders, offer to include such securities in the underwriting and such offer shall be conditioned upon the participation of the Company or such Other Selling Stockholders in such underwriting and the inclusion of the Company's and Other Selling Stockholders' other securities of the Company and their acceptance of the further applicable provisions of this **Section 2** (including **Sections 2.1(g)** and **2.7**). The Company shall (together with all Holders and Other Selling Stockholders proposing to distribute their securities through such underwriting) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected for such underwriting by the holders of a majority of the Registrable Securities held by the Initiating Holders. Such representative or representatives must be reasonably acceptable to the Company, and if the representative or representatives selected by the Initiating Holders are not reasonably acceptable to the Company there must be two "co-lead" representatives, both of which must be underwriters of national reputation, one of which is selected by the Initiating Holders and the other of which is selected by the Company.

   (ii) Notwithstanding any other provision of this **Section 2.1**, if the managing underwriter(s) advises the Initiating Holders in writing that marketing factors require a limitation on the number of shares to be underwritten, the number of shares of securities that are entitled to be included in the registration and underwriting shall be allocated as follows: (A) first, to the Holders requesting to include Registrable Securities in such registration statement based on the pro rata percentage of Registrable Securities held by such Holders relative to all other Holders requesting to include Registrable Securities in such registration statement, (B) second, to the Other Selling Stockholders requesting to include Other Shares in such registration statement based on the pro rata percentage of Other Shares held by such Other Selling Stockholders relative to all the Other Selling Stockholders requesting to include Other Shares in such registration statement, and (C) third, to the Company. For avoidance of doubt, no securities of the Company or Other Shares shall be included in a registration under this **Section 2.1** unless all Registrable Securities that are requested to be included in such registration are so included.

   (iii) If a person who has requested inclusion in such registration as provided above does not agree to the terms of any such underwriting, such person shall be excluded therefrom by written notice from the Company, the managing underwriter(s) or the Initiating Holders. The securities so excluded shall also be withdrawn from such registration. If securities are so withdrawn from the registration and if the number of shares to be included in such registration was previously reduced as a result of marketing factors pursuant to this **Section 2.1(d)**, then the Company shall offer to all Holders and Other Selling Stockholders who have retained rights to include securities in the registration the right to include additional Registrable Securities and Other Shares in the registration in an aggregate amount

-6-

equal to the number of shares so withdrawn, with such shares to be allocated among such Holders and Other Selling Stockholders requesting additional inclusion, in the manner set forth in **Section 2.1(d)(ii)**.

(e) Company Standstill. The Company may not (in the case of a request for registration pursuant to **Section 2.1** which is for an underwritten public offering, without the consent of the managing underwriter(s)) cause any other registration of securities for sale for its own account (other than a registration effected solely to implement an employee benefit plan or a transaction to which Rule 145 of the Securities Act is applicable) to become effective within (i) one hundred eighty (180) calendar days following the effective date of any registration pursuant to this **Section 2.1** if such registration is in connection with the Initial Public Offering (or such shorter period as is required by the managing underwriters, if any), or (ii) sixty (60) calendar days following the effective date of any other registration pursuant to this Section 2.1 that is not in connection with the Initial Public Offering (or such shorter period as is required by the managing underwriters, if any).

(f) Right to Terminate Registration. The holders of a majority of the Registrable Securities held by the Initiating Holders to be included in a registration pursuant to this Section 2.1 shall have the right to terminate or withdraw any registration under this Section 2.1 prior to the effectiveness of such registration whether or not the Company, any Holder or Other Selling Stockholder has elected to include securities in such registration (a "Withdrawn Registration"), in which case the Company will no longer be required to proceed with the registration; provided, however, that such Withdrawn Registration shall be counted as a registration for the purposes of Section 2.1(b)(ii) unless either: (i) the withdrawal by the Holders occurs prior to the initial filing of a preliminary registration statement with the Commission with respect to such registration, (ii) there is a Material Adverse Effect on the Company after the filing date of the most recent annual report or, if later, the most recent quarterly report, of TW filed with the Commission on a Form 10-K or Form 10-Q, as the case may be, filed prior to the making of the relevant Demand Registration Request pursuant to **Section 2.1** (the "**Last SEC Report**"), (iii) the Last SEC Report includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, relating to a Material Adverse Effect or (iv) in the event the Company has not previously filed a periodic report under the Exchange Act, the withdrawal occurs following a Material Adverse Effect that was not known to the Initiating Holders prior to the making of the relevant Demand Registration Request.

(g) Expenses of Registration. All Registration Expenses incurred in connection with registrations pursuant to **Section 2.1** shall be borne by the Company; provided, however, that the Initiating Holders and Other Selling Stockholders (and not the Company) shall be required to pay for all expenses (including Registration Expenses) of any Withdrawn Registration (unless the withdrawal is pursuant to **Section 2.1(f)(iii)** or **2.1(f)(iv)**; provided that, in the event of a withdrawal pursuant to **Section 2.1(f)(iv)**, the relevant Material Adverse Effect existed at the time of the relevant Demand Registration Request) pro rata among each other on the basis of the number of Registrable Securities or Other Shares proposed to be registered. All Selling Expenses relating to securities registered on behalf of the Holders or Other Selling Stockholders pursuant to **Section 2.1** shall be borne by the holders of securities included in such registration pro rata among each other on the basis of the number of Registrable Securities or Other Shares so registered.

2.2 Company Registration.

(a) Company Registration. If the Company shall determine to register any of its securities either for its own account or the account of a security holder or holders, other than a registration pursuant to a Demand Registration Request (including a registration contemplated by **Section 2.1(b)(iii)**), a registration of securities on Form S-8, a registration on Form S-4 (as

-7-

promulgated under the Securities Act), a registration of securities in a Rule 145 (as promulgated under the Securities Act) transaction, a registration of securities solely with respect to an employee benefit plan, or a registration relating to the offer and sale of debt securities (including in each case pursuant to successor forms and rules), the Company will:

(i) give to the Holders written notice thereof at least twenty (20) calendar days prior to the filing of a registration therefore; and

(ii) include in such registration (and any related qualification under blue sky laws or other compliance), and in any underwriting involved therein, all the Registrable Securities specified in a written request by the Holders made within twenty (20) calendar days after receipt of such written notice from the Company.

Notwithstanding the foregoing, if any such registration is being filed to effect the registration of a Distribution, the Holders shall not be entitled to include in such registration any Registrable Securities held by the Holders.

(b) Underwriting.

(i) If the registration of which the Company gives notice is for a registered public offering involving an underwriting, the Company shall so advise the Holders as a part of the written notice given pursuant to **Section 2.2(a)(i)**. In such event, the right of any Holder to registration pursuant to this **Section 2.2** shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company and the Other Selling Stockholders) enter into an underwriting agreement in customary form with the representative of the underwriter or underwriters selected by the Company.

(ii) Notwithstanding any other provision of this **Section 2.2**, if the underwriters advise the Company in writing that marketing factors require a limitation on the number of shares to be underwritten, the underwriters may (subject to the limitations set forth below) limit the number of Registrable Securities to be included in the registration and underwriting. The Company shall so advise all holders of securities requesting registration, and the number of shares of securities that are entitled to be included in the registration and underwriting shall be allocated, as follows: (A) first, to the Company for securities being sold for its own account, and (B) second, to the Holders and Other Selling Stockholders requesting to include Registrable Securities or Other Shares in such registration statement based on the aggregate pro rata percentage of Registrable Securities and Other Shares held by such Holders and Other Selling Stockholders, on a pari passu basis. Notwithstanding the foregoing, no such exclusion or allocation shall reduce the amount of securities of the Holders included in such registration statement below fifty percent (50%) of the total amount of securities included in such registration statement for the account of the persons other than the Company.

(iii) If a Holder or Other Selling Stockholder who has requested inclusion in such registration as provided above does not agree to the terms of any such underwriting, such person shall also be excluded therefrom by written notice from the Company or the managing underwriter(s). The Registrable Securities or Other Shares so excluded shall also be withdrawn from such registration. If securities are so withdrawn from the registration and if the number of shares of Registrable Securities or Other Shares to be included in such registration was previously reduced as a result of marketing factors pursuant to **Section 2.2(b)**, the Company shall then offer to all Holders and Other Selling Stockholders who have retained the right to include securities in the registration the right to include additional securities in the registration in an aggregate amount equal to the number of shares so

-8-

withdrawn, with such shares to be allocated among the persons requesting additional inclusion, in the manner set forth in **Section 2.2(b)(ii)**.

(c) Right to Terminate Registration. The Company shall have the right to terminate or withdraw any registration initiated by it under this **Section 2.2** prior to the effectiveness of such registration whether or not any Holder or Other Selling Stockholder has elected to include securities in such registration.

(d) Expenses of Registration. All Registration Expenses incurred in connection with any registrations pursuant to this **Section 2.2** shall be borne by the Company. All Selling Expenses relating to securities registered on behalf of the Holders or Other Selling Stockholders pursuant to this **Section 2.2** shall be borne by the holders of securities included in such registration pro rata among each other on the basis of the number of Registrable Securities or Other Shares so registered, and it shall be a further condition to the participation of Other Selling Stockholders in such registration that they have agreed in writing to pay their pro rata portion of such Selling Expenses.

(e) Effect of Registration. Notwithstanding any other provision of this Agreement, the Holders hereby agree that if the Company initiates a registration of equity securities for its own account in compliance with the provisions of Section 2.1(b)(iii) after the making of the IPO Demand but prior to the filing of the preliminary registration statement therefor, then, so long as the Company complies with the provisions of Section 2.1(b)(iii), such registration shall be deemed a Company registration that shall be governed by the terms of this Section 2.2 (and not by the terms of Section 2.1 other than the provisions of Section 2.1(b)(iii)) and such registration shall preempt the IPO Demand in accordance with Section 2.1(b)(iii) so long as the Company complies with the provisions of Section 2.1(b)(iii).

2.3 Registration Procedures. In the case of each registration effected by the Company pursuant to **Section 2.1** and each registration effected by the Company pursuant to **Section 2.2** in which any Holder participates, the Company will keep each participating Holder advised in writing as to the initiation of each registration and as to the completion thereof, and will, subject to **Sections 2.1(g)** and **2.2(d)**, at its expense:

(a) prepare and file with the Commission pre-effective amendments and post-effective amendments to such registration statement and such amendments to the prospectus used in connection therewith as may be necessary to maintain the effectiveness of such registration or as may be required by the rules, regulations or instructions applicable to the registration form utilized by the Company or by the Securities Act or the Exchange Act or the rules and regulations thereunder necessary to keep such registration statement effective for up to thirty (30) calendar days or, in the case of a Shelf Registration, three hundred sixty (360) calendar days, and cause the prospectus as so supplemented to be filed pursuant to Rule 424 under the Securities Act, and to otherwise comply with the provisions of the Securities Act with respect to the disposition of all Registrable Securities covered by such registration statement until the earlier of: (i) such 30th or 360th calendar day, as applicable, and (ii) such time as all Registrable Securities covered by such registration statement have ceased to be Registrable Securities; provided that a reasonable time before filing a registration statement or prospectus, or any amendments or supplements thereto, the Company will furnish to each participating Holder, the managing underwriter(s) (if applicable) and their respective counsel for review and comment, copies of all documents proposed to be filed and will not file any such documents to which any of them reasonably object prior to the filing thereof;

(b) furnish to each participating Holder such number of copies of such registration statement and of each amendment and post-effective amendment thereto (in each case including all exhibits), any prospectus or prospectus supplement and such other documents as such participating

-9-

Holder may reasonably request in order to facilitate the disposition of the Registrable Securities by such participating Holder (the Company hereby consenting to the use of the prospectus or any amendment or supplement thereto in connection with such disposition);

(c) register or qualify such Registrable Securities covered by such registration statement under such other securities or blue sky laws of such jurisdictions as the participating Holders reasonably request, and do any and all other acts and things which may be reasonably necessary or advisable to enable the participating Holders to consummate the disposition in such jurisdictions of the Registrable Securities owned by the participating Holders, except that the Company will not for any such purpose be required to qualify generally to do business as a foreign corporation, to subject itself to taxation or to consent to general service of process in any such jurisdiction where, but for the requirements of this paragraph, it would not be obligated to be so qualified or to be so subject to taxation or to general service of process;

(d) promptly notify each participating Holder at any time (a "**Suspension Period**") when a prospectus relating to any such Registrable Securities is required to be delivered under the Securities Act and the Company has become aware that the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing. As promptly thereafter as is practicable using reasonable best efforts, the Company shall prepare and file, and furnish to each participating Holder a reasonable number of copies of an amendment to such registration statement and/or supplement to the related prospectus as may be necessary so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing; provided that, in the event that an executive officer of the Company determines in good faith that the disclosure of such information as would result in such prospectus not including an untrue statement of material fact or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading would be materially detrimental to the Company, the Company shall be permitted to delay the filing of such corrective amendment or supplement for a period of time not to exceed one hundred twenty (120) days; and provided further, that the time during which such registration statement shall remain effective pursuant to **Section 2.3(a)** (if applicable) will be extended by the number of calendar days that any Holder is prevented from selling because it is unable to deliver a prospectus as a result of a Suspension Period;

(e) notify each participating Holder at any time:

(i) when any preliminary prospectus, final prospectus or prospectus supplement or post-effective amendment has been filed, and, with respect to the registration statement or any post-effective amendment, when the same has become effective;

(ii) of any request by the Commission for amendments or supplements to the registration statement or the prospectus or for additional information;

(iii) of the receipt by the Company of any written comments to the registration statement or the prospectus from the Commission (and the Company shall provide such comments and any responses thereto to a participating Holder upon request);

(iv) of the issuance by the Commission of any stop order of which the Company or its counsel is aware or should be aware suspending the effectiveness of the registration statement or any order preventing the use of a related prospectus, or the initiation or any threats of any proceedings for such purposes; and

-10-

Oracle America v. Google
3:10-cv-03561-WHA

GOOGLE-03170211

(v) of the receipt by the Company of any written notification of the suspension of the qualification of any of the Registrable Securities for sale in any jurisdiction or the initiation or any threats of any proceeding for that purpose;

(f) otherwise comply with all applicable rules and regulations of the Commission, and make available to each participating Holder an earnings statement which shall satisfy the provisions of Section 11(a) of the Securities Act; provided that the Company will be deemed to have complied with this **Section 2.3(f)** if it has satisfied the provisions of Rule 158 under the Securities Act;

(g) cause all such Registrable Securities to be listed on any Eligible Exchange on which the Company's common stock is then listed, if such Registrable Securities are not already so listed and if such listing is then permitted under the rules of such Eligible Exchange, and to provide a transfer agent and registrar and a CUSIP number for such Registrable Securities covered by such registration statement no later than the effective date of such registration statement;

(h) enter into agreements (including underwriting agreements) and in connection therewith:

(i) make such representations and warranties to each participating Holder and the underwriters, if any, in form, substance and scope as are customarily made by issuers to underwriters in comparable underwritten offerings;

(ii) use all reasonable efforts to obtain opinions of counsel to the Company thereof (which counsel and opinions (in form, scope and substance) will be reasonably satisfactory to the managing underwriter (s), if any, and the participating Holders) addressed to the participating Holders and the underwriters, if any, covering the matters customarily covered in opinions requested in comparable underwritten offerings and such other matters as may be reasonably requested by the participating Holders and the managing underwriter(s), if any;

(iii) use all reasonable efforts to obtain "cold comfort" letters and bring-downs thereof from the Company's independent certified public accountants addressed to the participating Holders and the underwriters, if any, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters by independent accountants in connection with underwritten offerings;

(iv) if requested, provide indemnification in accordance with the provisions and procedures of **Section 2.4** to all parties to be indemnified pursuant to said section; and

(v) deliver such documents and certificates as may be reasonably requested by the participating Holders and the managing underwriter(s), if any, to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by the Company;

provided, however, that the Company shall not be obligated to take any of the actions under this Section 2.3(h) more than an aggregate of three times in connection with registrations pursuant to Section 2.1;

(i) cooperate with each participating Holder and the managing underwriter(s) or underwriters or agents, if any, to facilitate, to the extent reasonable under the circumstances, the timely preparation and delivery of certificates (not bearing any restrictive legends) representing the Registrable Securities to be sold under such registration statement, and enable such Registrable Securities to be in such denominations and registered in such names as the managing underwriter(s) or underwriters or agents, if any, or any participating Holder may request;

-11-

(j) if reasonably requested by the managing underwriter(s) or underwriters or the participating Holders, incorporate in a prospectus supplement or post-effective amendment such information as the managing underwriter(s) and the participating Holders agree should be included therein relating to the plan of distribution with respect to such Registrable Securities, including without limitation information with respect to the purchase price being paid by such underwriters and with respect to any other terms of the underwritten offering of the Registrable Securities to be sold in such offering and make all required filings of such prospectus supplement or post-effective amendment as promptly as practicable upon being notified of the matters to be incorporated in such prospectus supplement or post-effective amendment;

(k) provide each participating Holder, any underwriter participating in any disposition pursuant to such registration statement and any attorney, accountant or other agent retained by such participating Holder or underwriter (collectively, the "**Inspectors**") reasonable access, during normal business hours and upon prior notification, to appropriate officers of the Company and the Company's subsidiaries to ask questions and to obtain information reasonably requested by any such Inspector and make available for inspection all financial and other records and other information, pertinent corporate documents and properties of any of the Company and its subsidiaries and affiliates as may be reasonably necessary to enable them to exercise their due diligence responsibilities;

(l) in the event of the issuance of any stop order of which the Company or its counsel is aware or should be aware suspending the effectiveness of the registration statement or of any order suspending or preventing the use of any related prospectus or suspending the qualification of any Registrable Securities included in the registration statement for sale in any jurisdiction, the Company will use its reasonable best efforts promptly to obtain its withdrawal; and the period for which the registration statement will be kept effective will be extended by a number of calendar days equal to the number of calendar days between the issuance and withdrawal of any stop orders;

(m) only in the event of a registration in connection with an Initial Public Offering, reasonably cooperate to make available members of senior management of the Company to participate in a customary "road show" with potential purchasers of the Registrable Securities, which "road show" shall last no longer than seven (7) calendar days and shall not require more than four (4) members of senior management of the Company to make investor presentations; and

(n) cause an Entity Conversion prior to effectiveness of the registration statement if such Entity Conversion has not occurred prior to such time.

2.4 Indemnification and Contribution.

(a) To the extent permitted by law, the Company will indemnify and hold harmless each Holder, each of its officers, directors and partners, legal counsel, and accountants and each person controlling such Holder within the meaning of Section 15 of the Securities Act, with respect to which registration, qualification, or compliance has been effected pursuant to this **Section 2**, and each underwriter, if any, and each of its officers, directors, and each person who controls within the meaning of Section 15 of the Securities Act any underwriter, against all expenses, claims, losses, damages, and liabilities (or actions, proceedings, or settlements in respect thereof) arising out of or based on: (i) any untrue statement (or alleged untrue statement) of a material fact contained or incorporated by reference in any preliminary prospectus, final prospectus, summary prospectus, "issuer free writing prospectus" as defined in Rule 433 of the Securities Act, offering circular, or other document (including any related registration statement, notification, or the like) incident to any such registration, qualification, or compliance, (ii) any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading,

-12-

Trial Exhibit 3215 Page 202 of 214

or (iii) any violation (or alleged violation) by the Company of the Securities Act, any state securities laws or any rule or regulation thereunder applicable to the Company and relating to action or inaction required of the Company in connection with any offering covered by such registration, qualification, or compliance, and the Company will reimburse each such Holder, each of its officers, directors, partners, legal counsel, and accountants and each person controlling such Holder, each such underwriter, each of its officers, directors, and each person who controls any such underwriter, for any legal and any other expenses reasonably incurred in connection with investigating and defending or settling any such claim, loss, damage, liability, or action; provided that the Company will not be liable in any such case to the extent that any such claim, loss, damage, liability, or action arises out of or is based on any untrue statement or omission based upon written information furnished to the Company by such Holder, any of such Holder's officers, directors, partners, legal counsel or accountants, any person controlling such Holder, such underwriter or any person who controls any such underwriter and stated to be specifically for use therein; and provided, further, that, the obligations of the Company contained in this **Section 2.4(a)** shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld).

(b) To the extent permitted by law, each Holder will, if Registrable Securities held by such Holder are included in the securities as to which such registration, qualification, or compliance is being effected, indemnify and hold harmless the Company, each of its directors, officers, partners, legal counsel, and accountants and each underwriter, if any, of the Company's securities covered by such a registration statement, each person who controls the Company or such underwriter within the meaning of Section 15 of the Securities Act, each other such Holder, and each of their officers, directors, and partners, and each person controlling such Holder, against all claims, losses, damages and liabilities (or actions, proceedings, or settlements in respect thereof) arising out of or based on: (i) any untrue statement (or alleged untrue statement) of a material fact contained or incorporated by reference in any such preliminary prospectus, final prospectus, summary prospectus, "issuer free writing prospectus" as defined in Rule 433 of the Securities Act, offering circular, or other document (including any related registration statement, notification, or the like) incident to any such registration, qualification, or compliance, or (ii) any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company and such Holders, directors, officers, partners, legal counsel, and accountants, persons, underwriters, or control persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability, or action, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such preliminary prospectus, final prospectus, summary prospectus, issuer free writing prospectus, offering circular, or other document (including any related registration statement, notification, or the like) in reliance upon and in conformity with written information furnished to the Company by such Holder and stated to be specifically for use therein; provided, however, that the obligations of such Holder contained in this **Section 2.4(b)** shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld); provided, further, that in no event shall any indemnity under this **Section 2.4** exceed the net proceeds from the offering received by such Holder unless such liability arises out of or is based on wilful misconduct by such Holder.

(c) Each party entitled to indemnification under this **Section 2.4** (the "**Indemnified Party**") shall give notice to the party required to provide indemnification (the "**Indemnifying Party**") promptly after such Indemnified Party has actual knowledge of any claim as to which indemnity may be sought, and shall permit the Indemnifying Party to assume the defense of such claim or any litigation resulting therefrom; provided that counsel for the Indemnifying Party,

-13-

Trial Exhibit 3215 Page 203 of 214

who shall conduct the defense of such claim or any litigation resulting therefrom, shall be approved by the Indemnified Party (whose approval shall not be unreasonably withheld), and the Indemnified Party may participate in such defense at such party's expense; and provided further that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this **Section 2.4**, to the extent such failure is not prejudicial. No Indemnifying Party, in the defense of any such claim or litigation, shall, except with the consent of each Indemnified Party, consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release from all liability in respect to such claim or litigation. Each Indemnified Party shall furnish such information regarding itself or the claim in question as an Indemnifying Party may reasonably request in writing and as shall be reasonably required in connection with defense of such claim and litigation resulting therefrom.

(d) If the indemnification provided for in this **Section 2.4** is held by a court of competent jurisdiction to be unavailable to an Indemnified Party with respect to any loss, liability, claim, damage, or expense referred to herein, then the Indemnifying Party, in lieu of indemnifying such Indemnified Party hereunder, shall contribute to the amount paid or payable by such Indemnified Party as a result of such loss, liability, claim, damage, or expense in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party on the one hand and of the Indemnified Party on the other in connection with the statements or omissions that resulted in such loss, liability, claim, damage, or expense as well as any other relevant equitable considerations provided, that, in no event shall any contribution by a Holder under this **Section 2.4(d)** exceed the net proceeds from the offering received by such Holder unless such liability arises out of or is based on wilful misconduct by such Holder. The relative fault of the Indemnifying Party and of the Indemnified Party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the Indemnifying Party or by the Indemnified Party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

(e) Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

2.5 Information by Holder. Each Holder of Registrable Securities shall furnish to the Company such information regarding such Holder and the distribution proposed by such Holder as the Company may request in writing and as shall be reasonably required in connection with any registration, qualification, or compliance referred to in this **Section 2**.

2.6 Rule 144 Reporting and Administration.

(a) If the Company registers a class of securities under Section 12 of the Exchange Act or shall commence to file reports under Section 13 or 15(d) of the Exchange Act, the Company agrees to use all reasonable efforts to:

(i) make and keep "public information" regarding the Company available as such term is defined in Rule 144 under the Securities Act; and

(ii) so long as a Holder owns any Registrable Securities, furnish to such Holder forthwith upon written request a written statement by the Company as to its compliance with the reporting requirements of the Exchange Act.

-14-

Trial Exhibit 3215 Page 204 of 214

(b) From and after an Initial Public Offering, the Company shall use all reasonable efforts to facilitate and expedite transfers of Registrable Securities pursuant to Rule 144 under the Securities Act, which efforts shall include timely notice to its transfer agent to expedite such transfers of Registrable Securities.

2.7 <u>Market Stand-Off Agreement</u>. Each Holder hereby agrees that such Holder shall not sell or otherwise transfer, or make any short sale of, any common stock (or other securities) of the Company held by such Holder (other than those included in the registration) during the one hundred eighty (180) calendar day period following the effective date of the Initial Public Offering; <u>provided that</u>, all officers and directors of the Company and all holders of at least five percent (5%) of the Company's outstanding securities are bound by and have entered into similar agreements. The obligations described in this **Section 2.7** shall not apply to a registration relating solely to employee benefit plans on Form S-1 or Form S-8 or similar forms that may be promulgated in the future, or a registration relating solely to a transaction on Form S-4 or similar forms that may be promulgated in the future.

2.8 <u>Transfer or Assignment of Registration Rights</u>. The rights to cause the Company to register securities granted to a Holder by the Company under this **Section 2** may be transferred or assigned by a Holder only to a transferee or assignee of Registrable Securities which is a permitted transferee pursuant to the applicable terms of the Operating Agreement.

2.9 <u>Limitations on Subsequent Registration Rights</u>. From and after the date of this Agreement, the Company shall not, without the prior written consent of Google or those Holders holding a majority of the Registrable Securities, enter into any agreement with any holder or prospective holder of any securities of the Company giving such holder or prospective holder any registration rights the terms of which are senior to, or which otherwise impair, the registration rights granted to the Holders hereunder.

2.10 <u>Termination of Registration Rights</u>. The right of any Holder to request registration or inclusion in any registration pursuant to **Sections 2.1** or **2.2** shall terminate on the date that is the earlier of (i) four (4) years after the closing of the Company's Initial Public Offering and (ii) the first date following the second anniversary of the closing of the Company's Initial Public Offering on which (x) the Conversion Stock of the Company has been listed on an Eligible Exchange for two years and remains so listed and (y) the Company is eligible to use Form S-3 under the Securities Act.

**Section 3**
**Miscellaneous**

3.1 <u>Amendment</u>. Except as expressly provided herein, neither this Agreement nor any term hereof may be amended, waived, discharged or terminated other than by a written instrument referencing this Agreement and signed by the Company and the Holders holding a majority of the Registrable Securities. Any such amendment, waiver, discharge or termination effected in accordance with this paragraph shall be binding upon each Holder and each future holder of all such Registrable Securities.

3.2 <u>Notices</u>. All notices and other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail, postage prepaid, sent by facsimile or otherwise delivered by hand or by messenger addressed:

-15-

(a) if to Google, to:

    1600 Amphitheater Parkway
    Mountain View, CA 94043
    Facsimile: (650) 649-1920
    Attention: David C. Drummond, Senior Vice President, Corporate Development

    Attention: Donald Harrison, Corporate Counsel, M&A and Securities

    with a copy to (which shall not constitute notice):

    Wilson Sonsini Goodrich & Rosati,
    Professional Corporation

    650 Page Mill Road
    Palo Alto, CA 94034
    Facsimile: (650) 493-6811
    Attention: David J. Segre

(b) if to the Company, to:

    AOL Holdings LLC
    c/o AOL LLC
    22000 AOL Way
    Dulles, VA 20166
    Facsimile: (703) 265-1105
    Attention: General Counsel; SVP Mergers and Acquisitions

    with a copy to (which shall not constitute notice):

    Cravath, Swaine & Moore LLP
    825 Eighth Avenue
    New York, NY 10019
    Facsimile: (212) 474-3700
    Attention: Richard Hall

    (c) if to any Holder (other than Google), at such address or facsimile number shown in the Company's records, or, until any such person so furnishes an address or facsimile number to the Company, then to and at the address of the last holder of such shares for which the Company has contact information in its records.

    Each such notice or other communication shall be deemed to have been delivered and given for all purposes (i) on the delivery date if delivered by confirmed facsimile, (ii) on the delivery date if delivered personally to the party to whom the same is directed, (iii) one (1) business day after deposit with a commercial overnight carrier, with written verification of receipt, or (iv) five (5) business days after the mailing date, whether or not actually received, if sent by U.S. mail, return receipt requested, postage and charges prepaid, or any other means of rapid mail delivery for which a receipt is available addressed to the receiving party as specified on the signature page of this Agreement. Changes of the

-16-

Trial Exhibit 3215 Page 206 of 214

person to receive notices or the place of notification shall be effectuated pursuant to a notice given under this Section 3.2.

3.3 <u>Governing Law</u>. This Agreement and the rights of the parties hereto shall be interpreted in accordance with the laws of the State of New York, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws. To the fullest extent permitted by applicable law, each of the parties hereto irrevocably agrees that any legal action or proceeding arising out of this Agreement shall be brought only in the state or United States Federal courts located in the State of New York. Each party hereto irrevocably consents to the service of process outside the territorial jurisdiction of such courts in any such action or proceeding by the mailing of such documents by registered United States mail, postage prepaid, to the respective address set forth in **Section 3.2**.

Successors and Assigns. Without the prior written consent of the Company and Holders holding a majority of the Registrable Securities, this Agreement, and any and all rights, duties and obligations hereunder, shall not be assigned, transferred, delegated or sublicensed by any party hereto to any third party (except as expressly permitted pursuant to **Section 2.8**). Any attempt by a party to assign, transfer, delegate or sublicense any rights, duties or obligations that arise under this Agreement, other than as permitted by the immediately preceding sentence, shall be void. Except as otherwise provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the successors, assigns, heirs, executors and administrators of the parties hereto.

3.4 <u>Entire Agreement</u>. This Agreement and the exhibits hereto and the applicable provisions set forth in the Operating Agreement constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof. No party hereto shall be liable or bound to any other party in any manner with regard to the subjects hereof or thereof by any warranties, representations or covenants except as specifically set forth herein.

3.5 <u>Delays or Omissions</u>. Except as expressly provided herein, no delay or omission to exercise any right, power or remedy accruing to any party to this Agreement upon any breach or default of any other party under this Agreement shall impair any such right, power or remedy of such non-defaulting party, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party to this Agreement, shall be cumulative and not alternative.

3.6 <u>Severability</u>. If any provision of this Agreement becomes or is declared by a court of competent jurisdiction to be illegal, unenforceable or void, portions of such provision, or such provision in its entirety, to the extent necessary, shall be severed from this Agreement, and such court will replace such illegal, void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the same economic, business and other purposes of the illegal, void or unenforceable provision. The balance of this Agreement shall be enforceable in accordance with its terms.

3.7 <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. All references in this Agreement to sections, paragraphs and exhibits shall, unless otherwise provided, refer to sections and paragraphs hereof and exhibits attached hereto.

-17-

3.8 <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the parties that execute such counterparts, and all of which together shall constitute one instrument.

3.9 <u>Telecopy Execution and Delivery</u>. A facsimile, telecopy or other reproduction of this Agreement may be executed by one or more parties hereto and delivered by such party by facsimile or any similar electronic transmission device pursuant to which the signature of or on behalf of such party can be seen. Such execution and delivery shall be considered valid, binding and effective for all purposes. At the request of any party hereto, all parties hereto agree to execute and deliver an original of this Agreement as well as any facsimile, telecopy or other reproduction hereof.

3.10 <u>No Impairment</u>. The Company agrees that it shall not amend its charter documents (e.g., certificate of formation, operating agreement, certificate of incorporation, bylaws) or enter into or amend any agreement if such amendment or agreement would materially impair or otherwise adversely affect the rights of the Holders pursuant to this Agreement.

3.11 <u>Confidentiality</u>. Each Holder expressly acknowledges that such Holder may receive confidential and proprietary information relating to the Company, including information relating to the Company's financial condition and business plans, and that the disclosure of such confidential information to a third party would cause irreparable injury to the Company. Except with the prior written consent of the Company, no Holder shall disclose any such information to a third party (other than (i) on a "need to know" basis to any affiliate or any employee, agent, representative or contractor of such Holder or its affiliates or (ii) in connection with any disclosure made to a prospective Financial Investor transferee as defined in and in accordance with Section 7.04 (b) of that certain Amended and Restated Limited Liability Company Agreement, by and among the parties hereto and certain additional persons, dated as of the date hereof (each of whom shall agree to maintain the confidentiality of such information)), and each Holder shall use reasonable efforts to preserve the confidentiality of such information. The obligations of a Holder under this Section 3.12 shall survive the termination of this Agreement or cessation of a Holder's status as a Holder for a period of five years. Information exchanged between Holders shall be non-confidential unless exchanged pursuant to a separate confidentiality agreement executed between such Holders. Notwithstanding the foregoing, a Holder shall not be bound by the confidentiality obligations in this Section 3.12 with respect to any information that is currently or becomes: (a) required to be disclosed by such Holder pursuant to applicable law, including federal or state securities laws, or a domestic national securities exchange rule (but in each case only to the extent of such requirement); (b) required to be disclosed in order to protect such Holder's interest in the Company or enforce Holder's rights under this Agreement (but in each case only to the extent of such requirement and only after consultation with the Company); (c) publicly known or available in the absence of any improper or unlawful action on the part of such Holder; or (d) known or available to such Holder via legitimate means other than through or on behalf of the Company or the other Holders.

[Remainder of Page Intentionally Left Blank]

-18-

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement effective as of the day and year first above written.

TIME WARNER INC.

By: _____

Name: _____

Title: _____


"COMPANY"

AOL HOLDINGS, LLC

By: _____

Name: _____

Title: Chief Executive Officer


"GOOGLE"

GOOGLE, INC.

By: _____

Name: _____

Title: _____


[SIGNATURE PAGE FOR THE REGISTRATION RIGHTS AGREEMENT]

EX-21.01 5 dex2101.htm LIST OF SUBSIDIARIES AND REGISTRANT

Exhibit 21.01

## Google Inc.,
### a Delaware corporation

### Subsidiaries

- @Last Software, Inc., a Delaware corporation
- Applied Semantics, Inc., a California corporation
- dMarc Broadcasting, Inc., a Delaware corporation
- Google International LLC, a Delaware limited liability company
- Google LLC, a Delaware limited liability company
- Ignite Logic, Inc., a Delaware corporation
- Kaltix Corporation, a Delaware corporation
- Liquid Acquisition Corp. 2, a Delaware corporation
- Neotonic Software Corporation, a California corporation
- Orkut.com, LLC, a Delaware limited liability company
- Picasa LLC, a Delaware limited liability company
- Upstartle, LLC, a Delaware limited liability company
- Urchin Software Corporation, a Delaware corporation
- Where2 LLC, a Delaware limited liability company
- ZipDash, Inc., a Delaware corporation
- Google (Hong Kong) Limited
- Google Akwan Internet Ltda.
- Google Australia Pty Limited
- Google Brasil Internet Ltda
- Google Canada Corporation
- Google Denmark ApS
- Google France SarL
- Google Germany GmbH
- Google International GmbH
- Google Ireland Holdings Limited
- Google Ireland Limited
- Google Italy s.r.l.
- Google Japan Inc.
- Google Korea, LLC.
- Google Mexico S. de R.L. de C.V.
- Google Netherlands B.V.
- Google Netherlands Holdings B.V.
- Google Online India Private Limited
- Google Spain, S.L.
- Google Sweden AB
- Google Switzerland GmbH
- Google UK Limited
- Reqwireless Inc.

Oracle America v. Google
3:10-cv-03561-WHA

GOOGLE-03170221

EX-23.01 6 dex2301.htm CONSENT OF ERNST & YOUNG LLP, INDEPENDENT
REGISTERED PUBLIC ACCOUNTING FIRM

Exhibit 23.01

## CONSENT OF ERNST & YOUNG LLP,
## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We consent to the incorporation by reference in the Registration Statements (Form S-8 Nos. 333-127451, 333-124350, 333-120099, 333-119378, 333-119282 and 333-117715; and Form S-3 No. 333-127648) of our reports dated March 10, 2006, with respect to the consolidated financial statements and schedule of Google Inc., Google Inc. management's assessment of the effectiveness of internal control over financial reporting, and the effectiveness of internal control over financial reporting of Google Inc., included in the Annual Report (Form 10-K) for the year ended December 31, 2005.

/s/    ERNST & YOUNG LLP

San Francisco, California
March 10, 2006

EX-31.01 7 dex3101.htm CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO EXCHANGE ACT RULES

Exhibit 31.01

**CERTIFICATION**

I, Eric E. Schmidt, certify that:

1. I have reviewed this annual report on Form 10-K of Google Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 16, 2006

/S/   ERIC E. SCHMIDT

Eric E. Schmidt
Chairman of the Executive Committee and
Chief Executive Officer

EX-31.02 8 dex3102.htm CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT
TO EXCHANGE ACT RULES

Exhibit 31.02

### CERTIFICATION

I, George Reyes, certify that:

1. I have reviewed this annual report on Form 10-K of Google Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (c) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 16, 2006

/S/ GEORGE REYES
George Reyes
Chief Financial Officer

EX-32.01 9 dex3201.htm CERTIFICATIONS OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER

Exhibit 32.01

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER**

**PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2003**

I, Eric E. Schmidt, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2003, that the Annual Report of Google Inc. on Form 10-K for the fiscal year ended December 31, 2005 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in this Form 10-K fairly presents in all material respects the financial condition and results of operations of Google Inc.

Date: March 16, 2006

By:    /S/   ERIC E. SCHMIDT
Name: Eric E. Schmidt
Title:  *Chairman of the Executive Committee and*
         *Chief Executive Officer*

I, George Reyes, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2003, that the Annual Report of Google Inc. on Form 10-K for the fiscal year ended December 31, 2005 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in this Form 10-K fairly presents in all material respects the financial condition and results of operations of Google Inc.

Date: March 16, 2006

By:    /S/   GEORGE REYES
Name: George Reyes
Title:  *Chief Financial Officer*