# EXHIBIT 8
## (PART 3 OF 3)

1    A.   AGAIN, DR. RAO'S SURVEY GIVES YOU RELATIVE VALUES, BUT IN

2    THIS CASE, RELATIVE TO THE VALUE OF FACETIME.  SO I USED THOSE

3    RELATIVE VALUE SCORES RELATIVE TO THE TOTAL VALUE OF FACETIME

4    TO DERIVE WHAT GOES INTO THE RELATIVE VALUE CIRCLE.

5    Q.   NOW, THE LAST CIRCLE SAYS 30/70 BARGAINING SPLIT.  I TAKE

6    IT THAT HAS TO DO WITH THE HYPOTHETICAL NEGOTIATION.

7    A.   SURE.  YOU CAN THINK ABOUT THE FIRST FOUR AS GIVING YOU

8    THE MONETARY VALUE OF THE FEATURE.  APPLE WOULDN'T BE WILLING

9    TO PAY ALL OF THIS TO THE PATENT HOLDER, AND THE HYPOTHETICAL

10   NEGOTIATION WOULD BE ABOUT HOW THAT WOULD BE DIVIDED.

11        IN THIS CASE, APPLE HAS TO TAKE THE TECHNOLOGY IN THE

12   PATENT -- IT'S NOT VOCI THAT CREATES FACETIME, IT'S APPLE --

13   APPLE HAS TO TAKE THAT, IT HAS TO INCORPORATE IT INTO A

14   COMMERCIAL PRODUCT, IT HAS TO SELL THAT COMMERCIAL PRODUCT.

15        SO YOU FIGURE APPLE AS THE DEVELOPER OF THE FACETIME

16   FUNCTIONALITY.

17        APPLE HAS A BUSINESS MODEL IN WHICH IT SHARES WITH THE

18   DEVELOPERS OF THINGS ON THE APP STORE, AND ELSEWHERE, ON A

19   30/70 BASIS WHERE THE DEVELOPERS GET 70 PERCENT, APPLE GETS 30.

20        SO I'M THINKING OF APPLE HERE IN THE ROLE OF THE DEVELOPER

21   RETAINING 70 PERCENT AND THEREBY WILLING TO PAY TO THE PATENT

22   HOLDER 30 PERCENT OF THE TOTAL VALUE OF THE FACETIME.

23   Q.   AND DID YOU USE THAT RATIO TO DO YOUR CALCULATIONS?

24   A.   I DID.

25   Q.   AND WITH REGARD TO THE '449 PATENT, DID YOU DO THOSE IN A

KEARL01756

1    SIMILAR WAY?

2    A.   I DID.  IT TURNS OUT THAT WITH THE '449 -- IN DOING THIS

3    KIND OF THING, YOU HAVE TO THINK ABOUT THE NON-INFRINGING

4    ALTERNATIVES.  IN THE -- FOR THE '239 PATENT, THERE ARE NO

5    NON-INFRINGING ALTERNATIVES, BUT FOR THE '449, THERE WAS A

6    NON-INFRINGING ALTERNATIVE.

7         SO WHAT I NEEDED TO THINK ABOUT FOR THE VALUE OF THE

8    FEATURE WAS THE INCREMENTAL VALUE ENABLED BY THE PATENT

9    RELATIVE TO A NON-INFRINGING ALTERNATIVE.

10        SO I HAVE TO TAKE A SIXTH STEP AND ADJUST THIS DOWN

11   FURTHER TO GET TO THE INCREMENTAL VALUE, AND I DID THAT FOR THE

12   '449 PATENT.

13            MR. CEDERBERG:  YOUR HONOR, NEXT I'D LIKE TO SHOW

14   WHAT'S BEEN ORDERED SEALED, AND THAT IS SHOWN TO THE COURT AND

15   THE JURY, DX 391A.  AND IF THE WITNESS HAS THAT UP ON THE

16   SCREEN?

17   Q.   DO YOU HAVE THAT, DR. KEARL?

18   A.   I DO.

19   Q.   CAN YOU TELL US WHAT THAT IS?

20   A.   SURE.  THIS IS THE SUMMARY OF THE EXACT CALCULATIONS THAT

21   I MADE USING THE METHODOLOGY I'VE DESCRIBED.  IN THE TABLE THAT

22   THE JURY CAN SEE AT THE TOP, YOU CAN SEE THE FEATURES IN THE

23   THREE COLUMNS, AND YOU CAN SEE THE ACCUSED PRODUCTS IN THE

24   THREE ROWS.

25        AND THE TOTAL AMOUNT, YOU CAN SEE IT FOR EACH FEATURE AND

KEARL01757

1   EACH ACCUSED PRODUCT, AND THE TOTAL AMOUNT OF A LITTLE OVER

2   6 MILLION IS THE AMOUNT THAT I TESTIFIED TO EARLIER.

3          IN THE BOTTOM TABLE, YOU SEE, FOR THE SINGLE FEATURE, THE

4   VALUE FOR THE REASONABLE ROYALTY FOR EACH OF THE INFRINGING

5   PRODUCTS, AND YOU CAN SEE THE TOTAL THERE IS THE NEARLY 160,000

6   THAT I TESTIFIED TO EARLIER.

7          THE OTHER PAGES IN THIS SUMMARY THAT I PUT TOGETHER DETAIL

8   THE CALCULATIONS FOR THE FOLLOWING METHODOLOGY THAT I DESCRIBED

9   IN A GENERAL WAY A MINUTE AGO.

10          MR. CEDERBERG:  OKAY.  YOUR HONOR, WE OFFER DX 391A,

11   SEALED.

12          THE COURT:  ANY OBJECTION?

13          MR. LEE:  NO OBJECTION, YOUR HONOR.

14          THE COURT:  AND THE ENTIRE DOCUMENT IS SEALED.  IT'S

15   ADMITTED.

16       (DEFENDANTS' EXHIBIT 391A WAS ADMITTED IN EVIDENCE.)

17          THE COURT:  GO AHEAD, PLEASE.

18          MR. CEDERBERG:  CAN WE PUT 3942 BACK UP?

19   Q.   BEFORE I ASK YOU ANOTHER QUESTION, AT THE '449 PATENT

20   THERE, OR THE '239 PATENT, YOU MENTIONED VOCI.  ARE YOU

21   FAMILIAR WITH A PERSON NAMED DR., OR MR. FREEMAN?

22   A.   YES.  I WAS HERE DURING HIS TESTIMONY.

23   Q.   AND JUST REMIND THE JURY WHO HE WAS.

24   A.   HE WAS THE INVENTOR, AND HE FORMED THIS FIRM CALLED VOCI

25   WHICH CAME TO HOLD THE PATENT.

KEARL01758

1    Q.   OKAY.  NOW, IF I LOOK AT THIS, THE '449 RESULTS THAT YOU

2    GOT ARE A LOT LOWER THAN THE '239 RESULTS.  CAN YOU EXPLAIN

3    THAT TO THE JURY?

4    A.   SURE.  THERE ARE TWO REASONS.  ONE IS, AS I INDICATED AT

5    THE BEGINNING OF MY TESTIMONY, THERE'S LOTS OF EVIDENCE THAT

6    THE '239 PATENTED FEATURES WERE IMPORTANT TO APPLE, THEY WERE

7    VALUABLE TO APPLE, THEY WERE ADVERTISED BY APPLE, THEY WERE

8    PART OF ITS MATERIALS.

9         THE '449 WAS LESS IMPORTANT.

10        AND SECOND, THE '449 ROYALTY REPRESENTS THE INCREMENTAL

11   VALUE RELATIVE TO A NON-INFRINGING ALTERNATIVE, WHILE THE '239

12   DOES NOT.

13   Q.   AND JUST SO WE'RE CLEAR, FOR THE '449, WHAT WAS THE

14   NON-INFRINGING ALTERNATIVE AS YOU UNDERSTAND IT?

15   A.   THE NON-INFRINGING ALTERNATIVE WAS ACTUALLY THE IPAD,

16   WHICH DIDN'T HAVE THE NUMBER ALBUM FEATURE ON IT.

17   Q.   NOW, WE HEARD EARLIER THAT THAT '239 PATENT SOLD FOR ABOUT

18   $2.3 MILLION.  WAS THAT AN IMPORTANT FACTOR IN YOUR ANALYSIS?

19   A.   SURE.  I'M AN ECONOMIST.  MARKET PRICES MATTER WHERE

20   PEOPLE MAKE EXCHANGES, AND IT WAS BOUGHT FOR 2.39 MILLION.

21        AND IN SOME SENSE, THIS IS SORT OF A REALITY CHECK.  THAT

22   IS, I HAVE A ROYALTY HERE OF A LITTLE OVER $6 MILLION FOR AN

23   IMPORTANT FEATURE TO APPLE, BUT IT'S A FEATURE THAT ALSO SOLD

24   IN THE MARKET, AT LEAST THE PATENT SOLD IN THE MARKET.

25        SO THE 2.3 MILLION IS -- SINCE THESE ARE KIND OF IN THE

KEARL01759

1    SAME BALLPARK, IT SUGGESTS THAT I'VE DONE THIS CORRECTLY.

2    Q.   JUST GOING BACK TO YOUR HYPOTHETICAL NEGOTIATION, BESIDES

3    COMING UP WITH A PRICE, WERE THERE FEATURES OF THE PATENT THAT

4    YOU THOUGHT WOULD RESULT FROM THAT HYPOTHETICAL NEGOTIATION?

5    A.   SURE.  I ASSUMED THAT, FOLLOWING THE GEORGIA-PACIFIC

6    FACTORS, THAT THE LICENSE WOULD BE NONEXCLUSIVE, THAT IT WOULD

7    BE FOR SALES IN THE UNITED STATES, AND I REVIEWED A LARGE

8    NUMBER OF APPLE LICENSES AND CAME TO LEARN THAT APPLE GENERALLY

9    HAD LUMP SUMP LICENSES.  SO I ASSUMED, BASED ON THAT REVIEW,

10   UNDER THE GEORGIA-PACIFIC FACTORS, THAT IT WOULD BE A LUMP SUM

11   LICENSE, LUMP SUM FEE FOR THE LICENSE.

12           MR. CEDERBERG:  NO FURTHER QUESTIONS, YOUR HONOR.

13           THE COURT:  ALL RIGHT.  TIME IS 10:08.

14       (PAUSE IN PROCEEDINGS.)

15           THE COURT:  ARE YOU READY?

16           MR. LEE:  YES.

17           THE COURT:  OKAY.  TIME IS 10:08.

18       GO AHEAD, PLEASE.

19                        **CROSS-EXAMINATION**

20   BY MR. LEE:

21   Q.   GOOD MORNING, DR. KEARL.

22   A.   GOOD MORNING, MR. LEE.

23   Q.   DR. KEARL, LET ME PUT BACK UP SDX 3942.  THIS IS THE SLIDE

24   YOU WERE JUST TALKING ABOUT, TOTAL DAMAGES OF ABOUT

25   $6.2 MILLION; CORRECT?

KEARL01760

1    A.   CORRECT.

2    Q.   ALL RIGHT.  NOW, YOU'RE BEING COMPENSATED AT THE RATE OF

3    $700 AN HOUR; CORRECT?

4    A.   THAT'S CORRECT.

5    Q.   AND YOU AND DR. RAO WORK AT CHARLES RIVER ASSOCIATES;

6    CORRECT?

7    A.   NOT QUITE CORRECT.  HE IS AN EMPLOYEE OF CHARLES RIVER.

8    I'M AFFILIATED WITH CHARLES RIVER.

9    Q.   FAIR ENOUGH.

10   A.   I WORK WITH CHARLES RIVER, SURE.

11   Q.   NOW, THE AMOUNT OF THAT CHARLES RIVER HAD BILLED FOR YOUR

12   SERVICES AND DR. RAO'S, AS OF SEPTEMBER OF LAST YEAR, EIGHT OR

13   NINE MONTHS AGO, WAS $2.2 MILLION; WASN'T IT?

14   A.   I DON'T KNOW WHAT IT WAS THEN.  BUT I CAN TELL YOU WHAT IT

15   IS NOW.

16   Q.   YEAH.  I'D LIKE TO KNOW THE TOTAL AMOUNT THAT

17   CHARLES RIVER ASSOCIATES HAS BILLED FOR THE $6 MILLION DAMAGE

18   CLAIM.  JUST GIVE ME THE DOLLAR AMOUNT IF YOU COULD.

19   A.   I'LL GIVE YOU THE NUMBER, BUT I NEED TO FRAME IT IN A

20   CERTAIN WAY.

21           MR. CEDERBERG:  EXCUSE ME, YOUR HONOR.

22           THE COURT:  EXCUSE ME.  THERE'S AN OBJECTION.

23           MR. CEDERBERG:  THE FIRST QUESTION WAS ABOUT WHAT

24   DR. KEARL AND DR. RAO HAD BILLED.

25       NOW I CAN'T TELL IF HE'S ASKING ABOUT THE WITNESSES WHO

KEARL01761

1    TESTIFIED OR THE WHOLE COMPANY FOR A WHOLE LOT OF --

2              THE COURT:  ALL RIGHT.  VAGUENESS.

3              MR. LEE:  I'LL RESTATE IT, YOUR HONOR.

4              THE COURT:  ALL RIGHT.  IT'S SUSTAINED.

5    BY MR. LEE:

6    Q.   HOW MUCH HAS CHARLES RIVER ASSOCIATES BEEN PAID FOR THE

7    WORK THAT YOU'VE DONE AND DR. RAO HAS DONE AND THAT THEY HAVE

8    SUPPORTED?

9    A.   WELL, I DON'T THINK CHARLES RIVER BREAKS IT OUT FOR JUST

10   DR. RAO'S WORK AND MY WORK.

11        CHARLES RIVER HAS BEEN PAID ABOUT $3.1 MILLION FOR THE

12   WORK BY DR. RAO, BY ME, BY THE SURVEY COMPANY ON THIS MATTER,

13   ON A LOT OF MATTERS THAT ARE NOT IN THIS LITIGATION.

14   Q.   AND YOU WERE HERE WHEN DR. SCHONFELD TESTIFIED; CORRECT?

15   A.   I WAS.

16   Q.   AND YOU WERE HERE WHEN MR. PARULSKI TESTIFIED; CORRECT?

17   A.   I WAS.

18   Q.   AND YOU HEARD THEM TESTIFY ABOUT THE AMOUNTS THAT THEY'VE

19   BEEN PAID; CORRECT?

20   A.   YES.

21   Q.   SO SAMSUNG HAS PAID, IN TOTAL, ABOUT -- MORE THAN

22   $4 MILLION FOR THESE TWO PATENTS, THE '239 AND '449, TO THEIR

23   EXPERT WITNESSES; CORRECT?

24              MR. CEDERBERG:  OBJECTION.  MISSTATES THE TESTIMONY,

25   YOUR HONOR.

KEARL01762

CROSS KEARL                                                    2672

```
1              THE COURT:  OVERRULED.

2          GO AHEAD, PLEASE.

3    BY MR. LEE:

4    Q.   IS THAT RIGHT?

5    A.   YES.  BUT, YOU KNOW, YOU DON'T KNOW THE END WHEN YOU

6    START.

7    Q.   OKAY.

8    A.   WHEN SAMSUNG RETAINED ME, IT DIDN'T KNOW WHAT THE END

9    VALUE WOULD BE.  IT ASKED ME TO GIVE MY BEST OPINION, TO DERIVE

10   A VALUE HERE, AND IT COMES OUT WHERE IT COMES OUT.

11   Q.   RIGHT.

12   A.   BUT THEY DIDN'T KNOW THAT GOING IN.

13   Q.   RIGHT.  BUT WE KNOW IT NOW, DON'T WE?

14   A.   WE DO.

15   Q.   NOW, LET ME SEE IF I CAN CORRECT ONE THING.  YOU SAID THAT

16   SAMSUNG BOUGHT THE '239 PATENT IN SEPTEMBER 2010.  IT'S

17   ACTUALLY SEPTEMBER 2011; CORRECT?

18   A.   CORRECT, YEAH.

19   Q.   YOU ALSO SAID THAT SAMSUNG BOUGHT THE PATENT FOR

20   $2.3 MILLION.  THEY ACTUALLY BOUGHT TWO PATENTS, DIDN'T THEY?

21   A.   THEY DID.

22   Q.   ALL RIGHT.  SO THE RIGHT DATE IS SEPTEMBER 2011; CORRECT?

23   A.   CORRECT.

24   Q.   AND THE TOTAL AMOUNT FOR TWO PATENTS WAS 2.3 -- WAS

25   $2.3 MILLION; CORRECT?
```

KEARL01763

1    A.   CORRECT.

2    Q.   AND THAT PURCHASE, IN 2011, WAS AFTER APPLE HAD MET WITH

3    SAMSUNG AND ASKED THEM TO STOP COPYING THEIR PATENTS; CORRECT?

4    A.   THAT'S MY UNDERSTANDING.

5    Q.   IT'S AFTER APPLE HAD SUED THEM FOR INFRINGEMENT; CORRECT?

6    A.   THAT'S MY UNDERSTANDING AS WELL.

7    Q.   AND YOU KNOW, DURING THE PERIOD OF TIME AFTER ACQUISITION

8    THROUGH THE DATE THAT THE CLAIM WAS ASSERTED, SAMSUNG WAS

9    SELLING COMPONENTS TO APPLE; CORRECT?

10   A.   THAT'S MY UNDERSTANDING.

11   Q.   AND YOU ALSO KNOW, DR. KEARL, THAT DURING THAT ENTIRE TIME

12   THEY WERE SELLING COMPONENTS, THEY NEVER ONCE SUGGESTED THAT

13   THE '239 PATENT WAS INFRINGED; CORRECT?

14   A.   THAT I HAVE NO WAY OF KNOWING.

15   Q.   AND THE '239 PATENT HAS EXPIRED; CORRECT?

16   A.   YES.  IT EXPIRED IN FEBRUARY.

17   Q.   AND IT'S NOT THE WORK OF ANYONE AT SAMSUNG; CORRECT?

18   A.   THAT'S CORRECT.

19   Q.   NOW LET'S TALK ABOUT THE '449 PATENT.

20        LET ME ASK YOU ONE QUESTION.  YOU HAD TALKED ABOUT APPS.

21        DO YOU REMEMBER THAT?

22   A.   YES.

23   Q.   DO YOU AGREE OR DISAGREE WITH THIS STATEMENT:  THE VALUE

24   THAT THESE USERS PLACED ON FACETIME IS LIKELY HIGHER, AND

25   LIKELY MANY TIMES HIGHER, THAN THE $.99 AMOUNT I USED IN MY

KEARL01764

1    CALCULATIONS.

2    A.   THAT'S FROM MY REPORT.  I AGREE WITH IT.

3    Q.   OKAY.  AND IT'S TRUE, IS IT NOT?

4    A.   YES, SIR.

5    Q.   OKAY.  NOW, SAMSUNG ALSO PURCHASED THE '449 PATENT;

6    CORRECT?

7    A.   IT DID.

8    Q.   FROM HITACHI; CORRECT?

9    A.   YES, ALONG WITH 33 OTHER PATENTS, I THINK SEVEN PATENT

10   APPLICATIONS, AND SOMETHING LIKE 66 FOREIGN PATENTS, PLUS A

11   CROSS-LICENSE.  SO IT WAS A BUNDLE OF THINGS THAT IT HAD

12   BOUGHT.

13   Q.   RIGHT.  NOW, LET ME ASK YOU TO LOOK AT TAB 4 IN YOUR

14   NOTEBOOK, WHICH IS JX 24.

15        YOUR HONOR, THIS IS SEALED, SO I'M NOT -- LET ME OFFER IT,

16   FIRST.

17        DO YOU HAVE IT?

18   A.   I DO.

19   Q.   TAB 4?

20   A.   THIS IS SAMSUNG'S USE OF APPLE'S PATENTS AND SMARTPHONES?

21   Q.   NO.  IT SHOULD BE AT TAB 4.  IT SHOULD BE THE ASSIGNMENT

22   AND PURCHASE AGREEMENT.

23   A.   THAT'S NOT THE TAB 4.

24   Q.   DO YOU HAVE THE RIGHT --

25        CAN I APPROACH, YOUR HONOR, AND ASSIST HIM?

KEARL01765

1               THE COURT:  GO AHEAD, PLEASE.

2          (PAUSE IN PROCEEDINGS.)

3     BY MR. LEE:

4     Q.   OKAY?

5     A.   TAB 2.

6     Q.   TAB 2.  MY FAULT.  MY PROBLEM.  MY BAD.

7          SO YOU HAVE TAB 2 BEFORE YOU?

8     A.   I DO.

9     Q.   YOU RECOGNIZE THAT AS THE ACQUISITION AGREEMENT; CORRECT?

10    A.   YES.

11              MR. LEE:  AND, YOUR HONOR, WE OFFER JX 24, WHICH IS

12    UNDER SEAL AS I UNDERSTAND IT.

13              THE COURT:  ANY OBJECTION?

14              MR. CEDERBERG:  NO OBJECTION.

15              THE COURT:  IT'S ADMITTED.

16         (JOINT EXHIBIT 24 WAS ADMITTED IN EVIDENCE.)

17              THE COURT:  GO AHEAD, PLEASE.

18    BY MR. LEE:

19    Q.   DR. KEARL, THAT PURCHASE OCCURRED IN JULY 2011; CORRECT?

20    A.   YES.

21    Q.   AND --

22    A.   I DON'T SEE THE DATE ON HERE, BUT -- IT'S EITHER JUNE OR

23    JULY 2011.

24    Q.   AND BEFORE THE DATE OF THE ACQUISITION, NO ONE AT HITACHI

25    EVER SUGGESTED THAT APPLE WAS INFRINGING THIS PATENT, THE '449

KEARL01766

1     PATENT; CORRECT?

2     A.   I DON'T KNOW THAT.

3     Q.   BUT YOU DO KNOW THAT AFTER THE DATE OF ACQUISITION,

4     SAMSUNG WAS SUPPLYING COMPONENTS TO APPLE; CORRECT?

5     A.   YES.

6     Q.   AND YOU KNOW THAT SAMSUNG NEVER ONCE SUGGESTED, BEFORE IT

7     FILED THIS LAWSUIT, THAT APPLE'S USE OF THOSE COMPONENTS WAS

8     INFRINGING THE PATENT?

9     A.   I DON'T KNOW THAT.

10    Q.   NOW, DR. KEARL, ONE LAST QUESTION OR TWO.

11         YOU AGREE WITH ME THAT -- YOU'RE AN EXPERIENCED DAMAGES

12    EXPERT; CORRECT?

13    A.   I'VE DONE THIS A FAIR NUMBER OF TIMES, YES.

14    Q.   AND YOU UNDERSTAND THAT YOU HAVE TO LOOK PATENT-BY-PATENT

15    IN DETERMINING THE APPROPRIATE LEVEL OF DAMAGES FOR A

16    PARTICULAR PATENT; CORRECT?

17    A.   THAT'S CORRECT.  THAT'S WHAT I'VE DONE.

18    Q.   AND WHEN YOU LOOK AT THE HYPOTHETICAL NEGOTIATION, YOU

19    HAVE TO LOOK AT THE PARTICULAR CIRCUMSTANCES THAT ARE INVOLVED

20    WITH THE PATENT HOLDER AND THE ALLEGED INFRINGER AT THE TIME OF

21    THE HYPOTHETICAL NEGOTIATION, PATENT-BY-PATENT; CORRECT?

22    A.   AGREED.

23         MR. LEE:  NOTHING FURTHER, YOUR HONOR.

24         THE COURT:  ALL RIGHT.  THE TIME IS 10:16.

25         MR. CEDERBERG:  ONE QUICK QUESTION, YOUR HONOR.

KEARL01767

1          THE COURT:  GO AHEAD, PLEASE.

2                    **REDIRECT EXAMINATION**

3    BY MR. CEDERBERG:

4    Q.   DR. KEARL, YOU WERE ASKED BY MR. LEE ABOUT HOW MUCH

5    CHARLES RIVER RECEIVED IN TOTAL FOR THIS CASE.

6          DO YOU REMEMBER THAT?

7    A.   I DO.

8    Q.   YOU SAID IT WAS WHAT YOU DID, WHAT DR. RAO DID, AND THE

9    THINGS NOT RELATED AT ALL TO THIS CASE?

10   A.   CORRECT.

11   Q.   MY QUESTION IS, CAN YOU TELL THE JURY HOW MUCH YOU HAVE

12   RECEIVED FOR YOUR DAMAGES ANALYSIS?

13   A.   ABOUT 340,000, BUT THAT'S FOR THE DAMAGES ANALYSIS, PLUS A

14   LOT OF OTHER THINGS I'VE DONE FOR SAMSUNG.

15          MR. CEDERBERG:  NOTHING FURTHER.

16          THE COURT:  ALL RIGHT.  THE TIME IS 10:17.

17          MR. LEE:  NOTHING FURTHER.

18          THE COURT:  ALL RIGHT.  MAY THIS WITNESS BE EXCUSED,

19   AND IT IS SUBJECT TO RECALL OR NOT SUBJECT TO RECALL?

20          MR. LEE:  NOT SUBJECT TO RECALL FOR APPLE, YOUR

21   HONOR.

22          THE COURT:  DO YOU AGREE WITH THAT, MR. CEDERBERG?

23          MR. CEDERBERG:  I DO.

24          THE COURT:  ALL RIGHT.  THEN YOU ARE EXCUSED.

25          (PAUSE IN PROCEEDINGS.)

KEARL01768