Pages 1 - 22

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,                )
                                     )
                Plaintiff,           )
                                     )
    VS.                              )  No. C 10-3561 WHA
                                     )
GOOGLE, INC.,                        )
                                     )
                Defendant.           )  San Francisco, California
_____)  November 19, 2015


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**:          ORRICK, HERRINGTON & SUTCLIFFE LLP
                          51 West 52nd Street
                          New York, NY 10019
                     BY:  **PETER A. BICKS, ESQUIRE**
                          **MATTHEW L. BUSH, ESQUIRE**

                          ORRICK, HERRINGTON & SUTCLIFFE LLP
                          405 Howard Street
                          San Francisco, CA 94105
                     BY:  **ANNETTE L. HURST, ESQUIRE**
                          **RUCHIKA AGRAWAL, ESQUIRE**

**For Defendant**:          KEKER & VAN NEST
                          633 Battery Street
                          San Francisco, California  94111-1809
                     BY:  **ROBERT ADDY VAN NEST, ESQUIRE**
                          **DANIEL PURCELL, ESQUIRE**

(Appearances continued on next page)


**Reported By:**     *Katherine Powell Sullivan, CSR #5812, RMR, CRR*
                  *Official Reporter - U.S. District Court*

**APPEARANCES (CONTINUED):**

| | |
|---|---|
| **For Dr. Kearl:** | FARELLA BRAUN & MARTEL LLP<br>235 Montgomery Street, 30th floor<br>San Francisco, California 94104 |
| BY: | **JOHN L. COOPER, ESQUIRE**<br>**WINSTON LIAW, ESQUIRE** |

<u>**P R O C E E D I N G S**</u>

NOVEMBER 19, 2015                                        8:44 A.M.

THE COURT:  We'll go to Oracle v. Google.  Case number 10-3561.  Let's have our appearances.

MR. BICKS:  Good morning, Your Honor.  Peter Bicks from Oracle.  And consistent with your court's order, I want to introduce Matt Bush, who's been with Oracle for a year after completing clerkships and graduating from University of Pennsylvania Law School.  So I'll turn it over --

THE COURT:  Welcome to you.

MR. BICKS:  -- to Mr. Bush.

Thank you.

THE COURT:  All right.  Mr. Bush, welcome.

MR. BUSH:  Thank you.

THE COURT:  And?

MR. VAN NEST:  Good morning, Your Honor.  Bob Van Nest and Dan Purcell from Keker & Van Nest.  And we're ready to proceed.

THE COURT:  Thank you.

And?

MR. COOPER:  Good morning, Your Honor.  John Cooper on behalf of Dr. Kearl.  I'd like to introduce Winston Liaw, who doesn't meet the four-year criteria but does meet the five-year criteria.  And Dr. Kearl is in the courtroom.

THE COURT:  Welcome to all of you.  All right.  Five

1  years I can handle.  Thank you.

2     Let's hear from the moving party.

3        **MR. BUSH:**  Thank you, Your Honor.  Matthew Bush on

4  behalf of Oracle.

5     Dr. Kearl should not serve as a neutral expert in this

6  case.  The question that's at the heart of this motion is, what

7  standard of neutrality should a Rule 706 expert be held to?

8     And the answer is that an expert should not serve in the

9  special neutral role when there's an appearance of impropriety.

10  And Dr. Kearl's work in *Apple v. Samsung* raises an appearance

11  of impropriety because he was on the Android team.  And that's

12  for three main reasons:

13     First, it was Android software that Apple accused of

14  infringing its products.  Second, Google was intimately

15  involved in the case and had control and authority over the

16  defense.  And, third, Dr. Kearl's analysis was used to aid in

17  that defense.

18     So taking the first point, Android's involvement in the

19  case.  Even though Samsung was the named defendant, the patents

20  at issue involved software that was on Google's Android, not

21  hardware that was on Samsung's equipment.

22     That's why Samsung told the jury in their opening

23  statement, over and over again, that the case was an attack on

24  Android.  A direct quote just one of the times was, "It's an

25  attack on Android.  It's an attack.  It's an attack."  And

1   objection's overruled.   "It's the truth.   It's an attack on

2   Android."   They're saying it over and over.

3       And Google never disputes that the case is an attack on

4   Android.   They complain that we're just parroting back Apple's

5   arguments in opening statements.   But when we relate to the

6   Court what Samsung's arguments are, Google is tellingly silent.

7       Google never disputes the case was an attack on Android

8   and that it was Android's software that was at the heart of the

9   defense.   And because it was perceived as an attack on Android,

10  Google wasn't just going to let anybody handle the defense.

11  They agreed to indemnity Samsung, and had authority and control

12  over at least part of the defense.

13      Google admits as much in Footnote 1 of their response,

14  that they agreed to indemnify Samsung and direct Samsung's

15  defense for at least part of these patents.

16      The Google-Samsung connection was so strong that the same

17  attorneys represented both Google and Samsung.   Not just the

18  same law firm.   The same attorneys.   Everybody who --

19          **THE COURT:**   What was the name of that firm?

20          **MR. BUSH:**   It was Quinn Emanuel, Your Honor.

21      And every attorney who entered an appearance on behalf of

22  Google also entered an appearance on behalf of Samsung.

23      Now, Google and Dr. Kearl try to say that this connection

24  to Google doesn't really matter because Dr. Kearl's analysis

25  dealt with Samsung's counterclaims against Apple.   But that's

1   really just trying to parse offense and defense too finely.

2       It's like a wide receiver saying, well, I'm on offense, so

3   I don't care at all how many sacks the defensive lineman gets

4   because he's on defense, and he's completely separate from me.

5   But they're not separate.  They're all on the same team.

6       And in this case, Dr. Kearl was on the Android team.  And

7   more than that, they have the same coach.  In this case, that

8   coach was Google.

9       Google was controlling this litigation.  It was a major

10  case handled by a major law firm.  They were going to ensure

11  that all their arguments, both their defenses and their

12  counterclaims, meshed into a single cohesive strategy.  They

13  weren't going to let a $6 million counterclaim potentially

14  interfere with a $2 billion claim against them.

15      And the fact that the same attorneys were representing

16  both Google and Samsung mean that they had a duty to ensure

17  that all their arguments were in Google's best interests.

18      Even if this difference between offense and defense

19  matters, Dr. Kearl's analysis was used as part of the defense.

20  Apple was asserting an over $2 billion claim against Samsung.

21  And Samsung responded by offering Dr. Kearl's $6 million

22  analysis to show that all the patents in the smart phone space

23  aren't really worth that much.

24      And you don't have to take Apple's word for it.  And you

25  don't have to take my word for it.  You just have to see what

1   Samsung said in their opening statement to the jury.  This is

2   on page 413.  They say:

3            "These types of features aren't worth hundreds of

4        millions of dollars.  They don't make a significant

5        difference in sales.  They have very limited value.  In

6        this case, Dr. Kearl determined that that was

7        $6.78 million."

8        So what the Samsung-Google team is doing is, they're

9   saying that all these features -- both Apple's claims against

10  them and Samsung's own counterclaims -- all have a very limited

11  value; that Apple's claims for $2 billion are far too high;

12  they should be lower.  And, as proof of that, they're offering

13  Dr. Kearl's analysis.

14       Samsung's -- Samsung's offense was also Google's defense

15  in this case.  And that's why Apple asked the jury, "Why pay

16  $5 million to defend a $6 million claim?"

17       But it's even worse than that, Your Honor.  One of the

18  patents Dr. Kearl concluded was worth only $158,000.  And even

19  after finding out that was what one of the patents was worth,

20  Samsung and Google brought that counterclaim all the way

21  through a full trial.

22       The only reason to spend that much money and time and

23  expense bringing a $158,000 counterclaim in a $2 billion case,

24  for a company like Google and Samsung, is to offer this

25  strategy of saying these patents and smartphones aren't really

1    worth that much.

2        And because Dr. Kearl was part of this defense, one of the

3    defenses that he found himself aligned with was this idea that

4    Google's engineers were so skilled that they would never copy.

5    That's basically what Samsung told the jury in that case.

6        But Google's copying, rather than creating the APIs

7    entirely from scratch, is at the heart of this case.  And we're

8    finding out, now, that Google didn't only copy just once, but

9    that they're continuing to copy as new versions of Java come

10   out.

11       So Java 5 was at issue in the first trial.  When Java 6

12   comes out, we're finding parts of Java 6 are matching in new

13   versions of Android.  And then when Java 7 comes out with new

14   features, Google is copying those features into its newer

15   version of Android then.

16       So it's not appropriate for Dr. Kearl to have been aligned

17   with this defense that Google would never copy, in a case where

18   Google's copying was so central to the case here.

19       And for a normal expert or a normal witness -- not a

20   court-appointed witness -- we could just cross-examine the

21   witness on any of these issues of connection to Google or these

22   appearance of impropriety.  But Dr. Kearl's special role as a

23   neutral expert if not completely prevents us from doing that at

24   least makes it extremely difficult.

25       I think everybody agrees that a court appointment carries

1    with it a powerful stamp of Court approval.  Those are Google's

2    words.  "A powerful stamp of Court approval."

3        And we see that being used in the Samsung case.  Samsung

4    tells the jury that one of the reasons Dr. Kearl was reliable

5    is because he was a court-appointed expert here.  Not just that

6    he was a court-appointed expert in that case, but that he was a

7    court-appointed expert in this case, so that the Samsung jury

8    could trust that he was reliable.

9        So our two options are to raise this issue of Dr. Kearl

10   being part of the Android team with the jury.  But that risks

11   suggesting to the jury that the Court has some approval of the

12   Android team.

13       Or we could take Google's suggestion, which is just to not

14   raise the issue at all.  But that means we wouldn't be able to

15   cross-examine him like we could any normal witness or any

16   normal party expert.

17       Your Honor wanted an expert who was unimpeachable and had

18   no conflicts.  And Dr. Kearl's work in *Apple vs. Samsung* opened

19   up an avenue of impeachment.

20       In the first trial, the parties searched for an expert

21   that both sides would find acceptable.  Google rejected some

22   experts on the ground that they were too connected to Sun and

23   Oracle.  And we rejected other experts on the ground that they

24   were too connected to Google.  We never would have agreed to

25   Dr. Kearl had he worked on Apple v. Samsung at the time.

 1          Of all the possible experts in the country, there

 2     shouldn't be an expert with this close ties to not only Google

 3     but Google's Android.

 4          And if we want to judge what is the standard of

 5     neutrality, it should be what kind of expert -- which expert

 6     would both parties have agreed to, Your Honor.

 7          And Dr. Kearl, had he worked on this case at the time, we

 8     just never would have agreed to him.  We would have picked

 9     someone who doesn't have these complications.  These

10     complications are just not necessary to have in this case.

11          And if Your Honor chooses that Dr. Kearl should no longer

12     serve as a neutral expert, then there is no need to replace him

13     with anybody else.

14          The best way to get at the truth here is to have two sides

15     presenting their strongest arguments.  That's how the adversary

16     process works.

17          As Judge Kozinski said in *Thompson*:

18          "Proceedings where the judge takes an active role in

19          ferreting out the truth are decidedly alien to our way of

20          thinking."

21          Rule 706 is an exception to this general way of doing

22     things because it's an extension of the Court taking an active

23     role in ferreting out the truth.

24          **THE COURT:**  The rule is in there.  You're arguing

25     against the rule.

1              **MR. BUSH:**  Your Honor --

2              **THE COURT:**  Why don't you go to the Advisory Committee

3       and get it taken out?

4              **MR. BUSH:**  We can try that, Your Honor.  But the rule

5       is still an exception to the adversary process.  And because of

6       that --

7              **THE COURT:**  Yes, of course it is.  In all these years,

8       I've never done it.

9              But you know what?  This is an exceptional case where

10      massively complicated damages issues are being raised by your

11      side and the other side.  And a jury needs some assistance to

12      help sort it out.

13             I've sat through too many trials where the jury --

14      somebody tries to buffalo the jury and trick the jury through

15      the adversary process.  That's the problem.

16             If this was a simple case or even a moderately complex

17      case, I would agree with you.  But this is not such a case.

18             **MR. BUSH:**  Well, we understand that Your Honor felt

19      that way.

20             **THE COURT:**  So even if I agreed with you -- and let's

21      hypothetically say I agreed with you and knocked out Dr. Kearl.

22      We would delay this case 18 months while we brought in another

23      expert, because we're going to have an independent expert under

24      Rule 706, very likely.

25             I'm going to keep -- when I actually see the damages

1    studies, and if I am shocked and find that they are simple

2    enough, then we don't need an expert, an independent expert.

3    But my hunch is that I will not be shocked; that I will be

4    dismayed.  It will be so complicated that I can't even

5    understand it.  And I doubt that you and your team would

6    understand it or maybe even the experts would understand it

7    because it's a ghostwritten thing by the lawyers.

8        I don't know.  Don't get me started on this.

9        (Laughter)

10       **THE COURT:**  I'm just telling you this is -- in 16

11   years, I've never done it.  This is the first time.  And I feel

12   like there's good reason that I did it.  And I'm going to wait

13   and see.

14       So if you want to put the trial off until 2020 or 2019,

15   maybe that's what you're going to get.  Meanwhile, Google goes

16   on; Android goes on; no trial occurs because you don't want to

17   have an independent person come in and say to the jury, "Here's

18   my own assessment."

19       I will tell the jury that they've got to -- I don't agree

20   with you that there's -- I'll give whatever the Appellate

21   Courts say is the right admonition to the jury as to how much

22   weight to give it, and not give it any special weight on

23   account of the judge having appointed the person.

24       **MR. BUSH:**  Well, Your Honor, I'm not going to fight

25   you too strongly on this idea of waiting until we see the

1   expert reports.  I think --

2          **THE COURT:**  I should do that.  Because I could be

3   wrong, and it could be simple enough that the adversary process

4   will play out in the normal way.  But if I just give up on it

5   altogether, then I won't even have the option.

6          **MR. BUSH:**  I understand, Your Honor.  And we have no

7   objection to waiting to see the expert reports.

8       And the only point I want to make -- because I see how

9   Your Honor is thinking about it -- is only that we're seeing

10  Google's revenue numbers now.  And Your Honor has seen from our

11  last submission that Google is making a lot of money with our

12  technology in their phones.  They are very profitable.  Android

13  is very popular.  They are making billions of dollars.  And we

14  are entitled to infringer's profits.  So just because our

15  damages request may end up being billions of dollars does not

16  necessarily make it extreme or unreasonable or complicated.

17      But I understand Your Honor's position to wait to see the

18  damages report.

19         **THE COURT:**  The last hearing we were here on, which I

20  ruled totally in your favor and against Google, was whether --

21  you had a very complicated argument about you needed all of the

22  financial statements, the internal financial statements,

23  everything that the -- whether it was certified or not, all

24  that internal stuff that every manager in Google got to see so

25  that you could go through there and construct an argument about

1  what the proper deduct should be from the profits.

2       And I gave you every scrap of paper that you asked for.

3  But as I walked off the bench I said, you know, these things

4  are going to be so complicated; they are going to be 150 pages

5  long; and all of those financial statements are going to be --

6  they're going to be quoting from -- flyspecking them, trying to

7  pick some little piece out of one that supports it; and it's

8  going to be such a hard project.  And I said, you know, if

9  that's the way it turns out, it's a good thing we've got an

10 independent expert to help me sort that through.

11      I'm going to need some help, I think.  But, certainly, the

12 jury is going to need some help.

13      So, you know, you can't have it both ways.  You can't

14 construct this thing:  "Oh, we may go for statutory; oh, we may

15 go for actual; oh, we've got to get the financial statements;

16 oh, it's going to be complicated beyond belief, and they are

17 robbing us blind," and then think it's going to be simple and

18 the adversary system can handle this.

19      I don't know.  Conceivably, but I doubt it.

20      So there's a have-it-both-ways aspect to what you're

21 trying to do here.

22      Now, the points that you make about Dr. Kearl with that

23 other case, that's separate.  That's separate.  And I've got to

24 give consideration to that point.  But on whether or not we

25 should have an independent expert I -- this is a very strong

1    candidate for an independent expert.

2        I need to hear from the other side.  I'll give you a few

3    moments of rebuttal in a moment.

4            **MR. BUSH:**  Thank you, Your Honor.

5            **THE COURT:**  May I hear, first, from the main accused

6    person who is Dr. Kearl's lawyer.  I would like to hear from

7    Dr. Kearl's lawyer next.

8            **MR. LIAW:**  Thank you, Your Honor.

9            **THE COURT:**  Please come up here.  I can't hear you way

10   back there.  Your name again?

11           **MR. LIAW:**  Thank you, Your Honor.  Winston Liaw.

12       Dr. Kearl does not have an adversarial position with

13   respect to Oracle or Google in this matter.  As the Court's --

14           **THE COURT:**  But come to grips with the argument that's

15   being made, which is that in the Apple case, Apple sued

16   Samsung, which uses the Android.  And your company -- not your

17   company but Google paid for part of the Apple -- was allied

18   with Samsung in some way and had an indemnity agreement on part

19   of the Apple claims.

20       So that, really, the argument is that that case was a

21   proxy for suing Google.  Apple v. Google, I guess.  It wasn't

22   informed, but maybe partly in substance is the argument.  So,

23   therefore, Dr. Kearl took advantage of the fact that I had

24   appointed him as an independent expert in this case and sold

25   himself on that basis to the jury.

1      So what do you say?

2          MR. LIAW:  Dr. Kearl had a very limited role in the

3  *Apple v. Samsung* matter.

4      First, he was retained by Samsung.  Not Google.  He

5  examined -- his role --

6          THE COURT:  Did Google in any way ever see any of the

7  draft reports or help draft reports?

8      Was Google in the background helping in any way, through

9  their lawyers or in any other way, what Dr. Kearl did in that

10  case?

11          MR. LIAW:  From my understanding, Dr. Kearl did

12  never -- did not confer with Google at any point.

13          THE COURT:  Well, did somebody from Google confer with

14  somebody from Android -- I'm sorry, from Samsung, who in turn,

15  through the ghostwriting process that the lawyers do, somehow

16  influence what Dr. Kearl said?

17          MR. LIAW:  I'm not aware.

18          THE COURT:  Okay.

19          MR. LIAW:  So he had a very limited role.  As I

20  mentioned, he was retained by Samsung.  He looked at Apple

21  products, not any Android or Google products.  And --

22          THE COURT:  Well, here's the argument.  That's true.

23  That's a good point for your side.  But the way it was

24  presented, it was used, in part, as a shield to say, "Look at

25  these gigantic numbers that Apple wants in their damage study.

1   We're going to show you what a real expert would do and how a

2   real expert values a patent.  And that's Dr. Kearl.  And he's

3   going to show you that those Apple numbers can't be trusted

4   because -- on our own patents."

5       So in some indirect way, not a direct way, but an indirect

6   way his study got used against Apple.

7       True?  Seems like that's true.

8           MR. LIAW:  I think what's -- Dr. Kearl did not have

9   input on the strategy portion of the case.  So I think to the

10  extent any position is taken by Samsung or Google and imputing

11  them on Dr. Kearl, I think it would be a bit unfair.

12          THE COURT:  All right.  All right.  What else would

13  you like to say?

14          MR. LIAW:  So I want to emphasize that we do not have

15  an adversarial position here with respect to Oracle or Google.

16  And, really, our primary role here is to make sure that the

17  facts are accurately represented.

18          THE COURT:  Well, that is my interest.  I don't want

19  an advocate for either side.  I want somebody who is

20  professionally pure, that will help the jury.

21      Okay.  Thank you.  Let's hear from Google.

22          MR. PURCELL:  Briefly, Your Honor, to address the

23  question that you posed to Mr. Liaw.  Google had no involvement

24  with Dr. Kearl or his report.  There is no one from Google who

25  was ghostwriting Dr. Kearl's report through communications with

1    Samsung.

2         **THE COURT:**  Including your firm?

3         **MR. PURCELL:**  Including our firm.  Certainly including

4    our firm.  Nobody from our firm had any involvement in

5    Apple-Samsung.  Dr. Kearl's work was entirely focused on

6    Samsung's counterclaims.

7         And I do want to rebut something that Oracle said.  They

8    said that Google was directing the litigation, was in control

9    of the litigation for Samsung.  That's completely false.

10        Google had involvement with part of Samsung's defensive

11   case against Apple.  There were a certain number of patents

12   where Google agreed to fund the defense and did participate in

13   the strategy.  Not all of Samsung's defense.

14        But Google didn't participate at all or fund anything

15   having to do with Samsung's affirmative counter case against

16   Apple.

17        **THE COURT:**  When you say that, let's make sure -- I

18   think I understand you.  But when you say that Google had a

19   limited role on those patents, does that include your firm?

20        **MR. PURCELL:**  It does not include our firm.

21        **THE COURT:**  In other words, your firm had nothing to

22   do with that case?

23        **MR. PURCELL:**  Our firm had nothing to do with that

24   case.

25        Google agreed to defend and participate in the strategy

1   with respect to some of the patents that Apple asserted against

2   Samsung.

3        And to be clear, they never agreed to indemnity a damages

4   award.  They agreed to pay for the defense costs.  And that was

5   the extent of it.

6        And I really don't have anything further to add.  Our

7   position has always been that the Rule 706 expert decision is

8   up to the Court.  And we're willing to live with what the Court

9   decides.

10       **THE COURT:**  Thank you.

11       Rebuttal.

12       **MR. BUSH:**  Your Honor, just briefly.

13       I just want to -- Google's counsel just said that they

14   were not directing the defense.  I just want to refer Your

15   Honor to Footnote 1 of Google's response, where they say that

16   they did make an agreement to direct Samsung's defense;

17   although, admittedly, for only some of the patents.

18       Just to read the full quote, it says:

19            "Oracle's assertion that Google agreed to indemnify

20       Samsung and direct Samsung's defense is deliberately

21       misleading."

22       As Oracle's evidence shows, Google made this agreement as

23   to and participated in only Samsung's defense of certain

24   counterclaims.  They're saying they didn't make this agreement

25   to indemnify and direct Samsung's defense, although they are

1    parsing their role --

2        **THE COURT:**  I thought that Google helped on the --

3    some of the patents asserted by Apple against Samsung.  But

4    Dr. Kearl had no comments on that part of the case.  Dr. Kearl

5    was commenting on Samsung's countersuit -- right? -- for its

6    own patents against Apple.

7        **MR. BUSH:**  I think this idea of parsing the roles,

8    both in particular patents and between the offense and defense,

9    is just not plausible considering the same attorneys

10   represented both sides.

11       I'm trying to picture a meeting where they're deciding

12   deciding on the strategy for some patents, the other patents

13   and their counterclaims.  And the lawyers first discuss their

14   strategy for one patent with their Google hats on; and then

15   they stop and take off and put on their Samsung hats and

16   discuss the rest of the patents; and then put on their offense

17   hats for discussing the counterclaims.

18       This was a single cohesive strategy.  As I said earlier,

19   there was just no way they were going to let these

20   counterclaims for $158,000 for one, and 6 million total,

21   interfere with their defense of the $2 billion claim.

22       This was all one strategy.  And Google was directing part

23   of the defense.  And under that circumstance and the fact that

24   Dr. Kearl found himself part of the Android team, it's not

25   appropriate for him to serve in this special neutral role here.

1    As Your Honor said, he ends up finding himself in a

2    situation where he's not professorially pure.

3    And the only other point I wanted to respond to is,

4    counsel for Dr. Kearl said that he had a limited role in

5    *Apple v. Samsung*.

6        **THE COURT:**  I did not say that he was -- I say that

7    that's what our goal is.  But I did not say that he was not

8    professionally pure.

9        **MR. BUSH:**  I'm sorry, Your Honor.  I did not mean to

10   suggest that.  I meant to say that --

11       **THE COURT:**  Let's be clear that -- I appreciate your

12   arguments, but it doesn't necessarily equate to he's not

13   professionally pure for purposes of our case.

14       **MR. BUSH:**  Your Honor, I wasn't trying to impute your

15   assessment of Dr. Kearl.

16       **THE COURT:**  I just want to be clear.  And you

17   didn't -- maybe I misunderstood.  All right.

18       **MR. BUSH:**  I was only saying, to just agree with Your

19   Honor, that the goal was to find someone professionally pure;

20   and that we should just have someone that doesn't have these

21   complications; and that Dr. Kearl did not have a limited role

22   in *Apple v. Samsung*.  He was a testifying witness who is

23   featured in both the opening and closing statements.

24   And, frankly, this was a very clever strategy on the

25   Samsung-Google side.  It's one thing to just say, "Well, we

1   don't want to pay Apple $2 billion.  That's a lot of money.  We

2   don't want to pay it."  It's quite another to then say, "Look,

3   our counterclaims we're not even asking for that much."  It's a

4   powerful strategy.

5        And Dr. Kearl's being featured in the closing and opening

6   statements means that he didn't have a limited role.  He had a

7   very important role in the case.

8            **THE COURT:**  All right. Thank you.

9            **MR. BUSH:**  Thank you, Your Honor.

10           **THE COURT:**  Under submission.  Thank you all.

11           **MR. PURCELL:**  Thank you, Your Honor.

12       (At 9:09 a.m. the proceedings were adjourned.)

13                      -  -  -  -

14

15

16                  **CERTIFICATE OF REPORTER**

17       I certify that the foregoing is a correct transcript

18   from the record of proceedings in the above-entitled matter.

19   DATE:   Friday, November 20, 2015

20

21

22            *Katherine Sullivan*

23   _____

24       Katherine Powell Sullivan, CSR #5812, RMR, CRR
                     U.S. Court Reporter

25