December 23, 2015

**VIA ECF**

The Honorable Donna M. Ryu
United States Magistrate Judge
Northern District of California
1301 Clay Street, Courtroom 4, 3rd floor
Oakland, CA  94612

>    Re:    *Oracle America, Inc. v. Google Inc.,* Case No. 3:10-cv-03561-WHA (N.D. Cal.),
>    Joint Letter Regarding Oracle's Motion to Compel Production of Google Search
>    Distribution Agreements and Further Rule 30(b)(6) Deposition

Oracle respectfully requests an order compelling Google to produce agreements regarding distribution of Google search services on mobile devices and to provide a witness prepared to testify about these agreements.  The parties have met and conferred telephonically, including on December 18, 2015, but were unable to resolve the issue.  Fact discovery cut-off was December 16, 2015, and party expert discovery cut-off is March 6, 2016.  *See* Dkt. 1356 & 1334.  The last day to file dispositive motions is March 21, 2016.  A pretrial conference is set for April 27, 2016, with trial tentatively set for May 9, 2016.  *See* Dkt. 1333.

**Oracle's Statement**

On November 2, 2015, Oracle served on Google Request for Production No. 313 (RFP 313), which requests *inter alia* "DOCUMENTS…evidencing YOUR negotiations and agreements for distribution of GOOGLE search by third parties such as AOL, Yahoo!, Apple, Mozilla, and Dell."  In addition to RFP 313, Oracle also sought to obtain information regarding Google's search distribution agreements and revenue sharing through deposition testimony.  Oracle noticed a Rule 30(b)(6) deposition on Google on the topic of Google's "negotiations, agreements or contracts with OEMs or mobile carriers pertaining to distribution, sales, use, service, marketing or development of GOOGLE SERVICES or GOOGLE applications for non - ANDROID operating systems, including the actual or anticipated impact of such agreements or contracts on GOOGLE's business including its revenues, expenses, profitability, market share, query volume, and /or Traffic Acquisitions Costs" ("Topic 5").  Google purportedly produced two witnesses on Topic 5, but neither was prepared to discuss Google's revenue sharing agreements with third parties.  *See* Lin Depo., Day 2 at 112:7-16 ("Q: Is there any agreement between Google and Apple that relates to revenue sharing associated with advertising? A: I've never seen one. Q:  Okay.  Do you know whether there is one way or another? A: I don't know"); Lockheimer Depo at  74:4-9 ("Q: Is it true that Google pays Apple in order to be the default search provider in iOS? A: I've head things, but I don't know the details of that").  As a compromise to address Google's stated confidentiality concerns, Oracle offered to forego receipt of the actual search distribution agreements requested in RFP 313 in exchange for a partial day of deposition testimony from a witness prepared to testify about the economic terms of Google's search distribution agreements.  Google refused.

Hon. Donna M. Ryu
December 23, 2015
Page 2

Google's outright refusal to provide this relevant information, either by document or witness, has necessitated this motion. Google's sole objection to providing the requested documents is a meritless relevance objection. The requested discovery is clearly relevant both to a commercial objective of Android to avoid paying exorbitant fees to others for search distribution (fair use), as well as to the hypothetical license measure of damages.

During the first trial in this action, former Google CEO Eric Schmidt testified that one of the primary reasons that Google acquired Android was to increase search advertising revenue by gaining control over the mobile device user experience. Tr. at 1455:16-1456:19; 1458: 9-16. Mr. Schmidt's testimony further established that, in addition to increasing the volume of search, Android also increased the profitability of mobile search advertising because Google's control over the Android platform allowed it share less revenue with third parties. *Id.* at 1458:17-1459:3. This is because Google's control over the Android platform allows Google to make google.com the default search engine on Android devices—a privilege Google otherwise has to pay for. For example, Mr. Schmidt testified that Google previously paid Sun to include a Google search toolbar with distributions of Java. Tr. at 1516:9-1517:8.

In addition, Oracle understands that Google intends to argue that pre-dispute negotiations between Sun and Google provide the basis for a hypothetical license measure of damages. The evidence will show, however, that those negotiations broke down because Google wanted control over the mobile platform and Sun would not give up control of Java. Sun's only license offers were predicated upon Sun retaining control. In order to value a hypothetical license in which Google unilaterally seized control, the jury will have to consider just how much that control is worth to Google. One potential measure is the much greater amount Google has had to pay to non-Android partners in comparison to the amounts it has had to pay to Android partners. Accordingly, agreements with third parties showing the price Google is willing to pay to control default search on non-Android devices is relevant evidence for purposes of a hypothetical license negotiation between Sun/Oracle and Google.

Google's argument that the Court has already held the requested information irrelevant to damages is both a red herring and blatantly incorrect. It is a red herring because it does not address either the fair use or hypothetical license rationales of relevance, and Google must eliminate all theories of relevance in order to avoid production. It is also clearly wrong. Google cites to Judge Alsup's August 22, 2011 Order discussing patent damages. Dkt. 230. Judge Alsup later expressly approved of Oracle's inclusion of Android advertising revenue in copyright disgorgement calculation. Dkt. 685 at 2 ("Unjust enrichment was calculated by adding together Android's ad revenue, the hardware revenue from selling Nexus phones, and applications sales in the Android Market store"); Dkt. 685 at 9 ("It is important to state that this order does not strike Dr. Cockburn's opinion on the unjust enrichment from copyright infringement. Under copyright law, the burden is on Google to allocate Android profit based on the copyrights in suit versus other non-infringing contributions."). Moreover, the patent damages order cited by Google supports Oracle's position, as the order expressly stated that advertising revenue was relevant to hypothetical license. Dkt. 230 at 9 (noting that "[t]here is evidence, for example, that users with Android phones 'search twice as much' as users with other types of phones, increasing the advertising revenue derived from Google's search service. Additionally, for searches on Android devices, Google must share its revenue only with the device operator and not with any other intermediary" and ruling that these facts would be

Hon. Donna M. Ryu
December 23, 2015
Page 3

relevant to hypothetical license negotiation).  Finally, Judge Alsup has made clear that in this phase of the case relevance is not a favored objection to discovery.  *See* Dkt. 1372 at 7-8.  Your Honor also adopted a similar rationale is handling Oracle's objection to the IBM deposition, ruling that such an objection is better presented as a motion in limine than a discovery relevance objection.

   Google's citation to Judge Alsup's January 1, 2012 Order (Dkt. 685) and its discussion of *Mackie v. Rieser* is similarly unavailing.  That Order *allowed* Oracle to present its advertising revenue theory of copyright disgorgement.  *Id.*  Apart from being a red herring (as noted above), Google's causation argument is just plain wrong.  The extremely attenuated causal nexus between a fine art photograph on a brochure and new symphony subscriptions in *Mackie* is nothing like the link between Android and mobile advertising revenue here.  *Compare Frank Music Corp. v. MGM, Inc.*, 772 F.2d 505, 517 (9th Cir. 1985) ("*Hallelujah Hollywood* had promotional value…. to draw people to the hotel and the gaming tables…we conclude indirect profits from the hotel and gaming operations, as well as direct profits from the [*Hallelujah Hollywood* ] show itself, are recoverable if ascertainable.").  In this case, the existing trial record, discovery responses, and expert analyses will be more than sufficient to establish that Google's increase in mobile adverting revenue is attributable in part to the infringed APIs that allowed Android to gain a dominant position as a mobile marketing platform.  And in all events, that is a determination that cannot be made prior to *Daubert* hearings.  Oracle is entitled to attempt to prove its case.  *See* Dkt. 1372.[1]

   Google's withholding of documents is interfering with Oracle's preparation of expert reports, and it also impeded Oracle's attempt to obtain full testimony from Google's Rule 30(b)(6) witnesses on Topic 5—both of whom were woefully unprepared to discuss the terms of its agreements with third parties regarding search distribution.  For example one of Google's Rule 30(b)(6) designees testified that he was aware of the existence of revenue sharing agreements between Google and third parties related to search advertising on non-Android devices, but the witness was unable to offer any specifics regarding such agreements.  The same witness testified that he had seen "news reports" that Google pays Apple for search traffic, but the witness did not review the actual Google-Apple search agreement prior to his deposition.

   Given the probative value of the information Oracle seeks to core fair use and remedies issues, the high stakes at issue in this case, Google's superior access to information on the issues discussed herein, and the fact that what is being requested is not in any way burdensome, but rather

---

[1] Google's citation to the August 19, 2011 hearing transcript does not help its cause for the same reason:  Judge Alsup later allowed the revenue to be included at the *Daubert* stage of proceedings.  Evidence adduced at trial established a direct link between Android and increased mobile advertising revenue, *supra* at 2, and further established that Google specifically selected the infringed material because that is what Google's target audience—application developers—wanted, Dkt. 212 at 6.  This and other record evidence is more than sufficient to support the requested discovery.  For example, in *Frank Music*, plaintiff's copyrighted songs accounted for only six minutes of the 100-minute, ten-act *Hallelujah Hollywood* review show.  772 F.2d at 510, 518.  But because there was evidence that the six minutes of infringed material was important to the show's popularity, the Ninth Circuit ruled that plaintiff was entitled to a share of hotel and casino profits that *Hallelujah Hollywood* indirectly contributed to.

Hon. Donna M. Ryu
December 23, 2015
Page 4

constitutes a discrete set of easily identifiable, easy-to-process and produce documents, the Rule 26(b) proportionality factors clearly weigh in favor of an order compelling Google to produce search distribution agreements and to properly prepare a Rule 30(b)(6) witness to testify in response to Topic 5. The protective order is sufficient to address Google's confidentiality concerns. Moreover, Oracle has offered Google multiple alternatives to assuage Google's confidentiality concerns— Oracle offered an "outside counsel's eyes only" designation for especially sensitive documents and also offered to forego receipt of the actual search agreements in exchange for deposition testimony on Topic 5. Google declined all of Oracle's reasonable proposals for compromise.

For the foregoing reasons, Oracle requests that the Court compel Google to produce agreements responsive to RFP 313 and to produce a properly prepared Rule 30(b)(6) witness to testify on Topic 5.

**Google's Statement**

At the close of discovery, Oracle claims it needs to uncover the details of Google's agreements with Apple and other third parties for search technology on platforms and devices that have *nothing* to do with the Android operating system, advertisements served on Android devices, Android users or the demand for Android, the Java programming language or platforms, the 37 Java API packages at issue in this case, or even mobile devices. These agreements Oracle seeks relate to, for example, what default search engine is used for Apple's own Safari web browser that Apple installs on its own devices running Apple's iOS operating system, or whether a PC manufacturer will make Google the default search for a web browser installed on a laptop or desktop computer running Microsoft's Windows operating system. Oracle's RFP 313, upon which this motion is based, is not even limited to mobile devices, but seeks Google's business deals with laptop and desktop computer manufacturers, internet service providers, and scores of others that have no relation to Android. .

Oracle claims it needs this material and information to determine the value of "a hypothetical license negotiation between Sun/Oracle and Google," and so its experts have more data points for their damages analyses. Not so. None of this material, which is among the most secret and competitively-sensitive material that Google maintains, and which is subject to confidentiality agreements with third parties who would need to be heard before any of this could be disclosed, is relevant to any issue in this case. Oracle's motion should be denied.

First, this discovery is irrelevant to a hypothetical license between Sun and Google as a matter of law. As the Ninth Circuit has repeatedly explained, damages based on a hypothetical license must be based on the negotiation that would have taken place *at the time the infringement began*. *See Mackie*, 296 F.3d at 917; *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004). This Court has emphasized this requirement with regard to copyright damages, explaining that "[i]n the context of copyright infringement, the hypothetical lost license fee can be based on the fair market value of the copyright at the time of infringement." Doc. No. 685 at 3. Here, that hypothetical license and negotiation happened in 2006 (as Oracle acknowledges). Thus, what Google may pay Apple for search services on iPhones in 2014 (or 2013, 2012, 2011, etc.) has no bearing whatsoever on what Google would have paid Sun for the structure, sequence, and organization of 37 APIs from Java *in 2006*. Indeed, Apple's iPhone was not even released until June 29, 2007.      Second, the information Oracle seeks now is exactly the sort of irrelevant and improper material that this Court,

and the Ninth Circuit, have held insufficient to establish copyright damages and that was excluded as improper expert opinion in prior orders in this case. This case is about the use of the sequence, structure, and organization of 37 Java APIs in the Android mobile operating system—it is not about Google's search business writ large (or anything else).

Google's agreements with third parties related to search technology on non-Android devices have no bearing on "what a willing buyer would have been reasonably required to pay to a willing seller for the owner's work," *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002), namely, the sequence, structure, and organization of the 37 Java APIs in 2006. As *Mackie* holds, "to survive summary judgment, a copyright infringement plaintiff seeking to recover indirect profits damages … must proffer some evidence to create a triable issue regarding whether *the infringement at least partially caused the profits* that the infringer generated as the result of the infringement." 296 F.3d at 911 (emphasis added). Mere speculation or reliance on material divorced from the infringed work itself is improper. "The revenue stream must bear a legally significant relationship to the infringement." *Polar Bear*, 384 F.3d at 711.

In *Mackie*, the Ninth Circuit affirmed summary judgment for the defendant because the plaintiff "failed to adduce any non-speculative evidence that would even suggest a link between the infringement and the Symphony's supposedly enhanced revenues." 296 F.3d at 911. There, the artist of a collage that the symphony used in promotional materials sought indirect damages in the form of future subscriptions for symphony tickets on the theory that many patrons renewed as the result of seeing her copyrighted work. In rejecting this expert theory, the Ninth Circuit emphasized that there must be "a legally sufficient causal link between the infringement and subsequent indirect profits." *Id.*, at 915. This requirement "dovetails with common sense—there must first be a demonstration that the infringing acts had an effect on profits before the parties can wrangle about apportionment" and "[t]o do otherwise would be inconsistent with both rudimentary principles of tort law, to which copyright law is often analogized" and with prior Ninth Circuit precedent. *Id.*; *see also Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 517 (9th Cir. 1985) (district court may preclude "recovery of a defendant's profits if they are only remotely or speculatively attributable to the infringement").

Here, despite Oracle's assertion otherwise, there is no causal link at all between Google's agreements with third parties to provide Google's search technology on non-Android, and/or non-mobile, devices—or Google's search business in general—and Google's use of the structure, sequence, and organization of 37 Java APIs in Android. Oracle argues above that "[e]vidence adduced at trial established a direct link between Android and increased mobile advertising revenue," but the agreements Oracle seeks through this motion are *not* for Android devices, the Android platform, advertising on Android devices, or any portion of Java. Thus, they have nothing to do with this case. As Judge Alsup has explained, "[t]he copyright claim [in this case] concerns the allegedly expressive elements of source code for Java class libraries" and "*[s]ignificantly, only part of Java and part of Android are said to embody the asserted claims*." Doc. 230 at 1, 2 (emphasis original). Whether and how much Google may pay to be the default search engine on iPhones has nothing to do with "source code for Java class libraries" or the "part of java and [the] part of Android" that include the 37 APIs at issue in this case.

Indeed, this Court previously rejected similar efforts by Oracle to discover information that is not tied to the copyright infringement at issue, instructing that "from a discovery perspective, I am not going to order damages that are speculative, that haven't in some way been tethered to an

Hon. Donna M. Ryu
December 23, 2015
Page 6

alleged infringement." August 19, 2011 Discovery Hearing Tr. at 21:4-6. As before, here "[t]here is nothing [presented] by Oracle to show that copyright infringements of particular class libraries that [Oracle is] alleging have any connection to advertising revenues" or to the search agreements that, in turn, may lead to advertising revenue at some point in the future. *See id.* at 21:14-17. Similarly, Judge Alsup previously rejected claims that everything related to Android is relevant to this case, explaining that "[t]he fact that Java may be a critical component of Android does not justify application of the entire market value rule," which is a theory of patent damages available when a patented component of a product creates "customer demand" for or market value of the product as a whole. Doc. 230 at 6. As the Court explained, "[w]heels are critical to an automobile, but no one would apportion all of the demand for a car to just the wheels." *Id.*[2] Likewise,

Oracle's expert in the prior trial was not permitted to testify regarding a hypothetical license to all of Java because "the hypothetical license must be limited to the asserted claims—*excluding the rest of the java platform*." Doc. 230 at 5 (emphasis in original). Here, Oracle tries to go miles further than even this excluded "hypothetical license for Java" and wants to rope in material that has no connection to either Java or Android. To follow the Court's prior analogy, the discovery Oracle seeks is not even about the wheels of a car, or even a vehicle of any sort, but about something else entirely—maybe an ocean or a forest.

Oracle's suggestion that the Court's prior orders support Oracle's position because they permitted discovery into Google's *Android-related* advertising revenues is misplaced. To be clear, the information Oracle seeks in this motion has nothing to do with advertising on Android devices. By definition, the topic is limited to "non-Android" devices, many of which are not even mobile devices, which is what this case is limited to. The only advertising revenues that are even arguably relevant to this case—and therefore arguably discoverable—are Google's revenues from advertisements served on Android devices. That is not what Oracle is seeking through this motion. And, regardless, Google has produced to Oracle a complete set of Android P&Ls for the entire life of Android, and those P&Ls include all revenues generated from Android-related ads, a point Oracle does not dispute.

Third, Oracle's motion is based on the faulty premise that "Google's control over the Android platform allows Google to make google.com the default search engine on Android device[s]." Oracle is wrong. Android is a free and open source platform that equipment manufacturers can use without any restriction. In fact, equipment manufacturers that use the open-source Android operating system for devices they make can choose—and indeed have chosen—any search engine they wish as the default one installed on their devices. *See* http://searchengineland.com/google-doesnt-require-google-search-on-android-133158 (noting that certain Android devices had non-Google search engines such as Yahoo! or Bing as the default search engine). Therefore, "default search" arrangements have no relation whatsoever to any potential damages for infringement of Oracle's copyright on the sequence, structure, and organization of 37 APIs from the Java programming language.

Fourth, even if this was a legitimate area of inquiry (and it is not), Google has already produced ample material and provided hours of testimony that Oracle can use to try to make its attenuated damages argument. Google witnesses have testified at length about the motivation and

---

[2] Although the market value rule discussed in this prior order was a measure of patent damages, the Court's guidance is notable here as it relates to the scope of damages that may be claimed. And, the issues in dispute now are far narrower than they were at the time of this guidance because no patent claims remain in the case.

purpose behind Android (including in the very testimony cited in Oracle's section of this letter), and provided a financial witness, Jon Gold, who testified in detail about revenues and costs associated with Android devices and users. The agreements Oracle seeks provide no incremental evidence of any commercial motive behind Google's actions, and no evidence whatsoever of any willfulness on Google's part, or any desire to injure a competitor. All of those issues can be (and have already been) explored fully without discovery of the actual confidential agreements between Google and third parties related to search on non-Android devices and unrelated to the issues of infringement in this case.

Oracle ignores the fact that Google also designated another 30(b)(6) witness on portions of Topics 3 and 5 that relate to revenue and financial issues, Mr. Gold, who testified about Google's revenue share percentages with Apple and mobile carriers, and even directed Oracle to the specific P&L statement that contains such revenue. *See* Gold Depo. at 12:17-16:14.

Google has also produced scores of documents and offered ample testimony detailing the terms and conditions for placement of Google applications and services—including its core map, search, email, YouTube, and other functions—on both Android devices and non-Android devices such as Apple's iOS devices, e.g., iPhones and iPads. These agreements included Mobile Application Development Agreements (MADAs), Anti-Fragmentation Agreements (AFAs), and Revenue Share Agreements with third parties that relate to the placement of Google apps on Android devices they produce. Google also produced its agreements with Apple for development of Google apps for iOS devices and placement of Google apps in Apple's App Store. Google's 30(b)(6) designee, Felix Lin, was prepared to speak to all of these agreements, and specifically noted his preparation efforts with regard to the Apple agreements. *See* Lin Depo. at 300:24-301:1 ("as part of the prep…I did talk to the lead engineer who is managing our IOS apps to find out more about what we do for IOS"). Mr. Lin also explained in detail the nature of Google's agreements with Apple for development and placement of Google apps on iOS devices. *Id.* at 301:9-302:3.

Finally, in an effort to compromise and avoid this motion practice, Google has already produced comprehensive financial documents that Oracle's experts can use however they see fit (subject, of course, to *Daubert* challenge). Google's production includes not only profit & loss statements for all Android business lines *and* periodic reports to senior Google executives discussing Android, but also *mobile* P&L data and *mobile search* financials (which include data for both Android and non-Android devices), as well as P&Ls for all *non-Android* business lines, including Google's Ads and Search businesses. Google has produced more than 670 financial presentations or reports related to not only Android, but every other Google business line. Much of this is irrelevant to any supportable damages claim, but Oracle has it nonetheless. Oracle already has had full discovery of Google's mobile search advertising revenue.

For all of the foregoing reasons, Oracle's motion should be denied.

Hon. Donna M. Ryu
December 23, 2015
Page 8

Respectfully submitted,

/s/ *Annette L. Hurst* /s/ *Robert A. Van Nest*

Annette L. Hurst                              Robert A. Van Nest
Counsel for Oracle America, Inc.              Counsel for Google Inc.


    I attest that concurrence in the filing of this document has been obtained from each of the other Signatories to this letter.

    /s/ *Annette L. Hurst*
_____