KEKER & VAN NEST LLP
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
CHRISTA M. ANDERSON - # 184325
canderson@kvn.com
DANIEL PURCELL - # 191424
dpurcell@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    (415) 391-5400
Facsimile:    (415) 397-7188

KING & SPALDING LLP
BRUCE W. BABER (pro hac vice)
bbaber@kslaw.com
1185 Avenue of the Americas
New York, NY 10036
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>            Plaintiffs,<br><br>     v.<br><br>GOOGLE INC.,<br><br>            Defendant. | Case No. 3:10-cv-03561 WHA<br><br>**DEFENDANT GOOGLE INC.'S MOTION IN LIMINE NO. 1 TO EXCLUDE CERTAIN TESTIMONY FROM EXPERT REPORT OF DR. CHRIS F. KEMERER**<br><br>Hearing    April 27, 2016<br>Dept.      Courtroom 8, 19th Fl.<br>Judge:     Hon. William Alsup |

**MOTION AND RELIEF REQUESTED**

Under Federal Rules of Evidence 401, 402, 403, 702, 703, and 802 defendant Google Inc. ("Google") hereby moves the Court for an order excluding *in limine* all evidence, opinion and argument offered by Oracle America, Inc. ("Oracle") in reliance on and regarding (1) the purported "centrality" and "stability" analyses described in the expert reports of Dr. Chris F. Kemerer (used to support his purported opinions that the APIs at issue were highly central to Java and Android, and that those APIs were more stable than others), and (2) the confusing and misleading use of the term "API" to discuss products and services not at issue in this case. This motion is based on the following memorandum of points and authorities in support, the Declaration of Maya Karwande ("Karwande Decl."), the Declaration of Edward Bayley ("Bayley Decl."), and accompanying exhibits, the entire record in this matter, and on such evidence as may be presented at the hearing of this motion.

Dr. Kemerer's "centrality" and "stability" opinions should be excluded because they are unreliable testimony that merely parrots the opinions of undisclosed witnesses. Dr. Kemerer is not a programmer, has not programmed since 1979, and has never written a program in any of the languages discussed in his reports: Java, "R," or "PHP." Yet, he purports to offer opinions in this case on highly technical code analyses that were, in fact, created and run by a "litigation support team" of undisclosed experts hired by Oracle's lawyers. Dr. Kemerer lacks expertise in this field, and his expert-by-proxy testimony insulates these undisclosed experts and their methodologies from scrutiny. Such spoon-fed, expert-by-proxy testimony is unreliable and should be excluded.

Further, Dr. Kemerer improperly offers opinions about market treatment of "APIs" in general, but does so by applying misleading and contradictory definitions of "API" to obfuscate the irrelevance of those opinions. In particular, Dr. Kemerer admitted in deposition that he uses the same term, "API," to refer to either (1) the SSO as reflected by the declaring code ("declarations/SSO"), and not implementing code; or (2) a broader and undefined collection of technology that could include implementing code and software-as-a-service products—a definition that he admits is "different than how we have been describing APIs in the context of this lawsuit." Yet, Dr. Kemerer's disclosed opinions discuss APIs as if he uses the same meaning

1

throughout, inviting the jury to conclude that other companies' "APIs" are not freely available for use, and therefore the declarations/SSO of the APIs at issue in this case shouldn't be either. Dr. Kemerer's intentional conflation of these materially distinct definitions of APIs will confuse the jury, who will understandably believe that, when Dr. Kemerer is offering an opinion related to "APIs," he is talking about the same thing throughout his opinions. Such testimony is very likely to mislead the jury, and has no probative value given the very distinct definitions of APIs used by Dr. Kemerer. Google respectfully requests the Court exclude Dr. Kemerer's testimony regarding these broader and ill-defined "APIs" as set out in Section VII.D of his rebuttal report.

## ARGUMENT

**I.     Dr. Kemerer's opinion testimony concerning his code "centrality" and "stability" analyses should be excluded as unreliable and improperly resting on analyses prepared by undisclosed experts in a different field.**

**A.     Expert testimony is unreliable where an expert merely serves as a mouthpiece for undisclosed experts in distinct fields.**

The essential prerequisite to any expert testimony is that the expert witness's testimony rests "on a reliable foundation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). As codified in Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the **expert** has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added).

Of increasing concern under *Daubert* and Rules 702 and 703 is the use of testifying experts who act as a mouthpiece for other, undisclosed experts, where the proffered mouthpiece does not have the necessary training or expertise to properly supervise the undisclosed experts in their work. As Judge Posner has explained, "[t]he *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). This concern is further heightened where, as

here, the testifying expert relies upon opinions and data developed by other experts retained for the purposes of litigation. *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003) ("Federal Rules of Evidence 702 and 703 permit an expert to rely upon 'facts and data'. The rules do not permit an expert to rely upon excerpts from opinions developed by another expert for the purposes of litigation."). "One of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion." *Therasense, Inc. v. Becton, Dickinson & Co.*, 2008 WL 2323856, at *1 (N.D. Cal. May 22, 2008).

      **B.**    **Dr. Kemerer's opinion is spoon-fed by experts who were hired by Oracle's lawyers, never disclosed as testifying experts in this litigation, and performed work that Dr. Kemerer could not and did not properly supervise or direct.**

It is readily apparent from the deposition and background of Dr. Kemerer that he was spoon-fed the facts, data, and substantive analyses that serve as the basis for his "centrality" and "stability" opinions by an undisclosed team of experts retained for this litigation by Oracle's lawyers, the Orrick law firm. Karwande Decl., Ex. 1 at 21:16-25 (Kemerer 3/3/16 Dep. Tr.). This is improper, and Dr. Kemerer's "centrality" and "stability" opinions should be rejected and stricken as unreliable, undisclosed expert opinion under *Daubert* and Federal Rules of Evidence 702 and 703. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292-293 (3d Cir. 2012) (affirming lower court's decision to exclude expert testimony where the expert did not know (1) the identity and qualifications of the person(s) who prepared the analyses or (2) the methodology used to create the analyses); *see also Goben v. Wal-Mart Stores, Inc.*, 2014 U.S. Dist. LEXIS 81442, *6 (D. Nev. June 16, 2014) ("Because Orchard is unable to state the principles and methods used to create the report that he relied on, testimony based on the report's contents

cannot satisfy the requirements of Fed. R. Evid. 702.").[1]

First, as a general matter, Dr. Kemerer's "centrality" and "stability" opinions are based on technical analyses of Android and Java source code, using specially prepared code scripts in a variety of programming languages that were not and could not have been directed or supervised by Dr. Kemerer. In particular, Appendices F, I, and Q to Dr. Kemerer's opening report, E-H of the rebuttal report, and C and D to the reply report are the computer scripts prepared in multiple programming languages and used to conduct the analyses about which Dr. Kemerer opines on the subjects of "centrality" and "stability." *See* Bayley Decl., Exs. C, D and E. Yet, when asked about these script-based analyses and the methods used to conduct them, Dr. Kemerer conceded that he is not a programmer, that the last time he did any programming was in 1979 in a language irrelevant to this case, and that he has never written a program in Java or the other languages used in his reports' analyses. Karwande Decl., Ex. 1 at 33:24-35:5 (Kemerer 3/3/16 Dep. Tr.). And, importantly, Kemerer could not explain why the scripts supposedly used to analyze the "stability" of API packages in Android contained the names of certain API packages. *Id*. at 178:3-179:20. In short, Dr. Kemerer served as a mouthpiece for the outcome of these studies and could neither ensure that the scripts used to perform them were prepared properly, or even whether they contained the correct API packages for purposes of the analysis. Dr. Kemerer's inability to answer such fundamental questions reflects an improper attempt to insulate these studies from scrutiny under *Daubert*.

With respect to the "centrality" opinions, Dr. Kemerer testified that these analyses (also called "PageRank" analyses) were based on four code analysis tools: NetworkX, Understand, and custom-written scripts in the PHP and R programming languages. *Id*. at 91:21-92:24.

---

[1] Even if it were proper and sufficient for Dr. Kemerer to simply vouch for the opinions and work of other undisclosed experts, he could not do so here. The identities and qualifications of these experts, and the methodologies they applied, are a mystery not only to Google, but also to Dr. Kemerer. When asked to identify the people on Orrick's litigation support team who assisted him in preparing his report, he admitted that "it might be a long list," that he "may not actually know everyone who contributed to the work," and couldn't "necessarily identify a specific individual for a task." Karwande Decl., Ex. 1 at 19:5-21:2 (Kemerer 3/3/16 Dep. Tr.). When asked about the background and qualifications of the people on the litigation support team, Dr. Kemerer was only able to identify that "Mo" attended Carnegie Mellon and "Anon" attended McGill University. *Id.* at 22:1-16.

1   Notwithstanding the fundamental role these analytical tools played in the "centrality" analyses,
2   Dr. Kemerer admitted he had never used any of these tools prior to this case. *Id*. at 93:10-15;
3   51:1-4; 58:10-12. Indeed, he wasn't even certain he had heard of NetworkX or Understand prior
4   to this case. *Id.* at 94:3-8. And, even when pressed, Dr. Kemerer could not give more than a
5   cursory explanation of what roles these tools played in his "centrality" analyses. *See, e.g., Id*. at
6   95:6-20 ("Q. What was the role of Understand in connection with this case? A. Again, as a tool
7   for pulling raw data and putting it in raw data for analysis. Q. Can you be more specific about
8   what Understand did in connection with this case. A. Yes. You -- you -- you have software that it
9   reads, and then it generates output, which is a different representation of that software, and a
10  representation that is more amenable to analysis than the raw source code. Q. Can you be more
11  specific in defining what Understand did in connection with this case? . . . A. No."). Nor could
12  Dr. Kemerer explain the methodologies used in these analyses. *See, e.g., Id.* at 105:17-106:3 ("Q.
13  Do you have enough familiarity with Understand to explain to me how a particular instance
14  variable would be weighted? A. No. Q. As part of the analysis that was performed in connection
15  with your centrality opinions, did your methodology adjust in any way for classes that are not
16  used? Q. For example, legacy code? A. I don't know."). It comes as little surprise that Orrick's
17  team of undisclosed experts selected the tools used to generate the "centrality" results testified to
18  by Dr. Kemerer. *Id.* at 93:16-94:1. Because Dr. Kemerer lacks the necessary expertise to
19  determine whether these techniques were properly chosen and applied, the "centrality" analysis,
20  and any other testimony that relies on it, should be stricken. *Dura Auto. Sys. of Indiana*, 285 F.3d
21  at 615 (holding that expert testimony was properly excluded where the undisclosed experts "did
22  not merely collect data" or "otherwise perform routine procedures" and the testifying expert
23  "lack[ed] the necessary expertise to determine whether the techniques were appropriately chosen
24  and applied").
25      The "stability" analysis results testified to by Dr. Kemerer, and all testimony that relies on
26  them, should be stricken for analogous reasons. Dr. Kemerer testified in his deposition that the
27  core of his opinion as it relates to the "stability" of the Android platform was "empirical work
28  looking at the code and, in particular, looking at the number—or amount of change that occurred

in the platform over time and analyzed the APIs in terms of their changes . . . ." Karwande Decl., Ex. 1 at 114:24-5 (Kemerer 3/3/16 Dep. Tr.). However, Dr. Kemerer could not answer even basic questions about the analysis. *See, e.g., Id*. at 178:3-12 ("Q. All right. So Appendix D is one of the scripts that was used to calculate package change across Android versions; right? A. Yes. Q And drawing your attention to the lines of the script that start on line 30 and go to line 229? A. All right. Q. Okay. What are the items in this list? A. Again, I don't have training in R, so I'm not going to be able to answer questions about this script."). Indeed, Dr. Kemerer could not explain the basic premise of how the particular API packages for those "stability" analyses were selected. *Id*. at 178:3-179:20. Further, when asked who would know how those particular APIs were selected, Dr. Kemerer admitted that it would be someone on Orrick's "technical support team," but he did not know who. *Id.* Although numerous Oracle experts similarly relied heavily (and inappropriately) on Orrick's "support team," Dr. Kemerer's lack of qualifications, knowledge and understanding of the fundamental methods and inputs into these analyses is uniquely egregious.[2] Dr. Kemerer's expert-by-proxy testimony is inadmissible under *Daubert* and the Federal Rules of Evidence, and should be stricken.[3]

**II.    The Court should exclude irrelevant and misleading testimony concerning third party licensing or intellectual property practices regarding distinct forms of technology that Dr. Kemerer calls "APIs", even though he admits they are different from what he calls "APIs" for purposes of his other opinions.**

The jury in this trial must decide whether Google's use of the declarations/SSO for 37 Java SE API packages in Android was fair. Thus, the jury's understanding of the concept and definition of "API" will be critical. According to Dr. Kemerer, the "most relevant meaning" of API in this lawsuit is "the declaring code and the structure, sequence, and organization of the

---

[2] *See, e.g.,* Karwande Decl., Ex. 2 at 144:1-145:4 (Jaffe 3/10/16 Dep. Tr.) (wherein Dr. Adam Jaffe admits, after not being able to answer a question about his report, that Orrick's litigation support team drafted portions of his report); *see also* Karwande Decl., Ex. 3 at 10:3-11:23 (Schmidt 3/4/16 Dep. Tr.) (wherein Dr. Doug Schmidt concedes he was hired by and relied on Orrick's litigation support team).

[3] To the extent Oracle attempts to shore up this deficient testimony by disclosing the experts on its litigation support team, the time for those disclosures under Federal Rule of Civil Procedure 26(a) has long since passed. Accordingly, any such disclosure would be subject to a motion to strike under Federal Rule of Civil Procedure 37(c)(1). *See, e.g., Dura Auto. Sys. of Indiana*, 285 F.3d at 616 (affirming district court's decision to strike untimely affidavits from undisclosed experts and noting that allowing additional discovery would only burden the moving party.)

application programming interfaces in Java." Karwande Decl., Ex. 1 at 67:15-21 (Kemerer 3/3/16 Dep. Tr.). Yet, Dr. Kemerer's rebuttal report introduces in Section VII.D a discussion of what he calls an "API," but which he gives a much "broader definition" than the most relevant meaning of API in this case. *Id*. at 67:7-68:8 ("As I discuss in a later report, there is a whole API economy business model that has other things having -- ***that are different than how we have been describing APIs in the context of this lawsuit***.") (emphasis added). According to Dr. Kemerer, he defines an "API" in the context of his "API economy" opinions as a "mechanism by which you access some other resources," which can include a host of technology not included in the narrower definition he employs for other parts of his opinions—such as implementing code, software-as-a-service functionality, and other concepts. *Id.* at 68:4-20 ("Q. What do you mean by that, 'used in a much broader context'? A. That it means that the broader definition, the idea that it's – it's the mechanism by which you access some other resource. Q. What do you mean by "other resource"? A. It could be a variety of things. Q. Like what? A Could be data. Q. What else? A. Could be an operating system. Q. What else? A. Those are two examples that come to mind. Q. Could it include a service? THE WITNESS: I don't know. I would have to think about that.").

Notwithstanding the drastic differences between these definitions of API, Dr. Kemerer uses the generic term "API" throughout his report without making any material distinction between them. Dr. Kemerer's deliberate conflation of these concepts is transparently intended to mislead jurors into believing that the API declarations/SSO at issue in this case are generally treated as proprietary in the same fashion as implementing code or the "IP, assets, goods, and services" accessed through APIs as used in his "API economy" opinions. Bayley Decl. Ex. D ¶ 174 (Kemerer, 2/8/16 Rebuttal Rpt). For example, in the following excerpt, Dr. Kemerer is using a definition of API that relates to the allegedly infringed material at issue in this case (although it seems to suggest improperly and confusingly that it includes implementing code): "The purpose of the API packages in Android, including the 37 API packages taken from the Java platform, are to act as pre-written programs that developers and programmers can invoke, rather than having to write their own code from scratch." Bayley Decl., Ex. C ¶ 30 (Kemerer, 1/8/16 Expert Rpt.).

Later, in his opinions concerning the API economy, which are intended to argue that "APIs" are not freely available in the market, he uses his alternative and much broader definition of APIs to invite the jury to conclude that the declarations/SSO of APIs are proprietary and frequently licensed for money:

> Control of APIs and other software development tools is a known and expected dynamic in the dissemination of software, and encourages innovation and investment by companies like Sun and Oracle to create new software. This established and widespread understanding is particularly important as APIs become more prevalent across software contexts, as part of what is sometimes referred to as the "API economy."

Bayley Decl., Ex. D ¶ 171 (Kemerer, 2/8/16 Rebuttal Rpt.); *see also Id.* ¶¶ 172-186.

Dr. Kemerer's intentional conflation of these materially distinct concepts will be confusing and misleading to the jury, who will understandably believe that when Dr. Kemerer is offering an opinion related to "APIs," that these are the same APIs at issue in the jury's fair use deliberations—all while Dr. Kemerer explicitly admitted in his deposition that these broader "APIs" discussed in some parts of his report are "***different than how we have been describing APIs in the context of this lawsuit.***" Karwande Decl., Ex. 1 at 67:7-14 (Kemerer 3/3/16 Dep. Tr.) (emphasis added). Such misleading and prejudicial testimony should be excluded under Rule 403, because it dramatically increases the risk that the jury's decision will rest on an improper understanding of key issues in this case. *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 993 (9th Cir. 2009) (quoting Fed. R. Evid. 403 Advisory Committee's note) ("'Unfair prejudice' within [this] context means an undue tendency to suggest decision on an improper basis.").

Finally, not only is Dr. Kemerer's testimony regarding these broader APIs misleading and prejudicial, it is also irrelevant. This testimony, which relates to a diverse mix of data, products, and services not at issue in this case (and which appear to be unbounded since Dr. Kemerer cannot even define them), is not probative of whether Google's use of the declarations/SSO of the 37 API packages from JavaSE 1.4 and JavaSE 5.0 was a fair use. 17 U.S.C. § 107. Because this testimony is far more prejudicial than probative, Google respectfully requests this Court exclude Dr. Kemerer's testimony regarding APIs in the context of the "API economy." *See United States v. Espinoza-Baza*, 647 F.3d 1182, 1190 (9th Cir. 2011) ("[E]vidence presenting even a 'modest

likelihood of unfair prejudice' is 'high enough to outweigh the . . . probative value' of marginally relevant evidence.") (citation omitted).

Dated: March 23, 2016

KEKER & VAN NEST LLP

By: */s/ Robert A. Van Nest*
ROBERT A. VAN NEST
CHRISTA M. ANDERSON
DANIEL PURCELL

Attorneys for Defendant
GOOGLE INC.