1    KEKER & VAN NEST LLP
     ROBERT A. VAN NEST - # 84065
2    rvannest@kvn.com
     CHRISTA M. ANDERSON - # 184325
3    canderson@kvn.com
     DANIEL PURCELL - # 191424
4    dpurcell@kvn.com
     633 Battery Street
5    San Francisco, CA 94111-1809
     Telephone:    (415) 391-5400
6    Facsimile:    (415) 397-7188

7    KING & SPALDING  LLP
     BRUCE W. BABER (pro hac vice)
8    bbaber@kslaw.com
     1185 Avenue of the Americas
9    New York, NY 10036
     Telephone:    (212) 556-2100
10   Facsimile:    (212) 556-2222

11   Attorneys for Defendant
     GOOGLE INC.

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                      SAN FRANCISCO DIVISION

15
     ORACLE AMERICA, INC.,                  Case No.  3:10-cv-03561 WHA
16
                  Plaintiffs,               **DEFENDANT GOOGLE INC.'S MOTION
17                                          IN LIMINE NO. 6 TO EXCLUDE
          v.                                PORTIONS OF EXPERT REPORT AND
18                                          TESTIMONY OF JAMES
     GOOGLE INC.,                           MALACKOWSKI**
19
                  Defendant.               Date:      April 27, 2016
20                                          Dept.      Courtroom 8, 19th Fl.
                                            Judge:     Hon. William Alsup
21

22

23

24

25

26

27

28

1042175.01

PLEASE TAKE NOTICE that on April 27, 2016, pursuant to Federal Rules of Evidence 401, 403 and 702, as well as case law interpreting those rules, defendant Google Inc. ("Google") will, and hereby does, move the Court for an order excluding in limine certain portions of the damages expert report and testimony of James Malackowski submitted by Oracle America, Inc. ("Oracle") in this case. This motion is based on the following memorandum of points and authorities in support, the Declaration of Maya Karwande ("Karwande Decl.") and the Declaration of Edward Bayley ("Bayley Decl."), and accompanying exhibits, the entire record in this matter, and on such evidence as may be presented at the hearing of this motion.

## I.      INTRODUCTION

Oracle's damages expert, James Malackowski, ignores the statutory standard for copyright damages and fails to offer anything resembling an expert analysis, all in service of claiming ███ ███ in supposed disgorgement from Google. The Copyright Act and authoritative case law make clear that disgorgement is justified only for profits "***attributable to"*** or which "***arise from***" Google's alleged infringement. And, as the Court knows, the alleged infringement here is limited to declaring code making up the structure, sequence, and organization ("Declarations/SSO") of 37 Java SE API packages ("the Java SE APIs"). The allegedly infringing material makes up a mere fraction of a percent of code in the complex Android smartphone platform. Just as it did (repeatedly) before the last trial, Oracle ignores this Court's admonition that

> The issue is not Java. It's not Android. It's very specific parts about Java that are protected, if at all, by copyrights or patents and very specific parts of Android that are accused. So if we start getting off onto this is Java versus Android, the judge is going to intervene and say it's not.

Apr. 16, 2012 Trial Tr. at 21:22-22:2; *see also* Dkt. 230 at 2:6-7; Dkt. 685 at 8:6-12; Dkt. 785 at 5-8. Oracle and Malackowski improperly equate the value of the entirety of Android with the value of the Declarations/SSO of the 37 Java SE APIs for purposes of their disgorgement analysis.

*First,* Malackowski fails to conduct any meaningful analysis supporting his claim that the alleged infringement of Declarations/SSO of the Java SE APIs caused Google to earn ███ ███ in advertising revenue. The first step in a disgorgement analysis under copyright law is the

1    plaintiff's obligation to establish a causal nexus between the alleged infringement and the

2    defendant's revenue. But Malackowski never even analyzes the **causal** aspect of the supposed

3    nexus, much less establishes one. He simply notes that Google has earned ███████ from

4    advertisements served on Android devices, which happen to contain the Declarations/SSO of the

5    Java SE APIs. By itself, that is inadequate as a matter of law, and renders his opinion

6    inadmissible. The Ninth Circuit and numerous district courts have established that mere ***use*** of

7    copyrighted material in a product that is a part of an indirect revenue stream does not mean that

8    the material ***caused*** those indirect profits. If Malackowski's but-for "use" test were the law (and

9    it's not), it would swallow the causal nexus test whole.

10        *Second,* once he deducts Google's costs to reach a profit number, Malackowski conducts

11   no apportionment of Android at all. He opines that the Android OS as a whole—including the

12   more than 99% of Android code that is not accused in this case—is responsible for 35.6% of

13   profits on advertisements shown on Android devices and 100% of profits on Google-branded

14   Android hardware, applications and digital content sold for use on Android devices. He admits

15   that the resulting ███████ in profits was earned by the entire Android platform, and that all the

16   myriad other elements of the platform contributed toward that profit. Bayley Decl., Ex. G ¶¶ 272,

17   286-87 (Malackowski 2/29/16 Rpt.); Karwande Decl., Ex.6 at 218:24-220:17; 220:22-225:11;

18   225:17-228:1; 230:2-13 (Malackowski Dep. Tr.). But he glibly says it doesn't matter. Citing no

19   law in his report, he falls back on "the legal theory of commingling," arguing that where an

20   infringer "has mixed the infringing and noninfringing attributes in a way that makes it difficult or

21   impossible to separate out the respective contributions of each to overall profits," Oracle is

22   entitled to every single penny of indirect profits earned by the Android platform. Bayley Decl.,

23   ExG ¶¶ 18, 272 (Malackowski 2/29/16 Rpt.). This makes no sense, because if there was no

24   commingling of infringing and noninfringing attributes in an accused product, there would be no

25   need to apportion anything. Unsurprisingly, his approach contradicts the mandate of 17 U.S.C. §

26   504(b) and controlling authority interpreting it. *See* 17 U.S.C. § 504(b); *Polar Bear Prods., Inc. v.*

27   *Timex Corp.,* 384 F.3d 700, 708 (9th Cir. 2004); 5-14 Nimmer on Copyright, § 14:03, 14-27.

28        *Third,* Malackowski's analysis is just as shoddy and result-oriented as to Oracle's claimed

2

DEFENDANT GOOGLE INC.'S MOTION IN LIMINE NO. 6 TO EXCLUDE PORTIONS OF EXPERT
REPORT AND TESTIMONY OF JAMES MALACKOWSKI
Case No.  3:10-cv-03561 WHA

1042175.01

lost profits. Here, Malackowski bases his analysis on a single 2008 Sun document projecting revenues for licensing Java ME—a different Java platform from Java SE, and not even the accused work here—through 2010 only, with an 8.3% increase from 2009 to 2010. Karwande Decl., Ex. 6 at 266:19-267:4 (Malackowski Dep. Tr.). Malackowski takes this lone forecast and, relying on a private conversation with former Sun (and now Oracle) employee Michael Ringhofer, assumes that Oracle would have increased its *Java ME* revenues 8.3% year over year through 2015 but for the presence of Android. Bayley Decl., Ex. F, n. 400 (Malackowski 1/8/16 Report); Karwande Decl., Ex. 6 at 274:22-275:20 (Malackowski Dep. Tr.). Despite having customer-specific data on Java ME licensing, he does not tie the loss of any specific Java ME business to Android.  Karwande Decl., Ex. 6 at 261:5-262:6 (Malackowski Dep. Tr.). He does not analyze whether Oracle's Java ME licensing business would have cratered anyway, because of the movement in the mobile device market from cheaper, less functional feature phones to modern smartphones, with full Internet browsing capability and responsive touchscreens. Bayley Decl., Ex. G ¶ 173 (Malackowski 2/29/16 Rpt.); Karwande Decl., Ex. 6 at 292:22-294:5(Malackowski Dep. Tr.).  And he certainly does not tie any allegedly lost licensing revenues to Google's use of the Declarations/SSO of the *Java SE* APIs in Android. In fact, Oracle offers contradictory testimony by Dr. Adam Jaffe, who testified that, in his opinion, the market was highly uncertain and difficult to model because of the complex and volatile nature of a market in transition, and therefore he was not offering an opinion as to what would have occurred had Android not used the 37 Java SE APIs at issue. Karwande Decl., Ex. 2 at 105:17-108:10 (Jaffe Dep. Tr.). And yet, Oracle's damages expert, Malackowski, simply assumes that Oracle's revenues would have grown at the rate projected in 2008. Such contradictory expert opinion is unreliable.

*Fourth,* Malackowski admittedly speculates that, had Google not allegedly infringed, Oracle would have created its own full-stack mobile platform—something it never came close to doing despite trying for years—and made just as much profit as Google has made indirectly from Android using an entirely different business model than Oracle's business model. Malackowski concedes that he cannot quantify how much Oracle would have made from "Project Acadia," but

nonetheless hopes to tell the jury that it surely would have been billions—an amount "best measured by the apportioned Android profits attributable to the Infringed Java Copyrights." Bayley Decl., Ex. F ¶ 217 (Malackowski 1/8/16 Rpt.). This is chicanery designed to trick the jury and give them an alternative basis to arrive at a huge damages award, based on no evidence or analysis.

The Court should strike all of the above opinions.

## II.    STATEMENT OF FACTS

At issue in this re-trial is Google's allegedly infringing use of the SSO and declaring code of 37 Java SE APIs in the Android platform. The Android platform is a full-stack mobile operating system that contains a vast amount of technology, including: a Linux kernel, a hardware abstraction layer, Android Runtime (which replaced the Dalvik virtual machine), an applications layer, native libraries (written in C++), core libraries (mostly developed by Google), and the Android framework. Karwande Decl., Ex.5 ¶¶ 109-11 (Astrachan 1/8/16 Rpt.); Ex .6 at 91:25-92:14 (Malackowski Dep. Tr.). Oracle does not dispute that the SSO and declaring code at issue comprise a fraction of a percent of the entire Android code base. Bayley Decl., Ex. G ¶¶ 108-11 (Malackowski 2/29/16 Rpt.); Karwande Decl., Ex. 6 at 223:6-16 (Malackowski Dep. Tr.). Nor does Oracle dispute that Google uses non-infringing implementing code for the 37 Java SE API packages at issue. *Id*., at 64:16-18; 221:6-9. Nevertheless, based on Google's use of this small fraction of a percent of code, Mr. Malackowski, opines that Oracle is entitled to ▮▮▮▮ *on* in disgorgement of Google's indirect profits and *$475 million* in actual damages.

*First,* Malackowski opines that there is a causal nexus between ▮▮▮▮ in Android-related revenue and Google's use of the Declarations/SSO of the 37 Java SE APIs. Bayley Decl. Ex. F ¶¶ 18, 220 (Malackowski 1/8/16 Rpt.). Malackowski asserts that Google's use of Declarations/SSO of the Java SE APIs purportedly allowed for faster programming, gave Google access to Java developers, increased speed to market, and was Google's only realistic alternative. *Id*. ¶¶ 224-38. Malackowski relies on Oracle's technical experts to conclude that Android is technically dependent on the APIs, because (1) if they were removed, Android would not compile, (2) the top 100 apps depend on one or more of the 37 Java SE API packages, and (3) the

4

DEFENDANT GOOGLE INC.'S MOTION IN LIMINE NO. 6 TO EXCLUDE PORTIONS OF EXPERT
REPORT AND TESTIMONY OF JAMES MALACKOWSKI
Case No.  3:10-cv-03561 WHA

1042175.01

37 Java SE APIs are more central than the other APIs to the Android platform (relying upon the reports of Dr. Chris Kemerer and Mr. Robert Zeidman). *Id.* ¶ 239. Because the 37 Java SE APIs allegedly provided maturity and stability to the Android platform (based upon Dr. Kemerer's stability analysis), (*id.* ¶ 230), Malackowski argues that they were essential for Google to attract developers, and thus users, to the Android platform during a time when the smartphone market was just developing. *Id.* ¶ 241.[1]

Malackowski admits that he relies on identical facts in concluding that a causal nexus exists between the Declarations/SSO of the 37 Java SE APIs and all four revenue streams, relating to: (1) sales of hardware, including phones and tablets, that run Android; (2) sales of applications to be used on Android devices; (3) sales of digital content that Android device users can download; and (4) advertising revenues generated when, for example, an Android phone user conducts a web search. Karwande Decl., Ex. 6, at 139:7-13; 140:22-141:3;146:20-147:10 (Malackowski Dep. Tr.). But Malackowski conceded that he performed no "but for" analysis to determine if any of these profit streams were caused or enabled in any respect by the use of the Declarations/SSO of the Java SE APIs, asserting that it would be impermissible and irrelevant to consider that sort of but-for counterfactual. *Id.* at 140:5-141:3. With respect to ad revenues specifically, Malackowski admits that both Google search and Google ad technology predated Android, and that Google's search technology was the foundation of Google's business. *Id.* at 149:3-5; 149:24-150:10; 149:12-15. Malackowski also admits that Google's ad technology is an entirely distinct area of technology. *Id.* at 148:13-21. Nevertheless, Malackowski applies the same causal nexus analysis to Google's ad revenues as to the other revenue streams, asserting that the contribution of Google's search engine or ad-targeting technology, and even the role of the Declarations/SSO of the 37 Java SE APIs in serving advertisements to Android users, is immaterial to evaluating the causal nexus. *Id.* at 150:11-153:12.

*Second*, in his reply report, Malackowski purports to apportion Google's Android-related indirect profits, but in reality does no such thing. With respect to hardware, applications, and

---

[1] For the reasons set forth in Google's *Motion in Limine to Exclude Certain Testimony from Expert Report of Dr. Chris F. Kemerer*, Google also moves to strike Dr. Kemerer's analyses.

DEFENDANT GOOGLE INC.'S MOTION IN LIMINE NO. 6 TO EXCLUDE PORTIONS OF EXPERT
REPORT AND TESTIMONY OF JAMES MALACKOWSKI
Case No.  3:10-cv-03561 WHA

digital content, Malackowski simply assigns 100% of those profits to Android—and stops there. He then concludes that the Android platform is responsible for ▮▮▮▮▮ of advertising profits indirectly related to Android, crediting Google's search engine and ad-targeting software with the rest.[2] But again, that is where he stops. Malackowski opines that Oracle should be awarded the entire ▮▮▮▮▮ in Google's indirect Android profits because the allegedly infringing Declarations/SSO of the 37 Java SE APIs have been "commingled" with other aspects of the Android platform. According to Malackowski, this allows him to avoid even making an attempt to apportion Android and to opine at trial that apportionment is not legally required. Bayley Decl., Ex F  ¶¶ 283-285 (Malackowski 1/8/16 Rpt.) .

With respect to this supposed legal theory of commingling, Malackowski's testimony is inherently contradictory and unreliable. Malackowski admits that Oracle is "not entitled to any profits other than the contribution of the copyrights at issue." Karwande Decl., Ex. 6 at 218:7-12 (Malackowski Dep. Tr.). He further admits that the components of the Android platform, other than the Declarations/SSO of the 37 Java SE APIs created value, and he agrees that those other components contributed to Google's profits. *Id.* at 218:24-219:7. Specifically, Malackowski agrees that the Linux kernel, the Dalvik Virtual Machine, the implementing code in the Android core libraries, Android runtime, the phone apps, phone functionality and the open source business model all contributed to the profits and value of the Android platform. *Id.* at 218:24-219:7; 219:8-220:17; 220:22-223:1; 224:16-225:11; 225:17-228:1; 230:2-13. Regardless, Malackowski did not independently evaluate these components—and did not ask the Oracle technical experts to do so—because it is defendant's burden to do so. *E.g., id.* at 222:11-224:15.[3] Yet he also testifies that such an analysis is required to determine whether there is "commingling." *Id.* at 343:22-

[2] Malackowski calculates the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bayley Decl., Ex.G ¶ 281 (Malackowski 2/29/16 Rpt.). Malackowski further claims that this ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "fairly represents the Android platform contribution to Google's mobile advertising business strategy." *Id.* ¶ 282-283.

[3] *See also,* Bayley Decl., Ex. G ¶¶ 17-18; 272-305 (Malackowski 2/29/16 Rpt.) (showing no additional analysis other than the assertion of the legal theory of commingling).

DEFENDANT GOOGLE INC.'S MOTION IN LIMINE NO. 6 TO EXCLUDE PORTIONS OF EXPERT
REPORT AND TESTIMONY OF JAMES MALACKOWSKI
Case No.  3:10-cv-03561 WHA

1042175.01

345:24.

*Third,* Malackowski opines that Oracle's actual damages caused by Google's alleged infringing use of the Declarations/SSO of the 37 Java SE APIs are $475 million in lost licensing profits from lost Java ME license agreements with third parties. Malackowski relies on a single 2008 forecast of Java ME license revenue through 2010, which forecast predicted an 8.3% increase in revenue from 2009 to 2010.  Bayley Decl., Ex. F n. 400 (Malackowski 1/8/16 Rpt.); Karwande Decl., Ex. 6 at 274:22-275:20 (Malackowski Dep. Tr.). He then assumes that Oracle would have achieved the same revenue growth (8.3%) through 2015, based on a private consultation with Oracle's Michael Ringhofer and notwithstanding the tremendous volatility of the mobile market between 2008 and 2015—a period that saw the advent of the modern smartphone and tablet and a corresponding decline in old-fashioned feature phones that were the lifeblood of Sun's Java ME licensing business. Bayley Decl., Ex. F ¶¶ 186-189 (Malackowski 1/8/16 Rpt.). Remarkably, Malackowski nowhere addresses the fact that Java ME is not the copyrighted work at issue in this case, and, in fact, contains only a portion of the 37 Java SE APIs at issue here. Karwande Decl., Ex. 3 at 14:21-16:3 (Schmidt Dep. Tr.).

*Fourth,* although Malackowski is unable to quantify Oracle's lost profits resulting from its inability to launch its own mobile operating system (called Project Acadia or SavaJe), Malackowski speculates that Oracle's lost profits would best be measured by Google's profits from using the allegedly infringing Declarations/SSO of the 37 Java SE APIs in the Android operating system. Yet Malackowski admittedly did no analysis to support this opinion. Bayley Decl., Ex. F ¶ 217 (Malackowski 1/8/16 Rpt.). Again, highlighting the speculative nature of Malackowski's opinion, Oracle's expert Dr. Jaffe testified that he could not opine whether SavaJe could have been successful in the absence of Android.  Karwande Decl., Ex. 2 at 185:5-8 (Jaffe Dep. Tr.)

## III.   LEGAL STANDARDS

Trial judges serve as gatekeepers for both the relevance and reliability of expert testimony. *Sundance, Inc. v. DeMonte Fabricating Ltd.,* 550 F. 3d 1356, 1360 (Fed. Cir. 2008); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Federal Rule of Evidence 702 permits

7

1  a court to admit expert testimony if it is (1) based upon sufficient facts or data, (2) the product of

2  reliable principles and methods, and (3) delivered by a witness who has applied the principles and

3  methods reliable to the facts of the case. Fed. R. Evid. 702. Damages expert opinion testimony

4  that fails to meet these criteria should be excluded. *See Uniloc USA, Inc. v. Microsoft Corp*, 632

5  F.3d 1292 (Fed. Cir. 2011). The Supreme Court has emphasized courts must consider "whether

6  expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the

7  jury in resolving a factual dispute." *Daubert v. Merrell Dow Pharms, Inc.,* 509 U.S. 579, 591

8  (1993).

9         Speculative expert testimony is inadmissible. *See Gen. Elec. v. Joiner,* 522 U.S. 136, 146,

10  118 S. Ct. 512 (1997). A damages theory must be based on "sound economic and factual

11  predicates." *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 67 (Fed. Cir. 2012)

12  (citation omitted). And as the proponent of Malackowski's testimony, Oracle has the burden of

13  proving its admissibility. *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

14  **IV.   ARGUMENT**

15      **A.   Malackowski fails to show the required causal nexus between Google's**
16          **advertising revenues and the allegedly infringing Declarations/SSO of the 37**
        **Java SE APIs.**

17         The Copyright Act permits a successful plaintiff to recover "any profits of the infringer

18  that are attributable to the infringement and are not taken into account in computing actual

19  damages." 17 U.S.C. § 504(b); *see also Polar Bear,* 384 F.3d at708. These profits may include

20  both the defendant's "'direct profits—those that are generated by selling an infringing product—

21  and indirect profits—revenue that has a more attenuated nexus to the infringement." *Polar Bear*,

22  384 F.3d at 710 (quoting *Mackie v. Rieser,* 296 F.3d 909, 914 (9th Cir. 2002)). But the scrutiny

23  courts apply  to indirect profits claims is more stringent. "[B]ecause the amount of profits

24  attributable to the infringement in an indirect profits case is not always clear, 'we have held that a

25  copyright holder must establish the existence of a causal link before indirect profits damages can

26  be recovered.'" *Id.* at 710-11. As noted by commentators, "because of the at-best highly

27  speculative nature of all indirect profits claims, the decision to send those claims to the jury

28  should be relatively rare." 6 William F. Patry, *Patry on Copyright,* § 22:131 (2010); *Univ. of Col.*

8

*Found. , Inc. v. Am. Cyanamid Co.,* 196 F.3d 1366, 1375 (Fed. Cir. 1999) (upholding trial court's ruling that plaintiff had not met its burden to show a causal connection with defendant's profits and citing Nimmer treatise for the proposition that that claims for indirect profits rarely succeed).

As explained by the Ninth Circuit, section 504(b) "creates a two-step framework for recovery of indirect profits: 1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and 2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement." *Polar Bear,* 384 F. 3d at 711. With respect to the causal nexus requirement, the *Polar Bear* court explained that:

> 'When an infringer's profits are only remotely and speculatively attributable to infringement, courts will deny recovery to the copyright owner.' 4 NIMMER ON COPYRIGHT § 14.03, 14–34; *see also Frank I,* 772 F.2d at 517 ("a court may deny recovery of a defendant's profits if they are only remotely or speculatively attributable to the infringement").

*Id.* at 711.

Thus, a plaintiff seeking to recover indirect profits "'must proffer some evidence . . . [that] the infringement at least partially caused the profits[.]" *Id.* at 711 (quoting *Mackie,* 296 F.3d at 911). "[A] district court must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and subsequent indirect profits. . . before the parties can wrangle about apportionment." *Mackie,* 296 F. 3d at 915. "[A] copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement. The result is that a plaintiff seeking to recover indirect profits must 'formulate the initial evidence of gross revenue duly apportioned to relate to the infringement.'" *Polar Bear,* 384 F. 3d at 711 (quoting *Mackie,* 296 F.3d at 911 and 5-14 Nimmer on Copyright § 14.03[B], 14-39); *see also On Davis v. The Gap, Inc.,* 246 F.3d 152, 160 (2d Cir. 2001), as amended, (May 15, 2001). When an infringer's profits are "only remotely and speculatively attributable to infringement," courts will deny recovery to the copyright owner. *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.,* 772 F.2d 505, 517 (9th Cir. 1985).

Here, because Google does not sell the Android platform itself, it has no direct profits from the sale of the allegedly infringing product. Oracle admits that all the profits it seeks to disgorge come from revenue streams that are ***indirect***: (1) hardware revenue, (2) app revenue (3)

9

DEFENDANT GOOGLE INC.'S MOTION IN LIMINE NO. 6 TO EXCLUDE PORTIONS OF EXPERT REPORT AND TESTIMONY OF JAMES MALACKOWSKI
Case No.  3:10-cv-03561 WHA

1042175.01

digital content revenue, and (4) advertising revenues generated from searches on Android devices.[4] As set forth above, Malackowski opines that the allegedly infringing Declarations/SSO of the 37 Java SE APIs have a causal nexus to these indirect revenue streams because Android's use of the Declarations/SSO of the 37 Java SE APIs allowed Google to recruit applications developers, and thus attract users, during a limited window of opportunity for success. Bayley Decl., Ex. F ¶¶ 223-244 (Malackowski 1/8/16 Rpt.).

Setting aside whether this showing is sufficient to establish a causal nexus for hardware, app, and digital content revenues (it is not), Malackowski fails to articulate how the Declarations/SSO in the 37 Java SE APIs, which comprise a fraction of a percent of the Java SE platform as a whole, and even less of the total Android platform, *cause* revenue generated by millions of Android device users who decide to conduct a search using Google's independent and pioneering search technology. Malackowski admits that Google's search and advertising revenue existed before and does not depend on Android, and that Google's search and ad business is a distinct technology and business model pioneered by Google. Karwande Decl., Ex. 6 at 148:13-21; 149:3-5; 149:24-150:10 (Malackowski Dep. Tr.). He also admits that end users generate advertising profits across all platforms when users conduct searches on any platform and any device, mobile or desktop, via the same mechanism—deciding to conduct a Google search, using Google search technology, and clicking on advertisements served by Google advertising technology.[5] *See id.* at 147:20-148:120; 258:6-15 (Malackowski Dep. Tr.).

Nonetheless, Malackowski opines that the mere presence of the Declarations/SSO of the

---

[4] Karwande Decl., Ex. 8 ¶¶ 14-17 (Leonard 2/8/16 Rpt.).  Google's damages expert, Dr. Leonard, opines in his report that Android does not generate any *direct* revenue and Malackowski nowhere disputes this.

[5] Malackowski also admits that Google's own technology and business efforts contributed to all Android-related revenues, such as Google's open source business model for Android (Bayley Decl., Ex. __, Malackowksi Opening ¶ 140), Google's successful establishment of distribution partnerships (¶¶ 151-59), Google's development of Android Market/Google Play (¶¶ 146-150), Google's successful partnership with HTC, Samsung and others to develop the hardware (the phone itself) that consumers would buy (¶¶ 160-61), the introduction of the Nexus and later, other, tablets (¶ 166). Moreover, according to Malackowski, additional market factors, such as the displacement of feature phones with smartphones (¶176), the development of wireless technologies with greater bandwidth and the increasing hardware capabilities of mobile devices (¶176), affected the broader market, and thus Android-related revenues.

1    37 Java SE APIs in the Android codebase establishes a causal nexus, without considering whether

2    those APIs have any incremental effect on advertising revenues or are involved as a technical

3    matter in ads served on Android devices. *Id.* at 150:11-153:12. Malackowski's analysis (or lack

4    thereof) fails to establish anything beyond the fact that (1) Android contains the Declarations/SSO

5    of the 37 Java SE APIs; and (2) Android users conduct searches that result in Google receiving

6    advertising revenue. Malackowski (and Oracle's other experts) never explain how (if at all) the

7    use of the Declarations/ SSO of the Java SE APIs influence the decisions of these millions of

8    users to use Google search technology, enable them to do so, or lead to any incremental

9    difference in Google revenue. For the reasons set forth below, Malackowski's causal nexus

10   opinion regarding Google's indirect advertising revenues on Android devices is nothing more

11   than a conclusion and untethered to the required causal-nexus analysis.[6]

12             **1.**    **Malackowski's causal nexus theory fails under *Polar Bear* and *Mackie*.**

13         In opposing this motion, Oracle will argue, as Malackowski did, that Google earns money

14   from advertisements served on Android devices – devices – which "use" the 37 Java SE APIs.

15   But "use" is not causation. The Ninth Circuit and Section 504(b) require more. In *Mackie v.*

16   *Rieser,* the Seattle Symphony incorporated plaintiff's artwork into a 24-page brochure promoting

17   the symphony's "Pops" performances. 296 F.3d at 912. The Ninth Circuit upheld the trial court's

18   rejection of plaintiff's request for disgorgement of a portion of the Symphony's profits generated

19   during that season, as well as future seasons, because plaintiff had failed to proffer a non-

20   speculative correlation between the Symphony's infringement and subsequent Pops revenues. *Id.*

21   at 916. The court commented that it could "surmise virtually endless permutations to account for

22   an individual's decision to subscribe to the Pops series," and then rejected plaintiff's expert's

23   opinion that the Symphony's goal of generating 1.5% response rate to the direct mail brochure

24   was "somehow directly correlated with revenue generated by individuals who subscribed because

25

26   ───────────────

27   [6] Although Google disputes the facts Malackowski relies upon to establish a causal nexus
     between the Declarations/SSO of 37 Java SE APIs and the hardware, and Google Play (digital
     content and app) revenues generated by Google, Google does not challenge that showing in this

28   motion but reserves its right to argue to the trier of fact that no causal nexus has been shown.

of [plaintiff's] art." *Id.* at 915-16.[7]

In *Polar Bear,* the Ninth Circuit reaffirmed the holding and logic of *Mackie,* applying the *Mackie* standard to determine whether the indirect revenues sought were "those that arise from infringement." 386 F.3d at 711. The district court concluded that the defendant's use of plaintiff's copyrighted PaddleQuest images at trade shows had "the requisite causal connection" to profits from trade booth sales at 12 trade shows, and from a Mountain Dew booklet promotion containing the PaddleQuest advertisement. *Id.* at 712. But the appellate court overturned the jury verdict with respect to the supposed enhanced prestige of the Expedition watches, which comprised the bulk of the indirect profits claim, reasoning that the causal link was missing between the infringement and the revenue resulting from overall sales. *Id.* at 715.

Here, Malackowski has made no showing of the type required by both *Mackie* and *Polar Bear*—a showing that causally connects Android device users' search efforts (relying on different pre-existing technology) that lead to advertising revenue (also relying on different pre-existing technology) with the use of the Declarations/SSO of the 37 Java SE APIs. Instead, Malackowski simply points to the fact that the APIs existed on the operating system of the Android device. Malackowski even testified that he did not need to account for the other technology that enabled the advertising profits, and that the causal nexus to the advertising profits was no more attenuated than the other profit streams. Karwande Decl., Ex. 6 at 152:8-153:12 (Malackowski Dep. Tr.).

Testifying at deposition more as advocate than expert, Malackowski repeatedly fell back on Judge Grewal's opinion in *Brocade Comm'ns Systems Inc. v. A10 Networks, Inc.,* No. C 10-3428, 2013 WL 831528 (N.D. Cal. Jan. 10, 2013), as justifying his position that the presence of the Declarations/SSO of the 37 Java SE APIs in the Android OS was enough by itself to satisfy the causal nexus standard. *Id.* It is worth noting that the same lawyers who hired Malackowski to serve Brocade are representing Oracle here. But in any event, his wholesale reliance on Judge

---

[7] *See also Bucklew v. Hawkins, Ash, Baptie & Co., LLP.,* 329 F.3d 923, 933 (7th Cir. 2003) (holding that evidence that defendants shifted profits to from the infringing forms to separate non-infringing financial software too speculative and rejecting expert testimony that 10 per cent of profits on defendant's sales of non-infringing software were due to one-stop shopping as having no factual basis whatsoever).

Grewal's opinion is misplaced, most obviously because the profits at issue in *Brocade* were direct rather than indirect. *Id.* \*7. But, the Ninth Circuit has made clear that a more demanding causal-nexus inquiry applies to indirect profits because of the attenuated nature of those claims. *See Polar Bear*, 384 F. 3d at 711. Indeed, in opposing a *Daubert* motion against Malackowski, Brocade's attorneys waved away objections to Malackowski's simplistic, but-for causal nexus analysis by arguing that this analysis was appropriate as to direct profits and distinguishing *Polar Bear* as involving only indirect profits. *See Brocade Comm'ns Sys. Inc. v. A10 Networks, Inc.* No. 5:10-cv-03428 LHK, 2012 WL 3966442 at \*10 & n.4 (N.D. Cal. June 21, 2012). Malackowski's persistent invocation of *Brocade* throughout his deposition underscores his failure to apply the correct legal standard and the unreliability of his causal nexus analysis.[8]

### 2. Courts find that the use of software as part of a complex income stream is too speculative and attenuated to satisfy plaintiff's burden under Section 504(b).

Applying the holdings of *Polar Bear* and *Mackie,* courts have concluded that plaintiffs cannot show a causal nexus to indirect revenues simply by pointing to ***use*** of infringing software, as opposed to attribution. This is exactly the shortcut Malackowski has taken here.

*First,* in *Complex Systems, Inc. v. ABN Ambro Bank N.V.,* No. 08 CIV. 7497 KBF, 2013 WL 5970065 (S.D.N.Y. Nov. 8, 2013) ("CSI"), the district court excluded evidence of defendant ABN's indirect profits earned by its use of plaintiff's software that facilitated certain banking transactions (BankTrade) after its license expired. The court reviewed causal-nexus case law comprehensively, before concluding that "[i]n these cases, while a connection between use of the infringer's product and the revenues obtained was shown, mere connection or usage alone was

---

[8] Malackowski cited to Judge Grewal's opinion at least 8 times during his deposition. Karwande Decl., Ex. 6 at 91:9-10 (Malackowski Dep. Tr.) ("I would reference my experience in the Brocade 10 case"); 96:4-8 ("I understand from my experience with the Brocade A10 case that I cited for you"); 140:18-19 ("and in particular my experience with Judge Grewal"); *see also* 143:8-10; 152:15-18; 214:12-16; 351:18-20; 352: 7-12. In addition to Malackowski's misapplication of the causal nexus standard for indirect profits, he also mistakenly claims that "Judge [Grewal] in his order, specifically tells you not to look at alternatives when assessing the causation." *Id.* at 143:8-10]. This also is wrong. In fact, Judge Grewal's opinion in *Brocade* supports the opposite conclusion, specifically discussing that defendant's expert testified at trial regarding a non-infringing alternative-based method of measuring apportionment. *Brocade,* 2013 WL 831528, \*6-7. Although the opinion also finds that that jury was entitled to reject or accept that expert's analysis, nowhere does the opinion criticize non-infringing alternatives as a matter of law.

13

1   insufficient—each case confirmed the general underlying proposition that a copyright owner must

2   meet the statutory requirement of showing attribution." *Id.* *5. The district court therefore granted

3   ABN's motion *in limine* even though CSI's expert had explained that the bank would face

4   "significant operational hurdles" if BankTrade was immediately turned off, and would need years

5   and tens of millions of dollars to replace that software. *Id.* at *7–8.

6         The *CSI* court rightly noted that "[u]se is, of course, not necessarily evidence of

7   causation." *Id.* *11. And "while it is clear that BankTrade is related to and supports ABN's work

8   in the trade finance sector—specifically by processing letters of credit and guarantees for ABN—

9   CSI has failed to identify the ways in which ABN's profits are attributable specifically to

10  BankTrade." *Id.* at *11. The court pointed to evidence that several other trade processing software

11  companies on the market provided the same basic set of functionality, and that ABN customers

12  did not care which software was used. *Id.* at *11–12. Ultimately, in addition to these obvious

13  failures, the court found no evidence that specific transactions occurred because of BankTrade

14  and that "but for" BankTrade certain transactions would not have occurred. The court concluded

15  that CSI's expert had failed to establish any causal nexus, even for transactions that "flow"

16  through BankTrade, and excluded ABN's testimony regarding indirect profits. *Id.* *13-14.[9]

17        *Second*, in *Int'l Business Machines Corp. v. BGC Partners, Inc.,* No. 10 CIV. 128 PAC,

18  2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013) ("IBM"), the district court granted BGC's motion *in*

19  *limine* to exclude damages expert testimony regarding over $100 million in alleged indirect

20  profits evidence. BGC had used the infringing Informix software for its back office functions in

21  serving as an intermediary between financial institutions, and acknowledged that immediate

22  disruption of use of the software would have a devastating effect. *Id.* *3. Nevertheless, the court

23

24  ---
    [9] *See also Lowry's Reports, Inc. v. Legg Mason, Inc.,* 271 F. Supp. 2d 737, 752 (D. Md. 2003)
25  (holding that even if the copyrighted stock market newsletter should have led to higher profits for
    defendant brokerage firm, plaintiff Lowry had articulated no more than a speculative correlation
26  because "[t]he complex, variable, independent thought processes of hundreds of individual
    brokers intervene between the copying and any subsequent gain."); *McIntosh v. Northern*
    *California Universal Enterprises, Inc., No.* CV F 07-1080 LJO GSA 2010 WL 2698747, at *9
27  (E.D. Cal. July 7, 2010) (finding an absence of a causal link or legally significant relationship
    between defendants' infringing use of subdivision map and improvement plans to defendants'
28  profits from sales of homes).

1    excluded evidence on indirect profits, reasoning as follows:

2          IBM points to nothing more than BCG's repeated statement that Informix
       software is "integral" to its operations and that the sudden removal or failure of
3       the Informix software would have devastating consequences to BCG's operational
       efficiency.  But simply saying that copyrighted material "may have played a
4       'important,' 'significant' or 'meaningful' role" is insufficient, particularly where,
       as part of BGC's information technology infrastructure, it comprises only a
5       portion of what enabled BGC to conduct its business profitably."

6    *Id.* *4-5.

7          *Third,* in *DaimlerChrysler Services v. Summit National, Inc.,* No. 02-71871, 2006 WL

8    208787 (E.D. Mich. Jan. 26, 2006), the district court rejected Summit's argument it had met its

9    causal nexus burden under section 504(b) "merely because [Summit's] ALAS source code was an

10   essential component of a larger profit-generating process." *Id.* at *3. The court noted that Daimler

11   was alleged to have used ALAS, the infringing software, "to make money through other means—

12   namely automobile financing." *Id.* at *2. The court reasoned that, "'in cases where profits cannot

13   be traced only to the infringing work but rather to a complex income stream, courts have required

14   that plaintiff introduce detailed evidence linking gross revenues to the infringement,'" and

15   concluded that Summit must meet that burden. *Id.* at *4.[10] Indeed, as the *Daimler* court

16   commented in rejecting the speculative causal nexus theory, Daimler "could not operate without

17   its toilets either, but that does not mean that all of its profits are attributable to commodes." *Id.* at

18   *2.

19         Here, as in *CSI*, *IBM*, and *Daimler*, the ▮▮▮▮▮▮▮ in advertising revenues is generated by

20   a complex income stream: Google search and ads technology that runs on a server at Google is

21   accessed via an Android device running an Android OS that is invisible to the user. This process

22   is analogous to the "back office" processes at issue in *CSI*, *IBM*, and *Daimler*. And as in those

23   _____

[10] Courts frequently find a lack of causal nexus to indirect profits in cases where the infringing
24   use is in advertising materials and plaintiff cannot establish more than a speculative nexus to the
     defendant's profits related to the advertised product. *E.g., Polar Bear,* 384 F.3d at 713-14 (Polar
25   Bear's theory that the infringing advertising for Timex Expedition watches caused enhanced
     brand prestige for the line of watches "stretches the causation rubber band to its breaking point");
26   *On Davis v. The Gap, Inc.,* 246 F.3d 152 (2d Cir. 2001) (plaintiff failed to prove which portions
     of The Gap's revenues were reasonably related to the infringing advertisement); *Masterson
27   Marketing, Inc. v. KSL Recreation Corp.,* 495 F. Supp. 2d 1044 (2007) ("Here, there is no
     admissible evidence establishing that the alleged use of the infringing images actually caused the
28   public to stay at the Resort thereby generating profits for the KSL defendants.").

cases, the allegedly infringing material is only a fraction of a percent of that "back office" software and a far smaller percentage, once the Google search engine and ads codebase are taken into account. The only connection with Google's advertising revenues is the fact that the users conducting searches and generating those profits by clicking on advertisements served by Google's independent advertising technology are doing so on an Android device that has the allegedly infringing Declarations/SSO of the 37 Java SE APIs contained within its operating system. This showing is insufficient as a matter of law to show a causal connection to Google advertising revenues on Android devices. Thus, Malackowski's opinion, which fails to even conduct the requisite causal analysis, should be stricken.

**B.      Malackowski's "apportionment analysis" should be stricken because it is contrary to 17 U.S.C. § 504(b) and long-standing controlling authority.**

In his reply report, Malackowski also impermissibly opines that, based on "the legal theory of commingling," Oracle is entitled to disgorgement of every penny of profits attributable to the Android platform as a whole, regardless of whether or how much of those profits are actually attributable to the fraction of Android code that allegedly infringes. This adds up to ██ ██—100% of Google's Android hardware, app, digital content profits, and ███ of profits from advertisements served on Android devices. Bayley Decl., Ex.G ¶¶ 18, 272 (Malackowski 2/29/16 Rpt.). Malackowski claims—without citing any case law in his report—that the "legal theory of commingling" permits Oracle to claim 100% of the value of all of Android. *Id.* ¶¶ 17-18, 272 ("my apportionment analysis is consistent with the application of the legal theory of commingling and is therefore based on 100% of the value of the Platform Contribution.").[11] Malackowski's apportionment analysis is contrary to governing legal authority, will invite legal error, and should be stricken in its entirety.

---

[11] Malackowski claims that "[c]ommingling occurs when the infringer has mixed the infringing and noninfringing attributes in a way that makes it difficult or impossible to separate out the respective contributions of each to overall profits attributable to the accused work." Bayley Decl. Ex. G ¶ 18 (Malackowski 2/29/16 Rpt.). He justifies the application of this supposed theory "because Google knowingly assumed the risk of its failure to obtain a license and created the scenario whereby the relative contribution of the 37 Java SE APIs [] to the total Platform Contribution are difficult to discern." *Id.* Begging the question of value, Malackowski also describes the Java SE APIs "as a 'gating item' to the Android Platform," meaning that the platform would not have existed without their use. *Id.*

16

DEFENDANT GOOGLE INC.'S MOTION IN LIMINE NO. 6 TO EXCLUDE PORTIONS OF EXPERT REPORT AND TESTIMONY OF JAMES MALACKOWSKI
Case No.  3:10-cv-03561 WHA

1042175.01

*First,* Malackowski's refusal to apportion is contrary to the plain language of 17 U.S.C. § 504(b) itself, as well as Ninth Circuit authority permitting only recovery of the profits that are attributable to the infringement. *See* 17 U.S.C. § 504(b) ("The copyright owner is entitled to recover…any profits of the infringer that are attributable to the infringement."); *Abend v. MCA, Inc.*, 863 F. 2d 1445, 1480 (9th Cir. 1988) ("[Plaintiff] can receive only the profits attributable to the infringement."); *Polar Bear,* 384 F.3d at 708 ("recoverable profits must be 'attributable to infringement.'") (quoting 17 U.S.C. § 504(b)).[12] As discussed above, the Copyright Act provides that, once the plaintiff establishes a causal nexus between the infringement and the defendant's revenue, the burden shifts to the defendant to "prove his or her deductible expenses and the elements of profit attributable to factors other than the copyright work." 17 U.S.C. § 504(b); *Polar Bear,* 384 F.3d at 708-10. Although a plaintiff can forego its own apportionment analysis and simply challenge defendant's apportionment, it cannot advance a specious legal theory that would invite the trier of fact to ignore the statute and not to apportion at all.

*Second,* where, as here, it is clear that much of the value of the Android OS is attributable to elements other than the Declarations/SSO of the Java SE APIs, apportionment in some form or another is ***required***. As the Ninth Circuit explained in *Cream Records, Inc. v. Jos. Schlitz Brewing Co.,* 754 F.2d 826, 828-829 (9th Cir. 1985):

> Although the statute imposes upon the infringer the burden of showing "the elements of profit attributable to factors other than the copyrighted work," 17 U.S.C. § 504(b), nonetheless where it is clear, as it is in this case, that not all of the profits are attributable to the infringing material, the copyright owner is not entitled to recover all of those profits merely because the infringer fails to establish with certainty the portion attributable to the non-infringing elements. "In cases such as this where an infringer's profits are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard ***it is the duty of the court to make some apportionment***."

---

[12] As confirmed in the House Report, "[t]he language of the subsection makes clear that only those profits 'attributable to the infringement' are recoverable; where some of the defendant's profits result from the infringement and other profits are caused by different factors, it will be necessary for the court to make an apportionment." H.R. Rep. No. 94-1476 at 161 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5777.

*Id.* (quoting *Orgel v. Clark Boardman Co.,* 301 F.2d 119, 121 (2d Cir.1962)) (emphasis added)[13];

*accord, Guthy-Renker Corp. v. Bernstein*, 39 Fed. Appx. 584 (9th Cir. 2002); *see also Abend*, 863

F.2d at 1480 (discussing that, in *Sheldon,* Judge Learned Hand  "resolved to avoid the one

certainly unjust course of giving the plaintiffs everything, because the defendants cannot with

certainty compute their own share.") (citing *Sheldon v. Metro-Goldwyn Pictures Corp.,* 106 F.2d

45, 51 (2d Cir. 1939).[14]

For example, in *John G. Danielson v. Winchester-Conant Properties, Inc.,* the First

Circuit reversed the district court for its jury instructions on apportionment, holding that

defendant did not need to show that profits were "wholly separate" and "completely free" of the

infringing architectural plans, and that "it was wrong to state, as did the second instruction, that

apportionment is unavailable where the final product was 'enhanced or allowed or undergirded by

the copyright infringement.'" 322 F.3d 26, 49-50 (1st Cir. 2003). In holding those instructions

inconsistent with both *Sheldon* and *Abend,* the First Circuit expressly rejected plaintiff's argument

that "apportionment is not appropriate because the entire development was 'intertwined' with the

infringed site plans." *Id.*at 50 n.12.

*Third*, again contrary to Malackowski's claim that commingling has excused the need to

apportion, the Ninth Circuit (relying upon Supreme Court's decision in *Sheldon*) has explained

repeatedly that, "[a]s to the amount of profits attributable to the infringing material, 'what is

required is . . . only a reasonable approximation,'" *Cream Records,*764 F. 2d at 829 (9th Cir.

1985) (quoting *Sheldon,* 309 U.S. at 408); *see also Frank Music*, 772 F.2d at 518  ("The district

court was correct that mathematical exactness is not required. However, a reasonable and just

apportionment of profits is required.") (citations omitted); *Polar Bear,* 384 F.3d at 712 (citing

*Cream Records'* quotation of *Sheldon* as requiring only a "reasonable approximation" is

---

[13] As the Second Circuit commented in *Orgel v. Clark Boardman Co.,* 301 F.2d at 121, where the plagiarized portion of the work was 35 percent of the overall work, the very existence of the non-infringing 65 percent "is convincing evidence that some part of the commercial value of the whole is attributable thereto."

[14] Indeed, prior to the enactment of the Copyright Act of 1976, the Supreme Court expressly held that apportionment is appropriate "where it is clear that all profits are not due to the use of the copyrighted material and the evidence is sufficient to provide a fair basis of decision." *Sheldon v. Metro-Goldwyn Pictures Corp.,* 309 U.S. 390, 401-2 (1940).

required); *Abend,* 863 F.2d at 1480 ("We likewise recognize that courts cannot be expected to determine with "mathematical exactness" an apportionment of profits. We require only a "reasonable and just apportionment.").

Malackowski repeatedly admitted at deposition that myriad noninfringing features of the Android platform contribute to the value of the platform and to Google's indirect profits. Karwande Decl., Ex. 6 at 218:24-219:7 (Malackowski Dep. Tr.). Specifically, he admitted that various components, such as the Linux kernel, the Dalvik VM, Android Runtime, phone apps, phone functionality, and the open source business model contributed to the profits from the Android platform. *See id.* at 218:24-225:11; 225:17-228:1; 230:2-13. He further admits that he did no independent analysis to determine to contribution of these components to Google's profits, because it was Google's burden to do so. *Id.* at 222:2-223:1. This is despite the fact that he also testifies that, as a foundational matter, even the commingling theory he espoused requires such an analysis. *Id.* at 343:22-345:24. Instead, he impermissibly seeks to confuse the trier of fact by opining, contrary to the cases cited above, that no further apportionment is possible (even though he did not try) or legally required. *Id.* at 231:19-25; 347:17-348:18 ("And what I concluded is that, no, we cannot because of the commingling. There isn't a way to break those things out."). This opinion should be stricken because it is directly contrary to this controlling authority.

*Finally,* although Malackowski argued in his deposition that the Supreme Court's holding in *Sheldon* requires this supposed approach, that argument—which is baseless in any event—is foreclosed by the 1976 Copyright Act. As discussed by *Nimmer on Copyright,* "[i]t was **formerly** the view that, if the infringing and noninfringing elements could not readily be separated, then plaintiff should recover all profits." 5-14 Nimmer On Copyright, § 14.03, 14-25 (emphasis added) (discussing the former rule in *Callaghan v. Myers*, 128 U.S. 617 (1888) and *Belford, Clarke & Co. v. Scribner,* 144 U.S. 488, 12 S. Ct. 734, 740 (1892)). Far from confirming this rule, *Sheldon* distinguished it, holding that the principle of apportionment from patent cases should also be applied in copyright cases as a matter both of equity and statutory interpretation. *Sheldon,* 309 U.S. at 401-2 (1940) ("We agree with the court below that these cases [*Belford* and *Callaghan*] do not decide that no apportionment of profits can be had where it is clear that all the profits are

DEFENDANT GOOGLE INC.'S MOTION IN LIMINE NO. 6 TO EXCLUDE PORTIONS OF EXPERT REPORT AND TESTIMONY OF JAMES MALACKOWSKI
Case No. 3:10-cv-03561 WHA

1    not due to the use of the copyrighted material, and the evidence is sufficient to provide a fair basis

2    of division so as to give to the copyright proprietor all the profits that can be deemed to have

3    resulted from the use of what belonged to him."). Indeed, Nimmer calls into question whether,

4    after the adoption of the 1976 Act and §504(b), "any vestige of the *Callaghan* rule still

5    survive[s]?" *Id.* As noted by Nimmer, "*Sheldon's* result has now won express adoption in the

6    1976 Act, which allows the defendant to prove (and thereby exclude from recovery) 'the elements

7    of profit attributable to factors other than the copyrighted work.'" 5-14 Nimmer, § 14:03, 14-27.[15]

8          In short, permitting Malackowski to testify to a purported analysis of apportionment that

9    fails to apportion because the infringing and non-infringing material are "commingled" in the

10   Android platform—even though the expert admits that greater than  than 99% of the non-accused

11   code contributes to the those profits and he made no independent attempt to determine how to

12   value that contribution—would erroneously invite the trier of fact to award Oracle a windfall of

13   ███████, in contradiction of Section 504(b) and established Supreme Court and Ninth Circuit

14   authority. *See Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMbH,* 408 F.3d 1374,

15   1380 (Fed. Cir. 2005 (barring expert from providing "testimony on the entire market value rule"

16   that "bore no relation to that rule").

17       **C.    Malackowski's opinion that Oracle's allegedly lost Java *ME* licensing profits
              *resulted from* Google's alleged infringement of the Declarations/SSO of the 37
18            Java *SE* APIs is unduly speculative.**

19         Under 17 U.S.C. § 504(b), "[a] copyright owner is entitled to recover the actual damages

20   suffered by him or her *as a result of the infringement*.]" (emphasis added). "'Actual damages are

21   usually determined by the loss in the fair market value of the copyright, measured by the profits

_____

[15] Moreover, despite Malackowski's repeated invocation of Judge Grewal's decision in *Brocade*, that **decision nowhere refers to the theory of commingling** and, as discussed above, was a direct profits, not indirect profits case. *Brocade,* 2013 WL 831528 *6-7. Since the Copyright Act was amended in 1976, courts have cited *Sheldon's* language concerning "commingling" in this same context to explain the rationale under Section 504(b) for placing the burden on the defendant to apportion the elements of profits attributable to factors other than the copyrighted work. *E.g., Data General Corp. v. Grumman Sys. Support Corp.,* 36 F. 3d 1147, 1176 (1st Cir. 1994) (citing Nimmer for the proposition that "the Copyright Act of 1976 "expressly adopted" the apportionment principle announced in Sheldon" and noting that "[i]n fact, the burden-shifting rule in *Sheldon* (and Section 504(b)) is itself an equitable response to an infringer who has frustrated the task of apportionment by co-mingling profits"); *Gaste v. Kaiserman,* 863 F.2d 1061, 1069-70 (2d Cir. 1988) (citing *Sheldon* in support of Section 504(b) apportionment).

DEFENDANT GOOGLE INC.'S MOTION IN LIMINE NO. 6 TO EXCLUDE PORTIONS OF EXPERT
REPORT AND TESTIMONY OF JAMES MALACKOWSKI
Case No.  3:10-cv-03561 WHA

lost due to the infringement or by the value of the copyrighted work to the infringer.'" *Polar Bear,* 384 F. 3d at 708 (citation omitted); *Jarvis v. K2, Inc.,* 486 F. 3d 526, 533-34 (9th Cir. 2007); *Frank Music*, 772 F.2d at 512 ("'Actual damages' are the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement.'"). As the Ninth Circuit has emphasized, "a causal link between the infringement and the monetary remedy sought is a predicate to the recovery of both actual damages and [infringer's] profits," and it is the plaintiff's burden to establish causation.  *Polar Bear,* 384 F. 3d at 708; *see also Oracle Corp. v. SAP AG,* 765 F. 3d at 1087 ("'[A] plaintiff in a § 504(b) action must establish [a] causal connection' 'between the infringement and the monetary remedy sought.'") (citation omitted).[16] "[T]his requirement is akin to tort principles of causation and damages." *Polar Bear,* 384 F.3d at 708. Moreover, as emphasized by the Ninth Circuit, "[i]n a copyright action, a trial court is entitled to reject a proffered measure of damages if it is too speculative." *Frank Music,* 772 F.2d at 512-13 (district court did not err in finding actual damages uncertain and speculative where plaintiffs offered no disinterested testimony showing that musical revue presenting six minutes of music for "Kismet" precluded plaintiffs from presenting Kismet at some other hotel in Las Vegas); *Polar Bear,* 384 F.3d at 709-10 (holding plaintiff's losses were not of defendant's making, and "mere speculation does not suffice to link the losses to the infringement.").

For the reasons set forth below, Malackowski's opinion that Android's use of the Declarations/SSO of the 37 Java SE APIs caused Oracle to lose $475 million in Java ME licensing profits should be stricken because it is speculative. Malackowski lacks any factual foundation that could support the contention that Oracle's lost licensing revenues for Java ME—a different work that Google is not accused of infringing—are directly attributable to Google's use

---

[16] Notably, Oracle's previous damages expert, Dr. Ian Cockburn, opined (after several reports were stricken) that injury to the market value of the copyrights, based on the hypothetical negotiation, was **$27.7 million** in a lost copyright license fee. *See* Dkt. 816 at 5:15; *see also* 785, 828. Oracle is no longer asserting a hypothetical license theory of damages, presumably because $27.7 million is dwarfed by Malackowski's opinion that harm to the market value of Java SE should be measured by $475 million in lost Java ME profits. Despite the fact that Oracle's prior damages expert offered at least three opinions as to the calculation of the hypothetical license damages for the Declarations/SSO of the 37 Java SE APIs, Malackowski now opines that such an analysis is not possible given the available data. Karwande Decl., Ex. 6 at 11:7-25 (Malackowski Dep. Tr.)].

21

DEFENDANT GOOGLE INC.'S MOTION IN LIMINE NO. 6 TO EXCLUDE PORTIONS OF EXPERT REPORT AND TESTIMONY OF JAMES MALACKOWSKI
Case No.  3:10-cv-03561 WHA

1042175.01

of the Java SE APIs in Android. Even as to Java ME, Malackowski relies on a single 2008 forecast of licensing revenue through 2010 to opine that, but for Google's use of the Declarations/SSO of the 37 Java SE APIs, Sun/Oracle's Java ME licensing revenue would have increased 8.3% year over year through 2015. Bayley Decl., Ex. F ¶¶ 186-193 (Malackowski 1/8/16 Rpt.) The only support for his conclusion that the 2008 forecast accurately measures the likely decline in Java ME licensing revenues caused by Google's use of the Declarations/SSO of the 37 Java SE APIs is a private interview Malackowski conducted with Michael Ringhofer of Oracle. *Id.* n. 397; Karwande Decl., Ex.6 at 274:22-275:20 (Malackowski Dep. Tr.).

### 1. To recover lost profits for a non-infringed work, Oracle must show the "necessary, immediate and direct causal connection" between the alleged infringement and the non-infringed work.

First, in seeking $475 million in lost Java ME license profits, Malackowski simply ignores that Java ME is not the allegedly infringed work in this case. In fact, Java ME does not even contain the entirety of the SSO and declaring code that is the allegedly infringed material here. Java ME has only 10 APIs packages in all—as opposed to 168 from Java SE 5.0—and is missing most of the 37 Java SE API packages whose declaring code makes up the SSO. Bayley Decl. Ex. C (Appendix H to Kemerer 1/8/16 Rpt.) Recovery of lost profits to a non-infringed work may be theoretically permissible in certain cases, but only where the plaintiff "demonstrate[s] by credible evidence a relationship between sales of non-infringed [works] and sales of the infringed [works], and further show[s] which sales were prevented as a result of defendant[']s infringement." *Cohen v. United States*, 100 Fed. Cl. 461, 481-82 (2011) (citation omitted); *Sunset Lamp Corp v. Alsy Corp.,* 749 F. Supp. 520, 521 (S.D.N.Y. 1990). As explained in *Cohen,*

> The requirement [is] that the amount of damages allegedly suffered by the plaintiff bear a 'necessary, immediate and direct causal connection' to the infringement . . . Furthermore, [plaintiff] will need to show that amount specifically rather than rely on speculation. If there is no evidence to establish the amount of such damages, proof merely that there were such damages will not support an award. Proving that lost profits on non-infringed works are 'directly attributable' to the defendant's infringement of another work is 'difficult, but not inconceivable.' Evidence of lost customers is used to determine whether the plaintiff established the requisite causation to recover actual damages.

*Id.* at 481-82 (citations omitted); *see also Sunset Lamp,* 749 F. Supp. at 525 (requiring plaintiff to show which sales were prevented as a result of defendant's infringement, for example, by

testimony from a purchaser that it canceled an order for non-infringing items when it became aware that defendant produced the infringing lamp).

Ultimately, in *Cohen,* the court held that the plaintiff had failed to show that sales of his non-infringed works were prevented as a result of defendant's infringement where the plaintiff's expert opined that the works were derivative of each other and then, rather than setting forth any evidence of causation, concluded that "any finding that the infringement caused lost sales on infringed works necessarily implies losses to the non-infringed works." *Cohen,* 100 Fed. Cl. at 482. "These conclusory statements – resting on assumptions and containing no evidence of causation – [were] insufficient to defeat summary judgment." *Id.; see also Sunset Lamp,* 749 F. Supp. at 524-25 ("[p]laintiff will have to demonstrate by credible evidence a relationship between sales of non-infringed items and sales of the infringed floor lamp, and further show which sales were prevented as a result of defendants' infringement."). Here, Malackowski does not cite any facts that could establish such a "necessary, immediate and direct causal connection" between Google's use of the Declarations/SSO of the 37 Java SE APIs and Oracle's failure to meet a single internal projection for Java ME licensing revenues.

### 2. Malackowski relies on a single speculative revenue projection from 2008 rather than concrete evidence of lost sales.

Malackowski quantifies the supposed lost revenues based entirely on a single, speculative 2008 Sun projection of Java ME licensing revenue through 2010. Because Sun forecasted in this one document that Java ME licensing would see 8.3% revenue growth from 2009 to 2010, Malackowski opines that Java ME revenues would have continued to grow at this same rate through 2015. Bayley Decl., Ex. G at Ex. 12.3 (Malackowski 2/29/16 Rpt). Malackowski never presents specific, concrete evidence of alleged lost customers or deals, even though Oracle's witnesses testified speculatively about (very few) such examples. He gives short shrift to alternative explanations for a decline in Java ME licensing revenue, such as the global 2008-09 recession, the sky-rocketing growth of the smartphone as opposed to feature phone market, or Oracle/Sun's release of OpenJDK in 2007. Each of these events would have negatively impacted Sun's Java ME license revenues even if Android had never existed. And, Malackowski's

assumption that Oracle's failure to achieve the 8.3% revenue projection was caused by Android alone is contradicted by Oracle's own economist, Dr. Jaffe, who testified that the market was highly uncertain and difficult to model because of the complex and volatile nature of a market in transition. Karwande Decl., Ex. 2 at 105:17-108:10 (Jaffe Dep. Tr.). Oracle's contradictory expert opinions underscore the unreliability of Malackowski's assumptions.

Courts routinely exclude damages calculations based on forecasts or revenue projections, rather than concrete evidence, to support damages. *See, e.g., Zenith Elecs. Corp. v. WH-TV Broad. Corp.,* 395 F. 3d 416, 420 (7th Cir. 2005) (rejecting a party's "internal projections, which rest on its say-so rather than statistical analysis" as a basis for damages claim); *TK-7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732-33 (10th Cir. 1993) (rejecting damages expert opinion that "failed to demonstrate any basis for concluding that another individuals' opinion on a subjective financial prediction was reliable"); *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.,* 249 F. Supp. 2d 622, 695 (E.D. Pa. 2003), *amended* 268 F. Supp. 2d 448 (rejecting damages expert's reliance on projection by plaintiff, who had incentive to inflate predicted financial success). In addition, Malackowski's reliance on a single 2008 projection is particularly problematic given that he could have analyzed actual lost customers and sales (if any exist), as well as market events that in fact impacted Oracle's Java ME license revenues. *See, Oracle v. SAP*, 765 F. 3d at 1089-90 (rejecting Oracle's reliance in hypothetical negotiation analysis on infringer's $900–million internal projection of what it "hoped it could achieve over three years" where in fact customers defendant attracted were only a fraction of those projected).

Malackowski does nothing to analyze the plausibility of the single 2008 Sun forecast that forms the basis of his opinion. Instead, he relies on an interview with, and the deposition testimony of, Michael Ringhofer, stating that his opinion is consistent with Ringhofer's belief ███████████████████████████████████████████ Bayley Decl., Ex. F ¶¶ 191, 193 (Malackowski 1/8/16 Rpt.). In his opening report, Malackowski cites to Ringhofer's testimony that Oracle believed that it lost ██████████████████ ████████████████████████████████ Karwande Decl., Ex. 9 at 38:13-39:22, 69:12-70:1 (Ringhofer Dep. Tr.).. In his reply report, Malackowski points to purported

24

DEFENDANT GOOGLE INC.'S MOTION IN LIMINE NO. 6 TO EXCLUDE PORTIONS OF EXPERT
REPORT AND TESTIMONY OF JAMES MALACKOWSKI
Case No.  3:10-cv-03561 WHA

1042175.01

evidence that ██████████████████████ had decreased their investment in Java in favor of Android. Bayley Decl. Ex.G ¶ 173 (Malackowski 2/29/16 Rpt.). But these citations are window dressing. Malackowski nowhere analyzes these particular deals to determine their monetary impact, whether they support or disprove the Sun projection, or whether they were caused by Android (or the use of the Java SE APIs in Android), as opposed to other market factors, such as the consumer shift from feature phones to smartphones. Malackowski never even establishes that these supposed lost deals involved Java ME, as opposed to ████████████ in some general sense. Karwande Decl., Ex. 6 at 327:15-328-6 (Malackowski Dep. Tr.). Malackowski also fails to consider Sun/Oracle records showing that Java ME was failing due to fragmentation and lack of support by Oracle. Karwande Decl., Ex. 10 (Barr Dep. Ex. 1371) (█ ██████████████████████████████████████████████████████████ ██████████████████████); Ex. 11 at 162:19-163:7 (Stahl Dep. Tr.). Thus, Malackowski's opinion is unduly speculative and not tied to the facts he purportedly opines on, and should be stricken.

### D. Malackowski's admitted speculation concerning Oracle's lost profits from its failure to launch a Java based mobile operating system should be stricken.

Malackowski further opines that Android had a negative impact on Sun's ability to launch project Acadia, Sun's effort to develop its own Java/Linux mobile operating system for a smartphone based on its acquisition of SavaJe in April 2007 for $13 million. Bayley Decl., Ex. F ¶¶ 204-214 (Malackowski 1/8/16 Rpt.).[17] Malackowski admits that "[t]he amount of losses attributable to the loss of the Acadia platform is very difficult to quantify since the product never achieved distribution agreements nor launched." *Id.* ¶ 215. Not only does Malackowski offer no analysis of the supposed lost profits from Sun's failed venture, but Dr. Jaffe, having analyzed supposed market harm suffered by Oracle, testified that he had no idea whether SavaJe would have been successful in the absence of Android. Karwande Decl., Ex.2 at 185:5-8 (Jaffe Dep. Tr.).

---

[17] Although Google disputes Malackowski's characterization of the reasons for Acadia's failure to launch, Google does not challenge these paragraphs of Malackowski's report in this motion.

1    Nevertheless, without any factual support, Malackowski opines that "[he] believe[s] that

2    Sun and later Oracle's actual losses attributable to the lost Acadia opportunity could be quite

3    significant, and potentially best measured by the apportioned Android profits attributable to the

4    Infringed Java Copyrights." Bayley Decl., Ex. F ¶ 217 (Malackowski 1/8/16 Rpt.). This is 100%

5    speculation and inadmissible under *Daubert.* To be admissible, expert testimony must "connote[]

6    more that subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590. In this

7    instance, Malackowski expressly concedes that this "opinion" is an unquantified hunch based on

8    subjective belief and speculation. Bayley Decl., Ex. F ¶ 217 (Malackowski 1/8/16 Rpt.) ("actual

9    losses attributable to the lost Acadia opportunity *could be* quite significant, and, *potentially* best

10   measured by the apportioned Android profits attributable to the Infringed Java

11   Copyrights.").(emphasis added). Courts, including the Ninth Circuit, consistently reject theories

12   of recovery of lost profits for failed business efforts in new unproven lines of business—like

13   Sun's failed effort to develop a full stack smartphone operating system. *Polar Bear,* 384 F. 3d at

14   710 ("It is too speculative to say that Timex's failure to pay a modest license fee was the cause of

15   Polar Bear's business failure."); *TAS Distrib. Co. v. Cummins Engine Co.,* 491 F.3d 625, 633 (7th

16   Cir. 2007) ("as a general rule, expected profits of a new commercial business" or new product

17   lines "are considered too uncertain, speculative and remote to permit recovery"); *see also*

18   *MindGames, Inc. v. Western Pub. Co.,* 218 F.3d 652, 658 (7th Cir. 2000) ("Damages must be

19   proved, and not just dreamed"), *cert. denied,* 531 U.S. 1126, 121 S. Ct. 882 (2001). The notion

20   that Google prevented Oracle from developing its own Android is based on no evidence and is a

21   transparent attempt to trick the jury into awarding billions of dollars in disgorgement in the guise

22   of lost profits.

                                                    KEKER & VAN NEST LLP
23   Dated:  March 23, 2016

24                                          By:    */s/ Robert A. Van Nest*
25                                                 ROBERT A. VAN NEST
                                                   CHRISTA M. ANDERSON
26                                                 DANIEL PURCELL

27                                                 Attorneys for Defendant
                                                   GOOGLE INC.
28

DEFENDANT GOOGLE INC.'S MOTION IN LIMINE NO. 6 TO EXCLUDE PORTIONS OF EXPERT
REPORT AND TESTIMONY OF JAMES MALACKOWSKI
Case No.  3:10-cv-03561 WHA