KEKER & VAN NEST LLP
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
CHRISTA M. ANDERSON - # 184325
canderson@kvn.com
DANIEL PURCELL - # 191424
dpurcell@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    (415) 391-5400
Facsimile:    (415) 397-7188

KING & SPALDING  LLP
BRUCE W. BABER (pro hac vice)
bbaber@kslaw.com
1185 Avenue of the Americas
New York, NY 10036
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>             Plaintiffs,<br><br>     v.<br><br>GOOGLE INC.,<br><br>             Defendant. | Case No.  3:10-cv-03561 WHA<br><br>**GOOGLE'S OPPOSITION TO MOTION IN LIMINE # 5 TO EXCLUDE GOOGLE'S SURVEY EXPERT DR. SIMONSON**<br><br>Hearing:    April 27, 2016<br>Time:       8:00 a.m.<br>Dept.       Courtroom 8, 19th Fl.<br>Judge:      Hon. William Alsup |

## I. INTRODUCTION

Dr. Itamar Simonson's survey results directly address and refute the causation theory that is the sole basis of Oracle's claim for disgorgement of Google's Android-related profits. Oracle contends that Google made money on Android because it was able to attract application developers to the platform by using the declarations and structure, sequence, and organization of 37 Java SE API packages (the "declarations/SSO"). Oracle has no empirical evidence that this actually happened. The survey proves the opposite—that developers choose to develop for mobile platforms with a significant user base that offers developers the opportunity to make more profit—not because the developers are familiar with a programming language or its APIs.

Oracle has no legitimate basis to exclude this evidence, so it misconstrues Dr. Simonson's survey results and cherry-picks internal Google predictions from months or even years prior to Android's release to claim (wrongly) that the record facts contradict the survey results (they do not) and to concoct an artificial litigation construct—"the critical 2007-2009 window"—to "test" the relevance of Dr. Simonson's survey. But the relevant question here is not what Google predicted *might* happen upon Android's release, but what actually *did* happen. Oracle also improperly conflates these documents' discussion of, e.g., Android's indisputably permissible "support of Java programming language" with the alleged infringement of declarations/SSO from 37 Java SE APIs that is at issue in this case.

The relevant record evidence from after Android's release is entirely consistent with the survey results—in particular the fact that the growth of apps on Android followed consumer adoption of the platform rather than vice versa. There is no evidence to suggest that motivations of application developers have changed over time. Oracle is free to raise that issue on cross-examination, but it is no basis for excluding probative expert testimony that will assist the trier of fact. Oracle even went so far as retaining an expert of its own, Dr. Olivier Toubia, to attack Dr. Simonson's study on methodological grounds. But Dr. Toubia's methodological criticisms are contradicted by the very same authorities he relies on in forming his opinions. Oracle's Motion in Limine #5 should be denied.[1]

---

[1] Google does not intend to offer Dr. Simonson as a witness as part of its case-in-chief during the Fair Use phase of the trial, and thus does not address Oracle's argument on that point.

## II. DR. SIMONSON'S SURVEY MEASURES THE ACTUAL MOTIVATIONS OF APPLICATION DEVELOPERS AGAINST ORACLE'S THEORY OF DAMAGES

Oracle asserts that Dr. Simonson's survey was trying to test "what drove developers to develop apps for Android before Android was popular." Oracle's MIL #5 at 3 (citing Simonson Rpt. ¶ 14). Not so. As Dr. Simonson explains, his survey tests Oracle's theory that "a primary driver of developers' decisions to develop Android applications, *and the resulting popularity of Android*, was the developers' prior familiarity with the Java programming language." ECF 1563-10 (Simonson Rpt. ¶ 14). Dr. Simonson tested Oracle's hypothesis that developers flocked to Android because of their prior familiarity with the Java programming language, and in doing so drove the popularity of Android. His survey measures the factors that motivate a developers' decision to develop for a mobile platform, the factors that led developers to develop for Android, and developers' willingness and ability to learn a new programming language to meet user demand, among other things. ECF 1563-10 (Simonson Rpt. ¶ 11).

Oracle points to a few Google internal business strategy documents from 2006 through 2008, the year the first Android-based phone was released, where certain Google employees speculate that the use of "the Java programming language" in the Android platform would attract developers. Based on nothing more, Oracle argues that it must be true that those predictions were right, and that it was specifically the declarations/SSO (which were never mentioned in Google's documents) that brought developers to Android, creating a multitude of apps which caused Android's success. Oracle offers no evidence that any of the links in its asserted causal chain actually came to pass. Instead, it falls back on rhetoric, accusing Google of "rewriting history." But Oracle is wrong that certain, cherry-picked, Google business strategy documents are a reliable measure of knowable "reality" occurring several years later.[2] Moreover, none of the documents Oracle cites refer to the declarations/SSO, and two of the four relate to early

---

[2] Oracle also takes Dr. Simonson's opinions from other expert reports out of context. In *Fox Broadcasting Co. v. DISH Network L.L.C.*, No. 2:12-cv-04529 (C.D. Cal. Sept. 19, 2014), Dr. Simonson analyzed a survey that found that TV viewers would not use a new Dish Network feature that allowed them to skip all commercials with one click as opposed to fast-forwarding. Dr. Simonson noted that this finding went against common sense, and that Dish itself did not implement the feature in markets where it benefitted and sold advertisements. *See* Simonson *Dish* Decl. ¶¶ 11, 21, 43. Here, there is no established causal link between the familiarity of language and developers' motivations – instead that is what the survey seeks to test.

Sun/Google partnership discussions regarding myriad things that were never actually used in Android, including Sun's Java Virtual Machine and implementing code.

The actual history is on Google's side, not Oracle's. From 2007-2009, the number of applications on Android did not increase significantly, as would be expected if developers were in fact motivated by familiarity with the Java programming language (which still would not be linked to the accused declarations/SSO). At the end of 2009 there were only 16,000 applications, in total, available on the Android Market (now the Google Play Store), compared to the 1.6 million applications now available.[3] It was not until the popularity of Android-based phones took off in early 2010, following the release of the Motorola Droid and HTC Nexus One phones, that the number of Android applications increased significantly, reaching 89,000 apps by the end of 2010. *See* Mullen Decl., Ex., 26 (Rutledge 12/9/15 Dep. 77:17-23); ECF 1563-7 (Leonard 3/10/16 Rpt. ¶¶ 166-68, Ex. 2g & 2h); ECF 1564-6 (Malackowski 1/8/16 Rpt. ¶ 258). Even according to Oracle's expert, James Malackowski, the Android Market only achieved "critical mass" at the end of 2010—three years after the release of Android—a conclusion that is again consistent with application developers following users. *See* ECF 1564-6 (Malackowski 1/8/16 Rpt. ¶ 258 (quoting Q4 2010 Google Android Operating Committee Quarterly Review stating that Android Market had achieved "critical mass")).[4]

Dr. Simonson's survey results are perfectly consistent with the real-world decisions of actual application developers, internal Google documents after the first Android-based phone's release, common sense, and other non-Google, not-created for litigation, studies of application developers' decision making. ECF 1563-10 (Simonson Rpt. ¶ 13); Mullen Decl., Ex. 27 (VisionMobile, *Mobile Developer Economics 2010 and Beyond*, p. 13 (July 2010)). Nevertheless, Oracle still argues—without any evidence—that the survey itself must be flawed as

---

[3] *See* ECF 1564-6 (Malackowski 1/8/16 Rpt. ¶ 149, Mullen Decl., Ex. 25 (Simonson Dep. 164:8-24); Statista, "Number of Apps Available in Leading App Stores as of July 2015, http://www.statista.com/statistics/276623/number-of-apps-available-in-leading-app-stores/.

[4] Other internal Google documents also demonstrate that Google recognized after Android's release that users and potential profit drove application development rather than vice versa. For example, the internal Google business strategy "value monetization cycles" that Mr. Malackowski and another Oracle expert, Dr. Adam Jaffe, rely on in fact demonstrate that by at least 2010, Google realized that it would need to "sell lots of [Android] devices" in order to "attract developers." *See* ECF 1564-1 (Jaffe 2/8/2016 Rpt., ¶¶ 156-57 Figures 33 and 34).

it does not recreate the marketplace predicted by certain Google's internal documents.  This is circular logic that ignores the facts.

### A. The 2007-2009 "window" of relevance is an artificial construct and there is no evidence that motivations of app developers have changed over time.

The relevance of the "2007-2009" time period is a construct of Oracle's litigation strategy. *See* Mullen Decl., Ex. 28 (Toubia Dep. 74:15-24 ("■■■■"); 75:9-76:17).  Although Oracle's other experts, Dr. Jaffe and Mr. Malackowski, repeatedly refer to a "mobile window of opportunity" neither of them ever define the time period for this so-called "window."  *See* ECF 1564-6 (Malackowski 1/8/16 Rpt. ¶¶ 20, 120, 126, 174-175, 215, 231, 241-42); 1560-9 (Jaffe 2/8/16 Rep. ¶¶ 21, 134 (Figure 26), 196, 439, 445); ECF 1563-7 (Leonard 3/10/16 Rpt. ¶ 165).

This lawyer-created "window" is irrelevant here, where Oracle offers ***no evidence*** that the motivations of application developers have changed over time.  Dr. Toubia's criticism of Dr. Simonson's failure to recreate the appropriate "historical context" depends on his spoon-fed conclusion that Oracle's other experts "have documented in their reports the extent to which developers faced unique circumstances at the time of Android's release." ECF 1563-12 (Toubia Rpt. ¶ 27; *see also* ¶ 29).  Dr. Jaffe's and Mr. Malackowski's conclusions, in turn, depend on internal Google documents speculating that using the Java language would attract developers.  *Id.* (Toubia Rep. ¶ 27 (citing Malackowski 1/8/16 Rpt. ¶ 224, which cites an 2005 internal Google presentation)).  But it is precisely this relationship that Dr. Simonson's survey was designed to, and did, test.

Moreover, Dr. Toubia cannot vouch for any methodologically sound way to recreate the "historical context" of 2007-2009 in a survey.  At deposition, he had ■■■■ Mullen Decl., Ex. 28 (Toubia Dep. 82:3-23).  In fact, as Dr. Simonson concluded, where (as here) there is no evidence that the specific market environment affects decision-makers, there is no need to recreate the specific

market environment.[5]

Moreover, Dr. Simonson's survey did in fact include application developers who had chosen to develop for Android during the 2007-2009 time period, finding that these survey respondents were *no more likely* than any other survey respondent to list familiarity with the programming language as a factor that influenced their decision to develop for Android.  ECF 1563-10 (Simonson Rpt. ¶¶ 43-46); Mullen Decl., Ex. 25 (Simonson Dep. 83:25-84:22, 163:6-15, 167:25-169:10).  For all these reasons, there also is no need to limit the respondents to only those who had chosen to develop for Android during the 2007-2009 period.[6]

Dr. Toubia discards this data because he believes application developers are unlikely to be able to recall these decisions from 2007-2009.  But Dr. Toubia ignores what is actually being tested.  As Dr. Simonson explains, the decision to develop for a new mobile platform is a "high-involvement" business decision and these types of decisions are not as likely to suffer from untestable problems of recall as other types of decisions may be.  Mullen Decl., Ex. 25 (Simonson Dep. 124: 10-15; 126:11-15; 163:20-24).  Indeed, the very articles that Dr. Toubia relies on confirm Dr. Simonson's methodology and reject Oracle's position.  In particular, Dr. Toubia, relies on academic literature describing the problems associated with recalling quantitative *"autobiographical"* information, such as how many times a person has visited the dentist in the past year or the alumni memory for the streets of a college town.[7]  These articles discuss the

---

[5] For example, as Dr. Simonson has pointed out in expert reports for other matters, that in the context of trademark confusion and dilution, it is very important to mirror marketplace conditions.  *See* Dr. Itamar Simonson Expert Report, *Safe Auto Ins. Co. v. State Automobile Mut. Ins. Co.*, No. 2:07-cv-1121 (S.D. Oh. Oct. 27, 2008), at ¶ 11, 2008 Misc. Filings LEXIS 8685 (likelihood of confusion survey); Dr. Simonson Expert Report, *Larin Corp. v. Alltrade, Inc.*, No. EDCV 06-1394 (C. D. Cal. Feb 15, 2008), at ¶ 13, 2008 Misc. Filings LEXIS 4724 (trademark confusion).

[6] Dr. Simonson's survey uses standard methodology by including within the survey pool any developer who makes or influences the decision to develop for Android.  In order to test how decision-makers make decisions, it is appropriate to include within the survey both those who decide and those who influence the decision.  Oracle's criticism is baseless and not supported by any authority.

[7] ECF 1563-12 (Toubia Rpt. ¶¶ 21, 25).  Dr. Toubia relies on two articles discussing the limits of recall on *autobiographical detail*.  *See id.* at ¶ 21 (citing Mullen Decl., Ex. 29 (Norman M. Bradburn, Lance J. Rips, and Steven K. Shevell, "Answering Autobiographical Questions: The Impact of Memory and Inference on Surveys," *Science*, New Series, Vol. 236, No. 4798, 1987, p. 158)); ¶ 25 (citing Mullen Decl., Ex. 30 (Roger Tourangeau, Lance J. Rips, and Kenneth

limits of a respondents' ability to recall past events, such as the content of a conversation, receiving a vaccination, or when a respondent first experienced back pain – not the ability for a respondent to recall motivations for making important business decisions. Tellingly, unlike Dr. Simonson, Dr. Toubia has never published any articles regarding recall, and also does not consider himself to have any special expertise in that area. Mullen Decl., Ex. 28 (Toubia Dep. 134:21-135:3).

Finally, Dr. Simonson correctly concludes that the fact that 62% of answers fall under the coding category of "User base/Market share/Demand/Popularity/ROI" shows that user demand and other related economic considerations are the primary factors driving most developers' decisions. ECF 1563-10 (Simonson Rpt. ¶ 40). Oracle suggests that the fact that *one* respondent listed Return on Investment ("ROI") as the first factor influencing his or her decision, *two* respondents listed ROI as the second factor, and *three* respondents listed ROI as a factor, suggests that these respondents care about costs to a developer and therefore familiarity with a programming language was a significant factor in developers' decisions. *Id.* (Simonson Rpt., Ex. F Table 4 at 4, 9, 13). This is fodder for cross-examination if anything, but it is baseless: it is clear from the survey results that majority of respondents gave answers that fall under the category of "size of user base," while some also gave answers that can be categorized as related economic considerations. *Id.* In total, ROI was a significant factor for at most *six* respondents. Dr. Simonson correctly analyzed the survey results.

### III. DR. SIMONSON'S SURVEY METHODOLOGY IS SOUND AND SUPPORTED BY THE VERY AUTHORITIES THAT ORACLE'S EXPERT RELIES ON IN HIS CRITICISM

*First: a control group was not necessary because Dr. Simonson was not testing a stimulus*: A control group is not necessary for every type of survey. *See* Mullen Decl., Ex. 25 (Simonson Dep. 98:12-99:19). To exclude Dr. Simonson's survey, Oracle relies on case law and literature primarily addressing **trademark consumer confusion surveys** that do not apply here.[8]

---

Rasinski, The Psychology of Survey Response, Cambridge University Press: 2000) (focusing on "memory for biographical facts" and noting that individuals are less likely to "forget important events than unimportant ones" (p. 92))).

[8] *See* Mullen Decl., Ex. 32 (Shari Diamond, Reference Guide on Survey Research, in *Reference Manual on Scientific Evidence* at 397-98 (discussing methodology for trademark consumer

6
OPPOSITION TO ORACLE'S MIL #5
Case No. 3:10-cv-03561 WHA

1047939.01

When testing a causal proposition, such as consumer confusion or deceptive advertising, a control group is necessary because the experiment seeks to measure the impact of a stimulus. Without the control group, the survey would not measure how much of the reaction is based on the stimulus, and how much is based on respondents' pre-existing beliefs. Diamond, *Reference Guide* at 398. A control group is also necessary when the survey asks respondents leading questions. Mullen Decl., Ex. 25 (Simonson Dep. 99:3-12). Here, Dr. Simonson was not testing impact of a stimulus, and asked open-ended, non-leading survey questions: no control was needed. *See id.* at 99:16-19.

***Second, the inclusion of pre-test results is proper, and even if these results were removed the results would not change*:** Dr. Simonson also followed established research protocol by including the pretest results in his final survey. As the very authority that Oracle relies on indicates, exclusion of pretest results is usually only necessary when a question is significantly modified or changed in the final survey. *See* ECF 1563-12 (Toubia Rpt., ¶ 62 (citing Mullen Decl., Ex. 31 Erin E. Ruel, William E. Wagner, and Brian J. Gillespie, *The Practice of Survey Research: Theory and Applications*, SAGE Publications, Inc., 2016, p. 117 (explaining how an ambiguous question in the pretest may be clarified in the full survey and thus render the pre-test survey results inaccurate)). Here, Dr. Simonson made only minor, cosmetic edits to survey, and thus it was appropriate to include the pre-test survey respondents. Even if these pre-test respondents were excluded, there would be no statistically significant change in the results of the survey.

## IV.    CONCLUSION

Dr. Simonson's report and testimony is relevant and reliable. Oracle's motion to exclude Dr. Simonson's testimony and report should be denied.

---

confusion and deceptive advertising surveys)); MIL # 5 at 6 (citing *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 877-78(C.D. Cal. 2013) (impact of photograph on consumer behavior); *CytoSport, Inc. v. Vital Pharm., Inc.*, 894 F. Supp. 2d 1285, 1291 (E.D. Cal. 2012) (trademark consumer survey); *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1257-58 (S.D. Cal. 2013) (trade dress confusion survey)).

| | |
|---|---|
| Dated: April 6, 2016 | KEKER & VAN NEST LLP |
| | By: /s/ Robert A. Van Nest |
| | ROBERT A. VAN NEST |
| | CHRISTA M. ANDERSON |
| | DANIEL PURCELL |
| | |
| | Attorneys for Defendant |
| | GOOGLE INC. |