ORRICK, HERRINGTON & SUTCLIFFE LLP
KAREN G. JOHNSON-MCKEWAN (SBN 121570)
kjohnson-mckewan@orrick.com
ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
GABRIEL M. RAMSEY (SBN 209218)
gramsey@orrick.com
405 Howard Street, San Francisco, CA  94105
Tel: 1.415.773.5700 / Fax: 1.415.773.5759
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
51 West 52nd Street, New York, NY  10019
Tel: 1.212.506.5000 / Fax: 1.212.506.5151

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (*pro hac vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY  10504
Tel: 1.914.749.8200 / Fax: 1.914.749.8300
STEVEN C. HOLTZMAN (SBN 144177)
sholtzman@bsfllp.com
1999 Harrison St., Ste. 900, Oakland, CA  94612
Tel: 1.510.874.1000 / Fax: 1.510.874.1460

ORACLE CORPORATION
DORIAN DALEY (SBN 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (SBN 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (SBN 211600)
matthew.sarboraria@oracle.com
RUCHIKA AGRAWAL (SBN 246058)
ruchika.agrawal@oracle.com
500 Oracle Parkway,
Redwood City, CA 94065
Tel: 650.506.5200 / Fax: 650.506.7117

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC., | Case No. CV 10-03561 WHA |
| Plaintiff, | **ORACLE'S OPPOSITION TO GOOGLE'S MOTION IN LIMINE #1 RE: PROF. CHRIS F. KEMERER** |
| v. | |
| GOOGLE INC., | Date:  April 27, 2016, at 8:00 am |
| Defendant. | Dept.: Courtroom 8, 19th Floor<br>Judge: Honorable William H. Alsup |

1

**TABLE OF CONTENTS**

2
**Page**

3
TABLE OF AUTHORITIES ................................................................................................... ii

4
**INTRODUCTION** ...................................................................................................................1

**BACKGROUND** ....................................................................................................................2
5

**ARGUMENT** .........................................................................................................................4
6

I.      PROF. KEMERER'S OPINIONS ARE RELIABLE AND ADMISSIBLE ...........................4
7

8          A.   Experts Are Permitted To Rely On Assistants And Data Collectors ................................. 5

9          B.   Prof. Kemerer's Support Staff Collected Data, But Conducted No Analysis...................... 6

10          C.   Google Does Not Claim The Programs Or Data Are Incorrect Or Unreliable ................... 6

11          D.   Google Grossly Mischaracterizes Prof. Kemerer's Testimony........................................... 7
II.     PROF. KEMERER USES THE FEDERAL CIRCUIT'S DEFINITION OF "API"..............9
12

**CONCLUSION** .....................................................................................................................10
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #1 RE: PROF. CHRIS F. KEMERER

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
5
    285 F.3d 609 (7th Cir. 2002)...............................................................................................5

6

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
    252 F. Supp. 2d 1005 (C.D. Cal. 2003)...............................................................................5
7

*McReynolds v. Sodexho Marriott Servs., Inc.*,
8
    349 F. Supp. 2d 30 (D.D.C. 2004) ...................................................................................5, 7

9

*Monsanto Co. v. David*,
    516 F.3d 1009 (Fed. Cir. 2008)........................................................................................5, 7
10

*Network Prot. Sciences, LLC v. Fortinet, Inc.*,
11
    No. C 12-01106 WHA, 2013 WL 5402089 (N.D. Cal. Sept. 26, 2013) ...................................9

12

*Oracle Am., Inc. v. Google Inc.*,
13
    750 F.3d 1339 (Fed. Cir. 2014)......................................................................................1, 10

14

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997)..............................................................................................5
15

*Sugar Ass'n v. McNeil-PPC, Inc.*,
16
    No. CV 04-10077 DSF, 2007 WL 5674020 (C.D. Cal. Dec. 19, 2007) ...................................5

17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
18
    2013 WL 124347 (N.D. Cal. Jan. 8, 2013) ...........................................................................6

19

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    No. C 04-02123 WHA, 2008 WL 2323856 (N.D. Cal. May 22, 2008)....................................8
20

*Tietsworth v. Sears, Roebuck & Co.*,
21
    No. 5:09-cv-00288-JF, 2012 WL 1595112 (N.D. Cal. May 4, 2012)......................................7

22

**Rules**

23

Fed. R. Evid. 702 ....................................................................................................................5
24

Fed. R. Evid. 703 ....................................................................................................................5
25

**Other Authorities**

26

Kemerer, et al., *Standards Competition in the Presence of Digital Conversion*
27
    *Technology*, MIS Quarterly, Vol 36, No. 3............................................................................7

28

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #1 RE: PROF. CHRIS F. KEMERER

1

**INTRODUCTION**

2        Oracle retained Prof. Kemerer, in part, to quantify how important the 37 Java API pack-

3   ages Google copied are to the Java and Android platforms.  ECF 1560-10 (Kemerer Op. Rpt.) ¶ 1;

4   ECF 1560-11 (Kemerer 2d Rpt.) ¶ 1.[1]  Prof. Kemerer conducts four primary analyses.  First, he

5   examines evidence of the smartphone market to opine about the business advantages Google

6   hoped to gain (and did gain) from copying Java.  Kemerer Op. Rpt. ¶¶ 61-94; Kemerer 2d Rpt. ¶¶

7   106-117.  Second, he examines use of the copied API packages by popular apps and opines that

8   they are a critical requirement.  Kemerer Op. Rpt. ¶¶ 126-140.  Third, he quantifies the relative

9   stability of Java and Android (i.e., lack of modifications to their APIs) and opines that the copied

10  API packages gave Android greater stability earlier, attracting developers to write apps, which at-

11  tracted users, who attracted more developers.  *Id.* ¶¶ 96-125; Kemerer 2d Rpt. ¶¶ 78-105.  Finally,

12  he assesses the centrality of the copied classes by comparing how often they are called upon by

13  other classes as compared to noncopied classes, and opines that the copied classes play a highly

14  valuable role in Java and Android.  Kemerer Op. Rpt. ¶¶ 141-157; Kemerer 2d Rpt. ¶¶ 28-51.

15       Google's only critique of Prof. Kemerer's opinions is that certain processes used to gather

16  data for his stability and centrality analyses were conducted by assistants using automated soft-

17  ware.  Notably, Google does not claim that those processes are flawed or that the data are incor-

18  rect.  Rather, Google argues that because Prof. Kemerer (who designed and supervised all data

19  collection processes) did not collect the data personally, his entire stability and centrality analyses

20  must be excluded.  But the processes Prof. Kemerer used to collect data and conduct his analyses

21  are well within the standards set by the Federal Rules of Evidence and *Daubert* and its progeny.

22       Google's only other complaint is with Prof. Kemerer's use of the term "API" to include

23  both declaring and implementing code.  This is nothing more than Google attempting to undo the

24  Federal Circuit's express holding that the Java API packages include both "(1) declaring code;

25  and (2) implementing code."  *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1349 (Fed. Cir.

26  2014).  Google's motion lacks merit, and should be denied.

27

28  [1] Op. Rpt. and 2d Rpt. refer to Prof. Kemerer's Jan. 8, 2016 and Feb. 8, 2016 reports unless noted.
    Citations to "Ex. __" refer to exhibits to the Silverman declaration filed concurrently with this
    brief.

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
                                    IN LIMINE #1 RE: PROF. CHRIS F. KEMERER

1

# BACKGROUND

2       Prof. Kemerer has 30 years' experience teaching and conducting research regarding

3  software measurement and metrics and the economics of software at institutions such as MIT.  He

4  is currently jointly appointed at the Katz Graduate School of Business (in Information Systems)

5  and the School of Information Sciences at the University of Pittsburgh, and serves as a professor

6  of Software Engineering at Carnegie Mellon University.  Prof. Kemerer has served in senior edi-

7  torial positions for leading peer-reviewed journals, including Information Systems Research, MIS

8  Quarterly, and The Institute of Electrical and Electronics Engineers' Transactions on Software

9  Engineering.  Prof. Kemerer has extensive experience supervising software projects in the private

10  sector; he even edited a book on it.  Kemerer Op. Rpt. Ex. B; *id.* p. 79 (*Software Project Man-*

11  *agement: Readings & Cases* (ed.)).  Prof. Kemerer opines based on four main analyses:

12       1.  <u>The Business Advantages of Copying Java</u>.  Applying his expertise in software mar-

13  kets and economics, Prof. Kemerer studied Google's contemporaneous statements and other evi-

14  dence of the market prior to and at the time Google released Android.  He concluded that Google

15  sought and obtained significant market advantages by copying the Java API packages because it

16  benefitted from Java's popularity, large developer base, and wide industry acceptance and suc-

17  cess.  Kemerer Op. Rpt. ¶¶ 61-94.  Google does not seek to exclude these opinions.

18       2.  <u>App Dependency</u>.  Prof. Kemerer reverse engineered 100 of the most popular Android

19  apps and found they each depend on (i.e., require) at least 3—and on average 11.5—of the 37 Ja-

20  va API packages copied into Android.  Prof. Kemerer also found the most frequently downloaded

21  apps (those downloaded between 1 billion and 5 billion times) depend even more heavily on the

22  copied API packages (on average requiring 13.8 of the 37 Java API packages).  Based on his find-

23  ings, Prof. Kemerer opines that "the 37 copied API [packages] are significant and central to the

24  Android app ecosystem." *Id.* ¶¶ 126-40.  Google does not seek to exclude these opinions.

25       3.  <u>Benefits to Android From Java's Stability</u>.  Google's contemporaneous statements

26  indicate it copied Java, in part, to capture Java's stability. *See id.* ¶¶ 80-81.  Prof. Kemerer quan-

27  tified the benefit to Android from Java's stability by counting and comparing the changes made to

28  the method declarations in both platforms over time. *Id.* ¶¶ 96-100; Kemerer 2d Rpt. ¶¶ 78-117.

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
                                           IN LIMINE #1 RE: PROF. CHRIS F. KEMERER

1    Prof. Kemerer explained that the Java APIs "could be expected to be of higher relative quality be-

2    cause they had been available and in use for a long period of time."  Kemerer Op. Rpt. ¶ 95.  Prof.

3    Astrachan, Google's expert, also recognized that a platform (such as Java) already in "widespread

4    use … would have been debugged … and programmers would have confidence that it would

5    work in a situation."  Ex. 4 (Astrachan Depo.) 164:25-165:9.

6           The first step in Prof. Kemerer's process was to assemble the method declarations from

7    Java and Android into tables so that changes between versions could be examined and compared.

8    Prof. Kemerer directed his research assistants to download from a public archive the source code

9    of the 37 API packages for each version of Java SE from 1.0.2-1.8.  Kemerer Op. Rpt. ¶ 97; Ke-

10   merer 2d Rpt. ¶ 86.  A commercial software program was then used to create an HTML file of the

11   method declarations, which were then retrieved from this file using a simple PHP script program.

12   Those declarations were manually verified for accuracy against publicly available documentation

13   and assembled into a table.  Kemerer Op. Rpt. ¶ 98, App. F; Kemerer 2d Rpt. ¶ 87, App. E.  Prof.

14   Kemerer also directed his research assistants to download from Google's public code repository

15   documentation for each version of Android.  For Android levels 1-13, the documentation was in

16   XML files, from which data was retrieved into a table using a publicly available software tool.

17   For Android levels 14-23, the documentation was in plain text files, from which data was re-

18   trieved using a PHP script.  The extracted method declarations were compared against Google's

19   documentation to ensure accuracy.  Kemerer Op. Rpt. ¶ 99; Kemerer 2d Rpt. ¶ 88.  Google does

20   not claim this process of collecting and creating tables of the method declarations was flawed.

21          Prof. Kemerer next asked his assistants to write scripts in the "R" programming language

22   to automatically count changes made in the method declarations (consisting of thousands of lines

23   of code) between each sequential version of each platform.  Kemerer Op. Rpt. ¶ 100, App. Q;

24   Kemerer 2d Rpt. ¶ 89, Apps. G, H.  Google does not contend that the scripts (or the counts) were

25   inaccurate.  Prof. Kemerer used the relative counts for each platform to analyze stability, conclud-

26   ing that Java was very stable compared to the non-accused APIs in Android, and thus by copying

27   Java's method declarations, Android benefitted significantly.  Prof. Kemerer opines that An-

28   droid's increased stability allowed it to grow more rapidly at crucial market junctures, just as

- 3 -

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #1 RE: PROF. CHRIS F. KEMERER

1    Google hoped.  Kemerer Op. Rpt. ¶¶ 101-121; Kemerer 2d Rpt. ¶¶ 90-117.  Google does not

2    claim that Prof. Kemerer lacks expertise to analyze the effect of platform stability on a market.

3            4.   Centrality of the Java API Packages.  Prof. Kemerer analyzed the value of the copied

4    Java API packages to the noncopied APIs in the Java platform, and to the non-accused APIs in

5    Android.  He did so using the PageRank algorithm created by Google founders Larry Page and

6    Sergey Brin that generates a value for each node in a network.  Kemerer Op. Rpt. ¶¶ 141-157;

7    Kemerer 2d Rpt. ¶¶ 60-77.  Each node value is the probability that a node selected at random will

8    have a connection to the subject node.  Kemerer Op. Rpt. ¶¶ 145-148.

9            Prof. Kemerer asked his assistants to collect data on the links between Android classes us-

10   ing the commercial "Understand" and "Network X" programs.  Source code for Java and Android

11   was input into Understand, which provided data on each class as a network node and each depen-

12   dency on another class as a network connection.  *Id.* ¶ 149; Kemerer 2d Rpt. ¶¶ 61-62.  Probabil-

13   ity data was then collected using NetworkX (developed by the Los Alamos National Lab, and

14   which includes the PageRank algorithm) to calculate PageRank values from the Understand data.

15   Kemerer Op. Rpt. ¶¶ 151-52; Kemerer 2d Rpt. ¶¶ 63-64.  Prof. Kemerer then analyzed the proba-

16   bility data for the copied Java API packages in relation to the APIs in Java that were not copied

17   and the non-accused APIs in Android.[2]  He concluded that, on average, copied classes have a

18   PageRank score about 9 times higher than noncopied classes in the Java platform, and about 33

19   times higher than noncopied classes in the Android platform.  Kemerer Op. Rpt. ¶ 157; Kemerer

20   2d Rpt. ¶ 65.  Google does not contend that Understand, NetworkX, or PageRank are unreliable

21   or inaccurate, or that Prof. Kemerer lacks expertise to conduct his centrality analysis.

22   **ARGUMENT**

23   **I.     PROF. KEMERER'S OPINIONS ARE RELIABLE AND ADMISSIBLE**

24           The only aspects of Prof. Kemerer's analyses that Google challenges are use of support

25   staff (1) to collect data, (2) to create simple computer programs to collect and format data, (3) to

26   create simple computer programs to count the changes in the method declarations between ver-

27

28   [2] The PageRank values on which Prof. Kemerer conducted his analysis are contained in Appendix M to his first report and Appendix D to his second report.  Kemerer Op. Rpt. ¶ 53, App. M; Kemerer 2d Rpt. ¶¶ 62-65, App. D.

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #1 RE: PROF. CHRIS F. KEMERER

1    sions, and (4) to use commercially available software tools to collect and format data.  Mot. at

2    3-6.  Significantly, Google *does not* contend that the collected data is inaccurate or flawed or that

3    the computer programs (either the commercial programs or the simple custom programs) are

4    flawed or caused inaccuracies.  Prof. Kemerer's data collection process is typical of experts in

5    modern complex litigation, who regularly direct research assistants to collect data and complete

6    simple (but time-consuming) tasks, like writing and running software programs.  This is codified

7    in the Rules of Evidence and well-settled case law.

8    **A.    Experts Are Permitted To Rely On Assistants And Data Collectors**

9    Courts soundly reject Google's premise that experts must personally conduct each and

10   every task necessary to arrive at their opinions.  *See Southland Sod Farms v. Stover Seed Co.*, 108

11   F.3d 1134, 1142 (9th Cir. 1997) ("The fact that [the expert]'s opinions are based on data collected

12   by others is *immaterial*; [Rule] 703 expressly allows such opinion testimony." (emphasis added));

13   *Monsanto Co. v. David*, 516 F.3d 1009, 1015-16 (Fed. Cir. 2008) ("[Expert]'s reliance on the sci-

14   entific reports prepared by his team is therefore the type of reliance that is reasonable for expert

15   witnesses"); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612-13 (7th Cir. 2002)

16   ("An expert witness is permitted to use assistants in formulating his expert opinion … [if] his re-

17   lying on their assistance was standard practice in his field"); *Sugar Ass'n v. McNeil-PPC, Inc.*,

18   No. CV 04-10077 DSF, 2007 WL 5674020, at *3 (C.D. Cal. Dec. 19, 2007) ("[Experts] designed

19   the experiments, supervised the work, and analyzed the data … [which] is not an abdication of

20   oversight sufficient to warrant exclusion of the proffered testimony"); *McReynolds v. Sodexho*

21   *Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 36 (D.D.C. 2004) (many experts "design tests, but for

22   various reasons—including costs to the client—do not personally run them, but instead rely on

23   their assistants to do so, reviewing their output to ensure that the test was properly conducted").

24   Courts also distinguish between nontestifying expert *opinions*, on which a testifying ex-

25   pert needs sufficient expertise to adopt, and *data collection*, for which experts can rely on assis-

26   tants and outside sources.  Expert reliance on facts and data collected by others is "immaterial" to

27   admissibility.  *Southland*, 108 F.3d at 1142; *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F.

28   Supp. 2d 1005, 1012 (C.D. Cal. 2003) ("[Rules] 702 and 703 permit an expert to rely upon 'facts

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #1 RE: PROF. CHRIS F. KEMERER

1    and data'"").  Moreover, to the extent data are known and subject to independent verification, the

2    propriety of an expert's reliance on the data is an issue for cross-examination.  *In re TFT-LCD*

3    *(Flat Panel) Antitrust Litig.*, 2013 WL 124347, at \*1 (N.D. Cal. Jan. 8, 2013).

4    **B.    Prof. Kemerer's Support Staff Collected Data, But Conducted No Analysis**

5    Prof. Kemerer's assistants used custom scripts and commercially available programs to

6    collect data, not to perform "technical analyses."  The custom PHP scripts retrieved data from

7    files, *supra* at 3, and the custom R scripts automated a simple yet laborious counting process, *su-*

8    *pra* at 3.  Google ignores that the scripts were used only to *collect data* and that Prof. Kemerer di-

9    rected his assistants to prepare the scripts.  Ex. 1 (Kemerer Depo.) 24:17-25:1; 56:24-57:1; 60:8-

10   11; 61:1-5.  Prof. Kemerer's analyses of what the number of changes to the method declarations

11   *mean* to Java and Android, including in the market, are properly based on the collected data.

12   Prof. Kemerer directed his staff to use the Understand and NetworkX programs to collect

13   data for his analyses.  Ex. 1 (Kemerer Depo.) 56:16-57:1 ("Appendix M, labeled 'PageRank Da-

14   ta,' are the raw data that are – form the basis for the PageRank analysis in [Prof. Kemerer's] re-

15   port."); *accord* Kemerer Op. Rpt. ¶ 153.  Google's claim that Prof. Kemerer was unable to de-

16   scribe how his PageRank analysis was performed is false:

17       PageRank is a tool to analyze network[s], so first you have to be able to represent
         the thing you are interested in as a network, and so, in this case, we are looking at
18       software, and we want to think about the components as being, you know, inter-
         connected nodes and network, and so we have to collect data on the software in
19       terms of what their connections are.  And then there's, again, commercially avail-
         able tool to compute the PageRank values, and earlier today you had me point out
20       the raw data values that I provided in the appendix, and those reflect the centrality
         of the nodes in the network, in this case these classes.
21

22   Ex. 1 (Kemerer Depo.) 91:3-19.  Prof. Kemerer's testimony accords with his report, where he ex-

23   plains that Understand collected data on Android classes as a network, *see supra* at 4, and Net-

24   workX applied the PageRank algorithm to collect probability values, *see supra* at 4.  Again, Prof.

25   Kemerer's *analysis* of the centrality of 37 Java API packages is based on this data.

26   **C.    Google Does Not Claim The Programs Or Data Are Incorrect Or Unreliable**

27   Every scrap of code and every step Prof. Kemerer took was made known to Google so that

28   it could reproduce and test Prof. Kemerer's analyses.  Yet Google's own expert found no flaws in

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #1 RE: PROF. CHRIS F. KEMERER

1  the scripts used.  Ex. 4 (Astrachan Depo.) 100:7-10 ("I cannot identify any such flaws, no.").[3]

2  Custom scripts are also an accepted source of data in Prof. Kemerer's field.  Prof. Kemerer has

3  authored peer-reviewed papers relying on data collected from public websites using custom

4  scripts.[4]  *See Monsanto*, 516 F.3d at 1016 (opinions based on evidence "of a type reasonably re-

5  lied upon by experts in the particular field" are admissible).  And Prof. Kemerer's ability to un-

6  derstand the scripts is irrelevant because the resultant data were manually verified.  Kemerer Op.

7  Rpt. ¶¶ 98-99; Kemerer 2d Rpt. ¶¶ 87-88; *see McReynolds*, 349 F. Supp. 2d at 36 (admitting ex-

8  pert opinion based on program he could not write where "results were always reviewed for errors

9  after running a program"); *Tietsworth v. Sears, Roebuck & Co.*, No. 5:09-cv-00288-JF, 2012 WL

10  1595112, at *9-10 (N.D. Cal. May 4, 2012) (finding opinion reliable where expert "did not per-

11  form the statistical analysis and cannot explain precisely how it was performed").

12        Also, Google's expert found no fault with use of Understand:  "[A]fter running it and see-

13  ing the results, it became clear to me, in discussing with counsel, that there was nothing that we

14  needed to do to respond …."  Ex. 4 (Astrachan Depo.) 97:3-17.  Nor does Google contest the use

15  of Understand by Dr. Schmidt and Mr. Zeidman.  *See* Ex. 6 (Zeidman Rpt.) ¶ 32; Ex. 3 (Schmidt

16  2d Rpt.) ¶ 104.  Mr. Zeidman explained that he has used Understand for years, over 30-40 times.

17  Ex. 7 (Zeidman Depo.) 26:13-19, 69:8-10.  The use of PageRank to conduct a centrality analysis

18  has been recognized as reliable in the peer-reviewed literature.  Kemerer Op. Rpt. ¶ 148 n.78.  In

19  fact, the paper Prof. Kemerer relies on was published by ACM, an organization that Prof. Astra-

20  chan belongs to and views as setting industry standards applicable to his academic work.  Ex. 4

21  (Astrachan Depo.) 50:10-20, 58:25-59:4.

22        **D.**    **Google Grossly Mischaracterizes Prof. Kemerer's Testimony**

23        With no grounds to attack Prof. Kemerer's methodologies, Google cherry-picks quotes

24  from his deposition to mischaracterize his testimony.  Google's claim that Prof. Kemerer was

25

26  [3] Prof. Astrachan's criticisms on centrality and stability were not raised until his third report ra-
ther than his rebuttal report, ECF 1563-7 ¶¶ 60-79, and should be stricken as improper sandbag-

27  ging.  *See* ECF 56 ¶ 8.  These critiques are not of the scripts or data at issue in Google's motion.

28  [4] *See, e.g.*, Kemerer, et al., *Standards Competition in the Presence of Digital Conversion Tech-
nology*, MIS Quarterly, Vol 36 No. 3, at 928 ("we also implemented a software agent to retrieve
daily observations of … prices, sale rank, and product review data from Amazon.com.").

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #1 RE: PROF. CHRIS F. KEMERER

1    "spoon-fed" is false.  "Spoon-feeding" is expert reliance on "untested and partisan foundation"

2    such as "client-prepared litigation-driven 'tests.'"  *Therasense, Inc. v. Becton, Dickinson & Co.*,

3    No. C 04-02123 WHA, 2008 WL 2323856, at \*2 (N.D. Cal. May 22, 2008).  It has nothing to do

4    with Prof. Kemerer's opinions, which are based on data he directed his staff to collect:

5    • *Compare* Ex. 1 (Kemerer Depo.) 23:19-24 ("I have done all of the analysis personally.  I
     have delegated certain tasks that support that analysis to the technical support team – again,

6    programming, that kind of thing – but all of the analysis is my analysis and was directed by

7    me.") *with* ECF 1562-1 (Google's excerpts omitting page 23);

8    • *Compare* Ex. 1 (Kemerer Depo.) 138:2-14. ("A.  No.  This was work that I directed, and,
     you know, I provided the – the – I'm searching for the word – the leadership on this effort.

9    Q.  Well, you didn't write the scripts that are associated with this analyses; correct? A.  No,
     because writing the scripts is a programming task to do *data collection*." (emphasis added))

10   *with* ECF 1562-1 (Google's excerpts beginning on page 139);

11   • *Compare* Ex. 1 (Kemerer Depo.) 61:4-5 ("I did not personally write this script, but it was
     done under my direction.") *with* ECF 1562-1 (Google's excerpts ending on page 58).

12

13        Google's claims about Prof. Kemerer's testimony on his centrality analysis are also mis-

14   leading.  Google's counsel repeatedly asked Prof. Kemerer about the use of Understand, but ig-

15   nores the first four answers, emphasizing only the fifth in its motion (Mot. at 5):

16        [1] Q.  What was the role of Understand in connection with your opinions in this case? …
          A. I view it as a data collection tool.

17        [2] Q.  What kind of data did Understand collect?  A.  … Basically it's a – something that
          allows you to pull raw data and then put in some other representation so that you can do

18        analysis on it.

19        [3] Q. What was the role of Understand in connection with this case?  A.  Again, as a data
          collection tool for pulling raw data and putting it in a form so that you can do analysis on

20        it.

21        [4] Q.  Can you be more specific about what Understand did in connection with this
          case[?]  A.  Yes.  You – you – have software that it reads, and then it generates output,

22        which is a different representation of that software, and a representation that is more
          amendable to analysis than the raw source code.

23
          [5] Q.  Can you be more specific in defining what Understand did in connection with this
24        case?  … A.  No.

25   Ex. 1 (Kemerer Depo.) 94:17-95:20 (corrected).  Google ignores Prof. Kemerer's explanations

26   here (and three pages earlier when he explained in detail how the PageRank data were collected,

27   *Id.* 91:7-19), and instead bases its motion on the misleading statement that, after four answers,

28   Prof. Kemerer could not be even "more specific" about Understand.

- 8 -

1    Google's claim that Prof. Kemerer could not explain the "methodologies used in these

2    analyses" is unsupported.  Mot. 5.  Both of the questions cited by Google had *nothing to do with*

3    *Prof. Kemerer's analyses*.  Google's first question asked "how a particular instance variable

4    would be weighted" in the Understand program.  Ex. 1 (Kemerer Depo.) 105:3-20.  But Prof.

5    Kemerer had spent pages explaining exactly why the weights applied in by the PageRank algo-

6    rithm were appropriate, and that the application of additional weighting was *not* supported in the

7    applicable academic literature.  *See* Ex. 1 (Kemerer Depo.) 98:16-105:2.  Google's second ques-

8    tion about "unused classes" and "legacy code" makes no sense.  Prof. Kemerer's analysis only

9    considered classes contained within the various versions of Android and Java, so every class he

10   considered was "used" in each platform.  Kemerer Op. Rpt. ¶¶ 97-99.

11       Google's claim that Prof. Kemerer could not explain how the API names in a script were

12   selected likewise mischaracterizes Prof. Kemerer's testimony and reports.  Prof. Kemerer did not

13   give his staff a list because he wanted them to assemble *all of the APIs* in Android's public docu-

14   mentation.  *Id.* ¶ 99 & n.52.  The script he was shown at his deposition listed all of the APIs in the

15   documentation he identified, which shows the programmer complied with the instructions.  *Id.*

16   ¶ 99; Ex. 1 (Kemerer Depo.) 178:3-21; ECF 1564-5 (Kemerer 3d Rpt.) App. D.  It is not surpris-

17   ing that Prof. Kemerer could not recall months later the details regarding how his assistants as-

18   sembled a list of API names from the files in the Android code repository, *see supra* 3, nor is it

19   grounds for excluding his opinions, *see Network Prot. Sciences, LLC v. Fortinet, Inc.*, No. C 12-

20   01106 WHA, 2013 WL 5402089, at *5 (N.D. Cal. Sept. 26, 2013) ("The extent to which [an ex-

21   pert's] memory failures at his *deposition* affect his credibility as an expert is an issue for the jury

22   to consider.  It does not necessarily mean that the analysis in his *report* was flawed.").

23   **II.    PROF. KEMERER USES THE FEDERAL CIRCUIT'S DEFINITION OF "API"**

24       Google's argument that "testimony concerning third party licensing or intellectual proper-

25   ty practices" of non-Java technology is irrelevant contradicts its own expert's opening report de-

26   voted to showing that "[r]e-implementing APIs is commonplace in the computing industry."  Ex.

27   9 (Cattell Op. Rpt.) ¶ 31.  Google's attack on Prof. Kemerer's *rebuttal* opinion regarding industry

28   practices seeks to redefine APIs in a way *expressly rejected* on appeal.  The Federal Circuit rec-

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #1 RE: PROF. CHRIS F. KEMERER

1   ognized each Java API "consists of two types of source code—what the parties call (1) declaring

2   code; and (2) implementing code." *Oracle Am.*, 750 F.3d at 1349; *accord* ECF 1018 (Final Jury

3   Instrs.) ¶ 18 ("the term API 'compilable code' refers to method names and class names, *declara-*

4   *tions*, … *and implementation* … implementing the various API functions" (emphasis added)).

5          Google claims that Prof. Kemerer will lead "jurors into believing that the API declara-

6   tions/SSO at issue in this case are generally treated as proprietary in the same fashion as *imple-*

7   *menting code* or the 'IP, assets, goods, and services' accessed through APIs as used in his 'API

8   economy opinions.'"  But that is exactly what the Federal Circuit held:  "[T]he declaring code and

9   the structure, sequence, and organization of the *API packages* are entitled to copyright protect-

10  tion," *expressly rejecting* Google's position "that the implementing code is the expression entitled

11  to protection—not the declaring code." *Oracle Am.*, 750 F.3d at 1348, 1360.

12         Prof. Kemerer was crystal clear about what Google copied:  "API, although [it] has a

13  broad set of definitions in different context[s], here we are talking about the application program-

14  ming interface [packages] that were written by Oracle and copied by Google in 37 instances and

15  that's the subject of the lawsuit." *Compare* Ex. 1 (Kemerer Depo.) 66:11-22 *with* ECF 1562-1

16  (Google's starting deposition excerpt on page 67).  Prof. Kemerer discusses APIs generally to *re-*

17  *but* Drs. Astrachan and Cattell's claims that "programmers would have *expected* Android to use

18  the same method declarations," ECF 1563-7 (Astrachan Op. Rpt.) ¶ 162, and "re-implementing

19  APIs in the computing industry … is consistent with long-standing industry custom," Ex. 9 (Cat-

20  tell Op. Rpt.) ¶ 47.  Google's experts claim it is okay to copy one part of an API (declaring code)

21  but not the other (implementing code), and Prof. Kemerer gives many examples that prove the

22  opposite.  If Google believed third-party APIs would confuse the jury, it should not have put them

23  at issue. *See* Ex. 9 (Cattell Op. Rpt.) ¶¶ 48-53.

24                                    **CONCLUSION**

25         Prof. Kemerer properly relies on data collected by assistants and computer programs.

26  Prof. Kemerer's rebuttal testimony regarding industry practices is consistent with the Federal Cir-

27  cuit's opinion and is admissible.  Google's motion should be denied.

28

- 10 -

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #1 RE: PROF. CHRIS F. KEMERER

1    Dated: April 6, 2016                          Respectfully submitted,

2                                                       Orrick, Herrington & Sutcliffe LLP

3                                                   By:  */s/ Lisa T. Simpson*
                                                        Lisa T. Simson
4
                                                    Counsel for ORACLE AMERICA, INC.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28