ORRICK, HERRINGTON & SUTCLIFFE LLP
KAREN G. JOHNSON-MCKEWAN (SBN 121570)
kjohnson-mckewan@orrick.com
ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
GABRIEL M. RAMSEY (SBN 209218)
gramsey@orrick.com
405 Howard Street, San Francisco, CA 94105
Tel: 1.415.773.5700 / Fax: 1.415.773.5759
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
51 West 52nd Street, New York, NY 10019
Tel: 1.212.506.5000 / Fax: 1.212.506.5151

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (*pro hac vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY 10504
Tel: 1.914.749.8200 / Fax: 1.914.749.8300
STEVEN C. HOLTZMAN (SBN 144177)
sholtzman@bsfllp.com
1999 Harrison St., Ste. 900, Oakland, CA 94612
Tel: 1.510.874.1000 / Fax: 1.510.874.1460

ORACLE CORPORATION
DORIAN DALEY (SBN 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (SBN 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (SBN 211600)
matthew.sarboraria@oracle.com
RUCHIKA AGRAWAL (SBN 246058)
ruchika.agrawal@oracle.com
500 Oracle Parkway,
Redwood City, CA 94065
Tel: 650.506.5200 / Fax: 650.506.7117

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ORACLE AMERICA, INC.,

Plaintiff,

v.

GOOGLE INC.,

Defendant.

Case No. CV 10-03561 WHA

**ORACLE'S OPPOSITION TO GOOGLE'S MIL NO. 4 REGARDING MARKET HARM TESTIMONY OF PROF. ADAM JAFFE**

Date: April 27, 2016, 8:00 a.m.
Dept.: Courtroom 8, 19th Floor
Judge: Honorable William H. Alsup

**TABLE OF CONTENTS**


Page

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

BACKGROUND .......... 2

ARGUMENT .......... 4

I. PROF. JAFFE CORRECTLY CONSIDERS HARM TO THE MARKETS FOR AND VALUE OF THE COPYRIGHTED WORKS AND THEIR DERIVATIVES .......... 4

A. Prof. Jaffe Correctly Considers Harm To Java SE And Its Derivatives .......... 4

B. Prof. Jaffe Properly Considers Potential Market Harm .......... 6

II. PROF. JAFFE CORRECTLY CONSIDERS THE MARKET EFFECT OF ANDROID BECAUSE WHAT GOOGLE COPIED, it copied "IN ANDROID" .......... 6

CONCLUSION .......... 9

# TABLE OF AUTHORITIES


Page(s)

**Federal Cases**

*Abend v. MCA, Inc.*, 863 F.2d 1465 (9th Cir. 1988) .......... 7

*Arica Institute, Inc. v. Palmer*, 970 F.2d 1067 (2d Cir. 1992) .......... 8, 9

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .......... 1, 5, 8

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998) .......... 7

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997) .......... 8

*Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622 (9th Cir. 2003) .......... 7

*Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) .......... 1, 5, 7

*Micro Star v. Formgen Inc.*, 154 F.3d 1107 (9th Cir. 1998) .......... 7

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012) .......... 6

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65 (2d Cir. 1999) .......... 7

*Oracle Am. Inc. v. Google Inc.*, 750 F.3d 1339 (Fed. Cir. 2014) .......... 1, 6, 8

*Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992) .......... 8

*Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) .......... 8

*Tiffany Design, Inc. v. Reno-Tahoe Specialty, Inc.*, 55 F. Supp. 2d 1113 (D. Nev. 1999) .......... 8

*Twin Peaks Prods. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366 (2d Cir. 1993) .......... 7

*Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000) .......... 6

*Wright v. Warner Books* 953 F.2d 731 (2d Cir. 1991) .......... 8

**Federal Statutes**

17 U.S.C. § 106 .......... 1

17 U.S.C. § 107(4) .......... 1, 5

## INTRODUCTION

"Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 566-67 (1985). The fourth factor, which considers "the effect of [defendant's] use upon the *potential* market for or *value* of the copyrighted work," 17 U.S.C. §107(4),[1] is thus "undoubtedly the single most important element of fair use," *Harper & Row*, 471 U.S. at 566. A defendant's copying is not fair if its "work adversely affects the value of any of the rights in the copyrighted work" or "supplants *any part* of the normal market for a copyrighted work," be it a current market or a potential market. *Id.* at 568 (quotation marks omitted). Since the fourth factor considers the value of the copyrighted work, "to negate fair use one need only show that if the challenged use *should become widespread*, it would *adversely affect* the *potential market* for the *copyrighted work*." *Id.* (quotation marks omitted). Since the value of a copyrighted work includes the right to make derivatives, 17 U.S.C. § 106(2), the fourth factor "must take account not only of harm to the original but also of harm to the market for derivative works," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (quoting *Harper & Row*, 471 U.S. at 568).

Oracle's expert economist Prof. Jaffe analyzes "the effect of Google's use in Android upon the potential market for or value of the Java platform."[2] ECF No. 1560-7-8 (Jaffe Op. Rpt.) ¶ 1 (hereinafter, "Jaffe Op. Rpt."). Following the law set out above, Prof. Jaffe's analysis encompasses harm from Android (the infringing product) to the actual and potential markets for and value of the Java SE platform versions 1.4 and 5.0, as well as its "derivative … the Java Micro Edition ('Java ME')." *Oracle Am. Inc. v. Google Inc.*, 750 F.3d 1339, 1350 (Fed. Cir. 2014).

Google raises two objections to Prof. Jaffe's analysis, both erroneous. First, Google contends that Prof. Jaffe's analysis is "vastly overbroad" because, according to Google, all that can be considered is "the market for Java SE 1.4 and Java SE 5.0—the asserted copyrighted works." Mot. at 1. But Google admits, as consistent with the settled law above, that the fourth

---

[1] All emphases added unless otherwise indicated. "Ex." refers to exhibits to the Silverman declaration being filed concurrently with this brief.

[2] Prof. Jaffe is the former Dean of Arts and Sciences at Brandeis University and currently is a Director, Senior Fellow at Motu Economics and Public Policy Research, and Professor in Economics Emeritus at Brandeis University. ECF No. 1560-7-8 (Jaffe Op. Rpt.) ¶ 3.

factor takes into account the harm to the exclusive right to exploit derivatives of Java SE. Google also too narrowly defines potential markets and ignores the remainder of Prof. Jaffe's opinions regarding current harm to Java SE and the impact of further widespread copying.

Second, Google tries to narrowly cabin consideration of the source of the harm to just 37 Java API packages somehow divorced from the rest of Android. However, the relevant statutory question is the "*effect of the use*"—and the use, as Google must admit, is "in Android." Mot. at 1, 4. There was no "use" by Google of 37 Java API packages out in the ether somehow unconnected to Android. Google's argument defies the law and the facts of this case.

**BACKGROUND**

Prof. Jaffe's market harm analysis can be divided into three independent components: (1) harm to the market for Java SE and its derivatives; (2) harm to potential markets for Java SE and its derivatives; and (3) the harm to the value of Java SE and its derivatives if copying such as Google's became unrestricted and widespread. Jaffe Op. Rpt. ¶¶ 320-430.

***Harm to the market.*** Prof. Jaffe considered harm to the market for the Java SE platform 1.4 and 5.0 and their derivatives, like Java ME. Oracle's Java business is based on "monetiz[ing] the Java platform through licensing." *Id.* ¶ 59. Prof. Jaffe describes Oracle's successful history of licensing Java SE and its derivatives for use in a variety of device types, including smartphones. *See generally id.* ¶¶ 67-68, 320-430. Specifically, Prof. Jaffe explains that by 2000, "the Java platform was powering ATMs, two-way pagers, mobile phones, personal organizers, games and game machines, cameras, industrial controllers, point-of-sale terminals, desktops, servers, and more." *Id.* ¶ 67 & Fig. 3. By the mid-2000s, the Java platform was the "preeminent software application platform," and "[a]s the mobile market took off, Sun was poised to take off with it." *Id.* ¶ 19. In 2007, "80% of mobile phones worldwide were based on the Java platform." *Id.* ¶ 330. Java SE was "running on" smartphones made by Danger and licensed by RIM and Nokia. *Id.* ¶ 308. Java SE was also the foundation for the SaveJe smartphone platform. *Id.* ¶ 309-11.

Prof. Jaffe concludes that "Android's unauthorized use of the Java API packages competes with and substitutes for the Java platform," including in the critical smartphone market: "Google's gain is Oracle's loss." *Id.* ¶ 13; *id.* ¶¶ 320, 322, 324, 340-42. Prof. Jaffe documents

the market harm to the Java platform across device categories throughout his report. In phones, Prof. Jaffe catalogs that Samsung, Motorola, LG, HTC, Sprint, Verizon, AT&T, T-Mobile, and Sony Ericsson all either reduced or completely eliminated their licensing of Java SE and ME as they switched to Android. *Id.* p. 143 (Table 7). By 2015, it was Android that was on "more than 80% of mobile phone device shipments," *id.* ¶ 330, with over 75% of worldwide Android activations in one quarter from former Sun/Oracle licensees who switched to Android, *id.* ¶ 331. *See id.* ¶ 173 ("Android crowded Oracle's Java platform out of the most important device category of the last decade, with substantial, adverse consequences to Oracle that will continue indefinitely").

The harm to Oracle was not limited to phones. Oracle lost other commercial licenses for Java SE and ME for tablets and e-readers, automotives, voice over internet protocol ("VOIP") (i.e., internet telephony) devices, home entertainment (including smartTVs, Blu-Ray players, set-top boxes, and gaming consoles), printers, cameras, etc.—in each situation, Oracle's former or potential licensee chose instead to license Android. *Id.* p. 144-45 (Table 8); *id.* ¶ 325 (quoting Oracle internal email that "most, if not all," Java accounts face direct competition from Android); *id.* ¶ 348 (quoting Oracle internal email: "'I see Android and am run over by it in all accounts.'").

***Harm in potential markets.*** Prof. Jaffe also examines potential markets for Java SE and its derivatives. He focuses on markets where the Java platform was already licensed and looks at potential market opportunities that were lost to Android. For example, in the market for e-readers and tablets, Amazon licensed Java ME for the Kindle before switching to Android for the Kindle Fire. Java SE could have been licensed for other e-readers and tablets thereafter, but those prospective OEMs licensed Android instead. *Id.* ¶¶ 361-64. The same is true of wearables, which was a potential market for the Java platform after Sun pioneered a Java Ring in 1998, but where Android now competes. *Id.* ¶¶ 365-70. Potential markets where Android competes and is causing market harm include the markets listed above—cars, home entertainment, VOIP devices, and cameras—as well as other markets such as the internet of things, GPS systems, household appliances, payment terminals, and vending machines. *Id.* ¶¶ 379-430. In each, Java SE or its derivative was either licensed to an early market participant or Sun/Oracle was in negotiations for a commercial license. In each market, Android has now displaced the Java platform. *Id.*

***Harm to value of the work through widespread copying.*** Finally, Prof. Jaffe considers "the impact upon both the Java platform and its derivatives if the copying in this matter were to become widespread." *Id.* ¶ 431-35. Prof. Jaffe explains that "many significant harms already suffered … across approximately 16 product markets in which Oracle monetizes its Java platform" would only "increase" if courts found fair use and thereby "invite[d] all who currently license the Java platform to copy the Java API packages without remuneration." *Id.* ¶¶ 432-33. Prof. Jaffe identifies the harm to Oracle if "current and significant Oracle customers such as Microsoft and Amazon" no longer paid for commercial licenses because they could copy without legal ramifications. *Id.* ¶ 433. Such a scenario would undermine "the incentive to invest in such creative work" and would "reduce the overall benefits to the technology community" causing "ripple effects on users worldwide." *Id.* ¶¶ 434-35.

Based on all the above, Prof. Jaffe concludes that "Google's use of the Java API packages … resulted in significant market harm" to the Java SE platform and its derivatives. *Id.* ¶ 450.

## ARGUMENT

### I. PROF. JAFFE CORRECTLY CONSIDERS HARM TO THE MARKETS FOR AND VALUE OF THE COPYRIGHTED WORKS AND THEIR DERIVATIVES

As discussed at the outset, the fourth factor considers the actual and potential market harm to the copyrighted work and its derivatives both from the defendant's infringement and from widespread uses of the type at issue. Though Google's motion broadly seeks an order excluding all "market harm testimony from … Dr. Adam Jaffe," Mot. at 1, Google's argument applies only to some portions of Prof. Jaffe's analysis that Google contends are "vastly overbroad," Mot. at 2. It does not apply to Prof. Jaffe's opinions and conclusions regarding the substantial harm that Android has *already caused* to Java SE itself. Nor does it apply to Prof. Jaffe's opinions regarding "Google's copying caus[ing] Oracle significant, ongoing and future harm to the potential market for *the Java API packages*." Jaffe Op. Rpt. ¶ 321, 327. And Google takes no issue with Prof. Jaffe's opinions regarding the effect of widespread, unrestricted copying. Google's critiques of the other portions of Prof. Jaffe's analysis are legally erroneous.

#### A. Prof. Jaffe Correctly Considers Harm To Java SE And Its Derivatives

Google complains that Prof. Jaffe's analysis is overbroad because he refers to "Java," "the

Java platform," and the "Java application platform" when analyzing the harm to the market for the copyrighted work rather than referring explicitly to "Java SE 1.4 and Java SE 5.0." Mot. at 2-4. But Prof. Jaffe does not use those terms to mean different things. He defines the terms expressly in his report, referring to the harm caused by Google's "unauthorized copying of key elements of the Java platform (which I understand to be an application platform and to which I will refer as 'Java', 'the Java platform', or the 'Java application platform')." Jaffe Op. Rpt. ¶ 9. Prof. Jaffe further explains that "[t]he Java platform consists of three main elements: (1) the Java computer programming language, (2) the Java Runtime Environment, … and (3) the Java Application Programming Interfaces ('Java API Packages')." *Id.* ¶ 53. And there can be no doubt that he is referring specifically to Java SE 5.0, because he cites to the documentation for Java 5.0 when defining the terms. *Id.* ¶ 53 n.30; *accord id.* ¶ 318 ("perform[ing] an economic analysis of the effects upon the potential market for or value of *the copyrighted work*"); *see also* Ex. 12 (Bloch Depo.) 45:1-12 ("the *platform* formerly *known as Java*, currently known as *Java SE*"). Because factor four considers harm to "the copyrighted work," 17 U.S.C. § 107(4), and the copyrighted work is *the Java SE platform* (not just the elements of the platform that Google copied), *see* TX 464 (registration for "Java 2 Platform, Standard Edition, v. 1.4"); TX 475 (same for Java SE 5.0), Prof. Jaffe properly considered harm to the Java SE platform.

Google does not specify what Prof. Jaffe's "overbroad" considerations are about the Java platform in his market harm analysis, but we assume Google is objecting to his consideration of market harm to Java ME. However, there can be no dispute that harm to the market for Java ME is properly considered. As Google acknowledges, Mot. at 2, 4, factor four considers "harm to the original" as well as "harm to the market for derivative works," *Campbell*, 510 U.S. at 590. "Evidence of substantial harm to [the market for derivatives] would weigh against a finding of fair use, because the licensing of derivatives is an important economic incentive to the creation of originals." *Id.* at 593; *accord Harper & Row*, 471 U.S. at 568 ("If the defendant's work adversely affects the value of any of the rights in the copyrighted work (in this case the adaptation and serialization [i.e., derivative] right) the use is not fair." (quotation marks omitted)).

The undisputed evidence shows that Java ME is a derivative of Java SE. *See* Ex. 4 (Astra-

chan Depo.) 101:22-25 ("most Java ME is a subset of something in Java SE"); Ex. 12 (Bloch Depo.) 45:1-12 ("Java ME derived from the platform formerly known as Java, currently known as Java SE …."); Ex. 13 (Reinhold Depo.) 92:15-93:6 (describing "parentage relationship" between Java SE and Java ME). The Federal Circuit found that "Sun was licensing a *derivative version* of the Java platform for use on mobile devices: the Java Micro Edition," and that "Oracle licensed Java ME for use on feature phones and smartphones." *Oracle Am.*, 750 F.3d at 1350.

Google is thus wrong to suggest that Prof. Jaffe erred by considering market harm "broader than any licensing opportunity for the Java SE platform." Mot. at 3. Under the law, Prof. Jaffe was obligated to consider harm to Java SE derivatives, such as Java ME, as well as broader market harm than just "licensing," such as fragmentation, lock out, and and loss of developers.

**B. Prof. Jaffe Properly Considers Potential Market Harm**

Google is also wrong that Prof. Jaffe "overreaches" in his definition of potential markets by considering markets that are not "traditional, reasonable, or likely." Mot. at 3-4. Google does not explain what those terms mean, and neither do the cases it cites. As detailed in Prof. Jaffe's report, each of the potential markets was one where Sun/Oracle was either already licensing or was negotiating to license the Java platform. That is more than sufficient in the Ninth Circuit, which takes a very broad view of potential markets, considering markets as potential even when the plaintiffs completely disavowed an intention to compete in that market. *See, e.g.*, *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1180-81 (9th Cir. 2012) ("little doubt" of market harm even where plaintiff "did not intend to sell" the works); *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000) (potential market harm even where "author … disavowed any intention to publish his work during his lifetime … because the relevant consideration was the 'potential market' and … he has the right to change his mind"). Each potential market addressed by Prof. Jaffe is a traditional, reasonable, or likely market for Java SE and its derivatives. Google's motion should therefore be denied.

**II. PROF. JAFFE CORRECTLY CONSIDERS THE MARKET EFFECT OF ANDROID BECAUSE WHAT GOOGLE COPIED, IT COPIED "IN ANDROID"**

Google's second argument is that, rather than "consider the effect of *Android* on Oracle's

potential market for and value of Java," Prof. Jaffe should have considered only "Google's use of the declarations/SSO of the 37 Java SE API packages." Mot. at 4-5. This is not the law.

Factor four considers not merely the harm caused by the infringing *part* of the defendant's work, but the harm caused by the defendant's infringing work. *Harper & Row*, 471 U.S. at 568 ("If the defendant's *work* adversely affects the value of any of the rights in the copyrighted work … the use is not fair." (quotation marks omitted)). In *Harper & Row*, the Supreme Court held that where a publisher copied verbatim a small excerpt from a forthcoming book into a larger magazine article, the relevant inquiry was the effect of the *article's* publication on the exclusive rights in the unpublished work. *Id.* at 568. Because "[t]he borrowing of these verbatim quotes from the unpublished manuscript lent *the Nation's piece* a special air of authenticity … *it directly competed* for a share of the market for prepublication excerpts." *Id.*

Adhering to *Harper & Row*, cases abound where courts consider the harm caused by the defendant's work, not just the element in defendant's larger work that infringes. *See, e.g.*, *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1113 (9th Cir. 1998) (finding that defendant's CD containing downloaded videogame software files "impinged on [game maker's] ability to market new versions of the [game's] story"); *Abend v. MCA, Inc.*, 863 F.2d 1465, 1481-82 (9th Cir. 1988) (considering the harm that defendant's "film" caused to potential market for plaintiff's work, rather than just the "20 percent" of the film containing infringing material); *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 631 (9th Cir. 2003) (finding that defendant's biographical film, not just the copyrighted video clips, photographs, and music in the film, "affect[ed] the market for those materials"); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145 (2d Cir. 1998) (finding book of trivia about television show, rather than individual infringing portions, usurped show's market because book "substitute[d] for a derivative market that a television program copyright owner … would in general develop or license others to develop"); *Twin Peaks Prods. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993) (finding defendant's whole book summarizing TV show "may interfere with the primary market for [the show's scripts] and almost certainly interferes with legitimate markets for derivative works"); *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 71, 73 (2d Cir. 1999) (looking at the effect of defendant's

entire work, "abstracts [of articles that] compete with and supersede [plaintiff's] articles," rather than looking at the effect of just the "two-thirds" of each abstract that infringes); *Tiffany Design, Inc. v. Reno-Tahoe Specialty, Inc.*, 55 F. Supp. 2d 1113, 1124 (D. Nev. 1999) (considering whether "incorporation of [plaintiff's work] into Defendant's finished products might have great effect upon commercial demand for Plaintiffs' [work]"); *cf. Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997) (affirming injunction against entire book even though infringement was "based on the back cover illustration").[3]

Google acknowledges that its "use" of Oracle's copyrighted work is "in Android." Mot. at 1, 4. All agree that Android incorporates the 37 Java API packages, ECF No. 1488 at 2, and that Google copied for "purely commercial purposes," *Oracle Am.*, 750 F.3d at 1376. As the cases above indicate, the correct inquiry is thus how *Android* affects the market for and value of Java SE and its derivatives.[4]

Nevertheless, in the face of the above authority, Google pulls a decontextualized quote from two old, out-of-circuit cases that are, in any event, not contrary. *Wright v. Warner Books* involves a "scholarly biography" of "'criticism,' 'scholarship,' and 'research.'" 953 F.2d 731, 736 (2d Cir. 1991). In that context, the Second Circuit says that a court must consider the market effect of the copying, rather than the effect of the criticism or research. *Id.* at 739. Indeed, as the Supreme Court would say years later, the harm caused to the market for the plaintiff's work from "a lethal parody, like a scathing theater review, [that] kills demand for the original, … does not produce a harm cognizable under the Copyright Act." *Campbell*, 510 U.S. at 592. Google also cites *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992), which relies on *Wright*, to make the same point about criticism and research. Moreover, *Arica Institute* states that a court can attempt to disaggregate the market effect of defendant's copying from the rest of the defen-

[3] *See also Sega Enters. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992) (considering the market effect of Accolade's video games on Sega, not just the copying from reverse engineering); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 607 (9th Cir. 2000) (similar).

[4] Google misuses the Court's prior statements that "'Android' is not the alleged infringing use in the case." Mot. at 5 (citing ECF No. 230). The Court's actual statement supports Oracle: "The accused product in this action is Android, a software platform that was designed specifically for mobile devices and that competes with Java in that market…. Significantly, only part of Java and part of Android are said to embody the asserted claims." ECF No. 230.

dant's work only "where a *meaningful distinction* may be drawn *between the infringing portions* of defendant's work and *the work as whole*." *Id.* There is no meaningful distinction to draw here.

As Oracle's experts verified, Android is "critically dependent" on the copied material. Ex. 14 (Schmidt Op. Rpt.) ¶ 28. If the copied declaring code or SSO of the 37 API packages is removed from Android, Android would not function. *Id.* ¶¶ 28, 78, 87-96 ("Android is not usable on a computing device, such as a phone or tablet, without each of the Java API packages at issue or the copied declaring code in them."); Tr. 2212:14-18 (Dr. Astrachan) ("Q. What would happen if you ripped those lines out of Android? A. Well, for the purposes of the Android core libraries, those are part of it, so they need to be there for Android to work as it's been designed.").

Google's argument also ignores the signicant effect that its use of the Java APIs had on getting Android to market during a fast-closing window of opportunity in mobile search, including: widespread acceptance among vital platform partners; a familiar, well-tested apps platform that ran predictably on numerous accepted systems; an educated and deep-rooted developer community; and the ability to reach the market faster with a stable, lower-risk, commercially successful product. Jaffe Op. Rpt. ¶ 161; *see id.* ¶¶ 132-73 (importance of the Java platform to Android); ECF No. 1566-5 (Exs. 12 & 19) (early Google presentations to OEMs touting Java API's in Android). As Android rose, it "substituted in existing and potential markets for the Java platform." Jaffe Op. Rpt. ¶ 323. Google's copying of Oracle's copyrighted work was critical to the success of the infringing *work* (Android) and correspondingly harmed the potential market for and value of those works and their derivatives.

In any event, as the legion of authorities demonstrate, it is sufficient that Google infringes "*in Android*," and the infringing Android product harms Java SE and its derivatives in the market. The law does not further require Prof. Jaffe to confirm with Android customers that they chose Android because of the Java APIs just in order to prove that Google's copying was not a fair use.

## CONCLUSION

Prof. Jaffe properly considered the infringing work (Android) and its adverse effects on traditional, reasonable and likely markets for the copyrighted works, Java SE 1.4 and 5.0, and derivatives thereof, including Java ME. Google's motion should be denied in its entirety.

Dated: April 6, 2016

Orrick, Herrington & Sutcliffe LLP

By: */s/ Lisa T. Simpson*
Lisa T. Simpson

Attorney for Plaintiff Oracle America Inc.