IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>          Plaintiff,<br><br>     v.<br><br> GOOGLE INC.,<br><br>          Defendant.                                  / | No. C 10-03561 WHA<br><br>**REQUEST FOR CRITIQUE RE INSTRUCTIONS ON FAIR USE** |

Below is an instruction on fair use that the Court expects to provide to the jury. Each side is invited to submit a five-page double-spaced critique (no footnotes, no attachments, block quotes may be single-spaced) by **NOON ON APRIL 14**. The purpose of the five-page limit is to require counsel to focus on their best points. Each point in your critique should be clear as to whether or not the passage critiqued accurately states the law. The critique must cite to legislative history or case law by the Supreme Court, our court of appeals, or the Federal Circuit. The Court will likely make revisions in light of your comments. Counsel will have subsequent opportunities to make lesser objections.

\*          \*          \*

**INSTRUCTION ON FAIR USE**

In this trial, all parties agree that the Android versions in question used aspects of Java 2 Standard Edition Version 1.4 and Java 2 Standard Edition Version 5.0, specifically using the declaring code and the structure, sequence, and organization of 37 Java API packages.

The pertinent Android versions were: 1.0, 1.1, Cupcake, Donut, Eclair, Froyo, Gingerbread, Honeycomb, Ice Cream Sandwich, Jelly Bean, Kit-Kat, Lollipop, and Marshmallow. In this trial, all agree that this use constituted copyright infringement under the federal Copyright Act of 1976 unless you find that Google has carried its burden as to the right of fair use. In other words, for purposes of this trial, all agree that Google copied certain aspects of copyrighted works and the question remaining for you to decide is whether or not Google's use was a fair use.

Now, I will explain what fair use means under the law.

One policy behind our copyright laws, of course, is to protect the work of authors from exploitation by plagiarists and others. When it applies, however, the right of fair use permits the use of copyrighted works without the copyright owner's consent. The policy behind the right of fair use is to encourage and allow the development of new ideas that build on earlier ones, thus providing a counterbalance to the copyright policy to protect creative works. In short, our copyright laws seek, on the one hand, to promote the progress of science and art by protecting artistic and scientific works while, on the other hand, encouraging the development and evolution of new works building on earlier ones.

Fair use is explained in the federal Copyright Act of 1976. Under the Act, anyone may make fair use of a copyrighted work and may do so without anyone's permission and without notice to anyone. Specifically, the Act states (and I will quote it exactly):

> The fair use of a copyrighted work for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include —
>
> 1. The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> 2. The nature of the copyrighted work;

2

>   3.  The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
>   4.  The effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all of the above factors.

I have just quoted for you the right of fair use exactly as enacted by Congress. In your deliberations, you must decide whether or not Google has met its burden in this trial to prove up that its copying was a fair use. Now I will further explain each of the four factors.

The first factor concerns the purpose and character of the use. This factor includes two issues: (1) whether and to what extent the use serves a commercial purpose, which weighs against fair use, versus a nonprofit educational purpose, which weighs in favor of fair use, and (2) whether and to what extent the new work is "transformative," which supports fair use. Although the Act does not explicitly use the word "transformative," our Supreme Court has decided that the central purpose of the first statutory factor is to evaluate whether and to what extent the purpose and character of the accused work is transformative.

What does transformative mean? A new use is transformative if it is productive and employs the quoted matter in a different manner or for a different purpose from the original, adding value over and above the original. By contrast, copying of copyrighted material that does little more than plagiarize the original in a manner that supersedes the objects of the original is not transformative. The extent of transformation will vary from case to case. The greater the transformation the more likely an accused use will be a fair use and the less the transformation, the less likely an accused use will qualify as a fair use.

In evaluating the first factor, the extent of the commercial nature of the accused use must be considered. Commercial use, as stated, weighs against a finding of fair use, but even a commercial use may be found (or not found, as the case may be) to be sufficiently transformative that the first factor, on balance, still cuts in favor of fair use. To put it

differently, the more transformative an accused work, the more other factors, such as commercialism, will recede in importance. By contrast, the less transformative the accused work, the more other factors like commercialism will dominate.

The second factor is the nature of the copyrighted work. This factor recognizes that traditional literary works, such as fictional novels, are closer to the core of intended copyright protection than informational works, such as instruction manuals. Creative expression is at the very heart of copyright protection. Fair use is generally more difficult to establish for copying of traditional literary works than for copying of informational works or using functional elements of a work such as computer software.

Computer programs and computer languages are not literary works; nevertheless they may be protected by copyright. This is true not only for the line-by-line code but also for the structure, sequence, and organization of a program. Even though a computer program performs functions and has functional elements, the structure, sequence, and organization of a computer program may be (or may not be) creative. When there are many possible ways to structure, sequence, and organize a program, the way created by a copyrighted program may be (or may not be) innovative. On the other hand, when the structure, sequence, and organization are dictated by functional considerations such as efficiency, compatibility, or industry standards, then less creativity is indicated and the core values of copyright protection are less implicated. When purely functional elements are embedded in a copyrighted work and it is necessary to copy associated creative elements in order to utilize those functional elements, then this circumstance favors fair use. In sum, this factor focuses on how close the copied material is to the core values of copyright protection. The less the copied material implicates the core values of copyright protection, the more viable will be fair use and vice versa.

The third factor is the amount and substantiality of the portion used in relationship to the copyrighted work as a whole, which concerns how much of the overall copyrighted work was used by the accused infringer. In addition, if the accused infringer used more than was reasonably necessary for the new work, then the excess use weighs against fair use. If,

4

however, the accused infringer used only what was reasonably needed for a transformative use, then this circumstance weighs in favor of fair use. The extent of permissible copying varies with the purpose and character of the use, which relates back to the first factor.

In assessing this third factor, both the quantity of the material used and the quality or importance of the material used should be considered. For purposes of this factor in our case, the "work as a whole" constitutes all of the compilable code associated with all of the 166 API packages (not just the 37) in the registered work, excluding the virtual machine.

The fourth and final factor is the effect of the accused infringer's use on the potential market for or value of the copyrighted work. This factor militates against fair use if the accused use materially impairs the marketability or value of the copyrighted work. This factor considers not only the extent of any market harm caused by the accused infringer's actions but also whether unrestricted and widespread use of the copyrighted materials of the sort engaged in by the accused infringer would result in a substantially adverse impact on the potential market for the copyrighted work. This factor also takes into account whether the accused work is offered or used as a substitute for the original copyrighted work. Market harm to the value of the copyrighted work may be a matter of degree, and the importance of this factor will vary not only with the amount of harm shown, but also with the relative strength of the showing on the other factors.

It is up to you to decide how much weight to give each of the statutory factors, but you must consider all of them. All of these factors must be explored, discussed, and evaluated by you. No single factor is dispositive. Your evaluation of all factors must be weighed together in light of the purpose of copyright, which as our Constitution states, is to promote the progress of science and the useful arts. Some factors may weigh in favor of fair use and some against fair use, and you must decide, after giving the factors such weight as you find appropriate based on the evidence, whether or not, on balance, they predominate in favor of fair use.

To illustrate the general way in which these factors have been applied, I will now give you some examples from the United States Supreme Court. None of these examples is directly

5

on point for our trial, but they illuminate the general approach taken by the Supreme Court in applying the fair use statute.  Two of them favored fair use and two of them rejected fair use.

In a decision involving Betamax recorders, early devices used to record television programs at home, the tape recordings themselves produced full and exact copies of copyrighted broadcast programs.  The copies at issue were made for home use, rather than for commercial resale, and the copyright owners had already made the broadcast programs available for free, so the home copying had no effect on the market for the television programs.  So, those findings both favored fair use.  The users recorded entire television programs and those programs were largely of an entertaining, rather than informational, nature (so they fell closer to the core of copyright protection), which would weigh against fair use.  Nevertheless, the noncommercial purpose and the minimal effect of the copying on the market for the television broadcasts predominated in the Supreme Court's analysis.  Accordingly, the Supreme Court held that Betamax copying at home was fair use.

Another Supreme Court case concerned a magazine scoop.  Specifically, it concerned publication of a magazine article that quoted President Gerald Ford's then-forthcoming memoirs, which quotes the magazine took from an unauthorized copy of the manuscript.  The book publisher of the memoirs sued the magazine for copyright infringement.  The Supreme Court recognized that news reporting normally weighs in favor of fair use but decided that the magazine had gone beyond the purpose of news reporting and had actively usurped the copyright holder's right of first publication and had done so for commercial gain, which weighed against fair use.  Although President Ford's memoirs were newsworthy and were not literary, the fact that they had not yet been published at the time of the article weighed against fair use.  The article had quoted only three hundred words of copyrighted material, but that material constituted the "heart" of the book, so the substantiality of the passage copied weighed against fair use.  Finally, as a result of the article, the book publisher lost a contract with another magazine for the exclusive right to publish previews of the memoirs, so this adverse effect on the market for the copyrighted work weighed against fair use.  In light of these facts, the

6

Supreme Court concluded that the public benefit of news reporting was insufficient to overcome the combined weight of the other factors, so the magazine's scoop did not constitute a fair use.

In a third case involving Roy Orbison's song, "Oh, Pretty Woman," a rap music group copied the lyrics and bass riff from that song to release a parody called "Pretty Woman." The Supreme Court found that parody was transformative because it used elements from the first to create expression with a different meaning and purpose, namely to critique the themes of the original. The Supreme Court recognized that the rap group created the parody for commercial gain but determined that the commercial nature of the parody was outweighed by the transformative nature of the parody. To be sure, the creative expression of the original song was close to the core of copyright's protective purposes, but the Supreme Court discounted that factor because parodies, by long tradition, are usually aimed at expressive works, and the transformation of one work into another, while shedding new light on the former, also furthered copyright's goals of advancing science and the arts. The Supreme Court determined that the rap group used only as much of the lyrics from the original as reasonably necessary for the parody even though the lyrics quoted the "heart" of the original. This was because, the Supreme Court said, significant copying may be necessary for parodies to "conjure up" the original. As to the other fair use factors, the Supreme Court sent the case back to the district court for further evaluation with instructions to take into account the Supreme Court's holding on the tranformative value of parodies on the fair use question.

As a final example, a film studio produced a movie based in part on a fictional short story. The studio had permission from the owner of the copyright in the short story to make and distribute the movie in the first place, but it later re-released the movie without permission while the copyright owner was then trying to produce a play or a television version of the story. The Supreme Court determined that the re-release was purely for commercial purposes, which weighed against fair use. The copyrighted work was creative expression, namely a fictional literary work at the core of the purpose of copyright protection. The movie used a substantial portion of it by copying the setting, characters, and plot of the short story, all of which weighed

against fair use. Finally, the re-release had prejudiced the copyright owner's ability to market the theatrical and television adaptations of the short story, also weighing against fair use. The Supreme Court determined the re-release did not constitute a fair use.

I have given you these four examples to illustrate the balancing-of-factors approach under the fair use provision. None of these four examples controls our case, but they may help you in understanding the way in which the Supreme Court has approached the balancing of these four factors and therefore the way in which you should approach your decision. It is up to you to weigh the four factors together to decide whether or not Google has carried its burden to establish fair use.

Dated:   April 7, 2016.

WILLIAM ALSUP  
UNITED STATES DISTRICT JUDGE