# REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

1  ORRICK, HERRINGTON & SUTCLIFFE LLP
   KAREN G. JOHNSON-MCKEWAN (SBN 121570)
2  kjohnson-mckewan@orrick.com
   ANNETTE L. HURST (SBN 148738)
3  ahurst@orrick.com
   GABRIEL M. RAMSEY (SBN 209218)
4  gramsey@orrick.com
   405 Howard Street, San Francisco, CA 94105
5  Tel: 1.415.773.5700 / Fax: 1.415.773.5759
   PETER A. BICKS (*pro hac vice*)
6  pbicks@orrick.com
   LISA T. SIMPSON (*pro hac vice*)
7  lsimpson@orrick.com
   51 West 52nd Street, New York, NY 10019
8  Tel: 1.212.506.5000 / Fax: 1.212.506.5151

9  BOIES, SCHILLER & FLEXNER LLP
   DAVID BOIES (*pro hac vice*)
10 dboies@bsfllp.com
   333 Main Street, Armonk, NY 10504
11 Tel: 1.914.749.8200 / Fax: 1.914.749.8300
   STEVEN C. HOLTZMAN (SBN 144177)
12 sholtzman@bsfllp.com
   1999 Harrison St., Ste. 900, Oakland, CA 94612
13 Tel: 1.510.874.1000 / Fax: 1.510.874.1460

   ORACLE CORPORATION
14 DORIAN DALEY (SBN 129049)
   dorian.daley@oracle.com
15 DEBORAH K. MILLER (SBN 95527)
   deborah.miller@oracle.com
16 MATTHEW M. SARBORARIA (SBN 211600)
   matthew.sarboraria@oracle.com
17 RUCHIKA AGRAWAL (SBN 246058)
   ruchika.agrawal@oracle.com
18 500 Oracle Parkway
   Redwood City, CA 94065
19 Tel: 650.506.5200 / Fax: 650.506.7117

20 *Attorneys for Plaintiff*
   ORACLE AMERICA, INC.

21              UNITED STATES DISTRICT COURT

22              NORTHERN DISTRICT OF CALIFORNIA

23                   SAN FRANCISCO DIVISION

24 | ORACLE AMERICA, INC., | Case No. CV 10-03561 WHA |
25 | Plaintiff, | **REPLY RE ORACLE'S MOTION IN LIMINE #5 TO EXCLUDE GOOGLE'S SURVEY EXPERT, DR. SIMONSON** |
26 | v. | |
27 | GOOGLE INC., | Hearing: April 27, 2016, 8:00 a.m. |
28 | Defendant. | Dept.: Courtroom 8, 19th Floor<br>Judge: Honorable William H. Alsup |

1    The purpose of Dr. Simonson's survey is to undermine Google's own internal documents, which show that Google copied the 37 Java API packages in order to rapidly attract Java's established base of developers to its brand new Android platform. Opp. 1-2. But the problem is, as Google admits, Dr. Simonson did not test "what drove developers to develop apps for Android *before* Android was popular." Opp. 2 (emphasis added). Instead, he conducted a vague, open-ended survey asking developers what would influence a decision *today* to develop apps for a platform introduced "*two years ago*" or that has been around "*for a few years*." The results of that survey prove that he tested the wrong thing. Dr. Simonson says his survey shows developers prefer to develop for platforms with *an established base of users*. But Android had no established base when it first launched, and thus developers had to be motivated by something else.

Dr. Simonson's survey is not probative of whether Google's copying attracted Java developers in Android's early days. Yet Google would use that survey to trick jurors into rejecting Oracle's powerful evidence *from Google* of why Google copied. These and other fundamental flaws in Dr. Simonson's survey are not just fodder for "cross-examination." They demonstrate that the survey and Dr. Simonson's conclusions are irrelevant and will serve only to confuse and mislead the jury. Indeed, when Dr. Kearl was asked about the survey, he pulled no punches. He responded that he did not consider the survey because it made no "▮▮▮▮▮▮▮," 3/23/16 Kearl Depo. 97:15-98:16:



Under these circumstances, the Court must exercise its role as gatekeeper and preclude admission of the survey and Dr. Simonson's testimony thereof.

Unable to show that Dr. Simonson's survey is relevant or reliable, Google resorts to rhetoric and mischaracterizations. The very first sentence of Google's brief falsely claims that the ability to attract developers is "the sole basis for Oracle's claim of disgorgement of Google's

- 1 -   REPLY RE ORACLE'S MOTION IN LIMINE #5 RE: GOOGLE'S SURVEY EXPERT, DR. SIMONSON

Android-related profits." Opp. 1. Surely Google's lawyers have read Oracle's expert reports and know that this is but one of several ways Oracle shows a causal nexus between Google's infringement and the Android-related profits Oracle seeks. The most important causal link is Android's undeniable technical dependence on the infringed Java copyrights. Oracle's experts have shown, and Google does not dispute, that Android cannot even compile without the copied 37 Java API packages, that the top Android apps all depend heavily on the copied API packages, and that the copied APIs are many times more central to the Android platform than other APIs.[1] The lack of available alternatives to Oracle's copyrighted works, and the faster programming and increased speed to market provided by Google's use of the copyrighted works, further support the causal link. Malack. Op. Rpt. ¶¶ 224-26, 229-38. In any event, Google's false claim does not justify admitting an irrelevant and unreliable survey.

## I.   DR. SIMONSON'S SURVEY IS IRRELEVANT

Google spends a significant portion of its opposition attacking Google's own internal documents, which contradict Dr. Simonson's conclusions. Google says there are only "a few Google internal business strategy documents" and that those documents are really just the "predictions" of "certain Google employees." Opp. 2. This mischaracterizes the documents. First, Oracle cited a Google presentation where the Android "Strategy" was: "Leverage Java for its existing base of developers." TX 158 at 10. Second, many official Google documents from its high-level executives and Android management team confirm that Google copied the Java API packages in order to speed Android to market, tap into the Java developer community, and convince OEMs and carriers to accept Android.[2] Third, Google ignores the more than 30 presentations it gave to OEMs and carriers promoting Android before Android was released, each time with Google specifically touting the use of the Java APIs as a key element of Android.[3]

For his part, Prof. Kearl considered the above-cited evidence and concluded that Google

---

[1] ECF Nos. 1578-1-4 (Malack. Op. Rpt.) ¶ 239, 1560-10 (Kemerer Op. Rpt.) ¶¶ 61, 95-159.

[2] ECF No. 1613-7 (App A. to Malack. MIL Opp.) at 12-22 (collecting evidence on the importance of Google's copying of Java to its Android strategy).

[3] *See* ECF No. 1560-9 (Jaffe 2d Rpt.) Ex. C (collecting presentations emphasizing "Core Java Lib[rarie]s" in Android).

1  believed that apps were important to Android's success in crafting its strategy for Android,

2  3/23/16 Kearl Depo. 38:6-12:

[redacted]

6  In any event, any dispute Google has with its own documents showing that Google used Oracle's

7  copyrighted works to attract developers does not cure the fundamental flaws in Dr. Simonson's

8  survey—i.e., that he didn't ask the right people, the right questions, at the right time.[4]  Mot. 2-5.

9      Google argues that its copying did not attract app developers because, according to

10  Google, the growth of apps followed consumer adoption and it took a couple of years to grow a

11  sizeable base of apps.  Opp. 3.  Prof. Kearl explained why this is not the correct question, and that

12  what matters is what Google thought it needed at launch, Kearl Depo. (3/23/16) at 59:7-20:



18  *See also id.* 61:7-62:11 (discussing reasons Google's ex-post platform-popularity-drives-apps

19  proposition is flawed and unhelpful).

20      Google tries to salvage its survey by arguing that Oracle has not shown that developers'

21  motivations "change [] over time."  Opp. 1, 4.  Google misses the point.  The mere passage of

22  time is not the issue, but rather that the circumstances impacting developers' motivations have

23  changed over time.  Google has not shown that its December 2015/January 2016 survey fairly and

24  accurately reflects developer decisions from 2007-2009 because it can't.  The app market and the

---

[4] Google also submitted one page of a study that it argues is consistent with Simonson's survey. Opp. 3.  It isn't. The page Google attaches cites market penetration as the number one reason developers cite for selecting a platform. Later in the report, however, the authors admit that respondents had an "emotional bias" towards their chosen platform and "felt that the best aspect of their platform was their large market penetration even if the actual market penetration did not bear that out."  The report also found that Android is the "easiest platform to learn" of all platforms included in the study—and that is because of Google's copying of the Java copyrighted works.

1  status of the Android platform were drastically different in 2007-2009 than they are today.  Mot.
2  2-3.  Google argues there is no evidence that the market environment affects decision-makers,
3  Opp. 4, but Dr. Simonson's own survey shows that the circumstances (i.e., an established base of
4  users) makes a difference.  Google's claim that lawyers created the relevant timeframe is a dis-
5  traction.  It can hardly be debated that the critical window is 2007-2009 because that was when
6  Android was introduced and competing for its survival.

7  Faced with the undeniable fact that Dr. Simonson tested the wrong thing, Google resorts
8  to chiding Dr. Toubia for not being able to "vouch for any methodologically sound" way to cor-
9  rect the survey.  Opp. 4.  But this is an attempt to draw attention away from the survey's flaws.
10  Dr. Toubia was not charged with fixing Dr. Simonson's ill-conceived survey and Google did not
11  move to exclude Dr. Toubia's opinions.  That Dr. Toubia did not have a solution to Dr. Simon-
12  son's errors further demonstrates the inherent difficulty and inappropriateness of conducting a
13  survey to determine what motivated developers to develop for Android 7-9 years ago.[5]

14  **II.  DR. SIMONSON'S SURVEY IS UNRELIABLE**

15  Google dismisses the methodological flaws in Dr. Simonson's survey by wrongly arguing
16  that the authorities Dr. Toubia cites in fact support Dr. Simonson.  But Google fails to back up
17  this argument or show that the survey yielded reliable results.

18  ***Remembering events that occurred 7-9 years earlier.***  Google cites no support for Dr.
19  Simonson's self-serving testimony that respondents are more likely to recall "'high-involvement'
20  business decision[s]" than other autobiographical events.[6]  Opp. 5.  Google argues that Dr.
21  Toubia's literature does not apply because it refers to "personal" rather than "business" decisions.
22  Opp. 5-6.  The import of "autobiographical" in the articles is that the events arise from a person's
23  *own experience or life*.  The decision to develop apps is something within the developer's own
24  experience.  Google does not refute the literature cited by Dr. Toubia that discourages surveys

---

[5] Google's "spoon-feeding" claims lack merit.  Opp. 3.  Dr. Toubia reviewed and relied on the record evidence, as well as facts set forth in reports of other Oracle experts.  Experts are permitted to rely on facts and data collected by others.  *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997).

[6] Although Google insinuates that Dr. Simonson has published relevant studies, Opp. 6, it cites none—presumably because any such articles, if they exist, do not support Google's position.

- 4 -  REPLY RE ORACLE'S MOTION IN LIMINE #5 RE: GOOGLE'S SURVEY EXPERT, DR. SIMONSON

purporting to study events that happened long ago due to the unreliability of recall.  Mot. 4-5.

*Lack of a control group.*  Google ignores Dr. Simonson's admission that he designed his survey to test the factors that *caused* developers to decide to develop for a platform.  Mot. 5-6; *see* Opp. 6-7.  Google also ignores that a control is required to test *causation*, as well as the cases excluding studies for lack of a control.  Mot. 5-6 (collecting authorities).  Dr. Simonson's self-serving testimony (after Dr. Toubia pointed out this flaw in his report) that he did not require a control *because* he asked open-ended questions, and did not test the impact of a stimulus, Opp. 7, overlooks that a control also is needed when testing *causation*.  Mot. 5-6.  Without a control, it is impossible to determine whether Dr. Simonson's assessment of the factors that caused developers to develop apps is accurate, reflects confounding factors, or reflects a flawed survey design.  *Id.*

*Using pre-test results despite no prior plan to do so.*  Google brushes off Dr. Simonson's inclusion of his pre-test by arguing that he made only "minor, cosmetic edits" to his survey, Opp. 7, which by itself renders his survey results unreliable.  Dr. Simonson admits he modified one of the questions because "the initial interviews suggested that some respondents misinterpreted" it and that he added an entirely new question.  ECF No. 1563-10 (Simonson Rpt.) ¶ 22.  Clarifying an ambiguous question is precisely the reason the article cited by Dr. Toubia excludes pre-test results.  Opp. 7 (citing article explaining that clarifying an ambiguous pre-test question in the full survey renders the pre-test unreliable).  And his new question—which probed whether respondents made the decision to develop apps by themselves or as part of a team—is anything but "minor" or "cosmetic."  Mot. 3-4 n.2.  Google ignores that including the pre-test results allowed Dr. Simonson to increase his respondents and their answers by nearly 20%, and to know beforehand whether those answers would support the arguments Google wishes to make at the upcoming trial.  Mot. 6-7.  That Dr. Simonson chose to include the pre-test results only after seeing both those results and the final test results, without any prior plan to use the pre-test results, is a violation of fundamental survey principles, Mot. 7, that renders his survey unreliable and inadmissible.

## CONCLUSION

Google should be precluded from admitting or relying on the survey in any manner.

Dated: April 13, 2016

Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP

By: */s/ Lisa T. Simpson*
     Lisa T. Simpson

Counsel for ORACLE AMERICA, INC.