KEKER & VAN NEST LLP
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
CHRISTA M. ANDERSON - # 184325
canderson@kvn.com
DANIEL PURCELL - # 191424
dpurcell@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    (415) 391-5400
Facsimile:    (415) 397-7188

KING & SPALDING LLP
BRUCE W. BABER (pro hac vice)
bbaber@kslaw.com
1185 Avenue of the Americas
New York, NY 10036
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>        Plaintiffs,<br><br>   v.<br><br>GOOGLE INC.,<br><br>        Defendant. | Case No. 3:10-cv-03561 WHA<br><br>**DEFENDANT GOOGLE INC.'S REPLY IN SUPPORT OF ITS MOTION IN LIMINE NO. 1 TO EXCLUDE CERTAIN TESTIMONY FROM EXPERT REPORT OF DR. CHRIS F. KEMERER**<br><br>Hearing:   April 27, 2016<br>Time:      8:00 a.m<br>Dept.      Courtroom 8, 19th Fl.<br>Judge:    Hon. William Alsup |

DEFENDANT GOOGLE INC.'S REPLY ISO MOTION IN LIMINE NO. 1
RE EXPERT REPORT OF CHRIS F. KEMERER
Case No. 3:10-cv-03561 WHA

1049483

Google's motion is premised on the fundamental fact that, while Oracle's expert Dr. Kemerer purports to offer opinions based on highly technical code analysis, he has no expertise in programming, has not programmed since 1979, and has never written a program in any of the languages that generated the opinions in his reports: Java, "R," or "PHP." Instead, for his opinions on "centrality" and "stability" he relies exclusively on the work done by a litigation support team of undisclosed experts hired by Oracle's lawyers—experts who Dr. Kemerer could not possibly have directed or supervised in any meaningful way because he has no expertise in conducting the expert work that they performed. Characterizing the undisclosed experts' work as "data collection" does not change what they did and does not save his opinions—they remain technical opinions of experts in different fields than Dr. Kemerer and are improper.

Further, Dr. Kemerer improperly offers opinions about market treatment of "APIs" in general, but does so by applying misleading and contradictory definitions of "API" that are certain to confuse the jury. And contrary to Oracle's arguments in its brief, nothing in the Federal Circuit opinion permits or justifies Dr. Kemerer's contradictory definitions of APIs within his opinions when the use of differing definitions is inherently misleading. Google therefore respectfully requests that the Court exclude Dr. Kemerer's testimony regarding these broader and ill-defined "APIs" as set out in Section VII.D of his rebuttal report.

**I.    Dr. Kemerer's opinion testimony concerning the API "centrality" and "stability" analyses should be excluded because it reflects analyses prepared by undisclosed experts in a different field.**

"A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist *in a different specialty*." *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) (emphasis added). Yet, that is exactly what Dr. Kemerer's purported analyses on "centrality" and "stability" consist of—opinions parroting the output of analyses generated by undisclosed experts who allegedly applied *their expertise* to construct scripts analyzing code under *their own methodologies*. The experts who actually performed the centrality and stability analyses were not disclosed and are not in Dr. Kemerer's field—indeed he concedes he is not an expert in their field and could not even comment upon the propriety of the scripts or the inputs used to conduct the analyses. *See, e.g.*, ECF 1562-1 (Kemerer Dep. Tr.) at 178:3-

1

DEFENDANT GOOGLE INC.'S REPLY ISO MOTION IN LIMINE NO. 1
RE EXPERT REPORT OF CHRIS F. KEMERER
Case No. 3:10-cv-03561 WHA

1049483

179:20. The concerns regarding Dr. Kemerer's opinions are further heightened where, as here, Dr. Kemerer has relied upon opinions and data developed by other experts solely for the purposes of litigation. *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003); *Therasense, Inc. v. Becton, Dickinson & Co.*, 2008 WL 2323856, at *1 (N.D. Cal. May 22, 2008).

In opposition to Google's Motion, Oracle first argues that "Courts soundly reject Google's premise that experts must personally conduct each and every task necessary to arrive at their opinions," Oracle Br. at 5:9-10, but Google made no such argument. Google, in fact, expressly acknowledged that reliance on work by others under the expert's direction and supervision can be appropriate—and did not challenge Oracle's other experts' (substantial) reliance on Orrick's litigation support team of undisclosed experts. The difference here is that Dr. Kemerer has an entirely different area of expertise and therefore lacked the ability to direct, supervise, or even explain the methodologies used by the undisclosed experts. That renders Dr. Kemerer's parroting of their analyses improper. *Dura Auto.*, 285 F.3d at 615 (reliance on analyses of undisclosed "assistants" inappropriate where the testifying expert "himself lacks the necessary expertise to determine whether the techniques were appropriately chosen and applied.").

Second, Oracle tries to defend Dr. Kemerer's reliance on the undisclosed experts' work by arguing that their work was mere "data collection" or the creation of "simple computer programs." ECF 1609 ("Opp.") at 4-6. Not so. Dr. Kemerer's "opinions" regarding the centrality and stability analyses restate the results of technical programming analyses of Android and Java source code conducted by the undisclosed experts, using specially prepared code scripts in a variety of programming languages. ECF 1560-10 (Kemerer Rep.) ¶¶ 96-114 (stability analyses) and ¶¶ 149-157 (PageRank/centrality analyses). The stability and centrality/PageRank analyses were not and could not have been directed or supervised by Dr. Kemerer, who admitted that he lacks the expertise to prepare or even comment upon those scripts. *See, e.g.,* ECF 1562-1 (Kemerer Dep. Tr.) at 58:1-58:12 (admitting he has never written a script in the "R" language, which was used by his "technical support team" to generate the stability analysis results); *see also* 178:11-12 ("Again, I don't have training in R, so I'm not going to be able to answer questions

2

DEFENDANT GOOGLE INC.'S REPLY ISO MOTION IN LIMINE NO. 1
RE EXPERT REPORT OF CHRIS F. KEMERER
Case No. 3:10-cv-03561 WHA

1049483

about this script.").[1] Indeed, Dr. Kemerer admitted that each and every analysis used to generate the centrality/PageRank results that are the subject of his "expert" opinions was suggested by Orrick's litigation support team and involved analytical tools he had never used (and in most cases, had never even heard of) prior to this case. *Id*. at 93:2-94:11.[2] Dr. Kemerer's abdication of his expert role and inability to direct and supervise experts conducting work in areas outside of his expertise is perhaps best evidenced by the fact that he could not explain how or why the API packages included (or excluded) in the ***API stability test*** were selected. *Id*. at. 178:3-179:20. Oracle tries to write off this fundamental problem as a mere "memory failure," Opp. at 9:11-22, but Kemerer admitted in his deposition that he wasn't sure he ever knew how the selection of API packages underlying the tests was made, and he could not answer basic questions about the methodology used in constructing this analysis purportedly done "at his direction."[3] Such decisions, which require "exercise of sound technical judgment" and "professional discretion" go well beyond mere data collection, and thus put Dr. Kemerer's opinions squarely in the purview of

---

[1] Dr. Kemerer's inability to answer basic questions on these analyses in his deposition undermines Oracle's argument that "the propriety of an expert's reliance on the data is an issue for cross-examination." Opp. at 9 (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 124347, at *1 (N.D. Cal. Jan. 8, 2013)).

[2] "Q. Have you given me a full list of tools used in conducting the analyses concerning PageRank in your opinions? A. Off the top of my head, yes, I believe that's correct. Q. All right. Who selected the use of NetworkX? A. I did in consultation with my technical support team. Q. Prior to this case, had you ever used NetworkX? A. I had not. Q. Prior to this case, had you ever used Understand? A. Prior to this case, I had not. Q. Prior to this case, had you ever used, PageRank? A. Prior to this case, no. Q. Did the technical support team suggest to you the use of NetworkX, Understand, or PageRank in connection with this case? A. We discussed a variety of options, but, yes, those were the options that seemed to be the best suited for this task. Q. And those were suggested to you by your technical support team; correct? A. After they completed a review of available tools that I asked them to do. Q Prior to this case, had you ever heard of NetworkX? A. I'm not certain. Q. Prior to this case, had you ever heard of Understand? A. Not certain about that either. Q. Prior to this case, had you ever heard of PageRank? A. Oh, yes. Everybody knows PageRank."

[3] "Q. How were these specific 200 API packages selected for study as part of your analysis? A. I honestly don't recall. Q. Did you ever know? A. I may have at one point. Q. Who would know? A. I don't know the answer to that question either. Q. Do you have whether anyone checked to see what was in the source code repository for each API level is preparing this list? A. No, I don't know that. Q. Do you know whether Android always had no more than 200 packages? A. No, I don't. Q. Do you know whether there were additional Android packages that were not counted in the analysis that is reflected in Appendix D? A. No, I don't know. Q. For the questions I just asked you where you said "I don't know," who would you ask to find out? A. I would ask someone from the technical support team…." ECF 1562-1 (Kemerer Dep. Tr.) at 178:23-179:20.

1049483

cases like *Dura Auto. Id.*, 285 F.3d at 614-15.[4]

Third, Oracle defends Dr. Kemerer's report by claiming (wrongly) that Google does not challenge the analyses reflected in his opinions. As an initial matter, Google ***has*** challenged those analyses—*see, e.g.*, ECF 1563-5 (Astrachan Rebuttal Rep.) ¶¶ 171-178 (challenging stability analysis); ECF 1563-6 (Astrachan Reply Rep.) ¶¶ 60-79 (challenging centrality and stability analyses)—Oracle simply leaves out portions of Google's experts' testimony in suggesting that its experts agree with Oracle's analyses. ECF 1614-7 (Astrachan Dep. Tr.) at 99:21-100:10.[5] Furthermore, Oracle's argument still does not change a fundamental problem—that the centrality and stability analyses are not the opinions of Dr. Kemerer, but instead of undisclosed experts whose credentials and methodologies are unknown to Dr. Kemerer himself, and who never produced their own expert reports or were subject to expert discovery in this case. Oracle should not be allowed to present the testimony of these undisclosed experts through Dr. Kemerer as a mouthpiece. Accordingly, Dr. Kemerer's stability and centrality/PageRank opinions should be stricken. *Dura Auto.*, 285 F.3d at 615 (holding that expert testimony was properly excluded where the undisclosed experts "did not merely collect data" or "otherwise perform routine procedures" and the testifying expert "lack[ed] the necessary expertise to determine whether the techniques were appropriately chosen and applied").[6]

---

[4] The cases cited by Oracle are not to the contrary. *See, e.g., McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 36 (D.D.C. 2004) (many experts "***design tests***, but for various reasons—including costs to the client—do not personally run them, but instead rely on their assistants to do so, ***reviewing their output to ensure that the test was properly conducted***") (emphases added). Here, Dr. Kemerer was neither capable of designing these experiments nor reviewing their output to be sure the tests were properly conducted.

[5] *Id.* ("A. [T]he scripts in Dr. Kemerer's report are reasonably extensive PHP scripts that I looked at, but did not look at in sufficient detail to determine, do they actually do what they claim to do? … I would be uncomfortable asserting that the PHP scripts in Dr. Kemerer's report were correct in some way. Q. Now, as you sit here today, can you identify any flaws in those PHP scripts in Dr. Kemerer's report? A. I cannot identify any such flaws, no.").

[6] Contrary to Oracle's assertion, Google did not represent Dr. Kemerer's testimony. Oracle's additional quotations confirm that Kemerer relied on a mantra that analyses were done "at his direction," rather than providing any substantive knowledge about those analyses. It is unclear how Kemerer "directed" analyses using analytical tools he had never heard of or used prior to this litigation, did not use himself in this case, and that Orrick's litigation support team selected.

4
DEFENDANT GOOGLE INC.'S REPLY ISO MOTION IN LIMINE NO. 1
RE EXPERT REPORT OF CHRIS F. KEMERER
Case No. 3:10-cv-03561 WHA

1049483

**II.     The Court should exclude Dr. Kemerer's irrelevant and misleading testimony concerning third party licensing or intellectual property practices regarding distinct forms of technology that Dr. Kemerer calls "APIs."**

Dr. Kemerer's opinions contain two contradictory definitions of the term "API"—contradictory in a way that is intended to mislead the jury and should not be permitted. For one portion of his opinions, Dr. Kemerer says that API narrowly is defined as "the declaring code and the structure, sequence, and organization of the application programming interfaces in Java." ECF 1562-1 (Kemerer Dep. Tr.) at 67:15-21 (. But, in his rebuttal report—offered to support Oracle's argument that the industry treated APIs as things that have traditionally been licensed for money—Dr. Kemerer says that API is a broad and distinct concept that includes a host of technology not limited to the narrow definition of API used in his opening and rebuttal reports. That broader definition of API includes implementing code, software-as-a-service functionality, and other concepts. ECF 1560-11 (Kemerer Reb. Rep.) ¶ 174; ECF 1562-1 (Kemerer Dep. Tr.) at 68:4-20.[7]

However, what is at issue here is not implementing code or software-as-a-service technology; instead, it is whether the declarations/SSO are intellectual property that industry participants would have expected to have to pay money for a license to use. It is highly misleading for an Oracle witness to testify about evidence of licensing implementing code and software-as-a-service as if it is relevant evidence of whether the industry believed licenses were required to use declarations, and, critically, even more misleading to conceal that distinction by calling these distinct types of intellectual property APIs. *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 993 (9th Cir. 2009) ("Unfair prejudice' within [this] context means an undue tendency to suggest decision on an improper basis.").

Finally, Google's motion does not contradict the Federal Circuit's opinion, which did ***not*** define API to be anything in a vaguely defined "API economy," nor did it offer contradictory and confusing definitions of the term.

---

[7] "Q. What do you mean by that, 'used in a much broader context'? A. That it means that the broader definition, the idea that it's – it's the mechanism by which you access some other resource. Q. What do you mean by "other resource"? A. It could be a variety of things. Q. Like what? A Could be data. Q. What else? A. Could be an operating system. Q. What else? A. Those are two examples that come to mind. Q. Could it include a service? A. I don't know…."

5

1049483

1
2  Dated: April 13, 2016                                        KEKER & VAN NEST LLP

3
                                                         By:   /s/ Robert A. Van Nest
4                                                              ROBERT A. VAN NEST
                                                               CHRISTA M. ANDERSON
5                                                              DANIEL PURCELL

6                                                              Attorneys for Defendant
                                                               GOOGLE INC.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

6
DEFENDANT GOOGLE INC.'S REPLY ISO MOTION IN LIMINE NO. 1
RE EXPERT REPORT OF CHRIS F. KEMERER
Case No. 3:10-cv-03561 WHA

1049483