Pages 1 - 138

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

ORACLE AMERICA, INC.,           )
                                )
          Plaintiff,            )
                                )
   VS.                          )    NO. C 10-03561 WHA
                                )
GOOGLE, INC.,                   )
                                )
          Defendant.            )
_____)

                         San Francisco, California
                         Thursday, April 14, 2016

                 **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    666 Fifth Avenue
                    New York, New York 10103
               BY:  **PETER A. BICKS, ATTORNEY AT LAW**
                    **LISA T. SIMPSON, ATTORNEY AT LAW**

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, California  94105
               BY:  **ANNETTE L. HURST, ATTORNEY AT LAW**
                    **GABRIEL M. RAMSEY, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiff:
                         ORRICK, HERRINGTON & SUTCLIFFE LLP
 3                       777 South Figueroa Street - Suite 3200
                         Los Angeles, California  90017
 4             BY:  ALYSSA M. CARIDIS, ATTORNEY AT LAW

 5                       ORRICK, HERRINGTON & SUTCLIFFE LLP
                         1000 Marsh Road
 6                       Menlo Park, California  94025
               BY:  ROBERT L. URIARTE, ATTORNEY AT LAW
 7
     For Defendant:
 8                       KEKER & VAN NEST LLP
                         633 Battery Street
 9                       San Francisco, California  94111
               BY:  ROBERT A. VAN NEST, ATTORNEY AT LAW
10                  CHRISTA M. ANDERSON, ATTORNEY AT LAW
                    MATTHIAS A. KAMBER, ATTORNEY AT LAW
11                  REID P. MULLEN, ATTORNEY AT LAW
                    MAYA KARWANDE, ATTORNEY AT LAW
12                  EUGENE M. PAIGE, ATTORNEY AT LAW

13   Also Present:       Matt Sarboraria, Oracle America, Inc.
                         Andrew Temkin, Oracle America, Inc.
14                       Ruchika Agrawal, Oracle America, Inc.
                         Renny Hwang, Google, Inc.
15

16

17

18

19

20

21

22

23

24

25
```

<u>**Thursday - April 14, 2016**</u>                          <u>**8:00 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

---oOo---

    **THE COURT:**  We'll continue with the Oracle versus Google case.

    And my law clerk has handed out to you some questions that we'll take up on Tuesday when we do the arguments.  We're going to do arguments on Tuesday and Wednesday -- have a seat, please -- for damages on Tuesday and something else will come up on Wednesday, 8:00 a.m. each day.

    And I need your help on a lot of questions on damages, but I wrote up some of them that are on my mind, and I ask you to please be completely frank with me and not give me smoke and mirrors because when I find out later on that what you told me was only half true and I've wasted ten minutes trying to get to the bottom of something, and then I get confused.  I need the help of the lawyers to be completely frank and officers of the court, not advocates, otherwise I'm just going to cancel these hearings and do the best I can on the briefs.

    All right.  Today is -- by the way, I can't find in the history of the universe a single decision that's ever accepted Google's noninfringing alternatives analysis.  I know that Dr. Kearl thinks it's right, but he's just an economist.  Is there a single decision by a Court of Appeals that says this noninfringing alternatives is a good way to allocate?  Maybe.

 1   I don't know.  I'd like to know if there is or is not.  If

 2   there's one that says it's no good, let me know that.

 3       All right.

 4           **THE CLERK:**  Calling civil action 10-cv-3561, Oracle

 5   America, Inc., versus Google, Inc.

 6       Counsel, please approach the podium and state your

 7   appearances.

 8           **MR. BICKS:**  Good morning, Your Honor.  Peter Bicks

 9   from Orrick for Oracle, and we have our -- you know

10   Ms. Hurst --

11           **THE COURT:**  You don't have to introduce everybody.

12   It's the same group; right?

13           **MR. BICKS:**  I would just say today that Alyssa Caridis

14   is going to address one of the motions, the JDK motion.  I

15   don't think Your Honor has met her.

16           **THE COURT:**  No.  That's correct.  Welcome to the

17   court.

18           **MS. CARIDIS:**  Good morning, Your Honor.

19           **THE COURT:**  What's your name again?

20           **MS. CARIDIS:**  Alyssa Caridis.

21           **THE COURT:**  All right.  Great.  Welcome.

22           **MR. VAN NEST:**  Good morning, Your Honor.  Bob

23   Van Nest, Keker & Van Nest, for Google.  This morning Michael

24   Kwun will address one of the motions -- you know Michael Kwun

25   from our office -- and Gene Paige will address the other.

1          **THE COURT:**  All right.  Welcome to all of you.

2          **MR. VAN NEST:**  Thank you.

3          **THE COURT:**  All right.  So let's go to OpenJDK, and it

4     comes up in a couple ways.  It comes up under factor four.  It

5     comes up under possible damages.  And I have -- I can't say

6     that it's not going to be allowed so I'm not ruling anything

7     out, but I want you to know it sounds counterfactual to me that

8     if it was so easy to have done it this way, it would have been

9     done this way; but that's just a commonsense reaction and not a

10    judge's reaction.  So I need to understand it, and I want you

11    lawyers to please be completely frank with me.

12         All right.  Okay.  You get to go first.  Give me your name

13    again.  Alyssa what?

14         **MS. CARIDIS:**  Alyssa Caridis.

15         **THE COURT:**  A-L-I-S-A?

16         **MS. CARIDIS:**  A-L-Y-S-S-A.

17         **THE COURT:**  All right.  And how do you spell your last

18    name?

19         **MS. CARIDIS:**  C-A-R-I-D --

20         **THE COURT:**  C-A-R --

21         **MS. CARIDIS:**  -- I-D --

22         **THE COURT:**  -- I-E --

23         **MS. CARIDIS:**  -- I-S.

24         **THE COURT:**  Alyssa -- do it again very slowly.

25         **MS. CARIDIS:**  Sure.  C-A-R --

1          THE COURT:  C-A-R --

2          MS. CARIDIS:  -- I-D --

3          THE COURT:  -- D --

4          MS. CARIDIS:  -- I-S.

5          THE COURT:  Thank you.  Ms. Caridis, go ahead.

6          MS. CARIDIS:  Good morning, Your Honor.  I am here on

7    behalf of Oracle to talk about Oracle's first *motion in limine*

8    relating to OpenJDK.

9          Oracle seeks to exclude Google from presenting improper

10   evidence and argument relating to OpenJDK for three reasons.

11   First, Oracle seeks to exclude Google from arguing about a

12   speculative hypothetical that it could have used OpenJDK from

13   2007 until the present; second, Oracle seeks to exclude Google

14   from presenting fair use theories that are improper and were

15   not disclosed during fact discovery; and, third, Oracle seeks

16   to strike the expert report of Mr. Andrew Hall.

17         THE COURT:  All right.  Let's do these one at a time

18   and we'll flip back and forth.  So let's start with your very

19   first point.  We're going to try to cover all three.  So repeat

20   that first point.

21         MS. CARIDIS:  The first point, Your Honor, is that

22   Oracle seeks to exclude Google from arguing the speculative

23   counterfactual that it could have used OpenJDK from 2007 until

24   the present.

25         THE COURT:  All right.  So -- all right.  Please go

1    ahead.

2              MS. CARIDIS:  So, Your Honor, Google intends --

3              THE COURT:  But isn't -- I mean, lots of times in

4    other cases lawyers are allowed to say, especially plaintiffs,

5    "Here's what we would have done.  We would have made billions

6    of dollars if we had only" -- I mean, you do it yourself on

7    your damages.  You come up with, "Here's the -- here's how we

8    would have hit a home run if we had not been knocked out of the

9    market."

10        So the fact that it's counterfactual is not the -- only

11   gets to first base; right?  So you have to explain why it's so

12   bad and so speculative and just a fraud on the court.  Not

13   quite -- I'm overstating it some, but to say that it's

14   counterfactual is not enough.  All right?

15             MS. CARIDIS:  I understand, Your Honor.

16             THE COURT:  So help me understand why it is so bad a

17   theory that we should not allow the jury to hear this.

18             MS. CARIDIS:  So, Your Honor, I think the answer to

19   your question is in two parts.  The first is that we have

20   documents and testimony showing that Google rejected for a very

21   real reason the exact hypothetical that it is now arguing it

22   could have done in 2007.

23             THE COURT:  All right.  I want you to remember your

24   words.  You said "the exact hypothetical."

25             MS. CARIDIS:  Yes, Your Honor.

1          **THE COURT:**  Okay.  So they come back and say, "No.  We

2     were talking about the virtual machine.  We weren't talking

3     about the Classpath and all that."  So you still stand by what

4     you just told me?

5          **MS. CARIDIS:**  I do, Your Honor.

6          **THE COURT:**  The exact hypothetical?  Okay.  I'm very

7     anxious to hear what you have to say.

8          **MS. CARIDIS:**  I look forward to telling you.

9          Your Honor, I was in the courtroom yesterday when you told

10    the parties that you wanted the jury to hear real facts from

11    percipient witnesses, and the second -- my second part to the

12    question that you posed is, in this case we're not hearing

13    about facts and witnesses on Google's side; we're hearing

14    expert witness speculation.  So we're not hearing from

15    percipient witnesses.  We're not looking at documents.  What

16    Google wants to tell the jury is solely driven by expert

17    testimony and ignores the actual facts.

18         So to put us in a little bit of the proper time frame

19    here, Sun announced OpenJDK to the public on November 13th,

20    2006.  This announcement included the identification of Sun's

21    chosen open source licenses.  So in November of 2006, it was

22    announced that the Java -- that OpenJDK, which includes the 37

23    packages here, was going to be licensed under GPL Version 2

24    with Classpath exception.

25         And, Your Honor, multiple times over the past two months

1   while we've been in court you've asked Google's counsel why

2   didn't they just use OpenJDK back in 2007, and their response

3   consistently has been:  It's a timing issue.  We just -- you

4   know, Android was about to launch.  It had already assembled an

5   Android platform.  It was getting ready to launch.  Mr. Kamber

6   said that same thing yesterday.  But it's just not true,

7   Your Honor.

8        So, Your Honor, what I'm displaying here is a deposition

9   that was marked -- is an exhibit that was marked during the

10  deposition of Dan Bornstein back during the first phase of

11  discovery.  I have a copy.

12       **THE COURT:**  I can't read it from that distance.  If

13  you get it a little bit closer maybe.  Just bring the whole --

14  let's see.  Sorry.  I don't know why I can't read very well.

15       **MS. CARIDIS:**  I have a paper copy if you'd like.

16       **THE COURT:**  All right.

17       **MR. VAN NEST:**  We'd like to be able to see it too,

18  Your Honor.

19       **THE COURT:**  All right.  Hand the paper copy to both

20  sides.  All right.

21       Okay.  Well, you did exactly what I wanted.  You --

22       **MS. CARIDIS:**  I brought you a poster board.

23       **THE COURT:**  It's so small I can't read it very well,

24  but okay.  "I forgot to ask," it says -- I'm going to read it

25  out loud because I want to -- this is Exhibit 112, Dan

1   Bornstein to Ramy.  It says "Java Open Source," date

2   November 28th '06, which you say is a couple weeks after that.

3   All right.  Here's what it says.  It's short:  (reading)

4        "I forgot to ask you the other day.  Will Sun's

5        recent announcement about open sourcing Java happen soon

6        enough to benefit Android?"

7   The answer:  (reading)

8        "It's not about timing so much as details.  The

9        licensing that Sun is using for both SE and ME are

10       incompatible with Android's needs.  I'm happy to talk

11       further about it in person.  Also, there are some pics

12       from my travels at," something, I can't read it, "if

13       you're interested."

14  All right.  Who is Ramy?

15       **MS. CARIDIS:**  Ramy Dodin is a software engineer at

16  Android, and he's the one that posed the question to Dan

17  Bornstein, and Mr. Bornstein was the technical lead for the

18  Dalvik virtual machine and core libraries at Android.

19       **THE COURT:**  Sorry.  Bornstein was?

20       **MS. CARIDIS:**  The technical lead.

21       **THE COURT:**  Technical --

22       **MS. CARIDIS:**  Lead.

23       **THE COURT:**  -- lead.  All right.

24  Okay.  So -- all right.  So what -- anticipate what the

25  other side's going to say about this and tell me what your

```
 1   response is.
 2           MS. CARIDIS:  Your Honor, in Google's opposition,
 3   Google argued that the documents that we were putting forward
 4   were about ME and not SE.  This document clearly discusses
 5   both.  I am, frankly, not sure what their response to this
 6   particular document is.
 7           THE COURT:  All right.  But your point -- your overall
 8   point is that timing was not what was going on, although it
 9   says "It's not about timing so much as details."  So that's
10   your point.
11           MS. CARIDIS:  Correct, Your Honor.
12           THE COURT:  All right.  Okay.  I understand that
13   point.  Why don't we continue on with your next exhibit.
14       You can use the ELMO if you want, but are you going to
15   hand up a copy?
16           MS. CARIDIS:  I can hand up a copy, Your Honor.
17           THE COURT:  Please do that.  That way I can keep it
18   after the hearing.
19       Okay.  So this one is Exhibit Number 156.
20           MS. CARIDIS:  Correct, Your Honor.  It was marked
21   during the first trial -- it was marked during the first trial.
22           THE COURT:  Oh, a trial exhibit.
23           MS. CARIDIS:  Yes.
24           THE COURT:  All right.  So it's a pretty long
25   document, so which part is the relevant part?
```

1          **MS. CARIDIS:**  Your Honor, so the very top of the

2     e-mail is the relevant part.  It's an e-mail from Cedric Beust

3     to a whole host of people at Android.  You'll see that it was

4     sent on November 13th, 2006, which is the day that Sun publicly

5     announced OpenJDK.

6          Sun actually gave Google a heads-up.  Google knew about --

7     Google and Android knew about OpenJDK the day earlier, but this

8     particular document is the day of the public announcement.  And

9     Cedric Beust in his e-mail acknowledges that the Java SE class

10    libraries, which are what we're talking about here, are

11    released in OpenJDK under the GPL Version 2 with Classpath

12    exception.  This is in the first --

13         **THE COURT:**  Where does it -- I don't see "JDK"

14    anywhere on here.

15         **MS. CARIDIS:**  Your Honor, this entire e-mail chain is

16    talking about Sun's open source announcement, which was the

17    OpenJDK announcement of November 13th, 2006.

18         **THE COURT:**  I'll take your word for that, but --

19         **MS. CARIDIS:**  I don't think that part is going to be

20    in dispute.

21         **THE COURT:**  -- it isn't clear to me, but let's assume

22    that's right.  So what is the important part here?

23         **MS. CARIDIS:**  So, Your Honor, the first main paragraph

24    after "Here is the current word," Mr. Beust rights:  (reading)

25              "Unmodified GPL2 for our SE, ME, and EE code."

1          And then he says:  (reading)

2              "GPL2 plus Classpath exception for the SE libraries."

3      Those are the libraries that we are talking about today.

4          **THE COURT:**  SE?

5          **MS. CARIDIS:**  Yes.

6          **THE COURT:**  What does "SE" mean?

7          **MS. CARIDIS:**  Standard Edition.

8          **THE COURT:**  Okay.

9          **MS. CARIDIS:**  Java SE.

10         **THE COURT:**  (reading)

11             "GPL2 plus Classpath exception for the SE libraries."

12     All right.  I'm going to put a big box around that.  But

13     that doesn't say anything.  So there must be something better

14     in there than this.

15         **MS. CARIDIS:**  Sure.  So two paragraphs later in that

16     same top e-mail, Mr. Beust writes:  (reading)

17             "I would already be happy if we can just drop in

18         their libraries, but still not sure it's compatible with

19         their licensing choices."

20         **THE COURT:**  Okay.  So that's the key language.

21         **MS. CARIDIS:**  Yes, Your Honor.

22         **THE COURT:**  But not being sure is not the same as

23     being sure it can't be done.  This is on the day it happened,

24     it was announced.

25         All right.  What else you got?

1              **MS. CARIDIS:**  Your Honor, you'll also notice that

2     later on in this e-mail chain Brian Swetland, about halfway in

3     the middle of the page, is a participant on this e-mail chain,

4     and Mr. Swetland was a senior staff software engineer, and he

5     was asked during his deposition about this e-mail and

6     specifically about Cedric -- Mr. Beust's e-mail.

7              **THE COURT:**  Okay.

8              **MS. CARIDIS:**  And in 2000 -- and in his deposition, he

9     was asked whether he, Mr. Swetland, would have been happy to

10    drop in Sun's libraries at that point; and Mr. Swetland's

11    response, and I can hand you up a copy of the transcript if

12    you'd like it but I'm just going to read it verbatim:

13    (reading)

14              "Based on the specifics of their licensing, no,

15         because they would be incompatible with our policy of not

16         using GPL for core libraries."

17              **THE COURT:**  Read it one more time, please.

18              **MS. CARIDIS:**  In response to the question, "Would you,

19    Mr. Swetland, have been happy to drop in Sun's libraries into

20    Android at that point," Mr. Swetland responded:  (reading)

21              "Based on the specifics of their licensing, no,

22         because they would be incompatible with our policy of not

23         using GPL for core libraries."

24              **THE COURT:**  Remind me, what -- okay.  You don't have

25    to read it again, but remind me what the problem was with the

1    GPL license.

2           MS. CARIDIS:  So, Your Honor, the GPL license is --

3    it's a very complicated license, let me just start out by

4    saying that.  So I apologize.  I can explain whatever you'd

5    like me to explain.

6           THE COURT:  What is it about the GPL that was a

7    problem for the APIs is what I'm trying to get at.

8           MS. CARIDIS:  Sure.  So during the 2006 to 2007 time

9    frame, Google was attempting to convince OEMs to adopt this

10   Android platform; and OEMs, like the Samsungs and HTCs of the

11   world, had a desire to take the Android platform and make

12   modifications to the source code in order to customize Android

13   for their particular phones.  So in order to differentiate

14   Samsung Android phones from HTC Android phones, they wanted to

15   make customizations.

16      And the GPL family of licenses -- there are several GPL

17   licenses, but the GPL family in general is known as a copyleft

18   license.  And "copyleft" basically means if you make

19   modifications to the source code, you have to make those

20   modifications public.  So --

21          THE COURT:  Public.  And so you mean disclose it, or

22   does that mean everyone in the world can use it as well?

23          MS. CARIDIS:  You have to publish your source code, so

24   it has to be made public.  It is still under an open source

25   license, so you publish it under the GPL license, but it is

1  made public for the whole world to see and to use pursuant to

2  the license terms.

3         **THE COURT:**  And in the actual event did these

4  companies like Samsung in fact take Android and customize it?

5         **MS. CARIDIS:**  Yes, they have, Your Honor.

6         **THE COURT:**  HTC as well?

7         **MS. CARIDIS:**  Yes, Your Honor.  So how -- so these

8  OEMs still keep their source code confidential to this day

9  because, you know -- in part because the Android source code is

10  released under Apache, which does not require you to make your

11  modifications public.

12      One of the things that one of our experts, Dr. Douglas

13  Schmidt, did was reverse engineer one of these phones to see

14  what modifications the OEMs made to the API packages and to

15  other portions of Android in an attempt to differentiate those

16  phones from their competitors.

17         **THE COURT:**  I'm just curious.  Give me a couple of

18  sentences on what he found.

19         **MS. CARIDIS:**  He found that the -- in particular it

20  was an HTC phone -- that HTC made changes to the 37 packages

21  that we're talking about in issue, and he also found that HTC

22  made changes to other portions of the Android source code.

23      And, Your Honor, the reason that other portions of Android

24  source code besides the libraries are relevant here is because,

25  depending on how you distribute source code that is subject to

1  these GPL licenses, you might be infecting other source code.

2       The terms of the license our expert, Ms. Gwyn Murray,

3  proffers requires you to make other parts of the Android source

4  code distributed under GPL with Classpath exception in addition

5  to just the core libraries.

6       **THE COURT:**  I'm sorry.  You're talking about Android,

7  or are you talking about the original Java GPL?

8       **MS. CARIDIS:**  I'm talking about Android.  So

9  depending -- so in the open-source world, depending on how you

10  use and distribute source code that is subject to a GPL

11  license, you might not -- based on the terms of the license,

12  you may not only have to distribute the original GPL license

13  code, your modifications to that, you may also be required to

14  distribute other parts of your source code under the GPL

15  license.

16       **THE COURT:**  Now you're back to the Java, though.

17       **MS. CARIDIS:**  No, Your Honor.  I'm still talking about

18  Android.

19       **THE COURT:**  You're still talking about Android?

20       **MS. CARIDIS:**  Yes.

21       **THE COURT:**  "GPL" means what?

22       **MS. CARIDIS:**  The GNU general public license.

23       **THE COURT:**  General?

24       **MS. CARIDIS:**  Public license.

25       **THE COURT:**  Let's go back to your e-mails.  I

1    understand your point on Number 156, so let's go to the next

2    one, and please hand it up to me if you've got a copy.  Thank

3    you.

4          All right.  This is one -- sorry.  This is Trial

5    Exhibit 415.

6          By the way, just for clarity's sake, are the trial

7    exhibits going to be numbered the same in the upcoming trial?

8                **MS. HURST:**  Yes, Your Honor.

9                **THE COURT:**  All right.  So we at least save ourselves

10   that point of confusion.

11         All right.  This is from Dan Bornstein to Ray Chen, copy

12   Steve Horowitz, "Greetings from the Android VM Team," and this

13   is a long one-and-a-half page so you have to help me zero in on

14   what you want me to focus on.

15               **MS. CARIDIS:**  Yes, Your Honor.  So about three

16   quarters of the way down the page there is a sentence that

17   starts -- a paragraph that starts "We talked about using GNU

18   Classpath."

19               **THE COURT:**  "GNU" means what?

20               **MS. CARIDIS:**  "GNU" is a name of the organization that

21   is involved in the open source community quite heavily.

22               **THE COURT:**  All right.  So go ahead.

23               **MS. CARIDIS:**  Okay.  So to give you a little bit of

24   context, Your Honor, yesterday you'll recall Mr. Kamber listed

25   three options that he said Google had for the 37 Java API

1    packages.  The first was Apache Harmony, the second was GNU

2    Classpath, and the third was OpenJDK.

3        Now, so Your Honor -- for Your Honor's information, GNU

4    Classpath and OpenJDK are released under the same license.

5    They're released under the GPL Version 2 with Classpath

6    exception.

7        So what we have here is Dan Bornstein saying that they

8    looked at GNU Classpath, and that the lawyer-advised consensus

9    is that there is a potential for trouble.  He continues:

10   (reading)

11            "The same situation holds with Sun's release of their

12        own class libraries under a very similar license."

13       So here we actually have Dan Bornstein, who again is the

14   tech lead for the Dalvik virtual machine and the core

15   libraries, saying, "We looked at GNU Classpath.  It doesn't

16   work.  There's a potential for trouble, and that the same thing

17   is true for Sun's open source OpenJDK."

18            **THE COURT:**  So when it says, "Sun's release of their

19   own class libraries under a very similar license," it doesn't

20   use the words "JDK" there.

21            **MS. CARIDIS:**  Correct.

22            **THE COURT:**  But you're saying that's what it means?

23            **MS. CARIDIS:**  Yes, Your Honor.

24            **THE COURT:**  And that a witness can back that up?  Is

25   that what Bornstein testified to?

1              MS. CARIDIS:  Mr. Bornstein I don't believe was asked

2    this point.  I would be very surprised if Google disputed that

3    that is referring to OpenJDK.

4              THE COURT:  All right.  So he's saying -- your point

5    is that Bornstein -- what's his position in all this?  Is he --

6              MS. CARIDIS:  Dan Bornstein was the tech lead for the

7    Dalvik virtual machine and core libraries at Android.

8              THE COURT:  Core libraries?

9              MS. CARIDIS:  Yes, Your Honor.

10             THE COURT:  Is that the same thing as APIs?

11             MS. CARIDIS:  It is the -- it is where the 37 packages

12   in the Android source code live.

13             THE COURT:  All right.  So the guy who was in charge

14   of the 37, Bornstein, says, "The lawyer-advised consensus is

15   that there is potential for trouble"?

16             MS. CARIDIS:  Yes, Your Honor.

17             THE COURT:  And he says that's true for both GNU and

18   JDK; right?

19             MS. CARIDIS:  Yes, Your Honor.

20             THE COURT:  While we're on this one, what does he say

21   about Apache here?

22             MS. CARIDIS:  I believe he says that Apache is

23   compatible with their business needs and their business

24   requirements.

25             THE COURT:  Okay.  All right.  So that's February 26,

1    '07.

2        All right.  What else do we have?

3        **MS. CARIDIS:**  The next document was marked as

4    Plaintiff's Deposition Exhibit 215 in July of 2011.

5        **THE COURT:**  All right.  That is from Joshua Bloch to

6    Jesse Wilson, "Re Open JDK on Android."  That's December 7th,

7    2009.

8        Okay.  What's the part there that is important?

9        **MS. CARIDIS:**  So there are two parts here that are

10   important.  The first is Mr. Wilson's original e-mail to

11   Mr. Bornstein, and at the very last sentence of the first full

12   paragraph from Mr. Wilson's e-mail, he says:  (reading)

13        "I'd like to be certain that OpenJDK's class library

14        is not an option for Android."

15   He says --

16       **THE COURT:**  Wait.  Wait.  I don't -- I'm just sorry I

17   don't see that paragraph.  I know you're reading it right, but

18   show it to me.  What paragraph is it?

19       **MS. CARIDIS:**  Sure.  So the first paragraph that

20   starts "I work on core libraries."

21       **THE COURT:**  Right.

22       **MS. CARIDIS:**  It's the last sentence of that

23   paragraph.

24       **THE COURT:**  I see.  Let me read the sentence before

25   that.  I'll read it out loud:  (reading)

1          "It's also a waste of Google's engineering talent to

2      be maintaining two independent copies of the Java class

3      libraries:  Google 3 and App Engine both use OpenJDK,

4      but" -- something -- Crore?

5          **MS. CARIDIS:**  Crore.

6          **THE COURT:**  (reading)

7      -- "Crore both use Harmony.  I'd like to be certain

8      that OpenJDK's class library is not an option for

9      Android."

10     Let me just read the next.  He continues on to say:

11 (reading)

12          "As I see it, the primary hurdle is OpenJDK's

13     licensing.  It's licensed under GPL plus Classpath

14     exception; whereas, Android is Apache licensed, but our

15     Linux kernel is GPL.  So there's a small precedent of

16     mixed licensing in Android.  As I understand it, OpenJDK's

17     Classpath exception gives us additional flexibility."

18     All right.  So what's your point to be made on this?

19         **MS. CARIDIS:**  Sure.  So Mr. Wilson is asking

20 Mr. Bornstein, "I want to be sure we can't do OpenJDK in

21 Android."  And at the top of the document that I handed --

22         **THE COURT:**  Well, I thought it was from -- the other

23 way around.  I thought it was from Bloch to Wilson.

24         **MS. CARIDIS:**  No, Your Honor.  If you look at the

25 fourth line of the e-mail, you see that it's a -- that the

1   e-mail that we were just looking at was from Jesse Wilson, and

2   then the top three lines of the document are Mr. -- sorry --

3   Mr. Bloch's response.  You're right, Your Honor.  I think I

4   said Mr. Bornstein.

5           THE COURT:  I'm confused.  The part that I read out

6   loud, who wrote that?

7           MS. CARIDIS:  Mr. Wilson.

8           THE COURT:  So -- I see.  You're right.  It does say

9   "Wilson wrote."  And then the part that is the response is

10  where the bullet points start?

11          MS. CARIDIS:  No.  The part that is the response are

12  the top three lines of the document where he says:  (reading)

13              "Jesse, ooh, you put your hand into the buzz saw."

14          THE COURT:  I see.  So the vast majority of this page

15  is all from Jesse all the way from on Monday, December 7th, all

16  the way down to "Thanks, Jesse."  That's all Jesse?

17          MS. CARIDIS:  Yes, Your Honor.

18          THE COURT:  And then Josh only has one short sentence

19  saying "a buzz saw"?

20          MS. CARIDIS:  Yes.

21          THE COURT:  All right.  So what is your point about

22  this document?

23          MS. CARIDIS:  So Mr. Bloch was asked during his

24  deposition in 2011 what he meant by his buzz saw comments.

25          THE COURT:  Okay.  What did he say?

1          **MS. CARIDIS:**  Mr. Bloch was asked:  (reading)

2           "Why did you write that?"

3      Speaking about the buzz saw comment.

4          **THE COURT:**  Yeah.

5          **MS. CARIDIS:**  And Mr. Bloch responded:  (reading)

6           "Because he" --

7          **THE COURT:**  Show me on there where that is.  Sorry to

8      be so... Oh, I see it.  All right.  "Because he mentioned sort

9      of a verboten topic"; right?

10         **MS. CARIDIS:**  Right.  (reading)

11          "And what was the verboten topic?

12          "Using OpenJDK instead of Harmony in Android."

13         **THE COURT:**  Keep going.  Read the rest for me.

14         **MS. CARIDIS:**  (reading)

15          "And why was -- why did you regard that as a verboten

16        topic?

17          "ANSWER:  Because I'd heard it discussed before and

18        quickly the discussions would always end with, 'You know,

19        we can't do that.  Our partners can't use GPL code other

20        than the Linux kernel itself.'"

21         **THE COURT:**  Okay.  Educate me on that part.  Why

22     was -- why could you use GPL on Linux?  Why would the partners

23     go with Linux GPL?

24         **MS. CARIDIS:**  So, Your Honor, Google used the Linux

25     kernel at the bottom of the Android source code stack.  So

Linux is part of the Android stack, and Linux is subject to the

GPL license.

But in order to protect the OEMs from the effects of the

GPL license in the Linux kernel, Google designed what is called

a hardware abstraction layer.  It's a separate piece of source

code that was designed in order to insulate the GPL of the

Linux kernel from the rest of the Android source code stack.

So Google basically designed an insulation layer to insulate

the effects of having the GPL Linux kernel in Android.

THE COURT:  All right.  I don't under -- just to be --

you did a good job explaining it, but I don't understand what

you just said, and maybe I don't need to.

So let's stick -- for our present purposes I don't need

to.  Let's stick with what you've got for your next exhibit.

How many more exhibits do you have?

MS. CARIDIS:  Your Honor, actually I think that that's

all to discuss for this particular point.

THE COURT:  All right.  So what I want to do is, we're

going to come to your other points in a minute unless you have

depo testimony you want to read to me or trial testimony that

bears on the same point.

MS. CARIDIS:  No, Your Honor.

THE COURT:  All right.  So why don't you have a seat,

or you can stand there if you wish.

Who's going to argue this for the other side?  Remind me

1   your name again.

2          **MR. KWUN:**  Michael Kwun, Your Honor.

3          **THE COURT:**  K-W-A-N?

4          **MR. KWUN:**  K-W-U-N.

5          **THE COURT:**  U-N.  All right.  So what do you say to

6   these exhibits?

7          **MR. KWUN:**  Okay.  So I --

8          **THE COURT:**  Take them one at a time now.

9          **MR. KWUN:**  Sure.

10      So before we go into the exhibits, I just want to remind

11   the Court what the legal standard is that we're confronting

12   here.  The basic argument is that we should not be allowed to

13   present evidence about what we could have done with OpenJDK

14   because it is supposedly contradicted by the evidence.

15      And the case they cite on this, one of the cases they

16   cite, is *Concord Boat v. Brunswick*, which is 207 F.3d 1039, and

17   it's a -- let me make sure -- it's -- actually it's an

18   Eighth Circuit case.

19      But what the Eighth Circuit case says is that an expert

20   opinion cannot sustain a jury's verdict when it is not

21   supported by sufficient facts to validate it.  That's nothing

22   surprising.  And then it also says, "or when indisputable

23   record facts contradict or otherwise render the opinion

24   unreasonable."

25      So for them to prevail on this motion based on the notion

 1   that the evidence shows that this never would have happened,

 2   that evidence has to create an indisputable record that

 3   contradicts the factual premise that we're trying to present.

 4       So to the extent that it's not indisputable, what they

 5   should be doing is they should be presenting this evidence, if

 6   they like, on cross-examination or otherwise trying to rebut

 7   the case.  But if they want to exclude it -- if they want you

 8   to exclude it, rather, they have to establish that it's

 9   indisputable that we never would have used the OpenJDK class

10   libraries.  So that's the first point.

11       The second --

12           THE COURT:  Are you ever going to get around to these

13   e-mails?

14           MR. KWUN:  Yes.  Yes, Your Honor.

15       The second point I want make, and then I will get into the

16   e-mails, but this is just going to be just two pages from an

17   admitted trial exhibit from the first trial.  This is Trial

18   Exhibit 387, and it's a long document, but I just want to point

19   the Court to a couple pages of it.

20       It's -- well, it's an e-mail on the front cover and it's

21   an e-mail from Rich Miner.  It's dated November 9th, 2006, and

22   it says --

23           THE COURT:  I need some of those little stick-on

24   things.

25           MR. BICKS:  Here, Judge.

1          **THE COURT:**  No, no.  My clerk will give me some.

2   Thank you.  Do you have the small little color-coded ones?

3      All right.  What page do you want me to look at?

4          **MR. KWUN:**  Well, first of all, just on the front page

5   we can see that this is from November 9th, 2006.  The subject

6   line is "Pres," and then it attaches a long PowerPoint

7   presentation.  And you can see from the next page, the first

8   page of the presentation, that this is a November 2006

9   presentation seemingly for T-Mobile.

10         **THE COURT:**  November 9.  Okay.

11         **MR. KWUN:**  And on the next page you can see that the

12  presentation itself, which is the attachment, is also

13  November 2006.

14         **THE COURT:**  Yeah.

15         **MR. KWUN:**  And if you turn to page 7 of the trial

16  exhibit, which is page 6 of the presentation, you can see in

17  the upper left that Google is trying to convince T-Mobile to

18  adopt Android.

19      And we have to keep in mind what Android was at the time.

20  So this is November 2006, which also is when OpenJDK -- well,

21  rather, the open sourcing of Java, which included OpenJDK; but

22  in November of 2006, we have to keep in mind what Android was

23  supposed to be at that point.

24      And what Android was supposed to be at that point, if you

25  look at this triple circle on this diagram, at the top you see

1    "J2ME."  That's Java 2 Micro Edition.  So in November of 2006,

2    the plan of record that we were telling partners about is that

3    we were going to use Java ME, not Java SE, Java ME in Android.

4         So you have to keep -- bear that in mind when you're

5    looking at some of these -- the evidence that you're seeing

6    that is from November of 2006 when this announcement was made.

7         So with that, why don't we go through some of these

8    exhibits that get cited.

9         So, first of all, we were going through Trial Exhibit 156.

10   Trial Exhibit 156 was marked in the *motion in limine* as

11   Silverman Declaration Exhibit 13.  And since that's the one

12   that was marked in the papers, that's the copy I have with me.

13   I believe the only difference is that it doesn't have the trial

14   exhibit label on it, but otherwise it should be the same

15   e-mail.  So this is one -- I think this is one of the ones that

16   was being discussed earlier in the argument today.

17        And because of the nature of how these e-mail threads

18   work, if you want to get the story in order, you have to kind

19   of read it from the bottom because you get the first e-mail;

20   and then when the next person responds, they respond above it

21   typically; and then the next person responds above it.  So the

22   chronological order here requires looking at the bottom here;

23   and, frankly, even there it's a little tricky because sometimes

24   when people respond, instead of just putting their response

25   above, they take the previous e-mail and intersperse their own

1   comments in it.

2       And that's what -- if you look here in the e-mail, about

3   halfway down the page you see November 13th, 2006.  So these

4   are all happening on the same day, and seemingly they're all

5   happening early in the morning since Cedric's e-mail at the

6   very top, the latest in chronological order, is at 7:12 a.m.

7       But you see this e-mail that came from Brian Swetland, and

8   in it he quotes some text from a prior e-mail, that we

9   seemingly don't have the entirety of, from Andy Rubin.  And

10  Andy Rubin is talking about the Classpath exception that has

11  been announced in this, and there's a CNET article that he's

12  talking about, a news dot-com article that he's talking about,

13  and that itself is talking about the open source announcement.

14      So Mr. Rubin talks about the Classpath exception; and then

15  Brian Swetland responds to Mr. Rubin's e-mail, and he quotes

16  that part that Mr. Rubin talked about the Classpath exception,

17  and then he says:  (reading)

18          "Ah ha.  Here's the trick.  Same article."

19      And he says:  (reading)

20          "In the case of Java SE," Java Standard Edition,

21          "we're enhancing the GPL with the Classpath exception."

22      And then in the next paragraph Mr. Swetland says:

23  (reading)

24          "If that really means only SE," which seems likely

25          based on his phrasing, "and ME," Java Micro Edition, "is

1   GPL only, it effectively prevents you from using it,"

2   meaning Java ME, "in most any embedded product unless the

3   entire thing," meaning your entire product, "is GPL."

4   So what Mr. Swetland is saying is, "Oh, they may have a

5 Classpath exception for Java SE, but it sounds like Java ME is

6 not going to have a Classpath exception.  And if Java ME

7 doesn't have a Classpath exception, then if we were to use

8 that, we would have a problem because of this GPL license that

9 does not have the Classpath exception."

10   Now, then, if you -- there is a following e-mail -- you

11 have to go further up the page now -- from David Turner, and he

12 says:  (reading)

13    "Very frankly, I wouldn't be surprised if the

14   Classpath exception did not cover ME."

15   So that's consistent with what Mr. Swetland said, and he

16 has some explanation for why he thinks that that would be the

17 case.

18   And then, finally, we have the e-mail from Mr. Beust, and

19 he says, "Here is the current word."  And we already heard

20 about this part.  And if you read the way that the current word

21 is written, it sounds a lot like he has cut and pasted it from

22 something Sun says because it refers to "unmodified GPL for our

23 SE, ME, and EE code," which would be, of course, something that

24 Sun says because it's their code, "GPL2 plus Classpath

25 exception for the SE libraries."

1          So, again, keeping in mind that at the time that this

2     e-mail thread is going on, the plan of record for Android was

3     to do something that was analogous to J2ME, Java 2

4     Micro Edition.  When Mr. Beust says "unmodified GPL2 for SE,

5     ME, and EE, GPL2 plus Classpath exception for the SE

6     libraries," what he is doing is he is confirming everything

7     that we have seen in the prior e-mail thread, which is that

8     Java ME will not have the Classpath exception.

9          And he said:   (reading)

10              "I would already be happy if we can just drop in

11              their libraries, but still not sure it's compatible with

12              their licensing choices."

13          So, again, as you noted, Your Honor, this is all happening

14     pretty much when this news is coming out.  So this is all very

15     preliminary.  But what he is saying is their libraries --

16     dropping in their libraries, would not be -- might not be

17     compatible with Sun's licensing choices.

18          And since what they were talking about at the time was

19     creating an operating system that used something like Java 2

20     ME, what -- I don't have -- the words are not here, but I think

21     that the logical conclusion is that what he is saying is that

22     if we were to drop in the open source Java ME libraries, that

23     would not be compatible with Sun's licensing choices, or might

24     not be compatible with Sun's licensing choices.

25          So, in other words, if we dropped in libraries that were

1    subject to GPL without the Classpath exception, we would have a

2    problem or potentially have a problem.  And why is that?  Well,

3    let's go back to the beginning of the thread, which is at the

4    bottom of the page, where Mr. Swetland says, and this is the

5    three-line paragraph towards -- near the bottom of the page:

6    (reading)

7              "If that really means only SE and ME is GPL only, it

8         effectively prevents you from using it in most any

9         embedded product unless the entire thing is GPL."

10   So they're not talking about problems with the Classpath

11   exception.  So that's the first e-mail that we saw.

12        **THE COURT:**  But -- all right.  Let's stick with this

13   for a second.

14        **MR. KWUN:**  Okay.

15        **THE COURT:**  This was the day that the announcement

16   came out about JDK; right?

17        **MR. KWUN:**  Yes.

18        **THE COURT:**  But what I don't get, help me understand,

19   no one uses that phrase "JDK" in this document.

20        **MR. KWUN:**  Yeah.  So I agree.  And what happened was

21   when the announcement was made, I don't think that they were

22   consistently using the term "JDK" yet.  So what they said, and

23   I don't have the CNET article that is being mentioned here, but

24   I believe what they said is that they were open sourcing

25   OpenJDK -- or excuse me -- they were open sourcing Java SE,

1  Java EE, and Java ME.  They didn't have brand names being

2  discussed in the article, or at least in many places they

3  weren't using brand names yet.

4  So -- but we do agree that when they talk about JDK, that

5  generally refers to OpenJDK.  That is a shorthand that Sun

6  typically uses to refer to OpenJDK.

7  And the announcement that they're talking about here is an

8  announcement of open sourcing SE, ME, and EE code, and when

9  they talk about open sourcing SE code, that is what ultimately

10  was called OpenJDK, whether or not it was consistently in

11  November 2006.

12  THE COURT:  Okay.  Let's go to the next one.

13  MR. KWUN:  Okay.  So I'm just trying to make sure I go

14  through the same exhibits.

15  We also saw Trial Exhibit 415.  This was not actually --

16  this is one of the ones that was handed up to you.  This, by

17  the way, was not an admitted trial exhibit in the first trial.

18  It was marked but it wasn't ever offered into evidence, and it

19  wasn't ever accepted into evidence; but --

20  THE COURT:  But maybe it will be this time.  I mean --

21  MR. KWUN:  No, I agree.  I just wanted --

22  THE COURT:  -- that doesn't get very far, but --

23  MR. KWUN:  No.

24  THE COURT:  -- tell me what your point is on this one.

25  MR. KWUN:  Yeah.  So this is in February of 2007.  So

this is a little later.  It's still before the formal actual
release of OpenJDK.

OpenJDK, the virtual machine source code was released in
November of 2006.  The class libraries weren't actually -- the
source code for the class libraries wasn't released as open
source until May of 2007.  And, of course, it's the class
libraries that are the ones we're most interested here.  So the
class library source code has not yet been formally released
yet.  So there is --

**THE COURT:**  What was it that was released in November?

**MR. KWUN:**  Two things happened in November of 2006.
One is Sun had from long before November 2006 hinted that they
would be open sourcing something for Java, and exactly when was
unclear.  In November of 2006, they made a clear commitment to
open source Java ME, SE, and EE; and at the same time they
released the source code under a pure GPL2 license, no
Classpath exception, for Hotspot, which is the virtual machine
that is inside OpenJDK, and for Java C, which is the compiler
that developers can use to compile their source code into byte
code.

And they said that they would be working to release the
class libraries and the rest of the material over -- I believe
at the time of the announcement they said they were planning to
do that in the first half of 2007, and they ultimately did that
in early May 2007.

1      **THE COURT:**  What was -- this is -- all right.  Maybe

2  you can explain it.  Prior to this announcement in November,

3  what was the licensing term, and how did it then get different

4  for, lets say, SE or ME, whichever one is easy to explain?

5  What changed about it in November?

6      **MR. KWUN:**  So prior to November 2006, Java ME and

7  Java SE were available if you wanted implementing code.  If you

8  wanted the whole thing, they were available under a

9  commercially negotiated license.  So they were closed source.

10  If you wanted to have access to it, you had to go to Sun.  You

11  had to negotiate a license, a very traditional source code

12  license, you know, that was far more common in a prior era

13  before open source became more popular.

14      **THE COURT:**  So even if you wanted to just write

15  something in Java, you had to have a license from Sun?

16      **MR. KWUN:**  If you wanted -- that's a good point.  You

17  could also download compiled object code.  So you could

18  download -- if you were a developer who wanted to write

19  programs that ran with Java ME or Java SE, you could download a

20  virtual machine, not the source code for the virtual machine,

21  but you could download a virtual machine, or you could

22  download -- you must have been able to download some sort of a

23  SDK that would not have the implementing code for the class

24  libraries but would have enough so that you could code to the

25  specification so that you could link with these binaries that

1    were provided by Sun.

2        So the thing that changed was -- really the big thing that

3    changed was that they were open sourcing the source code.

4            **THE COURT:**  What does that mean, "open sourcing"?

5            **MR. KWUN:**  So the -- "open sourcing" means that they

6    were providing it under the terms of a license that provided

7    for certain freedoms.  And so open sourcing is a legal umbrella

8    term for a variety of licenses.  It's also a bit of a

9    philosophy.

10       And the general notion of the open-source movement is that

11   you should be able to have access to the code so that if you

12   want to change it and you want to modify it, you can make

13   changes to make it work better for your system or whatever.

14       And there's also a general belief that if you open source

15   source code, that will allow bugs to be fixed more quickly and

16   generally allow improvements to the system.  So that if you

17   have -- to take a comparison, if you compare Linux, which is

18   open source, as an operating system to Windows, Windows has to

19   rely on its own internal developers to improve the system;

20   whereas, Linux because the source code is published and freely

21   available to anyone who wants to look at it, they can rely on

22   the efforts of a larger community to improve the product.

23           **THE COURT:**  But after this announcement in November

24   '06, there still was a problem with the GPL; right?  In other

25   words, the OEMs would not be able to keep secret their

1   modifications to Java programs; right?

2          **MR. KWUN:**  Under a pure GPL license, there were some

3   issues, definitely.  Under a -- under the Classpath exception,

4   you didn't necessarily have that problem.  And if you'd like, I

5   can walk through the license and explain what that means.

6          **THE COURT:**  No, not -- no, not yet.

7          **MR. KWUN:**  Okay.

8          **THE COURT:**  I want to stick with this document for a

9   moment.

10     All right.  So tell me again what you think -- I don't see

11  the part here that helps you on what happened in November '06.

12         **MR. KWUN:**  Yeah.  This is not -- this is not a

13  November '06 document.  This one is a February 2007 document.

14  I was just trying to go through all the documents that we had

15  seen.

16         **THE COURT:**  All right.  But let me zero in on it.  The

17  counsel told me a minute ago -- Ms. Caridis told me a moment

18  ago this paragraph says, the lawyer on the licensing front:

19  (reading)

20          "Although Classpath would 'probably' be okay in my

21      opinion, the lawyer-advised consensus is that there is

22      potential for trouble."

23     And she said that was talking about what we have been

24  referring to as JDK.

25         **MR. KWUN:**  So, yeah.  So there are a variety of

1  different licensing choices that Google could have made for the

2  Android project, and Android ultimately settled on a preferred

3  license for the Android project of using the Apache 2.0

4  license.

5      The Apache 2.0 license is another open source license.

6  It's what's known as a permissive open source license.  And

7  what that term generally means is that permissive open source

8  license gives you, the licensee, access to the source code,

9  allows you to modify it, and does not require that you publish

10 your modifications.  So that's a permissive open source

11 license.

12     There are also what are sometimes referred to as copyleft

13 open source licenses.  Copyleft open source licenses,

14 obviously, it's a play on copyright.  It's a term that was

15 created by the GNU Foundation, the free software foundation who

16 wrote the GNU license.  A copyleft license is sometimes by

17 others referred to as having a viral infect because it, you

18 know, infects, is the term that is used, code that is beyond

19 the open source code.

20     And so a copyleft license says that -- has two key

21 components.  One is it says that, "If you modify the code that

22 we give you, you need to publish your modifications."  That's

23 sometimes referred to as -- you may have heard witnesses in the

24 first trial refer to that as a give-back provision, you're

25 required to give it back to the licensor.  It's actually

1    technically not a give-back provision.  You have to publish it

2    to the world.  If the licensor then wants to take it, they

3    certainly can; but you don't have to literally give it back to

4    Sun, for example, but you have to make it freely available to

5    Sun in this instance.  So that's one aspect of the copyleft

6    license.

7              **THE COURT:**  What is -- I don't -- copyleft, how did

8    that term come -- copyleft, what does it mean?

9              **MR. KWUN:**  So the Free Software Foundation has a

10   general philosophical belief that copyright -- that the regime

11   of copyright can sometimes have the effect of clamping down

12   innovation; and that when people use copyright to keep their

13   code private, it means that other people can't improve that

14   code.

15       And whether they have that right or not, they think that

16   that is not the highest-and-best use of computer code.  So they

17   came up with a regime which uses the rights that you are given

18   under copyright but creates what the Free Software Foundation

19   views as a better world, and they called this new world --

20             **THE COURT:**  And the left is just --

21             **MR. KWUN:**  It's just a pun.

22             **THE COURT:**  -- a bookend, it's a pun on copyright?

23             **MR. KWUN:**  Yeah.

24             **THE COURT:**  Oh, okay.

25             **MR. KWUN:**  It's a play on copyright.  They're, like,

1   "Well, we don't think that the traditional copyright way of

2   doing things is our favorite.  We're going to come up with a

3   variation on it," and they called it copyleft.

4       But it has two key components.  One is that if you modify

5   your code with a copyleft license, you have to publish your

6   modifications and freely license them to others.

7       The other thing that can happen in a copyleft license is

8   they can sometimes say, "And, as a matter of fact, if you

9   combine the copy -- the GPL code, for example, with some other

10  code, not only do you need to publish your modifications to my

11  code," the licensor's code, "you need to publish the stuff that

12  you combined with my code."

13      So if you take source code file A, which is under a GNU

14  license, and you combine it with source code B, which you wrote

15  yourself, and you compile that and ship a product that is now

16  A plus B, which we can call C, when you do that, you need to

17  publish the source code not just for your modifications to A,

18  my code, but you also need to publish your code for B.  So that

19  second part is what is commonly referred to as the viral

20  effect.

21          THE COURT:  All right.  But you're -- okay.  You

22  probably explained this, but I am still not getting it.  What

23  do you say to the -- it says "the lawyer-advised consensus is

24  that there's potential for trouble," and she says that talks

25  about JDK.

1          MR. KWUN:  Yeah.  So --

2          THE COURT:  All right.  So that is a bad document for

3   you, and I don't see what you're -- I don't understand your

4   explanation for it.

5          MR. KWUN:  So the question for the *motion in limine* is

6   whether Mr. Bornstein suggesting that the Classpath license

7   would create a potential for trouble, whether that means that

8   it is indisputable that Google would not have adopted that,

9   and --

10         THE COURT:  Well, maybe this one document doesn't; but

11  if you put them all together, maybe it does.  I don't know.

12         MR. KWUN:  Well --

13         THE COURT:  All right.  So you don't have an

14  explanation for this.  You just say that potential for trouble

15  is not the same thing as an absolute dead-end.

16         MR. KWUN:  That's true.  And, yeah, I'm not saying

17  there is anything here that says absolutely, "Oh, let's use

18  OpenJDK."  That's definitely not the case.

19      What I think Mr. Bornstein is referring to here is a

20  general preference that Google had for a more permissive

21  license, such as Apache, the Apache 2.0 license.

22      That said, when Google launched Android, it included --

23  one of the key components in Android is something called

24  WebKit.  WebKit is a third-party open source product module

25  that allows -- that provides the functionality of Web page

rendering.  So that's pretty important for a smartphone.  It's

how you actually show things that you see on the Internet.

And WebKit is licensed under something called the Lesser

GNU Public License, the LGPL, and the LGPL is in many ways

similar to the GNU Classpath license and it also has copyleft

effects.

So I only bring that up to note that even if a license

like that causes a potential for trouble, that did not keep

Google from ultimately adopting WebKit, which is LGPL, and it

did not keep its partners from selling Android phones and using

the Android platform.

THE COURT:  All right.  What's your -- you've now done

415 and 156.  What do you say to the other two?

MR. KWUN:  So I don't have 112 because it wasn't cited

in the papers, but if you have -- if you can hand me your copy.

THE COURT:  I'll read it to you.  It's Dan Bornstein

on November 28th, "It's not about timing so much as details."

So you've been telling me it was a timing problem.  Here he

says, "It's not about timing so much as details."  So what do

you say to that one?

MR. KWUN:  So in November 2006, it was absolutely

about details, and the details were that the product that they

were talking about shipping -- or creating, I should say, in

November 2006 was a product that would use J2ME.  And so that

is the key detail, and the key detail is that in November 2006,

1  Sun said that they would be open sourcing Java ME under a pure

2  GPL2 license.

3       THE COURT:  But how could -- to me that doesn't make

4  sense.  How did Google plan to use J2ME and get around these

5  licensing restrictions?

6       MR. KWUN:  Well, at the time they were still exploring

7  a variety of options.  So one option would have been to get a

8  license from Sun.  Another option would have been to get a

9  virtual machine and libraries from another provider that for

10  whatever reason could provide that to them.  Another option,

11  which is the one that they ultimately went with with SE, was to

12  write their own libraries or use third-party libraries that

13  were available as open source because at the time nobody

14  thought that that was going to be a legal problem.

15     And that actually -- yesterday Mr. Kamber referred to some

16  options that we had and that we considered, and he mentioned --

17       THE COURT:  Remind me.  Just help me on the timeline.

18  Something you just said reminded me.  There was a memo I

19  remember, or e-mail, where there were negotiations with Sun,

20  and they finally collapsed and cratered.  When did that crater?

21       MR. KWUN:  I don't know the exact date on which they

22  stopped discussions, but I believe that their discussions were

23  still going on in 2007.

24       THE COURT:  If you just believe it, that's not good

25  enough.  Does somebody actually know the answer?  There's an

1    e-mail somewhere that's very clear-cut on it.   I remember it

2    from the first trial.

3          **MR. BICKS:**  Your Honor, you may be thinking of the --

4    because there were several rounds of negotiations, and you may

5    be thinking about the e-mail right prior to the filing of a

6    lawsuit.

7          **THE COURT:**  No.  This was a couple of years before the

8    lawsuit.

9       Okay.  Nobody knows.  All right.

10         **MS. HURST:**  Your Honor, it's May 2006.

11         **THE COURT:**  May 2006?

12         **MS. HURST:**  That's when the discussions of a Project

13   Armstrong ceased.

14         **MR. VAN NEST:**  I don't think that's right, Your Honor,

15   but we'll check.  I believe that there were negotiations much

16   later than that as well, but we'll check the record and try to

17   answer your question.

18         **THE COURT:**  All right.  Thank you.

19         **MR. KWUN:**  But yesterday Mr. Kamber discussed the fact

20   that there were several options that we could have used rather

21   than OpenJDK; that we could have used Apache Harmony, we could

22   have used GNU Classpath.

23      This is just a demonstrative.  You had asked for a chart.

24   We didn't make a blowup.  I apologize for that.  We thought it

25   might be easier to read, actually, if you have it in front of

1    you.  So I have it up on the ELMO, and this is just -- there

2    was actually many more options, and at some point it becomes

3    too complicated to present on a chart.

4         But our options included talking to Sun and doing a deal

5    with Sun.  That's the one in the far left column.  If we had

6    done that, we would have had to negotiate a license with some

7    sort of commercial terms; and what we would have gotten from

8    them was a full virtual machine and full set of class

9    libraries, including all the implementing code.

10        We could have done the open source route, such as

11   Classpath or Harmony; or once it was released, we could have

12   considered OpenJDK.

13        We also had some discussions with other companies, and as

14   one example, we had discussions with a company called Skelmir.

15   And as you can see from their logo, Skelmir is a virtual

16   machine technology company.  But we had discussions with

17   Skelmir.  Skelmir was at the time known for having created

18   implementations of Java that ran on set-top boxes.  So for, you

19   know, the television realm.  And we were -- we had some

20   discussions with them about potentially acquiring or licensing

21   from them a virtual machine which would have come with a set of

22   class libraries.

23        So --

24             THE COURT:  But how -- if you were going to use the

25   same 37 APIs, I don't see how Skelmir could have rewritten that

1   and avoided the licensing problem.

2        MR. KWUN:  Skelmir could not have avoided the

3   licensing problem.  They were a clean-room implementation.

4   Skelmir operated under the same theory that we operated under,

5   which was that this wasn't a legal problem.

6        As we now know from the Federal Circuit, absent a defense

7   of fair use, there is an issue; but at the time, you know, the

8   fact that Skelmir was out there actually commercializing this

9   in set-top boxes well illustrates that the industry didn't

10  believe this was a problem.

11       THE COURT:  I don't know if that's true or not.  Is

12  there some memo within Google anywhere that happens to say what

13  you just told me?

14       MR. KWUN:  Some memo discussing these five options?

15       THE COURT:  No.

16       MR. KWUN:  Or this --

17       THE COURT:  That says -- here's the way I -- look,

18  this is a simplistic way, but I think what I'm about to say is

19  true.  Initially Google went to Sun and tried to get a license,

20  and then they couldn't agree on the dollar amount so Google

21  backed up and decided to use those 37 APIs; but to avoid

22  copyright infringement, rewrote the implementing code.

23       Now, is there a memo somewhere in Google that says, "This

24  will solve the problem.  We are perfectly free to use the

25  declaring code in the SSO but as long as we rewrite the

1   implementing code"?

2          MR. KWUN:   We don't have a memo that directly says

3   that.   We do have witnesses who testified that at the last

4   trial.

5          THE COURT:   Is there a memo from one of these other

6   companies that says that that was contemporaneous at the time?

7          MR. KWUN:   I am not aware of such a memo.

8          THE COURT:   All right.   I want to go back to these

9   four documents that -- I think you've done three so far.   So

10   the last one is Number 215 about the "buzz saw," December 7th,

11   Pearl Harbor Day, 2009.

12         MR. KWUN:   Okay.   So this is December 7th, 2009.   By

13  December 7th, 2009, Google had launched Android.   It had a

14  product in the marketplace.

15         By December 2009, there were phones shipping that had

16  Android on them.   So the question in December 2009 was not,

17  "Hey, we're developing this product.   We have to write some

18  class libraries.   How should we do that?"   We had class

19  libraries.   We had complete implementations of the class

20  libraries based on Apache Harmony code.

21         So if in December 2009 we were going to switch to OpenJDK,

22  the question wasn't why not use OpenJDK, the question was why

23  should we use OpenJDK.

24         In December of 2009, we had shipped a product.   We had

25  received laudatory notes from Sun, including from its CEO, and

1    the question at that point was why should we use OpenJDK.

2        And there is some testimony from Mr. Bloch about this

3    e-mail suggesting that in his personal belief, there were some

4    issues; and if they want to use those in cross-examination,

5    they should feel free to use those in cross-examination.  But I

6    don't think that this establishes that there is no chance that

7    in 2007, that Google would have used OpenJDK.

8        THE COURT:  Again, I ask -- and it would help me a

9    great deal, and I can't believe the lawyers don't know the

10   date -- when did the negotiations with Sun crater and Google

11   then make the decision to write the implementing code for the

12   37?

13       MR. KWUN:  So, again, I apologize, Your Honor.  I

14   don't have that date readily at hand, but -- wait a minute.

15       MR. VAN NEST:  I think Christa knows.

16       MS. ANDERSON:  Just to double-check, Your Honor, just

17   on the date of the negotiations prerelease of the Android, it

18   does appear, we concur, the formal back-and-forth negotiations

19   ended in May '06.  There were some attempts by Sun to revive

20   them in '07 but, you know, the bulk of them were ended by May

21   '06 prior to that release.

22       THE COURT:  All right.  And where's the memo or e-mail

23   where -- inside of Google where they say, "Okay.  Those

24   negotiations cratered.  We're going -- our solution is to

25   rewrite the implementing code"?

1          **MR. KWUN:**  I don't know that we have a formal memo

2     that writes that up.

3          **THE COURT:**  Well, I'm asking, why don't you know?  Are

4     you saying there is no such memo, or are you saying you just

5     don't know one way or the other?

6          **MR. KWUN:**  I don't know one way or the other, but I

7     believe there is not such a memo.

8          **MS. ANDERSON:**  Yes.  Your Honor, again, I'm sorry to

9     jump in just to provide a little additional detail.

10        There are correspondence internal at both companies at

11    this time, and at Google there are internal correspondence

12    about planning.

13        But as Your Honor may recall from the first trial from

14    Mr. Rubin's testimony, Google had been proceeding on multiple

15    tracks.  It was -- at the same time that it was trying to have

16    negotiations with Sun to see if there was a way for a deal to

17    be made that they could work together, they were working on a

18    separate track the entire time to also develop their own

19    implementation so they would not need any license from Sun in

20    case it didn't work out.

21        So there are double tracks going on here, so you're not

22    going to see a "We're doing one thing and then we're going to

23    switch and do a totally different thing."  Throughout that time

24    period, they were working on both tracks, and --

25         **THE COURT:**  All right.  Then help me understand.  When

 1  did the 37 -- Google's own implementing code for the 37 get

 2  written?

 3          MS. ANDERSON:  It was written over the period of time

 4  leading up to the release, but I -- I mean, I think it took

 5  time to develop and assemble the code because some of it was

 6  taken from Apache, et cetera, and over time it was assembled

 7  into one full set of class libraries.

 8          MS. CARIDIS:  Your Honor, if I may.  Noser, which was

 9  a third-party development company that Google hired to help

10  implement the 37 packages, the statement of work for Noser was

11  signed at the end of March in 2007, which was just a mere --

12  which was after the announcement of OpenJDK and which was a

13  couple of weeks before the release of the Java SE class

14  libraries under OpenJDK.

15          THE COURT:  Wait a minute.  I want to write that down.

16  What was -- November -- I'm sorry.  Say it again.

17          MS. CARIDIS:  So the statement of work with Noser

18  and --

19          THE COURT:  How do you spell Noser?

20          MS. CARIDIS:  N-O-S-E-R.

21          THE COURT:  Uh-huh.

22          MS. CARIDIS:  -- was signed at the end of March in

23  2007.

24          THE COURT:  And the statement of work said what?

25          MS. CARIDIS:  The statement of work laid out how Noser

1   was going to implement the 37 packages and where Noser was

2   allowed to take code from, for lack of a better word.

3          THE COURT:  All right.  And when was the OpenJDK as

4   for the -- not for the virtual machine but for the APIs?  When

5   did that get announced?

6          MS. CARIDIS:  It was announced in November.  The

7   actual code was released the first week of May in 2007.

8          THE COURT:  All right.  So help me.  What I'm trying

9   to do is focus on the scenario, the counterfactual scenario,

10  for a moment to see when it would have come up.

11      All right.  So we have -- in '06 we have negotiations for

12  a regular commercial license, and those fail.  We then come to

13  November of '06, this announcement about JDK gets made.  And

14  let's assume that at that point the counterfactual event

15  occurs, which is -- let's assume that in some other -- in some

16  way the world is informed by the Federal Circuit that declaring

17  code in SSO of the type that's been found to be copyrightable

18  here is copyrightable.  So that new fact becomes part of the

19  scenario.  That was not then known -- maybe it should have been

20  known, but I'm going to ask you in a minute, Ms. Caridis,

21  whether or not that was expressly known at that time.

22      But let's assume that that was a new fact, a new

23  circumstance.  So in light of that new circumstance, what

24  Google is saying is, "Okay.  If we had known that then when the

25  announcement came out about OpenJDK with a Classpath exception,

1    knowing that what we were about to do with Noser would be

2    illegal unless fair use, we would have used the Classpath

3    exception."

4         So what do you say to that?  It is counterfactual because

5    that did not actually happen, but don't we have to imagine that

6    somehow Google gets informed that what they are about to do

7    would be illegal under Federal Circuit law?

8         All right.  So what do you say to that?

9              **MS. CARIDIS:**  So a couple things, Your Honor.  The

10   first is that, as Your Honor noted, Google was in negotiations

11   with Sun for an extended period of time.  They knew they needed

12   a license, and we saw, you know, all these documents come in at

13   the first trial about "we knew we needed a license."

14        There is evidence of Google's that Google saw the

15   copyright notices on these documents.  And so I don't think

16   it's fair to say they had no idea what they were doing was

17   wrong based on the say so of --

18             **THE COURT:**  No, that's not what I'm saying at all, and

19   I don't think you're quite being fair to the record.

20        What they were negotiating for with Sun was a license that

21   would have allowed them to use the implementing code, for

22   example.  So one explanation for what happened is that Sun

23   said, "No, we want lots more money than you're willing to pay."

24        And so then Google said, "Okay.  We can't just steal their

25   code.  We're going to rewrite the code."  And that's why they

1    hired Noser, in order to -- they decided, "As long as we write

2    our own implementing code, it's our original work, our work for

3    hire, and not theirs."

4        So the only part of it that they kept was the declaring

5    code, the lines of declaring code in the SSO.  Let's concede

6    all of that.

7        So they did wind up using much less than they were

8    bargaining for with Sun, and maybe they thought in all good

9    faith that that was perfectly legal.  I don't know if they had

10   a legal opinion or not, but we don't see any memo saying

11   that -- like we do for these others, we don't see any memos

12   that say that scenario would be a copyright problem.

13       So isn't that one way to look at the evidence here?

14       **MS. CARIDIS:**  Well, but, Your Honor, even if you were

15   to look at the evidence that way, the rejection evidence that

16   we see from OpenJDK is about licensing of the OpenJDK license.

17   So even if you were to assume that at that point Google knew

18   that the copyrightability for the implementing code and SSO had

19   been established, that wasn't their concern.  There were -- I

20   haven't seen, and maybe I'm missing something, any evidence in

21   the record saying, you know, "We didn't take OpenJDK because

22   this stuff isn't copyrightable."

23       **THE COURT:**  All right.  So -- but -- all right.  To go

24   back over your four documents, though, one says it's a buzz

25   saw.  All right.

1          **MS. CARIDIS:**  But the testimony, the testimony from --

2          **THE COURT:**  What was the testimony?

3          **MS. CARIDIS:**  The testimony was, "I had" -- let me

4    read it directly so I don't misquote, Your Honor.

5          **THE COURT:**  Uh-huh.  Go ahead.  This is the testimony

6    of Joshua Bloch; right?

7          **MS. CARIDIS:**  Yes, Your Honor.

8          **THE COURT:**  Okay.

9          **MS. CARIDIS:**  (reading)

10          "Using OpenJDK instead of Harmony was a verboten

11      topic.

12          "And why was it verboten?

13          "Because I'd heard it discussed before and quickly

14      the discussions would always end with, 'You know, we can't

15      do that.  Our partners can't use GPL code other than the

16      Linux kernel itself.'"

17      And, Your Honor, Mr. --

18          **THE COURT:**  That was talking about OpenJDK?

19          **MS. CARIDIS:**  OpenJDK versus Harmony Apache.

20          **THE COURT:**  All right.  Let's hold that thought.

21      What do you say to that point?

22          **MR. KWUN:**  OpenJDK is, first of all --

23          **THE COURT:**  It's still hard for me to read.  I don't

24      know why I'm having so much trouble reading that.

25          **MS. CARIDIS:**  Do you want me to hand up a paper?

1          **THE COURT:**  Hand up a copy for me.  Thank you.

2      So, Mr. Kwun, you need -- so this witness of yours says it

3  was verboten.  Well, it says:  (reading)

4              "Jesse, why did you say buzz saw?

5              "Because he mentioned a verboten topic.

6              "What was it --

7              "Using OpenJDK instead of Harmony in Android.

8              "Why did you regard that as verboten?

9              "Because I'd heard it discussed before and quickly

10      the discussions would always end with, 'You know, we can't

11      do that.  Our partners can't use GPL code other than the

12      Linux kernel itself.'"

13      All right.  So this is testimony --

14          **MS. CARIDIS:**  Turn over on the other side of the page,

15  Your Honor, Joshua Bloch.

16          **THE COURT:**  -- from Mr. Bloch --

17          **MR. KWUN:**  Yeah.  This was --

18          **THE COURT:**  -- which tends to indicate that at the

19  time they felt they couldn't use OpenJDK.  What do you say to

20  that?

21          **MR. KWUN:**  So I think ultimately that the point here

22  is that this is cross evidence, not a basis for excluding.  It

23  is not indisputable evidence that Google would not have been

24  able to use OpenJDK.

25          **THE COURT:**  If you say that again -- you've already

1    said that so many times, it's a broken record.

2              MR. KWUN:  All right.  The other point --

3              THE COURT:  Both sides want me to throw out each

4    other's entire case basically; and then whenever it's your

5    turn, you say, "Oh, that's for the cross-examination."  This is

6    not doing me any good.

7         Maybe I am going to throw all this out.  I don't know.  I

8    want to understand enough of the merits of it.

9         What are you going to say about this on the merits is what

10   I want.

11             MR. KWUN:  All right.

12             THE COURT:  That would help me.

13             MR. KWUN:  Your Honor, on the merits what he says is,

14   "Our partners can't use GPL."  So the class libraries in

15   OpenJDK are licensed under the GPL Version 2 license with the

16   Classpath exception, and the Classpath exception makes all the

17   difference.

18        Now, he does talk about using OpenJDK instead of Harmony,

19   but what he talks about remembering is discussions that

20   partners cannot use GPL code other than the Linux kernel

21   itself.  This is depo testimony in 2011 about a single e-mail

22   in 2009 that is two years after the e-mail, two years after the

23   decision was made to use the Harmony class libraries.

24        I think that's scant evidence on which to base a

25   conclusion that it is impossible that Google would have used

1    OpenJDK for the class libraries in 2007.

2         And you have a single page of the depo there, but what was

3    submitted along with that in the *motion in limine* papers was it

4    was a set of four pages, I believe, because it was a

5    mini-transcript.  And I'm just going to read a few quotes

6    from -- about the same e-mail that he is discussing there from

7    the following pages:

8         On page 207 of Mr. Bloch's deposition transcript, so the

9    following page, the question is asked:  (reading)

10            "Did you have follow-up discussions with him about

11       this?"

12        So that's follow-up discussions with Jesse Wilson about

13   this e-mail.  (reading)

14            "Not that I recall.

15            "Did you ever talk to him again about this e-mail

16       exchange?

17            "Not that I recall."

18        The following page, 208:  (reading)

19            "Did you have follow-up discussions with others about

20       whether OpenJDK could be used on Android in the wake of

21       this e-mail?

22            "Not that I recall."

23        And so really what we --

24            **THE COURT:**  Well, is there a single e-mail anywhere in

25   the entire Google universe where it says, "Look, we could use

1    OpenJDK for the 37 or any of the APIs because that's got the

2    Classpath exception, but we couldn't use it for the virtual

3    machine and so that's the problem"?  I mean, that's the

4    distinction you're trying to draw now, right, or one of the

5    distinctions?

6            MR. KWUN:  Yes, Your Honor.

7            THE COURT:  All right.  But you don't have a single

8    e-mail from the time in question that recognized that

9    distinction.

10           MR. KWUN:  We do.  Just a second, Your Honor.

11           THE COURT:  You do?  All right.  Good.  I'd like to

12   see it.

13       And I'd like you to know under Rule 403, a judge can

14   exclude and not let the jury hear a weak argument.

15           MR. KWUN:  Yes, Your Honor.

16           THE COURT:  Because it would take a lot of time, and

17   even -- you know, I have to balance a lot of factors; but under

18   Rule 403, the judge has got a lot of discretion.  So just

19   because some Eighth Circuit judge said that you've got to let

20   people cross-examine all day long, no.  Rule 403 is what

21   governs here.

22           MR. KWUN:  Understood, Your Honor.

23           THE COURT:  All right.  So what is your -- give me

24   your -- hand me a copy of what you're showing me.

25           MR. KWUN:  This is Trial Exhibit 154.  It was cited in

1    their *motion in limine* papers.

2         And just to give a little bit of context so that we

3    understand the timing, this is November 12th, 2006.  This is

4    the day before the announcement was made public that they would

5    be open sourcing OpenJDK.

6              **THE COURT:**  Okay.

7              **MR. KWUN:**  If you look at the bottom of the first

8    page, you can see an e-mail from Simon Phipps.  He was the

9    chief open source officer at Sun, and he is sending an e-mail

10   to a mailing list, "Trusted Friends," to let people know that

11   the following day Sun would be making this open source

12   announcement.

13        And this e-mail apparently went -- that "Trusted Friends"

14   e-mail list seems to have included Chris DeBona -- which is

15   right above the Simon Phipps e-mail header -- Chris DeBona, who

16   is a Google employee who works on open source projects at

17   Google, and he passes it along to Andy Rubin and to the Open

18   Source Team, and he says, "FYI."

19        So after that, let's go to the top of the e-mail, and we

20   can see that this is an e-mail thread between Andy Rubin, Jason

21   Harinstein, and Amin Zoufonoun.  And what Andy Rubin says,

22   seemingly forwarding the news that Chris DeBona forwarded that

23   came from Simon Phipps, is that:  (reading)

24              "Sun open sources Java.  This has got to bring the

25         price down."

1      So whether or not there were formal negotiations going on

2  in November 2006, there seemed to be some notion of some

3  discussions going on.

4      But what he says below that is:  (reading)

5          "We still need Skelmir because GPL license," Sun's

6      license, "doesn't work for us."

7      Skelmir, remember, is a virtual machine technology

8  company.  So what Andy Rubin is saying is that he has read this

9  release.  He understands the distinction between the license

10  for the virtual machine and the license for the class

11  libraries.  And he says that, "Well, gee.  You know, if we use

12  the GPL2 license for the virtual machine, that doesn't work for

13  us."

14      So I will concede, Your Honor --

15      THE COURT:  That's a lot of spin, don't you think?  It

16  doesn't say that.

17      MR. KWUN:  Well, Your Honor, that's why we'll need to

18  put on a witness and have some testimony about that.

19      THE COURT:  Did anyone testify about that?

20      MR. KWUN:  About Skelmir?

21      THE COURT:  Yeah.

22      MR. KWUN:  There was --

23      THE COURT:  No.  I mean about this very e-mail.

24      MR. KWUN:  This e-mail must have been discussed in

25  some sense, but not on this topic.  It was an admitted trial

1   exhibit at the trial, but there was no testimony directly on

2   that point because this issue was not front and center during

3   the first trial.

4        What was front and center, Your Honor, though, was

5   OpenJDK.  And, indeed, Oracle witnesses during direct

6   examinations offered testimony about OpenJDK, about the fact

7   that it was available as an open source license for Google,

8   that Google could have adopted that license and chose not to

9   adopt that license.

10       So the testimony that they offered before about OpenJDK,

11  they would now like to prevent us from offering our view of

12  that evidence.

13       **THE COURT:**  All right.  Do you have any other

14  documents that at the time in question --

15       **MR. KWUN:**  Sure.

16       **THE COURT:**  -- allegedly drew a distinction between

17  Classpath for API versus not Classpath for virtual machine?

18       **MR. KWUN:**  Sure.  So if you look at -- this is at

19  trial exhibit -- oh, I'm sorry, Your Honor; I'll hand up a

20  copy -- Trial Exhibit 230.  This was also cited in their motion

21  papers.

22       Mr. Rubin talking with Bob Lee, cc'ing others on the

23  Android team, says:  (reading)

24            "As far as GPL'ing the VM," the virtual machine,

25       "everything that is linked with the VM would get

1        infected."

2        So that shows an understanding of the viral effect of the

3   GPL license.  And he says that:  (reading)

4            "The problem with GPL-embedded systems" -- "in

5            embedded systems is that it's viral, and that that creates

6            issues for OEMs.  We are building a platform where the

7            entire purpose is to let people differentiate on top."

8        He says:  (reading)

9            "Sun has a different license for its library for SE

10           and ME."

11       He says:  (reading)

12           "The SE library is LGPL.  The ME library is GPL."

13       So --

14           **THE COURT:**  What is "LGPL"?

15           **MR. KWUN:**  "LGPL" stands for the lesser GNU public

16   license.  That's actually --

17           **THE COURT:**  Lesser what?

18           **MR. KWUN:**  The lesser GPL license.

19           **THE COURT:**  Uh-huh.

20           **MR. KWUN:**  So that's not actually entirely correct.

21   The LGPL license, like the Classpath exception, is designed to

22   provide an exception for code that links with a library.

23   Actually the SE library was due to be released -- or at that

24   point had been released -- this is August of 2007 -- under the

25   Classpath license, not the LGPL license.

1    So Mr. Rubin misspoke, but the thrust of what he is saying

2   is that the SE library is released under an open source license

3   with a linking exception; whereas, the ME library is released

4   under one that does not have a linking exception.  That's what

5   it means when it says, "The SE library is LGPL.  The ME library

6   is GPL."

7    And he says that means that anything that links with the

8   ME license gets infected.  So he has now mentioned the problem

9   of infection with a GPL VM and the problem with infection with

10   a GPL ME library.

11    What does he say about the SE library?  He says the SE

12   library -- and he's talking about OpenJDK because he's talking

13   about the open source implementation from Sun -- and the SE

14   library is not optimized for embedded systems.

15    He's gone out of his way to discuss the problem with the

16   viral effect for the VM and for the ME library.  He has

17   discussed the SE library.  He has said that it is subject to a

18   linking exception, and then he mentions nothing about a viral

19   infection problem for the SE library.  He instead says that

20   there is a technical problem, the technical problem being that

21   it is not optimized for embedded systems.

22    **THE COURT:**  What does that mean?

23    **MR. KWUN:**  The SE library comes from Java

24   Standard Edition, which largely targets desktops and servers.

25   And so if you were going to be in an environment where you are

1    on a CPU that is lower power and that is battery operated, has

2    a small battery because it has to fit in your pocket, you're

3    going to have special needs.  You're going to have to have a

4    library that is designed to run quickly on a low-powered

5    processor, one that doesn't take up too much memory because you

6    can't support too much memory on pricing the product, and one

7    that isn't going to consume too much battery power.

8            THE COURT:  What does "embedded" mean?

9            MR. KWUN:  An embedded system is a system in which the

10   software is embedded into a hardware device.  So, for example,

11   in your car you have a computer system.  Most people don't

12   think of their car as being a computer, but there's probably

13   many computers inside your car.  Those are embedded systems.

14       The other thing that I'll point to here is at the bottom

15   of this e-mail the P.S., Andy Rubin -- this is in August of

16   2007 -- (reading)

17           "We negotiated nine months with Sun and decided to

18       walk away after they threatened to sue us over patent

19       violations."

20       He doesn't talk about threatened lawsuits over using the

21   APIs from the class libraries.  He talks about patent

22   violations.  That was the focus of the discussions with Sun.

23   And, of course, we know now that those patent claims were not

24   meritorious.

25           THE COURT:  So I'd asked you if you had a document

1    that drew a distinction between the virtual machine and the

2    APIs as it related to OpenJDK, and so you're saying that this

3    supports that distinction; right?  Is that what you're saying?

4              **MR. KWUN:**  Yes.

5              **THE COURT:**  All right.  So --

6              **MR. KWUN:**  Yes, Your Honor.  It's not a conclusive

7    e-mail, just as their e-mail is not conclusive, but there is a

8    discussion going on of three different systems here:  A VM, a

9    virtual machine; SE libraries; and ME libraries.

10       And there is a clear discussion of the different licensing

11   regimes involved, and there is a clear discussion of the viral

12   effect, which is -- which he mentions only with regard to the

13   GPL product.

14             **THE COURT:**  Well, which is the one in the -- which in

15   the body of it?  It does say "New OpenJDK" up at the top, but

16   where does OpenJDK get referenced in the body of the e-mail?

17             **MR. KWUN:**  It does not come up by name.  What he says,

18   though, is -- in the third paragraph from Andy Rubin, he says:

19   (reading)

20             "Finally Sun has a different license for its library

21        for SE and ME."

22       So if that's all you read, you could be thinking he could

23   be talking about the commercial license, the closed-source

24   versions of SE or ME, or the open versions.

25       But what he then says is that the SE library is LGPL; the

1  ME library is GPL.  Those are open source licenses.  The only

2  open source versions of SE and ME are the ones that -- excuse

3  me -- the only open source version of SE released by Sun, so

4  the only thing he could be referring to there is OpenJDK.

5        THE COURT:  What again does "LGPL" mean?

6        MR. KWUN:  "LGPL" is a Free Software Foundation

7  written license that is referred to as the lesser general

8  public license, and it's so-called because it is like the

9  general public license but it is less restrictive.  It limits

10  the copyright effect -- the copyleft effect that is inherent in

11  the pure GPL license.

12        THE COURT:  Well, if the GPL -- okay.  All right.

13        MS. CARIDIS:  Your Honor, I have two documents that

14  might be responsive and helpful for you.

15        THE COURT:  Please.  All right.

16        MS. CARIDIS:  Your Honor asked a couple times whether

17  or not there is any document or memo internal to Google showing

18  that they could have used OpenJDK class libraries.  I submit

19  that there might be, but Google is hiding behind privilege to

20  show them to us.

21      And I'm going to project -- and I have a copy if you'd

22  like a copy, but this is --

23        THE COURT:  Give me a copy of this.  It will be easier

24  for me to read.

25              (Pause in proceedings.)

1          **MS. CARIDIS:**  And, again, I apologize for the size,

2    Your Honor.

3          **THE COURT:**  It's pretty small, but which one do I look

4    at?

5          **MS. CARIDIS:**  So if you look at the second entry on

6    the second page, Your Honor.

7          **THE COURT:**  4715?

8          **MS. CARIDIS:**  Yes, Your Honor.

9      This is an entry and there are a couple related ones that

10   follow on the same day as the "buzz saw" e-mail, and if you

11   look at the description of 4715, it says:  (reading)

12          "E-mail seeking advice of counsel re use of OpenJDK

13          licensing in Android and mixing of GPL and Apache licensed

14          code."

15     Your Honor, we don't know what this document says because

16   Google is claiming privilege, but now they are also, on the

17   other hand, claiming that there was never a licensing concern

18   and giving other reasons for their rejection of OpenJDK.

19                    (Pause in proceedings.)

20          **THE COURT:**  Okay.  You said there was another one.

21          **MS. CARIDIS:**  Yes, Your Honor.  Mr. Kwun said a moment

22   ago in response to your counterfactual about, "Well, what if

23   everybody knew in 2008 that these APIs were copyrighted?"

24   Apache knew, Your Honor, that the APIs were copyrighted.  And

25   I'm going to hand up to you a document that was produced in the

1    first part of this case, and I'm going to direct you to the

2    second page, Your Honor.

3        And this is an e-mail from an Apache employee who

4    ultimately went to work for Google.  And about three quarters

5    of the way down the page he says:  (reading)

6            "Simply by implementing a class with the same

7        signature of another in another name space and simply by

8        looking at available Java docs could be considered

9        copyright infringement even if the implementation is clean

10       room.  So we are, in fact, infringing on the spec lead

11       copyright if we distribute something that has not passed

12       the TCK, and we know that.  This makes us already doing

13       illegal things.  In fact, Android using Harmony code is

14       illegal as well."

15           THE COURT:  So this is when?

16           MS. CARIDIS:  So this is in early 2008, Your Honor.

17           THE COURT:  This is internal to Apache or what?

18           MS. CARIDIS:  This is from an employee who was at

19   Apache at the time and who has since -- and he joined Google in

20   2010.

21           THE COURT:  What was that person's name?

22           MS. CARIDIS:  Stefano Mazzocchi.

23           THE REPORTER:  Could you please spell that?

24           MS. CARIDIS:  S-T-E-F-A-N-O, M-A-Z-Z-O-C-C-H-I.

25       And, Your Honor, if you're actually -- I can direct your

1    attention to one line above where I started, which is about

2    halfway down the page.  This, again, is Mr. Mazzocchi.

3             THE COURT:  What year did he go to Google?

4             MS. CARIDIS:  2010.

5             THE COURT:  And when was the product launched?

6             MS. CARIDIS:  The product was launched late 2008.

7         He also, Your Honor, says --

8             THE COURT:  This is April 17th, 2008.  So he is saying

9    to somebody, "This makes us already doing illegal things."

10   That is -- that's internal to Apache?

11            MS. CARIDIS:  Yes, Your Honor.

12            THE COURT:  All right.  Did -- okay.  So back in 2008

13   did anybody at Apache say to Google the same thing, pass that

14   information on?

15            MS. CARIDIS:  Your Honor, I don't know this.  I wanted

16   to show you in response to Mr. Kwun's statement that Apache

17   thought what it was doing was okay.

18            THE COURT:  You did say something like that, so what's

19   your answer to this e-mail?

20            MR. KWUN:  Well, apparently there was at least one

21   person who expressed a dissenting view at Apache.  That's all I

22   can say having not seen this e-mail in briefing, but that's all

23   I can say.

24            THE COURT:  Well, do you have an e-mail within Apache

25   that goes the other way?

1           **MR. KWUN:**  I don't, Your Honor.  I do, however, have

2     their course of conduct, which was that they continued with the

3     Apache Harmony project for many years after this.

4           **THE COURT:**  But, look, people -- look what happened in

5     Wall Street in 2008.  I mean, people do things all the time

6     that are completely illegal, and you can't after the fact say

7     there must be some kind of presumption that they were acting in

8     good faith.  I don't think that's the law, and I don't think

9     there's any such presumption.

10          **MR. KWUN:**  I don't think --

11          **THE COURT:**  Maybe Google knew good and well and just

12    never put it in writing that what Apache was doing was, as this

13    guy said, illegal.

14          **MR. KWUN:**  I agree that there's not a presumption,

15    Your Honor, but I do think that the testimony from our

16    witnesses -- and, indeed, we have an expert witness who we --

17          **THE COURT:**  Experts will say anything.  Come on.

18          **MR. KWUN:**  He's largely actually a fact witness, if I

19    can explain.  He may not be able to testify at trial due to

20    medical issues, but we summarized his testimony in a filing for

21    Your Honor, and it's Rick Cattell.  Rick Cattell was an

22    employee of Sun.  He was a distinguished engineer at Sun, and

23    he worked with computer scientists around the world.  And his

24    testimony in his expert report is that the general

25    understanding of computer scientists that he worked with was

1     that reimplementing APIs was fine to do.

2              **THE COURT:**  Did he say that to Google at the time?  I

3     mean, look, you've got -- you've got to -- you've got a

4     document in '09, an e-mail seeking advice of counsel on

5     something that looks like it's pretty close on point.

6              **MR. KWUN:**  So, Your Honor, I don't think that we can

7     tell what it says.  And, Your Honor, we're not relying on that

8     e-mail, so the cases that Oracle cites saying that you cannot

9     rely on a defense of advice of counsel --

10             **THE COURT:**  I don't know how we're going to deal with

11    that.  So maybe you're not going to rely on advice of counsel,

12    but let's say we get into the trial and your argument to the

13    jury is, "Hey, everybody thought this was okay."  And so then

14    Oracle points out to the jury, "Well, look.  They asked their

15    lawyer in an e-mail on this very question, and what was the

16    answer?  We don't know because of privilege."

17             **MR. KWUN:**  Well, Your Honor, we don't even know that

18    it's the same question.  All we have is a vague description

19    that clearly is talking --

20             **THE COURT:**  Well, it's your description.  This is your

21    privilege log.

22             **MR. KWUN:**  It is our privilege log, and --

23             **THE COURT:**  So don't complain about vagueness if it's

24    your vagueness.

25             **MR. KWUN:**  But, Your Honor, I don't think that this

1    is -- first of all, I don't think it's evidence; and, second of

2    all, I don't think that it's clear that that's what it's

3    referring to.

4        And, finally, Your Honor, it's privileged.  So to the

5    extent that we were to try to figure out what it was talking

6    about, we claim privilege.

7            THE COURT:  Can a lawyer make -- I'll give you a

8    hypothetical.  Can a lawyer make a counterfactual argument and

9    say that everyone thought -- well, at the time thought that

10   what we were doing -- this is not even counterfactual.  Can a

11   lawyer make an argument to the jury, "Hey, we all thought this

12   was perfectly okay," and ignore the fact that the lawyers told

13   them at the time that it was not okay just because that's

14   privileged?

15           MR. KWUN:  Under that exact fact scenario, no,

16   Your Honor.  I mean, there's an ethical duty not to suborn

17   perjury.

18           THE COURT:  Well, then, possibly you ought to go back

19   and look at these and make sure that whatever testimony you're

20   going to give can actually be squared with what the lawyer said

21   at the time.  You don't have to answer that, but that's a

22   problem for you.  That's an ethical problem.

23       All right.  I need to move on here, and we don't have --

24   I've got to leave today at about 12:00 o'clock.  So it's almost

25   9:00 o'clock -- it's almost 10:00 o'clock now.

1          **MS. CARIDIS:**  Your Honor, may I make a brief legal

2    point quickly to respond?

3          **THE COURT:**  All right.

4          **MS. CARIDIS:**  Mr. Kwun keeps talking about

5    indisputable is the standard here.  Indisputable is not the

6    standard.  The record that we have is simply that Google's

7    experts are going to testify about this counterfactual.

8          **THE COURT:**  Is this your point number two?

9          **MS. CARIDIS:**  No, no.  This is the end of point number

10   one, and I promise to be super brief.

11         **THE COURT:**  All right.

12         **MS. CARIDIS:**  *Joiner* teaches us, the Supreme Court

13   says:  (reading)

14            "Nothing in either *Daubert* or the Federal Rules of

15        Evidence requires a District Court to admit opinion

16        evidence that is connected to existing data only by the

17        *ipse dixit* of the expert."

18        That's all we have here.  All we have are their experts

19   saying, "We've done it now.  We could have done it back then.

20   We're ignoring all the facts."

21        The standard here is not indisputable.  We are talking

22   about *Kumho* and *Joiner* and *Daubert*, and the expert's

23   supposition that we have is not supported by the record and is

24   not sufficient under FRE 702.

25         **THE COURT:**  Well, I'm thinking 403 is a more apt --

```
 1    I'm not saying I'm going to rule it out, but all the time
 2    judges say, "Look, that's going to take so much time to get
 3    into it, it's going to take so many days of testimony; and at
 4    the end of it all, what does it prove and is it a good enough
 5    point to take up that much time?"  That's a somewhat -- that's
 6    a different analysis, but --
 7             MS. CARIDIS:  And that's absolutely true, Your Honor.
 8         And here we have nine different experts, including the
 9    Rule 706 expert, providing opinions relating to this
10    speculative counterfactual.  So I think that absolutely
11    proves -- or would support a 403 waste-of-time, minitrial,
12    sideshow issue.
13             THE COURT:  I think the same thing is true with some
14    of your experts, like the one that says 37 percent goes to one
15    little tiny piece of the gigantic machine.  Think about that.
16         All right.  We're going -- what are your second and third
17    points?
18             MS. CARIDIS:  Sure.  So my second point, I can be very
19    brief.  During discovery, Oracle asked Google an interrogatory
20    saying, "State your bases for fair use."  And in response,
21    Google made a single point about OpenJDK; and that was, "You
22    released OpenJDK, and that fragmented Java.  So to the extent
23    that Android is fragmenting Java, you can't blame us because
24    you did it yourself."  So the only basis disclosed to rely on
25    OpenJDK during discovery for fair use was about fragmentation.
```

1        Since fact discovery closed, Google has added three

2    additional fair use arguments relating to OpenJDK.  So from a

3    procedural standpoint -- not even approaching the merits, from

4    a procedural standpoint, it's improper.

5        Early on in this case --

6            **THE COURT:**  Just tell me what the three are.

7            **MS. CARIDIS:**  One, releasing OpenJDK shows that Sun

8    consented to Google's copying; two, releasing OpenJDK is

9    relevant to factor two of fair use; and, three, OpenJDK

10   destroyed the potential market for Java SE.

11           **THE COURT:**  All right.  What is your third point going

12   to be?

13           **MS. CARIDIS:**  I will also note, Your Honor, we briefed

14   this for you yesterday, aside from being procedurally improper

15   because they weren't disclosed before, each of those three

16   would do great harm to open source and are also without merit.

17           **THE COURT:**  When did those new three things come into

18   the case?

19           **MS. CARIDIS:**  So the first two, the consent and the

20   factor two, came in during Google's opposition to the present

21   MIL.

22           **THE COURT:**  The present what?

23           **MS. CARIDIS:**  *Motion in limine*.  Pardon.

24           **THE COURT:**  It wasn't surfaced way back?  Did you ask

25   the right question way back then?

```
 1              MS. CARIDIS:  Yes, Your Honor.

 2              THE COURT:  Sometimes you don't ask the right

 3    question.  What was the question that you asked?  Why JDK is

 4    relevant?

 5              MS. CARIDIS:  No, Your Honor.  We asked for all bases

 6    for their fair use defense.

 7              THE COURT:  All right.  And they said JDK slash

 8    fragmentation?

 9              MS. CARIDIS:  Yes, Your Honor.

10              THE COURT:  And did not say JDK slash all those other

11    things, consent?

12              MS. CARIDIS:  Yes, Your Honor.

13              THE COURT:  So you're saying that they failed to

14    disclose it.

15              MS. CARIDIS:  Yes, Your Honor.  And previously in this

16    case you have cautioned the parties to make sure that their

17    interrogatory responses are full.

18              THE COURT:  All right.  Okay.  When we come back, are

19    you arguing this one, too?

20              MR. KWUN:  Yes, Your Honor.

21              THE COURT:  All right.  When we come back, we'll

22    get -- in ten minutes or so we're going to get your version of

23    what happened on that part.

24         Did I put on for today's hearing another motion on the

25    other products?
```

1          **MS. CARIDIS:**  Yes, Your Honor.

2          **MR. KWUN:**  One more *motion in limine*.

3          **THE COURT:**  I hope we can get to it, but we're running

4     out of -- we've already taken up two hours on one third of your

5     motions.

6          **MS. CARIDIS:**  The other two are quick.

7          **THE COURT:**  I hope that the Court of Appeals has mercy

8     when they look at how much work is required to go through just

9     one third, and I'm not even through with it yet.  I'm still

10    trying to understand it.  And it's me and a tiny staff.  Look

11    at the gigantic teams that you have.  So I hope that this is

12    all taken into account in the next appeal.

13         All right.  We'll take a few minutes.

14                    (Recess taken at 9:53 a.m.)

15                 (Proceedings resumed at 10:12 a.m.)

16         **THE COURT:**  All right.  Back to work.  Have a seat.

17         At sometime around 11:00, I have a case management

18    conference.  It won't take long, and I'll just let you-all

19    continue to sit there while I take two or three minutes and do

20    the case management conference.

21         All right.  Let's hear from Mr. Kwun.

22         **MR. KWUN:**  Yes, Your Honor.  So on the issue of what

23    we disclosed in our interrogatory response, this is Exhibit 21

24    from the Silverman declaration, which has the First

25    Supplemental Responses and Objections to Plaintiff's

1   Interrogatories Number 38 through 44.  And the fair use

2   interrogatory is Interrogatory Number 40, and it's -- actually,

3   it runs on for several pages, but I want to read just a couple

4   of points.

5           THE COURT:  The question runs on for several pages or

6   the --

7           MR. KWUN:  The response.

8           THE COURT:  The response.  All right.

9           MR. KWUN:  So it's not like the response just says

10  "fragmentation" and that's it, but I just wanted to make that

11  clear in case it wasn't clear.

12          THE COURT:  Well --

13          MR. KWUN:  But --

14          THE COURT:  -- counsel said it only said

15  fragmentation, the original answer.

16          MR. KWUN:  We said:  (reading)

17           "Google's use of the SSO and Android did not harm the

18      market for licensing the SSO.  Prior to Oracle's purchase

19      of Sun, Sun/Oracle, Sun's licensing practices did not

20      preclude Google from using the SSO and Android."

21      That's one of the things we disclosed.

22      A little further down in the response we said, and I quote

23  again:  (reading)

24           "In addition, by the time Android was released,

25      Sun/Oracle had already enabled the fragmentation of the

1          Java SE platform by giving away the SSO for free without

2          any restrictions on fragmentation through OpenJDK and the

3          associated GPL V2 with the Classpath exception open source

4          license which does not require compatibility."

5     That's --

6          **THE COURT:**  But Ms. Caridis said that you did bring up

7     fragmentation earlier.

8          **MR. KWUN:**  Yes, Your Honor.

9          **THE COURT:**  All right.  So that sounds like

10    fragmentation.

11         **MR. KWUN:**  The fragmentation is the key point that we

12    mentioned there, but we have disclosed more generally the

13    notion that the open source release of OpenJDK precludes the

14    argument of market harm.

15    And the reason why we mentioned fragmentation --

16         **THE COURT:**  Hand up to me your answer, the original

17    answer, so I can read that for myself.

18    All right.  I have the original answer here.

19         **MR. KWUN:**  Well, this is the first supplemental

20    response.  I believe the original answer --

21         **MS. CARIDIS:**  That's what I handed up.

22         **MR. KWUN:**  Actually, this replaced the original

23    answer, but this is the --

24         **THE COURT:**  I want the one that --

25         **MS. CARIDIS:**  That's the one that he was reading from,

1   Your Honor.

2           **THE COURT:**  What is the date of this one?

3           **MR. KWUN:**  I believe the date of this -- actually, I

4   don't know, Your Honor.

5           **MS. CARIDIS:**  It's December 16th, 2015.

6           **THE COURT:**  Is that after the discovery cutoff?

7           **MS. CARIDIS:**  That's on the day of fact discovery

8   cutoff.

9           **THE COURT:**  Well, which is the one that you want to

10  hold him to?  Is it this one or --

11          **MS. CARIDIS:**  That one, Your Honor.

12          **THE COURT:**  You're happy to let them bring up whatever

13  is in here?

14          **MS. CARIDIS:**  Absolutely.

15          **MR. KWUN:**  So where I was reading from, Your Honor, is

16  what is page 13 of the first supplemental response; and if

17  you -- just so that we know what this is responding to, page 9

18  is where the interrogatory appears.

19          **THE COURT:**  All right.  Let's look at that.

20      Number 40:  (reading)

21          "To the extent you contend that your use of any

22      aspect of the 37 Java API packages constitutes fair use,

23      state in detail the factual bases for that contention."

24      All right.  So then we go to --

25          **MR. KWUN:**  And, first of all, Your Honor, since we

1   have already had an entire trial where a lot of facts were

2   disclosed, if you go further down page 9, we state that:

3   (reading)

4           "In support of this contention, Google reserves the

5       right to rely upon all facts set forth in the previous

6       trial record."

7       Because, of course, the purpose of a contention

8   interrogatory is to make sure that there aren't facts that are

9   surprises.  And the interrogatory is directed at our factual

10  contentions or our factual bases for our fair use argument, not

11  our legal bases.

12      So we understood that that which was disclosed in the

13  prior trial, which would include testimony from Oracle

14  witnesses, including Larry Ellison, their CEO, that OpenJDK was

15  an available license in 2007.

16          **THE COURT:**  I don't know.  Can you really do that?  I

17  mean, can you just say, "We rest on the trial record.  Next

18  question"?

19          **MR. KWUN:**  Well, Your Honor, we actually had

20  back-and-forth discussions with Oracle on this point, and we

21  agreed that the purpose of the contention interrogatories was

22  to avoid new facts appearing that were surprises; that we had

23  had full discovery before --

24          **THE COURT:**  Show me the e-mail that says that.

25          **MR. KWUN:**  I don't have that e-mail with me,

1     Your Honor.

2              **THE COURT:**  Then it doesn't count.

3              **MR. KWUN:**  Okay.

4              **THE COURT:**  I told the lawyers, if you're going to do

5     this, you have to bring the e-mail so that --

6              **MR. KWUN:**  The point I would make, Your Honor, is that

7     we have that in our response, and there is no e-mail that has

8     been shown to you today saying that that is not proper, and

9     there was no motion made saying that was not proper.

10             **THE COURT:**  Look, I can't do what you just said.  What

11    you're saying is it's just -- you could just say, "Somewhere in

12    the record, in some deposition somewhere in this case there are

13    facts.  We rely upon all depos.  We rely upon all trial

14    testimony."  That's not specific enough.  The point of an

15    interrogatory is to give the other side what your arguments are

16    going to be.

17             **MR. KWUN:**  Well, the other thing I'll --

18             **THE COURT:**  Not to -- I don't buy that argument it's

19    just to avoid disclosing new facts unless they did the same

20    thing.  I don't know.  I'm not going -- I'm just going to rule

21    on it the way it should have been done.

22        Anyway, you went on for page after page laying out your

23    argument.

24             **MR. KWUN:**  And --

25             **THE COURT:**  All right.  So where do you -- where

1    did -- let's --

2         MR. KWUN:  The factual basis for OpenJDK is on

3    page 13, and first on lines 15 and 16 we note that Sun's

4    licensing practices did not preclude Google from using the SSO

5    in Android.  And starting on page 24 we note that Sun gave away

6    the SSO for free without any restrictions on fragmentation

7    through OpenJDK and the associated license for the libraries.

8         THE COURT:  Lines 15 and what, 16?

9         MR. KWUN:  So 15 and 16 was the first point.  That's

10   in what is the third --

11        THE COURT:  Let me read it out loud.  (reading)

12          "Prior to Oracle's purchase of Sun, Sun/Oracle,

13      Sun's" --

14      Why is it written that way?

15        MR. KWUN:  That was probably a typo, Your Honor.

16        THE COURT:  It's got the word "Sun" three times in

17   four words.  Anyway:  (reading)

18          "... Sun/Oracle, Sun's licensing practices did not

19      preclude Google from using the SSO in Android.  To the

20      contrary, Sun/Oracle's business model was to promote the

21      widespread and free use of the Java language and the

22      associated APIs, including the SSO, and to compete on

23      implementation for those APIs, including the

24      implementation of the 37 API packages."

25      Next bullet point:  (reading)

1              "Google's use of the SSO in Android also did not harm

2       the market for the SSO by fragmenting the Java SE platform

3       because by the time Android was released, Sun/Oracle had

4       already fragmented the Java SE platform itself by creating

5       separate versions of Java."

6       It goes on to talk about fragmentation, fragmentation

7  through the OpenJDK.

8       It also says:  (reading)

9              "Sun's other Java platforms, Java ME, were fragmented

10      before Android as witnesses testified to in deposition."

11      **MR. KWUN:**  And then, Your Honor, on the next page, on

12  page 14, in the third bullet point:  (reading)

13             "There is no evidence that any market harm or lost

14      business opportunity is due to Android's use of Java" --

15      or, excuse me -- "Android's use of the SSO.  Any harm is

16      due to flaws in Oracle's own products or strategies or

17      many desirable aspects of" -- excuse me -- "desirable

18      attributes of Android that have nothing to do with SSO.

19      One of Oracle's strategies was open sourcing Java SE using

20      OpenJDK."

21      So we have disclosed OpenJDK.  We've disclosed their

22  licensing practices.  We've disclosed that the harm was caused

23  by their strategies and products, not by our actions.

24             **THE COURT:**  But other than fragmentation, what are you

25  talking about that Sun did?

1          **MR. KWUN:**  Well, Your Honor, we talk about Sun's

2    licensing practices, which didn't preclude us from using the

3    SSO, and that certainly would include the fact that OpenJDK

4    allows us to use the SSO.

5          We talk about their own products and strategies causing

6    any alleged harm.

7          **THE COURT:**  I'm still very concerned about that.  You

8    want to put on some lawyer; right?  Some lawyer --

9          **MR. KWUN:**  We have --

10         **THE COURT:**  Has that lawyer reviewed the stuff that

11   you're withholding?

12         **MR. KWUN:**  No, Your Honor.

13         **THE COURT:**  Well, then, maybe they're inconsistent.

14   Maybe your lawyer is a paid gun who's coming in here to say

15   something inconsistent with what the lawyer said at the time.

16         **MR. KWUN:**  Well, Your Honor, we're not offering him to

17   offer a legal opinion, of course, and we're offering a few

18   witnesses on this point.  We're offering Dr. Astrachan, who is

19   a technical expert, to offer technical opinions.

20         We're offering Andrew Hall, who is an open source

21   licensing expert, to help guide the jury through some of these

22   open source licenses, which are not going to be familiar

23   concepts to them.  These notions like some of the ones we've

24   been discussing this morning about how these licensing regimes

25   work, I think it's going to be counterintuitive for some jurors

that it would make commercial sense for a company to release a product for free, including source code, whether it's subject to restrictions or not.  So he's going to help explain why companies do that and what the commercial benefits are to the companies that do that.

He's also going to discuss the difference between the various licenses, which is necessary because of the attempts to confuse the GPL2 license, which applies to, for example, the virtual machine, and the GPL2 license with the Classpath exception, sometimes referred to as the Classpath license, which applies to the Java SE class libraries in OpenJDK.

And the other thing is that Mr. Hall is not just an attorney who practices in the field of open source licensing. He's also a trained computer scientist.  And so the exception that we're talking about here is sometimes referred to as a linking exception.  "Linking" is a computer science term that explains how you can combine two different software modules to work together in a certain way.  And Mr. Hall is, by virtue of the fact that he practices in open source licensing and has a technical background, well-suited to offer testimony that ties those two together.

THE COURT:  Ms. Caridis, what were the three things that you said you wanted to have excluded?

MS. CARIDIS:  The third one was Mr. Hall, Your Honor.

THE COURT:  No.  You said the fragmentation was

```
 1   okay --
 2              MS. CARIDIS:  Oh.
 3              THE COURT:  -- but then they added in three things.
 4              MS. CARIDIS:  Yes.  Sorry, Your Honor.  Factor --
 5              THE COURT:  What were the other?
 6              MS. CARIDIS:  Factor two, that Google's attempt to
 7   rely on release of JDK under -- as relevant to factor two of
 8   fair use was the first one.
 9              THE COURT:  Was that added later?
10              MS. CARIDIS:  That was added in the opposition to the
11   motion in limine.
12              THE COURT:  All right.  Factor two, OpenJDK.
13         All right.  What was the next one?
14              MS. CARIDIS:  The next one was that by Sun releasing
15   OpenJDK, Sun consented to Google's copying.  Of course, you
16   know, there's no express or implied license defense in this
17   case, but they've said that our releasing of a licensed version
18   of the class libraries showed that we consented to the copying.
19         And the third one, Your Honor, is that Sun's releasing of
20   OpenJDK destroyed the market for Java SE.
21              THE COURT:  Isn't that the same thing as
22   fragmentation?
23              MS. CARIDIS:  No, Your Honor.  We made very clear in
24   the briefing, especially the briefing yesterday, we are not
25   moving to preclude fragmentation.
```

1          **THE COURT:**  I know, but isn't the last point very

2     close to fragmentation?

3          **MS. CARIDIS:**  They are trying to argue basically that

4     the release of OpenJDK destroyed the market value for Java SE,

5     which is separate from fragmenting the Java SE platform.

6          **THE COURT:**  What is their argument that it destroyed

7     that market?

8          **MS. CARIDIS:**  Their argument is because we released a

9     version of the Java SE platform for free, even though it has a

10    very specific license attached to it, they somehow speculate

11    we've destroyed the market for Java SE, even though Oracle

12    continues to --

13         **THE COURT:**  Well, how would it have been destroyed

14    under the Google theory?

15         **MS. CARIDIS:**  Honestly, I think you would have to ask

16    Mr. Kwun that.

17         **THE COURT:**  I mean, you must have read what they say.

18    They've got to have a reason.

19         **MS. CARIDIS:**  Their reason, Your Honor, is because you

20    offered a free option even though it was licensed.  Nobody

21    would have possibly paid for it ever again, which is just not

22    true.

23         **THE COURT:**  Do you have examples where it has been

24    paid for?

25         **MS. CARIDIS:**  Your Honor, I can tell you that -- I

1    don't have the document in front of me but since 2010, Oracle

2    has made well over $100 million licensing Java SE.

3              **THE COURT:**  On new licenses?

4              **MS. CARIDIS:**  On new licenses.

5              **THE COURT:**  We need to go to the third point.  What is

6    your third point?

7              **MS. CARIDIS:**  So the third point, Your Honor, is we're

8    moving to exclude the expert testimony of Mr. Hall.  As

9    Your Honor noted, Mr. Hall is an attorney.  He was engaged by

10   Google in this case to look at the source code that Google

11   published after the close of fact discovery and provide

12   opinions whether or not that publication conformed with the GPL

13   Version 2 with Classpath exception.

14       So first he says what Google has --

15             **THE COURT:**  Say that again.  You said it perfectly

16   well, but I was halfway through it and I lost track of it.  Say

17   it again.  He was retained to do what?

18             **MS. CARIDIS:**  He was retained to evaluate Google's

19   post-fact discovery release of publication of source code that

20   included OpenJDK and opine whether or not that was acceptable

21   under the terms of the GPL Version 2 with Classpath exception

22   license.

23             **THE COURT:**  So go through the history of that release.

24             **MS. CARIDIS:**  Sure.  So during fact discovery, Google

25   produced a single document relating to its purported plan to

1  have a future version of Android based on the OpenJDK class

2  libraries.  One document.

3      They also produced source code.

4          **THE COURT:**  One page or --

5          **MS. CARIDIS:**  Both.  One page, one document.

6          **THE COURT:**  One page, one document.  Okay.  And when

7  did that get released?

8          **MS. CARIDIS:**  November 12th, I believe.  Maybe

9  November 8th.  I have a copy for you if you'd like it.

10          **THE COURT:**  Can I see that?

11          **MR. KWUN:**  November 12th, Your Honor.

12                      (Pause in proceedings.)

13      **MS. CARIDIS:**  Your Honor, the way that it was produced

14  to us, it makes it show up quite small on the page.  I

15  apologize for that.

16                      (Pause in proceedings.)

17          **THE COURT:**  All right.  So go ahead.

18          **MS. CARIDIS:**  So we have this one single document.

19  They then made the --

20          **THE COURT:**  This was on November 12 you got this?

21          **MS. CARIDIS:**  We got it on December 4, I believe.

22          **THE COURT:**  Okay.  But it was dated November 12?

23      **MS. CARIDIS:**  Yeah.  We got it -- yes.  Correct.  It

24  was dated in November.  It was produced on December 4th.

25      Google then also made available for inspection the

1   in-progress source code that they were working on that's

2   referenced in that e-mail during fact discovery, but they

3   confirmed during fact discovery that there's no actual release

4   of Android using that source code.

5        It wasn't until after the close of fact discovery that

6   they made public that source code.  They posted it on their Web

7   page.  And then they confirmed with the press that they had --

8   that Google had plans to move a future version of Android to

9   OpenJDK class libraries instead of the 37 at issue here.

10       So that announcement -- that public announcement and that

11  public plan to move to OpenJDK was done December 24th, 2015,

12  after the close of fact discovery.

13            THE COURT:  Which was what day?  I've forgotten.

14            MS. CARIDIS:  I believe it was a Thursday.

15            THE COURT:  What was the day of the close of fact

16  discovery?

17            MS. CARIDIS:  December 16th, Your Honor.

18            THE COURT:  All right.  So what did Mr. Hall do?

19            MS. CARIDIS:  So then on January 8th we got the

20  opening report of Mr. Hall, and he looked -- he purports to

21  have talked to some engineers at Android and to look at what

22  Android was planning on doing with the OpenJDK libraries, and

23  he opines without a whole lot of analysis about the actual

24  license that Google's implementation of OpenJDK is permissible

25  under the relevant license today in 2016.

1     He then says:  (reading)

2          "It is also my opinion that Google could have adopted

3     the same approach when OpenJDK was first open sourced

4     licensed pursuant to GPL with Classpath exception in

5     2007."

6     So in a nutshell what he does is he says, "I looked at it.

7     I've interpreted the contract.  I've applied it to this case.

8     What they're doing today is okay; and, therefore, what they

9     were doing in 2000 -- it would have been okay for them to do it

10    in 2007," without any additional analysis about the facts or

11    business circumstances at the time.

12         **THE COURT:**  So I'm just curious.  Do you have a

13    counterexpert that says something else?

14         **MS. CARIDIS:**  We do, Your Honor.  Our expert is

15    Ms. Gwyn, G-W-Y-N, Firth Murray.  She was presented as purely a

16    rebuttal to Mr. Hall.  We had to go out and retain a new expert

17    to rebut Mr. Hall's responses.

18         In the summary of expert opinions that Your Honor asked

19    for earlier this week, we made clear that if Mr. Hall is

20    excluded, Ms. Murray's testimony will not be necessary.

21         **THE COURT:**  Does Hall testify to anything other than

22    this JDK problem?

23         **MS. CARIDIS:**  His report includes many, many pages

24    about general background of open source licenses and, you know,

25    discussing different open source licenses.

1      As we talked about at length this morning, I think that

2  the entirety of this OpenJDK counterfactual should be excluded,

3  and so I'm not sure what the relevant basis would be for any of

4  that other testimony.

5          THE COURT:  Well, if fragmentation came in, wouldn't

6  it be relevant to fragmentation even if the OpenJDK -- would it

7  be relevant to fragmentation?

8          MS. CARIDIS:  Your Honor, I don't believe so.  I think

9  the way that fragmentation would be relevant here is that

10  Oracle and Sun offered a potential license that did not require

11  full compatibility with the TCK.

12      It doesn't -- the details of that license, as it relates

13  to the open-source aspects, I don't think are relevant.  What

14  is relevant to the only fair use theory that Google disclosed

15  during fact discovery is Sun had this license that permitted

16  fragmentation, but the open-source aspect of it is an entire

17  sideshow.

18          THE COURT:  All right.  Let's hear from Mr. Kwun.

19          MR. KWUN:  Yes, Your Honor.  The relevance of the

20  fragmentation point is that Sun offered to the world a license

21  that allowed people to have a full implementation of Java SE

22  that allowed them to do all sorts of things that they now claim

23  we did that caused them harm.

24      And they claim that they've lost licensing opportunities,

25  that they've lost revenue, and that this curiously coincides

1   with the timing of our release of Android.  It also curiously

2   coincides with the timing of the open source release of

3   Java SE.

4       So for them to be able to argue that we caused this harm

5   because there is a sudden change in the trajectory of their

6   licensing revenue when, in fact, they exclude us or attempt to

7   exclude us from offering evidence about what happened in the

8   real world -- not a counterfactual, what they actually did with

9   OpenJDK, what they actually told people that they could do with

10  OpenJDK -- would be unfair and prejudicial.

11      The --

12      **THE COURT:**  Well, but, you know, you wait till a few

13  days before the end of fact discovery, and you gin up this

14  version called OpenJDK, which no one has ever used except in

15  your laboratory.  How fair is that?

16      **MR. KWUN:**  So, Your Honor, we have testimony from an

17  IBM witness that they have used OpenJDK.  They have been a

18  contributor to OpenJDK since 2010.  We are not the only ones

19  using OpenJDK.

20      **THE COURT:**  I'm talking about your version of Android

21  that uses OpenJDK.  Is any manufacturer using that now?

22      **MR. KWUN:**  It's not on a phone that has been released

23  to the public, that is true.

24      **THE COURT:**  Okay.  Well, then it sounds like something

25  ginned up for the litigation.

1          **MR. KWUN:**  Your Honor, we disclosed this to Oracle on

2    November 12th.  As of November 12th, they had access to the

3    source code.  They came.  They inspected the source code on

4    November 25th.

5        We had a very brief period --

6          **THE COURT:**  The source code in progress.

7          **MR. KWUN:**  Of the source code that fully implements a

8    version of Android that you could use, that operates.

9          **THE COURT:**  The very same one that Hall examined?

10         **MR. KWUN:**  Yes.

11         **THE COURT:**  Sounds like it was in progress.  So you're

12   saying it's identical.  He viewed the same one that was

13   produced to the other side?

14         **MR. KWUN:**  So, Your Honor, by the nature of the way

15   it's published, it is a -- it's what's called a version control

16   system.  And so when we published it in December to the world,

17   it included the dates of all the changes.  So you can see any

18   version of the code on any date, and --

19         **THE COURT:**  But you want to exclude all these new

20   products that they want to put in -- on the other motion, you

21   want to exclude them; but we hear you have a new product called

22   OpenJDK for Android that you came up with at the end of the

23   class -- at the end of the discovery period.  How fair is that?

24         **MR. KWUN:**  Your Honor, this is directly relevant to

25   what happened in 2007 when they open sourced OpenJDK.

1              **THE COURT:**  No, it's not.  Why didn't you do it back

2      in 2007, 2008, 2012 instead of 2015?

3              **MR. KWUN:**  Well, Your Honor, they had an opportunity

4      to ask our 30(b)(6) witness who was presented on this point why

5      we made the choice to use OpenJDK today --

6              **THE COURT:**  Well, I'm asking that question.

7              **MR. KWUN:**  -- and the reason -- they didn't ask her

8      many questions about that; but the key thing that happened --

9              **THE COURT:**  Well, it's clear.  It's clear.  It's a

10     gimmick to use for litigation.  Come on.  That's what it is.

11             **MR. KWUN:**  Well, Your Honor --

12             **THE COURT:**  It's just a gimmick.

13             **MR. KWUN:**  The key thing that happened recently in the

14     recent history is that in 2010 -- that in 2007, there were a

15     lot of industry supporters of Open -- excuse me -- of Harmony.

16     In 2010, the last of the major supporters, which was IBM,

17     shifted their development efforts for open source Java SE to

18     OpenJDK.  Shortly thereafter you had Apple release versions of

19     OpenJDK implementations on the Mac OS.  You had SAP announce

20     that they would be using OpenJDK.

21             So in this time period -- in the recent time period, as

22     opposed to the time period when Android was initially being

23     developed, in the recent period you have a fair number of

24     industry supporters using OpenJDK.  And at that point there's

25     every reason why you might consider using OpenJDK rather than

1    Apache Harmony, which is no longer supported by anyone other

2    than Google.

3         And the disclosure of OpenJDK in November of 2015, I just

4    want to remind the Court that we actually had a very brief

5    period of supplemental discovery; and so although November 12th

6    I will admit is approximately one month, slightly more than a

7    month before the close of discovery, we are talking about a

8    very short supplemental discovery period.  And because that was

9    a very short supplemental discovery period, I don't think a

10   disclosure that happened more than a month before the close of

11   discovery will unduly prejudice Oracle if we're allowed to have

12   testimony about it.

13        The publication to the world in December of 2015 is

14   irrelevant to the question of whether or not Oracle knew about

15   this.  We sent an e-mail to Oracle on November 12th, and this

16   is in the briefing.  And, Your Honor, may I pass a copy of that

17   up?

18        This is an e-mail where we served a supplemental

19   interrogatory response, and we noted in the e-mail itself, they

20   didn't even have to open the attachment, that:  (reading)

21        "We are making available for inspection

22        in-development source code implementing versions of

23        Android using OpenJDK.  Please let us know when you would

24        like to inspect the code per the procedures under the

25        protective order."

1          So that's what we told them on November 12th.  And in our

2     interrogatory responses, we said, and I quote:  (reading)

3               "Google further states it is developing Android

4          versions using OpenJDK, which is a free and open source

5          implementation of the Java platform Standard Edition,

6          Java SE, and it's made available under the GNU General

7          Public License Version 2, GPLV2, with the Classpath

8          exception."

9          We didn't hide the ball on this.  When the e-mail went out

10    internally to the Android team announcing that we were making

11    this move, on that day we served them with a supplemental

12    interrogatory response.  On that day we told them that the

13    source code was available for inspection.  That was more than a

14    month before the close of discovery.  Their expert came and --

15    or consulting expert came and reviewed the source code on

16    November 25th.

17         **THE COURT:**  What do you learn when you review the

18    source code?

19         **MR. KWUN:**  If you review the source code, you can see

20    what it is we do with this.  And the reason why that is

21    important is because the Classpath exception applies when you

22    have modules of code written by someone other than the licensor

23    that link with the licensee.

24         **THE COURT:**  Has it been run on hundreds of different

25    applications to make sure it actually works as opposed to

1   having a lot of bugs?  How do we know how good this is?

2       Just looking at the source code won't tell you unless

3   you're good at spotting bugs.  It's not going to tell you where

4   the bugs are unless you run it and exercise it through hundreds

5   of different applications, thousands probably.  Has that

6   occurred?

7       **MR. KWUN:**  Well, I don't know all the details of the

8   tests that have been run.  I do know that there are general

9   tests that apply to releases of code to make sure that, as best

10  as possible, it does not have -- that the changes that were

11  made do not introduce bugs.

12      And I do know that we offered the engineering director,

13  who is responsible for, among other things, the core libraries

14  in Android, we offered him for deposition, including on the

15  topic of commercially reasonable noninfringing alternatives,

16  and that was the phrase that they used -- Oracle used in their

17  30(b)(6) notice.  He was offered for deposition.  They kept him

18  on the record for four hours.  They concluded the deposition

19  midafternoon.  He was available to testify about the

20  development process, what we did to develop, what we did to

21  test.  Those questions were not asked of him.

22      **THE COURT:**  All right.  Your reply, and then we've got

23  to move on.

24      **MS. CARIDIS:**  Sure.  Very briefly.

25      As you heard from Mr. Kwun, there is no phone that has

1    this OpenJDK version being sold in the marketplace.  The

2    OpenJDK version was not released or announced until after fact

3    discovery.  It is not accused in this case, and Google has

4    conceded that it's not advancing a -- pardon -- is not

5    advancing an express license defense in this case either.

6         I will also note just for the record that we

7    interviewed -- sorry -- we deposed the head of Android,

8    Mr. Lockheimer, in December of 2015, and he testified basically

9    to really not knowing anything about this OpenJDK version until

10   that Project NSO e-mail was released.

11        So I think the entire timing and the testimony that we

12   have from the head of Android further calls into question this

13   release.

14        But even putting aside that fact, it wasn't announced

15   until after fact discovery closed.  Their opinions --

16            THE COURT:  Well, he said that you knew about it

17   through this e-mail.

18            MS. CARIDIS:  And he said it was in-development source

19   code.

20            THE COURT:  What does that mean?

21            MS. CARIDIS:  It means it was a work in progress.

22            MR. KWUN:  Your Honor, it means it's subject --

23            THE COURT:  But counsel said that the in-development

24   source code was exactly what Hall looked at; right?

25            MR. KWUN:  Yes, Your Honor.

1      **THE COURT:**  Or is that -- so -- but at the same --

2  okay.  But how are they supposed to know that -- it says "in

3  development."

4      **MR. KWUN:**  Your Honor, that's why we made the source

5  code available for inspection.  That's why we made Mr. Ghuloum

6  available as a witness.

7      **THE COURT:**  Well, but put yourself on the receiving

8  end of a memo like this.  Well, first of all, what did the

9  Interrogatory 37 say?

10      **MR. KWUN:**  Interrogatory 37 --

11      **THE COURT:**  Supplemental response.

12      **MR. KWUN:**  Yes.  So the interrogatory asked us to

13  identify all licenses Google has taken in connection with the

14  development or release of any version of Android.

15      When we started this work, we accepted the OpenJDK

16  license.  So we revealed that we were developing Android

17  versions and -- excuse me.

18      So we quoted at the end of this:  (reading)

19          "Google further states that it is developing Android

20          versions using OpenJDK, which is a free and open source

21          implementation of the Java platform Standard Edition,

22          Java SE, and is made available under the GNU General

23          Public License Version 2, GPLV2, with the Classpath

24          exception."

25      So in response to a question about what licenses we had

 1   taken, we disclosed that we were using their code subject to

 2   their license, and then we let them know that in addition to

 3   that interrogatory response, we were making that source code

 4   available.

 5           THE COURT:  All right.  Where did you let them know

 6   how you were going to be using this in the trial?

 7           MR. KWUN:  Well, that was we responded to the

 8   interrogatories that were responsive --

 9           THE COURT:  You said --

10           MR. KWUN:  -- that called for this information.

11           THE COURT:  But now you're -- after the close of

12   discovery you have sprung on them a much more detailed picture

13   of how you're planning to use it.

14           MR. KWUN:  Your Honor, we were asked --

15           THE COURT:  This fragmentation, it's going to be used

16   on fair use, factor two, factor four, and then on damages.  So

17   what you did was respond to an interrogatory asking about what

18   licenses have you taken.

19           MR. KWUN:  Yes, Your Honor, we responded to that

20   interrogatory.  We responded to -- we supplemented our response

21   to the fair use interrogatory.  We offered them the factual

22   bases for our fair use defense.

23           THE COURT:  That came after the close of discovery.

24           MR. KWUN:  That came -- you're right, Your Honor, that

25   interrogatory response came after conclusion of discovery.

1          The -- well, that's all I can say for now.   There may have

2     actually been a supplemental response in between that included

3     some of that.   I'm not sure.

4          But we disclosed our use of OpenJDK.   We disclosed the

5     code.   We disclosed the license that we were using, and we made

6     a witness available on the topic of noninfringing alternatives,

7     which was their question.

8          **THE COURT:**   I'm sorry.   You made -- where does it say

9     you will make available a witness on noninfringing

10    alternatives?

11         **MR. KWUN:**   That's not there.   That's the Ghuloum --

12    Anwar Ghuloum whose deposition testimony is addressed in the

13    *motion in limine* and in the opposition.   He was our

14    Rule 30(b)(6) designee on, as I recall, a couple of topics; but

15    one of the topics, topic 10, asked for in part everything that

16    we believed to be a commercially reasonable, noninfringing

17    alternative to our use of the 37 API packages.

18         **THE COURT:**   When did that testimony occur?

19         **MR. KWUN:**   That testimony occurred in early December.

20         **THE COURT:**   Early December?

21         **MR. KWUN:**   Yes.

22         **MS. CARIDIS:**   December 9th, Your Honor.

23         **THE COURT:**   So December 9 was the first time they

24    learned that this was going to be asserted as a noninfringing

25    alternative?

 1          **MR. KWUN:**  I think that in so many words perhaps; but,

 2   Your Honor, they were clearly aware of this possibility.  They

 3   marked at the deposition the e-mail announcement of

 4   December 12th -- excuse me -- of November 12th as a deposition

 5   exhibit.  They asked questions, not that many, but they asked

 6   questions about the OpenJDK alternative.  Clearly they were

 7   aware that this was going to be an issue.

 8          **THE COURT:**  Okay.  We've got to move to something

 9   else.

10      Yes, Ms. Anderson?

11          **MS. ANDERSON:**  Christa Anderson.  I apologize.

12      Your Honor had asked some questions before about -- you

13   wanted to see the documentation about the agreement that we had

14   with Oracle that we didn't need to recite and restate stuff

15   that had happened in the original trial because the parties

16   wanted to sort of streamline the contention rog and

17   supplemental rog response process.

18      And, interestingly -- I have collected the correspondence

19   on the subject -- this agreement had its genesis in an

20   objection by Oracle who didn't want to do that.

21      And so we have some e-mail correspondence, which I have on

22   my computer.  If the Court would like us to submit it, we can;

23   but basically we note in the first correspondence in October of

24   2015 that Oracle was not happy with the idea that they would

25   have to restate what occurred in the prior trial.  And we

1    explain:

2         While we previously proposed that Oracle respond to

3    interrogatories by identifying portions of the trial transcript

4    and exhibit list that it was relying on, you have expressed

5    concern -- you, Oracle, have expressed concern that identifying

6    those portions was unduly burdensome.  In light of that

7    concern, we propose Oracle respond by stating it reserves its

8    right to rely on the trial record, deposition, and exhibits and

9    briefing in this case, and stating it's unaware of additional

10   bases for its contention beyond what occurred before.  So if

11   Oracle has learned of new facts that are not within the trial

12   record, et cetera, then we believe that Oracle has to identify

13   new facts.

14        And this became essentially a no-surprises agreement.

15   That agreement -- this e-mail I was paraphrasing from was from

16   October 22nd.  This agreement was confirmed by Oracle's counsel

17   on November 2nd, 2015.

18        And, in fact, Oracle applied this process in responding

19   to, for example, its response to the fair use interrogatory we

20   issued to them.  They served a supplemental response on the

21   last day of discovery to Rog 23; and in that response they

22   state, quote -- among other things, they state, quote:

23   (reading)

24             "Facts supporting this conclusion were set out in the

25        previous trial in this matter, and Oracle hereby

1          incorporates and refers Google to the previous trial and

2          appellate record, including all trial exhibits, all

3          testimony, and all Trial Court and Appellate pleadings and

4          briefings on this issue.  Facts supporting this contention

5          also include," and then go on to list other things.

6          So this was an agreement the parties abided by,

7    Your Honor, and we abided by it as well, and I wanted to just

8    identify that for the Court.

9          **THE COURT:**  All right.  I'm going to get you to put

10   that in writing.

11         What do you say to that, Ms. Caridis?

12         **MS. CARIDIS:**  Sure, Your Honor.  I am not aware of

13   anyplace, nor have we heard of anyplace from Google where in

14   the trial record, the deposition, or anyplace in the past

15   Google disclosed that it thought that OpenJDK was relevant to

16   any fair use issue other than fragmentation.

17         So even if they want to rely on the entire wealth of

18   evidence that happened at the first trial and before, we were

19   still surprised, caught off guard, not put on notice that they

20   were going to rely on OpenJDK for these three previously

21   undisclosed theories.  We asked them during fact discovery for

22   their theories.  They gave us fragmentation.

23         **THE COURT:**  So by 9:00 o'clock tonight, Ms. Anderson,

24   you put in writing what you just covered; and by 9:00 a.m.

25   tomorrow, you give me your response.

1          **MS. CARIDIS:**  Yes, Your Honor.

2          **THE COURT:**  All right.

3          **MS. ANDERSON:**  Thank you.

4          **THE COURT:**  Just on this issue of whether or not there

5    was some agreement to the effect that I just heard.

6          All right.  Before we -- we've had a small amount of

7    discussion about noninfringing alternatives, and I don't know

8    the answer to what I'm about to say, so I'm not making a ruling

9    on this; but tomorrow when we get to the -- not tomorrow, next

10   week -- I'm going to give you an example of something that I

11   think would indicate that noninfringing alternatives is not the

12   right analysis when you come to disgorgement.  I'm only talking

13   now about disgorgement.

14         So I'll give you a hypothetical.  Let's say somebody has a

15   guidebook for San Francisco.  It has 200 pages, and 100 pages

16   are photographs of landmarks.  One of the photographs is a

17   copyrighted photograph by some local photographer, and it got

18   used in violation -- without a license and it should not have

19   been.  Let's say it appears on page 79.

20         Let's say that the guidebook is a big success, and so the

21   photographer sues and says, "I should at least get the 200

22   pages -- my picture takes up one page of 200, so I should at

23   least get half a percent of all the gross royalties."  And

24   let's say that turns out to be $10,000.

25         And so then the other side, the defendant, comes forward

and says, "Oh, well, we had a noninfringing alternative.  We
could have just paid $10, made our own picture, stuck that in
there.  We didn't need to use your picture.  We could have used
our own picture, and it would have cost us $10."  So that the
noninfringing alternative -- under that analysis, the plaintiff
winds up getting $10 instead of the larger amount.

But that ignores the fact that the book as sold had 200
pages and had 100 photographs, and the poor guy who was the
photograph photographer helped contribute to the success of the
book and should get 1/200th in my opinion in that case.

So I question whether or not this idea of a noninfringing
alternative -- I think this is something maybe the economists
invented because they get paid all the time by big firms to
come up with these kind of ideas.  So I acknowledge that even
Dr. Kearl seems to like the idea, but that doesn't mean it's
right.

So then I asked my law clerk the question -- who, by the
way, he doesn't get to sleep at night -- I say, "Give me the
case law in the Court of Appeals on noninfringing alternatives
and when it can be used."  And he says, "I'll get to it.  It's
a list of 45 things I've got to do."

So you're going to do it for me.  I want you to give me a
brief by Friday at noon, that's two days -- what is today?
Thursday?  Okay.  I'll give you till midnight on Friday to give
me a brief on the case law, five pages, where Courts of

 1    Appeal -- I'm not talking about district judges, I want Courts

 2    of Appeal -- have weighed in on when you can use noninfringing

 3    alternatives for apportionment.  That's what we're talking

 4    about here, apportionment.

 5        It can be in the patent context.  It can be in any

 6    context.  Obviously copyright would be much better, more on

 7    point; but the general problem we have is where you have an

 8    indirect -- you have one small item out of many, many dozens of

 9    things that contribute to profits.  How do you go about

10    apportioning the profits to the one item that was infringing,

11    the accused item?

12        And sometimes that's going to come up in patent cases.

13    It's going to come up in copyright.  It's going to come up in

14    other contexts.  And I would like to see if the Courts of

15    Appeal have blessed this approach.  Maybe they have.  I don't

16    know.  But I can't do everything and my law clerk can't do

17    everything, and so I want to know the answer to that question.

18        Okay.  Are the lawyers here on the case management

19    conference yet for the 11:00 o'clock calendar?

20            **UNIDENTIFIED SPEAKER:**  Yes, Your Honor.

21            **THE COURT:**  Okay.  We're going to interrupt this.

22    Just we're going to take -- I only need you for five minutes.

23    Come up here, please.

24        And then you other lawyers just stay right here, and as

25    soon as I can, I'm going to come back to you.

1            (Recess taken at 10:58 a.m.)

2            (Proceedings resumed at 11:01 a.m.)

3        **THE COURT:**  Okay.  Now we go back to Oracle versus

4   Google, Case Number 03561.

5      And we finished up on that motion.  Let's go to the motion

6   on new products.

7        **MR. PAIGE:**  Good morning, Your Honor.  Gene Paige

8   appearing on behalf of Google.

9        **THE COURT:**  P-A-G-E.

10       **MR. PAIGE:**  P-A-I-G-E, Your Honor.

11       **THE COURT:**  Say it again.

12       **MR. PAIGE:**  P-A-I-G-E.

13       **THE COURT:**  P-A-I-G-E.

14       **MR. PAIGE:**  Yes, Your Honor.

15       **THE COURT:**  With an E at the end?

16       **MR. PAIGE:**  That's correct.

17       **THE COURT:**  All right.  And Simpson, as I recall;

18   right?

19       **MS. SIMPSON:**  That's correct, Your Honor.

20       **THE COURT:**  Okay.  Go ahead.

21       **MR. PAIGE:**  So pursuant to Your Honor's order of

22   February 5th, which said what was going to be in the case, when

23   we saw lots of discussion of various products beyond mobile

24   phones and tablets in Oracle's reports, as you know, we moved

25   to exclude that evidence of the implementations you ruled would

1   not be part of the trial.  They weren't considered by the first

2   jury, and so they shouldn't be part of this retrial on fair

3   use.

4        Now, in its opposition, Oracle has agreed that it's not

5   going to raise Brillo at trial -- and that's Note 1 of the

6   first page of its opposition -- and so we believe our motion is

7   unopposed to that extent, and any evidence of Brillo and

8   products using Brillo should be excluded.

9        With respect to the rest of the additional new products

10  that Oracle would like to put into evidence, they say that the

11  Java APIs are on these products, but that doesn't really tell

12  the full story.

13       For something like Android Auto, Android Auto is an app

14  that can be run on a system other than Android on the car.  For

15  example, Ford cars use what they call the Sync 3 system; and in

16  those cars, there's a system that uses QNX.  What's QNX?  QNX

17  is a BlackBerry operating system or a company owned by

18  BlackBerry that makes the operating system.  It's on those Ford

19  cars.

20       The Android Auto can plug into that QNX system; and when

21  it does so, the app on the Android phone is going to be able to

22  use the display of the car in order to use the apps or get

23  input from the car, so on and so forth, but that's not really

24  on the car.  The app is still on the phone.

25       So it's unclear why Oracle needs to bring in evidence of a

 1   vehicle that isn't actually using Android, the 37 APIs.  It's

 2   like saying, well, you can use Bluetooth speakers with your

 3   phone or you can use an earpiece with your phone.  Therefore,

 4   we need to talk about how we're being superseded in the

 5   earpiece speakers or in the wireless microphone.

 6          **THE COURT:**  Wait.  Wait.  I've got -- my inclination

 7   is to exclude all of this as a concession to the shortness of

 8   life under Rule 403 and to avoid an infringement trial within

 9   the trial.  So that's -- I'm going to let you have a rebuttal.

10       But, Ms. Simpson, honestly, that's where I am, so you've

11   got to have a very good reason that this should come into

12   evidence.

13          **MS. SIMPSON:**  All right, Your Honor.

14       Frankly, Your Honor, I think that would be error to

15   exclude these products.

16          **THE COURT:**  That's okay.  I've been reversed before,

17   so that does not scare me.

18          **MS. SIMPSON:**  What we need to focus on here,

19   Your Honor, is that Android is an operating system.  It's a

20   software platform.  It is not a device.

21       We're getting all caught up in what devices Android is

22   running in, but Android runs in lots of consumer-facing

23   devices, and we have accused not the devices.  We have accused

24   Android.  We have accused certain versions of Android, and they

25   have conceded that those versions of Android contain our APIs

1    and they're infringing unless they can show that the use was

2    fair.  That is what we're talking about here.

3        There is no bases to arbitrarily draw lines between

4    products, Your Honor.  It happens to be running in a phone.  We

5    all agree.

6        **THE COURT:**  Of course there is.  Look, under factor

7    four, it's the effect on the market for licenses for various

8    derivative products, as well as for the main Java SE.  So one

9    of the derivative uses might be some of these additional

10   products.

11       You can always sue later.  You can always sue later, prove

12   up that it infringes, and then say how it's not fair use as to

13   that particular market.  And you don't have to bring every

14   single possible use in this trial.

15       **MS. SIMPSON:**  Your Honor, that's not --

16       **THE COURT:**  I don't see why we can't have multiple

17   trials.

18       **MS. SIMPSON:**  Your Honor, we can have multiple trials

19   on infringement.  We can't have multiple looks at the harm

20   evidence on factor four.  The harm evidence has distinct parts

21   that you're supposed to look at with respect to harm.  You have

22   to look at the potential markets, you have to look at the

23   actual markets, the potential markets, and you have to ask

24   yourself a somewhat hypothetical question.  You have to ask

25   yourself what happens if the use becomes widespread, if you

```
 1    select this, it becomes widespread, which takes the question

 2    even outside the parties to the case.  It actually looks even

 3    beyond that.

 4         All of these pieces have to be considered, and to

 5    curtail --

 6         THE COURT:  But you're using "widespread" in a

 7    different way.  You know, the way -- the usage of widespread

 8    comes up where you have one guy in his basement who's file

 9    sharing songs on Napster and, okay, there's not much harm from

10    one guy doing it; but if thousands of guys in their basements

11    are file sharing songs, then that does have a huge impact.

12         So that's a different problem, and that's the way that

13    phrase came up.  That's a different problem from whether or not

14    there is a -- the use of Android in these other markets and

15    with different products is -- we have to draw a line somewhere.

16    We have so much for the poor jury to understand and grasp now,

17    that I despair at how much you lawyers think that they can --

18    in four weeks we're going to be able to teach them.

19         MS. SIMPSON:  Your Honor, first of all, the widespread

20    inquiry is not limited in the way you suggest.  The cases that

21    apply it apply it much more broadly than that.  It's not just

22    one guy.

23         THE COURT:  Give me your best case that's an appellate

24    decision in the Ninth Circuit.

25         MS. SIMPSON:  Which circuit?  The Ninth Circuit?
```

1          **THE COURT:**  The Ninth Circuit would be good; but if

2    you don't have a Ninth Circuit, give me one that's anywhere in

3    the country.

4          **MS. SIMPSON:**  Your Honor, in the *Wall Data* case --

5          **THE COURT:**  Yeah.

6          **MS. SIMPSON:**  -- 447 F.3d 769.

7          **THE COURT:**  Is that the Ninth Circuit case involving

8    the sheriff?

9          **MS. SIMPSON:**  Yes, it is, Your Honor.

10         **THE COURT:**  Okay.

11         **MS. SIMPSON:**  So they overused their licensing

12   subscriptions, and the court looked beyond that and said,

13   "Okay.  What happens if everybody is overusing their licensing

14   subscription?  That could be a widespread use that could have a

15   harmful effect on copyright law in general."

16         **THE COURT:**  It's of the same product.  Of the same

17   product, the same program.  Right?

18         **MS. SIMPSON:**  It is the same program, Your Honor.  We

19   can look at other cases that deal with widespread use.  We

20   could look at, let's see --

21         **THE COURT:**  While you're at it, you said it would be

22   error, so you can cite to me the decision that says analogous

23   to this, where you've got a bunch of products already and some

24   new ones come out and haven't even been sued on, that it's

25   error for the judge to exclude those from consideration under

1    factor four.  I don't think you have such a case, Ms. Simpson.

2              MS. SIMPSON:  Your Honor --

3              THE COURT:  That's just you talking; but if you do

4    have such a case that says it's error for the judge to exclude

5    new products that come out late in the process, I will

6    certainly look at that, and I probably would change my mind if

7    there is such a decision.

8              MS. SIMPSON:  Your Honor, the question is whether the

9    use is a reasonable market, a likely market, a probable market.

10   These are not new products.  I just want to be clear.  They're

11   new products for Android.  They are not new products for Java.

12   These are products that Java has been running in in many cases

13   since the early '90s.  So this is not a hypothetical market.

14   This is not a market that we haven't been in.

15             THE COURT:  That they haven't been sued on.

16             MS. SIMPSON:  This is an established market that they

17   are --

18             THE COURT:  That haven't been sued on yet.

19             MS. SIMPSON:  Your Honor, we sued on Android.

20             THE COURT:  What?

21             MS. SIMPSON:  We sued on Android.  We sued the

22   software platform.  The software platform is running --

23             THE COURT:  You'd have to --

24             MS. SIMPSON:  -- in devices that are affecting us in

25   these other markets.

1          **THE COURT:**  You'd have to prove that.  You'd have to

2    prove that.

3          **MS. SIMPSON:**  Your Honor, the reply that they put in

4    suggesting that this stuff is not running is actually

5    sufficient to show that this should stay in the case, so let's

6    look at what their reply said.

7          In their reply they say:  (reading)

8               "Android Auto app is an application that runs on an

9          Android phone.  When a consumer runs the Android Auto app

10         on an app on an Android phone, the screen in his or her

11         Android Auto compatible car is used as a display."

12         Your Honor, that essentially admits that what we're

13   talking about here is the phone; right?  Your Honor, the phone

14   is not even disputed.  A phone we all agree is in the case.

15   They have now admitted that Android Auto is running through a

16   phone, which puts it squarely within what everyone agrees is at

17   issue in this case.

18         And we were in autos, Your Honor.  We have evidence of

19   harm.  We have evidence of being in the automobile industry.

20   We have documents from our salespeople that say they are seeing

21   Android Auto and that they are taking deals away from Java.

22   And that is evidence of harm that we should be allowed to put

23   in, and curtailing that evidence presents an incomplete view of

24   our harm evidence to the jury.  And there is no case that's

25   going to say that you can do that, that you can curtail

1    evidence of harm when there's actual evidence.

2         THE COURT:  Wait a minute.  Give me the case that you

3    said it was error.  Give me the decision by the Appellate Court

4    that says it's error for a district judge to do what I'm about

5    to do.

6         MS. SIMPSON:  Your Honor, the case law says that you

7    have to look at the markets that are at issue.  So I don't know

8    that there's a case that's going to say exactly what you're

9    asking for.  The case law says what the markets are that you

10   have to look at, and those are directed from the Supreme Court.

11   So *Campbell* and *Harper & Row* say that -- what markets you have

12   to look at, and those markets included potential markets.

13        THE COURT:  Look, in every single case that I've

14   looked at, it's been very clear what the market was.  It was a

15   market for movies maybe.  It was a market for rap music.  It

16   was a market for -- I've forgotten all the other ones, but the

17   market is very well -- it's really just one market.

18        And what you want to do is -- I guess you feel very weak

19   about the markets that you've got in the case.  You've already

20   got a lot of markets in the case, and so now you want to lard

21   in a lot more markets and I guess kind of hoping that the jury

22   is going to think -- I don't know what you're thinking, but

23   you've got so many things that you want the jury already to

24   master.

25        Rule 403 really is a powerful thing here.  We have to make

```
 1   some trade-offs as to what the ordinary mortals on the jury can
 2   understand and comprehend as opposed to making it so
 3   complicated with so many big dollars being thrown around that
 4   maybe they compromise and give you billions of dollars.  Now, I
 5   don't like that idea.  I want them to understand the case.
 6           MS. SIMPSON:  Your Honor, we talked yesterday about
 7   the Supreme Court cases that have ruled on fair use.
 8           THE COURT:  Yeah.
 9           MS. SIMPSON:  And the point was made that three of the
10   four of those are dealing with derivative markets, and that's
11   what we're talking about here.  This is not an unusual thing to
12   deal in a derivative market.  So even the *Harper* case, that was
13   not the actual market for a book; right?  So the book is what
14   was infringed, and the market they were looking at was in a
15   completely different space.  It was serialization rights, and
16   that was a derivative market.
17           THE COURT:  Yes, and it was that one market, one
18   derivative market.
19           MS. SIMPSON:  And, Your Honor, that is because --
20           THE COURT:  None other.  None other.
21           MS. SIMPSON:  -- that is because typically in these
22   cases you don't have the expansive record that we have here.
23       And I don't think that there is any reason that Oracle
24   should be punished because we've had more time go by and we've
25   had more opportunity to be harmed.  Your Honor, there is just
```

1    no basis for cutting off the evidence of our harm at any given

2    point.

3            THE COURT:  There is.  There is.  There's a limit to

4    what the ordinary jury can grasp and understand.

5            MS. SIMPSON:  Well, Your Honor, it's -- where is the

6    line --

7            THE COURT:  That's where Rule 403 comes in.  Honestly,

8    if this was the only case and they were all geniuses and could

9    keep everything straight and the judge didn't have other trials

10   that had to be done, then, yeah, maybe we could take 15 weeks

11   and get into all of these other things, but I thought we had

12   agreed on a time limit up front.

13           MS. SIMPSON:  Your Honor, we did agree on a time

14   limit, and we're --

15           THE COURT:  You can't do what you're asking to do.

16           MS. SIMPSON:  We are perfectly prepared to put in our

17   harm evidence within the times that you've given us.  We will

18   follow your rules, absolutely, and we've been planning to do

19   that because we expected to be able to present our full

20   evidence on harm.

21       Your Honor, I don't know even where the line is being

22   drawn, to be honest, Your Honor.

23           THE COURT:  Why didn't you bring this up way back when

24   whenever this first came up and I said these are going to be

25   out of the case?  You could have said then, "Oh, but we want to

1    do it for purposes of harm.  We'll sue on it later, but we want

2    to bring these in on -- the ones we are suing on as additional

3    harms."

4         **MS. SIMPSON:**  Your Honor, we were, I believe, in the

5    courtroom shortly thereafter discussing this very issue.

6         **THE COURT:**  I don't remember.  I don't remember it

7    being that close.

8         **MS. SIMPSON:**  So, Your Honor, the fact of the matter

9    is that we have, you know, exhibits that I can show --

10        **THE COURT:**  Of all these products, which is the one

11   that you feel you've got the most desire to put before the

12   jury?

13        **MS. SIMPSON:**  And we're talking about between auto,

14   television, and wearables?

15        **THE COURT:**  I guess.  Auto, television, and wearables,

16   is that the way you understand it, those categories?

17        **MR. PAIGE:**  Those are some of the categories they've

18   put into their reports, yes, Your Honor.

19        **THE COURT:**  Well, you said that there was one that you

20   conceded on.

21        **MR. PAIGE:**  They conceded on Brillo.  They conceded

22   they were not going to try to show the use of the 37 APIs in

23   Brillo.

24        **THE COURT:**  I don't know what that means.

25        **MR. PAIGE:**  It's a thing they accused, and then in

```
 1    Note 1 of their reply -- of their opposition they say:

 2    (reading)

 3              "We understand Brillo's complicated and so we're not

 4         going to try and put in evidence on Brillo."

 5         It's page 1, Note 1, of their opposition.

 6         THE COURT:  Okay.  Which is the one you feel is the

 7    most important to you?

 8         MS. SIMPSON:  Your Honor, I believe that auto would

 9    probably be the most important.

10         You know, I think there is a point to be --

11         THE COURT:  How many products does that involve?

12         MS. SIMPSON:  How many products is that in?

13         THE COURT:  I don't even know what we're talking about

14    here.  Auto -- it seems like there's got to be a product, an

15    app.

16         MS. SIMPSON:  It's in automobiles, Your Honor.  It's

17    in a variety of manufacturers.  They are in a variety of

18    manufacturers.

19         THE COURT:  It's in a wheel?

20         MS. SIMPSON:  Sorry?

21         THE COURT:  It's in a wheel?

22         MS. SIMPSON:  Oh, no.  I'm sorry.  It's in the

23    infotainment center, generally speaking.

24         THE COURT:  All right.  So what's wrong with letting

25    them do auto?
```

1      **MR. PAIGE:**  Because, Your Honor, not all cars that run

2  Android Auto have Android in them; right?  You have the

3  BlackBerry QNX system.

4      **THE COURT:**  She told me that you had conceded that it

5  was in there.  She said your reply brief concedes that Android

6  is in there.

7      **MR. PAIGE:**  Android Auto is in the phone.  It's an app

8  that can then be run using a system like the QNX system by

9  BlackBerry on a car.  So the fact that a car can run

10  Android Auto apps does not mean there is Android in the car

11  itself.  It does not require that.  The Ford Sync 3 system

12  again uses QNX, an operating system owned by BlackBerry.

13      I mean, what they would like to do is just say, "We were

14  in cars, now you're in cars.  That means you superseded us.

15  You replaced us.  It can't be fair use."  And that's not a fair

16  presentation of the evidence.

17      **THE COURT:**  How does the thing work in the car?  What

18  do you mean it uses the phone?

19      **MR. PAIGE:**  What we mean is there's an app on the

20  phone that you can then take the phone and plug it into the

21  system through a USB cord, and then that will allow you to

22  display what, you know, the phone has on the car head-up

23  display there.

24      **THE COURT:**  Yeah.

25      **MR. PAIGE:**  And you can also use the car systems, like

1   the buttons on the steering wheel, to give instructions back

2   through the system to your phone.  That doesn't require the

3   thing sitting on the car.  The infotainment system runs

4   Android.  The QNX system, again, is capable of running

5   Android Auto apps or running the Android Auto app through the

6   phone through the USB.

7          THE COURT:  But you're already conceding that the

8   phone uses Android.

9          MR. PAIGE:  Yes.  Absolutely.

10          THE COURT:  So what is the additional derivative use

11   beyond the phone itself that there could be a possible license

12   of Java for?

13          MS. SIMPSON:  Your Honor, Java runs in the cars in a

14   different way; right?  It embeds Java into the automobile.  And

15   Android does that too, and we have testimony from their

16   witnesses.  It's not only running on the phone, it also is

17   embedded in the cars.

18      And that is a competing market space.  We have evidence

19   from our salespeople saying that they're seeing Android taking

20   deals away from them that we intend to present.  It's not

21   lawyer argument.  It's not us getting up here and saying, "We

22   were in cars, now they're in cars, and they're superseding us."

23   We have witnesses that are going to come in and say, "I'm in

24   this space.  I sell to car manufacturers, and Android is now

25   taking my customers."

1            **THE COURT:**  What do you say to that?

2            **MR. PAIGE:**  It's true, Your Honor, that you can put

3    Android on cars.  My point is that you don't have to have the

4    Android on the car to use the Android Auto system.  You can use

5    the Android system.  You can use the QNX system.  You can use

6    other systems.

7            And what they're saying is, "Well, we had Java in cars."

8    But what does that mean?  There's no evidence about what Java

9    did in their cars, that it's the same sort of thing that the

10   Android Auto is doing today, that it's anything other than,

11   say, being able to display a radio station on the head-up

12   display.

13           I mean, just to say, "We were in cars, now you're in cars;

14   and, therefore, you're superseding us," that's a very unfair

15   argument.

16           **THE COURT:**  But you're saying licenses.  I'm trying to

17   understand what the line of commerce is.  Who signed the

18   license with Oracle?  Was it the car manufacturer?  You got a

19   license to use Java in the car, is that the way it works?

20           **MS. SIMPSON:**  Yes, Your Honor.

21           **THE COURT:**  All right.  So now I guess there would be

22   fewer of those because Android is being put in there in some

23   cases.

24           **MS. SIMPSON:**  Your Honor --

25           **THE COURT:**  How many cases is it being put in there?

1          **MS. SIMPSON:**  We have testimony from Mr. Lockheimer of

2    Google that in the past two to three years they have licensed

3    50 car manufacturers for Android in a market that we were in

4    before Android came to the scene.

5          **THE COURT:**  Okay.  Anything more you want to add on

6    this?

7          **MS. SIMPSON:**  Your Honor, I would just add this is

8    highly probative evidence, and I understand your 403 concerns.

9    We're willing to work within your time limits.  We're willing

10   to put the evidence in a streamlined way, but the fact of the

11   matter is you do have to weigh whether something is probative

12   or whether it's going to be prejudicial or take up too much

13   time.  There is nothing more probative than this evidence.

14   This evidence is highly relevant to the case.  It is our harm

15   evidence.

16         **THE COURT:**  It sounds like you don't have much of --

17   if this is your best case, what happened to the rest of your

18   case?

19         **MS. SIMPSON:**  Your Honor, we, of course, have a lot of

20   other things to talk about in terms of harm; right?  Obviously

21   we're going to talk about mobile phones, but there are other

22   products.  For example, the Android e-reader, I'm not sure

23   which side of the line that's falling on here.  That came into

24   the trial last time.

25        We have very good evidence that we were in the Amazon

1   Kindle, and that when Java came -- or when Android came along,

2   they replaced us in the Fire, and now we're still in the Kindle

3   in SE but we're not getting any of the Fire business.  That was

4   part of the trial last time.  I don't know which side of the

5   line that falls on.  I would submit since it's an e-reader

6   and a mobile handheld device in a sense, that it should fall on

7   the line of coming in.

8        Same thing with voiceover Internet protocol phones.  We

9   were in those.  Recently we've been replaced by Android.  Those

10  are phones as well.  I'm thinking those come in.

11       But, Your Honor, I'm not sure, is it just the TVs and the

12  cars and the televisions that we have issues with?  I mean,

13  we've been in televisions since '98, billions of televisions.

14  We're the standard in Brazil for televisions.

15            THE COURT:  Let's go to Mr. Paige.  Is it true that

16  Google has 50 licenses with automobile manufacturers?

17            MR. PAIGE:  I don't know the answer to the number of

18  licenses that we have, Your Honor.

19            THE COURT:  Well, Ms. Simpson, you said it was 50;

20  right?

21            MS. SIMPSON:  The deposition of Lockheimer on page 100

22  says it was 50.

23            THE COURT:  All right.  So why wouldn't those have

24  been 50 licenses that Java would have gotten?

25            MR. PAIGE:  Well, because the car manufacturers also

1    use BlackBerry's QNX system; right?  It's not just a choice

2    between using Java and using Android.  There are other

3    infotainment system providers out there.

4         THE COURT:  Yeah, but Android uses Java.  So if they

5    are getting a license to use Android, why would those other

6    systems even be in the cars?  I'm trying to understand why it

7    necessarily follows or doesn't follow that -- it's either

8    Android or Java.

9         MR. PAIGE:  Again, it doesn't necessarily follow it's

10   either Android or Java because there are systems like

11   BlackBerry QNX that runs on the Ford Sync 3 system that can be

12   used by car manufacturers.  It isn't a binary choice between

13   Android and Java by any means.

14        THE COURT:  What do you say to that, Ms. Simpson?

15        MS. SIMPSON:  Your Honor, again, I would point to our

16   very specific evidence.  This is not going to be generalized

17   presentations of we were there and now they're there.  This is

18   going to be very specific examples of particular customers that

19   we have documentary evidence for and/or witnesses that will

20   come in and say, "I sell to this customer.  This customer chose

21   Android instead of Java."

22        MR. PAIGE:  And here's the problem with that,

23   Your Honor:  All this stuff is coming from Mr. Jaffe's

24   corrected report where he basically relies on a few documents

25   and some newspaper articles and magazine articles, and things

1    like that.  There's no discussion of how Java worked or works

2    in cars versus how Android worked or works in cars.

3          They're going to say, "You're superseding us because we

4    were there and now you're there," without any question as to

5    whether this use is transformative, as to whether we're doing

6    something very different than what Java does, as to whether

7    we're adding things that Java never had.  So it isn't just

8    superseding.

9          **THE COURT:**  You're going to say all that stuff about

10   transformative.

11         **MR. PAIGE:**  Well, we're going to need to say it if

12   they're going to just come in and have a guy sit on the stand

13   and say, "Well, we were there and now Android is there."  We

14   need to explain why it is that we're transformative.  This

15   isn't just superseding is what they're going to say.  You can't

16   possibly say, "This is fair use because we were there and now

17   you're there despite the fact that we don't really talk about

18   what we did and what Android does."  That's not in Mr. Jaffe's

19   report.  It's just --

20         **THE COURT:**  They don't have to prove everything

21   through one witness.

22         **MS. SIMPSON:**  We're not intending to, Your Honor.

23         **THE COURT:**  They can -- they want to put on some

24   evidence, maybe even percipient evidence, as to factor four.

25   In fact, you don't even have to have an expert on the four

```
1   factors.  You know, I was a lawyer.  You would maybe prove it
2   all up with real witnesses, fact witnesses --
3          MS. SIMPSON:  Your Honor, we intend to have real fact
4   witnesses.
5          THE COURT:  -- instead of having some hired gun come
6   in and make the case for you.
7          MR. PAIGE:  And, Your Honor, that's exactly the point
8   about evidence you're making on 403.  Once that happens, we're
9   going to have lots of fact witnesses coming in here to talk
10  about, "You know, here is what Java did before, here is what
11  Android does now," and so on, because what they're going to
12  want to do is just say, "It was there and there."
13         THE COURT:  Ms. Simpson said you can see that Java --
14  I'm sorry -- that the Android with the infringing APIs subject
15  only to fair use is inside those products.  So is that really
16  going to be in dispute?
17      That's what she's telling me, it's not going to be in
18  dispute, that infringement doesn't have to be proven.  It's
19  just part of the fair use calculus.  That's what she's saying.
20      Look, I don't know the answer.  But I will note
21  Ms. Simpson could not cite a single decision that said it would
22  be error to do what I'm proposing to do.
23         MS. SIMPSON:  Your Honor, I think *Campbell* would stand
24  for that proposition.
25         THE COURT:  So read it to me.
```

1          **MS. SIMPSON:**  *Campbell* requires the courts to consider

2    not only the extent of the market harm caused by the particular

3    actions of the alleged infringer, but also whether unrestricted

4    and widespread conduct of the sort engaged in by the defendant

5    would result in a substantially adverse impact on potential

6    market for the original.  It requires the Court.  The Court is

7    required to consider the harm to our markets.  It doesn't say

8    some of our markets.

9          **THE COURT:**  That's what *Campbell* said or --

10         **MS. SIMPSON:**  Yes, Your Honor.

11         **THE COURT:**  That sounds like whatever you're quoting

12   from is -- is that your brief you're quoting from?  What are

13   you reading from?

14         **MS. SIMPSON:**  No.  I'm reading from a page of

15   *Campbell*, Your Honor.  Quote, "it requires."

16         **THE COURT:**  They're referring to themselves and

17   they're saying *"Campbell* requires."

18         **MS. SIMPSON:**  No, I didn't -- I don't think I said

19   that.  I'll try again.

20         **THE COURT:**  Maybe I misunderstood.

21         **MS. SIMPSON:**  I'll try again.

22         **THE COURT:**  All right.  So read it again.

23         **MS. SIMPSON:**  So it's page 590 and quoting:  (reading)

24         "It requires courts to consider not only the extent

25      of the market harm caused by the particular actions of the

1          alleged infringer, but also whether unrestricted and

2          widespread conduct of the sort engaged in by the defendant

3          would result in a substantially adverse impact on

4          potential market for the original."

5      And then it goes on to talk about derivative works, which

6  we spoke about at length yesterday.

7          THE COURT:  All right.  That's not exactly our

8  situation.

9      But, okay, I'm going to bring it to a close for today.

10     Do we have a hearing tomorrow -- I've lost track of it --

11 or is it next week?

12         MR. PAIGE:  No, Your Honor.

13         MS. SIMPSON:  Not that we're aware of, Your Honor.

14         THE COURT:  Okay.  So I want to go into the expert

15 reports on damages from both sides and, time permitting, even

16 for Dr. Kearl.  Is anyone here for Dr. Kearl?  So somebody --

17 who raised their hand?

18         MS. HURST:  Nobody is here for Dr. Kearl, Your Honor.

19         THE COURT:  Somebody let him know.

20         MS. HURST:  We can let him know.

21         THE COURT:  I'm not sure we'll get to him, but we'll

22 try.  We'll start at 8:00 o'clock on -- what did I say,

23 Tuesday?

24         MR. VAN NEST:  You did.

25         THE COURT:  All right.  And then for Wednesday we'll

1    schedule two more, but I don't know which two.

2        You-all should know I may not have a ruling until the day

3    or so before trial, and whole swaths of testimony may go out.

4    You're just going to have to -- we're going to have -- that's

5    what you wanted, was a trial, and maybe you don't -- it could

6    be, just to take an example, all of the disgorgement goes out

7    so you don't have a witness on that.  It could happen.  It

8    could happen to you.

9        So if somebody wants to move now before I gin up and get

10   the jury all in here, because once we do all that, it's going

11   to be -- see, you may not know the -- I may -- we may start the

12   trial and I may not have an answer for you because I'm going to

13   take my time and try to do it as carefully as I can.

14       But once we start the trial, don't come to me and say,

15   "Oh, Judge, you've knocked out my expert.  We've got to start

16   all over."  No.  Oracle is dying to have this trial.  I guess

17   you're dying to have the trial, too.  And you're giving me

18   things that are just driving me under the water for the third

19   time.  So many motions where you disagree.

20       So you have to be -- if somebody wants to move for a

21   continuance, you should do it soon because you're unlikely to

22   know the answers to these questions until -- I find that they

23   feed into each other -- some of them anyway feed into each

24   other so much that I think it would be better to wait and see

25   how I feel about everything before I rule on anything.

1      So there we are.

2          **MR. VAN NEST:**  Are you inviting that motion,

3  Your Honor?

4          **THE COURT:**  No, I'm not inviting it.  I've set the

5  time aside to try the case.  So I'm not inviting it, but it has

6  occurred to me that I don't want overhanging my head somebody

7  saying, "Oh, Judge, you've knocked out my witness and now we

8  need a chance to regroup and do it all over again."

9      If I -- at some point we've already got the jury coming

10  in.  We're already preclearing them for time.

11      I have to just say, you know, you're all big men and

12  women, and you're just going to have to roll with the punch;

13  and if I knock out your expert, too bad for you.  You shouldn't

14  have been overreaching.

15      So I'm not inviting anything.  I'm just putting you on

16  notice that it could happen, and there we are.

17          **MR. VAN NEST:**  That's fair, Your Honor.

18      One other question I had was:  Are we still trailing

19  anybody on the 9th, or are we clear to go?

20          **THE COURT:**  To be honest with you, probably we are not

21  trailing because I moved up that criminal trial by one week.

22  They say it would be a week trial.  So that means the week

23  before your trial, I would be very busy with a different trial.

24  However, the word in the hallway is that they're going to plead

25  out.  Now, will they?  You know, I don't know.  I can't gamble

```
 1    too much on that, but that is -- now you know everything that I

 2    know.

 3              MR. VAN NEST:  Thank you.  That's helpful.

 4              THE COURT:  I would say the odds are 70 percent -- you

 5    know, at least 70 percent that our trial will go on schedule on

 6    May 9th.

 7              MR. VAN NEST:  Thank you.

 8              THE COURT:  Have you ever gone to see Judge Grewal and

 9    tried to settle this case?

10              MR. VAN NEST:  Tomorrow.

11              MS. SIMPSON:  Tomorrow, Your Honor.

12              MS. HURST:  Tomorrow, Your Honor.

13              THE COURT:  Oh, you are.  Okay.  All right.  Well, I

14    didn't know that.  I'm glad to hear that there's some

15    discussions going on.

16        I won't make any comments other than what I've already

17    said about settlement is -- I still believe that this is

18    America -- I'm going to give you my standard speech.  I'll give

19    you what I say here.  Sit down.

20        My standard speech is:  This is still America.  If either

21    side wants to try their case, God bless them.  They get to try

22    their case.  And, you know, it's the vicissitudes of a trial.

23    Sometimes you get rulings in the middle of a trial you don't

24    like but, you know, that's the way it goes.

25        And then the second part of it is:  At the end of the
```

1    trial, one of you, I don't know who, will go walking through

2    those double doors with your arm around the client explaining

3    why you lost.  I see it with every trial.  And the side that

4    loses is -- not always but I would say generally they're kind

5    of shocked that they lost because they had convinced themselves

6    they had a great case.

7         Well, one of you is going to be in that position at the

8    end.  And there's always appeals but, nevertheless, you'll have

9    to go through those double doors with your arm around the

10   client, who will be in shock that they are -- you know, they

11   did not win, and you will be having to try to comfort them and

12   comfort yourself.

13        It's a hard moment for a trial lawyer to be in that

14   position, and you clients -- who are the clients here?  Raise

15   your hands.

16        So there's clients on both sides.  Yeah, you're the ones

17   who are going to be -- one of you may be in that position

18   trying to explain to your company how come you lost.

19        So this is big stakes.  And even under the most -- even if

20   I were to knock out disgorgement and still the biggest case

21   that I've ever seen I think, so you -- it's a huge case with

22   big stakes, the possibility of an injunction.  I think there's

23   a lot that you-all ought to take into account when you go see

24   Judge Grewal.

25        However, my job is not to try to settle your case.  My job

1   is to make fair rulings and give you a fair -- not a perfect

2   trial but a fair trial, and that's what I'm trying to do.

3        Good luck tomorrow.  I'll see you on Tuesday.  Thank you.

4        **MR. VAN NEST:**  Thank you, Your Honor.

5            (Proceedings adjourned at 11:37 a.m.)

6                    ---oOo---

7

8

9            **CERTIFICATE OF REPORTER**

10       I certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled matter.

12

13  DATE:   Sunday, April 14, 2016

14

15

16

17  _____

18       Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                 U.S. Court Reporter

19

20

21

22

23

24

25