KEKER & VAN NEST LLP
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
CHRISTA M. ANDERSON - # 184325
canderson@kvn.com
DANIEL PURCELL - # 191424
dpurcell@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    (415) 391-5400
Facsimile:    (415) 397-7188

KING & SPALDING  LLP
BRUCE W. BABER (pro hac vice)
bbaber@kslaw.com
1185 Avenue of the Americas
New York, NY 10036
Telephone:    (212) 556-2100
Facsimile:    (212) 556-2222

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC., | Case No.  3:10-cv-03561 WHA |
| Plaintiffs, | **GOOGLE'S TRIAL BRIEF** |
| v. | |
| GOOGLE INC., | Trial:      May 9, 2016 |
| Defendant. | Dept.     Courtroom 8, 19th Fl. |
| | Judge:   Hon. William Alsup |

1051838.02

1

# TABLE OF CONTENTS

2

**Page**

3  I.    INTRODUCTION ...................................................................................................1

4  II.   RELEVANT FACTUAL BACKGROUND...........................................................2

5  III.  LEGAL AND FACTUAL ISSUES TO BE TRIED............................................7

6        A.    Oracle will not be able to defeat Google's showing of fair use.................7

7        B.    Google will prevail on its defenses of equitable estoppel and laches....................11

8        C.    Even if it could prove liability, Oracle would not be entitled to substantial
              damages......................................................................................................12

9

        D.    Oracle's willfulness case is a fiction........................................................15

10
        E.    No matter what, Oracle will not be entitled to an injunction.................16
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1051838.02

1

## <u>TABLE OF AUTHORITIES</u>

2
<u>Page(s)</u>

3
### <u>Federal Cases</u>

4
*Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*
    803 F.3d 1032 (9th Cir. 2015) ................................................................... 8

5

6
*eBay, Inc. v. MercExchange, LLC*
    547 U.S. 388 (2006).............................................................. 16, 17, 18

7
*i4i Ltd. P'ship v. Microsoft Corp.*
    598 F.3d 831 (Fed. Cir. 2010)......................................................... 17

8

9
*Perfect 10, Inc. v. Google Inc.*
    653 F.3d 976 (9th Cir. 2011) .......................................... 4, 16, 18

10
*Petrella v. Metro-Goldwyn-Mayer, Inc.*
    134 S. Ct. 1962 (2014)........................................................................ 2

11

12
*Sega Enterprises Ltd.  v. Accolade, Inc.*
    977 F.2d 1510 (9th Cir. 1992) ....................................................... 9

13
*Sony Computer Entm't, Inc. v. Connectix Corp.*
    203 F.3d 596 (9th Cir. 2000) ......................................................... 9

14
### <u>Federal Statutes</u>

15

16
17 U.S.C. § 504(b) ........................................................................... 14

17

18

19

20

21

22

23

24

25

26

27

28

GOOGLE'S TRIAL BRIEF
Case No.  3:10-cv-03561 WHA

1051838.02

## I.   INTRODUCTION

This lawsuit is an attempt to obtain through the courts what the company formerly known as Sun Microsystems (now "Oracle America") failed for years to achieve through innovation, negotiation, or even costly corporate acquisitions—a viable path to competing in the smartphone market.  Oracle missed that boat and now wants the benefit of Google's initiative and hard work, both on its own and with numerous partners.  Oracle's lawsuit targeting Google's Android mobile platform rests on flawed premises.

***Copyright infringement.***  The remaining issue relating to Oracle's copyright infringement claim that remains to be tried is whether Google's inclusion in Android of the API labels found in code libraries supporting core Java-language application programming interfaces ("APIs") that are fundamental to the design of the Java language is a fair use of those API labels.  Google will prove at trial that its use of the API labels in the Android platform was transformative.  It will also prove that these API labels are functional mechanisms that facilitate use and preparation of code written in the Java language, and hence more susceptible to fair use than purely creative works.  It will prove that the amount and substantiality of the work it took, just the API labels of 37 Java SE API packages, was the smallest amount needed for the ability to make practical use of the Java programming language in a mobile platform.  And the evidence will show that, given that Sun/Oracle was never able to create a viable mobile operating system, any damage to Sun/Oracle's position in the market was due to its own actions or inaction and was not a result of any alleged infringement by Google.

Even if Oracle's infringement claims had merit (and they don't), it would be inequitable to hold Google liable given the fact that Sun knew all along that Google was developing Android.  Despite this, for four years after breaking off its partnership negotiations with Google in 2006, Sun not only never suggested Google was infringing any Sun copyrights, it went out of its way to publicly praise Android as the best thing ever to happen to its Java platform.  Sun had even in the past made numerous public statements that APIs were not copyrightable.  When it acquired Sun, even Oracle publicly praised Android.  Only when Oracle concluded it lacked the engineering skill to build its own "Java phone" did it choose Plan B—this lawsuit.  Oracle's statements and

acts should defeat liability.

*Damages*.  Even if Oracle could prove liability and overcome the equitable defenses just discussed, it would not be entitled to damages anywhere near the astronomical amounts it seeks. Oracle's expert, James Malackowski, claims that Oracle is entitled to as much as $8.8 billion in copyright damages, even though Sun's modest $28 million demand during negotiations with Google would have included a copyright license, as well as rights to a great deal more Sun intellectual property.  Mr. Malackowski arrives at this massive figure by opining that Oracle should be awarded the profits attributable to the entire Android platform, despite the fact that the alleged infringement only comprises 0.08% of the Android code.[1]  Mr. Malackowski also opines that Oracle failed to achieve its projected Java ME license revenues due to Android, and thus has suffered $475 million in lost license profits.  For years before Android's release, Sun had the opportunity to fill a market void by releasing its own smartphone platform.  It never did so successfully, for reasons having nothing to do with Google.  Even after Android was announced, Sun tried and failed to develop a product to complement Android.  If Oracle is entitled to any damages at all, the amount to which it is entitled is nowhere near the billions.

## II.      RELEVANT FACTUAL BACKGROUND

In 2005, Google acquired a small company called Android, Inc., intending to develop the world's first free, open, and complete (*i.e.*, "full stack") platform for mobile devices such as smartphones. Google believed that such a platform would be customizable and adaptable and would appeal to device manufacturers.  Eventually Google's idea would become the Android platform.  In 2005, Google recognized the advantages to partnering with other market participants to develop Android—and that attracting more partners would boost Android's chances of success. With that goal in mind, Google entered into talks with numerous companies, including the plaintiff in this lawsuit, Sun—the company later purchased by Oracle Corporation and renamed "Oracle America."

Google considered partnering with Sun because of Sun's experience developing the free

---

[1] Oracle's damages demand in this regard is a request for disgorgement of Google's profits, and the amount of the disgorgement of profits demanded by Oracle is properly decided by the Court rather than the jury. *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1977-78 (2014).

and open Java programming language and implementing "Java virtual machines" that enabled Java-language applications to run on various kinds of hardware.  But Sun had never previously been able to develop a full stack mobile platform—an underlying operating system, middleware, and applications, all working together.  Sun's business and expertise was limited to middleware running on a given operating system and enabling third-party applications to work.

Not only did Sun's expertise provide only part of what Google needed, Google had other options.  Whether or not it worked with Sun, Google could have used the freely available Java language.  Google also seriously considered other languages, like C or C++.  Those other languages would have had certain advantages (*e.g.*, speed) as well as differences compared to a Java-based system.

Google's discussions with Sun from late 2005 to April 2006 were not negotiations for an intellectual-property license.  The deal that they discussed would have given both parties much more—a partnership role in developing a new open source mobile platform based on Java; the ability to realize profits from that platform as each of them saw fit; and access to each other's technology and personnel, ***in addition to*** a cross-license to some of each other's intellectual property.  The license component alone would have given Sun the right to use substantial Google intellectual property, and would have allowed Google to use approximately 2,000 patents that Oracle now contends relate to Java, not to mention all the Java-related copyrights and the trademarked Java brand—the trademark that Sun had always treated as the crown jewel of its Java holdings.

By the end of April 2006, though other terms of their partnership remained unsettled, Sun had agreed to accept a payment from Google of $28 million over three years to compensate Sun for the risk of lost licensing revenue that might result from an open source Android platform.  In an email to his supervisor, ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████.[2]  Sun then formally proposed the $28 million figure to

---

[2]  TX 2436 (April 18, 2006 email).

Google in a draft contract.[3]  At the same time, Andy Rubin, Google's lead negotiator and the head of the Android team, gave an internal presentation discussing Sun's willingness to accept $28 million to partner on an open source platform.[4]  A few days later, Gupta confirmed in an internal email to Sun employees that the current financial terms with Google included only a $28 million payment "for the right to get Sun to OpenSource."[5]  Finally, Gupta described the terms of the offer—including the $28 million payment term—in an email to Sun CEO Jonathan Schwartz.[6]  Gupta identified two other contract terms as "important," noting that "impasse had been reached" on one of them; but never suggested Sun was rethinking the $28 million payment term.  Both Schwartz and Gupta testified at deposition ███████████████████████████████████████ ████████████.[7]

At that point, negotiations broke down over issues unrelated to money.  Both Google and Sun wanted greater control over Android's development, with Google wanting to make the platform more open and Sun wanting restrictions that Google viewed as incompatible with open source.  Another cause of the breakdown, according to Gupta, was that Sun (without telling Gupta or formally asserting infringement) brought to Google's attention certain patents unrelated to Android or the current lawsuit.  But there is no dispute that, had these other issues been worked out, Sun would have been willing to partner with Google on Android for $28 million.  Sun CEO Schwartz testified in this case that █████████████████████████████████████ ████████████████████████████████████████.[8]

After negotiations broke off, Google continued to develop Android with assistance from numerous other companies that made up the Open Handset Alliance.  Google and the OHA used the freely available Java language and other open source materials, but avoided any proprietary Sun technology.  In addition to writing all-new code, the Android engineering team also used

---

[3]  GOOGLE-01-0056540 at 49-50.

[4]  TX 7265.

[5]  TX 2078.

[6]  *Id.*

[7]  Schwartz Dep. at 111:17-20 & Gupta Dep. at 225:20-226:20.

[8]  Schwartz Dep. at 111:21-112:1.

open source code from existing sources (including Java language API libraries available from the Apache Software Foundation under an open source license).  For the bottom layer of its stack, the core operating system, Google used the open source Linux kernel.  For the middleware layer, rather than using Sun's proprietary Java virtual machine, it designed its own "Dalvik" virtual machine, which can execute programs written in Java and other languages.  For the Android API packages, Google independently wrote over 100 of its own API packages, and "re-implemented" (*i.e.*, wrote its own implementing code for) certain Java API packages that were relevant to a smartphone platform.

During the 18 months between the end of negotiations with Google and Google's public announcement of Android in November 2007, Sun knew that Google was continuing to develop Android without Sun's help.  But Sun never suggested that Google was infringing and did not insist that Google needed to take a license before it could release Android.  Sun occasionally talked to Google about ways that Sun might join the Android ecosystem, but there were no further partnership or licensing discussions.

When Google publicly announced Android and released the first Android SDK in November 2007, Sun didn't file a lawsuit; it didn't publicly condemn Android for having violated Sun's rights; it never even challenged Google privately or demanded that Google take some sort of license.  Just the opposite: Sun publicly and enthusiastically ***supported*** Android.  Schwartz congratulated Google in a blog post for having "just strapped another set of rockets to the [Java] community's momentum—and to the vision defining opportunity across our (and other) planets."[9]  Schwartz and Sun perceived Android as an opportunity to revive the application developer community's interest in Java and thus create more business opportunities for Sun. ██████ ████████████████████████████████████████████████████[10]  In fact, Sun had seen multiple, independent mobile-related projects end in failure.  It tried to develop its own full stack operating system, called "Project Acadia," using technology it acquired from a company called SavaJe, but abandoned that effort.  It also tried to design a variation on the

---

[9]  TX 2352.

[10]   Schwartz Dep. at 157:15-23.

1051838.02

1    Android platform, called "Sundroid" or "Project Daneel," that would replace the Dalvik virtual

2    machine in Android with Sun's Java virtual machine.  That too failed.  Given Sun's inability to

3    make market inroads itself, Schwartz testified, "██████████████████████████████████

4    ████████████████████████████████████████████████████████████████████████████

5    ████████████████████,"[11]

6        For over two years, Google continued to develop Android while relying on Sun's public

7    praise for the platform.  In October 2008, the first Android phone was launched.  Although

8    Android offered a good variety of applications from the start, growth of the platform was initially

9    slow.  Internal Sun documents suggest that other companies were skeptical about Android's

10   prospects.  Android took off when manufacturers of popular handsets began to adopt it, starting

11   with the release of the Motorola Droid in November 2009.  Since then, Android has grown

12   steadily into one of the most popular smartphone platforms in the world.

13       In early 2009, Oracle confirmed that it was negotiating to buy Sun.  That deal closed on

14   January 27, 2010, with Oracle paying a reported $7.4 billion for Sun and all its assets.  During the

15   due-diligence process prior to the purchase, Oracle considered building a "Java phone" along the

16   lines of Sun's Sundroid project—an Android-compatible smartphone that would use Sun's Java

17   virtual machine.  But Oracle abandoned that effort, just as Sun had done.  A few months after

18   buying Sun, in about May 2010, Oracle CEO Larry Ellison met with Google executives to discuss

19   a business relationship related to Android.  Only when that didn't bear fruit did Oracle, for the

20   first time, begin rattling its litigation saber at Google.  Oracle began suggesting to Google that

21   Android infringed some of Sun's (now Oracle's) Java-related intellectual property.  But even

22   then, Oracle remained frustratingly vague, refusing to identify what component of Android

23   infringed what Oracle intellectual property.  After years of assurances and even encouragement

24   from Sun, Oracle's contentions made no sense and Google therefore asked Oracle to specifically

25   explain the basis of its infringement claims.  But Oracle refused to offer any details.

26       It was not until July 20, 2010—almost three years after the release of Android's Software

27   Development Kit and Schwartz's congratulatory blog post—that Oracle finally supplied details

28
_____

[11]  *Id.* at 106:25-107:4.

about its infringement assertions, though the assertions were that Android infringed Sun patents. Oracle filed this lawsuit less than a month later, on August 12, 2010.

The parties first tried the case in April and May of 2012.  The evidence demonstrated that Sun was aware of multiple projects that – prior to Android – had re-implemented the API labels at issue, including the Apache Harmony project and GNU Classpath, but chose not to assert infringement by those projects of Sun's copyrights.  Sun's CEO explained that Sun had always viewed the APIs as open, and encouraged others to use the APIs in order to increase the adoption of the Java programming language.  The evidence also showed that certain of the 37 Java SE API packages were necessary in order to make practical use of the Java programming language.  The evidence also revealed Sun's support, both public and private, for the Android platform for years after its release.  At the conclusion of the first phase of trial, the jury found that Google had infringed upon the structure, sequence, and organization of the 37 Java SE API packages.  The jury was not, however, able to reach a verdict on whether Google's use of the SSO was a fair use. In the second phase of the trial, the jury found that Google did not infringe any of the asserted claims of Oracle's patents.  The third (damages) phase of the trial was therefore unnecessary. The Court subsequently held that the API labels that represented the infringed SSO of the copyrighted works were not copyrightable, and therefore granted judgment in Google's favor on Oracle's copyright claims.

Oracle appealed the Court's copyrightability ruling to the Federal Circuit.  It chose not to appeal any of the patent claims that the jury decided adversely to it.  On appeal, the Federal Circuit reversed this Court's order finding the API labels not copyrightable.  Despite Oracle's urging that judgment of infringement be entered, the Federal Circuit found that genuine issues of material fact remained regarding whether Google use of the API labels was a fair use, and remanded the case for a re-trial on that issue.  After an abbreviated period of supplemental discovery, this case is now set for a fair use retrial.

### III.   LEGAL AND FACTUAL ISSUES TO BE TRIED

**A.      Oracle will not be able to defeat Google's showing of fair use.**

Following the remand from the Federal Circuit, Oracle's copyright infringement claim,

which once encompassed both broad and vague claims relating to the documentation of the Java
APIs and assertions of the literal copying of a handful of lines of code, has been narrowed to a
single issue: whether Google's use of the API labels attached to the 37 Java SE API packages
(what Oracle calls "declaring code") and the structure, sequence, and organization ("SSO")
reflected in that declaring code, is a fair use.[12]  The answer is plainly yes.

As in the first trial, Oracle **does not** claim that the overwhelming majority of Google's
implementing code infringes any Oracle copyright, because Google used entirely different
implementing code, much of it newly written by Google and its partners.  Instead, Oracle claims
that Android's inclusion of the API labels that the Java SE platform uses for code libraries
implementing the APIs from 37 Java SE API packages (including, for example, the method
signatures for everyday functions like abs() to calculate an absolute value and sqrt() to calculate a
square root) infringes its copyrights.

The labels on the 37 Java SE API packages and their organization are functional elements
of the Java language that are oftentimes needed to make practical use of the Java programming
language.  Oracle has conceded that the Java programming language can be freely used by
anyone.  For years, Sun promoted the use of that language and its APIs by developers who write
Java-language code.  It is impossible, practically speaking, to use the Java language without at
least some of the API packages.  Even Oracle's witnesses conceded that some of the API
packages are "functionally necessary" to use the language.  The API packages and their
organization define the parts of speech—such as verbs and nouns—and rules of grammar that
enable Java-language speakers to understand one another.  Without Android libraries
implementing the API packages, an applications developer writing Java-language code for
Android today would have no way to ensure she could safely use existing code using the APIs,
and instead would have to learn a new vocabulary different from the standard widely-used Java
language vocabulary.

---

[12] Google does not waive and hereby expressly preserves its position that the SSO/declarations
are not protected by copyright law.  *See, e.g.*, *Bikram's Yoga Coll. of India, L.P. v. Evolation
Yoga, LLC*, 803 F.3d 1032 (9th Cir. 2015).  Because the upcoming trial will not address the issue
of copyrightability, Google does not further address that issue in this submission.

In *Sega Enterprises Ltd.  v. Accolade, Inc.*, Accolade had copied and disassembled Sega game cartridges "to discover the interface specifications for the Genesis console"[13] and then use the specifications in its own product.  Accolade's games did not copy Sega's code; as Accolade explained, "with the exception of the interface specifications, none of the code in its own games is derived in any way from its examination of Sega's code."[14]  The Ninth Circuit held that the fair use doctrine applied to Accolade's intermediate copying of interface specifications in order to reverse-engineer the Genesis console's APIs.  The court relied heavily on the fact that copying was the only way that Accolade could have gained access to the "unprotected ideas and functional concepts" in Sega's code—the "interface specifications for the Genesis console."[15]

Eight years later, the Ninth Circuit again held that wholesale copying of a work (this time the firmware for the Sony Playstation console) for the purpose of reverse engineering APIs is a fair use.[16]  To create a Playstation emulator called the Virtual Game Station, Connectix needed to replicate the interfaces to the Sony Playstation BIOS, but wrote its own code to implement those interfaces after uncovering the interfaces through reverse engineering.  As in *Sega,* the court held that intermediate copying to uncover, and then use, "unprotected functional elements" (*i.e.*, the interface specifications) was a fair use.[17]

Oracle's claim here is even weaker than Sega's or Sony's.  Here, there is not even an allegation of unauthorized intermediate copying of Oracle's code.  Instead, Oracle contends that copying ***the labels used with the APIs themselves*** is infringement.  But if copying of the code that implements APIs is a fair use so long as the end product copies only the APIs themselves, then, as a matter of law and logic, copying only the labels used for the APIs must also be a fair use.

The evidence will show that all four of the fair use factors favor Google in this case.

*First*, the purpose and character of the use is transformative.  The evidence will show that

---

[13]  977 F.2d 1510, 1515 (9th Cir. 1992).

[14]  *Id.*

[15]  *Id.* at 1525.

[16]  *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000).

[17]  *Id.* at 603, 608.

GOOGLE'S TRIAL BRIEF
Case No.  3:10-cv-03561 WHA

1051838.02

Google paired the labels of the 37 Java SE APIs with new implementing code that was optimized for use on a mobile platform, put them in a different context alongside additional API packages that are specially designed for use with a mobile platform, and then integrated the core libraries into a much larger mobile platform.  Even Oracle's own employees admit that the Android platform was transformative.

*Second*, the nature of the copyrighted work is mainly functional.  Although the Federal Circuit found that the API labels have sufficient creativity to support a finding of copyrightability, their predominant purpose is simply to allow access to the pre-written code in the API packages and thereby allow for the practical use of the Java programming language.

*Third*, the amount and substantiality of the portion taken is small.  The API labels for the 37 Java SE API packages are but a fraction of a percent of the code base found in the copyrighted works, Java SE 1.4 and Java SE 5.  Even if one were to compare the API labels for the 37 Java SE API packages with something less than the entire copyrighted work, such as both the declaring and the implementing code found in the 37 Java SE API packages themselves, it is still a small percentage of that subset of the copyrighted work.  Moreover, these API labels were themselves used and re-implemented by multiple projects in the past, as noted above, including the Apache Harmony project and the GNU Classpath project.

*Finally*, the evidence will show that any struggles that Oracle has experienced in the market for Java SE are attributable to its own actions or inaction, not to any harm caused by Android.  For example, as noted above, both Sun and Oracle tried repeatedly to adopt Java SE for use in modern mobile devices, but such attempts have failed—despite using some or all of the same API packages that Google is accused of infringing.  Moreover, in 2007, Sun made Java SE available under a free open-source license as part of a platform known as OpenJDK.  The license under which OpenJDK is offered permitted licensees to subset or superset the Java SE API packages, thereby enabling exactly the sort of fragmentation that Sun/Oracle claims to be damaged by.  Finally, with respect to Java ME, which does not even include all of the API labels, its subsequent market failure is due to its lightweight solution that targeted feature phones but did not provide sufficient functionality to power a smartphone.

**B.    Google will prevail on its defenses of equitable estoppel and laches.**

Even if Oracle could carry its burden of proving copyright infringement, it should be barred from enforcing those rights because of its long history of public statements and acts contrary to the positions it is taking here, and its long delay in filing suit.

Beginning as early as 2005, Sun was fully aware of Google's efforts to develop the free, open source, full stack Android mobile platform partly written in the Java programming language. Sun also knew that, in addition to offering middleware functionality, Android was a complete mobile platform with numerous components that Java SE lacked, such as an underlying kernel and key applications. Despite this knowledge, Sun never said a cross word to Google when Android was publicly announced in 2007 and then released in late 2008. Certainly Sun never asserted infringement or threatened to sue. Sun didn't change its tune until after it changed its name to Oracle America in early 2010, by which time Google and its many partners in the Open Handset Alliance had invested enormous amounts of time, money, and sweat in building the Android platform into a commercial success.

Sun's inaction conceded that Google was acting in a manner consistent with Sun's policies. Indeed, Sun publicly applauded Android's release as an open source platform. When Google first announced Android in 2007, Sun CEO Jonathan Schwartz posted a statement on his blog saying that he "just wanted to add [his] voice to the chorus of others from Sun in offering my heartfelt congratulations Google on the announcement of their new Java/Linux phone platform, Android. Congratulations!"[18] Sun never filed suit—or even threatened to file suit—against Google based on the Android platform, even though Google told Sun from the beginning that it would proceed with an independent full stack mobile platform project if the Sun partnership did not work out. And Sun and Oracle both consistently treated APIs as unprotectable, public domain material, by copying and incorporating third-party APIs into their own products.

These and other similar statements by Sun establish Google's defenses of equitable estoppel and laches—each premised on the fact that Sun expressly and publicly approved of Android and certainly never suggested it would sue Google. In fact, even Oracle applauded the

---

[18] TX 2352.

GOOGLE'S TRIAL BRIEF
Case No.  3:10-cv-03561 WHA

1051838.02

1  Android platform, announcing in 2009 at the Java One conference that it was "flattered" by

2  Android and further emphasizing that there were likely to be Android netbooks as a result of the

3  efforts of "our friends at Google."  Oracle cannot renege on these representations, claiming

4  entitlement to revenues associated with Android now that Android is a success.

5  **C.**     **Even if it could prove liability, Oracle would not be entitled to substantial damages.**

6       Oracle lays claim to more than one-third of the profits attributable to Android, seeking

7  $8.8 billion in disgorgement and $475 million in supposed lost licensing revenues for Java ME.

8       *First,* Mr. Malackowski opines that there is a causal nexus between an alleged *$40.5*

9  *billion* in Android-related revenue and Google's use of the declarations/SSO of the 37 Java SE

10  API packages.  Mr. Malackowski's causal nexus depends on a theoretical, attenuated causal

11  chain: that the declarations/SSO of the 37 Java SE API packages allegedly allowed Google to

12  attract Java developers, who then developed more apps, which in turn inspired consumers to not

13  only buy Android devices but also to perform more searches on Android devices, thus generating

14  more Android-related revenue.  Mr. Malackowski cites no evidence that this actually happened,

15  instead relying on Oracle technical experts' made-for-litigation analyses to support his theory.

16  Mr. Malackowski relies on identical facts in concluding that a causal nexus exists between the

17  declarations/SSO of the 37 Java SE API packages and all four revenue streams, relating to: (1)

18  sales of hardware, including phones and tablets, that run Android; (2) sales of applications to be

19  used on Android devices; (3) sales of digital content that Android device users can download; and

20  (4) advertising revenues generated when, for example, an Android phone user conducts a web

21  search and an advertisement is shown.

22       But Mr. Malackowski performed no analysis to determine if any of these profit streams

23  were caused or enabled in any respect by the use of the declarations/SSO of the 37 Java SE API

24  packages, asserting that it would be impermissible and irrelevant to consider that sort of but-for

25  counterfactual.  With respect to ad revenues specifically, Mr. Malackowski admits that both

26  Google search and ad technology predated Android, and that Google's search technology was the

27  foundation of Google's business.  Mr. Malackowski also admits that Google's ad technology is an

28  entirely distinct area of technology.  Nevertheless, Mr. Malackowski applies the same causal

1   nexus analysis to Google's ad revenues as to the other revenue streams, asserting that the

2   contribution of Google's search engine or ad-targeting technology, and even the role of the

3   declarations/SSO of the 37 Java SE API packages in serving advertisements to Android users, is

4   immaterial to evaluating the causal nexus.

5     *Second*, Mr. Malackowski purports to apportion Google's Android-related indirect profits,

6   but in reality does no such thing.  With respect to hardware, applications, and digital content, Mr.

7   Malackowski simply assigns 100% of those profits to Android—and from thence to Oracle.  He

8   also concludes that the Android platform is responsible for 35.6% of advertising profits indirectly

9   related to Android, crediting Google's search engine and ad-targeting software with the rest.  But

10  again, he "apportions" the entire profit attributable to Android to Oracle.  Mr. Malackowski

11  opines that Oracle should be awarded all $8.8 billion of Google's indirect Android profits because

12  the allegedly infringing declarations/SSO of the 37 Java SE API packages have been allegedly

13  "commingled" with other aspects of the Android platform.  According to Mr. Malackowski, this

14  allows him to avoid even making an attempt to apportion Android and to opine at trial that further

15  apportionment is not legally required.  Nonetheless, Mr. Malackowski admits that the components

16  of Android other than the 0.08% of code contributed to the $8.8 billion he claims for Oracle.

17  Although Mr. Malackowski did not independently evaluate these components—and did not ask

18  the Oracle technical experts to do so—he seeks to opine that any further apportionment is not

19  possible.

20    *Third*, Mr. Malackowski opines that Oracle's actual damages caused by Google's alleged

21  infringing use of the declarations/SSO of the 37 Java SE API packages are $475 million in lost

22  licensing profits from lost Java ME license agreements with third parties.  Mr. Malackowski

23  relies on a single 2008 forecast of Java ME license revenue through 2010, which forecast

24  predicted an 8.3% increase in revenue from 2009 to 2010.  He then assumes that Oracle would

25  have achieved the same revenue growth (8.3%) through 2015, notwithstanding the tremendous

26  volatility of the mobile market between 2008 and 2015—a period that saw the advent of the

27  modern smartphone and tablet and a corresponding decline in old-fashioned feature phones that

28  were the lifeblood of Sun's Java ME licensing business.  Remarkably, Mr. Malackowski nowhere

addresses the fact that Java ME is not the copyrighted work at issue in this case, and, in fact, contains only a portion of the 37 Java SE API packages at issue here.

*Fourth,* although Mr. Malackowski is unable to quantify Oracle's lost profits resulting from its inability to launch its own mobile operating system (called Project Acadia or SavaJe), Mr. Malackowski speculates that Oracle's lost profits would best be measured by Google's profits from using the allegedly infringing declarations/SSO of the 37 Java SE API packages in the Android operating system. Yet Mr. Malackowski admittedly did no analysis to support this opinion.[19]

In the face of Oracle's overreaching, Google's expert Dr. Leonard examines both actual damages and disgorgement under 17 U.S.C. § 504(b). Dr. Leonard concludes that that Mr. Malackowski fails to establish a causal nexus to Google's independent and pre-existing search and ad technologies, but then, assuming such a nexus exists, analyzed whether any of the profits Oracle seeks are attributable to the alleged infringement or to other factors, an analysis not performed by Oracle's damages expert. Dr. Leonard examined extensive economic evidence concerning the various contributions to the profits Oracle seeks, including Google's pre-existing search and ad technology, the Linux kernel, the hardware abstraction layer, the virtual machine/runtime, Google apps, built in apps, the Google brand name, and the ability to facilitate third party apps, which in turn included the Java language, the declarations/SSO of the 37 Java SE API packages, 151 other API packages, the Native Development Kit (allowing applications to be written in, *e.g.*, C or C++), the application developer framework and the developer support provided by Google, and the Google Play Store. Dr. Leonard also examined Oracle's theory that an increase in apps led to an increase in users, and found that the economic evidence supports the opposite conclusion. Apps follow users, not the vice versa. Dr. Itamar Simonson conducted a survey which reached the same result.

Based on the above, Dr. Leonard concluded the economic evidence indicated the contribution of the allegedly infringing declarations/SSO of the 37 Java SE API packages was small. He then measured the contribution using several different methodologies. First, relying on

---

[19] These opinions are the subject of *Daubert* motions pending before the Court.

Google's technical experts and economic evidence, Dr. Leonard opined that the declarations/SSO were no more important to Android than the other valuable elements of Android.  This is Dr. Leonard's "lines of code" analysis, which apportions the value of allegedly infringing code compared to the value of all code in the Android platform and the Google advertising code base. Second, Dr. Leonard evaluated that Oracle's counterfactual theory that the declarations/SSO did attract developers and increase the number of apps available on Android, and calculated the market share Google would have lost had those Android apps never been developed.  This is Dr. Leonard's "share loss" analysis under the Kim model, which meets Oracle's theory head-on and apportions the profits generated by the additional apps supposedly enabled by the alleged infringement based on actual market evidence, and determines the incremental profit attributable to the infringement.  Dr. Leonard also looked at the avoided costs Google incurred in not pursuing OpenJDK, training app developers or paying for app development.  Dr. Leonard's disgorgement analysis presents a range between $85,000 and $203 million under these approaches, which apportion the gross revenues claimed by Oracle to the alleged contribution of the copyrighted works at issue.

Dr. Leonard also examines Oracle's claim for lost licensing profits, opining that Oracle's actual damages are zero, because the decline in Java ME licensing revenues were caused by other factors, such as the displacement of feature phones by smartphones.  Assuming that any lost profits do exist, Dr. Leonard opines that Mr. Malackowski's approach is wrong and the proper way to calculate such profits requires consideration of what actually happened, not forecasts. This analysis results in an actual damages figure of $85 million.  Dr. Leonard also opines that Sun's Project Acadia failed for reasons unrelated to the alleged infringement.

**D.    Oracle's willfulness case is a fiction.**

Oracle will not be able to increase its recovery by proving that Google willfully infringed. Under copyright law, willfulness is relevant only to statutory damages, and Oracle will not seek statutory damages when all is said and done.  The Court has already rejected Oracle's claim that willfulness could be relevant to deductions other than deductions for taxes, and Google does not seek any deductions for taxes.  But even if willfulness were relevant, Google did not willfully

infringe any of the copyrights at issue.  Even though the Federal Circuit has now held that the labels on API packages are copyrightable, Google reasonably relied on Sun's repeated public insistence to the contrary, Sun's willingness to let others (such as the Apache Software Foundation and the GNU Classpath Project) use those same API packages freely, and Sun's own free use of third-party APIs.  Most of the alleged literal copying was done by contractors working for Google without Google's knowledge, and was stripped out of Android when Google was notified of the alleged copying.  The only alleged instance of literal copying of source code by Google relates to fewer than a dozen lines of code out of millions.  Something so trivial and unimportant to the success of Android cannot be a basis for a damages enhancement.

**E.    No matter what, Oracle will not be entitled to an injunction.**

Even if Oracle were to prevail on both its patent claims and copyright claim, it would not be entitled to injunctive relief.  The standard governing entry of a permanent injunction in copyright infringement cases is set forth in the Supreme Court's opinion in *eBay, Inc. v. MercExchange, LLC.*[20]  That standard requires a plaintiff to demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[21]

Oracle cannot satisfy any of the four parts of the *eBay* standard.

First, Oracle has not suffered, is not suffering, and will not suffer any irreparable injury because of Google's distribution of the Android software.  Oracle has never developed, much less sold, a product that competes with the full stack Android mobile platform—not when the company was called Sun, and not since it became Oracle.  At most, Oracle offers middleware products through its Java ME platform, but it has never come close even to developing a full stack.  Before it broke off partnership negotiations with Google over Android in 2006, Oracle (then Sun) acquired SavaJe in hopes of creating a full stack, but it could never make the SavaJe

---

[20] 547 U.S. 388, 391-92 (2006).  Although *eBay* was a patent case, the Ninth Circuit confirmed earlier this year in *Perfect 10, Inc. v. Google Inc.,* 653 F.3d 976 (9th Cir. 2011), that the *eBay* standard also applied in copyright infringement suits.

[21] *eBay,* 547 U.S. at 391.

technology work or develop technology of its own, so it abandoned that effort.  Both *eBay* and subsequent Federal Circuit cases confirm that proof of harm to sales of a viable competing product is critical to a showing of irreparable injury.[22]  Even as to its Java middleware products, Oracle has continued to do well in markets outside the mobile area, where the Java platform was already in decline, and limited to older feature phones, before Android was released.

Second, and for similar reasons, Oracle cannot show that money damages are inadequate to compensate it for the alleged infringement.  Not only does Oracle not compete with Google, but its argument that an injunction is the only way to prevent so-called "fragmentation" of "the Java ecosystem" is also baseless.  The evidence at trial will show that the Java mobile space was already deeply fragmented, with various incompatible forks, many condoned by Sun, long before Google acquired Android, Inc. in 2005.  For years, Sun had followed a practice of developing incompatible variations of its Java mobile platform for paying customers.  Similarly, the various iterations of Sun's own Java mobile platform were incompatible with one another—with applications written for one version being unable to run on others.  Even Oracle's claim that Sun assured compatibility by making its licensees certify that they passed compatibility tests is fictitious.  Sun never audited the results of those compatibility tests, and Oracle admits that the tests covered only 70% of the Java mobile functionality, thus allowing for incompatibility in the other 30%.  And in the FAQs explaining Sun's decision to release an open-source version of the Java SE platform, known as OpenJDK, Sun noted that users of OpenJDK were not obligated to maintain compatibility.  The alleged "write once, run anywhere" Java value proposition is marketing-speak that is contradicted by Sun's own conduct.  Any harm Oracle might have suffered can easily be compensated by payment of money.

Third, the balance of hardships strongly favors Google.  Oracle is asking the Court to bar Google from distributing or supporting one of the most popular mobile operating systems in the world, which system is used by hundreds of millions of people numerous times every day.  Such a

---

[22]  *See eBay,* 547 U.S. at 395-96 (Kennedy, J., concurring, joined by Stevens, Souter, and Breyer, JJ.) (noting that injunctions are unjustified where patentee does not use patents "as a basis for producing and selling goods, but, instead, primarily for obtaining license fees"); *see also, e.g., i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 861-62 (Fed. Cir. 2010) (affirming finding of irreparable injury where infringement caused plaintiff's product to lose market share).

1   disruption in Android distribution and support would have significant negative consequences.

2   Oracle, by contrast, is suffering only monetary harm (if any harm at all).

3   Fourth, for similar reasons, an injunction in this case would massively disserve the public

4   interest.  Oracle's requested relief would essentially shut down Android, leaving tens of millions

5   of users without their preferred operating system, forcing OEMs to eat millions of dollars in sunk

6   costs and inventory, including development costs for future Android models.  An injunction

7   would likewise jeopardize similarly large investments by wireless carriers.  No corresponding

8   benefit to Oracle, or anyone, would offset that sort of chaos.

9   Oracle may try to introduce two red herrings into the injunction analysis, neither with any

10  basis in law.  First, Oracle may assert that, if Google is found to have willfully infringed Oracle's

11  copyrights, the Court should be more willing to enter an injunction.  But willfulness is not one of

12  the relevant considerations under the four-part *eBay* test.  Fundamentally, injunctive relief is

13  designed to protect a party from irreparable harm where money damages will not suffice—not to

14  punish an alleged wrongdoer.  Second, to the extent Oracle attempts to rely on the old Ninth

15  Circuit rule that showing "a reasonable likelihood of success on the merits in a copyright

16  infringement claim raises a presumption of irreparable harm," that rule was expressly declared

17  dead by the Ninth Circuit years ago as having been "effectively overruled" by *eBay*.[23]

18  Finally, even if Oracle could prove that it was entitled to injunctive relief for unlicensed

19  use of the API labels from the 37 Java SE API packages (it cannot), it would still not be entitled

20  to an injunction because for subsequent versions of Android, Google is now using those 37 Java

21  SE API packages under the free, open-source license that Oracle offers for those 37 Java SE API

22  packages.  In December of 2015, Google published a new version of Android that incorporates

23  code for the 37 Java SE API packages taken from Oracle's OpenJDK, and that version is

24  therefore licensed.

25

26

27

28

---

[23]  *Perfect 10,* 653 F.3d at 981.

1    Dated:  April 20, 2016                    KEKER & VAN NEST LLP

2

3                                         By:    /s/ Robert A. Van Nest
                                                ROBERT A. VAN NEST
4                                               CHRISTA M. ANDERSON
                                                DANIEL PURCELL
5
                                                Attorneys for Defendant
6                                               GOOGLE INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOOGLE'S TRIAL BRIEF
Case No.  3:10-cv-03561 WHA

1051838.02