1   ORRICK, HERRINGTON & SUTCLIFFE LLP
    KAREN G. JOHNSON-MCKEWAN (SBN 121570)
2   kjohnson-mckewan@orrick.com
    ANNETTE L. HURST (SBN 148738)
3   ahurst@orrick.com
    GABRIEL M. RAMSEY (SBN 209218)
4   gramsey@orrick.com
    405 Howard Street, San Francisco, CA  94105
5   Tel: 1.415.773.5700 / Fax: 1.415.773.5759
    PETER A. BICKS (*pro hac vice*)
6   pbicks@orrick.com
    LISA T. SIMPSON (*pro hac vice*)
7   lsimpson@orrick.com
    51 West 52nd Street, New York, NY  10019
8   Tel: 1.212.506.5000 / Fax: 1.212.506.5151

9   BOIES, SCHILLER & FLEXNER LLP
    DAVID BOIES (*pro hac vice*)
10  dboies@bsfllp.com
    333 Main Street, Armonk, NY  10504
11  Tel: 1.914.749.8200 / Fax: 1.914.749.8300
    STEVEN C. HOLTZMAN (SBN 144177)
12  sholtzman@bsfllp.com
    1999 Harrison St., Ste. 900, Oakland, CA  94612
13  Tel: 1.510.874.1000 / Fax: 1.510.874.1460

14  ORACLE CORPORATION
    DORIAN DALEY (SBN 129049)
    dorian.daley@oracle.com
15  DEBORAH K. MILLER (SBN 95527)
    deborah.miller@oracle.com
16  MATTHEW M. SARBORARIA (SBN 211600)
    matthew.sarboraria@oracle.com
17  RUCHIKA AGRAWAL (SBN 246058)
    ruchika.agrawal@oracle.com
18  500 Oracle Parkway,
    Redwood City, CA 94065
19  Tel: 650.506.5200 / Fax: 650.506.7117

20  *Attorneys for Plaintiff*
    ORACLE AMERICA, INC.

21              UNITED STATES DISTRICT COURT

22              NORTHERN DISTRICT OF CALIFORNIA

23              SAN FRANCISCO DIVISION

24   ORACLE AMERICA, INC.                    Case No. CV 10-03561 WHA

25              Plaintiff,                   **ORACLE'S TRIAL BRIEF**

         v.                                  Trial Date: May 9, 2016
26   GOOGLE INC.                             Dept.: Courtroom 8, 19th Floor
                                             Judge: Honorable William H. Alsup
27              Defendant.

28

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ....................................................................................1

II.   PREVIOUSLY DETERMINED FACTS SHOULD BE DEEMED ADMITTED ............1

     A.    Oracle's Copyrighted Works Are Creative And Original ......................2

     B.    Google's Copying Was Purely And Entirely For Commercial Purposes...............3

     C.    Android Competes Against Java In The Mobile Market.........................4

     D.    Java Licensed A Derivative Version (Java ME) For Use On Mobile Devices .................................................................................4

     E.    Android Is Not Compatible With The Java Platform ..........................4

III.   MISCELLANEOUS WITNESS AND EVIDENTIARY ISSUES..................................5

     A.    Google Witness Simon Phipps Should Be Excluded Because He Was Not Disclosed As An OpenJDK Or Open Source Witness ...........................5

     B.    Oracle Reserves The Right To Move To Exclude Google Expert Witness Dr. Cattell Because He Has Not Yet Been Deposed ...............................6

     C.    Google Is Obligated To Produce Employee Rich Miner At Trial .........................7

     D.    The Parties Should Stipulate To Admission Of Undisputed Evidence Establishing The Extent of Google's Copying ...................................8

IV.   THE JURY SHOULD BE PRE-INSTRUCTED ON THE FAIR USE FACTORS ...........9

V.    INFRINGER'S PROFITS IS A QUESTION FOR THE JURY .................................10

     A.    The Copyright Act Requires Submission Of Infringer's Profits To The Jury.......10

     B.    The Seventh Amendment Also Requires Submission Of Infringer's Profits To The Jury ..............................................................................13

     C.    Submission Of Infringer's Profits To The Jury Is Particularly Appropriate In This Case ......................................................................15

     D.    Google Has Previously Conceded That Infringer's Profits Is A Question For The Jury..............................................................................16

     E.    This Court Has Ordered That Infringer's Profits Will Be Tried To The Jury .......17

VI.   ORACLE IS ENTITLED TO PREJUDGMENT INTEREST ...........................................18

VII.   GOOGLE'S EQUITABLE DEFENSES OF LACHES AND ESTOPPEL FAIL............20

     A.    Introduction.........................................................................20

     B.    Background.........................................................................22

         1.     Advent Of Mobile Computing Posed A Threat To Google......................22

         2.     Google Chose Java To Speed Its Entry Into The Mobile Market.............22

         3.     Google Released Android While Knowing That It Needed A License .................................................................................23

         4.     Oracle Acquired Sun, Tried To Negotiate A License, And Was Forced To Sue ..............................................................24

         5.     Procedural History ..........................................................25

C.    Laches Does Not Apply To Oracle's Claim For Legal Relief And Fails As To Oracle's Claim For Equitable Relief ................................................. 26

    1.    Sun/Oracle Did Not Delay In Bringing This Lawsuit .............................. 27

    2.    There Was No Unreasonable Delay .......................................................... 29

    3.    Google Was Not Prejudiced ...................................................................... 31

    4.    Google's Willful Infringement Precludes Its Laches Defense ................. 35

D.    Equitable Estoppel Does Not Apply ................................................................ 36

    1.    Sun and Oracle Did Not Initially Know Of Google's Unlicensed Copying .................................................................................................... 36

    2.    Sun And Oracle's Conduct Was Not Intended To And Could Not Reasonably Be Perceived As Assenting To Google's Infringement ........ 37

    3.    Google Knew That Sun And Oracle Did Not Agree To Google's Copying .................................................................................................... 40

    4.    Google Did Not Rely On Any Sun/Oracle Acts of Assent To Google's Copying ...................................................................................... 41

    5.    Google Cannot Claim Equitable Estoppel Given Its Egregious Conduct .................................................................................................... 43

VIII.    ORACLE IS ENTITLED TO A PERMANENT INJUNCTION ..................................... 44

A.    Oracle Has Suffered Irreparable Harm .......................................................... 45

B.    Monetary Damages Are Inadequate To Compensate Oracle .......................... 46

C.    The Balance Of Hardships Warrants An Injunction ....................................... 46

D.    An Injunction Promotes The Public Interest .................................................. 47

E.    Scope of Injunctive Relief Must Include Non-Litigated And Future Works ........ 47

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992) (en banc) ..........................................................29, 41

*Andreas v. Volkswagen of Am., Inc.*,
  336 F.3d 789 (8th Cir. 2003) ....................................................................................13

*Apple Inc. v. Pystar Corp.*,
  673 F. Supp. 2d 943 (N.D. Cal. 2009) ........................................................45, 47, 49

*Balsley v. LFP, Inc.*,
  691 F.3d 747 (6th Cir. 2012) ....................................................................................13

*Bangkok Broadcasting & T.V. Co. v. IPTV Corp.*,
  742 F. Supp. 2d 1101 (C.D. Cal. 2010) ...................................................................36

*Blankenship v. Liberty Life Assurance Co. of Bos.*,
  486 F.3d 620 (9th Cir. 2007) ....................................................................................20

*Bonner v. Dawson*,
  404 F.3d 290 (4th Cir. 2005) ....................................................................................13

*Broderbund Software, Inc. v. Unison World, Inc.*,
  648 F. Supp. 1127 (N.D. Cal. 1986).....................................................................36, 37

*Cayuga Indian Nation of N.Y. v. Pataki*,
  79 F. Supp. 2d 78 (N.D.N.Y 1999)............................................................................9

*Chavez v. Bank of Am. Corp.*,
  No. C-10-0653 JCS, 2012 WL 1594272 (N.D. Cal. May 4, 2012) ...........................2

*Comcast Cable Commc'ns Corp. v. Finisar Corp.*,
  No. C06-04206 WHA, 2008 WL 170672 (N.D. Cal. Jan. 17, 2008), *aff'd sub
  nom.* 319 F. App'x 916 (Fed. Cir. 2009) ................................................................29

*Dairy Queen, Inc. v. Wood*,
  369 U.S. 469 (1962)...................................................................................................14

*Daisy Grp., Ltd. v. Newport News, Inc.*,
  999 F. Supp. 548 (S.D.N.Y. 1998) ...........................................................................15

*Danjaq LLC v. Sony Corp.*,
  263 F.3d 942 (9th Cir. 2001) .............................................................................*passim*

*Data Gen. Corp. v. Grumman Sys. Support Corp.*,
  36 F.3d 1147 (1st Cir. 1994), *abrogated by Reed Elsevier, Inc. v. Muchnick*,
  559 U.S. 154 (2010) ................................................................................................... 13

*In re Digimarc Corp. Derivative Litig.*,
  549 F.3d 1223 (9th Cir. 2008) ............................................................................. 10, 15

*Disabled Rights Union v. Shalala*,
  40 F.3d 1018 (9th Cir. 1994) ....................................................................................... 31

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ............................................................................................. 44, 47

*Elvis Presley Enterpirses, Inc. v. Passport Video*,
  357 F.3d 896 (9th Cir. 2004) ...................................................................................... 47

*Evergreen Safety Council v. RSA Network Inc.*,
  697 F.3d 1221 (9th Cir. 2012) .................................................................................... 35

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ..................................................................................................... 11

*Feltner v. Columbia Pictures Television, Inc.*,
  523 U.S. 340 (1998) .............................................................................................*passim*

*Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*,
  654 F.3d 989 (9th Cir. 2011) ...................................................................................... 44

*Frank Music Corp. v. MGM Inc.*,
  886 F.2d 1545 (9th Cir. 1989) ............................................................................... 15, 18

*Gasser Chair Co. v. Infanti Chair Mfg. Corp.*,
  60 F.3d 770, 774 (Fed. Cir. 1995) ................................................................. 32, 42, 43

*Gaste v. Kaiserman*,
  863 F.2d 1061 (2d Cir. 1988) ..................................................................................... 13

*Gaylord v. United States*,
  678 F.3d 1339 (Fed. Cir. 2012) .................................................................................. 18

*Google Inc. v. Oracle Am., Inc.*,
  No. 14-410 (U.S. Oct. 6, 2014) ..................................................................................... 4

*Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*,
  874 F.2d 431, 437 (7th Cir. 1989) .............................................................................. 20

*In re Grand Jury Subpoena*,
  357 F.3d 900 (9th Cir. 2004) ............................................................................... 17, 43

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002)............................................................................................12

*Hampton v. Paramount Pictures Corp.*,
   279 F.2d 100 (9th Cir. 1960) ......................................................................*passim*

*Harris Mkt. Research v. Marshall Mktg. & Commc'ns, Inc.*,
   948 F.2d 1518 (10th Cir. 1991) .........................................................................13

*Jackson v. Axton*,
   25 F.3d 884 (9th Cir. 1994) ...............................................................................29

*Jerrold Elecs. Corp. v. Wescoast Broad. Co.*,
   341 F.2d 653 (9th Cir.1965), *cert. denied*, 382 U.S. 817 (1965)........................9

*Kamar Int'l, Inc. v. Russ Berrie & Co.*,
   752 F.2d 1326 (9th Cir. 1984) ...........................................................................15

*In re Katz Interactive Call Processing Patent Litig.*,
   No. 07-ML-1816-B-RGK, 2009 WL 8635161 (C.D. Cal. May 1, 2009)............43

*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009) ...........................................................................46

*Kling v. Hallmark Cards Inc.*,
   225 F.3d 1030 (9th Cir. 2000) ...........................................................................29

*L.A. News Serv. v. Reuters Television Int'l, Ltd.*,
   149 F.3d 987 (9th Cir. 1998) .............................................................................19

*Lego A/S v. Best-Lock Const. Toys, Inc.*,
   874 F. Supp. 2d 75 (D. Conn. 2012)..................................................................40

*In re Lorillard Tobacco Co.*,
   370 F.3d 982, 986 (9th Cir. 2004) .....................................................................49

*Lotus Dev. Corp. v. Borland Int'l, Inc.*,
   49 F.3d 807 (1st Cir. 1995), *aff'd by equally divided Court* 516 U.S. 233
   (1996).....................................................................................................................2

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
   658 F.3d 936 (9th Cir. 2011) .......................................................................35, 36

*MAI Sys. Corp. v. Peak Computer, Inc.*,
   991 F.2d 511 (9th Cir. 1993) .............................................................................28

*Maier Brewing Co. v. Fleischmann Distilling Corp.*,
   390 F.2d 117 (9th Cir. 1968) .............................................................................15

ORACLE'S TRIAL BRIEF
CV 10-03561 WHA

*McRoberts Software, Inc. v. Media 100, Inc.*,
  329 F.3d 557 (7th Cir. 2003) .................................................................................. 13

*Meyers v. Asics Corp.*,
  974 F.2d 1304 (Fed. Cir. 1992) ......................................................................... 35, 42

*Meyers v. Brooks Shoe Inc.*,
  912 F.2d 1459 (Fed. Cir. 1990), *overruled on other grounds by A.C.*
  *Aukerman*, 960 F.2d ........................................................................................ 35, 42

*MGM Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197, 1215 (C.D. Cal. 2007) ...................................................... 45

*MGM Studios, Inc. v. Grokster, Ltd.*,
  518 F. Supp. 2d 1197 (C.D. Cal. 2007) ........................................................... 38, 40

*Miller v. Glenn Miller Prods., Inc.*,
  454 F.3d 975 (9th Cir. 2006) .................................................................................. 27

*Miller v. Universal City Studios, Inc.*,
  650 F.2d 1365 (5th Cir. 1981) ................................................................................ 13

*Montgomery v. Noga*,
  168 F.3d 1282 (11th Cir. 1999) .............................................................................. 13

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
  210 F.3d 1099 (9th Cir. 2000) ................................................................................ 41

*NLRB v. Express Pub. Co.*,
  312 U.S. 426, 435 (1941) ........................................................................................ 48

*Open Text S.A. v. Box, Inc.*,
  No. 13–cv–04910–JD, 2015 WL 4940798 (N.D. Cal. Aug. 19, 2015) ........ 19, 20, 22

*Oracle Am., Inc. v. Google Inc.*,
  750 F.3d 1339 (Fed. Cir. 2014), *cert. denied* 135 S. Ct. 2887 (2015) ............ *passim*

*Oracle Am., Inc. v. Google Inc.*,
  Nos. 2013-1021, -1022 (Fed. Cir.) 1:02:54-1:03:00, *available at*
  http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2013-1021.mp3; ............... 3

*Orantes-Hernandez v. Thornburgh*,
  919 F.2d 549 (9th Cir. 1990) .................................................................................. 47

*Oregon Mortg. Co. v. Renner*,
  96 F.2d 429 (9th Cir. 1938) .................................................................................... 30

*Ormco Corp. v. Align Tech., Inc.*,
  647 F. Supp. 2d 1200 (C.D. Cal. 2009) .................................................................. 35

*Pelt v. Utah*,
611 F. Supp. 2d 1267 (D. Utah 2009)..................................................................30, 31

*Petrella v. MGM, Inc.*,
134 S. Ct. 1962 (2014).......................................................................................*passim*

*Petrella v. MGM, Inc.*,
695 F.3d 946 (9th Cir. 2012), *rev'd on other grounds* 134 S. Ct. 1962 (2014)................27, 31

*Polar Bear Prods., Inc. v. Timex Corp.*,
384 F.3d 700 (9th Cir. 2004) .............................................................................13, 18

*Price v. Stevedoring Servs. of Am., Inc.*,
697 F.3d 820 (9th Cir. 2012) .....................................................................................19

*Princeton Univ. Press v. Michigan Document Serv., Inc.*,
99 F.3d 1381, 1392- 93 (6th Cir. 1996)......................................................................48

*Roley v. New World Pictures, Ltd.*,
19 F.3d 479 (9th Cir. 1994) .......................................................................................27

*Ronald A. Smith & Assocs. v. Hutchinson Tech. Inc.*,
No. C 01-03847 WHA, 2002 WL 34691677 (N.D. Cal. Aug. 16, 2002)...........................31

*Save the Peaks Coal. v. U.S. Forest Serv.*,
669 F.3d 1025 (9th Cir. 2012) ...................................................................................33

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
562 F.2d 1157 (9th Cir. 1977) ..............................................................................14, 15

*Simler v. Conner*,
372 U.S. 221 (1963)...................................................................................................14

*Sony Corp. of America v. Universal City Studios, Inc.*,
464 U.S. 417, 429 (1984)............................................................................................47

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004)...................................................................................................11

*Stenograph L.L.C. v. Bossard Assocs., Inc.*,
144 F.3d 96 (D.C. Cir. 1998).....................................................................................13

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
862 F.2d 1564 (Fed. Cir. 1988) .................................................................................20

*Summit Entm't, LLC v. B.B. Dakota, Inc.*,
No. CV 10-4328 GAF, 2011 U.S. Dist. LEXIS 151582 (C.D. Cal. Nov. 21,
2011) .......................................................................................................................37

*Sun Microsystems v. Microsoft Corp.,*
   188 F.3d 1115 (9th Cir. 1999) ................................................................. 6, 39

*Swofford v. B & W, Inc.,*
   336 F.2d 406 (5th Cir. 1964) ..................................................................... 14

*Telecom Tech. Servs. Inc. v. Rolm Co.,*
   388 F.3d 820 (11th Cir. 2004) .................................................................. 13

*Thomas v. Bible,*
   983 F.2d 152 (9th Cir. 1993) ...................................................................... 2

*Tolliver v. McCants,*
   684 F. Supp. 2d 343 (S.D.N.Y. 2010), *aff'd*, 486 F. App'x 902 (2d Cir. 2012) ............... 39, 42

*Troxler Elec. Labs., Inc. v. Pine Instr. Co.,*
   597 F. Supp. 2d 574 (E.D.N.C. 2009) ......................................................... 43

*United States v. Alexander,*
   106 F.3d 874 (9th Cir. 1997) .................................................................... 2, 4

*United States v. Bynum,*
   566 F.2d 914 (5th Cir. 1978) ...................................................................... 9

*United States v. Caulder,*
   No. 06-10355, 2007 U.S. App. LEXIS 28418 (9th Cir. Dec. 4, 2007) ....................... 9

*United States v. Crawford,*
   372 F.3d 1048 (9th Cir. 2004) (*en banc*) ...................................................... 4

*United States v. Davis,*
   332 F.3d 1163 (9th Cir. 2003) .................................................................... 4

*United States v. King Features Entm't,*
   843 F.2d 394 (9th Cir. 1988) .................................................................. 37, 41

*United States v. Pend Oreille Cty. Pub. Util. Dist. No. 1,*
   135 F.3d 602 (9th Cir. 1998) .................................................................... 19

*United States v. Serrano,*
   187 F.3d 650 (9th Cir. 1999) ...................................................................... 2

*Walt Disney Co. v. Powell,*
   897 F.2d 565 (D.C. Cir. 1990) .................................................................. 48

*Warner Bros. Records, Inc. v. Brown,*
   2008 U.S. Dist. LEXIS 95171 (N.D. Cal. Nov. 13, 2008) .................................. 48

*West Va. v. U.S.,*
   479 U.S. 305 (1987) .............................................................................. 19

*Whitman v. Walt Disney Prods., Inc.,*
    263 F.2d 229 (9th Cir. 1958) ................................................................. 34

*William A. Graham Co. v. Haughey,*
    568 F.3d 425 (3d Cir. 2009) .................................................................. 37

*William A. Graham Co. v. Haughey,*
    646 F.3d 138 (3d Cir. 2011) .................................................................. 13

**Statutes & Rules**

17 U.S.C. § 502(a) ........................................................................44, 46, 47, 48

17 U.S.C. § 504(b) ...............................................................10, 11, 12, 13, 16, 17

17 U.S.C. § 504(c) ..........................................................................11, 17

17 U.S.C. § 507(b) ..................................................................................27

17 U.S.C. § 107 ......................................................................................9

Fed. R. Civ. P. 45(c) ...............................................................................7

Fed. R. Civ. P. 51(b)(3) ............................................................................9

Fed. R. Civ. Proc. 51 ...............................................................................9

Fed. R. Civ. Proc. 26 ...............................................................................7

**Other Authorities**

Am. Jury Project, *Am. Bar Ass'n, Principles for Juries and Jury Trials* Principal.
    6.C.1 (2005) ................................................................................ 10

B. Michael Dann, *From the Bench: Free the Jury* ........................................ 10

http://techcrunch.com/2015/11/09/rich-miner-of-google-ventures-on-what-
    alphabet-means-to-its-venture-arm-and-more/ ........................................7

https://angel.co/richminer ..........................................................................7

https://www.federalreserve.gov/releases/h15/data.htm ................................20

https://www.sec.gov/Archives/edgar/data/1288776/000119312513028362/d45213
    4d10k.htm .................................................................................20

Larry Heuer & Steven D. Penrod, *Instructing Jurors: A Field Experiment with
    Written and Preliminary Instructions,* 13 LAW & HUM. BEHAV. 409, 409
    (1989) .......................................................................................10

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.06[B] (2008) ...................45

32-12P Moore's Federal Practice - Civil ¶ 12.432............................................................9

Second Circuit, *A Report on Seven Experiments Conducted by District Court Judges in the Second Circuit,* 60 N.Y.U. L. Rev. 423, 442 (1985) ........................10

State Courts, *Jury Trial Innovations* 133 (G. Thomas Munsterman *et al.* eds., 2d ed. 2006) ..................................................................................................10

U.S. Const. amend. VII...................................................................................13, 14

William F. Patry, Patry on Copyright § 22:149 (2015) ..................................14

William Schwarzer, *Reforming jury trials*, 132 F.R.D. 575, 584 (1991) ...................10

Oracle's Trial Brief
CV 10-03561 WHA

## I.      INTRODUCTION

Plaintiff Oracle America, Inc. submits the following Trial Brief pursuant to the Court's Guidelines for Trial and Final Pretrial Conference in Civil Jury Cases.  The issues addressed in this brief are:

1) Previously determined facts that should be deemed admitted for purposes of trial;

2) Miscellaneous witness and evidentiary issues;

3) Request to pre-instruct the jury on the four fair use factors;

4) Oracle's entitlement to a jury trial on infringer's profits;

5) Oracle's entitlement to prejudgment interest;

6) Failure of Google's equitable defenses of laches and estoppel;

7) Oracle's entitlement to a permanent injunction.

## II.     PREVIOUSLY DETERMINED FACTS SHOULD BE DEEMED ADMITTED

Before the trial in 2012, the Court encouraged the parties to bring a motion to have facts "deemed accepted, for purposes of the trial" to avoid controversy during trial about whether particular factual issues had been resolved before trial.  March 28, 2012 Tr. 119:5-120:18. Pursuant to the Court's suggestion, Oracle requests that the following six facts be deemed admitted for purposes of trial and read as an instruction to the jury at the end of the case:[1]

1. **"[T]he declaring code and the structure[, sequence,] and organization of the [37 Java] API packages are both creative and original."** *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1365 (Fed. Cir. 2014), *cert. denied* 135 S. Ct. 2887 (2015);

2. **"Google … copied portions of the [37 Java] API packages and did so for what were purely [and entirely] commercial purposes …."** *Id.* at 1376;

3.  **"The accused product is Android, a software platform that was designed for mobile devices and competes with Java in that market."** *Id.* at 1350;

4. **"Sun was licensing a derivative version of the Java platform for use on mobile devices: the Java Micro Edition ("Java ME").  Oracle licensed Java ME for use on mobile devices, including feature phones and smartphones."** *Id.* at 1350.

5. **". . . Google designed Android so that it would *not* be compatible with the Java platform …."** *Id.* at 1371;

---

[1] The following facts, except for #3, are quoted directly from the Federal Circuit's decision and are shown here with citation to that decision for ease of reference only.  The citations should not be provided to the jury, nor should the jury be informed about the prior trial or decisions.

1    The Federal Circuit conclusively decided each of these facts when this case was on

2    appeal, and they are now law of the case.  *See United States v. Alexander*, 106 F.3d 874, 876 (9th

3    Cir. 1997) ("Under the 'law of the case' doctrine, 'a court is generally precluded from

4    reconsidering an issue that has already been decided by the same court, or a higher court[,] in the

5    identical case.'") (quoting *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993)); *United States v.*

6    *Serrano*, 187 F.3d 650, at *2 (Table) (9th Cir. 1999) (affirming application of "law of the case"

7    doctrine by district court on remand where defendant "failed to challenge, in his earlier appeal to

8    [the Ninth Circuit], the district court's factual findings"); *Chavez v. Bank of Am. Corp.*, No. C-10-

9    0653 JCS, 2012 WL 1594272, at *5-6 (N.D. Cal. May 4, 2012) (dismissing plaintiffs' claims

10   based on earlier undisputed factual findings that constituted the law of the case).  Oracle's request

11   to deem facts admitted is not intended to limit other facts relating to these topics.  Moreover,

12   although Google refused to stipulate to the above facts in the Joint Proposed Pretrial Order,

13   Google took the position during expert discovery that the Federal Circuit's findings are "treated

14   as undisputed in this litigation."  Jaffe Dep. 63:7-64:1.

15        **A.     Oracle's Copyrighted Works Are Creative And Original**

16        In holding the declaring code and the structure, sequence, and organization of the Java

17   API packages copyrightable, the Federal Circuit found it "undisputed here that the declaring code

18   and the structure and organization of the API packages are both creative and original."  *Oracle*

19   *Am.*, 750 F.3d at 1365.  Throughout its opinion, the Federal Circuit made similar findings that

20   "Google concedes" and that it is "undisputed" that Oracle's works are original.  *Id.* at 1356 (four

21   times finding concessions and an undisputed record regarding the originality of Oracle's API

22   packages); *id.* at 1368 (referencing the district "court's findings that the SSO [structure, sequence,

23   and organization] is original and creative").

24        The Federal Circuit made this finding when distinguishing the First Circuit's decision in

25   *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807 (1st Cir. 1995), *aff'd by equally divided*

26   *Court* 516 U.S. 233 (1996).  *Oracle Am.*, 750 F.3d at 1365.  In particular, the Federal Circuit held

27   that while "the *Lotus* court found that the commands at issue there (copy, print, etc.) were not

28   creative, … it is undisputed here that the declaring code and the structure and organization of the

1   API packages are both creative and original." *Oracle Am.*, 750 F.3d at 1365.

2       The Federal Circuit's finding is law of the case and should not be reconsidered. The

3   creativity and originality of Oracle's copyrighted works should be deemed admitted for purposes

4   of the second trial.

5       **B.      Google's Copying Was Purely And Entirely For Commercial Purposes.**

6       The Federal Circuit repeatedly found that Google copied Oracle's works purely for

7   commercial purposes. In addressing fair use, the Federal Circuit found that Google did not

8   challenge—and even conceded—that its copying was for purely commercial purposes: "Google

9   … *admittedly* copied portions of the API packages and did so for what were *purely commercial*

10  *purposes* …." *Oracle Am.*, 750 F.3d at 1376 (emphasis added). The Federal Circuit further

11  found: "[I]t is undisputed that Google's use of the API packages is commercial …." *Id.* These

12  findings are law of the case.

13      The Federal Circuit's factual findings were premised, at least in part, on judicial

14  admissions from Google before this Court and in the Federal Circuit. At oral argument in the

15  Federal Circuit, Google agreed its copying was entirely commercial:

16      JUDGE O'MALLEY: But for purpose and character, though, you don't dispute
        that it was entirely a commercial purpose.

17
        VAN NEST: No.
18

19  Oral Arg., *Oracle Am., Inc. v. Google Inc.*, Nos. 2013-1021, -1022 (Fed. Cir.) 1:02:54-1:03:00,

20  *available at* http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2013-1021.mp3; *see also* Feb.

21  24, 2016 Tr. 28:7-16 (playing this portion of the oral argument recording for the Court). This is

22  consistent with Google's statement to this Court during the trial in 2012:

23      I mean, again, the fact that it's a commercial use is not in dispute. Nobody is
        claiming that Google created Android as part of a charitable mission. The
24      evidence is pretty clear that they created it to provide a platform on which other
        Google product[s] could do better.
25

26  Tr. 1418:15-20 (Google's counsel); *see also* Oracle Op. Br., Nos. 2013-1021, -1022 (Fed. Cir.) at

27  69-70 (quoting this language to the Federal Circuit).

28      Google's statements to this Court and to the Federal Circuit during oral argument are

ORACLE'S TRIAL BRIEF
CV 10-03561 WHA

judicial admissions, *United States v. Crawford*, 372 F.3d 1048, 1055 (9th Cir. 2004) (*en banc*), and "are binding on both the parties and the court," *United States v. Davis*, 332 F.3d 1163, 1168 (9th Cir. 2003).  Accordingly, it should be deemed admitted for purposes of the second trial that Google copied Oracle's works for purely and entirely commercial purposes.

### C.   Android Competes Against Java In The Mobile Market

The Federal Circuit's factual finding that Android competes with Java in the mobile market should also be deemed admitted in the upcoming trial.  Specifically, the Federal Circuit found:  "The accused product is Android, a software platform that was designed for mobile devices and competes with Java in that market." *Oracle Am.*, 750 F.3d at 1350.  This finding is consistent with Google's judicial admission to the Supreme Court that "[t]here is no dispute that Google replicated the method headers [declaring code] that were most important for mobile devices …." Google  App. to Pet. Cert. at 31, *Google Inc. v. Oracle Am., Inc.*, No. 14-410 (U.S. Oct. 6, 2014).

### D.   Java Licensed A Derivative Version (Java ME) For Use On Mobile Devices

The Federal Circuit also found that "[t]he testimony at trial also revealed that Sun was licensing a derivative version of the Java platform for use on mobile devices: the Java Micro Edition ('Java ME').  Oracle licensed Java ME for use on feature phones and smartphones." *Oracle Am.*, 750 F.3d at 1350.  For example, Oracle presented evidence at trial that Nokia and Samsung licensed Java ME for use in smartphones.  TX 9048 (Nokia); TX 5965 (Samsung).  That Sun and Oracle licensed Java ME is law of the case and should be admitted for purposes of the second trial.  *See Alexander*, 106 F.3d at 876.

### E.   Android Is Not Compatible With The Java Platform

Google argued on appeal that the declaring code and the structure, sequence, and organization of the 37 Java APIs were not copyrightable because copying them was supposedly necessary for interoperability between Java and Android.  The Federal Circuit explained that "we find Google's interoperability argument confusing" "given the record evidence that Google designed Android so that it would *not* be compatible with the Java platform, or the JVM [Java virtual machine] specifically." *Oracle Am.*, 750 F.3d at 1371.  Indeed, the Federal Circuit found

that "it is undisputed that Android is not generally Java compatible." *Id.* at 1351.  These factual

findings by the Federal Circuit are law of the case.  Moreover, they are consistent with Google's

admission to the Supreme Court that "programs written in Java for the Java platform will not

necessarily run as intended on the Android platform."  Google App. to Pet. Cert., at 31.[2]

Accordingly, it should be admitted for purposes of the second trial that Android is not

compatible with the Java platform.

## III.   MISCELLANEOUS WITNESS AND EVIDENTIARY ISSUES

### A.   Google Witness Simon Phipps Should Be Excluded Because He Was Not Disclosed As An OpenJDK Or Open Source Witness

Oracle requests that the Court order Google to withdraw Simon Phipps from its trial

witness list.  Google disclosed Simon Phipps on its initial disclosures before the first trial as a

person knowledgeable about "[t]he patents-in-suit, the Asserted Copyrights, the Asserted Works,

Java, Android and its effects on the Java market, and issues related thereto."  Third Amended

Initial Disclosures of Google, Inc. (August 26, 2011) at 8.  Mr. Phipps was not deposed before the

previous trial and was not included in Google's trial witness list for that trial.  And in the

discovery phase of this trial, Google did not disclose Mr. Phipps as a witness for whom they

intended to expand the scope of his testimony.  Nor did Google disclose Mr. Phipps as an expert.

And now, Google apparently intends to call Mr. Phipps during this trial to discuss issues

relating to *OpenJDK*.  ECF No. 1627-1 at 8.  Google never disclosed Mr. Phipps as a potential

witness to discuss open source issues or OpenJDK; indeed Google's April 11, 2016 filing was the

first time that Google put Oracle on notice that Mr. Phipps might testify about issues relating to

open source.  (Of course, OpenJDK was never disclosed as a noninfringing alternative prior to or

during the first trial.  *See* ECF No. 1551.)  Moreover, at the time that Sun released OpenJDK, Mr.

---

[2] Google's full statement in its cert petition was as follows:  "Oracle and the Federal Circuit have emphasized that, because Google replicated the method headers from only 37 of the Java packages, programs written in Java for the Java platform will not necessarily run as intended on the Android platform.  As the district court observed, however, 'imperfect interoperability, and Oracle's angst over it,' only prove the point by 'illustrat[ing] the character of the command structure as a functional system or method of operation.'"  *Id.* (citations omitted).  Of note, *Google did not dispute* that "programs written in Java for the Java platform will not necessarily run as intended on the Android platform."

Phipps was an employee at *Sun*, and therefore has no relevant information about why *Google* rejected OpenJDK.  Because he was not adequately disclosed by Google and because Mr. Phipps' proposed testimony cannot support the counterfactual involving *Google's* choices and state of mind, Oracle requests that Mr. Phipps by precluded from testifying.

### B.       Oracle Reserves The Right To Move To Exclude Google Expert Witness Dr. Cattell Because He Has Not Yet Been Deposed

Google is producing Dr. Cattell for deposition on April 29, six weeks after the cutoff day for expert depositions, five weeks after the cutoff date for filing *Daubert* motions, two days after the final pretrial conference, and just ten days before trial.  Oracle thus reserves its right to move to exclude his report and testimony if such exclusion is warranted based on his deposition, or to supplement the responsive reports of Oracle's experts or otherwise challenge Dr. Cattell's late testimony. Oracle also reserves its right to seek to exclude Dr. Cattell's report and testimony altogether if Google cancels or further delays Dr. Cattell's April 29th deposition.

The Court-ordered deadline for expert depositions was March 16, 2016.  Originally, at Google's request, Oracle agreed to depose Dr. Cattell on April 1.  However, on March 29, Google informed Oracle that Dr. Cattell would not be able to attend his deposition due to personal circumstances.  Oracle then attempted to work with Google to reschedule the deposition.  On April 7, in view of the advancing calendar, Oracle requested a firm date for Dr. Cattell's deposition, and advised Google that if it could not get a date soon, Oracle would ask Google to withdraw his report.

On April 15, Oracle advised Google that any further delay in making Dr. Cattell available would materially interfere with Oracle's ability to prepare for trial and result in unfair prejudice.  Accordingly, Oracle requested that Google withdraw Dr. Cattell's report and withdraw him as a witness.  In response, Google finally offered Dr. Cattell for deposition on April 29.  Although this is virtually on the eve of trial when Oracle will be fully engaged in preparing for trial, Oracle has agreed to proceed with a deposition on that date.  However, Oracle reserves the right to seek to preclude Google from using Dr. Cattell's report and presenting Dr. Cattell as a witness at trial following that deposition.

1

## C.     <u>Google Is Obligated To Produce Employee Rich Miner At Trial</u>

2         Oracle requests that the Court order Google to produce Rich Miner for testimony during

3 the first phase of the trial.  Mr. Miner was a co-founder of Android Inc. and was formerly

4 involved in the development of Android at Google.  As such, he has crucial knowledge regarding

5 Google's motivations to enter the mobile phone market, Google's copying of Java APIs into

6 Android, and the value and importance of the Java APIs that Google used.  Mr. Miner also has

7 knowledge regarding Google's awareness of Sun's intellectual property rights and the need for

8 Google to obtain a license to use Java in Android, as well as Google's Java-related discussions

9 with Sun and Oracle.  Mr. Miner also was involved with, and thus has knowledge of, SavaJe.  Mr.

10 Miner is also able to authenticate certain Google documents.

11         Mr. Miner currently is a partner at Google Ventures in Cambridge, Massachusetts.

12 Because he is currently under Google's control, Google is obligated to accept a subpoena for Mr.

13 Miner and to secure his attendance at trial.  Accordingly, on March 21, Oracle requested that

14 Google accept service of a trial subpoena for Mr. Miner.  Over three weeks later, Google

15 responded on April 12 that it would not accept the subpoena.  Although the parties have

16 continued to meet and confer on this issue, Google has not provided any basis for its refusal to

17 accept service of Mr. Miner's subpoena.

18         In light of Google's unwarranted refusal, to be on the safe side Oracle also personally

19 served a subpoena on Rich Miner on April 19.  Because Mr. Miner sits on the boards of several

20 companies in the Bay Area[3] and lists San Francisco and Silicon Valley as "locations" on his

21 angel.co profile,[4] he should be required to appear for trial.  *See* Fed. R. Civ. P. 45(c).

22         Google has not alleged unfair prejudice in producing Mr. Miner at trial, and any claim of

23 prejudice is without merit.  Google was fully aware of its employee-witness Mr. Miner's relevant

24 knowledge (described above) and knew that he might be called as a trial witness.  Mr. Miner was

25 disclosed in all of Oracle's non-expert Rule 26 disclosures throughout the first trial and thus

26

27 [3] http://techcrunch.com/2015/11/09/rich-miner-of-google-ventures-on-what-alphabet-means-to-its-venture-arm-and-more/.

28 [4] https://angel.co/richminer.

ORACLE'S TRIAL BRIEF
CV 10-03561 WHA

1   incorporated into the disclosures for this trial.  He also was deposed in the first trial and was on

2   the witness list via deposition designations for the first trial.  Oracle also notified Google a month

3   ago that it intended to call Mr. Miner when it requested Google to accept a subpoena.  Mr.

4   Miner's highly relevant testimony should not be kept from the jury.

### D.     The Parties Should Stipulate To Admission Of Undisputed Evidence Establishing The Extent of Google's Copying

7   Oracle proposes that the parties stipulate to basic facts and documents showing the extent

8   of Google's copying in order to streamline the presentation of evidence at trial.  Google admits

9   that it copied the declaring code and sequence, structure, and organization ("SSO") of the 37 Java

10  API Packages at issue.  *Supra* at 3.  Nonetheless, Google has refused to stipulate to facts

11  quantifying its copying, even though Google itself has relied on those facts.

12  Oracle retained a software forensics expert, Robert Zeidman, to review Android source

13  code and identify and quantify the extent of Google's copying of Java.  To do so, Mr. Zeidman

14  compared Java SE 5, on the one hand, and 15 versions of Android, on the other.  Mr. Zeidman

15  then described his analysis in his January 8, 2016 expert report and provided exhibits (as

16  corrected on March 15, 2016) that identify the lines of declaring code Google copied.  Mr.

17  Zeidman's analysis is the only evidence quantifying Google's copying, as Google did not offer

18  any expert opinion quantifying its copying.  Rather, Google's damages expert Dr. Gregory

19  Leonard relied on Mr. Zeidman's count of the number of lines of copied declaring code, and he

20  did so without qualification or reservation.  *See* ECF No. 1563-7 (Corrected Leonard 2/8/2016

21  Expert Report ) ¶ 200.

22  In light of Google's decision not to perform its own competing quantification, and its

23  expert's reliance on Mr. Zeidman's analysis, Oracle proposes that the parties stipulate to Mr.

24  Zeidman's determination of the number of lines of declaring code from Java SE 5 copied into

25  each version of Android, as set forth in his report and the accompanying exhibits (as corrected).

26  This stipulation would eliminate the need for Oracle to offer Mr. Zeidman at trial and simplify the

27  presentation of evidence on the extent of Google's copying, saving the parties and the Court

28  precious trial time.  If Google continues to refuse to stipulate, half of the time that Mr. Zeidman is

1   on the stand for direct testimony should be credited to Google because of its expert's reliance on

2   this testimony for its own "lines of code" damages analysis.

3   **IV.     THE JURY SHOULD BE PRE-INSTRUCTED ON THE FAIR USE FACTORS**

4          Fair use is a complex issue requiring the jury to weigh a wealth of evidence in considering

5   the four fair use factors.  The Court should pre-instruct the jury as to the fair use factors by

6   reading Section 107 of the Copyright Act to the jury in its entirety before the taking of evidence.

7   This will provide jurors a framework for understanding the issues and evidence that they are

8   about to see and hear.  *See United States v. Bynum*, 566 F.2d 914, 924, n.7 (5th Cir. 1978)

9   (recognizing the "well-reasoned modern trend to give instructions outlining the issues *and the law*

10  involved prior to the taking of testimony" to "assist the jury in understanding the issues involved

11  and the application of the law") (emphasis added); *United States v. Caulder*, No. 06-10355, 2007

12  U.S. App. LEXIS 28418, at *2 (9th Cir. Dec. 4, 2007) (upholding preliminary instructions that

13  "were accurate statements of the law" and "adequate to guide the jury's deliberations"); *Cayuga*

14  *Indian Nation of N.Y. v. Pataki*, 79 F. Supp. 2d 78, 90 (N.D.N.Y 1999) (finding "ample

15  justification" in complex civil matters for "educat[ing] the jury as to the purpose of the trial …

16  through pre-trial instructions"); 32-12P MOORE'S FEDERAL PRACTICE - CIVIL ¶ 12.432 ("[j]urors

17  can deal more effectively with the evidence in a lengthy trial if they are provided with a factual

18  and legal framework to give structure to what they see and hear.")

19         Federal Rule of Civil Procedure 51 provides that the Court may instruct the jury before

20  argument, after argument or both.  Fed. R. Civ. P. 51(b)(3) (the court "may instruct the jury at any

21  time before the jury is discharged").  Thus, the Federal Rules do not preclude reading Section 107

22  to the jury before the taking of evidence in the case.  And the Ninth Circuit has approved such

23  pre-instruction so long as the jury is instructed on the same issues at the end of the case.  *Jerrold*

24  *Elecs. Corp. v. Wescoast Broad. Co.*, 341 F.2d 653, 665 (9th Cir.1965), *cert. denied*, 382 U.S.

25  817 (1965) (upholding preliminary instructions "advising the jury as to the nature of the case …

26  and of the issues" where the judge also fully instructed the jury after argument).  Here, the Court

27  also will provide detailed instructions on the fair use factors after closing arguments.

28         Reading Section 107 to the jurors will focus them on the issues relevant to fair use.  It will

1  enable them to better organize the evidence they see and hear, understand its significance to the

2  four fair use factors, and subsequently recall the evidence relevant to each factor during

3  deliberations.  *See* B. Michael Dann, *From the Bench: Free the Jury*, 23 LITIG. 5, 64 (1996)

4  ("substantive preliminary instructions improve jurors' recall, focus jurors' attention on the

5  relevant issues, reduce the chance that the jury will apply the wrong rule or standard to the

6  evidence … and assist the jurors to organize the evidence and understand its significance");

7  National Center for State Courts, *Jury Trial Innovations* 133 (G. Thomas Munsterman *et al.* eds.,

8  2d ed. 2006) ("Preinstruction helps the jury identify, recall, and evaluate the pertinent evidence"

9  and "enhances jurors' ability to remember information presented at trial . . . ."); William

10  Schwarzer, *Reforming jury trials*, 132 F.R.D. 575, 584 (1991) ("[S]ubstantive [pre]instructions

11  provide a framework which will help the jury understand the issues in the case and organize and

12  recall the evidence . . . .").[5]

13  **V.     INFRINGER'S PROFITS IS A QUESTION FOR THE JURY**

14          In its draft of the Joint Proposed Pretrial Order exchanged this week, Google claims that

15  the amount of Google's profits attributable to Google's copyright infringement is an issue for the

16  Court to decide, not the jury.  This is (1) legally wrong according to the Copyright Act, Supreme

17  Court precedent, and Ninth Circuit precedent; (2) contrary to Google's prior positions taken in

18  this case; and (3) contrary to the Court's prior order on this precise question.

19          **A.     The Copyright Act Requires Submission Of Infringer's Profits To The Jury**

20          According to 17 U.S.C. § 504(b), Oracle is entitled "to recover the actual damages

21  suffered by [it] as a result of the infringement, and any profits of [Google] that are attributable to

---

[5] In view of the benefits of pre-instruction, the American Bar Association advises that judges give preliminary instructions on basic relevant legal principles, among other things.  Am. Jury Project, *Am. Bar Ass'n, Principles for Juries and Jury Trials* Principal. 6.C.1 (2005).  The benefits of pre-instruction have been confirmed by empirical research.  A field experiment conducted in 34 civil trials in Wisconsin circuit courts concluded that preliminary instructions "assist the jurors with following legal guidelines in their decision making and would increase the jurors' satisfaction with the trial process."  Larry Heuer & Steven D. Penrod, *Instructing Jurors: A Field Experiment with Written and Preliminary Instructions,* 13 LAW & HUM. BEHAV. 409, 409 (1989).  A Second Circuit study likewise reported "increased juror attentiveness" during the proceeding due to clarification of both the jury's function and of the important issues at trial.  Committee on Juries of the Judicial Council of the Second Circuit, *A Report on Seven Experiments Conducted by District Court Judges in the Second Circuit,* 60 N.Y.U. L. REV. 423, 442 (1985).

1    the infringement and are not taken into account in computing the actual damages."  This

2    language, as well as the surrounding language of the Copyright Act, requires that a jury decide

3    the question of infringer's profits.

4         In *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998), the Supreme Court

5    considered whether the Copyright Act provides a jury trial for statutory damages awardable under

6    Section 504(c).  The Court concluded there was no statutory right to a jury trial for statutory

7    damages because Section 504(c) refers to the "court" as the actor providing that remedy.  *Id.* at

8    345-47.  In so deciding, the Court compared Section 504(c) with Section 504(b)—at issue here—

9    noting the significance of the absence of the words "the court" in 504(b):  "In contrast, the

10   Copyright Act does not use the term 'court' in the subsection addressing awards of actual

11   damages and profits, see § 504(b), which generally are thought to constitute legal relief."  *Id.* at

12   346.  Because "[t]he word 'court' in this context appears to mean judge, not jury[,]" *id.*, it was

13   "not possible" to construe Section 504(c) to require a jury trial on statutory damages.  *Id.* at 345;

14   *but cf. id.* at 355 (instead finding a *constitutional* right to a jury trial for statutory damages).

15        Here, we have the opposite situation.  Because Congress did not use the word "court" in

16   Section 504(b), Congress intended the jury to decide the remedies in Section 504(b), not the

17   judge.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses

18   certain language in one part of the statute and different language in another, the court assumes

19   different meanings were intended.").  In fact, Section 504(b) is the only civil remedy provision in

20   the Copyright Act that does not use the word "court."  *See Feltner*, 523 U.S. at 346.  Reading the

21   remedial provisions of the Copyright Act as a whole, it is therefore apparent that Section 504(b)

22   presents questions for the jury.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120,

23   133 (2000) ("It is a 'fundamental canon of statutory construction that the words of a statute must

24   be read in their context and with a view to their place in the overall statutory scheme.'").

25        Moreover, Section 504(b) explicitly requires that "profits of the infringer" be decided in

26   conjunction with "actual damages":

27                The copyright owner is entitled to recover the actual damages
                 suffered by him or her as a result of the infringement, and any
28

1

2

> profits of the infringer that are attributable to the infringement and
> are not taken into account in computing the actual damages.

3

Actual damages, such as "money damages[,] are, of course, the classic form of *legal* relief"

4

determined by the jury.  *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).

5

Section 504(b)'s explicit requirement that the actual damages and infringer's profits calculations

6

not result in duplication confirms the statutory right to a jury trial.

7

Indeed, it would not make sense to combine a jury remedy and a court remedy in a set of

8

interdependent calculations.  Once a jury determines actual damages, it may be impossible for the

9

court to later determine what aspects of infringer's profits the jury took into account in its

10

calculation.  This is especially so in this case, where some amount of the actual losses suffered

11

and the infringer's profits sought necessarily overlap.  For example, one area of damages that

12

Oracle suffered as a result of Google's infringement is harm to Oracle's ability to enter the

13

market with its own Java-based smartphone, named Project Acadia.  Oracle's damages expert

14

James Malackowski has opined that "[h]ad Google been delayed for a significant period in its

15

entry to market by having to develop its own APIs rather than using the 37 Java APIs from the

16

Java Copyrights, it is possible that Acadia could have captured the Java-based smartphone field."

17

ECF No. 1560-12 (Corrected 1/8/2016 Malackowski Expert Report) ¶ 216.  Given that fact,

18

according to Mr. Malackowski:

19

20

21

22

23

> Sun and later Oracle's actual losses attributable to the lost Acadia
> opportunity could be quite significant, and, potentially best
> measured by the apportioned Android profits attributable to the
> Infringed Java Copyrights.  In other words, Google's Android-
> related profits represent, in some part, Sun and Oracle's inability to
> pursue the exact same market opportunity for a Linux/Java SE
> based smartphone because Google was competing against them
> using their own Java Copyrights.

24

*Id.* ¶ 217.  Given this potentially significant overlap, it would be very difficult, if at all possible,

25

for two different decision makers to calculate damages in this case.

26

The statute thus requires the same decision maker who calculates actual damages—the

27

28

jury—to determine infringer's profits.[6]  In light of *Feltner*, juries have decided the question of infringer's profits in every regional circuit in the country,[7] and the Ninth Circuit Manual of Model Jury Instructions provides a model instruction regarding infringer's profits under 17 U.S.C. § 504(b).  17.33 Copyright—Damages—Defendant's Profits (17 U.S.C. § 504(b)).

### B.   The Seventh Amendment Also Requires Submission Of Infringer's Profits To The Jury

The Seventh Amendment also requires that the jury determine infringer's profits.  The Seventh Amendment provides:  "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."  U.S. Const. amend. VII.  The jury right applies "not only to common-law causes of action, but also to actions brought to enforce statutory rights that are analogous to common-law causes of action ordinarily decided in English law courts in the late 18th century, as opposed to those customarily heard by courts of equity or admiralty."  *Feltner*, 523 U.S. at 348 (quotation marks omitted).  "To determine whether a statutory action is more analogous to cases tried in courts of law than to suits tried in courts of equity or admiralty, . . . [a court must] examine both the nature of the statutory action and the remedy sought."  *Id.*

Infringer's profits have a "protean character."  *Petrella v. MGM, Inc.*, 134 S. Ct. 1962, 1967 n.1 (2014).  "[R]ecovery of profits is not easily characterized as legal or equitable," because "it is an amalgamation of rights and remedies drawn from both systems."  *Id.* (quotation marks

---

[6] Interpreting the Copyright Act as providing for a jury trial for infringer's profits is the best reading of the statute, but it does not even need to be.  To avoid a "constitutional question," a jury trial is provided for by statute if it is "fairly possible" to read the statute to permit a jury trial. *Feltner*, 523 U.S. at 345.  Interpreting the Copyright Act to provide a jury trial for infringer's profits easily satisfies that low bar.

[7] *See, e.g.*, *Balsley v. LFP, Inc.*, 691 F.3d 747, 771 (6th Cir. 2012); *William A. Graham Co. v. Haughey*, 646 F.3d 138, 141 (3d Cir. 2011); *Bonner v. Dawson*, 404 F.3d 290, 291 (4th Cir. 2005); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 703 (9th Cir. 2004); *Telecom Tech. Servs. Inc. v. Rolm Co.*, 388 F.3d 820, 830 (11th Cir. 2004); *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 565-69 (7th Cir. 2003); *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 792 (8th Cir. 2003); *Montgomery v. Noga*, 168 F.3d 1282, 1293 (11th Cir. 1999); *Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96, 103 (D.C. Cir. 1998); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1170 (1st Cir. 1994), *abrogated by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010); *Harris Mkt. Research v. Marshall Mktg. & Commc'ns, Inc.*, 948 F.2d 1518, 1524 (10th Cir. 1991); *Gaste v. Kaiserman*, 863 F.2d 1061, 1069 (2d Cir. 1988); *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1375 (5th Cir. 1981).

1    omitted).  But, in all events, when addressing the question of whether a jury trial right exists, the

2    Supreme Court has made clear that it considers profits "legal relief."  *Feltner*, 523 U.S. at 346;

3    *see also id.* at 349 ("Actions seeking damages for infringement of common-law copyright, like

4    actions seeking damages for invasions of other property rights, were tried in courts of law …

5    before juries.") (citations omitted); *Baily v. Taylor*, 1 Russ. & M. 73, 74 (noting that an award of

6    profits for infringement has long been considered a question of damages sounding in law);

7    Restitution and Unjust Enrichment § 4, Comment c (2010) ("The most widespread error is the

8    assertion that a claim in restitution or unjust enrichment is by its nature equitable rather than

9    legal.  From this false premise a court may conclude[] . . . that there is no right to jury trial of a

10   particular issue . . . .").

11        The Ninth Circuit gave the same answer to the question even before *Feltner* in *Sid &*

12   *Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1175 (9th Cir. 1977).

13   *Krofft* applied to copyright the Supreme Court's determination in *Dairy Queen, Inc. v. Wood*, 369

14   U.S. 469 (1962) that a claim for infringer's profits in a trademark matter is a legal claim

15   warranting a jury trial.  The *Krofft* court explained that while the infringer's profits remedy is "a

16   creature of equity," its equitable aspects are derived from "a rule of administration and not of

17   jurisdiction."  *Id.*  "The court of equity awarded compensatory damages incidental to an

18   injunction to avoid multiplicity of suits and not because the jury lacked competence."  *Id.*  In

19   other words, "equity courts had no jurisdiction over a claim for defendant's profits unless

20   jurisdiction was independently established[.]"  6 William F. Patry, Patry on Copyright § 22:149

21   (2015).  Thus, "'[t]o continue the past practice is to convert an administrative rule into an

22   jurisdictional one so as to deprive the parties of a jury on what is basically a money claim for

23   damages based on a charge of . . . infringement.'"  *Sid & Marty*, 562 F.2d at 1175.  Accordingly,

24   the Ninth Circuit concluded there is "a right to a jury trial" for infringer's profits under the

25   Seventh Amendment.  *Id.*; *see also Swofford v. B & W, Inc.*, 336 F.2d 406, 410-11 (5th Cir. 1964)

26   (finding a constitutional right to a jury for infringer's profits); Patry on Copyright § 22:149

27   (recognizing this same constitutional right).  This conclusion makes particular sense given that

28   "federal policy favoring jury trials is of historic and continuing strength."  *Simler v. Conner*, 372

1   U.S. 221, 222 (1963) (collecting cases).

2       **C.**    **Submission Of Infringer's Profits To The Jury Is Particularly Appropriate In**
          **This Case**

3

4         Even if this Court were to look beyond *Feltner* and *Sid & Marty*, it would find that the

5   circumstances of this case make it particularly appropriate for infringer's profits to go to the jury.

6   In determining whether a remedy is legal or equitable, courts look to the underlying rationale and

7   circumstances in the particular case.  The "purposes traditionally associated with legal relief" are

8   "compensation and punishment."  *Feltner*, 523 U.S. at 352.  By contrast, restitution may be

9   equitable when it is used to ensure that "wrongdoers" cannot benefit from their "ill-gotten gains."

10  *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1233 (9th Cir. 2008).

11        The Ninth Circuit recognizes that the purposes may be mixed when an "infringer's profits

12  is aimed in part at deterring infringements, and in part at appropriately compensating the

13  copyright holder."  *Kamar Int'l, Inc. v. Russ Berrie & Co.*, 752 F.2d 1326, 1332 (9th Cir. 1984)

14  (internal citation omitted); *accord Frank Music Corp. v. MGM Inc.*, 886 F.2d 1545, 1552 (9th

15  Cir. 1989) ("Profits are awarded to the plaintiff not only to compensate for the plaintiff's injury,

16  but also and primarily to prevent the defendant from being unjustly enriched by its infringing use

17  of the plaintiff's property.").  "Whether a profits remedy is more legal than equitable in nature

18  depends on which of these theories provides the basis for the requested profits award."  *Daisy*

19  *Grp., Ltd. v. Newport News, Inc.*, 999 F. Supp. 548, 552 (S.D.N.Y. 1998).  The *sine qua non* of

20  whether a compensatory damages rationale applies to a request for profits is whether the

21  copyrighted work and the accused infringing work compete with one another:  "In the case where

22  there is direct competition between the parties, … an accounting of profits [is] based on the

23  rationale of a returning or diverted profits."  *Maier Brewing Co. v. Fleischmann Distilling Corp.*,

24  390 F.2d 117, 123 (9th Cir. 1968).  Where there is "no direct competition … an accounting of

25  profits [is] based on unjust enrichment rationale."  *Id.*

26        In this case, Oracle's request for infringer's profits is compensatory in nature.  The Java

27  platform and Android directly compete as application development frameworks, including for

28  mobile and embedded devices.  *Oracle Am., Inc.*, 750 F.3d at 1350.  Oracle exploits the Java

1  platform, both directly and indirectly, by using it in its own products and by licensing it to others.

2  Google likewise exploits Android, both directly and indirectly, by using it in its own products and

3  by licensing it to others.  And Android's existence in the market has devastated Oracle's licensing

4  revenues in the same market—a market in which Java used to dominate.  Android's gain has been

5  Java's loss.

6       Thus, because Google's Android-related profits represent compensation for Oracle's

7  losses due to Google's infringement, they are legal in nature and should be presented to a jury.

8      **D.**    **Google Has Previously Conceded That Infringer's Profits Is A Question For The Jury**

9

10       Throughout this case, beginning before the first trial, Google has conceded that infringer's

11  profits is a question for the jury.  *See* ECF No. 523 (Parties' Joint Proposed Pretrial Order) at 23

12  (classifying as a factual issue "[t]he amount of Google's profits attributable to its copyright

13  infringement, to the extent not accounted for in the actual damages"); ECF No. 525 (Parties'

14  Corrected Joint Proposed Pretrial Order) at 24 (same); ECF No. 539 (Joint Proposed Jury

15  Instructions) at 156 (Google proposing a jury instruction for infringer's profits); ECF No. 1284 at

16  1 ("The only issues left for the jury to decide in this case will be whether Google's use of the

17  declarations and the structure, sequence, and organization ("SSO") of the 37 Java API packages is

18  a fair use, and, if not, the amount of Oracle's actual damages ***and Google's profits attributable to***

19  ***the alleged infringement under 17 U.S.C. § 504(b)***.") (emphasis added); ECF No. 1302 at 2

20  ("[A] willfulness phase is unlikely to be necessary because Oracle almost certainly will not elect

21  to recover statutory damages ***after the jury has resolved the liability, actual damages, and***

22  ***disgorgement of profits issues***.") (emphasis added).  As explained in more detail in the next

23  section, Google has raised the opposite argument only once before now, lost that argument, and

24  later waived opportunities to raise the argument again.  Google is even proposing jury instructions

25  on infringer's profits in the jury instructions that the parties are submitting concurrent with this

26  filing.[8]  Google's time to argue that infringer's profits is not a jury question has passed.

27

28  [8] The parties exchanged proposed jury instructions, including proposed jury instructions on infringer's profits, on Friday, April 15, 2016, and met and conferred on Monday, April 18, 2016.  Google also sent additional proposed instructions on the evening of Monday, April 18,

ORACLE'S TRIAL BRIEF
CV 10-03561 WHA

1

**E.**     **This Court Has Ordered That Infringer's Profits Will Be Tried To The Jury**

2

On July 31, 2015, after Google argued at a case management conference that the issue of

3

willfulness should not be tried to the jury, the Court ordered Google to file a formal motion on

4

that point.  The parties briefed that motion in August 2015.  Central to Oracle's opposition was an

5

argument that infringer's profits is a question for the jury.  ECF No. 1299 at 7-10.  Because

6

willfulness is relevant to the calculation of infringer's profits, Oracle reasoned, willfulness should

7

go to the jury along with infringer's profits.  *Id.* at 10-17.

8

In its reply, Google for the first time took the position that infringer's profits is *not* a

9

question for the jury.  Google argued that Oracle does not have a right to a jury trial on its claim

10

for disgorgement of profits, and "welcome[d] the opportunity to brief this issue in full as part of a

11

separate motion, if and when the Court desires."  ECF No. 1302 at 14.

12

The Court did not order further briefing.  Instead, the Court heard the matter on September

13

17, 2015, and issued an Order on September 18, 2015.  In its Order re Willfulness and

14

Bifurcation, ECF No. 1321, the Court made clear that the jury would decide the question of

15

infringer's profits in this matter:

16

> [T]he issues of damages and willfulness will be presented to the
> jury only if the jury rejects the fair use defense.  If the jury sustains

17

> Google's fair use defense, we will all be saved the burden of sorting
> through Oracle's multiple and complicated damage theories.  If the

18

> defense is rejected, the same jury will hear the damages evidence
> for both brands of damages [§ 504(b) and (c)] and any further

19

> willfulness evidence not previously presented.  The jury will then
> make a finding on willfulness and render a verdict on *both* damages

20

> possibilities.

21

 *Id.* at 13 (emphasis in original).

22

On February 8, 2016, the Court reiterated that infringer's profits is a question for the jury

23

in its Tentative Trial Plan.  *See* ECF No. 1488.  The Court proposed that "willfulness and

24

damages" be tried to the jury in Phase Two of the case, with "equitable defenses" to follow in

25

Phase Three.  *Id.* at 3.  The Court invited the parties to critique its Tentative Trial Plan, thus

26

2016.  At no point did Google assert that infringer's profits is a matter to be decided by the Court

27

rather than the jury.  It was only today, on April 20, 2016, that Google's proposed jury
instructions include a "note" that its proposed *jury* instructions are "without prejudice" to the

28

position that infringer's profits "should be determined by the Court rather than a jury."

ORACLE'S TRIAL BRIEF
CV 10-03561 WHA

1    giving Google a clear opportunity to argue that infringer's profits is not a question for the jury.

2    *Id.* at 1.  While Google did submit a critique of the Court's Tentative Trial Plan, that critique

3    made no mention of whether infringer's profits should be tried to the jury.  *See* ECF No. 1505.

4    Google again waived any such argument.  Google's current position is thus a belated attempt to

5    re-litigate a question that the Court has already decided and that Google has already conceded.

6    **VI.    ORACLE IS ENTITLED TO PREJUDGMENT INTEREST**

7            Following trial, Oracle will move for an award of prejudgment interest from the time

8    Google's infringement began through the entry of judgment.  *See* ECF 36 (Amend. Compl.) at 11;

9    ECF 1292 (Supp. Compl.) at 6-7; *Polar Bear*, 384 F.3d at 716 ("prejudgment interest is available

10   under the Copyright Act of 1976.").  Because "an award of profits or damages under the … Act

11   will not necessarily be adequate to compensate a prevailing copyright owner …. prejudgment

12   interest ordinarily should be awarded." *Frank Music Corp.*, 886 F.2d at 1552; *accord Gaylord v.*

13   *United States*, 678 F.3d 1339, 1345 (Fed. Cir. 2012) (vacating denial of prejudgment interest

14   because copyright holders are "entitled to prejudgment interest because it is necessary to make []

15   compensation complete.").  Prejudgment interest may be awarded for actual damages, infringer's

16   profits, and statutory damages.  *See, e.g.*, *Polar Bear*, 384 F.3d at 718 ("the statutory availability

17   of both remedies [of actual damages and infringer's profits] does not mitigate harm caused by

18   delay in making reparations—a harm the remedy of prejudgment interest is uniquely tailored to

19   address."); *id.* at 717 n. 14 (noting that prejudgment interest is awarded "regardless of whether the

20   underlying award is comprised of statutory damages or actual damages plus profits attributable to

21   the infringement." (collecting authority)).

22           "[P]rejudgment interest may be necessary to discourage needless delay and compensate

23   the copyright holder for the time it is deprived of lost profits or license fees." *Polar Bear*, 384

24   F.3d at 718.  Oracle proved at the first trial, and Google does not contest, that it knowingly copied

25   the declaring code and structure, sequence, and organization of the 37 Java API packages into

26   Android.  *See*, *e.g.*, ECF 1018 (Final Jury Charge) Instr. No. 19.  The evidence also shows that

27   Google copied and used Oracle's Java APIs fully aware that the "Java.lang apis are copyrighted."

28   TX 18 (Mar. 24, 2006 A. Rubin email); *see also*, ECF 1312 at 1 (summarizing evidence that

1    Google knew the Java API packages were copyrighted).  Google also know that because the APIs

2    were copyrighted, a license was necessary.  Trial Tr. 970:21-971:6; *see also*, ECF 1312 at 1-6

3    (summarizing evidence that Google new it needed a license).  Despite knowing all along that it

4    needed a license in order to use the Java API packages, Google elected to resist taking a license

5    and paying Oracle *anything* for nearly 10 years, over 5 of which have been in litigation.  Indeed,

6    Google resisted even though it knew it faced a potential lawsuit from Sun.  Tr. 1559:21-23

7    ("Google was sufficiently worried about being sued that it thought about buying all the rights to

8    Java."); TX 406 ("[B]uying the full rights to Java from Sun" would "solve all of these lawsuits

9    we're facing").  Oracle is entitled to prejudgment interest to compensate it for the time-value of

10   money lost due to Google's delay in payment and "the possibility that it would get stiffed[.]"  *See*

11   *Open Text S.A. v. Box, Inc.*, No. 13–cv–04910–JD, 2015 WL 4940798, at *11 (N.D. Cal. Aug. 19,

12   2015); *United States v. Pend Oreille Cty. Pub. Util. Dist. No. 1*, 135 F.3d 602, 613 (9th Cir. 1998)

13   ("[M]oney has a time value, and prejudgment interest is therefore necessary in the ordinary case

14   to compensate a plaintiff . . . ." (quotation omitted)).

15        Oracle is entitled to prejudgment interest accruing from the date of Google's first

16   infringement, November 12, 2007, through entry of final judgment in this case.  *See West Va. v.*

17   *U.S.*, 479 U.S. 305, 310 n.2 (1987) ("Prejudgment interest serves to compensate for the loss of

18   use of money due as damages from the time the claim accrues until judgment is entered, thereby

19   achieving full compensation for the injury those damages are intended to redress.").  A copyright

20   claim accrues "when an act of infringement occurs."  *L.A. News Serv. v. Reuters Television Int'l,*

21   *Ltd.*, 149 F.3d 987, 992 (9th Cir. 1998).  Oracle proved at the first trial, and will prove at the

22   retrial, that Google announced Android on November 5, 2007, and released the Android SDK

23   (Software Development Kit) on November 12, 2007.  ECF No. 1079 (Google's Resp. to Oracle's

24   Prop. Findings & Conc. of Law) ¶ 71; *accord* Tr. 1041:14-20 (Morrill); Tr. 1702:22-1703:25

25   (Rubin).  And Oracle will prove at the second trial that it is entitled to the profit that Google

26   earned attributable to its infringement beginning in 2008.  ECF No. 1560-12 (Corrected 1/8/2016

27   Malackowski   Expert Report) ¶¶ 294, 315.

28        No federal statute sets a prejudgment interest rate.  *See Price v. Stevedoring Servs. of Am.,*

*Inc.*, 697 F.3d 820, 840 (9th Cir. 2012) (rejecting use of post-judgment rate set by 28 U.S.C. § 1961 for prejudgment interest because "simple interest at the Treasury bond rate is inadequate alone to compensate parties for the decrease in a judgment's value over time").  "Courts often use an index, such as the prime rate, to calculate prejudgment interest, but this is largely a matter of convenience, as 'a more precise estimate would be the interest rate paid by the defendant for unsecured loans[.]'"  *Open Text*, 2015 WL 4940798 at *12 (quoting *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 437 (7th Cir. 1989)) (internal citations omitted); *see also Blankenship v. Liberty Life Assurance Co. of Bos.*, 486 F.3d 620, 628 (9th Cir. 2007) (affirming 10.1% prejudgment interest rate compounded monthly based on mutual fund returns where funds recovered in lawsuit would have been invested).  The prime rate applicable to short term business bank loans published by the Federal Reserve was at 3.25% from November 2007 until it increased to 3.5% in recent months.[9]  The "more precise estimate" of what Google pays for long-term unsecured loans is the coupon rate of 10-year corporate bonds Google sold in the spring of 2011 (the middle of the relevant period), which was 3.625% with semi-annual payments.  Google 2012 10-K, p. 44.[10]  Because Google has paid nothing to date, it is appropriate for interest to compound on the same semi-annual schedule.  *See Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1580 (Fed. Cir. 1988) (affirming award of prejudgment interest compounded quarterly); *Blankenship*, 486 F.3d at 628 (compounding monthly).

## VII.   GOOGLE'S EQUITABLE DEFENSES OF LACHES AND ESTOPPEL FAIL

### A.   Introduction

Google asserts equitable defenses of laches and equitable estoppel, on which Google bears the burden of proof.  Those defenses fail because Google has not and cannot adduce evidence sufficient to satisfy each element of each defense.  Moreover, each defense fails because the undisputed evidence disproves at least one required element of each defense.  Oracle describes in detail below why Google's defenses of laches and equitable estoppel fail.  However, Oracle is prepared to provide additional briefing on these issues before they are tried in the third phase if

---

[9] https://www.federalreserve.gov/releases/h15/data.htm.

[10] https://www.sec.gov/Archives/edgar/data/1288776/000119312513028362/d452134d10k.htm.

1    the Court prefers.

2         Laches may only apply if the plaintiff delays for such an unreasonable length of time that

3    it causes the defendant prejudice.  Google's defense fails principally because Oracle did not

4    delay:  Oracle brought suit within three years of the public release of Android's infringing soft-

5    ware, and laches does not apply when the defendant's infringement occurred within the Copyright

6    Act's three-year statute of limitations.  Also, it is undisputed that prior to filing suit, Oracle con-

7    tinued to negotiate with Google to resolve the dispute and convince Google to take a license.  For

8    its part, Google itself caused delay by stalling and attempting to conceal its infringement by

9    ordering its employees not to demonstrate Android to Oracle employees and lawyers.  Finally,

10   any supposed delay had no effect on Google's behavior, as evidenced by Google's continued

11   copying after the suit was filed.  Business necessity—not delay in litigation—led Google to copy,

12   and Google made the "final" decision to copy fully aware that it risked facing a lawsuit.

13   Google's laches defense fails, and, independently, Google's willfulness makes it ineligible to

14   even raise such a defense.

15        Google's equitable estoppel defense fails for similar reasons.  Google must prove Oracle

16   knew of Google's infringement, Oracle took steps intended to convey that it assented to the

17   infringement, Google was ignorant of Oracle's objection, and Google relied on Oracle's state-

18   ments and conduct to Google's detriment.  Google cannot meet its burden.  There is no evidence

19   that Google thought Oracle approved of its copying or that Google relied on any such approval.

20   Instead, the undisputed facts show Google knew of Oracle's copyrights and was a party to

21   lengthy licensing negotiations.  But Google had already decided for business reasons that it was

22   going to use the Java platform, with or without Oracle's permission, because copying Java

23   satisfied Google's most critical objective:  getting Android to market ASAP.  So, when the

24   negotiations for the license Google knew it needed failed, Google copied anyway, knowing

25   Oracle's work was copyrighted and Oracle would object.  Though Google now claims it believed

26   Oracle approved of the copying, the contemporaneous evidence disproves Google's *ex post*,

27   lawyer-driven argument.  Google actively tried to hide its infringement, undercutting any claim

28   that it believed Oracle had consented.  And Google's privilege log is full of documents withheld

1 on grounds that Google was anticipating litigation with Sun/Oracle.  Finally, like laches,

2 Google's willful conduct bars it from raising estoppel.

3  **B.**  **Background**

4    **1.**  <u>**Advent Of Mobile Computing Posed A Threat To Google**</u>

5    Google built its business around consumers searching the internet from their personal

6 computers.  TX 3215 at 4.  By 2005, however, Google faced a threat.  As Google's 10-K at the

7 end of 2005 reported:  Consumers were increasingly searching the internet from mobile devices,

8 not PCs, and Google's products were not optimized for mobile search.  *Id.* at 65.  Google was

9 desperate.  Without quick action, Google would "fail to capture significant share of an increas-

10 ingly important portion of the market for online services."  *Id.*  As Google later recognized:  "[I]f

11 we miss the 'mobile window,' we'll be out of business in 10 years."  TX 370 at 1.

12    To ensure consumers continued to use Google's products, Google set out to "build[] an

13 Open Source handset solution with built-in Google applications," TX 158 at 3, and to work with

14 wireless carriers and manufacturers to incorporate a Google mobile operating system into handset

15 designs, TX 1 at 5.  But, as Google's 10-K observed, this had to be done quickly or Google's

16 business would be in jeopardy.  TX 3215 at 65.

17    **2.**  <u>**Google Chose Java To Speed Its Entry Into The Mobile Market**</u>

18    Google's solution to get into the mobile market as quickly as possible was Java.  Google

19 knew that "Java dominate[d] [the] wireless industry," TX 15 at 7, and that there were already

20 "6M Java developers worldwide."  TX 158 at 10.  By incorporating the Java platform into

21 Google's Android operating system, Android would "enable all [those] Java developers to quick-

22 ly leverage their skills to build great Android apps," TX 238 at 1, allowing Google to "leverage

23 not only existing developers, but applications as well" for Android, TX 21.  By tapping into the

24 community of Java programs and programmers, Google could "[d]ramatically accelerate[] [its]

25 schedule."  TX 22 at 5; *see* TX 151 at 2 ("goal" of Android project is "quick time to market").

26    But there was a catch:  Google knew that the Java "apis are copyrighted," TX 18, and that

27 it "[m]ust take [a] license from Sun."  TX 1 at 9.  Google approached Sun about a license, but the

28 license Google wanted would have required Sun to "throw away their standing license … and . . .

1  develop a new license that was specifically what [Google] was asking for."  Tr. 1606:15-17.

2  When it appeared to Google that the parties might not be able to reach an agreement, Android's

3  Chief Andy Rubin sent an email to his boss summarizing Google's predicament:  "If Sun doesn't

4  want to work with us, we have two options:  1) Abandon our work … -or- 2) Do Java anyway and

5  defend our decision, perhaps making enemies along the way."  TX 7 at 2.  Google chose option 2:

6  It copied thousands of lines of Oracle's computer code as well as the structure, sequence, and

7  organization of the 37 Java API packages into Android.  ECF No. 1089 (Verdict) at 1; ECF No.

8  1202 (Copyright Order) at 7.

9          **3.**      **Google Released Android While Knowing That It Needed A License**

10        Google announced its Android operating system on November 5, 2007.  ECF No. 1079

11  (Google's Resp. to Oracle's Prop. Findings & Conc. of Law) ¶ 116; Tr. 1546:5-7.  Google

12  released the Android SDK (Software Development Kit), which, for the first time, identified some

13  of the Android APIs on November 12, 2007.  ECF No. 1079 (Google's Resp. to Oracle's Prop.

14  Findings & Conc. of Law) ¶ 93; *accord* Tr. 1041:14-20 (Morrill); Tr. 1702:22-1703:25 (Rubin).

15  Google did not release Android commercially until September, 23, 2008 and did not publically

16  release the full source code for the Android platform until October 21, 2008.[11]  Tr. 1719:10-14

17  (Rubin).

18        On November 5, 2007, the day of the general Android announcement, Sun's then-CEO

19  Jonathan Schwartz took to his blog to offer "congratulations to Google on the announcement of

20  … Android."  TX 2352.  At the time, Sun did not know what Google had done or was planning to

21  do and considered enlisting "the press to ask Google if their platform will be compliant with the

22  Java specification."  TX 1055.  As internal Sun correspondence before the Android release re-

23  vealed, Sun was still wondering "[i]f Google is still using Java in [its mobile platform]."  TX 565.

24  Sun internally strategized:  (1) If Android used the Java platform, "then they have to come for a

25  license with us - and will need to be compatible"; (2) If Google "decide[d] to go the non-

26  compliant, non-licensed route - then we will need to go deal with them or their handset vendor for

27

28  [11] As described in detail below, the commercial release date is the most probative because until then Sun did not know whether Google was going to take a license.  *Infra* at 28.

- 23 -

1   IP issues"; or (3) If Google took an open source license, then "we will have to wait and see if they

2   are following all [the] GPL [General Public License] rules." *Id.* at 2-3.

3        Sun did not know what Google was doing.  Even before Google announced Android in

4   November 2007, Google knew that Sun "won't be happy when we release our stuff," TX 207, and

5   "believe[d] [that] Sun is planning to come after us," GOOGLE-25-00045581.  Rubin emailed

6   Google's public relations people to tell them that because of a "really important … legal issue"

7   "only authorized speakers [can] speak to the press" about Android.  TX 382.  An order was also

8   sent down the chain of command at Google to the Google personnel running the Android booth at

9   JavaOne:  "[D]ont [sic] demonstrate to any [S]un *employees or lawyers*," "know exactly who you

10  are talking to," and "answer direct developer questions about Android … [o]ne-on-one, only."

11  TX 29 (emphasis added).

12       On September 23, 2008, Google released Android commercially, TX 2912, and, the next

13  month, Google publicly released the full Android source code, Tr. 1719:10-14 (Rubin).  Soon

14  thereafter, Sun asked Google to "certify Android through the Java process and become licensees

15  of Java," and Google "made the decision to say no."  TX 1002.

16       Negotiations between the two parties continued into the next year.  Sun told Google that it

17  "would be very interested" in providing more Java support but that Google would have to remedy

18  that Google has "no commercial use license" for Android.  Tr. 1073:6-9.  Google told Sun that

19  Google did not "need a commercial use license," Tr. 1073:11-12, while internally Google

20  recognized it needed a license, TX 1, TX 10.  "Google was sufficiently worried about being sued

21  that it thought about buying all the rights to Java."  Tr. 1559:20-23; *see also* TX 406 ("[B]uying

22  the full rights to Java from Sun" would "solve all of these lawsuits we're facing").

23                    **4.    Oracle Acquired Sun, Tried To Negotiate A License, And Was Forced
                             To Sue**

24

25       In January 2010, Oracle Corporation acquired Sun, and Sun became Oracle America, Inc.

26  ECF No. 525 (Stipulations) at 8 (¶ 3).  Throughout the first half of 2010, Oracle's then-President

27  Safra Catz and then-Executive Vice President for Software Development Thomas Kurian met

28  with Google to persuade Google to take a license, Tr. 391:15-395:1, 1711:12-13, 2309:22-2310:2,

1   but to no avail, TX 1074; Tr. 2315:4-21.  Several "more conversations between executives"

2   occurred, Tr. 2316:19-23, including at the highest levels, between Oracle's and Google's then-

3   CEOs, Tr. 304:23-305:8, but the parties could not reach an agreement.

4        Unable to come to a business resolution, Oracle filed this suit on August 12, 2010, alleg-

5   ing that Google infringed Oracle's copyrights and patents in the Java platform.  ECF 1 (Compl.).

6   Since then, Google's copying has continued unabated.  Since August 2010, Google has released

7   seven new major Android versions.  The parties agree that these new versions of Android

8   continue to copy the declaring code and the structure, sequence, and organization of 37 of

9   Oracle's Java API packages.  *See* Google's First Suppl. Resp. & Objs. to Oracle's Requests for

10  Admission, Nos. 246-52, 256-62; C. Anderson Proposed Stip. Lang., Oct. 4, 2015.

11               **5.      Procedural History**

12       This case proceeded to trial before a jury and the Court in April 2012 on Oracle's claims

13  of patent and copyright infringement and Google's equitable and fair use defenses.  On the

14  copyright claims, the jury and the Court found (and Google concedes) Google copied the

15  declaring code and the structure, sequence, and organization of the 37 Java API packages.  ECF

16  No. 1089 (Jury Verdict) at 1; ECF No. 1202 (Copyrightability Order) at 7; ECF No. 1018 (Final

17  Jury Instrs.) ¶ 19 (Google agreeing in jury instructions that the declaring code and structure,

18  sequence, and organization in Android is the same as in the Java platform).  The jury hung on

19  Google's defense of fair use.  ECF No. 1089 (Jury Verdict) at 1.

20       Google's defenses of implied license, waiver, laches, and equitable estoppel were tried to

21  the Court, with the jury asked to render an advisory verdict on elements of Google's equitable

22  estoppel defense.  The jury found that even if "Sun and/or Oracle engaged in conduct Sun and/or

23  Oracle knew or should have known would reasonably lead Google to believe it would not need a

24  license," Google had failed to "prove[] that it in fact reasonably relied on any statements from

25  Sun and Oracle in deciding to use" Oracle's work "without obtaining a license."  ECF No. 1089

26  (Special Verdict) at 3.  Post-trial, the Court rejected Google's implied license defense because

27  Google failed to meet its burden of showing that Oracle and/or Sun had "specifically and affirma-

28  tively grant[ed] permission to Google" to copy the Java platform, particularly in light of a lengthy

1    negotiation "for a real license" where "no license was given." ECF No. 1203 at 2.  The Court

2    rejected Google's waiver defense because "Google had not met its burden of proving an overt act

3    by Oracle and/or Sun indicating its intention to abandon all rights to the Java platform."  *Id.* at 3.

4         Notwithstanding the advisory verdict, the Court did not resolve Google's laches and equit-

5    able estoppel defenses, concluding instead that those defenses were "moot," *id.* at 3, in light of

6    the Court's order that the elements of the Java platform that Google copied were not copyright-

7    able.  ECF No. 1202 (Copyrightability Order).  On appeal, the Federal Circuit held that "the

8    declaring code and the structure, sequence, and organization of the 37 Java API packages at issue

9    are entitled to copyright protection," and remanded "with instructions to reinstate the jury's

10   verdict of infringement" and for further proceedings.  *Oracle Am.*, 750 F.3d at 1381.

11        On remand, the Court requested additional briefing on Google's equitable defenses.  ECF

12   No. 1274; ECF No. 1277; *see also* ECF No. 1276 (Joint Stmt); ECF No. 1290 (Oracle Brief);

13   ECF No. 1291 (Google Brief).  Now that fact discovery has closed and the parties have had an

14   opportunity to gather "new evidence [that] may possibly bear on the issues of equitable estoppel

15   and laches," ECF No. 1277 at 2, these defenses are ripe for decision.  No new facts to support

16   Google's equitable defenses exist.

17        **C.    Laches Does Not Apply To Oracle's Claim For Legal Relief And Fails As To
             Oracle's Claim For Equitable Relief**

18

19        The defense of laches may only apply when there is an "unreasonable, prejudicial delay in

20   commencing suit."  *Petrella v. MGM, Inc.*, 134 S. Ct. 1962, 1967 (2014).  Also, laches has no

21   relevance to Oracle's legal claims.  As the Court stated:  "Google conceded ... that laches cannot

22   bar an actual damages claim brought within the three-year statute of limitations period."  ECF No.

23   1277 (Second Case Mgmt. Order) at 2; *see also* ECF No. 1291 (Google Memo re Laches) at 2.

24   Laches similarly cannot bar statutory damages, which are also legal.  *See Feltner v. Columbia*

25   *Pictures Television, Inc.*, 523 U.S. 340, 347-55 (1998).  And, as Oracle has briefed at length, *see*

26   ECF No. 1290, laches cannot bar a claim for infringer's profits where, as here, the remedy is legal

27   under the circumstances of this case.  *See also supra* at 10-16.

28        Nevertheless, even assuming that one or more of Oracle's requested remedies is equitable,

1    the "defendant must prove that (1) the plaintiff delayed in initiating the lawsuit; (2) the delay was

2    unreasonable; and (3) the delay resulted in prejudice." *Petrella v. MGM, Inc*., 695 F.3d 946, 951-

3    52 (9th Cir. 2012), *rev'd on other grounds* 134 S. Ct. 1962 (2014).  Generally, laches can be

4    applied only to limit or reduce equitable remedies.  Only in the rare case where a defendant can

5    prove "extraordinary circumstances," can laches completely "bar at the very threshold the

6    particular relief [i.e., equitable remedy] requested by the plaintiff." *Id*. (failing to find

7    extraordinary circumstances even where plaintiff delayed 27 years).

8          Google cannot prove any of the three required elements to establish laches, much less

9    show that this case is so "extraordinary" as to allow laches to completely bar any relief sought by

10   Oracle.  Moreover, because laches is equitable in nature, Google is not eligible to rely on laches

11   due to its willful infringement.

12                      **1.      Sun/Oracle Did Not Delay In Bringing This Lawsuit**

13         "The first element of laches is delay," calculated "from when the plaintiff knew (or should

14   have known) of the allegedly infringing conduct[] until the initiation of the lawsuit." *Danjaq*

15   *LLC v. Sony Corp.*, 263 F.3d 942, 952 (9th Cir. 2001).  In assessing delay, a suit brought "within

16   the applicable period of limitations" carries "a *strong presumption* that laches does not bar the

17   claims." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) (emphasis added).

18   The statute of limitations is three years, 17 U.S.C. § 507(b), measured from when the plaintiff

19   "has knowledge of a violation or is chargeable with such knowledge." *Roley v. New World*

20   *Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994).

21         It is undisputed that Oracle brought suit "within three years of the first time that the APIs

22   and the code in Android were made available to the public."  ECF 1079 (Google's Resp. to

23   Oracle's Prop. Findings & Conc. of Law) ¶ 187.  Accordingly, Oracle did not delay.

24         The four key dates, as discussed above (at 23), are

25     •   **November 5, 2007:**  Google announces its Android operating system;

26     •   **November 12, 2007**:  Google releases the Android SDK, which, for the first time,
            identifies some of the Android APIs;

27

28     •   **September 23, 2008:**  Google releases Android commercially;

- **October 21, 2008:** Google publicly releases the full Android source code;

- **August 12, 2010:** Oracle files this lawsuit.

There is no dispute over these dates or that Oracle sued Google *within two years* of Android's full source-code and commercial release and *within three years* of the release of the Android SDK.

The commercial release date is the most probative because, until then, Sun did not know that Google had infringed Sun's copyrights by copying its work without a license. *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 517 (9th Cir. 1993) (infringement requires "copying of protectable expression beyond the scope of a license"); *cf. supra* 24 (Oracle continued to negotiate with Google about taking a license even after Android's commercial release). The date of the Android SDK release is not as probative because Sun did not know at the time whether Google was going to take a license. *Supra* 23-24. As Sun's former CEO testified: "[W]e were presuming they were going to be using GPL [General Public License] code." Tr. 2023:8-9. Nevertheless, even accepting, *arguendo*, that the relevant date is when the Android SDK was first released on November 12, 2007, Oracle still filed this suit within three years of that date.

Under either scenario, applying laches would require finding that Oracle delayed too long in filing suit, even though Google's infringement occurred within the congressionally enacted limitations period. That would circumvent Congress's prescribed time-limit for bringing copyright-infringement suits. As the Supreme Court explained: "To the extent that an infringe-ment suit seeks relief solely for conduct occurring within the limitations period ... courts are *not at liberty to jettison Congress' judgment on the timeliness of suit.*" *Petrella*, 134 S. Ct. at 1967 (emphasis added); *id.* at 1977 (the laches doctrine cannot "override the statute of limitations Congress prescribed"); *id.* at 1975 (the laches defense does not "[i]nvit[e] individual judges to set a time limit other than the one Congress prescribed"). Accordingly, the Supreme Court has "never applied laches to bar in their entirety claims for discrete wrongs occurring within a federally prescribed limitations period." *Id.*[12] Because Google's infringement began, and Oracle

---

[12] *Danjaq* suggested that laches may bar a claim for infringement brought within the statute of limitations, but, as discussed, that case involved multiple discrete acts of infringement over many years, some of which occurred outside the three-year limitations period. 263 F.3d at 954. The cases *Danjaq* cites similarly involve multiple acts of infringement extending beyond the

1  sued, within the limitations period, laches cannot be applied here without improperly jettisoning

2  Congress' judgment.  Google's defense therefore fails for this reason alone.

3  ## 2.  There Was No Unreasonable Delay

4  Laches also fails because Google cannot establish that any supposed delay was unreason-

5  able.  "In determining reasonableness, courts look to the cause of the delay."  *Danjaq*, 263 F.3d at

6  954.  It is black letter law that it is not "incumbent on copyright owners … to challenge each and

7  every actionable infringement[,] [a]nd there is nothing untoward about waiting to see whether an

8  infringer's exploitation undercuts the value of the copyrighted work, has no effect … , or even

9  complements it."  *Petrella*, 134 S. Ct. at 1976.  Here, any time period that Google claims as delay

10 resulted from multiple attempts by Sun and Oracle to engage Google in licensing negotiations to

11 resolve the dispute without litigation as well as dilatory negotiation tactics by Google and

12 attempts by Google to hide its infringement.

13 **a. Ongoing licensing negotiations.**  Rather than immediately sue, Sun and Oracle first

14 tried to resolve the dispute with Google through licensing negotiations, which is "recognized as a

15 justifiable excuse" for delay in filing suit.  *Comcast Cable Commc'ns Corp. v. Finisar Corp.*, No.

16 C06-04206 WHA, 2008 WL 170672, at *6 (N.D. Cal. Jan. 17, 2008), *aff'd sub nom.* 319 F.

17 App'x 916 (Fed. Cir. 2009); *accord A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d

18 1020, 1033 (Fed. Cir. 1992) (en banc) ("negotiations with the accused" is a legitimate reason for

19 delay).

20 The undisputed facts prove the reasonableness of any delay:

21 • **November 2007:**  Only three days after Google released the Android SDK, Sun

22 Executive Vice President Rich Green publicly expressed concern regarding Android.  TX 1048.

23 Android Chief Andy Rubin acknowledged he saw the article at the time, Tr. 1725:23-1726:10,

24 and reported internally at Google that Java and Android "is a very touchy subject," TX 180.

25 • **November 2008:**  Approximately a month after the full Android source code was

26 released, Rubin himself stated in an email that Sun approached Google again about "becom[ing]

27

28 limitations period.  *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1032 (9th Cir. 2000) (12 years); *Jackson v. Axton*, 25 F.3d 884, 885-86 (9th Cir. 1994) (21 years).

ORACLE'S TRIAL BRIEF
CV 10-03561 WHA

1    licensees of Java," but Google "made the decision to say no."  TX 1002.

2        • **April 2009:**  Leo Cizek from Sun "tried to sell Google a license for Android."  ECF

3    No. 1079 (Google Resp. to Oracle's Prop. Findings & Concls. of Law) ¶ 99.  This time, *Google*

4    initiated the conversation:  Martin Buchholz from Google contacted Sun about "the possibility of

5    Google's licensing the source code to Java."  Tr. 1072:9-14; *see also* 1071:25-1072:3.  Cizek

6    called Buchholz to tell him that "Sun would be very interested" in that arrangement but

7    "something … would have to be fixed, first":  "[T]he fact that regarding Android there was no

8    commercial use license; and, as we understood it, Android was shipping an incompatible version

9    of Java, commercially."  Tr. 1073:1-9.

10       • **2010:**  After it acquired Sun, Oracle continued to try to reach a business solution with

11   Google.  Oracle's Executive Vice President for Software Development met with Google twice,

12   Tr. 391:15-395:1, and Oracle's Senior Vice President of Development met with Rubin three

13   times, Tr. 1941:23-24.  One of the meetings included Oracle's then-President Safra Catz and

14   Rubin's boss, Alan Eustace.  Tr. 392:1-2, 1711:12-13, 2310:1-2.  Catz told Eustace that "Android

15   needed to be licensed," and made a proposal to Google.  Tr. 2313:25-2314:6.  Eustace took

16   Oracle's proposal back to Google's "founders[] and executives," but reported back to Oracle on

17   June 28, 2010, that Google would not take a license.  TX 1074; Tr. 2315:7-16.  There were "a few

18   more conversations between executives," Tr. 2316:19-23, including between Oracle's then-CEO

19   Larry Ellison and Google's then-CEOs Eric Schmidt and Larry Page, Tr. 304:23-305:8.  Though

20   Page testified that the negotiations never "broke[] off," Tr. 492:18-22, it eventually became clear

21   that Google would not take a license, and Oracle filed this suit in August 2010, ECF No. 1

22   (Compl.).

23       **b.  Google itself caused delay through stall tactics and concealment.**  A "party

24   interposing a defense of laches [who] has contributed to or caused the delay … cannot take

25   advantage of it."  *Oregon Mortg. Co. v. Renner*, 96 F.2d 429, 433 (9th Cir. 1938); *accord Pelt v.*

26   *Utah*, 611 F. Supp. 2d 1267, 1286 (D. Utah 2009).  Google contributed to any delay by

27   employing dilatory negotiation tactics and concealing its infringement.  With respect to the

28   negotiations, Google caused delay by failing to respond to Oracle's overtures:

ORACLE'S TRIAL BRIEF
CV 10-03561 WHA

- **Before the SDK was released in 2007:** Sun "sent emails to [Rubin] requesting a discussion around what they are planning, and if they need Java licensing." TX 565 at 3. There was "no response." *Id.* Rubin then "canceled [Sun's] face 2 face and requested an email instead, which [Rubin] did not respond to." *Id.*;

- **When Sun told Google it needed a license in April 2009:** Google choose to "step away" from negotiations "and only respond further if Sun chases after us." TX 1029. After Eustace met with Catz, Oracle had to prompt Google to respond. TX. 1074.

Google's attempt to "actively conceal" its infringement contributed to any delay that Google complains of now. *See Disabled Rights Union v. Shalala*, 40 F.3d 1018, 1021 (9th Cir. 1994) (equitable tolling). Google's own documents show that:

- Worried about potential "legal issue[s]," Rubin made sure that "only authorized speakers speak to the press" about Android, TX 382;

- Before the 2008 JavaOne conference, where Android was on display for the Java community, Rubin instructed the Google personnel running the Android booth: "[D]ont [sic] demonstrate to any [S]un *employees or lawyers*," TX 29 (emphasis added).

The undisputed facts show that Google contributed to any delay in Oracle's filing suit and thus that it was not unreasonable. Google's defense fails for this independent reason as well.

### 3.    Google Was Not Prejudiced

"Laches also requires a showing that a defendant was prejudiced by the plaintiff's unreasonable delay." *Petrella*, 695 F.3d at 953; *Danjaq*, 263 F.3d at 955 (prejudice is "[t]he very purpose of laches"; the delay must "*cause*[] prejudice to the defendant") (emphasis added). Where, as here, "only a short period of time ha[d] elapsed since the accrual of the claim, the magnitude of the prejudice required before the suit should be barred is great." *Petrella*, 695 F.3d at 953. Google has adduced no evidence of prejudice—much less great prejudice. Because Google cannot satisfy its burden to show prejudice, Google's claim fails for this reason as well. Moreover, Google is not only unable to prove great prejudice, the undisputed facts show that Google suffered no prejudice at all as a result of any delay for three independent reasons.

**a. Google's investment in Android was a business decision made long before any purported delay.** "[I]t is not enough that the alleged infringer changed his position—i.e., invested in production of the allegedly infringing device. The change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity." *Ronald*

1   *A. Smith & Assocs. v. Hutchinson Tech. Inc.*, No. C 01-03847 WHA, 2002 WL 34691677, at *11

2   (N.D. Cal. Aug. 16, 2002) (quoting *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770,

3   774 (Fed. Cir. 1995)).

4        Google's copying was motivated by the following business concerns:

5   • Google wanted to quickly enter the mobile market;

6   • Google knew that many attributes made the Java platform ideal for mobile;

7   • Google knew that basing Android on the Java platform would allow Google to
    leverage the Java developer community to speed Android to market; and

8

9   • Google wanted to leverage the Java developer community to develop apps that would
    attract consumers to Android, lead to Android's widespread adoption, and secure
    Google's revenue stream in the mobile market.

10

11   These undisputed facts show that Google's decision to copy was purely a business decision

12   designed to speed Android to market and protect Google's threatened revenue streams.

13        As discussed (at 22), Google's 10-K reported at the end of 2005 that Google's business

14   model of relying on advertising on personal computers was in jeopardy as "[t]he number of

15   people who access the Internet through … mobile telephones ... increased dramatically."  TX

16   3215 at 65.  This presented an existential threat to Google:  "[I]f we miss the 'mobile window,'

17   we'll be out of business in 10 years."  TX 370 at 1.

18        With that backdrop, Google looked to the Java platform to be the cornerstone of its mobile

19   operating system.  TX 7 at 1 (Rubin to Google co-founder Page:  "Android is building a Java OS

20   [operating system] … [and] making Java central to our solution[.]").  From the beginning, Google

21   knew that the Java packages were "[c]ritical" to its Android "strategy."  TX 15 at 7 (Android

22   presentation to Google executives); TX 11 at 2 (Android Monetization Proposal) (Java is "a key

23   component of the [Android] platform").  During an early presentation to Google's top executives,

24   Tr. 1351:14-23, the Android team explained that they had focused on Java because Java has an

25   "Existing pool of developers and applications," "Carriers require it," and there is an "Elegant

26   tools story."  TX 1 at 8; *accord* TX 7 at 1 (explaining why Java is "central" to Android).

27        At that time, Google knew that "Java dominate[d] [the] wireless industry."  TX 15 at 7;

28   *accord* TX 158 at 10.  Google reasoned that incorporating the Java platform into Android would

- 32 -

"enable all [those] Java developers to quickly leverage their skills to build great Android apps," TX 238 at 1, thereby allowing Google to "leverage not only existing developers, but applications as well" for Android, TX 21 (Android engineer Bornstein to Rubin). *Accord* TX 158 at 10 (Android presentation) ("Strategy:  Leverage Java for its existing base of developers."); TX 13 (email from Senior Android engineer:  the "[r]easons to shift to a primarily Java API," include that "[J]ava provides a nice safetynet and faster app development and debuggability" and "[t]he nature of the cellular market is that we are *required* to have [J]ava due to carrier requirements").  Tapping into the Java ecosystem would help Google meet its essential goals of "[d]ramatically accelerat[ing] our schedule" to reach the market in time, TX 15 at 7; TX 22 at 5, as well as "build[ing] a community force around Google handset APIs and applications" to preserve Google's lucrative and endangered revenue streams, TX 6 at 9 (Android presentation to Google executives); TX 151 at 2 (notes on executive meeting stating that Android's "goal" is "quick time to market").  In other words, by leveraging the Java developer community, Google could get Java developers to develop all the useful, quirky, and entertaining apps that would attract consumers to Android, which would in turn lead to Android's widespread adoption and secure Google's revenue stream.

In sum, making the Java platform the focal point of Android was a *business decision* by Google intended to accelerate Android's timetable, market adoption, and success; the decision was made long before Oracle was aware of Google's copying and had nothing to do with when Oracle sued.[13]

**b. Google was locked into the decision to use the Java platform.**  When considering whether the defendant has been prejudiced, a "court should closely examine [the defendant's] alleged reliance on [the plaintiff's] delay." *Petrella*, 134 S.Ct. at 1978.  That "prejudice must be judged as of the time the lawsuit was filed, thereby eliminating consideration of post-lawsuit expenditures." *Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1033 (9th Cir. 2012).

Google's final decision to copy came before any "delay" and despite knowing of the

---

[13] The Ninth Circuit also recognizes "evidentiary" prejudice, such as when evidence is "lost, stale, or degraded," witnesses' "memories have faded," or witnesses "have died." *Danjaq*, 263 F.3d at 955.  Google did not claim such prejudice after the first trial, ECF No. 1047 (Google's Prop. Findings & Concls. of Law) ¶¶ 21-26, nor could it given the enormous amount of documentary evidence and testimony in this case.

possible risk of litigation.  Significantly, there is no genuine dispute that:

- Google decided to copy long before it released the Android SDK, Google's Suppl. Resp. To Oracle's Req. For Admission No. 275-76 at 30-32;

- Google's decision to use the Java platform was "final" in August 2006, TX 23 at 1;

- Google's internal materials acknowledge that the APIs are copyrighted, TX 18;

- Google knew that Sun would object to Google's copying, TX 207; and

- Google was so worried about being sued that it considered buying the rights to Java, TX 326.

During discovery, Google admitted that it had already "decided" to copy from the Java platform "before" it publicly announced Android on "November 5, 2007."  *See* Google's Suppl. Resp. To Oracle's Req. For Admission No. 275-76 at 30-32.  Indeed, in August 2006, a Senior Android engineer stated that Google had already decided to use Java:  "[W]e are building a Java based system:  that decision is *final*."  TX 23 at 1 (emphasis added).  Google made this final decision knowing full well that the Java "apis are copyrighted," TX 18, and that Sun "won't be happy when we release our stuff," TX 207.  But none of that mattered to Google:  Google's own packages were "half-ass at best," and Google "need[ed] another half of an ass."  TX 215.  Google knew that, even without a license from Sun, it was going to "[d]o Java anyway."  TX 7.

Nor is this a case where Google was "lulled into a false sense of security."  *See Whitman v. Walt Disney Prods., Inc.*, 263 F.2d 229, 231 (9th Cir. 1958).  On the eve of Android's announcement, an Android Group Manager wrote to one of his engineers:  "This Java stuff can be nothing or very serious.  I do believe Sun is planning to come after us."  GOOGLE-25-00045581.  As discussed above (at 24), Google executives were concerned about Sun's reaction, and so they made sure that only certain people at Google spoke to the press and instructed Google personnel not to demonstrate Android to Sun lawyers.  Former Google CEO Schmidt testified that by 2009, "Google was sufficiently worried about being sued that it thought about buying all the rights to Java."  Tr. 1559:20-23; *see also* TX 406 (internal email to Schmidt suggesting "buying … Java from Sun" to "solve all of these lawsuits").  These are not the acts of a party lulled into a false sense of security.

**c.  Google's post-litigation conduct demonstrates the lack of prejudice.**  Google's con-

1   duct since this suit was filed confirms that Google would not have acted differently if "the plain-

2   tiff brought suit promptly." *Danjaq*, 263 F.3d at 955.  "[C]ontinuation of infringing activity is

3   probative of a lack of prejudice" where the defendant did not "stop[] selling the allegedly infring-

4   ing product" after the complaint was filed.  *Ormco Corp. v. Align Tech., Inc.*, 647 F. Supp. 2d

5   1200, 1206 (C.D. Cal. 2009) (quotation marks omitted); *accord Meyers v. Asics Corp.*, 974 F.2d

6   1304, 1308 (Fed. Cir. 1992) (rejecting laches where defendants did not "curtail[] design and de-

7   velopment" of accused products after plaintiff sued); *Meyers v. Brooks Shoe Inc.*, 912 F.2d 1459,

8   1463 (Fed. Cir. 1990) (similar), *overruled on other grounds by A.C. Aukerman*, 960 F.2d at 1020.

9       Here, it is undisputed that Google did not cease its infringing activity after Oracle filed the

10  suit.  Since this suit was filed, Google has developed and released seven major versions of An-

11  droid, and, as Google has admitted, each new version of Android copies the same declaring code

12  and the same structure, sequence, and organization from the Java API packages as the Android

13  versions at issue in the first trial.  *See* Google's First Suppl. Resp. & Objs. to Oracle's Requests

14  for Admission, Nos. 246-52, 256-62; C. Anderson Proposed Stip. Lang., Oct. 4, 2015.  Thus,

15  even if Oracle had filed its complaint earlier, Google's actions prove that it would not have made

16  any difference.

17              **4.     Google's Willful Infringement Precludes Its  Laches Defense**

18      Google's laches defense is barred for the additional reason that "laches does not apply in

19  cases of willful infringement." *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221,

20  1228 (9th Cir. 2012).  "To prove 'willfulness' under the Copyright Act, the plaintiff must show

21  (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's

22  actions were the result of 'reckless disregard' for, or 'willful blindness' to, the copyright holder's

23  rights." *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 944 (9th Cir. 2011).

24      Google's willful infringement of Oracle's copyrights has been discussed at length above.

25  *Supra* 22-24, 30-34.  Google knew from the start that the Java API packages are copyright pro-

26  tected and that it needed a license.  Though it engaged in licensing negotiations, Google intended

27  to copy if it could not get the license it wanted.  After Google copied, it engaged in deliberate

28  efforts to conceal its infringement and string out negotiations.  Even after Oracle sued, and even

after the Federal Circuit's decision finding Oracle's work copyright protected, Google continued

and expanded its infringement.  Google's willful infringement is best summed up by the famous

Lindholm email.  On the eve of litigation, asked to "investigate … alternatives … to Java"

Lindholm stated:  "We've been over a bunch of these [alternatives], and think they all suck.  We

conclude that we need to negotiate a license for Java under the terms we need."  TX 10.

As a result, Google's conduct easily meets the *Louis Vuitton* test for willful infringement

and, therefore, defeats its equitable defense of laches.

### D.   Equitable Estoppel Does Not Apply

Equitable estoppel is a "disfavored" defense that "should only be applied as needed to

avoid injustice."  *Bangkok Broadcasting & T.V. Co. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1115

(C.D. Cal. 2010) (quotation marks omitted).  The test is "exacting."  *Petrella*, 134 S. Ct. at 1977.

A defendant "must" satisfy "[f]our elements …:  (1) The party to be estopped must know the

facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting

the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts;

and (4) he must rely on the former's conduct to his injury."  *Hampton v. Paramount Pictures*

*Corp.*, 279 F.2d 100, 104 (9th Cir. 1960).  Thus, Google must prove:  (1) Oracle knew that

Google was infringing its copyrights, (2) Oracle acted in such a way that it knew (or should

reasonably have known) that Google would believe that Oracle intended to consent to Google's

infringement, (3) Google was unaware that Oracle did not consent, and (4) Google relied on

Oracle's conduct to its detriment.  *See* ECF No. 1276 (Google's Suppl. Joint Stmt.) at 9:2-7.

Google's equitable estoppel defense fails on each element.  Moreover, like laches,

Google's conduct was so egregious that Google cannot assert equitable estoppel.

### 1.   Sun and Oracle Did Not Initially Know Of Google's Unlicensed Copying

Whether the copyright holder knows of the infringement is "the critical fact," without

which "estoppel cannot be asserted."  *Broderbund Software, Inc. v. Unison World, Inc.*, 648 F.

Supp. 1127, 1138 (N.D. Cal. 1986).  At the relevant points in time (i.e., the dates of any alleged

intentionally misleading statements), Sun and Oracle did not know of Google's infringement.

1   The earliest time Sun could have known was not when Android was announced (also the day of

2   the Schwartz blog), but a week later (November 12, 2007) when some of Android's APIs were

3   publicly identified in the Android SDK.  But, Google did not commercially release Android for

4   another year (September 2008), and did not release the full Android source code for still another

5   month (October 2008).  Thus, Sun could not have known what Google copied without taking a

6   commercial use license until October 2008.

7         The mere fact that when Android was announced or the SDK was released, Android was

8   written in the Java language or performed some of the same functions as the Java APIs was insuf-

9   ficient for Sun to know of Google's infringement.  *Broderbund Software*, 648 F. Supp. at 1137

10  (no equitable estoppel where copyright owner knew defendant's software "would *perform the*

11  *same functions*" as its own but not that defendant copied its work).  Similarly, Oracle was not

12  obligated to investigate whether Google was going to infringe and sue before Google infringed.

13  *See William A. Graham Co. v. Haughey*, 568 F.3d 425, 439 (3d Cir. 2009) ("[A] copyright *owner*

14  does not have a duty to ferret out potential acts of infringement before they occur.");  *Summit*

15  *Entm't, LLC v. B.B. Dakota, Inc.*, No. CV 10-4328 GAF (RZx), 2011 U.S. Dist. LEXIS 151582,

16  at *66 (C.D. Cal. Nov. 21, 2011) (rejecting that copyright owner must sue before infringement to

17  avoid estoppel).

18         **2.    Sun And Oracle's Conduct Was Not Intended To And Could Not**
           **Reasonably Be Perceived As Assenting To Google's Infringement**
19

20        The second element of equitable estoppel requires proof that the copyright holder "en-

21  gage[d] in intentionally misleading representations."  *Petrella*, 134 S. Ct. at 1977 ("[t]he grava-

22  men of estoppel ... is misleading [conduct] and consequent loss").  The record (as documented

23  above, at 22-25) demonstrates that Sun and Oracle repeatedly informed Google that it needed a

24  license, and the parties negotiated for a license for years—both before Android's release and

25  after.  This negates any claim that Sun or Oracle led Google to believe that they assented to

26  Google's infringement.  *See United States v. King Features Entm't*, 843 F.2d 394, 400 (9th Cir.

27  1988) (summary judgment of no estoppel for copyright holder despite knowing that defendant

28  was going to infringe and accepting payments for the infringement because copyright holder told

1    defendant it needed a license).

2          Google has not presented sufficient evidence to refute this.  Google mainly points to the

3    Schwartz blog and similar uninformed statements, none of which mention Google's copying,

4    copyrights, licensing, or anything else that could reasonably lead Google to believe Sun assented

5    to the infringement.  *See* ECF No. 1203 (Order on Google's Equitable Defenses) at 2

6    ("[c]ongratulatory statements" by Sun are not "affirmative grant[s] of such consent" to copy the

7    "37 API packages").  Not surprisingly, no one from Google ever approached Sun or Oracle to say

8    that Google did not need a license because of the Schwartz blog or other congratulatory

9    statements, Tr. 1942:22-1943:1, while Sun and Oracle continued to pursue Google to urge it to

10   take a license, *supra* 24-25.  *See Hampton*, 279 F.2d at 104 ("[E]quitable estoppel does not erase

11   the duty of due care and is not available for the protection of [infringer] who has suffered loss

12   solely by reason of his own failure to act or inquire.").  Google never followed up because it

13   knew it did not have Sun's permission, and Sun would have objected to Google's copying if

14   Google had approached Sun.

15         In any event, as discussed (at 23, 28), the Schwartz blog was published before Sun knew if

16   and what Google copied and whether Google planned to take a license.  Critically, Google *knew*

17   that Sun did not yet have all the necessary information, disproving that Google reasonably per-

18   ceived the blog to be permission to copy.  GOOGLE-01-0030897-98 (Google software engineer

19   observing that "Sun's initial euphoria" "may … dim a bit" once Sun sees what Google actually

20   did).

21         Google has mentioned Mr. Ellison's post-October 2008 statements at Java One to argue

22   that both Sun and Oracle should be estopped from claiming infringement.  Because Google made

23   the decision to copy in 2006, those statements are too late for Google to prove reliance.  Indeed

24   once Android was released in November 2007, it became impossible for Google to prove reliance

25   on Sun/Oracle's subsequent actions and statements as a basis for its decision to copy.

26         Google's only other argument on this element is to reference third parties that may have

27   been using the Java APIs that have nothing to do with Google or Android.  Sun's actions toward

28   third parties are irrelevant to whether Sun consented to *Google's* infringement.  *MGM Studios,*

1   *Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1225 (C.D. Cal. 2007) ("no rule in copyright ... that

2   a copyright holder is bound to pursue either all infringers or none at all."); *Tolliver v. McCants*,

3   684 F. Supp. 2d 343, 349 (S.D.N.Y. 2010) ("[T]he failure to demand compensation from third

4   party use of the [work] in no way indicates that Plaintiff intended for Defendant to believe or

5   gave Defendant reason to believe that he could [infringe the work]."), *aff'd*, 486 F. App'x 902 (2d

6   Cir. 2012).  As the Supreme Court recently said:  It is not "incumbent on copyright owners … to

7   challenge each and every actionable infringement."  *Petrella*, 134 S. Ct. at 1976 (copyright

8   owners can assess whether bringing suit "is worth the candle").

9       But even if it were otherwise, Sun and Oracle engaged in high-profile efforts to enforce

10   their Java copyrights over the past two decades.  The most prominent was when Sun went to war

11   with Microsoft in *Sun Microsystems v. Microsoft Corp.*, 188 F.3d 1115 (9th Cir. 1999), a lawsuit

12   where, as Google's internal emails explain before Android's release:  "Sun sued [Microsoft] and

13   stopped [it] from shipping a nearly finished [Java] product."  TX 330.

14       Sun's high-profile enforcement efforts also included Apache Harmony and GNU Class-

15   path projects.  In a highly publicized battle with Apache, in which Google was a participant, TX

16   1047, Sun blocked Apache from developing and licensing its own version of the Java platform for

17   mobile phones, TX 1045.  As Apache was compelled to acknowledge when it shuttered its

18   project:  "Java specifications are *proprietary technology* that *must be licensed* directly from the

19   spec lead [i.e., Sun] …."  *Id.* (emphasis added); TX 917 (Apache recognizing Sun's TCK license

20   has "field of use" restrictions).  Indeed, as an internal email to Google's CEO explained long

21   before Android's release:  "Sun puts field-of-use restrictions in the Java SE TCK licenses which

22   prohibit Java SE implementations from running on anything but a desktop or server.  *These*

23   *restrictions prevent Apache Harmony from independently implementing Java SE* (Harmony can't

24   put those restrictions on their own users and still Apache license the code) *not to mention Android*

25   (*though that's water under the bridge at this point*)."  TX 405 (emphasis added).

26       Similarly, when Sun learned of the GNU Classpath project, a non-commercial endeavor to

27   develop an open-source implementation of the Java platform, Tr. 1695:10-15, Sun protected its

28   copyrights.  Specifically, when Sun learned that an entity in Korea was planning to use GNU

Classpath "commercially and not just as a research project," Sun "immediately engaged" and enlisted the "government[s]" of "the United States and South Korea" to stop the commercial infringement.  Smith Dep. at 237:12-239:9; *see also* OAGOOGLE0020194383-84.

The only intention that can be derived from Sun and Oracle's actions toward third parties is the intention to enforce their intellectual property rights.  *See Grokster*, 518 F. Supp. 2d at 1225 (rejecting estoppel defense based on plaintiff not suing *other* infringers).  Google cannot show that Sun and Oracle demonstrated consent to Google's infringement and Google's equitable estoppel claim fails for this reason alone.

### 3. Google Knew That Sun And Oracle Did Not Agree To Google's Copying

"[T]he weight of authority suggests that a defendant who was aware of the subject copy-right knew the 'true facts'" and cannot assert an estoppel defense.  *Lego A/S v. Best-Lock Const. Toys, Inc.*, 874 F. Supp. 2d 75, 85-86 (D. Conn. 2012); *accord Hampton*, 279 F.2d at 104 (reject-ing estoppel where infringer saw copyright notices).  Here, it cannot be disputed that:

- Google was aware that the Java platform was copyrighted and that it needed a license, *see* TX 1; TX 18; TX 149; Tr. 951:11-12 (Swetland, Senior Android Engineer) ("I do recall mention that Sun claimed copyright on the method signatures");

- Android's Core Library Lead Bob Lee admitted that he saw copyright notices while Google was copying, Tr. 982:22-983:12;

- Rubin and an Android engineer (Bornstein) both admitted "clicking through [Sun] licenses" to access Sun's copyrighted materials online, TX 12; Tr. 1622:11-12; and

- "Many of the Google employees were ex-Sun employees," and "knew how [Sun] did licensing," Kaul Dep. 98:9-11; *see* TX 1026 (Rubin and Swetland took Java licenses when at Danger); Tr. 1055:6-21 (Lindholm was Chief Technology Officer for Client Systems at Sun); Tr. 1470:19-24 (Schmidt was Sun's Chief Technical Officer).

Because Google was aware of Oracle's copyrights in the Java API packages, it was not ignorant of the "true facts."

Google also knew that Oracle would never agree to Google's copying:

- From the outset, Google knew that it needed a "license," TX 1 at 9, and that Sun required Android to pass compatibility testing, TX 7 (2005 email from Rubin);

- Google never submitted Android for compatibility testing, Tr. 984:22-24 (Lee);

- Google went ahead with Android knowing that Sun "won't be happy when we release our stuff," TX 207; and

1

- After the SDK was released, Sun voiced its concern, TX 1048, and later told Google
  that there was a problem because Google did not have a "commercial use license" and
  "was shipping an incompatible version of Java, commercially," Tr. 1073:1-9.

2

3   In short, from 2005 until litigation in 2010, Google always knew it "[m]ust take a license from

4   Sun." TX 1 at 9 (2005);TX 10 (2010) ("[W]e need to negotiate a license for Java ….").

5          With actual awareness that Sun, then Oracle, did not agree to Android's copying of the

6   Java API packages, Google's equitable estoppel defense fails. *See King Features Entm't*, 843

7   F.2d at 399 (no estoppel where defendant knew of plaintiff's licensing requirements).

8          **4.   Google Did Not Rely On Any Sun/Oracle Acts of Assent To Google's
               Copying**

9

10         Google's defense also fails because Google cannot prove, as it is required to do, that it

11   "detrimentally relie[d] on" any action or statement by Sun or Oracle. *Petrella*, 134 S. Ct. at 1977.

12   This final element requires (1) a "change of position" to Google's detriment (2) "in reliance upon

13   any act of omission by [Oracle]." *Hampton*, 279 F.2d at 105.  It has already been demonstrated

14   that Google was not prejudiced and, for the same reasons, there was no change in Google's

15   position. *Supra* 31-35.  This section focuses on Google's lack of reliance.

16         "[R]eliance … is essential to equitable estoppel." *A.C. Aukerman*, 960 F.2d at 1042.  The

17   jury already concluded that Google has *not* "proven that it in fact reasonably relied on … conduct

18   by Sun and/or Oracle in deciding" to copy Oracle's copyrighted work. ECF No. 1089 (Special

19   Verdict) at 3.  For the reasons already explained and discussed below, the jury was correct.

20         Google has not adduced any contemporaneous evidence showing that it actually relied on

21   any supposed assent by Sun or Oracle to Google's copying.  Google's argument is entirely ex

22   post-facto lawyer-based rationales, unsupported by any evidence because no actual evidence

23   exists to show reliance.  Google's equitable estoppel defense fails for this reason alone.  ECF No.

24   433 (discussing *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir.

25   2000)).  In any event, the undisputed facts show that Google did not rely on any supposed assent

26   by Sun or Oracle.

27         **a.   Google's decision to copy was motivated by business reasons, not reliance.**  As ex-

28   plained (at 31-33), Google's decision to infringe Oracle's copyrights was based on the business

1   strategy to get into the mobile business as quickly as possible—not based on any statement by

2   Sun or Oracle.  *Gasser Chair Co.*, 60 F.3d at 774 ("The change [by the defendant] must be

3   because of and as result of [plaintiff's conduct], not simply a business decision to capitalize on a

4   market opportunity."); *see also Meyers*, 912 F.2d at 1463 (no reliance because "[defendant]

5   would have followed the same course regardless of what [plaintiff] did or did not do.").[14]

6         **b.  Google decided to copy long before any supposed acts of assent.**  As explained (at

7   33-34), Google made its "final" decision to copy from the Java platform in 2006, while negotia-

8   tions were still ongoing.  Because Google decided to copy *before* Sun or Oracle supposedly

9   assented to it (i.e., the Schwartz blog post on November 5, 2007), Google cannot demonstrate

10  reliance.  *Tolliver*, 684 F. Supp. 2d at 350 ("Defendant could not have relied upon conduct that

11  had yet to occur—the timing does not add up.").

12        **c.  Google knew of and disregarded Oracle's copyright notices.**  The presence of copy-

13  right notices on the plaintiff's work negates any claim of reliance.  *Hampton*, 279 F.2d at 105

14  (finding no reliance where defendant had "notice conveyed to him by [the copyright owner's]

15  assertion of right printed on each [work]").  Oracle had "a copyright notice in every single one of

16  the API class source files."  Tr. 2231:6-2232:4.  Android's Core Library Lead admitted to seeing

17  the copyright notices while copying.  *Supra* 40.  Google even devised a way to *turn off* the "Sun

18  proprietary API" popup warnings issued by the Java compiler.  GOOGLE-12-00078801.

19        **d.  Google's own actions disprove Google believed it ever had or relied on any Oracle**

20  **assent.**  The defendant must *rely* on the plaintiff's apparent assent to the infringement.  *Supra* 36.

21  Reliance is therefore disproven when the defendant acts in a way "inconsistent with any reliance

22  on [p]laintiff's alleged acquiescence."  *Tolliver*, 684 F. Supp. 2d at 350.  In *Tolliver*, the defen-

23  dant's alleged reliance was disproven because he denied committing the infringement, even

24  though he would have had "no reason to … deny" it if he actually believed the plaintiff

25  acquiesced.  *Id.*  Here, even after the Schwartz blog, Google was worried about legal issues with

26  the press, attempted to conceal its infringement by refusing to demonstrate Android to Sun em-

27

28  [14] The quoted portions of *Gasser* and *Meyers* are taken from laches discussions, but, as *Gasser* explains, the analysis applies fully to equitable estoppel.  60 F.3d at 776.

1  ployees and lawyers.  *Supra* 24.  That is not the conduct of a company relying on Sun and

2  Oracle's assent to infringement.

3      **e.  Google's privilege log disproves that it relied on Sun or Oracle's assent.**  A party

4  cannot claim reliance when it "always envisioned the possibility of being sued."  *In re Katz Inter-*

5  *active Call Processing Patent Litig.*, No. 07-ML-1816-B-RGK, 2009 WL 8635161, at *21 (C.D.

6  Cal. May 1, 2009).  Here, Google's "privilege log confirms that [it] anticipated the possibility of

7  litigation" even in the time after Google claims that Sun and Oracle abandoned their copyrights

8  and assented to Google's copying.  Indeed, Google's privilege log lists 440 documents withheld

9  on attorney-client and work-product grounds that were created both in the lead up to Android's

10  release and in the days, weeks, and months that followed.  Google's claims of work product

11  necessarily refer to documents "prepared in anticipation of litigation or for trial."  *In re Grand*

12  *Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004).  Moreover, the privilege descriptions refer to

13  concerns about "suits," "lawsuits," "litigation," "suit for OS using Java," "copyright Sun and

14  Java," "violating IP," "IP claims," "Sun intellectual property issues," "Sun/Java issues for An-

15  droid," the "Sun/Java matter," "java code," "source code and java," "litigation holds," etc.

16  Google's concern about and preparation for litigation during the time Google claims to have be-

17  lieved it had Sun or Oracle's assent disprove that Google ever actually thought it had consent,

18  much less relied on it.  Anticipation of litigation after congratulatory statements proves that

19  Google did not believe it had permission to copy and that it did not rely on any statements or

20  actions by Sun.[15]

21      **5.**    <u>**Google Cannot Claim Equitable Estoppel Given Its Egregious Conduct**</u>

22      "[L]ike laches, egregious conduct must be considered as part of the equitable estoppel de-

23  termination."  *Gasser Chair Co.*, 60 F.3d at 776; *Troxler Elec. Labs., Inc. v. Pine Instr. Co.*, 597

24  F. Supp. 2d 574, 600 (E.D.N.C. 2009) ("[A]n otherwise meritorious laches or estoppel defense

25  may be defeated if it is shown that the defendant is guilty of egregious conduct, such as copy-

26  ing.").  Google's conduct was egregious.  Google *admits* that it copied and distributed Oracle's 37

27  Java API packages without a license.  *Oracle Am.*, 750 F.3d at 1350-51, 1353.  Google's own

28  _____

[15] For the same reasons, Google's privilege log disproves any prejudice as required for laches.

1    documents and statements show that Google *knew* that Oracle's work was copyrighted, that it

2    needed a license, and that copying without a license subjected it to legal liability.  *Supra* 40.  And,

3    Google's documents reveal that Google attempted to hide its infringement.  *Supra* 24.  Google

4    cannot rely on defenses in equity, like equitable estoppel, with such unclean hands.

5    **VIII.  ORACLE IS ENTITLED TO A PERMANENT INJUNCTION**

6         The Copyright Act authorizes the Court to grant a permanent injunction "on such terms as

7    it may deem reasonable to prevent or restrain" further infringement of Oracle's copyrighted

8    works.  17 U.S.C. § 502(a).  Oracle must show that it is entitled to a permanent injunction by

9    demonstrating:  "(1) that it has suffered an irreparable injury; (2) that remedies available at law,

10   such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the

11   balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4)

12   that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v.*

13   *MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Flexible Lifeline Systems, Inc. v. Precision Lift,*

14   *Inc.*, 654 F.3d 989, 995-96, 998 (9th Cir. 2011)(concluding that *eBay* applies to copyright cases).

15   "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the

16   district court, reviewable on appeal for abuse of discretion."  *eBay*, 547 U.S. at 391.

17        The evidence at trial will show that Oracle has met each of the four factors.  Google made

18   a business decision to take and build its Android platform using Oracle's copyrighted works

19   without permission.  And it continues to take and use those works today – still without Oracle's

20   permission.  Unless Google is permanently enjoined, it will not stop its infringement, which is

21   causing irreparable harm to the market and potential markets for, and value of, Oracle's

22   copyrighted works and their derivatives.  Google's continued infringement is also causing

23   irreparable harm to Oracle's business, brand and goodwill.  Money damages alone could never

24   compensate for the irreparable injury that Oracle has suffered.  Failure to enjoin Google from

25   continuing its infringement would constitute an involuntary license of Oracle's valuable

26   copyrighted works and encourage others to follow Google's pattern of deliberate disregard for

27   Oracle's rights.  Accordingly, the Court should grant a permanent injunction of a scope that will

28   unequivocally end Google's unlawful conduct.

1   Oracle addresses these issues below at a high level.  Oracle proposes that when the Court

2   sets a date for the third phase of the trial, which will include trial of Oracle's claim for a

3   permanent injunction, it also set a schedule for briefing to address these issues.

4   ### A.   Oracle Has Suffered Irreparable Harm

5   Although there is no presumption of irreparable harm with respect to permanent

6   injunctions, this Court has noted that "[i]n run-of-the-mill copyright litigation, however, proof of

7   such harm stemming from infringement – such as harm to business reputation and market share –

8   should not be difficult to establish." *Apple Inc. v. Pystar Corp.*, 673 F. Supp. 2d 943, 948 (N.D.

9   Cal. 2009) (citing *MGM Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1215 (C.D. Cal.

10  2007)).  When determining whether a plaintiff faces the threat of irreparable harm, courts should

11  consider evidence of past infringement as well as the likelihood of future infringement.  *See* 4

12  Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 14.06[B] (2008).  Oracle easily

13  meets this standard for showing irreparable harm.

14  Google has admitted that it copied Oracle's copyrighted works for purely commercial

15  purposes.  *See supra* at 3-4.  Moreover, there is ample evidence that, unless permanently

16  enjoined, Google will continue its pattern of infringing Oracle's copyrighted works.  *See* ECF No.

17  1465 (Oracle's Opp to Google's MTS Portions of Oracle's Expert Reports).  Oracle has suffered

18  irreparable harm as a result of Google's past infringement and will continue to suffer such harm

19  absent injunctive relief.  In particular, Google's infringement has irreparably harmed and will

20  continue to irreparably harm (1) the market for Java SE and its derivatives, (2) the potential

21  markets for Java SE and its derivatives, (3) the value of Java SE and its derivatives, (4) Oracle's

22  competitive position and market share in the mobile device space and (5) Oracle's brand, business

23  reputation, and goodwill.  Much of this harm was outlined in Prof. Jaffe's expert report, and

24  supporting evidence was presented to the Court in briefing on the motions *in limine*.  *See* ECF

25  No. 495-1 (Oracle's Opposition to Google's MIL No. 4 Regarding Market Harm Testimony of

26  Prof. Adam Jaffe).  Moreover, Google's infringement has enabled and will continue to enable

27  third parties to infringe Oracle's copyrights.  Each of these harms provides compelling support for

28  a finding of irreparable harm.

**B.**     **Monetary Damages Are Inadequate To Compensate Oracle**

The same evidence and rationale demonstrating irreparable harm show that an award of damages would be inadequate.  Although Mr. Malackowski was able to determine the amount of Java ME revenues Oracle lost due to Google's infringement, the entirety of the harm caused to the market and potential markets for Oracle's copyrighted works and their derivatives is difficult, if not impossible, to quantify.  ECF No. 1560-12 (Corrected 1/8/2016 Malackowski  Rpt.) ¶ 215 (describing difficulty in quantifying losses attributable to the Acadia platform).  This is also true for the harm Google has caused, and will continue to cause, to the value of those works and Oracle's brand and goodwill.

Moreover, monetary damages would not prevent Google from continuing to infringe Oracle's copyrights in the future.  Indeed, Google's actions throughout this litigation reveal Google's determination to expand its infringement by using more of Oracle's copyrighted materials from the Java API packages and from newer versions of Java.  *See* ECF No. 1465. Google also expanded its infringement into new versions of Android, and into new markets such as Auto, TV and wearable devices.  *See* ECF No. 1612-3 (Oracle's Opp to Google's MIL #2 Re: New Android Products).  In sum, the evidence demonstrates that legal remedies are inadequate to compensate Oracle for the injuries it has suffered, and may continue to suffer, as a result of Google's infringement.

**C.**     **The Balance Of Hardships Warrants An Injunction**

In determining whether injunctive relief is appropriate, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Klein v. City of San Clemente*, 584 F.3d 1196, 1199-1200 (9th Cir. 2009) (internal citation omitted).  Here, a permanent injunction in favor of Oracle would serve the narrow purpose of "prevent[ing] or restrain[ing]" further infringement of Oracle's copyrights.  *See* 17 U.S.C. § 502(a).  Google cannot claim any *legitimate* hardships as a result of being enjoined from committing unlawful activities.  And Google has argued in this case that it could use OpenJDK and that it would only cost approximately $85,000 for it to do so.  ECF No. 1563-7 (Leonard 2/8/2015 Corr. Rpt) ¶¶ 177-78  By contrast, Oracle would suffer irreparable and

1   immeasurable harms if an injunction were not issued, and thus this factor weighs strongly in favor

2   of Oracle.

3   **D.     An Injunction Promotes The Public Interest**

4           Under the traditional four-factor test, district courts must consider to what extent the

5   public interest would be disserved by the issuance of a permanent injunction.  *eBay*, 547 U.S. at

6   391.  This Court has concluded that "[o]n this issue, an examination of the interests underlying

7   copyright law is instructive."  *Apple Inc. v. Pystar Corp.*, 673 F. Supp. 2d at 950.  "The sole

8   interest of the United States and the primary object in conferring the monopoly [of copyright

9   protection] lie in the general benefits derived by the public from the labors of authors."  *Id.* (citing

10   *Elvis Presley Enterpirses, Inc. v. Passport Video*, 357 F.3d 896, 899 (9th Cir. 2004) (quoting *Sony*

11   *Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984)).  As this Court noted,

12   "the public receives a benefit when the legitimate rights of copyright holders are vindicated."

13   *Apple Inc. v. Pystar Corp.*, 673 F. Supp. 2d at 950.  Here, a permanent injunction reasonably

14   tailored to the circumstances of this litigation would vindicate the legitimate rights of Oracle in its

15   copyrights.  Consistent with the policies underlying copyright protection, an injunction preventing

16   Google from continuing to commit infringing acts under the Copyright Act would ensure that the

17   public will continue to benefit from the creative fruits of Oracle's labor.

18           Google may argue that an injunction would harm the public's interest in continued access

19   to the Android platform.  This, of course, would be inconsistent with its claim that it could

20   cheaply and easily use OpenJDK for Android.  Moreover, any such harm to the public could be

21   ameliorated by including a sunset provision in the injunction to allow Google time to implement

22   its workaround.

23   **E.     Scope of Injunctive Relief Must Include Non-Litigated And Future Works**

24           The terms of a permanent injunction must be "reasonable to prevent or restrain" further

25   infringement of a copyright. 17 U.S.C. § 502(a).  It therefore must be broad enough "to restrain

26   acts which are the same type or class as unlawful acts which the court has found to have been

27   committed or whose commission in the future, unless enjoined, may fairly be anticipated from the

28   defendant's conduct in the past."  *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 564 (9th Cir.

1   1990) (quoting *NLRB v. Express Pub. Co.*, 312 U.S. 426, 435 (1941)); 17 U.S.C. 502(a).

2       Consistent with this standard, a permanent injunction against Google should, *at a*

3   *minimum*, encompass the acts found unlawful in this action.  In other words, an injunction

4   should at least cover Google's acts constituting infringement of Oracle's reproduction,

5   distribution, and derivative-work rights under the Copyright Act.  It should also cover Google's

6   acts constituting vicarious and contributory infringement of Oracle's bundle of rights under the

7   Copyright Act because Google should not be allowed to assist, aid, abet or contribute to acts it

8   is not allowed to perform by itself.

9       Moreover, in situations where there is a clear pattern of copyright infringement by the

10  defendant, and there is a threat that other copyrights of the plaintiff may be infringed by the

11  defendant, the weight of authority clearly favors extending the injunction to future works of the

12  plaintiff in addition to existing works.  *See Warner Bros. Records, Inc. v. Brown*, 2008 U.S. Dist.

13  LEXIS 95171 at *6 (N.D. Cal. Nov. 13, 2008) (citing *Princeton Univ. Press v. Michigan*

14  *Document Serv., Inc.*, 99 F.3d 1381, 1392- 93 (6th Cir. 1996) ("The weight of authority supports

15  the extension of injunctive relief to future works [in copyright actions].")); *Walt Disney Co. v.*

16  *Powell*, 897 F.2d 565, 568 (D.C. Cir. 1990).  The inclusion of future works within the scope of an

17  injunction ensures that litigation need not be needlessly replicated when the defendant's

18  infringing *acts* are the same, but the copyrighted work has changed.  Put differently, whether or

19  not the later Java versions (J2SE 6.0 and 7.0) were at issue in this case, an injunctive decree can

20  reach beyond the four corners of the litigated copyrighted works to cover non-litigated items of

21  similar character.  *See, e.g.*, *Walt Disney*, 897 F.2d at 568 (extending a permanent injunction to

22  copyrighted characters that were not expressly litigated in the underlying action); *Brown*, 2008

23  U.S. Dist. LEXIS 95171 at *6 (extending an injunction to works that did not exist when the

24  injunction was imposed).

25      This principle undoubtedly applies here, as during the course of this litigation Google

26  expanded its copying to the later versions of Java that incorporate the same copyrighted materials.

27  *See* ECF No. 1465.  If Google is not enjoined from infringing J2SE 6.0 and 7.0 and future

28  versions of Java, it will continue its pattern of infringement.  Because a copyrighted work need

not be included within the scope of litigation to fall within the scope of a permanent injunction, other Java products including J2SE 6.0 and 7.0, should not be excluded from the scope of the injunction.  Rather, they should be *included* to the extent that they — and any other non-litigated Java versions of similar character to J2SE versions 1.4 and 5.0 — qualify as a protected work under the Copyright Act.

Moreover, the injunction should be broad enough to encompass non-litigated Google *products* that include the litigated Java versions or non-litigated Java versions of similar character. *See Apple Inc. v. Pystar Corp.*, 673 F. Supp. 2d at 954 (rejecting defendant's request to expressly exclude a non-litigated product from an injunction).  In the *Apple* case, this Court concluded that "whether a non-litigated act or product of an accused infringer falls within the ambit of an injunction goes to the *enforceability*, rather than the scope, of the injunction."  *Id.* (citing *In re Lorillard Tobacco Co.*, 370 F.3d 982, 986 (9th Cir. 2004) (noting that the three fundamental characteristics of an injunction are that it is directed to a party, *enforceable by contempt proceedings*, and designed to protect the substantive relief sought by a complaint in more than a temporary fashion) (citations omitted) (emphasis added)).

In sum, Oracle will seek an order permanently enjoining Google, its officers, agents, servants, employees, attorneys, affiliated companies, assigns and successors in interest, and all others in active concert or participation with Google from directly, indirectly, or vicariously infringing Oracle's copyrights in suit, or inducing, causing, or materially contributing to infringement of the copyrights in suit.  Oracle will brief the precise contours of the requested injunction according to the briefing schedule that is set by the Court.


Dated:        April 20, 2016                    Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP

By:  */s/ Annette L. Hurst*
Annette L. Hurst

Counsel for ORACLE AMERICA, INC.