ORRICK, HERRINGTON & SUTCLIFFE LLP
KAREN G. JOHNSON-MCKEWAN (SBN 121570)
kjohnson-mckewan@orrick.com
ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
GABRIEL M. RAMSEY (SBN 209218)
gramsey@orrick.com
405 Howard Street, San Francisco, CA  94105
Tel: 1.415.773.5700 / Fax: 1.415.773.5759
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
51 West 52nd Street, New York, NY  10019
Tel: 1.212.506.5000 / Fax: 1.212.506.5151

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (*pro hac vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY  10504
Tel: 1.914.749.8200 / Fax: 1.914.749.8300
STEVEN C. HOLTZMAN (SBN 144177)
sholtzman@bsfllp.com
1999 Harrison St., Ste. 900, Oakland, CA  94612
Tel: 1.510.874.1000 / Fax: 1.510.874.1460

ORACLE CORPORATION
DORIAN DALEY (SBN 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (SBN 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (SBN 211600)
matthew.sarboraria@oracle.com
RUCHIKA AGRAWAL (SBN 246058)
ruchika.agrawal@oracle.com
500 Oracle Parkway,
Redwood City, CA 94065
Tel: 650.506.5200 / Fax: 650.506.7117

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE INC.,<br><br>Defendant. | Case No. CV 10-03561 WHA<br><br>**ORACLE'S OPPOSITION TO GOOGLE'S MOTION IN LIMINE NO. 3 RE PRIVACY AND ANTITRUST**<br><br>Dept.: Courtroom 8, 19th Floor<br>Judge: Honorable William Alsup |

1

**INTRODUCTION**

2          Nowhere do Oracle's experts "insinuate that Google is violating the jury's privacy,

3  privacy laws writ large, and antitrust laws." Mot. 1. Rather, Google is concerned that the way it

4  collects and makes money off of the personal and behavioral data and data consumption of An-

5  droid users, and its control over the Android ecosystem, will "inflame" jurors. Google should not

6  be heard to complain that it is prejudiced by evidence *of its own business practices*. In any event,

7  the probative value of evidence concerning Google's Android business model far outweighs any

8  "alleged" prejudice because it is essential to the first fair use factor and the causal nexus for in-

9  fringer's profits. FRE 403 (relevant evidence may be excluded only "if its probative value is ***sub-***

10  ***stantially*** outweighed" by risk of unfair prejudice (emphasis added)).

11  **I.      GOOGLE'S USER DATA PRACTICES ARE RELEVANT**

12          **A.      Google's User Data Practices Are Highly Probative Evidence Of Google's
                        Commercial Purpose Under The First Fair Use Factor**

13

14          Google's witnesses have testified that Google's principal objective in launching Android

15  was to make money. Trial Tr. (Schmidt) 1458:13-16 ("[T]he primary reason to have something

16  like Android is that people will do more searches, and then we'll get more money as a result.

17  And that's how we, essentially, pay for the strategy of Android."); Ex. E (Morrill Depo.) 73:7-10

18  ("[T]he more people use the internet, the more they do searches, and the more they do searches,

19  the more likely they are to use Google to do so and therefore create revenue for Google through

20  advertising."). And Google has repeatedly recognized that Android is not "philanthropy" or a

21  "charitable" endeavor. TX 5169 (Q2 2010 Earnings Call) at 5; Trial Tr. 1418:15-19 (Google's

22  counsel). Nonetheless, Google intends to argue to the jury that its copying of the 37 Java API

23  packages was not commercial because it gives Android away for free:

24          I can tell you that, obviously, Android is used in many non-commercial ways all
            the time. Android is offered for free. Google doesn't sell Android. It is offered
25          for free for use for anyone.

26  2/24/2016 Tr. 50:8-11 (Tutorial); *see also* ECF No. 1563-4 (Astrachan Rpt.) ¶ 144 (describing

27  how the 37 Java API packages are part of the "free distribution" of Android).

28          But, as Dr. Jaffe explains, "[t]he Android platform is not 'free' in any economically rele-

1  vant sense.  Rather, it is a part of the Google platform that provides a service to users free of

2  charge ***in exchange for their behavioral data and the right to monetize their data consumption***

3  by selling access to Google's audience to advertisers."  ECF No. 1560-7-8 (Jaffe Rpt.) ¶ 315

4  ("Jaffe Rpt.") (emphasis added).  The collection of user data is central to how Google makes

5  money.  Oracle needs to explain this to the jury to (1) demonstrate the commercial nature of An-

6  droid, (2) demonstrate the extent of the commercial nature of Android, and (3) counter Google's

7  misleading argument that Android is not commercial because it is given away for free.

8       Google makes money through search-engine based advertising.  *See generally* Jaffe Rpt.

9  ¶¶ 73-94; TX 3211 (2004 Google 10-K) at 1; Ex. F (Agarwal Dep.) 24:24-25 ("[W]e generate

10  revenue from ads shown on Google Search on Android devices").  User data is central to

11  Google's ad business because it "allows advertisers to 'target' based on user information such as

12  gender, age, and interests."  Jaffe Rpt. ¶ 78; TX 3211 at 8; ECF 1560-10 (Kemerer Rpt.) ¶ 68

13  ("Kemerer Rpt.").[1]  Because "ad targeting may increase the performance and perceived value of

14  ads," Google can extract higher prices from potential advertisers.  Jaffe Rpt. at ¶ 78; TX 3211 at

15  3.  Google offers an array of ad targeting services "derived from information it collects about

16  users interacting with its products."  Jaffe Rpt. at ¶ 80; TX 3211 at 7-9.  Advertisers line up for

17  these services.  Jaffe Rpt. at ¶ 81-82; TX 3211 at 8-10, 22-24, 28, 85; Kemerer Rpt. ¶ 69.  Google

18  also uses "search queries and click-through behavior data … to improve [its] products, which

19  propel the positive feedback loop of attracting more users" and selling more ads.  Jaffe Rpt. at ¶

20  78.

21       Google argues that it is sufficient for Oracle to state only that Google generates revenues

22  from advertisers, without explaining any more detail about Android's revenue model.  ECF No.

23  1558 at 2.  But, the ***degree*** of commerciality affects the weight that may be afforded to commer-

24  cial nature as a factor.  *See Elvis Presley Enters. v. Passport Video*, 349 F.3d 622, 627 (9th Cir.

---

[1] Google gathers data "signals" from its users, which "provide specific information such as geo-graphic location, search query content and web browsing activities, all of which can be collected, organized and sold to third parties …"  Kemerer Op. Rpt. ¶ 68.  Mobile devices are "the main source of a user's mobile data signals," which users generate "through the use of web browsers, email applications, navigation aids, messaging applications, video players, streaming music ser-vices, games, and a vast array of downloaded applications …."  *Id.* at ¶ 70.

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE NO. 3 RE PRIVACY AND ANTITRUST

2003) ("[T]he degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise—affects the weight we afford commercial nature as a factor.").  Because user data is the lynchpin of Google's Android ad business—and because use of the Java API packages helps draw users to the Android platform (*infra* at 3)—evidence relating to Google's user data practices is highly probative of the extent of Google's commercial purpose under fair use factor one, and essential to countering Google's misleading assertions regarding commerciality.

### B. Google's User Data Practices Are Highly Probative Evidence Of The Causal Nexus Between Google's Copying And Its Infringer's Profits

One of the several ways Oracle shows a causal link between Google's infringement and the Android-related profits Oracle seeks is that the top Android apps all depend heavily on the copied API packages.  *See, e.g.*, ECF No. 1560-12 (Malackowski Op. Report) ¶¶ 225-40 ("Malack. Rpt."); Kemerer Rpt. ¶¶ 115-118, 126-137.  Apps are a big selling point and attract more users to a mobile platform.  Malack. Rpt. ¶ 254; Kemerer Rpt. ¶¶ 61-63, 121-125; *see also id.* ¶¶ 119-120 (describing how dearth of BlackBerry apps and poor availability of Windows Phone apps contributed to the weak market position of those platforms).  More users results in more user data for targeted advertising, which in turn increases the perceived value of ads.  This allows Google to extract higher prices from potential advertisers.  Jaffe Rpt. ¶ 78; Malack. Rpt. ¶ 254.  Better app offerings also leads to more user time on the platform, and thus more opportunities for data collection for targeted ads, as well as opportunities to target ads to users, all of which in turn lead to greater revenues.  Jaffe Rpt. ¶ 91.  Google's witnesses have acknowledged that its "plan for generating profits from Open Source Android" depends upon high user traffic:  "[T]he more people use the internet, the more they do searches, and the more they do searches, the more likely they are to use Google to do so and therefore create revenue for Google through advertising."  Ex. E (Morrill Depo.) 73:6-10; Ex. G (Rubin 30(b)(6) Depo.) 74:19-75:14  ("The more people that use Google services, the more opportunity Google has to get new customers" and "getting new customers matter[s] … [b]ecause Google can advertise to them"); Ex. H (Holzle Depo.) 302:1 ("more traffic generally means more revenue").  Google's collection and use of user

1   data to generate revenues is therefore highly probative evidence of the "causal connection be-

2   tween the infringement and the gross revenue reasonably associated with the infringement."  *Po-*

3   *lar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 715 (9th Cir. 2004) (as amended).

4   **II.     GOOGLE'S PLATFORM CONTROL STRATEGY IS RELEVANT**

5          **A.     Google's Platform Control Strategy Is Highly Probative Evidence Of
6                  Google's Commercial Purpose Under The First Fair Use Factor**

7          Evidence of Google's strategy to control a mobile operating system platform—like evi-

8   dence of Google's user data practices—is highly probative of the ***extent*** of Google's commercial

9   purpose under the first fair use factor and essential to countering Google's misleading assertions

10  regarding commerciality.  *See supra* at 1-3.  Google's control of Android enabled Google to offer

11  it for free and then subsidize wireless carriers, OEMs, and app developers, and to extract value

12  through charging advertisers.  Jaffe Rpt. ¶¶ 39, 51; Ex. I (Eric Schmidt Depo.) 11:9-15 (agreeing

13  that "the model Google has for Android is to make it available for free and to make money from

14  advertising and the value-add services that go on top of the Android platform"); Ex. J (Kolotouros

15  Depo.) 98:11-20 (Google "show[s] [its] support of [OEM] participation in Android by introduc-

16  ing search revenue-share agreements").  "The fact that Google does not demand royalties for and

17  instead actually subsidizes the use of Android by phone manufacturers ***reinforces the commercial***

18  ***nature of the enterprise***…."  Jaffe Rpt. ¶ 21 (emphasis added).

19         Control over the platform also enabled Google to require OEMs to include Google certain

20  apps on their phones.  Jaffe Rpt. ¶ 44.  This assured a large base of potential users for advertisers

21  on those apps, further increasing Google's ad revenues.  Jaffe Rpt. ¶ 44.  The copied Java APIs

22  are a critical requirement for those Google apps.  Kemerer Rpt. ¶¶ 135-140.  Controlling the An-

23  droid platform thus furthered Google's commercial use of the copied API packages.

24         It also reduced the risk that Google would lose user traffic.  Jaffe Rpt. ¶ 92; Kemerer Rpt.

25  ¶73.  Google was concerned that it might be shut out of mobile platform search if someone else

26  controlled the platform:

27         [Larry Page and Sergey Brin] saw that, well, at some point someone is going to do
           an operating system for mobile phones that actually is usable that actually is a plat-
28         form that you can write real applications for, and that platform would be open,
           right, because if it's closed—if it's Microsoft, again, for example, then we're going

1    to be toast. You know, it's not good if the platform is controlled by someone else.

2    Ex. H (Holzle Depo.) 295:4-12.  As Android Chief Andy Rubin explained:  "In a sense, Android

3    exists to make sure folks can't block access to Google; it ensures that users have equal access to

4    services from their phone."  TX 195 at 4; *accord* TX 3215 (2005 Google 10-K) p. 20 (competitors

5    "[could] use their experience and resources against us" leading to "a significant decline in user

6    traffic" that "could negatively affect our revenues.").  With Android, "Google-owned site traffic

7    is completely within its own control to be monitored, monetized and protected in furtherance of

8    its own long-term financial and strategic interests."  Jaffe Rpt. ¶ 92.  This evidence of the value to

9    Google of control of the platform is critical to the commercial nature of Google's use.

10            **B.  Google's Platform Control Strategy Is Essential To The Explanation Of Why**

11            **Google Chose To Copy In The First Place**

12           Google's desire to avoid being locked out of search on mobile, and the consequential race

13    to launch a mobile platform that it controlled, drove Google to copy the Java API packages.

14    Google knew full well that this copying was illegal, having negotiated with Sun for a license for

15    months.  Google's willingness to disregard IP rights in order to launch its own platform within

16    the critical window is a necessary component to the story of why Google copied and is highly

17    probative of Google's bad faith under the first fair use factor and willfulness.  *See Harper & Row,*

18    471 U.S. at 562 ("Fair use presupposes good faith and fair dealing." (quotation marks omitted));

19    *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 944 (9th Cir. 2011) (willfulness

20    requires proof "that the defendant's actions were the result of reckless disregard for, or willful

21    blindness to, the copyright holder's rights").

22           Google's mobile strategy depended upon early market entry and platform control.  *See* TX

23    3215 at 65 (Google 10-k) (without quick action, Google would "fail to capture a significant share

24    of an increasingly important portion of the market for online services."); TX 370 at 1 ("if we miss

25    the 'mobile window', we'll be out of business in 10 years"); TX 151 at 2 (the "goal" of Android

26    project is "quick time to market"); Ex. H (Holzle Depo.) 295:10-12 ("it's not good if the platform

27    is controlled by someone else").  Copying the Java API packages allowed Google to launch a

28    platform it controlled within the critical market window.  Kemerer Rpt. ¶¶ 65-94; Jaffe Rpt. ¶¶

1   161-163; TX 22 at 5 (leveraging Java developer community enabled Google to "[d]ramatically

2   accelerate[] [its] schedule"); TX 13 at 1 ("[J]ava saved us a pretty crazy amount of time.").

3       But there was a catch:  Google knew that the Java "apis are copyrighted," TX 18, and that

4   it "[m]ust take [a] license from Sun."  TX 1 at 9.  Google "discuss[ed] with Sun the possibility of

5   taking a license" but, after several months of negotiation, the parties "were unable to reach a

6   deal."  ECF No. 1202 (Copyrightability Order) at 6:1-5.  Without a license, Google had two op-

7   tions: "1) Abandon our work … -or- 2) Do Java anyway and defend our decision, perhaps making

8   enemies along the way."  TX 7 (Rubin email) at 2.  Google chose option two.

9       Google knew that its copying was wrong.  *See* Tr. (Schmidt) 1559:20-23 ("Q. Now, there

10  came a time when Google was sufficiently worried about being sued that it thought about buying

11  all the rights to Java; correct, sir? A. Yes."); TX 326 at 2-3 (proposing "Google buys the rights to

12  Java from Sun (patents, copyrights, etc)" and describing as "Good for Google" because "Our Java

13  lawsuits go away").  But Google's mobile strategy did not permit "a platform that was highly

14  controlled by Sun" since it "may have created risk for Google in terms of Google's ability to

15  move into the market quickly and to take development of the platform wherever Google wished."

16  Kemerer Rpt. ¶ 163.

17      Google's willingness to knowingly copy the Java API packages is "an indication of the se-

18  riousness with which it took the pressure to get to market with a competitive mobile ecosystem"

19  and "the import of the Java platform to those aspirations."  Jaffe Rpt. ¶ 164.  This evidence shows

20  that "the character" of Google's use was not fair.  *See Los Angeles News Serv. v. KCAL-TV

21  Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997) ("the propriety of the defendant's conduct is rel-

22  evant to the character of the use at least to the extent that it may knowingly have exploited a pur-

23  loined work for free that could have been obtained for a fee" (internal quote omitted)).

24                                    **CONCLUSION**

25      The Court should not exclude highly probative evidence of Google's user data practices

26  and platform control because Google is concerned jurors will not like how Google makes money.

27  This Court should deny Google's motion *in limine* in its entirety.

28

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE NO. 3 RE PRIVACY AND ANTITRUST

1    Dated: April 29, 2016                            Orrick, Herrington & Sutcliffe LLP

2

3                                            By:    */s/ Andrew D. Silverman*

4                                                Andrew D. Silverman

                                                Attorney for Plaintiff

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE NO. 3 RE PRIVACY AND ANTITRUST