Pages 1 - 116

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

```
ORACLE AMERICA, INC.,            )
                                 )
             Plaintiff,          )
                                 )
  VS.                            )  No. CV 10-3561 WHA
                                 )
GOOGLE, INC.,                    )
                                 )
                                 )  San Francisco, California
             Defendant.          )  Wednesday
_____)  April 27, 2016
```

TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiff:**            ORRICK, HERRINGTON & SUTCLIFFE LLP
                              The Orrick Building
                              405 Howard Street
                              San Francisco, California  94105
                   BY:  **ANNETTE L. HURST, ESQUIRE**
                        **GABRIEL RAMSEY, ESQUIRE**

(Appearances continued on next page)

Reported By:  Pamela A. Batalo, CSR 3593, RMR, FCRR
              Official Reporter

```
 1   APPEARANCES (CONTINUED):

 2   For Plaintiff:          ORRICK, HERRINGTON & SUTCLIFFE LLP
                             The Orrick Building
 3                           51 West 52nd Street
                             New York, New York 10019
 4                   BY:  PETER A. BICKS, ESQUIRE
                          LISA T. SIMPSON, ESQUIRE
 5                        ANDREW SILVERMAN, ESQUIRE

 6

 7   For Defendant:          KEKER & VAN NEST
                             633 Battery Street
 8                           San Francisco, California  94111-1809
                     BY:  ROBERT A. VAN NEST, ESQUIRE
 9                        CHRISTA M. ANDERSON, ESQUIRE
                          MICHAEL S. KWUN, ESQUIRE
10                        MAYA KARWANDE, ESQUIRE
                          REID MULLEN, ESQUIRE
11                        MATTHIAS KAMBER, ESQUIRE

12                           KING & SPALDING
                             1180 Peachtree Street, N.E.
13                           Atlanta, Georgia  30309
                     BY:  BRUCE W. BABER, ESQUIRE
14
     Also Present:
15
     For Dr. James Kearl:    FARELLA, BRAUN & MARTEL LLP
16                           235 Montgomery Street
                             San Francisco, California  94104
17                   BY:  JOHN L. COOPER, ESQUIRE

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Wednesday - April 27, 2016**                    **8:00 a.m.** |

2              **P R O C E E D I N G S**

3                  ---000---

4          **THE CLERK:**  Calling CV 10-3561, Oracle America, Inc.

5   vs. Google, Inc.

6      Counsel, please step forward to the podium and state your

7   appearances.

8          **MR. BICKS:**  Good morning, Your Honor.  Peter Bicks

9   from Orrick for Oracle.  And you know Ms. Hurst.

10         **MS. HURST:**  Good morning, Your Honor.

11         **MR. BICKS:**  Andrew Silverman the Court has not met.

12  Gabe Ramsey, and Trudy Harris does courtroom technology.  She's

13  over here.  And Lisa Simpson you know.

14         **MS. SIMPSON:**  Good morning, Your Honor.

15         **THE COURT:**  All right.  Thank you.

16         **MR. VAN NEST:**  Good morning, Your Honor.  Bob Van Nest

17  for Google.  I'm here with Christa Anderson, with Eugene Paige,

18  with Michael Kwun, with Reid Mullen, Maya Karwande, and also

19  with us Bruce Baber from King & Spalding as part of our Google

20  of team.

21         **THE COURT:**  Welcome back.

22         **MR. COOPER:**  Good morning, Your Honor.  John Cooper on

23  behalf of Dr. Kearl, and Dr. Kearl is in the courtroom.

24         **THE COURT:**  Again, thanks to both of you for being

25  present.

1          We are here for final pretrial conference.  I want to go

2     over some procedural things, and, time permitting, we will go

3     into some of the motions in limine, but as I said before, some

4     of these motions in limine will have to be decided on the

5     papers because you all have bombarded the Court with so much

6     paper that it's impossible to responsively go through it in the

7     time you have given me.

8          We will start with something easy.

9          Did you have something you wanted to raise?

10         **MR. BICKS:**  No, Your Honor.

11         **THE COURT:**  Okay.  You can stand there for a moment.

12    I'm handing down to Mr. Bicks -- thank you for your timeline.

13    I have given you the -- I'm going to hand it down, but let me

14    hold it up.  This is kind of what I have in mind, something

15    that looks like that, and you can -- don't feel obligated to

16    use my version, but I tried to make it simpler, so you can go

17    use that as a starting point and come up with a timeline

18    that -- we'll have it up in the courtroom so the jury can

19    always refer to it, and I will probably also hand it out as a

20    single sheet of paper so the jury can have it in their steno

21    pad.  All right.

22         **MR. BICKS:**  Yes.

23         **THE COURT:**  All right.  So enough on the timeline.

24         I need your witness list that I can put on the back of the

25    questionnaire.  Do you have that ready for me?

1      **MR. BICKS:**  Yes, we do, Your Honor.

2      **THE COURT:**  All right.  Hand that up, please.

3  Mr. Van Nest, have you seen this?

4      **MR. VAN NEST:**  Yes, I have, Your Honor.

5      **THE COURT:**  So these are not lawyers.  These are

6  witnesses; right?

7      **MR. BICKS:**  Yes.

8      **THE COURT:**  Okay.  That's great.  Thank you.  All

9  right.  How about the one-page statement to read to the jury?

10      **MR. BICKS:**  That, Your Honor, we've been working on

11  and I think we've made good progress.  There are two basic

12  issues, if I could just quickly bring them to Your Honor's

13  attention, that we're debating.  If we got quick guidance from

14  you, I'm sure we could sort it out.

15      Issue one is whether or not in the neutral statement there

16  would be reference to the damage claim in the case and whether

17  or not we can say that we have a damage claim for billions of

18  dollars.  That's the question one.

19      And then question two is whether or not we can refer to

20  the fact that Oracle has a claim for willfulness.  Those are

21  the two issues that we've been debating.  I think if we get

22  guidance from you, then we put the neutral statement to bed.

23      Our position obviously is that, you know, the amount of

24  the damage claim is something that we think the jury in the

25  venire should know about because I think people would naturally

1  have strong feelings one way or another, and it's something I

2  think we should get out on the table, subject to a point I know

3  the Court made about not conditioning.  We are not trying to do

4  that, but it is a fact that that's what we're claiming.  And so

5  that's -- that's where we are on those two issues.

6        **THE COURT:**  All right.  What's wrong with telling the

7  jury up front that billions of dollars are being sought?

8        **MR. VAN NEST:**  I just don't think that is appropriate

9  for the neutral statement.  We're just basically laying out

10  that it's an infringement case, that there is a fair use

11  defense, that Oracle has a claim that both parties are

12  disputing the claim and the defense, period.  If he wants to

13  explore the damages in his 40-minute *voir dire*, I don't have

14  any problem with that.  If Your Honor wants to explore it in

15  your *voir dire*, I don't have any problem with that.  But I

16  think this is a neutral statement that doesn't need to include

17  that information and shouldn't.  It should just be *Here are the*

18  *claims.  They're disputed.  This is generally what the case is*

19  *about.*

20      That's the same objection I have to willfulness which is

21  it's sort of a detail that is not going to be involved until

22  Phase Two, if we get there.  Other than that, the parties have

23  pretty much worked out the language of this thing.

24        **THE COURT:**  Well, we should tell the jury in the

25  opening statement what the dollar amount is so that if

1  someone -- there will be people in the venire who will be so

2  offended by that number that they -- we will have to excuse

3  them because they will be prejudiced against Oracle.  There are

4  people like that.  And so we need to give them some clue as to

5  what the number being sought is so that they can self-select

6  out and that -- so you can either put in the actual number or

7  you can put in -- just say billions of dollars.  Whatever --

8          MR. VAN NEST:  Very well.

9          THE COURT:  Can you two at least agree on that?

10          MR. BICKS:  Yes.

11          MR. VAN NEST:  We will.

12          THE COURT:  Now, on willfulness, remind me how

13  willfulness plays into the case again.

14          MR. VAN NEST:  Willfulness doesn't come into play

15  unless they elect statutory damages, and they've refused to

16  make that election yet, so as Your Honor ruled, willfulness is

17  part of Phase Two if we get there because it's relevant only to

18  statutory damages.

19          THE COURT:  And you have not tried to take any

20  deduction for overhead and so forth; right?

21          MR. VAN NEST:  Well, it's not just overhead.  The

22  willfulness would apply if we took a deduction for taxes, and

23  we've elected not to do that.  We've taken it out of play.

24          THE COURT:  So it's only in play for statutory

25  damages?

1           **MR. BICKS:**  And it's also, Your Honor, relevant for

2      purposes of the injunction.

3           **THE COURT:**  Well, I know, but that's something that I

4      could decide on my own without a jury finding, but for that

5      purpose, however, yes, it is relevant for that.

6           I think that one ought to be left out.  I'll tell you why.

7      Oracle is playing games with the statutory thing anyway.  You

8      know that.  You're not going to ask for statutory damages.  So

9      the idea that we're going to insinuate the word *willfulness*

10     into the statement up front on the theory that downstream

11     they're going to have to make that finding, it's -- yeah, they

12     will have to make the finding, but it's not important enough to

13     surface in the neutral statement.  Leave willfulness out for

14     the time being in your one-page statement.

15          **MR. BICKS:**  Okay.

16          **MR. VAN NEST:**  Your Honor, with that guidance, we'll

17     get you the statement this afternoon.

18          **THE COURT:**  Great.  Thank you.

19          All right.  Next we go to -- let's just do some practical

20     things for a moment.

21          I know that you big law firms like notebook -- witness

22     notebooks with exhibits, and we don't do that here.  We do it

23     the old-fashioned common-law way because the notebooks never

24     have the exact right copy.

25          So there will be one paper exhibit that is in paper form

1    or photograph, whatever, per exhibit number, and it has to be

2    marked, and that is the official thing.  That should be shown

3    to the witness.  That means before the witness shows up, you've

4    got to fish out the right exhibits, have them stacked up, ready

5    to go, hand them to the witness one at a time or sometimes in

6    groups.

7         If you don't do it that way, the following problem can

8    arise.  I've had it happen in trials.  I had it in closing

9    argument in a civil case.  Right in the middle of the defense

10   closing argument, it turned out that the lawyer had put up on

11   the screen Exhibit 17.  I even remember the number.  Exhibit 17

12   had never been put into evidence.  What had been put into

13   evidence and marked was something different.  And the lawyer

14   screwed up and blamed it on a paralegal.

15        So I then had to admonish the jury, *Mr. So and So just*

16   *showed you a document that was never in evidence.  You have to*

17   *disregard that.*  Well, the defense lost and got hit with

18   millions of dollars because they showed the bogus document to

19   the jury in closing argument.  I don't know what the real

20   reason was, but that's what my theory is.

21        That should never have happened and why did it happen?

22   Because the big, big firms wanted to have big, big notebooks,

23   and those notebooks are never right.  They leave off a

24   document.  The appendix is not right.

25        So, anyway, the rule is this.  It's the common-law rule.

1    There will be a document.  It will have the tag put on by the

2    clerk, Exhibit 3.  That's what's official.  So when it's moved

3    into evidence, that's what comes in.  I don't care if you

4    didn't look at it, it's your own problem if you don't look at

5    it.  You should have vetted it up front.  But when Exhibit 3

6    comes in, you cannot later come to me and say, *Oh, we thought*

7    *that was a different document.*  *We thought they were talking*

8    *about Exhibit 3 to the deposition.*  *Oh, my God, we made a*

9    *mistake.*  No.  It's too late.  Whatever it was comes into

10   evidence.  So we want to make sure the witness on the stand is

11   actually playing with the same deck of cards that the Court of

12   Appeals is going to be playing with.  So it has to be -- that's

13   the way we do it.

14        Now, we come to the electronic part.  Here I have to trust

15   the lawyers to show the jury the electronic version on the

16   screen of what the hard copy document is.  And I have to trust

17   the other side to jump up and say something if the wrong

18   document gets shown.

19        So that's the way we do the documents.  All right.  Any

20   heartburn over that?

21        **MR. VAN NEST:**  No heartburn, but just a question,

22   Your Honor.  So I'm understanding that when we put a direct

23   exam witness on, we can't give him a notebook with exhibits in

24   it?

25        **THE COURT:**  That is correct.

1          **MR. VAN NEST:**  I'm just going to walk up one at a time
2     with the exhibits?

3          **THE COURT:**  That's correct.

4          **MR. VAN NEST:**  Then we're responsible, of course, for
5     making sure what we display is what's in the actual exhibit?

6          **THE COURT:**  That is correct.

7          **MR. VAN NEST:**  Now, on cross --

8          **THE COURT:**  Same thing.

9          **MR. VAN NEST:**  -- are we going to proceed the same
10    way?

11         **THE COURT:**  Yes.

12         **MR. VAN NEST:**  No notebook for cross for the witness?

13         **THE COURT:**  No.  No.  I promise you, your paralegals
14    will goof it up.  Then you'll blame the paralegals.

15         **MR. VAN NEST:**  I have never had that experience,
16    Your Honor, but I trust you have.

17         **THE COURT:**  No.  My paralegals were great.  They never
18    made a mistake --

19         **MR. VAN NEST:**  Mine either.

20         **THE COURT:**  -- when I was practicing, but you
21    lawyers -- mine were better.

22         **MR. VAN NEST:**  That I have to dispute, Your Honor.

23         **THE COURT:**  I tell you, I won't trust your paralegals
24    to do it right.

25         **MR. VAN NEST:**  That I dispute.

1      **THE COURT:**  Because then you will be throwing yourself

2  on the mercy of the Court.  So too bad, you're going to do it

3  one at a time.  It can be done.  It works great.  It's better

4  for the jury to do things one at a time.

5      **MR. VAN NEST:**  Fair enough.

6      **THE COURT:**  Any heartburn over there?

7      **MR. BICKS:**  No.

8      **THE COURT:**  So now we go to deposition, use of

9  depositions.  I don't like it when the lawyers say, *In your*

10  *deposition, didn't you say the light was red*?  Raise your hand

11  if you know why that's no good.  Okay.  Ms. Hurst raises her

12  hand.  She probably knows the answer.

13      **MR. BICKS:**  Because they didn't say that at the

14  deposition.

15      **THE COURT:**  Well, the lawyer always embellishes it.

16  The lawyer didn't ask the right question and wants to fix it

17  up.

18      **MR. BICKS:**  Yes.

19      **THE COURT:**  So whenever -- so in fact instead of

20  saying the light was red in the deposition, the question was

21  *didn't you say that the officer said the light was red*.  That's

22  totally different.  And yet the lawyer, knowing that that's

23  inadmissible for hearsay, tries to fix it up and say to the

24  witness, *Didn't you say the light was red in your deposition*?

25      So the way you have to do it is that whenever you think

1   it's time to impeach with a deposition or -- or even -- it

2   could be for any purpose if it's a party witness, you just say,

3   *Judge, I want to read page 32 of the witness' testimony, lines*

4   *1 to 4.* So I will pause about two seconds. The other side

5   should already have this out. If I don't hear an objection, I

6   will say *proceed.*

7       You should not, on the other side, say, *Oh,* scramble

8   around and then you're running for the boxes and delaying.

9   That's a delay tactic. You got to have that deposition ready

10  to go. Have it so that you can say *objection* if you have an

11  objection, because otherwise, if there's a delay, the advocate

12  loses the benefit of showing that the witness said exactly the

13  opposite in the deposition. And so what you do once you say --

14  you always got to say *question.*

15      *Question: What color was the light*?

16      *Answer, the light was red.*

17      And don't -- you don't then start -- you don't need to

18  start saying, *You were under oath. You lied, didn't you*? No,

19  you don't get to do that. That's just argument. We don't do

20  that. I will explain that it was under oath. I will explain

21  what the depositions are. So the jury will just start

22  cataloging all the inconsistencies and -- all right. So that's

23  the way you do depositions.

24      **MR. BICKS:** And then, Your Honor, as I read the way

25  you like to do it, then the question at the end would be, *Do*

 1     *you stand by that testimony.*

 2                 **THE COURT:**  You can ask that question.  Yes.  I will

 3     allow that.  You can ask that question.  You can say, *All*

 4     *right, Mr. Witness, do you stand by the testimony you gave in*

 5     *that deposition or not?*  What are they going to say, you know?

 6     Yeah.  That's a good question.  You can ask that if you want.

 7     You don't have to ask that, but you can.

 8                 **MR. BICKS:**  Thank you.

 9                 **THE COURT:**  All right.

10         Ms. Hurst, was that the reason you were going to offer?

11                 **MS. HURST:**  I could never have said it as well,

12     Your Honor.

13                 **THE COURT:**  All right.  Well, thank you.

14         Okay.  Depositions.  All right.

15         Here's another easy one.  Sometimes during trials like

16     this, the lawyers will jump up and say, *They can't do that*

17     *because they didn't disclose that.*  I have learned that I can't

18     take -- the lawyers then get up and I'll say, *What do you mean*

19     *they didn't disclose it?*

20         *Well, in their Rule 26 they didn't disclose it.*

21         So then we usually I just say, *Forget it, we're going*

22     *forward.*  But it may be we have a break.  At the break, then I

23     say, with the jury not present, show me the Rule 26 disclosures

24     and then the lawyer says, *Well, it's back at my office.*  Well,

25     that doesn't do me any good.  All these boxes, you've got to

1    have it there.  Chapter and verse, you've got to cite it, show

2    it to me so I don't have to take anybody's word for what was

3    and was not disclosed.

4        So if you're going to get into a discovery -- what

5    happened in discovery or Rule 26 disclosures, you have to have

6    it here in the courtroom so that I can see who's telling me the

7    truth.

8        Stipulations.  I guess we're going to have a few.  Not

9    many, but some.  So the stipulations get read to the jury.

10   That's the only way they come in.  You do not send a document

11   into the jury room with your stipulations on it because that

12   gives the stipulations more weight than the rest of the

13   testimony, so we -- and the jury gets to hear it and absorb it

14   so you got to read, and then after you read it, I will turn to

15   the other side and say, *Do you so stipulate* and they say *yes*

16   and so then I'll tell the jury that's evidence in the case.

17       How long do you want for your opening statements?

18       **MR. BICKS:**  You know, I would love an hour ten

19   minutes.

20       **THE COURT:**  That's too much.

21       **MR. BICKS:**  I thought I'd --

22       **THE COURT:**  That's too much for an opening statement.

23   For a closing argument that's not enough, but for opening

24   statements, I think that's too much.

25       **MR. BICKS:**  How about an hour?

1        **MR. VAN NEST:**  Sixty minutes is what I had in mind.

2   Actually I think that's what you said earlier in an order that

3   made sense.

4        **THE COURT:**  Did I say 60 minutes?  All right.  One

5   hour.  We will give you one hour.

6        **MR. VAN NEST:**  I'm assuming that although we're a

7   defendant, we'll open first in Phase One since we have the

8   burden of proof.

9        **THE COURT:**  I think I should instruct that the -- on

10  this phase they do have the burden of proof, they do get to go

11  first.  Any objection?

12       **MR. BICKS:**  Well, I understand -- I mean, this is an

13  open issue that we had which I understand, for purposes of

14  presentation of the evidence, that they put on their evidence

15  first.  But, for example, when it comes to *voir dire* and

16  actually giving the opening statement, you know, I could see

17  views one way or the other.

18       **THE COURT:**  Let's do this.  For *voir dire*, you should

19  go first.  But for -- because this is -- there are multiple

20  parts to the case, but for the opening statement, are we going

21  to limit the opening statements to just the fair use issue or

22  are we going to -- we have to explain the overall -- I think

23  you should get to go -- why don't you let Mr. Bicks go first on

24  the opening statement.

25       **MR. VAN NEST:**  Well, I think, Your Honor, that you

earlier said we would go first in Phase One, and I have

assumed, since we have the burden of proof, that we would go

first, we would open first.  Obviously my understanding from

last time is you can talk about the whole case, too.  He can

talk about damages, I can talk about damages.  We're not

limited in the opening for Phase One to just fair use.  He can

talk about damages and so on, but since I have the burden of

proof and since the focus of Phase One is on fair use and

damages will be discussed but not the real focus immediately

for the jury, I ought to go first, and that's what I assumed --

            **THE COURT:**  Mr. Cooper wants to say something here.

            **MR. COOPER:**  Yes, Your Honor.

      Dr. Kearl feels it's necessary for him to hear the opening

statement for damages.  So if the original opening statement is

going to include both fair use and damages, Dr. Kearl would

need to be here.  If there is going to be a second opening

statement that relates to only damages, then that would affect

his schedule.  He would be here for that.

            **MR. VAN NEST:**  What I assumed, Your Honor, there could

be reference to it.  If counsel wanted to spend a lot of time

on it, he or she could, but I certainly didn't plan to spend a

lot of time on it.  My focus is going to be on fair use because

that's what the jurors are going to be hearing evidence about.

And certainly Dr. Kearl can read the transcript of the first

opening if he does -- is not able to be here.

1      **MR. BICKS:**  Again, I just, Your Honor, think it's fair

2  for us, as the plaintiff, to be able to set the stage for the

3  opening statement, and we are in this unusual procedural

4  posture, but --

5      **THE COURT:**  Look, I agree with that.  I think the

6  plaintiff gets to go first, even though you have the burden of

7  proof, and we'll explain that.  And then you will get to go

8  first on the actual presentation of the evidence, and for

9  closing argument on the first phase, you will get to go first

10  in close since you have the burden of proof.  But for the

11  overall kick the case off and introduce the case to the jury,

12  the plaintiff I think should have that privilege.

13      So you get to go first, Mr. Bicks.

14      Are you going to give the opening statement?

15      **MR. BICKS:**  Yes, sir.

16      **THE COURT:**  So you get to go first.

17      And now you raise an interesting point.  I think we should

18  tell the jury there will be too phases, and if you want to

19  address damages, I think it's okay.  But I think we should also

20  have a -- before the second phase, we should have at least a

21  short opening statement then to reorient the jury and tell them

22  what they're about to hear, and it would be -- so maybe you

23  have two shots at it in a sense, but -- so I wouldn't spend

24  much time on damages in this opening, but I think it's fair to

25  tell the jury how the overall case is going to get organized.

1        **MR. BICKS:**  Yes.

2        **THE COURT:**  If Dr. Kearl feels he has got to be here

3   in person and can't pick it up from the transcripts, that's

4   fine.  I want to accommodate him, but my guess is it will be

5   fine just to read the transcripts.

6        **MR. BICKS:**  Just so Dr. Kearl knows, I don't intend to

7   go into damages in any great detail, and I think the process

8   that Your Honor had set forth was, you know, an hour opening

9   and then I think you had indicated a half an hour for Phase

10  Two, you know, to kind of set the stage on damages.  So while I

11  may just touch on it, I'm kind of following your lead.

12       **THE COURT:**  All right.  Okay.

13    Who will the corporate representatives be?  Let's take

14  another easy one.  Will we have corporate representatives here?

15       **MR. BICKS:**  Yes.  I think for us it's going to be a

16  gentleman by the name of Mr. Saab, S-A-A-B.

17       **THE COURT:**  And --

18       **MR. VAN NEST:**  And for Google, it will be Catherine

19  Lacavera, Your Honor, who is here today and was our corporate

20  representative in trial one as well.

21       **THE COURT:**  What is her position?

22       **MR. VAN NEST:**  She is the chief of IP litigation.

23       **THE COURT:**  What is Mr. Saab's position?

24       **MR. BICKS:**  He is -- he is a senior executive at

25  Oracle.  I can get you his exact title.  He's not a lawyer.  He

1    is an executive.

2            THE COURT:  That's a different person than we had last

3    time.  Seems like we had a woman.

4            MR. BICKS:  You had Ms. Katz.

5            THE COURT:  That's who it was.

6            MR. BICKS:  And she will be testifying in the case.

7            THE COURT:  Experts.  Let's have a discussion about

8    experts.  It's okay with me if you want to have the experts

9    attend all of the trial, part of the trial, but I'm going to

10   have a caveat on that.

11       What do you all think?

12           MR. BICKS:  I was assuming, understanding how you had

13   done it before, that experts would be allowed to attend and we

14   had planned on that.

15           MR. VAN NEST:  I assumed that as well, Your Honor.

16           MR. COOPER:  Dr. Kearl would like to hear Dr. Jaffe's

17   testimony, regardless of when it comes in, so we would like

18   some advance notice as to when Dr. Jaffe is going to testify,

19   if he is going to testify in the liability phase.

20           THE COURT:  Whose witness is that?

21           MR. BICKS:  He is our witness, Your Honor.

22           THE COURT:  Would you then notify Mr. Cooper?

23           MR. BICKS:  Absolutely.

24           MR. COOPER:  And Dr. Kearl intends to be present

25   during the damages trial.  We would want some indication as to

1   how long that would be, and we would appreciate 24-hours'

2   notice before it begins.

3           **THE COURT:**  All right.  We will do all of that.

4           **MR. COOPER:**  Thank you.

5           **THE COURT:**  So now here is a caveat that goes with it.

6   The rule says, Rule 26, that you're limited to what's in

7   your -- on direct examination -- I should be very clear.  On

8   direct examination by the proponent of the expert, you are

9   lockstep limited to what's in your report.  I just want to stop

10  here and make sure you've got that.  The report has got to have

11  every opinion and every bases, and if you left something out,

12  too bad.  On objection, you can't get into it.  Let's stop.

13      Does everyone understand that's what the rule says?

14          **MR. VAN NEST:**  We do, Your Honor.

15          **MR. BICKS:**  Yes.

16          **THE COURT:**  If you two want to stipulate you want a

17  *Wild West* trial by ambush and you don't want that to apply, I

18  will let you do that.

19          **MR. BICKS:**  I like that.

20          **THE COURT:**  You like what?

21          **MR. BICKS:**  Wild Wild West.

22          **THE COURT:**  Wild West.

23          **MR. VAN NEST:**  I like the traditional rule,

24  Your Honor, stick to the reports.

25          **THE COURT:**  So you won't stipulate?

1       **MR. BICKS:**  No.  I'm fine.

2       **THE COURT:**  What?

3       **MR. BICKS:**  We understood the rules.

4       **THE COURT:**  All right.  Okay.  Now, here is the reason

5    I bring that up.  The fact that the witnesses get to sit in

6    here and hear all this other testimony does not give them some

7    kind of permission to enlarge on their direct exam.  They're

8    still stuck with what they said in their report.

9       **MR. VAN NEST:**  Understood.

10      **THE COURT:**  All right.  But there is a way that it

11   makes a difference.  Because on cross-examination, the

12   witnesses are not stuck with what's in their report.  If you

13   open the door to something that's not in the report, that's

14   your problem, if you are the examiner.  Do you understand that

15   part?

16      **MR. VAN NEST:**  I understood that, too.

17      **THE COURT:**  Okay.  So that's where seeing all the

18   testimony may benefit the witness.  The witness might say,

19   *Well, Mr. Van Nest, I'm glad you asked that because just the*

20   *other day I was in here and I heard so and so testify and that*

21   *fills the missing link.  The missing link is now filled, and*

22   *thank you for giving me the opportunity to make that*

23   *clarification.*

24      **MR. VAN NEST:**  That is nonresponsive, Your Honor.

25      **THE COURT:**  Then you would jump up and say, *That is*

1    *not in the report* and I would say, *Too bad, you opened the door*

2    *on cross-examination.*  Then within reason on redirect, if it is

3    responsive to something that was directly asked on cross --

4    this is sometimes not easy to apply -- but then the original

5    proponent might be able to go beyond the four corners of the

6    report because the other side went beyond the four corners of

7    the report.  So that's the way the thing about experts can

8    still make a difference if they stay in the courtroom and --

9    okay.  Enough on that.

10       We have this jury electronic cart that will be in the jury

11   room during deliberations.  We have plenty of time on this, but

12   before it goes in there, you need to know how it works and make

13   sure it's loaded up properly.  In the last trial, it was not

14   loaded up properly, and the jury had problems with it.  Not

15   your trial.  A criminal trial.

16       But you have got plenty of time.  Just put on your list of

17   things to do to learn how that jury electronics cart works.

18       All right.  Back East, they have a rule on -- that's not

19   as enforced out here, but I think we did it last time, that on

20   cross-examination, nobody, including your own lawyer, can talk

21   to a witness while they are on cross.  Real cross is what I

22   mean.  Adverse examination.  Even overnight.  You can't talk

23   about the substance of their testimony.

24       This is so that lawyers don't get in there and woodshed

25   the witness and fix up the testimony.  This would even apply to

```
 1    Mr. Cooper and Dr. Kearl.
 2         Everybody okay with that rule?
 3              MR. BICKS:  Yes.
 4              MR. COOPER:  Yes.  We understand that, Your Honor.
 5              MR. VAN NEST:  Yes.
 6              THE COURT:  What?
 7              MR. COOPER:  We understand that.
 8              THE COURT:  That's the way -- that's the way we will
 9    do it, too.  Good.
10         Here's a small thing.  I would like to get each side's,
11    say, top 20 documents, but agree on this.  In other words, if
12    you've already overlapped, then don't give me multiple copies.
13    Just give me one notebook about -- even this is too big, but
14    something like this size that would have the top 20 documents.
15    If you can't fit it all in one, just give me the top 15 then.
16    But I'm sure there's not -- every case comes down to a small
17    number of documents.
18         Mr. Cooper might remember what the old saying in our
19    district that Joe Alioto only needed two documents to win any
20    case.  So you don't know what they were.  Raise your hand if
21    you know what the two were.
22         Okay.  What were they?
23              MR. PAIGE:  The worst the document in the case and the
24    Magna Carta.
25              THE COURT:  That's it.  Did I say that before to you?
```

1          **MS. ANDERSON:**  Yes.

2          **THE COURT:**  That's good.  For those of you who didn't

3     hear, one would be the worst document in your files and the

4     other is the Magna Carta.  You are supposed to laugh at this

5     point.

6          You really only need one document, but 15 would be good.

7          Let's go to the jury selection.  I think we are going to

8     have about 60 to 70, so I'm going to try to squeeze them all in

9     there on the left.  In that front row, I'm going to have to

10    have all that clear over there so this is only during jury

11    selection, and everyone else is going to have to squeeze in

12    over there, and I still may have to ask some of the troops to

13    go somewhere else if we can't fit them all in on the left.

14    Once we get a jury sworn, then everyone can resume your

15    original seats.

16         I think we -- I've laid out what the plan is in this

17    document.  The only wrinkle is that I'm going to ask you to use

18    the stand up -- thank and excuse on your three peremptories.

19         So, Mr. Bicks, you would stand up and say, *Mrs. So and So,*

20    *we thank and excuse you.*  So everyone will know who you

21    excused.  Same for both sides.  All right?

22         **MR. VAN NEST:**  That's fine, Your Honor.

23         **THE COURT:**  Okay.  Otherwise, I think I'm -- I don't

24    need to make any clarifications, but do you all have any issues

25    you want to bring up on the jury selection?

1        **MR. BICKS:**  Yes.  I have a question, Your Honor, which

2    was we went back and forth on the question of the mini opening.

3    Your Honor had proposed --

4        **THE COURT:**  We don't need that anymore because we're

5    going to use the one-page statement.

6        **MR. BICKS:**  Okay.

7        **THE COURT:**  Unless you want it.

8        **MR. BICKS:**  I just thought -- I thought it was

9    actually a good idea, only in the sense that to have the jurors

10    hear a little bit more about the case before they fill out the

11    questionnaire I think may give us more of kind of an

12    informed --

13        **THE COURT:**  See, the objection to doing that was that

14    Mr. Van Nest -- I'll put words in his mouth, but he said that

15    he is such a good advocate, that of course they're going to be

16    strongly in favor of his side at the end of the mini opening.

17    And that's a fair point, you know, because maybe -- because of

18    the strength of the opening statement, the mini statements,

19    that they would already be persuaded, and that would be okay, I

20    guess, because -- so I think we need to just -- we need to

21    measure that -- what we could do is this.

22    We bring them in.  We give them the one-page statement.

23    I'll read it to them, and then they fill out the questionnaire.

24    As they come forward and get into the jury box, then we could

25    give them another mini opening.  I wouldn't want them, though,

1    to go back and change any of their answers.

2            **MR. VAN NEST:**  I think it gets a little complicated,

3    Your Honor.  I understood that we were going to replace that

4    with the neutral statement and get the jurors' reactions and

5    save the openings for openings.

6            **THE COURT:**  I think that's what we should do now.  I

7    have done the mini openings, and it has this advantage.  It

8    gets them engaged.  We might have even done it in this case.

9    It gets the jury venire engaged so they want to serve.  They

10   say, *These are pretty good lawyers.  This would be a great case*

11   *to be on.*

12           **MR. VAN NEST:**  I don't think that really is a good

13   enough reason, but I don't feel strongly if Your Honor wants to

14   do it, but I think it should come later in the process, not

15   before they do the questionnaire.  That was my objection.

16           **THE COURT:**  Let's leave off the mini openings.

17           **MR. VAN NEST:**  That's fine, Your Honor.

18           **MR. BICKS:**  The reason I was thinking about it,

19   Your Honor, was the notion that when people -- the neutral

20   statement is very, very short and pretty vanilla.  The thinking

21   I had was that people may not really realize that much about

22   the case, and after there was a mini opening, a light bulb

23   could go off and somebody could say, *Oh, now I do know about*

24   *this case.  I remember seeing this, this or that and that*

25   *was --*

```
1          THE COURT:  Possibly that will happen anyway through

2     the -- I'm going to allow each side to have some -- what did I

3     say?  45 minutes?

4          MR. BICKS:  I think you said 40.

5          MR. VAN NEST:  I think it was 50, Your Honor.  No.

6     You said 40.  You said 40.

7          THE COURT:  40?

8          MR. VAN NEST:  Yes.  We started at an hour.

9          THE COURT:  I reduced it down because I'm doing your

10    questionnaire.

11         MR. VAN NEST:  I assume -- will you do your standard

12    voir dire as well?

13         THE COURT:  Yes.

14         MR. VAN NEST:  That's what I thought.

15         THE COURT:  I'm going to do all of that.

16         MR. VAN NEST:  Thank you.  I think the rest of it is

17    very clear.  And we will thank and excuse jurors as we go.

18         THE COURT:  All right.  Anything more on jury

19    selection?

20         MR. BICKS:  Just as a matter of logistics, Your Honor,

21    getting the questionnaires --

22         THE COURT:  Here is the way it's going to work.  You

23    won't see any of these questionnaires unless they're called

24    forward, and then they will stand right there and the person

25    called forward and hand up his one copy of the questionnaire to
```

1    me.  If it's got those strong views listed, then I send them

2    back out there and you just have to take my word that it had

3    strong views.

4        Then we call the next person.  Let's say that person does

5    not have strong views.  So then they get -- then I will have

6    one of my staff go make two copies, and each side will get a

7    copy of that questionnaire.  You will get the copies of the

8    ones who actually get seated in the box.  We are going to need

9    two extra seats over there to get 16.  We will put a stool over

10   there and another -- it will be a temporary arrangement, but it

11   will work.

12       So that's how you get a copy of the questionnaire.

13           **MR. BICKS:**  Thank you.  Got it.

14           **THE COURT:**  What else on jury selection, I mean?

15           **MR. BICKS:**  So in terms of just anticipated scheduling

16   for that day, what's Your Honor's thinking in terms of --

17           **THE COURT:**  Well, I think there is a good chance we

18   will do the opening statements the same day.  I doubt that

19   we'll get to the first witness, though.  So I wish you would

20   have one ready to go just in case, but I suspect we will only

21   get through the opening statements.  So be ready on your

22   opening statements.

23       Now, speaking of which, I think it's -- Google says they

24   would like to bring in some big screen, and I just can't do it.

25   I tell you why.  This equipment has broken down in every trial,

just the equipment that we have.  It starts out working, then
one day the ELMO won't work or -- and there's -- so we have to
do it the old-fashioned way until two hours -- I just don't
want to add and complicate it by larding in yet another system
that is going to be putting a strain on the electronics in the
courtroom.

MR. VAN NEST:  I think that was a joint request,
Your Honor.  I think we had agreed on courtroom technology and,
it's really up to date and really up to speed, and I think it
will eliminate any problems with older equipment if you've had
those.

THE COURT:  You're not even going to use the stuff
that is in the jury box?

MR. VAN NEST:  I think we would.  I think we
supplement that.  I think it's a joint request --

THE COURT:  I didn't understand.  I thought it was
your request.

MR. BICKS:  No.  It's joint, Your Honor.

THE COURT:  Where would you put the screen?  Where
would it go?

MR. VAN NEST:  I will leave that to the technical
people, but I think the screen goes here and I think that maybe
the -- they may supplement the screens in the jury box.  I'm
not even sure.

THE COURT:  What?  No.  We're not going to put extra

1   screens in the jury box.

2          MR. VAN NEST:  I will be honest with you, I haven't

3   looked at the details of the request, but I know it's joint,

4   and the main point is to get a bigger screen and bigger

5   projector so the documents are easy to see.  That's the main

6   point.

7          THE COURT:  Where would the projector go?

8          MR. VAN NEST:  Mr. Kamber knows the answer to this.

9          MR. KAMBER:  Matthias Kamber on behalf of Google.

10      I think the idea between and among the parties is to have

11   a screen that can be pulled up with a projector as necessary.

12   Most of the time, it can be put away in the corner, and it

13   wouldn't be interfering with the courtroom, but to the extent

14   that the parties would want or need a larger screen, we would

15   put it up there.

16          THE COURT:  You mean you get to a document and you

17   say, *Wait a minute, Mr. Witness, I've got to put up the screen*,

18   and you are scrambling around over there trying to get his

19   screen put up and warming up the projector.  That will never

20   work.

21          MR. KAMBER:  No.  I don't envision that it would be

22   done that way.  You would have to know or think through your

23   direct examination or cross-examination, have the setup ready

24   and not be doing it on the fly, but the point being that it

25   won't be in the way or in the courtroom for *every single*

1    witness, I believe.

2           THE COURT:  You know that you're going to use

3    documents like crazy.  It's going to have to be in place at all

4    times.

5        Look, the most I would consider -- and I don't even like

6    this because I think it's going to crowd it -- is if you could

7    find a way to put a projector there and a screen there and

8    that's it, nothing else in the jury box -- the jury has already

9    got screens.  We ought to be using that system.

10          MS. HURST:  We can do that, Your Honor, with a short

11   throw projector.  We can put it right on the end of the table

12   there and the screen on that side of the courtroom and it will

13   be a nice, big image using a short throw projector over there.

14          THE COURT:  Does it correct for the keystone effect?

15          MS. HURST:  It does, Your Honor.

16          THE COURT:  We can at least try it, and test it out

17   before the trial starts.  The thing is, starting tomorrow, I

18   have a criminal trial that will go through at least Wednesday.

19   I hope it's over by Wednesday, but after court or at some other

20   time, you can come in here and test out your equipment.  But

21   it's got to be integrated so that it doesn't interfere with the

22   existing equipment because I need to be able to look at the

23   screen myself now and then, and I want definitely -- I want the

24   jury to use the equipment that's in the jury box, although you

25   can -- they can look at the big screen, too.

1          **MR. KAMBER:**  Understood, Your Honor.  I think that's

2     the idea.

3          **THE COURT:**  You should know, while we're talking about

4     documents, that the witness on the stand can draw circles, and

5     I think it's -- I don't even know if it's various colors, but

6     say they draw an orange circle around a keyword.  That doesn't

7     stay there forever.  It vanishes soon.  You have to make a

8     request of the clerk to save it, and that takes about a minute.

9     It's not worth it unless it's very important.  So you can do

10    it, but be sparing in how many times you ask for that because

11    it's not easy.  All right.  Okay.

12         Anything more on courtroom equipment?

13         **MR. BICKS:**  Just so we do what Your Honor wants, I

14    remember -- I think I had read if there is a video or something

15    of a deposition, that that won't be picked up by the court

16    reporter, so it's helpful to actually have that be --

17         **THE COURT:**  An excellent point.  Many people think

18    that the court reporter will take down everything that is heard

19    in the courtroom.  It's not true.  The court reporter only gets

20    the words spoken in the courtroom, but any audio recording or

21    any video recording is just on a CD.

22         So you then have the problem okay, how will the Court of

23    Appeals know what it was the jury saw because you're only going

24    to show very select snippets from the deposition.  Well, here

25    is what you have to do.  You have to give to the court clerk at

the end of the day or the next day a CD that has just the

snippets that were shown and then you identify it on the record

as saying *we've marked for identification*.   It's not in

evidence, but marked for identification the excerpts from the

deposition of Jonathan Schwartz that were shown to the jury.

Then I will ask the other side, *Do you vouch that's what's on*

*there*, and they will probably say yes, and that will be there

for the record.

But what's on the court reporter's record, it will just

say *video played*.   That's it.

Do you understand how that works?

     **MR. BICKS:**  Yes.

     **MR. KAMBER:**  Yes, Your Honor.

     **THE COURT:**  Okay.  All right.  Anything else on the

subject of courtroom equipment?

     **MR. BICKS:**  No, Your Honor.

     **MR. KAMBER:**  I don't believe so, Your Honor.

     **THE COURT:**  Do I have to give my speech about how

important it is for junior lawyers to examine witnesses?

     **MR. BICKS:**  No.

     **MR. VAN NEST:**  We understand, Your Honor.

     **THE COURT:**  All right.  Good.  Okay.  Because I could

ask Mr. Cooper to come forward and give the same speech.

     **MR. COOPER:**  Thank you, Your Honor.  I would.

     **THE COURT:**  I know he believes in what I preach.  So

good.

Now, the last time I told you about this, and most people think I'm crazy, for many reasons, but this is one which I get a lot of laughs about, but okay, I'll say it anyway.

When somebody's got the floor, you cannot create any disturbances, including hacking and coughing.  If you've got to hack and cough, you go out in the hallway.  If Mr. Bicks has got somebody on the ropes and your client is going down for the third time, too bad.  You cannot start hacking and coughing and distracting the jury.  It's an old trick.

            MR. BICKS:  That includes like --

            THE COURT:  You probably have been the victim of it in other courts, but you won't be the victim of it here.  So you must be respectful of the other side's -- this is unlike those depositions where you get to yank the witness out and take him in the hallway and tell him *why did you say that*.  No.  You just have to sit there and suffer while your witness goes down for the third time because this is the moment of truth.  This is where good cross-examination blows stories out of the water. I love to see it.  And you don't get any relief from it.  You just have to sit there and suffer.  All right.  Both sides. It's going to happen to both of you.

But you cannot, because it's a very good moment in the court when that moment of truth finally comes out -- then you cannot distract by shuffling papers and hacking and coughing.

1   All right.  Same thing on your opening statements and the like.

2   I know you'll be good about this.

3        All right.  So are there any other procedural things I can

4   go over with you before we get into the motions in limine?

5        **MR. BICKS:**  I just tell the Court that we had

6   agreed -- a couple things -- one, on the openings, you know, to

7   exchange graphics on Sunday before we start and make sure we

8   don't have any issues, and we reached an agreement to do that

9   Sunday afternoon.

10       **THE COURT:**  You were here the last time, but you were

11  not here.  So here's the way I like to work.  You get here at

12  7:30, and for the next 30 minutes, I am delighted to help the

13  lawyers as much as I can, but at 8:01, we bring the jury in and

14  we start hearing evidence.  So the idea of long-winded motions

15  in limine is out.  We've got 30 minutes to address any

16  problems.  I'm going to say in most cases we don't need the 30

17  minutes.  Ten minutes is usually enough.

18       And the jury gets here at 7:45, so sometimes we start

19  right at 7:45 because the lawyers run out of things to bring

20  up.  But out of caution, we have up to 30 minutes.  And maybe

21  even during the course of the trial during the day, we might

22  take up an issue at a break.

23       But it is very important that we not waste the jury's time

24  when they're here in the courthouse.  So when they're here, the

25  top priority is letting them hear the evidence and the opening

1    statements and doing their job subject only to the minimum

2    number of rest breaks that everybody of course needs.

3        So sidebars and breaks for motions in limine are -- we

4    don't do that, so that's why I have you here at 7:30, so we can

5    sort that out before we start with the jury.  Okay?

6            **MR. VAN NEST:**  That's great, Your Honor.

7            **MR. BICKS:**  Your Honor, should I provide you with a

8    copy of the graphics for the opening?

9            **THE COURT:**  You can, but I don't need them unless

10   there is a dispute.

11           **MR. BICKS:**  Understood.

12           **THE COURT:**  All right.

13           **MR. BICKS:**  The jurors are allowed to have notepads?

14           **THE COURT:**  Yes.  We are going to give them a steno

15   pad and a pencil, if they need it.  They don't get -- if

16   somebody -- so far no one has ever asked to use a computer to

17   take notes.  I guess if somebody asked, I probably would let

18   them do it, but they still, even in this day and age, just go

19   with the steno pad.

20           **MR. VAN NEST:**  Your Honor, I had a couple of questions

21   along those lines, just procedural.

22       I think last time we gave the jurors notebooks, but the

23   only thing we gave them other than some paper was as a witness

24   testified, you'd bring in a picture on a page of that witness

25   so that they would have some recollection after the two weeks

1   of testimony.  In other words, you would show the picture to

2   the other side --

3          **THE COURT:**  Where would this picture come from?

4          **MR. VAN NEST:**  It would be a picture that we take --

5   we take it of our witnesses; they take it of their witnesses.

6   It's supposed to be a current picture of the witness that looks

7   like him or her, and it goes in the notebook as they testify.

8          **THE COURT:**  I tried that in a criminal trial.  Was it

9   a criminal trial?  Yeah.  No, no, no.  It was an employment

10  trial.  And one of the lawyers photoshopped it and put -- so

11  it's very high contrast on this person who was a perfectly

12  nice-looking woman in real life, suddenly looked like the

13  Wicked Witch of the East from the harsh shadows of this --

14  every wrinkle in her face showed, and it was done by Photoshop,

15  so let's make sure -- again, I don't want there to be monkey

16  business with the photos.  I'm okay with the idea, but I don't

17  like the idea of giving them a piece of paper.  I think it's --

18  why don't we just --

19         **MR. VAN NEST:**  Just give them the picture.

20         **THE COURT:**  I'm not even sure we need to do that.  Why

21  not you just show the pictures at the end and so -- why do we

22  need to give them anything?

23         **MR. VAN NEST:**  The only thought I had was since we are

24  going to be in here for a couple of weeks, being able to

25  associate testimony with various witnesses is useful.  And if

1    all they have is a notepad, they can take notes, but I think

2    most people pick up a visual image a little better, and the

3    idea is just to give them a picture on the piece of paper that

4    goes in the notebook on any day that a witness has testified so

5    both sides would do it and we would clear the pictures ahead of

6    time so we don't have the problem Your Honor mentioned.

7         **MR. BICKS:**  He must think his witnesses are a lot

8    better looking than our witnesses.

9         **MR. VAN NEST:**  Well, mine are going to go first so

10   they will be a little more -- less proximate for jurors.  I

11   don't feel strongly, but it's commonly done now, and I think

12   it's a good idea.

13        **THE COURT:**  Well, what I think is commonly done is to

14   have the photos so you can use them in the closing argument and

15   say, *Remember Mr. So and So?  He testified to X.*  That I don't

16   have any problem with, as long as it's not an objectionable

17   photo in some way.

18        **MR. VAN NEST:**  Fair enough.

19        **THE COURT:**  I think with so many witnesses in this

20   case, we would be giving the jury 40 or 50 pieces of paper with

21   pictures on them, and I think it could turn into a mess.  They

22   would have all these loose pieces of paper, maybe with their

23   notes falling out.  I would prefer not to do that.

24        **MR. VAN NEST:**  That's fine, Your Honor.  I don't think

25   there will be 40 witnesses, but that's fine.

1    Would we be allowed -- we are going to be playing some

2    video depositions, I think both sides, and possibly some

3    reading from the last trial.  Would we be allowed to give a

4    brief introduction to the videos, just, *This is Witness X*.  *He*

5    *or she is from Y company*.  *Their job was Z and they're*

6    *testifying about X*?

7          **THE COURT:**  You mean --

8          **MR. VAN NEST:**  Before the video is played.

9          **THE COURT:**  Of course.  Yes.  You can do that.

10          **MR. VAN NEST:**  Fair enough.

11    The other procedural question I had was we have our

12    witness disclosure obligations and we're all set on those.

13    Last time you also imposed, I think, a seven-witness rolling

14    disclosure requirement that was on top of our exchanging

15    witnesses, and the way it worked was we gave you and the other

16    side a list of our next seven witnesses, and you didn't have to

17    do them in exactly that order, but you couldn't bring somebody

18    in outside that, and you imposed that, I think, on top of the

19    standard disclosure.  Do you want to do that again?

20          **THE COURT:**  What do you want to do?

21          **MR. VAN NEST:**  I'm fine with just the regular

22    disclosures we have which we've agreed on, and they're

23    consistent with Your Honor's rules.  I don't care about it, but

24    I know the last time you asked for it, and I just want to be

25    sure if you want it, we do it.  I'm not asking for it.

1          **MR. BICKS:**  I think, Your Honor, it's a good idea --

2          **THE COURT:**  What is a good idea?

3          **MR. BICKS:**  The seven -- you know, kind of the rolling

4    disclosure because there is, frankly, so many witnesses -- I

5    think they've got 25, 26 will-call witnesses, and I think it's

6    helpful in that respect to --

7          **THE COURT:**  I think the reason I must have done that

8    was that the normal rules didn't give you quite enough notice

9    and still by saying seven, you would have the flexibility to

10   choose within the seven, but you -- the other side would be

11   able to get their cross-examination better organized.

12        Is that what I had in mind?  It seems like I probably did.

13        **MR. VAN NEST:**  Ms. Anderson remembers this better than

14   I do.

15        **MS. ANDERSON:**  I remember, Your Honor, you did have

16   that rule.  I don't remember Your Honor stating specifically

17   what you were most worried about in imposing it, but part of it

18   was delivering that list to you as well.

19        **THE COURT:**  Okay.  In my writeup that you -- the

20   guidelines, what do I require there?

21        **MS. ANDERSON:**  I believe it's two days' notice,

22   Your Honor.

23        **MR. BICKS:**  Two days' notice.  I thought it was at

24   2:00 p.m., and then if you were going to use exhibits with the

25   witness that you disclosed on day one to appear on day three,

1    then the cross-examiner then on day two at the same time would

2    disclose the exhibits that would be used on cross-examination

3    but not impeachment, I thought, as I understand the procedures.

4         **THE COURT:**  That reminds me, I have got to come, in a

5    minute, to what constitutes real impeachment, but -- so the

6    seven thing -- I'm pretty sure that the reason for that was to

7    give the responding side more time to get their act together

8    because of the need to cross-examine.  But I could be talked

9    out of it.

10        You don't want that?

11        **MR. BICKS:**  No.  I think it's a good idea to do it.

12        **THE COURT:**  You do want it?

13        **MR. BICKS:**  Both sides will do it.

14        **THE COURT:**  Mr. Cooper, what were you about to say?

15        **MR. COOPER:**  All I want to say is all our concern is

16   with regard to Dr. Jaffe in the liability phase, we would

17   appreciate at least 24-hours' notice so Dr. Kearl can be here.

18        **MR. BICKS:**  I will do way -- I'll give them more than

19   24.

20        **MR. COOPER:**  Thank you.

21        **MR. VAN NEST:**  Your Honor, just so you're clear, we're

22   not asking for it --

23        **THE COURT:**  Let's do it.  Let's do the -- whatever the

24   rule of seven was last time, let's superimpose that in addition

25   to the normal rule.

1      Let's come to what is true impeachment.  A true

2  impeachment, classic impeachment is they said on the stand that

3  the light was red but in a written statement to police signed

4  and dated by them, they said it was green.  Okay.  That's a

5  signed statement.  Or a letter.  All right.  It could be that

6  they didn't actually sign it, but they somehow approved of it.

7  They looked at it, they approved it, and then somebody else

8  signed it.  That would be an approval, an adoption.  That would

9  be good enough for impeachment.

10      But what I have found is that one side thinks it's

11  something that generally contradicts the whole theory of the

12  other side is impeachment.  No.  I don't think that's -- that's

13  just case-in-chief material.  So true impeachment has got to be

14  pretty specific.  So if you're going to hold it back on the

15  theory that it's impeachment, you got -- it's got to be in that

16  kind of category.

17      The one thing which I will allow for impeachment that is

18  not signed by or adopted by the witness is a video, say, in a

19  case where the plaintiff says that they can't even get out of

20  the wheelchair, the insurance company has got videos of them

21  playing tennis.  That's actually happened.  So that is

22  impeachment, even though it's not been adopted by -- so I

23  can't -- it's got to be very strong directly contradictory to

24  testimony and something that you can tag that particular

25  witness with, as opposed to just general material that

1  contradicts the general themes of the other side.  So keep that

2  distinction in mind.  All right.

3  **MR. VAN NEST:**  Your Honor, I have one more procedural

4  point --

5  **THE COURT:**  Sure.

6  **MR. VAN NEST:**  -- which we left open, and that was now

7  that we're going to be in trial, the one request we have, and I

8  think it could be observed by the parties without any

9  intervention by the Court, is a request that when we're talking

10  about revenue sharing on deals with current partners, that the

11  experts have used broad averages and that the parties stick to

12  broad averages rather than disclosing --

13  **THE COURT:**  It's okay with me.  As long as both sides

14  are willing to do that, I'm okay with that.

15  **MR. VAN NEST:**  I think -- I'm not sure that we have an

16  agreement, but I do know that the experts are using averages,

17  not particular rev share deals, and I know there is concern

18  about this among our partners as well.

19  **THE COURT:**  Can we live with that?

20  **MR. BICKS:**  Can I confer, Your Honor.  This is not

21  likely to be a Phase-One issue.

22  **THE COURT:**  Right.  Report back.  I wish you would

23  find a way to make this work.

24  **MR. BICKS:**  I'll try to.

25  **MR. VAN NEST:**  Thank you, Your Honor.  That's all the

1    procedural -- those, I think, are all the procedural questions

2    I had.

3              THE COURT:  Okay.

4              MR. BICKS:  Your Honor, I don't know, at some point is

5    it appropriate to talk about timing, time of the trial?

6              THE COURT:  Let's talk about it right now.

7              MR. BICKS:  Okay.

8              THE COURT:  What do you want to do there?

9              MR. BICKS:  Well, so --

10             THE COURT:  I've already given you some time limits.

11             MR. BICKS:  Right.  So what you said was you get -- it

12   was a total of 19 hours, right?  This is where we started.

13   Twelve in Phase One and then seven in Phase Two.  We had asked

14   for three additional hours for Phase One, so it was going to be

15   15 and 7.  And --

16             THE COURT:  That's 22 hours.

17             MR. BICKS:  Correct.  And the reason, Your Honor,

18   obviously this is not something that we're just kind of

19   willy-nilly suggesting.  We really are looking carefully at the

20   issues and the witnesses and the proof and the documents and

21   being pretty practical, actually sitting down going witness by

22   witness, and every time we do it, we're sitting there really in

23   a really, really serious time crunch.

24       Obviously we know from the Court that there are two

25   critical issues that are outstanding, the OpenJDK issue and

1   what I call the Apache issue.  As we have talked about on

2   OpenJDK, I think they're more -- six, seven, eight experts who

3   touch on that and a number of fact witnesses.

4        The Apache, we've argued that to some extent, and the

5   Court remembers all the issues with the jury and the questions

6   on that.

7        As we're just practically looking at all the issues that

8   are out there, you know, the time is something very serious,

9   and so Your Honor had indicated in one of your orders that we

10   would revisit that at this point.

11        So I wanted to ask for that additional time.  Your Honor

12   said you would consider it.  And then you, I think in essence,

13   allowed us to kind of -- I think the expression was *bank it* and

14   if we didn't use it, we could use it at a subsequent point.

15   But as I say, I'm not -- I'm totally mindful and I have

16   listened very, very carefully to what you've said about jurors

17   and the time and so on and so forth, but when you really look

18   at the issues that are out there, it's going to be really very,

19   very difficult to present our case in that amount of time.  I

20   mean, it's just --

21             **THE COURT:**  What does Mr. Van Nest say?

22        **MR. VAN NEST:**  Your Honor, we've come to the

23   conclusion that the time limits you set were good.  What you

24   said you might revisit was the split between Phase One and

25   Phase Two.  You have 12 for Phase One and seven for Phase Two,

1   and I think that's perfectly appropriate.

2        We all know whatever time you give us we'll fill.  That

3   has at least been my experience, and I think we have a lot of

4   issues for the jurors, and if we expand the time, the issues

5   are going to get more complex, not less.

6        So my experience has been -- and I have often been

7   complaining about too little time and I have tried five patent

8   cases in Texas in a week, so I have been on both ends of this.

9   I think the 12-hour limit is fair.  We can do it.  We should

10  meet it.  I think having 7 hours if we get to a damages phase

11  is right.  There will be percipient and expert testimony in the

12  Phase Two if we get there.

13       So you did say you would look again at the split between

14  Phase One and Phase Two.  But I think the split you have is a

15  good one and we will fit within it.

16       **MR. BICKS:**  And, Your Honor, you did -- we did discuss

17  this and we talked -- Your Honor asked the question of how long

18  should we screen jurors for, what was the timing.  We debated

19  four or five weeks, and I can't underscore, you know, the --

20  this is not a rationale to waste time.  It's a rationale to

21  make sure the issues are fully vetted and things aren't rushed,

22  particularly as it relates to people understanding the

23  technology.  It's very tricky, as the Court knows.

24       And ordinarily -- we're the plaintiff, and typically the

25  plaintiff likes to -- most jurisdictions go fast, but we have

1    looked at all the elements.  When you look at the experts on

2    the technology, the importance of the packages, you know, the

3    economist, Dr. Jaffe, explaining the markets, and then you put,

4    on top of that the fact witnesses -- they've got 26 will-call

5    witnesses.  Not may call; will call.  And we have a comparable

6    number.

7        If you add that up -- and we know that there is fat on

8    those lists and they should be cut down, but there's, you know,

9    a fair amount to cover.  We are really talking about 10

10   years -- as you look at that timeline, at least 10 years of

11   kind of history, and I don't -- I really do say it with

12   conviction that every time we map out the witnesses -- and

13   lawyers, as you know, and I'm mindful of this, are hopelessly

14   poor at estimating time, but in critical areas, we are looking

15   at having to cut pretty substantive things that are very, very

16   important.

17       The other thing is -- and I hear what the Court is saying

18   about documents, that, you know the Magna Carta example and the

19   20 to 25, but each side, as you can see from those boxes, you

20   know -- there is a fair amount of documents in the case and

21   it's clearly our duty to cut that down.  But I can just see

22   things rushing, and so the three hours, I think, is really

23   critical.  Hey, if we don't use it, great, but, you know, I

24   think it is very, very important to us --

25           **THE COURT:**  All right.

1          **MR. VAN NEST:**  Your Honor, could I just make one

2     comment?  What we see developing here -- which is different

3     from last time.  Last time they presented basically one expert

4     on the fair use/copyrightability.  Now they've got four or five

5     all to say how critical, essential, and important these

6     declarations are.  Right?  The 11,000 or 7,000 lines of code

7     out of 15 million.

8          The reason they want this time is to load up on experts,

9     and we can see that, comparing this trial to last trial.

10    Right?  I have essentially the same expert lineup and the same

11    expert that we had last time that is going to cover all of

12    this.  They want to put in Schmidt, Kemerer, Jaffe, Zeidman.

13    They have got four experts, all going to get up and here and

14    say, *All these declarations were critical.*  *They are the heart*

15    *of Java.*  That's why they want the extra time.

16         And Your Honor has already expressed concern -- and I

17    think rightly -- that we load this thing up and lard it up with

18    experts, and that's exactly what they want to do with this

19    expert time, and I don't think it's right.

20         They should have an expert that talks about fair use.

21    I've got an expert that talks about fair use.  We don't need

22    four experts to say how important and critical these things

23    are, and the 12 hours is a fair estimate of what it should take

24    to try this thing in Phase One.

25              **THE COURT:**  The answer is 15 and 5, grand total 20.

1   Any unused part of the 15 can be carried forward to the second

2   phase.

3           **MR. VAN NEST:**  Very well, Your Honor.

4           **MR. COOPER:**  Your Honor just for clarification, that

5   is five hours per side for damages, and Dr. Kearl does not

6   count during that period of time; is that right?

7           **THE COURT:**  I was thinking he would count.  What have

8   I said, though, in the past?

9           **MR. BICKS:**  You said he did not count.

10          **MR. COOPER:**  I think you said he did not.

11          **THE COURT:**  Oh, well, then maybe I should make it 15

12  and 4 to leave room for that possibility.  Why don't we do

13  this:  15 and 5, but that includes Dr. Kearl.

14          **MR. COOPER:**  15 and 5.

15          **THE COURT:**  That doesn't count your time to examine

16  Dr. Kearl, but it counts their cross-examination of Dr. Kearl.

17          **MR. COOPER:**  The damage trial will be five hours per

18  party and my direct does not count?

19          **THE COURT:**  Right.  I will have to add in more time

20  for you to do the direct.

21          **MR. COOPER:**  Okay.  Thank you.

22          **THE COURT:**  But their cross-examination of Dr. Kearl

23  is within that five hours.

24          **MR. COOPER:**  Thank you.

25          **THE COURT:**  I had asked you to meet and confer on the

1  fair use instruction.  And I know your briefs are not due on

2  that until later, but give me a heads-up.  Are you going to be

3  able to -- is there going to be a lot of issues left for me to

4  decide?

5       **MR. BABER:**  Your Honor we had a face -- Bruce Baber

6  from King & Spalding.

7       We had a meet and comfort yesterday face to face with

8  Mr. Silverman and Ms. Simpson.  I don't think we're going to

9  agree to a fair use instruction.  Where we are right now is we

10  have identified, I believe, five, maybe, things in your draft

11  that both sides agree should be changed.  Okay.  So we will

12  identify those for you.  And then I suspect we will each have

13  some issues that we will raise on the other pieces of your

14  draft.

15       But we have not been able to reach agreement on complete

16  paragraphs or things like that.

17       **MS. SIMPSON:**  That's fair, Your Honor.

18       **THE COURT:**  Today is number 27.  Your briefs are due

19  on that tomorrow; right?

20       **MR. BABER:**  Tomorrow at noon, Your Honor.

21       **MS. SIMPSON:**  Correct.

22       **THE COURT:**  All right.  Good.  Thanks.

23       **MR. BICKS:**  Your Honor, on the topic of the jury

24  instructions, I don't know, we had suggested at least

25  consideration of a pre-instruction by using the statute and the

```
1   factors, and both sides --

2           THE COURT:  The statute doesn't mention -- what's that

3   word?

4           MR. VAN NEST:  Transformation.

5           THE COURT:  Transformation.  So we can't just use --

6   that would be very unfair to Google to just repeat the statute

7   because the Supreme Court has said that -- so I'm probably

8   going to just give the draft I've been giving, subject to your

9   changes -- I'm going to give something like that, and then I

10  will tell the jury that I will give them a slightly longer

11  version at the end of the case.

12          MR. VAN NEST:  That would be fine, Your Honor.

13          THE COURT:  I am going to pre-instruct.  I think

14  they've got to have some idea of what the issues are.

15          MR. BICKS:  Yes.  And I wasn't -- I was just focusing

16  on the statute because it's clearly one thing that everybody

17  had agreed on, but however we work it out, I think that would

18  be helpful.

19          THE COURT:  You mean the only things you can agree on

20  are the statute?

21          MR. BICKS:  I shouldn't say that, but --

22          THE COURT:  Come on.

23          MR. BICKS:  It was a good starting point.

24          THE COURT:  Okay.  We're going to take up -- let me

25  look at my notes.  Give me -- we will take a break in a moment,
```

1    but before we do that, tell me what one motion in limine per

2    side that you would like to have argued because we are not

3    going to be able to do everything today and some will have to

4    get submitted.  I would like to hear argument on the one

5    involving the memo, the email, Lindholm email and that meeting

6    that preceded it.

7         **MR. BICKS:**  That, Your Honor, you had asked for

8    briefing on --

9         **THE COURT:**  You're right.  I did.  So that hasn't come

10   in yet.

11        **MR. BICKS:**  Yes, yes.

12        **THE COURT:**  I guess I can't do that one.

13      Of the things that have been teed up, is there one per

14   side that we could hear argument on today?

15        **MR. BICKS:**  So on our side, Your Honor, I think we

16   would address the -- if it would be helpful, the Apache

17   situation.  We touched on it, but if it would be helpful to the

18   Court, I think it's such a critical issue that we'd be prepared

19   and welcome the opportunity to address that.

20        **MR. VAN NEST:**  That would be fine, Your Honor.  I

21   don't think any of ours --

22        **THE COURT:**  On your side, is there any other motion

23   that you feel is important to argue today?

24        **MR. VAN NEST:**  I don't think so, Your Honor.  I think

25   we're good.  You can decide them on the paper.  I think arguing

```
 1   Apache is fine.  That's their motion.
 2            THE COURT:  Let me look at my notes here.
 3            MR. BICKS:  Obviously, Your Honor, we are prepared to
 4   help as we could.  I had on my list Federal Circuit, what you
 5   had called the factoids and kind of the import of that.
 6            THE COURT:  I have a plan there.  I think further
 7   argument would only encumber my plan.
 8            MR. BICKS:  Don't want to do that.
 9            MR. VAN NEST:  Our motion that we would want to argue,
10   Your Honor, is Lindholm, but as Mr. Bicks pointed out, that is
11   not teed up yet.  That is coming in later in the week.
12            THE COURT:  Let's do this.  Let's take a 15-minute
13   break and come back and hear about the Apache situation.  All
14   right?
15            MR. BICKS:  Yes, Your Honor.
16                 (Recess taken at 9:21 a.m.)
17              (Proceedings resumed at 9:34 a.m.)
18            THE COURT:  Okay.  On that timeline, what I'd like to
19   do is hand out to the jury -- if you put it sideways on a piece
20   of paper, they will be able to draw in -- make little notes on
21   their timeline, their copy of it, so you don't want the wording
22   to be too big because it won't leave enough room for notes, but
23   on the other hand, if it's not big, they may not be able to see
24   it across the room on the blowup, so they will see it on the
25   blowup, but they will also have a handout copy.  Okay?  Got
```

1    that idea?

2         The other thing that my law clerk says we could use is one

3    of the issues that Google has raised is whether or not there is

4    a right to a jury trial on disgorgement and that has not been

5    briefed.  Google's still making that argument or not?

6              **MR. VAN NEST:**  Yes, Your Honor.

7              **THE COURT:**  All right.  So then let's say by -- when

8    can you --

9              **MR. VAN NEST:**  Friday at noon.

10             **THE COURT:**  Friday at noon you submit a brief.

11             **MR. VAN NEST:**  Yeah.

12             **THE COURT:**  Can you also submit a brief by Friday at

13   noon, Ms. Hurst?

14            **MS. HURST:**  Your Honor, we have addressed this in our

15   trial brief already, but we would be happy to file an

16   additional brief, if the Court wishes.

17             **THE COURT:**  My law clerk said no one had given more

18   than one paragraph.  Had you given more than one paragraph?

19            **MS. HURST:**  We gave you -- hold on.  I think we gave

20   you six pages.

21             **THE COURT:**  Six pages.  That's more than one

22   paragraph.

23            **MS. HURST:**  We gave you from pages 10 to 17 so seven

24   pages, Your Honor, in our trial brief.

25             **THE COURT:**  Let's do this.  You respond by Friday at

1    noon, and by Monday at noon, if you wish to do a reply, you

2    may.

3              MS. HURST:  Thank you, Your Honor.

4              THE COURT:  All right.  Thank you.  Okay.  Let's hear

5    about the Apache situation.

6              MR. BICKS:  Your Honor, I have to call an audible

7    here.  I got out ahead of myself on Apache, and Ms. Simpson

8    reminded me that we felt we had covered that with you, and

9    unless you had any further questions on it, we thought what may

10   be a more prudent use of our time is to preview for you -- it

11   was motion four -- the issue that related to whether or not any

12   copying was required, you know, to use the Java language and

13   you had asked for additional briefing on that.

14       What we thought is maybe Ms. Hurst just preview just very

15   briefly kind of the direction we were thinking of going there

16   to kind of give the Court --

17             THE COURT:  Is this the 3 APIs versus 37?

18             MS. HURST:  Yes, Your Honor.

19             THE COURT:  That's a good point.

20       Is that all right?  Can we swap gears and go to that

21   subject?

22             MR. VAN NEST:  I understood that we were going to be

23   talking about possibly a stipulation --

24             MS. HURST:  And that's what I wanted to inform the

25   Court.

1        **MR. VAN NEST:**  I'm not sure why we need to preview

2    this.  You set this for briefing on Friday, and I think in the

3    meantime, we've talked about possibly a stipulation.

4        **THE COURT:**  All right.  Why don't we just leave it at

5    that then and not take time up now.

6        **MR. VAN NEST:**  We're happy -- we're fine not arguing

7    Apache.  The only point I would make, Your Honor, is of all the

8    motions, that's one that would be useful for me to know before

9    the openings.  The others can probably drag, you know, in my

10   case, but that's one that would be good to know the answer to.

11       **THE COURT:**  Well, tell me this, because I have been

12   working on it.  I will just ask you a question.

13       Apache could confer on Google no greater rights to use the

14   Java System than it had to begin with, meaning that Apache had

15   to begin with?

16       **MR. VAN NEST:**  That's right.

17       **THE COURT:**  And since Google knew about the

18   field-of-use restriction -- in fact, Google even sent a letter

19   complaining about it; right?

20       **MR. VAN NEST:**  Mr. Paige is the one that is going to

21   argue this motion if we are going to get into argument.

22       **THE COURT:**  Come up here, Mr. Paige.  I don't want to

23   argue it in depth, but I want to have in mind how you answer

24   this point.

25       So to use your timeline, where is Apache on here?  It's

```
 1   not on here?
 2            MR. VAN NEST:  It's not on the timeline, Your Honor.
 3            THE COURT:  All right.  So --
 4            MR. VAN NEST:  We had only -- we only had five items
 5   each, but Apache comes out roughly --
 6            MR. PAIGE:  May of 2005, Your Honor, is when it
 7   started.
 8            THE COURT:  All right.  Well, anyway, May 2005.  So
 9   there came a point where Google itself sent an open letter
10   to -- and for that matter, Oracle did, too, before it acquired
11   Sun -- an open letter complaining about the field-of-use
12   restriction.
13            MR. PAIGE:  That's right, Your Honor.
14            THE COURT:  So you can't say you didn't know about the
15   field-of-use restriction.  So how can you say that you thought
16   you got some rights greater than -- how can you say that you
17   thought Apache had any right to let you use the SSO and the
18   headers?
19            MR. PAIGE:  Because, Your Honor, the field-of-use
20   restriction was on the TCK license that would allow, if Apache
21   were to pass the TCK, Apache to call itself Java.  That was the
22   point of the TCK license.  Apache wanted to say *we are*
23   *compatible, we are an implementation of Java that is fully*
24   *compatible*, and in order to do that, they needed to have the
25   right to take the TCK and pass the TCK.  That is what the
```

1   license they wanted was.

2       Sun never came to Apache and said *You can't use the*

3   *declaring code.*  They just said, If *you want a TCK license to*

4   *call yourself Java, you have to accept this field-of-use*

5   *restriction.*

6       And on the point of the letter, as Your Honor noted, it

7   was sent by Oracle, as well as by Google, and in fact, Exhibit

8   10 to the Mullen declaration shows that Oracle was the one who

9   came up with the letter in the first place.

10          **THE COURT:**  But you're still begging the question of

11  what was the -- even if the field-of-use restriction was on

12  something else, how do you get around the issue of what did

13  Apache -- what rights did Apache have to use the Java language

14  in the first place?

15          **MR. PAIGE:**  To use the Java language, the same --

16          **THE COURT:**  Or the 37 APIs.  To use the 37 APIs.

17          **MR. PAIGE:**  We are not claiming that we have rights

18  derived from Apache, that the Apache license gives us

19  particular rights to the declaring code.  Obviously it does

20  give us rights to the implementing code that Apache itself

21  wrote and that it licensed to us under the Apache license.

22      But as to the declaring code, the point of Apache is that

23  it shows that there was industry custom and practice of

24  re-implementing APIs using the declarations in Apache, in GNU

25  Classpath, in Android.  Using those when you wrote your

1   implementing code.  And there is not --

2         **THE COURT:**  Does that mean that to get to that point,

3   you have to concede that you -- that you knew that it was

4   copying the declaring lines of code and therefore it was fair

5   use?  I mean, how are you going to fit that with the jury

6   instructions?  What is your argument going to be to the jury as

7   to --

8         **MR. PAIGE:**  I believe, Your Honor, it would be that if

9   this was in fact copyrightable, something that was debatable at

10  the time, then because there were projects that were doing this

11  without complaint from Sun, it showed that it was at least

12  considered a fair use if, in fact, the declarations were

13  copyrightable, which, again, was a matter of some debate at the

14  time.

15        **THE COURT:**  So you're saying -- let me see if I got

16  your point.  Your point is that Sun knew that Apache was using

17  those 37 APIs and probably a lot more --

18        **MR. PAIGE:**  Using 166, I think, Your Honor.

19        **THE COURT:**  But without complaint.

20        **MR. PAIGE:**  That's right.  Apache asked for a TCK

21  license, but Sun never said *you can't use the declarations*.

22  Never said it.  There is nothing in the record saying Sun said

23  cease and desist from using declarations.  They just said,

24  *We're not going to let you take the TCK and call yourself Java*

25  *without accepting these field-of-use restrictions*.

1          THE COURT:  Is *calling yourself Java* the only

2    consequence of the TCK?

3          MR. PAIGE:  I don't think so, Your Honor.  I think it

4    also gives certain rights to other intellectual property like

5    patents held by Sun, for example, perhaps.  So I think there

6    are other consequences as well, perhaps.

7          THE COURT:  It seems like there was the further

8    argument -- and I will hear from the other side on this in a

9    second.  But it seems like there was the further argument that

10   the TCK -- it was something like you couldn't use Java at all

11   unless you contributed it back to the open-source community.

12   What am I thinking of there?

13         MR. PAIGE:  I think you are thinking of OpenJDK,

14   Your Honor, which is a way that Sun released Java SE later

15   under the GPL 2 license plus Classpath exception, and if you

16   wanted to take the OpenJDK license, you would then have to

17   contribute it back.  But that was a separate issue later in

18   time than the Apache project.

19         THE COURT:  Hold that thought for a moment.

20      Who is going to speak over there?

21      Ms. Simpson, what do you say to -- Paige; right?

22   Mr. Paige?

23         MR. PAIGE:  Yes, Your Honor.

24         THE COURT:  -- Mr. Paige's point that Sun never raised

25   one complaint and yet it knew all about the Apache project and

knew that those APIs were being used with different

implementing code and stood by and said nothing.  The only time

they ever complained was the field-of-use restriction, which

went to a different issue altogether.  What is your argument?

          **MS. SIMPSON:**  Your Honor, that's really not how the

facts went.

     So Apache took a spec license from Sun which allows them

to do an independent implementation of the Java APIs.  Part of

that spec license requires that in order to do that, you also

pass the TCKs.  It says *and pass the TCK* in the spec license.

It's a requirement of the spec license.

     TCK is not limited to branding.  It does require that you

pass it to compatible with the Java implementation.

     So while Apache was building the Harmony project, they

were in compliance.  They took a spec license, they were

building the project.  They came back to Sun for the TCK, and

that's where the dispute arose.

     At no point did Sun ever say, *It's fine with us that

you're not taking the TCK*.  There was an actual dispute over

whether there should be or shouldn't be a license granted to

the TCK.

     And Apache implored Sun to allow it to have the TCK

without the field-of-use restriction, but Sun said no, and

Google also knew that there was no license granted to the TCK

because they sent the letter to Apache and signed the letter

1    saying, *Please, please, give Apache a license that gets rid of*
2    *the field-of-use restrictions*.

3         So all the parties knew that this was a licensing dispute
4    and that Apache was an unlicensed use of Java.  Unlicensed.  It
5    had not been licensed.

6         So for Google to get up and say that they've gotten their
7    code from Apache, it's going to lead to absolute confusion
8    amongst the jury thinking that indeed they did have a license
9    to that code through Apache when Apache was not fully licensed
10   itself.

11        **THE COURT:**  The field-of-use restriction was a --
12   where did that come in?  That was in the TCK?

13        **MS. SIMPSON:**  Yes, Your Honor.  It requires you to use
14   it on a general purpose computer, and it does not allow use on
15   a mobile device.

16        **THE COURT:**  All right.

17        Mr. Paige, what do you say to Ms. Simpson?

18        **MR. PAIGE:**  Two points, Your Honor.  First, saying
19   that Sun complained about this is actually opposite the record.
20   Jonathan Schwartz said *Apache can ship today*.  Right?  He
21   specifically said, *They can ship today.  There is no reason*
22   *they can't ship today*.  Second --

23        **THE COURT:**  Wait a minute.  What do you mean?  When
24   did he say that?

25        **MR. PAIGE:**  He said that in May of 2007, Your Honor.

1      THE COURT:  When did Google download it from Apache?

2      MR. PAIGE:  I would think sometime around that

3  timeframe, Your Honor.  I don't know the exact date.

4      THE COURT:  Well, let's see.  November '07, Google

5  releases Android Software Development Kit.  It doesn't say on

6  your timeline when it got downloaded.

7    Ms. Simpson, do you know when the download occurred?

8      MS. SIMPSON:  When Google downloaded Apache code?  I

9  do not, Your Honor.

10      THE COURT:  Was it before or after?  Did he make that

11  statement before or after the download?  And don't guess at it.

12  If you don't know, just say you don't know.

13      MR. PAIGE:  I don't know the answer, Your Honor, but

14  his statement is Exhibit 9 to the Mullen declaration, TX2341,

15  his report of it.

16      THE COURT:  How did that come up?  How did Schwartz

17  have an occasion to make that comment?

18      MR. PAIGE:  Because there were disputes about whether

19  or not they should be granted the TCK license without a

20  field-of-use restriction, and in response he said, *They can't*

21  *ship today.  They just can't call themselves Java.*  That was

22  his trial testimony last time as well, Your Honor.

23    In terms of the specification license, the statement that

24  Apache took a specification license, in the Document 1081, our

25  proposed findings of fact, we had a finding of fact Apache

1    never took a license from Sun for Harmony, and Oracle said they

2    agreed, and therefore Apache never had a license from Sun for

3    Harmony.  So this idea that they were taking this specification

4    license I don't think is supported by the record.

5              THE COURT:  Wait a minute.  Ms. Simpson said that

6    there was a specification license from Sun to Apache.

7              MR. PAIGE:  There was --

8              THE COURT:  Is that right?  Did I say that right?

9              MS. SIMPSON:  Correct, Your Honor.

10             THE COURT:  That this whole story starts with a

11   specification license from Apache to a Apache from Sun.

12             MS. SIMPSON:  Yeah.  And there is an example of the

13   spec license at Trial Exhibit 610.1.

14             THE COURT:  Is it one signed by Apache?

15             MS. SIMPSON:  No, Your Honor.  It's a click-through

16   license.

17             THE COURT:  But you have one somewhere that was

18   actually signed by Apache?

19             MS. SIMPSON:  It's a click-through license, Your

20   Honor.  There is no signature on the license.

21             THE COURT:  All right.  Is there testimony that they

22   clicked through it?

23             MS. SIMPSON:  Well, to download the Java

24   implementations, you need to click through this license.

25             THE COURT:  Is that part agreed to?  Is that the way

1    it happened?

2         MR. PAIGE:  I don't know what Apache would have to do.

3    I believe this is part of some bunch of software files that

4    they had on an SDK.  I don't know what the status of having to

5    click through anything is.

6         THE COURT:  Well, but I'm sure Google does the same

7    thing with click-through licenses on its licenses.

8         How did Apache get it?  Do we have to bring somebody in

9    from Apache to testify?  You're the one that wants this story

10   in there.  How come you just know the parts that help you and

11   not the parts that hurt you?  Come on, you got to know the

12   whole story, Mr. Paige.

13        How did Apache get this license?

14        MR. PAIGE:  I don't know that Apache did get this

15   license, Your Honor.  They said last time Apache never took a

16   license from Sun for Harmony and agreed with it.

17        THE COURT:  Then how did Apache get the Java language

18   to begin with?

19        MR. PAIGE:  The Java language is free and open for all

20   to use, Your Honor.

21        THE COURT:  Don't you have to download it from some

22   source?  Like you go online, you click through it, and it comes

23   to your computer after you say *yes* and agree to the terms of

24   the license?

25        MR. PAIGE:  It's in a book, Your Honor.  They have the

1    Java application programming interface.  They have the Java

2    programming language specification.  There are many books that

3    explain how this works.

4           **THE COURT:**  We are going -- are we really going to

5    have a dispute -- is there somebody from Apache who -- how

6    about that guy who said this was a crime or something?

7           **MS. SIMPSON:**  Illegal.  Yes, Your Honor.

8           **THE COURT:**  Has he been deposed?

9           **MS. SIMPSON:**  He has not been deposed, Your Honor.

10          **THE COURT:**  By the way, while I'm on that, please

11   don't get me in this position where you are insisting that

12   Google produce witnesses and vice versa, and, in other words,

13   you all subpoena -- you subpoena the people you want for trial

14   unless you work out some agreement.

15       Do you understand what I'm saying?  Because you shouldn't

16   come to me at the last minute and say, *We expected them to*

17   *bring their witness to -- their -- we want them but we didn't*

18   *subpoena them*.  *You* got to subpoena the people unless you work

19   out an agreement.  Understand that?

20          **MS. SIMPSON:**  Yes, Your Honor.  We have been underway

21   in that process.

22          **THE COURT:**  If you have to stand out in front of their

23   house at midnight, you have my permission to do that.  Because

24   the lawyer won't accept service, then you get out there at

25   midnight.

1    To come back to this, we are going to have a dispute over

2   whether or not Apache even had the license to use Java?  I

3   don't know.

4         **MS. SIMPSON:**  Your Honor, I would just add that that

5   goes to our entire point on this motion, that it's prejudicial

6   to the jury to be putting all this extra evidence in front of

7   them, and whether Apache was licensed or not licensed or

8   whether it was authorized or unauthorized, that's a separate

9   point that has really very little to do with whether Google was

10  authorized in what it was doing.

11        And the fact of the matter is that the -- there is another

12  point I wanted to make in response to Mr. Paige.  You know, he

13  quoted at least five times in their brief that Mr. Schwartz

14  said that Apache was free to ship.  But the quote that they're

15  taking is completely out of context of the document that

16  they're looking at, which is an article, and if you look at the

17  sentence before and the sentence after, in context what he

18  means is they're free to ship if they take the TCK and then

19  Apache says *but we can't take the TCK because that's contrary*

20  *to our free and open software philosophy.*

21        So they're taking that quote completely out of context,

22  and their entire opposition hinges on the free-to-ship language

23  that they repeat over and over again.

24        **THE COURT:**  Wait a minute.  Is that true, Mr. Paige?

25        **MR. PAIGE:**  No, it's not, Your Honor.  At trial

1   Mr. Schwartz said they were free to ship.  They just can't call

2   themselves Java.  That was his testimony at trial.

3         **THE COURT:**  What do you say to that?

4         **MS. SIMPSON:**  At trial, Your Honor, he also admitted

5   that he did not have knowledge about the licensing terms and

6   that he was not speaking as a lawyer, nor was he giving a legal

7   opinion.  That it was merely his business view that they should

8   go ahead and ship.

9         **MR. BICKS:**  2341, that exhibit, Your Honor, we just

10   pulled up on your screen the article Ms. Simpson spoke about.

11   2341.

12         **THE COURT:**  I wish it was on my screen.  I don't have

13   any -- nothing there that -- maybe --

14         **MS. SIMPSON:**  Would you like a hard copy?

15         **THE COURT:**  If you have one, that would be great.

16      All right.  Let's go back to square one.  So, Mr. Paige,

17   looking at this problem from your point of view -- and I've

18   tried to think about this problem from both sides' viewpoint so

19   from your point of view, your best argument is that this goes

20   to rebut a charge of willfulness.

21         **MR. PAIGE:**  No, Your Honor.  It goes to fair use.

22         **THE COURT:**  Why is that?

23         **MR. PAIGE:**  Because it shows the industry custom and

24   practice at the time was to regard the declarations as

25   something that could be reimplemented using your own

1  implementing code.

2          THE COURT:   One instance is a custom?

3          MR. PAIGE:   No, Your Honor, there was GNU Classpath as

4  well.   They were doing the same thing.

5          MS. SIMPSON:   Your Honor, there is no custom of

6  unlicensed use because this was a dispute over a license,

7  right?   And at the end of the day, Apache put the Harmony code

8  to bed because they couldn't resolve the issues.   And they

9  acknowledged at the end of the day that the spec license is --

10  it's a license that you have to take and that Sun gets to

11  control who they license it to.   There is a document that

12  actually says that from Sun, so -- I mean, from Apache.

13      So the fact that this is a custom and practice is first,

14  you know, false because we're talking about companies that had

15  disputes over licensing terms.   To just say that there were

16  people out there using this with no restrictions and that there

17  was no license and everything was fine and Sun was happy with

18  it is not even correct.

19      But again to your point, Your Honor, there is no argument

20  here that what is going on here is a custom.   There just isn't

21  any argument there.

22          MR. PAIGE:   Of course, Your Honor, the December 2010

23  statement she is referring to by Apache is after this lawsuit

24  was filed, after Oracle had bought Sun, after they had kind of

25  changed their mind about all of this.

1    **THE COURT:**  But I guess it's true that they had bought

2    it, but still before the lawsuit and before the acquisition,

3    Sun was insisting on this field-of-use and the TCK.  Sun never

4    gave up on that, did they?

5    **MR. PAIGE:**  Sun never said Apache could call itself

6    Java, that's true.  That's what this was about.  The TCK and

7    compatibility is a red herring.  This is just about whether or

8    not they could call themselves Java.  There isn't any license

9    needed to --

10   **THE COURT:**  But do you have a memo in-house from

11   Google that says something like this:  *We are going to use*

12   *Harmony from Apache.  It uses the identical Java APIs that*

13   *we're interested in and uses the identical headers, but with*

14   *different implementing code, but that's okay because it's*

15   *customary to use -- carry those over?*

16   I don't think you have such a memo but, do you?

17   **MR. PAIGE:**  I don't know that we do, Your Honor, but

18   the point is that Sun never said *Cease and desist from using*

19   *our declarations.*  They never said *You can't do this.*  They

20   just said, *We're not going to let you call it Java.*

21   I mean, that Apache Harmony project was used in products

22   by IBM demonstrated at JavaOne in 2009.  Someone got on stage

23   and said *Here is Apache Harmony.  It can be used just like any*

24   *other Java platform.*  Sun didn't say, *What are you doing?  You*

25   *can't do that.  Those are our declarations.*

1      **THE COURT:**  When was that again?

2      **MR. PAIGE:**  That was in June of 2009, Your Honor.

3      **THE COURT:**  That was after the fact, wasn't it?

4      **MR. PAIGE:**  After what fact?

5      **THE COURT:**  After Android had been released.

6      **MR. PAIGE:**  Yes, it was.

7      **THE COURT:**  You could not have relied on that.

8      **MR. PAIGE:**  It was.

9      Look, Mr. Schwartz said it was open APIs, compete on

10     implementations.  The meaning of that is that you can use

11     things like declarations and write your own implementing code

12     in order to do it.  That's good evidence of fair use,

13     Your Honor.

14     **MS. SIMPSON:**  Your Honor, I have a document that says

15     the opposite of what you just asked Google for.

16     **THE COURT:**  Hand that up.

17     **MS. SIMPSON:**  This is Trial Exhibit 405.  This is an

18     email from Eric Schmidt to Bob Lee.  But the quote is -- this

19     is them writing to each at Google -- "Sun puts restrictions in

20     the Java SE TCK license which prohibits Java as the

21     implementations from running on anything but a desktop or

22     server.  These restrictions prevent Apache Harmony from

23     independently implementing Java SE.  Harmony can put those

24     restrictions on their own users and still Apache license the

25     code, not to mention Android, though that's water under the

bridge at this point."

So here they're expressly saying that they can't do the independent implementations without following the TCK.

**THE COURT:**  Let me ask you, Ms. Simpson, why don't you want the Apache story in there?  I mean, you want to prove willfulness; right?  What is your plan for proving willfulness?

**MS. SIMPSON:**  Your Honor, we have plenty of evidence that Google knew that these APIs were subject to license, that they needed a license, that they were going to implement even though they knew they needed a license, and that they would pay the price later, more or less.

With respect to Apache, it's just an awful lot of information, and, frankly, Your Honor, it's easy for Google to throw the Apache terms around.  It's going to take quite a bit of time for us to explain the story back and forth with the letters back and forth to Sun.  We have to explain the TCK.  We have to explain the spec license.  We have to go into all of this extra evidence.  We don't have a lot of time.  And so this is not something that we want to consume our time with, plus we're very concerned at the end of the day, the jury is going to think, as they did last time -- Your Honor will remember that they sent notes to the Court --

**THE COURT:**  Okay.  They sent a lot of notes and it was a point of confusion and I'm sympathetic to you on that, but here's the argument the other way.  You're accusing them of

1  willfulness, and anybody who is accused of willfulness has the
2  right to explain to the jury where they got the offending code
3  from.

4      So we can't just put duct tape over their mouth and not
5  let them explain where they got the code.  The jury is going to
6  want to know where did they get the code?  Did they steal it
7  from Java?  Did they write it from scratch out of one of these
8  books themselves?  Where did it come from?  And it came from
9  someplace, and the true story is it came from Apache Harmony.

10         **MS. SIMPSON:**  Well, some of it did, Your Honor.  But I
11  don't think that's necessarily relevant because the fact of the
12  matter is they did not have a license to do what they did and
13  Apache doesn't give them a license to do what they did because
14  it was also an incompatible version of Java, and as you have
15  said before, Your Honor, they stand in the shoes of Apache.

16      So if Apache is unlicensed, they're unlicensed, and there
17  is not really a reason to get into all of that extra evidence
18  to merely display the fact that they got their code from an
19  unlicensed source.

20         **THE COURT:**  Mr. Paige, how do you get around this, the
21  water-under-the-bridge email.

22         **MR. PAIGE:**  Certainly, Your Honor.

23         **THE COURT:**  This is like from Mr. Big in the company.

24         **MR. PAIGE:**  What it's saying is that because the
25  field-of-use restriction was in there, Apache is effectively

unable to distribute its software because Apache licenses

open-source software, and one of the main rules of open-source

software and free open-source software is that you cannot put

restrictions on how software is used.  It's freedom number zero

in the Free Software Foundation.

So if you say, *You can have my software but you can't use

it for X,* that violates all the rules of free and open-source

software.  So as long as they're not permitted to have a TCK

license free of a field-of-use restriction, they are

effectively not allowed to distribute their software under

their license.  That's what that's about.  It's not about any

sort of problem --

THE COURT:  It says, "not to mention Android, although

that's water under the bridge at this point."  That to me

sounds like Mr. Schmidt knew that there was a fundamental

licensing problem.

MR. PAIGE:  I believe that is an email from Mr. Lee to

Mr. Schmidt.

THE COURT:  It is, but -- that's true.  Mr. Lee is the

one that sent it, but he sent it to Mr. Schmidt.

MR. PAIGE:  He did.  That's true, Your Honor.

THE COURT:  Is Mr. Lee going to testify?  Are you

calling Mr. Lee?

MS. SIMPSON:  I don't think he is on our list.

MR. PAIGE:  I don't believe so, Your Honor.

1          **THE COURT:**  Is Mr. Schmidt going to testimony?

2          **MR. VAN NEST:**  Absolutely, Your Honor.

3          **MS. SIMPSON:**  He is, Your Honor.

4          **THE COURT:**  How is he going to get around this?  This

5    is a pretty bad document for Google, I would say.

6          **MR. VAN NEST:**  I'm not sure -- he testified last time.

7    I'm not sure that this was discussed with him or not.  But I

8    think it's what Mr. Paige is talking about.  This is a

9    different issue a year after the fact.

10         Remember, the Apache story is sort of a fundamental part

11   of the story, as you observed.  That's where Google got the

12   implementing code.  And what Mr. Schwartz said last time was

13   our whole business plan at Sun was make the language and the

14   API declarations open and people compete on the

15   implementations.  And one example of that was GNU Classpath.

16   One example was Apache.  One example of that was Android.  And

17   that explains why, when Android was released, Mr. Schwartz said

18   it put a rocket onto Java.  It's fine.  They weren't

19   complaining.  This didn't come up until Mr. Ellison bought the

20   company.

21         So to try to separate Apache out is wrong.  We're not

22   going to claim that the Apache license gives us a license to

23   the implementing code or anything else.  Our argument is that

24   it was considered in the day by the copyright owner, Sun, to be

25   a fair use because it tolerated the use in GNU Classpath.  It

tolerated the use in Apache.  So Google went and used the same
declarations that everyone else was using and reimplemented
it's code.  That's why it took three years and all that money.
They reimplemented the code just the way Apache did, just the
way Sun did.

This license issue is a complete red herring.  What Apache
wanted to do was say *we're Sun compatible* and of course what
Google originally wanted to do was say *we're Java compatible*.
Apache wanted to say we're *Java compatible*.  Google negotiated
for a similar license, right?  We negotiated.  It broke off
because the parties couldn't agree on control.  But that does
not mean -- this whole TCK thing is a red herring.

Google didn't use the tea cup, the coffee cup.  Google
didn't call itself Java, and that's why Mr. Schwartz said it's
okay.  This is critical evidence, the Apache story, of kind of
at the center of the story, where we got the code, why we did
what we did, why Mr. Schwartz, on behalf of Sun, said it was
okay to do this.  I don't know how you could try the case
without this evidence.  It's central to everything, really.

And for them to say they had a spec license when last time
they agreed to a stipulated fact that there was no license for
Apache -- it's a stipulated fact in the findings we submitted
after the trial.  They agreed; we agreed.  Apache didn't have a
license.

They liked that point then because they wanted to make the

1    point Apache didn't have a license so Google didn't get

2    anything from Apache.  Now they say there is a spec license.  I

3    don't think that's true because Apache didn't download any

4    implementing code.  Apache didn't download the code for Java.

5    They took the declarations that Mr. Schwartz will testify were

6    free and open to use and they wrote their own code, just like

7    Google wrote its own code.

8        So I don't know how you separate Apache out.  It's not a

9    complex story where -- they want to make it complex.  They want

10   to throw in the spec license.  They want to throw all that in,

11   and, fine, they cross-examined Mr. Schwartz on that last time

12   and I fully expect them to cross-examine him on that again, but

13   to say somehow we're going to cut out Apache from the middle of

14   the case and have somebody give some sort of explanation, that

15   makes no sense whatsoever.

16       This is what Mr. Lee said.  Mr. Lee said exactly what

17   Mr. Paige said.  He is talking about *we can't call Android*

18   *Java.*  You say there is water under the bridge.  *We can't call*

19   *Android Java.*  That was in his testimony last time.

20          **THE COURT:**  Where does it say that in this memo?

21          **MR. VAN NEST:**  This is what he testified to about the

22   memo in the first trial.

23          **THE COURT:**  Who said that?

24          **MR. VAN NEST:**  Mr. Lee.

25          **MR. PAIGE:**  Mr. Lee.

1      **MR. VAN NEST:**  At page 989 of the transcript.  Mr. Lee

2   said what he's talking about in this memo is you can't call

3   Android Java.  That's water under the bridge.  Why we released

4   it as Android, not as Java.  Just like Apache couldn't call

5   itself Java.  Just like GNU Classpath couldn't call itself

6   Java.

7      This spec license is a red herring, and they don't like

8   it, but last time they stipulated that there was no license for

9   Apache.

10      **THE COURT:**  Is that true, Ms. Simpson?

11      **MS. SIMPSON:**  Your Honor, Apache was not licensed.

12   Let me just say, this is not a red herring.  The spec license

13   is very clear.  It has three requirements.  If you want to do

14   an independent implementation, which is what they are talking

15   about, you want to write your own implementing code, you use

16   the spec license.  If you use the spec license, you have to

17   fully implement the spec, you have to not modify, subset or

18   superset the spec, and you have to pass the TCK.

19      The TCK is not just about calling things *Java*.  The TCK is

20   how Sun ensured that implementations were compatible, which was

21   a key element of what they were trying to do with their

22   licensing scheme.  This is not a red herring and it is not

23   about branding.  It's about passing the TCK.

24      So, yes, Google could do this, too and they could pass the

25   TCK, but they chose not to.  And Apache had a dispute.  They

1    didn't want to accept the TCK the way that it was worded.  They

2    didn't want the field-of-use restrictions.  It was a dispute.

3    It was a licensing dispute.

4        Yes, they were not licensed.  At the end of the day, they

5    were not licensed.  Because when you refused to do the third

6    part of this requirement in the spec license, the license

7    terminates.  The spec license terminates under its terms.  If

8    you fail to comply with any material provision or act outside

9    the scope of this license, the agreement immediately

10   terminates.  So, yes, when they didn't --

11           THE COURT:  Tell me, did Sun realize that Apache had

12   the Harmony code up on its website and it could be downloaded?

13           MS. SIMPSON:  They did, because, Your Honor, they were

14   talking about -- they were negotiating and trying to resolve

15   their differences.  They were aware that they were implementing

16   the code.  They were aware that they had a project.  No one was

17   hiding their head in the sand that Apache Harmony was out there

18   developing, and, frankly, I think they would have fully

19   supported it had they taken the TCK and made it, you know,

20   compliant.

21           THE COURT:  But knowing that there was a TCK dispute,

22   did Sun ever put out a statement saying *nobody should be*

23   *copying and downloading because that's a violation of our*

24   *copyright*?

25           MS. SIMPSON:  I don't know that they explicitly did

1   that, Your Honor, but these letters were open on the web.  You

2   know, these letters back and forth about the dispute over the

3   TCK were not just between the companies.  These were open

4   letters.

5            **MR. VAN NEST:**  Your Honor --

6            **THE COURT:**  Wait, wait.  I'm sorry.

7       Mr. Bicks, did you want to say something?

8            **MR. BICKS:**  No.  I was just stretching.  Sorry.

9            **THE COURT:**  These lines of declaring code, what do you

10  say to the idea that it was customary at the time that the

11  lines -- that the declaring lines of code were free game?

12  Anybody could use those as long as they had their own

13  implementing code?

14          **MS. SIMPSON:**  Well, Your Honor, it comes right back to

15  the spec license.  The spec license is what allows people to do

16  that, right?  You take the specification, you can develop your

17  own implementing code.  But you're doing it within the

18  licensing scheme that Sun has set forth, and that licensing

19  scheme requires you to pass the TCK.  And when you don't do

20  that, then you are no longer a licensed entity.

21          **THE COURT:**  Why would someone want to have their

22  own -- why wouldn't they just take the original Java lock,

23  stock, and barrel?  Why would they want to have their own

24  implementing code?

25          **MS. SIMPSON:**  Well, Your Honor, I think you would

probably have to ask the folks that are doing that, but

sometimes there are tweaks that they would want to make to that

code, and as long as they were compatible, they would have that

sort of in-house and they'd be able to run that code source

in-house if they wanted to do that.

     But the fact of the matter is, Your Honor, no one really

did that for a commercial implementation.  And I know they keep

mentioning IBM, but IBM was licensed.  It was a Sun licensee.

So for them to trout IBM out as a person using Apache Harmony

in a commercial sense, they had a global license that covered

their activities.

          **THE COURT:**  From Sun?

          **MS. SIMPSON:**  From Sun.

          **THE COURT:**  Is that true?

          **MR. PAIGE:**  I don't know whether that's true or not,

Your Honor.  I mean, that's their licensing between them and

IBM, but certainly no one said, you know, *IBM, you can do this*

*at JavaOne publicly, say Apache Harmony is great, but anyone*

*else sitting out there in the audience, you can't use Apache*

*Harmony*.  Never said.

          **MR. VAN NEST:**  Your Honor, if I just could add that

you went over this with Mr. Schwartz yourself while he was

here.  And what -- and at pages 1976 through 78, 19 -- yeah.

And you asked him did they, Apache, have a license, and what he

is talking about is they -- they can't use the trademark.  He

1    says, "They participated in our Java community process."  I'm

2    showing direct exam Schwartz, and then you interrupted to ask a

3    question at page 1976.  And he said, "They did participate in

4    our Java community process, which is the way we brought people

5    together to enhance technologies.  But they didn't want to live

6    by the financial requirements of paying Sun for a license to

7    the brand, and although that's a trademark issue in the Java

8    world, the trademark issue and the specs are tied in that if

9    you pass the test to prove you're compatible, then we allowed

10   you to call your product *Java compatible*.  But if you didn't,

11   you could still make the product available, but you couldn't

12   call it *Java*."

13        Again, Schwartz, "We couldn't stop people from creating

14   brand Java and Oracle" -- oops.  Excuse me.  "Creating their

15   own technologies.  And they could call them, you know, black or

16   white or Fred or Bob.  It's up to them.  That's not our

17   province."

18        I mean, you went over this.  They want to make this more

19   complicated than it is.  Apache was out there.  Sun knew

20   everything they were doing.  They were using the declarations.

21   And Mr. Schwartz will testify to all of that and he'll testify

22   that he said publicly, *You can ship Apache today*.  *You just

23   can't call it Java*, just like he did last time, and I'm sure he

24   will give you the same answers you asked last time, too.

25        There was a trademark issue.  That's the TCK.  But it

1    defies imagination if -- was this all going on behind Sun's

2    back?  Heck no.  It was all out in the public.  And the

3    statement from Sun's CEO was, *You can do this*.  *You just can't*

4    *call it Java*.  Just like GNU Classpath, just like Android.

5    That's why when Android was launched using the same

6    declarations, their own implementation, he said, *Welcome to the*

7    *community*.  *We're happy*.  It's all part of the same story.

8    They would love to carve it out, but it can't be carved out.

9    It's part and parcel of what happened.

10            **MS. SIMPSON:**  Your Honor, a few pages later,

11   Mr. Schwartz admits that he doesn't know what the licensing

12   terms are, and the fact of the matter is he's just wrong on the

13   licensing terms.

14       I would like to direct Your Honor back to the article I

15   handed up which is really taken out of context.  If you look at

16   the flow of the text in the article, Apache is saying it's --

17   it's an interview or it's a quote from Jonathan Schwartz, and

18   it's embedded in between two discussions about how the TCK is

19   needed.  So I encourage Your Honor to look at that.  It's the

20   third paragraph, fourth paragraph, fifth and sixth

21   paragraphs --

22            **THE COURT:**  Read it out loud.

23            **MS. SIMPSON:**  It says -- the sentence preceding

24   Schwartz's quote is, "Apache said certain, quote,

25   fields-of-use, unquote, restrictions regarding the TCK were

preventing it from adopting Sun's technology for use in
Harmony.  Jonathan Schwartz, CEO at Sun, said in a press
conference, 'There is no reason that Apache cannot ship Harmony
today.  We are very focused on the GPL community'."

Then it says, "That is technically true, but Apache
officials said that to do so with the TCK restrictions in place
would actually go against the Apache software license."

So they're not going to ship because they don't agree with
the TCK, but everybody agrees the TCK is needed, including
Apache.

**MR. PAIGE:**  That's what I just said about open-source
software, Your Honor.  The Apache license doesn't allow you to
say you can't use open software for a particular purpose.  That
goes against open-source requirements.  So they couldn't ship
if the field-of-use is there under the TCK.

**THE COURT:**  Is there some independent witness, other
than Schwartz, somebody, a professor, maybe, who could say, *I
lived through that time period and Google is correct or Oracle
is correct that either it was or was not free game for anybody
to use the declaring code as long as they didn't call
themselves Java?*

**MR. PAIGE:**  I think Mr. Phipps, Your Honor, was in
Sun's open-source office.

**THE COURT:**  Who?

**MR. PAIGE:**  Mr. Simon Phipps.

1            THE COURT:  Is going to be a witness?

2            MR. PAIGE:  He is.

3            THE COURT:  What is he going to say?

4            MR. PAIGE:  I believe he would tell you that that is

5       the kind of thing that was allowed.

6            THE COURT:  He is in whose open-source office?

7            MR. PAIGE:  Sun's.

8            THE COURT:  Did he testify last time?

9            MR. PAIGE:  He did not.

10           THE COURT:  Has he been deposed?

11           MR. PAIGE:  I don't believe so, Your Honor.

12           THE COURT:  He is going to be a witness?

13           MR. PAIGE:  Yes, Your Honor.

14           MS. HURST:  Your Honor, we have asked for his

15      deposition, and he was not disclosed the last time as a trial

16      witness on this topic, and they have refused to give us his

17      deposition.  And that's the subject of one of our motions.  We

18      tried to get it resolved with the depo and they wouldn't give

19      him to us.

20           THE COURT:  Was he properly disclosed under Rule 26?

21           MR. PAIGE:  He was, Your Honor.

22           THE COURT:  Well, I don't -- I don't think I can just

23      order him -- if he was properly disclosed, you could have taken

24      him back at the time -- I'm talking about was he disclosed in

25      your initial disclosures?

1          **MS. SIMPSON:**  In the first case, Your Honor.

2          **THE COURT:**  But have the initial disclosures been

3     updated?

4          **MS. SIMPSON:**  They were.

5          **MS. HURST:**  Your Honor --

6          **THE COURT:**  If he's been disclosed all along, you

7     could have deposed him all along.

8          **MS. HURST:**  But he was not disclosed on this subject

9     matter, Your Honor.  He was disclosed on the patents, the

10    asserted copyrights, the asserted works, Java, Android and its

11    affect on the Java market and issues related thereto.  He

12    wasn't disclosed on Apache, Your Honor.  There is no mention

13    here of Apache or of licensing practices or licensing terms,

14    and that's why we've asked for the deposition, Your Honor.

15         **MS. SIMPSON:**  This was their initial disclosure from

16    the original case.

17         **THE COURT:**  What do you say to that point?

18         **MR. PAIGE:**  Mr. Kwun.

19         **MR. KWUN:**  Your Honor, I mean, he was disclosed -- as

20    Ms. Hurst said, he was disclosed on Java and he was disclosed

21    on Android and its effect on the Java market.  But Java

22    alone -- Apache Harmony is an implementation of class libraries

23    for Java.  So if he was disclosed on Java and he is -- he was

24    the chief open-source officer at Sun.

25         The fact that he's disclosed on Java, the fact that his

1    job duty was open-source issues, I don't see how they can claim

2    surprise that that would include within it --

3            THE COURT:  Where does he work today?

4            MR. KWUN:  I actually don't know what his current

5    employment is, Your Honor.  He is not employed by Google.  He

6    is not employed by Oracle.  He is not employed by Oracle

7    America.

8            THE COURT:  When did you make this motion?  I was

9    unaware of this motion.

10           MR. KWUN:  Your Honor I believe it was mentioned in

11   their trial brief, not in a separate motion.

12           MS. SIMPSON:  When he appeared on their witness list,

13   Your Honor, we asked them for the deposition.

14           MS. HURST:  Your Honor, the disclosure that I was

15   referring to was in August of 2011.

16           MR. KWUN:  Actually it was disclosed on July 6, 2011.

17           MS. HURST:  Okay.  This Proof of Service says August

18   26, 2011.  I'm just reading through the Proof of Service,

19   Your Honor.

20           MR. KWUN:  He was first disclosed on July 6, 2011.  It

21   was repeated in a later disclosure --

22           THE COURT:  Was he disclosed on the subject of

23   open-source practices and that kind of thing?

24           MS. HURST:  No, Your Honor.  He has never been

25   disclosed on that subject.

1        **THE COURT:**  Is that what you are going to present him

2   on?

3        **MR. KWUN:**  I'm sorry, Your Honor.  If I could just beg

4   your indulgence and ask you to repeat the question.

5        **THE COURT:**  You are going to be presenting him as a

6   witness on open-source practices at Sun?

7        **MR. KWUN:**  Yes, Your Honor.  Open-source -- not

8   open-source generally.  Open-source related to Java.

9        **THE COURT:**  Is he in the Bay Area?

10        **MR. KWUN:**  He is in the UK at the moment.

11        **THE COURT:**  UK.  Is he coming over -- when is he

12   coming to testify?

13        **MR. KWUN:**  He is prepared -- he is coming in early May

14   so he will be prepared to testify during our case in chief.

15        **THE COURT:**  I don't know.  How many of these kind of

16   problems do you all have?

17        **MR. KWUN:**  Your Honor, this is --

18        **THE COURT:**  Do you have a similar problem with one of

19   their witnesses?

20        **MR. KWUN:**  We have issues with witnesses that they

21   have named who were never disclosed such as Sergey Brim.

22        **MS. HURST:**  We have dropped the request for Mr. Brim.

23        **MR. KWUN:**  There is another witness from the Apache

24   Foundation that they have named that was never disclosed in any

25   prior Rule 26 disclosures.

1          THE COURT:  Well, can't you work out a deal?

2          MR. KWUN:  Your Honor, we disclosed this witness in

3   July of 2011.  We don't really feel the two situations are

4   parallel.

5          THE COURT:  Well, maybe they're not exactly parallel,

6   but you did not use open source in your description, so there

7   is something of an argument.

8          MR. KWUN:  Your Honor, again, this was a Sun employee

9   who -- whose entire field within the company was open source.

10  He was the --

11         THE COURT:  Yes.  But you didn't say that is what you

12  were going to call him as a witness on.  You said you were

13  going to call him on other things.

14         MR. KWUN:  Your Honor, we disclosed him on Java, and

15  he is not going to be talking about open source generally.  He

16  is going to be talking about open source as it relates to the

17  Java platform.

18         THE COURT:  Here is what I think you should do.  It's

19  not an order.  It's just a suggestion, but I think when

20  Mr. Phipps -- is that his name?

21         MR. KWUN:  Yes, Your Honor.

22         THE COURT:  Phipps or Phibbs.

23         MR. KWUN:  Phipps.

24         THE COURT:  Whenever he shows up, you get a two-hour

25  deposition if you subpoena him and all that, but that's on the

1    condition that you help them take a two-hour deposition of the

2    witness they want to take.

3            MS. HURST:  That's fine with us, Your Honor.  The

4    other witness is their employee so it shouldn't be a problem.

5            THE COURT:  Well, they don't need a deposition then.

6    They can just interview him; right?  Is there somebody you do

7    want to take a deposition of?

8            MR. KWUN:  Your Honor, we would have to confer on

9    that.  I think there is.

10           THE COURT:  Well, you figure out somebody and let them

11   know, but I believe -- I'm not ordering this.  I'm just saying

12   that I am a little sympathetic here to Oracle's problems.

13           MR. MULLEN:  Reid Mullen for Google.

14      If I could just address the Court's question.  I think

15   there are several witnesses on their witness list who have

16   never been disclosed under Rule 26.

17           THE COURT:  Well, the normal rule is going to be they

18   don't get to testify, period.

19           MR. MULLEN:  That's fine with us.

20           THE COURT:  But I can't say *never*.  Conceivably you

21   could be allowed, even at trial, to amend your -- to supplement

22   your initial disclosures.  But I regularly refuse to let people

23   testify who were not disclosed under the initial disclosure

24   rule, period.

25           MR. MULLEN:  That's fine with us, Your Honor.

1        THE COURT:  Well, I'm not saying that -- I have to go

2    one by one and figure out what the right thing to do is, but if

3    there is somebody you do want to depose, maybe you should take

4    advantage of the opportunity.

5        MR. VAN NEST:  We don't need that, Your Honor.

6        THE COURT:  All right.  Well, I -- then I'm just going

7    to order you two hours.  Mr. Phipps is going to sit for two

8    hours to be deposed on this subject.  Now it is an order.  And

9    you don't get anything in return.

10       What else can I help you with?

11       MS. SIMPSON:  Do you have any other questions on

12   Apache, Your Honor, or did you want to move on?

13       THE COURT:  No.  I think -- what are you going to say

14   if Mr. Phipps comes in and says, *Oh, Google is right.  The*

15   *declaring lines of code were open to anybody.  They just*

16   *couldn't call themselves Java.*  I mean, that would be a huge --

17   you would probably lose the case if that testimony comes in.  I

18   don't know.  Maybe that's a broad statement, but that would be

19   a dynamite thing.

20       I never heard that before.  All I have heard are these

21   complicated things that I can't -- like these emails, but if

22   it's true that the open-source person at Java is going to come

23   in and -- I mean, at Sun and say that anybody could take the

24   headers, do their own implementation and call it somebody else

25   like Android and that was perfectly okay, surely that's -- that

1      comes in for fair use.

2               **MS. SIMPSON:**  Your Honor, I think we are conflating

3      two things here.  This spec license and the way that Apache

4      went about implementing the Harmony project is not open source.

5      All right?  There is a separate open-source license, OpenJDK,

6      and my understanding is that is what Mr. Phipps is familiar

7      with and prepared to testify on.  That's a separate licensing

8      scheme than the spec license and the TCK.  Two different

9      licensing schemes that Sun uses to distribute its products.

10               **THE COURT:**  Let me ask Mr. Paige.

11           Mr. Paige, a moment ago you said that he would testify

12      that he could -- is it conditioned on there being some kind of

13      a license?  Mr. Phipps is going to say as long as you had some

14      kind of a license, you could do that, what you were saying?

15               **MR. KWUN:**  Your Honor, I can't vouch for precisely

16      what he is going to say because he is a witness and we are

17      going to have to ask him the questions at trial, but he is

18      going to be the person who is knowledgeable about open-source

19      practices at Sun with regard to Java.  He is the person who

20      would have worked with other people in the open-source

21      community, including not just the OpenJDK users, but also

22      people who worked on other open-source implementations.

23               **THE COURT:**  One of the key questions is going to be

24      could Apache do this at all without a license.  Is he going to

25      answer that question?

1    **MR. KWUN:**  If he's asked that question, I am sure he

2   will answer that question.

3        **THE COURT:**  If he is going to -- he should know the

4   facts so that he doesn't stumble over the facts and I -- all

5   right.

6        See, to me, the way this was -- is coming across from

7   Google right now is that the header lines of code for all 166

8   APIs could be completely copied and reused in somebody else's

9   software as long as it was your own implementing code, and that

10   was the custom and practice in the industry.  You didn't need

11   any license.  You could just do it, period.  That's what you're

12   saying; right?

13        **MR. PAIGE:**  That is certainly how the situation with

14   Apache Harmony and GNU Classpath showed the practice and custom

15   in the industry to be, yes.  Absolutely.  Mr. Schwartz said

16   they could ship.

17        **THE COURT:**  Well, that -- no.  I don't want to tie

18   this in to Mr. Schwartz and that comment that -- because

19   there's other lines that you didn't read to me in the article.

20   But what you're -- let me be clear.  You're saying you didn't

21   need any license at all.  You didn't even need the

22   click-through license.  You didn't need anything.  You could

23   use those 166 APIs, the header lines only, do your own

24   implementing code, and you were fine?

25        **MR. PAIGE:**  That's right, Your Honor.

1          **THE COURT:**  That's what you're saying?

2          **MR. PAIGE:**  That's right.

3          **THE COURT:**  And you're saying that was the custom and

4    belief in the industry at the time?

5          **MR. PAIGE:**  It's shown by -- with Harmony.  They never

6    told Harmony to stop doing this.  They just said *you can't call*

7    *it Java.*

8          **THE COURT:**  Well, you know --

9          **MR. PAIGE:**  Same with GNU Classpath.

10         **THE COURT:**  I hope you got better proof than they just

11   didn't stop them.  I mean, that doesn't prove everything, that

12   they didn't stop them.  Is it their burden to go out and get an

13   injunction?

14         **MR. PAIGE:**  Not that they didn't stop them,

15   Your Honor.  They didn't even ask them to stop.  They didn't

16   say *Stop using the declaring code*.  They just said *We're not*

17   *going to let you to take the TCK license without a field-of-use*

18   *restriction it*.  They didn't say, *And, by the way, you're*

19   *infringing our copyright*.  *Please stop*.  Never said.  It was

20   never said.

21         **THE COURT:**  Well, all right.

22       So if there is testimony to that effect, Ms. Simpson, that

23   would be pretty powerful, wouldn't it?

24         **MS. SIMPSON:**  It would, Your Honor, but it's

25   completely false.  It's completely false.  There is a licensing

1   scheme at Sun.  Apache was following the licensing scheme.

2       The next step in the licensing scheme was to get the TCK,

3   which they decided not to do which meant they no longer were

4   licensed.

5       This is not a free-for-all.  If the code were free to take

6   from anyone, we wouldn't be here, Your Honor.  That is not the

7   way the licensing scheme at Sun works.

8       It's proprietary code.  It can be distributed under

9   various licensing schemes under Sun's and now Oracle's plans

10  for those licenses.  You can't come in and just take it.

11  That's not how it works.

12      And Harmony was operating under that scheme.  And while

13  they were building the code, the expectation was they would

14  follow the rules.  At the end of the day, they decided they

15  didn't want to follow the rules and then they shot the project

16  down and acknowledged that the rules were in place and that

17  they couldn't do what they wanted to do.

18          **THE COURT:**  What do you say to the fact that Apache

19  shut down the Harmony project and acknowledged that they didn't

20  follow the rules?

21          **MR. PAIGE:**  I don't think that's correct, Your Honor.

22  They shut it down for sure because IBM, one of its backers,

23  went over to OpenJDK.  Oracle was another huge backer of

24  Apache.

25          So with IBM and Oracle both working at OpenJDK, there

wasn't much for Apache Harmony to do anymore.  The only person

supporting it was Google.

**THE COURT:**  All right.  Is there anyone else like

Mr. Phipps, a professor, for example, who will come in and say,

*Yes, it was okay to copy the exact words of the headers and the*

*166 and that was the custom in the industry at the time as long*

*as you didn't call yourself Java and as long as you didn't copy*

*the implementing code*?

**MR. KWUN:**  Your Honor, we also have another witness,

Dr. Rick Katell.  He is not a professor, but he is a Ph.D.  He

was a distinguished engineer at Sun for many years.  He worked

within the JavaSoft division, and he will offer testimony about

his understanding as somebody who is an expert in the field

about what was the understanding of computer scientists with

regard to declaring code generally.

**THE COURT:**  Has he been deposed?

**MS. SIMPSON:**  No, Your Honor.

**MR. KWUN:**  Due to medical issues, he has not yet been

deposed, but the parties have agreed his deposition will go

forward on Saturday the 30th.

**MS. SIMPSON:**  Your Honor, that's a separate issue we

wanted to raise.  We wanted to reserve the right to make a

motion after we deposed Mr. Katell since we hadn't had the

opportunity to do so yet.

**THE COURT:**  Well, I don't -- you want to raise a

1    motion.  I don't get it.

2            MS. SIMPSON:  Well --

3            THE COURT:  You are already going to get a chance to

4    depose the guy.

5            MS. SIMPSON:  An additional motion in limine, should

6    his testimony call for that once we have been able to depose

7    him.  We haven't been able to depose him all this time, even

8    though he was disclosed back in December.

9            THE COURT:  What is his medical issue, if I may ask?

10           MR. KWUN:  He actually had a pair of medical issues.

11           THE COURT:  Maybe you shouldn't say it on the public

12   record, but how can he be here to testify at trial if he is so

13   sick he can't testimony at deposition?

14           MR. KWUN:  Your Honor, what happened -- and I have

15   discussed with Dr. Katell what might be disclosed publically,

16   so he is comfortable with this.

17       After he submitted his expert report, he had a medical

18   diagnosis that required some surgery.  Thereafter, he needed

19   several weeks to recover on the recommendation of his doctor.

20   So we agreed that his deposition would go forward late.

21       Two days before his deposition, he was admitted to the

22   hospital again for an unrelated complication.  That unrelated

23   complication is what kept him from having his deposition taken,

24   what would have been a late deposition, but agreed late

25   deposition, and he is now at the point where he can have his

1   deposition -- sit for his deposition.  He's still not fully

2   recovered, but he is prepared mentally to have his deposition

3   taken, and he is also prepared --

4           THE COURT:  What is the best point he is going to make

5   on this for you?  For example, in his expert report, what is he

6   going to say?

7           MR. KWUN:  His expert report, which they have, by the

8   way -- his expert report says that he is aware of instances

9   where Sun reimplemented APIs of others, in particular, the SQL,

10  the Structured Query Language, that IBM created for use in

11  database for databases.

12      His particular field of expertise is in databases, so he

13  will talk about that.  He will talk about the use of the --

14  reasons why companies agreed to use common APIs, particularly

15  again based on his experience working for Sun and negotiating

16  agreements like this with other people in the industry, how

17  that actually benefits society.

18      He will also talk about his understanding as a computer

19  scientist of many, many years and a distinguished engineer at

20  Sun of what was and was not allowed.

21          THE COURT:  Is he going to say that it was allowed to

22  copy all header lines in 166 APIs with no license whatsoever?

23          MR. KWUN:  He is not -- his report does not speak

24  specifically to the Java APIs.  He speaks more generally about

25  the understanding of computer scientists, about APIs generally.

1          **THE COURT:**  I don't know.  I'd have to -- okay.  Thank

2     you.

3          Any other witnesses that you have who will say that it was

4     okay to copy the headers for all 166?

5          **MR. KWUN:**  We will certainly have the testimony of

6     people who were part of the Android team who will testify to

7     their own beliefs at the time that they were implementing

8     Android.

9          **THE COURT:**  Give me an example of what their belief

10    was.

11         **MR. KWUN:**  Their belief -- for example, Mr. Rubin, who

12    was the head of the Android project, will testify that he

13    believed that this was fine.

14         **THE COURT:**  What did he say last time?

15         **MR. KWUN:**  I don't have his -- I couldn't tell you off

16    the top of my head.

17         **THE COURT:**  All right.  I have a different question.

18    What is the difference between Apache Harmony and GNU

19    Classpath?

20         **MS. SIMPSON:**  Your Honor, there is not a huge

21    difference, other than the fact that, you know, GNU was --

22    there is not as a detailed history involved with GNU, but GNU

23    was also a noncommercial entity who wanted to implement the

24    code and they also have put their code aside --

25         **THE COURT:**  Who is GNU to begin with?

1          **MS. SIMPSON:**  Who is GNU to begin with?

2          **THE COURT:**  What was the name of that entity?

3          **MS. SIMPSON:**  That is the name of it, GNU.

4          **THE COURT:**  What did that stand for?

5          **MS. SIMPSON:**  I think we tried to answer that earlier

6    in a prior conference.  I don't know the answer to that

7    question.

8          **THE COURT:**  All right.  But it was not Apache.  It was

9    a different group?

10         **MS. SIMPSON:**  It was a different entity.

11     And, Your Honor, just as an example of how this is going

12   to evolve into a whole line of testimony that is going to

13   complicate matters, you know, GNU was a nonprofit entity.  They

14   were messing with the Java code.  At one point, Sun learned

15   that an entity in South Korea was going to use the GNU code to

16   create a standard for that country and that would be a vast

17   commercial use and Sun went out and shut it down.

18     So that is an example of how we're going to have to get

19   into all of these other examples of things.

20     And I should add, Your Honor, that the law does not

21   require Sun or Oracle to hunt down every person that is doing

22   something that might be wrong with the code in essence.

23   They're not required to do that.

24     As the Court said, I think it was in *Campbell*, they get to

25   decide whether it's worth the candle to go after an infringer,

1   and so to the extent that these parties were even infringing,

2   you know, that's something that we get to decide whether we

3   want to go after them or not.

4       We're not going to go after potentially a nonprofit who is

5   using code for educational purposes.  That's a decision that

6   the company can make.  They can make that decision.  They might

7   go after a company that is going to use it for vastly

8   commercial purposes.

9       Your Honor, I would just also add in response to something

10  that was said earlier that Apache, when they shut down -- I can

11  give you the cite.  It's TX1045.  And they said, "Java

12  specifications are proprietary technology that must be licensed

13  directly from the spec lead on whatever terms the spec lead

14  chooses."

15      **THE COURT:**  I'm sorry.  I was back on GNU.  What is it

16  you are reading from?

17      **MS. SIMPSON:**  This is an Apache trial exhibit.  This

18  is when they shut down Apache, they said, quote, Java

19  specifications are proprietary technology that must be licensed

20  directly from the spec lead on whatever terms the spec lead

21  chooses.

22      Proprietary technology, it's not free for anyone to take,

23  Your Honor.  There is a licensing scheme.  And it's interesting

24  to hear that they're going to have a bunch of witnesses come in

25  and testify about their beliefs as to what they could and could

1  not do.  But those beliefs are contrary to the actual

2  documents, the actual license agreements that governed.  So I

3  don't know how that can trump the license agreements that are

4  in place, to have witnesses come in one after another --

5       **THE COURT:**  No.  I disagree.  Let me give you the

6  hypothetical.  Let's say that you had these form documents, and

7  notwithstanding the form documents that everyone signed, the

8  well-known established custom was that the header lines could

9  be copied.

10      Now, I'm not saying that that's going to be so clear.  But

11  if it was clear and a clearly-established custom, then

12  notwithstanding what's in the documents, that custom would have

13  to be taken into account in -- for example, in evaluating

14  willfulness, because if everyone was doing it, like everyone on

15  the freeway goes 65 miles an hour, not 55 miles an hour, or

16  faster even, that's the custom and okay.  Is it willful?  I

17  don't know.  But you're charging them with willfulness, and if

18  there was a custom, that would mitigate willfulness, even if it

19  didn't technically comply with the agreement.

20      **MS. SIMPSON:**  Two points --

21      **MR. PAIGE:**  If I could --

22      **THE COURT:**  I want to hear what Ms. Simpson says to

23  that.

24      **MS. SIMPSON:**  If it's willful, we are talking about

25  Phase Two.  None of this needs to come in for Phase One if we

are talking about relevance to willfulness.

A second point, a custom in the industry --

THE COURT:  I did say earlier I'm not going to be that will strict on -- because I -- one of the problems with bifurcating is that people start to argue well, make them save that for part two.

But this is part of the story of the infringement of how they got the code to begin with, and Google is entitled to tell the story of how they got the code, and I'm saying I think this is clearly going to have to be a Phase One story.

MS. SIMPSON:  I don't think that is relevant to Phase One.  We have already decided copyrightability and infringement and so we're not talking about where they got the code anymore. We have already established that it's been copied, and the copy is an infringement unless it's fair use.  So unless we can ping this into one of the particular factors --

THE COURT:  There is the word *custom* in the *Wall Data* case.

MS. SIMSPON:  Your Honor, that is dicta in the *Wall Data* case, and, frankly, it's being blown way out of proportion.  That line in *Wall Data* is really intended to show that those are things you can consider when you are considering the four factors.  The four factors are really what governs the of determination of whether something is fair or not.

And custom is -- *Wall Data* didn't apply custom.  It

actually found that it wasn't part of the case.  No other case has done that.  We found one Eleventh Circuit case that talks about how that is an incorrect way to look the four factors. That you are really supposed to be looking at the four factors themselves and that that really is an informational piece, not a separate test.

I would also add, Your Honor, that a custom here is not what they're talking about.  So we've got Apache where Sun insisted that they get a license and they said no and then they stopped.  And then we've got GNU, which was a not-for-profit. When it was taken and used commercially, they were also stopped.

So if there is any practice here, it's shutting down people that are using things without -- outside of the license. So I don't know how we are establishing a custom that things were free for everyone to take.

**MR. PAIGE:**  If I could just address what she is saying about Phase Two.  They are saying that good faith/bad faith is part of the fair-use factors, so obviously if they're going to say we're in bad faith, we have to be able to show what Apache did and what Sun did with Apache.  I mean, that's going to be part of the good faith/bad faith story.

As to GNU Classpath, it is basically the same as Apache Harmony.  They are reimplementing.  The big difference is that GNU Classpath started in 1998, seven years before Apache.  And

1    I think I heard her say that GNU Classpath has shut down.

2    That's not true.  GNU Classpath continues to this day.

3        So, you know, the only thing that GNU Classpath adds is

4    that it's actually a longer time period in which Sun has not

5    said *you can't use the declaring code*.  There is not a scrap of

6    paper in the --

7            THE COURT:  Well --

8            MR. PAIGE:  -- in the discovery, in the evidence that

9    says *you are infringing by using our declaring code*.  They say

10   *we won't give you a TCK license*.  They do not say *you are*

11   *infringing by using our declaring code* --

12           THE COURT:  Well, who has downloaded the GNU to  --

13   who in the real world has ever used what GNU has put out there?

14   Anybody?

15           MR. PAIGE:  I believe there might have been some use

16   by Oracle itself before OpenJDK came around, but I don't know

17   that for a fact.

18           THE COURT:  So what is it exactly that GNU did with

19   the 166 headers?

20           MR. PAIGE:  The same thing Apache Harmony did.  It

21   takes the headers and writes its own implementing code so it

22   can reimplement the APIs.

23           THE COURT:  What's its product called?

24           MR. PAIGE:  GNU Classpath.  The GNU Classpath Project.

25           THE COURT:  And anyone can go download that?

1          **MR. PAIGE:**  Yes.

2          **THE COURT:**  Without license?

3          **MR. PAIGE:**  I believed it's licensed under the

4    GPLv2+Classpath exception.  I think that's where the Classpath

5    exception comes from, in fact.

6          **THE COURT:**  That's a Java license?

7          **MR. PAIGE:**  It's a Free Software Foundation license,

8    the GNU Public General License.

9          **THE COURT:**  And what license does GNU have from Oracle

10   or Sun?

11         **MR. PAIGE:**  I don't know that they have any license

12   from Oracle or Sun, Your Honor.

13         **THE COURT:**  Any license?

14         **MS. SIMPSON:**  They don't have a license, Your Honor.

15   I mean they took the spec license to download the code, but

16   they don't have the TCK license.

17         **MR. PAIGE:**  I don't think there is any evidence of

18   that.

19         **THE COURT:**  Mr. Paige's point is that all these years

20   have gone by and Sun and Oracle have never complained to GNU

21   Classpath; is that true?

22         **MS. SIMPSON:**  Your Honor, I don't know if there was

23   never any complaining, but the fact of the matter is it's a

24   nonprofit entity and no one is using the code, so it isn't

25   worth -- I think the companies made the decision that it's not

1  worth fighting with them when no one is actively using the

2  code.

3          **MR. PAIGE:**  Two points, Your Honor.

4      Again, there isn't a scrap of paper in discovery that says

5  anything about going to GNU or going to Apache and saying you

6  are infringing by using the declarations.  It's just not there.

7  They can't point it to it.

8      Second, in the same document where they were stipulating

9  as to Apache not having a license, they stipulated that GNU

10  never took a license from Sun.  So, again, this idea they took

11  the specification license --

12          **THE COURT:**  But Ms. Simpson's point on that is they

13  didn't get past the TCK so that's why they didn't have a

14  license.

15      It would be interesting if you can come up with -- you

16  should have somewhere in your files where they click through it

17  at Apache, where they clicked through.  Surely Sun has a record

18  of that.

19          **MS. SIMPSON:**  I don't know if they do or not,

20  Your Honor.

21          **THE COURT:**  So are you briefing this point about

22  custom in the briefing that's under way in connection with the

23  instructions?

24          **MS. SIMPSON:**  Yes, Your Honor.

25          **THE COURT:**  Are you briefing that, too?

1          **MR. BABER:**  Yes, we are, Your Honor.

2          **MS. SIMPSON:**  It was actually, I think, already in our

3     jury instruction brief that was submitted last Wednesday.  But

4     we will revisit it in the next filing as well, I'm sure.

5          **THE COURT:**  You mean in addition to your trial brief,

6     you've got a brief on jury instructions?

7          **MS. SIMPSON:**  Your Honor, your rules required a brief.

8          **THE COURT:**  Oh, did they?  Okay.

9          **MS. SIMPSON:**  Yes.

10         **THE COURT:**  There are so many briefs.  All right.  I

11     don't know the answer to this.

12         **MS. SIMPSON:**  Your Honor, I would say if we are going

13     down a path where some of this evidence is going to come in, we

14     would ask for a pre-instruction, and I don't think that would

15     remedy the situation, but I think that some kind of instruction

16     that informed the jury that there is no license here would

17     be --

18         **THE COURT:**  Well, I will be happy to say, off the top

19     of my head because I know this by heart -- just to say to the

20     jury You're going to hear evidence now about Apache and Harmony

21     and you should know that Apache -- that Google could get no

22     greater rights by way of license from Apache than Apache had to

23     begin with from Sun.  I believe that's a correct statement of

24     the law.

25         **MR. PAIGE:**  That's right, Your Honor.

1          **THE COURT:**  So --

2          **MS. SIMPSON:**  I don't --

3          **THE COURT:**  Let me raise a different point.  I am

4    thinking about giving both sides some time during the --

5    additional time, maybe -- maybe we could start out at 20

6    minutes per side, but use five minutes here, seven minutes

7    there, to explain things to the jury after the evidence is

8    under way.  For example, once in a patent case or some kind of

9    a case, we had a witness get on the stand, and he spent 55

10   minutes going through invoices.  And after three minutes, I

11   could tell the jury was completely lost.

12         So I interrupted after about 15 minutes of this.  I said,

13   *Tell the jury why we're doing this.*  It took one minute or

14   less, and then it became clear that this was a setup for a

15   foundational thing for some expert who was coming later so that

16   the jury would now understand that these were going to be the

17   lost profits or something.

18         So maybe we ought to have some flexibility to let you make

19   non-argumentative statements to the jury now and then that helps

20   them understand why they're about to hear a witness, or I may

21   just interrupt in the middle and say *please explain to the jury*

22   *why we are even hearing this witness.*  In fact, I'm just going

23   to do this.  You don't need to tell me *yes* or *no.*  You just

24   have to be ready.

25         I may call upon you -- I will try to give you both equal

1   time.  If one side makes a small speech, I will always give the

2   other side an opportunity right then and there to make the same

3   speech going the other way.  But it helps the jury follow the

4   evidence.

5       In that regard, can we come up with a list of the top,

6   say, dozen or 20 actors in the case?  And just have a one-page

7   handout that -- and then maybe on the other side, a glossary of

8   terms of the top 12 to 20 terms?  So the jury could look on the

9   back side and see, *Oh, Classpath exception, here is what that*

10  *means*.  Or can you think about that.

11          **MR. BICKS:**  I can say, Your Honor, you did that last

12  time, and I actually was looking at that document.  I think

13  it's helpful.

14          **THE COURT:**  Let's do that again.  You have to adjust

15  it for this trial.

16      I have run out of steam on Apache.  I don't have an answer

17  for you.

18          **MS. SIMPSON:**  Thank you, Your Honor.

19          **MR. PAIGE:**  Thank you, Your Honor.

20          **THE COURT:**  Anything else you want to take up?  What

21  time is?  Almost 11:00.  Any other pretrial issues you want

22  to --

23          **MR. VAN NEST:**  Nothing for Google, Your Honor.  We are

24  all set.

25          **THE COURT:**  How about for Oracle?

1          **MR. BICKS:**  I was going to say, Your Honor, one

2     question you asked at one point, you know, what would be

3     helpful to know about before the openings.  Obviously the whole

4     OpenJDK issue, you know, in terms of shaping things is going to

5     be key.

6          And then the -- one of the concerns I have is this:

7     Obviously the Court knows our position on bifurcation, so I

8     won't repeat that.  But the concern I have is essentially

9     telling a jury that you don't have to get to the damages stuff

10    if you decide what Google has done is fair use, and I'm just

11    concerned about that.  I know it's kind of between a rock and a

12    hard place.

13         **THE COURT:**  I realize -- that's a good point, but I

14    think it's an overblown concern.  In the cases where I've done

15    this in the past, I think the juries have been extremely

16    conscientious, and I have not detected any willingness on their

17    part to give short shrift to the plaintiff just because they

18    could get out of some work.

19         I don't think that's -- and I would give -- I wouldn't

20    repeat it over and over again, but I would say things, you

21    know, that I know the jury would not do such a thing and that

22    they will make a fair determination on part one.

23         Once the jury gets into it, that will not be -- they are

24    going to want to do the right thing, whatever they think is the

25    right thing.  I don't think you should worry about that.

1          **MR. BICKS:**  Understood.

2          **THE COURT:**  Anything else I can help you with?

3          **MR. BICKS:**  No.  We appreciate the Court's time.

4          **THE COURT:**  OpenJDK, that is something that you would

5     like to know the answer to.  And I forgot.

6          On your side, what is it you want to know the answer to?

7          **MR. VAN NEST:**  Apache, Your Honor, what we've just

8     been talking about.

9          **MS. HURST:**  We have one other issue, Your Honor.

10         **THE COURT:**  All right.  Please.

11         **MS. HURST:**  On the expert report schedule as we

12    stipulated that the Court ordered, there were three rounds of

13    reports, Your Honor, and to take an example, there were

14    technical experts on our side who served an opening round

15    report on matters on which we did not bear the burden of proof

16    on fair-use-related issues.  Then they served a second round

17    responsive to Google's fair use technical analysis, Your Honor.

18         It would seem that those -- since those were both part of

19    our response to Google's case, that during the direct

20    examination of those witnesses, we would be permitted to cover

21    anything in either of those reports since it was in the posture

22    of disclosures responsive to Google's case and we'll be going

23    second, but I wanted to see if that's within the scope of what

24    the Court had in mind.

25         **THE COURT:**  What do you say over there?  I don't --

I'm not saying *yes* or *no* because I don't know the -- yes?

**MS. ANDERSON:**  Yes, Your Honor.  This is a fairly complicated issue to raise sort of all of a sudden.  We didn't know this was going to be raised today.

The parties did agree and the Court entered a schedule for these reports and it was laid out what could be part of replies and rebuttals, and it was quite specific and not exactly the default rule.

And so if there's a specific issue, I know that there were some things raised in some of the later reports from Oracle that may not be proper under the agreements, but I didn't realize that Oracle was raising that today, and I think we need to disentangle that a little bit if there is something that Oracle is concerned about that they are trying to get in that wasn't permitted under that schedule.

**THE COURT:**  All right.  I think it's witness by witness, and I don't want to give a blanket rule on this.  So let's -- I don't want to rule one way or the other on that right now.

**MS. ANDERSON:**  Thank you, Your Honor.

**MS. HURST:**  Thank you, Your Honor.

We did offer the stipulation to just consolidate everything on both sides, Your Honor.  I don't know what the holdup is to agreeing to that, but we did offer that stipulation and so I thought it was fair game.

1          **THE COURT:**  All right.  No.  It's good to raise, but I

2    have seen situations where somebody tries to slip stuff in in a

3    reply report where it should have been raised in the initial

4    report, and it's not true reply, and I'm not saying that

5    occurred here, but then they -- so --

6          **MS. ANDERSON:**  Thank you, Your Honor.

7          **THE COURT:**  Sometimes I've made the expert come back

8    twice.  They get to go over what they did in their initial

9    report.  Then they got to wait until the opposition testifies.

10   Sometimes the opposition gives up on everything but one issue.

11   And then they get to reply only on that one issue.  It's like

12   within the scope of the cross-type thing, and they don't get to

13   lard in in their initial direct everything that was covered in

14   the reply.  That might apply here.  I don't know.  We have

15   to -- but we'll sort that out as the witnesses come.

16         **MS. HURST:**  Thank you, Your Honor.

17         **MS. ANDERSON:**  Thank you.

18         **THE COURT:**  I hate to let you all go because it's so

19   much fun having you here.

20         Let's just say on your one-page summary motions, I've

21   asked you to brief some of them, but -- and I've read them all.

22   But the burden is on you to bring them up at the right time so

23   that I can -- and the right time may be the morning that the

24   witness is going to appear.  It could be the afternoon before.

25   You have to use a rule of reason, but the burden is on you to

1    bring it up and maybe let the other side know that you're going

2    to bring it up.  All right.  I guess we're done for now.

3              **MR. VAN NEST:**  Thank you, Your Honor.

4              **THE COURT:**  All right.  Thank you.  See you -- good

5    luck to both sides.

6         Oh, the odds are 95 percent or better that we will go on

7    schedule.  I believe that criminal case will be out of the way

8    in time.  There is a tiny percent chance that the jury would be

9    deliberating that morning.  I don't think so.  I think it will

10   be done and the decks are clear for your case.  All right.

11

12              (Proceedings adjourned at 11:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                      CERTIFICATE OF REPORTER

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Friday, April 29, 2016

8

9    *Pamela A. Batalo*

10   _____
     Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11   U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25