# EXHIBIT C

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            SAN FRANCISCO DIVISION

4

5   ORACLE AMERICA, INC.

6        Plaintiff,

7            vs.       No. 3:10-cv-03561-WHA

8   GOOGLE, INC.,

9        Defendant.

10  _____

11

12

13

14      VIDEOTAPED DEPOSITION OF OWEN ASTRACHAN, Ph.D.

15           San Francisco, California

16           Monday, March 14, 2016

17                Volume I

18

19

20

21  REPORTED BY:

22  REBECCA L. ROMANO, RPR, CSR No. 12546

23  JOB NO. 2241710

24

25  PAGES 1 - 184

                                    Page 1

1    Q.  Did you perform any statistical analysis
2  to determine that the methods that you tested were
3  representative of the remainder?
4    A.  I did not perform any such statistical
5  analysis.
6    Q.  For example, did you take a random
7  sample?
8    A.  I did not run a random number generator
9  and then from that choose this, if that's what a
10  "random sample" meant.  I chose the methods
11  arbitrarily.
12    Q.  Apart from your own test, did you also
13  try to duplicate in any way the results of Miss --
14  Dr. Schmidt's test?
15    A.  I -- I -- in Dr. Schmidt's report, he
16  talks about several tests, including removing
17  individual -- and I don't recall, you know --
18  classes or methods on a methodical basis.  And I
19  didn't run all of those.  I ran ones that I thought
20  were being indicative of saying that yes, in fact,
21  the build did fail.
22      So I did not reproduce in the entirety
23  his tests, but I tried to reproduce the tests, to
24  the extent that I could, with fewer runs.
25    Q.  And -- to the extent that you

Page 94

1  reproduced his test, did you get any different
2  results than Dr. Schmidt reported?
3    A.  I did not get any different results in
4  what he reported in his original report.  I did
5  have a difference in -- I am not sure if it is his
6  rebuttal or reply, because I forget which ones were
7  there, in terms of removing an entire method and
8  having a build fail.
9    Q.  All right.  And are you referring now to
10  actually Dr. Schmidt's effort to duplicate your
11  tests and the difference in results?
12    A.  That's correct.
13    Q.  All right.  Do you have any explanation
14  for those difference in outcome?
15    A.  There are many differences in the
16  versions of Android that we used, and I would have
17  to go back and look to see what they were.  When
18  you construct the build, you can create a default
19  build by saying essentially make, and then there
20  are ways of creating a different build other than
21  the default.
22      In all my tests, I simply ran the default
23  build, and I'm reasonably confident that, should
24  anybody run that same default build, the results
25  would be the same.

Page 95

1    Q.  Now, are you familiar with Dr. Schmidt's
2  analysis using the Understand software?
3    A.  I read in his report where he undertook
4  to run Understand and create visualizations for his
5  report, yes.
6    Q.  Have you done anything to try to
7  duplicate that work?
8    A.  I ran Understand so that I would
9  understand how it worked, and looked at the results
10  of that.  I did not try to create visualizations,
11  but I wanted to understand what the output of the
12  Understand platform program was, since it was used
13  in several of the reports that I read by experts
14  that are working for Oracle.
15    Q.  All right.  And did you make that -- when
16  did you do what you just described, running
17  Understand to understand the output?
18    A.  Sometime in February.
19    Q.  And that was after you received
20  Dr. Schmidt's report, and before you made your
21  second-round report?
22    A.  That sounds right.  I would have to
23  review my notes and logs to see precisely when that
24  was.  But I did -- I certainly did not run it
25  before receiving the -- the reports from experts --

Page 96

1    Q.  All right.
2    A.  -- and Dr. Smith in particular.
3    Q.  And did you report on any results or
4  offer any opinions on the basis of the work that
5  you did in using the Understand program?
6    A.  I did not write about those in my
7  reports, no.
8    Q.  Is there any reason why not?
9    A.  There was nothing that I, in talking with
10  counsel, thought warranted in my reports in
11  replying that was based on running Understand.
12  Running Understand was something to do to
13  comprehend the scope of what might be possible.
14  And after running it and seeing the results, it
15  became clear to me, in discussing with counsel,
16  that there was nothing that we needed to do to
17  respond to, in terms of that.
18    Q.  Is it fair to say, then, that your --
19  your work in using Understand to comprehend the
20  scope of what might be possible revealed no major
21  flaws in Dr. Schmidt's analysis?
22      MR. KAMBER:  Objection to form.
23      THE DEPONENT:  I ran Understand simply to
24  see the results of what Understand produced.  And
25  Dr. Schmidt's analysis, in terms of creating

Page 97

25 (Pages 94 - 97)

1   Q.  All right.  Is your -- your view that
2  Google's use is fair informed in any way by the
3  assumption that there was no harm to Sun or Oracle?
4      MR. KAMBER:  Objection to form.
5      THE DEPONENT:  I don't think that's part
6  of my analysis.  I have talked about the four
7  factors of fair use, and except in the fourth
8  factor, I'm not sure where harm would come into
9  play.  But I don't think I have taken a position,
10  nor on whether harm has come, in my analysis.
11   Q.  (By Ms. Hurst)  So this is not an
12  example, in your view, of no harm, no foul?
13   A.  I think, in your question, you're making
14  a reference to the first exhibit that you gave me
15  with a no harm, no foul in my Comp Sci 108 class.
16  And, in that particular case, what I was trying to
17  explain to students is that it's not acceptable to
18  say because you don't think there's harm, that it's
19  necessarily okay.  And following up, perhaps
20  unnecessarily, in your statement just moments ago
21  about just because 98 percent of the people have
22  downloaded it.
23      So I think harm -- we're looking at these
24  as legal things and perhaps ethical.  So the harm
25  is not part of what you look at in understanding

Page 182

---

1  whether what you are doing is legal or ethical.
2      MS. HURST:  Okay.  I think my examination
3  is concluded.
4      MR. KAMBER:  No questions for me.  Thank
5  you.
6      THE VIDEOGRAPHER:  This concludes today's
7  deposition of Dr. Owen Astrachan.  Total number of
8  media used is four.  We are going off the record at
9  4:00 o'clock p.m.
10      (TIME NOTED:  4:00 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 183

---

1      I, Rebecca L. Romano, a Certified Shorthand
2  Reporter of the State of California, do hereby certify:
3      That the foregoing proceedings were taken before me
4  at the time and place herein set forth; that any
5  witnesses in the foregoing proceedings, prior to
6  testifying, were administered an oath; that a record of
7  the proceedings was made by me using machine shorthand
8  which was thereafter transcribed under my direction;
9  that the foregoing transcript is true record of the
10  testimony given.
11      Further, that if the foregoing pertains to the
12  original transcript of a deposition in a Federal Case,
13  before completion of the proceedings, review of the
14  transcript [ ] was [X] was not requested.
15      I further certify I am neither financially
16  interested in the action nor a relative or employee of
17  any attorney or any party to this action.
18      IN WITNESS WHEREOF, I have this date subscribed my
19  name.
20      Dated:  March 15, 2016
21
22
23
24      Rebecca L. Romano, RPR,
25      CSR. No 12546

Page 184

47 (Pages 182 - 184)