IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ORACLE AMERICA, INC.,

    Plaintiff,

  v.

GOOGLE INC.,

    Defendant.

No. C 10-03561 WHA

**MEMORANDUM OPINION RE GOOGLE'S MOTION *IN LIMINE* NO. 4 CONCERNING DR. ADAM JAFFE**

## INTRODUCTION

In this copyright infringement action, the final pretrial order largely **DENIED** defendant Google Inc.'s motion to exclude the testimony of plaintiff Oracle America, Inc.'s fair use expert. The only portion of Jaffe's testimony excluded is testimony that relied on evidence related to Android Auto, Android Wear, Android TV, and Brillo, addressed in detail in a separate memorandum (Dkt. No. 1781). This memorandum explains the reasoning behind the denial of Google's motion as to the remaining testimony.

## STATEMENT

This action concerns defendant Google Inc.'s use of the declaring code and structure, sequence, and organization of 37 API packages from Java 2 Standard Edition Version 1.4 and Version 5.0 in its operating system for mobile devices, Android. Google's use has already been found to infringe plaintiff Oracle America, Inc.'s copyrights in Java SE 1.4 and 5.0, subject only to Google's defense of fair use.

Oracle offers Dr. Adam Jaffe, an economist, as an expert on topics related to Google's fair use defense. In his report, Jaffe conducted a two-part analysis of the market effect of Google's alleged infringement. Specifically, he considered: (1) the harm to Oracle's actual and potential markets for Java in various device categories (including harm to the Java developer community) and (2) the harm that would occur if copying like Google's became widespread. *Jaffe did not evaluate the effect of Android on the market for Java 2 SE 1.5 or 5.0 in their primary market, namely, desktop computers.* Jaffe also did not compare the current valuation of the copyrighted work as a whole to its valuation absent Google's alleged infringement. Rather, Jaffe's theory of market harm rested on the sum of the harms that Oracle allegedly suffered in various markets in which it has licensed or may potentially license derivatives of the copyrighted works.

Jaffe analyzed the effect that Android had on Oracle's efforts to license alleged derivatives in each of over a dozen markets: "mobile phones; tablets; e-readers; wearables; automotive; Internet of Things; VOIP phones; Blu-Ray; televisions and set-top boxes; gaming; GPS systems; vending machines; printers; household appliances; cameras; payment terminals and point of sale systems" (Jaffe Rpt. ¶ 328). Jaffe described these markets as "product markets for which Java would have been an appropriate application platform solution" (*id.* ¶ 320). Jaffe then reviewed Oracle's opportunities for licensing derivatives of the copyrighted works in each market and attributed specific missed opportunities to competition with Android.

Jaffe's primary focus was on the effect of Android on Oracle's efforts to license the copyrighted works or derivatives thereof in the market for mobile phones. He first discussed Java Micro Edition, an alleged derivative of the copyrighted works. Java ME included ten of the 166 API packages in the copyrighted work and a low-footprint Java Virtual Machine to enable Java developers to write applications for devices with limited computing resources. Jaffe also considered Oracle's licenses for Java in smartphones made by RIM (Blackberry) and Nokia (Symbian), although he did not specify the scope of the licenses or how the licensees actually used Java in their products. He then assessed the scope of the harm to the market for Java based on the loss in market share suffered by each of Oracle's licensees, Oracle's resulting

2

revenue loss and missed licensing opportunities, and forecasts of harm in the market for low-cost "feature phones" based on Google's intent to enter that market (*id.* ¶¶ 330–337, 340–47).

Jaffe's evaluation of Oracle's losses in other product markets followed the same pattern. He discussed early efforts by Oracle (or its predecessor, Sun Microsystems, Inc.) to develop each market and its subsequent failed licensing opportunities, which he generally attributed to competition with Android or an implementation thereof.

Google moves to exclude Jaffe's testimony regarding the alleged market harm. The parties fully briefed this motion *in limine*, and the Court held five hearings totaling more than twenty hours of oral argument on several motions *in limine*, including this one.

**ANALYSIS**

District courts are charged as the gatekeepers who evaluate the admissibility of expert opinion testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Rule 702 of the Federal Rules of Evidence permits a court to admit expert testimony that is (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) delivered by a witness who has applied the principles and methods reliably to the facts of the case. The admissibility of expert testimony turns on "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591 (1993). The proponent of expert testimony has the burden of demonstrating its admissibility. *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Here, Google seeks to exclude Jaffe's testimony on the issue of the harm to the market for the copyrighted works, which relates to the fourth fair use factor. 17 U.S.C. 107(4). Specifically, Google contends that Jaffe defines the "market" too broadly, and that he fails to trace any alleged harm specifically to the infringement.

1. **MARKET DEFINITION.**

Google contends that Jaffe improperly considered the effect of Android on Oracle's potential market for and value of the Java platform, without narrowing his focus on the market

3

for the particular asserted copyrighted works. Google also argues that Jaffe improperly considered markets that Oracle was unlikely to develop.

### A. Harm to the Java Platform.

In *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 568 (1985), the Supreme Court clearly stated that consideration of the fourth fair use factor "must take account not only of harm to the original but also of harm to the market for derivative works."

Both sides agree that harm to the market for derivative works may be considered under the fourth fair use factor, but Google contends that Jaffe improperly considered the market for the "Java platform" as opposed to the particular works at issue. Jaffe made clear, however, that his discussion of the Java platform addressed Java SE 1.4 and 5.0, and derivatives thereof.

Google only copied the declaring code and SSO from 37 Java API packages, but Jaffe considered licensing efforts without regard to which API packages from Java SE 1.4 or 5.0 drove demand. The jury may nevertheless find that Google's unlicensed use superseded Oracle's efforts to license the entire copyrighted work, as well as subsets and derivatives of it, even to the extent those subsets and derivatives included API packages that Google did not copy. Thus, Jaffe's discussion of the Java platform does not warrant exclusion of his testimony.

### B. Potential Markets.

Google also contends that Jaffe considered product markets in which Oracle's potential entrance is too speculative.

The Court of Appeals for the Second Circuit has recognized that there is a "danger of circularity" in defining the market under the fourth factor to include the loss of potential licensing revenue. *See Ringgold v. Black Entertainment TV, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997). That is, an accused infringer can always be considered a "potential licensee," inasmuch as the accused infringer might have sought a license for its use of the copyrighted material. The accused infringer's failure to obtain a license, therefore, will support a finding that the copyright owner lost potential licensing revenue in the market for the very kind of work accused of infringement, which would weigh against fair use under the fourth factor. But fair use asks whether the accused infringer needed a license for its use in the first place. Thus, consideration

4

of harm to the potential market to license works like accused infringer's begs the question of fair use. To avoid defining the market under the fourth factor so broadly as to swallow the rule of fair use, the Second Circuit held that "only traditional, reasonable, or likely to be developed markets" may be considered under the fourth fair use factor. *Id.* at 81.

Our court of appeals has not expressly addressed the so-called "danger of circularity," but it adopted the rule that the fourth factor considers only "traditional, reasonable, or likely to be developed markets" for the copyrighted works. *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013) (citing *Ringgold*, 126 F.3d at 81).

Each of Jaffe's market analyses included a discussion of some real world effort by Oracle or Sun to develop that market. Although some examples were short-lived or ill-fated, a reasonable jury could nevertheless find each market "traditional, reasonable, or likely to be developed . . . ." *Ibid.* Thus, Jaffe's consideration of those markets is not properly excluded at the threshold.

Google also notes that Jaffe made no attempt "to construct a specific scenario or description of what the market would have looked like in the absence of the infringing behavior" (Jaffe Dep. at 107). That failure goes to the weight of Jaffe's opinion, and Google may raise that issue on cross-examination.

The jury will be instructed to consider the harm to the broader potential market for products that feature independent elements in addition to the copyrighted material only insofar as those product markets shed light on the licensing or market value of the copyrighted work (and derivatives thereof). Oracle must be permitted to present the full story of its lost opportunities, and Jaffe's conclusions regarding Oracle's various failures and lost opportunities for licensing the copyrighted works and derivatives thereof in the wake of Android's release will be helpful to the jury, even if Google disputes whether those opportunities could have been realized absent infringement.

### 2. ATTRIBUTION TO THE INFRINGEMENT.

Jaffe did not trace any example of market harm specifically to the alleged infringement. Rather, he only considered market harm due to Android's entry into each market he considered.

5

Google contends that Jaffe's failure to trace his market harm opinions to its specific use of the declaring code and SSO of 37 APIs is insufficient to establish market harm under the fourth fair use factor. Specifically, it notes that the fourth fair use factor considers "the effect *of the use* upon the potential market for or value of the copyrighted work." 17 U.S.C. 107(4) (emphasis added). Thus, Google argues, Jaffe may not offer testimony regarding harm attributable to Android in general.

Google is correct that the fourth factor focuses on the effect of the *infringement* on the market for the copyrighted work, but it is incorrect that Jaffe's conclusions must be excluded on that basis.

In *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992), as amended (Jan. 6, 1993), our court of appeals considered a video game developer's copying of another's game in order to reverse engineer the game to access functional elements necessary to create an entirely new game. There, our court of appeals first considered the market effect of the work as a whole, and then attributed any harm to the market for the original to the competitive effect of the transformative elements of the work.

Similarly, in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 592–94 (1994), the Supreme Court directed the lower court to consider on remand whether the accused work specifically affected the market for rap derivatives of "Oh, Pretty Woman." It further noted, "[o]f course, the only harm to derivatives that need concern us, as discussed above, is the harm of market substitution. The fact that a parody may impair the market for derivative uses by the very effectiveness of its critical commentary is no more relevant under copyright than the like threat to the original market." *Id.* at 593.

*Campbell* and *Sega* demonstrate that the only market harm to consider in the fair use analysis is that which is attributable to the harm of market substitution, and not the transformative elements of the work; however, Google's motion to limit Jaffe's testimony because he failed to trace the proffered harm to the infringement begs the question of the extent to which Google's use was transformative. It will be helpful for the jury to have the full story of the alleged market harm and to evaluate the extent of that harm in light of its findings on the

6

remaining fair use factors. As the Supreme Court noted in *Campbell*, 510 U.S. at 590 n.21, "[m]arket harm is a matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors."

Thus, Google's arguments that Jaffe's proffered market harm is due either to exogenous market changes or due to Google's alleged transformative incorporation of the 37 APIs into a smartphone platform should be directed to the jury.

## CONCLUSION

Google's motion to exclude Jaffe's testimony regarding market harm is largely **DENIED**. Jaffe's testimony is excluded only to the extent it relies on Android Auto, Android Wear, Android TV, and Brillo, for reasons stated in the memorandum opinion addressing those products.

Dated: May 5, 2016.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE