Volume 1

Pages 1 - 215

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,            )
                                 )
              Plaintiff,         )
                                 )
   VS.                           )  No. C 10-3561 WHA
                                 )
GOOGLE, INC.,                    )
                                 )
              Defendant.         )
_____  )  San Francisco, California
                                    Monday, May 9, 2016


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          ORRICK, HERRINGTON & SUTCLIFFE LLP
                            The Orrick Building
                            405 Howard Street
                            San Francisco, California  94105
                       BY:  **ANNETTE L. HURST, ESQUIRE**
                            **GABRIEL M. RAMSEY, ESQUIRE**



(Appearances continued on next page)



Reported By:  Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              Official Reporters - U.S. District Court

```
1   APPEARANCES (CONTINUED):

2   For Plaintiff:          ORRICK, HERRINGTON & SUTCLIFFE LLP
                            The Orrick Building
3                           51 West 52nd Street
                            New York, New York 10019
4                    BY:    PETER A. BICKS, ESQUIRE
                            LISA T. SIMPSON, ESQUIRE
5
                            ORACLE
6                           500 Oracle Parkway
                            Redwood City, California 94065
7                    BY:    DORIAN ESTELLE DALEY, GENERAL COUNSEL
                            MATTHEW SARBORARIA,VICE PRESIDENT
8                            and ASSOCIATE GENERAL COUNSEL

9                           ORRICK, HERRINGTON & SUTCLIFFE LLP
                            2050 Main Street, Suite 1100
10                          Irvine, California  92614-8255
                     BY:    CHRISTINA VON DER AHE RAYBURN,  ESQUIRE
11
    For Defendant:          KEKER & VAN NEST
12                          633 Battery Street
                            San Francisco, California  94111-1809
13                   BY:    ROBERT A. VAN NEST, ESQUIRE
                            CHRISTA M. ANDERSON, ESQUIRE
14                          MICHAEL S. KWUN, ESQUIRE
                            DANIEL PURCELL, ESQUIRE
15                          MATTHIAS ANDREAS KAMBER, ESQUIRE
                            EUGENE MORRIS PAIGE, ESQUIRE
16
                            KING & SPALDING LLP
17                          1185 Avenue of the Americas
                            New York, New York 10036-4003
18                   BY:    BRUCE W. BABER, ESQUIRE

19                          GOOGLE, INC.
                            1600 Amphitheatre Parkway
20                          Mountain View, California  94043
                     BY:    RENNY HWANG, LITIGATION COUNSEL
21
    Also Present:
22
                            GEORGES SAAB
                            ORACLE CORPORATE REPRESENTATIVE
23
                            CATHERINE LACAVERA
24                          GOOGLE CORPORATE REPRESENTATIVE

25
```

PROCEEDINGS

```
 1   Monday - May 9, 2016                          7:30 a.m.

 2                    P R O C E E D I N G S

 3                       ---000---

 4        (The following proceedings were held in open court,

 5   outside the presence of the jury:)

 6            THE COURT:  Good morning.  Have a seat, please.  Let's

 7   call the case.

 8            THE CLERK:  Calling CV 10-3561-WHA, Oracle America,

 9   Inc. vs. Google, Inc.

10        The matter is on for a jury trial, jury selection this

11   morning.

12        Counsel, please state your appearances for the record.

13            MR. BICKS:  Good morning, Your Honor.  Peter Bicks

14   from Orrick for Oracle.  And you know Annette Hurst.  Mark

15   Phillips will be helping me this more.  Matt Sarboraria you

16   have met from Oracle, Lisa Simpson, Gabe Ramsey, and Georges

17   Saab, who is going to be the corporate representative.

18            THE COURT:  Say the name of the representative.

19            MR. BICKS:  Georges Saab.  S-A-A-B.

20            THE COURT:  Okay.  Welcome to all of you.  And?

21            MR. VAN NEST:  Good morning, Your Honor.  Bob

22   Van Nest, Keker & Van Nest, for Google, and I'm here with a

23   number of people whom you met.  Christa Anderson, Dan Purcell,

24   Matthias Kamber.

25            THE COURT:  The last name again?
```

1              **MR. VAN NEST:**  Kamber, K-A-M-B-E-R.  Michael Kwun.

2    Mike Tiktinsky is helping us this morning, and our corporate

3    representative from Google is Katherine Lacavera.  She was here

4    last time as well.  I should introduce Reed Mullen.  We don't

5    have enough chairs.  And Maya Karwande.

6              **THE COURT:**  I guess you will just have to stand.

7              **MR. VAN NEST:**  I will yield shortly.

8              **THE COURT:**  I see the famous file cabinet over there.

9              **MR. VAN NEST:**  It will remain standing.

10             **THE COURT:**  All right.  Welcome to all of you.  We are

11   here for trial, jury trial, and we will get started as soon as

12   the jury assembly room is ready to send them down.

13        I apologize to those of you in the public seating area.

14   I'm going to need all of that section over there so you three

15   will have to move over here in order -- or move someplace

16   because I need that whole section for the jury, plus a couple

17   of rows over there, but once we get the jury selected, we'll

18   have plenty of room, I'm sure, for everyone.

19        But that's probably going to take at least half of today

20   to get the jury selected.

21        Okay.  What items can I help you with this morning before

22   we call in the jury?

23             **MR. VAN NEST:**  Your Honor, we have one agreement on

24   the questionnaire for automatic strikes.  You had asked us to

25   try to agree on that.

**PROCEEDINGS**

1           THE COURT:  Yes.

2           MR. VAN NEST:  I do have a question on the

3    questionnaire, Question 9F, as in *Frank*, which is, "If you are

4    personally acquainted with a witness," and assuming that it's

5    the right witness, the witness is the actual person that

6    they're acquainted with, that's the -- the parties agree that

7    person can be automatically excused from the questionnaire as

8    long as it's clear that they've identified --

9           THE COURT:  This is Question 9D?

10          MR. VAN NEST:  9F.

11          THE COURT:  9F?

12          MR. VAN NEST:  Potential witnesses.

13          THE COURT:  Well, how about Question 9D?

14          MR. VAN NEST:  B?  D?

15          THE COURT:  No.  D.  We're already going to put the

16   people who have a strong opinion on 9D or E -- we're going to

17   put them in the back of the room; right?

18          MR. VAN NEST:  That's right.

19          MR. BICKS:  Right.

20          THE COURT:  All right.  But then on automatic

21   exclusions, we're going to just automatically excuse anyone who

22   circles a name on the back side, but we have to check to make

23   sure it's somebody who is really in the case.

24          MR. VAN NEST:  That's right.  That's right.

25          THE COURT:  So I may have to -- you won't have the

 1   benefit of the questionnaires at the time I do that quizzing.

 2   The juror is going to be standing right there, and I will just

 3   have to ask enough questions to satisfy you that it's the same

 4   person.

 5              MR. VAN NEST:  That's right.

 6              THE COURT:  Let's look at Number 9D or E.  Could I

 7   convince you that we should just excuse automatically anybody

 8   on 9D or E who answers *yes* to either D or E?

 9              MR. VAN NEST:  Your Honor, I would prefer to wait and

10   see how the selection shakes out and how many people we have.

11   And I don't know how many people are going to be in that

12   category, but I'd prefer to follow the procedure you indicated.

13              THE COURT:  All right.  If you don't agree, both of

14   you don't agree, I'm not going to do it.  What's going to

15   happen is you both are going to play games and you're going to

16   say *oh, that person is favoring our side*.  *Oh, we've got to*

17   *fight like hell to keep them in the venire*, and then you're

18   both going to have that situation and then you're both going to

19   waste a lot of time trying to save somebody who can't be saved,

20   but who knows.

21       All right.  At least we'll have them sent to the end of

22   the line.

23              MR. VAN NEST:  That's right.

24              THE COURT:  So we have -- thank you for the -- that's

25   the only one you could come up with an automatic exclusion on?

 1          **MR. VAN NEST:**  That's right.  We had a disagreement

 2     about 9C.  9C was, "Had you or a loved one within the last 10

 3     years been employed, owned stock."

 4          I think Google is okay with an automatic strike there, but

 5     I think Oracle wanted some further examination on that.  We'd

 6     be okay with automatically disqualifying those people, too.

 7          **MR. BICKS:**  We have a concern there, Your Honor.  It's

 8     just that ten years, are we going to lose people that would be

 9     good to keep?  If it's somebody current, it seems like an easy

10     call, but if we're going back that far, is it helpful to have a

11     larger group here?

12          **THE COURT:**  Okay.  So let's -- are we done on this?

13          **MR. VAN NEST:**  Yes.

14          **THE COURT:**  All right.  What else can I help you with?

15          **MR. BICKS:**  Can I, Your Honor, just raise a couple

16     questions I had, just so I know?

17          **THE COURT:**  Yes.

18          **MR. BICKS:**  First of all, if there are privacy issues

19     that come up during the *voir dire*, what is the Court's

20     preference for how we handle that?  I don't want to overdo it,

21     but I -- on the other hand, I want to know what you expect and

22     what's the best way to handle it.

23          **THE COURT:**  Give me an example of what you mean?

24          **MR. BICKS:**  We ask somebody a question and you can see

25     that they're kind of feeling uncomfortable about answering and

1    there is some indication that they may want to discuss it in

2    private, something along those lines.

3         THE COURT:  Well, you can ask them would they prefer

4    to go over that in private.  Now, it can't be in private.  It

5    will just be more private.

6         MR. BICKS:  Right.

7         THE COURT:  Because we'll still have at least two

8    lawyers and me and the court reporter, and it may, depending on

9    the circumstances, be that it's in open court if it's during a

10   break when most people are out having a break.

11        Most of that front row there I'm going to need now for the

12   jury, so you have got to give that up.

13        So just ask them that question and probably they'll say

14   yeah, that would be better.

15        MR. BICKS:  Understood.

16        And when we do the individual follow-up -- let's say, for

17   example, somebody has strong feelings about a witness or

18   something like that and we have to caucus or take it up with

19   Your Honor, would that come out of -- that would come out of

20   the time of the side who is doing the *voir dire*?

21        THE COURT:  Yes.  But if it reaches the point of

22   unfairness to that person, to that lawyer, then I will probably

23   give them a little more time.  But I -- yes.  If you're the one

24   asking questions and it requires a sidebar, yeah, that comes

25   out of your time.

 1           **MR. BICKS:**  Okay.  And one issue I can just anticipate

 2    kind of, given the kind of the neutral statement and the

 3    posture of the case, is that there's a good shot that some

 4    people kind of will be thinking that Google is kind of starting

 5    out behind here because of the -- what the Court has -- what

 6    everybody agrees in terms of kind of the instruction on the

 7    copyright infringement.  I'm just raising now whether or not

 8    that kind of a leaning -- I don't think that should be kind of

 9    an automatic strike for cause on the Google side until we have

10    an opportunity to discuss it with the individual.

11           **THE COURT:**  I'm not going to give them the jury

12    instruction on fair use, one we have had so many rounds on.

13    That comes later.  That is not going to come during the *voir*

14    *dire*.  Did you think that was going to come during the *voir*

15    *dire*?

16           **MR. BICKS:**  We have the shorter neutral statement.

17           **THE COURT:**  The half-page statement.

18           **MR. BICKS:**  Yes.  I can kind of see that issue coming

19    up during the *voir dire*.  And my only observation of that is I

20    just don't think if the posture of this is people are hearing

21    okay, so, you know, we've got --

22           **THE COURT:**  You are asking me to rule on a

23    hypothetical.  I'd have to hear how -- look at the body

24    language and everything else to see what I thought about it.  I

25    can't say positively that that's -- we'll just have to see.

PROCEEDINGS

```
1              MR. BICKS:  Okay.

2              THE COURT:  I'm not going to give you a ruling on that

3       yet.

4              MR. BICKS:  Thank you.

5              THE COURT:  I don't see that as likely to come up, but

6       maybe.  Let's wait and see how it comes up in the exact wording

7       of the questions.

8              MR. BICKS:  Thank you.

9              THE COURT:  What else?

10             MR. BICKS:  We've exchanged graphics yesterday for the

11      openings and they're pretty minor issues on both sides, but

12      since I would be the one who is going first, I would want to

13      have those issues cleared up.  There are only one or two pretty

14      minor ones, but --

15             THE COURT:  Let's get into that then.

16          Dawn, can you check down there to see how they are doing

17      timewise.

18             THE CLERK:  Oh, it's going to take them a while,

19      Judge.  They're right next door --

20             THE COURT:  We have some -- probably have 20-plus

21      minutes, maybe 30 minutes, so we can get into your opening --

22      let's do it.  Let's do it right now.  What's the first issue?

23             MR. BICKS:  Bob, are you still on the Bob Lee thing?

24             MR. VAN NEST:  No.

25          I wanted to talk about one of the slides, Your Honor.  I
```

PROCEEDINGS

```
 1   can either hand it up or we can put it on the graphic, if we
 2   could get control of it, or I can hand it up to Your Honor.
 3            THE COURT:  I don't have a clerk at this moment.  This
 4   young lady here who just came forward -- here we go.  Now I've
 5   got somebody.  Thank you.
 6        What shall I do?
 7            MR. VAN NEST:  We had some discussion about this
 8   earlier.  They have an exhibit, which I'm showing you there,
 9   which is written by a man named Makowski.  Mr. Makowski was at
10   Apache Software Foundation when he wrote this.  He was never
11   disclosed on any Rule 26 whatsoever.  This document was
12   produced by Apache.  Oracle subpoenaed Apache back in 2011.
13   They received the document from Apache.  They never followed
14   up, they never asked to take a deposition --
15            THE COURT:  Just a second.  Is that true, that you are
16   trying to put a witness on who was not disclosed under Rule 26?
17            MR. BICKS:  That is not correct, Your Honor.
18            THE COURT:  Show me the initial disclosure or
19   supplement thereto that disclosed this witness.
20            MR. BICKS:  So this is actually Google's October --
21   disclosure from --
22            THE COURT:  I asked for yours first.
23            MR. BICKS:  Well, they disclosed the people from
24   Apache and then we do a *me, too* and say each side buys into the
25   other's disclosures.  This fellow is a Google employee.
```

1      **THE COURT:**  Was he closed by Google?

2      **MR. BICKS:**  Yes.

3      **THE COURT:**  Is that true?

4      **MR. VAN NEST:**  I don't believe so.

5      **THE COURT:**  Well, take a look at whatever document it

6  is Mr. Bicks has got there.

7      **MR. BICKS:**  And so the Court knows what I'm referring

8  to, there is a disclosure by Google where they identify all

9  employees or former directors, officers of Apache, and this

10 individual was a former director of Apache, and as

11 Your Honor -- I think we've discussed.  He works at Google.

12 He's been at Google for -- since July of 2010, and he was --

13 he's been subpoenaed to testify on this document, which

14 Your Honor knows about.

15     **THE COURT:**  I know the document and I think it's a

16 potentially-important document in the case, but I tell the

17 lawyers from day one, you must disclose under Rule 26.

18     **MR. BICKS:**  Yes.  And what I'm saying, Your Honor, is

19 that this individual -- these -- this group of folks, all the

20 folks from Apache have been disclosed by Google going back to

21 2011.

22     **THE COURT:**  Well --

23     **MR. VAN NEST:**  Your Honor, he was never disclosed by

24 name.  There's a --

25     **THE COURT:**  How did you -- see, here's the problem.  I

 1   hate it when the lawyers do this.

 2       What made you think that your disclosure was good enough

 3   whenever you did a group disclosure?

 4       MR. VAN NEST:  We disclosed the Foundation, including,

 5   but not limited to, Geir Magnusson.  So we disclosed an

 6   individual whom they could have deposed and didn't.  That's not

 7   this individual.  They had the document.  It was obtained from

 8   a third party, from Apache.  Neither side disclosed this

 9   witness, Makowski.  Neither side asked for his depo.  Neither

10   side took a depo.  He was never on a disclosure that Oracle

11   filed ever from day one, last trial, this trial, at any time.

12   And now they want to jam it in --

13       THE COURT:  It doesn't matter about the last trial so

14   much.  They could have updated it between the last four years.

15   There an opportunity to say *here is our supplement to our Rule*

16   *26.*

17       MR. VAN NEST:  That's right.  We both supplemented,

18   and he has never been on any supplemental ever.  I object to

19   that slide because it comes in only through him.

20       THE COURT:  What else do you have to say?

21       MR. BICKS:  My point, Your Honor, is that he's -- this

22   witness -- this has been disclosed by them.  And --

23       THE COURT:  That disclosure doesn't count.  I would

24   have ruled that disclosure bogus and void from day one.  If

25   that's what you're relying on -- look, if you didn't list him

**PROCEEDINGS**

1   by name someplace, at least for opening purposes, you can't use

2   this.  You can't spring this on me at the opening statement

3   stage.

4          **MR. BICKS:**  But, Your Honor, just so we're clear, the

5   26 disclosures are the ones that we've discussed, but he was

6   identified when we were exchanging witness lists back in April,

7   and we have been discussing this document in court for like the

8   last -- over the last month.  So everyone has known about

9   him --

10         **THE COURT:**  Okay.  But was he disclosed under Rule 26

11  like the rule requires, like the Federal Rules of -- this is

12  not my rule.  This is the national rule.  It says you've got to

13  do it and you can supplement for good cause.  You probably

14  would have had good cause to supplement.

15         I'm not going to make a final ruling on whether you can

16  use this testimony or this document.  I'm going to say you

17  cannot use it in the opening.  I'm going to need more time, and

18  I'm going to make you lawyers brief it, and here's some of the

19  things that would be useful to me.

20         To find out every instance in which Google has gotten away

21  with something like you're trying to get away with because I'm

22  not going to let them have it both ways.  I just cannot fathom

23  the idea that you think you can make a group disclosure under

24  Rule 26.  You have to identify the specific people.

25         **MR. VAN NEST:**  Your Honor, that's the only issue I

PROCEEDINGS

1    had --

2              **THE COURT:**  All right.

3          **MR. VAN NEST:**  -- on the opening slides --

4          **THE COURT:**  I'm going to make the same ruling on

5    your -- you cannot use that testimony on your opening about

6    transformative because that was an argumentative question.  I

7    may not let you even use it period, but I haven't heard your

8    argument on it yet.  That's my tentative ruling.

9          Tell me what your argument is.

10         **MR. VAN NEST:**  Here's the thing, Your Honor.  This is

11   no different than their asking our witnesses whether Android is

12   commercial, whether APIs are creative.

13         Bob Lee -- they have a slide which -- from Bob Lee, who is

14   a Google employee, where he says, *We took the good stuff from*

15   *Java.*  That's also a question where it's taken out of context.

16         The reason -- Mr. Barr has been at Sun for almost 20

17   years.  He was designated by them as a witness.  He is a senior

18   principal technologist.  He is out there writing a blog

19   congratulating Android.  He says on the blog, "I still applaud

20   Google for the effort.  The mobile industry is in the midst of

21   a major shift and Android is an embodiment of that shift."

22   That was the blog that he posted.

23         **THE COURT:**  I'm not saying he can't use the blog.

24   What I'm saying is that snippet about transformative where the

25   witness himself says *what do you mean by transformative* and --

**PROCEEDINGS**

1  it's just taking -- like *commercial* is a normal word, but

2  *transformative* is one that has possibly special legal meaning

3  and is not a normal word, and I just think you -- the witness

4  never gave a definition of what he meant by it.

5        **MR. VAN NEST:**  Well, he did, though --

6        **THE COURT:**  It's more argumentative than it is

7  probative.

8        **MR. VAN NEST:**  He did though, Your Honor.  He did in

9  the sense that he was asked -- he asked the examiner to clarify

10 what it means, and the examiner said:

11        "In other words, did it change the status quo in a very

12 significant way when it came out?

13        "A   The status quo of the mobile industry, yes.

14        "**Q.**  Was Android transformative?

15        "**A.**  I think I already answered that, that I believe in

16        some ways, yes."

17        He asked for clarification and he got it.  This is no

18 different than the quote they have from Bob Lee on *the good*

19 *stuff*.  That's the same sort of thing.  He wants to know what

20 does good stuff mean, what are we talking about.  I'm not sure

21 why transformative is different from saying *is this the good*

22 *stuff, is this the good stuff from Java* or different from

23 saying *is this creative*, *is an API creative*.  It's the same --

24 it's the same point for all of them, and there ought to be --

25 if they're going to get to get up and put in their opening Bob

1   Lee, the good stuff from Java, an expert saying *yeah, it's*

2   *creative,* I don't know why Mr. Barr, who is a witness they

3   designated and has been at Sun for 20 years, can't be on the

4   same plane.  It's the same sort of thing, both sides.

5          **MR. BICKS:**  Your Honor, some of that is just frankly

6   not accurate.  This individual was not designated.  He's not a

7   senior executive.  He expressly says it in his deposition,

8   Transformative is a really vague term so I'm not sure if I can

9   even answer that."

10      As the Court knows better than the parties, the definition

11  of *transformative* in this case is a specific phrase that is

12  very complex and very nuanced.  That's a very different issue

13  than asking somebody who actually put in an email when they

14  described these packages that they were good stuff, normal

15  English language, and he was asked are they the good stuff and

16  he said they're the good stuff.  That testimony was actually

17  admitted at the last trial.

18      So words like *good stuff* and *commercial* are very different

19  than this definition, which is complex, where a witness already

20  said --

21          **THE COURT:**  Are you going to use *good stuff* in your

22  opening statement?

23          **MR. BICKS:**  Yes.  And he -- I thought we were okay

24  with me doing that.

25          **MR. VAN NEST:**  I think they should either both be in

1    or both be out.  They're on the same plane.  That's what I told

2    counsel last night.  They should either both be in or both be

3    out.  It's not fair to let him put someone up on that and not

4    allow me to show a very direct and clear response from a

5    witness who asked for clarification, got it, and made the

6    statement.

7        This is --

8            **THE COURT:**  Who said *good stuff*?

9            **MR. BICKS:**  A fellow named Bob Lee.

10           **THE COURT:**  He is at which company?

11           **MR. BICKS:**  He is at Google, Your Honor, and he was

12   one of the lead platform designers here, and it was a pretty

13   straightforward question, Your Honor.

14           **THE COURT:**  What factor does good stuff go to?  Factor

15   3?

16           **MR. BICKS:**  Yeah.  It's important.  It's actually,

17   frankly, from my view in terms of helping a jury understand

18   this, simple stuff like that I think can be easier to

19   understand than some of the complex technical language.

20           **THE COURT:**  Well, did he go further to say that the

21   implementing code was the bad stuff?

22           **MR. BICKS:**  I don't think he was asked that, Judge.

23   He was asked a pretty straightforward question:

24       "Would you agree that the Java APIs that Android supports

25   are good stuff from Java?

**PROCEEDINGS**

1    "Answer:  Yes."

2       This was played at the trial.

3          **THE COURT:**  Look, I thought you said it was omitted at

4    the last trial.

5          **MR. BICKS:**  No.  It was played.

6          **THE COURT:**  Admitted.  I thought you said *omitted*.

7          **MR. BICKS:**  No, no, no.  Admitted.

8          **THE COURT:**  All right.  You know, that is worth

9    something, but I can't -- maybe there wasn't an objection last

10   time.

11         **MR. VAN NEST:**  There was.  I mean, this is -- the *good*

12   *stuff* was in an email that Mr. Lee didn't even write, and he is

13   asking for the same kind of clarification that Mr. Barr did.

14   He has asked okay -- he's read an email that someone else

15   wrote:

16      "They take good stuff from Java into their own little

17   Ecosystem.

18      "What good stuff from Java are you referring to there?

19      "I'm not sure," says the witness.

20      "Would you agree that Android took the good stuff from

21   Java?

22      "Object.  Could you be more specific?

23      "Yes.  Would you agree" -- question, "Would you agree that

24   Android uses Java APIs?

25      "Answer:  It certainly supports certain Java APIs.

1          "Would you agree that the Java APIs that Android supports

2     are good stuff from Java?

3          "Object to form.

4          "Answer:  Yes."

5          He's also asking for clarification throughout on what *good*

6     *stuff* means.  So these two witnesses are on an equal footing,

7     and I, frankly, don't care whether they're both in or both out.

8          **THE COURT:**  Are you going to read to the jury the

9     pre-instruction that I'm going to give on *fair use*?

10         **MR. BICKS:**  I'm quoting some of it, yes.  But I gather

11    they are, too.  I'm not going to be going over the top with it,

12    Your Honor.  I get your direction.  It's --

13         **THE COURT:**  They're both -- Mr. Van Nest has a point.

14    *Good stuff*, that's like *What do you keep in your liquor*

15    *cabinet*?  *Where do you keep the good stuff*?  As opposed to the

16    *what kind of stuff*.

17         **MR. VAN NEST:**  The question right before it,

18    Your Honor -- his answer is -- he's asked:

19         "Would you agree that Android took good stuff from Java

20    into its own private Ecosystem?

21         "Answer:  I would object vehemently.  It's Apache

22    licensing so it's completely free so it didn't take anything

23    into a private Ecosystem."

24         **THE COURT:**  Who said that, the lawyer?

25         **MR. VAN NEST:**  No.  This is Mr. Lee, the witness.

1    This is what they're not showing.

2       Then he is asked:

3       "Would you agree that Android took good stuff from Java?

4       "Answer:  Could you be more specific.  What do you mean?

5       "Yes, okay, I'll be more specific."

6       **THE COURT:**  I've got a good solution for both of you.

7    Both of you get to use it, but you have to have the full page

8    or so of that kind of argumenting back.  You can't just take a

9    snippet.  You got to put in all of that that Mr. Van Nest read

10   and then you've got to put on -- about transformative, you've

11   got to start back there with the questions about Apple, and

12   then where he says *that's a vague term, what does that mean,*

13   you've got to put all that down, water it down with all of

14   those -- the true transcript as opposed to the snippet, and

15   then you need on the Van Nest side -- you've got to say *now,*

16   *the judge will instruct you on what the term transformative*

17   *means.*  And then you've got to read it.

18      Somewhere in your opening, you've got to read the entire

19   paragraph on what *transformative* is so that it will -- the

20   scales will fall from the eyes of the jury and they will see

21   that the definition that you gave them in the depo was not

22   quite the same one that I'm going to give them.

23      So if you think it's still worth using after all that, you

24   can go for it.  And you've got to read factor 3 to the jury so

25   that they can see that the phrase *good stuff* does not appear

 1  anywhere in the definition and then -- so there.  That way

 2  there won't be any misleading of the jury by either side.

 3          **MR. VAN NEST:**  I think you just shortened up the

 4  openings there a little bit, Your Honor.  Thank you.

 5          **THE COURT:**  Well, you both -- one of you can decide to

 6  do it, but you've got to do the complete package.

 7          **MR. VAN NEST:**  We get the idea.

 8          **THE COURT:**  All right.  What else can I help you with?

 9          **MR. BICKS:**  I think that's it.

10          **MR. VAN NEST:**  The other thing that we should spend

11  just a minute on, Your Honor, we have now started to exchange

12  deposition designations, and we have a couple of sets to hand

13  up to Your Honor where we need your guidance.

14          **THE COURT:**  Fine.  Hand them up.

15          **MR. VAN NEST:**  I would ask Mr. Mullen to step forward.

16  That's the other thing we can spend time on briefly.

17          **THE COURT:**  All right.  Is there a packet?

18          **MR. MULLEN:**  Good morning, Your Honor.  Three packets,

19  actually.

20          **THE COURT:**  When will these be read to the jury?  When

21  are they going to come up?

22          **MR. VAN NEST:**  I don't think they'll come up -- I'm

23  expecting that we won't do any evidence today.  If we ended up

24  with a few minutes today, we'd read Mr. Ellison, but apart from

25  that, they won't come up until Wednesday at the earliest,

**PROCEEDINGS**

1    Your Honor.

2          **THE COURT:**  All right.

3          **MR. VAN NEST:**  So I wouldn't expect any of them to be

4    done tomorrow or today.  Probably Wednesday at the earliest.

5          **THE COURT:**  You gave me four and not three.

6          **MR. MULLEN:**  There is trial testimony and a deposition

7    transcript for Mr. Ellison, Your Honor.

8          **THE COURT:**  All right.

9          **MR. MULLEN:**  Those both go together.  And that

10   actually, if I could, I just wanted to raise an issue that the

11   parties have had so far in dealing with designations.  It came

12   to a head with Mr. Ellison's deposition designations.  He is

13   unavailable this week.  That's okay.  We're going to play his

14   deposition, and we designated the testimony that we wanted to

15   play.

16        Oracle has added a whole bunch of designations that

17   they're calling completeness, but they really don't go to

18   completeness at all.  I think completeness is a line or two of

19   deposition testimony.  They have several lines and sometimes

20   full pages that they're calling completeness.

21        It's an issue with Mr. Ellison's deposition and it's also

22   an issue with several other witnesses whom we have designated,

23   and we would like to kind of cut that off at the head before it

24   gets --

25        **THE COURT:**  To give you -- the kind of thing that I

**PROCEEDINGS**

1   just said that Mr. Van Nest would have to read about Apple and

2   iOS and *transformative* and all of that would be required under

3   the Rule of Completeness.  On the other hand, things that are

4   sideswipes and you don't really need to get to the meaning of

5   what the testimony you want to offer, that's not Rule of

6   Completeness.

7          So do you have something to say?  What is your name?

8          **MS. VON DER AHE:**  Good morning, Your Honor.  Christine

9   Von der Ahe on behalf of Oracle.

10          We believe the completeness designations we did for Oracle

11   are completely within the guidelines you set forth.

12          **THE COURT:**  I will have to look at it unless you too

13   think you could look at it again and agree.  What I usually

14   just say is *in/out*.  Two letters, three letters and then I

15   don't give long explanations.  Sometimes I give no explanation.

16   I just say *in/out*.  When I hand it back, you'll see that's the

17   only practical way to do it.  And I will see if I can get

18   through -- what is the -- let me put these in the order that we

19   need them first.  You want Ellison first; right?

20          **MR. MULLEN:**  Yes, Your Honor.

21          **THE COURT:**  I will put him on the top of the stack.

22   Who would be next?

23          **MR. MULLEN:**  I think Mr. Duimovich, Your Honor.

24          **THE COURT:**  I will take him next.  I will do them in

25   that order.  Great.  Okay.

PROCEEDINGS

1          **MS. VON DER AHE:**  Thank you, Your Honor.

2          **THE COURT:**  I want to come back to the -- the memo

3    from the guy at Apache.  Right now I'm only ruling that you

4    can't use it in the opening.  I'm not saying it won't come in

5    at trial.  And it disturbs me that this was not -- they were

6    not disclosed, but -- so I want -- I do not want someone to

7    have it both ways and be using this as a gimmick.

8      So we're going to have a further argument over this before

9    it gets to the stage where you're putting on your case.  So we

10   have some time.  But if I'm going to be this hard on Oracle,

11   which is what the rule calls for, Mr. Van Nest, I'm going to be

12   just as hard on Google.  So when the day comes that you need

13   some flexibility under Rule 26, too bad for you.

14     So you need to be -- this is usually the kind of thing

15   good lawyers work out.  But if I've got to do it by the rule,

16   I'm going to be just as hard on you.  And when I say *hard*, I'm

17   not being -- I'm just doing what the rule says.

18          **MR. VAN NEST:**  Understood, Your Honor.  Thank you.

19          **THE COURT:**  All right.  Okay.  Shall we bring in our

20   venire?

21          **THE CLERK:**  They just told me it's five minutes.

22   They're printing out the list and they will be here in five

23   minutes.

24          **THE COURT:**  All right.  Those of you in the back of

25   the room, I think we're going to need those seats.  And I'm

 1   sorry that we don't have more space in here, but after we get

 2   the jury selected, we'll have more space than we need.

 3       We'll take, let's say, a five-minute break and get the

 4   jury all in here and then we'll get started.

 5                   (Recess taken at 8:01 a.m.)

 6               (Proceedings resumed at 8:26 a.m.)

 7       THE COURT:  Everyone be seated.  And welcome to all of

 8   you.  It's a big crowd today.  Thank you for coming out.  And

 9   the first order of business is for the clerk to call the roll

10   and make sure know who's here and then to -- before doing that,

11   to swear you in.

12       So I'm going to turn things over to Dawn Logan, who will

13   do that part.

14       THE CLERK:  Thank you, Your Honor.  All right, when

15   you hear your name, please just acknowledge that you are here.

16                   (Roll call taken)

17       THE CLERK:  Anybody here who I did not call?  Everyone

18   has been called.

19       THE COURT:  Somebody raised their hand.

20       THE CLERK:  Your name?

21       PROSPECTIVE JUROR AGUILAR: Manuel Aguilar.  I.

22       THE CLERK:  I don't have *Aguilar* on the list.  The

23   jury person staff is here to take you back to the jury office.

24       THE COURT:  Anybody?  Okay.

25       THE CLERK:  I will administer the oath, Your Honor.

1    I'm going to administer an oath to all the perspective jurors,

2    and I would ask that you please stand, raise your right hand to

3    follow the oath.

4                    *Prospective Jurors Sworn*

5              **THE CLERK:**  Thank you.  Please be seated.

6              **THE COURT:**  All right.  Welcome again to your U.S.

7    District Court for the Northern District of California, which

8    runs all the way from Monterey up to the Oregon border and

9    about halfway into the state.  So welcome to you and thank you

10   for coming out on this misty May morning.

11        We're going to start things off right by having the case

12   called and asking counsel to make their appearances.

13        Dawn, would you please call the case.

14             **THE CLERK:**  Of course, Your Honor.  Thank you.  It's

15   Civil 10-3561-WHA, Oracle America, Inc. vs. Google, Inc.

16        Counsel, please go ahead and state your appearances for

17   the record.

18             **MR. BICKS:**  Thank you, Your Honor.  Good morning,

19   everyone.  My name is Peter Bicks.  And I would like to

20   introduce you to some folks at my table here.

21        This is Matt Sarboraria and Georges Saab.  They are both

22   with Oracle.  This is my colleague, Gabe Ramsey, and over to

23   the corner over here, Lisa Simpson and Annette Hurst and then

24   Mark Phillips.

25             **THE COURT:**  All right.

1          MR. BICKS:  Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Bicks.

3     And?

4          MR. VAN NEST:  Good morning, Your Honor.

5     Good morning everyone.  My name is Bob Van Nest from Keker

6  & Van Nest, and I'm here on behalf of Google, and our Google

7  representative is Katherine Lacavera from Google.  And with me

8  at counsel table are Christa Anderson, Dan Purcell, Matthias

9  Kamber, Michael Kwun, and Mike Tiktinsky.

10         MR. VAN NEST:  Thank you, Your Honor.

11         THE COURT:  Thank you.  It will take a while to get

12 all the names of the lawyers down, but eventually those of you

13 selected to serve on the jury will know who's who.

14     But just to give you a very brief summary, this side of

15 the room is Oracle America, Inc., Oracle America Inc.  This

16 side of the room is Google, Inc.  Google.  And those are the --

17 then you met the lawyers.  We'll get their names down in due

18 course.  So there we go.

19     I need to do something right off the bat and give you a

20 direct order.  I hate to give a direct order to jurors because

21 I have so much respect for the jury and the jury system and

22 every one of you individually.

23     This is a high profile case.  There has been a lot of

24 publicity about this case, and both sides have been waiting

25 months, even more than that, for their day in court.  And so

1    have the newspapers and the magazines.

2        And my direct order to you is you may not, you must not,

3    you cannot go out and do any research or, to use a bad phrase

4    in this case, Google anything having to do with this case.  If

5    you do, it will be a direct violation, and I have to hold you

6    in contempt.  I would hate to do that.

7        But there's a good reason for this order, and that is that

8    whoever is selected to serve has to decide the case based on

9    the evidence here in the courtroom and not upon any stuff,

10   including propaganda, that you hear on the Internet or see on

11   the Internet or read in the newspapers.  This case has to be

12   decided on what's presented here under the Rules of Evidence

13   and not on anything, any search outside the courtroom.

14       Similarly, you cannot talk with anyone about the case,

15   even each other.  Those of you who are selected to serve on the

16   jury will have a duty to talk about the case at the end of it

17   during deliberations, but not before that.

18       So you can't talk with your loved ones, other than to say

19   you're serving on this case.  You could tell them the name of

20   the case, but no talking about the case, even with your loved

21   ones.

22       So to come back to the -- I just know how half of you are

23   so into your cell phones and trying to Google stuff and go on

24   Facebook.  You cannot do any of that.  You cannot put on

25   Facebook or your social media page that you're on this case as

1    a juror or even being considered as a juror.  You cannot do

2    that.  And that's because you would start getting comments from

3    your friends or maybe friends of your friends:  *Oh, that's*

4    *great; oh, that's terrible*.  Whatever they would say.  You

5    cannot do that.

6        Now, part of the good news of this is that these excellent

7    lawyers on both sides have both agreed with the Court that they

8    will not try during -- what sometimes happens in jury selection

9    is to do searches on you, so they're not going to be going out

10   while you're being considered to serve on the jury and

11   searching your background on social media.  So you're safe

12   there.  Until the very end of the case, then you and the

13   lawyers and everyone in the world can do all the research they

14   want to do once the verdict is in.

15       So they will then go back, maybe, and look and see

16   everything that you wrote, make a motion for a mistrial if you

17   did something -- some misconduct.  I don't know.  But they can

18   do it then, but they've agreed not to do it until that point,

19   and you can't do it either, but once you're free from your jury

20   service, then of course you can go -- you can hold a press

21   conference, if you want.  You can write a book about the case.

22   I don't care.  But you can't do it before that.

23       Now, the lawyers, these excellent lawyers, have both

24   agreed that they will not be doing that, but I cannot promise

25   you about the press.  Somewhere in the room we've got members

1    of the press and we've got members of the public, and those

2    people who have nothing to do with the lawyers presenting the

3    case, they can Google you all day long if they want.

4         So at some point, if you know how to adjust your privacy

5    settings on your Facebook, if you have that, you might want to

6    do that.  But that's up to you.

7         I can't control the press.  They're not subject to any of

8    my orders, and if they want to look you up and see what you've

9    said or whatever, that's their right, and they will not be

10   restricted in any way, but if you want to give yourself more

11   privacy, you can adjust your privacy settings on Instagram or

12   whatever, one of those Twitter -- whatever service that you

13   particularly like.

14        I think the world of jurors, but I have to tell you, I'm

15   deadly serious about this.  If I find out that you have

16   violated the Court's order and done research on the case or

17   made comments on Facebook or anything else, it will be contempt

18   of court and you will put me in a terrible position of having

19   to sentence you to some kind of community service or whatever

20   and make you -- you don't want to put me in that position.

21   Please honor this.  Please honor this.  The temptation, because

22   it is a high-profile case, will be enormous and you must resist

23   it and not do it.  All right.  Enough said on that.

24        Okay.  We're going to go now to what are we here for

25   today.  We are here to select a jury.  We need 10 of you to

 1  serve, so we've a lot more than we need, and we will spend

 2  probably up until close to 11:30 or noon on this jury selection

 3  process.  And the whole point is to ask you questions and to

 4  see if you would be fair and impartial to both sides and follow

 5  the law and the instructions that I will give you about the law

 6  and then be a good conscientious juror and decide the case.

 7        So that's what we will be doing.  And rather than explain

 8  it to you, you just have to see how it unfolds.  That's the

 9  best way to do it.

10        The first item of business, I want to get rid of anybody

11  who's sick and can get the rest of you contagious.  If you have

12  the flu, a bad hacking cough, bronchitis, you've got to raise

13  your hand right now.  Come up here.  I'm going to interview.

14  Remember, all of you are under oath.  I rarely have people who

15  try to get out of jury service by claiming they're not --

16  they're sick when they're not.

17        Right here.  Right here.  Go up to the microphone.

18        Tell me your name, please.

19              **PROSPECTIVE JUROR GOLD**: Mark Gold.

20              **THE COURT:**  Who?

21              **PROSPECTIVE JUROR GOLD**: Mark Gold.

22              **THE COURT:**  Your situation?

23              **PROSPECTIVE JUROR GOLD**: I have been having stomach

24  problems.

25              **THE COURT:**  What?

1   **PROSPECTIVE JUROR GOLD**: I have stomach problems.

2   **THE COURT**: Are you contagious?

3   **PROSPECTIVE JUROR GOLD**: I don't know.  I have trouble

4 going to the bathroom.

5   **THE COURT**: Right now?  I mean, currently?

6   **PROSPECTIVE JUROR GOLD**:  Currently, yes.

7   **THE COURT**:  I'm going to excuse Mr. Gold, unless I

8 hear an objection.

9   **MR. VAN NEST**:  No objection, Your Honor.

10   **MR. BICKS**:  No objection.

11   **THE COURT**:  Go back to the jury assembly room and tell

12 them what happened.

13   **PROSPECTIVE JUROR GOLD**:  Thank you, Your Honor.

14   **THE COURT**:  Thank you.  Good luck.

15  Anyone else?  The gentleman back there.  You have to come

16 up here.  I can't hear you back there.  It's not going to be

17 that easy.  You have to come all the way up here, stand in

18 front of all these people, and tell me how sick you are.

19  First thing is what is your name?

20   **PROSPECTIVE JUROR TYRRELL**: I'm James Tyrrell.

21   **THE COURT**:  Mr. Tyrrell, what is your situation?

22   **PROSPECTIVE JUROR TYRRELL**: I'm not ill, Your Honor,

23 but I'm having a difficult time hearing.  I'm having trouble

24 with my hearing.  I haven't been able to get hearing aids yet

25 so I barely have understood any information.

1          **THE COURT:**  Who in the front row would like to switch?

2    He is way back in the back.  Who would raise their hand and sit

3    back in his spot for a moment?

4          Thank you, sir.  You go back there, and you go sit up

5    there, Mr. Tyrrell.  We will make sure you can hear okay.

6          Anyone else?  Come on.  Nobody else?  Out of 71 people,

7    that's great.  See, you're so willing to serve that this is why

8    I love juries.  Only one person out of 71.  Okay.

9          So next step, this is going to -- let me tell you how long

10   this case will be.  Probably it will go to June 10th.  I don't

11   think it will go any longer than June 10th and it probably will

12   go a little less than June 10th.  And all of you should have

13   been cleared through that length of time already.

14         So whenever you get called forward, if you have some

15   hardship issue, you've got to bring it up.  But we will be in

16   session every single day that's a holiday, except I'm going to

17   probably give you off May 20, Friday May 20.  And the other

18   days we'll be in session.  This week five days, next week four

19   days, the following week five days, and so forth.

20         So that's the drill.  And the jury -- the 10 members of

21   the jury have to be here at 7:45 each morning.  7:45.  And then

22   they get to go home at 1:00.  1:00 p.m.  1:00 p.m.  Except when

23   they start to deliberate, then usually the juries decide they

24   want to stay later in the day because often they can decide the

25   case right away and not have to come back the next day.  It's

1    up to them.  They can stay as late as they want.  Midnight if

2    they want.  We will always be here if they want to go to

3    midnight.  No one has done that yet, but they have gone to

4    7:00 p.m.  So it's up to them.

5         So that's going to be our situation on the timing.  You

6    have to be here at 7:45 and you have to be -- why is that?

7    Some of you think well -- I bet you have never served on a

8    jury.  You think *Oh, if I'm a little late, I can just look at*

9    *somebody's notes*, like high school.  No.  You have to be here

10   to see and hear every single word said by every single witness

11   for yourself.  You can't rely on somebody else's notes.

12        So on those rare occasions when somebody is sick -- not

13   sick.  They're just late.  Not sick.  They're just late.  We

14   sit here counting the dots on the ceiling.  Everybody in the

15   jury box, we're just counting the dots on the ceiling in total

16   stoney silence until you arrive, so you don't want to put us in

17   that position.  You've got to be here at 7:45.

18        Once you get selected, there is no such thing as to say

19   *oh, I forgot to tell you this.*  You've got to tell us

20   beforehand because it's like the Army.  If you get drafted,

21   you're in for the duration.  You don't get out.  You can't say

22   *oh, I forgot to tell you this.*  Okay.

23        All right.  Again, I want to thank all of you.  This is

24   such a -- it's wonderful that we have juries that will come in

25   from all over the district and decide these cases and just --

1    it's wonderful.

2        So what is this case that we're talk about?  Remember, I

3    said this side of the room is Oracle America.  I'm just going

4    to call it Oracle.  And over here is Google.  These are large

5    companies in America, and they are here with a disagreement and

6    the jury will decide the disagreement.  Not the judge; the

7    jury.

8        And I have a very short statement here that I'm going to

9    read to tell you what the case is about.  Why am I doing this?

10   Well, possibly once you hear the statement of the case, there

11   will be something about your background that would cause you to

12   be biased.  For example, if you currently work for one of these

13   companies, that's probably not good.  We probably wouldn't be

14   allowed to keep you on the jury.  So here we go.

15       "The plaintiff in this case is Oracle America, Inc.,

16   formerly known as Sun Microsystems.  And the defendant is

17   Google, Inc."

18       Let me say that again so it will sink in.

19       "The plaintiff in this case is Oracle America, Inc.,

20   formerly known as Sun Microsystems.  And the defendant is

21   Google, Inc.  This is a case involving claims of copyright

22   infringement."

23       Copyright.  Copyright infringement.  That's what the case

24   is about.

25       "In November 2007, Google announced a new operating system

1   called Android."  Android.

2       "November 2007, Google announced a new operating system

3   called Android which has been used in devices such as

4   smartphones and tablets.  Android uses certain parts of a

5   copyrighted software platform called Java SE."

6       You're going to find out that SE standards for *standard*

7   *edition*.  Right?  Am I right about that?

8           **MR. VAN NEST:**  Yes, you are, Your Honor.

9           **THE COURT:**  So I'm going to repeat that sentence.

10      "Android uses certain parts of a copyrighted software

11  platform called Java SE owned by Oracle."

12      It used to be owned by Sun Microsystems, but Sun

13  Microsystems was acquired by Oracle America or by Oracle and

14  now called Oracle America, Inc., so Java SE owned by Oracle.

15      "Oracle contends that Android's use of this material

16  infringes Oracle's copyrights.  Google contends that Android

17  does not infringe these copyrights because its use is a, quote,

18  fair use, close quote under the law."

19      Now later on I'll give you a definition of that term *fair*

20  *use*.  It is in the Copyright Act it's a thing called *fair use*

21  and I'll have to explain that to you later.

22      So let me read this paragraph again.

23      "Oracle contends that Android's use of this material

24  infringes Oracle's copyrights.  Google contends that Android

25  does not infringe these copyrights because its use is a fair

1    use under the law.  Oracle also seeks billions," billions,

2    that's with a *B*.  "Oracle also seeks billions of dollars in

3    damages.  Google denies that Oracle is entitled to any

4    damages."

5         Okay.  That's what the case is about.

6         So the issues that the jury will have to decide will be is

7    it a fair use.  Okay?  Number one.  And number two, if it's not

8    a fair use, then what are the damages.  And was it willful.

9    There may be a few other issues that the jury would have to

10   decide that I can't think of right now, but that's kind of what

11   the jury is going to have to be deciding for us.

12        Okay.  So did everyone here -- did you in the front row,

13   did you hear what I just said?

14        **PROSPECTIVE JUROR TYRRELL**: I'm struggling a little

15   bit, but it's better, yes, thank you.

16        **THE COURT**:  What we are going to do now is pass out --

17   are my troops ready with the passing out thing?  Where is that?

18   I don't even see it in here.

19        **THE CLERK**:  We have them in the back.

20        **THE COURT**:  They are going to wheel in some

21   questionnaires.  It is a very short questionnaire, but we've

22   decided this will go faster if you answer a one-page

23   questionnaire, and we're going to give you 15 minutes to do

24   that.  So we'll give you specific instructions as we go along

25   here, but the first thing you've got to do is get your hands on

1  a questionnaire and a pencil and a clipboard so it will be easy

2  for you to write.

3     While they're getting organized, you will get one -- it's

4  a front and back of one page.  It's not that many questions.

5  But you've got to read each one to yourself and answer it

6  truthfully.  Remember that you are under oath.  And then on the

7  back side, there are the possible witnesses in the case, and

8  you need to circle anybody that you think you know.

9     And it's just go to be easier if we all sit here, and

10  we'll give you 15 minutes of silence to answer the questions.

11  And then when you finish answering the questions, just hold on

12  to your copy of the clipboard and the questionnaire.  Don't try

13  to pass it down to the end.  Just hold it in your lap.

14     Raise your hand if you did not get a questionnaire.  Okay.

15     Somebody in the front row just left the courtroom.  What

16  was going on there?

17        **MR. TOTH:**  He went to the restroom.

18        **THE COURT:**  Does he have a questionnaire?

19        **MR. TOTH:**  Yes.

20        **THE COURT:**  Okay.  You have about 15 minutes.  When it

21  looks like everyone is staring up toward me, then we'll resume.

22              (Off the record at 8:54 a.m.)

23              (On the record at 9:02 a.m.)

24        **THE COURT:**  Anybody still working on the

25  questionnaire, raise your hand.  We will give you all the time

 1    you need.

 2                   (Off the record at 9:02 a.m.)

 3                   (On the record at 9:03 a.m.)

 4        **THE COURT:**  How about now?  Anyone still working on

 5    it?  I still have one in the front row.  Do you still need more

 6    time?

 7            **PROSPECTIVE JUROR:**  No.  I'm done.

 8        **THE COURT:**  Anyone else still working on your

 9    questionnaire?  Please raise your hand.  Okay.  Please go

10    ahead.  We'll wait.

11                   (Off the record at 9:03 a.m.)

12                   (On the record at 9:04 a.m.)

13        **THE COURT:**  Done?  Anyone else still need time?  It

14    looks like you're all done.

15        Here's the thing.  Just hold on to your questionnaire.

16    Make sure you signed it at the bottom and put on the date.

17    Today's date is May 9.  Be sure you signed it at the bottom

18    under penalty of perjury.  And just hold it in your lap until

19    we know if you're called forward or not, and then at that time,

20    I will tell you what to do when you're called forward.

21        So we're going to now turn to exactly that.  The clerk

22    will now call forward 16 of you.

23        And, counsel, I just want to be clear.  You see we have

24    two additional seats to accommodate 16.  Do you see that?

25        **MR. VAN NEST:**  Yes.

1    **THE COURT:**  The Seat No. 1 is the temporary seat

2    nearest the court reporter, and then it goes across to No. 8

3    and then we start with 9.  The temporary seat goes across to

4    16.  Understand?

5    **MR. BICKS:**  Yes.

6    **MR. VAN NEST:**  Understood.

7    **THE COURT:**  Let's start calling forward some of our

8    good people.

9    **THE CLERK:**  Cary Heil, H-E-I-L.

10   **THE COURT:**  All right.  Come forward.  Don't call any

11   more names yet.  I want to show everybody how the drill works.

12       I'm sorry.  See how crowded it is?  It takes you --

13   naturally, the first person called would be at the very end;

14   right?

15       All right.  Welcome.  Come forward, if you would, to one

16   of these two podiums.  And your name again?

17   **PROSPECTIVE JUROR HEIL**:  It's Cary Heil.

18   **THE COURT:**  May I see your questionnaire, please.

19       So on number -- all right.

20       Counsel, you have agreed, I believe, that -- here, counsel

21   let's make sure that we understand.  Take a look at the back of

22   this form, and under your stipulation, I think I am supposed to

23   excuse Ms. Heil; correct?

24   **MR. VAN NEST:**  *Acquainted with*, Your Honor.

25   **THE COURT:**  Yes.  But look at the back.  It was

 1    circled.  Wasn't that your stipulation?

 2            MR. VAN NEST:  It is, but *acquainted with* I think

 3    should require just a question or two.

 4            THE COURT:  No.  You all had a stipulation.

 5            MR. VAN NEST:  I think *acquainted* means knows

 6    personally.

 7            THE COURT:  Wasn't the stipulation that if anyone

 8    circled somebody on the back, that they were excused?

 9            MR. VAN NEST:  Right.

10            MR. BICKS:  Yes.

11            MR. VAN NEST:  Subject to a question about whether

12    it's the person that they're acquainted with.

13            THE COURT:  I guess you did say that.  All right.

14       On the person -- do you know Mr. Ellison personally?

15            PROSPECTIVE JUROR HEIL:  I know -- I worked for his

16    personal accounting firm, and I know just about everything

17    about him personally.  I have never met him personally.

18            THE COURT:  All right.

19       Isn't that good enough?

20            MR. VAN NEST:  It is.

21            MR. BICKS:  It is.

22            THE COURT:  All right.

23       Ms. Heil, please go back to the jury assembly room AND

24    tell them what happened.  You're excused.  Thank you.

25            Now, counsel, before I call the next person, on the other

 1  protocol, which is go to the end of the line, it's on Questions

 2  9D or E; correct?

 3          **MR. BICKS:**  Yes.

 4          **THE COURT:**  Both of those?

 5          **MR. BICKS:**  Yes.

 6          **MR. VAN NEST:**  Yes, Your Honor.

 7          **THE COURT:**  All right.  Okay.  Let's call the next

 8  name.

 9          **THE CLERK:**  Okay.  Kelci Lowery, L-O-W-E-R-Y.

10          **THE COURT:**  All right.  So please come stand at the

11  lectern, Ms. Lowery.  Is that your name?

12          **PROSPECTIVE JUROR LOWERY:**  Yes.

13          **THE COURT:**  How are you today?

14          **PROSPECTIVE JUROR LOWERY:**  Good.  Thank you.

15          **THE COURT:**  Let's have your questionnaire.

16          **THE COURT:**  Okay.  So congratulations.  You get to sit

17  in that first chair right over there, and just wait a few

18  minutes and enjoy the show so to speak.

19      Next name.

20          **THE CLERK:**  Diana Rocha, R-o-c-h-a.

21          **THE COURT:**  Who's going to be after Ms. Rocha?

22          **THE CLERK:**  Judith Shattuck.

23          **THE COURT:**  Let's call her too.

24          **THE CLERK:**  Judith Shattuck.  S-h-a-t-t-u-c-k.

25          **THE COURT:**  All right.  While she's coming forward,

 1   Ms. Rocha?

 2            **PROSPECTIVE JUROR ROCHA:**  Rocha.

 3            **THE COURT:**  Thank you.

 4       You did look at the names on the back; correct?

 5            **PROSPECTIVE JUROR ROCHA:**  I did.

 6            **THE COURT:**  You didn't circle anybody.  All right.

 7   Good for you.

 8       Please take the second seat.

 9       And now we get Ms. Shattuck.  And we'll be calling another

10   name forward.

11       Ms. Shattuck, if you will hand the clerk your

12   questionnaire, please.

13       You can take seat number three.

14            **PROSPECTIVE JUROR SHATTUCK:**  Thank you.

15            **THE COURT:**  Can we please keep the names coming.

16            **THE CLERK:**  Okay.  I have to write and do several

17   things to keep up with you.

18       Jacqueline McGrath.  M-c-G-r-a-t-h.

19            **THE COURT:**  And then a second name.

20            **THE CLERK:**  Michael Wong.  W-o-n-g.

21            **THE COURT:**  All right.  Mr. Wong, we've got to go to

22   Ms. McGrath first.

23       Welcome, Ms. McGrath.  Let's have your questionnaire.

24       Okay.  You can sit in seat number 4.

25       And, Mr. Wong, you can have seat number 5.

1          **THE CLERK:**  Marion Jacobs.  J-a-c-o-b-s.

2      And Patricia Sizemore, Sizemore.

3          **THE COURT:**  All right.  Ms. Jacobs, is that you?

4          **PROSPECTIVE JUROR JACOBS:**  Yes, sir.

5          **THE COURT:**  Welcome.

6      Okay.  Please have the next seat over there.

7      And then, Ms. Sizemore, please have the next seat over

8  there.

9      And?

10         **THE CLERK:**  Bradley Peralta, P-e-r-a-l-t-a.  And John

11 Kotlar, K-o-t-l-a-r.

12     Thank you.

13         **PROSPECTIVE JUROR PERALTA:**  You're welcome.

14         **THE COURT:**  I need my law clerk to come start making

15 some copies.

16         **THE CLERK:**  Angie will do it.

17         **THE COURT:**  We need two copies; one for each side.

18 And I'll just work with the original, all right.

19     Okay.  So you say -- I'm sorry, your name?

20         **PROSPECTIVE JUROR PERALTA:**  Bradley Peralta.

21         **THE COURT:**  Peralta.  You circled a name on the back,

22 Hiroshi Lockheimer.

23         **PROSPECTIVE JUROR PERALTA:**  Yes.

24         **THE COURT:**  And what do you -- what do you know about

25 that person?  Because it may be not the same person.  So tell

 1   us their age, something about them.

 2           PROSPECTIVE JUROR PERALTA:  I'm not sure what his age

 3   is, but I went to college with his wife.  And I'm friends with

 4   his wife.

 5           THE COURT:  And how old would he be?

 6           PROSPECTIVE JUROR PERALTA:  Maybe in the early 40s,

 7   possibly.

 8           THE COURT:  Early 40s.  Do you know where he might

 9   work?

10           PROSPECTIVE JUROR PERALTA:  He works at Google.

11           THE COURT:  He works at Google.  All right.  I think

12   we've got to excuse him.

13           MR. VAN NEST:  Yes, Your Honor.

14           PROSPECTIVE JUROR PERALTA:  Thank you.

15           THE COURT:  So, Mr. Peralta, you're excused.  Please

16   go to the jury assembly room and explain what happened.

17           PROSPECTIVE JUROR PERALTA:  All right.

18           THE COURT:  Okay.  You're Mr. Kotlar?

19           PROSPECTIVE JUROR KOTLAR:  Kotlar, yes, sir.

20           THE COURT:  All right.  You get to take that last seat

21   over there.

22           PROSPECTIVE JUROR KOTLAR:  Okay.

23           THE COURT:  Thank you.

24       And now we go to a new name.

25           THE CLERK:  Okay.  Betsy Harper.  H-a-r-p-e-r.

```
 1          And Paul Roberds, R-o-b-e-r-d-s.

 2               THE COURT:  All right.  Ms. Harper.

 3               PROSPECTIVE JUROR MS. HARPER:  Yes.

 4               THE COURT:  Welcome.  And, let's see.  You may have

 5     that seat behind Ms. -- what's your name?

 6               PROSPECTIVE JUROR LOWERY:  Kelci.

 7               THE COURT:  Kelci.

 8          And now Mr. Roberds.  Am I saying your name right?

 9               PROSPECTIVE JUROR ROBERDS:  Roberds.

10               THE COURT:  Okay.  Please take the next seat.

11               THE CLERK:  Debra Riddle, R-i-d-d-l-e.

12          Claudette Goldberg.  G-o-l-d-b-e-r-g.

13               THE COURT:  Good morning.  Are you Ms. Riddle?

14               PROSPECTIVE JUROR RIDDLE:  Yes.

15               THE COURT:  How are you today?

16               PROSPECTIVE JUROR RIDDLE:  Fine.  How are you?

17               THE COURT:  Excellent.

18               PROSPECTIVE JUROR RIDDLE:  Uh-huh.

19               THE COURT:  All right.  I can't tell which one -- did

20     you say -- on number 9E, it looks like you marked it both ways.

21     Which is your final answer?

22               PROSPECTIVE JUROR RIDDLE:  I'm not favorable.  I was

23     in the beginning because I was thinking of Google's products.

24     I like Google products.

25               THE COURT:  But I can't tell which one you answered
```

```
 1   here.  On 9E it looks like you checked both boxes.

 2           PROSPECTIVE JUROR RIDDLE:  I meant to cross the top

 3   one off.  It should be "No."

 4           THE COURT:  It should be what?

 5           PROSPECTIVE JUROR RIDDLE:  "No."

 6           THE COURT:  It says "No, I have no strong opinion."

 7           PROSPECTIVE JUROR RIDDLE:  Right.

 8           THE COURT:  So you have no strong opinion.  All right.

 9   So you get to go have the next seat.

10      Thank you.

11           PROSPECTIVE JUROR RIDDLE:  Thank you.

12           THE COURT:  Okay.  Who's next?

13           THE CLERK:  She's right here.  Ms. Goldberg.

14           THE COURT:  Okay.  You get to have the next seat.

15   Thank you.

16      Okay.  Two more names.

17           THE CLERK:  Give me just a second.  Okay.  Jeannie

18   Settles, S-e-t-t-l-e-s.  And Szymon Perkowski,

19   P-e-r-k-o-w-s-k-i.

20           THE COURT:  Okay.  Ms. Settles, is that the way you

21   say it?

22           PROSPECTIVE JUROR SETTLES:  Yes.

23           THE COURT:  Please take the next seat over there.

24           PROSPECTIVE JUROR SETTLES:  Thank you.

25           THE COURT:  So on account of the way you answered, you
```

1   do not get excused to the jury assembly room, but you do have

2   to go back and sit where you were for a moment.

3         We may or may not get to you, but there we are.

4               **PROSPECTIVE JUROR PERALTA:**  Thank you.

5               **THE COURT:**  Who's next?

6               **THE CLERK:**  Melanie Calonsag, C-a-l-o-n-s-a-g.

7         And Ford Turping.  T-u-r-p-i-n-g.

8               **THE COURT:**  So, Ms. Calonsag?

9               **PROSPECTIVE JUROR CALONSAG:**  Calonsag.

10              **THE COURT:**  Calonsag?

11              **PROSPECTIVE JUROR CALONSAG:**  Yes.

12              **THE COURT:**  Please have the next seat over there.

13        Do I have anyone here from the clerk's office to do some

14   copying?

15              **THE CLERK:**  Angie just walked back in.

16              **MR. VAN NEST:**  Your Honor, could you please say her

17   name again.  K or C?

18              **THE COURT:**  C.

19              **MR. VAN NEST:**  Thank you.

20              **THE COURT:**  C-a-l-o-n-s-a-g.

21              **MR. VAN NEST:**  Thank you.

22              **THE COURT:**  So, Mr. Turping, you are in the same

23   category.  You get to go sit in the back, in your seat for a

24   moment.  We may or may not get to you.

25              **PROSPECTIVE JUROR TURPING:**  Okay.

```
 1          THE COURT:  Okay.

 2          THE CLERK:  Melissa Hines, H-i-n-e-s.

 3      And Michael Owens, O-w-e-n-s.

 4          THE COURT:  So you are Melissa Hines.  Welcome.

 5      All right.  Ms. Hines, you get to go sit in the next seat

 6  over there.

 7      Mr. Owens?

 8          PROSPECTIVE JUROR OWENS:  Yes.

 9          THE COURT:  Welcome.  So, Mr. Owen?

10          PROSPECTIVE JUROR OWENS:  Owens.

11          THE COURT:  Owens.

12          PROSPECTIVE JUROR OWENS:  Yes.

13          THE COURT:  You didn't write the S on here.  You

14  misspelled your own name.

15      (Laughter)

16          THE COURT:  But doesn't matter.  Right now you get to

17  go sit in the back in your other seat.  We might get to you.

18  We might not.

19      All right.  Next.

20          THE CLERK:  Okay.  David Mangels, M-a-n-g-e-l-s.

21          THE COURT:  Where is Angie?

22          THE CLERK:  Right here.  She's waiting for the last

23  one.

24          THE COURT:  Okay.  Mr. Mangels.

25          PROSPECTIVE JUROR MANGELS:  Mangels.
```

1        **THE COURT:**  You get to have that last seat.

2      Angie, please copy these.  Same thing.

3      Now, the rest of you out there will probably be called --

4    not all of you, but some of you will be called forward before

5    this is all over.  So you need to continue to listen very

6    carefully to all of the questions.  And so there we go.

7      Now, first order of business for you 16 is to ask you

8    about hardship of serving on this case.  In other words, let's

9    just go over the drill again.

10     Who remembers what time it is you've got to be here in the

11   morning?

12        **PROSPECTIVE JURORS:**  7:45.

13        **THE COURT:**  7:45.

14     Now, the lawyers will actually get here at 7:30.  And I

15   will meet with them at 7:30 so we can clear away any problems

16   that might be pending so that at 7:45, or very close to it, we

17   get you out here and start with the evidence.

18     And then that may seem like it's early in the morning, but

19   then you get to go home at 1:00.  We don't even have a lunch

20   break.  We just have convenience breaks during the morning.

21   And at 1:00 o'clock you get to leave.  So the traffic is a lot

22   better at 1:00 o'clock.  A lot of advantages to this schedule.

23     But every now and then somebody has a hardship meeting

24   this schedule.  So I need to listen to what your hardship issue

25   is if you have one.  Maybe you don't.  I don't know.

1        So do we have the microphone ready to go?

2            THE CLERK:  Yes.

3            THE COURT:  Raise your hand if it would be a hardship

4    to serve on this case.  Remember you could be here as late as

5    June 10.  I think it will be done a little sooner than that,

6    but we can't be sure.  And you need to be clear the decks all

7    the way through June 10.

8        So raise your hand if you want to ask for hardship.  Okay.

9    Ms. -- don't tell me.  Ms. Lowery.

10           PROSPECTIVE JUROR LOWERY:  Yes.

11           THE COURT:  We need to give you the microphone.

12       Okay.  What's your issue?

13           PROSPECTIVE JUROR LOWERY:  Uhm, I do not have a car.

14   And I live about 45 minutes away.  So the commute would be me

15   having to take the bus, and it would be very difficult.

16       I'm also currently enrolled in summer semester classes

17   through the Santa Rosa Junior College.  And my current semester

18   that I'm in now would continue, I think, through the beginning

19   of the trial.

20           THE COURT:  You mean you're taking classes now?

21           PROSPECTIVE JUROR LOWERY:  Yes.

22           THE COURT:  Are you missing classes today?

23           PROSPECTIVE JUROR LOWERY:  No.

24           THE COURT:  What time of day are your classes?

25           PROSPECTIVE JUROR LOWERY:  My class is 10:30 to noon,

1    Tuesdays through Thursdays.

2       **THE COURT:** That's an automatic excuse there.

3     How come you didn't say this on your form?  We tried to

4    free clear everyone.

5       **PROSPECTIVE JUROR LOWERY:** I did say it.

6       **THE COURT:** Then I goofed up.

7     (Laughter)

8       **THE COURT:** That's the first time in a long time.

9     (Laughter)

10       **THE COURT:** All right.  I'm going to excuse

11   Ms. Lowery.  She has to go to her classes.  We can't keep her

12   here.

13     Any objection?

14       **MR. BICKS:** No, Your Honor.

15       **MR. VAN NEST:** No, Your Honor.

16       **THE COURT:** All right, Ms. Lowery.  Good luck.  Make

17   A's for me.

18      (Laughter)

19       **PROSPECTIVE JUROR LOWERY:** Thank you.

20       **THE COURT:** Thank you.  Before we move on, we need to

21   replace Ms. Lowery.

22     Anybody else over there a student?  It's an automatic out

23   if you would miss classes.

24     Okay.

25       **THE CLERK:** Rune Stromsness S-t-r-o-m-s-n-e-s-s.

1          **THE COURT:**  Okay.  You get to have seat number 1.

2      All right.  Again, I ask the question, did you hear the

3  hardship thing?

4          **PROSPECTIVE JUROR STROMSNESS:**  Yes.

5          **THE COURT:**  Do you know the schedule?

6          **PROSPECTIVE JUROR STROMSNESS:**  Yes.

7          **THE COURT:**  Do you have any hardship issue you want to

8  bring up?

9          **PROSPECTIVE JUROR STROMSNESS:**  No.

10         **THE COURT:**  Anyone else?

11     We go to Ms. McGrath.  You need to use the microphone,

12  please.

13         **PROSPECTIVE JUROR MCGRATH:**  I don't want to miss my

14  daughter's graduation on Tuesday from the credential program at

15  Sonoma State.

16         **THE COURT:**  This coming Tuesday?

17         **PROSPECTIVE JUROR MCGRATH:**  Yes.

18         **THE COURT:**  What time of day would that be?

19         **PROSPECTIVE JUROR MCGRATH:**  It's in the afternoon.

20         **THE COURT:**  What time?

21         **PROSPECTIVE JUROR MCGRATH:**  I think it's at 2 o'clock.

22     And the other thing is, I work full-time as a nurse at

23  Kaiser, in the cardiology clinic, as a heart failure care

24  monitor.  And that's a nursing job and an extended role.  And

25  there's no one trained to replace me when I'm off.

1          **THE COURT:**  That one I cannot give you.  Kaiser is a

2     big company.  They can figure it out.  Under the law, that's a

3     hardship to the company, not to you.  So that one I can't do.

4        But I'm more sympathetic to, your daughter is about to

5     graduate?

6          **PROSPECTIVE JUROR MCGRATH:**  Uh-huh.

7          **THE COURT:**  How early -- are you sure it's 2 o'clock?

8          **PROSPECTIVE JUROR MCGRATH:**  Yes.

9          **THE COURT:**  So let's say it's 2 o'clock.  How early

10    would we need to adjourn that day for you to make it up to the

11    graduation?

12         **PROSPECTIVE JUROR MCGRATH:**  Well, I live in Napa.  So

13    I would normally be taking BART back to Martinez.  So I would

14    drive from Martinez.  I should get my husband first.

15        (Laughter)

16         **PROSPECTIVE JUROR MCGRATH:**  And then drive to Sonoma.

17    I don't know how long.  A few hours.

18         **THE COURT:**  Is that the only issue you have for this

19    whole time period?

20         **PROSPECTIVE JUROR MCGRATH:**  Yes.

21         **THE COURT:**  Here's what we'll do.  If you get selected

22    to serve, we will end early enough that day that you can make

23    the graduation.

24        Is that okay?

25         **PROSPECTIVE JUROR MCGRATH:**  All right.

1    **THE COURT:**  All right.  So you'll just have to tell me

2   what you need.  And I'll rely on it in good faith.  And we'll

3   have a shorter day that day.  We'll figure out how to make it

4   up in some other way.  But we're going to end at 1:00 o'clock

5   every day, so all right.

6        Anyone else?  Down there.  Ms -- how do you say your name?

7        **PROSPECTIVE JUROR SIZEMORE:**  Sizemore.

8        **THE COURT:**  Sizemore.

9        **PROSPECTIVE JUROR SIZEMORE:**  I don't know if you call

10   this a hardship, but I'm a single person.  And I have a Great

11   Dane that just turned 11 years old.  And he's very sick.  He's

12   not eating.  I'm afraid he's going to pass in the next couple

13   of weeks.  I will be an emotional wreck.  I just wanted you to

14   know that.  If I'm sitting here crying during the trial, you'll

15   know why.

16        **THE COURT:**  What kind of dog is this?

17        **PROSPECTIVE JUROR SIZEMORE:**  He's a Great Dane.  And

18   it's very rare for them to be 11 years old.  He's like my kid.

19   I know it's not a kid, but I still a feel like that.

20        **THE COURT:**  So is there anyone there taking care of

21   the dog now?

22        **PROSPECTIVE JUROR SIZEMORE:**  No.  He stays at home.

23   But he's not doing well.  He's gone from 115 to 93 pounds.  And

24   I have to give him stimulants to make him eat stuff.

25        **THE COURT:**  Are you going to be worrying about this

 1   the whole time?

 2              **PROSPECTIVE JUROR SIZEMORE:**  Pretty much, yeah.

 3              **THE COURT:**  I'm going to excuse Ms. Sizemore unless I

 4   hear an objection.

 5              **MR. VAN NEST:**  No objection.

 6              **MR. BICKS:**  No.

 7              **THE COURT:**  Good luck with your pet.

 8              **PROSPECTIVE JUROR SIZEMORE:**  Thank you very much.

 9              **THE COURT:**  I hope the last days with your pet are

10   good ones.

11              **PROSPECTIVE JUROR SIZEMORE:**  Thank you.

12              **THE COURT:**  All right.  Please go back to the jury

13   assembly room.

14       Anyone else have a hardship issue?  Nobody is raising

15   their hand.

16       Dawn, we need to call forwards somebody else.

17              **THE CLERK:**  Okay, Judge.  Ronald Haley, H-a-l-e-y.

18              **THE COURT:**  Okay.  You get to take the empty seat,

19   Mr. Haley.

20       Mr. Haley.  Do you have any hardship issue?

21              **PROSPECTIVE JUROR HALEY:**  No.

22              **THE COURT:**  Again, I need to ask, anyone of the 16 of

23   you have a hardship issue?

24       Okay.  In the back row, Mr. Mangels.

25              **PROSPECTIVE JUROR MANGELS:**  Question is right now I

1    have to pee.

2            **THE COURT:**  What?

3            **PROSPECTIVE JUROR MANGELS:**  I have a weak bladder.

4            **THE COURT:**  Do you have to go right now?

5            **PROSPECTIVE JUROR MANGELS:**  Yeah.  The question is,

6    how close are the breaks put together?

7            **THE COURT:**  They can be -- they usually run an hour

8    and a half to an hour and 45 minutes apart.

9            **PROSPECTIVE JUROR MANGELS:**  Okay.  That's fine.

10           **THE COURT:**  Can you make it that long?

11           **PROSPECTIVE JUROR MANGELS:**  Yeah.

12           **THE COURT:**  All right.  Do you need to go right now?

13       The thing is, I've got to take a break for everyone.  Can

14   you last about another -- do you have to go right now?

15           **PROSPECTIVE JUROR MANGELS:**  I can hold off.

16           **THE COURT:**  All right.  You hold off.

17       Anyone else?

18       Anyone over there have difficulty with the English

19   language?  This is going to involve a lot of documents and the

20   English language.  If you have difficulty with English, you

21   really ought to raise your hand now.

22       Okay.  Nobody is raising their hand.  Good.

23       Okay.  All right.  What we're going to do now is start

24   getting some basic biographical information on you.  And then

25   we will probably take a break in -- not go through all of you

 1   yet.

 2        Who's got the microphone?  Please hand it over to

 3   Mr. Stromsness.

 4        Mr. Stromsness, can you see that chart, that poster board?

 5        **PROSPECTIVE JUROR STROMSNESS:**  Pretty much.  When I

 6   get to the bottom one I will stand up.

 7        **THE COURT:**  Go down it and give good, accurate

 8   information on each point.

 9        **PROSPECTIVE JUROR STROMSNESS:**  My name is Rune

10   Stromsness.  I live in Oakland, California.  I have a

11   bachelor's of science degree in electrical engineering and

12   computer science from the University of California at Berkeley.

13        I currently work for the Lawrence Berkeley National Lab as

14   a network and telephone manager.

15        I'm not sure exactly what you want for number 5.  People I

16   donate money to, 40 or 50 or groups I'm actually active with.

17        **THE COURT:**  Err on the side of telling us more than

18   less.

19        **PROSPECTIVE JUROR STROMSNESS:**  Okay.  The only group

20   that I'm currently active with is the North American Network

21   Operators Group.

22        **THE COURT:**  North American what?

23        **PROSPECTIVE JUROR STROMSNESS:**  North American Network

24   Operators Group.  People who run systems on the Internet.  And

25   I attend their meetings two or three times a year and pay

1   membership dues to them.

2       I have in the past been active in alumni associations of

3   UC Berkeley.  And then I give money to 40 or 50 different

4   causes.  Environmental causes.  Gay rights causes.  I believe

5   that I have in the last couple of years given money to the EFF.

6   Just vaguely, I'm not sure I remember what all the causes I

7   donate to are.

8           **THE COURT:**  All right.

9           **PROSPECTIVE JUROR STROMSNESS:**  Hobbies, I like

10  walking, hiking, traveling, reading.

11      I am single but with a partner of seven years.  My partner

12  is a network engineer, also at Lawrence Berkeley National

13  Laboratory.

14      I have no children.

15      I've never been on a jury before.  Although I've been at

16  this stage once or twice in Superior Court.

17      I've never been in the military or law enforcement.

18      And I've never actually made it to be in a court.

19  Although, I was interviewed by a district attorney once.  But

20  there was a plea deal.  I never showed up in court.

21          **THE COURT:**  Okay.  Angie, whatever happened to the

22  originals?

23          **THE CLERK:**  I have them.

24          **THE COURT:**  You've got the originals.

25      All right.  So Mr. Stromsness -- am I saying your name

1    right?

2              **PROSPECTIVE JUROR STROMSNESS:**  Stromsness.

3         **THE COURT:**  You work in an area where you probably

4    know something about the subject matter we're dealing with.

5    Would that be a fair statement?

6              **PROSPECTIVE JUROR STROMSNESS:**  I probably know

7    something about it, yes, as a student 20-some years ago.

8         **THE COURT:**  It doesn't matter.

9         **PROSPECTIVE JUROR STROMSNESS:**  Okay.

10        **THE COURT:**  You can still be a juror on the case.

11        But you and your partner both work in this computer

12   science area; true?

13             **PROSPECTIVE JUROR STROMSNESS:**  Correct.

14        **THE COURT:**  So if you get selected to serve, you

15   cannot talk to your partner, when you go home at night, about

16   what the evidence was or about the arguments they're making.

17   Because then pretty soon he would be talking to you; right?

18             **PROSPECTIVE JUROR STROMSNESS:**  Right.

19        **THE COURT:**  Do you understand that?

20        **PROSPECTIVE JUROR STROMSNESS:**  I do.

21        **THE COURT:**  Are you going to have any trouble

22   following that?

23             **PROSPECTIVE JUROR STROMSNESS:**  No.

24        **THE COURT:**  All right.  Please pass the microphone

25   over to Ms. Rocha.

1    **PROSPECTIVE JUROR ROCHA:**  Hi.  My name is Diana Rocha.

2    I live in Concord, California.

3        I have some college.

4        I work as a transitional employment coordinator for

5    Goodwill Industries.  And I'm not affiliated with any

6    organizations or clubs.

7        My hobbies are hiking, kayaking, and going to the beach.

8        And I'm divorced.

9        And I have three children.  They are 31, 28, and 24.  My

10   oldest works in finance.  My middle child is a manager at Mac

11   Makeup.  And my youngest is a manager at Panera Bread.

12       I have never had any prior jury service.

13       I've never been in the military or law enforcement.

14       And I've never been a party or a witness in court.

15       **THE COURT:**  Okay.  Thank you.

16   Next.  Ms. Shattuck.

17       **PROSPECTIVE JUROR SHATTUCK:**  My name is Judy Shattuck.

18   I live in Berkeley.

19       My education stopped somewhere around being a sophomore in

20   college.

21       I worked at the University of California as a clerical

22   employee for, I don't know, about 40 years.

23       I was active in my union.

24       I don't think -- well, somebody mentioned organizations to

25   which they contribute.  And I do contribute to about 40

1   organizations.

2       Hobbies, I do ceramics.

3       I'm divorced.  My -- I was divorced from a mathematician.

4       I have one child, who is 40.  And he does something about

5   computers.  I really don't understand them.

6       Which reminds me that I wanted to say I don't have any

7   trouble with English.  But in my limited experience with

8   computers, I find that English is used in strange and unnatural

9   ways.

10      (Laughter.)

11          **PROSPECTIVE JUROR SHATTUCK:**  By computer people.  And

12  I don't understand the second meaning that -- what computer

13  people mean by what I thought was, you know, simple words.

14      I've never been on a jury.

15      I have not been in the military or law enforcement.

16      And I've never been a party or witness in court.

17          **THE COURT:**  Wonderful.  Thank you.

18      Ms. McGrath.

19          **PROSPECTIVE JUROR MCGRATH:**  My name is Jackie McGrath.

20  I live in Napa, California.

21      I have an associate degree.  I'm a registered nurse at

22  Kaiser.

23      I'm a member of the California Nurses Association and a

24  couple of medical organizations.

25      I like gardening, hiking.

1     Married.  My husband has an auto repair business in Napa.

2     We have five children, adults.  One is an auto repair

3 technician.  One is a dental hygienist.  One is a nurse.  One

4 is graduating to be a teacher.  And the other one is a pharmacy

5 technician.

6     I was on a jury in my 20s.  And I barely remember anything

7 about it.  Although, it was a guilty verdict.

8     I've never been in the military or law enforcement.

9     And I've never been a witness in court or in any court

10 proceeding myself.

11          **THE COURT:**  Thank you.

12 Mr. Wong.

13          **PROSPECTIVE JUROR WONG:**  My name is Michael Wong.  I

14 live in San Francisco.  I've had some college education.

15     I work at UCSF Medical Center.

16          **THE COURT:**  Closer to the microphone, please.

17          **PROSPECTIVE JUROR WONG:**  I work at UCSF Medical Center

18 as maintenance.

19     Organizations, Chinese American Citizens Alliance.  But I

20 go for the activities.

21     Hobbies, electronics, some sports.

22     Single.  No spouse.  No kids.

23     I've never been on a jury duty, jury service.

24     I have no military or law enforcement background.

25     And I was a character witness about 30 years ago.  A

1  friend of mine just was accused of shoplifting.

2          THE COURT:  Okay.  What do you like about electronics?

3  What do you -- what's your thing there?

4          PROSPECTIVE JUROR WONG:  I like to just tinker with

5  everything that comes out on the market.

6          THE COURT:  Like what?  Give us an example.

7          PROSPECTIVE JUROR WONG:  Photography, video, audio.

8  Computers as well.

9          THE COURT:  Thank you.

10     Next we go to Ms. Jacobs.

11         PROSPECTIVE JUROR JACOBS:  Hi.  My name is Marion

12  Jacobs.  I live in Concord, California.

13     I have a bachelor's of science in nursing.  I am an R.N.

14  in the emergency department for John Muir.

15     I am involved with ENA, Emergency Nurses Association.

16  Also, I'm an active member of nursing union.

17     Hobbies, I like to garden.  I have a 1-year-old so there's

18  not much time for hobbies.

19     (Laughter)

20         PROSPECTIVE JUROR JACOBS:  I am married.  My husband

21  is a retired deputy sheriff for Contra Costa County.  But he's

22  a stay-at-home father now.

23     We have a 13-month-old.  He does not work.

24     (Laughter)

25         PROSPECTIVE JUROR JACOBS:  I have not been on a jury.

1        Like I said, my husband is retired law enforcement.

2        And I have never been part of a witness or party of a

3   court case.

4            THE COURT:  Thank you.

5        Mr. Haley.

6            PROSPECTIVE JUROR HALEY:  Hi.  My name is Ron Haley.

7   I live in Portola Valley.

8        My education is I have an MBA from UC Berkeley.

9        I'm currently retired.  Previously, I was a CFO for an

10  aerospace company.

11           THE COURT:  What kind of company?

12           PROSPECTIVE JUROR HALEY:  Aerospace company.

13           THE COURT:  Do you mind telling us which one?

14           PROSPECTIVE JUROR HALEY:  Sure.  Space Systems Loral.

15  They make communication satellites.  Mostly commercial venture.

16  A little bit of government.

17           THE COURT:  And you were the CFO?

18           PROSPECTIVE JUROR HALEY:  I was the CFO, correct.

19           THE COURT:  All right.

20           PROSPECTIVE JUROR HALEY:  No organizations or clubs to

21  speak of.

22       Hobbies are hiking and other activities.

23       I am married.  My spouse is retired also.  She was a

24  stay-at-home spouse for most of our relationship together.

25  Worked briefly as a product line manager for Bechta (phonetic)

1    Machines, which is a biomedical firm.

2        Children two.  31 and 29.  My oldest is just getting out

3    of school with an MBA.  Graduates this spring.  And my daughter

4    works with a software company in marketing.

5        I have been on a prior jury.  We did not reach a verdict.

6    It was a plea bargained before we got it, about three days into

7    the court.  It was a criminal action.

8        Never been in the military.  And I have been a witness in

9    court as part of my job responsibilities in a wrongful

10   discharge suit.

11           **THE COURT:**  When you were working for the satellite

12   company?

13           **PROSPECTIVE JUROR HALEY:**  That's right.

14           **THE COURT:**  Thank you.

15       Next, Mr. Kotlar.

16           **PROSPECTIVE JUROR KOTLAR:**  Yes, John Kotlar.  City of

17   residence Oakland.

18       Finished a bachelor's of arts in Biblical studies at

19   Marionette Baptist Bible College.

20       Most recently got hired by East Bay MUD.  Member of

21   Heritage Baptist Church.  And, unfortunately, a member of the

22   union at 444 AFSCME.

23       Gave you my work.

24       Hobbies are trees, movies, TV, coin collecting.  Things

25   like that.

1      Married to my wife of almost 19 years.  She's a teacher at
2  California Crosspoint High School.

3      No children, unfortunately.

4      Prior jury service, recently, about a month ago, say, in
5  Oakland.  Every time I go to Oakland on a jury I get selected.
6  I was an alternate.  They were supposed to tell me their
7  verdict, but I didn't hear it.

8      But two decades ago at Oakland, also, I served on a jury.
9  And we reached a verdict.  It was a preliminary trial.  Both
10  were civil.  And we were supposed to find for some guy who had
11  mesothelioma, which you hear a lot about now.  So then it
12  wasn't a big thing back then.  But we found he should get some
13  money.  But it was only a preliminary hearing.

14      No military service.  Although, I wanted to join the
15  Marines.

16      Never been a witness.

17          **THE COURT:**  What do you do for East Bay MUD?

18          **PROSPECTIVE JUROR KOTLAR:**  Janitorial.

19          **THE COURT:**  Thank you.

20      Let's go back.  Mr. Mangels -- okay.  Angie is doing it.
21  We'll take over with Ms. Harper.  Thank you.

22      Ms. Harper, your turn.  Can you see the chart?

23          **PROSPECTIVE JUROR HARPER:**  Yes.  My name is Betsey
24  Harper.  I live in Petaluma.

25      I possess a 2-year degree in human resources.  And I'm

1   working on a four year business degree.

2       I work as an employment and training counselor for the

3   County of Sonoma.

4       I belong to a union with the County.  In the past I've

5   been involved with Girl Scouts, Project Grad, and other

6   children-related organizations.

7       Hobbies include gardening, traveling, motorcycle riding.

8       I am married.  My husband is a salesman and business

9   manager for a family-owned company in Petaluma.

10      We have two children, 23 and 27.  One of them works in

11  retail.  And one of them works in childcare.

12      I have never been selected to participate in a jury.

13      I have no previous military or law enforcement experience.

14      And I've been in court speaking only for myself for

15  custody issues and things of that nature.

16          **THE COURT:**  All right.  Thank you.

17      Mr. Roberds.

18          **PROSPECTIVE JUROR ROBERDS:**  Hi.  My name Paul Roberds.

19  I'm from Concord, California.

20      Education, electrical education.  I work for Performance

21  Electric.

22      And no organizations.  Hobbies, motorcycles and music.

23      I'm single.  Have no children.

24      No prior jury service.

25      Never been in the military.

```
 1        And never been a party or witness in court.

 2             THE COURT:  And do you -- are you an electrician?

 3             PROSPECTIVE JUROR ROBERDS:  Yes.  I'm electrician.

 4   But right now I'm -- I'm not working, so.

 5             THE COURT:  All right.  Thank you.

 6        Now we go to Ms. Riddle.

 7             PROSPECTIVE JUROR RIDDLE:  I can't see the board.

 8             THE COURT:  Can we bring it up a little closer to you?

 9   I'll tell you what, I'll call out the questions.  How's that?

10             PROSPECTIVE JUROR RIDDLE:  Okay.

11             THE COURT:  First one:  Name.

12             PROSPECTIVE JUROR RIDDLE:  Debra Riddle.

13             THE COURT:  City of residence.

14             PROSPECTIVE JUROR RIDDLE:  Union City.

15             THE COURT:  Education.

16             PROSPECTIVE JUROR RIDDLE:  Two years in college.

17             THE COURT:  Did you have a major?

18             PROSPECTIVE JUROR RIDDLE:  Psychology.

19             THE COURT:  Okay.  Most recent employer or job.

20             PROSPECTIVE JUROR RIDDLE:  I work at El Camino

21   Hospital.

22             THE COURT:  Where?

23             PROSPECTIVE JUROR RIDDLE:  El Camino Hospital, as a

24   help desk technician.

25             THE COURT:  Are you doing that now?
```

1              **PROSPECTIVE JUROR RIDDLE:**  IT, yes.

2              **THE COURT:**  What organizations, clubs, unions, et

3    cetera, are you --

4              **PROSPECTIVE JUROR RIDDLE:**  I'm not in any.

5              **THE COURT:**  Not in any.

6       Okay.  How about a union.  Are you in the union?

7              **PROSPECTIVE JUROR RIDDLE:**  No.

8              **THE COURT:**  Hobbies?

9              **PROSPECTIVE JUROR RIDDLE:**  Dancing, reading, movies.

10   That's about it.

11             **THE COURT:**  Okay.  Marital -- what does that say?

12   Marital status.

13             **PROSPECTIVE JUROR RIDDLE:**  Single.

14             **THE COURT:**  What?

15             **PROSPECTIVE JUROR RIDDLE:**  Single.  No children.

16             **THE COURT:**  Okay.  Spouse.  Do you have any children?

17             **PROSPECTIVE JUROR RIDDLE:**  No.

18             **THE COURT:**  All right.  Prior jury service.

19             **PROSPECTIVE JUROR RIDDLE:**  I got as far as this, the

20   jury selection.  And I was excused.

21             **THE COURT:**  Okay.  Ever served in the military or law

22   enforcement?

23             **PROSPECTIVE JUROR RIDDLE:**  No.

24             **THE COURT:**  Ever been a party or a witness in court?

25             **PROSPECTIVE JUROR RIDDLE:**  No.

1          **THE COURT:**  Okay.  That's it.  Thank you.

2     Now, we go to Ms. Goldberg.  Can you see that?

3          **PROSPECTIVE JUROR GOLDBERG:**  Yes, thank you.

4          **THE COURT:**  Mr. Van Nest, would you rotate the thing

5     about 30 degrees so everyone over there can see it.

6     Thank you.

7          **MR. VAN NEST:**  Is that better?

8          **PROSPECTIVE JUROR GOLDBERG:**  Thank you.

9     My name is Claudette Goldberg.  I live here in

10    San Francisco.

11    I have a master's in environmental management.

12    I'm currently employed at Climate Works Foundation as a

13    coordinator in funder collaborations.

14    No organization/affiliation at the moment.

15    Hobbies, I swim when I get a chance.

16    I'm married.  My husband is retired and does different

17    things.  Most relevant to this case is he represents

18    technologists.  And he had a patent awarded a couple of months

19    ago.  And he'll be taking it to market in a few more months.

20    And these are several potential buyers in this room.

21         **THE COURT:**  I didn't understand that part.  Is your

22    husband a lawyer?

23         **PROSPECTIVE JUROR GOLDBERG:**  He is not a lawyer, but

24    he -- we have a lawyer.  He is a patent holder.  And he will be

25    selling the patent, the rights to use the patent.

```
 1              THE COURT:  Are you saying he will be approaching one
 2   of these companies --
 3              PROSPECTIVE JUROR GOLDBERG:  Yes.
 4              THE COURT:  -- to buy his patent?
 5              PROSPECTIVE JUROR GOLDBERG:  Correct.
 6              THE COURT:  While this trial is going on?
 7              PROSPECTIVE JUROR GOLDBERG:  Quite possible.  As soon
 8   as possible would be great.  It is possible there would be
 9   overlap.
10       I think relating to question 9D, I would like all those
11   six people to really like me.  So this is a little concerning
12   for me to be here.
13              THE COURT:  Well, I don't know.  I guess this is going
14   to sabotage that patent thing.
15              PROSPECTIVE JUROR GOLDBERG:  I hope -- let's see.
16              THE COURT:  Okay.  Keep going.
17              PROSPECTIVE JUROR GOLDBERG:  Prior jury service, none.
18   Never got past this point.
19       No military or law enforcement experience.
20       And no party or witness in court.
21              THE COURT:  All right.  Thank you.
22       Ms. Settles.
23              PROSPECTIVE JUROR SETTLES:  Thank you.  My name is
24   Jeannie Settles.  I live in San Carlos, on the peninsula.
25       I have some college.
```

1        I work for San Mateo County as a telephone operator.

2        I am involved in the union.

3        My hobbies, hiking, cooking.

4        I am married.  My husband has his own business, appliance

5    repair.

6        We have four children.  Do you want their occupations?

7            **THE COURT:**  Occupations.

8            **PROSPECTIVE JUROR SETTLES:**  Electrician.  My second

9    works at the glass store in Marin County.  My daughter is at

10   some college in Squaw Valley.  And my son is at San Francisco

11   State.

12           **THE COURT:**  Okay.

13           **PROSPECTIVE JUROR SETTLES:**  No jury duty.

14       My husband did serve in the military six years, with the

15   U.S. Navy.

16       And I've never been a witness in court.

17           **THE COURT:**  Thank you.  Ms. Calonsag.

18           **PROSPECTIVE JUROR CALONSAG:**  Hi.  My name is Melanie

19   Calonsag.  I live in Daly City, California.

20       I have a bachelor's degree in finance.  I'm an accountant

21   for KaMMCO Mutual Insurance Company.

22       I'm not involved in any organizations.

23       My hobbies are traveling and photography.

24       I am married.  My spouse is -- he works in business

25   development for a high-tech startup.

1      I have no children.

2      No prior jury service.

3      Never been in the military.

4      And never a party or witness in court.

5          THE COURT:  So what's the name of the high-tech

6   startup?

7          PROSPECTIVE JUROR CALONSAG:  Sherline Systems

8   (phonetic) in San Jose.

9          THE COURT:  All right.  Thank you.

10     Go to Ms. Hines.

11         PROSPECTIVE JUROR HINES:  Hi.  I'm Melissa Hines.  I'm

12  from Clayton, California.

13     I have a marketing degree from St. Mary's College in

14  Moraga.

15     I currently work for PG&E as their product manager.  I'm

16  involved in a few of the employee resource groups at PG&E.

17     I like to travel and do Yoga.

18     Single.

19     No children.

20     No prior jury service.

21     I've never been in the military, law enforcement.

22     Nor have I been a party or witness in court.

23         THE COURT:  Thank you.

24     Mr. Mangels.

25         PROSPECTIVE JUROR MANGELS:  Dave Mangels.  Livermore.

 1        High School with some college classes.

 2        Retired 2005 from Oakland International Flight Service

 3   Station.

 4        No organizations.

 5        Gardening.

 6        Married.  Wife secretary.

 7        No children.

 8        Services, as far as jury is, DWI and a lawsuit about a

 9   malpractice with a doctor.

10        And, let's see.  Military four years.

11        And was a witness in the Sinatra plane crash accident.

12             **THE COURT:**  Say that again.

13             **PROSPECTIVE JUROR MANGELS:**  A witness for the Frank

14   Sinatra's mother's plane accident in Palm Springs back in the

15   '70s.

16             **THE COURT:**  You were an eyewitness to that?

17             **PROSPECTIVE JUROR MANGELS:**  I was a witness.

18             **THE COURT:**  Really?  Okay.

19        So you --

20             **PROSPECTIVE JUROR MANGELS:**  That's because the pilot

21   filed his flight plan through the FAA.  That's where the

22   witness thing came in.

23             **THE COURT:**  You said that you were on a jury before.

24   But did those juries -- don't tell me what the verdicts were,

25   but did you reach a verdict?

JURY VOIR DIRE

1        **PROSPECTIVE JUROR MANGELS:**  Oh, yeah.  Yes.  Yes.

2  Both the municipal and a superior.

3        **THE COURT:**  Okay.

4     Now, here's the deal:  We're going to take a break.  And I

5  need to remind you of that important -- really, I have to say,

6  direct order, no research about the case.  No talking with each

7  other about the case or with anyone else about the case.

8     You can talk about sports.  I don't even recommend

9  politics.

10     (Laughter)

11        **THE COURT:**  You don't even want to go there.  Just

12  stick with safe topics, weather, sports, traffic.  And we'll

13  take a 20-minute break.  And then we'll resume right at that

14  spot.

15     And, now, all of you in the back of the room, we will need

16  some of you yet, most likely.  So you've got to come back too.

17  And then we'll just pick it up from there.

18     You should take your purses and belongings with you just

19  in case.  But remember where you're seated so that we can get

20  you back in the same order.

21     And we can't start until you're all here.  So if one of

22  you is late, then we just have to sit here.  So please be on

23  time.

24     We'll take a 20-minute break.  Thank you.

25        **THE CLERK:**  All rise.

1          **THE COURT:**  You need to take your questionnaire with

2     you or leave it on the bench.

3          (Venire exits courtroom.)

4          **THE COURT:**  All right.  Everyone be seated.  '.

5     Is there anyone still in the courtroom who is a

6     prospective juror?  If so, raise your hand.  Everyone is gone.

7          First item of business, for the three of the venire who I

8     returned back to their seats, I'm going to hand down to you the

9     questionnaires so you can come look at them now and make sure I

10    did it right.

11         I want you to take a look and see if I did it right.  I

12    think I did.  They had answered that they had a strong view one

13    way or the other on the question number 9.

14         (Counsel review questionnaires.)

15         **THE COURT:**  And they had not circled anybody on the

16    reverse side.

17         **MR. BICKS:**  Looks right.

18         **MR. VAN NEST:**  I think so, Your Honor.

19         **THE COURT:**  Okay.  So hand those back to me.

20    Given how many we have in the courtroom and what our hit

21    ratio is, I feel that we could excuse these now.

22    You didn't want to -- because it's very unlikely we're

23    going to get to them.  They're going to be at the very end.

24    But I will continue with our protocol as we agreed on it.

25         **MR. VAN NEST:**  I would just as soon hold on for now,

 1  Your Honor.

 2          **THE COURT:**  All right.  We'll hold on to them.

 3      Okay.  Then I feel that Ms. Goldberg is going to have her

 4  husband go to one of you two companies and try to sell her

 5  patent.

 6      (Laughter)

 7          **THE COURT:**  And I feel that that's a problem.  And I

 8  don't want that even in the mix.  It could just be a gimmick to

 9  get out of jury service.  I don't know.  But I think we should

10  excuse her.  I want to get your views.

11          **MR. VAN NEST:**  I agree, Your Honor.

12          **MR. BICKS:**  Your Honor, I think we might benefit from

13  hearing a little bit more about it.  Not a copyright and --

14          **THE COURT:**  Look.  You just want somebody who likes

15  IP.  That's it.  That's all you want.  And you're going to

16  waste our time while Mr. Van Nest shows that she's biased.

17      I'm going to leave her on for now, but I can see right

18  through what you're doing.

19          **MR. BICKS:**  I couldn't tell the -- how real --

20          **THE COURT:**  She says her husband wants to sell patents

21  to your company, and she wants Mr. Ellison to love her.

22      (Laughter)

23          **THE COURT:**  Right?

24          **MR. BICKS:**  She said --

25          **MR. VAN NEST:**  Your Honor, she did say, even

1   unsolicited, there are a couple of buyers in the room.   I mean,

2   it was --

3            THE COURT:   Couple of what?

4            MR. VAN NEST:   Buyers, potential buyers.

5            THE COURT:   That's what she said?

6            MR. VAN NEST:   That's what --

7            MR. BICKS:   Your Honor, I didn't hear the "buyers in

8   the room" comment.   But that makes sense to let her go.

9            THE COURT:   Didn't she say that?

10       Did anyone else over there -- she said that the two

11   companies that are represented here were potential buyers of

12   her husband's patent; right?

13            MR. VAN NEST:   Yes.

14            MR. BICKS:   Yeah.

15            THE COURT:   Do you agree that I can excuse her?

16            MR. BICKS:   Yes.

17            THE COURT:   All right.   She's gone.

18       Okay.   How about Ms. McGrath?   Ms. McGrath is a different

19   situation.

20       She's the nurse who wants to attend her -- the only issue

21   there is whether or not -- we may have to give up two hours of

22   testimony that day in order to keep her.

23       I'm willing to do that because she seems like a good

24   person.   But if you both stipulated, I would excuse her.   But I

25   feel like ordinarily I couldn't do that.   I think we can

 1    accommodate that one conflict.

 2            MR. BICKS:  I agree.

 3            MR. VAN NEST:  Also, Your Honor.

 4            THE COURT:  All right.  So we will excuse her; agreed?

 5            MR. VAN NEST:  Yes, sir.

 6            THE COURT:  All right.  So those two.  Is there anyone

 7    else you want to discuss?

 8            MR. BICKS:  I was going to raise Ms. Riddle, Your

 9    Honor.

10            THE COURT:  All right.

11            MR. BICKS:  On her questionnaire she was the one who,

12    I think, stood up and made comments she was very fond of

13    Google.  And then I see on the questionnaire I think it says

14    "Adorable" about Google.  "Favorable."  And then it says, "Yes,

15    I have a strong opinion."  And then it was crossed out.

16            THE COURT:  Well, under our protocol I have to go the

17    way I did.

18        But what do you say over there?  What she wrote -- she

19    wrote down "Favorable" about Google, but then she scratched

20    that out.  At first she said, "Yes, I have a strong opinion

21    about Google."  She scratched that out and said, "No, I have no

22    strong opinion."

23            MR. BICKS:  And next, Your Honor, she said she likes

24    Google's products.

25            THE COURT:  Yeah.

1              **MR. VAN NEST:**  Your Honor, she also said, maybe more

2    important than this, she can't see well.  She couldn't even see

3    this board.  So I'm fine letting her go.

4              **THE COURT:**  You're fine letting her go.  Is that what

5    you both want to do?

6              **MR. BICKS:**  Sure.

7              **MR. VAN NEST:**  Yes.

8              **THE COURT:**  Let me hear it.

9              **MR. BICKS:**  Yes.

10             **THE COURT:**  So Ms. Riddle is gone.

11         Anybody else you want to talk about?

12             **MR. BICKS:**  Not here, Your Honor.

13             **THE COURT:**  All right.  So what I'm going to do now is

14   replace them in the order of -- I'll just excuse all three and

15   then replace them in their seated order.

16         McGrath, Riddle, Goldberg.  Agreed?

17             **MR. VAN NEST:**  Agreed.  By their seat order, you mean

18   1, 2, 3?

19             **THE COURT:**  McGrath would be first.  She has the

20   lowest seat.  Riddle next. Then Goldberg next.

21             **MR. VAN NEST:**  That's fine.

22             **THE COURT:**  Does Oracle agree on that?

23             **MR. BICKS:**  On Ms. McGrath, I said I was fine with her

24   staying, as Your Honor indicated.

25             **THE COURT:**  I misunderstood.  Are you fine with me

1  excusing her?

2          **MR. BICKS:**  I thought we're fine with her staying.

3          **THE COURT:**  Are you fine with excusing her?

4      I mean, in other words, I proposed to excuse her because I

5  think we might need that two hours of time.  Now, if you say

6  no, you object --

7          **MR. BICKS:**  I don't object.

8          **THE COURT:**  What?

9          **MR. BICKS:**  I do not object.  If you wanted to keep

10  her, I said I was fine with that.

11          **THE COURT:**  I would prefer to -- I think it's a close

12  call.  It's a close call.  I think, though, that we're better

13  off getting somebody who going in we know we don't have to --

14  we don't have to cut two hours out of what might be a tight

15  schedule.

16      But I'm thinking about it.  That's the way I would like to

17  go, is to excuse her.

18          **MR. VAN NEST:**  No objection.

19          **MR. BICKS:**  That's fine, Your Honor.

20          **THE COURT:**  All right.  We're going to excuse all

21  three.  I'm going to replace them in the orders of McGrath,

22  Riddle, Goldberg, which is their seat order.

23      Any other people you want to bring up and discuss?

24          **MR. VAN NEST:**  Not here, Your Honor.

25          **THE COURT:**  Okay.  Well I'm not quite to the point

 1   where I'm going to have -- you're going to get your question,

 2   but in the next -- you will get to ask some questions.

 3        You get to go first; right?

 4             **MR. BICKS:**  Yes.

 5             **THE COURT:**  Okay.  So, all right.

 6        On the two that we excused because they circled a name on

 7   the back, one was the woman who does Larry Ellison's

 8   accounting.

 9        (Laughter)

10             **THE COURT:**  And the other was the guy who knows

11   Hiroshi Lockheimer.  So those two, if you want to see them,

12   I'll leave them up here.  And Dawn can show them to you.

13        Okay.  We're going to take about an 11- or 12-minute break

14   ourselves and then resume.

15             **MR. BICKS:**  Thank you.

16        (Recess taken from 10:06 to 11:17 a.m.)

17             **THE COURT:**  Be seated, please.  No need to get up.

18   Thank you.

19        All right.  We -- Ms. McGrath, we don't want you to miss

20   out on your graduation.  We could end early, but then that

21   presents a problem for us.  We're going to excuse you unless

22   you want to -- no.  Just go ahead.

23        (Laughter)

24             **THE COURT:**  It's important for you to take off.  Tell

25   the jury assembly room what happened.

1              **PROSPECTIVE JUROR MCGRATH:**  Thank you.

2              **THE COURT:**  Okay.  Ms. Riddle, you get to be excused,

3    too, because you're having trouble reading the poster board.

4    And you have to read a lot of stuff in this case.  You're

5    excused as well.

6         Ms. Goldberg, you're excused on account of you're trying

7    to sell products to both sides here.

8         (Laughter)

9              **PROSPECTIVE JUROR GOLDBERG:**  Thank you.

10             **THE COURT:**  Now, the clerk will call the name and

11   replace Mrs. McGrath.

12             **THE CLERK:**  Sean McKnew, M-c-K-n-e-w.

13             **THE COURT:**  Please take the front-row seat.

14             **THE CLERK:**  We need his questionnaire first, Your

15   Honor.

16             **THE COURT:**  That's right.  I'm sorry.  Come up here.

17   Let me see your questionnaire.

18        Mr. McKnew, you get to go sit back in your seat.

19             **PROSPECTIVE JUROR MCKNEW:**  Okay.

20             **THE COURT:**  I'll explain later.

21        All right.  Now we go to?

22             **THE CLERK:**  Anthony west, W-e-s-t.

23        All right.  Thanks.

24             **THE COURT:**  Mr. West, you get to go sit in that

25   first-row seat.

1       And the next name, please.

2             THE CLERK:  Yvonne Brown, B-r-o-w-n.

3             THE COURT:  Yvonne Brown.  Please let me see your

4    questionnaire.

5       Ms. Brown, welcome.  You get to take the number 3 seat in

6    the back row.

7       It's going to be a little tough for you to manage it, but

8    Angie will show you the best way in.

9       Next name, please.

10            THE CLERK:  Luis Torres, T-o-r-r-e-s.

11            THE COURT:  Mr. Torres, you get to go sit in your

12   original seat.  Thank you.

13            THE CLERK:  Jonathan Bruesewitz, I guess.  Bruesewitz.

14            THE COURT:  Bruesewitz.

15            PROSPECTIVE JUROR BRUESEWITZ:  There it is.

16       (Laughter)

17            THE CLERK:  Thank you.

18            THE COURT:  All right.  You get to take the empty

19   seat, please.

20       Angie, would you mind doing these three.  Thank you.

21       So I'll just ask the three of you who just joined us,

22   Ms. Brown, Mr. Bruesewitz, Mr. West, do you have any hardship

23   issue you wish to raise?

24            PROSPECTIVE JUROR WEST:  No, sir.

25            THE COURT:  Ms. Brown?

 1          **PROSPECTIVE JUROR BROWN:**  No.

 2          **PROSPECTIVE JUROR PROSPECTIVE JUROR BRUESEWITZ:**  No.

 3          **THE COURT:**  All right.  So no hardship.  This is the

 4    time to do it.  If you get selected, you can't later say, "I

 5    have a hardship issue."

 6          I have that happen every now and then.  Somebody gets

 7    selected for the jury, and then suddenly they're being sworn

 8    in.  In the opening statements they say, Wait, wait, wait.  I

 9    should have told you this.  And then I say, You're in for the

10    duration.  You have been drafted into the U.S. Army.

11          (Laughter)

12          **THE COURT:**  You are in for the duration.  You can't

13    get out of it later.  So this is the time to say something.

14          Okay.  Nobody said anything.

15          Okay.  Mr. West, can you seat the chart?

16          **PROSPECTIVE JUROR WEST:**  My name is Anthony West.

17          **THE COURT:**  Wait.  We have to give you the microphone.

18    Who has the microphone?  It's right there.

19          **PROSPECTIVE JUROR WEST:**  My name is Anthony West.  I'm

20    from Concord.

21          Education is high school only.

22          I'm in plumbing.  I work for Absolute Plumbing.

23          No clubs.

24          Hobbies are action sports and video games.

25          **THE COURT:**  Talk more into the mic.

1          **PROSPECTIVE JUROR WEST:**  Marital status is single.

2      No children.

3      No prior jury service.

4      Never been in the military.

5      And I've never been a witness.

6          **THE COURT:**  Okay.  All right.  Please pass the mic to

7  Ms. Brown.

8          **PROSPECTIVE JUROR BROWN:**  My name is Yvonne Brown.  My

9  education is back home in the Philippines, high school

10  graduate.  I took college, but I didn't finish.  And three

11  years college.  That's all.

12          **THE COURT:**  Was that in the Philippines or here?

13          **PROSPECTIVE JUROR BROWN:**  In the Philippines.

14          **THE COURT:**  Okay.

15          **PROSPECTIVE JUROR BROWN:**  I'm not -- I am not

16  experience in -- I am not a member of any organization.

17      And my work is a caregiver right now.  And I took up CNA

18  back in Texas.

19      And I don't have much hobbies because I work most of the

20  time.

21      And I'm married.

22      I have no experience in military or jury -- any jury or

23  any -- or any court witnesses whatsoever.

24          **THE COURT:**  So you've got to be here at 7:45 each

25  morning all the way through June 10th.  Do you understand that

1  part?

2          PROSPECTIVE JUROR BROWN:  Yes, sir.

3          THE COURT:  Can you make that time?

4          PROSPECTIVE JUROR BROWN:  I will try, sir.

5          THE COURT:  Well, you have to be here.  And then --

6  and go all the way through 1:00 o'clock each day.  Do you

7  understand that part?

8          PROSPECTIVE JUROR BROWN:  Yes.

9          THE COURT:  Will that be a hardship on you?

10          PROSPECTIVE JUROR BROWN:  No.

11          THE COURT:  No?  Okay.  Thank you.

12          PROSPECTIVE JUROR BROWN:  Especially going home it's

13  not a hardship.

14      (Laughter)

15          THE COURT:  All right.  Mr. Bruesewitz.

16          PROSPECTIVE JUROR BRUESEWITZ:  My name is Jonathan

17  Bruesewitz.  I live in Pleasant Hill, California.

18      I have a bachelor of science in international management,

19  with a minor in economics.

20      My current job is financial analyst with NRT Inc.  They

21  are a commercial real estate company.

22      No clubs or anything like that.

23      Hobbies, golf when I have time.

24      Marital status, newlywed.  Spouse, she works for GAP Inc.

25  as a merchandiser.

1        No children.

2        No prior jury service.

3        Did not serve in the military, law enforcement.

4        And have not been a party or witness in court.

5             **THE COURT:**  Okay.  Thank you.

6        Just hold on to the mic for a minute.

7        Now, all of you 16, just to kind of summarize a little

8   bit, if you have been on a prior jury, please raise your hand.

9         (Show of hands.)

10            **THE COURT:**  One, two, three of you.

11       If you were the foreperson on the jury, raise your hand.

12       So nobody has been the foreperson before.  All right.

13       I want to tell you, we're -- we're not even halfway done

14  yet so we -- just relax and listen to the questions, and answer

15  the questions properly.

16       I want to go over what the jury does, what the important

17  role of the jury is, because, believe it or not, I found in

18  this job -- I used to be a lawyer -- I knew what a jury did,

19  but I find that many people don't because a lot of you haven't

20  served on a jury before.  So I'm going to tell you what

21  happens.

22       We need ten of you in the end.  Ten will be the magic

23  number.  And the ten members of the jury are in the jury box.

24  And they are the decision-maker.  They decide who wins and who

25  loses.

1      So they have to consider two things in making their

2  decision.  One is the -- one side or the other on every issue

3  will have what's called the burden of proof.

4      So just to take an example on the question of fair use,

5  fair use under the copyright law -- and you'll learn a lot more

6  about this later -- the burden of proof is on Google.

7      So at the end of the case I will explain to you what it is

8  that Google has to prove in order to carry its burden of proof.

9  And that will involve four factors that Congress has said are

10  the factors to consider.  And then you, in your own mind, weigh

11  the factors.  But Google is the one who has to carry the burden

12  of proof on that issue.  There are other issues in the case

13  where Oracle will have the burden of proof.

14      Anyway, at the end of all the evidence and at the end of

15  all that segment, you, the jury, ask, Has the party with the

16  burden of proof carried its burden of proof on this issue?

17      If the answer is yes, and you agree unanimously -- it has

18  to be unanimous.  That means all of you agree, all ten.  If you

19  all agree that the party with the burden of proof has proven

20  what it needs to, to carry its burden of proof, then that party

21  wins.  Your verdict should be for that party.

22      On the other hand, if they fall short even a little bit

23  and they don't quite persuade you that you've carried their

24  burden of proof, even though they have some good points, maybe,

25  then the party with the burden of proof loses.  And it's your

 1    duty to say they lose on that issue.

 2        Now, that's what the jury does.  It's like a laboratory

 3    experiment.  The laboratory is this room.  And the data and the

 4    evidence that comes in all comes in through witnesses on the

 5    witness stand and documents that you will see.  And that's the

 6    evidence in the case.

 7        And so what you do is you lay that evidence alongside what

 8    the elements of proof are that have to be proven, and ask the

 9    question, Has the party with the burden of proof done what they

10    have to do to carry their burden of proof?

11        And if you say yes, they persuaded me, great.  If you say

12    no, they didn't persuade me, that's great too.  But that's what

13    you do.

14        And you must lay the facts, as you find them, alongside

15    the areas of proof that are required under the law, and you

16    decide whether or not the party with the burden of proof

17    measured up or not, okay.

18        I've said that, now, three or four times.  But I'm telling

19    you that a lot of people don't know what a jury does.  Some

20    people think, well, the judge is going to give us some kind of

21    secret handshake or signal or come into the jury room and tell

22    us how to come out.  No.  We never do that.

23        In fact, I will shall -- I don't have a view on who should

24    prevail.  But even if I did have a view, then I would never

25    tell you.  It's a decision for you to make, not for me to make.

 1   And I would never try to signal to you how you should decide

 2   the case.

 3       So with that explanation, you can see it's very -- it's so

 4   important that you pay close attention and you listen to the

 5   evidence.  And you try your best to understand it.

 6       It's going to be technical -- a lot of technical evidence

 7   too.  And you've got to try hard to understand it and then go

 8   into the jury room and see if you -- whether the party with the

 9   burden of proof has persuaded you on whatever issue it is.

10           **THE COURT:**  So now the part that is my responsibility

11   is to tell you what the elements of proof are that have to be

12   proven.  That's called the instructions of law.  I will tell

13   you what it is; that on every single issue in the case, I will

14   tell you A, B, C and D have to be proven or whatever the test

15   is.  I will explain to you what the test is and then you have

16   to be the one to apply it, but you do have to follow my test

17   because I'm telling you, for example, what Congress has told us

18   that we have to do under the Copyright Act and then I convey to

19   you what that is.

20       These lawyers went to school for three years at least in

21   law school.  You get to go to law school for 45 minutes, and I

22   will explain to you what the law is in about 45 minutes, but

23   it's tailor-made to this case, so it's really very efficient so

24   you learn as much law as you need to decide the case.

25       But the fact part of the case, the facts of the case,

1    you're going -- this is going to be amazing to you.  There are

2    going to be some things these lawyers agree on and some things

3    they -- one side will say the light was red and the other will

4    say the light was green.  It's going to be completely the

5    opposite.  So you will need to decide maybe who is telling the

6    truth.  Or what witnesses are mistaken because on some things,

7    they both can't be right, so you're going to need to make those

8    kind of credibility determinations for yourself.  I don't tell

9    you this.

10        Now, here's another thing that you need to know.  I will

11   repeat this several times.  As the trial goes on, you're not

12   going to hear much from me.  You have heard a lot from me right

13   now, but as the trial goes on, you won't hear much from me.

14   You will hear tons from these lawyers.

15        Not one word a lawyer ever says in court is evidence.  I'm

16   going to repeat that because most of you don't know that.

17   These opening statements and closing arguments and even the

18   questions that they ask, they are not evidence.  The evidence

19   is what the witness agrees to on the stand under oath and what

20   the documents say that come into evidence and the photos and so

21   forth.  Yes.  That's evidence.  But not one word that a lawyer

22   ever says in a courtroom is evidence.  Zero.  Z-E-R-O.  That

23   spells zero.

24        And that's the single biggest way that a jury can go wrong

25   is by thinking that they heard something out there in the

1    courtroom that the -- they will say somebody out there said the

2    light was red.  And then I hope somebody else on the jury says,

3    *That was just the lawyer talking*.  *No witness ever said that*.

4    *That was just the lawyer talking*.

5         You have to -- these are great lawyers.  They're excellent

6    lawyers.  But you're going to hear a lot from them, and you

7    must always remember nothing they say is evidence except in the

8    case of a stipulation.

9         Now, if they ask a question *isn't it true the light was*

10   *red* and the witness says *yes, that's true*, then of course

11   that's evidence.  But if the lawyer says *isn't it true the*

12   *light was red* and the witness says *I don't know*, is that

13   evidence?  No.  It's only evidence that the witness doesn't or

14   at least claims not to know.

15        All right.  So you over there in the jury box have to not

16   only distinguish between which witnesses are telling the truth,

17   you have to keep separate what the lawyers say versus what the

18   actual evidence is.  And then use their opening statements and

19   their closing arguments, because they are great lawyers and

20   they're going to make great openings and great closings and

21   they're very useful for you to hear those, but it's -- none of

22   that will be evidence.  Even if they play a snippet from some

23   deposition in their opening statement, it's not evidence yet.

24        All right.  So that's what the jury does.  And why I'm

25   going into this little speech is you should not be on the jury

1   if you can't carry out that function.  If you're biased toward

2   one side or the other, you shouldn't be on the jury because

3   you've got to be fair to both sides.

4        If you think that you would have trouble following the law

5   because you don't agree with the way the law is, you can't

6   serve because you've got to follow the law as it is, and if you

7   don't like the law, go to Congress.  Run for Congress.  But

8   don't sabotage what our Congress has done by not following the

9   law.  There are plenty of laws that I don't agree with, but I

10  faithfully follow them because I took an oath to do so, and

11  I -- so you've got to do the same thing when you take your

12  oath.

13       All right.  So that's my little speech about what the jury

14  does.  The jury decides the case.  I just cannot say that.

15  It's a very solemn and important responsibility.  It is a

16  burden, but it is a monumental important function, and this

17  case has gotten a lot of press.  It's gotten a lot of

18  publicity.  You get to read all about it after the case is

19  over, but not now.  And you will be the one to decide which one

20  of these two big companies is right and which one is wrong.

21  And so your decision will go down in the history books.  You've

22  got to do it carefully and without any bias at all.

23       All right.  So let me just ask, now that you've heard my

24  talk about -- raise your hand if you think there is something

25  about yourself that would cause you to be unable to do what I

 1  just described.  Raise your hand if you think you -- maybe you

 2  shouldn't be on this jury.

 3      Mr. Mangels, let's get the microphone down to you.

 4      **PROSPECTIVE JUROR MANGELS**: I don't know if I'm biased

 5  or not, but I just didn't like the way Oracle handled when they

 6  took over PeopleSoft and then fired everybody.

 7      **THE COURT:**  Well, maybe they had good reasons.  I

 8  don't know.  But you tell me, is that going to be -- you're

 9  good to raise it, you're right to raise it.  But you would have

10  to -- to be on this jury, you've got to realize that PeopleSoft

11  has zero to do with this case.  This case involves a different

12  company, Sun, who got acquired by Oracle, and one of the assets

13  was this Java that came with Sun and that's what we're here

14  for.  It has nothing to do with PeopleSoft.

15      So now if you're telling me you don't like the way that

16  happened and you would hold it against Oracle, okay, maybe you

17  shouldn't serve on this case.  So you've got to tell us, what

18  are you trying to tell us?

19      **PROSPECTIVE JUROR MANGELS**:  That's the part I -- I've

20  got to hear things, but it's just the way -- maybe it's the way

21  it was put in through the press the way that some -- PeopleSoft

22  had something.  Oracle acquired PeopleSoft and then immediately

23  just shut down the entire operation in Pleasanton and just laid

24  off all the people.

25      **THE COURT:**  Okay.  Well, maybe they did that, but are

1   you able to put that out of your mind?  Is that going to -- you

2   have to be able to tell me, to be on this jury, *Judge, I'll*

3   *forget about PeopleSoft.  I know that has nothing to do with*

4   *this case.  I'll decide this case fair and square.*  That's Door

5   No. 1.

6       Door No. 2 is, *Judge, I think that's going to influence me*

7   *and I just wouldn't be able to get it out of my mind and I*

8   *would be a little biased in this case.*

9       **PROSPECTIVE JUROR MANGELS:** I think I'm a little biased

10  on that --

11      **THE COURT:**  I'm going to excuse Mr. Mangels unless I

12  hear an objection.

13      **MR. VAN NEST:**  No objection, Your Honor.

14      **MR. BICKS:**  No objection.

15      **THE COURT:**  You are excused, Mr. Mangels.  You get to

16  go back to the jury assembly room.  Thank you for your candor.

17  There is nothing wrong with telling us you had that problem.

18  Okay?  Good luck to you, sir.

19      Who is going to replace Mr. Mangels?

20      **THE CLERK:**  Okay.  It's Meenakshi Subbaraman,

21  S-U-B-B-A-R-A-M-A-N.

22      **THE COURT:**  Subbaraman.

23      **PROSPECTIVE JUROR SUBBARAMAN:** Subbaraman.

24      **THE COURT:**  How are you today?

25      **PROSPECTIVE JUROR SUBBARAMAN:** I'm very good.  Thank

 1    you.

 2          **THE COURT:**  Just one moment.  Let me look at your

 3    thing.  You get to go take Mr. Mangels' seat.

 4       Ms. Subbaraman, do you have any hardship issue?

 5          **PROSPECTIVE JUROR SUBBARAMAN:** I don't.  But I do have

 6    a ticket to leave for Europe on June 9th.

 7          **THE COURT:**  Okay.  That's a Thursday; right?

 8          **PROSPECTIVE JUROR SUBBARAMAN:**  That is a Thursday.

 9    And the flight is at 9:00 a.m.

10          **THE COURT:**  I'm going to excuse Ms. Subbaraman.  I

11    think we might go that late.  All right.  Any objection?

12          **MR. BICKS:**  No, Your Honor.

13          **MR. VAN NEST:**  No objection, Your Honor.

14          **THE COURT:**  All right.  I hope you have a great

15    vacation.

16          **PROSPECTIVE JUROR SUBBARAMAN:**  Thank you.

17          **THE COURT:**  Okay.  Who's next?

18          **THE CLERK:**  All right.  Juliusnikko Tamayo Tiongco,

19    t-I-O-N-G-C-O.

20          **THE COURT:**  You may have that seat up there.  It says

21    here you're in college right now?

22          **PROSPECTIVE JUROR TIONGCO:** Yes.

23          **THE COURT:**  Are you missing classes today?

24          **PROSPECTIVE JUROR TIONGCO:**  No.  But I'm currently

25    enrolled in summer.

 1          THE COURT:  When do your classes start?

 2          PROSPECTIVE JUROR TIONGCO:  I think it's June 13.

 3          THE COURT:  All right.  So between now and June 10th,

 4  do you have any classes?

 5          PROSPECTIVE JUROR TIONGCO:  No.

 6          THE COURT:  All right.  Do you have any hardship issue

 7  you wish to raise?

 8          PROSPECTIVE JUROR TIONGCO:  No.

 9          THE COURT:  Can you see the chart?

10          PROSPECTIVE JUROR TIONGCO:  Yeah.

11          THE COURT:  All right.  Please give us the

12  biographical information.

13          PROSPECTIVE JUROR TIONGCO:  My name is Juliusnikko

14  Tiongco.  I'm from South San Francisco, California.  And I'm in

15  college.  I am unemployed.  I'm not a part of any organization

16  or any type of stuff like that.

17      My hobbies are running and video games.  I'm single.  I

18  have no partner.  No children.  No prior jury service.  I have

19  never been in the military or been a witness.

20          THE COURT:  What are you studying?

21          PROSPECTIVE JUROR TIONGCO:  Right now I'm just taking

22  my prerequisite classes and I'm still deciding on what to major

23  in.

24          THE COURT:  Okay.  Did you hear my talk about what a

25  jury does?

1    **PROSPECTIVE JUROR TIONGCO:**  Yes.

2        **THE COURT:**  All right.  Would you have any trouble

3    with being a fair and impartial juror in this case?

4        **PROSPECTIVE JUROR TIONGCO:**  No.

5        **THE COURT:**  Okay.

6      I'm going to have some random questions here for you.

7    Raise your hand if you have any kind of license other than a

8    driver's license.  Like if you had a license to be a plumber,

9    for example, or any other kind of state-issued license, I want

10   you to raise your hand.  Okay.  We've got several.  Okay.  Pass

11   the microphone over to Mr. Bruesewitz.

12       **PROSPECTIVE JUROR BRUESEWITZ:**  The only license I have

13   is a license for firearms.

14       **THE COURT:**  Okay.  And down here on the front row.

15       **PROSPECTIVE JUROR:**  I'm licensed by the state as a home

16   improvement salesperson.

17       **THE COURT:**  Okay.  Next over here?  And say your name,

18   please.

19       **PROSPECTIVE JUROR JACOBS:**  Marion Jacobs.  I have a

20   nursing license.

21       **THE COURT:**  All right.  Then over here.  Name, please.

22       **PROSPECTIVE JUROR KOTLAR:**  You said license.  I don't

23   think this is licensed by the state, but about five years --

24   no.  Say seven years ago, I was licensed by a gospel ministry

25   through a church, Foothill Baptist Church.

1       **THE COURT:**  Very good.  Thank you.

2     Okay.  Just so you know what I'm doing, the lawyers and I

3   have talked in advance about some topics I should raise with

4   you.  And so out of caution, I'm going to ask you some

5   questions that -- just to see if any of this strikes a bell.

6   If it does, raise your hand.

7     Okay.  Oracle is a sponsor of the America's Cup races.  Is

8   there anything about that that might affect your ability to be

9   fair to one side or the other in this case?  If so, raise your

10  hand.  Some of you may not have even known that, but I suspect

11  there are others of you who do know that.  So if you do,

12  regardless, would that affect your ability to be fair and

13  impartial?  If you think it might, raise your hand.

14    Okay.  No one is raising their hand.

15    Question about Google.  How many of you have a smartphone?

16  Raise your hand if you've got a smartphone.  Let's see.  Okay.

17  It looks like every single one of you.  Isn't that interesting.

18  Okay.  Put your hand down.

19    Raise your hand if you've got an Android smartphone.  So

20  about half of you.  Keep your hands up because the lawyers are

21  probably going to want to know.  How many of you have an Apple

22  phone?  Okay.  There you go.  If any of you have any other kind

23  of smartphone, raise your hand, like BlackBerry.

24       **PROSPECTIVE JUROR**:  I must have Android.

25       **THE COURT:**  You have Android.  What kind do you have?

1          **PROSPECTIVE JUROR**:  I'm confused between Android and

2     my phone.   I don't know maybe is Android or what is the other

3     one?

4          **THE COURT**:  Apple.

5          **PROSPECTIVE JUROR**:  No.  It has Android in my phone.

6          **THE COURT**:  Do you have a Samsung phone?

7          **PROSPECTIVE JUROR**:  Yes.  Samsung.

8          **THE COURT**:  Okay.  All right.  Now, those of you

9     who -- regardless of whether you raised your hand to which one

10    of those questions, the -- maybe you're biased one way or the

11    other in favor or against Android, I don't know.  I don't know.

12    Maybe you'd be biased for or against Google on account of its

13    position in the marketplace.  And if so, if you think in any

14    way that your familiarity with the phone or a competitor's

15    phone would affect your judgment in this case, you need to

16    raise your hand so we can talk about it.

17         So just to -- who down here had raised -- who is it -- are

18    you an Android person?

19         **PROSPECTIVE JUROR STROMSNESS:** I have both with me so

20    far.

21         **THE COURT:**  You have both of them.  The record will

22    show you pointed with one finger to your left pocket and one

23    finger to your right pocket.

24         **PROSPECTIVE JUROR STROMSNESS**: yes.

25         **THE COURT:**  You've got all bases covered.

1          **PROSPECTIVE JUROR STROMSNESS:**  One is personal and one

2     is work.

3          **THE COURT:**  All right.  So here's the question I've

4     got for you.  And you're Mr. Stromsness.

5          There is going to be -- thank you, Angie.  You are going

6     to hear all about Android in this case.  But the evidence that

7     you're going to have to base the -- it's like the laboratory

8     again.  Your personal phone is not evidence.  And what you know

9     from personal experience is not evidence.  It's going to be the

10    evidence here in the courtroom that matters.

11         Are you able to decide this case based on the evidence in

12    the case, or do you think you're going to be influenced one way

13    or the other by what you know about the systems?

14         **PROSPECTIVE JUROR STROMSNESS:**  I believe I would be

15    able to decide it based on the evidence in the case.

16         **THE COURT:**  All right.  Do any of the rest of you feel

17    that you would have a problem separating all that out?  Okay.

18    No one is raising their hand.  Let's move on.

19         How about a company that you're going to hear a large

20    amount in this case about that is called Sun Microsystems that

21    used to be a very prominent company in the Bay Area, but it was

22    acquired by Oracle and is now known as Oracle America so it

23    still exists but has a different name.

24         Back in the era of when it was called Sun, we are going to

25    have a lot of witnesses' testimony about that era.  Do any of

1    you have some connection with Sun or some great fond memories

2    of Sun that might influence you in this case?  If so, raise

3    your hand.  Okay.

4        Ms. Rocha.

5            **PROSPECTIVE JUROR ROCHA:**  I used to work for a work

6    training facility, and Sun Microsystems was one of the

7    companies that were training the people that I served.

8            **THE COURT:**  Did you personally go out to Sun's

9    premises?

10           **PROSPECTIVE JUROR ROCHA:**  They were -- Sun had an

11   office inside the building where I worked.  It was a training

12   program.

13           **THE COURT:**  And did you personally interact at Sun?

14           **PROSPECTIVE JUROR ROCHA:**  No.

15           **THE COURT:**  Do you think the -- that connection will

16   influence you pro or con in this case?

17           **PROSPECTIVE JUROR ROCHA:**  No.

18           **THE COURT:**  All right.  That's fine.

19       Anyone else?  Okay.  Oh, wait.  Wait.  Mr. Stromsness.

20           **PROSPECTIVE JUROR STROMSNESS:**  I've used a lot of

21   different companies' hardware in the past, including Sun's, but

22   you asked about going to their headquarters.  I have been

23   invited to executive briefing centers for most of the tech

24   companies.  I have been to most of them.  I was at Sun's

25   headquarters once for half a day for a briefing.

1          THE COURT:  Is there anything about their hardware or

2     that experience with Sun that would influence you one way or

3     the other in this case?

4          PROSPECTIVE JUROR STROMSNESS:  I don't believe so.

5          THE COURT:  Anyone else?  Down there.  Mr. Haley.

6          PROSPECTIVE JUROR HALEY:  Just for full disclosure,

7     one of our old buildings was at one point Sun Microsystems'

8     headquarters.  We had sold to them.  And obviously in that

9     function, we did buy a lot of their hardware back in the day.

10         THE COURT:  Did you find any secret documents behind

11    the radiator?

12         PROSPECTIVE JUROR HALEY:  No.  Didn't find them.

13         THE COURT:  You said you bought some of their

14    equipment; right?

15         PROSPECTIVE JUROR HALEY:  Sure.

16         THE COURT:  So did you have any particularly good or

17    particularly bad experience with the equipment?

18         PROSPECTIVE JUROR HALEY:  No.

19         THE COURT:  Is there any way that equipment is going

20    to influence you in this case?

21         PROSPECTIVE JUROR HALEY:  No.

22         THE COURT:  All right.  Thank you.

23      Anyone else?  Okay.  Good.

24      So we know a couple of you already.  But raise your hand

25    if you believe you're good with computers.  One, two, three --

 1    keep them up high.  One, two, three, four, five.  Okay.  I may

 2    let the lawyers just follow up themselves.  All right.  Put

 3    your hands down.

 4         Raise your hands if you subscribe to any computer

 5    magazines.  Zero.  Okay.

 6         How about if you subscribe to some computer magazine

 7    online, raise your hand.  No one does that.  Okay.

 8         How many of you can program in any language whatsoever,

 9    even in the simplest languages?  How many of you can program in

10    software, write code?  One -- one person.  Okay.

11         And how many of you have ever heard of application program

12    interface?  One, two.  Okay.  All right.

13              **PROSPECTIVE JUROR**:  Excuse me, Your Honor.

14              **THE COURT**:  Three.

15              **PROSPECTIVE JUROR**:  Just the term --

16              **THE COURT**:  Have you ever heard that term, application

17    program interface?

18              **PROSPECTIVE JUROR**:  Maybe.  I don't know.

19              **THE COURT**:  You don't know.

20         Mr. Haley, you have heard of it?

21              **PROSPECTIVE JUROR HALEY**:  Yes, sir.

22              **THE COURT**:  Okay.  In what context did you hear about

23    it?

24              **PROSPECTIVE JUROR HALEY**:  Work-related.  You know,

25    back in the day, we used to do a lot of COTS program -- COTS

 1   software development programs where you have to have a lot of

 2   interfaces between the different software that you'd buy.

 3          THE COURT:  All right.

 4          PROSPECTIVE JUROR HALEY:  And then just general

 5   knowledge just from reading.

 6          THE COURT:  Okay.  Now, this case involves -- it's

 7   already an established fact in this case that Oracle America

 8   has a copyright on certain aspects that are at issue in this

 9   case on what we are going to refer to as an application

10   programming interface, and more particularly, declaring lines

11   of code.  So let me just stop there.

12      Have you ever heard the phrase *declaring line of code*?

13          PROSPECTIVE JUROR HALEY:  No.

14          THE COURT:  How about you, Mr. Stromsness?  Do you

15   know what a declaring line of code is?

16          PROSPECTIVE JUROR STROMSNESS:  Yes, I do.

17          THE COURT:  Okay.  Now, again, I have to ask you this

18   question, is there anything about that body of knowledge that

19   you already have which is going to cause you to be biased one

20   way or the other in this case?

21          PROSPECTIVE JUROR STROMSNESS:  I do not believe so.

22          THE COURT:  Okay.  How many of you have ever heard of

23   the term *open source software*?  *Open source software*?  One,

24   two, three.  Okay.

25      Mr. Stromsness, what have you heard about that term?

1     **PROSPECTIVE JUROR STROMSNESS**:  I've worked at U.C.

2  Berkeley and Lawrence Berkeley National Lab, and they are known

3  to some extent for the Berkeley system distribution and

4  Berkeley Internet name daemon for open source package of

5  software from the 80s that are very popular', so I know some of

6  the people who worked on the periphery of those projects over

7  the course of the years.

8     **THE COURT:**  All right.  Well, now, the open source

9  software is a -- tell me -- you, I'm sure, know more than I do

10  about this so I'm going to ask you, is this something that is

11  controversial within the programmer profession, the term *open*

12  *source*?

13     **PROSPECTIVE JUROR STROMSNESS**:  I don't think the term

14  is particularly controversial.

15     **THE COURT:**  But the concept?

16     **PROSPECTIVE JUROR STROMSNESS**:  I think it's pretty

17  well established now.  It was more controversial, I think, 20

18  years ago.  I think pretty much all the companies that have

19  paid software now also support open source software of one form

20  or another as well.

21     **THE COURT:**  So in this case, there is going to be

22  testimony and evidence about -- in the background about open

23  source software.  Can you decide the case based on what the

24  evidence here is in the courtroom, or are you going to be

25  filling in the blanks with what you know about it yourself?

1              **PROSPECTIVE JUROR STROMSNESS:**  I think I can base it

2      just on what's in the courtroom.

3              **THE COURT:**  All right.  Now, again, I need to say the

4      plaintiff here, which is Oracle, it is established and we can't

5      deviate from the fact that unless fair use is established in

6      this case, Oracle has the right to enforce its copyright and it

7      does not have any duty to do any open source whatsoever.

8      That's going to be the law.

9          So the issue is going to come down solely to whether or

10     not Google can carry the burden of proof to show fair use.

11     Maybe it can; maybe it can't.  I don't know.  That's for the

12     jury.

13         But you can't be substituting your judgment in saying

14     *well, I like open source so I'm going to go with open source*

15     and that's -- that's not -- we're past that.  Do you understand

16     that?

17             **PROSPECTIVE JUROR STROMSNESS:**  I do.

18             **THE COURT:**  But we're going to hear evidence about it

19     anyway because it relates to some of the other issues.  All

20     right?

21             **PROSPECTIVE JUROR STROMSNESS:**  Yes.

22             **THE COURT:**  Again, I ask you will you decide the case

23     fairly and impartially based on what happens here in the

24     courtroom?

25             **PROSPECTIVE JUROR STROMSNESS:**  Yes.

 1          THE COURT:  Okay.  Anybody ever heard of the term *open*

 2   *source software*?  Okay.

 3       Mr. Bruesewitz, your turn.  How did you hear about it?

 4          PROSPECTIVE JUROR BRUESEWITZ:  This was just during,

 5   you might say, academia.  A lot of lottery searchers at

 6   different universities were using open source software to

 7   actually transmit and give people options of looking at things.

 8          THE COURT:  Did you hear what I said to

 9   Mr. Stromsness, our No. 1 juror down here?  Did you hear our

10   conversation?

11          PROSPECTIVE JUROR BRUESEWITZ:  Yes.

12          THE COURT:  Are you able to put to one side what you

13   heard in your life on open source and base the case solely on

14   what you hear in the courtroom?

15          PROSPECTIVE JUROR BRUESEWITZ:  I am.

16          THE COURT:  Will you do that fairly and impartially?

17          PROSPECTIVE JUROR BRUESEWITZ:  Yes.

18          THE COURT:  Who else raised their hand?

19       Mr. Haley, same questions to you.

20          PROSPECTIVE JUROR HALEY:  Mostly just general

21   knowledge, and I don't think there would be an issue with

22   deciding on the evidence presented.

23          THE COURT:  All right.  Thank you.  Okay.

24       A different question.  How many of you have ever worked in

25   new product development?  New product development.  If so,

1    raise your hand.

2        Mr. Haley, you've been a busy man in your life.  Tell us

3    about your new product development.

4        **PROSPECTIVE JUROR HALEY**:  Well, as part of my

5    responsibilities in the corporation, one of the things we did

6    was managing the IRD budget and so one of my principal

7    functions was to assess where we should spend our dollars and

8    the expected outcome of those expenditures and how to measure

9    that.

10       So it was basically looking at, you know, the market

11   return, the competing products out there, and the whole life

12   cycle of the investment.

13       **THE COURT:**  All right.  Will that in any way influence

14   your ability to decide this case fairly and squarely?

15       **PROSPECTIVE JUROR HALEY**:  No.

16       **THE COURT:**  Okay.  Thank you.

17       Anyone else on new product development?

18       Yes, Ms. Hines?

19       **PROSPECTIVE JUROR HINES**:  So at Pacific Gas &

20   Electric, we are a utility, so our products are mainly

21   regarding options for customers, so I have worked on *customize*

22   *your payment schedule* and what we're calling the rate mailer.

23   So different avenues that we're outreaching to customers and,

24   you know, products that a utility could offer.

25       **THE COURT:**  All right.  Same question.  Can you put

1  that to one side and decide the case here solely on the

2  evidence here in the courtroom?

3          **PROSPECTIVE JUROR HINES:**  Yes.

4          **THE COURT:**  And do that impartially for both sides?

5          **PROSPECTIVE JUROR HINES:**  Yes.

6          **THE COURT:**  Okay.  Thank you.

7      Different question.  Have any of you ever been involved in

8  licensing of intellectual property, patents, copyrights,

9  trademarks, trade secrets, anything like that?  Licensing.  All

10  right.

11      Again, Mr. Haley.

12          **PROSPECTIVE JUROR HALEY:**  Same thing, part of my

13  responsibilities in my work career was to basically assess

14  the -- the licensing costs as part of the budgeting exercise

15  and whether or not it was worth our effort.

16          **THE COURT:**  Do you have any legal background?

17          **PROSPECTIVE JUROR HALEY:**  Only through business law as

18  part of my educational background and then of course some of my

19  responsibilities had a very tight interplay with the legal

20  organization.  I was responsible for contract negotiations, the

21  business terms and conditions, that sort of thing.

22          **THE COURT:**  Did you ever actually read one of these

23  license agreements?

24          **PROSPECTIVE JUROR HALEY:**  Not a license agreement so

25  much, but I have read a number of patents.

1            **THE COURT:**  Okay.  How about copyrights?  Ever have

2     any experience with copyrights?

3            **PROSPECTIVE JUROR HALEY:**  Not directly, no, sir.

4            **THE COURT:**  Okay.  There is no patents in this case,

5     so this is strictly a copyright case.

6            **PROSPECTIVE JUROR HALEY:**  Understood.

7            **THE COURT:**  All right.  Anyone else want to raise

8     their hand to that question about licensing?  Okay.  No one.

9         All right.  So let me ask a question I normally would not

10    ask, but because of the length of this trial, you know, I've

11    told you that you cannot, you must not, cannot do Google

12    research or any kind of research about this case, even though

13    you would be tempted to do that until you are at the end and

14    discharged and the case is over.  Then you can do all the

15    research you want.  And you can even hold a press conference,

16    whatever you want to do.  At that point, there is no

17    admonition, no restriction.  But until that point, you would

18    have to be true blue to what I told you.

19        Now, I've had some jurors who just can't do that.  They

20    just -- they get on their phone, they say, *The judge will never*

21    *know*.  *I'll just do this anyway*.  We find out one way or the

22    other.

23        If you think you just can't help it and you would violate

24    that direct order not to go do research about the case, I want

25    you to raise your hand now because we need to talk about it.

 1    Okay.

 2         Mr. Tiongco, let's hear what you have to say.

 3         **PROSPECTIVE JUROR TIONGCO:**  Well, I spend a lot of

 4    time on the Internet and I find this trial a little interesting

 5    so I might be tempted to search it up once I get home.

 6         **THE COURT:**  Yeah.  Okay.  Now, when you're there, what

 7    would you do?  Be sitting in a nice easy chair and TV going in

 8    the background and you look around, you see *the judge can't see*

 9    *me here*; right?  So you would be thinking *okay, I'm going to*

10    *put in some keywords about this case.*  That's what you're

11    saying you might do that; right?

12         **PROSPECTIVE JUROR TIONGCO:**  Yes.

13         **THE COURT:**  And would you even think about the fact

14    that I told you -- that I have given you a direct order not to

15    do that?

16         **PROSPECTIVE JUROR TIONGCO:**  Yes, I would, but it would

17    be really hard not to, like, search it up.

18         **THE COURT:**  So that's a problem.  You know, I'll just

19    tell you, there is propaganda out there on the Internet about

20    this case both ways.  And if you were to read one of the

21    propaganda for one side or the other side and be influenced by

22    that, it would be a travesty of justice because those people

23    are just propagandists, and they -- first of all, that's number

24    one.

25         Number two, half of them don't know what they're talking

1    about.   That's the other thing.

2        And number three and most important, it's outside the

3    evidence in the case.

4        So you're telling me, though, notwithstanding my little

5    lecture here, you're going to do it anyway?   Is there a 50/50

6    chance that you would do it?

7            **PROSPECTIVE JUROR TIONGCO:**   I think so.

8            **THE COURT:**   I'm going to excuse him, unless there is

9    an objection?

10           **MR. VAN NEST:**   No objection, Your Honor.

11           **MR. BICKS:**   No, Your Honor.

12           **THE COURT:**   I want you to know there are other big

13   antitrust cases that are going to go even longer than five

14   weeks.   Maybe we can get you into one of those.   And it may be

15   they don't care whether you're trying to look them up because

16   it's a nobody case and nobody cares about it and there is

17   nothing on the Internet anyway.

18       So I hope you get on one of those cases, but this is not

19   the case for you.

20       So you go back to the jury assembly room and tell them

21   what happened.   Thank you, sir.   Thank you for being candid.

22       Let's replace that seat.

23           **THE CLERK:**   Barbara Kreslake, K-R-E-S-L-A-K-E.

24           **THE COURT:**   How do you spell that?

25           **THE CLERK:**   K-R-E-S-L-A-K-E.

1              **THE COURT:**  Kreslake.

2         Is that right, Kreslake?

3              **PROSPECTIVE JUROR KRESLAKE:**  Yes.

4              **THE COURT:**  Kreslake.  All right.  Let's see your

5     write-up.  Okay.  You get to have that last seat over there.

6     And here's this.

7         Ms. Kreslake, may I give you the microphone.  Who has

8     that?  Welcome to the jury box.  How are you today?

9              **PROSPECTIVE JUROR KRESLAKE:**  Fine.  Thank you.

10             **THE COURT:**  Good.  Do you have a hardship issue?

11             **PROSPECTIVE JUROR KRESLAKE:**  No.

12             **THE COURT:**  Can you see that chart from that distance?

13             **PROSPECTIVE JUROR KRESLAKE:**  Yes.

14             **THE COURT:**  Please give us the info.

15             **PROSPECTIVE JUROR KRESLAKE:** my name is Barbara

16    Kreslake.  I live in San Carlos.  I have an Associate's degree.

17    I'm a homemaker.  Previously years ago I was San Mateo County

18    Community College.  No organizations, although my husband is

19    involved in the union and I help out.

20         Hobbies, yoga, swimming, hiking.  I'm married.  My husband

21    is retired from the U.S. Postal Service and previously he was a

22    metrologist at United Airlines.

23         I have three children:  43 and 38 and 36.  The oldest is

24    airline occupation.  The second one is a researcher.  She just

25    started a new company in Bethesda, Maryland.  And the third one

1  is international relations and she's searching for a job.

2      No prior jury service.  No military or law enforcement.

3  And I have never been a witness.

4          THE COURT:  Great.  Did you hear all the questions I

5  asked?

6          PROSPECTIVE JUROR KRESLAKE:  Yes.

7          THE COURT:  Would you have raised your hand to any of

8  those?

9          PROSPECTIVE JUROR KRESLAKE:  No.

10         THE COURT:  Did you hear my description about what the

11 jury does?

12         PROSPECTIVE JUROR KRESLAKE:  Yes.

13         THE COURT:  And would you be able to faithfully and

14 impartially carry out that responsibility?

15         PROSPECTIVE JUROR KRESLAKE:  Yes.

16         THE COURT:  All right.  Thank you.

17     So just -- I'm getting close to where I'm going to turn

18 the questioning over for a while to the lawyers.  And just so

19 you'll know, the lawyers have a copy of your questionnaire.

20 And they may -- it's okay if they ask you questions about it.

21     Every now and then, it's rare, but I would say if you have

22 something highly personal and private that you feel like you

23 should tell us about, then -- but you want to do it just with

24 me and the lawyers at what's called a sidebar, I will allow

25 that.  I discourage it, but I will allow it if you really want

 1   it.  So I want you to know that that opportunity is there.

 2        So at this time, I'm going to let -- Mr. Bicks, are you

 3   ready?  Are you going to be the one?

 4             **MR. BICKS:**  Yes, Your Honor.  Thank you.

 5             **THE COURT:**  Why don't you do this.  Reintroduce

 6   everyone at your table so we all have in mind who everyone is

 7   at your table and then you get the floor for a while.

 8             **MR. BICKS:**  Thank you.

 9        So I guess it's good morning.  So at our table, this is

10   Matt Sarboraria from Oracle and Georges Saab also from Oracle,

11   and Gabe Ramsey, who works with me at Orrick Herrington, and

12   Lisa Simpson and Annette Hurst and Mark Phillips.

13             **THE COURT:**  You know, a question I forgot to ask, and

14   maybe you could do it for me and I will give you a couple extra

15   minutes, is whether or not anybody knows any of the lawyers or

16   the judge or the court personnel.  I forget to ask that.  If

17   you wouldn't mind doing that for me, I would appreciate it.

18             **MR. BICKS:**  So as I say, I'm from Orrick Herrington,

19   and I guess I should ask everyone here, does anyone know any of

20   the folks here who are with me or anyone at our firm or anyone

21   in the Court, any of the Court personnel?

22             **THE COURT:**  Okay.  Thank you.  Over there,

23   Ms. Kreslake.

24             **PROSPECTIVE JUROR KRESLAKE:**  Our next-door neighbor

25   works for Oracle and my closest friend used to work for Oracle.

1          **MR. BICKS:**  Understood.  And actually when I say

2    *Orrick*, our firm is called Orrick Herrington.  Our client is

3    Oracle.

4          **PROSPECTIVE JUROR KRESLAKE:**  I see, okay.

5          **MR. BICKS:**  And in terms of Ms. Kreslake, the folks

6    that you know from Oracle, is that something that in any way is

7    going to influence you in the case?

8          **PROSPECTIVE JUROR KRESLAKE:**  No.

9          **MR. BICKS:**  All right.  Thank you.

10       So this is a great opportunity for me -- and thank you,

11   Your Honor.  This will be really the only time that I would get

12   to speak with you directly, and I really appreciate it.

13       I'm going to ask some individual follow-up questions and

14   then some more general questions, and if I don't ask an

15   individual question, it's just because we've got time here and

16   I want to go as efficiently as I can.

17       Mr. Stromsness, can I just start with you, sir?

18         **PROSPECTIVE JUROR STROMSNESS:**  Sure.

19         **MR. BICKS:**  You, I think, have indicated in your

20   questionnaire that you've read -- you've heard a little bit

21   about this case, and I want to just ask you what kind of

22   details have you heard?

23         **PROSPECTIVE JUROR STROMSNESS:**  Not very many.  I mean,

24   I've seen it in headlines and seen some stories about it.  It's

25   been a while.  I didn't realize the case was still going on.  I

1    don't really remember what has gone on in the case, but I knew

2    that there was a lawsuit about Android.

3            **MR. BICKS:**  You mentioned, I think, something called

4    the EFF.  Tell me what that is.

5            **PROSPECTIVE JUROR STROMSNESS:**  I don't remember

6    exactly what it stands for.  It's an Internet freedom group.  I

7    think E stands for *electronic*.  But -- and I had started

8    supporting them when they were supporting some websites back in

9    the day that had gay and lesbian conduct that people tried to

10   get taken down.  And so I've given them, I think, maybe 225

11   bucks per year since then.

12           **MR. BICKS:**  Any knowledge of any positions any

13   organizations like that have taken in any way about this case?

14           **PROSPECTIVE JUROR STROMSNESS:**  No.

15           **MR. BICKS:**  Thank you.

16       Let me, Mr. Haley, just speak with you for a moment.

17       In terms of your experience that you mentioned in

18   connection with overseeing of litigation, things like that, can

19   you just describe a little bit what exactly you were doing?  I

20   think you were overseeing some patent litigation, things of

21   that nature?

22           **PROSPECTIVE JUROR HALEY:**  Well, general.  If it had

23   actually gone to litigation, I would be sort of behind the

24   scenes.  I would be sitting down with the lawyers and

25   understanding the strategy.  One of my functions was on the

 1   accounting side of it, I had to try to figure out what the risk

 2   assessment was, and obviously if there was an issue associated

 3   that had a financial impact, I had to capture that somehow in

 4   financials.

 5        In terms of the overview of the budgeting process, my

 6   recollection was we had a fairly sizeable line item in the

 7   indirect budget for patents, and so the whole aspect of

 8   retaining and the dollar expended, as well as the employee

 9   rewards for achieving a patent, were part of my overview.  I

10   wouldn't say I was the decision-maker, but I was one of two or

11   three.

12        **MR. BICKS:**  Any attitudes on patent lawsuits in

13   general?  Some people say there are too many; people shouldn't

14   be bringing these kind of cases.  Some people have different

15   views.

16        Do you have views one way or the other on that?

17        **PROSPECTIVE JUROR HALEY:**  On the patent side, I

18   guess -- I did have one bad experience.  We lost a very large

19   patent lawsuit.  It was litigated after I had already left the

20   firm, but the -- all the runup to it was under my watch.  It

21   was sort of a surprise what the Patent Office would issue

22   patents for.  And the conflict was really around industry

23   practice versus something that was patentable, and it also got

24   involved with co-development.

25        **MR. BICKS:**  With what?  I'm sorry.

 1          **PROSPECTIVE JUROR HALEY:**  Co-development.  Our typical

 2   contracts would have basically in the contract itself -- it

 3   would call for whoever brought the idea owned the idea, and if

 4   it was jointly developed, then it was split, and of course in

 5   my world, the products we built had very much a collaborative

 6   aspect to it in terms of defining and developing the product

 7   between the customer and the manufacturer.

 8          **MR. BICKS:**  And so given -- the judge briefed a little

 9   bit about the case.  How do you think, if at all, that

10   experience might impact how you come to this case?

11          **PROSPECTIVE JUROR HALEY:**  I think it gives me a

12   certain level of familiarity with some of the legalese and some

13   of the arguments that lawyers put forth, but I have no

14   knowledge of specifics on this particular case.

15          **MR. BICKS:**  Thank you.

16     And is it Mr. Kotlar?

17          **PROSPECTIVE JUROR KOTLAR:**  Yes.

18          **MR. BICKS:**  So you indicate that I think you have

19   heard something about this case?

20          **PROSPECTIVE JUROR KOTLAR:**  You know, something in

21   passing in the news.  I don't know if I paid attention.  You

22   know, Channel 2, Dave Clark.  You know that dude?  I might have

23   been getting ready for work or help my wife get ready for work

24   and might have heard something about the case, but no

25   specifics.  The dollar amounts were here.  I didn't know there

1   was that much money being haggled over before I got to this

2   courtroom.  So I don't -- I might have, but I'm not actually

3   sure.

4           **MR. BICKS:**  Anyone else hear anything about the case

5   that would be worth discussing?  Anyone read anything, seen

6   anything about it?  Thank you.

7       Ms. Harper.

8           **PROSPECTIVE JUROR HARPER:**  Yes.

9           **MR. BICKS:**  So I think you indicate that your brother

10  has some contact with Oracle.

11          **PROSPECTIVE JUROR HARPER:**  My understanding is he just

12  started working for -- my understanding is he just started

13  working for them again.  He has worked for several of the large

14  software companies.  He is a computer programmer and works with

15  new product development.

16          **MR. BICKS:**  You're understanding is he works at Oracle

17  now?

18          **PROSPECTIVE JUROR HARPER:**  Correct.

19          **MR. BICKS:**  Okay.

20          **PROSPECTIVE JUROR HARPER:**  Oracle America.  I'm not

21  sure which.

22          **MR. BICKS:**  Understood.

23          **PROSPECTIVE JUROR HARPER:**  Brand new job.

24          **MR. BICKS:**  Where does he work?  Do you know?

25          **PROSPECTIVE JUROR HARPER:**  I don't.  He just mentioned

 1    it when we saw him at Easter.

 2            **MR. BICKS:**  I understand.

 3            **PROSPECTIVE JUROR HARPER:**  He lives in the East Bay.

 4            **MR. BICKS:**  How do you think -- we represent Oracle.

 5    And Google's on the other side.  Do you think that situation

 6    with your brother could influence your views on this case?

 7            **PROSPECTIVE JUROR HARPER:**  I do not.  Obviously I felt

 8    like full disclosure was necessary.

 9            **MR. BICKS:**  Yes.  Thank you.

10            **PROSPECTIVE JUROR HARPER:**  On the jury, you make a

11    commitment to review the facts as set forth, so . . .

12            **MR. BICKS:**  I'll try to pronounce it right.

13    Ms. Calonsag.  You mentioned Sureline Systems?

14            **PROSPECTIVE JUROR CALONSAG:**  Yes.

15            **MR. BICKS:**  Tell me a little bit about that company

16    again.

17            **PROSPECTIVE JUROR CALONSAG:**  To be honest, I'm not

18    really that familiar with the high tech.  It's -- my husband

19    throws a lot of high tech jargon, but it's a little confusing

20    to me.  It has something to do with platforms.  So that's as

21    far as I know.

22            **MR. BICKS:**  Thank you.

23        And, Ms. Hines, I think you have indicated that you have

24    had some contact with Oracle.  Any part of that experience that

25    might color you being on this case if you ended up on it?

 1          **PROSPECTIVE JUROR HINES**:  No.

 2         **MR. BICKS:**  Let me ask just more generally about

 3    Oracle and hear folks' attitudes about Oracle.  Many of you may

 4    have heard, obviously, about Oracle cloud computing, database,

 5    hardware.  The question that is really on our mind, both sides,

 6    is having people that won't lean really one way or the other.

 7         Any folks kind of have negative feelings about Oracle?  It

 8    won't hurt my feelings if you say it.  But anyone here kind of

 9    have negative feelings about Oracle?

10         (A show of hands by the prospective jurors in the box)

11         **MR. BICKS:**  Anyone here heard of Mr. Ellison?

12         (A show of hands by the prospective jurors in the box)

13         **MR. BICKS:**  And anyone, based on that information, you

14    know, have opinions or thoughts of him that kind of lean on the

15    negative side based on any of that?  How about on the positive

16    side?  Tell me -- tell me about that.

17         **THE COURT:**  Say your name again, so the record will be

18    clear.

19         **PROSPECTIVE JUROR BRUESEWITZ:** Jonathan Bruesewitz.

20    Anybody who can buy Lanai, I mean, come on.  I'm a golfer so

21    that's kind of cool.

22         **THE COURT:**  Anybody who can buy what?

23         **PROSPECTIVE JUROR BRUESEWITZ:**  He purchased Lanai, the

24    island in Hawaii.

25         **THE COURT:**  All right.  Okay.  I just didn't

 1    understand what you said.  I got it.

 2          MR. BICKS:  And remind me again, the folks that we

 3    discussed the topic of open source.  And, Mr. Stromsness, I

 4    remember you knew about it; Mr. Haley; and Mr. Bruesewitz.

 5          So on the question of open source, do you -- do either --

 6    any of you have views on whether or not software, just as an

 7    attitude view, should be given away for free, that are leaning

 8    one way or the other on that?  If I asked you Mr. Stromsness,

 9    what were your views on that, would -- help me out.

10          PROSPECTIVE JUROR STROMSNESS: I don't think I have

11    anything philosophical about the question.  I mean, I think

12    that we need high-quality software that's secure and that

13    probably always means someone is working on making it secure.

14    Whether that's because it's, you know, commercially licensed

15    software or just because things like, you know, Linux where

16    lots of companies want to put time into it, I don't think it

17    really matters as long as you can get quality software.

18          MR. BICKS:  I would love to hear, Mr. Haley, any

19    thoughts from you on this?

20          PROSPECTIVE JUROR HALEY:  Well, as you might imagine,

21    my first thought is how do they make money.

22          MR. BICKS:  Yeah.

23          PROSPECTIVE JUROR HALEY:  But I understand there is a

24    lot of different models out there.  When I hear something is

25    being given away for free, that's the first place my mind goes.

 1           **MR. BICKS:**  And, Mr. Bruesewitz, what are you thoughts

 2     on that?

 3           **PROSPECTIVE JUROR BRUESEWITZ:**  I don't really have an

 4     opinion either way.  It was just in academia that I heard about

 5     it.

 6           **MR. BICKS:**  The judge mentioned Java, but not coffee.

 7     But folks here have familiarity with Java?  Heard about it?

 8           **THE COURT:**  Raise your hands a little higher, please.

 9           **MR. BICKS:**  So let's go one by one.  Tell me, sir,

10     Mr. Stromsness, your experience.

11           **PROSPECTIVE JUROR STROMSNESS:** In 1994, '95 in computer

12     science, the class started out trying to program in Java, but

13     then decided it wasn't mature enough at the time and we moved

14     back to C++.  Since then, I have mainly been involved in

15     patching it on my work stations.

16           **MR. BICKS:**  Say it again.  You said you have mainly

17     been involved with what?

18           **PROSPECTIVE JUROR STROMSNESS:**  Patching it.  Updating

19     it as new updates come out.

20           **MR. BICKS:**  Do you have views about Java, good, bad,

21     things of that nature?

22           **PROSPECTIVE JUROR STROMSNESS:** I mean, it's software.

23     It's a useful tool.  Lots of people use it.  They do

24     conferencing software frequently.

25           **MR. BICKS:**  Thank you.

1        Ms. Rocha, did you tell me your experience with Java?

2            **PROSPECTIVE JUROR ROCHA:**  Just on my computer.

3   Telling me to update the Java updates.  That's about it.

4        **MR. BICKS:**  And do you do the updates and things like

5   that?

6            **PROSPECTIVE JUROR ROCHA:**  Yes.  I allow it.

7            **MR. BICKS:**  And, Ms. Shattuck, did you --

8            **PROSPECTIVE JUROR SHATTUCK:**  Yeah.  Recently I've been

9   trying to do something with my computer at home, and I don't

10  even have the right words to say what it is it's telling me.

11  But it's telling me that I don't have Java or Java's

12  misbehaving and I need to update.  Maybe that was what it was

13  telling me to do.

14       And I've had a lot of trouble doing what it told me what

15  to do.  So maybe I've been a little impatient with whoever

16  wrote the directions for Java.  Like, I don't get it.  And it's

17  frustrating.  But I have every confidence that in my lifetime,

18  I will figure it out.  Maybe.

19           **MR. BICKS:**  Mr. West, share with us your experience.

20           **PROSPECTIVE JUROR WEST:**  Using Java, I just know of it

21  from general computer use.  Nothing more than that.

22           **MR. BICKS:**  Do you work with it in any kind of

23  frequency?

24           **PROSPECTIVE JUROR WEST:**  Not that I know of.

25           **MR. BICKS:**  And, Mr. Wong, tell me your experience.

1          **PROSPECTIVE JUROR WONG**: To me, Java is just add-on

2     software that they -- it pops up on your computer.  I really

3     don't know what it does.  If I don't really need it for the

4     application I'm using, I'll pass on it.

5          **MR. BICKS:**  Thank you.

6       Ms. Jacobs, do you?

7          **PROSPECTIVE JUROR JACOBS**:  As much as I know, it's a

8     computer term.  I couldn't tell you much further than that.

9          **MR. BICKS:**  Mr. Haley, I bet you know a lot about it.

10          **PROSPECTIVE JUROR HALEY**: I know a lot about a lot of

11    things, very thin, though.  So I don't know a whole lot of

12    depth.

13       I seem to recall that Java was developed by Sun and was

14    giving it back away, back in the late '60s -- late '90s, I

15    believe.  I do know it's one of the skill sets we often

16    advertise when we're looking for employees in the software

17    area.

18          **MR. BICKS:**  Mr. Kotlar, do you have experience with --

19          **PROSPECTIVE JUROR KOTLAR**:  Perhaps, but I have more

20    experience with java that you drink than Java on a computer,

21    but I don't like either one -- I don't know about Java, but I

22    don't like coffee myself.

23          **MR. BICKS:**  Thanks.

24       Ms. Kreslake.

25          **PROSPECTIVE JUROR KRESLAKE**:  The only experience is

 1 | with updating, which I agree.  I have had problems with it.

 2 | That's about it.

 3 |         **MR. BICKS:**  Ms. Hines,.

 4 |         **PROSPECTIVE JUROR HINES:**  Same with me, just updating,

 5 | make sure the script is the updated version especially so you

 6 | can use it.  Especially at PG&E, we have a lot of secure

 7 | networks.  So dealing with it at home and work, as well.

 8 |         **MR. BICKS:**  Ms. Calonsag.

 9 |         **PROSPECTIVE JUROR CALONSAG:**  Same answer.  It just

10 | comes up on my computer every now and then that it needs to be

11 | updated.

12 |         **PROSPECTIVE JUROR SETTLES:**  Just familiar as a

13 | computer term.  I haven't had any problem with it one way or

14 | the other.

15 |         **MR. BICKS:**  Thank you.

16 |         **PROSPECTIVE JUROR BRUESEWITZ:**  My company uses Oracle

17 | with obviously Java for their APAR through my work.  I don't

18 | work with it directly, but I know we use it.

19 |         **MR. BICKS:**  Any experiences one way or the other that

20 | would kind of --

21 |         **PROSPECTIVE JUROR BRUESEWITZ:**  Like I said, I don't

22 | really use it, so . . .

23 |         **MR. BICKS:**  I didn't mean to skip you, Ms. Brown.

24 |         **PROSPECTIVE JUROR BROWN:**  I have no knowledge about

25 | Java.  I just saw it on a billboard.  That's it.

 1          **MR. BICKS:**  Thank you.

 2      Mr. Roberds?

 3          **PROSPECTIVE JUROR ROBERDS:**  I've no familiarity with

 4  it.  Just familiar with updating it.  I don't even know what it

 5  does.

 6          **MR. BICKS:**  Thank you.

 7      Ms. Harper.

 8          **PROSPECTIVE JUROR HARPER:**  Only as an end user.

 9          **MR. BICKS:**  Thank you.

10      Let me turn to the topic of Google.  As the judge has

11  indicated, we're Oracle.  Google is over here.

12      How many folks on the -- sitting in front of me have

13  experience and use Google things on kind of a regular basis, by

14  a show of hand?

15          **MR. BICKS:**  I'm sorry, Ms. Brown, I couldn't hear you.

16          **PROSPECTIVE JUROR BROWN:**  Is it on the phone?  On the

17  phone?  I don't use computer.

18          **THE COURT:**  Are you -- we need the microphone to you.

19  But are you saying -- are you asking --

20          **PROSPECTIVE JUROR BROWN:**  I'm asking if it's in

21  computer or because it's always on the phone that there is --

22          **THE COURT:**  She is asking are you talking about on the

23  desktop computer?  Are you talking about on the phone?  She is

24  confused.

25          **PROSPECTIVE JUROR BROWN:**  And there is Google on the

 1   phone.

 2         **MR. BICKS:**  Do you have experience with on the phone

 3   or the desktop?

 4         **PROSPECTIVE JUROR BROWN:**  No.  Actually, I'm

 5   illiterate when it comes to computer, but I know how to talk to

 6   Google and some of the things on my phone.

 7         **MR. BICKS:**  So if I put out the question how many

 8   people think Google is an innovative company, you know, that

 9   has done things that really made a big difference, by a show of

10   hands, how many people would say that that's true?

11       So if I compared -- how many people, if I asked the same

12   folks, who said Google is an innovative company, if I asked is

13   Oracle an innovative company, how many, by show of hands --

14   what would folks say?

15       And to those of you who I think I can see are raising

16   hands both ways, does any one of you think that when you look

17   at kind of Google and Oracle together, kind of starting out at

18   the starting line, that Google would be starting out a little

19   bit ahead, you know, because of experiences that you've had

20   kind of compared to Google?  And it may not necessarily be

21   strong, but kind of starting out a little bit ahead?

22         **THE COURT:**  You mean in this trial?

23         **MR. BICKS:**  Yes.

24         **THE COURT:**  So --

25         **MR. BICKS:**  Yes.

 1          **THE COURT:**  Let's be clear.  What counsel is asking is

 2   are there any of you over there who would think in your own

 3   mind that in your own mind, Google has a slight advantage over

 4   Oracle merely because of your impressions of the companies

 5   going in?

 6        That's what you're asking; right?

 7          **MR. BICKS:**  Yes.

 8          **THE COURT:**  Raise your hand if you think in your own

 9   mind that's true.

10          **MR. BICKS:**  Let me talk a little bit about the

11   question of damages.

12                         (No hands raised)

13          **MR. BICKS:**  The Court mentioned in the beginning that

14   this is a case involving a large amount of damages and that

15   will be the request from Oracle, and the judge will instruct on

16   the law and things of that nature.

17        But my question is I would like to explore people's

18   attitudes about damages.  This case is a case that Oracle's

19   position is that it involves damages that involve billions of

20   dollars.  I think the Court mentioned that.

21        When anybody heard that, did they kind of cringe a little

22   bit and say wow, you know, that's -- that hits you in a way

23   that you kind of think doesn't sound right?  Anyone kind of

24   have that reaction when they heard that?

25        Anyone have kind of attitudes that businesses should work

 1   things out and shouldn't come into court and ask for a lot of

 2   money?  Anyone kind of have those views?  Nobody has views on

 3   big damages?

 4           **THE COURT:**  Ms. Hines -- Ms. Hines; right?

 5           **PROSPECTIVE JUROR HINES:**  Yes.

 6           **THE COURT:**  Ms. Hines raised her hand.

 7           **PROSPECTIVE JUROR HINES:**  Obviously the company that I

 8   work for is also under trial to go to federal court.  We just

 9   got postponed.  Lots of money is involved as well for the

10   San Bruno accident that had occurred.

11           **MR. BICKS:**  Yes.

12           **PROSPECTIVE JUROR HINES:**  So they give us updates on

13   the trial that's happening as well, PG&E employees, to kind of

14   know as they know what's going on.  Similar talk is going on at

15   my work as well.

16           **MR. BICKS:**  So what are your, Ms. Hines, just general

17   kind of attitudes?  You heard a mention of what this case

18   involved.  What do you think?

19           **PROSPECTIVE JUROR HINES:**  It was interesting how kind

20   of I feel, especially at my company; right?  You know both

21   sides of the story, kind of how you feel as an employee versus

22   also how you feel of the situation that had occurred itself.

23   So it just was bringing up that for me, mainly what we're

24   dealing with at work and kind of how it feels in the courtroom

25   versus what you feel as an employee.

1          **MR. BICKS:**  Ms. Kreslake, the question of damages,

2     when you heard the numbers involved, what was your reaction?

3          **PROSPECTIVE JUROR KRESLAKE:**  I really don't have a

4     problem with that.  I mean, bringing it to court.  We live in

5     America.  This is the right of every citizen and company, so I

6     don't -- I really didn't think one way or another in the amount

7     of damages because big companies, worth a lot of money.

8          **MR. BICKS:**  And, Mr. Kotlar, I can see you nodding.

9          **PROSPECTIVE JUROR KOTLAR:**  Oh, well, I was thinking

10    about the case.  Like I mentioned when the judge asked a

11    question about the prior jury service, that you know, if it's

12    warranted, you know, based on the case and the facts of the

13    case, if the party is -- is deemed worthy of the damages, then

14    we had to find for -- ours was just a preliminary hearing.  It

15    was going to another -- to see what -- and so we found for, I

16    think, millions of dollars because mesothelioma is incurrable,

17    I suppose.  That's a different kind of damage.

18         But, yes, I don't have any problem with when based on the

19    facts of the case, if it's warranted, then I don't have a

20    problem.

21         **MR. BICKS:**  Ms. Jacobs, I would love to hear your

22    thoughts on that topic.

23         **PROSPECTIVE JUROR JACOBS:**  I think that's what our

24    system is for, is to solve disputes between individuals and

25    companies and I think that's what the whom system is for.

1          **MR. BICKS:**  Thank you.

2      Mr. Wong, any attitudes on damages and things of that

3  nature?

4          **PROSPECTIVE JUROR WONG:**  No.  None.  This seems like a

5  dispute between products, and I figure if the product justifies

6  itself in its own way, this trial is justified.

7          **MR. BICKS:**  Thank you.

8      And, Mr. West, share with me your thoughts on damages.

9          **PROSPECTIVE JUROR WEST:**  I don't really have any views

10 as far as the amounts, the damages that go, but I know you

11 asked earlier about the software thing.  Software is something

12 I think that in general is something that you should be

13 compensated for.  It shouldn't be free.

14         **MR. BICKS:**  I didn't quite -- say it again.

15         **PROSPECTIVE JUROR WEST:**  The only thing I can think of

16 is that I do think software should be compensated for.  The

17 free source thing that you were talking about earlier, that's

18 the only thing that I would have an opposing view on.

19         **MR. BICKS:**  Yeah.  Understood.

20     And, Ms. Shattuck, tell me your thoughts.  You heard that.

21         **PROSPECTIVE JUROR SHATTUCK:** I really don't have any.

22         **MR. BICKS:**  Thank you.

23     Ms. Rocha, your views.

24         **PROSPECTIVE JUROR ROCHA:**  Well, I figured big

25 companies, big money.  It goes together.

1          **MR. BICKS:**  Mr. Stromsness, are your thoughts?

2          **PROSPECTIVE JUROR STROMSNESS:**  Yeah.  I mean, the

3    amount didn't surprise me.  Most of the tech suits seem to be

4    for billions of dollars these days.  Yeah, I'm not sure what

5    the law is but, you know, nothing surprises me or seems wrong

6    to me.

7          **MR. BICKS:**  Ms. Harper, could you share with us your

8    thoughts.

9          **PROSPECTIVE JUROR HARPER:**  Well, initially when you

10   hear billions, that seems like a lot, but the size of the

11   companies, I recognize that we're talking about billions isn't

12   the same to a company like Google or Oracle as it is to my

13   personal checking account.

14       I have no opinion either way on damages.

15         **MR. BICKS:**  Thank you.

16       Mr. Roberds.

17         **PROSPECTIVE JUROR ROBERDS:**  I pretty much don't have

18   an opinion either.  Big company, big money.

19         **MR. BICKS:**  Thank you.

20       Ms. Brown.

21       **PROSPECTIVE JUROR BROWN:**  This is my first time to

22   hear billions of dollars, but I have no opinion regarding whose

23   ever stand for their rights.

24         **MR. BICKS:**  Yes.

25       **PROSPECTIVE JUROR BROWN:**  No comments.  That's it.

1      **MR. BICKS:**  Thank you.

2          Mr. Bruesewitz, your --

3          **PROSPECTIVE JUROR BRUESEWITZ:**  I'm fine with damages.

4   However, to me there should be some proof of how you get to

5   that dollar figure.  The million dollars for the woman who

6   burnt her tongue on hot coffee --

7      **MR. BICKS:**  McDonald's.

8      **PROSPECTIVE JUROR BRUESEWITZ:**  Yeah.  So damages is

9   fine, but to me it's got to be something you can actually prove

10  some type of dollar amount for.

11     **MR. BICKS:**  Ms. Settles.

12     **PROSPECTIVE JUROR SETTLES:**  When I first heard the

13  number, it kind of jolted me a little bit, but Oracle and

14  Google, like you said, large companies, and I don't know how

15  the damages are -- how they're brought into court, how it's

16  agreed upon.  So . . .

17     **MR. BICKS:**  Mr. West, your point on, I think, the

18  software, as I understood, you were saying you thought it

19  should be paid for?

20     **PROSPECTIVE JUROR WEST:**  Yeah.  Basically I'm

21  saying --

22     **THE COURT:**  You have to speak clearly and into the

23  microphone.  I can't hear you.

24     **MR. BICKS:**  I'm having a problem.

25     **THE COURT:**  Say it again.

1          **PROSPECTIVE JUROR WEST**:  Yeah.  Basically I just am

2     not exactly -- I wouldn't -- I don't know how to put it.  I

3     don't believe in the free source -- the concept of it.

4          **MR. BICKS**:  Yeah.

5          **PROSPECTIVE JUROR WEST**:  But --

6          **THE COURT**:  You do or you don't believe?

7          **PROSPECTIVE JUROR WEST**:  I don't believe.

8          **THE COURT**:  You do not.  Tell me if we got it right.

9     You do not believe in free software?

10         **PROSPECTIVE JUROR WEST**:  No, sir.

11         **THE COURT**:  Okay.  Thank you.

12         **MR. BICKS**:  Can I just -- can you explain why you say

13    that?

14         **PROSPECTIVE JUROR WEST**:  I would say it's just the way

15    I was raised and brought up.  I don't believe anything to be

16    free, especially if it was something that somebody came up with

17    out of their own -- something that came out of somebody's head

18    deserves to be compensated for.

19         **MR. BICKS**:  So in hearing the discussion that we've

20    been having, does anyone say to themselves, you know, that this

21    is a case you think that, you know, may not be the right case?

22    Anyone hearing the discussion and the topics saying to

23    themselves, you know, *this doesn't feel like the right kind of*

24    *case for me?*  Anyone feeling that in any way?  Yes.

25    Ms. Shattuck?

1          **PROSPECTIVE JUROR SHATTUCK:**  Well, I do just to the

2     extent that I'm concerned that I may not understand all the

3     discussion in the courtroom.

4          **MR. BICKS:**  What kind of is on your mind on that

5     topic?  Is there something that you're hearing and you're

6     saying that kind of unsettles you a little bit?

7          **PROSPECTIVE JUROR SHATTUCK:**  I have failed to

8     understand a lot about computers for a pretty long time, so I'm

9     used to it, but it, you know -- I don't -- you know, you just

10    don't feel comfortable when you don't understand what's going

11    on.  I think it's that simple.

12         **MR. BICKS:**  And, Ms. Brown, did you -- I

13    couldn't . . .

14         **PROSPECTIVE JUROR BROWN:**  I have little knowledge

15    about computers.  But most of it I don't understand.  And I

16    don't understand much about the Oracle or Google.  And I

17    believe this is not the right case for me, although I

18    understand some of the English conversation that we have here.

19    But I don't know what it is really all about.

20         **MR. BICKS:**  Thank you.

21        Let me say it kind of the other way, which is anyone

22    listening to this discussion and saying *Wow, I really want to*

23    *be on this case?  This sounds like an exciting case and I'd*

24    *like to be on it?*

25        Why?

1          **PROSPECTIVE JUROR HALEY:**  I think it's fascinating.  It

2    sounds --

3          **THE COURT:**  You need to use the microphone, please.

4          **PROSPECTIVE JUROR HALEY:**  I just think it's -- it's

5    fascinating to see, you know, two very innovative companies

6    sort of battle it out and fight over some of the things which,

7    you know, you see happening in this Silicon Valley all the

8    time.

9          And to be honest, I've also been on the patent side.  I've

10   seen some of these things go, although I wasn't quite nearly as

11   close as I am here.

12         **MR. BICKS:**  Yes.

13         Mr. Kotlar, your thoughts.

14         **PROSPECTIVE JUROR KOTLAR:**  Yes.  It seems like an

15   interesting case.  The only thing I'd have to fight hard to is

16   not to bust anything out to my wife.  That would be hard to

17   hold for five weeks, but I will do my best.

18         **MR. BICKS:**  I'm sorry.  Say it again.

19         **PROSPECTIVE JUROR KOTLAR:**  You know.  To not -- not to

20   inadvertently say something to my wife that I, you know -- when

21   you're married, you know, it's hard to not say anything, but,

22   you know, I'll do my best.

23         **THE COURT:**  You can say that you're on the case.

24   That's it.

25         **PROSPECTIVE JUROR KOTLAR:**  My wife is more tech savvy

 1    than me.

 2         THE COURT:  No pillow talk about the case.  All right.

 3    Now, somebody else raised their hand down here.

 4    Ms. Rocha.

 5    You're down to five minutes to go.

 6         MR. BICKS:  Thank you, Your Honor.

 7         THE COURT:  She raised her hand about wanting to be on

 8    the case.

 9         MR. BICKS:  Yes.

10         PROSPECTIVE JUROR ROCHA:  Well, I didn't know what it

11    was going to be about until I got here, and it sounded very

12    intriguing and it sounded like I could learn a lot from it.

13         MR. BICKS:  And what --

14         PROSPECTIVE JUROR ROCHA:  Interesting.

15         MR. BICKS:  When you say you think you might learn a

16    lot --

17         PROSPECTIVE JUROR ROCHA:  You know, in faces, new

18    people, new opportunity.

19         MR. BICKS:  Thank you.

20    Anyone else have any kind of thinking *wow, this would be a*

21    *good case to be on?*

22         THE COURT:  Ms. Hines is raising her hand.

23         PROSPECTIVE JUROR HINES:  Same kind of response.  Just

24    really interesting subject matter.  Something way outside of

25    the field that I typically work on.  And obviously we all know

**JURY VOIR DIRE**

1    Oracle and Google, so kind of to hear more about what the

2    actual company does and specifically a topic like this would

3    just be a really interesting thing to be a part of.

4         **MR. BICKS:**  So one of our former jurors mentioned

5    something involved PeopleSoft.  Anyone, in hearing that, think

6    that's -- kind of at least give a negative feeling about Oracle

7    based on that comment that was made by one of our former jurors

8    here?  Anyone hear that and say, *you know, that makes me lean*

9    *for or against Oracle?*

10        So this will be the last time, you know, that I will be

11   able to ask any of you questions.  So my final wrap-up is

12   anything that if you were sitting over there and standing where

13   I am with my colleagues here and representatives from Oracle

14   that you think we should know that might be important in

15   indicating you may have -- this may not be the right case or

16   you may have kind of a leaning against Oracle?  Anything that I

17   haven't covered with you on that?  It's kind of now or, as they

18   say, forever hold your peace.  Anything that comes up that

19   people think that we should share and talk about?

20        Final thing.  I said that was the final, but lawyers are

21   never -- many of you indicated that you've got Android

22   products.  Any concerns when you hear about what's at stake

23   here that, as the judge mentioned -- as people who have Android

24   products, is it on anybody's mind that that might impact

25   something that you like, you use, in a way that could be

 1  something that would be of concern to the Oracle side?  Anyone?

 2  Okay.

 3        So thank you for your time.

 4        And, Your Honor, thank you for the chance to do this.

 5        **THE COURT:**  All right.  Thank you, Mr. Bicks.

 6        We will take a break in a moment, but before we do it, on

 7  the first day -- this is the first day -- we will not finish by

 8  1:00 today.  I had said earlier we will finish by 1:00.  That's

 9  once we get going with the evidence, but I'm pretty sure we're

10  not going to have the jury selected by 1:00 today, but maybe by

11  2:00 or 2:30 we will be done for today, would be my guess.  I

12  might have misled you about the 1:00 thing.  That doesn't apply

13  for today.  So that's number one.

14        And number two, way back at the first of Mr. Bicks'

15  questions, he made -- it was a little unclear the difference

16  between Orrick and Oracle.  So let's be very clear about it.

17  The law firm is the Orrick -- say the full name of the law

18  firm.

19        **MR. BICKS:**  Oracle, Herrington & Sutcliffe.

20        **THE COURT:**  Any of you ever heard of that law firm or

21  done business with that law firm?  Okay.  Good.

22        How about -- and then Oracle, of course you know that

23  we -- if you have any connection to the Oracle, we need to know

24  about it.  Do any of you own stock in the company?  Yes?

25        **PROSPECTIVE JUROR JACOBS:**  I think we own stock in both

 1   companies, actually, in our portfolio.  But my husband manages

 2   it so I'm not even sure.

 3         THE COURT:  That could be a problem.  I mean, here you

 4   would be sitting on a jury where the value of your own

 5   portfolio could go up or down, depending on how your verdict

 6   was.  Can you find out during the break whether you own stock

 7   in either of these companies?

 8         PROSPECTIVE JUROR HALEY: sure.

 9         THE COURT:  All right.  Anyone else?  Anyone else own

10   stock in one of these companies?  Okay.  Let's go to

11   Mr. Stromsness.

12         PROSPECTIVE JUROR STROMSNESS:  Just index funds so --

13         THE COURT:  Those don't count, I don't think.  You

14   could tell us about it, but I'm talking about direct ownership.

15         PROSPECTIVE JUROR HARPER:  My husband may or may not

16   own stock.

17         THE COURT:  Can you find out during the break?

18         PROSPECTIVE JUROR HARPER:  Sure.

19         THE COURT:  Anyone else?  And here is another thing.

20   It should go without saying, but you've got to appreciate this.

21   No one who is on the jury can trade in these two companies'

22   stock while the case is under way.  That would be called

23   *insider trading*.  And there are big penalties under the Title

24   18 of the United States Code for that.  No insider -- I know

25   you wouldn't do it, but it's my duty to tell you.

1      If you were to buy or sell the stock in one of these two

2   companies while the case was pending, it would be such a mess.

3   We can't -- so you know you just can't do that.  Do you

4   understand that part?  You got it?  Okay.  Good.

5      While we're on the break, I want -- we're going to come

6   back and hear from the Google lawyer and ask you some

7   questions, too.

8      I want you to be thinking about is there anything by way

9   of full disclosure you should bring up and let us know about.

10   I will just give you what sometimes happens.  After the case is

11   over and somebody loses, because somebody is going to lose in

12   this case; right?  Somebody is going to win.  Once the case is

13   over -- not this case, but I've had it in other cases.  It

14   might happen in this case.  Whoever loses -- whoever wins is

15   happy.  They don't look at -- but whoever loses finds out maybe

16   that a member of the jury failed to disclose something.  So

17   they then bring a motion saying, *Judge, you got to set aside*

18   *that verdict because juror number X did not tell us that they*

19   *had something going* or whatever it is.  *And if we had known*

20   *that, we would have challenged that juror.*

21      So it's impossible for us, no matter how good the lawyers

22   are, how much I ask -- it's impossible for me to get in

23   everything.  So you need to be thinking is there anything you

24   think, just out of caution, you ought to disclose to us so that

25   we can let the lawyers take that into account.  And they've got

 1    to go from 16 of you down to 10.  So they will stand up in due

 2    course and -- each side gets three.  So they will exercise

 3    their challenges based upon what you've told them.  And so they

 4    need to know if there is anything more there.  Be thinking

 5    about it, would you, please.  I would appreciate it.

 6        All right.  We are going to take another break for 15

 7    minutes.  Please remember the admonition.  Don't talk about the

 8    case.  But those of you who are supposed to call your spouses

 9    and find out about stocks, you've got to do that, please.

10    Thank you.

11            **PROSPECTIVE JUROR HOSSEINIAN:**  I have a question.

12    Having stock in either company automatically excuse us?

13            **THE COURT:**  What?

14            **PROSPECTIVE JUROR HOSSEINIAN:**  Having stock in either

15    company --

16            **THE COURT:**  You do?

17            **PROSPECTIVE JUROR HOSSEINIAN:**  I do have in Google.

18            **THE COURT:**  Hang on a minute.  Stay here.

19        Have all prospective members of the jury left now except

20    for you?

21        Okay.  Anyone else who is a prospective member of the

22    jury, please raise your hand.  Okay.  You're leaving.  Anyone

23    else?  All right.  Everyone else be seated.

24        And your name, sir?

25            **PROSPECTIVE JUROR HOSSEINIAN:**  Hamid Hosseinian.

1           THE COURT:  Say again, please.

2           PROSPECTIVE JUROR HOSSEINIAN: H-A-M-I-D.

3    H-O-S-S-E-I-N-I-A-N.

4           THE COURT:  You're telling us that you own stock in

5    one of these companies?

6           PROSPECTIVE JUROR HOSSEINIAN:  I bought four Google

7    stock long time ago.  They split.  Now it is eight, and I'm

8    not -- I have left it for the retirement.

9           THE COURT:  But you own it now?

10          PROSPECTIVE JUROR HOSSEINIAN:  I own it.

11          THE COURT:  Common stock in Google?

12          PROSPECTIVE JUROR HOSSEINIAN:  Common stock of the

13   Google.

14          THE COURT:  Anyone want to ask him any questions?

15          MR. VAN NEST:  No, Your Honor.

16          MR. BICKS:  No.

17          THE COURT:  All right.  You go take your 15-minute

18   break, and I will give you the answer when we come back.  All

19   right?

20          PROSPECTIVE JUROR HOSSEINIAN:  Okay.  Thank you.

21          THE COURT:  I need one of my law clerks to right that

22   name down.  Okay.

23       I want to make sure, is there anyone else in the courtroom

24   who is a prospective juror?  No one.  All right.  Okay.

25       So can we all agree that he should be excused?

1          MR. BICKS:  Yes.

2          MR. VAN NEST:  Yes, Your Honor.

3          THE COURT:  All right.  Thank.

4      Now, what do you want to do -- any suggestions on excusing

5  anybody?

6          MR. VAN NEST:  I do, Your Honor.

7          THE COURT:  Please.  Let's hear it.

8          MR. VAN NEST:  I think Mr. West has said he just

9  doesn't believe in free software.  It should always be paid

10  for.  We're going to have a ton of testimony about open source

11  and obviously --

12          THE COURT:  I'm not going to do it yet.  You're going

13  to have to -- that's not -- the record is not good enough,

14  unless you want to stipulate.  All right.  I'm not going to --

15  you could ask him questions.  Maybe it will come out that there

16  is a good enough record, but so far it's not good enough.

17      Anyone else?

18          MR. VAN NEST:  I have concern about Ms. Shattuck, who

19  said several times she can't really follow what's going on with

20  computers and doesn't understand it, and we're going to have a

21  long trial with a lot of detail.

22          THE COURT:  All right.  I have that same concern and

23  also that same concern about Mrs. Brown.

24          MR. VAN NEST:  And me as well.

25          THE COURT:  My suggestion to both of you is you excuse

1   both of them.  I'm not going to do it unless you both agree.

2           **MR. VAN NEST:**  We would agree.

3           **MR. BICKS:**  Is that something, Your Honor, I could

4   speak with my folks about?

5           **THE COURT:**  Of course.  You can speak with them.  My

6   experience in these cases has been that the people who know the

7   most on the jury and the best able to serve you will knock them

8   off.  I promise you, that's what going to happen.

9       And all you members of the public out there, watch to see

10  that the people who get knocked off the jury are the ones who

11  could understand the best.

12      But so, Mr. Bicks, if you want to keep these two on the

13  jury, go ahead.  But at least I'm not going to knock them off

14  without -- there is not cause yet to knock them off, but you go

15  ahead.  Here, I will sit right here until you make your mind

16  up.

17          **MR. BICKS:**  Really what's going through my mind,

18  Your Honor, is Ms. Shattuck, for example, a lot of people can

19  get intimidated hearing about this, but as I was speaking with

20  her, she is clearly very capable --

21          **THE COURT:**  You don't have to -- look, I'm not going

22  to argue with you.  You two decide what you want to do.

23              (Plaintiff's counsel confer off the record.)

24          **MR. BICKS:**  So my thinking, Your Honor, would be with

25  Ms. Brown, you know, we would stipulate to that, but maybe we

1     hear a little bit more on Ms. Shattuck.

2          **THE COURT:**  All right.  We will excuse Ms. Brown so

3     I'm not going to rule Ms. Shattuck out.  There is not cause to

4     rule her out, but to my mind, it's pretty clear she is not

5     going to understand the evidence and -- but that's not grounds

6     to knock somebody off, at least on this record.

7          So we'll excuse Ms. Brown.  And I said, I was not going to

8     excuse Mr. West yet.  All right.

9          Anybody you want to have a discussion about?

10          **MR. BICKS:**  I think I just should raise something that

11     was brought to my attention about Mr. Kotlar.

12          **THE COURT:**  Yes?

13          **MR. BICKS:**  And I don't know if this is accurate.

14     Someone suggested to me he was handing something to one of the

15     jurors who had been dismissed out in the hallway.  I don't know

16     anything more than that.

17          **THE COURT:**  What?  Somebody told you that he did that?

18          **MR. BICKS:**  Yeah.

19          **THE COURT:**  What was he handing?

20          **MR. BICKS:**  I don't know, Your Honor.  Pamphlet or

21     something.  I don't know.  Just because it was reported to me I

22     thought I would relay it.

23          **THE COURT:**  It might be one of these biblical things.

24     Who knows?  He seems like he is a very religious guy.

25          Do you want me to ask him if he did that?

1          **MR. BICKS:**  Can I chat about that, Judge?  I think we

2    probably should.

3          **THE COURT:**  No.  I'm happy to ask.  So somebody who

4    was dismissed?

5          **MR. BICKS:**  Yes.

6          **THE COURT:**  Okay.  By the way, the two people who

7    asked that I -- that I sent to the back of the room, you're

8    free to look at these as well.

9       Angie, would you hand these to counsel.

10      You can verify that I did it the right way.

11         **MR. BICKS:**  Thank you.

12         **THE COURT:**  Why don't you do that right now.

13         **MR. VAN NEST:**  Your Honor, could I raise one other

14   point?

15         **THE COURT:**  You can.  But look at these two.  Look at

16   it and see Question 9.  They were not excused.  They were just

17   sent to the back of the room.  Okay.  Are we good?

18         **MR. VAN NEST:**  I'm sorry.  Is the question whether --

19         **THE COURT:**  The question is did I do it right?

20         **MR. BICKS:**  Yes.

21         **MR. VAN NEST:**  Yes, you did it right.

22         **THE COURT:**  Then just hand them back.  All right.

23   Good.

24      Now, what else did you want to raise?

25         **MR. VAN NEST:**  I want to raise -- and Ms. Harper has

1   on her -- Juror No. 9, she -- her brother is working at Oracle.

2   She answered *yes* actually to the question, "Have you or a loved

3   one within the past ten years been employed by" --

4          **THE COURT:**  Yes.

5          **MR. VAN NEST:**  -- "owned stock."  Her brother works at

6   Oracle.  I think it sounded like, from what she said, he has

7   worked there twice.  Maybe once and come back.  She says her

8   husband may own stock in Google.  She is going to check on

9   that.  I would think if she has any sort of relationship with

10  her brother and he is working at Oracle and programming, that

11  would be a reason to excuse --

12         **THE COURT:**  Not necessarily.  She said flat out it

13  would not influence her.  I had invited you two to stipulate to

14  automatic exclusion for answers like that and you wouldn't do

15  it.  You said you had to get more details.

16         **MR. VAN NEST:**  We didn't say that.  I was willing to

17  stipulate to that and thought we should, actually, on it.

18         **THE COURT:**  Well, I'm not going to excuse her based on

19  the fact that her brother works at one of the companies.  I

20  think she was asked -- now, you can follow up and ask her

21  questions and find out if she would be biased and maybe she is

22  going to turn out to own stock anyway.  That would be a

23  deal-killer right there.

24         **MR. VAN NEST:**  Right.  Okay.  Thank you, Your Honor.

25         **THE COURT:**  But, yeah -- all right.  Anything else?

 1          **MR. BICKS:**  No, Your Honor.

 2          **THE COURT:**  We'll take about a ten-minute break.

 3  Thank you.

 4                (Recess taken at 12:04 p.m.)

 5                (Proceedings resumed at 12:15 p.m.)

 6          **THE COURT:**  All right.  Be seated, please.

 7      Mr. Hamid, Hosseinian, where are you?

 8          **PROSPECTIVE JUROR HOSSEINIAN:**  Here.

 9          **THE COURT:**  Yes.  We've agreed to excuse you.  So go

10  back to the jury assembly room and tell them what happened,

11  okay.

12          **PROSPECTIVE JUROR HOSSEINIAN:**  Okay.

13          **THE COURT:**  Would you give us your questionnaire

14  though.

15          **PROSPECTIVE JUROR HOSSEINIAN:**  Thank you.

16          **THE COURT:**  You're most welcome.

17      Let's follow up.  Ms. Harper, did you get any info?

18          **PROSPECTIVE JUROR HARPER:**  I was not able to reach my

19  spouse.  I left a message.

20          **THE COURT:**  Well, the thing is, we can't have somebody

21  on the jury who owns stock in the company.  Or their spouse

22  does.

23          **PROSPECTIVE JUROR HARPER:**  I understand.

24          **THE COURT:**  Or, for that matter, if you have a

25  partner, same thing.

1        We've got to have people in here who have no source of

2    bias, okay.  So you've got to find out the answer.

3        What makes you think that your husband might own stock?

4            **PROSPECTIVE JUROR HARPER:**  Well, he has a small stock

5    account separate from mine.  So he's constantly buying and

6    selling.  So I did put it on my questionnaire that he might own

7    stock in Google initially.  And I'm just not sure if he still

8    holds stock in Google or in Oracle.

9            **THE COURT:**  One thing you've got to tell your spouses

10   and partners while the case is going on, no buying and selling

11   stock in either of these two companies.  That much you have to

12   tell them.

13       Who else was going to check?

14       Ms. Jacobs.

15           **PROSPECTIVE JUROR JACOBS:**  We had Google.  And it was

16   sold last year.  My husband owns ten shares, worth $417, of

17   Oracle in his IRA.

18           **THE COURT:**  Right now?

19           **PROSPECTIVE JUROR JACOBS:**  Yes.

20           **THE COURT:**  Don't we have to excuse Ms. Jacobs?

21   Agreed?

22           **PROSPECTIVE JUROR JACOBS:**  It's a small percentage of

23   his portfolio.

24           **THE COURT:**  Listen -- yes, Mr. Bicks.

25           **MR. BICKS:**  This is an individual stock?  Or, like, an

1    index or --

2         **THE COURT:**  It's stock directly in Oracle, but it's

3    owned in his retirement account.

4         **PROSPECTIVE JUROR JACOBS:**  Correct.

5         **THE COURT:**  So it's not an index fund.  It's direct

6    ownership.  Agreed?

7         **MR. BICKS:**  Yes.

8         **THE COURT:**  Okay.  You would be a great juror,

9    Ms. Jacobs, but we've got to do it.  We can't let you serve.

10        All right.  I'm sorry.  I should have brought this up

11   sooner.

12        Okay.  Let's call a name to replace Ms. Jacobs.

13        **THE CLERK:**  Jennifer Yasumoto, Y-a-s-u-m-o-t-o.

14        **THE COURT:**  Yasumoto.  All right.  Please let me see

15   your questionnaire.

16        Great.  Please have that seat over there.  While you're

17   doing that...

18        Mr. Kotlar, can I ask you a question?

19        **PROSPECTIVE JUROR KOTLAR:**  Yes, sir.

20        **THE COURT:**  Someone -- I won't say who -- observed the

21   possibility that you gave some document to one of the jurors,

22   potential jurors who were dismissed, out in the hallway.

23        Did they see the right thing, or is that mistaken?

24        **PROSPECTIVE JUROR KOTLAR:**  Uhm -- oh, you mean the,

25   uhm, one of the jurors in the box here?

1          THE COURT:  Yes, sir.

2          PROSPECTIVE JUROR KOTLAR:  Yes, sir.

3          THE COURT:  What happened?

4          PROSPECTIVE JUROR KOTLAR:  That's not mistaken.

5          THE COURT:  What were you giving them?

6          PROSPECTIVE JUROR KOTLAR:  I can give you a copy if

7   you wish.

8          THE COURT:  What is it?

9          PROSPECTIVE JUROR KOTLAR:  It's a pamphlet related to

10  my church, and has some verses from the Word of God on it.

11         THE COURT:  All right.

12         PROSPECTIVE JUROR KOTLAR:  And it seemed, like,

13  appropriate because she's possibly mourning the loss, and Jesus

14  is the hope that she needs.

15         THE COURT:  All right.  Now, let me tell you

16  something.  That's grand.  That's fine.  But you can't be

17  proselytizing your religion among the jury.  Do you understand

18  that?

19         PROSPECTIVE JUROR KOTLAR:  I cannot say I will keep

20  that.  I serve a higher authority than you are, sir.

21         THE COURT:  Well --

22         PROSPECTIVE JUROR KOTLAR:  And there is a judge that

23  is higher than you, that we have to come to.

24         THE COURT:  I accept that.  But so far he has not

25  communicated to me.

1      (Laughter)

2          **PROSPECTIVE JUROR KOTLAR:**  He has left his

3   communication for everybody to read.  You just have to open it

4   up.

5          **THE COURT:**  I'm going with what's been communicated to

6   me.  And you can't be intimidating the rest of the members of

7   the jury with your religion.

8          **PROSPECTIVE JUROR KOTLAR:**  I don't try to intimidate.

9   But I cannot keep what you say.

10          **THE COURT:**  Fine.  You sit there for a minute and I'll

11   take it up with the lawyers.  We'll see if that's a problem,

12   okay.

13          **PROSPECTIVE JUROR KOTLAR:**  Okay.

14          **THE COURT:**  All right.  What is your religion, anyway?

15          **PROSPECTIVE JUROR KOTLAR:**  I am a born again

16   Christian.  Jesus is my savior.  I am a Baptist by church

17   authority.  But Jesus is the only savior.

18          **THE COURT:**  All right.

19          **PROSPECTIVE JUROR KOTLAR:**  And that we have to claim.

20          **THE COURT:**  I got it.

21          **PROSPECTIVE JUROR KOTLAR:**  People trust in many

22   different kinds, but he's the only one.

23          **THE COURT:**  Okay.  I got it.

24      Thank you.

25      Now, Ms. -- I've got to change subjects.  Ms. Brown.

1        **PROSPECTIVE JUROR BROWN:**  Yes.

2        **THE COURT:**  Because of the reservations you expressed

3    about understanding the case, the lawyers want to excuse you.

4    Both agree.  Both sides agree.  So you're excused.

5        **PROSPECTIVE JUROR BROWN:**  Thank you.

6        **THE COURT:**  So you may go back to the jury assembly

7    room and tell them what happened.

8        **PROSPECTIVE JUROR BROWN:**  Yes, sir.

9        **THE COURT:**  And we will now replace Mrs. Brown.

10        **THE CLERK:**  Okay.  Victoria Davis.  D-a-v-i-s.

11        **THE COURT:**  Good morning, Ms. Davis.  No, it's good

12    afternoon.

13        **PROSPECTIVE JUROR DAVIS:**  Yes.

14        **THE COURT:**  How are you today?

15        **PROSPECTIVE JUROR DAVIS:**  Cool.

16        **THE COURT:**  You're good.  It's a little cold in here.

17    We have to keep it a little cold in here because there's so

18    many people, and you get sleepy if I don't keep it cold.

19        (Laughter)

20        **THE COURT:**  So good for you.  All right.

21        You get to sit in Mrs. Brown's spot.  Thank you.

22        Okay.  Can I see counsel at the sidebar for one moment.

23        (The following proceedings were heard at the sidebar:)

24        **THE COURT:**  Okay.  I believe we should excuse

25    Mr. Kotlar, but I don't want to do that without a stipulation.

 1           **MR. VAN NEST:**  So stipulated.

 2           **MR. BICKS:**  Agreed.

 3           **THE COURT:**  So I'm going to excuse him right now.

 4  Thank you.

 5           **MR. VAN NEST:**  Thank you.

 6      (Sidebar concluded.)

 7           **THE COURT:**  Mr. Kotlar, based on your religious

 8  beliefs that there's higher authority than I am -- which is

 9  fine in some respects, but in this courtroom I've got to be the

10  highest authority.

11           **PROSPECTIVE JUROR KOTLAR:**  I understand.

12           **THE COURT:**  So you're excused.  Please go back to the

13  jury assembly room and tell them what happened.  All right.

14  Good luck to you, sir.

15           **PROSPECTIVE JUROR KOTLAR:**  Before I leave, can I give

16  you a copy of that?

17           **THE COURT:**  No.  It would be wasted.

18           **PROSPECTIVE JUROR KOTLAR:**  Yes, sir.

19           **THE COURT:**  Thank you.

20      Next, let's replace Mr. Kotlar.

21           **THE CLERK:**  Wendy Huynh.  H-u-y-n-h.

22           **THE COURT:**  H-u-y-n- --

23           **THE CLERK:**  -- h.

24           **THE COURT:**  -- h.

25      How do you say your last name?

1          **PROSPECTIVE JUROR HUYNH:**  Huynh.

2          **THE COURT:**  Ms. Huynh, please take that empty seat.

3   All right.

4       Let's start with you, Ms. Davis.  We've got two new

5   people.  I have forgotten how many.  Two new people.  No,

6   three.  We've got Ms. Yasumoto; right.

7       Pass the mic to Ms. Yasumoto first.

8       Ms. Yasumoto, do you have any hardship issue.

9          **PROSPECTIVE JUROR YASUMOTO:**  No.

10         **THE COURT:**  Can you see the chart?

11         **PROSPECTIVE JUROR YASUMOTO:**  Yes.

12         **THE COURT:**  Can give us the information.

13         **PROSPECTIVE JUROR YASUMOTO:**  Jennifer Yasumoto.

14  El Cerrito.

15      Graduate school, law school.

16      Current job is Chief Deputy County Counsel in Napa County.

17  I'm not a member of any organizations or clubs.

18         **THE COURT:**  A little closer to the microphone please.

19         **PROSPECTIVE JUROR YASUMOTO:**  Hobbies, cooking, baking,

20  crafting, piano playing.

21      I am married.  My spouse is a psychologist.

22      We have no children.

23      I did serve on a jury about three years ago.  It was

24  civil.  We reached a verdict.  I was the foreperson.  No

25  military or law enforcement.

1          Never a party or witness in court.

2              THE COURT:  So you're a lawyer?

3              PROSPECTIVE JUROR YASUMOTO:  Correct.

4              THE COURT:  Practicing?

5              PROSPECTIVE JUROR YASUMOTO:  Correct.

6              THE COURT:  And your client is the County of Napa

7     County?

8              PROSPECTIVE JUROR YASUMOTO:  Correct.

9              THE COURT:  Do you do litigation?  What kind of work

10    do you do?

11             PROSPECTIVE JUROR YASUMOTO:  I do employment.  And I

12    represent most relative to human services agencies.

13             THE COURT:  Is there anything about the work you do

14    that bears on the kind of case we've got here?

15             PROSPECTIVE JUROR YASUMOTO:  I don't think so.

16             THE COURT:  All right.  Have you heard all of the

17    questions so far?

18             PROSPECTIVE JUROR YASUMOTO:  Yes.

19             THE COURT:  Would you have raised your hand to any of

20    those questions?

21             PROSPECTIVE JUROR YASUMOTO:  No.

22             THE COURT:  Can you be a fair and impartial juror?

23             PROSPECTIVE JUROR YASUMOTO:  Yes.

24             THE COURT:  Would you follow the instructions I give

25    you?

 1          **PROSPECTIVE JUROR YASUMOTO:**  Yes.

 2          **THE COURT:**  Would you do that thing about laying the

 3     evidence alongside the items of proof that have to be proven

 4     and then do that fair and square?

 5          **PROSPECTIVE JUROR YASUMOTO:**  Yes.

 6          **THE COURT:**  All right.  Great.  Please pass the

 7     microphone to Mrs. Davis.

 8        Ms. Davis, do you have a hardship issue?

 9          **PROSPECTIVE JUROR DAVIS:**  No.

10          **THE COURT:**  Can you see the chart okay?

11          **PROSPECTIVE JUROR DAVIS:**  (Nods head.)

12          **THE COURT:**  Please give us the info.

13          **PROSPECTIVE JUROR DAVIS:**  My name is Victoria Davis.

14     I live in Berkeley.

15        I have a bachelor's in English literature.

16        I'm retired.  My most recent job was as a medical

17     transcriptionist and working in medical records.

18        I belong to the Stewards of the Coast and Redwoods.

19        My hobbies is reading, and more reading, walking,

20     bicycling.

21        I'm divorced, but I've been living with a partner for 10,

22     12 years.

23        I have one living child.  I had a daughter die a couple of

24     years ago.  He's 29.  He is a production engineer, I think in,

25     a netcasting, podcasting, netcasting, something like that.

1    TWIT.  It's called TWIT.  This Week in Technology.  That's all

2    I know.

3         I have had prior -- I've had four prior jury services, but

4    two of them were several -- many, many years ago in another

5    state.

6         Two in California.  One was criminal.  One was civil.  The

7    criminal was 15 or more years ago in Sonoma County.  And we

8    reached a verdict.  And the civil was just three or four years

9    ago in Oakland.  And we reached a verdict.  Although, that one

10   was difficult.  That took us a long time.

11        No military, law enforcement.

12        And I've never been a party or a witness in court.

13        THE COURT:  Did you hear all the questions that were

14   asked earlier?

15        PROSPECTIVE JUROR DAVIS:  No problem.

16        THE COURT:  The questions I asked and the questions

17   that Mr. Bicks asked, would you have raised your hand to any of

18   those?

19        PROSPECTIVE JUROR DAVIS:  No.

20        THE COURT:  Let me ask, how about this, do you have an

21   Android telephone?

22        PROSPECTIVE JUROR DAVIS:  No.  I've had iPhones all

23   along.

24        THE COURT:  IPhones, okay.  All right.  Do you own

25   stock in either of these two companies?  Or your partner?

1        **PROSPECTIVE JUROR DAVIS:**  No.

2        **THE COURT:**  I forgot, Ms. Yasumoto, do you or your

3   husband own any stock in one of these companies?

4        **PROSPECTIVE JUROR YASUMOTO:**  No.

5        **PROSPECTIVE JUROR DAVIS:**  I mean, I don't.  And I'm --

6   I think that my partner's stock is -- is all in biotech.  He's

7   got -- I tried to call him, but he's playing golf.  So I can't

8   possibly reach him.  But he changed everything to mutual funds

9   and biotech, as far as I know.  He keeps pretty up with me on

10  what he's got.

11       And I know that he's not at all interested in -- in

12  technology.  I've never heard him ever talk about how Google is

13  going, or Oracle.  So he would talk about it because he talks

14  about everything else.

15       (Laughter)

16       **THE COURT:**  Okay.  So.

17       **PROSPECTIVE JUROR DAVIS:**  I can't say for a hundred

18  percent sure, but I think I would know because I know how all

19  the other stocks are doing.

20       **THE COURT:**  Okay.  All right.  Let's please pass the

21  mic to Ms. Huynh.

22       Ms. Huynh, do you have any hardship issue?

23       **PROSPECTIVE JUROR HUYNH:**  No.

24       **THE COURT:**  You can you see the poster.

25       **PROSPECTIVE JUROR HUYNH:**  Yes.

1           THE COURT:  Please give us the info.

2           PROSPECTIVE JUROR HUYNH:  My name is Wendy Huynh.  I

3   live in Hercules.

4      I have a bachelor of science in biological sciences from

5   UC Davis.

6      I currently work at Biomarin Pharmaceutical in Novato.

7      I'm not affiliated with any organizations.

8      Hobbies are running, reading.  I am not married, but I am

9   engaged.

10     Uhm, my fiance works as a technical specialist at Biomarin

11  also.

12     I don't have any children.

13     No prior jury service.

14     Never been in the military.

15     Or have never been a witness in court.

16          THE COURT:  Okay.  Do you have an Android phone?

17          PROSPECTIVE JUROR HUYNH:  I have an iPhone.

18          THE COURT:  Have you ever had one in the past?

19          PROSPECTIVE JUROR HUYNH:  No.

20          THE COURT:  Do you think you're biased slightly one

21  way or the other in this case?

22          PROSPECTIVE JUROR HUYNH:  No.

23          THE COURT:  Can you be fair and impartial to both

24  sides?

25          PROSPECTIVE JUROR HUYNH:  Yes.

1          **THE COURT:**  Will you?

2          **PROSPECTIVE JUROR HUYNH:**  Yes.

3          **THE COURT:**  And will you follow my instructions as to

4     the law?

5          **PROSPECTIVE JUROR HUYNH:**  Yes.

6          **THE COURT:**  All right.  Thank you.

7      Anyone, before we continue with the next lawyer, did you

8     think of anything that you want to disclose?

9      Okay.  Ms. Harper.  Let's take the microphone back to

10    Ms. Harper.

11         **PROSPECTIVE JUROR HARPER:**  With no disrespect

12    intended, Your Honor, I did leave my phone on so I could

13    receive a text regarding the stock.

14         **THE COURT:**  Yeah.

15         **PROSPECTIVE JUROR HARPER:**  And my husband says he has

16    holdings in a mutual fund that holds Google, but that's all.

17         **THE COURT:**  All right.  Counsel, I don't think that's

18    a problem.  But do any of you think it's a problem?

19         **MR. VAN NEST:**  No, Your Honor.  It's a mutual fund.

20         **MR. BICKS:**  My question would just be would it have an

21    impact?

22         **THE COURT:**  Here, why don't you ask a few questions.

23    I'll give you a little extra time.  Go ahead, ask the

24    questions.

25         **MR. BICKS:**  Any -- appreciate --

 1          **PROSPECTIVE JUROR HARPER:**  It has no impact for me.

 2          **MR. BICKS:**  Because people -- if you have a mutual

 3     fund, people think -- you know, that can be concerned about

 4     that.  But from your perspective you're okay?

 5          **PROSPECTIVE JUROR HARPER:**  Yes.

 6          **MR. BICKS:**  Thank you.

 7          **THE COURT:**  So you've got a brother that works for one

 8     side; right?

 9          (Laughter)

10          **THE COURT:**  And you've got a husband that owns a

11     mutual fund that has stock in Google; right?

12          **PROSPECTIVE JUROR HARPER:**  Correct.

13          **THE COURT:**  But none of that is going to matter to

14     you; correct?

15          **PROSPECTIVE JUROR HARPER:**  No.

16          **THE COURT:**  Wait.  See, I had a bad question.  Will it

17     matter to you?

18          **PROSPECTIVE JUROR HARPER:**  No.

19          **THE COURT:**  All right.  That's what I meant to ask.

20     All right.  Great.

21      Anyone else have a full disclosure point?  Ms. Rocha, we

22     need to get you the microphone.

23          **PROSPECTIVE JUROR ROCHA:**  When you mentioned

24     PeopleSoft, I did work for PeopleSoft, through a temp agency,

25     for two months about 20 years ago.

 1           THE COURT:  That was before Oracle was on the scene;

 2    correct?

 3           PROSPECTIVE JUROR ROCHA:  Yes, yes.

 4           THE COURT:  Will that have anything to do with how

 5    good a juror you are?

 6           PROSPECTIVE JUROR ROCHA:  No.

 7           THE COURT:  All right.  Thank you.

 8       Anyone else?  That's a good point to bring up though.

 9    That's exactly the kind of point that should be disclosed.

10       Anyone else?  Great.

11       So I'm going to -- Mr. Bicks, we've got three new people

12    on the panel.  So I'm going to give you extra time, but not

13    yet.

14       Let's let Mr. Van Nest ask his questions, and then we'll

15    come back to you and give you some more time.

16           MR. VAN NEST:  Thank you.  Thank you, Your Honor.

17       Good afternoon everyone.  My name is Bob Van Nest.  I'm at

18    Keker & Van Nest, here in San Francisco, and very proud to be

19    here representing Google.

20       I'd like to reintroduce my team as well, Your Honor.

21           THE COURT:  Do so.

22           MR. VAN NEST:  Our client representative from Google

23    is Catherine Lacavera.

24       And with me Christa Anderson, Dan Purcell, Matthias

25    Kamber, Michael Kwun, Mike Tiktinsky.  And that's our team.

**JURY VOIR DIRE**

1      Do any of you know any of those folks, me, or anyone else?

2      Very good.  Thank you.

3      And I want to start by thanking you for your service as

4      jurors.  As you've heard a couple of times, it's a very

5      important case for both parties.  And I really appreciate the

6      candor you've shown on the questionnaires and in the answers.

7      And I'm going to keep at it for a little while.  Thank

8      you.

9      Ms. Kreslake.

10      **PROSPECTIVE JUROR KRESLAKE:**  Yes.

11      **MR. VAN NEST:**  Good afternoon.

12      You mentioned that you've got a neighbor and your best

13      friend that both work at Oracle.

14      **THE COURT:**  Pass the mic down there, please.

15      **PROSPECTIVE JUROR KRESLAKE:**  The nextdoor neighbor

16      currently works at Oracle.  My closest friend, she no long

17      works with Oracle.  And she's moved out of state.

18      **MR. VAN NEST:**  How long ago did your closest friend

19      move away?

20      **PROSPECTIVE JUROR KRESLAKE:**  She moved away a year

21      ago.  And she departed Oracle, probably, 18 months ago.

22      **MR. VAN NEST:**  Okay.  Did you and she talk together a

23      lot about Oracle or about her work?  Was that a common source

24      of discussion?

25      **PROSPECTIVE JUROR KRESLAKE:**  Yes, because she worked

1    at several places.  And, yes, she would talk about her work

2    with me.

3            MR. VAN NEST:  How often would the two of you talk?

4            PROSPECTIVE JUROR KRESLAKE:  We saw each other once a

5    week.

6            MR. VAN NEST:  What area of Oracle was she working in?

7            PROSPECTIVE JUROR KRESLAKE:  She was in human

8    resources.

9            MR. VAN NEST:  Here in Redwood Shores?

10           PROSPECTIVE JUROR KRESLAKE:  Yes.

11           MR. VAN NEST:  I take it she shared her views of

12   Oracle, and was happy to work there?

13        (Laughter)

14        MR. VAN NEST:  Let me ask another question.  Let's

15   talk about your neighbor.

16           PROSPECTIVE JUROR KRESLAKE:  Yes.

17        MR. VAN NEST:  The neighbor who works there at Oracle

18   now.  How often do you talk with him or her?

19           PROSPECTIVE JUROR KRESLAKE:  Quite a bit, but never

20   about his work, other than I know he's in cloud computing.

21           MR. VAN NEST:  Okay.

22           PROSPECTIVE JUROR KRESLAKE:  But he doesn't speak to

23   me about details of his work.

24           MR. VAN NEST:  And he works here at Redwood Shores as

25   well?

1          **PROSPECTIVE JUROR KRESLAKE:**  Yes.

2          **MR. VAN NEST:**  Your neighbor, are you close friends,

3     good friends, good neighbors?

4          **PROSPECTIVE JUROR KRESLAKE:**  Good neighbors.

5          **MR. VAN NEST:**  Good neighbors.  But the two of you

6     haven't talked about work?

7          **PROSPECTIVE JUROR KRESLAKE:**  No.

8          **MR. VAN NEST:**  So, Ms. Kreslake, my question is, would

9     your relationship with either your best friend or your current

10    neighbor, does that have any -- will that cause you to put

11    Oracle a little bit ahead as we start this case where they're

12    the plaintiff suing Google?

13         **PROSPECTIVE JUROR KRESLAKE:**  No, because we live in

14    San Carlos.  All of our neighbors work for some tech firm.

15    Some Google, some -- you know, I'm not privy to everybody's

16    job.  But I hear a lot of talk about tech companies because I'm

17    in that neighborhood.  San Carlos is full of it.

18      But as far as my closest friend, I agreed with some of her

19    opinions.  And I didn't agree with others.  And, you know, I

20    mean, it was just -- no, I don't think it would bias me one way

21    or another.

22         **MR. VAN NEST:**  Would it cause you to think more

23    favorably about Oracle vis-a-vis Google --

24         **PROSPECTIVE JUROR KRESLAKE:**  No.

25         **MR. VAN NEST:**  -- without having heard any evidence?

1        **PROSPECTIVE JUROR KRESLAKE:**  No, huh-uh.

2        **MR. VAN NEST:**  Thank you, Ms. Kreslake.

3      One thing we didn't find out.  Do you have a smartphone?

4        **PROSPECTIVE JUROR KRESLAKE:**  I have an old-fashioned,

5   basic cell phone because we have a tablet.

6        **MR. VAN NEST:**  And your tablet is?

7        **PROSPECTIVE JUROR KRESLAKE:**  Samsung Galaxy.

8        **MR. VAN NEST:**  Galaxy.  So you have a Samsung Galaxy

9   tablet?

10       **PROSPECTIVE JUROR KRESLAKE:**  Yes.

11       **PROSPECTIVE JUROR DAVIS:**  Have you had any problems

12  with that?

13       **PROSPECTIVE JUROR KRESLAKE:**  No.

14       **MR. VAN NEST:**  Happy with it.

15       **PROSPECTIVE JUROR KRESLAKE:**  Uh-huh.

16       **MR. VAN NEST:**  Thank you very much.

17       **PROSPECTIVE JUROR KRESLAKE:**  Okay.

18       **MR. VAN NEST:**  Ms. Harper, good afternoon.  I know

19  we've had a number of questions for you.

20      Your brother works at Oracle.

21       **PROSPECTIVE JUROR HARPER:**  Yes.

22       **MR. VAN NEST:**  Did he work there before as well?

23       **PROSPECTIVE JUROR HARPER:**  My understanding is he's

24  worked there previously, yes.

25       **MR. VAN NEST:**  And do you know how long he was an

 1  Oracle employee the first time?

 2          PROSPECTIVE JUROR HARPER:  I few years, I believe.  It

 3  gets a little murky.  I don't understand everything that he

 4  does.  And sometimes he's worked independently and contracted

 5  for some of the software companies.  So --

 6          MR. VAN NEST:  Is he a programmer?

 7          PROSPECTIVE JUROR HARPER:  Yes.

 8          MR. VAN NEST:  And he's just now recently returned to

 9  Oracle?

10          PROSPECTIVE JUROR HARPER:  Correct.

11          MR. VAN NEST:  Do you see your brother frequently?

12  Infrequently?  How often do you two talk?

13          PROSPECTIVE JUROR HARPER:  About three or four times a

14  year.

15          MR. VAN NEST:  So not a lot?

16          PROSPECTIVE JUROR MS. HARPER:  No.

17          MR. VAN NEST:  Have you ever talked about work?

18          PROSPECTIVE JUROR HARPER:  Like I said, I don't

19  understand everything he does.  So a lot of it (indicating).

20          MR. VAN NEST:  Very good.

21      And, again, the fact that he's now back at Oracle, would

22  that have any impact on your thinking about this case?

23          PROSPECTIVE JUROR HARPER:  No.

24          MR. VAN NEST:  Would it give Oracle an advantage even

25  before the first witness shows up?

1          PROSPECTIVE JUROR HARPER:  No.

2          MR. VAN NEST:  And it's not something that you're

3   worried about in terms of your ability to be fair and

4   impartial?

5          PROSPECTIVE JUROR HARPER:  No.  I've not heard

6   anything about the case from him, or read anything in the news

7   or anything like that.  So currently I have no opinion.

8          MR. VAN NEST:  Thank you.

9      Ms. Shattuck, good afternoon.

10     You said a couple of times that you -- you have concerns

11  about computers because sometimes the language we're using is

12  confusing.

13     Can you elaborate on that just a little bit for us.  Are

14  you worried about being able to understand testimony about

15  computers?

16         PROSPECTIVE JUROR SHATTUCK:  Yes.

17         MR. VAN NEST:  And why?

18         PROSPECTIVE JUROR SHATTUCK:  Well, if you don't

19  understand the language, you're not going to understand what's

20  being talked about.

21         MR. VAN NEST:  And when you -- do you have a computer

22  at home now?

23         PROSPECTIVE JUROR SHATTUCK:  Yes, I do.

24         MR. VAN NEST:  Do you have -- need help with that?  Do

25  you ask your kids for help or your --

1          **PROSPECTIVE JUROR SHATTUCK:**  My son lives in Chicago,

2    but when he visits I always ask him for help.

3          **MR. VAN NEST:**  And are you concerned that technical

4    testimony about computers or the computer business will be

5    difficult for you to follow?

6          **PROSPECTIVE JUROR SHATTUCK:**  Yes.

7          **MR. VAN NEST:**  Is this the kind of case, you think,

8    that's maybe not cut out for you?  Would you rather sit on a

9    different case?

10         **PROSPECTIVE JUROR SHATTUCK:**  Oh, what do you have in

11   mind?

12        (Laughter)

13         **MR. VAN NEST:**  Well said.  Well said.

14        (Laughter)

15         **MR. VAN NEST:**  I wish I were in charge.  That's not

16   the case.  That's not the case.

17         **PROSPECTIVE JUROR SHATTUCK:**  I don't -- you know, I

18   don't -- I don't have a feeling one way or the other --

19         **MR. VAN NEST:**  Okay.

20         **PROSPECTIVE JUROR SHATTUCK:**  -- about that.

21         **MR. VAN NEST:**  Thank you.  Thank you.

22        One other question I had for you.  You mentioned that --

23   are you -- were you active in your union when you were working?

24         **PROSPECTIVE JUROR SHATTUCK:**  Yes.

25         **MR. VAN NEST:**  What positions did you hold?

 1          **PROSPECTIVE JUROR SHATTUCK:**  I've been a shop steward

 2     for many years.  I was president of my local for many years.  I

 3     was a member of the statewide board for many years.

 4          **MR. VAN NEST:**  And were those positions that you were

 5     appointed to or you were elected to?

 6          **PROSPECTIVE JUROR SHATTUCK:**  Elected.

 7          **MR. VAN NEST:**  Elected to.  Congratulations.

 8          **PROSPECTIVE JUROR SHATTUCK:**  Thank you.

 9          **MR. VAN NEST:**  And I see you enjoyed that a lot.

10          **PROSPECTIVE JUROR SHATTUCK:**  I did.

11          **MR. VAN NEST:**  Are you retired from that now, as well?

12          **PROSPECTIVE JUROR SHATTUCK:**  Yes.

13          **MR. VAN NEST:**  Thank you.  Thank you.

14        Let's go right next door to Mr. West.

15        Good afternoon, Mr. West.

16          **PROSPECTIVE JUROR WEST:**  How's it going?

17          **MR. VAN NEST:**  It's going well.

18        I want to ask you your views on software.  Tell me, again,

19     I think you responded earlier that your view was that there's

20     no such thing as open source software, or all software should

21     be compensated.

22          **PROSPECTIVE JUROR WEST:**  Yeah.

23          **MR. VAN NEST:**  Tell us what you meant by that.

24          **PROSPECTIVE JUROR WEST:**  Basically, what I mean is it

25     would go the same with any category, whether somebody has an

1   idea, an invention, or even an efficient process that they come

2   up with on their own should always be compensated for.

3   Especially if it's something that -- that you have help with by

4   a bigger corporation.  Something like that.  You would

5   always -- it should always be compensated for.  Nothing should

6   be really free for everybody to use.

7        **MR. VAN NEST:**  And is that a view that you have based

8   on your work or based on school or both?

9        **PROSPECTIVE JUROR WEST:**  A little bit of -- well,

10  mostly work.  And then just the way I was brought up.

11       **MR. VAN NEST:**  What is it about work that's caused you

12  to have those views?

13       **PROSPECTIVE JUROR WEST:**  I'm just a tradesman in

14  general.  And I tend to work pretty hard.  And I prefer to be

15  well-compensated for the things that I do, especially if I come

16  up with something that's a more efficient way of doing things.

17  I would expect to be compensated for that.

18       **MR. VAN NEST:**  Now, have you ever heard of software

19  called open source, that a bunch of companies work on together

20  and give away for free?  Is that something you're familiar

21  with?

22       **PROSPECTIVE JUROR WEST:**  Not exactly.  I mean, I've

23  kind of heard of the open source concept, but not in detail.

24       **MR. VAN NEST:**  Okay.  There will be some evidence,

25  some testimony about open source software and software that was

 1   either free or not free.  I take it you would come to that

 2   with, sort of, a previous position as to whether software can

 3   ever be free?

 4           **PROSPECTIVE JUROR WEST:**  Yeah.

 5           **MR. VAN NEST:**  And why do you think that?

 6           **PROSPECTIVE JUROR WEST:**  Uhm, can you rephrase that?

 7           **MR. VAN NEST:**  Let me put it this way:  You have

 8   strong views about paying for software.  Would it be difficult

 9   for you to put those views aside and listen to evidence about

10   open source software and free software?

11           **PROSPECTIVE JUROR WEST:**  No.

12           **MR. VAN NEST:**  Some of the evidence will go to the

13   issue of companies sharing software.

14           **PROSPECTIVE JUROR WEST:**  Uh-huh.

15           **MR. VAN NEST:**  Do you have any views about that?

16           **PROSPECTIVE JUROR WEST:**  No.

17           **MR. VAN NEST:**  No?

18       And do you think you could sit impartially in a situation

19   where one party was claiming that the software was free and the

20   other party was claiming that the software was only for sale?

21           **PROSPECTIVE JUROR WEST:**  Yeah, absolutely.

22           **MR. VAN NEST:**  All right.  Thank you, Mr. West.

23       Ms. Huynh.

24           **THE COURT:**  Just one second.

25       All right.  Thank you.  Go ahead.

1        **MR. VAN NEST:**  I'd like to ask Ms. -- Ms. Huynh, good

2   afternoon.

3        **PROSPECTIVE JUROR HUYNH:**  Good afternoon.

4        **MR. VAN NEST:**  You mentioned on your questionnaire

5   that your father may own stock in Oracle or Google.  Do you

6   know that for a fact?  Or that's something you think may be

7   true?

8        **PROSPECTIVE JUROR HUYNH:**  I think may be true.  I know

9   he talks a lot about stocks, mentions Google and Oracle.  But I

10  am not sure.

11       **MR. VAN NEST:**  And this is your father?

12       **PROSPECTIVE JUROR HUYNH:**  Yes, my father.

13       **MR. VAN NEST:**  Do you live with your parents now?

14       **PROSPECTIVE JUROR HUYNH:**  Yes, I live with them.

15       **MR. VAN NEST:**  Does your dad talk about stocks

16  frequently?

17       **PROSPECTIVE JUROR HUYNH:**  He would just mention

18  because he would watch, you know, the stocks on TV, and just

19  mention, oh, stocks are going up or down.  But I don't really

20  pay attention.

21       **MR. VAN NEST:**  You don't follow it yourself?

22       **PROSPECTIVE JUROR HUYNH:**  No.

23       **MR. VAN NEST:**  This is something he talks about.  And

24  this is his account, your parents' account, not your own

25  account?

 1          **PROSPECTIVE JUROR HUYNH:**  Yeah, not my account.

 2        **MR. VAN NEST:**  Okay.  Can you tell us a little bit

 3   what you do at Biomarin?  You mentioned quality control.  What

 4   are you doing day by day?

 5          **PROSPECTIVE JUROR HUYNH:**  So I work in the quality

 6   control department in environmental monitoring group.  And our

 7   group pretty much monitors the environment, the rooms and the

 8   water utility systems for the manufacturing facility at our

 9   company.  And I -- my job is really writing up deviations or

10   investigations on -- if we have any excursions over

11   specification limits, then I write up the investigations for

12   those.  And just pretty much making sure that the lab runs

13   smoothly, because I work in the lab as well.

14          **MR. VAN NEST:**  Thank you.

15      The reports you're doing there for the company's benefit?

16   You're reporting within the company --

17          **PROSPECTIVE JUROR HUYNH:**  Yes.

18        **MR. VAN NEST:**  -- on whether they are exceeding

19   specifications, and that sort of thing?

20          **PROSPECTIVE JUROR HUYNH:**  Yes.

21        **MR. VAN NEST:**  Do you have enforcement responsibility

22   in that regard?  Or you're simply making a report and passing

23   it on?

24          **PROSPECTIVE JUROR HUYNH:**  I'm just making the report.

25   There's always an approver.  My boss approves my investigations

 1  before it's official.

 2          MR. VAN NEST:  And your background in school is in

 3  pharmaceuticals?

 4          PROSPECTIVE JUROR HUYNH:  In biology.

 5          MR. VAN NEST:  In biology.  Thank you.  Thank you

 6  Ms. Huynh.

 7      Ms. Davis, one of our new arrivals.

 8      Ms. Davis, you mentioned that you read a lot.  Have you

 9  written anything?

10          PROSPECTIVE JUROR DAVIS:  Written?

11          MR. VAN NEST:  Have you written anything?

12          PROSPECTIVE JUROR DAVIS:  Written, no.

13          MR. VAN NEST:  You're not an author; you're a reader?

14          PROSPECTIVE JUROR DAVIS:  I'm a reader.

15          MR. VAN NEST:  Do you think about -- this is a case

16  about copyright.  Is copyright something that you think about a

17  lot, a little, or not much?

18          PROSPECTIVE JUROR DAVIS:  Uhm, the only way -- place

19  I've been following it is with like eBooks.

20          MR. VAN NEST:  And what have you been following on

21  eBooks?

22          PROSPECTIVE JUROR DAVIS:  Well, not too much.  I'm not

23  even clear how I feel about it, you know, eBooks versus real

24  books.  I like real books.

25          MR. VAN NEST:  You like to hold --

1          **PROSPECTIVE JUROR DAVIS:**  On the other hand, I have a

2     Kindle.

3          (Laughter)

4          **PROSPECTIVE JUROR DAVIS:**  And that's not really a

5     copyright issue, I think.  That's a whole different issue.  So,

6     no, I don't -- I don't actually know too much about copyright.

7          **MR. VAN NEST:**  Okay.  And you mentioned you have

8     always had an iPhone, not an Android.

9          Do you have anything against an Android, or simply chose

10    an iPhone?

11         **PROSPECTIVE JUROR DAVIS:**  No, I just had iPhone from

12    the beginning.  I have a Mac.  And, you know, I just sort of

13    drank the Kool-Aid, and I have the whole system.  And it's just

14    easier to have everything all in one.

15         **MR. VAN NEST:**  Perfect.

16         **PROSPECTIVE JUROR DAVIS:**  Because Android didn't have

17    that in the beginning.  You know, if you had -- if you had an

18    Android phone and a Mac computer, you couldn't put all your

19    photos.

20         **MR. VAN NEST:**  That's gotten a lot better.  But not

21    yet.

22         **PROSPECTIVE JUROR DAVIS:**  I know.  I've heard.  My son

23    is a total Microsoft person, so --

24         **MR. VAN NEST:**  So he's into Windows.

25         **PROSPECTIVE JUROR DAVIS:**  Yeah.

 1          **MR. VAN NEST:**  Let me ask, while we're talking about

 2    copyrights, does anybody in our panel hold a copyright on

 3    anything?

 4          Has anybody applied for a copyright?

 5          Does anybody have strong views about copyrights or

 6    copyrightability?

 7          This is a case about copyrights.  Both Oracle and Google

 8    have a lot of copyrights.  But in this particular case Oracle

 9    has the copyrights and they're asserting them against Google.

10          Is there anybody -- and I'll ask for a show of hands.

11    Does anybody feel that the owner of the copyright starts off

12    ahead in a copyright lawsuit that's disputed?

13          Anybody feel that just because -- before there's any

14    evidence, just because Oracle holds the copyrights, they start

15    off a little bit ahead of Google, which is the defendant?

16          How about patents -- oh, yes, sir, Mr. Stromsness.

17          **PROSPECTIVE JUROR STROMSNESS:**  I think the judge told

18    us earlier that if -- that it's already settled that the

19    copyright is held, and so the burden of evidence is with

20    Google.

21          **MR. VAN NEST:**  And let me ask about that.  He did say

22    that.  And you were listening closely.

23          Does that cause you to put one party ahead of the other at

24    the starting gate?

25          **PROSPECTIVE JUROR STROMSNESS:**  I'm not sure "ahead."

 1   It's just who has to show whatever the burden is.

 2        **MR. VAN NEST:**  But in terms of -- we all know that

 3   someone -- someone mentioned it's got to be proven, it's got to

 4   be evidence.  And that's certainly true, and you'll hear that a

 5   number of times.

 6        In terms of where we stand now, before there's any

 7   evidence, you would place the two parties on an equal footing?

 8        **PROSPECTIVE JUROR STROMSNESS:**  Yes.

 9        **MR. VAN NEST:**  Is there anybody that feels different,

10   either because Oracle holds a copyright or because of anything

11   Judge Alsup said?

12        Does anybody feel that the parties are not on an even

13   footing starting out, or that Google is behind?  That's what I

14   would really be concerned about --

15        (Laughter)

16        **MR. VAN NEST:**  Anybody put Google behind?

17        Okay.  Good.  Thank you.  I appreciate that.

18        Let's ask Mr. Bruesewitz.  I just want to clarify what you

19   said about Mr. Ellison.  Obviously, he's the CEO of Oracle.

20   He'll play a role in the case.

21        Is he someone you admire a lot?  You mentioned Lanai and

22   golf and all that.  Tell us about your views on Mr. Ellison.

23        **PROSPECTIVE JUROR BRUESEWITZ:**  Just especially in our

24   culture today, it's not, how would you say, normal for people

25   to actually look at someone and say, I want to be that.  Now

 1  it's like, I deserve that.  So I consider him a pretty

 2  inspiring person.

 3          **MR. VAN NEST:**  Okay.

 4          **PROSPECTIVE JUROR BRUESEWITZ:**  The fact he's been able

 5  to do what he's been able to do.

 6          **MR. VAN NEST:**  He's accomplished a lot.  If I ask you,

 7  do you admire Mr. Ellison, the answer would be?

 8          **PROSPECTIVE JUROR BRUESEWITZ:**  Yes.

 9          **MR. VAN NEST:**  Okay.  And have you been following his

10  career in particular?

11          **PROSPECTIVE JUROR BRUESEWITZ:**  No, just Lanai.

12      (Laughter)

13          **MR. VAN NEST:**  Just Lanai.  That was a big one.

14          **PROSPECTIVE JUROR BRUESEWITZ:**  Yeah.  I played there

15  twice, so I knew he bought it.  I was hoping he would make the

16  course a little nicer.

17      (Laughter)

18          **MR. VAN NEST:**  How does that impact your thinking

19  here?

20          **PROSPECTIVE JUROR BRUESEWITZ:**  I don't see the

21  relevance, myself.

22          **MR. VAN NEST:**  Would you be able to put that aside,

23  and, again, put Google and Oracle on the same footing in the

24  case?

25          **PROSPECTIVE JUROR BRUESEWITZ:**  Of course.

1          **MR. VAN NEST:**  Would your admiration come into play at

2   all, even a little?

3          **PROSPECTIVE JUROR BRUESEWITZ:**  I don't see how it

4   could because I don't see him on a day-to-day basis kind of

5   thing.  I don't have a personal attachment to him.

6          **MR. VAN NEST:**  Is there anything else about the case

7   you've heard that causes you to question whether you would be

8   impartial?

9          **PROSPECTIVE JUROR BRUESEWITZ:**  I actually haven't

10  heard about the case, which I guess is shocking from what

11  everyone is saying.

12         **MR. VAN NEST:**  Good.  You haven't heard or read

13  anything about the case, sounds like.

14         **PROSPECTIVE JUROR BRUESEWITZ:**  No.

15         **MR. VAN NEST:**  All right.  Let me ask a couple of

16  other questions, just general, for the group.

17      Most people raised their hands on Google products.

18      Is there anybody on our panel that has never used a Google

19  product?

20      Google products are Google Search, Google Maps, Google

21  Mail.  I think everybody knows.

22      Is there anybody that's never used a Google product?

23      Okay.  The marketing people will be very happy about that.

24      Is there anybody on the flip side, anybody that's been

25  unhappy with a Google product, or had a problem that was

1   significant that caused them concern or inconvenience, or cost

2   them money?  Again, with any of the Google products that we're

3   all familiar with.

4       Has anybody dealt with Google in any way?  You've met with

5   Google sales folks, other than just in the course of using

6   Google products.  Does anybody deal on a regular basis with

7   anybody from Google?

8       How about from Oracle -- yes, Mr. Haley.

9           **PROSPECTIVE JUROR HALEY:**  Point of clarification.  I

10  do have my next-door neighbor.  He's head of worldwide

11  marketing for applied computing.

12          **MR. VAN NEST:**  For Oracle?

13          **PROSPECTIVE JUROR HALEY:**  For Google.

14          **MR. VAN NEST:**  For Google.

15      Okay.  Do you speak with him often about work? Are you

16  close friends?

17          **PROSPECTIVE JUROR HALEY:**  Seldom.  Basic neighbor

18  talk.

19          **MR. VAN NEST:**  That wouldn't influence your thinking

20  in this case?

21          **PROSPECTIVE JUROR HALEY:**  No.

22          **MR. VAN NEST:**  He's not a close friend --

23          **PROSPECTIVE JUROR HALEY:**  No.

24          **MR. VAN NEST:**  -- or anything like that?

25          **PROSPECTIVE JUROR HALEY:**  No.

1       **MR. VAN NEST:**  On the same vein, has anybody dealt

2    with people from Oracle?  Salespeople or marketing people or

3    the field application people.

4       Ms. Hines.  Tell us about that.

5       **PROSPECTIVE JUROR HINES:**  So, at PG&E our main billing

6    system is owned by Oracle.  And so if we make enhancements, we

7    work with consultants from their side to get that work, the

8    code in and completed.

9       **MR. VAN NEST:**  That's something you did personally --

10      **PROSPECTIVE JUROR HINES:**  Uh-huh.

11      **MR. VAN NEST:**  -- with them?

12   And how often were you working with your Oracle

13   representative?

14      **PROSPECTIVE JUROR HINES:**  It depends on the project.

15   I've only been on one project where we were working directly

16   with the Oracle consultant to get the code completed.  And that

17   was last year.

18      **MR. VAN NEST:**  Was that a good experience?

19      **PROSPECTIVE JUROR HINES:**  Yeah.

20      **MR. VAN NEST:**  Any problems, anything like that?

21      **PROSPECTIVE JUROR HINES:**  Huh-uh.

22      **MR. VAN NEST:**  On that project were you seeing your

23   Oracle representative every day, every week, every month?  How

24   often --

25      **PROSPECTIVE JUROR HINES:**  We had weekly status

```
 1   meetings.

 2          MR. VAN NEST:  Would that cause you any concern in

 3   terms of sitting in a case where Oracle is one party and Google

 4   is the other party?

 5          PROSPECTIVE JUROR HINES:  No.

 6          MR. VAN NEST:  This didn't become a close friendship

 7   or anything like that?

 8          PROSPECTIVE JUROR HINES:  No.

 9          MR. VAN NEST:  This is just business.

10          PROSPECTIVE JUROR HINES:  Yes.

11          MR. VAN NEST:  You don't think that would enter into

12   your thinking at all?

13          PROSPECTIVE JUROR HINES:  No.

14          MR. VAN NEST:  Thank you, Ms. Hines.

15      Anybody else?

16      Mr. Stromsness.

17          PROSPECTIVE JUROR STROMSNESS:  Years ago, at the

18   Performing Arts Center at UC Berkeley, Sun Microsystems

19   sponsored a dance series, and worked with us with some loaned

20   hardware to put up a Gopher server.  For people who remember

21   back.

22      And then the person who worked with us there sent me --

23   you know, cold-called me sometimes after that before she went

24   to work for HP.  But that's it.  That was 20 years ago.

25          MR. VAN NEST:  Okay.  And a long time ago.  That was
```

1   Sun?

2          **PROSPECTIVE JUROR STROMSNESS:**  That was Sun, yeah.

3       **MR. VAN NEST:**  Anybody else have experience?

4   Mr. Haley.

5          **PROSPECTIVE JUROR HALEY:**  I apologize.  I triggered my

6   thought process.

7      We did run Oracle Financials.

8          **MR. VAN NEST:**  We did what?

9          **PROSPECTIVE JUROR HALEY:**  My company ran Oracle

10  Financials.  So we had a whole implementation scheme.  This was

11  probably 2001-2002, sometime in that time frame.

12     So at that point I did have a fair amount of interface

13  with them, when we were doing that.  Can't recall any specifics

14  in terms of people and names.

15         **MR. VAN NEST:**  So you may have interacted with folks

16  from Oracle?

17         **PROSPECTIVE JUROR HALEY:**  Sure.

18         **MR. VAN NEST:**  But that was quite a long time ago?

19         **PROSPECTIVE JUROR HALEY:**  Sure, yes.

20         **MR. VAN NEST:**  And that doesn't give you any pause in

21  terms of sitting on this case and being fair?

22         **PROSPECTIVE JUROR HALEY:**  No.

23         **MR. VAN NEST:**  Thank you for bringing it up.

24     Google is in the news a lot.  Oracle is in the news too.

25     Has anybody read anything about Google recently that they

 1  think would impact their thinking to this case?  I'm not

 2  limiting to this case.  Judge Alsup has made clear we are not

 3  to be doing that.

 4       But has anybody read anything about Google recently that

 5  they think might impact their thinking about this case?

 6       Okay.  Good.

 7       Has -- has -- do any of you work for companies -- and,

 8  Mr. Haley, I'm going to hold on, on you, on this one because

 9  you've already said something about it.  So I'm going to exempt

10  you from answering it.

11       Does anybody else have any responsibility for intellectual

12  property where they work?  By that I mean patents or copyrights

13  or trademarks or any of that.  Just give me a hand up.

14       Nobody?

15       What I'm asking about is if anyone at work -- not at

16  home -- has any responsibility for either getting patents or

17  filing patents or copyrights or that sort of thing.

18       Okay.  Very good.

19       I'm going to ask one of our new jurors.

20       Ms. Yasumoto, good afternoon.

21       You said you're deputy county counsel.  Give us a little

22  discussion about your range of responsibilities at the County.

23            PROSPECTIVE JUROR YASUMOTO:  So I either handle or

24  oversee all of our employment litigation.  And also oversee all

25  of our legal services to our Health and Human Services Agency,

 1   which is an integrated super agency.

 2          **MR. VAN NEST:**  Okay.  So the employment.  Employment

 3   litigation, that's usually against the County?

 4          **PROSPECTIVE JUROR YASUMOTO:**  Against the County, yeah.

 5   Against employees.

 6          **MR. VAN NEST:**  And are you --

 7          **PROSPECTIVE JUROR YASUMOTO:**  Dealing with the union.

 8          **MR. VAN NEST:**  Are you a supervising attorney on those

 9   cases?

10          **PROSPECTIVE JUROR YASUMOTO:**  I am.

11          **MR. VAN NEST:**  So you're in court?

12          **PROSPECTIVE JUROR YASUMOTO:**  Arbitration.

13          **MR. VAN NEST:**  In arbitration.  Okay.  And is that a

14   daily activity?  Weekly?  Monthly?

15          **PROSPECTIVE JUROR YASUMOTO:**  I'm not in arbitration

16   daily or weekly, but I'm handling employment on an ongoing

17   basis.

18          **MR. VAN NEST:**  What about the Health and Human

19   Services side, what's the nature of that work?

20          **PROSPECTIVE JUROR YASUMOTO:**  Overseeing everything

21   from LPS trials to juvenile dependency, CPS, mental health

22   issues, public health, social services.

23          **MR. VAN NEST:**  No responsibility for intellectual

24   property for copyrights or patents or anything like that?

25          **PROSPECTIVE JUROR YASUMOTO:**  No.

 1          **MR. VAN NEST:**  And have you read anything about this

 2    case?

 3          **PROSPECTIVE JUROR YASUMOTO:**  No.

 4          **MR. VAN NEST:**  Let me ask another general question.

 5    There was talk earlier about billions.  And somebody said

 6    something about agreement.

 7          I want to make clear that nobody is in agreement about

 8    billions on this case.

 9          So I want to ask this question:  Is there anybody that

10    would not be willing to award nothing if that's what the

11    evidence showed was correct?

12          Is there anybody that feels like, gee, they're here; gee,

13    they're the plaintiff we've got to give them something no

14    matter what the evidence shows?  Is there anybody who has that

15    frame of mind?  Everybody is going to wait and hear the

16    evidence on that subject?

17          I didn't want my silence to suggest that I believe this

18    thing has anything to do with billions.  And maybe you guys

19    assumed that, but I just wanted to be sure.

20          Now, one of the things that Judge Alsup has mentioned is

21    fair use.  The fair use doctrine and so on.

22          Does anybody have any familiarity with fair use, or come

23    into contact with it at work or in the course of -- yes, sir,

24    Mr. Stromsness.

25          **PROSPECTIVE JUROR STROMSNESS:**  At UC Berkeley we would

 1  somewhat regularly get, you know, all employee emails

 2  reminding -- mainly aimed at professors about what they were

 3  allowed to do in their courses, and what they weren't allowed

 4  to do in their courses.  It didn't really apply to me on the

 5  administrative computer support side.

 6          **MR. VAN NEST:**  These were general emails?

 7          **PROSPECTIVE JUROR STROMSNESS:**  Yeah, always deans and

 8  directors memos, so they went to everyone at the campus.

 9          **MR. VAN NEST:**  Do you have enough recollection of any

10  of those to be familiar with fair use?  Or is this something

11  you saw in the past?

12          **PROSPECTIVE JUROR STROMSNESS:**  I remember that there

13  were four tests, and mainly that they told professors to

14  contact the intellectual property office if they had questions.

15          **MR. VAN NEST:**  Okay, good.  And you would be able to

16  set aside anything you remember about that, and follow

17  Judge Alsup's instructions in this case?

18          **PROSPECTIVE JUROR STROMSNESS:**  Yes.

19          **MR. VAN NEST:**  That wouldn't be a problem for you?

20          **PROSPECTIVE JUROR STROMSNESS:**  Not at all.

21          **MR. VAN NEST:**  There will be testimony during the case

22  about use of software which Google engineers believe was open

23  and free.

24      My question is, is there anybody on the panel that thinks

25  that copying is always wrong, no matter what, no matter what

1   the circumstances are?  If you feel that way, give me a hand

2   up.

3       In other words, what I want to know is, is anybody so

4   concerned or offended by someone copying something else, even

5   though they felt it was okay to do, that that would be a real

6   problem in terms of evaluating evidence fairly and impartially,

7   which we all need to do?  Anybody feel that way?

8       Anybody have a situation where someone copied from you

9   and -- and became a big deal?

10      Anybody here -- has anybody experienced a situation where

11  you felt that someone, either intentionally or unintentionally,

12  copied your work, used your work?

13      Or has anyone here ever been accused of copying or using

14  anything?

15      Or any of your companies, does anyone work for a company

16  that was accused of taking something from someone else?

17      Mr. Haley, you've already talked about that.  That's the

18  patent litigation you are talking about.

19          **PROSPECTIVE JUROR HALEY:**  (Nods head.)

20          **MR. VAN NEST:**  Okay.  We've heard a little bit about

21  that.  Thank you, though, for volunteering.

22      Anybody else been with a company that was accused of

23  taking something that someone else said belonged to them?

24      Anyone work at a company that they claim was harmed by

25  competition from someone else, wrongfully so?  Any of your

1   companies, your employers?

2       Anybody in a situation where their company felt, hey, this

3   other company is not competing fairly, not playing by the

4   rules?

5       Okay.  Good.  Great.

6       Is there -- is there anyone that feels as though there's

7   some question that we haven't asked, that we should have asked

8   about you, that might affect your thinking about this case?

9       I know that's pretty open-ended.  But what I'm trying to

10  get at is, you guys have been very patient listening to the

11  questions and responding to them.

12      Does anybody have anything they think should be discussed

13  or brought up for either party, that hasn't come up yet, that

14  we haven't asked you about yet?

15      May I have just a moment, Your Honor?

16      (Pause)

17          **MR. VAN NEST:**  I have no further questions, Your

18  Honor.

19          **THE COURT:**  Thank you.

20      Mr. Bicks, I was going to give you a moment.  But before I

21  do that, Ms. Huynh, I want to make sure that we understand

22  something.

23      You live with your parents; right?

24          **PROSPECTIVE JUROR HUYNH:**  Yes.

25          **THE COURT:**  So when your dad finds out that you're on

1    this case, assuming that you get selected, he might be tempted

2    to say something because he owns some stock in one or the other

3    companies.

4        And you would need to tell him you can't -- you're not

5    going to talk about it, you don't want him to -- do you think

6    he would honor that?  Or do you think he would be so tempted to

7    say something to you that we couldn't stop him?

8        **PROSPECTIVE JUROR HUYNH:**  I think he would understand

9    that I wouldn't be able to say anything to him about this case.

10        **THE COURT:**  All right.  So will you tell him that?

11    Say, look, Dad, I just can't talk about this case?

12        **PROSPECTIVE JUROR HUYNH:**  Yeah.  I don't -- I wouldn't

13    tell him that I'm on the case.  So I don't think he would ask

14    me.

15        **THE COURT:**  All right.  Well, if he did find out and

16    he did say something to you that, hey, he owned stock in Oracle

17    or he owned stock in Google, can you promise us that you will

18    completely disregard that and decide -- in deciding this case.

19        **PROSPECTIVE JUROR HUYNH:**  Yes.  I'm not even sure if

20    he owns stock.

21        **THE COURT:**  I know you're not sure.  But if it did

22    turn out that way, and if he did blurt it out in some manner,

23    would you promise us that you will disregard that statement?

24        **PROSPECTIVE JUROR HUYNH:**  Yes.

25        **THE COURT:**  All right.  Thank you.

 1          Mr. Bicks, did you have any -- I'll give you a few more

 2   minutes to ask some questions of the new arrivals on the panel.

 3          **MR. BICKS:**  Thank you, Your Honor.

 4       Good afternoon.

 5          Ms. Yasumoto, you described that you, I think, were a

 6   foreperson on a jury before.

 7              **PROSPECTIVE JUROR YASUMOTO:**  That's correct.

 8          **MR. BICKS:**  And, just, how was that experience?

 9              **PROSPECTIVE JUROR YASUMOTO:**  Interesting.

10       (Laughter)

11          **MR. BICKS:**  Tell me about that.

12          **PROSPECTIVE JUROR YASUMOTO:**  Well, being on the other

13   side, seeing it from completely different vantage points.

14          **MR. BICKS:**  Understood.

15          Anything about that that would influence anything on this

16   case if you sat on it?

17              **PROSPECTIVE JUROR YASUMOTO:**  No.

18          **MR. BICKS:**  You mentioned, I think, you're more

19   typically on the defense side rather than the plaintiff side.

20          **PROSPECTIVE JUROR YASUMOTO:**  It depends.  But I

21   guess -- I guess that's probably an accurate statement.

22          **MR. BICKS:**  Anything about that -- we're over here.

23   We're on the plaintiff's side.  And some people -- nothing

24   wrong with it, but sometimes there's some people kind of feel

25   one way or the other they don't like people on the plaintiff's

**JURY VOIR DIRE**

1    side.  McDonald's coffee example.

2         Any kind of orientation on your part that puts you more,

3    kind of, leaning toward the defense side rather than

4    plaintiff's side?

5              **PROSPECTIVE JUROR YASUMOTO:**  I don't think so.

6         **MR. BICKS:**  Just to our new three folks, just because

7    I didn't have a chance to speak with you as with the others, I

8    was focused on a couple of key things, which are people that --

9    you know, that we're requesting a very, very high amount of

10   damages.  And any concerns about that among, any of the three

11   of you?

12        Ms. Davis, anything, when I mention that?

13             **PROSPECTIVE JUROR DAVIS:**  (Inaudible.)

14        **MR. BICKS:**  I'm sorry, I can't hear you.

15        **THE COURT:**  Give her the mic.

16        **PROSPECTIVE JUROR DAVIS:**  They always seem like high

17   amount of damages to me.

18        **MR. BICKS:**  Yeah.  And explain what you mean by that.

19        **PROSPECTIVE JUROR DAVIS:**  Well, every time I see a

20   business lawsuit, they just always seem high.  But I don't have

21   any feeling about it one way or the other as far as if it's

22   right or wrong.

23        **MR. BICKS:**  Understood.

24        **PROSPECTIVE JUROR DAVIS:**  Just like another

25   billion-dollar lawsuit.

1          **MR. BICKS:**  But when you say that, in your -- kind of,

2     your heart, are you sitting there thinking, you know, You folks

3     should have worked this out?

4          **PROSPECTIVE JUROR DAVIS:**  No.  I don't read the

5     business section.  I don't -- I'm not really involved in

6     business or sports.  Those are the two things I don't get into.

7          **MR. BICKS:**  Ms. Huynh, anything, any concerns or --

8     about sitting on a case, if you were on it, where we're asking

9     for those kind of damages?

10         **PROSPECTIVE JUROR HUYNH:**  No.

11         **THE COURT:**  Microphone.

12         **MR. BICKS:**  On Oracle, kind of, anything negative that

13    either of the three of you, kind of, heard, feel, see, as we've

14    been in the room talking, that you think the folks at Oracle or

15    I should know about, something that would be important in this

16    case?

17         **PROSPECTIVE JUROR HUYNH:**  No, not from me.

18         **PROSPECTIVE JUROR YASUMOTO:**  (Shakes head.)

19         **MR. BICKS:**  Thank you, Your Honor.

20         **THE COURT:**  Thank you, Mr. Bicks.

21       Okay.  Again, I ask you, full disclosure time, anything

22    you want to volunteer to put it out there for us to evaluate

23    just out of an abundance of caution?  If so, raise your hand.

24         So if you are selected, you must listen carefully and

25    impartially -- meaning fair to both sides -- to all the

1  evidence; and then at the end of the case lay the evidence

2  alongside the elements of proof that I will give you; and then

3  ask the question whether or not the party with the burden of

4  proof has carried the burden of proof under the law.  And if

5  the answer is yes, then they win.  If the answer is no, then

6  they lose.

7      And are you all able to do that and to do that fairly and

8  impartially?  If so, raise your hand.

9          (Show of hands.)

10     **THE COURT:**  Okay.  Everyone has raised their hand.

11  Okay.  Can we pass the panel for cause?

12     **MR. VAN NEST:**  May I approach, Your Honor?

13     **THE COURT:**  All right.  We will have a sidebar.

14  (The following proceedings were heard at the sidebar:)

15     **THE COURT:**  All right.  Can we pass the panel for

16  cause?

17     **MR. VAN NEST:**  Your Honor, I think Ms. Shattuck, again

18  has indicated an inability to comprehend and follow this

19  testimony and evidence like this.

20     And she's expressed in a number of different ways that she

21  is not capable of following technical testimony about

22  computers.  And that's, of course, what we're going to be

23  talking about.  She said it both in Mr. Bicks' questions, she

24  said it in my questions.  She said it in your questions.  And

25  she said it most clearly in my questions that she just doesn't

1    understand.

2        And I think that, given we want the jurors that understand

3    and can follow evidence, she should be stricken, excused.

4        **MR. BICKS:**  I don't think that's right, Your Honor.

5    This woman has a degree from Berkeley and is clearly a very

6    bright, thoughtful person.  I don't believe the standard is we

7    have to have all tech savvy people on a jury.

8        When you asked her could she be fair, she said she could.

9    I think she's in here feeling a little bit, kind of,

10   intimidated.  And I don't mean it in an overt physical way.

11       But I just don't see that.  That's a smart person.  I

12   don't think that's the standard.  I really don't.

13       **THE COURT:**  Can I make a ruling?

14       **MR. BICKS:**  Yeah.

15       **MR. VAN NEST:**  Sure.

16       **THE COURT:**  Denied.  The -- I agree that she's

17   probably on the lower half of the ability of the 16 people to

18   understand the technology.  But that's not the test.  Under the

19   law, we can't exclude her for that reason.

20       And she is bright enough and I think she will try hard to

21   understand it.  And there are certainly other people on the

22   jury that I have equal doubts about, that I won't tell you who

23   they are.  But I think there are several on the jury who have

24   even less chance of grasping it.  So I will never get a jury

25   that's technically savvy.

1    Anyway, that motion is denied.

2    All right.  Anyone else?

3        **MR. VAN NEST:**  No, Your Honor.

4        **MR. BICKS:**  No.

5        **THE COURT:**  Anyone on your side?

6        **MR. BICKS:**  No.

7        **THE COURT:**  Do you understand the process that we're

8    going to go through now?

9        **MR. BICKS:**  It may be worth explaining it.

10        **THE COURT:**  Okay.  So you go first, Mr. Bicks.  You

11    stand and excuse whoever you want.  Then it goes to --

12    challenge goes to Van Nest.  Then back to you until each of you

13    have done three.

14    If you pass, you do not -- you've used it.  You don't get

15    a chance to go back and retrieve it.  It's gone forever.  And

16    if there are two consecutive passes, then the lowest ten seat

17    numbers will be the jury.

18        **MR. BICKS:**  In other words, you stand up and you do

19    it.  We don't exchange -- we don't give you a list of three?

20        **THE COURT:**  No, no.  You have to do it in open court.

21    And you don't give a reason.  You just --

22        **MR. VAN NEST:**  Thank and excuse.

23        **THE COURT:**  You thank and excuse.

24        **MR. VAN NEST:**  Ask the Court to thank and excuse.

25        **THE COURT:**  You give the names.  And you don't give a

1   reason.  You just do it.

2            MR. VAN NEST:  Yeah.

3            THE COURT:  And you get to go first as the plaintiff.

4            MR. BICKS:  And do I have a chance to confer with our

5   client?

6            THE COURT:  Yeah, take -- how long do you need though?

7            MR. BICKS:  Ten minutes?

8            THE COURT:  Then I have to -- I'm going to -- well, do

9   you want the jury here while you do that?  Maybe you do.

10            MR. BICKS:  Whatever -- maybe we can just go out in

11   the hallway.  It's not going to take a long time, but I just

12   feel --

13            THE COURT:  Ten minutes is a long time.  How about

14   five minutes?

15            MR. BICKS:  All right.  Let's do that.

16            THE COURT:  All right.  I'll give you five minutes.

17   And I'll just keep the jury here.

18            MR. BICKS:  Thank you.

19            THE COURT:  Thank you.

20            MR. VAN NEST:  Thank you, Your Honor.

21        (Sidebar concluded.)

22            THE COURT:  Let me explain to all of you what is about

23   to happen.

24        The lawyers, in just a few moments -- I'm giving them five

25   minutes to consult -- will stand and excuse three per side, up

1  to three per side.  And then the remaining ten will be the

2  jury.

3      So they are going -- I'm letting them step into the

4  hallway so they can make their final decision.  So it's just

5  best if you sit tight for a moment.

6      And then all of those in the back of the room, probably

7  I'm not going to need you, but you need to stay here just in

8  case.

9      So I'm giving them a few moments.  It will save time if I

10 just ask you to sit there.  And if you have a book, read it for

11 a few minutes.  And you can go on and consult your emails and

12 so forth.

13     But don't talk about the case, of course.  And just bear

14 with us while we let the lawyers make their best estimates as

15 to what the right thing to do is.

16     (Pause)

17     **THE COURT:**  All right.  Now, Counsel, are we ready to

18 proceed?

19     **MR. VAN NEST:**  Yes, Your Honor.

20     **MR. BICKS:**  Yes, Your Honor.

21     **THE COURT:**  All right.  Before we proceed, I just want

22 you, over there in the jury box, to appreciate that we are

23 about to make the decisions about who gets to stay on the jury

24 and not.

25     So if there is anything you feel you've got to raise your

 1   hand and tell us, do it now.  You cannot do it after these

 2   lawyers make their selections.

 3        All right.  So based upon that, at this time, Oracle

 4   has -- the challenge lies with Oracle.

 5             **MR. BICKS:**  Thank you, Your Honor.  So Oracle thanks

 6   and excuses juror 1, Mr. Stromsness.

 7             **THE COURT:**  All right.  Mr. Stromsness, you're

 8   excused.  Please go back to the jury assembly room and tell

 9   them you've been excused.  Have a great day.  Thank you very

10   much.

11        And, now, the challenge lies with Google.

12             **MR. VAN NEST:**  Your Honor, Google would ask the Court

13   to thank and excuse juror number 4, Mr. West.

14             **THE COURT:**  Mr. West, you're excused with thanks to

15   the Court.

16        Please go back to the jury assembly room and tell them

17   what happened.

18        The challenge lies with Oracle.

19             **MR. BICKS:**  Oracle thanks and excuses juror number 5,

20   Mr. Wong.

21             **THE COURT:**  Mr. Wong, thank you.  You're free to go.

22   Go back to the jury assembly room and tell them what happened.

23        Google.

24             **MR. VAN NEST:**  Your Honor, we would request that you

25   thank and excuse juror number 12, Mr. Bruesewitz.

```
 1           THE COURT:  Mr. Bruesewitz, thank you.  You're free to
 2    go.  And go back to the jury assembly room and tell them what
 3    happened.
 4         And now Oracle.
 5           MR. BICKS:  Oracle thanks and excuses juror number 8,
 6    Ms. Huynh.  Thank you.
 7           THE COURT:  All right.  Ms. Huynh, you're free to go
 8    back to the jury assembly room.  Tell them what happened.
 9         The final challenge lies with Google.
10           MR. VAN NEST:  Just a moment, Your Honor.
11         Your Honor, Google requests that the Court thank and
12    excuse juror number 16, Ms. Kreslake.
13           THE COURT:  Ms. Kreslake; right?  You're free to go
14    back to the jury assembly room.  We thank you very much.
15    Please have a great day.
16         All right.  So would you two please move down these two
17    seats.
18         And then, Ms. Harper, I'm going to ask you to come around
19    and take the fifth seat.
20         And then you three scoot down one seat each.  Yes, you
21    three over there, we're consolidating.  Move over.
22         Okay.  See how we've got two rows of five?  That's it.
23    Two times five is ten.
24         Congratulations.  You're going to be the jury to decide
25    this case.
```

**PROCEEDINGS**

1      At this time, please stand and raise your right hand.

2      (Jurors sworn.)

3          **THE COURT:**  Thank you.  Have a seat.

4      At this time what I'm going to do is ask you to go into

5  the -- let me just make sure, so far everything is cool; right?

6  We did it right?  I excused the right people?

7      (Laughter)

8          **MR. VAN NEST:**  You did, Your Honor.

9          **THE COURT:**  Okay.  Good.

10         **MR. VAN NEST:**  Just right.

11         **THE COURT:**  Right?

12         **MR. BICKS:**  Everything is cool.

13     (Laughter)

14         **THE COURT:**  All right.  Now, what we're going to do is

15  introduce you to your new home away from home, which is behind

16  this door.

17     And every morning, when you get here by 7:45, and --

18  you're over there acting like something is wrong, Ms. Davis.

19  What's the problem?

20         **PROSPECTIVE JUROR DAVIS:**  No.

21         **THE COURT:**  You're in shock?

22     (Laughter)

23         **THE COURT:**  Well, it's like the Army.  Okay.  7:45.

24  When you arrive by 7:45, I get you hot coffee.  It's going to

25  be there.  And federal doughnuts.  And you will enjoy being in

1    the jury room.

2        And then you'll enjoy the trial even more.  We have these

3    great lawyers.  You're going to see a very good performance by

4    both sides.

5        So what we're going to do is, you get to go back in there

6    and she's going to give you a badge.  She's going to give you a

7    spiral notebook to take notes in.  And she will give you some

8    instructions on how to get in here in the morning.  And then

9    you'll be on your way.

10       And I'm not going to bring the jury back in today, but I

11   do-- is that all right, Counsel?  Or do you want me to bring

12   them back in for more admonitions?

13           **MR. BICKS:**  No, no that's fine.

14           **MR. VAN NEST:**  No, Your Honor.

15           **THE COURT:**  Okay.  I do want to give you a couple of

16   admonitions.

17       You are going to be deciding an important case.  You

18   cannot let anyone talk with you.  There are people out there in

19   the -- not these people, not the lawyers or -- but there are

20   people out there who are propagandists and have views about

21   things.  And if they were to come and try to talk to you about

22   this case, I would put them in jail.  And you would need to let

23   me know that they had done that.

24       So you have to stay pure and don't talk with anyone about

25   this case.  And don't do any research about this case.  And

**PROCEEDINGS**

1    don't put on your Facebook or Twitter or any of those things

2    that you have anything to do with this case.  That's really --

3    I have to give you that direct order to make sure that we

4    protect the integrity of this trial.  So that's the main thing.

5        I want you to -- the flu season is behind us, thankfully.

6    But wash your hands like crazy.  Don't get the flu.  Don't get

7    sick because then we have to slow down the trial and maybe

8    not -- you know, and it goes past June 10th.  So stay healthy.

9        And the great thing about a trial is you don't have to do

10   any homework.  You sit back and see what the lawyers convince

11   you of or don't convince you of.  And so you just have to pay

12   close attention and follow the law.  That's your main

13   obligation in life right now.  At least in the courtroom.

14      Okay.  Counsel, I'm going to send them back to the jury

15   room unless you want me to say anything more.

16          **MR. BICKS:**  We're fine.  Thank you, Your Honor.

17          **MR. VAN NEST:**  Thank you, Your Honor.

18          **THE COURT:**  And then you get to go out to the secret

19   passageway out of here.  And then don't let any member of the

20   press -- there are people out there, members of the press --

21   actually, they're pretty high standards and a lot of integrity.

22   They're not going to do it.  But you cannot talk to anybody.

23      After the case is over and I've discharged you, you can

24   hold a press conference.

25      All right.  We'll see you here tomorrow at 7:45 or

1    earlier.

2          **THE CLERK:**  All rise.

3          (Jury out at 1:31 p.m.)

4          **THE COURT:**  Okay.  Be seated.

5       Now, Counsel, as for all of the people in the back of the

6    room, who were excellent candidates to serve on the jury, I'm

7    just going to say that they can take their questionnaire with

8    them.  We don't need to collect it at this point; is that

9    correct?

10         **MR. VAN NEST:**  That's fine, Your Honor.

11         **THE COURT:**  Right.

12         **MR. BICKS:**  Yes.

13         **THE COURT:**  Okay.  Good.  So all of you who still have

14   your questionnaire, you can leave the clipboard with us, but

15   you are free to take your questionnaire with you.  And we will

16   never know what you put on there because at this point we don't

17   need to know.

18      But let me add this final word.  I have been in this job,

19   now, 17 years.  And before that I was -- a quarter of a century

20   I was a trial lawyer.  And I must say the willingness of good

21   citizens to come and serve their country by serving on a jury,

22   I see it all the time, and it's the most inspiring part about

23   the whole process.

24      So I thank you very much for your willingness to serve.

25   And I hope you have a great day.  And good luck to you.  And

**PROCEEDINGS**

1  we'll get you on another case sometime in the future.  So

2  bye-bye.

3      (Venire exit courtroom.)

4      **THE COURT:**  Okay.  Everyone have a seat.

5    At this point, even the people discharged, they're free to

6  stay.  They're back to being civilians if they want to stay.

7    Listen.  What can I do for you before we break for the

8  day?  We're all set for our openings tomorrow?

9      **MR. VAN NEST:**  We are, Your Honor.  I don't think

10  there's anything else to take up today.

11      **THE COURT:**  Right?

12      **MR. BICKS:**  Nothing.  Thank you.

13      **THE COURT:**  All right.  So probably by 8 o'clock we'll

14  be under way with opening.  You go first.  Van Nest goes

15  second.

16      **MR. BICKS:**  Yes.

17      **THE COURT:**  Then we will get in some of the actual

18  evidence.  And we'll break at 1:00 o'clock tomorrow.

19    So do you have your electronic equipment ready to go so it

20  doesn't break down and that kind of thing?

21      **MR. VAN NEST:**  We hope so.

22      (Laughter)

23      **MR. VAN NEST:**  We hope so.

24      **MR. BICKS:**  We'll find out.

25      **MR. VAN NEST:**  We've got our own equipment.  Let's put

PROCEEDINGS

 1    it that way.

 2         MR. BICKS:  I understand everything is in order.  It

 3    was checked out in good order.

 4         THE COURT:  So my assignment overnight is to try to

 5    see if I can get some of your deposition read-ins ruled on.

 6         MR. VAN NEST:  We won't need those, obviously, until

 7    Wednesday, Your Honor, I don't believe.

 8         THE COURT:  All right.

 9         Well, then, good luck to both sides.  We'll see you

10    tomorrow.

11         MR. VAN NEST:  Thank you, Your Honor.

12         (At 1:35 p.m. the proceedings were adjourned until

13    Tuesday, May 10, 2016.)

14                        -  -  -  -

15                 CERTIFICATE OF REPORTERS

16         We certify that the foregoing is a correct transcript

17    from the record of proceedings in the above-entitled matter.

18    DATE: May 9, 2016

19

20                      _Katherine Sullivan_

21    _____

22         Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter
23
                         _Pamela A. Batalo_
24    _____

25         Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    U.S. Court Reporter