Volume 2

Pages 216 - 438

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,           )
                                )
            Plaintiff,          )
                                )
  VS.                           )  No. C 10-3561 WHA
                                )
GOOGLE, INC.,                   )
                                )
            Defendant.          )
_____)  San Francisco, California
                                   Tuesday, May 10, 2016


### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiff:**          ORRICK, HERRINGTON & SUTCLIFFE LLP
                            The Orrick Building
                            405 Howard Street
                            San Francisco, California  94105
                      BY:   **ANNETTE L. HURST, ESQUIRE**
                            **GABRIEL M. RAMSEY, ESQUIRE**


(Appearances continued on next page)


Reported By:  Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              Official Reporters - U.S. District Court

```
 1   APPEARANCES (CONTINUED):

 2   For Plaintiff:          ORRICK, HERRINGTON & SUTCLIFFE LLP
                             The Orrick Building
 3                           51 West 52nd Street
                             New York, New York 10019
 4                      BY:  PETER A. BICKS, ESQUIRE
                             LISA T. SIMPSON, ESQUIRE
 5
                             ORACLE
 6                           500 Oracle Parkway
                             Redwood City, California 94065
 7                      BY:  DORIAN ESTELLE DALEY, GENERAL COUNSEL
                             MATTHEW SARBORARIA,VICE PRESIDENT
 8                            ASSOCIATE GENERAL COUNSEL.

 9   For Defendant:          KEKER & VAN NEST
                             633 Battery Street
10                           San Francisco, California  94111-1809
                        BY:  ROBERT A. VAN NEST, ESQUIRE
11                           CHRISTA M. ANDERSON, ESQUIRE
                             MICHAEL S. KWUN, ESQUIRE
12                           DANIEL PURCELL, ESQUIRE
                             MATTHIAS ANDREAS KAMBER, ESQUIRE
13                           EUGENE MORRIS PAIGE, ESQUIRE
                             STEVEN P. RAGLAND, ESQUIRE
14
                             KING & SPALDING LLP
15                           1185 Avenue of the Americas
                             New York, New York 10036-4003
16                      BY:  BRUCE W. BABER, ESQUIRE

17                           GOOGLE, INC.
                             1600 Amphitheatre Parkway
18                           Mountain View, California  94043
                        BY:  RENNY HWANG, LITIGATION COUNSEL
19

20   Also Present:

21                           GEORGES SAAB
                             ORACLE CORPORATE REPRESENTATIVE
22
                             CATHERINE LACAVERA
23                           GOOGLE CORPORATE REPRESENTATIVE

24

25
```

1

**I N D E X**

2

Tuesday, May 10, 2016 - Volume 2

3
                                                    **PAGE**   **VOL.**

4
Opening Statement by Mr. Bicks                       251     2
Opening Statement by Mr. Van Nest                    281     2

5

**DEFENDANT'S WITNESSES**                            **PAGE**   **VOL.**

6

**SCHMIDT, ERIC**

7
(SWORN)                                              329     2
Direct Examination by Mr. Van Nest                   330     2

8
Cross-Examination by Mr. Bicks                       380     2

9
                            - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**E X H I B I T S**</u>

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 22 | | 423 | 2 |
| 31 | | 412 | 2 |
| 205 | | 351 | 2 |
| 401 | | 413 | 2 |
| 435 | | 355 | 2 |
| 886.1 | | 389 | 2 |
| 951 | | 419 | 2 |
| 980 | | 382 | 2 |
| 2352 | | 367 | 2 |
| 2372 | | 357 | 2 |
| 3211 | | 391 | 2 |
| 3441 | | 374 | 2 |
| 3466 | | 371 | 2 |
| 5121 | | 403 | 2 |
| 5147 | | 396 | 2 |
| 5167 | | 395 | 2 |
| 5250 | | 400 | 2 |
| 5321 | | 415 | 2 |
| 5987 | | 376 | 2 |
| 6053 | | 427 | 2 |

1   **Tuesday - May 10, 2016**                           **7:20 a.m.**

2                   **P R O C E E D I N G S**

3                       **---000---**

4       (The following proceedings were held in open court,

5   outside the presence of the jury:)

6       **THE COURT:** Let's take up -- first I want to hand back

7   to you three of the packets you gave me with my rulings on the

8   deposition and trial transcripts.  I still have the one from

9   John Duimovich.  How do you say that name?

10      **MR. VAN NEST:** Duimovich.

11      **THE COURT:** Duimovich.  Duimovich.  All right.

12      Anyway, here is the question I have for you.  If there was

13  a license between Sun and IBM that allowed at the time now

14  this -- it has to have covered the actual circumstances.  If

15  there was a license that already allowed the use that this

16  witness is testifying to, then I don't see much point in

17  allowing this testimony.

18      So, on the other hand, I'm not going to just take Oracle's

19  word for it and Oracle has got to have a way to prove that to

20  me.  First item of business is show me the actual, signed

21  license agreement between IBM and Sun that affects all of this

22  witness' testimony.  Is there such an animal?

23      **MS. HURST:** There is, Your Honor.  I have it here for

24  the Court.  I'm going to hand up three documents:  The original

25  technology license and distribution agreement dated 1996;

 1   Amendment No. 7 in December 2005, which extends the term for 10

 2   years because the Court wants to see that it covers the entire

 3   term at issue; and then I'm going to hand up an email,

 4   Your Honor, between Mr. Miner and Mr. Rubin indicating their

 5   understanding at the time that IBM was a Java licensee.

 6        Your Honor, the license agreement and the amendments were

 7   produced in discovery back in 2011.  They have Bates numbers on

 8   them indicating their production.

 9             **THE COURT:**  All right.  Please hand those up.

10        Your name over there is what?

11        **MR. RAGLAND:**  Steven Ragland on behalf of Google.

12   Could I have copies?

13             **THE COURT:**  Your last name is what?

14        **MR. RAGLAND:**  Ragland, R-A-G-L-A-N-D.

15             **THE COURT:**  What is your answer to this?

16        **MR. RAGLAND:**  Well, Your Honor, I'm looking at this

17   for the first time.  It may have been produced among the 16

18   million documents and 16 million pages of documents that Oracle

19   produced, but it is not on any trial exhibit list that Oracle

20   has provided.  It has not been marked at any deposition, and

21   there is no testimony about this anywhere.  And that matters

22   for many reasons.

23        First, Mr. Duimovich's testimony was taken specifically to

24   respond to Oracle's argument that Apache Harmony was never in

25   any commercial products.  That was in the first trial.  They

**PROCEEDINGS**

1  argued that in the proposed findings of fact.  After the trial

2  they argued that, so we took Mr. Duimovich's deposition and he

3  testified clearly that Apache Harmony was in Lotus Notes, it

4  was in other commercial products of IBM.

5       At that deposition, the sum total of the testimony

6  regarding any license was Oracle asking does IBM have a license

7  with Sun?  Mr. Duimovich said yes.  This was not marked.  This

8  was not presented.  He did not testify about it.  There were no

9  questions.  And that's important.

10      The testimony we do have from Oracle's 30(b)(6) designee,

11 Mark Wayne, about licensing issues implies that whatever this

12 license may be, that -- again, we haven't had a chance to look

13 at.  Whatever it may be, does not cover Apache Harmony.  He

14 testified in his deposition -- and I have copies of the segment

15 to hand up.

16      **THE COURT:**  I'm sorry.  Whose deposition?

17      **MR. RAGLAND:**  This is Mark Wayne.  He was Oracle's

18 30(b)(6) designee regarding licensing issues.  His deposition

19 was taken on December 3rd, 2015.

20      **MS. HURST:**  Thank you.

21      **MR. RAGLAND:**  And he was asked specifically -- I'll

22 hand this up.  This is on page 135, Your Honor.  He was asked

23 what does -- you'll see at line 6, what does that license --

24 this refers to the testimony about a license between Sun/Oracle

25 and IBM.

1       "What does that license generally permit IBM to do?"  He

2   responded, "It permits them to create products using Java, as

3   long as they add value and they're compatible and they are

4   described in binary code."

5       Now, the compatibility point is important because of

6   course the Court recalls that there was a dispute about Apache

7   Harmony compatibility being able to call itself Java, have the

8   TCK license.  And Apache Harmony was never, quote, compatible

9   in Sun/Oracle's eyes.  And so therefore this implies that

10  whatever this hundred-plus-page document that we were just

11  handed provides, it does not provide a license to IBM taking

12  Apache Harmony code and putting it in its products for

13  commercial use.

14      And this, Your Honor --

15          **THE COURT:**  Well --

16          **MR. RAGLAND:**  Go ahead.  Yes?

17          **THE COURT:**  Why didn't you -- the other day in

18  court -- I don't remember which Oracle lawyer it was, but they

19  said it was produced in discovery.  You intentionally came to

20  court today not having looked this document up to help me out.

21  That's what you did.

22      Why didn't you go find this document from your own files

23  and study up on it so you could tell me something better than

24  what you're telling me now?

25          **MR. RAGLAND:**  Well, Your Honor, because there are 60

1    million pages of documents --

2              THE COURT:  I'm sorry.  That's your fault.  You almost

3    got -- you've got a lot of lawyers in this case.  You could

4    have done this.  You could have found this document.  Ms. Hurst

5    found it.

6              MR. RAGLAND:  Well, we looked for it following the

7    Court's order.  We looked for it.  And at around 11:30 last

8    night, I was told by the discovery vendor that we found

9    something.  This is -- this must be it.  I haven't had a chance

10   to review it.

11        But the point is there is no witness who testifies about

12   this.  It is Oracle's burden to prove that this license --

13             THE COURT:  Just a second.

14        What do you say to the point that you didn't designate

15   this, it's not even a trial exhibit, it's never going to come

16   into evidence because Oracle failed to follow the rules?  What

17   do you say to that?

18             MS. HURST:  Two things, Your Honor.  First of all,

19   just as Mr. Van Nest has asked the Court to keep confidential

20   the economic terms of agreements between Google and its

21   business partners, Oracle has the same concerns.  So Oracle

22   hopes not to introduce this agreement because it's continuing

23   in effect until today and it has confidential information in

24   it.

25        Mr. Wayne testified there is a license between IBM and

**PROCEEDINGS**

1  Oracle, and, Your Honor, there's a little bit of concern here

2  because --

3         THE COURT:  But I know enough to know that doesn't

4  answer the question whether the license permits what happened

5  here or covers what happened here.

6         MS. HURST:  Your Honor, I can --

7         THE COURT:  You know --

8         MS. HURST:  I can walk the Court through that.  But,

9  Your Honor, more importantly, they knew about this license.

10        THE COURT:  The fact that you want it confidential,

11  too bad.  This is a trial.  It's a public trial.  You should

12  have designated it.

13        MS. HURST:  Your Honor, they knew about this license.

14  They incorporated it into their discovery requests.  They

15  served a request for admission based on this license agreement,

16  Your Honor.

17     RFA No. 386, they asked to admit --

18        THE COURT:  I cannot go down the path -- no, no, no.

19  I cannot go down the path -- here we are in trial, and both of

20  you have screwed up on the disclosure obligations like you

21  didn't, on your side -- didn't designate any expert testimony

22  from Joshua Bloch.  He's not going to testify to expert

23  testimony, period, because you didn't designate him as an

24  expert.

25     You over there didn't do some Rule 26 things either.

 1   Well, too bad.  We cannot go through life in the middle of a

 2   trial with each of you saying they served us with a document

 3   request or an interrogatory and they knew all about this

 4   problem.  No.  You can't -- it takes too much time to do that.

 5   I've learned that the hard way.  Either you follow the rule --

 6   it's easy to follow the rule.  You could have designated this

 7   as a trial exhibit.

 8        MS. HURST:  Well, Your Honor, we can have witnesses

 9   who are competent regarding the terms of the document come and

10   testify to that without introducing the document.

11        If they want to cross-examine, they can cross-examine

12   regarding the adequacy of the scope of the license, but

13   certainly we're permitted to have our witnesses testify to the

14   contents of something that was actually produced in discovery.

15        THE COURT:  I don't know if you are or not.  Possibly

16   that's true.  I'm not going to rule on that.

17        Show me in here the -- let's pass that for the moment.  In

18   this big thick document, what are the key pages?

19        MS. HURST:  Yes, Your Honor.  First starting at the

20   Bates page ending 829, Bates page ending 829, which is internal

21   page 6 of the document.  The Court can see that there is a

22   license grant.

23        THE COURT:  Yes.

24        MS. HURST:  And, Your Honor, the keyword that we need

25   to look at here is *Technology* with a capital T.  You see there

**PROCEEDINGS**

 1  is a grant to technology.

 2        THE COURT:  No.  I don't see this, but I'm sure you're

 3  right.

 4        MS. HURST:  It's in 2.1A, Your Honor, license, in the

 5  second to the last line --

 6        THE COURT:  Yes.

 7        MS. HURST:  -- there is a grant there for a variety of

 8  rights to the technology and source code form.

 9        THE COURT:  Yes.  I see that, yes.

10        MS. HURST:  Your Honor, then if we go to page 5, the

11  immediately prior page, there's a definition of *technology*,

12  and, Your Honor, it says, "The technology" -- it's a variety of

13  things listed there, including the technology on Exhibit A.  So

14  next we're going to go to Exhibit A, Your Honor.  And that is

15  at the Bates page ending 8594859.

16        THE COURT:  Yes.

17        MS. HURST:  And, Your Honor, there is a long list of

18  classes and variety of things here, but if you turn to the page

19  ending 862 --

20        THE COURT:  Okay.

21        MS. HURST:  At the bottom, there's a reference there

22  to the Java API specification.  It's within the scope of the

23  license, Your Honor.

24        THE COURT:  So that's the same thing as the declaring

25  code; right?

1          **MS. HURST:**  Correct, Your Honor.

2      And then the final relevant matter here would be the term

3  of the agreement, Your Honor, to show, as the Court indicated,

4  that it was relevant, it was in effect during the relevant time

5  period.

6      The original term of the agreement, Your Honor, is on

7  Bates page ending 850 at paragraph 10.1.  The initial term is

8  10 years.  So 4 years and then automatic renewals for 6 years

9  thereafter.  And this, as the Court can see from the footer,

10  was a 1996 license.

11          **THE COURT:**  We don't know that IBM extended it.

12          **MS. HURST:**  I have that with the other document I

13  handed you, Your Honor.

14          **THE COURT:**  All right.  Go ahead.

15          **MS. HURST:**  The Amendment No. 7 that I handed up,

16  Your Honor, which is the document that starts with the Bates

17  number ending in 5180, that's Amendment No. 7.  If the Court

18  turns to the page ending 188, which is halfway through the

19  document, the Court can see Amendment No. 7 to technology

20  license and distribution agreement, and, Your Honor, right

21  there in the very first paragraph, the term is extended by

22  adding 10 years.  It says each year for 6 consecutive years is

23  amended to each year for 16 consecutive years.  So that extends

24  it out through, gosh, I guess that's this year, Your Honor,

25  2016.  So the license was continuously in effect from 1996

PROCEEDINGS

 1   through 2016.

 2        And then, Your Honor, if the Court looks at the email that

 3   I handed up, which is an email from Mr. Rubin, it's trial

 4   Exhibit 389, and Mr. Miner, who was one of the co-founders of

 5   Android wrote, *Could IBM be the solution for our problem*.  I'm

 6   paraphrasing, Your Honor.  Mr. Rubin replied IBM is a Java

 7   licensee, so they can't open source their implementation.

 8        Mr. Rubin understood that IBM was a licensee and this is

 9   2006, Your Honor.  This is the time frame of the development of

10   Android and Apache Harmony and all of that.

11        Now, Your Honor, I mentioned that Google was aware of the

12   production of this license agreement, and I'd like to hand up a

13   Request for Admission No. 386, Your Honor, which says -- this

14   is served by Google, *Defendant Google's First Set of Requests*

15   *for Admission to Plaintiff Oracle America*.  Keker & Van Nest is

16   listed on the caption -- "admit that the portions of the API of

17   java.txt copyrighted by IBM and/or Taligent were licensed to

18   Sun under the terms of the technology license and distribution

19   agreement between IBM and Sun dated October 25, 1996 were under

20   the terms of any amendments to that agreement."

21        So, Your Honor, Google was plainly aware that this

22   document was produced and in fact incorporated it into their

23   own discovery earlier in the case.

24        **MR. RAGLAND:**  Could I have a copyright of that,

25   please, counsel?

1          **MS. HURST:**  Can we get another copy of that printed?

2    We just had that printed.  I'll have another copy printed and

3    brought in, Your Honor.

4          **MR. RAGLAND:**  And I have a response as well when the

5    Court is ready, Your Honor.

6          **THE COURT:**  Yes, please.  Go ahead.  But we need to

7    cover other things.

8          **MR. RAGLAND:**  Very quickly, Your Honor, three points.

9          First, the issue of saying this is confidential, therefore

10   that's why we didn't mark it, that's a red herring.  In

11   depositions, all kinds of confidential material was marked and

12   testified about so that's no -- that's just a red herring.

13         Second, as -- what was pointed out here was the Java API

14   specification as the Court noted -- as the Court knows, that

15   was a declaring code.  Apache Harmony had its independent

16   implementation.  We're talking not just about a specification.

17   We are talking about IBM contributing code to Harmony, writing

18   its own implementation and using the same method headers and

19   all that from Sun's Java, giving it to Apache Harmony.  So that

20   is separate from any licensing issue.  That is important to

21   show that IBM understood that the declarations were open and

22   free to use.

23         But additionally, there was implementing code that

24   Mr. Duimovich testified was put in to Lotus Notes and IBM

25   commercial products.  So this license I'm looking at now,

1   again, we have no testimony on it.  It appears from counsel's

2   argument it relates to the specification and not the

3   independent implementation of Harmony, which is what

4   Mr. Duimovich talked about.

5            THE COURT:  Just a second.  Show me a good example

6   from the deposition excerpts about this -- the independent

7   implementation.

8            MR. RAGLAND:  Certainly, Your Honor.  If you turn to

9   page 38 of Mr. Duimovich's deposition, line 12 -- and I'll turn

10  to it myself -- Mr. Duimovich was asked, "Has IBM ever used

11  source code derived from the Apache Harmony project in its

12  products?  Answer:  "Yes."

13            THE COURT:  You have to say *question*.

14            MR. RAGLAND:  I'm sorry.

15     "Q.  Has IBM ever used source code derived from the Apache

16  Harmony project in its products?

17     Ä.   Yes.

18     "Q.  Which products has IBM used Apache Harmony code in

19     its products?"

20     Objection.

21     "A.  The IBM Java SDK."

22     And then if Your Honor turns over to page 39, the very

23  next page at line 10, another question:

24     "Q.  Any other IBM products that use the IBM SE SDK that

25     you can think of sitting here today?

PROCEEDINGS

1   **"A.**  There's lots.

2   **"Q.**  Can you give me a list?"

3   Objection.

4   **"A.**  Off the top of my head, Lotus Notes was using it.

5   IBM commerce.  There's lots and lots of products."

6   **THE COURT:**  I'm not quite sure I follow.  Where does

7   it say in there that IBM wrote the implementation?

8   **MR. RAGLAND:**  So let me find that, Your Honor.  There

9   is testimony that -- yes.  So if you turn to page 53, starting

10  at line 10, there's a question:

11  **"Q.**  Do you understand that at this time in 2010, Sun had

12     its own proprietary implementation of the Java class

13     libraries?"

14  Objection.

15  **"A.**  Yes."

16  If you skip down, Your Honor, to line 25 of the same page

17  and it goes on to the next page:

18  **"Q.**  And the core classes that IBM contributed to the

19     Apache Harmony, did they have the same package names as

20     Sun's implementations of the Java API or the same API

21     classes?"

22  Objection.

23  **"A.**  They had the same class names and package names as

24     the specifications."

25  Now, this goes to contributing the same -- he says that

 1   what -- here that what they're giving to Harmony is their

 2   independent implementation with the same declaring code as

 3   Java, Sun's Java, but their own implementations of source code.

 4   That ties up to what he said before about source code from

 5   Harmony which is referred to generally as the implementing code

 6   in the project.

 7        And if Your Honor looks at the email that counsel handed

 8   up, Trial Exhibit 389, what's said in there is IBM is a Java

 9   licensee so they can't open source their implementation.  It's

10   talking about implementations here.  That's important --

11           **THE COURT:**  Say that again.

12        **MR. RAGLAND:**  Well, the email that counsel handed up,

13   Exhibit 389, refers to implementations.  Again, it looks like

14   this license covers declarations and not implementations.  The

15   specifications.  And so that's -- so the important point for

16   Mr. Duimovich is that he testified that they contributed source

17   code, implementing code, and declarations, which were the same

18   headers as in Sun Java, but the implementation was different,

19   to Apache Harmony.  Gave it to them.  And Apache Harmony made

20   it available.

21        IBM also took that Apache Harmony implementing code and

22   the declarations and put it in its own products.  Just from the

23   look of the license this morning, that may or may not be

24   covered.  We don't know because Oracle never elicited that

25   testimony when it could have.

**PROCEEDINGS**

1      I have to respond to this RFA point, Your Honor, and some

2   context is important.  IBM has many products.  Many -- many

3   Sun/Oracle products.  It has Solaris, IBM Solaris, which is a

4   UNIX operating system.  They have a license from IBM for that.

5   They have other commercial products -- a license from Sun, Sun,

6   now Oracle.  They have other commercial products that have

7   nothing to do with Java SE 2 1.4 and 5, but have to do with

8   other products.

9      This RFA request was about Google's understanding that

10  there was other technology licensed to IBM aside from the

11  Java SE issues in this case.  That's why we served the RFA.

12  Admit that the cited license here relates to something else.

13          **THE COURT:**  All right.

14          **MS. HURST:**  Your Honor, may I respond briefly?

15          **THE COURT:**  Very briefly.

16          **MS. HURST:**  Your Honor, if the Court looks at the

17  license, it says the right to use and to prepare derivative

18  works.  That's exactly what we're talking about here.  The

19  implementing code is a derivative work, but the implementing

20  code is also a red herring, Your Honor.

21      Google has the burden to prove if there was a custom in

22  the industry.  The custom in the industry that they proposed to

23  prove is that there was a practice of using the API

24  declarations without a license in commercial products.  That's

25  the custom they have to prove, Your Honor.  That the API

declarations were used in an unlicensed and uncontrolled

fashion in commercial products.

This license covers the API declarations.  So the

custom -- IBM's conduct cannot satisfy their burden of proof as

to the custom that they need to prove here.

**THE COURT:**  Maybe; maybe not.  I have to think about

that.  But what do you say to this point?

Does this license that you handed up allow IBM to use the

exact declaration header codes and do its own implementation,

but to use the exact specification and hand that over to

Harmony?  I think your answer to that is *no*.

**MS. HURST:**  No.  They can --

**THE COURT:**  Well, if that's true, then the license has

nothing to do with this.

**MS. HURST:**  No, Your Honor.  What it shows is that

when IBM included the Harmony code -- imagine that Harmony --

basically what IBM is doing with Harmony is outsourcing its

development.

**THE COURT:**  But you're not coming to grips with what

he's saying -- this testimony does say that IBM used your

header codes --

**MS. HURST:**  Yes.

**THE COURT:**  -- and gave it to Harmony.  That's clear

from this testimony.  And you're saying the license did not

allow that.

1          MS. HURST:  I'm saying --

2          THE COURT:  They're going to say that's proof that

3    there was a custom.

4          MS. HURST:  No.  The license allowed IBM to use it.

5    What their argument is is that IBM used it in its commercial

6    products.  Mr. Ragland pointed out Lotus Notes, a variety of

7    other things.  That's what Google is saying --

8          THE COURT:  That's not --

9          MS. HURST:  -- is the unlicensed commercial use,

10   Your Honor.

11         THE COURT:  That's only part of it.  You didn't listen

12   to what the other part of it was, that IBM, as part of this

13   Harmony project, donated to Harmony your specification lines.

14         MS. HURST:  Your Honor, there's no right to

15   sub-license in here so they can --

16         THE COURT:  That's the point.  They thought it was

17   okay to do it.

18         MS. HURST:  They could have Harmony prepare it for IBM

19   to use, Your Honor.  If Harmony prepared the implementations

20   and gave the code back to IBM and IBM then commercialized it,

21   IBM had every right to do that understand this license for

22   itself.

23       What it could not grant the right to do was for Harmony to

24   give it to anybody.

25         THE COURT:  But everybody knew that Harmony was not

**PROCEEDINGS**

```
 1   going to just be IBM's toady and that the whole world was going
 2   to have access to it.  I don't buy that.
 3           MS. HURST:  Well, Your Honor, Apache --
 4           THE COURT:  That's what open source means.  It was an
 5   open source project.
 6           MS. HURST:  No.  It means there were restrictions,
 7   Your Honor.  There were restrictions in this license.  IBM had
 8   the right under 2.1A to have prepared derivative works, if they
 9   wanted to, of the technology.  That includes the API
10   specifications.
11        The Apache Harmony implementation is a derivative work.
12   We know that because we have a verdict in this case that
13   Android, based on those 37 packages, is infringing.  And that
14   makes it a derivative work, Your Honor.
15        And so what IBM had the right to do for itself was to have
16   prepared derivative works, and if Apache made one and gave it
17   back to IBM, IBM could license -- had a license to use that in
18   its products.
19        That doesn't mean the rest of the world had a license.
20           THE COURT:  All right.  That's your position.  And I
21   will take that into account.  We have to bring it to a close.
22        All right.  If anyone is going to submit anything else in
23   writing, it's got to be done by noon today.  You've got tons of
24   lawyers who can get it done by noon today if you're going to
25   submit anything more.
```

1        In the meantime, Duimovich -- how do you say it again?

2   Duimovich.

3        **MS. HURST:**  Duimovich.

4        **THE COURT:**  He's not going to be allowed -- we're not

5   going to use this yet.

6        We are going to go to Joshua Bloch.  I'll just say there

7   will be no expert testimony from Joshua Bloch.  Does anyone

8   want to argue with me on that?

9        **MR. RAGLAND:**  Yes, Your Honor.  I think we would like

10  to be heard briefly on that.

11       **THE COURT:**  You better have a good -- look, go ahead.

12       **MR. RAGLAND:**  Mr. Kamber is going to --

13       **THE COURT:**  Go ahead.  Tell me how you're -- you hold

14  them to Rule 26, I'm going to held them to Rule 26.

15       **MR. KAMBER:**  Absolutely, Your Honor.

16       **THE COURT:**  The first time he says anything that is an

17  opinion, his expert opinion, then I'm going to jump on it.

18  What do you say to that?

19       **MR. KAMBER:**  I don't know if it's useful, Your Honor.

20  We did prepare a pocket brief response to the objection that

21  was filed.

22       **THE COURT:**  Tell me verbally.  Hand it up and I will

23  look at it later.

24       **MR. KAMBER:**  I'll give you --

25       **THE COURT:**  I don't have time to read it right now.

**PROCEEDINGS**

1           **MR. KAMBER:**  I will give you the explanation,

2   Your Honor.

3      The objection, as I understand it, is that Dr. Bloch --

4          **THE COURT:**  How do you mean as you understand it?

5   Come on.

6          **MR. KAMBER:**  The objection --

7          **THE COURT:**  It's as simple as day.  This is one that

8   is simple.  I can even understand this.  You didn't designate

9   him as an expert and now you want to draw out of him expert

10  testimony.

11         **MR. KAMBER:**  That's not correct, Your Honor.  The

12  testimony we intend to present from Dr. Bloch is just as at the

13  last trial.

14         **THE COURT:**  Don't say that.  A lot of things happened

15  at the last trial that I got reversed on, so don't go there.

16  No.

17         **MR. KAMBER:**  It is neither undisclosed nor is it

18  expert testimony.  The fact is Dr. Bloch was an employee of

19  Sun.  He's going to testify, just as he did the last time,

20  about the APIs, explain them to the jury, and as part of his

21  analysis, last time around, he testified that he understands

22  in --

23         **THE COURT:**  His present understanding doesn't count

24  for anything.  That's expert testimony.  What he can testify to

25  is prior historic percipient facts.

1        **MR. KAMBER:**  These are percipient facts as to his --

2   as to the scope of the Java language and to what --

3        **THE COURT:**  I have -- no, no, no.  I'm going to just

4   tell you now, if he veers off into expert opinion, I'm going to

5   stop it.

6        **MR. KAMBER:**  Understood.  He didn't do expert opinion

7   last time.  The testimony came in without objection --

8        **THE COURT:**  I don't remember what he did.  Don't tell

9   me I let it in last time because I don't remember and I'm not

10  going to go back and look.

11       You have objected on Rule 26 grounds to him.  You are

12  going to live by the same rule.

13       If he veers off into expert opinion, you jump up and

14  object, and probably I'll sustain it.

15       You better proceed with great caution.  I have a feeling

16  as we go through this trial, we are going to have a lot of Rule

17  26 problems, and you lawyers have goofed up.  You ought to go

18  back to your clients and confess error.  You didn't designate

19  enough stuff on both sides.  You ought to meet and confer and

20  work some of this stuff out as we go through this; otherwise,

21  it's going to be scrambled eggs.

22       **MR. KAMBER:**  Your Honor, I would encourage you to look

23  at the brief that addresses both of these issues about the fact

24  that it was both disclosed and that it's not expert testimony.

25  It's the type of testimony --

1          **THE COURT:**  It has to be a Rule 26 disclosure.

2          **MR. KAMBER:**  If it's expert testimony --

3          **THE COURT:**  That's what you argued the other day.

4    There was all kind of disclosure about that guy and the

5    transformative -- I forget.  Which one was it that you were

6    objecting to yesterday?

7          **MS. HURST:**  Your Honor, they were objecting to

8    Makowski yesterday.

9          **THE COURT:**  That's right.  You could make the same

10   arguments that way.  It's either on the Rule 26 disclosures or

11   not.

12         **MR. KAMBER:**  He was disclosed, Your Honor.  He has

13   always been disclosed.

14         **THE COURT:**  Show me the Rule 26 disclosure where he is

15   going to give expert testimony.

16         **MR. KAMBER:**  He is not going to give expert testimony,

17   Your Honor.  That's the point.

18         **THE COURT:**  That's the gamble you are taking, isn't

19   it?  As soon as he veers off into expert testimony -- I will

20   tell you this.  Any present-day opinion is always expert

21   testimony.  Always.  Present-day as opposed to past, historical

22   facts.

23         **MR. KAMBER:**  Understood, Your Honor.

24         **THE COURT:**  Any question that begins, *Is it your*

25   *understanding,* which is leading and everything else, a lot of

1    things wrong with that, but that's automatically going to be

2    curtailed.

3         MR. KAMBER:  His testimony is about a book that dates

4    back to the 2003 or 2002 time period.  It's a historical fact

5    that he was aware of --

6         THE COURT:  I just promise you I can see it coming,

7    and it's going to be all jumbled up, and you are going to look

8    bad before the jury because you can't get your stuff in.  So

9    there you go.  It's your problem.

10        I will rule question by question when the problem comes

11   up.  All right.

12        Are all the members of the jury here?

13        THE CLERK:  Yes.

14        THE COURT:  If there is a very short item -- I need --

15   this thing about Phipps, Simon Phipps.  Oracle raises what

16   sounds like some excellent points on Simon Phipps.  I don't

17   have time to argue it now, but I need a brief on Simon Phipps,

18   and he's not going to be allowed to testify until I get your

19   brief and we have an argument on it.

20        MR. VAN NEST:  I think you ordered a time on it, 11:00

21   night.  I think you gave us a time.

22        THE COURT:  He will have to be postponed until

23   tomorrow.

24        Are we ready to proceed with the opening statements?

25        MR. BICKS:  I am, Your Honor.  Could I have a few

PROCEEDINGS

1   minutes to move the podium?

2           THE COURT:  Set it up any way you want.

3           MR. BICKS:  And just check the sound system?

4           THE COURT:  Please do that.

5           MR. VAN NEST:  One question on the openings.  We do

6   have this agreed-upon timeline, and I was thinking of putting

7   it up over here so everybody could see it.

8           THE COURT:  Where is that thing?  Can we put that up

9   now so the jury can see it?

10          MR. VAN NEST:  Your Honor, you are going to read the

11  pre-instruction?

12          THE COURT:  I'm going to read the pre-instruction

13  after the opening.  You're free to use it in your opening, but

14  I'm going to do my reading after.

15          MR. VAN NEST:  Okay.  Fair enough.  And then will we

16  break between the openings?

17          THE COURT:  Probably.

18          MR. VAN NEST:  I'm good either way.

19          THE COURT:  I'll go by -- I can't promise you, but

20  probably.

21          MR. VAN NEST:  Okay.  Thank you.

22                          (Off the record)

23          THE COURT:  Are we ready?

24          MR. BICKS:  Yes, Your Honor.

25          THE COURT:  Let's bring in the jury.

```
1          THE CLERK:  Okay, Judge.

2          THE COURT:  Members of the public, I want counsel to

3    have the undivided attention of the jury, so, please, no

4    shuffling of papers, no hacking and coughing, no going in and

5    out of the room.  Total silence back there, please, so the

6    lawyers will be able to engage the jury.  Thank you.

7          (Proceedings were heard in the presence of the jury:)

8          THE COURT:  Good morning.  Everyone find their seats,

9    please and have a seat.  And everybody is doing great and thank

10   you for being here so punctually and on time.  We had good hot

11   coffee waiting for you, doughnuts.  So we're going to just get

12   right down to it, but I need to give you some pointers, so to

13   speak.  This will take about five minutes and then we're going

14   to have the opening statements by the lawyers.

15         So here are some things.  You see this wonderful court

16   reporter we have there working the machine with her fingers?

17   They usually lead members of the jury to think you're going to

18   have a transcript of what has been said here in court.  I'm

19   sorry to say that's not true.  You will not have that

20   transcript.  That's for purposes of appeal.  And you will not

21   have it, so that's why we give you a notepad, so you can write

22   down anything you feel you need to remember.

23         Also at the end of the case, there is a cumbersome -- if

24   the jury wants to have a read-back, we can read back, bring you

25   back in here during your deliberations, and the court reporter
```

PROCEEDINGS

 1   can read through her notes and tell you what was said, but

 2   that's a very cumbersome thing, and I don't recommend it unless

 3   it's really critical for your thinking.

 4       So your notepads are a good idea if you want to remember

 5   something.  But it's up to you.  You don't have to take any

 6   notes at all, zero.

 7       So there we are.  It's up to you.  You're the boss when it

 8   comes to how you want to keep track of whatever you want to do.

 9       I want to give you a general overview of the entire trial.

10   The lawyers are going to do that, too, so I'll make mine brief.

11       This case is a copyright case under the federal copyright

12   law.  And it's Google who now owns Sun which came up with this

13   Java programming language and is suing Google.  And it's not

14   over using the programming language.  That everyone agrees is

15   free for anyone to use, but over something called the API, and

16   the lawyers will explain that.  It's a subpart of the overall

17   Java System.  And so you will hear all about that from the

18   lawyers.

19       As the case comes to you, it has already been established

20   that Google used the so-called specification from the API, and

21   the issue comes down to whether or not you determine that was

22   fair use or not.  I told you the other day, *fair use* is a term

23   under the statute, and I'm going to -- later on today I'm going

24   to give you an instruction of law on that.

25       *Fair use* is a term of art under the statute, and if you

 1   decide that it was fair use, then no problem.  Google is

 2   entitled to use it.  If it was not fair use, then Google is

 3   liable for copyright infringement.

 4       So you can see that's an important decision for you to

 5   make and you'll want to be paying close attention.

 6       If it is determined to be liable, Google determined to be

 7   liable, then we go to a second phase of the case, all of this

 8   to be done by June 10th at the latest.  Second phase of the

 9   case to consider the issue of damages, and so we will have a

10   two-part analysis.

11       The first one is the threshold issue of fair use, and

12   depending on how you come out on that, we go to the damages.

13   The fair use part will be the longest of the -- it will

14   probably take -- three-fourths of the trial time is on the fair

15   use part.  And, of course, both sides are going to be

16   presenting evidence.

17       Now, even though Oracle is the plaintiff in the case and

18   normally the plaintiff gets to go first, because the burden of

19   proof on the fair use issue lies with Google, the rule is that

20   the party with the burden of proof gets to go first.  So when

21   we actually start hearing the evidence later on this morning,

22   Google will present first.  And then Oracle will present its

23   case.

24       So that's the overview of the case.  The lawyers will do a

25   better job than me because they're really deep into the

1   evidence and they know the case better than me, but that's

2   what -- they'll probably summarize that for you better than me.

3        Just a couple of other things.  I have told you that you

4   cannot read newspaper stories.  Raise your hand if you have

5   read any newspaper stories or seen anything about this case

6   since yesterday.  So, good, you haven't.  Please don't do that.

7   You have to be pure and not be possibly influenced by anything

8   out there.

9        There will be a lot of press about this case, and after

10  the trial is over, you can go back and read everything,

11  including what they said about you.  They will have stories

12  already.  I've seen them myself about some of you in the jury

13  selection process, and I know you're dying to see what they

14  said about you, but you can look at it after the trial is over.

15  Don't look at it now.

16       So you've got to do what I've said here, and the great

17  thing about a trial is it's like a laboratory experiment.  You

18  sit back with your laboratory jacket on and you carefully

19  listen to what these lawyers actually present in court as

20  evidence as opposed to what they say, and then you decide the

21  case at the end as to whether it measures up or it doesn't

22  measure up, does the litmus paper turn pink or does it turn

23  blue.  That's for you to decide.

24       So you can't be doing research or being influenced by what

25  somebody might tell you or newspaper story or magazine article

**PROCEEDINGS**

1   or TV, any of that stuff.  No.  No.  No.  But at the end, after

2   you're discharged, God bless you, go for it, it's okay.  But

3   not yet.

4        All right.  I've beaten it to death about Twitter,

5   BlackBerry, Facebook.  I'm not going to repeat any of that.  I

6   think you know that by now.

7        I want to end my little preliminary remarks by saying two

8   things about the lawyers.  We have some outstanding lawyers

9   that are nationally known.  A few went into court in

10  Washington, D.C. or Austin, Texas or L.A., New York.  You might

11  see these very lawyers before you if you were on a jury there.

12  So we're very privileged to have such outstanding lawyers.

13       But I'm going to tell you again, not one word they ever

14  say is evidence.  Zero.  You're going to hear two-hours' worth

15  of opening statements.  Not a thing they show you, even though

16  they're going to show you some documents, none of that is in

17  evidence yet.  It will probably come in into evidence, but

18  sometimes things they show you in the opening statements

19  actually can't get into evidence.  So too bad for them.  It's

20  not in.  And nothing they say is evidence.

21       And the reason I bring this is up is that in the

22  deliberations, it is possible that one of you might say,

23  *Listen, I heard that one of those lawyers said something about*

24  *the API does this or doesn't do that* and I hope you remember to

25  say to yourself, *That was just the lawyer talking.  That is not*

**PROCEEDINGS**

1    *evidence.   What was the actual evidence in the case*?

2         Sometimes the lawyers exaggerate, they just argue.  It's

3    okay to argue.  It's perfectly ethical to make a good argument,

4    but it may be you disagree with the argument when you actually

5    understand the evidence involved, so you need to pay attention

6    to what the evidence is, and the evidence is what the witness

7    says under oath.  To give you that example I gave you

8    yesterday, if the lawyer says *was the light red* or *wasn't the*

9    *light red when you went through the intersection,* and the

10   witness says *I don't think so* or *I don't remember*, does that

11   prove that the light was red?  Zero.  No.  It's just the lawyer

12   talking.  And what the witness says is what the actual evidence

13   is.

14        So you need to keep straight in your mind -- the last

15   trial I had, afterwards, one of the jurors said to me -- he

16   said *I'm so glad you told me that because in my notes I kept*

17   *straight what the lawyers said versus what the witnesses said.*

18   *It was really true that I would have been confused by it if you*

19   *hadn't told us that up front.*  Well, it's up to you how you

20   keep your notes, but I'm telling you, you need to pay attention

21   to what the actual evidence is as opposed to what the lawyers

22   say.

23        Now, just to finish that point, if the lawyer says *isn't*

24   *it true the light was red* and then the witness says *yes*, of

25   course that's evidence that the light was red because the

PROCEEDINGS

 1    witness agreed to it.

 2        Anyway, you will be hearing a ton from these lawyers and

 3    not much from me as the case goes along, so that's why I stress

 4    this so much.

 5        These are great lawyers.  You're going to enjoy the

 6    professional work that they do and be very impressed.  I have

 7    already been impressed by both sides, and so I'm sure you will

 8    be as well.

 9        I'll give you some of the other pointers as we go through.

10    I guess the one last thing, if any of you have ever been on a

11    criminal case -- I forgot, any of you ever been on a criminal

12    case?  Okay.

13        In that kind of case, the burden of proof is called *proof

14    beyond a reasonable doubt*.  That doesn't have anything to do

15    with this case.  What we are dealing with here is called

16    *preponderance of the evidence*.  And that's a 51-percent test,

17    more likely than not.

18        So the party with the burden of proof has to prove that

19    it's more likely than not, which means 51 percent versus 49

20    percent is enough.  Or the scales tip very slightly in favor of

21    that's enough.  You don't have to be proof beyond a reasonable

22    doubt.  This is a civil case, not a criminal case.  So there we

23    go.

24        I think that's all I need to cover for the moment, unless

25    the lawyers -- before we get started with the openings, is

 1    there anything else that you would like for me to say?

 2              MR. VAN NEST:  I don't believe so, Your Honor.

 3              MR. BICKS:  No, Your Honor.  I'm ready to go.

 4              THE COURT:  So at this time on behalf of Oracle

 5    America, Inc., Mr. Bicks will give the opening statement.

 6         You have one our.

 7              MR. BICKS:  Thank you, Your Honor.

 8         And, Dawn, could I have the system turned on?

 9              THE CLERK:  It is on.

10              MR. BICKS:  Thank you.

11                        **OPENING STATEMENT**

12              MR. BICKS:  Good morning, ladies and gentlemen.  You

13    know my name is Peter Bicks, and I'm actually thrilled now to

14    present this opening statement for the women and men of Oracle.

15    We know that we've taken you away from your jobs and your

16    lives, and I can say for both sides, thank you.

17         You probably sensed yesterday and you can sense looking

18    out here now that this is an important case with a lot at

19    stake.  Ladies and gentlemen, this is an important case.  And

20    there is a lot at stake.  It involves fundamental principles of

21    fairness and business conduct, and in this case, how the

22    defendant Google acted outside of business-acceptable conduct.

23         I wrote over on this board a couple numbers:  100,000, 3

24    billion.  By the time I'm finished with my opening statement,

25    100,000 smartphones with an Android operating system will be

1   activated and they will have Oracle's property in them.

2       Since this conduct started in about 2008, 3 billion mobile

3   phones have been activated with Oracle property in them.

4       I'm going to write over here another set of numbers.  And

5   I always have to think when I write it because I'm not used to

6   writing billions.  $42 billion of revenue through all of those

7   activations, each one with our client's property in them.

8   Valuable computer code.

9       I am going to talk about what the Court referred to as

10  evidence.  Everything I put up here will be talking about

11  evidence.

12      And the evidence, ladies and gentlemen, that I'm going to

13  talk to you about is evidence that came out of files of Google,

14  and it came out of those files at a time when they thought no

15  one would see the evidence that you will see in this case.

16      So I'm going to start with a piece of evidence that came

17  about 6 days before this lawsuit was filed.  Something was

18  going on inside the offices of Google.  This email, written on

19  the 6th of August, 2010 -- you can see on that timeline, this

20  case got filed August 12, 2010 -- was an email written by an

21  engineering named Tim Lindholm.  Larry and Sergey, you probably

22  know who they are.  *Larry* is Larry Page.  Sergey is Sergey

23  Brin.  Those are the two founders.

24      This engineer, Mr. Lindholm, was asked to do an

25  investigation.  They knew they had a problem because they had

1  been using Java for quite some type in every one of these

2  mobile devices.

3      He was asked to determine if they had any alternatives to

4  Java.  He looked.  And he wrote back "they all suck."  Not my

5  words, ladies and gentlemen, the words from their files.

6      And so what did they conclude?  They needed to negotiate a

7  license for Java.  A license, ladies and gentlemen, is

8  permission to do something.  This email doesn't say anything

9  about fair use, and you won't see any document about fair use.

10     Google, one of the largest and most sophisticated

11 companies in the world, made a deliberate business decision not

12 to take a license and to copy and use Oracle's valuable

13 software illegally.  Why?  Huge profits.

14     So what is this case about in very simple terms?  It's

15 about decisions and it's about consequences, something that

16 each and every one of us know and teach.  Decisions and

17 consequences.

18     Time was not on Google's side.  And the evidence will show

19 that Google's top executives referred to in emails like the one

20 I showed you motivated by billions of dollars in profit -- and

21 I say billions -- and the fear of getting locked out, their

22 words, not mine, took a shortcut, and it was at Oracle's

23 expense.

24     When Google did that, they broke a very basic rule, a rule

25 we've all known when we were this high.  You do not, ladies and

**OPENING STATEMENT / BICKS**

1  gentlemen, take somebody's property without permission and use

2  it for your own benefit.  That's what this case is about.  And

3  that's what Google did.

4      Google took Oracle's property and, with it, Oracle's

5  opportunities, and that's why we're the plaintiff in this case.

6  And that's why we're here.  And that's the story I want to talk

7  to you about now.

8      Judge Alsup told you that this is a copyright case, and

9  here is the copyright, one of the copyrights that's important

10  in this case.  A copyright protects written works, things like

11  books and songs, and it also protects computer code.  You see

12  on this slide Sun Microsystems.  The Court mentioned Sun

13  Microsystems.  They were a local innovative company that we

14  talked a little bit about yesterday.  Some of you had heard of

15  it.

16      Oracle had worked with Sun for 20 years.  And Oracle had a

17  license to use Java, so they knew how valuable and important

18  Java was.  Oracle, as the Court has mentioned, bought Sun, and

19  when it bought Sun, it got Java.  The Court has told you that

20  the computer code that is at issue here comes from something

21  called the Java 2 Standard Edition or SE.  And you will hear

22  that in this case.

23      Oracle has the copyright to this code, and when you have

24  the copyright, you set the rules.  And the rules are typically

25  in a license.  Google didn't want to play by these rules.  And

 1   that's what the evidence and this case is all about.

 2       After Oracle bought Sun, they told the world that Java was

 3   the single most important software asset that they had ever

 4   acquired.  What then exactly is Java?  It's software and it's a

 5   platform -- you'll hear that word -- for writing apps --

 6   everyone calls them apps now, applications -- and running

 7   applications.  That's what it is.  And Oracle, since it

 8   purchased Sun, has spent hundreds of millions of dollars

 9   keeping up Java, the steward of the Java community which

10   consists of millions of developers who love Java.

11       Why would the Java platform be so important to a company

12   like Oracle?  Let me tell you a little bit about Oracle.

13       Here's a picture of Safra Catz.  She'll come before you

14   and sit on that stand.  Yesterday the comment was made by

15   Google's counsel that Mr. Ellison is the CEO.  Actually he was

16   the CEO.  This is the current CEO.  And what she says here in

17   this graphic about Oracle is that "We solve the world's most

18   complicated technology problems."

19       Oracle is involved in many areas of technology, some of

20   which you may not know about.  If you're following the Golden

21   State Warriors, you probably know the Oracle Arena, but there

22   are many things you may not know about.  These are some of the

23   areas and businesses that Oracle's technology can be found in,

24   whether it's cloud computing, the iTunes store, the technology

25   at MD Anderson Cancer Center, everything from your ATM card.

1    If, when you go to work, you have to take one of those cards

2    for security to get in, there's a good chance Oracle's

3    technology was behind that.

4        Java is key to many of Oracle's technology, so let me tell

5    you a little bit about Java so you'll see in this case and it

6    will be helpful, I hope.  There are three parts to Java.  The

7    first the judge talked about was something called programming

8    language.  And the second are these packages, the APIs, and

9    you'll hear that phrase in this case.  API is an application

10   programming interface and those are bundles, you can think of

11   them like bundles, of pre-written code, pre-written that can

12   then be used to write all the apps and programs and things like

13   that.

14       You will also hear about something called the JVM, Java

15   Virtual Machine.  That's kind of like a little computer that

16   sits on whatever kind of computer you have and it runs the

17   programs, including things like these ready-to-use programs.

18       Judge Alsup will give you instructions later today, and

19   this is one of the things that he will tell you.  In this

20   instruction, which will guide some of this case, he will tell

21   you that even though the Java programming language, like the

22   English language, any language, was freely usable by Google and

23   others, Google's use of the declaring lines of code and the

24   structure sequence and organization of these 37 packages that I

25   mentioned constituted copyright infringement under the Federal

**OPENING STATEMENT / BICKS**

1  Copyright Act of 1976, unless you find fair use and that Google

2  meets their burden.

3      So, ladies and gentlemen, this case is all about the

4  packages.

5      What did Google take?  Google copied and used the design

6  of those 37 packages and they also copied and used 11,000 lines

7  of Oracle computer code.  And you may hear today that 11,000

8  lines is not a lot.  *We left a lot behind*, may be a story

9  you'll hear.  *We took your property, but we didn't take all of*

10  *it.*

11      Eleven thousand lines, ladies and gentlemen, is a lot of

12  computer code.  It took 10,000 lines of code to power this

13  Apollo Lunar Module when lives were at state on that module.

14  Math was never my strong suit so I had to make sure I had it

15  put up for me.  That's a thousand less than what Google copied

16  in this case.

17      So what will we hear from Google?  *What we did was a fair*

18  *use.  We copied the design, we copied over 11,000 lines,* and

19  now it was fair use.  Ladies and gentlemen, I call this case

20  the *fair use excuse*.  After Google got sued, Google had to come

21  up with a way to avoid the consequences of its decisions, and

22  we're here in this case because the evidence will show that

23  Google is taking this fair-use exception and twisting it to try

24  to excuse its bad conduct.

25      Let me tell you a little bit about fair use and the judge

 1  will tell you this.  You may be saying what are examples of

 2  fair use?  Here are some examples in the law.  Criticism.

 3  That's not what Android is.  Comment.  That's not what Android

 4  is.  News reporting.  A news reporter can copy, show a clip

 5  from something to explain a story.  That's not what this is.

 6  Classroom use.  A teacher can make a copy to teach people in a

 7  classroom.  And that's not what this is either.  Scholarship,

 8  research.  That's not what Android is all about.

 9       These are examples, and then in this case, we'll have some

10  principles that the Court will tell you about that we'll see if

11  Google can go beyond these examples, which Google will never

12  suggest have anything to do with this case.

13       So what are those rules?  The first question here is why

14  did Google copy Oracle's property?  Was it for commercial

15  reasons or not for profit?

16       Was Google's use transformative?  That's going to be a

17  word you'll hear in this case, *transformative*.  It's got

18  specific legal meaning that the Court will tell you about.

19       Did Google act in good faith?  Very important question.

20  The evidence will show they acted outside of the law, and you

21  will decide if that is good faith, if that is acceptable

22  conduct.

23       Is the API package design that I showed you creative, and

24  if so, how creative?  That's a question that we'll focus on.

25       Are the API packages important?  Why did Google take them

OPENING STATEMENT / BICKS

 1   and what did they do?

 2        And then, ladies and gentlemen, did Google's copying cause

 3   actual or potential harm to Oracle's Java?  And a very

 4   important question is what if everybody was allowed to do this?

 5   What if everybody could take Oracle's property, this code, and

 6   use it?  What would happen?  And we'll answer that question.

 7        Google has the burden of proof, and that's very important

 8   to remember.  They need to convince you by a preponderance of

 9   the evidence that what they did fits the fair-use exception.

10        I've organized for you three chapters, if you will, in the

11   story, to try to organize the evidence.  The first chapter is

12   Java's success.  The second is Google's decisions.  And the

13   third is the consequences and harm that came to Oracle because

14   of those decisions.

15        Let's talk first about Java's success.  Java solved a very

16   important problem.  You may remember some time ago that if you

17   had a computer at your office that had a floppy disk and you

18   had a computer at home, that the floppy disk wouldn't work if

19   the computers were different.  What this problem was, was that

20   every time a programmer wanted to write an application -- there

21   you see a Sun Microsystems computer at the top, a Mac in the

22   middle and a Windows at the bottom -- they would have to write

23   the application over again because their computer only

24   understood one language, and the languages were different for

25   each computer.

 1      If your job was to be a computer programmer, you'd have to

 2  keep writing programs again and again, depending on what

 3  computer you were writing for.  It was tedious, it took a lot

 4  of the fun out of it, and it was expensive to do that,

 5  particularly on a big-business level.

 6      This was the Java innovation, write once and run it

 7  anywhere.  You could write a program, an app, and if you used

 8  Java, it could write and work on any computer.  That was a

 9  revolution in its time.  And it made Java the ideal solution

10  for distributing computer code across the Internet because it

11  didn't make any difference what kind of computer you used.  If

12  you had a Mac personal PC in Rome, a Windows PC in Boston, both

13  people at those PCs could download programs over the Internet,

14  and that was because of Java.

15      And one of the key parts to Java were the API packages

16  that Google copied.  They were at the heart of what made Java

17  so valuable.

18      You will hear evidence in this case from some of the

19  people who wrote those packages because -- I've put up there

20  one of the questions is, is it creative and how creative is it

21  to do this?  You will hear the witnesses in this case who wrote

22  some of these packages, and you will also hear from expert

23  witnesses.  On our side, Douglas Schmidt at the top.  He will

24  explain to you how putting together those codes, the declaring

25  code and the design of these packages, was highly creative.

1          And you will also hear from an expert at Google, Dr. Owen

2     Astrachan, and he will tell you, because he has before, that

3     the design of these packages is hard, just like being an artist

4     or a concert violinist.

5          And so this is kind of a neat graphic, I think, that will

6     help you here.  This is called a software map.  And it shows

7     the design of these packages and how they fit together, kind of

8     like a complex blueprint to build a magnificent building.  And

9     you'll see how these packages are all connected and interrelate

10    to each other.  And let me show you what Google took.

11         You see the red on the screen?  They took the heart of

12    these packages.  And what you will learn in this case is if

13    that code is not in those 3 billion phones, not one would work.

14    They took the heart out of these packages.  And let me tell you

15    this, ladies and gentlemen.  You see this filing cabinet over

16    here?  I can tell you right now that this heart, this software

17    map, is not a filing cabinet.

18         This technology was loved.  It came out, you see on the

19    timeline, in 1995.  By 2005, 4.5 million developers were using

20    Java and using these packages.  This is a photograph from a

21    conference called Javapolis, 2005.  More than 4.5 million

22    developers were using this after just 10 years.  And let me

23    show you where it was used because it's very important in this

24    case.

25         Java became widely adopted in mobile phones, and we're

**OPENING STATEMENT / BICKS**

1   going back to a time period starting around 2000, going back 16

2   years ago, a time when things were very, very different.  The

3   Apple iPhone hadn't even been on the market until 2008.

4        Over 120 million Java phones were out there in 2003.  By

5   2006, 1.5 billion phones were running in Java by 2006, two

6   years before October 2008, when the first Android phone was

7   released.

8        By 2007, 85 percent of all mobile phones were in the

9   market with Java in them.  Java was there first.  And in all of

10   these phones.

11        It wasn't just in mobile phones that Java was running.

12   Java was in technology that touched our lives in many ways,

13   from OnStar in the car to tablets to TV's to disks to PCs to

14   printers, video games, app servers and more.  Java was

15   everywhere.

16        And this was known inside the offices of Google because in

17   cases like this, we get their documents from their files and we

18   can see what they knew and when they knew it.

19        In 2006, an internal Google presentation, they were trying

20   to think about what are we going to do in this phone market?

21   Who is Sun?  And they knew, as they say here, that Java

22   dominates the wireless industry in 2006.

23        And now the story gets a little bit more interesting,

24   ladies and gentlemen, because now we're into Chapter 2,

25   decisions, and then we'll talk about the third chapter, which

1   are consequences.

2        As I mentioned before, Google was a company that was big

3   in the search business, and so I typed up here -- it was

4   Mother's Day just a while ago -- so I said what would happen if

5   I wanted to get flowers?  And I typed in on a laptop, desktop.

6   What would come up?  San Francisco family-owned florist.  And

7   you see that orange box that says *ad*?  Every time I click to

8   pull that up, Google makes money.  And what happens is that

9   information, when I type that in, Google knows, so if I go do

10  another search tomorrow and I'm searching for something

11  different, I may see on my computer screen something about

12  flowers because they knew that I had done that before.

13       And when we go back to 2004 and 2005, this is a very

14  important time, and it's very different then than it is now.

15  This is a statement from Google's public filing with the

16  Securities and Exchange Commission.  Got to be accurate.

17  Google was big in the search business on things like this,

18  laptops and desktops, but the world was undergoing an

19  incredible change, something that -- today we live by these

20  phones.  I have one in my pocket.  But it wasn't the case 10

21  years ago.

22       People were doing searching on their desktops and their

23  laptops.  The world was changing and Google said mobile phones

24  are increasing dramatically.  And what they say here in their

25  filing with the Government, that if we are slow to develop

1    products and technologies -- and it says non-PC communication

2    devices, they're talking about mobile phones -- we will fail to

3    capture a significant share of the market.  That's what they

4    said publicly.  They were concerned.  They can fail to capture

5    a significant share of the market.  Internally the language was

6    a little bit stronger.

7          BlackBerry was out on the market with Java in it.  What

8    did Google do?  They bought Android in 2005 to get into the

9    market.  And what do some of the documents that came from their

10   files -- what will they show?  Here's a picture of the

11   headquarters from the outside.  In this case, we're going to go

12   on the inside and see what has happened at the time, not today

13   when people come in and want to rewrite history.

14         What did we see?  "Don't get locked out."

15         Imagine Google locked out.  Their words; not mine.

16         You will see in this case that when Google bought Android,

17   they had a contract; they had a deal.  And the deal had some

18   sweeteners in it.

19         They had to get to the market with a phone in three years.

20   And if that happened, $60 million could be put in somebody's

21   pocket.

22         Three years is not a lot of time to get a mobile phone

23   from scratch into the market.  So I want you to hear a clip

24   from a witness you will see in this case, the founder of

25   Android who then came to Google.  His name is Andy Rubin.

OPENING STATEMENT / BICKS

1     This is what he said when we asked him some questions.

2       (Video clip played.)

3       **MR. BICKS:**  "The shortest time possible."

4     Short time.  The pressure was on.  $60 million incentive.

5   Emails saying that, We could be locked out.  Public filings

6   saying that, We could fail and lose a significant share of the

7   market.

8     What do you think the solution was to get to the market

9   fast?

10    They needed three things.  They needed something that ran

11  on many companies' phones.  They needed something that would

12  get them quick time to the market.  And they needed something

13  that would attract millions of app developers, the folks who

14  write the apps, those six million folks who had been writing

15  programs in Java.

16    The solution that they came up with was Java.  And how do

17  we know that?  Because we got the documents from their files.

18    2005, Android is building a Java operating system.  The

19  number one choice for mobile developments.  And the carriers

20  require it.

21    Carriers are the AT&T, the Verizons, the companies that

22  you have to hook up to run one of these phones.

23    Internally, they knew, when the pressure was on, Java,

24  because it had been in those billions of phones, was the thing

25  to take because it would be a shortcut for them.

**OPENING STATEMENT / BICKS**

 1      So they knew that they had to do something.  They had to

 2 get a license, which is the written permission, the deal to

 3 take somebody else's property.

 4      If do you it the right way, you get a license.  And this

 5 is their internal document.  They must take a license.

 6      And why did they know that they needed a license?  This is

 7 important, ladies and gentlemen.

 8      There was a company called Danger.  I showed you

 9 Mr. Rubin's clip.  Mr. Rubin worked at a company called Danger.

10      And Danger came out with a phone called the Sidekick, one

11 of the first smartphones.  Also, they called it the Hiptop.

12 Don't know why they gave it two names.  Most people know it as

13 Sidekick.

14      He was at Danger, and he took a license from Sun.  And he

15 took a license for Java, including the packages that were used

16 in this phone.

17      He went to Android.  And then Google bought Android.  So

18 all of that knowledge came, and all of that knowledge about the

19 importance of those packages.

20      He also knew something else.  And you'll see here

21 something called java.lang .api.

22      Java.lang is one of the APIs.  And they knew that they

23 were copyrighted because the copyright that I've talked about

24 is on file for the world to see.  And they knew that they were

25 copyrighted.

1        They also knew that using these packages would save them

2   in, their words, a pretty crazy amount of time.   Remember I

3   mentioned shortcut.   Internally their documents say that using

4   Java would save them a pretty crazy amount of time.   And the

5   top there says "Reasons to shift to primarily a Java API."

6   Those are the packages.

7        Everybody else took a license.   Google wasn't alone in

8   recognizing that a license was critical.   Everybody else took

9   one.   Companies like RIM, BlackBerry, Motorola, Nokia.   While

10  everybody else took a license, Google took a shortcut.

11       And remember what I told you earlier, that Google broke a

12  basic rule.   You don't take people's property without

13  permission.   They have now been caught.   And when you get

14  caught, you make excuses.

15       So let me tell you about excuse 1.   Open source means we

16  can take your property and use it without your permission and

17  have $42 billion in revenue because it's free.   That will be

18  excuse 1.

19       Sun and Oracle have licenses.   And those licenses have

20  rules.   The open source license that you will hear about here,

21  sometimes called OpenJDK, but open source, requires that if you

22  take somebody's computer code and you change it -- like,

23  somebody who would make a phone would want to have their phone

24  be different than somebody else's, and they would make changes

25  to the code, but they wouldn't want somebody else to know about

1  that.  Samsung, who takes code and puts it in their phone and

2  tweaks it to be different than another company, wants to keep

3  that information private.  And there are rules with open source

4  licenses, and that happens to be one of them.

5      That was not acceptable to Google.  And it wasn't

6  acceptable to its business partners.  And how do we know that?

7  Because we've got inside of their files.  And we saw what they

8  were saying at the time, before they thought the people like

9  you, ladies and gentlemen of a jury, would see what was going

10  on.

11      And this is their internal statements about that open

12  source license, the OpenJDK.  This is what they said at the

13  time, before anyone thought they would be seen:

14      "Using OpenJDK in Android was a verboten topic."

15  Verboten, forbidden.

16      "The lawyer-advised consensus is that there is potential

17  for trouble."  Let's stay away from that open source license

18  because there's trouble.

19      And "It's incompatible with Android's needs."  Doesn't

20  work.

21      That's what the evidence will be when you hear this

22  argument that everything is free to take.  Woulda, coulda,

23  shoulda.

24      So they had two options:  "Abandon our work and go one

25  route," fork in the road, "or do Java anyway and defend our

 1   decision, perhaps making enemies along the way."

 2        Their words; not mine.

 3        Ladies and gentlemen, they decided to make enemies along

 4   the way, and they knew that they would if they did what they

 5   did.

 6        They also had another problem.  It wasn't just that Java

 7   was so great.  As they put it in their own documents, their own

 8   APIs were half-ass.  And, ladies and gentlemen, these are their

 9   words; not mine.

10        So they decided that going ahead with Java and the

11   packages was a final decision, even though they didn't have a

12   license to do it.

13        As time rolled forward, the clock was ticking.  The

14   pressure got higher.  Another internal memo. "We are beyond out

15   of time."  That's right coming up to the time that they

16   actually took those packages.  They were "beyond out of time."

17        Another excuse that you will hear, excuse 2 of the fair

18   use excuse:  Apache Harmony.

19        They will say a company out there, not for profit, called

20   Apache Foundation, used some of this code in something called

21   Apache Harmony.  And they will say, just like a child says,

22   They did it, so I can do it too.

23        That's an excuse.

24        Apache, you will learn from the evidence, was not licensed

25   and never had the right to give Google anything.  And worse

1    than that, Google knew it.  Google knew that Apache didn't have

2    a license to give them anything.

3        Apache Harmony ended up being put on the shelf pretty

4    quickly.  That will be excuse 2 that you'll hear from Google.

5        So they move forward.  The decision is final.  And they're

6    out there trying to rouse up business partners and get them

7    signed up to get to the market.  And these are some of the

8    companies that they send information to.  And they went out and

9    met with.

10       And what do you think, in all these presentations, that

11   they told them about?  What was front and center to try to sign

12   them up?  From their own internal documents:  Do business with

13   us because we've got Java.

14       And you see in these documents, it's not just plain Java.

15   Java.class, the libraries.  6 million developers.  We've got

16   those developers too.  Java APIs.  Java class libraries.

17       The class libraries, you will learn, are part of the APIs.

18   That's where they are in the libraries.  And this is what they

19   were telling their business partners in private presentations.

20       You'll see over here core Java libraries.  And you'll see

21   this presentation.  This is what they were handing out.  But

22   when it came to talking in public, private presentation to

23   AT&T, the core Java libraries.

24       But then they went out in public.  Same thing.  No mention

25   of Java.

1     Java Conference comes up 2008.  They're almost ready to

2 bring their phone out.  One of their engineers is getting ready

3 for the conference and asks Mr. Rubin, What can I tell people

4 about what we've got?

5     Talk to people only one-on-one.  And please don't

6 demonstrate to any Sun employees or lawyers.

7     Don't let them see what we are doing.  Don't let the

8 lawyers know.

9     Ladies and gentlemen, evidence like that shows that

10 someone knew what they were doing was wrong.

11     Documents from their internal files:  "Scrub out a few

12 more Js."  Scrub the J word out.  "The J word" is Java. "Bad

13 words" in their documents.

14     This lawsuit was filed August 2010.  Six weeks later,

15 someone is looking at their code and saying, Let's make sure

16 there aren't bad words in there.  The bad words are "Java."

17 And the bad words are "license."  The license they never took.

18     Well, they took the design, these packages, and they put

19 them right into the Android operating system.  And that's what

20 the evidence will show.

21     And this is interesting.  This is an HTC Touch Pro phone

22 that had a Microsoft operating system in it and had Java and

23 certain of these packages in it.  This was licensed by Sun in

24 2008.  This was the first Android phone.  Same year.  Has the

25 Java API packages in it.  Copying is what the evidence will

 1    show.

 2        And one of the questions you will hear about is the word

 3    "transformation."  I mentioned that before.

 4        So we asked one of the Google witnesses:

 5            These packages, do they do the same thing in Android

 6        that they do in Java?

 7            "They serve the same purpose."  That was the

 8        testimony.

 9        And I thought it would be useful to give an example of

10    what transformative might be.  Because when do you something

11    and you copy it, and you use it for the same purpose so that it

12    is a substitute -- here are the two phones, so that if you're

13    trying to buy one, you're going to choose between the two, and

14    one would be in place of the other.

15        But I thought it would be useful to show an example of

16    using Java in a way that could be transformative.  Piece of

17    artwork.  It's got some Java code on it.  And an artist took it

18    and put it on a piece of artwork.

19        This is a different purpose than taking code where it's

20    used in a mobile smartphone and then using it in another mobile

21    smartphone.  So when you think of this idea of transformative,

22    I thought this might be a useful example.

23        Well, we roll forward.  Phones were on the market.

24    Executives were having discussions.  And Google was concerned.

25        They were concerned sufficiently about being sued that

**OPENING STATEMENT / BICKS**

 1   they thought about buying all of the rights to Java.  Because

 2   you may hear in this case, another excuse:  We thought

 3   everything was okay.  We thought taking your property without

 4   permission was okay.

 5        You may hear that excuse.  But the evidence will be that

 6   they were worried.  They were worrying about being sued.

 7        And from their internal files, right around the time that

 8   this lawsuit got filed, it's almost incredible to see and

 9   believe this:  They thought, at this time, that they could be

10   out of business in ten years if they missed the mobile window.

11   This from the president of their mobile platform group.

12   Henrique de Castro wrote this memo that we got out of their

13   files.

14        2010, imagine Google being out of business.  2010 they

15   wrote this.  And they don't say in that document, by the way,

16   "maybe."  They say, "We'll be out of business."

17        So the memo that I started with, they went back and

18   looked.  Oracle was on the scene.  Oracle had bought Sun and

19   was concerned about what it was seeing.  Google was too.  And

20   they knew that the alternatives, in their words, all "suck,"

21   and they needed a license.

22        So what might you hear? An excuse.  They're going to talk

23   to you about a blog.  Yes, ladies and gentlemen, a blog that

24   was written by the former CEO of Sun, named Mr. Schwartz.  He

25   wrote a blog when Android came out, congratulating them.

1    And you will hear from Google the excuse:  We thought it

2   was okay.  Everything is fine.  The CEO sent out a blog saying

3   nice things.

4    What will the evidence show?  The blog was a public

5   relations step to try to keep friendly, to try to work a deal

6   and not poke somebody in the eye.

7    But when you see internally what was going on, you will

8   see that Sun was trying to make the best out of a really bad

9   situation.

10    Google was very, very popular and getting bigger.

11    Sun was struggling a little bit.  They had some tough

12   times in their business.  Fortunately, Oracle came along,

13   bought them and saved a lot of jobs.  But at this time Sun was

14   trying to make the best of a bad situation.

15    And you'll see the story and you'll hear the evidence that

16   Sun was not happy with what Google was doing.  But they had a

17   full plate that they were dealing with, with some of their

18   issues.  So when you hear the excuse that, oh, we always

19   thought it was okay, wait to hear the evidence.

20    So now we're into the third phase of the chapter, the

21   consequences and harm.

22    Sun was on the market at that time with all of these

23   phones.  The smartest phones that there were.  BlackBerry,

24   Nokia at that time.  The smartest phones on the market.  Sun

25   was in those phones.

1    Then the HTC phone comes out on the timeline, the one I

2    showed here.

3    So what happens?  Oracle completes its purchase of Sun,

4    and it's seeing evidence of harm.

5    And I stop here for a moment because the judge will read

6    you an instruction when the openings are done.  And he will

7    tell you in this case that there need not even be evidence of

8    actual harm under fair use.  If there's just a potential harm,

9    then that is a problem for Google.

10    The evidence will be here that there's evidence of actual

11    harm.

12    Deteriorating profitability in key OEMs.  OEM, original

13    equipment manufacturer, the folks who make the phones.

14    Oracle was seeing money go out the door.  And the door was

15    going into the Google door.

16    Android impact is revenue decline.  Direct evidence of

17    actual harm.  Severely damaged handset sales.  That will be the

18    evidence.

19    You will also see evidence of things like Kindle, where

20    Oracle had a commercial license for Kindle, and now the Kindle

21    Fire came out and it's using Android instead.  And the Android

22    in there has our client's property in it.  Oracle's Java.

23    They're competing against themselves.

24    And even worse than that, Google was giving away Oracle's

25    property for free.  Although, they were making $42 billion in

 1   revenue.

 2        Other markets in this case.  The judge will say in his

 3   instructions what would happen if there was unrestricted and

 4   widespread use of the copyrighted materials.

 5        In other words, what if everybody did this?  What if this

 6   went beyond phones?  What if it went into other products?

 7        And you will see all of these products, the evidence will

 8   show, that Java is used in.  All of these other products.  And

 9   you will hear evidence of the potential harm if this goes even

10   beyond where it is now.

11        Inside of Google they were doing well.  Oracle was getting

12   harmed.  Their Android revenues are huge.  According to their

13   CEO.

14        (Video played.)

15        This is their CEO.  "Hugely profitable" to Google.  Here

16   it is, $42 billion.  Oracle is saying, in their words, "severe

17   damage."

18        Google, $42 billion in revenue.  Profits, ladies and

19   gentlemen, on that, about $21 billion

20        THE COURT:  You're down to about three minutes.

21        MR. BICKS:  Thank you, Your Honor.

22        And so what -- if we look at the timeline and we look at

23   the graph, this is what was happening to Java and its sales.

24   And this is what was happening to Android.  One going down, one

25   going up.  That will be the evidence on the harm.

1        And even worse than that, ladies and gentlemen, Google

2   kept coming out with new what they call flavors.  New versions

3   of Android, each time using these APIs, even though they knew

4   that they shouldn't be doing that.  Gingerbread, Honeycomb, Ice

5   Cream Sandwich, Jelly Bean.  They kept going even though they

6   knew that it was not the right thing to do.

7        So let's come back to the factors that the judge will tell

8   you about, because I want to go one by one and tell you what

9   the evidence will show.

10       Was this for commercial reasons or for not for profit?

11       It was for commercial reasons, the evidence will show.  It

12   was hugely profitable.

13       Was it transformative?  No.  The Java API packages do the

14   same thing in Android, as I showed you in those phones, as they

15   do in Java.

16       Did they act in good faith?  The evidence will show that

17   they did not.

18       Are these packages, the design, creative?  And how

19   creative?  The evidence from both sides will show that they are

20   highly creative to put those packages together.

21       Are they important?  Google took the heart out of Java and

22   put it in those 3 billion devices.

23       And is there actual or potential harm?  Google's copying

24   caused severe harm to Oracle and potential harm.

25       So this is what the evidence will show from their

**PROCEEDINGS**

1 documents.  Not my words; their words.

2      (Presentation displayed.)

3      **MR. BICKS:**  It's time for me to sit down.  That is my

4 opening statement.  And before I do, I'd like to say one other

5 thing.  Google goes first.  We go second.

6      Please wait until you hear all of the evidence because

7 they've got the burden of proof.  And we'll sit and wait to put

8 our case on.

9      So on behalf of Annette, and Lisa, Gabe, Georges, Matt,

10 and Trudy, and the rest of the folks from Oracle, we look

11 forward to presenting the case.

12      And I really appreciate your time this morning.  So thank

13 you very much.

14      **THE COURT:**  All right.  Thank you, Mr. Bicks.

15      We're going to take a short break.  Because we'll be going

16 another hour, I think I should give you a break over there.

17      But before we do that, do you see the timeline over here

18 on the poster board?

19      The lawyers have done a good thing and agreed to this

20 timeline.  So this will be evidence that you may consider.  And

21 we want to keep it in the courtroom so that as witnesses

22 testify to various meetings and emails, and the like, you can

23 at a glance look over here and see where it fits in the overall

24 timeline.

25      I'm going to try to get handouts on a small sheet of paper

**PROCEEDINGS**

 1   to give you.

 2        Do you have those ready?

 3            **MR. BICKS:**  Yes, we do.

 4            **THE COURT:**  I tell you what.  When you come back,

 5   these will be sitting on your chairs.  And you can stick them

 6   in the back of your steno pad and consult them as you wish.

 7        It will be your personal copy to keep.  You don't have to

 8   write anything on it.  You can write everything on it.  It's up

 9   to you.

10        But it's something to help you with the keeping straight

11   the dates.  It won't have every date.  It just has some of the

12   key dates.

13        All right.  Remember the admonition you're not supposed to

14   talk about the case.  I order you, you're not supposed to talk

15   about the case.

16        We'll see you back here in 15 minutes.  Thank you.

17            **THE CLERK:**  All rise.

18        (Jury out at 9:11 a.m.)

19            **THE COURT:**  Okay.  Be seated.  Thank you.

20        Could you give Dawn those handouts, and then she will put

21   them on the chairs.

22        These have been stipulated too; right?

23            **MR. BICKS:**  Yes.

24            **THE COURT:**  I'm going to step off the bench unless the

25   lawyers need me for something.

PROCEEDINGS

1            MR. VAN NEST:  No, Your Honor.

2            THE COURT:  You can rearrange the courtroom any way

3    you want.

4            MR. VAN NEST:  We will do it.

5            THE COURT:  Thank you.  See you in a minute.

6        (Recess taken from 9:12.m. to 9:25 a.m.)

7            THE COURT:  All right.  I don't know where my clerk

8    is.

9            THE CLERK:  Right here.

10            THE COURT:  Here she is.  Are we ready to bring in the

11    jury?

12            THE CLERK:  Yes.

13            THE COURT:  Everyone please be seated.

14        Counsel, what I would like to do is, after your next

15    opening, I will read the preinstruction on fair use.  And then

16    we'll start with the evidence.

17        And then when the first expert witness is about to appear,

18    that's the point I would like to read the instruction on expert

19    witnesses.  And then I will repeat it when the first Oracle

20    expert witness is about to appear.

21        Is that satisfactory to both sides?

22            MR. VAN NEST:  That sounds great, Your Honor.

23            MR. BICKS:  Yes.

24            THE COURT:  Okay.  Good.  I don't think we're going to

25    have any retained experts anyway, are we, today?

1          **MR. VAN NEST:**  No.

2          **THE COURT:**  Okay.  Ready?

3          **THE CLERK:**  Yes.

4          **THE COURT:**  We're ready.

5       (Jury enters at 9:26 a.m.)

6          **THE COURT:**  Welcome back.  Please be seated.

7      All of you should have the timeline.

8      And when you're all settled in, we will go to the next

9   item of business.

10     Are you ready over there in the jury box?

11     Okay.  Now Mr. Van Nest will make the opening statement on

12  behalf of Google.

13                       **OPENING STATEMENT**

14         **MR. VAN NEST:**  Thank you, Your Honor.

15     And good morning, everybody.

16     As you know, we met yesterday.  My name is Bob Van Nest.

17  And I'm really proud to be here on behalf of Google, one of the

18  most innovative technology companies to come along down the

19  road in many, many years.

20     First thing I want to do is say thank you for your service

21  as jurors.  You've heard many times this is an important case.

22  And it really is for Google.  And so we appreciate your taking

23  time out to help us and all the attention that we know you'll

24  give the case.

25     The really phenomenal success of Google's Android platform

OPENING STATEMENT / VAN NEST

1   was due to the hard work of Google engineers and Google's

2   decision right at the beginning to build Android with free and

3   open technology and make it available for everyone else to use.

4       Google engineers spent several years and hundreds of

5   millions of dollars to build the Android platform using Google

6   technology and know-how.  And what they created is something

7   that had not existed before.  Not in Java and not in anything

8   else.  They created a brand-new platform for innovation in

9   smartphones and tablets that was beyond anything that any of us

10  had ever seen before.

11      And then Google made the decision to make that platform --

12  which they spent the time and money to build -- open source so

13  that manufacturers could use it without any payment to Google,

14  to build smartphones and tablets.

15      And that's why we have so much choice now in Android

16  phones.  We can get phones from Samsung, LG, Motorola, Sprint,

17  Verizon, and many, many others.  Dozens of others.  That's why

18  Android has become the number-one selling smartphone in the

19  world by a long, long measure.

20      Now, parts of Android were built using the Java

21  programming language.  But the Java programming language is

22  open and free for anyone to use.  That's an established fact in

23  our case.

24      Judge Alsup will read established facts later on.  But

25  it's an established fact that the language was free to use.

1  There's no claim in this case that Android's use of the

2  language is wrong in any way.

3      Sun created the Java programming language back in the

4  '90s.  And Sun gave Java away to the world.  Sun taught Java in

5  universities, in high schools.  They put it in textbooks.  They

6  put it in conferences.

7      The whole idea of Java, for Sun, was to create as many

8  people as possible writing in Java, a big pool of customers for

9  Sun.

10      And these Java APIs, that you heard so much about the

11  application programming interfaces, they were promoted by Sun

12  along with the language.  They were open and free, given away

13  with the language, to use with the language.

14      Why was that?  Well, when programmers write in the Java

15  Language, they use these API labels as a kind of a shorthand to

16  refer to the common methods that any computer program does.

17  Methods like sort, add, print.  Common building blocks of any

18  computer system.  They use these building blocks, these simple

19  APIs, to call on these methods for performing things as part of

20  a program.

21      Sun's whole business plan was to make the language and the

22  APIs as popular as possible so that there would be a big base

23  of users familiar with Java and the APIs that Sun could sell

24  Java-based products and services to.  That was their whole

25  business plan.

OPENING STATEMENT / VAN NEST

1    Now, what did Google do?  Google used just the labels for

2  these APIs; not the packages.  They used the labels.  They put

3  their own source-implementing code in the labels.  They

4  integrated these 37 Java API packages into 131 additional

5  Android packages.

6    They built this up with a lot of additional technology to

7  create the Android platform, which is the software that can run

8  your whole smartphone inside.  We say full stack.  It runs the

9  whole thing.

10    As a result of all of that technology, these APIs that

11  they're complaining about, they represent less than 1 half --

12  excuse me.  Less than one-tenth of 1 percent of what's in

13  Android.

14    There are 15 million lines of code in Android.  They're

15  talking about 11,000 labels.  And we'll talk about what those

16  labels in a minute.  It's less than one-tenth of 1 percent of

17  all the code.

18    Now, when Android came out, it was phenomenal.  It was

19  remarkable.  And even Sun was aware that Android had changed

20  everything.

21    In 2007, when Android was announced -- and it was

22  announced publicly; and the APIs and everything else were put

23  on a website so that anybody in the world could see that

24  Android was using the Java Language and all these APIs -- Sun

25  didn't complain.

 1        Sun, which had created the language, they didn't object.

 2    Instead, their chief executive officer posted on an official

 3    Sun website, an official Sun website:

 4        "Congratulations Google."

 5        "Welcome, Android, to the Java community."

 6        "Sun supports your effort."

 7        "Android has strapped a rocket onto Java."

 8        This was a public acknowledgment on a Sun website,

 9    welcoming not only Android, but Android's use of Java.

10        There were no secrets here.  Android was published open

11    source.  Not only that, but in the years that followed, both

12    Sun and, to some extent, Oracle continued to praise Android and

13    offer further support.

14        I'll show you the emails a little bit later on.

15        Mr. Schwartz privately acknowledged the importance of

16    Android and even developed his own products.  Sun developed

17    their own products to work on top of Android.

18        So this claim that you heard in Oracle's opening statement

19    that Android is wrong or it's an infringement or it's unfair,

20    that claim wasn't made until years later, after Oracle

21    purchased Sun and tried to change the rules around Java.

22        Mr. Ellison, who was the chief executive officer of Oracle

23    at the time, he tried to use Java to build their own

24    smartphone.  They wanted to be in the smartphone market too.

25    They weren't in it.  They were in the feature phone market,

OPENING STATEMENT / VAN NEST

1    which is a very different thing.  Flip phones.  They weren't

2    able to do it.  Unsuccessful.

3         They then tried to partner with Google.  We want to be

4    part of Android.  We would like you to use some of our

5    technology with Android.  Unsuccessful.  Too late.  2010.

6         Then and only then did Oracle claim that there was

7    something wrong with Android.  And so now, after taking no risk

8    at all, and making no investment whatsoever, they want all the

9    credit for Android's success, and, apparently, billions of

10   dollars in damages.

11        But the evidence isn't going to support that.  And I want

12   to talk about the four key points of evidence that I'll be

13   reviewing this morning and that we expect to present when our

14   case begins.

15        First of all, Android is successful because of the hard

16   work and innovation of Google and its partners.  It's Google

17   technology that makes Android what it is.

18        Secondly, Sun openly applauded Android's use of the Java

19   Language and APIs.  They welcomed Android to the Java

20   community.

21        Sun's use of the Java APIs is transformative.  As I'll

22   show you in a minute, Android is a brand-new use for these Java

23   APIs, one that had never existed before.  And that's part of

24   the definition of transformation and fair use.

25        And, finally, Sun and Oracle's mobile strategy to get into

1    the mobile market was a failure on its own.  Android didn't

2    cause it.  And you're going to hear testimony from Sun

3    executives to back that up.  They failed to innovate.

4         Android is not a replacement for any version of the Java

5    platform.  It's not a replacement.  It's its entire brand-new

6    category, different from anything that Sun ever had or intended

7    to be used.

8         So you know that this trial is about fair use.  And you're

9    going to receive some instruction from Judge Alsup when I

10   finish.  But, basically, the right of fair use -- this is part

11   of the instruction you'll receive -- permits the use of

12   copyrighted work by others without the copyright owner's

13   consent in limited circumstances.  The idea is to encourage the

14   development of new ideas that build on old ones.

15        So if a use is a fair use, if you find that it's a fair

16   use, then there is no copyright infringement because the law is

17   there both to protect the copyright owner and to encourage fair

18   use in transformation.

19        This is another of the instructions that you'll receive

20   shortly, because transformative use is the hallmark of fair

21   use.  A knockoff, a bootleg CD, that's not fair use.  Something

22   you simply copy and resell, not a fair use.

23        What fair use requires is something transformative.  A use

24   is transformative if it adds something new, with a further

25   purpose or different character, altering the first with new

1   expression, meaning, or message.

2       Commercial uses qualify as fair use if it's

3   transformative.  It's not the law that if you use something

4   commercially that's not a fair use.  Commercial uses are fair

5   uses, too, if they're transformative.

6       And Android is exactly the kind of transformative use that

7   fair use was intended to protect and encourage.  Why?

8       Google engineers used a very tiny portion of Java SE.

9   They used less than one half of 1 percent of all the code in

10  Java, and they created something brand-new and different.  A

11  new platform for innovation in smartphones and tablets.

12  Something Sun was never able to do.  Something Oracle has never

13  been able to do.

14      They took a tiny part of a great big copyrighted work,

15  found exactly the right ingredients, added their own work to

16  it, changed it, supplemented it, made it big, added open source

17  technology.  And now there's something that has never existed

18  before, ever.

19      So what do I mean?

20      You heard a lot about Java.  But we're talking about some

21  specific platforms of Java.

22      Java SE 5 is the copyrighted work.  I'm showing that on

23  the left.  Java SE 5 was created for servers and desktops.

24  Rather large.  That's what Java SE 5 was created for.  Never

25  for smartphones.

 1          Java ME, that's what Sun had in feature phones.  It's

 2     really small.  It's called Micro Edition.  10 APIs.  It's not

 3     capable of supporting a smartphone.  Not even capable.

 4          So what do we have?  We have Java SE on the left.  We have

 5     Java Micro on the right.  And Android is an entire new

 6     platform.  Something that Java SE can't do.  Something Java ME

 7     can't do.  It's transformative in that it took a tiny part of

 8     Java SE 5, used it in a new and different way to create

 9     something that had not existed before.

10          Now, how did this happen?  It happened through a lot of

11     hard work and innovation.

12          Let me pause for a minute because we're talking about

13     Google.

14          You met a lot of people yesterday.  I want to introduce,

15     again, our representative from Google, Catherine Lacavera, who

16     is going to be with us throughout the trial.

17          **MS. LACAVERA:**  Good morning.

18          **MR. VAN NEST:**  So, as we know, Google is a highly

19     innovative company.  Invests a lot in R&D.  Big investment.

20     Four out of ten Google engineers work in research to build new

21     products.

22          And we're all pretty familiar with what they've done

23     product-wise.  We've got Google Search; Google Mail.  We heard

24     a lot of discussion about jurors yesterday.

25          The whole idea is to make brand-new things that didn't

1  exist before; change the status quo; give the products away to

2  consumers for free and charge for the ads.

3       Yes, we have ads when we use these products.  That's how

4  Google makes money.  No big secret about that.  The consumers

5  get the products.  Then there's ads on top of the products.

6  Google charges for the ads.

7       This was the status quo in 2005.  That's when our story

8  really starts.  The status quo was flip phones, small phones,

9  feature phones.  Nice phones for making calls.  You can text on

10 these.

11      But, boy, they're nothing like today's smartphone; right?

12 They don't have the applications.  They don't have video.  They

13 don't have streaming.  They don't have GPS.  They don't have

14 WiFi.  They don't have all those things that we've all come to

15 expect in a modern smartphone.

16      Google wanted to change the status quo.  They felt they

17 could do better, they could come up with something much better.

18      Took about three years, 85 to 90 Google engineers,

19 hundreds of millions of dollars to build Android, just to get

20 to the very first step of making the platform available.

21      Now, Google also went out and did something else.  They

22 recruited a whole group of open source people, major companies:

23 Sprint; Samsung; eBay, HTC; Motorola.  Some of the leading tech

24 companies became part of the Open Handset Alliance.

25      The idea was everybody contributes, and we make the

1   platform available for development in smartphones and tablets.

2   So everybody can use it; so there would be a lot of consumer

3   choice; so nobody is going to control it.  It's going to be out

4   there for folks to use.

5       You're going to hear from decision makers and the builders

6   at Google who did this.

7       Eric Schmidt will be our first witness this morning.  He's

8   here in the building, waiting to testify.  He's our chief --

9   was Google's chief executive officer then.  He was a big

10  proponent of Android.  And he's a special witness because he

11  started at Sun.  He was involved in the launch of Java way back

12  when.

13      And Andy Rubin is the father of Android, if you will.

14  Mr. Rubin developed the idea.  And he built Android with other

15  engineers at Google.

16      So what is Android?  What's the Android platform?  You're

17  going to be hearing a lot about Android, and I want to talk

18  about the platform and how these APIs fit in.

19      This is a picture that Google uses to display the

20  platform.  And it's representing software.  It's the software

21  system inside your phone, that runs it.  And I want to run

22  through what's there, top to bottom.

23      There are applications that we are all familiar with.

24  Your phone, itself, is an application.  Google Maps is another

25  application.  You want to browse, that's an application.  A lot

1   of the applications come installed on the phone.  Others you

2   can download.

3       In the beginning the applications on Android were written

4   primarily by Google engineers.  And over time other application

5   developers joined in too.

6       To run those, you need an application framework to do

7   simple things.  What's on your screen?  How are you going to

8   change from one screen to another?  You get a notification, you

9   have a phone call.  There's a lot of code there, all written by

10  Google engineers in the application platform.

11      Next one.  Libraries.  Now, the libraries, some were built

12  by Google -- these are not the Java libraries.  We haven't

13  talked about any Java APIs yet.  We'll get there.

14      But these libraries are from open source or written by

15  Google.  What do they do?  They provide some of the key things

16  you want and use in your smartphone.

17      So, for example, one of the open source libraries is Open

18  GL, Open Graphics Library.  You want to play games, Candy Crush

19  Angry Birds, all those 3D graphics, they come from an open

20  source place.  And the Google engineers integrated them into

21  Android.

22      You want to surf the Web.  WebKit is something that Apple

23  created.  Apple created WebKit and made it open source.

24      By "open source," what do we mean?  We're using that term

25  a lot.  But open source generally means companies or

1   individuals contribute code to a common thing that's made

2   available for everybody to use for free.  You're not charged

3   for it.

4        There's licensing restrictions sometimes.  But, generally

5   speaking, open source is made by a variety of people, made open

6   source.  Folks can share it for free.  That's open source.  And

7   it's a big thing in commercial products today, too, not just --

8   not just hobbies.

9        So Apple made WebKit available.  Google used it.  Google

10  had to build -- if you're going to listen to Spotify, Pandora,

11  you want to run video, go on YouTube, and all that, which you

12  can do on your smartphone, you need an audio and video system.

13  Google built that.  They built the open media framework that

14  runs all the video top to bottom.

15       Now, in addition to that, you need something to

16  communicate with the hardware.  Because this is just the

17  software.  This isn't -- this isn't the hardware.  That's made

18  by the OEMs, Samsung, Motorola, whatever phone brands you have.

19  We're talking about the software, now, inside.

20       But software has to communicate with the hardware.  Google

21  used a very famous open source project, created in Berkeley,

22  the Linux kernel.  The Linux kernel is an operating system that

23  sits on the bottom of this platform and communicates with the

24  hardware.

25       You want to use your phone, want to use your camera, want

1  to use your WiFi, want to use your GPS, those are all physical

2  things in the hardware that Linux communicates with.

3       Still not to any Java APIs yet.  This is all separate from

4  that.

5       In Android runtime, there's something called the Dalvik

6  virtual machine.  You're going to meet the engineer who built

7  and designed the Dalvik later this week.

8       Dalvik is important because it translates the computer

9  code that programmers write into machine code that the hardware

10 can understand.  So Dalvik is a critical part of Android.  And

11 the Google engineers spent quite a bit of time building that.

12      Now, on top of that are the core libraries.  The core

13 libraries are 168 libraries in Android.  131 of those are not

14 even in dispute at all here; right.  Those are Android packages

15 designed by Google engineers.  In some cases they used open

16 source technology.  But those 131, not an issue.  What's an

17 issue are the 37 Java API packages, which I'm showing next.

18      Now, in these Java packages the Google engineers

19 understood that they couldn't use source code created by Sun.

20 That was proprietary.

21      The implementing code, the implementing code in the

22 packages is original Google.  And Judge Alsup will tell you

23 that a little bit later on.

24      The labels I mentioned, the labels for these packages,

25 Google engineers understood those were open and free to use.

1    And it was well-known to Mr. Schwartz that Google was using

2    those labels when he said, "Welcome to the Java community."

3         So I'm showing these as squares with nothing in them

4    because it's only the labels that are accused of anything here,

5    not the code.

6         And the Google engineers built the code themselves, or

7    used open source sources for it.  And so all we're talking

8    about now are the labels, which are a very, very small part of

9    Android; right.

10        There are 15 million lines of code.  So my next slide.  If

11   this -- if this disk represents all of Android, the 15 million

12   lines of code, here's where those 11,000 lines of labels come

13   in.  Less than one-tenth of one 1 percent.  Less than one-tenth

14   of 1 percent.

15        And if you compare that to the Java SE 5, those labels

16   only represent only less than one half of 1 percent.  It's not

17   as though this is about all of Java SE.  No, there's a lot of

18   implementing code in Java SE that wasn't used at all in

19   Android.  And there's no claim to the contrary.

20        So this is what I mean by transformation; right?  This

21   didn't exist before.  No one had been able to do this,

22   especially using Java.

23        And then they went ahead and gave it away.  The Android

24   platform is free for any manufacturer to use to build a

25   smartphone or tablet.  And, look, they all have.

1    I've only got a few up here but, as we all know, there are

2    tablets and smartphones from lots of manufacturers.

3    Okay.   Sun and Oracle openly applauded Android's use of

4    Java.   This was no secret.   Mr. Schwartz wasn't in the dark.

5    And for years they -- they were working to get with Google on

6    Android; right.

7    No one was claiming any copyright infringement back in the

8    day.   That's a new invention of Oracle starting in 2010.

9    So why would it be, why would it be that Sun would welcome

10   us?   Well, let's take a look at what these a APIs actually are

11   all about.

12   Here is Mr. Ellison.   He understands nobody owns the Java

13   programming language.   We took his deposition under oath.

14   Anybody can use that without any royalty at all?

15   Correct.

16   This next witness is a witness that worked at Sun and is

17   now at Oracle.   And he's saying, hey, the APIs are a critical

18   part of the Java Language.   We asked him:

19   Do you understand the Java Language to include the APIs?

20   Yes.   I mean, the APIs are a critical part of the Java

21   Language.

22   Would you say that's true for the APIs in this case?   In

23   this case.

24   Those APIs are a fundamental part of what makes Java Java.

25   What a developer recognizes as Java.

OPENING STATEMENT / VAN NEST

1        And let's remember, the Java programming language is free.

2    Sun promoted the APIs for use with the language.  And it was

3    understood by engineers at Google that using the labels was

4    fine and fair.

5        And here's Mr. Schwartz.  He will be a witness here this

6    week as well.  We're calling him.  He used to run Sun back in

7    the day, back during this announcement, okay.

8        Were the APIs marketed along with the language?  In other

9    words, free and available for everyone?

10       Yes, absolutely.

11       We talked about open APIs, and you compete on

12   implementations.

13       You can use the labels, but the content of the package you

14   have to design yourself.  The implementing code.

15       Those packages you saw in the Oracle opening, Google

16   didn't use the packages.  Google used only the labels.  That's

17   it.

18       Now, why is that significant?  Bear with me, but I want to

19   talk a little bit about what an API is and how it works so you

20   can understand the significance when you hear people throwing

21   the term around.

22       There are generally two elements of an API, two parts.

23   One is the declaration, the labeling.  In this case, our

24   example is public static float max.

25       What's max?  Max is just a simple computer function to

1    compare two numbers and see which one is the maximum; right.

2    You are going to sort by number.  Which number is the maximum.

3    That's why it's called max.

4         So there are two parts to our max API.  There's the label

5    that the programmer uses to call upon the method.  And then

6    there's the implementing code that's ingrained.  The

7    implementing code does the work.  It actually makes the

8    comparison.

9         So the implementing code actually performs the task that

10   the programmer wants.  The label simply says go ahead and do

11   the work.

12        So let's see how this would work.  Let's assume that

13   you've got a programmer and he wants to write a program that we

14   could all download on our devices to compare prices at Amazon;

15   right.  Maybe he works for Amazon.  He's going to create an

16   application.

17        He knows he needs to compare prices, so he puts his max.

18   He's going to sort high to low.  So part of his program tells

19   the computer, okay, max, compare these two prices:  51.99, 64.

20   Compare those.

21        Well, he writes "max"; the program inputs the numbers; and

22   the implementing code, itself, does the work.  Not the

23   declaration.  The code does the work.  And the code produces

24   the result.  The code does the comparison, produces the result.

25        And there's the result.  $64 is more expensive than the

1    other one.  And that's part of his program.  He's used the

2    label to call on the implementing code.

3        Now, why is it important?  I want to draw a distinction

4    between the labels and the implementing codes in programs like

5    these.

6        So you heard about the structure and sequence, the design.

7    Well, the design is simply a combination of all of these

8    declaration labels together, okay.  The structure, sequence and

9    organization.  So in this example, if I'm writing in "max," max

10   is my method.  My method is a math method.  So it's in the math

11   class.  And the math class is something called java.lang.

12   "Lang" stands for language.

13       So why do I have a file cabinet out here?  It's to

14   emphasize that this SSO that they're complaining about being

15   used in Android is only a method of operation.

16       It may have been hard to develop, but it's a functional

17   thing.  And that's important in fair use law.

18       So let's assume, now, that this cabinet is my Java

19   package.  Java.lang is my package.  It's the library.  The

20   package will have a series of classes.

21       And the developers learn this when they learn Java.  All

22   the developers learn these terms when they learn the Java

23   Language.

24       So in the java.lang package I've got a math class, a

25   number class, an object class, and a process class.  The

**OPENING STATEMENT / VAN NEST**

1   numbers are together; the objects are together.  The

2   programmers know where to find them.

3        Now, if a programmer wants to use max, he or she knows, I

4   go to java.lang; I go to the max class; I pull it open.  And

5   what do I have here?  I have a whole bunch of math functions

6   because they're all together.  And the math functions include

7   "max."  Here's our max function just like on the screen.

8        What did the Google engineers believe they were free to

9   use?  They thought and understood they were free to use the

10  label.  Code that does the work inside, the implementing code,

11  all written original by Google engineers or used from open

12  source -- open sources that were free and available for use.

13       So of the thousands and thousands of lines of implementing

14  code in Android, there's no complaint here that any of that was

15  taken from Java.  All the engineers at Google used were the

16  labels.  They didn't use any of the implementing code.  And

17  that helps you understand why Sun, at the time, felt this was

18  completely fair.  This was completely fair to do.

19       Let's look at our next slide.

20       Oh, one more thing.  If you compare the code in Java SE,

21  the implementing code which we have on the left -- let's show

22  it -- the labels in Android are the same, but the code is

23  different.  That's what I just showed you in the cabinet.  The

24  code is different.  Google engineers wrote the implementing

25  code.

OPENING STATEMENT / VAN NEST

1    Now let me show you one other example of how you might

2    think about an API.

3    We all know when we go into grocery stores they're

4    organized in a certain way.  If you want sugar, you go to the

5    baking aisle.  If you want produce, you go to the produce

6    aisle.  If you want fruit and vegetables, you go there.  You

7    want cereal, pancakes, you go to the breakfast aisle.

8    The APIs are organized in a very functional way.  A lot

9    the same way.  The developers learn these conventional names as

10   part of learning the language.

11   And so it's important for you to listen to the evidence.

12   We're not talking about all of Java.  We're only talking about

13   the labels and declarations.  We're not talking about all of

14   Android.  All that platform is original Google and open source.

15   We're talking about a very small part both of Android and from

16   Java SE.

17   So how do the engineers go about doing this?  What do they

18   look at?

19   There were a number of projects that were open source

20   projects that were using the Java declarations and writing

21   their own implementing code, which is what the engineers at

22   Android thought they wanted to do.

23   GNU Classpath is one.  It was well-known to Sun that GNU

24   was using the declarations, and had written their own

25   implementing code.

OPENING STATEMENT / VAN NEST

1    So in the very beginning of the development of Android,

2  the engineers at Android actually used GNU to see how well it

3  worked.  They used the implementing code from GNU.

4    GNU had no license from Sun.  And Sun was fully aware of

5  GNU.  It's actually GNU.  I'm using the initials, but GNU.

6  They were fully aware of it.  And because GNU was not using the

7  implementation code from Java, it was fine.  It was okay.

8    Google decided not to use GNU in Android.  They didn't

9  think the implementing code that had been written by GNU was

10  good enough.  So they looked at another project called Apache

11  Harmony.

12    Now, Apache is part of the Apache Software Foundation.

13  The Apache Software Foundation is a group of large companies.

14  Oracle is a member.  IBM is a member.  Intel is a member.  They

15  all contribute code to various projects and make it available

16  as open source.

17    Apache has lots of different products, but the one we're

18  talking about in this case is Apache Harmony.

19    Harmony was a reimplementing of the same Java libraries

20  we're talking about.  They took Java SE 5.  They took the

21  labels and the declarations and built their own implementing

22  code.

23    Again, Sun was aware of Apache.  Sun understood that

24  Apache was using the same labels and had written its own

25  implementing code.

1     And so Google engineers believed and still believe today

2     that it was completely fair and appropriate to use the

3     declarations.  And they took some, they used some, the open

4     source implementing code from Apache, in Android.  This was --

5     this was well-known.  All well-known.

6     So that's why it's not a surprise that in 2007 -- let's go

7     to our timeline -- Google started building Android in '05.  And

8     they announced it in '07.

9     Can everybody see this from over there?  Is it too far

10    away?  Oh, you've got it in your hands.  Thank you.  Thank you.

11    That's a good thing.

12    So this announcement I'm talking about -- let's go to our

13    next slide -- was in November of 2007.  Notice what

14    Mr. Schwartz says.  This is on an official company blog in '07.

15    "I want to add my voice to the course of others at Sun in

16    offering my heartfelt congratulations to Google on the

17    announcement of their new Java Linux phone platform."  Java

18    Linux phone platform.

19    Mr. Schwartz knew that Android as using Java the language

20    and the Java APIs.  That was not a secret.  And he says:

21    "We've obviously done a ton of work to support developers on

22    all of Java platforms."  That's part of what my -- it's part of

23    what I said.  They wanted Java out there.  It was a good thing

24    for Sun to have lots of people adopting Java and using Java and

25    creating more people.

 1          It was a good thing for Sun that Android came along and

 2     used the Android programming language.  And that's what

 3     Mr. Schwartz recognized.

 4          "We've done a lot for everybody on these platforms, and

 5     we're pleased to add Google's Android to the list."

 6          "We're pleased to add Google's Android to the list."

 7          Now, you heard Oracle's counsel talk about PR stuff.  This

 8     next line puts the lie to that.

 9          Mr. Schwartz privately and publicly was talking with

10     Google about Android.  This is an email that he sent to Eric

11     Schmidt, the same week as this announcement, saying, "Eric, let

12     us know how we can support your announcements next week."

13     There was going to be a further announcement of Android after

14     the first one.  "We're happy to do so."

15          There's a bunch of these.  There's a bunch of discussions.

16     There's communication directly between Mr. Schwartz, who ran

17     Sun, and Mr. Schmidt.

18          And at no time, at no time did Mr. Schwartz ever say this

19     is copyright infringement, or you can't use the APIs, or

20     that's -- that's unfair.  Any of that.

21          It was always about, How can we work together?  We want to

22     put a product of our own on top of Android's.

23          Now, then Mr. Ellison gets in the act.  You can see on

24     your timeline, in October of '08, there's more handsets

25     released.  And Mr. Schwartz is glad about that.

1       And then in April of '09, Oracle agrees to acquire Sun.

2   Takes a while to make it happen, but they agree.

3       So Mr. Ellison, he comes to the JavaOne Conference in '09.

4   The JavaOne Conference is the conference of all the Java

5   developers.  They're all there.  Sun is there.  GNU is usually

6   there.  Apache is there.  All these folks are there at JavaOne.

7       And Mr. Ellison shows up and he says on stage, "Sun has

8   done a fantastic job opening up Java, giving Java to the world,

9   and we are going to do more of the same."  We, Oracle, are

10  going to do more of the same.

11      Not only that, he actually took the time to praise Android

12  specifically, and said he was excited and flattered by

13  Android's use of Java.

14      We've got a video from Mr. Ellison.

15      (Video played.)

16      **MR. VAN NEST:**  "I'm flattered.  I'm excited by

17  Android's use of Java."

18      That was in June of 2009.

19      Mr. Ellison later figured out that he couldn't use Java to

20  build a smartphone.  He tried and failed.  And that it was too

21  late to partner with Google.  And that's when this claim first

22  arose.  Right?  After all this praise and his efforts to build

23  and his efforts to partner, that's when this lawsuit started.

24      So let me talk about what happened a little bit earlier in

25  time, because I want to make clear what happened during these

1   discussions.

2       You saw a lot from Oracle about we need a license; got to

3   have a license; critical license.  Okay.  That all started back

4   in '05, and is completely out of context from what actually

5   happened.  They want to revise history.  Here's what happened:

6       At the beginning of Android, Google was hoping to work

7   with a lot of different companies to build Android.  One of the

8   companies was Sun.  They went to Sun.  They spoke to Sun.  What

9   they proposed to Sun was not, We need a license to the APIs.

10  No, no, no.  It was a joint development project.  A joint

11  development project between Sun and Google to build Android.

12      Why would that have been a good thing?  Well, if they

13  could have used all the implementing code that Sun had already

14  written, and the virtual machine that Sun already had, and all

15  this technology, Google thought this would get us to market

16  faster.

17      Google is always trying to get to market quickly.  They

18  said in '07, the window is closing.  They said in '10, the

19  window is closing.  At Google everything -- they want

20  everything to happen now, right, and get it out there for

21  consumers.

22      But the idea of this partnership was -- and you see it in

23  this slide here -- Sun and Google will jointly develop the

24  solution.  Sun will give us the virtual machine, the class

25  libraries, the stack, and everything from Java.

 1        That's all proprietary stuff.  The implementing code is

 2   proprietary.  You have to have a license to that.  The virtual

 3   machine, proprietary.  You have to have a license for that.

 4        Notice here, no mention of APIs or the Java programming

 5   language, because those are free.  Those are free.  You don't

 6   need a license to those.

 7        The other thing Google thought would be great to get is

 8   the brand.  The brand.  The Java brand was popular with the

 9   telecom carriers, the wireless carriers.  If you could actually

10   call your phone a Java phone, that would be good.

11        But these negotiations -- oh, and by the way, Sun doesn't

12   give the brand away for free.  That you do have to pay for.

13   And you have to pay for the virtual machine and the

14   implementing code.

15        So at the time we're talking about now, back in '05 to

16   '06, Google knew it needed a license if it wanted all this

17   proprietary technology and the brand.  They knew that.  And

18   that's where these emails you saw come from.  Yeah, we need a

19   license.

20        And Mr. Rubin was a big fan of using Java.  And it turned

21   out the carriers didn't really care, because Google never got

22   the right to use the brand.  And that's why it's called Android

23   and not Java phone.  And Google never got the implementing code

24   or the virtual machine.  That's why it took three years to

25   build.

1    These talks broke down in '06.  Google had been working

2  hard on its own.  And it took another year and a half to get

3  this launched.  Why?  Because Google had to do it by itself.

4    It did the right thing.  They used the labels that

5  everybody thought were open and free.  And they built their own

6  implementing code, their own virtual machine.

7    All that stuff that's proprietary, Google had to build.

8  Now Oracle wants credit for all that, but it was built by

9  Google.

10    Negotiations broke down not over money.  The negotiations

11  between Google and Sun broke down over, How are we going to

12  make this new joint-developed product open?  How open is it

13  going to be?

14    Sun wanted to place controls and limits on it.  Google

15  wanted it open for everybody to use.  And it broke down.

16    And, as a result of that, Google didn't get any of the

17  advantages that it was looking for in this joint development

18  relationship.  None of the code.  None of the brand.  None of

19  the virtual machine.  None of that stuff.  And that's why it

20  took another couple of years to get Android ready to go.

21    Here's another thing that was taken completely out of

22  context.  I'm surprised they brought this up.  There's no claim

23  in this case of any infringement of documentation.

24    And this is going to be explained by Mr. Bornstein.  The

25  engineers were using the word "Java" in the code because it's

1    Java code.  And everybody knew that.

2         But there are comments that surround the code.  And the

3    comments had the words "Java" and "license" in them.  And

4    Google didn't have a license to call this Java.

5         So they went through and they took out the words "Java"

6    from the comments.  But everybody in the world knew that the

7    labels and the declarations, the APIs, were Java, because

8    Google was running Java in Android.

9         So this is taken way out of context.

10        Okay.  Point three.  Google's use of the Java APIs is

11   transformative.  And I want to come back to this because it's

12   one of the key factors in fair use analysis.

13        Is it a bootleg CD?  Is it a fake Rolex?  Those aren't

14   fair use; right?  Those are just copies and knockoffs.  That's

15   not what we're talking about.

16        If it's transformative, it can be a fair use.  And, again,

17   this is what you'll hear from Judge Alsup in just a few

18   minutes.

19        If it adds something new with a further purpose or a

20   different character, even if it's commercial product, if it's

21   transformative, a transformative product can constitute fair

22   use.  And, as I said, Android is just such a product.

23        I want to come back to this.  I want to emphasize it.

24        Their copyrighted work, the one that you're being asked to

25   make decisions about, is Java SE, the Standard Edition.  The

OPENING STATEMENT / VAN NEST

1  Standard Edition is made for desktops and servers.

2      You didn't hear much about harm to the Standard Edition in

3  Oracle's opening statement because Android is not a substitute

4  for Java SE; right.  Android is smartphones and tablets.

5      Now let's look at Java ME.  That's what you heard them

6  talk about when they're talking about harm to their phones and

7  so on.

8      But Java ME has ten APIs.  It was designed for use in

9  feature phones.  It was designed for use in simple, small

10 devices.  DVDs.  Set-top boxes.  You saw the list that they put

11 up.  That's right.

12     The system of Java inside here isn't capable of running a

13 smartphone.  And Oracle witnesses will concede that.  It

14 doesn't have any of the characteristics that you need to run a

15 modern smartphone.  And they know it too.

16     Why?  Sun tried to use these same APIs to build their own

17 smartphone.  These are two projects at Sun in July and October

18 of '09.  They tried and failed to use the same APIs to build

19 something like Android.  They failed.  Couldn't get there.

20     Same thing for Oracle.  Mr. Ellison asked for a study of

21 Java and, Can we build a smartphone?  And they studied it and

22 they concluded, We can't do it.  Very limited internal

23 expertise to make smart decisions.

24     With the thousands and thousands of engineers at Oracle --

25 you heard how inventive they are and how creative; and I'll

OPENING STATEMENT / VAN NEST

 1   give them credit for what they do -- they didn't have anybody

 2   they thought could build a smartphone.  Nobody.

 3       And so they abandoned the smartphone market.  They didn't

 4   have anything -- they don't have anything that competes with

 5   Android.

 6       And on the flip side, Android doesn't compete with Java SE

 7   or Java ME.  It's a brand-new category.  It's a platform for

 8   innovation in smartphones and tablets that didn't exist before.

 9   And I would say the great success of Android and the wide

10   adoption by others proves the point.

11       Products that are just a little better or a small

12   improvement or a copy, they don't take off like Android has.

13   You don't see manufacturers all over the world using that

14   platform if it's no darn good and it's just a copy.

15       Sun didn't have anything to offer.  Oracle didn't have

16   anything to offer.  Android is transformative, new and

17   different.  And the evidence will prove that out.

18       Another factor in fair use that you heard about from

19   Oracle was harm.  And our point on harm is, Android didn't harm

20   Java.  Sun and Oracle harmed Java by failing to innovate and

21   failing to keep up with the modern needs of consumers that want

22   more features, functions, and uses.

23       Android is a new use for Java that Sun and Oracle weren't

24   able to accomplish.

25       Next slide please.

OPENING STATEMENT / VAN NEST

1          So, again, these are two very different things.   The

2    phones that you saw during Oracle's opening, they're nothing

3    like Java -- excuse me, like Android.   They're feature phones.

4          And the phones that he showed you, that he claimed were

5    somehow Java in the smartphone, those were Windows Operating

6    System or the Danger Operating System.   None of those are a

7    Java Operating System.   Those phones use a little bit of Java

8    in them, but they are not Java smartphones.

9          Now, further evidence of this is found in the internal

10   files at Oracle and Sun.

11         Everybody gets discovery, and you get to look inside.   And

12   I'm not going to make a big deal of that like they did.   But

13   everybody exchanges their information.   This is a slide we

14   found in Sun's files, making our point.

15         Feature phones are where Java is.   I have drawn yellow

16   circles around these things.   The yellow circles aren't in the

17   original, but everything else is original.

18         Look where Sun puts Java.   They put it in the feature

19   phone category.

20         Where do they put Android?   They put up there with

21   iPhone, where it should be.

22         More uses.   More functions.   More features.   A whole

23   different market than feature phones.   That's the market they

24   were in.

25         And Mr. Ellison, when we played a videotape from him, he

1   concedes that too.  He openly concedes that where Java was, was

2   not smartphones.  It was feature phones.  Otherwise, why would

3   they be trying to build something new?

4        Why was Java declining, and why wasn't it keeping up?

5   It's because the strategy of Sun and Oracle at Java was lousy,

6   as they concede.  This is an internal memo from Terrence Barr

7   at Sun.  He's a long-term Sun employee.  This was said a week

8   after Android was announced.  One week.  "I'm keeping my

9   fingers crossed that Android gets to the powers that be at

10  Sun" -- as a wake-up call -- "that our mobile Java strategy is

11  failing."

12       Java was in trouble long before Android came along.  And

13  Android isn't what caused harm to Java, as you'll hear from

14  Mr. Schwartz when he's here later this week.

15       Sun knew what the problem was.  "Java is perceived as

16  stagnant and legacy."  This is an internal document from Sun in

17  '09.  "Stagnant and legacy."  Nothing about Android here.  This

18  is completely separate and apart from any criticism of Android.

19  "Stagnant and legacy."

20       Here's a chart -- this is a projection they made before

21  Android was even announced.  In other words, you saw the chart

22  that Oracle's counsel put up showing feature phones.  They knew

23  that was going to happen anyway.

24       This is a chart created at Sun in 2006, a full year before

25  Android was even out there.  And look at the dropoff they're

1  predicting.  Why?  Because Java was stagnant.  Java was legacy.

2  And "Our mobile strategy is no good.  We're nowhere."

3      And here's another thing.  Here's another thing.  You want

4  to talk about who did what to Java.

5      In 2007, Sun, itself, made all of Java SE free and open

6  source.  Let me say that again.  Sun, itself, made Java SE free

7  and open source in 2007.

8      What does that mean?  Not the language, not the APIs.

9  They were always free.  The implementing code, the virtual

10  machine, all of the proprietary technology they say was harmed

11  by Android, they made available for free under an open source

12  license in 2007.

13      So this same copyrighted work that they're claiming we owe

14  billions of dollars for because we used the labels in Android,

15  they made the whole thing public and free for anybody to use in

16  2007.

17      They are the ones that gave lots of folks incentive to

18  stop paying license fees if they can get the same thing for

19  free, which is what OpenJDK is all about.  Open Source SE 5.0

20  from Sun itself.

21      I'll close by saying thanks again.

22      But our main point is that Android is precisely the kind

23  of thing that fair use was intended to encourage.  It's a leap

24  forward to a new platform, creating a new market for innovation

25  not just by Google but by lots and lots of other people.  Other

1   manufacturers, application developers, wireless carriers.  It's

2   become a whole community because Google made it open and free.

3       And Mr. Ellison wants to shut it down.  He wants Java back

4   in his pocket.  And that is not fair.  That is not right.  And

5   that is not what fair use or copyright was ever intended to

6   allow.

7       So I'll thank you for your time and attention again.  Our

8   case will start in just a few minutes.  And I think the judge

9   will have some instructions for you.  And thanks, once again,

10  for all the time and attention that you're paying to our case.

11          THE COURT:  All right.  Thank you, Mr. Van Nest.

12      I'm going to read to the jury about 12 minutes of an

13  instruction.  I've learned that many members of the public

14  don't want to sit through it.  So if you're going to leave at

15  all, leave now so that you will not distract the jury.

16      (Pause)

17          THE COURT:  Thank you.  I appreciate the public giving

18  the jury the benefit of no distractions.

19      Usually we give the instructions of law at the end of the

20  case and I will, of course, do that at the end of the case, but

21  the lawyers have suggested on both sides that I do what's

22  called pre-instructing you; that I give you some instruction up

23  front so that it will help, you as you hear the evidence,

24  catalog what you're hearing and how it's relevant.

25      And I agreed to do that and I worked through several

PROCEEDINGS

1    drafts with the lawyers.  I can't tell you that they agree with

2    everything I'm about to tell you, but I'm giving you my best

3    judgment of it, and I reserve the possibility that some changes

4    will be made by the end of the case so that this is my first

5    cut at it, but it's received a lot of attention.  I don't think

6    there will be many changes at the final stage, but there could

7    be some.  So take it with that in mind.

8        This will take about 12 minutes.  I will not give you a

9    hand-out copy.  I will give you a hand-out copy at the end of

10   the case because that is a final version, but this is a

11   preliminary version that will be close, but not final enough.

12   I'm only going to read it to you this one time, and if you want

13   to make notes, great.  If you don't want to make notes, that's

14   okay, too.  So bear with me while I do this.

15       "In this trial, it has already been established that the

16   Android versions in question used aspects of Java 2 Standard

17   Edition Version 1.4 and Java 2 Standard Edition Version 5.0,

18   specifically using the declaring code and structure sequence

19   and organization of 37 Java API packages.

20       "The pertinent Android versions were 1.0, 1.1.  Cupcake,

21   Donut, Eclair, Froyo, Gingerbread, Honeycomb, Ice Cream

22   Sandwich, Jelly Bean, KitKat, Lollipop, and Marshmallow.

23       "Even though the Java programming language was freely

24   usable by Google and others, Google's use of the declaring

25   lines of code and the structure sequence and organization of

those 37 API packages constituted copyright infringement under

the Federal Copyright Act of 1976, unless you find that Google

has carried its burden of proof as to the defense of fair use.

"In other words, for purposes of this trial, it has

already been established that Google used certain aspects of

copyrighted works, and the question remaining for you to decide

is whether or not Google's use was a fair use.

"There is no contention, however, that Google copied the

implementing code for the 37 APIs.  The point of contention is

over the declaring lines of code within the 37 APIs, also known

as header lines, which Google concededly used in Android as

well as the overall structure, sequence, and organization of

these 37 APIs.

"This dispute will involve the details of the method

names, class names, and declarations definitions, parameters

and organization.

"Now I will explain what *fair use* means under the law.

One policy behind our copyright law of course is to protect the

compositions of authors from exploitation by others.  When it

applies, however, the right of fair use permits the use of

copyrighted works by others without the copyright owner's

consent.

"The policy behind the right of fair use is to encourage

and allow the development of new ideas that build on earlier

ones, thus providing a counterbalance to the copyright policy

**PROCEEDINGS**

```
 1   to protect creative works.

 2        "Since the doctrine of fair use is an equitable rule of

 3   reason, no generally-accepted definition is possible and each

 4   case raising the question must be decided on its own facts.

 5   And in this dispute between Oracle and Google that question

 6   falls to you for decision.

 7        "Under the Copyright Act of 1976, an author owns the

 8   exclusive right to use or to license his or her writings or

 9   images or other copyrightable works with the statutory

10   exception that anyone may make fair use of even a copyrighted

11   work and may do so without anyone's permission and without

12   payment of money to anyone.  Specifically the act states" --

13   and I will quote it exactly -- "the fair use of a copyrighted

14   work for purposes such as criticism, comment, news reporting,

15   teaching, including multiple copies for classroom use,

16   scholarship, or research is not an infringement of copyright.

17   In determining whether the use made of a work in any particular

18   case is a fair use, the factors to be considered shall include,

19   one, the purpose and character of the use, including whether

20   such use is of a commercial nature or is for nonprofit

21   educational purposes."

22        I'm going to repeat that again.

23        "One, the purpose and character of the use, including

24   whether such use is of a commercial nature or is for nonprofit

25   educational purposes.
```

1      "Two, the nature of the copyrighted work."

2      I'll repeat that.

3      "Two, the nature of the copyrighted work.

4      "Three, the amount and substantiality of the portion used

5   in relation to the copyrighted work as a whole.  Three, the

6   amount and substantiality of the portion used in relation to

7   the copyrighted work as a whole.

8       "And, four, the effect of the use upon the potential

9   market for or value of the copyrighted work."

10      To repeat, "four, the effect of the use upon the potential

11  market for or value of the copyrighted work."

12      That's the end of the quote.  I have just quoted for you

13  the right of fair use exactly as enacted by Congress in 1976.

14      "In your deliberations, you must decide whether or not

15  Google has met its burden in this trial to prove that its

16  copying was a fair use.

17      "Now I will further explain each of the four statutory

18  factors.  The first statutory factor concerns the purpose and

19  character of the accused use.  This factor includes these

20  issues:  One, whether and to what extent the accused use serves

21  a commercial purpose which weighs against fair use versus a

22  nonprofit educational purpose which weighs in favor of fair

23  use; and, two, whether and to what extent the accused work is

24  transformative, which supports fair use.

25      "Although the act does not explicitly use the word

1    *transformative*, our courts uniformly hold that the first

2    statutory factor calls for an evaluation whether and to what

3    extent the purpose and character of the accused work is

4    transformative.

5        "What does *transformative* mean?  A use is transformative

6    if it adds something new with a further purpose or different

7    character altering the first use with new expression, meaning,

8    or message rather than merely superseding the objects of the

9    original creation.

10       "New works have been found transformative when they use

11   copyrighted material for purposes distinct from the purpose of

12   the original material.  A use is considered transformative only

13   where a defendant changes a plaintiff's copyrighted work, or

14   where the copyrighted elements remain unchanged from the

15   original, a defendant uses them in a different context such

16   that the original work is transformed into a new creation.

17       "A work is not transformative where the user makes little

18   or no alteration to the expressive content or message of the

19   original work and uses it in the same or similar context.

20       "The extent of transformation may vary from case to case.

21   The greater the transformation, the more likely an accused use

22   will qualify as a fair use, and the less the transformation,

23   the less likely an accused use will qualify as a fair use.

24       "In evaluating the first statutory factor, the extent of

25   the commercial nature of the accused use must be considered as

 1  stated.  In this case, all agree that Google's accused use was

 2  commercial in nature, but disagree over the extent.

 3      "Commercial use weighs against a finding of fair use, but

 4  even a commercial use may be found or not found, as the case

 5  may be, to be sufficiently transformative that the first

 6  statutory factor on balance still cuts in favor of fair use.

 7  To put it differently, the more transformative an accused work,

 8  the more other factors such as commercialism will recede in

 9  importance.

10      "By contrast, the less transformative the accused work,

11  the more other factors like commercialism will dominate.

12      "Also relevant to the first statutory factor is the

13  propriety of the accused infringer's conduct because fair use

14  presupposes good faith and fair dealing.  Where, for example,

15  the intended purpose is to supplant the copyright holder's

16  commercially valuable right of first publication, good faith is

17  absent.  Under the law, if the use is otherwise fair, then no

18  permission need be sought or granted.  Thus, seeking or being

19  denied permission to use a work does not weigh against a

20  finding of fair use.

21      "The second statutory factor"-- now we're at the second

22  factor.

23      "The second statutory factor is the nature of the

24  copyrighted work.  This factor recognizes that traditional

25  literary works are closer than informational work, such as

1    instruction manuals, to the core of the intended copyright

2    protection.  Creative writing and expression lie at the very

3    heart of copyright protection.  So fair use is generally more

4    difficult to establish for copying of traditional literary

5    works than for copying of informational works.  The focus of

6    this statutory factor is on how close the used material is to

7    the core values of copyright protection.  The less the used

8    materials implicates the core values of copyright protection,

9    the more viable will be fair use and vice versa.

10        "In this case, it is undisputed that the declaring code

11   and the structure sequence and organization of the 37 API

12   packages at issue were sufficiently creative and original to

13   qualify for copyright protection.  *Original*, as the term is

14   used in copyright, means only that the work was independently

15   created by the author as opposed to copied from other works and

16   that it possesses at least some minimal degree of creativity.

17        "The extent to which the 37 API packages in question here

18   involve greater creativity than the minimum required to obtain

19   copyright is disputed and it is open for you to examine; that

20   is, you should consider the extent to which the used materials

21   were created and original versus functional.  The more creative

22   the work, the less this factor favors fair use and vice versa.

23        "Even though a computer program performs functions and has

24   functional elements, the structure sequence and organization of

25   a computer program may be or may not be highly creative.  When

1  there are many possible ways to structure sequence and organize

2  a program, the particular weight chosen for a copyrighted

3  program and even individual lines of declaring code may be or

4  may not be highly creative.  On the other hand, when the

5  declaring code and the structure sequence and organization are

6  dictated by functional considerations such as efficiency,

7  compatibility or industry standards, then less creativity is

8  indicated and the core values of copyright protection are less

9  implicated.

10      "When purely functional elements are embedded in a

11  copyrighted work and it is necessary to copy associated

12  creative elements in order to use -- utilize those functional

13  elements, then this circumstance favors fair use.  Conversely,

14  copying creative expression that is not necessary to perform

15  the functions cuts against fair use.

16      "Google, of course, had the right to write its own code to

17  perform any function it wished because no one can get a

18  copyright on a general method of operation other than to get a

19  copyright on its specific implementation for that function.

20  Unless it was a fair use, however, Google did not have the

21  right to use the exact lines of declaring code and the overall

22  structure sequence and organization of the 37 API packages as

23  copyrighted by Sun and now owned by Oracle.

24      "Because Google was free to use the Java programming

25  language to write Android, you should also consider the extent

1   to which you find it was necessary for Google to use any or all

2   of the declaring code and structure sequence and organization

3   of any of the 37 API packages to write in the Java language.

4   Such a finding to that extent only would support fair use.

5       "To the extent that you find that it was not necessary,

6   however, that finding would disfavor fair use.  This

7   consideration also bears on the third statutory factor to which

8   I will now turn.

9       "The third statutory factor is the amount and

10  substantiality of the portion used in relation to the

11  copyrighted work as a whole which concerns how much of the

12  overall copyrighted work was used by the accused infringer.

13  Analysis of this factor is viewed in the context of Oracle's

14  copyrighted works, namely, Java 2 Standard Edition Versions 1.4

15  and 5.0, not Android.  The fact, if true, that a substantial

16  portion of an infringing work was copied verbatim is evidence

17  of the qualitative value of the copied material, both to the

18  originator and to whoever seeks to profit from marketing

19  someone else's copyrighted work.  Wholesale copying does not

20  preclude fair use per se, but it militates against a finding of

21  fair use.

22      "Even a small part may be qualitatively the most important

23  part of the work.  If, however, the secondary user only copies

24  as much as is necessary for a transformative use, then this

25  factor will not weigh against him or her.  The extent of

1   permissible copying varies with the purpose and character of

2   the use which relates back to the first statutory factor.  In

3   assessing this third statutory factor, both the quantity of the

4   material used and the quality or importance of the material

5   used should be considered."

6       Now we're to the last factor.

7       "The fourth and final statutory factor is the effect of

8   the accused infringer's use on the potential market for or

9   value of the copyrighted work.  This factor militates against

10  fair use if the accused use materially impairs the

11  marketability or value of the copyrighted work.  This is the

12  single most important statutory factor, but it must be weighed

13  with all the other factors and is not necessarily dispositive.

14  This factor considers whether the accused work is offered or

15  used as a substitute for the original copyrighted work.  This

16  factor considers not only the extent of any market harm caused

17  by the accused infringer's actions, but also whether

18  unrestricted and widespread use of the copyrighted materials of

19  the sort engaged in by the accused infringer would result in a

20  substantially adverse impact on the potential market for the

21  copyrighted work.

22      "Market harm to the value of the copyrighted work may be a

23  matter of degree, and the importance of this factor will vary

24  not only with the amount of harm shown, but also with the

25  relative strength of the showings on the other factors.  In

1    connection with the fourth statutory factor, the term *potential*
2    *market for or value of* refers to the value of the entire
3    copyrighted work itself and licensing opportunities for the
4    copyrighted work via derivative works.  A *derivative work* is a
5    work based upon one or more pre-exiting copyrighted works such
6    as a musical arrangement or dramatization based on a book, to
7    name only two specifics, or any other form in which a work may
8    be recast or adapted.

9        "In this case, the copyrighted works in suit are Java 2
10   Standard Edition Versions 1.3 and 5.0 so the only derivatives
11   that count are those that derive from those two works.

12       "In making your evaluation under the fourth factor, you
13   should assess the harm, if any, to the potential market for or
14   value of the copyrighted work itself and to its licensing value
15   for derivative works.  You may consider the broader potential
16   market for products that feature independent elements in
17   addition to the copyrighted material and their successes or
18   failures only insofar as they shed light on the licensing or
19   market value of the copyrighted work itself and its
20   derivatives.  In doing this, moreover, you must ignore benefits
21   from the use to the copyright owner outside the genre claimed
22   to have been harmed.

23       "Actual present harm need not be shown, nor is it
24   necessary to show with certainty that future harm will result
25   so long as some meaningful likelihood of future harm exists.

PROCEEDINGS

1    If the intended use is for commercial gain, that likelihood may

2    be presumed except where the second use is transformative

3    because in cases of transformation, market substitution is at

4    least less certain and market harm may not be so readily

5    inferred.

6        "I have now completed my explanation of the four factors

7    in the act.  You might ask are we limited to these four

8    factors?  The act states that the factors to be considered

9    include the four statutory factors and the law holds that those

10   four factors are not exclusive and you may consider any

11   additional circumstance in evidence, pro or con, that, in your

12   judgment, bear upon the ultimate purpose of the Copyright Act,

13   including protection of authors and the right of fair use,

14   namely, to promote the progress and science of useful acts --

15   progress of science and useful arts.  It is up to you to decide

16   whether all relevant factors, when considered fully and

17   together, favor or disfavor fair use.  All of these factors

18   must be explained, discussed, and evaluated by you.  No single

19   factor is dispositive.  Your evaluation of all factors must be

20   weighed together in light of the purpose of copyright, which,

21   as our Constitution states, is to promote the progress of

22   science and useful arts.

23       "Some factors may weigh in favor of fair use and some

24   against fair use, and you must decide, after giving the factors

25   such weight as you find appropriate based on the evidence,

1   whether or not on balance Google has shown or will show by a

2   preponderance of the evidence that those factors predominate in

3   favor of fair use."

4        Okay.  That's my preliminary instruction to you.  Let me

5   ask you over there if you need to -- we can go straight to the

6   first witness unless somebody would prefer a restroom facility

7   break.  If so, raise your hand.

8        Okay.  We are going to take a 15-minute break at this

9   time.  Please remember the admonition.

10       (Proceedings were heard out of presence of the jury:)

11          THE COURT:  Do the lawyers need me for anything?

12          MR. VAN NEST:  Just briefly, Your Honor.  We have some

13  more deposition transcripts that Mr. Kamber will hand up.

14          THE COURT:  Hand them to my law clerk.

15          MS. HURST:  May we have until 2:00 p.m. for the brief?

16  We need to add some exhibits.

17          THE COURT:  You may have until 2:00 p.m.

18          MR. VAN NEST:  I take it that is for both of us?

19          THE COURT:  Of course.

20              (Recess taken at 10:20 a.m.)

21           (Proceedings resumed at 10:55 am.)

22       (Proceedings were heard out of presence of the jury:)

23          THE COURT:  Shall be go?  Is there a witness ready?

24          MR. VAN NEST:  Yes.  Mr. Schmidt.

25          THE COURT:  Why don't you come on up here and take the

1   stand and then we will be all the more efficient.

2         THE WITNESS:  Nice to see you again.

3         THE COURT:  Welcome back.  But don't say that in front

4   of the jury.  We have an agreement not to refer to any of the

5   prior proceedings.  So there we go.

6       We are going to have about two hours of testimony.  How

7   long will the direct be?

8         MR. VAN NEST:  I think about 45 minutes, Your Honor.

9   Something like that.

10      (Proceedings were heard in the presence of the jury:)

11        THE COURT:  Mr. Van Nest, you will be calling your

12   first witness.

13        MR. VAN NEST:  Thank you, Your Honor.  Google calls

14   Eric Schmidt.

15          **ERIC SCHMIDT**, **DEFENDANT'S WITNESS, SWORN**

16        THE CLERK:  Thank you.

17        THE COURT:  Mr. Schmidt, welcome.  And you need to

18   slide the microphone close enough to your voice that it picks

19   it up.

20      Why don't you say your name.

21        THE WITNESS:  Eric Schmidt.

22        THE COURT:  It's not on.

23      Dawn, the microphone must be on.

24        THE WITNESS:  Is this better?

25        THE COURT:  It's like old tube equipment.  It takes a

1   while to warm up, even though there is not a single tube in

2   there.  Okay.  Now try.

3             THE WITNESS:  Can you hear me now?  Oh, my God.

4             THE COURT:  Very good.  Go ahead, counsel.

5                     DIRECT EXAMINATION

6   BY MR. VAN NEST:

7   Q.   Good morning, Mr. Schmidt.  Please introduce yourself to

8   the jury.

9   A.   I'm Eric Schmidt.  I'm the Executive Chairman of Alphabet,

10  parent of Google.

11  Q.   Can you tell the jurors a little bit about your

12  background, where you grew up, where you went to school?

13  A.   I grew up in Virginia.  I went to Princeton and Berkeley.

14  I'm a computer scientist with a Ph.D.

15  Q.   When did you graduate from Berkeley?

16  A.   1982.

17  Q.   What did you study in your Ph.D. program?

18  A.   My software -- my Ph.D. was on computer software and it

19  was on the way in which people build software networks.

20  Q.   When did you become the Chief Executive Officer of Google?

21  A.   2001.

22  Q.   And what brought you to Google?

23  A.   I wanted to work with the two young founders and the Board

24  convinced me to take the job.

25  Q.   Who were those founders?

1  A.   Larry Page and Sergey Brin.

2  Q.   Can you tell the juror's just a little bit -- we'll come

3  back to Google, but give them a rough idea of your

4  responsibilities when you were CEO of Google?

5  A.   I was CEO for about a decade, so ending in 2011.  During

6  that time, I had sort of the operational management duties of

7  the company, although it's fair to say that Larry and Sergey

8  and I ran and made the strategic decisions as a group.

9  Q.   When did you become chairman of Alphabet or when did you

10 become Chairman of the Board of Google?

11 A.   Well, I've been Chairman of the Board since 2001 on and

12 off, and then in -- a year ago, Google decided to invert itself

13 and create a parent company called Alphabet and then the people

14 who were at that board became the Alphabet board.  But they're

15 more or less the same for purposes of this discussion.

16 Q.   When was it that you became Chairman instead of Chief

17 Executive Officer?

18 A.   February 2011.

19 Q.   Now, at some point after graduating from Cal, did you join

20 Sun Microsystems?

21 A.   Yes.  I joined Sun Microsystems as I finished my Ph.D. at

22 Berkeley in 1983.

23 Q.   And at the time you joined Sun, what business was Sun in?

24 A.   At the time -- well, Sun had invented a particular kind of

25 work station which looks a lot like a personal computer today.

1  It was -- we -- it was one of the first that was used for

2  high-end graphics, fast networking, that sort of thing.

3  **Q.**   Can you give the jurors just a brief thumbnail of your

4  career at Sun, what positions you held, what responsibilities

5  you had?

6  **A.**   I was hired as an engineering software manager to manage

7  the then, you know, 10 people or so doing software, but it grew

8  very rapidly, and over the years, I eventually became the

9  Chief Technical Officer, and during that, I was also in charge

10 of the Java Project for a number of years.

11 **Q.**   What is a Chief Technical Officer responsible for?

12 **A.**   Because of my technical background, I was the technical

13 person in the business meetings, so as the company would decide

14 whether to go to a new market or new product, I was the

15 technical voice, if you will.  I have also managed quite a few

16 of the researchers on some of the new projects.

17 **Q.**   You mentioned Java.  Did you -- at some point, did you

18 become responsible for Java?

19 **A.**   Yes.  Java was invented in the late '80s or -- sorry.

20 Late '80s, early '90s by a team that was reorganized under me

21 as part of my duties as Chief Technology Officer, so I was in

22 charge of Java for some years at Sun.

23 **Q.**   And did you have direct responsibility for Java strategy

24 at Sun?

25 **A.**   I was a member of the team.  I was titularly in charge,

1    but of course these decisions are not made by a single

2    individual and there were a number of people and myself who did

3    it.

4             THE COURT:  I'm sorry.  You're a little too close.

5    Can you push it back about half an inch?  All right.  Try that.

6    Thanks.

7             MR. VAN NEST:  There we go.  Thank you, Your Honor.

8    Q.   Can you tell our jurors briefly, Mr. Schmidt, how the Java

9    language was developed at Sun?

10   A.   There was a team run by a guy named James Gosling.

11            THE COURT:  Now you are looking at the jury instead

12   of -- I'm sorry.  I've got to do this; otherwise, they won't

13   hear.

14            THE WITNESS:  There was a team headed by a brilliant

15   engineer -- his name is James Gosling -- and they had an idea

16   in the late 1980s to build software that would work on set-top

17   boxes, and if you remember the set-top boxes of the time, they

18   were connected to your television set.  They were not powerful

19   at all.

20            So the idea was to build a new solution, literally a new

21   operating system.  It was very clever, very visual, and it was

22   called -- the project was called Oak.

23   BY MR. VAN NEST:

24   Q.   Why did it take so long to develop a language like Oak?

25   A.   It just takes forever.  The iteration -- there are

1    relatively a small number of computer languages that come to

2    prominence in the world, and there is something about the

3    design and the judgment and the art and so forth that this

4    particular team was unusually good at.

5        So to continue, Oak was actually built in a completely

6    separate building, and then at some point, we agreed to make it

7    part of our core Internet strategy.  This is when I was at Sun.

8    And that's why I took it over.

9    **Q.**   Okay.  And what was that core Internet strategy?

10   **A.**   This is again 1992/1993.  There was a browser that had

11   just come out from a company called Netscape, and the idea was

12   to animate the use of the Internet with this new technology,

13   but it also solved an important problem for Sun at the time,

14   which was called *write once/run anywhere*.

15       At the time, there was no program language that you, as a

16   programmer, could write your code in that could run on all the

17   different kinds of computers that people had, and so the joke

18   about Java was we built it -- you could write it once.  It

19   would run on any kind of computer, whether it was a personal

20   computer, a Macintosh, or other ones at the time.

21   **Q.**   Were you personally involved in releasing the language

22   when it was finally built?

23   **A.**   Yes.  I actually announced it here at Moscone Center in

24   May of 2005.  The announcement was not very well understood.

25   Maybe we didn't quite understand what we were doing, but we did

1    announce it here in Moscone.

2    **Q.**   I want to call your attention to our --

3         **THE COURT:**  2005 doesn't sound right.

4         **THE WITNESS:**  I'm sorry.  I'm sorry.  I apologize,

5    guys.  1995.  Twenty years ago.

6    **BY MR. VAN NEST:**

7    **Q.**   Twenty years ago.  At Moscone Center right here in

8    San Francisco.

9         Did Sun -- how was the Java language released?  Was it

10   released for anyone to use?

11   **A.**   Sun had a -- at the time, a license for the implementation

12   which you would sign up for and it also had a trademark license

13   which included the Java logo that you could pay a fee for.

14   **Q.**   How about the language itself?  How was that made

15   available?

16   **A.**   The language was -- we published a book along with its

17   interfaces, as we call them, and those were called the *Java*

18   *Language Manual*.

19   **Q.**   And was the Java book available and free for anyone to

20   use?

21   **A.**   Yes.

22   **Q.**   And the language, was a fee charged for using the Java

23   language at that time?

24   **A.**   There was no charge to use the language.  However, if you

25   wanted to use the implementation of the language, you would

1    have to pay a fee.

2    **Q.**   When you say *implementation of the language*, tell our

3    jurors what you mean.

4    **A.**   A language is like a -- like math in the sense that you

5    write it down and it tells the computer what to do.  But the

6    other side of that that actually does the work is programmed by

7    other people, by a computer -- by typically programmers

8    somewhere else.  I'm trying to think of a good example.

9         When you think about a power plug in a -- in like this

10   room, there's something behind it that's providing the power,

11   but from your perspective, it's just a plug.  You don't know

12   how it was implemented.

13        So in a computer language, there has to be something that

14   does what you asked it to do.  That's the implementation.

15   **Q.**   That's the implementation?

16   **A.**   That's right.

17   **Q.**   All right.  Now, did Sun make efforts to popularize the

18   use of the language itself?

19   **A.**   Yes.  I was in charge of that.

20   **Q.**   How did you go about doing that?

21   **A.**   Well, we had the idea that we would get everyone to use

22   our implementation, so I went from company to company to

23   sell/license the implementation to everybody.  And that would

24   include Oracle, Microsoft, Netscape, the other players at the

25   time.

1   Q.   What about the language itself?  Did Sun make efforts to

2   promote the language and its use?

3   A.   Well, of course.  We wanted everyone to use the language

4   because the more people who would use the language, the more --

5   the bigger the ecosystem that would be built would occur.

6   Q.   How did you go about promoting the language?  Was it

7   taught?

8   A.   Yes.  But we had big programs -- we decided to try to get

9   computer science schools to teach it, so there were textbooks

10  that were developed in universities, and the theory was that

11  young programmers would emerge with the ability to use this

12  language and do amazing things.

13  Q.   What is JavaOne?

14  A.   JavaOne was a conference that we held also here at Moscone

15  which I was in charge of when I was at Sun, and the idea was to

16  get all of the people in the ecosystem in one place.  And we

17  had our -- a huge JavaOne conference.  All the programmers

18  came.  We celebrated the brilliance of our ideas and our

19  accomplishments.

20  Q.   Did JavaOne become an annual event?

21  A.   Yes.

22  Q.   And continues on through the '90s and beyond as well?

23  A.   Yes.  It was of immense scale.

24  Q.   Are you familiar with the term API, Application

25  Programming Interface?

1  **A.**   Yes.

2  **Q.**   What is that?

3  **A.**   If you're a programmer, you want something to happen, and

4  you have to call up -- called procedures or methods or what

5  have you that somebody else wrote.  The programming interface

6  is how you make that happen.

7       So if I asked you to jump, now I'm a programmer, I would

8  say, *Mr. Van Nest, jump*, and you would hear that as a -- as an

9  interface, and then you'd say, *Ah, I know how to jump.*  But

10  somebody else might jump at a different way.  All I said was

11  *jump.*  I didn't say how.  It's sort of that -- think of it is

12  as a programmer directs the computer to do something for them

13  through an interface.

14  **Q.**   Can you distinguish that from the implementing code that

15  you talked about a minute ago?

16       **MR. BICKS:**  Your Honor, I would object on expert

17  testimony if we're going to get into detail here.

18       **MR. VAN NEST:**  This is just background, Your Honor.

19       **THE COURT:**  No.  Sustained.  Was he designated as an

20  expert?

21       **MR. VAN NEST:**  No, Your Honor.

22       **THE COURT:**  Well, you have to stick to the past tense

23  and not -- do not veer off into expert subject matter.  You're

24  asking him a present tense question.  He was not designated as

25  an expert.  So you have to stick to his biographical timeline

1    and what he did at Sun.

2         **MR. VAN NEST:**  Thank you, Your Honor.

3    **Q.**   Mr. Schwartz -- Mr. Schmidt, excuse me -- were you in

4    charge of the development of the Java APIs during your time as

5    CTO at Sun?

6    **A.**   I was.

7    **Q.**   And what responsibilities did you have for that?

8    **A.**   Well, my -- my objective and therefore my job was to get

9    widespread adoption of these interfaces and of course as many

10   licenses for the implementation as I could.

11   **Q.**   Okay.  And when Sun first released the language, were the

12   Java APIs included along with it?

13   **A.**   Yes.

14   **Q.**   And why was that done?

15   **A.**   It's not possible to use a language without its -- the

16   interfaces.  The language by itself -- again, I'm using the

17   stupid example, maybe a better example, of jump.  Let's say

18   that I wanted you to jump, but I had no way of calling it.  I

19   had no way of making it happen.  So that's why we needed to

20   have the -- those interfaces as part of our package.

21        **MR. BICKS:**  Your Honor, again, I would object as this

22   is now expert testimony, and we're going back to mid 1990s.

23        **THE COURT:**  Well, I'll allow the answer to stand, but

24   the witness needs to -- you were not designated as an expert.

25   He asked you a past-tense question and you leaped forward to

1    present tense answer.

2         I've got to go with the Rules of Evidence.  You were not

3    designated as an expert.  You've got to stick to what happened

4    back then.

5         And, counsel, you have to stick to what happened back

6    then.  He does have past tense knowledge about what --

7    percipient knowledge about the development of Java back then,

8    but don't skip forward to some of these present tense problems.

9         I need to say to the jury, both sides have argued with me

10   over this problem.  There are a set of rule books about what

11   you have to disclose and who gets to be an expert and all that

12   stuff.  And I have got to stick with the rules.  I'm just going

13   to follow the rule book.  So both sides are going to be doing

14   this during the trial.  So that's the answer.

15        Go to the next question in the past tense.

16            **MR. VAN NEST:**  Yes.  I will, Your Honor.

17   **Q.**   How did Sun make the Java APIs available during the time

18   you were CTO, Mr. Schmidt?

19   **A.**   Well, as I -- as I indicated, at that time, there was a

20   book that included a specification for all those APIs.

21   **Q.**   Okay.  And was that free and open for anyone to use?

22   **A.**   Yes.

23   **Q.**   And how did you expect developers to use the APIs?

24   **A.**   Well, at the time, the way a programmer would call those

25   APIs is they would include them in their code.

SCHMIDT - DIRECT / VAN NEST

1   Q.   Now, how was Sun planning to make money, if it was giving

2   the language and the APIs away for free?

3   A.   So there were many reasons why this was beneficial to Sun

4   at the time.   One was that this lack of *write once/run anywhere*

5   meant that our computers could not be commingled with other

6   people's computers.   So the strategy allowed us to sell more

7   hardware.   That's one aspect of the revenue plan.   But the

8   other revenue plan was to also get some licensing revenue from

9   the deals that we did.

10  Q.   Did Java also have a trademark associated with it?

11  A.   It did.

12  Q.   What was that?

13  A.   It was a coffee cup logo.

14       MR. VAN NEST:   Could we put the coffee cup logo up,

15  please.

16       THE COURT:   Is this an exhibit somewhere?

17       MR. VAN NEST:   It's a graphic, Your Honor.

18       THE COURT:   Well, is this coming into evidence?   Or is

19  this just illustrative --

20       MR. VAN NEST:   It's just for illustrative --

21       THE COURT:   Any objection?

22       MR. BICKS:   No, Your Honor.

23       THE COURT:   All right.   Go ahead.

24  BY MR. VAN NEST:

25  Q.   Tell the jury, what's the coffee cup and was it

 1   licensed --

 2          THE COURT:  Is this coming through in the jury box?

 3   Please let the jury see it in the jury box.

 4          MR. VAN NEST:  There it is.  There it is.

 5   Q.   What are we looking at, Mr. Schmidt?

 6   A.   So this is the Java logo, and the idea -- the idea that we

 7   had was this would help promote the use of Java because of

 8   course it's a pun on coffee.

 9   Q.   Now, did Sun charge a license fee for people to use the

10   Java cup in connection with their own products?

11   A.   Yes, we did.

12   Q.   Why was that?

13          MR. BICKS:  Your Honor, again, we're in the Sun's

14   licensing practices during the mid '90s, which the Court had

15   indicated previously was of marginal relevance here.

16          THE COURT:  Overruled.  No.  I'm going to allow this.

17   It's past historical development.  We have heard about

18   licensing from you, Mr. Bicks, and so this is fair game for the

19   moment.  I'll see where it goes.  Go ahead.

20   BY MR. VAN NEST:

21   Q.   Now, at that time, would Sun have permitted someone to use

22   their own version of Java to call it Java without paying a fee?

23   A.   We had a trademark license, and so if you wanted to say

24   that it was the Java from Sun, you had to have this picture and

25   you had to fulfill the terms of the trademark license.

1    Q.   At that time, could you build your own version of Java as

2    long as you didn't call it Java without paying a fee to Sun?

3              MR. BICKS:   Again, objection, Your Honor.

4              THE COURT:   Sustained.   That calls for a lot of

5    opinion.   He has not been designated as an expert.

6    BY MR. VAN NEST:

7    Q.   Mr. Schmidt, when did you leave Sun?

8    A.   1997.

9    Q.   And what did you do next?

10   A.   I became the CEO of a company called Novell.

11   Q.   When did you arrive -- well, tell us a little bit about

12   Novell.   Where is Novell located and what did you do there?

13   A.   Novell is a company that was headquartered in Provo, Utah,

14   and it was a networking company, networking software.

15   Q.   I think you told us you arrived at Google in 2001?

16   A.   That is correct.

17   Q.   And took a position as CEO at that time?

18   A.   That is correct.

19   Q.   Could you describe for our jurors generally what is

20   Google's business and how does Google make money?

21   A.   Virtually all the revenue of Google comes from its

22   advertising products, and I'm sure you all have seen them over

23   the years, the little blue links.   People click on them and the

24   sum of that is many billions of dollars across many different

25   users globally and so forth.   It's essentially an advertising

1    company, and the majority of the revenue comes from those links

2    that you see when you do a Google search.

3    **Q.**    Does Google create new products?

4    **A.**    All the time.

5    **Q.**    And does Google invest in research and development to make

6    that happen?

7    **A.**    A great deal of investment in R&D.

8    **Q.**    How big a part of Google is research and development,

9    Mr. Schmidt?

10   **A.**    The general guideline is about 50 percent of Google is

11   associated with R&D, so a very high number in the industry.

12   **Q.**    Can you give our jurors some examples of Google products?

13   **A.**    Well, I'm sure you're familiar with Gmail.  I'm sure

14   you're familiar with Google Earth and Google Maps.  Obviously

15   Android is part of this discussion here.  Many, many others.

16   **Q.**    Does Google make its consumer products available for free

17   to consumers?

18   **A.**    Our -- our -- our global users as a general rule do not

19   pay a fee, and we make our money from advertising that comes

20   from with -- or travels with those programs.

21   **Q.**    You mentioned search.  When was Google Search created?

22   **A.**    It was invented by Larry and Sergey when they were

23   graduate students at Stanford, and they founded the company

24   based on their success of the algorithm called PageRank, and

25   this is roughly 1998.

1   Q.   What is Google Ads?

2   A.   So one of the ideas they had was how do we make money?   We

3   have this great search product, and so the idea was we would

4   take the advertising and tie it to the ads, so if you were

5   looking for a digital camera, then we would show an ad for a

6   digital camera, the people would click on that, and then people

7   purchase the camera.

8   Q.   Are Google Search and Google Ad separate technologies from

9   Android?

10  A.   Yes.

11  Q.   Give us a little background, Mr. Schmidt.   What is

12  Android?

13  A.   Android is the name of an operating system that runs on

14  smartphones.   Would you like me to describe its components

15  or --

16  Q.   No.   What was the concept behind Android?

17  A.   I see.   So the problem at the time was that smartphones

18  were just starting, and there was the idea that we could build

19  a mobile operating system that would get wide adoption, a lot

20  of people -- it would drive new ways people would use mobile

21  computing, and it started again -- and I think it's on your

22  timeline even.   And Android is a company that was founded by a

23  fellow named Andy Rubin, and we acquired the company when it

24  was very small.

25  Q.   Did you have ultimate responsibility for Android at

1    Google?

2    **A.**    Yes.

3    **Q.**    Has Google developed mobile products for other devices

4    than just Android?

5    **A.**    Well, an example -- I mentioned that we made most of our

6    money from Search.  We have a search product that runs on the

7    iPhone which would be a well-known example.  But there are

8    plenty of other mobile products that -- a good example would be

9    Google Maps.

10   **Q.**    That runs on other platforms --

11   **A.**    Yes.  It runs on many platforms, but primarily the iPhone

12   and Android.

13   **Q.**    Let's go to our timeline, Mr. Schmidt.  We have on it July

14   2005, Google acquires Android.  What was the purpose for

15   acquiring Android?

16   **A.**    At the time, Android was very small, and the idea was that

17   it would be useful to have a mobile operating system that would

18   be much more powerful for the smartphone than the earlier, what

19   we called, feature phones or people would say dumb phones.  So

20   it was just becoming clear that powerful phones or powerful

21   screens would become available.  You know this today as the

22   iPhones/Android phones that you use every day here in the

23   courtroom.

24   **Q.**    When Google acquired Android, was there a fully-baked

25   smartphone available from Android at that point?

**SCHMIDT - DIRECT / VAN NEST**

1   **A.**   No.  The work that had been done was simply preparatory.

2   It was exploratory.  It was research and development, and the

3   first Android phone did not come out until years after the

4   acquisition.

5   **Q.**   And were there various options for Google in building

6   Android?

7   **A.**   Well, we purchased Android.

8   **Q.**   Right.

9   **A.**   So we had the choice of not purchasing Android and doing

10  something else.  We had tried strategies before involving

11  partnerships with telecommunications companies, but none of

12  them worked very well.  They were just bad products, if I could

13  be blunt.

14  **Q.**   Okay.  And once Android came in, once Android had been

15  acquired by Google, did you still have options as to how to

16  build it, whether to buy it or build it internally?

17  **A.**   We had many choices once we acquired because we needed to

18  fill out the offering.  And at the time, if you wanted to build

19  a smartphone, you had to pay a lot of different fees to a lot

20  of different players.

21       So typical example is that there is the thing that does

22  audio and video.  You had to pay a royalty or fee to use this

23  particular piece of software.  So our idea was that we would

24  have an offering, a piece of software, that would pay off all

25  of those royalties.  In other words, it would be free software

1    to the licensee who wanted to use it.  This is called an open

2    source.  And it was revolutionary at the time.

3    **Q.**  Why was it so revolutionary?

4    **A.**  Because most people were trying to pay for their

5    implementations by licensing, but we thought we will just allow

6    it to be freely licensed, and we could always make money from

7    our applications.

8    **Q.**  Your applications being things like Search?

9    **A.**  I think Search would be a primary example there.

10   **Q.**  Early on, did you consider partnering with Sun to develop

11   Android?

12   **A.**  We did.

13   **Q.**  At that time, did Sun have a Java product for use in

14   mobile phones?

15   **A.**  At the time -- and, again, remember I'm now at Google so

16   these are my friends at Sun, but I'm not at Sun anymore.

17   Google had Android, and we thought it would be a good idea to

18   take what is called the Java Mobile and put it inside of this

19   Android product.  We thought that that would be good for

20   everybody.  I'm obviously very pro Java, etc.

21   **Q.**  And did Google expect Android to be different from what

22   existed at that time?  By that I mean feature phones?

23   **A.**  Our view of Android was there was never anything like it

24   and it was completely different from any other approach.  There

25   was nothing like -- we were building something new from our

1    experience.

2    **Q.**   What did you see as the benefit to Google as a partnership

3    with Sun?

4    **A.**   Well, I had an emotional reason why I thought it would be

5    good to work with Sun from my own history, but as a technical

6    matter, I liked the team, I liked the implementation that they

7    had done because I had overseen it, and it would be good to

8    have that quality inside of our phone, in my view.

9    **Q.**   And what is the technology you were hoping Sun would

10   contribute to the partnership?

11   **A.**   So if we go back to this business about implementations,

12   there was an implementation that the Java people had done on

13   the Sun side that we -- that if we just put it in our phone, it

14   would allow people to write applications and invent the future

15   in interesting ways.  We did not understand at the time how it

16   would be used, but we thought it would be useful.

17   **Q.**   And were you considering using the Java logo and brand,

18   too?

19   **A.**   Yes.  That would be ideal because, again, we liked the

20   logo, we liked the brand.

21   **Q.**   Would there have been a time advantage to Google if you

22   had been able to work out a partnership with Sun?

23   **A.**   Well, probably.

24            **MR. BICKS:**  Objection, Your Honor.  Hypothetical.

25            **THE COURT:**  You may rephrase that.  It's improperly

1    phrased.  You should phrase it to say at the time, did you

2    consider whether or not there was an advantage, and if he, in

3    fact, did consider that back then, then that would be a

4    historical fact.  He can testimony to that.  But the way you

5    phrased it calls for present-day opinion.

6    BY MR. VAN NEST:

7    Q.   At the time, did you consider whether there would have

8    been an advantage in time from a partnership with Sun?

9    A.   I believed that there would, although I was not sure.

10   Q.   Now, did you participate in some of the discussions with

11   Sun?

12   A.   I did.

13   Q.   And I want to get our jurors oriented to the timeline.

14   We're showing that they began sometime in August of 2005 and

15   continued into 2006.  Is that consistent with your general

16   recollection?

17   A.   That is correct.

18   Q.   Okay.  And who is it that you were talking with at Sun?

19   A.   I spoke to both Scott McNealy, who was my -- had been my

20   boss, and I believe at the time was the chairman.  And I also

21   spoke with Jonathan Schwartz, who I believe at that time was

22   just -- was the CEO -- was just about to become the CEO of Sun.

23   Q.   And did you and Mr. Schwartz or you and Mr. McNealy

24   exchange emails at the time?

25   A.   We did.

SCHMIDT - DIRECT / VAN NEST

1           MR. VAN NEST:  Your Honor, may I approach the witness?

2           THE COURT:  Yes, you may.

3    BY MR. VAN NEST:

4    Q.   I'm showing you Trial Exhibit 205.

5    A.   Okay.

6    Q.   Do you recognize that, Mr. Schmidt?

7    A.   I do.

8    Q.   What is it?

9    A.   This is an email that is from Scott McNealy from Sun back

10   to me, which includes the message I sent to him before.

11          MR. VAN NEST:  I would offer 205 into evidence,

12   Your Honor.

13          MR. BICKS:  No objection.

14          THE COURT:  Received in evidence.

15

16   (Trial Exhibit 205 received in evidence)

17          MR. VAN NEST:  Can we display it on the screen?

18          THE COURT:  You may.  Is that coming through in the

19   jury box?  Yes, it is.  Go ahead.

20   BY MR. VAN NEST:

21   Q.   You start there -- we're going to read these from the

22   bottom to the top, Mr. Schmidt.

23        You start off at the bottom, "Scott, I'm in a product

24   review, and we're looking at a very interesting partnership

25   proposal with Sun."

1        What is the partnership proposal that you were looking at

2   at the time?

3   **A.**   For the benefit of everybody, the first message is the

4   second of the two that you see, so what you're reading is

5   something I sent to Scott.

6   **Q.**   Right.

7   **A.**   So I'm in product review and we're looking at a very

8   interesting partnership proposal with Sun.   Yes.

9   **Q.**   And what's the nature of the proposal you were

10  considering?

11  **A.**   Well, a part of this was this discussion about using Java

12  licensed implementation in our platform.

13  **Q.**   Now, if were you in going to use the Java-licensed

14  implementation, would you have had to pay a fee for that and

15  license it?

16  **A.**   If we were to get the implementation from Sun, yes,

17  absolutely.

18  **Q.**   And the coffee cup logo, would that have required a

19  license fee as well?

20  **A.**   It would have as well.

21  **Q.**   That's what you were considering doing at the time?

22  **A.**   Right.   Think of this as I'm telling him we are

23  considering such a deal.

24          **MR. BICKS:**   Your Honor, objection.

25          **THE COURT:**   What is the objection?

1          **MR. BICKS:**  It's not responsive to any question.

2          **THE COURT:**  I'm sorry.  I --

3          **MR. VAN NEST:**  I think it's directly responsive,

4     Your Honor.

5          **THE COURT:**  Well, it's editorial comment.  I probably

6     should have sustained the objection at the time.  I'll let it

7     go.  We've got to just stick with the historical facts rather

8     than editorializing now.

9          Unless, Mr. Bicks, if you're going to be asking questions

10    on cross that allow -- that calls for the same kind of thing,

11    then we might as well just start doing it now because I'm going

12    to let them do it on redirect if you do it because you can't

13    have it both ways.  So keep that in mind.

14         Next question.

15    **BY MR. VAN NEST:**

16    **Q.**   You go on to say, "It's an opportunity for our two

17    companies to work together to define the de facto standard

18    software stack."  What is the de facto standard software stack

19    you're referring to there?

20    **A.**   Well, the standard -- the term *standard* -- the term

21    *standard software stack* at the time meant all of the software

22    that a developer or user would need to use a smartphone.

23    **Q.**   Did Mr. McNealy respond?

24    **A.**   Yes.  His response is above.

25    **Q.**   And he said, "Thanks for the note.  Jonathan and team are

1  on top of this."  Who is he referring to?

2  **A.**   He is referring to Jonathan Schwartz and his employees.

3  **Q.**   He says, "I'm worried about how we're going to replace the

4  revenue.  This is likely to submarine.  I'm very supportive of

5  driving a completely open phone stack."

6       Did you understand what Mr. McNealy was saying there?

7  **A.**   Yes.

8  **Q.**   What was that?

9  **A.**   So I read this as he would like to do a deal.  He has some

10  revenue that he might lose if he does our deal, and he wants to

11  make sure that he gets that revenue from us.

12  **Q.**   Okay.  Did you continue discussions further on with

13  Mr. Schwartz or Mr. McNealy?

14  **A.**   I did.

15  **Q.**   Were there further emails?

16  **A.**   Yes.

17       **MR. VAN NEST:**  Your Honor, may I approach the witness?

18       **THE COURT:**  Yes.

19  **BY MR. VAN NEST:**

20  **Q.**   Mr. Schmidt, I'm handing you TX435.  Do you recognize

21  that?

22  **A.**   I do.

23  **Q.**   What is it?

24  **A.**   This is a message from Jonathan Schwartz to me copying

25  Scott McNealy and Sergey Brin, who is the co-founder of Google.

1          **MR. VAN NEST:**  Your Honor, I would offer 435 in

2    evidence.

3          **MR. BICKS:**  No objection.

4          **THE COURT:**  Thank you.  Received.

5    (Trial Exhibit 435 received in evidence)

6          **MR. VAN NEST:**  May we display it?

7          **THE COURT:**  When I say it's received in evidence, you

8    can go ahead.  You don't have to ask me to display it again

9    once it's in evidence.

10   **BY MR. VAN NEST:**

11   **Q.**  Mr. Schwartz says right in the first line, "My team has

12   alerted me that our negotiations to jointly create a Java/Linux

13   mobile platform are at an impasse."

14        Do you know what he was referring to, Java/Linux mobile

15   phone?

16   **A.**  That's his word for our Android project.

17   **Q.**  Had you made clear to him that you were using Java in

18   Android?

19   **A.**  That was part of the discussions, yes.

20   **Q.**  What is Linux?

21   **A.**  Linux was the part of the software that was part of

22   Android at the bottom.  So the way this worked was that Linux

23   was at the bottom and then there was software on top of it.

24   **Q.**  He says in the second paragraph -- third paragraph, "Sun

25   is ready to embrace Google's innovation in order to make sure

1   Google apps will shine.  However, we're not willing to cede

2   complete control of the management for key components of the

3   stack."

4       What was the basis of the discussion at that point?  What

5   was the impasse?

6   **A.**   Each company had a different way it wanted to approach the

7   market.  In our case, our model required that we give the

8   software out to the community as a whole.  The Sun group had a

9   different model.  And the two models were not the same.

10  **Q.**   Okay.  Did discussions continue following -- excuse me.

11  Let me get down to the last paragraph.  He says, "Sun has key

12  technology assets, as well as enormous depth in creating

13  communities in ecosystems."

14      What key technology assets were you talking about with Sun

15  at that time?

16  **A.**   Well, it turns out that we had a set of deals with Sun

17  involving search technology, tool bars, distributing Java in

18  other ways.

19  **Q.**   But he's talking about "our Java/Linux phone."  My

20  question is "Sun has technology assets as well as enormous

21  depth."  Was he referring to something in connection with the

22  phone project?

23  **A.**   Well, Sun had its mobile partners.  It had its own

24  enterprise software on Java, a large set of products that it

25  had built as well.

SCHMIDT - DIRECT / VAN NEST

1  Q.   Following this, was there further discussion?

2  A.   Yes.

3         MR. VAN NEST:  Your Honor, can I approach the witness?

4         THE COURT:  Yes.

5  BY MR. VAN NEST:

6  Q.   Do you recognize TX 2372?  Actually, Mr. Schmidt, turn to

7  the second page.  Your email is on the back.

8  A.   I'm sorry.  I did not recognize the first page.

9  Q.   Do you recognize the email on the back?

10  A.   I do.

11  Q.   What is it?

12  A.   This is a message from me to Jonathan congratulating him

13  on his promotion.

14         MR. VAN NEST:  Your Honor, I would offer 2372 in

15  evidence.

16         MR. BICKS:  No objection.

17         THE COURT:  Thank you.  Received.

18  (Trial Exhibit 2372 received in evidence)

19  BY MR. VAN NEST:

20  Q.   Let's display the second page of Mr. Schmidt's email.  You

21  are congratulating Mr. Schwartz.  What are you congratulating

22  him on?

23  A.   He had been promoted to CEO and Scott had been promoted to

24  chairman.

25  Q.   This was in May of 2006?

SCHMIDT - DIRECT / VAN NEST

1   A.   That's correct.

2   Q.   Now, in that large second paragraph, you start by saying,

3   "I got your message about a potential partnership between

4   Google mobile Android and Sun Java."  Is that the same

5   partnership discussion we've been referring to?

6   A.   Yes.

7   Q.   You go on to say about halfway down, "Google has made

8   considerable investment in this area and we're starting to see

9   solid progress.  Although well under way, we're still open to

10  having Sun contribute components of the stack."

11       What were you referring to in the progress that Google had

12  made by this point?

13  A.   Well, as you build these platforms, you start with little

14  pieces and you build more and more of the components, so an

15  example would be thinking about pieces of a smartphone.  You

16  just have to build all of those pieces.  Those are called

17  components.

18  Q.   And you mention that you're still open to having Sun

19  contribute components of the stack.  What Sun components were

20  you and Sun discussing at that point?

21  A.   So Sun had an objective of having many of the pieces of

22  software that Sun had built separately added to our effort, and

23  we were open to that.

24  Q.   And that's proprietary software?

25  A.   Yes.

SCHMIDT - DIRECT / VAN NEST

1    Q.    That would have required a fee?

2    A.    And more importantly, a deal, yes.

3    Q.    Very good.

4          Were you able to reach agreement with Sun over Android,

5    Mr. Schmidt?

6    A.    We were not.

7    Q.    Can you tell the jury why the deal discussions broke down?

8    A.    You can see that in the third paragraph.

9    Q.    Okay.

10   A.    "However, Google should have the final say as to which Sun

11   technology is contributed to the open platform since Google is

12   writing the check."

13   Q.    What check were you talking about?

14   A.    This would be a fee to -- fee from Google to Sun for the

15   implementation.

16   Q.    So, again, did the deal break down based on money, or was

17   it something else?

18   A.    It broke down over who was in charge.

19   Q.    How much money was being discussed at this time?

20   A.    I was willing to pay -- these were initial discussions --

21   $30, $40 million kind of numbers, and that was in the

22   discussions that we had.

23   Q.    What would that have purchased from Sun?

24          MR. BICKS:  Again, objection, Your Honor.  This is

25   completely speculative testimony.

1           **THE COURT:**  Sustained as phrased.  There is no way for

2    him to know what he would have purchased unless there was a

3    firm offer on the table that he could testify to.

4           **MR. VAN NEST:**  Okay.

5    **Q.**   Had you identified for Sun the technology that you were

6    willing to have contributed to the platform?

7    **A.**   There was the technical team that had done that.

8    **Q.**   Now, after negotiations with Sun broke down, what, if any,

9    steps did Google take to complete Android?

10   **A.**   We -- again, I'm trying to not be too technical here.

11          We used software that implemented the public interfaces of

12   Java to offer a different implementation of the interfaces that

13   Java has.

14   **Q.**   How did you go about building the different

15   implementation?

16   **A.**   We had a set of software programmers who worked -- they

17   just did a different implementation in a different place

18   without using the technology that Sun had developed.

19   **Q.**   Did you use any Sun implementing code in Android?

20   **A.**   We did not use any code that Sun had implemented to

21   implement the interfaces.

22   **Q.**   And did you get the right to use the Java logo?

23   **A.**   We did not.

24   **Q.**   Was it your belief that you could use the Java language --

25   let's start with the language -- in Android, notwithstanding

1   that you didn't have a partnership with Sun?

2          MR. BICKS:  Objection on relevance, Your Honor.

3          MR. VAN NEST:  Good faith, Your Honor.

4          THE COURT:  No.  That's a proper question.  It is

5   leading, but please don't lead the witness, but the objection

6   made is overruled.

7       Please answer.

8          THE WITNESS:  We believed it was permissible to

9   implement the language without a license from Sun.

10  BY MR. VAN NEST:

11  Q.   And did you have a belief as to whether or not you could

12  use the APIs?

13  A.   Yes.

14  Q.   What was that believe based on?

15  A.   That it was permissible to do so.

16  Q.   What was your belief in that based on?

17  A.   Forty years of experience.

18  Q.   Tell the jury what you mean.

19         MR. BICKS:  Your Honor, we're going on 40 years of

20  experience.  I'm going to object depending on where this is

21  going in terms of time frame.

22         MR. VAN NEST:  Let me ask another question,

23  Your Honor.

24  Q.   At the time that Google built Android using the Java APIs,

25  was it your understanding that that was permissible to do as

1  long as you wrote your own implementing code?

2  **A.**   That is correct.

3  **Q.**   What was that understanding based on at the time?

4  **A.**   Well, business advice, legal advice, many years of

5  experience in the industry.

6  **Q.**   Let's leave the legal advice out.

7      What was the many years of experience contributing to this

8  belief?

9          **THE COURT:**  The jury will disregard that comment about

10  legal advice.  Because --

11          **MR. VAN NEST:**  Let's stick -- excuse me.

12          **THE COURT:**  -- because I could get into the reasons,

13  but the parties have elected not to get into and tell you what

14  the legal advice was, so we can't make these vague allusions to

15  legal advice.  You must disregard the idea that there was legal

16  advice behind what the witness is going to say.  I'm not saying

17  the legal advice was bad or good, but you just have to

18  disregard it.

19      However, the other parts of the question are permissible.

20      So please answer as to the other parts of the question,

21  the basis.

22          **THE WITNESS:**  Would you like a historical example?

23  **BY MR. VAN NEST:**

24  **Q.**   Sure.

25  **A.**   Okay.  When I was at Sun in the early '90s, I built a

1    product called WABI which was roughly analogous to what we were

2    doing at Google, and this used the public -- public interfaces

3    for Windows to build an implementation of Windows without the

4    license fee to Windows.

5    **Q.**   That was something you did at Sun?

6    **A.**   That is correct.

7    **Q.**   Now, by then, by 2006/2007 at Google, did you have other

8    experience with APIs that informed your decision?

9          **MR. BICKS:**   Again, Your Honor, objection because this

10   witness is not an expert on custom relating to APIs.

11         **THE COURT:**   Well, as long as it's his actual -- he's

12   explained -- as long as this is meant to explain what he

13   actually thought at the time as to his good faith or bad faith,

14   it's permissible.  So I will overrule that objection, but it

15   has to be cast in terms of what he actually had in mind at the

16   time and not veer off into expert opinion.

17        So to that extent, the objection is overruled.

18        Please answer.

19         **THE WITNESS:**   So in the industry, I had seen a number

20   of examples over my service of this kind of thing.  So that's

21   why I believed what I did.

22   **BY MR. VAN NEST:**

23   **Q.**   Was it a secret that Google was developing Android with

24   Java?

25   **A.**   Certainly not.

1    Q.    Was Mr. Schwartz told that you would be continuing to use

2    the Java language in the APIs?

3              MR. BICKS:   Again, Your Honor, leading.

4              THE COURT:   It is leading.   Sustained.

5         Please don't lead the witness on something that is

6    important.

7    BY MR. VAN NEST:

8    Q.    Had you and Mr. Schwartz discussed the nature of Google's

9    effort to build the phone?

10   A.    Yes.   Many times.

11   Q.    Okay.   And in those discussions, did you have any

12   discussion about either the language or the APIs?

13   A.    I told Mr. Schwartz the details of what we were doing as I

14   knew them at the time, which would have included that

15   information.

16   Q.    Now, do you have any idea how long it took Google to build

17   Android, Mr. Schmidt?

18   A.    If we refer to the timelines, since I got the date wrong

19   last time, we purchased Android in --

20   Q.    2005?

21   A.    -- 2005.   And it had been in development for a couple of

22   years before.   And we released the first version of Android in

23   2009 -- 2008.

24   Q.    Actually, November 2007 Google releases Android?

25   A.    Yeah.   But that one didn't work.   We really released the

1    working version in 2008.

2    **Q.**    Why did it take so long to develop?   That's three years.

3    July '05 to '08?

4    **A.**    There is just a tremendous number of pieces to make the

5    magic happen on these smartphones, and we were under a great

6    deal of pressure because the iPhone had come out earlier.

7    **Q.**    Okay.   We have on our timeline an announcement, Google

8    releases Android.   What announcement was made in November of

9    2007?

10   **A.**    So we announced something called the Open Handset

11   Alliance, and again, our idea was to have as many partners in

12   the ecosystem that would use this, so our goal was to get as

13   many people on this platform as possible, which, of course, we

14   were freely licensed -- licensing.   Excuse me.

15   **Q.**    Was the announcement made on behalf of the entire

16   Alliance?

17   **A.**    Yes.   And I did it.

18   **Q.**    Can you provide a few examples of members of the Alliance

19   to the jurors?

20   **A.**    Well, pretty much all of the telecommunications companies

21   and pretty much all of the enterprise software companies.

22   **Q.**    At the time you announced Android, did you also announce

23   the nature of licensing for Android to the public?

24   **A.**    Yes.   We indicated that Android would be freely licensed.

25   **Q.**    What do you mean by that?

1    **A.**    You did not need to pay a fee to use Android.

2    **Q.**    Now, at this time, November of 2007, was Mr. Schwartz

3    still the CEO of Sun?

4    **A.**    He was.

5    **Q.**    And did he have a popular blog?

6    **A.**    He did.

7    **Q.**    Was this something you read periodically?

8    **A.**    I did.

9    **Q.**    Did you understand whether or not it was an official

10    statement of Sun?

11    **A.**    I -- I assumed it was his view and also the view of the

12    company.

13    **Q.**    Did Mr.--

14         **MR. BICKS:**  Objection, Your Honor.  It's add-on

15    testimony.  It's not responsive.

16         **THE COURT:**  Well, it -- even if he doesn't know for

17    sure, it may go to his state of mind, which is an issue in the

18    case, on propriety of the use under Factor 1, so the objection

19    is overruled.

20    **BY MR. VAN NEST:**

21    **Q.**    Did Mr. Schwartz publish a blog post concerning Android?

22    **A.**    He did.

23    **Q.**    Did you read it at the time?

24    **A.**    I did.

25         **MR. VAN NEST:**  May I approach the witness, Your Honor.

```
 1              THE COURT:  Yes.

 2   BY MR. VAN NEST:

 3   Q.   Would you please take a look at Exhibit TX 2352.  Do you

 4   recognize that?

 5   A.   I do.

 6              MR. VAN NEST:  I offer TX 2352 into evidence.

 7              MR. BICKS:  I do object to the relevance of it.

 8              THE COURT:  I need to see it then.  Is this the blog?

 9              MR. VAN NEST:  It is, Your Honor.

10              THE COURT:  Objection overruled.

11
     (Trial Exhibit 2352 received in evidence)
12

13   BY MR. VAN NEST:

14   Q.   Let's display 2352 to the jurors.

15        Mr. Schmidt, the first paragraph of this makes

16   reference -- he says, "I just wanted to add my voice to the

17   chorus of others from Sun in offering my heartfelt

18   congratulations to Google on the announcement of their new

19   Java/Linux phone platform, Android."

20        What did you understand Mr. Schwartz to be referring to

21   when he said Java/Linux phone platform?

22   A.   Well, he was referring to Android.

23   Q.   The second paragraph ends with the statement -- excuse me.

24   Let's go to the first sentence there.  "I would also like Sun

25   to be the first platform software company to commit to a
```

SCHMIDT - DIRECT / VAN NEST

1   complete developer environment around the platform as we throw

2   Sun's NetBeans Developer Platform for mobile devices behind the

3   effort."

4        Did you know what the NetBeans Developer Platform was?

5   **A.**   I did.

6   **Q.**   What was it?

7   **A.**   It was a set of libraries called JavaBeans which they had

8   built on top of the Java language which they would be putting

9   on Android and they had told us this.

10  **Q.**   Did you consider that a good thing?

11  **A.**   Absolutely.

12  **Q.**   Why?

13  **A.**   It's a good partner.

14  **Q.**   What was your reaction to this blog post?

15  **A.**   This was a great -- a great message of congratulations.

16  **Q.**   He goes on to say further on, "And needless to say, Google

17  and the Open Handset Alliance just strapped another set of

18  rockets to the community's momentum and to the vision defining

19  our opportunity across our and other planets."

20       What opportunity was he referring to there?

21  **A.**   Well --

22            **MR. BICKS:**   Objection, Your Honor.

23            **THE COURT:**   Sustained, but you can ask him what this

24  witness at the time thought in his own head he was referring

25  to.   That would be a proper question.

1   BY MR. VAN NEST:

2   Q.   What did you understand Mr. Schwartz to be referring to,

3   Mr. Schmidt?

4   A.   So my interpretation of this is Google --

5          THE COURT:   Not your present interpretation.   Back

6   then.   If you had one, you can tell us what it was then.

7          THE WITNESS:   I apologize, Your Honor.   I meant to say

8   when I read this, what I interpreted it to mean was Google and

9   Sun are partners at the time and that we're going to grow this

10  ecosystem bigger and bigger and bigger as a result of the Open

11  Handset Alliance and their development work on top of what we

12  were doing.   That's how I interpreted it.

13  BY MR. VAN NEST:

14  Q.   Now, following the blog post, did you continue to receive

15  communications from Mr. Schwartz?

16  A.   I did.

17  Q.   Did you receive further emails?

18  A.   I did.

19  Q.   I'm sorry.   I have wrong the exhibit.   Can I get 3441,

20  please.

21         THE COURT:   There is a snafu.   I know the heart is

22  singing in the jury box when you heard there is 3,441 documents

23  that you are going to have to review, but if history is any

24  guide, it will be maybe a couple hundred, but it won't be that

25  many.   They marked a lot of exhibits, but most of them won't

1  actually be used.  So there still will be several hundred, at

2  least 200, I'm sure.

3      Do we have the document?

4          **MR. VAN NEST:**  We don't, but we're looking for it.

5  Let me move on to another exhibit.

6  **Q.**  After the Android -- let me back up just a minute.

7      When Android was announced in November of 2007, was part

8  of Android made public?

9  **A.**  Well, as I said, our strategy was to be freely licensed so

10 we said that we would make our source code available.

11 **Q.**  Could someone wishing to see what APIs were used be able

12 to find that out?

13 **A.**  Yes.

14 **Q.**  How would they do that?

15 **A.**  Well, we published the APIs, we created a cite, many

16 things to make sure people could see what we were doing.

17 **Q.**  Could anyone access that cite?

18 **A.**  Yes.  Worldwide.

19 **Q.**  Now, did you continue to meet and talk with Mr. Schwartz

20 after the announcement of Android?

21 **A.**  I did.

22 **Q.**  May I approach the witness, Your Honor.

23     Take a look at Exhibit TX 3446 and tell me whether you

24 recognize that?

25 **A.**  I do.

SCHMIDT - DIRECT / VAN NEST

1    Q.   What is it?

2    A.   It's a message from me to Jonathan Schwartz of Sun copying

3    Andy Rubin of Google.

4         MR. VAN NEST:  I would offer TX 3466 in evidence.

5         MR. BICKS:  No objection.

6         THE COURT:  I'm sorry.  3466 or 3446?

7         MR. VAN NEST:  3466.

8         THE COURT:  All right.  Received in evidence.  Thank

9    you.

10   (Trial Exhibit 3466 received in evidence)

11   BY MR. VAN NEST:

12   Q.   Let's refer to -- the first line refers to, "Nice to see

13   you this morning.  As a follow-up to our conversation, I ask

14   for details on our Android licensing terms.  Please review.  We

15   are happy to have our teams meet."

16        Had you met with Mr. Schwartz that day?

17   A.   I believe this is when I met with him at his office or

18   cafeteria in the morning at Sun.

19   Q.   All right.  And what was the purpose for that meeting?

20   A.   A catch-up.

21   Q.   You were a customer of Sun's at that time?

22   A.   Just business -- good friends.  Business conversation.

23   Q.   And did the two of you discuss Android during the meeting?

24   A.   We did.

25   Q.   And what discussion did the two of you have about Android?

1   **A.**   The key question is how do we go forward so that they

2   could remain part of the community.  We could do the right

3   thing; everyone would be happy.

4   **Q.**   And did he have some questions for you about Android?

5   **A.**   Yes.

6        As I recall, he was still slightly confused in his

7   questions to me about what we were exactly doing.  And so I

8   clarified it in a follow-up email.

9   **Q.**   And the email makes a reference to, in point 1, "Our

10  license is Apache v2."  Do you know what that is?

11  **A.**   Yes.

12  **Q.**   What is Apache v2?

13  **A.**   Apache is the name of a particularly liberal license for

14  use of software.  And this paragraph defines what we do with

15  that license.

16  **Q.**   And why were you providing that information to

17  Mr. Schwartz?

18  **A.**   They were not using the same license.

19  **Q.**   You go on in point 2 to say --

20        **THE COURT:**  That's unclear.  What do you mean "they"?

21        **THE WITNESS:**  Sorry.

22        Sun had a different license model, and they were not using

23  Apache v2.

24        **THE COURT:**  Thank you.

25

1    BY MR. VAN NEST

2    Q.    You go on to say, in point 2, "As a result, Sun will be

3    able to take Android and do whatever you like to it, subject to

4    the license."

5          What were you referring to there?

6    A.    Could we read the second --

7    Q.    Sure.

8    A.    -- sentence as well?

9    Q.    Yes.

10   A.    "This should allow you to, for example, add Java code or

11   anything else on top of Android and make it available."

12         So what I'm telling him in my email here is they can take

13   our version of Android and do whatever they want.   It's

14   completely free for their use in any way they wish.

15   Q.    Did he indicate to you that he was interested in working

16   with Android?

17   A.    Yes.   He had said he would like to discuss that.

18   Q.    All right.   Now, I have 3441.

19         **MR. VAN NEST:**  May I approach the witness, Your Honor?

20         **THE COURT:**  You may.

21   BY MR. VAN NEST

22   Q.    Do you recognize 3441?

23   A.    I do.

24   Q.    What is it?

25   A.    This is a message from Jonathan to me; and then from me to

1    Jonathan; and then back from Jonathan to me.  So it's, let's

2    see.  Him to me; me to him; him back to me, bottom to top.

3            **MR. VAN NEST:**  Your Honor, I would offer 3441 in

4    evidence.

5            **MR. BICKS:**  No objection.

6            **THE COURT:**  Received.

7        (Trial Exhibit 3441 received in evidence.)

8    **BY MR. VAN NEST**

9    **Q.**   All right.  This is a little bit earlier than the last

10   one, Mr. Schmidt.  We found it now.

11       The email at the bottom, is that the first email in the

12   chain?

13   **A.**   That's correct.

14   **Q.**   Right.  And Mr. Schwartz says to you, "Let us know" --

15   it's re Android.

16       "Let us know how we can help support your announcements

17   next week.  We're happy to do so."

18       What announcements was he referring to?

19   **A.**   This is the open handset announcement of Android.

20   **Q.**   And did you respond?

21   **A.**   I said, "Thanks, Jonathan.  I'll review right now.  The

22   software development kit is supposed to release in Early Look

23   on Monday."

24   **Q.**   What's the software development kit?

25   **A.**   Software development kit is the first thing a programmer

1   tests when they have a new offer to them.

2       So try this; see if you like it; get excited about it or

3   decide you don't like it.

4   **Q.**   Does the SDK disclose the APIs that are available on

5   Android?

6   **A.**   Yes.  As part of the software development kit, the APIs

7   are part of that.

8   **Q.**   And, again, can anybody access that?

9   **A.**   It was a public release.

10  **Q.**   Did you have further email correspondence with

11  Mr. Schmidt -- with Mr. Schwartz?  Excuse me.

12  **A.**   I.

13  **Q.**   You're Mr. Schmidt.

14        **MR. VAN NEST:**  May I approach, Your Honor?

15        **THE COURT:**  Yes.

16  **BY MR. VAN NEST**

17  **Q.**   This is TX 5987.  Do you recognize that?

18  **A.**   I do.

19  **Q.**   What is it?

20  **A.**   It's a message, again, from Jonathan to me; me to

21  Jonathan; Jonathan back.

22        **MR. VAN NEST:**  I'd move 5987 into evidence, Your

23  Honor.

24        **MR. BICKS:**  No objection.

25        **THE COURT:**  Thank you.  Received.

1              (Trial Exhibit 5987 received in evidence.)

2    **BY MR. VAN NEST**

3    **Q.**   All right.  Your portion of the email says, the one on the

4    bottom, "Thanks, Jonathan.  Did you get the email I sent about

5    the details on Android licensing?"

6         What were you referring to there?

7    **A.**   Well, from the bottom up, he writes to me, "On your deal,

8    don't hesitate.  Let me know if I can be supportive, from Sun."

9         I'm responding saying, "Did you read the details that I

10   sent you?"  I sent it too.  Here's the email.  And then his

11   response is above.

12   **Q.**   He says, "At some point I'd love to get the teams in a

13   room to talk about Java certifying the platform and having Sun

14   ship it as such."

15        Did you understand what he was referring to there?

16   **A.**   I did.

17   **Q.**   What was he referring to?

18   **A.**   Because our implementation did not have the trademark

19   license and had not been certified, because we didn't follow

20   that path, he is -- he is saying he would like us to do that at

21   some point in the future.  And he says that that would be

22   beneficial; we would bring 10,000 apps to it.

23   **Q.**   Now, this email is dated April of 2008?

24   **A.**   That's correct.

25   **Q.**   Do you see that?

1    When did the first Android-based smartphone come out?

2  We're showing October on our timeline.

3  A.   That is correct.

4  Q.   And were there subsequent releases from -- strike that.

5    Who released that phone?

6  A.   Well, we had a set of partners.  But the first one was the

7  HTC company.

8  Q.   Who is HTC?

9  A.   The Taiwanese hardware manufacturer.

10 Q.   Did other companies begin following to release Android

11 phones?

12 A.   They did.

13 Q.   Did you continue talking with Mr. Schwartz throughout this

14 period?

15 A.   I did.

16 Q.   Was he made aware that these phones were released and

17 shipping?

18 A.   Yes.

19 Q.   Okay.  Now, in any of the meetings and conversations you

20 had with Mr. Schwartz, did he ever express disapproval about

21 what you were doing in Android?

22 A.   He did not.

23 Q.   In any of those meetings, did Mr. Schwartz suggest that it

24 was wrong or unfair for Android to use the Java APIs?

25 A.   He did not.

1   Q.   Did he express disapproval, in any way, of Android's use

2   of the Java APIs?

3   A.   He did not.

4   Q.   Did he ever tell you, in any of your meetings, discussions

5   or emails, that Google needed a license from Sun to use the

6   Java APIs?

7   A.   He did not.

8   Q.   Based on your discussions with Mr. Schwartz, and his

9   comments to you, did you feel you had a good understanding of

10  what was permissible from Sun's perspective?

11  A.   I did.

12  Q.   And what was that?

13  A.   That our approach was appropriate and permitted.

14  Q.   And what understanding, if any, did you have at the time

15  as to whether or not your use of the APIs in Android was

16  consistent with Sun's business practices?

17  A.   Well, because of my own history, I -- I had a long history

18  with this, and I was quite sure this was all permissible.

19  Q.   Why?

20  A.   Because I set up the original deal 20 years earlier, and I

21  participated with them for such a long time.

22  Q.   Okay.  And when you say you "set up the original deal,"

23  would you tell our jurors what you mean.

24  A.   This was when we did the original Java announcements.

25  These were the terms.  So I did them.

1          **THE COURT:**  It's unclear whether you're talking about

2    Google or Sun.

3          **THE WITNESS:**  Oh, I apologize.

4          **THE COURT:**  Please clarify.

5          **THE WITNESS:**  In 1995, when we announced Java -- which

6    I did -- these were the terms that I set.  So I knew them quite

7    well.

8    **BY MR. VAN NEST**

9    **Q.**   And by these are the terms we set, can you tell the jury

10   what you mean?

11   **A.**   To summarize, that if you have an implementation, it has

12   to be licensed and you have to pay for it; but that you can use

13   the published interfaces and build your own implementation.

14   **Q.**   Did you rely on that knowledge in going forward in

15   building Android?

16   **A.**   I did.  Or we did.

17          **MR. VAN NEST:**  Pass the witness, Your Honor.

18          **THE COURT:**  All right.  Thank you.

19      Cross-examination.

20      Before you get started, Mr. Bicks...

21      My plan is to push all the way through to 1:00 o'clock.

22   If anyone in the jury box needs a break we, of course, will

23   take one.  So if we get to that point, raise your hand and just

24   let me know.  Are we okay for now, or do we need to break now?

25      Great.  We will push on.  If you need one, raise your hand

1    at the appropriate time.

2         Mr. Bicks, the floor is yours.

3         **MR. BICKS:**  Thank you, Your Honor.

4                        **CROSS-EXAMINATION**

5    BY MR. BICKS

6    Q.   Good afternoon, Mr. Schmidt.  Let's just start with some

7    basic things on timing.

8         When did you leave Sun, sir?

9    A.   I left Sun in June of 1997.

10   Q.   All right.  So I'll put a little sticker there next to the

11   year 1997.

12        You left Sun in 1997?

13   A.   That is correct.

14   Q.   All right.  And do you know -- when you were talking about

15   licensing practices you were talking about them before 1997;

16   right?

17   A.   With respect to my own involvement, yes.

18   Q.   Right.  So when we're talking about licensing practices

19   after 1997, at Sun, you were not there; correct?

20   A.   That is correct.

21   Q.   And when you mentioned on your direct testimony -- I think

22   you mentioned to the jury a book that had the language and

23   specifications in that.  You did; right?

24   A.   I did.

25   Q.   And did you mention to the jury, in this book -- that in

1   the book is actually a license?  Did you say that on direct?

2   **A.**   I was not asked that.

3   **Q.**   Is there a license in this book?  Do you know, sir?

4   **A.**   I do not know.

5   **Q.**   You didn't look at this before you came to testify?

6   **A.**   I have not looked at that book in 15 years.

7   **Q.**   Well, let me show you the book.  It's TX 980.

8          **MR. BICKS:**  And can I hand that up?

9          **THE COURT:**  Yes, you may.  980.  Do you want to put it

10  in evidence?  Any objection?

11         **MR. VAN NEST:**  Objection, Your Honor.  This was not

12  disclosed as an exhibit for cross.

13         **MR. BICKS:**  Well, he mentioned it on direct, Your

14  Honor.  It's not mentioned --

15         **MR. VAN NEST:**  --

16      (Indecipherable simultaneous colloquy.)

17         **THE COURT:**  Well, this is the book you mentioned.

18  There was a question on direct.  I'm going to let -- if the

19  witness says it's the same book, I'm going to let him use it.

20         **MR. BICKS:**  All right.

21         **THE COURT:**  Did you want to move it, or not?

22         **MR. BICKS:**  I'm happy to move it, Your Honor.

23         **THE COURT:**  Any objection to 980?

24         **MR. VAN NEST:**  My objection stands, Your Honor.

25         **THE COURT:**  Overruled.  Number 980 is in evidence.

1              (Trial Exhibit 980 received in evidence.)

2    BY MR. BICKS

3    Q.   Take a look at 980.

4         You mentioned a book.  Tell me if this was the book.

5    A.   It is.

6    Q.   And then I asked you about a license.  I put a little

7    orange sticky flag there to help us find it.  Do you see where

8    it says it there, "Restricted rights legend"?

9              MR. BICKS:  Is there a way to publish the book?

10        Can you blow this up.

11        (Document displayed.)

12   BY MR. BICKS

13   Q.   Do you see where I'm talking about, sir, and I'm

14   highlighting, "pass all test suites relating to the

15   specification"?

16   A.   I see that.

17   Q.   Does this help you remember that there's a license in the

18   book?

19   A.   Yes, there's a license.

20   Q.   All right.  Now, I think I also heard you say on direct

21   that you were under a great deal of pressure because Apple came

22   out.

23        Did I hear you say that?

24   A.   That's correct.

25   Q.   And tell me when Apple came out.

**SCHMIDT - CROSS / BICKS**

1    A.    Apple would have released their iPhone in roughly 2007.

2    Q.    And do you remember when your corporation decided to take

3    the design of the API packages that's at issue in this case?

4    A.    No.  But it would have been earlier.

5    Q.    Do you know when it was?

6    A.    You'd have to refresh my exact memory.

7    Q.    So you don't recall specifically when it was, do you?

8    A.    Well, you're asking me for a precise date.

9    Q.    I am.

10   A.    It would have been during Google-Sun discussions.

11   Q.    Do you remember a company called Noser?

12   A.    I do not.

13   Q.    Do you know when your company signed a contract with Noser

14   to work on those APIs?

15   A.    I do not.

16   Q.    Now, I do want to ask you about, you asked me to refresh

17   your memory.

18        You had a very good recollection of some conversations you

19   had with Mr. Schwartz.  Tell me, again, when was this -- you

20   said in the lunchroom.  Or where was that?

21   A.    Again, it was ten years ago.  So I had -- I recall a

22   meeting where I went to the Sun cafeteria in Menlo Park and sat

23   around and talked to Jonathan for a while.

24   Q.    And, I'm sorry.  Tell me, again, when the lunch meeting

25   was.

1  **A.**   Again, we'd have to place it on the -- we'd have to go

2  back to the direct.

3  **Q.**   To the what?

4  **A.**   We'd have to go back to when I was asked about it by

5  Mr. Van Nest.

6  **Q.**   So as you're sitting here, if I want to take a yellow

7  sticky and put it over there --

8           **THE COURT:**  Wait a second.  Would one of those

9  documents you looked at earlier -- is that what you're trying

10 to tell us?

11          **THE WITNESS:**  Yes.

12          **THE COURT:**  Take a moment.  Look at one of those

13 documents and see if you can tell us what the date is.

14          **THE WITNESS:**  "Jonathan, nice to see you this

15 morning."  March 31st, 2008.  That would be my best

16 recollection.

17 **BY MR. BICKS**

18 **Q.**   So do you have any notes or an email or a letter that says

19 what happened at that lunch meeting?

20 **A.**   As far as I know, this is the only -- only recollection.

21 There may be others.

22 **Q.**   And point out, in that memo that you have there, point out

23 where it says that you told him you were going to take the

24 design of those API packages.

25 **A.**   It's implied by my -- by my message.

1          MR. BICKS:  So can we just publish that exhibit for a

2    moment?

3          THE WITNESS:  I'm not sure I understood your question.

4          THE COURT:  Well, which Exhibit are you looking at?

5          THE WITNESS:  This is 3466.

6          THE COURT:  All right.  Let's put that on the screen

7    for the jury.

8          (Document displayed.)

9    BY MR. BICKS

10   Q.   And tell me in here where there's reference to these API

11   packages.

12   A.   Okay.  So our license is Apache v2.  That covers all of

13   the work we did, including the implementations that we did of

14   the Java API.

15   Q.   And are you familiar, sir, with the details of the Apache

16   license?

17   A.   I read it a long time ago.

18   Q.   Okay.  And you're not the expert on the Apache license at

19   your company; right?

20   A.   I am not.

21   Q.   All right.  And did I hear you say on direct that --

22   looking at this schedule, that this first Google release of

23   Android, that was -- did you say that was a flop?

24   A.   No, I said it didn't work.  It was a software development

25   kit.

**SCHMIDT - CROSS / BICKS**

1    Q.    You said it didn't work?

2    A.    Yeah.   That was a euphemism for you couldn't build a phone

3    from it.

4    Q.    Oh.   And was that -- the software development kit, was

5    that the one that Mr. Schwartz was talking about in his blog?

6    A.    Yes.

7    Q.    As a matter of fact, the software development kit came out

8    after the blog; right?

9    A.    I'll have -- again, I'll have to see the time line.

10   Q.    Yeah.   November 7th was the blog.   The software kit came

11   out a week later.   Does that help your memory?

12   A.    Yeah, but they were well aware of this SDK being in

13   development.

14   Q.    Just so we're clear, sir, the software development kit was

15   announced after the blog; right?

16   A.    I don't think that's true, because we would have in the

17   OHA mentioned that we were releasing SDK.

18   Q.    Are you sure, sir?   I will get out documents.   I think

19   both sides agree that software development kit --

20          THE COURT:   Wait, wait, wait.   No.   We don't have the

21   lawyers testify.   You just get to ask questions.

22          THE WITNESS:   I would need to see the exact sequence.

23      From my perspective, they were coterminous.

24   BY MR. BICKS

25   Q.    And this HTC phone that came out, your first phone, was

**SCHMIDT - CROSS / BICKS**

1    that a smartphone?

2    A.    Yes.

3    Q.    And it was a smartphone because why?

4    A.    It had a powerful screen and a good processor.  And it was

5    connectible to the Internet.

6    Q.    It also had instant messaging and things of that nature on

7    it; right?

8    A.    I don't remember instant messaging.  The --

9    Q.    Uhm -- but it was a smartphone; right?

10   A.    Yes, it was a smartphone.

11   Q.    Uh-huh.  And BlackBerry, do you still have a BlackBerry?

12   A.    No.

13   Q.    You used to; right?

14   A.    I did.

15   Q.    And is BlackBerry a smartphone?

16   A.    Uhm, today, yes.

17   Q.    Do you know who the first licensee to BlackBerry was?

18   A.    Of what?

19   Q.    Of Java.

20   A.    First licensee of Java to --

21   Q.    Did you know that Sun licensed Java to RIM for BlackBerry?

22   Did you know that?

23   A.    No.

24   Q.    And today is Android in BlackBerry?

25   A.    Today I believe BlackBerry uses Android as its base

1  operating system.

2  **Q.**   And you're also on the Board of Apple?  You were at one

3  point; right?

4  **A.**   I was.  I am no longer.

5  **Q.**   Were you at Apple when they came out with the iPhone?

6  **A.**   I was.

7  **Q.**   When the iPhone came out, did it use the Java APIs?

8  **A.**   To my knowledge, no.

9  **Q.**   So it came out and got on the market as a smart phone.

10  And it didn't use the Java APIs; correct?

11  **A.**   That is correct.

12  **Q.**   Now, one thing we do know is that you, as CEO, do a lot of

13  public speaking for Google; correct?  When you were the CEO.

14  **A.**   Yes.

15  **Q.**   And your goal in those speeches was to be truthful, was it

16  not?

17  **A.**   Of course.

18  **Q.**   And do you recall giving a speech at the Carnegie

19  Endowment for International Peace event, around February 6,

20  2007, where you talked about the importance of intellectual

21  property to your company?

22  **A.**   I do not.  I'm sure you'll refresh me.

23        **MR. BICKS:**  Yeah.  Your Honor, I would like permission

24  to play as a party admission video 710, which is Trial Exhibit

25  886.

```
 1              THE COURT:  Any objection?

 2              MR. VAN NEST:  What's the Exhibit Number?

 3              MR. BICKS:  Trial Exhibit 886.1.

 4              MR. VAN NEST:  No objection, Your Honor.

 5              THE COURT:  886.1?

 6              MR. BICKS:  Yes, Your Honor.

 7              THE COURT:  .1 is received in evidence.

 8          (Trial Exhibit 886.1 received in evidence.)

 9              THE COURT:  You may play it.

10              MR. BICKS:  Thank you.

11          (Video played)

12      BY MR. BICKS
```

13  **Q.**   And that were your views at the time and, I presume,

14  today?

15  **A.**   They are.

16  **Q.**   And in that recording we just heard, you said

17  "Intellectual property rights are fundamental to how Google

18  operates."

19       Is it true then and true now?

20  **A.**   It is.

21  **Q.**   And you say in that video that you operate best on a set

22  of proprietary things which you view yourself as intellectual

23  property.

24       Was that true then and true now?

25  **A.**   It is.

1    Q.    And you say in that speech that the company wouldn't exist

2    without basic intellectual property rights.   True then and true

3    now?

4    A.    That is correct.

5    Q.    And those intellectual property rights, those include

6    copyrights; correct?

7    A.    Yes.

8    Q.    Uh-huh.

9          And you also certify your company's annual reports, do you

10   not, sir?

11   A.    I do.

12   Q.    And, do you know, in those annual reports you intend to be

13   accurate, do you not?

14   A.    Yes.

15   Q.    And those are things that the investment community,

16   shareholders and the world rely on as truthful?

17   A.    Yes, they do.

18   Q.    And do you know in your annual reports that you tell the

19   world that if somebody takes your intellectual property and

20   it's unauthorized, that it can materially harm your company?

21   You say that, don't you?

22   A.    I'm assuming we do, yes.

23            MR. BICKS:  May I approach, Your Honor?

24            THE COURT:  Yes.

25            MR. BICKS:  This is Exhibit 3211.  It's an annual

1    report.

2    **BY MR. BICKS**

3    **Q.**   You've seen it before; right?

4    **A.**   Yes.

5            **MR. BICKS:**  I tender this in evidence.

6            **THE COURT:**  3211.  Any objection?

7            **MR. VAN NEST:**  No objection, Your Honor.

8            **THE COURT:**  In evidence.

9         (Trial Exhibit 3211 received in evidence.)

10           **MR. BICKS:**  Can we go to page 129.

11        (Document displayed.)

12   **BY MR. BICKS**

13   **Q.**   That's your signature at the end; correct?

14   **A.**   It is.

15   **Q.**   Date is March 30th, 2005.

16        There's some legalese up at the top, that you're

17   certifying the truth; correct?

18   **A.**   I am.

19   **Q.**   And if we go to this document, at page 55, you've got a

20   statement about your intellectual property rights.

21        Do you see that?

22   **A.**   I do.

23   **Q.**   And it says at the top, in black, that they are valuable;

24   true?

25   **A.**   Yes.

1   Q.   And your inability to protect them could reduce the value

2   of your products, services and brand.

3        That is true; correct?

4   A.   Yes.

5   Q.   And?

6        MR. BICKS:   And if we could go down here, Trudy, and

7   scroll down.

8        (Document displayed.)

9   BY MR. BICKS

10  Q.   And you say here at the top, "Any increase in the

11  unauthorized use..."

12       MR. BICKS:   It's the end of that top paragraph, Trudy.

13  BY MR. BICKS

14  Q.   Do you see that, sir?

15  A.   I do.

16  Q.   That's truthful, isn't it?

17  A.   Yes, it is.

18  Q.   Any increase in the unauthorized use of your intellectual

19  property could make it more expensive to do business and harm

20  your operating results; correct?

21  A.   Yes.

22  Q.   And you know here today, in this trial, we're here to talk

23  about the use of intellectual property that is the property of

24  Oracle.  You know that?

25  A.   We are certainly talking about intellectual property that

1    is the property of Oracle, yes.

2    Q.    Right.

3        And you know that the Court has told this jury that the

4    use of declaring code and the structure sequence and

5    organization of 37 API packages violates the copyright laws in

6    less fair use?  You know that?

7            MR. VAN NEST:  Objection, Your Honor.  He has not been

8    present for anything said to the jury.

9            MR. BICKS:  Well --

10           THE COURT:  That's a good point.

11           MR. VAN NEST:  Mr. Schmidt has been out in the hall.

12           THE COURT:  That's argumentative.

13   BY MR. BICKS

14   Q.    All right.  You're aware why you're here today; right?

15   A.    I am.

16   Q.    And you know you're here relating to the use of the design

17   of 37 API packages; right?

18   A.    I am.

19   Q.    All right.  And you talked about some discussions that you

20   had with Mr. Schwartz and others back in the '05-'06 time

21   period; right?

22   A.    Yes.

23   Q.    And one thing we can agree on is you never got a written

24   license, or signed one, to use those API packages; correct?

25   A.    That is correct.

**SCHMIDT - CROSS / BICKS**

1  Q.   And we know, sir, that you also had discussions before

2  this lawsuit got filed with executives at Oracle; correct?

3  A.   The company did.  I did not.

4  Q.   You don't remember that you met with Mr. Ellison in

5  about --

6  A.   No.

7  Q.   -- March of 2010?

8  A.   I thought you were referring to this round.  Yes, I met

9  with Larry Ellison.

10  Q.   So one thing we can be sure of is that you knew, certainly

11  no later than August 2010, when this case got filed, that

12  Oracle believed that what you were doing was a violation of the

13  copyright law.  You knew that; right?

14  A.   I was certainly aware of Larry's view, yes.

15  Q.   And did you take any steps, after this lawsuit got filed

16  in August 2010, to take out of the mobile devices on the market

17  any code or anything relating to those API packages?

18  A.   I'm not aware of any in that time period.

19  Q.   Now, you've given certain speeches and discussions about

20  the success of Android; right?

21  A.   I have.

22  Q.   And when we talk about the number of mobile phones in the

23  marketplace, that's something you speak about from time to

24  time; true?

25  A.   I do.

1  Q.   And in about August 5th, 2010, a week before this lawsuit

2  got filed, you told a bunch of folks that there were 200,000

3  device activations every day.

4       Does that sound about right to you?

5  A.   It's possible, sure.

6  Q.   So there's no question about it, let me show you 5167.

7       You recognize this.  It's got your name on it because you

8  sent it out; right?

9  A.   I do.

10         MR. BICKS:  So I move it into evidence.

11         MR. VAN NEST:  Sorry, what's the exhibit number?

12         MR. BICKS:  5167.

13         THE COURT:  Any objection?

14         MR. VAN NEST:  Give me a moment, Your Honor.

15     No objection.

16         THE COURT:  Thank you.  Received.

17     (Trial Exhibit 5167 received in evidence.)

18     (Document displayed.)

19         MR. BICKS:  Can we please blow up "The rapid

20  adoption," Trudy, on 5167.

21  BY MR. BICKS

22  Q.   I was asking about the number of phones that were

23  activated in August of 2010.  And this says 200,000 activation

24  devices per day, does it not?

25  A.   That's correct.

**SCHMIDT - CROSS / BICKS**

1  **Q.**  And it says that you were "well past escape velocity at

2  every level at that time."  Is that accurate?

3  **A.**  That's correct.

4  **Q.**  What's "escape velocity" mean?

5  **A.**  It's a term we're using to talk about the likely success

6  of our product line.

7  **Q.**  Things were looking rosey?

8  **A.**  Very, very optimistic.

9  **Q.**  And if we roll forward, do you know who Henrique de Castro

10  is?

11  **A.**  Sorry, Henrique de Castro?

12  **Q.**  Yeah.

13  **A.**  Can you refresh my memory?

14  **Q.**  He was the president of the mobile platform at your

15  company.  Does that ring a bell?

16  **A.**  Henrique de Castro?

17  **Q.**  Henrique de Castro.

18  **A.**  Oh, yes.  Different pronunciation.  Yes, I do know who he

19  is.

20        **MR. BICKS:**  All right.  5147, the parties have already

21  agreed that this is in evidence.  I formally move it in.  We

22  had a stipulation.

23        **THE COURT:**  Received in evidence unless I hear an

24  objection.

25        (Trial Exhibit 5147 received in evidence.)

1              **THE WITNESS:**  Yes.  It's Henrique.

2              **MR. VAN NEST:**  No objection, Your Honor.

3              **THE COURT:**  Thank you.

4    **BY MR. BICKS**

5    **Q.**   You know who he is; right?

6    **A.**   I do.

7    **Q.**   And he was president of -- important part of the platform

8    business; right?  Android.  Did you know that?

9    **A.**   I believe -- I thought he was in a different job.  He

10   certainly was an executive in this area at the time.

11   **Q.**   And you remember him --Let's go to the back here.

12        This was a memo he wrote about mobile metrics.  And he

13   says in the bottom, "We see 550,000 Android activations every

14   day.  That's more than the number of babies who are born every

15   day."

16        Is that accurate?

17   **A.**   I can only speak on the Android side, but I'm sure that's

18   correct.

19        (Laughter)

20   **Q.**   You would expect Henrique de Castro to know the numbers;

21   right?

22   **A.**   I'm assuming his words are correct.

23   **Q.**   You used the word "escape velocity."  Is this, kind of,

24   the escape velocity that you were talking about?

25   **A.**   It is.

1   Q.   And if we roll forward -- so this is 2011.  He's saying

2   550,000 per day.

3        You said, in about 2013, that you were at 1.5 million

4   activations per day.  Does that sound about right?

5   A.   That's correct.

6   Q.   And each and every one of those activations has the design

7   of those 37 packages in it; right?  Every one of those phones.

8   A.   Yes.

9   Q.   So what are the activations today then?

10  A.   I don't know the exact number.

11  Q.   Give us a ballpark as the -- you explained the inverted

12  thing, the alphabet.  Give us the ballpark as -- at what it

13  would be today.

14  A.   It's certainly more than a million a day, would be my

15  estimate.

16  Q.   Certainly more than a million a day?

17  A.   Yes.

18  Q.   So it was 1.5 million in 2013.  And you think it went

19  down?

20  A.   No.  I said it's -- it's certainly more.  It's hard to

21  estimate because activations measure new customers.  So I don't

22  know the exact number.  But it's certainly -- it's certainly

23  more than a million.

24  Q.   Uh-huh.  And I want to come back to the question of

25  intellectual property because you said in your annual report

**SCHMIDT - CROSS / BICKS**

1   that if somebody takes your intellectual property

2   unauthorized -- and that includes copyright; correct?

3   **A.**   Yes.

4   **Q.**   -- that there can be material harm to your company;

5   correct?

6   **A.**   Yes.

7   **Q.**   And do you know and did you look at, before you came here

8   today, contracts that your company has that relates to your

9   APIs?  Did you look at any of those?

10  **A.**   Not recently.

11  **Q.**   Uh-huh.

12          **MR. BICKS:**  Can I have 5250.

13  **BY MR. BICKS**

14  **Q.**   Do you know that when it comes to your APIs, that you have

15  contracts which say that they're proprietary; say that they've

16  got copyrights; and say don't use them for commercial reasons?

17         Do you know that?

18  **A.**   I need to see them.

19  **Q.**   It's 5250.

20         Do you see that, sir?

21  **A.**   I do.

22  **Q.**   It says "Google AdWords" at the top.

23  **A.**   I do.

24          **MR. BICKS:**  And I'd move this into evidence.

25          **MR. VAN NEST:**  Objection, Your Honor.  Lacks

**SCHMIDT - CROSS / BICKS**

1   foundation.  This is not a document that came from Google.

2           **MR. BICKS:**  It's got your Google logo on the top.

3           **THE COURT:**  Do you know what this document is?

4           **THE WITNESS:**  Uhm, okay.  It appears -- I mean, I can

5   tell you what I think it is.

6           **THE COURT:**  First of all, have you seen this document

7   before?

8           **THE WITNESS:**  I have not.

9           **THE COURT:**  All right.  Nevertheless, do you have a

10  solid basis on which to give us an estimate of what it is?

11          **THE WITNESS:**  So, Google has an advertising product --

12  completely different from any of the things we are talking

13  about now -- that has an interface that allows you to use it to

14  get ads.  And this is the license that allows you to use that.

15  AdWords API data.

16          **THE COURT:**  Is the document prepared by Google?

17          **THE WITNESS:**  This would have been -- this is a

18  website document that was written by Google business people and

19  lawyers some time ago.

20          **THE COURT:**  All right.  That's good enough.  5250 is

21  received in evidence.

22          (Trial Exhibit 5250 received in evidence.)

23  **BY MR. BICKS**

24  **Q.**  So I'm looking up at the top there, the "AdWords API."  Do

25  you see this, sir?

**SCHMIDT - CROSS / BICKS**

 1   A.   I do.

 2   Q.   And you know what an API is; right?  What does that stand

 3   for?

 4   A.   API stands for applications programmer interface.

 5   Q.   Uh-huh.

 6        And you see in the highlighted passage, the second

 7   paragraph with the lines there, that there's some language I

 8   want to ask you about.  Do you see that?

 9   A.   I do.

10   Q.   And it says here that the AdWords API and AdWords

11   specifications -- do you see those words?

12   A.   I do.

13   Q.   And it says those are the intellectual property and

14   proprietary information of Google.  Do you see that?

15   A.   I do.

16   Q.   And you do expect people with these contracts to honor

17   them, do you not?

18   A.   We do.

19   Q.   And it says here that, "Your right to use, copy and retain

20   your copy of the AdWords API and the AdWords API specifications

21   is contingent on your full compliance with this agreement."

22   Right?

23   A.   I do.

24   Q.   It does; right?

25   A.   Uh-huh.

**SCHMIDT - CROSS / BICKS**

1  Q.  And you consider these to be the intellectual property of

2  your company; right?

3  A.  Well, they're one of a very large collection, yes.

4  Q.  One of a very large collection.

5      This isn't actually the only agreement where you treat

6  APIs as the intellectual property of your company; right?

7  A.  There are many, many different kinds of APIs.  This is the

8  AdWords API.

9  Q.  Uh-huh.  And let me show you 5121, which is another

10 contract involving APIs.  Do you see that?

11 A.  I do.

12 Q.  You're familiar with this; right?  One of your company's

13 contracts.

14 A.  This is not a contract.

15 Q.  Well, it's a terms and conditions; right?

16 A.  Again, may I explain what this is?

17 Q.  Absolutely.

18 A.  Okay.  So we built a set of services that programmers who

19 we don't normally deal with can use.  And we, for business

20 reasons, had restrictions on the things that they could do.

21     When you would build that service, by using that service

22 you were bound by this document.

23 Q.  Yeah.  So I said it was a contract.  You seem to call it

24 something else.  What is it?  Is the contract a license?  How

25 would you describe it?

1   **A.**   It's essentially an automatic license.

2   **Q.**   An automatic license.  Whatever we call it, you expect

3   people to follow it; right?

4   **A.**   We do.

5        **MR. BICKS:**  So I would move this into evidence, Your

6   Honor.

7        **MR. VAN NEST:**  No objection, Your Honor.

8        **THE COURT:**  Received in evidence.

9        (Trial Exhibit 5121 received in evidence.)

10       (Document displayed.)

11  **BY MR. BICKS**

12  **Q.**   5121.  This is the terms and conditions.  It says,

13  "Personal and legitimate uses only."

14       Do you see that?

15  **A.**   Yes.

16  **Q.**   And it says there that, "The Google Web APIs service is

17  made available to you for your personal, non-commercial use

18  only (at home or at work)."  True?

19  **A.**   Yes.

20       It would be helpful if I explained the difference between

21  an API and a Web service.

22  **Q.**   You can do that in a moment.

23  **A.**   Okay.

24  **Q.**   But bear with me.

25       What we're talking about here, just so we're clear, is

1  this is the terms and conditions for Google's Web API service;

2  correct?

3  **A.**   That is correct.

4  **Q.**   All right.  And what you say here is only use it at home;

5  don't use it for commercial reasons.  Right?

6  **A.**   That's correct.

7  **Q.**   And there's no question in this case that when you have

8  Oracle's API packages in the -- and it's billions of phones

9  that have been activated, right, in the history of Android?

10 **A.**   Yes.

11 **Q.**   When you have in those billions of phones those -- the

12 design of those API packages, that's for commercial reasons;

13 right?

14 **A.**   Uhm, we don't have -- I'm sorry, would you ask your

15 question precisely again.

16 **Q.**   You're doing this because you're a for-profit company.

17 And you're highly profitable with Android; right?  In fact, you

18 said that in shareholder statements.

19 **A.**   We freely license Android.  And we make our money on

20 Search and other applications on top of Android as well as the

21 iPhone.

22 **Q.**   Right.  You make your money on advertising search, on top

23 of Android; right?

24 **A.**   And on other platforms, yes.

25 **Q.**   Right.  And that's profit-making activity; right?

SCHMIDT - CROSS / BICKS

1   **A.**   Yes.

2   **Q.**   In fact, you've said -- and these are your words; not

3   mine -- "hugely profitable"; right?

4   **A.**   We are -- yes.  Yes.

5   **Q.**   All right.  And back to what I was asking you about here

6   is, this is your API service contract.  I want to go to the

7   intellectual property --

8   **A.**   May --

9   **Q.**   -- section.  And I want to ask you about that.

10          **THE COURT:**  What are you trying to say?

11          **THE WITNESS:**  I don't know what the protocol here is,

12   but this is about a service we provide, not an API.  There is a

13   difference.

14          **THE COURT:**  You said he can explain that at some

15   point.  You don't have to, but if you're going to get around to

16   it, let him explain.

17   **BY MR. BICKS**

18   **Q.**   Well, but you've got contracts where you treat your APIs

19   as proprietary, do you not?

20   **A.**   You'd have to show me such a contract.

21   **Q.**   Are you telling us here today that you do not treat your

22   APIs at Google as proprietary to your company?

23   **A.**   There are millions of APIs.  So you have to ask on a

24   per-API basis.

25   **Q.**   Well, you tell me which ones, because I don't know all

1    your APIs.  You tell me which ones, of all these millions of

2    APIs, that you do treat as proprietary.

3    **A.**   Well, I am not aware of ones that we treat as proprietary

4    in the way you're asking your question.

5         We treat our implementations, which is what I was

6    referring to earlier, as very proprietary.

7         And if I could just say that there's a difference between

8    the service and the API.  And these documents that you've

9    handed me are about constraints on the use of the service,

10   because people could use too much of it.

11        It's a completely different question.

12   **Q.**   So your testimony here today is that you give away your

13   APIs and any design or structure, sequence and organization of

14   those APIs, that you give them away and they're not proprietary

15   to your company?

16   **A.**   As a general rule.  Again, there may be some exceptions --

17   our view is that the APIs are not what is proprietary.  It's

18   the implementation that's proprietary.

19   **Q.**   Uh-huh.

20        Well, let's go to the section of this agreement that was

21   up there, that talks about/describes your API specifications.

22   This is 5121.

23        And you see the intellectual property definition here?

24   **A.**   Yes, I do.

25   **Q.**   Yeah.  And you see where it says, "You agree not to

**SCHMIDT - CROSS / BICKS**

1  remove, obscure, or alter Google's copyright notice or other

2  proprietary notice affixed to or contained within Google Web

3  APIs"?

4  **A.**   Yes.

5  **Q.**   Did I read that correctly?

6  **A.**   Uh-huh.

7  **Q.**   I did; right?

8  **A.**   Yes.

9  **Q.**   Okay.  Now --

10  **A.**   Again, as I previously testified, this is about the Web

11  service.

12  **Q.**   Now, when we talk about Sun and the time period after you

13  left, you are not here today suggesting you're familiar with

14  Sun's licensing terms for Standard Edition, SE and ME after you

15  left; right?

16  **A.**   I was briefed on them, but I'm not an expert.

17  **Q.**   All right.  And you do agree that in 2004, that you told

18  your shareholders in your annual report -- which was 3211, at

19  page 6162.

20  **A.**   Yes.

21  **Q.**   Are you with me?

22  **A.**   I am.

23  **Q.**   You, at this point, were concerned that you could be shut

24  out of an important part of the market; right?

25  **A.**   Can you point to the paragraph you're referring to.

**SCHMIDT - CROSS / BICKS**

1   Q.   You say here that more individuals are using nonPC devices

2   to access the Internet and versions of your Web search

3   technology developed for these devices, and they may not be

4   widely adopted for users in these devices.   Right?

5   A.   That's correct.

6   Q.   And this was something that was something you were focused

7   on.   You actually signed this annual report; right?

8   A.   Uhm, I did.

9            MR. BICKS:   Yeah.   And if we can just go to the

10   next -- the top of the next page, Trudy.

11   BY MR. BICKS

12   Q.   And you say here at the top, "If we are unable to attract

13   and retain a substantial number of alternative device users to

14   your Web search services or if we're slow to develop products

15   and technologies that are more compatible with nonPC

16   communication devices, we will fail to capture a significant

17   share of an increasingly important portion of the market."

18        That's something you were concerned about; right?

19   A.   Yes.

20   Q.   You didn't want to fail to capture a significant share of

21   the market, did you?

22   A.   Of course not.

23   Q.   And, in fact, that was one of the reasons that Google

24   brought Android; correct?

25   A.   At the time it was not clear to me whether Android would

**SCHMIDT - CROSS / BICKS**

 1    solve these problems or solve a different problem.

 2    **Q.**    Well, I want to show you Trial Exhibit 31.

 3          Did you have concerns that you would get locked out of the

 4    market?

 5    **A.**    Locked out of what market?

 6    **Q.**    The mobile smartphone market, the market we're talking

 7    about in this case.

 8    **A.**    I was not too worried about it.  I was worried about the

 9    specifics of the iPhone.

10    **Q.**    You were worried about the iPhone because, in your

11    words, you were under a lot of pressure; right?

12    **A.**    No.  I was on the Board of Apple.  So I knew exactly what

13    was going on with the iPhone.

14    **Q.**    You knew exactly what was going on with the iPhone

15    because you were on that Board, didn't you?

16    **A.**    Yeah.

17    **Q.**    And you knew that the Apple iPhone was a competitive

18    product to Android, didn't you?

19    **A.**    Uhm, that's actually not correct.

20          So the original version of Android was a different kind of

21    mobile platform.  And when the iPhone -- I have to explain it

22    in context.

23          When Apple invented the iPhone, the Android did not have

24    a UI of the kind that you're thinking of today.  So there was a

25    big initiative to try to add that.

1      So all of these conversations were not about -- they were

2  for earlier ideas of what phones would be.  We didn't know it

3  would look like a smartphone today.

4          **THE COURT:**  What does "UI" mean?

5          **THE WITNESS:**  Sorry.  User interface.

6  **BY MR. BICKS**

7  **Q.**   Yeah.  User interface is -- I'm not a technology person,

8  but that's like a touchscreen.  That would be an example of a

9  user interface?

10  **A.**   Yes, that would be an example.

11  **Q.**   Right.  And, actually, do you know that in that HTC Pro

12  Phone of 2008, do you know it had a touchscreen on it?

13  **A.**   I do.

14  **Q.**   It does; right?

15  **A.**   Yeah.

16  **Q.**   And back to the Apple question.  You did get worried about

17  Apple at some point; right?

18  **A.**   Well, I was on the Apple Board.  So as it became clear

19  that the iPhone would be successful, what I did was I recused

20  myself.  So at some point I lost information about the

21  iPhone.

22  **Q.**   All right.  You, in your words, were under a great deal of

23  pressure because Apple came out.

24  **A.**   Uhm --

25  **Q.**   The Apple iPhone.

1    **A.**   Again, if we go back to our timeline, it became clear the

2    iPhone would do well, and it was important that we have a good

3    competitor.

4    **Q.**   Well, your words, you were under pressure; right?  You

5    said that?

6    **A.**   Strategic pressure.

7    **Q.**   Strategic pressure.

8    **A.**   Yeah.

9    **Q.**   And in TX 31, this is one of your company presentations on

10   Android?  You see that; right?

11   **A.**   I do.

12          **MR. BICKS:**  And I move 31 in evidence.

13          **MR. VAN NEST:**  I'm not sure the witness has seen this,

14   Your Honor.  But if he has, I have no objection.

15          **THE COURT:**  Have you seen 31?

16          **THE WITNESS:**  I don't believe I've seen it.

17          **THE COURT:**  Show him 31.

18          **MR. BICKS:**  He has it.

19          **THE WITNESS:**  No, I'm looking at it.

20          **THE COURT:**  You have it.

21          **THE WITNESS:**  I'm looking at it now.

22          Could you direct me --

23   **BY MR. BICKS**

24   **Q.**   It's a corporate record of your company; right?

25   **A.**   I'm not sure what it is.  But if you could direct me --

1   Q.   Look on the front page of it.  It says what it is.

2   A.   What it says is Android One to One; Introduction to

3   Android; and Android Partnerships.

4   Q.   All right.

5   A.   It says, "Google Confidential and Proprietary."  So I

6   would infer that this is a Google document.

7           THE COURT:  All right.  That's good enough.  Received

8   in evidence.

9       (Trial Exhibit 31 received in evidence.)

10  BY MR. BICKS

11  Q.   Let's go to page 12.  I asked you did you see any

12  documents in your corporate files you were concerned about

13  getting locked out.

14      Had you seen this before?

15  A.   I don't believe I've seen this document.

16  Q.   All right.  Now, you do agree that you wanted to have as

17  quick a time to market as you could for Android; isn't that

18  true?

19  A.   Yes.

20  Q.   And you also know -- you know who Mr. Larry Page is, do

21  you not?

22  A.   Yes, I do.

23  Q.   And do you recall that he informed you and a group of

24  people working on the Android Project that he was disappointed

25  at Android's timing?  You remember that?

1   A.   I don't recall specifically, but it's certainly plausible.

2   Q.   This is Exhibit 401.  Do you know what the EMG is?

3   A.   Yes.

4   Q.   Were you on it?

5   A.   I was.

6   Q.   It's the executive management group at your company;

7   correct?

8   A.   That is correct.

9          MR. BICKS:  Move 401 into evidence.

10          MR. VAN NEST:  No objection, Your Honor.

11          THE COURT:  Received.

12      (Trial Exhibit 401 received in evidence.)

13  BY MR. BICKS

14  Q.   These are notes of a mobile strategy meeting.  And you

15  were there, weren't you?

16  A.   It appears so, yes.

17  Q.   And do you see, I asked you if Mr. Page was disappointed

18  in Android's timing.  Do you recall that?

19  A.   I have no recollection of this.

20  Q.   Let me see if this will help you.  Do you see the "Larry"

21  in this document?

22  A.   I see the notes state that.  I don't recall him -- I don't

23  recall this specifically.

24  Q.   So who's the Larry and who's the Eric in these

25  confidential notes?

**SCHMIDT - CROSS / BICKS**

1   **A.**   I would assume that's Larry Page, and that Eric is myself.

2   **Q.**   So what's Larry saying?

3   **A.**   As I said, I didn't take the notes.

4   **Q.**   He's saying he's disappointed in Android's timing; right?

5   Right?  Do you see that?

6   **A.**   Again, all I can state is that I see the sentence that

7   says that.

8   **Q.**   Yeah.  And you remember sentiments like this?  Or you

9   don't remember that?

10   **A.**   I honestly don't remember the meeting.

11   **Q.**   But you remember the conversation with Mr. Schwartz over

12   in the lunch room?

13   **A.**   Yes.  I see one occasionally and the other every day.

14   **Q.**   Yeah.  And -- but the timing here was important; right?

15   And, I mean, to use your words, it was a big bet and the

16   schedules were tight.

17        Do you remember saying that?

18   **A.**   It's perfectly plausible I said it.

19   **Q.**   Let's make it, instead of plausible --

20   **A.**   Sure.

21   **Q.**   -- see what actually happened.  5321.  It's an email

22   you're on; right?

23   **A.**   Yes, I see that.

24   **Q.**   You wrote it, didn't you?

25   **A.**   Yes.

1    Q.    So let's put it in evidence, please, and put it on the

2    screen.

3              THE COURT:  Any objection?

4              MR. VAN NEST:  No objection, Your Honor.

5              THE COURT:  Received.

6         (Trial Exhibit 5321 received in evidence.)

7    BY MR. BICKS

8    Q.    Item G.  Your words?

9    A.    "Android is a big bet and the schedules are very tight;

10   will we actually deliver all that we need."

11   Q.    And what date is this?

12   A.    This is 2007.

13   Q.    And when you say "a big bet," how was it a big bet?

14   A.    Well, we're putting lots of resources behind it.

15   Q.    Lots of resources and a potential for big upside; right?

16   A.    Or failure.  It's how we operate.

17   Q.    I'm sorry?

18   A.    Or failure.  Google operates on big bets.  This is a big

19   bet.  Some fail; some succeed.

20   Q.    And you were asked about discussions with Mr. McNealy.  It

21   was 205, was your exhibit.

22             MR. BICKS:  Can we pull 205 up.

23        (Document displayed.)

24   BY MR. BICKS

25   Q.    Do you remember what he said to you, that he was worried

**SCHMIDT - CROSS / BICKS**

1   about revenue submarining --

2   **A.**   I do.

3   **Q.**   -- up at the top-third line?

4   **A.**   I do.

5   **Q.**   What does it mean, the word, when a revenue submarines?

6   What does that mean?

7   **A.**   I assume it means going down.

8   **Q.**   And that was a concern that he had?

9   **A.**   That's what he's saying in the email, yes.

10  **Q.**   And that's what you knew; right?

11  **A.**   I'm sorry?

12  **Q.**   You knew that; right?

13  **A.**   I'm sorry, I knew what?

14  **Q.**   You knew that he and Sun were concerned about revenue

15  submarining; right?

16  **A.**   I got the message, yes.

17  **Q.**   And those revenues -- because you knew, actually, that

18  Sun, at this time, was in how many smartphones?  I'm not going

19  to fuss about what kind of phones.

20       How many mobile phones were they in?

21  **A.**   I don't know.

22  **Q.**   I think you were shown an exhibit on that.  I'm going to

23  show you an exhibit on that, that was in your direct, in a

24  minute.

25       Do you know, sir -- I mean, one of the reasons you were

1   talking to Sun is they were a leader in the mobile phone

2   market; right?

3   **A.**   Uhm, again, I would disagree with your -- the way you

4   stated it.

5   **Q.**   Well, how many mobile phones was Sun in, in, say, 2006?

6   Do you know?

7   **A.**   Again, you used the phrase "leader in mobile phones."  Sun

8   didn't make mobile phones.

9   **Q.**   Yeah.  And, actually, because they licensed the Java

10  platform into mobile phones; right?

11  **A.**   So to be technically precise, they had partners who had

12  Java inside their phones.

13  **Q.**   Yeah.  And you have Java inside your phones; right?

14  **A.**   We have our implementation of the Java Language and APIs

15  in our phones, yes.

16  **Q.**   And you received communications during this time period

17  about Sun's position in the mobile phone market; right?

18  **A.**   I'm sure I did, but I don't remember them.

19  **Q.**   And you just tell me, sir, how many mobile phones was Java

20  licensing to, by Sun, at the time that you were talking about

21  them in -- with them in 2005-2006?

22  **A.**   Uhm, I remember his revenue number but not the number of

23  phones.

24  **Q.**   You have no ballpark idea for us today about the number of

25  phones?

1   **A.**   I'm sure it's in one of your documents.

2   **Q.**   Let me ask you about statements that you make on earnings

3   calls.  Right?  You do that from time to time; right?

4   **A.**   Yes.

5   **Q.**   And do you remember making a statement that, "The open

6   source approach means that we give the software away, which is

7   always paradoxical."

8        Remember making that statement?

9   **A.**   Sounds right.

10  **Q.**   And when you made that statement -- well, let me show you

11  the statement and see if this helps us.

12        **MR. BICKS:**  Trudy, this is 951.

13  **BY MR. BICKS**

14  **Q.**   And this is from an earnings call.  You're familiar with

15  this; right?

16  **A.**   I'm familiar with earnings calls, yes.

17  **Q.**   Uh-huh.  Here's a transcript of 951.

18        Do you recall this?

19  **A.**   I'll have to review it.  Can you identify the area you'd

20  like me to review?

21  **Q.**   I'm looking at transcript of this at pages 8 through 9 of

22  the earnings call.

23        Do you see that?

24  **A.**   I do.

25  **Q.**   And do you see there's a statement from you as the

 1  chairman and the CEO?  Let me move this into evidence first.

 2  Do you see that?

 3  **A.**   Yes, I do.

 4           **THE COURT:**  Any objection?

 5           **MR. VAN NEST:**  No objection, Your Honor.

 6           **THE COURT:**  Received in evidence.

 7       (Trial Exhibit 951 received in evidence.)

 8  **BY MR. BICKS**

 9  **Q.**   And you see in there -- and maybe we can put it up on the

10  screen, 951.

11       (Document displayed.)

12  **Q.**   And we'll go to 8 and 9.

13       Do you see that, starting with the latter?  It's down

14  there at the bottom.

15           **MR. BICKS:**  Let's go over to the next page, Trudy.

16           **THE WITNESS:**  Yes, I do.  Yes, I see it.

17  **BY MR. BICKS**

18  **Q.**   And you say here, "So in the open source approach, that

19  means we give the software away, but that's always paradoxical.

20  People say, How do you make money from that?"  Right?  Remember

21  you were talking about that on the earnings call?

22  **A.**   Yes.

23  **Q.**   And you explained how you make money even though you give

24  the software away; right?

25  **A.**   Yes.

**SCHMIDT - CROSS / BICKS**

1  Q.   Right.  And so we're very, very clear, the software that

2  you were giving away here for free, that software had in it

3  those API packages; right?

4  A.   Again, we -- the implementations that we made, we licensed

5  freely.  That's -- "giving away" is vernacular for we license

6  it freely.

7  Q.   That may be your vernacular.  But I'm going to break it

8  down easy.  You give it away for free; right?  People don't pay

9  for it; right?

10  A.   Again, I'm trying to be very precise.

11  Q.   Right.

12  A.   There is a license that allows you to use it without

13  having to pay for it.

14  Q.   All right.  So when you don't pay for it, can we agree

15  that's for free?

16  A.   Subject to the terms of the license, yes.

17  Q.   All right.  And within what you give away for free, it's

18  the declaring code and the structure, sequence and organization

19  of the 37 packages that we're here in this courtroom talking

20  about; right?

21  A.   Yes.

22  Q.   All right.  And so what you're explaining here is, We give

23  the software away, but we make money from that.

24       And you're explaining how you do it here; right?

25  A.   Uh-huh, yes.

**SCHMIDT - CROSS / BICKS**

1  Q.   And you're explaining to the shareholders of your

2  corporation the truth; correct?

3  A.   I do, yes.

4  Q.   And you say here that, "The evidence is that the people

5  who use Android search twice as much as everything else";

6  right?

7  A.   Yes.

8  Q.   And so, clearly, there's more revenue associated with

9  those searches.  And you say that; right?

10  A.   I do.

11  Q.   And then you say, "One other thing, of course, is if

12  they're using Android operating systems the revenue that we

13  share and the searches are shared with the operator but not

14  with anybody else."  Right?

15  A.   Yes.

16  Q.   And you didn't share any of those revenues with Oracle,

17  did you?

18  A.   No.

19  Q.   And you say here "it's more lucrative," do you not?

20  A.   I do.

21  Q.   And "Not only is there more searches, and there's more

22  ads, but it's also more lucrative."  Your words; true?

23  A.   Yes.

24  Q.   So on that basis alone, you say Android is what?

25  A.   It's "hugely profitable."

SCHMIDT - CROSS / BICKS

1  **Q.**   And you use the word "hugely."  What do you mean by

2  "hugely"?

3  **A.**   Well, I'm trying to promote our platform.

4  **Q.**   You're trying to promote your platform.  But you're doing

5  it on an earnings call, which is a public forum that's governed

6  by the regulations of the government and the securities rules

7  and things of that nature; right?

8  **A.**   Of course it is.

9  **Q.**   Right.  And it's got to be truthful; right?

10  **A.**   Yes, of course.

11  **Q.**   And so when you say the word "hugely," tell us what you

12  mean by "hugely."

13  **A.**   Well, in general, Google is a very profitable company.

14      But it's important to state that these profits are coming

15  out of our Google Search.

16      (Reporter interrupts.)

17  **A.**   They are coming out of our Google Search, which is where

18  our money is made, as I said earlier.

19  **Q.**   What you say here is, the more people who use Android,

20  they search twice as much as anything else; right?

21  **A.**   I am.

22  **Q.**   Yeah.

23      And I was asking you questions about what you knew about

24  Sun.

25      Let me show you Trial Exhibit 22, please.

1          22 is a document that you've seen before; right?  EMG,

2     executive --

3     **A.**   I believe I've seen this, yes.

4               **MR. BICKS:**  Move 22 into evidence, please.

5               **MR. VAN NEST:**  No objection, Your Honor.

6               **THE COURT:**  Received in evidence.

7          (Trial Exhibit 22 received in evidence.)

8     **BY MR. BICKS**

9     **Q.**   Remember I was asking you information about Sun, and you

10    were a little hazy on the details; right?

11    **A.**   Uh-huh.

12    **Q.**   So let's go to 22, and go to page 3.

13              **MR. BICKS:**  Put it on the screen, please.

14         (Document displayed.)

15    **BY MR. BICKS**

16    **Q.**   "Android/Sun final approval."  That's the title; right?

17    **A.**   It is.

18    **Q.**   And if we go to page 3, there was a question posed:  "Who

19    are they?"  And the question, they were talking about Sun

20    Microsystems.

21         Does that refresh your memory about what you knew at that

22    time?

23    **A.**   I don't actually remember being in this meeting, but I'll

24    accept that this -- it's possible I was in this meeting because

25    this is -- this is what would have been presented to the group

**SCHMIDT - CROSS / BICKS**

1  management.

2  **Q.**   "Who are they?"  This is folks -- you're trying to make

3  business decisions, and you want to have truthful information;

4  right?

5  **A.**   Of course.

6  **Q.**   Yeah.  And when the question is, "Who are they?" you're

7  talking about Sun products and services for network computing.

8  It says, "Java dominates the wireless industry."

9       Is that your understanding?

10  **A.**   Well, those are their words, whoever wrote this document.

11  **Q.**   And do you know who wrote it?

12  **A.**   Uhm, I will check.  The authors are on the first page.

13  Andy Rubin, Tim Lindholm, Chris DiBona, Ethan Beard, Frank

14  Mayorga.

15  **Q.**   And they know what they're talking about; right?

16  **A.**   I would assume so, yeah.

17  **Q.**   Yeah.

18       So back to this, "Who are they?" it was Sun.  And they

19  dominated the wireless industry; right?

20  **A.**   Again, I would not use the word "dominate."  But this is

21  what they wrote.

22  **Q.**   Well, I don't want to fuss about it.  These are the people

23  who were working on the project at your company; right?

24  Mr. Rubin was in charge of it; right?

25  **A.**   Again, as CEO, you get a lot of documents.  This is their

1  opinion.  And I'll accept it as what they thought.

2  **Q.**   Yeah.  And you say here "market presence."  Or you don't

3  say, you see.  I was asking you questions about the number of

4  phones that Sun licensed Java into.  Remember I was asking you

5  about that?

6  **A.**   Yes.

7  **Q.**   So what does this say in your internal corporate document

8  about how many phones?

9  **A.**   It says 1 billion Java-embedded handsets.

10  **Q.**   And what about carrier deployments, how many?

11  **A.**   180 carrier deployments.

12  **Q.**   And how many phones was Google in at this time, and

13  Android?

14  **A.**   2006.  So Android would not have been released yet.

15       **THE COURT:**  We're going to break in four minutes.

16       **MR. BICKS:**  I'm going to finish, Judge.

17  **BY MR. BICKS**

18  **Q.**   You have given interviews about how Android makes money;

19  right?

20  **A.**   I have.

21  **Q.**   And you're given interviews about how you have personal

22  information about people and how that fits into your business.

23  Do you remember that?

24  **A.**   You'd have to give me a reference.

25  **Q.**   Yeah.  6053.

1          Remember being interviewed by Jim Cramer, the guy -- the

2    stock guy?

3    **A.**   I remember him.

4    **Q.**   Yeah.  And you were on that show, Mad Money.  Remember?

5    **A.**   I do.

6    **Q.**   6053.

7              **THE COURT:**  Isn't he the one that always seemed to

8    have too much caffeine?

9        (Laughter)

10             **THE WITNESS:**  He's very excitable.

11       Can you direct me to --

12   **BY MR. BICKS**

13   **Q.**   Yeah, 6053, page 2 to 3.

14   **A.**   Page 2 to 3.  Okay.  Thank you.

15             **MR. BICKS:**  And I move 6053 into evidence.

16             **MR. VAN NEST:**  Objection.  The article is hearsay.  I

17   don't have a problem with him asking about Mr. Schmidt

18   statements, but the article is hearsay.

19             **THE COURT:**  Sustained so far.

20   **BY MR. BICKS**

21   **Q.**   Well, I'm focusing on, you see your statement there at

22   page 2 to 3?

23             **THE COURT:**  Take a look at it and tell us whether or

24   not you can vouch for it being your statement.

25             **THE WITNESS:**  I am assuming this is an accurate

1  transcript, this is a truthful transcript of what I said.

2         THE COURT:  All right.  Based on that, I will allow it

3  into evidence.

4        (Trial Exhibit 6053 received in evidence.)

5         MR. BICKS:  2053.

6         THE COURT:  I thought you said 6053.

7         MR. BICKS:  I'm sorry, 6053.

8        Thank you, Your Honor.

9  BY MR. BICKS

10  Q.   So this is the interview you gave on Mad Money; right?

11  Remember that?

12  A.   I do.

13  Q.   And page 2 to 3 you say here -- right now he's asking you

14  a question, predominantly desktops.  But countries like

15  Japan -- it goes on to the top.  Is that going to be up to

16  snuff?  And can you make as much money in mobile computing

17  because of the cell phone companies?

18        Right?

19  A.   Yes.

20  Q.   Do you see that?

21  A.   I do.

22  Q.   And you say, "We can make more in mobile than desktop

23  eventually.  The reason, because the mobile computer is more

24  targeted.  Think about it.  You carry your phone everywhere.

25  It knows all about you.  We can do a very, very targeted ad.

```
 1   Over more time, we will make more money for mobile

 2   advertising."

 3        Right?

 4   A.   Yes.

 5   Q.   Those were your words.

 6        And do you recall saying that it's Google's policy --

 7   well, let me back up for a minute.

 8        Do you recall being interviewed and using the phrase

 9   "creepy"?

10   A.   Yes, I remember an interview where that was -- where I

11   answered that question.

12   Q.   And do you recall in that interview you said that it's

13   Google's policy about a lot of these things is to get right up

14   to the creepy line, but not cross it.

15        Remember that?

16   A.   I do.

17   Q.   And you remember saying, "We know where you are.  We know

18   what you're doing.  And we know what you're thinking."  Do you

19   remember that?

20   A.   That was in a different context.

21   Q.   But you said that; right?

22   A.   Again, you're picking things out of very long interviews.

23   But yes.  You're taking a sentence out of paragraphs.

24   Q.   Well, you remember that you said, "That's what I call the

25   creepy line.  And the Google policy about a lot of these things
```

1  is to get right up to the creepy line but not cross it."

2  **A.**   And you're asking out of a completely different context.

3  **Q.**   Well, I'll actually play the tape for you, and maybe it

4  will help with the context.

5  **A.**   No, no, I remember the context.

6  **Q.**   Yeah.

7  **A.**   Maybe you should ask a question.

8         **THE COURT:**  We're at 1:00 o'clock.  I'll let you ask

9  one more question.  We can resume tomorrow.

10         **MR. BICKS:**  All right.  Your Honor.  Maybe we should

11  resume.

12         **MR. VAN NEST:**  Your Honor, I don't think there's a lot

13  more with this witness.

14         **THE COURT:**  We're not going to go past 1:00 o'clock.

15  You lawyers have -- this jury has got -- we're not going to

16  make you stay five more minutes.

17      Remember the admonition.  We will see you back here

18  tomorrow.  Thank you for your time and attention.

19         **THE CLERK:**  All rise.

20      (Jury out at 1:00 p.m.)

21         **THE COURT:**  Be seated.

22      The witness is still on cross-examination, so the rule

23  applies.

24      Do you understand what I mean?

25         **MR. VAN NEST:**  Of course.

1      **THE COURT:**  All right.  So we will resume then.

2      Listen, I have to tell you, I am strict about the

3  1:00 o'clock thing.  I would have given you one extra minute --

4  that's it -- to finish your witness.

5      I know this witness is a busy man, but so is the jury.

6  And right now the jury's convenience counts for a lot more.  So

7  we're not going to detain the jury when I told them they're

8  going to get out of here at 1:00 o'clock every day.  Five

9  minutes would be too much.  I'm not going to do five minutes.

10      So there we are.  So you can step down, but be back at

11  7:30 in the morning, Mr. Schmidt.  Thank you so far, but we

12  will have to see you back here tomorrow.  You're still on

13  cross-examination.

14      Anything -- anything the lawyers need me for now?

15      **MR. BICKS:**  Nothing, Your Honor.

16      **THE COURT:**  How about over there?

17      **MR. VAN NEST:**  Yes, Your Honor.

18      **THE COURT:**  What's that?  Do you want the witness here

19  or not?

20      **MR. VAN NEST:**  No.

21      **THE COURT:**  Should the witness be here?

22      **MR. VAN NEST:**  No.

23      **THE COURT:**  Mr. Schmidt, you need to give those to

24  counsel and step out in the hallway.  And we'll see you at 7:30

25  in the morning.  Have a good day.

1    **THE WITNESS:**  I will see you then.

2    **MR. VAN NEST:**  This doesn't pertain to the witness in

3    particular, Your Honor.  But -- and I hate to bring this to the

4    Court's attention, but I've tried to deal with it otherwise and

5    I can't.

6    Your rules require that if we provide our direct exam

7    exhibits two days ahead, they are required to provide

8    cross-exam exhibits a day ahead.  They've been doing it.  The

9    problem is, I think the rule requires that you give a

10   good-faith list of what you're going to use on cross-exam.

11   We've been getting lists for witnesses that exceed a

12   hundred exhibits.  I instructed my team, and we've been giving

13   our direct exam list very close to what we plan to use.  Maybe

14   a couple of extra just in case.  That's what I did with

15   Mr. Schmidt.

16   On Mr. Schmidt, they disclosed more than 50 cross

17   exhibits.  Mr. Rubin, 115.  And, as you can see, we've used

18   maybe a dozen.

19   I've tried to do this without the Court's guidance, but

20   it's to the point where my staff is getting taxed every night

21   with these massive dumps of more than a hundred cross exhibits.

22   And I'd like to have some clarity on what the rule is so that

23   we don't have to be sorting through the haystack to find the

24   needle, which is what I think is happening to us.

25   **THE COURT:**  50 is not so many.

1          **MR. VAN NEST:**  115?

2          **THE COURT:**  No.  You said 50 for this witness.  Did I

3    mishear?

4          **MR. VAN NEST:**  No, you didn't.  More than 50.  That's

5    right.  They've used a dozen, maybe.

6       On Mr. Rubin, I've got 115 exhibits for cross.

7          **THE COURT:**  I don't know the answer to this.  What did

8    I do in the first trial?  I've had this problem before.  And I

9    have solved it how?

10         **MR. VAN NEST:**  In the first trial we had a different

11   problem.  In the first trial the Oracle side was vastly

12   over-designating depositions.  And you said, If you do that,

13   I'm going to make you play the whole thing.  And then the

14   designations got cut down.

15      I, frankly, don't know, apart from an admonition or some

16   sort of clear rule, what to do about this problem.  I just know

17   that it's not fair if we're providing our direct exhibits,

18   which are, you know, a dozen or 20, whatever we're going to use

19   with the witness, to get 115 cross-exam exhibits.  The staff

20   has to go through, sort, figure out which of the actual ones we

21   are going to use.

22      We have two binders the size of a birthday cake for

23   Mr. Schmidt.  And, you know, there's got to be some limit on

24   this.  Otherwise, it's just unfair to the staffs.  And it's

25   sort of hiding the ball.

1        **THE COURT:**  Why don't we have a rule that you don't

2   have to show any cross-examination documents?  Then everybody

3   will have trial by ambush.  Both sides could just use anything

4   you wanted.

5        If you want to suspend it and you both agree, then I would

6   be okay with that.  But then what will happen is they will pull

7   out a document and then you'll be over there saying, Wait a

8   minute, wait a minute, I got to find it.  I didn't know they

9   were going to use this.  And then there will be a delay.  It

10  will burn up jury time doing that.

11       So I --

12       **MR. VAN NEST:**  I don't think that's the answer, Your

13  Honor.  I think there's got to be some kind of good-faith

14  requirement here.

15       And where I'm disclosing a dozen exhibits for

16  Mr. Schmidt's direct, I shouldn't have to sift through 50 or 55

17  cross exhibits.  When we're disclosing 20 for Rubin, we

18  shouldn't have to go through 115.

19       I think Your Honor's rules say the exhibits you plan to

20  use, what you actually plan to use.  So I understand on cross

21  that you can't predict perfectly what you're going to use.  But

22  that doesn't mean you should be able to disclose 115, because

23  there may be 10 in there that eventually become relevant.

24       **THE COURT:**  Let's hear from the other side.

25       **MS. HURST:**  Your Honor, Mr. Rubin is on a lot of

1    documents.  He ran Android from the beginning, for about 12

2    years.

3        The documents that we listed on the list for Mr. Rubin

4    were all in my outline at the time.  I hope not to have to

5    offer nearly that many, but Mr. Rubin has in the past proven to

6    be a witness that is somewhat hard to pin down, Your Honor.

7    And I am, therefore, prepared with a document for every single

8    point in my outline.  This was absolutely done in good faith.

9        And the Court has indicated in the past -- we've studied

10   the Court's rules from the first trial -- that it prefers

11   disclosure to impeachment.  And, therefore, I've held back only

12   one or two true impeachment documents and disclosed everything

13   else that in that moment we believed that we would use in the

14   outline, a couple of days ago.

15       And I'll be honest with, Your Honor, I haven't eliminated

16   much since.  So Mr. Rubin is a very important witness.  The

17   Court noted that there may be 200 documents that come into

18   evidence in this case.  He's probably on 150 of them, Your

19   Honor.

20           **MR. VAN NEST:**  Your Honor, if that were the rule, he's

21   on a document, then we wouldn't have any need for the

22   disclosure.  That means you just deliver everything he's

23   written.  That's not the rule.

24           **MS. HURST:**  Well, we certainly didn't do that.  He's

25   on much, much more than was delivered.

PROCEEDINGS

```
 1              THE COURT:  I don't have an answer for you now.  I'm
 2    going to think about it.
 3              MR. VAN NEST:  Thank you, Your Honor.
 4              THE COURT:  What else can I help you with?
 5              MR. BICKS:  Can I just, Your Honor, on the -- he was
 6    talking about two different witnesses, so we're very clear.  I
 7    handled the cross-examination, as you can see there.
 8         I would suggest one shortcut, which I mentioned to
 9    Mr. Van Nest.  And I think there were about 40 to 50 documents
10    used for cross.  You can see I probably only used ten of them;
11    that a big pile of them was the Google annual reports that have
12    figures in there that we need for our damages case, to have
13    them into evidence belt and suspenders.
14         If he'd agree that those annual reports are authentic
15    corporate records and in, then that would really shortcut a lot
16    of time and make things easier.
17         I would ask him now to stipulate to the admission of his
18    annual reports rather than have a sponsoring witness and take
19    time.  But that's one of the reasons we have to put those
20    exhibits on the exhibit list.  And that's a good example.  He
21    can shortcut it.  And if he can do it now, that would be great.
22              THE COURT:  How many have you designated for other
23    witnesses?  For example, on that list of seven, what were the
24    number of cross-examination documents you designated?
25              MR. BICKS:  We're only up for the first two yet so
```

1  far.

2        **MS. HURST:**  No, we've designated Mr. Bloch.

3        **MR. BICKS:**  We did Schwartz too.

4        **MS. HURST:**  Well, eight documents for --

5        **MR. BICKS:**  I've got, probably 15 to 20 for Schwartz.

6        **MS. HURST:**  Eight for Mr. Bloch.

7        **THE COURT:**  It is true that Rubin is a hot item for

8  Oracle.  They are looking forward to beating up on him.

9        (Laughter)

10       **THE COURT:**  And they are going to have a lot of

11 documents.  So maybe -- maybe he's the worst possible case, and

12 as we go along it won't be quite as many designations.

13       **MR. VAN NEST:**  That's what I'm hoping, Your Honor.

14 That's why I brought it up.

15       **THE COURT:**  I'm going to think -- I've had this

16 problem in the past.  I honestly can't remember how I solved

17 it.  So I need to think -- see if I can reconstruct it.  There

18 is a possible way, if I can remember it.

19     All right.  Anything else I can help you with?

20       **MR. VAN NEST:**  That's all we have, Your Honor.

21       **THE COURT:**  I have a 2 o'clock criminal calendar.  I

22 will need the tables.  But you can leave all your other stuff

23 here.

24       **MR. VAN NEST:**  Excuse me, Your Honor.

25       **MR. PAIGE:**  Your Honor, in ECF 1839, the order you

**PROCEEDINGS**

 1  issued relating to reports relating to the 62 class concession

 2  by Oracle, it said that it was to be done on Thursday,

 3  May 11th, at noon.  And since May 11th is tomorrow, we weren't

 4  sure whether that meant to be Wednesday, May --

 5          THE COURT:  I thought this was all solved with Judge

 6  Kim.

 7          MR. PAIGE:  No.  This is your order relating to

 8  updating of expert reports or supplementation of expert

 9  reports.

10          THE COURT:  What's your question then?

11          MR. PAIGE:  It said Thursday, May 11 is when they are

12  due.  But tomorrow is May 11th.  So we wanted to clarify

13  whether it was supposed to be Wednesday, May 11, or Thursday,

14  May 12.

15          THE COURT:  You mean, I got the number of the day

16  wrong?

17          MR. PAIGE:  Right.

18          THE COURT:  What day do you want?  Tomorrow?

19          MS. HURST:  Either is fine with us.

20          MR. PAIGE:  Sure.  Tomorrow is fine, Your Honor.

21          THE COURT:  That's fine.  Tomorrow night is fine.

22          MR. PAIGE:  Thank you, Your Honor.

23          MS. HURST:  Thank you.

24          THE COURT:  Agree on the time, though, now, the two of

25  you.  How about midnight?  5:00 p.m?  Just agree.

 1          (Counsel confer off the record.)

 2              MS. HURST:  8:00 p.m., Your Honor.

 3              THE COURT:  Agreed?

 4              MR. PAIGE:  Agreed.

 5              THE COURT:  Very well.  Thank you.

 6              MR. PAIGE:  Thank you, Your Honor.

 7              THE COURT:  See you tomorrow at 7:30.

 8          (At 1:11 p.m. the proceedings were adjourned until

 9  Wednesday, May 11, 2016.)

10                      -   -   -   -

11                  CERTIFICATE OF REPORTERS

12          We certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14  DATE: May 10, 2016

15

16

17                    *Katherine Sullivan*

18      _____

19      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

20

21

22      _____*Pamela A. Batalo*_____

23      Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    U.S. Court Reporter

24

25