Volume 3

Pages 439 - 693

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,              )
                                   )
              Plaintiff,           )
                                   )
  VS.                              )  No. C 10-3561 WHA
                                   )
GOOGLE, INC.,                      )
                                   )
              Defendant.           )
_____)  San Francisco, California
                                       Wednesday, May 11, 2016


### TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

**For Plaintiff:**          ORRICK, HERRINGTON & SUTCLIFFE LLP
                            The Orrick Building
                            405 Howard Street
                            San Francisco, California  94105
                      BY:   **ANNETTE L. HURST, ESQUIRE**
                            **GABRIEL M. RAMSEY, ESQUIRE**


(Appearances continued on next page)


Reported By:  Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              Official Reporters - U.S. District Court

```
 1   APPEARANCES (CONTINUED):

 2   For Plaintiff:          ORRICK, HERRINGTON & SUTCLIFFE LLP
                             The Orrick Building
 3                           51 West 52nd Street
                             New York, New York 10019
 4                      BY:  PETER A. BICKS, ESQUIRE
                             LISA T. SIMPSON, ESQUIRE
 5
                             ORACLE
 6                           500 Oracle Parkway
                             Redwood City, California 94065
 7                      BY:  DORIAN ESTELLE DALEY, GENERAL COUNSEL
                             MATTHEW SARBORARIA,VICE PRESIDENT
 8                            ASSOCIATE GENERAL COUNSEL

 9   For Defendant:          KEKER & VAN NEST
                             633 Battery Street
10                           San Francisco, California  94111-1809
                        BY:  ROBERT A. VAN NEST, ESQUIRE
11                           CHRISTA M. ANDERSON, ESQUIRE
                             MICHAEL S. KWUN, ESQUIRE
12                           DANIEL PURCELL, ESQUIRE
                             MATTHIAS ANDREAS KAMBER, ESQUIRE
13                           EUGENE MORRIS PAIGE, ESQUIRE

14                           KING & SPALDING LLP
                             1185 Avenue of the Americas
15                           New York, New York 10036-4003
                        BY:  BRUCE W. BABER, ESQUIRE
16
                             GOOGLE, INC.
17                           1600 Amphitheatre Parkway
                             Mountain View, California  94043
18                      BY:  RENNY HWANG, LITIGATION COUNSEL

19   Also Present:

20                           GEORGES SAAB
                             ORACLE CORPORATE REPRESENTATIVE
21
                             CATHERINE LACAVERA
22                           GOOGLE CORPORATE REPRESENTATIVE

23

24

25
```

```
1                        I N D E X

2    Wednesday, May 11, 2016 - Volume 3

3    DEFENDANT'S WITNESSES                    PAGE   VOL.

4    SCHMIDT, ERIC (RECALLED)
     (PREVIOUSLY SWORN)                        462    3
5    Cross-Examination resumed by Mr. Bicks    462    3
     Redirect Examination by Mr. Van Nest      479    3
6    Recross-Examination by Mr. Bicks          487    3

7    SCHWARTZ, JONATHAN
     (SWORN)                                   490    3
8    Direct Examination by Mr. Van Nest        491    3
     Cross-Examination by Mr. Bicks            562    3
9    Redirect Examination by Mr. Van Nest      612    3

10   RUBIN, ANDY
     (SWORN)                                   615    3
11   Direct Examination by Ms. Anderson        616    3

12                       - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 1 | | 640 | 3 |
| 11 | | 653 | 3 |
| 43.1 | | 668 | 3 |
| 331 | | 660 | 3 |
| 405 | | 475 | 3 |
| 406 | | 467 | 3 |
| 563 | | 608 | 3 |
| 617 | | 646 | 3 |
| 1048 | | 592 | 3 |
| 1055 | | 594 | 3 |
| 1056 | | 604 | 3 |
| 2004 | | 649 | 3 |
| 2353 | | 583 | 3 |
| 2357 | | 545 | 3 |
| 2368 | | 585 | 3 |
| 3103 | | 550 | 3 |
| 5097 | | 471 | 3 |
| 5316 | | 588 | 3 |
| 5317 | | 661 | 3 |
| 5986 | | 578 | 3 |
| 5989 | | 572 | 3 |
| 5991 | | 574 | 3 |
| 7275_1 | | 560 | 3 |

1

<u>**I N D E X**</u>

2

<u>**E X H I B I T S**</u>

3

<u>**TRIAL EXHIBITS**</u>                                    <u>**IDEN**</u>  <u>**EVID**</u>  <u>**VOL.**</u>

4

  7573                                                              553    3

5

  7746                                                              555    3

6

  9191                                                              568    3

7

                                    - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

```
 1  Wednesday - May 11, 2016                    7:32 a.m.

 2                  P R O C E E D I N G S

 3                      ---oOo---

 4       (The following proceedings were held in open court,

 5  outside the presence of the jury:)

 6           THE CLERK:  Remain seated.  Please come to order.

 7           THE COURT:  Good morning.

 8           MR. VAN NEST:  Good morning, Your Honor.

 9           MR. BICKS:  Good morning.

10           THE COURT:  Please be seated.  I have a question for

11  you.

12       On Rule 26 -- I've got to get my law clerk to run and get

13  my glasses somewhere in my room.  I don't have my reading

14  glasses.  I do have my reading -- I need the other ones.

15       Rule 26 has the part -- there's the part, of course, where

16  you have to disclose the retained experts and that's not what

17  I'm getting at.  26(a)(2)(c) entitled *Witnesses Who Do Not*

18  *Provide A Written Report*, "Unless otherwise stipulated or

19  ordered by the Court, if the witness is not required to provide

20  a written report, this disclosure," talking about the expert

21  testimony disclosure, "must state, one, the subject matter on

22  which the witness is expected to present evidence under Federal

23  Rule of Evidence 702, 703 or 705, and a summary of the facts

24  and opinions to which the witness is expected to testify."

25       All right.  So I asked did --
```

1              (Incoming loudspeaker announcement)

2         **THE COURT:**  Okay.  I have two questions, but the first

3    one is did either side supply the other side with any such

4    disclosures?

5         **MR. KAMBER:**  Your Honor, the answer is yes.  There

6    were some, what we called, employee expert witness disclosures

7    that were provided by both parties in the last trial and then

8    Oracle provided some additional expert witness disclosures this

9    time around.

10        **THE COURT:**  I'm not talking about expert witnesses

11   now; I'm talking about witnesses who are not required to give a

12   report, but where you -- they would be someone who, even though

13   they're not giving a report, they're going to give 702

14   testimony and therefore Rule 26 calls it out and says you've

15   got to give this more limited information.  All right.

16        **MR. KAMBER:**  That's what I'm talking about,

17   Your Honor.

18        **MS. SIMPSON:**  Yes, Your Honor, we provided a number of

19   those disclosures.

20        **THE COURT:**  Okay.  So that's one question.

21      So then on Mr. Bloch, was anything like that given?

22        **MR. KAMBER:**  Pardon me?

23        **MS. SIMPSON:**  No.

24        **THE COURT:**  For Joshua Bloch?

25        **MR. KAMBER:**  Joshua Bloch was disclosed as a fact

1    witness, Your Honor.  He's a former employee of Sun and a

2    former employee of Google who worked on the APIs.

3            THE COURT:  Yes.  And as long as he sticks to facts,

4    there's not a problem, but then the question gets into whether

5    or not he is going to be giving 702-type evidence.

6            MR. KAMBER:  We don't intend to elicit 702-type

7    evidence from Dr. Bloch.

8        Last time he was here, he was also a fact witness.  He did

9    provide some help to the Court or to the jury in terms of

10   explaining APIs, but that was mostly in response to questions

11   from the bench.

12           THE COURT:  So on Bloch, the other side, Oracle, give

13   me just one -- don't give me a speech.  I don't have time for a

14   speech.  Just give me one example of something you think he's

15   going to say that should have been disclosed.

16           MS. HURST:  He performed an analysis of technical

17   constraints of the APIs by the language, and he offered an

18   opinion that because there were certain constraints in the 62

19   classes, an additional 175 classes are constrained.

20       There was no report, there was no explanation of how the

21   analysis was performed or the method used.  There's --

22           THE COURT:  Wait a minute.  Wait a minute, he did this

23   way back then?

24           MS. HURST:  Yes.  He testified at trial to what I just

25   described, but there was no testimony then and there was no

PROCEEDINGS

1   further disclosure during this phase of the case.  There has

2   never been a report.

3           THE COURT:  My question wasn't very clear.

4       Did he do this way back in the '90s -- or, I'm sorry --

5   the 2005 time period during the events in question, or did he

6   do this for preparation for the litigation?

7           MS. HURST:  Your Honor, my belief is it was an

8   analysis performed for litigation.

9           THE COURT:  What is the answer on your side?

10          MR. KAMBER:  It was during trial in response to

11  Dr. Dr. Reinhold's testimony about TX 1062.

12          THE COURT:  Do you plan to use that again?

13          MR. KAMBER:  We don't plan to elicit that testimony,

14  but if it comes up, they've indicated that they plan to

15  cross-examine him on a similar subject matter, at which point

16  they would open the door --

17          THE COURT:  Well, that part is true.  If you avoid the

18  subject on direct, then there is no problem.  But if they then

19  open the door on cross, they've invited the problem.  That's

20  clear-cut.  But then if you're not going to get into it on

21  direct -- okay.

22      Give me another example of something that you're afraid

23  they're going to bring up on direct.

24          MS. HURST:  That's the main one I'm concerned about,

25  Your Honor.

PROCEEDINGS

1          **THE COURT:**  Isn't this moot now?

2          **MR. KAMBER:**  We always thought it was moot,

3    Your Honor.

4          **THE COURT:**  I'm going to order you not to get into

5    that 62 plus more on direct examination.

6          **MR. KAMBER:**  Understood Your Honor.  Thank you.

7          **MS. HURST:**  Got it.

8          **THE COURT:**  I don't -- I went through the guy from IBM

9    twice.  I'm just not prepared yet to tell you what the answer

10   is on him.

11      Here is Donald Smith.

12         **MR. VAN NEST:**  Thank you, Your Honor.  Thank you.

13         **THE COURT:**  What issues can I help you with this

14   morning?

15         **MR. VAN NEST:**  I have two that affect -- good morning,

16   Your Honor.  I have two that affect this morning's witnesses.

17      We have Mr. Schmidt on redirect or on cross at this point.

18   They opened up a line yesterday involving *the creepy lines*.

19   They indicated last night they wanted to play some video of an

20   interview of Mr. Schmidt, and I'd like to raise it ahead of

21   time so we don't waste time with the jury on 402, 403.

22      If that's something they're going to go into further, I

23   don't think it's relevant to anything.  It has nothing to do

24   with the APIs.  If they are going to go into it, I would like

25   to make my point that it's really an effort to prejudice Google

1    and prejudice Mr. Schmidt, and there's really nothing about it

2    that's relevant.

3              THE COURT:  I remember the *creepy* thing came up, not

4    on cross.  It came up -- did it?

5              MR. BICKS:  It came up on cross.

6              MR. VAN NEST:  The *creepy line*.  He did an interview

7    at the Newseum in Washington, D.C. and it was a free-flowing

8    interview with an audience, and apparently the moderator got a

9    question from the audience about implanting chips in our brains

10   to monitor us, and it was a fairly light-hearted discussion,

11   frivolous, I would say.  Everyone's smiling and laughing and

12   Mr. Schmidt is talking about all the things that Google

13   engineers may investigate and so on.

14       They have two videos.  One is the entire answer that he

15   gives; the other is just a snippet from the answer where he's

16   talking about what mobile phones can do for us.  And I don't

17   see the relevance of it.  I don't think it's proper.  I don't

18   plan to redirect on it and won't, but if they plan to raise it

19   further, I think we should discuss it.

20             THE COURT:  Are you going to raise it further?

21             MR. BICKS:  Well, I was intending to, Your Honor,

22   because when I crossed him on it, he suggested that I took

23   something out of context.

24             THE COURT:  Why don't you play the entire segment,

25   though?  Don't just --

1          **MR. BICKS:**  That's what I was prepared to do.

2          **THE COURT:**  Why don't we just hear the entire segment?

3    If this is going to be so light-hearted, then this won't be

4    prejudicial.

5          **MR. VAN NEST:**  We can, but it's really not relevant to

6    anything in the case.

7          **THE COURT:**  Both sides say the other side's entire

8    trial story is irrelevant.

9          **MR. VAN NEST:**  Well, I haven't heard anybody link up

10   the creepy line to anything -- any of the four fair-use

11   factors, Your Honor.  But I do know that pretrial, we were

12   concerned that they would attempt to suggest to jurors that

13   Google is actively invading their privacy on a daily basis, and

14   this is part of that effort, which, again, has nothing to do

15   with anything Mr. Schmidt talked about or anything relevant for

16   our jurors.

17         **MR. BICKS:**  Your Honor, first of all, they made an

18   *in limine* motion on this.  It was denied.  How they make money

19   and their strategy is at the core of the case.  I raised the

20   issue on cross.  The witness suggested I left something out.

21   And if it's so light-hearted, then let the jury --

22         **THE COURT:**  Play the whole thing.  It won't be that

23   prejudicial, but this is taking up your time on Oracle side,

24   and things like this I see backfire all the time whenever you

25   try to win the case on some prejudicial point that has nothing

1    to do the merits.  The jury will see through that, if it's

2    true.

3        I don't know enough about it yet to tell, but if you think

4    that you can score points by using the creepy line, go ahead.

5    It's not that prejudicial.  I don't think this is -- as long as

6    you play the whole interview.

7            **MR. VAN NEST:**  Your Honor, I had a second issue that

8    affects our next witness, who is going to be Jonathan Schwartz

9    from Sun.

10           **THE COURT:**  He is the blog guy?

11           **MR. VAN NEST:**  That's right.  He was the Chief

12   Executive Officer of Sun.

13       They disclosed a cross exhibit, which is TX 9116.  TX 9116

14   is a document that was created at Sun, and there are a couple

15   of pages of it in which there's some legal discussion,

16   something from Sun legal.

17       We were -- it was produced by Sun, and we were examining a

18   witness about it, and the Sun attorney clawed it back and said,

19   *Hey, that's improper.  It shouldn't have been produced.  It's*

20   *privileged*.

21       Mr. Purcell, who was conducting the examination, stopped

22   immediately.  They went off the record.  And Sun took the

23   position it's privileged; you can't examine it.  So we didn't.

24       Now it appears on a trial exhibit list, and I asked

25   counsel does he really plan to use it in light of the fact that

1   it was clawed back, and he has indicated that he does want to

2   use it with Mr. Schwartz.

3          **THE COURT:**  Okay.  What do you say?

4          **MR. BICKS:**  I say the following.  Number one, the

5   document is not privileged.  Number two, the document was --

6          **THE COURT:**  Was it clawed back?

7          **MR. BICKS:**  It was not clawed back.

8          **THE COURT:**  If it was clawed back -- one of you is not

9   telling me the truth.  This is going to stop.  We are going to

10  find out -- because if it was clawed back, it's the same thing

11  as with Lindholm.

12         **MR. VAN NEST:**  Here is the transcript.  Here's

13  transcript.

14      Question from Mr. Purcell:  "I would just like to direct

15  your attention to the second question and answer on the first

16  page.  That's the question we're talking about.

17      Answer from counsel --

18         **THE COURT:**  Wait.  When you say counsel, do you mean

19  Oracle's counsel?

20         **MR. VAN NEST:**  Yes.  Oracle's counsel.

21      Counsel:  "It looks like it has something in it that

22  should be redacted, actually.  It says *private statement not to*

23  *be used publicly by Sun legal."*

24      Witness:  "Yes."

25      Oracle counsel:  "I think that probably should have been

**PROCEEDINGS**

1   redacted in whatever version of this was produced."

2       Mr. Purcell, counsel for Google:  "Okay.  Do you want to

3   take a minute and decide how to proceed?  Let's go off the

4   record for a second.

5       We go off the record.

6       Counsel indicated there would be no further examination.

7   Mr. Purcell respected that.  And when we came back on the

8   record, Mr. Purcell said, "Mr. Gupta, we're going to put Google

9   185 for a second.  We may not get back to it, but we will be

10  deciding that in due course."

11      So we were told that we were not allowed to examine on

12  it --

13          THE COURT:  Wait a minute.  I didn't hear that part on

14  the record.  Where does it say you were not allowed to examine?

15          MR. VAN NEST:  That's not on the record, but

16  Mr. Purcell went off the record, was told that he couldn't --

17          THE COURT:  Mr. Purcell, come up here.  Raise your

18  right hand and take an oath.

19                    **DANIEL PURCELL, SWORN**

20          THE COURT:  All right.  Mr. Purcell, you are under

21  oath.  You must be exactly honest and don't give us belief.

22  Give us actual memory.

23      What occurred on that occasion off the record?

24          MR. PURCELL:  Off the record, I had a discussion with

25  Ms. Rutherford, who was counsel from Oracle for the Boies

**PROCEEDINGS**

 1    Schiller firm.  She said the document was privileged and they

 2    didn't think that it was proper us to use it, and so I agreed

 3    not to.  I mean, I don't believe, Your Honor --

 4              **THE COURT:**  Now you're giving me a belief.

 5              **MR. PURCELL:**  All right.  I will stop.

 6              **THE COURT:**  Do you have any questions for the witness?

 7              **MR. BICKS:**  Well, the questions for the witness, so,

 8    Mr. Purcell, you were at that deposition; right?

 9              **MR. PURCELL:**  I was.

10              **MR. BICKS:**  And the next question you said was, "We

11    may not get back to this, but we'll be deciding that in due

12    course"; correct?

13              **MR. PURCELL:**  I envisioned a further meet and confer.

14              **MR. BICKS:**  Yes.  And did you have such a meet and

15    confer?

16              **MR. PURCELL:**  I did not.

17              **MR. BICKS:**  Did you write a letter confirming that

18    *This was a privileged document, I wanted to have questions up*

19    *on it and make a record but I didn't ask any questions about*

20    *it?*

21              **MR. PURCELL:**  I don't believe there was further

22    correspondence about it.

23              **MR. BICKS:**  And this document, was there ever a letter

24    reproducing the document and redacting it or putting it on a

25    privileged log?

PROCEEDINGS

1          **MR. PURCELL:**  I don't know.

2          **MR. BICKS:**  Did you check before you came here?

3          **MR. PURCELL:**  I did not find any correspondence on the

4  issue.

5          **MR. BICKS:**  Right.

6      So, Your Honor --

7          **THE COURT:**  Wait.

8      Mr. Van Nest, do you have any questions for the witness?

9          **MR. VAN NEST:**  Did Oracle counsel ever indicate to you

10  that you would be free to proceed and re-adjourn the deposition

11  and examine Mr. Gupta on this document?

12          **MR. PURCELL:**  No.  She never changed her position that

13  I was not allowed to use it.

14          **MR. BICKS:**  Your Honor, can I ask you to just look at

15  the document?

16          **THE COURT:**  Okay.

17      You can sit down, Mr. Purcell.

18          **MR. BICKS:**  So we are clear, this is a document that

19  goes to every executive within the company prior to a public

20  meeting, and this is a document that gives what the positions

21  are for this meeting.  No attorney on the document, probably 75

22  executives.  And there is -- that red tag there is the

23  statement we're talking about.

24          **THE COURT:**  How do you plan to use this?

25          **MR. BICKS:**  Because as Your Honor has heard, that

1    the -- what's been told to the jury and what this witness,

2    Mr. Schwartz, is going to come in and say is there was never

3    any issue about anything having to do with what Android was

4    doing.  Everyone at the company was fine with it.  And that's

5    what my blog was all about.

6        What I said in my opening is when we actually look at

7    what's going to happen, we're going to look at a series of

8    internal documents where actually all of the executives were of

9    the view that there was serious investments that were made and

10   that what was going on here was not licensed.  And that's what

11   all the executives are being told at this meeting, that --and

12   the caution here is be careful about making public statements

13   to the press on this topic unless you get approval from legal.

14       And so I'd like to establish with this document and

15   several others that this party line was nothing more than a PR

16   position that everybody knew was not consistent with actually

17   what was going on.  And there are multiple examples, but here

18   is what all the executives are saying is the position at the

19   company.

20            **THE COURT:**  Yes.  But this is a statement by Sun

21   legal.  And it was -- and they were not allowed to -- the

22   lawyer on your side told Mr. Purcell he could not pursue it in

23   that deposition.

24       Now, it's true they never went back and litigated it

25   further, but what difference does that make?

1          **MR. BICKS:**  Your Honor, I think what should have

2  happened here -- this has never been treated -- there was this

3  colloquy at the deposition.  What should have happened is --

4  Mr. Purcell is saying we'll be deciding what to do in due

5  course.  We're not suggesting that any assertion of privilege

6  is proper, and what should have happened is the witness should

7  have been questioned, there should have been instructions not

8  to answer, and then if there was any issues about it, there

9  should have been motions directed to it, but it was kind of

10  left there hanging and nothing was done about it.

11          The document was never pulled back or clawed back and it

12  was never logged as privileged.  It was something that appears

13  to have been left up in the air at the time.  And it's a

14  critical point on one of their major themes.  And I don't

15  believe, Your Honor, in looking at that --

16          **THE COURT:**  Look, whether it's critical or not is

17  not -- I'm sorry if it's critical or not, but I got to figure

18  out whether or not this was -- I have a -- in my guidelines --

19  somebody quote from one of the guidelines.  I have a guideline

20  that runs something like if you refuse to allow discovery into

21  a point, then you can't use it yourself.  I have forgotten how

22  I worded it, but it's in the discovery guidelines somewhere.

23          My law clerk is going to go find that.  One of my law

24  clerks, go find my -- get the one that was in effect in this

25  case.

1      All right.  What were you going to say, Mr. Van Nest?

2          **MR. VAN NEST:**  Excuse me, Your Honor.  I was going to

3   say two things.  One, everything that counsel mentions he can

4   try to establish with Mr. Schwartz without this particular

5   document.  If it's true that all the executives were up in arms

6   and everybody at Sun thought this was terrible, he can

7   certainly establish that, although I don't think there are any

8   Sun witnesses on their exhibit list -- on their witness list,

9   but if he can establish that with Mr. Schwartz, he can do it

10  without this document, number one.

11      And number two, I agreed to a stipulation to stay away

12  from legal issues with Mr. Schwartz; right?  The *no grounds to*

13  *sue*.  And I assume if we're going to go into this, that that

14  stipulation would be off and the door would be open.  If he is

15  going to be questioning him about what legal advice he got,

16  which he shouldn't be, then our stipulation, which we worked

17  hard to get, I would assume would be open again.  And I'm not

18  the one asking to go there --

19          **THE COURT:**  Well, look, this is definitely more legal

20  advice.  By this, I'm talking about the private statement from

21  Sun legal that's in this document in question.  This is

22  definitely more legal advice than the statement that he made in

23  the trial last time that *we didn't believe we had grounds to*

24  *sue*.

25      So if we're going to let this go down, then -- the thing

PROCEEDINGS

```
1   is, you two reached an agreement.  I'm not going to get into --
2   see, now you're asking me to let you renege on an agreement.
3        MR. VAN NEST:  No.  I'm saying the agreement says if
4   they ask about this, the door is open.  I'm not asking for
5   anything other than --
6        THE COURT:  I don't remember how you worded your
7   agreement.  I just remember a document where you said that you
8   would not be going into we didn't have grounds to sue.
9        MR. VAN NEST:  Again, it's clear that if they open the
10  door, then the agreement is reopened.  I don't want that.  I'm
11  saying we didn't get to examine on this document.  They said it
12  was privileged.  We take privileged issues very seriously
13  around here, and if counsel for Oracle tells us you can't
14  examine, it's privileged, we respect that, and if they were
15  going to reverse that and want to use this document, then it
16  was up to them to do it.  You can't bar somebody from doing
17  something.  We all try to respect privilege claims.
18       THE COURT:  I'm going to hand this back.  I guess this
19  is your work copy.
20       MR. BICKS:  Yes.
21       THE COURT:  I don't have an answer for you now.  I'm
22  going to look and see what my guidelines said, and -- but the
23  -- all right.
24       MR. VAN NEST:  I have one other thing, Your Honor.
25  Would you mind telling the jury why we can't talk to them?  We
```

**PROCEEDINGS**

1  have been running into them in the hallways and stuff.  That's

2  usually one of your standard instructions.

3          **THE COURT:**  It is.

4          **MR. VAN NEST:**  And I didn't hear it.

5          **THE COURT:**  You're right.

6          **MR. VAN NEST:**  Just please let them know we're not

7  rude people, but we've been instructed not to talk to them.  Or

8  you can tell them we're rude and we've been instructed not to

9  talk to them.  Either way.

10      Thank you, Your Honor.

11          **THE COURT:**  All right.  I hope both sides know that

12  the most you can say is *good morning*.  You can say that much if

13  you see them in the elevator.  Okay.

14      Are we ready to go?

15          **MS. SIMPSON:**  One other question.  Both parties have

16  submitted briefs on Mr. Phipps.  We would like to be heard on

17  that --

18          **THE COURT:**  I'm not ready to make a ruling.  I haven't

19  even read the brief.  I've been busy with the guy from IBM.

20          **MS. SIMPSON:**  He is on the trial disclosure list.

21          **THE COURT:**  Is he coming up today?

22          **MS. SIMPSON:**  Not today.

23          **THE COURT:**  I will try to find time today that we can

24  do it.

25          **MS. SIMPSON:**  Thank you.

1          **MR. VAN NEST:**  Are we ready for the witness, Your

2     Honor?

3          **THE COURT:**  I'm ready.

4       Dawn, can we get started with the witness?

5          **MR. VAN NEST:**  We have Mr. Schmidt here.

6          **THE COURT:**  I know.  Let's bring him in.  Let's bring

7     in the jury and Mr. Schmidt.

8       (Proceedings were heard in the presence of the jury:)

9          **THE COURT:**  I didn't even hear you come in.  You must

10    be wearing your house slippers over there.

11       Good morning.  I forgot to say something to you about the

12    lawyers because you're going to be here a long time and you're

13    going to be running into the lawyers and their teams in the

14    elevators and hallways and places like that.

15       And these are excellent lawyers.  They know their

16    professional obligations, and they have enormous respect for

17    you and the jobs you have to do, and I haven't even ordered

18    them to do this, but they know from practice that they should

19    not try to cozy up to you.  So they will not be saying, *Oh, did*

20    *you see that ballgame the other day?  Oh, that's a nice shirt*

21    *you have on.  Oh, you know, how do you get to court in the*

22    *mornings*?  They're not going to say a thing like that.  The

23    most they will say is *good morning* and go their own separate

24    way.

25       And you might think that they're being rude to you,

SCHMIDT - CROSS / BICKS

1    they've got something against you, they don't like your shirt

2    or whatever, but, no, that's not it at all.  They are being

3    very respectful of your important position, and they don't want

4    you to think in any way that they are cozying up to you to try

5    to curry favor by personal appeals to you.  So keep that in

6    mind and don't hold it against them when they act respectful

7    toward you in that manner.

8         All right.  Enough said on that.  You will remember

9    yesterday we had Mr. Schmidt on the stand.  He's still on the

10   stand.

11        You're still under oath, Mr. Schmidt.

12        We had not quite finished the cross-examination.  We are

13   going to resume right there.

14           THE COURT:  Please go ahead, Mr. Bicks.

15        **ERIC SCHMIDT, DEFENDANT'S WITNESS, PREVIOUSLY SWORN**

16              **CROSS-EXAMINATION**    (resumed)

17   BY MR. BICKS:

18   **Q.**   Good morning, Mr. Bicks.

19   **A.**   Good morning.

20   **Q.**   When we broke, I asked you about an interview you gave

21   where -- and I asked you did you state that the Google policy

22   about these things is to get up to the creepy line, but not

23   cross it.  Do you recall that line of questioning?

24   **A.**   I do.

25   **Q.**   And you said that in that interview; right?

SCHMIDT - CROSS / BICKS

1    **A.**   I did.

2    **Q.**   And --

3              THE COURT:  Is the microphone on?  It doesn't sound

4    like it.

5              THE WITNESS:  I'll adjust.

6              THE COURT:  It's on.  Good.

7    BY MR. BICKS:

8    **Q.**   You also said in that interview that "We know -- we don't

9    need you to type at all because we know where you are, with

10   your permission; we know where you've been, with your

11   permission.  We can more or less guess what you're thinking

12   about.  Now, is that over the line, is that right over the

13   line."

14        Did you say that?

15   **A.**   In the context that you haven't given, yes.

16             THE COURT:  I thought you were going to play this.

17             MR. BICKS:  Yes.

18             THE COURT:  Let's play the interview so we don't have

19   to guess at it.

20             **MR. BICKS:**  Let's play the interview and see if I

21   reflected accurately what you said.

22        For the record, it's Trial Exhibit 9197.

23             THE COURT:  All right.  Let's play it.

24        (Whereupon, the video was played for the jury).

25             THE COURT:  All right.  Next question.

1    BY MR. BICKS:

2    Q.   Now, Mr. Schmidt, I want to go back to a topic of kind of

3    what you knew and when you knew it.

4         It is a fact, sir, that there came a time when Google was

5    sufficiently worried about being sued that it thought about

6    buying all the rights to Java; is that correct, sir?

7    A.   When you say *all the rights*, what do you mean?

8    Q.   Well, I'd like to read -- permission to read 1559 to 2023.

9              THE COURT:   Is that from the deposition?

10             MR. BICKS:   It is from --

11             THE COURT:   Prior proceedings?

12             MR. BICKS:   Yes.

13             THE COURT:   All right.

14        Any objection?

15             MR. VAN NEST:   No, Your Honor.

16             THE COURT:   Let me just explain to the jury what we're

17   doing here.

18        The witness and several of the other witnesses in this

19   trial have given prior testimony, and you will now hear that

20   prior testimony.   It was under oath at the time.   And it will

21   be read in, and it counts just as much as any other testimony

22   in the case, and even though counsel is reading it, this is one

23   instance where, because they're going to read it exactly, it

24   does count as evidence.

25        All right.   Please go ahead.

1          MR. BICKS:   (Reading):

2          "Q.   Now, there came a time when Google was sufficiently

3     worried about being sued that it thought about buying all

4     the rights to Java; correct, sir?

5          "A.   Yes."

6     Q.   Do you stand by that testimony?

7     A.   I'm sorry.  Is that *yes* from me?

8     Q.   Yes.

9     A.   Then that must be what I said at the time.

10    Q.   All right.  Because, in fact --

11         THE COURT:   Well, did you -- do you stand by the

12    testimony?

13         THE WITNESS:   I'm sorry.  I didn't answer your

14    question.  I apologize.

15         Yes.

16    BY MR. BICKS:

17    Q.   All right.  Because, just to orient ourselves on our

18    timeline, the blog that we were talking about came out in

19    around November of 2007; right?

20    A.   Yes.

21    Q.   And your testimony yesterday in substance was that the

22    blog made you think that copying the design of these APIs was

23    okay, in essence; right?

24    A.   That is not what I said yesterday.

25    Q.   Well, you interpreted the blog to be some approval by

**SCHMIDT - CROSS / BICKS**

1   Mr. Schwartz of what was going on with Android; right?

2   **A.**   I already knew Jonathan's view ahead of the blog.

3   **Q.**   All right.

4        Ahead of the blog you knew that?

5   **A.**   Yes.

6   **Q.**   But it's actually a fact that in 2009, if we roll forward,

7   that you were sufficiently worried about being sued that you

8   considered buying the rights to Java; right?  2009.

9   **A.**   So you're using the word *considered*.  So -- which is what

10  was discussed in the previous testimony, the previous trial.

11  **Q.**   Right.

12  **A.**   Considered is like having an idea.

13  **Q.**   And let me show you -- when you say *have an idea*, you

14  asked your team to pursue that idea; right?

15  **A.**   As I recall -- may I explain the context?

16  **Q.**   I'd prefer that you answer the question, sir, because I'm

17  on time.

18       You asked your team to pursue that idea; is that correct?

19  **A.**   An employee suggested this and I said think about it.

20  **Q.**   You said, "It's a clever idea.  I'll ask our team to

21  pursue it."  Those were your words; right?

22  **A.**   Right.  I did nothing beyond that.

23  **Q.**   All right.

24       Well, let's look at what you said in an email.  406.  It's

25  an email that you wrote?

**SCHMIDT - CROSS / BICKS**

1    **A.**    It is.

2    **Q.**    Dated January 29, the year 2009; correct?

3    **A.**    It is --

4              **MR. BICKS:**  Move it into evidence, Your Honor, please.

5              **THE COURT:**  Any objection?

6              **MR. VAN NEST:**  No objection, Your Honor.

7              **THE COURT:**  Received in evidence.  You may publish it.

8    (Trial Exhibit 406 received in evidence)

9    **BY MR. BICKS:**

10   **Q.**    And can we display this on the screen.

11          So here it is.  It's a man named Brett Slatkin.  He wrote

12   to you on January 29, 10:59 a.m.  Do you see that, sir?

13   **A.**    I do.

14   **Q.**    He says, "I was talking to Vic about what will happen to

15   Sun long term"; right?  And he says to you, "What do you think

16   with about us buying the full rights to Java from Sun?  Maybe

17   it would cost a hundred million.  We could turn it into an open

18   foundation," and then it says, "and solve all these lawsuits

19   we're facing."

20          That was information that was brought to your attention;

21   right, sir?

22   **A.**    By a software engineer that I did not know.

23   **Q.**    Well, he appears to be on a first-name basis with you.  He

24   says, "Hey, Eric"?

25   **A.**    That's the policy of Google for 70,000 employees.

**SCHMIDT - CROSS / BICKS**

1  **Q.**   Okay.

2       Well, whether you knew him or not, you responded, didn't

3  you?

4  **A.**   I respond to employees' emails.

5  **Q.**   Yep.  And if we look at the time that you responded -- can

6  we show up there in the right corner, Trudy -- it wasn't an

7  email that you just kind of fired off in a minute without any

8  thought; right?

9  **A.**   I'm the fastest responder in email in the company.

10 **Q.**   I'm sorry?

11 **A.**   I'm a very fast responder.  I'm the very fastest responder

12 in email in the entire company.  That's part of how I manage.

13 **Q.**   You responded at 5:14, but this one maybe you didn't

14 respond as quickly to, I guess --

15 **A.**   Something else was going on.

16 **Q.**   Maybe you were actually looking into this and thinking

17 about it.

18 **A.**   I can assure you that's not the case.

19 **Q.**   All right.

20      Well, you certainly responded and said, "Certainly it's a

21 clever idea.  I'll ask our team to pursue."

22      When you speak to somebody, whatever their title is in

23 your company, whether an engineer, a designer, a senior

24 executive, you tell it to them straight; right?

25 **A.**   You won't find a follow-up to this.

**SCHMIDT - CROSS / BICKS**

1   Q.   But you told him you were going to do that?

2   A.   Yes.  I had it in my brain.

3   Q.   And you say here that, "In my experience, Sun used Java as

4   its identity"; right?  "Remember they renamed their stock

5   symbol Java"; right?

6   A.   That's correct.

7   Q.   And you also tell this individual, "This is a clever

8   idea"; right?

9   A.   I do, yes.

10  Q.   And you didn't say in this email, *Hey, Brett, Jonathan*

11  *Schwartz sent out a blog and then I had a conversation with*

12  *him -- in the cafeteria with him.  Everything's okay.  This*

13  *would be a waste of time.*

14       You don't say that, do you?

15  A.   My policy with employee emails is to be supportive of

16  their creativity?

17  Q.   Even when it comes up with creativity where they say, "We

18  should consider buying Sun because of these lawsuits we're

19  facing"?  That's embodied within your concept of creativity?

20  A.   If you read my email response, *clever idea, unlikely to*

21  *occur.*  That's how I treated this --

22  Q.   Where in that email does it say *unlikely to occur*?  Is

23  that what "I'll ask our team to pursue" means?

24  A.   So "it's unlikely, but you never know."  Those are my

25  words.

**SCHMIDT - CROSS / BICKS**

1   Q.   So what you're saying is you told this employee that you

2   were going to ask your team to pursue it, but you didn't really

3   mean you were going to ask your team to pursue it?

4   A.   What I did is I put it in my head and I'm sure that I -- I

5   thought about it in our next review.

6   Q.   So then who did you ask to pursue it?  If you told them

7   that you were going to ask somebody, then what did you do to

8   follow up on what you told the person?

9   A.   I have no recollection of a follow-up to this gentleman's

10  suggestion.

11  Q.   And there were other emails that you've got as well

12  indicating that there were, on the Sun side, problems with what

13  was going on.  Do you remember any of that?

14  A.   You'll have to refresh my memory.

15  Q.   Let me show you Exhibit 5097.  Do you see 5097?  You're at

16  the bottom of the email chain.

17  A.   I do.

18          MR. BICKS:  Your Honor, I would move 5097 in.

19          MR. VAN NEST:  May we have a moment, Your Honor?

20          THE COURT:  5097.

21          MR. BICKS:  Yes.

22          MR. VAN NEST:  We don't have a copy, Your Honor.  It

23  wasn't on their pre-list.

24          MR. BICKS:  It was on the list.

25          THE COURT:  Just show it to counsel.  Let him see it.

1        Any objection?

2              MR. VAN NEST:  Has the witness identified it?

3              MR. BICKS:  Yes.

4              THE COURT:  Can you identify that document for us?

5              THE WITNESS:  I see that, one, that this is an email

6    trail that I'm not part of, which includes a message from me.

7    BY MR. BICKS:

8    Q.   Yes.  You're on some of the email but not all of it?

9    A.   I -- I'm -- I'm -- to be very precise, a message that

10   Jonathan sent to me is referred to by others.

11   Q.   Right.  All right.

12        So I put 5097 in.

13             THE COURT:  Any objection?

14             MR. VAN NEST:  No objection.

15             THE COURT:  Thank you.  Received.

16   (Trial Exhibit 5097 received in evidence)

17   BY MR. BICKS:

18   Q.   So these emails can be tricky, but -- if we go down to the

19   bottom of it and start on the other page, please, Trudy -- we

20   go from here, and this is an email from Mr. Schwartz to you

21   talking about something called the Summer of Code Activities,

22   right?

23   A.   Yes.

24   Q.   And the Summer of Code Activities was, what?  Some kind of

25   a trade show or something like that where people in the

**SCHMIDT - CROSS / BICKS**

1   business get together?

2   **A.**   I believe that's correct.

3   **Q.**   And a dispute had arisen because people from Sun wanted to

4   have a booth and wanted to be part of it, but they were being

5   excluded from this; right?

6   **A.**   I believe that's correct.

7   **Q.**   And so Mr. Schwartz is writing to you saying, Hey, why --

8   why is it at Google that you guys are excluding people at Sun

9   from this conference; right?  And he's asking you for help?

10  **A.**   He says, "Let me know if there is anything we can do to

11  turn that around."

12  **Q.**   Yeah.  And then going back up the page, you flip it to

13  someone in your place, Jonathan Rosenberg and Vic, whose name I

14  don't know.

15  **A.**   Shall I give you his name?  It's Vic Gundrota,

16  G-U-N-D-R-O-T-A.

17  **Q.**   Mr. Gundrota -- you sent an email to both of them.  You

18  say, "Can you investigate and then let me know"; right?

19  **A.**   "Vic, I'm assuming this is in your group.  Can you

20  investigate; let me know."

21  **Q.**   Right.  And then the email at the top, is this one that

22  you saw, the response to this?

23  **A.**   I did not.

24  **Q.**   Uh-huh.

25       So the reason I'm asking this is about the knowledge of

SCHMIDT - CROSS / BICKS

1   Google and the concerns about whether or not Sun was okay with

2   what was going on.  That's one of the general topics.  And you

3   can see in this email that there's a statement here that the

4   other part of this is "they are very threatened by the Dalvik

5   Virtual machine and haven't exactly sugarcoated their

6   displeasure"; right?  Did you know that?

7   A.   As I said, I was not part of this, part of the email, so I

8   was not aware of that.

9   Q.   Nobody shared this with you?

10  A.   I have not seen this part of the email, to my knowledge.

11  Q.   And the statement is here, "And we still do not have any

12  assurance that they will not, as they threatened in late 2006,

13  sue us for nine percent of the company."  Did you know that?

14  A.   I did not.

15  Q.   Yes.

16       This indicates that in this time period, there's some

17  folks within Google who certainly knew that there were some

18  folks at Sun who were unhappy about what was going on with

19  Android; right?

20  A.   Chris DiBona appears to be the author of these paragraphs.

21  Q.   Yes.

22  A.   Chris is an engineering manager who was the manager of the

23  Open Source Project.

24  Q.   Right.  So he would know what was going on; right?

25  A.   Well, he's an engineer.  This is his view of what was

SCHMIDT - CROSS / BICKS

1    going on.  He states in the first paragraph at some length of

2    the poor quality of Sun's behavior.  These are his words, not

3    mine.

4    Q.    Yeah.  And this was never shared with you?

5    A.    That is correct.

6    Q.    Now --

7          THE COURT:  Could I ask a question?  Does this lawsuit

8    involve the Dalvik Virtual machine?

9          MR. VAN NEST:  No, Your Honor.

10         THE COURT:  Does it, Mr. Bicks?

11         MR. BICKS:  It does not, Your Honor.

12         THE COURT:  All right.  Thank you.

13   BY MR. BICKS:

14   Q.    And so we're clear here, my question to you was there were

15   concerns on the Sun side about what was going on with Android;

16   right?

17   A.    I cannot speak for Sun's concerns.  I see Chris has

18   documented his view that there were in your display of email

19   here.

20   Q.    And you were also notified by somebody named Mr. Lee about

21   concerns about what was going on with something called Apache

22   Harmony and that what was going on was not consistent with

23   Sun's licensing policies.  Do you remember that?

24   A.    I do not.  You'll have to show me the email.

25   Q.    This is Trial Exhibit 405.

1    This is a document you've received, sir; correct?

2  **A.**   I -- I assume I saw it some years ago.

3  **Q.**   Yes.

4    And I think it's already in evidence, Your Honor, but in

5  precaution, I would move it in, 405.

6         **MR. VAN NEST:**  No objection, Your Honor.

7         **THE COURT:**  405 received.  Please show it to the jury.

8  (Trial Exhibit 405 received in evidence)

9  **BY MR. BICKS:**

10 **Q.**   This is a memo you've got, email, on May 30, 2008; right?

11 **A.**   Yes.  It appears to be.

12 **Q.**   And do you know who Bob Lee is?

13 **A.**   I do not.  His email is *Crazy Bob*.

14 **Q.**   Yep.

15    You don't know who he is, but at least in the beginning,

16 it says, "You were great to walk around with," indicating you

17 spent some personal time with him; right?

18 **A.**   As I said, I don't have any memory of him.  Perhaps he

19 approached me and we chatted in the hallway or something.

20 **Q.**   Uh-huh.

21    And he writes an email to you and he says here that -- he

22 talks here about Sun keeping SE.  Do you see this?  Java SE in

23 order to keep it off phones and protect their Java ME licensing

24 revenues.  Do you see that?

25 **A.**   I do.

SCHMIDT - CROSS / BICKS

1    Q.   Was that a concern at the time that you were aware of that

2    Sun had revenues from the use of something called Java ME that

3    it was concerned about.  Did you know that?

4    A.   I was aware that Sun was concerned about a revenue --

5    remember the submarine conversation yesterday?

6    Q.   Right.

7    A.   I would -- I believe that that's the same thing.

8    Q.   Right.  So you knew that; right?

9    A.   I believe he's referring to the submarine thing --

10   Q.   And so we're clear here, he is also telling you that Sun

11   puts field-of-use restrictions.  You know what those are;

12   right?

13   A.   I think so, yes.

14   Q.   Field-of-use restriction means you can operate in some

15   areas, but not others; right?

16   A.   I think so.

17   Q.   And you were aware that Sun had field-of-use restrictions

18   which prevented use of Java SE implementations from running on

19   anything but a desktop or a server.  That's what he's telling

20   you; right?

21   A.   He is informing me of that, yes.

22   Q.   And you had that information in May of 2008; right?

23   A.   It appears so, yes.

24   Q.   Now, so we're clear, Android is a Java SE implementation

25   that runs on a smartphone; right?

**SCHMIDT - CROSS / BICKS**

1    **A.**    That's not correct.

2    **Q.**    Well, it runs on a smartphone, right, whatever you do with

3    the design of those --

4    **A.**    Your statement is not factually correct.

5    **Q.**    Okay.  But the packages and the design of which your

6    company has copied run on a smartphone; right?

7    **A.**    That is correct.  However, Java SE is not -- what you said

8    is not correct about Java SE.

9    **Q.**    Well, you used packages from Java SE; correct?

10   **A.**    That is not correct.

11   **Q.**    Where do you believe those packages came from?

12   **A.**    Right.

13       I'm cautious of your concern about my expertise in this

14   area, Your Honor.

15           **THE COURT:**  You have been asked a question.  The door

16   is open.  You can answer it any way that you feel is an honest

17   answer.

18           **THE WITNESS:**  Yes, sir.

19       So what we did is we took 37 APIs, right, and we did an

20   implementation -- a separate implementation.  Java SE is a

21   large set of implementations, which is not what we did.  And

22   Java SE includes many interfaces that we had nothing to do

23   with.  It's just -- your statement is not correct.

24   **BY MR. BICKS:**

25   **Q.**    I didn't say you took everything from Java SE, but what is

**SCHMIDT - CROSS / BICKS**

1    at issue in this case -- the structure, sequence and

2    organization of 37 API packages -- that your company copied

3    came from Java SE; right?

4    **A.**    They came from the book that you handed me yesterday.

5    **Q.**    Right.  The book that had the license in it, it's Java SE;

6    right?

7    **A.**    That's the new name for it.

8    **Q.**    Right.

9    **A.**    When they were invented, that was not its name.  I know

10   because I was there when it was invented, and Java SE was

11   invented much later after I left.

12   **Q.**    Okay.

13        And what he tells you here is that these implementations

14   are prohibited from running anything but on a desktop or

15   server; correct?

16   **A.**    That's what he says, yes.

17   **Q.**    That's what he tells you; right?

18        And then he says, "These restrictions prevent Apache

19   Harmony from independently implementing Java SE"; right?

20   **A.**    That's what he says, yes.

21   **Q.**    All right.

22        And then he says, "not to mention Android"; right?  He

23   told you that?

24   **A.**    Yes.

25   **Q.**    And then he said, "That's water under the bridge at this

SCHMIDT - REDIRECT / VAN NEST

1    point"; right?

2    **A.**    Yes.

3    **Q.**    And it was water under the bridge because in May of 2008,

4    May 30th, you had already decided to go ahead with Android;

5    right?

6    **A.**    Yes, we had.

7    **Q.**    All right.

8         I have no more questions.  Thank you, sir.

9              **THE COURT:**  All right.  Thank you, Mr. Bicks.

10        All right.  Any redirect?

11             **MR. VAN NEST:**  Yes.  Just a few, Your Honor.

12                      <u>**REDIRECT EXAMINATION**</u>

13   **BY MR. VAN NEST:**

14   **Q.**    Good morning.

15        And good morning, Mr. Schmidt.

16        You were asked a couple of questions yesterday about the

17   web search APIs.  Do you recall that?

18   **A.**    I do.

19   **Q.**    And you mentioned that you wanted to provide some context.

20        Could we put 5121 up on the screen.  It's in evidence,

21   Your Honor.

22             **THE COURT:**  Just remind everyone, was this one we saw

23   yesterday?

24             **MR. VAN NEST:**  It is, Your Honor.

25             **THE COURT:**  Fine.

1    **MR. VAN NEST:**  And could we focus in on the very first

2    lines there, right up at the top.

3    **Q.**   You were shown this and asked some questions about APIs,

4    Mr. Schmidt, and you mentioned these were very different than

5    the APIs we're talking about here.  Tell the jury what you

6    meant.

7    **A.**   So this is a service where people can come in and do web

8    search on their own.  And it uses a lot of our computers to do

9    it.  So it's a service.  It like sits there and you call it and

10   it answers and you call it some more and it answers.

11        So we were concerned that it would overwhelm the Google

12   Search service and so we put some restrictions on the use of

13   our implementation.

14        This has nothing to do with the constraints on the

15   interface itself.

16   **Q.**   Is this web API anything like the Java method declarations

17   that we're talking about in this case?

18   **A.**   It has nothing to do with it, and I'm not even sure it's

19   in the Java language.  It's a completely separate system,

20   separate timing, separate set of issues.

21   **Q.**   Okay.

22   **A.**   And just to be precise, you see it says *web API service*.

23   It's a service that vends this interface.  It's not the

24   interface.

25   **Q.**   Could we put up 5250.  And could we circle the very first

1    definition under definitions, please.  Thank you.

2        This was a second example of a Google API, and I think you

3    said there are many, many, many APIs used at Google; correct?

4    **A.**   Yeah.  Many thousands would be a minimum number.

5    **Q.**   What sort of an API is being discussed in Trial Exhibit

6    5250, Mr. Schmidt?

7    **A.**   Again, this is a situation where you want to do

8    advertising and you want to put advertising on your own site

9    and so you call a service that we provide that gives you those

10   ads, and we also have restrictions on that because of our

11   concern over overwhelming our systems which provide these ads.

12       Again, it has nothing to do with the specific APIs and

13   it's probably not written in Java.

14   **Q.**   So this is an entirely different type of API than we're

15   talking about in this case?

16   **A.**   That is correct.

17       And you'll notice, by the way, when the gentleman brought

18   it up and I said I recognized it, this is a document that's a

19   contract, as the gentleman mentioned, that you -- that you --

20   that you agree to when you use the service.  It's a completely

21   different entity than the other things we're talking about.

22   **Q.**   Could we have Trial Exhibit 406 up, please.

23       Mr. Schmidt, you were asked a couple of questions about

24   this exhibit this morning and an email that you received from

25   an employee back in January of 2009.

SCHMIDT - REDIRECT / VAN NEST

1          Could we highlight the bottom paragraph, please.  Make

2   that a little bigger.

3          Mr. Schmidt, this lawsuit that we're in now, it didn't

4   start until August of 2010; correct?  I've got our timeline

5   over here.  Can you see it?

6   A.    That would be correct, yes.

7   Q.    So this email is a year and a half earlier.  Does it say

8   anything at all about Android?

9   A.    It does not appear to.

10  Q.    All right.

11         And I notice that this gentleman -- I take it -- does

12  Google use Java throughout its company?

13  A.    No.

14  Q.    Does it use Java in products other than Android?

15  A.    We use Java, the language, as part of our advertising

16  systems, and we also use it as one of the languages on the

17  project that this gentleman appears to be associated with.

18  Q.    Is this gentleman working in the Android group?

19  A.    He is not, according to -- at the bottom, you'll see it

20  says -- it says where he came from.  He's in something called

21  App Engine.

22  Q.    It says Google App Engine?

23  A.    An app engine is completely separate from Android.

24  Q.    And when he says, "solve all of these lawsuits we're

25  facing," did you have any idea what he was talking about?

**SCHMIDT - REDIRECT / VAN NEST**

1    **A.**    I did not.

2    **Q.**    Could I have Trial Exhibit 22 up, please.

3          Trial Exhibit 22 is an exhibit you were shown yesterday.

4          I take it EMG is Executive Management Group?

5    **A.**    Yes.  That would be the senior executives who ran the

6    company at the time.

7    **Q.**    You were asked some questions about this particular

8    exhibit.  This is -- could we go to the next page.

9          Is this the type of presentation that you would typically

10   be reviewing as part of --

11   **A.**    Yes, it is.

12   **Q.**    Could I go to the page marked *proposed deal terms*.  And

13   make that as big as we can.

14         Does this refer to a proposed deal between Google and Sun?

15   **A.**    It does.

16   **Q.**    This document is dated April 22, 2005.  So this is back --

17   this is back even before discussions with Sun started.  They

18   started in August.  This is in April?

19   **A.**    That's correct.

20   **Q.**    And you were looking at a proposed deal with Sun?

21   **A.**    Yes.

22   **Q.**    The third line says, "Co-development partnership."  Do you

23   know what that refers to?

24   **A.**    It would refer to jointly developing software

25   implementations as joint teams.

SCHMIDT - REDIRECT / VAN NEST

1  Q.   And then two lines -- the next line down says, "Sun makes

2  Java Open Source as part of Android platform."  Do you know

3  what that referred to?

4  A.   It refers -- it would refer to taking their Java

5  implementation and freely licensing it as part of the Android

6  implementation.

7  Q.   And if you took a Java implementation from Sun, you'd need

8  a license for that --

9  A.   Absolutely.

10 Q.   -- right?  And the coffee cup, you would need a license

11 for that?

12 A.   We would get the coffee cup as part of this.

13 Q.   All of the proprietary Sun technology?

14 A.   Yes.

15 Q.   Could we go back to price -- fee.  It says, "$28 million,

16 payments spread over three years."  Do you know what that

17 refers to, Mr. Schmidt?

18 A.   That would be the fee that we would pay Sun in order to

19 get their implementations commingled with ours.

20 Q.   And was that in the range of payments that you were

21 considering as part of this --

22 A.   As I testified yesterday, my opinion -- my willingness was

23 30 to 40 million, I should say.

24 Q.   And I think, as you said yesterday, the deal -- excuse me.

25        THE COURT:  One thing is unclear.  Maybe you can --

1    certainly to me.

2        Can you clarify is this a proposal by Sun or was this a

3    proposal by Google?  It's not clear.

4        THE WITNESS:  Your Honor, my -- we have always had

5    conversations -- had always conversations going on between Sun

6    and Google, and this is an example of a conversation that they

7    would have jointly had that was being discussed but had not

8    been agreed to by either party.

9        MR. VAN NEST:  And, Your Honor, I misstated the date.

10   I made a mistake.  The date is April 22, 2006.  So I apologize

11   to the Court.  It's in the middle of these -- near the end of

12   the period of discussions, not before it.

13       THE WITNESS:  Thank you for that clarification.

14       THE COURT:  I still am unclear.  The top of this

15   document says *Client, Sun Microsystems*.  Who is it that has a

16   client?  What is it talking about?

17       THE WITNESS:  The term *client* refers to the partner.

18   This is Google doing a deal with Sun Microsystems.  Sun is the

19   client.

20       THE COURT:  This is not a Sun proposal?  This is

21   internal Google thinking?

22       THE WITNESS:  This document reflects -- so there were

23   conversations between the two firms at a lower level.  This

24   reflects a conversation of somebody from Sun and somebody from

25   Google, but neither had the authority to agree to these terms.

1    So there is probably an analogous document on the Sun side

2    saying, you know, maybe this is a good idea.

3        We reviewed this as part of our normal review process.

4    This is a deal in front of me, if you will; do I like it.  But

5    it's not clear from this document that Sun had approved it or

6    not.

7            THE COURT:  All right.  Thank you.  Go ahead.

8    BY MR. VAN NEST:

9    Q.   In other words, Mr. Schmidt, this document was part of a

10   request to you and executive management to approve these terms?

11   A.   That is correct.

12   Q.   All right.  Let's go down to page 7, agreement highlights

13   in the same document.

14           THE COURT:  Is this a document that Mr. Bicks used or

15   not?

16           MR. VAN NEST:  Yes.

17           THE COURT:  The one that you're --

18           MR. VAN NEST:  Yes.  Yes.

19           THE WITNESS:  Yes.  We saw this --

20   BY MR. VAN NEST:

21   Q.   Could we just highlight the top section.  This is a

22   co-development agreement.

23       This is part of the same document, part of the deal that

24   was being proposed?

25   A.   Under consideration.

SCHMIDT - RECROSS / BICKS

1   Q.    Under consideration.  And it says, "Sun handles Java and

2   Tools.  Google handles OS."  What does that mean?

3   A.    That would refer to our implementation of Android at the

4   time, which was based on the Linux operating system.

5   Q.    OS stands for what?

6   A.    Operating system.

7   Q.    What did you understand to mean "Sun handles Java plus

8   Tools"?

9   A.    So this is a standard way the industry works where there

10  are two companies and Group A does a part and Group B does a

11  different part.  The A here says Sun does Java and the Tools

12  around the language.  I understood that because I built those

13  way back when when I was at Sun.  And then Google handles the

14  operating system and I understood that because that's what we

15  were building as parts of our Android efforts.

16  Q.    Thank you, Mr. Schmidt.

17        I have no further questions, Your Honor.

18            THE COURT:  Any recross?

19            MR. BICKS:  Yes.  A couple questions.

20                       RECROSS-EXAMINATION

21  BY MR. BICKS:

22  Q.    Mr. Schmidt, on this potential deal, a deal was never

23  reached; right?

24  A.    This deal was not agreed to.

25  Q.    Right.

SCHMIDT - RECROSS / BICKS

1           And one of the reasons that there was no deal was because

2     Sun wanted to have control over what we would call the Java

3     Ecosystem; right?

4     A.    That is correct.

5     Q.    When you have control over the ecosystem, that's the

6     ecosystem that you all developed with Android; right?

7     A.    To be technically precise, the ecosystem was an open

8     source ecosystem.

9     Q.    Right.

10    A.    And the Sun view was different than our view of how that

11    would evolve.

12    Q.    Right.

13          But in any event, that's the ecosystem that you went and

14    developed that's got the design of the 37 packages that you

15    told me on cross has been hugely profitable to your company;

16    correct?

17    A.    The design of the 37 -- the implementation of the 37

18    interfaces that we used, that's correct.

19    Q.    Right.

20          And in that email that you got from Mr. Slatkin, 406,

21    where he talks about all the lawsuits that you were facing, did

22    you ask him what he was talking about when he mentioned all

23    those lawsuits?

24    A.    I don't believe so.  I don't believe I -- I don't believe

25    there's further correspondence besides this.

 1          MR. BICKS:  Thank you.

 2          THE COURT:  All right.  Thank you.  So may the witness

 3   step down now and be excused?

 4          MR. VAN NEST:  Yes, Your Honor.

 5          THE COURT:  Mr. Bicks?

 6          MR. BICKS:  Yes.

 7          THE COURT:  Thank you, Mr. Schmidt.  You are free to

 8   go.

 9          MR. VAN NEST:  Can he be released, Your Honor?

10          THE COURT:  Please give to counsel -- just give to

11   Mr. Van Nest that document.

12          THE WITNESS:  Okay.

13          MR. VAN NEST:  May Mr. Schmidt be released?

14          THE COURT:  Yes, he may.  He is excused from the

15   subpoena.

16       Have a good day, Mr. Schmidt.

17       While you're bringing in the next witness, I want to just

18   make sure, Ms. Shattuck, did you get your wallet?

19          JUROR SHATTUCK:  Yes.  Thank you.

20          THE COURT:  You're good with your wallet?

21          JUROR SHATTUCK:  Yes.  Thank you.

22          THE COURT:  Okay.  Very good.  And are you the one

23   that had the bee stings?

24          JUROR SHATTUCK:  Yes.

25          THE COURT:  Are you feeling okay today?

1        JUROR SHATTUCK:  In as much as it's possible.

2        **THE COURT:**  Where did you get bee stings?  Is your

3   cheek all swollen?

4        JUROR SHATTUCK:  Not compared to what it was.

5        **THE COURT:**  Are you feeling all right?

6        JUROR SHATTUCK:  Yes.

7        **THE COURT:**  Are you able to follow the testimony?

8        JUROR SHATTUCK:  Let's see.  The answer to that would

9   be --

10        **THE COURT:**  Let's say this.  Are you able to follow

11   the testimony as well as you did before the bee stings?

12        JUROR SHATTUCK:  Good.  Yes.

13        **THE COURT:**  That's all that counts.

14     I'm sorry that you've got those bee stings.  Those are not

15   fun, and I -- good for you that you're willing to keep coming

16   in here, and thank you for that.  All right.

17     So now are we ready for the next witness?

18        **MR. VAN NEST:**  We are, Your Honor.

19        **THE COURT:**  Who is our next witness?

20        **MR. VAN NEST:**  Google calls Jonathan Schwartz.

21        **THE COURT:**  Are you Jonathan Schwartz?

22        **THE WITNESS:**  I am, indeed.

23        **THE COURT:**  Please raise your right hand to take an

24   oath.

25        **JONATHAN SCHWARTZ**, **DEFENDANT'S WITNESS, SWORN**

```
 1              THE CLERK:  Thank you, Mr. Schwartz.  Please have a
 2   seat.
 3              THE COURT:  Welcome again.
 4        You see how the microphone will move all around?  It has
 5   to be this close in order to catch your voice.
 6        Say your name, and we'll test it out.
 7              THE WITNESS:  Jonathan Schwartz.
 8              THE COURT:  I think that's great.  Go right ahead,
 9   counsel.
10              MR. VAN NEST:  Thank you, Your Honor.
11                         DIRECT EXAMINATION
12   BY MR. VAN NEST:
13        Good morning, Mr. Schwartz.
14   A.   Good morning.
15   Q.   Can you introduce yourself to the jury, please.
16   A.   I am Jonathan Schwartz.
17   Q.   Mr. Schwartz, are you the former CEO of Sun Microsystems?
18   A.   I am.
19   Q.   How long did you work there?
20   A.   From 1996 until about 2010.
21   Q.   And what are you doing currently?
22   A.   I run a little software company and I'm a dad.
23   Q.   Okay.  And the software company, what does that do?
24   A.   CareZone.  My family has a variety of health challenges,
25   and about six years ago, I wanted to create a company to help
```

1  people that have health challenges, and we help people that
2  have health challenges.
3  **Q.**   That is called?
4  **A.**   CareZone.
5  **Q.**   Can you tell the jurors about your background, where you
6  grew up and where you went to school?
7  **A.**   How far back would you like me to go?
8  **Q.**   Let's go back to high school and take it from there.
9  **A.**   So I grew up a little bit on both coasts of the country,
10  just outside of Los Angeles and then just outside of
11  Washington, D.C.
12      I attended college at Wesleyan University in Connecticut.
13  I studied math and economics.  And then graduated from school,
14  went to work in New York City.  Got a little bored.  Thought I
15  would go start a company because if it failed, then I'd get
16  into grad school and I'd look like I'd done something.
17      The company did pretty well, and we ended up being
18  acquired by Sun Microsystems in 1992 -- '6.  Sorry.
19  **Q.**   What was the name of the company that you founded?
20  **A.**   Lighthouse Design and we did not design lighthouses.
21  **Q.**   What did Lighthouse Design do, Mr. Schwartz.
22  **A.**   We created software, software for people who are creating
23  presentations or writing documents or trying to calculate
24  numbers and spreadsheets.
25  **Q.**   When did Lighthouse Design -- when was Lighthouse Design

SCHWARTZ - DIRECT / VAN NEST

1   acquired by Sun?

2   **A.**   In 1996.

3   **Q.**   Is that when you joined Sun as an employee?

4   **A.**   That's when I joined Sun as an employee.

5   **Q.**   What was your position when you started at Sun?

6   **A.**   When I started at Sun, my position was to oversee my

7   little company, which was now a part of the massive company.

8   **Q.**   Did you work with Eric Schmidt?

9   **A.**   I did.  He was my first boss.

10  **Q.**   Did there come a time when you were promoted to Chief

11  Operating Officer of Sun?

12  **A.**   That was quite a bit later, but, yes.

13  **Q.**   Why don't you just review for our jurors your career, the

14  positions you held, and approximately when you held them and

15  what you did?

16  **A.**   Sure.

17       So I joined Sun to run my little startup, but to be a part

18  of a bigger company.  And for a whole variety of reasons, that,

19  as you might imagine a little tiny company in a big company,

20  got very complicated, and we ended up being integrated into the

21  overall company, which gave me an opportunity and all of our

22  employees to get new jobs.

23       I ended up running marketing, product marketing, for Java,

24  the programming language.  Subsequent to that, I ended up

25  running our software company, running our venture group that we

SCHWARTZ - DIRECT / VAN NEST

1    made investments in small companies.

2        I was our Chief Strategy Officer, so I kind of looked

3    across the landscape, tried to figure out where the company

4    should go, and then I became the Chief Operating Officer in

5    approximately April of 2004 until the same April 2006, when I

6    became Sun's Chief Executive Officer.

7    Q.   Just to get ourselves oriented, we have an agreed-upon

8    timeline we've been using, Mr. Schwartz.

9        So you became Chief Executive Officer in, I think you

10   said, April of 2006?

11   A.   That's correct.

12   Q.   And then how long did you remain Chief Executive Officer

13   of Sun?

14   A.   Up until the acquisition of Sun by Oracle closed, and that

15   was in February of 2010.

16   Q.   Our agreed timeline here has it in January of 2010, but in

17   any event, is that the time that you stopped being CEO?

18   A.   That's when I resigned, yes.

19   Q.   Okay.  Very good.

20       You mentioned Java.  Did there come a time when you

21   assumed responsibility for Java product marketing?

22   A.   Yes.

23   Q.   Approximately when did that happen?

24   A.   A very long time ago.

25   Q.   Okay.  And did that last for some years?

**SCHWARTZ - DIRECT / VAN NEST**

 1    A.    I believe so.

 2    Q.    What responsibilities did you have as -- in Java product

 3    marketing?

 4    A.    To pair with the engineering leader at the time to try to

 5    help craft the products and the strategy we would use to get

 6    those products distributed across the world.

 7    Q.    And as you rose up through the company through Chief

 8    Operating Officer and Chief Executive, did you continue to have

 9    oversight responsibility for Java?

10    A.    Absolutely, yes.

11    Q.    Now, during the time you were employed at Sun, was the

12    Java programming language free and available for anyone to use?

13    A.    Absolutely, yes.

14    Q.    And how long has that been the case?

15    A.    Since its inception.  Since long before I arrived at Sun.

16    Q.    Okay.  And during your time there, was Sun promoting

17    widespread use of the Java programming language?

18    A.    Absolutely, yes.

19    Q.    How did you go about doing that?

20    A.    Any way we could.

21    Q.    Can you tell the jurors how you went about promoting the

22    language?

23    A.    Yes.  We distributed free educational materials.  We made

24    sure the technology was broadly available to anyone who wanted

25    to use it.

**SCHWARTZ - DIRECT / VAN NEST**

1          We visited high schools and colleges universities around

2     the world.  We gave money to those universities and students to

3     try to promote their becoming aware of and educated about Java,

4     because it was in our interests to do so.

5          As we promoted that language and as we promoted that

6     technology, that created -- that opened that market that

7     historically we couldn't have gone after.  But if you were

8     using Java, then everything else that Sun sold we could sell to

9     you.

10          If you were using Microsoft Windows, which was at the time

11     the dominating operating system, we had nothing to sell you.

12     So by promoting Java we were creating an alternative to Windows

13     and creating a marketing opportunity for the company.

14     **Q.**   I'm going to ask you just to slow down a little bit,

15     Mr. Schwartz.  We're trying to transcribe every word.

16     **A.**   My apologies.

17     **Q.**   You mentioned that one goal was to help you sell the other

18     Java products that Sun had, apart from the language.  What

19     products are those or were those?

20     **A.**   So when you write a program, at some point the program has

21     to run somewhere.  So it's going to run on a computer.  And we

22     made those computers.

23     **Q.**   And what is JavaOne?

24     **A.**   JavaOne is a conference.

25          **THE COURT:**  No.  Wait.  Wait.  Let's put it in the

SCHWARTZ - DIRECT / VAN NEST

```
 1    past tense, because he's not here as an expert.  He's here to
 2    explain what happened.
 3              MR. VAN NEST:  My mistake.
 4              THE COURT:  What was JavaOne?
 5              MR. VAN NEST:  Well, JavaOne exists today, Your Honor.
 6    That's why I made the mistake.
 7              THE COURT:  Maybe.
 8    BY MR. VAN NEST
 9    Q.   What was JavaOne when you were employed at Sun?
10    A.   When I was employed at Sun, JavaOne was a big trade show,
11    a conference we would have, at the Moscone Center here in
12    San Francisco and other venues around the world, to bring
13    together Java developers and get everybody excited and to tell
14    everybody about these new innovations that were coming down the
15    pike.
16    Q.   Was -- was JavaOne an annual event?
17    A.   Yes.
18    Q.   Was it part of your effort to promote the Java programming
19    language?
20    A.   Absolutely, yes.
21    Q.   What was the annual attendance at JavaOne?
22    A.   I don't recall.  Tens of thousands of people.  Moscone was
23    filled.
24    Q.   At Sun, were you familiar with the Java APIs,
25    Mr. Schwartz?
```

SCHWARTZ - DIRECT / VAN NEST

1   **A.**   Yes.

2   **Q.**   Could you describe for the jurors, what were the Java APIs

3   you worked with at Sun?

4   **A.**   So first it might be helpful to understand what an API is

5   in terms that those of us who don't write code would

6   understand.

7        When you go to a restaurant, there's a menu.  And the menu

8   has on it --

9             **MR. BICKS:**  Expert testimony.

10            **THE COURT:**  All right.  You have to stick to past

11  tense and what was part of your job description at the time;

12  what you did and understood as part of your job back then.

13  Don't put it in present tense.

14       In other words, if you are testifying to something you

15  boned up on recently, you can't do that.  But if this was part

16  of your job back then to know all of this information, and you

17  did know this and used it, you may put it in the past tense.

18  And that's okay.

19       So to that extent, the objection is sustained.  So start

20  over, please.

21            **THE WITNESS:**  To explain then, if I was trying to

22  educate a group of people about what APIs are and still remain,

23  they are ways of getting access to technology.

24       You have to -- just as when you walk into a restaurant you

25  want to see the breakfast items and lunch items and dinner

items, there are ways of explaining to folks what is accessible

in a product and then making them accessible to developers who

might want to use that product.

Similar to when a customer walks into a restaurant, they

want to know what products are available and how they should go

about ordering them.

THE COURT:  That makes no sense to me.  I don't know

what the witness just said.  The thing about the breakfast menu

makes no sense.

Just explain in two sentences back then between the

programming language and the API.

THE WITNESS:  You use a language to write programs.

You are going to incorporate preexisting functionality by

accessing APIs.

THE COURT:  Thank you.

Next question.

MR. VAN NEST:  Thank you, Your Honor.  Much more

clear.

BY MR. VAN NEST

Q.  Was there a set of Java APIs in existence while you were

employed at Sun?

A.  Yes.

Q.  And you had responsibility for those as part of Java?

A.  Back when I was running product marketing, I was aware of

the APIs that existed at the time.  But I wasn't personally

**SCHWARTZ - DIRECT / VAN NEST**

1    creating those APIs.

2  **Q.**   Okay.  Fair enough.

3        What was the purpose for having APIs as part of Sun's

4    offerings?

5  **A.**   They make the underlying technology accessible.  They help

6    organize the technology.  And they give developers the

7    standardized way of writing applications using those

8    preexisting sets of functionality.

9  **Q.**   Did Sun promote the Java APIs along with the language?

10  **A.**   Yes.

11  **Q.**   How did they go about doing that?

12  **A.**   They were promoted across the world.  We wanted people to

13   understand how to write programs.  But then when we wanted them

14   to use preexisting functionality, we delivered our own

15   preexisting functionality.  We licensed those APIs.  We made

16   them broadly available to anybody else who wanted to create

17   technology.

18        So it was one in the same.  We wanted to promote the

19   availability of the programming language, and then we wanted to

20   make the APIs available as well.

21  **Q.**   And were the APIs marketed by Sun along with the language;

22   in other words, as free and open?

23  **A.**   Absolutely, yes.

24  **Q.**   And can you tell the jurors how that was done?

25  **A.**   When you are marketing products to technologists across

**SCHWARTZ - DIRECT / VAN NEST**

1    the world, you are not simply saying, here is the book, good

2    luck.

3        You are saying, here's the download site.  Go download not

4    only technologies that might help you show movies and display

5    pictures and manipulate text or do calculations, you are

6    promoting the language and giving a whole set of APIs and

7    preexisting functionality to those developers.

8    **Q.**   And were the APIs made free and open like the language at

9    that time?

10   **A.**   Absolutely, yes.

11   **Q.**   Okay.  Were the APIs -- during your tenure at Sun, were

12   the Java APIs ever sold or licensed separately from the

13   language?

14   **A.**   No.

15   **Q.**   Did you use the term "open APIs" at Sun in the aughts when

16   you were employed there?

17       (Reporter interrupts.)

18   **Q.**   The aughts.  In the period that you were employed at Sun.

19   **A.**   Absolutely, yes.

20   **Q.**   Tell the jury what open APIs meant at that time.

21   **A.**   So the strategy, which had been the strategy long before I

22   joined Sun, was we agree on APIs, on these open APIs; we share

23   them; and then we compete on implementations.

24       So we have a way to think about, for example, rendering a

25   movie.  And we're going to tell developers how they could go

1    about doing that.  But the code you would use to show the

2    movie, you are going to have to write on your own.  We have to

3    agree on the APIs so that the application I write to show a

4    movie runs on your device.  Then it would still run, but it

5    would run your implementation of how to show a movie.

6        So you agreed at a high level on what you wanted the

7    application to do.  You used a standard set of interfaces.  But

8    then when you went to run the application, you would compete on

9    those implementations.  My movie rendering application would

10   compete against your movie rendering application.

11   **Q.**   You're distinguishing or you distinguished between the API

12   and the implementation.  Can you explain to the jurors what you

13   meant by implementation.

14       We've been hearing about implementing code and that sort

15   of thing.  What do you mean by implementation?

16   **A.**   Can I go back to my restaurant analogy?  Because I think

17   that might be helpful.

18   **Q.**   Well, that didn't work with the judge, but go ahead.

19       (Laughter)

20           **THE COURT:**  If you think it works, go ahead.

21           **THE WITNESS:**  I do think it works.

22       When you walk into a restaurant, there's a menu.  And you

23   understand what the different items on the menu are.  And one

24   restaurant may offer hamburgers.  The hamburgers are the

25   implementation of the item you saw on the menu.

SCHWARTZ - DIRECT / VAN NEST

1         And so when you agree on APIs, you're agreeing on the

2    menus.  And then you all have your own implementation.  The

3    implementations are the products that you create that are

4    accessed through the APIs.

5         So if I write a complicated application server for my

6    enterprise, the way it's used is accessed through a set of APIs

7    that are common to all application servers like that.  And then

8    we compete by delivering our own application server.

9         The reason why you agree on APIs and compete on

10   applications is then you can turn around to another developer

11   who wants to use your application server, and you can say, hey,

12   write to my server; it will run here.  But because we and all

13   these other companies had agreed on APIs, the application you

14   write can work on their servers as well.

15        So it's a way of pooling together resources to make sure

16   we can all agree to a common set of instructions.  And then the

17   applications can run wherever the implementations are

18   available.  But you're not locked into one company's

19   implementation.

20        I hope that was helpful.

21   BY MR. VAN NEST

22   Q.   Well, was it important -- that last phrase you mentioned,

23   you're not tied to one company or locked into one company, why

24   was that particularly important, if it was, at that time?

25             MR. BICKS:  Your Honor, again, the examples and things

SCHWARTZ - DIRECT / VAN NEST

1    like this are really expert testimony.

2              THE COURT:  Well, you have to rephrase it and ask,

3    first, "To what extent, if at all," and stop leading the

4    witness.  You're doing a lot of leading.  To what extent if at

5    all did you think it was important?  That's the proper

6    question.

7              MR. VAN NEST:  There's a good one.

8              THE COURT:  All right.

9              THE WITNESS:  What was important?

10   BY MR. VAN NEST

11   Q.   Having open APIs, so no one company could control things.

12   A.   Having an open API was very important to us.

13            As an example, we agreed on how applications could be

14   written for servers running in big businesses.  The companies

15   we got together to agree on how those applications could be

16   written had names like Oracle and IBM and SAP.  You know, very

17   large companies who if they felt that what Sun was delivering

18   preferenced Sun, they would never agree to work with us.

19            So open APIs allowed us all to say, let's agree on this

20   common set of standards.  And then we'll go be competitive in

21   the marketplace, but we won't have to change what any one

22   company is doing to give anyone a bias or preference.

23            So it was a way to try to make things fair.  We would make

24   the APIs accessible to anyone who was willing to use them, and

25   then we would compete on the implementations of the products

**SCHWARTZ - DIRECT / VAN NEST**

1  that would be built using those APIs.

2  **Q.**   During your tenure at Sun, did you use the phrase

3  "reimplementing APIs"?

4  **A.**   I don't believe I did.

5  **Q.**   Do you know -- well, was the phrase a common one during

6  your tenure at Sun, "reimplementing APIs"?

7  **A.**   I don't recall.

8  **Q.**   Let me ask this question:  During the time you were at

9  Sun, did Sun ever build its own implementations for APIs

10  produced originally by other companies?

11  **A.**   Yes.

12  **Q.**   Can you give us an example?

13       **MR. BICKS:**  Your Honor, on this testimony now we're

14  really getting beyond the disclosures for this witness, because

15  there's no disclosure about API practices and things of this

16  nature.

17       **MR. VAN NEST:**  He was broadly disclosed, Your Honor,

18  on practices regarding Java and APIs at Sun.

19       **MR. BICKS:**  I have it right here.

20       **THE COURT:**  Can I see what you're talking about?

21     (Pause)

22       **MR. VAN NEST:**  Your Honor, I stand by my question.

23       **THE COURT:**  Show me the part that you think picks up

24  this question.

25       **MR. VAN NEST:**  Sun's positions and -- Sun's positions

**SCHWARTZ - DIRECT / VAN NEST**

1    and communications with regard to independent implementations.

2    Sun's actions regarding copyrights.  The history of Java

3    program and the APIs.  His representations to the public.

4    Sun's actions or inactions.  Industry use of and support --

5             **THE COURT:**  We're going to pass this until the jury is

6    not here.

7         You have to go to something else for now.

8             **MR. VAN NEST:**  That's fine, Your Honor.

9    **BY MR. VAN NEST**

10   **Q.**   Mr. Schwartz, during your tenure at Sun, all the way up to

11   the very end, was there ever a time where the Java APIs were

12   considered proprietary to Sun?

13   **A.**   No, never.

14   **Q.**   Did Sun have a trademark for Java?

15   **A.**   Absolutely, yes.

16   **Q.**   And what was the Java trademark?

17   **A.**   The Java trademark was the name as well as the logo.

18   **Q.**   Okay.  And was that licensed to folks for a fee?

19   **A.**   Absolutely, yes.

20   **Q.**   Were your implementations, the implementations that Sun

21   wrote, were those also licensed for a fee?

22   **A.**   It was important that when people went to companies to

23   sell their products, that they could put a logo on the top to

24   say this is Java compatible or this is written to be Java, so

25   that they would understand this is consistent with the Java

SCHWARTZ - DIRECT / VAN NEST

1   that we've all used.

2   **Q.**   And what would be required of someone that wanted to do

3   that?  In other words, represent that their product was Java

4   and have the Coffee Cup.

5   **A.**   In order to call your product Java and to get permission

6   to use that logo, you had to pass a series of tests and

7   compatibility kits that would allow us to say it is compatible,

8   it will run all the applications that run on Java-compatible

9   products.  This one will allow you to run them as well.

10  **Q.**   Now, during your time at Sun were you familiar with an

11  organization --

12          **THE COURT:**  What was that test called?

13          **THE WITNESS:**  I don't recall.  The TCK.  The test

14  compatibility kit.

15          **THE COURT:**  All right.  Go ahead.

16          **MR. VAN NEST:**  TCK.  That's right.

17  **BY MR. VAN NEST**

18  **Q.**   Did folks have to pay a fee to take the TCK?

19  **A.**   Folks had to pay a fee if they wanted to show that logo.

20          And there were several companies that -- and organizations

21  that had no interest in displaying that logo.  They didn't have

22  to pay anything.

23  **Q.**   And why was that?

24  **A.**   Because they didn't get anything -- you know, they weren't

25  going to get the benefit of calling their product Java

**SCHWARTZ - DIRECT / VAN NEST**

```
 1   compatible or Java.
 2   Q.   During your tenure at Sun, was it permissible for a third
 3   party like that to use the APIs with their own implementation
 4   without a license from Sun?
 5             MR. BICKS:  Again, Your Honor, objection.
 6             THE COURT:  Sustained.  You need to rephrase that.
 7             MR. VAN NEST:  All right.
 8             THE COURT:  That calls for a legal conclusion.
 9   BY MR. VAN NEST
10   Q.   Let me rephrase it.
11        What was the practice at Sun, during your tenure, with
12   respect to third-party implementations of the Java APIs?
13             MR. BICKS:  Again, Your Honor, that's beyond the scope
14   and not fact testimony.
15             THE COURT:  Where does that -- well, where does it
16   show up in the scope of this designation?
17        I think it falls within the scope.  This question does
18   fall within the scope.  And so objection overruled.
19        Please answer the question.
20             THE WITNESS:  Can you repeat the question.
21   BY MR. VAN NEST
22   Q.   What was the practice at Sun during your tenure -- during
23   your tenure there, with respect to third parties who used the
24   APIs with their own implementations?
25   A.   There was nothing we could do to stop it.  It was
```

**SCHWARTZ - DIRECT / VAN NEST**

1    completely -- you know, it was fair.  It's what they were --

2    they weren't asking us to put our logo on it, and they weren't

3    asking us to call it Java or bless or endorse it.

4        So we would -- you know, one of the many projects that

5    were out there that was doing exactly this, was a project

6    supported by Oracle called Apache Harmony.  And they wanted us

7    to give them our brand.  They wanted to call it Java.  We kept

8    saying no, you have to pay us a fee to do that.  They didn't

9    pay us a fee.  They didn't get to use the logo.

10            **MR. BICKS:**  Your Honor, this is the topic that we

11    really talked about in the in limine that, I think, is off

12    limits.

13            **MR. VAN NEST:**  I don't believe so, Your Honor.

14            **THE COURT:**  Well, I need to remind the jury of

15    something, which is that it is -- I'm not saying that what the

16    witness says is true, not true.

17        I'm just giving you a fact, that the declaring code for

18    these 37 APIs are copyrighted.  And so is the structure,

19    sequence and organization of those 37.  And that comes to us as

20    a given.  Regardless of what the witness may say or not say,

21    that is now the law in this case.

22        However, what the witness's attitude toward it was back at

23    the time in question, you may consider that.  But that does not

24    change the fact that Oracle and Sun at the time did have a

25    right, if it wished, to enforce the declaring code as a

1    copyright, as well as the structure, sequence and organization

2    of those 37 APIs.

3         There.  That's the best I can do for the moment.

4              MR. VAN NEST:  Thank you, Your Honor.

5              THE COURT:  All right.  Now, but this witness should

6    not get into legal opinions.  In fact, I think he's gotten

7    enough into a legal opinion that we're going to have to have a

8    discussion about that thing we were discussing before.  Go

9    ahead.

10             MR. VAN NEST:  All right.  Thank you, Your Honor.

11   BY MR. VAN NEST

12   Q.   During your time at Sun, Mr. Schwartz, were you familiar

13   with an organization called GNU?

14   A.   Yes.  Quite familiar.

15   Q.   What is GNU?

16             MR. VAN NEST:  And GNU is G-N-U, Katherine.  Excuse

17   me.

18             THE WITNESS:  Which is a little recursion that stands

19   for GNU is not UNIX.

20             THE COURT:  Say that again.  I want the jury to

21   understand.  I still don't understand it.

22        (Laughter)

23             THE COURT:  Give us 30 seconds on GNU.

24             THE WITNESS:  There's a very smart man who won a

25   MacArthur Prize -- if you know what they are; they're prizes

**SCHWARTZ - DIRECT / VAN NEST**

1   that recognize genius -- named Richard Stallman, who had a

2   belief that software should be written and made freely

3   available in the world.  And it was a great inspiration.  It

4   created --

5             THE COURT:  No, no, no.  Now you're giving a speech

6   for open source.

7             (Laughter)

8             THE WITNESS:  So the license --

9             THE COURT:  Tell us what GNU means.

10            THE WITNESS:  So the licenses that he used, though, to

11  make sure that if you got the benefit of that code that you

12  couldn't just walk away with it, was a license called the GPL.

13  Which basically said, and GNU pioneered, if you take our code,

14  then your obligation is to give back whatever enhancements you

15  make to the comments to everyone else.

16  BY MR. VAN NEST

17  Q.   I think the other question was, what does GNU stand for?

18            THE COURT:  Yeah, G-N-U.

19            THE WITNESS:  GNU is not UNIX.

20  BY MR. VAN NEST

21  Q.   GNU is not UNIX?

22  A.   Yes.

23  Q.   What does that mean?

24            MR. BICKS:  Your Honor, again, there's a relevance

25  issue here.

```
 1              THE COURT:  Oh, come on.

 2         (Laughter)

 3              THE COURT:  I struggle myself.  I spent -- I spent ten

 4    minutes trying to figure that out myself, because -- so the G

 5    part stands for what?  GNU?

 6              THE WITNESS:  GNU.

 7              THE COURT:  So it's like a repetitive thing?

 8              THE WITNESS:  It's a recursion.

 9              THE COURT:  Okay.  So GNU not UNIX.

10         And UNIX is some other kind of operating system; right?

11              THE WITNESS:  Yes.

12              THE COURT:  All right.  Enough on that.  Let's move

13    on.

14         (Laughter)

15              THE WITNESS:  UNIX had a series of APIs.

16              THE COURT:  No, no.  The end of this speech.

17         Next question.

18         (Laughter)

19    BY MR. VAN NEST

20    Q.   Okay.  So let's go back.  During your tenure at Sun, you

21    were aware of a group called GNU.  Were you aware of a project

22    called GNU Classpath?

23    A.   Yes.

24    Q.   What was that?

25    A.   Uhm, when that same group decided they were going to
```

1    create an open source version of Java, there was a problem.

2    Because the idea that -- the way the license in that world

3    works is if you use any technology that links to the Foundation

4    technology, you have to give everything you wrote back to the

5    public.

6        And the definition of depending upon the underlying code

7    that would trigger your obligation to give everything back to

8    the world was kind of impractical for people who didn't want to

9    give everything that they had ever written back to the public.

10       So there was a technology called Classpath, which was a --

11   an open source version of Java.  And there was an exception in

12   that technology that basically allowed you not to have to give

13   all of your code back to the public.

14   **Q.**   I want to ask a more basic question, and that is:  The GNU

15   Classpath Project, was it using the Java programming language?

16   **A.**   Absolutely, yes.

17        **MR. BICKS:**  Your Honor, I would object to this

18   testimony given the Court's ruling on custom.  This is beyond

19   the scope of what the Court --

20        **MR. VAN NEST:**  I'm trying to establish what this --

21        **THE COURT:**  Well, I did say that the -- didn't I say

22   that we could get into --

23        **MR. VAN NEST:**  Yes.

24        **THE COURT:**  GNU was relevant on the Classpath

25   Exception.

1          MR. VAN NEST:  Yes.

2          THE COURT:  I think I did say that.

3          MR. VAN NEST:  You did.

4          THE COURT:  So this part is okay.

5    BY MR. VAN NEST

6    Q.   So was GNU also using the Java APIs?

7    A.   Yes.

8    Q.   What was GNU doing with the Java APIs?

9    A.   They were creating a free open source version of Java.

10   Q.   Okay.

11          THE COURT:  Wait.  Let's be clear.

12       Are you saying they had their own implementations on the

13   APIs?  Or they were using the Sun implementations?  Which one

14   was it?

15          THE WITNESS:  They were using the implementations that

16   were available to them.

17          THE COURT:  You mean Sun's?  What do you mean?

18          THE WITNESS:  The -- yes.  They were using the Java

19   APIs as they existed in the marketplace.

20          THE COURT:  With the Sun implementations?

21          THE WITNESS:  No.  They were using their own -- they

22   were creating their own GPL version of Sun technology.

23          THE COURT:  All right.

24          THE WITNESS:  Using a standard set of APIs.

25

1    BY MR. VAN NEST

2    Q.    Just so it's clear for all, they were using the Java APIs

3    that were free and open; correct?

4    A.    Yes.

5              MR. BICKS:   Your Honor --

6    BY MR. VAN NEST

7    Q.    And the implementation --

8              THE COURT:   Wait, wait, wait.   This is leading.

9              MR. VAN NEST:   I'll withdraw the question, Your Honor.

10   Let me just clarify.

11   BY MR. VAN NEST

12   Q.    The implementing code in GNU Classpath was created by

13   whom?

14   A.    By people in the community who were interested in seeing a

15   free version of Java made available.

16   Q.    Okay.   And did GNU Classpath ever take a license from Sun?

17   A.    Absolutely not.

18   Q.    Did Sun ever interfere with what GNU was doing with its

19   Java implementations?

20             MR. BICKS:   Your Honor, again, this is beyond the

21   scope of what the Court has ruled is in play here.

22             THE COURT:   No, this is okay.   Overruled.

23        Go ahead.   Answer the question.

24             THE WITNESS:   No, we did not interfere with them.

25

1    BY MR. VAN NEST

2    Q.    Why not?

3            THE COURT:  No.  This is going to get into legal

4    issues, isn't it?

5            MR. VAN NEST:  I don't think so, Your Honor.  But I

6    understand the Court's concern.  Let me move on for just a

7    minute, and I'll ask a different question.

8    BY MR. VAN NEST

9    Q.    Were you satisfied, as the CEO of Sun, that GNU's use of

10   the Java APIs was consistent with your business practices at

11   that time?

12           MR. BICKS:  Again, Your Honor, objection.  Leading.

13           THE COURT:  Well, he's trying to avoid a legal

14   problem.  All right.  I'll let you do it at this -- overruled.

15       Please answer the question.

16           THE WITNESS:  Can you repeat the question.

17   BY MR. VAN NEST

18   Q.    I will try.

19       As the CEO, were you satisfied --

20           THE COURT:  Instead of leading, you can say, To what

21   extent, if at all, were you satisfied?

22           MR. VAN NEST:  Perfect.

23           THE COURT:  To what extent, if at all.  That always

24   solves the legal problem.

25

SCHWARTZ - DIRECT / VAN NEST

1   BY MR. VAN NEST

2   Q.   To what extent, if at all, were you satisfied that GNU's

3   use of the APIs, the Java APIs, was consistent with the

4   business practices and policies of Sun at the time?

5           THE COURT:   But not legal.   Don't get into legal

6   issues.

7   BY MR. VAN NEST

8   Q.   Business practices and policies, please, Mr. Schwartz.

9   A.   I was annoyed, but it was completely consistent with our

10  practices.   It was competitive to what we were doing.

11  Q.   And when you say it was consistent with your practices,

12  what do you mean?

13  A.   When you say open APIs will compete on implementations, it

14  has to mean they are going to be competitive implementations.

15  That's annoying if you're trying to get everybody to buy your

16  product.

17  Q.   Okay.   Were there some respects which, in your view, GNU

18  Classpath benefited Sun?

19          MR. BICKS:   Again, Your Honor, this is leading.

20          THE COURT:   Sustained.   To what extent, if at all.

21     (Laughter)

22  BY MR. VAN NEST

23  Q.   To what extent, if at all, Mr. Schwartz, did the

24  activities of GNU benefit Sun?

25  A.   They were beneficial to the extent that if you make a

**SCHWARTZ - DIRECT / VAN NEST**

1    product freely available, by definition the more people use it

2    the more they have chosen your technology rather than someone

3    else's.

4         And so we knew that by their creating their own

5    implementation, they would promote it and distribute it

6    aggressively throughout the world.

7         And although it wasn't our technology, at least it was

8    running Java and it wasn't running Microsoft Windows.  That

9    would be beneficial to us because after the fact we could sell

10   products that supported it.

11   Q.   Now, during your employment at Sun, were you also familiar

12   with the Apache Software Foundation?

13   A.   I was.

14   Q.   What was that?

15   A.   A group of public-spirited individuals who come together

16   to try to solve problems with free software.

17   Q.   And were there company sponsors of the Apache Software

18   Foundation?

19   A.   There were many.

20   Q.   Can you give our jurors examples of a few.

21   A.   Oracle was an aggressive supporter of the Apache Software

22   Foundation.  IBM was a supporter of the Foundation.  Sun was

23   occasionally a supporter of the Foundation.

24   Q.   Were you familiar with the Apache Harmony Project?

25   A.   Intimately.

**SCHWARTZ - DIRECT / VAN NEST**

1   Q.   What was the Apache Harmony Project?

2   A.   The Apache Harmony Project was a competitive Java

3   implementation that was supported by the companies I just

4   mentioned, that -- and I was aware of them because they

5   continually came back to us saying, we would like to call our

6   product Java, and we would like to use the brand, but we don't

7   want to pay you any money.

8   Q.   What was Apache Harmony?  What was the product, itself, or

9   the platform?

10  A.   It was a Java virtual machine.  It was the underlying

11  implementation that would allow you to run a Java application.

12  Q.   Were there Java libraries as well?

13  A.   Yes.

14  Q.   And I assume Harmony was using the Java programming

15  language?

16  A.   It absolutely was.

17  Q.   Was it also using the Java APIs?

18  A.   It absolutely was.

19  Q.   And where did the implementation for the Apache libraries

20  come from, the implementing code?

21  A.   The community of individuals who helped with it, which

22  included, again, Oracle, IBM, other companies.

23  Q.   So was it your understanding companies were contributing

24  code to the Harmony project?

25  A.   Absolutely, yes.

**SCHWARTZ - DIRECT / VAN NEST**

1    Q.    Did -- was Apache Harmony's use of Java and the APIs

2    similar to what GNU was doing?

3    A.    It was.

4    Q.    Were there differences?

5    A.    The one primary difference between products created in the

6    Apache world versus products created in the GNU world, the GNU

7    license, the license that you -- you took when you started

8    using their technology required you to give back any

9    improvement you made to their code to the community.

10          The Apache license was very different.  It was much

11   friendlier to businesses.  It said you could use whatever you

12   want.  You don't have to pay us anything.  And if you embed our

13   product, you don't have to give back anything that you're

14   embedding with it.  So it made it much more business friendly.

15   Q.    Did Apache Harmony ever have a license from Sun?

16   A.    No, they did not.

17   Q.    Did Sun do anything to interfere with Apache making the

18   Harmony product available?

19   A.    There was nothing we could do.  And there's nothing we

20   did.

21   Q.    And to what extent, if any, were you satisfied as CEO that

22   Harmony's use of the Java APIs was consistent with the business

23   practices and policies of Sun at that time?

24   A.    Again, it was frustrating.  But it was consistent with our

25   business practices.  It was a competitor to our core products,

**SCHWARTZ - DIRECT / VAN NEST**

 1    one that was being promoted by other big companies.  But it was

 2    not going to call itself Java, so there was nothing we could do

 3    to say you're not allowed to do that anymore.

 4    **Q.**   And to what extent, if any, did Apache Harmony benefit

 5    Sun?

 6    **A.**   Again, similar to the GNU project, it promoted the

 7    availability of Java.  If you were going to pick -- you know,

 8    the more products there are that are competitive, ultimately

 9    the more accessible those products will be to different types

10    of people and different interest groups and different

11    communities around the world.

12    **Q.**   Did there come a time in your tenure at Sun, Mr. Schwartz,

13    where Sun and Google discussed a partnership for a mobile

14    phone?

15    **A.**   Yes, we did.

16    **Q.**   And did you play a role in those discussions?

17    **A.**   Yes, I did.

18    **Q.**   Did you personally discuss the proposal, from time to

19    time, with Mr. Schmidt?

20    **A.**   Yes, I did.

21    **Q.**   And I guess you knew Mr. Schmidt -- you had known

22    Mr. Schmidt for a long time?

23    **A.**   Yes.

24    **Q.**   Can you tell the jury, from your perspective as CEO, what

25    was Sun looking for in terms of a partnership with Google?

1   **A.**   Sun was looking for Google to promote the brand.

2        Having Google endorse Java and endorse that logo and the

3   brand Java would mean that lots of other companies would want

4   to pick up the product from Sun that had that brand and had

5   that logo.

6        So we wanted Google to use the Java from Sun because that

7   would create more market opportunity for Sun, and make Sun a

8   little bit more relevant in the marketplace.

9   **Q.**   Was there certain Sun technology that you were willing to

10   contribute to the partnership?

11   **A.**   Yes.   We would have made significant contributions to the

12   partnership in exchange for having Google call their product

13   Java.

14   **Q.**   And what were the -- what were the contributions you were

15   contemplating at that time?

16   **A.**   Whatever technical assistance Google needed to incorporate

17   our technology into their phone.

18   **Q.**   Would that have included the virtual machine and the

19   implementing code?

20   **A.**   Yes.

21   **Q.**   Would it have included, at some point, the Java brand?

22   **A.**   Uhm, under the appropriate commercial license, yes.

23        **MR. VAN NEST:**   Okay.   I'd like to put up TX 205.

24   And may I approach the witness, Your Honor?

25        **THE COURT:**   You may.   And don't stop now, but tell me

**SCHWARTZ - DIRECT / VAN NEST**

1    how much more you have on direct.

2              MR. VAN NEST:  I have probably another 25 minutes.  Or

3    30.

4              THE COURT:  All right.  Let's do this document, and

5    then we're going to take a 15-minute break.

6              MR. VAN NEST:  Okay.

7    **BY MR. VAN NEST**

8    Q.    This document is Trial Exhibit 205.  Would you take a look

9    at that, Mr. Schwartz, and tell me whether you recognize it.

10   A.    I do recognize it.

11             MR. VAN NEST:  Okay.  Let's display this.  It's

12   already in evidence, Your Honor.

13        (Document displayed.)

14   **BY MR. VAN NEST**

15   Q.    This is an email between you and Mr. Schmidt in February

16   of 2006?

17   A.    Yes.

18   Q.    And Mr. McNealy is involved as well?

19   A.    Yes, he is.

20   Q.    Who is Mr. McNealy?

21   A.    In February of 2006, he was then the chief executive

22   officer of Sun Microsystems.

23   Q.    And this is just before you became the CEO?

24   A.    Yes.

25   Q.    Let's go down to the -- Mr. Schmidt writes -- second

1  paragraph there, please -- "Google has engaged Sun's Java team

2  in an effort to form an alliance around our open handset

3  platform."

4       Had you been familiar with discussions along those lines

5  up to that point?

6  A.   Somewhat, yes.

7  Q.   What was being discussed?

8  A.   An attempt to bring together a diversity of players around

9  the industry, to all agree on a common handset platform, a

10 common software environment to make it easier to build a phone

11 that would -- that would be useful around the world.

12 Q.   And then at the very top of what Mr. McNealy responded, he

13 says, "Jonathan and his team" --

14          MR. VAN NEST:   Can we go up to the top, please, Mr.

15 Dahm.

16       (Document displayed.)

17 BY MR. VAN NEST

18 Q.   "Jonathan and his team are on top of this."  I take it

19 that's a reference to you?

20 A.   Yes.

21 Q.   You were responsible for the negotiating team at Sun at

22 that time?

23 A.   I was involved in the negotiation, but I wasn't

24 responsible for the negotiation.

25 Q.   Okay.  Fair enough.

PROCEEDINGS

1          **MR. VAN NEST:**  Your Honor, I think this would be a

2     good time to take the break that you asked about.

3          **THE COURT:**  All right.  We will -- 15 minutes.  Please

4     don't discuss the case.  We'll see you back here then.

5          **THE CLERK:**  All rise.

6          (Jury out at 9:21 a.m.)

7          **THE COURT:**  All right.  The witness can step down.

8     Everyone be seated.  The witness can step down and out

9     into the hallway.  Please be back in 15 minutes.

10    And let's have a discussion with the lawyers for a minute.

11    Let's go back to the question about --

12         **MR. VAN NEST:**  Your Honor, I'll pass that question.

13    We don't need to spend time on it.

14         **THE COURT:**  I was going to rule against you anyway.

15    (Laughter)

16         **THE COURT:**  All right.  So you're passing that

17    question.

18    Now let's go to the second question, which is the -- on

19    cross-examination can Mr. Bicks get into that thing about the

20    arguably privileged that Oracle-Google -- I'm sorry, Oracle

21    lawyer said they couldn't ask about.

22         **MR. VAN NEST:**  I'm sorry, are you --

23         **THE COURT:**  Well, let me tell you the problem.  I'm

24    just thinking out loud.

25    Mr. Bicks, are you listening?

PROCEEDINGS

```
 1          MR. BICKS:  Yes, I am.

 2          THE COURT:  All right.  I can't control everything

 3   that happens with witnesses.

 4      This witness slipped in a number of things before the jury

 5   such as, We didn't -- came very close to saying, We had no

 6   legal right to stop GNU, we had no legal right to stop Android,

 7   and made it sound like there were no proprietary rights and so

 8   forth.

 9      So I'm going to let you use that, even though you

10   shouldn't be allowed to because you stonewalled at the

11   deposition.

12          MR. BICKS:  It wasn't me, Your Honor.  I wasn't even

13   there.

14          THE COURT:  It wasn't you.

15      But because Google has gotten away with more than I think

16   they should have gotten away with, with this witness, in

17   slipping those things in about they didn't have them --

18   Mr. Schwartz believes that; you can't stop him -- you're going

19   to get a little bit more flexibility than you deserve.  So you

20   can use those two lines from the document that you stonewalled

21   in the deposition.

22      Who is the lawyer who did that?  Is that lawyer here?

23          MR. VAN NEST:  No.

24          THE COURT:  Well, you go back and tell that lawyer how

25   much trouble they caused and that they shouldn't stonewall next
```

 1   time.

 2              **MR. VAN NEST:**  Your Honor --

 3              **THE COURT:**  But at least in the Lindholm situation we

 4   had it fully briefed, and everything, ahead of time.  This is

 5   coming up on the fly.

 6       And I know I'm being somewhat inconsistent, but it's not

 7   dramatically inconsistent.  And there are good reasons of

 8   fairness to allow Mr. Bicks to use that snippet.  So that's

 9   what's going to happen.

10              **MR. VAN NEST:**  I'm going to be vigilant, Your Honor,

11   as to my stipulation.  Because I do think if he gets into legal

12   issues, then my agreement to stay away from those --

13              **THE COURT:**  But your witness is saying things like, We

14   couldn't stop them anyway.  Things like that.

15              **MR. BICKS:**  And it was over your admonition, Your

16   Honor, that he did it.  I kept objecting.

17              **MR. VAN NEST:**  He's -- excuse me.

18              **MR. BICKS:**  It was inappropriate.

19              **THE COURT:**  Well, look.  It's a vague/close line

20   between a legal thing versus what he actually said.  It's like

21   getting right up to the creepy line.

22          (Laughter)

23              **MR. BICKS:**  But not going over it.

24              **THE COURT:**  But not going over it.

25       So -- but I'm going to let you use that snippet to -- it's

PROCEEDINGS

```
1    the best I can do on this mess.

2        All right.  Anything else I can help you with?

3            MR. VAN NEST:  I don't believe so, Your Honor.

4            THE COURT:  205 was not moved into evidence.

5            MR. VAN NEST:  It's in evidence already, Your Honor.

6            THE COURT:  It's already in evidence?

7            MR. VAN NEST:  Yes.  I'm sorry.  I said that, but --

8            THE COURT:  Yes, you did.

9        All right.  We'll take 15 minutes.

10       (Recess taken from 9:25 to 9:37 a.m.)

11           THE COURT:  All right.  Let's go back to work.  Please

12   be seated.

13           THE CLERK:  Please come to order.  Court is now in

14   session.

15           THE COURT:  Can we get started?  Ready?

16       MR. BICKS:  Yes.

17           MR. VAN NEST:  We have some depositions to hand up

18   while we've got them over here.

19           THE COURT:  Mr. Bicks has something he wants to raise.

20       Mr. Bicks.

21           MR. BICKS:  I want to make it clear, Your Honor, on

22   your in limine ruling on May 5th, 2016, that I was objecting on

23   the basis of, made it clear that when it came to the GNU

24   Classpath, that it was only coming in on fragmentation issues

25   and to the extent there was any alternative to essentially
```

**PROCEEDINGS**

1    taking our client's property.  And it was a very narrow

2    exception.  And --

3          THE COURT:  My law clerk will go get my copy.

4          MR. BICKS:  And that testimony I was objecting.  And

5    that went beyond what the Court has already ruled was in fair

6    play.

7          MR. VAN NEST:  I don't believe so, Your Honor.  But

8    I'm not --

9          THE COURT:  I'm not going to strike anything now, but

10   I should get a copy of my ruling.

11         MR. BICKS:  I mean, I have it here, Your Honor.

12         THE COURT:  I want to get -- let me get mine because I

13   always have to give you back what I get from you.

14         MR. BICKS:  All right.

15         MR. VAN NEST:  Your Honor, these are a few more

16   deposition designations, which I'll hand up, that have been

17   prepared by the parties.

18      Thank you.

19         THE COURT:  I want to -- I think I found a way to

20   solve your problem of over-designation.  Are you ready for the

21   answer?

22         MR. VAN NEST:  I'm not sure.

23      (Laughter)

24         THE COURT:  All right.  Here's the answer:  Right now

25   there's a procedure in place where the party who's calling the

**PROCEEDINGS**

1    witness has to say what their documents are going to be on

2    their direct.  And then there's a passage of time, and then the

3    other side gets to say what the -- what their documents are

4    going to be on cross-examination.

5         And there are certain benefits of doing it soon enough.  I

6    have forgotten exactly how it works.  But, anyway, to solve

7    your problem, if the cross-examiner designates more than 30 and

8    more than twice as many as the direct examination, then they've

9    got to do it eight hours sooner.  That will give both sides an

10   incentive to reduce the number of documents that they

11   designate, all right.

12        Now, if anybody has real heartburn over that, just let me

13   know.  That's going to be the order.  But we don't have time to

14   debate it now.  But we can debate it at the next break if you

15   feel that's going to be a disaster for you.  But that way you

16   will have an incentive to -- so listen.  I'll just give you an

17   example.

18        Let's say that the direct examiner designates 25

19   documents.  Then you could designate 50 and still be okay, and

20   do it on the normal time.  But if you designated 51, that would

21   be more than 30.  It would be more than twice as many and,

22   therefore, you would be in trouble and have to do it eight

23   hours sooner.

24             MR. VAN NEST:  Thank you, Your Honor.

25             THE COURT:  Are we ready to go with the witness?

```
1              MR. VAN NEST:  I sure am.

2              THE COURT:  Let's bring -- where did Dawn go.

3              MR. VAN NEST:  I think she went back with the jurors.

4              MS. HURST:  Your Honor, we have counter-designations

5      for those ones that were just handed up.

6              THE COURT:  Wait a minute.  You mean it's not already

7      put together?  Aren't they supposed to be lumped together?

8              MS. HURST:  You handed them --

9              MR. VAN NEST:  Right.  You had the package, Your

10     Honor.

11             THE COURT:  Dawn, we're ready for the jury.

12             THE CLERK:  You are ready.

13             THE COURT:  Yeah, we're ready.

14             THE CLERK:  All rise.

15        (Jury enters at 9:41 a.m.)

16             THE COURT:  Be seated, please.  Thank you.

17        All set over there?  Ready?  Great.

18        Mr. Van Nest, please continue.

19             MR. VAN NEST:  Thank you, Your Honor.

20        May I approach the witness?

21             THE COURT:  Yes, you may.

22     BY MR. VAN NEST

23     Q.   Mr. Schwartz, please take a look at Trial Exhibit 435.

24             MR. VAN NEST:  Your Honor, it's already in evidence.

25     Could we display it for the jury?
```

SCHWARTZ - DIRECT / VAN NEST

1        THE COURT:  Yes.

2          (Document displayed.)

3    BY MR. VAN NEST

4    Q.    And tell us whether or not you recognize it.

5    A.    I do.

6    Q.    It appears to be an email between you and Mr. Schmidt in

7    April of 2006; is that right?

8    A.    That is right.

9    Q.    And just to orient with our timeline, we're now in April

10   of 2006.  And you and Mr. Schmidt are communicating by email.

11        MR. VAN NEST:  Can I have the first line, please?

12        "Eric, my team has alerted me that our negotiations to

13   jointly create a Java/Linux mobile phone platform are at an

14   impasse."

15        What did you mean by "Java/Linux mobile phone platform"?

16   What were you referring to?

17        THE WITNESS:  Our understanding at the time was that

18   Google was going to use Java as the interfaces that developers

19   would write applications to.

20        And then Linux would be the underlying operating system

21   that would make all the guts of the phone work.  But what

22   developers would see would be Java.

23   BY MR. VAN NEST

24   Q.    When you say "Java," you mean the Java programming

25   language?

SCHWARTZ - DIRECT / VAN NEST

1    **A.**    Yes.

2    **Q.**    Would that have included the Java APIs?

3    **A.**    Yes.

4    **Q.**    So as of April of 2006, you were aware of that?

5            **MR. BICKS:**  Again, Your Honor, leading.

6            **THE COURT:**  Well, it is leading.  It's preliminary

7    enough it's probably okay.  But try not to lead on so much.

8        Sustained for now.

9            **MR. VAN NEST:**  Okay.  I think the witness has answered

10   the question, Your Honor.

11   **BY MR. VAN NEST**

12   **Q.**    There's reference to an impasse.  What was the impasse at

13   the time?

14   **A.**    They weren't agreeing to pay us any money.

15   **Q.**    Okay.

16   **A.**    We could not construct a commercial relationship.

17   **Q.**    All right.  And the third paragraph says, "Sun is ready to

18   embrace Google's innovation in order to make sure Google apps

19   will shine.  However, we're not willing to cede complete

20   control of the management hosting authorizing committers for

21   key components of the stack."

22        What did you mean by that?

23   **A.**    First of all, that we wanted a relationship with Google.

24   If we had a relationship with Google, that would make Java more

25   popular, again, around the world, just creating more market

SCHWARTZ - DIRECT / VAN NEST

1   opportunity.

2       What we were trying to do was to insert ourselves to

3   become the app store for the Google phone.  And to make sure

4   that when we built this in open source, the people who made a

5   decision about what went into the platform, the committers,

6   would be people that Sun employed, so we could have some

7   semblance of control about how the underlying technology would

8   move forward.

9   Q.   Ultimately, Mr. Schwartz, were you able to work out a deal

10  with Google?

11  A.   No.

12  Q.   Can you tell the jury, just in a general sense, what were

13  the points on which the deal fell apart?

14  A.   I wasn't that close to the specifics of the deal.  What we

15  knew and we had seen before is Google was a very capable

16  company.  They could make a decision at any point just to say,

17  We're going to go build this on our own.

18       MR. BICKS:  Your Honor, again, I would move to strike

19  that in light of the lack of foundation.

20       THE COURT:  Well, the part about we're going -- it's

21  ambiguous, but the part, the sentence that says, "They could

22  make a decision at any point just to say, We're going to go

23  build this on our own," that will be stricken because it's

24  inconsistent with the law that we now have controlling this

25  case.  Arguably.

1    I'm not sure what the witness meant, but it's ambiguous.

2    So I'm going to make that very clear to the jury that -- again,

3    I'm going to repeat, the 37 APIs of declaring code in the

4    structure, sequence and organization are copyrightable.  And

5    the issue for you to decide is whether or not the use by Google

6    was fair use.

7        So I'm just going to let -- that one sentence is going to

8    be stricken, but go ahead.

9            MR. VAN NEST:  Thank you, Your Honor.

10   BY MR. VAN NEST

11   Q.   Did negotiations break down over money?  Was it a money

12   issue at the end of the day, Mr. Schwartz, or not?

13   A.   I think it was a combination of money and technical

14   independence.  Google didn't want to rely, as best I

15   understood, on anyone else.

16           MR. BICKS:  Your Honor, again, speaking about

17   understanding about somebody else is not competent testimony.

18           THE COURT:  Well, he's explaining -- it's true, it is

19   hearsay.  But he's explaining why he understood the deal fell

20   apart.  So that's okay.  That answer will stand.

21   BY MR. VAN NEST

22   Q.   Can you tell us whether or not at that time Sun would have

23   been willing to pay money to be part of the Android project?

24           MR. BICKS:  Objection, Your Honor.

25           THE COURT:  That's a present-tense thing.

SCHWARTZ - DIRECT / VAN NEST

1      If he had an opinion at the time and actually thought

2   about it back then, okay, you can ask that.  But present-day

3   opinion is just speculation.

4           MR. VAN NEST:  I thought that's --

5           MR. BICKS:  He's asking what somebody would have done.

6           MR. VAN NEST:  At the time --

7           THE COURT:  Well, let me -- you could ask this

8   question:  Back at the time, did you consider, would you have

9   done this, A, B, C.  If the answer is actually yes, we did

10  consider that, then, okay, what was your thinking on that

11  point?  That's okay.  That's a historical fact.  That will come

12  into evidence.

13  BY MR. VAN NEST

14  Q.   Back at the time, Mr. Schwartz, did you consider whether

15  or not Sun would be willing to pay money to be part of Android?

16  A.   Back at the time, we considered paying money, making

17  contributions, assigning developers to the task.  We really

18  wanted Google to incorporate Java and help us promote it around

19  the world.

20  Q.   And what was your thinking around that?  Strike that.  I

21  think you've answered the question.

22      Now, during your time as CEO, did you maintain a corporate

23  blog, Mr. Schwartz?

24  A.   Yes, I did.

25  Q.   And what was it called?

```
 1   A.    It's been a long while.  "Jonathan's Blog."  It wasn't

 2   very creative.

 3         (Laughter)

 4   Q.    Where was Jonathan's Blog posted?

 5              THE COURT:  Blog or log?

 6              THE WITNESS:  Blog.

 7              MR. VAN NEST:  Blog with a b.

 8              THE COURT:  All right.

 9   BY MR. VAN NEST

10   Q.    Where was it hosted, Mr. Schwartz?

11   A.    On Sun.com.

12   Q.    Okay.  What was the purpose of having a blog for the CEO?

13   A.    To communicate on behalf of the corporation, to help

14   customers, employees, shareholders understand where we were

15   heading.

16   Q.    When you made statements on the blog, were you, at that

17   time, speaking on behalf of the company?

18   A.    Absolutely.

19   Q.    What types of information would you typically post on the

20   blog?

21   A.    I would post anything that I thought would drive awareness

22   of what we were trying to do, that would attract new employees,

23   that would attract new investors, that would more clearly

24   articulate to customers where we were headed.

25         It was meant as a direct means of communicating with the
```

SCHWARTZ - DIRECT / VAN NEST

1    world.  Rather than going through people who would interpret
2    what we were doing, we wanted to speak directly.
3    **Q.**   And did you consider, at the time, the blog to be an
4    official statement of Sun itself?
5    **A.**   It was an official statement.
6    **Q.**   What do you mean by that?
7    **A.**   It was how we announced our quarters.  It was how we told
8    the SEC to view our statements we were making, the regulatory
9    agency that oversees companies.  So it was very much a formal
10   mechanism for us to communicate with the world about where we
11   were headed.
12   **Q.**   Now, when Android was announced, did you publish a
13   statement on your official company blog?
14   **A.**   Yes, I did.
15          **MR. VAN NEST:**  May I approach the witness, Your Honor?
16          **THE COURT:**  Yes, you may.
17   **BY MR. VAN NEST**
18   **Q.**   Mr. Schwartz, if you would please identify Trial Exhibit
19   2352.
20          **MR. VAN NEST:**  This is in evidence, Your Honor.
21   **BY MR. VAN NEST**
22   **Q.**   What is it?
23   **A.**   It is a blog from November of 2007.
24   **Q.**   Okay.
25          **MR. VAN NEST:**  And could we publish it to the jury,

**SCHWARTZ - DIRECT / VAN NEST**

1    please, first paragraph.

2            (Document displayed.)

3    **BY MR. VAN NEST**

4    **Q.**   Mr. Schwartz, let's come back to our timeline.

5    Discussions with Google, we're showing, ended in around May of

6    2006.

7            Is that consistent, roughly, with your recollection.

8    **A.**   Yes.

9    **Q.**   And then in November of 2007, that's the date of your blog

10   post?

11   **A.**   Yes.

12   **Q.**   So we're a year and a half later.

13           The very first paragraph says, "I just wanted to add my

14   voice to the chorus of others from Sun in offering my heartfelt

15   congratulations to Google on the announcement of their new

16   Java/Linux phone platform, Android.  Congratulations."

17           When you said "Java/Linux phone platform," what were you

18   referring to there?

19   **A.**   The fact they were going to use the Java programming

20   language and build a phone using the Linux operating system.

21   **Q.**   And there's a reference in the next paragraph.

22           **MR. VAN NEST:**  Let's highlight that.  Can we make it

23   bigger?  There we go.  Okay.

24   **BY MR. VAN NEST**

25   **Q.**   The last sentence there says -- let me read the first one.

1        "I'd also like Sun to be the first platform software

2   company to commit to a complete developer environment around

3   the platform as we throw Sun's NetBeans developer platform for

4   mobile devices behind the effort.  We've obviously done a ton

5   of work to support developers on all Java-based platforms.

6   We're pleased to add Google's Android to the list."

7        What is NetBeans?

8   **A.**   NetBeans is a developer environment.  It's a software

9   product you would use as a developer to write an application.

10  **Q.**   And does NetBeans have to be adjusted depending on the

11  platform, or does it work on all platforms?

12  **A.**   It basically runs on computers and can be used primarily

13  to write Java applications.

14  **Q.**   And then a little further down, two paragraphs down, you

15  say, "And, needless to say, Google and the Open Handset

16  Alliance..."  What was the Open Handset Alliance?

17  **A.**   The group of companies that came together with Google to

18  try to promote Android.

19  **Q.**   You say that Google and that group "just strapped another

20  set of rockets to the community's momentum."

21       What did you mean by that?  "The community's momentum,"

22  what does that mean?

23  **A.**   So we referred, at the time, to the Java community not to

24  the Java customers.  Because there were so many developers who

25  were just a part of the movement we were creating to get people

SCHWARTZ - DIRECT / VAN NEST

1    aware of Java, using Java, promoting Java.

2        So we did our best to invest in the community by making

3    free products available, by making educational materials

4    available.  And our view at the time was this was going to give

5    more for the community to take advantage of, create more

6    opportunities for that community.

7    Q.   So at this time, at the time of your blog, can you tell us

8    to what extent you thought Android might help Sun?

9    A.   It was certainly helpful that it wasn't a Microsoft phone.

10   And given the choice between Google embracing Microsoft or

11   Google embracing Java, obviously Google embracing Java was

12   better.

13       It would have been better yet if they had agreed to take a

14   license from Sun to do so.

15           MR. VAN NEST:  May I approach the witness, Your Honor?

16           THE COURT:  Yes.

17   BY MR. VAN NEST

18   Q.   Mr. Schwartz, take a look at TX 3441.

19           MR. VAN NEST:  This is in evidence, Your Honor.

20   BY MR. VAN NEST

21   Q.   Do you recognize that email?

22   A.   Yes.

23   Q.   Is it an email exchange between you and Mr. Schmidt on

24   November 9th?

25   A.   Yes.

SCHWARTZ - DIRECT / VAN NEST

1  Q.   And that's a couple of days after your blog post, I

2  believe?

3  A.   Yes.

4       MR. VAN NEST:  And could we highlight -- could we

5  highlight the bottom, where Mr. --

6  BY MR. VAN NEST

7  Q.   Mr. Schwartz, you are writing to Mr. Schmidt re Android.

8       MR. VAN NEST:  Can we highlight "Android."

9       "Let us know how we can help support your announcements

10 next week.  We're happy to do so."

11 BY MR. VAN NEST

12 Q.   This was a private communication between you and

13 Mr. Schmidt?

14 A.   Yes, it was.

15 Q.   On email?

16 A.   Yes.

17 Q.   Did the two of you email often?

18 A.   No.

19 Q.   Okay.  And what announcements were you referring to in

20 this email?

21 A.   The expectation, I think this preceded the announcement.

22 Q.   Okay.  So this was the announcement of Android that you're

23 referring to?

24 A.   Yes.

25 Q.   And up above Mr. Schmidt responds, "Thanks Jonathan.  I

1    will review right now.  The SDK is supposed to release in Early

2    Look on Monday.  Eric."

3          What's the SDK?

4    A.   Software developer [sic] kit.  The phone was announced.

5    They said, here is this wonderful thing we're building; it's

6    going to be fabulous; more details to come; and if you're a

7    developer, we'll have a software development kit for you.

8    Q.   What's in the software development kit?

9    A.   Tools and technologies that you would use to create an

10   application that ran on the Android phone.

11   Q.   Were the Java APIs included in the software development

12   kit?

13   A.   Yes.

14   Q.   And when he says "Early Look," did you understand what

15   that meant?

16   A.   I pre- -- no, not explicitly.

17   Q.   Was the SDK eventually posted to a website?

18   A.   Yes.

19   Q.   Could anyone gain access to that website?

20   A.   Yes.

21   Q.   Would that website have disclosed all the APIs in the SDK?

22   A.   Yes.

23          MR. BICKS:  Objection, Your Honor, calling for

24   speculation.

25          THE COURT:  I'm sorry, what's the objection?

SCHWARTZ - DIRECT / VAN NEST

```
 1   Speculation?
 2           MR. BICKS:  Yeah.  Would something have been there.
 3           THE COURT:  That's true.
 4           MR. BICKS:  The question is, did he look at it?
 5           THE COURT:  That's true.
 6       Sustained.  And the jury will disregard that question and
 7   answer.
 8   BY MR. VAN NEST
 9   Q.   Do you know whether or not the SDK for Android included
10   all the APIs?
11   A.   I did not personally download the SDK.
12   Q.   Fair enough.
13       Did you continue communicating with Mr. Schmidt and others
14   at Google after the announcement?
15   A.   Yes.
16   Q.   Sometime after the announcement, did you have a meeting
17   with Mr. Schmidt to discuss Android and other issues?
18   A.   I don't recall.
19           MR. VAN NEST:  May I approach the witness, Your Honor?
20           THE COURT:  You may.
21           THE WITNESS:  I'm confident you'll help me.
22   BY MR. VAN NEST
23   Q.   This exhibit is Exhibit 2357.  Do you recognize that,
24   Mr. Schwartz?
25   A.   I do.
```

1  Q.   What is it?

2  A.   It's a summary that I sent to my management team after

3  meeting with Eric.

4          MR. VAN NEST:  I move 2357 in evidence, Your Honor.

5          THE COURT:  Any objection?

6          MR. BICKS:  No objection, Your Honor.

7          THE COURT:  That's received.  Thank you.

8          (Trial Exhibit 2357 received in evidence.)

9          (Document displayed.)

10  BY MR. VAN NEST

11  Q.   The very first line says, "Met with Eric Schmidt this

12  morning."

13       This is dated March of 2008.  So we're now -- after the

14  announcement, we're now in 2008.

15       There's a reference further down the page to a discussion

16  about Android.  If we could go down a couple of paragraphs.

17       "Android is very late."

18       Do you recall discussing Android with Mr. Schmidt during

19  this meeting in March of '08?

20  A.   Yes.

21  Q.   What do you remember discussing about Android?

22  A.   That there wasn't enough of a finished product in the

23  marketplace.  And so we had a window to try to convey to him,

24  here are changes you should make that would make it more

25  successful; and, more importantly, that would help us be a part

**SCHWARTZ - DIRECT / VAN NEST**

1  of that success.

2  **Q.**   Did you talk with him about Sun products that might work

3  with Android?

4  **A.**   We talked to him about making sure that he could take

5  advantage of our brand across the world, and that the -- that

6  it was viewed as proprietary.  Meaning only coming from Google.

7  And Java would help him get out from that because Java came

8  from so many other companies.

9  **Q.**   Did you ask him during the meeting or do you recall asking

10  him about the licensing available with Android?

11  **A.**   I -- I don't recall at the time whether the license was --

12  whether which license they picked was available at the time.

13  **Q.**   Let me -- let me --

14       **MR. VAN NEST:**  May I approach the witness, Your Honor?

15       **THE COURT:**  Yes.

16  **BY MR. VAN NEST**

17  **Q.**   Let me ask you to look at TX 3466, and tell the jury

18  whether you recognize that.

19       **MR. VAN NEST:**  This is in evidence already, Your

20  Honor.

21      (Document displayed.)

22  **BY MR. VAN NEST**

23  **Q.**   Do you recognize that as an email that Mr. Schmidt sent

24  you in March of 2008?

25  **A.**   Yes.

**SCHWARTZ - DIRECT / VAN NEST**

1    **Q.**   And he says in the first line, "Nice to see you this

2    morning."

3         This appears to be referring to the same meeting we just

4    looked at, does it not?

5    **A.**   Yes.

6    **Q.**   Okay.  And he goes on to say, "As a follow-up to our

7    conversation, I asked for the details of our Android licensing

8    terms.  Please review.  We're happy to have our teams meet with

9    anyone at Sun who would like more information."

10        Does this refresh your recollection about a particular

11   discussion about products?

12   **A.**   Yes.

13   **Q.**   What do you remember about that discussion?  Please tell

14   our jurors.

15   **A.**   Well, again, at the time Google had generated quite a bit

16   of fanfare they're going to build a phone.  That was very

17   exciting at the time.  And we wanted to be a part of it.

18        The only way for us to be a part of it was to have Google

19   agree to take our brand, put a Java logo on that phone, or to

20   incorporate other technologies that would require payment.

21        And at this point they had basically said, We don't have

22   any interest, and we don't really, you know, need or want it.

23   **Q.**   So why were you asking about the license?  Were you

24   considering, at that time, putting a Sun product on top of

25   Android?

1              MR. BICKS:  Again, Your Honor, leading.

2              THE COURT:  That's true.  Sustained.

3    BY MR. VAN NEST

4    Q.    To what extent were you considering putting a Sun product

5    on top of Android at or around this time in 2008?

6    A.    We were considering taking the foundation that Google had

7    built, putting our own Java on top of it, and then shipping

8    that as a product into the marketplace as a Java phone as

9    opposed to Android phone.

10   Q.    Ah.  Did that product have a name?

11   A.    That initiative had a few efforts.  JavaFX Mobile was one

12   of them.

13   Q.    JavaFX Mobile?

14   A.    Yes.

15   Q.    Now, in the next paragraph he says, "Our license is

16   Apache v2."  Did you know what that meant?

17   A.    I did.

18   Q.    What was that?

19   A.    So as we discussed earlier, the software license is -- the

20   terms and conditions under which you take free code from the

21   marketplace vary.  One license required any change you made to

22   give everything that you changed back.  Apache was a

23   business-friendly version of that.  It said you can take

24   whatever you wanted; do whatever you want with it; and you

25   don't have any of those give-back obligations.

1          **MR. BICKS:**  Your Honor, I would move to strike that as

2   outside of the bounds of testimony.  Expert testimony.  It was

3   not disclosed in the proffer.

4          **MR. VAN NEST:**  I asked him if he understood it, Your

5   Honor.  It's in the email.  It's a fact in the day.

6          **THE COURT:**  Well, he's going beyond what Apache

7   Version 2 was.

8      Start over.  Disregard that last answer.  And just tell

9   the jury what you understood, at the time of this email, Apache

10  v2 was whenever you saw it in the email.

11         **THE WITNESS:**  Eric was basically telling me that the

12  license they picked would require -- was the business-friendly

13  license and wouldn't require them to give anything back to the

14  marketplace.

15         **THE COURT:**  All right.  Next question.

16  **BY MR. VAN NEST**

17  **Q.**   Following the meeting with Mr. Schmidt, can you tell us

18  whether or not Sun actually demonstrated the JavaFX demo?

19  **A.**   I believe we did at JavaOne.

20  **Q.**   Okay.  And I have a video.  Were you -- were you present

21  for the demonstration?

22  **A.**   I believe so.

23         **MR. VAN NEST:**  And, Your Honor, I have a video of the

24  demonstration I would like to play.

25

**SCHWARTZ - DIRECT / VAN NEST**

1  **BY MR. VAN NEST**

2  **Q.**   Have you had a chance to review this video of the JavaFX?

3  **A.**   I have not.

4       **MR. VAN NEST:**   Okay.  Your Honor, I would move 3103

5  into evidence.

6       **THE COURT:**   Any objection?

7       **MR. BICKS:**   Object on relevance grounds, Your Honor.

8       **THE COURT:**   Overruled.

9       **MR. VAN NEST:**   Okay.

10       **THE COURT:**   Received in evidence.

11     (Trial Exhibit 3103 received in evidence.)

12       **MR. VAN NEST:**   This is a very short video, Your Honor,

13  I would like to play at this time for our jurors.  It's Trial

14  Exhibit 3103.

15     (Video played.)

16  **BY MR. VAN NEST**

17  **Q.**   Mr. Schwartz, did JavaFX ever become a product?

18  **A.**   No.

19  **Q.**   Can you tell the jury why not?

20  **A.**   It was part of our product lineup when we sold the company

21  to Oracle.  So I think you probably need to ask Oracle that.

22  **Q.**   I see.

23     At the time of the acquisition in 2009, it was still in

24  the works?

25  **A.**   Yes.

1  Q.   Okay.  But, as far as you know, during your tenure at Sun

2  did it ever make it to the market?

3  A.   No.

4  Q.   Okay.  Did you continue to have email communication with

5  Mr. Schmidt beyond what we've seen?

6  A.   Nothing substantial, that I can recall.

7         MR. VAN NEST:  May I approach the witness, Your Honor?

8         THE COURT:  Yes.

9  BY MR. VAN NEST

10 Q.   This is Exhibit 5987, TX 5987.

11        MR. VAN NEST:  It's in evidence, Your Honor.

12 BY MR. VAN NEST

13 Q.   Do you recognize it, Mr. Schmidt?  Mr. Schwartz.  Excuse

14 me.

15 A.   Yes, I do.

16 Q.   What is it?

17 A.   It is a email that I sent to Eric, strongly recommending

18 that he basically enter into a commercial relationship with us;

19 the benefit from which would be everyone who believed they had

20 written an application to run on Java would now believe they

21 could write and run that application on Android.

22        Basically, we were promoting the idea to him to put a Java

23 logo on the phone.

24 Q.   Now, there's a reference in the middle of the email to,

25 "Thanks Jonathan.  Did you get the email I sent about the

1    details on Android licensing?"

2        Is that a reference to the other email that we saw with

3    Apache, and so on?

4    **A.**   Yes.

5    **Q.**   Okay.  And did you and he have any further discussions

6    about that license?

7    **A.**   No.

8    **Q.**   At this point, I take it -- well, was Sun still willing to

9    work with Google on Android at this point in time, which is

10   April of 2008?

11   **A.**   I think up until April of 2009, we would have been willing

12   to work with Google.

13           MR. VAN NEST:  May I approach the witness, Your Honor?

14           THE COURT:  Yes.

15   **BY MR. VAN NEST**

16   **Q.**   Let me show you what's been marked as Trial Exhibit 7573.

17   Tell us whether you recognize that.

18   **A.**   I do recognize that.

19   **Q.**   Is that an email chain between you and others at Sun?

20   **A.**   Yes, between me and our -- I think at the time our chief

21   marketing officer.

22           MR. VAN NEST:  I would offer 7573 in evidence, Your

23   Honor.

24           MR. BICKS:  No objection.

25           THE COURT:  7573 received in evidence.

1          (Trial Exhibit 7573 received in evidence.)

2              **MR. VAN NEST:**  Please display it.

3          (Document displayed.)

4    **BY MR. VAN NEST**

5    **Q.**   I would like to go to the bottom of the email and read

6    from the bottom up, and highlight that.  This is a part of the

7    chain in which you're sending an email.

8          "By the way, where are we?  Just spoke with Eric on

9    another topic.  Says he's still interested in working together

10   on distribution via the JRE."

11         Do you know what that refers to?

12   **A.**   Yes, I do.

13   **Q.**   What were you referring to there?

14   **A.**   On a desktop computer, if you want to run a Java

15   application, because it doesn't come on the computer you bought

16   you have to go get a Java runtime.  You've probably seen a

17   little logo pop up on your screen saying you need to download

18   something to run this application.

19         When Sun distributed those Java -- they are called JREs in

20   technical term, Java runtime environments.

21         When we distributed them, we distributed them very high

22   scale.  Hundreds of millions of them.  And we had a commercial

23   relationship with Google in which they would pay us to offer

24   the Google Search toolbar to anyone who downloaded that

25   runtime.  That was very valuable to Google.  They paid us to

1   have us give them -- give them the advantage of our

2   distribution

3   **Q.**   Now, in the next email response, which is just up the

4   page, "Please, Mr. Godfrey" -- who is Mr. Godfrey?

5   **A.**   I believe at the time he was the Chief Marketing Officer

6   of Sun.

7   **Q.**   He says, "Right now we would love to partner on the

8   Android side of things, as you know."

9        Was that still true at this point in the history, April of

10   2009?

11   **A.**   Yes.

12   **Q.**   And then at the very top -- let's go back to Mr. Schwartz.

13   "I said we'd love to work together on Android.  He's still

14   quite confident, despite having no hit phone out there."

15        What were you referring to there?  Is that about Android?

16   **A.**   He had made Android available earlier, but back at that

17   point, if memory serves, the iPhone was taking off like

18   wildfire and no one cared that much about Android.

19   **Q.**   Sort of a slow start?

20   **A.**   A very slow start, and I thought I could help him

21   accelerate it.

22   **Q.**   Did you communicate with some of the handset folks when

23   they actually built Android phones?

24   **A.**   We had -- I didn't directly, but our teams obviously

25   communicated all the time, trying to license our technologies

1    to them.

2              MR. VAN NEST:  May I approach the witness, Your Honor?

3              THE COURT:  You may.

4    BY MR. VAN NEST:

5    Q.   Mr. Schwartz, please take a look at Trial Exhibit 7746.

6    Do you recognize that?

7    A.   I do.

8    Q.   And there's two sides.  I'm sorry.  There is a back side,

9    too.

10        Is this an email correspondence between you and the folks

11   at Verizon?

12   A.   Yes.

13             MR. VAN NEST:  I'd offer 7746 in evidence, Your Honor.

14             MR. BICKS:  No objection.

15             THE COURT:  Thank you.  Received.

16   (Trial Exhibit 7746 received in evidence)

17   BY MR. VAN NEST:

18   Q.   Could we flip to the second page, Mr. Schwartz, the very

19   bottom, and highlight that, please.  We'll make it a little

20   bigger.

21        What's the date of this email?

22   A.   November of 2009.

23   Q.   All right.  So we're now past '08.  We're in November of

24   2009.

25        So Oracle has already agreed to acquire Sun, but the deal

**SCHWARTZ - DIRECT / VAN NEST**

1   hasn't closed; correct?

2   **A.**   That's correct.

3   **Q.**   Did you know who Mr. Lowell was?

4   **A.**   You mean Mr. McAdam?

5   **Q.**   I'm sorry.  Lowell McAdam.

6        Who was McAdam?

7   **A.**   At the time I believe he oversaw their wireless business.

8   **Q.**   You say, "Congrats on your Droid launch.  Don't hesitate

9   to call on us if we can be of help in ensuring your

10  extraordinary success."

11       What were you referring to, Mr. Schwartz?

12  **A.**   Verizon Wireless was, at the time, the largest wireless

13  carrier in the United States.  They were a very large Sun

14  customer so we ran all the back-end systems that make your cell

15  phone work and make sure your bills are accurate, and so we

16  were contacting them because they had announced a relationship

17  with Google around the Google phone to say what can we do to

18  help.

19       If you remember back at the time, they had been excluded

20  from working with Apple because Apple chose AT&T exclusively

21  and rejected Verizon.  We wanted to try to become more involved

22  in helping Verizon build their business.

23  **Q.**   Mr. Schwartz, in all of your many conversations and emails

24  with Mr. Schmidt concerning Android, did you ever complain to

25  him that Google was doing anything wrong?

1    **A.**    No.

2    **Q.**    In those conversations and emails, did you ever tell him

3    that Google needed a license just to use the Java APIs and

4    Android?

5    **A.**    No.

6    **Q.**    From your perspective as a CEO, was Google's use of the

7    Java Android -- APIs and Android consistent with your business

8    policies at the time?

9          **MR. BICKS:**    Objection, Your Honor.   Calling for a

10    conclusion beyond that which you said we could get into.

11          **THE COURT:**    Sustained for now.   It's just too vague.

12    Sustained.

13    **BY MR. VAN NEST:**

14    **Q.**    Well, as the CEO of Sun at this point in time during this

15    period of discussions with Mr. Schmidt, did you ever tell him

16    that his use of the Java APIs and Android was not consistent

17    with the business policies and practices of Sun?

18          **MR. BICKS:**    Objection, Your Honor.   That's an end-run

19    around what we just discussed.

20          **MR. VAN NEST:**    I'm trying to be careful, Your Honor.

21          **THE COURT:**    You can ask this question -- I thought you

22    did ask it, but you can ask did he ever say to anybody at

23    Google that what Google was about to do, at least as he

24    understood it, was somehow wrong.   But I thought you asked that

25    question.

1          MR. VAN NEST:  Perfect.

2          MR. BICKS:  Asked and answered, Your Honor.

3          THE COURT:  What?

4          MR. BICKS:  Asked and answered.

5          THE COURT:  Given all the confusion, you can ask it

6    again.  Ask that question.

7    BY MR. VAN NEST:

8    Q.   Mr. Schwartz, did you ever tell anyone at Google that what

9    Google was doing or about to do with the Java APIs and Android

10   was wrong?

11   A.   No.

12   Q.   Now, did there come a time when Sun itself made Java SE

13   open source?

14   A.   Yes.

15   Q.   When was that?

16   A.   I don't recall the date.

17   Q.   Tell the jurors what it meant to make Java SE open source.

18   What did you do?

19   A.   So, first of all, there were multiple Javas.  There was a

20   really big Java that ran in big data centers.  There was a

21   little itty-bitty tiny Java that ran on credit cards, and

22   Java SE was the Java Standard Edition.  That's the one that

23   would run on your PC.

24        To make it open source is exactly as it sounds.  We made

25   the source code available so anybody could pick it up, create

**SCHWARTZ - DIRECT / VAN NEST**

1    their own version of it, and ship it into the marketplace.

2    **Q.**   Why did you do that?

3    **A.**   We did it for a few reasons.  One, developers who were

4    very important to Sun don't like just picking up a product and

5    being told to buy it.  They want to see how it works, they want

6    to tinker with it, they want to make modifications.

7    Occasionally if they find a bug, they want to fix it for you,

8    so if your product is open source, you get the benefit of that

9    contribution.

10       You also can use that to build a community around a

11   product.  Now you have multiple people who are interested in

12   using it.

13       And then not insignificantly, if you make it truly free as

14   in accessible to anybody, then anyone can afford it, and by

15   definition, free services and free technologies are the most

16   popular in the world like a free Facebook account or a free

17   Google Search.

18   **Q.**   Did you make a public announcement of the open source

19   version of Java SE?

20   **A.**   Absolutely, yes.

21   **Q.**   And is there a videotape of that available?

22   **A.**   I would not know.

23   **Q.**   Was it done at JavaOne?

24   **A.**   I don't -- I don't recall.  It was a long time ago.

25            **MR. VAN NEST:**  Your Honor, I'd like to offer in

1    evidence TX 7275_1, which is an excerpt from his announcement

2    of open sourcing at JavaOne in 2006.

3              THE COURT:  7275?

4              MR. VAN NEST:  Underscore 1, yes.  It's a video.

5              THE COURT:  Any objection?

6              MR. BICKS:  Objection on relevance grounds,

7    Your Honor.

8              THE COURT:  Overruled.  Go ahead.

9    (Government Exhibit 7275_1 received in evidence)

10             MR. VAN NEST:  Could we play 7275_1 for the jury,

11   please.

12        (Whereupon, the video was played for the jury)

13   BY MR. VAN NEST:

14   Q.   Is that a somewhat younger version of Jonathan Schwartz in

15   the video?

16   A.   I'm not sure I'd say *somewhat younger*.

17   Q.   Did Sun ever consider, during your tenure there, building

18   a full-stack smartphone platform based on Java?

19   A.   Absolutely, yes.

20   Q.   Do you recall approximately when you first considered

21   doing so?

22   A.   I -- from the earliest times surveying other handset

23   manufacturers.  We sold technology to Nokia and Ericcson and

24   Sony and other companies.

25   Q.   Was Sun ever able to successfully build a Java-based

1  smartphone platform?

2  **A.**   We had the foundation technologies to make it work.   Had

3  Java FX Mobile, which was the core platform.   But we weren't

4  able to get it to market by the time we were sold.

5  **Q.**   Why not?

6  **A.**   It's complicated.   It's very difficult, as Google can no

7  doubt attest.   But, you know, we also had R&D choices we had to

8  make given R&D -- Research and Development choices and

9  staffing.   Given the economic environment we were operating in,

10  we couldn't fund every project with every dollar we had.

11  **Q.**   Was Sun's failure to build its own Java smartphone

12  platform attributable in any way to Android?

13       **MR. BICKS:**   Objection, Your Honor.   It's beyond the

14  scope, the disclosure.

15       **THE COURT:**   All right.   Let me see the disclosure.   I

16  think I handed it back.

17       **MR. VAN NEST:**   I have one in a notebook right here,

18  Your Honor.

19       **THE COURT:**   Can you highlight the language you think

20  covers it?   Highlight the language you say covers it so that I

21  can -- Mr. Van Nest, can you highlight it or circle it in some

22  way so I can just focus on what you think is the key language.

23       **MR. VAN NEST:**   Thank you, Your Honor.   Thank you,

24  Dawn.

25       **THE COURT:**   All right.   Have you shown counsel?

1           MR. VAN NEST:  My highlighted version, no.

2           THE COURT:  I think the lines down near the bottom are

3    close enough, so I'm going to allow the question.

4        Objection overruled.

5    BY MR. VAN NEST:

6    Q.   Do you have the question in mind, Mr. Schwartz, or would

7    you like it again?

8    A.   Please repeat it.

9    Q.   I will.

10       Was Sun's failure to build its own Java-based smartphone

11   platform attributable in any way to the presence of Android?

12   A.   No.

13          MR. VAN NEST:  I pass the witness, Your Honor.

14          THE COURT:  All right.

15       Cross-examination.

16                     **CROSS-EXAMINATION**

17   BY MR. BICKS:

18   Q.   Good morning, Mr. Schwartz.

19   A.   Good morning.

20   Q.   Just in terms of background, you were the CEO of Sun

21   between 2006 to 2010?

22   A.   That's correct.

23   Q.   And when Oracle purchased Sun, you didn't go on to work

24   for Oracle, did you, sir?

25   A.   No, I did not.

SCHWARTZ - CROSS / BICKS

1  Q.   In fact, you resigned your position as CEO, did you not?

2  A.   Yes.

3  Q.   And Oracle didn't offer you a position as CEO, did they?

4  A.   Well, they had a CEO.

5  Q.   Well, they didn't offer you any senior management

6  position, did they?

7  A.   No.  I resigned.

8  Q.   And it's also the case that Oracle was frustrated by your

9  guidance during a transition period between signing of the

10  contract to purchase and the closing of that deal; is that

11  fair?

12  A.   I think Oracle was frustrated at the speed with which

13  customers started abandoning Sun when they knew that Oracle

14  would acquire us.

15  Q.   And they were frustrated with your guidance.  That's what

16  you said; right?

17  A.   No.  They were frustrated that I wouldn't take their

18  guidance.

19       MR. BICKS:  Your Honor, can I have permission to read

20  prior testimony?

21       THE COURT:  All right.  Just identify the page and

22  line.

23       MR. BICKS:  It's page 233 -- 2032, line 16, to 2033,

24  line 5.

25       THE COURT:  All right.

1          So, again, even though the lawyer is reading it, it's

2    being read exactly -- this counts as evidence, just like all

3    the rest of the evidence in the case.

4          Be sure to say *question*, then *answer*.

5               **MR. BICKS:**  (Reading):

6    "Q.   When were you no longer CEO of Sun in 2010?

7    "A.   February.

8    "Q.   The day the acquisition closed?

9    "A.   Pretty much.

10   "Q.   Pretty much or exactly?

11   "A.   Exactly.

12   "Q.   Upon Oracle buying Sun, you were terminated as CEO;

13        correct?

14   "A.   I believe I resigned.  They already had a CEO.

15   "Q.   And before that, Mr. Sutfin had been in place as the

16        person to make major business decisions at Sun by the

17        Board of Sun; isn't that correct, sir?

18   "A.   I was still the CEO.  Oracle was frustrated with my

19        guidance."

20              **THE COURT:**  Okay.  That's the read-in.  It counts as

21   evidence, just like anything else in the case.

22   **BY MR. BICKS:**

23   Q.   And do you stand by that testimony, sir?

24   A.   I think Oracle was frustrated with the guidance --

25              **MR. BICKS:**  Your Honor, can we have an answer to the

SCHWARTZ - CROSS / BICKS

1    question?

2              THE COURT:  You should say -- do this.  You can either

3    say *yes* or *no* and then give a ten-word or less explanation.

4              THE WITNESS:  Guidance to whom?

5    BY MR. BICKS:

6    Q.   Sir, do you stand by the testimony you gave under oath?

7    A.   Guidance to whom?  It's ambiguous.

8              THE COURT:  Well, it's your own words, though, so --

9              THE WITNESS:  Okay.  So --

10             THE COURT:  Do you stand on what you said last time?

11             THE WITNESS:  Yes.  They were frustrated with my

12   guidance.  They were frustrated with the guidance I was giving

13   them.

14             MR. BICKS:  Your Honor --

15             THE COURT:  No.  He is answering the question.

16        All right.  When he asked you do you stand by that

17   testimony, it's testimony you gave once before.  You can say

18   *yes*, you can say *no*, you can say *yes, but* and give a very short

19   explanation, or *no, but* and give a very short explanation.

20        But what you can't do is, you know, argue.  So at least on

21   this one you can't.  Some things I'm going to let witnesses

22   argue over, but this is one that you can say *yes, no* and give a

23   ten-word or less explanation.  So try again.

24             THE WITNESS:  I stand by my testimony.  They were

25   frustrated with the guidance I was giving them.

SCHWARTZ - CROSS / BICKS

1    BY MR. BICKS:

2    Q.   All right.  And Mr. Sutfin was the individual put in place

3    to lead the integration activities between Sun and Oracle;

4    right?

5    A.   After the acquisition, yes.

6    Q.   Right.

7         And you're not involved with Oracle's business today, are

8    you, sir?

9    A.   No.

10   Q.   All right.

11        And I think you've got no involvement with the Java

12   community at all today; right?

13   A.   None.

14   Q.   All right.

15        And you say you run a company.  You said it was called

16   CareZone?

17   A.   Yes.

18   Q.   And you've got the Health Act, do you not?

19   A.   Yes.

20   Q.   Is the Health Act available on the Google Play store?

21   A.   Yes.

22   Q.   Do you know how many downloads there are?

23   A.   Many.

24   Q.   Do you receive any economic benefit by virtue of those

25   downloads?

SCHWARTZ - CROSS / BICKS

1    **A.**   Yes.

2    **Q.**   You didn't mention that on direct, did you?

3    **A.**   I wasn't asked that.  I don't write the code.

4    **Q.**   And you -- did I hear your testimony on direct that you

5    said there was no license agreement between Sun and Apache?

6    **A.**   Yes.

7    **Q.**   Are you sure about that?

8    **A.**   There was no commercial license between the two companies.

9    **Q.**   Oh, you were referring to the absence of a commercial

10   license when you gave that testimony?

11   **A.**   Yes.

12   **Q.**   Was there a specification license?

13   **A.**   I was not involved in the integral details of Sun's

14   relationship with Apache.

15   **Q.**   You weren't involved with those details, were you?

16   **A.**   No.

17   **Q.**   Would it surprise you to know that there was a

18   specification license in place?

19   **A.**   No.

20   **Q.**   Do you know whether there was or wasn't?

21   **A.**   I do not.

22   **Q.**   Well, let me show you Exhibit 9191 and see if that helps

23   your memory.  It's got your name on it; right?

24   **A.**   Yes.

25        **MR. BICKS:**  Move 9191 in.

1          **MR. VAN NEST:**  Your Honor, this was not on the

2     disclosed list, so I need to have a moment to look at it.

3          **MR. BICKS:**  Here it is.  It wasn't, Your Honor,

4     because I didn't think he was going to get into that area of

5     testimony.

6          **THE COURT:**  All right.  Any objection?

7          **MR. BICKS:**  Dawn, can I have you flip the switch?

8          **THE CLERK:**  Yes.

9          **MR. BICKS:**  Your Honor, I move 9191 in.

10         **THE COURT:**  Any objection?

11         **MR. VAN NEST:**  No objection, Your Honor.

12         **THE COURT:**  Thank you.  Received in evidence.

13    (Trial Exhibit 9191 received in evidence)

14         **THE COURT:**  This machine here -- now they are doing it

15    a different way, just so -- this is called the ELMO, E-L-M-O.

16    Don't ask me why.  I think that's the name of the company.

17       Anyway, this will -- it's like a projector, a fancy

18    projector, and they're going to just put the image on the

19    screen straight off the ELMO.

20         **THE CLERK:**  Okay.  There you go.

21         **THE COURT:**  Try it now.

22    **BY MR. BICKS:**

23    **Q.**   So, Mr. Schwartz, you've seen this document; right?

24    **A.**   I haven't.  Can you give me a moment to read it?

25    **Q.**   Yep.

1        **THE COURT:**  Now you can zoom a little bit, Mr. Bicks.

2   There is a zoom feature.  You can go down --

3        **MR. BICKS:**  Is that the plus/minus here?  Oh, zoom.

4        **THE COURT:**  That's about it right there.  I wouldn't

5   go any -- now you're only getting -- you've got to make that

6   big or no one is going to be able to read it.

7        **MR. BICKS:**  Got it.  Can people see it?

8   **Q.**  Do you see this, Mr. Schwartz?  You've got this?

9   **A.**  Yes.

10  **Q.**  And you testified, I believe, on direct that there wasn't

11  a license agreement with Apache; right?  That's what you said?

12  **A.**  Yes.

13  **Q.**  All right.  And you see this.  And you see now that

14  through Apache Harmony, the Apache Software Foundation entered

15  into the specification license in good faith.  Do you see that?

16  **A.**  I do.

17  **Q.**  Do you know what the specification license is?

18  **A.**  I do not.

19  **Q.**  You're not familiar with how the specification license

20  works, are you?

21  **A.**  No.

22  **Q.**  Do you know it has compatibility requirements,

23  super-setting, sub-setting, things designed to ensure what you

24  testified about, compatibility?

25  **A.**  And branding, but I'm not -- I don't think that's a part

SCHWARTZ - CROSS / BICKS

1  of the specification license.  I think that's part of the TCKs.

2  Q.   Right.

3       And you know that there are requirements about things like

4  compatibility; right?

5  A.   In order to get the brand, you need to be compatible, yes.

6  Q.   Right.

7       And it actually doesn't say that in that contract, does

8  it?

9  A.   Well, I haven't read that contract recently.

10 Q.   Right.

11      And you're not familiar with that contract, are you?

12 A.   I'm -- at this point, no.

13 Q.   Now, I want to ask you, sir, you kept a Google Blog on

14 yourself, didn't you?

15 A.   No.

16 Q.   You didn't?  You didn't keep a Google Blog on yourself?

17 A.   No, I did not.

18 Q.   Uh-huh.

19      You know what a Google Blog is; right?

20 A.   I believe so.

21 Q.   That's a blog -- does that help?  Do you know what a

22 Google Blog is?  Do you see 5989?

23 A.   I think you have misinterpreted what this is.

24 Q.   Uh-huh.  Well --

25 A.   It is certainly not a Google Blog.  It's a set of alerts

SCHWARTZ - CROSS / BICKS

1    that Google looks for in blogs.

2    **Q.**   Yeah.

3          But you've seen this before; right?

4    **A.**   I have not.

5    **Q.**   Oh.  See "To: jls@sun.com"?  Isn't that you?

6    **A.**   No.  I was jis@sun.com.

7    **Q.**   Yeah.

8          And you can see that, JIS; right?  Do you see it there?

9    **A.**   Yeah.

10          **MR. BICKS:**  I move this into evidence.

11          **THE COURT:**  Any objection?

12          **MR. VAN NEST:**  Lacks foundation, Your Honor.

13          **THE COURT:**  All right.  Let me see the document.

14    Mr. Schwartz, did you receive this document at some point

15    when you were with Sun?

16          **THE WITNESS:**  I imagine if it was addressed to me, it

17    was either in a junk folder -- it looks, from my reading, to be

18    a Google Alert which allows you to type some text into Google

19    and have it send you alerts when your name or a topic of

20    interest appears searchable.

21          **THE COURT:**  So even though you don't remember it, just

22    looking at it, does it look like the type of thing you would

23    have received, even though you cannot now remember it?

24          **THE WITNESS:**  It looks like a lot of the spam I

25    received, yes.

SCHWARTZ - CROSS / BICKS

1            THE COURT:  5989 will be received in evidence.

2    (Trial Exhibit 5989 received in evidence)

3    BY MR. BICKS:

4    Q.   So can we display 5989.

5         What I was asking you, sir, just so we're clear, do you

6    see up at the top where it says *To* and that's JIS.  Those are

7    your initials?

8    A.   Yes.

9    Q.   And remember I was asking you did you get Google Alerts on

10   yourself?

11            THE COURT:  No.  You said blogs.

12            THE WITNESS:  You said blogs.

13   BY MR. BICKS:

14   Q.   Google Blog or Google Alert?

15            THE COURT:  You did say blog.

16   BY MR. BICKS:

17   Q.   You've got a Google Alert on yourself; right?

18   A.   Clearly, yes.

19   Q.   And here it says a Google Blog for Jonathan Schwartz;

20   right?

21   A.   No.  That's a Google Alert.  You set them in Google and it

22   will send you topics of interest.

23   Q.   And you were tracking what people were saying about you;

24   right?

25   A.   I or someone who set up the Google Alert, yes.

SCHWARTZ - CROSS / BICKS

1   **Q.**   Do you recall some of the information you received about

2   how the employees viewed how you were doing at Sun?

3   **A.**   We had 30,000 employees.  I got lots of feedback on lots

4   of topics.

5   **Q.**   Yeah.

6        And do you remember some of the things that -- some of the

7   feedback you got?

8   **A.**   Of course.

9   **Q.**   And do you remember here -- and, again, these are not

10  things I wrote, but these are things that I guess came up.

11  This one article, *Who Are The Naughty And Nice CEOs*.  Do you

12  remember that?

13  **A.**   I do not.

14  **Q.**   You don't remember getting that in the Google Alert on

15  you?

16  **A.**   No.

17          **THE COURT:**  Which one was he?  Was he naughty or was

18  he nice?

19  **BY MR. BICKS:**

20  **Q.**   Do you remember this, sir?  It's 5991.

21  **A.**   Right.

22          **MR. BICKS:**  Move 5991 into evidence.

23          **THE COURT:**  5991.

24          **MR. VAN NEST:**  No objection, Your Honor.

25          **THE COURT:**  Received in evidence.

SCHWARTZ - CROSS / BICKS

1    (Trial Exhibit 5991 received in evidence)

2    **BY MR. BICKS:**

3    **Q.**    Do you remember this, sir?

4    **A.**    Never seen it before.

5    **Q.**    Uh-huh.  So this -- you were getting these Google Alerts

6    on yourself, and one of them was a rating of how employees

7    viewed you, and you were one of the top -- the bottom ten CEOs

8    in the country, according to the employees.  Did you know that?

9    **A.**    According to who?

10   **Q.**    According to this Google Alert on yourself that you were

11   getting.

12   **A.**    There is a lot of stuff on Google that I don't control.

13   It's a pretty big Internet.

14   **Q.**    Sir, I'm just asking you a document from your files of

15   information that you had --

16   **A.**    This was in my files?

17   **Q.**    Well, let's see.

18       Do you remember this?  And can we go to page 3 of 5.  You

19   have your copy in front of you, sir?

20   **A.**    Yes.

21   **Q.**    Yeah.

22       And it indicates in this document that I have here that

23   you were on a list that was coined for the CEOs with the

24   highest disapproval ratings with at least 50 reviews that are

25   at risk of being ousted.  Do you recall seeing information like

SCHWARTZ - CROSS / BICKS

1    that about yourself?

2    **A.**   We had a lot of employees, we had a lot of shareholders,

3    and in the midst of the greatest recession of my lifetime,

4    there were a lot of people who were upset.  I was upset, too.

5    **Q.**   And you remember seeing other reviews, including a review

6    in a *Wall Street Insider* article about yourself?  Do you

7    remember that?

8    **A.**   I don't.

9    **Q.**   Let me show you 5984.

10       Do you remember this, sir?

11       Let's not put it up, Trudy.

12   **A.**   I do not.

13   **Q.**   You don't remember in 5984 being rated as one of the 15

14   worst CEOs in American history?

15   **A.**   In May of 2010, which is after Oracle announced the

16   acquisition of Sun, our customers started abandoning us in

17   droves.  Many of them were unhappy.

18   **Q.**   Sir, I just asked you -- here you are.  Did you -- have

19   you seen this before?

20   **A.**   I have not.

21   **Q.**   So you didn't read an article that appeared that rated you

22   as one of the 15 worst CEOs?

23           **THE COURT:**  Mr. Bicks, really, you're laying before --

24   this is a good example.

25       What counsel just said, zero evidence, unless you're going

 1   to put that in in some other way.  You cannot just start

 2   reading stuff to the jury that's not in evidence and --

 3            **MR. BICKS:**  Fair enough.

 4            **THE COURT:**  Or is it in evidence?  I don't know.  Is

 5   this one in evidence?

 6            **MR. VAN NEST:**  No, it's not, Your Honor.

 7            **THE COURT:**  All right.

 8            **MR. BICKS:**  Understood.

 9            **THE COURT:**  I just have to insist that the jury keep

10   straight what the lawyers say versus what the witnesses say

11   under oath and what the documents say.

12        Now, if counsel gets that into evidence some other way,

13   God bless him.  That's great.

14        But you have to do it the right way.  You cannot make

15   these kinds of speeches like that and lay before the jury

16   things that are probably not going to get into evidence.

17            **MR. BICKS:**  Understood.

18   **Q.**   You have never seen this article before?

19   **A.**   No.

20   **Q.**   Do you remember seeing any article where the folks at

21   Oracle commented on your tenure as CEO at Sun?

22   **A.**   I don't think they're allowed to speak independent, and I

23   know Larry made some comments.

24   **Q.**   What's that?

25   **A.**   I said I know the CEO made some comments.

SCHWARTZ - CROSS / BICKS

1    Q.    Do you remember what those comments were?

2    A.    I don't.

3    Q.    Let me show you, if it will help your recollection, 5985.

4          Do you remember seeing this, sir?

5    A.    Can I take a chance to read it?

6    Q.    Yes.

7              THE COURT:  All right.  What's the question?

8    BY MR. BICKS:

9    Q.    You've seen this before; right?

10   A.    I have not.

11   Q.    You don't remember commenting on this article?

12   A.    No.

13   Q.    You don't remember that you saw this article and then made

14   a comment?  5986.  Maybe this will refresh your recollection.

15             THE COURT:  Does that refresh your memory?

16             THE WITNESS:  Yes.

17        What is the question?

18   BY MR. BICKS:

19   Q.    I showed you an article and you said you couldn't remember

20   this and I showed you this.  Does this help you remember that

21   you, in fact, saw it?

22   A.    I did not see the article.  I was asked for a quote by a

23   reporter.

24   Q.    So you were quoting and commenting on an article that you

25   hadn't looked at?

SCHWARTZ - CROSS / BICKS

1   **A.**    No.   I was quoting on a comment that Larry Ellison had

2   made about Sun.

3   **Q.**    Uh-huh.

4        And what did he say?

5   **A.**    He said some disparaging things, as relayed to me by

6   Ashlee Vance at the *New York Times* at the time.

7   **Q.**    And the things that were said are in the article, right,

8   5985?

9   **A.**    Ashlee wasn't referring to an article.   He was referring

10   to comments that Larry had made.

11   **Q.**    What were the comments?

12   **A.**    They were disparaging.

13   **Q.**    What did he say about you?

14   **A.**    It was six years ago, and I believe he provides a quote in

15   the *New York Times*.   That's not what he was reading to me.   He

16   said, "What do you say about the comments that Larry has been

17   making about you?"

18        **MR. BICKS:**   And so can I move in 5986?   That's the --

19   **Q.**    That's got your comment in it?

20   **A.**    Yes.

21        **MR. BICKS:**   Your Honor, 5986.

22        **THE COURT:**   5986, any objection?

23        **MR. VAN NEST:**   No objection, Your Honor.

24        **THE COURT:**   5986 is received.

25   (Trial Exhibit 5986 received in evidence)

1   **BY MR. BICKS:**

2   **Q.**   And Mr. Ellison, he said some things that you were not

3   happy about; right?

4   **A.**   I had no reason to be happy or unhappy at that point.

5   **Q.**   Well, he said that, referring to Sun's management, made

6   some very bad decisions that damaged their business; right?

7   And those were decisions made under your watch; right?

8   **A.**   The economic environment we were operating in caused us to

9   make some very, very tough decisions.

10  **Q.**   Uh-huh.

11       And is it fair that, without going through all of these

12  articles and comments, that there were some things said that

13  were not exactly flattering about how you ran that business --

14  **A.**   I was not there to have a personal opinion.  I was there

15  to try to maximize the price we could get from an acquirer.

16  **Q.**   During your tenure as CEO, stock price somewhere up in the

17  20s went down, at some points, to 2, in that range?

18  **A.**   It was the greatest recession of our lifetime.  A third of

19  our revenue went to banks, and our customers were going

20  bankrupt, and when you have a company that buys $200 million a

21  year from you that stops buying anything, it's hard to replace

22  that.

23       The market as a whole went down.  We certainly went down

24  with it.  We were just as upset as everyone else.

25  **Q.**   And with you as CEO, how many billions of dollars in

**SCHWARTZ - CROSS / BICKS**

1    market cap was lost at that company with you at the helm?

2    A.    At Sun?

3    Q.    Yes.

4    A.    With me at the helm, I don't know the exact number.  I'm

5    sure you have it at hand.

6    Q.    And I want to come to your blog, sir, because you remember

7    asking -- being asked questions about your blog?

8    A.    And my Google Blog.

9    Q.    Yeah.  Not your Google Blog.  The blog that you sent out

10   in November 2007 after Android was released.

11   A.    Right.

12   Q.    And did that blog really contain all of your true feelings

13   about what was going on with Google and Android?

14   A.    That blog was designed to promote our involvement in

15   Google's activities to create a handset.

16   Q.    Yeah.

17         But internally you said some things that were not exactly

18   flattering that didn't quite make it into the blog; right?

19   A.    We were clearly frustrated that we weren't able to find a

20   way to craft a commercial relationship.

21   Q.    And you wanted a commercial relationship, right, and you

22   really wanted a commercial relationship that had royalties?

23   That was one of the things you wanted; right?

24   A.    Every commercial relationship we wanted would yield

25   benefit to Sun.  Of course we wanted that.

SCHWARTZ - CROSS / BICKS

1   Q.   Right.

2        Because at that time, you had commercial relationships

3   with many of the major handset carriers; right?

4   A.   Not for Java SE.  That was freely available on computers.

5   Q.   Sir, how many contracts and licenses did you have with

6   people in the handset company, handset world?

7   A.   For a tiny version of Java, we had contracts with all the

8   major handset manufacturers.

9   Q.   And which handset manufacturers?

10  A.   Nokia, Ericcson, Sony, many.  I don't recall the number.

11  Q.   And how many phones, mobile phones, at this time was Java

12  in, ballpark?

13  A.   Well, none of them were running SE.  None of them were

14  running desktop Java.

15  Q.   Right.

16       And did you -- are you familiar actually with the terms of

17  your licensing to tell us here under oath that you didn't have

18  licenses out to the handset manufacturers for SE?

19  A.   To the best of my knowledge, we didn't.  We had licenses

20  for Java ME which was the micro edition, the tiny version of

21  Java.

22  Q.   Are you familiar with the license agreement with Nokia?

23  A.   I don't recall the terms of it, no.

24  Q.   Are you familiar with the license agreement with Danger?

25  A.   No.

SCHWARTZ - CROSS / BICKS

1    Q.   Uh-huh.

2         Are you familiar with the license agreement with Savage?

3    A.   No.

4    Q.   Do you know that Savage had Java SE in it?

5    A.   I don't recall.

6    Q.   I want to go back to your blog because I'm going to ask

7    you about things that you said that were not in the blog.

8         Do you remember when the Google announcement came out that

9    you referred to parts of it as crap, in your words?

10   A.   Sure.  I would not be surprised.  I was very frustrated.

11   Q.   But you didn't put some of these things in the blog;

12   Right?

13   A.   I'm not going to put every possible thought I've had in

14   every blog I read.

15   Q.   Right.

16        But the blog I think you were telling us was supposed to

17   be an official statement of the company; right?

18   A.   It was.

19   Q.   And so I want to ask you about certain things that you

20   were saying to executives at your company but didn't get into

21   the blog.

22        You called the announcement, parts of the announcements,

23   crap.  Do you remember that?

24   A.   We had private conversations.  I had conversations with

25   attorneys.  I had conversations with our CFO.  I didn't put

SCHWARTZ - CROSS / BICKS

1  those in the blog.  It was not appropriate.

2  **Q.**  Right.

3      So let's see what you were actually saying to many people

4  at your company.

5      Let me show you 2353.

6          **THE COURT:**  Is this in evidence already?

7          **MR. BICKS:**  Not yet, Your Honor.

8          **THE COURT:**  What's the number?

9          **MR. BICKS:**  2353.

10          **THE COURT:**  2353.  Thank you.

11 **BY MR. BICKS:**

12 **Q.**  Do you recognize this, Mr. Schwartz?

13 **A.**  Yes.  I'm not calling their product crap.

14 **Q.**  Yeah.

15      Well, you referred to part of the announcement as crap;

16 right?

17 **A.**  I said, and I quote, "they are claiming developers are

18 underserved, which is crap."

19 **Q.**  Right.  So let's just look at -- move 2353 in.

20          **THE COURT:**  Any objection?

21          **MR. VAN NEST:**  No objection, Your Honor.

22          **THE COURT:**  Any objection?

23          **MR. VAN NEST:**  No.  No objection.

24          **THE COURT:**  All right.  Thank you.  In evidence.

25 (Plaintiff's Exhibit 2353 received in evidence)

SCHWARTZ - CROSS / BICKS

1    BY MR. BICKS:

2    Q.    And this is what you wrote; right?  Right at the top, do

3    you see they are claiming developers are underserved and you

4    say, "which is crap"; right?  Those are your words; right?

5    A.    Yes.

6    Q.    And then the reference here -- who is Karen Kahn?

7    A.    She ran PR for us.

8    Q.    And she is trying to refer to the current partyline;

9    right?

10   A.    Yes.

11   Q.    What does the partyline mean?

12   A.    It's the statement that you make to ensure that Sun is a

13   consistent message across all the different audiences and

14   speakers.

15   Q.    And it's important to be truthful when you make those

16   statements; right?

17   A.    To the extent you can, yes.

18   Q.    And actually you -- I pointed out that word that you put

19   in here, and you said you weren't actually talking about the

20   phones.

21        Do you actually remember internally that you basically

22   said their phones were lousy?

23   A.    No.  I don't recall saying that.

24   Q.    You don't remember that?

25   A.    No.

1    Q.   Do you recall in -- right the day this announcement came

2    out that you said that you had no clue what Google was up to

3    and your sense was that they were playing fast and loose with

4    your licensing terms.  Does that sound familiar to you?

5    A.   Yes.

6    Q.   Because you said it; right?

7         2368.

8         THE COURT:  All right.  Are you moving it into

9    evidence?  What is it --

10        MR. BICKS:  I want him to look at it, Your Honor.  But

11   I would like to move it into evidence.

12        THE COURT:  Tell us what that document is,

13   Mr. Schwartz.

14        THE WITNESS:  That document is a communication between

15   myself and John Fowler.

16        THE COURT:  Any objection?

17        MR. VAN NEST:  No objection, Your Honor.

18        THE COURT:  Received in evidence.  You may put it up

19   on the screen.

20   (Trial Exhibit 2368 received in evidence)

21   BY MR. BICKS:

22   Q.   So this comes out right on the same day as the blog;

23   right?  A couple days after, maybe?

24   A.   I think a couple days before.  I don't have the date in

25   front of me.

SCHWARTZ - CROSS / BICKS

1  Q.   The blog, I think, is November 5th.  This is November 7th.

2  Do you see this?

3  A.   Right.

4  Q.   And you say, "I have no clue what they're up to.  My sense

5  is they're playing fast and loose with licensing terms."

6       And who were you referring to when you say they were

7  playing fast and loose?

8  A.   Google.

9  Q.   Uh-huh.

10      And you didn't put that in the blog, did you?

11  A.   We didn't have any clarity on what their licensing terms

12  were.  This was internal speculation.  I didn't speculate on my

13  blog.

14  Q.   Uh-huh.

15      Well, you said you had no clue what they're up to.  If you

16  had no clue what they were up to, how could you be making an

17  official company statement about what they were up to if you

18  didn't know?

19  A.   We wanted to be a part of the momentum they were building

20  around making sure there was innovation in the handset

21  community.  That's what we were going to be a part of.

22      We didn't have any complete details, but there was a

23  tremendous amount of PR surrounding their announcement, and we

24  wanted to make sure we were a part of that PR.

25  Q.   You wanted to be kind of on the stage, but, in fact, you

**SCHWARTZ - CROSS / BICKS**

1  weren't, but you wanted to be; right?

2  **A.**   Oh, absolutely.

3  **Q.**   But it is an accurate statement that you had no clue what

4  they're up to, and your sense was they're playing fast and

5  loose with licensing terms.  This is what you said to

6  Mr. Fowler; right?

7  **A.**   Yes.  It was before we knew what they were actually up to.

8  **Q.**   And I asked you the question about whether or not you said

9  their phones were lousy and -- you recall that.  Do you

10  remember that, sir?

11  **A.**   Was there a question?

12  **Q.**   5316.

13  **A.**   What was your question?

14  **Q.**   I asked you if you remember saying that the Google Android

15  phone was horrible product, lousy or lame.  Do you remember

16  that?

17  **A.**   I do not.  And can I have a moment to read this?

18  **Q.**   Absolutely.

19  **A.**   (Witness reviews document.)

20  **Q.**   This is something you wrote; right?  Have you had a chance

21  to look at it, sir?

22  **A.**   No.  I'm not quite done.

23       (Witness reviews document).

24       So what was the question?

25  **Q.**   My question was I had asked you when I put up the document

1    where you had referred to parts of the announcements as crap

2    and you said you weren't saying it about the phone, and I said

3    actually do you remember making negative comments about the

4    Android phone; right?  And you said you didn't remember.

5         Now you remember; right?

6    A.   Yes.

7    Q.   All right.

8         So let's move 5316 in.

9              THE COURT:  Any objection?

10             MR. VAN NEST:  No objection, Your Honor.

11             THE COURT:  Received in evidence.

12   (Trial Exhibit 5316 received in evidence)

13   BY MR. BICKS:

14   Q.   And if we can go to the first paragraph there, this is

15   something you wrote on May 2nd, 2009; right?

16   A.   Yes.

17             THE COURT:  Not May 2nd.

18             THE WITNESS:  February 2nd.

19             MR. BICKS:  February 2nd.  Thank you, Your Honor.

20   Q.   February 2nd, 2009; right?  So this was after your blog;

21   right?

22   A.   Right.

23   Q.   And you say here, "And to this day, even with a horrible

24   product, it's Apple's iPhone versus Google's Android, even

25   though the latter is lame" -- those were your words; right?

**SCHWARTZ - CROSS / BICKS**

1    **A.**   This was Android in 2009, and back when they first

2    introduced it, it was lame.

3              **MR. VAN NEST:**  Move to strike, Your Honor.

4              **THE COURT:**  All right.  Go ahead.

5    **BY MR. BICKS:**

6    **Q.**   So it -- I mean, I want to come back to your blog because

7    you internally said parts of the Google announcement were crap.

8    You said they were playing fast and loose with the licensing

9    rules.  You had no clue.  And now you're saying the phone you

10   knew at the time was lame, but none of that information was in

11   your blog; right?

12   **A.**   The point of the blog was to become a part of the

13   conversation.  You know, I had all kinds of internal

14   discussions and dialogues, private conversations.  That's not

15   what the blog was for.

16   **Q.**   But in these private conversations, this was truthful,

17   wasn't it?

18   **A.**   Yes.

19   **Q.**   And your statement that they were playing fast and loose

20   with the licensing rules and you had no idea what they were up

21   to, that was truthful?

22             **THE COURT:**  Did it say licensing rules?  I don't think

23   that's the term that was used.

24   **BY MR. BICKS:**

25   **Q.**   Playing fast and loose with licensing terms.

1          Thank you, Your Honor.

2          That was truthful; right?

3   **A.**   Can you read the whole sentence for me?

4   **Q.**   Yes.

5          "I have no clue what they're up to.  My sense is that

6   they're playing fast and loose with licensing terms and they're

7   going to start pissing people off."

8          That was a truthful statement?

9   **A.**   That was speculation.  I didn't do a lot of speculating on

10  my blog.  I was the CEO.

11  **Q.**   Well, but the truth was when you wrote your blog, you

12  really didn't know a lot of the details about what was going on

13  with the Android product; right?

14  **A.**   We knew one very clear thing, which was that it was not

15  going to be based on Windows and it was going to get the Java

16  developer community very excited.

17  **Q.**   Well, the fact of the matter is you were not, as these

18  emails show -- and I'm going to show you some more.  You were

19  not exactly thrilled with what was going on; right?

20  **A.**   I was certainly frustrated that we had a new competitor.

21  **Q.**   And they were a competitor; right?

22  **A.**   Just as Apache Harmony was a competitor, yes.

23  **Q.**   And they were a competitor of yours because your company

24  was involved with mobile phones; right?

25  **A.**   They were a competitor of ours because we were both

SCHWARTZ - CROSS / BICKS

```
 1    looking to recruit developers to create applications for our
 2    products.
 3    Q.   Right.
 4         And Java had, what?  How many developers were working with
 5    Java?
 6    A.   Tens of millions.
 7    Q.   And that was a great asset of the company, those
 8    developers; right?
 9    A.   Yes.  And Google's work enhanced that.  It brought more
10    developers in.
11    Q.   And there were statements made by your company where Sun
12    was really concerned that Android was going to fracture Java;
13    right?  You know that?
14    A.   Yes.
15    Q.   And that was a concern you had as well; right?
16    A.   Sure.
17    Q.   Exhibit 1048.  You've seen this before; right?
18    A.   I don't recall, but . . .
19    Q.   You're familiar with it.  You know who Rich Green is?  I
20    think you watched him on a video?
21    A.   Yes.  Very smart man.
22    Q.   Yep.
23         And he'd know what he was talking about; right?
24    A.   Yes, he did.
25         MR. BICKS:  1048 I would move into evidence.
```

1          **MR. VAN NEST:**  No objection.

2          **THE COURT:**  Received in evidence.

3    (Trial Exhibit 1048 received in evidence)

4    **BY MR. BICKS:**

5    **Q.**   The title of this article -- this is after Google

6    announces Android; right?

7    **A.**   Yes.

8    **Q.**   And it's after it releases something called the SEK;

9    right?

10   **A.**   Yes.

11   **Q.**   And the headline here is that Sun is concerned Google's

12   Android will fracture Java?

13   **A.**   Yes.

14   **Q.**   Was that a concern?

15   **A.**   Yes.

16   **Q.**   And what could happen to your company if Java became

17   fractured?  How could that harm your company?

18   **A.**   If they were calling their product Java and it was

19   behaving in a way that was not compliant, then it would begin

20   to risk the value proposition we had articulated to customers,

21   that if you write your application, it will run on anything

22   called Java.

23   **Q.**   And compatibility, that was important; right?

24   **A.**   Absolutely.

25   **Q.**   Uh-huh.

**SCHWARTZ - CROSS / BICKS**

1       Because, as stated here, "anything that creates a more

2   diverse or fractured platform is not in developers' best

3   interests," and that was stated here; right?

4   **A.**   That's what Rich said.

5   **Q.**   And that was something that was of concern to you; right?

6   **A.**   Absolutely.

7   **Q.**   Now, you used the expression that you were given lemons

8   and you were trying to make lemonade.  Do you remember that?

9   **A.**   Yes.

10  **Q.**   And by that you meant you kind of got dealt some

11  challenges and you were trying to kind of make the best of it;

12  right?

13  **A.**   Yes.

14  **Q.**   And I think, to use words that I read of yours, you were

15  gritting your teeth; right?

16  **A.**   You bet.

17  **Q.**   And at one point, you wanted to get Google, at least in

18  your words, on the defense; right?

19  **A.**   Yes.

20  **Q.**   Why would you want to get somebody on the defense?

21  **A.**   So that they would feel compelled to come back to us for

22  help.

23  **Q.**   That's what you wanted; right?

24  **A.**   Absolutely.

25  **Q.**   And you wanted a commercial relationship where you were

SCHWARTZ - CROSS / BICKS

1    getting royalties.  That was one of your goals; right?

2    **A.**    Or at least we were a part of their announcement, yes.

3    **Q.**    Right.

4          And that was a concern to you; right?

5    **A.**    Not being a part of the announcement was definitely a

6    concern.

7    **Q.**    1055.  It's another email you wrote; right?

8    **A.**    Yes.

9             **MR. BICKS:**  I would move 1055 in.

10            **MR. VAN NEST:**  Give me a moment, please, Your Honor.

11         No objection.

12            **THE COURT:**  Received.

13   (Trial Exhibit 1055 received in evidence)

14   **BY MR. BICKS:**

15   **Q.**    1055, the first paragraph, at the end you said, "Let's get

16   them on the defense"; right?

17   **A.**    Can I have a second to read this?  It's quite long.

18            **THE COURT:**  If the only thing you're going to ask

19   about on this document is that one phrase, then I will ask the

20   witness just to look at the bottom of the first paragraph.  But

21   if you're going to have more questions on this document, then

22   I'm going to let him read the whole thing.

23         What's the answer, Mr. Bicks?

24   **BY MR. BICKS:**

25   **Q.**    Well, you see here it says, "Let's get them on the

1   defense"; right?

2          THE COURT:  Wait, wait, wait.  All right.

3          MR. BICKS:  Your Honor, I am going to ask -- I was

4   going to ask about another sentence.

5          THE COURT:  All right.  Then let him read the whole

6   thing.

7          MR. BICKS:  I was going to ask you about "compliant

8   with the Java specification."

9          THE WITNESS:  So do I have the time to read the whole

10  article?

11         THE COURT:  He is going to ask you about the

12  compliance with the -- which one?  The next paragraph?  I don't

13  see what you're talking about.

14         MR. BICKS:  It's the first paragraph, Your Honor --

15         THE COURT:  Do you see the phrase "compliant with the

16  Java specification?  Let's get them on the defense."  He is

17  going to ask you about that.

18      Read enough of the document that, in your judgment, you're

19  prepared to discuss that part, but maybe you don't have to read

20  the whole thing.

21         THE WITNESS:  It's a pretty long document.

22         THE COURT:  Do what you feel you've got to do.  You're

23  under oath.

24                    (Witness reads document)

25

1    BY MR. BICKS:

2    Q.   Sir, I'm just going to ask you about this paragraph right

3    here.

4    A.   Which paragraph?

5    Q.   "We should ask the press to ask Google if their platform

6    will be compliant with the Java specification."

7    A.   Yes.

8    Q.   And you're familiar with the Java specification; right?

9    A.   Yes.

10   Q.   And you know it has requirements in it about

11   compatibility.  You can't superset, you can't subset or do

12   anything of those things; right?

13   A.   If you call your product Java, you cannot do that.  They

14   did not call their product Java.

15   Q.   And you're sure that's in that spec agreement that it says

16   that?

17   A.   I'm sure that what we were attempting to get the press to

18   do was to ask them if they were going to be shipping Java.

19   Q.   I asked you, sir, about what that contract says.  Do you

20   think that's what it says?

21   A.   I don't have the contract in front of me.

22   Q.   Do you remember, sir -- you were the CEO during the time

23   period when your company was in merger discussions with Oracle;

24   right?

25   A.   Yes.

1   Q.   And do you remember that on July 30th, 2009 -- you were

2   CEO at the time; right?

3   A.   Yes, I was.

4   Q.   And do you recall that certain questions were raised

5   during that merger about Android and Sun's views about Android?

6   A.   Sorry.  What was the question?  Were there --

7   Q.   Do you recall during that merger that there were questions

8   made -- raised by the government, the European Commission,

9   about Sun's views about Android?  Do you remember that?

10   A.   I don't recall.  I wasn't involved in the -- in the

11   discussions with the EU.

12   Q.   But you were the CEO; right?

13   A.   Yes.

14   Q.   And as the CEO, this was an important merger; right?

15   A.   We believed so.

16   Q.   And you would want to make sure that any position that was

17   told to a governmental body was truthful; right?

18   A.   Absolutely.

19   Q.   And people in the company reported to you during that time

20   period; right?

21   A.   Yes.

22   Q.   I want to show you Exhibit 5295.

23        Do you know, sir, the position that was taken by Sun about

24   Android when it came to questions that were raised by the

25   European Commission in connection with this merger?

SCHWARTZ - CROSS / BICKS

```
 1   A.    I wasn't involved in the details.

 2   Q.    But you were the CEO and this was something that

 3   ultimately you're responsible for; right?

 4   A.    Oracle was clear, they were the only ones who were to

 5   speak with competition authorities.

 6   Q.    And do you actually know what was actually going on at

 7   that time in terms of who was dealing with the competition

 8   authorities?

 9   A.    You'll need to ask Oracle.

10   Q.    But you don't know what Sun was articulating as Sun's

11   position?

12   A.    At the time, I wasn't involved in the dialogue with the

13   EU.

14   Q.    Well, let me show you Exhibit 5295 and see if you've seen

15   any of this document before.

16         THE COURT:  He's going to want to read the whole

17   thing.  That's a huge document.

18         THE WITNESS:  That's a lot of material.

19   BY MR. BICKS:

20   Q.    Take a look -- look at page 39, question 70.

21   A.    Who is the author of the document?

22   Q.    I can tell you that --

23         THE COURT:  Wait a minute.  Counsel doesn't -- you

24   can't ask him questions.  You've just got to answer questions,

25   and he doesn't get to testify.
```

1      Have you ever seen that document before?

2              THE WITNESS:  I have never seen this document before.

3              THE COURT:  Well, then why are -- let's not pursue it.

4          MR. BICKS:  I'm pointing to a paragraph of it and

5      asking if it refreshes his memory that he knew about the

6      position that Sun was taking.

7              THE COURT:  You can do that.  Look at page 39,

8      paragraph what, 70?

9          MR. BICKS:  Yes.

10             THE COURT:  And then read that part and see if that

11     refreshes your memory on anything that Sun might have said to

12     the European somebody -- Commission.  Have you done that?

13             THE WITNESS:  I have.

14             THE COURT:  All right.  Does it refresh your memory?

15             THE WITNESS:  No.  As I said, I was not involved in

16     discussions with the EU.

17             THE COURT:  If it doesn't refresh his memory, let's

18     move on.

19     BY MR. BICKS:

20     Q.   All right.  But you had a team you know that was --  at

21     Sun that was working on this, right, with people at Oracle?

22     A.   Of lawyers, yes.

23     Q.   But they weren't in any way reporting to you during this

24     time period?

25     A.   Am I permitted to discuss what I discussed with my lawyers

SCHWARTZ - CROSS / BICKS

1   at the time.?

2   **Q.**   I'm asking whether they reported to you.

3   **A.**   The general counsel of the company reported to me.

4   **Q.**   And who was the general counsel at that time?

5   **A.**   Michael Dillon.

6   **Q.**   And were you keeping abreast of what was going on with

7   this merger?

8   **A.**   I was instructed earlier not to discuss what I discussed

9   with Sun's attorneys.   Should I review what I discussed with

10  Sun's attorneys?

11  **Q.**   I was asking whether you kept yourself abreast.

12  **A.**   Yes, to the best I could.

13  **Q.**   All right.

14        But you're not familiar with this?

15  **A.**   Not at all.

16  **Q.**   Okay.

17        Now, let me ask you about Exhibit 91 -- I'm going to show

18  you a document.   And what I was asking about was in your blog

19  there were things -- things that you were saying internally

20  that didn't make it into the blog; right?

21  **A.**   Many things I said internally didn't make it into the

22  blog.

23  **Q.**   Uh-huh.

24        And you remember there's a briefing book for something

25  called the Mobile Congress.   Do you know about the Mobile

SCHWARTZ - CROSS / BICKS

1   Congress?

2   **A.**   Vaguely, yes.

3   **Q.**   That was -- what was the Mobile Congress?

4   **A.**   I believe it was a trade show related to advancements in

5   wireless communications.

6   **Q.**   Uh-huh.

7       And that's an important trade show, right, for your

8   company?

9   **A.**   Yes.  All trade shows were important to us.

10   **Q.**   And it's a trade show where people get prepared to talk

11   about what the positions of the company are?

12   **A.**   Yes.

13   **Q.**   And I want to show you a briefing book, 9116.

14   **A.**   (Witness reviews document.)

15   **Q.**   Do you see this, sir?

16   **A.**   Yes.

17   **Q.**   And this is a document, kind of document you would be

18   familiar with?

19   **A.**   I'm not familiar with this document.

20   **Q.**   Well, there's something called the DSM group at Sun.

21   What's that?

22   **A.**   I don't know.

23   **Q.**   So this is a document to every executive, and you don't

24   think you've ever seen it before?

25   **A.**   I don't think it was sent to every executive.

**SCHWARTZ - CROSS / BICKS**

1    Q.    But you can see this is a document that is a business

2    record of your company; right?

3    A.    We produced a lot of documents, sir.

4    Q.    Right.  And you can see this is a business record

5    preparing executives for a conference?

6    A.    I suppose so.  I haven't read the document.  Would you

7    like me to?

8         MR. BICKS:  Your Honor, let me move this into evidence

9    and then I would like to point part of it out to him.

10        MR. VAN NEST:  Objection.  No foundation.

11        THE COURT:  Sustained so far.

12   BY MR. BICKS:

13   Q.    Well, you can look at this, right, sir and -- look on the

14   first page of it.  Do you see it says *Mobile World Congress,*

15   *2007, Java Software Strategy Briefing Book?*

16   A.    Yes.

17   Q.    This is a briefing book that prepares executives at your

18   company for a meeting; right?

19   A.    Yes.

20   Q.    Right.

21        And these are documents that are supposed to be accurate;

22   right?

23   A.    I don't know who wrote it, but I assume so.

24   Q.    All right.  And these are documents that you know as the

25   CEO -- these are the kind of documents that are prepared so the

SCHWARTZ - CROSS / BICKS

1    people can do their jobs at meetings; right?

2    **A.**   We had 30,000 employees, each of whom are creating

3    documents, so I'm not familiar with this particular document.

4    **Q.**   Well, when you actually look at the document, you see some

5    of the people whose names are on it.  You see Eric Kline?

6    **A.**   I'm sorry.  Where am I looking?

7    **Q.**   The email right at the top, the people who got all this,

8    Eric Kline, Jeff Morton, people like that.  These are senior

9    executives?

10   **A.**   Yes.

11   **Q.**   All right.

12        And no question, this is a document that is supposed to be

13   accurate and is a record from your company; right?

14   **A.**   I'm not familiar with the document.

15   **Q.**   Right.

16        Your Honor --

17        **THE COURT:**  He just doesn't know the document.  It's

18   impossible to get this document in through him.  It's not a

19   party admission by Google.  It's a Sun document.

20        **MR. BICKS:**  Fair enough, Your Honor.

21   **Q.**   Now, you were of the view, were you not, that Google takes

22   Java for Android without attribution or without contribution.

23   Those were your views; right?

24   **A.**   At the time, yes.

25   **Q.**   And when you say *at the time*, what time are you talking

1    about?

2    **A.**   I would have made those comments early on after Android

3    was just announced.

4    **Q.**   So tell me when you think you made that comment.

5    **A.**   I'm sure you know, but I don't recall exactly.

6    **Q.**   Because Android came out in November 2007.  So when do you

7    think that you made this comment?

8    **A.**   I don't know.

9    **Q.**   Would it surprise you that you made it in March of 2008?

10   **A.**   No.

11   **Q.**   So, what, about four months afterwards?

12   **A.**   Right.

13   **Q.**   This is an email you wrote; right?

14   **A.**   Yes.

15          **MR. BICKS:**  Move 1056 in.

16          **THE COURT:**  Any objection?

17          **MR. VAN NEST:**  No objection, Your Honor.

18          **THE COURT:**  Received.  Thank you.

19   (Trial Exhibit 1056 received in evidence)

20   **BY MR. BICKS:**

21   **Q.**   It's a document you wrote; right?

22   **A.**   I didn't write the document.  I replied to an email

23   thread.

24   **Q.**   And it's an email -- starts at the bottom, right, "It's

25   funny with Google."  It's someone named Marten Mickos who

SCHWARTZ - CROSS / BICKS

```
 1   writes this to you; right?

 2   A.   Yes.

 3   Q.   And can we blow this up, Trudy.

 4        He says, "It's funny with Google.  They take without

 5   paying"; right?

 6   A.   Yes.

 7   Q.   And then he says, "The FOSS code."  What's the FOSS code?

 8   A.   Free Open Source Software.

 9   Q.   And they say, "Of ten million developers"; right?

10   A.   Yes.

11   Q.   And then it says, "The web contents of one hundred million

12   websites"; right?

13   A.   Yes.

14   Q.   And then the searches of -- what is that number?  One

15   thousand million web users?

16   A.   Yes.

17   Q.   And then you say, "I so totally agree with you.  We all

18   do.  They also take Java for Android without attribution or

19   contribution."

20   A.   Yes.

21   Q.   Those were your views?

22   A.   Yes.

23   Q.   And then you say, "That is were I love Scroogle"?

24   A.   Yes.

25   Q.   Now, when you wrote your blog, did you say in it that they
```

1   also take Java for Android without attribution or contribution?

2   **A.**   No.  There was no point in saying that.

3   **Q.**   But you didn't say that; right?

4   **A.**   Well, I'm -- the blog is there to promote Sun, not to

5   speculate or criticize.  It's there to create opportunity for

6   us, not to diminish opportunity for us.

7   **Q.**   But these were your honest, internal thoughts that you

8   were stating here, right, to Mr. Mickos?

9   **A.**   Well, first of all, I was trying to motivate Mr. Mickos to

10  feel like we had a future that he could be a part of.

11  **Q.**   Right.

12  **A.**   So part of my objective in agreeing with him is to try to

13  motivate him.

14  **Q.**   And motivating him was saying that "They take Java for

15  Android without attribution or contribution and that it's funny

16  with Google, they take without paying."  That's a form of your

17  motivation?

18          **THE COURT:**  Is that a question?

19  **BY MR. BICKS:**

20  **Q.**   That's a form of motivation?

21  **A.**   Can you ask the question again?

22  **Q.**   This was your form of motivation to say this?

23  **A.**   It was to support the critique that Marten, who is one of

24  the pioneers in the free and open source software movement,

25  had.  He was an employee at Sun.  We wanted to keep him

**SCHWARTZ - CROSS / BICKS**

1    motivated and keeping him aligned with where we were headed.

2    **Q.**   And let me show you -- I want to ask you a question about

3    the spec license.  Do you remember you talked a little about

4    that?

5    **A.**   I do.

6    **Q.**   I want to show you 610.1 and let me show you that.

7               **THE COURT:**  What is the exhibit number?

8               **MR. BICKS:**  It's 610.1.

9               **MR. VAN NEST:**  This is another undisclosed exhibit,

10   Your Honor.

11              **THE COURT:**  610 what?

12              **MR. BICKS:**  610.1.

13              **MR. VAN NEST:**  Another one undisclosed, Your Honor.

14              **THE COURT:**  If it's undisclosed, let's pass it.

15              **MR. BICKS:**  Well, Your Honor, I didn't know he was

16   going to get into -- start talking about the licensing.

17              **THE COURT:**  All right.  Go ahead.  Ask your questions.

18   **BY MR. BICKS:**

19   **Q.**   Are you familiar with the spec license, sir?

20   **A.**   No, I'm not.

21   **Q.**   So if I started walking you through provisions of it,

22   would you know exactly what the details are?

23   **A.**   No.  It's a legal contract.

24   **Q.**   Right.  And you're not familiar -- you're not an expert on

25   legal contracts; right?

1    **A.**    I'm not a lawyer.

2    **Q.**    And you remember that -- you know who Mr. McNealy is;

3    right?

4    **A.**    I'm very familiar with Scott.

5    **Q.**    I'm sorry.  You're familiar with him?

6    **A.**    Yes.

7    **Q.**    And you've got emails from him?

8    **A.**    Quite a few.

9    **Q.**    Let me show you 563.  This is an email you've got.  Is

10   this an email you've got?

11   **A.**    Yes.

12           **MR. BICKS:**  And can I move 563 into evidence?

13           **MR. VAN NEST:**  No objection.

14           **THE COURT:**  Received.

15   (Trial Exhibit 563 received in evidence)

16   **BY MR. BICKS:**

17   **Q.**    He says March 8th, 2007; right?

18   **A.**    Yes.

19   **Q.**    And he is somebody who you have a great deal of respect

20   for; right?  He was essentially, at one point, the CEO on the

21   Board?

22   **A.**    Yes.

23   **Q.**    And he says to you, "The Google thing is really a pain.

24   They are immune to copyright laws."

25           Do you see that?

SCHWARTZ - CROSS / BICKS

1    A.    I do.

2    Q.    And this was the highest-ranking executive at the company

3    at that time; right?

4    A.    He was entitled to his opinions.

5    Q.    And he sent this on to you, didn't he?

6    A.    Yes, he did.

7    Q.    And I'm scrolling up at the top -- and you didn't disagree

8    with that, did you?

9    A.    He was primarily asking for admin support so it didn't

10   seem appropriate to respond to his comment, right.

11   Q.    But you didn't; right?

12   A.    No.

13   Q.    And one thing we know of is that intellectual property and

14   things of that nature were critical to Sun; right?

15   A.    Absolutely.

16   Q.    And how much did you invest in intellectual property when

17   you were the CEO?

18   A.    Billions of dollars.

19   Q.    And those were critical investments for your company;

20   right?

21   A.    Yes.

22   Q.    And those APIs were very important intellectual property

23   to your company; right?

24   A.    Promoting them around the world was very important, yes.

25   Q.    And they were important intellectual property; right?

1   A.   Promoting them freely across the world was absolutely

2   important.

3   Q.   And substantial investments were made in all aspects of

4   Java by your company; right?

5   A.   Absolutely.

6   Q.   And you agree that it's important for shareholders who

7   invest and contribute money to Sun, that their investments be

8   protected when it comes to intellectual property; right?

9   A.   Absolutely.  We have multiple strategies for making that

10  happen, some of which include promoting them freely across the

11  world.

12  Q.   Yep.  Yep.  Yep.

13       So what I did here was I made a list of all the things

14  that were in those emails, and I'm going to ask you, the word

15  *crap*, did you put that in your blog?  *Yes or no*?

16  A.   No.

17  Q.   *Fast and loose with licensing terms,* did you put that in

18  the blog?

19  A.   No.

20  Q.   Did you put in that *no clue what they are up to* -- did you

21  put that in the blog?

22  A.   I can save you the time and simply say I didn't put any of

23  that in the blog.  They were internal thoughts.  It would be

24  inappropriate to put it in a public communication.

25  Q.   *Take Java for Android without attribution or contribution.*

1   Did you put that in there?

2   **A.**   Again, I can make the same point.  Those were all

3   inappropriate to put in a public blog.

4   **Q.**   Right.

5       But these were truthful points, weren't they?

6   **A.**   At the time and to the best of my knowledge, but obviously

7   there is a lot of speculation, there is a lot of motivation,

8   there are things I'm going to say internally that just won't be

9   appropriate for a public blog.

10  **Q.**   *Horrible product, lame, they take without paying, taking*

11  *IP and other risks, things likes that.*  None of that was in the

12  blog; right?

13  **A.**   Not all those were statements made by me.  They were

14  statements made by others so I wouldn't put other people's

15  quotes in my blog.

16          **MR. BICKS:**  All right.  Thank you very much.

17          **THE COURT:**  Done?

18          **MR. BICKS:**  Yes.

19          **THE COURT:**  Thank you.

20      How long will the redirect be?

21          **MR. VAN NEST:**  Just a couple minutes, Your Honor.

22          **THE COURT:**  All right.  Let's try to finish.

23      Can we all go a few more minutes and then we can take our

24  break?  All right.  Let's please do that.

25

1
<u>**REDIRECT EXAMINATION**</u>

2
**BY MR. VAN NEST:**

3
**Q.**   Could I have Exhibit 563 up, please.  Do you have 563 up

4
there?

5
**A.**   Yes, I do.

6
**Q.**   You were just shown this.  Could we blow up the date.

7
        This is the one about the Google thing is really a pain.

8
This is March of 2007; correct?

9
**A.**   Yes.

10
**Q.**   That's six months before Android was even announced;

11
right?

12
**A.**   Yes.

13
**Q.**   Is there anything in that email about Android?

14
**A.**   No.

15
**Q.**   As far as you can tell, is it related to Android in any

16
way?

17
**A.**   No.

18
        **MR. VAN NEST:**  That's all I have, Your Honor.

19
        **THE COURT:**  All right.

20
     Anything on recross?

21
        **MR. BICKS:**  Nothing, Your Honor.

22
        **THE COURT:**  May this witness be excused and discharged

23
from any subpoena?

24
        **MR. BICKS:**  Yes.

25
        **MR. VAN NEST:**  Yes, Your Honor.

PROCEEDINGS.

1          THE COURT:  Mr. Schwartz, thank you for coming.

2          THE WITNESS:  Thank you, sir.

3          THE COURT:  You are free to go.  No more subpoena.

4    All right?

5          THE WITNESS:  Thank you.

6          THE COURT:  I want to say to the jury, we're going to

7    take a 15-minute break now.  Remember the admonition, no

8    talking about the case.  See you back here in a few minutes.

9          (Proceedings were heard out of presence of the jury:)

10          THE COURT:  Please be seated.  I have a comment I want

11    to make, a request to the lawyers, but before I do that, is

12    there any issue you need to take up with me?

13          MR. VAN NEST:  I don't believe so, Your Honor.

14          THE COURT:  Over there?

15          MR. BICKS:  No.

16          THE COURT:  This is not meant as any kind of a

17    criticism, but I do think that we need to be careful when

18    you're examining witnesses, and this applies to both sides, but

19    I'm just going to give some examples from what we just heard.

20          Mr. Bicks, you converted the word *licensing terms* to

21    *licensing rules*.  I know it was inadvertent, but there is a

22    difference; a difference, of course, that helps your side.  But

23    the document didn't say *licensing rules*.  It said *terms*.

24          And when you're -- you've got the witness on the ropes, he

25    didn't actually agree with that, but if we're going to quote

1   from a document, we've got to quote from it the way it's there.

2       And at one point you converted the word *lame* to *lousy*.

3   You argued with him over whether or not he had used the word

4   *lousy*.  It turned out it was *lame*.  Maybe those two mean the

5   same, but maybe not.

6       On Exhibit 1055, it used the word *specification*.  It did

7   not say *specification license*.  And as I understand it, the

8   specification is the overall API set of libraries with the

9   declaring code.  The declaring code part of that is the

10  specification.  And it's not the specification license.  That's

11  a license that has a lot to do with the specification and the

12  use of it, but you converted 1055 to dealing with the license

13  and not the specification.

14      And then finally, when you used the term API, it -- I'm

15  not -- you're free to do this and both sides can do it, but

16  one -- you two keep arguing over what does API mean.  Well, it

17  certainly, as I understand it -- the API is the overall library

18  and it includes the declaration, but it also has the

19  implementing code.

20      So when there's a suggestion that the implementing code

21  was stolen, that's just not true.  Everyone should be conceding

22  that that was not stolen in any way.  What was copied was the

23  declarations and the SSO.  So if it comes down to later on

24  there's some objection made because the evidence is not clear

25  or it's ambiguous or whatever, I guess that's a matter of

**PROCEEDINGS**

1  argument before the jury, but as someone who -- here we are at

2  the outset of the case.  I think it would behoove both sides to

3  be more precise and to stick with what the documents say and

4  not embellish.  On a key question like API and what it means,

5  you have to be -- you've got to try to be more clear.

6      However, as a former trial lawyer, I sympathize with what

7  you both are up to and I'm not making anything more than an

8  observation and a request, and I know you have a very hard job

9  to do.

10     Okay.  We're going to take a 15-minute break.  Thanks.

11                 (Recess taken at 11:30 a.m.)

12              (Proceedings resumed at 11:44 a.m.)

13     (Proceedings were heard in the presence of the jury:)

14         **THE COURT:**  Google may call its next witness.

15         **MS. ANDERSON:**  Thank you, Your Honor.  Google calls

16  Mr. Andy Rubin, who is already seated.

17         **THE COURT:**  Please stand and raise your right hand.

18             **ANDY RUBIN**, **DEFENDANT'S WITNESS, SWORN**

19         **THE CLERK:**  Thank you.

20         **THE COURT:**  Thank you, Mr. Rubin.

21     Do you see the microphone?  You need to be about as close

22  as I am to make it sound right.

23     Say your name, please.

24         **THE WITNESS:**  Something like this?  Is that good?

25     My name is Andy Rubin.

1          **THE COURT:**  Can everyone in the jury box hear loud and

2    clear?  Maybe you ought to adjust it upwards a little bit

3    because you're tall.

4          **THE WITNESS:**  Something like that.  How is that?

5          **THE COURT:**  Ms. Anderson, the floor is yours.  Please

6    proceed.

7          **MS. ANDERSON:**  Thank you, Your Honor.

8                        <u>**DIRECT EXAMINATION**</u>

9    BY MS. ANDERSON:

10   **Q.**   Good morning, Mr. Rubin.  Would you please introduce

11   yourself to the jury and let them know who you are in

12   relationship to this case.

13   **A.**   Sure.  My name Andy Rubin and I'm an entrepreneur and one

14   of the founders of Android.

15   **Q.**   Would you please describe for the jury at a high level

16   your career over the years.

17   **A.**   Yep.

18        I graduated with a degree in computer science, and then I

19   started working at robotics companies.  Eventually came to

20   Silicon Valley to work for Apple, and then I caught the startup

21   bug a little bit and worked for my first startup called General

22   Magic after that.  And this was as an engineer, so I was

23   writing software for many, many years.

24        And then after General Magic, another startup, WebTV, and

25   then I started my first company called Danger after WebTV, and

1   then I started Android which later got acquired by Google.

2   **Q.**   Thank you.

3        And are you still with Google today?

4   **A.**   No, I'm not.

5   **Q.**   And where do you work today?

6   **A.**   I started another company post-Google called Playground.

7   **Q.**   And would you describe to the jury the name of your

8   company and generally what it does.

9   **A.**   Sure.

10       Playground Global is the official name.  It's a venture

11  capital firm and kind of product services organization.  So we

12  invest in entrepreneurs, mentor them, and also help them build

13  their product.

14  **Q.**   Is Google one of the investors in your company?

15  **A.**   Yes, it is.

16  **Q.**   Would you please tell the jury what years you were with

17  Google, when did you start and when did you leave?

18  **A.**   Sure.

19       About 2005 to early 2014 was my time at Google.

20  **Q.**   And during the years that you were with Google, what was

21  your role in regard to Android?

22  **A.**   For the majority of the time, I think over nine years, it

23  was leading the Android effort within Google.

24  **Q.**   When you say you led the Android effort within Google, did

25  that include overseeing the engineering team and others who

**RUBIN - DIRECT / ANDERSON**

1   were working on developing and releasing that platform?

2   **A.**   Yes, it did.

3   **Q.**   Let's back up a little bit in time.

4       Would you please just tell the jury how you became

5   interested in computers?

6   **A.**   Well, I mean, when I was a kid I was really interested in

7   tinkering and trying to learn how things work.  My parents

8   enjoyed supporting me in doing that.  I would take apart their

9   phones and they would tolerate it, and things like that.

10      And then in 1976 or '77, I got -- I convinced them to get

11  me my first computer.  And this was in an era where computers,

12  you couldn't take them home.  So this was a new thing.  And

13  they supported me.

14      And I began learning everything I could about the

15  technology in computer and, kind of, immersing myself in it for

16  many, many years after that.

17  **Q.**   Over the course of the years that you have been involved

18  in computers, have you had occasion to learn how to program?

19  **A.**   Of course, yeah.  When I was young, probably 14 years old.

20  In that time frame, yes.

21  **Q.**   All right.  In what languages?  Could you give examples to

22  the jury.

23  **A.**   In those early days, it was basic. It was in a language

24  that, you know, came with the program.  But then as I went to

25  university I learned C assembly language, other languages as

RUBIN - DIRECT / ANDERSON

1   well.

2   Q.   One of the things you mentioned is that you had founded a

3   company called Danger.

4   A.   Yes.

5   Q.   When did you found the company called Danger?

6   A.   It was in December of 1999, I believe.

7   Q.   And how long did you work there?

8   A.   About four years.

9   Q.   What, generally, did Danger do?  What was its line of

10  business?

11  A.   We built, I think, what could be called one of the first

12  smartphones.

13  Q.   Would you describe that to the jury, please.

14  A.   Sure.  It was called the T-Mobile Sidekick.  And it was a

15  phone that was very, very good at accessing the Internet as

16  well as being a regular phone that you could make phone calls

17  with.

18  Q.   When you say that it was a smartphone, are you

19  distinguishing it in any way from some other kind of phones

20  available at the time?

21  A.   Yeah.  I mean, the prevalent phones in the market were

22  what we called feature phones.  They had small screens.

23       In the 1999 time frame, the carriers didn't have any data

24  networks.  So you couldn't go buy a data plan from, like,

25  Verizon or AT&T.

**RUBIN - DIRECT / ANDERSON**

1       So it was, kind of, on the cutting edge of -- you know,

2  Danger was experimenting on the cutting edge of what you could

3  do beyond what the feature phones were doing.  They were just

4  good phones.

5  **Q.**   And when you described that Sidekick phone as one of

6  the -- the first smartphone, I believe you said, is it the kind

7  of smartphone that we're familiar with today, the modern

8  Android and iPhones?

9  **A.**   More or less.  I mean, it did a lot of the same

10 functionality.  It allowed to you surf the Web, get the full

11 Web on a phone.  It had a larger screen.  The screen could be

12 in landscape or portrait mode.  It did instant messaging.  It

13 did email and things like that.

14      What it lacked is some of the user refinements like

15 touchscreens and things like that.  It didn't have a

16 touchscreen.

17 **Q.**   Did you consider that phone to have been as successful as

18 the modern devices we see today on Android?

19 **A.**   The scale is much different.  I think in that era we sold

20 about 2 million of the T-Mobile Sidekicks, which isn't very

21 much.

22 **Q.**   Isn't very much as compared to what?

23 **A.**   As compared to what a smartphone would do today, which

24 would be in the hundreds of millions per phone.

25 **Q.**   When did you leave Danger?

**RUBIN - DIRECT / ANDERSON**

1   **A.**   Left Danger in 2004.

2   **Q.**   And why did you leave Danger?

3   **A.**   I wanted to pursue my next -- my next startup company.

4   You know, I thought Danger -- we did a good job of, kind

5   of, creating that category of smartphones -- really nailed

6   being a very, very good Internet device.

7   When we founded the company, we loved the Internet.  We

8   loved that you could always have information at your

9   fingertips.  But we didn't like being rolled up to our desktop

10   computer to do it.

11   So we spent a lot of time thinking about the technology

12   necessary to cut that cord and bring the Internet with you.  So

13   I hope we did a great job.

14   But in order for it to be the hundred-million category,

15   you know, the mass-marketed product, I felt it also needed to

16   be a very good phone.  Needed to be pocketable.  It needed to

17   be small.

18   So I left to start another company that really focused on

19   bringing that to the mass market.

20   **Q.**   And what was the other company that you decided to found?

21   **A.**   That company was Android.

22   **Q.**   What year did you found Android?

23   **A.**   Android was founded in 2004, right after I left Danger.

24   **Q.**   And what was the goal of Android?

25   **A.**   To create a combination of the best Internet experience

1   and the best phone.

2   **Q.**   All right.  Did you have a business plan, when you founded

3   Android, as to how you would make Android devices available?

4   **A.**   Again, I mean, this is a matter of scale.  How do you --

5   how are you a small startup company, and how can you best

6   leverage your expertise to bring it to as many people as

7   possible.  That was the goal of the new company.

8        So we kind of innovated this model of open source, which

9   is, I didn't need to have a skyscraper full of salespeople

10  selling my product into the wireless industry, which is a

11  global industry.  So I didn't have to have people in Korea,

12  China, in the United States.

13       With open source, I could just basically create the

14  perfect operating system and the perfect smartphone, and let

15  the open source adoption spread it across the globe.

16  **Q.**   And who would be using this open source software that you

17  are describing?

18  **A.**   Primarily, it would be the engineers at -- at mobile phone

19  manufacturers like Samsung, as well as wireless operators.  But

20  it was basically -- it was software, right.  So it was mostly

21  meant for engineers.

22  **Q.**   And when you say "open source," what do you mean by that?

23  **A.**   I mean that everything we created we gave away for free.

24  So there was no charge to get it.  And we uploaded it to a file

25  server on the Internet.  And anybody could download it in

1    source code form.

2    **Q.**   When you say you were planning to provide the software for

3    free in an open source fashion, what were you hoping that would

4    accomplish, if anything, in regard to innovation?

5    **A.**   Well, you know, I was kind of unhappy with the innovation

6    in the cell phone space in that era.  It was really, really

7    hard to build a phone.  And it was mostly hard because there

8    was a whole ecosystem of software developers, these little

9    companies that somebody like a Motorola would have to aggregate

10   all these different pieces, like pieces of a puzzle.  And they

11   would have to build a video player from one company, and an

12   operating system from another company, and the user interface

13   from a third company.

14       And that would all get kind of put into these feature

15   phones.  And the result, it just wasn't a good user experience.

16   It wasn't good for the consumer.

17       And I was frustrated because I was a consumer.  I used

18   these things.  And I just wanted it to be much, much better.

19   So our goal was to make that whole vertical stack in one space,

20   where we could control the user experience and make it the best

21   for consumers.

22   **Q.**   Did you have any business plan, in regard to Android, that

23   Android would provide any way to make any money, given that you

24   were providing the software, the open source software, on a

25   free basis?

**RUBIN - DIRECT / ANDERSON**

1  **A.**   So how do you make money if you give everything away for

2  free?

3       So there are really two parts to the business.  One part

4  was that open source platform, where we wanted to create a

5  great user experience.  The other one was a services business

6  model.  And we sold the services to wireless operators.

7       So you kind of give the thing away for free to consumers,

8  but you have provisioning servers and app stores, and things

9  like that, that you sell to the industry, to the wireless

10  industry, to make your money.

11  **Q.**   Did Android, the company you founded, ever become a part

12  of Google?

13  **A.**   It did in.  July of 2005, we got acquired by Google.

14  **Q.**   And when Android was acquired by Google in 2005, what role

15  did you have at Google in regard to Android?

16  **A.**   I was the director of the engineering project, continuing

17  to head up the effort within Google.

18  **Q.**   And when you say "continuing to head up the effort," do

19  you mean continuing to head up Android or something else?

20  **A.**   It was Android, but within Google.

21  **Q.**   All right.  For how long were you the head of the Android

22  team at Google?

23  **A.**   Uhm, for the -- almost the remainder of my entire stay at

24  Google.  About nine and a half years.

25  **Q.**   Did that end at about 2013?  Does that sound right?

**RUBIN - DIRECT / ANDERSON**

1  **A.**    Uh-huh.

2  **Q.**    Okay.  Once Android was acquired by Google, did the

3  general approach and plan of offering Android as an open source

4  software platform change in any way?

5  **A.**    No.  I mean, I think that was one of the things that

6  meshed really well with Google, is that they had their own

7  services business model.  They had Gmail and Google Maps and

8  Search.  And those are all cloud services.

9       So with Android we could keep our open source strategy.

10  But instead of the Android services that we're selling to

11  wireless operators, it became Google services instead.

12  **Q.**    Thank you.

13       And to orient us a bit to the time frame of the questions

14  I'm about to ask you, I would just like you to take a look, if

15  you can, at this timeline.

16       Are you able to see it at all from there?

17  **A.**    I think so, yes.

18  **Q.**    Here we have in the timeline July 2005 Google acquires

19  Android.  Does that sound right to you?

20  **A.**    Yeah.

21  **Q.**    All right.  And here we have November 2007, Google

22  releases Android.  Do you see that?

23  **A.**    Yes.

24  **Q.**    And are those dates correct, in your recollection?

25  **A.**    That's about right, yeah.

**RUBIN - DIRECT / ANDERSON**

1  Q.   All right.  And just to keep some more time frames clear,

2  what did Google release in regard to Android in November of

3  2007?

4  A.   It was the software development kit, some documentation.

5  Basically, a simulator.

6      You know, when you create something like this, you have a

7  little bit of a chicken-or-egg problem.  You're not building a

8  phone, and you have an operating system.  But you want the OEMs

9  to, kind of, get involved.  You want them to check it out.

10     So the Samsung and the Motorolas of the world, you want

11 them to basically be able to look at your work.  And that was

12 the purpose of this release.

13 Q.   And you said "SDK."  That stands for software development

14 kit; is that right?

15 A.   That's correct.

16 Q.   And as part of the release in November of 2007, that

17 you've been describing, did the release include information

18 about whether or not Java and Java APIs were being implemented

19 as part of Android?

20 A.   I believe it did.

21 Q.   All right.

22 A.   I believe the SDK had documentation around the APIs, which

23 were implemented in Java programming language.

24 Q.   And so when you were referring to Java -- strike that.

25 Excuse me.

1       When you're referring to the APIs that were part of the

2   November 2007 release, you're including within them Java APIs;

3   is that right?

4   **A.**   Yes.   Yes, that's right.

5   **Q.**   All right.   And then was there a later point in time at

6   which further information or code was released as part of the

7   Android release?

8   **A.**   Yes.   At some point after that, I think it was coincident

9   with the release from the first phone, which was the HTC-G1, we

10  released the entire source code for the platform.

11  **Q.**   Okay.   And does October 2008, give or take, sound correct

12  to you?

13  **A.**   Sounds about right.   It's a long time ago, but it sounds

14  about right.

15  **Q.**   All right.   And as part of that release, could you tell

16  the jury what was released to the public as part of that

17  release of code?

18  **A.**   I think -- I mean, the best way to describe that event was

19  that was the open-sourcing event.   That's when we took the

20  years of work that we did, you know, silently inside of Google

21  and we released it to the world.

22  **Q.**   And just to clear, as part of that release did Google

23  release all of the code that it had implemented and

24  incorporated as part of the Android Open Source platform it was

25  releasing at that point?

**RUBIN - DIRECT / ANDERSON**

1  **A.**   Yes.  All the development up until that point was

2  released.

3  **Q.**   And as part of that, did it release publicly the

4  implementations of the Java APIs that were part of the

5  platform?

6  **A.**   Yes, we did.

7  **Q.**   All right.  So let's focus, if we can, on the period of

8  development of Android from the time that you joined Google in

9  2005, until there was the release of Android publicly.

10     Have you ever heard the phrase "buy versus build"

11  discussed as part of the development at Android at the time?

12  **A.**   Yes, I may have used it myself.

13  **Q.**   What does that mean?  Describe to the jury.

14  **A.**   Well, basically, when you're new entering into this

15  industry -- that's a huge trillion-dollar industry, the mobile

16  industry worldwide -- you have to use, kind of, every mechanism

17  at your disposal to be successful.

18     And I was really worried about the competitive landscape,

19  what everybody else was doing in the industry.  And I wanted to

20  basically figure out a way to basically launch our product

21  faster.

22     At Danger, it took me a little over four years to build

23  the first -- what I consider the first smartphone.  And I

24  wanted to figure out a way to do that faster with Android at

25  Google.

**RUBIN - DIRECT / ANDERSON**

1    **Q.**    Okay.  And so when you talk about "buy" in the

2    buy-versus-build expression, what are you referring to?

3    **A.**    Well, so we could do everything ourselves, and hire all

4    the engineers and do the recruiting, and, you know, get

5    everybody -- get everybody aligned.  But if there was something

6    available where I could just buy it, software that was already

7    developed by another team or another company, I could bring it

8    in-house and accelerate that whole effort.  I wouldn't need as

9    many engineers.  I wouldn't need as many resources.  I could do

10   it much quicker.

11   **Q.**    And where does the use of open source free software fit in

12   the buy versus build continuum you're describing?

13   **A.**    Sure.  I mean, in a couple of scenarios we could pay money

14   to a developer that had developed a piece of software and bring

15   it in-house.

16        Remember when I talked about all the different ways people

17   used to make cell phones, they used to make these puzzle

18   pieces.  I felt that if we brought some of those puzzle pieces

19   in-house that we could actually control that user experience

20   better.  Then it would be coming from one team, would be the

21   end result.

22        So we -- you know, it's not necessary to pay money for

23   everything that engineers develop.  There was this open source

24   movement that we were part of.  And some of the software in the

25   build -- make-versus-buy discussion was brought in from

1  existing open source projects.  And it was a huge accelerant to

2  our effort.

3  Q.  Okay.  Does the phrase open -- strike that.

4       Does the phrase "Open Handset Alliance" have any

5  relationship to Android?

6  A.  It does.  The Open Handset Alliance was something that we

7  created to basically get the industry support for Android.

8       It was a collection of semiconductor companies, the people

9  that built the chips that went inside the phones, cell phone

10  manufacturers, software companies, and wireless operators.

11      So that was basically everybody that was, kind of,

12  necessary to bring a phone to market.  And we had multiple of

13  each in the alliance.

14  Q.  And were the participants in the Open Handset Alliance

15  supporters of the release of Android?

16  A.  Yes, of course.  That was the reason they joined us.

17  Q.  Can you provide the jury with some examples of companies

18  that were members of the Open Handset Alliance with regard to

19  Android?

20  A.  Sure.

21      I think Texas Instruments is one of the companies that was

22  building the semiconductor components for us.

23      PacketVideo was a company that we licensed video playback

24  software for, and brought it in in one of those make-versus-buy

25  decisions, and incorporated it into the platform.

**RUBIN - DIRECT / ANDERSON**

1    Q.   When you were working on the development of Android while

2    at Google, did you and your team have occasion to consider

3    different technical options that were available for developing

4    that platform?

5    A.   Certainly.  I mean, we were -- I remember hallway debates

6    pretty, much constantly in the early days, where people were

7    trying to architect this perfect system that we were off

8    building.  It happened quite often.

9    Q.   Okay.  Could you give the jury some examples of the kinds

10   of decisions you had to make and your team had to make in

11   choosing how to build this platform?

12   A.   Sure.  I mean, you know, a lot of it was decisions about

13   acceleration.  How do we do it faster?  How do we do it more

14   efficiently?  Nobody likes, kind of, reinventing the wheel if

15   not necessary.

16       And some of the decisions were, What's this thing going to

17   look like for the developers, for the app developers, for the,

18   you know, the guys that are writing the angry bird app?  How

19   are they going to be able to write their app?

20       So we thought a lot about the programming languages that

21   third-party developers would use to write their apps and things

22   like that.

23   Q.   Okay.  Of the many decisions that may have gone into the

24   development of Android, would you characterize the decision of

25   what language that developers would be able to use to write

**RUBIN - DIRECT / ANDERSON**

1  applications in something that occupied a lot of the time of

2  the Android team?

3  **A.**   I mean, in the grand scale of things, I think it was -- it

4  was an important decision for us, but it didn't occupy a lot of

5  time.   I think the decision happened pretty quickly.

6  **Q.**   And were there other choices of languages available to you

7  that you considered at the time for use in the Android

8  platform?

9  **A.**   Yes.   Like I said, these were lively discussions.   And the

10  nature of engineering is everybody has an opinion and everybody

11  has, kind of, their favorite.

12      So it wasn't a democracy, but I think we gave it a little

13  time to argue between things like Lua, which was a programming

14  language back then; JavaScript, which was a programming

15  language back then; Python, which was another programming

16  language.

17      We were trying to figure out, kind of, what the

18  up-and-coming thing was; what already had an installed base.

19  There's a lot of complexity in picking the right thing.

20  **Q.**   And was there a debate within your own team as to what was

21  the appropriate language?

22  **A.**   Yeah.   I would say absolutely, yes.

23  **Q.**   Okay.   During the course of your development of the

24  Android platform, did you believe at the time whether or not

25  Java was necessary to the success of Android?

**RUBIN - DIRECT / ANDERSON**

**A.**   My opinion was it wasn't necessary.   It was just another one of those accelerants.

**Q.**   Why did you decide to turn to the Java Language as the language that would be available for developers who wanted to write apps for Android?

**A.**   I mean, one of the mechanisms I used to reduce the set of all of the languages that everybody was arguing for is I spent a lot of time thinking about, how do developers learn these languages?   You know, what does it take to bring a developer up to speed?

I mean, we could have created our own programming language for this thing.   But the work that a developer would have to go through to learn something completely new, I thought, was just out of question.   I didn't want to burden a new developer with having to learn something new, because I had a new platform that I was about to release to the market and they had other choices.   So I was trying to get the mind share of the developer so that it was frictionless for them to adopt my platform.

And the way I did that is I looked at all the programming language that a developer -- that an engineer might be taught in university, right.   And that reduced dramatically the number of languages we could have chosen, including building our own because that couldn't have been taught in university.   And we ended up picking one that was, you know, taught in university

**RUBIN - DIRECT / ANDERSON**

1   to engineers.

2   **Q.**   During the course of your time with the Android team at

3   Google, did you have reason to pay attention to what potential

4   competition existed in the market to Android phones?

5   **A.**   Of course.  We spent a lot of time thinking about the

6   landscape and where the market would move in the future.

7   **Q.**   Okay.  Did there come a point in time when you became

8   aware of the iPhone during the period you were with Android?

9   **A.**   Yeah.  I mean, the iPhone was -- we were going to be in

10  development a long time when we were working with Android.  And

11  then, you know, even before we shipped our first phone, the

12  iPhone launched.

13  **Q.**   Okay.  And did you have an understanding as to what

14  language developers were using to develop apps for iPhone as

15  part of the work you did in studying the market?

16  **A.**   Sure.  I mean, you know, the market -- the existing mobile

17  market consisted of a lot of different programming languages to

18  make phones work.

19      You know, there was Microsoft Windows software that was

20  out there, that used a specific programming language called C

21  and C++.  And when the iPhone was announced and the developer

22  kit was made available, they used an derivative of C called

23  Objective C.

24  **Q.**   So when you're talking about Objective C, is that the same

25  language as Java?

**A.**   It's not the same language, no.  It's another programming

language.

**Q.**   Did you have a view or evaluate, as the head of the

Android team at the time, whether or not the iPhones's use of a

language like Objective C shed any light as to whether or not

the choice of Java for the developer language for Android was a

good choice?

**A.**   Well, I mean, look.  If -- I was spending a lot of time

worrying about the friction that developers would have to

adopt, you know, picking the programming language.

     Another consideration about developers would be, wow, is

it even possible for the developers to just write their

application once and have it run across different phones?

Wouldn't it be great if a developer could write an application

in something like C or Objective C and have it run on the

Android phone and an iPhone.  That would have been a great

scenario.  It would have been easier for the developers.

**Q.**   Easier than what?

**A.**   Easier than programming their app once in Java and then

completely rewriting their application in Apple's programming

language as Objective C.

**Q.**   And just to clarify for the jury, as things stood during

the time you were with the Android team, developers writing

applications for Android would often be writing in the Java

Language but not the language used for developers for the

**RUBIN - DIRECT / ANDERSON**

1    iPhone; is that true?

2    **A.**    Correct.

3            **MS. HURST:**   Objection.   Leading, Your Honor.

4            **THE COURT:**   That was leading, but it was a summary

5    enough opinion -- statement.   I'll allow it.   But try not to

6    lead the witness.

7            **MS. ANDERSON:**   Thank you, Your Honor.

8    **BY MS. ANDERSON**

9    **Q.**    During the course of your work as the head of the Android

10   team early on, when the Android platform was being developed,

11   did you describe the use of the Java Language in the

12   contemplated Android platform as something that would be

13   required for the carriers, for phone carriers?

14   **A.**    I recall using that language, yes.

15   **Q.**    And why did you use that language?

16   **A.**    Well, again, I was optimizing this, you know, small new

17   team within Google to basically sell to a huge industry.   And

18   probably a good percentage of that industry was already

19   familiar with Java.

20        So it wasn't like they required it contractually, but it

21   just made my job easier if I aligned with, you know, what some

22   percentage of the rest of the industry was doing at the time.

23   **Q.**    Based on your observations of the market after Android was

24   released, do you believe that your view about requirements was

25   accurate at the time?

**RUBIN - DIRECT / ANDERSON**

1    **A.**    It changed over time obviously.  Everything changes.  But

2    at the time I think it was probably neutral.  I don't think it

3    was as big an advantage as I hoped.

4    **Q.**    Does the market for the iPhone have any effect on your

5    view in that regard?

6    **A.**    Absolutely.

7         **MS. HURST:**  Object, Your Honor.  This is present-day

8    opinion regarding past events.  The witness was not disclosed

9    as an expert.

10        **THE COURT:**  Sustained for now.

11        **MS. ANDERSON:**  I would be happy to rephrase, Your

12   Honor.

13        **THE COURT:**  Please rephrase it.

14   **BY MS. ANDERSON**

15   **Q.**    During the period of time you were with Android, when you

16   were evaluating what was going on in the market around Android,

17   did your understanding of the iPhone success have any effect

18   on your views?

19   **A.**    Well, we started before the iPhone was announced.  And

20   as we evolved, other operating systems were out there.

21        The iPhone, I think, is the most -- you know, the

22   biggest impact to the industry because it was so different at

23   the time.  But that was definitely the beginning of a sea

24   change for sure.

25   **Q.**    And, again, did the iPhone use the Java Language?

1    **A.**   It did not.

2    **Q.**   Did you have a view, during your years of working with the

3    Android team and developing the Android platform, as to whether

4    or not the Java Language was free for you to use as part of the

5    Android platform?

6    **A.**   I believe that the Java programming language was free to

7    use for us.

8    **Q.**   Same question now, but directed to the declarations and

9    organization of the Java APIs.

10        Did you have a view, at the time you were working with the

11   Android team, as to whether or not your team was free to use

12   the API declarations and organization as part of the

13   development of the Android platform?

14            **MS. HURST:**   Objection.   Leading, Your Honor.

15            **THE COURT:**   Well, it is leading.   I think you should

16   rephrase it.

17            **MS. ANDERSON:**   Sure, Your Honor.

18   **BY MS. ANDERSON**

19   **Q.**   Did you have an opinion -- strike that.

20            **THE COURT:**   Why don't you say, To what extent, if at

21   all, did you have an opinion whether or not, then --

22            **MS. ANDERSON:**   Sure.

23            **THE COURT:**   -- fill in the blank.

24            **MS. ANDERSON:**   Thank you, Your Honor.

25

1    BY MS. ANDERSON

2    Q.    During your time with the Android team, Mr. Rubin, to what

3    extent did you have an opinion, if at all, as to whether your

4    team was free to use API declarations and organization for the

5    Java APIs as part of the development of the platform?

6    A.    I mean, we didn't think there was any problem with us

7    using the API declarations for the development of Android.

8    Q.    All right.  Let's turn, now, to another subject but during

9    the same period of time.  Your discussions that you may have

10   had with Sun, all right.

11         After you joined Google in 2005, did you begin having

12   discussions with Sun as to whether or not they might have a

13   relationship with Google with respect to Android?

14   A.    Yes.  I was -- we had a lot of discussions with Sun over

15   the years.  The initial discussions around them contributing

16   some of the pieces of Android in the make-versus-buy decisions,

17   and ultimately inviting them to become a member of the Open

18   Handset Alliance.

19   Q.    Beginning in 2005, did you have any personal interaction

20   with Sun over these subjects?

21   A.    Yeah, I would frame it as I led those discussions.

22   Q.    All right.  And at a high level, could you please explain

23   to the jury what was the general nature of what you were

24   discussing with Sun on behalf of Google in or around 2005, on

25   the subject of Android?

1  **A.**   Well, we were -- we were trying to accelerate the effort.

2  We were trying to bring in technology that Sun had implemented.

3  J2ME, virtual machines, Java libraries.  Everything necessary

4  to basically put the programming language on an Android phone.

5  **Q.**   Thank you.

6       Would you please take a moment and take a look at Exhibit

7  1, which should be in the folder before you on the table.

8       And I ask you if you recognize this document?

9  **A.**   Yes, I do.

10 **Q.**   And what is it?

11 **A.**   It's a presentation that I gave to the executive team at

12 Google shortly after arriving at Google in 2005.

13       **MS. ANDERSON:**  Your Honor, we offer Exhibit 1 in

14 evidence.

15       **MS. HURST:**  No objection.

16       **THE COURT:**  1?

17       **MS. ANDERSON:**  1.

18       **THE COURT:**  1.  Is received.

19       (Trial Exhibit 1 received in evidence.)

20       **MS. ANDERSON:**  Thank you.

21       (Document displayed.)

22 **BY MS. ANDERSON**

23 **Q.**   Now, would you please explain to the jury to whom this

24 presentation was made.

25 **A.**   Yeah.  It was the management team, the Google management

1  team.  So the vice presidents and above.

2  **Q.**   And what does "GPS" stand for?  We see that on the front

3  page.

4  **A.**   It's an outdated term, but it was Google Product Strategy.

5  **Q.**   And at the time you made this presentation, how long had

6  you been with Google?

7  **A.**   Probably two weeks.

8  **Q.**   Okay.  Was this one of your first presentations at Google?

9  **A.**   It was.

10  **Q.**   All right.  Let's take a look at the fourth page of this

11  presentation.

12      (Document displayed.)

13  **Q.**   We see here on this page some language after the question

14  "What is Android?"  Would you please read that to the jury and

15  explain generally what this is.

16  **A.**   "Project Android is building the world's first Open Source

17  handset solution with built-in Google applications."

18  **Q.**   And what did you mean in this presentation when you say

19  that it would be the first open source handset solution?

20  **A.**   Well, the whole thesis -- I mean, even back in the day

21  when I was raising money in my investor pitches for Android was

22  the world didn't need another operating system.  There was a

23  bunch of operating systems out there for phones.  What the

24  world needed is an open operating system that was vertical, to

25  basically build that better user experience that I talked

1    about.

2    **Q.**    Okay.  If you would, please, turn to page 8 of this

3    presentation.

4         (Document displayed.)

5    **Q.**    Do you see there on the left-hand side of page 8 of this

6    exhibit, you see a number of bullet points.  Would you please

7    explain to the jury at a high level what is being presented on

8    this slide.

9    **A.**    This is basically rationalizing our decision to choose

10   Java as the programming language.

11   **Q.**    And I see here on the first bullet you use the language

12   "Carriers require it."

13        Did you have a view, when you were working with the

14   Android team, that it was an absolute requirement and necessity

15   that carriers utilize Android?  Or was it an optional thing?

16        **MS. HURST:**  Objection.  Leading.

17        **THE COURT:**  Sustained.

18   **BY MS. ANDERSON**

19   **Q.**    Did you have a view, at the time that this presentation

20   was made and during your development of Android, as to whether

21   or not carriers actually required Java?

22        **MS. HURST:**  Same objection.

23        **THE COURT:**  Well, it's preliminary to whether he had a

24   view.  So you can either say yes, you did have a view, or no,

25   you didn't.  So say that much.

**RUBIN - DIRECT / ANDERSON**

1      **THE WITNESS:**  Yes, I had a view on this.

2    BY MS. ANDERSON

3    Q.   And what was your view?

4           **THE COURT:**  You can now ask what the view was.

5           **MS. ANDERSON:**  Thank you, Your Honor.

6    BY MS. ANDERSON

7    Q.   What was your view, sir?

8    A.   My view was that the carriers didn't require it, like I

9    said, contractually.  It just made my job easier.

10   Q.   All right.  And then the reference below that to "MSFT

11   will never do it," what is that a reference to?

12   A.   So Microsoft is MSFT.  And they had their own programming

13   languages.  And they had already shipped phones and were well

14   established in the market.  And -- and I thought at the time

15   Microsoft was our main competitor.

16   Q.   All right.  Thank you.

17         Let's turn to the next page, which is page 9 of this

18   exhibit.  Generally, at a high level, would you please describe

19   to the jury what's being described on this slide.

20   A.   Sure.  So we're basically saying, okay, the thesis was to

21   use the Java programming language for all the reasons we just

22   talked about.  And, now, what is it exactly?  What are we

23   doing?  What are we building?  How does it work?  Things like

24   that.

25   Q.   And I see under "Current Scenario" the first bullet says

1   "Developing a clean-room implementation of JVM."

2        Would you please explain to the jury what that means in

3   that bullet.

4   **A.**   Sure.  So if you want to use the Java programming language

5   you have to, kind of, start from scratch.  We created a -- you

6   know, a clean-room implementation, which means our engineers

7   from scratch created a Java virtual machine that we were going

8   to use for our products.

9   **Q.**   And so --

10  **A.**   In-house Java virtual machine.

11  **Q.**   So does JVM stand for Java virtual machine?

12  **A.**   Yes, it does.

13  **Q.**   And then beneath that there is a bullet that says, "Need

14  coffee-cup logo for carrier certifications."  And right

15  underneath that there is another bullet that says, "Must take

16  license from Sun."

17       Would you please explain to the jury what those bullets

18  mean.

19  **A.**   Sure.  Similar to, kind of, the language around carriers

20  requiring it, this is the crux of it, which is, you know, there

21  was a percentage of the industry that was already using Java.

22  The carriers and the certification people within the carriers

23  recognized Java.  They knew what it was.  They knew how to deal

24  with it.

25       And it would have helped us to be able to call our

1    clean-room implementation Java.  Right.  So it was really a

2    trademark issue on how we licensed that trademark so we could

3    use it when we faced the carrier with our solution.

4            **MS. HURST:**  Your Honor, I'm going to object and move

5    to strike the legal interpretation at the end of that answer.

6            **MS. ANDERSON:**  Your Honor, the witness --

7            **THE COURT:**  No.  Objection is overruled.  You can

8    cross-examine on that.

9            **MS. ANDERSON:**  Thank you.

10   **BY MS. ANDERSON**

11   **Q.**   Mr. Rubin, when you're talking about the reference to

12   "Must take license from Sun," would you tell the jury what you

13   were referring to in terms of the license?

14   **A.**   Yeah.  The license to be able to call our product Java.

15   **Q.**   And when you say "call our product Java," are you or are

16   you not referencing the coffee-cup logo issue you identified in

17   the previous bullet?

18   **A.**   Yes.

19   **Q.**   Thank you.

20   **A.**   That's exactly what I was talking about.

21   **Q.**   Thank you.

22        Did you engage in discussions with Sun following this

23   presentation in Exhibit 1?

24   **A.**   Yes.

25   **Q.**   All right.  Let's take a look at Exhibit 617, which again

**RUBIN - DIRECT / ANDERSON**

1   should be before you in one of those folders.

2   **A.**   Okay.

3   **Q.**   All right.  What is Exhibit 617, Mr. Rubin.

4   **A.**   It's an email between myself and the Sun Java sales lead.

5   **Q.**   Okay.  And when you say "the Sun Java sales lead" who are

6   you referring to?

7   **A.**   His name is Leo Cizek.

8   **Q.**   And when you say "sales lead," in particular what did you

9   understand he was selling for Sun?

10  **A.**   He was selling a broad spectrum of things within the Java

11  organization at Sun.

12  **Q.**   All right.  If I can draw your attention to the earliest

13  email in this string of emails.  Is that an email that you

14  authored in September of 2005?

15  **A.**   Yes.

16  **Q.**   All right.

17          **MS. ANDERSON:**  Your Honor, we would offer Exhibit 617

18  in evidence.

19          **MS. HURST:**  No objection.

20          **THE COURT:**  Thank you.

21      Received.

22        (Trial Exhibit 617 received in evidence.)

23        (Document displayed.)

24  **BY MS. ANDERSON**

25  **Q.**   Let's take a look at Exhibit 617 and the earlier email in

1    the exchange, and in particular the one that appears starting

2    on page 3.

3        Would you please identify whether or not this is the email

4    that you just described in your testimony as having been sent

5    to Mr. Cizek?

6    **A.**    Yes, this is what I was looking at.

7    **Q.**    All right.  Drawing your attention down below, where it

8    says, "Hi, Leo."  In the third paragraph of this email, would

9    you please read the first and second sentence appearing there

10   in that third paragraph.

11   **A.**    "Right now we are moving ahead with the project, and doing

12   an independent implementation.  If Sun would like to get

13   involved, we'd be happy to have you."

14   **Q.**    And what were you seeking to communicate with Mr. Cizek at

15   that time?

16   **A.**    That I would like to partner on the development of the

17   Java programming language for Android.

18   **Q.**    All right.  Let's draw your attention to the first page of

19   Exhibit 617 and the email that goes from yourself to Mr. Cizek.

20       (Document displayed.)

21   **Q.**    There we go.

22       And drawing your attention to this email, in the last

23   paragraph, where you write, "If Sun doesn't want to partner

24   with us to support this initiative, we are fine releasing our

25   work and not calling it Java."

**RUBIN - DIRECT / ANDERSON**

1       Do you see that?

2   **A.**   Yes, I do.

3   **Q.**   What were you communicating to Mr. Cizek of Sun at the

4   time?

5   **A.**   Sure.  At this point, we had already begun our internal

6   clean-room implementation with Java.  I was looking to partner

7   with Sun to accelerate that effort and license technology.

8   Basically, I was communicating, hey, if we can't become

9   partners, then we're just going to go off and continue doing

10  what we're doing.

11  **Q.**   When you say "not calling it Java," does that have any

12  relationship to the bullet we discussed in the last slide deck?

13  **A.**   Yeah.  I mean, obviously, if we couldn't be partners and I

14  couldn't get a license to be able to call it Java, then I

15  wasn't going to call it Java.

16  **Q.**   Okay.  All right.  Let's take a look now at Exhibit 2004.

17       Do you recognize Exhibit 2004?

18  **A.**   Uhm, yeah, I do.

19  **Q.**   All right.  And what is it?

20  **A.**   This is an email from me to Vineet Gupta, who I think was

21  the head of business development at the time for Sun Java.

22       **MS. ANDERSON:**   Your Honor, we offer Exhibit 2004 in

23  evidence.

24       **MS. HURST:**   No objection.

25       **THE COURT:**   Thank you.

RUBIN - DIRECT / ANDERSON

1          Received.

2              (Trial Exhibit 2004 received in evidence.)

3              (Document displayed.)

4    **BY MS. ANDERSON**

5    **Q.**   What is the overall purpose, Mr. Rubin, of this email

6    exchange that you had in October of 2005, with Mr. Gupta of

7    Sun?

8    **A.**   Well, I think, you know, the partnership discussions are

9    progressing.  The teams had been meeting multiple times, I

10   believe.  And this is, kind of, a current state, from Sun's

11   perspective, on some of the action items.  That's, the AIs in

12   the email stands for action items that the sub team came up

13   with.

14   **Q.**   And who is Vineet Gupta?

15   **A.**   I believe, at the time, he was leading the business

16   development, kind of, the partnership.  It's beyond sales.

17   It's -- it's -- it's partnering at a deeper level.

18   **Q.**   And when you say "partnering at a deeper level," are you

19   talking about potential partnership between Sun and Google, or

20   are you referring to a different kind of partnership?

21   **A.**   That kind of partnership between Sun and Google, correct.

22   **Q.**   All right.  Let's take a look at this email.

23          And the first paragraph from Mr. Gupta to you, that

24   begins, "Andy, I have captured below the main AIs," do you see

25   that?

1   A.   Yes, I do.

2   Q.   What did you understand AI to refer to?

3   A.   Action items.

4   Q.   Action items.  Okay.

5        And then drawing your attention down to a little more than

6   halfway down the page, we see a line that begins "Action items

7   from last meetings."  And it encompasses essentially three

8   numbered items.  Do you see that?

9   A.   Yes, I do.

10  Q.   All right.  Would you please describe to the jury what

11  that generally is a reference to.

12  A.   The meeting that we had between the two companies to

13  progress the partnership.  This is -- the action items are the

14  result of that meeting.

15  Q.   And number one, what is that a reference to?

16  A.   You know, if we're going to partner in open source Java,

17  which is one of the things I was asking them to do by

18  incorporating it into my platform, what would be the licensing

19  model?

20  Q.   Okay.  And the second item there, under star number 2, it

21  says "CLDC-HI."  Do you see that?

22  A.   Yeah.

23  Q.   What is that reference to?

24  A.   CLDC, I believe, was the standard for the virtual machine

25  that was available in Java ME at the time.

**RUBIN - DIRECT / ANDERSON**

1    Q.    When you say "Java ME," what are you referring to?

2    A.    The mobile version of Java that was available at the time.

3    Q.    And then below that, where it says "tool chain," what is

4    that a reference two?

5    A.    Tool chain is one of those app developers.  What the Angry

6    Bird developer would use to build their application.

7    Q.    And I see a reference on that same line to "NetBeans."

8    What is that a reference to?

9    A.    NetBeans was Sun's development tool that they made

10   available to third-party developers for Java.

11   Q.    All right.  Let's take a look at the next exhibit, which

12   is Exhibit 11.

13         Have you seen Exhibit 11 before?

14   A.    Yes, I believe I have.

15   Q.    Do you have it before you?

16   A.    Uh-huh.

17   Q.    And what is Exhibit 11?

18   A.    It is, kind of, a presentation that was shared between the

19   companies, between Google and Sun, that was further detailing

20   the partnership discussions that were in progress.

21         MS. ANDERSON:  Your Honor, we offer Exhibit 11 in

22   evidence.

23         MS. HURST:  Your Honor, this one has no Sun recipient

24   on it.  I'm going to object.  This is hearsay.

25         MS. ANDERSON:  Your Honor, this is part of the

```
 1    business records and also reflects that this was a copy of what

 2    was sent to Sun.

 3               THE COURT:  May I see it?

 4               THE WITNESS:  Yes.

 5               THE COURT:  I just want you both to know that -- is

 6    this an email?  You both have contended that emails are

 7    business records.  That's not true.

 8         So if you both want to stipulate going forward that I will

 9    treat emails on both sides as business records, I'll be happy

10    to let you stipulate to that.  But under the law, emails are

11    not business records.

12         How do I know this was sent to Sun?

13               MS. ANDERSON:  I would be happy to lay further

14    foundation, Your Honor.

15               THE COURT:  All right.  Do you need this back to

16    answer the questions?

17               THE WITNESS:  Maybe, yeah.

18               THE COURT:  All right.

19               THE WITNESS:  Thank you.

20               THE COURT:  Okay.

21    BY MS. ANDERSON

22    Q.   Mr. Rubin, drawing your attention to Exhibit 11, feel free

23    to review it if you need to, of course.  But my question to you

24    is, do you believe that this is a version of a Sun document

25    that you provided to Sun in or around March of 2006?
```

1    A.    Yeah.  I mean, for clarification, I believe this is a

2   document that I was one of the coauthors on.

3              THE COURT:  "Believe."  We're now relying on beliefs?

4   Does he actually remember?

5        Do you remember doing that?

6              THE WITNESS:  I do remember contributing to the

7   document.  I was one of the main authors.

8              MS. ANDERSON:  Actually, Your Honor, I have --

9              THE COURT:  What?

10             MS. ANDERSON:  I apologize, Your Honor.

11       I have just been passed a note that Oracle has already

12   agreed that this is a preadmitted exhibit.

13             THE COURT:  Is that true?  Number 11 is preadmitted?

14             MS. HURST:  Let me check, Your Honor.  I apologize.

15        (Pause)

16             MS. HURST:  Yes, Your Honor.  It was on the

17   stipulation.  My apologies.

18             THE COURT:  All right.  No problem.  It's received in

19   evidence.

20        (Trial Exhibit 11 received in evidence.)

21             MS. ANDERSON:  Thank you.

22             THE COURT:  Let's go.

23             MS. ANDERSON:  If we can publish that, please.  Thank

24   you.

25        (Document displayed.)

1   BY MS. ANDERSON

2   Q.   All right.  Mr. Rubin, would you describe to the jury what

3   is in this exhibit and what is attached?

4   A.   Sure.

5        This is a document that was a document that we wrote at

6   Google, kind of, summarizing the partnership that was being

7   contemplated between Sun and Google.

8   Q.   All right.

9        MS. ANDERSON:  Mr. Dahm, if we could have the second

10  page of this exhibit up on the screen.

11       (Document displayed.)

12  BY MS. ANDERSON

13  Q.   All right.  Is this the first page of the attachment to

14  Exhibit 11?

15  A.   Yes, it is.

16  Q.   All right.  Would you please read to the jury the first

17  sentence of -- that appears under "Background" on this first

18  page.

19  A.   Sure.

20       "Google is seeking partnerships with leading wireless

21  technology companies and service providers to collaboratively

22  develop an open source handset platform."

23  Q.   Did you communicate this concept to Sun in or around March

24  of 2006?

25  A.   Yes.

1    Q.   All right.  And then, generally, what did you seek to

2    describe as part of Exhibit 11 in this multipage document?

3    A.   Well, when -- when -- during these business discussions,

4    we were asking Sun to take the implementation of Java and open

5    source it as part of the Android platform.  So we're asking to

6    take, you know, their work and have them contribute it to the

7    effort.

8         And I think one of the big questions at the time is, how

9    are we going to make money if we take the -- if we take the Sun

10   work and contribute it to the effort?

11        So this outlines the monetization strategy.  It was a

12   proposal from us to them on how they would make money.

13   Q.   All right.  And let's take a look at page 7, which is the

14   last page of this exhibit, and the general section entitled

15   "Proposal," and the first paragraph.

16        MS. ANDERSON:   If we could have that highlighted,

17   Mr. Dahm.

18   BY MS. ANDERSON

19   Q.   What was this section intended to communicate, Mr. Rubin?

20   A.   So this is, kind of, the summation of the document, which

21   is we're proposing -- Google was proposing to Sun that we

22   jointly develop a solution together.  And then we were trying

23   to, kind of, split the responsibility.  What's Google going to

24   work on, and what's Sun going to work on.

25   Q.   Drawing your attention to the second sentence under the

**RUBIN - DIRECT / ANDERSON**

1  section "Proposal," that starts "Sun's main responsibility."

2  Do you see that?

3  **A.**   Yes.

4  **Q.**   Would you please describe to the jury what that sentence

5  was intended to communicate to Sun.

6  **A.**   Sure.

7       It's -- Sun's main responsibility is basically take care

8  of everything related to Java.

9  **Q.**   Specifically, would you read to the jury the second

10 sentence.

11 **A.**   Sure.

12      "Sun's main responsibility is the Java cdc virtual

13 machine, class libraries, MIDB stack and relevant JSRs."

14 **Q.**   All right.  And the reference to "cdc," would you please

15 explain to the jury what that is?

16 **A.**   Yes.

17      That's the desktop version of the virtual machine.

18 Previously, I mentioned CLDC was the mobile version.  This is

19 the equivalent for the desktop computer.

20 **Q.**   The reference in the same sentence to "class libraries,"

21 what is a reference to?

22 **A.**   Those were a reference to the implementation of the Java

23 class libraries.

24 **Q.**   When you say "implementation," what are you referring to?

25 **A.**   The actual code that made the libraries do their

1   functions.

2   **Q.**   All right.   And earlier you had used a phrase "independent

3   implementation" when describing some of the work that had been

4   done.

5        How, if at all, does that phrase relate to the word

6   "implementation" here?

7   **A.**   I think it's the same.   Both companies had their own

8   implementation.   And this document was contemplating using

9   Sun's.

10  **Q.**   Okay.   During the years you were with Android, and over

11  the years that Android had been released, did Google take a

12  license to use Sun's proprietary implementation of any class

13  libraries?

14  **A.**   No.   We were -- I was never able to conclude the

15  partnership as I wished.

16  **Q.**   What kind of implementation did Google use for its class

17  libraries as a result?

18  **A.**   We ended up shipping our clean-room implementation.

19  **Q.**   And during the years that you were with Google and Android

20  and was released over a period of years, did Google brand the

21  Android platform with the Java brand coffee-cup logo?

22  **A.**   No.   We never concluded that partnership and we never

23  licensed the Java brand from Sun.

24            **THE COURT:**   Can you explain what a clean-room

25  implementation is.

**RUBIN - DIRECT / ANDERSON**

1           **THE WITNESS:**  That's when you, kind of, know what the

2    target is.  You know what you want to build.  You're not going

3    to get help from anybody else.  And you just do it in first

4    principles.

5        You sit down at your blank screen on the computer, and the

6    engineers start writing the code to basically target your

7    destination.  Just created from scratch.

8           **THE COURT:**  All right.

9    **BY MS. ANDERSON**

10   **Q.**    During the time that you were with the Android team at

11   Google, did you have an understanding of what the phrase

12   "implementing code" meant?

13   **A.**    Yes.

14   **Q.**    And what did it mean to you?

15   **A.**    It means allowing a computer scientist to practice their

16   craft, which is write software.

17   **Q.**    Can you be more specific in distinguishing it from any

18   other part of code?

19   **A.**    Sorry, can you ask that question again.  I want to be sure

20   I understand.

21   **Q.**    Sure.  I would be happy to.

22       Have you ever heard of the phrase "declarations"?

23   **A.**    Yes.

24   **Q.**    And have you heard of the phrase "declarations" used in

25   the context of writing source code?

1    **A.**    Yes.

2    **Q.**    All right.  And is that concept distinct or the same as

3    the concept of implementing code?

4    **A.**    I think it's different.

5    **Q.**    Okay.  Could you please explain what your understanding

6    was during the time you were with Android.

7    **A.**    Sure.

8         I mean, implementing code is what an engineer does when he

9    wants to make something happen.  I think he or she could write

10   code in a thousand different ways.  And they have to be very

11   precise in the way they craft this code.  It's a little bit of

12   a creative process.

13        And the majority of the work in making these things work,

14   whether -- you know, we talked about a desktop computer and we

15   talked about mobile phones.

16        I think the magic that happens when an engineer practices

17   their craft is worrying about things like power management,

18   does it run on a battery.  You know, unlike your desktop

19   computer that you have to plug into the wall.

20        So all those, kind of, thousands of decisions they have to

21   make along the way are the things that actually make the

22   function serve its purpose.  It does its function by executing/

23   implementing those decisions.

24   **Q.**    Thank you.

25        Let's turn to the time you were at Google when you were

1    involved in negotiations with Sun.

2        Did you make proposals to management during that time

3    period in relation to a potential partnership with Sun?

4    A.   I'm sure I made multiple proposals to management about the

5    negotiations that were ongoing with Sun.

6    Q.   All right.  Let's take a look at Exhibit 331.

7        Have you seen Exhibit 331 before?

8    A.   Yes, I have.

9    Q.   And what is it?

10   A.   It is a -- a work-in-progress presentation that we were

11   reviewing with the team before we presented it to management.

12   Q.   And is this a presentation that you participated in the

13   authoring of?

14   A.   Yes, it is.

15       MS. ANDERSON:  All right.  Your Honor, we offer

16   Exhibit 331 in evidence.

17       MS. HURST:  No objection, Your Honor.

18       THE COURT:  Thank you.

19       Received.

20       (Trial Exhibit 331 received in evidence.)

21       (Document displayed.)

22   BY MS. ANDERSON

23   Q.   Drawing your attention to the second page of Exhibit 331,

24   the document says "Android/Sun final approval."

25       What was the purpose of Exhibit 331 at the time?

**RUBIN - DIRECT / ANDERSON**

1   **A.**   The discussions for a partnership with Sun had ebbed and

2   flowed and progressed to the point where we finally thought

3   that we could probably go and ask for approval from management

4   on the current structure of that partnership.

5   **Q.**   All right.   Thank you.

6        All right.   Let's turn, now, to Exhibit 5317, which also

7   should be before you.

8        Have you seen Exhibit 5317 before?

9   **A.**   Yes, I have.

10  **Q.**   All right.   And what is this exhibit?

11  **A.**   It was an email from Vineet Gupta to myself, asking if we

12  could talk.

13  **Q.**   All right.

14        **MS. ANDERSON:**   Your Honor, we offer Exhibit 5317 in

15  evidence.

16        **MS. HURST:**   No objection.

17        **THE COURT:**   5317 received.

18      (Trial Exhibit 5317 received in evidence.)

19      (Document displayed.)

20  **BY MS. ANDERSON**

21  **Q.**   All right.   Let's take a look, if we can, at the first

22  page, Mr. Dahm.   This is an email from Mr. Gupta to yourself,

23  dated March, 2006.

24        Would you please read to the jury what you asked Mr. Gupta

25  to do in the email.

1    **A.**    Yeah.

2          So I had a meeting scheduled with Eric, who was the then

3    CEO of Google.  And I asked Vineet to send me the presentation

4    that he was about to -- that Sun was about to share with

5    Sprint.

6    **Q.**   In response, did he send you the attached presentation in

7    Exhibit 5317?

8    **A.**   Yes, I believe when he said we need to talk, he also

9    enclosed the presentation that I asked for.

10   **Q.**   All right.  To be clear, in March of 2006, the date of

11   this exhibit, had Android been released to the public yet?

12   **A.**   No, it had not.

13   **Q.**   And as of this time, had Google and Sun reached any

14   agreement on a partnership yet?

15   **A.**   No, we had not.

16   **Q.**   All right.  Drawing your attention to the first page of

17   the presentation, which is the second page of the exhibit, did

18   you have an understanding as to whether or not Sun had shared

19   this presentation with Sprint?

20          **MS. HURST:**  Objection.  Hearsay.

21          **THE COURT:**  It does call for hearsay.

22          **MS. ANDERSON:**  Let me lay some foundation, Your Honor.

23          **THE COURT:**  All right.

24   BY MS. ANDERSON

25   **Q.**   Did -- did any Sun representative tell you that they had

1    shared this presentation with Sprint?

2    **A.**   Yes, they did.

3    **Q.**   All right.  And what did you understand -- strike that.

4         Did you have an understanding, based on any communications

5    with Sun representatives, as to why they were sharing this

6    presentation with Sprint?

7    **A.**   I believe that Sprint was one of their preexisting

8    customers.  And they wanted to propose this Sun and Google

9    partnership to Sprint and gauge their reaction, figure out if

10   they liked it or not.

11   **Q.**   Let's take a look at page 7 of this exhibit.

12        (Document displayed.)

13   **Q.**   Would you please describe to the jury, on page 7, what at

14   a high level is being communicated in this part of the

15   presentation?

16   **A.**   Yeah.

17             **MS. HURST:**  Objection.  Lacks foundation.  Calls for

18   hearsay.

19             **THE COURT:**  Do you know what this page is referring

20   to?

21             **THE WITNESS:**  Yeah.  This presentation was a --

22             **THE COURT:**  Wait.  Just say yes or no.

23             **THE WITNESS:**  Yes.

24             **THE COURT:**  All right.  What's the "lacks foundation"

25   part?

1           **MS. HURST:**  Your Honor, this was a Sun document.  The

2    witness was not present for any presentation that was made.

3    He's interpreting a document that was authored by another.

4           **THE COURT:**  That's okay.

5        It's in evidence; right?  If he knows what it's talking

6    about, then he can explain it, even though he didn't author it.

7        And you were involved in these discussions, as I

8    understand it?

9           **THE WITNESS:**  Yeah.  I did author a couple of pages of

10   this presentation.

11          **THE COURT:**  So I'm going to overrule the objection.

12       You can give your explanation.

13   **BY MS. ANDERSON**

14   **Q.**   Mr. Rubin, would you please describe at a high level

15   what's being addressed in this slide of this presentation.

16   **A.**   So Sun is presenting a Google-Sun potential collaboration

17   to Sprint.  And on this page we're talking about each parties'

18   responsibility and why bringing both of us together makes

19   sense.

20   **Q.**   Okay.  At this time, did you consider this slide deck to

21   be a fair representation of the items that Google was looking

22   to Sun to contribute to a potential partnership with Google?

23   **A.**   At that point in time, based on where the discussions were

24   at that time, yes.

25   **Q.**   And would you please read to the jury the first bullet,

1    where it says "Sun responsible for."

2    **A.**    Sure.

3        "Sun responsible for the Java implementation, developer

4    tools, and building the ISV community."

5    **Q.**    And when you read the words "Java implementation," what

6    was your understanding of what that meant at the time?

7    **A.**    That was basically using Sun's implementation of the

8    virtual machine and the class libraries instead of Google's

9    internal one.

10   **Q.**    Okay.  Did Sun and Google ever come to an agreement about

11   a partnership over the Android platform?

12   **A.**    No, we did not.

13   **Q.**    At a very high level, did you have a view at the time as

14   to why those discussions fell apart?

15   **A.**    You know, they -- like I said, they kind of ebbed and

16   flowed over the years.  But, ultimately, I think it was hard to

17   ask Sun to do open source with Java, which was our vision for

18   how to get this thing to be a global product.

19       And I'm -- I don't know what their reasons were, but I

20   felt it was a difficult thing we are asking them to do.

21   **Q.**    Okay.  With regard to the actual development effort at

22   Google, for developing the Android platform, how, if at all,

23   did the end of discussions with Sun affect the development

24   effort at Google?

25   **A.**    Well, I mean, I was managing the team independent of the

**RUBIN - DIRECT / ANDERSON**

1    discussions I was having with Google -- I mean with Sun.  So

2    the team was still -- you know, the engineers, when they came

3    in every day to work, they were working on their own

4    implementation of all this stuff.

5        In the background, I was having year-long discussions with

6    Sun on whether we could form a partnership or not.

7        So, you know, the good thing about that is if I couldn't

8    get a partnership, I would still have something I could launch.

9    The bad thing about it is if I couldn't get a partnership it

10   was going to take me longer to launch.

11   **Q.**   With regard to the development effort of the Android

12   platform, did you know who some of the lead engineers were at

13   Android on developing the platform?

14   **A.**   Yeah.  I hired them all.

15   **Q.**   Tell us a few of them.

16   **A.**   I mean, some of the guys that were developing the virtual

17   machine.  Dalvik is what we called it.  Dan Bornstein was the

18   lead on that.

19       Brian Swetland was one of the engineers who was the head

20   of system software at the time.  He did all the low-level

21   software, kind of, underneath the virtual machine.

22       Diane Hackborn [phonetic] was one of the framework

23   engineers who led the architecture of the framework.

24   **Q.**   When you say "virtual machine," would you explain what you

25   mean?

**RUBIN - DIRECT / ANDERSON**

1  **A.**   Sure.  I liken a virtual machine to a record player that

2  plays content.

3       If a developer like the Angry Birds example writes an app,

4  and that app is written in the Java programming language, that

5  language is interpreted by this virtual machine.  And it plays

6  the Angry Birds app.

7  **Q.**   All right.  Did you provide any high-level instructions to

8  the engineers working on developing Android about what they

9  should and shouldn't do in developing the platform?

10  **A.**   Yeah.  I mean, I put some framework around, you know, hey,

11  we're doing a clean-room implementation.  I was pretty

12  transparent with the team.  I was telling them, hey, I'm

13  negotiating with Sun, but I want you guys to focus on the

14  clean-room implementation.  I don't want you to get any help

15  from anybody outside of the company.  I want you to do

16  everything, you know, without clicking through any licenses or

17  things like that.

18  **Q.**   All right.  Let's talk a bit about the structure of the

19  Android platform.

20       Turning now, if you would, to Exhibit 43.1.  Do you

21  recognize this exhibit?

22  **A.**   Yes do I.

23  **Q.**   And what is it?

24  **A.**   This is what we call an architecture diagram.  It

25  basically is a pictorial way to help people understand the

1  whole system that we're building.

2  **Q.**   All right.  And as a representation of the system, is this

3  accurate as of the time that the platform was released?

4  **A.**   Yeah.  It obviously changes.  As we add more

5  functionality, there's more boxes in there.  But at the time I

6  think this is accurate.

7              **MS. ANDERSON:**  Your Honor, we offer 43.1 in evidence.

8              **MS. HURST:**  No objection.

9              **THE COURT:**  Thank you.

10      In evidence.

11       (Trial Exhibit 43.1 received in evidence.)

12       (Document displayed.)

13  **BY MS. ANDERSON**

14  **Q.**   Who created this diagram at Google?

15  **A.**   I think it was multiple members of the Android team,

16  including myself.

17  **Q.**   All right.  Would you please describe for the jury the

18  platform in general, at the various levels, based on your

19  experience running the Android team, and advise as to what is

20  the import of the various levels as you go.

21  **A.**   Sure.  Can I reference it by color?

22  **Q.**   Please do.

23  **A.**   Does everybody see it in color?

24  **Q.**   Please.

25  **A.**   So at the bottom layer, which is, you know, typically like

1    the foundation of your house, we have the Linux kernel.

2         Linux is an existing open source effort.  It's a very

3    widely adopted kernel operating system.

4         So we use that.  We imported the Linux Open Source Project

5    as the base in that foundation for Android.

6         And then moving up the stack to the green area, these are

7    a mix of C language, C++ compiling languages that either we

8    developed at Google or we imported through the use of other

9    open source efforts.

10   **Q.**   Okay.

11   **A.**   Should I continue?

12   **Q.**   Yeah, keep moving on.

13   **A.**   On the right of the green area is the yellow area with the

14   blue boxes and the yellow boxes.  The yellow box is the virtual

15   machine.  That's the record player that I talked about.  That

16   interprets these instructions that are being sent to it from

17   the app -- from the programs.

18        And on top of it are the Java core libraries.  These

19   libraries in this case were based on the Java specification but

20   also some additional libraries that were created by the Android

21   engineers by themselves.

22        Moving up the stack, the app --

23        **THE COURT:**  Can we be -- that's where the 37 APIs

24   would be, in that blue box; is that correct?

25        **THE WITNESS:**  That's the implementation of the 37 APIs

1    and then some other ones that were our own.

2              THE COURT:  So 37 plus others.

3              THE WITNESS:  That's right.

4              THE COURT:  All right.  Thank you.

5              THE WITNESS:  Uh-huh.

6              MS. ANDERSON:  All right.

7              THE COURT:  Continue on.

8              THE WITNESS:  And an interesting thing about this

9    color coding is, what is in blue is written in the Java

10   programming language.  So those core libraries are written and

11   implemented in the Java programming language, as well as

12   everything on top that's in the blue section.

13        Under application framework, this is the framework that's

14   made available to third-party developers to basically provide

15   services to their application.

16        So if they want to put a video on the screen, it would

17   call into one of these blue boxes.  If they wanted to talk to a

18   printer, they would call into one of these blue boxes.  If they

19   wanted to exit their application, they would call into one of

20   these blue boxes.

21        And then the final layer is the apps themselves.  This is

22   where you would find Angry Birds if you downloaded it from an

23   app store.

24        It also came with applications to look at your contact

25   list, to browse the Web, and to make phone calls.

RUBIN - DIRECT / ANDERSON

1    BY MS. ANDERSON

2    Q.    Thank you.

3        Let's go back over a few of those platform levels, just to

4    clarify a few things.

5        First, drawing your attention down to the bottom red

6    layer, the Linux kernel, you mentioned that this was code that

7    was obtained from an open source.   Is that true?

8    A.    The majority of it was open source, yes.

9    Q.    And when you say "open source," did you have an

10   understanding at the time you were with Android and the

11   development team as to what kind of open source license had

12   been offered to Google under it?

13   A.    Yeah.   I had been obviously involved in this for so long

14   and was pretty intimate with the various licenses that were out

15   there.

16       And the Linux kernel is made available via the GPL

17   license.

18   Q.    When you say this was offered on an open source basis, was

19   money exchanged for use of the Linux kernel?

20   A.    No, that's not the way open source works.   It's free for

21   you to adopt it.

22   Q.    Okay.   Then drawing your attention up to the next level,

23   in green, the libraries there, you had mentioned that other

24   languages had been used at that level.   Do you know which

25   languages were used as part of those libraries?

1   **A.**   It was a variety, but it was mostly C and C++.

2   **Q.**   And I see in that green area there, there's a box called

3   "WebKit," which is the far-right column of the three columns

4   there.

5        Do you see that?

6   **A.**   Yes.

7   **Q.**   All right.  Did you have an understanding, based on your

8   work with the Android team, as to whether or not that had been

9   provided to Android under an open source license?

10  **A.**   Yes.  WebKit is a -- it's the engine that runs browsers.

11  And it was a -- it was licensed as open source.

12  **Q.**   Do you know which open source license it had been offered

13  to Google under?

14  **A.**   That one was under the LGPL license.

15  **Q.**   All right.  You mentioned, in response to the Court's

16  questions, that in describing the Android runtime section, and

17  specifically the core libraries.  Would you tell the jury

18  whether or not that is the part of the platform that contains

19  declarations of Java APIs.

20  **A.**   Yeah.  A small part of that is the declarations

21  themselves.

22  **Q.**   Okay.  And so if you were to be looking at this diagram

23  for where the 37 Java API declarations would be found, would

24  you look to that box or somewhere else?

25  **A.**   That box.  A small part of that box, yes.

1    Q.   All right.  And you mentioned there were other things in

2    that box.  Could you describe what's also in that core library

3    box?

4    A.   Sure.  You know, when -- when -- when you adopt something,

5    we were trying to fit Android between, kind of, a desktop

6    computer and the mobile phones of that era, which were these

7    flip phones, these feature phones.

8        So we added a lot of libraries of our own that made phones

9    do more desktop-like things.  That functionality wasn't

10   available in the -- in the Java implementation.

11   Q.   Okay.  And based on your experience working with the

12   Android team and supervising its development, did you have

13   views as to the relative importance of various levels of the

14   Android platform?

15   A.   Yeah. I mean, I had -- I had some view into it.

16       I think, you know, we were taking industry approaches in

17   some places, and then our own approach in other places.  And I

18   think I had a pretty good grasp of that.

19   Q.   Did you have a particular view about the application

20   framework layer?

21   A.   Yeah.  I mean, I think -- again, if you're -- if the whole

22   reason you're doing this -- the world doesn't need another

23   operating system.  The world needs an open one.

24       Your customer -- you have to think both of the consumer,

25   the person like you and me who would use the phone, and also

**RUBIN - DIRECT / ANDERSON**

1   the third-party developer.  Because, in these days, a platform

2   without any third-party developer is an island.  It never gets

3   better.  But if you have a third-party developer, you can

4   continuously download new apps and get delighted throughout

5   years.

6       So I felt the application framework, that's the area where

7   Google really shines, is creating these functions for

8   third-party developers so they can express their creativity in

9   a way that would create a great user experience for consumers.

10  And that part was a lot of work.  And there was a lot of new

11  thinking there as well.

12  **Q.**  Thank you.

13      You mentioned in your earlier testimony that some code had

14  come from Linux, the Linux kernel, and some code had come from

15  another open source project for the WebKit.

16      Could you explain to the jury other sources for where code

17  that's part of the Android platform came from?

18  **A.**  We talked about -- well, previously we talked about

19  licensing in code.  And we talked about PacketVideo was the

20  people who submitted how to play a video.  An MPEG video, is

21  what their code did.

22      But other open source projects, I think, were easy

23  targets.  They were existing open source projects.  You know,

24  they were already released.  Everybody knew about them.  So we

25  would import one of those.  Linux is the biggest one, but we

**PROCEEDINGS**

1    imported other ones as well.

2    **Q.**    Have you heard of Apache Harmony?

3    **A.**    Yes, I have.

4    **Q.**    Does Apache Harmony code have any role with respect to the

5    development of the Android platform?

6    **A.**    That was one of the external open source projects that we

7    imported into Android.  And it was an implementation of the

8    Java class libraries.

9    **Q.**    And based on your experience at Android, what was your

10   understanding as to the kind of license that you obtained

11   Apache Harmony code under?

12          **MS. HURST:**  Objection.  Foundation.

13          **THE COURT:**  You have to lay the foundation.

14   Why don't we stop here.  It's 1:00 o'clock.  Time to end

15   for the day.  And we will see the jury tomorrow at 7:30 -- I'm

16   sorry, 7:45.  7:45.

17          Please have a good evening.  Don't talk about the case.

18   No research.  No reading about the case.  See you.  Be safe,

19   please.

20          **THE CLERK:**  All rise.

21      (Jury out at 12:59 p.m.)

22          **THE COURT:**  Be seated.

23      Mr. Rubin, you can take off.  We need to have you back

24   here at 7:30 a.m.

25          **THE WITNESS:**  Thank you.

**PROCEEDINGS**

 1          **THE COURT:**  All right.  Thank you.

 2      Before we break, are there any issues?  There's one issue.

 3  Do you want to argue with me over the add-on rule on

 4  cross-examination designations that if you have more than twice

 5  as many as the other side's direct examination designations,

 6  and that number adds up to more than 30, meaning your twice as

 7  many is more than 30, then you have to do it eight hours

 8  earlier than the normal schedule?

 9      So that will give everybody an incentive to lower the

10  number of designations.

11          **MR. VAN NEST:**  I think it's an outstanding idea, Your

12  Honor.

13      Unfortunately, it doesn't help us at this point because it

14  only restricts us going forward.  They've already unloaded on

15  us.  I noted this morning four or five -- they disclosed a lot

16  of exhibits for Schwartz and these others, and yet half a dozen

17  of them weren't disclosed.

18      So I'll live with what I have because, otherwise, I'm the

19  only one that's going to suffer under the new rules.  They've

20  already -- they've already done the damage at this point.

21      So I would ask the Court not to -- not to burden me --

22          **THE COURT:**  What does the other side say?

23          **MR. BICKS:**  Well, we don't have to agree to it, Your

24  Honor.  But you know, this comment that you're using documents

25  that aren't identified, when witnesses go beyond that which is

1    really expected, you've got to get documents to cross them on.

2    And so we were --

3            THE COURT:  I agree with you.

4            MR. BICKS:  Yeah.

5            THE COURT:  There's going to be some of that.

6            MR. BICKS:  Right.

7            THE COURT:  Because unless you're going to give a

8    script of what the direct is, how is the defense supposed to

9    know everything that they're going to cross on?

10           MR. VAN NEST:  If they read the trial testimony from

11   last time, Your Honor, they'd know 90 percent of it.

12           THE COURT:  Oh, we're talking about the 10 percent.

13       (Laughter)

14           MR. VAN NEST:  What?

15           THE COURT:  We're talking about the 10 percent.

16           MR. VAN NEST:  Well, if you read Mr. Schwartz from

17   last time, you'll find it's just about the same as this time.

18           THE COURT:  Look.

19           MR. VAN NEST:  Please don't burden me, since they

20   haven't suffered.

21           THE COURT:  I think it would be good to burden you.

22       (Laughter)

23           THE COURT:  No, I'm not going to burden anybody.

24       You shouldn't have brought it up in the first place.  You

25   were just complaining.  And I lost an hour of sleep trying to

**PROCEEDINGS**

1   come up with this system.

2        (Laughter)

3           **MR. VAN NEST:**  You get plenty of sleep, Your Honor.

4           **THE COURT:**  That's not going to -- all right.  Let

5   me --

6           **MR. VAN NEST:**  Thank you.

7           **THE COURT:**  -- ask you a different question.

8      I need to, at some point, read to the jury the agreed-upon

9   things that you did with Judge Kim.  And I -- so I am going to

10  read those things, but I haven't done it yet.

11       But if you get to a point in your work where you feel it's

12  important that the jury hear it before we go any further, then

13  of course we will do it then.

14          **MR. VAN NEST:**  We're going to do that, Your Honor.  We

15  were going to ask you at -- you can read one at a time, or can

16  we --

17          **THE COURT:**  I was thinking I would --

18          **MR. VAN NEST:**  Read them all?

19          **THE COURT:**  -- I would just read them all.  And then

20  you could go back to them at any point you wanted.  They are

21  just going to be read.  They're not going to be put in the jury

22  room as a document.

23     You can go back at any time you wish to read it again.

24          **MR. VAN NEST:**  Okay.  We'll do that, Your Honor.

25          **THE COURT:**  Remind the jury what I said.

1        **MR. VAN NEST:**  Right.  We'll set that up.  Thank you.

2        **THE COURT:**  Anything else today?

3        **MR. VAN NEST:**  No, Your Honor.

4        **THE COURT:**  On the things that I owe you, what is the

5   most important?

6        **MR. VAN NEST:**  Patel?  Michael?

7      Probably Mr. Patel.

8        **MS. SIMPSON:**  From our end, Your Honor, it's

9   Mr. Phipps, who I believe is ahead of Mr. Cattell on your list.

10        **MR. VAN NEST:**  That may be right.

11        **THE COURT:**  Remind me what the issue on Phipps is.

12        **MS. SIMPSON:**  We took a deposition of him for two

13   hours.  He indicated that he had no knowledge, whatsoever, with

14   respect to custom and practice, which is what he had been

15   disclosed as a witness on.  And so we have a variety of

16   objections to his testimony.

17        **THE COURT:**  Is he coming live, or is he coming in the

18   depo?

19        **MS. SIMPSON:**  He's coming live.

20        **THE COURT:**  What do you say to that?

21        **MR. KWUN:**  Your Honor, he was -- well, first of all,

22   we disagree on the custom and practice, whether or not he -- he

23   showed at depo that he could testify about this.

24      They had some selected snippets.  We filed a response that

25   included some other portions of his deposition, where he noted

1    that he's worked with developer communities at IBM and at Sun.

2    And on that basis, he actually has a -- he has knowledge of

3    what people in the industry think.

4        But that aside, Mr. Phipps was the chief --

5            THE COURT:  It shouldn't be what people in the

6    industry think.  It's what the practices are.

7            MR. KWUN:  Right, Your Honor.  What they did.  What

8    they did.  And he can testify what they did based on his

9    observations going to conferences, working with developers, and

10   also, the smaller extent of him having been a programmer

11   himself.

12           THE COURT:  Was he part of our story to begin with?

13           MR. KWUN:  He was the chief open source officer at

14   Sun.

15           THE COURT:  At Sun.

16           MR. KWUN:  Yeah.  So he was a Sun employee.  He was a

17   chief open source officer.  He held that title when they

18   released Open JDK.  He can testify about documents that they

19   released to the public about the open sourcing of OpenJDK.  He

20   can testify about what they meant when they made certain

21   statements.

22       His testimony is highly relevant, even leaving aside the

23   issue of custom and practice.

24           THE COURT:  What did he -- what was his role with

25   Apache?

PROCEEDINGS

1            MR. KWUN:  Pardon me?  What was his role with Apache?

2            THE COURT:  Did he have anything to do with Apache?

3            MR. KWUN:  He worked with people in the Apache

4    community.  He has emails where he is discussing with people at

5    Sun Apache Harmony, where he's announcing to people at Sun

6    co-contributions from IBM to Apache Harmony.

7        In the FAQs that Sun released after open sourcing OpenJDK,

8    they specifically acknowledge both GNU Classpath and Apache

9    Harmony.  They specifically say that they will not be trying to

10   shut down or close up shop.

11           THE COURT:  Who is "they"?

12           MS. ANDERSON:  Sun.

13           THE COURT:  What was his role in connection with that?

14           MR. KWUN:  He was the chief open source officer, and

15   he worked with members of his team, members of other teams to

16   develop these frequently asked questions that they posted

17   publicly on the Sun website.

18           THE COURT:  So he was one of the authors of the FAQ?

19           MR. KWUN:  Yes.

20           THE COURT:  All right.  And that was what time frame?

21           MR. KWUN:  That was November of 2006, when they --

22   there was three announcements relevant to OpenJDK.  One was at

23   JavaOne in May of 2006, when -- when Jonathan Schwartz

24   announced that they would be open sourcing the Java platforms.

25       The second was in November, when they announced some more

**PROCEEDINGS**

 1   details about the upcoming open source release.  The FAQs were

 2   posted contemporaneous with that announcement.

 3        And then in May of 2007, they actually released the open

 4   source code.

 5             THE COURT:  Where does he work now?

 6             MR. KWUN:  He is an independent consultant.

 7             THE COURT:  Is he an expert or --

 8             MR. KWUN:  He is disclosed as a fact witness.

 9             THE COURT:  Is he being paid?

10             MR. KWUN:  He was retained as a consultant by Google,

11   yes.

12             THE COURT:  So he's going to be -- by the way, you all

13   have to have all this info because I may ask it if you don't.

14        Do you have some kind of conspiratorial agreement not to

15   bring up how much the experts are being paid?

16             MR. KWUN:  We do not.

17             MR. VAN NEST:  We're trying to work one out, though

18   Your, Honor.

19        (Laughter)

20             THE COURT:  I may screw that up because I think the

21   jury should know how much these experts are being paid.

22             MR. KWUN:  He'll be prepared to testify about what --

23             THE COURT:  I bet some of them are in the millions of

24   dollars by now.  It's going to shock the jury.  But they should

25   know that.

1      All right.  What is Ms. Simpson's short version of --

2 what's wrong with what I just heard?  Sounds like it's a part

3 of the story.

4           MS. SIMPSON:  We have a variety of objections, Your

5 Honor.

6      First and foremost, I believe we're playing a bit of whack

7 a mole here, with this witness.

8           THE COURT:  What?

9           MS. SIMPSON:  Whack a mole.

10          THE COURT:  That's always a great image.

11     (Laughter)

12          THE COURT:  But, okay, go ahead.

13          MS. SIMPSON:  All right.  So originally it was

14 represented to the Court that Mr. Phipps was going to come

15 testify about -- as the chief open source officer of Sun, he

16 was going to come testify about the fact that it was an

17 industry custom or practice to use declarations or SSOs without

18 a license, and that Sun's position was consistent with that, as

19 evidenced by the fact, in his capacity as open source officer,

20 he was asked to do certain things.

21     You granted us a two-hour deposition.  We went and took

22 the two-hour deposition.  We asked him about his knowledge with

23 respect to each one of these topics.

24     He was unable to answer a single question on those topics

25 or identify a single entity that would be evidence of such

1   custom and practice.  For example:

2       "Q.  Cite me, during the time period 2005 through 2007,

3       any entity who used the Java APIs in a commercial product

4       without taking a license.

5       "A.  At this point, I would need to go and perform

6       research, as I told you the last time you asked.

7       "Q.  So you don't have any facts you can tell me right

8       now?

9       "A.  As you didn't ask me in advance to perform research

10      in order to prepare for that question, I can't cite you

11      any data."

12      This happened eight or nine times.

13      He also confirmed that he fully understands that

14  everything that Sun did was licensed.  He confirmed there's a

15  commercial license.  He confirmed there's a spec license.  He

16  confirms that there's an OpenJDK and that's also subject to a

17  license.

18      Nothing that they indicated he was going to testify to

19  panned out.

20      Now, we get a filing last night, and it's a whole

21  different list of topics, completely different than the list

22  they gave the Court before.  And we have a whole separate list

23  of issues with that list of topics.

24          THE COURT:  All right.  What do you say to

25  Ms. Simpson?

1      **MR. KWUN:**  Ms. Simpson was reading to you from the

2  proffer that we submitted which was specifically on a

3  particular issue, which was GNU Classpath and the extent to

4  which GNU Classpath is evidence of the custom and practice of

5  reimplementing APIs.

6      So we did not -- we discussed the testimony of many

7  witnesses, and we discussed in that proffer the testimony they

8  were expected to give on that issue of whether or not GNU

9  Classpath is evidence of a custom and practice of

10  reimplementing APIs in the industry.

11      So we did not include in each witness's testimony in that

12  proffer what they would be testifying on other issues, because

13  what we had been directed to do was to submit a proffer, again,

14  on GNU Classpath and the extent to which that evidences a

15  custom and practice of reimplementing APIs.

16      **THE COURT:**  But if he can't identify a single company,

17  what kind of evidence is that?

18      **MR. KWUN:**  So the custom and practice that he

19  testified to at his deposition is that he has worked in the

20  industry for many years.  He has been a programmer in the

21  industry.  He was worked with developers.  And he has worked

22  with customers of Sun.  And that in his observed practice, none

23  of those developers, including himself, believed that it is

24  necessary or understand that it is necessary or act in a manner

25  consistent with it being necessary of having to have a license

1    in order to use declarations.

2        **THE COURT:**  But he ought to be able to point to at

3    least one company who did not have a license who did that.

4        **MR. KWUN:**  Well, Your Honor, I mean, frankly, I think

5    that if you have something that is an observed practice that is

6    uniform, that's the sort of variable where you don't

7    necessarily readily come to mind with individual examples from

8    a long career.

9        **THE COURT:**  I have to go look at what you all

10   submitted.

11       **MR. KWUN:**  Your Honor, you know, we appreciate that

12   you'll look at the materials that we filed.  But regardless of

13   whether Mr. Phipps is allowed to testify on that issue, on the

14   issue that was the subject of the GNU proffer, he was a Sun

15   employee.  And he was there when they open sourced OpenJDK.

16   And he was the one responsible for that activity.

17       **THE COURT:**  Why don't you just limit it to that?  Why

18   do you need to get him off into alleged custom and practice?

19       **MR. KWUN:**  Well, Your Honor, we believe that we

20   should, at the end of the day, be entitled to have a jury

21   instruction on that point.  And we really need to be able to at

22   least have a chance to get that evidence in.

23       **THE COURT:**  What would be -- I'm not saying you've got

24   to have this, but surely you've done the research to find out

25   is there some article from Computer World, or something back at

PROCEEDINGS

1   the time, let's say 2005-2006, somewhere in there, which makes

2   your point which it's okay to copy the specifications so long

3   as you do your own implementation and as long as you don't use

4   the logo.

5        So if there was a custom, didn't somebody write it down

6   and refer to it in writing?

7             MR. KWUN:  You know, Your Honor, I do think that with

8   the things that are the most basic these are the things that

9   you don't write down.

10       (Laughter)

11            THE COURT:  So pervasive that no one refers to it.

12            MS. SIMPSON:  No one has ever done it.

13            THE COURT:  It's like we all breath air, so I guess we

14   don't refer to breathing air.

15       I don't know --

16            MS. SIMPSON:  Your Honor, it's most likely because the

17   specification license is an actual written document.  It says

18   what it says.

19            THE COURT:  Ms. Simpson, the specification license

20   doesn't -- or maybe you can convince me, but surely if you want

21   to be able to hold it out as being Java and call it Java, then,

22   yeah, sure you've got to pass that TCK and that kind of thing.

23       But if you just want to copy the -- the declaring lines of

24   code, and then write your own implementation -- I read that

25   language.  I'm not so sure it is specific to that.

1          **MS. SIMPSON:**  Your Honor, the specification license

2      has three requirements set forth in it.  You're not allowed to

3      superset and subset.  You have to implement faithfully.  You

4      also have to pass the TCK.

5          **THE COURT:**  Where does it say you can't copy these

6      declarations?

7          **MS. SIMPSON:**  It's set up to allow you to copy the

8      declarations, provided you comply with the remainder of the

9      agreement.  You can't -- you can't do part of the agreement.

10         **THE COURT:**  It doesn't say that language.  In the form

11     of the book it does not say, Under no circumstances can you

12     copy one of these declarations.  You cannot do that.  You

13     cannot do that.  You have to get a license.  Where does it say

14     that?

15         **MS. SIMPSON:**  Your Honor, it's set up as a permission.

16     It's a license.  It's not going to say what you can't do.  It

17     says what you can do.

18         **MR. KWUN:**  And, Your Honor, actually what it does, it

19     says that we will give you IP rights if you agree to do this.

20     It doesn't say you are prohibited from not following these

21     three terms.  It says, I will give you right that I don't

22     otherwise need to give you, if you agree to do this.

23         **MS. SIMPSON:**  Your Honor, copyright law provides the

24     prohibition.  That's how licensing works in copyright law.

25       Copyright law provides the prohibition.  And the license

1    gives you permission.  So the license sets forth the terms by

2    which you have permission to do these things.

3              THE COURT:  Well, see, here's the -- okay.  That's

4    true.  That part is true.  You don't need to register.  The

5    moment that you put pen to paper, the copyright attaches.

6         That's another flaw.  One of the Oracle documents said

7    that these other things were not copyrighted.  The copyright

8    attaches immediately.  You don't have to register a copyright.

9    But that's a different point.  But the moment that the words

10   are put to paper, a copyright attaches if it's copyrightable in

11   the first place.  Okay.  So then could somebody then copy the

12   words out of that book?

13        Look.  I don't know the answer to this.  I think I -- I

14   think this is a piece of history that's about 15 years old, and

15   that some people back then actually believed they could do it,

16   and other people believed no, we protect our copyright.  We'll

17   make them not do it.  And I --

18             MR. KWUN:  Your Honor, if I could read you a little

19   bit from the specification license that Ms. Simpson is relying

20   on to explain to you why it actually shows --

21             THE COURT:  Is it going to take more than 50 words?

22   Go ahead.  Read it to me.

23             MR. KWUN:  So the license provision that has the three

24   requirements is for creating an Independent Implementation.

25   Capital I, capital I.  It's a defined term.

1        And to create an independent implementation, the first

2    requirement is that you have to fully implement the spec.  So

3    that means you're going to include what we're calling the

4    declaring code.

5        But the independent implementation is defined by the

6    agreement to be an implementation of the specification that

7    neither derives from any of Sun's source code or includes any

8    of Sun's source code.

9        So the authors of this document believed that you would be

10   able to fully implement the spec; i.e. that you would include

11   the declaring code.  And yet you would not include any of Sun's

12   source code.

13       The only way you can read that consistently is if you

14   assume that the authors of this document understood that the

15   declaring code -- regardless of what the Federal Circuit said

16   many years later, the authors of this document understood the

17   declaring code not to be copyrightable.

18       And that is consistent with the custom and practice that

19   Mr. Phipps will testify to and the other witnesses already

20   testified to.

21       **THE COURT:**  Maybe.  Maybe not.  I don't know.

22       I am going to send out -- I am going to try to send out to

23   you today a -- this feeds into another point.  I'm not going to

24   make a ruling on this, on Mr. Phipps yet.

25       I believe that you lawyers are making a mistake in

1   agreeing that we don't tell the jury about the prior

2   proceedings.

3       We already had Mr. Schmidt blurt it out that there was a

4   trial.

5       Did anybody else hear that besides me?

6           **MS. SIMPSON:**  I did, Your Honor.

7           **THE COURT:**  All right.  So now the jury knows.

8       Mr. Van Nest, your witness blurted it out.  The jury now

9   knows that there was a prior proceeding.  They probably would

10  have figured it out anyway.  We got a lawyer who does

11  litigation on the jury, and she is going to know good and well

12  that these prior proceedings were a prior trial.  She's going

13  to figure that out.

14      I think you all should just come clean with the jury and

15  say that we had a prior trial and the jury found infringement

16  subject to good faith.  Fair use -- they couldn't figure it

17  out -- they didn't reach a verdict on fair use.  I decided it

18  was not copyrightable.  It then went up to the Federal Circuit

19  and I was reversed, and they sent it back down here for a trial

20  on the rest of the case.

21      Just let the jury know exactly how it came down.  That way

22  the trial testimony would make more sense.  And then these

23  things about it was a historical -- it was -- the first

24  decision ever to rule at the appellate level was the Federal

25  Circuit.  I wouldn't tell them that, but I would just say it

1  got reversed.

2      I'm going to send out a proposal to you, and you meet and

3  confer.  I am not yet to the point that I would force it on

4  you, but I might because if it continues on that witnesses

5  blurt it out and we continue to read prior testimony in, it may

6  just be that I have to say something.

7      But you are -- the way you two have set this up, you're

8  going to invite speculation by the jury over what has

9  previously happened, and I can imagine ways it hurts both of

10  you big time.  Each side can wind up getting hurt over that,

11  and I just feel like you ought to just come clean and let them

12  know.

13      MR. VAN NEST:  We'll look at your proposal, of course,

14  Your Honor.  I would remind the Court that that's not all that

15  happened at the first trial.

16      THE COURT:  What else happened?

17      MR. VAN NEST:  There was a claim we copied their

18  specification, too, and that was found not infringed.  The

19  documentation around Java.  There was a claim that we copied

20  that.  The jury resolved that in our favor.

21      THE COURT:  Maybe you could add in -- you could meet

22  and confer and you could say patent claims were put in there

23  and that those were rejected, whatever, but it would help set a

24  stage so that the jury could understand why it is that a case

25  filed six years ago is now going to trial.

1    **MR. VAN NEST:**  I just think if it's going to happen,

2    it's got to be complete.

3    **THE COURT:**  Well, within reason, fine.  But I have a

4    feeling you're trying to lard in things that help Google and

5    keep out things that --

6    **MR. VAN NEST:**  I haven't agreed to lard in anything.

7    I am the one that said we don't need to say anything about it.

8    I'm not larding anything in.  My problem is if they get a

9    partial view of what happened before, that's not fair.  We won

10   part of the copyright case, too, and we won the patent case as

11   well.  So it's not, you know --

12   **THE COURT:**  You two should be able to agree on this.

13   Honestly, I think if the jury understands the truth, it will

14   not prejudice anybody.  But if they don't understand the true

15   background, it will lead to speculation, and that could come

16   back to hurt somebody in a terrible way.

17   **MR. VAN NEST:**  We'll look forward to your proposal, of

18   course.

19   **THE COURT:**  All right.

20   **MR. VAN NEST:**  Thank you.

21   **THE COURT:**  Okay.  See you in the morning, 7:30.

22      (At 1:22 p.m. the proceedings were adjourned until

23   Thursday, May 12, 2016.)

24

25

CERTIFICATE OF REPORTERS

    We certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE: May 11, 2016




_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
           U.S. Court Reporter




_____

Pamela A. Batalo, CSR No. 3593, RMR, FCRR
           U.S. Court Reporter