Volume 4

Pages 694 - 923

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,               )
                                    )
            Plaintiff,              )
                                    )
  VS.                               )  No. C 10-3561 WHA
                                    )
GOOGLE, INC.,                       )
                                    )
            Defendant.              )
_____)  San Francisco, California
                                       Thursday, May 12, 2016


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          ORRICK, HERRINGTON & SUTCLIFFE LLP
                            The Orrick Building
                            405 Howard Street
                            San Francisco, California  94105
                    **BY:  ANNETTE L. HURST, ESQUIRE**
                          **GABRIEL M. RAMSEY, ESQUIRE**




(Appearances continued on next page)



Reported By:  Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              Official Reporter - U.S. District Court

```
 1    APPEARANCES (CONTINUED):

 2    For Plaintiff:          ORRICK, HERRINGTON & SUTCLIFFE LLP
                              The Orrick Building
 3                            51 West 52nd Street
                              New York, New York 10019
 4                       BY:  PETER A. BICKS, ESQUIRE
                              LISA T. SIMPSON, ESQUIRE
 5
                              ORACLE
 6                            500 Oracle Parkway
                              Redwood City, California 94065
 7                       BY:  DORIAN ESTELLE DALEY, GENERAL COUNSEL
                              MATTHEW SARBORARIA,VICE PRESIDENT
 8                            ASSOCIATE GENERAL COUNSEL

 9    For Defendant:          KEKER & VAN NEST
                              633 Battery Street
10                            San Francisco, California  94111-1809
                         BY:  ROBERT A. VAN NEST, ESQUIRE
11                            CHRISTA M. ANDERSON, ESQUIRE
                              MICHAEL S. KWUN, ESQUIRE
12                            DANIEL PURCELL, ESQUIRE
                              MATTHIAS ANDREAS KAMBER, ESQUIRE
13                            EUGENE MORRIS PAIGE, ESQUIRE
                              STEVEN P. RAGLAND, ESQUIRE
14
                              KING & SPALDING LLP
15                            1185 Avenue of the Americas
                              New York, New York 10036-4003
16                       BY:  BRUCE W. BABER, ESQUIRE

17                            GOOGLE, INC.
                              1600 Amphitheatre Parkway
18                            Mountain View, California  94043
                         BY:  RENNY HWANG, LITIGATION COUNSEL
19
      Also Present:
20                            GEORGES SAAB
                              ORACLE CORPORATE REPRESENTATIVE
21
                              CATHERINE LACAVERA
22                            GOOGLE CORPORATE REPRESENTATIVE

23

24

25
```

1                    <u>I N D E X</u>

2     Thursday, May 12, 2016 - Volume 4

3     <u>DEFENDANT'S WITNESSES</u>                          <u>PAGE</u>  <u>VOL.</u>

4     <u>RUBIN, ANDREW (RECALLED)</u>
      Direct Examination resumed by Ms. Anderson    722   4
5     Cross-Examination by Ms. Hurst                748   4
      Redirect Examination by Ms. Anderson          912   4
6     Recross-Examination by Ms. Hurst              919   4

7                    <u>E X H I B I T S</u>

8     <u>TRIAL EXHIBITS</u>                    <u>IDEN</u>  <u>EVID</u>  <u>VOL.</u>

9       7                                            856   4

10      8                                            858   4

11      10                                           882   4

12      13                                           861   4

13      14                                           780   4

14      15                                           791   4

15      17                                           866   4

16      18                                           891   4

17      21                                           764   4

18      29                                           907   4

19      134                                          788   4

20      147                                          766   4

21      151                                          775   4

22      158                                          868   4

23      165                                          903   4

24      180                                          896   4

25

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 181 | | 817 | 4 |
| 190 | | 809 | 4 |
| 196 | | 798 | 4 |
| 207 | | 842 | 4 |
| 215 | | 803 | 4 |
| 217 | | 905 | 4 |
| 339 | | 782 | 4 |
| 382 | | 900 | 4 |
| 538 | | 899 | 4 |
| 1004 | | 749 | 4 |
| 1061 | | 876 | 4 |
| 1065 | | 762 | 4 |
| 2765 | | 732 | 4 |
| 5109 | | 829 | 4 |
| 5114 | | 831 | 4 |
| 5183 | | 871 | 4 |
| 5391 | | 863 | 4 |
| 5557 | | 870 | 4 |
| 5559 | | 838 | 4 |
| 6027 | | 826 | 4 |
| 6485 | | 793 | 4 |

# I N D E X

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 7196 | | 842 | 4 |
| 7755 | | 740 | 4 |

| | |
|---|---|
| 1 | **Thursday - May 12, 2016**                          **7:17 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---000--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE COURT:**  I want to hand down the transcripts that I |
| 6 | have worked on for deposition read-ins.  Two of them were |
| 7 | impossible to read.  The highlighting was so strong that I was |
| 8 | unable to read it, so those two you'll have to redo in a more |
| 9 | user-friendly way.  The others I have made rulings on. |
| 10 | All right.  I put out -- I'm about to put out an order in |
| 11 | writing on Cattell and allowing some and disallowing some, and |
| 12 | then I did put out an order allowing Mazzocchi to be presented |
| 13 | by Oracle.  That will be -- it's in writing.  It should be on |
| 14 | your machines any moment. |
| 15 | Okay.  What can I do to help the lawyers this morning? |
| 16 | **MR. BICKS:**  Your Honor, I had a little trouble hearing |
| 17 | what you said about Mazzocchi. |
| 18 | **THE COURT:**  You will by allowed to -- well, let's put |
| 19 | it this way:  You've still got to subpoena him, but the Rule |
| 20 | 26(a) objection is overruled. |
| 21 | **MR. BICKS:**  Okay.  He is under subpoena.  He was |
| 22 | subpoenaed. |
| 23 | **THE COURT:**  I'm not saying the subpoena is valid or |
| 24 | not.  You have to do it the right way.  Google is under no |
| 25 | obligation to produce him as a witness, but they are certainly |

PROCEEDINGS

1    under an obligation not to interfere with the subpoena, and

2    it's up to the witness if he wants to try to contest the

3    subpoena.

4            MR. BICKS:  Thank you.

5            MR. VAN NEST:  Your Honor, there was, I think, a

6    misstatement in the Oracle filing.  There has been no -- the

7    subpoena was served on Mr. Mazzocchi.  He is still under

8    subpoena.  There's no problem.  Their brief indicated there was

9    some statement by counsel that he wouldn't comply.  That's

10   simply not true, and Mr. Bicks was going to address that.

11           THE COURT:  Well, all right.

12           MR. BICKS:  We assume, then, he will comply.

13           MR. VAN NEST:  Well, but I thought you were going to

14   address the briefing.

15           MR. BICKS:  Yeah.  There's apparently some confusion

16   about discussions Mr. Van Nest and I had.  Mr. Van Nest did

17   tell me that he was served with the subpoena, that he wasn't

18   going to release him from the subpoena, and our paper suggested

19   that there was a possibility of some contempt of court.  I

20   think that was probably an overstatement.

21           MR. VAN NEST:  Thank you.

22           THE COURT:  Well, all right.  You shouldn't make wild

23   accusations like that and try to put counsel in a bad light.  I

24   didn't -- all right.  Anyway, you'll see the order.

25           All right.  What else?

1          **MS. HURST:**  Your Honor, there is an exhibit for

2    Mr. Bloch who's coming later this afternoon.  It's

3    Exhibit 4027.  It's the original Java language specification

4    from 1996.  That does not correspond to the versions of the

5    platforms that are at issue and, Your Honor, we -- I just

6    wanted to raise the objection in advance for the Court.

7          **THE COURT:**  We're getting a lot of historical

8    information here.  I don't understand why.  What is the

9    problem?

10          **MS. HURST:**  Well, Your Honor, it's both irrelevant and

11    prejudicial because the original version of the language

12    specification combines the language specification with a

13    portion of the API, and so they're going to come up and try to

14    say that means the API is part of the language for a version of

15    the platform that is not at issue.  And that is both confusing

16    and prejudicial because it's not the right version of the

17    language, and because later in the next edition, they

18    separately published the API, made clear it was separate; and

19    this is another effort to get undisclosed expert testimony

20    about what's part of the language and what's part of the API.

21          And worse, it goes to a version of the language that's not

22    even at issue.

23          **THE COURT:**  Mr. Baber.

24          **MR. BABER:**  Your Honor, Bruce Baber for Google.

25          It's not undisclosed expert testimony of any kind,

PROCEEDINGS

1    Your Honor.  It's part of Dr. Bloch's story.

2         **THE COURT:**  It's what?

3         **MR. BABER:**  It's part of Dr. Bloch's historical

4    factual story.  As Your Honor may remember --

5         **THE COURT:**  Is he an expert?  Who is he?

6         **MR. BABER:**  No, Your Honor.  He was at Sun for many

7    years as one of the primary engineers working on the Java

8    platform and then he was at Google for a while.  He will tell

9    how he learned the Java language before he took his job at Sun,

10   and he learned it in part by reading the language

11   specification.  And he will identify the first language

12   specification as one of the materials that he looked at in

13   learning how to write Java, how to write APIs for Java, and how

14   to use the language.

15        **THE COURT:**  Now the objection is overruled.

16       What else can I help you with?

17        **MR. VAN NEST:**  Your Honor, yesterday during the

18   testimony of Mr. Schwartz, you gave an admonition to the jury

19   that I think was an incorrect statement of the law.

20       He was testifying about the treatment of the APIs by Sun

21   back in the relevant time period, and what you said was:

22   (reading)

23            "Regardless of what the witness may say or not say,

24       that is now the law in this case."

25       "That" being the structure and sequence are copyrighted.

1    Then you said:  (reading)

2         "However, what the witness' attitude toward it was

3    back at that time you may consider."

4    That's all fine.  Then you went on to say:  (reading)

5         "But that does not change the fact that Oracle and

6    Sun at the time did have a right, if it wished, to enforce

7    the declaring code as a copyright as well as the

8    structure, sequence, and organization."

9    That sort of writes out the fair use.  Right?  In other

10   words, fair use doesn't require permission, and your

11   preliminary instruction got it exactly right, which was to say

12   that if it applies, it permits the use to copyrighted works by

13   others without the copyright owner's consent.

14   And then you went on to say:  (reading)

15        "Under the law, if the use is otherwise fair, then no

16   permission need be sought or granted.  Thus, seeking or

17   being denied permission to use a work does not weigh

18   against the finding of fair use."

19   So my request is that if the Court were to give such an

20   admonition in the future, that it be balanced as it was in the

21   claim construction.

22        **THE COURT:**  I'll try to do that, and I didn't mean to

23   leave out the "fair use" part; but the way the witness was

24   going on and on, it sounded like he was directly add odds with

25   what the Federal Circuit ruled in this case, and that was

1    leaving a false impression with the jury.  "False" is too

2    strong, but an incorrect impression.

3              **MR. VAN NEST:**  Well -- oh, I'm sorry.

4              **THE COURT:**  That's -- I just --

5              **MR. VAN NEST:**  My only --

6              **THE COURT:**  One of my jobs in this case -- you know, I

7    can comment on the evidence if I want.  I rarely do it, but I

8    can comment on it.  And in a case like this where it's easy for

9    the jury to go wrong and some witness is up there going on and

10   on about how -- leaving the impression that these weren't even

11   copyrightable, even though he didn't quite use those words,

12   then that's -- I have -- you know, I feel a duty to set that

13   straight.

14             **MR. VAN NEST:**  Well, but his testimony was that to the

15   effect he's the chief executive officer of Sun, and his point

16   is:  We were giving these away as part of our business plan.  I

17   mean, that's certainly directly relevant to fair use.

18       If the copyright owner at the time says, "My business

19   model was get these out there, have them free, have them freely

20   available," the fact that he has a copyright doesn't prevent

21   him from giving it away, in other words, the giving the work

22   away, which is what Sun certainly did in the relevant time

23   period.

24       So --

25             **THE COURT:**  I don't know that they did that.  They had

1    the specification license.  They had all these licenses.  They

2    had a legitimate interest in making sure that anyone who

3    reinvented the APIs had a -- had -- did it fully and so that it

4    would work with all other programs written in Java, and so I

5    don't know that they were giving it away.  That's your

6    propaganda, but I'm not sure that it's --

7         **MR. VAN NEST:**  Well, we'll see where the specification

8    license comes in.  Remember, this was a product of the last

9    trial where they put it on through some of the Oracle

10   witnesses; but certainly the witnesses that were working on the

11   project at the time, including Schwartz and Schmidt, there was

12   never any discussion of this spec license.  That's an invention

13   of the Oracle -- excuse me -- of the Oracle lawyers later on.

14       But, be that as it may, my only point is if --

15       **THE COURT:**  What do you mean it was an invention?  It

16   did exist at the time.

17       **MR. VAN NEST:**  Yeah, but nobody discussed it.  It

18   wasn't brought up.  None of these witnesses have heard of it.

19   None of these witnesses talked about it.  Schmidt didn't talk

20   about it.  Schwartz didn't talk about it.  It's not part of the

21   evidence.  It's part of the argument of the Oracle lawyers now.

22   That's where it came up.

23       And it came up in the last trial as well with Mr. McNealy

24   and others, saying, "Oh, we had this spec license."  But that's

25   something they're saying now, not something they said then, as

PROCEEDINGS

1   you'll hear as the testimony unfolds.

2        THE COURT:  But there was a legitimate interest --

3   I've seen the emails -- in avoiding fragmentation --

4        MR. VAN NEST:  Well, we'll see how that plays out.

5        THE COURT:  -- and thought the spec license was

6   designed to -- maybe they had two programs going on.  Maybe on

7   the one hand they had the spec license going on; on the other

8   hand, they really did want to get it out and get as many people

9   using Java language as possible and they were giving it away,

10  and maybe they were working at cross-purposes.  It's a little

11  hard for me to grasp, but I -- I think -- I am troubled that

12  there is this spec license out there and you didn't get one,

13  but --

14       MR. VAN NEST:  In any event, my point is really on the

15  admonition.

16      We have one other jury instruction --

17       THE COURT:  Well, look, next time I give it, I will

18  put the "fair use" in.

19       MR. VAN NEST:  Thank you.

20       THE COURT:  All right.

21       MR. VAN NEST:  Mr. Kwun has a point that will come up

22  with Mr. Phipps, and Mr. Baber has a point on the Court's

23  proposed jury instruction.

24       THE COURT:  Yes?

25       MR. KWUN:  Your Honor, I'm going to hand up a copy of

**PROCEEDINGS**

1  Trial Exhibit 9190, which has been disclosed by Oracle as a

2  potential cross exhibit for Mr. Phipps.  So, remember,

3  Mr. Phipps was a Sun employee.  9190 is an email between

4  several Google employees.  It was not sent to Mr. Phipps.  It

5  was not received by Mr. Phipps.

6      None of these witnesses -- or none of these recipients on

7  the email nor the sender of the email are going to be witnesses

8  at this trial.  None of them are officers of Google.  This is

9  really just intended to inflame the jury.  And this -- we

10 believe this should not come in.

11     **THE COURT:**  Just wait a minute.  I see Phipps' name on

12 here.

13     **MR. KWUN:**  He is mentioned in the email.  This is an

14 email they're sending to each other.  They did not send it to

15 Mr. Phipps.  He's never seen this email before other than when

16 they tried to use this at his deposition even though it was

17 marked AEO.

18     **THE COURT:**  Wait a minute.  Don't say anything yet.

19 Let me read this for a second.

20     He was at Sun.

21     **MR. KWUN:**  He was at Sun.  He's never been a Google

22 employee.

23     **THE COURT:**  Who is OSPO?

24     **MR. KWUN:**  OSPO is -- the OS in there is open source.

25 It's an email for -- internal to Google for a team within

**PROCEEDINGS**

1    Google.

2          **THE COURT:**  It says:  (reading)

3             "Don't beat around the bush.  Say what you mean.  Let

4          me be more verbose."

5          **MR. KWUN:**  Your Honor, I would request that we not air

6    the dirty laundry out in public here.  This is exactly why

7    they're trying to bring this into the case, even though they

8    don't have a witness who can actually lay a foundation for this

9    email, even though they haven't put any of these people on the

10   witness list, and even though none of these people are officers

11   of the corporation.

12         **THE COURT:**  Well, I'll skip over all the dirty words.

13   Then it goes down to:  (reading)

14             "If any of the rest of you did your regular work the

15          same way Simon Phipps did open source at Sun, you'd be

16          fired in less than a month.  Now he sells greeting cards."

17         Well, all right.  Their point is Phipps -- this -- what's

18   the -- why do you want to bring this up with Phipps?

19         **MS. SIMPSON:**  Your Honor, just to point out, the

20   second page of the document was written by Mr. Phipps.  It's

21   his own words.  It was his writing.  It was a piece of work

22   that he released on his last day at Sun.  So it's not as though

23   he's never seen this before.  This is a document written by

24   him.

25         **THE COURT:**  I'm sorry.  The second page?

PROCEEDINGS

1      **MS. SIMPSON:**  Yes.

2      **THE COURT:**  Starting where?

3      **MS. SIMPSON:**  Starting with "Today is my last day of

4  employment with Sun" at the top of the page.

5      **THE COURT:**  They didn't give me that.  I just have two

6  pages.

7      **MS. SIMPSON:**  It's on the second --

8      **MR. KWUN:**  I'm sorry.  I thought I had given -- here.

9  I have a -- there is -- on the back of that page?  Is there a

10  back of that page?

11      **THE COURT:**  Oh, I see.  There is a back page.

12      **MR. KWUN:**  But there should be actually, I realize

13  now -- I thought I handed up, Your Honor, two sheets of paper.

14      **THE COURT:**  Here.  I'll hand it back so you can see

15  what you gave me.

16      **MR. KWUN:**  Yes, Your Honor.  So it's a four-page

17  email, front and back, and I believe Ms. Simpson is referring

18  to the back of the first sheet of paper.

19      **THE COURT:**  All right.  Back of the first one:

20  (reading)

21      "Today is my last day of employment at Sun."

22  It goes on and on.  So what's the problem there?

23      **MS. SIMPSON:**  So there's no problem here with that,

24  Your Honor.  And the reason we need to use this email and would

25  like to use this email is because they're offering Mr. Phipps

**PROCEEDINGS**

1    as -- they're holding him up as an expert on open source, and

2    here these Google employees --

3             **THE COURT:**  But was he designated as an expert?

4             **MR. KWUN:**  He is not designated as an expert,

5    Your Honor; and as a matter of fact, they've objected to the

6    notion of him providing expert testimony.

7        Moreover, this second page --

8             **THE COURT:**  Well, wait.  Wait.

9        Okay.  Continue on.

10       All right.  But what do you say to that, he's not

11   designated as an expert?

12            **MS. SIMPSON:**  I understand he's not designated as an

13   expert, but they're going to present him as an open source

14   specialist, if you want to say, instead of expert; and this

15   commentary -- and I understand that some of it is rather

16   flowerful, if you will -- but the sentence you yourself read,

17   Your Honor, about his work on open source, that's a direct

18   comment on his skills.  And if he's going to be talking about,

19   you know, what he did and didn't do as an open source manager,

20   this is a direct comment on whether he was doing that, you

21   know.

22            **THE COURT:**  Well, look, this is easy.  If he does veer

23   off into opinion testimony that looks like expert testimony,

24   I'm going to allow this.

25            **MR. KWUN:**  Your Honor, it's hearsay.

PROCEEDINGS

1      **THE COURT:**  No, it's not.  If you present him as an

2  expert even though you didn't -- look, you got away with all

3  kinds of expert stuff with your prior witnesses so far.  That

4  first guy, Schwartz -- was that his name? -- he came in here

5  and said -- Schmidt -- he came in here and said -- and so did

6  Schwartz, all kinds of things about expert things even though

7  you told me they weren't being presented as experts.

8      So if you're going to veer off -- I'll wait and see.  I'll

9  wait and see.  If you veer off, then -- are you going to be

10  doing the examination?

11      **MS. SIMPSON:**  Yes, Your Honor.

12      **THE COURT:**  Ms. Simpson is going to be able to say,

13  "Did you know that they have a very low opinion of you at

14  Google?"  If you present him as an expert.  If you don't

15  present him as an -- by "present" I mean substance, not form.

16  So I'm just going to wait and see.

17      **MR. KWUN:**  Yes, Your Honor.

18      **THE COURT:**  So remind me when the time comes whether

19  or not if you veer off into expert -- I'm not saying,

20  Ms. Simpson, I'm going to let you use it yet.  You can

21  certainly use the redacted portion that he wrote.  That's okay.

22  But the inflammatory comments will be usable if he is presented

23  in effect as an expert.

24      **MS. SIMPSON:**  Got it, Your Honor.  Thank you.

25      **THE COURT:**  All right.  I can't decide that yet until

PROCEEDINGS

1    I hear what he says.  Okay?  So proceed with caution is the

2    answer.

3         All right.  Mr. Baber, your turn.

4         **MR. BABER:**  Thank you, Your Honor.

5      We wanted to address just briefly the issue Your Honor

6    raised at the end of the day yesterday --

7         **THE COURT:**  What's that?

8         **MR. BABER:**  -- about telling the jury about the first

9    trial.

10        **THE COURT:**  Well, I have the brief from Oracle.  I

11   read the first page, and then I had to come out here.  So

12   what -- I haven't read it all yet.  What is your view?

13        **MR. BABER:**  Your Honor, our view is we understand

14   Your Honor's concern about jury confusion but, candidly, we

15   have some additional concerns that we believe Oracle has

16   already at least twice used that unfairly to its advantage and

17   to the prejudice of Google.  The fact that the jury --

18        **THE COURT:**  What?

19        **MR. BABER:**  Well, twice.  In the opening statement on

20   Tuesday, one of the last things Mr. Bicks told the jury was --

21   and I'm quoting now, Your Honor, from the transcript at page

22   277 -- (reading)

23             "Even worse than that, ladies and gentlemen, Google

24        kept coming out with what they called new flavors, new

25        versions of Android, each time using these APIs, even

1    though they knew that they shouldn't be doing that.

2    Gingerbread, Honeycomb, Ice Cream Sandwich, Jelly Bean.

3    They kept going even though they knew that it was not the

4    right thing to do."

5         THE COURT:  Well, what's wrong with that?  I mean,

6    that's not inconsistent with that you knew it from day one that

7    you shouldn't have been doing that.

8         MR. BABER:  No, your Honor, but certainly from the

9    time period between Your Honor's decision and the Federal

10   Circuit decision, there would have been no reason to change

11   anything in Android.

12        But he did even worse with Mr. Schmidt in the

13   cross-examination yesterday -- I believe it was yesterday,

14   Your Honor.  He again suggested to the jury that Google has

15   acted improperly in not changing the APIs during the entire

16   time period since this lawsuit was filed.  He asked him:

17   (reading)

18        "Q.  So one thing we can be sure of is that you knew

19        certainly no later than August 2010 when this case got

20        filed that Oracle believed that what you were doing was a

21        violation of the copyright law.  You knew that; right?

22        "A.  I was certainly aware of Larry's view, yes.

23        "Q.  And did you take any steps after this lawsuit got

24        filed in August 2010 to take out of the mobile devices on

25        the market any code or anything relating to those API

**PROCEEDINGS**

1    packages?

2        "**A.**  I'm not aware of any in that time period."

3        So they're continuing to suggest to the jury that Google

4    should have done something to change Android during the entire

5    time period since this lawsuit was filed.  And certainly the

6    fact that there was -- there was a time period in there --

7        **THE COURT:**  All right.  So your point is that when I

8    made the ruling -- when was it?  2012?

9        **MR. BABER:**  Yes, Your Honor.

10       **THE COURT:**  -- and then all the way up to 2014 when

11   the Federal Circuit went the other way, the law of the case was

12   that you were right and Oracle was wrong.

13       **MR. BABER:**  Correct, Your Honor.

14       **THE COURT:**  All right.  So maybe, Mr. Bicks, you've

15   been leaving a false impression with the jury that during the

16   entire time, the law has been clear along the copyrightability

17   point.

18       **MR. BICKS:**  Your Honor, you -- first of all, I didn't

19   leave a false impression on the jury.  The instruction to the

20   jury that has been given is that all of those flavors are in

21   play.  That was the instruction that was given.  Those are the

22   rules that have been applied here, and that's what we're

23   dealing with here.

24       **THE COURT:**  Well, yeah, but that's not the same thing

25   as saying that they willfully -- during the period that my

**PROCEEDINGS**

1   order was the law of the case, that's hard to see how anything

2   could be willful.

3      **MR. BICKS:**  Your Honor, the way the -- well, first of

4   all, the way this works, and you'll see in our objection, is

5   that for the Court now to interject itself into the case, we

6   think is extraordinarily prejudicial.

7      **THE COURT:**  We'll just say some other judge.  We'll

8   just say the trial judge and not say it was me.

9      **MR. BICKS:**  Well --

10     **THE COURT:**  That's why I didn't --

11     **MR. BICKS:**  -- I think everyone will --

12     **THE COURT:**  No, not necessarily.  It could be a

13  different one.  We'll just say "the trial judge."

14     **MR. BICKS:**  Well --

15     **THE COURT:**  And I think you're overstating by a lot

16  the -- it's an issue.  I'm not saying it's not a legitimate

17  point to raise, but you've got to weigh that against the

18  potential confusion, speculation that will be created if --

19     **MR. BICKS:**  Yeah.

20     **THE COURT:**  -- we don't somehow educate the jury about

21  the prior history.

22     **MR. BICKS:**  Your Honor, I think if we go that route,

23  it can be easily solved with telling the jury that, "You're

24  probably wondering why this case got filed in August 2010 and

25  we're sitting here today 2016."  And if we're going to say

PROCEEDINGS

1    anything, even though the parties agreed that we need not, that

2    all we need to say is, "Ladies and gentlemen, you know, a

3    lawsuit like this can take a long time, and you need not read

4    into that one way or the other" --

5         THE COURT:  And they've already heard this prior

6    testimony.

7         MR. BICKS:  What's that?

8         THE COURT:  They're going to know there's another

9    trial.  You brought it out on cross-examination.

10        MR. BICKS:  I didn't bring out the fact there was

11   another --

12        THE COURT:  Well, the witness did in answering your

13   question.

14        MR. BICKS:  I didn't ask -- I didn't -- we marked all

15   the transcripts.  We took "trial" off of it.  And the way the

16   law works is, once there's a reversal, what happened here was a

17   nullity; and I -- we've laid it out in our papers --

18        THE COURT:  Not for purposes of willfulness.  I can't

19   believe that.  You're saying that even during the two-year

20   period, it was willful?  You've got to give me some authority

21   on that.

22        MR. BICKS:  I think in -- anyway -- in any event --

23        THE COURT:  I would like to get authority on that.

24      But I am concerned that you're going to go to the jury on

25   a proposition that the law was clear all along that these were

PROCEEDINGS

1    copyrightable and that Google acted in willful disregard of the

2    law when everyone now in the room knows that that didn't occur

3    till 2014.

4          **MR. BICKS:**  Yeah.  Well, as I say, Your Honor, I

5    don't -- as I say, if we're going to instruct the jury about

6    anything, we can instruct them to the effect that, "There's

7    been litigation going.  These things can take a long time.  You

8    need not read one way into this what's going on."

9       When I see the Court's instruction telling people about

10   patent claims that they know nothing about, I think the risk is

11   obviously jurors --

12         **THE COURT:**  You just want the jury to think that the

13   law has been crystal clear from the day the country was founded

14   that these APIs were copyrightable, and --

15         **MR. BICKS:**  Your Honor --

16         **THE COURT:**  Okay.  That's what the Federal Circuit

17   said, but I don't think that has been so clear.  In fact, I

18   know it hasn't been clear, but it is clear now.

19         **MR. BICKS:**  Yeah.

20         **THE COURT:**  As of the date of the Federal Circuit

21   decision, new ballgame; but in the old ballgame, it was up for

22   grabs.

23         **MR. BICKS:**  Well, as Your Honor knows, and I don't

24   mean to veer into other areas, but you've already seen the

25   internal documents from their files where they knew that.  And

PROCEEDINGS

1    we see Mazzocchi's mail where he knows it; and when people

2    assume the risk for situations like this, they're on the hook

3    for that.

4              THE COURT:  I don't know if that's true.

5              MR. BICKS:  And there was never an advice of counsel,

6    opinion, nothing of that sort when all the decisions were being

7    made; and the point is that when the Federal Circuit rules,

8    that unwinds what happened, and --

9              THE COURT:  Maybe.  Maybe, but that's you just

10   talking.  Give me a decision right on point that says that.

11   Mr. Baber, you give me a decision on point that says something

12   on that.

13       You know, you lawyers just want me to do your work for

14   you.  Go out and get me a decision right on point that says it

15   unwinds, you go back, you don't -- you assume that that law has

16   been exactly the way it was from day one.

17       And maybe that is the rule.  I can imagine that being the

18   rule.  I can also imagine the other being the rule.  So you

19   need to help me out on this and do some homework.

20       I'm not going to make a comment to the jury on this.  We

21   have time to sort this out.

22             MR. BICKS:  Thank you.

23             THE COURT:  I'm not going to do it now.  I may do it

24   later, but I'm not going to do it today.

25             MR. BABER:  Your Honor, and we think with some

**PROCEEDINGS**

1    relatively minor edits we can address some of the issues Oracle

2    has raised if we --

3              **THE COURT:**  Do it in writing.

4              **MR. BABER:**  We'll do that, Your Honor.

5              **THE COURT:**  Please do it in writing.

6         All right.  How else can I help you this morning?

7              **MR. VAN NEST:**  I just have a procedural question

8    quickly, Your Honor.

9         We're going to begin after Mr. Rubin with some video

10   depositions.  In one of them, we're actually going to have the

11   video deposition and also the prior trial read-in.  Do you want

12   a witness on the stand for the read-in, or do you want it read

13   from here?

14        We had intended to have the lawyer that examined, namely

15   me, examine one of our lawyers on the stand and just read the

16   trial testimony.

17             **THE COURT:**  You can do it that way.  It's up to you.

18             **MR. VAN NEST:**  Is that okay?

19             **THE COURT:**  You can do it that way, but they can't

20   become an actor.

21             **MR. VAN NEST:**  Well, I'm trying to get them some

22   shades and a black T-shirt.

23             **THE COURT:**  No acting.

24             **MR. VAN NEST:**  No?  No?

25             **THE COURT:**  No acting and they have to read everything

1    clearly and without trying to de-emphasize the bad parts, and

2    so forth, and emphasize the good parts.

3         MR. VAN NEST:  But my part I won't be acting.  I'll be

4    in --

5         THE COURT:  You'll be your own role.

6         MR. VAN NEST:  Right.

7         THE COURT:  I know.

8         MR. VAN NEST:  Right.

9         THE COURT:  But you've got to read the transcript

10   exactly and with no attempt to use inflection to argue the

11   case.

12        MR. VAN NEST:  I certainly won't do that, Your Honor.

13        THE COURT:  All right.  You can also, if you want,

14   just read it --

15        MR. VAN NEST:  I think it's better to have someone --

16        THE COURT:  You know, if it's a short read-in, it's

17   better to just do it from the podium with you doing it; but if

18   it's more than five or six questions, fine, go ahead and put a

19   reader on the stand.

20        MR. VAN NEST:  Thank you, Your Honor.

21        THE COURT:  Is that it?  Let's see if the jury is

22   present.

23                    (Pause in proceedings.)

24        THE COURT:  Now, you know, 15 times 60 is what?  900?

25        MR. BICKS:  15 times 60?

PROCEEDINGS

1      **THE COURT:**  Yeah.  That's how many minutes you get.

2   I'm keeping exact track.  It looks like Google has used 230

3   minutes.  It looks like Oracle has used 150 minutes.  And

4   you-all tell me if you think I'm off on that.

5      Everyone's here?  Okay.

6      Can we bring in the jury and get started?  Is our witness

7   out in the hallway?

8      **MS. ANDERSON:**  We've asked to bring him up right now,

9   Your Honor.

10      **THE COURT:**  What?

11      **MS. ANDERSON:**  We've asked to bring him in now,

12   Your Honor.

13      **THE COURT:**  Yeah, please, let's do that.

14                  (Pause in proceedings.)

15      **THE COURT:**  My notes say 150 minutes for Oracle and

16   230 minutes for Google.  So Google is using up a lot of your

17   time.  You need to save some for cross-examination.

18      And on the read-ins now on the deposition, you need to

19   tell me -- what we do is -- what percentage of it is yours

20   versus the other side's, the designations.  So if 10 percent of

21   it is Rule of Completeness, then that is charged against

22   whoever asks for that 10 percent.

23      Okay.  Let's -- please come forward Mr. Rubin.

24      Ready?

25      Let's bring in the jury.

1          (Proceedings were heard in the presence of the jury:)

2          **ANDREW RUBIN**, **DEFENDANT WITNESS, PREVIOUSLY SWORN**

3          **THE COURT:**  Thank you for being so punctual.  See,

4    here it is you're not barely supposed to be here and you're all

5    ready all here ready to go.  The rest of California is laying

6    in bed thinking of their first latte, and here you are in the

7    jury box ready to do your country's work.  So thank you for

8    that.

9          Mr. Rubin is the one on the stand.  He's still under

10   direct examination.

11         And you're ready to go, Ms. Anderson?

12         **MS. ANDERSON:**  Yes, Your Honor.  Thank you.

13         **THE COURT:**  All right.  The floor is yours.

14                   **DIRECT EXAMINATION**  (resumed)

15   BY MS. ANDERSON:

16   **Q.**   Welcome back, Mr. Rubin.  Good morning.

17   **A.**   Good morning.

18   **Q.**   Let's pick up with your examination from yesterday with a

19   few more points I wanted to cover with you.

20         You mentioned yesterday that the Android platform was

21   released to the public in around 2008; is that right?

22   **A.**   That's correct.  Yes.

23   **Q.**   All right.  Based on your experience leading up the

24   Android team, could you please tell the jury about how many

25   engineers at Google were working on the Android platform to

RUBIN - DIRECT / ANDERSON

1    bring it to its release in 2008?

2    **A.**    Sure.  I mean, when it started, we were ten people in

3    2005; but then you hire and you hire and you keeping hiring,

4    and there was about 90 people when we shipped the first

5    product.

6    **Q.**    All right.  And did you have reason to know approximately

7    how many lines of code were in the final Android platform when

8    it was released in 2008?

9    **A.**    Yeah.  I had asked that question of the engineering team,

10   and at that time they came back with about 11 million lines of

11   software code.

12        **MS. HURST:**  Your Honor, I'm going to object.  This

13   gets into one of the MIL rulings about the comparison on factor

14   three and what's proper and what's not.

15        **THE COURT:**  Well, we can't cover everything in one

16   question, so all of this will come out in due course, but we do

17   it one step at a time.  And for other reasons, the percentage

18   of code is relevant, so the objection is overruled.

19        **MS. ANDERSON:**  Thank you, Your Honor.

20   **Q.**  And we talked yesterday about Exhibit 43.1.

21        And, Mr. Dahm, could you put that up for us for a moment.

22   Thank you.

23        Do you have that before you?

24        **THE COURT:**  Is that coming through in the jury box?

25   That's great.  Thanks.

1    BY MS. ANDERSON:

2    Q.   When you say about 11 million lines of code, where are you

3    talking about in terms of this diagram?  Where is that code

4    coming from?

5    A.   Well, I mean, it's the whole -- whole system.  I think

6    Linux is a big part of that.  It's, you know, probably around

7    half and the rest is distributed pretty evenly.  It's -- I

8    mean, the boxes kind of represent the code.  Linux is a little

9    smaller than it should be, but the boxes kind of represent the

10   amount of work that is involved in creating it.  The size of

11   the boxes I mean.

12   Q.   Thank you.

13        Once the first release of Android came out in 2008, did

14   Google continue to do any work on the Android platform during

15   the time you headed up that team?

16   A.   Yes, of course.

17   Q.   Okay.  And were there any additional releases of the

18   Android platform during the time that you were heading up that

19   team?

20   A.   Many.  Initially, I mean, we were playing catch-up to the

21   industry, so we felt we needed to make some -- you know, many

22   releases initially to get to competitive parity with what the

23   industry was doing.  So in the first couple of years, we did

24   multiple releases a year.

25   Q.   All right.  And during the time that you were heading the

**RUBIN - DIRECT / ANDERSON**

1   Android team from 2008 until the time you left that team,

2   approximately how many new Android releases came out during

3   that time?

4   **A.**   Oh, man.   At least 10 if you count the major releases and

5   the minor releases that go in between.

6   **Q.**   Okay.   And were there changes between releases?

7   **A.**   Of course.   Additions and bug fixes and new features and

8   everything else.

9   **Q.**   And by the time you left the Android team in around 2013,

10  do you have an estimate of how many engineers had been working

11  on the platform during the years leading up through your

12  departure in 2013?

13  **A.**   You know, I think the team was well over a thousand.   It

14  was probably somewhere between 1,000 and 2,000 at that time.

15  **Q.**   All right.

16      Besides engineering resources, are there other categories

17  of resources that were devoted by Google to building up the

18  Android platform over the years?

19  **A.**   I mean, we had the support of some teams in other parts of

20  the company that weren't on the Android team.   A lot of the

21  applications that were built that use some of these APIs were

22  built by other teams at Google.   We continued in to interact

23  with the Open Handset Alliance.   People continued to make

24  contributions to the platform outside of Google as well.

25  **Q.**   Did Google provide any support externally in regard to the

1    Android platform?

2    **A.**    Yeah.   I mean, we had partner support.   A lot of the

3    people that were using Android, we provided developer support

4    to the third-party developers and things like that.

5    **Q.**   You mentioned yesterday that some of the code that's

6    contained in the Android platform core libraries came from

7    Apache Harmony.   Do you recall generally that testimony?

8    **A.**    Yes.

9    **Q.**   How did Google actually obtain the code from Apache

10   Harmony?

11   **A.**    Well, Apache Harmony's open source, and we went to the

12   website and downloaded it and then brought it into our

13   repository.

14   **Q.**   All right.   And when you say that this code was used

15   within the core libraries, are you referring to Java core

16   libraries or other core libraries in that section?

17   **A.**    It was the Java core libraries.

18   **Q.**   All right.   At the time that you were working on

19   development of the Android platform over the years leading up

20   to its release, did you have a belief about whether there were

21   other products in the market that were using Apache Harmony

22   code?

23   **A.**    I believe there were.   I mean, it --

24        **MS. HURST:**   Objection.   Lacks foundation.   Improper

25   custom testimony.

1          **MS. ANDERSON:**  Your Honor, he's only giving his

2     understanding during the course of his development under your

3     motion in limine ruling.

4          **THE COURT:**  Subjective belief is relevant because it

5     goes to issues that Oracle has put in play, so the objection is

6     overruled.

7          **THE WITNESS:**  Can you ask it again?  I'm sorry.

8     BY MS. ANDERSON:

9     **Q.**   Certainly.  During your work on the Android platform, did

10    you have a belief about whether there were other products in

11    the market that were using Apache Harmony code?

12    **A.**   Yes.  I had an understanding of it, yes.

13    **Q.**   What did you understand while you were working on that

14    platform?

15    **A.**   I mean, it was used in --

16         **THE COURT:**  No.  No.  You have to tell us what you

17    understood and believed at the time without the benefit of any

18    resent education on that subject.  So you have to stick with

19    what you thought back then.

20         **THE WITNESS:**  Sure.

21         **THE COURT:**  All right.  Go ahead.

22         **THE WITNESS:**  I knew that IBM used it in their

23    WebSphere web services.

24    BY MS. ANDERSON:

25    **Q.**   Had you heard of something called an Apache web server at

**RUBIN - DIRECT / ANDERSON**

1    that time?

2    **A.**    Yes.

3            **MS. HURST:**  Objection.  Leading.

4            **THE COURT:**  That is leading.  Sustained.

5        Don't lead the witness.

6        Now, the microphone is not picking your voice up as

7    clearly as it should.

8            **MS. ANDERSON:**  Oh.  I'm sorry, Your Honor.

9            **THE COURT:**  So you need to --

10           **MS. ANDERSON:**  I'm going to move it a little closer.

11           **THE COURT:**  Please do that.

12           **MS. ANDERSON:**  Is that better?

13           **THE COURT:**  That's better.

14   BY MS. ANDERSON:

15   **Q.**    During the work that you performed in heading up the

16   Android team leading up to its release, did you have a belief

17   as to whether or not declarations for Java APIs were free for

18   use in developing the Android platform?

19           **MS. HURST:**  Leading, Your Honor.

20           **THE COURT:**  Leading.  That's leading.  Sustained.

21   BY MS. ANDERSON:

22   **Q.**    What, Mr. Rubin, did you believe, if anything, about your

23   ability to use declarations for Java APIs in Android?

24   **A.**    I mean, we -- we started the whole development effort

25   believing that it was fine to do.  That's why we invested so

1    much time and resources in it.

2    **Q.**   Would you explain to the jury, please, why you thought it

3    was fine to do that?

4    **A.**   It was just my understanding as a computer scientist about

5    how open source works and how to build systems that were

6    interoperable.

7    **Q.**   What, if anything, did the concept of independent

8    implementation have to do with your beliefs regarding the use

9    of declarations for Java APIs?

10   **A.**   Well, the independent implementation or the clean room

11   implementation -- I believe software engineering is a creative

12   process.  The implementation is where a lot of the creativity

13   happens.  We had a lot of computer scientists on staff whose

14   job it was to do this every day.  So setting them on that

15   course and asking them to, you know, create these independent

16   implementations, it's what engineers do.

17       I think that, you know, the clean room implementation,

18   again, I was really transparent with how I managed the team and

19   I asked everybody to beware of external influences that might,

20   you know, change the creativity and the code that you were

21   writing.  So I asked people not to, you know -- you know, seek

22   out the aid of outsiders and just do it in a clean room, in a

23   closed chamber.

24   **Q.**   And --

25            **MS. HURST:**  Your Honor, this is going behind the

1    Court's instruction that infringement is established absent

2    fair use.  The witness is now testifying that they didn't copy

3    when the Court has already instructed that that is the case.

4        **MS. ANDERSON:**  Your Honor, the witness -- my

5    apologies, Your Honor.

6        **THE COURT:**  I thought he was referring to the

7    implementing code.

8        Is that correct?

9        **THE WITNESS:**  I was.

10       **THE COURT:**  Does that change things for you, Ms.Hurst?

11       Let's be clear.  We're talking about two different things.

12   There's the line of code up at the top of the method or

13   whatever else.  There are many things other than methods, but

14   that is an important line and that, as the case comes to us, is

15   copyrightable and that was copied by Google.  No question.

16   That's all conceded.

17       Underneath that was the implementing code that carried out

18   that declaring line of code.  What the witness is saying is

19   with respect to that, they had a clean-room implementation and

20   they did their own implementation.

21       Did I understand you correctly?

22       **THE WITNESS:**  That's correct, yes.

23       **THE COURT:**  All right.  And as I understood -- as I

24   told you earlier on, there is no contention in this case by

25   Google -- I'm sorry -- by either side that the implementing

**RUBIN - DIRECT / ANDERSON**

1   code violated anything.  It's the first declaring line of code,

2   which is the one in contention.

3       So what the witness is explaining is the way they got to

4   the implementing code through a clean room implementation.

5       The objection is overruled.  Please continue.

6       **MS. ANDERSON:**  Thank you, Your Honor.

7   Q.   Mr. Rubin, would you please take out Exhibit 2765.  While

8   you're pulling that out, I'll ask you, are you familiar with

9   the company called Noser?

10  A.   Yes, I am.

11  Q.   What is Noser?

12  A.   Noser is a company I hired.  They're a professional

13  services organization.  They are contractors that write

14  software for hire.

15  Q.   Did Noser have any relationship to the work done on

16  Android?

17  A.   Yes.  I hired them to help us accelerate the effort and

18  implement some of the Java libraries on our behalf.

19  Q.   And what is Exhibit 2765?

20  A.   It is the contract between Google and Noser that we signed

21  to establish that relationship.

22  Q.   And drawing your attention to page 8 of this exhibit, what

23  was the date of the contract you're describing?

24  A.   It looks like the contract was signed and executed on

25  April 19th of 2007.

1            **MS. ANDERSON:**  Your Honor, we offer in evidence

2    Exhibit 2765.

3            **MS. HURST:**  No objection.

4            **THE COURT:**  2765?

5            **MS. ANDERSON:**  Yes.

6            **THE COURT:**  Received in evidence.  Thank you.

7    (Trial Exhibit 2765 received in evidence)

8    **BY MS. ANDERSON:**

9    **Q.**  Did you have a role in negotiating this contract,

10   Mr. Rubin?

11   **A.**  Yes, I did.

12   **Q.**  If we could, Mr. Dahm, pull up page 7 of this exhibit.

13          Would you please tell the jury, Mr. Rubin, on page 7 what

14   is the statement of work intended to indicate?

15   **A.**  The statement of work is -- is an addendum to the contract

16   that we're detailing what we were expecting Noser to provide to

17   us.

18   **Q.**  Did Google provide any guidance to Noser about what it

19   wanted Noser to do in regard to the work?

20   **A.**  Yes.  And that was detailed in the statement of work.

21   **Q.**  And did Noser's work concerning Android in any way concern

22   the core libraries, the Java core libraries?

23   **A.**  Yes.  They were -- they were helping us -- aiding us in

24   creation of the clean room implementation of those Java

25   libraries.

1   **Q.**   All right.  And if I could draw your attention to page

2   10 -- excuse me -- page 11 of this exhibit at the top, the

3   section that is entitled "Importation and Reuse of Existing

4   Code."  Do you see that?

5   **A.**   Barely, yes.

6   **Q.**   All right.  Just take a moment to orient yourself.  Do you

7   have it there?

8   **A.**   Yes.

9   **Q.**   It's small, I realize.

10     Would you please explain to the jury generally what's

11   being discussed in this section at a high level.

12   **A.**   Sure.  So this is basically us telling Noser what's fair

13   game as far as the clean room implementation goes.  So we list

14   known projects, like Apache Harmony and others that they could

15   draw from to aid them in developing the work that we asked them

16   to do.

17   **Q.**   Okay.  And did this work concern the 37 Java APIs?

18   **A.**   Yes, it did.

19   **Q.**   And drawing your attention to Bouncy Castle, do you see

20   that reference there in the, let's see, second bullet point in

21   this importation section?

22   **A.**   Yes, I do.

23   **Q.**   That bullet says:  (reading)

24       "Important improved code from the Apache Harmony

25      project or from Bouncy Castle."

1          We talked earlier about Apache Harmony.  Could you tell

2    the jury what Bouncy Castle is, please?

3    **A.**   It was a similar effort by another team, open source team,

4    similar to Apache Harmony, to basically do a clean room

5    implementation of the Java class libraries.

6    **Q.**   Okay.  And then if I could draw your attention back to

7    page 10, in the middle part of this page of page 10 under the

8    description of project services, "Prerequisites Google will

9    deliver."  Do you see that general section?

10   **A.**   Yes.

11   **Q.**   What generally is being communicated here in terms of

12   guidance?

13   **A.**   Basically we're communicating to Noser that we were going

14   to give them a starting place where they could begin their

15   development and that was a snapshot of everything that we had

16   done internally in our clean room implementation up until that

17   point.

18   **Q.**   Okay.  And the first bullet, what is that a reference to?

19   **A.**   The -- just what I mentioned.  It's our code base so that

20   is the snapshot of the code that we had written.

21   **Q.**   Was that provided to Noser to work on?

22   **A.**   Yes, it was.

23   **Q.**   All right.  And then under the fourth bullet in this list,

24   it says, "Detailed minimum list of packages."  Do you see that?

25   **A.**   Yes, I do.

1   **Q.**   All right.  What is this a reference to?

2   **A.**   This is basically package by package what we wanted Noser

3   to implement from a clean room perspective.

4   **Q.**   And there is a reference in this particular bullet to GNU

5   ClassPath project.  What is that?

6   **A.**   That is yet another open source version of the Java APIs

7   that existed before.

8   **Q.**   Thank you.  You can put that particular exhibit down.

9        I would like to turn your attention to the 2006 time

10  frame.  In or around this time period, did you ever come to

11  learn as to whether or not Sun had offered any Java platform on

12  an open source basis?

13  **A.**   Yes.  I believe around that time frame, there was some

14  announcements about open sourcing portions of Java.

15  **Q.**   And when, if ever, did Sun actually release code on an

16  open source basis for a Java platform that you're aware of?

17  **A.**   I think there was an announcement and then there was a

18  period of time, I guess, of preparation or something, and then

19  probably about, I don't know, a handful of months after the

20  announcement, they actually open sourced what they said they

21  were going to.

22  **Q.**   And do you remember what that open source that was

23  actually offered to the public was called?

24  **A.**   OpenJDK, I believe.

25  **Q.**   And did that OpenJDK get released before or after Android

**RUBIN - DIRECT / ANDERSON**

1  was first announced in November 2007?

2  **A.**   It was before.

3  **Q.**   All right.

4        **THE COURT:**  I want -- this will confuse the jury.

5  OpenJDK.  *Open* and then *JDK* all in caps, the *JDK* part all in

6  caps.  All one word; right?  Is that it?

7        **MS. ANDERSON:**  Yes, Your Honor.

8        **THE COURT:**  All right.  So the first time you hear it,

9  it doesn't make sense.  So you -- but these lawyers don't

10  remember that.  They have been thinking about it too long.  But

11  I'm still new enough to it that it still confuses me.

12     OpenJDK is the name that we're dealing with, and the JDK

13  part is all in caps and it's all one word.  All right.

14     Thank you for letting me interrupt.  Go ahead.

15        **MS. ANDERSON:**  Thank you, Your Honor.

16  **Q.**   When you first heard about the plans of Sun to release an

17  open source version of a Java platform in 2006, what was your

18  reaction?

19  **A.**   I was delighted.  It kind of -- you know, after years and

20  years of trying to partner with them, I thought that our vision

21  actually was a little bit contagious and they adopted it, which

22  kind of made me -- made me pretty happy.

23  **Q.**   All right.  And when you heard that Sun was planning to

24  release an open source implementation of Java, did you tell the

25  Google engineers, *Stop working, Sun's about to release an*

RUBIN - DIRECT / ANDERSON

1    *implementation of a Java platform and APIs?*

2    **A.**   No.   I mean, that wouldn't make business sense to bet our

3    whole project on an announcement, so I had my engineers stay

4    the course.   They asked me the same questions when they read

5    the announcement and I continued to hedge, as I had done

6    throughout the entire project.

7    **Q.**   All right.   And then you said that shortly before Android

8    was announced in November 2007, Sun actually released that

9    OpenJDK code; is that right?

10   **A.**   Yes.

11          **MS. HURST:**   Objection.   Leading.   Also misstates the

12   witness' testimony.

13          **MS. ANDERSON:**   I'm just reorienting the witness,

14   Your Honor.

15          **THE COURT:**   I don't remember whether he said that or

16   not.   Please -- I'll let you get away with it this time, but

17   don't lead the witness on something that he has not yet

18   testified to.

19          **MS. ANDERSON:**   Yes.   Yes, Your Honor.   I understand.

20          **THE COURT:**   All right.   Overruled.   Go ahead.

21          **MS. ANDERSON:**   Thank you.

22   **Q.**   When you learned that Sun released an open source OpenJDK

23   Java platform shortly before the release of Android, what, if

24   anything, did that mean to you?

25   **A.**   Well, like I said, it was kind of a vote of confidence

1    that we were on the right path and they were also following the

2    same path.  So I felt pretty good about that.

3        But whether we could -- we should switch to it or stop

4    developing our clean room implementation, it was so close to

5    our announcement and our launch that we didn't feel that would

6    be helpful.  It would probably actually take a little longer if

7    we were to adopt somebody else's code rather than ship the

8    thing we had been working on for years.

9    Q.   Thank you.

10       If you could turn to Exhibit 7755.  Have you seen this

11   exhibit before?

12   A.   Yes.  It was an email between myself and Steve Horowitz.

13   Q.   And what was the date on this email?

14   A.   It looks like it was November 12th of 2006.

15   Q.   Who is Steve Horowitz?

16   A.   He was one of the engineering leaders that was running an

17   engineering team on Android.

18   Q.   Did Mr. Horowitz report to you?

19   A.   Yes, he did.

20       MS. ANDERSON:  Your Honor, we offer in evidence

21   Exhibit 7755.

22       MS. HURST:  Hearsay, Your Honor.

23       MS. ANDERSON:  Your Honor, this is standard business

24   record of what was --

25       THE COURT:  Emails are not business records.

1      May I see the document?  Which part of this are you

2   interested in?

3           **MS. ANDERSON:**  I'm going to discuss with the witness

4   the first part of their observations in reaction to the Sun

5   release of the open source or announcement of their intention

6   to open source.  And given the bad faith allegations in this

7   case, we are addressing this.

8           **THE COURT:**  All right.  So the ruling is as follows.

9   And I'll give a limiting instruction to the jury.  A document

10   like this cannot come in for the truth of what is stated in the

11   document.  So Oracle is correct on that.

12      On the other hand, it can come in to explain state of

13   mind, which Oracle itself has placed in issue in this case by

14   claiming that Mr. Rubin and the others at Google were acting in

15   bad faith, which is one of the factors that you consider under

16   Factor 1 of the statutory factors that I read to you earlier.

17   The state of mind of the actors is something you've got to

18   consider.

19      And in this case, Oracle is contending and will try to

20   show that Mr. Rubin and others acted in bad faith and with

21   disregard for the copyright rights of Sun and now Oracle.

22      This is a memo that Google wants to lay before you to show

23   what their thinking was at the time and what they, at least,

24   were saying, which reflects on their thinking, and whether it's

25   true or not is -- it's not admissible for that, but for at

RUBIN - DIRECT / ANDERSON

1   least what they were saying and thinking at the time, it is

2   admissible, so with that limiting instruction, 7755 is admitted

3   in evidence.

4        You may examine.

5   (Trial Exhibit 7755 received in evidence)

6            **MS. ANDERSON:**   Thank you, Your Honor.

7        If we could, Mr. Dahm, put up on the screen the email that

8   is about two-thirds of the way down that first page that starts

9   "on 11/12/06, Andrew Rubin wrote."  There you go.  Thank you so

10  much.

11  **Q.**   Mr. Rubin, is this an email that you wrote to

12  Mr. Horowitz?

13  **A.**   Yes, it is.

14  **Q.**   What, if anything, did this email relate to in terms of

15  Java?

16  **A.**   It was related to the type of license.  I think the

17  engineering team was looking at it from the perspective of in

18  the future, if we could use it or not.

19  **Q.**   Okay.  And in 2006, had Sun's open source OpenJDK been

20  actually released yet?

21  **A.**   No.  This is, I believe, just based on the announcement.

22  **Q.**   All right.  In this email, you write, "They say they will

23  be announcing a link exception as well."  Do you see that?

24  **A.**   Yes.

25  **Q.**   And then you write, "We'll have to see exactly what it

1    says, but in the best case, it could mean we can use their libs

2    and even VM if any of it is good."

3         Do you see that?

4    A.   Yes, I do.

5    Q.   Would you explain to the jury generally what you mean by

6    that at a high level?

7    A.   Well, again, I mean, you have two implementations.  You

8    have our clean room implementation and you have one that Sun

9    had announced that they are going to make open source, and we

10   were optimistically evaluating whether we could use the --

11   the -- the version that they were about to open source.

12   Q.   All right.  And did you know at the time of this email

13   specifically what link exception they might be offering?

14   A.   Yes.  I was very familiar with that.

15        In these open source licenses, we talked about GPL and

16   LGPL.  They're different in that how those licenses are

17   managed, if it has a link exception, it makes it easier for

18   third-party developers, the people developing the apps for the

19   platform, to keep their app separate from open source.  That's

20   what the link exception serves, to my understanding.

21   Q.   And during the time that you were working on the

22   development of Android, did you understand or believe that all

23   of Sun's open source code had been offered with a linking

24   exception?

25   A.   I didn't know because it wasn't open sourced yet.

RUBIN - DIRECT / ANDERSON

1    Q.   Did you ever come to learn whether or not Sun offered open

2    source licenses without linking exceptions in some instances?

3    A.   Yes.  Previously they had.

4    Q.   Okay.  And could you give the jury some examples of that?

5    A.   Well, I believe some of the Java SE code that was -- that

6    was released did have some exceptions, but the J2ME code that

7    was finally released kept the -- did not have the link

8    exceptions, to my understanding.

9    Q.   And you say VM.  What is that a reference to?

10   A.   It's the virtual machine, the record player that plays the

11   Java code.

12   Q.   And did you believe, during the time you were working on

13   the Android development, that --

14          MS. HURST:  Objection, leading.

15          THE COURT:  Sustained.

16   BY MS. ANDERSON:

17   Q.   Did you have any understanding at the time as to --

18          THE COURT:  To what extent, if at all.

19   BY MS. ANDERSON:

20   Q.   To what extent, if at all, did you understand the

21   licensing terms under which Sun open sourced any virtual

22   machine code?

23   A.   Honestly, at that point I wasn't paying too much attention

24   to it.  We had kind of already given up.

25   Q.   Thank you.

**RUBIN - DIRECT / ANDERSON**

1      You testified yesterday that Android was announced in

2   November of 2007.  Did you observe how the industry responded

3   to that announcement?

4   **A.**   Yes, of course.  I read the press that it generated.

5   **Q.**   Okay.  Please take a look at -- excuse me.

6      Could you characterize the reaction that you observed at

7   the time to the announcement?

8   **A.**   I would say enthusiastic.  You know, some of the -- some

9   of the competitors were skeptical, but the majority of the

10  press was positive and enthusiastic.

11  **Q.**   All right.  Did you ever have occasion to see any press

12  released by Sun in response to that release?

13  **A.**   Yes.  I remember.

14  **Q.**   All right.  Would you take a look at Exhibit 2352, which

15  is in evidence.

16     Do you recognize this exhibit?

17      **MS. HURST:**   Your Honor, I object to the

18  characterization of this document as a press release by

19  counsel.

20      **THE COURT:**   All right.  It's up to the jury to decide

21  what it is so the jury will disregard the characterization by

22  counsel, but whatever the witness says is okay.

23     Go ahead.

24      **MS. ANDERSON:**   Thank you, Your Honor.

25  **Q.**   What is Exhibit 2352?

RUBIN - DIRECT / ANDERSON

1   A.   It looks like a post from the then CEO of Sun's blog.

2   Q.   When did you first read this post?

3   A.   Pretty much the day it came out.

4   Q.   All right.  And where did you read it?

5   A.   Online after somebody had forwarded me to the link letting

6   me know that it existed.

7   Q.   All right.  And how did you feel about this particular

8   announcement in Exhibit 2352 by Jonathan Schwartz?

9   A.   Similar to their announcement to open source Java.  This

10  is more support for what we're doing and I think a further

11  indication that Sun was kind of thinking along the same lines

12  that we were.

13  Q.   And who did you understand had authored Exhibit 2352 when

14  you read it back at the time?

15  A.   I mean, it was posted to the CEO's blog.  It's his

16  personal blog.

17  Q.   And the CEO of what company?

18  A.   Sun.

19  Q.   What was your reaction to reading this blog at the time?

20  A.   I was excited and delighted.

21  Q.   And why is that?

22  A.   Because it was basically putting Sun's support behind our

23  open source mobile operating system.  In, you know, no

24  uncertain terms, it was thrilling.

25  Q.   All right.  Did you receive any visit from any Sun

1   representative after reviewing this particular blog, this

2   Exhibit 2352?

3   **A.**   Yeah.  I mean, we were in constant communication with Sun.

4   I was always optimistic that we would come to a partnership.

5   It was something that I had spent a lot of time on and kept the

6   communication channels open.

7   **Q.**   Did Mr. Gupta of Sun ever visit you after this blog came

8   out?

9   **A.**   Yes.  I recall he did.

10  **Q.**   And when was that, approximately?

11  **A.**   It was -- well, this -- it was somewhere between our --

12  Android's announcement and the first release of the first phone

13  running Android.

14  **Q.**   And what did Mr. Gupta tell you during this visit?

15          **THE COURT:**  Well, please tell us first who Mr. Gupta

16  was at company.

17          **THE WITNESS:**  Vineet Gupta was kind of the head of

18  strategy and business development for the Java division at Sun.

19  **BY MS. ANDERSON:**

20  **Q.**   Was Mr. Gupta one of the gentleman on some of the emails

21  we talked about yesterday about your negotiations?

22  **A.**   Yes, he was.

23  **Q.**   What did Mr. Gupta tell you during this visit?

24  **A.**   You know, we further talked about areas that we could

25  partner.  And he also congratulated me on the announcement and

1    indicated that Sun was very supported.

2    **Q.**   Did Mr. Gupta make any reference during this communication

3    about any products that Sun was developing?

4    **A.**   Yes.  He -- again, you know, Sun's support changed over

5    the course of our negotiation and our potential partnership

6    discussions, and at this point, I had already announced

7    Android.  Based on the blog post and the open sourcing of their

8    own software, I saw Sun becoming more supporting.  And in this

9    discussion, Mr. Gupta was discussing further support that Sun

10   could provide to Android by making their tool chain, the

11   NetBeans that's talked about, available on Android, as well as

12   other unannounced products that they're working on that would

13   run on top of Android.

14   **Q.**   Okay.  One of the things you mentioned yesterday was that

15   the first Android phone came out in the fall of 2008 on our

16   timeline there, HTC Dream release.  Do you see that?

17   **A.**   Yes.

18   **Q.**   Do you have a view as to the success or lack thereof of

19   the Android platform overall during the course of your work at

20   Android?

21   **A.**   Well, it -- I mean, it can't be successful until it's

22   launched to consumers where, you know, average people can

23   actually buy it and use it, and -- and in that time frame in

24   October of 2008, that was the first phone that launched, that

25   ran Android.  So I would say that we were optimistic, but we

1  didn't really know what consumers would think of it.

2  **Q.**   Ultimately did you come to believe that Android became a

3  success in the market?

4  **A.**   Yes.  I was -- I was very happy to see the sales of that

5  unit and the sales of subsequent units.  It proved that

6  consumers were willing to shell out their hard-earned money for

7  the product that I had spent so many years working on.

8  **Q.**   Was there a point at which you really believed the Android

9  platform took off?  Was there any point like that during the

10  course of your work with the Android?

11  **A.**   There were a couple of them.  Every time an OEM announced

12  a new phone that was based on Android, and it happened

13  gradually over a period of time, there would be a bump in, you

14  know, sales of those phones, and I think the one that you would

15  consider kind of the first hit that the Android OEMs had was

16  the Motorola Droid, which was offered by Verizon.  And I think

17  the partnership between a well-known OEM like Motorola and the

18  nation's number one carrier really kind of, you know, helped it

19  take off and sell a lot of units.

20  **Q.**   All right.  And around when did that Droid get released,

21  approximately what period?

22  **A.**   I remember the exact date because I was in the labor room

23  with my wife and it was my son's birth, so it was November 5th

24  or 6th of 2009.

25  **Q.**   All right.  Thank you very much, Mr. Rubin.

1        I pass the witness, Your Honor.

2             **THE COURT:**  All right.  Thank you.  We will now go to

3   cross-examination.

4             **MS. HURST:**  Thank you, Your Honor.  It might take me a

5   moment to get set up here.  There are a lot of documents with

6   this witness.

7             **THE COURT:**  Take your time.

8                         **CROSS-EXAMINATION**

9   **BY MS. HURST:**

10  **Q.**    Good morning, Mr. Rubin.

11  **A.**    Good morning.

12  **Q.**    We haven't met before?

13  **A.**    No.

14  **Q.**    My name is Annette Hurst and I represent Oracle.

15        Mr. Rubin, after founding Android in 2004 -- we can see

16  that on the timeline over here -- you sold it to Google; is

17  that right?

18  **A.**    Yes.

19  **Q.**    And you were in negotiations with Google for about six

20  months in the first half of 2005; is that right?

21  **A.**    I don't recall the duration of the negotiations.

22  **Q.**    You entered into a deal with Google in about July 2005; is

23  that right?

24  **A.**    That's when the acquisition concluded.

25             **MS. HURST:**  Your Honor, may I approach?

1          **THE COURT:**  Yes.

2     **BY MS. HURST:**

3     **Q.**   I'm handing you Exhibit 1004, Mr. Rubin.  Would you look

4     at that, please, and tell us whether you recognize it as the

5     Android Acquisition Agreement between Google and Android.

6     **A.**   It -- yeah.  It -- it appears to be the Stock Purchase

7     Agreement that was part of the acquisition of Android by

8     Google.

9     **Q.**   And you signed that agreement; right?

10    **A.**   A version of it, yes.  I can't say if this was the exact

11    version I signed without reading it.

12         **MS. HURST:**  Move to admit it, Your Honor.

13         **THE COURT:**  Any objection?

14         **MS. ANDERSON:**  No objection, Your Honor.

15         **THE COURT:**  Received in evidence.

16    (Trial Exhibit 1004 received in evidence)

17         **MS. HURST:**  Ms. Harris, could we have the first top of

18    that document, please, Exhibit 1004.  Oh, I'm sorry.  There we

19    go.

20    **Q.**   All right.  Now, Mr. Rubin, the purchase price at closing

21    for Android was a total of about $11 million; is that right?

22    **A.**   About that.

23    **Q.**   And that was the amount that you received at the time of

24    the transaction in July 2005; is that true?

25    **A.**   It's not the amount I personally received, no.  It's the

1   amount that was exchanged in value for the company, Android.

2   **Q.**   And there were a number of shareholders of Android who

3   received a portion of those funds; is that right?

4   **A.**   Yes.

5   **Q.**   And you were one of them?

6   **A.**   Yes, I was.

7   **Q.**   If we look at the bottom, we can see who the shareholders

8   were, is that true, the bottom of the first page of Exhibit

9   1004?

10  **A.**   Yes, it is.

11  **Q.**   And it lists there you?  And you received $2.6 million?

12  **A.**   About that, yes.

13  **Q.**   And the next three people listed there -- Chris White,

14  Richard Miner, Nicholas Sears, they were your other co-founders

15  of Android; is that right?

16  **A.**   Yes, they were.

17  **Q.**   And they were your friends; right?

18  **A.**   I had worked with them before.

19  **Q.**   You knew them for a while?

20  **A.**   Yes.

21  **Q.**   You were friendly with them?

22  **A.**   Yeah.

23  **Q.**   Now, there are also listed at the bottom of this page

24  Katie Rubin, Michael Rubin, and a Robert Rubin.  Are those your

25  relatives, sir?

1   **A.**   Yes.   Some of them.

2   **Q.**   So some of your relatives were also shareholders of

3   Android?

4   **A.**   Yes, they were.

5   **Q.**   And they received some of the money upon the closing of

6   this transaction?

7   **A.**   A little bit, yes.

8   **Q.**   It was a little bit then, but you stood to make more if

9   you could deliver on Android; isn't that right?

10  **A.**   The Stock Purchase Agreement had the notion of earn-outs

11  where if we performed well inside of Google, we would be able

12  to continue to earn money towards the original acquisition.

13  **Q.**   And that was called *Milestones* in Exhibit 1004; is that

14  right?

15  **A.**   I don't recall if they referred to them as earn-outs or

16  milestones.

17  **Q.**   Let me refer you, sir, to page 9 of the exhibit.   If you

18  see there paragraph 1.3 -- do you see that?   "Achievement of

19  Milestones."

20  **A.**   Yes.   I see that.

21  **Q.**   All right.   And the milestones in this agreement were

22  $8 million for the first milestone payment; is that right?

23  **A.**   That's what it says, yes.

24  **Q.**   10 million for the second; 15 for the third; 27 for the

25  fourth.   That's a total of about $60 million in milestones;

1    right, Mr. Rubin?

2    **A.**   I -- I'm not -- I'm not doing the math in my head here,

3    but I think the total acquisition price, including that

4    original payment of $11 million, was about -- I think that

5    totaled about 60 million.

6    **Q.**   Well, let's add it up here.  8 plus 10, that's 18; right?

7    **A.**   Oh, yes, yes.

8    **Q.**   Plus 15 is 33; right?

9    **A.**   Yes.  Yes, ma'am.

10   **Q.**   Plus 27 is 60?

11   **A.**   You've got it.

12   **Q.**   Right?

13   **A.**   Yeah.

14   **Q.**   So that's $60 million in milestones; right?

15   **A.**   Okay.

16   **Q.**   Is that true?

17   **A.**   Yes.

18   **Q.**   All right.  And is it true also, sir, that all of that $60

19   million was riding on the first milestone?  You had to meet the

20   first one in order to get any of that $60 million?

21   **A.**   Yes.  That's what the original agreement said.

22   **Q.**   All right.  And, sir, let's look and see what that first

23   milestone was on page 79 of the exhibit.  Milestone 1.  Do you

24   see that, Mr. Rubin?

25   **A.**   Yes.

1    **Q.**   All right.  And it says, "Buyer's mobile telephone handset

2    manufacturing partner shall have shipped a minimum of one

3    functional mobile telephone using an operating system developed

4    by the company, the company enabled phone, and buyer shall have

5    entered into a definitive agreement with at least one wireless

6    carrier, which carrier must provide service to a minimum of 15

7    million customers, providing for the service contract related

8    to the company-enabled phone."

9         Did I read that correctly?

10   **A.**   Yes.

11   **Q.**   So that meant you needed to have a deal with a wireless

12   carrier; right?

13   **A.**   Yes.

14   **Q.**   And the carrier had to be -- have at least 15 million

15   subscribers; right?

16   **A.**   Yes.

17   **Q.**   At that time that meant you had to get T-Mobile or higher;

18   right?

19   **A.**   I believe T-Mobile would qualify as having 15 million

20   subscribers at that time.

21   **Q.**   All right.  And you had to have a contract with a handset

22   manufacturing partner; right?

23   **A.**   Yes.

24   **Q.**   And sometimes those are called OEMs, original equipment

25   manufacturers; right?

**RUBIN - CROSS / HURST**

1   **A.**   Sometimes, yeah.

2   **Q.**   And so you had to have the contract with both of those

3   companies and you had to finish the platform; right?

4   **A.**   I don't see where it says *finish the platform* in that

5   paragraph.

6   **Q.**   Well, it says you had to use an operating system developed

7   by the company; right?

8   **A.**   It had -- the handset had to be using an operating system

9   developed by the company, correct.

10  **Q.**   Right.  And then let's read the last sentence of that

11  paragraph, Mr. Rubin.

12      "The company-enabled phone may not be a mere prototype,

13  but rather shall be a functional mobile telephone that, if

14  replicated, would be suitable for use by a large number of

15  consumer end users."

16      That's what it said; right?

17  **A.**   You read exactly what it said.

18  **Q.**   All right.  So not a prototype, Mr. Rubin?

19  **A.**   That's -- I want to make the distinction.  That's talking

20  about the phone, not the software.

21  **Q.**   So you were going to ship something without Android in it?

22  **A.**   I didn't say that either.  I'm just being specific to what

23  the paragraph said.

24      **MS. HURST:**   Your Honor -- I'm sorry.

25  **Q.**   Mr. Rubin, it says using an operating system developed by

1   the company; right?

2   **A.**   Yes, it does.

3   **Q.**   And that's what you founded Android to do?

4   **A.**   That is true.

5   **Q.**   And that's what you were working on to try to meet this

6   milestone; isn't that true?

7   **A.**   Yes, ma'am.

8   **Q.**   Now, when you founded Android, you had competitors all

9   over the place; right?

10  **A.**   There were a number of competitors building operating

11  systems in the market, yes.

12  **Q.**   And Microsoft was a competitor?

13  **A.**   I saw them to be, yes.

14  **Q.**   And they had a version of Windows for mobile devices at

15  that time?

16  **A.**   Yes.

17  **Q.**   And Symbian was a competitor; right?

18  **A.**   Yes.

19  **Q.**   And that was a mobile device operating system; true?

20  **A.**   Yes, it was.

21  **Q.**   And they had a big company, Nokia, using their platform;

22  right?

23  **A.**   I believe so, yep.

24  **Q.**   And Nokia was one of your competitors?

25  **A.**   Nokia I didn't consider a competitor, no.

RUBIN - CROSS / HURST

**Q.**    There were also all sorts of Linux-based phone operating

system initiatives that you considered competitors at that

time; true?

**A.**    There were a lot of initiatives.  It's hard to consider

initiatives competition because they weren't shipping products.

**Q.**    And you weren't shipping product yet either, were you?

**A.**    What time frame are we talking?

**Q.**    When you founded Android, sir.

**A.**    Correct.

**Q.**    And all the way up until October of 2008, you weren't

shipping product; true?

**A.**    In 2007 we shipped an SDK which could be considered a

product.

**Q.**    And that was not a working phone; true?

**A.**    It was an emulator that emulated the hardware of a phone,

but obviously it wasn't something you could hold in your hand

unless you put it on a laptop or something like that.

**Q.**    That software development kit was not a working phone;

true?

**A.**    It was software.  It wasn't hardware, correct.

**Q.**    It also wasn't a working software platform yet at that

time, was it?

**A.**    That's debatable.  I considered it working enough to

release it so that third-party developers could use it so they

could begin writing their apps, so from that perspective, it

RUBIN - CROSS / HURST

1    certainly worked.

2    **Q.**   So if somebody were here and testified that that didn't

3    work, that would be inaccurate testimony?

4    **A.**   It depends what function they were expecting it to serve

5    at the time.

6    **Q.**   In this period of time when you founded Android and when

7    Google acquired it, you also had BlackBerry as a competitor in

8    the mobile market; is that true?

9    **A.**   No.  I didn't consider BlackBerry a competitor.

10   **Q.**   BlackBerry was certainly selling mobile devices; right?

11   **A.**   And I was not.

12   **Q.**   Is that the only reason you didn't consider them a

13   competitor?

14   **A.**   Yeah.  I mean, I spent a lot of time thinking about the

15   distinction between hardware and software, and I wasn't

16   building hardware.  I wasn't an OEM.

17   **Q.**   Well, BlackBerry had software on it; right?

18   **A.**   Yes.

19   **Q.**   Okay.  And it had phone capabilities; right?

20   **A.**   It did.

21   **Q.**   It had email on it; right?

22   **A.**   Yes.

23   **Q.**   It had a web browser on it?

24   **A.**   Yes.

25   **Q.**   It had the ability to run applications on it?

**RUBIN - CROSS / HURST**

1  **A.**    Yes.

2  **Q.**    And those were all things that you were building into the

3  Android platform; true?

4  **A.**    True.

5  **Q.**    Now, in this period of time, after you founded Android, it

6  was a very dynamic market, wasn't it?

7  **A.**    What do you mean by dynamic?

8            **MS. HURST:**   Your Honor, permission to read from the

9  deposition at page 179:21 through 180:12.

10           **THE COURT:**   Any objection?

11           **MS. ANDERSON:**   Your Honor, if we might ask counsel to

12  identify the date.

13           **MS. HURST:**   July 27, 2011.

14           **MS. ANDERSON:**   Thank you very much.   I didn't mean

15  to --

16           **THE COURT:**   Okay.   Permission granted.   Go ahead.

17  Read it exactly.   Say *question* and then *answer*.

18       Is this the deposition of the witness?

19           **MS. HURST:**   It is, Your Honor.

20           **THE COURT:**   Let me remind the jury how this works.

21  Before you come to court in a case like this, both sides get to

22  do investigation and go out and take depositions, what are

23  called depositions, of witnesses, and they proceed question and

24  answer, just like at trial.   It's usually in some lawyer's

25  office.   The witness is under oath, and there's a court

1    reporter, just like the one we have here, who takes it down

2    stenographically, and then the lawyers get to use that in

3    court, depending on the circumstances, and can read the

4    testimony.

5         So what we're about to hear is something that the witness

6    on the stand said in 2011?

7              **MS. HURST:**  Yes, Your Honor.

8              **THE COURT:**  At a deposition.  Please read it exactly.

9              **MS. HURST:**  Your Honor, we actually have a video clip

10   for this one.

11             **THE COURT:**  All right.  You may play the video clip.

12             **MS. HURST:**  It's clip 795, Trudy.

13        (Whereupon, the video was played for the jury)

14   **BY MS. HURST:**

15   **Q.**   Do you stand by that testimony, Mr. Rubin?

16   **A.**   Yeah.

17   **Q.**   So a dynamic market, that was your word.  You asked for a

18   definition of it.  Let me give you one.  "Marked by continuous

19   change, activity or progress."

20        Do you accept that definition?

21   **A.**   It sounds -- it sounds good.

22   **Q.**   So there was a very dynamic market in this period of time

23   when you were developing Android, and in your own words, you

24   had to go to extraordinary lengths to ship sooner; true?

25   **A.**   I believe those were my words, yes.

1   **Q.**   And that was because the market could shift direction at

2   any time?   That's what you thought?

3   **A.**   One of the reasons.

4   **Q.**   And your job was to do everything you possibly could to

5   get your solution to market in the shortest possible time?

6   **A.**   Yes.

7   **Q.**   True?

8   **A.**   Uh-huh.

9   **Q.**   And you and your friends and your family had $60 million

10  riding on that, too, didn't you, Mr. Rubin?

11  **A.**   Not true.

12  **Q.**   Those milestones, Mr. Rubin, depended on you getting

13  Android to market in three years after the acquisition; is that

14  true?

15  **A.**   I just want to be clear that I wasn't to gain $60 million

16  by achieving the launch date.   And neither was my family.

17  **Q.**   Mr. Rubin, is it true that all $60 million of those

18  milestones were riding on you making that first deadline?   Yes

19  or no?

20  **A.**   It wasn't all me.   There was a team of support that I had

21  doing their job very, very well.

22  **Q.**   Mr. Rubin, isn't it true that all that $60 million would

23  be forfeited if you did not make the first milestone?

24  **A.**   That's what the contract said.   Whether I believed that

25  would actually happen might be a different story.

1   **Q.**   So you don't believe in honoring contracts, Mr. Rubin?

2   **A.**   I absolutely do believe in honoring contracts.

3   **Q.**   Now, it's true that after you joined Google and agreed to

4   those milestones, you were under incredible schedule pressure.

5   That's what we just saw on the video; right?

6   **A.**   I wanted to ship something as soon as possible.

7   **Q.**   And you were under incredible schedule pressure, using

8   your own words.  Wasn't that what we just saw there?

9   **A.**   I believe I said something to that, yes.

10   **Q.**   And you stand by that testimony?  You were under

11   incredible schedule pressure; isn't that true?

12   **A.**   Yes.  I wanted to win.

13   **Q.**   And you had Larry Page, who was one of the founders of

14   Google -- he was putting incredible pressure on you, wasn't he,

15   to get that phone done?

16   **A.**   I never felt any pressure from Larry.

17   **Q.**   You never felt any pressure from Mr. Page?

18   **A.**   No.  That wasn't his management style.

19   **Q.**   Didn't you write Mr. Page an email once that said, "Is it

20   time to cancel Android because of the schedule?"

21   **A.**   I don't remember that.

22   **Q.**   Is your recollection sufficient for you to deny that you

23   wrote Mr. Page that email?

24   **A.**   No.  I can't -- I just can't remember.  It's a long time

25   ago.

1                MS. HURST:   Permission to approach, Your Honor.

2                THE COURT:   Sure.

3    BY MS. HURST:

4    Q.   Exhibit 1065, Mr. Rubin.   These email threads we have to

5    read from the bottom of the second page, Mr. Rubin.

6         Do you see there, starting at the first email thread,

7    there is one that you're on, and continuing all the way to the

8    top, you're on every single one of these emails in Exhibit

9    1065?

10   A.   Yeah -- I mean, I see all the emails, yes.

11               MS. HURST:   Move to admit, Your Honor.

12               THE COURT:   Any objection?

13               MS. ANDERSON:   No objection, Your Honor.

14               THE COURT:   Received in evidence.

15   (Trial Exhibit 1065 received in evidence)

16   BY MS. HURST:

17   Q.   All right.   Now, Mr. Rubin, on the first page of 1065,

18   about three quarters of the way down, there's an email that you

19   wrote on October 11, 2005.   Now, this is just three months

20   after you've been acquired by Google; is that right?

21   A.   Yes.   That's about right.

22   Q.   And you wrote -- and you wrote this to Mr. Page; is that

23   right?

24   A.   Yes.

25   Q.   "Time to cancel Android because of its schedule," question

1    mark.  That's what you wrote, sir?

2    A.   Yes, ma'am.

3    Q.   And Mr. Page's response was "No.  Was just expressing that

4    I'd really like to do something quickly, which I've also told

5    you."  That was his response, sir, wasn't it?

6    A.   Yes.

7    Q.   And that was just three months after you'd joined the

8    company, wasn't it?

9    A.   That's right.

10   Q.   And you had Mr. Page telling you he wanted to do something

11   quickly.

12   A.   Yes.

13   Q.   And that was part of your incredible schedule pressure,

14   wasn't it, Mr. Rubin?

15   A.   You know, I really didn't feel like it was.  I felt a lot

16   of the pressure was self-imposed.  It didn't come from Larry.

17   Q.   Didn't you have people on your team telling you that you

18   couldn't make a smartphone in the available time?

19   A.   I've had people tell me stuff that can't be done my entire

20   career.

21   Q.   Exhibit 21, Mr. Rubin.  Is that an email exchange between

22   you and Mr. Bornstein and Mr. Horowitz?

23   A.   Give me a second.  It looks like I'm just in this -- yes.

24   I believe it is.

25        MS. HURST:  Your Honor, I believe this exhibit is

1   preadmitted, Exhibit 21.

2           **THE COURT:**  Ms. Anderson?

3           **MS. ANDERSON:**  No objection to it, Your Honor.

4           **THE COURT:**  All right.  Very well, received.

5   (Trial Exhibit 21 received in evidence)

6   **BY MS. HURST:**

7   **Q.**   On the bottom, this was an email from Mr. Bornstein to

8   you; is that right?

9   **A.**   Originally it's hard to tell.  It looks like one of the

10  headers got clipped off, but I was the last one to respond and

11  then Bornstein wrote something that was also included text --

12  **Q.**   All right.  Mr. Bornstein was one of your engineers;

13  right?

14  **A.**   Yes, he was.

15  **Q.**   You mentioned him in your direct testimony?

16  **A.**   Yes.

17  **Q.**   And he wrote down here, "I do not believe we can make a

18  smartphone by your definition in the currently-envisioned time

19  frame with the scope of development as currently outlined in

20  the PRD."

21          Now, PRD, that stands for *product requirements document*;

22  is that right?

23  **A.**   Yes.

24  **Q.**   All right.

25          And that's what Mr. Bornstein wrote to you and this was

1   now April of 2006; right?

2   A.   Yes.

3   Q.   And he wrote, "By the way, my definition of smartphone is

4   a phone that has an open API for third-party developers and

5   whose own applications use that same API."  That's what he

6   wrote; right?

7   A.   That's what he wrote, yep.

8   Q.   And he wrote, "Java has very little fragmentation and it's

9   adoptable.  If we play our cards right, we can also leverage

10  not only existing developers, but applications as well."

11      That's what he told you in April of 2006 when he was

12  worried about making a smartphone in the currently-envisioned

13  time frame; is that right?

14  A.   That's what he wrote, yes.

15  Q.   Now, there were other top people at Google who perceived

16  that you were desperate at the time; is that true?

17  A.   I have no idea.

18  Q.   Well, you know who Urs Hoelzle is; right?

19  A.   Yes, I do.

20  Q.   He was one of your -- he was one of the early employees at

21  Google?

22  A.   I believe so, yes.

23  Q.   He was one of the top engineers at Google?

24  A.   He was a vice-president.

25  Q.   He was somebody that you considered an advisor on Android

RUBIN - CROSS / HURST

1  from time to time?

2  **A.**   I wouldn't -- I couldn't characterize it as that.  I would

3  seek his advice, but I don't think he was an advisor on Android

4  per se.

5  **Q.**   Mr. Rubin, let me ask you to look at Exhibit 147.  Is this

6  an exchange that you had with Mr. Hoelzle in July of 2006?

7  **A.**   It looks like an email between myself and him, that's

8  correct.

9          **MS. HURST:**  Move to admit, Your Honor, Exhibit 147.

10          **MS. ANDERSON:**  Your Honor, we only have one objection

11  on privacy ground.  I want to confirm that some information was

12  redacted, as Oracle represented it would be.

13          **MS. HURST:**  Your Honor, we will make sure to redact

14  that in the admitted version.  We will not display the phone

15  number during this exam.

16          **THE COURT:**  All right.  Very well.  With that

17  qualification, admitted.

18          **MS. ANDERSON:**  Thank you, Your Honor.

19  (Trial Exhibit 147 received in evidence)

20  **BY MS. HURST:**

21  **Q.**   Now, starting at the bottom of this on the second page, on

22  July 23rd, 2006, Mr. Hoelzle wrote to you; right?  Is that

23  true?

24  **A.**   Yes.  That's when it was written.

25  **Q.**   All right.  And in this time frame, you were talking about

1  buying a company called Skelmir; right?

2  **A.**   I believe so, yes.

3  **Q.**   And Mr. Hoelzle wrote, "It may be a good idea, but perform

4  in-depth due diligence.  The devil is in the details"; right?

5  **A.**   Yes.

6  **Q.**   All right.  And then you responded on the first page, the

7  bottom of the first page there where it says, "Andy Rubin wrote

8  actually 'it's a clean room implementation we're buying.

9  Anyone with specific knowledge, especially from Sun, are

10  tainted and would be bad'."  That's what you wrote?

11  **A.**   Yes.

12  **Q.**   And then Mr. Hoelzle responded here on July 23rd; right?

13  "I totally understand your first point, but your second one is

14  uninspiring, i.e., scary."  Do you see that?

15  **A.**   Yes, I do.

16  **Q.**   And he wrote, "That is not a good reason to acquire a

17  company because there is no correlation between shipping soon

18  and acquiring a company if you don't do due diligence."

19       That's what he wrote; right?

20  **A.**   Yes.

21  **Q.**   And then he said a couple lines later, "Perhaps I misread

22  your email and you're not as desperate as it sounds."

23       That's what he wrote?

24  **A.**   Yes.

25  **Q.**   So Mr. Hoelzle perceived you as desperate to get a clean

```
 1    room implementation when you were talking to Skelmir; isn't
 2    that true, Mr. Rubin?
 3    A.   That's not quite how I read it.
 4    Q.   Isn't it true, Mr. Rubin, that Mr. Page told you that he
 5    was disappointed in your timing?
 6    A.   I don't recall him -- him saying that.
 7    Q.   Exhibit 401, Mr. Rubin.
 8         This is already in evidence, Your Honor.
 9              THE COURT:  Oh, all right.  Thank you.
10    BY MS. HURST:
11    Q.   All right.  Now this is -- Exhibit 401, this is "Subject
12    Mobile Strategy Meeting Notes."  Do you see that?
13    A.   Yes.
14    Q.   And the date's November 2006?
15    A.   Yes.
16    Q.   And you're a recipient of these notes from the mobile
17    strategy meeting; is that right?
18    A.   Yeah.  I'm a little -- little confused.
19    Q.   Just stick with the first page, Mr. Rubin, just at the top
20    of the email header.
21    A.   It says 2007.  So I'm just --
22    Q.   Let's just look at the email header, Mr. Rubin.  One step
23    at a time.  Okay?
24    A.   Okay.
25    Q.   The email header says sent November 7, 2006; right?
```

1   **A.**   Yes.

2   **Q.**   And your name is right on there, Andy Rubin?

3   **A.**   Yes.

4   **Q.**   Okay.  Now, this is towards the end of 2006; right?

5   **A.**   It is November 7th of 2006.

6   **Q.**   All right.  So you're having a strategy meeting to get

7   ready for 2007; right?

8   **A.**   I don't recall why we had the meeting or . . .

9   **Q.**   So were you at this meeting, Mr. Rubin?

10  **A.**   I don't -- I don't recall being there.  I wouldn't be

11  surprised because there was a section with my name on it.  I'm

12  usually there for that.

13  **Q.**   Right.  So if we look on the second page of the exhibit

14  towards the bottom, it says "Android strategy" down here.

15  **A.**   Uh-huh.

16  **Q.**   And it has your name next to it, Andy Rubin?

17  **A.**   Yes.

18  **Q.**   Now, are you denying that you made a presentation about

19  Android strategy at this meeting?

20  **A.**   No.  I'm just telling you I don't remember it.

21  **Q.**   Let's look at the next page, page 3.  And here is a

22  discussion represented in the notes after your -- after your

23  presentation of the strategy, and it says "Larry:  Disappointed

24  in Android's timing."  Do you see that?

25  **A.**   Yes.

1    **Q.**   And does that refresh your recollection that at the end of

2    2006, you had a strategy meeting for Android for 2007 while

3    that clock was ticking, and Larry Page, one of the two founders

4    of Google, said "I am disappointed in your timing"?

5    **A.**   I mean, there's some paraphrasing going on, but generally

6    I think that's what the notes said.  It -- it was a total

7    mobile strategy meeting where Android was part of it.

8    **Q.**   I just want to know, Mr. Rubin, are you saying you don't

9    remember that, when Larry Page got in a strategy meeting with

10   you and told you he was disappointed in your timing?  You don't

11   remember that when the top brass at the company says "get it

12   done, Mr. Rubin"?

13   **A.**   I don't recall Larry ever saying "get it done, Mr. Rubin."

14   I do see that he was disappointed, and it didn't -- I didn't

15   remember that.

16   **Q.**   All right.  Well, let's look at the take aways on this

17   document.  Now, they're down at the bottom.  Do you see several

18   bullet points there?

19   **A.**   Yes.

20   **Q.**   At that point, you decided you could not make any Android

21   public announcements until the second half of 2008; right?

22   **A.**   I didn't decide that, no.  I think that was more --

23   **Q.**   That was the group's consensus?

24   **A.**   Yes.

25   **Q.**   What was that milestone again?

1   **A.**   I'm sorry?

2   **Q.**   That milestone was July 2008, wasn't it?  Milestone 1,

3   three years from July 2005 to July 2008?

4   **A.**   I wasn't counting the months or years.

5   **Q.**   Here you are at the end of 2006, and you've already missed

6   that milestone, haven't you, Mr. Rubin?

7   **A.**   I -- no.  I can't say, based on the calendar, that I

8   missed the milestone in 2006 when you just said it was a 2007

9   milestone.

10  **Q.**   Let's look at the next page on the take aways.  "The

11  Android platform needs to work."  That was one of the take

12  aways, wasn't it, Mr. Rubin?

13  **A.**   Yes.

14  **Q.**   Now, Mr. Rubin, this was the end of 2006.  Two months go

15  by.  It's early January, 2007.  You're at CES in Las Vegas.

16  You know what CES is; right?

17  **A.**   Yes, I do.

18  **Q.**   It's Consumer Electronics Show; right?

19  **A.**   Yes.

20  **Q.**   You're at CES in Las Vegas.  That's where everybody goes

21  to show off their new products, talk to the industry, do deals,

22  generate buzz, all that stuff; right?

23  **A.**   Yes.

24  **Q.**   So you're at CES, and you hear that Apple is making an

25  announcement of an iPhone; right?

RUBIN - CROSS / HURST

1   **A.**   Yes.

2   **Q.**   You hear they're making an announcement of the iPhone and

3   you're in your car on the way to a meeting; is that true?

4   **A.**   There has been press written about this.  I don't recall

5   the actual . . .

6   **Q.**   There was an Atlantic article about this; right?

7   **A.**   I believe there was some press about this.

8   **Q.**   Called *The Day Android Had To Start Over*; right?

9   **A.**   I'm not sure what the title was.

10  **Q.**   But you know what I'm talking about?

11  **A.**   I remember the press that you're talking about.

12  **Q.**   And it was -- it was reported that you pulled over at the

13  side of the road and said words to the effect of, "Oh, my God,

14  we can't ship that phone.  We're going to have to start over."

15  Right?

16  **A.**   I'm positive I didn't say that.

17  **Q.**   But it was reported that way, wasn't it?

18  **A.**   I -- I don't think it was reported that way either.  I

19  never said "start over."

20  **Q.**   How about this.  Did you say, "Holy crap, I guess we're

21  not going to ship that phone"?

22  **A.**   That sounds more like my style, yes.

23       (Laughter)

24  **BY MS. HURST:**

25  **Q.**   All right.  So that phone, the one you had been

1    developing, at that point in January 2007, since you started

2    Android, could not ship.  That's what you decided that day when

3    you saw Steve Jobs make that iPhone presentation; am I right?

4    **A.**   No.  You've got it wrong and the press got it wrong as

5    well.

6    **Q.**   Well, there was a phone on your plan at that point called

7    The Sooner; right?

8    **A.**   Correct.

9    **Q.**   There was The Sooner and there was The Later; right?

10   **A.**   There was Sooner because we could ship it sooner and there

11   was Dream, which was our dream phone that was what we actually

12   wanted to ship.

13   **Q.**   And after you saw the iPhone, you decided not to do The

14   Sooner; isn't that true?

15   **A.**   Correct.

16   **Q.**   Now, within a week of that iPhone announcement,

17   Mr. Schmidt, the CEO of the company, called for a product

18   strategy meeting; right?

19   **A.**   I don't recall.

20   **Q.**   Let me show you Exhibit 216, Mr. Rubin, which is already

21   in evidence.  Let's look at the date on this.  The date is

22   January 15, 2007.  That's about a week after the iPhone was

23   unveiled by Mr. Jobs; is that right?

24   **A.**   I don't remember the date of the iPhone announcement.

25   **Q.**   Well, will you accept my representation that's about a

1    week after the iPhone?

2    A.    Sure.

3    Q.    Mr. Schmidt, he was then the CEO of Google; is that right?

4    A.    Yep.

5    Q.    He wrote to you, Jonathan Rosenberg -- he was the head of

6    Google products at that time?

7    A.    Product management, yes.

8    Q.    Larry Page and Sergey Brin, who were the two founders of

9    Google, and together with Mr. Schmidt, were the top management

10   team at the company; right?

11   A.    Among the top, yes.

12   Q.    And yael@google, who was that?

13   A.    A coordinator, project coordinator.

14   Q.    Somebody who would get the meeting scheduled for you?

15   A.    I believe so, yes.

16   Q.    And Alan Eustace, that was your direct boss at the time;

17   true?

18   A.    That's right.

19   Q.    So the very top management at the company, you and your

20   boss, got this email from Mr. Schmidt; is that right?

21   A.    Yes.

22   Q.    And he said, "I would like to have an Android GPS as soon

23   as practical.  There are a few things to discuss"; right?

24   A.    Yes.

25   Q.    And GPS, that stood for?

1    **A.**   Google product strategy.

2    **Q.**   Google product strategy.  I always get that confused and

3    think it's global positioning system.  Thank you for helping me

4    on that.

5        Now, you had this meeting on January 17 of 2007; is that

6    right?

7    **A.**   I don't recall when the meeting actually occurred.

8    **Q.**   Let me see if I can help you.

9        Exhibit 151.  All right.  Exhibit 151, Mr. Rubin, is that

10   an email exchange between you and Mr. Horowitz with the subject

11   GPS notes dated January 17, 2007?

12   **A.**   Yes.

13   **Q.**   All right.

14       And we've redacted the phone number on this one,

15   Your Honor.  And with that, I offer Exhibit 151.

16            **MS. ANDERSON:**  No objections, Your Honor.

17            **THE COURT:**  151 is admitted.

18   (Trial Exhibit 151 received in evidence)

19   **BY MS. HURST:**

20   **Q.**   All right.  Now, Mr. Rubin, these are the notes of the

21   global -- sorry.  Google product strategy meeting that you had;

22   is that right?

23   **A.**   Yes.

24   **Q.**   All right.  And there's a summary of discussion there,

25   starting in the middle on the first page; right?

1    **A.**    Yes.

2    **Q.**    Okay.  And you're saying -- oh, I'm sorry.  Middle of the

3    second page.  Sorry about that, Trudy.

4         You're saying, "We are a technology project with the goal

5    of quick time to market using approved open source mobile

6    technology"; right?

7    **A.**    Yes.

8    **Q.**    And then there is a lot of discussion, and we go to page 5

9    of the document.

10        Now, this is January 2007.  You're a year and a half into

11   your milestone.  Mr. Page has told you he's disappointed in

12   your timing.  The iPhone has been unveiled.  Mr. Schmidt calls

13   for a Google product strategy meeting.  You have this

14   discussion.

15        And then we look at the bottom of the page, at the very

16   end of the notes, we have Eric.  That's Mr. Schmidt; right?

17   **A.**    Yes.

18   **Q.**    Mr. Schmidt says, "What about Java"; right?

19   **A.**    Yes.

20   **Q.**    And you tell him, "We're doing it ourselves."  And the

21   reason you told him that is because by that time, there were no

22   more discussions between you and Sun; right?

23   **A.**    You know, I recall some discussions, but I don't know the

24   exact dates.  After 2007, we still had some discussions with

25   Sun.

RUBIN - CROSS / HURST

1   Q.   But your initial round of negotiations ended -- we can see

2   it right over here on the stipulated timeline, Mr. Rubin -- in

3   May of 2006; right?

4   A.   That was -- yes.   That was a period of the ebb and flow of

5   the discussions about Google and Sun.

6   Q.   That was the end of your original round of discussions,

7   wasn't it?

8   A.   Original round, yes.

9   Q.   Well, you walked away from those discussions, didn't you?

10  A.   I wouldn't characterize it -- characterize it as that.

11  Q.   You walked away from those discussions because you were

12  having a fight with Sun over control of Java and Android; isn't

13  that true?

14  A.   I would not characterize it as that, no.

15  Q.   All right.   We'll see some documents on that in a moment.

16  Let's finish with these notes.

17       Mr. Schmidt says, "What about Java?"   And you say, "We're

18  doing it ourselves.   We have the JVM," that's the Java virtual

19  machine; right?

20  A.   Yes.

21  Q.   "But not the libraries."

22       Now, let's stop there for a moment.   The libraries, that's

23  the core libraries that we saw in Exhibit 43.1, that diagram

24  that you were talking about on direct?

25  A.   I could assume it was those, plus some other ones.

1   Q.   And that's where the Java APIs are that Google took that

2   the judge told the jury is infringement unless you prove fair

3   use; is that right?

4   A.   I don't know if I was referring to the declarations or the

5   implementation in these notes.

6   Q.   Well, the declarations are in the libraries, aren't they,

7   Mr. Rubin?

8   A.   I -- I think we're talking about something we don't have,

9   so it's hard to say where they were.

10  Q.   Are the declarations in the class libraries, in the core

11  libraries, or not, Mr. Rubin?  Do you even know?

12  A.   In the version that shipped, I believe they are, yes.

13  Q.   All right.  And you were still looking for them here in

14  January of 2007; right?

15  A.   Yes.

16  Q.   In fact, you negotiated with a bunch of different

17  companies to try to get them, didn't you?

18  A.   I did.

19  Q.   IBM; right?

20  A.   I'm sorry?

21  Q.   IBM?

22  A.   We were looking -- looking to them.  We were talking to

23  them, yes.

24  Q.   Esmertec?

25  A.   Yep.

1    **Q.**    XCE?

2    **A.**    Yep.

3    **Q.**    Skelmir?

4    **A.**    Yep.

5    **Q.**    You said in that meeting in January of 2007, "This is

6    still a hotspot"; is that right?

7    **A.**    Yes.

8    **Q.**    So Mr. Schmidt, who had been at Sun, wanted to know about

9    Java, and your answer was *hotspot*; right?

10   **A.**    No.   That wasn't my answer.   That was somebody's notes

11   that they took of the meeting.

12   **Q.**    Oh, so Mr. Horowitz doesn't take good notes?

13   **A.**    I -- I probably didn't -- I don't think he was quoting

14   verbatim what people said in the meeting.

15   **Q.**    You don't think that Mr. Horowitz wrote down *hotspot*

16   because you said it?  You think he's just kind of a guy who

17   took, you know, lyrical license?

18   **A.**    I think you should ask him that question.  I really don't

19   know what the actual quote was in that meeting.

20   **Q.**    All right.  Let's go to those Sun negotiations.

21           **THE COURT:**  What was the exhibit number that we were

22   just looking at?

23           **THE CLERK:**  151.

24           **MS. HURST:**  151 Your Honor.

25           **THE COURT:**  Okay.  Thank you.

1   BY MS. HURST:

2   Q.   All right.  Now, Mr. Rubin, you had that exchange with

3   Mr. Schmidt when he asked you "what about Java?"  Let's go back

4   a little bit in time to that acquisition date.

5       At that point, you had really only very early code; is

6   that right?

7   A.   Yeah.  I would say it was just a demo.  It wasn't very

8   real.

9   Q.   Really just a prototype of a user interface?

10  A.   Yes.

11  Q.   All right.  And between, as we see here on the timeline --

12  between August 2005 and May 2006, you had some discussions with

13  Sun about a potential development collaboration regarding the

14  Java platform and Android; is that right?

15  A.   Yes.

16  Q.   All right.  Mr. Rubin, I'm handing you Exhibit 14.  This

17  is an email from you to Sergey at google.com with a copy to

18  Larry Page, LSA and Alan Eustace dated January 13, 2006; is

19  that right?

20  A.   Yes.

21       MS. HURST:  And that's Exhibit 14, Your Honor, and I

22  move that into evidence.

23       MS. ANDERSON:  No objection, Your Honor.

24       THE COURT:  Received.

25  (Trial Exhibit 14 received in evidence)

RUBIN - CROSS / HURST

1   BY MS. HURST:

2   **Q.**   All right.   Now, Sergey, that's Mr. Brin; right?

3   **A.**   Yes.

4   **Q.**   And Mr. Page, he's the other co-founder of Google; right?

5   **A.**   Yes.

6   **Q.**   And Mr. Eustace, that's your boss?

7   **A.**   Yes.

8   **Q.**   So this is an important email, isn't it?

9   **A.**   Yeah.   I guess you could say that.

10  **Q.**   And the subject is Sun Microsystems; right?

11  **A.**   Yes.

12  **Q.**   And you're explaining here that you've been talking with

13  Sun and pushing them to open source Java and now you're really

14  at a point where they've agreed to do it and they're willing --

15  you're describing to the top brass they're willing to do

16  business; right?

17  **A.**   More or less.   I mean, we're still in the conceptual

18  stage, I would say.

19  **Q.**   You wrote here at the end of the first paragraph, "Sun is

20  prepared to walk away from a $100 million annual licensing

21  business into an open source business model.   This is a huge

22  step for Sun and very important for Android and Google."

23       That's what you wrote; right?

24  **A.**   Yes.

25  **Q.**   And you said, "Soon I'm going to give you a presentation."

1    That's the EMG, that's the Executive Management Group; right?

2    **A.**   Yes.

3    **Q.**   "I'm writing this email to give you a heads-up that you

4    may receive a phone call from Jonathan Schwartz."

5         Now, that was the CEO of Sun at the time?

6    **A.**   Yes.

7    **Q.**   Right?

8    **A.**   Yes.

9    **Q.**   And you said, "Mr. Schwartz doesn't know any of the

10   details.  He's gotten some basic concepts," and you were

11   letting them know that Mr. Schwartz might be calling them to

12   talk about this deal; is that right?

13   **A.**   Yes.

14   **Q.**   Let me show you Exhibit 339, Mr. Rubin, and that's dated

15   January 31 of 2006?

16   **A.**   Yes, it is.

17   **Q.**   And that's an email from you to Tim Lindholm, Richard

18   Miner, Chris DiBona and David Lee; right?

19   **A.**   Yes.

20        **MS. HURST:**  I move Exhibit 339 into evidence.

21        **MS. ANDERSON:**  No objection.

22        **THE COURT:**  Received.  Thank you.

23   (Trial Exhibit 339 received in evidence)

24   **BY MS. HURST:**

25   **Q.**   All right.  Mr. Rubin, this is an email at the end of

1   January, 2006.  This is just a couple of weeks after the last

2   one, where you were briefing Mr. Page, right, Mr. Brin?

3   **A.**   Yes.

4   **Q.**   Now, Tim Lindholm was a Google employee at this time;

5   right?

6   **A.**   Yes.

7   **Q.**   But he had previously been at Sun; right?

8   **A.**   That's correct.

9   **Q.**   And he was kind of a Java expert, wasn't he?

10  **A.**   Yeah.  I think so.  You could say that.

11  **Q.**   And you considered him one of your advisors to Android;

12  right?

13  **A.**   Yes.

14  **Q.**   And Richard Miner, he was one of your co-founders of

15  Android, and he was still at Google; right?

16  **A.**   That's correct.

17  **Q.**   And Mr. DiBona, he was an open source guy; is that right?

18  **A.**   Open source evangelist, I would say.

19  **Q.**   Who was Mr. Lee?

20  **A.**   I believe he was an attorney.

21  **Q.**   So you were doing a slide deck for the finance group to

22  get approval of the proposed deal that you had with Sun; is

23  that right?

24  **A.**   I'm not sure if it was to get an approval, but we were

25  presenting it to the -- it was a financial committee.

1  Q.   All right.  Well, you had a process you had to go through.

2  You had to go through the finance people and get their feedback

3  and then you go to the top brass at the Executive Management

4  Group; right?

5  A.   Yep.

6  Q.   All right.  So let's look at this.  On page 4 of the

7  exhibit, it says, "Partner overview, Sun Microsystems."  And

8  your presentation for the finance management group said, "Okay,

9  who are they?  Who is Sun?  They have products and services for

10  network computing.  Java dominates the wireless industry.  The

11  carriers require Java in their terminal specifications."

12       That's what you drafted for the finance group; right?

13  A.   Yes.

14  Q.   And you wrote that "Sun is not profitable"; right?

15  A.   Yeah.  That's what it says.

16  Q.   All right.  And that was important to know because if you

17  were negotiating terms with them and they really needed money,

18  that was important for people to know; wasn't it?

19  A.   I don't think that's why I wrote it.

20  Q.   Certainly you considered it significant enough to include

21  that information, "not profitable," in your presentation;

22  right?

23  A.   I considered it a risk to be partnering with a company

24  that wasn't profitable.

25  Q.   You considered it a risk to partner with a company that

1   had a $15 billion market cap?

2   A.   Yeah.

3   Q.   Because Sun was a little bit in trouble then, wasn't it?

4   A.   Well, not being profitable, I don't know if you could say

5   it's in trouble.  I've seen people come out of that pretty

6   well.

7   Q.   It was in trouble and Mr. Schwartz was taking over, wasn't

8   he?

9   A.   I believe he was the CEO.

10  Q.   Yeah.  There wasn't a lot of confidence in the industry

11  about Mr. Schwartz, was there?

12  A.   I wouldn't say that.

13  Q.   Well, the company wasn't profitable and you just said you

14  thought it was a big risk, even though it had a $15 billion

15  market cap; isn't that right?  That's what you just said?

16  A.   I said it's risky partnering with a company that's not

17  profitable.

18  Q.   Especially one where Mr. Schwartz is the CEO?

19  A.   I did not say that.

20  Q.   Now, there was some information that you were missing here

21  on market presence and size; right?

22  A.   Oh, you mean the XXX?

23  Q.   Yes.

24  A.   Yeah.  It must have been a draft.

25  Q.   And you asked Mr. Gupta to get you that information;

1    right?

2    **A.**   I don't recall.

3    **Q.**   All right.  We'll look at that in a minute.

4         When you drafted these slides, you said, "Why do the

5    deal?"  And you said, "It's critical to our open source handset

6    strategy and it dramatically accelerates our schedule"; right?

7    **A.**   Yes.

8    **Q.**   All right.  Now, let's look at page 6 of this slide deck,

9    "Proposed Deal Terms."

10        Now, in this slide deck, you wrote "Fee, 25 to $50

11   million, and a bullet point to be negotiated, potentional" --

12   pardon me -- "potential rev share on platform-enabled mobile

13   ads;" right?

14   **A.**   I see that.

15   **Q.**   Because you were talking about revenue sharing with Sun as

16   part of this deal, weren't you?

17   **A.**   At that time, yes.

18   **Q.**   And everybody knew the way Android was going to make money

19   was on the advertising; right?

20   **A.**   One of the ways, yes.

21   **Q.**   And so Mr. Gupta wanted a cut of the action, didn't he?

22   **A.**   I don't know exactly what Gupta was thinking.

23   **Q.**   *Rev share* that means *revenue sharing*; right?

24   **A.**   Yes.

25   **Q.**   And that's what you put in your slide deck as part of the

1   proposed deal terms?

2   **A.**   Yeah.  I remember -- yes.

3   **Q.**   And we saw just a minute ago in that email where Sun was

4   worried -- you reported to Larry Page that Sun was worried that

5   they were going to tank a hundred million dollars a year in

6   revenue, right, if they did this open source thing?

7   **A.**   I think they were looking for the business opportunity in

8   open source.

9   **Q.**   Looking for the business opportunity, but without cutting

10  off their nose to spite their face; right, Mr. Rubin?

11  **A.**   I don't even know what that means.

12  **Q.**   That's not a phrase you're familiar with, not that idiom

13  in the English language?

14  **A.**   I've heard it, but I haven't spent a lot of time thinking

15  about it.

16  **Q.**   I'm from Ohio.  Sometimes I use ones they don't know here.

17  I don't know.

18         Anyway, let's go to page 11 of this.  So "financial

19  compensation."  Here's what you said:  "Google compensates Sun

20  for current business risk.  Estimated cost 25 to $50 million.

21  If Google recognizes money from services running on open source

22  Java/Linux mobile platform or derivatives, Google will revenue

23  share with Sun."  That's what you put in your slides; right?

24  **A.**   That was one of the many proposals, yes.

25  **Q.**   All right.  Let's look at Exhibit 134.  Now, that's an

1   email that you sent to Mr. Gupta and a response that he sent to

2   you, including some data that you had requested on January

3   31st, 2006; right?

4   **A.**   I believe so.   That's what it looks like, yep.

5        **MS. HURST:**   Move the admission of Exhibit 134.

6        **MS. ANDERSON:**   No objection, Your Honor.

7        **THE COURT:**   Thank you.

8   (Trial Exhibit 134 received in evidence)

9   **BY MS. HURST:**

10  **Q.**   All right.   Now, this was the same day as that last

11  presentation we saw, Exhibit 339.   Do you have that there?

12  **A.**   Yeah.

13  **Q.**   So you can make a comparison?

14  **A.**   I was just trying to figure out the actual timing of all

15  of this.   It's kind of hard to find here.   Give me a second.

16  **Q.**   Sure.

17  **A.**   Yeah.   I think -- certainly the email was sent around, but

18  the email -- the presentation was probably prepared before the

19  email was sent.

20  **Q.**   Right.   So if we look at Exhibit 339, which is the one on

21  the screen, you wrote, "I'm proposing our deal to the execs

22  today.   Can you send me ASAP," and then you had some numbers

23  you wanted from him; right?   Do you see that?

24  **A.**   I just want to make sure.   You said 339?

25  **Q.**   Yes, 339.   Oh, wait.   Sorry.   I'm wrong; you're right.

1   134.  Sorry about that.

2   **A.**   Yeah.  So -- yeah.  That's what it said.

3   **Q.**   You didn't get it in time.  You had those slides and they

4   didn't have the numbers in there yet?

5   **A.**   It happens all the time.

6   **Q.**   All right.  But let's look at the data that Mr. Gupta sent

7   you.

8        So turning to page 3 of the exhibit, Mr. Gupta told you in

9   this data that you asked for that Java ME and wireless had

10  phenomemonal (sic)"-- pardon -- "phenomenal momentum in 2004

11  and 2005"; right?

12  **A.**   I see that.

13  **Q.**   It was a billion installed base as of December 2005?

14  **A.**   Yes.

15  **Q.**   635 handset models?

16  **A.**   Yes.

17  **Q.**   That means all those OEMs, those handset manufacturers we

18  talked about, they were churning out phones with Java in it;

19  right?

20  **A.**   Yeah.

21  **Q.**   180 deployments worldwide, carrier deployments.  Those are

22  the all over the world, the wireless carriers agreeing to work

23  with phones that had Java in them; right?

24  **A.**   Yes.

25  **Q.**   612 million units shipped; right?

1    **A.**    I see it.

2    **Q.**    That was more than the Danger?

3    **A.**    Quite a bit.

4    **Q.**    All right.  Let's look at the next page, page 4 of the

5    exhibit.

6          "The Java community has created tremendous opportunity."

7    Mr. Gupta told you, and you knew this at the time, that Java

8    was in all these different devices; right?

9    **A.**    I -- I knew that, yes.

10   **Q.**    A billion Java powered phones.  A billion; right?

11   **A.**    I see it there.

12   **Q.**    Printers; right?  PCs, Blu-rays, set-top boxes, Java

13   cards, gaming, all of it.  Java was everywhere, wasn't it?

14   **A.**    It was in a lot of products on this slide, that's for

15   sure.

16   **Q.**    And Sun risked all of that if it went along with you and

17   open sourced and made it freely available to everybody --

18   risked all of that; isn't that right?

19   **A.**    No.  I don't -- I don't see it that way.

20   **Q.**    So you've got the information from Mr. Gupta, and then you

21   went to the Executive Management Group with your presentation.

22   Let's look at Exhibit 15.

23          Your Honor, this one is preadmitted.  Exhibit 15.  Move it

24   into evidence.

25              **THE COURT:**  Received.

1   (Trial Exhibit 15 received in evidence)

2   **BY MS. HURST:**

3   **Q.**   All right.   Now, let's look here at the top of the email.

4   You're writing, "We're on stage at 11:00.   Probably get called

5   in at 11:30."   And the subject is "EMG Deal Review," and the

6   date is -- the email is February 5th, 2006; right?

7   **A.**   The email date, correct.

8   **Q.**   And you're sending the slides to Mr. Miner and

9   Mr. Lindholm; right?

10  **A.**   Yes.

11  **Q.**   And did they help you with the presentation at the EMG

12  deal review?

13  **A.**   I imagine they either reviewed it or contributed to it.   I

14  don't recall exact roles.

15  **Q.**   All right.   So the Executive Management Group, that was

16  the top brass at Google; right?

17  **A.**   Yes.

18  **Q.**   And you were proposing this potential deal to them; true?

19  **A.**   Yes.

20  **Q.**   All right.   Let's look at page 7 of the exhibit.   You

21  filled in the blanks for Mr. Gupta here; right?

22  **A.**   Yes.

23  **Q.**   And you told the top brass, "Look at that.   Sun Java, one

24  billion Java embedded handsets"; right?

25  **A.**   Yes.

1   **Q.**   180 carrier deployments; right?

2   **A.**   I see it.

3   **Q.**   "Critical to our open source handset strategy,

4   dramatically accelerates our schedule."  That's what you told

5   them?

6   **A.**   That's why we should partner with Sun, yes.

7   **Q.**   And you thought Sun had the potential to be a great

8   partner, didn't you?

9   **A.**   That's why I kept trying so hard to get a deal done.

10  **Q.**   In fact, you went to a conference in February of 2006,

11  after this presentation, called 3GSM; right?

12  **A.**   I believe so, yes.

13  **Q.**   And 3G, that's a wireless term; right?

14  **A.**   Yes.

15  **Q.**   And 3G was a big wireless conference?

16  **A.**   Back then.

17  **Q.**   3GSM?

18  **A.**   Back then, yes.

19  **Q.**   In Barcelona that year, do you remember?

20  **A.**   I don't remember if it was in Barcelona or Nice.  They

21  kept moving it around.

22  **Q.**   All right.  So it was your practice to make a trip report

23  when you went, you know, to some exotic, foreign locale on the

24  company's dime; isn't that right?

25  **A.**   That I would do a trip report when I traveled, yes.

1  **Q.**   So I'm showing you Exhibit 6485.  And is this a trip

2  report for Android dated February 22nd, 2006, from you to

3  Nikesh Arora of Google?

4  **A.**   Nikesh and a couple of other people cc'd, yes.

5       **MS. HURST:**  Move to admit 6485.

6       **MS. ANDERSON:**  No objection, Your Honor.

7       **THE COURT:**  Received.

8  (Court's Exhibit 6485 received in evidence)

9  **BY MS. HURST:**

10  **Q.**   Let's look at the first page, Trudy.  Let's look at the

11  date.

12       It's February -- now it's February.  Let's think again.

13  IPhone has been announced.  It's February.  You presented the

14  Sun deal.  You've gone to 3GSM.  Let's look at page 2.  It's

15  Barcelona.  Right there at the top; right?

16  **A.**   You're right.

17  **Q.**   All right.  And let's look what you wrote there in the

18  second paragraph.

19       "Sun is turning out to be a strong partner.  They have

20  digested the open source platform message and model.  Having

21  shipped Java in over a billion phones, they bring significant

22  added credibility to our story.  Sun created their own pitch to

23  present to their partners.  They were on message and providing

24  significant support for our effort."

25       That's what you thought when you went to Barcelona, isn't

1    it?

2    **A.**   Yeah.  That's what I wrote.

3    **Q.**   All right.  Let's look at page 3.  You went and you

4    pitched Sprint down at the bottom there, one of the operators.

5    That's one of the carriers.  You needed the carriers to get

6    your phones out on their network; right?

7    **A.**   No.  I mean, we wanted to make sure that we were building

8    a product that carriers would adopt.

9    **Q.**   Well, if they didn't adopt it, you couldn't use the phone;

10   right?

11   **A.**   That's debatable, but let's just say it would have been

12   nice to partner with the carriers.

13   **Q.**   Well, it's debatable because maybe Google would offer its

14   own WiFi phone and then it would compete with all these people

15   you were talking to; right?

16   **A.**   I'm sorry.  What was the question?

17   **Q.**   Well, you said it was debatable whether you needed the

18   wireless carriers or not.  The reason it was debatable was

19   because maybe Google would do its own phone just using WiFi and

20   bypass them altogether.  That's what they were worried about at

21   the time, wasn't it?

22   **A.**   I don't know.  I mean, that wasn't what I was thinking

23   certainly.  What I was talking about whether you needed the

24   carriers or not is you could do an unlocked phone where you

25   wouldn't need carrier approval.

RUBIN - CROSS / HURST

1   **Q.**   That wasn't very common at that time, was it?

2   **A.**   It was common in Europe and other places, not in the U.S.

3   **Q.**   All right.

4        You were pitching with Sprint, and you said "pitch in

5   conjunction with Sun Microsystems.  Well received"; right?

6   **A.**   Yes.

7   **Q.**   So you pitched Sprint.  You went there together with

8   representatives of Sun.  Sun already had a relationship with

9   Sprint; right?

10  **A.**   I believe so, yeah.

11  **Q.**   You pitched them together.  Sun really got behind you in

12  that pitch, didn't they?

13  **A.**   Well, you -- before we had a signed partnership, we were

14  off talking to people about our proposal.

15  **Q.**   Even before you had a deal, they were doing their best to

16  help you?

17  **A.**   We were helping each other, is the way I viewed it.

18  **Q.**   Well, they had a hundred million dollars a year of revenue

19  at stake, didn't they?

20  **A.**   At stake.

21  **Q.**   That's what you told Mr. Page, a hundred million dollars

22  they could lose.  A hundred million annual revenue if they open

23  sourced this thing, so there better be something on the back

24  end; isn't that true, Mr. Rubin?

25  **A.**   I don't know.  Is that a question?  Are you asking me what

1    I thought?

2    **Q.**   Well, that's what you told Mr. Page; right?   A hundred

3    million a year at stake.

4    **A.**   I -- I believe that it was communicated to me by Sun that

5    they were -- there was a hundred million of revenue from Java.

6    **Q.**   Now let me show you Exhibit 196.

7           **THE COURT:**   We are going to take a break after this

8    document, so let's finish up on this document.

9           **MS. HURST:**   This one is going to be a lengthy one,

10   Your Honor.   Do you want to take our break now or should I

11   continue?

12          **THE COURT:**   We'll take our break now.   Before we do

13   that, I have learned from prior trials that the jury sometimes

14   gets a little confused about leading questions.   You will

15   remember that Ms. Hurst objected when Ms. Anderson asked

16   leading questions, but then since Ms. Hurst has been up here,

17   that's all she's done, is ask a leading question.

18          So you might be thinking over there that that's not fair,

19   but actually it is fair.   It's part of the rules of the games

20   in trials, is that the party presenting the witness does not

21   get to ask leading questions except on preliminary matters, but

22   the party doing cross-examination is free to ask leading

23   questions because they're not on the -- they're adversaries,

24   usually, and so you want to get them to admit your point.

25          So Ms. Hurst is entitled to ask a leading question on

1   cross-examination.  Of course, it works the same way when we

2   get to the reverse situation.  So there is no inconsistency,

3   there is no unfairness in Ms. Hurst asking all these leading

4   questions.

5        All right.  We will take a 15-minute break.  Please

6   remember the admonition.

7        (Proceedings were heard out of presence of the jury:)

8             THE COURT:  Be seated.  Anything the lawyers need me

9   for?

10            MR. VAN NEST:  I don't believe so, Your Honor.

11            MS. HURST:  No, Your Honor.

12            THE COURT:  Fifteen minutes.  The witness may take a

13   15-minute break, too.

14                    (Recess taken at 9:34 a.m.)

15                (Proceedings resumed at 9:51 a.m.)

16        (Proceedings were heard out of presence of the jury:)

17            THE CLERK:  Court's now in session.  Please come to

18   order.

19            THE COURT:  Shall I bring in the jury?  Ready?

20            MS. HURST:  Yes, Your Honor.

21        (Proceedings were heard in the presence of the jury:)

22   BY MS. HURST:

23   Q.  All right.  Mr. Rubin, we left off at Exhibit 196.  Do you

24   have that before you, sir?

25   A.  Yes, I do.

**RUBIN - CROSS / HURST**

1   **Q.**   It's an email dated April 19, 2006, from Mr. Gupta at Sun

2   to you; is that right?

3   **A.**   Yes.

4   **Q.**   And it's got a draft of a license agreement attached to

5   it; right?

6   **A.**   Uh-huh.

7   **Q.**   It's at this point in your negotiations you were actually

8   exchanging possible deal documents; is that right?

9   **A.**   Yeah.  It seems like it's a contract --

10   **Q.**   All right.

11   **A.**   -- draft.

12       **MS. HURST:**  Your Honor, move the admission of

13   Exhibit 196.

14       **MS. ANDERSON:**  No objection, Your Honor.

15       **THE COURT:**  Received in evidence.

16     (Trial Exhibit 196 received in evidence)

17   **BY MS. HURST:**

18   **Q.**   All right.  Now, let's look here.  Mr. Gupta says:

19   (reading)

20       "Included is the next draft revision of the license."

21    And he's giving you some comments in brackets here, and he

22   says:  (reading)

23       "Can you please review and provide feedback?  We'd

24    like to get business and legal teams in a room early next

25    week to get any remaining items finalized to meet our

1        deadlines."

2        Right?

3   A.   Yep.

4   Q.   All right.  So at this point you had exchanged a number of

5   discussions.  You were on some terms.  You were exchanging some

6   deal documents.  And the negotiations were still progressing;

7   is that right?

8   A.   Yeah.  We were still in the process of -- of trying to

9   partner on this.

10  Q.   All right.  Now, let's look here on page 11 of the exhibit

11  at paragraph 5, and it says "Payment and Costs:  $28 million";

12  right?  Do you see that, sir?

13  A.   Yes.  Second paragraph.

14  Q.   Okay.  And then if we go over to the top of the next page,

15  at the end of that there's a note in the bracket, and it says

16  "Proposal based on agreement on Section 13.1"; right?

17  A.   Yes.

18  Q.   And that's a bracket Mr. Gupta said he would insert his

19  comments in the brackets; right?

20  A.   Yeah.  I think that's what he was referring to.  He said

21  he provided comments in brackets.

22  Q.   All right.  So let's go to 13.1, and that's on page 15 of

23  the exhibit.  And that's the "Go to Market Plan."  That's what

24  you were talking about at the time; right?

25  A.   That is the topic of Section 13.1.

1   **Q.**   And the "Go to Market Plan" meant you guys had to figure

2   out how were you going to actually implement this idea of this

3   joint collaboration and get it out into the marketplace, who

4   was going to do what, who was going to have control of that?

5   **A.**   Yeah.  This is basically when you publicize the

6   partnership to the world, how's it going to happen, how's it

7   going to come about.

8   **Q.**   All right.  And Mr. Gupta wrote in the brackets:

9   (reading)

10          "We need to discuss.  We propose agreement to the

11       price in return for Sun's hosting an ISV leadership."

12       Do you see that?

13  **A.**   Yes.

14  **Q.**   All right.  So the price and the market plan were linked

15  together by Mr. Gupta; isn't that right?

16  **A.**   Well, I mean, there were other brackets in the -- in the

17  document as well, but for this section, yeah, he wanted to --

18  he basically was agreeing to the price if they also could get

19  agreement on some of their ideas on hosting in the developer

20  community.

21  **Q.**   Now, you hated this draft, didn't you?

22  **A.**   What's that?

23  **Q.**   You hated this draft of the agreement, didn't you?

24  **A.**   I don't recall if I used those words.  I might have.  But

25  I don't know if I had an opinion as strong as that.

1   **Q.**   You didn't like it at all; isn't that true?

2   **A.**   I -- I think the proposal had a lot of negotiating that

3   still had to be done.

4   **Q.**   All right.  You were worried about how Sun was going to

5   use its control in this "Go to Market Plan" to make money on

6   the side, weren't you?

7   **A.**   I had observed that Sun -- all of Sun's comments to our

8   proposal was -- were based on control.  That was -- seemed to

9   be the only thing they were thinking about.

10  **Q.**   All right.  And, in fact, the negotiations came to a head

11  at this point and, in your view, you walked away based on

12  control and trust issues; is that right?

13  **A.**   Yeah.  That sounds like about right.

14  **Q.**   All right.  Now, this is April, and you walked away

15  sometime around May; right?

16  **A.**   I don't recall the exact timing.

17  **Q.**   All right.  Well --

18         **THE COURT:**  Just remind the jury the year.  April and

19  May of what year?

20         **THE WITNESS:**  2007, I believe.

21         **THE COURT:**  2007?

22         **MS. HURST:**  Actually, Your Honor, I believe it's 2006

23  as on the joint timeline.

24         **THE COURT:**  All right.  Let's get it clear.

25  Mr. Rubin, think about it.  What year are we talking about?

1      **THE WITNESS:**  Well, I've just been corrected.

2    Apparently it's 2006.

3           **THE COURT:**  Can you look at that document and tell us?

4           **THE WITNESS:**  Sure.  That's easy.  The email is

5    April 19th, 2006.

6           **THE COURT:**  All right.  2006.  So put the jury at the

7    right time on the timeline.

8       Go ahead.

9    **BY MS. HURST:**

10   **Q.**   All right.  Now, the deal broke off, and that meant you

11   didn't have the technology from Sun anymore; right?  You didn't

12   have that as an option at that point in time?

13   **A.**   Correct.

14   **Q.**   Now, do you know Chris DeSalvo?

15   **A.**   Yes, I do.

16   **Q.**   Who is Chris DeSalvo?

17   **A.**   He was one of the engineers on the Android team.

18   **Q.**   Was Mr. DeSalvo responsible for working on the core

19   libraries?

20   **A.**   I think that was one of his roles, yes.

21   **Q.**   I'm showing you Exhibit 215, Mr. Rubin.  Is that an email

22   from Mr. DeSalvo to you dated June 1st, 2006?

23   **A.**   It's one of my favorite emails from Chris.

24   **Q.**   I take that as a yes?

25   **A.**   Yes.

1          MS. HURST:  Move to admit 215.

2          MS. ANDERSON:  No objection, Your Honor.

3          THE COURT:  Received.

4        (Trial Exhibit 215 received in evidence)

5   BY MS. HURST:

6   Q.   All right.  Now, Mr. DeSalvo -- you've broken off your

7   talks with Sun, and Mr. DeSalvo, who was the one who had to get

8   the Java class libraries into the platform, wrote to you:

9   (reading)

10         "With talks with Sun broken off.  Where does that

11      leave us regarding Java class libraries?"

12         MS. ANDERSON:  Objection.

13  BY MS. HURST:

14  Q.   (reading)

15         "Ours are half-ass at best.  We need another half of

16      an ass."

17         MS. ANDERSON:  Objection, Your Honor, to the colloquy

18  at the beginning of the question.  It lacks foundation.

19         THE COURT:  Just a minute.

20                   (Pause in proceedings.)

21         THE COURT:  I don't see it is.  What is the objection?

22         MS. ANDERSON:  Your Honor, counsel made prefatory

23  statements about -- drawing collusions about the subject matter

24  of this email before she asked a question.

25         THE COURT:  All right.  I'm going to just remind the

RUBIN - CROSS / HURST

1    jury.

2         I can't interrupt every time the lawyers do it, and both

3    sides will be guilty of this and probably have been; but when a

4    lawyer has a little prefatory statement before a question and

5    then asks a question, it's only what the witness says that is

6    evidence and all that prefatory stuff, you have to just expunge

7    it from your mind.

8         Because that's the easiest way that a jury can go wrong,

9    is confusing what the lawyer says versus what the actual

10   evidence is.  You must keep that straight.  The lawyers get

11   carried away and they make speeches in front of the jury while

12   they're asking questions.  A speech is not evidence.

13        Both sides either have been or will be guilty of this.  It

14   applies to both sides.  You must remember that.

15        The objection is sustained as to any prefatory statement

16   that was made.  No more prefatory statements.

17   **BY MS. HURST:**

18   **Q.**   Mr. Rubin, at this point, had the talks with Sun broken

19   off?

20   **A.**   Yeah.  Like four times in the past they had broken off.

21   This is just the most recent time based on the date.

22   **Q.**   You're saying you broke off talks with Sun four times

23   before June 2006?

24   **A.**   Yeah.  They ebbed and flowed.  We were talking to Sun in

25   2005.

1    Q.   All right.  Mr. Rubin, at this time, you had most recently

2    walked away from the negotiations based on control and trust

3    issues; is that right?

4    A.   I believe that to be accurate, yes.

5    Q.   And Mr. DeSalvo is the person responsible for getting the

6    Java class libraries into the Android platform; right?

7    A.   Yes.

8    Q.   And you no longer had that possibility of the license for

9    that technology; true?

10   A.   Yes.

11   Q.   And then Mr. DeSalvo wrote to you:  (reading)

12            "Talks with Sun broken off.  Where does that leave us

13        regarding Java class libraries?  Ours are half-ass at

14        best.  We need another half of an ass."

15        That's what he wrote to you; right?

16   A.   Yes.

17   Q.   Trudy, can we see Exhibit 43.1, please.

18        Now, this is the exhibit that you were talking about with

19   Ms. Anderson on direct?

20   A.   Yes.

21   Q.   And when we're talking about those class libraries, we're

22   talking about these core libraries here; right?

23   A.   Yep.

24   Q.   And so Mr. DeSalvo had to get those core libraries into

25   the platform, and at this point in June 2006, he didn't have

1  them; right?

2  **A.**   I think the -- I think the context of his email was he had

3  about -- he was about halfway done developing them.

4  **Q.**   Halfway done in June 2006?

5  **A.**   Yes.

6  **Q.**   All right.  And then you tried to get those libraries;

7  right?  You tried to get them from IBM.  You tried to get them

8  from XCE.  You tried to get this them from Esmertec.  You tried

9  to get them from Skelmir.  Right?

10  **A.**   I was constantly looking for ways to accelerate the

11  effort, and having people contribute to the open source effort

12  was one of the ways I was looking for.

13  **Q.**   And specifically the class libraries, those core

14  libraries, those were what you were trying to get -- part of

15  what you were trying to get from each of those companies;

16  right?

17  **A.**   Yes.

18  **Q.**   Now, you said that the discussions ended -- you can take

19  that down, Trudy -- because the two companies couldn't agree on

20  terms; right?  At this point the discussions ended because the

21  two companies couldn't agree on terms?

22  **A.**   Sorry.  Is that a question?

23  **Q.**   Yes.  That's true; right?

24  **A.**   Yes.

25  **Q.**   And you personally on behalf of Google made the decision

1  that Google would walk away from that deal at that point in

2  time?

3  **A.**   Yes.

4  **Q.**   And you could not agree on who would control the developer

5  ecosystem; is that right?

6  **A.**   I think that I walked away because Sun wanted to control

7  more than I was willing for them to control.

8  **Q.**   And you thought that you had to give up control as one of

9  the key principles of an open platform; right?

10 **A.**   I think with open source, the notion of control is

11 obsolete.

12 **Q.**   And you were worried that Sun had mechanisms of control

13 that it would try to use and that would interfere with your

14 open source strategy; right?

15 **A.**   I think that's pretty accurate, yep.

16 **Q.**   And you walked away from the deal because you at Google

17 wanted to give up control of Android and just have it flourish

18 in the open?

19 **A.**   The whole idea about open source is to have very, very few

20 restrictions on what people can do with it.

21 **Q.**   You wanted to delight people with it flourishing out there

22 in the open; isn't that right?

23 **A.**   I'm not sure if I used that exact term.  I may have.

24     **THE COURT:**  I'll give you a hint.  Anytime a lawyer

25 turns to the jury and outstretches her arms skyward and gives a

1  soliloquy in the way that Ms. Hurst just did, she's probably

2  quoting from something that you wrote.

3                    (Laughter)

4            THE COURT:  All right.  So let's see the document.

5            MS. HURST:  Well, Your Honor, I was -- I think I had

6  it so I was going to move past to the next one, if that's all

7  right.

8            THE COURT:  All right.

9  BY MS. HURST:

10  Q.   All right.  Now, isn't it true, Mr. Rubin, though, that

11  Google had methods of controlling Android?

12  A.   Yeah.  I mean, from certain, I would say, bad actors,

13  yeah.

14  Q.   Well, isn't it true you had a comprehensive strategy to

15  put Android out as an open source platform and, nonetheless,

16  retain mechanisms of control over it?

17  A.   Well, control over which aspects I think is the open

18  question.

19  Q.   All right.  Well, let me show you Exhibit 190.

20       Now, Exhibit 190, that's on the bottom, an email from you

21  to Kristen Gil at Google dated October 9, 2010.  Do you see

22  that?

23  A.   Yes.

24  Q.   And the subject is "BOD Question"?

25  A.   Yes.

RUBIN - CROSS / HURST

1  **Q.**  And "BOD," that means board of directors; right?

2  **A.**  Yes.

3  **Q.**  So you say:  (reading)

4  "Enclosed are slides for the board of directors.

5  Please do not distribute.  These detail our partner

6  strategy and control points for the product we create."

7  That's what you wrote, right?

8  **A.**  Yes, ma'am.

9  **MS. HURST:**  Move to admit Exhibit 190, Your Honor.

10  **MS. ANDERSON:**  No objection, Your Honor.

11  **THE COURT:**  Received.

12  (Trial Exhibit 190 received in evidence)

13  **BY MS. HURST:**

14  **Q.**  Let's just look at that, Trudy, where at the bottom where

15  Mr. Rubin is writing to Ms. Gil.

16  Now, is Ms. Gil the one kind of organizing all the

17  presentations for the board of directors at that time?

18  **A.**  You know, at that time I don't exactly remember her role.

19  I'm sorry.

20  **Q.**  All right.  So she says:  (reading)

21  "Thanks for putting this together.  Forward only to

22  the OC copied here."

23  Let's just stop there.  "OC," that meant operating

24  committee; right?

25  **A.**  Yes.

1   **Q.**   That was the whole level of top brass at Google; right?

2   **A.**   Yeah.  I think in 2010 that was the renamed EMG.

3   **Q.**   All right.  So that was getting them ready for the board

4   meeting; right?

5   **A.**   Yes.  Well, no, not specifically.  I think the board had a

6   question.  Question number 2 was a response, so I think it was

7   after the board meeting if they already got a question.

8   **Q.**   Well, it says "in preparation for the board meeting";

9   right?

10   **A.**   For the next board meeting.  I guess there was more than

11   one board meeting.

12   **Q.**   It says "in preparation for the board meeting" at the top

13   of the email from Ms. Gil?

14   **A.**   Yes.

15   **Q.**   So the board had a question for you.  And let's go to

16   page 2.  This was your answer to strategy questions for the

17   board of directors of Google; right?

18   **A.**   Yes.

19   **Q.**   It doesn't get any higher than that in the company; right?

20   That's it.  The buck stops there; right?

21   **A.**   The board oversees the duties of the executive team at a

22   company.

23   **Q.**   So that's the absolute top of the company; right,

24   Mr. Rubin?

25   **A.**   I don't know.  Investors should play a role in there

1    somewhere it seems.

2    **Q.**   All right.  The board certainly is responsible for the

3    performance of the company in reporting to the investors about

4    that, aren't they?

5    **A.**   That's right.

6    **Q.**   All right.

7        So let's look at page 4 of this exhibit.  Now, you wrote

8    these slides; right?

9    **A.**   Yes.

10   **Q.**   And you wrote:  (reading)

11            "How do we retain control of something we gave away?"

12       Let's go to the third bullet point:  (reading)

13            "Google was historically seen as a threat to

14       operators.  Giving up control was a key component of

15       operators adopting Android."

16       Now, you believed that was true when you reported that to

17   the board of directors; right?

18   **A.**   Yes, ma'am.

19   **Q.**   And you wanted the open source to be a signal to the

20   operators that they could trust Google; isn't that right?

21   **A.**   More than a signal.  I wanted it to be a fact, a proveable

22   fact.

23   **Q.**   All right.  A proveable fact that you had given up

24   control?

25            **THE COURT:**  Just to -- have we jumped way ahead now?

1    Is this a much later document than we've been looking at?

2              MS. HURST:  Your Honor, this is.  This is 2010.  It's

3    after the Android platform has been released.

4    Q.   Right, Mr. Rubin?

5    A.   Yes.

6              THE COURT:  All right.  Thanks for the clarification.

7    BY MS. HURST:

8    Q.   All right.  Let's go to page 6 of this exhibit.  Now, this

9    is your heading for this slide, Mr. Rubin, "Carrots are healthy

10   food but carrying a stick can save lives."  That's what you

11   wrote; right?

12   A.   Yes.

13   Q.   The carrot and the stick, those are mechanisms of control;

14   is that right, Mr. Rubin?

15   A.   I -- I wouldn't characterize it that way.  I would more

16   call it incentives and structure.

17   Q.   Incentives and structure.

18        Okay.  Structure in the form of a stick.  Over here you

19   identified on the left all the different structures that you

20   put into place; is that right?

21   A.   Those are mostly the contracts that we had in place, yes.

22   Q.   And that's what you mean by "structure"; right?

23   A.   Agreements.  And it's not all -- it's not all the

24   structure, but it's -- the agreements were part of the

25   structure let's say that.

1  **Q.**   And on the right-hand side, you explain how that structure

2  gives you the control that you want; right?

3  **A.**   That -- it isn't quite true.  "Control" is kind of the

4  wrong word.  It on the right-hand side talks about how those

5  structural mechanisms help Android be successful.

6  **Q.**   All right.  Well, let's just read them.  The first one

7  over here explaining the first three -- the first three items

8  says, let's just look here:  (reading)

9          "Stops our partners and competitors from forking

10       Android and going alone."

11       Is that right?

12  **A.**   Yes.

13  **Q.**   "Forking," that means cutting off a new version of

14  Android, going over here with it and trying to get all the

15  developers and the consumers and the carriers and everybody

16  over there.  You didn't want that to happen; right?

17  **A.**   Yeah.  Like what Amazon did with their phone.

18  **Q.**   You didn't want that to happen, did you?

19  **A.**   I didn't think it was healthy for the third-party

20  developers.  Those were the people I was thinking about when I

21  came up with that concept.

22  **Q.**   Explain that for me a little bit.

23  **A.**   So when a developer like Facebook or somebody who's

24  writing an app for a platform writes their app, if there's like

25  a dozen ditch platforms out there that each behave a little

1    different because a lot of people forked it, as time goes by,

2    those things kinds of gradually become separate and they -- it

3    makes it really hard for the developers.

4         APIs change.  The -- the whole concept of the services

5    that the platform offers changes.  So what happens is one

6    version of the platform won't run the same applications as

7    another version.  And I thought at the time, and still believe

8    today, that that's really bad for consumers.  It's a terrible

9    consumer experience for them not to know if an app will run on

10   their phone.

11   **Q.**   Because if it's an Android, you want it to write once and

12   run anywhere; right?

13   **A.**   I don't recall using that term.

14   **Q.**   You've heard Mr. Lockheimer, who's now the head of

15   Android, use that term, haven't you?

16   **A.**   I don't remember.

17   **Q.**   All right.  So:  (reading)

18            "Stops our partners and competitors from forking

19            Android and going it alone."

20        Now we have next:  (reading)

21            "We define the standard and shape the ecosystem."

22        That's what you wrote; true?

23   **A.**   Yes.

24   **Q.**   And you were going to do that in part by a compatibility

25   test; right?

1   **A.**    Yes.

2   **Q.**    A compatibility test suite and CDD, that means

3   compatibility document; right?

4   **A.**    Compatibility definition document.

5   **Q.**    And one of the ways you prevent that bad forking that you

6   just talked about is by having a compatibility requirement;

7   right?

8   **A.**    It's a test suite.  It's basically software that we

9   developed that let the people that are using Android figure out

10  if what they built is compatible, and we offered that as free

11  software so they could use it as a tool to make sure that they

12  didn't break something by accident.

13  **Q.**    And in order to define the standard and shape the

14  ecosystem, you used compatibility testing; true?

15  **A.**    We offered an open source version of a compatibility test

16  suite, which was software that anybody could use, to prove that

17  their implementation was compatible.

18  **Q.**    Now, did you enter into agreements with your partners in

19  order to enforce these various requirements?

20  **A.**    We asked partners if they were partnering with Google, not

21  to go make incompatible versions of Androids -- of Android --

22  I'm sorry -- which would cause third-party developer apps to

23  break across versions.

24  **Q.**    You called that an anti-fragmentation agreement?

25  **A.**    That's correct.

1   **Q.**   And not only did you enter into those anti-fragmentation

2   agreements, but you enforced them, didn't you?

3   **A.**   You know, "enforcing" I think is a strong word.  I think

4   that we encouraged people to basically do right by the

5   community that we created.

6        There were a lot of people in the Open Handset Alliance

7   who were aligned.  To be a member of the Open Handset Alliance,

8   you had to agree to anti-fragmentation, and everybody agreed at

9   the time that that was good for Android, that was good for open

10  source.

11  **Q.**   Well, from time to time, you had some problems with some

12  of your business partners about anti-fragmentation; right?

13  **A.**   Yeah.  I recall every now and then a partner would do

14  something kind of unknowingly and we would have to remind them

15  that it's good for Android for everybody to be compatible so

16  applications run across handsets and we have happy consumers.

17  **Q.**   Let me show you Exhibit 181, Mr. Rubin.  If you start at

18  the very bottom of the second page, there's a draft email that

19  Mr. Eustace prepared for your review and then you responded.

20  Mr. Eustace wrote another email and then you responded; is that

21  right?

22  **A.**   Yeah.  I think that's it.

23  **Q.**   And this email exchange occurred on July 26, 2009 -- 25

24  and 26, 2009; right?

25  **A.**   Yes.

1           MS. HURST:  Move Exhibit 181, Your Honor.

2           MS. ANDERSON:  No objection, Your Honor.

3           THE COURT:  Received.

4        (Trial Exhibit 181 received in evidence)

5   BY MS. HURST:

6   Q.   All right.  Let's start at the very bottom, Trudy, with

7   the -- on the next page.  I'm sorry.  Page 2.  There you go.

8   Yeah.  Let's start up there.

9        All right.  Now, Mr. Eustace, he was your boss; right?

10  A.   At the time -- this is 2009?  I'm not sure.  I got

11  promoted at some point around that time.  He was my former

12  boss.

13  Q.   All right.

14          MS. HURST:  Sorry, Your Honor.  I heard a noise in the

15  audience, and I just got distracted.

16          THE COURT:  Whoever has got -- somebody back there, a

17  couple of times now it's happened, has got some kind of

18  recorder going.  You're not supposed to be recording any

19  proceedings.  If you are, you've got to turn it off, or I'll

20  have the U.S. Marshals take you away.  So, please, no

21  recording, no photographs; and if you have a cell phone on,

22  you've got to turn it off if it's going to start making racket

23  like it just did.  So be aware.

24          Please go ahead.

25

1    BY MS. HURST:

2    Q.   All right.  Mr. Eustace, whether or not he was your boss

3    at this time in July 2009, he was a top executive at Google;

4    right?

5    A.   Yes.

6    Q.   All right.  He wrote:  (reading)

7             "Eric asked me to set the record straight with Intel.

8        Here is my first draft.  Comments welcome.  Alan."

9        Right?

10   A.   Yes.

11   Q.   And then he's got a draft of an email that he's prepared

12   for you to Renee James, cc Paul Otellini -- is that how you

13   pronounce that?

14   A.   I believe so, yeah.

15   Q.   -- and Eric Schmidt, "Subject:  Moblin and Android."

16        Now, Renee James, she is today the president of Intel;

17   right?

18   A.   I -- I'm not sure.

19   Q.   She was a high-ranking executive at Intel at this time?

20   A.   Yes.

21   Q.   And so was Mr. Otellini also?

22   A.   He was the CEO at the time I believe.

23   Q.   CEO of Intel.

24        Okay.  Mr. Eustace was drafting this email and he was

25   proposing to tell Intel:  (reading)

1              "We never had any discussion of Google supporting

2         Moblin's Android compatibility hack for cell phones, and I

3         am categorically opposed to it.  Intel signed a

4         non-fragmentation agreement as part of joining the Open

5         Handset Alliance."

6         Do you see that?

7    A.   Yes.

8    Q.   Now, Moblin -- let's look at the next email, Trudy, from

9    Mr. Eustace.

10        What was Moblin?

11   A.   I think that was Intel's operating system for netbooks.

12   Q.   All right.  So Mr. Eustace, he's pretty excited about

13   this.  He doesn't even wait for you to respond.  He sends

14   another email before you've even responded; right?

15   A.   Yeah.  Based on this thread, it looks like he sent another

16   email about ten minutes after he had read up a little bit on

17   what Moblin is.

18   Q.   All right.  And he says:  (reading)

19             "I've been reading up on Moblin and it has clearly

20        targeted Android.  I think I need to modify this message

21        to have a more aggressive stance on Moblin.  I'll work on

22        it today."

23        That's what he said; right?

24   A.   That's what he wrote, yep.

25   Q.   All right.

1          And then you responded at the top.  You've got a long

2      response.  Let's start at the top.  You wrote:  (reading)

3              "Competitors are all around us."  Right?  "One part

4              of our" -- "one of the important parts of your strategy is

5              the compatibility spec."

6              Right?  That's a specification; right?

7   A.   Yes.

8   Q.   That's part of the anti-fragmentation agreement; right?

9   A.   No.  It's separate from the anti-fragmentation agreement.

10  It's -- the spec is the CDD, and that's the thing that we open

11  source and make available with the software that allows people

12  to read the spec openly, and then the software tests their

13  implementation against the spec to let them know whether

14  they're compatible.  It basically gives a green light or red

15  light on whether they're compatible so they know.

16  Q.   It's required by the anti-fragmentation agreement.  That's

17  how you measure whether somebody is fragmented or not.

18  A.   Whether they get a green light or red light.  They run the

19  tool by themselves and the anti-fragmentation agreement

20  basically says if you passed, you can do whatever you want.

21  Q.   And that is in their agreement?  That's what the

22  requirement is?

23  A.   I believe so, yeah.  It's changed over the years and I'm

24  sure it's changed after I left.  In this time frame, I was

25  still running the team so I believe it was in there.

1    **Q.**   All right.  Well, you know what?  Let's just read it and

2  see if that helps.

3      Let's go down to this paragraph, "How we implement":

4  (reading)

5        "How we implement this is as follows:  We make

6      everyone sign an anti-fragmentation agreement as part of

7      the OHA" -- "joining the OHA."

8      That's the Open Handset Alliance; right?

9    **A.**   Yes.

10   **Q.**   (reading)

11       -- "as well as in our GMS license."  That's Google

12      mobile services, all the apps.  "We require them to pass

13      the CTS" --

14      That's the compatibility test suite you were just telling

15  us about; right?

16   **A.**   Yes.

17   **Q.**   -- "and so on."

18      Now, Intel was an important business partner of Google;

19  isn't that right?

20   **A.**   I -- I wasn't in charge of the Intel relationship, so I

21  couldn't really gauge their importance from a business

22  perspective.

23   **Q.**   Well, they were part of the Open Handset Alliance?

24   **A.**   Yes.

25   **Q.**   And you considered that significant; right?

1    **A.**    I thought it was good for Android.

2    **Q.**    Yeah.  It gave Android credibility to have Intel sign on

3    to the Open Handset Alliance, didn't it?

4    **A.**    And the other 136 members.

5    **Q.**    And so when you have a business partner like this, when

6    you're in deals with people, you don't like to run right out

7    and sue them even though they might be doing something that

8    violates an agreement; isn't that true?

9    **A.**    I don't -- I don't -- I don't understand the question.

10   **Q.**    Well, Intel and Google, they had an anti-fragmentation

11   agreement; right?

12   **A.**    Yes.

13   **Q.**    It looks like you had some problems around Moblin

14   violating that agreement; right?

15   **A.**    I'm not sure.  I'm not sure.

16   **Q.**    Well, certainly that's what you and Mr. Eustace were

17   working on in this email; right?

18   **A.**    I think honestly what Intel wanted to do is they wanted to

19   put our app store, which is a Google proprietary application,

20   on Moblin.  That's what they wanted to do.  I think that's the

21   context of this email.

22   **Q.**    And that would have forked Android; right?

23   **A.**    It would not have forked Android.

24   **Q.**    Well, you would have had a whole other app store to

25   contend with with competitors all around you; right?

**RUBIN - CROSS / HURST**

1    **A.**    Just to be clear, it was our app store.  It wasn't open

2    source.  It wasn't part of Android.  It was part of GMS, and

3    they were asking to put that on their operating system, which

4    was incompatible with Android.  Technically I didn't even know

5    how you would do that.  Strategically I wasn't sure we wanted

6    to do that.

7    **Q.**    Let's just look again at what Mr. Eustace said.  He said,

8    "Moblin is clearly targeted directly at Android"; right?

9    **A.**    That's what Mr. Eustace wrote.  I see it right here.

10   **Q.**    "And I better modify this message and make it even more

11   aggressive."  That's what he wrote?

12   **A.**    He did.

13   **Q.**    But he was trying to work it out with Intel, wasn't he?

14   **A.**    I don't know.  It's a question for him.

15   **Q.**    All right.  Well, let me ask you this:  Did Google ever

16   sue Intel over this lack of compatibility?

17   **A.**    Not that I know of.

18   **Q.**    That's because that's a tough decision for any business to

19   make, isn't it, to sue a business partner?

20   **A.**    I -- I don't know.  I've never sued a business partner.

21   **Q.**    Now, you also had problems with Motorola and

22   anti-fragmentation, didn't you?

23   **A.**    I remember we had to remind a couple of our OEMs, you

24   know, what would be in the best interest of developers for

25   compatibility so all apps could run on all phones, and it

1   wouldn't hurt the consumer.

2   **Q.**   Well, you had trouble getting Motorola to even sign that

3   agreement, didn't you?

4   **A.**   I mean, you know, it took me a lot of effort and a lot of

5   energy to educate what I felt was like a whole industry of

6   people that didn't understand open source, didn't understand

7   the value of compatibility.

8       What we're talking about was a future where there would be

9   like millions of applications; but when we're having all these

10  discussions, there were like zero applications.  Right?  So our

11  vision was up here, and we're trying to kind of move the

12  industry in that direction and, honestly, not everybody got it.

13  **Q.**   Let me show you Exhibit 6027.  You were starting at zero

14  applications.  Is that what you said?

15  **A.**   Yeah.  The -- when the operating system doesn't exist,

16  it's hard to have an application for it.

17  **Q.**   And in a mobile phone, smartphone ecosystem, you need the

18  applications; right?

19  **A.**   Applications are good.  Didn't always used to be there.

20  Apparently Sun shipped a bunch of Java phones that didn't come

21  with applications.  There weren't app stores back then.

22  Smartphones kind of changed the game a little bit and I think

23  ended up being really good for consumers.  It made better

24  phones.

25  **Q.**   They make more lucrative phones, don't they?

RUBIN - CROSS / HURST

1    **A.**   Just makes better phones.

2    **Q.**   And more lucrative?

3    **A.**   I didn't say that.

4    **Q.**   Well, I'm asking you if it's true.  Is it true that

5    applications help make more lucrative phones?

6    **A.**   Yeah.  I mean, certainly the app developers are selling

7    some of their applications.  Not all of them do, but they make

8    a lot of money selling applications.

9    **Q.**   And you make money because the applications keep the

10   consumers interested in your devices, and at Google that means

11   they keep swiping on that search bar and you get ad revenue;

12   isn't that right?

13   **A.**   I wouldn't quite describe the -- the philosophy that way.

14   We provided a conduit for third-party developers to reach all

15   the consumers that were running Android.  That conduit was our

16   app store.  And in order to run the infrastructure and host

17   that app store and market it and maintain it and keep all the

18   malware out of it and all the work we had to do to operate that

19   conduit, we rev share with third-party developers.  We take a

20   small percentage of the app sale and put it towards the expense

21   and effort to run that service.

22   **Q.**   Is it true that you measure Android handsets on the basis

23   of whether they've been recently used called seven-day actives?

24   **A.**   I don't think we measure the handsets.  I believe we

25   measure the Google applications that are on the handsets.

1    Q.    So you don't even think you measure the phones that way?

2    A.    Not that I know of.

3    Q.    All right.  Let's go back to Exhibit 6027, Mr. Rubin.

4    A.    Yes.

5    Q.    Now, this is an email you sent.  Help me with the

6    pronunciation here.

7    A.    Sanjay Jha.

8    Q.    Sanjay Jha.  That's J-H-A.

9          And that's an email you sent dated February 25, 2010?

10   A.    Yes.

11             MS. HURST:  All right.  Move to admit 6027.

12             MS. ANDERSON:  No objection, Your Honor.

13             THE COURT:  Received.

14         (Trial Exhibit 6027 received in evidence)

15   BY MS. HURST:

16   Q.    Now, Mr. Jha, he was with Motorola; is that right?

17   A.    Yes.

18   Q.    And the subject of your email was "Anti-fragmentation

19   Agreement"?

20   A.    Yes.

21   Q.    And he says:  (reading)

22             "We sent you the revised agreement in December that

23         hasn't been signed yet."

24         Right?

25   A.    Yes.

1   **Q.**   (reading)

2               "Feedback from your team, Christie, is that they" --

3        I think that's supposed to be "their"; right? -- "is no

4        insensitive for Motorola to sign this agreement."

5        That's what you wrote?

6   **A.**   Yes.

7   **Q.**   You say in the third paragraph:  (reading)

8               "If you are unwilling to agree that fragmentation

9        will hurt Android and our respective businesses, then I

10       will need to rethink my approach on how I work with you."

11       That's what you wrote; right?

12  **A.**   Yes.

13  **Q.**   Because you were trying to get Motorola to sign that

14  anti-fragmentation agreement?

15  **A.**   No.  I was trying to make Android successful by not having

16  somebody fragment it.

17  **Q.**   In other words, you wanted them to sign the

18  anti-fragmentation agreement?

19  **A.**   No.  I didn't want them to fragment Android.  They could

20  fragment Android by not using it.  They could not sign the

21  agreement and still be compatible because we open sourced all

22  those test kits and everything.  They could still be compatible

23  and not sign the agreement.  Why would I be upset?  It doesn't

24  fragment Android.

25  **Q.**   You wrote:  (reading)

1              "The purpose of the agreement is to align our

2        interest as strategic partners in the continued growth of

3        One Android."

4        Right?

5   A.   Yep.

6   Q.   All right.  Trudy, you can take that down.  Thank you.

7           So you disagreed with Sun on control, and you said that

8   the reason that you wanted to walk away was so that the

9   platform would be open, and then you at Google implemented

10  various mechanisms of control, carrots and sticks, over the

11  platform; is that right, Mr. Rubin?

12  A.   Yeah.  And we're talking about different types of control

13  that were being requested by Sun.

14  Q.   So let's go back to Exhibit 215, which is now in evidence.

15  Jumping around a little in the timeline here.

16          So we're back to June 2006.  The talks with Sun broken

17  off.  You walked away over control, and Mr. DeSalvo says you

18  need another half of an ass.  And as you've already said, you

19  were trying to get the Java core libraries from other sources.

20          Now, at one point --

21          THE COURT:  You see, these are -- these preliminary

22  statements like this are -- please, just ask questions instead

23  of making these preliminary argumentive statements.

24          MS. HURST:  All right, Your Honor.  I apologize.

25  Q.   Let me show you Exhibit 5109, Mr. Rubin.  Now, that email

1    was -- that we just saw, that was June 2006.  Now, this one is

2    January 2007; right?

3    **A.**   Yes.

4    **Q.**   And this is an exchange between you and Mr. Miner; right?

5    **A.**   Yes.

6    **Q.**   Mr. Miner was one of your cofounders?

7    **A.**   Yes, he was.

8    **Q.**   He was one of the shareholders of Android who stood to get

9    some of the milestone payments?

10   **A.**   I'm sorry.  Can you ask that again?

11   **Q.**   Sure.  Mr. Miner, he was one of the shareholders of

12   Android who was in line for milestone payments?

13   **A.**   Yes.

14   **Q.**   And if we look at the very bottom of the first page, it

15   says, "On January 25th, 2007" -- let's just wait a moment.

16        Oh, sorry.  I forgot to move it into evidence.  My crack

17   team made sure they didn't display it first.

18             **MS. HURST:**  Your Honor, I move 5109 into evidence.

19             **MS. ANDERSON:**  No objection, Your Honor.

20             **THE COURT:**  Received.

21        (Trial Exhibit 5109 received in evidence)

22   BY MS. HURST:

23   **Q.**   All right.  The very bottom line, page 1, very bottom

24   line, Trudy, all the way down at the bottom.

25        On January 25th, 2007, at 6:23 a.m., Rich Miner wrote, and

1    let's go over to the second page now:   (reading)

2              "Andy, a month ago you seemed energized that we did

3         not have the necessary mobile libraries being built by our

4         team.  You said you were going to lead the charge and take

5         the responsibility yourself to get those implemented.  We

6         now seem to be giving up and saying that we are just not

7         going to do any of that stuff."

8         Do you see that?

9    A.   Yes.

10   Q.   All right.  And then you wrote back -- and the way these

11   emails go, we have to read up from the bottom.

12        So, Trudy, let's go back to the first page.  Down there

13   towards the bottom.  Yeah, that's the one.

14        On January 25th, 2007:  (reading)

15              "Give up?  Me?  Never.  This stuff is really

16         important.  I'm on it.  Esmertec has a term sheet in hand

17         and is flying here next week.  They have virtual

18         machine" --

19         That's what "VM" stands for; right?

20   A.   Yes, ma'am.

21   Q.   -- "libs" -- that's libraries; right?

22   A.   Yes.

23   Q.   (reading)

24              -- "and some other stuff.  Never fear.  We are both

25         industry guys and know how important this stuff is.  We

1          can't do a ta-da with a substandard platform.  That's not

2          called a ta-da.  It's an oh, no."

3          That's what you wrote, Mr. Rubin?

4     A.   Yes.

5     Q.   All right.  So in January 25th, 2007, you still didn't

6     have those core libraries; isn't that right?

7     A.   I think we were working on it pretty hard, but obviously

8     since we hadn't launched yet, the product wasn't done.

9     Q.   All right.  Let's look at 5114.  5114 is an email

10    exchange.  It starts with Andy Tien on page 2 and then turns

11    into a page -- exchange between you and Mr. Steve Horowitz

12    after that; is that right?

13    A.   Yes.

14    Q.   And those are all Google people?

15    A.   Yes.

16    Q.   And this is about March 28th, 2007?

17    A.   Yep.

18              MS. HURST:  Move the admission of 5114, Your Honor.

19              MS. ANDERSON:  No objection, Your Honor.

20              THE COURT:  5114 in evidence.

21         (Trial Exhibit 5114 received in evidence)

22    BY MS. HURST:

23    Q.   All right.  Now, let me give you a second to read that.

24         So what's happening here, let me make sure and see if I

25    can summarize it correctly, is Mr. Tien is working on a PPT,

1   that's a PowerPoint presentation, with China Mobile; right?

2   **A.**   Yeah.  And it's confusing because his name is Andy as

3   well, so . . .

4   **Q.**   So there's a presentation for China Mobile, and then Steve

5   Horowitz offers a bunch of comments; right?

6   **A.**   Yep.

7   **Q.**   And then you say to Mr. Horowitz there in the middle of

8   the first page:  (reading)

9           "Steve, please, let me handle the partnership

10          presentations," exclamation point.

11          Right?

12  **A.**   Yep.

13  **Q.**   And he wrote back:  (reading)

14          "Sorry.  Was just trying to help correct some of the

15          big errors.  Wasn't sure how much time you'd have to

16          review before the 9:00 a.m. meeting.  Apologies."

17          Right?

18  **A.**   Yep.

19  **Q.**   And then your response was:  (reading)

20          "He got different input from you and I.

21          Additionally, I have a presentation which I show."

22          And then you wrote:  (reading)

23          "I need you to focus 100 percent on discussion of the

24          handset.  We risk failure if you get distracted.  We'll

25          talk later about how I can help you.  We are beyond out of

time."

That's what you wrote?

A.   Yes.

Q.   And that was in March 2007?

A.   Yes.

Q.   That's after the iPhone announcement January of 2007?

A.   Sorry.  Was that a question?  I don't know exactly when the iPhone was announced.

Q.   So all of -- you mentioned the company called Noser on direct; right?

A.   Yes.

Q.   And you signed that agreement with Noser in April of 2007; right?

A.   I could go look back at it, but I'll trust you to . . .

Q.   All right.  So in April 2007, you hired Noser and you told them to do the class libraries; right?

A.   They were contributing.  We had engineers on class libraries like Dan Bornstein, who you mentioned before, as well.

Q.   You also had Bob Lee; right?

A.   We had a number of engineers on class libraries.

Q.   Bob Lee was one of them; right?

A.   I think so, yes.

Q.   And you know that Bob Lee sat down with the application programming interface book and copied right out of it into

1    Android; right?

2    **A.**    I don't -- I didn't know that firsthand.

3    **Q.**    You didn't know that?

4    **A.**    Not firsthand.

5    **Q.**    But you've heard it since and you know it's true; right?

6    **A.**    I've heard it since.

7             **MS. ANDERSON:**  Objection.  Foundation and hearsay.

8             **THE COURT:**  Well, have you heard it since?

9    You asked two questions.  Compound.  Sustained.  Please

10   start over.  The answer is stricken.  You can only ask one

11   question at a time, not two.  We don't know which one he's

12   answering.  So the answer is stricken.  You may ask again.

13            **MS. HURST:**  Thank you, Your Honor.

14   **Q.**    You believe it to be true as you sit here today that

15   Mr. Lee sat down with the application programming interfaces of

16   Sun and copied them into Android; true?

17   **A.**    Honestly, I can't tell if it's true or not.

18   **Q.**    You don't know?

19   **A.**    I don't know.

20   **Q.**    So you don't know -- you don't know whether these APIs are

21   in Android or not?  Is that what you're saying?

22   **A.**    I -- first of all, I've never seen that book.  I mean,

23   there's a lot I don't know about this.  I can answer your

24   questions, but you're asking me about somebody else and what

25   they did with a book that I've never seen, and it's kind of

RUBIN - CROSS / HURST

1    confusing.

2    **Q.**   Did you testify on direct that there was a clean room

3    implementation in Android of those core libraries?

4    **A.**   We were working on a clean room implementation of the core

5    libraries in Android.

6    **Q.**   A "clean room" means you don't copy stuff out of somebody

7    else's book; isn't that right, Mr. Rubin?

8    **A.**   That depends.  I mean, you can use open source software in

9    a clean room implementation.  There's a variety of ways to do

10   it.  I know there's books on open source software.  I don't

11   know specifically the book you're talking about.

12   **Q.**   You don't have any idea if this is a clean room or not

13   then, because you don't even know if somebody came and copied

14   out of Sun's book; isn't that right?

15              **MS. ANDERSON:**  Objection.

16              **THE COURT:**  Sustained.  The witness has said four

17   times he has not seen the book you're referring to.  He does

18   not know what's in there.  This is argumentative, improper

19   questioning.  Please ask proper questions.

20   **BY MS. HURST:**

21   **Q.**   Is it true that you don't know whether folks at Google

22   copied the application programming interfaces, the declaring

23   code owned by Sun, into Android?

24   **A.**   The question is did I know if the engineers at Google

25   copied the APIs?

1            THE COURT:  No.  She's talking about the declaring

2    lines of code.  I thought you had already told us that the

3    declaring lines of code, at least some of them, are in Android.

4            THE WITNESS:  They're in Android.  The question is did

5    somebody, like, copy it, like, copy and paste; right?  And I

6    don't know the answer to that.  I don't know, like, the

7    mechanics of --

8            THE COURT:  I think Ms. Hurst is asking how did those

9    exact lines -- because they have to be exact; right?

10            THE WITNESS:  Yep.

11            THE COURT:  -- how did those exact lines get into the

12    Android.  That's what she's asking.

13            THE WITNESS:  I don't know.  It could have been Noser.

14    It could have been a Google employee.  It could have been from

15    Apache Harmony.  I have no idea.

16            THE COURT:  All right.  Next question.

17    BY MS. HURST:

18    Q.   Well, you testified that Android was a clean room

19    implementation of those core libraries; is that right?

20    A.   Yes, ma'am.

21    Q.   But a clean room has to be done without copying somebody

22    else's specifications; isn't that true?

23    A.   It depends whether the specification is open or not.

24    Q.   Well, did you tell the jury that when you defined a clean

25    room on direct?

1  **A.**   No.   Actually -- and I lost some sleep last night, because

2  actually when Judge Alsup asked me what a clean room was, I

3  forgot the most important part in defining it, which is it's

4  done unaided, which means it happens in a vacuum.  And when he

5  asked me, I forgot the most important part because I was trying

6  to rush through the actual explanation.

7  **Q.**   Unaided without the specification?

8  **A.**   Without a specification that would taint the clean room

9  implementation.  There's some specifications that don't taint.

10  There's some specifications that do taint.  For example, Apache

11  Harmony I didn't feel tainted anything.

12  **Q.**   And that's because you believed it was okay just to take

13  Sun's stuff that had been copied into Apache Harmony?

14          **MS. ANDERSON:**  Objection.  Argumentive.

15          **THE COURT:**  Sustained.

16  **BY MS. HURST:**

17  **Q.**   So after you walked away from the discussions with Sun in

18  the spring of 2006, you kept making presentations to potential

19  business partners to join the Open Handset Alliance; right?

20  **A.**   Yes.  I was constantly inviting people to join us.

21          **THE COURT:**  May I ask a question?  I know it's

22  confusing the jury.

23          Open Handset Alliance, is that something just for Android,

24  or does that apply more generally to other operating systems?

25  What is Open Handset Alliance?

1              THE WITNESS:  It was an association we put together to

2    support Android.  It was basically all of the partners that we

3    organized behind Android.  Think of it as a marketing --

4              THE COURT:  So it's an Android-specific organization?

5              THE WITNESS:  Yes.

6              THE COURT:  All right.  Thank you.

7              THE WITNESS:  Uh-huh.

8    BY MS. HURST

9    Q.   Mr. Rubin, I'm showing you Exhibit 5595.  Is this a

10   presentation deck that was prepared within Google by the

11   Android team for a presentation with NTT DoCoMo in or around

12   April 9th, 2007?

13   A.   So it's a presentation around that time.  April 9th, 2007,

14   is the email, but it wasn't put together by the Android team.

15   It was put together by the business development team at Google,

16   and -- and it's a draft that he's asking the Android team's

17   feedback from because he's not on the Android team.

18   Q.   All right.  Did you make this presentation to NTT DoCoMo?

19   A.   I don't know if it was actually given to them.

20             MS. HURST:  Move Exhibit 5559 into evidence.

21             MS. ANDERSON:  No objection, Your Honor.

22             THE COURT:  Received.

23        (Trial Exhibit 5559 received in evidence)

24   BY MS. HURST:

25   Q.   Let's look at page 6 of this.  Open handset distribution

1    architecture, that part came from the Android team; right?

2    A.   Well, it's not that exact diagram that we reviewed

3    earlier.  It seems to be some derivative of it.  I don't

4    remember where this came from honestly.

5    Q.   All right.  Well, this is a presentation for NTT DoCoMo in

6    April of 2007 where your diagram is still calling it core Java

7    libraries; right?

8    A.   It wasn't my diagram.  My diagram looks like the other one

9    we saw.  This presentation wasn't written by my team, and I

10   don't know where this diagram came from.

11       I mean, just to be clear, I was always transparent and

12   careful with the team not to call it Java, and you'll see in

13   emails and correspondence where I take responsibility for that

14   and I ask people not to call it Java.

15   Q.   Is that some of the "scrub the J's" emails?

16   A.   You know, it was more about not having a trademark

17   license, and I thought that was the best thing to do.  We never

18   concluded those partnership discussions.

19   Q.   Is it true that the Android team went around presenting to

20   all sorts of business partners showing them documents where it

21   was described that you were using Java libraries?

22   A.   To the best of my knowledge, no.  I fought really, really

23   hard and aggressively to avoid calling it Java publicly to any

24   partners.  Internally the only thing that we said was it uses

25   the Java programming language.

1   **Q.**   It would be the wrong thing to do to go around making

2   those presentations and call it Java libraries when it wasn't?

3   **A.**   I mean, Android was a whole lot more than Java libraries.

4   We were -- we were creating the first open handset platform.

5   **Q.**   It would be the wrong thing to do to go around making

6   those presentations to potential business partners calling it

7   Java core libraries when it wasn't; isn't that true?

8   **A.**   I think if -- I think it could have been a mistake if

9   somebody made that mistake.

10  **Q.**   It would be the wrong thing to do, Mr. Rubin; isn't that

11  right?  Can you answer that question?

12  **A.**   You know something?  I can't.  I'm not sure if you're

13  telling me something that I might have said before.  I might

14  have.  I don't remember.  Is it something you're saying?

15  **Q.**   Let's look at Exhibit 7196.  Do you remember you were

16  asked on direct some questions about when OpenJDK was released

17  by Sun?

18  **A.**   Yes.

19  **Q.**   And Exhibit 7196 is a copy of the press release from Sun

20  announcing that.  Do you see that?

21  **A.**   Yes, I do.

22  **Q.**   Does that refresh your recollection that it was May 8th,

23  2007, when Sun released the OpenJDK?

24  **A.**   This is the first time I've seen this, so just give me a

25  second to familiarize myself with it, please.

1          (Witness reviews document)  Okay.  Yes.

2     **Q.**   All right.

3     **A.**   Yeah.  This seems to be the availability of what was

4     previously announced by Sun.

5     **Q.**   All right.  And that's May 8th; right?

6     **A.**   That press release came out May 8th.

7               **MS. HURST:**  I move 7196, Your Honor, into evidence.

8               **MS. ANDERSON:**  Objection.  Hearsay and foundation.

9     The witness says he's never seen it before today.

10              **THE COURT:**  I thought you said that this looked like

11    the announcement to you; is that correct, Mr. Rubin?

12              **THE WITNESS:**  Yeah.  It comes from PR Newswire and

13    that's a PR service.

14              **THE COURT:**  Is this being offered for the truth or

15    being offered for notice to the witness?

16              **MS. HURST:**  Your Honor, it's offering for notice to

17    the witness.

18              **THE COURT:**  For that limited purpose -- well, he said

19    he had never seen it before.

20         Did you ever get information like that before?

21              **THE WITNESS:**  Yeah.  Somebody probably forwarded me a

22    link to this in email.

23              **THE COURT:**  All right.  I'm going to allow it in as

24    notice to the witness or something like this to the witness

25    about OpenJDK.

1      Go ahead.

2          **MS. ANDERSON:**  Thank you, Your Honor.

3      (Trial Exhibit 7196 received in evidence)

4  **BY MS. HURST:**

5  **Q.**  All right.  Now is it true -- is it true, Mr. Rubin, that

6  just after this announcement, Mr. Schwartz reached out to

7  Google to try to rekindle discussions?

8  **A.**  I mean, the relationship ebbed and flowed so many times

9  I've kind of lost track whether it's Mr. Gupta or Schwartz or I

10 don't know who.

11 **Q.**  Let me show you Exhibit 207.

12     While we're looking at that, open sourcing Java was what

13 you had always wanted Sun to do; isn't that true?

14 **A.**  Well, yeah.  It's funny.  I mean, these terms "open

15 sourcing," we wanted to do it a specific way where it could be

16 used in an open handset platform.  That's what we wanted them

17 to do.

18 **Q.**  You wanted them to open source it in a very specific way;

19 right?

20 **A.**  Yes.  That's what I just said.

21         **MS. HURST:**  Your Honor, Exhibit 207 is preadmitted by

22 stipulation.  I move it into evidence.

23         **THE COURT:**  Received.

24     (Trial Exhibit 207 received in evidence)

25

1    BY MS. HURST:

2    Q.   All right.  Let's look here at the bottom.  It's an email

3    from Mr. Schwartz.

4         Trudy, can you keep the Eric Schmidt part in, too?  Just

5    right there.  Thanks.

6         All right.  An email from Mr. Schwartz to Mr. Schmidt --

7    right? -- May 10th, 2007.  So that's just two days after the

8    big Sun open source announcement; right?

9    A.   Yes.

10   Q.   And Mr. Schwartz says to Mr. Schmidt:  (reading)

11            "By the way" --

12   "BTW," that means by the way; right?

13   A.   I believe so, yes.

14   Q.   (reading)

15            -- "we would of course love to work together.  Our

16       intent isn't to deliver a phone.  It's to help others do

17       so."

18   Do you see that?

19   A.   I see that there.

20   Q.   And then Mr. Schmidt forwarded that to you and asked for

21   your comments; right?

22   A.   Yes.

23   Q.   And then you wrote back to Mr. Schmidt, "They have been

24   calling me as well"; right?

25   A.   Yes.

1    **Q.**   You wrote:  (reading)

2              "I don't see any way we can work together and not

3         have it revert to arguments of control.  I'm done with

4         Sun.  Tail between my legs.  You were right."

5         That's what you wrote; right?

6    **A.**   Yes.

7    **Q.**   And then you wrote, "They won't be happy when we release

8    our stuff"; right?

9    **A.**   Yes.

10   **Q.**   And you wrote, "We now have a huge alignment with

11   industry, and they are just beginning"; right?

12   **A.**   Yes.

13   **Q.**   You viewed Sun as a competitor now at this time; isn't

14   that true?

15   **A.**   Yeah.  When we couldn't agree to be partners and I was

16   about to release a clean room implementation of a virtual

17   machine and class libraries and the whole operating system on

18   top of it, this was a space that Sun was already in.  They were

19   selling things to the mobile industry, and by not -- by

20   basically, like, my failure to partner with them, turned

21   them -- turned us into a competitive nature.  We were both

22   targeting the same industry with similar products.

23   **Q.**   And you wrote:  (reading)

24              "I'm not underestimating their ability when folks

25         like DoCoMo tell us they want to dump Sun for us.  I'm

1          assuming we have something valuable and good."

2          Right?

3     A.    Yes.  That's what I wrote.

4               THE COURT:  What is DoCoMo?

5               THE WITNESS:  One of the main Japanese carriers like

6     Verizon.  They're government sponsored.

7     BY MS. HURST:

8     Q.    Now, when OpenJDK came out -- take that down, Trudy,

9     please -- it had on it what's called a GPL license; right?

10    A.    I'm sorry.  Is that a question?

11    Q.    Yeah.

12    A.    You know, I'm not sure exactly what the license was when

13    OpenJDK first came out.  I don't remember.

14    Q.    Well, you certainly decided that the license that Sun used

15    on OpenJDK was not acceptable to you; isn't that right?

16    A.    Yeah.  I mean, I recall at the time I looked at it,

17    understood it, but I have forgotten a lot.  Unfortunately, it's

18    been a number of years.

19    Q.    All right.  But you looked at it, you understood it, and

20    you decided the OpenJDK license was unacceptable to you; true?

21    A.    I believe so, yes.

22    Q.    All right.  And you thought that phones could not be built

23    using GPL software; isn't that right?

24    A.    I thought there would be -- it would be difficult for

25    third-party developers to write their apps for phones if the

1    phones were based on GPL.

2              THE COURT:  We need to remind the jury what GPL means.

3    Explain in one sentence what GPL means.

4              THE WITNESS:  Yep.  It's called the GNU public license

5    GNU, and basically it's an open source license that -- one

6    sentence?

7              THE COURT:  What does it mean, GPL?

8              THE WITNESS:  It -- it's a viral license where --

9              THE COURT:  A general public license?

10             THE WITNESS:  GNU public license.  GNU.

11             THE COURT:  G stands for general, P stands for public,

12   and L stands for license; right?

13             THE WITNESS:  No.

14             THE COURT:  No?

15             THE WITNESS:  General is -- it's the foundation that

16   created it is called GNU, and it's the -- they call it GNU, GNU

17   public license, GPL.

18             THE COURT:  At least the PL part is public license?

19             THE WITNESS:  Absolutely right, yeah.

20             THE COURT:  So that's what we're talking about?

21             THE WITNESS:  Yes.

22             THE COURT:  Thank you.

23             THE WITNESS:  Sorry.

24   BY MS. HURST:

25   Q.   Now, you said the GPL is viral.  What did you mean by

1   that?

2   **A.**    That means it's a type of open source license that I

3   wasn't a proponent of, which was when a developer develops

4   software and -- and combines it with software that was a GPL,

5   it actually affects the software that the developer created.

6        So if you as an artist go and create a painting alongside

7   of a GPL painting, that means automatically your painting has

8   to be -- take on the GPL license.  And that's what the viral

9   nature of it is.  So if you contribute something, it takes

10  control of your code.  That's the way I would describe it in

11  kind of laymen's terms.

12  **Q.**    Trudy, can we have 43.1 again?

13       Now, there's something called the Classpath exception to

14  the GPL; right?

15  **A.**    Yes, there is.

16  **Q.**    And the Classpath exception makes it so that app

17  developers don't have to give up their apps like that.  They

18  write -- if they write above that top layer, the Classpath

19  exception will save them from the viral nature of GPL; right?

20  **A.**    That's correct.

21       **MS. ANDERSON:**  Objection, Your Honor, to the extent

22  these questions are aimed at current day, legal understanding.

23  Lacks foundation --

24       **MS. HURST:**  I'll rephrase.  I'll rephrase.

25  **Q.**    This was your understanding at the time, Mr. Rubin, in

1    this time period when you were developing Android and the

2    OpenJDK was released, the Classpath exception would save the

3    app developers from the viral nature of the license?

4    **A.**   I would term it slightly differently.  They created the

5    Classpath exception to fix the problem -- this problem in GPL.

6    **Q.**   All right.  But it wouldn't fix the problem for the phone

7    makers, would it, in your understanding at the time?

8    **A.**   I think it was a slightly different problem with the phone

9    makers, but I don't recall the exact specific issue.

10   **Q.**   Because the phone makers might need to make changes over

11   here in the core libraries; right?

12   **A.**   Which they would be free to do so under any license that

13   was an open source license.

14   **Q.**   They would be free to do it, but if it was under GPL, then

15   they would have to publish those changes that they made; right?

16   **A.**   Yeah.

17        **MS. ANDERSON:**  Objection.  Foundation.  Legal

18   conclusion.  Again, the witness is being asked current-day

19   understanding.

20        **THE COURT:**  Well, that's true.  You have to phrase it

21   in terms of what he knew back then.

22      With that understanding, please answer the question.

23        **THE WITNESS:**  Sure.  I mean, this is kind of a funny

24   thing.  You know, these days and even back then, when you're an

25   engineer, you kind of have to understand this stuff to do your

1   job.  So I don't consider myself an expert on the topic, but I

2   think I understand it well enough to --

3            THE COURT:  No, not now.  We're trying to get at what

4   you understood at the time in question.

5            THE WITNESS:  My understanding is the same.

6            THE COURT:  All right.  Well, then tell us what the

7   answer is.

8            THE WITNESS:  Now can you reask the question?  I'm

9   sorry.

10  BY MS. HURST:

11  Q.   Let me see what it was, Mr. Rubin.  Thank you.

12       Back in the time when you were considering this and

13  OpenJDK had come out, you understood that if the viral nature

14  of GPL affected those core libraries and the handset maker made

15  a change in there for their phones --

16           THE COURT:   In the core libraries.

17  BY MS. HURST

18  Q.   -- in the core libraries, they would have to publish that

19  change to the rest of the world; right?

20  A.   Yeah, and I was fine with that.  I was more worried about

21  an app developer who had a proprietary app that wasn't open

22  source being forced to publish the source code of their app.  I

23  thought that would be really bad.

24  Q.   Well, isn't it true that you were also worried about the

25  handset manufacturers?

1   **A.**   Not in the area that you're describing.   In the area where

2   if a handset manufacturer came along and modified a core

3   library, whether or not they would have to publish the source

4   code to their modification of core library, I didn't care

5   about.   I actually thought that was good.

6   **Q.**   So let me just ask you this:   Is it true that you told

7   people at the time, 2008 when you were considering all this,

8   that the thing that worries you about GPL is this:   (reading)

9        "Suppose Samsung wants to build a phone that's

10       different in features and functionality than one from LG.

11       If everything on the phone was GPL, any applications or

12       user interface enhancements that Samsung did, they would

13       have to contribute back."

14       Did you say that publicly in that time frame?

15   **A.**   Yes, I did.   That's just what I described about the

16   proprietary code having to be opened.

17   **Q.**   Because they're competitors, Samsung and LG were

18   competitors, even though they were both using Android, and if

19   they tweaked it to make it especially good in their phones,

20   they didn't want to tell the other guy about that; right?

21   **A.**   No.   I think I was more worried about what they built on

22   top of it.   Like their user interface for example, that's --

23   that's them.   That's not Android.   I want them to be able to

24   express themselves and make great successful phones.

25   **Q.**   Can we see 207 again?

1          Let's go to that "on a separate note" paragraph.

2          You've got 207 there, Mr. Rubin?

3     A.   Yes, I do.

4     Q.   You wrote this:  (reading)

5              "On a separate note, I need to speak with you re

6          Korea.  LG and Samsung are two of my most difficult

7          partners.  Extremely aggressive when it comes to

8          competition."

9          Right?

10    A.   Yes.

11    Q.   Those handset manufacturers were competing with each

12    other, weren't they?

13    A.   Yeah.  I love that.

14    Q.   And the last thing they wanted to do was have to disclose

15    their proprietary modifications to Android and have to give

16    that information to their competitors; isn't that so?

17    A.   I don't follow you.  I don't see where that -- where it

18    says that here.

19    Q.   I'm not asking about the document.  I'm just asking you.

20    A.   I'm sorry.

21    Q.   At the time isn't it true you believed those handset

22    manufacturers did not want to share their secret changes to

23    Android with each other?

24    A.   No.  That -- the way I would describe it is I wanted to

25    make sure that I wasn't, like, painting myself in a corner by

**PROCEEDINGS.**

1    agreeing to some license for Android that would force the

2    manufacturers to do something that wouldn't allow them to be

3    effective competitors.

4         Like, for example, if I picked the wrong open source

5    license, then maybe they would all look the same, and I really

6    didn't want that to happen.  I wanted everybody to have the

7    freedom to innovate because I think that type of competition is

8    really good for consumers.  They end up winning because, you

9    know, the phones keep getting better and better and better.

10             **MS. HURST:**  Your Honor, I'm about to go to a different

11   subject.  Would now be a good time for a break?

12             **THE COURT:**  How much longer do you have on cross?

13             **MS. HURST:**  I'm sure my team is going to tell me to

14   cut out another half of whatever I've got left here,

15   Your Honor.  I'm going to try and go another half an hour and

16   be done.

17             **THE COURT:**  We'll take a 15-minute break at this time.

18   Please remember the admonition.

19        (Proceedings were heard out of presence of the jury:)

20             **THE COURT:**  Do the lawyers need the judge for

21   anything?

22             **MR. VAN NEST:**  Excuse me?

23             **THE COURT:**  Do you need me for anything?

24             **MR. VAN NEST:**  Just one quick heads-up, which is that

25   when -- we're going to do a couple videos after Mr. Rubin is

**PROCEEDINGS.**

1   done.  When we come to Mr. Bloch, who I hope to get to today,

2   we would like you to read one of the statements that we worked

3   out with Judge Kim.  So we'll have that copyright -- it's the

4   one that explains what's at issue, APIs --

5        **THE COURT:**  I'll read them all just before that video.

6        **MR. VAN NEST:**  It's not the four admitted facts.

7   Those aren't the ones.  It's the copyright APIs versus

8   implementing, and we'd like to have you do that just before

9   Josh Bloch, which will be after the videos.

10       **THE COURT:**  Remind me.

11       **MR. VAN NEST:**  We'll hand it up.

12       **THE COURT:**  All right.  Thank you.

13       **MR. VAN NEST:**  We'll get it up.  Thank you.

14       **THE COURT:**  We're going to take our 15 minutes, too.

15       **MR. VAN NEST:**  Thank you.

16       **MS. HURST:**  Thank you.

17       (Recess taken at 11:10 a.m.)

18       (Proceedings resumed at 11:25 a.m.)

19     (Proceedings were heard out of presence of the jury:)

20       **THE COURT:**  We're going to bring in the jury.  Are you

21  ready?

22     Bring in the jury.

23     (Proceedings were heard in the presence of the jury:)

24       **THE COURT:**  Ms. Hurst, please proceed.

25       **MS. HURST:**  Thank you, Your Honor.

BY MS. HURST

Q.   Mr. Rubin, I put a few exhibits up there in front of you
to try to speed things up a little bit.  Do you see a folder
for Trial Exhibit 1 there?

A.   Yes, I do.

Q.   And that one is already in evidence.  I believe you talked
about that on direct.

     Let's look at page 8 of that, please.

A.   Okay.

Q.   Now, this is where you were making your first
presentation, page 8, to -- your first Google product strategy
presentation; is that right?

A.   Yes.

Q.   And you were explaining to the folks at Google, the top
executives, why Java; right?

A.   Yes.

Q.   And you pointed out a couple of things on direct, but
there are a couple of other reasons here, too.  Existing pull
of developers and applications, do you see that?

A.   Yes, I do.

Q.   And that was important because, as you described it
yesterday, you wanted this to be frictionless; right?

A.   As frictionless as possible.

Q.   So you wanted to, if you could, tap in to that existing
base of developers and applications; is that right?

RUBIN - CROSS / HURST

1    **A.**    Yep.

2    **Q.**    And you understood at the time that there was a licensing

3    structure at Sun; is that right?

4    **A.**    I understood -- I think I understood Sun's business model

5    at the time, and that was a licensing-based business model.

6    **Q.**    And the OEM -- under that licensing model, the OEM, the

7    handset maker, would pay for the license; right?

8    **A.**    Well, would pay.  I mean, I think they were already paying

9    Sun a license for Sun's technology.

10   **Q.**    But you didn't like that model; right?

11   **A.**    Well, I didn't really have a strong opinion about who pays

12   who in this model.

13   **Q.**    So you were okay with it if there was an open source model

14   where the OEMs would pay?  Is that back then?

15   **A.**    Look, if there's free software and somehow Sun convinces

16   an OEM to pay for something that's free, go for it.

17   **Q.**    Let's look at Exhibit 7.  And is that an email exchange

18   that you had with Mr. Page starting in the middle of the first

19   page to the second?

20        **MS. HURST:**  Oh, this is preadmitted.  I've been handed

21   a note, Your Honor, so I'll move Exhibit 7.

22        **THE COURT:**  7?

23        **MS. HURST:**  Yes.

24        **THE COURT:**  7 received in evidence.

25        **MS. HURST:**  Thank you, Your Honor.

1          (Trial Exhibit 7 received in evidence)

2     BY MS. HURST:

3     Q.    All right.  Let's look at this email that you wrote to

4     Mr. Page starting in the middle of the first page.

5     A.    I see it.

6     Q.    And this is October 11, 2005.  So we're going all the way

7     back to the beginning here; right?  This is just a few months

8     after you've joined Google; right?

9     A.    Yes.

10    Q.    And the subject is "Sun Meeting"; right?

11    A.    Yes.  I see it.

12    Q.    And you're prepping Mr. Page for a meeting that you're

13    going to have with Sun, and you're asking him to please try to

14    stop by and show support for this effort; right?

15    A.    Yeah.  I was looking for Larry to just swing by and

16    basically say hi to the folks.

17    Q.    All right.  So you told Mr. Page:  (reading)

18              "We have been having discussions with Sun regarding

19         Android's open source VM" --

20         That's virtual machine; right?

21    A.    Yes.

22    Q.    (reading)

23              -- "strategy.  Alan Brenner who owns the P and L" --

24         That means profit and loss; right?

25    A.    Yes.

**RUBIN - CROSS / HURST**

1  **Q.**   (reading)

2        -- "for J2ME at Sun is coming over to tell us that

3        Sun doesn't want to work with us.  His big concern is that

4        by open sourcing our J2ME VM we will make licensing

5        enforceability impossible for Sun and he will lose

6        revenue."

7        That's what you told Mr. Page?

8  **A.**   Well, you left out the "I believe" that was supposed to be

9  in parentheses because I didn't really know why he was coming

10 over.  This was just my, you know, idea.

11 **Q.**   You were worried that that was what he was going to come

12 over and tell you?

13 **A.**   "Worried" is probably not the right word.  I believed

14 that's what he was going to come over and tell us.

15 **Q.**   All right.  Then if we go all the way down to the bottom

16 of that email, you said, "Android is building a Java OS";

17 right?

18 **A.**   Yes.

19 **Q.**   (reading)

20        "We are making Java central to our solution because,

21        A, Java as a programming language has some advantages

22        because it's the number one choice for mobile development;

23        B, there exists documentation and tools; C, carriers

24        require managed code; and, D, Java has a suitable security

25        framework."

1          That was what you wrote in October of 2005; right?

2     A.    Yes.

3     Q.    And then if we go to the next page -- Trudy -- Mr. Rubin,

4     you wrote:  (reading)

5               "If Sun doesn't want to work with us, we have two

6          options:  One, abandon our work and adopt Microsoft CLRVM

7          and C sharp language or do Java anyway and defend our

8          decision, perhaps making enemies along the way."

9          That's what you wrote?

10    A.    Yes.

11    Q.    Let's go to Exhibit 8.  Do you have that there in front of

12    you, Mr. Rubin?

13    A.    I'm sorry.  Exhibit?

14    Q.    Eight.

15         Now, Exhibit 8, that's a draft of a long email that you

16    wrote to Deep Nishar and then shared with Mr. Miner for his

17    review; is that right?

18    A.    I believe so, yes.

19             MS. HURST:  Move Exhibit 8 into evidence.

20             MS. ANDERSON:  No objection, Your Honor.

21             THE COURT:  Thank you.  In evidence.

22         (Trial Exhibit 8 received in evidence)

23    BY MS. HURST:

24    Q.    Let's look at page 2.  I'm sorry.  First let's look at

25    page 1.  Let's see the date on this.  October 2005; is that

1    right?

2    **A.**   Yes.  Uh-huh.

3    **Q.**   All right.  Now let's look at page 2.

4        By the way, while we're looking at that, this was your

5    preparation of information in response to Eric Schmidt's

6    questions; right?

7    **A.**   You know, I haven't seen this in a while.  I'd have to

8    read the whole thing to familiarize myself with it.  Would you

9    like me to do that?

10   **Q.**   Well, it says right here, "Here are the Android team

11   responses to Eric's questions," on page 1; right?

12   **A.**   Let's see here.  So Rich wrote this; right?

13   **Q.**   No.  Do you see there in the middle of the first page,

14   Mr. Rubin, where it says "Deep"?

15   **A.**   Yeah.  And Rich Miner wrote this to me; right?

16   **Q.**   Okay.  Yeah.

17   **A.**   Okay.

18   **Q.**   And he says he drafted, "Here are the Android team

19   responses to Eric's questions"; right?

20   **A.**   Yes.

21   **Q.**   And you understand that to mean Eric Schmidt at the time;

22   right?

23   **A.**   Yes.

24   **Q.**   So let's look at page 2.  Here we are in October 2005 at

25   the bottom here, "It is widely believed."  Do you see that?

1    **A.**   Where are we here?  Yes.  I see.

2    **Q.**   (reading)

3        "It is widely believed by" --

4    It looks like there is a word missing there; right?

5    **A.**   Yeah.

6    **Q.**   (reading)

7        -- "that if an open platform is not introduced in the

8    next few years, then Microsoft will own the programmable

9    handset platform.  Palm is dying, RIM is a one-trick pony;

10   and while Symbian is growing market share, it's becoming a

11   Nokia-only solution."

12   That was the draft description for Mr. Schmidt; right?

13   **A.**   That Mr. Miner wrote, yes.

14   **Q.**   Mr. Miner was one of your cofounders of Android; right?

15   **A.**   He was.

16   **Q.**   And he was kind of the business guy; right?

17   **A.**   No.  I think Ethan was the business guy.  Rich was -- he

18   was based in Boston and kind of working on special projects.

19   **Q.**   Well, he went out and met with a lot of the potential

20   members of the open handset alliance, didn't he?

21   **A.**   Yeah.  And, actually, in this time frame he was really

22   active in this kind of stuff with me for sure.

23   **Q.**   Later he left?

24   **A.**   Yes.

25   **Q.**   Let's look at Exhibit 13.  No, just the pile in front of

1    you is the one with my current set.

2    **A.**    Okay.

3    **Q.**    All right.  Exhibit 13, that's an email from

4    Mr. Swetland --

5    **A.**    Yes.

6    **Q.**    -- to is that Mathias or Mathias Agopian?

7    **A.**    Mathias, yep.

8    **Q.**    And it's copied to you; is that right?

9    **A.**    Yes.

10   **Q.**    And Mr. Swetland was an engineer working on the Android

11   project in January of 2006?

12   **A.**    Yes.

13            **MS. HURST:**  Move the admission of 13.

14            **MS. ANDERSON:**  No objection.

15            **THE COURT:**  Thank you.  Received.

16        (Trial Exhibit 13 received in evidence)

17   **BY MS. HURST:**

18   **Q.**    And who was Mr. Agopian at this time?

19   **A.**    He was an engineer working on framework.

20   **Q.**    The Android framework?

21   **A.**    Yes.

22   **Q.**    Let's start in the middle of the page here where

23   Mr. Swetland wrote -- and Mr. Swetland -- Mr. Swetland was one

24   of your engineers on Android; right?

25   **A.**    He worked -- all the recipients of this email were on

1    Android.

2    **Q.**    And Mr. Swetland, you had worked with him before at

3    another company called Danger; right?

4    **A.**    Yes.   That's correct.

5    **Q.**    And then you recruited him after you founded Android to

6    come over and work with you there; right?

7    **A.**    Yes.

8    **Q.**    And at Danger you built what you considered to be one of

9    the very first smartphones; right?

10   **A.**    Yeah.

11   **Q.**    And it was called the T-Mobile Sidekick you said?

12   **A.**    That was T-Mobile's name for it.   We had our own internal

13   name for it.

14   **Q.**    And what was that name?

15   **A.**    Hiptop.

16   **Q.**    All right.   I'm going to show you Exhibit 5391.

17         Ms. Anderson, there's only just one of these.   It's the

18   phone.

19         Do you recognize Exhibit 5391 as a T-Mobile Sidekick?

20   **A.**    I think I have one of these on my wall of shame at home.

21   **Q.**    So that's a yes?

22   **A.**    Yes.

23             **MS. HURST:**   All right.   I move 5391 into evidence.

24             **THE COURT:**   Received.

25             **MS. ANDERSON:**   Excuse me.   I'm sorry?

1          **THE COURT:**  Do you have any objection?

2          **MS. ANDERSON:**  Yes, Your Honor.  This was not

3    disclosed as an exhibit for the examination.

4          **MS. HURST:**  He referred it on direct, Your Honor.

5          **MS. ANDERSON:**  Your Honor, if they were going to raise

6    this, I'm sure they were aware of it before they commenced

7    their exam.

8          **THE COURT:**  Overruled.  It's going in.

9          **MS. ANDERSON:**  Thank you.

10         (Trial Exhibit 5391 received in evidence)

11   **BY MS. HURST:**

12   **Q.**   Is there a Java logo on that phone anywhere?

13   **A.**   Well, let's see.  No, I don't see a Java logo.

14   **Q.**   All right.  Let's go back to Exhibit 13.

15   **A.**   By the way, just for the record, I'm not sure if this is a

16   Danger phone because our phone flipped around and this one

17   slides up.  And after Danger, post-Danger, T-Mobile continued

18   to use the Sidekick brand.  They even had an Android-powered

19   Sidekick, so --

20         **THE COURT:**  I don't understand the point you're trying

21   to make.

22         **THE WITNESS:**  I don't think this is a Danger phone.

23         **THE COURT:**  What did you originally say?  That it was?

24         **THE WITNESS:**  She handed it to me and she claimed it

25   was a phone called the Sidekick that Danger created for

1    T-Mobile, and I'm not sure.

2             THE COURT:  At first you said yes, but now -- you said

3    it was on the wall of shame.

4             THE WITNESS:  She asked me -- she asked me if it was

5    branded T-Mobile Sidekick, and I hadn't seen it until I flipped

6    it open where it says "Sidekick" there.  That's the only place

7    it says "Sidekick."

8             THE COURT:  Is it -- okay.  So what's the amendment

9    you're trying to make?

10            THE WITNESS:  I'm not sure if it was a phone that was

11   designed by my company Danger.

12            THE COURT:  All right.  Let's move on.

13   BY MS. HURST:

14   Q.   Let's go back to Exhibit 13, Mr. Rubin.

15        Mr. Swetland, who had worked with you at Danger -- by the

16   way, at Danger, you had Java APIs in the Hiptop platform; isn't

17   that right?

18   A.   Yes.

19   Q.   So Mr. Danger who worked with -- or pardon me --

20   Mr. Swetland who worked with you at Danger where you had used

21   Java APIs, wrote:  (reading)

22            "Reasons to shift to a primarily Java API.  Single

23        language massively simplifies application development

24        story.  Massively simplifies system development and

25        reduces our development time."

1      It's the second paragraph, Trudy.

2      Down here (indicating):  (reading)

3          "This is based on experience developing Hiptop.  Java

4      saved us a pretty crazy amount of time."

5      That was what Mr. Swetland wrote; right?

6  **A.**    I believe so.

7  **Q.**    He also wrote, "Using Java simplifies the 'why did you

8  invent a new API' story"; right?

9  **A.**    I see that.

10 **Q.**    And if we keep going to the next page, there's a lot of

11 other stuff he wrote in here about the benefits of Java.  One

12 other specific thing that he wrote is:  (reading)

13         "The nature of the cellular market is that we are,"

14     quote/unquote, "required to have Java due to carrier

15     requirements, etc."

16     Right?  That's what he wrote?

17 **A.**    Yes.

18 **Q.**    All right.  Let's go to Exhibit 17.  It should be there in

19 front of you as well.

20     After we look at one, if you want to just move it over to

21 the other pile, we probably won't go back to it, you'll be safe

22 doing that.

23     All right.  Exhibit 17.  Exhibit 17, that's an email from

24 Mr. Lindholm to Bill Coughran and you dated February 10th and

25 Mr. Coughran's response; is that right?

RUBIN - CROSS / HURST

1    **A.**    Yes.

2    **Q.**    February 10th, 2006; true?

3    **A.**    Yes.

4              **MS. HURST:**  And I move Exhibit 17 into evidence.

5              **MS. ANDERSON:**  No objection, Your Honor.

6              **THE COURT:**  Received.

7         (Trial Exhibit 17 received in evidence)

8    **BY MS. HURST:**

9    **Q.**    All right.  So let's look here at the email from

10   Mr. Lindholm.  Mr.--

11        At the bottom, Trudy.  This one in the middle.  Sorry.

12   This one in the middle.  There we go.

13        All right.  So Mr. Lindholm, he was at Google; right?

14   **A.**    Yes.

15   **Q.**    He had been at Sun; right?

16   **A.**    Yes.

17   **Q.**    He was a big Java guy at Sun; right?

18   **A.**    I -- I don't know how to characterize his role at Sun.

19   **Q.**    You considered him one of your advisors to Android; right?

20   **A.**    Yes.

21   **Q.**    And in February 2006, he wrote to Bill Coughran.  Was that

22   his boss?

23   **A.**    I'm not sure what the reporting structure was.

24   **Q.**    Well, he was requesting approval for travel for Android;

25   right?

1    **A.**   Yes.  I guess so.

2    **Q.**   And Mr. Rubin [sic] wrote:  (reading)

3             "As you might vaguely be aware, I have been helping

4         Andy Rubin with some issues associated with his Android

5         platform.  This has mostly taken the form of helping

6         negotiate with my old team at Sun for a critical license."

7         Right?  That's what he wrote?

8    **A.**   Mr. Lindholm wrote that, yes.

9    **Q.**   All right.  Let's look at Exhibit 158.  Is that in your

10   stack, sir?

11   **A.**   I see it.

12   **Q.**   And this is a presentation dated -- it's an email from

13   Andy T.  That was Andy Tien; is that right?

14   **A.**   Yep.

15   **Q.**   And he was part of the Android team?

16   **A.**   No, he was not.

17   **Q.**   Who was he?

18   **A.**   We discussed this before.  He was a sales guy, I think,

19   for Google.

20   **Q.**   All right.  And you're copied on this email; is that

21   right?

22   **A.**   Yes.

23   **Q.**   And it's being sent to China Mobile; right?

24   **A.**   Yes.

25   **Q.**   And the subject is "Materials on Google Open Handset OS";

1    right?

2    **A.**    Yes.

3    **Q.**    And the date is September 28th, 2006?

4    **A.**    Yes.

5            **MS. HURST:**  Move the admission of 158.

6            **MS. ANDERSON:**  No objection, Your Honor.

7            **THE COURT:**  Received in evidence.

8          (Trial Exhibit 158 received in evidence)

9    **BY MS. HURST:**

10   **Q.**    Let's look at this email.  Mr. Tien is sending to

11   China Mobile materials on our open handset OS; right?

12   **A.**    Yes.

13   **Q.**    So it's a whole slide deck that Google was sending to

14   China Mobile about Android; right?

15   **A.**    Yes.

16   **Q.**    Let's look at page 10, Trudy.

17         And the deck that Google sent to China Mobile said,

18   "Supporting Java is the best way to harness developers"; right?

19   **A.**    That's the title of this slide on page 10.

20   **Q.**    And it said:  (reading)

21             "Six million Java developers worldwide.  Tools and

22         documentation exist to support app development without the

23         need to create a large developer services organization.

24         There exist many legacy Java applications.  The wireless

25         industry has adopted Java, and the carriers require its

1    support."

2         That's what Google told China Mobile; right?

3    **A.**   I see it, yes.

4    **Q.**   China Mobile knew that.  They were one of the carriers;

5    right?

6    **A.**   I don't know if that's true or not.

7    **Q.**   Well, did they write back and say, "You know what?  We

8    don't really require Java.  That's okay.  Forget all about it"?

9    **A.**   I don't know.

10   **Q.**   All right.  So the deck that you sent China Mobile said:

11   (reading)

12         "Strategy.  Leverage Java for its existing base of

13         developers.  Build a useful app framework."

14         And down there at the end, at that point you were talking

15   to Skelmir and proposing to integrate class libraries from them

16   to accelerate your effort; right?

17   **A.**   Yeah.  A lot of that stuff never actually happened.

18   **Q.**   Right.  The Skelmir deal never happened; right?

19   **A.**   Yeah, and the J2ME apps in compatibility mode didn't

20   happen either.

21   **Q.**   That's right, because Android isn't compatible with J2ME,

22   is it?

23   **A.**   Android is -- doesn't support all the functionality of

24   feature phones.  It's meant and targeted for smartphones, which

25   J2ME wasn't.

1    **Q.**   So it was not compatible; right?

2    **A.**   Yeah, I think that's what that means.  We're building a

3    smartphone, and it built feature phones.

4    **Q.**   Do you have 5557 up there, sir?

5    **A.**   Yep.  I see it.

6    **Q.**   And that's an email with slides for an LG meeting; right?

7    **A.**   Yes.  I see it.

8    **Q.**   And you're one of the recipients on that email dated

9    March 11, 2007?

10   **A.**   Yes.

11           **MS. HURST:**  Move the admission of 5557.

12           **MS. ANDERSON:**  No objection, Your Honor.

13           **THE COURT:**  Thank you.  Received.

14       (Trial Exhibit 5557 received in evidence)

15   **BY MS. HURST:**

16   **Q.**   This is March 11, 2007; right?  Let's just look here on

17   our timeline.  This is after you walked away in May 2006 and

18   before the release of OpenJDK which was May 2007; right?

19   **A.**   I'm sorry.  Can you repeat?  It's -- this is before the

20   open sourcing of OpenJDK?

21   **Q.**   Right.

22   **A.**   Yes.  Post-announcement but before it became available.

23   **Q.**   All right.  So you're meeting with LG; right?

24   **A.**   Yes.

25   **Q.**   And all these people meeting with LG, these are all Google

1    people; right?

2    **A.**    Yes.

3    **Q.**    None of those are Sun people; right?

4    **A.**    That's correct.

5    **Q.**    All right.  Let's look at page 10.  So, here again, you've

6    got the slides for LG and you're calling it the core Java

7    libraries; is that right?

8    **A.**    Yep.

9    **Q.**    All right.  Is 5183 up there, sir?

10   **A.**    Somewhere.  I have to find that one.

11   **Q.**    If you don't have it right in front of you --

12   **A.**    It wasn't in the small pile.

13   **Q.**    -- it's not there.  I'll start fresh here.

14         All right.  Exhibit 5138 is entitled "OC Quarterly Review,

15   Q1 2009 Android."  And you see your name is first there?

16   **A.**    Yes.

17   **Q.**    All right.  What was an OC quarterly review?

18   **A.**    That was the executive review of various projects at

19   Google.

20             **MS. HURST:**  Move to admit 5183.

21             **MS. ANDERSON:**  No objection, Your Honor.

22             **THE COURT:**  Received.

23         (Trial Exhibit 5183 received in evidence)

24   **BY MS. HURST:**

25   **Q.**    Let's look at the first page.

**RUBIN - CROSS / HURST**

1          All right.  So OC, that's the operating committee; right?

2     **A.**   Yes.

3     **Q.**   So quarterly you would meet with the operating committee

4     to review the status of Android and how was it doing?

5     **A.**   Yeah.

6     **Q.**   So this is Q1 2009.  Now you're out on the market; right?

7     **A.**   Yes.

8     **Q.**   Okay.  You're out on the market.

9          And let's look at page 7.  At this point only the

10    HTC Dream is out; is that right?

11    **A.**   Yeah.  This is like two and a half months after we

12    launched.

13    **Q.**   Pretty early?

14    **A.**   Yep.

15    **Q.**   Let me just hand you Exhibit 5389, which is, I believe, an

16    HTC Dream, but make sure you check it closely.

17    **A.**   Thank you.  That's it.

18          **MS. ANDERSON:**  Your Honor, this is another exhibit

19    that was not disclosed.

20          **THE COURT:**  Sustained.

21          **MS. HURST:**  Your Honor, it was discussed on direct.

22          **THE COURT:**  Not the features of it.  I don't

23    understand why it matters, but you should have disclosed it.

24    It wasn't discussed enough to -- so sustained.  We're not going

25    to get into that.

1          Which one is that?  51 what?

2              **MR. VAN NEST:**  5183, Your Honor.

3              **THE COURT:**  I thought I already ruled --

4              **MS. HURST:**  Actually it was 5389, Your Honor.

5              **THE COURT:**  All right.  Let's pass it.

6              **MS. HURST:**  All right.  Thank you, Your Honor.

7    **Q.**   All right.  Going back to the presentation, page 7, your

8    quarterly operating committee report, you wrote "Search plus

9    Android equals huge"; right?

10   **A.**   Yes.

11   **Q.**   "And speed matters.  70 percent of all searches are

12   initiated from the Android search framework rather than

13   Google.com website"; right?

14   **A.**   Yes.

15   **Q.**   That meant they didn't have to go into the browser and

16   open it up and go to Google.com and then type it all in; right?

17   **A.**   Yes.

18   **Q.**   Because the framework was built right into the platform;

19   right?

20   **A.**   Aspects of the framework.  Google wasn't built into the

21   platform.  Again, like the platform's open source, so that

22   doesn't come with Google Search.  That's proprietary to Google.

23   The open source platform had a framework where any search

24   provider could insert their search engine into the phone.

25   **Q.**   And that came preset for Google; right?

RUBIN - CROSS / HURST

1  **A.**   On the HTC Dream, yes.

2  **Q.**   In fact, you negotiated deals with people where you got

3  them to agree to have that be preset for Google; right?

4  **A.**   Yeah.  There were some, for example, in different

5  countries where Google wasn't available that had different

6  search engines.

7  **Q.**   Let's look at page 8.  Now here you were reporting, "How

8  are we doing on mobile browser share"; right?

9  **A.**   Yes.

10  **Q.**   How much are people using different platforms to do their

11  mobile Internet browsing; is that what that meant?

12  **A.**   Yes.

13  **Q.**   And you were reporting that it was iPhone, there was

14  Android, there was Java ME, there was Symbian, there was

15  Windows Mobile, and then other, which included Palm,

16  BlackBerry, and Brew; right?

17  **A.**   Yes.

18  **Q.**   And it was important which platform people were searching

19  on because some platforms might decide that they would set

20  their search to something other than Google; right?

21  **A.**   I'm not sure if I understand the question.

22  **Q.**   Well, you had those deals where Google was the default

23  setting for Android, but it was possible that handset

24  manufacturers would choose other search engines, wasn't it?

25  **A.**   I guess theoretically possible.  Of course, I mean, just

RUBIN - CROSS / HURST

1    to be clear, those search deals were separate from Android.

2    So -- and Google typically had a sales team that was in charge

3    of the strategy and effort for those.

4    **Q.**   Let's look at page 28.  At this point in the Q1 2009,

5    bullet point 3, your key insights were you had a

6    year-and-a-half window of opportunity.  That's what you wrote,

7    right?

8    **A.**   Yes.  I see that bullet point.  About a year-and-a-half

9    window of opportunity.

10          **MS. HURST:**  Your Honor, I have a number here I'd like

11   to move without sponsoring testimony if Ms. Anderson is

12   amenable.

13          **THE COURT:**  Why don't you go show her which ones they

14   are.

15          **MS. HURST:**  I'm just going to pull them out,

16   Your Honor, and then I will do that immediately.

17          **THE COURT:**  All right.  Ms. Anderson, can you just

18   call out the numbers of the ones you agree can be admitted, and

19   I'll write them down and that will be the fastest way to go.

20          **MS. ANDERSON:**  Sure.  May I read them really quickly,

21   Your Honor?  I don't know what they are.

22          **THE COURT:**  Come stand right there and read them off

23   as you -- and then the ones you don't agree with, there's no

24   need to -- just put those in a separate pile.

25          **MS. ANDERSON:**  I will do that, Your Honor.

1          THE COURT:  Just tell me the ones you agree to.

2                       (Pause in proceedings.)

3          THE COURT:  This is taking too much of the jury's

4    time.  We are going to have to do this offline.  You take those

5    but you can't do two things at once, so you go to your next

6    question and we will try to save the jury's time.  I thought

7    this could be done quickly, but it can't be.

8    BY MS. HURST:

9    Q.   Mr. Rubin, I'm showing you Exhibit 1061.

10         And, Ms. Anderson, I believe this is in by stipulation at

11   ECF 1524.

12         MS. ANDERSON:  That's correct.

13         THE COURT:  Received.

14         (Trial Exhibit 1061 received in evidence)

15   BY MS. HURST:

16   Q.   Let's look at page 3.  And this is another one of your

17   quarterly reviews.  This time in 2010; is that right,

18   Mr. Rubin?

19   A.   Yeah.  I'm not sure whether this was a draft or something

20   that was actually shown.

21   Q.   Well, the finance people were asking for the numbers to be

22   filled in, right, in the email on the front?

23   A.   Yeah, but I wasn't on the email thread.

24   Q.   But your name is on the presentation, isn't it?

25   A.   I'm not sure if this presentation was ever showed or if it

1    was a draft.

2    Q.   Let's look at page 15, and we'll see if you recognize it.

3    Is that a slide that you made?

4    A.   Oh, man.  It's been a while.  I actually don't know.  It

5    could have been me.  It could have been somebody on my team.

6    It could have been somebody not on my team.

7    Q.   All right.  What it describes here is that Android spreads

8    value; right?

9    A.   That's the title of the slide, yeah.

10   Q.   It has, "Android has a direct revenue impact."  That means

11   on Google; right?  Direct revenue impact.

12   A.   I see that, yep.

13   Q.   Because there are mobile ad revenue enabled on Android.

14   That's what it says; right?

15   A.   I see.

16   Q.   And also there's Android market revenue.  That's what it

17   says; right?

18   A.   I see that as well.

19   Q.   So that's the apps and the ads that the quarterly review

20   describes as direct revenue impact; true?

21   A.   I'm sorry.  What was the question?

22   Q.   The apps and the ads --

23   A.   The app store -- the Android market is the app store, and

24   the mobile ad revenue that was enabled by Android is indirect

25   revenue.

1    **Q.**   I'm sorry.  Did you say "indirect"?

2    **A.**   Yeah.

3    **Q.**   What does the document say?

4    **A.**   The document says it's revenue that's enabled by something

5    else.

6    **Q.**   I'm sorry.  Just read me the blue box there on the top,

7    Mr. Rubin.

8    **A.**   That says "direct revenue impact."

9    **Q.**   And then there were all these additional benefits to

10   Google; right?

11   **A.**   Yep.

12   **Q.**   And benefits -- you thought benefits to the whole

13   ecosystem; right?

14   **A.**   You said "you thought" and, again, I'm not really sure if

15   I authored this or if somebody else did, whether it was ever

16   shown.

17   **Q.**   Well, let's look at the next page, Mr. Rubin.

18   **A.**   Uh-huh.

19   **Q.**   Page 16 of the exhibit, "Android Strategy.  Focused on

20   Phase II, moving to Phase III."  Do you recognize this slide?

21   **A.**   I do.

22   **Q.**   Did you create this slide?

23   **A.**   I probably had a pretty big role in creating it, minus

24   probably -- I probably didn't put in the numbers.  The way we

25   were structured at Google is Android was strategy and

1    engineering, ads team --

2    **Q.**    Mr. Rubin, the question was just did you create the slide.

3    **A.**    Parts of the slide.

4    **Q.**    Okay.  Thank you.

5          And in item 1 of the four-part strategy, you had

6    "ecosystem building"; right?

7    **A.**    Yes.

8    **Q.**    And you wanted to be a leading software platform; right?

9    **A.**    Yes.

10   **Q.**    You needed apps; right?

11   **A.**    Yes.

12   **Q.**    You wanted to get multiple OEMs and devices; right?

13   **A.**    Yes.

14   **Q.**    Multiple carriers?

15   **A.**    Yes.

16   **Q.**    Millions of users?

17   **A.**    I see all of that there, yep.

18   **Q.**    Then you said, "Once we build this ecosystem, then we're

19   going to extend our core business"; right?

20   **A.**    Yes.

21   **Q.**    "And we're going to do that with search, ads, and apps";

22   right?

23   **A.**    I see "apps" twice but, yeah.

24   **Q.**    Because apps were important?

25   **A.**    Apps were important, yeah.

RUBIN - CROSS / HURST

1   Q.   All right.  And at this point in time, you were at

2   Phase II moving to Phase III in the Android strategy, and this

3   was in the latter part of 2010; right?

4   A.   I'm not sure of the date, if this was ever shown or what.

5   Q.   Well, just check out page 3 --

6        THE COURT:  Whether it was ever shown or not, it's

7   something that came from the Google files, and is it true?  I

8   mean, isn't that --

9        THE WITNESS:  Yeah.  I mean, it --

10       THE COURT:  All right.  Okay.  Well, then, so whenever

11  she asks you a question, you back up to saying something like,

12  "Well, I don't know if this was ever shown or not."  That's not

13  what she's asking you.

14       THE WITNESS:  Okay.

15       THE COURT:  Just pay attention to the question and

16  answer her question.

17       THE WITNESS:  Okay.

18       THE COURT:  Ask it again.

19  BY MS. HURST:

20  Q.   So this is a report in July 2010; right?  As best you can

21  tell from the document, it's a report in July 2010?  Look at

22  page 3.

23  A.   I mean, I could read the whole document.  I wasn't

24  included on the original email.  I'm not familiar with it.

25  There's just a lot I don't know.

1    **Q.**    Just look at page 3, Mr. Rubin.

2              **THE COURT:**  You're trying to enhance it by calling it

3    a report, so that causes him to quibble.

4              **MS. HURST:**  I'm sorry, Your Honor.

5              **THE COURT:**  This is some kind of internal -- it could

6    be a draft.  We don't know what it is, but maybe it's all true.

7    I think you just should focus on what's there and ask him was

8    that true.

9              **MS. HURST:**  All right.

10   **Q.**    Was it true that in the latter part of 2010, you were

11   focused on Phase II and moving towards Phase III?

12   **A.**    Yes, I believe so.

13   **Q.**    All right.  Let me show you Trial Exhibit 10.  Do you

14   recognize Exhibit 10, Mr. Rubin?

15   **A.**    Yes.

16   **Q.**    This is an email sent to you by Mr. Lindholm?

17   **A.**    Yes.

18   **Q.**    Mr. Lindholm who had been at Sun?

19   **A.**    Yes.

20   **Q.**    Mr. Lindholm who was one of your Java advisors?

21   **A.**    He was one of our general advisors, not specific to Java.

22   **Q.**    And he sent this email to you on or about August 6, 2010?

23   **A.**    Yes.

24   **Q.**    Phase II, moving to Phase III; right?

25   **A.**    Sure.

1              MS. HURST:  Move the admission of Exhibit 10.

2              MS. ANDERSON:  Your Honor, we continue to object under

3     403 and the motion in limine.

4              THE COURT:  Is this the one that we've talked about

5     before?

6              MS. ANDERSON:  Yes, Your Honor.  It has been addressed

7     in the motions in limine.

8              THE COURT:  Overruled.  10 is received in evidence.

9              MS. ANDERSON:  Thank you, Your Honor.

10         (Trial Exhibit 10 received in evidence)

11    BY MS. HURST:

12    Q.    Did you know that Mr. Lindholm was an author of some of

13    the Java APIs?

14    A.    I know he worked at Sun on Java for a long time.

15    Q.    Did you know he was an author of some of the very APIs

16    that are at issue in this case?

17    A.    No, I did not.

18    Q.    So Mr. Lindholm wrote to you on August 2010.  The subject

19    was "Context for discussion.  What we're really trying to do";

20    right?

21    A.    I see the subject, yep.

22    Q.    And he wrote:  (reading)

23              "Hi, Andy.  This is a short preread for the call at

24         12:30.  In Dan's earlier email we didn't give you a lot of

25         context looking for the visceral reaction that we got."

1          Did I read that correctly?

2     **A.**    Apparently, yeah.

3     **Q.**    (reading)

4               "What we've actually been asked to do by Larry and

5          Sergey" --

6          Let's stop there.  You understood Larry and Sergey to mean

7     Larry Page and Sergey Brin; right?

8     **A.**    Yes.

9     **Q.**    So Mr. Lindholm is telling you that what he's been asked

10    to do by the two founders of Google is to investigate what

11    technical alternatives exist to Java for Android and Chrome;

12    right?

13    **A.**    Yes.  I see that there.

14    **Q.**    Now, this is August 2010; right?

15    **A.**    Yes.

16    **Q.**    Your platform is out on the market at this point; right?

17    **A.**    Yes.

18    **Q.**    And you know what Java APIs are in that platform at that

19    point in time; right?

20    **A.**    More or less.  Not every technical detail of the APIs, but

21    I know we included our own implementations of Java APIs in the

22    platform.

23    **Q.**    And you know that you included the declaring code in the

24    platform too, don't you?

25    **A.**    Yes.  In order to interoperate, you need the declarations

1    as well as the implementation.

2    **Q.**   So you received this email from Mr. Lindholm.  He wrote,

3    "Investigate the technical alternatives."  He wrote:  (reading)

4         "We've been over a bunch of these and think they all

5         suck."

6         That's what he wrote; right?

7    **A.**   I see that, yep.

8    **Q.**   He wrote:  (reading)

9         "We conclude that we need to negotiate a license for

10        Java under the terms we need."

11        Right?

12   **A.**   I see that.

13   **Q.**   And then he wrote:  (reading)

14        "That said, Alan Eustace said the threat of moving

15        off Java hit Safra Catz hard."

16        Right?

17   **A.**   I see that.

18   **Q.**   Safra Catz, she was then the president of Oracle and now

19   she's the CEO of Oracle; right?

20   **A.**   I'm not sure what her role was back then, but this is

21   certainly past the acquisition timeframe of Sun to Oracle, so

22   she's -- she's with Oracle is what I know.

23   **Q.**   All right.  And Mr. Lindholm wrote:  (reading)

24        "Objective C provides the most credible alternative

25        in this context which should not be confused with us

1            thinking we should make the change."

2            That's what Mr. Lindholm wrote; is that right?

3    **A.**    I see it there, yeah.

4    **Q.**    Now, after you received this email, you continued to

5    release versions of the Java platform -- Froyo, Gingerbread,

6    Honeycomb, Ice Cream, KitKat, Lollypop, Marshmallow -- with

7    those Java APIs in them; isn't that true?

8            **MS. ANDERSON:**   Objection.   Misleading.   Misstates

9    testimony.

10           **THE COURT:**   What?   The -- it is a compound question,

11   but you can -- it's a -- you can answer the question.   Please

12   answer the question.   Overruled.

13           **THE WITNESS:**   What was the first part of the question?

14   BY MS. HURST:

15   **Q.**    After you received this email, you continued to release

16   those 10 versions up through Marshmallow of the Android

17   platform that you mentioned on direct; right?

18   **A.**    Yeah.   I'm not even certain I was at Google when

19   Marshmallow was released.

20   **Q.**    So you were responsible up through Lollipop?

21   **A.**    I'm not sure when I left.   I left in March of 2013.

22   **Q.**    All right.   So, Mr. Rubin, Mr. Lindholm did not write,

23   "Don't worry.   We don't need a license because of Jonathan

24   Schwartz's blog", did he?

25           **MS. ANDERSON:**   Objection.   Argumentive.

1      **THE COURT:**  Sustained.

2   **BY MS. HURST:**

3   **Q.**   When you left Google, did Android have a license from Sun

4   or Oracle?

5   **A.**   For Android?

6   **Q.**   Yes.

7   **A.**   No.

8   **Q.**   All right.  Did you write back to Mr. Lindholm and say,

9   "Don't worry.  We don't need a license because Jonathan

10  Schwartz put up a blog post in November of 2007 saying 'Welcome

11  to the community'"?

12     **MS. ANDERSON:**  Objection.  Argumentive.

13     **THE COURT:**  Sustained.  Sustained.  If you have more

14  questions like that, I'm going to sustain the objection.

15     **MS. HURST:**  Understood, Your Honor.

16  **Q.**   Mr. Lindholm said, "We need to negotiate a license for

17  Java under the terms we need"; right?

18  **A.**   I see that.

19  **Q.**   He did not write, "We can use the open source license for

20  Java" --

21     **MS. ANDERSON:**  Objection.  Argumentive.

22  **BY MS. HURST:**

23  **Q.**   -- true?

24     **THE COURT:**  Sustained.

25

1    BY MS. HURST:

2    Q.   Now, Mr. Rubin, this was not the first time that you heard

3    somebody tell you that you needed a license for Java, was it?

4    A.   I actually don't think that's what's going on with this

5    email.   I don't think he's telling me I need a license for

6    Java.   He was asked to look for alternatives by the founders of

7    the company.

8    Q.   Mr. Rubin, this was not the first time that you were told

9    that you needed to take a license for Java, was it?

10   A.   I -- I don't think this is -- this counts as a time I was

11   told I needed a license.

12   Q.   Let's just read it again:   (reading)

13          "We conclude that we need to negotiate a license for

14       Java under the terms we need."

15       Did I read that correctly?

16   A.   You did.

17   Q.   Were you at a company called Danger before you went to

18   Android?

19   A.   Yes.   That's one of the companies I cofounded.

20   Q.   And that was the Sidekick/Hiptop that we talked about?

21   A.   Yes.

22   Q.   And you put Java to SE APIs in Hiptop; is that right?

23   A.   Yes.   We created our own implementation of the Java 2 SE

24   APIs for Hiptop.

25   Q.   And then Mr. Syzek at Sun came to you and he said, "You

1    need a license for that", didn't he?

2    A.    Yeah.  I think the -- I think the request was if we wanted

3    to call it Java -- and I did at the time, at the previous

4    company -- and I wanted to basically brand it with the logo,

5    that I would need a license for that.

6    Q.    You didn't have the Java logo on the Hiptop, did you?

7    A.    On the Hiptop itself?

8    Q.    Right.

9    A.    On the hardware?

10   Q.    You didn't have the Java logo on Hiptop, did you?

11   A.    I feel like I need to explain that we didn't make the

12   hardware.

13   Q.    Just yes or no, Mr. Rubin.  Did you put a Java logo on the

14   phone?

15          MS. ANDERSON:  Objection.  Interrupting the witness'

16   testimony.

17          THE COURT:  The witness should be allowed to answer

18   the question.  Say yes or no and then explain.

19          THE WITNESS:  No, there was no Java brand on it.  It

20   was a -- we didn't build the hardware.  We just provided the

21   software.  So I didn't have the authority to put a Java logo on

22   somebody else's hardware.

23   BY MS. HURST:

24   Q.    All right.  You had what you thought was an independent

25   implementation at Danger; is that right?

1    **A.**    I had what I knew was an independent implementation.

2    **Q.**    And Danger took a license; isn't that true?

3    **A.**    Yes, a trademark license so we could call it Java.

4    **Q.**    Have you ever even seen that license?

5    **A.**    I don't recall.  It was a long time ago.  This was 1999,

6    2000.

7    **Q.**    So you don't know if that was a trademark license or a

8    copyright license, do you?

9    **A.**    Well, I know that much because I was the one that

10   instigated it all, but whether I looked at the license and read

11   it, I don't recall that.

12   **Q.**    Isn't it true that the Danger license was a license to the

13   specifications of the Java API?

14          **MS. ANDERSON:**  Objection.  Foundation.  Calls for

15   legal conclusion as well.

16          **THE COURT:**  If you know the answer, please answer.  If

17   you don't know the answer, then you say "I don't know."

18          **THE WITNESS:**  I don't know.

19   **BY MS. HURST:**

20   **Q.**    You knew, sir, from the time that you worked at Danger

21   that it was Sun's position that the Java APIs were

22   copyrightable?  Isn't that true?

23   **A.**    I don't recall what Sun's position was at the time.

24          **MS. HURST:**  Your Honor, permission to read from the

25   July 27, 2011, deposition, page 149:18 through 150:13.

1           THE COURT:  Party deposition; correct?

2           MS. HURST:  Yes.

3           THE COURT:  Go ahead.

4           MS. HURST:  Clip 807.

5       (Whereupon, the video was played for the jury)

6    BY MS. HURST:

7    Q.  Do you stand by that testimony, Mr. Rubin?

8    A.  That Sun was making an argument to me about whether

9    something was copyrighted or not?

10   Q.  Yes or no, Mr. Rubin?  Do you stand by your prior sworn

11   testimony?

12   A.  Sure.  Yes, I do.

13   Q.  Let me show you Exhibit 18.

14       Now, Mr. Rubin, you didn't only know from Sun that the

15   Java language APIs were copyrighted.  You told other people

16   that they were copyrighted, didn't you?

17   A.  I have a recollection of sending an email to that matter,

18   yep.

19   Q.  All right.  Exhibit 18 is that email, isn't it?

20   A.  Let's see here.

21   Q.  Email from you -- email exchange between you and a

22   Mr. Greg Stein; true?

23   A.  Yes.

24           MS. HURST:  And, Your Honor, this is preadmitted

25   pursuant to stipulation.  I move the admission of Exhibit 18.

1          **THE COURT:**  Received.

2          (Trial Exhibit 18 received in evidence)

3          **MS. HURST:**  Put that up.  Trudy, let's start at the

4     bottom, Mr. Stein.

5     **Q.**   Now, Mr. Stein was writing to you from Google; right?

6     **A.**   Yes.

7     **Q.**   And did you know at the time he was also involved in the

8     Apache project?

9     **A.**   No.  I wasn't sure what his role was or who he was at the

10    time.

11    **Q.**   Do you know today that he was, in fact, then involved in

12    the Apache project?

13    **A.**   No.

14    **Q.**   So Mr. Stein wrote to you:  (reading)

15          "Andy, Chris DeBona said you're the right person to

16          talk to about our J2ME plans with Sun."

17          Right?

18    **A.**   I see that, yep.

19    **Q.**   And he wrote that to you in 2006; right?

20    **A.**   Yes.

21    **Q.**   And you wrote back.

22          Let's make sure we get this right because there's a couple

23    quick exchanges here, Trudy.  I lost my clicker.

24          All right.  I'll just go over here.  Let's just do this

25    one at a time.

1              He wants to open source J2ME; right?

2     A.    You know.  I'm --

3     Q.    Here he writes:  (reading)

4                "I've recently become aware of a similar effort to

5           create an open source J2ME."

6           Right?

7     A.    Yeah.  And that wasn't -- your statement was that he

8     wanted open source J2ME, and that's not what he's saying.  He's

9     saying he became aware of something that somebody else is

10    doing.

11    Q.    Yeah.  Like maybe Apache; right?

12    A.    I don't know.  I have no idea who this guy is.

13    Q.    All right.  So a guy you don't know, you write back to

14    him.  Let's look at the next one.  You say right here on

15    March 24, 2006 -- let's blow that one up.  You wrote this;

16    right?  You wrote this?

17    A.    Yes.

18    Q.    And what did you write?  Just read it for us.

19    A.    Do you want me to read it?

20    Q.    Yes.

21    A.    (reading)

22                "I don't see how you can open Java without Sun since

23           they own the brand and IP."

24    Q.    "IP," that means intellectual property; right?

25    A.    Yes.

1    **Q.**   Including copyrights; right?

2    **A.**   I wasn't specific.

3    **Q.**   Well, then, gosh, let's look at the next couple of lines

4    and see if you got more specific.

5        Let's look at the response from Mr. Stein:  (reading)

6            "Oh, they have a plan for that.  The ability to call

7        it Java is simply a matter of passing the J2ME TCK, as I

8        understand it."

9        That's what you wrote; right?

10   **A.**   That's not what I wrote.

11   **Q.**   Oh.  Pardon me.  That's what Mr. Stein wrote to you;

12   right?

13   **A.**   Yep.

14   **Q.**   So Mr. Stein said, "Don't worry.  They're just going to

15   call it Java.  They're going to get the coffee cup logo";

16   right?  That's what he wrote?

17           **MS. ANDERSON:**  Objection.  Argumentative and compound,

18   Your Honor.

19           **THE COURT:**  Compound.  Sustained.

20   **BY MS. HURST:**

21   **Q.**   He wrote:  (reading)

22            "The ability to call it Java is simply a matter of

23        passing the J2ME TCK, as I understand it."

24        Right?

25   **A.**   I see that, yes.

1  Q.   And the TCK, that was the compatibility test kit that Sun

2  had; right?

3  A.   Yes.

4  Q.   All right.  Now, let's look at your response, Mr. Rubin.

5  On March 24th, 2006 -- this is before you released any version

6  of Android; is that right?

7  A.   Yes.

8  Q.   Any version.  (reading)

9        "Ha, wish them luck.  Java.lang APIs are copyrighted.

10       Sun gets to say who they license the TCK to and forces you

11       to take the shared part which taints any clean room

12       implementation."

13       Did you write that, Mr. Rubin?

14  A.   Yes, I did.

15  Q.   You wrote, "Wish them luck.  Java.lang APIs are

16  copyrighted," in March 24, 2006; right?

17  A.   Yes.

18  Q.   That's what you wrote?

19  A.   Yes.

20  Q.   And later when you released Android for the first time,

21  that was November 2007; right?

22  A.   Yep.

23  Q.   But the actual code itself was released about eight days

24  after the announcement of Android; right?

25  A.   Yeah.  I -- I don't recall the exact sequencing, but we

1  released the SDK and the documentation, and then there was an

2  open sourcing event.

3  **Q.**  So there was some time between releasing the announcement,

4  here it comes, and about eight days later, the actual code and

5  documentation?

6  **A.**  I'm -- I'm pretty sure there were actually three things.

7  And I might be a little fuzzy here, so I'm sure you can correct

8  me if I'm wrong.  But I believe we made the announcement.  Then

9  we released the documentation and the simulator; and then,

10  like, a long time later, when we released the G1, that's when

11  we actually released the source code.

12  **Q.**  So first it was -- this is November 5, 2007.  Let's help

13  the jury with the dates if we can.

14      November 5th, 2007, you make your announcement.  About

15  eight days later out comes the simulator and the APIs and the

16  documentation, and then a year later is the actual full

17  platform release in the first phone?

18  **A.**  No.  That's not what I said.  So announcement.  A couple

19  of days later, the emulator; the SDK, which is not source code;

20  and the documentation.  And then a long time later, probably a

21  little less than a year, then the source code was released.

22  **Q.**  Let me show you Exhibit 180.

23          **MR. VAN NEST:**  Counsel, what's the number?

24          **MS. HURST:**  180.

25          **MR. VAN NEST:**  180.  Thank you.

RUBIN - CROSS / HURST

BY MS. HURST:

Q.   Do you recognize Exhibit 180?

A.   No.  I -- it's been too long for me to remember all these emails.

Q.   Do you know Barry Schnitt?  He was a guy in PR at Google.

A.   Yeah, I recall.

Q.   He forwarded you some request from CNET for comment; right?

A.   Yeah.  Yeah.

Q.   And then you worked it out with him what -- to try to figure out what the response would be; right?

A.   Yep.

          MS. HURST:  Move the admission of Exhibit 180.

          MS. ANDERSON:  No objection, Your Honor.

          THE COURT:  Received.

     (Trial Exhibit 180 received in evidence)

BY MS. HURST

Q.   Let's go to the Stephen Shankland email, Trudy, on page 2.

     Mr. Shankland, he was a reporter at CNET at the time; is that right?

A.   I don't -- I don't -- I know he's a reporter.  I'm not sure who he was with at the time.

Q.   You've heard of CNET; right?

A.   Yes.

Q.   It was a popular technology industry blog reporting; is

1    that right?

2    **A.**   I'm sorry.  Is that a question?

3    **Q.**   Yes.

4    **A.**   I don't know how popular it was.  I think it's --

5    **Q.**   CNET, popular technology publication.

6    **A.**   I think it's -- it's some kind of news organization.  I

7    think it's -- I read it at news.com.

8    **Q.**   All right.  So:  (reading)

9         "Rich Green, Sun's" -- this is Mr. Shankland

10        reporting to Mr. Schnitt -- "Rich Green, Sun's EVP of

11        software, just said at Oracle Open World News Conference

12        that he's concerned about Google's Java work on Android."

13        Quote, "'We're really interested in working with Google to

14        make sure developers don't end up with a fractured

15        environment.'"

16        Now, Mr. Schnitt forwarded that quote from Mr. Green to

17   you; right?

18   **A.**   Yes, through Mr. Shankland.

19   **Q.**   Mr. Schnitt forwarded that Rich Green quote to you; right?

20   **A.**   He forwarded me an email from Shankland who quoted Green.

21   **Q.**   Right.  And you wrote -- let's go to the bottom of page

22   1 -- "This is a very touchy subject."  That's what you wrote;

23   right?

24   **A.**   Yep.

25   **Q.**   And then Mr. Schnitt wrote back, if we look on November

1   14th in the second line:  (reading)

2           "We're still not exactly answering the question 'Are

3       you talking to Sun?'  I suspect we don't want to comment

4       on that so I'll let him ask that again."

5       That's what Mr. Schnitt wrote back to you; right?

6   **A.**   I see that.

7   **Q.**   And you said, "Perfect.  Avoid the question."  That's what

8   you said; right?

9   **A.**   I didn't say, "Avoid the question."

10  **Q.**   Well, "Perfect on both points."  That's what you wrote?

11  **A.**   That's correct.

12  **Q.**   All right.  Now, Mr. Gupta, after this announcement,

13  started following -- pardon me -- around the time of this

14  announcement was following up with you asking you what's going

15  on; right?

16  **A.**   I don't recall the exact sequence of events.

17  **Q.**   Let me show you Exhibit 538.

18      Now, Mr. Gupta, this was the guy you had been negotiating

19  a license with earlier; is that right?

20  **A.**   Yeah.  He was the head of business development and I think

21  strategy for the Java division within Sun.

22  **Q.**   And within Exhibit 538 is a series of three emails that he

23  sent to you; right?

24  **A.**   Yeah.  I can see a couple of them, yep.

25  **Q.**   And on or about October 29th, 2007, just before the

1   Android announcement; right?

2   **A.**   Yes.

3         **MS. HURST:**   All right.   Move the admission of 538.

4         **MS. ANDERSON:**   No objection, Your Honor.

5         **THE COURT:**   Received.

6      (Trial Exhibit 538 received in evidence)

7   **BY MS. HURST:**

8   **Q.**   So at the bottom, we see the first email.  Mr. Gupta:

9   (reading)

10        "Andy, sorry we have not been able to connect for a

11      while.  Several people at Sun are asking me about Google's

12      plan in supporting Java on the announced Google phone

13      software stack.  Can you share anything with us?"

14      That's what he asked; right?

15  **A.**   Yeah.  You left out a bunch before the "can you share

16  anything with us," but you paraphrased.

17  **Q.**   All right.  So then there's another email from Mr. Gupta:

18  (reading)

19        "Hi, Andy.  Jonathan has been connecting with Eric S.

20      on several fronts."

21      That's Jonathan Schwartz and Eric Schmidt; right?

22  **A.**   I believe so, yes.

23  **Q.**   (reading)

24        "He was asking me if we had anything being discussed

25      around Java ME for your platform.  Can you please let me

1        know if we should discuss Java ME for your stack?"

2        That's what Mr. Gupta asked you; right?

3   A.   Yes.

4   Q.   Okay.  And then there's a third email:  (reading)

5           "Any updates?  If there is intended support for Java

6        platform, would love to get the discussions resolved

7        earlier rather than later."

8        That's what Mr. Gupta wrote; right?

9   A.   Yes.

10  Q.   Did you ever respond to those emails?

11  A.   I don't recall.

12  Q.   All right.  In the first document in the stack that I've

13  handed you is Exhibit 382.  Do you see that?

14  A.   Yes, I do.

15  Q.   Would you take a look at that, please, sir.

16  A.   Yes.

17  Q.   And this is a publication, Techworld.com, got forwarded to

18  you by Mr. Eric Chu, and then you responded to him and you

19  copied Rich Miner, Barry Schnitt, and a couple other people;

20  right?

21  A.   Yes.

22           MS. HURST:  Move the admission of Exhibit 382.

23           MS. ANDERSON:  No objection, Your Honor.

24           THE COURT:  Received.

25         (Trial Exhibit 382 received in evidence)

1    BY MS. HURST:

2    **Q.**   All right.   Let's look down there about two thirds of the

3    way here.   It's Peter Judge from Techworld, November 15, 2007;

4    right?

5    **A.**   I see that.

6    **Q.**   And he's reporting about Android; right?   And he's saying

7    that a guy name David Burke or Dave Burke, an engineering

8    manager within Google's mobile team, was speaking publicly

9    about Android; right?

10   **A.**   I see that, yes.

11   **Q.**   And the report was that Burke phased probing questions on

12   the details of the environment; right?

13   **A.**   Yes, I see that.

14   **Q.**   All right.   And there was a quote from him, "We have our

15   own APIs and a better flavor of Java."   That's what it was

16   reported to you that Mr. Burke had said on this occasion; true?

17   **A.**   I see that.

18   **Q.**   All right.   And Mr. Chu -- Mr. Chu called that note out

19   specifically to you when he forwarded this to you.

20        Trudy, let's look towards the top of page 1 there.

21        Mr. Chu wrote:   (reading)

22             "Note the quote" -- "FYI.  Note the quote.   We have

23        our own APIs and a better flavor of Java."

24        Do you see that?

25   **A.**   Yes, I do.

1    **Q.**   And you wrote:   (reading)

2            "PR team, can you make sure that only authorized

3        speakers speak to the press?"

4        You wrote that; right?

5    **A.**   Yes, I did.

6    **Q.**   What did you write next?

7    **A.**   I wrote, "This is really important and a legal issue."

8    **Q.**   Now let's look at Exhibit 165.

9        Is this an email exchange with you and Mr. Burke followed

10   by a further exchange among you and Rich Miner and some other

11   Google employees?

12   **A.**   What is this?   This looks like something between Miner and

13   somebody else, and then eventually forwarded on to me by Miner

14   asking me if he should respond to them.

15   **Q.**   Thank you.

16       So Mr. Miner was at Google?

17   **A.**   Yes.

18   **Q.**   And Mr. House was at Google?

19   **A.**   I'm not sure.

20   **Q.**   Well, it says Anthony H. at Google.com; right?

21   **A.**   It looks pretty legit.

22   **Q.**   All right.   And then Mr. Burke weighed in; right?

23   **A.**   Yes.

24   **Q.**   He was at Google?   He was the one who was reported to have

25   given the presentation on the prior document we saw?

RUBIN - CROSS / HURST

1    A.   Yes.

2    Q.   And then Mr. Miner reported -- sent all this along to you;

3    is that right?

4    A.   Yep.  That's how I got copied.

5    Q.   And then you received it?

6    A.   Uh-huh.

7          MS. HURST:  Move the admission of 165.

8          MS. ANDERSON:  No objection.

9          THE COURT:  Received.

10        (Trial Exhibit 165 received in evidence)

11   BY MS. HURST:

12   Q.   This date is November 18, 2007; is that right?

13   A.   Yes.

14   Q.   So, again, that's right around the time right after that

15   initial release of Android; right?

16   A.   Yes.

17   Q.   All right.  And Mr. Burke wrote to Mr. Miner in the middle

18   of the first page here, and part of what he said is:  (reading)

19          "I understand the subtleties of Dalvik" --

20        That was your virtual machine; right?

21   A.   Yes.

22   Q.   (reading)

23          "But I also heard that Sun has contacted us and so I

24        should avoid talking about it at all."

25        Right?

1    **A.**   I see where he writes that, yes.

2    **Q.**   And that was after Mr. Schwartz's blog post on November

3    5th; right?

4    **A.**   Yes.

5    **Q.**   All right.  So let's see what Mr. Miner then wrote to you.

6    He said:  (reading)

7           "I think we would prefer to have me or someone else

8           from our team handle these calls if they Android related."

9           It looks like he left out the word "are" there; right?

10   **A.**   Yes.

11   **Q.**   (reading)

12          "There is lots of sensitivity around Android and Sun

13          Java, and this is an area where David's answers were off

14          message.  Press trying to make a story may have picked up

15          on that and be trying to dig a deeper hole."

16          You received this email from Mr. Miner in November of

17   2007; is that right?

18   **A.**   Yes.

19   **Q.**   And then you reached out to Mr. Burke to shut that down,

20   didn't you?

21   **A.**   Yeah.  I mean, just for context, Dave wasn't on the

22   Android team.  He was in a different team at Google, and I felt

23   that having somebody else on a different team speaking about

24   our project probably wasn't the best thing.

25   **Q.**   Well, let's look at Exhibit 217.  Is that an email from

RUBIN - CROSS / HURST

1    Mr. Burke to you on November 21st, 2007?

2    **A.**   It appears so, yes.

3          **MS. HURST:**   Move to admit 217.

4          **MS. ANDERSON:**   No objection, Your Honor.

5          **THE COURT:**   Received.

6          (Trial Exhibit 217 received in evidence)

7    **BY MS. HURST:**

8    **Q.**   So Mr. Burke is writing you about the future of mobile

9    conference; right?  Is that right?

10   **A.**   Yes.

11   **Q.**   He says:  (reading)

12          "Hi, Andy.  Shannon mentioned you were a little

13          surprised that I made a presentation on Android last week

14          and that you had some concerns about what was reported.

15          Sorry you weren't aware that I was asked to talk.  I did

16          go through a proper prep with Rich, as well as the PR

17          people, and I did my best to learn of the official Q and

18          A."

19          Do you see that?

20   **A.**   Yes.

21   **Q.**   The official Q and A, that means the party line; right?

22   **A.**   It's a question and answer where they -- yeah, where they

23   basically try to envision all the questions that might be asked

24   and then provide some answers.

25   **Q.**   Mr. Burke wrote:  (reading)

1    "I was very conscious of the sensitivity around Java

2  and was careful to sidestep any pointed questions."

3  That's what he wrote?

4      (Pause in proceedings.)

5   **THE COURT:**  She's asking is that what he wrote.

6   **THE WITNESS:**  Oh, that was a question?  I'm sorry.

7  That's what he wrote.  It looks like that's what he wrote,

8 yes.

9 **BY MS. HURST:**

10 **Q.** And this was after Mr. Schwartz's blog post; right?

11 **A.** I believe so, yes.

12 **Q.** All right.  Do you have Exhibit 29 up there, sir?

13 **A.** Yes.

14 **Q.** Exhibit 29, that's an email exchange between you and Dick

15 Wall.  He's a Google guy; right?

16 **A.** I guess.  I don't know him very well.

17 **Q.** On the Android communications team; right?

18 **A.** I don't know where he's -- what team he's on.

19 **Q.** No.  That's the other recipient of the email, sir.  Sorry.

20 **A.** Oh, I see.  Yes.  I see that.

21 **Q.** Okay.  And this was an email exchange on or about

22 March 24th, 2008; right?

23 **A.** Yes.

24   **MS. HURST:**  Move the admission of Exhibit 29.

25   **MS. ANDERSON:**  No objection, Your Honor.

1          **THE COURT:**  Received.

2          (Trial Exhibit 29 received in evidence)

3    **BY MS. HURST:**

4    **Q.**   All right.  So let's start here at the bottom.  Mr. Wall

5    reported to you:  (reading)

6               "Hi, folks.  I will be at JavaOne for the entire week

7          and will be volunteering for several spots of booth duty.

8          As a side effect of this, I have some questions regarding

9          Android."

10         Do you see that?

11   **A.**   Yes, I do.

12   **Q.**   Now, JavaOne, that was a big conference for Java

13   developers; right?

14   **A.**   I think so, yep.

15   **Q.**   So all kinds of people would come and they would set up

16   booths in the big exhibition hall, like a big trade show,

17   showing their products and talking about them and trying to get

18   the buzz going.  It was a great promotional opportunity for

19   Android, wasn't it?

20   **A.**   No.  Android wasn't represented at JavaOne.

21   **Q.**   Well, Mr. Wall asked you, "Can we answer developer

22   questions about Android at the booth?"  Right?

23   **A.**   Yeah.  I see where he asked that.

24   **Q.**   "Can we demonstrate the tooling, emulator, development

25   environment, etc.?"  Right?

1   **A.**   Yep.  I see where he said that as well.

2   **Q.**   And he said:  (reading)

3          "Is the story of," quote, "'You use Java source code

4       but libraries and VM differ from Java SE' still the right

5       message to be carried?"

6       That's what he asked you?

7   **A.**   I see where he wrote that, yep.

8   **Q.**   Yep.  And he put that in quotes; right?  "You use Java

9   source code but libraries and VM differ from Java SE."

10  **A.**   I see where he put that in quotes, yes.

11  **Q.**   And he put that in quotes because that was the party line;

12  right?

13  **A.**   I don't know why he put it in quotes.  I can't tell what

14  he was thinking.

15  **Q.**   All right.  Well, let's see how you responded, Mr. Rubin.

16       You understood this well enough to respond to it; isn't

17  that right?

18  **A.**   Sure.  I just didn't know why he put quotes in it.

19  **Q.**   So here's your response:  (reading)

20          "Question 1" -- you rewrote it -- "Are we able to

21       answer direct developer questions about Android at the

22       booth?  Yes.  One-on-one only please."

23       That was your answer; right?

24  **A.**   Yes.

25  **Q.**   (reading)

1              "2.  Can we demonstrate the tooling, emulator,

2         development environment, etc.?"

3         Do you see that?

4    A.   Yes.

5    Q.   Read me your answer, Mr. Rubin.

6    A.   (reading)

7              "Yes.  One-on-one only, please, where you know

8         exactly who you are talking to.  Please don't demonstrate

9         to any Sun employees or lawyers."

10   Q.   "Please don't demonstrate to any Sun employees or

11   lawyers."  That was what you wrote?

12   A.   Yes.

13   Q.   And that was after Mr. Schwartz's blog post; right?

14   A.   Yes.

15   Q.   And then Question 4:  (reading)

16             "Is the story of," quote, "'You use Java source code

17        but libraries and VM differ from Java SE' still the right

18        message to be carried?"

19        And you took out the reference to "libraries and VM,"

20   didn't you?

21   A.   I gave him a new quote to use when he's interacting with

22   people outside of Google.

23   Q.   And that made no mention of the libraries; isn't that

24   true?

25   A.   That is true.

1  **Q.**   And you instructed him don't demonstrate to any Sun

2  employees or lawyers; isn't that true?

3  **A.**   Yes.  On point number 2, that's what that said.

4  **Q.**   Now, Mr. Rubin, you said on direct that you thought it was

5  just fine to use the APIs.  The basis for your belief that the

6  APIs were not copyrightable was folklore and industry stories;

7  isn't that true?

8  **A.**   No.  I think --

9  **Q.**   Yes or no, Mr. Rubin.  Folklore and industry stories?

10  **A.**   No.

11         **MS. HURST:**  I apologize, Your Honor.  I wrote this

12  quote down wrong and I've got to find the cite.  Just give me

13  one more moment.

14                     (Pause in proceedings.)

15         **MS. HURST:**  All right.  Your Honor, from the July 27,

16  2011, personal capacity deposition at page 155, 13 through 21.

17         **THE COURT:**  Any objection?

18         **MS. ANDERSON:**  No, Your Honor.

19         **THE COURT:**  Please -- are you going to play it or read

20  it or what?

21         **MS. HURST:**  I'm going to read it, Your Honor.

22         **THE COURT:**  All right.  So you've got to read it

23  exactly.  Say question and so forth.

24         **MS. HURST:**  (reading)

25      "**Q.**  What is your basis for your personal belief that the

1        APIs are not copyrightable?

2        "A.   Industry stories and folklore of what I've heard

3        about various legal cases around Nintendo and the fact

4        that a lot of these things were documented in books that

5        were in the public domain.

6        "Q.   Anything else?

7        "A.   No."

8    Q.   Do you stand by that testimony?

9    A.   Yes.

10   Q.   Now, did you ever go look for that book that you had heard

11   was in the public domain?

12   A.   I don't think it was a single book and, no, I never looked

13   for it.

14   Q.   Did you ever go look to see if there was a specification

15   license in the front of that book that you thought was in the

16   public domain?

17   A.   No.

18        MS. ANDERSON:   Objection.   Argumentative.   Lacks

19   foundation.

20        THE COURT:   Sustained.

21   BY MS. HURST:

22   Q.   If you picked up another book like this one, *Rogue Lawyer*,

23   by John Grisham, do you think it was okay to copy out of that

24   and make a movie or a TV show out of it without getting

25   permission?

1          **MS. ANDERSON:**  Objection.  Argumentive.

2          **THE COURT:**  Sustained.

3          **MS. HURST:**  Pass the witness.

4          **THE COURT:**  All right.  Thank you.

5          **MS. ANDERSON:**  Thank you.

6      And if it's okay with the Court, I can take it from here.

7   There's a lot of material over there.  I only have a few

8   questions for the witness.

9          **THE COURT:**  All right.  You have ten minutes.

10          **MS. ANDERSON:**  Thank you.

11                      **<u>REDIRECT EXAMINATION</u>**

12   **BY MS. ANDERSON:**

13   **Q.**   Mr. Rubin, I only have a few questions to follow up on.

14       You were asked some questions by Oracle's counsel about

15   the subject of Danger when you worked there.  Do you recall

16   generally that line of questioning?

17   **A.**   Yes, I do.

18   **Q.**   All right.  You mentioned that at some point in time,

19   Danger took a license from Sun.  Do you recall that?

20   **A.**   Yes.

21   **Q.**   Why did Sun -- strike that.

22       Why did Danger take a license from Sun during the time

23   that you were with Danger?

24   **A.**   The scenario was we had a clean room implementation of our

25   own virtual machine and, again, it wasn't what was prevalent in

1   the market that day.  It was something that we were shooting

2   for to what we thought a first smartphone would need.  So we

3   did our own implementation of that.

4        And at the time I was a very small company.  Didn't have a

5   lot of money.  Didn't want to take a lot of risk.  So I wanted

6   to align with what the rest of the industry was doing.  And the

7   rest of the industry, even though they were on those feature

8   phones, which weren't very usable, was -- was using Java in

9   some of the phones.  So I took a license so I could call what

10  Danger was doing Java so I could align with the industry and

11  make it easier to sell the phones to wireless operators.

12  **Q.**   When you say "call it Java," what do you mean?

13  **A.**   What I was seeking was a trademark license.  What we --

14  look, I mean what we ended up shipping on Danger was our

15  implementation of the virtual machine.  It wasn't J2ME.  It was

16  something that we invented that was better than J2ME for

17  smartphones.

18  **Q.**   Thank you.

19       And then you were asked some questions about Exhibit 7.

20       Mr. Dahm, if we could have that up, please.

21       There was a line in this email exchange from October 2005

22  in which you were explaining to Mr. Page that if Sun didn't

23  want to work with you in regard to Android --

24           **MS. ANDERSON:**  I'm sorry?

25           **THE COURT:**  What?

1       **MR. VAN NEST:**  Excuse me, Your Honor.  We just needed

2   the display.

3       **MS. ANDERSON:**  Thank you so much.

4       **MR. VAN NEST:**  I apologize.

5       **MS. ANDERSON:**  Thank you.

6   **Q.**   You were discussing this email exchange you had with

7   Mr. Page back in 2005.  And in this email exchange, you had

8   stated that, "If Sun didn't want to work with us, we have two

9   options."  Do you recall that portion of the email?

10  **A.**   Yes, I do.

11  **Q.**   And one of the options you said was:  (reading)

12          "Number two, do Java anyway and defend our decision,

13       perhaps making enemies along the way."

14  So that's the second one there right next to number 2.

15  **A.**   Yes, I see that.

16  **Q.**   Would you explain to the jury what you meant by "making

17  enemies"?

18  **A.**   Sure.  I mean, years and years of ebbing and flowing of

19  these partnership discussions.  You know, at the end, if we

20  decide not to partner, we're operating in the same space.  We

21  have technology that we'll both be evangelizing the third-party

22  developers.  We'll try to get developers on our platform.  Sun

23  will continue to get developers on Java.  Even though we

24  wouldn't be able to call it Java, it makes us competitors for

25  the first time instead of potential partners, which would --

RUBIN - REDIRECT / ANDERSON

1    was what I was hoping for.

2    Q.    Thank you.

3          Do you also recall under examination by Oracle's counsel

4    you were asked some questions about statements made by

5    Mr. Burke of Google that you had some concerns about when he

6    was speaking about the Android platform?  Do you generally

7    remember that?

8    A.    Yes, I do.

9    Q.    And one of the statements that was discussed in regard to

10   Exhibit 382 is Mr. Burke talking about Android having a better

11   flavor of Java.  Do you remember that reference?

12   A.    Yes, I do.

13   Q.    Did that expression cause you any concern; and if so,

14   would you explain to the jury why?

15   A.    It did.  And, again, I can't media train every Google

16   employee to be on message.  Again, he wasn't on the Android

17   team, so I didn't have a lot of say in what he said to the

18   public.  But because we didn't take -- we ended up not being

19   able to complete the partnership, we didn't have a license to

20   call what we were building Java.

21         So if I were to media train him, I would have said, "We

22   use the Java programming language.  We use industry standard

23   development tools, but don't call it Java."

24   Q.    Thank you.

25         And then if we could take a look at Exhibit 29, Mr. Dahm.

1    Do you recall you were asked some questions about this

2    email exchange you had with Mr. Wall in March of 2008?

3    **A.**    Yes.

4    **Q.**    Do you remember that?  And drawing your attention to right

5    under number 2 where you were asked by Mr. wall if they could

6    demonstrate the tooling emulator, development environment, and

7    you answered, "Yes.  One-on-one only, please."  And you stated

8    that you didn't want it to be demonstrated to Sun employees or

9    lawyers.  Would you please explain to the jury what you meant

10   when you said that?

11   **A.**    Yeah.  I mean we were still in discussions with Sun, and I

12   didn't want somebody at an industry trade show engaging in a

13   conversation with Sun employees on a topic that they didn't

14   know anything about.  I think these discussions were delicate.

15   As you know, they ebbed and flowed.  We had good days, we had

16   bad days, and I kind of wanted to have full control over those

17   negotiations.  We were in the middle of these negotiations.

18   So it was hard for me to kind of tell somebody, "Yeah, go

19   out and say whatever you want when you're talking to the

20   employees of, you know, the partner that I'm negotiating with."

21   **Q.**    And when you made the statement in March of 2008, had

22   Android already been announced?

23   **A.**    It had been announced, yes, but not released.

24   **Q.**    Okay.  Had the SDK been released by this point?

25   **A.**    Yes.

1   **Q.**   And did that release include information that Android was

2   using Java APIs?

3   **A.**   Yes.

4   **Q.**   Okay.  Drawing your attention to Exhibit 18, if we could

5   get that up, please.

6        Actually, let me start instead with Exhibit 134, if that's

7   okay, Mr. Dahm.

8        And turning to page 3 of this slide deck, do you recall

9   being asked some questions about this slide deck from January

10  of 2006?

11  **A.**   Yes.

12  **Q.**   All right.  And you were asked in regard to page 3 of this

13  exhibit -- one page up, please.  Thank you.

14       You were asked some questions about this slide.  Do you

15  recall that?

16  **A.**   I do.

17  **Q.**   At the top it says "Java ME."  What is Java ME?

18  **A.**   Java ME is the micro edition.  It's what ran on the

19  feature phones of that era, the flip phones and pre-smartphone

20  era.

21  **Q.**   And is that the same or different than Java SE?

22  **A.**   It's different.  Java SE runs on desktop computers, what

23  you would expect on a PC like the ones we're using in here.

24  **Q.**   And is there another acronym that sometimes is used in

25  some of the correspondence about Java ME to identify it?

1   **A.**   We talk a little bit about the name of the virtual

2   machine, which is CLDC, and things like that.

3   **Q.**   Does J2ME mean anything to you?

4   **A.**   Yeah.  J2ME is another term for Java ME, I believe.

5   **Q.**   All right.  Thank you.

6       And if we could just take a look at Exhibit 18 now.  If

7   you could pull that up, please.

8           **THE COURT:**  You have about two more minutes.

9           **MS. ANDERSON:**  We can do it, Your Honor.

10  **Q.**   Exhibit 18, you were asked some questions about this

11  exhibit and a statement in it in which you said Java.lang APIs

12  are copyrighted around the middle of this email.

13      Right there in the middle Mr. Dahm under 3/24/06.

14      When you made this statement, what did you mean by that?

15  **A.**   Well, we've been talking a lot about the declarations

16  versus the implementation, and I was really focused on the

17  implementation so I couldn't see how he could open source

18  somebody else's implementation, and that's what I was

19  commenting on.

20          **MS. ANDERSON:**  I pass the witness, Your Honor.  Thank

21  you.

22          **THE COURT:**  All right.  Anything?  Can we let the

23  witness go.

24          **MS. HURST:**  Two questions, Your Honor.

25          **THE COURT:**  All right.  Go ahead.

1                        <u>**RECROSS-EXAMINATION**</u>

2    **BY MS. HURST:**

3    **Q.**   You said at Danger you didn't want to take a risk; is that

4    right?

5    **A.**   Yeah.

6    **Q.**   And at Danger you took a license; true?

7    **A.**   I'm sorry.  Say -- two questions.  So as an entrepreneur,

8    I don't like taking on additional risk, that is true.

9          What was the second question?

10   **Q.**   And you took a license at Danger --

11   **A.**   I did.

12   **Q.**   -- right?

13   **A.**   Yes.

14   **Q.**   And at Google you wanted to win; isn't that right?

15   **A.**   I wanted to build a popular product that delighted a lot

16   of consumers.

17   **Q.**   You wanted to win.  That's what you said --

18               **THE COURT:**  I thought you said you had two questions.

19               **MS. HURST:**  Four.  I'm sorry.

20               **THE COURT:**  That's argumentive anyway.

21   **BY MS. HURST:**

22   **Q.**   At Google you never took a license; isn't that right?

23   **A.**   We never concluded those partnership discussions that I

24   was hoping to conclude.

25               **THE COURT:**  Thank you.

1        May the witness now be excused and discharged from any

2   subpoena?

3            **MS. ANDERSON:**  Yes, Your Honor.

4            **MS. HURST:**  Your Honor, we may need this witness for

5   Phase II.  I can't discharge him completely.

6            **THE COURT:**  All right.  You may have to come back, Mr.

7   Rubin.  I can't let you go for good.

8            **MR. VAN NEST:**  Excuse me, Your Honor.

9            **THE COURT:**  What?

10           **MR. VAN NEST:**  Excuse me.  We have an agreement

11  between counsel as to this witness that everything --

12               (Counsel confer off the record.)

13           **THE COURT:**  We'll deal with it outside the presence of

14  the jury, but for right now it's 1:00, the magic hour and

15  you-all have a great evening.  See you here at the regular --

16  oh.  Can I just say one thing to you?  Have a seat.

17       You know, you heard that -- you saw that long list of

18  witnesses on the back of the questionnaire, and I know what

19  you're thinking.  You're saying, "My God, we haven't even

20  gotten through number three."

21                        (Laughter)

22           **THE COURT:**  I promise you that's not going to be a

23  problem because these lawyers are under strict hour limits; and

24  when the magic hour comes and their time is out, it stops.  And

25  if they don't get through their witnesses, it's their own fault

**PROCEEDINGS.**

1    for the way they have proceeded.

2        So there we are.  And we are over one third of the way

3    through the time allotted for the first phase of this case.  So

4    there you are.  We are on track.

5        All right.  Now you may go.  Thank you.

6        (Proceedings were heard out of presence of the jury:)

7        **THE COURT:**  The jury is gone.  Everyone be seated.

8        Well, what's the issue now with Mr. Rubin?

9        **MR. VAN NEST:**  We'll deal with it later, Your Honor.

10       **THE COURT:**  What do you mean?  While I've got him

11   here, I need to know if I need -- I'm just going to order you

12   to be back upon reasonable notice, and I may change that later

13   on if I find out there has been some contrary agreement, but I

14   can't let you go.  You may have to come back.  All right?

15   Thank you.

16       Yes?

17       **MR. VAN NEST:**  But not tomorrow.

18       **THE COURT:**  Not tomorrow.  No.  You're gone for at

19   least a week and a half.  Okay?

20       **THE WITNESS:**  Okay.

21       **THE COURT:**  Thank you.

22       All right.  So now a few things for the lawyers.  When you

23   show a CD from the -- you've got to give the -- when you show a

24   clip from the depo, it does not go -- the court reporter does

25   not take it down.  You know, it's not -- it's just going to be

**PROCEEDINGS.**

1   CD played.  So there's no way for the Court of Appeals to know

2   what that was unless you give it to the -- a CD with that on

3   there and identify it to the court reporter.

4        In all of my prior trials, this is at least one thing the

5   lawyers have been able to agree on, so I shouldn't even have to

6   get involved with it; but I'm just reminding you once again, if

7   you want your record right, both sides have got to agree on

8   that.

9        Tomorrow at some point I am hoping to get each of you to

10  stand up and make a five-minute statement to the jury as to

11  where we are in the case, what you think has been proven, not

12  proven.  It can be slightly argumentative.  But it will be of

13  immense help to the jury to be able to know what in the world

14  has been proven or not proven so far.

15       So I'll just wait to see if a good opportunity for that

16  comes up.  If you don't want to take the opportunity to do it,

17  then the other side will do it, but I urge you both to try to

18  help the jury understand where we are.

19       Timewise, Oracle has used 380 of its 900 minutes, and

20  Google has used 275.  I do not plan to enlarge the time.  I

21  believe that you both have taken more time than you should.

22  And anytime you ask an argumentative question, it's just a nail

23  in the coffin for me to say no for more time.  And I'm not

24  going to give you more time.  But you should not be asking

25  those kind of argumentative questions.  So I'm telling you, you

**PROCEEDINGS.**

1    must make it within 900 minutes.  And Google is now at 380.

2              **MR. VAN NEST:**  No, Your Honor.

3              **THE COURT:**  What?

4              **MR. VAN NEST:**  Google is at 275 I thought you said.

5              **THE COURT:**  I'm sorry.  I misspoke.  Oracle is at 380

6    and Google is at 275.  Yes.  I misspoke.

7         So you must make it.  It will be your own fault if you run

8    out of time.

9         Okay.  Anything the lawyers wish to take up with me?

10             **MR. BICKS:**  No, Your Honor.

11             **THE COURT:**  How about over there?

12             **MR. VAN NEST:**  We're fine, Your Honor.

13             **THE COURT:**  See you at 7:30 in the morning.  Thank

14   you.

15                  (Proceedings adjourned at 1:03 p.m.)

16

17

18

19

20

21

22

23

24

25

**PROCEEDINGS.**

1

2

3                        CERTIFICATE OF REPORTER

4              I certify that the foregoing is a correct transcript

5      from the record of proceedings in the above-entitled matter.

6

7      DATE:    Thursday, May 12, 2016

8

9      _Pamela A. Batalo_

10     _____
       Pamela A. Batalo, CSR No. 3593, RMR, FCRR
11     U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25