1   ORRICK, HERRINGTON & SUTCLIFFE LLP
    KAREN G. JOHNSON-MCKEWAN (SBN 121570)
2   kjohnson-mckewan@orrick.com
    ANNETTE L. HURST (SBN 148738)
3   ahurst@orrick.com
    GABRIEL M. RAMSEY (SBN 209218)
4   gramsey@orrick.com
    405 Howard Street, San Francisco, CA  94105
5   Tel: 1.415.773.5700 / Fax: 1.415.773.5759
    PETER A. BICKS (*pro hac vice*)
6   pbicks@orrick.com
    LISA T. SIMPSON (*pro hac vice*)
7   lsimpson@orrick.com
    51 West 52nd Street, New York, NY  10019
8   Tel: 1.212.506.5000 / Fax: 1.212.506.5151

9   BOIES, SCHILLER & FLEXNER LLP
    DAVID BOIES (*pro hac vice*)
10  dboies@bsfllp.com
    333 Main Street, Armonk, NY  10504
11  Tel: 1.914.749.8200 / Fax: 1.914.749.8300
    STEVEN C. HOLTZMAN (SBN 144177)
12  sholtzman@bsfllp.com
    1999 Harrison St., Ste. 900, Oakland, CA  94612
13  Tel: 1.510.874.1000 / Fax: 1.510.874.1460

14  ORACLE CORPORATION
    DORIAN DALEY (SBN 129049)
15  dorian.daley@oracle.com
    DEBORAH K. MILLER (SBN 95527)
16  deborah.miller@oracle.com
    MATTHEW M. SARBORARIA (SBN 211600)
17  matthew.sarboraria@oracle.com
    RUCHIKA AGRAWAL (SBN 246058)
18  ruchika.agrawal@oracle.com
    500 Oracle Parkway,
19  Redwood City, CA 94065
    Tel: 650.506.5200 / Fax: 650.506.7117

20  *Attorneys for Plaintiff*
    ORACLE AMERICA, INC.

21                  UNITED STATES DISTRICT COURT

22                NORTHERN DISTRICT OF CALIFORNIA

23                   SAN FRANCISCO DIVISION

24  ORACLE AMERICA, INC.              Case No. CV 10-03561 WHA

25            Plaintiff,              **ORACLE'S RULE 50(a) MOTION FOR
         v.                          JUDGMENT AS A MATTER OF LAW**
26  GOOGLE INC.
                                      Dept.: Courtroom 8, 19th Floor
27            Defendant.              Judge: Honorable William Alsup

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

MEMORANDUM OF POINTS AND AUTHORITY ........................................................ 1

I.     GOOGLE HAS NOT MET ITS BURDEN ON FACTOR ONE ...................................... 1

     A.    Google's Use Is Entirely Commercial. ................................................................ 2

     B.    Google's Use Is Not Transformative. ................................................................. 2

          1.    Google's use does not fit within the statutory examples. ......................... 3

          2.    Android merely supersedes the Java Platform. ......................................... 4

          3.    Android's declaring code and SSO, taken from Java SE, serve the same purpose when used in Java SE. .................................................. 8

          4.    Google made no alteration to what it copied from Java SE. ...................... 9

     C.    Google Copied In Bad Faith. .......................................................................... 10

     D.    Conclusion ....................................................................................................... 13

II.    GOOGLE HAS NOT MET ITS BURDEN ON FACTOR TWO .................................. 13

     A.    The Java API Packages Are Highly Creative ...................................................... 14

     B.    Google Has Not Shown Copying Was A Technical Necessity............................ 17

     C.    Oracle Invested Heavily In Developing The Java API Packages. ....................... 18

III.   GOOGLE HAS NOT MET ITS BURDEN ON FACTOR THREE............................... 18

IV.   GOOGLE HAS NOT MET ITS BURDEN ON FACTOR FOUR .................................. 20

     A.    Java SE And Android Compete In The Smartphone Market. ............................. 21

     B.    There Is No Evidence OpenJDK Caused Market Harm To Java SE. .................. 22

V.    GOOGLE HAS NOT MET ITS BURDEN TO DEMONSTRATE CUSTOM .............. 23

VI.   *SEGA* AND *CONNECTIX* ARE NOT RELEVANT ........................................... 25

CONCLUSION ................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*A&M Records, Inc. v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001).................................................................................4, 5, 8, 20

*Am. Geophysical Union v. Texaco Inc.*,
    60 F.3d 913 (2d Cir. 1994)......................................................................................................3

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ......................................................................................................4, 5, 21

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
    109 F.3d 1394 (9th Cir. 1997).....................................................................................17, 20, 21

*Elvis Presley Enters., Inc. v. Passport Video*,
    349 F.3d 622 (9th Cir. 2003)................................................................................................10

*Folsom v. Marsh*,
    9 F. Cas. 342 (C.C.D. Mass. 1841) .......................................................................................6

*Gaylord v. United States*,
    595 F.3d 1364 (Fed. Cir. 2010).............................................................................................2

*Harper & Row Publ'rs, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) ........................................................................................... *passim*

*Itar-Tass Russian News Agency v. Russian Kurier, Inc.*,
    886 F. Supp. 1120 (S.D.N.Y. 1995).......................................................................................2

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2002)................................................................................................19

*L.A. News Serv. v. KCAL-TV Channel 9*,
    108 F.3d 1119 (9th Cir. 1997)...............................................................................................10

*Micro Star v. Formgen Inc.*,
    154 F.3d 1107 (9th Cir. 1998).............................................................................................9, 21

*Monge v. Maya Magazines, Inc.*,
    688 F.3d 1164 (9th Cir. 2012).................................................................................1, 9, 19, 21

*Morris v. Young*,
    925 F. Supp. 2d 1078 (C.D. Cal. 2013).................................................................................2

*Oracle Am., Inc. v. Google Inc.*,
    750 F.3d 1339 (Fed. Cir. 2014)......................................................................... *passim*

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .................................................................................6, 16

*Sega Enters. Ltd. v. Accolade, Inc.*,
977 F.2d 1510 (9th Cir. 1992) .......................................................................15, 25, 26

*Sony BMG Music Entm't v. Tenenbaum*,
672 F. Supp. 2d 217 (D. Mass. 2009) ...........................................................8, 25, 26

*Sony Computer Entm't, Inc. v. Connectix Corp.*,
203 F.3d 596 (9th Cir. 2000) ..................................................................................25, 26

*Stewart v. Abend*,
495 U.S. 207 (1990) ..............................................................................................2, 10

*Three Boys Music Corp. v. Bolton*,
212 F.3d 477 (9th Cir. 2000) ....................................................................................6

*Wall Data Inc. v. L.A. Cty. Sheriff's Dep't*,
447 F.3d 769 (9th Cir. 2006) ....................................................................8, 18, 24, 25

*Worldwide Church of God v. Phila. Church of God, Inc.*,
227 F.3d 1110 (9th Cir. 2000) .....................................................................................1

**State Cases**

*Miller v. Germain Seed & Plant Co.*,
193 Cal. 62 (1924) ...................................................................................................25

**Federal Statutes**

17 U.S.C. § 107 ...........................................................................................................2, 3, 4

**Rules**

Fed. R. Civ. P. 50(a) ....................................................................................................1

## MEMORANDUM OF POINTS AND AUTHORITY

Oracle submits this memorandum of points and authority in support of the Rule 50(a) motion it made at the close of Google's evidence.[1]  Tr. 1292:22-25.  Google's use of the Java API packages in Android is not the kind of copying fair use was intended to allow.  Google "bears the burden of proof" on fair use.  *See Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012).  Before any factor can be weighed in Google's favor, it must show that the factor supports fair use.  *See id.* at 1180 (examining whether defendant met its burden on a factor-by-factor basis).  Yet at the close of Google's case in chief, there is "no legally sufficient evidentiary basis" to conclude that Google has met that burden.  *See* Fed. R. Civ. P. 50(a).  Google has not submitted evidence to support a finding that *any* of the fair use factors weighs in its favor; instead, the evidence shows that each factor weighs against fair use.  No reasonable jury could find that Google's verbatim and entirely commercial use of the declaring code and SSO to compete against the Java platform was a fair use.  Oracle is entitled to judgment as a matter of law on Google's fair use defense.  *See Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir. 2000) ("[T]he defense of fair use of MOA fails.  The first three factors weigh in WCG's favor and the [most important] fourth factor is, at worst, neutral."); *Monge*, 688 F.3d at 1184 ("Without a single factor tipping in its favor, Maya has not met its burden [to prove fair use].").

## I.  GOOGLE HAS NOT MET ITS BURDEN ON FACTOR ONE

Google adduced no evidence at trial from which a jury could find that the first fair use factor—the "purpose and character of [Google's] use"—weighs in its favor.  *See* 17 U.S.C. § 107(1).  This factor has three sub-issues: (1) whether and to what extent the accused use serves a commercial purpose; (2) whether and to what extent the accused use is transformative; and (3) whether Google acted in bad faith.  *See Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1374 (Fed. Cir. 2014); *Harper & Row Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985) ("Fair use presupposes good faith and fair dealing." (quote omitted)); Tr. 319:17-321:20 (Pre-Instr.).  No reasonable jury could find that these sub-issues balance in Google's favor.

---

[1] Oracle makes this motion without prejudice to later raising arguments based on 1) evidence Oracle attempted to introduce that was improperly excluded, and 2) evidence Google should not have been permitted to admit.

### A.    Google's Use Is Entirely Commercial.

"In this case, all agree that Google's accused use was commercial in nature…." Tr. 321:1-2 (Pre-Instr.).  The evidence at trial shows that Google's use is not only commercial, but commercial use of unprecedented magnitude.  Trial testimony shows Google makes "many billions of dollars" and "[v]irtually all the revenue of Google comes from its advertising." Tr. 343:21-24 (E. Schmidt).  Specifically, the "majority of the revenue comes from those links that you see when you do a Google search." Tr. 344:1-2 (E. Schmidt).  Android was particularly profitable because "people who use Android search twice as much as everything else." Tr. 421:4-7 (E. Schmidt).  Or, as former head of Android Andy Rubin put it: "Search + Android = Huge." TX 5183 at 7.  And "[n]ot only is [sic] there more searches, and there's more ads, but it's also more lucrative." Tr. 421:21-23 (E. Schmidt).  That means "there's more revenue associated with Android searches." Tr. 421:8-10 (E. Schmidt).  "[E]verybody knew [one] way Android was going to make money was on the advertising…" Tr. 786:18-20 (Rubin).  As a result, "Android has a Direct Revenue Impact" on Google.  TX 1061 at 15.  In short, Android is "hugely profitable." TX 951; Tr. 421:25 (E. Schmidt).

Courts have found revenues far lower than Android's billions and billions of dollars to be sufficiently commercial to weigh against fair use under factor one.  *See, e.g.*, *Gaylord v. United States*, 595 F.3d 1364, 1374 (Fed. Cir. 2010) ($17 million); *Stewart v. Abend*, 495 U.S. 207, 237 (1990) ($12 million); *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 886 F. Supp. 1120, 1130-31 (S.D.N.Y. 1995) ($600,000); *Morris v. Young*, 925 F. Supp. 2d 1078, 1084 (C.D. Cal. 2013) ($8,940).  "[C]ourts will not sustain a claimed defense of fair use … when the copier directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted material." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994) (quotation marks omitted)).  Google's financial rewards are as "conspicuous" as they come, unprecedented in the case law, and Google's copying for an undisputed commercial use of unprecedented scale weighs heavily against fair use.

### B.    Google's Use Is Not Transformative.

Google has not shown that its use of the declaring code/SSO of the 37 Java API packages

in Android is transformative.  Google merely showed the jury the deposition of Terrance Barr.  While Mr. Barr, not a lawyer or expert in any relevant field, used the word "transformative" when Google's lawyer put it in his mouth, he did not use it in any way that matters to fair use.  In fact, when asked about transformativeness, he said that "'[t]ransformative' is a really vague term" and asked Google's counsel for a definition.  Ex. X (Barr Depo. Clip Rpt.) 138:3-4.  Google's counsel defined "transformative," contrary to the legal definition relevant here, as changing "[t]he status quo of the mobile industry…"  *Id.* 138:9-10.  Using that plain English definition, Mr. Barr said in that context that Android was transformative "in some ways."  *Id.* 138:12-15.  That is not relevant to the fair use definition of "transformative."  By the same token, Google's expert Dr. Astrachan used only the plain English definition of "transformative" when he testified.  Under the proper legal test, his testimony does not support transformative use.  Tr. 1261:13-14 (The Court:  "[Dr. Astrachan] is not qualified to tell you what [transformative] means under the law").  Under the proper test, Google has not met its burden to show that its use was transformative.

In copyright law, "[a] use is transformative if it adds something new, with a further purpose or different character, altering the first with new expression, meaning or message.  The critical question is whether the new work merely supersede[s] the objects of the original creation ... or instead adds something new."  *Oracle Am.*, 750 F.3d at 1374 (quotation marks); *see also* Tr. 320:5-9 (Jury Pre-Instr.).  Google's use is not transformative for four reasons.  *First*, Google's use does not fit within the uses listed in the preamble to 17 U.S.C. § 107; nor does the use resemble the items on the list.  *Second*, Google's use "merely supersedes" the objects of the original.  *Third,* the purpose of the Java API packages in Android is the same as the purpose of the Java API packages in the Java Platform.  *Fourth*, Google made no alteration to the expressive content or message of the copyrighted Java API packages.

### 1.    Google's use does not fit within the statutory examples.

Though not dispositive, the factor one inquiry "may be guided by the examples given in the preamble to § 107."  *Oracle Am.*, 750 F.3d at 1374.  Those examples are "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."  17 U.S.C. § 107.  The categories are all instances of commenting on the copyrighted work (criti-

1   cism, comment, news reporting) or using it for a scholastic purpose (teaching, scholarship, re-

2   search).  Google's use of the Java API packages does not fit within the statutory categories, and

3   Google does not argue otherwise.  Indeed, Google's use does not even resemble the statute's ex-

4   amples.  Rather, Google's copying in Android is a commercial use with the same purpose that

5   competes against and supersedes Java SE (including its derivatives) in the market.

6                    **2.      Android merely supersedes the Java Platform.**

7          The reason Google's use does not resemble the statutory examples is because Android

8   merely "supersede[s] the objects[]" of Java SE and its derivatives.  *Campbell v. Acuff-Rose Mu-*

9   *sic, Inc.*, 510 U.S. 569, 576 (1994).  Because "fair use is 'limited to copying by others which does

10  not materially impair the marketability of the work which is copied,'" superseding uses are not

11  fair.  *Oracle Am.*, 750 F.3d at 1376 (quoting *Harper & Row*, 471 U.S. at 566-67).

12         Google repeatedly argued in its opening that Android is transformative because it is a

13  smartphone platform that Google gives away for free.  *See e.g.*, Tr. 289:25-290:2 (Google Open-

14  ing) ("The whole idea is to make brand-new things that didn't exist before; change the status quo;

15  give the products away … for free…"); *id.* 310:3-4 ("Android is not a substitute for Java SE;

16  right. Android is smartphones and tablets."); *see also id.* 285:24-286:1, 288:23-25, 289:25-290:2,

17  310:12-13, 311:6-8.

18         First, the fact that Android is purportedly given away for free does not make it transforma-

19  tive.  In *Napster*, the defendant gave customers "for free something they would ordinarily have to

20  buy."  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001).  The Ninth Cir-

21  cuit concluded the use was both highly commercial and non-transformative.  *Id.*; *see also Harper*

22  *& Row*, 471 U.S. at 569 (increased public access does not evidence fair use because "[a]ny copy-

23  right infringer may claim to benefit the public by increasing public access to the copyrighted

24  work").  Nor is it relevant that Oracle did not manufacture its own phone because fair use consid-

25  ers "derivative uses … that creators of original works … license others to develop," *Campbell*,

26  510 U.S. at 592, and thus the question is whether Sun licensed the work at issue (Java SE) or de-

27  rivatives thereof for mobile phones and smartphones before Google released Android.  In any

28  event, Google does not *manufacture* phones either.  Tr. 757:14-16 (Rubin) ("I spent a lot of time

ORACLE'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW

1    thinking about the distinction between hardware and software, and I wasn't building hardware.  I

2    wasn't an OEM [Original Equipment Manufacturer].").  At Android's release, Google and

3    Sun/Oracle were both software makers "targeting the same industry with similar products," vying

4    for the business of third-party OEMs who actually manufacture the hardware.  Tr. 844:21-22

5    (Rubin).

6          Second, as alluded to above, the evidence shows that Sun's Java SE APIs were in

7    smartphones, serving the same purpose as in Android, *years before* Android's release.  Eric

8    Schmidt, Google's former CEO and Chairman of Google's parent company Alphabet, defined a

9    smartphone as one with "a powerful screen and a good processor[] [a]nd … connectible to the

10   Internet."  Tr. 387:4-5.  Andy Rubin used a similar definition when explaining why the Danger

11   Hiptop, released in the early 2000's, was "the kind of smartphone that we're familiar with today,

12   the modern Android and iPhones," Tr. 620:6-8:  "It allowed to you [sic] surf the Web, get the full

13   Web on a phone.  It had a larger screen.  The screen could be in landscape or portrait mode.  It did

14   instant messaging.  It did email and things like that."  *Id.* 620:10-13.  Rubin explained that Danger

15   included an "implementation of the Java 2 SE APIs [in] Hiptop," *id.* 887:23-24, a smartphone that

16   sold millions of units and was released years before Rubin founded Android, *id.* 620:19-21.  *See*

17   *also id.* 619:11-12, 862:8-15.  The Java API packages were also in RIM devices like Blackberry,

18   Ex. Y (Gering Depo. Designation) 104:2-15, which Eric Schmidt agreed "was a smartphone."  Tr.

19   387:9-10.  Both Sun and Google recognized that Java-powered smartphones were direct competi-

20   tors to Android-based smartphones.  On Google's end, Rubin agreed that he "viewed Sun as a

21   competitor" because "[w]e were both targeting the same industry with *similar* products."  Tr.

22   844:13-15, 21-22 (emphasis added).  On Sun's end, Schwartz testified that when Android was

23   announced, he "was certainly frustrated that we had a new competitor."  Tr. 590:20.

24         Finally, testimony from Google's retained witness Prof. Astrachan is an insufficient basis

25   for a reasonable jury to find that Android is a transformative use of the Java SE APIs.  Prof.

26   Astrachan testified that Google "transformed" what it copied in three steps:  ***First,*** "[i]n *selecting*

27   the 37 API packages and the method declarations from them," Tr. 12:52:12-13; s***econd,*** "Google

28   created a *new context* for [the 37 API packages] to be used, the new Android mobile smartphone

ORACLE'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW

platform.  That's a completely different context than these have been used before," Tr. 1252:14-16; and **third,** by "releasing [Android] as *open source*, Google has created new opportunities," Tr. 1237:20-21 (emphasis added).  None of these elements—separately or collectively—can support a finding of transformative use.

First, selecting from or excerpting a work is alone not transformative, or else every act of plagiarism would constitute fair use—so long as the copyist selected something less than the whole.  This is not the law.  *See, e.g.*, *Harper & Row*, 471 U.S. at 579-80 (Brennan, J. dissenting) (noting that majority found copying 300 words out of 200,000-word manuscript, or 0.15%, was not fair use); *Folsom v. Marsh*, 9 F. Cas. 342, 345 (C.C.D. Mass. 1841) (fair use does not protect "merely the facile use of the scissors; or extracts of the essential parts" of the original work).[2] Indeed, the jury has been instructed that "even a small part [of the original] may be qualitatively the most important part of the work."  Tr. 324:22-23.

Second, Prof. Astrachan's "new context" opinion is based on the factual assumption that Java SE was never implemented in smartphones which is soundly refuted by the record evidence.  Dr. Astrachan's assumption is directly contrary to testimony from Google's Eric Schmidt, and Messrs. Rubin, and Gering that Java SE had been in smartphones for years, from the first smartphone made by Danger in the early 2000s up through RIM Blackberry smartphones that were on the market when Android launched.  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."); *cf.* ECF No. 1697 (Ord. on Google's MIL Re Expert Testimony) (permitting expert reliance on, "subject to the … rules of evidence, … [facts] which are part of the *res gestae* of the case").  Dr. Astrachan heard Rubin testify that Java SE was in Danger smartphones, but ignored the testimony when rendering his opinion.  Tr. 1266:3-10 (Astrachan) ("Q. And you heard Mr. Rubin say that he used the Java SE APIs in Danger; right?

---

[2] Such a rule would also undermine the "substantial similarity" test for copyright infringement, as any plagiarist would be able to claim that he "transformed" the original to the extent that no ver-batim copying is identifiable at all.  *See e.g.*, *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) (affirming infringement verdict despite no evidence that any portion of the infringed work was copied verbatim, and expert testimony was required to identify any copying).

1    A. I did hear him say that. … A. I heard him say that they were early smartphones.").

2         Dr. Astrachan was also aware that the Java SE APIs were used in SavaJe mobile phones

3    and that Nokia licensed Java SE for use in its mobile phones, but ignored those examples as well.

4    Tr. 1266:11-17.  Dr. Astrachan's opinion that the Java SE APIs could not support a smartphone

5    not only contradicts the other fact testimony offered by Google, he offered no opinion at all as to

6    whether Java SE could be used in a mobile phone *without* the modifications made in Android.  Tr.

7    1274:3-5 (Astrachan) ("If you're asking did I offer an opinion about Java SE on phones, I don't

8    think that's in my report.  I think that's right.").  In other words, Dr. Astrachan has no idea if in-

9    cluding a subset of Java SE APIs in Android "adds something new, with a further purpose or dif-

10   ferent character, altering the first with new expression, meaning or message." *Oracle Am.*, 750

11   F.3d at 1374.  No reasonable jury could accept Dr. Astrachan's claim that Android used the cop-

12   ied API packages in a "new context" because the fact testimony shows they had been used in the

13   same context for years before Google copied.

14        Third, Dr. Astrachan opines that Google transformed the Java APIs by copying them and

15   distributing them under an open-source license.  But Google filled the record with evidence that

16   Sun open sourced Java through the OpenJDK platform before the Android source code was re-

17   leased in Fall 2008. *See, e.g.*, Tr. 1205:4-7 (Google) (RFA: "[I]n May 2007, Sun released the

18   code for Java SE … under the terms of GNU General Public License with the Classpath Excep-

19   tion (GP:v2+CE) as part of the OpenJDK project."); Tr. 1247:10-11 (Astrachan) ("OpenJDK con-

20   tains all of the API declarations that we're talking about here.  All of them are part of Open-

21   JDK.").  Google's decision to take Oracle's property and release it under an open-source license

22   does not alter the message or content of the code in any way, just as it would not be transforma-

23   tive to photocopy a book and distribute it under a "license" without charge.  In any event,

24   Google's argument is factually baseless in light of Oracle's decision to open source Java well be-

25   fore Android was open sourced in 2008.[3]  Tr. 627:6-628:2 (Rubin) (Android open sourced in Oc-

26

---

27   [3] The only thing Google's choice of the Apache license "added" was market harm because it al-
     lowed companies to modify Oracle's code, make it closed source, and use it to compete with Ora-

28   cle and its licensees without paying a penny. *See* Tr. 520 (Schwartz) ("The Apache license …
     said you could use whatever you want.  You don't have to pay [Sun] anything.").

ORACLE'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW

1   tober 2008).  Additionally, even if Oracle had not released OpenJDK, the fact that an infringing

2   work is given away for free by the plagiarist weighs *against fair use.  See Napster*, 239 F.3d at

3   1015; *see Sony BMG Music Entm't v. Tenenbaum*, 672 F. Supp. 2d 217, 231 (D. Mass. 2009)

4   (distributing a copied work for free increases harm to the original work and decreases likelihood

5   of fair use).

6       Android was just another implementation of the Java SE APIs in a smartphone that super-

7   seded the Sun-licensed commercial products that had been on the market for years before An-

8   droid's release.  There is no evidence supporting Google's claim that its use was transformative.

9       **3.      Android's declaring code and SSO, taken from Java SE, serve the**
            **same purpose when used in Java SE.**

10

11      "In cases where [the] use is for the same intrinsic purpose as the copyright holder's such

12   use seriously weakens a claimed fair use."  *Wall Data Inc. v. L.A. Cty. Sheriff's Dep't*, 447 F.3d

13   769, 778 (9th Cir. 2006) (quotation marks and alterations omitted).  Google presented no evi-

14   dence it uses the copied code for a different purpose; the evidence shows the purpose is the same.

15      In *Wall Data*, [t]he Sheriff's Department created exact copies of RUMBA's software.  It

16   then put those copies to the identical purpose as the original software."  447 F.3d at 778.  The

17   Court concluded: "Such a use cannot be considered transformative."  *Id.*  Google did the same

18   thing.  It created exact copies of the declaring code, and put those copies to the identical purpose

19   as the original code.  Tr. 1265:15-17 (Astrachan) ("as I mentioned earlier the API has the sa[m]e

20   purpose.  It connects my code with the implementing code[ in both Android and Java SE].  That

21   purpose is the same.").[4]  And Dr. Bloch explained (in testimony that was not stricken) that be-

22   tween Android and Java, "[t]he declarations don't change;" "[t]hey are what allows a caller of the

23   function to call it."  Tr. 997:10-12.  He further testified that even when the implementing code of

24   an API is replaced, the declaring code still serves the exact same purpose as in the original API

25   from which it was copied:  "The method declaration basically forms the nexus between the code

26   that calls the library and the code that does the work.  So you can change the implementation all

27   _____

28   [4] To the extent Google incorporated what it copied into a broader work, it is insufficient to show a
    distinct purpose.  *See* ECF No. 1780 (Op. Rejecting Broader Work) 1 ("Incorporating as part of a
    broader work, however, simply cannot be enough to qualify as transformative.").

1  you like…. [I]t can be a completely different technique, but … the client code that is the calling

2  code is none the wiser." Tr. 970:10-17 (Bloch).[5]

3              **4.    Google made no alteration to what it copied from Java SE.**

4        "A work is not transformative where the user makes *no alteration* to the expressive con-

5  tent or message *of the original work*." *Oracle Am.*, 750 F.3d at 1374 (quotation marks omitted)

6  (emphasis added).  Thus, different purpose alone would not satisfy the transformative component

7  of factor one because even a "different, and possibly beneficial, purpose[] of the copying is out-

8  weighed by the total absence of transformativeness." *Monge*, 688 F.3d at 1177.

9        Google did not change the expressive content of the declaring code or SSO.  "The declar-

10  ing code is the line or lines of source code that introduce, name, and specify the package[,] class

11  or method" and "allows programmers to understand and make use of the pre-written programs in

12  the API packages to write their own programs." Tr. 1155:20-25 (Jury Instrs.). "The declaring

13  code for the packages, classes, and methods reflects the structure, sequence, and organization or

14  SSO for the Java API packages." Tr. 11:55:25-1156:2 (Jury Instrs.). "The SSO specifies the re-

15  lationships between and among the elements of the Java API packages and also organizes the

16  classes, methods, and other elements in the package." Tr. 1156:3-5 (Jury Instrs.).  All Google did

17  was take the declaring code and the SSO from the copied API packages and incorporate it into a

18  broader work:  "The declarations don't change" between Android and Java. Tr. 977:10-11

19  (Bloch).  As this Court has already held, "[i]ncorporating as part of a broader work, however,

20  simply cannot be enough to qualify as transformative."  ECF No. 1780 (Decision Rejecting "As

21  Part of a Broader Work" Instruction) at 1.  *Monge*, the case on which the Court relies, "involved

22  incorporation of the wedding photos into a larger work and that fact was decidedly not enough to

23  excuse the piracy by the tabloid.  Piracy as well as fair use both will almost always involve using

24  the copyrighted material as part of a larger work."  ECF No. 1780 at 2-3; *see also Monge*, 688

25  F.3d 1164 at 1176; *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1113 n.6 (9th Cir. 1998) (combin-

26  ing infringing files into compilation "can hardly be described as transformative; anything but").

27

---

28  [5] Eric Schmidt also testified that "after negotiations with Sun broke down," Google "used
software that implemented the public interfaces of Java to offer a different implementation of the
interfaces that Java has."  Tr. 360:8-13.

ORACLE'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW

For similar reasons, the fact that Google wrote its own implementing code is irrelevant to the transformation inquiry.  The relevant question is whether Google altered the material it copied, i.e., the thousands of lines of declaring code and SSO, not whether it rewrote materials it didn't copy.  If that were the law, The Nation's use of President Ford's memoir would have been a fair use because the Nation took only 300 words, and replaced the rest of the memoir with original text.  *See Harper & Row*, 471 U.S. at 566 (finding no fair use where copyist wrote original text for article, but "article is structured around the quoted excerpts which serve as its dramatic focal points").  Similarly, the Supreme Court found that a movie consisting only of 20% of copied materials and 80% original materials was not a fair use.  *Stewart*, 495 U.S. at 238; *see also Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 625 (9th Cir. 2003) (16-hour video biography consisting of 5-10% copyrighted material excerpted from variety of sources and compiled along with original material not a fair use); *L.A. News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir. 1997) (use of 30-second video excerpt not a fair use because "[w]hile a small amount of the entire Videotape was used, it was all that mattered … its 'heart.'").  Here, Google copied the declaring code and SSO, and made no changes to the expressive content of either.

### C.  Google Copied In Bad Faith.

"'[T]he propriety of the defendant's conduct' is relevant to the character of the use at least to the extent that it may knowingly have exploited a purloined work for free that could have been obtained for a fee."  *L.A. News Serv.*, 108 F.3d at 1122 (quoting *Harper & Row*, 471 U.S. at 562).  The evidence shows that Google knew it needed a license, but went ahead and copied anyway.

Google built its business around consumers searching the internet from their personal computers.  TX 3211 at 4.  By 2004, however, the emergence of internet-connected mobile devices threatened Google's core business.  As Google's 10-K at the end of 2004 reported: "More individuals are using non-PC devices to access the Internet and versions of our web search technology developed for these devices may not be widely adopted by users of these devices."  *Id.* at 61.  The problem was that "[t]he lower resolution functionality and memory associated with alternative devices make the use of [Google's] products and services through such devices difficult."  *Id.* at 61-62.  Accordingly, Google knew: "[I]f we are slow to develop products and technologies that

1    are more compatible with non-PC communications devices we will fail to capture significant

2    share of an increasingly important portion of the market for online services." *Id.*

3         To solve this problem, Google turned to Android.  Tr. 346:14-23 (E. Schmidt).  Rubin was

4    under "incredible schedule pressure" to release the Android platform.  Tr. 761:10-11 (Rubin).

5    Google "wanted to ship something as soon as possible."  Tr. 761:6 (Rubin).  "[He] wanted to

6    win."  Tr. 761:12 (Rubin).  And Rubin had a lot at stake personally.  Android's shareholders—

7    including Rubin and his friends and family—stood to earn "milestone payments" totaling $60

8    million if Rubin met Google's timetable.  Tr. 752:14; TX 1004 at 9.  Failure was not an option

9    because "all that $60 million would be forfeited if [he] did not make the first milestone."  Tr.

10   760:22-24; TX 1004 at 10 ("If Milestone 1 is not achieved … by the third anniversary of the

11   Closing … all Milestone Payments shall be unearned.").  To meet the first milestone, a manufac-

12   turer needed to ship one functional Android phone with a wireless carrier providing service to at

13   least 15 million customers by July 2008.  Tr. 753:1-8; TX 1004 at 79.  But as far back as 2006,

14   Rubin received an email from one of his engineers, Dan Bornstein, who wrote: "I do not believe

15   we can make a smartphone by your definition in the currently envisioned time frame with the

16   scope of development as currently outlined in the [product requirements document]."  TX 21.

17        Announcement of the iPhone in January 2007 intensified that pressure.  Rubin was build-

18   ing a version of Android called the "Sooner."  Tr. 773:6-8 (Rubin).  Once the iPhone was an-

19   nounced, Rubin realized: "Holy crap, I guess we're not going to ship that phone."  Tr. 772:20-22

20   (Rubin).  Rubin did not yet have Java libraries two weeks after iPhone was announced, but he

21   knew he needed API libraries, "[t]his stuff is really important," and he knew Google "can't do a

22   'ta da!' with a sub-standard platform.  That's not called a ta-da, it's an 'oh no!'"  TX 5109.  Rubin

23   knew he "had to go to extraordinary lengths to ship sooner" than his competitors because mobile

24   is "a very dynamic market."  Tr. 759:22-25.  Rubin's job was to "do everything [he] possibly

25   could to get [his] solution to the market in the shortest possible time."  Tr. 760:4-6 (Rubin).

26        Google used Java as an "accelerant[]."  Tr. 633:2 (Rubin).  Brian Swetland, who worked

27   with Rubin at Danger, told Rubin that a "shift to a primarily Java API" would "reduce our devel-

28   opment time" and that "[J]ava saved us a pretty crazy amount of time" when developing Rubin's

first smartphone, the Java-based Hiptop.  TX 13.  Because it did not have time to write all the im-

plementing code itself, Google hired software contractor Noser "to help [Google] accelerate the

effort and implement some of the Java libraries on our behalf."  Tr. 731:15-18.

While writing its own APIs from scratch would have been technically feasible, Tr.

1268:7-11 (Astrachan), "the work that a developer would have to go through to learn something

completely new … was just out of question."  Tr. 633:12-14 (Rubin).  Google knew that "Java

dominate[d] [the] wireless industry," and that there were already "6M Java developers world-

wide."  TX 158 at 7 (Google Presentation: Open Handset Alliance by Rubin and Android Team).

Though the Java platform was Rubin's solution, Rubin and Google knew that the Java

"apis are copyrighted," and that Google "[m]ust take [a] license from Sun."  TX 18; TX 1 at 9.

And "one of Sun's arguments to [him] while [he] was at Danger is that the – they thought the Ja-

va API's were copyrightable."  Tr. 889:20-891:12 (Rubin) (acknowledging that Sun told Rubin

that the Java APIs were copyrighted).

Google and Sun tried to reach an arrangement, but "negotiations came to a head," and

Google "walked away because Sun wanted to control more than [Rubin] was willing for them to

control," Tr. 801:10-13, 807:6-7 (Rubin); *see also* Tr. 488:1-4 (E. Schmidt) ("control" a reason

"there was no deal"); TX 435 (Schwartz Email: "[W]e are not willing to cede complete control

…").  With "[t]alks with Sun broken off," and Google's Java libraries "half-ass at best," Google

"need[ed] another half of an ass."  TX 215.  Rubin knew the answer:  "If Sun doesn't want to

work with us, we have two options: 1) Abandon our work … -or- 2) Do Java anyway and defend

our decision, perhaps making enemies along the way."  TX 7 at 2.  Google chose option 2.

After Android's release, there is no evidence that Google believed its copying was per-

missible based on any public statement by Sun or Oracle.  When it came time to show Android at

a Sun-hosted trade show called JavaOne six months *after* Mr. Schwartz's blog post, Rubin in-

structed:  "[D]ont demonstrate to any [S]un *employees or lawyers*."  TX 29 (emphasis added).  If

Rubin thought copying the declaring code and SSO was legal and on the up-and-up, there would

have been no reason to hide it from Sun's *attorneys*, despite Rubin's testimony that Google may

have wanted to avoid demonstrating to *business people* of its new competitor:  Sun.  In that same

1    email, he also directed: "[K]now exactly who you are talking to," and "answer direct developer

2    questions about Android … [o]ne-on-one, only." *Id.*  Google knew its copying was unauthorized,

3    and it knew that code from Apache Harmony could not be used in mobile due to "field-of-use re-

4    strictions in the Java SE TCK licenses," which "prevent[ed] Apache Harmony from independent-

5    ly implementing Java SE…."  TX 405.  Mr. Ellison's developer conference remarks in fall

6    2009—before Oracle acquired Sun—likewise did not convince Google that it was permitted to

7    copy because in 2010, Google still knew it needed a license:  on the eve of litigation, Tim Lind-

8    holm was asked to "investigate … alternatives … to Java."  TX 10.  He reported back:  "We've

9    been over a bunch of these [alternatives], and think they all suck.  We conclude that we need to

10   negotiate a license for Java under the terms we need."  *Id.*

11       Google knew full well that it could not copy the declaring code and SSO without Sun's

12   permission.  But it did it anyway, because it had to get Android to market as quickly as possible,

13   no matter what.  A reasonable jury could only conclude that Google acted in bad faith.

14       **D.       Conclusion**

15       Android's unprecedented and massive commerciality and copying in bad faith would out-

16   weigh any argument going to transformative use of the Java SE API packages.  This is especially

17   so on this record where Google has presented no evidence of transformative use.  Android was

18   just another implementation of the Java SE APIs in a smartphone—something Google's evidence

19   shows had been done years prior to Android's release.  Android was not transformative, it was an

20   unlicensed use of Oracle's valuable property.  There can be only one reasonable conclusion:

21   Google did not meet its burden of proving that this factor favors fair use.

22   **II.     GOOGLE HAS NOT MET ITS BURDEN ON FACTOR TWO**

23       The second factor—the nature of the copyrighted work—"calls for recognition that some

24   works are closer to the core of intended copyright protection than others, with the consequence

25   that fair use is more difficult to establish when the former works are copied."  *Oracle Am.*, 750

26   F.3d at 1375 (quotation marks omitted).  "Creative expression falls within the core of the copy-

27   right's protective purposes."  *Id.* (quotation marks omitted).  However, the "second factor argua-

28   bly supports a finding that the use is fair" where "functional elements exist in the work and it is

1    necessary to copy the expressive elements in order to perform those functions."  *Id.*; *see also* Tr.

2    321:23-324:8 (Pre-Instr.).  Google has not met its burden on factor two for at least three reasons.

3    **A.      The Java API Packages Are Highly Creative**

4          On the parties' agreement, the Court instructed the jury that "[t]he declaring code and the

5    structure, sequence and organization of the API packages are creative and original enough to

6    qualify for copyright protection.  You will consider the degree of creativity beyond that, if any, as

7    part of your consideration of the fair use factors."  ECF No. 1845 (Stipulated Established Facts)

8    1; *see* Tr. 322:17-19 (instructing the jury, "The extent to which the 37 API packages in question

9    here involve greater creativity than the minimum required to obtain copyright is disputed and

10   open for you to examine").  The parties also agree that Google copied both the declaring code *and*

11   the SSO, and that each element serves a distinct purpose.  ECF No. 1846 (Stipulated Copyrighta-

12   bility Statement) 1 ("The declaring code is the line or lines of source code that introduce, name,

13   and specify the package, class, or method….  The SSO specifies the relationships between and

14   among elements of the Java API packages, and also organizes the classes methods and other ele-

15   ments in the package."); *see* Tr. 955:25-956:13, 1155:23-1156:5 (instructing the jury).  Google

16   thus bears the burden, as it does on all the factors, of showing for *both* the declaring code *and* the

17   SSO "whether the work is informational or creative" and the degree to which what Google copied

18   is "closer to the core of intended copyright protection[.]"  *Oracle Am.*, 750 F.3d at 1375 (quotes

19   omitted).  The evidence presented shows that both elements are highly creative.

20         Google's own witness Joshua Bloch said it best:  The reason that "some APIs [are] harder

21   to write than others" is "[b]ecause of the complexity of figuring out how best to *express* what it is

22   that the programmer wants done."  Tr. 1004:21-24 (Bloch) (emphasis added).  Dr. Bloch went on

23   to explain just how much creativity goes into designing an API.  In his words: "API design is a

24   noble and rewarding craft."  Tr. 1007:18-20; TX 624 at 47.  He called API design "an art, not a

25   science."  TX 877 at 2; Tr. 1008:9-14.  He advised to "[s]trive for beauty."  TX 877 at 2.

26         And the declaring code specifically is the valued component of the Java API packages:

27   "The whole beauty of APIs" is that "[y]ou don't have to touch the method declaration."  Tr.

28   970:10-11.  That is why he tells API developers to begin designing the API "*before* you've im-

1    plemented the API." TX 624 at 9.  In fact, "[i]mplementation should not impact API[s]" at all.

2    *Id.* at 15.  According to Bloch, "[e]arly drafts of APIs" should be one page with just the "class

3    and method signatures and one-line descriptions."  TX 877 at 1.  The reason given was that ap-

4    proach makes it "easy to *restructure* the API when you don't get it right the first time."  *Id.*  It is

5    the declaring code *and* the structure*,* sequence, and organization of the packages that is creative.

6         Bloch further explained that he applies "a whole bunch" of "design principles" when

7    "writing out method declarations."  Tr. 971:8-10.  The applicable "design principles" are of a

8    highly subjective nature, and require judgment and skill:  "[A]n API should be short as possible,

9    but no shorter ….  You want APIs to be easy to learn and to use but hard to misuse ….  So you

10   try to design APIs so that using the APIs won't cause bugs, and there are other principles like

11   that."  Tr. 971:10-20.  Bloch even has specific principles for "Class Design," TX 624 at 23,

12   "Method Design," *id.* at 27, and "Exception Design," *id.* at 37.

13        Google's technical expert, Dr. Astrachan, did not undermine Bloch's testimony that API

14   *design* is a difficult and creative art.  At most, Dr. Astrachan testified that the method *declaration*

15   *names* were "functional" and "short" in length.  Tr. 1211:6-7.  But this testimony does not ex-

16   clude the possibility that the method declarations are *both* functional and creative.  *See Sega En-*

17   *ters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1524 (9th Cir. 1992) (recognizing that components of

18   a computer program may be both functional and "highly creative and idiosyncratic" at the same

19   time).  This testimony also says nothing about the creative and expressive choices Oracle made

20   when organizing the method declarations into a hierarchy of "[c]onceptually related" packages

21   consisting of numerous classes and methods.  Tr. 1222:1-2 (Astrachan); *see Sega*, 977 F.2d at

22   1524 ("the programmer's choice of program *structure* … may be highly creative and idiosyncrat-

23   ic." (emphasis added)).

24        Dr. Astrachan's testimony all but ignored the structure, sequence, and organization of the

25   declaring code, except to say it is the same as and indistinguishable from the method declarations

26   themselves.  Tr. 1223:22-25 (Astrachan) ("I treat the names – because they start package name,

27   class name, method names.  That is the structure, sequence and organization that Java *requires* us

28   to use.  So I, kind of, treat those declarations in the SSO as the same.") (emphasis added).  On

1   cross, Dr. Astrachan admitted that the Java language requires the general package-class-method

2   hierarchy, but the API author's choices are unlimited within that general framework, and Google

3   could "rewrite [the Java] APIs using something that was a *completely different* package and class

4   organization." Tr. 1268:4-11 (Astrachan) (emphasis added).

5          Dr. Astrachan's testimony cannot be understood any other way, lest it contradict the par-

6   ties' stipulation that Oracle made creative choices when authoring the SSO of the API packages,

7   and that the declaring code and SSO are distinct elements of the API packages with distinct pur-

8   poses. *See Rebel Oil*, 51 F.3d at 1436 ("when indisputable record facts contradict or otherwise

9   render the [expert] opinion unreasonable, it cannot support a jury's verdict."). If Dr. Astrachan so

10  testified, he would also violate the Court's *in limine* order, ECF No. 1783 at 8 ("Astrachan must

11  clearly state that … Google had no technical need to copy the … SSO in order to use the Java

12  programming language").[6]  Google cannot use impermissible expert testimony to contradict set-

13  tled facts in the evidentiary record.

14         To the extent Dr. Astrachan offered permissible testimony regarding the creativity of the

15  SSO, he supported Dr. Bloch's testimony.  The Java language requires the "three-level hierarchy"

16  of package-class-method, Tr. 964:13-21 (Bloch), but the parties have agreed that the constraints

17  within that general structure are minimal, and the API author's expressive choices are many.  Tr.

18  1156:3-20 (Jury Instrs.); Tr. 1268:7-10 (Astrachan) (it is "possible to rewrite the APIs using … a

19  completely different package and class organization); *id.* 1270:6-8 ("Google engineers could have

20  used a completely different set of [Java language] APIs").

21         Dr. Astrachan testified that the "*design* process of creating an API is – difficult for sure."

22  Tr. 1266:19-20.  He distinguished the Java APIs from other APIs because the Java APIs are

23  "good" APIs, Tr. 1270:22-23, with reference to a "notion of quality in software," *id.* 1270:25-

24  1271:4, and "quality in APIs," in particular, *id.* 1271:13.  Thus, the only record evidence shows

25  that Sun/Oracle had many ways to express and design the Java APIs—which methods to write,

26

27  ───────────────
    [6] Dr. Astrachan conflates "the idea of organizing functions into packages, classes, and methods,"
    which all agree is not at issue in this case, with Oracle's highly creative expression, "the SSO as
28  expressed in the 37 Java API packages."  ECF No. 1846 (Stipulated Copyrightability Statement)
    2; *see also Oracle Am.*, 750 F.3d 1367-68.

ORACLE'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW

1    which classes to put them in, and which classes belong in the same packages, as a few exam-

2    ples—and the expressive choices Sun/Oracle made led to a "good" API, which is highly valuable

3    because it "makes a programmer's task simpler than a bad API," Tr. 1271:16-18.

4         Google bears the burden of showing that *both* the declaring code *and* the SSO of the cop-

5    ied Java API packages are "informational and functional" rather than creative and "closer to the

6    core of intended copyright protection" under this factor.  *Dr. Seuss Enters., L.P. v. Penguin Books*

7    *USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997) (quote marks omitted).  The record is undisputed

8    that the *design* of the Java APIs was highly creative.  Google has not met its burden.

9         **B.      Google Has Not Shown Copying Was A Technical Necessity.**

10        On the other side of the scale are those components of the Java API packages that are

11   "necessary for anyone to copy if they are to write programs in the Java language."  *Oracle Am.*,

12   750 F.3d at 1377.  Had Google limited its copying to elements of the few API packages necessary

13   to access the language, it could have been relevant to fair use.  *Id.*  However, Google and its ex-

14   pert had to admit that Google copied much more than was technically necessary in order to use

15   the Java programming language.  ECF No. 1783 at 6 (ordering Dr. Astrachan to "clearly state that

16   … Google had no technical need to copy the declaring code and SSO in order to use the Java pro-

17   gramming language, with the exception of the three core libraries addressed in the Federal Circuit

18   opinion"); Tr. 1268:12-13 (Astrachan) ("Q. The choice to use the 37 APIs was not a requirement

19   of the Java programming language; correct?  A. That's correct.").

20        Moreover, to isolate the purely functional components of the copied method declarations

21   and SSO, Google must separate expressive elements from the functional elements such that "the

22   idea or core functional element of each" software subcomponent is identified.  *Oracle Am.*, 750

23   F.3d at 1377.  At the time of the Federal Circuit decision, however, "that type of filtration analy-

24   sis had not occurred."  *Id.*  Now on remand, Google still has no admissible evidence that any of

25   Google's copying was necessary as a *technical* matter due to the constraints of the language, be-

26   yond the 170 lines the parties agree is necessary to use the Java programming language.[7]  Accord-

27

28   ───────────────

[7] The parties agreed that 170 lines of code were technically necessary for Google to use the Java language.  Tr. 1442:24-1443:2 (Jury Instrs.).  Copying those lines was deemed fair use and those lines are no longer at issue.  Tr. 1443:6-12 (Jury Instrs.).

ORACLE'S RULE 50(A) MOTION FOR
JUDGMENT AS A MATTER OF LAW

1    ingly, it is undisputed that Google copied much more than it needed to.  TX 9223.

2            **C.      Oracle Invested Heavily In Developing The Java API Packages.**

3            In *Wall Data*, the Ninth Circuit faced a record, like this one, where the defendant had

4    failed to filter the creative aspects of a software program from the functional.  447 F.3d at 780.

5    *Wall Data* held that "[a]lthough … software products are not purely creative works, copyright law

6    nonetheless protects computer software…," and where the defendant failed to separate the func-

7    tional portions of the software product from the creative aspects, where the software product was

8    "developed over several years, and required a multi-million dollar investment … the nature of the

9    copyrighted work weighs against a finding of fair use." *Id.*  Google has not conducted a filtration

10   analysis, and it presented no evidence that Sun/Oracle's investment in the Java APIs was incon-

11   sequential.  Instead, the evidence shows Sun invested "[b]illions of dollars" in its intellectual

12   property generally, Tr. 609:18 (Schwartz), and "substantial investments were made in all aspects

13   of Java" by Sun, *id.* 610:3-5.

14           Designing the declaring code and SSO that Google copied was a highly creative process.

15   Google has not shown that the functional constraints of the Java language necessitated copying a

16   single line of code beyond the stipulated 170 lines.  On top of that, Sun invested heavily in Java.

17   The only conclusion a reasonable jury could draw from this evidence is that Google failed to meet

18   its burden of proving that factor two weighs in its favor.

19   **III.    GOOGLE HAS NOT MET ITS BURDEN ON FACTOR THREE**

20           The third factor focuses on the "amount and substantiality of the portion used in … the

21   context of the copyrighted work, not the infringing work."  *Oracle Am.*, 750 F.3d at 1375 (quota-

22   tion marks omitted).  "[A] taking may not be excused merely because it is insubstantial with re-

23   spect to the infringing work."  *Id.* (quotation marks omitted); *see also* Tr. 324:9-325:5 (Pre-Instr.).

24   The third factor is at most neutral, and here does not weigh in favor of the copyist.  "If the sec-

25   ondary user only copies as much as is necessary for his or her intended use, then this factor will

26   *not weigh against him or her.*"  *Oracle Am.*, 750 F.3d at 1375-76 (emphasis added) (quote omit-

27   ted); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 821 (9th Cir. 2002) (finding third factor was *neu-

28   tral* where secondary user copied only what "was *necessary*" (emphasis added)).  But where the

1   copyist "used far more than was necessary" of the original work, "this factor weighs against fair

2   use." *Monge*, 688 F.3d at 1179.  As a matter of law, the best Google can do is break even.  But

3   the evidence shows that Google did not break even; rather this factor weighs against fair use.

4         "[T]he fact that a substantial portion of the infringing work was copied verbatim is evi-

5   dence of the qualitative value of the copied material, both to the originator and to the plagiarist

6   who seeks to profit from marketing someone else's copyrighted expression."  *Oracle Am.*, 750

7   F.3d at 1375 (quotation marks omitted).  Here, Google's verbatim copying supports an inference

8   that the copied material is valuable.  As discussed above, Google copied far more than dictated by

9   the constraints of the Java language.  Because Google's copying was not necessary to use the Java

10   programming language, Google has argued that it copied only what it needed to meet "developer

11   expectations,"  but "leverag[ing] a large body of software developers," Tr. 1270:10-18 (Astra-

12   chan), and Oracle's Java fan base in order to capitalize on Java's popularity is not a legitimate

13   purpose.  *Oracle Am.*, 750 F.3d at 1372 ("Google cites no authority for its suggestion that copy-

14   righted works lose protection when they become popular, and we have found none.").  Rather, it

15   underscores the importance of what Google took.

16         Moreover, the evidence at the close of Google's case shows that Google used Java to

17   compete for developers with Sun, and that third party re-implementations of the Java APIs caused

18   market harm to Sun.  Jonathan Schwartz testified that re-implementations like Apache Harmony

19   (and Android) are "competitor[s]" of Sun's because "we were both looking to recruit developers."

20   Tr. 590:24-591:1.  It was "absolutely" a concern to him that "anything that creates a more diverse

21   or fractured platform is not in developers' best interests."  Tr. 593:1-6.  Google's stated purpose

22   of meeting "developer expectations" demonstrates Sun's market advantage in the developer

23   community.  Market competition is not a cognizable purpose under the first factor, and cannot

24   justify Google's copying under factor three.  *Oracle Am.*, 750 F.3d at 1376 (the factor three anal-

25   ysis includes "the persuasiveness of a parodist's justification for the particular copying done, and

26   the enquiry will harken back to the first of the statutory factors because the extent of permissible

27   copying varies with the purpose and character of the use.") (citation and alterations omitted).

28         Finally, even if Google had presented evidence that the amount of Oracle's copyrighted

1   work that Google copied was quantitatively small, Google has nothing to show that what Google

2   copied was qualitatively insignificant where its expert's testimony failed to consider the SSO at

3   all, discussed only a handful of lines of code out of thousands, and agreed that the Java APIs are

4   "good" and valuable.  *See* Tr. 1252:18 (Astrachan) ("I've got one example here, ja-

5   va.lang.math.max.");  *see supra* 16.  Indeed, the evidence shows the opposite: the declaring code

6   and SSO Google copied were important to Java SE, and Google copied far more than it need to

7   for any *legitimate* purpose, such as compatibility with the Java programming language.  No rea-

8   sonable jury could find that Google copied just what was necessary for a proper purpose.

9   **IV.    GOOGLE HAS NOT MET ITS BURDEN ON FACTOR FOUR**

10  "The fourth and final factor focuses on the effect of the use upon the potential market for

11  or value of the copyrighted work."  *Oracle Am.*, 750 F.3d at 1376 (quote marks omitted).  It is

12  "undoubtedly the single most important element of fair use," because fair use is "limited to copy-

13  ing by others which does not materially impair the marketability of the work which is copied."

14  *Id.*; Tr. 325:11-12 (Jury Instrs.) ("This is the single most important statutory factor….").  As with

15  each element of the fair use affirmative defense, the defendant bears the burden of proof and

16  "must bring forward favorable evidence about relevant markets."  *Dr. Seuss*, 109 F.3d at 1403.

17  And "if the intended use is for commercial gain [under factor one]," as is undisputed here, the

18  "likelihood of market harm may be presumed."  *Napster*, 239 F.3d at 1016 (quotation omitted).

19  "[The fourth factor] requires that courts consider not only the extent of market harm

20  caused by the particular actions of the alleged infringer, but also whether unrestricted and wide-

21  spread conduct of the sort engaged in by the defendant would result in a substantially adverse im-

22  pact on the potential market for the original."  *Oracle Am.*, 750 F.3d at 1376 (quotation marks and

23  alterations omitted).  The analysis also considers harm to "[t]he market for potential derivative

24  uses," including "those that creators of original works would … license others to develop."

25  *Campbell*, 510 U.S. at 592.  The copyright holder's exclusive right to choose when to enter a

26  market—if at all—is also taken into account, lest fair use become a "license to forever deprive

27  [authors] of their right to decide when, whether and in what form to release" the copyrighted

28  work into new markets.  *Monge*, 688 F.3d at 1182 (quote omitted); *see also Micro Star*, 154 F.3d

1    at 1113 (finding no fair use in part because "[o]nly [the copyright holder] has the right to enter

2    that market; whether it chooses to do so is entirely its business.").

3         Despite the importance of this factor, and Oracle's entitlement to a rebuttable presumption

4    of market harm based on Google's commercial use, Google did not present to the jury an econo-

5    mist to analyze the relevant markets.  That alone should end the matter because Google has not

6    met its burden of producing "favorable evidence about relevant markets."  *Campbell*, 510 U.S. at

7    590.  *See* Tr. 1275:9-12 (Google's only expert, Dr. Astrachan, agreeing he "did not consider

8    whether there was any harm to the Java platform"); *id.* 1272:23 (Astrachan) (agreeing he "did not

9    apply any economic expertise in evaluating the effect of Android on Java SE").  Indeed, the entire

10   fair-use defense fails on the fourth factor where, as here, the defendant fails to submit favorable

11   evidence on market harm.  *Dr. Seuss*, 109 F.3d at 1403 ("[I]t is impossible to deal with the fourth

12   factor except by recognizing that a silent record on an important factor bearing on fair use disenti-

13   tle[s] the proponent of the defense.") (quotation omitted).  As discussed below, significant evi-

14   dence of actual and potential market harm because of Google's infringement is in the record.

15                    **A.    Java SE And Android Compete In The Smartphone Market.**

16        Google claims that Oracle was not harmed by Android because Oracle never adapted the

17   Java SE platform for use in smartphones.  In Google's case in chief, the evidence showed the op-

18   posite.  The Java SE APIs were in smartphones years before Android's release.  Android founder

19   and former Google executive Andy Rubin testified that (1) Danger produced one of the earliest

20   smartphones in the early 2000s, years before Android and (2) the Danger smartphone included a

21   licensed implementation of the Java SE APIs.  *See supra* 5.  Thus, Rubin testified, Sun (through

22   its licensing business) and Android (also through a licensing model) were "both targeting the

23   same industry with similar products."  Tr: 844:21-22 (Rubin); *see also* Ex. __ (Gering Depo. Clip

24   Rpt.) 104:2-15 ("there were other devices in the market that had Java on them … for example

25   RIM ….  I think all RIM devices would be in the smartphone category…").

26        The evidence shows Android won the competitive race:  By 2013, there were 1.5 million

27   Android activations *each day*.  Tr. 398:3-5 (E. Schmidt).  Such market dominance undoubtedly

28   caused actual and potential market harm to a direct competitor like Sun.  Indeed, both parties rec-

1   ognized the risk of harm Android presented to Sun.  When Google and Sun were initially negoti-

2   ating a deal, Sun informed Google that Sun's "revenue … is likely to submarine" due to

3   Google's proposed business model for Android.  TX 205.  And Andy Rubin wrote that the deal

4   would cause Sun to lose a "$100 million annual licensing business."  TX 14.  Such actual and po-

5   tential harm from direct competition by a copyist is precisely the focus of factor four.

6            **B.        There Is No Evidence OpenJDK Caused Market Harm To Java SE**.

7            Google argues that any harm Java SE suffered in the market was caused by Sun/Oracle's

8   release of OpenJDK, not Android.  Google produced no evidence at trial to support this argument.

9   The Court limited Google's use of OpenJDK evidence to proving two points.  *First,* the Court

10  stated that "Google will be allowed to prove that OpenJDK was a viable alternative for Android

11  when it was under development."  ECF No. 1829 at 3.  Google presented no evidence that such

12  hypothetical use of OpenJDK by Android would have any impact on the market for Java SE.

13  Moreover, Google's witnesses repeatedly confirmed that it was not a viable alternative.  Tr.

14  845:19-21 (Rubin) ("Q. All right. But you looked at it, you understood it, and you decided the

15  OpenJDK license was unacceptable to you; true?  A. I believe so, yes."); TX 358 (asking to use

16  OpenJDK in Android was "put[ting] your hand into the buzz saw."); Tr. 1117 (Bornstein) ("The

17  licensing that Sun is using for both SE and ME are incompatible with Android's needs.").

18          *Second,* the Court stated that "OpenJDK is relevant as well to show that the harm to Java

19  from fragmentation as well as to the market value of the copyright was caused by Sun's own de-

20  cision to release OpenJDK with the Classpath Exception."  ECF No. 1829 at 3.  Google has ar-

21  gued because OpenJDK is free, it ***could*** cause a loss of commercial licenses for Java SE.  But

22  there is no evidence in the record that any commercial license was lost due to OpenJDK.  Nor is

23  there evidence of anyone using OpenJDK in a smartphone.  Google also presented no evidence

24  that OpenJDK resulted in fragmentation.  At best, Google's witnesses, such as Mr. Phipps and Dr.

25  Astrachan, testified that the OpenJDK license did not contain a provision preventing fragmenta-

26  tion.  *See* Tr. 1065:20-21 (Phipps), Tr. 1248:11-1249:3 (Astrachan).  But "[Prof.] Astrachan is not

27  qualified to offer conclusions about the economic impact of certain events" such as Oracle's re-

28  lease of OpenJDK, ECF 1783 (Ord. on Astrachan MIL) 7-8, and he offered no testimony that

1    OpenJDK has caused or will cause fragmentation of the Java platform.  Mr. Phipps similarly of-

2    fered no testimony that OpenJDK licensees had actually created and distributed incompatible im-

3    plementations that had fragmented Java SE.  *See* Tr. 1057:13-18 (Phipps).

4          Further, Andy Rubin testified that the Java SE implementation in the Danger smartphone

5    *passed* the Java compatibility tests, Tr. 889:2-3 (Rubin), making Android the only implementa-

6    tion of Java SE in the record that constitutes an incompatible subset of Java APIs.  It is undisput-

7    ed that the Android versions at issue (through Marshmallow) have nothing to do with the Open-

8    JDK license.  Tr. 372:9-23 (Android was not released under the OpenJDK licensing model); TX

9    3466.  Google has no evidence that OpenJDK caused or will cause market harm to the Java plat-

10   form through fragmentation, or otherwise.

11         Given (1) the presumption of market harm flowing from the commerciality of Google's

12   use, (2) the actual and potential harm flowing from Android's direct competition with the Java

13   Platform, and (3) Google's failure to adduce any favorable evidence about relevant markets, no

14   reasonable jury could find that factor four weighs in favor of fair use.

15   **V.      GOOGLE HAS NOT MET ITS BURDEN TO DEMONSTRATE CUSTOM**

16         Google failed to show an industry custom that comports with its copying as a matter of

17   law.[8]  Google was given every chance imaginable to demonstrate it was following a custom.  The

18   Court allowed Google to proffer all of its evidence of custom.  *See* ECF No. 1767 (Proffer) at 1.

19   That proffer, at best, "seemed like a 'mish-mash' that by itself would not rise to the level of cus-

20   tom within the meaning of *Wall Data*."  ECF No. 1829 (Custom Order) at 4.  In particular,

21   Google could not point to a scrap of evidence that it relied on any alleged use by Apache Harmo-

22   ny or the GNU Classpath Project, or any other alleged third party copying, when it decided to

23   copy Oracle's copyrighted declaring code and SSO.  *See generally* ECF No. 1785 (Proffer Re-

24   sponse).  Accordingly, the Court prohibited Google from using GNU Classpath to show custom.

25   Instead, it could *only* use GNU Classpath to show fragmentation or a viable alternative for An-

26   _____

27   [8] For all the reasons stated below, Oracle submits that Google has not presented sufficient evi-
     dence to warrant an instruction on custom.  *See* ECF No. 1790 (Penultimate Proposed Instruction)
     (advising the parties that the Court will not provide an instruction on custom until sufficient evi-

28   dence warrants the instruction).  Moreover, Oracle continues to maintain that custom is legally
     irrelevant.  *See, e.g.*, ECF Nos. 1552, 1653, 1705, 1744, 1785 (Oracle's objs. to custom instr.).

1    droid.  ECF No. 1829 (GNU Classpath/Custom Order) at 4-5.

2         Google claimed in its proffer that Simon Phipps would show that "it was an industry cus-

3    tom or practice to use declarations/SSOs without a license."  ECF No. 1767 (Proffer at 1).  De-

4    spite the fact that he was not properly disclosed, the Court allowed Phipps to testify so long as

5    Oracle could conduct a two hour deposition.  4/2/2016 Hr'g Tr. 92:6-9.  That deposition revealed

6    that Phipps had no knowledge of any such industry practice.  ECF No. 1852 (Phipps Objection) at

7    2.  Rather, Phipps confirmed that "during the time period that [he was] at Sun, Sun made the Java

8    APIs, including the declaring code and SSO, available for use by others pursuant to …[the] speci-

9    fication license and other arrangements."  Tr. 1056:2-7 (reading deposition transcript into the rec-

10   ord).  At trial, Phipps could not identify "any entity in the 2005 to 2007 time frame who used the

11   Java APIs in a commercial product without taking a license from Sun."  Tr. 1057:13-18.

12        Google's "custom" is at best made up of a single rogue actor—Apache Harmony—whose

13   copying led to a major public dispute with Sun.  One example of an organization seeking to ob-

14   tain a license pursuant to the Java specification license and then retiring its project after having

15   failed to obtain a license does not make a custom of *unlicensed* copying.  TX 9191.  Hence, Har-

16   mony is a poor example of unlicensed copying.  Equally poor examples of *unlicensed* copying are

17   Dr. Astrachan's descriptions of APIs that Sun supposedly implemented years ago.  *See* Tr.

18   1250:21-1252:5.  Dr. Astrachan did not testify that Sun used *any* third-party intellectual property

19   *without permission*, and the Court recognized that such testimony is probative of nothing.  ECF

20   No. 1879 (Ord. Re Cattel) ("what matters is re-implementing APIs *without a license or permis-*

21   *sion*, not just re-implementing APIs." (emphasis original)).[9]

22        At trial, Google's fair use expert testified that Google's copying *did not comport* with in-

23   dustry standards.  The "ACM [Association for Computing Machinery] and IEEE … create many

24   standards that are offered for academics and software practitioners to use in their work[.]"  Tr.

25   1275:24-1276:2 (Astrachan).  The ACM publishes a code of ethics that is "a good guideline for

26   academics and professionals to follow."  *Id.* 1278:12-14.  This code of ethics states, "Honor prop-

27   _____

28   [9] Google also offered Dr. Roderic Cattell as an expert to testify with regard to industry custom.
     Dr. Cattell was not presented because all his proposed examples of custom (except arguably one)
     also did not involve copying "*without a license or permission*."  ECF No. 1879 (Cattell Order).

erty rights including copyrights and patents…. Even when software is *not so protected*, such violations are *contrary to professional behavior.* Copies of software should be made only with *proper authorization. Unauthorized* duplication of materials *must not be condoned*." TX 5338 at 3 (emphasis added). With evidence of this ethical code published by an industry standard organization in the record, no reasonable jury could find that Google has proven that an objectively "reasonable copyright owner would have consented to [Google's] use" when industry-standard ethics guidelines say the opposite. *Wall Data*, 447 F.3d at 778.

The record includes no evidence of any custom of copying declaring code or SSO without a license, but strong evidence going the other way. There is certainly not enough evidence of such a "general and universal application that [one] may be conclusively presumed to know of the custom." *Miller v. Germain Seed & Plant Co.*, 193 Cal. 62, 69 (1924). Accordingly, Google's custom argument fails as a matter of law.

## VI.    *SEGA* AND *CONNECTIX* ARE NOT RELEVANT

In its trial brief, Google relied primarily on two Ninth Circuit cases to demonstrate fair use: *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1530 (9th Cir. 1992) and *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000). *See* ECF 1706 at 9. Neither case applies to Google's use of the 37 copied Java API packages.

The issue in both *Sega* and *Sony* was whether it was a fair use to make *intermediate* copies of protected computer code to produce a final product that itself contained no copyrighted material. As Google explained: in *Sega*, "none of the code in [the defendant's] own games is derived in any way from its examination of the Sega Code." ECF 1706 at 9 (quoting *Sega*, 977 F.2d at 1515). The same was true in *Sony*: "[N]one of the [plaintiff's] copyrighted material was copied into, or appeared in, [the defendant's] final product." *Sony*, 203 F.3d at 600. That is not the case here where it is undisputed that Oracle's copyrighted declaring code and SSO is in billions of Android devices. The narrow exception to infringement laid out in *Sega* and *Sony* does not apply.

## CONCLUSION

For these reasons, the Court should grant judgment as a matter of law in Oracle's favor.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  May 17, 2016

Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP

By: */s/ Peter S. Bicks*

Peter S. Bicks

Counsel for ORACLE AMERICA, INC.