## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of June 30, 2005 by and among Google Inc., a Delaware corporation ("**Buyer**"), Android, Inc., a Delaware corporation (the "**Company**"), each stockholder of the Company, each of which is identified on the signature pages to this Agreement and Schedule 1.1 as may be amended prior to the Closing pursuant to Section 7.3(p) (individually, a "**Stockholder**" and collectively, the "**Stockholders**"), Andrew E. Rubin as Stockholder Agent (as such term is defined in Section 9.4), and with respect to Article VIII, Article IX, Article X and Article XI hereof only U.S. Bank, National Association as Escrow Agent. Capitalized terms used and not otherwise defined in this Agreement shall have the meanings ascribed to them in Article XI.

### RECITALS

A.  The Boards of Directors of each of Buyer and the Company believe it is in the best interests of the Company to enter into this Agreement and Buyer to purchase all issued and outstanding shares of common stock of the Company, par value $0.0001 per share (the "**Company Common Stock**") pursuant to the terms hereof.

B.  The Stockholders own all of the issued and outstanding shares of Company Common Stock.

C.  Buyer desires to acquire from the Stockholders, and the Stockholders desire to sell to Buyer, all of the issued and outstanding shares of Company Common Stock held by each such Stockholder upon the terms and conditions set forth in this Agreement (the "**Acquisition**").

NOW, THEREFORE, in consideration of the mutual agreements, covenants and other promises set forth herein, the mutual benefits to be gained by the performance thereof, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and accepted, the parties hereby agree as follows:

### ARTICLE I

### THE ACQUISITION

1.1  Purchase and Sale.

(a)  At the Closing (as defined in Section 1.8) and subject to and upon the terms and conditions of this Agreement, Buyer shall purchase from each Stockholder and each Stockholder shall sell, convey, transfer, assign and deliver to Buyer, free and clear of all Liens, encumbrances or other defects of title, all of the issued and outstanding shares of Company Common Stock held by such Stockholder as set forth opposite such Stockholder's name on Schedule 1.1.

CONFIDENTIAL                                        Oracle America v. Google, 3:10-cv-03561-WHA            GOOGLE-00303928

Trial Exhibit 1004, Page 7 of 82

(b)  At the Closing, subject to Section 1.7, in consideration of the sale, assignment and transfer of such shares of Company Common Stock and the agreements of the Stockholders made in connection with the transactions contemplated hereby, Buyer shall pay to each Stockholder his or her Pro Rata Share of the Closing Purchase Price. On the day prior to the Closing Date, Company shall deliver to Buyer a certificate containing a calculation of the Adjusted Net Equity in reasonable detail, which certificate shall be deemed as a representation and warranty as if made in this Agreement.

(i) "**Adjusted Net Equity**" shall mean, as of the Closing, the sum of (a) all assets of the Company determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), plus (b) the Shared Lease Liability, plus (c) the Google Note Balance, plus (d) $1,000,000, less (e) all Liabilities of the Company determined in accordance with GAAP.

(ii) "**Closing Purchase Price**" shall equal $11,000,000 less the Net Equity Shortfall.

(iii) "**Google Note Balance**" shall mean, as of the Closing, the principal plus accrued interest owed by the Company to Buyer pursuant to that certain Secured Promissory Note dated as of May 25, 2005 (the "**Google Note**").

(iv) "**Net Equity Shortfall**" shall mean (a) zero, if Adjusted Net Equity is zero or greater than zero and (b) the absolute value of Adjusted Net Equity, if Adjusted Net Equity is less than zero.

(v) "**Pro Rata Share**" with respect to each Stockholder shall mean the number obtained by dividing (a) the number of shares of Company Common Stock held by such Stockholder on the Closing Date, as set forth opposite such Stockholder's name on the updated Schedule 1.1 called for under Section 7.3(p), by (b) total number of shares of Company Common Stock that are outstanding on the Closing Date.

(vi) "**Shared Lease Liability**" shall mean, as of the Closing, the absolute value of the product of (a) 50% multiplied by (b) the aggregate amount of the Liability payable by the Company in connection with the Lease Modification (defined in Section 7.3(k)); *provided, however*, that in no event will the Shared Lease Liability exceed $350,000.

(c)  Following the Closing, subject to the terms and conditions of this Agreement (including Section 1.7 and Article IX) and the satisfaction of the applicable Milestones, Buyer shall pay to each Stockholder his or her Pro Rata Share of up to $60,000,000 (collectively, the "**Milestone Payments**") as provided for and subject to this Article I.

1.2  Milestone Payments.

(a)  The parties acknowledge and agree that Buyer's achievement of the Milestones after the Closing is a material factor in determining the valuation of the Company.

-2-

CONFIDENTIAL    Oracle America v. Google, 3:10-cv-03561-WHA    GOOGLE-00303929

Trial Exhibit 1004, Page 8 of 82

Therefore, except as provided under Section 1.5(c), the Stockholders shall have no right to receive any Milestone Payments unless and until the applicable Milestone has been achieved as provided in this Article I.

(b) To the maximum extent allowable by law, the Milestone Payments payable pursuant to this Article I do not constitute compensation for services, but rather constitute part of the consideration for the Company Common Stock purchased by Buyer pursuant to this Agreement and shall be treated as such (subject to the requirement to treat a portion as imputed interest) for all Tax purposes.

(c) Subject to the provisions of this Article I, Buyer shall pay to each Stockholder pursuant to this Article I his or her Pro Rata Share of the Milestone Payments, if any, to which the Stockholders are entitled on the respective Milestone Payment Date.

(d) No Stockholder may sell, exchange, transfer or otherwise dispose of his or her right to receive any portion of the Milestone Payments, other than by the laws of divorce, descent and distribution or succession; provided, however, that a Seller may transfer his or her right to receive any portion of the Milestone Payments to a corporation, partnership, fund, trust or similar entity directly or indirectly controlled by such Stockholder primarily for investment, tax or estate planning purposes so long as, prior to the effectiveness of any such transfer, such transferee executes and delivers to the Buyer an agreement in form and substance reasonably acceptable to the Buyer in which such transferee agrees to be bound by all applicable terms and conditions of this Agreement. Any transfer in violation of this Section 1.2(d) shall be null and void and need not be recognized by the Buyer

1.3   Achievement of Milestones.  Subject to the terms and conditions of this Agreement (including Section 1.7 and Article IX), by virtue of this Agreement:

(a) $8,000,000 of the Milestone Payments (the "**First Milestone Payment**") shall be paid upon the Milestone Payment Date occurring immediately after the achievement of Milestone 1, but only if such Milestone is achieved.

(b) $10,000,000 of the Milestone Payments shall be paid upon the Milestone Payment Date occurring immediately after the achievement of Milestone 2, but only if such Milestone is achieved.

(c) $15,000,000 of the Milestone Payments shall be paid upon the Milestone Payment Date occurring immediately after the achievement of Milestone 3, but only if such Milestone is achieved.

(d) $27,000,000 of the Milestone Payments shall be paid upon the Milestone Payment Date occurring immediately after the achievement of Milestone 4, but only if such Milestone is achieved.

CONFIDENTIAL                                                          Oracle America v. Google, 3:10-cv-03561-WHA           GOOGLE-00303930

Trial Exhibit 1004, Page 9 of 82

1.4     Support for Earn-Out Milestones. Buyer acknowledges and agrees that the opportunity to earn the Milestone Payments is a material inducement to the Stockholders to enter into this Agreement. After the Closing, Buyer shall provide to the Company or the Business Group commercially reasonable resources (including, without limitation, commercially reasonable personnel and equipment) in connection with the Company's or the Business Group's efforts to reach the Milestones (the "**Milestone Support**"); *provided* that (a) the foregoing shall not constitute a guarantee of employment of any Employee and Buyer may terminate any Employee, with or without cause, at any time and such termination shall not constitute a breach of this Agreement and (b) no breach shall be deemed to have occurred under this Section 1.4 unless and until the Stockholder Agent shall have given written notice to Buyer of such alleged breach and, if a violation has in fact occurred, Buyer shall have had a reasonable period of time after receipt of such notice to cure such breach. The period of time in excess of six months from (a) the effective date that notice is given that Buyer has failed to provide Milestone Support and Buyer has acknowledged in writing that it has so failed to provide the Milestone Support until (b) the date such Milestone Support is restored is referred to as a "**Milestone Extension Period.**"

1.5     Limitations on Milestone Payments.

(a)     If Milestone 1 is not achieved pursuant to this Article I by the third anniversary of the Closing extended for any intervening Milestone Extension Period, all Milestone Payments shall be unearned, forfeited and retained permanently by Buyer.

(b)     Without limiting Section 1.5(a), if any of Milestones 2, 3 or 4 are not achieved pursuant to this Article I by the seventh anniversary of the Closing extended for any intervening Milestone Extension Period, the Milestone Payments associated with such unachieved Milestones shall be unearned, forfeited and retained permanently by Buyer. The period from the Closing Date until the last date upon which a Milestone may be achieved is referred to as a "**Milestone Period.**"

(c)     Without limiting any other provision of this Agreement, if Buyer in its sole discretion determines not to pursue (1) the development of operating systems for mobile telephones using Company Intellectual Property (as defined in Section 2.11(a)) or Intellectual Property (as defined in Section 2.11(a)) of the Business Group developed after Closing or (2) the sale of mobile telephones enabled with such operating systems, then Buyer may, at its option by providing notice to the Stockholder Agent, (i) enter into an agreement with the Principal Stockholders or entity designated by them (which agreement shall be negotiated in good faith among Buyer and Stockholders) pursuant to which Buyer will grant to the Principal Stockholders a nonexclusive, transferable, sublicensable, irrevocable, perpetual, world-wide, royalty-free, fully paid license to (x) make, have made, use, sell, offer for sale, create derivative works and improvements of, distribute (directly or indirectly) or otherwise commercially exploit the Company Intellectual Property and derivative works or improvements thereof and practice any method or process in connection therewith, (y) copy, distribute, reproduce, and perform the Company Intellectual Property, and (z) to create derivative works of and improve on the Company Intellectual Property; (ii) release the Principal Stockholders from the noncompetition obligations under the Noncompetition Agreements (as defined in Section 7.3(l)); and (iii) if the notice provided by Buyer

-4-

CONFIDENTIAL                               Oracle America v. Google, 3:10-cv-03561-WHA          GOOGLE-00303931

Trial Exhibit 1004, Page 10 of 82

under this Section 1.5(c) is given prior to the one-year anniversary of this Agreement, make the First Milestone Payment regardless of whether Milestone 1 has been achieved (*provided* that Buyer shall not be required to make the First Milestone Payment more than once). Upon Buyer providing such notice, so releasing the Principal Stockholders from the non-competition obligations and, if required, making such First Milestone Payment, Buyer shall be under no further obligation to make any unearned Milestone Payments and any unearned Milestone Payments shall be unearned, forfeited and retained permanently by Buyer. Nothing in this Section 1.5(c) shall be construed to provide or imply a remedy to or for the Stockholders in the event one or more of the Milestones are not achieved hereunder.

(d) Buyer agrees to provide promptly all information as reasonably requested by the Company or the Business Group or its advisor or agent, and to make available for inspection and review to the Company or its advisor or agent, during regular business hours upon reasonable prior notice, the books and records of Buyer relating to the Company or the Business Group, in each case solely to the extent such information and books and records are relevant to the determination of whether the Milestones have been satisfied. Access to such information, books and records will be conditioned upon execution by the Company and its designated advisors and agents of a confidentiality agreement acceptable to Buyer. Until the end of the Milestone Period, Buyer shall maintain books and records reasonably necessary to support and document the determination of whether the Milestones have been satisfied.

1.6  Resolution of Disputes. The parties agree that disputes arising under this Article I shall be resolved exclusively in the manner and pursuant to the procedures substantially as set forth in Section 9.3(e) hereof.

1.7  Escrow. Buyer, without any act of the Company or the Stockholders, shall deposit with the Escrow Agent (a) on the Closing Date, ten percent (10%) of the Closing Purchase Price otherwise payable to the Stockholders pursuant to Article I and (b) on the applicable Milestone Payment Date, $1,200,000 of the First Milestone Payment otherwise payable to the Stockholders pursuant to Article I if Milestone 1 is achieved and earned pursuant to this Article I, which in each case shall be held in escrow as collateral for the indemnification obligations of the Company and the Stockholders under Article IX hereof (such amounts, together with any accrued interest thereon, the "**Escrow Fund**"); *provided, however,* that if the Milestone Payment Date related to the Milestone 1 occurs two years following the Closing Date, the $1,200,000 to be deposited with the Escrow Agent pursuant to clause (b) above shall not be deposited with the Escrow Agent but shall be paid to the Stockholders (but may be subject to Offset pursuant to Section 9.2(b) and Section 9.3(h)).

1.8  Closing.

(a) Unless this Agreement is earlier terminated pursuant to Section 8.1 hereof, the closing of the Acquisition (the "**Closing**") will take place as promptly as practicable after the execution and delivery hereof by the parties hereto, but no later than two (2) Business Days following satisfaction or waiver of the conditions set forth in Article VII hereof (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or waiver of those conditions), at the offices of Buyer, 1600 Amphitheatre Parkway, Mountain View,

-5-

Trial Exhibit 1004, Page 11 of 82

California, 94043 unless another time and/or place is mutually agreed upon in writing by Buyer and the Company. The date upon which the Closing actually occurs shall be referred to herein as the "**Closing Date.**"

(b) Subject to the conditions set forth in this Agreement, at or prior to the Closing:

(i) Buyer shall pay each Stockholder the portion of the Closing Purchase Price to which such Stockholder is entitled pursuant to this Article I, by wire transfer of immediately available funds (subject to any amounts withheld pursuant to Section 1.7); and

(ii) each Stockholder shall deliver to Buyer one or more certificates representing the shares of Company Common Stock to be sold by such Stockholder to Buyer as set forth on Schedule 1.1, accompanied by a completed and duly executed letter of transmittal in a form acceptable to Buyer.

1.9 Effect of Transaction. As a result of the transactions contemplated by this Agreement, the Company will, upon the Closing, become a wholly-owned subsidiary of Buyer, which will become the record and beneficial owner of all of the issued and outstanding shares of the Company's capital stock, and there shall be no outstanding options, warrants or rights to subscribe for or purchase any shares of the Company's capital stock.

1.10 Expenses. Each party shall be solely responsible for its own costs and expenses (including attorneys' fees) incurred in negotiating and consummating the transactions contemplated hereby. Notwithstanding the foregoing, if the Closing occurs, at the Closing Buyer shall pay by wire transfer up to $50,000 of the reasonable and documented fees and expenses of the Company's legal counsel incurred in connection with the Acquisition (any expenses incurred in excess of such amount is referred to as "**Excess Expenses**"). The Company shall deliver to Buyer at least one day prior to the Closing a statement of all Excess Expenses in reasonable detail which statement shall be deemed a representation and warranty as if made in this Agreement, which shall be deducted from the Closing Purchase Price.

1.11 Required Withholding. Buyer shall be entitled to deduct and withhold from any consideration payable or otherwise deliverable pursuant to this Agreement amounts as are required to be deducted or withheld therefrom under the Code, or under any provision of state, local or foreign tax law or under any other applicable legal requirement. To the extent such amounts are so deducted or withheld, such amounts shall be treated for all purposes under this Agreement as having been paid to the person to whom such amounts would otherwise have been paid.

1.12 Taking of Necessary Action; Further Action. If at any time after the Closing, any further action is necessary or desirable to carry out the purposes of this Agreement, to vest in Buyer the full right and title to all the Company's capital stock or to ensure that the Company retains full right, title and possession to any and all assets, property, rights, privileges, powers and franchises of the Company, Buyer and the officers and directors of the Company are fully authorized in the name of their respective corporations to take all such lawful and necessary action.

CONFIDENTIAL                                     Oracle America v. Google, 3:10-cv-03561-WHA          GOOGLE-00303933

Trial Exhibit 1004, Page 12 of 82

## ARTICLE II

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to Buyer, except as set forth in the "**Schedule of Exceptions**" provided to Buyer in connection with this Agreement, that the statements contained in this Article II are true and correct. The Schedule of Exceptions will be arranged in sections corresponding to the numbered and lettered sections contained in this Article II, and shall qualify the sections herein to which each exception refers and to any other section herein to the extent that it is reasonably apparent from such exception that such exception is applicable to such other section. Notwithstanding the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty pertains to the existence of the document or other item itself). References to the "Company" in this Article II shall refer, whenever not inappropriate by reference to the context, to the Company and its Predecessor Entities. For purposes of this Article II, the phrase "to the Company's knowledge" or any phrase of similar import shall be deemed to refer to the actual knowledge of the Principal Stockholders plus the knowledge of the Principal Stockholders after reasonable inquiry within the Company.

2.1     Organization and Standing of the Company. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. The Company has all requisite corporate power and authority necessary to enable it to own and operate its properties and to conduct its business as presently conducted and proposed to be conducted. The Company is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the failure to so qualify would have a Company Material Adverse Effect. The minutes and consents of the directors and stockholders of the Company constitute all such minutes and consents of the Company since the inception thereof. The Company has delivered a true and correct copy of each of its certificates of incorporation and bylaws (collectively, the "**Organizational Documents**"), each as amended to date and in full force and effect on the date hereof, to Buyer. Schedule 2.1 lists the directors and officers of the Company.

2.2     Authority; Valid and Binding Agreements. The Company has all requisite corporate power and authority to execute and deliver this Agreement and each of the agreements contemplated hereby, and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the Company of this Agreement and each of the agreements contemplated hereby, and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of the Company and the Stockholders and no further corporate action is required. This Agreement and each of the agreements contemplated hereby have been duly executed and delivered by the Company and, as applicable, each of the Stockholders, and assuming the due authorization, execution and delivery of the other parties hereto and thereto, constitute legal, valid and binding obligations of the Company and each of the Stockholders, as applicable, enforceable against the Company and each of the Stockholders, as applicable, in accordance with their respective terms except as such enforceability may be limited by bankruptcy, insolvency, moratorium or other similar laws affecting or relating to

-7-

creditors' rights generally and rules of law and equity governing specific performance, injunctive relief and other equitable remedies.

2.3     Conflicts; Consents. The execution and delivery by the Company and the Stockholders of this Agreement and each of the agreements contemplated hereby does not, and the consummation of the transactions contemplated hereby and thereby and compliance with the terms hereof and thereof will not, breach, conflict with, or result in any violation of or default under (with or without notice or lapse of time or both), or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of any benefit under, or result in the creation or imposition of any Lien of any nature whatsoever upon any of the properties or assets of the Company, except as set forth on Schedule 2.3, under any provision of: (i) any loan or credit agreement, note, bond, mortgage, indenture, lease, deed of trust, agreement, contract, commitment, license, franchise, permit, understanding, instrument or obligation or other arrangement to which the Company is a party or by which the Company or any of its properties or assets may be bound or affected; (ii) the Organizational Documents or other constitutive or governing documents of the Company or (iii) any material Legal Requirement applicable to the Company or any of its properties or assets. No consent, approval, order, license, permit or authorization of, or notification, registration, declaration or filing with, any Governmental Authority or any other Person is required to be obtained or made by or with respect to the Company, any Stockholder or any of their respective Affiliates in connection with the execution, delivery and performance by the Company of this Agreement or any of the agreements contemplated hereby, or the consummation of the transactions contemplated hereby or thereby.

2.4     Subsidiaries; Powers of Attorney. The Company does not own or control, directly or indirectly, any interest in any other corporation, association or other business entity. The Company is not a participant in any joint venture, partnership or similar arrangement. There are no outstanding powers of attorney executed on behalf of Company.

2.5     Company Capitalization.

(a)     As of the date of this Agreement, the authorized capital stock of the Company consists of 20,000,000 shares of Company Common Stock, of which 10,715,735 shares are issued and outstanding. All outstanding Company Common Stock has been duly authorized and validly issued in compliance with applicable laws, is fully paid and non-assessable and is not subject to any preemptive or subscription rights. All outstanding shares of Company Common Stock are held as of the date of this Agreement by the Stockholders with the domicile addresses and in the classes and amounts set forth on Schedule 1.1, which is a true, correct and complete list of the record holders of shares of capital stock of the Company, and to the Company's knowledge, contains accurate wire-transfer instructions for each Stockholder. As of the Closing, all outstanding shares of Company Common Stock will be held by the Stockholders with the domicile addresses and in the classes and amounts set forth on the version of Schedule 1.1 updated pursuant to Section 7.3(p), which as of Closing will be a true, correct and complete list of the record holders of shares of capital stock of the Company. Such Stockholders own of record and (to the Company's knowledge) beneficially all the outstanding shares of Company Common Stock, each of them so owning the number of shares set

-8-

forth opposite such Stockholder's name on Schedule 1.1 free and clear of all Liens or any other restriction on the right to vote, sell or otherwise dispose of such capital stock. All capital stock of the Company has been issued in compliance with all applicable federal and state securities laws.

(b) Except as otherwise set forth on Schedule 2.5(b), there are no outstanding warrants, options, rights, other securities, agreements, subscriptions or other commitments, arrangements or undertakings pursuant to which the Company may become obligated to issue, deliver or sell, or cause to be issued, delivered or sold, any additional capital stock or other securities of the Company or to issue, grant, extend or enter into any such warrant, option, right, security, agreement, subscription or other commitment, arrangement or undertaking. There are no outstanding options, rights, other securities, agreements or other commitments, arrangements or undertakings pursuant to which the Company is or may become obligated to redeem, repurchase or otherwise acquire or retire any capital stock or other securities of the Company or any securities of the type described in this Section 2.5(b), which are presently outstanding or may be issued in the future.

(c) Except as set forth on Schedule 2.5(c), there are no bonds, debentures, notes or other indebtedness or securities of the Company having the right to vote (or convertible into, or exchangeable for, securities having the right to vote) on any matters on which stockholders of the Company may vote.

(d) Except as set forth on Schedule 2.5(d), there are no outstanding rights which permit the holder thereof to cause the Company to file a registration statement under the Securities Act or which permit the holder thereof to include securities of the Company in a registration statement filed by the Company under the Securities Act, and there are no outstanding agreements or other commitments which otherwise relate to the registration of any securities of the Company under the Securities Act.

(e) Except as set forth on Schedule 2.5(e), which schedule sets forth the vesting provisions applicable to each outstanding equity security of the Company, including amount vested as of the date hereof, all issued and outstanding equity securities of the Company are fully vested and are not subject to any right of repurchase or risk of forfeiture.

(f) There are no voting trusts, proxies, or other agreements or understandings with respect to the voting stock of the Company. As a result of the Acquisition, Buyer will be the sole record and beneficial holder of all issued and outstanding Company Common Stock and all rights to acquire or receive any shares of Company Common Stock.

(g) To the Company's knowledge, all elections and notices under Section 83(b) of the Code have been timely filed by all individuals who have purchased Company Common Stock subject to repurchase by the Company.

2.6 Financial Information. Schedule 2.6 includes complete and correct copies of: the Company's unaudited balance sheet as of May 31, 2005 (the "**Balance Sheet Date**"), and the related unaudited statement of income, cash flow and stockholders' equity for the five months then ended

CONFIDENTIAL                                           Oracle America v. Google, 3:10-cv-03561-WHA        GOOGLE-00303936

Trial Exhibit 1004, Page 15 of 82

(the "**Financials**"). The Financials (i) are true and correct in all material respects and have been prepared in accordance with GAAP consistently applied throughout the periods indicated and consistent with each other, except that the Financials do not contain notes that may be required by GAAP, and (ii) present fairly, in all material respects, the Company's financial condition, operating results and cash flows as of the dates and during the periods indicated therein, subject to normal year-end adjustments, which are not material in amount or significance in any individual case or in the aggregate. The forecasts and projections previously delivered to Buyer by the Company and attached hereto as Schedule 2.6 have been prepared in good faith and on the basis of assumptions that are fair and reasonable in light of current and reasonably foreseeable circumstances. Without limiting the foregoing, (i) Exhibit D attached hereto contains a true, complete and accurate list of all of the notes payable by the Company (other than the Google Note) as of the date hereof including (A) the amount of principal and interest payable as of the date hereof (including the amount payable assuming the Acquisition occurs) and (B) to the Company's knowledge, accurate wire-transfer instructions for each noteholder listed thereon, and (ii) Exhibit D as updated as of the Closing as provided for under Section 7.3(q) contains a true, complete and accurate list of all of the notes payable by the Company (other than the Google Note) as of the Closing including (A) the amount of principal and interest payable as of the Closing (including the amount payable assuming the Acquisition occurs) and (B) to the Company's knowledge, accurate wire-transfer instructions for each noteholder listed thereon. Except as set forth on Schedule 2.6, all of the notes listed on Exhibit D are prepayable and assignable by the Company without the consent of any other party.

      2.7    Undisclosed Liabilities. Except as set forth in the Financials or on Schedule 2.7, the Company does not have and, as a result of the transactions contemplated by this Agreement and the agreements contemplated hereby, will not have, any Liabilities or obligations of any nature except for (i) Liabilities and obligations incurred in the ordinary course of business consistent with past practice, and which, individually or in the aggregate, do not exceed $50,000 and (ii) contractual and other Liabilities incurred in the ordinary course of business which are not required by GAAP to be reflected on a balance sheet.

      2.8    Tax Matters.

          (a)    Definition of Taxes. For the purposes of this Agreement, the term "**Tax**" or, collectively, "**Taxes**" shall mean (i) any and all U.S. federal, state, local and non-U.S. taxes, assessments and other governmental charges, duties, impositions and liabilities, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, and value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, excise and property taxes, together with all interest, penalties and additions imposed with respect to such amounts, (ii) any liability for the payment of any amounts of the type described in clause (i) of this Section 2.8(a) as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, and (iii) any liability for the payment of any amounts of the type described in clauses (i) or (ii) of this Section 2.8(a) as a result of any express or implied obligation to indemnify any other person or as a result of any obligations under any agreements or arrangements with any other person with respect to such amounts and including any liability for taxes of a predecessor or transferor entity.

-10-