Volume 7

Pages 1322 - 1571

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,           )
                                )
                Plaintiff,      )
                                )
    VS.                         )  No. C 10-3561 WHA
                                )
GOOGLE, INC.,                   )
                                )
                Defendant.      )
_____)  San Francisco, California
                                   Tuesday, May 17, 2016


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**              ORRICK, HERRINGTON & SUTCLIFFE LLP
                               The Orrick Building
                               405 Howard Street
                               San Francisco, California  94105
                        BY:  **ANNETTE L. HURST, ESQUIRE**
                             **GABRIEL M. RAMSEY, ESQUIRE**

                               ORRICK, HERRINGTON & SUTCLIFFE LLP
                               The Orrick Building
                               51 West 52nd Street
                               New York, New York 10019
                        BY:  **PETER A. BICKS, ESQUIRE**
                             **LISA T. SIMPSON, ESQUIRE**

 (Appearances continued on next page)


Reported By:  Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              Official Reporters - U.S. District Court

**APPEARANCES (CONTINUED):**

**For Plaintiff:**             ORRICK, HERRINGTON & SUTCLIFFE LLP
                              777 South Figueroa Street, Suite 3200
                              Los Angeles, California  90017-5855
                        BY:  **ALYSSA M. CARIDIS, ESQUIRE**
                             **GEOFFREY GAVIN MOSS, ESQUIRE**

                              ORRICK, HERRINGTON & SUTCLIFFE LLP
                              2050 Main Street, Suite 1100
                              Irvine, California  92614-8255
                        BY:  **CHRISTINA VON DER AHE RAYBURN,  ESQUIRE**

                              ORACLE
                              500 Oracle Parkway
                              Redwood City, California 94065
                        BY:  **DORIAN ESTELLE DALEY, GENERAL COUNSEL**
                             **MATTHEW SARBORARIA,VICE PRESIDENT**
                              **ASSOCIATE GENERAL COUNSEL**

**For Defendant:**             KEKER & VAN NEST
                              633 Battery Street
                              San Francisco, California  94111-1809
                        BY:  **ROBERT A. VAN NEST, ESQUIRE**
                             **CHRISTA M. ANDERSON, ESQUIRE**
                             **MICHAEL S. KWUN, ESQUIRE**
                             **DANIEL PURCELL, ESQUIRE**
                             **MATTHIAS ANDREAS KAMBER, ESQUIRE**
                             **EUGENE MORRIS PAIGE, ESQUIRE**
                             **STEVEN P. RAGLAND, ESQUIRE**

                              KING & SPALDING LLP
                              1185 Avenue of the Americas
                              New York, New York 10036-4003
                        BY:  **BRUCE W. BABER, ESQUIRE**

                              GOOGLE, INC.
                              1600 Amphitheatre Parkway
                              Mountain View, California  94043
                        BY:  **RENNY HWANG, LITIGATION COUNSEL**

**Also Present:**
                              GEORGES SAAB
                              ORACLE CORPORATE REPRESENTATIVE

                              CATHERINE LACAVERA
                              GOOGLE CORPORATE REPRESENTATIVE

1

**I N D E X**

2

Tuesday, May 17, 2016 - Volume 7

3

**PLAINTIFF'S WITNESSES**                                    **PAGE**   **VOL.**

4

**CATZ, SAFRA (RECALLED)**
(PREVIOUSLY SWORN)                                          1350     7

5

Direct Examination resumed by Ms. Hurst                     1350     7
Cross-Examination by Ms. Anderson                           1364     7

6

Redirect Examination by Ms. Hurst                           1385     7

7

**SCREVEN, EDWARD**
(SWORN)                                                     1389     7

8

Direct Examination by Ms. Hurst                             1389     7
Cross-Examination by Mr. Purcell                            1413     7

9

Redirect Examination by Ms. Hurst                           1438     7

10

**REINHOLD, MARK**
(SWORN)                                                     1446     7

11

Direct Examination by Ms. Simpson                           1446     7
Cross-Examination by Mr. Purcell                            1465     7

12

Redirect Examination by Ms. Simpson                         1490     7

13

**HOLZLE, URS**
(By videotaped deposition)                                  1507     7

14

15

**MEIER, RETO**
(By videotaped deposition)                                  1508     7

16

**GHULOUM, ANWAR**
(By videotaped deposition)                                  1508     7

17

18

**SCHMIDT, DOUGLAS**
(SWORN)                                                     1510     7

Direct Examination by Ms. Hurst                             1510     7

19

Cross-Examination by Mr. Kamber                             1548     7

20

- - - - -

21

22

23

24

25

<u>**E X H I B I T S**</u>

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 610.10 | | 1394 | 7 |
| 971 | | 1369 | 7 |
| 1028 | | 1452 | 7 |
| 1074 | | 1388 | 7 |
| 2041 | | 1383 | 7 |
| 2044 | | 1376 | 7 |
| 6571 | | 1513 | 7 |
| 7406 | | 1378 | 7 |
| 7495 | | 1484 | 7 |
| 9223 | | 1442 | 7 |
| 9224 | 1447 | | 7 |

| | |
|---|---|
| 1 | **Tuesday - May 17, 2016**                                    **7:23 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---000--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE COURT:**  Good morning.  On this objection I got |
| 6 | overnight about stonewalling and Exhibit 9116, I need to see |
| 7 | the deposition.  I can't tell if there was stonewalling, and |
| 8 | you lawyers are so good at quoting only part, I need to see the |
| 9 | whole transcript of the deposition.  And tag the pages where |
| 10 | the stonewalling occurred so that I can see that there was -- |
| 11 | there really was stonewalling. |
| 12 | **MS. HURST:**  Your Honor, while they're getting that, I |
| 13 | would like to make an offer of proof regarding the European |
| 14 | Commission document that Ms. Catz -- that we were offering with |
| 15 | Ms. Catz, if that's all right. |
| 16 | **THE COURT:**  Sure. |
| 17 | **MS. HURST:**  Your Honor, this offer of proof is going |
| 18 | to consist of five documents.  I'll hand them up one by one. |
| 19 | They have been provided to counsel. |
| 20 | First, Your Honor, is proposed Trial Exhibit 9219 with an |
| 21 | email from Ms. Catz at the bottom, and this demonstrates, |
| 22 | Your Honor -- which the witness is prepared to testify -- that |
| 23 | she was deeply involved at the time in the preparation of this |
| 24 | document for the European Commission. |
| 25 | **MS. ANDERSON:**  Your Honor -- |

1    **THE COURT:**  Wait.  I've got to look at it.

2    **MS. ANDERSON:**  Oh, sure, sure.

3    **MS. HURST:**  Ms. Anderson if I could get through the

4    documents first --

5    **MS. ANDERSON:**  I think it's important for the Court to

6    know that the first time we've ever seen these documents was

7    late last night; four of them last night, one of them this

8    morning.  They were never produced in discovery.  They're

9    covered with lawyers.  As far as we can tell, these were

10   withheld on privileged grounds during the litigation.  There is

11   no basis for withholding, setting aside all the hearsay

12   problems and other issues with these documents.  I just want to

13   make sure the Court is aware of that.

14   **THE COURT:**  Thank you for that.  Let's get the offer

15   of proof.  Okay.  9219, let me just say for the record, to

16   Tracy Coughlin from Henata Hesse.

17   **MS. HURST:**  And, Your Honor, if you can see, that

18   email is forwarding the message from Safra and that was an

19   email from Ms. Catz saying, "As a follow-up to yesterday's

20   call, please forward to the entire extended team.  The most

21   important thing we can do right now is to get the answers in

22   ASAP.  ASAP means within 24 hours of getting them.  I know

23   this is a huge task, but I know if it can be done, this team

24   can do it."

25   **THE COURT:**  Is the Dan Wall here a lawyer.

**PROCEEDINGS**

1          **MS. HURST:**  Yes.  Your Honor, that was Oracle's lawyer

2     at Latham & Watkins and Thomas Vinje was Oracle's lawyer at

3     Clifford Chance.  And then --

4          **THE COURT:**  Why are you showing me attorney-client

5     documents?

6          **MS. HURST:**  Your Honor, because the charge was laid on

7     the table in connection with the objection made to the European

8     Commission document yesterday that the contents of the answer

9     to question 70 really came from Oracle and not Sun.  And,

10    Your Honor, I would like to make an offer of proof to the Court

11    showing for preliminary purposes under Rule 104 that it was not

12    from Oracle and it was from Sun for the purpose of the Court

13    overruling the objection and permitting the witness to answer

14    that the contents of the answer came from Sun.

15         If the Court would bear with me for a second --

16         **THE COURT:**  I'm going to bear with you, but this is an

17    extraordinary thing to reveal attorney-client communications.

18    Are you doing this on purpose and with conscious knowledge that

19    it's a waiver?

20         **MS. HURST:**  Your Honor, we have, if necessary, to

21    produce with us here today a binder of all of the documents

22    concerning the preparation of the exhibit that we offered.

23         **THE COURT:**  Well, I'm not ruling that this is in

24    evidence.  I'm not going to rule anything on this until I hear

25    your offer of proof.

1          **MS. HURST:**  I understand.

2          **THE COURT:**  But be aware that this is extraordinary.

3          **MS. HURST:**  I understand.

4     As the Court can see, the email from the Oracle side gets

5     forwarded to the lawyers and client on the Sun side.  So at the

6     top, Tracy Coughlin was a lawyer, in-house person, and Jonathan

7     Nemer, who is listed there on the two -- Jonathan Nemer was

8     Sun's -- one of Sun's chief intellectual property lawyers at

9     the time, and he was one -- and Ms. Catz is prepared to testify

10    he was one of the key people involved in preparing the answers

11    to the transaction.

12        Ms. Renata Hesse, who is listed here as forwarding this to

13    the Sun folks, she was the lead outside counsel for Sun in

14    addressing the European Commission.  She was at Wilson Sonsini

15    at the time, and so you will see her name again.

16        Next, Your Honor, is Exhibit 9222.  I'm sorry.  9220.  And

17    this is an email from Mr. Nemer, who I just mentioned as Sun's

18    IP lawyer, to Sun's legal team, and, Your Honor, we are going

19    to look -- I'm going to roll this over at what was then

20    question 69 in the draft.

21         **THE COURT:**  9220 is a lengthy document from --

22         **MS. HURST:**  Mr. Nemer.

23         **THE COURT:**  -- Nemer to a lot of people, and it's

24    dated '09, July '09, and you've turned to page 16.

25         **MS. HURST:**  Your Honor, if you see there on page 16,

1   the question that we were talking about yesterday which

2   ultimately became 70 in the final submission, "Please explain

3   the conflict between Sun and Google with regard to Google's

4   Android."

5       Now, Your Honor, this was Sun's draft of the answer, Sun's

6   internal draft of the answer.

7       "The Dalvik Virtual machine, plus class libraries, which

8   together constitute the Android Runtime environment, are Sun's

9   perspective and unauthorized derivative work of Java SE for

10  which Google should be prepared to be as responsible as any

11  other copyright infringer. We think that it would be

12  inappropriate for Google, were it to do so, to seek refuge from

13  the Commission for Google apparently deliberate infringement of

14  Sun's IP rights.  A recidivist bank robber should not complain,

15  at least to the authorities, that the bank's new owner might

16  increase security measures around the bank."

17          THE COURT:  All right.

18          MS. HURST:  That was Sun's draft, Your Honor.  Then

19  what happens, Your Honor -- this is 9218 -- is Sun's outside

20  counsel, Allen & Overy -- I'm going to explain it first and

21  then hand it up -- deletes the kind of inflammatory part of

22  that answer.  And this is 9218, Your Honor.

23          THE COURT:  Okay.  So it looks like from someone named

24  Mansfield to Nemer and a lot list of other people.

25          MS. HURST:  Right.  Mansfield is Allen & Overy,

PROCEEDINGS

1    Your Honor, and that's Sun's outside counsel at the time.  So

2    the outside counsel is saying, "Here are our edits."  You can

3    see it says 60 to the end, Your Honor, and we're talking about

4    69, which incorporate comments from the folks at A&O.  And you

5    can see, Your Honor, if you look at the answer, now it's just

6    that first sentence about the unauthorized derivative work, and

7    the inflammatory recidivist bank robber language has been cut

8    down.

9              THE COURT:  All right.  What's your next document?

10             MS. HURST:  All right.  And then, Your Honor, this one

11   is 9222, which is not branded yet, but we're in the process of

12   getting that done.  I've written the number on here.

13        Mr. Nemer complains.  If you see there, from Mr. Nemer to

14   the folks at Allen & Overy and the folks at Wilson Sonsini and

15   down about two-thirds of the way, number 70, "Re Android, we

16   liked our recidivist bank robber analogy."  So Mr. Nemer at Sun

17   is complaining that they took out the inflammatory language for

18   the final submission.

19             THE COURT:  Well, who is -- what was his position,

20   Nemer?

21             MS. HURST:  He was the chief of IP at Sun at the time.

22             THE COURT:  Had he been a new person there or was

23   he -- was he a long-time person there?

24             MS. HURST:  He was a long-time employee, Your Honor.

25             THE COURT:  Okay.

PROCEEDINGS

1              **MS. HURST:**  And then, Your Honor, the final document

2    in the offer of proof is Exhibit 9221.  Now, Your Honor, you'll

3    see this is where the document finally goes across to Oracle.

4    So up until now, we've just been looking on the Sun side --

5              **THE COURT:**  There was the first one --

6              **MS. HURST:**  Except for Ms. Catz.  Exactly.  And so now

7    it finally goes across to Oracle.  This is 9221, and you see

8    that's from Ms. Hesse, who was Sun's lead lawyer on the deal at

9    the time from Wilson Sonsini, and it goes to Allen & Overy,

10   which is Sun's lawyer, and then it goes to, Your Honor, if you

11   can see, Clifford Chance and also Dan Wall, and Mr. Wall was

12   from Latham & Watkins and the Clifford Chance folks and the

13   Latham & Watkins, they represented Oracle in the deal.  So

14   finally the answers go across.

15      Ms. Hesse says, "Here is a partial on the Java questions.

16   The answers in this document are done from our standpoint

17   unless otherwise noted."

18      And, Your Honor, at this point it's become -- it's still

19   No. 69, and if you look at the answer, which is on page 8 of

20   the exhibit, Sun's view, "Sun believes that the Dalvik Virtual

21   machine plus class libraries, which together constitute the

22   Android Runtime environment, are an unauthorized derivative

23   work of Java SE."

24      And, Your Honor, when we look at the trial exhibit that

25   was offered yesterday, which was Exhibit 5295 -- I think I need

PROCEEDINGS

1    to check that.  Let me just check.  They're telling me that's

2    right.  That was the final submission to the European

3    Commission.

4            **THE COURT:**  May I see that, please.

5            **MS. HURST:**  Yes.

6            **THE COURT:**  Didn't I rule that out as hearsay?

7            **MS. HURST:**  Your Honor, what you said yesterday -- and

8    we can get the transcript.  Does somebody have a copy of 5295

9    for me?

10         What you said yesterday, Your Honor, was if we could show

11   you the version that proved that that language came from Sun

12   and not from Oracle, that we would be allowed to offer that

13   version, the one where the language came from Sun.

14         Your Honor, what I propose, given the offer of proof, is

15   that we stick with the final version, but Ms. Catz, who is

16   prepared to offer testimony regarding her foundation as to this

17   entire chain, be permitted to testify that the answer came from

18   Sun.

19         Your Honor, it could be a lot more inflammatory.  This

20   jury heard the objection.  They heard the accusation that the

21   answer really came from Oracle and not from Sun.  That's

22   clearly not true.  And Sun's position was even stronger,

23   Your Honor.  And, frankly, Mr. Schwartz came here and

24   testified, "Oh, we didn't think we had any claims."  Four times

25   he said it, Your Honor.

 1        And this absolutely disabuses the jury of any notion that

 2   at the time Sun didn't think it had a claim.  Sun was adamant

 3   that it had a claim.  But, Your Honor, given all of that and

 4   the privilege situation, what we propose to do, given the offer

 5   of proof, is that the Court admit 5295 and let the witness

 6   testify with foundation that the answer in that document came

 7   from Sun.

 8        **MS. ANDERSON:**  Your Honor, may I respond?

 9        **THE COURT:**  Wait a minute.  I still haven't seen the

10   document.

11        **MS. HURST:**  This is it, Your Honor, 5295, and the

12   answer is the answer to question 70.

13        **THE COURT:**  All right.  The key question is Sun --

14   "Please explain the conflict between Sun and Google with regard

15   to Google Android.  Sun believes that the Dalvik Virtual

16   machine plus class libraries, which together constitute the

17   Android Runtime environment, are an unauthorized derivative

18   work of Java SE."  Okay.

19        So what do you say -- this is by Oracle Corporation.  What

20   do you say to this now?

21        **MS. ANDERSON:**  Your Honor, this proposal and what just

22   happened stands just about every possible rule on its head in

23   this Court.  These documents that Oracle is trying to shoehorn

24   in -- the arguments they are trying to shoehorn in, the waiving

25   of a privilege while a witness is actually on the stand

**PROCEEDINGS**

 1   testifying is so outrageous.

 2        Oracle, on behalf of Sun, and now they're standing in its

 3   shoes, hid this material and all the subject matter that

 4   they're now waiving -- hid from discovery for years and years

 5   and years.  It has never been a secret that Google has been

 6   saying that Oracle, upon acquiring Sun, decided to change the

 7   rules that Sun publicly announced to the world would govern its

 8   APIs.

 9        That has always been the argument.  We made it at trial

10   the first time.  We're making it again here.  If Oracle wanted

11   to rely on privileged communications -- and let's make no

12   mistake.  These are on their log, as well as hundreds of others

13   in this subject area.  If they wanted to rely on these, they

14   needed to waive that privilege when discovery was underway so

15   we could test what is in this material.

16        I don't think it's an accident that these communications

17   are happening months after Oracle has announced its intention

18   to acquire this company and outside counsel are seeking to

19   favor whatever Oracle's new position is going to be on this IP.

20        That said, this stuff doesn't justify getting in a hearsay

21   communication, and that communication that we saw in 5295 is

22   unambiguously hearsay.

23        Ms. Catz can testify to what she knows about what

24   happened, just like any other witness.  But trying at the last

25   minute -- and literally last night and this morning these

1   documents were produced -- to waive a privilege in the middle

2   of trial on a subject matter as broad as whether or not

3   Android's activities were legal under the law according to Sun,

4   it's outrageous that this is happening right now.

5       Oracle should not be benefited or rewarded for this kind

6   of gamesmanship during trial.  And there are a host other

7   problems with these documents, including hearsay, and a number

8   of other things.  But first and foremost, Your Honor, if any

9   rule matters here, it's the parties haven't been allowed to do

10  this kind of thing.  This is outrageous.

11          **MS. HURST:**  Your Honor, may I respond?

12          **THE COURT:**  Yes.

13          **MS. HURST:**  Your Honor, what is outrageous is that we

14  had a motion that Mr. Schwartz could not come here and testify

15  that Sun didn't think it had any claims.  And a stipulation was

16  entered into between the parties agreeing the witness would not

17  give that testimony.

18      I personally transmitted the Court's order on that

19  stipulation to Mr. Schwartz's lawyer, Laurence Pulgram.  He

20  absolutely had notice of that order, and he got on the stand

21  and he testified three or four times, "We didn't think we could

22  do anything."  And that is absolutely false.

23      And, you know what?  Ms. Anderson just repeated the

24  accusation that this was somehow to favor Oracle, and if I need

25  to, I will go and get the Court a February 2008 document which

**PROCEEDINGS**

1   shows that Koreen Krall, who was then the top litigator within

2   Sun's legal department, believed this was a copyright

3   infringement.  And that's a document that's been produced in

4   the litigation, Your Honor.

5       This should be a search for the truth.  And the truth --

6       **THE COURT:**  Well, if that's true, then why don't we

7   open up the thing on the Lindholm privilege?  You have

8   succeeded in preventing Google from explaining away the

9   Lindholm email.  To hear their offer of proof, there is a

10  perfectly good excuse for what he really meant, but I have

11  prohibited them from doing that on account of the privilege

12  that they asserted.

13      And you're getting a huge benefit out of that, even though

14  I suspect that's being misused by your side, but that's the way

15  it is in litigation.  They asserted the privilege.  So too bad

16  for Google.  But maybe in this case, too bad for you because

17  you asserted the privilege on these documents.

18      **MS. HURST:**  All right.  So, Your Honor, my offer of

19  proof is simply for the purpose so that the witness can testify

20  to her foundation for the document --

21      **THE COURT:**  I don't think -- you know, you're doing a

22  tricky thing here.  When I said yesterday it would come in if

23  it came from Sun, what I meant was through documents that have

24  been properly designated to be used in the trial or otherwise

25  admissible evidence.  I didn't mean that you could go do some

 1   secret privileged offer of proof the jury would never see and

 2   that's never been produced to counsel, and you're springing it

 3   on them at the last minute.

 4       I'm sorry.  I'm not going to accept.  Your offer of

 5   privilege is noted for the record.  I'm rejecting it.

 6           **MS. HURST:**  Your Honor, may the witness please testify

 7   that the answer came consistent with the truth as she

 8   understands it and was involved in it at the time --

 9           **THE COURT:**  That's a privileged issue, isn't it?

10           **MS. HURST:**  The answer came from Sun on Exhibit 5295.

11   May she explain her foundation -- it's not privileged with

12   respect to the final document.  It's just a fact.  It's not an

13   attorney-client privileged communication.  It's a fact that

14   that answer came from Sun.  That's all we're asking for,

15   Your Honor.  We're not asking to admit the recidivist bank

16   robber or any of these other things.  We just want the witness

17   to be able to testify in the admission of 5295 that one

18   question and answer, that it came from Sun to rebut the charge

19   that Mr. Schwartz and Google have laid here on the table that

20   somehow this was all a creation of Oracle after the fact.

21           **MS. ANDERSON:**  Your Honor, nothing has changed about

22   5295 since yesterday.  It is still an Oracle hearsay statement

23   which is why the Court properly noted that yesterday.  This

24   witness shouldn't be allowed to read in Oracle hearsay

25   statements.

1    **THE COURT:**  I'm going to stand by the ruling yesterday

2   and not allow what you're suggesting.  That is a hearsay

3   document.  It's a self-serving -- it could be under oath.

4   People testify under oath all the time in self-serving ways.

5   It's still hearsay.

6       This document is a hearsay document offered by Oracle and

7   that's the ruling.  So I'm going to stand by that.

8    **MS. HURST:**  Your Honor, under the residual exception,

9   the witness who was responsible for the preparation of the

10  hearsay document is on the stand and can be cross-examined.

11  It's a sworn document, Your Honor.  It was filed with the

12  governmental commission, and the witness -- this witness was

13  responsible for approving it.

14      Your Honor, it has all the indicia of reliability that is

15  required to even, if it were hearsay -- which, Your Honor, we

16  submit that it was not because it was filed with a governmental

17  agency.

18      But in any event, Your Honor, certainly this is the

19  witness who could be cross-examined about the out-of-court

20  statement.

21   **THE COURT:**  Only by revealing privilege and waiver of

22  privilege.

23   **MS. HURST:**  Just the fact of the communication,

24  Your Honor, not the contents.  Just the fact that the answer

25  came from Sun.

PROCEEDINGS

 1           **THE COURT:**  I mean, you showed me some documents, the

 2   bank robber thing.  The history of how that came about, any

 3   legitimate cross-examination would have to get in there, and to

 4   be fair to Google, they would have had to have taken

 5   depositions of those people and figure out who planted the seed

 6   for the bank robber analogy and did that really come from

 7   Oracle --

 8           **MS. HURST:**  Your Honor, we tried to put the document

 9   in front of Mr. Schwartz who was the CEO of Sun at the time and

10   remarkably testified that he had no idea what was in the

11   company's European Commission filing.  That was ridiculous,

12   Your Honor.

13           **MS. ANDERSON:**  Your Honor --

14           **THE COURT:**  Wait, wait.

15           **MS. ANDERSON:**  I apologize.

16           **MS. HURST:**  He should have been able to say what his

17   own company's, you know, positions were at the time.  Mr. Bicks

18   laid the document before the witness.  He disclaimed all

19   knowledge of it.  Your Honor, this is really about

20   Mr. Schwartz.

21           **MS. ANDERSON:**  Your Honor --

22           **MS. HURST:**  He came in here and he testified

23   repeatedly that Sun didn't think they had any claim and this --

24   you know, that the charge has been laid by Mr. Van Nest in his

25   summation yesterday that, you know, it was all open and Sun

**PROCEEDINGS**

 1   didn't think it was any problem and it's just greedy Oracle,

 2   and we're going to hear more of that today, and it's just not

 3   true, Your Honor.   The jury should not be left with this false

 4   impression.

 5              **MS. ANDERSON:**  Your Honor --

 6              **THE COURT:**  Listen, I wish we could go that way on a

 7   lot of things in this case, but false impressions have been

 8   left by you, for example, with the jury about the time period

 9   of -- where the order of the Court -- the judgment of the Court

10   was that everything that Google was doing was okay.

11        Look, I can't solve every problem like that.   I'm going by

12   the Rules of Evidence in this case, and, believe me, you have

13   gotten -- you have come out way ahead on issues of preclusion

14   in this case.   The Lindholm email is the prime example where

15   the full truth about that email will probably never come out

16   and you will be the beneficiary of the way that thing was

17   written.   So I can't solve all of those problems.

18        This is a hearsay document.   It, in my mind, doesn't come

19   close to satisfying the residual exception, so I'm not going to

20   allow that.   All this stuff should have been produced long ago

21   if you were going to use it, waive the privilege, let them take

22   depositions.   It's just not fair to spring it on them at the

23   last minute.

24        Now, I want to say, though -- I want to say, though --

25   I'll just give you a hypothetical.   Let's say that it was not a

 1    privileged communication.  Let's say that Ms. Catz had -- was

 2    sitting down for coffee at Starbucks back at the time in

 3    question with somebody at -- say Schwartz even.   Somebody at

 4    Sun.  And they were talking over the business.  And the guy

 5    says, "Hey, you know, that Google and that Android thing,

 6    that's a gross -- they're bank robbers."  If it wasn't

 7    attorney-client, she could testify to that all day long.

 8    That's not a problem.  I would allow that in.

 9         But what you've shown me is -- has all been cloaked in

10    privilege, and they've never had a chance to get at it, and

11    it's just not fair.

12         So, anyway, there is still some possibility that Ms. Catz

13    or some other witness could make the same point through a

14    non -- repeating a non-privileged communication, and I would

15    allow that in, even though it would be -- ordinarily be

16    hearsay, it would come in for the limited purpose that I

17    allowed similar statements yesterday to come in, to rebut the

18    charge that this was all Oracle's idea.  So maybe you'll get it

19    in in some other way.

20         All right.  Your offer of proof has been made.

21              **MS. HURST:**  Thank you, Your Honor.

22              **MS. ANDERSON:**  Thank you, Your Honor.

23              **THE COURT:**  Wait.  Do I now need -- I still have this

24    Oracle objection to --

25              **MR. BICKS:**  Right.

PROCEEDINGS

1          THE COURT:  -- 9116.

2          MR. BICKS:  Yep.

3          MR. RAGLAND:  That is actually Google's objection.

4          THE COURT:  That's what I mean, Google's objection.  I

5   need to see the deposition.

6          MR. RAGLAND:  I have the full transcript of

7   Mr. Gupta's deposition.

8          THE COURT:  Is it marked with the key pages?  Do you

9   want me to read the whole thing?

10         MR. RAGLAND:  I thought Your Honor was asking for the

11  whole thing.

12         THE COURT:  I am asking for the it, but mark the page

13  where the stonewalling takes place.

14         MR. RAGLAND:  I'll get a Post-it and I can do just

15  that.

16         MR. BICKS:  I gave it to you, Your Honor.

17         THE COURT:  I want the whole thing plus this page.

18         MR. RAGLAND:  Right.  I'll do that.

19         MR. BICKS:  Your Honor, can I just -- just to

20  refresh --

21         THE COURT:  You need to refresh -- I don't remember

22  any of this.

23         MR. BICKS:  That's totally understandable.  This was

24  an issue that we dealt with with Mr. Schwartz.  Remember, we

25  discussed this testimony.  You told me to go back and tell the

PROCEEDINGS

1    lawyer who was involved, you know, to -- how they should handle

2    this in the future, and we -- I actually cross-examined -- you

3    asked me to examine one of the Kekker lawyers, Mr. Purcell

4    here, about what -- as you can see from the back and forth an

5    objection was made and the lawyers kind of left the issue open

6    and apparently nobody came back and dealt with it.  There was

7    no privilege document logged or no clawback or anything like

8    that, and the conclusion you reached after we went through this

9    was that I could raise it with Mr. Schwartz.  And then when

10   Mr. Schwartz got on the stand, I put a document in front of

11   him.  It's e-mailed to every -- basically every executive in

12   the company, and then as with the EC document, you know, he had

13   no memory or knew absolutely nothing --

14           THE COURT:  Show me the document that you're talking

15   about.

16           MR. RAGLAND:  I can hand it up, Your Honor.  It's the

17   last two pages.  And actually --

18           THE COURT:  Give this back to counsel.

19           MR. RAGLAND:  I need to respond to that, if I may,

20   Your Honor.

21           THE COURT:  Wait a minute.  Show me the relevant part.

22           MR. RAGLAND:  It's the next to the last page.  And I'm

23   afraid I don't have a copy of it in front of me, but I believe

24   it's the next to the last page, and there is a public statement

25   and a private statement.  It's the private statement,

PROCEEDINGS

 1   Your Honor, from Sun legal that was never communicated to the

 2   outside world --

 3          THE COURT:  Wait a minute.  This document was produced

 4   in discovery; right?

 5          MR. RAGLAND:  Yes.

 6          THE COURT:  But then when Mr. Purcell tried to examine

 7   on it, the witness was instructed not to answer, and then no

 8   one ever made a follow-up motion.  Is that the --

 9          MR. RAGLAND:  Your Honor, what happened actually is

10   Mr. Purcell testified -- is that counsel for Oracle said it's

11   privileged.  You can't ask questions on it.  Mr. Purcell and

12   Google took that in good faith and we treated it as privileged.

13   And then it showed up on the exhibit list for trial, and we

14   filed a motion previously about it, and we weren't allowed --

15   we, of course, didn't go dig it out of our files to ask

16   questions of other witnesses because that would be improper.

17          THE COURT:  All right.  So why isn't that -- if you

18   did instruct him not to answer, isn't that the end of it?

19          MR. BICKS:  It's not the end of it, Your Honor,

20   because if you look at the transcript of the deposition, the

21   lawyers had a discussion off the record.  Mr. Purcell comes

22   back on right after and says, "I'm not going to ask you about

23   this.  We'll take this up later."  And things stopped at that

24   point.

25          And I think what happened clearly is you had a lawyer who

1     saw something sprung at a deposition, was trying to be careful,

2     and if you look at this statement, it's not a privileged

3     statement.  That's the bottom line.  And it's going to be

4     consistent, as Your Honor will see during the examination of

5     the witness where this will come up -- there will be multiple

6     references in documents where Sun is making it clear that there

7     are problems with what Google is doing.  This just happens to

8     be a document, a briefing document --

9          **THE COURT:**  Don't you have some that aren't

10    encumbered -- it is true that your own lawyer told him not to

11    answer the question, said it should be redacted, should not

12    have been produced, and then Mr. Purcell, as a good citizen,

13    says, "Okay, we'll put that to one side."  And now you're

14    blaming him for not having a made a motion when you're the one

15    that started the problem.

16         **MR. BICKS:**  I'm not -- I'm saying, Your Honor, that as

17    we -- we've all been in that situation where somebody saw

18    something and was trying to be careful and it got left open at

19    the deposition.  Nobody then wrote and said "Give me back all

20    these documents, we're putting them on a privilege log."  None

21    of that ever happened.  And my fundamental point is, Judge, if

22    you look at the statement, it's not a privileged statement.

23         **THE COURT:**  But then why did your lawyers say it

24    should have been redacted?

25         **MR. BICKS:**  I think it's somebody being careful,

PROCEEDINGS

 1  overly careful probably at a deposition.

 2          THE COURT:  But who should bear that burden?  Is it

 3  the party who was there?  Mr. Purcell was perfectly prepared to

 4  go ahead and ask his questions, and it looks like

 5  Ms. Rutherford said, "No, you can't do that.  It shouldn't have

 6  been produced."  Who should bear the burden of this problem

 7  now?

 8          MR. BICKS:  Well, as I say, Your Honor, there was

 9  never any kind of a motion -- typically the examiner will start

10  asking questions.  You know, go into it, have a privilege

11  invoked, and if they want to get into the document, then

12  they'll make some kind of a motion.

13      Nothing like that was done.  As I said, there was no

14  clawback or anything to that effect.  And, you know, I don't

15  believe this is a privileged statement.

16          THE COURT:  Well --

17          MR. BICKS:  And, Your Honor --

18          THE COURT:  -- probably it wasn't.  That makes it all

19  the worse.  Yes.  Go ahead.

20          MR. RAGLAND:  Well, first, the idea that there is no

21  clawback at the deposition, you heard Mr. Purcell testify under

22  oath here that he was told it was privileged, not to ask

23  questions about it.  He said okay.

24          THE COURT:  Let's just -- to be precise,

25  Ms. Rutherford said, "It looks like it has something in it that

1    should be redacted actually.  It says, 'Private statement not

2    to be used publicly by Sun legal'."  The witness says, "Yes."

3    Ms. Rutherford, "I think that probably should have been

4    redacted in whatever version of this was produced."

5    Mr. Purcell, "Okay.  Do you want to take a minute and decide

6    how to proceed?  Let's go off the record."  They go off the

7    record.  And then they go back on the record, and Mr. Purcell

8    says, "Mr. Gupta, we're going to put Google 185 aside for a

9    second.  We may not get back to it, but we'll be deciding that

10   in due course."  So then they go on to Exhibit 186.

11              MR. BICKS:  Right.

12              MR. RAGLAND:  Right.  And, Your Honor, you remember

13   you called Mr. Purcell --

14              THE COURT:  Yeah.  I remember now.

15              MR. BICKS:  Right.

16              MR. RAGLAND:  So the issue, Your Honor, is that he

17   testified that Ms. Rutherford said it's privileged and don't

18   ask questions, and he took that in good faith and did so.

19        I have to say also the idea that this is not a privileged

20   document, it says Sun legal not to be said publically.  That's

21   private Sun legal.  It's absurd that that's not a privileged

22   document.

23        It's also hearsay.  It's bald hearsay and it's 403 because

24   it was never communicated to the outside world.  It was

25   internal Sun and so it absolutely cannot go to Google's

1    understanding or state of mind.  So it's 403 on that alone.

2    It's hearsay and it's privileged and we were forbidden from

3    asking questions --

4            THE COURT:  Well, if it weren't the privileged issue

5    and if it were properly sponsored, it would come in to show

6    that the idea of suing Google had already surfaced within Sun

7    because -- to contradict what -- I think for purposes of that

8    limited purpose, it would be admissible, but it was with -- the

9    questioning on this -- look, life is too short.

10       You told him not to ask questions.  You can't get out of

11   that.  You're stuck with the instruction not to answer and you

12   blocked Mr. Purcell from asking questions.  And it's true, he

13   didn't follow up, but you shouldn't put the burden on him.  The

14   problem came up because your side decided this was privileged

15   and would not allow questions about it, so we're just not going

16   to use it.  I'm sorry.  You can get at it some other way, but

17   not through this document.

18       So 9116 is -- it's the same as the Lindholm email.  Well,

19   no.  Actually, that gets to be used, but this one -- this

20   one -- this -- no.  This particular part that -- the sentence

21   in question that should have been redacted according to -- that

22   cannot be used.

23           MR. RAGLAND:  That's all we're asking for, Your Honor.

24       There are a few other issues with exhibits related to Mr.

25   Civjan.  Given the hour, we can take that up at a break.

 1          THE COURT:  We need to move on with the jury now.  Can

 2    we bring back the witness and the jury.

 3          MS. HURST:  Your Honor, I think we left with you, the

 4    Court, Exhibit 5295.

 5          THE COURT:  While the jury is coming -- good morning,

 6    Ms. Catz.  While the jury is coming back, did you all get the

 7    stipulation on the 62 methods yet?

 8          MS. HURST:  We did.

 9          MR. VAN NEST:  Yes, Your Honor.

10          THE COURT:  Why don't you hand that up to me.

11       (Proceedings were heard in the presence of the jury:)

12          MS. HURST:  Your Honor, this is the stipulation.  We

13    would suggest it be read at the time of Mr. Reinhold's

14    testimony because he will be testifying about it.

15          THE COURT:  Remind me at that time.

16       Welcome back, everyone.  Be seated.  Good morning to our

17    jury as well.

18       Good morning to Ms. Catz.  Welcome back.  I remind you,

19    you are still under oath.

20       Are you all set in the jury box with your notepads and

21    pens poised?  Excellent.  Okay.  You may continue.

22          MS. HURST:  Thank you, Your Honor.

23          **SAFRA CATZ**, **PLAINTIFF WITNESS, PREVIOUSLY SWORN**

24              **DIRECT EXAMINATION**  **(resumed)**

25

CATZ - DIRECT RESUMED / HURST

1  **BY MS. HURST:**

2  **Q.**   Ms. Catz, we looked yesterday at the email that

3  Mr. Schwartz sent that mentioned battles with Google Android.

4  Can you just remind the jury what Mr. Schwartz told you about

5  that?

6            **MS. ANDERSON:**   Objection.   Hearsay again, Your Honor.

7            **THE COURT:**   Was this already testified to?

8            **MS. HURST:**   Yes.   It was offered for the limited

9  purpose that the Court gave for the instruction yesterday to

10  respond to Mr. Schwartz.

11            **THE COURT:**   Is the answer going to be the same?

12            **MS. HURST:**   Yes.

13            **THE COURT:**   All right.   Go ahead and repeat the

14  answer.

15       Objection overruled.   It will be received for this limited

16  purpose.

17            **THE WITNESS:**   Mr. Schwartz told me it was an

18  unauthorized unlicensed fork of Java SE.

19  **BY MS. HURST:**

20  **Q.**   Ms. Catz, since acquiring Sun, what has Oracle done with

21  respect to the Java platform?

22  **A.**   We've invested a lot in the Java platform.   We've hired

23  engineers.   We've had hundreds of engineers working on it to

24  continue to enhance it.   We've actually had two new versions,

25  Java 7 and Java 8.   Both versions have come out since we took

**CATZ - DIRECT RESUMED / HURST**

1   over.

2      We have -- we have really expanded the entire educational

3   network of Java.  We teach Java to high school teachers.  We

4   share Java with universities, not only in the United States,

5   but around the world, so we work very extensively through the

6   Oracle Academy teaching Java.

7      We market Java.  We use Java and we support the big show

8   JavaOne which is now even larger than it's ever been, which is

9   a big show for developers, for Java developers, to meet and

10  work, and of course we run the JCP, the Java Community Process.

11  **Q.**   And can you approximate for the jury how much Oracle has

12  spent in all of those efforts?

13  **A.**   Hundreds of millions of dollars.

14  **Q.**   Ms. Catz, how would you characterize the significance, if

15  any, of intellectual property protection to Oracle?

16      **MS. ANDERSON:**  Objection, Your Honor, to the extent it

17  calls for a legal opinion.

18      **MS. HURST:**  It's for the witness' understanding and

19  her business, Your Honor.

20      **THE COURT:**  Well, maybe it's a problem, but it's a

21  vague question.  I'll let her answer, and we'll see how

22  problematic the answer is.

23      Stay away from legal things, but otherwise, you may

24  answer, Ms. Catz.

25      **THE WITNESS:**  All right.  Thank you.

1    So our whole business is based on the ideas and work that

2   come out of our programmers' and employees' heads and that they

3   type into computer code.  And we spend five and a half billion

4   dollars a year on research and development, which is those

5   brilliant ideas coming out of our employees' minds, that they

6   write down as computer code.

7    And what happens is though it's very, very hard and

8   expensive to build it, it's actually very easy to just make a

9   copy.  It's very, very simple to make all sorts of unauthorized

10  copies.  And intellectual property is really an -- and

11  intellectual property rights is what protects those brilliant

12  ideas as expressed in computer code.  If it wasn't for that, we

13  wouldn't have any way of stopping people from just taking

14  stuff.

15  **BY MS. HURST:**

16  **Q.**   And to your knowledge as a business person, is Oracle

17  alone in feeling this way about the importance of copyright and

18  software?

19       **MS. ANDERSON:**  Objection --

20       **THE WITNESS:**  No.

21       **MS. ANDERSON:**  Foundation, speculation.

22       **THE COURT:**  Look, I'm going to allow the question.

23    Here's what's going on, ladies and gentlemen of the jury.

24  Both sides have made their speeches about -- well, the other

25  side, Google, made -- gave some of their witnesses the exalted

1   open source and all of that and the values behind open source

2   and so you got to hear that, and now we're going to hear the

3   other side which is the value of protecting intellectual

4   property.

5        These are cosmic issues that are in play, and I'm not

6   trying to diminish their importance, but both sides are going

7   to have their say, so let's -- I'm going to allow Ms. Catz to

8   answer that question.

9        So please answer the question.

10       **THE WITNESS:**  Most of the software industry, including

11  the business software association, which works very, very

12  hard -- it's our trade group that is made up of nearly all of

13  our competitors, and they all agree that it's very important to

14  have the intellectual property, the brilliance that comes out,

15  protected so that companies like ours and others can license

16  that software to customers, receive money for it so they can

17  invest back into it to build new software.  The entire software

18  industry is based on this.

19  **BY MS. HURST:**

20  **Q.**   All right.  You mentioned a license, Ms. Catz.  What's a

21  license?

22  **A.**   A license is actually a permission to use or copy the

23  software.  It's written in a written document that actually

24  lays out in quite a lot of detail exactly what the copier is --

25  what their rights are, what they're allowed to do.  And that's

**CATZ - DIRECT RESUMED / HURST**

1    actually what we do with our product.  We license it.  It's not

2    like a car where you just pick the car up and you hand it to

3    someone.  They give you money.

4        Because our software is all about taking a copy of what

5    we've created, a license is -- really explains in writing

6    exactly what the user is allowed to do.

7    **Q.**  All right.  Ms. Catz, let's turn to a different subject.

8    In the course of your business at Oracle, have you learned to

9    what extent, if any, Android has had an effect on Sun and

10   Oracle?

11   **A.**  Well, Android's had a very negative effect on Sun Oracle

12   in a number of ways.

13   **Q.**  Would you describe those, please.

14   **A.**  Sure.  First, it's -- it's basically forked the Java whole

15   principle, the whole Java community has been forked, meaning

16   split into two because the whole idea of Java, as I mentioned

17   yesterday, is write once, run on any platform.  That's really

18   the -- the bottom line.

19       And that meant that for developers, they could write it

20   once, brilliant idea, write it once, and it would run on all

21   sorts of different systems, which made it much more functional,

22   much -- not functional.  Much more useful to those developers

23   because they could -- they could write it once and it would run

24   anywhere.

25       Android -- once you write it in Android, you can't run it

1    on anything but Android.  So -- and if you write it in Java,

2    you can't write it in Android.  Now, that's one side of it.

3         Secondly, many of those customers that we used to license

4    to to take a copy, to take a licensed copy like Samsung or ZTE

5    or Motorola, just different licensees, BlackBerry, etc., they

6    don't need a license -- they don't take a license from us

7    anymore because they use Android, which is free, and they end

8    up using Android instead of actually paying us for a copy of --

9    of our software.

10   **Q.**   All right.  Ms. Catz, let me have you look at Exhibit 5961

11   that's before you there.  And do you recognize Exhibit 5961?

12   **A.**   Yes.  This is -- this is one of the embedded business

13   unit's budget -- budget presentation that was given to us.

14   **Q.**   And how are those budget presentations used within Oracle?

15   **A.**   They're used as our way of planning for next year.

16   They're also used to educate us on what is going on in the

17   business.

18   **Q.**   And are those budgets approved by the board of Oracle?

19   **A.**   Yes.  They actually go directly to -- after they're

20   approved by the Executive Management Team, they're actually

21   presented directly to the Board of Directors.

22            **MS. HURST:**  Your Honor, I offer Exhibit 5961.

23            **MS. ANDERSON:**  Objection.  Hearsay, Your Honor.

24            **THE COURT:**  May I see the document?  The objection is

25   sustained so far.

 1   BY MS. HURST:

 2   **Q.**   Ms. Catz, is the budget review a regularly-conducted

 3   activity at Oracle?

 4   **A.**   Yes, it is.

 5   **Q.**   And do you do it every year?

 6   **A.**   Yes, we do.

 7   **Q.**   Is Exhibit 5961 part of your budget review for the fiscal

 8   year 2011?

 9   **A.**   Yes.

10   **Q.**   Was that presented to the management group of Oracle in

11   preparation for adoption by the Board of Directors of the

12   annual budget for fiscal year 2011?

13   **A.**   Yes, it was.

14        **MS. ANDERSON:**   Objection.  Leading and --

15        **THE COURT:**   Sustained.  All of these are leading.

16        **MS. HURST:**   Your Honor, it's foundational for the

17   admission of a document.

18        **THE COURT:**   When it's important, you are not supposed

19   to lead.

20        There are too many slide shows in that document.  If it

21   was just a financial statement, I would allow it, but there are

22   too many slide shows in that document to qualify it as a

23   business record.

24        **MS. HURST:**   Your Honor, may we offer one page from the

25   document?  I will point the Court to that page.

**CATZ - DIRECT RESUMED / HURST**

1    **THE COURT:**  Yes.  Please do that.

2    **BY MS. HURST:**

3    **Q.**   Ms. Catz, would you turn to page 21 of the exhibit.

4           **THE COURT:**  Objection still sustained.  That's a

5    speech.  It's not a business record.  That's a speech.  So I'm

6    sorry.  You'll have to --

7    **BY MS. HURST:**

8    **Q.**   Ms. Catz, in the budget review process for fiscal year

9    2011 -- first of all, was there anything significant about that

10   particular year?

11   **A.**   Yes.  It was going to be the first full year that we

12   actually owned Sun.  We were -- we were -- we'd only owned them

13   a few months previously.  This would be the first full year

14   going forward.

15   **Q.**   All right.  And were presentations made to you related to

16   the Java business in that process?

17   **A.**   Yes.  It was made to me directly.

18   **Q.**   All right.  And what did you learn about the status, if

19   anything -- about the status of the Java business as part of

20   the budget review in that first year?

21   **A.**   What we learned is -- and what I learned was that the Java

22   business was being very heavily and negatively impacted by

23   Android.

24   **Q.**   And can you explain that, please.

25   **A.**   Yes.  The -- the licensing business that this had always

**CATZ - DIRECT RESUMED / HURST**

1  been going on was disappearing because a number of the -- what

2  were called OEMs or handset manufacturers were in fact

3  adopting -- had adopted Android and were not licensing Java

4  anymore.

5  **Q.**   And how, if at all, did that affect the profitability of

6  the Java business?

7  **A.**   It had a very negative impact.  Companies like Samsung

8  that would license a $40 million contract were down to -- would

9  be licensing a million dollars.

10  **Q.**   How did that affect profitability?

11  **A.**   Well, profitability -- when revenues are here and expenses

12  are over here, this period -- this piece in between is your

13  profitability.  But when your revenues go down but your

14  expenses are still high, still the same, your profitability

15  goes away.

16  **Q.**   All right.  Did you ever have occasion to become aware of

17  a situation with respect to licensing in Amazon?

18  **A.**   Yes.

19  **Q.**   What was the situation with respect to Amazon licensing?

20  **A.**   So Amazon for the Kindle -- it's a reader.  For the Kindle

21  Reader had used Java to create that Kindle Reader for many

22  years.  And then they had another product called the Kindle

23  Fire and that one they used Android and so they didn't license

24  Java at that time.

25  **Q.**   And how did this situation come to your attention?

**CATZ - DIRECT RESUMED / HURST**

1  **A.**   Because the way we look at different discounts and handle

2  them with different customers comes through an approval process

3  that came -- comes to me, and so I was -- I was made aware

4  through that process that we -- that -- that -- that basically

5  Amazon was going to do the Kindle Fire with Android and that

6  they were now considering a new product called the Paperwhite.

7  It's called the Amazon Paperwhite, and they were considering

8  whether to use Java for that or Android.

9  **Q.**   And what happened?

10 **A.**   Well, in order to compete with them, we ended up giving

11 them like a 97 and a half percent discount for the Paperwhite.

12 So instead of what we would have historically charged them,

13 because our competition was free, they -- they -- we had to

14 offer them a 97 plus basically couple cents on the dollar price

15 from the list price.

16 **Q.**   And overall, Ms. Catz, if you know, how have Oracle's Java

17 licensing revenues in phones, mobile phones and similar

18 devices, fared since Android?

19 **A.**   They've done very, very poorly.

20 **Q.**   Now, Ms. Catz, you do have the open source version of

21 Java.  Is that the reason for the decline in revenues?

22         **MS. ANDERSON:**  Objection.  Calls for expert opinion.

23 This witness was not disclosed on that, Your Honor.

24         **THE COURT:**  Well, those are two different points.  Was

25 she disclosed on this subject?

**CATZ - DIRECT RESUMED / HURST**

1          **MS. HURST:**  No, Your Honor, but this is part of her

2    ordinary business and understanding at the time, which was

3    the -- I believe the rule we heard last week.

4          **THE COURT:**  Does she actually know the answer from her

5    personal knowledge, or is this something that's been fed to her

6    by somebody else?

7          **MS. HURST:**  Personal knowledge, Your Honor.

8          **THE COURT:**  All right.  I'm going to let her answer

9    then.

10         **THE WITNESS:**  The phones that -- that are in use by

11   these other handset users use Android.  They don't use OpenJDK.

12   They are Android phones.

13   **BY MS. HURST:**

14   **Q.**   Now, Ms. Catz, we looked on the timeline yesterday between

15   the decision to acquire Sun and the closing of the deal.  Did,

16   at some point in that process, Oracle consider whether it might

17   release a phone?

18   **A.**   Well, we considered a number of things, but we decided

19   that releasing a phone didn't make sense for us.

20   **Q.**   Why not?

21   **A.**   Well, as far as an actual phone, we were not in that

22   business and that wouldn't have made sense for us.

23   **Q.**   And what about more advanced phone software?

24   **A.**   Well, as far as a phone platform, we looked at that very

25   hard and realized that Android was just too far out ahead in

**CATZ - DIRECT RESUMED / HURST**

1   the market and that it would be very difficult to compete with

2   free, especially since they were using our software in it.

3   **Q.**   All right.  So what was your decision?

4   **A.**   We decided not to do it.

5   **Q.**   Is it true, Ms. Catz, that there are some Oracle products

6   that work on Android?

7   **A.**   Yes.

8   **Q.**   And --

9   **A.**   It is true, because Android has so taken over the handset

10  market, if our applications didn't run on Android, our

11  customers simply wouldn't be able to use some of our products,

12  so we -- we've ended up having to make them function on -- on a

13  number of devices, including Android devices.

14  **Q.**   Ms. Catz, one of the considerations that the judge has

15  instructed the jury is relevant to fair use is what would

16  happen if everyone could do what Google is doing.  What are

17  your thoughts with respect to Oracle's business, if that were

18  the case?

19          **MS. ANDERSON:**  Objection, Your Honor, to the extent

20  it's calling for a legal evaluation.

21          **MS. HURST:**  Just as a business person, Ms. Catz.

22          **THE WITNESS:**  Well --

23          **THE COURT:**  Well, if the objection is legal

24  evaluation, that objection is overruled.

25      Go ahead.  Answer the question.

1              **THE WITNESS:**  If everyone took a copy of our software

2    without actually licensing it, we wouldn't have a business

3    anymore.  We simply wouldn't be able to afford to invest and --

4    into the software industry if everyone else did what Google

5    did, which is just take a copy of the software without a

6    license.  We wouldn't have a business.

7    **BY MS. HURST:**

8    **Q.**   Ms. Catz, did there ever come a time completely outside

9    the context of this lawsuit when you had an interaction with a

10   Google executive about Google taking a license?

11   **A.**   I'm sorry.  Could you ask me that again?

12   **Q.**   Sure.  Was there ever a time when, completely outside the

13   context of this lawsuit, in a social setting you had an

14   interaction with a Google executive about Oracle's desire for

15   Google to take a license?

16   **A.**   Yes.  Actually I was at a Bat Mitzvah and -- which is like

17   a Bar Mitzvah, but for girls -- and Kent Walker, their general

18   counsel, came up to me and said, "You know, Safra, Google's a

19   really special company, and the old rules don't apply to us."

20   And I immediately said, "Thou shalt not steal."  It's an oldie

21   but a goodie.

22   **Q.**   When was this conversation?

23   **A.**   This was in March of 2012.

24              **MS. HURST:**  Pass the witness.

25              **THE COURT:**  All right.  Let's go to cross-examination.

**CATZ - CROSS / ANDERSON**

1        **MS. ANDERSON:**  Thank you, Your Honor.  Just one

2    minute.  I'll set stuff up here.

3                        <u>**CROSS-EXAMINATION**</u>

4    **BY MS. ANDERSON:**

5    **Q.**   Good morning, Ms. Catz.  My name is Christa Anderson.  I'm

6    counsel to Google.

7    **A.**   Hello.

8    **Q.**   I have a few questions for you.

9         You said you're the Co-Chief Executive Officer of Oracle;

10   correct?

11   **A.**   Yes.

12   **Q.**   That's the parent of Oracle America; right?

13   **A.**   Yes.

14   **Q.**   And Oracle America is the new name for Sun today; right?

15   **A.**   It is.

16   **Q.**   All right.  And as Chief Executive Officer, you're called

17   upon to speak on behalf of your company from time to time;

18   right?

19   **A.**   Yes.

20   **Q.**   You're a top executive of a very large corporation; true?

21   **A.**   Yes.

22   **Q.**   And you make those statements to employees of the company;

23   right?

24   **A.**   Yes.

25   **Q.**   And to the public in general; true?

**CATZ - CROSS / ANDERSON**

1    **A.**    Sometimes.

2    **Q.**    And you make representations to government about the state

3    of your company; true?

4    **A.**    That's correct.

5    **Q.**    And you know that people count on you as a Chief Executive

6    Officer to make truthful statements in those statements to the

7    government and the public; right?

8    **A.**    Yes.

9    **Q.**    And you agree that people in the world should be able to

10   rely on the statements that you've made as Chief Executive

11   Officer; right?

12   **A.**    Yes.

13   **Q.**    As a general matter, don't you think it's fair that people

14   in the world should be able to rely on the truthfulness of the

15   representations made by chief executive officers of companies;

16   right?

17   **A.**    It would depend on what they are.

18   **Q.**    You think it's important they should be able to rely on

19   the truth --

20          **THE COURT:**  Well, I think --

21          **MS. ANDERSON:**  -- true?

22          **THE COURT:**  Why don't we move to whatever she said in

23   the past.

24          **MS. ANDERSON:**  Happy to.

25   **Q.**    I just want to make sure, there is nothing special about

CATZ - CROSS / ANDERSON

1  you as CEO in terms of the importance that people be able to

2  rely on the truth of what you say; right?

3  A.    Yeah.   It would depend on what I'm talking about.

4  Q.    So you're aware that when CEOs like yourself tell the

5  world about what they are giving away for free, the world

6  should be able to rely on those statements; true?

7  A.    It really depends on the context.   Why don't you show me

8  what you want to --

9  Q.    So you're not sure that's true?

10         THE COURT:  Ms. Anderson, this is too argumentive.

11         MS. ANDERSON:  I would be happy to move on.

12         THE COURT:  It would be much better to move to

13  whatever the statement is and then we can argue over that one.

14  BY MS. ANDERSON:

15  Q.    There have been a lot of statements in this case by chief

16  executive officers, including yourself; right?

17  A.    This is the second day, so I don't know what's been going

18  on here.

19  Q.    All right.  Mr. Ellison, you said, was Chief Executive

20  Officer of Oracle before you; right?

21  A.    Yes, he was.

22  Q.    And he was the Chief Executive Officer of Oracle when

23  it -- when it agreed to acquire Sun; right?

24  A.    Yes.

25  Q.    And you also said that Jonathan Schwartz was the Chief

**CATZ - CROSS / ANDERSON**

1  Executive Officer of Sun when Oracle agreed to purchase Sun;

2  right?

3  **A.**   Yes.

4  **Q.**   All right.  Now, you, as a representative of Oracle that

5  owns Oracle America, know that you keep business records of Sun

6  from the past; true?

7  **A.**   Yes.

8  **Q.**   Some of those records were the Certificate of Registration

9  of the copyrights at issue in this case; right?

10  **A.**   That's right.

11  **Q.**   And you also keep what are known as 10K reports from the

12  times of Sun; right?

13  **A.**   Yes.  Annual statements.

14  **Q.**   And 10Ks are important statements made by a company like

15  Sun or like Oracle to the Securities and Exchange Commission

16  about the current state of the business of that company; right?

17  **A.**   Yes.

18  **Q.**   All right.  And you reviewed these statements in

19  performing your due diligence in acquiring Sun; right?

20  **A.**   I did review them.

21  **Q.**   All right.

22  **A.**   Some of them, not all of them.  But some of them.

23  **Q.**   Thank you.

24       Your Honor, may I approach the witness?

25            **THE COURT:**  Yes.  Why don't we remove that other stack

CATZ - CROSS / ANDERSON

1   of documents --

2           MS. ANDERSON:  I'd be happy to.

3           THE COURT:  -- so that the witness will have a clear

4   bench.

5   BY MS. ANDERSON:

6   Q.   You've seen Exhibit 971 before, right, Ms. Catz?

7   A.   Is it the one in this package?  Should I open this

8   package?

9   Q.   Oh, yes, please.  Go ahead and open this up.  Thank you

10  of.

11       Have you seen this document before, Exhibit 971, the form

12  10K for Sun Microsystems for the period ending June 30, 2008?

13  A.   I probably looked at parts of it for sure.

14          MS. ANDERSON:  Your Honor, we move in evidence Exhibit

15  971.

16          MS. HURST:  It's an awfully large document,

17  Your Honor.  I wonder if we could just have the pages that are

18  relevant to the witness' examination.

19          MS. ANDERSON:  We would be happy to excerpt it,

20  Your Honor, but this is the entire form of 10K, and we will be

21  talking about just a few pages of it.

22          THE COURT:  Do you have an objection to it as is,

23  Ms.Hurst?

24          MS. HURST:  Your Honor, that's fine.  No objection.

25          THE COURT:  971 received in evidence.

1   (Trial Exhibit 971 received in evidence)

2   **BY MS. ANDERSON:**

3   **Q.**   So this is one of the documents that Sun Microsystems

4   submitted to the Government and the public about the state of

5   its company for that fiscal year ending June 30, 2008; right?

6   **A.**   Yes.

7   **Q.**   All right.  If you would, please, ma'am, please turn to

8   page 14 of this report.  And there are numbers at the bottom

9   that tell you page 14 of 592 pages.  Do you see that?

10  **A.**   Yes, I do.

11  **Q.**   Thank you.  And let's take a look at the statements by Sun

12  that start about a third of the way down the page starting with

13  the words "we have licensed significant elements of our

14  intellectual property."  Do you see that paragraph?

15  **A.**   Yes.

16  **Q.**   All right.

17       And, Mr. Dahm, if we could have that -- yes.  Those two

18  paragraphs.  Thank you.  And blow that up just a little bit.

19  That would be great.

20       Let's take a look at the first sentence there:  "In June

21  of 2008, Sun represented to the public and the government that

22  Sun has licensed significant elements of our intellectual

23  property, including our Solaris operating system and Java

24  technology as open source software and intend to license

25  additional intellectual property in the future under open

 1   source licenses which could reduce a competitive advantage we

 2   derive from this intellectual property," end quote.  Do you see

 3   that?

 4   **A.**   Yes, I do.

 5   **Q.**   All right.  And you knew that when Oracle acquired Sun;

 6   right?

 7   **A.**   Yes.

 8   **Q.**   All right.  And then drawing your attention down a little

 9   father in this paragraph to the sentence that starts, "We have

10   also released our Java platform, do you see that?  It's like

11   the second sentence, I believe.

12   **A.**   Yes.

13   **Q.**   Do you see that?  So in 2008, Sun represented to the world

14   and the government that, "We have also released our Java

15   Platform Standard Edition, Java SE; Enterprise Edition, Java

16   EE; and Micro Edition Java Technologies under an open source

17   license.  Although open source license models vary, generally

18   open source software licenses permit the liberal copying,

19   modification and distribution of a software program allowing a

20   diverse programming community to contribute to the software.

21   As a result of such release, there could be an impact on

22   revenue related to this intellectual property and we may no

23   longer be able to exercise control over some aspects of the

24   future development of this intellectual property."  Do you see

25   that?

**CATZ - CROSS / ANDERSON**

1    **A.**    Yes.

2    **Q.**    And Oracle knew that when it acquired Sun; right?

3    **A.**    Yes.

4    **Q.**    And drawing your attention down a little farther in this

5    paragraph, the sentence that starts, "In addition, disclosing

6    the content," do you see that?  Towards the end of this

7    paragraph.  "In addition disclosing the content of our source

8    code."  Do you see that?   That would be the second-to-the-last

9    sentence?

10   **A.**    I see it.

11   **Q.**    Thank you.  Sun stated, "In addition disclosing the

12   content of our source code could limit the intellectual

13   property protection we can obtain or maintain for that source

14   code or the products containing that source code and could

15   facilitate intellectual property infringement claims against

16   us."  Do you see that will in knowledge?

17   **A.**    Yes.

18   **Q.**    So Oracle knew that when it acquired Sun; right?

19   **A.**    Yes.

20   **Q.**    Let's turn our attention to the testimony you gave

21   yesterday on a subject of Oracle's acquisition.  You made some

22   comments suggesting that Oracle's acquisition of Sun saved

23   jobs.  Do you generally recall that testimony?

24   **A.**    Yes.

25   **Q.**    But you know that after the acquisition, Oracle was

**CATZ - CROSS / ANDERSON**

1   criticized in the press for going back on its promises to

2   retain Sun employees; right?

3   **A.**   I actually don't remember that.

4   **Q.**   So did you read an article in June of 2010 entitled

5   "Oracle SEC Filing Gives Indication Of Much Larger sun Layoff

6   Plan"?

7   **A.**   I don't remember that, but you can show it to me, if you

8   want.

9   **Q.**   Were you --

10  **A.**   Because we hired people.

11  **Q.**   Okay.  Were you familiar with the official Securities and

12  Exchange Commission filings of Oracle Corporation in 2010 about

13  the subject of Sun?

14  **A.**   Yes.

15  **Q.**   Okay.  So you're familiar with one of those filings, the

16  8K filed in May of 2010 in which Sun informed the government --

17  excuse me -- in which Oracle informed the government about the

18  Sun restructuring plan that was in connection with the

19  integration of Sun into Oracle.  Do you remember that

20  generally?

21  **A.**   Yes.

22  **Q.**   And in that document, Oracle was informing the government

23  that it was making amendments to the plan because it was going

24  to get more expensive in relation to layoffs.  Do you remember

25  that?

**CATZ - CROSS / ANDERSON**

1    A.    We were doing our reorganization within Oracle Sun.

2    Q.    And specifically, Oracle informed the government that that

3    amendment further reduces the size of Oracle's combined

4    workforce.  Do you remember that?

5    A.    Yes.  Oracle's combined workforce.

6    Q.    And do you remember that Oracle estimated the cost related

7    to that amendment would be an additional $675 million to $825

8    million related to improving efficiencies in the operation;

9    right?

10   A.    Yes.

11   Q.    Including the layoffs; right?

12   A.    Yes.

13   Q.    Thank you.

14        Let's turn to the time period before the actual Sun

15   acquisition.  It is correct that you were never employed by Sun

16   Microsystems prior to acquisition by Oracle; true?

17   A.    That's correct.

18   Q.    And you were never a representative of Sun during any of

19   the communications between Google and Sun; right?

20   A.    Can you say that one more time?

21   Q.    Sure.  You did not participate in any negotiations between

22   Google and Sun prior to acquisition; right?

23   A.    That's correct.

24   Q.    You have no personal knowledge of anything that the Sun

25   representatives told Google prior to Oracle's acquisition of

**CATZ - CROSS / ANDERSON**

1   Sun; right?

2   **A.**   Do you mean I wasn't there?

3   **Q.**   Yes.  That's correct.

4   **A.**   Okay.  I was not there.

5   **Q.**   You were not there, so you don't know what happened;

6   right?

7   **A.**   I was not there.

8   **Q.**   Thank you.

9        But you are aware that after acquiring Sun and in August

10  of 2010, Oracle sued Google in this case; right?

11  **A.**   We did sue Google, yes.

12  **Q.**   And Oracle sued after it had evaluated and decided not to

13  pursue developing a Java phone; right?

14  **A.**   That's correct.

15  **Q.**   And Mr. Ellison at the time, the CEO, was the person who

16  evaluated it and decided to kill it as a project; right?

17  **A.**   We evaluated it, a number of us together, and we did not

18  pursue it, that's right.

19  **Q.**   Mr. Ellison said that he was the one that evaluated it and

20  decided to kill it; right?

21  **A.**   As -- as -- you bet.

22  **Q.**   And Oracle couldn't build a smartphone because of its own

23  lack of internal expertise and knowhow; true?

24  **A.**   Could I just ask you to clarify just one question?  Are

25  you talking about the physical phone or a phone platform?

**CATZ - CROSS / ANDERSON**

1  **Q.**  I've been talking about building a Java phone.

2  **A.**  A phone, a physical phone?

3  **Q.**  Yes.  Yes.

4  **A.**  Okay.

5  **Q.**  Right?

6  **A.**  That's correct.

7  **Q.**  And you stand by your testimony; right?

8  **A.**  Yes.  We -- we decided -- we decided that we should not

9  make a physical phone.

10  **Q.**  I'd like you to please take a look at Exhibit 2044, which

11  should be in a folder before you.

12        **THE COURT:**  Help the witness find the right --

13        **MS. ANDERSON:**  Actually, Your Honor, may I approach?

14  I may have kept it here by accident.  May I approach the

15  witness?

16        **THE COURT:**  Yes.

17        **MS. ANDERSON:**  Thank you.

18    Here you go.  I would be happy to move this, if you like.

19        **THE COURT:**  What was the exhibit number for that big

20  10K?

21        **MS. ANDERSON:**  That's 971, Your Honor.

22        **THE COURT:**  All right.  Okay.  That's in evidence.

23  All right.

24  **BY MS. ANDERSON:**

25  **Q.**  Exhibit 2044 is an email you received from Thomas Kurian

**CATZ - CROSS / ANDERSON**

1  of Oracle in June of 2009; correct?

2  **A.**   Yes.

3          **MS. ANDERSON:**   Your Honor, we move in evidence Exhibit

4  2044.

5          **THE COURT:**   Any objection?

6          **MS. HURST:**   No objection, Your Honor.

7          **THE COURT:**   Thank you.   Received.

8  (Trial Exhibit 2044 received in evidence)

9  **BY MS. ANDERSON:**

10 **Q.**   Who is Mr. Kurian?

11 **A.**   Mr. Kurian runs our development -- software development

12 organization.

13 **Q.**   And when he sent this email to you, he sent it to you in

14 June of 2009 and attached a presentation to it; correct?

15 **A.**   Yes.

16 **Q.**   If you would, please, turn to page 3 of this exhibit.   The

17 title of this exhibit is "Project Java Phone, Strategy and

18 Product Definition"; correct?

19 **A.**   Yes.

20 **Q.**   All right.   And if you could, turn to page 11 of

21 presentation.   Do you see --

22         **MS. HURST:**   Ms. Anderson, the presentation or the

23 exhibit?

24         **MS. ANDERSON:**   I apologize.   To be clear, it's the

25 slide presentation, page 11, but it's the exhibit, page 12.

**CATZ - CROSS / ANDERSON**

1   They're one off.

2   **Q.**   It's the one entitled "Operating System Options and

3   Recommendation" and starts off with the first bullet, "Options

4   for Version 1.0."

5            **THE COURT:**  What's the question?

6   **BY MS. ANDERSON:**

7   **Q.**   Do you have that before you?

8   **A.**   Yes.

9   **Q.**   Okay.  Thank you.  Actually there is a page missing from

10  my slide.

11           Let's take a look, please -- I apologize.  There is a

12  slide missing from my copy.  We'll come back to that.

13           Do you see page 24 of Exhibit 2044?  Turning down to

14  "Organizational Model, Options and Recommendation," first

15  bullet issues.  Do you see that?

16  **A.**   Yes.

17  **Q.**   All right.  These were the issues that were in the

18  presentation sent to you by Mr. Kurian; right?

19  **A.**   Yes.

20  **Q.**   All right.  And one of the issues, the third bullet under

21  "Organizational Model" is that Oracle had, quote, "very limited

22  internal expertise to make smart decisions," end quote; right?

23  **A.**   I see it, yes.

24  **Q.**   Right.  And that was limited internal expertise to make

25  smart decisions about a Java phone; right?

**CATZ - CROSS / ANDERSON**

1   **A.**   I think so.  Honestly, I don't know.  I don't know for

2   sure.

3   **Q.**   And then below that are some recommendations in the

4   presentation from Mr. Kurian in which he has -- the first

5   recommendation is "To hire a Superstar team of three to four

6   people who have built a phone"; right?

7   **A.**   I see that, yes.

8   **Q.**   Because Oracle didn't have those people who knew how to do

9   it; right?

10  **A.**   That's right.  We've never built a phone before.

11  **Q.**   I'd like now, if you would -- I'm going to show you

12  Exhibit 7406.

13      Your Honor, may I approach?

14          **THE COURT:**  Yes.

15          **MS. ANDERSON:**  Thank you.

16  **Q.**   Exhibit 7406 is an email exchange from Mr. Kurian to Larry

17  Ellison and yourself; right?

18  **A.**   Yes.

19  **Q.**   And it's dated March of 2010; true?

20  **A.**   Yes.

21  **Q.**   All right.

22      Your Honor, we move this exhibit in evidence.

23          **MS. HURST:**  No objection.

24          **THE COURT:**  Received in evidence.

25  (Trial Exhibit 7406 received in evidence)

CATZ - CROSS / ANDERSON

BY MS. ANDERSON:

Q.   In this email exchange -- and again at the top it says
it's from Mr. Kurian dated March 22, 2010.  Mr. Kurian tells
Mr. Ellison, quote, "Larry, I understand you will be meeting
with Eric Schmidt on Wednesday," end quote.  Do you see that?

A.   Yes, I do.

Q.   So this is material that Mr. Kurian wanted to provide to
the CEO, Mr. Ellison, in relation to Mr. Ellison's planned
meeting with Eric Schmidt of Google; right?

A.   Yes.

Q.   And attached to this particular email is a presentation he
sent to Mr. Ellison starting on page 3 of this exhibit; right?

A.   Yes.

Q.   And so the presentation indicates it's a proposal about,
quote, "Java on Android devices," end quote; right?

A.   Yes.

Q.   But Oracle and Google did not ultimately agree to a deal
to work together in relation to Android; true?

A.   That's correct.

Q.   Instead, Oracle pivoted to a new strategy; right?

        MS. HURST:  Objection.  Vague.

BY MS. ANDERSON:

Q.   Did Oracle switch to a new strategy of deciding to
threaten Google?

A.   We sued Google.

**CATZ - CROSS / ANDERSON**

1   **Q.**   Right.  You filed suit in August 2010; right?

2   **A.**   Yes.

3   **Q.**   Okay.  And as part of that, Oracle went to Google to

4   demand that it pay money for licensing unspecified aspects of

5   Java; right?

6           **MS. HURST:**  Your Honor, I think this gives in to the

7   subject matter that's been previously excluded.

8           **MS. ANDERSON:**  No.  Actually, Your Honor, we are going

9   to be talking about a different exhibit, Exhibit 1074,

10  Your Honor, if I may approach.

11          **THE COURT:**  Show counsel to make sure it's a different

12  problem.

13          **MS. ANDERSON:**  Your Honor, may I approach?

14          **THE COURT:**  Yes.

15          **MS. HURST:**  I believe this is hearsay, Your Honor.

16          **THE COURT:**  Well --

17          **MS. HURST:**  And not authored by Oracle.

18          **THE COURT:**  All right.

19          **MS. ANDERSON:**  Your Honor, it's authored by the

20  witness.  It's not hearsay.

21          **MS. HURST:**  The middle email, Your Honor, is hearsay.

22  From Mr. Eustace at Google.

23          **THE COURT:**  Who is Alan?

24          **MS. ANDERSON:**  Mr. Eustace is a representative of

25  Google responding to a demand from the witness, Ms. Catz, which

 1   starts at the bottom of this exhibit.  It's an email exchange

 2   between this witness and a representative of Google.

 3            THE COURT:  Well, what is this being offered for, if

 4   not for the truth of the statement in this case?

 5            MS. ANDERSON:  Your Honor, it is, among other things,

 6   being offered for the fact that Oracle had no information to

 7   provide Google at the time in relation to their claim of IP

 8   infringement and to the fact that this was a state of mind, and

 9   Mr. Eustace represents to Oracle in this document that it will

10   not be paying for --

11            THE COURT:  Okay.  Wait a minute.

12            MS. ANDERSON:  The only objection that is asserted on

13   the objection from Oracle was hearsay, and this is not a

14   hearsay exchange, given that it begins with statements from

15   Oracle's representative and then ends with it as well.

16            MS. HURST:  Well, I also made the earlier objection,

17   Your Honor, about this getting into excluded areas.

18            MS. ANDERSON:  And we have no --

19            THE COURT:  We are going to take this up separately.

20   For now, I'm going to sustain the objection because it has a

21   lot of self-serving material in there.  And I'll just leave it

22   at that for the moment.  I don't see too much relevance.

23   There's a lot of self-serving material there.  I'm going to

24   sustain the objection.

25

**CATZ - CROSS / ANDERSON**

1  **BY MS. ANDERSON:**

2  **Q.**   Do you recall testifying yesterday, Ms. Catz, about an

3  Exhibit 2632?  It should be, I hope, in the pile near you.

4  **A.**   I don't remember which one that is.

5  **Q.**   2362.  Let me help you find it.  Application developers,

6  2362.

7  **A.**   It's not here in this pile.  These are just what you gave

8  me.

9  **Q.**   Here you go.  This is from your counsel's examination.

10      Your Honor, may I approach and hand this to the witness?

11          **THE COURT:**  Yes, you may.

12          **MS. ANDERSON:**  Thank you.

13  **BY MS. ANDERSON:**

14  **Q.**   You were asked some questions about Exhibit 2362 from

15  April 20th, 2009.  Do you generally remember that testimony?

16  **A.**   Yes.

17  **Q.**   About a communication between Jonathan Schwartz and

18  Mr. Ellison copied to Safra Catz.  Do you remember that as

19  well?

20  **A.**   Yes.

21  **Q.**   And generally your testimony was about the idea of there

22  being battles related to Google and Android with Sun.  Do you

23  remember generally your testimony?

24  **A.**   I remember this document.

25  **Q.**   Okay.  But about a month and a half after this email

1  exchange, Mr. Larry Ellison, CEO of Oracle, made public

2  comments in June of 2009 about Android at the JavaOne

3  conference; right?

4  A.    Yes.

5  Q.    All right.  He said to the public and the world that it

6  was very exciting to see devices based on Java that are Android

7  devices; right?

8  A.    I don't remember exactly what he said, but if you have it,

9  we can go over it.

10 Q.    But that sounds right to you; right?

11 A.    I don't remember exactly what he said.

12 Q.    Let's take a look.

13       Your Honor, may I approach again?

14       THE COURT:  Yes.

15 BY MS. ANDERSON:

16 Q.    I'm showing you Exhibit 2041.  This is another official

17 filing made relating to Mr. Ellison's comments at JavaOne

18 concerning, among other things, Java and Android; right?

19 A.    Yes.

20       MS. ANDERSON:  Your Honor, we move into evidence

21 Exhibit 2041.

22       THE COURT:  Any objection?

23       MS. HURST:  No objection, Your Honor.

24       THE COURT:  Received.

25 (Trial Exhibit 2041 received in evidence)

1          **MS. ANDERSON:**  If we could, Mr. Dahm, have the page

2    that quotes Mr. Ellison's comments related to him being excited

3    to see devices based on Java that are Android devices.

4    **Q.**   Do you have that before you?  Does that refresh your

5    memory that, in fact, Mr. Ellison said just those words at

6    JavaOne about a month and a half after that email exchange,

7    Exhibit 2362?

8    **A.**   Yes.  I see what he said.

9    **Q.**   All right.  And he said that he expected to see a lot more

10   Java devices from Oracle's friends at Google; right?  Can we

11   have -- do we have that up there?  Get that highlighted for

12   you.

13        Do you see that there, Mr. Ellison's comments, "They're

14   going to be Netbooks based on Android and I think we can see

15   lots and lots of Java devices, some coming from our friends at

16   Google."  Do you see that?

17   **A.**   Yes.

18   **Q.**   That's what the CEO of Oracle told the world and the

19   JavaOne developing community, told them about Mr. Ellison's

20   views about Android and Google; right?

21   **A.**   Well, this is what Larry said at JavaOne before we owned

22   Sun and before we had all the information about Google's

23   behavior.

24   **Q.**   Right.  And, again, it was a month and a half after

25   Exhibit 2362; right?

**CATZ - REDIRECT / HURST**

1   A.   Yes.

2        MS. ANDERSON:  Your Honor, subject to Exhibit 1074

3   being resolved, we pass the witness, of course.

4        THE COURT:  All right.

5        MS. HURST:  Very briefly, Your Honor.

6        THE COURT:  Okay.

7                    <u>REDIRECT EXAMINATION</u>

8   BY MS. HURST:

9   Q.   What was the purpose of an appearance at JavaOne in the

10  summer of 2009 by Mr. Ellison?

11  A.   Well, it was to get the Java developers to realize how

12  important they were to us.  It was the first time that we would

13  be able to speak to them after announcing the deal and to just

14  let them know that Java was very important to Oracle and just

15  let them know how happy we were to have an agreement with Sun.

16  Q.   And had there been any concern in the community that led

17  to the conclusion that that kind of a statement would be

18  appropriate?

19  A.   Well, I think folks -- there's always uncertainty when an

20  acquisition is announced, so you want to just let them know

21  that JavaOne would continue and is very, very important to us

22  going forward.

23  Q.   All right.  Ms. Catz, what role, if any, did Android have

24  in your decision at Oracle, after the acquisition, not to go

25  forward with a new smartphone platform?

CATZ - REDIRECT / HURST

```
1              MS. ANDERSON:  Objection.  Beyond the scope.

2              MS. HURST:  It's related to the document --

3              THE COURT:  Overruled.  Please answer.

4              THE WITNESS:  It was absolutely central to it because

5    Android was already out of the box and they had agreements with

6    all of our former customers and they were offering Android for

7    free.

8    BY MS. HURST:

9    Q.   Let's just look over here.  When were you making this --

10   approximately when were you making this decision on the

11   timeline?

12   A.   To not --

13   Q.   Yes.

14   A.   -- continue on?  After -- after, you know -- after Google

15   had already released Android, past 2007.

16   Q.   After the acquisition closed?

17   A.   Oh, yeah.  Obviously much after the acquisition closed.

18   Q.   And that was because you couldn't tell Sun what to do in

19   the meantime?

20             MS. ANDERSON:  Objection.  Leading.

21             THE WITNESS:  Of course not.  We could not make any

22   decisions for Sun until we owned them.

23             MS. HURST:  No further questions.

24             THE COURT:  All right.  The objection is overruled.

25        Can I see that document again?  I have an idea on 1074
```

 1    before we excuse the jury.  The one --

 2            MS. ANDERSON:  This one has marking on it.

 3            THE COURT:  Let me --

 4            MS. ANDERSON:  The witness has the official one.

 5            THE COURT:  Ms. Catz, if you could stretch your arms.

 6            MS. ANDERSON:  It goes to state of mind and bad faith

 7    position as well.

 8            THE COURT:  Well, look.  Just a minute.  Here is why

 9    the -- the witness testified at the end of her direct to the

10    "thou shalt not steal" conversation, meaning she saw somebody

11    at a Bat Mitzvah from Google, she said, who said the normal --

12    the guy from Google said the normal rules don't apply to Google

13    and she said, "thou shalt not steal."  All right.  So in the

14    interests of completeness, I'm going to allow 1074 with a

15    limitation because this is also a communication from Google

16    about the same general subject which has a different drift.

17        Now, it's not admissible for the truth of it.  For

18    example, what you're going to see, the guy from Google -- this

19    is a different guy, a guy named Alan, and he makes an argument

20    about why they're not using Oracle's IP and so forth.  So it's

21    not -- it's not admissible for the truth of the statement, but

22    it is admissible to complete the story of what was communicated

23    to this witness on the stand from Google, to balance out the

24    "thou shalt not steal" conversation.  I think it's legitimate

25    to admit it for that and just keep in mind -- so put it up on

 1   the screen and let the jury see the -- see the document and

 2   it's admitted with this limitation.

 3          **MS. ANDERSON:**  Thank you, Your Honor.

 4          **THE COURT:**  If you have further questions to ask

 5   Ms. Catz about it, you may ask now.

 6       (Trial Exhibit 1074 received in evidence)

 7          **THE COURT:**  Do you have any more questions?  Do you

 8   have more questions on this?

 9        (Document displayed.)

10          **MS. ANDERSON:**  No, Your Honor.  Google will just have

11   it moved in evidence.

12          **THE COURT:**  Do you have any more questions on this,

13   Ms. Hurst?

14          **MS. HURST:**  No, I don't, Your Honor.

15          **THE COURT:**  All right.  Now, may the witness be

16   excused?

17          **MS. HURST:**  Yes, from our perspective.

18          **MS. ANDERSON:**  Yes, Your Honor.  Thank you.

19          **THE COURT:**  Ms. Catz, have a great day.  Thank you for

20   coming.  Leave all those documents there.  And we will clear

21   off the bench.

22        (Witness excused.)

23          **THE COURT:**  Can you all hold out a little longer and

24   go 15 or 20 minutes before our break?

25        (Jurors respond affirmatively.)

1    **THE COURT:** Call your next witness.

2    **MS. HURST:** Your Honor, Oracle calls Edward Screven.

3    **THE COURT:** Raise your right hand and take an oath to

4    tell the truth.

5    **EDWARD SCREVEN, PLAINTIFF'S WITNESS, SWORN**

6    **THE CLERK:** Please state your name for the Court, and

7    spell your last name for the record.

8    **THE WITNESS:** Yes.  My name is Edward Screven.  My

9    last name is spelled S-c-r-e-v-e-n.

10   **MS. HURST:** Your Honor, I was just going to get those

11   exhibits out of the way from the last witness.

12   **THE COURT:** Thank you.

13   Mr. Screven, welcome to you.

14   You need to get about this close to the mic so it will

15   catch your voice.  Make yourself comfortable and we'll ask you

16   some questions.

17   **DIRECT EXAMINATION**

18   **BY MS. HURST**

19   **Q.** All right.  Mr. Screven, would you please introduce

20   yourself to the jury.

21   **A.** Yes.  As I said, my name is Edward Screven.  My title is

22   chief corporate architect.  I've worked at Oracle for about 30

23   years.  I'm married.  I have two children.

24   **Q.** And what do you do?

25   **THE COURT:** Did you say you've worked at Oracle for 30

SCREVEN - DIRECT / HURST

1    years?

2           THE WITNESS:  Almost 30 years.

3           THE COURT:  How old are you?

4        (Laughter)

5           THE WITNESS:  I will be 52 this summer.

6           THE COURT:  All right.

7           MS. HURST:  Youthful-looking Mr. Screven.

8        (Laughter)

9           THE COURT:  I would have thought he was 29.

10          THE WITNESS:  When I put on these reading glasses, you

11   may see a difference.

12       (Laughter)

13   BY MS. HURST

14   Q.   What do you do, sir, as the chief corporate architect?

15   A.   Well, my job is overseeing technology at Oracle,

16   overseeing how pieces of technology fit together.

17       I get involved in our mergers and acquisitions activities.

18   And that includes doing technical due diligence.

19       I'm responsible for a couple of businesses at Oracle.  So

20   our Linux business and our MySQL business.

21       I'm also in charge of security at Oracle.  And, you know,

22   various other functions.

23   Q.   All right.  And did you work your way up in that 30 years?

24   A.   Yes.  I joined -- I joined Oracle out of college, and

25   started off as a programmer.  And have just stayed there ever

SCREVEN - DIRECT / HURST

1   since.

2   **Q.**   Are you familiar with the use of Java at Oracle?

3   **A.**   Yes, very familiar.

4   **Q.**   And would you explain to the jury the role Java plays in

5   Oracle's technologies.

6   **A.**   Well, Java is one of the most important technologies to

7   Oracle.

8      For one thing, it's used in our database to help our

9   customers build applications.  They use the database.  It is

10  the foundation for our middleware, which is software that is

11  used to put together applications.  And, of course, our own

12  applications are written using Java.

13     By "applications" in this case I mean business

14  applications.

15  **Q.**   All right.  And was all of that true before Oracle

16  acquired Sun?

17  **A.**   Yes.

18  **Q.**   And, you know, you used this term "middleware."

19     Would you just explain that to the jury.  I think that's a

20  hard one for some of us.

21  **A.**   So if I'm building an application which is typically a Web

22  application, you know, I have the user on one side and I have

23  the database on another side.

24     And middleware is the software that lets me write my

25  business logic.  So it's the software that says if I'm

1   submitting an order, you know, what are all of the -- what are

2   all of the steps that I needed to carry out in order to put

3   that purchase order inside the database and then check the

4   rules the companies may have about what is a valid purchase

5   order.

6       So it's the environment in which an application programmer

7   implements the business logic of the application.

8   Q.   Okay.  And were you involved in Oracle's decision to

9   acquire Sun?

10  A.   Yes.

11  Q.   What was your involvement in that?

12  A.   Uhm, very involved.  I report directly to Larry Ellison,

13  who was CEO of Oracle at the time and is now chairman.  And

14  among senior executives we discussed whether it made sense to

15  buy Sun.  And because Java was so very important to Oracle, I

16  was a strong proponent of acquiring Sun.

17  Q.   So were you in favor of the deal?

18  A.   Oh, very much.

19  Q.   Were you in favor of the deal because you thought that

20  would give you a chance to sue Google?

21      **MR. PURCELL:**  Objection.  Leading.

22      **THE COURT:**  I'll allow the question.  It's

23  argumentative in a way.  But, given the suggestion that's been

24  made, Oracle is entitled to direct denial.

25      So you can answer the question.

1          **THE WITNESS:**  No, it -- no.  I was in favor of

2    acquiring Sun because Java was a very important technology to

3    Oracle.  It let us build many different kinds of products.  And

4    it seemed to me that it would enable us to continue growing our

5    business around Java.

6    **BY MS. HURST**

7    **Q.**   Prior to acquiring Sun, what was Oracle's relationship

8    with Sun, if any, as it pertained to Java?

9    **A.**   Well, we were a customer of Sun's.  So we had licenses

10   from Sun, including a spec license, something called a TCK

11   license, and also commercial licenses that let us build

12   independent implementations of Java and also distributed Sun's

13   implementation of Java.

14   **Q.**   All right.  Sir --

15          **MS. HURST:**  May I approach, Your Honor?

16          **THE COURT:**  You may.

17   **BY MS. HURST**

18   **Q.**   I'm going to show you an exhibit that is marked number

19   610.1.

20          Do you recognize Exhibit 610.1?

21   **A.**   Yes.  This is a Java spec license for Java version 5.

22   **Q.**   And was this form of the license a legal document that was

23   in effect between Oracle and Sun at the time?

24   **A.**   Yes.

25   **Q.**   And which version of the Java platform does that pertain

SCREVEN - DIRECT / HURST

1    to?

2    **A.**    It's version 5.  Also, it's sometimes called 1.5.

3              **MS. HURST:**  Move the admission of 610.1, Your Honor.

4              **MR. PURCELL:**  No objection.

5              **THE COURT:**  610.1 received in evidence.

6         (Trial Exhibit 610.10 received in evidence.)

7         (Document displayed.)

8    **BY MS. HURST**

9    **Q.**    All right.  So this was -- for you at Oracle, even before

10   you acquired Sun, you were operating under this license; is

11   that right?

12   **A.**    Yes, that's right.

13   **Q.**    Okay.  And, first of all, did you have any understanding

14   at the time as to whether this specification license allowed

15   developers to create Java applications?

16   **A.**    Yes, definitely.  In fact, it's explicitly mentioned in

17   the first paragraph.

18   **Q.**    So that's in the first paragraph?

19   **A.**    Yes.

20   **Q.**    The notice.  It starts "Notice"; is that right?

21   **A.**    That's right.

22   **Q.**    Okay.  Would you explain how that paragraph related to you

23   as application developer?

24   **A.**    Uhm, well, it says that, you know, you have the right to

25   use the specification internally, which shall be understood to

**SCREVEN - DIRECT / HURST**

1   include developing applications intended to run on an

2   implementation of the specification.

3   **Q.**    Okay.

4            **THE COURT:**  Can you explain the word "specification."

5            **THE WITNESS:**  Yes.  So the Java specification is --

6   it's two things put together.  It's a set of Java source

7   language declarations and English text that describes what

8   those declarations do.

9            **THE COURT:**  So -- but does not include the

10  implementation itself?

11           **THE WITNESS:**  That's correct.

12     So the source language components of the -- of the

13  specification are declarations.  And then what an independent

14  implementation does is they then write Java programming

15  language statements that fill in the implementation.

16           **THE COURT:**  All right.  So our jury has heard the term

17  "declaring lines of code."  So you're telling us that that

18  equates to the specification; is that true?

19           **THE WITNESS:**  Yes.  Declaring lines of code would be

20  another -- another way to say declaration, yes.

21           **THE COURT:**  Or specification?

22           **THE WITNESS:**  Uh-huh.

23           **THE COURT:**  And then -- but the specification, as

24  you've described it, also includes the commentary in just plain

25  old English words that help you understand what the

1    specification does; is that true?

2         **THE WITNESS:**  That -- that is true.  Although, I would

3    say, you know, the central part of the specification really

4    is -- are those declaring statements.  It is -- it is -- it is

5    the thing that fundamentally defines the APIs that either

6    applications use or independent implementers implement.

7         **THE COURT:**  All right.  So under this document that

8    you're showing us now, Oracle, back at the time, had permission

9    under this document to take the declarations and do its own

10   implementing code; is that what you're telling us?

11        **THE WITNESS:**  Well, okay.  So there -- there, of

12   course, are important conditions in the license about creating

13   an independent implementation.  So the first paragraph is about

14   the right to create applications that call the API.  The second

15   paragraph talks about the right to create an independent

16   implementation.

17        **MS. HURST:**  All right.  Trudy, why don't we put the

18   second paragraph up.

19        (Document displayed.)

20        **MS. HURST:**  Would you like to continue, Your Honor?

21   Or should I continue?

22        **THE COURT:**  You go ahead.  I may interrupt, but go

23   ahead.

24        **MS. HURST:**  Okay.

25

 1   BY MS. HURST

 2   Q.   So I think the second paragraph, Mr. Screven, was what you

 3   were referring to in answer to the Court's questions.   Why

 4   don't you explain those conditions --

 5           MS. HURST:   Trudy, can we get that over a little more

 6   to the left so we can read it clearly.   Sorry.

 7   BY MS. HURST

 8   Q.   All right.   Why don't you walk us through those conditions

 9   you referred to.

10   A.   Sure.

11        So this paragraph is Sun granting the right to create an

12   independent implementation of the specification with the

13   following conditions:

14        First of all, the independent implementation must fully

15   implement the spec.   And so that means that -- that Oracle, as

16   an independent implementer, would actually have to implement

17   all of the declarations that are part of that API

18   specification.

19        You know, that's -- that is important because Java has

20   this characteristic of write once, run anywhere, which means

21   that if I build my Java application, I can run it in many

22   different environments on many different implementations of the

23   specification.

24        Number two, this double ii clause really further expands

25   that idea, right, which is that your independent implementation

**SCREEN - DIRECT / HURST**

1   must not modify, subset, superset or otherwise extend the

2   license or namespace.  And it goes on to talk about various

3   kinds of Java programming language elements.

4        Again, that is a way to require implementations to fully

5   implement the spec and not add anything to the spec.

6        So, in other words, if Sun's implementation of Java has a

7   certain set of methods for the class file, then Oracle, when we

8   do our independent implementation, we're not allowed to add

9   things to the file, because an application programmer may

10  become confused about what they can actually depend on between

11  our two different implementations.

12       We also would not be allowed to actually remove a method

13  from a file because, again, you know, that would mean that

14  applications could no longer enjoy this write once, run

15  anywhere characteristic.

16  **Q.**   So let's just stop there for a minute, Mr. Screven.

17       There's a reference to "licensor name space."  Do you see

18  that?

19  **A.**   Yes.

20  **Q.**   What did you understand that to mean at the time?

21  **A.**   Well, in the Java programming language, declarations are

22  organized into a hierarchical namespace.  So, in other words,

23  you could kind of think of it as, like, a person's name is

24  Edward Screven.  So, you know, Edward is my short name, and

25  Screven is my family name.

1    Well, in Java it's sort of similar.  So there's a -- more

2    or less a family name called Java.  And all of the

3    declarations -- you know, and there are many, many declarations

4    as part of that Java name family.

5         There's also another name family called javax.  There's

6    another name family called com.Sun.  So those top-level parts

7    of that namespace are restricted under this license.

8         So I, as an independent implementer, am not allowed to

9    actually put new names into that namespace, because

10   programmers -- application programmers assume that declarations

11   that are within those namespaces are part of standard Java

12   specification.  And if they write their programs under that

13   assumption, then when they try to run their application on

14   someone else's Java platform, it won't work.

15   **Q.**  All right.  And then there's a third condition.  Could you

16   explain that.

17   **A.**  Yes.  The third condition says that the independent

18   implementation must pass something called the TCK.

19        So TCK stands for Technology Compatibility Kit.  The TCK

20   is a collection of programs that actually call the

21   specification API.

22        And if you -- if those programs run correctly, the

23   programs are designed to verify that the specification is -- is

24   correct, then there's a high level of assurance that the

25   independent implementation actually does correctly implement

**SCREVEN - DIRECT / HURST**

1  the specification.

2  **Q.**   All right.  You've used this term "independent

3  implementation" several times.  Could you describe what that

4  is, sir.

5  **A.**   Yes.  So as -- as Your Honor was actually asking about,

6  creating independent implementation means taking the Java

7  programming language declarations that are part of the

8  specification and then inserting -- you know, putting those

9  into source files, Java source files, and then adding to those

10  source files, you know, Java programming language statements

11  that carry out the operations declared by the specification.

12  **Q.**   Okay.  Is that the same thing as a clean room?

13  **A.**   No, no.  That's totally different.

14  **Q.**   Why not?

15  **A.**   Well, a clean room is when I am intentionally trying to

16  avoid having to satisfy some -- some license terms or avoid

17  having -- trying to pay some money where I intentionally don't

18  use a specification that requires a license.

19      So creating an independent implementation under this

20  license is definitely not a clean-room operation.

21  **Q.**   All right.  You mentioned that it was important -- these

22  terms were important for preserving write once, run anywhere.

23  Could you explain that a little bit more for the jury.

24  **A.**   Yes.  As a -- as a programmer who's writing Java

25  applications, one of the very most important aspects of Java is

SCREEN - DIRECT / HURST

 1    that if I write a Java application against the Java APIs, then

 2    I can run my Java application in many different environments.

 3    So not only in different operating systems on different types

 4    of computers, but also against different implementations of

 5    Java.

 6         So if I build my application using Oracle's Java platform,

 7    I can also run it on IBM's Java platform.  I can also run it on

 8    Red Hat's Java platform.  So as an application programmer

 9    that's very important because it means I have the widest

10    possible market for my application at what is really a low

11    cost.

12    Q.  And was that compatibility requirement -- did you consider

13    whether that was beneficial to customers because it promoted

14    competition?

15    A.  It definitely promotes competition.  It promotes

16    competition among Java platform vendors.  And, also, it lowers

17    the cost for application developers.  So, you know, a small

18    group of people can build an application which runs in many

19    different environments on many different platforms.

20         I can tell you from Oracle's experience a long time ago,

21    before we wrote software in Java we wrote software in C.  So

22    even though there are such things as C libraries, it was very

23    expensive for us to actually run our applications on many

24    different platforms.  We had to do a lot of work to make them

25    suitable to run on all those different platforms.  With Java,

**SCREVEN - DIRECT / HURST**

1   we don't have to do that.

2   **Q.**   And so what happened, then, if there's a lack of

3   compatibility?

4   **A.**   Well, what happens is basically I -- I have to make one of

5   two choices.   Either I have to spend a lot of money to put my

6   application on to different environments and different Java

7   platforms, or I get locked into one single Java implementation.

8   **Q.**   All right.   You mentioned that TCK was a requirement of

9   this?

10  **A.**   Yes.

11  **Q.**   What was a TCK?

12  **A.**   The TCK is a collection of programs that -- that -- whose

13  purpose is to actually exercise the API.

14       So, in other words, they call the -- the method and other

15  parts of the API specification in order to -- and check the

16  results from that -- from those calls in order to verify that

17  the implementation of the specification is -- is correct.

18  **Q.**   All right.   So that's -- that TCK is actually software

19  also?

20  **A.**   Yes.   It's a collection of Java programs.

21  **Q.**   All right.   So is there a license with that software?

22  **A.**   Yes.   That software is licensed as well.

23  **Q.**   All right.   And would you describe the TCK license,

24  please.

25  **A.**   Well, it's -- it's -- there is a fee.   It's a -- it's a

1    moderate fee.  I mean, it's not -- it's not -- it's not

2    prohibitively expensive.  But it is -- you know, it is -- it's

3    a separate license than the spec license.

4    Q.   And are there any restrictions in the TCK license?

5    A.   Uhm, well, you know, you need to pass the TCK, right, in

6    order to actually -- actually have a compatible version of

7    Java.

8    Q.   And were there any other sorts of restrictions that you

9    understood at the time with respect to the TCK and how the

10   software, the compliant software could be used?

11   A.   Well, you know, if I -- if I want to -- to distribute my

12   Java platform, I have to pass the TCK.

13   Q.   All right.  And did you have any understanding at the time

14   that you could simply avoid those TCK requirements by not

15   calling it Java?

16           MR. PURCELL:  Objection.  Foundation.

17           THE COURT:  Sustained.

18   BY MS. HURST

19   Q.   Did you, at Oracle, actually operate under this

20   specification license back in this 2004 to 2006 time frame?

21   A.   Yes, we did.

22   Q.   And did you actually have to take a TCK license and pass

23   it?

24   A.   Yes, we did.

25   Q.   And you were familiar with that process at the time?

SCREVEN - DIRECT / HURST

1   A.   Yes.

2   Q.   And was it your understanding at the time, given the spec

3   license and the TCK terms with which you were familiar, that

4   you could simply avoid those tests by not calling it Java?

5   A.   No.

6        MR. PURCELL:  Objection.  Foundation.  Also calls for

7   a legal conclusion.

8        THE COURT:  Sustained for now.

9   BY MS. HURST

10  Q.   As part of your business as the corporate architect, did

11  you need to have an understanding of the license terms in order

12  to operate your technology?

13  A.   Yes.

14  Q.   And you acquired that understanding in order to develop

15  your technology?

16  A.   Yes.

17  Q.   Based on that business understanding at the time, what did

18  you believe you could do with respect to the TCK and your

19  independent implementation?

20  A.   That if we didn't pass the TCK, we couldn't distribute any

21  implementation of the specification.

22       I think the specification license is actually very clear

23  about that.  It says that your license to create an

24  implementation depends on passing the TCK.

25  Q.   All right.  Now, have you ever heard of the Apache

 1  Software Foundation?

 2  **A.**   I have.  It's a consortium of companies and developers

 3  that create open source software under the Apache license.

 4  **Q.**   And have you ever heard of an Apache project called

 5  Harmony?

 6  **A.**   I have.  It was a project -- it was a project whose goal

 7  was to create an independent implementation of Java.

 8          **MS. HURST:**  Trudy, could we put 610.1 back up, that

 9  second paragraph, please.

10      (Document displayed.)

11  **BY MS. HURST**

12  **Q.**   So did you have any understanding at the time whether

13  Harmony was operating under any license?

14  **A.**   Yes.  Harmony was operating under the spec license.

15  **Q.**   And can you explain that.

16  **A.**   Well, to get access to the specification in order to

17  create an implementation, you actually -- you actually accept

18  the spec license.  And in order to create an implementation of

19  the specification, I mean, you must be operating under the spec

20  license.

21  **Q.**   So we heard some testimony that Google was able to

22  download files from Apache.

23      What is your understanding, if any, at the time about

24  whether that was part of the spec license?

25          **MR. PURCELL:**  Objection.  Foundation.

1           THE COURT:   Sustained.

2    BY MS. HURST

3    Q.   Did the spec license, to your understanding at the time,

4    permit the open development of an independent implementation?

5           MR. PURCELL:   Objection.   Foundation.

6           THE COURT:   I question whether he's in a position to

7    answer that question.

8           MS. HURST:   Let me move forward, and then I'll move

9    back, Your Honor.

10   BY MS. HURST

11   Q.   Were you involved in any industry communications on behalf

12   of Oracle around this whole Harmony situation?

13   A.   Yes.

14   Q.   What communications were you involved in?

15          MR. PURCELL:   Objection.   Calls for hearsay.

16          THE COURT:   Let's hear the answer.   Just tell us the

17   general nature of the communications first.

18          THE WITNESS:   It was an open letter signed by many

19   folks, including myself, to Sun, that -- that urged Jonathan

20   Schwartz to give a TCK license to the Apache Harmony Project.

21          THE COURT:   Haven't we already heard about this?

22          MR. PURCELL:   Yes, Your Honor.

23          MS. HURST:   Yes.

24          THE COURT:   All right.   Well, then, I will allow the

25   testimony.   Go ahead.

1   **BY MS. HURST**

2   **Q.**   All right.  Let me find Exhibit 2347 here, Mr. Screven.

3   This is already in evidence.

4        (Document displayed.)

5   **Q.**   Is this a letter that you were referring to?

6   **A.**   Yes, this is the letter.

7   **Q.**   And you signed this on behalf -- so this was before the

8   merger?

9   **A.**   This is before the merger, yes.

10  **Q.**   So you signed this on behalf of Oracle?

11  **A.**   Yes.

12  **Q.**   And what, on behalf of Oracle, were you asking Sun to do?

13  **A.**   We were asking Sun to grant a TCK license to the Apache

14  Harmony Project.

15  **Q.**   And what was your understanding, if any, as to the

16  necessity of such a license?

17  **A.**   That it was essential.  That in order for Apache to

18  deliver an independent implementation of Java, they would have

19  to actually have a TCK license and pass the TCK test.

20  **Q.**   Was Apache already developing an implementation of Java?

21  **A.**   They were already developing an implementation of Java.

22  **Q.**   So how did that relate to what you're describing?

23  **A.**   Well, in order to actually distribute your Java

24  implementation, you have to pass the TCK tests.  In order to

25  have a TCK test to run, you have to have a license.

**SCREVEN - DIRECT / HURST**

1    Now, you know, you could start developing your independent

2  implementation before you've got the license.  But before you

3  actually distribute, make it available to other parties, you

4  need to have this TCK license and pass the TCK tests.

5  **Q.**   Now, who was this letter addressed to?

6  **A.**   It was addressed to Sun's CEO at the time, named Jonathan

7  Schwartz.

8  **Q.**   And why did you, on behalf of Oracle, sign this letter?

9  **A.**   Well, as I described earlier, Java was very important to

10  Oracle.  It still is very important to Oracle.

11    And I was concerned that Sun, because they weren't doing

12  well in business terms, would stop being a good steward of

13  Java; that they might significantly reduce their level of

14  investment in the technology; they might change their licensing

15  practices in some way that was unfavorable to Oracle.

16    And so I thought it was in Oracle's best interests if

17  there was some other implementation of Java out there that --

18  you know, that we could rely on in case Sun could not be relied

19  upon.

20  **Q.**   And what was Mr. Schwartz's response, if any, to the

21  letter?

22  **A.**   He declined to give the license.  So he said no.

23  **Q.**   And what did Oracle do?

24  **A.**   Well, basically nothing.  We continued on as we had

25  before.  We continued on with our spec license, our TCK

1  license, and our commercial license.  We continued paying Sun

2  for Java.

3  **Q.**  All right.  Let's just look -- what's the date on this

4  letter?  And let's look at that on our timeline.

5  **A.**  This is June 22nd, 2007.

6  **Q.**  So that's before the first release of Android?

7  **A.**  Yes.

8  **Q.**  And were you knowledgeable about Android at the time?

9  **A.**  No.  At the time that I signed this letter, I had no idea

10  that Android existed as a project.

11  **Q.**  All right.  And what's the status of Harmony now?

12  **A.**  Harmony is -- is discontinued as a project.

13      Apache Foundation has a term they use called "in the

14  attic," which means no one is working on it anymore.  So Apache

15  Harmony is in the attic.

16  **Q.**  All right.  And are you aware of any unlicensed commercial

17  uses of Apache Harmony in the world today?

18  **A.**  Only one.  Only Android.

19  **Q.**  Since acquiring Sun, has Oracle continued to license the

20  Java platform?

21  **A.**  Yes.  We license the Java platform in the same ways that

22  Sun did.

23  **Q.**  And other than the spec license, would you briefly

24  describe what those ways are?

25  **A.**  So beyond the spec license, of course, we still license

**SCREVEN - DIRECT / HURST**

 1   the TCK.  And we also -- we also have commercial licenses to

 2   Java.

 3       Then there's also a separate offering, called OpenJDK,

 4   which is an implementation of Java, which is licensed under the

 5   GNU license called GPLv2 with Classpath Exception.

 6   **Q.**   All right.  So you have both commercial licenses and open

 7   source licenses?

 8   **A.**   That's right.  So we have a dual licensing strategy.  So

 9   OpenJDK is available to encourage application programmers to

10   learn and use Java.

11       And then we sell commercial licenses to companies that

12   wish to have support for Java so if they have issues we can

13   help them out, or if they wish to embed the license in devices

14   and they don't wish to have to -- to deal with restrictions

15   imposed upon them by the GPL license.

16   **Q.**   And what sort of restrictions are those?

17   **A.**   Well, the GPL requires a party that uses software under

18   the GPL to -- to, first of all, make the source code available

19   for -- for -- for that.

20       So, in other words, if I distribute OpenJDK to someone as

21   a third party, I have to provide the source code to OpenJDK.

22   But, moreover, if I change the OpenJDK to make it better in

23   some way so that I'm adding value to it, I changed it to make

24   it easier to embed on my smartphone, for example, then I have

25   to give away those changes for free.  Right?  I have to

SCREVEN - DIRECT / HURST

1    actually make the source code of those changes available for

2    free.

3        So, you know, we can sell commercial licenses to Java

4    because many parties don't want to have to do that.  They want

5    to make their changes to -- to Java and keep them for

6    themselves at a competitive advantage.

7    **Q.**   Well, wouldn't the Classpath Exception solve that problem?

8        **MR. PURCELL:**  Objection.  Foundation.

9    **BY MS. HURST**

10   **Q.**   Are you familiar with the Classpath Exception as part of

11   your OpenJDK license?

12   **A.**   Yes.

13   **Q.**   Would you explain that, please.

14   **A.**   Okay.  So the Classpath Exception says that just because I

15   have written a program that combines the JDK with some other

16   components, those other components do not have to be licensed

17   under the GPL.

18       However, if I have changed the JDK, if I changed the

19   implementation of the APIs, then those changes must be released

20   under the GPL.

21       So the Classpath Exception does not permit someone to

22   optimize the JDK and then charge for it.

23   **Q.**   What, to your understanding, does it permit then?

24   **A.**   It permits me to create applications, my own applications,

25   and not have my components of the application be released under

1   the GPL.  It also means that it's easier for me to mix in

2   components from other third parties.

3   **Q.**   All right.  So why do you have both of these types, both

4   commercial and open source licensing?

5   **A.**   Well, it's a business strategy.  So we strike a balance

6   between making Java as widely available as possible to

7   developers, to people who want to build applications, and then

8   charging for licenses for folks who want to embed Java.  So

9   ISVs and smartphone manufacturers and other kinds of device

10  manufacturers.

11        So we have this thing called a dual-licensing strategy,

12  which is actually pretty common in the open source industry,

13  that lets us both widely promote Java, make it freely available

14  to programmers who want to build applications or just

15  experiment with it, and also charge companies that want to --

16  to embed it.

17          **MS. HURST:**  No further questions.

18          **THE COURT:**  Maybe this would be a good point for our

19  15-minute break.  Please remember the admonition.

20        (Jury out at 9:23 a.m.)

21          **THE COURT:**  All right.  Be seated.

22      Anything the lawyers need me for?

23          **MR. VAN NEST:**  I don't believe so, Your Honor.

24          **THE COURT:**  All right.

25          **MS. HURST:**  Nothing.

SCREVEN - CROSS / PURCELL

1    **THE COURT:**  We'll take our 15 minutes.

2    Oh, I have one thing for you.  There have been four or

3    five documents that have been received for a limited purpose.

4    I would like for you to meet and confer and come up with a

5    sticker that says "This exhibit has been admitted for a limited

6    purpose," just to remind the jury when they're looking at it in

7    the jury room.

8    So can you come up with a yellow or, you know, green,

9    whatever color you want to do, something that will stand out

10   that will be on the front page near the exhibit number?  Okay.

11   **MR. VAN NEST:**  Yes, Your Honor.

12   **THE COURT:**  Okay.  Thank you.  Let's take our break.

13   (Recess taken from 9:24 to 9:38 a.m.)

14   **THE COURT:**  Be seated, please.

15   Can we bring in the jury?

16   **MS. HURST:**  Yes, Your Honor.

17   **MR. VAN NEST:**  Yes, Your Honor.

18   **THE COURT:**  All right.  Let's do that.

19   (Jury enters at 9:40 a.m.)

20   **THE COURT:**  Welcome back.  Please have a seat.

21   All right.  Cross-examination may begin.

22                         **CROSS-EXAMINATION**

23   BY MR. PURCELL

24   **Q.**   Good morning, Mr. Screven.

25   **A.**   Good morning.

**SCREVEN - CROSS / PURCELL**

1   Q.   I think you testified on direct that you've worked at

2   Oracle for 30 years; correct?

3   A.   I think I said almost 30 years.

4   Q.   Just about?

5   A.   Uh-huh.

6   Q.   And that was your first job straight out of college;

7   correct?

8   A.   That's right.

9   Q.   And you've worked at Oracle for your entire professional

10  career?

11  A.   I took a leave of absence for seven months and did some

12  independent consulting.

13  Q.   Other than that, you've never worked anywhere for the

14  entirety of your professional career; right?

15  A.   That's right.

16  Q.   And in particular, Mr. Screven, you never worked at Sun

17  Microsystems, did you?

18  A.   No.

19  Q.   You didn't work at Sun in the 1990s, when Sun first

20  introduced Java to the world; correct?

21  A.   That's right.

22  Q.   You had no role at all in creating the Java programming

23  language or the Java APIs?

24  A.   That's right.

25  Q.   You didn't work at Sun in the 1990s, when Sun created its

1    strategy for promoting the Java Language and the APIs; correct?

2    A.    That's right.

3    Q.    You didn't work at Sun when Sun first developed its

4    strategy for licensing Java; correct?

5    A.    That's right.

6    Q.    You didn't work at Sun when Sun first learned of the

7    implementation of Java SE by the GNU Classpath project, did

8    you?

9    A.    No, I've never worked for Sun.

10   Q.    And you don't have any firsthand knowledge about how Sun

11   reacted to GNU Classpath at the time; correct?

12         MS. HURST:    Your Honor, this is argument.

13         THE COURT:    No.   There's an argumentative aspect to

14   it, but it's establishing what he has personal knowledge of and

15   what not personal knowledge.   So it's proper.

16   Overruled.

17   BY MR. PURCELL

18   Q.    Mr. Screven, the question was, you have no firsthand

19   knowledge about how Sun reacted to GNU Classpath at the time it

20   was introduced; correct?

21   A.    That's right.

22   Q.    And, similarly, you didn't work at Sun when Sun first

23   learned of the independent implementation of Java SE by Apache

24   in the Apache Harmony Project; correct?

25   A.    That's right.

**SCREVEN - CROSS / PURCELL**

1  Q.  And you have no firsthand knowledge about how Sun reacted

2  to Apache Harmony; correct?

3  A.  Well, I know that they did not give Apache Harmony a TCK

4  license; that they declined to actually grant them a license

5  when we signed and published an open letter.

6  Q.  Mr. Screven, you have no firsthand knowledge of anything

7  that happened internally at Sun regarding Sun's position on

8  Apache Harmony; correct?

9  A.  That's correct.

10  Q.  And you didn't work at Sun when Sun had discussions with

11  Google in 2005 and 2006, about a technology partnership for a

12  mobile platform; correct?

13  A.  Correct.

14  Q.  So you have no firsthand knowledge about Sun's

15  negotiations with Google; correct?

16  A.  Correct.

17  Q.  And you didn't work at Sun when Google released Android in

18  November 2007, did you?

19  A.  I did not.

20  Q.  So you have no firsthand knowledge about how Sun reacted

21  to Android internally; correct?

22  A.  Correct.

23  Q.  And when the first Android phone was released in

24  October 2008, you still did not work at Sun; correct?

25  A.  I still did not work at Sun.

1   Q.   All right.   But you were personally involved in Oracle's

2   decision to acquire Sun; correct?

3   A.   Yes.

4   Q.   And as part of evaluation whether to buy Sun, Oracle

5   engaged in due diligence about Sun's business; correct?

6   A.   We had a very brief period in which to -- to evaluate Sun.

7   Not a normal kind of due diligence period.   We had about two or

8   three days, at which time we met with Sun executives and

9   discussed things with them.   But because of the timing -- there

10   was a competing offer from IBM -- it was a very short window.

11   Q.   You participated in that due diligence process, that

12   abbreviated process personally; right?

13   A.   I did.

14   Q.   And you investigated Sun's business as exhaustively as you

15   could, given the limited time available; right?

16   A.   Well, we -- we had certain questions in mind.   They were

17   important to us during the acquisition process.   And we -- we

18   asked those questions.

19   Q.   Even before early 2009, when it was deciding whether to

20   acquire Sun, Oracle regularly maintained competitive

21   intelligence on Sun, didn't it?

22   A.   Yes.

23   Q.   That was a routine part of Oracle's business practice?

24   A.   Well, we have a competitive intelligence group that

25   produces reports from time to time.   I don't know how regular I

1    would say it is.  But, yes, they did produce competitive

2    intelligence reports, probably including on Sun.

3    **Q.**   Now, this trial was about Java.  And Java is software;

4    right?

5    **A.**   Yes.

6    **Q.**   But Sun's business was overwhelmingly focused on hardware,

7    not software; right?

8    **A.**   Uhm, well, most of their revenue was hardware.

9    **Q.**   In fact, over 95 percent of Sun's revenue was from

10   hardware; correct?

11   **A.**   I actually don't know the percentage, but it was mostly

12   hardware.

13   **Q.**   All right.  Let's -- may I approach, Your Honor?

14         **THE COURT:**  Okay.

15   **BY MR. PURCELL**

16   **Q.**   Mr. Screven, this is Trial Exhibit 2036, which is in

17   evidence.

18         **MR. PURCELL:**  And if we could get that up on the

19   screen.

20      (Document displayed.)

21   **BY MR. PURCELL**

22   **Q.**   This is one of those competitive intelligence reports on

23   Sun, that we were just discussing; correct?

24   **A.**   Yes, it looks like that, yes.

25   **Q.**   And Oracle considers it important to create and maintain

 1  these sorts of intelligence reports; right?

 2  **A.**   Well, as different parts of the business base, different

 3  competitors, they ask the competitive intelligence group to

 4  create a report for them.  So to them it's important.

 5  **Q.**   And Oracle tries to be sure that everything in its

 6  competitive intelligence reports is accurate; correct?

 7  **A.**   I should hope so, yes.

 8  **Q.**   Oracle wouldn't want to deceive itself or give itself

 9  inaccurate information about the state of competitors in the

10  market, would it?

11  **A.**   Well, as -- as a person who might receive a competitive

12  intelligence report, I certainly hope the information is

13  accurate.

14          **MR. PURCELL:**  All right.  Could we go to slide 12,

15  please.

16      (Document displayed.)

17          **MS. HURST:**  Which page of the exhibit?

18          **MR. PURCELL:**  It's page 12.

19  BY MR. PURCELL

20  **Q.**   You see that bar graph there, Mr. Screven, for Sun's

21  fiscal years 2007 and 2008?

22  **A.**   Yes, I see that.

23  **Q.**   And you see the first bullet there that says, "Sun is

24  primarily a hardware company.  Sun's software revenue as a

25  percentage of total annual revenue is less than 5 percent, and

SCREVEN - CROSS / PURCELL

1  its year-over-year growth is minimal."

2     Do you see that?

3  A.   I see that.

4  Q.   And that was accurate information about Sun, as far as

5  Oracle was aware in November of 2008, when this document was

6  created; right?

7  A.   Well, it's consistent with my understanding of the time.

8  Q.   It's consistent with your understanding that Sun's revenue

9  was 95 percent hardware, or more, 5 percent or less software;

10 right?

11 A.   Well, again, I don't -- I don't have any sort of

12 independent recollection of the exact percentage.  But, yes,

13 they were much more hardware than software.

14 Q.   That's what this document says; right?  It says 95/5?

15 A.   That's what this document says.

16 Q.   And if this were presented to you in the course of your

17 business at Oracle, as a competitive intelligence report

18 created by Oracle, you would rely on those numbers, wouldn't

19 you?

20 A.   Uhm, yes, probably.

21 Q.   And not only is Sun's software revenue less than 5 percent

22 of its total, but its year-over-year growth at the time was

23 minimal; right?

24 A.   Yes.

25 Q.   And when we're talking about Sun's software, we're not

1   only talking about Java; correct?  Sun had other software

2   products?

3   **A.**   They did.

4   **Q.**   And they're listed there; right?

5       And the second bullet says, "Software revenue consists of

6   Java middleware, identity management, MySQL, Solaris,

7   virtualization, and Java licensing"; right?

8   **A.**   Yes.

9   **Q.**   And there was more than just Java?

10  **A.**   There is more than just Java.

11  **Q.**   And the software revenue includes the Java licensing

12  business; correct?

13  **A.**   Yes, that's right.

14  **Q.**   So all of Sun's software, including its Java licensing

15  business, was less than 5 percent of Sun's revenue, according

16  to this document?

17  **A.**   According to this document.

18          **MR. PURCELL:**  Could we go to slide 14, please.

19      (Document displayed.)

20  **BY MR. PURCELL**

21  **Q.**   This is the summary page, which has a number of takeaways.

22      The first one says, "Investing in Sun technologies is a

23  risky bet."  Do you see that?

24  **A.**   I see that.

25  **Q.**   And then the third bullet from the bottom says, "Software

1  is a 'step child' of the broader hardware business."  Do you

2  see that?

3  **A.**   I do.

4  **Q.**   And that was Oracle's conclusion from its competitive

5  intelligence department about how Sun treated its software

6  business at the time; correct?

7  **A.**   Well, it's -- it's their conclusion.  Although, I probably

8  would have drawn a different conclusion than some of these

9  bullets.

10  **Q.**   And then right below that it says, "Resignation of

11  software executive hurts employee morale and corporate focus."

12  Do you see that?

13  **A.**   I do.

14  **Q.**   You felt under Sun's direction the progress of Java had

15  stalled around the time of the acquisition, didn't you?

16  **A.**   Yeah.  They had slowed down their release cadence.

17  **Q.**   Right.  The regular releasing of new versions of software

18  with new functionality had slowed down; correct?

19  **A.**   That's right.

20  **Q.**   In fact, there hadn't been a new release of the Java SE

21  platform in about five or six year before the time Oracle

22  bought Sun?

23  **A.**   I actually can't remember how long it was.  But, yes, it

24  had definitely slowed down.

25  **Q.**   Five or six years, that sounds about right to you?

1    **A.**   I really can't remember how long it was.

2    **Q.**   But you did know that Sun's failure to deliver new

3    releases of Java was frustrating to companies that relied on

4    Java; right?

5    **A.**   Yes.

6    **Q.**   It was frustrating to Oracle specifically, wasn't it?

7    **A.**   Yes.

8    **Q.**   And Sun's failure to deliver new Java releases was also

9    frustrating to Java programmers and developers; right?

10   **A.**   I imagine it probably was.

11   **Q.**   I'd like to talk a little bit about the specification

12   license.

13        You testified during your direct examination that the

14   Apache Software Foundation took a specification license from

15   Sun; correct?

16   **A.**   Uhm, well, I think what I may have testified is -- maybe I

17   misremember my words -- is that they had a specification

18   license because, you know, if you access the specification,

19   whether it's in book form or it's on the website, the

20   specification license is part of the book.  It's -- you know,

21   it's a link on the Web page that you get when you download the

22   specification.

23        **MR. PURCELL:**  Your Honor, right now I'd like to read

24   prior sworn testimony from Mr. Screven, at pages 560, line 24,

25   to 561, line 1.

1      MS. HURST:  What date?

2      MR. PURCELL:  This is April 18, 2012.

3      THE COURT:  All right.  Go ahead.

4      MS. HURST:  No objection.

5      THE COURT:  What?

6      MS. HURST:  No objection.

7      THE COURT:  Please read.

8      MR. PURCELL:  "And now you testified" --

9      THE COURT:  You have to say "question."

10      MR. PURCELL:  Sorry.  I apologize, Your Honor.

11   "Q.  And now you testified, I think, that Sun never gave a

12   license to Apache; correct?

13   "A.  No, they never gave a license.  That's right."

14 BY MR. PURCELL

15 Q.  Do you know who Thomas Kurian is?

16 A.  I do know who Thomas Kurian is.

17 Q.  He's currently Oracle's president of product development;

18 correct?

19 A.  That's right.

20 Q.  And he reports directly to Mr. Ellison?

21 A.  Yes.

22      MS. HURST:  Your Honor, I have a rule of completeness

23 reading on that last read-in.

24      THE COURT:  Is it adjacent to the same read-in?

25      MS. HURST:  Yes.  It's two questions prior.

1          THE COURT:  Go ahead and read those in.

2          MS. HURST:  (As read:)

3       "Q.  And you signed this letter requesting that Sun grant

4       a license to the Apache Harmony Project; correct?

5       "A.  Yes.

6       "Q.  And you wanted Sun to grant a license free of any

7       field-of-use restrictions to Apache Harmony; correct?

8       "A.  Yes."

9       And then Mr. Purcell's portion:

10      "Q.  And, now, you testified, I think, that Sun never gave

11      a license to Apache; correct?

12      "A.  No, they never gave a license.  That's right."

13         THE COURT:  All right.  Thank you.

14      Go ahead.

15         MR. PURCELL:  Your Honor, I'd like to read a portion

16   of Mr. Kurian's prior sworn testimony, dated April 17, 2012,

17   page 396, lines 3 to 9, and then page 397, line 19, to 398,

18   line 4.

19         THE COURT:  Who is Mr. Kurian?

20         MR. PURCELL:  Mr. Kurian, as the witness just said, is

21   Oracle's president, who reports directly to Mr. Ellison.

22         THE COURT:  All right.  Go ahead.  Read it.

23         MR. PURCELL:  This is Thomas Kurian speaking.

24      "Q.  Okay.  Now, Apache Harmony, that wasn't owned by Sun

25      or Oracle?

SCREVEN - CROSS / PURCELL

1    ■A.   No, it was not.

2    ■Q.   Apache Harmony, that's an independent project?

3    ■A.   That's an independent project, yes.

4    ■Q.   And Apache Harmony never took a license from Sun;

5    right?

6    ■A.   Correct.  They were never granted a license from Sun.

7    ■Q.   These libraries were out there being used by Harmony

8    with no license from Sun since approximately 2005;

9    correct?

10   ■A.   Yes.  There had been many discussions between Apache

11   and both Sun and the Java community process about

12   resolving this matter, but no license had been granted.

13   ■Q.   So in 2005, 2006, 2007, 2008, 2009, Apache was using

14   the same libraries and the same APIs we're talking about

15   in this case without license from Sun; correct?

16   ■A.   Correct.  And Sun had been trying to negotiate with

17   Apache about a license because Apache had petitioned Sun

18   for such a license."

19   BY MR. PURCELL

20   Q.   Now, you testified on direct, Mr. Screven, that you're not

21   aware of any Apache products in the market, any commercial

22   products other than Android; correct?

23   A.   No.  I said I'm not aware of any unlicensed products other

24   than Android.

25   Q.   So you're not aware of IBM having any products using

SCREVEN - CROSS / PURCELL

1   Apache Harmony on the market?

2   **A.**    IBM has Java licenses.

3   **Q.**    IBM doesn't have a license to contribute IBM code back to

4   Apache Harmony for Apache Harmony to freely distribute, does

5   it?

6   **A.**    Uhm, I don't think they have the right to -- to -- to pass

7   on to third parties the -- the rights that you're given under

8   the specification license, TCK license, or commercial licenses.

9   **Q.**    All right.  And you also testified on direct about the

10  terms of the specification license; right?

11  **A.**    Yes.

12         **MR. PURCELL:**  Could we get that up on the screen.

13  That's Exhibit 610.1.

14       (Document displayed.)

15  **BY MR. PURCELL**

16  **Q.**    This license was written at Sun by Sun; correct?

17  **A.**    Well, I assume that Sun wrote it.  I actually don't know

18  if they wrote it or not.

19  **Q.**    You weren't at Sun when this license was first published?

20  **A.**    That's right.

21  **Q.**    Now, I think you testified that the specification license

22  is required to use the declaring lines of code that we're

23  talking about in this case; right?

24  **A.**    Well, it's the only license I know about that allows

25  someone to create an independent implementation.  It's -- and

1    it also grants application programmers the right to create

2    applications against that specification.

3    **Q.**   Mr. Screven, this specification license -- isn't it your

4    testimony that this specification license is the license that

5    gives a developer permission to use the lines of declaring

6    code?

7    **A.**   Yes.

8    **Q.**   All right.  And declaring code is a form of source code.

9    That's Oracle's position in this case; right?

10   **A.**   Declaring code is a form of source code.

11   **Q.**   All right.  Now, the specification license requires that

12   any independent implementation be compatible with Java; right?

13   **A.**   Yes.

14   **Q.**   And any independent implementation has to pass the TCK,

15   the Technology Compatibility Kit; right?

16   **A.**   Yes.

17   **Q.**   And to be compatible and to pass the TCK, an

18   implementation has to use the declaring code not just of the 37

19   API packages at issue here, but all the declaring code from all

20   the API packages in the Java platform; right?

21   **A.**   Yes.  The specification license requires you to create a

22   complete implementation of the specification.

23   **Q.**   Right.  So you have to use all of the declaring code, copy

24   all of the declaring code word for word; right?

25   **A.**   If you're creating an independent implementation, yes.

1   **Q.**   All right.  And Oracle developed an independent

2   implementation, I think you said; correct?

3   **A.**   Yes.

4   **Q.**   So Oracle used the declaring code?

5   **A.**   Yes.

6   **Q.**   Of all the API packages word for word; right?

7   **A.**   Yes.

8   **Q.**   And Oracle had to do that in order to pass the TCK?

9   **A.**   Yes.

10  **Q.**   And Oracle did, in fact, test its independent

11  implementation using all that declaring code against the TCK,

12  and passed the TCK; right?

13  **A.**   Yes.

14          **MR. PURCELL:**   I'd like to blow up the definition of

15  "independent implementation," which is about two-thirds of the

16  way down the page.

17  **BY MR. PURCELL**

18  **Q.**   Do you see that definition, Mr. Screven?

19  **A.**   Yes.

20  **Q.**   Your counsel didn't show this definition to you during

21  your direct examination, did she?

22  **A.**   Uhm, I don't think so.

23  **Q.**   All right.  So just reading the definition, it says,

24  "Independent implementation shall mean an implementation of the

25  specification that neither derives from any of Sun's source

SCREVEN - CROSS / PURCELL

1  code or binary code materials nor, except with an appropriate

2  and separate license from Sun, includes any of Sun's source

3  code or binary code materials."

4      Do you see that?

5  A.   Yes.

6  Q.   So this says an independent implementation may not use any

7  Sun source code; right?

8  A.   That's right.

9  Q.   In fact, it forbids an independent implementation from

10 using any Sun source code; right?

11 A.   It defines an independent implementation as not using

12 source code.  I wasn't exactly sure I would use the word

13 "forbid."

14 Q.   All right.  But that's exactly what Oracle did when it

15 developed its own independent implementation.  It did use the

16 source code, the declaring code.  In fact, it copied it word

17 for word; right?

18 A.   Yes.  But the implementation that this is referring to,

19 the source code they're referring to here, is actually the

20 lines of code that -- that are the Java statements, the

21 carryouts, the operation of the declaration.

22 Q.   Okay.  So in this license, your testimony is that source

23 code excludes declaring code and only refers to implementing

24 code; right?

25 A.   No.  So -- so independent implementation shall mean an

1  implementation of the specification.  Implementation is source

2  code.  But implementation is not all the source code that you

3  wind up having in the platform.

4       So all of the source code that you have in the platform is

5  the conjunction of the declaring source code plus the

6  implementation code.

7       The implementation code are the procedural Java statements

8  that you add to the declaring source code to create the

9  independent implementation.

10 **Q.**   Mr. Screven, you said that source code includes declaring

11 code; right?

12 **A.**   Yes.

13 **Q.**   And you said that you have to, to create an independent

14 implementation, use all the declaring code; right?

15 **A.**   Yes.

16 **Q.**   And this section says that in order to create an

17 independent implementation, you may not use any source code?

18 **A.**   Actually, it says -- it says "shall mean an implementation

19 of the specification."

20      So implementation is the source code, which -- which is

21 the lines of code that actually carry out the operations

22 declared by the declaring source code.

23 **Q.**   The declaring code is repeated in the implementation,

24 Mr. Screven, isn't it?

25 **A.**   Yes, but --

SCREVEN - CROSS / PURCELL

1   **Q.**   In fact, it can't work -- the implementation can't work

2   unless the declaring code is repeated in the implementation;

3   correct?

4   **A.**   That -- that's right.

5   **Q.**   All right.  Thank you.

6       Mr. Screven, this specification license never mentions the

7   phrase "declaring code"; right?

8   **A.**   No, I don't think --

9   **Q.**   And it never says anything about structure, sequence and

10  organization, does it?

11  **A.**   I don't think it says that, no.

12  **Q.**   All right.

13          **MR. PURCELL:**  May I approach, Your Honor?

14          **THE COURT:**  Sure.

15  **BY MR. PURCELL**

16  **Q.**   Mr. Screven, this is Trial Exhibit 2237, which is also in

17  evidence.

18      (Document displayed.)

19  **Q.**   This is a document that Oracle submitted to the European

20  Commission when it acquired Sun; correct?

21  **A.**   I'm actually not familiar with this document.  I mean,

22  it -- it says it's -- actually, I'm not sure where it actually

23  says that, but, uhm.

24          **THE COURT:**  Wait a minute.  Is this the same document?

25          **MS. HURST:**  I'm confused.

 1             **THE COURT:**  Is this the same document that --

 2             **MR. PURCELL:**  It is not.

 3             **MS. HURST:**  When did this come into evidence?

 4             **MR. PURCELL:**  I believe it was stipulated in

 5    yesterday.  Am I right?

 6        If it's not, I apologize.

 7             **MR. BICKS:**  It's not.

 8             **MR. PURCELL:**  I apologize.

 9             **MS. HURST:**  I don't think this is in evidence, Your

10    Honor.

11             **MR. PURCELL:**  All right.  I apologize for publishing

12    it to the jury.

13             **MR. VAN NEST:**  It's on the preadmitted list.

14             **MR. PURCELL:**  It's preadmitted, Your Honor.

15             **MS. HURST:**  I still object.  This witness lacks

16    foundation.

17             **MR. PURCELL:**  Well, Your Honor, may I read from

18    Mr. Screven's prior sworn testimony, at page 552, line 19 to

19    24?

20             **THE COURT:**  Sure.

21             **MR. PURCELL:**  (As read:)

22        "Q.  Mr. Screven, I've handed you Trial Exhibit 2237.  Do

23        you recognize this document, sir?

24        "A.  Yes, I do.

25        "Q.  And this is the -- a report that Oracle prepared

1        about the acquisition of Sun to submit to the European

2        community?

3        **"A.**  Yes."

4    **BY MR. PURCELL**

5    **Q.**   So, Mr. Screven, between April 18th, 2012, and today have

6    you forgotten this document?

7    **A.**   You know, if I haven't seen the document in four years,

8    yeah, probably I can't be sure what document it is in front of

9    me.  I mean, so.

10        **MR. PURCELL:**  All right.  If we could get it back up

11   on the screen, please.

12        (Document displayed.)

13        **MR. PURCELL:**  So could we go to the last page of the

14   document.  And just blow up the signature block, please.

15        (Document displayed.)

16   **BY MR. PURCELL**

17   **Q.**   So this document is dated July 30, 2009.  Do you see that?

18   **A.**   I see that, yes.

19   **Q.**   So that's about 20 months or so after Google first

20   released the Android software publicly; right?

21   **A.**   Yes.

22        **MR. PURCELL:**  Could we turn to page 65 of the

23   document.

24        (Document displayed.)

25        **MS. HURST:**  Exhibit page 65, Mr. Purcell.

1              **MR. PURCELL:**  It's page 61 of the submission, page 65

2    of the document.

3         Could we blow up the -- actually, strike that.  Let's try

4    to shortcut this a little bit.

5         Let's go to the next page, page 66 of the document, page

6    62 of the submission.

7              (Document displayed.)

8              **MR. PURCELL:**  And could we look at the last full

9    paragraph.

10   **BY MR. PURCELL**

11   **Q.**   Do you see that Oracle represented to the European

12   Commission that a license from Sun is not a prerequisite for

13   all development scenarios?

14   **A.**   Yes.

15   **Q.**   Do you see that?

16        And then there's a chart that summarizes scenarios in

17   which a license might be required.  And each scenario is

18   described in greater detail in the text that follows.  Do you

19   see that?

20   **A.**   Barely.  It's pretty blurry.

21   **Q.**   It is blurry, unfortunately.

22             **MR. PURCELL:**  If we could go to the next page.

23             (Document displayed.)

24             **MR. PURCELL:**  All right.  So there's the end of the

25   chart.  And then if we go down to the -- scroll down, please,

1    Jeff.  And the next-to-last paragraph.

2         (Document displayed.)

3    **BY MR. PURCELL**

4    **Q.**  All right.  So Oracle is telling the European Commission

5    here that, "Only vendors that modified the source code of the

6    reference implementation or create independent implementations

7    and want to distribute their products as Java-compliant need

8    TCK licenses."  Do you see that?

9    **A.**  Yes.

10   **Q.**  So what Oracle is saying here is that you need both to

11   either modify the source code or develop your own

12   implementation, and you need to want to distribute your product

13   as Java compatible in order to need a TCK license; right?

14   **A.**  Uhm, that's what this says.

15   **Q.**  Yeah.  There's two conditions there; right?

16        You either have to modify the source code and develop an

17   independent implementation and you have to use the Java brand;

18   right?

19   **A.**  Are you asking me what this says or what I think --

20   **Q.**  That's what Oracle told the European Commission in 2009;

21   right?

22   **A.**  That is what is in this document.

23   **Q.**  All right.  And Google never distributed Android as Java

24   compliant, did it?

25   **A.**  No.

SCREVEN - CROSS / PURCELL

1    Q.   And Google never represented to anyone that Android was

2    Java compliant, as far as you know; right?

3    A.   No, I don't -- not as far as I know.

4    Q.   Google has never used the coffee cup, right, coffee-cup

5    logo as far as you know?

6    A.   Not as far as I know.

7           MR. PURCELL:   One last thing.   Let's move on to the

8    section at the bottom of the page.   Actually, go to the next

9    page.   Sorry.

10          (Document displayed.)

11   BY MR. PURCELL

12   Q.   All right.   At the bottom of that page there's a section

13   that says "License Availability."   Do you see that?

14   A.   Yes, I see that.

15   Q.   And the sentence says, "As discussed below, Sun's licenses

16   impose restrictions relating to compatibility requirements and

17   can incorporate field-of-use provisions to allow Sun to satisfy

18   its obligations under the JSPA to ensure uniformity of the Java

19   implementation for each distinct Java environment."

20          Do you see that?

21   A.   I see it.

22   Q.   And then continuing on to the next page, says, "For

23   example, one cannot take a license to Java SE for use in a

24   mobile device since Java SE and Java ME are not compatible."

25          Correct?

1  **A.**   That is what it says.

2  **Q.**   So you talked in your direct testimony about write once,

3  run anywhere.  But you can't write code for Java SE and expect

4  it to run on a Java ME device, can you?

5  **A.**   No.  But the converse is true.  So Java ME is a subset of

6  Java SE, a standard subset of Java SE that allows people to

7  have write once, run anywhere on smaller devices.

8  **Q.**   But you can't write it once anywhere and run it on every

9  Java platform, because if you write it for an ME device it

10  won't run on SE, will it?

11  **A.**   That's right.

12        **MR. PURCELL:**  All right.  No further questions.

13        **THE COURT:**  All right.

14                  <u>**REDIRECT EXAMINATION**</u>

15  BY MS. HURST

16  **Q.**   Mr. Screven, to your understanding, is Android a, quote,

17  unquote, independent implementation as defined under the spec

18  license?

19  **A.**   It's an independent implementation of a subset of the --

20  of the specification.  It doesn't comply with the restrictions

21  that are required, that -- that an implementation has to -- has

22  to follow.

23        **MS. HURST:**  Trudy, can we get -- Madam Clerk, can we

24  switch back over.

25        Trudy, can we get 610.1 back up there.

1        (Document displayed.)

2   BY MS. HURST

3   Q.   All right.  Let's look at that second paragraph again.

4        So these are the restrictions that you're referring to?

5   A.   Yes.

6   Q.   And so what do you mean it doesn't follow those

7   restrictions?

8   A.   Well, it doesn't fully implement the spec, for one thing.

9   It doesn't -- and, really, one of the most important

10  conditions, it doesn't implement all of -- of the -- of the

11  API.

12  Q.   And what's the significance of that in your mind, sir?

13  A.   Well, it means that -- that a programmer who -- who is

14  writing a program in Java, you know, must choose either to

15  program for the Android environment or program for a standard

16  Java environment.  So I can't -- I can't have both.

17       Furthermore, you know, of course, because they don't

18  actually implement the full API, they cannot pass the TCK.

19  And, as far as I know, they don't have a TCK license.

20       So that further means that I cannot be assured as a Java

21  programmer that my program will run correctly in both

22  environments.  So as an application programmer, I have to pick.

23  I have to pick Android or I have to pick standard Java.

24  Q.   And you described on your -- in your prior testimony the

25  way in which these requirements promote competition.

 1          Would you explain how the failure to follow those

 2     requirements in Android's case has affected competition, in

 3     your view?

 4     **A.**   Yes.   Basically, you know, because smartphone

 5     manufacturers are creating phones --

 6          **MR. PURCELL:**   Objection, Your Honor.   This is beyond

 7     the scope of the cross.

 8          **MS. HURST:**   He asked about whether Android complied

 9     with the license in connection with the EC document, Your

10     Honor.

11          **MR. PURCELL:**   I didn't ask about effects on

12     competition.

13          **THE COURT:**   I think it's beyond the scope.

14          **MS. HURST:**   All right.

15     **BY MS. HURST**

16     **Q.**   What, if anything, is your understanding of the

17     consequence of Android's failure to be an independent

18     implementation as defined by the spec license?

19     **A.**   It locks --

20          **MR. PURCELL:**   Objection.   That's the same question.

21          **THE COURT:**   Possibly.   But you did ask about the --

22     you did ask about that license.   So that objection is

23     overruled.

24          Go ahead.

25          **THE WITNESS:**   It locks programmers into Android.   It

PROCEEDINGS

 1   means that they can't -- their applications can't run in other

 2   environments, other than Android.

 3        **MS. HURST:**  No further questions.

 4        **THE COURT:**  Anything more?

 5        **MR. PURCELL:**  Nothing further from me, Your Honor.

 6        **THE COURT:**  May the witness be excused?

 7        **MR. PURCELL:**  Yes.

 8        **THE COURT:**  Thank you, sir.  You're free to go.

 9      (Witness excused.)

10        **THE COURT:**  Next witness.  And while we're brining the

11   next witness forward, maybe counsel can clear off the witness

12   bench.

13        **MR. SIMPSON:**  Your Honor, at this time we ask that the

14   Court read into the record the stipulations the parties have

15   reached.

16        **THE COURT:**  That's a great idea.  See if I can find

17   it.

18      Are you going to be putting on the screen this big, long

19   exhibit?

20        **MR. SIMPSON:**  We can do that if you like.

21        **THE COURT:**  I think it would be useful to do that.  Is

22   this in evidence, 9223?

23        **MR. SIMPSON:**  Not yet, Your Honor.

24        **THE COURT:**  Welcome, sir.  Just have a seat there, and

25   we'll get to you in a second.

PROCEEDINGS

 1       Don't swear in the witness yet.  Just have a seat.  I'm

 2   going to do something here.

 3       Is 9223 in evidence?

 4            **MR. SIMPSON:**  Not yet, Your Honor.

 5            **THE COURT:**  Any objection to 9223?

 6            **MR. KWUN:**  No objection.

 7            **THE COURT:**  All right.  Received in evidence.  9223.

 8        (Trial Exhibit 9223 received in evidence.)

 9            **THE COURT:**  Okay.  So the lawyers on both sides have

10   come up with a helpful stipulation.  I'm going to read it to

11   you first, and then I'm going to give you a slight explanation,

12   and then I'm going to read it again so it will sink in.

13       And up on the screen you can see what this is relating to.

14   Can we -- there are only three or four, five pages.  Can you

15   scroll through the pages quickly so the jury will see what the

16   listing is.

17       Now, go back to, say, the first page, and blow up one of

18   them so it will be easier to read.

19        (Document displayed.)

20            **THE COURT:**  There we go.  Keep that on the screen.

21   That will do.

22       All right.  So I'm going to read it first, and then I'm

23   going to come back and read it again.

24            "It is an established fact that 170 lines of declaring

25        code from 62 classes and interfaces in the 37 API packages

1    at issue are technically necessary to use the Java

2    programming language.

3        "Those 170 lines of declaring code are listed in Trial

4    Exhibit 9223, which is admitted in evidence and which I

5    will now show you on the screen.

6        "Because that declaring code is necessary to use the

7    language, it is established that Google's use of the

8    declaring code in Trial Exhibit 9223 was a fair use.  This

9    is without prejudice to evidence that other additional

10   declaring code beyond those lines identified in Trial

11   Exhibit 9223 either was or was not necessary for use of

12   the Java programming language."

13       All right.  Now, I'm going to give you a short comment

14   about this so you can -- you'll see where this fits in the

15   overall issue.  Then I'm going to read this again.

16       The main issue you, over there, have got to decide is fair

17   use.  And you remember we're dealing with 37 API packages.  And

18   that breaks down into -- I think it's, like, 6,000 classes.

19       Is that how many it is?  How many classes are we talking

20   about?  It's a lot of classes.  37 packages, which turns out to

21   be many classes.

22       Well, it turns out that a few of these, it looks like 62

23   classes out of the entirety you can't even write in the

24   language itself unless you have those.  It wouldn't work.

25       So both sides are in agreement that as to that group of 62

1    classes, which is just part of the larger group, that as to

2    those 62 both sides are agreeing that that was a fair use.

3         So what the fight now becomes over is the rest of the 37

4    API packages and whether or not that was a fair use.  That's

5    what you've got to decide and they don't agree on.  So that's

6    what we mean without prejudice to either it was or was not fair

7    use.

8         All right.  I'm going to now read the stipulation again so

9    you will have the benefit of that small explanation --

10        MS. SIMPSON:  Your Honor, before you read it again,

11   can we have one clarification?  The actual number of lines of

12   code is not the full 62 classes, but rather the 170 lines

13   within those classes.  So it's not the entirety of each of

14   those classes.

15        THE COURT:  Okay.  But the declaring code is what

16   we're talking about here; right?

17        MS. SIMPSON:  But it isn't the full class of each of

18   those classes.  It's portions of those classes.

19        THE COURT:  Okay.  All right.  But the lawsuit is over

20   the declaring code; right?

21        MS. SIMPSON:  It's pieces of the declaring code.  It's

22   not all of the declaring code of those classes either.

23        THE COURT:  All right.  In any event, I guess I see

24   your point.

25        But the parties are in agreement that "170 lines of

**PROCEEDINGS**

1   declaring code from 62 classes and interfaces and the 37 API

2   packages at issue are technically necessary to use the Java

3   programming language.  Those 170 lines of declaring code are

4   listed in this trial exhibit that I just went through.  It's in

5   evidence, 9223.

6       "Because that declaring code is necessary to use the

7   language, it is established that Google's use of the declaring

8   code in Trial Exhibit 9223"-- I'm sorry.

9       Who was that hacking and coughing?  Would you take this

10  cough drop back there?  And I'm going to start all over.

11          **MR. VAN NEST:**  Happy to do it.

12          **THE COURT:**  I'm going to start all over because

13  somebody in the gallery was interfering with what I was trying

14  to explain.  If you're going to do that back there, you have to

15  go outside into the hallway, please.

16      "It is an established fact that 170 lines of declaring

17  code from 62 classes and interfaces in the 37 API packages at

18  issue are technically necessary to use the Java programming

19  language.  Those 170 lines of declaring code are listed in

20  Trial Exhibit 9223, which is admitted in evidence.

21      "Because that declaring code is necessary to use the

22  language, it is established that Google's use of the declaring

23  code in Trial Exhibit 9223 was a fair use.  This is without

24  prejudice to evidence that other additional declaring code

25  beyond those lines identified in 9223 either was or was not

1  necessary for the use of the Java programming language."

2      So it's that other group that is still very much in play

3  in our trial and which you are going to have to decide the

4  issue of fair use.  Okay.  I'm done with reading it.

5      Is that satisfactory to you?

6          **MS. SIMPSON:**  Yes, Your Honor.

7          **THE COURT:**  All right.  Thanks.  Go ahead.

8          **MS. SIMPSON:**  Oracle calls Dr. Mark Reinhold.

9          **THE COURT:**  All right.  Dr. Mark Reinhold, please

10  stand and raise your right hand.

11          **MARK REINHOLD**, **PLAINTIFF WITNESS, SWORN**

12          **THE CLERK:**  Please state your name for the Court and

13  spelled your last name for the record.

14          **THE WITNESS:**  Reinhold, R-E-I-N-H-O-L-D.

15          **THE COURT:**  Have a seat.  Make sure the mic catches

16  your voice.  You need to pull it a little closer to you.  Say

17  your name again.

18          **THE WITNESS:**  Mark Reinhold.

19          **THE COURT:**  Go ahead.

20                    **DIRECT EXAMINATION**

21  BY MS. SIMPSON:

22  **Q.**   Good morning, Dr. Reinhold.

23  **A.**   Good morning.

24  **Q.**   Can you tell the jury where you're currently employed and

25  what your job title is.

**REINHOLD - DIRECT / SIMPSON**

1   **A.**   I'm employed at Oracle America and my job title is chief

2   architect of the Java Platform Group.

3   **Q.**   Can you explain a little bit about what you do in your job

4   as the chief architect?

5   **A.**   Basically I'm responsible for steering the high-level

6   direction of the Java SE platform from a technical perspective.

7   **Q.**   And prior to joining Oracle, were you employed by Sun?

8   **A.**   I was employed by Sun.

9   **Q.**   At Sun, were you involved with Java?

10   **A.**   Yes, I was.

11   **Q.**   How many years have you worked on the Java platform?

12   **A.**   Almost 20.

13   **Q.**   During that almost 20 years of working on at Java

14   platform, does that you include API design and implementation?

15   **A.**   Yes.

16   **Q.**   Can you tell the jury a little bit about your educational

17   background?

18   **A.**   I have a Ph.D. in computer science from the Massachusetts

19   Institute of Technology.

20        **MS. SIMPSON:**  Your Honor, we have some demonstrative

21   slides we would like to use with this witness.  May I display

22   them?  We would like to mark them for identification as Trial

23   Exhibit 9224.

24        (Trial Exhibit 9224 marked for identification)

25        **THE COURT:**  Have you shown them to Counsel.

1          **MS. SIMPSON:**  Yes.

2          **THE COURT:**  Go ahead.

3    **BY MS. SIMPSON:**

4    **Q.**   Dr. Reinhold, what is the Java platform?

5    **A.**   The Java platform is a software development platform.  It

6    allows developers to write applications and users to run those

7    applications on a wide variety of computers and computing

8    devices.

9    **Q.**   Can you describe for the jury what the three components of

10   the platform are?

11   **A.**   Sure.  It has three main components.  There is the Java

12   programming language, the Java API packages, and the Java

13   virtual machine, which is referred to usually as the JVM.

14   **Q.**   Can you give the jury a little detail at a high level as

15   to what each of those components do.

16   **A.**   The programming language is the foundational language in

17   which all Java programs and applications are written.  So every

18   application developer needs to know that.

19        The Java API packages are essentially a collection of

20   ready-to-use programs that application developers can use when

21   they write their own applications, and it's -- their main

22   purpose is to save them time.  They provide lots of rich

23   functionality so developers don't have to write it all from

24   scratch every time.

25        And then finally the J VM, the Java virtual machine, is

1   what enables the same Java application to run in the same way

2   on different machines.

3   **Q.**   What is Java SE?

4   **A.**   Java SE is the Java Standard Edition Platform.

5   **Q.**   What is Java ME?

6   **A.**   Java ME is the Java Micro Edition Platform.  You can think

7   of it is as Java SE's little sibling.

8   **Q.**   Tell me more about that.  What does that mean?

9   **A.**   So Java ME was designed in the late 1990s, the early

10  2000s, to fit into very resource-constrained devices where

11  Java SE just wouldn't fit.

12  **Q.**   Does Java ME contain some of the same declaring code as

13  Java SE?

14  **A.**   Yes, it does.

15  **Q.**   Does Java ME contain the same structure, sequence, and

16  organization as Java SE?

17  **A.**   Where Java ME contains the same declaring code, it

18  contains the same structure, sequence, and organization.

19  **Q.**   Are there any additional packages in Java ME that are not

20  available in Java SE?

21  **A.**   Yes.

22  **Q.**   As an example, what version of Java SE was used to create

23  Java ME Version 1.1?

24  **A.**   Java ME 1.1 was derived from Java SE 1.4.

25  **Q.**   And can you give me an explanation of some of the benefits

1    of Java?

2    **A.**   Well, the biggest one really is it allows developers to

3    write an application once and have it be able to run on a

4    variety of platforms.  This is what's shown in the diagram

5    here.  You write something in Java using the language, the API

6    packages, and you can deliver that to users who can then run

7    it, say, on a Sun computer, on an Apple computer, on a Windows

8    computer or other types of machines.

9    **Q.**   Can you explain to the jury what a Java API package is.

10   **A.**   An API package, as I said, it's a set of pre-written

11   programs that application developers can use when writing their

12   own applications.  They are programs that have been tested.

13   They're well documented, they're designed to be easy to learn

14   and easy to remember.

15   **Q.**   Can you give an example of one of the Java APIs for the

16   jury?

17   **A.**   So one example would be there is a Java API package for

18   creating secure network connections.  If you are writing an

19   application that needs to transmit secure information over the

20   Internet like a credit card number, you don't want snoopers to

21   be able to see that, so there is an entire API package for

22   establishing -- establishing -- for doing what you need to do

23   to transmit that information in a secure fashion.

24   **Q.**   Are you aware of what -- which packages are at issue in

25   this lawsuit?

REINHOLD - DIRECT / SIMPSON

1   **A.**   I believe there is a list of 37.

2   **Q.**   And is that the list of 37?

3   **A.**   That is the list of 37.

4   **Q.**   Can you identify for the jury on this list the package you

5   were just describing, the secure network connection package?

6   **A.**   Yeah.  The package I was just describing is called

7   javax.net.ssl and it's about a third of the way down in the

8   right-hand column.

9   **Q.**   I want to talk a little bit more about the structure of a

10  Java API package.  Can you tell us what the main elements of an

11  API package are?

12  **A.**   The main kinds of elements that you find in an API

13  package -- working from the top down, at the high level, there

14  is the package itself.  A package contains things called

15  classes and interfaces.  Classes and interfaces contain things

16  called methods.  Classes can also contain things called fields,

17  but it's not just a hierarchical kind of thing.  There are also

18  lots of rich cross-connections from one element to another.

19  **Q.**   Dr. Reinhold, I would like to show you a poster which has

20  been marked Trial Exhibit 1028.  Do you recognize this poster?

21  **A.**   Yes, I do.

22  **Q.**   What is it?

23  **A.**   This poster was created by Sun around the time that

24  Java SE 5 shipped.  It was something -- it was something you

25  could buy on Amazon.  It -- it tries to -- it depicts, in a

1    visual notation, the high level structure organization and

2    names of many, but not all, of the Java SE 5 API packages.

3    **Q.**    Was this something that was used by developers?

4    **A.**    Yes.   The intent was that you could order from Amazon, put

5    it up on your wall, and use it as a handy reference when you're

6    writing your own code.

7              **MS. SIMPSON:**   I would like to offer this Exhibit 1028

8    into evidence, please.

9              **THE COURT:**  Any objection?  Hearing none --

10             **MR. VAN NEST:**  No objection.

11             **THE COURT:**  Received.

12   (Trial Exhibit 1028 received in evidence)

13   **BY MS. SIMPSON:**

14   **Q.**   Is the poster a complete representation of the structure

15   and organization of the API?

16   **A.**    No, it is not.

17   **Q.**    What's missing from the poster?

18   **A.**    It doesn't show methods.   It doesn't show fields.   It

19   doesn't show all of the classes, and it doesn't show all of the

20   packages.   If we -- if I tried to put that on the poster, there

21   is just so many complexities, the poster would be gargantuan or

22   the print would be so teeny you wouldn't be able to read it.

23   **Q.**    How many packages are in Java SE 5?

24   **A.**    Java SE 5 had 166 packages.

25   **Q.**    How many classes are in those 166 packages?

REINHOLD - DIRECT / SIMPSON

1  **A.**   Roughly, 3,500.

2  **Q.**   How about methods and field?  How many of those?

3  **A.**   Roughly 35,000.

4  **Q.**   I would like to go back to the slides, Dr. Reinhold.  Have

5  you prepared some slides to help explain the structure?

6  **A.**   Yes.

7  **Q.**   Can you tell the jury what this is?

8  **A.**   Sure.  So I was thinking about how to explain the -- the

9  rich complexity of the API packages and what they express.  And

10 it occurred to me that, well, the API packages are defined by a

11 bunch of text that happens to be written in the Java

12 programming language.

13      We have many examples in the world of other -- other

14 collect -- large bodies of text.  One example might be a series

15 of books, and just for the sake of the example, here is a --

16 a -- a photo of the *Harry Potter* series, all seven books in a

17 handy case.  You know, at a high level, I think you can think

18 of the API packages as corresponding to -- the -- the entire --

19 set of API packages as corresponding to the series of books.

20 You can think of a particular -- a particular package is one

21 book, which, you know, having designed API packages makes a lot

22 of sense to me because it -- designing an API package from

23 scratch is actually a lot like writing a book.

24      And then going down one more level, if we look at a

25 particular class in a package, here I have identified the class

REINHOLD - DIRECT / SIMPSON

 1   signature on the left.  It's in the java.security package.  We

 2   can think of a class as corresponding to a chapter.  And here,

 3   just for the example, I have chosen, Chapter 6 of the first

 4   *Harry Potter* book.

 5   **Q.**   And how do methods fit into your analogy?

 6   **A.**   So going down further still, if we look at a method in the

 7   signature class, I've shown that there.  That's the full Java

 8   source code for a method called SignObject.  We can think of a

 9   method as corresponding to a paragraph in one of the books.

10   **Q.**   And what is declaring code, Dr. Reinhold?

11   **A.**   Declaring code is source code that names and introduces an

12   API element and relates that element to other API elements.  In

13   other words, you can say that it communicates to developers the

14   structure and organization of the overall API design.

15   **Q.**   And in your *Harry Potter* exampling, what is the declaring

16   code?

17   **A.**   The declaring code on the left is highlighted in yellow.

18   That's the two lines at the very top.  And it corresponds --

19   one can think of that as a topic sentence in a paragraph.  Just

20   as a topic sentence sets up the paragraph and draws connections

21   to other paragraphs, the declaring code for a method sets up

22   what's needed to understand the rest of the method and relates

23   it to other methods and classes and elements of APIs.

24   **Q.**   In what way is declaring code expressive, if at all,

25   Dr. Reinhold?

REINHOLD - DIRECT / SIMPSON

1    **A.**   Declaring code is extremely expressive.  There are an

2    infinite of number of creative choices necessary to design it

3    well.

4    **Q.**   What is the implementing code?

5    **A.**   The implementing code in this example is the code on the

6    left that is not highlighted in yellow.  The implementing code

7    tells the computer how to perform the action required by that

8    method.

9    **Q.**   For the Java API packages at issue in this lawsuit, is the

10   declaring code or the implementing code more important from a

11   developer perspective?

12   **A.**   It depends on what kind of developer you are, really.

13   **Q.**   And what do you mean by that?

14   **A.**   Well, you can take two -- two views of declaring code.

15   You can take the view of an application developer or you can

16   take the view of a developer who actually writes the API

17   package, which is what I do a lot of time.  So if you're an

18   application developer, then declaring code is extremely -- is

19   relatively more important.

20        The declaring code is what you have to read.  It's part of

21   the documentation.  You have to learn it.  That's how you learn

22   an API.  So it's important that it's -- it's important that the

23   declaring code is designed so that it's easy to learn and

24   remember.

25        As an application developer, you care that the

REINHOLD - DIRECT / SIMPSON

1    implementing code is there.  You care that it's efficient and

2    does the right thing, but you don't necessarily read it very

3    often, and that's okay.  You trust the authors of the API

4    package to have gotten it right.

5        Now, the other case I mentioned was if you're developing

6    an API package itself, well, then you care about both very

7    intensely, but in different ways.  The declaring code, as I

8    said, in order for it to be useful to application developers

9    has to be well designed, you have to put a lot of thought into

10   that.

11       The implementing code, you have to make sure that it's

12   correct and efficient.  Sometimes the implementing code can be

13   really hard to read, but that's okay because -- as long as it

14   does the right thing and does it efficiently.  Application

15   developers will very rarely read the implementing code.

16   **Q.**   Do you have an understanding, Dr. Reinhold, of what it is

17   that Google has been found to have copied in the 37 API

18   packages?

19   **A.**   Yes.  Google has copied the declaring code from all of

20   those packages and the sequence, structure, and organization.

21   **Q.**   And in your *Harry Potter* analogy, what does that

22   correspond to?

23   **A.**   You could think of that -- in the *Harry Potter* analogy, it

24   would be the titles of the books, the headings on each chapter,

25   the topic sentences of every paragraph, but not just that.

REINHOLD - DIRECT / SIMPSON

1  It's also all of the connections drawn between those elements

2  over time.  For example, a character could be introduced in one

3  chapter and then referred to, you know, five chapters later,

4  later on.  The location could be used in one book and it

5  reappears later on, you know, in -- three books later.  There

6  are all these deep connections.  It's not just about the

7  hierarchical structure.

8  Q.   Let's look at the next slide.  What is the

9  java.nio.channel package?

10  A.   So this is an API package which I designed, along with

11  four tightly-related packages.  It has to do with high

12  performance input/output.

13  Q.   And when did you design this package?

14  A.   Started work on this in the -- about the year 2000, and it

15  shipped in Java SE 1.4 in 2002.

16  Q.   Is this one of the 37 API packages at issue in this case?

17  A.   Yes, it is.

18  Q.   For this API, the java.nio.channel package, did it have to

19  have the particular structure represented up there?

20  A.   Oh, no.  It could have been designed in many different

21  ways.

22  Q.   Is that the case for the other Java APIs that are on the

23  list of 37?  Is it possible to design them in different ways

24  with different declaring codes, structures, and organizations

25  and have them solve the same problem.

REINHOLD - DIRECT / SIMPSON

1   **A.**   Oh, yes.

2   **Q.**   Can you give us an example of how that might work?

3   **A.**   So one example would be there is an API package in Java

4   for logging -- logging events.  If a program is running for a

5   long time, it can be useful to keep a record of what goes on in

6   it, so an application developer will use an API to create the

7   log messages that are stored somewhere for later analysis.

8        There's an API package in Java SE called

9   java.util.logging.  It is one of the packages in dispute.

10  That's one way to do logging.

11       Around the same time, completely outside of Sun

12  Microsystems, some other folks in the community decided they

13  preferred a different approach, so they created an API package

14  called Log4J.  It solves essentially the same problems, but the

15  API is almost completely different.

16  **Q.**   Let's talk a little bit about the designing process.  If

17  you're launching an API designing process, how do you begin?

18  **A.**   Well, you -- you -- you begin usually in kind of a

19  confused state, actually.  You start out considering well, what

20  are the -- what are the broad problems that we want to solve

21  with the API package, what are the technical limitations of the

22  platform we're using, the hardware it's got to run on, things

23  of that nature.

24       Once you've gone that far, what we often do is collect a

25  set of use cases, which are terse descriptions of more precise

REINHOLD - DIRECT / SIMPSON

 1    kinds of problems that we would want to solve.

 2          And then there is often, you know, a long period of

 3    brainstorming and writing on white boards and having meetings

 4    with colleagues and collaborators.  Eventually, you get to a

 5    point where you can start writing fragments of declaring code

 6    that start to give shape to what will be the API.

 7          I started writing fragments of declaring code for this

 8    package and the related packages, I don't know, a few months

 9    after -- after starting work on it, but it changed immensely

10    over time due to feedback.  Once you get that initial declaring

11    code, you get colleagues to review it, you get other people to

12    review it, you get feedback, and then you start writing some of

13    the implementing code so people can actually write sort of toy

14    applications that attempt to solve some of the use cases and

15    they can try to see well, how well does this work.

16    **Q.**   Over the two years you spent working on designing the Java

17    java.nio packages, how many drafts of the API were generated?

18    **A.**   There were about 30 drafts.

19    **Q.**   And you testified you've been working for 20 years in this

20    field designing APIs.  Do you consider the process of designing

21    APIs to be creative?

22    **A.**   Oh, it's intensively creative.  That's why I like the

23    *Harry Potter* analogy so much.  It really is a lot like writing

24    a book.  You have to keep a lot of stuff in your head, and the

25    end result is -- is very, very rich and complex.

1  **Q.**   Can you tell me about some of the creative choices that

2  you make while you're designing an API?

3  **A.**   Well, a lot of it is really about figuring out the

4  structures that you want.  Just going through the various

5  elements, the kinds of API elements that Java lets you define.

6  You know, first you have packages for the -- for this

7  java.nio.channels package and the four packages related to it,

8  we had to decide well, how many packages should there be.  We

9  could have put everything into one package, but that would have

10 been more difficult to learn, so we came up with a division of

11 five.

12      Once we had the rough concepts in our head, we had to

13 decide which classes we wanted, which interfaces we wanted.  We

14 had to decide how our classes and interfaces related, is one

15 class a subclass of this one or is it a subclass of that one

16 over there?  Does a class implement some interface in this API?

17 Maybe it implements an interface in some other API.

18      And then going down further, you know, there are all the

19 methods.  How do the methods relate?  For every method, what

20 kinds of inputs does it take?  What kind of outputs does it

21 produce?  What kind of errors can it report?  So methods can

22 also be related to classes and interfaces in that way.

23 **Q.**   How would you characterize the typical length of a line of

24 declaring code?

25 **A.**   Well, I think that's very hard to characterize.  Some are

1  very short and some are extremely long.

2  **Q.**   Can you tell the jury about these examples of declaring

3  code on this slide?

4  **A.**   So these are four examples from some of the packages in

5  the 37 in dispute.  These are examples of declaring code of

6  four methods.  As you can see, there's quite a bit of text for

7  each one.  They say -- they say quite a lot.  And it took quite

8  a bit of effort to design each one of these, along with all of

9  the other methods and classes and interfaces that they relate

10  to.

11  **Q.**   So these are -- these are single declarations on the

12  slide?

13  **A.**   Each -- each one of these in the right-hand column -- each

14  line is the declaring code for a particular method.

15  **Q.**   And what about names?  Are they a creative part of the

16  Java API design process?

17  **A.**   Names are certainly a creative part.  It's important to

18  choose good names, but it's also important to use judgment.

19  The thing about names is the -- is the shorter the name, the

20  nicer it looks, but there are many fewer short names than long

21  names just because with long names, you have more choices to

22  make.  So names are important, but they are not the be all/end

23  all.

24  **Q.**   Do you think it's accurate to describe the Java APIs as

25  labels?

REINHOLD - DIRECT / SIMPSON

1   **A.**   As labels?  I think that's laughably simplistic.

2   **Q.**   Why do you say that?

3   **A.**   Well, a label is just a name.  If all we had were names,

4   then we wouldn't need any of the -- of the structure and

5   organization that you actually find in the API packages.

6   **Q.**   Is the Java programming language defined by a

7   specification?

8   **A.**   Yes, it is.

9   **Q.**   And what -- where would you find that specification?

10  **A.**   It's actually a book called *The java Language*

11  *Specification*.

12  **Q.**   And is that available online?

13  **A.**   It is -- most -- most editions of it are available online.

14  **Q.**   And do you have Trial Exhibit 984 up there?

15  **A.**   No, I have something completely different here.  2237.

16          **MS. SIMPSON:**  This is already in evidence, Your Honor.

17  **Q.**   Dr. Reinhold, is that a copy of the Java Language

18  Specification?

19  **A.**   This is a photocopy -- I'm sure it was quite tedious to

20  make -- of the book, of the Java Language Specification, Third

21  Edition.

22  **Q.**   And what version of the Java Language Specification does

23  Java SE 5 require?

24  **A.**   It requires this version, the third edition.

25  **Q.**   Are the Java APIs part of the Java programming language?

REINHOLD - DIRECT / SIMPSON

1   **A.**   No, they're not.   The APIs -- the APIs and the language

2   are distinct parts of the Java platform.

3   **Q.**   Is there any relationship between the Java programming

4   language and the Java API packages?

5   **A.**   There is a very narrow, tightly-constrained relationship

6   between the programming language and a small number of classes

7   and interfaces.

8   **Q.**   Have you performed any analysis to determine how many

9   classes may be required by the Java programming language?

10   **A.**   Yes, I have.

11   **Q.**   And I'd like to display Trial Exhibit 9223, which we just

12   admitted.   Do you have that in front of you, Dr. Reinhold?

13   **A.**   Yes.

14   **Q.**   Does this document summarize your analysis?

15   **A.**   Yes, it does.

16   **Q.**   Dr. Reinhold, have you recently updated your analysis?

17   **A.**   Yes, I have.

18   **Q.**   And why is that?

19   **A.**   Just yesterday, I received an updated report from

20   Dr. Astrachan in which he observed that four methods in the

21   earlier version of this document were missing.

22   **Q.**   And what did you do?

23   **A.**   So I sat down and redid my analysis, you know, from

24   scratch in a different way, just to be sure.   I verified that

25   Dr. Astrachan was correct and that those four methods were

REINHOLD - DIRECT / SIMPSON

1    missing from the earlier version.  I also identified 12

2    additional methods that are required by the Java Language

3    Specification and were not in the original version of this.

4    **Q.**   Can you explain to the jury what each of these two columns

5    represents?

6    **A.**   The first column is a list of the classes and interfaces

7    that are required by the Java programming language

8    specification.  And then in the right-hand column for each

9    class or interface, there are lines or partial lines of

10   declaring code, and what -- basically the Java Language

11   Specification mandates that one of the -- the thing on the left

12   contain the declaring -- the declaring code or the partial

13   declaring code on the right.  But the language specification

14   doesn't say anything else about what the declaring code for

15   that class or interface should be.

16   **Q.**   So for the 62 classes and interfaces in this document, how

17   many lines of declaring code did you identify that are

18   constrained by the Java language?

19   **A.**   170.

20   **Q.**   And other than being in the book in front of you, the Java

21   Language Specification, Third Edition is there any other way

22   that parts of the Java API could be required by the Java

23   programming language?

24   **A.**   No.  If it's not mentioned in the book, then it's not --

25   it's not required by the language.

1  Q.   Dr. Reinhold, did Google have to copy the declaring code

2  from the 37 API packages at issue in this case in order to use

3  the Java programming language in Android?

4  A.   Certainly not.  All Google had to copy was the declaring

5  code -- the partial bits of declaring code in this document.

6          MS. SIMPSON:  Pass the witness.

7          THE COURT:  All right.  Thank you.  So let's go to

8  cross.

9                    **CROSS-EXAMINATION**

10 BY MR. PURCELL:

11 Q.   Good morning, Dr. Reinhold.

12 A.   Good morning.

13 Q.   Dr. Reinhold, you have been working closely with Oracle's

14 lawyers and their paid and retained expert witnesses in getting

15 ready for this trial; correct?

16 A.   Yes.

17 Q.   Over the course of this lawsuit, you have had dozens of

18 meetings with Oracle's lawyers to discuss this case; correct?

19 A.   Yes.

20 Q.   In fact, just this year, you submitted two separate

21 written declarations in support of Oracle's claims; correct?

22 A.   Correct.

23 Q.   You've also worked closely with several of Oracle's

24 specially-retained and paid outside experts; right?

25 A.   I -- I wouldn't say closely, but I have worked with them

REINHOLD - CROSS / PURCELL

1    some.

2    Q.   Well, you're familiar with Dr. Douglas Schmidt, who is one

3    of Oracle's outside experts?

4    A.   Yes.

5    Q.   You reviewed and commented on drafts of Dr. Schmidt's

6    expert report before Oracle provided that report to Google,

7    didn't you?

8    A.   I reviewed it -- reviewed portions of drafts, yes.

9    Q.   You reviewed portions of at least two or three drafts of

10   Dr. Schmidt's report; correct?

11   A.   Could be.

12   Q.   And you also spoke directly to Dr. Schmidt before he

13   finalized his report?

14   A.   Yes.

15   Q.   You're also familiar with Dr. Chris Kemerer, who is

16   another one of Oracle's outside retained experts in this case;

17   right?

18   A.   Yes.

19   Q.   You reviewed and commented on one draft of Dr. Kemerer's

20   expert report before Oracle provided that to Google?

21   A.   Yes.

22   Q.   You also spoke to Dr. Kemerer directly while he was

23   preparing his report?

24   A.   Very briefly, if I recall correctly.

25   Q.   And that took place at an in-person meeting you had at the

1   offices of Oracle's lawyers; right?

2   **A.**   Yes.

3   **Q.**   And you were at that meeting, along with Oracle's counsel,

4   Dr. Kemerer, and Dr. Schmidt?

5   **A.**   Yes.

6   **Q.**   And you're also familiar with a company called Keystone

7   Strategies that does litigation consulting and has provided

8   support to Oracle's experts in this case; right?

9   **A.**   Yes.

10  **Q.**   Keystone has provided behind-the-scenes support for

11  Dr. Schmidt and Dr. Kemerer and another one of Oracle's

12  experts, Dr. Robert Zeidman; correct?

13  **A.**   That is my understanding.

14  **Q.**   And you've participated personally in meetings with

15  Keystone and Oracle's lawyers, haven't you?

16  **A.**   Yes.  Very small number.

17  **Q.**   You've also participated in coaching Oracle witnesses in

18  the middle of having their depositions taken by Google;

19  correct?

20       **MS. SIMPSON:**  Objection, Your Honor.

21       **THE COURT:**  Well, if it's true, you can -- you can say

22  so.  Overruled.

23       Please answer.

24       **THE WITNESS:**  I -- I did provide advice on at least

25  one occasion to an Oracle witness.

1   BY MR. PURCELL:

2   Q.   You know an Oracle employee named Donald Smith; correct?

3   A.   Yes, I do.

4   Q.   That's who we are talking about?

5   A.   Well, that's who you are talking about.

6   Q.   Well, you agreed with me right that you spoke to him

7   during his deposition, didn't you?

8   A.   I did speak with him during his deposition.

9   Q.   The last year when Oracle -- or, sorry, when Google was

10   taking Mr. Smith's deposition in this case, you got an

11   emergency call from Mr. Smith and Oracle's lawyers in the

12   middle of that deposition; correct?

13   A.   I did receive a call in the middle of that deposition.   I

14   don't remember exactly who made the call.

15   Q.   And Mr. Smith called you in the middle of the deposition

16   or you were called in the middle of that deposition and

17   informed that Mr. Smith was concerned about some testimony that

18   he had given; right?

19   A.   Yes.

20   Q.   And Oracle's lawyers needed you to set Mr. Smith straight;

21   right?

22   A.   I was asked to explain certain things to Mr. Smith.

23   Q.   And you told Mr. Smith what he should say once he got back

24   under oath; right?

25   A.   I did not tell Mr. Smith exactly what he should say.

1    Q.   Well, you told Mr. Smith that he had previously been

2    mistaken and then you told him what the correct information was

3    that he should clarify once the deposition resumed; right?

4    A.   Essentially, yes.

5    Q.   Yeah.  And once the deposition resumed, Mr. Smith gave the

6    answer that you had told him to give as opposed to the one he

7    had given before; right?

8    A.   I -- I have not read Mr. Smith's deposition transcript, so

9    I don't know exactly what he said.

10   Q.   One of Oracle's claims in this case is that Google has

11   unfairly used the structure, sequence, and organization of 37

12   API packages in Java SE; right?

13   A.   Yes.

14   Q.   And I'm going to use the abbreviation SSO for *structure,*

15   *sequence and organization*.  Is that okay?

16   A.   Yes.

17   Q.   All right.  Now, you're the chief architect of Oracle's

18   Java Platform Group; right?

19   A.   No.  I'm the chief architect for the Java SE platform.

20   Q.   All right.  Fair enough.

21        You're the chief architect of Oracle's Java SE platform,

22   and Java SE is the platform that contains the SSO that Oracle

23   is suing about; right?

24   A.   Yes.

25   Q.   And you've been working on Java for either Sun or Oracle

REINHOLD - CROSS / PURCELL

1    since 1996?

2    **A.**   Yes.

3    **Q.**   And yet in all those years at Sun and Oracle, you'd never

4    even heard of the term *structure, sequence and organization* or

5    *SSO* until Oracle filed this lawsuit; isn't that right?

6    **A.**   That's correct.

7    **Q.**   The purpose of API design is to make APIs easy and

8    intuitive for developers to use; wouldn't you agree with that?

9    **A.**   I would say that's -- that's a main goal.

10   **Q.**   Now, if it wanted to, Sun could have made the Java SE SSO

11   very simple; correct?

12   **A.**   I don't think so, no.

13   **Q.**   Well, let me give you a couple of examples.  Sun could

14   have chosen to put every single class into one API package,

15   couldn't it?

16   **A.**   Yes.

17   **Q.**   All right.  And Sun could have chosen to put hundreds or

18   even thousands of methods in each class?

19   **A.**   Yep.

20   **Q.**   And Sun didn't want to do that, and the reason it didn't

21   want to do that is because that sort of SSO would be very hard

22   for developers to learn and use; right?

23   **A.**   That's correct.

24   **Q.**   And Sun didn't want its APIs to be hard for developers to

25   learn and use?

1  **A.**   On the contrary, Sun wanted them to be easy to learn and

2  use.

3  **Q.**   So Sun developed the SSO of the Java APIs based on what it

4  believed would enable developers to learn and use those APIs

5  most efficiently; right?

6  **A.**   Yes.

7  **Q.**   And in developing an easy-to-use, easy-to-learn SSO for

8  the Java platform, Sun believed that that would enable it to

9  draw more developers to the platform; right?

10  **A.**   Yes.

11  **Q.**   Now, could we get the list of the 37 API packages on the

12  screen.   Do we have the demonstrative?   This is good enough.

13      So let me just ask the question, Dr. Reinhold.   So there

14  is a package, an API package in Java SE called java.lang;

15  right?

16  **A.**   Yes.

17  **Q.**   And, in fact, most of the required lines of declaring code

18  that you identified are contained in the java.lang package;

19  right?

20  **A.**   That's true.

21  **Q.**   That's a package that contains information, methods,

22  classes that are fundamental to the operation of the Java

23  language; right?

24  **A.**   It contains -- it contains classes, interfaces, methods

25  and so forth that are more closely related to the Java

 1  programming language than other API packages, generally

 2  speaking.

 3  **Q.**   And Sun chose the name java.lang for that class because

 4  that name would communicate to developers that they could find

 5  functions in that package that were closely tied to the

 6  language; right?

 7  **A.**   Sun chose the name java.lang to convey that these were --

 8  to convey that the classes and interfaces in these packages

 9  were kind of -- were essentially the core of the platform.

10  These were -- these were the ones you had to learn first.  You

11  learned the language.  When you learned the language, you

12  learned some, though not all, of the APIs in the Java language

13  package and then you start learning things in other API

14  packages.

15  **Q.**   But that was the purpose of naming that package java.lang,

16  is because Sun wanted to convey to developers that these

17  methods, these classes, were relatively central to the

18  language; right?

19  **A.**   Sun wanted to convey to developers that these were

20  relatively central to the overall platform.

21  **Q.**   And within the java.lang package, there is a class called

22  java.lang.math; right?

23  **A.**   Yes, there is.

24  **Q.**   And in the java.lang.math class, Sun chose to put math

25  functions in that class; right?

1   A.   Yes.

2   Q.   And Sun believed that by using the name java.lang.math,

3   that would logically imply to developers that this was the

4   place they could find math functions; right?

5   A.   Yes.

6   Q.   There is another package in Java SE called java.net;

7   right?

8   A.   Yes.

9   Q.   Ah, the list is up on the screen.  I didn't even know.

10  All right.

11       So this is the list of the 37 API packages at issue here.

12  You see java.net?

13  A.   Yes.

14  Q.   All right.  And java.net contains network functionality;

15  right?

16  A.   It does.

17  Q.   And Sun believed that by giving that package the name

18  java.net, that would convey to developers that this was a place

19  they could find network functionality; right?

20  A.   That's true.

21  Q.   They wouldn't have to go hunting for it; they could just

22  look in java.net?

23  A.   Yes.

24  Q.   And we see there is also a package up there, java.security

25  at the top of the second column?

REINHOLD - CROSS / PURCELL

1  **A.**   Yes.

2  **Q.**   And that package contains security functions; right?

3  **A.**    It contains some of the security functions of the

4  platform.

5  **Q.**   All right.  And Sun wanted to convey to developers by

6  choosing that name that this was a place they could find some

7  of the security functions in the platform; right?

8  **A.**   Yes.

9  **Q.**   Now, Dr. Reinhold, without APIs, the Java programming

10  language wouldn't be much use, would it?

11  **A.**   That's true.

12  **Q.**   Without APIs, a Java programmer could write a program in

13  the Java language, but that program couldn't then communicate

14  with a computer monitor so you could even read the output;

15  right?

16  **A.**   Correct.

17  **Q.**   And without APIs, a programmer could write in the Java

18  programming language, but that program couldn't communicate

19  with a printer so you could print the output; right?

20  **A.**   Correct.

21  **Q.**   Basically without the Java APIs, you could write a program

22  in Java in isolation, but nothing you wrote could communicate

23  with the outside world at all; right?

24  **A.**   No.  Without any APIs, you could not write a Java program

25  that communicated with the outside world.

1   Q.   Without APIs, the Java language wouldn't be very

2   interesting to use for a programmer, would it?

3   A.   That's true.

4   Q.   Now, in addition to the declaring code, the Java API

5   packages also contained implementing code; correct?

6   A.   Yes.

7   Q.   In terms of the sheer amount of code in Java SE, the

8   overwhelming majority is implementing code and not declaring

9   code; right?

10  A.   That's true.

11  Q.   And you'd agree that to developers, the implementing code

12  in the API packages is equally important as the declaring code,

13  wouldn't you?

14  A.   No.  I would -- I would agree that to developers of API

15  packages, they're equally important.

16  Q.   All right.

17       Let's play Dr. Reinhold's deposition from, I think it's,

18  March 15, 2016 page 71, lines 6 to 14.

19       **MS. SIMPSON:**  No objection.

20       (Whereupon, the video was played for the jury).

21  **BY MR. PURCELL:**

22  Q.   Dr. Reinhold, Oracle maintains four separate and distinct

23  Java platforms; right?

24  A.   Yes.

25  Q.   There is Java ME; correct?  That's Java Micro Edition?

REINHOLD - CROSS / PURCELL

1   A.   Yes.

2   Q.   There is Java SE, Java Standard Edition?  That's what

3   we're talking about here; correct?

4   A.   Correct.

5   Q.   Theres Java EE, which is Java Enterprise Edition?

6   A.   Correct.

7   Q.   That's for large devices like big mainframe computers and

8   large servers; right?

9   A.   Uh-huh.

10  Q.   Is that "yes"?

11  A.   Roughly, yes.

12  Q.   Okay.  I'm sorry.  The court reporter just can't take down

13  "uh-huh."  She needs an audible response.

14  A.   I'm sorry.

15  Q.   And then there is Java Card.  That's for very small

16  devices like smart credit cards; right?

17  A.   Yes.

18  Q.   And each of those Java platforms has different APIs in it;

19  right?

20  A.   No.

21  Q.   Different API packages?

22  A.   There is -- there is a lot of overlap across most of them.

23  Q.   All right.  Fair enough.

24       There is overlap, but each of those platforms contains a

25  different set of API packages; correct?

1   **A.**   Correct.

2   **Q.**   All right.  And if a program written for one Java platform

3   calls on an API that isn't available in another Java platform,

4   that program won't run; right?

5   **A.**   It depends on which combination of platforms you're

6   talking about.

7   **Q.**   All right.  Let's say a program written in Java SE calls

8   on an API that isn't available in Java ME.

9   **A.**   Okay.

10   **Q.**   That program won't run on an ME device, will it?

11   **A.**   That's true.

12   **Q.**   Now, in fact, the write once/run anywhere principle, it

13   just doesn't apply across these four Java platforms; correct?

14   **A.**   Indeed it was never meant to.

15   **Q.**   Looking just at the Java ME platform, over time there have

16   been different configurations of ME; correct?

17   **A.**   Yes.

18   **Q.**   The first configuration or one of the early ones was

19   something called the connected limited device configuration or

20   CLDC?

21   **A.**   That's correct.

22   **Q.**   And that contained a very small number of API packages,

23   just the minimum that were required to run a virtual machine?

24   **A.**   I wouldn't characterize it that way, but it was a small

25   number.

1  **Q.**  All right.  And then after CLDC came CDC, connected device

2  configuration, and that had more APIs; correct?

3  **A.**  I don't recall whether CDC came after or before, but, yes,

4  CDC had relatively more APIs in it.

5  **Q.**  All right.  And if a program written for a CDC device

6  called on an API that wasn't available in a -- in CLDC, that

7  program wouldn't run on a CLDC device, would it?

8  **A.**  That's true.

9  **Q.**  And on top of the configurations of Java ME, there is

10 things called profiles; right?

11 **A.**  Yes.

12 **Q.**  And there's a profile called the mobile information device

13 profile or MIDP?

14 **A.**  Yes.

15 **Q.**  And then there is different versions of MIDP.  There is

16 MIDP2, MIDP3; right?

17 **A.**  Correct.

18 **Q.**  And each of those profiles has different sets of APIs;

19 right?

20 **A.**  That's true.

21 **Q.**  And if a program is written for one profile, calls on an

22 API that is not available in another profile, that program

23 might not run; right?

24 **A.**  That's true.

25 **Q.**  Java ME wouldn't pass any of the compatibility tests for

1  Java SE, would it?

2  **A.**   No.

3  **Q.**   And, in fact, Java SE and Java ME are so different that

4  asking whether they are compatible that doesn't even really

5  make sense; correct?

6  **A.**   Correct.

7  **Q.**   Now, you gave some testimony on direct about how Java ME

8  is supposedly derived from Java SE.  Do you recall that?

9  **A.**   Yes.

10  **Q.**   You're not a lawyer, correct, Dr. Reinhold?

11  **A.**   That's true.

12  **Q.**   And you're not offering any legal opinion about the

13  relationship between ME and SE?

14  **A.**   No.

15  **Q.**   The CLDC configuration of Java ME that we just discussed,

16  that was released in May of 2000.  Does that sound right?

17  **A.**   Could be.  I --

18  **Q.**   You don't recall?

19  **A.**   I haven't memorized any release dates.

20  **Q.**   All right.

21       Your Honor, may I approach?

22            **THE COURT:**  Yes.

23            **MR. PURCELL:**  I would like to hand the witness Trial

24  Exhibit 7782.

25  **Q.**   Dr. Reinhold, I would like to --

1        MS. SIMPSON:  Your Honor, this exhibit wasn't

2   disclosed.

3        MR. PURCELL:  It's to refresh the witness'

4   recollection.

5        THE COURT:  All right.  Well, then don't read it out

6   loud.  Just read it to yourself.

7        MS. SIMPSON:  Do you have a copy?

8        THE COURT:  Ask the question now.

9        MS. SIMPSON:  Your Honor, may I see the document?

10       THE COURT:  Of course.  Show counsel the document.

11       Have you looked at this as to release dates,

12  Dr. Reinhold, and if so, just close it up because once -- your

13  memory is either refreshed or not.

14       Ask the question again.

15  BY MR. PURCELL:

16  Q.   Does that document refresh your recollection that CLDC

17  configuration was first released in April of 2000?

18  A.   This you document says when it was registered.

19  Q.   It says that the copyright was registered in April of

20  2000?

21  A.   I believe that's what I just read.  Maybe I'm incorrect.

22  Q.   All right.  The CDC configuration, you said you didn't

23  recall when that was released, whether that was before or after

24  CLDC?

25  A.   Correct.

REINHOLD - CROSS / PURCELL

1    **Q.**    It was around the same time?

2    **A.**    Could have been.

3    **Q.**    All right.  Just directing your attention over to the

4    board, the parties have stipulated that Java SE 1.4 platform,

5    one of the works at issue in this case, first came out in

6    February of 2002.

7    **A.**    Yes.

8    **Q.**    Do you see that?

9    **A.**    Yes.

10   **Q.**    Isn't it the case that the CLDC and CDC configurations of

11   Java ME both preceded Java 1.4 onto the market?

12   **A.**    Their first releases did.

13   **Q.**    Okay.  The first releases of both CDC and CLDC preceded

14   Java 1.4?

15   **A.**    Apparently, according to this, one of them did.  I don't

16   know from direct knowledge exactly when the other one shipped.

17   **Q.**    But from direct knowledge, do you know that Java ME and

18   the two configurations, CLDC and CDC, those products were on

19   the market before Java SE 1.4 came out in February of 2002?

20   **A.**    They could have been.

21   **Q.**    Now, you would agree historically that the Java SE

22   platform has been monolithic, wouldn't you?

23   **A.**    Yes.

24   **Q.**    And by monolithic, you mean that Sun required the

25   implementation of all of the Java SE API packages; correct?

1    A.    Yes.

2    Q.    And before the release of the OpenJDK open source

3    package -- platform, rather there was no way for a third party

4    implementer to pick and choose only the Java SE API packages

5    that he or she wanted to implement; right?

6    A.    That's true.

7    Q.    And because the Java platforms were monolithic, that made

8    them large systems that didn't scale down very well; right?

9    A.    It would all depend on the kind of thing you're trying to

10   scale down to.

11   Q.    All right.

12        I would like to play Dr. Reinhold's deposition at page 23,

13   lines 14 to 19.

14            MS. SIMPSON:   Which transcript?

15            MR. PURCELL:   This is again the March 15, 2016.

16            MS. SIMPSON:   Page and line number?

17            MR. PURCELL:   Page 23, lines 14 to 19.

18            THE COURT:   Let's play it, no objection being heard.

19        (Whereupon, the video was played for the jury)

20   BY MR. PURCELL:

21   Q.    When you saw that the Java platforms didn't scale down

22   very well, you mean that they contained extra functionality

23   that could create complications if you are trying to implement

24   it in a smaller device; right?

25   A.    They contain -- they contained functionality that would

 1   take up space, and that functionality might not be necessary.

 2   Q.   Right.  And the functionality that would take up space and

 3   that would be unnecessary, that would be a problem for

 4   developers who only wanted to use only those Java SE APIs that

 5   would be useful in a mobile device; right?

 6   A.   It would depend on the mobile device.

 7   Q.   But it could create that problem, couldn't it?

 8   A.   It could.

 9   Q.   Before Oracle acquired Sun, Sun had begun to work on a

10   project called One Java; correct?

11   A.   Yes.

12   Q.   And the long term goal of One Java was to unify the

13   Java SE and ME platforms; right?

14   A.   Roughly speaking, that was one of its goals.

15   Q.   And you were personally involved in One Java?

16   A.   I was personally involved in a project that supported it.

17   Q.   All right.  Could we look at -- well, we shouldn't look at

18   it first.  Let me hand it to you.

19       I would like to approach the witness, Your Honor.

20       Dr. Reinhold, this is Trial Exhibit 7495.  Dr. Reinhold,

21   is this an email that you received during your work at Oracle?

22   A.   Yes.

23           MR. PURCELL:  I'd like to move to admit Trial Exhibit

24   7495.

25           MS. SIMPSON:  No objection, Your Honor.

 1              **THE COURT:**  Received in evidence.

 2      (Trial Exhibit 7495 received in evidence)

 3      **BY MR. PURCELL:**

 4      **Q.**   If we could blow up the top.

 5          Dr. Reinhold, this is an email that you and others,

 6      including Mr. Saab, Oracle's corporate representative, received

 7      from a man named Paul Hohensee on November 30, 2010.  Do you

 8      see that?

 9      **A.**   Yes.

10      **Q.**   Now, in the first paragraph about a third of the way down,

11      Mr. Hohensee writes, "Recall that the original OJ proposal was

12      an attempt to save ME.  Unfortunately, it was interpreted as an

13      attack on ME and ignored.  It's too late -- it's now too late.

14      ME is, for all practical purposes, dead."

15          You understand that by OJ there, Mr. Hohensee means One

16      Java; right?

17      **A.**   Yes.

18      **Q.**   And by the date of this email, Oracle had made the

19      decision to terminate One Java; right?

20      **A.**   That is true.

21      **Q.**   Oracle terminated One Java earlier in 2010, shortly after

22      it acquired Sun; right?

23      **A.**   Sometime after it acquired Sun, yes.

24      **Q.**   And Oracle didn't replace One Java with any other

25      initiative; correct?

1  **A.**   Not with any initiative of the same nature.

2  **Q.**   And Oracle decided One Java wasn't consistent with its

3  business goals; right?

4  **A.**   I do not know exactly why One Java was terminated.  I was

5  not part of that decision.

6          **MR. PURCELL:**  Your Honor, I would like to read from

7  Dr. Reinhold's prior sworn testimony, the date of which is

8  April 19, 2012, and page and line number, page 727, lines 5

9  through 8.

10         **THE COURT:**  All right.  Go ahead.

11         **MR. PURCELL:**  (Reading):

12  **"Q.**  Oracle decided that directly addressing the

13      smartphone market in that way through One Java, it wasn't

14      a very interesting -- sorry -- it wasn't a very

15      interesting business idea; correct?

16  **"A.**  That was my understanding."

17      Actually, Your Honor, I misspoke.  I would like to read

18  from line 5 through line 12 on that page.

19         **THE COURT:**  Go ahead.

20         **MR. PURCELL:**  (Reading):

21  **"Q.**  Oracle decided to pull the plug on One Java because

22      it did not see the project as consistent with its business

23      goals?

24  **"A.**  Yes.

25  **"Q.**  Oracle decided that directly addressing the

1    smartphone market in that way through One Java, it wasn't

2    a very interesting business idea; correct?

3    **"A.**  That was my understanding."

4    **Q.**  Later in that paragraph, Mr. Hohensee writes, "OJ was and

5    is our alternative to Android.  We totally dropped the ball by

6    not doing it.  If we want to get anything from suing Google,

7    we've got to have a product to fill the Android space."

8    Do you see that?

9    **A.**  Yes, I do.

10   **Q.**  When Mr. Hohensee wrote this email, Oracle hadn't created

11   any product to fill the Android space, had it?

12   **A.**  Not to my knowledge.

13   **Q.**  And as of today, Oracle still has never created any

14   product to fill the Android space; correct?

15   **A.**  That is true.

16        **MR. PURCELL:**  Pass the witness.

17        **THE COURT:**  Ms. Simpson, do you mind if I ask a couple

18   of questions so you'll have the benefit of whatever I'm going

19   to ask before you ask your questions?

20        **MS. SIMPSON:**  Of course, Your Honor.

21        **THE COURT:**  All right.  Thank you.  Hang on one

22   minute.  I've got to note down the time.  Very brief questions.

23        You have referred several times, and the lawyers, to

24   "calling," "calling a method and API."  Is that the right -- is

25   that the right term?

```
1          I want to clarify for the jury what the right term is when

2     somebody is you actually using the language, wants to use one

3     of the methods in the API, what is the right terminology?

4          THE WITNESS:  So, Your Honor, when we speak of

5     "calling a method" or sometimes people say invoke, that's when

6     you're writing implementing code and you -- you're basically

7     writing code that instructs the computer okay, now go run this

8     method over there and pass it this information and then receive

9     its results and maybe do something further.

10         THE COURT:  All right.  So if you're writing an app,

11    the word is "invoke" or how about "call"?  We have heard --

12         THE WITNESS:  Calling is perfectly fine.

13         THE COURT:  "Call," "invoke."  Now, in the old days it

14    was something called a command in computer language, but it

15    sounds like that is no longer the right word.  So that would

16    not be called a command or is it like a command?

17         THE WITNESS:  The concept of a command is more

18    commonly found, Your Honor, in -- in simpler languages that are

19    designed for -- for sort of, you know, small programs that just

20    perform a specific function that you need -- need done a few

21    times, not something you would ever bother --

22         THE COURT:  Like a print command?

23         THE WITNESS:  A print command, for example.

24         THE COURT:  But if you wanted to print something using

25    the API, what would it look like?  What would that line look
```

1    like in the developer's code?

2         THE WITNESS:  So if you wanted to print, say, just a

3    string of text to the console --

4         THE COURT:  What whatever is a good example.

5         THE WITNESS:  If you want to just print a string of

6    text so it appears in a console window, the letters you would

7    write would be system.out.println and then you have an open

8    parentheses and then a string or an expression that produces a

9    string --

10        THE COURT:  Like "let's go to the movie" in quotes and

11   then that would show up on the screen?

12        THE WITNESS:  That's correct.

13        THE COURT:  Okay.  So that's no longer called a

14   "command" in modern language.  That would be called a "call" or

15   "invoking."  Tell us what you would call it.

16        THE WITNESS:  So that overall thing,

17   system.out.println parentheses string semi colon, that in Java

18   is called a statement.  It's like a command.

19       The other principle type of implementing code in Java is

20   called an expression.  You know, for example, if you were just

21   doing some arithmetic, you have two fields A and B and you add

22   them together, A plus B, that is an expression that returns a

23   result.

24        THE COURT:  "Statement," "expression."  But the

25   statement is quote, "calling" or "invoking" something in the

1   API to print?

2              THE WITNESS:  Correct.

3              THE COURT:  Okay.  All right.  I've got one other

4   question.

5         Oh, here it is.  One of the lawyers asked you this

6   question.  If you were to move the many, many different methods

7   around so that they were scrambled around and not in the same

8   packages and classes that they're in now but in different

9   packages and classes and let's say they even had different

10  names --

11             THE WITNESS:  Yes, sir.

12             THE COURT:  -- but otherwise they were identical, the

13  methods, how would that affect the declaring code?  What would

14  you have to do to make it work if you had -- to the line of

15  declaring code?

16             THE WITNESS:  You would have -- you would have to

17  change every part of the declaring code that mentions some old

18  name to whatever the new name is.

19             THE COURT:  So the names are actually in the declaring

20  code?

21             THE WITNESS:  Yes, sir.

22             THE COURT:  Okay.

23             THE WITNESS:  Would you like me to use the print

24  example again?

25             THE COURT:  Yes.  Let's do that.

1    THE WITNESS:  So just picture the word

2    system.out.println and then a string, that method could be

3    called "show string."  It could be part of a field called

4    "output" and it could be in a class called "console."  So

5    instead, you know, in some alternative universe, you would

6    write that as console.output.show string string.  But the

7    implementing code would be the same except for all these

8    renames.

9         THE COURT:  All right.  And so then the big outline

10   like you're chart would look different with different packages

11   and classes if everything was renamed and reorganized?

12        THE WITNESS:  Yes, sir.

13        THE COURT:  Okay.  But you could still do all that

14   with the same function -- overall functionality?

15        THE WITNESS:  Correct.

16        THE COURT:  All right.  Thank you.  Go ahead,

17   Ms. Simpson.

18                    **REDIRECT EXAMINATION**

19   BY MS. SIMPSON:

20   **Q.**   Dr. Reinhold, do people in -- at Oracle regularly seek you

21   out for your Java expertise?

22   **A.**   Yes.

23   **Q.**   And is that the case, particularly with respect to the

24   technology?

25   **A.**   Yes.

**REINHOLD - REDIRECT / SIMPSON**

1   **Q.**   Can you explain to the jury why you were consulted by

2   Oracle's experts in this case?

3           **MR. PURCELL:**  Objection.  Foundation.  Also calls for

4   privilege, I think.

5           **THE COURT:**  Well, you got into it.  I'm going to let

6   Ms. Simpson get into it.

7        Just say why you thought they were calling you.

8           **THE WITNESS:**  They called me because I have a lot of

9   technical expertise and understanding of Java's history, having

10  worked on it for most of its existence.  And that's all highly

11  germane to this case.

12  **BY MS. SIMPSON:**

13  **Q.**   You testified, when you were talking to Mr. Purcell, about

14  whether a computer program could communicate without any APIs.

15  Do you remember that testimony?

16  **A.**   Yes.

17  **Q.**   And can you explain what you meant when you were

18  emphasizing the word "any"?

19  **A.**   What I meant was, at least with the Java programming

20  language, you don't need the Java API packages in dispute in

21  this case.  You could write your own.  You could write your own

22  API packages for printing to the console, for doing

23  input/output, for doing networking.  Everything that is in the

24  37, you could write your own, and then -- and other than those

25  partial 62 that are required by the language, your API packages

 1   could be completely different.

 2            **MS. SIMPSON:**  No further questions, Your Honor.

 3            **MR. PURCELL:**  Nothing further, Your Honor.

 4            **THE COURT:**  Okay.  Dr. Reinhold, thank you.  Have a

 5   great day.  You are free to go.

 6        All right.  Who is our next witness going to be?

 7            **MS. HURST:**  Your Honor, the next witness is Professor

 8   Douglas Schmidt, and we need to read in the Zeidman stipulation

 9   before Professor Schmidt takes the stand.

10            **THE COURT:**  Can we do that and then the jury have a

11   15-minute break and then we'll come back and hear Dr. Schmidt?

12            **MS. HURST:**  Good idea.

13            **THE COURT:**  Where is the -- I'm sorry.  You're going

14   to --

15            **MS. HURST:**  I'm going to hand it up, Your Honor.

16   Your Honor, this is ECF 1901.

17            **THE COURT:**  Are you going to be able to put this long

18   list on the screen?

19            **MS. HURST:**  We were going to put the demonstrative as

20   part of the stipulation on the screen, Your Honor, and while

21   you were reading it or I could read it, however you want to do

22   it --

23            **THE COURT:**  I'll read it, but I think it would help

24   the jury to have it.  All right.  So I'm about to read to you

25   another stipulation that will be useful for the next witness,

 1   who is one of these retained experts.

 2        "The exhibits to Mr. Robert Zeidman's," Z-E-I-D-M-A-N,

 3   "Zeidman's January 8, 2016 expert report partially revised on

 4   March 15, 2016" -- wait a minute.  That's not the part I'm

 5   supposed to read.  Where do I start reading?  Oh, here it is,

 6   down here.  I'm sorry.  Forgive me over there.  I misunderstood

 7   the stipulation.

 8        Okay.  "The parties agree that the Court should read the

 9   following statement to the jury.  Mr. Robert Zeidman was

10   retained by Oracle to perform a source code comparison.  The

11   parties have agreed that Mr. Zeidman shall not testify live in

12   the case."  Mr. Zeidman -- how is he going to testify then?  By

13   deposition or something?

14        **MS. HURST:**  He prepared reports and was

15   cross-examined, Your Honor, and the stipulations will take the

16   place of his testimony.

17        **THE COURT:**  Oh, I see.  All right.

18        "Mr. Zeidman performed a comparison of the source code

19   from the Java SE 5 platform and various versions of the Android

20   platform.  He determined that Google used the following numbers

21   of declaring code statements from the 37 Java API packages in

22   Android."  Okay.  So now I'm going to read a long list.

23        "Android Gingerbread, API Level 9, 11,578 declaring code

24   statements.

25        "Android Gingerbread, API Level 10, 11,578.

1        "Android Honeycomb, API 11, 11,578.

2        "Android Honeycomb, API Level 12, 11,578."

3        I'm omitting the part about declaring code statements.

4    11,578 declaring code statements.

5        "Android Honeycomb, API Level 13, 11,578.

6        "Android Ice Cream Sandwich, API Level 14, 11,432.

7        "Android Ice Cream Sandwich, API Level 15, 11,432.

8        "Android Jelly Bean, API Level 16, 11,433.  11,433.

9        "Android Jelly Bean, API Level 17, 11,434.

10       "Android Jelly Bean, API Level 18, 11,460.

11       "Android KitKat, API Level 19, 11,470.

12       "Android KitKat, API Level 20, 11,471.

13       "Android Lollipop, API Level 21, 11,475.

14       "Android Lollipop, API Level 22, 11,475."

15       And finally, "Android Marshmallow, API Level 23, 11,457

16   declaring code statements."

17       And have you put that Exhibit A on the screen?

18       **MS. HURST:**  It's been on the screen, Your Honor, while

19   you were reading so the jury could make notes, if they wanted

20   to.

21       **THE COURT:**  Great.  All right.  So unless -- I'm not

22   going to reread this unless somebody over there in the jury

23   wants me to reread it.  Raise your hand.  I think you've got --

24   what I did was go down every single one of the versions of

25   Android at issue in this trial and read out the number of

1    declaring code statements that this witness found was the same,

2    most of them around 11,400 and 500.

3         **MS. HURST:**  Your Honor, I misspoke.  We have about six

4    minutes of video which we can do before or after the break.  I

5    just wanted the Court to know.

6         **THE COURT:**  Let's do it after.  I promised you a

7    break.  Please remember the admonition.

8        (Proceedings were heard out of presence of the jury:)

9         **THE COURT:**  Okay.  Anything for the judge?  Everyone

10   be seated please.  Anything for the judge?  Anything you need

11   me for?

12        **MR. VAN NEST:**  Yes, Your Honor.

13        **MR. KAMBER:**  One thing, Your Honor.  With respect to

14   Dr. Schmidt's demonstrative, the parties have reached agreement

15   on everything except for one issue, and that is some of the

16   demonstrative slides are argumentive in that they refer to

17   "copied code" and repeatedly kind of emphasize the copied

18   nature, and we would request and have requested that the slides

19   be more neutral and refer to just the use, which is consistent

20   with the --

21        **THE COURT:**  Whose expert is this?

22        **MS. HURST:**  This is our expert, Your Honor.

23        **THE COURT:**  Let me look at it and see.

24        **MR. KAMBER:**  I believe it's slides -- it's a little

25   bit later into the deck about --

PROCEEDINGS.

```
 1              MS. HURST:  It's not until 9 and 10, Your Honor, that
 2     the word "copied" appears.
 3              THE COURT:  It says, "The purpose of the copied APIs
 4     is not altered."  That's all right.  It's not that bad.  So I
 5     don't think the word "copied" sounds as bad as you think it
 6     sounds.  I'm not going to -- this fine as is.
 7              MS. HURST:  Thank you, Your Honor.
 8              THE COURT:  You're welcome.
 9              MR. KAMBER:   Thank you, Your Honor.
10              THE COURT:  Anything else I can help you with?
11              MR. VAN NEST:   We have one other thing that relates to
12     a witness that comes after Dr. Schmidt.
13              THE COURT:  Is Schmidt next?  I thought we were going
14     to have a video.
15              MS. HURST:  Yes.  About six minutes of video and then
16     Professor Schmidt.
17              MR. VAN NEST:  And then after him is Mr. Civjan and
18     there are some issues with Mr. Civjan.
19              THE COURT:  All right.  Tell me what the issues are.
20     Everyone be seated over there.
21              MR. RAGLAND:  There are three exhibits that were
22     disclosed for Mr. Civjan that are 2010 exhibits.  One is
23     December 16, 2010.  In addition to it being hearsay, it's also
24     403.
25          This was a PowerPoint declaration created after this
```

**PROCEEDINGS.**

1  litigation was filed, finalized after this litigation was

2  filed, that has very inflammatory statements such as "Google is

3  using our IP without a license."

4      It also includes references to a separate dispute that

5  Oracle had with Google related to --

6          **THE COURT:**  Stop on that one for a second.  If it's an

7  in-house Google document, how can you possibly -- that's just

8  self-serving hearsay?  How can you get that into evidence.

9          **MR. BICKS:**  Your Honor, I'm happy for you to see the

10  document.  These are documents that are prepared.  The witness

11  is coming.  Has a -- is -- was head of sales and has a

12  responsibility to prepare regular reports on sales information

13  for the company.

14          **THE COURT:**  Let me see the document.

15          **MR. BICKS:**  The comment that the document was prepared

16  for litigation is completely incorrect.  The witness will

17  explain that.  And this is a document the witness prepared as

18  part of regularly reporting business activities.  And that's

19  what the witness will say.  And I will ask the witness did this

20  have anything to do with litigation and he will say no.  He

21  will say that --

22          **THE COURT:**  Show me --

23          **MR. RAGLAND:**  Sure, Your Honor.  If you would turn --

24  there are several of them.  I'm including ones that show

25  commentary being made to make sure the inflammatory language is

**PROCEEDINGS.**

1   the most inflammatory possible, but we'll get to that.

2        In 6431, if you would turn to page 59 of the exhibit,

3   Your Honor.  The slide is titled "Consumer Trends."  You will

4   see under the second bullet -- are you there, Your Honor.

5            **THE COURT:**  Yes.

6            **MR. RAGLAND:**  "Google is using our IP without a

7   license and providing platform for free and monetizing through

8   app store."  And this was December 2010, months -- four months

9   after this lawsuit was filed.  There is an email trail as to

10  one of these documents in July 2010, right before the lawsuit

11  was filed, that shows someone perfecting the language to make

12  sure that -- there is a typo on "feed."  They want to make sure

13  it said "free" there.

14       First, they're not created in the normal course.  These

15  are slides.  They aren't, you know, business records,

16  accounting records.  This is a presentation slide, so it's not

17  a business record.  It's definitely hearsay because it's

18  internal Oracle.  It's also 403, Your Honor, because it's got

19  inflammatory statements.

20       There is also a reference on page 70, Your Honor --

21           **THE COURT:**  Look, this is easy.  I don't care so much

22  about the inflammatory part, but this an internal

23  self-serving -- it is not a business record.  It's just not.

24  It's a presentation made in-house, and it does not come into

25  evidence until -- until you, on the Google side, say like he's

1  just made this up for -- his testimony up for purposes of trial

2  and then he gets to come back and say, "No, I said this back in

3  December of 2010 and here's the proof."

4      So maybe you've got to wait to use it, if the door is

5  opened, on redirect.  But I don't know where you lawyers think

6  that things like this when it's your own company that produces

7  them are somehow business records that get into evidence.  It's

8  not a business record.

9          MR. BICKS:  Your Honor, if you just look at the front

10 page of the document, page 2 of it --

11         THE COURT:  Yeah.

12         MR. BICKS:  Right?  And you see the heading of the

13 document, right, "Java Business Review, Neal Civjan, the

14 vice-president, Java Global Sales," right?  Just because the

15 document is a PowerPoint, right, this is the regular type of

16 document that this witness prepares with respect to his

17 business duties in the company.  This records information.

18 He's got a responsibility to do so accurately, and it's

19 reported and decisions are made based on the information.

20         THE COURT:  Look, there is no way this could be -- if

21 we allowed things like this to be put into evidence, then we

22 might as well just bring in wheel barrels full of the company's

23 internal propaganda and just dump it into the jury box.  It's

24 all self-serving.

25     No.  It's not a business record within the meaning of the

**PROCEEDINGS.**

1    Rules of Evidence.  So I'm sorry.  This is just not going to

2    come in unless the door gets opened to it.

3            **MR. BICKS:**  Well --

4            **MR. RAGLAND:**  Thank you, Your Honor --

5            **THE COURT:**  Wait.  Wait.

6            **MR. BICKS:**  So -- all right.  And there are several of

7    these PowerPoints that this witness -- because this is what

8    they do to report.  So I'd like to be in a position, because

9    there is real detail on these documents in terms of customers

10   and things of that nature -- I mean, without admitting them

11   into evidence --

12           **THE COURT:**  There is a way to use it, maybe, as

13   follows.  What's his name again?

14           **MR. BICKS:**  Neal Civjan.

15           **THE COURT:**  Say, "Mr. Civjan, what's your position?"

16       "Well, I" -- what is his position?  Sales?

17           **MR. BICKS:**  Head of worldwide sales.

18           **THE COURT:**  "I'm head of worldwide sales," and then

19   you say, "Well, to what extent, if at all, did Android become a

20   problem?"

21       "They put us out of business.  It was awful."

22       And then he just tells the story live.  Even more

23   inflammatory.  And then --

24           **MR. VAN NEST:**  Move to strike, Your Honor.

25           **THE COURT:**  And then if he can't, for some reason,

**PROCEEDINGS.**

1   remember something, then you say, "Would it help to take a look

2   at one of your sales things to see if it tells you exactly how

3   much you lost?"

4        "Yeah, maybe it would."  Then he looks.  "Oh, yeah, we

5   lost $85 billion."  You can do that.

6            **MR. BICKS:**  Okay.

7            **THE COURT:**  But you can't use it as a stand-alone

8   document.

9            **MR. RAGLAND:**  I presume, also, Your Honor, he can't

10  look at this, answer the question, look at the -- testify from

11  the document essentially.

12           **THE COURT:**  You're not supposed to do that.  You're

13  not supposed to do that.  Sometimes witnesses get away with it

14  because both sides do it.

15           **MR. RAGLAND:**  One other issue that this --

16           **THE COURT:**  Both sides haven't been doing it in this

17  case.  In other cases, both sides do it.  So far this is one

18  thing you haven't done in this case.

19           **MR. RAGLAND:**  Thank you.  So that relates --

20           **MR. VAN NEST:**  Can we underscore that on the record,

21  please.

22           **MR. RAGLAND:**  That relates to Exhibits 853, 6431, 6470

23  are the ones that were disclosed for Mr. Civjan.

24           **THE COURT:**  I haven't looked at anything but 6431.

25           **MR. RAGLAND:**  I have the others --

 1           THE COURT:  If they are in the same category, that's

 2     how I'm going to rule.

 3           MR. RAGLAND:  It raises another issue as we were

 4     reviewing these.  There was a dispute between Oracle and

 5     Google.  It relates to Java SE embedded that has nothing to do

 6     with this case.  There are some references in these documents

 7     to a dispute with Google, McDonald's, EMC, other companies.  I

 8     just want to make sure -- I'm not saying that counsel will do

 9     this --

10           THE COURT:  Are you going to get into the embedded

11     thing?

12           MR. BICKS:  No.

13           THE COURT:  All right.  That's no problem.

14           MR. RAGLAND:  Your Honor, the last issue relating to

15     Mr. Civjan, there are two documents that relate to some sort of

16     dispute -- these are the two documents I've seen about it -- in

17     Korea that Sun had with wireless standards in Korea.  First

18     they're hearsay.  I can hand them up.

19         Also I think they are 403.  I don't know what the IP

20     protection rights are in Korea or how that relates to wireless

21     standards.  So those are Exhibits 6247 and 9198.

22           THE COURT:  Because of Android, they were having

23     troubles in Korea?

24           MR. RAGLAND:  No.  It has nothing to do with Android.

25           THE COURT:  Are you going to get into Korea?

PROCEEDINGS.

1      MR. BICKS:  I'm not getting into that.

2      THE COURT:  Korea is out.

3      MR. RAGLAND:  Thank you, Your Honor.

4      MR. BICKS:  There is one exhibit I do want to --

5      THE COURT:  Let's see the exhibit you want to use.

6      MR. RAGLAND:  Which one is that?

7      MR. BICKS:  9133.

8      This is another exhibit that he's prepared, Your Honor.

9  This is prior to Oracle acquiring Sun when he's been asked to

10  report on what areas the company is in.  It's got helpful kind

11  of demonstrative-type exhibits on who were the customers and

12  things of that nature.

13      THE COURT:  Like this organizational --

14      MR. BICKS:  Organizational charts --

15      THE COURT:  I'll let you use the organizational chart.

16      MR. BICKS:  And, you see, I've highlighted one with my

17  flag there of who the carriers were, who their license partners

18  were, and --

19      THE COURT:  I'm going to let them use this list here

20  because I have a feeling any of this could be testified to,

21  so -- he's going to testify to all of it right?

22      MR. BICKS:  Yes.

23      THE COURT:  All right.  No problem with -- the first

24  one that has been tagged, you can use that.  And then the next

25  one that has a tag --

**PROCEEDINGS.**

1          MR. RAGLAND:  Those are pages 10 and 11, correct,

2     Your Honor?

3          THE COURT:  This one right here, the ecosystem one?

4          MR. BICKS:  Yes.

5          THE COURT:  I'll let you use that.

6          MR. RAGLAND:  We have no objection.

7          THE COURT:  You've already used it anyway; right?  It

8     seems like I saw it before.

9          MR. BICKS:  One similar.

10         THE COURT:  And the one that says "compliance," let's

11     see.  I don't know.  I don't like the -- I think this one is

12     too self-serving, the last one that says "compliance."  Did you

13     propose to use that one, too?

14         MR. BICKS:  I had intended to.

15         MR. RAGLAND:  We would object to that one, Your Honor.

16         MR. BICKS:  I mean, I'm going to ask him about it --

17         THE COURT:  You can ask him about it, but don't -- in

18     other words, ask about the same subject matter, but not show

19     the document --

20         MR. BICKS:  All right.

21         THE COURT:  -- to the jury, but if he needs it to

22     refresh his memory, you can use it then.

23         MR. RAGLAND:  I will point out, Your Honor, we are

24     concerned about this one in particular.  It conveniently refers

25     to Skelmir, which is a virtual machine, and Apache, both of

**PROCEEDINGS.**

 1  which were at issue in this litigation.  Of course the prior

 2  trial was all about the virtual machine and Apache obviously is

 3  here.  So I would ask that if there is -- this just again --

 4          **THE COURT:**  I have already said not to show it to the

 5  jury on the compliance page, but he can use it to refresh

 6  memory.

 7          **MR. BICKS:**  Understood.

 8          **MR. RAGLAND:**  And making sure, the bottom there of

 9  that page "using our code but not willing to pay" referring to

10  Google, McDonald's --

11          **THE COURT:**  Why are you beating a dead horse?  I have

12  already said he can't use it.

13          **MR. RAGLAND:**  Understood, Your Honor.  I want to make

14  sure that it's not used to elicit that because that's the other

15  issue that has nothing to do with --

16          **THE COURT:**  Which one is that?

17          **MR. RAGLAND:**  The bottom, "using our code but not

18  willing to pay, IPanel, Google, McDonald's," that is completely

19  a different issue, nothing to do with this case.  I want to

20  make sure that testimony is not elicited --

21          **THE COURT:**  Are you planning to get into that subject?

22          **MR. BICKS:**  I'm not going to get into that subject,

23  Your Honor, but this witness is going to be of the view that a

24  license should have been taken and he will testify to it.

25          **MR. RAGLAND:**  A license to a product that is not at

1    issue in this case should not be elicited --

2         THE COURT:  Look, counsel, Oracle is entitled to have

3    its say in this case, and you don't like to hear them say that

4    you should have gotten a license, but that's what they're going

5    to say, and then you get to bust them on cross-examination.

6    Maybe.  Maybe not.  We'll see how good the witness is.  But I'm

7    not going to go to that point.  I'm not going to agree with you

8    on that last point.

9         MR. RAGLAND:  All right.  Thank you, Your Honor.

10        THE COURT:  Can we take a few minutes ourselves?  Ten

11   minutes.  We'll take 10 minutes.

12                (Recess taken at 11:34 a.m.)

13              (Proceedings resumed at 11:44 a.m.)

14        THE COURT:  Let's bring in the jury.

15      (Proceedings were heard in the presence of the jury:)

16        MS. HURST:  Our colleague, Ms. Christina Von der Ahe

17   who hasn't appeared before the jury, is going to introduce

18   these depositions.

19        THE COURT:  Say that again.

20        MS. HURST:  Our colleague, Ms. Christina Von der Ahe,

21   who has not yet appeared before the jury, will do the

22   deposition's wrangling.

23        THE COURT:  Great.  So be sure to introduce yourself

24   so that the jury can write down your name when that occurs.

25      (Proceedings were heard in the presence of the jury:)

PROCEEDINGS

1        THE COURT:  Welcome back.  Please be seated.  So

2   what's our next item?

3        MR. BICKS:  So, Your Honor, we were going to have some

4   very short video clips.  Christina Von der Ahe is going to

5   handle that.

6        THE COURT:  Please come forward.

7        MS. VON DER AHE:  Good morning.  My name is Christina

8   Von der Ahe, and I'm one of the attorneys representing Oracle

9   in this matter.

10        THE COURT:  Say your name more slowly.

11        MS. VON DER AHE:  Christina Von der Ahe.

12        THE COURT:  How do you spell that?

13        MS. VON DER AHE:  V-o-n d-e-r A-h-e.

14        THE COURT:  Go ahead.  Tell us what you're up here

15   for.

16        MS. VON DER AHE:  Sorry, Your Honor.

17      We'll present our next three witnesses by short video

18   clips.

19      The first is the videotaped sworn deposition testimony of

20   a Mr. Urs Holzle.  U-r-s, H-o-l-z-l-e.

21      At the time of his deposition, he was a Google employee.

22   The deposition was taken on November 24th of 2015.  And the

23   questioning attorney was Annette Hurst.

24        THE COURT:  Very good.  Please proceed.

25        (Videotaped deposition of Urs Holzle played.)

PROCEEDINGS

1      **THE COURT:**  Done?

2    Okay.  Who's next?

3      **MS. VON DER AHE:**  The next video witness is Reto

4    Meier.  R-e-t-o, M-e-i-e-r.

5      Again, this is a sworn videotaped deposition.  The

6    deposition took place on December 11th, 2015.  And the

7    questioning attorney was Alyssa Caridis.

8      **THE COURT:**  Please, go ahead.

9      (Videotaped deposition of Reto Meier played.)

10      **THE COURT:**  All right.

11      **MS. VON DER AHE:**  Last one.

12    The next videotaped deposition is the sworn 30(b)(6)

13    deposition of a Mr. Anwar Ghuloum.  A-n-w-a-r.  Ghuloum,

14    G-h-u-l-o-u-m.  He was also a Google employee at the time of

15    his deposition, which took place on December 9th, 2015.  And

16    the questioning attorney was Gabe Ramsey.

17      (Videotaped deposition of Anwar Ghuloum played.)

18      **MS. HURST:**  Your Honor, that last witness,

19    Mr. Ghuloum, was a 30(b)(6) witness at the time.

20    It may be appropriate to have an instruction explaining

21    that to the jury.

22      **THE COURT:**  All right.  Just one moment.

23    You know I've told you in the jury box how the lawyers can

24    go and take depositions.  And that's a regular deal.  You've

25    seen enough of it already.

1    There's a special type of deposition that both sides can

2    take, called a 30(b)(6) deposition.  And that is where you say

3    to the other side, when it's a corporation, as both are here,

4    please bring to the deposition somebody who is qualified to

5    speak on the issue of A, B or C, whatever the subject is.

6    It might be how Android works or how Java works, or how

7    much money Android has made for the company or how much it's

8    lost for the company as the case may be.

9    So you specify what the topic is.  And then the company

10   has the burden to go figure out who is best able to answer

11   those questions and bring them to the deposition.  And then

12   that person is put under oath and gives testimony.

13   So that testimony is deemed to be made on behalf of the

14   corporation, and has extra force because it's made on behalf of

15   the corporation as opposed to just on behalf of that individual

16   talking for themselves.

17   Okay.  There you go.  30(b)(6).

18   Next witness.

19   **MS. HURST:**  Your Honor, Oracle calls Professor Douglas

20   Schmidt.

21   **THE COURT:**  Okay.  Are you Dr. Schmidt?

22   **THE WITNESS:**  I am, sir, yes.

23   **THE COURT:**  All right.  Welcome to the court.  Please

24   stand somewhere comfortable and raise your right hand.

25

1    <u>**DOUGLAS SCHMIDT, PLAINTIFF'S WITNESS, SWORN**</u>

2          **THE CLERK:**  Please state your name for the Court and

3    spell your last name for the record.

4          **THE WITNESS:**  Douglas Craig Schmidt.  S-c-h-m-i-d-t.

5          **THE COURT:**  Okay.  Great.  Have a seat.  Welcome

6    again.

7          **THE WITNESS:**  Thank you.

8          **THE COURT:**  And adjust the mic so it will catch your

9    voice.

10          **THE WITNESS:**  Okay.

11          **THE COURT:**  Please go ahead, Ms. Hurst.

12                     <u>**DIRECT EXAMINATION**</u>

13    **BY MS. HURST**

14    **Q.**   Would you please introduce yourself to the jury.

15    **A.**   Sure.

16       Hi.  I'm Doug Schmidt.  And I'm a professor of computer

17    science at Vanderbilt University in Nashville, Tennessee.

18    **Q.**   And would you describe your educational background,

19    please.

20    **A.**   I have a master's degree and Ph.D. in computer science

21    from the university California Irvine, in Irvine, California.

22       And I also have a bachelor's degree and master's degree in

23    sociology from the College of William and Mary in Williamsburg,

24    Virginia.

25    **Q.**   How long have you taught computer science?

1   **A.**   I've been teaching computer science courses for about the

2   past 25 years or so, teaching courses on C++, Java, C, many

3   other languages as well.

4   **Q.**   Have you had any other professional activities related to

5   computer science?

6   **A.**   So I've done many things.

7      I'm a researcher.  Written lots of papers, done lots of

8   research on computing.

9      I've taught a number of massive open online courses on

10  topics related to platforms and mobile development and mobile

11  cloud computing.

12     I've written lots of software related to middleware and

13  various types of object-running program platforms.

14  **Q.**   And have you ever done anything for the government?

15  **A.**   Yes.  I was a deputy director and program manager at

16  DARPA, where I led the national effort on research related to

17  distributed computing.

18  **Q.**   Have you ever done anything in industry?

19  **A.**   Yes.  I've been the chief technology officer for several

20  companies and a federally funded research and development

21  center.  The FFRDC was the software engineering institute at

22  Carnegie Mellon University.  And the two companies were Prism

23  Technologies and Zircon Computing.

24  **Q.**   Somewhere along the line did you have something to do with

25  Mars Lander?

1    **A.**    Yes, I worked on NASA's Mars Scientific Laboratory Mission

2    Concept review board, where we ended up putting a truck-size

3    vehicle on the surface of Mars to go and do various

4    experiments.

5    **Q.**    All right.  As part of all of those things that you've

6    described, do you have any Java experience?

7    **A.**    Yes.  I've been programming with Java since the middle

8    '90, late '90s, shortly after it first came out.

9    **Q.**    And have you actually written any Java programs of your

10   own?

11   **A.**    Yes.  I've written many Java programs.

12        In '96 to '99, or so, I developed one of the first

13   concurrent network middleware frameworks written in Java,

14   called Java ACE.

15        A little bit later I was involved in helping to codevelop

16   something called Zen, which was an object request broker that

17   was a design for embedded systems and memory-constrained

18   devices.

19        I've also written lots of Java applications for the

20   courses I've taught over the years.

21   **Q.**    Professor Schmidt, I'm going to hand you what's been

22   marked as Exhibit 6571.

23   **A.**    Thank you.

24   **Q.**    By the way, how many publications have you authored?

25   **A.**    I've authored upwards of about 575 journals and articles,

1    and a bit over -- coauthored a bit over ten books.

2    Q.   Do you recognize Exhibit 6571?

3    A.   Yes, I do.

4    Q.   What is it?

5    A.   It's my curricular vitae, which is basically a summary of

6    my professional accomplishments and my career experience.

7            MS. HURST:  Move the admission of Exhibit 6571.

8            MR. KAMBER:  No objection.

9            THE COURT:  Received.

10           (Trial Exhibit 6571 received in evidence.)

11   BY MS. HURST

12   Q.   All right.  Now, you're a retained expert in this case.

13   Oracle hired you?

14   A.   Yes, that's correct.

15   Q.   Have you ever served as retained expert before?

16   A.   No, I've not.  This is my first time.

17   Q.   And this is the first time in front of a jury?

18   A.   That's correct, yes.

19   Q.   All right.  Did you prepare a report in this matter?

20   A.   Yes.  I prepared several reports.

21   Q.   All right.  And have you created some slides in order to

22   help illustrate your opinions for the jury today?

23   A.   Yes, I have.

24   Q.   I'm going to hand you the clicker.

25   A.   Okay.

SCHMIDT - DIRECT / HURST

1    Q.   You're in charge.

2    A.   Thank you.  Appreciate that.

3         MS. HURST:  All right.  Trudy, can I have that first

4    slide.

5         (Document displayed.)

6    BY MS. HURST

7    Q.   All right.  What does this slide represent, Professor

8    Schmidt?

9    A.   This slide provides an overview of the Java platform.

10        Java platform is a environment for developing and running

11   applications on top of a whole bunch of different kinds of

12   computing devices.

13   Q.   All right.  And are you going to tell us a little bit more

14   about each of those parts?

15   A.   Sure.

16        The three main components I would like to talk about here,

17   each of these components has their only published

18   specification, which basically describes what the component

19   does and its purposes, and in some cases actually provides some

20   declaring code, as we'll talk about.

21   Q.   All right.

22   A.   So one part of the platform is the Java Programming

23   Language.  And that's the part that provides the basic

24   capabilities, the basic features for writing programs.

25        Another key part of the platform is something called the

1   Java API packages.  The Java API packages are sets of

2   prewritten programs that allow application developers to

3   develop more feature-rich and powerful applications more

4   rapidly and effectively.

5        And the third main part of the platform that has its own

6   specification is the Java Virtual Machine.  And the Java

7   Virtual Machine is the execution environment in which these

8   applications actually run.

9        There's also, if you can see, a few other miscellaneous

10  pieces shown, that are part of the platform.  Things like the

11  compiler, Java compiler, and disassembler.  But their

12  specifications aren't as detailed as the three main components

13  we've talked about here.

14  **Q.**  The jury has already heard a lot about this today and

15  during the course of the trial.

16       By the way, have you been here for the trial?

17  **A.**  Yes, ma'am.

18  **Q.**  All right.  So this document was admitted earlier, with

19  Dr. Reinhold, Trial Exhibit 1028.  Do you recognize this thing?

20  **A.**  I do recognize it, yes.

21  **Q.**  What is it?

22  **A.**  It's kind of a wall art that provides a thumbnail sketch

23  of many of the packages and some of the classes, a portion of

24  the classes and packages that are part of the APIs in the Java

25  platform.

SCHMIDT - DIRECT / HURST

1   Q.   All right.  And did you hear Dr. Reinhold testify that

2   this doesn't reflect everything?

3   A.   Yes, absolutely.

4   Q.   Now, in your work in this case, did you make an effort to

5   create a diagram that does reflect the Java -- whole structure

6   of the Java SE 5 API?

7   A.   Yes, I have.

8   Q.   And what did you create?

9   A.   So I created something, which is shown on this slide,

10  which is called a software map.

11  Q.   All right.  Would you explain to the jury, what is a

12  software map?

13  A.   So a software map is basically a way of visualizing the

14  design of the Java APIs in this particular case.  You could use

15  it for other things, too, but in this case I'm using this to be

16  able to show the design of the Java APIs.

17       And as we'll see in the software map, it allows us to be

18  able to get a nice bird's-eye perspective on all the classes

19  and all the interfaces, and how they are organized and grouped

20  together.

21       And then we'll see in a few slides how they are related to

22  each other as well.  And this is, you will see, a much richer

23  view of the other exhibits.  Shows much more of the interesting

24  parts.

25  Q.   Okay.  Is this the first time you've ever used a software

1   map?

2   **A.**    No.  I've used software visualization techniques

3   throughout my career.  Many of the books I've written have many

4   diagrams that visualize the way in which classes and interfaces

5   and other parts of software are organized and related to each

6   other.

7   **Q.**   So this is a standard tool?

8   **A.**   Yes, this is a very standard technique.

9   **Q.**   All right.  So what do we see here on this first part of

10  the map?

11  **A.**   The first part of the map, kind of, gives the overall

12  perspective showing all of the classes and interfaces in the

13  Java API, which, as we heard -- as we've learned, there are 166

14  of these packages.  And these are all the classes and

15  interfaces that are part of the Java API.

16       This is really just showing the organization, the way

17  things are actually grouped together.  We'll see the

18  relationship in just a moment.

19  **Q.**   So this is the whole set of classes and interfaces in

20  Java SE 5 API?

21  **A.**   Yes, that's correct.  This is all the classes and --

22  **Q.**   Approximately how many are there?

23  **A.**   So there are an awful lot.  I think there's in the order

24  of thousands, 3,000 or so classes and interfaces.  And there's

25  30,000-plus methods.  Many, many methods.  Many, many classes

SCHMIDT - DIRECT / HURST

1   and interfaces.

2   **Q.**    Okay.  Why don't you continue.

3   **A.**    So this diagram here shows an overlay of the 37 API

4   packages at question in this case, and show roughly where they

5   correspond to the various classes and interfaces that are part

6   of the Java API.

7        So this really, kind of, gives a view of how the packages

8   touch or are associated with the classes and interfaces that

9   are part of the overall Java API.

10  **Q.**    So is this all of the packages?

11  **A.**    No.  There's actually 166 total packages.  And these are

12  the 37 that are at issue in this case.

13  **Q.**    All right.  And what do you want to show us next?

14  **A.**    So that's, kind of, a big-picture view.  And sometimes

15  when you see something from that 30,000-foot level, it's a

16  little hard to get a feel for what's really going on inside.

17       So what I've done here is I've created animation that

18  blows up or expands a particular part of the software map.  And

19  this part of the software map shows the various classes and

20  interfaces that are part of the so-called java.util package.

21       Let me just talk a bit about what a class is, and

22  interface in this context.  A class is essentially a small

23  program that contains both declaring code and also implementing

24  code.

25       And you'll see that the classes are shown here colored

1    blue.  They're kind of the blue circles or blue nodes or blue

2    dots.

3        The interfaces are shown in green.  Interfaces are

4    basically lightweight classes that only contain declaring code.

5    There's no implementing code associated with an interface.  And

6    that will become important when we get a little bit further

7    along.

8    **Q.**   Stop here for one moment.

9        Is this the methods?

10   **A.**   No.  This diagram does not show the methods.

11   **Q.**   And why didn't you show the methods?

12   **A.**   If we showed the methods on this diagram, it would be so

13   much information being presented that it would be rather

14   difficult to understand it.  It would be just a lot of words on

15   the screen.  It would make it hard to see the design.  The

16   design essence and design organization and design relationships

17   would be obscured to some extent.

18   **Q.**   All right.  What's next?

19   **A.**   So what I would like to do now is show the relationships.

20       Up to this point, I've shown the classes and the

21   interfaces, how they're organized together.  But classes and

22   interfaces are not islands.  They don't exist in isolation.

23   They're actually connected together in a very intricate web of

24   relationships.  And this diagram starts to show those

25   relationships.  In fact, this diagram shows all the

1    relationships between the classes and interfaces that are part

2    of the Java API packages.

3    **Q.**   All right.  So what are those gray lines?

4    **A.**   So the gray lines are basically the relationships.  And

5    we'll talk a bit more.  In a second I'll show you a zoomed-in

6    view.

7        But at the high level, these gray lines show relationships

8    between classes.  So the classes relate to classes.  Interfaces

9    relate to interfaces.  And classes relate to interfaces.  So

10   it's ways of showing the connection, the interconnected web of

11   relationships between the various elements.

12   **Q.**   All right.

13   **A.**   What we're really showing here is the design.  This is the

14   declaring code.  This is the part that's the design element.

15   **Q.**   All right.  Have you got more to zoom in on?

16   **A.**   So now what I'm doing, at long last, is kind of getting

17   into the heart or the core of what we're showing here in terms

18   of details.

19       So I'm zooming in on the java.util package.  And I'm

20   showing a particular portion of the java.util package that

21   relates to something called the Java collections framework.

22   And I'll use this as a running example throughout my

23   discussion.

24       So the Java collections framework provides a set of

25   classes and interfaces that allow programmers to store and

SCHMIDT - DIRECT / HURST

 1   retrieve data.

 2        Imagine, for example, you have friends in your contact

 3   list.  And you want to be able to find a friend's phone number.

 4   So you could use elements of the collections framework in order

 5   to do that.

 6        So we're zooming in on just a portion of the Java

 7   collections framework and looking in more detail at some of the

 8   many classes and many interfaces and their interrelationships.

 9        So what you're seeing there is, we have dozens of classes.

10   Those are the blue parts.  And there are gray lines connecting

11   them, which means that they're also related to each other.

12        We also see dozens of interfaces, the green nodes.  And

13   there's lots of gray lines connecting those pieces.

14        And then there's lots of gray lines that connect the

15   classes and interfaces together as well.

16        The key thing to note about this -- and I'll show you some

17   examples shortly -- is that this diagram represents many of the

18   creative design choices that the people who built the Java APIs

19   had to consider when they came up with this particular way of

20   doing things.

21        Could have looked totally different.  They could have had

22   different connections.  They could have had different

23   relationships.  They could have had different classes,

24   different interfaces.

25        They chose them to be this particular way.  But I'll show

1   you shortly there's lots of other ways of being able to put

2   these things together in order to provide the same purpose.

3   Collections or pretty much anything else that's shown in these

4   software maps.

5   **Q.**   All right.  Let me stop you there for a sec.

6         Still, are we seeing the methods?

7   **A.**   The methods are not shown here.  We're just looking at a

8   class and an interface in relationship level.

9   **Q.**   So the structure would be even more complex if you

10  included that additional level?

11  **A.**   Absolutely.

12         **MR. KAMBER:**  Objection.  Leading.

13         **THE WITNESS:**  Yes, there would be more complexity --

14         **THE COURT:**  It is leading, but it's okay in this

15  instance.

16  **BY MS. HURST**

17  **Q.**   All right.  And, Professor Schmidt, is this java.util

18  package that you're showing here, is that one of the ones at

19  issue?

20  **A.**   Yes.

21  **Q.**   All right.  So show us what you've got next?

22  **A.**   So to, kind of, round up this discussion showing the

23  big-picture view and diving a little into the details of

24  classes and the interfaces of this package, I'm going to show

25  you a couple of concrete examples of actual classes that exist

**SCHMIDT - DIRECT / HURST**

1    in this particular package.

2         And so what you see here are three classes and their

3    relationships.  And also show an interface and its relationship

4    to the class.

5         So we have a class called AbstractList.  And you can see

6    from the diagram --

7    **Q.**   Do you have the green pointer on there?  Maybe that would

8    help a little bit.

9    **A.**   There we go.  So AbstractList is one class.  It's called a

10   superclass.  And then down below are two other classes, called

11   subclasses.

12        Oops.

13   **Q.**   All right.  Hold on.  Let's get back there.  Take your

14   time.

15   **A.**   There we go.

16        So the abstract list is the superclass.  And it's related

17   to two subclasses.  ArrayList and Vector.  And they add

18   additional capabilities and so on.

19        And the AbstractList actually is also related to the list.

20   So this, again, just gives you a little bit more concrete

21   examples of how the software design are connected together.

22        And one of the things -- we just talked about methods.

23   When you look at the methods, what you find is they are really

24   actually rather small and infinitesimal relative to the overall

25   design structure.

SCHMIDT - DIRECT / HURST

1       And that's what this diagram does such a nice job of

2   showing.  It shows the big-picture view of how the classes and

3   the interfaces, the main elements of the structure, are

4   organized together in the design.

5       The methods appear, but they're much more microscopic.  We

6   don't have to show them in order to see the big-picture view.

7   **Q.**   All right.  Let's go back to the big-picture view then.

8       What -- what then, after examining this map of the Java SE

9   5 API, did you next do?

10  **A.**   So what I just showed you was the big-picture view from

11  the Java SE perspective, Java SE APIs, how those things are

12  organized.

13      What I'm going to do now is move to show you how Google

14  copied parts of the design into Android.  And that's what this

15  diagram is about to show.

16      So to give you a little context, when I created this

17  diagram, I used a tool, standard software analysis tool, called

18  Understand.  Funny name.

19      And it reads through -- I had it read through all the Java

20  source code one file at a time.  And every time the Understand

21  tool saw a file, it would look inside the file and would find a

22  class or interface.

23      And it would proceed to look at all the different pieces,

24  all the different elements of declaring code in that class or

25  interface.  And it would output into a very, very large file

1  all these dependencies showing the package name, the class

2  name.  It would show the class.  Let's say array, or ArrayList

3  or Vector that we just looked at, and a relationship like

4  extends to another class, like ArrayList or AbstractList.  So

5  we show the relationships.

6  Q.   And did you look on the Android side as well?

7  A.   So I took a report and analysis that was done by

8  Mr. Zeidman.

9  Q.   The one we heard about in the stipulation earlier?

10 A.   Yes, yes.

11      So I took his report.  He had, as you saw, 11,500'ish

12 copied lines of code.  And for every line of code that he

13 identified in his report, I would then mark in this big output

14 which of the relationships that were copied were ones that had

15 come from Android's -- Google's copying into Android.

16      So I ended up with a very large file with certain things

17 marked as being copied.

18 Q.   All right.  Can you show us what kind of a map that

19 resulted in?

20 A.   Yes.  So then I put that through my visualization tool,

21 and that produced this diagram.

22      And what you see here is that all the relationships in the

23 design that were copied are colored in red.

24 Q.   All right.  And what, if any, significance did you take

25 from this mapping of what was copied?

SCHMIDT - DIRECT / HURST

1   **A.**   So there's a couple of interesting things to note here.

2        First thing to note is the copied APIs, the copied

3   classes, the copied interfaces, appear throughout the Java SE 5

4   API packages and classes.

5        So you can see, just looking visually, that they touch

6   many, many different parts of this overall circle.  The red is

7   widespread throughout.

8   **Q.**   And what -- what significance did you draw from that?

9   **A.**   That basically means what's copied is central or

10  important.  It shows it's -- the copied APIs are all over from

11  the API packages.

12  **Q.**   All right.  And did you --

13          **THE COURT:**  Can I?  Just, I want to mention something.

14  These are just for illustrative; right?

15          **MS. HURST:**  Correct, Your Honor.

16          **THE COURT:**  All right.  The jury doesn't know this

17  yet.

18       When we have retained experts like this, they always show

19  diagrams and things like this.  But none of this will be in the

20  jury room.  They don't come into evidence.  They are -- the

21  evidence is what the witness is saying.  That is evidence.

22       But these illustrative diagrams and charts, and things

23  that these experts use, are not in evidence.  And they won't be

24  in the jury room.

25       So I bring this up in case you see something that you

1    think you want to remember, make a note about it.  But you will

2    not be -- I wouldn't want you to fail to make a note because

3    you think this is going to be in the jury room.  Sometimes

4    jurors get that point of confusion.

5         I really should have said something sooner.

6         So thank you.  I'm sorry for the interruption.

7              **MS. HURST:**  Thank you, Your Honor.

8    **BY MS. HURST**

9    **Q.**  All right.  You were saying that, I think -- I don't want

10   to paraphrase, but the red lines reflect the Android pieces,

11   and it's throughout the platform?

12   **A.**  That's correct.

13   **Q.**  Did you draw any other significance from what you found

14   when you colored in the lines for the Android piece?

15   **A.**  Sure.

16        So if you look really carefully at what's colored red,

17   you'll notice that some of the circles, the nodes, are red and

18   some of the links are red.

19        The nodes that are colored red originally were either blue

20   or green.  So if there was a blue node that's now colored red,

21   that meant that the class was copied.

22        And what that meant was that Google had copied the

23   declaring code.  And then, because it's a class, they provided

24   their own implementation code.

25        On the other hand, if you see something that was colored

1  green before, that was an interface.  And interfaces only have

2  declaring code.  There is no implementing code associated with

3  an interface.

4  **Q.**   All right.  Explain that a little bit, would you, because

5  I think we did not hear that yet before with Dr. Reinhold or

6  Dr. Astrachan.

7  **A.**   Right.

8      So there's two types of ways of defining things in Java.

9  There's classes, which have declaring code and implementing

10 code; and interfaces, which only have declaring code.

11      And what this diagram shows is that what was copied here

12 by Google was not just the parts that they were eventually

13 going to reimplement, which is the classes, what was also

14 copied were the interfaces, which have no implementations.

15      So they're simply copying them to copy the design

16 structure.  This is purely declaring code.  Its purpose in

17 life, of an interface, is to provide declaring code that other

18 things will come along and define later.

19 **Q.**   Now, we heard some testimony from Dr. Reinhold that he

20 prepared a chart of parts of the API that should be considered

21 part of the language.

22      And are you familiar with that chart?

23 **A.**   Yes.

24 **Q.**   And are you familiar with the corrected version of that

25 chart?

1   **A.**   I'm also familiar with the corrected version, yes.

2   **Q.**   What is the relationship, if any, between that chart and

3   this diagram?

4   **A.**   Knowing the sensitivity around the issues of these partial

5   portions of something like 62 classes that -- or interfaces

6   that were part of this -- that were mentioned in the Java

7   Language specifications, we actually did not color any of those

8   classes to be red in this diagram.

9        So this diagram shows copying of the design, excluding the

10  entire classes that are considered to be part -- whose portions

11  of which are considered to be part of the language.  So to be

12  conservative here, we just left those out.  So those are not

13  shown.

14  **Q.**   All right.  So this is just the stuff that's not -- that

15  Android copied, that's not on the Reinhold chart?

16  **A.**   That's correct.

17  **Q.**   All right.

18       **THE COURT:**  When you say -- does that include the

19  green ones?

20       You said the red ones were not on that chart.  But how

21  about the green ones?

22       **THE WITNESS:**  Yes, sir.  So anything that's red --

23  green or blue on this chart was not copied.  Anything that's

24  red, if it's a circle or if it's a relationship, those are

25  representing things that are copied.

1             **MS. HURST:**  And so -- I think I can help, Your Honor.

2             **THE COURT:**  Go ahead.

3    **BY MS. HURST**

4    **Q.**   If it was blue or green in the original diagram, and it

5    was also on Dr. Reinhold's chart, then you didn't color it red?

6    **A.**   That's correct.

7    **Q.**   Okay.  So the red stuff is only the stuff that nobody

8    would consider part of the language that was copied into

9    Android?

10   **A.**   That's correct.  It's the designs, the declaring code.

11            **THE COURT:**  But did that part include interfaces?

12            **THE WITNESS:**  Copied code did include interfaces.  I

13   believe there was 170 or so interfaces that were copied.

14            **THE COURT:**  That would be -- and that's not on the

15   Reinhold chart?

16            **THE WITNESS:**  If there were interfaces on the Reinhold

17   chart, we would have excluded them here.

18            **THE COURT:**  So some of these red things that you say

19   were copied were interfaces?

20            **THE WITNESS:**  Yes, yes.

21       Sir, I believe there were 170 interfaces and roughly 620

22   copied classes, give or take.

23            **THE COURT:**  All right.  Thank you.

24   **BY MS. HURST**

25   **Q.**   Did you, having examined your software and the other work

1   that you did in this case, reach any further conclusions about

2   the relationship of the copied code and Android?

3   **A.**    Yes.  So I've created some charts to show this.

4        So what I just showed you was a perspective from the

5   Java SE platform.  And now what I'm going to do is I'm going to

6   take what we just talked about and show it in the context of

7   Android.

8        So, first, this is a diagram, very familiar diagram

9   showing the layers in Android.  As you can tell from the

10  diagram, Android is actually quite similar in many ways to the

11  Java platform.  We have -- it's a way of developing and

12  executing apps written in Java across many different types of

13  computing devices, very much like the Java platform.

14       It also has some other things in common.  We read all the

15  apps in Java.  There's core libraries that have either -- have

16  a portion of the Java APIs.  We have a virtual machine that's

17  used to execute this.  And there's an operating system that

18  runs on top of the hardware.  That's just putting into context

19  what is Android in what I'm about to show you.

20       If we go to the next build, what we see here is where the

21  copied declaring code from the 37 APIs actually appears in

22  Android.

23       And, as you can see, it appears here in something called

24  the Android runtime layer.  And more specifically, within this

25  little, looks like a pill or something, inside that, which is

1    labeled "Core Libraries."  And the declaring code from the 37

2    copied APIs exists in that context, inside of those core

3    libraries.

4    **Q.**    All right.  And did you do anything to test the

5    relationship between the copied code and Android?

6    **A.**    So what you can see here, this is actually shown,

7    interesting, in a visual way.  The portions of the code that's

8    been copied is actually literally central right in the middle

9    of the platform.  And everything that's on top, all the things

10   that are in blue, the application framework, the applications

11   are all very heavily dependent on the declaring code that was

12   copied from the -- by Google into Android.

13   **Q.**    Did you perform any tests to try to measure that

14   dependency?

15   **A.**    Yes.

16   **Q.**    And what did you do?

17   **A.**    I conducted a number of so-called platform dependency

18   tests.  And that's what these -- this slide shows.

19        So what I did is I wanted to be able to measure the extent

20   to which the copied code was central or necessary in order to

21   be able to use -- in order to be able to use Android.  So I did

22   three tests.

23        Test number one took all the packages containing the

24   declaring code and removed the entire package implementation.

25   I took out the declaring code.  I took out the implementing

1    code for all the packages.  I tried to build the Android

2    software, and it failed.

3         When it build fails, that means it doesn't turn into

4    something called an image that you could put onto a hardware

5    device and actually use the phone.  So it becomes a nice

6    paperweight.

7         The second thing I did is I removed individual packages

8    one at a time.  So I took each of the 37 packages, took one out

9    at a time, left all the others, tried to do the build again.

10   Once again, the build failed.

11        The third experiment I did went and removed just the

12   declaring code at sue.  This is the code that was copied.  So

13   the implementing code that Apache and Google has written

14   remained.  And only the declaring code is taken out of all the

15   packages.  So now we're just taking out the parts that were

16   copied.  Once again, the build failed.

17   **Q.**   Okay.  And I think Dr. Astrachan testified, well, if you

18   took out any line of code, that's what would happen.

19        Do you have any views on that?

20   **A.**   Right.

21        So I also have run experiments where I tried removing

22   individual lines of code.  And, now, keep in mind, the

23   individual lines --

24        **MR. KAMBER:**  Objection, Your Honor.  This is outside

25   the scope of the report.

1           THE COURT:  Is that true?

2           MS. HURST:  Your Honor, there have been multiple

3   reports responsive.  And this is our responsive case.  So it's

4   in a later report, but this is our responsive case.

5           MR. KAMBER:  Your Honor, that's a different -- the

6   analysis --

7           THE COURT:  It's got to be in his initial report.  He

8   can come back on surrebuttal.

9           MS. HURST:  All right, Your Honor.  Thank you.

10  BY MS. HURST

11  Q.   Did you also analyze Your Honor -- pardon me, Professor

12  Schmidt, how much code in Android Google wrote?

13  A.   Yes, I also analyzed that.  And I prepared --

14  Q.   What did you determine?

15  A.   So this slide is a little bit messed up, but I remember

16  what it is, so I will explain it.

17  Q.   Let me put it on the ELMO.  Looks like we got the wrong

18  one on there loaded up.  Can you see that?

19  A.   Yes.

20          MR. KAMBER:  Your Honor, this is also from the reply

21  report.

22          MS. HURST:  Your Honor, it's because we don't have a

23  rebuttal case.  They have the burden of proof on this.

24          THE COURT:  You can have a surrebuttal case.

25          MS. HURST:  We weren't, I don't think, planning on

1    doing that past Thursday, Your Honor.

2        This is just to save the witness from having to come back,

3    Your Honor.  And Dr. Astrachan --

4            THE COURT:  He's been here all the time anyway.

5            MS. HURST:  Dr. Astrachan can respond to it, Your

6    Honor, when he --

7            THE COURT:  How long is this going to be?

8            MS. HURST:  Two minutes at the most.

9            THE COURT:  Was it in the -- was it in the follow-up

10   report?

11           MS. HURST:  It was.

12           MR. KAMBER:  In the reply report, Your Honor.

13           THE COURT:  All right.  Well, Google is correct on

14   this.  But, nevertheless, I'm going to let you do it.  Go

15   ahead.

16           MS. HURST:  Thank you, Your Honor.

17   BY MS. HURST

18   Q.   All right.  What does this show, Professor Schmidt?

19   A.   So I did some analysis of several versions of Android,

20   where I went in and looked at the source code and analyzed the

21   source code with respect to copyright headers.  That's a way of

22   being able to ascertain authorship of who wrote which parts of

23   the code.

24       And what this shows is the results of my analysis.  So I

25   searched for names like Google.  I searched for names like IBM

1   or Apple.  And I found basically, more or less, who had written

2   the different parts of the code.

3   **Q.**   All right.  Let me stop you there.

4   **A.**   Yeah.

5   **Q.**   Can you just run through the percentages for us.  Because,

6   as the judge has said, this particular document won't be part

7   of the record.

8   **A.**   Sure.

9       So there's 13 percent of the code was unspecified.  I

10  couldn't find any copyright headers at all.  We just left that

11  unspecified.

12      64 percent of the code had copyright headers from someone

13  else other than Google or affiliates.  So this would be, I

14  found IBM copyright headers.  I found Apple copyright headers.

15  And so on.  I found the Apache license stuff in there.  And

16  there was 64 percent of that.

17      And then there was 23 percent that I found that had Google

18  or its affiliates' copyright headers.  When I looked into it in

19  a little bit more detail, it turned out about 14 percent of

20  that code was actually code that was code, and about 9 percent

21  of the code were blank lines or comments.  So they weren't

22  really code.

23  **Q.**   All right.  Let me stop you there.

24      So we've heard a lot about how -- and we just saw how

25  Linux is part of the overall platform.  Is this including the

1    Linux lines or not including --

2    **A.**    This is not including Linux lines.

3    **Q.**    What would happen if you included the Linux?

4    **A.**    Linux is massive.  Linux has, depending on which version

5    you're looking at, in 2011 Linux had about 15 million lines of

6    code.  And all the code we're seeing here is roughly 6 million

7    lines of code.

8    **Q.**    So if you added in Linux in the denominator, this number

9    would go way down?

10   **A.**    That's correct.

11   **Q.**    All right.  So when you did this analysis, did you find

12   any Sun Microsystems copyright notices?

13   **A.**    No, I did not find any Sun Microsystems copyright notices.

14   **Q.**    All right.  Have you done --

15           **THE COURT:**  Before you leave this.

16           **MS. HURST:**  I'm sorry, Your Honor.

17           **THE COURT:**  It's confusing on one part.

18           **MS. HURST:**  Sure.

19           **THE COURT:**  On the big circle, is that all of the code

20   in the Android that's written in Java?  Or is it just the

21   declaring lines of code that you say were copied?

22           **THE WITNESS:**  Great question.

23       So, sir, this is all the code, declaring lines,

24   implementing lines, Java, C++, C, other stuff.  So this is all

25   the whole kit and caboodle of everything.

1           **THE COURT:**  Except for Linux.

2           **THE WITNESS:**  Except for Linux, which is largely

3    written in C.

4           **THE COURT:**  Thank you.

5    **BY MS. HURST**

6    **Q.**   Did you examine whether this -- the purposes, in your

7    opinion, of the Java APIs in Android were comparable to the

8    purpose in other platforms?

9    **A.**   Yes, I did.

10   **Q.**   All right.

11   **A.**   If we can switch back.

12          **MS. HURST:**  Trudy, can we switch back?  Are we okay

13   now that we have the right ones?

14       (Document displayed.)

15          **THE WITNESS:**  Great.  So what I did was do an

16   analysis --

17          **MR. KAMBER:**  Your Honor, I have an objection to this

18   line of questioning.

19       The disclosure in the report has the analysis of the

20   purpose as against a nonasserted version of Java.  And that's

21   what the witness is about to testify about.

22       They removed the text from the slide, but I believe that

23   the witness will be talking about it.

24   **BY MS. HURST**

25   **Q.**   Let me just ask.  Is this part of your software map that

**SCHMIDT - DIRECT / HURST**

1    you did for Java SE 5?

2    **A.**   Yes, ma'am.

3    **Q.**   This is a subset of that?

4    **A.**   It's a snippet.  Yes, that's correct, subset.

5          **MS. HURST:**  The text was inaccurate.  That's why we

6    removed it.

7          **MR. KAMBER:**  As long as the witness doesn't testify

8    about nonasserted --

9          **MS. HURST:**  We're not going to do that.

10          **THE COURT:**  All right.  Thank you.

11   BY MS. HURST

12   **Q.**   What does this show?

13   **A.**   So this diagram illustrates the commonality between the

14   Java security package -- which is, as you can imagine, given

15   the importance of security today, an important part of Java.

16   It basically shows that the package design and purpose is the

17   same between Android Gingerbread, in this case, which is one

18   version of Android, and Java SE 5.

19   **Q.**   Show us that.

20   **A.**   Take a look here.  You can see that the design is

21   equivalent.  So the same classes exist.  The same interfaces

22   exist.  The classes being blue.  Interfaces being green.  The

23   same relationships exist.  So they're basically, fancy word,

24   isomorphic.  The two graphs have the same structure

25   illustrating the same design.

**SCHMIDT - DIRECT / HURST**

1   Q.   All right.  If we think about that from a developer's

2   perspective in the security package, what's the significance of

3   it having the same purpose?

4   A.   So it would mean that if somebody knew how to use security

5   in Java SE 5, they would also know how to use this in the same

6   way in Android.  And, of course, we all know security is

7   important.  So that would be a valuable thing to have.

8   Q.   All right.  Have you done any further examinations related

9   to this matter?

10  A.   Yes.  I've also taken a look at how -- there were several

11  full stack operating systems that were used in mobile devices

12  that existed prior to Android.

13       And so the next couple of slides just walk through a

14  couple of examples describing these full stack --

15  Q.   Let's stop there.

16       On the left, what is this?  Savaje?

17  A.   On the left is a full stack operating system called

18  Savaje.  Kind of a funny name.

19       And Savaje was -- I think that it was created around the

20  2002 time frame.  And they produced a phone that was shown at

21  the JavaOne Conference in 2006.  That's where the "2006" comes

22  from.

23       So it's a full stack operating system that uses Java SE.

24  In fact, it uses all the Java SE packages that are at issue in

25  this case.

SCHMIDT - DIRECT / HURST

1    Q.   All right.  And so tell us what this diagram shows.

2    A.   So this diagram illustrates how the architecture, the

3    layers of the Savaje full stack operating system platform for

4    mobile devices were essentially equivalent in terms of purpose

5    to the layers in Android.

6         So as you can see there, both operating systems had Java

7    applications.  Both operating platforms had either full Java 2

8    class libraries or partial Java 2 class libraries.

9         Both of them had virtual machines.  Both of them had

10   native methods that are used to optimize the performance of the

11   system.

12   Q.   So that's the pink on the left and the green on the right?

13   A.   Yes, ma'am.  Native methods in both.

14        And they also both run on top of operating system kernels

15   that shield and manage the different resources that are

16   provided by all the hardware computing devices.

17   Q.   So 2006, you're saying that's Java 2 SE on what kind of

18   device?

19   A.   So that would have been on a mobile device.

20   Q.   All right.

21        And what significance, if any, do you draw from this

22   comparison?

23   A.   So what this says to me is that full stack operating

24   systems were being used running Java SE prior to the release of

25   the Android mobile device, mobile devices.

1   Q.   All right.   And do you have another example of that?

2   A.   Yes, I do.

3   Q.   Show us.

4        (Document displayed.)

5        THE WITNESS:   So this is another example.   This is an

6   example of Java being used in a smartphone prior to the release

7   of Android.

8        And what we see here is something called the T-Mobile

9   Sidekick.   This particular version that's shown up here, I

10  believe, was released -- it was the Motorola Q700 phone, I

11  believe, released in around 2007.

12       MS. HURST:   Your Honor, may I approach to hand the

13  witness a couple of additional demonstratives?

14       THE COURT:   Sure.

15       THE WITNESS:   So this phone is the T-Mobile Sidekick.

16  That's the one that's shown on the left.

17       MS. HURST:   Hold on.   We want to make sure we've got

18  the right ones here.

19       THE WITNESS:   Okay.

20       (Pause)

21  BY MS. HURST

22  Q.   Did we give you the right ones?

23  A.   I believe so, yes.

24  Q.   Go ahead.

25  A.   So this is the Sidekick.   This is the one, you can see

1    it's red.  And this is the other one.  This is the HTC Dream.

2    This was the first phone that was released that ran Android in

3    the 2008 time frame, as we see on the timeline.

4        And what's interesting about these two phones, aside from

5    the fact they look very similar -- they're very similar form

6    factors.  They both have sliders.  They both have full

7    keyboards.  Both of them were using Java.  And both of them ran

8    apps.  So you could use email.  You could use Web browse.  And

9    you could use other kinds of apps, just the same way you could

10   use when the HTC Dream came out.

11       So it basically shows that people were using Java on

12   smartphones prior to the release of the Android hardware in

13   2008.

14   **Q.**   All right.  Were you here for Mr. Rubin's testimony?

15   **A.**   Yes, ma'am.

16   **Q.**   And did you hear him testify which version of Java was in

17   Danger?

18   **A.**   Yes.

19   **Q.**   And what was that?

20   **A.**   He said that Danger was running Java 2 SE, which is the

21   same version which is at issue in this case.

22   **Q.**   All right.  Did you also have some opinions about

23   creativity in the design of the Java APIs?

24   **A.**   Yes.

25   **Q.**   All right.

1   **A.**    Absolutely.

2   **Q.**    What do you have to tell us about that?

3   **A.**    So if we think back to the big diagram that shows all the

4   different classes and interfaces, and their relationships, that

5   diagram gave one view on creativity.  It showed the intricate

6   Web of relationships that connected all the classes and

7   interfaces.

8        But if you look at that diagram, that kind of raises the

9   question did those interfaces and classes and relationships

10  have to look that way?  Or was that the result of creative

11  design that people had to think about very deeply?

12       And this example here illustrates one example -- and I

13  actually have several of them to show here -- of how people had

14  created equivalent capability, equivalent classes, equivalent

15  functionality, and so on, that was available in that diagram we

16  saw, but had completely different design structure.

17       And so the way to illustrate this is by using, once again,

18  the Java collections framework that we were talking about

19  before.

20       So the Java collections framework, if you recall, is the

21  thing that allows you to be able to store and retrieve data

22  that you might have in friends contact list or something.

23       And the java.util package in Java SE has the classes from

24  the Java collection framework.  All those classes exist in one

25  package.  There's many of these classes.  There's dozens and

1    dozens of them.

2        And around the same timeframe there was another

3    implementation of a collection framework called JGL, the Java

4    Generic Library.  J-G-L.  Pronounced juggle.

5        And this was created by a company called Object Space.

6    And it did more or less the same kinds of things that the Java

7    collection framework did.  It had ways of being able to store

8    data, retrieve data, operate on data, and so on.

9        The difference was it had six packages.  It had many, many

10   more classes.  And the ways the classes were designed were

11   quite different.  They didn't have the same design.  They

12   didn't have the same relationships.  They had different names.

13       In some cases they had the same names, but the names

14   actually meant different things.  Showing, once again, that

15   just because something has the same name, doesn't always mean

16   it has the same purpose or the same meaning.

17       So this is a small example of many examples where

18   different people with different design esthetics, different

19   design sensibilities got together, created different ways of

20   doing the design.

21       And what's important about this -- and there's several

22   other examples shown here as well.  There's RogueWave, JTools.

23   There's Doug Lea's Collections Framework.  All those are

24   different from Java.  All of those are different from JGL, even

25   if they do more or less the same thing.

1    Q.   Let me stop you there, because that was fast and a lot of

2    information.

3         So you're saying these are all APIs; is that right?

4    A.   Yes, these are all APIs.

5    Q.   And they all ultimately are designed to do the same thing?

6    A.   They all have, more or less, the same purpose.  They store

7    and retrieve data.

8    Q.   All right.  But the -- they're different?

9    A.   They're very different.

10   Q.   And these are actually out there in the world?

11   A.   They are all out there.  Some of them came early.  Some of

12   them came later.  They all came, actually, around the same

13   time.

14        But the key point there is, there was nothing in the Java

15   Language, there was nothing in the Java Language specification,

16   there was nothing in the programmer convention that forced the

17   design of these libraries to have the same structure, sequence

18   and organization.

19        The only thing that made it look the way it did was the

20   degree of creativity and experience of the developers who wrote

21   those classes.

22   Q.   All right.  Would you summarize your opinions for us?

23   A.   Yes, ma'am.

24        So to summarize my opinions, which I've hopefully showed

25   in my talk, the copying that Google made of the 37 API packages

1    did not alter the APIs in any way.

2        The APIs are used in Android -- the 37 copied APIs are

3    used in Android for precisely the same purpose that they're

4    used in Java, number one.  So they're not altered.

5        Secondly, there were a number of examples, which I've

6    talked through, of full stack operating platforms for mobile

7    devices that existed prior to the introduction of the Android

8    device and the release of the Android device in 2008.  So

9    that's one of the opinions.

10       The second opinion, which I've hopefully shown, is that

11   the copied declaring code and design was created -- as we saw

12   with the big circle diagram with all the interesting lines and

13   gray lines and classes, there's a very intricate web of

14   relationships that are woven together.  And that web didn't

15   occur by accident.  It was very smart, very creative, very

16   dedicated people working a very long time to put all those

17   pieces together in the particular way they put it together.

18       And, moreover, that isn't the only way to do it.  There's

19   lots of different ways to do it.  The JGL example; the JTools

20   example; Doug Lea's Collections; the Java Collections

21   Framework; the work that I did for three years as professor at

22   Washington University on this thing called Java ACE.  It was

23   quite different from other things that came out in Java that

24   did concurrent and network communication.  So the only thing

25   that limited me was my creativity and my experience.

1    The final point I would like to make is that the portions

2  of the Java APIs that were copied are substantial.  They

3  appear -- the APIs that are copied appear throughout the Java

4  APIs, the Java API declaring code.  Appears all over the place

5  in the Java packages.

6    And the other thing that I can hopefully show was that

7  part of what was copied had nothing to do with implementation.

8  It was purely copying design structure.

9    And so these things are crucially important.  They are

10  obviously important to be able to have.  That's why the design

11  was copied, was to be able to leverage all of that work that

12  had been done to build these APIs for over a long period of

13  time.

14    **MS. HURST:**  Pass the witness.

15    **THE COURT:**  Okay.  Thank you.

16    Now, we'll go to cross-examination.

17    <u>**CROSS-EXAMINATION**</u>

18  **BY MR. KAMBER**

19  **Q.**   Good afternoon, Dr. Schmidt.

20  **A.**   Good afternoon, Mr. Kamber.

21  **Q.**   You first became involved in this litigation in about

22  November of 2015; right?

23  **A.**   Yes, that's correct.

24  **Q.**   And you were brought in to help by a consulting firm

25  called Keystone; isn't that right?

**SCHMIDT - CROSS / KAMBER**

1   A.   That's correct.

2   Q.   And you had never worked with Keystone before; correct?

3   A.   That's correct.

4   Q.   Okay.  But you got help from a number of people at

5   Keystone in connection with your work on this case; isn't that

6   true?

7   A.   That's correct.

8   Q.   Okay.  You had help from four separate people who are

9   helping you with the reports that you drafted and the opinions

10  that you developed in this case; right?

11  A.   So I instructed these people to do some work on my behalf.

12  Q.   Dr. Schmidt, you had help from four different people from

13  Keystone, correct, on your report?

14  A.   Yes.

15  Q.   Okay.  One of them was Rohit Chatterjee; correct?

16  A.   That's correct.

17  Q.   And he's done analysis and work for other experts in this

18  case?  Dr. Kemerer; correct?

19  A.   So I'm not sure if he's done analysis.  I know he's been

20  directed to do other work.

21  Q.   And he's helped out on the reports and the analysis in

22  this case; right?

23  A.   He's done some things.  I'm not sure I worked with

24  Dr. Kemerer.

25  Q.   But you've met Dr. Kemerer before; right?

SCHMIDT - CROSS / KAMBER

1   **A.**    Yes.

2   **Q.**    Now, you also worked with Greg Richards and Anan Natu

3   (phonetic) at Keystone; correct?

4   **A.**    That's correct.

5   **Q.**    They helped you with your analysis?

6   **A.**    So, again, they did some things at my direction.

7   **Q.**    And you worked with another person at Keystone, whose name

8   you couldn't even remember at the time of your deposition;

9   right?

10  **A.**    That's correct.

11  **Q.**    Do you remember today?

12  **A.**    Not really, no.

13  **Q.**    You never identified a single individual who was helping

14  you from Keystone in any of the reports that you wrote in this

15  case; isn't that right?

16  **A.**    That's correct.

17  **Q.**    Now, let's pull up demonstrative 1 that you put up,

18  please.

19       (Document displayed.)

20  **Q.**    You have this layer diagram, right, this stack diagram.

21  That's what they call these in the industry; right?

22  **A.**    That's right.

23  **Q.**    And at the top is the Java Language; right?

24  **A.**    That's what it says, yes.

25  **Q.**    The Java programming language is free and open for anyone

1  to use; isn't that right?

2  **A.**  I've heard Mr. Ellison say that.

3  **Q.**  That's a fact in this case, right, as you understand it?

4  **A.**  I've heard him say that.

5          **THE COURT:**  It's an important point.  Isn't that

6  correct?

7          **MS. HURST:**  It's stipulated, Your Honor.

8          **THE COURT:**  All right.  So the programming language

9  itself is free and open for all to use without license, period.

10     Everybody agree with that?

11         **MR. VAN NEST:**  Yes, Your Honor.

12         **MR. KAMBER:**  Yes, Your Honor.

13         **THE COURT:**  All right.  So what's at issue here are

14  these libraries, not the programming language.

15     So go ahead.

16         **MR. KAMBER:**  Thank you, Your Honor.

17  **BY MR. KAMBER**

18  **Q.**  At the time you did your analysis in this case, it was not

19  your understanding that the Java programming language was free

20  and open for everyone to use; correct?

21  **A.**  At the time I did my analysis for this case, I didn't

22  understand the definition of what free and open meant.  I have

23  since learned that.

24         **MR. KAMBER:**  Can we play the deposition transcript

25  from at 58, 18 through 21, please.

1          (Video played.)

2    BY MR. KAMBER

3    Q.   You understand that sitting in the courtroom today based

4    on your counsel's stipulation; correct?

5    A.   I do.

6    Q.   Thank you.

7          Now, sitting here today, you understand that the use of

8    numerous declarations has been deemed to be a fair use;

9    correct?

10   A.   The use of numerous -- which declarations are you

11   referring to?

12   Q.   There were some declarations read into the record.  There

13   was an exhibit that Dr. Reinhold talked about.  I believe it's

14   9223.  I may have the number wrong there.

15   A.   The 170 lines --

16   Q.   Yes, the 170 lines of declaring code.  You remember that

17   from this morning; right?

18   A.   I do.

19   Q.   Okay.  And those 170 lines of code have been deemed a fair

20   use; correct?

21   A.   Uhm, if that's been stipulated, then that's what they have

22   been deemed.

23   Q.   Well, let me put it this way:  Those lines of code, those

24   170, are subject to a technical constraint that is placed on

25   them by the Java language specification; correct?

SCHMIDT - CROSS / KAMBER

1   **A.**   Uhm, if that's the way that Dr. Reinhold characterized it,

2   I'm not going to disagree with him.

3   **Q.**   You don't have any reason to disagree with that statement;

4   correct?

5   **A.**   Uhm, I don't really know what "technical constraint" means

6   in this context.

7   **Q.**   Okay.  Now, you yourself have sworn that -- well, let me

8   show you Trial Exhibit 5322.  I may have missaid that.  5332.

9           **MR. KAMBER:**  May I approach, Your Honor?

10          **THE COURT:**  Yes.

11          **THE WITNESS:**  Thank you.

12  **BY MR. KAMBER:**

13  **Q.**   Do you recognize 5332?

14  **A.**   Yes.

15  **Q.**   Okay.  And you swore in a report that these were the only

16  declarations that were acquired by the Java Language

17  specification; correct?

18  **A.**   That's correct.

19  **Q.**   Okay.  And you said that you -- you reviewed and

20  independently reviewed this list that you're looking at in

21  5332, and determined that those were the only declarations or

22  lines of declaring code that were necessary to implement the

23  Java Language specification; correct?

24  **A.**   That's correct.

25  **Q.**   That document lists -- is missing 16 of the declarations

1    or lines of declaring code that Dr. Reinhold talked about this

2    morning as being necessary to implement the Java Language

3    specification; correct?

4    **A.**   Yes, that's correct.

5    **Q.**   Okay.  So you missed that in your analysis; right?

6    **A.**   That's correct.

7    **Q.**   Now, let's put up -- well, let me talk about the software,

8    now, that you were showing the jury.

9         A software tool called D3 was used to create that

10   visualization; correct?

11   **A.**   Yes, that's correct.

12   **Q.**   And you said on direct that you put it through the

13   visualization tool.  Do you remember saying that?

14   **A.**   That's correct.

15   **Q.**   Okay.  But it actually wasn't you; right?

16   **A.**   It was done by one of the members of Keystone.

17   **Q.**   It wasn't you; right, Dr. Schmidt?

18   **A.**   It was done under my direction.

19   **Q.**   Did you actually, as you testified on direct, put it

20   through the visualization tool?

21   **A.**   No.

22   **Q.**   Okay.  Now, it was actually done by somebody at Keystone;

23   right?

24   **A.**   That's correct.

25   **Q.**   And, in fact, you don't even own a copy of the software

1  package D3 that was used to create that visualization; right?

2  **A.**   D3 is not something you own.  It's a Web service that you

3  access via your browser.

4  **Q.**   But you've never used it before this case either?

5  **A.**   I've looked at it before, sure.

6  **Q.**   You've looked at it.  You've never used D3 prior to this

7  case; right?

8  **A.**   That's correct.

9  **Q.**   You didn't use it in this case either.  It was Keystone

10  that used it in this case?

11  **A.**   That's right.

12  **Q.**   You called it "standard" on direct.  But it's never been

13  something that you used?

14  **A.**   It's -- in the reading I've done, it's a very popular tool

15  that's commonly used to visualize software.

16  **Q.**   But not by you?

17  **A.**   That's correct.

18  **Q.**   Okay.  There's nothing -- well, excuse me.

19        **MR. KAMBER:**  Let's put up the visualization.

20  **BY MR. KAMBER**

21  **Q.**   The first step of your analysis actually involved using a

22  different software program called Understand.

23  **A.**   Yes.

24  **Q.**   You mentioned that; right?

25  **A.**   That's right.

1   Q.   And every time Understand sees a class, it looks through

2   and it finds the things that that class uses; correct?

3   A.   It analyzes the contents of the class and then takes the

4   contents piece by piece -- other extensions, interfaces,

5   dependencies, and so on -- and it goes ahead and does what's

6   called a search, to find all the dependencies that that class

7   source code relies on in the rest of the source code.

8   Q.   Right.  One class will rely on another; correct?

9   A.   That's correct.

10  Q.   There are dependencies between and among the Java APIs and

11  the classes there; right?

12  A.   They're relationships.

13  Q.   They're relationships.  It's a web, as you described it;

14  right?

15  A.   That's right.

16  Q.   They're not an island?

17  A.   That's right.

18  Q.   No API is an island; right?

19  A.   Some APIs are actually islands, but not many.

20  Q.   Okay.  So this is a map of the dependencies.  That's what

21  you were talking about; right?

22  A.   You mean --

23  Q.   The petri dish we were looking at before?

24        MS. HURST:   I'm going to object.  That

25  mischaracterizes the witness's testimony.

```
 1              THE COURT:  "Petri dish"?

 2         (Laughter)

 3              MS. HURST:  No, whether this shows the dependencies,

 4    Your Honor.

 5              THE COURT:  I thought it was the other one, with all

 6    the lines.

 7              MR. KAMBER:  Right.  Let's go to slide -- I believe

 8    it's 6 or -- why don't we go to 7.

 9         (Document displayed.)

10    BY MR. KAMBER

11    Q.   You say here at the top, right, "Relationships between

12    classes and interfaces" --

13    A.   That's correct.

14    Q.   -- right?

15         This is called a force-directed graph model; right?

16    A.   The D3 visualization tool uses something called

17    force-directed graphs in order to be able to show the

18    visualizations displayed on there.

19    Q.   And you created it for this litigation; right?

20    A.   Created what?

21    Q.   The force-directed graph visualization that you called the

22    software map?

23    A.   Actually, the D3 tool created the visualization.

24    Q.   But you're presenting it here in court; right?

25    A.   That's right.
```

1  Q.   And the reason you had to do it was because nobody -- you

2  couldn't find it out there.   Nobody had represented the Java

3  API using a visualization or a software map like this before;

4  right?

5  A.   I actually don't know whether anybody has ever done it

6  before.   Seems like a reasonable thing to do.

7  Q.   The way that Sun described and showed its API to people

8  and developers in the community was via this Exhibit 1028;

9  right (indicating)?

10  A.   That's a develop -- an application developer's limited

11  perspective.   This is what the application package developers

12  would have understood.

13  Q.   This is what -- how Sun published the APIs so that

14  developers would understand how to use it and which packages go

15  where?

16  A.   That's not published APIs.   That's something you would put

17  up as wall art, on your wall, to show that.

18  Q.   Dr. Schmidt, this is a list of the APIs.   And this is how

19  Sun presented that list to developers; right?

20  A.   It may be one way.   But it's not the entirety of the list.

21          THE COURT:   Can I ask a question about that?

22          MR. KAMBER:   Sure.

23          THE COURT:   You two just referred to that poster board

24  as APIs plural.   But I thought it was just one API.   What is

25  the correct terminology?

1      THE WITNESS:  Well, we would have to count them all,

2  sir.  But I suspect that there's probably a hundred-plus APIs.

3  Each of the things that are kind of brown are a separate API or

4  an API package.  So there's API packages.  And inside of those

5  API packages are going to be APIs.

6      THE COURT:  So --

7      THE WITNESS:  So there's lots of them.

8      THE COURT:  So that whole thing is not one interface,

9  but a bunch of interfaces?

10      THE WITNESS:  Many, many, many, many.  But interface

11  actually has a specific term.  So they're what's called APIs,

12  because there's an interface and a class.

13      THE COURT:  All right.  Next.

14  BY MR. KAMBER

15  Q.   There's nothing in the 20-year history of Java that

16  depicts the APIs the way that you did with the software map;

17  right?

18  A.   I don't know one way or the other.

19      MR. KAMBER:  If we could bring up the slide on the

20  build tests, please.  It is slide number 10.

21      (Document displayed.)

22  BY MR. KAMBER

23  Q.   Now it was also Keystone employees, not you, who carried

24  out the build tests; right?

25  A.   Working under my direction, yes.

1   **Q.**   You don't actually know who at Keystone did the build

2   tests?

3   **A.**   Yes, I do.

4   **Q.**   Well, who was it?

5   **A.**   Rohit Chatterjee.

6          **MR. KAMBER:**  Can we roll the video, please, of

7   Dr. Schmidt's deposition, starting at page 146, lines 9 through

8   15.  I'm sorry.  We don't have that queued up.

9       Let me read that into the record, Your Honor.

10         **THE COURT:**  Question and answer.

11         **MR. KAMBER:**  Absolutely.

12      **"Q.**  With respect to the build tests, again who performed

13       those tests?

14      **"A.**  So those tests were performed under my supervision by

15       Keystone.  But -- but who actually ran the computer that

16       performed the tests?  Oh, I'm not sure exactly who, who

17       ran that."

18   **BY MR. KAMBER**

19   **Q.**   Was that your testimony?

20   **A.**   That was.

21   **Q.**   In any event, you testified about three different

22   scenarios that you did; right?

23   **A.**   That's correct.

24   **Q.**   And I believe you called them dependency tests; right?

25   **A.**   Platform dependency tests.

**SCHMIDT - CROSS / KAMBER**

1    **Q.**   Platform dependency tests.

2         In the first platform dependency test, you removed all of

3    the 37 packages; correct?

4    **A.**   All the declaring code and implementing code, yes.

5    **Q.**   Right.

6         Even though the implementing code isn't at issue in this

7    case, you removed it in that test; right?

8    **A.**   That's correct.

9    **Q.**   Okay.  In the second scenario you removed the declaring

10   code and the implementing code from a single package; correct?

11   **A.**   One package at a time.

12   **Q.**   One package at a time.  But there you were also removing

13   implementing code even though it's not accused in this case;

14   right?

15   **A.**   That's also correct.

16   **Q.**   Okay.  And in the third you removed declarations,

17   individual declarations; right?

18   **A.**   That's correct.

19   **Q.**   Okay.  And, now, based on the -- the build tests, you

20   concluded that the removal of those code lines were fatal to

21   Android's operability; right?

22   **A.**   I'm sorry, what was the --

23   **Q.**   Based on your build tests, you concluded that the removal

24   of those code lines was fatal to Android's operability;

25   correct?

1   A.   That's correct, yes.

2   Q.   Okay.  In fact, you suggested their removal was of greater

3   consequence than the removal of other code; correct?

4   A.   That's correct.

5   Q.   You arrived at that conclusion based on the build tests;

6   correct?

7   A.   Uhm, various things.

8        The platform dependency tests were part of that basis of

9   my conclusion.

10  Q.   But that's not really what these build tests demonstrate,

11  is it, Dr. Schmidt?

12       Removing a single line of declaring code from any one of

13  the Google-developed Android packages in those code libraries

14  would also cause a build failure; correct?

15  A.   No, that's not correct.

16  Q.   It is correct -- well, you tried that with the

17  pingsupplicant method in Android 5.0; correct?

18  A.   That's one of the things I tried, yes.

19  Q.   You removed the declaring code for pingsupplicant in

20  Android 5.0, and it wouldn't build; correct?

21  A.   So that's one of the tests.  I did other tests.

22           MS. HURST:  Your Honor, I tried to get into this on

23  direct, and Counsel objected that it was beyond the scope.  And

24  now he's doing it on cross.  And that just doesn't seem fair,

25  Your Honor.

 1              **MR. KAMBER:**  Your Honor, she is absolutely welcome to

 2  do redirect on this.  But unless and until I open the door,

 3  it's not her turn to do it.

 4              **THE COURT:**  I mean, it is a little -- why did you

 5  object to her going into it if you were going to do it anyway?

 6              **MR. KAMBER:**  Because I actually wasn't sure that

 7  Mr. Schmidt would disagree with me on that point.  I thought he

 8  wouldn't.

 9              **THE COURT:**  All right.  Go ahead.

10              **MR. KAMBER:**  Okay.

11              **THE COURT:**  We've got about two minutes.

12              **MR. KAMBER:**  Thank you, Your Honor.

13  **BY MR. KAMBER**

14  **Q.**   To actually -- you actually changed the methodology that

15  you applied in order to get it to build when you did these

16  other tests that you're referring to; correct?

17  **A.**   No.

18  **Q.**   You removed the entire method when you were able to get it

19  to build by taking out entire Android packages; correct?

20  **A.**   That was one of the tests I did, but not all of them.

21  **Q.**   None of the tests that you're referring to right now are

22  disclosed in your reports; correct?

23  **A.**   That's correct.

24  **Q.**   Okay.

25              **THE COURT:**  Is this a good place to break for the day?

 1             **MR. KAMBER:**  It is, Your Honor.

 2             **THE COURT:**  All right.  We're going to break here.  I

 3    think we're on track for ending the evidence on Thursday,

 4    ladies and gentlemen of the jury.

 5         Please remember the admonition.  Thank you for your very

 6    close attention.  See you tomorrow morning.

 7             (Jury out at 12:59 p.m.)

 8             **THE COURT:**  Be seated.  The witness can step down.

 9    You've got to be back tomorrow morning.  And you're still on

10    cross-examination, so no talking with lawyers.

11             **THE WITNESS:**  Okay.

12             **MR. VAN NEST:**  Your Honor, I assume the rule of no

13    contact on cross applies to experts.

14             **THE COURT:**  Yes.  That's what I just said.

15             **MS. HURST:**  Yes, that's a fair assumption, Your Honor.

16             **THE COURT:**  I have a question for you.  Maybe -- if

17    you don't want to answer this because the witness is still in

18    the room, I can -- but what is your answer to the interfaces

19    having nothing but declaring code and no implementing code, and

20    you copied them anyway?

21         At least that's what the witness said.

22         Anyone on the Google side want to answer that question?

23             **MS. HURST:**  Professor Schmidt, why don't you leave the

24    room for this.

25             (Witness exits courtroom.)

1          THE COURT:  All right.  So I'm just curious.  I'm

2    learning as I go.

3       Do you know the answer?

4          MR. VAN NEST:  I don't, Your Honor.  We're finding

5    out.

6          THE COURT:  Does anyone over there know?

7          MR. VAN NEST:  Mr. Kwun may know it.

8          THE COURT:  Call on Mr. Baber.

9       (Laughter)

10         MR. KWUN:  Your Honor, the interfaces define certain

11   functionality that is then implemented elsewhere.  And if it's

12   not defined in the interfaces and people are expecting it, then

13   code won't work.

14      When people invoke -- you can, for example, have an

15   interface.  There is an interface called "comparable."  And

16   comparable indicates -- if you apply that interface to another

17   class, that means that the class has the feature of being

18   comparable.

19      And so what it means to have the feature comparable is

20   that there are things that can -- are greater than or less

21   than.  It can be sorted.

22      So members of that class, there is one that is greater

23   than the other.

24      So you can have a sort routine that then says, I am a

25   general purpose sort routine.  I will work with any class that

1    has the feature of being comparable.

2         So there's going to be code out there that then makes use

3    of this feature, this well-known feature.  And that

4    functionality, if it was not replicated in Android, then that

5    functionality would not be available to programmers.

6         So even though there is no actual implementation in the

7    interface itself, the interface itself defines -- so, for

8    example, "comparable" is an interface when it defines certain

9    methods that must be available in any class that is declared as

10   having the comparable feature.

11        And then all of those methods -- excuse me, all those

12   classes that are declared as comparable will have implementing

13   code for the declarations --

14        **THE COURT:**  Are you saying it's like incorporation by

15   reference?

16        **MR. KWUN:**  It's -- I suppose you could think of it

17   that way.  It's kind of -- it's kind of the reverse.

18        It's telling you what you're going to have to have

19   elsewhere as opposed to saying -- it's the headings that you're

20   going to incorporate by reference, rather than the contents.

21   But it's similar.

22        **THE COURT:**  All right.  Did you want to say anything,

23   Ms. Hurst.

24        **MS. HURST:**  I think Professor Schmidt's testimony

25   stands.  And the point of interfaces is to reproduce the

**PROCEEDINGS**

 1    structure and relationship within and among those classes, Your

 2    Honor.

 3        And that is quite significant in terms of the

 4    substantiality of this copying in relation to the design of the

 5    Java API and what developers would be familiar with, and

 6    reducing the friction, to use Mr. Rubin's term, in getting

 7    people to sign on to the Android platform.

 8            MR. KWUN:  And, Your Honor, there actually were briefs

 9    filed by the parties at your request about -- I believe it was

10    a couple of topics, but one of them was:  What are interfaces

11    and how should they be dealt with in this case?

12        That was during the first trial.  It was -- I can't

13    remember exactly, but maybe a week or two before your

14    copyrightability ruling.

15        And I would be happy to get the docket numbers if that

16    would be helpful.  I don't have them quickly at hand.

17            THE COURT:  No.  I can look them up.

18        All right.  Anything the lawyers need the judge for before

19    we take our break today?

20            MR. BICKS:  Your Honor, I don't know, in terms of just

21    efficiently using time, if I had, say, 20-plus exhibits that

22    the parties stipulated to moving into evidence, in terms of

23    what would be the best time to do that and not waste time.

24            THE COURT:  Well, if you can all agree to do it --

25            MR. BICKS:  Yeah.

PROCEEDINGS

1    THE COURT:  Have you got an agreement right now?

2    MR. BICKS:  Yes.

3    THE COURT:  All right.  Let's do it right now.

4    MR. VAN NEST:  It's my understanding we needed to do

5 this in front of the jury, Your Honor.  That's why I did it.

6 We did all ours before the jury.  That's what I had understood

7 your rule was.  But it doesn't matter to me.

8    THE COURT:  If that's what you've been doing then --

9    MR. VAN NEST:  That's what I did.

10    THE COURT:  -- at an appropriate point tomorrow just

11 stand up, say, "I move these in."  Give the list slowly enough

12 that I can write it down.  And then Mr. Van Nest says,

13 "Admitted."

14    MR. VAN NEST:  That's right.

15    THE COURT:  All right.  Is that it for today?

16    MR. VAN NEST:  I think so, Your Honor.

17  We benefit from -- we didn't get your time count after

18 yesterday.  And I'm not sure on the videos whether there's any

19 Google time in there.

20    THE COURT:  Well, on the three that -- I have nine

21 minutes.  I kept track.  It was nine minutes total on your --

22 that's the way mine actually came out in real life.  And I'm

23 charging all that to you unless you tell me some of it went to

24 the other side.

25    MS. VON DER AHE:  Your Honor, the parties have agreed

**PROCEEDINGS**

1   it's 80 us, 20 them.

2          THE COURT:  All right.  So that's going to be 7 for

3   you and 2 for them.  That's rough justice.

4          MS. VON DER AHE:  Okay.

5       (Laughter)

6          THE COURT:  Okay.  We're done?  All right.  We're

7   still on track to finish the evidence on Thursday?

8          MR. VAN NEST:  I think so, Your Honor.  But, again --

9          THE COURT:  How many experts do you have in rebuttal?

10         MR. VAN NEST:  Experts in rebuttal, probably two.

11         THE COURT:  Who are they going to be?

12         MR. VAN NEST:  Possibly more.  Professor Astrachan and

13  Dr. Leonard.

14         THE COURT:  Have we heard from him yet?

15         MR. VAN NEST:  Not yet.

16         THE COURT:  How many more experts do you have?

17         MR. BICKS:  We've got very brief testimony from

18  Dr. Kemerer.  And then we've got Dr. Jaffe, our economist.

19         THE COURT:  So we'll get to all that tomorrow, do you

20  think?

21         MR. BICKS:  You know, if not tomorrow, we've got

22  Mr. Page Thursday morning.  And you know we've got a few more

23  witnesses.  So whether or not --

24         THE COURT:  We might not finish, then, on Thursday.

25         MR. VAN NEST:  Your Honor, what we did agree to with

PROCEEDINGS

1     Mr. Page, he will be available first thing in the morning on

2     Thursday.

3          If there's a long expert that's carrying over from

4     Wednesday night, Counsel have agreed to interrupt so we can get

5     him on and off Thursday morning.  But he'll be here and

6     available first thing in the morning.

7               THE COURT:  Fine.

8               MR. VAN NEST:  And --

9               MR. BICKS:  And we're still trying to work out

10    Mr. Mazzocchi.  Your Honor may remember --

11              THE COURT:  What's the problem with him?  Oh, he's the

12    guy "This is illegal."

13              MR. BICKS:  He said it was illegal.  And then he said

14    that -- that Oracle's IP was being ripped off.  We found

15    another email to that effect.

16         And we're trying to see if we can work out a stipulation.

17    And where we're having -- I'm hopeful we can work it out so we

18    don't have --

19              THE COURT:  Wasn't he under subpoena?

20              MR. BICKS:  He's under subpoena.  But just to save

21    time.  But we -- I'm just saying we're trying to work that out.

22              THE COURT:  Well, that would be great.  But don't let

23    it slide.  Make sure he's here.  Because if he's not here on

24    Thursday and we rest, that's too late.

25              MR. BICKS:  Mr. Van Nest has assured us he will be

**PROCEEDINGS**

1    here.

2              THE COURT:  All right.  See you tomorrow.  Thank you.

3              MR. VAN NEST:  Thank you, Your Honor.

4              THE COURT:  Oh, I haven't done the math.  It would

5    take me five minutes to do the math right.

6              MR. VAN NEST:  Just send it out, Your Honor.

7              THE COURT:  I'll try to send it out.

8              MR. VAN NEST:  Send it out.  Thank you.

9         (At 1:08 p.m. proceedings were adjourned until Wednesday,

10   May 18, 2016.)

11                         -  -  -  -

12                   CERTIFICATE OF REPORTERS

13        We certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15   DATE: May 17, 2016

16

17                    *Katherine Sullivan*

18        _____

19        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

20

21

22              *Pamela A. Batalo*
          _____

23        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    U.S. Court Reporter

24

25