Volume 9

Pages 1810 - 2060

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,           )
                                )
            Plaintiff,          )
                                )
  VS.                           )  No. C 10-3561 WHA
                                )
GOOGLE, INC.,                   )
                                )
            Defendant.          )
_____)  San Francisco, California
                                   Thursday, May 19, 2016



**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**            ORRICK, HERRINGTON & SUTCLIFFE LLP
                              The Orrick Building
                              405 Howard Street
                              San Francisco, California  94105
                          BY: **ANNETTE L. HURST, ESQUIRE**
                              **GABRIEL M. RAMSEY, ESQUIRE**

                              ORRICK, HERRINGTON & SUTCLIFFE LLP
                              The Orrick Building
                              51 West 52nd Street
                              New York, New York 10019
                          BY: **PETER A. BICKS, ESQUIRE**
                              **LISA T. SIMPSON, ESQUIRE**

 (Appearances continued on next page)



Reported By:  Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              Official Reporters - U.S. District Court

```
1   APPEARANCES (CONTINUED):

2   For Plaintiff:          ORRICK, HERRINGTON & SUTCLIFFE LLP
                            777 South Figueroa Street, Suite 3200
3                           Los Angeles, California  90017-5855
                       BY:  ALYSSA M. CARIDIS, ESQUIRE
4                           GEOFFREY GAVIN MOSS, ESQUIRE

5                           ORRICK, HERRINGTON & SUTCLIFFE LLP
                            2050 Main Street, Suite 1100
6                           Irvine, California  92614-8255
                       BY:  CHRISTINA VON DER AHE RAYBURN,  ESQUIRE
7
                            ORACLE
8                           500 Oracle Parkway
                            Redwood City, California 94065
9                      BY:  DORIAN ESTELLE DALEY, GENERAL COUNSEL
                            MATTHEW SARBORARIA,VICE PRESIDENT
10                           ASSOCIATE GENERAL COUNSEL

11  For Defendant:          KEKER & VAN NEST
                            633 Battery Street
12                          San Francisco, California  94111-1809
                       BY:  ROBERT A. VAN NEST, ESQUIRE
13                          CHRISTA M. ANDERSON, ESQUIRE
                            MICHAEL S. KWUN, ESQUIRE
14                          DANIEL PURCELL, ESQUIRE
                            MATTHIAS ANDREAS KAMBER, ESQUIRE
15                          EUGENE MORRIS PAIGE, ESQUIRE
                            STEVEN P. RAGLAND, ESQUIRE
16
                            KING & SPALDING LLP
17                          1185 Avenue of the Americas
                            New York, New York 10036-4003
18                     BY:  BRUCE W. BABER, ESQUIRE

19                          GOOGLE, INC.
                            1600 Amphitheatre Parkway
20                          Mountain View, California  94043
                       BY:  RENNY HWANG, LITIGATION COUNSEL
21
    Also Present:
22                          GEORGES SAAB
                            ORACLE CORPORATE REPRESENTATIVE
23
                            CATHERINE LACAVERA
24                          GOOGLE CORPORATE REPRESENTATIVE

25
```

## I N D E X

Thursday, May 19, 2016 - Volume 9

|                                              | PAGE | VOL. |
|----------------------------------------------|------|------|
| Plaintiff Rests                              | 1886 | 9    |
| **PLAINTIFF'S WITNESSES**                    | PAGE | VOL. |
| **PAGE, LARRY**                              |      |      |
| (SWORN)                                      | 1824 | 9    |
| Direct Examination by Mr. Bicks              | 1825 | 9    |
| Cross-Examination by Mr. Van Vest            | 1840 | 9    |
| **JAFFE, ADAM (RECALLED)**                   |      |      |
| (PREVIOUSLY SWORN)                           | 1850 | 9    |
| Cross-Examination resumed by Mr. Van Nest    | 1850 | 9    |
| Redirect Examination by Mr. Bicks            | 1877 | 9    |
| **DEFENDANT'S REBUTTAL WITNESSES**           | PAGE | VOL. |
| **LEONARD, GREGORY**                         |      |      |
| (SWORN)                                      | 1887 | 9    |
| Direct Examination by Mr. Ragland            | 1887 | 9    |
| Cross-Examination by Ms. Hurst               | 1905 | 9    |
| **ASTRACHAN, OWEN**                          |      |      |
| (PREVIOUSLY SWORN)                           | 1917 | 9    |
| Direct Examination by Mr. Paige              | 1917 | 9    |
| Cross-Examination by Ms. Hurst               | 1936 | 9    |

| | | IDEN | EVID | VOL. |
|---|---|---|---|---|

**E X H I B I T S**

**TRIAL EXHIBITS**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 6 | | 1883 | 9 |
| 12 | | 1883 | 9 |
| 23 | | 1883 | 9 |
| 125 | | 1883 | 9 |
| 154 | | 1883 | 9 |
| 269 | | 1883 | 9 |
| 348 | | 1883 | 9 |
| 356 | | 1883 | 9 |
| 370 | | 1883 | 9 |
| 387 | | 1883 | 9 |
| 5137 | | 1883 | 9 |
| 5142 | | 1883 | 9 |
| 5145 | | 1883 | 9 |
| 5146 | | 1883 | 9 |
| 5148 | | 1883 | 9 |
| 5241 | | 1883 | 9 |
| 5322 | | 1883 | 9 |
| 5560 | | 1883 | 9 |
| 5562 | | 1883 | 9 |
| 5583 | | 1883 | 9 |
| 5584 | | 1883 | 9 |
| 5585 | | 1883 | 9 |
| 5586 | | 1883 | 9 |

1

# **I N D E X**

2

## **E X H I B I T S**

3

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 5603 | | 1883 | 9 |
| 6086 | | 1838 | 9 |
| 6437 | | 1883 | 9 |
| 6446, page 46 | | 1911 | 9 |

| | |
|---|---|
| 1 | **Thursday - May 19, 2016**                           **7:22 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | (Proceedings were heard out of presence of the jury:) |
| 5 | **THE COURT:** All right. You will be pleased to know |
| 6 | all the members of the jury are here and it's only 7:23. |
| 7 | Okay. Do we still have a dispute over Leonard? I'm about |
| 8 | to rule on Leonard. Do we have a dispute on Leonard? |
| 9 | **MS. HURST:** We still have a dispute on Leonard. |
| 10 | **THE COURT:** I'm ready to rule on the papers. Anything |
| 11 | you want to add to the papers? |
| 12 | **MS. HURST:** No, Your Honor. |
| 13 | **THE COURT:** Objection overruled. Oracle is trying to |
| 14 | be most unfair on this. You all entered into a stipulation, |
| 15 | and now you're trying to wiggle off the stipulation. This is |
| 16 | not fair, it's not right, and Google is going to be allowed to |
| 17 | use Leonard. |
| 18 | All right. The redaction. I'm going to leave that |
| 19 | redaction on. That was a legal opinion by somebody who is not |
| 20 | a lawyer. It would be highly prejudicial to remove that |
| 21 | redaction. That request is denied. |
| 22 | Anything else I can solve for you this morning? |
| 23 | **MS. HURST:** Your Honor, we had a time split on the |
| 24 | video yesterday. |
| 25 | **THE COURT:** Please give me that. |

PROCEEDINGS

1    **MS. HURST:**  It was 87 percent Oracle and 13 percent

2    Google.

3        **THE COURT:**  Wait a minute.  That was -- I've got to

4    find the right spot.  It was a total of 11 minutes.  And I have

5    charged you all of it, so I've got to adjust that.

6        **MS. HURST:**  Eighty-seven for us; thirteen for them.

7        **THE COURT:**  So we'll give them three and we'll give

8    you eight.  So that adds three minutes to your time.  So now

9    you're to 54.  Okay.

10       We can get started with the -- do we have the witness here

11   who has got to go out of turn?

12       **MR. VAN NEST:**  We do, Your Honor, but before we do

13   that, Mr. Bicks just mentioned to me this morning that they

14   want to recall a witness that was called and off the stand and

15   he wasn't disclosed in the list last night.  He was released

16   from subpoena.

17       **THE COURT:**  He was released from the subpoena?

18       **MR. VAN NEST:**  I believe so.

19       **MS. HURST:**  It's Dr. Reinhold, Your Honor.  They know

20   exactly who he is.  He's an Oracle employee.

21       **THE COURT:**  Well, they don't need to have him under

22   subpoena if he's an Oracle employee, but --

23       **MR. VAN NEST:**  We had no notice of this.  Mr. Purcell,

24   who handled the cross, is not here this morning.  He's working.

25   I just got notice of this two minutes ago, five minutes ago

PROCEEDINGS

 1    from Mr. Bicks.

 2         I think it's unfair.  He was here.  They had an

 3    opportunity to examine him, and we examined him as well, and he

 4    was released.  He should have been on the list last night.

 5              THE COURT:  He was not on the list last night?

 6              MR. VAN NEST:  No.  And he's been sitting here

 7    listening to testimony.

 8              THE COURT:  Who has?

 9              MR. VAN NEST:  Mr. Reinhold, Dr. Reinhold.  He has

10    been here since he testified.  He has been sitting in the

11    courtroom listening to all the witnesses.  He's in here right

12    now.

13              MS. HURST:  We are just trying to avoid having a

14    surrebuttal case to deal with one technical issue.  It's three

15    questions.  It won't take long.  If it comes after Mr. Page and

16    after Dr. Jaffe, they can get Mr. Purcell here in plenty of

17    time, but it's literally three questions, Your Honor.  And it's

18    far better to do this than have a bunch of motions on it and

19    have to deal with it that way.

20              MR. VAN NEST:  He shouldn't have been in the

21    courtroom.

22              THE COURT:  He has been in the courtroom.  I assume

23    that's true.  I'm taking Mr. Van Nest's --

24              MS. HURST:  He was a disclosed employee expert,

25    Your Honor, so he has been allowed to be here for expert

 1    testimony of the technical nature.  Other experts have been

 2    here the whole time, Your Honor.

 3          THE COURT:  Retained experts, I know we said they

 4    could.  Did we also say that company employees --

 5          MR. VAN NEST:  That is the very first I have heard of

 6    that and this is a guy that it was established on

 7    cross-examination he's the one that called Mr. Smith in the

 8    middle of the deposition.  He's a long-time employee.  I

 9    assumed that he was done since he has been sitting in the

10    courtroom since he finished his testimony and he was excluded

11    ahead of that.

12          THE COURT:  Look, the easy answer was he was not

13    disclosed yesterday.  He should have been so they could make

14    arrangements.  Mr. Purcell is not here.  So I guess you won't

15    be able to do it because he wasn't disclosed.

16          MS. HURST:  Your Honor, that doesn't seem fair in

17    light of the Leonard holding.  I mean, Dr. Leonard is a late

18    expert that was not tendered in the first round.  I understand

19    the Court's ruling.  He's coming on.  But this is not even

20    close to that.

21          This is not new subject matter.  The witness was

22    disclosed.  He's been on the stand.  They know who he is, and

23    there will be plenty of time to get Mr. Purcell here before he

24    goes on after Mr. Page and after Dr. Jaffe.

25          THE COURT:  When it comes time for a surrebuttal case,

**PROCEEDINGS**

1    I will consider it.  In the meantime, try to get Mr. Purcell

2    here.  And I think it's problematic that he's been sitting here

3    in the courtroom in violation of the rule against -- not

4    experts, non-retained experts.

5           **MS. HURST:**  We'll exclude him from the remainder of

6    the testimony this morning, Your Honor.  That way if the issue

7    comes up in their expert testimony, he will not have heard it.

8    He will simply testify based on the current state of the

9    record.

10       As far as I know, they haven't raised this issue in their

11   testimony so far, and we're just being preemptive to make sure

12   it doesn't come out.

13          **THE COURT:**  So he would be testifying about things

14   that Leonard would be testifying about; is that it?

15          **MS. HURST:**  I think Dr. Astrachan, Your Honor.

16          **THE COURT:**  Is Astrachan coming back?

17          **MS. HURST:**  Yes.

18          **THE COURT:**  But he would be testifying about things

19   Astrachan will say on the rebuttal case.

20          **MS. HURST:**  I don't know exactly what he's going to

21   say on the rebuttal case, but, you know, that's --

22          **MR. VAN NEST:**  Your Honor --

23          **THE COURT:**  Yes.  We've got to wait and see what

24   Astrachan says.

25          **MR. VAN NEST:**  I just think it's highly improper.  He

PROCEEDINGS

 1   has been sitting in the courtroom.  He's a party witness;

 2   that -- that's extraordinary.  If this is what they had in

 3   mind, then he shouldn't have been allowed back in the courtroom

 4   after he testified.

 5          THE COURT:  Maybe you're right.  I don't know the

 6   answer to that part yet.  We'll wait until the surrebuttal

 7   case.  You may be totally out of time by then and it will be

 8   moot.

 9       MS. HURST:  Your Honor, Rule 615 on sequestration says

10   if the Court orders.  I don't think the Court has ordered that

11   rebuttal witnesses needed to be excluded, so we certainly did

12   not understand that that was the case.  All I can do is throw

13   myself on the mercy of the Court.

14      They've got Leonard in, Your Honor.  We need to get

15   Dr. Reinhold hold on for about three --

16          THE COURT:  I don't see how you can say -- like they

17   tricked me somehow.  That was the deal all along.  I went and

18   read your stipulation that led to this mess, and Google's

19   interpretation of this is totally correct and you're totally

20   wrong.

21          MS. HURST:  Your Honor, when that issue came up when

22   we had the motions on Mr. Malackowski, the Court did not

23   enforce the stipulation in the same way and instead refashioned

24   the ordering of the report.  So I understand that the parties

25   did have a stipulation, but from time to time, that -- we have

PROCEEDINGS

 1   not followed that stipulation scrupulously.

 2       So, you know, we were very concerned about this.  We did

 3   not even know they were going to call him.  There is a dozen

 4   witnesses on their will-call list that never made the rolling

 5   7, Your Honor.

 6       I understand and respect the Court's ruling.  I'm just

 7   looking for a little parity here.

 8           THE COURT:  Well --

 9           MR. VAN NEST:  Your Honor, that's simply not true.

10   Mr. Leonard -- Dr. Leonard has been disclosed --

11           THE COURT:  These are not the same problems, and I've

12   ruled on Leonard.  He's going to be allowed.

13       Now, it's first and fourth factors.  Let's be clear on

14   that.  First and fourth factors only.

15           MR. VAN NEST:  Right.  We understand.

16           THE COURT:  On Leonard.

17           MS. HURST:  There is one other issue I want to raise

18   with respect to Dr. Leonard, which is that reply report that he

19   put in is mainly simply legal argument.  It's here's a Sun

20   document, here's an argument, and, Your Honor, they are the

21   ones who filed the motion that experts shouldn't be allowed to

22   come and just make an argument for the lawyers.

23           THE COURT:  Well, of course Dr. Jaffe came very close

24   to doing exactly that.  However, you can't -- the Google people

25   can't do legal arguments either.

**PROCEEDINGS**

1        Are you planning on doing legal arguments?

2              **MR. RAGLAND:**  We are not, Your Honor.

3              **THE COURT:**  If you start doing that, I will interrupt.

4              **MR. RAGLAND:**  Understood.

5              **MR. VAN NEST:**  I'm bringing our witness up,

6   Your Honor.

7              **THE COURT:**  Wait a second.  Are you done, Ms. Hurst?

8              **MS. HURST:**  Yes, Your Honor.

9              **THE COURT:**  Let's bring in the jury.  Let's bring up

10   the witness.

11             **MR. VAN NEST:**  Your Honor, he will be up.  He's on 18.

12   He will be up in just a moment.

13             **MR. BICKS:**  Your Honor, as housekeeping, I was going

14   to admit some exhibits.

15             **THE COURT:**  While we are waiting on the jury, go

16   ahead.

17             **MR. BICKS:**  All right.  Trial Exhibit 6, Trial Exhibit

18   12, Trial Exhibit 23, Trial exhibit 125 --

19             **THE COURT:**  Wait a minute.  You are way ahead of me.

20             **MR. VAN NEST:**  Counsel, are these the ones we agreed

21   on?

22             **MR. BICKS:**  Yes.

23             **THE COURT:**  Go one at a time.

24             **MR. BICKS:**  All right.  It was 6, 12, 23, 125, 154,

25   269, 348, 356, 370, 387, 5241, 5322, 5560, 5562, 5583, 5584,

1    5585, 5586, 5603, 6437, 5137, 5142, 5145, 5146, and 5148.

2            **MR. VAN NEST:**  Your Honor, we need to take this up at

3    a break.  I'm sorry.

4            **THE COURT:**  I thought it had been stipulated --

5            **MR. VAN NEST:**  This list is far beyond what I think

6    was agreed.  And I'm not sure about that.

7            **MR. BICKS:**  It is what we agreed to.

8            **THE COURT:**  All right.  Would you -- I'm going to let

9    you have a moment to read that.  We'll take it up at the next

10   break.  All right.  Are we ready?  Let's bring in our jury.

11       (Proceedings were heard in the presence of the jury:)

12           **THE COURT:**  You weren't even supposed to be here until

13   7:45 and here it is 7:33.  You hold the record in all my 17

14   years as a judge.  This jury holds the record for getting here

15   so far in advance of when they're supposed to be here, all of

16   you.  If it had just had been 9 of you, we couldn't start.

17   Here we are, 7:33, and we are ready to go.  That's great.

18   Thank you.

19       Now, what we're going to do is -- is the witness here yet?

20           **MR. VAN NEST:**  He will be here any minute, Your Honor.

21           **THE COURT:**  You will remember yesterday that we had on

22   the stand Dr. Jaffe, and he will return to the stand soon.  But

23   the lawyers have a need to put on a witness, what is called,

24   out of turn.  So for reasons I don't need to get into, we have

25   a witness that they need to put on out of turn.

PROCEEDINGS

1        What is the name of that witness?

2            MR. BICKS:  Larry Page, Your Honor.

3            THE COURT:  Larry Page.  And he will be testifying,

4     and then we'll come back to Dr. Jaffe.  So you have to kind of

5     switch gears and make a note to yourself that we're going to

6     come back to Dr. Jaffe.

7        My estimate, to let you know, is that we will finish the

8     evidence today and then you'll have a long weekend.  We won't

9     be in session tomorrow.  And then we come back and we'll have

10    the closing arguments and instructions on Monday.

11       Now, Angie told me you discussed you want to stick with

12    the 1:00 p.m. finish time each day next week; is that correct?

13    Is that what -- okay.  You can change it, but we will

14    tentatively plan on that as our program.

15       Let's see if there is anything else.

16       Is the witness here yet?

17           MR. VAN NEST:  He's coming in right now.

18           THE COURT:  We will go to the witness.  Who is calling

19    the witness?

20           MR. BICKS:  Oracle calls Larry Page, Your Honor.

21           THE COURT:  Very well.  Please bring him forward.

22    Welcome and please raise your right hand.

23            **LARRY PAGE**, **PLAINTIFF WITNESS, SWORN**

24           THE CLERK:  Please state your name for the Court and

25    spell your last name for the record.

```
 1                THE WITNESS:  Larry Page, P-A-G-E.

 2                THE COURT:  Have a seat.  Do you see how the

 3     microphone moves all around, and you need to get in about this

 4     close to your voice.  Say your name again.

 5                THE WITNESS:  Larry Page.

 6                THE COURT:  That's good.  Thank you.

 7                THE WITNESS:  Sorry.  I'm a little bit soft.

 8                THE COURT:  Well, that's what we've got a microphone.

 9     It will be fine.

10                THE WITNESS:  Thank you, Your Honor.

11                THE COURT:  Mr. Bicks, Your Honor turn.

12                          DIRECT EXAMINATION

13     BY MR. BICKS:

14     Q.   Good morning, Page.  You are currently the CEO of Google's

15     parent company Alphabet?

16     A.   Yes.

17     Q.   And you were one of the founders of Google?

18     A.   Yes.

19     Q.   You were, I think, what was called the executive champion

20     of the Android acquisition?

21     A.   I don't remember being involved in it so I don't remember

22     being the champion.

23     Q.   You don't remember being the executive champion?

24     A.   No.

25     Q.   You had a role, though, didn't you, sir?
```

**PAGE - DIRECT / BICKS**

1   **A.**   I was definitely an advocate for it.

2   **Q.**   You know that we are here in this courtroom today because

3   Google copied more than 11,000 lines of computer code and the

4   structure, sequence, and organization of 37 Java API packages.

5   Do you know that, sir?

6   **A.**   No.  I don't know the detail of what's alleged.

7   **Q.**   You're the CEO of Alphabet and you're not familiar with

8   the details of why we're here in this courtroom?

9   **A.**   I have been briefed by my lawyers and I have general

10   knowledge.

11   **Q.**   You do know, sir, that we're here because certain code and

12   design of certain packages were copied.  Do you know that

13   generally, sir?

14   **A.**   No.  My understanding is there's an allegation over the

15   declarations and Java.

16   **Q.**   Do you know exactly what your company did copy, sir, as

17   you're here in this courtroom?

18   **A.**   No.  I'm not familiar with the details of the engineering.

19   **Q.**   All right.  You do know, though, before Android launched,

20   you were involved in that process, were you not, sir?

21   **A.**   I was, you know, involved in reviewing Android before it

22   launched, yes.

23   **Q.**   And you do know, sir, because you've so testified, that

24   Google did not take a license -- you do know that, do you not,

25   before Android launched?

1   **A.**   Yes.  I do not believe we took a license or had a deal

2   with Sun.

3   **Q.**   You did not take a license before Android launched.  You

4   know that; right, sir?

5   **A.**   Yes.

6   **Q.**   And as of -- you gave testimony on April 18, 2012, and you

7   didn't know of any other company that was using the Java APIs

8   without a license besides Google.  You couldn't identify one;

9   isn't that true, sir?

10  **A.**   Can you clarify what you mean by APIs?

11       **MR. BICKS:**  Well, permission to read prior testimony,

12  Your Honor.  48827?

13       **MR. VAN NEST:**  Objection, Your Honor.  The witness

14  asked for clarification.  APIs have been used in many ways in

15  this courtroom for the last two weeks.

16       **MR. BICKS:**  Your Honor, may I have permission to read

17  the testimony?

18       **THE COURT:**  Is it a deposition or is it trial

19  testimony?

20       **MR. BICKS:**  It's trial testimony, Your Honor.

21       **THE COURT:**  Does that can count as the same under

22  Rule 32?

23       **MR. BICKS:**  Yes.

24       **THE COURT:**  I don't know about that.  I'll let you do

25  it anyway, but I don't think you're right about that.  Go

PAGE - DIRECT / BICKS

1    ahead.

2              MR. BICKS:   (Reading)

3         "Q.   Can you name a single company that uses Java APIs

4         that has not taken a license from Sun or Oracle except for

5         Google?

6         "A.   As I said, I'm not an expert on that and I already

7         said that I didn't."

8    Q.   Was that testimony that you gave, and do you stand by it?

9    A.   Sure.  Yes.

10   Q.   All right.  Now, you do agree, sir -- and I want to put up

11   on the screen Trial Exhibit 3211, which is a copy of your

12   annual report, page 55.  It's a document already admitted in

13   evidence.

14        Trudy, can we go to the part of the exhibit, please.

15        Do you agree, sir, with me that as stated in your annual

16   report, that any increase in the unauthorized use of Google's

17   intellectual property could make it more expensive to do

18   business and harm Google's operating results.  Do you agree

19   that that's a true statement?

20   A.   Yes.  I agree it's a true statement.

21   Q.   And the same would apply to Oracle.  You would agree with

22   me that any increase in the unauthorized use of Oracle's

23   intellectual property could make it more expensive to do

24   business and harm Oracle's results.  Would you agree with that

25   statement?

**PAGE - DIRECT / BICKS**

1   **A.**   I mean, yes, it could make it more expensive.

2   **Q.**   Are you familiar within your corporation, sir, of

3   something called *Larry's Lists of Don'ts*?  Does that sound

4   familiar?

5   **A.**   I don't recall it, so -- it sounds plausible.

6   **Q.**   Do you remember one of your *Lists of Don'ts* was *don't copy*

7   *other products*.  Does that sound familiar?

8   **A.**   Yeah.  That sounds familiar.

9   **Q.**   And you know somebody named Mr. Rubin.  I think I asked

10  you that; correct?

11  **A.**   Yes.  Of course I know Mr. Rubin.

12  **Q.**   And did he share with you information where he stated that

13  the java.lang APIs are copyrighted.  Did he share that with

14  you?

15  **A.**   Java.lang APIs?

16  **Q.**   Yes.  Did he share that information with you.

17  **A.**   Yes.  I believe he did share that information with me.

18  **Q.**   When did he share that information with you, sir?

19  **A.**   I should say the APIs there again is not a well-defined

20  term.

21  **Q.**   Let me show you Trial Exhibit 18, sir.

22       Trudy, can you bring up Trial Exhibit 18.

23       You know who Mr. Rubin is, do you not, sir?

24  **A.**   I believe I've already answered that *yes*.  Yes.

25  **Q.**   Have you seen this memo before, sir, before you got on the

1    stand?

2    **A.**   Let me take a look at it for a second.

3    **Q.**   I'm calling your attention in particular to the statement

4    that says the java.lang APIs are copyrighted.  Do you see that,

5    sir?  I have highlighted it on the screen.

6            **MR. VAN NEST:**  Objection, Your Honor.  Foundation.

7    **BY MR. BICKS:**

8    **Q.**   Mr. Rubin had a reporting relationship to you in some

9    respect, did he not, sir?

10           **MR. VAN NEST:**  Excuse me, Your Honor.  Lack of

11   foundation.

12           **THE COURT:**  Just a moment.  Is this email to the

13   witness?

14           **MR. BICKS:**  It is not, Your Honor.  I asked him if he

15   knew from Mr. Rubin that the Java API langs are copyrighted.

16           **MR. VAN NEST:**  It's not an email to the witness,

17   Your Honor.  That's correct.

18           **THE COURT:**  The objection is sustained.  It's just

19   argument.  This is just argument.

20   **BY MR. BICKS:**

21   **Q.**   Did Mr. Rubin inform you, sir, that the java.lang APIs are

22   copyrighted?

23   **A.**   I do not recall that.

24   **Q.**   Did you ever ask yourself, sir, whether using the Java

25   APIs -- whether or not they were copyrighted -- did you ask

**PAGE - DIRECT / BICKS**

1   anybody that?

2   **A.**   I do not believe I asked anyone that.

3   **Q.**   Did you ever ask anyone to investigate whether or not

4   Google engineers had copied Oracle's copyrighted materials?

5   Did you ever ask anybody to investigate that?

6   **A.**   I don't recall ever asking for that.

7   **Q.**   Is it true, sir, that you wanted Android to get to the

8   market as quickly as possible?  Is that true?

9   **A.**   Yes.  I think any project, you know, you want to get out,

10  you know, sooner than later.  Everybody else wanted to be very

11  good and Android did take about five years, even after we

12  acquired it.

13  **Q.**   And do you recall in particular on October 11th, 2005,

14  saying to Mr. Rubin that "I'd really like to do something

15  quickly, which I've also told you."  Do you recall that?

16  **A.**   No, I don't recall that.  I assume you have a record of

17  that and I don't have any reason to doubt it.

18  **Q.**   Can we pull up Trial Exhibit 1065.  It's admitted in

19  evidence, Trudy.

20       Do you see this, Mr. Page?  It's a document where you say

21  here, "I'd really like to do something quickly, which I've also

22  told you."  Do you recall saying that to Mr. Rubin?

23  **A.**   I -- I believe this email is correct, yes.

24  **Q.**   All right.  And do you also recall on that day, October

25  11th of 2005, being informed by Mr. Rubin that if your company

1  did not take a license and went ahead with Java, that they were

2  going to make enemies along the way.  Do you recall receiving

3  that communication?

4  **A.**   I don't -- I've some remembrance of that.

5  **Q.**   Let's go to Trial Exhibit 7, page 2, please.  I have it on

6  the screen, Mr. Page.  Do you see what I've highlighted there?

7  **A.**   Yeah.

8  **Q.**   And up at the top, "If Sun doesn't want to work with us."

9  The way events unfolded, Sun and Google did not end up working

10 together after these discussions; right?

11 **A.**   I think we didn't end up doing a deal with them.

12 **Q.**   Right.

13 **A.**   But they did publicly support our Android.

14 **Q.**   Right.  Well, actually, let's look at what is said in this

15 email, sir.  You were talking about two options.  "Abandon your

16 work."  Did you abandon your work, sir, at Google?

17 **A.**   No, I don't think we did.

18 **Q.**   And the second option was "do Java anyway and defend your

19 decision, perhaps making enemies along the way."  Did you

20 decide to go ahead and use Java, sir?

21 **A.**   I think we did use Java language.  Again, there is many

22 subtleties to that.  I believe at the time we were discussing

23 doing a deal with Sun that involved using their proprietary

24 technology and --

25 **Q.**   And you decided to go ahead and --

1    **THE COURT:**  Wait, wait, wait.

2         Have you finished your answer?

3    **THE WITNESS:**  No.

4    **THE COURT:**  Finish your answer and then --

5    **THE WITNESS:**  I mean, my -- my remembrance of this

6    time is that we were negotiating with Sun for their

7    implementation of Java or part of their implementation of Java,

8    and I'm not sure at the time that the course that we took was

9    contemplated.  Obviously we didn't do -- we didn't do the first

10   one.

11   **BY MR. BICKS:**

12   **Q.**   Right.  You didn't do the first one, but you did go ahead

13   and copy code and copy the structure, sequence, and

14   organization of API packages.  You know that for a fact, do you

15   not?

16   **A.**   I don't agree we copied code.

17   **Q.**   Well, we've been in this courtroom and it's been agreed to

18   by the parties that 11,500 lines of declaring code --

19   **A.**   Declaring --

20   **Q.**   -- are in Android devices?

21   **A.**   Sorry.  For me, code is not declaring code.  That would be

22   a widespread industry practice of using APIs to --

23   **Q.**   Sir --

24   **A.**   I don't think I finished.

25   **Q.**   Sir, please answer my question.  How many lines of

1    declaring code did your company copy?  Do you know?

2    A.    Your Honor, should I keep answering the question or --

3           THE COURT:  We've got to do this in an orderly way.  I

4    think you've got enough of your point in a moment ago.  He is

5    asking a fresh question and he is asking how many lines of

6    declaring code from Java are in Android.

7           THE WITNESS:  I have already testified I don't know

8    the details of that.

9    BY MR. BICKS:

10   Q.    You don't know the details of that.  You are familiar with

11   details on earnings calls, are you not?  Those are important

12   things to get accurate?

13   A.    You know, I spent some time reading on the earnings calls.

14   I'm actually not on the earnings calls today.

15   Q.    I'm going to ask you about an earnings call.  This is

16   5169.  It's an earnings call transcript from the second quarter

17   of 2010.

18        You're familiar with earnings calls transcripts; correct,

19   sir?

20   A.    I mean, I believe this is the transcript of the earnings

21   call.  I don't generally read them.

22   Q.    Yeah.  Well actually -- tell me your CFO at the time.  I

23   don't want to mispronounce his name.  Is it Patrick Pichette?

24   A.    Yes.  That's correct.

25           MR. BICKS:  Your Honor, I move 5169 in.

1          **MR. VAN NEST:**  Objection, Your Honor.  Lacks

2    foundation.  He's not on this call.

3          **THE COURT:**  The witness is not on this call?

4          **MR. VAN NEST:**  I don't believe so.

5          **MR. BICKS:**  Your Honor, this is an earnings call.  His

6    company is on the board and one of the senior executives.  I

7    want to ask him -- it's a party admission.  I want to ask about

8    a statement by his CFO.

9          **MR. VAN NEST:**  He can ask about the statement, Your

10   Honor, but putting it in evidence -- he's not on the call.

11         **THE COURT:**  There is no foundation for the document,

12   at least so far.

13   **BY MR. BICKS:**

14   **Q.**   Sir, do you agree that the investment in the Android

15   platform was not material in terms of cost, but that the return

16   was formidable because you have an entire ecosystem exploding.

17   Do you agree with that?

18   **A.**   I mean, we're a commercial company, and I think that, you

19   know, Android obviously is a significant thing for us.  I

20   wouldn't dispute that.

21   **Q.**   All right.  And I want to show you Trial Exhibit 190, page

22   8.  This is a document that's been shown to this jury, and it

23   makes reference here to a $43 billion a year ecosystem.  Here's

24   the exhibit, sir, if you want to have a look at it.

25         Can you tell this jury whether or not this is an accurate

**PAGE - DIRECT / BICKS**

1  statement, that your application and advertising services

2  helped Android build a $43 billion ecosystem?

3  **A.**   Let me read the slide for a second.  I think the point of

4  this is that they're saying that there's $43 billion worth of

5  hardware and so on sold on Android.  I assume that's the actual

6  value of the hardware, but it's a little bit hard for me to

7  understand from the slide.

8        **THE COURT:**  Mr. Bicks, has the witness ever seen this

9  before?

10  **BY MR. BICKS:**

11  **Q.**   Well, sir, look on the front.  This is a document that was

12  circulated to the operating committee.  You were on the

13  operating committee at that time, were you not, sir?

14  **A.**   Yeah.  I'm sure I was on the operating committee, yes.

15  **Q.**   You were, right?  I'm sorry.  I didn't hear you.

16  **A.**   Yeah.

17  **Q.**   All right.  And so that's -- this is answers to strategy

18  questions for the board of directors.  Were you also on the

19  board of directors?

20  **A.**   Yes.

21  **Q.**   All right.  So can we go back to this, Trudy.

22        My question, sir, was very simple, that is it true that

23  your "application and advertising services helped build Android

24  into a $43 billion a year ecosystem and that these same

25  services protect us from losing control."  Was that an accurate

1   statement, sir?

2   **A.**   I mean, I think clearly this was presented to me.  I think

3   you know, they're saying carriers have 20 billion in revenue

4   and hardware players have 22 million in revenue.  I'm not sure

5   it has that much to do with Google.

6   **Q.**   Sir, do you expect information to your board to be

7   truthful and accurate?

8   **A.**   I think it's truthful and accurate, but I think in terms

9   of the case you're making --

10  **Q.**   I'm not making a case, sir.  I'm asking a question.

11          **THE COURT:**  Please let the witness answer.

12          **MR. BICKS:**  Fair enough.  Trying to save time,

13  Your Honor.

14          **THE WITNESS:**  I don't think these revenues are Google

15  revenues.  They're talking about the Android ecosystem, which

16  is carrier revenues like AT&T and Verizon.  They pay a lot of

17  money, but that doesn't do Google much good.

18  **BY MR. BICKS:**

19  **Q.**   But you did say on an earnings call that Android was

20  mind-boggling that 700,000 phones are lit up every day.  Do you

21  recall saying that on an earnings call?

22  **A.**   I don't remember, but that sounds -- I'm sure that's

23  correct, if you have a record of that.

24  **Q.**   So this is 6086.  Do you see this, sir?  This is an

25  earnings call that you actually were on.

**PAGE - DIRECT / BICKS**

1  **A.**   I mean, yes, I've already testified I think Android is

2  significant to Google.

3       **MR. BICKS:**  Your Honor, I would move 6086 into

4  evidence.

5       **THE COURT:**  Any objection?

6       **MR. VAN NEST:**  No objection, Your Honor.

7  (Trial Exhibit 6086 received in evidence)

8       **MR. BICKS:**  Can we go Trudy to page 4 of 43.

9  **Q.**   Do you see statement, Mr. Page, that I have on the screen?

10  And so we're clear, if we go scroll up, Trudy, so we can see

11  Mr. Page's name, this is you speaking, is it not, sir?

12  **A.**   I have already said I have no reason to doubt any of this.

13  **Q.**   Yes.  And you see the comment where it says that "Android

14  is quite simply mind-boggling."  Truthful statement?

15  **A.**   Yeah.

16  **Q.**   "700,000 phones are lit up every day"; true?

17  **A.**   Yeah.  Android is an open source thing and it's had

18  tremendous distribution.

19  **Q.**   And you were "pleased to announce 250 million Android

20  devices in total, up 50 million since our last announcement in

21  November"; right?

22  **A.**   Yeah.

23  **Q.**   And do you know, sir, that every single one of those 700

24  mobile devices have been activated and have declaring code and

25  the structure, sequence, and organization from Oracle's

PAGE - DIRECT / BICKS

1    intellectual property in them?  Do you know that?

2            MR. VAN NEST:  Objection.  Argumentative, Your Honor.

3            THE COURT:  Sustained.  Argumentative.

4    BY MR. BICKS:

5    Q.   Do you know whether or not that code of Oracle's is in

6    each and every one of those phones?

7    A.   Again, I don't -- don't accept code.  The definition of

8    code includes API declarations.

9    Q.   Is that in there, sir, in your phones?  Do you know?

10   A.   The phones have the Java language in the same way that,

11   you know, much code you might use, you might use Google, but

12   you have no idea what language it's in.

13   Q.   Sir, my question to you is do you know whether or not the

14   declaring code that we're in this courtroom talking to this

15   jury about -- do you know whether or not that declaring code

16   and the structure, sequence, and organization of 37 API

17   packages -- do you know whether that is in each and every one

18   of these 700,000 phones that you say here to your shareholders

19   were lit up every day?

20   A.   I think I've already testified that I know that the APIs,

21   declarations are in the phones that compromise Java language.

22   Q.   So tell our jury, sir, how much you paid to Oracle for

23   having those declaration code and those headers in every one of

24   your phones?

25           MR. VAN NEST:  Objection, Your Honor.  It's

 1    argumentive.

 2            THE COURT:  Sustained.

 3    BY MR. BICKS:

 4    Q.    Sir, have you paid anything to Oracle for use of that

 5    intellectual property?

 6    A.    Again, I'm not sure I agree that's -- I believe that

 7    everyone -- when Sun established Java, they established it as

 8    an open source thing.  I believe the APIs that we used were

 9    free and open.

10    Q.    Sir, a very simple question --

11    A.    No.  I don't think --

12    Q.    You didn't; right?

13    A.    We didn't pay for the free and open things.

14    Q.    And you didn't have a license to use it, did you, sir?

15    A.    I'm not a lawyer.  I don't know the vagaries of licensing,

16    but we did not have a deal with Sun.

17    Q.    Thank you.  Thank you.

18        I have no more questions.

19            THE COURT:  Okay.  All right.  Any cross-examination?

20            MR. VAN NEST:  Just a few minutes, Your Honor.

21                       CROSS-EXAMINATION

22    BY MR. VAN NEST:

23    Q.    Good morning, Mr. Page.

24    A.    Good morning.

25    Q.    You didn't have a chance to introduce yourself to our

1    jurors.  Would you just introduce yourself and tell us where

2    you are from and where you went to school.

3    A.   I'm from East Lansing, Michigan.  I went to school there,

4    and then I came out here for grad school for my Ph.D. at

5    Stanford, and then Google was kind of a result of my Ph.D.

6    research at Stanford.

7    Q.   Were your parents computer scientists?

8    A.   Yeah.  Both of my parents actually were computer

9    scientists.  My dad was a professor of computer science and my

10   mom was a programmer.

11   Q.   When did you start getting interested in computers?

12   A.   I was really lucky with my dad.  I was six years old in

13   1978 when we got our first computer, an Exidy Sorcerer.

14   Q.   Sorcerer.

15   A.   Sorcerer it was called.  Nobody knows what it is today,

16   but it was very exciting at the time.

17   Q.   You game out here to Stanford.  What did you study at

18   Stanford?

19   A.   Computer science.  I was in the Ph.D. program at Stanford.

20   Q.   Did you complete your Ph.D.?

21   A.   No.  I didn't quite get around to that.  Started Google,

22   but I got my Master's degree along the way.

23   Q.   Tell us, how did you come to start Google?  Just a brief

24   overview of how it -- what was the genesis of it?

25   A.   You know, it was a good example of pure research.  So I

1  wasn't intending to build a search engine at all.  We were just

2  looking at the web and the way the pages linked to other pages,

3  and so we actually downloaded a large portion of the web, which

4  was fairly small at the time.  This was '98 or so, something --

5  a little before '98, and we realized we had a good way of

6  ranking web pages using just the links of the web.

7  **Q.**  How did you get the money to start the company?

8       **MR. BICKS:**  Your Honor, I would object.  This is

9  beyond the scope of my cross.

10      **THE COURT:**  True.

11      **MR. VAN NEST:**  Very brief background, Your Honor.

12      **MR. BICKS:**  We had two Google witnesses --

13      **THE COURT:**  I think that -- I think this is beyond the

14 scope of the cross.

15      **MR. VAN NEST:**  Okay, Your Honor.

16 **Q.**  Mr. Page, why did -- let's turn the clock forward to 2005.

17 We have a timeline here.  I hope you can see it.

18      2005, Google acquires Android.  Why did Google acquire

19 Android?

20 **A.**  Well, I think we were -- you know, I was super frustrated

21 with the state of phones at the time, you know, many of which

22 were running Java.  But they didn't really work very well.  You

23 couldn't even like take a picture and share it with someone.

24      We actually -- I remember visiting -- we had a closet

25 literally full of like a hundred phones so that we could test

1  them, and they all worked differently, and basically we

2  couldn't get our software to work on those phones.  So it was

3  tremendously frustrating.

4  Q.    What software were you hoping to have work on the phones?

5          MR. BICKS:  Your Honor, again, this is beyond the

6  scope of my cross.

7          MR. VAN NEST:  This has to do with Android,

8  Your Honor, and why they got it.

9          THE COURT:  Stick to Android, and Android's within the

10 scope.

11         MR. VAN NEST:  Thank you.

12         THE COURT:  But some of this background is beyond the

13 scope.

14 BY MR. VAN NEST:

15 Q.    Mr. Page, what was the software you were trying to get on

16 the phones?

17 A.    You know, we had basic Google Search, which I think is how

18 we make most of our money, you know, which is available to you

19 on any phone, but we also like to improve it so we add things

20 like voice.  We like having things that work really well and

21 having a platform that actually works reliably, you know, that

22 you can use to use our services is really important, and so I

23 think that was the main reason why we did Android.

24 Q.    You mentioned during your direct examination that Android

25 is open source.  Was it always the idea to make Android

 1  available as an open source project?

 2  **A.**    Yeah.   I think from the very early days, that was -- that

 3  was the intention.

 4  **Q.**    Why was that important?

 5  **A.**    I think that we were generally aligned around having

 6  really wide distribution and also because, like I said, we make

 7  most of our money from Google Search.   We want people to be

 8  able to access that, you know, even if they don't have that

 9  much money or have basically very wide distribution.   That's

10  always been our philosophy.

11  **Q.**    You mentioned that it took five years to get Android out

12  on the market.   Can you tell the jurors why it took so long?

13          **MR. BICKS:**   Again, Your Honor, this is beyond the

14  scope of my cross.

15          **THE COURT:**   The thing about five years did come up on

16  your direct.   Overruled.

17          **THE WITNESS:**   I think even longer than five years.   I

18  mean, the company we acquired also had been working on Android

19  for a while.   People had also been working on phones for a

20  while and built other phones and so on.

21      So I think as much as I would like things to not take very

22  long, it takes a long time to make something good.   I think the

23  iPhone took a similar amount of time.   So in order to make a

24  product that's really transformative and that is much better

25  than the ones before, it did take a significant amount of time

 1   and effort.

 2          THE COURT:  All right.  This has turned into a speech

 3   about transformative.  Objection sustained.  Okay.  Come on.

 4   BY MR. VAN NEST:

 5   Q.   Did you ever believe there was some window in which you

 6   had to get Android out on the market?

 7   A.   No.  I think there's always moving targets and we always

 8   have different options available to us and we have very clever

 9   engineers and product people.

10   Q.   Now, you mentioned -- you were asked on direct examination

11   about discussions with Sun.  Were you kept advised about

12   discussions between Google and Sun?  Let's focus on these early

13   days in August 2005 through May of 2006.  Were you generally

14   kept aware of the progress of discussions with Sun?

15   A.   Yeah.  I think we were briefed from time to time.

16   Q.   What was Google looking for in a relationship with Sun at

17   that time?

18   A.   I think we were, you know, intending to use their

19   technology, the implementation of Java, and their proprietary

20   technology to put into Android.

21   Q.   Would you have needed a license for all that?

22   A.   Yes.

23          MR. BICKS:  Objection, Your Honor.  Calling for a

24   legal conclusion.

25          THE COURT:  Well, that's true.  But you could ask the

1    question *were you seeking a license*.   That would be all right.

2         MR. VAN NEST:   Sure.

3    Q.   Were you seeking a license as part of those discussions?

4    A.   Yes.   And I think a broader deal around other things, you

5    know, branding and cooperation and so on.

6    Q.   How would a partnership with Sun have benefited Google, if

7    at all?

8    A.   Well, I think, you know, they spent a lot of time on the

9    implementation of that code and that may have been useful to

10   us.

11   Q.   Now, after discussions with Sun broke off, did you believe

12   that Google needed a license to use the APIs in Java?

13   A.   No, I did not believe that.

14   Q.   And tell the jury why.

15   A.   The declarations of the APIs, yes.

16   Q.   Okay.   The declarations.   Tell the jury why you felt that

17   way.

18   A.   I think it was established industry practice that the API,

19   just the headers of those things, could be taken and basically

20   reimplemented very carefully, not to use any of the existing

21   implementation of those systems.   That's been done many, many

22   times.

23   Q.   Okay.   And you're familiar with that practice?

24   A.   Yes.

25   Q.   Is it common in the industry?

1    **A.**    Yes.   I think it's very common in the industry.

2    **Q.**    Has it been going on for years?

3    **A.**    Yeah.   I think that's how you --

4          **MR. BICKS:**   Objection.   No foundation.   This is now

5    into an area where the Court has already cautioned.

6          **MR. VAN NEST:**   Well, Your Honor, his state of --

7          **MR. BICKS:**   He is not disclosed as a witness on custom

8    and usage.

9          **MR. VAN NEST:**   His state of mind.   He was asked a lot

10   of questions about licenses and so on on his cross, Your Honor.

11   He has got a right to explain what the company did.

12         **THE COURT:**   Well, Mr. Bicks, you did accuse him of

13   willful conduct, basically, on your direct examination through

14   the questions that you asked, and he's entitled to give his

15   response on -- so I think this is -- this is legitimate within

16   the scope of the examination.

17         Overruled.   Please go ahead.

18   **BY MR. VAN NEST:**

19   **Q.**   Go ahead, Mr. Page.

20         **THE COURT:**   But you have to stick to what was in your

21   mind at the time all this was going on and not veer off into a

22   speech.

23         **THE WITNESS:**   Okay.   I think we acted very responsibly

24   and carefully around these intellectual property issues.

25

1    BY MR. VAN NEST:

2    Q.    And what was your understanding about the Java API method

3    declarations?

4    A.    They were free and open, and even after that fact, we know

5    Sun publicly supported our use of Java and Android.

6              MR. VAN NEST:   I have nothing further, Your Honor.

7              THE COURT:   Anything more?

8              MR. BICKS:   No, Your Honor.

9              THE COURT:   All right.   May the witness be excused and

10    discharged?

11              MR. BICKS:   Yes.

12              THE WITNESS:   Thank you, Your Honor.

13              THE COURT:   Thank you, Mr. Page, you are free to go.

14              MS. HURST:   Your Honor, we have some read-ins before

15    we recall Dr. Java.

16              THE COURT:   Okay.

17              MS. HURST:   It will go quick.

18              THE COURT:   All right.

19              MS. HURST:   "Request for Admission No. 285 from Oracle

20    to Google:   Admit that code in Android is not derived from code

21    from the GNU Classpath project.

22         "Response:   Google admits that its source code

23    implementation for the Android core libraries is not derived

24    from the GNU Classpath project.

25         "Request for Admission No. 287 from Oracle to Google:

1   Admit that Google does not distribute 37 Java API packages

2   copied in Android under and in compliance with the terms of the

3   open source license applicable to the OpenJDK project.

4       "Response:  Google admits this request for admission with

5   respect to versions of the Android core libraries asserted in

6   this case.

7       "Interrogatory No. 42 from Oracle to Google.  To the

8   extent that you contend you are entitled to a license defense

9   because your use of any aspect of the 37 Java API packages is

10  covered by any license authorized by Sun or Oracle, state in

11  detail the factual basis for that contention.

12      "Response:  Google states that it does not assert the

13  defense of license as to any of the versions of Android

14  asserted in this case."

15      And, Your Honor, we have Agreed Fact No. 4 from ECF No.

16  1845.  "Sun/Oracle could have written and organized the

17  declaring code for the 37 Java API packages in any number of

18  ways and still have achieved the same functions."

19          THE COURT:  Okay.  All of that's agreed can be deemed

20  evidence; correct, Mr. Van Nest?

21          MR. BABER:  That's an established fact, Your Honor.

22          THE COURT:  All of those things you just heard, even

23  though read by a lawyer, will be deemed to be evidence in the

24  case.  All right.  Very well.  Thank you.

25      Now can we bring back Dr. Jaffe at this time?  So all of

**JAFFE - CROSS / VAN NEST**

```
 1    you -- Dr. Jaffe, I'm going to ask the lawyers to please clear

 2    the witness bench off as a courtesy to Dr. Jaffe, so we'll

 3    have -- let him have a clean bench.

 4         And, Dr. Jaffe, welcome back.

 5              THE WITNESS:  Thank you.

 6              THE COURT:  And you all over in the jury box will

 7    remember that we were in the middle of cross-examination when

 8    we adjourned yesterday.  And so Mr. Van Nest was doing that,

 9    and he's going to pick up where he left off.  Let's see.

10         Somebody is over there making movements about -- are you

11    okay?  I want you to be -- Mr. Van Nest should have the

12    undivided attention of the jury.

13              MR. VAN NEST:  She's fine, Your Honor.  She's helping.

14              THE COURT:  Mr. Van Nest will now proceed.

15              MR. VAN NEST:  Good morning, everyone.

16              ADAM JAFFE, PLAINTIFF WITNESS, PREVIOUSLY SWORN

17                   CROSS-EXAMINATION    (resumed)

18    BY MR. VAN NEST:

19    Q.   Good morning, Dr. Jaffe.

20    A.   Good morning.

21    Q.   I think when we broke yesterday, we were talking about the

22    fact that before Android was announced in November of 2007,

23    people at Sun were aware that the market for mobile phones was

24    changing.  Do you recall discussing that?

25    A.   I do.
```

**JAFFE - CROSS / VAN NEST**

1  Q.   And there are many, many internal documents at Sun back in

2  '05 and '06 reflecting the fact that they knew the market for

3  mobile phones was changing; right?

4  A.   I don't know that there were many.  We have seen some.

5  Q.   There certainly were some that you came upon in your

6  review of the files and records in this case; right?

7  A.   Yes.

8  Q.   Could we have TX 7237 on the screen, please.  And let's

9  start with the cover page.

10      We did look at this yesterday, Your Honor.  It's already

11  in evidence.  Just to establish the date again, it's September

12  29th, 2006.

13      Do you see Mr. Brenner's name on the cover of the slide

14  deck?

15  A.   I do.

16  Q.   He was here yesterday to testify.  That's the same person,

17  isn't it?

18  A.   That's my understanding.

19  Q.   Okay.  So let's go to page 3.  And "Market Changes

20  Threaten Our Position."  That's the title of this slide deck.

21  This is one of the documents that reflect that Sun was fully

22  aware that changes were afoot for smartphones -- for mobile

23  phones, excuse me; right?

24  A.   I'm not sure I understand the question.  This is a

25  document that says what it says.

**JAFFE - CROSS / VAN NEST**

1   Q.   Okay.  Let's go down to the third bullet.  "Increase in

2   device capability and networking shifting the market to

3   advanced platforms.  Growth is more than 5X feature phones."

4        You understood that as a reference to the fact that folks

5   at Sun back in '06 knew that increase in device capability and

6   networking is shifting to more advanced phone platforms; right?

7   A.   You read it correctly.

8   Q.   And that was your understanding from all the documents you

9   have read, too?

10  A.   That part, yes.

11  Q.   Okay.  And it also says below that "New competitors

12  entering the advanced market.  No entrenched incumbent"; right?

13  A.   It says that.

14  Q.   That's consistent with your view that this market was

15  highly dynamic, changing, and very hard to predict; right?

16  A.   Yes.

17  Q.   Okay.  Now, could we go -- I think we saw yesterday, but

18  let's go down to page 5.

19       As a result of the changes that Sun saw coming, they were

20  predicting a potentially big drop in their ME revenue; right?

21  A.   They made a number of different predictions, and as

22  Mr. Brenner explained, they anticipated that under some

23  circumstances, they could have this kind of revenue drop, yes.

24  Q.   And it's -- this is '06, so this is before Android was

25  announced.  You've seen documents in '07 and '09 and 2011 where

JAFFE - CROSS / VAN NEST

1   the problem they identified at Sun, namely, *we're not keeping*

2   *up*, was still outstanding; right?

3   **A.**   I don't recall, as I sit here, specifically what other

4   documents there were.   I have seen other documents at other

5   times, yes.

6   **Q.**   Okay.   And the documents tend to reflect that

7   Mr. Brenner's hope that Sun would do something other than stay

8   the course was not being realized at Sun.   They weren't

9   developing Java ME to keep up with these changes; right?

10   **A.**   I'm not sure.

11   **Q.**   Okay.   Well, let's look at some of the documents.   Can we

12   go to TX 7234.

13         This is in evidence, Your Honor.

14         Could we highlight the top of the page there.   This is an

15   email in November.   Let's make it a little bigger, please.

16   This is an email, November 14th, 2007.

17         Now, Mr. Barr was a Sun employee at that time; correct?

18   **A.**   That's my understanding.

19   **Q.**   We saw him.   He was the senior principal technology and

20   product manager.   We saw him on video earlier this last week;

21   right?

22   **A.**   I don't recall.

23   **Q.**   Okay.   In any event, could we highlight the first sentence

24   of Mr. Barr's email.   "I am keeping my fingers crossed that

25   Android hits the powers that be at Sun as a wake-up call that

**JAFFE - CROSS / VAN NEST**

1   our mobile Java strategy is failing."

2        Do you see that?

3   **A.**   I do.

4   **Q.**   That was sent just a few days after the announcement of

5   Android in 2007; right?

6   **A.**   Yes.

7   **Q.**   So according to Mr. Barr, who was one of the principal

8   technologists at Sun, their mobile strategy was failing before

9   there was -- long before there was an Android phone on the

10  market; right?

11  **A.**   Well, at this time he does say that Java's strategy is

12  failing.

13  **Q.**   And a couple years later, it was still the case at Sun

14  that they perceived that Java was stagnant and legacy; right?

15  **A.**   You'd have to give me more context.

16  **Q.**   Well, let's get the context from TX 2199.  This is in

17  evidence, Your Honor.

18        This is a OneJava market landscape discussion.  I believe

19  it's from 2009, but I don't see a date on the front.  Maybe

20  we'll see it inside.

21        In any event -- ah, there is an email attached to this.

22  Is there an email, Mr. Dahm, preceding this slide deck?  No.

23  Okay.

24        In any event, let's open it up to the page that says

25  *Trends*.  This is a Sun document.  And could we highlight the

1    second point above that.  Great.

2         "Java is perceived as stagnant and legacy."  That was

3    something that Sun was aware of in 2009; right?

4    **A.**   Well, that's what this document says.

5    **Q.**   And it says below that, "Stagnant innovation, only aimed

6    at Java programmers and fragmented between Java SE and ME and a

7    lot of other things."  Do you see that language?

8    **A.**   I do.

9    **Q.**   Now, there's nothing on this page about Android; right?

10   **A.**   That's correct.

11   **Q.**   This is their recognition, internal at Sun, that they had

12   a lot of problems with Java, at least as of the date of this

13   email -- of this slide deck; correct?

14   **A.**   I'm not sure what it is.  It says what it says.

15   **Q.**   And actually Mr. Rizvi, who was a very senior Sun person,

16   testified about precisely this slide deck last week here in

17   court; right?

18   **A.**   I believe so, yes.

19   **Q.**   And he testified that there were areas within Java that

20   had become dated and needed to be refreshed urgently; right?

21   **A.**   I don't remember.

22        **MR. VAN NEST:**  Actually, let's play from Mr. Rizvi's

23   deposition, page 106, line 8 to 106, line 23.

24        (Whereupon, the video was played for the jury)

25

JAFFE - CROSS / VAN NEST

1  BY MR. VAN NEST:

2  Q.   Now, this was evidence that you had access to throughout

3  the course of your work on this case, Dr. Jaffe; correct?

4  A.   Yes.

5  Q.   And the folks at Keystone, do you recall, did they make

6  this deposition available to you or the document we looked at

7  or not?

8  A.   Yes.

9  Q.   So you were aware in your work that as of the date of this

10  slide deck, folks internal at Sun were concerned that Java

11  needed be updated, refreshed, and was not keeping up; right?

12  A.   I was familiar with what the document said.

13  Q.   And you know that by 2012, after Oracle acquired Sun and

14  Sun became Oracle America, there was still a problem that

15  Oracle had Sun -- America had no solutions for smartphones;

16  right?

17  A.   I don't recall that specific language, no.

18  Q.   Could we have TX 7362 up, please.  It's an exhibit that

19  was admitted last week.  Let's get the top.

20      This is an email from Henrik Stahl of Oracle to Mr. Saab.

21  He's copied on it.  In February of 2012.  Do you see that,

22  Dr. Jaffe?

23  A.   Yes.

24  Q.   And the very first line of his email says, "We have no

25  solution for smartphones, true."  This was one of the documents

**JAFFE - CROSS / VAN NEST**

1  that you had available, right, during your research?

2  A.   Yes.

3  Q.   So this is 2012.  This is three years later, and Oracle is

4  recognizing they don't have a solution for smartphones.

5  A.   It says that, yes.

6  Q.   And as a matter of fact, Mr. Stahl has testified that was

7  still true in 2015, just last year; right?

8  A.   I don't recall.

9  Q.   Well, let's play Mr. Stahl's testimony from his deposition

10  on January 14th of 2016, page 153, lines 17 through 22.

11       (Whereupon, the video was played for the jury)

12  BY MR. VAN NEST:

13  Q.   So as of 2015, Mr. Stahl confirmed for us last week, there

14  still was no smartphone platform in existence at Oracle or

15  Oracle America; right?

16  A.   Well, what I was talking about in my testimony was not a

17  platform.  It was licensing Java to people who build various

18  things.

19  Q.   Okay.  Let's talk about that.  You mentioned three of them

20  in your testimony yesterday.  You mentioned licensing deals

21  with Samsung, HTC, and Sony Ericsson.  Do you recall that from

22  your direct exam?

23  A.   Yes.

24  Q.   And I think we established yesterday those were all

25  Java ME licensees; right?

JAFFE - CROSS / VAN NEST

1    A.    Yes.

2    Q.    And you testified that at least one of them, Samsung, lost

3    revenue -- excuse me -- that Oracle lost revenue because

4    Samsung didn't renew its license at as big amount as it had;

5    right?

6    A.    Yes.

7    Q.    And the reason for that is that Samsung wanted to build

8    smartphones like Galaxy, not feature phones; right?

9    A.    I would agree that they wanted to build smartphones.  I

10   would not agree that that was necessarily the reason why they

11   were not licensing from Oracle.

12   Q.    Well, you didn't do any investigation to find out exactly

13   why Samsung did what they did; right?

14   A.    That's true.

15   Q.    But don't you assume, as an economist knowing what you

16   know about this market, that the reason Samsung didn't re-up on

17   Java ME is they wanted to build a smartphone and Java ME isn't

18   capable of supporting a smartphone; right?

19   A.    I don't agree with everything in what you just said.

20   Q.    Okay.  Let's unpack it.  I asked two questions.

21         So we've established that the folks at Sun and Oracle have

22   acknowledged that ME doesn't support a modern smartphone;

23   right?  We established that yesterday?

24   A.    Yes.

25   Q.    That's because ME was intended for resource-constrained

**JAFFE - CROSS / VAN NEST**

1  devices much smaller and much simpler than a modern smartphone;

2  right?

3  **A.**   That's my understanding.

4  **Q.**   Okay.  And the reason that Samsung did not re-up at as

5  high a number is they want to build smartphones like the

6  Galaxy; right?

7  **A.**   I agree that they want to build smartphones.

8  **Q.**   Okay.  And the same is true for HTC and Sony, they want to

9  build smartphones, too?

10  **A.**   Yes.

11  **Q.**   Now, you're offering an opinion on market harm, and as we

12  discussed yesterday, the test you're applying is whether or not

13  there was market harm to the copyrighted work or derivatives of

14  that; correct?

15  **A.**   Yes.

16  **Q.**   Okay.  The copyrighted work in this case is Java SE?

17  **A.**   Yes.

18  **Q.**   And I didn't hear any testimony from you yesterday about

19  any loss of revenues in the Java SE line of Oracle's business,

20  did I?

21  **A.**   Well, honestly, it's in my report.  I don't remember as

22  the direct point yesterday whether we covered that or not.

23  **Q.**   Now, Java SE, the Standard -- SE stands for Standard

24  Edition; right?

25  **A.**   Yes.

**JAFFE - CROSS / VAN NEST**

1    Q.   It's traditional mark was desktops and servers; correct?

2    A.   I think that's fair.

3    Q.   And for years as Java SE was introduced and sold, it was

4    sold primarily for use in desktops and servers and fairly

5    powerful laptops; right?

6    A.   That's my understanding.

7    Q.   Okay.  And as far as you know, that part of Oracle's

8    business -- by that I mean Java SE -- is doing just fine;

9    right?

10   A.   Oracle continues to license SE in those markets, yes.

11   Q.   And as a matter of fact, it's doing better than ever?

12   A.   I don't recall.

13   Q.   Did you look to see whether Java SE revenues are going up

14   or going down as part of your work?

15   A.   Well, as I testified yesterday, in considering market

16   harm, I looked at the markets of mobile -- mobile phones,

17   tablets and E-readers and other device categories that I

18   mentioned yesterday.

19   Q.   But that wasn't my question, Dr. Jaffe.  My question was

20   did you look to see whether Java SE revenues were going up or

21   going flat or going down?

22   A.   I looked at that within the markets that I examined, which

23   you're right, did not include desktop computers, laptops or

24   servers.

25   Q.   So in the traditional market for Java SE, as far as you

JAFFE - CROSS / VAN NEST

1  know, revenue is going up and Java SE is doing fine; right?

2  **A.**   I don't know whether it's going up or down.   I know that

3  they do continue to license it in those markets.

4  **Q.**   Okay.   Let's actually play some testimony from Donald

5  Smith, who was a 30(b)(6) witness, as his Honor explained, from

6  his November 20, 2015 deposition at page 277, lines 23 to 278,

7  line 7.

8      (Whereupon, the video was played for the jury)

9  **BY MR. VAN NEST:**

10  **Q.**   Did you talk to anybody in the Java SE business at Oracle

11  America to confirm what Mr. Smith said?

12  **A.**   No.

13  **Q.**   So even though you knew that the copyrighted work was

14  Java SE, you didn't go to the trouble of talking to the Java SE

15  managers to see how that was doing?

16  **A.**   No.

17  **Q.**   Did you have Keystone do that?

18  **A.**   No.

19  **Q.**   Did anybody do that?

20  **A.**   Not that I know of.

21  **Q.**   So as far as you know, what Mr. Smith says is right?

22  They're doing just fine?

23  **A.**   As far as I know, yes.

24  **Q.**   Okay.   And Mr. Ellison also testified that the Java

25  business overall was doing fine; right?

**JAFFE - CROSS / VAN NEST**

1  A.   Yes.

2  Q.   He said that in the video we played, that as far as he

3  knew, they were hitting their targets and Java SE -- the Java

4  business overall was doing fine.  That's what he said; right?

5  A.   Yes.

6  Q.   By the way, yesterday, Dr. Jaffe, you mentioned the HTC

7  Touch Pro as a Java smartphone, I think you said.

8  A.   Yes.

9  Q.   Now, actually HTC Touch Pro runs Windows mobile platform

10  from Microsoft; right?

11  A.   But it has Java on it as well, yes.

12  Q.   Let's break this down.  You know that Android is a full

13  stack, top to bottom, it does everything a smartphone needs to

14  do; right?

15  A.   Yes.

16  Q.   There's no Java product that does that?

17  A.   That is correct.

18  Q.   Java provides some functionality, but it needs a much

19  bigger system around it to be relevant; right?

20  A.   Provides a portion -- it provides the applications

21  interface in a larger system, yes.

22  Q.   So when you talked about smartphones using Java, you

23  didn't have any examples, other than maybe SavaJe, where the

24  whole thing was Java; right?

25  A.   Of course.

JAFFE - CROSS / VAN NEST

1   Q.   Okay.  And that's true for HTC Touch Pro, it uses -- it's

2   a Windows phone; right?

3   A.   It's a Windows phone that has Java on it doing what Java

4   does.

5   Q.   Okay.  And the BlackBerry you talked about, that is not a

6   Java operating system either; right?  That's a Symbian system

7   or a BlackBerry system; right?

8   A.   Java ME is not a phone operating system.  It does what it

9   does.

10  Q.   Now, yesterday you talked about a tipping point for

11  Android.  Do you recall that testimony?

12  A.   Yes.

13  Q.   That was related to your testimony about a mobile window

14  that was either opening or closing; right?

15  A.   Yes.

16  Q.   And I think you said somehow along the way that the method

17  declarations from the 37 Java packages enabled Android to get

18  to the market.  Do you recall testimony along lines?

19  A.   Yes.

20  Q.   As we established yesterday, you're not a technical

21  person; right?

22  A.   That is correct.

23  Q.   So you can't tell us exactly how these declarations work

24  inside of Android?

25  A.   In terms of the software engineering, no.

**JAFFE - CROSS / VAN NEST**

1   Q.   Because you didn't even know what implementing code was at

2   the time you formed your opinions; right?

3   A.   That's correct.

4   Q.   Are you relying on some other expert for this conclusion

5   about the tipping point or that's all you?

6   A.   I think it's both.  I think there is some reliance on the

7   technical experts like Dr. Schmidt regarding the role of the

8   declarations, but I'm also as an economist thinking about the

9   economic problem that Android needed to solve, which was having

10  a developer community and getting the carriers on board, and, I

11  mean, even Mr. Bloch last week referred to the declaring code

12  as the nexus between the applications and the device, and so as

13  an economist, I can understand that that means that having that

14  is going to be important in bringing that developer community

15  on board.

16  Q.   Okay.  So as an economist, you also know that SavaJe used

17  the Java SE APIs; right?

18  A.   I do know that, yes.

19  Q.   And it was a big failure?

20  A.   It was a failure.

21  Q.   Huge; right?

22  A.   It was a failure.

23  Q.   Okay.  So just having the Java -- the method -- actually,

24  SavaJe had the whole kit and caboodle.  It didn't just have the

25  method headers; it had the implementing code and the whole

**JAFFE - CROSS / VAN NEST**

1   thing, the virtual machine, all of the proprietary Sun code;

2   right?

3   **A.**   Yes.

4   **Q.**   It was a flaming failure.

5   **A.**   It was a failure.

6   **Q.**   So just having all that doesn't guarantee success for a

7   smartphone; right?

8   **A.**   It does not guaranty success.

9   **Q.**   And that's consistent with what you said yesterday, which

10  was this is a very hard market to predict anything in; right?

11  **A.**   Yes.

12  **Q.**   I think you said nearly impossible to predict how this

13  market comes out; right?

14  **A.**   I did say that, yes.

15  **Q.**   Okay.  You also know that other smartphones that have been

16  hugely successful don't use any Java at all; right?

17  **A.**   Well, the only one that I know of is the iPhone.

18  **Q.**   That's a pretty big, successful item; right?

19  **A.**   It is.  They had a different way of solving that economic

20  problem.

21  **Q.**   And they did it without any -- they didn't use the Java

22  programming language or the APIs or any of that; right?

23  **A.**   That's correct.

24  **Q.**   Apple is written in a completely different programming

25  language?

**JAFFE - CROSS / VAN NEST**

1   **A.**   That is correct.

2   **Q.**   And yet I think we would say Apple has been very

3   successful; right?

4   **A.**   I would agree with that.

5   **Q.**   You've said you think Apple's iPhone was revolutionary and

6   a market breakthrough?

7   **A.**   I think a lot of people think that.

8   **Q.**   And you do, too?

9   **A.**   I do.

10   **Q.**   And they did that without any Java at all; right?

11   **A.**   Correct.

12   **Q.**   All right.  Let's talk about money for a minute.  Could we

13   put up Dr. Jaffe's slide 14, please.  I think it's 14 from

14   yesterday.  It's the bar chart.

15       Do you recall, Dr. Jaffe, showing us a bar chart of money

16   that you say Android has earned?

17   **A.**   Yes.

18   **Q.**   The numbers have changed a couples times.  It's the bar

19   chart that shows the towering numbers and all that.  In any

20   event, most of -- there it is.

21       Most of that money is from Google Search and Google

22   Advertising; right?  The vast majority of it?

23   **A.**   Yes.  From users using Android phones.

24   **Q.**   So these -- this dark green layer -- excuse me for

25   stepping in front of that.  This thing that gets it up so high,

**JAFFE - CROSS / VAN NEST**

1   that's ad revenue; right?

2   **A.**   That's ad revenue from Android users.

3   **Q.**   Now, the ad revenue comes from people using Google Search;

4   right?

5   **A.**   Using Google Search from an Android phone.

6   **Q.**   And Google Search, that existed a long time before

7   Android; right?

8   **A.**   It did.

9   **Q.**   You heard Mr. Page, that's what got the company started?

10   **A.**   Is that a question?

11   **Q.**   Well, did you understand that Google Search was the

12   company's first major product?

13   **A.**   Yes.

14   **Q.**   And very successful?

15   **A.**   Yes.

16   **Q.**   And the technology in Google search, that's totally

17   separate from any Android technology; right?

18   **A.**   Yes.

19   **Q.**   Google Search runs on iPhone --

20   **A.**   Yes.

21   **Q.**   -- correct?  It runs on a desktop?

22   **A.**   Yes.

23   **Q.**   It runs on a laptop?

24   **A.**   Yes.

25   **Q.**   It can run on a server?

**JAFFE - CROSS / VAN NEST**

1  A.   I assume so.

2  Q.   It can run on Windows mobile?

3  A.   Yes.

4  Q.   It can run on BlackBerry?

5  A.   Yes.

6  Q.   And it's technology that Google created that's become

7  among the most popular search engines in the world; right?

8  A.   It is the most popular, as far as I know.

9  Q.   And then you also are aware that there's a Google

10  advertising product as well?

11  A.   Yes.

12  Q.   That is sold to advertisers?

13  A.   Yes.

14  Q.   They get to choose search words and so on and so forth and

15  advertise?

16  A.   That's my understanding.

17  Q.   Okay.  And that's also a very successful technology,

18  Google Ads?

19  A.   Is that a question?

20  Q.   I'm asking you whether that's just as successful as Google

21  Search.

22  A.   It is very successful.

23  Q.   It's yet a separate technology from Google Search or from

24  Android; right?

25  A.    Yes.

**JAFFE - CROSS / VAN NEST**

1   Q.   And Google Ads, it works on all these other devices, too;

2   correct?

3   A.   Yes.

4   Q.   It runs on a desktop, a laptop, all these other

5   smartphones.  It's not unique.  In other words, none of this is

6   unique to Android?

7   A.   Is that a question?

8   Q.   Yes.

9   A.   It was a statement.  Are you asking me if your statement

10  is true?

11  Q.   Yes.

12  A.   Yes.  Your statement is true.

13  Q.   In other words, Dr. Jaffe, you understood when you put

14  this together that the ad revenue came from Google Search and

15  Google Ads, which are completely separate technologies from

16  Android; correct?

17  A.   Well, you -- you listed a whole bunch of things that use

18  Google Search.  Those are all excluded from this picture.  This

19  is revenue.  The advertising revenue in here is advertising

20  revenue that comes from users using the Android phone.

21  Q.   And obviously the ad revenue is not something that Oracle

22  America could ever have earned because they're not in that line

23  of business; right?

24  A.   I have never suggested they would have earned this

25  revenue.

**JAFFE - CROSS / VAN NEST**

1  Q.   In other words, this has nothing to do with any revenue

2  that Oracle America could have earned?

3  A.   I put this up to display and illustrate the commerciality

4  of the Android use of the Java products.  I did not make any

5  claim that this had anything to do with my market harm

6  analysis.

7  Q.   Okay.  Now, yesterday you spent some time talking about

8  Oracle's licensing program for ME and SE.  Do you recall that

9  testimony?

10  A.   Yes.

11  Q.   You're not a licensing expert?

12  A.   I said that yesterday.

13  Q.   Right.  Now, you understand the issue in this case is fair

14  use; right?

15  A.   Yes.

16  Q.   And fair use, when it applies, it allows the use of a

17  copyrighted work without any license at all; right?

18  A.   Well, I'm not a legal expert, but that is consistent with

19  my understanding.

20  Q.   Okay.  It's your understanding that the right of fair use,

21  which is what we're talking about -- if your use qualifies as a

22  fair use, that means you can use the copyrighted material

23  without the consent of the copyright owner; right?

24       MR. BICKS:  Your Honor, I don't -- I just object on

25  the grounds that we're in a legal area, and I wasn't allowed --

**JAFFE - CROSS / VAN NEST**

1    I was cautioned to stay away from this.

2            **MR. VAN NEST:**  Well, he has testified about fair use

3    and he has thrown licenses in, Your Honor.  I think I have a

4    right to clarify.

5            **THE COURT:**  I believe -- have you read it the way I

6    stated it to the jury at the outset of the trial?

7            **MR. VAN NEST:**  I think so, but I have a slide I can

8    put up.

9            **THE COURT:**  It sounded close.

10           **MR. VAN NEST:**  If I put the slide up, it's taken right

11   from your instruction.

12           **THE COURT:**  You can put the slide up.

13           **MR. VAN NEST:**  Why don't I do that.

14           **THE COURT:**  And we will rely on that.

15           **MR. VAN NEST:**  Why don't I do that.  Can we put up

16   slide 4 from the opening.  Okay.

17   **Q.**   So, Dr. Jaffe, it's important to get this right, but the

18   right of fair use permits the use of copyrighted works by

19   others without the copyright owner's consent; right?

20   **A.**   Yes.

21   **Q.**   And that's the test that you understood you would be

22   applying in discussing fair use in the course of this trial?

23   **A.**   Yes.

24   **Q.**   So that's true whether the copyright owner offers licenses

25   or not; right?

**JAFFE - CROSS / VAN NEST**

1   **A.**   Yes.

2   **Q.**   If fair use is established, the licensing program of Sun

3   or Oracle is completely irrelevant; right?

4   **A.**   I would agree that if it's fair use, it does not need to

5   be licensed.  I think the nature of the licensing program is an

6   important consideration in understanding whether or not it was

7   in fact fair use.

8   **Q.**   Well, fair use is a legal doctrine that applies whether or

9   not the copyright owner licensed his or her work; right?

10   **A.**   I think I've agreed to that three or four times now.

11   **Q.**   Okay.  Now, you also agree that it's important to

12   understand -- I think you said this yesterday -- what Sun was

13   doing in terms of disseminating for use these Java APIs; right?

14   **A.**   Yes.  I think it's relevant to the economic analysis.

15   **Q.**   Right.  And you would agree that from an economic

16   perspective, it could be perfectly logical for a copyright

17   owner to make its intellectual property free for use without a

18   fee; right?

19   **A.**   It may be perfectly rational for them to do that in a

20   controlled way as part of their licensing strategy.

21   **Q.**   And you said it's common practice for intellectual

22   property owners to allow free or unlicensed use of their

23   property under some circumstances; right?

24   **A.**   If I said *unlicensed*, I misspoke.  I didn't mean that.

25   **Q.**   Well, actually you said it in your report, didn't you?

JAFFE - CROSS / VAN NEST

1   A.   I don't recall.

2   Q.   Could we have paragraph 447 from Dr. Jaffe's February 8,

3   2016 report up, please.  Okay.  Could we highlight the second

4   sentence please, Mr. Dahm.

5        It says, "As discussed above, it is common practice for

6   intellectual property owners to allow free or unlicensed use of

7   their property under some circumstances, but not others."

8        That's from your expert report in this case; right?

9   A.   Yes.

10  Q.   Okay.

11  A.   Under some circumstances, but not others.

12  Q.   Okay.  Now, you know that Sun's business was primarily

13  hardware?

14  A.   Yes.

15  Q.   Something like 95 percent of its business was hardware;

16  right?

17  A.   I don't recall the number.  It was primarily hardware.

18  Q.   And you're aware that Sun publicly promoted its support

19  for open interfaces; right?

20  A.   I don't recall.

21  Q.   All right.  Could we have up TX 971, which is a 2008 10K.

22       You had available to you all the public statements that

23  Sun made --

24            THE COURT:  Is this in evidence?

25            MR. VAN NEST:  It is, Your Honor.

**JAFFE - CROSS / VAN NEST**

1    **Q.**    Right, Dr. Jaffe?

2    **A.**    Yes.

3    **Q.**    And these are statements made to the government and made

4    public at the time they're made; right?

5    **A.**    Yes.

6    **Q.**    Could we go to page -- do you recall reviewing this one in

7    particular?  Did you look at some?

8    **A.**    I looked at some.  I can't tell from what I see here

9    whether I reviewed this one.

10   **Q.**    Let's go to page 3 under *business strategy* and make that a

11   little bit bigger.  Okay.  Can we move that over a little bit,

12   Mr. Dahm.  It's hard to see.  There we go.  Okay.

13        So this is Sun making statements to the public about its

14   policies with respect to its products; correct?

15   **A.**    Yes.

16   **Q.**    And its business strategy; right?

17   **A.**    Yes.

18   **Q.**    And it says, "With a strong commitment to open standards,

19   open interfaces, and the open source community, we believe

20   sharing and collaboration is key to our long-term success."

21   You see that; right?

22   **A.**    I do.

23   **Q.**    Now, open interfaces, that's APIs; right?

24   **A.**    Well, APIs would be one example of an interface.

25   **Q.**    Okay.  Because API stands for *application programming*

JAFFE - CROSS / VAN NEST

1    *interface*; right?

2    **A.**    Yes.

3    **Q.**    And this is a Sun statement in 2008, right around the time

4    the first Android phone came out, expressing a strong

5    commitment to open interfaces and the open source community;

6    correct?

7    **A.**    Yes.

8    **Q.**    Now, wasn't Sun aware, based on what you've reviewed, that

9    given its commitment to open standards and open interfaces,

10   that could have an effect on its licensing revenues?

11   **A.**    Yes.

12   **Q.**    And that would be logical for any copyright owner,

13   including Sun, that if you're going to support open technology,

14   open standards and open interfaces, it could interfere with

15   your ability to license your own technology; right?

16   **A.**    Yes.   And you would pursue that in a systematic way being

17   open where it was important to do so while maintaining the

18   appropriate restrictions so you could protect your business.

19   **Q.**    And Sun itself knew that this policy could impact

20   revenues, didn't it?

21   **A.**    As a theoretical matter, I think it's true that actions

22   you take with respect to open source software and open

23   interfaces could affect revenue.   I think they were aware of

24   that as a theoretical possibility.

25   **Q.**    Let's make it real, not theoretical, and go to page 14.

JAFFE - CROSS / VAN NEST

1   Could we blow that up, please.

2        This is in the same document, Dr. Jaffe.

3        Make that a little bigger.  Okay.  I think it's further

4   down in the page.

5        It says, "As a result of such release, there could be an

6   impact on revenue related to this intellectual property."

7        So they're talking about, "We've also released our Java

8   Platform Standard Edition" -- that's the copyrighted work --

9   "under an open source license.  As a result of such release,

10  there could be an impact on revenue related to this

11  intellectual property, and we may no longer be able to exercise

12  control over some aspects of the future development of our

13  property."

14       Do you see that?

15  **A.**   I do.

16  **Q.**   Dr. Jaffe, that was well known to Sun back in 2008 when

17  they expressed their commitment to open interfaces and open

18  source; right?

19  **A.**   Again, they're appropriately disclosing the theoretical

20  possibility that while they will try to retain control, that

21  the existence of the open source license could have an effect

22  on their revenues.

23       **MR. VAN NEST:**  I have nothing further.  Thank you,

24  Your Honor.

25       **THE COURT:**  All right.  Redirect, please.

JAFFE - REDIRECT / BICKS

1          **MR. BICKS:**  Trudy, could we bring up the deposition of

2    Larry Ellison, please.

3                     **<u>REDIRECT EXAMINATION</u>**

4    BY MR. BICKS:

5    **Q.**   Mr. Jaffe, a few questions.  You were asked about

6    testimony of Mr. Ellison and Oracle's efforts to build a

7    smartphone.  Do you recall that?

8    **A.**   Yes.

9    **Q.**   So I put up on the screen testimony from Mr. Ellison.  And

10   I want us to quickly take a look at it together.  Do you see

11   it, sir?

12   **A.**   Yes.

13   **Q.**   And do you see the -- the question and answer down at the

14   bottom.  He says, "We came to the conclusion it was a bad

15   idea," and the answer was, "Why?"  And do you see the answer

16   there?

17   **A.**   Yes.

18   **Q.**   "Because Android -- there was already a Java phone in the

19   market.  That Google had gotten to market before us with the

20   Java technology.  They were giving it away for free, giving

21   away our IP for free, which is kind of interesting.  It's very

22   hard to go out and compete against our own IP when someone else

23   is giving that IP away for free"?

24   **A.**   Yes.

25   **Q.**   As an economist and consistent with your opinion, you were

**JAFFE - REDIRECT / BICKS**

1  asked about Mr. Ellison's testimony, but you weren't shown

2  that.  Can you explain to the jury how testimony like that, if

3  at all, influences your opinion about market harm?

4  **A.**   Well, I think what's important is that -- two things.

5  First, whatever challenges Sun faced independent of Android, it

6  clearly faced additional challenges by having to compete with

7  Android, as Mr. Ellison describes here.  So I think that's --

8  when I think about market harm, the factor that Sun had

9  challenges doesn't change the fact that dealing with those

10  challenges is going to get worse when you're competing with a

11  product that has Java in it and is free.

12      And then the other part is that when it comes to Java or

13  Sun or Oracle addressing their own challenges and updating

14  their own technology, that costs money, and you have to make

15  decisions about whether or not to invest that money, and if you

16  have seen that the market is already, to a significant extent,

17  being taken over by this technology that is free, you may make

18  an intelligent business decision not to make the investments to

19  keep up, but you're doing that in part because you realize

20  you've already lost and you've already lost because of the free

21  Android.

22  **Q.**   And to what extent did that free Android cause harm to

23  Oracle, if at all?

24  **A.**   Well, I think, as we saw yesterday, it caused significant

25  harm because Oracle lost the opportunity to license its Java

**JAFFE - REDIRECT / BICKS**

1    technology into this mobile phone space, primarily.

2        I also talked about the tabloid and the E-reader market,

3    but the -- primarily in the mobile phone space, the -- the --

4    the market was, to a significant extent, taken over by the

5    Android product, which made it difficult to impossible for

6    Oracle to license into those products.

7    **Q.**   And can you explain to the jury the difference between a

8    business model of licensing Java into an operating system

9    compared to building a phone.

10   **A.**   Yeah.  We talked about this a bit yesterday.

11       You know, Sun never built a phone.  Oracle never built a

12   phone.  That wasn't the business they were in.

13       The intellectual property of Java had been created.  And

14   the way -- the way they had and the way one frequently does

15   with intellectual property make money from it is by licensing

16   it to other people.  And they were licensing it to other people

17   who were going to use it together with other software and

18   hardware to build a phone.

19       And the fact that -- I mean, Oracle was not in the

20   business of making phones.  The fact that they couldn't make a

21   phone does not mean they weren't harmed by losing the ability

22   to license the software to other people who were making phones.

23   **Q.**   And final area.  You were asked questions about SavaJE.

24   Do you remember that?

25   **A.**   Yes.

**JAFFE - REDIRECT / BICKS**

1  **Q.**   And Google's counsel was pointing out that SavaJE was a

2  phone that was out on the market for a short period of time in

3  the 2004-2005 time frame, generally.

4  **A.**   Yes.

5  **Q.**   All right.  I want to show you an exhibit that the parties

6  have agreed is admissible.  Exhibit 5322.

7       And this is an exhibit from Mr. Miner to Mr. Rubin.

8           **MR. BICKS:**  And can we highlight, Trudy, "As a case in

9  point."

10  **BY MR. BICKS:**

11  **Q.**   And so we're clear, this is October of 2006.  Do you see

12  this, Dr. Jaffe?

13  **A.**   Yes.

14  **Q.**   It says here, "As a case in point, if we were not doing

15  what we are doing, SavaJE would probably have gotten more

16  funding."

17       Do you see that?

18  **A.**   Yes.

19  **Q.**   I want to come back to that in a moment.

20       Remember we were talking on direct about presentations

21  Google was making to OEMs, phone makers, and others about Java?

22  **A.**   Yeah.

23  **Q.**   And remember on direct we were talking about presentations

24  that were made in the fall of 2006 and in 2007, that time

25  period generally?

PROCEEDINGS

1   **A.**   Generally, yes.

2   **Q.**   Yeah.  So what does this tell you, if at all, about the

3   impact of Android on SavaJE's efforts?

4   **A.**   Well, it says SavaJE would probably have gotten more

5   funding.  That means more funding from Sun, to further develop

6   it.

7         And what it -- what it suggests to me is that Sun, at the

8   time, was juggling a lot of things and dealing with the fact

9   that Android was being sold to customers in the sense of OEMs

10  and carriers.

11        Android was being sold, as we saw yesterday, as a solution

12  that has the Java application framework.  And that was part of

13  the challenging environment that Sun was evaluating when

14  deciding how much to invest in SavaJE.

15              **MR. BICKS:**  Thank you very much, Doctor.

16              **THE COURT:**  May the witness be excused?

17              **MR. VAN NEST:**  He may, Your Honor.

18              **MR. BICKS:**  Yes.

19              **THE COURT:**  Thank you, Dr. Jaffe.  You may step down.

20              **THE WITNESS:**   Thank you.

21          (Witness excused.)

22              **THE COURT:**  I am going to let us break a few minutes

23  early.  I need to talk with the lawyers about something.  So

24  we're going to take our break at this time.

25          Please remember the admonition.  15 minutes.

PROCEEDINGS

```
 1          (Jury out at 8:56 a.m.)

 2          THE COURT:  Counsel, can I give you what your time is?

 3      Google has used 867 minutes.  So that means you've got 33

 4   minutes left.

 5      Oracle has used 873 minutes.  So that means you have,

 6   looks like, 27 minutes left.

 7          MR. VAN NEST:  Your Honor, I don't think that can be

 8   correct.  You had us, at the end of the day yesterday, at 775.

 9   And I used about 40 minutes or so with Dr. Jaffe, I think.

10          THE COURT:  Well, let me check my math again.  I did

11   say 775.  And you had 10 minutes on Larry Page; right?

12          MR. VAN NEST:  Yes.

13          THE COURT:  And you had 40 minutes.  So that would be

14   50.

15          MR. VAN NEST:  That would be 825.

16          THE COURT:  That -- I can't even do math.

17          (Laughter)

18          THE COURT:  Let's see.  It's not even math.  It's

19   arithmetic.

20          MR. VAN NEST:  Your Honor, Dr. Kearl is here.

21          (Laughter)

22          THE COURT:  Hang on a minute.  Let me see where I

23   goofed up.

24      All right.  I stand corrected.  All right.  You -- you

25   have used 825, which means you have 75 minutes.
```

**PROCEEDINGS**

```
1        And Oracle has used -- I believe my math is correct.  You
2   had -- I've given you credit for 3 more minutes from yesterday.
3   846 plus 20 plus 1 plus 6.  And that adds up to what I said,
4   which is 873.
5        So both sides should be mindful of the clock.  That's the
6   reason I wanted you to -- all right.  I had miscounted on
7   Google.  But, nevertheless, you both are running low on time.
8        So who's our next witness going to be?
9            MR. VAN NEST:  Well, I think Oracle intends to close
10  their case.  That hasn't happened yet.
11           MR. BICKS:  Right.  We've got to deal with the
12  exhibits, Your Honor.
13           THE COURT:  Let's deal with that right now.
14       Have you looked at that list yet?
15           MR. VAN NEST:  Yes, yes.  We've confirmed they are
16  all --
17           THE COURT:  All of those will be evidence.  Thank you
18  for that.
19       Okay.  And --
20           MR. VAN NEST:  I don't think we need to read them in
21  in front of the jury.  He read them.  I have no objection.
22           THE COURT:  They are in evidence.  They can be used.
23  They don't need to be read in front of the jury.
24           (Trial Exhibits 6, 12, 23, 125, 154, 269, 348, 356, 370,
25  387, 5241, 5322, 5560, 5562, 5583, 5584, 5585, 5586, 5603,
```

PROCEEDINGS

```
 1  6437, 5137, 5142, 5145, 5146, 5148 received in evidence.)
 2            THE COURT:  Are you about to rest?  Is that it?
 3            MR. BICKS:  We are, Your Honor.  And I think we just
 4  have to -- subject to the issue we raised with Dr. Reinhold,
 5  which, I guess --
 6            THE COURT:  Well, that will be a surrebuttal problem,
 7  in any event.
 8            MR. BICKS:  Yes.
 9            THE COURT:  If there's time left over.
10            MR. BICKS:  All right.
11            THE COURT:  How many witnesses are you planning on
12  putting on?
13            MR. VAN NEST:  Just two, Your Honor.
14            THE COURT:  Who are they going to be?
15            MR. VAN NEST:  Dr. Leonard and Professor Astrachan.
16            THE COURT:  And then --
17            MR. VAN NEST:  Then I'll rest after that.
18            THE COURT:  So then we may have to take another break
19  to fight out over Reinhold.
20            MR. VAN NEST:  Right.
21            THE COURT:  Did you all think about whether or not to
22  let the jury take their notepads home over the weekend?
23            MR. BICKS:  That was fine with us, Your Honor.
24            MR. VAN NEST:  And us as well, Your Honor.
25            THE COURT:  Okay.  Good.  I'm going to tell them that.
```

**PROCEEDINGS**

1    It seems like there was another issue I wanted you to

2  consider.

3        **MR. VAN NEST:**  We haven't decided on time for closing.

4  That was one item.

5        **THE COURT:**  We can talk about that at the charging

6  conference.

7        **MR. VAN NEST:**  And the other item, I think, was the

8  top 20 list, or something like that.

9        **THE COURT:**  Oh, yes, giving the jury -- we can talk

10  about that, too, at the charging conference.

11        **MR. VAN NEST:**  Thank you.  I think those are the only

12  outstanding issues we had.  And we're ready to go with

13  rebuttal.

14        **THE COURT:**  All right.  We'll take a short break.

15        (Recess taken from 9:00 to 9:18 a.m.)

16        **THE COURT:**  Please have a seat.

17     Can we bring in the jury and get started?  Are we ready?

18        **MR. VAN NEST:**  Yes, Your Honor.

19        **THE COURT:**  All right.  Let's bring in our jury.

20        (Jury enters at 9:19 a.m.)

21        **THE COURT:**  All right.  Be seated, please.

22     And before we go any further, you have tomorrow off.  You

23  will have a long weekend.  And both sides have agreed that it's

24  okay if you want to take your notepads home and read -- you

25  don't have to.  But you're so diligent over there that it

PROCEEDINGS

1  occurred to me that some of you probably would like to take

2  your notepads home and study them over the weekend.  And that's

3  perfectly okay.

4      Of course, you cannot talk with your loved ones at home

5  about it.  You can sit there in stoney silence --

6      (Laughter)

7          THE COURT:  -- and read your notes and make sense out

8  of it.  That's great.  And then bring your notes back with you,

9  of course, when you come.

10     So if you want to do that, you can.  But you're not

11 required to do that.

12     Okay.  What's next?  Does Oracle have its next witness?

13         MR. BICKS:  Oracle is resting, Your Honor.

14     (Plaintiff rests.)

15         THE COURT:  All right.  Oracle now rests.

16     So we've reached another milestone in the case.  We now go

17 to a much shorter phase of the case called a rebuttal case.

18 And Google, at this time, gets to put on a rebuttal case.

19     All right.  Mr. Van Nest, what's next?

20         MR. VAN NEST:  Yes, Your Honor.  At this time Google

21 calls Dr. Greg Leonard.

22         THE COURT:  Let's bring him forward.

23     Welcome.  Stand in there somewhere and raise your right

24 hand.  The clerk will swear you in.

25

```
 1           GREGORY LEONARD, DEFENDANT'S REBUTTAL WITNESS, SWORN

 2           THE CLERK:  Please have a seat.

 3      Please state your name for the Court, and spell your last

 4  name for the record.

 5           THE WITNESS:  Gregory Leonard.  L-e-o-n-a-r-d.

 6           THE COURT:  All right.  Welcome.

 7      Make yourself comfortable, but then adjust the mic so it

 8  will catch your voice.

 9      I think we're out of water.  Angie --

10           MR. RAGLAND:  We can get --

11           THE COURT:  We will give you fancy water from the

12  government.

13           MR. RAGLAND:  Thank you, Your Honor.

14      Good morning, members of the jury.

15                       DIRECT EXAMINATION

16  BY MR. RAGLAND

17  Q.   Good morning, Dr. Leonard.

18      Would you please introduce yourself to the jury.

19  A.   Sure.  So my name is Greg Leonard.  I'm an economist.  And

20  I'm with an economics consulting firm called Edgeworth

21  Economics.

22  Q.   Can you tell us a little bit about your educational

23  background.

24  A.   Yes.

25      I received a bachelor of science degree in applied math in
```

**LEONARD - DIRECT / RAGLAND**

 1  economics from Brown University.  And then after that I went on

 2  to get a Ph.D. in economics from the Massachusetts Institute of

 3  Technology.  Or MIT, as it's commonly known.

 4  **Q.**  Could you also give us a brief history of your relevant

 5  work experience.

 6  **A.**  Sure.

 7       So right after I got my Ph.D., I started off as an

 8  assistant professor at Columbia University, teaching economics.

 9  And then from there I went into the consulting world.  And over

10  the course of my career, I've worked at a couple of different

11  firms.  And I'm now at Edgeworth, as I mentioned earlier.

12  **Q.**  Do you have any particular specialties within the field of

13  economics?

14  **A.**  Well, I specialize in studying how markets operate and how

15  actors in those markets behave.

16  **Q.**  Have you published any scholarly work -- scholarly work in

17  that field?

18  **A.**  Yes, I have.  I've got over 60 publications in scholarly

19  and professional journals and books, and that kind of thing.

20  **Q.**  Have you been retained by Google in this case?

21  **A.**  Yes, I have.

22  **Q.**  So are you getting paid for your work on this case?

23  **A.**  I am.

24  **Q.**  What assignment were you given here?

25  **A.**  My assignment was to analyze the markets at issue in the

LEONARD - DIRECT / RAGLAND

1    case and also specifically to take a look at and respond to the

2    opinions of Dr. Jaffe.

3    **Q.**   Dr. Jaffe is Oracle's expert?

4    **A.**   That's correct.

5    **Q.**   What steps did you take to get prepared to do this

6    analysis?

7    **A.**   I analyzed a bunch of information about the markets at

8    issue.  So there are documents produced by both parties in the

9    case.  There are depositions taken.  I reviewed those.

10       There's a lot of third-party information from market

11   research companies and various data you can get.

12       And I also, of course, looked at Dr. Jaffe's report in the

13   case.

14   **Q.**   Have you formed any opinions related to market harm

15   assertions in this case?

16   **A.**   Yes, I have.

17   **Q.**   Can you please provide the jury with a brief overview of

18   what those opinions are.

19   **A.**   Yes.

20       I've concluded that the use -- Google's use of the 37

21   APIs, or more specifically the declaring code and SSO from the

22   37 APIs, did not cause any market harm to Java SE.

23       And, likewise, that the use of the declaring code and SSO

24   of the 37 APIs did not cause any market harm to Java ME.

25   **Q.**   So let's dig in a little bit, into those opinions.

1    Dr. Leonard, in forming your opinions to what extent, if

2    any, did you consider the concept of product substitution?

3    **A.**    Well, Dr. Jaffe talked about this yesterday.  As I recall,

4    he said that he looked at the concept of one product

5    superseding another, and that that was related to the economic

6    concept of substitution.

7        And, in particular, I think he said he would view one

8    product as superseding another if they were substitutes to some

9    extent, or something to that effect.

10   **Q.**    What opinion, if any, do you have about that assertion?

11   **A.**    Well, I agree that economic substitution is a useful

12   concept to look at here.  But I don't agree that any amount of

13   substitution is enough to say that one product supercedes

14   another.  It's really got to be a very close substitute for --

15   for me, as an economist, to say that it's superseding.

16       **MS. HURST:**  Your Honor, I'm going to object that that

17   is a legal matter for the Court to instruct on, the degree of

18   harm that is necessarily material for the core factor.  That's

19   inappropriate testimony.

20       **THE COURT:**  Well, he starts off saying it's an

21   economic -- you've got to stick to economics and not the law.

22       But it is true that your witness brought up the subject of

23   substitution.

24       So as long as you respond at the same level on

25   substitution, as an economist, and how you think that applies

1    to the evidence in this case, you can do that.

2          MS. HURST:  Your Honor --

3          THE COURT:  To that extent, objection overruled.

4          MS. HURST:  Your Honor, the witness offered the

5    opinion that there has to be a close substitute in order to

6    have a high degree of harm.  And that gets into the Court's

7    instruction about the degree of harm.

8          THE COURT:  Well, all right.  He's not -- he cannot

9    tell the jury what the law is.  Ms. Hurst is right about that.

10   But he can tell the jury about the economics that relates to

11   the factors that I have already told you about, that you may

12   consider.

13       So, so far I'm going to let the testimony stand.

14       But you can't try to get off into -- you've got to stick

15   into economics.

16          THE WITNESS:  I would love to just stick to economics.

17       (Laughter)

18          THE COURT:  Go ahead.

19          MR. RAGLAND:  Thank you, Your Honor.

20   BY MR. RAGLAND

21   Q.   So you were talking about product substitution concept.

22   Can you, sort of, flush that out a bit more, from your economic

23   perspective, from your expertise, in, sort of, something that

24   is maybe a little more real-world example?

25   A.   Yeah.  So, again, I have an example that hopefully

 1  explains what I'm talking about here.

 2      So when I was a kid -- or not a kid, a high schooler, and

 3  I first learned to type, I did it in a typing class where we

 4  used typewriters.

 5          MS. HURST:  Your Honor, this analogy is beyond the

 6  scope of the witness's reply report.

 7          THE COURT:  It can't get past the report.

 8          MR. RAGLAND:  Your Honor, it's in paragraph 13.  It's

 9  not.

10          THE COURT:  Look at paragraph 13, Ms. Hurst.  See if

11  it's in there.

12      Is the thing about the typewriter in there?

13          MR. RAGLAND:  Page 8.  If you look at paragraph 12.

14  It's also in paragraph 13.

15          THE COURT:  Does it refer to the typewriter there?

16          MS. HURST:  I don't see any reference to QWERTY here,

17  Your Honor.

18          THE COURT:  Well, he hasn't said QWERTY yet.

19          MR. RAGLAND:  Hasn't said QWERTY.

20          THE COURT:  Does he say typewriter?

21          MR. RAGLAND:  Yes, he does.

22          MS. HURST:  Yes, Your Honor.

23          THE COURT:  All right.  Overruled.

24      Please continue.

25          THE WITNESS:  So, anyway, back then people used

**LEONARD - DIRECT / RAGLAND**

1  typewriters.  And then subsequently what happened is there was,

2  you know, PCs.  With the advent of PCs, there was the

3  development of wordprocessing software.  And, of course, there

4  was a huge switch to wordprocessing software.  And, you know,

5  today typewriters aren't much used.

6       The point of that is to say, at some superficial level are

7  typewriters and wordprocessing software substitutes?  Well, at

8  a superficial level, yes, because they can both be used to

9  prepare documents.

10      But at a, you know, deeper level they really aren't

11  substitutes.  Because we all know how easy it is to use a

12  wordprocessing software to create documents.  And I think there

13  are very few people who would say, gee, I would be quite happy

14  to substitute back to a typewriter at this point in time.

15      In particular, if -- you know, let's say I use Microsoft

16  Word.  If somebody took Microsoft Word away, would I go back to

17  a typewriter?  Would I consider that to be an alternative to

18  wordprocessing software that's out there and use that instead?

19      So even though at some superficial level they're

20  substitutes, at a more deeper level they really aren't.

21  **BY MR. RAGLAND**

22  **Q.**   And does this concept -- to what extent, if any, does this

23  concept of product substitution relate to consumer value

24  created by a new product?

25  **A.**   Yeah, so this is an area where I, as an economist, have

**LEONARD - DIRECT / RAGLAND**

1    done a lot of research.

2         What's interesting is, if you have a new product that has

3    characteristics that are very different from the existing

4    products, what that can do is meet some unmet needs of

5    consumers or users in the marketplace.

6         So wordprocessing software did that.  Gosh, it would be

7    great to shift paragraphs around very easily.  And don't have

8    to worry about making typing mistakes; it's easy to correct

9    them.  That met an unmet need in the marketplace.

10        So when you have a product like that with these new

11   characteristics, it creates additional what's called product

12   variety.  And that product variety, if it's useful, of course,

13   to someone can create a lot of value for consumers.

14        So new products that are -- have different characteristics

15   that increase product variety can be very valuable.

16   **Q.**   Dr. Leonard, did you evaluate whether or not all new

17   products benefit consumers by increasing product variety?

18   **A.**   There are lots of new products that come in the market

19   that really aren't adding to product variety.  And often people

20   refer to that as a "me too" product.

21   **Q.**   Did you form an opinion in this case, Dr. Leonard, about

22   whether or not Android is a "me too" product?

23   **A.**   Android is most certainly not a "me too" product.

24   **Q.**   Why do you say that?

25        **MS. HURST:**  Object.  This is beyond the scope of the

LEONARD - DIRECT / RAGLAND

1    reply report.

2              **THE COURT:**  Is this in the report?

3              **MR. RAGLAND:**  Your Honor, it's paragraph 13 again.

4    It's also section 5 and section 6, which are titled -- I can

5    read the title, Your Honor.  Section 5 -- section 6.  Java --

6              **THE COURT:**  Wait.  Wait.  Wait.  You read so fast.

7              **MR. RAGLAND:**  Sure.  Sorry, Your Honor.

8         "Java SE is not a substitute for Android."  If you look

9    within there, there's a discussion of "me too" products.

10   That's paragraph 13.  It's in the report.

11             **THE COURT:**  It sounds like it's in the report,

12   Ms. Hurst.

13             **MS. HURST:**  I'm looking, Your Honor.  I don't see a

14   concept of "me too" in here.

15             **THE COURT:**  Is the word "me too" in there?

16             **MR. RAGLAND:**  Well, let me --

17   **BY MR. RAGLAND**

18   **Q.**   Dr. Leonard --

19             **THE COURT:**  Wait.  Wait.  Is "me too" in there?

20             **MR. RAGLAND:**  I'm confident it is.  I don't

21   particularly --

22             **THE COURT:**  Witness, you ought to know.  It's your

23   report.  Is the phrase "me too" in your report?

24             **THE WITNESS:**  I may have used -- I don't know whether

25   I used that specific phrase.  I used a related concept.

1          **THE COURT:**  Stick to the related concept.

2      Let me just explain to the jury.  One of the things that

3  lawyers are supposed to do is, their experts are supposed to

4  provide written reports.  They don't go into evidence, but they

5  help each side know what the other side's expert is going to

6  say.

7      One of the things over time I've learned is it's got to be

8  in the report.  You can't deviate from the report.  You can't

9  start adding new stuff.  It's just got to be in the report.

10  Otherwise, it's called a donnybrook.  It's just a donnybrook.

11      And so I enforce the rule.  So if they don't have it in

12  the report, they've got to use the words that were in the

13  report.  I'm sorry.  Life is too short to go the other way.

14      So strike that question from your memories.  Forget that

15  phrase "me too," because I don't think it's in the report.

16      Go back and start over a different way.

17          **MR. RAGLAND:**  Very well, Your Honor.

18  **BY MR. RAGLAND**

19  **Q.**   And, Dr. Leonard, if I phrase things poorly --

20          **THE COURT:**  Wait a minute.  I want to say one other

21  thing.

22      However, on cross-examination, if the question fairly

23  calls for it, they can say anything, whether it's in the report

24  or not.  This is just a limitation on the one presenting the

25  report.

1      All right.  Go ahead.

2   BY MR. RAGLAND

3   Q.   Dr. Leonard, did you form an opinion as to whether or not

4   Android increased product variety?

5   A.   I did.

6        It's -- it has a lot of characteristics that no existing

7   product in the marketplace at the time had; and, therefore, it

8   expanded product variety and has been a boon for consumers.

9   Q.   Now I would like to talk a little more detail,

10  specifically regarding Java SE.

11       In the course of your work evaluating the evidence in this

12  case, did you come to an understanding of what Java SE is?

13  A.   Yes, I did.

14  Q.   Can you please tell us what your understanding is.

15  A.   Java SE is one of the Java applications programming

16  platforms.  And it's the one that specifically was designed for

17  desktop computers.

18  Q.   Did you reach an opinion as to whether or not Android had

19  superseded Java SE in the market?

20  A.   I have.

21  Q.   Can you please tell the jury what that opinion is.

22  A.   It has not superseded -- Android has not superceded

23  Java SE.

24  Q.   Do you have reasons for reaching that opinion?  If so can,

25  you explain them?

LEONARD - DIRECT / RAGLAND

1   **A.**   Yes, I have two reasons.

2       The first is that the two products are on very different

3   devices.  As I just mentioned, Java SE is on personal

4   computers.  Android, on the other hand, is on smartphones.

5   **Q.**   And what's the second reason?

6   **A.**   Yeah, the second reason is that -- I think we heard this

7   before -- is that Java SE is just an applications programming

8   framework or platform.  Whereas, Android is an entire mobile

9   operating stack that runs a smartphone.  Those are just very

10  different types of products.

11  **Q.**   To what extent, if any, are you aware of efforts by Sun to

12  develop a smartphone operating system based on Java SE?

13  **A.**   Uhm, well, Sun made several attempts to do that.  And they

14  ultimately all failed.

15  **Q.**   And are you aware of whether or not Oracle similarly made

16  attempts to develop a smartphone operating system using

17  Java SE?

18  **A.**   They did.  And they also failed.

19  **Q.**   Have you reached any conclusion, Dr. Leonard, with regard

20  to the market impact, if any, of Android on Java SE?

21  **A.**   Well, my conclusion is that Android does not have any

22  market impact on Java SE.

23  **Q.**   Turning, Dr. Leonard, to Java ME, did you perform an

24  analysis of Java ME?

25  **A.**   I did.

LEONARD - DIRECT / RAGLAND

1  Q.   Why did you do that?

2  A.   Well, because that really was the focus of Dr. Jaffe's

3  analysis, that the market for Java ME had been harmed.

4  Q.   Do you have a view as to whether or not Dr. Jaffe is

5  correct on that?

6  A.   Uhm, my view is that it has not been harmed by the use of

7  the 37 -- or the declaring code and SSO of the 37 APIs.

8  Q.   Do you have any reasons for that conclusion?

9  A.   I do.

10  Q.   Can you explain them?

11  A.   It's really, in a way, the same two reasons as it was for

12  Java SE.

13      The products are used on different devices and, therefore,

14  there's no overlap from that point of view.  And, secondly,

15  they're just very different types of products.

16  Q.   Did you consider, in the course of your review of the

17  evidence, Dr. Leonard, any evidence that at one time Java ME

18  was used on feature phones?

19  A.   I did, yes.

20  Q.   And what conclusions, if any, did you draw based on that

21  review of the evidence?

22  A.   I mean, it doesn't really change anything because, again,

23  once smartphones, the advent of smartphones, following first

24  with the iPhone and thereafter, once those products were

25  introduced to the market -- and those were, of course, very

**LEONARD - DIRECT / RAGLAND**

1  different than what had preceded it, including feature phones,

2  and those products were addressing an unmet need.

3       And just as with the wordprocessing software we had,

4  people who switched to smartphones because they wanted those

5  kind of functionalities, those people weren't going to then

6  consider a feature phone to be a substitute.

7       So once the smartphone movement started, Java's -- ME's

8  days were numbered because, as we've heard, it is not able to

9  run on a smartphone.  It wasn't designed for it.  And it just

10 wasn't going to be able to compete in this new world of

11 smartphones.

12 **Q.**  In your area of expertise and market research,

13 Dr. Leonard, do you occasionally study consumer behavior?

14 **A.**  Yes, I do.

15 **Q.**  And how might consumer behavior relate to this analysis?

16 **A.**  Well, it's really -- and consumers are driving the

17 economic substitution.

18      It's really what I just mentioned, that once you have --

19 you have people who want to do certain things on their phone

20 like watch a YouTube video.  And the current -- the existing

21 products before Android came on the market, there was the

22 iPhone that could do it.  But other products, feature phones

23 in particular, weren't very good at it.

24      This is what Mr. Rubin talked about.  He wanted to create

25 something that would allow that kind of experience.

1       So what smartphones did --

2           MS. HURST:  Your Honor, there is no discussion of the

3    comparison of features between feature and smartphones in the

4    report.

5           THE COURT:  All right.  Is that true?

6           MR. RAGLAND:  Your Honor, paragraphs 10 and 11 talk

7    about why consumers may prefer a feature phone versus a

8    smartphone.  I don't know, sitting here, whether every single

9    word Dr. Leonard said appears verbatim in the report.

10       I don't believe Dr. Leonard has tried to memorize his

11   report.  He's tried to testify to his experience and review of

12   the evidence based on what was disclosed.

13          THE COURT:  What paragraphs do you want me to look at?

14          MR. RAGLAND:  Paragraphs 10 and 11, Your Honor, of his

15   report, rebuttal expert report of Dr. Leonard.

16          MS. HURST:  There is no discussion of consumer

17   preference at all in those paragraphs, Your Honor.

18          MR. RAGLAND:  I'll move on, Your Honor.

19          THE COURT:  All right.  Let's move on.

20   BY MR. RAGLAND

21   Q.   Dr. Leonard, have you reached an opinion as to the effect

22   of smartphones on the market for feature phones?

23   A.   Yes, I have.

24   Q.   What is that opinion?  Can you please tell the jury about

25   it?

1    **A.**    Sure.

2        Smartphones certainly displaced feature phones as a whole.

3    But it's very much, again, like the wordprocessing and

4    typewriter example, where once smartphones are out there people

5    who want that functionality are not going to view feature

6    phones as a substitute.

7        If I walk into the store and I'm interested in watching a

8    YouTube video, I'm not going to say, oh, I'm going to buy a

9    feature phone.  No.  I'm going to look at the smartphones.  And

10   that's the product that I'm going to walk out of the store

11   with.

12       **MS. HURST:**  Your Honor, same discussion of customer

13   preferences that the Court just ruled the witness should move

14   on.  I move to strike that answer.

15       **MR. RAGLAND:**  Your Honor, paragraphs 10, 11 and 12 of

16   Dr. Leonard's report talk about why -- talk about the

17   substitution issue.

18       **MS. HURST:**  There's no discussion of consumer

19   preferences for YouTube in here, Your Honor.  None whatsoever.

20       **MR. RAGLAND:**  I will agree, there's not a reference to

21   YouTube, Your Honor.  The concept is in here.

22       **THE COURT:**  Everything else seems to be covered in

23   there.  All right.  The answer will stand except for the

24   example on YouTube.  That will have to be deleted from your

25   memory.

**LEONARD - DIRECT / RAGLAND**

1    All right.  Stick to what's in your report.  On

2  cross-examination you can go beyond the report if it's fairly

3  an answer.  But help me out on this.  Stick to what's in the

4  report.

5              THE WITNESS:  Thank you, Your Honor.

6              THE COURT:  All right.  Now, you mostly were, but you

7  veered off a little bit.

8      Okay.  Next question.

9              MR. RAGLAND:  Thank you, Your Honor.

10  BY MR. RAGLAND

11  Q.   Dr. Leonard, in your opinion, did Google's use of the SSO

12  and declarations of the 37 API packages at issue in this case

13  cause the smartphones to supersede feature phones?

14  A.   No.

15  Q.   Why do you say that?  What are your reasons?

16  A.   Well, again, first, because they aren't substitutes in the

17  market because Android phones are competing with other

18  smartphones like the iPhone.

19      So what that means then is if in the, you know, absence of

20  Android as a whole, people who wanted smartphones would just

21  buy other types of smartphones, such as the iPhone.  They

22  wouldn't, again, be switching back to feature phones.

23      On top of that, since this is really about the use of the

24  37 declaring code and SSO of the 37 APIs, it's a crucial point

25  that those weren't really necessary for Google to do what it

LEONARD - DIRECT / RAGLAND

1    did.

2         So there would have been a version of Android out there in

3    any event.  And those products would have been something that

4    were sold to consumers who wanted smartphone functionality.

5    **Q.**  As you understand Dr. Jaffe's opinions, does he say that

6    Android could not have entered into the market without the 37

7    API declarations?

8    **A.**  I think he said it was crucial, or something like that.

9    He made a big deal about how important it was for Android to

10   have the use of those 37 APIs.

11   **Q.**  What are your views on that opinion?

12   **A.**  I just disagree with that.

13   **Q.**  Why?

14   **A.**  Uhm, well, because Java is not -- first of all, it's not

15   the only programming language out there.  There's lots of other

16   programming languages.  And a lot of them are very popular like

17   C++, for instance.

18        So Google could well have just chosen to use C++ and the

19   associated libraries with that, and produced a version of

20   Android that, in my view, would have been very much as

21   successful as what actually happened.

22        On top of that, you know, to support that, I guess, you

23   can look at the example of the iPhone.  The iPhone doesn't

24   use Java.  It uses a programming language called Objective C,

25   which was must less popular before the iPhone started using

1    it than was Java.  And, yet, the iPhone, of course, has been

2    tremendously successful.

3        So in my view, it's really the other aspects of Android

4    that made it the success that it is.  And the choice of

5    programming language, and in particular the use of the SSO and

6    declaring code of the 37 APIs was not crucial to Android's

7    success.

8    Q.   Dr. Leonard, what is your ultimate conclusion as to

9    whether or not there was a market impact on Java ME from the

10   use of the 37 API declarations in Android?

11   A.   For the reasons I've described, there was no market harm

12   from the use of the declaring code and SSO of the 37 APIs.

13            MR. RAGLAND:  Thank you.  Pass the witness.

14            THE COURT:  All right.  Cross-examination.

15                        **CROSS-EXAMINATION**

16   BY MS. HURST

17   Q.   Is it true that your opinions that you've just offered

18   depend upon your view that feature phones and smartphones are

19   separate markets?

20   A.   Uhm, yes, that's certainly one way to look at it.

21   Q.   And nobody at Google ever told you that Google had taken a

22   contrary position; isn't that true?

23   A.   I think that's correct.  No one at Google told me that.

24   Q.   But Google did take a contrary position, didn't it?

25   A.   I believe that they --

 1   **Q.**   Just yes or no, Dr. Leonard.  Did Google take a contrary

 2   position?

 3           **MR. RAGLAND:**  Objection, Your Honor.  This is

 4   argumentative and badgering.

 5           **THE COURT:**  No.  It is a yes-or-no question.  And then

 6   you can explain.

 7           **THE WITNESS:**  Okay.

 8           **THE COURT:**  So do you know the answer to the question?

 9   And if so, tell us yes or no.

10           **THE WITNESS:**  I don't think I know because I don't

11   think I ever saw a Google filing, or anything like that, that

12   may have laid out that position.

13   **BY MS. HURST**

14   **Q.**   Isn't it true, Dr. Leonard, that google told the European

15   Commission that, quote, there is --

16           **MR. RAGLAND:**  Objection, Your Honor.  She is

17   testifying from a hearsay document that's not in evidence.

18           **MS. HURST:**  I asked the witness this question at his

19   deposition.  He has seen the document.  And I have the

20   testimony, Your Honor.

21           **THE COURT:**  Is it in evidence?

22           **MS. HURST:**  It is not yet in evidence.  But it is

23   material the witness was shown at his deposition.  And he

24   testified about it.

25           **MR. RAGLAND:**  Your Honor, that doesn't change it.  She

1   is just reading from the document, Your Honor.

2          MS. HURST:  Your Honor, they're trying to burn time.

3   They know what the situation is.

4          (Laughter)

5          THE COURT:  Go ahead.

6   BY MS. HURST

7   Q.   Is it true, Dr. Leonard, that you saw at your deposition a

8   document from the European Commission reciting that Google told

9   the European Commission, quote, There is a single-product

10  market for the supply of all mobile devices, whether basic or

11  more advanced?

12       Isn't that true?

13  A.   Yes, I think that was the European Commission -- or DG

14  Comm -- but the European Commission reciting that position from

15  Google.

16       But I don't think I've seen Google's filing itself.

17  Q.   That's right, because Google never gave you that filing,

18  did they?

19          THE COURT:  Wait a minute.

20       What you read from was -- I thought you said, Ms. Hurst,

21  was a Google statement.

22          MS. HURST:  It was a European Commission recitation of

23  Google's statement, Your Honor.

24          THE COURT:  Was it in quotes?

25          MS. HURST:  It says the position that Google took,

**LEONARD - CROSS / HURST**

1   Your Honor.

2           **MR. RAGLAND:**  So, Your Honor, I would also move to

3   strike.  It's hearsay upon hearsay.

4           **THE COURT:**  I didn't understand that.

5       Well, just so the jury will understand, I'm going to let

6   it all stand.  But it's not quite the same thing as Google

7   saying it directly.  It's -- it's the commission summarizing or

8   characterizing what it thought Google said.  And it might be

9   exactly right.  It might have a little spin on it.

10      I misunderstood.  I thought it was a statement by Google.

11  But, anyway, we'll let it stand.

12  **BY MS. HURST**

13  **Q.**   All right.  When Google acquired Motorola, Motorola was a

14  mobile phone company; right?

15  **A.**   It was.

16  **Q.**   And the European Commission investigated that from an

17  antitrust perspective; isn't that right?

18          **MR. RAGLAND:**  Objection, Your Honor.  This is more

19  just counsel testifying.  It's also 403.

20          **THE COURT:**  Sustained on 403 grounds.

21  **BY MS. HURST**

22  **Q.**   Wasn't there an investigation in which filings were made

23  by Google to the European Commission?  Isn't that true?

24          **MR. RAGLAND:**  Your Honor, same question.  It's all

25  403.

1        THE WITNESS:  Again --

2            THE COURT:  This part I'm going to allow.

3        Go ahead.  Answer the question.

4            THE WITNESS:  I can't say for certainty because I

5    haven't seen those filings.  So I just don't know.

6    BY MS. HURST

7    Q.   Because Google is offering you here to testify whether

8    feature phones and smartphones are in the same market without

9    having provided you their own filings on that issue before the

10   European Commission.  Isn't that true, sir?

11   A.   They didn't provide me with that.  But, in any event, I do

12   my own analysis.  And I'll also say DG Comm agreed with me that

13   feature phones and smartphones are in different markets.

14   Q.   Your Honor, it's true that Google --

15           MS. HURST:  Pardon me, Your Honor.

16   BY MS. HURST

17   Q.   Dr. Leonard, it's true Google never gave you their filings

18   in that case, isn't it?

19   A.   It's true they never gave me those filings.

20   Q.   I'm showing you, sir, 6446.

21       Do you see that that's a Google document called "State of

22   the Mobile Developer"?

23   A.   I do.

24   Q.   And it's dated 2015; is that right?

25   A.   It seems to be, yes.

LEONARD - CROSS / HURST

1   Q.   Would you please turn, sir, to page 46 of the exhibit.

2   A.   Sorry, by "46" you mean where it says --

3   Q.   46 of 180, in the middle of the bottom.

4   A.   I'm there.

5   Q.   Do you see that?

6   A.   Uh-huh.

7        MS. HURST:  Your Honor, I move to admit that page and

8   the cover page of the exhibit.

9        MR. RAGLAND:  Objection, Your Honor.  There's no

10  foundation.

11       MS. HURST:  It's a Google admission, Your Honor.  It's

12  a Google document.  It's a party admission.

13       MR. RAGLAND:  Not through an expert witness, Your

14  Honor.

15       THE COURT:  What?

16       MR. RAGLAND:  There's no foundation whatsoever.  It

17  also wasn't disclosed.

18       MS. HURST:  It was disclosed.

19       MR. RAGLAND:  Not disclosed in conjunction with this

20  witness.

21       MS. HURST:  You didn't give notice 48 hours in

22  advance, so you're not entitled to the cross exhibits.

23       THE COURT:  May I see?

24     (Pause)

25       THE COURT:  Have you seen this document before?

1           **THE WITNESS:**  Uhm, it looks vaguely familiar.  But I

2     can't be sure without checking what I have in my files.

3           **THE COURT:**  Was this document produced by Google

4     during the discovery period?  It looks like it was.

5           **MR. RAGLAND:**  I believe so, Your Honor, yes.

6           **THE COURT:**  All right.  Somewhat irregular, but I'm

7     going to let Ms. Hurst do this.  So it will be -- it will be

8     received in evidence.

9           (Trial Exhibit 6446, page 46, received in evidence.)

10          **MS. HURST:**  Do you have page 46, Trudy?

11          **THE COURT:**  What page is it?

12          **MS. HURST:**  46, Your Honor.

13          **THE COURT:**  Page 46 of 6446.

14    BY MS. HURST

15    **Q.**    This is a 2015 document; is that right, Dr. Leonard?

16    **A.**    Yes, I think so.

17    **Q.**    And it's true that in this document, sir, as late as 2015,

18    Google was still measuring sales that it would take from

19    feature phones; isn't that true?

20    **A.**    Android was a smartphone.  And the smartphones were

21    displacing feature phones.  But, you know, I've talked about

22    why that happened.

23    **Q.**    It's true, sir, that as late as 2015, Google was measuring

24    the degree to which Android would take sales from feature

25    phones; isn't that right?

1              MR. RAGLAND:  Objection, Your Honor.  Argumentative

2    and asked and answered.

3              THE COURT:  No.  Do you understand the question?

4              THE WITNESS:  Yes, I think so.

5              THE COURT:  All right.  Please -- you can say yes or

6    no.  Then you can have a one-sentence explanation.

7              THE WITNESS:  Okay.  Yes, it was part of the

8    displacement of feature phones by smartphones.

9              MS. HURST:  All right.  May I have the ELMO, please,

10   Angie.

11   BY MS. HURST

12   Q.   It's also true, sir, that Andy Rubin viewed Sun as a

13   competitor of Android; isn't that true?

14   A.   Uhm, I don't know.  You'll have to show me what he said,

15   and I can take a look at it.

16   Q.   All right.  I'll do that.

17        (Testimony displayed.)

18   BY MS. HURST

19   Q.   I have here from the trial, earlier in the trial, page 844

20   of the transcript.  And this is the testimony of Mr. Rubin who

21   wrote:

22             "They won't be happy when we release our stuff."

23        You can see here he's referring to "Sun."  And he wrote:

24             "We have a huge alignment with the industry and they

25        are just beginning?

LEONARD - CROSS / HURST

1        "**A.**   Yes.

2        "**Q.**   You viewed Sun as a competitor now at that time;

3    isn't that true?"

4    **Q.**   Do you see that question, Dr. Leonard?

5    **A.**   I do.

6    **Q.**   And Mr. Rubin answered:

7            "Yeah.  When we couldn't agree to be partners and I

8    was about to release a clean room implementation of a

9    virtual machine and class libraries and the whole

10   operating system on top of it, this was a space that Sun

11   was already in.  They were selling things to the mobile

12   industry, and by not -- by basically, like, my failure to

13   partner with them, turned them -- turned us into a

14   competitive nature.  We were both targeting the same

15   industry with similar products."

16       Do you see that testimony?

17   **A.**   Yes.

18   **Q.**   Were you here for that testimony?

19   **A.**   Uhm, is that trial testimony?

20   **Q.**   It was.

21   **A.**   I did not -- I wasn't here for Rubin's testimony.  I did

22   read his transcript though.

23   **Q.**   You didn't come for Mr. Rubin's testimony?

24   **A.**   I was not here.  I read it though.

25   **Q.**   Did you read his transcript of his testimony?  Was that

1    supplied to you?

2    **A.**    Yes, it was.

3    **Q.**    So you knew that that testimony was in there before you

4    came and testified today that these were not competitive

5    products; isn't that true?

6    **A.**    Yes.  As it turns out, Sun did not have a competitive

7    product.

8    **Q.**    Well, Mr. Rubin was certainly worried about one, wasn't

9    he?

10   **A.**    Uhm, I don't know.  He was worried about them being upset

11   that they weren't going to partner with -- with Sun.

12   **Q.**    Let me ask you this, Dr. Leonard:  Did you see exhibit

13   5322, that was just displayed during Dr. Jaffe's testimony,

14   where Rich Miner -- he was one of the founders of Android;

15   right?

16   **A.**    Yes, I think so.

17   **Q.**    -- said, "As a case in point, if we were not doing what we

18   are doing SavaJE would have probably gotten more funding."

19        Now, you know SavaJE was a full stack operating system

20   with SE in it, don't you, sir?  You know that?

21   **A.**    Well, I wouldn't go so far as to say that it was a

22   smartphone operating system that would have done what a

23   smartphone could do.

24        But it was a full stack operating -- or it had a phone

25   with a full stack operating system on it.

**LEONARD - CROSS / HURST**

1   Q.   And isn't it true, sir, that on November 2007, when Google

2   released Android, it announced an Open Handset Alliance with 30

3   companies?  Isn't that true?

4   A.   I believe so, yes.

5   Q.   And that Open Handset Alliance did not spring fully formed

6   from the head of Zeus, did it, sir?

7        It took some effort to put that together, didn't it?

8   A.   I imagine there was some coordination effort, yeah.

9   Q.   There were months of meetings between Google and OEMs and

10  carriers, and everybody else, trying to put together that Open

11  Handset Alliance, isn't that true, sir?

12  A.   I don't know about that.

13  Q.   And those were the very same customers of Sun, weren't

14  they, sir?

15  A.   Uhm, they may have been to some extent.  But they could

16  well have continued using the Sun products if they thought that

17  they could make a market out of it.

18  Q.   You know --

19  A.   And they didn't agree that they could.

20  Q.   -- that's a great point.

21       Does your report, in it anywhere, identify any phone that

22  has both Android and a licensed version of Java on it?  Your

23  report does not identify a single phone with that, do you?

24  A.   That's because Android is in smartphones and Java ME is on

25  feature phones.  And, again, they are separate markets.  They

1    are not substitutes.

2    **Q.**    Your report, yes or no, sir, does not identify any

3    examples with Android and licensed Java on it?  Yes or no?

4    **A.**    With Android and licensed Java?

5    **Q.**    Right.

6    **A.**    Again.  No, because I don't think there are any that I can

7    think of offhand.

8            **MS. HURST:**  Angie, may I have the control back to

9    Trudy, please.

10           (Document displayed.)

11   **BY MS. HURST**

12   **Q.**    Sir, have you seen Trial Exhibit 10, admitted in this

13   case?

14   **A.**    Let me see.  Yes, I've seen this.

15   **Q.**    All right.  And before reaching your opinions here today,

16   that the Java APIs were of no significance, whatsoever, to

17   Android, you read this email where Mr. Lindholm, the Java

18   expert at Google said, "We conclude the alternatives all suck.

19   And we need to negotiate a license."

20           You saw that document, didn't you sir?

21   **A.**    I did.

22   **Q.**    And then you came here and testified that the Java APIs

23   had no value at all in Android; isn't that right?

24   **A.**    Yes.  I think you're misinterpreting the document.

25           **MS. HURST:**  No further questions.

```
 1              THE COURT:  Thank you.

 2         Anything by you, Mr. Ragland?

 3              MR. RAGLAND:  Nothing further, Your Honor.

 4              THE COURT:  All right.  So may this witness step down?

 5         Yes, you may.  Please step down.

 6              THE WITNESS:  Thank you, Your Honor.

 7           (Witness excused.)

 8              THE COURT:  Okay.  Now, we go to your next witness.

 9              MR. PAIGE:  Your Honor, Google calls Professor

10    Astrachan back to the stand.

11              OWEN ASTRACHAN, DEFENDANT'S REBUTTAL WITNESS

12              THE COURT:  Okay.  Counsel for both sides, may we

13    treat Professor Astrachan as still under oath?  Or do I have to

14    reswear him?

15              MR. PAIGE:  Yes, Your Honor.

16              THE COURT:  How about Oracle?  Do you want me to

17    reswear him or --

18              MS. HURST:  No, that's fine, Your Honor.  Thank you.

19              THE COURT:  You're still under oath.  You understand

20    that?

21              THE WITNESS:  Yes, I do, sir.

22              THE COURT:  Please, go ahead.

23                        DIRECT EXAMINATION

24    BY MR. PAIGE

25    Q.   Good morning, Professor Astrachan.  Welcome back to the
```

ASTRACHAN - DIRECT / PAIGE

1    stand.

2    **A.**    Thanks.

3    **Q.**    Were you in court for Professor Schmidt's testimony?

4    **A.**    Yes, I was.

5    **Q.**    And do you recall his discussion of the build tests that

6    he performed?

7    **A.**    I do.

8    **Q.**    Is a build test of the sort he described on the stand

9    something that computer scientists regularly do?

10   **A.**    No, it's not something that we do to understand platforms

11   like Android.

12   **Q.**    Why not?

13   **A.**    Because Android is a complicated integrated platform.  And

14   it would fail to build in many situations.

15   **Q.**    And why did it fail to build in situations he described?

16   **A.**    Professor Schmidt's build tests looked at several things.

17   And in each of them he looked at the 37 Java API packages and

18   performed the build tests based on them, and missed making some

19   kind of control test using, for example, the Android packages

20   to see if the platform would also fail to build.

21   **Q.**    So what did you do in order to form an opinion regarding

22   the results that Professor Schmidt had reported?

23   **A.**    So I constructed my own build tests in an environment

24   similar to that with which Professor Schmidt did the build

25   tests.

1      But where he used the 37 API packages from which the

2   declarations come, I used the Android packages that the Java

3   engineers added to create the Android smartphone platform.

4      So I conducted similar tests to see if the Android

5   packages and the Java packages worked the same in the Android

6   platform.

7      **MR. PAIGE:**  Can we have slide 10 up, please, Mr. Dahm.

8   Professor Schmidt's demonstratives.

9   **BY MR. PAIGE**

10  **Q.**   So, Professor Astrachan, what specifically did you do to

11  test Professor Schmidt's results?

12      **THE COURT:**  Let the witness explain what the jury is

13  seeing on the screen.

14      Bring us back to whatever point will help the jury

15  understand what is now on the screen.

16      **THE WITNESS:**  This is a slide that Professor Schmidt

17  used in his testimony to help explain to you how his build

18  tests failed.

19      So I would like to look at each of these three lines one

20  at a time.

21      And the first line shows that he removed all 37 packages

22  in the Android system that used the declaring code.  So this is

23  just the 37 packages that the Android engineers had the

24  implementing code.  But he removed those packages, and then the

25  Android platform failed to build.

1  BY MR. PAIGE

2  **Q.**   What does it mean when you say "failed to build,"

3  Professor Astrachan?

4  **A.**   Well, Android, as I said, is a large software stack.   And

5  when you take the source code, which is human readable code,

6  and you want to turn it into the 0s and 1s, that's called

7  building.

8        So you take the source code that you download, and you

9  type some commands on your computer.   And then the system would

10  build, and you would be able to put it on a phone.

11        So building it is taking from the source code level to the

12  low-level bytecodes in 0s and 1s.

13  **Q.**   And what does it mean when it fails to build?

14  **A.**   Well, in this particular case, building Android generates

15  some specific images that would be put on the mobile handset.

16  And when you try to run the build, if those images don't --

17  aren't created, then the build fails.

18        So understanding whether the build failed is not so hard

19  once you run the build, which takes a long time.   You just look

20  to see, did the images get created?   And if they didn't, you

21  say the build failed.   It means you wouldn't be able to put

22  that code on a phone.

23  **Q.**   So what specifically did you do to test the first type of

24  build test that Professor Schmidt ran?

25  **A.**   So I wanted to understand how the Android packages

1    compared with the 37 Java API packages.  And I wasn't surprised

2    that when I removed all the Android packages, the ones that the

3    Google engineers had created for the Android platform, when I

4    removed all the Android packages, the platform failed to build.

5    Just as it had failed to build with the 37 that Professor

6    Schmidt wrote about.

7    **Q.**   The second test Professor Schmidt talked about with the

8    jury, what did that involve?

9    **A.**   Well, removing all the packages makes the platform fail to

10   build.  And that line says, What happens if we just remove one

11   package?

12       In Professor Schmidt's case, one of the 37.  So I removed

13   one Android package.  And again, not surprisingly, the Android

14   platform failed to build.  And I did that with other Android

15   packages too.

16   **Q.**   And then the last test that Dr. Schmidt reported on, what

17   did you do to test that in the context of the Android platform?

18   **A.**   Well, Dr. Schmidt showed that if you remove just the

19   declaring code, and you left the implementing code, and in this

20   case the 37 API packages, that implementing code would be what

21   the Android developers had created for the Android platform.

22   If you remove just the declaring code, the platform failed to

23   build.

24       So I did the same thing in an Android class.  I removed

25   the declaring code.  And again, not surprisingly, the system

1    failed to build.

2    **Q.**   Were you surprised by the results of your experiments?

3    **A.**   I wasn't.  Because, in general, when you alter source code

4    in ways like this, it's often the case and certainly be

5    expected that the platform would fail to build when you change

6    the source code.

7    **Q.**   So is there anything special about the 37 Java APIs in

8    this regard?

9    **A.**   What I think this shows is that, from the perspective of

10   the Android platform, these basic API packages from Java aren't

11   any different, aren't special.  And like the Android packages,

12   changing them causes the platform to fail to build.  So they're

13   not special in any way.

14   **Q.**   Based on your experiments, what's your opinion of the

15   validity of the conclusions that Dr. Schmidt drew on the stand

16   from those build tests?

17   **A.**   I don't think this shows that, as it says on this slide,

18   that they're a critical part of Android.

19       I think in an integrated platform all the parts are

20   critical.  So this doesn't show that those 37 packages have any

21   more relative criticality or importance than any other

22   packages.

23   **Q.**   Professor Astrachan, did you see the visualizations that

24   Professor Schmidt presented as part of his testimony?

25   **A.**   Yes, I did.

1    Q.   And are you familiar with what Professor Schmidt referred

2    to as a software map?

3    A.   Well, I'm familiar with visualizations for software.  But

4    I haven't seen the phrase "software map" used before.

5    Q.   Are you familiar with things like slide 7 of Professor

6    Schmidt's demonstratives?

7    A.   I haven't seen a diagram like this used for developers.

8    So I don't understand how this diagram would help developers

9    understand the relationship between classes and interfaces.

10   Q.   Is what Professor Schmidt prepared there, in your opinion,

11   a map?

12        MS. HURST:  Your Honor, beyond the scope.

13        THE COURT:  Is this in the report?

14        MR. PAIGE:  No, Your Honor.

15        THE COURT:  Then we shouldn't get into it.

16   BY MR. PAIGE

17   Q.   What did Professor Schmidt's so-called software map tell

18   you, if anything, about the Java APIs?

19        MS. HURST:  Beyond the scope.

20        MR. PAIGE:  It's in the report, Your Honor.  Paragraph

21   24, reply report.

22        THE COURT:  Show Counsel where it is.

23   BY MR. PAIGE

24   Q.   Professor Astrachan, what resemblance do these

25   visualizations bear to the way that Sun or Oracle shows the SSO

ASTRACHAN - DIRECT / PAIGE

1   outside the context of this litigation?

2   **A.**    These visualizations -- and I think Professor Schmidt

3   talked about how he created them using software -- aren't at

4   all similar to what Sun and Oracle have provided for developers

5   to understand the API packages.  We saw one of those in the

6   courtroom.

7   **Q.**    And what was that, that we saw in the courtroom?

8   **A.**    We saw something that we were told you could get from

9   Amazon that could be hung on the wall.

10       In fact, when I first started programming in Java, I had

11  that diagram, because it did show all the classes in one kind

12  of wall art that you could use to understand the API packages.

13  You saw their names and how they were related.

14       So that chart was something that Sun and then Oracle

15  distributed to help developers understand the API packages.

16  **Q.**    Professor Astrachan, did you see Dr. Reinhold's slide

17  setting forth some example labels using the API packages?

18  **A.**    Yes, I did.

19           **MR. PAIGE:**  Slide 17 of Dr. Reinhold's demonstratives,

20  please.

21       (Document displayed.)

22  **BY MR. PAIGE**

23  **Q.**    What does that slide demonstrate, in your opinion, about

24  the nature of the names used in the API package labels?

25  **A.**    I thought this was a very clear example of how functional

1  and descriptive the names for the declaring code, the packages

2  and classes and methods, are.

3          MS. HURST:  Your Honor, I'm going to object.  This is

4  beyond the reply report; contains no rebuttal of Dr. Reinhold.

5          MR. PAIGE:  Dr. Reinhold did not submit a report, Your

6  Honor.  He was disclosed as an employee expert on

7  February 29th, the day the reply reports were due.  So

8  Professor Astrachan hasn't had chance to submit anything in

9  writing, as this was the first time, yesterday, the witness has

10  been shown --

11          MS. HURST:  All right.  I'll withdraw the objection,

12  Your Honor.

13          THE COURT:  Thank you.

14     Go ahead.

15          THE WITNESS:  As I was explaining, I think this shows

16  exactly how descriptive and functional the names of the

17  methods, classes and packages are in the Java programs.

18  BY MR. PAIGE

19  Q.   Let's take an example of that.

20     Were you familiar with the API label for the

21  authentication class in the java.net package before Tuesday?

22  A.   No.  It was kind of interesting.

23     So I knew about the java.net package.  That's one of the

24  things I talked about, that because it's name is java.net we

25  would understand that it had network classes.

1    But in my own programming use, I hadn't used the

2  authenticator class before.  But I thought when I looked at

3  this description, I would have a pretty good understanding of

4  how that method worked simply because of how the labels, the

5  names are described.

6         THE COURT:  It's not clear to me.

7    What the jury is now seeing, is that something you

8  prepared?  Or is that something that another witness has shown

9  the jury?

10        THE WITNESS:  This is what Dr. Reinhold showed the

11 jury.

12        THE COURT:  This very document?

13        THE WITNESS:  This very one, yes, sir.

14        THE COURT:  All right.  And the -- under

15 "Declaration," what is -- what is that?

16        THE WITNESS:  Okay.  I was going to explain that --

17        THE COURT:  All right.

18        THE WITNESS:  -- second line there.

19    So what we see there is the package name, java.net, the

20 class name, authenticator.  Now, the declaration, that's a

21 method declaration.  So if we look at

22 java.net.authenticator.requestpasswordauthentication, that's

23 the method declaration.  It includes the package name, the

24 class name, and the method name, which, for me, is hard to say,

25 apparently, because it has an "s" and a "th"

1  requestpasswordauthentication.

2      So I knew immediately, when I read that label name, what

3  it was used for.  It was used to request a password

4  authentication.

5      And so I thought, when I saw Dr. Reinhold display this, I

6  think I can understand pretty well what this method would do

7  based simply on its names and its inputs and outputs.

8      I thought that was kind of a good example of functionality

9  and descriptive nature of these labels.

10  BY MR. PAIGE

11  Q.   Well, did you do anything to confirm your opinion about

12  what that class did?

13  A.   I did.  After I saw this in the -- in trial, I went and

14  looked up the API specification, the comments that a developer

15  would use to understand it.

16      And my own understanding that I had built simply from

17  looking at this demonstrative, were kind of validated because

18  when I read the description, it was the same, which I think

19  isn't surprising based on these descriptive names that we see

20  for both the method, the inputs, and the outputs.

21  Q.   Can you explain to the jury what you concluded from

22  looking at those elements of the declaration?

23  A.   There's a lot on this line.

24      For a developer, it wouldn't be too hard to understand

25  because developers are used to being able to find the pieces.

1      And when I described the pieces of the method, I said the

2   word "limiting," "request password authentication," and then

3   the inputs and the outputs.

4      The output comes after "public static."  We can see

5   "password authentication."  Now, that might be hard for people

6   who aren't programmers, but for me I realized right away that's

7   the return.  That's what this method gives you back.  It's a

8   password authentication object.  So I knew right away that's

9   what I would get.

10      The inputs are also described.  And we can see many.

11   Host, iNet address, protocol, prompt, scheme, requester type.

12   And, again, for a developer, those descriptive names would be

13   very easy to understand.

14      If you look, for example, at the one that says "URL," a

15   URL is a uniform resource locater.  It's how we find things on

16   the Internet like www.cnn.com.  That would be a URL.

17      So here, this method requires as one of its inputs a URL.

18   So the name of the class, URL in capital letters, is very

19   descriptive and functional about what it does.  And then the

20   name of the input itself, which is the lower case url.

21      So although this looks like it's complicated, each part is

22   very descriptive and functional about what the method does.

23   Q.   And what does the name there tell you about the SSO of

24   this method, if anything?

25   A.   Well, I talked about how the package name, class name and

ASTRACHAN - DIRECT / PAIGE

1    method name, that together is, in my opinion, the structure,

2    sequence and organization.

3         Because Java -- the Java Language requires that every

4    method be in a class, and that every class be in a package.  So

5    we see right there what's called the SSO; the package name, the

6    class name, the method name.

7    Java.net.authenticator.requestpassportauthentication.

8    Q.   Would you expect to find a class like this in java.net?

9    A.   I would absolutely expect to find a class like this in

10   java.net because it deals with network authentication.

11        So the classes in java.net would be those around networks.

12   This is precisely where I would think to find it.

13   Q.   So what's your conclusion as to what Dr. Reinhold's slide

14   shows about the functional nature of these names?

15   A.   I think it's a good example of how these names are

16   functional and descriptive of their purpose in Java.

17   Q.   Dr. Reinhold also expressed the opinion that declaring

18   code was relatively more important to some develop than

19   implementing code.

20        Do you remember that testimony?

21   A.   I do, yes.

22   Q.   What is your opinion regarding the relative importance of

23   declaring code and implementing code to application developers?

24   A.   I think that you can't really make valid conclusions about

25   the relative importance of declaring code versus implementing

ASTRACHAN - DIRECT / PAIGE

1    code for developers.  I think you can't do that, really.

2    **Q.**    Would developers care about how good the implementing code

3    is?

4    **A.**    Developers would absolutely care about implementing code.

5         Here's a small hypothetical:  If I had a good API and bad

6    implementing code, so a good API, the declaring code was good,

7    it was easy for developers to use, but the implementing code

8    was buggy or didn't run fast, so a developer might be able to

9    develop a program but then it wouldn't run correctly.  And so

10   you would have to try to debug it or figure out the mistakes.

11   That would be very difficult.

12        Typically, bugs for developers are in their code, not in

13   the library code.  So if you had a good API that made it easy

14   to develop programs but hard to actually get them to work, that

15   would not be so good.  But you have really good implementing

16   code.  So the implementing code was great.  And the API

17   declarations were a little cumbersome to use, so maybe not so

18   good, a developer would still be able to develop programs

19   because developers are pretty capable.  And it might be longer

20   because it wasn't a good API, but debugging would be easier.

21        And debugging is the balk of the development process.  So

22   what that showed to me is that it's hard to describe relative

23   importance do declaring code and implementing code.

24   **Q.**    Did you hear Professor Schmidt's testimony regarding the

25   purpose for which APIs are used in Java and Android?

ASTRACHAN - DIRECT / PAIGE

1  A.    Yes, I was here for that.

2  Q.    And what is your opinion on his explanation of the purpose

3  of the Java API packages, the Java SE, and the Android

4  platform?

5       MS. HURST:  Objection.  Beyond the scope of the

6  report, reply report.

7       THE COURT:  What do you say to that?

8       MS. HURST:  Your Honor, this is about to be some legal

9  testimony.

10      THE COURT:  Well, so far the question does not call

11 for legal.

12      Don't veer off into anything legal.  Just stick to your

13 area of expertise.

14      The question will be allowed.

15      THE WITNESS:  Could you come back to that question,

16 please.

17 BY MR. PAIGE

18 Q.    Sure.  What's your opinion on Dr. Schmidt's explanation of

19 the purpose of the Java API packages in Java SE and in the

20 Android platform?

21 A.    I think that Professor Schmidt missed the context in which

22 the APIs are being used.

23      And the purpose of an API is to create an application in

24 the context.  For example, to create an application that runs

25 on the Android platform or on a desktop or laptop.  So that

ASTRACHAN - DIRECT / PAIGE

1    context is key for understanding the purpose of an API.

2    **Q.**   Did Professor Schmidt disagree with your evaluation of the

3    new context into which these Java API package declaring code

4    was put?

5    **A.**   No.  Like me, he understands that Android has really

6    changed the landscape of the kinds of courses we can teach by

7    using this open platform.

8        And he recognized that having a smartphone that you walk

9    around with the power of what used to be a server, has kind of

10   changed the landscape of how we live with our digital devices.

11   So I think he does agree with me that this is different.

12       **MS. HURST:**  Your Honor, that kind of comment on

13   another witness's trial testimony is improper argument.

14       **THE COURT:**  Was it in the report?

15       **MR. PAIGE:**  The report talked about the larger

16   structure in which declaring code was made part of, yes.

17       **MS. HURST:**  Your Honor, that was testimony about

18   Professor Schmidt's trial testimony.  It was not something that

19   was described in the report.

20       **MR. PAIGE:**  The report says --

21       **THE COURT:**  You can't put in the report something on

22   the trial because he can't see into the future.

23       The testimony will stand.  It's okay for one expert to

24   comment on another expert's testimony.

25       **MR. PAIGE:**  He notes Oracle's experts focusing on the

1    assertion --

2              **THE COURT:**  I overruled the objection.

3              **MR. PAIGE:**  Thank you, Your Honor.

4              **THE COURT:**  Please.  It stands.  Go ahead.  Next.

5    **BY MR. PAIGE**

6    **Q.**   How could Professor Schmidt conclude that the purpose of

7    the API packages was the same in both Java SE and Android if he

8    agrees with you about what was integrated into Android?

9              **MS. HURST:**  Your Honor, improper argument.  Leading

10   and calling for the mental state of another.

11             **THE COURT:**  Well, I think -- I don't like the way you

12   phrased that.  I mean, how is he supposed to know what was in

13   Professor Schmidt's mind about how he -- you can get at the

14   same thing and phrase it in a different way.

15             **MR. PAIGE:**  Sure.

16   **BY MR. PAIGE**

17   **Q.**   How would one agree about the context in which these APIs

18   are put, but yet disagree about the purpose for which they're

19   used?

20   **A.**   Well, I've described the purpose of these APIs as creating

21   programs on the Android platform.  Or if you were developing

22   for a desktop or laptop, the purpose would be for creating

23   applications that ran on that platform.

24             But when I was speaking with you all before, I talked

25   about how as a developer I wrote my program and used the labels

ASTRACHAN - DIRECT / PAIGE

1  to connect my code with implementing code, that those labels

2  made that connection.  I would say open a Web page, and the

3  thousands of steps that were needed to open a Web page would be

4  in the implementing code.

5      So at the level of in my code I have a label.  And in the

6  library there's implementing code with the label.  That

7  functionality of mapping the labeling here to the label there,

8  that functionality is the same on my developed program for the

9  Android platform as it would be in my developed program for

10 Java SE laptop or desktop platform.  But the purpose of the

11 APIs is to create the program on an Android platform.  And

12 that's different.

13 **Q.**   Professor Schmidt also discussed the SavaJE operating

14 system in his presentation.  Do you remember that testimony?

15 **A.**   Yes, I do.

16 **Q.**   Do you have any opinions on whether the APIs used in the

17 stack for the SavaJE operating system were appropriate?

18 **A.**   No, I don't think they were appropriate.

19 **Q.**   Why not?

20 **A.**   Well, we've heard that SavaJE used Java SE --

21      **MS. HURST:**   Your Honor, objection.  Beyond the scope

22 of the report, Your Honor.

23      **MR. PAIGE:**   Paragraph 14.

24      I'll rephrase, Your Honor.

25

1    BY MR. PAIGE

2    Q.    In your opinion, was putting the entirety of the Java SE

3    on a mobile phone a good idea?

4    A.    No, I don't think that was a good idea.

5    Q.    Why not?

6    A.    Using all 166 packages from Java SE, which is a platform

7    designed for desktop and laptop computers, all of those

8    wouldn't be appropriate for a mobile platform.

9          And we saw that, for example, with SavaJE.  It didn't work

10   in making a successful platform.  They missed, kind of, a key

11   step by taking all of Java SE.

12   Q.    What's the key step you're talking about?

13   A.    Well, the Google engineers took -- they took the ideas and

14   they used the labels of these 37 packages.  So in using the

15   labels of just 37 packages, they were able to create the

16   Android platform by adding the functionality to it that they

17   need.

18         So the key step there was selecting just the 37 labels and

19   not using the entirety of the Java SE.

20   Q.    So, Professor Astrachan, could you summarize your opinion

21   on Google's use of the Java APIs?

22   A.    Sure.

23         That first step that I just outlined was selecting the 37

24   packages and using those method declarations, the declaring

25   code.  And then the next step was implementing those

1  declarations with code optimized for a mobile platform, and

2  then adding to that the library specific for a mobile platform.

3  Things like location and WiFi.

4       So at that point, the Google Android developers then

5  brought in third-party libraries, these open source libraries

6  for making Web browsers or graphics.  And then they made a

7  virtual machine, the Dalvik Virtual Machine.  Again,

8  specifically optimized for a mobile platform.

9       So starting with that selection and then going down

10 through the virtual machine, all optimized for Android, and

11 then building that on top of Linux, a version of the low-level

12 operating system specific for this Android platform, that whole

13 sequence led to this open source innovative Android platform.

14       **MR. PAIGE:**  Thank you, Professor Astrachan.

15 I pass the witness.

16       **THE COURT:**  All right.

17                  **CROSS-EXAMINATION**

18 **BY MS. HURST**

19 **Q.**   Professor Astrachan, I want to hand you a binder with your

20 reports in it, Exhibit 7641.

21 **A.**   Okay.

22 **Q.**   And if you open the binder, you'll see that your reply

23 report there is with a flag on it, on page 5.  Do you see that,

24 sir?

25 **A.**   I -- this is my opening report.  Do you want me to look at

ASTRACHAN - CROSS / HURST

1    my --

2    **Q.**   There's a flag on the top, sir.

3    **A.**   Sorry, I missed the flag.  Okay.

4    **Q.**   Do you have that page of your report, page 5 of your reply

5    report?

6    **A.**   Yes, I can see something is highlighted.

7    **Q.**   All right.  And would you also look at Exhibit 7641,

8    please.

9            **MR. PAIGE:**  Can I have a copy?  Thank you.

10   **BY MS. HURST**

11   **Q.**   And --

12   **A.**   Okay.

13   **Q.**   -- Exhibit 7641 is the document that you refer to and

14   discuss here on page 5 of your reply report; is that true?

15           **MR. PAIGE:**  Objection, Your Honor.  This is beyond the

16   scope of my direct.

17           **MS. HURST:**  It's about SE/ME.  It goes right to the

18   purpose testimony he just gave, Your Honor.

19           **THE COURT:**  All right.  Overruled.

20   **BY MS. HURST:**

21   **Q.**   That's a document that you relied on in your reply report,

22   isn't it, Exhibit 7641?

23   **A.**   Yes.  That's right.

24           **MS. HURST:**  Move to admit Exhibit 7641 so it can be

25   displayed for the jury.

1            **MR. PAIGE:**  Objection, Your Honor.  This is again

2    beyond the scope.  I did not ask Dr. Astrachan about any at

3    all.

4            **MS. HURST:**  He did, Your Honor.  The witness testified

5    at length that SE was not appropriate because it was not for

6    mobile devices, and this goes directly to that testimony.

7            **MR. PAIGE:**  I did not ask the witness about Java ME at

8    all, Your Honor.

9            **MS. HURST:**  Your Honor, ME is a derivative of SE and

10   that opened the door --

11           **THE COURT:**  Maybe you didn't ask about ME, but it's

12   close enough for cross-examination purposes.  You have a point.

13   I'm going to allow the line of questioning.

14           **MR. PAIGE:**  I object to the document being admitted.

15   It's hearsay.

16           **THE COURT:**  Don't put it on the screen yet.

17       Where did this document came from?

18           **MR. PAIGE:**  From Professor Kemerer's report.

19           **MS. HURST:**  The witness relied on it in his report,

20   Your Honor.

21           **THE COURT:**  It's not going to come in for that

22   purpose, no.  It's from another expert.  He is responding to

23   another expert.

24   **BY MS. HURST:**

25   **Q.**   Isn't it true that Java ME has in it some of the 37 API

ASTRACHAN - CROSS / HURST

1   packages at issue in this case?  Isn't that true?

2            **MR. PAIGE:**  Beyond the scope, Your Honor.

3            **THE COURT:**  Overruled.

4            **THE WITNESS:**  As I understand it, there are some

5   packages from Java SE that are also part of Java ME.

6   **BY MS. HURST:**

7   **Q.**   And you have your report there; right?

8   **A.**   Yes, I do.

9   **Q.**   And it says, "Java ME has only" -- that's your word -- "a

10  fraction of the 37 Java SE API packages at issue in this case";

11  isn't that true?

12  **A.**   That is what my report says, yes.

13  **Q.**   So the infringed packages, some of them were also in

14  Java ME; isn't that true?

15  **A.**   It is true that some of these 37 packages are in Java ME.

16  **Q.**   In fact, in the CDC version of Java ME, there were 11 of

17  the infringed packages; isn't that right?

18  **A.**   I -- I don't know how many were in Java CDC.

19  **Q.**   Well, that's what's in the exhibit that you adopted as

20  part of your report, isn't it?

21           **MR. PAIGE:**  Object to the characterization,

22  Your Honor.

23           **THE COURT:**  Sustained.

24  **BY MS. HURST:**

25  **Q.**   Did you rely on Appendix S in your report, sir?

ASTRACHAN - CROSS / HURST

1   **A.**   Yes.

2   **Q.**   And you were happy to do that at the time you served this

3   report; isn't that true?

4   **A.**   I did use it in preparing my report.

5   **Q.**   And isn't it true that Appendix S indicates that there

6   were 11 of the infringed packages in Java ME?

7           **THE COURT:**  You can answer that.

8           **THE WITNESS:**  Well, to answer that I have to look at

9   this document.

10          **THE COURT:**  Go ahead.  Look at it.  It's not going to

11  come into evidence, but we can refer to the parts that Ms.Hurst

12  wants you to refer to.

13          **THE WITNESS:**  Which particular version of Java ME

14  would you like me to look at?

15  **BY MS. HURST:**

16  **Q.**   Do you see there it's Java ME CDC 1.1.2.  There is a

17  column indicating --

18  **A.**   Yes, I do.

19  **Q.**   Do you see that?  Eleven packages; right?

20  **A.**   Yes.  There are 11 Xs in this diagram.

21  **Q.**   That indicates, as you understood when you filed your

22  report, that there were 11 of the Java SE packages at issue in

23  this case in ME CDC; right?

24  **A.**   Yes.  That's my understanding.

25  **Q.**   And there were four of the 37 Java packages from CLDC

1    version of Java ME; right?

2    **A.**   In one column, there are three Xs and in one column, there

3    are 4 Xs, yes.

4    **Q.**   So on the 1.1 version -- I apologize, you're right -- you

5    understood at the time you did your reply report that four of

6    the infringed packages were in Java ME?

7    **A.**   Yes.

8    **Q.**   And in fact, sir, isn't it true that Sun showed a

9    propensity over time for adapting its API packages to different

10   types of devices?

11   **A.**   I'm not sure what Sun showed over time.  I wasn't really

12   asked to describe what Sun did over time in preparing my

13   reports.

14   **Q.**   So you don't know that?

15   **A.**   No.  I don't think I can offer a solid opinion on that.

16   **Q.**   You've seen this before.  It's Dr. Schmidt's software map

17   with the infringing packages highlighted; right?

18   **A.**   This is the graphic that was used in his testimony here

19   earlier this week.

20   **Q.**   Right.

21   **A.**   Yes.

22   **Q.**   And you have heard of Dr. Schmidt before this case; right?

23   **A.**   Yes.  Absolutely.

24   **Q.**   You both teach massively online courses about Java; is

25   that right?

ASTRACHAN - CROSS / HURST

1  **A.**   We have, that's right.

2  **Q.**   And you teach the introductory course and he teaches the

3  advanced course; is that right?

4  **A.**   We don't coordinate our offerings at all, but, yes, I

5  teach a beginning one and he teaches more advanced ones, yes.

6  **Q.**   And, in fact, you've read many of his papers, haven't you?

7  **A.**   Yes, I have.

8  **Q.**   And it's true that Dr. Schmidt has a good reputation,

9  isn't it, sir?

10  **A.**   Yes.   That's true.

11  **Q.**   Now, your report did not in any way say anything about

12  this map, other than it was created in litigation; isn't that

13  true?

14  **A.**   I -- I -- what I said was I believed that this kind of

15  visualization wasn't one that developers would use or that Sun

16  had provided for developers to use.   I did say it was created

17  for the purpose of Professor Schmidt's reports.

18  **Q.**   And you've done things in your reports, sir, that you

19  analyzed for the first time for purposes of litigation; isn't

20  that true?

21  **A.**   Yes.   I think that's fair.

22  **Q.**   And, in fact, when you were doing your analysis in this

23  case, you did not hire any research assistants or graduate

24  assistants to assist you; right?

25  **A.**   That's correct.   I did all the work myself.

ASTRACHAN - CROSS / HURST

1    Q.   Well, you did your work with Google's lawyers, didn't you?

2    A.   I worked with Google's lawyers in preparing my report, but

3    I didn't -- the Google lawyers did not run my build tests or

4    software speed, for example.

5    Q.   Isn't it true, sir, that Google's lawyers were extensively

6    involved in the writing of your reports?

7    A.   I -- we went back and forth on writing, drafting, so they

8    were absolutely extensively involved in writing my reports.

9    Q.   Now, sir, in this case, you gave testimony that the

10   existence of Apache Harmony helped you understand -- let's look

11   right here.  "That it would be expected and reasonable for

12   those things to happen."  You gave that testimony on your

13   earlier appearance here; isn't that right?

14   A.   Yes.  That's right.

15   Q.   And you were here in court yesterday when Mr. Mazzocchi

16   testified that he was a founder of the Harmony project and one

17   of the Project Management Committee members; true?

18   A.   I was in the court, yes.

19   Q.   And you saw that he wrote an email, sir, that said, "The

20   Harmony PMC would never consider the option of releasing

21   Harmony without a license."  You saw that; right?

22   A.   I -- I saw this email displayed, yes.

23   Q.   And you also saw that Mr. Mazzocchi said, "The copyright

24   on the API is real and hard to ignore."

25          MR. PAIGE:  Your Honor, this is outside the scope of

1    my direct examination.

2              THE COURT:  Sustained.  This is beyond the scope of

3    the direct.

4    BY MS. HURST:

5    Q.   Do you still stand by your opinions, sir?

6              MR. PAIGE:  Objection, Your Honor.

7              THE COURT:  Sustained.  Beyond the scope of direct.

8              MS. HURST:  No further questions.

9              THE COURT:  All right.  Any redirect?

10             MR. PAIGE:  No, Your Honor.

11             THE COURT:  All right.  Thank you, sir.  You may step

12   down.

13             THE WITNESS:  Thank you.  I'll let you guys deal with

14   this.

15             THE COURT:  Please, yes.  We will do that.

16        Next witness.

17             MR. VAN NEST:  Give me a moment, Your Honor, please.

18        Your Honor, at this time, Google rests its rebuttal case.

19             THE COURT:  All right.  I'm going to let the jury step

20   outside for just a moment.  Fifteen-minute break.  Please

21   remember the admonition.

22        (Proceedings were heard out of presence of the jury:)

23             THE COURT:  Please have a seat.  All right.  So we're

24   at the point where we need to revisit this issue with Reinhold,

25   if you still want to present him.

1    **MS. HURST:**  We do not need to present him, Your Honor.

2    We solved the problem.  Thank you.

3    **THE COURT:**  So do you have any case, surrebuttal, that

4    you wish to put on?

5    **MS. HURST:**  No, Your Honor.

6    **THE COURT:**  So can I bring the jury back and give them

7    an admonition and send them home for the day?

8    **MR. BICKS:**  On one point, Your Honor, on the notes,

9    can we just make it clear, just out of an abundance of caution,

10   that the notes shouldn't be copied if they were going to take

11   them home?  I know you said *don't share them*, but make sure

12   they're not copied and things of that nature?

13   **THE COURT:**  Well, I can tell them that.  That's okay.

14   But I don't know what you mean by *of that nature*.

15   **MR. BICKS:**  Copying, sharing them, that's the concern.

16   I think you mentioned *don't share them with people*, but I just

17   want to make sure we're extra careful about what happens with

18   the notes.

19   **THE COURT:**  All right.  I can tell them that.

20   **MR. BICKS:**  Thank you.

21   **THE COURT:**  Anything else that you wish for me to

22   cover?

23   **MR. BICKS:**  No, Your Honor.

24   **MR. VAN NEST:**  With our jurors, I don't believe so,

25   Your Honor.  Anything you think is necessary and your regular

PROCEEDINGS

 1   admonition.

 2         THE COURT:  Angie, see if the jury is willing to come

 3   back on very short notice.  Tell them they may enjoy what they

 4   are going to hear.

 5         While that is happening, can somebody clean off the

 6   witness bench, please.

 7         While we're waiting, give me an estimate of how much time

 8   we need for the charging conference.

 9         MR. BABER:  From the Google side, Your Honor, I would

10   think we should be done in under an hour, frankly, given as

11   many drafts as we have had and back and forth.

12         THE COURT:  Ms. Simpson?

13         MS. SIMPSON:  I would agree with that, except for your

14   admonition in the order where you indicated that we needed to

15   preserve all of our prior arguments.

16         THE COURT:  I was going to say the ones that you

17   submitted on the -- both sides submitted with respect to the

18   four factor test, that that has been so thoroughly vetted, I

19   don't see the point in making you repeat those objections.  I

20   would just be happy to have them deemed made and part of an

21   objection to this version.  So that admonition I think was a

22   little misleading in that respect.

23         But if we do that, if we allow you to stand on the

24   objections that were made in that series of three rounds of

25   objections, how long do you think you need?

PROCEEDINGS

1          MS. SIMPSON:  That sounds about right, Your Honor.

2    Hour, hour and a half.

3          MR. BABER:  I would say well less than an hour if

4    that's the case.  If we're just going to flag issues and say we

5    stand on our prior, I don't think it's going to take very long.

6          THE COURT:  Well, on the things that were not part of

7    the four-factor test, I may -- you know, I want --

8          MR. VAN NEST:  The door seems to be open.  I'm sorry.

9          THE COURT:  Are they ready?  They can come in.

10         (Proceedings were heard in the presence of the jury:)

11         THE COURT:  Welcome back and thank you for letting me

12   bring you back early.  I think you will be happy with what I'm

13   about to tell you.

14       So you rested your rebuttal case in front of the jury?

15         MR. VAN NEST:  I sure did, Your Honor.

16         THE COURT:  And I understand that Oracle has no

17   surrebuttal case; is that correct?

18         MR. BICKS:  That's correct, Your Honor.

19         THE COURT:  So that means all of the evidence that you

20   will be receiving for purposes of the first phase of this case

21   has now been presented.  So the evidentiary record on that part

22   is closed.  And what remains to be done is the oral arguments,

23   which will be very important, and the instructions of law, so

24   that will all take place on Monday.

25       And so I'm about to let you leave early today so that you

 1   can go -- have an extra long weekend.  And I want, though,

 2   before I do that, to give you a couple of very important

 3   admonitions.

 4        I want to remind you first about the importance of not

 5   doing any research.  I know you haven't and I know -- but it's

 6   so important for you to decide the case based on the record

 7   here in the courtroom and not let anything extraneous -- don't

 8   go, for example, and look up the word *API* on the Internet.

 9   That would be so potentially harmful to do that because it's

10   the responsibility of the lawyers to explain it all to you

11   through the witnesses, and you can't supplement the record by

12   looking things up.

13        So you need to just focus on your notes and focus on your

14   memory of what was said and the documents that you've seen in

15   evidence, and that's the record that will go into the jury

16   room.

17        So no homework, no research, no research of any type.  You

18   couldn't go to the library and check out a book on computer

19   science, for example.  That would not be a smart thing to do

20   now.  Don't do that.  I'm telling you you can't do that.

21        I emphasize this.  I said it at the outset, but it's so

22   important that you decide the case based on the record here in

23   the courtroom and the instructions of law that I will give you.

24   And that you already heard a preview of anyway.  So that's

25   point number one.

PROCEEDINGS

```
 1          Point number two on the notes.  As I said, you're free to
 2   take your notes home with you and study them, if you wish.
 3   Please do not have them copied in any way.  Don't make an extra
 4   set for posterity.  No.  Don't do that.  Don't share your notes
 5   and let anyone else read them.  Don't speak with anyone about
 6   the case.  I know you wouldn't do that, but I just have to
 7   emphasize it because it's important that you not do any of
 8   those things.
 9          But you can read all your notes to your heart's content.
10   You can study them to see what you might have forgotten.
11   That's perfectly okay.  You don't have to do it at all.  You
12   don't have to take your notes home.  You don't even have to
13   think about this case over the weekend.
14          When you come back, you've got to think about the case,
15   but I know how conscientious you all have been so I know some
16   of you probably do want to take your notes home.  There you go.
17          Counsel, is there anything else I should cover before I
18   let the jury go home for the weekend?
19          MR. BICKS:  No, Your Honor.
20          MR. VAN NEST:  I don't believe so, Your Honor.
21          THE COURT:  Everyone in the courtroom has been so
22   impressed with your attention and your care and punctuality
23   that really -- even the members of the gallery I know agree
24   with this.  And so we sincerely thank you for that.  We look
25   forward to seeing you on Monday morning at the regular time.
```

1   Please have a great long weekend.

2       (Proceedings were heard out of presence of the jury:)

3       **THE COURT:**  We will do this.  Please have a seat.

4   We'll take a 15-minute break.  Come back and we'll jump into

5   the problem of the charging conference.  And we'll also discuss

6   how much time you need for the closings and any ground rule

7   issues you want me to try to resolve.  All right.  Fifteen

8   minutes.  Thank you.

9              (Recess taken at 10:41 a.m.)

10             (Proceedings resumed at 10:55 a.m.)

11      **THE COURT:**  Let's get started.  Before we get into the

12  jury instructions, a couple of things.  The easier one is the

13  stickers to go on the exhibits that came in for a limited

14  purpose.  Have you done that yet?

15      **MR. VAN NEST:**  The legal and paralegal teams have

16  worked that out, and I think the stickers aren't quite yet

17  prepared, but they will be.  I think they've agreed on the text

18  of it.

19      **THE COURT:**  But they have to be affixed?

20      **MR. VAN NEST:**  Right.  They're getting that done.

21      **THE COURT:**  Next.  Index of exhibits.  Let's see how

22  many exhibits I've got here.  I've got -- I've got three

23  columns, six columns, seven columns.  That's around 30 per

24  page.  That's around 200 exhibits.  It's pretty close.  That's

25  what I told the jury you would come up with, around 200.

1           Anyway, it would be useful for a jury to have an index,

2    non-argumentive.  It can't be something like *here's where*

3    *Mazzocchi says it's illegal.*  No.  You can't do that.  But what

4    you can do is say such and such, email, date, from, to, exhibit

5    number, whatever the number is, and it can be -- ideally, you

6    would give them one in chron order and give them one in exhibit

7    number, but I will settle for exhibit number, but it has to be

8    stipulated to; otherwise, we won't do it.

9           **MS. HURST:**  I think we should do both, Your Honor.

10          **THE COURT:**  I know, really, I think it would be better

11   to do it both ways.  So can you all confer about that with your

12   multitudinous teams and see if you can't get somebody to do

13   that?

14          **MR. BICKS:**  Yes.

15          **MS. HURST:**  We will.

16          **MR. VAN NEST:**  We'll confer, Your Honor.

17          **THE COURT:**  Great.  Okay.  All right.

18          So now we come to the instructions, and what I'd like to

19   do is just say that anything that you -- with respect to any

20   paragraph that is unchanged from the pre-instruction, if you

21   made an objection in those three rounds of critique that led up

22   to the pre-instruction, then that is good enough to preserve

23   your record.  You don't have to make it again today.  Just

24   so -- am I clear on that?

25          **MR. BICKS:**  Yes.

1        THE COURT:  Is that clear?

2        MR. BABER:  Clear, I think.  The only question I have

3   is some of those things were critiques, some of them in some

4   instances the parties expressed objections, other times

5   suggestions.  I'm not sure --

6        THE COURT:  All right.  I will rephrase it then.  With

7   respect to any paragraph that is identical in the proposed

8   instruction now, identical to the way the pre-instruction came

9   out, any critique, suggestion, objection that was previously

10  made on those three rounds that led up to the pre-instruction

11  will be deemed as if they had been made right here and now in

12  exactly the same words.  So if it was a mere suggestion, it

13  would be a mere suggestion now.  If it was a real objection

14  then, it would be a real objection now.

15       So it would be -- I'm just saying you don't have to repeat

16  what you said before.  I'm not trying to elevate everything

17  that was a mere suggestion to something higher than it really

18  was, but I'm just trying to say you don't have to repeat it.

19       MR. BABER:  Understood, Your Honor.

20       THE COURT:  Okay.  Is that good?

21       MR. VAN NEST:  That's good.

22       THE COURT:  So now we can leave.  No.  All right.

23       So what we will do is go through this paragraph by

24  paragraph and you can make your comments.

25       Paragraph No. 1 -- Mr. Silverman, are you going to be

 1   doing this?

 2           **MR. SILVERMAN:**  Me and Ms. Simpson are going to be

 3   handling it.

 4           **THE COURT:**  Who is going to do it over there?

 5           **MR. VAN NEST:**  Mr. Baber is going to handle it.

 6           **THE COURT:**  Mr. Baber, it's two to one.  I don't know

 7   whether you are up to this.

 8           **MR. BABER:**  I'm up for it.

 9           **THE COURT:**  All right.  Paragraph 1, you can just say

10   *no objection* or you can tell me you've got an objection.

11   Paragraph 1.

12           **MR. SILVERMAN:**  Your Honor, a couple of proposed

13   changes for Paragraph 1.  In page 4, lines 2 to 3, the first

14   sentence, *Members of the jury*, we would propose getting --

15   deleting *Phase 1 of this trial* and just saying *Members of the*

16   *jury, it's now my duty to instruct you on the law that applies*

17   *to this trial.*

18           **THE COURT:**  But I do need to tell them at some point,

19   don't I, about the second phase?  Are you going to have a

20   running thing that you don't want them to know about the second

21   phase?

22           **MR. BABER:**  You already told them about the second

23   phase.

24           **THE COURT:**  I think I have.  I don't mind taking it

25   out here, but I'm not sure I'm going to buy into not reminding

1  them about Phase 2.

2      Do you have any problem with taking out *Phase 1*?

3          **MR. BABER:**  I don't have any problem with taking it

4  out, but we may just say something like *the law that applies to*

5  *your decision on fair use* or *the decision that you need to make*

6  *at this time*.  But I don't have any problem with taking out

7  *Phase 1*.

8          **THE COURT:**  I'm just going to say *applies to the issue*

9  *of fair use*.  All right.

10     What else did you have?

11         **MR. SILVERMAN:**  Page 4, line 5, *It is your duty to*

12  *find*.  I think maybe *determine the facts from all the evidence*

13  *in the case*.

14         **THE COURT:**  All right.  *Determine* is okay.

15         **MR. BABER:**  No problem with *determine*, and Google has

16  no comments on Paragraph 1.

17         **THE COURT:**  Paragraph 2.

18         **MR. SILVERMAN:**  No objection.

19         **MR. BABER:**  No comments, Your Honor.

20         **THE COURT:**  Am I leaving out anything?  Stipulations?

21  I think 2 covers it.  All right.  No. 3 --

22         **MR. BABER:**  Your Honor, we had request for admissions.

23         **THE COURT:**  What?

24         **MR. BABER:**  We had request for admissions and maybe

25  one interrogatory answer that were read in today.

1     **THE COURT:**  That's a good point.  Let's fix that.  I'm

2  going to say *answers* -- were there interrogatory answers?

3     **MR. SILVERMAN:**  Yes, Your Honor.

4     **MR. BABER:**  There was one.

5     **THE COURT:**  You all know what that means.  I'm going

6  to say *answers to interrogatories and requests for admissions*

7  *read to you during the trial*.  All right.  That's a good one.

8  Anything more?

9     **MR. BABER:**  Nothing else on 2, Your Honor.

10     **MR. SILVERMAN:**  No, Your Honor.

11     **THE COURT:**  Now, you all know what an interrogatory

12  is, but the jury -- except for the lawyer on the jury -- will

13  probably not know what that means.  They will think it just

14  means a question --

15     **MR. BABER:**  You can say, Your Honor, *There were some*

16  *requests for admissions and responses that were read to you,*

17  *and one thing is an interrogatory, a question and answer*.  But

18  that's . . .

19     **THE COURT:**  Next, No. 3.

20     **MR. SILVERMAN:**  A small change, Your Honor.  Lines 2

21  and 3, by way of example, the end of the sentence says *you may*

22  *find from that fact that it rained during the night*.  Again,

23  maybe just switch that to *decide* rather than *find*.

24     **THE COURT:**  No.  I like *find* there.  I have been using

25  this for 17 years.  This is a good example.  Okay.

1    MR. SILVERMAN:  We have no problem with the example,

2  Your Honor.

3         THE COURT:  *Find* is good.  What do you have?

4         MR. BABER:  Nothing on paragraph 3.

5         THE COURT:  Number 4.

6         MR. SILVERMAN:  No objection.

7         MR. BABER:  On 4, Your Honor, in the indented little

8  paragraph one, the last sentence says, *If the facts as you*

9  *remember them*.  Let me suggest maybe that should be *if the*

10  *evidence as you remember it.*

11         THE COURT:  All right.  I can make that change.  Any

12  problem?

13         MR. SILVERMAN:  No, Your Honor.

14         THE COURT:  All right.  No. 5.

15         MR. SILVERMAN:  Your Honor, no objection to Paragraph

16  5, but it is very similar, almost identical to Paragraph 12.

17         THE COURT:  You know, I think you're right about that.

18  So let's take out No. 5 here and leave in No. 12, but leave in

19  the -- you see that very bottom part of No. 5 about *the weight*

20  *of the evidence*, I think we should leave that in.

21         MR. BABER:  Your Honor, also -- we also may want to --

22  I'm not sure the later -- I'm looking to see if the preamble of

23  5, the second sentence about *you may believe everything a*

24  *witness says or part of it or none of it*, I don't know that

25  that's in the later --

 1          THE COURT:  We can --

 2          MR. BABER:  That part is not included in 12.

 3          THE COURT:  All right.  I'll move it over there.

 4          MR. BABER:  The first sentence, too, *you have to*

 5  *decide which testimony to believe and which not to believe.*

 6          THE COURT:  I'll carry that over.  Okay.  All right.

 7          MR. BABER:  Nothing from us on 5.

 8          THE COURT:  We'll leave -- this stays in.  *The weight*

 9  *of the evidence.*  That will stay in there as No. 5.  Okay.

10     No. 6.

11          MR. SILVERMAN:  No objection, Your Honor.

12          MR. BABER:  Nothing on 6, Your Honor.

13          THE COURT:  It's kind of duplicative of the thing

14  about number of witnesses.  Six will stay as it is.  No. 7.

15          MR. SILVERMAN:  No objection.

16          MR. BABER:  Nothing on 7.

17          THE COURT:  Eight.

18          MR. SILVERMAN:  Just one minor change.  Line 16 to 17,

19  *however, a witness* --

20          THE COURT:  Uh-huh.

21          MR. SILVERMAN:  There may be a word missing or maybe

22  just a word would help there.  *However, a witness who is*

23  *willfully false in one part of his or her testimony is to be*

24  *distrusted in others.*

25          THE COURT:  How about if I say *a witness you think is*

1    *willfully false.*

2             **MR. SILVERMAN:**  That works.

3             **THE COURT:**  *However, a witness you think is willfully*

4    *false* and so forth.  That's a good change.

5             **MR. BABER:**  Your Honor, how about *however, if you find*

6    *the witness was willfully false in one part of his or her*

7    *testimony, you may distrust any other parts of that witness'*

8    *testimony*, instead of the *is to be distrusted*.  They may find

9    somebody got a little detail wrong and was hedging on it and

10   you're telling them to disregard the whole thing.

11            **THE COURT:**  I think this is a correct statement as it.

12   We are talking about willfully false.  *You may reject the*

13   *entire testimony*.  I think -- okay.  I'm going to overrule

14   Google's objection.

15        No. 9.

16            **MR. SILVERMAN:**  No objection, Your Honor.

17            **MR. BABER:**  Nothing on 9.

18            **THE COURT:**  Ten.

19            **MR. SILVERMAN:**  No objection, Your Honor.

20            **MR. BABER:**  On 10, Your Honor, the last sentence, it

21   says, *It is up to you, the jury, to determine fair use on your*

22   *own based on the evidence you hear in this trial*.  That may be

23   a carryover from an earlier time before the evidence was

24   closed, and we would suggest you take out *on your own* and you

25   tell the jury *it's up to you to determine fair use based on the*

1    *evidence you have heard in this trial and my instructions on*

2    *the law.*

3              THE COURT:  All right.  I think those are good

4    changes.

5              MS. SIMPSON:  No objection to those, Your Honor.

6              THE COURT:  Now, I do have a comment to make here.

7    And somewhere in here, I have the one about just the evidence

8    before the case was filed.

9              MR. SILVERMAN:  Yes, Your Honor.

10             THE COURT:  Help me find that.  Where is that?  It's

11   later on, but it ties in to this.

12             MR. BABER:  It's paragraph 27, Your Honor.

13             THE COURT:  I know this is jumping ahead, and I'm only

14   just doing it to bring to your attention that I am going to

15   tell them that they have to base the fair use decision on

16   events that occurred up to August 12, 2010.

17        And I propose to leave out what Google had asked me to do,

18   which I came very close to doing, which is to let them know

19   about the almost two-year period when the judgment in this case

20   was that Google was right and Oracle was wrong.  Admittedly,

21   that got overruled by the Court of Appeals, but for that

22   two-year period almost, it was the law of the case.

23        Now, I want to make clear that if, in your closing

24   argument, you get off into that conversation, the thing that

25   happened after this date, the Bar Mitzvah party --

 1          **MR. BABER:**  Kent Walker and Safra Catz.

 2          **THE COURT:**  All of that.  That would put me now in a

 3     position where I've got to go back and revisit this because

 4     that's after the date of the lawsuit.

 5          So I just want you to know this is the way I plan to do

 6     it, but I'm going to order you not to refer to anything after

 7     the lawsuit was filed.  You don't need to do that.  That was --

 8     I'm not saying it's not legitimate evidence to consider, but if

 9     you want to have the jury consider that evidence, then we have

10     to let the jury know the full circumstances of what the record

11     was during the period after the lawsuit was filed.  So that's

12     my thinking on it.

13          **MS. SIMPSON:**  Your Honor, there may be some

14     complications there, and I'm not sure that the Catz example is

15     an example of where this would come in, but the limitation is

16     with respect to the good faith evidence and not with respect to

17     the other factors.

18          Good faith -- the limitation you put in is on Factor 1,

19     but there are other -- there is other evidence that may

20     postdate with respect to harm and things of that nature that

21     shouldn't be limited, and I wouldn't want the jury to think --

22          **THE COURT:**  Okay.  They did see some diagrams that go

23     past 2012.  I think that's right.  Okay.  I think that's okay.

24          Maybe the thing to do if you're planning to use anything

25     that is after the date of the Complaint, you should show it to

1    counsel.  I would approve that use of a diagram showing lost

2    sales after the date of the Complaint.  That's okay.  That's

3    future harm.  That will be okay.  But the things that will go

4    to bad faith, good faith for sure I feel should not be

5    referenced.

6          MS. SIMPSON:  So, Your Honor, I am handed a note about

7    another example, so things going to Factor 3, the amount of

8    lines and things of that nature -- the amounts of lines of code

9    and those sorts of things are all postdating the Complaint.  I

10   mean, so --

11         THE COURT:  You mean the ones that had the many

12   different versions where it showed about 11,500 lines of code?

13         MR. SILVERMAN:  That's right, Your Honor.

14         THE COURT:  I think that's okay, too.  I don't have a

15   problem with that.

16         MS. SIMPSON:  So, Your Honor, the way we propose to

17   address this is in Instruction 27, we would recommend that we

18   add a sentence that tells the jury that this limitation applies

19   only to the good faith portion of Factor 1 and not to the other

20   factors, because there are a number of examples here that we're

21   going to need to use evidence beyond the state --

22         THE COURT:  I'm going to flag that.  When we get to

23   it -- what was that paragraph again?

24         MS. SIMPSON:  27.

25         THE COURT:  Maybe that only applies to the good

1   faith/bad faith thing.  All right.

2       Right now I tentatively agree with you, that would be

3   okay, but I still think individual items of evidence that

4   you're going to use in the closing that get past the date of

5   the Complaint you should let counsel see it so we can deal with

6   it before the closing.  Okay.

7       Now, back to No. 8.

8           MR. BABER:  We're on 10.

9           MR. VAN NEST:  Your Honor, excuse me.  I think you're

10  right, I don't disagree with any of that, but I hear a

11  suggestion that the Bat Mitzvah is going to come up on some

12  other factor, but maybe I'm mistaken.

13          MR. BICKS:  Your Honor, I don't intend to get into

14  that.

15          MR. VAN NEST:  Fine.  Thank you.  Thank you.

16          MR. BICKS:  As much as I would like to.  Because

17  Mr. Walker -- you offered to get him on the stand.

18          THE COURT:  Yes.  I noticed that he didn't come.

19  Okay.

20      All right.  No. 8 -- we're done with 8.  No. 9.

21          MR. BABER:  We were on 10, Your Honor, I think.

22          THE COURT:  On 10.  Okay.  Yes.  Okay.  And then now

23  we go to 11.

24          MR. SILVERMAN:  No objection, Your Honor.

25          MR. BABER:  Nothing on 11, Your Honor.

1          THE COURT:  12.

2          MR. BABER:  12, Your Honor, I think there is a typo on

3    the first line.  *I will now suggest some considerations for you*

4    *as to evaluate* --

5          THE COURT:  That's crazy, isn't it?

6          MR. BABER:  Maybe *some considerations for you as you*

7    *evaluate witnesses' opinions?*

8          THE COURT:  I'll just say *witnesses*.

9          MR. BABER:  *Witnesses*.  *Witnesses' testimony*.

10         MR. SILVERMAN:  Your Honor this is probably going to

11   be superseded by moving parts of Paragraph 5 over to 12.

12         THE COURT:  That's true.  I know that I've got to move

13   No. 5 over and fix this.  It didn't come out right.  Just trust

14   em on No. 12.  I'll get it right.

15      No. 13.

16         MR. SILVERMAN:  Your Honor, for 13 and 14, these were

17   originally proposed, I think, when there was an expectation

18   that there were going to be a lot more expert witnesses

19   testifying than there ended up being.

20         THE COURT:  If you both agree for me to take 13 out

21   and the whole thing on experts, I guess I will because you're

22   being equally guilty, but I don't know.

23         MR. BABER:  Your Honor, we think they should stay in.

24         THE COURT:  All right.  Then I'm going to leave them

25   in.  If you have problems with the way it's worded, we can

1    address that.

2           MR. BABER:  I think Your Honor did actually send this

3    out earlier and ask for comments from the parties, and other

4    than some typos, neither party objected.

5           MS. SIMPSON:  That is correct, Your Honor.

6           THE COURT:  We will leave 13 and 14 alone.

7        No. 15.

8           MR. SILVERMAN:  Your Honor, Paragraph 15, Oracle is

9    fine with the first paragraph.  The second paragraph about

10   *agency* -- *agents*, I'm not sure that that has come up in the

11   case.  It may be --

12          THE COURT:  I'll take it out if you both agree.

13       Mr. Baber, can we take out that second paragraph, *Agent is*

14   *a person*?

15          MR. BABER:  We don't have any problem with that.

16          THE COURT:  You don't have any problem with taking it

17   out?

18          MR. BABER:  Taking it out.

19          THE COURT:  All right.  We'll take it out.  Okay.  16.

20          MR. BABER:  Your Honor, before we go to 16, we would

21   request that the Court give an additional instruction between

22   15 and 16.

23          THE COURT:  What's that?

24          MR. BABER:  It's one about telling the jury that Sun

25   and Oracle are the same entity and what that means.

CHARGING CONFERENCE

1          **THE COURT:**  Sun America.

2          **MR. BABER:**  Sun and Oracle America are the same

3    entities, Your Honor.  I have a very short -- that I can hand

4    up.  We propose this, Your Honor -- if you want to read it

5    first.

6          **THE COURT:**  I'm okay with this.  Do you have any

7    problems with this proposal?

8          **MR. SILVERMAN:**  Your Honor, we don't object to

9    something along the lines that the parties stipulated to, just

10   that when Oracle acquired Sun, Sun changed its name to Oracle

11   America, Inc.

12        There is some other stuff in this, particularly the third

13   sentence, *As a result, you must consider for purposes of your*

14   *deliberations that any actions, inactions or statements of Sun*

15   *prior to the time it was purchased by Oracle are actions,*

16   *inactions and statements of Oracle that are binding on Oracle*,

17   I think that this is more than just saying Sun has become

18   Oracle America.

19          **MR. BABER:**  Your Honor, we think this is necessary

20   because we've now heard two weeks of testimony by Oracle

21   disparaging the management of Sun, challenging the veracity of

22   statements made by Sun executives when they were Sun

23   executives, both publicly and to Google privately, and since

24   Mr. Schwartz testified, Your Honor, we have had a litany of

25   attempts to trash Mr. Schwartz, his management, the business

1    practices he adopted, and what Sun was doing at the time.

2        THE COURT:  Look, I'm going to give the first two

3    sentences and I'm going to leave out the rest.  The rest is

4    argument.  I will give the first two sentences and I'm not

5    going to say *one and the same*.  I'll just say *are the same*

6    *legal entity*.  And then you can make your argument based on

7    that.  Parts of that will go in between 15 and 16.

8        MR. BABER:  Thank you, Your Honor.

9        THE COURT:  How about 16?

10       MR. BABER:  Nothing on 16.

11       MR. SILVERMAN:  Nothing on 16, Your Honor.

12       THE COURT:  17?

13       MR. SILVERMAN:  Your Honor, on 17, it's a bit of a

14   strange posture I think that the case finds itself in where

15   Google is the defendant, they went first, they bear the burden

16   of proof.  I think a sentence at the beginning along the lines

17   of *Even though Oracle is the plaintiff and the plaintiffs would*

18   *normally bear the burden of proof, here because your decision*

19   *pertains to Google's defense of fair use, Google is the party*

20   *that bears the burden of proof*, I think that will address any

21   confusion the jury might have.

22       MR. BABER:  I think you have already told the jury

23   that, Your Honor.  And I don't think the jury needs to be told

24   anything --

25       THE COURT:  I think this is good enough.  I think it's

1   been very clear who the plaintiff is and that this is a defense

2   and so forth.  I don't think we need to embellish it.

3        **MR. BABER:**  On 17, Your Honor, we have a separate

4   issue, which is the first sentence says, *If you find Google*

5   *carried its burden, your verdict should be for Google*.  The

6   second sentence says, *If you find Google did not carry its*

7   *burden of proof*, we think that should say *your verdict should*

8   *be for Oracle*.

9        **THE COURT:**  Fine.

10       **MR. SILVERMAN:**  Fine with us, Your Honor.

11       **THE COURT:**  18.

12       **MR. SILVERMAN:**  A couple of things on 18, Your Honor.

13  This is basically the statement that the parties agreed on with

14  Judge Kim.  There were two additions in Paragraph 18 that we

15  propose removing so that it remains the statement that it was.

16       Page 11, lines 15 and 16, *the Java programming language is*

17  *free and available to use*.  The Court added *without permission*

18  *from anyone*.  We're fine with the first part of the sentence,

19  but we think that *without permission from anyone* is going to

20  start to create some confusion.

21       We'll note, as we go through this, the concept that the

22  Java programming language is free and available is in here

23  about four or five different times.  Oracle's fine with saying

24  it once, maybe even twice, but after a while, I think it starts

25  to become argumentive and starts to play into some of the

1    parties' theories in the case.  So that's the first --

2         **THE COURT:**  When you say *without permission from*

3    *anyone*, are you suggesting that permission is needed?

4         **MR. SILVERMAN:**  No.  I think that the first part of

5    the sentence, Your Honor, covers it.  *The Java programming*

6    *language is free and available to use.*

7         **THE COURT:**  Well, the reason I put that phrase in

8    there is because one of your witnesses made it sound like you

9    had to download it and agree to some kind of agreement whenever

10   you downloaded it, and I thought that was not correct.  That

11   the programming language itself anybody can use with nobody's

12   permission.

13        **MR. BABER:**  That's correct, Your Honor.

14        **THE COURT:**  Are you going to suggest in any way to the

15   jury that permission is needed to use the programming language?

16        **MR. SILVERMAN:**  No, Your Honor.  This is just about

17   trying to keep this as slimmed down and clear for the jury as

18   possible.

19        **THE COURT:**  I'm going to leave it as I have it here.

20   I think -- you may be correct that we need to weed out some

21   other places.  I don't want it to be a repetitive broken

22   record.  I agree with that concept, but I'm going to leave in

23   *without permission from anyone* the first time it appears.

24        **MR. SILVERMAN:**  Lines 14 and 15, Your Honor, *The*

25   *declaring code and the SSO of the 37 Java API packages at issue*

1    *are*, the Court added *part of the overall work*.

2              THE COURT:  Just a minute.  I can't find that.  Where

3    is that?

4              MR. BABER:  On the next page, Your Honor.  Page 12.

5              THE COURT:  What lines?

6          MR. SILVERMAN:  14 and 15.

7              THE COURT:  Okay.  What's the problem?

8          MR. SILVERMAN:  In the middle of the sentence, *part of*

9    *the overall work protected by copyrights owned by Oracle*, I

10   think it adds some complexity that is probably unnecessary.  I

11   also think it's potentially inconsistent with the Federal

12   Circuit's decision, which just says *the declaring code and the*

13   *structure, sequence and organization are copyright protected*.

14             MR. BABER:  Your Honor, they're not separately

15   protected.  They're protected as parts of these two much larger

16   works.  We think that is absolutely appropriate, what the Court

17   has in the charge.

18             MR. SILVERMAN:  Again, this is part of a statement

19   that the parties agreed on.  And that wasn't part of it --

20             THE COURT:  I don't understand.  I'm trying to make it

21   clear for the jury, and the way you want to make it sound like

22   there' a separate copyright document from the Copyright Office

23   that calls out the declaring code and the SSO and it's not that

24   way.  It's the declaring code and the SSO are part of the

25   larger work.  I'm going to leave it as it is.

1          **MS. SIMPSON:**  Your Honor, I do think it's a little

2   misleading to the jury because you could have a copyrighted

3   work, parts of which are not protected as protectable

4   expression.  That's why we were suggesting the edit.

5          **THE COURT:**  Well, that's a good point.  All right.

6   I'm going to say *are protected as part of the overall work*

7   *protected*.  How's that?  *Protected as part of the overall work*

8   *protected by the copyrights owned by Oracle.*  Okay.

9          **MR. SILVERMAN:**  We think that's better, Your Honor.

10         **MR. BABER:**  That's fine.

11         **MR. SILVERMAN:**  One last one, same page, page 12,

12   lines 3 through 6, right after the instruction mentions

13   *structure, sequence and organization*, Oracle thinks it would be

14   helpful to add that the SSO or the structure, sequence and

15   organization, that that's a legal term that's used in copyright

16   law that's been adopted by the parties in this case.  There has

17   been some suggestion that it's not something that would come up

18   in programming itself, and that's correct.  That's because it's

19   a legal term.

20         **THE COURT:**  Where do you want to make this

21   clarification?

22         **MR. SILVERMAN:**  Right after the sentence that ends --

23   right after the first sentence of that paragraph, Your Honor.

24         **THE COURT:**  But that's paragraph -- line 3?

25         **MR. SILVERMAN:**  Yes.  So it would be towards the end

1  of line 4 of that paragraph -- line 4 on that page.

2          THE COURT:  So line 6 we would add something like --

3          MR. BABER:  How about, Your Honor, just up in line 3,

4  *The declaring code for the packages, classes and methods*

5  *reflect what the lawyers and the judge have referred to as the*

6  *structure, sequence and organization or SSO.*

7          MR. SILVERMAN:  Rather than that, I would say maybe

8  *what the law recognizes as the structure, sequence and*

9  *organization*, but I think that would be fine.

10          MR. BABER:  *Reflects what is known in legal matters*

11  *as.*

12          MS. SIMPSON:  Your Honor, I do think just adding a

13  sentence might be the easiest way.  *The SSO is a legal term*

14  *used in copyright law that has been adopted by the parties in*

15  *this case.*

16          THE COURT:  I'll say, *The term structure, sequence and*

17  *organization is a concept used by lawyers and courts in*

18  *connection with copyrights.  It is not a term used by computer*

19  *scientists.*  How's that?

20          MR. BABER:  I think that's fine, Your Honor.

21          MS. SIMPSON:  That's fine.

22          MR. SILVERMAN:  I think that's fine.

23          THE COURT:  Anything more on 18?

24          MR. SILVERMAN:  Not from Oracle, Your Honor.

25          MR. BABER:  I notice you've got a paragraph break in

1    the wrong place, 13, 14.  *Code* should be up with *declaring*.

2          **THE COURT:**  I don't know how that happened.  There we

3    are.  Sun No. 19.

4          **MR. BABER:**  19, Your Honor, we think some of the

5    language in the first -- second sentence should be changed

6    where it says, *Sun further developed the copyrighted Java API*

7    *library of pre-written code to carry out more advanced*

8    *functions and made it available for all to use with a license.*

9    The first part is clearly talking about the whole shooting

10   match, right, including implementing code because you're

11   talking about the libraries of code that carries out the

12   functions.

13       So we think the second part of the sentence should say

14   something like *and made implementations of it*, or something

15   like that, *available to use with a license.*  So it's clear that

16   this statement about these big libraries of code that carry out

17   the functions --

18          **THE COURT:**  So if I say *pre-written code including*

19   *implementing code*?

20          **MR. BABER:**  That would help.

21          **THE COURT:**  Is that what you're trying to get at?

22          **MR. BABER:**  What I'm trying to get at really is more

23   the next part, the part about *made it available for all to use*

24   *with a license*.  We would acknowledge that you need a license

25   if you want their implementing code for sure.

 1          **MS. SIMPSON:**  Your Honor, we are not willing to limit

 2    the need for a license to the implementing code, as I'm sure

 3    you can imagine.

 4          **MR. BABER:**  That is the dispute the jury is going to

 5    decide, but this is about something different.  This is about

 6    the things you can go buy from Sun in terms of full

 7    implementations, and we acknowledge that is available for a

 8    license fee.  I just want to make clear that that's what we're

 9    talking about.

10          **THE COURT:**  Well, but I go on to say in the very same

11    sentence, *Although the question for you to decide is the extent*

12    *to which, if at all, it may be copied without a license under*

13    *the statutory right of fair use.*

14          **MR. BABER:**  The question for the jury to decide is not

15    whether the entire library that performs the functions is free.

16    We have never argued --

17          **THE COURT:**  I understand that.  But that's why the

18    words *the extent to which* seems to me protects you there.

19          **MR. BABER:**  I don't think it does, Your Honor.  I

20    think we have never suggested that a single line of

21    implementing code could be used without a license.

22          **THE COURT:**  All right.  How about this?  We say

23    *including implementing code* up at the first time.  And then

24    where it says *although the question for you to decide is the*

25    *extent to which, if at all the* --

1    MR. BABER:  Your Honor how about if at that part --

2    THE COURT:  -- *declaring code* --

3    MR. BABER:  The declaring code, exactly, and SSO.

4    THE COURT:  *-- and SSO may be copied without a*

5  *license.*

6    MR. BABER:  I would say *used* rather than *copied*, if we

7  could.

8    THE COURT:  Well, you know, I don't know why you run

9  away from the word *copied*.  It was copied exactly.  It wouldn't

10  work if it wasn't copied exactly.  It wasn't like they

11  accidentally used it.

12    MR. BABER:  I only do it because they call it fair

13  use, not fair copying.

14    THE COURT:  Well, we are going to have some *uses* and

15  some *copies*.

16    MR. BABER:  Understand.  And I'm not going to quibble

17  with the others.

18    MR. SILVERMAN:  We would be happy to call it *fair*

19  *copying* from now on if that would solve the problem.

20    THE COURT:  I'm going to say, *Sun further developed*

21  *the copyrighted Java API library of pre-written code, including*

22  *implementing code, to carry out more advanced functions and*

23  *made it available for all to use with a license, although the*

24  *question for you to decide is the extent to which, if at all*

25  *the declaring code and SSO may be copied without a license*

1   *under the statutory right of fair use*.  It seems to me

2   that's --

3            MR. BABER:  That works, Your Honor.

4            THE COURT:  -- a perfectly fair statement.

5            MR. SILVERMAN:  We're fine with that amendment,

6   Your Honor.

7            THE COURT:  All right.  What else on 18?

8            MR. BABER:  On 18, Your Honor, the next sentence, it

9   talks about -- and I think this is the only reference, at the

10  very end of the sentence, it talks about *pre-written programs*

11  *to carry out various recurring functions*.  The language of the

12  earlier in Paragraph 18, it said they're used to perform *common*

13  *computer functions*, and I don't think the jury has heard

14  anything about *recurring*.  We used --

15           THE COURT:  All right.  Obviously if it doesn't recur,

16  what's the point of doing it?  I mean, if it's a one-time deal,

17  where is the -- where does it say *common*?

18           MR. BABER:  It's in Paragraph 18 on page 11, line 20.

19  That's the parties agreed statement we did with Judge Kim.

20           THE COURT:  All right.  I'll say *common*.

21      What else?

22           MR. BABER:  Nothing else on 19, Your Honor.

23           MR. SILVERMAN:  A couple of things, Your Honor.  The

24  very first sentence, I just want to point out that this is --

25  again, the instruction refers to *Sun developing the Java*

1   *programming language making it free for all to use without a*

2   *license.*  I just think the repetition starts to create some

3   issues with the jury.

4       It's fine to say *the programming language is free for*

5   *everyone to use* once, maybe even twice over the course of the

6   instructions, but I think the repetition starts to be

7   prejudicial.

8              **MR. BABER:**  We think it's absolutely appropriate to --

9              **THE COURT:**  I'm going to say *free for all to use*

10  period and I don't need to say *without a license* here.  And I'm

11  sympathetic to Mr. Silverman's point, but I'm drawing a

12  distinction in the first paragraph between the first they did

13  not require a license and the second they did.  Okay.

14             **MR. SILVERMAN:**  One more quick one, Your Honor.  Lines

15  23 and 24 on page 12, the sentence *anyone using the Java*

16  *programming language,* it says, *is free to write their own*

17  *library.*  We would propose *can write their own library.*  Just,

18  again, the repetition of *free* which is --

19             **THE COURT:**  All right.  I'll put in *can.*

20             **MR. SILVERMAN:**  Or *may.*  Either of those would work.

21             **MR. BABER:**  *May* is a better word, Your Honor.

22             **THE COURT:**  *May.*  Okay.

23       What else on 19?

24             **MR. BABER:**  Nothing else for us, Your Honor.

25             **MR. SILVERMAN:**  Nothing else for us, Your Honor.

1              THE COURT:  How about No. 20?

2          MR. SILVERMAN:  A couple of things from us,

3    Your Honor.  Page 13, line 10, *the pertinent Android versions*

4    *were*.  I think maybe *are* makes more sense in that context.

5              THE COURT:  All right.  All right.

6          MR. SILVERMAN:  Lines 11 and 12, also on page 13, the

7    sentence begins, *Even though the Java programming language was*

8    *freely usable by Google and others,* just another repetition of

9    the Java programming language point.  This is now the third

10   time.  So we'd propose just beginning the sentence with

11   *Google's use of the declaring lines of code*.

12             THE COURT:  We'll take it out there and see if that

13   works.

14          MR. SILVERMAN:  Also in that sentence, Your Honor,

15   *Google's use of the declaring lines of code and the structure,*

16   *sequence and organization of those 37 API packages constituted*

17   *copyright infringement*, the instruction says *under the Federal*

18   *Copyright Act of 1976*.  We think you could omit that phrase.

19             THE COURT:  Is that because it's referenced earlier?

20          MR. SILVERMAN:  No, Your Honor.

21          THE COURT:  All right.

22          MR. SILVERMAN:  I believe this is the first reference.

23             THE COURT:  Well, I do -- okay.  All right.  I just --

24   I mean, I do tell them we're dealing with a 1976 Act.  I

25   wouldn't want somebody to think I'm talking about some other

1  kind of copyright infringement.

2      All right.  I can --

3          MR. SILVERMAN:  If Your Honor wanted to say "under the

4  Copyright Act," I think that's fine.

5      "The 1976" starts to -- the jury might start to wonder,

6  "The 1976," what does that mean?  This seems like a long time

7  ago.  This is more recent technology.

8      Don't want the jury going off on a tangent.

9          THE COURT:  I'll take it out for now.

10         MR. BABER:  (Inaudible) copyright law.

11     (Reporter interrupts.)

12         THE COURT:  Finally, Congress can agree on something.

13  That was the golden era.

14     (Laughter)

15         MR. BABER:  Outstanding year, Your Honor.

16         THE COURT:  Okay.  Let's go to what else have you got

17  on 20?

18         MR. SILVERMAN:  I'm sorry, page 13, the sentence, "The

19  point of the contention is over the declaring code."  This is

20  line 18.  There's a reference to "37 APIs, also known as the

21  header lines."

22     I think the testimony has generally referred to when --

23  when it's named the lines of code as declarations.  I think

24  "headers" has rarely, if ever, come up.

25     So I would either delete that or propose changing it to

1   "declarations."

2          **MR. BABER:**  Google has used "header lines."

3          **THE COURT:**  I'm going to say "also known as

4   declarations or header lines."  I'll just say "also referred

5   to."

6          **MR. SILVERMAN:**  That works for us, Your Honor.

7      In that sentence --

8          **MR. BABER:**  Say again?

9          **THE COURT:**  "Also referred to as declarations and

10  header lines."

11         **MR. BABER:**  That's fine, Your Honor.

12         **MR. SILVERMAN:**  "Declarations or header lines," Your

13  Honor?

14         **THE COURT:**  "Or header lines."  All right.

15         **MR. SILVERMAN:**  The end of that sentence, the way the

16  sentence is set up, it suggests that there is agreement on

17  Google's use in Android of the declaring code, but not

18  necessarily the SSO, the way the -- sort of, the way the

19  sentence structure works out.

20     So we would propose, towards the end of the sentence "as

21  well as the overall structure, sequence and organization of the

22  37 packages," comma, "which Google also used."  And get rid of

23  the rest of the sentence.

24         **MR. BABER:**  Can back up?  We actually have a comment

25  on the earlier part of what he just read.

1    **THE COURT:**  "As well as the overall structure,

2    sequence and organization, which Google conceded and used."

3        I'll put that in there.  But that leads to a question I

4    have for you.

5    **MR. BABER:**  Your Honor, we were going to suggest

6    actually changing "as well as" to use the language, again that

7    we worked out with Judge Kim, which is that "the declaring

8    lines of code, quote, reflect the structure, sequence and

9    organization."

10   **THE COURT:**  That is true.  Where is that?

11   **MR. BABER:**  That's on page 12, Your Honor, line 3.

12   **MR. SILVERMAN:**  The problem with that, Your Honor, is

13   that the Federal Circuit recognized both that the declaring

14   code and the SSO are copyright protected.  So to merge them

15   together conflates them in a way that the Federal Circuit has

16   said they are distinct at least for copyright protection

17   purposes.

18   **MR. BABER:**  The basis of our agreement in front of

19   Judge Kim is that this is the language from the Federal

20   Circuit, that the declaring code reflects the SSO.  That's what

21   Oracle agreed to.

22   **THE COURT:**  I'll take out that -- I'm just going to

23   make a note to conform to what -- to page 12.  But let's --

24   let's pause on that for a minute.

25       Nobody has -- there was one witness that got close to this

1    issue.  What if you -- in fact, one witness, I think it was

2    Oracle's witness, said you could have exactly the same

3    functionality if it was reorganized.  Right?

4            MR. SILVERMAN:  That's correct, Your Honor.

5            THE COURT:  The guy from Vanderbilt, I think, said

6    that.

7         So you can have all the one that has all the security.

8    And if you reorganized it into different packages and classes,

9    then, you know, those declarations have -- start off with the

10   name of the method.  So let's say you change the name.  But,

11   otherwise, it was identical.  I'm talking about the

12   declarations being identical.  But now they're reorganized,

13   scrambled around in a different taxonomy.

14        It seems to me that that would not infringe.  But no one

15   has -- except the witness from Vanderbilt has -- because the

16   functionalities are fair game; right?

17        Now, that's not what happened here.  What happened here,

18   they didn't reorganize it.  So you don't even have to face up

19   to that.  But maybe if you win and we get down to the remedial

20   time, and they just kind of do a little rearranging -- because

21   copyright doesn't protect the idea.  It protects the exact

22   expression.  That's what "copy" means.  You copy the exact

23   expression.

24            MR. SILVERMAN:  So, Your Honor, if they use different

25   names, different declaring code with a different

 1   organization --

 2          **THE COURT:**  The declaring code would be identical

 3   except the names would be changed to protect the innocent.

 4        (Laughter)

 5          **THE COURT:**  So to speak.

 6      So you'd have a different class name, different method

 7   name.  And they would be under different -- they would be

 8   scrambled around in some way that it wouldn't just -- maybe

 9   you're not supposed to answer a question like this, but I've

10   been thinking about this the entire -- not the entire time, but

11   every now and then I wake up at 2:00 a.m. in this case and say,

12   What would the answer to that be?

13      The Federal Circuit did not give us the answer per se.

14      Anyway, I think the point you're getting at is it

15   implicates that point.  All right.  You don't have to answer

16   that.  I'm just thinking out loud.

17      I'm going to change -- Mr. Baber has convinced me.  I'm

18   going to change that to conform to the Judge Kim's wording.

19          **MR. SILVERMAN:**  Your Honor, Oracle would object to

20   that.

21      The language with Judge Kim was about the facts, whether

22   or not the declaring code may reflect the structure, sequence

23   and organization.

24      But as a legal matter, the Federal Circuit has said that

25   they are separate things for copyright protection purposes.

1        **THE COURT:**  But how could they be separate in this

2   case?  Because the SSO is part of the name.

3        **MR. BABER:**  Well --

4        **THE COURT:**  You can't get to the file unless you call

5   it up by the package name, class name, with a dot in between,

6   and then the method name.

7       And those are all part of the declaring line of code.  So

8   by definition if you change the SSO, you're going to change the

9   declaration.

10        **MR. BABER:**  More to the point, Your Honor --

11        **THE COURT:**  Am I right?  Is that correct?

12        **MR. BABER:**  You're correct, Your Honor.

13        **THE COURT:**  I thought that's what the witnesses said.

14        **MR. BABER:**  More to the point, though, the way the

15   case was tried, neither party distinguished between these are

16   arguments on the declaring code and these are separate

17   arguments on the SSO.  The jury is going to get one question

18   that covers them both, that we both --

19        **THE COURT:**  That's true.  No one came in and said

20   look, they did a little game and just changed the names to

21   protect the innocent, but otherwise it was exactly the same.

22   No one brought that scenario up.  And I'm trying not to bring

23   it up myself.

24       I'm not trying to inject an issue in here.  But I'm just

25   telling you all who have lived with this that I see the issue

1    there.  And I -- it wasn't clear to me that the -- that the

2    Federal Circuit said that if the names were changed -- I don't

3    know.  I have to go back and look at it and see.  I'm not sure

4    what the Federal Circuit said on that.

5         Okay.  Your objection is noted for the record.  I'm going

6    to go ahead.

7         21.  Number 21.  Anything that you want to raise that

8    hasn't already been raised and preserved for the record in the

9    way that I suggested at the outset would be deemed preserved?

10        **MR. BABER:**  Nothing from us on 21, Your Honor.

11        **MR. SILVERMAN:**  Oracle will stand on its earlier

12   objections, Your Honor.

13        **THE COURT:**  All right.  Thank you.

14        22.

15        **MR. BABER:**  Your Honor, on 22 we have a request, which

16   is after --

17        **THE COURT:**  Do you want me to take out "1976"?  I'm

18   going to take it out.

19        **MR. BABER:**  Oh.

20        **THE COURT:**  Because Mr. Silverman has got a point.  I

21   didn't mean for the jury to be thinking, oh, this is ancient

22   law.

23        To me, 1976 is pretty recent.

24         (Laughter)

25        **THE COURT:**  Maybe they will think it's old.  I'll just

1  say "the Copyright Act."

2        **MR. BABER:**  Yeah.

3        **THE COURT:**  All right.

4        **MR. BABER:**  Underneath the statutory quote, Your

5  Honor, where you say, "I have just quoted for you the right of

6  fair use exactly as enacted by Congress" --

7        **THE COURT:**  Yeah.

8        **MR. SILVERMAN:**  -- we can take out "1976," say

9  "enacted by Congress."

10        **THE COURT:**  I'm going to.

11        **MR. BABER:**  Add a sentence that says something along

12  these lines:  As you just heard, the statute includes several

13  examples of some of the types of uses that may be found to be

14  fair uses, but that list is not exhaustive or exclusive.  A use

15  may be found to be a fair use even if it is for a purpose other

16  than one of the illustrative purposes listed in the statute.

17      The reason we suggest that, Your Honor, is because

18  *Campbell* -- the Supreme Court addressed this in *Campbell*

19  specifically.

20      They said, in the United States these days virtually all

21  of the listed activities in the preamble to 107 are conducted

22  for profit.  And those can't be limiting.

23      *Campbell* and many other cases tell us the fact something

24  is done for profit and doesn't fit in one of these little

25  cubbyholes, that doesn't disqualify it from fair use.

1    We've already seen in the opening statement, Your Honor,

2  Mr. Bicks got up there with only this part of the statute, the

3  preamble, and he struck through each of those words, clearly

4  suggesting to the jury, well, if you're not comment, you're not

5  criticism, you're not news reporting, you lose.

6    And that's not what the statute says.  It's -- twice in

7  the same phrase it makes it clear it's illustrative.  It says

8  "such as" and "including."  So these are not exhaustive, and we

9  think the jury should be told that.

10        **THE COURT:**  Do you have proposed language there?

11        **MR. BABER:**  I do, Your Honor.

12        **THE COURT:**  Show counsel and me your proposed

13  language.

14       **MR. SILVERMAN:**  Your Honor, I think this is addressed

15  by the rest of the instructions.  Nowhere in the instructions

16  does it suggest that -- anything about 107 as exclusive.

17    In fact, in paragraph --

18        **THE COURT:**  But it is true that Mr. Bicks -- I thought

19  it was very effective, too.  I liked that graphic.

20        **MR. BICKS:**  Yeah, but --

21        **THE COURT:**  He X'd through it with a line, a big heavy

22  line.  "It's not scholarship.  It's not news reporting."

23    And then there was nothing left.  So Google looked pretty

24  guilty at that point.

25        (Laughter)

 1              THE COURT:  But Mr. Baber is right.  It's not an

 2   exhaustive list.

 3              MR. BICKS:  Judge, I didn't say it was an exhaustive

 4   list, in any event.

 5              THE COURT:  Yes, but your graphic sure made it look

 6   that way.

 7              MR. BICKS:  Well, I went through it.  I said it's none

 8   of that.  Then I said we've got to look at the factors to see

 9   if they fit into the exception.  That's what the statute says.

10   That's what the construction says.

11              THE COURT:  I think something along these lines should

12   be given.  I want to make sure it's not --

13              MR. SILVERMAN:  Your Honor, I think the instruction as

14   proposed is pretty argumentative.

15       If the Court feels like it needs to say that this is --

16   that this is not exclusive, that these examples are not

17   exclusive, sort of in passing, I think that that would be fine.

18       But I don't know that we need two or three sentences on

19   it.

20              THE COURT:  Well, let's see.

21       All right.  The first sentence will do.  We don't need to

22   have the second sentence.

23       All right.  I'm going to give the first sentence, okay, of

24   the Baber -- what's the word?

25              MR. BABER:  I don't think you need to finish the

1    sentence.

2             THE COURT:  What?

3             MR. BABER:  Let's go on.

4        (Laughter)

5             THE COURT:  Addendum or something.

6             MR. SILVERMAN:  Your Honor, I'm sorry.  Can I go back

7    to 20 for one moment?

8        Paragraph 20, this is on page 13, lines 18 and 19.  At the

9    end of the sentence it says "37 APIs," at the end of line 18.

10   Could we change that to "37 API packages"?  That's

11   consistent --

12            THE COURT:  I think that is a good change everywhere.

13   They should always be referred to as "packages."

14            MR. BABER:  So the next line --

15            MR. SILVERMAN:  Next line as well.  And we'll search

16   around and find if there are any other ones.

17            THE COURT:  That's a very good change.  Because

18   "packages" is easier to understand.

19       I think we ought to get rid of the word "API," it's been

20   so misused in this case.

21       All right.  Okay.  Back on 22.

22            MR. BABER:  Nothing else from us on 22, Your Honor.

23   Even though the word "copying" is in there.

24            THE COURT:  Number 23.

25            MR. SILVERMAN:  Nothing else from us on 22, Your

1      Honor.

2          On 23, page 15, lines 3 through 5, it says "Our Courts

3      uniformly hold the first statutory factor calls for an

4      evaluation of transformative."

5          We would just take out "uniformly."

6              THE COURT:  Well, look.  I had "Supreme Court" in

7      there before.

8              MR. SILVERMAN:  This is better than that.

9              THE COURT:  No.  Wait a minute.

10          Then you said oh, it's wrong to say the Supreme Court buys

11      into transformative.  And so I said -- you know, what am I

12      supposed to do?

13          So then I said, okay, I have to explain how come

14      "transformative" is part of the thing when the statute itself

15      doesn't call it out.  Otherwise, the jury could think it's just

16      this one crazy judge talking.  But it's actually the Supreme

17      Court of the United States.  And so then I said okay.  I

18      watered it down to "The Courts uniformly hold."

19          So I'll give you a choice.  We'll either say "Courts

20      uniformly hold" or we're going to say "the Supreme Court of the

21      United States."

22          Which would you prefer?

23              MR. SILVERMAN:  I think we like the current version,

24      Your Honor.

25              THE COURT:  All right.  I thought you would.

1       (Laughter)

2               **THE COURT:**  So there.  Okay.  Any more on 23?

3               **MR. BABER:**  Fine with 23, Your Honor.

4               **THE COURT:**  24?

5               **MR. BABER:**  24, Your Honor, I want to raise an issue

6       with the Court in terms of trying to help the jury.

7           I acknowledge that the language on line 9, right, talks

8       about "rather than merely superseding the objects of the

9       original creation," it's right out of the cases.  No doubt

10      about it.  I just don't know that's going to mean anything to

11      the jury.

12          And I was going to suggest, and based on the way the

13      parties tried the case, whether we should say something in more

14      normal English like "rather than merely serving as a substitute

15      for the original work."

16              **THE COURT:**  What do you think?

17              **MR. SILVERMAN:**  Your Honor --

18              **THE COURT:**  That's exactly what your expert said.

19          Ms. Hurst is coming forward to say you should snap that

20      up.

21              **MS. HURST:**  No, I'm not, Your Honor.

22              **MR. SILVERMAN:**  The language comes directly from

23      *Campbell*, Your Honor, as quoted by --

24              **THE COURT:**  I'm going to stick to "superseding" unless

25      you agree.  That's what your expert said, "substitution."

1           MR. BABER:  I'm just not -- I agree it's from

2    *Campbell*.  The Federal Circuit quoted it.  No doubt about it.

3    I'm just trying to use words that mean something to the jury.

4           THE COURT:  I think it's a fair point.

5           MR. SILVERMAN:  Your Honor, if the question is just

6    the word "objects," if the Court wants to change that to

7    "superseding the purpose of the original creation" I think we

8    would be fine with that.

9           MR. BABER:  It's not purpose.  This is different from

10   the purpose test.

11          MR. SILVERMAN:  I think the Court --

12          THE COURT:  "Objects" is also from the Federal

13   Circuit.

14          MR. BABER:  Absolutely.  The whole phrase is from

15   *Campbell*.

16          THE COURT:  I tried to stick to what the Federal

17   Circuit said, except where Ms. Hurst said I had to add into it,

18   like the proprietary of the defendant's conduct.  That's not in

19   the Federal Circuit opinion, but I was persuaded that it

20   probably should be in there given the *Harper & Row* decision.

21       So this is right out of the Federal Circuit.

22          MR. SILVERMAN:  Your Honor, we're in favor of keeping

23   it out.

24          THE COURT:  You're okay with this?

25          MR. SILVERMAN:  Yes, Your Honor.

1      **THE COURT:**  I think we're going to stick with it.  I

2  agree with Mr. Baber, it's legalese and it's not

3  well-explained.

4      If you all could come up with a good extra sentence.  I

5  think "substitution" is not a bad one, but you don't agree with

6  it.

7      That's what your expert said on the Oracle side.

8  "Substitution."

9      All right.  But I'm overruling that objection.  What else

10  do you have?

11      **MR. BABER:**  Nothing else on 24.

12      **MR. SILVERMAN:**  On 24, we'll stand on our previous

13  objections.

14      **THE COURT:**  All right.  By "previous" I'm talking

15  about the ones that I said were fair game.  There were then

16  three rounds of comments and critiques and objections to what I

17  had sent out as proposed instruction to the jury.

18      **MR. SILVERMAN:**  Understood, Your Honor.  There's no

19  changes in paragraph 24 from the -- from the --

20      **THE COURT:**  I can't be positive, but I don't think so.

21  But it's very close.

22      All right.  Number 25.

23      **MR. BABER:**  Your Honor, 25, on the second line you

24  talk about "so long as the material and the context into which

25  it is copied."  We would suggest "the context in which it is

1    used."

2        Because that suggests you, sort of, already have an

3    existing context and you copy something into it.  I'm not sure

4    exactly what that would mean.  So --

5            THE COURT:  Where is this?

6            MR. BABER:  Second line of 25, line 21 of the --

7            THE COURT:  What's your version?

8            MR. BABER:  "So long as the material and the context

9    in which the material is used."

10           THE COURT:  All right.  Well, this is a case where I

11   think "copied" probably sounds too sinister.  In which it what?

12           MR. BABER:  "In which it" or "in which the material is

13   used."

14           THE COURT:  "Which the material is used."

15       All right.  We'll -- we will go with "used" instead of

16   "copied."  All right.  Okay.

17           MR. BABER:  Otherwise, nothing else, nothing else

18   until the end of 25, Your Honor.

19           THE COURT:  What's your other one?

20           MR. BABER:  Well, it's actually the next point, which

21   goes to "commercial."  There's several --

22           THE COURT:  Oh, is that 26?

23           MR. BABER:  No, it's also at the tail end of 25.

24           THE COURT:  Tell me your problem on that.

25           MR. BABER:  The issue with that, Your Honor, is the

1    word "extent."

2        Because if you look at the cases, the case -- I'm not

3    aware of any case that looks at, quote, extensive commercialism

4    in terms of sale.

5        Courts look at the significance of the commercialism in

6    light of the other factors.  But it's not -- if you look at

7    *Sony* and *Sega*, the Ninth Circuit never talked about, well, how

8    many virtual game stations did connect excel.  Or in *Accolade*,

9    the Court didn't look at -- and you have to look at fair use

10   as, is it fair or not at the time the use is first made.  It's

11   not measured by later was it successful or not commercially.

12       So it's a commercial -- commercialism, commercial use is,

13   sort of, a binary thing.  It either is or isn't.  We have

14   admitted it is.  We have acknowledged that.

15       But it's now for the jury to decide what's the

16   significance of that.  What's the significance of the fact that

17   Google's --

18           THE COURT:  I think -- well, let's see.  What's your

19   view over there?

20           MS. SIMPSON:  On this point, Your Honor, or on the

21   instruction altogether?

22           THE COURT:  What?

23           MS. SIMPSON:  On the commercialism?

24           THE COURT:  On the commercial point.

25           MS. SIMPSON:  We don't agree with that.

1    The extent of commercialism is, you know, exactly

2 something that needs to be weighed.  And this is a factor that

3 has a bunch of elements to it, and they have to be weighed

4 together.

5    So the fact that you need to look beyond, sort of, the

6 mere fact that it's commercial to how commercial and how it was

7 commercialized is absolutely relevant.

8    MR. BABER:  I don't necessarily disagree with that,

9 Your Honor.

10    They can probe as much as they want the commerciality of

11 the use.  But I don't know if that's accurately characterized

12 as the extent of the use.  "Extent" sounds like it's something

13 you can measure.

14    MS. SIMPSON:  That language exactly --

15    (Unreportable simultaneous colloquy.)

16    MS. SIMPSON:  -- is used in *Sony*, Your Honor.

17    THE COURT:  See, here's why I intentionally used the

18 word "extent."  Something could be slightly transformative,

19 moderately transformative, Einstein-level transformative.  And

20 we've got to weigh that against commercial purpose and the

21 other factors too.

22    So let's say the jury were to conclude that the Android

23 and the use of the code here was hugely transformative.  I

24 still think that they -- they can't just say, oh, it was just

25 moderately commercial or small.  They've got to also weigh what

1    the -- the commercial part.  And so I think --

2         MR. BABER:  The problem, Your Honor, is the one, I

3    think, about timing.  Right?

4         Imagine -- imagine if instead of this case having first

5    gone to trial -- well, let's assume -- this is back in 2012;

6    right.  And the jury is going to decide is it a fair use or

7    not.  Right.  The jury has to decide that based on the factors

8    about the use at the time the use was made.  And if that jury

9    had reached a verdict on those issues, that's -- there wouldn't

10   be like it was fair use back then because Android hadn't yet

11   taken off, but now it's not fair use because Android is doing

12   much better.

13        It's not a -- I don't think that's a relevant --

14   absolutely, the fact it's commercial, the degree of

15   commercialism.  But it's not a measurement thing where you can

16   say it's an extent.  Because that is -- whether or not the

17   defendant's product is a commercial success, again, I don't

18   know of any case that has said that's how you look at

19   commercialism.

20        It either is commercial or it's not commercial.  And then

21   how do you weigh that?  How commercial is it versus how

22   transformative is it?

23        THE COURT:  Yeah, but -- all right.  Maybe.  But,

24   actually, in this case the -- inside Google they did see it as

25   a home run even before they launched.

1          **MR. BABER:**  Absolutely.  It was significantly

2   commercial.

3          **THE COURT:**  So --

4          **MR. BABER:**  No dispute about that.

5          **THE COURT:**  How does that point help you?

6      Really, from day one, they thought it was going to be a

7   huge success.

8          **MR. BABER:**  I just -- I just have the issue, Your

9   Honor, with the word "extent," to the extent that suggests it's

10  some sort of measurement you can make.

11     I think the word "significance" conveys the same thing,

12  and, frankly, allows both parties to argue whatever they want

13  to argue.  They can still argue.  Measure it by the billions of

14  dollars.  But I just don't think "extent" is the right way to

15  frame it to the jury.

16         **THE COURT:**  Plus, you know, every -- it was used -- it

17  wasn't like a school teacher handing out copies to the class on

18  one occasion.  This -- this was up for years on your website.

19  And it was updated.  So every time there was a new use -- I'm

20  going to leave it.  I'm going to leave it as it is.

21     All right.  Did you have any other changes you want to

22  make on 25?

23         **MS. SIMPSON:**  Your Honor, I think we have a global

24  objection to this --

25         **THE COURT:**  Go ahead.

1              **MS. SIMPSON:**  -- instruction.

2        We -- you know, we vetted extensively the "transformative"

3   definition.  We thought we had it set in instruction 24.

4        25, I think, is reopening a bunch of doors that we had

5   already visited amongst the parties and Your Honor.

6        In particular, you know, the lead-off sentence that says,

7   you know, you don't need to modify anything in the new work is

8   directly contrary to the language in the Federal Circuit

9   opinion that says very clearly that if you make no alteration

10  to the expressive content or message, the work is not

11  transformative.

12       So I understand you're making a distinction here, but the

13  language, as it's worded, suggesting that you -- you know, if

14  you don't modify that you, you know-- that you need not modify

15  to be transformative, that's just not accurate.

16             **THE COURT:**  Well, but I -- again, we have to deal with

17  the United States Supreme Court, not just the Federal Circuit.

18       And in the *Sony* case, the copies that were made were exact

19  copies of the TV programs that were copyrighted.  They were

20  exact.

21       And I -- it is a correct statement of the law by the U.S.

22  Supreme Court that you don't have to modify the work.  The old

23  work can be carried forward to a new work.  And as in the *Sony*

24  case, if the context is transformative enough then that's okay.

25  That's fair use.

1          **MS. SIMPSON:**  Well --

2          **THE COURT:**  I can't deny Google that point of law

3     merely because the Federal Circuit didn't call it out.  I've

4     given you points of law that the Supreme Court has called out

5     that the Federal Circuit did not put in their opinion.

6          **MS. SIMPSON:**  Right.  Understood, Your Honor.

7          But *Campbell* itself, also the Supreme Court, says

8     specifically that *Sony* is not a transformative case and that

9     the use made in *Sony* is not transformative.

10         So we can't use that as an example of something that is

11    transformative because it's an exact copy because later the

12    Supreme Court acknowledged that was not a transformative use.

13    It was a fair use for other reasons.

14         **MR. BABER:**  Your Honor, we have been through this in

15    the earlier briefs and critiques.  I think this charge is

16    exactly right.

17         **THE COURT:**  Let's pause on that.

18         Is that true that the pretty woman case said that the *Sony*

19    thing was not transformative?

20         **MR. BABER:**  Yes, Your Honor.  And in our brief we said

21    *Sony* was, sort of, in the pretransformativeness days; right.

22    But I don't think anyone would argue today that the result

23    would be different in *Sony* under transformativeness.

24         **THE COURT:**  What did the Supreme Court say was how

25    they got to fair use in the *Sony* case?

1    **MR. BABER:**  They got to fair use looking at all four

2  of the factors.  They were obviously creative works.

3       The purpose was to allow the time-shifting by consumers.

4  That's what really made the difference, I think, in the court

5  in *Sony*.

6       It was the whole work.  So there was no issue of about how

7  much of it you took.  There were creative works, TV shows, et

8  cetera.  *Sony* was making money by selling the Betamaxes.  But

9  the issue really was no market harm.  And the overall purpose

10  was to allow consumers to time shift and watch the movies

11  whenever they wanted.

12       But on the *Campbell* point, Your Honor, this is not

13  inconsistent with *Campbell*.  The language Ms. Simpson just

14  quoted from *Campbell* --

15       (Unreportable simultaneous colloquy.)

16    **THE COURT:**  -- *Campbell*, they used exact words from

17  the Roy Orbison song, didn't they?  At least certain verses

18  were exactly the same.

19    **MR. BABER:**  They used some.  Some were different.

20    **THE COURT:**  Am I wrong about that?

21       I thought that the words -- that was the whole point, was

22  that the parody used the same words.  And that was the basis

23  for the copyright infringement, was it was the same words.

24    **MS. SIMPSON:**  Your Honor, both of those cases are

25  different; right.

1          So *Sony*, the fair use was because it was private use in

2    your home to time shift shows.  And that was the driving -- the

3    driving factor behind the decision in *Sony*.  And in the other

4    case it was a parody.  So there you were looking at whether the

5    use was fair for the purposes for which it was used.  And that

6    was a parody.

7          We don't have either one of those --

8          **THE COURT:**  You're not answering the question,

9    Ms. Simpson.

10         In the *Campbell* case, the words were the same without

11   change.  It was a new context.  Parody was a different context.

12   But the words carried over were the same.

13         **MS. SIMPSON:**  I believe in many cases they were.

14         **THE COURT:**  All right.  So what I'm trying to say here

15   is, in order to be a parody -- or not a parody, transformative,

16   the material copied need not be modified in the new work.  The

17   context, the new context has to be -- something has to be

18   transformative.  But you don't look just at the words.

19         **MS. SIMPSON:**  I'm being corrected, Your Honor.  The

20   refrain was the same, but the rest of the words were different.

21         **THE COURT:**  Okay.  But the -- that's part -- that's

22   the refrain.  That's enough.  That's what the whole lawsuit was

23   about, was using that refrain exactly.

24         **MS. SIMPSON:**  Your Honor, I don't think we dispute the

25   fact that you can have a fair use when you've made an exact

 1   copy.

 2       I think what we dispute is the direction that this

 3   instruction is taking, which is, essentially instructing the

 4   jury, you know, particularly by the last line on page 15, that

 5   you may not disqualify it from being transformative merely

 6   because the declaring code and SSO were carried over without

 7   change is essentially instructing the jury if they find that --

 8   you know, that they can't find, you know, that it wasn't

 9   transformative.

10       THE COURT:  Well, there's plenty of argument that it

11   was not transformative in this case, notwithstanding this.

12       You have put evidence before the jury that the jury could

13   conclude that Android, yeah, new product, so what; it's not so

14   dramatically different from other platforms that existed; and,

15   therefore, the context is not all that different; and,

16   therefore it's not transformative.

17       This doesn't say you've got to find that it is

18   transformative.  It just says you can't disqualify merely

19   because the same -- it was carried over without change.

20       MS. SIMPSON:  Your Honor, I think it just goes too far

21   the way it's written here.

22       I mean, I think the jury is going to read this.  And if

23   they find that, you know, it was carried over without change,

24   that, you know, they -- they have to find one way or another.

25       MS. HURST:  Your Honor, just for the record, I want to

1   make sure we preserve this.  It's actually quite different, the

2   lyrics in *Campbell*.  It's "big hairy woman, bald-headed woman,

3   two-timing woman."

4        **THE COURT:**  That's the part that would be the rest of

5   the 166, the Android.

6        **MS. HURST:**  Well, there's not much else, Your Honor.

7   There's only three lines that say "pretty woman."  The rest are

8   all different.

9        **THE COURT:**  That's the declaring code.

10       (Laughter)

11       **THE COURT:**  That's the declaring code.

12       **MR. VAN NEST:**  Yes, yes.  You got it.

13       **MS. HURST:**  I don't think there are a hundred packages

14   here, Your Honor.

15       **UNIDENTIFIED SPEAKER:**  More than 0.4 percent.

16       (Laughter)

17       **THE COURT:**  And it's even the same SSO.  They've got a

18   chorus --

19       (Laughter)

20       **MS. HURST:**  But it does look like 2 Live Crew wrote

21   these lyrics.

22       (Laughter)

23       **MS. SIMPSON:**  Your Honor, our point, I think, is that

24   we covered all this in instruction 24.  It really does -- it's

25   a universal instruction.  It takes all the law.  We vetted it

1    extensively.  Adding on yet another piece to transformative --

2         THE COURT:  I know.  But I did say I was going to

3    adjust it.

4         And I listened to the way the case was tried in the

5    opening statements.  And you made a big point to the jury that

6    it was carried over exactly the same without change.  And

7    that's true.  But it was carried over to a new context.  And

8    that new context could qualify it as transformative, I think,

9    under the law.

10        MS. SIMPSON:  Well, Your Honor, you covered that

11   context concept in 24.

12        THE COURT:  Well, show me where it is.

13        MR. BABER:  Your Honor, I disagree.

14        THE COURT:  Wait.  Wait.  Wait.  Show me where I

15   covered it.

16        MR. BABER:  It's the third from the last sentence,

17   Your Honor, where you do say the work is -- I'm sorry, it's the

18   one -- it's the sentence in the middle of the paragraph.

19   Starts on line 11.  "A use is considered transformative only

20   where a defendant changes a plaintiff's copyrighted work or

21   where the elements remain unchanged, used in a different

22   context."

23        So you have that buried up there in the middle of 24.  We

24   think the instruction 25 -- because that's what's happened in

25   this case, we think it's especially appropriate to give the

1    jury paragraph 25 so that they know how to apply that language.

2         MS. SIMPSON:  Your Honor, if we were going to do that,

3    then we also need an instruction on how to apply the

4    superseding use.

5         THE COURT:  I asked you for a good example on

6    superseding use, because I do think that term "superseding,"

7    could use some explanation.  But you didn't want to make a

8    change.

9         MS. SIMPSON:  Your Honor, we're sticking with the

10   language that's used in the decisions that we've been

11   discussing.

12       It is a -- there's a balancing act going on here, right,

13   Your Honor.  This language that we've agreed to in 24, that

14   we've all, you know, vetted in 24 is language that comes out in

15   the case law.  And we've been back and forth on it numerous

16   times.

17       If we're going to start pulling out pieces of that

18   instruction and start enumerating or elaborating on individual

19   aspects of it, then, you know, we might have to revisit 24 as

20   well.

21        MR. BABER:  Your Honor, 25, I think, is appropriate.

22   It's balanced.  It tells the jury specifics about the law.  You

23   give them Google's contention.  Oracle's contention.  You say

24   it's up to them.

25       But you can't just rule it out on the ground there's no

1    change.   And then you go on to say, and even if you find

2    transformative, now you go to commercialism.   Which, of course,

3    they love.

4         MS. SIMPSON:   Your Honor, we haven't gone to the

5    factual inaccuracies in this instruction.

6         THE COURT:   Tell me the factual inaccuracies.

7         MS. SIMPSON:   The contention that is indicated here,

8    that Oracle contends that Sun was already adapting the

9    copyrighted works for use on mobile devices, is not accurate.

10        THE COURT:   I want to get -- let's make it accurate.

11   What do you contend in that respect?

12        MS. SIMPSON:   So the mobile device market, Oracle was

13   already in -- or Sun was already in the mobile device market.

14   So suggesting that we were --

15        THE COURT:   Why don't we say "using and adapting," or

16   "using."   "Using the copyrighted works."

17        Okay -- I want to make it -- I'm trying to -- I meant to

18   say it as clearly as I could, what you were actually

19   contending.   So this I will change.

20        MS. SIMPSON:   Your Honor, I just don't think this is

21   the correct focus of the transformative question.

22        THE COURT:   Well, that's a different point.   You made

23   that point.   And I'm going to rethink about it.

24        But I feel like -- I want the facts to be -- your argument

25   to be factually correctly portrayed here.

1    I can say Sun was already using the copyrighted works for

2  mobile devices.

3         **MS. SIMPSON:**  Your Honor, we also need to cover the

4  licensing piece.

5         **THE COURT:**  "Using the copyrighted works for mobile

6  devices and licensing"?

7         **MR. BABER:**  "Using and licensing."

8         **THE COURT:**  "Using and licensing."

9         **MR. SILVERMAN:**  "Using, licensing and adapting."

10        **THE COURT:**  "And adapting."  All right.  All of those

11 can be done.

12    All right.  But I am going to think about whether or not

13 this is making too big a point out of it.  But the earlier

14 thing is just a phrase in a long sentence, in a long paragraph.

15 And it's a bigger point for the jury to understand than that,

16 maybe.

17        **MR. BABER:**  Your Honor, while we're there, we would

18 suggest that we would also like you to rephrase Google's

19 contention in that same paragraph a little bit.

20        **THE COURT:**  All right.  I want to get your --

21        **MR. BABER:**  Okay.  This is on line 22.  "In this case,

22 Google contends that it used the exact lines of declaring code

23 at issue and their SSO together with new implementing code and

24 other technology as part of a new platform for mobile devices."

25    I think you want to stay away from the word "adaptation"

 1    for sure, Your Honor, because that goes to the whole derivative

 2    work thing.   That's one of the statutory words for derivative

 3    work.

 4        So "with new implementing code and additional technology

 5    as part of a new platform for mobile devices."

 6             MR. SILVERMAN:   Your Honor, I think that the "and

 7    other technology" part runs into your order already on

 8    incorporating into a broader work.

 9        You already issued an order on transformative use, saying

10    that incorporating into a broader work is not a transformative

11    use.

12             MR. BABER:   Paragraph 24 says, "A use is

13    transformative if it adds something new."   We added 99.9

14    percent new.

15             THE COURT:   Wait a minute.

16        What was that part about a platform?

17             MR. BABER:   "New implementing code and additional

18    technology as part of a new platform for mobile devices.

19             THE COURT:   If I use this, at least I'm going to say

20    your contention correctly.

21             MR. SILVERMAN:   One more piece on our contention, Your

22    Honor.   At the end of the sentence, "mobile and other devices"

23    for Oracle.

24             THE COURT:   All right.   Okay.

25             MR. SILVERMAN:   We want to preserve for the record,

1  Your Honor, we think paragraph 24 covers everything you need.

2  And to the extent paragraph 25 adds anything new or changes

3  anything from 24, we object.  We think we should stick with 24.

4         THE COURT:  Thank you.

5      Number 26.

6         MR. BABER:  I won't raise the "extent" issue again.

7  So nothing else on 26, other than --

8         THE COURT:  All right.  Number 26.

9         MS. SIMPSON:  Your Honor, I think we would just note

10  that "extent" comes straight out of the case law.  *Sony* and the

11  Dr. Suess case.  That language is from the law.

12         THE COURT:  Okay.

13         MR. SILVERMAN:  Your Honor, just one other thing.

14      There was a slight change in 26.  And so just to make sure

15  we've preserved the issue, we do think that the instruction

16  should say, "In this case, all agree that Google's use was

17  entirely commercial in nature."

18         THE COURT:  No.

19         MR. SILVERMAN:  We know that you've ruled on it, Your

20  Honor, but --

21         THE COURT:  You make that point, but that is so

22  argumentative I can't put that.

23      That was something that came from argument at the Federal

24  Circuit.  And the Judge asked Mr. Van Nest, and, yes, he

25  conceded it.  But that's -- that's just give and take between

1    and an oral argument at the appellate level.

2        It would be so unfair.  Because then if you say "entirely

3    commercial" then that rules out everything else, because

4    there's nothing left after you say it's entirely something.

5    It's a hundred percent commercial.

6        And that's just not a fair -- I don't think that's what

7    the judge meant or what Van Nest meant.  And I'm not going to

8    do that.

9        Okay.  Your point is preserved for the record.

10       All right.  Anything else on 26?

11           MR. BABER:  Nothing else from us, Your Honor.

12           THE COURT:  27?

13           MR. BABER:  Several points on 27.

14           MR. SILVERMAN:  I'm sorry.  One second, Your Honor on

15   26.

16       (Pause)

17           MR. SILVERMAN:  Your Honor, the last two sentences of

18   paragraph 26, "To put it differently" is how it begins.  We've

19   objected to this previously.  We think that those sentences

20   should be omitted; that paragraph 26 should just be about

21   commercial use; that there shouldn't be a back and forth here

22   between commercial and transformative.

23       Because there's been a change to paragraph 26, we just

24   want to make sure that those arguments are preserved.

25           THE COURT:  I'll take those last two sentences out --

1        **MR. BABER:**  Your Honor, they come straight out of the

2    case law.  They should stay in.

3        **THE COURT:**  I don't know if they come straight out of

4    the case law.  I think I invented those myself.  But they were

5    my view of what the case law says.  I'm just trying to explain

6    it to the jury.  I'm going to leave it in.

7        All right.  Number 27.

8        **MR. BABER:**  27, Your Honor, as you know, you've added

9    some more in this most recent version.

10       The first issue I want to raise is, up until yesterday,

11    the charge never had the phrase "bad faith" in it anywhere;

12    right?

13       This factor was only about the propriety of Google's

14    conduct; whether or not there's evidence Google did not act in

15    good faith.

16       Now it reads as if the jury has got to make some decision;

17    was it good faith or bad faith?  And that's not the context of

18    this proprietary factor.

19       As the Court said in *Harper* -- I'm not going to reargue

20    our point that this whole thing should come out.  We still

21    believe that.  But in *Harper* the Court basically said, we

22    presuppose good faith for fair use; right.  And if there's some

23    facts that show that the defendant was not acting in good faith

24    when they made the fair use, then you can take that into

25    account on this factor, okay.

1          But I don't know that it's fair to set it up and say it's

2     good faith or bad faith.  It's just you should look and see is

3     there anything about the proprietary of Google's conduct that

4     shows it wasn't acting in good faith?

5          So we would ask that "bad faith" come out of this

6     instruction altogether.

7               THE COURT:  What do you say over there?

8               MS. SIMPSON:  Your Honor, I think it's a balanced

9     presentation this way.  And the jury might not fully understand

10    what these terms mean.  And suggesting that there's two sides

11    of the coin makes sense from our perspective.

12              MR. BABER:  Your Honor, if we get to Phase Two and

13    Oracle maintains its claim for statutory damages, the jury is

14    going to be called upon to answer yes or no, willfulness;

15    right.  They're going to have to make, at that point, a binary

16    choice.  Good faith/bad faith.  Right.

17         This is not the time and I don't think the cases say this

18    is what the jury should be doing.  At this point, they should

19    be just looking at is there anything here that calls into

20    question Google's good faith.  We don't have to decide were

21    they good actors or bad actors.  If there's not something that

22    calls into question, this factor does not weigh against Google.

23         So we don't think it's appropriate to start now talking

24    about bad faith all of a sudden.

25              THE COURT:  I disagree with your comment.  But I think

1   I can make the same point by saying "meaning good faith or

2   not," "evaluating good faith or not."

3         **MS. SIMPSON:**  Your Honor, the *Harper* decision, I

4   believe, disqualifies you from fair use if you're acting in bad

5   faith.  So I don't think that it is a far reach to include "bad

6   faith" in the instruction at this point.

7         **THE COURT:**  I remember that.  It was an egregious set

8   of facts.  It was literally stolen in that case.

9         **MR. BABER:**  That was the purloined unpublished

10  manuscript, Your Honor.

11        Even in *Harper*, it didn't disqualify it, like end of

12  story; we're not going to look at the factors.  *Harper* went on

13  and looked at all the factors.

14        **MR. SILVERMAN:**  This instruction doesn't disqualify

15  it.  It says that it's one the factors.

16        But *Harper* says that fair use presupposes good faith and

17  fair dealing.

18        **THE COURT:**  All right.  I'll consider it.

19        What else do you have on 27?

20        **MR. BABER:**  The next thing I have, Your Honor, is in

21  the second paragraph, which starts on line 24, which is the

22  language you just added about recognized practices in the

23  industry.

24        Instead of saying, "The extent to which Google relied on

25  or contravened," rather than any concept of reliance, we think

1    it should just be a more neutral, Did Google act in accordance

2    with or contrary to any recognized practices in the industry?

3            THE COURT:  Well, here's the problem with that:

4    First, I want to go back and remind everyone that we -- the

5    Federal Circuit decision did not call out propriety of the

6    defendant's conduct at all.  That was not a factor that the

7    Federal Circuit opinion called out.

8            However, Oracle pointed out that the *Harper & Row* decision

9    by the Supreme Court did call that out as a factor, at least in

10   that particular case.  And I read the decision.  It seems to me

11   that a district judge can't ignore what the Supreme Court has

12   said.  So we put this factor in.

13           Well, once you decide that the copyright owner can show

14   that the defendant did not act in good faith, the defendant is

15   entitled to show they did act in good faith.

16           And, frankly, that's the main way in which all of your

17   so-called custom evidence got in, was because anyone who's

18   accused of bad faith has a right to get up on the stand and

19   explain, no, I acted in good faith; and here's what my thinking

20   was at the time, even if it doesn't rise to the level of a

21   custom.

22           So I question -- and I'm not saying I would rule on this,

23   but I think it's a close call whether or not the evidence would

24   be sufficient for a jury to conclude that there was a

25   well-established custom of copying API declarations.

1          The evidence would show that at least within the industry

2    it was recognized that some people did it; others may not have

3    done it.  But it was enough people did it that you could say it

4    was a recognized practice.  And is that enough to qualify as a

5    custom under the *Wall Data* decision?  I'm not sure that it

6    does.  I'm not saying it doesn't.

7          But -- so you want me to change this from subjective to

8    objective.  In other words, now you're saying the extent -- the

9    extent to which Google relied upon or contravened any

10   recognized practices in the industry concerning

11   reimplementation of API libraries, without regard to the

12   existence of a license.

13         I think you -- once we say that you can -- the Google

14   people can explain what was in their mind and their subjective

15   intent, the jury then has got to evaluate was that reasonable?

16   Was that a reasonable belief?  If it turns out almost nobody

17   ever did it, then it would be unreasonable.

18         I think this is correct.  As the case has been tried, as

19   opposed to what strictly should or should not be the law on

20   custom or whatever, as the case has actually be tried I believe

21   this is the best way to deal with the problem.

22         Let me hear from the Oracle side.

23         **MS. SIMPSON:**  Your Honor, if we're looking just at

24   that paragraph.

25         **THE COURT:**  Just that paragraph for now.

1    MS. SIMPSON:  We just have a grammatical correction.

2    THE COURT:  What's that?

3    MS. SIMPSON:  At the end the language says "relied

4    upon or contravened any recognized practices in the industry."

5    THE COURT:  Yeah.

6    MS. SIMPSON:  And then it says -- at the very end it

7    tags on "without regard to the existence of a license."  So you

8    can't contravene without regard to existence of a license and

9    also rely without regard to the existence of a license, because

10   you could reimplement with a license as a recognized practice.

11   I think we just need to change the language there.

12   THE COURT:  You want me to take out "without regard to

13   existence of a license"?

14   MS. SIMPSON:  I think that would help.

15   THE COURT:  Fine.

16   MR. BABER:  Fine.

17   MS. SIMPSON:  Your Honor, just to back up a little

18   bit.  After the first paragraph is where we had proposed adding

19   the limitation that we talked about earlier saying that the

20   date limitation applies to this factor but not others.

21   So this is where it would go with respect to the evidence

22   coming in on good faith.

23   THE COURT:  It is right here August 12, 2010.

24   MS. SIMPSON:  No, no, no.  We say "this limitation,"

25   the date limitation, "does not apply to the other fair use

1    factors" that we discussed earlier.

2         **THE COURT:**  I'm happy to do that, but I don't want to

3    get -- is there something that you have up your sleeve that I

4    should know about now?

5         **MS. SIMPSON:**  Your Honor, we simply want to be able to

6    present the rest of our evidence without a date limitation.

7         You know, we're not trying to get the Catz thing in.

8    That's not what we're trying to do.  But our code analysis and

9    our harm evidence and a lot of the other factors have things

10   that don't adhere to a 2010 date.  So we want to be able to

11   argue about those things as well.

12        **THE COURT:**  I will put that in.

13        **MR. BABER:**  Your Honor, I raise the issue of whether

14   or not we need to tell the jury the sentence beginning on line

15   20, that their decisions to fair use will govern as to all

16   versions.

17        Isn't that an issue for the Court later?  I don't think

18   there's an issue about that, but we're just telling the jury,

19   look, don't consider anything after the case was filed.

20   Period.

21        **THE COURT:**  Say that again?

22        **MR. BABER:**  The sentence that begins "your decision as

23   to fair use, however, will govern as to all versions of Android

24   in this case, regardless of their date of issue."

25        I just don't know that that's necessary to tell the jury

1   that if that's --

2          THE COURT:  Well, if you all agree that -- here's what

3   might happen.  The jury knows, they've heard about events that

4   have occurred after this case was filed.  So --

5          MR. BABER:  Okay.

6          THE COURT:  They get into the jury room and they'll --

7          MR. BABER:  That's fine.  We'll leave it in.

8          MR. VAN NEST:  That's fine.

9          MR. BABER:  Overruled.

10          THE COURT:  Okay.

11          MR. BABER:  I will note, while we're on paragraph 27,

12   Your Honor, because the issue of telling the jury that there

13   was a legal ruling on which Google had a right to rely, that

14   wasn't part of the (unintelligible).  It was a separate filing,

15   and we would ask that that be included.

16          THE COURT:  All right.  Right now I'm going to

17   overrule that, even though I'm sympathetic to your problem.

18      But I also am stuck with the stipulation -- I'm not stuck

19   with it, but you all have.  You helped create this problem by

20   that stipulation.  So I'm trying to do the least amount of

21   damage to your stipulation.

22          MR. VAN NEST:  That stipulation, Your Honor, made very

23   clear that if someone opens the door, then all bets are off.

24   And they opened the door right out of the gate in the opening

25   statement.

1    So, yes, we agreed.  And I was part of the discussion

2    there to try to save everybody time and effort.  But we had a

3    very clear statement in the stipulation that it was qualified.

4    If someone opened the door, then the stipulation was off.  And

5    they've opened the door repeatedly through the case.  Even

6    after we objected, they kept on doing it.

7         So I really think it's unfair the way it is now --

8              THE COURT:  Well --

9              MR. VAN NEST:  -- to hang us with a stip when we had a

10   clear statement that if you open the door it's off.

11             THE COURT:  I'm sympathetic, but I have to balance a

12   lot of factors here.

13        And I'm urging Oracle to stay far away from anything that

14   would suggest bad faith after the lawsuit was filed, because

15   then I can always change this before I give it.  I rarely do,

16   but I can do it.  I'm required to do it if the circumstances

17   require it.  So --

18             MR. VAN NEST:  Thank you.

19             THE COURT:  Please don't go there.

20        All right.  Now I'm going to page 17, the next paragraph.

21   "You have heard evidence."

22             MR. BABER:  Yes, Your Honor.  On that one, the second

23   line, where it says, "Under the law, if the accused use is

24   otherwise fair," it then says "then no permission."  We would

25   say "or license need be sought or granted," just because

1    there's been so much talk about license, license, license.

2            THE COURT:  All right.  We'll put in "license."

3            MR. SILVERMAN:  Can you repeat that?

4            MR. BABER:  "Or license" after "permission" on line 2.

5            THE COURT:  Okay.  Now we go to the next paragraph.

6            MR. BABER:  Nothing on that paragraph, Your Honor.

7            MS. SIMPSON:  Your Honor, I think it's a little

8    unclear to us what we're -- what we're trying to convey to the

9    jury here.

10       There has been testimony about Apache.  There's been

11   testimony about the GPL license.  We weren't sure if this was

12   an attempt to reference the GNU situation, which is under a

13   strict MIL and wasn't followed at all.  We're just not entirely

14   sure --

15           THE COURT:  Well, I was trying to help you here by

16   dealing with the problem, which is a different problem than we

17   had in the first trial, because now we're only on the fair use

18   part.

19       But in the first trial we had the confusion that the jury

20   might have thought that there was a license -- they heard about

21   the license from Apache, and somehow that exonerated Google.

22       And here I'm just going to tell them Google makes no claim

23   that its use was pursuant to a license from Sun or Oracle

24   directly or indirectly.

25       And I'm happy to strengthen this, so you'll -- but this

1    was meant to meet the problem you raised.  And so if it doesn't

2    do the job, give me a suggestion.

3              MS. SIMPSON:  We think, Your Honor, that we can edit

4    your proposal just to make it clear that Google does not have a

5    license, as opposed to makes no claim.

6              THE COURT:  Okay.  "Google makes no claim."  Well, it

7    did have a license from Apache.  So that wouldn't be quite

8    right to say that.

9              MS. SIMPSON:  That's not accurate, Your Honor.

10             THE COURT:  It did have a license from Apache.

11             MR. BABER:  Of course we did.

12             THE COURT:  But the legal point is that that does them

13   no good.  So what I'm trying to say --

14             MS. SIMPSON:  It might help to add that Apache also

15   doesn't have a license, Your Honor.

16             THE COURT:  Right.  That's what I meant by -- that

17   "Google makes no claim that its use was pursuant to a license

18   from Sun or Oracle directly or indirectly."

19             MR. BABER:  Your Honor, we could say "Google makes no

20   claim that its use was pursuant to a license from Sun, Oracle

21   or any other entity."  Or that -- or that its use -- well --

22             MR. SILVERMAN:  Something along those lines would

23   work, I think.  "Google makes no claim that its use is pursuant

24   to a license from Sun or Oracle or any other" --

25             MR. BABER:  Apache.  That's why I hesitated.  I think

```
 1    it has to be "a license from Sun or Oracle, directly or

 2    indirectly."

 3            THE COURT:  How about this?  I'm going to say this:

 4    "Google concedes it had no license from Sun or Oracle.  And it

 5    is important to remember that Google makes no claim that this

 6    use was pursuant to a license from Sun or Oracle directly or

 7    indirectly."

 8        So that way I'm saying they, in fact, had no license from

 9    Sun or Oracle.

10            MR. BABER:  I think that may be overkill, but I'm okay

11    with it.

12            THE COURT:  All right.  We're going to have to take a

13    break soon.  I have a hearing at 2:00.  I hope we're going to

14    be done by 2:00.

15        Do you think we'll be done by 2:00?

16            MR. BABER:  I hope so.

17            THE COURT:  Let's try to go to one more paragraph and

18    then take a short break.  Paragraph 28, any --

19            MR. BABER:  Nothing from us, Your Honor.

20            THE COURT:  -- heartburn?  28?

21            MR. SILVERMAN:  We'll rest on our previous objections,

22    Your Honor.

23            THE COURT:  Thank you.

24        29?

25            MR. BABER:  Nothing on 29, Your Honor.
```

1        THE COURT:  What?

2        MR. BABER:  Nothing on 29.

3        THE COURT:  Okay.  29?

4        MR. SILVERMAN:  Two quick things, Your Honor, on 29.

5  Page 18, lines 1 and 2.

6        THE COURT:  Yeah.

7        MR. SILVERMAN:  "The more creative the work" it

8  currently says "the less this factor favors."

9      The previous sentence -- to make it consistent, I think it

10  would be easier for the jury to say "the more creative the

11  work, the more this factor weighs against fair use," and vice

12  versa, just to keep the more more, less less.

13        THE COURT:  I don't see what page you're on.

14        MR. BABER:  What's the more more, less less?

15        THE COURT:  What paragraph are you on?

16        MR. SILVERMAN:  Page 18.

17        THE COURT:  18.

18        MR. SILVERMAN:  Top of 18, lines 1 and 2.

19        THE COURT:  I see.

20        MR. SILVERMAN:  That full sentence, "The more creative

21  the work, the less this factor favors fair use and vice versa."

22  I wonder if keeping "The more the creative the work, the more

23  this factor weighs against fair use," just keep the more with

24  the more, rather than less.

25        THE COURT:  You always have a problem with that when

 1   you're writing.  I agree that -- okay.  I'm going to do it the

 2   way you want it.

 3        "The more creative the work, the more this factor" how

 4   about "disfavors fair use"?

 5        **MS. ANDERSON:**  No.

 6        **THE COURT:**  Is that right?  "More creative the work,

 7   the more this factor disfavors fair use, vice versa."

 8        There's no perfect way to write that.  I don't like using

 9   negatives, the word "not."

10        **MR. SILVERMAN:**  Understood, Your Honor.

11        **THE COURT:**  Okay.  Let's try to -- I don't know.

12   Let's try to get down to the third factor.

13        Okay.  Number 30.

14        **MR. BABER:**  Nothing on 30, Your Honor.

15        **MR. SILVERMAN:**  Line 6 through 8, Your Honor, the end

16   of that sentence, "and even individual lines of declaring code

17   may be or may not be highly creative," we propose just deleting

18   "even."  "And individual lines of declaring code may be or may

19   not be highly creative."

20        **THE COURT:**  All right.  That's fine.

21        And then what else on 30?

22        **MR. SILVERMAN:**  Nothing else from us, Your Honor.

23        **THE COURT:**  31.

24        **MR. BABER:**  Nothing on 31, Your Honor.

25        **MR. SILVERMAN:**  Just stand on our previous objections,

 1   Your Honor.  There has been no evidence.

 2          THE COURT:  Okay.  32.

 3          MR. SILVERMAN:  Same -- same on 32, Your Honor.  We'll

 4   rest on previous objections.

 5          THE COURT:  Okay.  How about you?

 6          MR. SILVERMAN:  Oh, I'm sorry.

 7          MR. BABER:  Your Honor, I'm sorry.  I was just -- if

 8   we may, I apologize.  Could we go back to paragraph 29, that

 9   language talking about the creative, and the more and less

10   thing we just --

11          THE COURT:  Yes.

12          MR. BABER:  The end of the prior sentence is talking

13   about creative versus functional.

14      So if we're going to say "the more creative the work, the

15   more it favors fair use," instead of saying "vice versa" we

16   should spell out the rest.  "The more functional the work, the

17   less this factor favors fair use."

18          THE COURT:  All right.

19          MR. BABER:  Put those pieces in.

20          MR. VAN NEST:  More.

21          MR. BABER:  I'm sorry.  "The more functional, the

22   more" -- see, that's the more and less, right.  So -- the more

23   creative --

24          MR. VAN NEST:  That's right.  Just parallel the other

25   ones.

1          **MR. BABER:**  "The more functional the work, the more
2  this factor favors fair use."  No, it depends which way you --
3  that doesn't sound right.
4          **MS. ANDERSON:**  That's right.
5          **THE COURT:**  Even you can't keep it straight.
6          **MR. BABER:**  Yeah.
7          **THE COURT:**  And you're, you know --
8          **MR. SILVERMAN:**  Your Honor, the --
9          **THE COURT:**  -- a smart guy.
10         **MR. BABER:**  "The more creative the work" --
11         **THE COURT:**  "The more functional the work, the more
12  this disfavors" --
13         **MR. BABER:**  No, weighs in favor of here.
14  Functionality is in favor of fair use.
15         **THE COURT:**  "Favors fair use."  You've right.
16         **MR. BABER:**  Yeah.  That's why the other one, when we
17  said, "The more creative the work, the more this factor favors
18  fair use," that's not right.
19         **THE COURT:**  The more creative the work --
20         (Unreportable simultaneous colloquy.)
21         **MR. BABER:**  Okay.
22         **THE COURT:**  I'll read it aloud.
23         **MR. BABER:**  Please.
24         **THE COURT:**  This is ridiculous, but here we go.
25      "The more creative the work, the more this factor

1  disfavors fair use.  And the more functional the work, the more

2  this factor favors fair use."

3          MS. ANDERSON:  Yes.

4          MR. BABER:  Your Honor --

5          THE COURT:  There are too many Fs in there.  That's

6  the --

7          MR. SILVERMAN:  We have a problem with one of the Fs,

8  Your Honor.  I think the focus on function isn't exactly right.

9  It's about the creative expression.

10     And so it's really the less the creative the expression --

11          MR. BABER:  The cases contrast creative and functional

12  works.

13          THE COURT:  I'm going to leave it this way.  I think

14  this is very close to what you're trying to get at.

15     Okay.  Now, number 30 we already did.

16     Number 31.

17          MR. BABER:  Nothing on 31, Your Honor.

18          THE COURT:  32?

19          MR. BABER:  32, I think there's a stray word.  Page

20  19, line 6.  You're saying, "It is for you to determine the

21  extent to which it."  I think that "it" shouldn't be there.

22          THE COURT:  Yes, that's true.

23          MR. BABER:  Otherwise, nothing 32, Your Honor.

24          MS. SIMPSON:  Your Honor, we were just looking at

25  whether there was a way to simplify it a little bit.  It's a

1    lot of complicated language in here.

2              MR. SILVERMAN:  So, Your Honor, we think we can

3    propose something at the beginning of the paragraph that would

4    allow you to delete three or four sentences towards the end.

5         Probably a little complicated to explain.  Maybe I can

6    just hand it up.

7              THE COURT:  Go ahead.  Hand up whatever you've got.

8              MR. BABER:  Sorry.

9              THE COURT:  Where am I supposed to read?

10             MR. SILVERMAN:  It's the red line, Your Honor,

11   paragraph 32.  I think you were looking at it.  It says

12   paragraph 32 at the top.  The red line is the proposed change.

13             THE COURT:  The red line is knocking out everything.

14        MR. SILVERMAN:  Yeah, the --

15             THE COURT:  You mean the blue line.

16        MR. SILVERMAN:  Yeah, the blue adds, and then the red

17   deletes.

18             THE COURT:  I see.  I'm okay with your change.

19        What do you say?

20             MR. BABER:  May I consult for a second, Your Honor?

21             THE COURT:  Uh-huh.

22         (Pause)

23             MR. BABER:  Your Honor I don't think we have a problem

24   with the red strikeout towards the bottom.

25        We do think the way Your Honor drafted initially starts

1   out with, sort of, setting the stage by saying, it's because we

2   were free to use the language that these necessary things have

3   been found to be a matter of -- already of fair use.

4       So we think that part should stay intact.  And I think --

5   that actually may have been the way the established fact

6   statement read.

7       **MR. SILVERMAN:**  Your Honor, these are all

8   nonsubstantive.  We were just trying to help the Court.  If the

9   Court is fine with how it is --

10      **MR. BABER:**  No, I'm sorry, Your Honor.  This is the

11  problem with these.  No, their changes are not acceptable to

12  us.  They are taking out the statement that says

13  (unintelligible).

14      (Reporter interrupts.)

15      **THE COURT:**  You talk so fast.

16      **MR. BABER:**  I apologize.  I just realized what I had

17  almost done.

18      "Because that declaring code is necessary to use the

19  language, it is established that it was a fair use."  They want

20  to take that out.  No way.  That was agreed upon.  You found it

21  first after an order to show cause.

22      That needs to stay in, Your Honor.

23      **THE COURT:**  All right.  You're okay with the way I

24  wrote it to begin with?

25      **MR. SILVERMAN:**  Yes, Your Honor.  We were just trying

1    to help.

2        THE COURT:  Here's your proposal back.

3        I'm just going to do that.

4        Okay.  We're up to the third statutory factor.  And we're

5    going to take a break here for just ten minutes; not 15

6    minutes.  And then we'll come back.

7        Thank you.

8        MR. VAN NEST:  Your Honor --

9        THE COURT:  Yeah.

10        MR. VAN NEST:  Would you be willing to resolve the

11   time for the closing argument before you take your break?  Or

12   do you want to do that when you come back?

13        THE COURT:  Okay.  Let's do that.  Are you just

14   hanging around for that part?

15        MR. VAN NEST:  No, no, but it would give an option.

16        (Laughter)

17        THE COURT:  Okay.  What --

18        MR. BICKS:  Your Honor, I think I should go first.  I

19   should have three hours.  He should have one hour.

20        (Laughter)

21        MR. BICKS:  No, I think on our side I think an hour

22   and a half.  That's what you had done the last time.  I think

23   that's --

24        MR. VAN NEST:  That seems long to me.  I was going to

25   suggest 70 minutes, an hour and ten per side.

```
 1              THE COURT:  Well, you go first.  You've got the burden
 2     of proof.
 3              MR. VAN NEST:  I go first.  And then -- I would split
 4     my time between my opening.  And I'll have some rebuttal.  But,
 5     I mean, an hour and 10 minutes, an hour and 15 minutes seems
 6     like more than enough.
 7              THE COURT:  Well, you want an hour and a half.
 8              MR. BICKS:  Yes.
 9              THE COURT:  All right.  We're going to go with an hour
10     and a half.  You get an hour and a half.
11              MR. VAN NEST:  Okay.
12              MR. BICKS:  Great.
13              THE COURT:  What else?
14              MR. BICKS:  That's it.
15              THE COURT:  You know you're not supposed to vouch for
16     the credibility of witnesses.  Attorneys can't do that.
17              MR. BICKS:  I'm sticking to the evidence.
18              THE COURT:  But you can't say something like, And
19     Mr. So-and-so came in here, and I think he told the truth.  Or,
20     I think so-and-so came in here and lied.  Lawyers are not
21     supposed to -- as officers of the Court, they're not supposed
22     to vouch for who's telling the truth.
23          You can argue that.  You can say so-and-so came in here
24     and lied.  That's okay.  You can do that all day long.  But
25     what you can't do is say, "I think," "I believe."  You can't
```

 1   put your prestige on the line and tell them what you think is

 2   the -- who's telling the truth.

 3        In a criminal case, if the government does it -- and they

 4   do it every now and then -- it's usually automatic reversal by

 5   the Ninth Circuit anyway.

 6        But it's also a professional rule of conduct.  I bring

 7   this up just in case.  Sometimes the lawyers get carried away.

 8        I have nothing else, really, to -- I think you should

 9   exchange what you're going to show on the screen.

10             MR. VAN NEST:  That's --

11             THE COURT:  You'll have my blessings to use as much as

12   you want of the verdict form and the instructions.

13             MR. VAN NEST:  Your Honor, could the parties work out

14   that themselves?

15             THE COURT:  Work out what?

16             MR. VAN NEST:  What we do exchange.

17             THE COURT:  Go ahead.

18             MR. BICKS:  We worked it out the last time.

19             THE COURT:  Work it out between yourselves.

20             MR. VAN NEST:  Yeah.  Thank you.

21             THE COURT:  All right.  Is that -- is that all you

22   need from me on the closings?

23             MR. VAN NEST:  I think so.

24             MR. BICKS:  Yes.

25             THE COURT:  I'm getting so tired, seems like there's

 1   something else I should ask you about.  But, all right, we'll

 2   take ten minutes.

 3          MR. VAN NEST:  Your Honor, there's one other thing we

 4   might as well clean it up.  You had suggested a top 10 hit

 5   list, or something like that.

 6          THE COURT:  Yes, top 20.

 7          MR. VAN NEST:  We don't think that's useful.

 8          THE COURT:  You have to stipulate to it.

 9          MR. VAN NEST:  Thank you.

10          THE COURT:  And so I'm not going to do it unless both

11   sides --

12          MR. VAN NEST:  I think this was the other thing

13   hanging on, that was unresolved.

14          MR. BICKS:  I guess they --

15          THE COURT:  Is there anything else my law clerk can

16   think of?  These two are going to leave as soon as they've

17   gotten down to how much time they have.

18      Are you thinking of anything I need to take up?

19          LAW CLERK:  You got it covered.

20          MR. VAN NEST:  Thank you, Your Honor.

21          THE COURT:  All right.  See you in a bit.  Ten

22   minutes.

23          (Recess taken from 12:48 to 1:03 p.m.)

24          THE COURT:  Back to work.  Third statutory factor,

25   Paragraph 33.

 1            **MS. SIMPSON:**   , Your Honor, we just had one thing on

 2    this -- two things, I think, actually.  Line 14, where it has

 3    sort of *not Android* at the beginning of that line, the correct

 4    statement of the law, that the way that the evidence has come

 5    in, you know, it's been repeated over and over and over again

 6    the number of lines of code in Android versus what was taken,

 7    and I think the jury is likely to be confused or to not apply

 8    this factor properly, which we all agree is supposed to

 9    compared to the copyrighted work, not the infringer's work, so

10    I'm not sure that this *not Android* following after sort of all

11    this sort of technical language about the title of our

12    copyrighted work is going to capture that, so I would ask that

13    the Court add another sentence, at least, that says, you know,

14    *you are not permitted to consider* or *what you should consider*,

15    whichever, would be an improvement over the way it is now.

16            **THE COURT:**  And for Factor 3, Ms. Simpson is correct,

17    isn't she?

18            **MR. BABER:**  She's right.  Factor 3 is the copyrighted

19    work, Your Honor, not Android.

20            **THE COURT:**  All right.  This is a point I meant to

21    make in your favor, so let's make sure it's in your favor.  But

22    it's the third factor now.  We're not --

23            **MS. SIMPSON:**  Correct.

24            **THE COURT:**  We've got to limit this to the third

25    factor.

1           MS. SIMPSON:  If you could say *for this factor, you*
2    *may not consider the lines of code in Android.*

3           THE COURT:  All right.  *For this factor* -- how about
4    *it is irrelevant* -- *the number of lines of code in Android is*
5    *irrelevant.*

6           MR. SILVERMAN:  *Total number of lines* maybe.

7           THE COURT:  Huh?

8           MR. SILVERMAN:  *Total number of lines or something*
9    *like that.*

10          THE COURT:  All right.  *Total number of lines in*
11   *Android is irrelevant.*  Then if we get into total number of
12   lines -- I'm just going to do what you've suggested.

13       What else about No. 33?

14          MR. BABER:  Can you read back, Your Honor, what we are
15   going to say?

16          THE COURT:  Instead of saying *not Android*, that comes
17   out.  Then say *For this factor, the total number of lines in*
18   *Android is irrelevant.*

19       So we go to anything else in 33?

20          MS. SIMPSON:  That's it, Your Honor.

21          THE COURT:  Okay.  34.

22          MR. SILVERMAN:  Nothing from us, Your Honor.

23          MR. BABER:  Nothing on 34, Your Honor.

24          THE COURT:  35.

25          MR. BABER:  Yes, Your Honor.  We have an issue on 35.

1    This is the first time in the charge the words *derivative*

2  *work* appear.  And we think -- well, two things.  First -- and I

3  know we briefed this several times, but I do want to raise it

4  again today.

5    We think the jury needs a more complete definition of what

6  a derivative work is.  Oracle has not quarreled with the

7  correctness of the second paragraph of our proposed

8  instruction.

9        **THE COURT:**  Show me your proposal.  I remember looking

10  at something once.  I didn't think it was very clear.

11       **MR. BABER:**  Yeah.  I don't have it printed,

12  Your Honor.  I can tell you quickly what it is.  It's that, *In*

13  *order to be a derivative work, the claimed derivative work has*

14  *to be based in whole or substantial part on the prior work and*

15  *it must include protected elements of the prior work.*

16  That's --

17       **THE COURT:**  How does that help you in this case?  Tell

18  me how you're going to use that.

19       **MR. BABER:**  Your Honor, my second point is at this

20  point I believe there has been no proof of any derivative works

21  of Java SE 1.4 or 5.0.  We don't think there should be any

22  reference to derivative works at all in the charge because

23  there is no evidence that makes a derivative works charge

24  appropriate.  That's what they were trying to fix with

25  Professor Astrachan at the very end today.

1          Your Honor, there is simply no evidence in the record on

2    which the jury could conclude that any version of Java ME is

3    based in whole or in substantial part on any version of

4    Java SE.

5          They asked Dr. Reinhold questions about this.  They asked

6    Mr. Brenner questions about this.  Then they tried to fix it

7    with Dr. Astrachan.  But there is no evidence as to anything

8    from Java 1.4 or 5.0 that is in any version of Java ME.  And we

9    know from the testimony that Java ME was first released before

10   these works in suit.  Java ME -- the testimony from their

11   people was it came out back in 1999 and 2000.  So as a matter

12   of law, at their inception, they couldn't --

13          **THE COURT:**  Where does this *in whole or in part* come

14   from?

15          **MR. BABER:**  It comes from Ninth Circuit cases,

16   Your Honor.  I can give you the cites in just a second.

17          And when we've gone around and around on the charges, I

18   think what you're recalling is we had a third paragraph in ours

19   that talked about the scope of protection for derivative works.

20   Frankly, that is moot at this point.  They quarreled with that.

21   I think that's not an issue in the case.  The question is

22   simply whether they've proven that any version of ME is in fact

23   a derivative work.

24          **THE COURT:**  Could my law clerk go in and get my

25   booklet -- it's that gray book that has the trademark,

1    copyright and patent laws.  It's on my bookshelf.

2        Don't say anything.  I'm trying to absorb this.

3        But the fourth factor says -- I've got it fortunately

4    right here word for word.  *The effect of the use upon the*

5    *potential market for or value of the copyrighted work,* and

6    then --

7            MR. BABER:  It's from the case law, Your Honor, that

8    says in factor four, you can consider harm to derivative works.

9    We've been in agreement with that all along.  That's what

10   *Harper* says.

11           THE COURT:  Does it have to be an actual derivative

12   work or can it be a potential derivative work?

13           MR. BABER:  Either way, Your Honor.  They haven't

14   talked about any potential derivative works, right, but as to

15   the ones that they say is actual derivative works, Java ME,

16   they simply haven't proven that it's a derivative work.  They

17   haven't even come close.

18           MS. HURST:  Your Honor, that's simply incorrect.

19   Dr. Astrachan testified that ME was a subset of SE.  He

20   testified the same infringed packages were in ME that are at

21   issue in the case.  Mr. Brenner described repeatedly how ME was

22   derived from SE and so did Dr. Reinhold.  There have been no

23   fewer than three witnesses who have confirmed that ME is a

24   derivative work of SE.

25           Moreover, Your Honor --

 1          MR. BABER:  That's exactly --

 2          MS. HURST:  Mr. Baber, may I finish, please.

 3          THE COURT:  Ms.Hurst has got a point here.  Go ahead.

 4          MS. HURST:  Moreover, Your Honor, the test -- it does

 5    count potential derivative works and there's been testimony

 6    about those as well.  In fact, they're the ones who elicited

 7    testimony from the witnesses over and over again about how Sun

 8    and Oracle failed to market their potential derivatives of SE.

 9          They have opened the door wide on potential derivative

10    works, existing derivative works, and it's absolutely

11    appropriate, Your Honor.

12          Moreover, the only thing that should be used as a

13    definition here is the statutory language.  Mr. Baber has

14    overstated significantly the legal test for what constitutes a

15    derivative work.

16          THE COURT:  This thing about *in whole or in part*,

17    where does that come from?

18          MS. HURST:  I don't know, Your Honor.  The statute --

19          MR. BABER:  I have it right here.

20          MS. HURST:  The statute says, Your Honor, *it is a work*

21    *based upon one or more preexisting works,* and that's -- that's

22    all it says.  *Such as a translation, musical arrangement,*

23    *dramatization, fictionalization, motion picture version,* and so

24    forth, Your Honor, *in any other form in which a work may be*

25    *recast, transformed, or adopted.*  And the statute goes on --

1    this is Section 103, *a work consisting of* -- pardon me, 101,

2    Your Honor.  *A work consisting of editorial revisions,*

3    *annotations, elaborations or other modifications which, as a*

4    *whole, represent original work of authorship is a derivative*

5    *work.*  And that's exactly what ME is, Your Honor.

6         The witnesses testified --

7              **THE COURT:**  But how can it be a derivative work if it

8    came before the copyrighted works?

9              **MS. HURST:**  Your Honor, it didn't come before.

10   Mr. Brenner testified that they created SE first and then ME

11   derived from that.  And then they went step-wise like this,

12   Your Honor, with each adding new material.

13        And the registrations that we've put in for SE cover all

14   the prior material.  And ME is clearly a derivative in that

15   chain, as Mr. Brenner and Dr. Reinhold and even Dr. Astrachan

16   admitted, Your Honor.

17             **MR. BABER:**  Your Honor, if I may.  ME may well be -- I

18   don't know because they didn't put in any proof.  ME may well

19   be a derivative work of whatever version of SE was out there

20   when ME was created.  It's probably Java 1.3, may have been

21   1.2.  But it can't be a derivative work of something that came

22   after it.  And --

23             **THE COURT:**  But Ms.Hurst said that the copyrights

24   cover prior versions SE.

25             **MR. BABER:**  That's a different issue, Your Honor.

1   Totally separate issue as to whether or not they can sue in

2   this case on content that came from earlier versions of SE.

3   That has nothing to do with whether or not ME is a derivative

4   work.

5        You asked what our authority was for our charge.  First of

6   all, this is our proposed charge.  I apologize.  The

7   highlighting -- the orange, the second paragraph, is what I'm

8   talk about.  And then we cite the cases in there.  And I can

9   read to you from *Micro Star vs. FormGen*.

10        **THE COURT:**  That's the one that Ms.Hurst told me was

11   directly on point, but it's not actually.  That was a totally

12   different thing.  That case did not even involve

13   copyrightability.  However, that's an aside.  I don't get --

14   okay.  Tell me your -- is this a direct quote?

15        **MR. BABER:**  Direct quote, Your Honor.  What Ms.Hurst

16   just read to you is the statutory language.  It is very broad.

17   It just says *based*, right?

18        The Ninth Circuit has said -- and I'm quoting now from

19   *Micro Star -- the statutory language* -- and this is the

20   definition of derivative work -- *is hopelessly broad, however,*

21   *for every book in literature, science and art borrows and must*

22   *necessarily borrow and use much of which was well-known and*

23   *used before.  To narrow the issue to a manageable level, we,*

24   the Ninth Circuit -- *we have developed certain criteria a work*

25   *must satisfy in order to qualify as a derivative work.*  One is

1    that it has to be in concrete form.  That's not at issue here.

2    The second is that *it must substantially incorporate protected*

3    *material from the preexisting work.*

4         So it has to be -- we cited the other cases.  The Nimmer

5    Treatise looks at all these cases, and there is two parts to

6    this test.  It can't just have something in there that comes

7    from 1.4 or 1.5 that was added.  They have to show it's

8    substantial and it's something that is protected in 1.4 and

9    5.0.

10        I have all the testimony here, Your Honor.  There was very

11   little testimony at trial about what is really in Java ME.  We

12   know that there are some packages that are skinnied-down

13   versions of things in SE that have some of the same names, but

14   we don't have a word of testimony from any witness as to

15   whether there are any lines of code in any version of Java ME

16   that has come out since the works in suit that is code that

17   came from 1.4 or 5.0.  Not a word.

18        **MS. HURST:**  Well, if that were true -- and it's not --

19   it would be Google's problem because they have the burden of

20   proof.  And we have met our burden of production absolutely and

21   our burden of persuasion, if we had it, Your Honor, to

22   demonstrate that ME is a derivative work of SE.

23        Dr. Reinhold testified that ME 1.1, which is the same one

24   that Dr. Astrachan just admitted contains 11 of the infringed

25   packages, derived from Java SE 1.4.  That's one of the

1    registrations in suit.

2         Moreover, Your Honor, it is not --

3         **MR. BABER:**  That was --

4         **THE COURT:**  Wait, wait, wait.

5         **MS. HURST:**  Moreover, Your Honor, it is not a red

6    herring or irrelevant that we're entitled to sue on all the

7    prior material in the registration.

8         And really, Mr. Baber is putting way more import on that

9    *Micro Star* language than it deserves.  The test in the Ninth

10   Circuit is this.  If it would be an infringement without a

11   license, then it's a derivative work.  That's the test.

12        Since ME is based upon and derived from and incorporates

13   substantial material, as three witnesses testified, including

14   Dr. Astrachan, it clearly meets the test.

15        **MR. BABER:**  Your Honor, no witness, no witness has

16   identified -- they've said *well, it's derived from*.  They all

17   qualified -- on cross-examination, they said all *No, no, no, I*

18   *wasn't giving you a legal opinion.  I don't know, derivative*

19   *work, nothing about that.*  No witness said anything about any

20   code.  In fact, Mr. Brenner's testimony was very interesting on

21   this.  He was the one who held develop ME.  He said, *We did it*

22   *in 1999 and 2000*, he said, *after we released 1.4.*  He said, *We*

23   *went through the components of ME and we included or added to*

24   *ME new material, made updates to preexisting ones.*

25        We said, *Well, what did that consist of*?  This is on

1    cross.  Just like Dr. Reinhold, he had given no testimony about

2    what specific versions of ME he was talking about.  He didn't

3    give any testimony about specifics of what was included in ME.

4    So we asked him on cross -- we said, *Did you take any of the*

5    *code from SE and put it into ME?*

6         He said, *Well, no, my testimony was that the APIs from SE*

7    *were applied to ME.  In some cases we leveraged code.  In other*

8    *cases we implemented a consistent spec.*

9         We asked, *Well, how much -- any code put into ME from SE?*

10        *I can't recall enough to quantify that.*

11            **THE COURT:**  This was at trial?

12            **MR. BABER:**  This was at trial, Your Honor.  This was

13   Mr. Brenner.  He was here yesterday.

14        We said, *Do you have any idea how much code from Java SE,*

15   *the works in suit -- how much code from SE was put into ME?*

16        He says, *Well, I don't know.  My guess -- I recall, maybe*

17   *there were several dozen APIs in there at the time.*  And that's

18   all he said.  He never -- no witness ever gave any testimony of

19   any protected elements of 1.4 or 5.0 that were added to any

20   version of Java ME after 1.4 and 5.0 came out.  There just was

21   no evidence on that.

22        We thought Dr. Reinhold might testify about that.  We

23   thought Mr. Brenner might come in with the details and could

24   say, *We got these packages.  Here's what's in them.  You can*

25   *see, this one has got all the same classes.*  Because we know

 1    from all the discovery, ME is a totally different beast.  ME

 2    has its own virtual machine stripped down.  It has its own

 3    compiler stripped down.  Their witnesses called it a tiny

 4    version of ME -- of SE.  That's why they call it the *micro*

 5    *edition*.

 6        In order for them to have any plausible claim that any

 7    current version of ME is a derivative work of the two works in

 8    suit, they have to point to some version of ME that came after

 9    the works in suit.  You can't be a derivative work of something

10    that came after you.  They should have to show that it came

11    after and what was put into it from 1.4 or 5.0.

12        Ms.Hurst says it's our burden of proof.  I disagree,

13    Your Honor.  We have the burden of proof on fair use.  Okay?

14    This is an issue of is there any evidence in the record to

15    support, including this in the jury charge, given the fact that

16    the party with the information about whether or not they want

17    certain works to be considered derivative works have put in

18    enough evidence to justify the instruction.

19        **THE COURT:**  Well, all right.  I'm not going to decide

20    this.  I have to look at some of these cases.

21        What's wrong with putting *in whole or in substantial part*?

22    Just on what I have here, *a derivative work* -- I already have *a*

23    *derivative work is a work based upon*.  Why not just say *based*

24    *in whole or in part upon*?  That sounds like that would satisfy

25    Mr. Baber.

1          MS. HURST:  Let me make sure I understand the Court's

2   proposal.  *In order to be a derivative work, the new work must*

3   *be based in whole --*

4          THE COURT:  No.  I would just go with the language I

5   already got.

6          MS. HURST:  Oh, okay.  I misunderstood.

7          THE COURT:  On paragraph 35, second sentence, *A*

8   *derivative work is a work based upon one or more preexisting,*

9   so forth, and just stick in the phrase *in whole or in*

10  *substantial part.*

11         MR. BABER:  I don't think that's sufficient,

12  Your Honor.  That's half of it.  That's the first half.

13         THE COURT:  Let me see how the first half goes.

14     While they're thinking, what's the second half?

15     MR. BABER:  The second part, Your Honor, is the second

16  part of the test which is that it has to include protected

17  elements of the prior work.  In other words, if they want to

18  say ME -- again, we don't even know what versions of ME they're

19  talking about, and there are several.  But if they have some

20  versions of ME that they want to say are derivative works of

21  either of these two works in suit, they have to prove that

22  they're substantially based on these versions and they contain

23  things that are protected in these versions.

24         THE COURT:  Why wouldn't everything be protected?

25         MR. BABER:  Because as I said, Your Honor, earlier,

1    imagine the virtual machine.  They've had a Java ME virtual

2    machine for years.  It's a virtual machine, so it does the same

3    thing in part as the virtual machines in SE, but the code is --

4    it's this big as opposed to this big.  And there may be not a

5    single line of code in there that comes from SE ever.  Right?

6        So you look at ME and you say okay, we had ME.  It was out

7    there.  It's been out there since 2000.  It's had 10 API

8    packages in the CDC iteration.  Well, it still only has 10

9    packages.  It may well be that there's 10 lines of code in

10   there that were changed after the works in suit came out.  And

11   those 10 lines of code are 10 out of a hundred thousand.

12       Your Honor, but the problem is going to be the jury will

13   have no basis on which to make this determination because there

14   is no evidence to support it.

15       **MS. HURST:**  Your Honor, that's simply incorrect.

16   First of all, the virtual machine has nothing to do with this.

17   Android's virtual machine isn't based on Java either, and it's

18   still an infringing work.  And we can't go behind that, and

19   effectively now he's offering a whole new standard for how we

20   are going to make these comparisons, and that's not

21   appropriate.

22       But Dr. Reinhold testified Java ME 1.1 was derived from

23   Java SE 1.4 and Dr. Astrachan just testified there were 11

24   packages in Java ME 1.1 that were also in Java SE 5.  We have

25   got it covered both ways, but we also have it covered because

1    those registrations cover all the preexisting material.

2        And, Your Honor, furthermore there is nothing in the case

3    law to suggest that this kind of a nit-picky approach to what

4    constitutes a derivative in this situation would be

5    appropriate.  And, you know, so it's just -- it's just not

6    appropriate.

7        They didn't put on any evidence -- they didn't bring a

8    code comparison expert in here to show ME's not based upon SE,

9    the way our witnesses testified it is.

10           MR. BABER:  We're not trying to prove --

11           MS. HURST:  Our witnesses testified it was based upon,

12   their witnesses testified it was based upon.

13           THE COURT:  What do you say to *in whole or in part*?

14   *Substantial part*?

15           MS. HURST:  Your Honor, I just think that's not the

16   test.  The test is whether it would be an infringement or not,

17   and this --

18           THE COURT:  I'm just going by what is quoted here in

19   the thing Mr. Baber handed up, and it does have a number of

20   references like Nimmer in whole or in substantial part.

21           MR. BABER:  Your Honor, I'll say in all the back and

22   forth and the briefing and ever the critiques where we talked

23   about derivative work, Oracle has quarreled with the third

24   paragraph of our proposed charge.  They have never quarreled

25   with the second paragraph, in substantia part or whole.  They

1    have never said that there is anything incorrect about that as

2    a matter of Ninth Circuit law.

3              THE COURT:  I have got a 2:00 hearing so I've got 30

4    minutes to get through the rest of this with you.

5              MS. HURST:  One moment, Your Honor.

6         Your Honor, we're willing to cut a deal for *in whole or in*

7    *substantial part* against elimination of the remainder.

8              THE COURT:  You mean against -- elimination of

9    Mr. Baber's remainder?

10             MS. HURST:  Yes.  Mr. Baber's remainder.  I apologize,

11   Your Honor.  Yours is fine with us.

12             MR. BABER:  Your Honor, at the risk of making a

13   terrible joke based on an exhibit and without offending the

14   Court, we saw the exhibit about something being half-assed.

15   Why would we give the jury half of the correct legal

16   description -- the correct legal definition?  It makes no

17   sense.

18        The Ninth Circuit has said there are actually three things

19   you need to show to be a derivative work.  One of them is not

20   an issue here.  But the other two are clearly an issue.

21             MS. HURST:  None of those cases are in this context,

22   Your Honor, and the safe thing to do would be to charge the

23   statute.  But we are willing to compromise with Mr. Baber and

24   now he's overreaching by calling us half-assed.  That's

25   offensive.

1          MR. BABER:  That's not a compromise, Your Honor.  It's

2    a correct statement of the law.  It should be in the charge.

3          THE COURT:  I'll think about it.

4      Anything more on 35?

5          MS. SIMPSON:  Your Honor, this is a running theme

6    throughout the next couple of instructions.  We talk about

7    licensing opportunities and the licensing opportunities pertain

8    to the copyrighted works and the derivatives, and at times the

9    language suggests that the licensing only relates to the

10   derivative and not the copyrighted works.  This happens in 35

11   at line 13 on page 20 where we think it should read *the*

12   *copyrighted work itself and licensing opportunities for the*

13   *copyrighted work and its derivatives.*

14         THE COURT:  Well, all right.  Okay.  Say that again.

15         MS. SIMPSON:  *Copyrighted work and its derivatives.*

16         THE COURT:  All right.

17         MR. BABER:  I think it should be *derivative works.*

18         THE COURT:  *And its derivative works?*

19         MS. SIMPSON:  Right.  Sorry.  I didn't mean to

20   paraphrase.

21         MR. BABER:  Same in the last line, 17.  It says

22   *derivatives.*  It should be *derivative works.*

23         THE COURT:  Okay.  All right.

24         MR. BABER:  Nothing else on 35, Your Honor.

25         THE COURT:  What?

1          MR. BABER:  Nothing else on 35.

2          THE COURT:  36.

3          MS. SIMPSON:  It would be the same issue in 36,

4    Your Honor, line 20.

5          MR. BABER:  Line 21 says *derivative works*.

6          MS. SIMPSON:  *Its licensing value*.

7          THE COURT:  *Its licensing value* or say *the licensing*

8    *value of -- for it and its derivative works*.  Okay.  Anything

9    more on 36?

10         MR. SILVERMAN:  Not from us, Your Honor.

11         THE COURT:  37?

12         MS. SIMPSON:  Same issue, Your Honor, line 4.  *Exist*

13   *to the market value or the licensing value of the copyrighted*

14   *work and its derivative works* would fix that.

15         THE COURT:  Okay.

16         MR. BABER:  Your Honor, we have an issue with the last

17   sentence of 36.

18         THE COURT:  Wait.  I've got to go back to that.  We

19   passed that one.  Let's go back to 36.  All right.  What's the

20   issue?

21         MR. BABER:  It says, *In doing this, you must ignore*

22   *benefits from the use of the copyrighted owner outside the*

23   *genre claimed to have been harmed*.  I'm not --

24         THE COURT:  Well, this is what I'm trying to get at

25   there.  There is a decision -- I believe it's U.S. Supreme

1  Court, but I can't remember any more, but it says the infringer

2  doesn't get the benefit of arguing *well, we helped you in some*

3  *other way.*

4       **MR. BABER:**  We helped you with your book sales because

5  we went and made a movie.  *Rear Window*.

6       **THE COURT:**  That's the case.  So if you don't like the

7  word *genre*, give me the word you do like.

8       **MR. BABER:**  I'm not sure the jury will know what to do

9  with *genre* and I'm not sure -- candidly, I'm not sure I know

10 what is the genre that Oracle claims to have been harmed in

11 this case.  Is it the genre of platform software for the Java

12 language?  Is it platform software for desktops and laptops?  I

13 just don't know.

14      **THE COURT:**  No.  I don't know -- the jury will -- the

15 jury may get -- somebody in the jury might get in there and

16 say, *Look, this was the best thing that ever happened to Sun*

17 *because, you know, now we got a lot more Java users*.  I don't

18 know what they'll say.  But I have to tell them no, you don't

19 get any credit for that.

20      **MR. BABER:**  I'm not sure that's right, Your Honor.

21      **THE COURT:**  I think that's what the *Rear Window* case

22 said.

23      **MR. BABER:**  Well, that's because in *Rear Window*, they

24 were -- they were totally disparate uses.  Here --

25      **THE COURT:**  That's why I'm using the word *genre* here

1    like book versus movie.  If you don't like the way I've written

2    it here, give me a better way to say it, but when I asked you

3    for that, you went off shrugging your shoulders and saying you

4    don't know, you don't know, you don't know about what the other

5    side is going to argue.  Well, that doesn't do me any good.

6         I'm going to stick with this unless you have a concrete --

7         **MR. BABER:**  I have not come up with a better word for

8    *genre*.

9         **THE COURT:**  Then too bad.  Now we move on.  We are

10   done with 37.  38.

11        **MR. BABER:**  38, Your -- Honor.

12        **MR. SILVERMAN:**  Your Honor, we will stand on our

13   previous objections.  Nothing more from us.

14        **MR. BABER:**  I think that's all we have, too.

15        **THE COURT:**  39.

16        **MR. BABER:**  39 the only question I have, Your Honor,

17   is your new language you add about *enumerating the power of*

18   *Congress*.  I would cabin that just a little to say *the power of*

19   *Congress to enact laws like the Copyright Act*.

20        **THE COURT:**  I'm just going to say *the legislative*

21   *power of Congress*.

22        No. 40.

23        **MR. BABER:**  I can speed it up, Your Honor.  We have

24   nothing --

25        **MR. SILVERMAN:**  One thing on 39, lines 21 through 24,

 1   the sentence *some factors may weigh*, it says, *after giving the*

 2   *factors such weight as you find appropriate based on the*

 3   *evidence*, we would add *and subject to the instructions*.

 4           **MR. BABER:**  How about *based on the evidence and my*

 5   *instructions*?

 6           **THE COURT:**  All right.  Fine.  Does anyone have

 7   anything from 40 all the way to the end?

 8           **MR. BABER:**  Nothing else from us.

 9           **MR. SILVERMAN:**  A couple of things, Your Honor.  We'll

10   move very quickly.

11       On 40, page 22, lines 1 and 2, it says *your verdict as to*

12   *each claim and as to the damages, if any, must be unanimous*.

13           **THE COURT:**  That's a very good -- *your verdict*, just

14   say *must be unanimous*.

15           **MR. SILVERMAN:**  Yes.

16           **THE COURT:**  That's a very good catch.  Thank you.

17       Mr. Baber, why didn't you find that?

18           **MR. BABER:**  I stopped reading at 39.  I apologize,

19   Your Honor.

20           **MR. SILVERMAN:**  We'll sneak a bunch of stuff in.

21           **THE COURT:**  See, they outdid you on that one.  That's

22   where two to one comes in handy.

23       What else have you've got there?  Keep going.  That was a

24   good one.

25           **MR. SILVERMAN:**  Nothing on 41 -- nothing else on 40,

1    Your Honor.  Nothing on 41 for us.

2            **MR. BABER:**  Nothing here.

3            **MR. SILVERMAN:**  Nothing on 42 for us, Your Honor.

4            **THE COURT:**  Remember, on the index, you've got to

5    agree to the index.  If you don't have one, I'll have to take

6    that one out.  I bet you will have one.  Okay.

7            **MR. SILVERMAN:**  Nothing on 43, Your Honor.

8        44, Your Honor, at line 19, I think there is a typo.  *You*

9    *let the us know.*  Probably just --

10           **THE COURT:**  *Let us know.*  Very good.

11       They've already told us they're probably going to quit at

12   1:00 each day.  That's what they told Angie, but you never

13   know.  They might change their mind.  Okay.

14           **MR. SILVERMAN:**  Nothing else on 44.  Nothing on 45 for

15   us, Your Honor.

16       46.  We have some proposed language to pass up on 46.

17   This addresses what we began with Your Honor talking about the

18   phasing of the trial.  This is just an attempt to address any

19   sideways thinking.

20           **THE COURT:**  I'm going to say -- I'm going to say

21   *second and shorter*.

22           **MR. SILVERMAN:**  That's very much what we proposed.

23           **THE COURT:**  *Will proceed to a shorter and final*.  How

24   is that?  Because it will be shorter.  Is that okay?  *Shorter*,

25   is that what you're trying to get across?

1          **MR. SILVERMAN:**  That's one of the two things.

2          **THE COURT:**  What's the other one?

3          **MR. SILVERMAN:**  Second sentence in what we propose is

4     just to say that *this isn't going to add any length to what I*

5     *already told you I had been thinking about when I calculated*

6     *the time for you when we first met.*

7          **MR. BABER:**  I think you've already told them that you

8     built in time for both phases and the June date.

9          **MS. HURST:**  It's been a long time since they've heard

10    that, though.

11         **THE COURT:**  Just a minute.  I'm going to say *this*

12    *would still be within the* -- what was it?  June 10.

13         **MR. SILVERMAN:**  Yes.

14         **MS. HURST:**  Yes.

15         **THE COURT:**  -- *June 10 end date stated earlier*.  Okay.

16    I'm going to say that.

17         **MR. SILVERMAN:**  Just one other thing, Your Honor.  We

18    would propose sort of a combining of the two sentences you have

19    in the middle to say, *Please do not allow any desire to*

20    *complete the trial sooner to influence your thinking*.  Sort of

21    combines the two you have.

22         **THE COURT:**  Say that again.  *Please* what?

23         **MR. SILVERMAN:**  *Do not allow any desire to complete*

24    *the trial sooner to influence your thinking*.

25         **THE COURT:**  All right.

1          MR. SILVERMAN:  That's all from us.

2          MS. SIMPSON:  No.  One more.

3          MR. BABER:  Can you read, Your Honor, how 46 will now

4    be --

5          THE COURT:  *Once you render a verdict on the fair use*

6    *question, we may proceed to the shorter and final phase of the*

7    *trial on damages issues, depending on your answer to the fair*

8    *use question.  This would still be within the June 10th end*

9    *date stated earlier.  Please do not allow -- please do not*

10   *allow a desire -- any desire to complete the trial sooner to*

11   *influence your thinking once you render your verdict*, and so

12   forth.

13         MR. BABER:  Okay.

14         MS. SIMPSON:  We have one more thing, Your Honor, a

15   potential additional instruction.  The evidence, as it's come

16   in, has not conformed at all to your motion in limine with

17   respect to GNU Classpath which required that the evidence be

18   limited to evidence on fragmentation or evidence that GNU could

19   be used in Android as a substitution.  Instead, we've heard a

20   whole litany of evidence from Schwartz, Rubin, Bloch, Phipps

21   about GNU and it's reimplementation of the Java APIs that's

22   outside of the motion in limine, so we would ask for an

23   instruction either that the jury not consider the GNU evidence

24   at all or that it, at the very least, it -- it's consideration

25   of that evidence be limited to the two categories that you

 1    identified in your motion in limine.

 2         **MR. BABER:**  Your Honor, I think this is an attempt to

 3    revisit evidentiary rulings you've made over the past two

 4    weeks, and you certainly can't say ignore all the evidence

 5    about GNU.

 6         **THE COURT:**  I think it's an unworkable -- it's too

 7    unworkable now, and possibly I was too harsh on how that

 8    information could be relevant in the case, so I'm going to

 9    overrule that request.

10         What else?

11         **MR. BABER:**  We have no comments on the verdict form,

12    Your Honor.

13         **THE COURT:**  How about -- that's only one question.

14    This is an important question.  It can reverberate through the

15    annals of time, so let's get it right.  I don't have it up

16    here, do I?  Is it attached?  Here it is.

17         *Did Google's use in Android of the declaring lines of code*

18    *and their structure, sequence, and organization from Java 2*

19    *Standard Edition Version 1.4 and Java 2 Standard Edition 5.0*

20    *constitute a fair use under the Copyright Act?  Yes, finding*

21    *for Google.  No, finding for Oracle.*

22         **MS. SIMPSON:**  Your Honor, our only question is whether

23    the burden of proof should be referenced in the form.

24         **MR. BABER:**  I'm sorry.  I didn't hear.

25         **MR. SILVERMAN:**  The burden of proof.

1          **MS. SIMPSON:**  The burden of proof.

2          **MR. SILVERMAN:**  Did Google prove its use.

3          **MR. BABER:**  They are going to hear that in the

4    verdict, Your Honor.  I think this is similar to the one --

5          **THE COURT:**  Well, let's see.  I think I usually do

6    that.  *Has Google shown by a preponderance of the evidence that*

7    *its use in Android* -- okay.  We can put that in there.  All

8    right.  Is that it?

9          **MR. SILVERMAN:**  Yes, Your Honor.

10          **MS. SIMPSON:**  Yes, Your Honor.

11          **THE COURT:**  Okay.  Don't go away just yet.

12    Timewise, I will try to get these out to you in final form

13    by tomorrow.  But, again, I need to say in a rare case as I

14    hear the way the arguments unfold, if I'm surprised by some

15    line of argument, I may say to you that I feel an adjustment

16    has to be made because I got ambushed in some way.  I don't

17    think that's happened more than once in 17 years, but I have to

18    keep open that possibility.  And the one that is most likely

19    would be something that's suggested on this issue of the period

20    of time when the judgment of the Court in this case was that

21    Google was correct.  So you need to stay away from that.  All

22    right.  Can we quit for the day?

23          **MR. BABER:**  I think so, Your Honor.

24          **THE COURT:**  Good luck to both sides.

25          **MR. BICKS:**  Thank you.

1          MS. HURST:  Thank you, Your Honor.

2          MR. BABER:  Have a good weekend.

3       (At 1:42 p.m. the proceedings were adjourned until

4   Monday, May 23, 2016.)

5                          -  -  -  -

6

7

8                    CERTIFICATE OF REPORTERS

9          We certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11

12  DATE:  May 19, 2016

13

14                    _Katherine Sullivan_

15       _____

16       Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

17

18                    _Pamela A. Batalo_

19       _____

20       Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    U.S. Court Reporter

21

22

23

24

25