ORRICK, HERRINGTON & SUTCLIFFE LLP
KAREN G. JOHNSON-MCKEWAN (SBN 121570)
kjohnson-mckewan@orrick.com
ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
GABRIEL M. RAMSEY (SBN 209218)
gramsey@orrick.com
405 Howard Street, San Francisco, CA  94105
Tel: 1.415.773.5700 / Fax: 1.415.773.5759
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
51 West 52nd Street, New York, NY  10019
Tel: 1.212.506.5000 / Fax: 1.212.506.5151

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (*pro hac vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY  10504
Tel: 1.914.749.8200 / Fax: 1.914.749.8300
STEVEN C. HOLTZMAN (SBN 144177)
sholtzman@bsfllp.com
1999 Harrison St., Ste. 900, Oakland, CA  94612
Tel: 1.510.874.1000 / Fax: 1.510.874.1460

ORACLE CORPORATION
DORIAN DALEY (SBN 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (SBN 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (SBN 211600)
matthew.sarboraria@oracle.com
RUCHIKA AGRAWAL (SBN 246058)
ruchika.agrawal@oracle.com
500 Oracle Parkway,
Redwood City, CA 94065
Tel: 650.506.5200 / Fax: 650.506.7117

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.<br><br>            Plaintiff,<br>      v.<br><br>GOOGLE INC.<br><br>            Defendant. | Case No. CV 10-03561 WHA<br><br>**ORACLE'S REPLY IN ISO ORACLE'S RULE 50(A) MOTION**<br><br>Dept.: Courtroom 8, 19th Floor<br>Judge: Honorable William Alsup |

1

**TABLE OF CONTENTS**

2
                                                                                      Page

3

4   I.      Google Concedes That It Failed to Meet Its Fair-Use Burden ........................................... 1

    II.     No Reasonable Jury Could Find For Google On Factor One ............................................ 1

5           A.      Google Concedes Android Is Massively Commercial At Unprecedented
6                   Scale .................................................................................................................... 1

            B.      Google Concedes, Under The Proper Legal Test, That Android Is Not
7                   Transformative .................................................................................................... 2

8                   1.      Google concedes it made no alteration to what it copied, and the
                            infringed elements serve the same function and purpose........................... 2

9                   2.      Java SE was in smartphones for years before Android existed .................. 4

10                  3.      Google's transformative arguments contradict controlling authority ......... 4

            C.      Good Faith Does Not Favor Fair Use, But Bad Faith Weighs Against It ............... 5
11
            D.      Conclusion ........................................................................................................... 6

12  III.    NO REASONABLE JURY COULD FIND GOOGLE MET ITS BURDEN ON
            FACTOR TWO  BECAUSE THE JAVA SE API PACKAGES ARE HIGHLY
13          CREATIVE ...................................................................................................................... 6

14          A.      Uncontradicted Evidence Shows That The SSO Is Highly Creative ...................... 6

            B.      Conclusion ........................................................................................................... 8
15
    IV.     No Reasonable Jury Could Find that Google Met Its Burden On Factor Three ................ 8

16          A.      There Is No Evidence That Android Met "Developer Expectations"...................... 8

17          B.      Google Concedes It Copied Much More Than Was Technically Necessary........ 10

    V.      No Reasonable Jury Could Find For Google on Factor Four Because GooglE's
18          Case Proved Market Harm to Java SE .......................................................................... 10

19          A.      Google Does Not Dispute That It Has No Market Analysis................................ 11

            B.      Google Ignores Uncontroverted Evidence Of Direct Competition Between
20                  Android And Java SE In the Smartphone Market............................................... 12

            C.      Mr. Schwartz Offered Undisputed Testimony That Android Harmed Java
21                  SE .................................................................................................................... 12

22          D.      Google Does Not Address Potential Harm To Java SE And Its Derivatives........ 13

            E.      Google's Case In Chief Establishes Java ME Is A Derivative of Java SE,
23                  And That Google's Copying Harmed It.............................................................. 14

24  VI.     Conclusion .................................................................................................................... 15

25

26

27

28

ORACLE'S REPLY ISO RULE 50(A)

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*A&M Records, Inc. v. Napster, Inc.*,
5     239 F.3d 1004 (9th Cir. 2001)................................................................................5, 11, 14

6     *Authors Guild v. HathiTrust*,
      755 F.3d 87 (2d Cir. 2014)..............................................................................................13
7

8     *Campbell v. Acuff-Rose Music, Inc.*,
      510 U.S. 569 (1994) ....................................................................................................11, 14

9     *DC Comics v. Towle*,
10    802 F.3d 1012 (9th Cir. 2015)..........................................................................................15

11    *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
      109 F.3d 1394 (9th Cir. 1997)...............................................................................10, 11, 14
12

13    *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
      499 U.S. 340 (1991) ..........................................................................................................7

14    *Folsom v. Marsh*,
15    9 F. Cas. 342 (C.C.D. Mass. 1841) ...................................................................................5

16    *Gaylord v. United States*,
      595 F.3d 1364 (Fed. Cir. 2010).........................................................................................2
17

18    *Harper & Row Publishers, Inc. v. Nation Enters.*,
      471 U.S. 539 (1985)......................................................................................................2, 5

19    *Kelly v. Arriba Soft Corp.*,
20    336 F.3d 811 (9th Cir. 2002).............................................................................................8

21    *Micro Star v. Formgen Inc.*,
      154 F.3d 1107 (9th Cir. 1998)...........................................................................................5
22

23    *Monge v. Maya Magazines, Inc.*,
      688 F.3d 1164 (9th Cir. 2012)...............................................................................1, 2, 6, 9

24    *Oracle Am., Inc. v. Google Inc.*,
      750 F.3d 1339 (Fed. Cir. 2014)......................................................................................7, 14
25

26    *Perfect 10, Inc. v. Amazon.com, Inc.*,
      508 F.3d 1146 (9th Cir. 2007)...........................................................................................3

27    *Sega Enters. Ltd. v. Accolade, Inc.*,
28    977 F.2d 1510 (9th Cir. 1992)...........................................................................................2

ORACLE'S REPLY ISO RULE 50(A)

*Stewart v. Abend*,
495 U.S. 207 (1990) ................................................................................................2, 14

*Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*,
447 F.3d 769, 780 (9th Cir. 2006) ........................................................................8

*Worldwide Church of God v. Phila. Church of God, Inc.*,
227 F.3d 1110 (9th Cir. 2000)..........................................................................13, 14

**Federal Statutes**

17 U.S.C. § 102(a) .................................................................................................7

ORACLE'S 50(A) REPLY

1    **I.      GOOGLE CONCEDES THAT IT FAILED TO MEET ITS FAIR-USE BURDEN**

2           Oracle moved for judgment as a matter of law at the close of Google's case-in-chief on

3    the ground that Google failed to create an evidentiary record sufficient to meet its threshold bur-

4    den on its fair use affirmative defense.  *See Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170

5    (9th Cir. 2012) ("As with all affirmative defenses, [Google] as the defendant bears the burden of

6    proof."); Tr. 1292:22-25 ("[Oracle:]  Your Honor, Oracle would intend to be making a Rule 50A

7    motion.  THE COURT: Okay.  I'm going to deem that to be made right now [at the close of

8    Google's case-in-chief], but we'll hear it later."); *id.* 1317:23-1318:6 ("THE COURT:  … And

9    [Oracle's Rule 50(a) motion] would be as if it were made at the close of the Google case.  [Ora-

10   cle]: Yes.").  Google has not responded in any meaningful sense to Oracle's motion, which was

11   based on the record as it existed at the close of Google's case.  Because the evidence submitted

12   for Google's case-in-chief does not support a verdict in Google's favor, Google improperly relies

13   on at least 49 citations to the record developed *after* Google rested its case-in-chief.  Google's op-

14   position relies extensively on record evidence from *Oracle's* case amounts to a concession that

15   Google's case-in-chief cannot support a jury verdict in Google's favor.  Google has not shown

16   that it met its threshold burden at the time of Oracle's motion, and Oracle is entitled to judgment.

17   **II.     NO REASONABLE JURY COULD FIND FOR GOOGLE ON FACTOR ONE**

18           **A.      Google Concedes Android Is Massively Commercial At Unprecedented Scale**

19           "Google does not contest Android's commercial nature," Opp. at 2, which the evidence in

20   Google's case-in-chief shows is commercial on an unprecedented scale.  Android, the work con-

21   taining the 37 Java API packages, is "hugely profitable" because "Search + Android = Huge,"

22   "virtually all the revenue of Google comes from its advertising," and Google's revenue is many

23   "billions of dollars."  Mot. at 2 (collecting record citations).

24           With Android's massive profitability and commerciality undisputed, Google's only re-

25   sponse is to state the incorrect legal standard and claim that it was *Oracle's* burden to prove

26   Google's affirmative defense by parsing revenues attributable to use of the declarations/SSO, ra-

27   ther than revenues attributable to Android as a whole.  Opp. at 2-3.  The proper test, however, fo-

28   cuses on revenues on the work as a whole, *without any apportionment*.  The Supreme Court in

1    *Stewart v. Abend* considered a film's *gross* revenues of $12 million under factor one, despite the

2    fact that the film contained only 20% infringing material.  495 U.S. 207, 237-38 (1990) (citing

3    *Abend v. MCA, Inc.*, 863 F.2d 1465, 1468 (9th Cir. 1988) ("The [film's infringing] re-release gen-

4    erated over $12 million in revenue.")); *accord Gaylord v. United States*, 595 F.3d 1364, 1374

5    (Fed. Cir. 2010) (finding gross stamp revenues of $17 million to be highly commercial where

6    $11.6 million in sales were made for postal services and only $5.4 million were attributable to the

7    infringing aspects of the stamps).  Indeed, the first factor commerciality inquiry is not concerned

8    with attributing exact dollar amounts between infringing and non-infringing aspects of the de-

9    fendant's work; it is enough that Google "is motivated by profits, and in fact profited from the

10   [infringement.]"  *Monge*, 688 F.3d at 1177; *accord Harper & Row Publ'rs, Inc. v. Nation Enters.*,

11   471 U.S. 539, 562 (1985) ("The crux of the profit/nonprofit distinction is not whether the sole

12   motive of the use is monetary gain but whether the user *stands to profit* from exploitation of the

13   copyrighted material without paying the customary price." (emphasis added)).

14          Here, it is undisputed that Google was motivated to copy by a "Direct Revenue Impact"

15   from Android, TX 1061 at 15, the prospect of massive profits, and that Google in fact profited on

16   the unprecedented scale of many billions of dollars.  Google cites *Sega* to suggest copying for

17   profit is in the public interest, but that case found a public interest in the proliferation of non-in-

18   fringing "creative expression, based on … *unprotected* ideas," not making billions in profits from

19   billions of infringing products.  *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir.

20   1992) (emphasis added) (the final product did not contain any infringing code; the copying oc-

21   curred in the reverse-engineering stages).  Google has not and cannot cite a case where an in-

22   fringement with revenues anywhere close to this magnitude have been found to constitute fair

23   use.  *See* Opp. at 4.  This factor weighs heavily against fair use as a matter of law.

24          **B.      Google Concedes, Under The Proper Legal Test, That Android Is Not Trans-
                      formative**

25

26          **1.      Google concedes it made no alteration to what it copied, and the in-
                      fringed elements serve the same function and purpose**

27          Google offers no response to evidence that Google's copying was verbatim, and Google's

28   use of the copied Java API packages is for the same purpose as their use in Java SE.  *See* Mot. at

1    8-10.  Google further concedes that where the defendant exactly copies protected portions of a

2    work, as is the case here, the infringing use "may be transformative *so long as* the copy serves *a*

3    *different* function than the original work."  Opp. at 3 (quoting *Perfect 10, Inc. v. Amazon.com,*

4    *Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (emphasis added)).[1]  Under the proper legal definition,

5    there is no evidence that Google's use is transformative because the evidence shows what Google

6    copied has the same function (and purpose) in both Java SE and Android.

7            Google cites no evidence that the declaring code and SSO serve different functions in Java

8    SE and Android—nor could it—because the uncontroverted evidence shows they do the exact

9    same thing in both platforms.  Dr. Astrachan testified that API declarations serve the same func-

10   tion regardless of platform:  "That [API declaration] serves the function of connecting my soft-

11   ware with the implementing code in the [API package]."  Tr. 1243:12-14 (Astrachan).  As Dr.

12   Bloch testified, the point of copying the method declarations from Java SE was to retain the exact

13   same functionality in Android as was found in Java SE.  Tr. 997:10-12 (Bloch) ("The declarations

14   don't change ….  They are what allows the caller of a *function* to call it." (emphasis added)).

15           In fact, the basis of Google's "developer expectations" argument is that the copied Java

16   API packages *must be* and function exactly the same, even though technically Google could have

17   written "a completely different package and class organization," Tr. 1268:8-9 (Astrachan).  Tech-

18   nically Google could have "create[d] API packages with different [method and class] labels. *Id.*

19   1270:15-16.  Google chose not to do so precisely because it wanted Android to have an API that

20   could be "used to access that same functionality," *id.* 1217:2-6, in Android as in Java SE so that

21   Google could "us[e] the same Java developers," *id.* 1270:15-17, who were drawn to Java and

22   trained in the platform due to Sun/Oracle's investment of "[b]illions of dollars" in intellectual

23   property," Tr. 609:18 (Schwartz).  But even with respect to "developer expectations," which is

24   just code for Google's business goal of capturing for free the developer community Sun/Oracle

25   worked so hard to create, the testimony shows that developers only "expect that if you're going to

26

27   _____

     [1] Although *Perfect 10* contains this language, the case did not involve an example of "exact copy-
     ing," and Google does not cite a case excuses exact copying in a commercial product as fair use.
28   508 5.3d at 1155 ("The [infringed] thumbnail images are *reduced, lower-resolution versions* of
     full-sized images stored on third-party computers." (emphasis added))

1   be using the Java programming language, that you have access to a rich suite of APIs … to be

2   able to write the programs," Tr. 1262:6-11 (Astrachan), not that Google needed to copy wholesale

3   from Java SE in order to provide APIs for Android.

4        Google concedes that its verbatim copying of the Java SE API packages must "serve[] a

5   different *function* than the original work" in order to be transformative, and the evidence shows

6   just the opposite.  Opp. at 3 (quoting *Perfect 10*, 508 F.3d at 1165) (emphasis added).

7                  **2.**       **Java SE was in smartphones for years before Android existed**

8        Google's argument that verbatim copying of the Java API packages was transformative

9   because the copied code served a different purpose in Android—to create "a full mobile stack"

10  for the first time—falls flat.  This argument ignores undisputed evidence that Java SE was in

11  smartphones for years before Android.  Java SE was in Danger smartphones that were "[m]ore or

12  less" the same as "the modern Android and iPhones" with "a lot of the same functionality," i.e.,

13  "allowed you to surf the Web, get the full Web on a phone … had a larger screen … [that] could

14  be in landscape or portrait mode … did instant messaging … email and things like that."  Tr.

15  620:5-13 (Rubin); *id.* 887:22-24 (Danger included "the Java 2 SE APIs for Hiptop.").  Google

16  also ignores uncontravened evidence that Java API packages were in RIM Blackberry

17  smartphones, ECF No. 1917-9 (Gering Depo. Desig.) 104:2-15, SavaJe smartphones, and that

18  Nokia licensed Java SE for smartphones, Tr. 1266:11-17 (Astrachan)—all *before* Android was

19  released.  Far from a "new creation," Opp. at 3 (quoting *Perfect 10*, 508 F.3d at 1165), the evi-

20  dence shows that when Google released Android, it superseded Java in the marketplace because

21  Google was now "targeting the same industry with similar products."  Tr. 844:21-22 (Rubin).

22  The only thing "different" about Android's use of the Java API packages was that it was unli-

23  censed—everything else about it was done years ago by others, with a license from Oracle.

24                 **3.**       **Google's transformative arguments contradict controlling authority**

25       Google concedes that Android does not invest the Java SE API packages with a "new pur-

26  pose, meaning, or message" because they serve the same function and purpose in Android as they

27  do in Java SE.  Google further recognizes in opposition that its transformative argument is limited

28  to the three premises identified by Oracle in its Motion, at 5-6, each rejected in controlling cases:

1    Android is transformative because it 1) is an excerpt from a copyrighted work, 2) was incorpo-

2    rated into a broader work, and 3) was given away for free.  *See* Opp. at 5-7.

3             ***Excerpting a copyrighted work verbatim is not transformative.***  Google argues that it

4    transformed Java SE by "selectively us[ing] the declarations/SSO of only 37 of the 166 Java SE

5    API packages … rather than the entirety of Java SE."  Opp. at 5.  But it has been the law for cen-

6    turies that excerpting a protected work is not transformative.  *See, e.g.*, *Folsom v. Marsh*, 9 F.

7    Cas. 342, 345 (C.C.D. Mass. 1841) (Story, J.) (fair use does not protect "merely the facile use of

8    the scissors; or extracts of the essential parts"); *see also Harper & Row*, 471 U.S. 569.

9             ***Copying for incorporation into a broader work is not transformative.***  Google's argues

10   that it "combined the declarations/SSO with new libraries designed for a mobile platform."  Opp.

11   at 5.  As the Court has recognized, "Piracy as well as fair use both will almost always involve us-

12   ing the copyrighted material as part of a larger work.  This consideration does not help distinguish

13   between allowed uses versus disallowed uses."  ECF No. 1780 (Order Rejecting Prop. Instr.) at 3;

14   *see also Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1113 n.6 (9th Cir. 1998) (combining infring-

15   ing files into compilation "can hardly be described as transformative; anything but").  Google of-

16   fers no response to the Court's holding or the applicable law, choosing instead to forge ahead

17   with a rejected and legally irrelevant argument.

18            ***Giving away protected expression for free is not transformative.***  Google argues that giv-

19   ing away Android for free somehow makes it transformative:  "Google's open source distribution

20   of Android also makes it transformative."  Opp. at 6.  Google again ignores directly contrary

21   binding authority.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001)

22   (finding platform that distributed copyrighted material for free to be non-transformative and

23   highly commercial).  Google also ignores the record, which shows that Oracle open sourced Java

24   *before* Android was released, making Google's use of the Java SE APIs as open source nothing

25   new.  Mot. at 7 (collecting record evidence detailing the release of OpenJDK); *see* TX 415

26   (Google acknowledging that the Apache license was not compatible with the OpenJDK license).

27            **C.      Good Faith Does Not Favor Fair Use, But Bad Faith Weighs Against It**

28            Google's opposition concedes that its industry custom and practice arguments, including

1   all evidence related to Sun's supposed reimplementation of APIs decades ago, Apache Harmony

2   and GNU Classpath, are relevant only to the good faith/bad faith sub-factor of fair use factor one.

3   Opp. at 7.  This emphasis on industry custom and practice is an attempt to prove Google's good

4   faith in the face of overwhelming contemporaneous evidence of Google's bad faith infringement.

5   *See* Opp. at 7-12 (dedicating 6 pages of 23 to bad faith); Mot. at 10-13 (collecting record evidence

6   of bad faith).  In any event, the existence of any evidence of good faith cannot weigh in favor of

7   fair use.  A finding that "[the defendant's] actions do not amount to an abuse of the good faith and

8   fair dealing underpinnings of the fair use doctrine" simply means that "[a]pplication of the de-

9   fense is not foreclosed," *Monge*, 688 F.3d at 1173 n.6 (quotation marks and internal citation

10  omitted).  Thus, even if Google could show evidence sufficient to support a verdict of good faith

11  (which it cannot), this component of factor one would merely be neutral.  Since Google's use was

12  commercial and not transformative, factor one weighs in Oracle's favor no matter what evidence

13  of good faith Google presented to the jury.

14          **D.    Conclusion**

15          The Java SE API packages copied into Android serve the same purpose and function in

16  both platforms, and Google's use of the Java SE API packages cannot be transformative.  An-

17  droid's unprecedented commerciality weighs heavily against fair use.  Google's good faith is con-

18  tradicted by extensive contemporaneous record evidence, and good faith is at best neutral.

19  **III.    NO REASONABLE JURY COULD FIND GOOGLE MET ITS BURDEN ON FAC-
            TOR TWO  BECAUSE THE JAVA SE API PACKAGES ARE HIGHLY CREA-**
20  **TIVE**

21          **A.    Uncontradicted Evidence Shows That The SSO Is Highly Creative**

22          Google cites no record evidence (and there is none) that shows the *SSO* of the copied Java

23  API packages is anything but highly creative, the product of "a whole bunch" of "design princi-

24  ples."  Tr. 971:8-10 (Bloch).  The uncontradicted record testimony is that "API *design* is a noble

25  and rewarding craft," Tr. 1007:18-20; TX 624 at 47; "an art, not a science" where the author

26  "[s]trive[s] for beauty," TX 877 at 2.  *See also* Mot. at 14-16 (collecting record evidence showing

27  the highly creative nature of the declaring code and SSO of the Java SE API packages).

28          Google's only response to this evidence is to claim that the SSO and method declarations

1  are "equivalent for purposes of understanding functionality."  Opp. at 12.  But the SSO and

2  method declarations are distinct, with each constituting a separate and independently copyrighta-

3  ble aspect of Java SE.  *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1348 (Fed. Cir. 2014);

4  ECF No. 1846 (Stip. Copyrightability Stmt.) ("The declaring code for a method tells the program-

5  mer the information the method needs (the inputs) to perform the desired function" and "[t]he

6  SSO specifies the relationships between and among the elements of the Java API packages, and

7  also organizes the classes, methods and other elements in the package."); *see* Mot. at 16-17.

8  Google's argument that the SSO and method declarations are equivalent should be rejected be-

9  cause it violates the parties' binding factual stipulation and the Federal Circuit opinion.

10       Not even the testimony of Google's own expert supports Google's position.  Dr. Astra-

11  chan testified that although the Java language requires the general package-class-method hierar-

12  chy, API authors have unlimited choices within that framework, such that Google could have "re-

13  writ[ten the Java] APIs using something that was a completely different package and class organi-

14  zation…"  Tr. 1268:7-11.  While this "completely different package and class organization"

15  would be reflected in the declaring code of the rewritten API, this says nothing about the creative

16  choices involved in designing API packages containing hundreds of classes and thousands of

17  methods, i.e., the design process by which the API author selects from unlimited possibilities to

18  group methods classes and classes into packages according to the subjective and creative design

19  techniques that Dr. Bloch described.  With no evidence that the SSO (or design) of the copied

20  Java SE API packages was functional rather than creative, Google has failed to meet its burden on

21  factor two to show what it copied—both the declaring code and SSO—is functional rather than

22  creative.  No jury could find that this factor weighs in Google's favor.

23       *Feist*, a copyrightability decision, is inapposite.  Google's claim that Oracle's investment

24  in the Java SE platform is irrelevant to factor two is wrong. Opp. at 14.  Google cites *Feist*

25  *Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 362 (1991), a *copyrightability* decision that

26  stands for the proposition that labor alone, without creativity, does not satisfy 17 U.S.C. §

27  102(a)'s originality requirement for copyrightability.  But when copyrightability is not at issue,

28  time and investment to create a copyrighted work weighs against fair use under factor two.  *Wall*

*Data Inc. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 780 (9th Cir. 2006) ( "undisputed evidence that RUMBA software products were developed over several years, and required a multi-million dollar investment on Wall Data's part" weighs against fair use); *see* Mot. at 18.  Google has identified no evidence contradicting the testimony cited in Oracle's Motion showing that Sun/Oracle invested heavily in intellectual property, including "substantial investments … made in all aspects of Java."  Tr. 610:3-5 (Schwartz).

### B.    Conclusion

Google has not submitted any evidence showing that the SSO or design of the copied 37 Java SE API packages is anything but highly creative and the product of a design process involving significant subjective judgment and art.  Nor has Google pointed to any evidence calling into question testimony that Oracle invested heavily in Java SE.  Without evidence upon which the jury could base a finding in Google's favor on this factor, it weighs in Oracle's.

### IV.    NO REASONABLE JURY COULD FIND THAT GOOGLE MET ITS BURDEN ON FACTOR THREE

At the outset, Google agrees that the best it can do on factor three is break even because "[i]f the secondary user only copies as much as is necessary for his or her intended purpose, then this factor will *not weigh against him or her*." Opp. at 14-15(emphasis original) (quoting *Oracle Am.*, 750 F.3d at 1375-76); *see* Mot. at 18-19 (same).  Thus, in *Kelly v. Arriba Soft Corp.*, where the defendant proved that amount copied was *necessary* to a permissible purpose, the third factor did not favor either party.  336 F.3d 811, 820–21 (9th Cir. 2002).  Here, even if a reasonable jury accepts Google's arguments and credits Google's evidence, this factor *cannot favor* fair use.  And on the undisputed record evidence from Google's case-in-chief, any reasonable jury would find that factor three militates heavily against fair use.

### A.    There Is No Evidence That Android Met "Developer Expectations"

Google's factor three argument is almost entirely based on the claim that it copied just enough in order to "meet developer expectations." *See* Tr. 1233:6 (Astrachan).  In its opposition, Google alternately claims that it copied because "developers would expect to be able to use all of the 37 API packages in order to make effective use of the [Java] language," or that it copied to

1    achieve "the portability of programming knowledge between platforms[.]"  Opp. at 15.  Both of

2    Google's arguments fail because where copying is not *necessary*, and alternatives exist, this fac-

3    tor weighs against fair use—even if the alternatives are less effective or less desirable.  *Monge*,

4    688 F.3d at 1179.  Because Maya could have published a marriage certificate or used fewer in-

5    fringing photos to document the wedding, factor three weighed against fair use.  *Id.*

6            *First*, Dr. Astrachan, Google's only expert, testified that Sun made "a great effort to make

7    Java and the API libraries available to both me in my teaching responsibilities, but also to compa-

8    nies that would be able to use Java….  So Sun took great, kind of, care and steps to make sure

9    that Java and the APIs were both well-known and easy to use for both teaching purposes and for

10   developers writing programs."  Tr. 1224:11-22.  Sun competed to "recruit developers" to Java SE.

11   Tr. 590:24-591:1 (Schwartz).  Because Sun's investments were successful, developers learned to

12   use the Java SE APIs copyrighted by Sun.  But there was nothing about Sun's success that locked

13   developers into Sun's Java SE APIs.  Dr. Astrachan testified that if Google created a new API,

14   developers could learn it "by consulting documentation and reading books," just as they had when

15   they learned Oracle's Java SE APIs, and just as they would if they want to learn any new com-

16   puter program.  Tr. 1233:12-15.  Dr. Astrachan further testified that what matters to developers is

17   not the particular declaring code of Sun's Java SE APIs (although the evidence also shows that

18   Oracle's APIs are among the best and most valuable available), but that they "have access to a

19   rich suite of APIs … to be able to write the programs," Tr. 1262:6-11, and that "effective use of

20   the language" just requires "libraries to be able to use the language," Tr. 1262:12-20, but not nec-

21   essarily Oracle's libraries.  Thus, Google "engineers could have used a completely different set of

22   APIs" in Android, Tr. 1270:6-9, but Google would have had to invest, like Sun had, in training

23   and recruiting developers to its platform.  There was no guarantee Google could have written an

24   API as popular and valuable as Oracle's, and Google was out of time, so Google chose to copy.

25   No reasonable jury could find Google's copying was necessary to meet developer expectations.

26           *Second*, Google seems to claim that it copied to achieve "the portability of programming

27   knowledge between platforms" is not supported by any evidence.  Opp. at 15.   Android is not

28   compatible with Java SE, Tr. 1231:8-10 (Astrachan), and developers who switch from Java SE to

1   Android have to forget about the packages Google did not copy from Java SE and learn the pack-

2   ages Google wrote specifically for Android, *id.* 1231:15-25.  Nor was copying, as Google argues,

3   about familiarity with the Java *language*, Opp. at 16, because the evidence is that the copied API

4   packages are different from the language, Tr. 1268:2-4 (Astrachan) ("I think the programming

5   language and the APIs are used together, but they're different.").

6   **B.      Google Concedes It Copied Much More Than Was Technically Necessary**

7   Google has not conducted the necessary filtration analysis, and introduced no evidence

8   during its case in chief that its copying was required for use of the Java language.  *See* Mot. at 17-

9   18.[2]  Indeed, the only evidence Google presented in its case-in-chief regarding the necessity of

10   copying beyond three of the 37 Java API packages was stricken from the record.  Tr. 1316:3-

11   1317:2.  At best, then, Google can cite to testimony that the language provided "syntax and se-

12   mantics" and that the API "conformed to the rules and conventions" of the language, Opp. at 15

13   (citing Bloch testimony), but as Dr. Astrachan testified, an API written in conformance with the

14   requirements of the Java language (much like a book written in conformance with the syntactic

15   and semantic requirements of the English language) can be written using a "completely different

16   package and class organization," and the "choice to use the 37 [Java SE] APIs was not a require-

17   ment of the Java programming language[.]"  Tr. 1268:5-14 (Astrachan); *see also* ECF No. 1845

18   (Stip. Facts) # 4 (the 37 API packages could have been "written and organized … in any number

19   of ways and still have achieved the same functions.").   Google identifies no permissible purpose

20   for which it was necessary to copy from the Java SE APIs.

21   **V.      NO REASONABLE JURY COULD FIND FOR GOOGLE ON FACTOR FOUR
        BECAUSE GOOGLE'S CASE PROVED MARKET HARM TO JAVA SE**

22

23   Google does not dispute that the fourth factor is the most important fair use factor, nor

    does it dispute that a "failure to submit evidence … on an important factor bearing on fair use dis-

24   entitle[s] the proponent of the defense …"  *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,

25   109 F.3d 1394, 1403 (9th Cir. 1997).  Google also offers no reason, relying on outdated language

26

27   _____

28   [2] This issue and the parties' stipulation that 170 lines of code were required to use the Java lan-
    guage, evidence of which was introduced after Google closed its case, is addressed in Oracle's
    Opposition to Google's Rule 50(a) Motion.

1   from *Campbell v. Acruff-Rose Music, Inc.*, 510 U.S. 569 (1994), to ignore the Ninth Circuit's pre-

2   sumption of market harm where, as here, Google's use is not transformative, and it is purely com-

3   mercial. *See Napster, Inc.*, 239 F.3d at 1016; ECF No. 1950 (Final Jury Charge) ¶ 37.  Further,

4   Google tries to erase significant and undisputed evidence of market harm by mischaracterizing

5   the law and citing out-of-circuit authority.  None of this changes the fact that Google failed to

6   submit evidence from which a reasonable jury could find in its favor on factor four, nor does it

7   erase ample evidence of direct competition between Java SE and Android and resultant market

8   harm—all adduced during Google's case.

9            **A.**      **Google Does Not Dispute That It Has No Market Analysis**

10         Google's case-in-chief contains no evidence from which a reasonable jury could analyze

11   the relevant markets, and it offers no response in its opposition. *See* Mot. at 21; Opp. at 19-20

12   (relying almost entirely on citation to the post-motion record *rebuttal* testimony of Dr. Leonard).

13   This failure of proof is critical and dispositive in Oracle's favor.  The fourth factor requires not

14   only evidence about the market for the original work, Java SE, "but also whether unrestricted and

15   widespread conduct of the sort engaged in by the defendant ... would result in a substantially ad-

16   verse impact on the potential market for the original." *Campbell*, 510 U.S at 590–91 (quote omit-

17   ted).  This type of hypothetical market impact is the province of expert testimony, FREs 701-702

18   (opinion testimony limited to experts), and Google does not dispute that it presented no qualified

19   expert in its case-in-chief to link the testimony of percipient witnesses to Google's unfounded

20   claims about the hypothetical lack of market harm. *See* Opp. at 16-20.  This leaves Google in the

21   peculiar position of claiming that undisputed testimony showing direct market competition be-

22   tween Android and Java SE, which was elicited from Google's own witnesses, should simply be

23   ignored.  But Google bears the burden on this most important factor, and "it is impossible to deal

24   with the fourth factor except by recognizing that a silent record on an important factor bearing on

25   fair use disentitle[s] the proponent of the defense." *Dr. Seuss*, 109 F.3d at 1403 (quote omitted).

26   The analysis should end here because the law is clear that Oracle is entitled to judgment in its fa-

27   vor, but even so, the record in Google's case-in-chief is filled with evidence of actual market

28   harm to Java SE that Google cannot explain away.

ORACLE'S 50(A) REPLY

**B.      Google Ignores Uncontroverted Evidence Of Direct Competition Between Android And Java SE In the Smartphone Market**

Google's own witnesses testified about competition between Android and Java SE.  Andy Rubin, the head of Android who was involved with smartphones from nearly the beginning, testified that his prior company, Danger, developed the software for a smartphone called Hiptop/Sidekick years before Android was released.  Tr. 628:22-25.  He testified that the Sidekick used the Java SE APIs.  Tr. 887:23-24.  Thus, when Android finally hit the market, Rubin testified that Sun and Android—both in the business of licensing smartphones—were direct competitors because they were "both targeting the same industry with similar products" at the time of Android's release into "a space that Sun was already in.  They were selling things to the mobile industry …."  Tr. 844:18-22 (Rubin); *see also* ECF No. 1917-9 (Gering Depo. Desig.) 104:2-15 ("[T]here were other devices in the market that had Java on them … for example RIM….  I think all RIM devices would be in the smartphone category ….").  Of course, Android was giving away Sun/Oracle's property for free at the same time Sun/Oracle was trying to license it commercially.  Tr. 623:3-6 (Rubin).  In opposition, Google simply ignores Rubin's testimony, which is uncontradicted and dispositive on market harm.

**C.      Mr. Schwartz Offered Undisputed Testimony That Android Harmed Java SE**

Google suggests that because "Sun never sought to separately license any copyright in the *specific* declarations [and] SSO in Java SE used by Google," that Google was free to take them, Opp. at 17 (emphasis added), even though Google asserts no license defense, ECF 1950 (Final Jury Charge) ¶ 27 ("Google makes no claim that its use was pursuant to a license from Sun or Oracle, directly or indirectly.").  Mr. Schwartz testified that compatibility was important to Sun's business, and Sun required companies to "pass a series of tests and compatibility kits that would allow [Sun] to say [a third party implementation] is compatible" for a fee.  Tr. 507:5-9.  Mr. Schwartz also acknowledged that Sun's specification license prohibited super-setting and sub-setting of the Java SE API.  Tr. 569:22-25.  It is no surprise that Sun did not offer a license to the

1    "specific" Java API packages copied by Google because, as a subset of Java SE, Google's use vi-

2    olated Sun's license.  TX 610.1 (permitting *full* implementations of the API specification).[3]

3         But compatibility is a sideshow that Google is using to distract from the fact that Mr.

4    Schwartz offered testimony that Android was "a competitor of [Sun's] because we were both

5    looking to recruit developers to create applications for our products."  Tr. 590:25-591:2.  Direct

6    market harm need not be monetary, and the fourth factor recognizes any harm that may "impair

7    the copyright holder's ability to obtain the rewards that Congress intended him to have."  *World-*

8    *wide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1119 (9th Cir. 2000).  Thus, in

9    *Worldwide Church*, market harm was likely where two competing non-profit churches used the

10   same publication as a marketing device for adherents, just as Oracle and Google both use the

11   same Java API packages to attract developers to their ecosystems.  The record is undisputed that

12   Android competes with Java SE in this manner.

13        For the same reason, Google's citation to *Authors Guild v. HathiTrust*, 755 F.3d 87, 99

14   (2d Cir. 2014), cuts against Google's case on both transformative use and market harm.  The evi-

15   dence is that Android harms Java SE "because the secondary use serves as a substitute for the

16   original," and under *HathiTrust*, Google's use is not transformative because "transformative uses

17   …, by definition, do not serve as [market] substitutes for the original work."  *Id.*  The harm (and

18   lack of transformative use) extends well beyond competition for developers, however, as there is

19   undisputed evidence that Java SE and Android competed with one another directly.  TX 205.

20       **D.**     **Google Does Not Address Potential Harm To Java SE And Its Derivatives**

21        Relying heavily on evidence introduced after Google rested its case-in chief, such as evi-

22   dence in Google's *rebuttal* case, Google claims that Android is not a substitute for Java SE.  Opp.

23   at 19-20.  *First*, Google's argument is not based on any pre-motion evidence because Google of-

24   fered no testimony on which a reasonable jury could base a market substitution analysis.  *See* Tr.

25   1272:22-25 (Astrachan) ("I am not an economist.  Q.  And you did not apply any economic ex-

26   pertise in evaluating the effect of Android on Java SE; isn't that right?  A.  That is true.");  Opp. at

27   _____

28   [3] If Google argues that Mr. Schwartz's testimony was that the APIs were not subject to any li-
     cense, the argument fails.  He was aware of the specification license, but could not remember the
     details except the prohibition on supersetting/subsetting the APIs.  Tr. 569:17-570:12.

1    19-20 (relying heavily on post-motion record evidence).  Second, Google can only make this ar-

2    gument by ignoring evidence showing direct competition between Java SE and Android in the

3    smartphone market from Andy Rubin, cited above.  *Third*, Google is struggling with the wrong

4    question.  Market harm for purposes of fair use focuses on market harm to the original work, cer-

5    tainly, but it is also equally concerned with harm to the *potential* market for the original *and* po-

6    tential derivatives, i.e., derivative works that *do not yet exist*.  *Campbell*, 510 U.S. at 593.  In

7    *Campbell*, for instance, the Supreme Court held that 2 Live Crew had not met its burden of proof

8    as the defendant on market harm because it only submitted evidence relevant to the market for the

9    original, not the potential market for licensing the original for derivative use in the rap music mar-

10   ket, even though no such derivative works yet existed.  *Id.*; *accord Dr. Seuss*, 109 F.3d at 1403.

11          Google's focus on whether or not Oracle has created its own smartphone platform is also

12   irrelevant.  Many authors lack the interest or ability to enter new markets with derivative works,

13   and they sometimes lack the resources and expertise necessary to do so.  "Even an author who

14   had disavowed any intention to publish his work during his lifetime was entitled to protection of

15   his copyright, first, because the relevant [fair use] consideration was the 'potential market' and,

16   second, because he has the right to change his mind."  *Worldwide Church*, 227 F.3d at 1119.  But

17   unauthorized copying by third parties to create derivative works is nevertheless not fair use.  *See*

18   *Stewart v. Abend*, 495 U.S. 207, 238 (1990) (short story author harmed by infringing film despite

19   no evidence story author could produce and direct a competing film); *Campbell*, 510 U.S. at 593

20   (recognizing possibility of harm to licensing market for derivatives despite the fact that the late

21   Roy Orbison would not produce a rap version of *Pretty Woman*).

22          **E.      Google's Case In Chief Establishes Java ME Is A Derivative of Java SE, And
                      That Google's Copying Harmed It**

23
     Google's characterization of derivative work stretches the bounds of logic.  Opp. at 18-19.

24
     The infringement verdict (subject to fair use) satisfied two elements of infringement: (1) owner-

25
     ship and (2) infringement (copying) of copyright-protected elements of the work.  *Napster*, 239

26
     F.3d at 1013; *Oracle Am.*, 750 F.3d at 1381 (reinstating infringement verdict).  The record in

27
     Google's case-in-chief shows that Java ME is a derivative of the copyrighted work, Java SE.  Tr.

28

- 14 -

1   1273:1-5 (Astrachan) ("There are [ad]ditions to the Java ME that aren't part of Java SE because it

2   runs on feature phones and embedded devices.  But, in general, it's a subset."); Tr. 1201:5 (Ger-

3   ing) ("Java ME and Java SE were two different editions of Java."); Tr. 581:19-21 (Schwartz)

4   ("We had licenses for Java ME which was the micro edition, the tiny version of Java.").  The rec-

5   ord also shows that Google knew that using the Java SE APIs in Android would cause market

6   harm to Sun's Java ME, precisely because ME was derivative of SE.  Tr. 476:1-5 (E. Schmidt)

7   ("Q. … you were aware of that Sun had revenues from the use of something called Java ME that

8   it was concerned about … ? A. I was aware that Sun was concerned about a revenue -- remember

9   the submarine conversation yesterday?").  Java ME contains elements from Java SE that are

10  owned by Oracle, thus infringement of SE is harm to ME.  *See, e.g.*, *DC Comics v. Towle*, 802

11  F.3d 1012, 1024 (9th Cir. 2015) ("if the material copied was derived from a copyrighted underly-

12  ing work, this will constitute an infringement of such work regardless of whether the defendant

13  copied directly from the underlying work, or indirectly via the derivative work.").  Moreover, the

14  fair use analysis considers *potential* derivatives, and it would make no sense to ignore harm to

15  Java ME, which contains elements of Java SE, but consider harm to hypothetical derivatives that

16  do not yet exist.  There is no reasonable basis upon which evidence of market harm to Java ME

17  should be disregarded for purposes of market harm.

18       Google's case-in-chief established that Java SE had been running in smartphones before

19  the release of Android, and that Android competed directly with Java in the mobile phone market

20  when it was released.  Despite evidence of direct competition and market harm, Google presented

21  no market analysis from which a jury could conclude that Java SE unharmed in the market.

22  **VI.  CONCLUSION**

23       Oracle is entitled to judgment as a matter of law because no reasonable jury could find

24  that Google met its burden of proof.

25

26

27

28

1

2    Dated:  May 25, 2016                              Respectfully submitted,

3                                                      Orrick, Herrington & Sutcliffe LLP

4                                                      By: */s/ Peter S. Bicks*
                                                           Peter S. Bicks

5                                                      Counsel for ORACLE AMERICA, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28