# Exhibit C

```
                                        Volume 15
                                        Pages 2680 - 2738

              UNITED STATES DISTRICT COURT

            NORTHERN DISTRICT OF CALIFORNIA

         BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,          )
                               )
         Plaintiff,            )
                               )
    VS.                        )   No. C 10-3561 WHA
                               )
GOOGLE, INC.,                  )
                               )
         Defendant.            )   San Francisco, California
_____)   May 3, 2012


              TRANSCRIPT OF PROCEEDINGS

APPEARANCES:
For Plaintiff:          MORRISON & FOERSTER
                        755 Page Mill Road
                        Palo Alto, California  94304
                  BY:   MICHAEL A. JACOBS, ESQUIRE
                        KENNETH A. KUWAYTI, ESQUIRE
                        MARC DAVID PETERS, ESQUIRE
                        DANIEL P. MUINO, ESQUIRE

                        BOIES, SCHILLER & FLEXNER
                        333 Main Street
                        Armonk, New York  10504
                  BY:   DAVID BOIES, ESQUIRE
                        ALANNA RUTHERFORD, ESQUIRE

(Appearances continued on next page)


Reported By:  Katherine Powell Sullivan, RPR, CRR, CSR #5812
```

```
APPEARANCES (CONTINUED):
For Plaintiff:          BOIES, SCHILLER & FLEXNER
                        1999 Harrison Street, Suite 900
                        Oakland, California  94612
                  BY:   WILLIAM FRED NORTON, ESQUIRE
                        STEVEN C. HOLTZMAN, ESQUIRE

                        ORACLE AMERICA, INC.
                        500 Oracle Parkway
                        Redwood Shores, California  94065
                  BY:   ANDREW C. TEMKIN, CORPORATE COUNSEL
                        DORIAN DALEY, GENERAL COUNSEL

For Defendant:          KEKER & VAN NEST
                        633 Battery Street
                        San Francisco, California  94111-1809
                  BY:   ROBERT ADDY VAN NEST, ESQUIRE
                        CHRISTA MARTINE ANDERSON, ESQUIRE
                        DANIEL PURCELL, ESQUIRE
                        MICHAEL S. KWUN, ESQUIRE

                        KING & SPALDING LLP
                        1185 Avenue of the Americas
                        New York, New York  10036-4003
                  BY:   BRUCE W. BABER, ESQUIRE

                        GOOGLE, INC.
                        1600 Amphitheatre Parkway
                        Mountain View, California  94043
                  BY:   RENNY HWANG, LITIGATION COUNSEL

Also Present:           SAFRA CATZ, President and CFO
                        Oracle Corporate Representative

                        CATHERINE LACAVERA
                        Google Corporate Representative
```

PROCEEDINGS                                          2682

```
 1              P R O C E E D I N G S
 2   MAY 3, 2012                              10:58 A.M.
 3
 4        (The following proceedings were held in open court,
 5        outside the presence of the jury.)
 6        (Today's Vol. 15 immediately follows Vol. 14, page
 7        2675; nothing omitted nor deleted in pages 2676
 8        through 2679.)
 9        THE COURT:  All right.  Please, be seated.  Thank
10   you.
11        How is everybody?
12        MR. VAN NEST:  Fine, Your Honor.  Good morning.
13        THE COURT:  I want to start by saying, yesterday I
14   sent out a short request to the lawyers saying that if we were
15   to get a verdict today I would like to give the jury tomorrow
16   off, and would that create any problems for you.
17        Of course, you lawyers know that that was just
18   intended for your eyes, and the jury had no idea that that was
19   in the works.  But then members of the press picked it up like
20   I was telling the jury they get a day off if they come back
21   with the verdict today.
22        Of course, I never would have done that.  The jury
23   has no idea that that was a possibility.  I just wanted to make
24   that clear in case someone takes an appeal based on what's in
25   the newspapers.
```

PROCEEDINGS                                          2683

```
 1        The newspapers had that one totally wrong.  And I ask
 2   the members of the press to correct that, because I don't want
 3   the verdict in this case, the public not to have confidence in
 4   it.
 5        I think some people in the public might draw the
 6   wrong impression if they thought the judge was trying to induce
 7   the jury to speed it up.  I would never do that.
 8        All right.  Enough said on that.  It was just a
 9   misunderstanding of what I had said.
10        We have a new note.  Have you read the new note?
11        MR. PURCELL:  We have.
12        THE COURT:  Well, we will now deal with that.  This
13   is from Ms. Jennifer Michals.  Ms. Michals says:
14        "In paragraph 28, when referring to 'average
15        audience,' is the average audience the
16        general public or the audience of programmers
17        using the code?"
18        Let's see what paragraph 28 says.  This is on
19   de minimus.
20        Oh, I see, the second sentence:
21        "Copying is de minimus only if it is so
22        meager and fragmentary that compared to the
23        work as a whole the average audience would
24        not recognize the appropriation."
25        Okay.  What would you like to say on this subject?
```

MR. VAN NEST: Your Honor, we'd like a few minutes. We're checking to see if there's any law on it. If we could have a few minutes to do that, we would like to follow that up. We're just checking to see whether anyone has interpreted that language. And, if so, we would bring that to Your Honor's attention right away.

I don't know the answer off the top of my head. Maybe Mr. Baber does, and here he is.

THE COURT: Mr. Baber has elbowed his way to the lectern.

(Laughter)

MR. VAN NEST: He didn't have to elbow me, Your Honor.

MR. BABER: I think, Your Honor --

THE COURT: I'm teasing. Go ahead, please.

MR. BABER: I'm not sure that there is any specific authority making it clearer, but the language about "average audience" comes directly out of *Newton vs. Diamond*, which is one of the cases we rely on for the de minimus doctrine.

And in *Newton vs. Diamond*, the Ninth Circuit said that the -- "this relates to the test for substantial similarity which, quote, also looks to the response of the average audience, or ordinary observer."

And that language about "ordinary observer" has been in copyright cases for decades. Off the top of my head, I

don't know of any case where a court has said it's anything less than, you know, the average, quote, ordinary observer.

MR. JACOBS: There is a fair amount of law on this, Your Honor. I have not located Ninth Circuit authority yet.

There is a fair amount of law that says that, particularly in technical cases or in cases involving distinct subject matter, the standpoint of the observer is measured from the standpoint of an observer in that field, rather than from the lay observer.

I'm not sure, at this stage, what to do because neither of us really briefed this in the context of the instruction.

So the question is whether the Court would want to elaborate, at this stage. If so, I think we probably should hustle and get you the right authority to look at very quickly.

THE COURT: Unless you both agree. If you both agree the law of the case would be whatever you agree to.

MR. JACOBS: I think Mr. Baber just suggested it's an ordinary observer. And I suggest that it's an observer in the relevant -- who is knowledgeable in the relevant subject area.

THE COURT: Well, may I make an observation and -- without it being deemed to be a ruling?

Shouldn't the average audience be the audience of people who would read this sort of thing, as opposed to the general public?

I rather suspect the general public would not be able to read source code. And, from that point of view, they would need expert guidance to decide, I suppose. I'm not sure.

But from the point of view of people who read software programs, that's the audience that these works are directed to. And, to me, it seems like we should be defining "average audience" to be the group of people who would be reading this kind of thing.

Now, that's just my observation. I'm not making that ruling yet. But I can see all kinds of mischief if we were to come up with a different standard.

MR. JACOBS: One of my colleagues handed me a note that I do think crystallizes the question, which is: What if the defendant plagiarized a book in French? Plainly, you would want to evaluate the similarity from the standpoint of a French speaker, albeit before an American jury.

They would be aided by the expert testimony, who would say to any French reader these words, this structure, whatever the relevant copyrightable material, this looks identical.

MR. BABER: Your Honor, just in terms of the history here, looking back at the instructions that the parties proposed, the language about "average audience" actually comes from Oracle's proposed instruction, rather than ours.

Oracle asked for an instruction that said, in the

copyright infringement context, copying is considered de minimus only if it is so meager and fragmentary that the average audience would not recognize the appropriation. And they didn't address anything about being more specific.

Our proposed instruction on de minimus didn't use that language out of *Newton vs. Diamond* that I just cited to you.

THE COURT: Perhaps, but that doesn't get us anywhere. The jury is asking a question about the -- or at least one member of the jury is asking a question about the instruction as it was given. So --

MR. VAN NEST: Could we have just a moment to caucus, Your Honor, or handle this at the end of the hearing, either one?

THE COURT: I think we ought to deal with the jury's note first. I will sit here in stoney silence --

MR. VAN NEST: Thank you.

THE COURT: -- and wait for you to caucus.

(Pause)

MR. VAN NEST: Your Honor, what about -- something, I think, along the lines of what Your Honor suggested -- the average audience is essentially the audience for the works. In other words, it's a copyrighted work. The average audience would be the audience for the works. That's who -- that's who is really the intended audience.

1        I don't think it would be limited to just people
2   writing in this code or just people using it, but the average
3   audience probably is narrower than the general public.  It
4   would be the intended audience for the works.
5        **THE COURT:**  What does that mean, people who are --
6        **MR. VAN NEST:**  People --
7        **THE COURT:**  A teenager in high school who has an
8   Apple on her phone --
9        **MR. VAN NEST:**  No.
10       **THE COURT:**  -- and she is punching the button and
11  using that?  What does that mean?
12       **MR. VAN NEST:**  No, no, no.  The average audience that
13  can read and understand code.  It would include programmers and
14  app developers.
15       **THE COURT:**  All right.  How about the "average
16  audience" means those who would be expected to read the work?
17       **MR. VAN NEST:**  Copyrighted works.
18       **THE COURT:**  Copyrighted works.
19       **MR. JACOBS:**  I think that's fine, Your Honor.
20       **THE COURT:**  "'Average audience' means those who would
21  be expected to read the copyrighted works."
22       Agreed?
23       **MR. VAN NEST:**  That's fine, Your Honor.
24       **THE COURT:**  Is this one I can just send back in
25  without bringing the jury back?

1        **MR. VAN NEST:**  Sure.
2        **THE COURT:**  Here's what I'm going to do.  I'm going
3   to say, "answer."  Why don't you take a look at this, to see if
4   you think I'm okay.  What is today?  May 3rd, 11:10.  Look at
5   it and see if I wrote it down correctly.
6        (Pause)
7        **MR. JACOBS:**  Yes, Your Honor.
8        **MR. VAN NEST:**  That's fine, Your Honor.
9        **THE COURT:**  Do I have your permission now to send
10  that into the jury room?
11       **MR. JACOBS:**  Yes, Your Honor.
12       **MR. VAN NEST:**  Yes.
13       **THE COURT:**  Great.  Dawn will do that now.
14       Now we can turn to the other event.  I've lost my
15  train of thought; didn't I?
16       Oh, yes, we want to go over your motion to exclude,
17  so who's going to argue that and bring me up to speed on this?
18       **MR. PURCELL:**  Well, it's their motion, Your Honor.  I
19  don't know if you wanted them to start.  I'm happy to provide
20  some background on it.
21       There's one, actually, important development that
22  just happened in the past couple of days.  If you recall, this
23  motion started off as a motion to strike based on the fact that
24  we didn't have the foundational interviewee on our witness
25  list, Aditya Agarwal, so Your Honor gave us leave to substitute

1   Mr. Rubin.
2        They have now subpoenaed Mr. Argarwal to testify at
3   trial.  We have accepted service of the subpoena, so it seems
4   like that problem should be solved, and we should be able to
5   put Mr. Agarwal on the stand, put Mr. Rubin on the stand, lay
6   the foundation to the documents through them, and then proceed
7   from there.  If they have any objections, we can deal with
8   those as they make them.
9        That's how I would suggest to proceed.
10       **THE COURT:**  Well, that would be great if it's that
11  simple.
12       Mr. Norton, does that solve the problem?
13       **MR. NORTON:**  It does not.
14       **THE COURT:**  Okay.
15       **MR. NORTON:**  The problem is not whether Aditya
16  Agarwal testifies at trial, and it never was.
17       The problem is that Mr. Argarwal testified, as the
18  30(b)(6) representative of Google, that he didn't know how the
19  P&L was generated; he didn't know how Android costs were
20  allocated.  He didn't know anything about that P&L.
21       That was the basis for our motion to strike, was that
22  Dr. Kearl assumed that Dr. Cox had correctly allocated costs
23  for Android under 504(b).  Dr. Cox assumed that the P&L
24  correctly allocated costs.  Dr. Cox's only basis for making
25  that assumption was that he believed that Mr. Argarwal said so.

1   And Mr. Argarwal testified he didn't have the faintest idea how
2   those numbers were generated.
3        **THE COURT:**  So you know-- okay.  Interrupt you for a
4   second.  Show me the numbers we're arguing over.
5        I would have thought that we had -- this is a public
6   company.  We would be dealing with audited financials, and that
7   there would be no issue here.  So why --
8        **MR. PURCELL:**  We are, Your Honor.
9        **THE COURT:**  No, Mr. Purcell --
10       **MR. PURCELL:**  Fair enough.
11       **THE COURT:**  It's his motion.  Stop interrupting him.
12       **MR. PURCELL:**  Fair enough.
13       **MR. NORTON:**  I can hand up Exhibit 1069, which was
14  the document produced by Google before Mr. Rubin's deposition
15  and is the P&L for Android.
16       **THE COURT:**  Is that this one?
17       **MR. NORTON:**  You have an easier-to-read copy than I
18  do.
19       **THE COURT:**  What kind of document is this?
20       **MR. NORTON:**  It is a document that was -- Mr. Rubin
21  testified he received from the Google lawyers.  And he
22  testified that it appeared to be similar to the types of
23  documents he received --
24       **THE COURT:**  Is it ginned up just for this case, or a
25  real document used in the ordinary course of business?

1          **MR. NORTON:**  This document, I'll have to defer to
2   Google on that.  This is not a document that anyone has
3   testified about, other than Mr. Rubin, who said that he
4   received this document from the lawyers.
5          Dr. Cox cited a P&L statement in his report, and he,
6   too, cited a document that he said he received from Google
7   lawyers.
8          Google, in its discovery response, did direct us to
9   other P&L statements, but not the ones that Dr. Cox relied upon
10  and not the one that Mr. Rubin produced for his deposition.
11         So this document, so far as we can tell, so far as
12  the testimony so far establishes, is not a document that is
13  maintained in the ordinary course of business.  It may be, but
14  no one has ever testified to that.
15         **THE COURT:**  All right.  Help me understand the
16  significance of the document.
17         How does this fit into the issues in the case on
18  damages?
19         **MR. NORTON:**  Sure.  So we're solely focused on the
20  question of infringer's profits right here.  And for
21  infringer's profits, we need only show their revenues for
22  Android.  And then they are required to prove their deductible
23  expenses that are attributable to the copyright infringement.
24         Now, this issue right now is solely focused on what
25  are the deductible expenses.  And under Ninth Circuit law, the

1   only expenses they are entitled to deduct are those expenses
2   that actually contributed to the sales of the infringing work.
3   That's *Frank Music*.  We cited that in our papers both on this
4   motion and the prior motion.  I don't think there is any actual
5   dispute about that.
6          So this argument is not about whether or not Exhibit
7   1079 is admissible; although, it very well may not be.  The
8   argument is about whether or not Dr. Cox, and by extension
9   Dr. Kearl, has any basis to conclude that the numbers that
10  appear in Exhibit 1079 reflect expenses that actually
11  contributed to the sales of the infringing work.
12         The problem is that Mr. Rubin has testified now -- we
13  have good reason to think it's not.  So, one, no Google witness
14  has been able to explain --
15         **THE COURT:**  I don't even understand the document,
16  though.
17         **MR. NORTON:**  Sure.
18         **THE COURT:**  Help me understand the basics, how the
19  Google side says that it shows those expenses.
20         **MR. NORTON:**  Sure.  So on the first page -- and I
21  think that, really, Dr. Cox only uses the first page -- we have
22  the revenues, and we have them by period.
23         This includes a forecast when we get all the way to
24  the right side.  But Your Honor will see -- mine is very small,
25  but there are 2010 actual revenues by quarter.  There's 2011.

1          **THE COURT:**  I don't see that -- oh I see it over
2   here.  2010 actual by quarter revenues.
3          **MR. NORTON:**  Okay.
4          **THE COURT:**  So just stick with that part.
5          **MR. NORTON:**  Sure.
6          **THE COURT:**  Where are the deducts?
7          **MR. NORTON:**  So then we have -- beneath that you'll
8   see that there's a series of indented revenue figures:  "Ads
9   (AFMS)," "Ads (AFMA)," and so on.  And then you'll see,
10  "TAC:Dist/Organic."  And, at that point, I understand we are
11  deducting costs.
12         **THE COURT:**  What is "TAC"?
13         **MR. NORTON:**  I've seen it referred to both as "total
14  acquisition cost" and "traffic acquisition cost."
15         At his deposition on the 27th, Mr. Rubin described it
16  as total acquisition cost.
17         **THE COURT:**  Just stick with one column, quarter 1.
18  It says "Revenue, 97.66."  Is that 97 million?
19         **MR. NORTON:**  Yes.
20         **THE COURT:**  And then those subparts underneath
21  there --
22         **MR. NORTON:**  Then there will be deductions for sales,
23  marketing.  You'll see under the bolded "Gross Margin":
24  "sales, Marketing, Co-Marketing, PM, Engineering."  And
25  engineering is consistently the greatest expense claimed.

1          And then, as a result of those deductions, we get a
2   number at the bottom, "Product Contribution," which I
3   understand Google would contend represents the profit or loss
4   for Android for that particular reporting period.
5          **THE COURT:**  I'm sorry -- okay.  Bear with me here.
6          **MR. NORTON:**  Yes, Your Honor.
7          **THE COURT:**  At the very top it says 97.66 million
8   revenue.
9          **MR. NORTON:**  For Q2010, yes, Your Honor.
10         **THE COURT:**  Let's just stick with one column.  The
11  next one says, Revenue Ads distant -- d-i-s-t and organic.
12  What does that mean?
13         **MR. NORTON:**  That's advertising revenue, distribution
14  and organic.  And I don't know, offhand, right now what the
15  distinction is between those two.
16         **THE COURT:**  All right.  Do those other non-bolded
17  numbers supposedly add up to the one at the top?  Is that the
18  way it works?
19         **MR. NORTON:**  Yes, Your Honor.
20         **THE COURT:**  It's not like the total is at the bottom.
21  The total is at the top.
22         **MR. NORTON:**  That's correct.
23         **THE COURT:**  Okay.  I got that part.  So now we go to
24  "Est. TAC 3.74."  What does that column, that -- that row
25  represent?

1  MR. NORTON: I'm trying to find the column. I'm
2  sorry, Your Honor.
3  THE COURT: About this far down (indicating).
4  MR. NORTON: All right. "Est. TAC."
5  THE COURT: Yes.
6  MR. MUINO: Those are additional costs incurred by
7  Google. They are claimed to have been incurred by Google with
8  respect to Android in that period.
9  THE COURT: All right. Is that where the costs are
10 to be shown?
11 MR. NORTON: Yes.
12 THE COURT: All right. So that's the first cost
13 item.
14 MR. NORTON: And then they continue to be cost
15 items -- I believe that the gross margin number reflects the
16 adjustments that come above it. And then they continued to
17 deduct sales, marketing, co-marketing --
18 THE COURT: All right. So gross margin is the
19 18 million.
20 MR. NORTON: Yes, on that column, yes.
21 THE COURT: 18.88. And that's gross. And then there
22 is a -- then, yet, more deductions; is that right? So it comes
23 out to they are losing money.
24 MR. NORTON: So they claim.
25 THE COURT: They are losing money. Well, that would

1  mean there would be no disgorgement.
2  MR. NORTON: Well, no, it would not. But the
3  standard -- this is disputed in the instructions, but the
4  standard is not straight losses, but if the losses were
5  avoided. Avoidable losses are considered profits.
6  That is, if you would have lost $10 million but as a
7  result of the infringement you only lost $1 million, that's a
8  $9 million differential, and those are actually profits.
9  But for present purposes, in that particular quarter,
10 they do claim a loss.
11 THE COURT: Okay. So we have loss quarter 1, loss
12 quarter 2, loss quarter 3, loss quarter 4. That adds up to a
13 big loss for the whole year.
14 Then we come to -- we come to, I guess, year -- Have
15 we got all the years? We got a lot of months here for 2011.
16 Looks like each one of these months -- no, here's a profit.
17 June. Profit July --
18 MR. NORTON: And in May, Your Honor, yes.
19 THE COURT: Yes, I see.
20 So there are big losses but small profits from the
21 second half of 2011. Okay. Now I understand the general
22 format of this document.
23 MR. NORTON: Right.
24 THE COURT: And what is your problem with it?
25 MR. NORTON: Okay. So this is a P&L, purportedly,

1  just for Android. Your Honor asked, Google is a public
2  company, surely there's information out there.
3  They don't publicly report Android as a distinct
4  business unit. So it's not like we can go to their SEC filings
5  and see, okay, here's the profit and loss for Android. So this
6  is the document that we have.
7  Now, the problem is that not -- there has to be some
8  step along the way where there are expenses incurred partly for
9  Android and partly for other business units. So we asked
10 Mr. Agarwal, how does Google do that? And he did not know.
11 So we asked -- and that was the basis, in part, for
12 our prior motion, was, Mr. Argarwal couldn't explain how Google
13 actually allocated its expenses to Android. Which engineers
14 are actually working on Android, and which are the hundreds of
15 other engineers at Google working on other projects, how are
16 these numbers actually generated?
17 And Mr. Argarwal cannot answer that question.
18 Mr. Rubin does not know the answer to that question.
19 THE COURT: Well, let me stop. Are you questioning
20 the revenue side of this, or the expense side of this?
21 MR. NORTON: We are questioning the expense side of
22 this.
23 THE COURT: All right. So the big number on here is
24 that engineering.
25 MR. NORTON: That is the biggest portion of it, yes.

1  So here's the problem is, first, we know from Mr. Rubin, for
2  example -- he testified to this on the 27th -- one of the
3  things that's included in engineering costs is the cost of
4  developing the Gmail app.
5  THE COURT: The what?
6  MR. NORTON: The Gmail, the e-mail app for Google.
7  THE COURT: Yes.
8  MR. NORTON: Now, the Gmail app is not just for
9  Android. The Gmail app is the one they use on all the
10 different phones, whether it's an Android phone or not. But it
11 appears that, based on his testimony, that a hundred percent of
12 the cost of the Gmail application has been allocated to
13 Android.
14 Now, that may be appropriate in some accounting
15 sense. It may or may not. It doesn't really matter for our
16 purposes. Our purposes here are, are these expenses that
17 actually contributed -- that's the standard -- actually
18 contributed to the sales of the infringing work?
19 And the development of an application for use on
20 non-Android phones doesn't fit the bill. So that's one.
21 Another problem is that Mr. Rubin testified that
22 there are costs here to investigate options/alternatives to
23 Android as far back as 2008. So Mr. Rubin testified -- and
24 this is at page 11 of his deposition -- that there were
25 additional costs that they incurred to look at other ways,

1  alternative ways to develop Android.
2         Well, those, again -- for example, the Court will
3  hear testimony, has already heard testimony, that Google
4  considered not using Java, and explored those alternatives.
5  Well, apparently, they are claiming those cost, as well.  But
6  those two are not costs that actually contributed to the sales
7  of the infringing work.
8         So then Mr. Rubin also says, in his deposition, that
9  when he spoke to Dr. Cox -- he says, "When we reviewed the
10 costs" -- I'm quoting from his deposition:
11            "**ANSWER:** When we reviewed the costs, I
12         indicated there were a couple of -- you know,
13         there was a couple of pieces of background
14         information that were important to consider.
15         One was, we didn't start any of the
16         accounting until 2008.  So there's a bunch of
17         costs associated with Android that weren't
18         tracked before 2008.
19            "I also talked to him briefly, that although
20         the spreadsheets in these reports
21         represent -- should certainly represent costs
22         that were part of developing Android, the
23         spreadsheets also could include costs in
24         other areas that weren't Android.  And those
25         were -- we tried our best to -- you know, the

1         accounting system tries its best to sort
2         those out.  But, you know, there's some odd
3         chance that other data would be in there."
4         So Mr. Rubin -- who doesn't really know how these
5  things are created -- believes that there are other costs that
6  are not Android, that are reflected in Exhibit 1079.
7         **THE COURT:**   Let me ask you this, on just that
8  engineering item that is the big one, 28 million.
9         **MR. NORTON:**   Yes, Your Honor -- yes, Your Honor.
10        **THE COURT:**   Is there a spreadsheet that backs the
11 detail that goes behind that number?  Were can I find that?
12        **MR. NORTON:**   It's not a document on which Dr. Cox
13 relied.  Dr. Cox only uses this front -- this first piece of
14 paper (indicating).  This is the entirety of Dr. Cox's
15 analysis, is what's here.  And Dr. Cox doesn't know what this
16 is.
17        Dr. Cox, by the way, is not an accountant.  He's an
18 economist.
19        **THE COURT:**   That may be a good enough point, but I
20 want to understand it better than that.
21        Is there a backup detail sheet for that 28 million?
22        **MR. NORTON:**   There is some detail, but it would
23 not -- the additional detail, which appears in the additional
24 pages behind Exhibit 1079, does not answer our question.
25        **THE COURT:**   Well, show me where that -- is there a

1  place where I can look and see the 28-plus million, and it has
2  some line items that add up to 28 million?
3         **MR. NORTON:**   I believe the answer to that is in
4  Exhibit 1079 the answer is no, but I want to be certain of
5  that.
6         On the second page of the document they break things
7  down by headcount, but they do not appear to ever break things
8  down by cost.
9         **THE COURT:**   All right.  Let's look at the second
10 page.
11        It has the months.  It has all of 2010.  And it has
12 engineering.  These are quite large numbers.  I'm not quite
13 sure what to make of those numbers.  But do they -- is there a
14 line item that adds -- that ties to the engineering line on the
15 main page, 2878?  2878.
16        **MR. NORTON:**   Your Honor, we have not been able to
17 find any such line in the spreadsheet.  Again, there is a
18 headcount breakdown.  There is not a number that relates back
19 to that --
20        **THE COURT:**   What is the headcount breakdown?
21        **MR. NORTON:**   The head count breakdown is page 2 of
22 Exhibit 1079.
23        **THE COURT:**   Right.  I see that.
24        **MR. NORTON:**   And so there are subcategories here for
25 engineering.  Of course, these are -- the cost for this

1  particular sheet start more recently, June 11.  So to find the
2  period that would correspond to the number Your Honor is
3  interested in, first quarter of 2010, you would actually have
4  to sum the three months, January, February and March of 2010,
5  that are in the right most third of the page.  But that would
6  only tell you how many engineers were working.  It wouldn't
7  actually tell you a cost.
8         **THE COURT:**   So "headcount" refers to number of
9  engineers?
10        **MR. NORTON:**   That is what I understand it to mean and
11 what I believe Mr. Rubin indicated at his deposition.
12        **THE COURT:**   So he says engineering is Dev.  There's
13 quite a number of categories.  "Dev" means what?
14        **MR. NORTON:**   I believe "Dev" is development.  Yes.
15        **THE COURT:**   Skip "Other."  "PM" means what?
16        **MR. NORTON:**   I'm going to need some help here, Your
17 Honor.
18        I believe that one is product management.  I think
19 that Mr. Rubin's testimony on this was that he was familiar
20 with the categories but not necessarily all the acronyms.
21        **THE COURT:**   Well, the -- far and away the biggest one
22 of these categories is "Dev."
23        **MR. NORTON:**   "Dev" is the most substantial one.
24        **THE COURT:**   All right.  May I let you sit down for a
25 moment.

1  MR. NORTON: If I could make one last point, Your
2  Honor.
3  THE COURT: All right. What is that?
4  MR. NORTON: The other problem with relying on this
5  particular document, or any other similar such document, is
6  that when we asked Google point blank what their revenues were
7  by way of an interrogatory, what they answered was -- and this
8  is Google's Third Supplemental Response to Plaintiff's
9  Interrogatory No. 17. And Google specifically said -- this is
10 on page 7 and 8:
11           "Google states that any financial data
12           relating to mobile platforms from prior to
13           January 2009 that it may have maintained are
14           inaccurate and unreliable."
15          So they want us to take on faith -- because no one
16 has been able to actually explain how this document was
17 created -- that this document is entirely accurate;
18 notwithstanding a lot of testimony that suggests that it isn't,
19 and notwithstanding the fact that they themselves concede that
20 their financial documentation up until January 2009 is
21 inaccurate and unreliable.
22          So neither we nor Dr. Cox nor Dr. Kearl has any basis
23 to be able to say that there's any line on Exhibit 1079 that
24 you could say is a cost that was actually incurred by Android
25 and actually contributed to the sales of the infringing work.

1  THE COURT: In what context was that interrogatory
2  made? What was the question?
3  MR. NORTON: The question was:
4           "Please state the total amount of your actual
5           and (as applicable) projected unit sales,
6           revenues, gross profits, and operating
7           profits, separately for each month
8           January 2005 through December 2011, relating
9           to or derived from each of (i) Android
10          application developers' registration fees,
11          (ii) Android application transaction fees
12          (regardless of whether application downloads
13          or transactions were conducted using Android
14          Market), (iii) Android Market application
15          downloads or other transactions, (iv) in-app
16          billing on Android devices, (v) advertising
17          on or through Android devices, (vi) any other
18          product or service sold, licensed,
19          downloaded, or otherwise offered in
20          connection with Android, (vii) advertising on
21          or through each mobile platform other than
22          Android, and (viii) any other product or
23          service sold, licensed, downloaded, or
24          otherwise offered in connection with any
25          mobile platform other than Android."

1           And then there's a request that documents on which
2  the answer is based be produced. And they gave an answer,
3  which provides some information. But what is most relevant
4  here is their statement that their financial data up until
5  prior 2009 -- prior to 2009, is inaccurate and unreliable, and
6  yet they want us to rely upon a document that no one can
7  actually explain.
8           THE COURT: Well, but that statement about being
9  unreliable prior to 2009, the dates that you've got for me here
10 are all after that.
11          MR. NORTON: Well, the dates -- that's actually true
12 and interesting. The dates on this document are all after
13 that. But it's not clear to us whether the numbers that appear
14 for fiscal year 2009 include costs incurred in the prior
15 period. But --
16          THE COURT: When did Google go public?
17          MR. NORTON: Google has been public since -- they'll
18 know better than I, but well before this. Around 2000, 2001, I
19 think.
20          But they do have on this sheet numbers for fiscal
21 year 2008. This document, the very first column of the
22 document says fiscal year 2008, the very year on which they say
23 they don't have accurate or reliable numbers.
24          But it's not just a question of whether they have
25 accurate numbers for the period prior to 2009. The question

1  is, in conjunction with all of the other evidence, how are
2  we -- how is Dr. Cox -- and this is a motion directed at
3  Dr. Cox and Dr. Kearl, really, not this particular document
4  exclusively -- but how can Dr. Cox offer an opinion that
5  Google's expenses that actually contributed to the sales of the
6  infringing work, what those are?
7           THE COURT: All right. Let me hear from Mr. Purcell.
8           MR. PURCELL: So a couple of basic things, Your
9  Honor. This document was not ginned up for the litigation.
10          If I could step back, Mr. Argarwal is the accountant
11 for Android, who actually takes the inputs that are reported to
12 him and creates these spreadsheets.
13          And then Mr. Rubin, of course, is the business head
14 who reviews these every quarter, every time they are released
15 to him, and uses them as a basis for running the business.
16          Both of them testified that these documents are
17 created in the ordinary course of Google's business. They are
18 reviewed regularly. They are checked.
19          Mr. Rubin said the financials are audited and they're
20 relied on for purposes of product planning.
21          THE COURT: Mr. Rubin said these spreadsheets are
22 audited?
23          I do understand auditing, Mr. Purcell, so you're not
24 going to slip something by me. These are clearly not audited.
25          MR. PURCELL: Well, he said Google financials are

1  audited.  He did not say the spreadsheets are audited.  That's
2  right.
3              THE COURT:   Show me, then, if these were audited --
4              MR. PURCELL:   I don't believe that we know whether
5  these were audited.  I don't believe Oracle asked that
6  question.  I can't represent that they are.
7              THE COURT:   I'm sure they weren't.
8              What is the -- the backup to the 28.78 that we have
9  been looking --
10             MR. PURCELL:   The backup for the engineering costs
11 for quarter 1, 2010?
12             THE COURT:   Right.
13             MR. PURCELL:   I don't believe it's shown on this
14 spreadsheet.  What's shown is headcount.
15             THE COURT:   Did that number just get pulled out of
16 thin air?
17             MR. PURCELL:   No.  That number was calculated by
18 Google in the ordinary course of its business, and incorporated
19 on the spreadsheet.
20             THE COURT:   I don't think that's good enough.
21             I just don't get this.  You're telling me this
22 document is used in the ordinary course of business?
23             MR. PURCELL:   This is an executive summary financial
24 spreadsheet that is used by Andy Rubin every time he gets
25 reports on how Android is doing; every month, every quarter.

1  This is the format in which he gets it, the format in which he
2  reviews it, receives it, and makes decisions based on it.
3              And it doesn't include specific line item breakdowns
4  for each individual line item.  Those documents do exist.  I'm
5  sure they could be generated.  That was not something we
6  provided to Dr. Cox.  That was not something that we provided
7  to Oracle.  That's something that we could provide, certainly.
8              I have no doubt that that 28.78-million-dollar number
9  is accounted for somewhere in a more specific form than this.
10             THE COURT:   But you're saying that a -- that this
11 very document that I'm holding is one that sometime in the
12 past -- I don't mean it was drawn and compiled together from
13 someone -- I mean this very document that somebody gave me this
14 morning, there was a time in the past when Mr. Rubin looked at
15 this for business purposes and it was exactly the same
16 document?
17             MR. PURCELL:   What Mr. Rubin said at his deposition
18 is that this document is in the format that he is given
19 financials on a monthly and a quarterly basis.
20             THE COURT:   That is a much different proposition.
21             MR. PURCELL:   I believe that this was -- I mean, this
22 looks to me, just based on the numbers, that this is the
23 financial statement for August of 2011.  That's the last actual
24 month.  And I believe in that context this would have been
25 reviewed by Mr. Rubin.

1              THE COURT:   Have you produced the real documents that
2  he looked at on an ongoing basis going back to 2008?
3              MR. PURCELL:   We haven't produced them for every
4  month.  We could.  This is --
5              THE COURT:   Would they track these numbers?
6              MR. PURCELL:   I believe they would, Your Honor.  I
7  don't believe the numbers have changed.
8              This should be the document that Andy Rubin received
9  after August 2011.  That's the last actual month that's
10 reported on this.  He testified that this is the document in
11 the format that he received it.
12             THE COURT:   But "format," you have to forgive me
13 because -- go ahead.
14             MR. PURCELL:   I'm informed that we actually have
15 produced every single Android profit and loss statement that we
16 have.  They should have those.
17             THE COURT:   And it's in this format?
18             MR. PURCELL:   I believe so.
19             THE COURT:   Okay.  Mr. Norton, is that true?
20             MR. PURCELL:   Hold on.  If I could, I would like to
21 respond to a couple of the other things that Mr. Norton said
22 that aren't right.
23             Number one, he raises this issue that there's costs
24 in here about non-Android apps, apps that were developed -- the
25 Gmail app he mentioned specifically -- for other platforms.

1  And he thinks we allocated all of those costs for the iPhone
2  Gmail app, and the -- you know, Symbian Gmail app, just to the
3  Android P&L.  That's not right.  That's not what Mr. Rubin
4  said.
5              The question by Ms. Rutherford at the deposition was:
6              "Are the costs of the apps that Google
7              develops that are specific to Android
8              included?"
9              Mr. Rubin said yes.  And then he said Gmail is a good
10 example of the application.  And then he also mentioned GMaps.
11             As Your Honor knows, Google has to design separate
12 versions of the Gmail app for Android versus for iPhone versus
13 for other platforms.  These platforms use different programming
14 languages.
15             All Mr. Rubin said is that Android-specific apps,
16 like Gmail on Android, are included in the P&Ls.
17             The other thing I would like to reference is the
18 interrogatory response that Mr. Norton referenced about data
19 before 2009.
20             If you listen to the categories that he mentioned,
21 the categories he mentioned are all products, services,
22 advertising related to Android.
23             Android didn't launch until October/November of 2008,
24 with these platforms, these projects, these services.  There
25 wouldn't be any costs, really, for 2008.

1   And if you look at the P&L, what's represented on the
2 P&L for 2008 is engineering, predominantly, which makes sense
3 because in 2008 Android was being developed.  There were huge
4 engineering costs going into actually getting the first release
5 of the software out there, which happened at the very end of
6 the year?
7   **THE COURT:**  Wait.  Let me -- I want to get to the
8 bottom of whether or not the financial statements in the
9 ordinary course of business, that were in this format, were
10 produced to Mr. Norton.
11   Mr. Norton, what is the answer to that?
12   **MR. NORTON:**  The answer is, they were not.
13   So what we got, Google identified P&L statements in
14 its interrogatory response, and -- in the interrogatory
15 response I just read to the Court.
16   And I didn't bring everything.  But I can show it to
17 counsel.  These are examples of the documents that are cited
18 specifically in the interrogatory response.
19   You might want to show this to --
20   **MR. PURCELL:**  These are also -- documents in that
21 format are also attached to this, which is another one of the
22 documents Mr. Rubin testified about at his deposition, and that
23 we produced to Oracle recently, as supporting Mr. Rubin's
24 discussion with Dr. Cox.
25   **THE COURT:**  Well, I -- I would like to know whether

1 or not the very documents that Mr. Rubin would have looked at
2 at the end of each quarter, for 2010, 2011, earlier, the ones
3 done in the ordinary course of business without any massaging
4 at all, the historical actual thing that he held in his hand,
5 was that produced?
6   **MR. NORTON:**  No.  We are confident that they were
7 not.  Let me explain why I am so confidence.
8   **THE COURT:**  This is an opinion you are about to give
9 me?
10   **MR. NORTON:**  I don't think so.
11   **THE COURT:**  You don't actually know, you're just
12 giving me an opinion.  You're confident -- anyone who is
13 confident means it's an opinion.
14   **MR. NORTON:**  I'm going to explain the evidence.
15   We don't have spreadsheets that look like 1079, that
16 first page.  Those were not produced to us.
17   Secondly, Mr. Rubin testified at his deposition on
18 the 27th.  He was shown Exhibit 1079, the document that Your
19 Honor has.  And Ms. Rutherford asked:
20       "All right.  You have before you Exhibit
21       1079.  Would you just verify that that's the
22       spreadsheet you've been discussing, that you
23       reviewed with Dr. Cox.
24       **"ANSWER:** This is -- well, let's see.
25       There's many pages here, and I think there's

1       actually different spreadsheets here.  So
2       let's review it for a second.
3       **"QUESTION:** Okay.
4       **"ANSWER:** It's an eye chart.  This is -- I
5       mean, it seems to be kind of some of the same
6       data, but it's not in the exact form,
7       probably just because of the way it was
8       printed.  For example, my spreadsheet had the
9       names of tabs for one of these reports, and
10       this doesn't have it.
11       **"QUESTION:** You are looking at a spreadsheet
12       on a computer; is that correct?"
13       Objection to form.
14       **"ANSWER:** I looked at a version of this
15       spreadsheet that was projected on the screen
16       from a computer because the numbers are
17       really small.  And I'm trying to figure out
18       if this is just one spreadsheet or more than
19       one spreadsheet.  I don't -- I don't know if
20       this is the identical document that I
21       reviewed.  I guess that's my conclusion."
22   The point of that --
23   **THE COURT:**  All right.  That's a good point.
24   It would be okay -- it would be perfectly okay if
25 these numbers were drawn from the same columns on some other

1 document that was produced in the ordinary course of business,
2 and this just happens to be a summary sheet, so long as we
3 could go back to the original documents.  And if there was a
4 big number, we could go behind it and find out what it was
5 based on.
6   That's what we ought to be asking here is, where are
7 the original documents that he held in his hand, so that you
8 could sit down at a desk, put on your green eyeshade like Bob
9 Cratchit, and then go to work seeing if you could reverse
10 engineer this thing to see if the numbers add up, or whether
11 it's been ginned up for litigation.
12   It wouldn't be the first time something had been
13 ginned up for litigation.  So that's what we ought to be trying
14 to get to the bottom of.  And then if -- a big number like
15 28 million, you ought to be entitled to see the detail behind
16 that.
17   **MR. NORTON:**  I don't think there is any dispute here
18 that we did not get that level of detail.
19   **THE COURT:**  Well, then, maybe you should get the
20 detail.
21   **MR. NORTON:**  So -- but even with, you know, the
22 challenge -- although, the document would need to be
23 authenticated at trial.  Our motion is not focused exclusively
24 on the document.  Right.
25   **THE COURT:**  Well, if there was -- if I'm satisfied

1  that this -- these numbers are in the ballpark of reasonable,
2  then I would let him testify to it, and put the burden on you
3  to show that it was bogus.  But I am concerned that he
4  doesn't -- somebody just gave him a document.  And Mr. Rubin
5  can't -- can't vouch for it.
6          MR. NORTON:  We absolutely share --
7          THE COURT:  Somebody has got to be able to vouch for
8  this document and where the numbers came from.
9          MR. NORTON:  Well, that's exactly right.  And we did
10 take the deposition of a 30(b)(6) witness on Android finances.
11 That was Mr. Argarwal.
12         And our original motion on this issue was not that
13 Mr. Argarwal was not a trial witness.  It was that Mr. Argarwal
14 had testified, as the 30(b)(6) witness that, he did not know
15 how these numbers were generated.
16         So now what they want to do is put up Mr. Rubin, who
17 also doesn't know.  And then, failing that, they want to
18 produce some more documents to us that might justify these
19 numbers.  But we've been through several iterations of this,
20 and, at the end of the day, they have a burden to produce the
21 evidence that will allow them to prove their allocable costs.
22         THE COURT:  Yes, that's their burden.
23         MR. NORTON:  And we don't have that.  And their
24 expert can't offer an opinion in the absence of that evidence.
25         THE COURT:  Dawn, can I have some water, please.

1  What would you like to say, Mr. Purcell?
2          MR. PURCELL:  Very briefly, Your Honor.
3          I can't represent to you that I'm a hundred percent
4  sure.  And maybe that means that isn't good enough, but I
5  believe that we produced to them our entire Android financial
6  site, basically all of the data on that, which includes
7  quarterly reports in greater detail than what they have, going
8  back to 2009.  So that's one point.
9          The other point is, I think their last motion was
10 based entirely on Mr. Argarwal not being on the witness list.
11 To the extent they felt his 30(b)(6) testimony was inadequate,
12 they never moved to compel on that.
13         And, in fact, Mr. Argarwal did testify at his
14 deposition that although he hadn't personally vetted every
15 single input to his analysis, that he was the one who prepared
16 these charts; he did so regularly; and he vouched for his
17 accuracy.
18         And he certainly vouched for the fact that they
19 weren't concocted for the litigation.  He certainly vouched for
20 the fact that this how Google does business, litigation or no
21 litigation.
22         THE COURT:  Who prepared this spreadsheet?
23         MR. PURCELL:  That spreadsheet, I believe, is an
24 output from Google's financial system, that I believe was
25 created -- I think Mr. Argarwal did produce it in preparation

1  to give to Dr. Cox in about August of 2011.  It was the most
2  recent financial data that was available then.  Dr. Cox's
3  expert report was due on October 3rd.  And it was the most
4  recent monthly --
5          THE COURT:  Do you have any workpapers that would
6  help us reconstruct how he -- the original source for some of
7  these numbers?
8          MR. PURCELL:  I'm sure he does.  I'm sure that that
9  information is all in Google's accounting system and could be
10 generated fairly quickly.
11         THE COURT:  Look.  I am going to tell you what should
12 be done here.  And I'm going to skip over the niceties of what
13 this exact motion is all about.
14         We're talking about huge numbers here.  If there
15 is -- if the jury finds liability, $600 million can turn on
16 whether or not these numbers are any good, this spreadsheet is
17 any good.  And no one seems to know much about the pedigree of
18 this thing.
19         So here's what should be done:  Mr. Purcell, it is
20 your burden to produce, again, in hard copy form, the actual
21 documents that Mr. -- that were given to Mr. Rubin.  Not these
22 things that are constructed for the expert, but the actual
23 documents that were given on a quarterly basis for 2010 and
24 2011.  Just those two years would be good enough.  And to
25 produce the backup of how the big number, which is the

1  engineering number, just that one number, how that was
2  calculated, and the source for that information.
3          MR. PURCELL:  We'll do it.
4          THE COURT:  And then Mr. -- is it Agarwal, is his
5  name?
6          MR. PURCELL:  Yes, Your Honor.
7          THE COURT:  He should be deposed again.
8          MR. PURCELL:  We'll do that, too.
9          THE COURT:  This should be done promptly.  Let's say
10 you produce the documents by Monday, and he gets deposed by the
11 end of next week.
12         MR. PURCELL:  We can do that.
13         THE COURT:  Then if there's anything to fight over --
14         MR. PURCELL:  I suspect there might be.
15         THE COURT:  -- we can fight over it again later.
16         But my general view of it is that if the
17 $28.78 million is actually the way it was accounted for, for
18 Android only, and allocated to Android, and there was some kind
19 of reasonable method for allocation, that was the way it was
20 done in the actual course of business, fine, then that can go
21 before the jury and Mr. Norton can -- can argue over whether or
22 not the allocation method was proper or not.
23         But, right now, it's unclear to me that anyone can
24 vouch for any of these numbers, as to how they got put
25 together.  So this is the -- that's what we ought to do.

1  MR. PURCELL:  Thank you, Your Honor.
2  THE COURT:  Thank you.
3  All right.  Any other items to take up right now?
4  MR. VAN NEST:  I don't believe so, Your Honor.  We
5  understand, all of us, that the patent phase will begin Monday
6  morning.  That's what we understood from Your Honor's order
7  last night.
8  THE COURT:  That really is the way it has to be,
9  because if they are deliberating tomorrow, then they will be
10 deliberating and we won't be able to start.  And if they reach
11 a verdict today, then we'll all take Friday off and start on
12 Monday.
13 So I think, basically, I've in effect said we will
14 start on Monday unless they are still deliberating.
15 MR. VAN NEST:  That's what we all understood, and
16 that's what we're planning for.  Thank you.
17 THE COURT:  Anything more?
18 MR. JACOBS:  Thanks, Your Honor.  Nothing from us.
19 THE COURT:  Well, please stand by.
20 Dawn, are they going to be here until 4:00 today?
21 THE CLERK:  Correct.
22 THE COURT:  Remember the note said they would be here
23 until 4:00 today.
24 As soon as we know anything, any more notes, we'll
25 let you know right away.

1  All right.  We are in recess.
2  (Proceedings in recess from 11:53 to 2:27 p.m.)
3  THE COURT:  Are we set and ready to go?
4  MR. VAN NEST:  We are, Your Honor.
5  THE COURT:  Mr. Jacobs.
6  MR. JACOBS:  Just a minute, Your Honor.  Yes.
7  THE COURT:  Ready?
8  MR. JACOBS:  Yes.
9  THE COURT:  All right.  We have note No. 7 from the
10 jury.  This one is from Megan Gallo.  She says:
11         "To determine the transformative value of the
12         copyrighted work, can we consider the
13         non-copyrighted elements (the elements that
14         Google added to make the Android platform) in
15         deciding the 'purpose & character of the use'
16         of the SSO of the 37 APIs?"
17 Okay.  Views by the lawyers.
18 MR. KWUN:  Your Honor, we would -- we would request
19 that you tell the jury:
20         "Yes, you can consider the material Google
21         added, and you should give it the weight you
22         decide it deserves."
23 And the reason for that is that Jury Instruction 26,
24 in the discussion of the first factor, states that the jury
25 should consider whether the:

1         "... work is transformative, meaning whether
2         Google's use added something new, with a
3         further purpose or different character,
4         altering the copied work with new expression,
5         meaning, or message."
6  Moreover, if you look at fair use cases generally,
7  when considering the first factor, the courts regularly look at
8  material that was added.
9  So, for example, if you consider whether a piece of
10 news criticism is transformative, you don't just look at the
11 material they quoted.  You look at what they said about it.
12 That's obviously material that was added.
13 If you look at the *Campbell* case, in the Supreme
14 Court, and you consider what use was made of *Pretty Woman*, you
15 don't just look at what words were taken from the original
16 work.  You look at what additional expression was added by 2
17 Live Crew that made it a parity.
18 So I think, just as a general matter, the first
19 factor will almost always look at what material was added by
20 the defendant.
21 MR. JACOBS:  The answer is "no" to this question.
22 The reason the answer is no lies in the instruction that was
23 given.
24 We had problems and objected to the -- to providing
25 an instruction on transformative use.  But having crossed that

1  bridge, the language of the instruction is:
2         "... whether such work is transformative,
3         meaning whether Google's use added something
4         new, with a further purpose or a different
5         character, altering the copied work with new
6         expression, meaning, or message."
7  The purport of that language, in light of the cases
8  that fall in favor of fair use on transformational grounds, is
9  that it's not merely the non-copyrighted elements, the elements
10 that Google added to make the Android platform, within the
11 meaning of Question No. 7, that are to be considered but,
12 rather, new elements that added something new, with a further
13 purpose or different character, altering the copied work with
14 new expression, meaning or message.
15 So transformative use is not merely take the first
16 three stanzas of a song, and then add new expression to the
17 remaining seven stanzas out of a ten-stanza song.  That's not
18 transformational even though, in that scenario, non-copyrighted
19 elements, non- -- on a stanza-by-stanza basis, non-infringing
20 elements would have been added to alter the song.  That is not
21 the addition of new expression that alters the copied work with
22 a further purpose or a different character within the meaning
23 of the instruction or within the meaning of the law of
24 transformational fair use.
25 MR. KWUN:  Your Honor, just a couple of points in

response.

First of all, if you look at *Kelly v. Arriba Soft* in the Ninth Circuit, that was a case involving thumbnail images that were used on an Internet search engine. That was held to be a fair use. The thumbnail images were smaller versions of the original image. But what was held to be transformative was the fact that the search engine as allowing people to find these images. So it was material that was added, that was not -- other than making the image smaller, there was not a transformation to the image itself.

Moreover, even under Mr. Jacobs' example, it is proper for the jury to consider material that was added. What Mr. Jacobs is suggesting is his read on what is required to be done with that material that's added. But that is adequately covered by the instruction.

The answer to the question, which is whether you consider material added, is clearly yes, even under the example given by Mr. Jacobs.

And, Your Honor, the material that's in the -- in the jury instruction comes from *Sony v. Connectix*, which itself gets the -- looks like it's a quote, actually, in *Sony v. Connectix*, from *Campbell v. Acuff-Rose*. So it's binding Supreme Court authority and Ninth Circuit authority.

THE COURT: All right. Anything more that anyone wishes to say?

MR. JACOBS: In the alternative, Your Honor, if you don't agree that the answer is "no," this may be a case where the best thing to do is say the existing instruction provides all the guidance on this topic that the Court is able to provide.

MR. KWUN: Your Honor --

MR. JACOBS: I fear that anything more in the direction that Google urges will only aggravate the potential for error lurking in giving a transformational instruction in the first place.

MR. KWUN: Your Honor, yesterday there was a question from the jury about another aspect of the first factor, on commerciality. And there, the Court provided the jury with a direct answer to their direct question.

And it's only appropriate that the Court, once again, give a direct answer to a direct question about the first factor, as it did yesterday, which is why we ask that the Court say that, yes, the jury can consider added material, and that they should give it whatever weight they determine is appropriate.

THE COURT: All right. Here's what I propose to say:
"In evaluating the transformative value, you
may consider the non-copyrighted elements,
but only insofar as they shed light on" --
Someone coughed and I have to start over. It's just

hard to follow whenever we have hacking and coughing.

Would you like a cough drop?

MR. KWUN: I would, Your Honor.

THE COURT: All right. Right here.
"In evaluating the transformative value, you
may consider the non-copyrighted elements,
but only insofar as they shed light on the
actual purpose and use of the copied part of
the copyrighted work as used in the accused
work. Of course, please remember to consider
all of the factors set forth in paragraph
26."

MR. BABER: The only one-word tweak, Your Honor, you said something about the copied parts.

THE COURT: Yes.

MR. BABER: And that's telling the jury something was or wasn't copied. You say "the parts of the copyrighted work that are used in Android."

THE COURT: I'll say the "accused part."

MR. BABER: That's fine.

MR. JACOBS: Your existing instruction says "altering the copied work." So that language comes straight from paragraph 1.

THE COURT: I'm sorry, I don't get your point.

MR. JACOBS: So referring to "copied work" links back

to the way you expressed this thought in -- in paragraph 1 of the fair use instructions.

THE COURT: I see that. But, you know, I think "accused part of the copyrighted" -- let's see. The actual purpose and use of the -- no, I do think "copied" is best here. So we're going to say "copied part."

They don't reach this unless they've decided that it's been copied.

MR. VAN NEST: "Copied work," Your Honor, I think is what you're talking about. Copied work. Copied work is what the instruction says.

THE COURT: All right. I'll say:
"But only insofar as they shed light on the
actual purpose and use of the part of the
copyrighted work used in the accused work."

MR. BABER: "Purpose and character of the use," Your Honor, in the preamble.

THE COURT: Oh, "purpose and character," yes. That's what it should say.

MR. BABER: Otherwise, I think that's fine with us.

THE COURT: Purpose and character of the use. Of the part of the copyrighted work used in the accused work.

MR. BABER: Yes, Your Honor.

THE COURT: Now, I could either write that out and send it in, or we could have the jury come back out. Whatever

1  you prefer.
2      **MR. VAN NEST:** Whatever Your Honor prefers. I'm
3  happy to have them come out.
4      **MR. JACOBS:** Fine, Your Honor.
5      **MR. VAN NEST:** Or send it in. What do you prefer,
6  Your Honor?
7      **THE COURT:** I'm going to write it out.
8      **MR. VAN NEST:** Fine.
9      **THE COURT:** Because I've got another hearing
10 underway. But --
11     **MR. VAN NEST:** That's fine.
12     (Pause)
13     **THE COURT:** May I ask you to look at what I've
14 written here.
15     Dawn, could you show this to counsel.
16     **THE CLERK:** Okay.
17     (Pause)
18     **MR. JACOBS:** Approved as to form, Your Honor.
19     **MR. KWUN:** Yes, Your Honor.
20     **THE COURT:** All right.
21     **MR. BABER:** I think, again, a tweak --
22     **THE COURT:** No. I don't want --
23     **MR. BABER:** I thought it was supposed to be "nature
24 and character," but you wrote "purpose and character."
25     **THE COURT:** That's what's in the -- "purpose and

1  character" is in paragraph 1.
2      **MR. BABER:** Fine.
3      **THE COURT:** You're trying to tweak me into an error.
4      Dawn, you may take that in -- please make a copy in
5  case -- we may not be able to retrieve the original. So make a
6  copy for the file. But let me just read it out loud into the
7  record, so we'll at least have it there. Here's what's going
8  in:
9      "In evaluating the transformative value, you
10     may consider the non-copyrighted elements but
11     only insofar as they shed light on the actual
12     purpose and character of the use of the part
13     of the copyrighted work used in the accused
14     work. Of course, please remember to consider
15     all the factors set forth in paragraph 26.
16     The Judge. May 3rd, 2:40 p.m."
17     All right. That problem solved for now, subject to
18 all of your appeals.
19     Thank you. Stand by for more notes.
20     (Counsel simultaneously thank the Court.)
21     (Proceedings in recess from 2:44 to 3:42 p.m. )
22     **THE COURT:** Back to work.
23     Next note says, signed by Ms. Gallo:
24     "What happens if we can't reach a unanimous
25     decision and people are not budging?"

1      All right. Suggestions.
2      **MR. VAN NEST:** Your Honor, you have a very good
3  instruction on this. It's instruction 31. I think you could
4  read the second and third paragraphs of that or point them to
5  it.
6      The first paragraph just talks about electing a
7  foreperson. And maybe then say you guys -- you jurors are free
8  to continue deliberating this evening, in the time you have
9  left, or feel free to return in the morning.
10     But paragraph 31 is actually -- that's one of your
11 standard instructions, and talks about discussing the case with
12 your fellow jurors. Each of you has to decide for yourself.
13 You should all consider all the evidence. Don't be afraid to
14 change your opinion. Don't come to a decision just because
15 other jurors think it's right. Et cetera.
16     My recommendation would be either send them home
17 tonight -- read that to them and have them come back in the
18 morning, or give them the choice whether they want to
19 deliberate further tonight. But something like that is
20 appropriate with this question, I think.
21     **THE COURT:** Mr. Jacobs.
22     **MR. JACOBS:** Your Honor has vastly more experience in
23 this situation than we do. I would be most interested in what
24 your proposed -- I imagine it's something like an Allen charge
25 you would give them in this situation.

1      **THE COURT:** Well, I have a few observations. First,
2  this is not the foreperson who is writing it. And, second, it
3  doesn't say that they are deadlocked. It says, "What happens
4  if ...?"
5      We don't know yet that -- the jury is not writing us
6  that they're deadlocked. It could be -- the meaning, it's
7  possible that that's a -- that that's what's going on, but,
8  read literally, it's not what the question -- the question by
9  one juror is, "What happens if ...?"
10     Well, let me ask you a few other things, to look
11 forward for a moment.
12     Let's assume, for the sake of argument, that we do
13 get a note that says they're deadlocked and can't reach a
14 verdict. Then I would like to get your views on -- before we
15 know anything more than that -- whether or not anyone is going
16 to say, "Oh, we need a mistrial," or, "Oh, no, we can't take a
17 partial verdict," or, "We would be wrong to continue with the
18 patent part of the case."
19     I'm not agreeing with any of that. But I think it's
20 best to get your views on that before you know which way they
21 come out. Then whoever is unhappy about which way they come
22 out on a partial verdict might want to raise all sorts of
23 issues. Now is the time for me to hear your views on that.
24     Mr. Jacobs.
25     **MR. JACOBS:** May I have a moment, Your Honor?

1   THE COURT:  Yeah.
2       Let me make it easy for you, so that there will be --
3   my view of this, but I could be talked out of it, but my
4   tentative view of it is if they have reached a partial verdict,
5   we should get as much benefit as we can from the work that
6   they've done and then move then to the second phase.
7       So let's say that they found, yes, infringement, no
8   or they can't agree on something else, or maybe they got
9   answers to some of the questions but not all of the questions.
10  I think, my view would be take what we can get and move on to
11  the patent phase.  That would be my view, but that's just a
12  suggestion to you.  And I'm not making that as a ruling.
13      All right.  So go ahead and tell me what you think.
14      MR. VAN NEST:  Your Honor, I would want to give that
15  a little consideration.  I think a lot depends on what it is.
16  But I note that we've got Seventh Amendment issues that would
17  certainly come into play.
18      THE COURT:  There's no Seventh Amendment issue.  What
19  is the issue?  Come on.
20      MR. VAN NEST:  Well, if we believe that one jury has
21  to hear all phases, which is what we are operating under, I
22  think the fact they couldn't reach a verdict on one phase would
23  be -- may be fatal to the rest of it.
24      I would want to find out a little more and do
25  research on it.  For example, the question -- Question 1 is one

1   question.  It's got part A and part B.  I think if they can't
2   resolve fair use, if that were the -- if that were the
3   situation, then Question 1 hasn't been resolved because if
4   there's -- we have an absolute right to fair use, and if that
5   issue hasn't been resolved, then I don't think 1 has been
6   resolved.  It's possible that 2 and 3 are severable, and
7   possibly 4.
8       But without doing any research, I really would prefer
9   not to speculate on it, and give a little research tonight.  As
10  Your Honor points out, we are not there, and I don't want to
11  answer off the top of my --
12      THE COURT:  I'm not going to force the other side to
13  answer that.  Both of you ought to be prepared to answer at the
14  same time.
15      Another thing that, in my experience, could happen --
16  although I haven't had this precise scenario, but I know enough
17  about human nature -- that is, we could take a partial verdict,
18  go to the patent phase.  The scales will fall from someone's
19  eyes on the jury and they will resolve all the issues.  They'll
20  go back and be able to decide the copyright issues that they
21  previously weren't because something that they've seen in the
22  course of it has caused them to reevaluate the evidence that
23  they heard in Phase One.  Could easily happen.
24      Frankly, I wouldn't see anything wrong with that.  So
25  I think what you need to be -- have in mind is the proposal

1   that I have given you to consider and to react to.
2       So what do you want me to do about this immediate
3   note?
4       MR. VAN NEST:  Your Honor, I think either nothing, or
5   I think my original suggestion of just pointing them to
6   Instruction 31 is appropriate, too.
7       MR. JACOBS:  I suspect Your Honor has a form of
8   guidance to give to a jury in this situation.  And even though
9   they haven't yet reported this is the result, that is, that
10  they can't reach a unanimous decision and people are not
11  budging, I think it's close enough to that that you could say
12  to them what you would say if that was the result they would
13  report.  I would -- something along the lines of, I would urge
14  you to continue to deliberate, listen, et cetera.
15      I think the instruction that Mr. Van Nest is pointing
16  to is not directly responsive to this question, I think.
17      MR. VAN NEST:  And we would object to that.  I mean,
18  we're a long way from Allen charge territory, or anything like
19  that, given this note that we have from our juror.  A long way
20  from that.
21      THE COURT:  All right.  I have an idea in mind.
22  Let's bring in the jury, and I will -- it's close to the end of
23  the day.  They are probably ready to go home for the day.
24  Let's catch them before they go.
25          (Jury enters at 3:52 p.m.)

1   THE COURT:  Okay.  Welcome back and have a seat.
2   So you're all working very hard in there.
3   UNIDENTIFIED JUROR:  Oh.
4   THE COURT:  We know that.  And I know you were going
5   to leave at 4:00 today, so I wanted to catch you before you
6   leave because I got a note from Ms. Gallo.
7       And just in case you all don't know, she didn't have
8   to share it with you before she sent out the note.  So here's
9   what it says:
10      "What happens if we can't reach a unanimous
11      decision & people are not budging?"
12      All right.  So I've got a few things to say about
13  this.  But you remember a few weeks back or a few days back
14  somebody sent out a note, What happens if one of us gets hit by
15  a car or a truck?  I think it was.
16      Well, that was an iffy question.  President Roosevelt
17  used to say he wouldn't answer iffy questions.  I'm not old
18  enough to remember President Roosevelt.  I shouldn't suggest
19  that.  But I read about it.  And he just didn't like to answer
20  hypothetical questions.
21      Now, in your case, you're saying, "What happens
22  if ...?"  But nobody has actually said you're not able to reach
23  a unanimous decision.  And so this is -- it sort of smacks of
24  "what if" as opposed to you think you are in the position where
25  you're not going to be able to reach a decision.

So I need to be careful not to presume upon your deliberations and assume that you've reached some deadlock when you haven't actually told me that. And so I will be -- I will make my comments brief, at this point.

If you were to tell me that you were deadlocked, there are admonitions that I could give to you that I would talk with the lawyers about first, and we would consult about what is the best course to pursue. If that were to occur.

In all event, if you eventually were unable to reach any decision, even a partial decision on what you have been deliberating on, nonetheless, we would go to Phase Two, all of us. All of you. All of us.

We would put aside the copyright part of the case. That would have to be retried with a different jury at some point in the future. At least parts of it would have to be, whatever you cannot decide.

But, we would go ahead with the patent part of the case and then to the damages part of the case. So we would just have some unfinished business, if that ever were to occur.

We don't -- you know, you are dealing with some many hundreds of exhibits and many witnesses over a pretty long period of time. It's not unusual for people to disagree. And, you know, then if you discuss it long enough sometimes you begin to see a point of view that the other side -- other person has. And maybe in the middle of the night you wake up -- like I do -- and you think of something that hadn't occurred to you before. You see things in a different light.

So it may be that it's a bit premature for you to panic and think that you're not going to be able to reach a unanimous verdict if you continue to work hard and in good faith, and to see each other's point of view.

Don't give up a point of view that you genuinely hold just to reach agreement. That would be wrong. But this is not as simple as who ran the red light. There's a lot of exhibits here and a lot of history that takes some time for a jury.

And you're doing a good job getting in there and rolling up your sleeves and working hard. So don't be mad at yourself for -- and no one is telling me that you are. You're just saying, "What if?" "What if?"

So I've already said more than President Roosevelt would have said.

Here's what I suggest you do. You go home, get a good night's rest, come back and start fresh in the morning and continue to do your work.

And we very much appreciate your hard efforts in this case.

So, counsel, can I send the jury home for the evening? Is there anything more you want me to say?

**MR. VAN NEST:** You certainly may, Your Honor.

**MR. JACOBS:** Yes, Your Honor.

**THE COURT:** Okay. Have a good evening. See you tomorrow.

**THE CLERK:** All rise.

(Jury out at 3:57 p.m.)

**THE COURT:** All right. So you all should do your homework on those issues. We will confer tomorrow. I guess nobody will get any 3-day weekend, will they?

(Laughter)

**THE COURT:** Too bad, but here we are.

Anything else I can help you with today?

**MR. VAN NEST:** I don't believe so, Your Honor. Thank you.

**MR. JACOBS:** Nothing from us, Your Honor.

**THE COURT:** See you tomorrow.

(At 3:58 p.m. the proceedings were adjourned until Friday, May 4, 2012, for further jury deliberations.)

- - - -

CERTIFICATE OF REPORTERS

I, KATHERINE POWELL SULLIVAN, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings in C 10-3561 WHA, **Oracle America, Inc., vs. Google, Inc.,** was reported by me, certified shorthand reporter, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings at the time of filing.

/s/ Katherine Powell Sullivan

Katherine Powell Sullivan, CSR #5812, RPR, CRR
U.S. Court Reporter

Thursday, May 3, 2012