1    KEKER & VAN NEST LLP
     ROBERT A. VAN NEST - # 84065
2    rvannest@kvn.com
     CHRISTA M. ANDERSON - # 184325
3    canderson@kvn.com
     DANIEL PURCELL - # 191424
4    dpurcell@kvn.com
     633 Battery Street
5    San Francisco, CA 94111-1809
     Telephone:    (415) 391-5400
6    Facsimile:    (415) 397-7188

7    KING & SPALDING LLP
     BRUCE W. BABER (pro hac vice)
8    bbaber@kslaw.com
     1180 Peachtree Street, N.E.
9    Atlanta, Georgia  30309
     Telephone:    (404) 572-4600
10   Facsimile:    (404) 572-5100

11   Attorneys for Defendant
     GOOGLE INC.

12                     UNITED STATES DISTRICT COURT

13                    NORTHERN DISTRICT OF CALIFORNIA

14                        SAN FRANCISCO DIVISION

15

16   ORACLE AMERICA, INC.,              Case No.  3:10-cv-03561 WHA

17            Plaintiffs,               **GOOGLE'S RESPONSE TO REQUEST
                                        FOR FURTHER BRIEFING RE RULE 50
18        v.                            MOTION**

19   GOOGLE INC.,                       Dept:      Courtroom 8, 19th Fl.
                                        Judge:     Hon. William Alsup
20            Defendant.

21

22

23

24

25

26

27

28

1062645.01

On Monday evening, the Court directed the parties to "please advise what evidence in the trial record addresses the causal mechanism by which Android (which was given away for free) itself added to Google's advertising revenue." Request for Further Briefing Re Rule 50 Motion (ECF 1955) at 1:15-17. The Court further explained, "That is, in the absence of Android, some other platform would have filled the void — presumably Sun's Java platform, if Oracle is correct — and why wouldn't Google continue to receive advertising revenue from those mobile users?" *Id.* at 1:17-19. The Court specifically asked whether evidence in "the trial record for Phase One" included evidence that would "explain what, if anything, was special about Android itself (as opposed to other platforms) leading to use of the Google search engine (and thus to greater advertising revenue)?" *Id.* at 1:20-22. The Court indicated that its question "potentially goes to the extent of commercialism (factor one) and to the harm caused to the market (factor four)." *Id.* at 1:24-25.

Google Executive Chairman (and former CEO) Eric Schmidt testified that "[v]irtually all the revenue of Google comes from its advertising products, and I'm sure you all have seen them over the years, the little blue links." Tr. 343:21-23 (E. Schmidt). Google's search and ad technologies are separate from Android. Tr. 345:8-10. Google's mobile search also runs on other mobile platforms, such as the iPhone. Tr. 346:3-7. Oracle's economic expert, Dr. Adam Jaffe, testified that Google was a "major player" in the search market long before Android, and that even before Android, Google was "already making significant money in advertising." Tr. 1752:12-15; *see also* Tr. 1867:6-15 (Google search existed and was successful long before Android). He further testified that Google's search technology is totally separate from any Android technology, runs on other mobile platforms, and on the desktop. Tr. 1867:16-1868:5. He testified that Google's ad technology is also separate from Android, also runs on desktop computer, and on devices other than Android. Tr. 1868:23-1869:12. Indeed, *Dr. Jaffe conceded that it is true that neither Google search nor Google ads are unique to Android.* Tr. 1869:4-12.

*Relevance to the first statutory fair use factor.* Google does not dispute the commercial nature of Android. That said, the relevant question for the first statutory fair use factor is the extent to which Google's use *of the copyrighted material*—i.e., the declarations and SSO from the

1    37 Java SE API packages—is commercial.  *See* 17 U.S.C. § 107(1).  And *no* evidence in Phase

2    One ties the advertising revenue that Google receives for ads shown on Android devices to the

3    declarations and SSO from the 37 Java SE API packages.

4          Oracle argues that users search more on Android devices, but there is *no* evidence that this

5    is due to the use of copyrighted material from Java 2 Standard Edition versions 1.4 or 5.0.  As

6    Oracle has done from the very beginning of this case, it seeks to conflate *Android* (15 million

7    lines of code) with the *declarations/SSO* (11,500 lines of code).  Yet there is *no* evidence in the

8    trial record that would support a finding that the declarations/SSO increase the amount of

9    revenue-generating searches performed on Android devices.  To the contrary, the record is replete

10   with evidence that Google carefully optimized Android to work well in a mobile environment.

11   *See* Tr. 1106:5-12 (Bornstein); Tr. 1228:12-22, 1234:8-1235:9 (Astrachan); Tr. 1599:5-1603:11,

12   1604:4-1608:15 (D. Schmidt); *see also* Tr. 1784:25-1785:17 (Jaffe) (agreeing it was a feat for

13   Google to establish Android as a new, viable mobile application platform, a feat that many other

14   technology companies tried and failed).  This record supports a finding that Google's

15   *optimizations* are why Android users "search twice as much as everything else."[1]  TX 951 at 9.

16   The record lacks substantial evidence to support a finding that any additional searching is due to

17   the declarations/SSO.  Instead, such a finding could only be based on speculative assumptions.

18   The trial record thus precludes a finding that the additional searching arises from the use of the

19   copyrighted material.[2]

20          *Relevance to the fourth statutory fair use factor.*  Oracle argues that Android allows

21   Google to avoid sharing revenue it with an operating system provider.  *See* Tr. 421:11-15 (E.

22   Schmidt).  But Oracle does not stand in the shoes of other providers of operating systems,

23   because "Java is not an operating system.  It's a platform that sits *on an operating system*."  Tr.

24   _____

25   [1] This statement, made by Mr. Schmidt during an earnings call, is ambiguous. It could mean that
     Android users spend two-thirds of their time using Android devices searching (i.e. twice as much
     "everything else" that they do on the devices).  It could mean that they search twice as much as

26   they do on desktop computers.  It could mean they search twice as much as users on other mobile
     platforms.  Or it could mean something else.  There is no evidence in the trial record that would

27   allow the jury to choose between these possible options.

     [2] Google further notes that commerciality must be weighed against the transformativeness of the

28   use.  *See* Jury Instruction No. 26.

1646:20-21 (Civjan) (emphasis added).  Thus, had Google had to share its revenues with an operating system provider, *that revenue share would have gone to someone other than Sun/Oracle.*

Indeed, Sun Senior Vice President Alan Brenner testified that he approved deal terms under which Google would have paid $28 million to Sun over a three year period, *with no revenue sharing.*  Tr. 1689:19-1690:9 (Brenner).  The evidence thus shows that Sun was willing to license its technology (which would have included implementing code and a virtual machine) without receiving a share of Google's ad revenue.  Indeed, there is no evidence from Phase One that any licensees shared revenue with Sun.  Thus, the fact that Google did not pay a revenue share to Oracle does not demonstrate any harm to the copyrighted works.

Moreover, Dr. Jaffe opined that the mobile platform market is extremely challenging to model and predict; that this was especially so at the time at which Android launched; and that it would be "nearly impossible" to predict success with certainty in platform markets.  Tr. 1782:20-1783:7.  For these reasons, Google's ad revenues cannot be evidence of harm to the market for Java SE (or, even if there were proof that it was a derivative work of either of the copyrighted works, Java ME), because it would be mere speculation to conclude that Java SE (or Java ME) would, but for Android, have been successful in this market.  *See Seltzer v. Green Day, Inc.,* 725 F.3d 1170, 1179 (9th Cir. 2013) (limiting derivative markets to "traditional, reasonable, or likely to be developed markets" for the copyrighted work).  Far from being a traditional, reasonable or likely to be developed market for Java SE, Dr. Jaffe admitted that Oracle never could have earned these ad revenues.  Tr. 1869:21-25.  Indeed, Dr. Jaffe *disclaimed* any assertion that Google's search and ad revenues are evidence of market harm to the copyrighted works. *See* Tr. 1869:21-1870:6 (Jaffe); *see also Arica Inst., Inc. v. Palmer,* 970 F.2d 1067, 1078 (2d Cir. 1992) (where a defendant's work is comprised of far more than just the allegedly infringing material, "the relevant market effect is that which stems from defendant's use of plaintiff's 'expression,' not that which stems from defendant's work as a whole"); *Wright v. Warner Books, Inc.,* 953 F.2d 731, 739 (2d Cir. 1991) (holding that the "effect on the market must be attributable to the [alleged infringement].").

1062645.01

*Damages.*  Oracle's response to the Court's request for further briefing includes an extended summary of what it *hopes* to prove in *Phase Two* of the trial (if there is a second phase). *See* ECF 1958-2 at 9:18-10:16.  The Court's request asked for evidence from "the trial record for Phase One" (ECF 1955 at 1:20), and thus Oracle's discussion of what it hopes *might* come into evidence in *Phase Two* is not responsive to the Court's request.

Dated:  May 24, 2016                                      KEKER & VAN NEST LLP


                                          By:    s/ Robert A. Van Nest
                                                 ROBERT A. VAN NEST
                                                 CHRISTA M. ANDERSON
                                                 DANIEL PURCELL

                                                 Attorneys for Defendant
                                                 GOOGLE INC.