Volume 10

Pages 2061 - 2228

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,              )
                                   )
              Plaintiff,           )
                                   )
   VS.                             )   No. C 10-3561 WHA
                                   )
GOOGLE, INC.,                      )
                                   )
              Defendant.           )
_____   )   San Francisco, California
                                       Monday, May 23, 2016


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**           ORRICK, HERRINGTON & SUTCLIFFE LLP
                             The Orrick Building
                             405 Howard Street
                             San Francisco, California  94105
                    BY:  **ANNETTE L. HURST, ESQUIRE**
                         **GABRIEL M. RAMSEY, ESQUIRE**

                             ORRICK, HERRINGTON & SUTCLIFFE LLP
                             The Orrick Building
                             51 West 52nd Street
                             New York, New York 10019
                    BY:  **PETER A. BICKS, ESQUIRE**
                         **LISA T. SIMPSON, ESQUIRE**

 (Appearances continued on next page)


Reported By:  Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Pamela A. Batalo, CSR No. 3593, RMR, FCRR
              Official Reporters - U.S. District Court

```
 1   APPEARANCES (CONTINUED):

 2   For Plaintiff:          ORRICK, HERRINGTON & SUTCLIFFE LLP
                             777 South Figueroa Street, Suite 3200
 3                           Los Angeles, California  90017-5855
                      BY:    ALYSSA M. CARIDIS, ESQUIRE
 4                           GEOFFREY GAVIN MOSS, ESQUIRE

 5                           ORRICK, HERRINGTON & SUTCLIFFE LLP
                             2050 Main Street, Suite 1100
 6                           Irvine, California  92614-8255
                      BY:    CHRISTINA VON DER AHE RAYBURN,  ESQUIRE
 7
                             ORACLE
 8                           500 Oracle Parkway
                             Redwood City, California 94065
 9                    BY:    DORIAN ESTELLE DALEY, GENERAL COUNSEL
                             MATTHEW SARBORARIA,VICE PRESIDENT
10                            ASSOCIATE GENERAL COUNSEL

11   For Defendant:          KEKER & VAN NEST
                             633 Battery Street
12                           San Francisco, California  94111-1809
                      BY:    ROBERT A. VAN NEST, ESQUIRE
13                           CHRISTA M. ANDERSON, ESQUIRE
                             MICHAEL S. KWUN, ESQUIRE
14                           DANIEL PURCELL, ESQUIRE
                             MATTHIAS ANDREAS KAMBER, ESQUIRE
15                           EUGENE MORRIS PAIGE, ESQUIRE
                             STEVEN P. RAGLAND, ESQUIRE
16
                             KING & SPALDING LLP
17                           1185 Avenue of the Americas
                             New York, New York 10036-4003
18                    BY:    BRUCE W. BABER, ESQUIRE

19                           GOOGLE, INC.
                             1600 Amphitheatre Parkway
20                           Mountain View, California  94043
                      BY:    RENNY HWANG, LITIGATION COUNSEL
21

22   Also Present:
                             GEORGES SAAB
23                           ORACLE CORPORATE REPRESENTATIVE

24                           CATHERINE LACAVERA
                             GOOGLE CORPORATE REPRESENTATIVE
25
```

<u>**I N D E X**</u>

Monday, May 23, 2016 - Volume 10

|                                          | <u>**PAGE**</u> | <u>**VOL.**</u> |
|------------------------------------------|------|------|
| Jury Instructions                        | 2077 | 10   |
| Closing Argument by Mr. Van Nest         | 2091 | 10   |
| Closing Argument by Mr. Bicks            | 2134 | 10   |
| Rebuttal Argument by Mr. Van Nest        | 2184 | 10   |
| Jury Instructions                        | 2200 | 10   |

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|----------------|------|------|------|
| 623            |      | 2065 | 10   |
| 2347           |      | 2069 | 10   |
| 9100           |      | 2065 | 10   |
| 9101           |      | 2065 | 10   |
| 9102           |      | 2065 | 10   |
| 9103           |      | 2065 | 10   |
| 9104           |      | 2065 | 10   |
| 9105           |      | 2065 | 10   |
| 9106           |      | 2065 | 10   |
| 9107           |      | 2065 | 10   |
| 9108           |      | 2065 | 10   |
| 9109           |      | 2065 | 10   |
| 9110           |      | 2065 | 10   |
| 9111           |      | 2065 | 10   |

1   **Monday - May 23, 2016**                        **7:31 a.m.**

2                    P R O C E E D I N G S

3                       ---oOo---

4        (The following proceedings were held in open court,

5   outside the presence of the jury:)

6        **THE COURT:**  Good morning, everyone.  Please be seated.

7        All right.  Are we all set to go?

8        **MS. HURST:**  We have a few exhibit housekeeping issues,

9   Your Honor.

10       **THE COURT:**  Well, what do you mean housekeeping?

11       **MS. HURST:**  There were some exhibits admitted by

12   stipulation that weren't moved into evidence, and Google would

13   like us to do that formally, and there are disputes about

14   whether a couple of other exhibits came into evidence.

15       **THE COURT:**  Oh, my goodness.  All right.  This is not

16   housekeeping.  This is what is the trial record.  So don't call

17   it housekeeping.

18       **MS. HURST:**  My apologies, Your Honor.

19       **THE COURT:**  All right.  Okay.  Give me the first one.

20       **MS. HURST:**  These are the ones that were admitted by

21   stipulation, Your Honor, that were not disputed and that we are

22   moving into evidence.  These are the source code exhibits that

23   were part of the Zeidman stipulation, Your Honor.

24       Exhibit 623, Exhibit 9100, 9101, 9102, 9103, 9104, 9105,

25   9106, 9107, 9108, 9109, 9110, and 9111.  And those were by

PROCEEDINGS

1    stipulation on ECF 1901, Your Honor.

2          **THE COURT:**  Any objection?

3          **MR. MULLEN:**  No objection, Your Honor.

4          **THE COURT:**  All of those will be deemed in the trial

5    record.

6    (Trial Exhibits 623 and 9100 through 9111 received in evidence)

7          **THE COURT:**  What else?

8          **MS. HURST:**  Your Honor, the next issue is this poster,

9    Exhibit 1028, which was described by Dr. Reinhold and offered

10   into evidence and received at trial record page 1452 at line

11   11, which I have the transcript excerpt here for the Court.  It

12   was received without objection.

13        Google is, however, maintaining an objection to this

14   poster, which is how it was described.  It was a poster in its

15   original form.  And that's how it was received.

16        **THE COURT:**  I remember that thing.  What did I say

17   before?

18        **MS. HURST:**  It was received, Your Honor.

19        **THE COURT:**  What's the objection?

20        **MR. MULLEN:**  I don't think there is actually an

21   objection, Your Honor.  Our only point here is that if the

22   large poster board, which isn't exactly Exhibit 1028 -- Exhibit

23   1028 is a small piece of paper, that was the exhibit exchanged

24   before trial --

25        **THE COURT:**  Was the poster board marked?

 1            **MS. HURST:**  Yes, the poster board is marked.  This was

 2    the form in which it was previously admitted at the last trial

 3    and it was described as a poster --

 4            **THE COURT:**  In this trial was this marked?

 5            **MS. HURST:**  Yes.

 6            **THE COURT:**  What then is this?

 7            **MR. MULLEN:**  This is 1028, Your Honor.

 8            **THE COURT:**  What is that?

 9            **MS. HURST:**  This is 1028.

10            **THE COURT:**  Dawn, you are the clerk.  Tell us which

11    one was officially marked as an exhibit.

12            **THE CLERK:**  Since I was not here that day, I will have

13    to go back through the record to see myself what happened.  I

14    don't know which one she marked then, if it was the poster

15    board.

16            **MR. MULLEN:**  I believe the version signed by the clerk

17    is the small 1028, although I don't have that.

18            **MS. HURST:**  Your Honor, the transcript describes it as

19    a poster and the witness describes it as a poster and it was

20    this that was being displayed before the jury.

21            **THE COURT:**  I remember that was displayed.  It could

22    have been for illustrative purposes.  I don't remember well

23    enough whether we marked a small version or not.

24            **THE CLERK:**  The small version is signed.  It could be

25    that's what she retrieved from the exhibit box.

PROCEEDINGS

1            THE COURT:  The clerk has marked as 1028 the -- is

2       this Angie?

3            THE CLERK:  It is.  So she would have retrieved it.

4            THE COURT:  -- the small version.

5            MR. MULLEN:  Your Honor, if I could say, we don't

6       necessarily have an objection to the larger version going into

7       the jury room so long as our larger version of 43.1 also goes

8       into the jury room.  That is the exhibit of the Android stack

9       that the jurors have seen blown up on the screen.

10           THE COURT:  Do you have any trouble with that?

11           MS. HURST:  Yes.  Here is what is going on.  43.1 is

12      part of the documentation that came with the Cupcake release of

13      source code of Android.  It was normal documentation in a

14      regular, you know, computer screen size.  It was never created

15      in that size, and that is solely for demonstrative purposes.

16           However, both Dr. Reinhold and Dr. Bloch and Dr. Astrachan

17      all testified that this document in its original form was in

18      poster size.  So what they're trying to do is tit for tat, 1028

19      for 43.1, when this, in its original form, was a poster and

20      that has only ever been a demonstrative.  And it's not

21      appropriate, Your Honor, for 43.1 to be sitting in the jury

22      room making an argument.

23           This was admitted into evidence as a poster because that

24      is what it was in its original form and it was described as

25      such by three different witnesses.

PROCEEDINGS

```
 1            THE COURT:  The one the clerk signed into evidence was

 2    the smaller version.

 3            MS. HURST:  Your Honor, all I can tell you is that was

 4    a mistake.  That form of that document was never displayed to

 5    the jury at all.

 6            THE COURT:  Then who marked it as 1028?

 7            MS. HURST:  I can don't know.  We brought this.

 8            THE COURT:  Somebody -- my clerk didn't do it.  One

 9    side or the other marked as Trial Exhibit 1028 the small

10    version.

11            MR. MULLEN:  Your Honor, if I could clarify, Exhibit

12    1028, the version you are holding in your hand, was the version

13    exchanged to us before the trial.  It's the version that has

14    been sitting in these banker boxes as the official trial

15    exhibit, and it's the version that was marked.

16            MS. HURST:  Your Honor, that is incorrect.  Like many

17    documents that were in native or other format, this was simply

18    marked as a placeholder in exchange to provide notice to Google

19    as to what the actual exhibit would be.  Obviously we couldn't

20    send the poster board over to their offices.  It was to provide

21    them notice of what was on the trial exhibit list and it was

22    never supposed to go into the boxes.

23            THE COURT:  Didn't I say clearly before the trial

24    started that you lawyers are supposed to monitor this and that

25    the document that had the clerk's tag on it was the one that
```

1    would go into the jury room?  Didn't I say that?

2             MR. MULLEN:  Yes, Your Honor.

3             THE COURT:  I'm going to hold off on this for a

4    moment.

5        What are your other problems?

6             MS. HURST:  Your Honor, Exhibit 2347 was referred to

7    during the testimony of Edward Screven.  Somebody passed me a

8    note at that time saying it was preadmitted, and I was mistaken

9    in that regard.  There was no objection to the exhibit at the

10   time, and it was displayed to the jury, but it was not moved

11   into evidence.  It's the letter to Apache that Mr. Screven

12   signed when he was at Oracle in June of 2007.

13            THE COURT:  Is there an objection?

14            MR. MULLEN:  No, Your Honor.

15            THE COURT:  2347?

16            MS. HURST:  Yes, Your Honor.

17            THE COURT:  That will be deemed in evidence.

18   (Trial Exhibit 2347 received in evidence)

19            THE COURT:  What else?

20            MS. HURST:  That's all for us.

21            MR. MULLEN:  Your Honor, this one is easy.  The

22   parties have agreed upon a joint translation sheet for exhibits

23   that were originally offered through a deposition and have now

24   been marked as trial exhibits, so what we have here is just a

25   translation sheet that can be handed to the jury.  I think we

PROCEEDINGS

1    have agreement on this.  It corresponds to the depo exhibit to

2    the actual trial exhibit number.

3            **MS. HURST:**  We are willing to do this if the Court

4    believes it would aid the jury in tracking exhibits that were

5    shown by video, Your Honor.

6            **THE COURT:**  Can I see it for a second?

7            **MR. MULLEN:**  It's multiple copies of a one-page

8    document, Your Honor.

9            **THE COURT:**  While we're on this general subject, this

10   just refers to depositions, but will there be a trial exhibit

11   index?

12           **MS. HURST:**  Yes.  We have them in both forms, as the

13   Court requested, both chronological and by exhibit number, and

14   we have it in three different versions just waiting for the

15   Court's ruling on these final issues, and we're ready to hand

16   it you up as soon as that's needed for that purpose.

17           **THE COURT:**  It's been stipulated to?

18           **MS. HURST:**  Yes, Your Honor.

19           **MR. MULLEN:**  Yes, Your Honor.

20           **THE COURT:**  So this one is called *Deposition Exhibit*

21   *Cross-Reference Chart*.  You mean the -- I thought whenever we

22   read the exhibits to the -- the depositions in, we were going

23   to change the exhibit numbers.

24           **MR. MULLEN:**  Yes, Your Honor.  That is true for

25   deposition or trial read-ins, but for those depositions that

**PROCEEDINGS**

1    were played by video, it's not possible on the video obviously

2    to dub over what the witness says or the attorney in referring

3    to an exhibit, so what we've done is simply match up the depo

4    exhibit as it was referred to on the record in the videotaped

5    deposition to what the trial exhibit will actually be in

6    evidence.

7              THE COURT:  So this is a problem only for the video

8    version, not for the read-in version?

9              MS. HURST:  Correct.

10             MR. MULLEN:  Correct, Your Honor.

11             THE COURT:  So let's put into your title *for documents*

12   *admitted into evidence via video depositions*.

13             MR. MULLEN:  Sure.

14             THE COURT:  With that exception, this can go into the

15   jury room.  It's not evidence itself of course.  It's just

16   going to be sent in to the jury room as an aid, just like the

17   other indexes.

18        All right.  What else do you have?

19             MR. MULLEN:  Nothing further from our side,

20   Your Honor.

21             MS. HURST:  Same.

22             MR. MULLEN:  I apologize.

23             MR. BABER:  Just very quickly and just for the sake of

24   good order, Rule 51 says we are required to state our

25   objections to the charge on the record.  Both sides filed

**PROCEEDINGS**

1    written objections last night.  I'm sure we would be happy to

2    read them, but if Your Honor deems the written versions to have

3    been made on the record, I think we've covered that.

4             THE COURT:  Well, the time to have done it was at the

5    charging conference so both are untimely.  You can take that up

6    with the Court of Appeals, but I think I've -- you can't just,

7    after I've sent out the -- unless I told you you could do it

8    that late.  Did I?  Maybe I did.  But I don't think so.  I said

9    that you could rest on your earlier objections.  That was okay.

10   The objections made in that multiple rounds.  But after I've

11   already sent out the final final version and taken into account

12   all of the things you've said at the charging conference, I

13   don't think it's fair to spring a bunch of new things on the

14   judge at the last minute.

15        Let's put it this way.  To the extent that you need to say

16   anything on the record, it's too late now.  And it was too late

17   last night.  But there's no point in doing it again.  If the

18   Court of Appeals forgives you for doing it as late as last

19   night, then I'm going to forgive you for not doing it again

20   this morning.

21             MR. BABER:  That's fine, Your Honor.

22             THE COURT:  I'm going to let Oracle use and put into

23   the jury room that big poster board because it was shown to the

24   jury.  1028 will -- this number 1028 will just be, I guess, for

25   purposes of appeal, and 1028 will go in separately as a -- as

PROCEEDINGS

1    that big poster board, but the illustrative thing will not go

2    in as a poster board because I don't think there was a mistake

3    there in the designation.

4         **MS. HURST:**  Thank you, Your Honor.

5         **MR. MULLEN:**  Thank you, Your Honor.

6         **MS. HURST:**  We will have those lists to reflect that

7    shortly.

8         **THE COURT:**  Thank you.

9       Are we ready now to begin?

10        **MR. VAN NEST:**  Yes, Your Honor.

11        **MR. BICKS:**  Yes, Your Honor.

12        **THE COURT:**  Do we not have enough seating room back

13   there for those people standing up.

14        **MS. HURST:**  Your Honor, there are people in the back

15   of the courtroom standing and people in the hallway.  If there

16   could be an overflow, I think people would be very grateful.

17        **THE COURT:**  I thought we did have an overflow.

18        **THE CLERK:**  We do have an overflow, and I'm waiting to

19   be able to confirm that IT will be able to turn it on.

20        **THE COURT:**  Where is the overflow room?

21        **THE CLERK:**  Eighteenth floor, Courtroom 15.  That is

22   where everybody has been going.

23        **THE COURT:**  Do we have a CSO officer coming?

24        **THE CLERK:**  They are going to be coming.  They are

25   rearranging their coverage downstairs to accommodate us.

PROCEEDINGS

1          **THE COURT:**  All right.  Let's just lay out what's

2    going to happen here --

3          **THE CLERK:**  The CSO is in front of the door now.

4          **THE COURT:**  Could I see -- I don't think we inked in

5    the right change here.  Could you bring me the change the

6    Google lawyer wanted.  I had evidently made a mistake on

7    paragraph 20 and Google lawyers pointed that out and I think --

8    I intended to do what they said that I intended to do.  I don't

9    think it's controversial, but I need to look at the document

10   again.

11         Anyway, what I want to do this morning, I will read about

12   10 minutes, the first one-third of the instructions.  Then I

13   will call on Mr. Van Nest to give his closing.  Then we will

14   have all of Mr. Bicks'.  Then we will take a break, and then we

15   will have the rebuttal, and I will finish the instructions at

16   that point.

17         While the instructions are being read, please, in the

18   gallery, no getting up and leaving.  You would lose your seat

19   anyway, but it is the most boring part of the trial, maybe for

20   the gallery, but for the jury it is extremely important.  So if

21   I -- you just cannot move.  So you have to suffer along with

22   everyone else while the instructions are being read.

23         All right.  You want to say the point of contention is

24   over the declaring lines of code within the 37 API packages,

25   also referred to as declarations or header lines, which Google

**PROCEEDINGS**

1  concededly used in Android.  Okay.  I am going to phrase it

2  that way.

3      Are both sides ready to go?

4          **MR. VAN NEST:**  Yes, Your Honor.

5          **THE COURT:**  You have swapped out your exhibits that

6  you are going to be using and everyone is aware and there are

7  no further objections?

8          **MR. VAN NEST:**  We have agreed not to exchange the

9  graphics.  So that's the way we have elected to proceed.

10          **THE COURT:**  So you mean it's trial by ambush and then

11  there will be objections made as we go along?

12          **MR. VAN NEST:**  Hopefully not.

13          **THE COURT:**  I don't like objections in closing

14  argument.  But if it's critical, I will -- you should of course

15  jump up.  But try not to just disturb the other side's argument

16  with objections.  I wish you had all exchanged them.  I thought

17  you were going to do that.

18          **MR. BICKS:**  We agreed not to, Your Honor.

19          **THE COURT:**  I hope you agree not to object during the

20  closing arguments.

21          **MR. VAN NEST:**  That's fine with us, Your Honor.

22          **THE COURT:**  Let's bring in the jury, please.

23      (Proceedings were heard in the presence of the jury:)

24          **THE COURT:**  I hope you all had a great, long, restful

25  weekend.  Did you?  Yes.  Good.  Got your notepads ready?

1    Let's go over what's going to happen today.

2         You know the evidence is closed.  So we will have the

3    closing arguments and instructions of law and I think that will

4    take us almost up to noontime.  So not quite, but you need --

5    this is not going to go by fast.  We've heard a lot of

6    evidence, and it will be good to hear good, long closing

7    arguments by both sides to see what they think has or has not

8    been proven.

9         And we have excellent lawyers here to give us excellent

10   closing summations.

11        Now, I need to remind you of something very important that

12   I said earlier.  Despite the fact that these lawyers are

13   world-class lawyers, not one word they say is evidence.  Please

14   remember that.  Not a single word they say is evidence.

15        What they say is very important nevertheless because it

16   gives you a guide to what they think has been proven or not

17   proven, but you always have to do a double check and ask

18   yourself is this the way the evidence really came in.  Or was

19   there some -- yes, it did come in that way, but wasn't there

20   some other important qualification.  Or was there a limited

21   purpose for that evidence.  And you need to be the one who did

22   that double check in your own mind on both sides to keep the

23   lawyers totally honest.  Of course they are honest lawyers.  I

24   don't mean they're not, but what I mean is that they are good

25   advocates, but nevertheless, what they say is not evidence and

1    you are the judge of the evidence.  This is very important.

2        All right.  The way we will proceed is I have instructions

3    that -- I'm not going to give all of them now, but I'm going to

4    give the first third of the instructions to you, and this

5    concerns the evidentiary part of the case.  And then we will go

6    immediately into the closing arguments.  All right.

7        So bear with me now.  I'm going to read this, but this

8    is -- we all went to law school for three years.  You get to go

9    to law school for 45 minutes.  This is your instructions on the

10   law, but we've worked very hard -- this 45 minutes tells you

11   what you need to know about the law in order to decide this

12   case.

13       So a lot of time has gone into these instructions.  There

14   will be a copy for you in the jury room, but, nevertheless,

15   I'll read about the first 10 minutes, and then we will break on

16   the instructions and go to the closings.  Okay.

17                          **JURY INSTRUCTIONS**

18       **THE COURT:**  "Members of the jury, it is now my duty to

19   instruct you on the law that applies to the issue of fair use.

20   A copy of these instructions will be available in the jury room

21   for you to consult as necessary.  It is your duty to determine

22   the facts from all the evidence in the case.  To those facts

23   you will apply the law as I give it to you.  You must follow

24   the law as I give it to you whether you agree with it or not.

25   You must not be influenced by any personal likes or dislikes,

1    opinions, prejudices or sympathy.  That means that you must

2    decide the case solely on the evidence before you.  You will

3    recall that you took an oath promising to do so at the

4    beginning of the case.

5         "In following my instructions, you must follow all of them

6    and not single out some and ignore others.  They are all

7    equally important.  You must not read into these instructions

8    or into anything the Court may have said or done as suggesting

9    what verdict you should return.  That is a matter entirely up

10   to you.

11        "The evidence from which you are to decide what the facts

12   are consists of, one, the sworn testimony of witnesses on both

13   direct and cross-examination, regardless of who called the

14   witness; two, the exhibits which have been received into

15   evidence; three, the sworn testimony of witnesses in

16   depositions and other proceedings read into evidence; any facts

17   to which the lawyers have stipulated.  You must treat any

18   stipulated facts as having been conclusively proved.  Answers

19   to interrogatories and requests for admissions read to you

20   during the trial.  And any facts that I have instructed you

21   must be treated as having been established.

22        "Evidence may be direct or circumstantial.  Direct

23   evidence is direct proof of a fact such as testimony by a

24   witness about what that witness personally saw or heard or did.

25   Circumstantial evidence is proof of one or more facts from

1  which you could find another fact.  By way of example, if you

2  wake up in the morning and see that the sidewalk is wet, you

3  may infer from that fact that it rained during the night.

4  However, other evidence, such as a turned-on garden hose, may

5  explain the presence of water on the sidewalk.  Therefore,

6  before you decide that a fact has been proved by circumstantial

7  evidence, you must consider all of the evidence in light of

8  reason, experience and common sense.

9      "You should consider both kinds of evidence.  The law

10  makes no distinction between the weight to be given to either

11  direct or circumstantial evidence.  It is for you, the jury, to

12  decide how much weight to give any evidence.  You should base

13  your decision on all of the evidence regardless of which side

14  presented it.

15      "In reaching your verdict, you may consider only the types

16  of evidence I have described.  Certain things are not evidence

17  and you may not consider them in deciding what the facts are.

18  I will list them for you.  These are things that are not

19  evidence.

20      "Arguments and statements by lawyers are not evidence.

21  The lawyers are not witnesses.  What they have said in their

22  opening statements, closing arguments, and at other times is

23  intended to help you interpret the evidence, but it is not

24  evidence itself.  If the evidence, as you remember, it differs

25  from the way the lawyers have stated it, your memory of it

1    controls.

2         "A suggestion in a question by counsel or the Court is not

3    evidence unless of course it is adopted by the answer.  A

4    question by itself is not evidence.  Consider it only to the

5    extent it was adopted by the answer.

6         "Objections by lawyers are not evidence.  Lawyers have a

7    duty to their clients to consider objecting when they believe a

8    question is improper under the Rules of Evidence.  You should

9    not be influenced by any question, objection, or the Court's

10   ruling on it.

11        "Testimony or exhibits that have been excluded or stricken

12   or that you have been instructed to disregard are not evidence

13   and must not be considered.  In addition, some testimony and

14   exhibits have been received only for a limited purpose.  Where

15   I have given a limiting instruction, you must follow it.

16        "Anything you may have seen or heard when the Court was

17   not in session is not evidence.  You are to decide the case

18   solely on the evidence received here in the courtroom at trial.

19        "The weight of the evidence as to a fact did not

20   necessarily depend on the number of witnesses who testified nor

21   did it depend on which side called witnesses or produced

22   evidence.  You should base your decision on all the evidence,

23   regardless of which side presented it.

24        "You are not required to decide any issue according to the

25   testimony of a number of witnesses which does not convince you

1    as against the testimony of a smaller number or other evidence,

2    which is more convincing to you.  The testimony of one witness

3    worthy of belief is sufficient to prove any fact.  This does

4    not mean you are free to disregard the testimony of any witness

5    merely from caprice or prejudice or from a desire to favor

6    either side.  It does mean that you must not decide anything by

7    simply counting the number of witnesses who have testified on

8    the opposing sides.  The test is not the number of witnesses

9    but the convincing force of the evidence.

10       "A witness may be discredited or impeached by

11   contradictory evidence or by evidence that at some other time

12   the witness has said or done something or failed to say or do

13   something that is inconsistent with the witness' present

14   testimony.  If you believe that any witness has been impeached

15   and thus discredited, you may give the testimony of that

16   witness such credibility, if any, you think it deserves.

17       "Discrepancies in a witness' testimony or between a

18   witness' testimony and that of other witnesses do not

19   necessarily mean that such witness should be discredited.

20   Inability to recall and innocent recollections are common.  Two

21   persons witnessing an incident or transaction will sometimes

22   see or hear it differently.  Whether a discrepancy pertains to

23   an important matter or only to something trivial should be

24   considered by you.

25       "However, a witness you think is willfully false in one

1   part of his or her testimony is to be distrusted in others.

2   You may reject the entire testimony of a witness who willfully

3   has testified falsely on a material point unless, from all the

4   evidence, you believe that the probability of truth favors his

5   or her testimony in other particulars.

6       "In determining what inferences to draw from evidence, you

7   may consider, among other things, a parties' failure to explain

8   or deny such evidence.  You may have heard from a witness in

9   our trial that there was a prior trial in this case.  It is

10  true that there was a prior trial.  We have heard evidence in

11  this trial of a prior proceeding, which is the earlier trial

12  that occurred in this case.  Do not speculate about what

13  happened in the prior trial.  No determination on fair use was

14  made one way or the other in that trial.  It is up to you, the

15  jury, to determine fair use based on the evidence you have

16  heard in this trial and my instructions on the law.

17      "In this case, members of the jury, you have heard from

18  two types of witnesses.  First you have heard fact witnesses.

19  These are people who were part of the story on trial and have

20  testified to the facts they experienced firsthand.

21      "Second, you have heard expert witnesses.  Unlike fact

22  witnesses who were part of the story on trial, the various

23  expert witnesses have been retained by both sides after the

24  fact to testify to opinions based upon their specialized

25  training or experience.  To take an example from a more routine

case, in a traffic case, a fact witness is someone who saw or

heard the accident or was part of it, whereas an expert witness

is someone like an accident reconstruction specialist who

offers an opinion on the car's speed based on skid marks.

"In deciding the facts in this case, you may have to

decide which testimony to believe and which testimony not to

believe.  You may believe everything a witness says or part of

it or none of it.  In considering the testimony of each

witness, you may take into account the opportunity and ability

of the witness to see, hear, or know the things testified to;

the quality of the memory of the witness; the pattern of the

witness while testifying; the interest of the witness in the

outcome of the case and any bias or prejudice; whether other

evidence contradicted the testimony of the witness; the

reasonableness of the witness' testimony in light of the

evidence; and any other factors that bear on believability.

"Now, with respect to expert witnesses, the main reason we

allow their testimony is because they have specialized training

and experience with insights that may help the jury understand

a field of specialized knowledge and how it applies to the case

at hand.  Usually these witnesses are paid by their respective

sides in litigation.

"Two important caveats for experts are as follows:  No

expert witness should ever vouch for which side's fact scenario

is correct.  No retained expert was present at the events in

1  question.  None has firsthand knowledge.  Experts may rely on

2  particular documents and testimony and may make an assumption

3  that the document or testimony is correct and then give an

4  opinion based on that assumption.  But the opinion is only as

5  good as the factual assumption, and the foundational fact

6  question is always for you -- and that foundational fact

7  question is always for you, the jury, to resolve, not for the

8  experts.

9      "Put differently, experts should not invade the province

10  of the jury by purporting to tell the jury which side's fact

11  version is true.  Similarly, no expert witness should attempt

12  to tell the jury what someone had in mind or was thinking.  The

13  mental state and intent of the characters in our story on trial

14  is for you to decide, not for the experts to decide.  It is,

15  however, permissible for experts to quote testimony or

16  documents and then to assume that their statements therein were

17  accurate and then base thereon to apply their expertise to

18  render an opinion.

19      "With this in mind, I will now suggest to you some further

20  inquiries for your evaluation of the testimony of experts.

21  First, to what extent, if at all, has the expert witness

22  overstepped his or her role and tried to usurp the function of

23  the jury by vouching for the truth of one side's witnesses

24  versus the other or by giving opinions on the mental state of

25  the characters involved in the case.

1    "Two, to what extent is the expert witness' opinion

2    actually anchored in his or her specialized knowledge and

3    training as opposed to just partisan argument, which you are

4    just as qualified to make and reject as him or her.

5    "Three, to what extent is the expert witness' opinion

6    supported by facts you find have been independently proven.

7    "Four, to what extent is the opinion contradicted by the

8    facts.

9    "Five, to what extent has the expert witness relied upon a

10   source of factual information that is biased.

11   "Six, to what extent has the expert witness cherry-picked

12   the factual record to highlight material helpful to his or her

13   opinion while downplaying the facts that undercut his opinion.

14   "Seven, to what extent has the expert witness forthrightly

15   conceded points versus stubbornly refused to concede a point

16   you think he or she should.

17   "Eight, to what extent has the expert witness been

18   influenced by money compensation paid by the side presenting

19   him or her.

20   "These are merely considerations.  It is always up to you,

21   the jury, to decide how much weight to give, if any, to any

22   testimony or evidence, including from expert witnesses.

23   "Under the law, a corporation is considered to be a

24   person.  It can only act through its employees, agents or

25   directors or officers.  Therefore, a corporation is responsible

1    for the acts of its employees, agents, directors, or officers

2    performed within the scope of authority.

3        "You have heard testimony that Oracle Corporation bought

4    Sun Microsystems, Inc., in 2010 and changed the name of the

5    corporation from Sun Microsystems, Inc., to Oracle America,

6    Inc.  This means that Sun and Oracle America, the plaintiff in

7    this case, are the same legal entity.

8        "In these instructions, I will often refer to a party's

9    burden of proof.  Let me explain what that means.  When a party

10   has a burden of proof on any claim by a preponderance of the

11   evidence -- I'm going to repeat that.  That's a very important

12   phrase you will hear a lot.  *Preponderance of the evidence*.

13       "When a party has the burden of proof on any claim by a

14   preponderance of the evidence, it means that you must be

15   persuaded by the evidence that the claim is probably more true

16   than not true.  To put it differently, if you were to put the

17   evidence favoring a plaintiff and the evidence favoring a

18   defendant on opposite sides of the scale, the party with the

19   burden of proof on the issue would have to make the scale tip

20   somewhat toward its side.  If the party fails to meet this

21   burden, then the party with the burden of proof loses on that

22   issue.  *Preponderance of the evidence* basically means more

23   likely than not.

24       "If you find that Google carried its burden of proof as to

25   fair use, your verdict should be for Google.  If you find that

1    Google did not carry its burden of proof, your verdict should

2    be for Oracle.

3        "I will now remind you of some important established facts

4    regarding the copyrighted works at issue in this case.

5        "The Java platform is a software application platform that

6    is used to write and to run programs in the Java programming

7    language.  The Java programming language is free and available

8    to use without permission from anyone.  The Java platform

9    includes, among other things, the Java virtual machine and the

10   Java API packages.

11       "API stands for *application programming interface*.  What

12   is at issue in this case are the Java API packages which are

13   sets of pre-written computer programs used to perform common

14   computer functions without a programmer needing to write code

15   from scratch.  These pre-written computer programs assist

16   developers in writing applications.  These pre-written programs

17   are organized into packages, classes, and methods.  Packages,

18   classes and methods.

19       "An API package is a collection of classes.  Each class

20   contains methods and other elements.  The packages, classes,

21   and methods are defined by declaring code."

22       I'll repeat that sentence.

23       "The packages, classes and methods are defined by

24   declaring code.  The declaring code is the line or lines of

25   source code that introduce, name and specify the package,

1   class, or method.  The declaring code allows programmers to

2   understand and make use of the pre-written programs in the API

3   packages to write their own programs.

4        "The declaring code for packages, classes, and methods

5   reflects the structure, sequence, and organization, or SSO, for

6   the Java API packages.  The SSO -- that's structure, sequence

7   and organization -- specifics the relationships between and

8   among the elements of the Java API packages and also organizes

9   the classes, methods, and other elements in the package.

10       "The term structure, sequence and organization is a

11   concept used by lawyers and courts in connection with

12   copyright.  It is not a term used by computer scientists.

13       "Each individual method performs a specific function.  The

14   declaring code for a method is sometimes referred to as the

15   method declaration, header, or signature.  The declaring code

16   for a method tells the programmer that the information" -- I'm

17   sorry.  I'll start over.

18       "The declaring code for a method tells the programmer the

19   information the method needs; that is, the inputs to perform

20   the desired functions.

21       "Each method" -- actually, it should say *desired function*.

22   So I'll read that sentence again.

23       "The declaring code for a method tells the programmer the

24   information the method needs, that is, the inputs, to perform

25   the desired function.

1    "Each method also contains implementing code.  The

2    implementing code provides step-by-step instructions that tell

3    the computer how to perform the function specified by the

4    declaring code.  The declaring code and the SSO of the 37 Java

5    API packages at issue are protected as part of the overall work

6    protected by copyrights owned by Oracle.  The copyright

7    protection does not extend to the idea of organizing functions

8    into packages, classes, and methods, but the copyright

9    protection does cover the SSO as expressed in the 37 Java API

10   packages.

11       "Sun developed the Java programming language and made it

12   free for all to use.  Sun further developed the copyrighted

13   Java API library of pre-written code, including implementing

14   code, to carry out more advanced functions and made it

15   available for all to use with a license, although the question

16   for you to decide is the extent to which, if at all, the

17   declaring code and SSO may be copied without a license under

18   the statutory right of fair use.

19       "Anyone using the Java programming language may write

20   their own library of pre-written programs to carry out various

21   common functions.  They may even write their own library to

22   cover the same functions as covered by the copyrighted works.

23   This is because copyright protects a particular set of words or

24   expression, but it does not and cannot cover ideas or

25   functions.  However, even in writing their own programs to

1    carry out the same functions, Java programmers may not begin

2    their methods, classes, or packages with the identical line or

3    lines of declaring code as used in the copyrighted works unless

4    such use of the declaring lines constitutes a fair use, nor may

5    they organize their methods into the same packages and classes

6    as the copyrighted works unless to do so qualifies as fair

7    use."

8         Now I'm going to pause there because I've gotten up to the

9    part of the instructions which will deal with the specifics of

10   the law, the four statutory factors that I read to you at the

11   outset of the trial.  And we will pick up the instructions in a

12   few hours at the close of all of the closing arguments.

13        Now, remember that in this case, the burden of proof on

14   this issue lies with Google, and because of that, Google gets

15   to make the closing argument first, and then we hear from

16   Oracle and then Google gets a rebuttal.

17        So you will actually hear from the Google side twice,

18   opening and closing, with Oracle in the middle.  However, both

19   sides have the same amount of overall time, so the time will be

20   the same amount of argument time.

21        So over there in the jury box, you're all set with full

22   attention and ready to go.  It looks like they are.

23        Mr. Van Nest, on behalf of Google will make the closing

24   argument.

25             **MR. VAN NEST:**  Thank you, Your Honor.

<u>**CLOSING ARGUMENT**</u>

1

2          **MR. VAN NEST:**  And good morning, ladies and gentlemen.

3   I want to begin by thanking you again for your service as

4   jurors.  As Judge Alsup has noted a couple of times, we

5   understand and know how hard you're working and we really do

6   appreciate it.

7          This is a very important case, not only for Google, but

8   for innovation and technology in general, and it's been a real

9   privilege for me and my team to have represented Google during

10  the course of our trial.

11         So you notice by now that this case is about fairness and

12  fair use.  And you now heard from all the key players in this

13  story.  You heard from Eric Schmidt, our first witness, who was

14  the chief technology officer at Sun when the Java language was

15  introduced.  He was also the CEO of Google when Android was

16  first launched.

17         Our second witness was Jonathan Schwartz.  He's an

18  important player, too, he was the chief executive officer of

19  Sun when Android came out.  He was a long-time Sun employee

20  before that.

21         You heard from Andy Rubin.  Mr. Rubin led the Android

22  design team at Google and got the product launched and on the

23  market.

24         And you heard on Thursday from Larry Page, Google's

25  founder, who was also a big proponent of Android.

1      I think it's fair to say the testimony of these folks was

2  very clear and very consistent and now is largely unchallenged

3  by Oracle.  What they told you was that the Java programming

4  language has been open and free from the very beginning,

5  available for anyone to use without permission.  And in

6  addition to that, the Java API declarations that are at issue

7  in this lawsuit have always been treated by Sun as open and

8  free and given away, along with the language, making those Java

9  API declarations available to everybody.  It was part of Sun's

10 business plan to make the language extremely popular and build

11 a big base of customers for Sun's products.  So as are part of

12 that plan, Sun permitted third parties like GNU Classpath and

13 Apache Harmony, to build their own separate implementations

14 using the same API declarations that Google used in Android.

15     So what the Google engineers did was nothing out of that

16 mainstream.  They built Android from scratch using new Google

17 technology and adapted technology from open sources.  They also

18 used a very small portion of Java SE, these free API

19 declarations which everybody at that time assumed and

20 understood were free to use, they matched them with new

21 implementing code written by Google or adapted from open

22 source, and they integrated that into this great big platform

23 that we call Android.

24     And Android was a remarkable thing.  It was a brand new

25 and different platform for innovation, and most importantly, it

CLOSING ARGUMENT / VAN NEST

1   was a brand new use for the Java declarations which had never

2   been used in this way before.  Never.  And a use which no other

3   company before or since has been able to achieve.

4       So when Android was launched, Sun didn't object.  Sun

5   didn't complain.  Sun's chief executive officer said publicly

6   on a Sun website, "Congratulations, Google.  Android, welcome

7   to the Java community.  We support your effort.  We support

8   your effort."  And "Thank you.  Android has put a set of

9   rockets onto Java."  That was Mr. Schwartz.

10       Mr. Schwartz further testified that he never objected to

11   the way in which Google was using the Java API declarations.

12   He thought it was fair.  It was consistent with Sun's business

13   practices at the time.  And the evidence backs that up and I'm

14   going to walk you through the evidence step by step here in

15   just a minute, but the evidence was not only Mr. Schwartz, but

16   everybody else at Sun supported Android.  They offered support.

17   They expressed their appreciation and they developed their own

18   product to work on top of Androids.  No better endorsement than

19   that.

20       Not once, ever, did anyone from Sun tell anyone from

21   Google, *hey, you need a license to use these API declarations*.

22   That simply never happened.

23       Even Mr. Ellison said he was excited and flattered by

24   Android's use.  You saw the video and you will see it again

25   this morning, but he stood up at a JavaOne conference and told

1    everybody, "Hey, I love the way Sun has given Java away and I

2    am excited and flattered by the way Google is using Java in

3    Android."  That's what he said.

4         It wasn't until later, it wasn't until later, that

5    Mr. Ellison changed his mind.  It was after he had tried to use

6    Java to build his own smartphone and failed to do it.  After he

7    had tried to sell Sun technology to Google to use in Android.

8    That failed, too.  Then and only then was this claim made.

9         And so now we're in the situation where Oracle, which had

10   no investment in Android, took none of the risk, they now want

11   all the credit and a whole lot of money.  And that's not fair.

12   Because the evidence you've heard, which I'm going to review in

13   detail, establishes that not only was Google's use of these

14   open API declarations a fair use, but it was consistent with

15   Sun's policy.  It was applauded by Sun executives.  It was a

16   benefit to Java and Java developers and it has caused no harm

17   whatsoever to the copyrighted works.  It's helped Java.  It

18   hasn't hurt Java.

19        So let's put up a very important slide.  You're going to

20   hear from Judge Alsup when we finish more about the jury

21   instructions.  This one is very important.  I expect he will

22   read this one to you.  This case is about fair use and fair use

23   involves the right to use copyrighted works without the

24   copyright owner's consent.  That's important.  It's not about

25   licenses, because if a use is fair, no permission from the

1   copyright owner is necessary.  No license is necessary.  Why?

2   Because the policy behind the right of fair use is to encourage

3   and allow the development of new ideas that build on earlier

4   ideas.  That's innovations.  Building on old ideas to create

5   something new and different.

6        So as this next slide shows, transformative use is one of

7   the hallmarks, one of the hallmarks of fair use.  Why?  Because

8   just copying something like a bootleg CD, that's not fair use.

9   But if you use a small amount of a copyrighted work to build

10  something completely different and new that is transformative,

11  that's what fair use is all about.  And as this slide

12  indicates, this is one of the tests for transformative use.

13  Does it add something new with a further purpose or different

14  character that alters what was used from the copyrighted work

15  with a new expression.

16       Android is exactly the kind of thing that the Fair Use

17  Doctrine was intended to protect.  Because Google engineers

18  used a very tiny portion.  They used less than one-half of one

19  percent of all the code in Java SE.  And they used what they

20  understood and everyone understood were the free and open

21  declarations, and they built a brand new system around that

22  with new implementing code, more technology, a new virtual

23  machine, an operating system, the whole shebang.  And so it was

24  not only a brand new platform for people to innovate on, but it

25  was a new way of using the Java declarations.

1          Now, Judge Alsup will also outline a number of factors for

2    you to take into account in determining fair use.  I'm going to

3    go through those, too, and talk about the evidence on them.

4    But it's really important to note that those factors are not

5    exclusive.  Those factors are not exclusive.  Fair use is a

6    doctrine to promote innovation and change and so you can take

7    into account any other factor that you think relates to the

8    purposes of fair use, one of which is certainly to promote

9    innovation and change, just like Android.

10         So let's look at the key points of evidence, and we'll

11   start walking through the evidence with you step by step.  All

12   of the factors and the evidence that we're going to see support

13   a finding of fair use.  All of them.  Every single one.  And

14   I'm going to go through them one at a time.  But these are the

15   points that we'll make and the order we'll make them.

16         One is that Sun Oracle made the Java API declarations free

17   and open along with the Java language.  That was true from the

18   very start of Java.

19         Android is highly transformative.  I've said that and

20   we'll prove it with the evidence.

21         The declarations are both purely functional, that's

22   important, and a tiny fraction of Java SE.  That's this concept

23   of if you copy the whole thing, like a bootleg CD, that's not

24   fair use, but if what you are using is a very small portion and

25   if what you're using is functional or has a functional purpose?

1   That supports fair use.

2        Finally, Android's use of the API declarations did not

3   harm Java.  Another factor you will be asked to consider is has

4   Android harmed Java.  We had a lot of discussion about that

5   with Dr. Jaffe and you now know that Android hasn't -- is not a

6   substitute for Java.  It's a brand new category, a brand new

7   thing.  It's not like Java SE.  It's not like Java ME.  It's a

8   category all unto itself, and we will review the evidence on

9   that.

10        Here is our four key players:  Mr. Schmidt, Mr. Schwartz,

11  Mr. Rubin, Mr. Page.  And I would suggest they are -- you've

12  heard them from the stand.  You have a chance to evaluate their

13  testimony.  But it was all largely consistent and unchallenged

14  by Oracle.

15        So principle one, Sun developed the Java programming

16  language and made it free for all to use.  Judge Alsup just

17  read you that during the instructions.  That's an established

18  fact in the case.  No debate about it whatsoever.  And now that

19  you've heard the testimony, the evidence is also undisputed

20  that the API declarations that we're talking about in this case

21  were promoted by Sun as free and open, along with the language.

22  This is the testimony you heard from Mr. Schwartz on the second

23  morning of trial.  I asked him, "Were the APIs marketed by Sun

24  along with the language; in other words, free and open?

25        "Absolutely, yes?"

1      We asked him again, "Were the APIs made free and open like

2  the language at that time?

3      "Absolutely yes."

4      Remember, he said we promoted this all over the world,

5  high schools, universities, conferences.  We put it out there

6  to make the language more popular.  That's what we did.

7      Next one, Mr. Schwartz, "During your tenure at Sun" --

8  this is all testimony that you heard -- "all the way up to the

9  very end" -- let me pause there.  His tenure at Sun was 13

10  years.  He started in '97 and worked his way up.  He was Chief

11  Strategy Officer, Chief Operating Officer.  Then he was Chief

12  Executive Officer.

13      "Was there ever a time, ever a time where the Java APIs

14  were considered proprietary to Sun?

15      "No.  Never."

16      Remember, he talked about open APIs.  And I asked him,

17  "Tell the jury what open APIs meant at that time.

18      "So the strategy -- the strategy, which had been the

19  strategy long before I joined Sun, was we agree on APIs, on

20  these open APIs.  We share them.  We share them.  And then we

21  compete on implementations.

22      "What does that mean?

23      "It means that the interfaces, the interfaces, the APIs,

24  they're shared, they're free, they're open.  You can use them.

25  And what you build with them is proprietary.  What you build

1   with them is proprietary."

2       Now, we have heard a lot of different testimony about

3   APIs, and you will remember my file cabinet, the point of which

4   was to say that the APIs are just a method of organization.

5   The cabinet is a package, the drawers are like the classes, and

6   in the drawers are the methods.

7       But a couple of the witnesses offered their own version of

8   the file cabinet, so Mr. Schmidt talked about an electrical

9   wall outlet and plug, and his point was the API, the interface,

10  is the plug and the outlet and everybody uses the same one so

11  we don't have 30 different outlets in our homes or 30 different

12  plugs on appliances.  What you build behind the wall, that's

13  your proprietary technology.  Just like what Sun built in its

14  implementing code was their proprietary property, but here, you

15  might use sun power, you might use wind power, you might use

16  electrical power.  You compete on those, but the interface is

17  open and free, which is what Sun chose to do with their

18  interfaces.  That was Mr. Schmidt.

19      Mr. Schwartz gave a little different one.  Remember, he

20  was hamburger for breakfast.  What he was saying was everybody

21  works off the same menu.  If you order a hamburger, and that

22  was his example, we all have some idea what a hamburger is.

23  Everybody can use that, the same menu and the same names, but

24  we compete on the kind of hamburger you serve in your

25  restaurant.  That's your proprietary -- that's your property.

1   So the API is hamburger there.  It's the menu.

2       Now, we went on and I asked Mr. Schwartz, "What about

3   these third parties that are using your APIs to build their own

4   implementations?  What about them?  What was the practice at

5   Sun during your tenure with respect to third parties who used

6   the APIs with their own implementations?"

7       He said, "There was nothing we could do to stop it.  It

8   was completely -- it was fair.  It was fair.  It's what they

9   were -- they weren't asking us to put our logo on it and they

10  weren't asking us to call it Java.  The idea was if you want to

11  build something with the APIs and call it Java and use the Java

12  coffee brand, the logo, and tell everybody we're compatible

13  with Java, then you have to pay Sun a fee.  That was their

14  rule.  If you are going to call it Java, use the brand, you've

15  got to pay.  But if you want to build your own independent

16  version using the open APIs, like GNU Classpath did, like

17  Apache Harmony did, like IBM did, that's okay.  That's okay."

18      That's what the policy was throughout his tenure at Sun.

19      And this is important.  Judge Alsup just read this to you.

20  You may have been surprised by the way Oracle's lawyers treated

21  Mr. Schwartz.  Right?  They didn't challenge his testimony, but

22  they criticized him as CEO and suggested that he wasn't a very

23  good CEO.  Well, Sun is Oracle America.  It's the same party.

24  He was in charge of the party that's the plaintiff at the time

25  in question in this lawsuit.  That is a very critical thing to

 1  understand.  Sun/Oracle -- what we call Oracle America is Sun.

 2  They just changed the name.

 3      Now, it's not just Mr. Schwartz.  You heard from other

 4  folks that we brought in that were important at the time in

 5  Sun.  Josh Bloch wrote many of the APIs that are at issue.  He

 6  talked about writing APIs and what that means.  And Mr. Phipps

 7  was the head of open source at Sun back in the day.  Their

 8  testimony was absolutely consistent with what Mr. Schwartz and

 9  Mr. Schmidt said.

10      We asked Mr. Bloch, "Can you explain why it was that the

11  APIs were being made public?

12      "They were being made public so people could use them.  If

13  you build a tool but don't tell people, you might as well not

14  have built it."

15      Remember, he said he did everything he could to make the

16  APIs more popular and more useful.  He wrote a book, wrote

17  several books, he taught lectures, he taught engineers.  He was

18  trying to make the APIs as popular and as useful and as

19  widespread as he possibly could.  And he even worked with GNU

20  Classpath.  You recall his testimony that with the knowledge of

21  his boss, he worked with GNU, one of these independent

22  implementations, to help make their independent version as good

23  as he possibly could.

24      Now, Mr. Phipps said the same thing.  And he gave us a

25  document that existed back in the day.  It's TX 7722.  Now,

 1    note, down in the left-hand corner I have the TX number.  That

 2    means *trial exhibit*.  You will not have my beautiful slides

 3    back in the jury room, but you will have the exhibits.  So if

 4    you see an exhibit that you think is important -- and I've

 5    tried to pick the ones that are the most significant -- I've

 6    got the number on the slide, and that will help you -- it may

 7    help you find it.

 8         All right.  Here is Mr. Phipps in 2006 on an official Sun

 9    website telling folks that Sun is working with Apache and GNU

10    and others.  I mean, the question is, "Have you been engaging

11    with the non-Sun Java SE platform committees?

12         "Yes, I have.  We've been in contact with these folks.

13    We're very grateful to them."

14         And who's listed there?  Apache Harmony is listed, GNU

15    Classpath is listed.  These folks were part of the Java

16    community.  They weren't renegades or outlaws.  They were

17    welcome at JavaOne, and Sun was fully aware of them.  None of

18    them had licenses.  GNU didn't have a license, Apache didn't

19    have a license.  Sun was happy to have them.

20         And guess what?  Sun made this also clear in its 10K

21    official government filings, as this next line shows.  This is

22    something that was filed with the Securities and Exchange

23    Commission outlining the policies of Sun.  This was created

24    back in 2008, so it's right in the relevant period we're

25    talking about, and what they told everybody -- and all the top

1    executives signed these -- right?  And what they told everybody

2    was, "With a strong commitment to open standards, open

3    interfaces and the open source community, we believe sharing

4    and collaboration is the key to our success."

5         You heard Dr. Jaffe confirm for me on Thursday open

6    interfaces, that means APIs.  That's declarations.  That's the

7    same thing we're talking about.  This is Sun in 2008 confirming

8    for the world "we support open interfaces."  That's just

9    exactly what Mr. Schwartz testified to and Mr. Schmidt, Eric

10   Schmidt, as well.  It wasn't something that Mr. Schwartz

11   thought up.  It was there from the beginning.

12        This is Eric Schmidt's testimony.  Remember, he is now at

13   Google, but he was at Sun for 18 years and he was responsible

14   for the Java language and the APIs.  He testified that he was

15   the person at Sun responsible.  All right.

16        We asked him, "When Sun first released the language, were

17   the Java APIs included along with it?

18        "Yes.

19        "Why was that done?

20        "It's not possible to use a language without the

21   interfaces."

22        And that point, ladies and gentlemen, is confirmed by all

23   the witnesses, both sides.  That to make effective use of the

24   language, you must use the APIs.  It doesn't make sense to use

25   the Java language if you can't use the APIs, which is what

1    Oracle's trying to tell you in this trial.

2         Here is Dr. Reinhold.  He's their chief architect of Java

3    and he was involved, as you heard, in putting this whole trial

4    together.  Even he admits, "Dr. Reinhold, without the APIs, the

5    Java programming language wouldn't be much use, would it?

6         "That's true."

7         He said that right from the stand during the course of our

8    trial.

9         And you heard from Donald Smith.  We played his video.

10   That was testimony sworn under oath.  "Do you understand the

11   Java language to include the APIs?

12        "Yes.  I mean, the APIs are a critical part of the Java

13   language.  Remember, the Java language is free and available

14   for anyone to use with no permission.

15        "Would you say that's true for the APIs at issue in this

16   case?"  We asked him a specific question.  "What about the

17   declarations from the 37 packages that we're talking about?

18        "Yes.  Those APIs are a fundamental part, a fundamental

19   part of what makes Java Java -- what makes a developer

20   recognize Java."

21        He was designated as a corporate witness by Oracle.  He is

22   speaking on behalf of their company.

23        And all of this was tied up by what Mr. Schwartz said in

24   this video that I'm going to play.  This was long before the

25   lawsuit started back in 2006.  He made clear that their basic

1    business plan or part of it was make some of our technology

2    free and open so that we have opportunities with the rest of

3    our technology.  Sun at that time, 95 percent of its revenues

4    were from hardware, servers.  Servers, personal computers.

5    That's what they sold.  So let's listen to Mr. Schwartz talk

6    about what the strategy was.

7         (Whereupon, the video was played for the jury)

8         **MR. VAN NEST:**  "There is a rising tide that lifts all

9    the boats."  That is Mr. Schwartz describing the concept at Sun

10   of giving some of their technology away for free.  That's why

11   when Android was launched in '07, there wasn't a huge outcry.

12   You have heard the folks from Oracle saying, "Oh, boy, you knew

13   you needed a license, you knew you needed a license, you were

14   stealing our technology.  You knew it was in your phones."  If

15   that were really true, then why wasn't there a huge outcry in

16   '07 when Android became public and was posted on the website,

17   including all the APIs.  This is what happened instead.

18        Mr. Schwartz, on an official public blog, said

19   "Congratulations, Google.  I want to add my voice to that of

20   others in offering my congratulations on the announcement of

21   their new Java/Linux phone platform Android.  Congratulations."

22        Down at the bottom, he says, "We've done a ton of work to

23   support developers on all Java-based platforms, and we want to

24   add Android to the list."

25        This is a public statement, official statement that the

1    plaintiff made back when Android was launched.

2          And it's not just that.  It's not just that.  That is

3    consistent with what Schmidt said and Schwartz said had been

4    going on for Sun at years.  But let's look at the other

5    exhibits that follow this.  I'm going to show you this one, TX

6    3441.  This is an email that same week from Mr. Schwartz to

7    Mr. Schmidt about Android.  "Let us know how we can help.  Let

8    us know how we can help.  We want to help."

9          Now, let's put up our timeline.  I've got a bunch of blue

10   exhibit numbers on there.  The black ones are from this

11   timeline.  This is some of the evidence you have received about

12   what went on between Google and Sun after Android launched.  So

13   look at the left-hand corner, TX 207.

14         Before the launch, Mr. Schwartz offers support.  At the

15   launch, 3441, he offers support.  After the launch in March of

16   '08, the two met.  That's in TX 3466.  Mr. Schmidt didn't say

17   "you're using our technology unfairly."  He said -- excuse me.

18   Mr. Schwartz didn't say, "you're using our technology

19   unfairly."  He said, "I want to build something on top of

20   Android.  Can I do it?"  And there was an email exchange that's

21   reflected on our timeline.

22         And then in May of '08, they actually demonstrated at

23   JavaOne a new Sun device working on Android.  Let's pull that

24   up.  We don't have -- I'm not going to play the video again

25   because it's kind of long, but you remember there was a video

1    of some of the sales and engineering folks at Sun demonstrating

2    what they called a brand new Sun product, Java FX.  And they

3    said, "Wow, look what it's running on.  Android."  That's an

4    Android phone, development phone that you see there.

5         Okay.  Then the story continues.  There's more email

6    traffic in April of '09, Schwartz to Schmidt.  "We'd love to

7    work together on Android.  Love to work together."  That is TX

8    7573.

9         And then Mr. Ellison gets up and praises Android.  We will

10   see that in a minute.

11        Mr. Schwartz then congratulates Verizon on their first

12   Android phone.  And on and on and on it goes.

13        So after all that, I asked Mr. Schwartz this question:

14   "In those conversations and emails" -- and now I'm referring to

15   the conversations and emails on that slide -- "did you ever

16   tell him" -- him is Mr. Schmidt -- "that Google needed a

17   license just to use the Java APIs and Android?

18        "No."

19        Again, unchallenged testimony from both Mr. Schmidt and

20   Mr. Schwartz, who were the two guys talking about this at the

21   very top of their companies.

22        I asked him a second question:  "Did you ever tell anyone

23   at Google that what Google was doing or about to do with the

24   Java APIs," that's the Java APIs at issue here, "was wrong?

25        "No."

1    Unequivocal.  And nobody came in here and told you

2  otherwise.  Nobody came in here and told you that somebody went

3  to Google or Mr. Schmidt or anybody and said you need a license

4  just for the open free APIs.  They knew that what Google had

5  done was reimplement with its own technology something new and

6  different.

7    Here's Mr. Ellison.  He also endorsed the use of Java in

8  Android.  He says, just like -- just like Mr. Schwartz and

9  Mr. Schmidt testified, "Sun has done a fantastic job opening up

10  Java, giving Java to the world, and we're going to do more of

11  the same."  And then what did he say specifically about

12  Android?  Let's play that video which is from TX 2939.1.

13    (Whereupon, the video was played for the jury)

14    **MR. VAN NEST:**  So for years after Android was

15  announced and launched and public, Sun was supporting,

16  Mr. Ellison was supporting.

17    I want to pause now to talk about these license

18  negotiations that you're going to hear a lot about when Oracle

19  gets up.  You are going to see a million emails about critical

20  lines and so on.  That has nothing to do, nothing to do with

21  the Java API declarations.  Those discussions happened, we now

22  know, much earlier in '05 and '06.  And every witness has

23  testified, including Mr. Schwartz, Mr. Rubin, Mr. Page, and

24  Mr. Schmidt -- said those were about something different.

25  Those were about getting proprietary technology from Sun and

1   the logo and the whole kit and caboodle.

2       Can I have our next slide up, please.  This is a joint

3   presentation by Sun and Google.  It's TX 5317.  A joint

4   presentation where both of them acknowledge what Sun was going

5   to contribute was a Java implementation, and that second line,

6   "proven experience in building word-class Java

7   implementations."  That's proprietary Sun technology.  And what

8   Mr. Page told you on the next slide was yes, we wanted to do

9   that early on to help facilitate our building of Android.

10      What was Google looking for in its relationship with Sun

11  at that time?  I think we were, you know, intending to use

12  their technology, the implementation of Java and their

13  proprietary technology to put in Android.  Would you have

14  needed a license for that?  Yes, we would.  And they negotiated

15  for a license.  But they didn't get a deal.  There was no joint

16  development agreement, and so then Google did the right thing,

17  with Sun's full knowledge.  They used the open and free

18  declarations.  They wrote their own implementation, their own

19  implementing code.  They took open source code and used it,

20  adapted it from Apache and so on.  And when 2007 rolled around

21  and they made Android public, they announced it, Sun said,

22  "Fine.  Welcome.  We're glad you're here."

23      Now, I want to pause for a minute and talk about the

24  factors that you're going to hear about in Judge Alsup's

25  instructions.  I want to go through the evidence on each one of

1    these as well.

2        The purpose and character of the use.  What you're going

3    to hear is that there are certain factors that you should

4    consider and you can consider any other factors that you think

5    are relevant, too, but these are ones that you're going to hear

6    a little bit about.  The purpose and character of the use means

7    is it just a copyright or is it transformative.  Is it like a

8    bootlegged CD, or is it something where you made changes and,

9    as I've said, Android is highly transformative?

10       The nature of the copyrighted work.  That means what is

11   Java, what are these declarations.  Are they literary like a

12   poem or novel or are they functional like something you use?

13   Obviously they are functional.

14       The third one, the amount and substantiality of the

15   portion used.  That means how much.  Did you copyright the

16   whole thing?  Well, Java SE is five million lines of code and,

17   you know that the only thing that was used in Android are the

18   method declarations, a very tiny fraction of Java SE.

19       The effect of the use on the market or value.  That's what

20   we talked about with Dr. Jaffe.  And that is has Android been a

21   substitute for Java SE.  Java SE is the copyrighted work.  If

22   you copy something in whole and you're just a substitute,

23   obviously it may be hard to sell the original.  That didn't

24   happen here because Android is not a substitute.

25       And other factors we'll talk about are good faith and

CLOSING ARGUMENT / VAN NEST

1    industry practice.  Google engineers and managers acted in good

2    faith consistent with what they understood industry practice

3    was and Sun understood that at the time, too.

4        And this next slide just reemphasizes what I said.  Those

5    factors are not exclusive and you may consider any additional

6    circumstances that promote the Copyright Act, including the

7    right of fair use, promoting the progress of science and useful

8    arts.  That means innovation.  Promoting the progress of

9    science and useful arts.

10       Okay.  Let's talk about transformation.  I showed this

11   slide a little bit earlier.

12       Let's go to the next one, please, Mr. Dahm.

13       A use is transformative if it adds something new with a

14   further purpose or different character.  All right.  What's

15   Java SE?  What's the original copyrighted work?  You know that

16   it was designed for desktops and servers, big devices.  That's

17   where Java SE is and that's where it is today.  It wasn't even

18   intended to be used in a smartphone.  And before Android came

19   along, nobody had ever used any part of Java SE successfully in

20   a smartphone.  Right?

21       You saw the SavaJe.  Let's go to the next step.  You saw

22   the SavaJe.  This is the SavaJe.  This was an attempt very

23   early on to use Java SE in a smartphone.  It's not what we

24   would consider a smartphone.  There is no touch screen.  There

25   is no GPS.  You have to punch these -- it's got a keypad.  No

**CLOSING ARGUMENT / VAN NEST**

1   keyboard or anything like that.  But this was the first effort

2   at using Java SE, and it was a failure, as you heard everyone

3   testify.

4        There were other examples of failure, too.  The one on the

5   left.  Project Daneel was testified to by Mr. Gering on video

6   during our portion of the case, and the one on the right,

7   OneJava, that is something Dr. Reinhold testified to.  So no

8   one had been able to make any use of Java SE in a smartphone

9   and that had nothing to do with Android.  All this happened

10  pretty much before Android got out there.

11       That's what Mr. Schwartz says.  "Was Sun's failure to

12  build its own Java-based smartphone platform attributable in

13  any way to the presence of Android?

14       "No."

15       SavaJe failed long before Android was even announced and

16  these other projects failed before there was any Android phone

17  of any note on the market.  So Oracle, they tried, too.

18  Mr. Ellison commissioned a study.  Project Java Phone.  He

19  concluded very limited experience to make smart decisions.

20       Now, Oracle prides itself, and rightly so, on solving the

21  most complex computing problems there are, and yet even Oracle

22  couldn't figure out how to do this.  That's further evidence

23  that this is truly a transformative thing.  And what is the

24  evidence that you heard from the experts and the witnesses

25  about Android?  Let's put up the stack.

CLOSING ARGUMENT / VAN NEST

1     You heard testimony about this platform from Mr. Rubin,

2    Mr. Bornstein, Mr. Bloch, Professor Astrachan, and their

3    expert, Professor Schmidt.  I want to distinguish Doug Smith

4    from Eric Schmidt.  Eric Schmidt is the Chairman of Google.

5    Douglas Schmidt was there expert.  Fifteen million lines of

6    code in Android.  And that's 15 million above the Linux kernel.

7    And the Linux kernel is other 10 or 11 million.

8     And what is it that was said about the transformative

9    nature of this?  You remember Professor Astrachan drew this

10   chart, and his testimony, which Professor Schmidt, Doug

11   Schmidt, from Oracle confirmed was "Wow, did they make some

12   changes."

13    First of all, they selected 37 API will packages out of

14   166 in Java.  They didn't just try to ram Java SE into it.

15   They selected the ones they thought developers would want to

16   use in mobile.  They then implemented that with new

17   implementing code.  And why was that important?  Because a

18   desktop has got all the power it needs and all the memory it

19   needs, but a smartphone doesn't it.  It's using a battery.  You

20   want it to be low battery, low power, low memory.

21    So they implemented it with code that they wrote or

22   adapted from Apache, optimized for mobile.  Then they added all

23   these libraries, these green libraries which their Professor

24   Schmidt says that does the heavy lifting.  This gives you your

25   graphics, your audio, your video, your media framework, your

**CLOSING ARGUMENT / VAN NEST**

1    WebKit for browsing.  That's all taken from open source.

2         Then because Java SE was never intended for smartphone,

3    they had to write their own Android libraries there in Android

4    Runtime, and they added 100 of those for things like an

5    accelerometer because you might want to shake your phone and

6    you will never shake your desktop, right?  Or GPS which you

7    don't use on a desktop.  Or a camera which you typically

8    wouldn't have on a desktop.  They had to do that from scratch.

9    And then the Dalvik Virtual machine was customized to run a

10   smartphone because it runs faster, uses less power, it's

11   different and better than the Java virtual machine.  And you

12   don't have to take this from Professor Astrachan.  Professor

13   Schmidt confirm all this, too.

14        That's not to mention the Linux kernel, which didn't exist

15   anywhere in Java SE.  They added that operating system on the

16   bottom to make the platform.  The most important part of all

17   this is that none of that involved any of the proprietary

18   implementing code from Java.

19        Let's look at the next slide.

20        Remember, the only thing that's at issue is the yellow

21   method declarations that everybody understood were open and

22   free.  On the left for the max function is the code from

23   Java SE.  On the right is Android.  They're different because

24   Android engineers, Google engineers wrote that from scratch.

25   They wrote that from scratch or adapted it.

1    So at the end of the day, there's really virtually nothing

2    in common between Java SE and Android.  Right?  Android's using

3    a tiny fraction of the declarations, a lot of libraries that

4    don't exist in Java.  It's using a Dalvik Virtual machine,

5    which is different from the Java Virtual machine.  It's using

6    an operating system, Linux, which doesn't exist in Java at all,

7    and a hundred new libraries written by Google to work on a

8    smartphone.

9    And who was the biggest salesman of Android in the room?

10   Obviously the Google folks love Android, but so does Professor

11   Schmidt.  When he is not here as a testifying expert, he is

12   teaching Android.  His course is Overview of Computer Science

13   and Android.  He teaches Android as a separate standalone

14   course, and there he is, holding up his Android phone.  There

15   is more evidence of transformative use, too, from the Oracle

16   side.

17   This is TX 460.  Mr. Barr was a longtime Sun employee.

18   The senior technologist for Java, one of them, and he says on a

19   blog, again officially hosted, "I still applaud Google for the

20   effort" -- excuse me.  I will read that again.  "I still

21   applaud Google for the effort.  The mobile industry is in the

22   midst of a major shift and Android is an embodiment of that

23   shift."  That's among the evidence you will have in the jury

24   room.

25   And what did Mr. Barr say about that?  We played his

1   testimony under oath.

2       "Do you believe that Android transformed the mobile

3   industry as well?

4       "I think I answered that before.  In some ways, yes.

5       "Was Android transformative?

6       "I think I already answered that, that I believe in some

7   ways, yes."

8       Testimony under oath.

9       Even their expert, Dr. Jaffe, called Android a feat not

10  achieved by any other tech giant.  He conceded this on the

11  stand on Thursday.

12      "You said it was a feat for Google to have established

13  Android as a new viable mobile application platform?

14      "Yes.  And that's a feat," he says, "that many other

15  sophisticated tech companies failed to achieve.  Yes."

16      He listed Facebook, Microsoft, and even Sun itself.

17      Now, an important concept here.  Oracle's position in the

18  opening was well, none of this is transformative because you

19  use the declarations in the same way they were used in Java.

20      Well, number one, we didn't do that.  Google didn't do

21  that.  The declarations are used in a totally different context

22  in Android.  They're used in the context of an open source

23  mobile platform that was innovative and new.

24      But even if that weren't true, the jury instruction that I

25  got have up there that you will hear from Judge Alsup

1  momentarily says "to qualify as transformative, the material

2  copied need not be modified in the new work."  You can use it

3  in the new work the same way it's used in the old work as long

4  as it's otherwise transformative.  In other words, if you've

5  added new expression and meaning and put it in a different

6  context.

7       So the argument that somehow Android doesn't qualify

8  because the same declaration headers were used, that doesn't

9  fly as a matter of law.  That doesn't fly as a matter of law.

10      You're also going to hear that Android is commercial and

11 therefore disqualified from being transformative.  Well, that's

12 not true either.  That's not true either.  Something can be

13 both commercial and transformative.  And I would suggest that,

14 yes, there are commercial uses for Android, but of course

15 Android itself is open source.  Google doesn't charge any

16 money.  They give the platform away.

17      But what this instruction tells you is that although

18 commercial use counts against fair use, the more transformative

19 an accused work, the more other factors such as commercialism

20 will recede in importance.  In other words, if your creation is

21 highly transformative, it can also be commercial and qualify as

22 a fair use.  Commercial use does not disqualify.  And the

23 nature of commercial use here is not direct because, again,

24 Google makes no money selling Android.  They make it open

25 source.  What does that mean?  It's a platform for benefit for

1   everybody.  Developers can use it, OEMs, handset manufacturers

2   can use it, carriers can develop phones using it.  It gives

3   consumers an enormous range of choices, which we see here on

4   all these phones and tablets.

5       So it's a platform for innovation for many, many people

6   which counts in favor of fair use.  And Google competes on

7   Android like everybody else.  Oracle could build a product to

8   use with Android.  Sun attempted to build products to use with

9   Android.  It's open.  Anybody can use it.  You don't need

10  Google's permission or anything like that.  Okay.  Android is a

11  highly transformative use of the API declarations.

12      This next point we'll cover quickly.  "The API

13  declarations are both purely functional and a tiny fraction of

14  Java SE."  So we're asking two questions here.  The first one

15  is how much of the copyrighted work was used.  And what was the

16  context of the copyrighted work.  Is it a play?  Is it a novel?

17  Let's look at the next slide and we'll make this clear.

18      "The second statutory factor is the nature of the

19  copyrighted work.  This factor recognizes that traditional

20  literary works are closer."  That means closer to protection of

21  copyright than informational.  In other words, if you write a

22  novel or a play or a movie, that's sort of at the heart of what

23  copyright is intended to protect.  If you writing something

24  functional like computer code or declarations, that's not so

25  close.  Why is that?

CLOSING ARGUMENT / VAN NEST

1   What the Copyright Act is attempting to protect is the

2   items that in the end their finished work are creative as

3   opposed to functional.  That's really what this is all about.

4       Now, it may be true that it's hard to design an API.

5   Maybe it's a creative process to design.  That doesn't matter.

6   It's a creative process to design a good instructional manual

7   too, as we all know.

8       The idea is what is the finished work?  Is it a literary

9   work or is it a functional work?  The more functional it is,

10  the more this use favors fair use.  Well, we know what these

11  declarations are.  They are functional.  This next slide tells

12  you and you saw this with Professor Astrachan.  The words used,

13  java.net means networking; java.io means input/output;

14  java.security means exactly what it says; java.util.  And so

15  are all the method names, too.  These are class and method

16  names on the right.  GetDateAndTime.  Do we wonder what that

17  means?  GetDateAndTime.  Many of the APIs at issue are of that

18  nature.  They're *get* or *set*.  What do you think setDateAndTime

19  means or ConnectEvent?  These are all descriptive words.  They

20  are functional.

21      That's why I say as in the file cabinet example, if a

22  developer wants to do a function that involves math, he or she

23  knows to go to the java.lang package, go to the math class, and

24  open up the math class and pull out the method, and, again, the

25  only thing that is used in Android from Java is this method

1    declaration, this title, the declaration itself, all the code,

2    and that's what the developer ultimately wants to access, all

3    the code written by Google or taken from open source.  Not used

4    from Java.

5        The point is this is a system and a method of

6    organization.  It's not a novel.  It's not a play.  It's not a

7    poem.  And that is crystal, crystal clear.

8        The third factor, how much?  Did you copy the whole thing?

9    Did you use the whole thing?  Well, we know that's not true.

10   This is the third factor.  How much of the overall copyrighted

11   work was used?

12       So what's the overall copyrighted work here?  Java SE.

13   Java SE is a great big platform.  Five million lines of code.

14   These are approximate numbers.  It's not exactly 5 million,

15   just like the declarations aren't exactly 11,500.  But if you

16   look at this, the big pie, that's Java SE.

17       The little sliver, that's the lines of code.  That's the

18   open and free method declarations that Google engineers and

19   everyone else understood were free to use.  And guess what?

20   Those labels aren't any more important than anything else.

21       Professor Schmidt tried to sell you on a build test.  He

22   talked about a build test.  Well, he messed up the build test.

23   He said, "I took out some of the APIs and Android wouldn't

24   work."  Well, all he did was take out some of the Java APIs.

25   You have to have a control when you do an experiment like that.

1    What happens if you take out the Android ones that no one is

2    complaining about?

3         Guess what, Professor Astrachan did that.  He said you

4    can't do an experiment like that without control.  So he went

5    and he took some Android packages and took them, and it

6    wouldn't work either.  And that's totally logical.

7         Because Mr. Bornstein and Professor Astrachan, and

8    Professor Schmidt, Doug Schmidt, they all confirmed this is one

9    big thing, Android.  It's one big unified cohesive thing, and

10   if you take any part of it out, it won't work.  So that build

11   test is meaningless.

12        And you know from common sense, it can't possibly be true

13   that these Java API declarations are critical to building a

14   smartphone.  Right?  Because you know that some of them were

15   used in SavaJe, which was a total failure.  And you know --

16   those of you that have iPhones, iPhones are very successful.

17   They don't use any Java at all.  IPhones are written in a

18   different language entirely.  They're written in Objective-C.

19        So all of these lines are the same.  Here's Mr.--

20   Dr. Reinhold confirming this for us, that there's nothing more

21   special about the declarations than about the implementing

22   code.  It's the implementing code that makes up a lot of this

23   platform.

24        So we've talked about functional, we've talked about small

25   portion.  All of these factors so far, they all weigh in favor

**CLOSING ARGUMENT / VAN NEST**

1    of finding fair use.  Highly transformative, small portion

2    used, functional portion.

3         Now I want to talk about this factor at the bottom there.

4    Android's use of the API declarations did not harm Java.  If

5    you copy someone's work and start selling that copy as your

6    own, you can understand how the original work might suffer from

7    harm.  Right?  It's not fair use to just massively copy the

8    whole thing and start selling it as your own.  That's not

9    anything like what's happened here.

10        This factor considers whether the new work is a substitute

11   for the old.  That's the key to this factor.  Whether the

12   accused work, that's the -- that's Android, is offered or used

13   as a substitute for the original work.

14        Well, you now know that that is certainly not true.

15   Java SE is intended, always was, for desktops and servers.

16   That's what we're showing here.  That's what Java SE is all

17   about.  Desktops and servers.  You haven't heard any testimony,

18   none, that there's been harm to Oracle in these markets.

19   Nobody came in here and said, "Oh, we're suffering in our

20   desktop or server market."  Nothing.  Not even an effort to

21   prove that.  And the standard is has there been harm to the

22   copyrighted work.  So they didn't present anything.

23        We actually proved through Professor Leonard and through

24   Dr. Jaffe's admissions that the opposite is true.  Java SE is

25   doing fine.  I examined Dr. Jaffe on this.

 1          "As far as you know, that part of Oracle's business, by

 2     that I mean Java SE, is doing just fine?

 3          "Oracle continues to license in those markets."

 4          Now, he didn't do his homework, Dr. Jaffe.  We know that.

 5     It was embarrassing.  I asked him, "So even though you knew

 6     that the copyrighted work was Java SE, you didn't go to the

 7     trouble of talking to the SE manager to see how he was doing?"

 8     You heard him testify he had access to anybody he wanted to

 9     talk to.  All those depositions, all those exhibits, he could

10     have talked to anybody.

11          "No.

12          "Did you have Keystone" -- that's his support group -- "do

13     that?

14          "No.

15          "Did anybody do that?

16          "Not that I know of."

17          I mean, he completely failed to do the most basic

18     fundamental homework, particularly a noted economist, should

19     do.

20          But, again, we know what happened because we have

21     testimony from Mr. Smith.  He's their official corporate

22     representative and he runs a part of Java SE.  What did he say?

23          "Well, Java SE, Java SE Advanced is growing well.  Support

24     revenue is growing well.

25          "How is the business doing overall?

1        "It's growing well.  Java SE is doing just fine."

2        And you didn't hear any testimony or evidence to the

3   contrary there.

4        And you heard Professor Leonard, who was one of our final

5   witnesses on Thursday.  He said they're not substitutes.

6   Android is not a substitute.  Java SE is on personal computers;

7   Android is on smartphones.  If you are buying a personal

8   computer, you want to buy a personal computer or desktop.  You

9   don't go out and look for Android or any smartphone.  He also

10  said Java SE is not the same as Android in any respect.  It's

11  an applications programming framework.  It's nothing like that

12  full stack you saw.  It's a little sliver of that stack.

13  That's another reason why they're not substitutes.

14       And Java ME.  Why am I talking about Java ME?  It's not

15  the copyrighted work.  Java SE is the copyrighted work.  I'm

16  talking about it because the only even theory of harm that

17  Oracle advanced was as to Java ME.  That's the only theory.

18  But they don't have any evidence again to back it up.  ME means

19  Micro Edition.

20       So Micro Edition -- the evidence is undisputed that the

21  Micro Edition was created for small, simple devices, and it

22  won't even support a smartphone.  So Android is not replacing

23  ME or a substitute for ME either because ME is for feature

24  phones like these.  Much simpler; right?  No touch screen, no

25  GPS.  Much simpler.  And coke machines and set-top boxes and

 1    things like that that are much, much simpler.  And there isn't

 2    even a dispute about it.

 3        This document we showed you from inside Sun in 2009, even

 4    the folks at Sun agree with us on this.  That Java there in the

 5    middle, it's in the feature phone business.  That's where Java

 6    is.

 7        The smartphone market is different.  They're showing it as

 8    a separate market.  And who's in that?  Well, my -- Windows

 9    Mobile barely makes it in.  But iPhone and Android.  IPhone and

10    Android.  They're in a different market; right?  This is Sun.

11    This isn't anything that we prepared.  This was prepared by Sun

12    in the ordinary course of business.  Smartphone market,

13    separate from feature phone market, and all of the testimony

14    was to the same effect.

15        Here is Mr. Rizvi, whom you heard from, again under oath

16    during our portion of the case on video.  We asked him what

17    would be missing from Java ME?  That's the question.

18        "I couldn't give you the details, but Java ME is not fully

19    capable for what is required by a smartphone."

20        And that was backed up and supported by every other

21    witness.  Mr. Stahl said it, Mr. Rizvi said it, Mr. Gering said

22    it.  Java ME is for small simple devices, not a smartphone.  So

23    Android isn't replacing that.

24        And this next slide shows that it's true.  They knew at

25    Sun a year before Android was even announced that if they

**CLOSING ARGUMENT / VAN NEST**

1    didn't do something with Java ME, it was going to fall off the

2    map.  Not because of Android, but because of the transition in

3    the market to smartphones.  Right?  IPhone was out.  They could

4    see that the market was moving and that ME wasn't in that

5    market, and so the folks at Sun understood full well and they

6    did nothing, nothing to change it.

7         Now, there's also evidence for you to consider that

8    Android has helped Java.  It's helped Java because it is now

9    the number one smartphone in the world and it's written in the

10   Java programming language, which means that Java developers can

11   write applications and programs for Android without learning a

12   new language.  And their witness, Mr. Stahl, agrees with us on

13   this.

14        "Do you believe that the existence of Android is a

15   positive for the mobile phone market as a whole?  Not a

16   negative, a positive?

17        "Yes."

18        This is their vice-president of product management.

19        "I think the existence of Android is positive for the

20   mobile phone market.  And Android is an example of the

21   widely-available platform.  And it's good for Java developers,

22   too."

23        Android has lifted up the use of the Java programming

24   language, as Professor Astrachan told you in this next one.

25        "What's your understanding of Java's place in the world of

1    programming languages today?"

2        Thank you, Christa.

3        Oracle's website says that Java is the number one

4    programming language.  So not only is Java SE doing fine, but

5    the language is doing fine.  It's the number one programming

6    language in the world now.

7        So where are we?  All the factors that we've talked about

8    favor a finding of fair use.  And it's not particularly close

9    either.  The purpose and character, highly transformative, a

10   brand new platform.  The nature of the SE declarations, the API

11   declarations, they're functional.  The amount and

12   substantiality used, a tiny fraction, less than a half of one

13   percent.  The effect on the market, not a substitute.

14       Here's another factor that's relevant.  Good faith and

15   industry practice.  Google engineers and managers acted in good

16   faith and consistent with industry practice.

17       Why do we know that?  Virtually every computer programmer

18   that testified or computer scientist said reimplementing APIs

19   is common.  It's often done.  Sun did it.  Everybody did it.

20   Everybody understood that API interfaces are open.

21       Let's go back to this next one.

22       So Judge Alsup will tell you that in evaluating the good

23   faith question, you may take into account the extent to which

24   Google relied upon or didn't any recognized practices in the

25   industry concern reimplementation of API libraries.  So that's

CLOSING ARGUMENT / VAN NEST

1    one of the issues that you are entitled to consider.

2         Well, you heard example after example after example from

3    all of the computer science folks and the programmers that from

4    their understanding, using open interfaces like the API

5    declarations in this case and writing your own implementing

6    code was common, accepted, and widely done, and we know that's

7    true at Sun because Mr. Schwartz said over and over, you can

8    use these APIs.  You can use the interfaces.  They're open and

9    free.  They're part of the language.

10        Here's what Dr. Bloch testified to.  I'm not going to go

11   through every one of these, but I'll go through this one at

12   least.

13        "Why did you think it was okay to reimplement the Perl 5

14   Regular Expression API?"

15        Now, remember, Dr. Bloch was at Sun.  And he is testifying

16   that Sun itself is taking an API created by someone else from

17   the Perl language and doing their own independent version of it

18   without taking a license.  They didn't take a license.  That's

19   what Dr. Bloch said.

20        So Sun itself was engaging in this practice and they put

21   this Regular Expression API right into Java.  One of the Java

22   APIs that's at issue in this case is from Perl, reimplemented

23   and placed there by Sun.  Now, that was just Dr. Bloch.  But

24   every single computer programmer or computer scientist that

25   testified has had an example.

1    Mr. Schmidt talked about an example that he was aware of

2 when he was at Sun.  They took a Microsoft API called Wahoo and

3 they reimplemented that.

4    Mr. Schwartz talked about it.  Mr. Page, when he was here

5 Friday -- Thursday said we've always understood that using APIs

6 and interfaces is acceptable and common.

7    Mr. Bornstein said it.  Mr. Phipps said it.  Professor

8 Astrachan gave us three separate examples.  Three separate

9 examples.  Solaris, open office, those were examples of

10 reimplementing, creating an independent implementation of

11 someone else's API at Sun.  At Sun itself.  In products that

12 Sun is selling.

13    So this practice explains why, number one, there was no

14 human pride.  In '07 when Google released Android, they posted

15 on a website the software development kit, SDK, and that kit is

16 on a website that anybody can access, and it lists all the APIs

17 that are going to be used in Android.  And Sun was fully aware

18 of what they were and Sun understood, just like everybody else,

19 that as long as you write your own implementing code, as long

20 as you do that, that's fine.  You're okay.

21    These interfaces are being shared and they're open, and

22 that explains Google's reaction when Oracle first raised a

23 claim that something was wrong or that Google needed a license.

24 That happened many years later.  After Mr. Ellison acquired

25 Oracle, after he tried and failed to build a smartphone, after

 1    he tried to sell technology to Sun.

 2        Let me -- can I put the timeline back up that we had up

 3    there, Mr. Dahm.  The timeline -- because I forgot to cover one

 4    point.  There is an exhibit that you saw during Ms. Catz

 5    examination.  I believe it's TX 7406.  We didn't talk much

 6    about it, but it proves my point that what Mr. Ellison was

 7    trying to do was sell technology to Google before he claimed

 8    anything was wrong.  That slide deck was prepared for him by

 9    folks at Sun, and take a look at it.  It doesn't say Android is

10    infringement, Android is wrong, Android needs a license.  It's

11    an effort to sell Sun technology to Google for use in Android.

12    And that just finishes out that part of the story that I forgot

13    to mention.  That's the subject of TX 7406.

14        So let's go back to where we are and put up TX 1074.  This

15    is the last exhibit that I'm going to present in this portion

16    of the program.

17        This was Google's reaction when Oracle first said, "Oh,

18    boy, you need a license."  They said, "We will not pay for code

19    that we are not using because the implementing code is all

20    original, for a license IP that we strongly believe we are not

21    violating and that you refuse to enumerate."

22        Google's position then is the same as Google's position

23    now.  Android doesn't use any proprietary technology.  Android

24    is a fair use of free and open API declarations that have been

25    open for years, made open by Sun.  Android was endorsed by Sun,

1  supported by Sun.  And you can't come around three, four, five

2  years later when you are the same company and say, "No, no, no.

3  We want to go back to the start and change everything."  That's

4  not fair.  That's not right.

5      All of the evidence, ladies and gentlemen, on fair use

6  favors a finding of fair use.  And I'm not going to say much

7  more about that now, other than to say that it's particularly

8  important in a case like this where we're talking about

9  innovation and advance and where we are talking about something

10  that has changed everything, something that's out there, open

11  source, available for everyone to use.  That is the very

12  definition of something that fair use was intended to endorse,

13  encourage and protect.

14      And now I'm going to stop talking.  I'm going to say thank

15  you for your attention one more time.  You're going to get a

16  break, and you will hear from the Oracle lawyers, and I'll get

17  a short amount of time when that's over to wrap up and rebut.

18      And again, thanks very much for your attention on behalf

19  of Google.

20      Thank you, Your Honor.

21          THE COURT:  All right.  Thank you, Mr. Van Nest.

22      We will take a 15-minute break.  Remember now no talking

23  about the case.  It will be your duty to talk about the case in

24  a few hours, but not yet.  Please remember the admonition.

25      (Proceedings were heard out of presence of the jury:)

PROCEEDINGS

1      **THE COURT:**  Be seated, please.

2      Let me -- I have got a couple of questions for you.

3      Some of the exhibits are in CD form, like the programs,

4  the JavaOne programs.  Have the lawyers loaded those on to the

5  computer to go into the jury room?

6      **MS. HURST:**  Yes, Your Honor.  Anything that was only

7  available in native format, such as the source code, has been

8  loaded.

9      **THE COURT:**  Okay.  I may need then to explain that to

10  the jury so that they will know how to use it.

11      Have your lawyers looked at the instructions that go with

12  that little computer?  Is it clear enough so the jury can

13  figure it out?

14      **MR. VAN NEST:**  It is, Your Honor.

15      **THE COURT:**  All right.  Great.

16      Second question is we have given a little small handout of

17  this timeline to the jury and they all have their own.  Is

18  there any value in sending the big poster board into the jury

19  room so that they can use it for their discussion?

20      **MR. VAN NEST:**  Sure.  I think we should.

21      **THE COURT:**  What do you say?

22      **MR. BICKS:**  That's fine.

23      **THE COURT:**  Okay.  We'll do that then.  Anything else

24  the lawyers need me for?

25      **MR. VAN NEST:**  No, Your Honor.

**PROCEEDINGS**

```
 1              MR. BICKS:  No.

 2              THE COURT:  Mr. Bicks, feel free to set up any way you

 3   want.  You will have an hour and a half.

 4         By the way, you have 25 minutes left.  Twenty-five

 5   minutes.  You used an hour and five minutes.

 6              MR. VAN NEST:  Thank you.

 7           (Recess taken from 9:22 a.m. to 9:37 a.m.)

 8              THE COURT:  Let's go back to work.

 9         Counsel, are you ready?

10              MR. BICKS:  Yes, Your Honor.

11              THE COURT:  All right.  Let's see if the jury is

12   ready.

13              THE CLERK:  Okay, Judge.

14              MR. VAN NEST:  Your Honor, we're going to break after

15   Mr. --

16              THE COURT:  Yes.

17         I'm assuming you're going to use about an hour and a half.

18              MR. BICKS:  Yes.

19              THE COURT:  Very close.  So take a break at that time.

20              MR. BICKS:  Yeah.  Thank you, Your Honor.

21           (Jury enters at 9:37 a.m.)

22              THE COURT:  Welcome back.  Be seated.

23         Do you need more pages in another notebook?

24              JUROR MS. SHATTUCK:  I left my notebook.

25              THE COURT:  Why don't you run back and get your
```

CLOSING ARGUMENT / BICKS

1    notebook.

2          **JUROR MS. SHATTUCK:**  Thank you very much.

3        (Juror exits courtroom.)

4          **THE COURT:**  Yeah.  I noticed that you were about to

5    lose some pages from your notebooks.

6        (Jury enters courtroom.)

7          **THE COURT:**  Ms. Shattuck, are you doing okay today?

8          **JUROR MS. SHATTUCK:**  Yes.

9          **THE COURT:**  How are the bee stings?

10         **JUROR MS. SHATTUCK:**  Much better.  Thank you.

11         **THE COURT:**  Ready now?

12     Now, at this time, on behalf of Oracle America, Mr. Bicks

13   will give the closing argument.

14     The floor is yours.

15                    <u>**CLOSING ARGUMENT**</u>

16         **MR. BICKS:**  Thank you, Your Honor.

17     And good morning, ladies and gentlemen.  I am really

18   thrilled to deliver this closing statement to you all.

19     I stood before you in the opening and I told you that I

20   was going to speak about the evidence.  And I told you in this

21   case that I would be sharing with you evidence that came from

22   the files of Google and evidence that they never thought would

23   see the light of day.

24     And over the next hour and a half, I'm going to share that

25   evidence with you and now tie it to the questions that you as

CLOSING ARGUMENT / BICKS

1    this jury are going to answer.

2        And before I want to do that, I really do want to thank

3    you.  I want to thank you on behalf of the women and men of

4    Oracle because you all have been working hard, and we see that.

5        This is a tough case, but it is an important case.  And I

6    said it was an important case in the opening statement because

7    it gets down to a very simple rule.  You don't take people's

8    property without permission and use it for your own benefit.

9        And that's the rule that has been broken in this case.

10   Google took a shortcut.  And they took a shortcut at Oracle's

11   expense.

12       I'm going to talk to you about the evidence.  And the

13   first question is:  Why?  Why are we here?  And I'm going to

14   start walking through some of the reasons.

15       Google did not want to get locked out.  Trial Exhibit 31.

16       According to Mr. Schmidt, who was here, they wanted a

17   quick time to market, as quick as they could.  In evidence, on

18   the stand.

19       $60 million was on the line for the founders of Android.

20   It would be forfeited if they didn't get a phone on the market

21   in three years.  The clock was ticking as soon as they bought

22   Android.

23       They were under incredible schedule pressure.  You heard

24   that from Mr. Rubin on the stand.  Incredible schedule

25   pressure.

CLOSING ARGUMENT / BICKS

 1        Mr. Page, CEO, he was disappointed in Android's timing.

 2   You saw that in evidence.   Trial Exhibit 401, an internal

 3   meeting.   He was disappointed.

 4        Mr. Rubin, the clock was ticking.   They were "beyond out

 5   of time."   Evidence that came in, in this case.

 6        "If we miss the mobile window," their words, Google was

 7   going to be "out of business in 10 years."

 8        Those were their words in internal documents that were

 9   produced in this case.   That's why we're here.

10        This email from the CEO of Sun, Scott McNealy.   Google was

11   immune from the copyright laws.   This is what was said.

12   Internal memo.   Their own CEO at the time, "immune from the

13   copyright laws."   Good citizenship.   A document written at the

14   time before lawyers came into court.   That's what this case is

15   about.   A company that believes that it is immune from the

16   copyright laws.

17        And Mr. Rubin was here on the stand, and he said that he

18   wanted to win.

19        Wanting to win can be okay.   But when you want to win and

20   you break the rules, that is not okay.   Oracle is a competitor.

21   And they're a fierce competitor.   But when you compete, you

22   need to play by the rules and not take shortcuts.   And in this

23   case Google took shortcuts.

24        One of the most important pieces of evidence is August 6,

25   2010, because this document disproves everything that was

1    stated over the last hour.

2        You heard from Google that everybody thought what they

3    were doing was okay; that they didn't need a license; that the

4    APIs were open and free.  But that's not what the internal

5    documents say.  That's not what the evidence shows.

6        Trial Exhibit 10.  A document written and an investigation

7    undertaken at the request of Mr. Page, who was actually on the

8    stand, done by Tim Lindholm.

9        He looked at whether or not there were any alternatives to

10   Java -- right before this case was filed -- and he concluded

11   that the alternatives all suck.  Their words; not mine.  And

12   that they needed a license.  They needed permission.  And they

13   never took a license.  They went forward.  And that's what this

14   case is about.  This is critical evidence.  Trial Exhibit 10.

15       What was the impact of this?  Google suggested there was

16   no impact.

17       You heard Neal Civjan on the stand.  He was head of

18   worldwide Java sales.  He said to you the impact of what

19   Android did was devastating.  And that's what I'm going to talk

20   to you and tie the evidence together.

21       All of these companies had licenses.  They played by the

22   rules.  And that was the evidence in the case.  Every one of

23   these companies.

24       And I want to mention right here, right now, IBM, because

25   it was suggested that there was this practice out there where

1   people were taking these APIs without permission.

2       Ladies and gentlemen, IBM had a license.  And every one of

3   these companies had licenses because they played by the rules.

4   They didn't take shortcuts.

5       When Mr. Page was here, I asked him:  Can you name a

6   single company that uses these Java APIs that has not taken a

7   license from Sun or Oracle, aside from Google?

8       I asked him on the stand.  He's the top executive.  Not

9   one company could he identify.  Not one.  And he stood by

10  testimony that he had given before, that the judge spoke about.

11      And what I also found interesting, as the man who came to

12  this courtroom, I asked him did he know that this case was

13  about his company taking more than 11,000 lines of code and

14  copying the structure, sequence and organization of the 37

15  packages.  And what did he say to us and to you as the jury?

16  "I don't know the detail of what's alleged."

17      He should have known the detail.  And he should have

18  shared the detail with you as the jury.

19      The judge has told you in his instructions that Google's

20  use of the declaring lines of code and the structure, sequence

21  and organization of those 37 packages constitute copyright

22  infringement unless they can meet their burden on fair use.

23      Google has the burden of proof.  I said that in the

24  opening, and I repeat it here.  We don't have the burden.

25      But what I'm going to show you is a mountain of evidence

**CLOSING ARGUMENT / BICKS**

1   that we've gotten in this case, and that we've put together to

2   present, that shows they haven't come anywhere near meeting

3   their burden of proof.

4       I put scales here to go through each of the factors,

5   because scales of justice are really what this is all about.

6   And the evidence will show that Google has not met its burden

7   of proof on each and every factor important to this case.

8       This, as I mentioned before, is a case that is about an

9   excuse.  I call it the "fair use excuse."

10      And in all the documents that have been presented in this

11  case, you haven't seen one document where anybody at Google

12  ever, at the time, said they thought this was fair use.

13      The documents that I'm going to show you on a timeline in

14  a moment will show the exact opposite.  They knew they were

15  breaking the rules.  They knew they were taking shortcuts.  And

16  they knew it was wrong.  This is an excuse.

17      What are the factors?  I'm going to go through each of

18  them because I think Google did not stay true to these factors

19  that will guide you because some of these factors they don't

20  like because they go against them.

21      Here are all the factors listed out.  And I've put this up

22  before, both in my opening and in my mini opening.  And now I

23  want to walk through each of the factors with you.

24      The first factor will be commerciality.  And when you get

25  the instructions, the judge will give you examples of things

 1    that are fair use.

 2        And I showed this in the opening.  Things like

 3    "criticism."  Android was not criticism.  Things like

 4    "comment."  Android was not comment.  Things like use

 5    "reporting."  Android was not news reporting.  Things like

 6    teaching, for classroom use, "scholarship," "research."

 7    Android was none of these.  These are typical examples of

 8    things that are fair use.  Android fits none of these typical

 9    examples.

10        On the question of commerciality, the nature and purpose,

11    what was this all about?  The judge has already said that

12    everyone agrees here that their use was commercial.  So that's

13    a factor that goes against Google.

14        Now, the question is, how much does that factor go against

15    Google?  How commercial was this?

16        Ladies and gentlemen, this was real commercial.

17    $42 billion of revenue tied directly to Android.  Tied directly

18    to Android.  Advertising on Android phones is both of this.  Ad

19    revenues.  That's how they made their money.  $42 billion of

20    revenue.

21        Their own internal documents, direct revenue impact.  This

22    is right at the beginning, before they reached what they said

23    was escape velocity in 2010, right when things were taking off.

24        Their own internal documents say there's a direct revenue

25    impact from Android.  And that's from advertising.

 1          Search plus Android is huge.  2009, before things took

 2     off.  Their words; not mine.  Trial Exhibit 5183.

 3          And then you heard Mr. Page.  He said it was mind

 4     boggling, when he was talking to shareholders.  700,000 phones

 5     are lit up every day.  Two days over the holiday weekend,

 6     3.7 million Android's were activated.  And he said "Wow."  That

 7     is hugely commercial.

 8          Mr. Schmidt, I asked him the same thing.  1.5 million

 9     activations per day.  And then I said, Each and every one of

10     those activations, that has Oracle's intellectual property in

11     it, the design of those 37 packages.  And he said that's true.

12          Then I asked, How do you make money?  Is this profitable?

13     And he said it was "hugely profitable."  It was lucrative

14     because there are more searches on the mobile phones, more ads

15     are seen, more clicks.  And it is hugely profitable.  And

16     that's what the evidence is.  Hugely profitable.  Trial Exhibit

17     951.

18          Trial Exhibit 190, a $43 billion year ecosystem.  And this

19     is just talking about one year.  This is their document, a

20     $43 billion a year ecosystem.

21          And they stood before you and they said, We give away

22     Android for free, as if there was no control.  But this

23     internal document shows that they were worried about losing

24     control.  Control was very important to them.  Control of the

25     ecosystem.

1        But this is the height of commerciality.  One year, a

2    $43 billion ecosystem.  And tied directly to ad revenues.

3    Clicks that generate money.

4        And then we presented Dr. Jaffe, who looked at all the

5    evidence and confirmed that, of course, this is highly

6    commercial.  That's the first question for you all to consider.

7    How commercial is this?  Ladies and gentlemen, the evidence is

8    showing that this is highly commercial.

9        The second question is transformative.  And I told you in

10   my opening that that's a term of legal art.  And here's some

11   language from the jury instruction:  "Further purpose."  And

12   then I highlighted the word "distinct."  You'll have the jury

13   instruction.

14       Did Google, when they copied Oracle's valuable property,

15   was it used for a distinct purpose?  Did it alter the

16   expressive content with new expression?  That's a question.

17   And was it a substitute or not?  Three critical questions on

18   transformative use.

19       So what did the evidence show?  It was not for a distinct

20   purpose.  It did not alter the expressive content.  And it was

21   a substitute.  And let me walk through and show you what the

22   evidence shows on that.

23       They copied 11,500 lines of code.  And these are all the

24   different versions of Android that came out and the lines of

25   code that they copied in each.  You saw this from Dr. Zeidman.

 1  Undisputed.  They took the code, they copied it, and then they

 2  put it right into Android.

 3      11,500 lines of code.  And it varies a little bit

 4  depending on which platform, which version.  Very important

 5  testimony, ladies and gentlemen.  These -- this is testimony

 6  from Google's own witnesses.

 7      Mr. Ghuloum, he's an engineering manager.  He said that

 8  the classes that were, in other words, copied, serve the same

 9  purpose at Android that they serve in Java.  And he said, I

10  believe they serve the same purpose.

11      And one of the questions is, was it a distinct purpose?

12  Was it different or the same?  Their own witnesses said when

13  they copied that code it did the same thing.  It was used for

14  the same purpose.

15      Mr. Meier was asked, using these APIs, were they used,

16  because -- in the same way.  The Java APIs that are available

17  in both platforms, would you expect them to work in the same

18  way?  "Yes."

19      Testimony from two of their witnesses who said this.  It

20  was used for the same purpose.  It did the same thing.

21      You heard from Doug Schmidt, same purpose.  The code was

22  not altered.  When they put it in those billions of devices, it

23  did the same thing.  Same purpose.  That's what the evidence

24  showed.

25      He actually, Mr. Schmidt, looked at the actual packages.

 1   And he showed that the 37 that were used in Java were in
 2   Android, and that they were used the same way.
 3        And he picked out a specific example, the security
 4   package.  And he says they would also know how to use it in the
 5   same way in Android.  Same purpose.  That's what the evidence
 6   is showing.  And some of that evidence came from Google's own
 7   witnesses.
 8        Google has acted as if, "Look at what we did; we're the
 9   ones who wrote all this new code."  But the actual fact is that
10   a lot of that code was written by others; and only 23 percent
11   even close to being written by Google.  And that doesn't even
12   include all the Linux code underneath.  If we calculated that,
13   it would be much, much less.  Most of this code was written by
14   others, not Google.
15        And where was Java?  Because we've got to talk about
16   substitute.  What was the evidence about Java and where it was
17   in mobile phones?
18        Sun licensed Java SE for use in smartphones.  That's what
19   the evidence shows.  SE was in smartphones.
20        And Sun licensed Java ME for use in feature and
21   smartphones.  That's what the evidence showed in the case.
22        And I underlined the word "license" because that was the
23   business model.  Not building a phone, but licensing the Java
24   platform for others to use, and for royalties.  Commercial
25   licenses.

**CLOSING ARGUMENT / BICKS**

1        Now, Java was in feature and smartphones before Android

2   was launched.  They were the market leaders in both areas.

3        And Sun, as well as others, anticipated that -- that

4   phones would become like mini computers, and that software like

5   the Standard Edition Java SE, which was used on desktops, would

6   transition to be used on mobile phones.  And they knew that at

7   Sun.  And they were licensing Java SE into mobile phones before

8   Android.

9        We know this from Neal Civjan, who said that Java was in

10  85 percent of the market.  It was ubiquitous.  That was his

11  testimony.

12       And when you look at phones, this is not a revolution.

13  This is an evolution.  Phones have evolved over time.  But Sun

14  and Java, in Java SE, were in the first smartphones.  They were

15  there first.

16       Alan Brenner took the stand, and he said what percentage

17  of smartphones were Java-powered.  Nearly 100 percent at that

18  time.  And this is at 2006.

19       And same thing with Mr. Civjan:  Our jury has heard the

20  phrase smartphone.  Was Java in smartphones?  "Java was in

21  smartphones."

22       RIM.  Danger.  SavaJe.  These phones are not the same as

23  phones today.  The hardware is different.  But when you look at

24  what's inside, and you look under the hood, some of the same

25  software is used in those phones that are now being used on

**CLOSING ARGUMENT / BICKS**

1  Android.  The same API packages.  And that's what this case, as

2  the judge said, is about, the use of those API packages that

3  the evidence showed served the same purpose.

4      The SavaJe phone, you heard a little bit about that.

5  Google was suggesting the phone wasn't a big success.  It

6  wasn't a big success.  But what was important about that phone

7  was it had a full stack operating system inside that was based

8  on Java SE.  It was there, that technology.

9      And you heard from Mr. Schmidt that it was a full stack

10  operating system.  It was there first.  Inside of that phone,

11  Java SE was being used.  And it was being licensed by SavaJe.

12      And what was SavaJe?  What does that stand for?  It's

13  Java SE.  That's what that stands for.

14      And a piece of evidence that came up quickly, which I

15  didn't have a chance to focus on, was an internal email, Trial

16  Exhibit 5322, where Mr. Miner, from Google, says to Mr. Rubin,

17  If we were not doing what we're doing, SavaJe would probably

18  have gotten more funding.

19      SavaJe had run out of money.  And Google is saying

20  internally here that they're looking at their phone compared to

21  SavaJe, and says, If it weren't for us, they probably would

22  have gotten more funding.

23      You heard from Mr. Rubin.  Danger was one of the first

24  smartphones.  And they were licensed from Sun.  And they were

25  using Java SE in that phone.  That's what the evidence showed.

1    Java and -- through SE and license was there first.

2         And then I showed you the Touch Pro, which was a

3    Java-powered phone on a Microsoft operating system.  And you

4    saw those phones.  And then you saw the HTC Dream that came out

5    that same year, that also had Java in it.

6         If this isn't an example of a substitute, I don't know

7    what is a substitute.  Keyboards, both had Internet access.

8    Both had instant messaging.  Both of them had Java in them, on

9    different operating systems.  This is an example of a

10   substitute, which shows that it is not transformative.  This

11   was the first Android phone.

12        And this testimony, ladies and gentlemen, is absolutely

13   critical.  This testimony by Mr. Rubin on this stand says that

14   Google was in the same industry with similar products to Sun.

15        There is no better evidence to show what a substitute is

16   when their own witness comes on the stand and says that it's

17   similar product in the same industry.

18        He says that they were competitors.  That was testimony

19   that was given on this stand by Mr. Rubin.

20        Mr. Schwartz, a new competitor.  People -- these folks

21   were competing in the same market.  If they weren't in the same

22   market, they would not be competitors.  But that was the

23   evidence that came on the stand.

24        And then an email from Mr. McNealy, the CEO of Sun, to

25   Mr. Schmidt.  They were worried about revenues submarining.

1    And if they weren't in the same market and were completely

2    different, how could one take away revenues from the other?

3        One of the great things about juries is common sense.  And

4    this is common sense.  He was worried about revenues being

5    submarined because they were going head to head in the market.

6    And Mr. Rubin said they were competitors.

7        And then Professor Jaffe confirms, from an economist's

8    perspective, that they were substitutes.  One was taking the

9    place of the other.

10       Now, you heard reference to Mr. Barr's testimony, where he

11   used the word "transformative."  But he was using a definition

12   given to him by a Google lawyer.  That was not the definition

13   that applied in this case.

14       In other words, he said -- asked, Did it change the status

15   quo in a significant way?  That's not what transformative is.

16       He was given the wrong definition when he gave that

17   testimony.  The judge has indicated what's transformative.

18   Different purpose.  Is it a substitute?  And that was the wrong

19   definition.

20       I showed you this art in the opening because to me it was

21   a helpful way to understand what transformative is.  Taking

22   computer Java code, which is used in the desktop or a mobile

23   phone, and then using it in artwork.  This is an example of a

24   different purpose (indicating).

25       But taking Java API packages that are used in one HTC

CLOSING ARGUMENT / BICKS

1    phone and then using them in another HTC phone, where the Java

2    APIs do the same thing, that is not transformative.

3        It's important to always recognize here that you have to

4    look at transformative against the commercialism, the

5    $42 billion.  Because the less something is transformative, the

6    more other factors like commercialism will dominate.

7        And that's important.  You have to look at them together

8    here.  And there is no question in this case the evidence has

9    shown that this is hugely commercial.  No question about it.

10       Good faith.  This, ladies and gentlemen, is a very

11   important topic because the instructions here tell you that

12   fair use presupposes good faith and fair dealing.  And I want

13   to talk to good faith and fair dealing.

14       These are the documents that came from the files that I've

15   talked about throughout this case.  And I'm going to walk

16   through them with you in order.

17       And I want to ask you, as you look at this, is this what

18   an innovative company does?  Is this what an innovative company

19   does?

20       "Do Java anyway, and defend our decision, perhaps making

21   enemies along the way."  They knew, when they decided to go

22   forward with Java, that they were going to make enemies along

23   the way.  Trial Exhibit 7.

24       The APIs were copyrighted.  Is this what an innovative

25   company does?  Trial Exhibit 18, Mr. Rubin writing to

CLOSING ARGUMENT / BICKS

1    Mr. Stein.

2        Ladies and gentlemen, remember the name Mr. Stein.   Trial

3    Exhibit 18.   The "java.lang APIs are copyrighted."   That's the

4    declaring code.   This is the title of the packages.   They knew

5    that they were copyrighted.   And that's what this document

6    says.   March 24th, 2006, they know that they are copyrighted.

7        And the important thing I'm going to talk about in a

8    moment, this wasn't just known to Mr. Rubin, because when

9    Mr. Page was here I asked him about this.   And I asked him did

10   he know.

11       Java.lang APIs are copyrighted.   Did he share that

12   information with you?   "I believe he shared that information

13   with me."   Mr. Page knew that himself.   That's what came out on

14   the witness stand.   And he wasn't alone in knowing that.

15       Mr. Swetland, even he knew that Sun had at one point made

16   some claim about owning the copyright on the API method

17   signatures.   He knew about it, that it was Sun's position.   He

18   knew that.   And he gave that testimony on videotape in this

19   case.

20       And Mr. Lee, he observed the copyright notices himself.

21   They all knew in Google about Sun's view that this was

22   copyrighted.   And it's in this testimony and in these

23   documents, ladies and gentlemen.

24       What motivated them?   Again, from their documents.   These

25   are not my words; it's theirs.

1        Their APIs were half-assed at best.

2        To hit those milestones and not be out of the market, they

3   were up against the clock.  And they had to take a shortcut.

4   And their own internal documents, the folks who are working on

5   this, are saying that, We have a problem with our own API

6   packages.  These are their words, ladies and gentlemen; not

7   mine.  Trial Exhibit 215.

8        They make the decision, and they make it final on

9   August 16th, 2006.  And they make that decision that they're

10  going forward with Java on that day not because of any blog

11  statement, because that didn't even happen at the time.  They

12  already made the decision to go ahead and copy at that point,

13  knowing full well about the copyrights up to the highest level

14  of the company.  Trial Exhibit 303.

15       And then as things move forward, you heard it from

16  Mr. Rubin, they were beyond out of time as the milestone date

17  was coming, and they had to get to market in three years.  They

18  were beyond out of time.  These were their words; not mine.

19       And then scrubbing out a few more Js, taking things out of

20  the source code that could get them in trouble.  These come

21  from their own internal documents.  Trial Exhibit 26.  "Scrub

22  out a few more Js."  Again, their words; not mine.

23       This is a really important legal -- important and a legal

24  issue.  They were worried.  Trial Exhibit 382.  Don't

25  demonstrate to any Sun employees or lawyers.

1          This is in 2008.  If everything was open and free, and

2    everybody was allowed to do this, then why are they telling

3    people to don't let people at Sun know, and don't demonstrate

4    to any lawyers?

5          Ladies and gentlemen, because just like all this evidence,

6    they knew what they were doing was wrong.  And I ask you, is

7    this what innovation is supposed to be about?

8          This, ladies and gentlemen, is critical evidence that came

9    in toward the end of the case.

10         Mr. Mazzocchi, you probably remember he came on the stand.

11   He was at Apache.  The copyright on the API is real and hard to

12   ignore.  And he sent this to the members at Apache.org.

13   Remember all about Apache.  He came in here.  He was one of the

14   key people on Harmony, that Harmony project.  One of the three

15   people.

16         And he looked at what was going on and he said, We can't

17   pretend we don't know of any API that we infringed unless

18   explicitly mentioned.  And he says here, the copyright on the

19   API is real and hard to ignore.  Just like Mr. Rubin; just like

20   Mr. Page; just like Mr. Swetland.  They all knew.  And he

21   looked at this too, and said this is a problem that I see here.

22         And remember what I said about Mr. Stein, who was at

23   Google.  He also said in here that simply by implementing the

24   class with the same signature of another, which is what Google

25   claims that it has done in -- in another namespace, and simply

1    by looking at available Java docs, it could be considered

2    copyright infringement, even if the implementation is a clean

3    room.

4         And then he goes on and he says, "We are, in fact,

5    infringing on the spec lead copyright if we distribute

6    something that has not passed the TCK" -- the compatibility

7    kit -- "and we know that."  He's saying as clear as day that

8    what was going on was improper.  He's saying it right here.

9         And members at Apache.org, Greg Stein, he was examined on

10   the stand by Ms. Hurst.  And it was established that Mr. Stein

11   was a member at Apache.org on that email list.

12        And remember when I said "Mr. Stein"?  Mr. Stein was on

13   that same email from Mr. Rubin that said the APIs are

14   copyrighted.

15        This whole Apache story does not add up, ladies and

16   gentlemen.  Google claims and is suggesting to you that somehow

17   Sun approved this.

18        Look at these documents.  Apache didn't even end up with a

19   license.  And this fellow knew this.

20        And Google is saying to you that there are all these

21   commercial products out there that are doing things like what

22   was going on here.  And they mentioned IBM.  IBM had a license.

23        And even internally at Apache, this man is saying what

24   they were doing was not consistent with the law.  And this is

25   sent to members of Apache, including somebody at Google,

CLOSING ARGUMENT / BICKS

1    Mr. Stein.

2        Internally, there were also documents which showed that

3    Google knew that what was going on at Apache Harmony was not

4    consistent with the licenses.  This was the water under the

5    bridge email that I asked Mr. Schmidt about.

6        These restrictions prevent Apache Harmony from

7    independently implementing Java SE.  They can't do that.  The

8    restrictions are the license restrictions, the rules.

9        Not to mention Android, though that's water under the

10   bridge at this point.  It was water under the bridge because

11   they had already decided to go ahead.  The decision had been

12   final.  And they wanted to make enemies along the way.  Those

13   are their words; not my words.

14       Internally, again -- and I showed these internal documents

15   because the suggestion was made to you in this trial that

16   everybody at Google thought everything was fine.  We saw

17   Mr. Schwartz's blog, and everything was okay.

18       But every one of these internal documents shows that

19   internally they knew they had a problem.  And they were worried

20   all along about lawsuits, as they should have been.

21       And here's another internal document where they considered

22   in 2009, Why don't we buy the rights to Java to solve the

23   lawsuits we're facing?  And Mr. Schmidt says, It was a clever

24   idea.  I'll ask our team to pursue it.

25       Not just one email; not just two.  There is a mountain of

 1   evidence which shows knowledge that what they were doing was

 2   not right.  It was not fair.

 3       This, ladies and gentlemen, is another critical piece of

 4   evidence.  It came in fast through Mr. Mazzocchi, but this is

 5   what he had to say.

 6       And I don't know.  We can put all the legalese aside,

 7   transformative, some of the very complicated intellectual

 8   property issues that you all have to grapple with in this case,

 9   and we can bring it down to language of someone that cuts to

10   the chase and tells us what the case is really about.

11       April 20th, 2009, Mr. Mazzocchi, to all the members at

12   Apache.org:  "What is Oracle going to do about Android's

13   ripping off some of their IP and getting away with it?"  These

14   are his words, sent to members at Apache.org April 20th, 2009.

15       And that's what's happened here.  But Oracle is not

16   letting Google get away with it.  Just like what was said here

17   by Mr. Mazzocchi.  "The alternatives all suck.  We need to

18   negotiate a license."  Their words; not mine.  Up until

19   August 12, right before this case was filed.  This is the

20   timeline of bad faith.

21       And when you deliberate, I would ask that you look at this

22   evidence, Trial Exhibit 10, the Mazzocchi emails, the making

23   enemies along the way.  Those were what people were saying

24   before they would ever think that their thoughts would be

25   exposed to people like you.  And these documents tell the

1   truth.  And they tell the whole truth.

2       And Mr. Rubin, he wanted to win.  He wanted to win.  And

3   he wanted to win at all costs.  And you look at all those

4   internal emails that show what was really going on.

5       Wanting to win is okay.  In fact, it's probably good.  But

6   not when you take shortcuts and not when you break the rules.

7       So look at Mr. Schwartz's blog.  We heard so much about

8   it.  I got to examine him.  And I want to remind you all the

9   evidence to what happened when he got on the stand.

10      This is what he said on the blog.  "My heartfelt

11  congratulations."  He was in a pickle.  Remember I asked him,

12  it was lemons to lemonade; you had a bad situation; you were

13  gritting your teeth.

14      And I then I walked out email after email of what he was

15  actually saying at the time internally.  He wasn't happy about

16  what was going on.

17      And all those emails I just showed from Google, they knew

18  that they had a problem.  And so did Mr. Schwartz.  Because he

19  said -- and this was from Mr. McNealy.  And I asked him on the

20  stand -- Mr. McNealy was chairman of the board -- that Google

21  was immune from the copyright laws.  He said, I don't disagree

22  with that.

23      He looked at that announcement that his blog addressed,

24  and he said it was crap.  This is what he said internally when

25  he wrote that announcement.  He wrote an email saying it was

 1   crap.  Exhibit 2353.

 2        And then he said, I have no clue what they're up to.  My

 3   sense is they are playing fast and loose with licensing terms.

 4        Fast and loose with licensing terms.  Those are the rules,

 5   ladies and gentlemen.  This is what Mr. Schwartz was saying

 6   internally.  Trial Exhibit 2368, playing fast and loose with

 7   the licensing terms.

 8        And then he says, They take Java for Android without

 9   attribution or contribution.  "This is why I love scroogle."

10   Those were his words at the time; not mine.

11        And then he writes the email to Ms. Catz and Mr. Ellison,

12   referring to what was going on as a battle.  Calling this a

13   battle is not exactly saying we're happy about what's going on.

14        And you put all those emails together and you can see

15   exactly what was going on.  Sun knew they were playing fast and

16   loose with the licensing rules.  Sun was having a tough time.

17   You heard that.

18        And it takes somebody with strength and courage to stand

19   up to somebody like Google.  And that's what Oracle has done.

20   Because you saw what Mr. Mazzocchi said.  What is Oracle going

21   to do when they find out that Google is ripping off their IP?

22        And then Mr. Rubin, as if a business would rely on a blog

23   or a public announcement.  Ms. Hurst asked him about the

24   OpenJDK announcement.  And said, It wouldn't make business

25   sense to bet our whole project on an announcement.

**CLOSING ARGUMENT / BICKS**

1    No executive bets their company on something it says in a

2  blog, particularly when all the internal documents show that

3  they knew what they were doing was not right to the point where

4  Mr. Schmidt was so worried that he thought about buying the

5  rights to Java.  And he said yes.

6    If everything was fine, if everything was free, why would

7  the top executive be thinking about buying all the rights to

8  Java?  It doesn't add up.  The internal contemporaneous

9  documented story doesn't add up with the story that's being

10 told in the courtroom.

11    So when you put this Factor 1 together, Google hasn't met

12 its burden.  It weighs in Oracle's favor.

13    Let's talk about creativity, because Judge Alsup has

14 already said in his instruction, because there was copyright

15 protection, that these APIs have a level of creativity.

16    And you all, in this case, will have to decide how

17 creative was this, what these people did?

18    Mark Reinhold was in the courtroom.  And he testified as a

19 witness.  You would think he would know about creativity,

20 because he designed this.  It was his work, as he told you,

21 some of which took years to come up with these design of these

22 packages.

23    And he explained how creative it was when he was doing it.

24 And he said it is intensely creative.  And he compared it to

25 *Harry Potter* and how those books related.  And I'll come back

CLOSING ARGUMENT / BICKS

1    to that.

2        Just like in *Harry Potter*, what we talked about here is

3    comparing these packages, methods, and headers, very much like

4    a book in a series.  A book, title, chapter, topic sentence.

5        And what the evidence has shown here is that Google copied

6    all of that, except it was a book of 37 series.  Each of these

7    packages is like a book.  And they copied all of that, the

8    whole interrelationship; the titles, the chapters, each topic

9    sentence of every paragraph, and then how the books relate to

10   one another.

11       It's an easy way, I think, to maybe understand some of

12   this.  Very much like that software map that Doug Schmidt

13   showed.  But this was helpful for Dr. Reinhold as one of the

14   creators.

15       And one of the important things, when it comes to

16   creativity in the instructions, is when there are many possible

17   ways to structure, sequence and organize something it can be

18   highly creative.

19       So you have to ask yourself, what was the evidence on the

20   choices that were made to those who were writing these API

21   packages?

22       Dr. Reinhold would know because he was the individual who

23   was doing it.  He says they are extremely expressive, and there

24   are an infinite number of creative choices in designing these

25   packages.  This was his testimony -- and he was the one who

**CLOSING ARGUMENT / BICKS**

1  designed some of these packages -- that there were an infinite

2  number of choices.

3      And here are what some of the choices are that he talked

4  about on the stand.  When you're sitting down to design a

5  package, these are all the questions that may go through your

6  mind if you're doing this.  No different than coming up with a

7  poem, writing a book, or anything else.  These are the creative

8  choices that he spoke about.

9      Mr. Bloch, on their side, wrote a document saying that

10  this was an art, not a science, designing these API packages,

11  and strive for beauty.  These were his words.  That Exhibit

12  right there, Trial Exhibit 877.

13      Noble and rewarding craft.  API design is tough.  Again,

14  from Mr. Bloch.  This is evidence from their witness about how

15  creative putting these packages together is.

16      And then he talked about, right, consistent with the

17  judge's instructions, creative writing and expression lie at

18  the heart of copyright protection.

19      And he talked about why some APIs are harder to write.

20  And he said because you have to figure out how best to express.

21  Those were his words, showing how creative this is.

22      Doug Schmidt talked about the degree of creativity, as

23  well, and all the choices that have to be made.

24      And let me show you what Bob Lee's testimony was, because

25  it happened quickly.  But he was asked -- he's at Google, one

1    of the key people on these libraries.  And he was asked how

2    creative is this.

3          (Videotaped testimony played as follows:

4          "Q.  Would you say the -- designing APIs is a creative

5          activity?

6          "A.  Yes, absolutely.")

7              MR. BICKS:  Absolutely a creative activity.

8          There is a mountain of evidence from all of these

9    witnesses about how creative this is.  And just because it's

10   functional -- and, of course, almost all computer code is

11   functional.

12         The question here is, how creative is it?  Just because it

13   does two things, does important things, and is hugely creative

14   to get there, that doesn't take away from how creative it is.

15   And that's very, very important.

16         The labels that we heard about, we asked Dr. Reinhold, is

17   that really fair to call these things labels?  You designed

18   them.  And he said that was laughably simplistic, those labels.

19         He's the one who was at the bench.  He's the one who put

20   his heart and soul into some of these packages.  And they're

21   not labeled.

22         "Labels" are what people use when they're in a courtroom,

23   to try to minimize the creativity of the hard work of the

24   people who did this.

25         Factor 2, on creative, I believe, weighs in favor of

1    Oracle based on that evidence.

2          Now, factor 3, what did they copy?  How much?  How

3    important?  And the instruction here says that even a small

4    amount may be qualitatively the most important part of the

5    work.

6          If you take just a little bit and it's real important,

7    then this factor will go against you.  You don't just look at

8    the amount.  You have to look at how important it is.

9          So what was the evidence?  Google says, Look.  Look at how

10   much we did.  Look at how much we did on our side.

11         Don't be tricked by that, because the total number of

12   lines in Android is not relevant here on this factor.  That's

13   what the instruction says.  That's not the right test.

14         So when you're looking at this, how much and how

15   important, be careful about the argument that I've heard in the

16   courtroom, which is, Let's look at what we did on our side,

17   over at Google.

18         That's not part of this.

19         This, you saw, was the software map that Mr. Schmidt

20   brought to court to show you, kind of like *Harry Potter*, how

21   connected all of this stuff is.  The packages, the methods, the

22   interfaces, how connected it is and how it works together.

23         And he showed you the software map that he prepared for

24   this case to help us.  And he showed us that Google copied the

25   heart of that platform.

1    And that, as we know, if you take this out, that not one

2    of those billions of phones would work.  We know that.  Nobody

3    disputed that.  And this was the software platform that was

4    presented.

5        You heard from Mr. Schmidt that what they copied was

6    substantial.  This was his testimony, his expert opinion.

7        And then you heard from Mr. Reinhold, back to *Harry*

8    *Potter*, how everything is connected; the headers or the

9    chapters, the topic sentences, and how they all connect

10   together.  And he explained that on the stand.

11       And I want to come back to two very, very basic questions

12   that I ask myself.  And I hope you will ask yourselves.

13       If this wasn't important, why did Google copy it?  And if

14   it wasn't important, why didn't Google just write their own

15   declaring code?

16       They've got all the resources in the world.  They've got

17   all these engineers.  Why did they take it, if it wasn't so

18   important?

19       You don't check your common sense when you come to the

20   jury outside of the courtroom.  And that's why juries, people

21   like you, are so great, because you bring common sense to this

22   case.

23       There's a reason they copied it.  And the evidence shows

24   why they copied it.  Because it was the heart.  And I'll show

25   you some of their own internal evidence.  They had used it

 1  before at Danger.

 2       Mr. Rubin did when he actually had a license to use it.

 3  And he said here in their documents -- not my words; their

 4  documents -- the reasons to shift to a primarily Java API,

 5  because it "saved us a pretty crazy amount of time."

 6  Shortcuts, saving time.  "A crazy amount of time."

 7       And when you're competing, we all know that time is money.

 8  And time can be big money.  And this is what their internal

 9  documents say about why they were doing this.

10       And when they went out to their customers, they were

11  telling them how important what they got was.  And this was

12  evidence that, kind of, came in quickly because the case moved

13  fast.  And I only showed you -- I think Ms. Hurst showed one or

14  two of these presentations.

15       But this was the evidence.  And there are all the exhibit

16  numbers down at the bottom of this, of all the presentations

17  that they were making to customers.

18       And in those presentations they were telling them, look

19  what we've got:  The Java class libraries.  Java APIs.

20  Java.class.java files.  6 million developers are using this.

21       And this is when they're out giving private presentations,

22  this is what they're telling people that's showing how

23  important this is.  Their own documents show how important it

24  is.  Because this is what they were saying to people when they

25  wanted to get them onboard.

1      So what's their argument that you've heard?  Well, the

2  language is free, so we could use the language; and, therefore,

3  we could take the APIs.  That's the suggestion.  But that's not

4  what the evidence showed.

5      The APIs and the language are distinct parts of the

6  platform.  You can go out and use the language and design your

7  own APIs.  You know it would be hard work.  And you know it

8  would take a lot of time.  But the evidence was that that could

9  be done.  And they didn't do it.

10     And you hear from Dr. Astrachan, the programming language

11 is different from the APIs.  And he says yes.  So this argument

12 that the language isn't free; therefore, you can steal the APIs

13 without a license does not add up.  And that's not what the

14 evidence showed.

15     This is from their own senior vice president, testimony

16 that was given in this case.  We did it by videotape.  Very

17 important evidence.  And I'm going to play it.

18     (Videotaped testimony played as follows:

19         "Again, that programming language and the libraries or

20     APIs are two completely separate things.  And so with the

21     exception of the case that we talked this morning

22     java.lang.star, I think no programmer would consider them

23     to be part of the language.")

24     **MR. BICKS:**  And remember what he says here, the

25 language is not part of the APIs.

CLOSING ARGUMENT / BICKS

1        Now, the judge will instruct you that there were 170 lines

2    of code that were required.  And the judge will also instruct

3    you that you do not take more than you need.  And when you take

4    more than you need, that counts against fair use.

5        And remember, now, that Google took 11,500 lines of code.

6    11,500.  That's what the evidence is showing.  Substantiality,

7    that weighs in favor of Oracle.

8        And now let me talk to you about market harm.  It's

9    important to remember that when we're talking about market

10   harm, we're talking about actual markets and potential markets.

11   Markets that exist and markets that may come to be at some

12   future time.

13       And it's important to remember that it's not just

14   licensing opportunities for Java Standard Edition -- and the

15   evidence, ladies and gentlemen, is the Java Standard Edition

16   was being licensed into mobile phones and smartphones -- but,

17   also, harm that can be done to something called derivatives.

18   Things that are related to Java Standard Edition.

19       You can't harm Java Standard Edition and you can't harm

20   something that's related to it.  Something that's called a

21   derivative.  You heard that in the case.  And that's what this

22   instruction says.

23       There was evidence about how Java ME and SE fit together.

24   You heard that evidence in the case because Java SE is the

25   copyrighted work.  But what the law says is that the

1   copyrighted work is protected, and also work that is a

2   derivative of it, like Java ME is.

3        So you have to look at harm to Java SE and harm to

4   derivatives like Java ME, because Java ME was used in some

5   phones, and Java SE was also being licensed.

6        And when you're talking about harm, ladies and gentlemen,

7   you have to remember that the business model of Sun and Oracle

8   is licensing.  Written contracts to allow somebody else to use

9   the Java platform, not to manufacture their own phone.

10       Just like Google is not a company that manufactures its

11  own phone, except I believe with one.  But their main business

12  is an operating system where others make the phones, like

13  Samsung, LG, and other companies.

14       But it's very important, when we look at harm, we have to

15  make sure we remember what kind of business Sun and Oracle were

16  in.  They license technology.  They license it.

17       And now we're looking at Standard Edition and also this

18  question of derivatives.  And so here is the testimony from

19  Mr. Screven, Mr. Reinhold, Mr. Brenner, and Owen Astrachan,

20  that ME, "I always view it as a little sibling" because it

21  doesn't have as many packages as Java SE, but there's some

22  overlap.  Kind of like a little sibling.  They sometimes call

23  it a "subset."  Or here, "a derivative," what Mr. Brenner says.

24       But they're closely related.  And you can see why.

25  Because when it actually comes to SavaJe, SavaJe was using ME

1    and SE.  And Danger had the license to ME, but they were using

2    SE.  So some of these platforms, some of these SE and ME, they

3    get used together.

4        And then when they were developed, they kind of developed

5    in steps together.  One goes in front.  The other catches up.

6    And that's the way technology works.

7        Dr. Reinhold says that ME was derived from SE.  And then

8    Mr. Brenner explained what I was talking about, the updated,

9    one in front of the other.  SE, he says, We would regularly

10   update Java ME to track the development of Java SE.  And that's

11   how they were being developed, kind of in tandem, one going out

12   in front of the other.

13       But ME is a derivative for purposes of this.  That's what

14   the evidence is showing.  And there's been no contrary evidence

15   by Google about this.  So when you're looking at harm, you have

16   to look at both of those.

17       And Dr. Astrachan said the same thing, where he said 11 of

18   the Java SE packages, that's the same as in ME, he said.

19       Now, this is also important because everybody at the time

20   was seeing that SE was going to be important because these

21   phones are like computers.  They really are.  They're like

22   computers.

23       And that's why there was, kind of, a movement toward SE as

24   time was moving forward.  And that's what Mr. Brenner

25   explained.  And that's the same thing that Owen Astrachan,

1    Dr. Astrachan was saying as well.  And people were seeing that.

2         Capability, power, memory and so forth.  That allowed us

3    to take on more of the scope of SE.  That's what they were

4    focused on at Sun.  And that's what SavaJe, which was Java SE,

5    they saw this coming.  And they were working on it.  And that

6    was opportunities for Sun and then Oracle.  That's what the

7    evidence has shown.

8         Now, when we talk about the actual harm, we have presented

9    evidence -- and I will review it with you -- of actual harm

10   that has occurred in this case.  But we didn't even have to

11   present that evidence.  Though we did.  Because it's the

12   potential for harm, which is what the jury instruction will

13   tell you will be important here.  Actual present harm need not

14   be shown.

15        And when it comes to future harm, we don't even have to

16   show it with certainty.  We just have to show that there's a

17   likelihood of it.

18        So let me review with you the evidence of harm, because

19   there was a lot of evidence on harm, actual harm.

20        To remind us of where Java was with Sun:  Phenomenal

21   momentum in wireless.  They were the market leader in

22   2004-2005.  That's what the evidence was.

23        These people were not coming out of nowhere before

24   Android.  They owned the market.  They were the market leader.

25   And this is a document before litigation, before anybody wanted

**CLOSING ARGUMENT / BICKS**

1    to come in and change something, that talks about phenomenal

2    momentum.

3         That's where they were in '06-'07.  You heard from

4    Mr. Civjan.  This is a document I used with him.  This rolled

5    forward to the 2009 time period, when he's talking about where

6    Java was.

7         And you're saying here that they were in 2.6 billion

8    handsets.  This is Trial Exhibit 9133.  6.5 million developers.

9    180 carriers.  They're leading the market.  And they were

10   leading the smartphone market.

11        And, yes, the smartphone market was different then than it

12   is now.  But it was evolving and it was underway then.  And

13   they had the toehold at this point in time.  They had the

14   agreements with RIM.  They had that deal with Danger.  They had

15   the technology from SavaJe, because they bought SavaJe after, I

16   showed you, that funding dried up because of Android.  Sun

17   owned that operating system from SavaJe.

18        And then we get to the evidence.  And we started with

19   Ms. Catz and asked her about the harm.  What harm, as you as

20   the CEO of your company, have you seen yourself?  And this is

21   what she said:  There's been a very negative effect on Sun and

22   Oracle.

23        And she went through that harm.  And the first harm was

24   that the Java community had been forked.  And that goes back to

25   the write once, run anywhere promise.  That you write computer

1  programs, and it runs on all different kinds of systems.  All

2  different kinds of computers.  All different phone computers.

3  It writes and runs on all of them.  And that was part of the

4  promise and part of the value.

5       And what happened here is that Android was forking and

6  hurting that community because that write once, run anywhere

7  promise had been broken.  And she testified to that harm.

8       Mr. Screven talked about it as well.  The programmers were

9  getting locked into Android because their applications can't

10 run in other environments other than in Android.  And that is

11 harm.  That breaks the write once, run anywhere promise.

12      And then you heard about what I would call control; that

13 when it came to Android, they didn't want people forking their

14 own technology.  They wanted to stop that.  And they wanted to

15 define the standard and shape the ecosystem.

16      But when they did that, as Mr. Screven pointed out, they

17 locked out Java because it wasn't compatible with the Android

18 Operating System.  And that's where the fork was.  And that's a

19 type of harm.

20      And then this language, "carrying a stick can save lives."

21 There was a lot going on here about control of the platform,

22 which is what Google wanted.  They wanted control and they

23 wanted to keep others, like Oracle, out.  And remember the

24 document "locked out."

25      And then we got into specific companies where Oracle lost

1    business.  Samsung; ZTE; Motorola; BlackBerry.  They don't take

2    licenses any more because they end up using Android instead of

3    entering into commercial contracts with Oracle.  That was her

4    testimony.  Specific companies that had licenses that were no

5    longer working with Oracle.

6         A specific example she used of Samsung, a $40 million

7    license down to 1.

8         And let me come back to harm again because we were not

9    required to even prove harm.  It was Google's burden to show

10   the absence of harm.  But we showed evidence of actual lost

11   deals.  40 million to 1, Ms. Catz identified as a Samsung deal.

12        And nobody challenged that testimony.  They didn't even

13   ask her a question about it on cross-examination.  And they

14   didn't bring in a witness from Samsung to say, no, that's not

15   why that deal got lost.  So this evidence went unchallenged

16   even though it was not our burden.

17        Mr. Civjan took the stand, and he addressed this both from

18   customers but from a human standpoint.  The person who had

19   built the business, I think he had 133 people.  And he was

20   proud.

21        And, by the way, he had no dog in this fight because he

22   wasn't even working for Oracle.  He left Oracle.  And he came

23   on the stand, and they attacked him about his LinkedIn page.

24   They didn't ask him about the deals that got lost and the

25   evidence about that.

1    And he talked about not just the deals, but what it means

2  when you build up an organization and you establish your --

3  your team as the market leader, which they were.  85 percent of

4  the market, 2.6 billion phones.

5    We say those numbers and we throw them around in this

6  courtroom and in this trial.  But we have to come back and

7  really say to ourselves, what does that mean?  2.6 billion

8  phones Java was in.  They were the market leader.

9    And it's people like Neal Civjan and his team and others

10  who built that.  And this is what he told you about the impact.

11    And then I asked him to describe to you all what was the

12  impact of Android.  And he said because it was free, it

13  displaced Java and had a massive impact very quickly on his

14  business.  That's what he said to you up on the stand.

15    And then we went through some of the specific companies.

16  Samsung; Motorola; HTC; Sony Ericsson.  He said 50 to

17  60 percent of mobile phones were now using Android instead of

18  Java; whereas, before they had the whole market or

19  85/90 percent.

20    Android came in, and Android came in with Java's

21  technology in it.  So they're competing against themselves in

22  the marketplace.

23    Somebody takes your property that you invested in and you

24  built, and you want to do something with it.  And then you find

25  yourself out there trying to do something with it, and you come

CLOSING ARGUMENT / BICKS

 1  across somebody who took it from you and is then competing

 2  against you for free.

 3      And I want to come back to something that I've heard here

 4  in this courtroom, which was Sun failed, Oracle failed; so,

 5  therefore, we can take it.

 6      When it's your property, and you write a book, that

 7  doesn't mean somebody can come in, a movie company, and can

 8  take your property and turn it into a movie without your

 9  permission.

10      And even if you take that book and you try, and maybe

11  you're not successful at it, that still doesn't give somebody

12  the right to come and take your book from you.

13      Just doesn't -- just like it doesn't give you the right,

14  if you have a piece of property that you own, a parcel of land,

15  and you want to build something on it, and maybe you build it,

16  and it's a barn that doesn't stand up that well, somebody

17  doesn't get to come on your property and say, you know what,

18  you weren't good at building the barn; I'm going to come on

19  your property now and build a barn because you couldn't do it.

20      And I will show you in a moment that the evidence isn't

21  that Oracle failed.  It's that Android took over the market.

22  And Oracle, like any smart company who's got shareholders, is

23  not going to throw good money after bad.

24      You have to remember that common sense about taking

25  somebody else's property.  And Mr. Civjan also talked about

1    massive lost revenues that he was projecting in various -- what

2    he called "A-Pac markets."  Asian Pacific.

3        And I asked him about the morale that I had mentioned

4    before.  And he said it was a huge success story of that

5    industry, and it was highjacked.  They took our technology.

6    They gave it away for free.  And they took our customers, and

7    it was devastating.  And that's what he said on the stand.  And

8    the cross-examination of him was what he said on his LinkedIn

9    page, that he had been good in Java sales.

10       He was good in Java sales.  He was also selling Java not

11   just in phones.  Java was used everywhere, in all the products

12   that he talked about.  So it was a little bit of a slight of

13   hand to say to you that Java SE, oh, it's not doing that badly;

14   so, therefore, we didn't harm.

15       Java SE is used in multiple devices.  And what we're

16   talking about now is the harm to the mobile space.  So I don't

17   think that was fair.

18       You heard from Ms. Catz on the Kindle deal, because there

19   were two problems with Kindle, the evidence showed.  The Kindle

20   Fire came out, and Java wasn't in it.

21       And then there was another Kindle, the Paperwhite, where

22   Oracle found themselves competing against themselves, where

23   somebody had taken their technology -- Google -- and was giving

24   it away for free.  So they had to discount down 97 percent.

25   So, again, evidence of actual harm in the marketplace.

CLOSING ARGUMENT / BICKS

1    And then we have Dr. Jaffe looked at all the evidence and

2    confirmed that there was significant harm, based on documents,

3    based on testimony, and based on the platform economic model

4    and what their business objectives were.

5    And then we looked at, from a practical standpoint, this

6    chart of -- of the smartphone market, of where Java was.

7    And, yes, it's absolutely true, in 2007, it was a smaller

8    market.  But they had the toehold.  They were in 70 percent of

9    those smartphones.  RIM; Nokia; Danger.  Those, at that time,

10   were the leaders in that market.  iPhone wasn't even out

11   then.  And that was the market position of Java in the

12   smartphone market.

13   And then Android took off, and now we see the harm that's

14   resulting.

15   So this is back to this question about -- we heard it

16   again and again -- the argument was, Oracle, you're bringing

17   this lawsuit because you couldn't do it.

18   That's not true.  Oracle decided, and Ms. Catz said it --

19   and I'll show you testimony again -- in the 2011 time period,

20   that making a huge investment to build a phone, to buy a

21   company, to build a phone was not a good investment.

22   Why?  Four years of copying had been going on up until

23   that point.  And Android went, as I showed you, from basically

24   starting out as a startup to a $43 billion ecosystem in two

25   years.

1    And they decided it would be very difficult to compete

2  with free, because Android was too far out.  And there's

3  nothing wrong with making smart business decisions when

4  somebody else takes your property and takes shortcuts and

5  doesn't play by the rules.

6    You can't do a -- point the finger and say it was okay for

7  me to steal because you didn't do it.  That's not what fairness

8  is about.  And that's not what fair use is about.

9    Mr. Ellison, we heard a lot about him.  We heard two

10  things that he made a statement at JavaOne.  But I want to make

11  sure we know a little bit about timing and use our common

12  sense.

13    Mr. Ellison made the comment at JavaOne in June.  He

14  didn't even own Sun at that time.  And he got up in a developer

15  conference in front of developers and basically said yes, we're

16  going to commit to investing in Java.  And Oracle did.

17  Hundreds of millions of dollars, as Ms. Catz told you.

18    And it's actually true.  He didn't get up at that public

19  forum, before he had even closed that deal, and said, I've got

20  an email from Java -- from Schwartz, indicating that there's

21  some battles, and I think there seems to be some serious issues

22  here involving licensing problems.  Because Ms. Catz explained

23  that Jonathan Schwartz had told her, during that due diligence

24  before the deal closed, that there were problems, that this was

25  unlicensed.

CLOSING ARGUMENT / BICKS

1        And it's absolutely true, Mr. Ellison didn't get up in a

2   public forum, in front of developers, and start making a public

3   ruckus related to Google.  He didn't even own the company at

4   that time.

5        And there was a time and a place for everything.  And you

6   heard from the evidence that after that deal closed, these

7   folks did sit down and try to work it out.

8        And you saw an email that was presented by Google, I

9   believe in the June time frame, right before the August email

10  from Mr. Lindholm, that said, "We needed to take a license."

11       And then that email was shown to you.  One of the Google

12  people said, We didn't copy anything.  We know that's not

13  truthful, because we're in this courtroom because it's been

14  determined that they copied 11,500 lines of code and the design

15  of all of those packages.

16       And you'll never see any email or document where somebody

17  at Google is saying, gee, we think we're okay because

18  Mr. Ellison got up in front of a developers conference, before

19  this deal closed, and made those statements.  And you'll also

20  remember what he said, which was, I'd like to see some of those

21  phones be Sun phones, Java and Sun.

22       And business people don't always get up, particularly good

23  ones, and air their dirty laundry in public.  But you can rest

24  assured, as you saw this documentary trail, and you saw that

25  email from Mr. Mazzocchi about Oracle being ripped off, that

 1    they were not happy.  And for good reason.  But there's a time

 2    and a place to mention things.

 3         Back to Mr. Ellison testimony.  So I'm clear, it was

 4    always the -- the evidence and the argument was these people

 5    just failed, Oracle.

 6         We know how good Oracle is as a company and all the great

 7    things they've done.  And we can probably rest assured that

 8    with their brain power and talent, if it was playing fair, fair

 9    competition, given what they had with Java, and given how

10    valuable that technology was, we'd probably, with common sense,

11    said they could have been a bigger player here, if someone

12    had't violated the rules; gotten out in front; took their

13    property; and then competing against them and giving it away

14    for free.

15         But what Mr. Ellison says here is that already -- there

16    was already a Java smartphone with a lot of momentum.  And we

17    couldn't enter the smartphone market.  That was the decision

18    that was made.

19         And same thing for Mr. Stahl.  You heard testimony -- and

20    it's always tricky when you hear deposition clips, because

21    they're taken out of context.  And he said that Android was

22    dominating the market.

23         Open source does not equal open season.  You heard all of

24    this about OpenJDK.  Oh, we could have done this differently.

25    We could have taken this other license.

1    They didn't.  And there was a reason.  All their witnesses

2    said it was verboten.  It was incompatible.  And it was

3    incompatible with their policy of not using GPL, which is the

4    public license for core libraries.

5        All their witnesses said it wouldn't work because it was

6    designed by Sun to protect their commercial opportunities.

7    That was their licensing setup.  And that was their right to

8    have those rules.  And Google didn't like that license.  They

9    already said it.

10       All of their witnesses said that was not compatible.  And

11   the reason is, the evidence explained, that the companies who

12   use that license have to make all of their information public

13   when they make changes to the technology.  And they don't do

14   that because they're competitors.

15       And it was set up that way by Sun because when there were

16   commercial opportunities, they wanted to be at the table

17   because it was their technology that was being licensed.

18       So none of this GPL license, they never took it.  And they

19   say why they never took it.  And they suggested that this

20   OpenJDK stuff, that that's what hurt.  If anything hurt Oracle,

21   that that hurt them.

22       But the evidence from Mr. Civjan was:  Didn't that reduce

23   the company's competitive advantage?  He said it didn't really

24   impact the business.  The OpenJDK didn't hurt Oracle, didn't

25   hurt Sun.  So there was no evidence of that.

 1          THE COURT:  Mr. Bicks, you're down to about three

 2   minutes.

 3          MR. BICKS:  Thank you, Your Honor.

 4      And then I asked their executives, would taking your

 5   property unauthorized hurt your results?  And they said that it

 6   would.

 7          And then I asked Mr. Page, look at it from our

 8   perspective.  Would the same apply to Oracle if you took our

 9   property unauthorized -- which is what happened here -- could

10   that hurt us?  And he said it could make things more expensive.

11   He said that.

12          And then when it came to their licenses, they wanted to

13   make sure that everybody goes by the terms.  That's what

14   Mr. Schmidt said on his open source license.  He wanted to make

15   sure that they play by the terms.

16          And then there was their own API license, 5250, where they

17   protected their APIs.  But ours couldn't be protected.  5250.

18   That, to me, is being a little bit of a hypocrite.

19          And he said, I expect people to honor those contracts.

20   This was a teaching moment when Mr. Astrachan was here, and he

21   explained how he taught his students and what their rules were.

22   And he said even if things are unauthorized, you don't copy.

23   It must not be condoned.  And such violations are contrary to

24   professional behavior.

25          That's what he teaches his students.  And those are the

 1   rules that got broken here, the same ones that he teaches his

 2   students at his class.

 3        Final point.  What happens if everybody did this, if it

 4   was unrestricted and widespread?  And Ms. Catz answered this

 5   question for us.  All of these markets where Oracle is in.  All

 6   of these markets Java is in.  And she said, If everybody did

 7   this, we wouldn't have a business any more.  That's what she

 8   said.

 9        Final factor, they all weigh in our favor.  And they have

10   not met their burden of proof.  And that's what the evidence

11   shows.

12        This case, I told you in the beginning, is about decisions

13   and consequences.

14        You will see the verdict sheet.  And you're going to have

15   to answer one question.  Did they meet their burden of proof to

16   show that this was fair use?

17        And I believe the evidence has shown that this was not

18   fair use; that they made decisions; and the consequence has

19   harmed our client.

20        It's my time to sit down.  I thank all of you so much.

21   And now it's their turn.  And I won't be able to get up and I

22   won't be able to respond.  But I hope you know by now that if I

23   had a chance to, I'd have something to say.

24        (Laughter)

25        **MR. BICKS:**  As would Ms. Hurst.

PROCEEDINGS

 1      But I'm going to ask, before I sit down, I wrote up on

 2  this sheet all of the documents and all the trial exhibits that

 3  I quoted from their files.  Submarining; making enemies;

 4  ripping off IP.  Every document I wrote.  Fast and loose.  All

 5  the evidence.  Or at least what I considered some of the

 6  critical ones.

 7      And I hope before this case closes, that Google can

 8  explain to you those internal documents that were written at

 9  the time before anyone thought that folks like you would be

10  able to see it.

11      So thank you very much.

12      **THE COURT:**  Thank you, Mr. Bicks.

13      We will take a 15-minute break.  Please don't talk about

14  the case yet.  It will be your duty to.  When we come back, we

15  have 25 minutes of rebuttal from Google and about 20 minutes of

16  finishing up on the instructions.  And then the case will be in

17  your hands.  So getting very close.  But, in the meantime, no

18  talking about the case.

19      We'll see you back here in 15 minutes.

20      **THE CLERK:**  All rise.

21      (Jury out at 11:10 a.m.)

22      **THE COURT:**  Be seated, please.

23      Do the lawyers need the judge for anything?

24      **MR. VAN NEST:**  No, Your Honor.

25      **THE COURT:**  Go ahead and set up the courtroom in the

 1 | way that you wish.

 2 | **MR. VAN NEST:**  Thank you.

 3 | **THE COURT:**  And then getting down to the end, aren't

 4 | we?  Okay.  Thanks.

 5 | **MR. VAN NEST:**  Thank you.

 6 | (Proceedings were heard in the presence of the jury:)

 7 | **THE COURT:**  Everyone got their notepads?  Okay.

 8 | Mr. Van Nest, you have 25 minutes.

 9 | **REBUTTAL ARGUMENT**

10 | **MR. VAN NEST:**  Thank you, Your Honor.

11 | Welcome back, everyone, and again, thanks for your

12 | patience and your tolerance and your attention.  I have one

13 | opportunity now --

14 | **THE COURT:**  I'm sorry.  Wait.  Somebody is waving at

15 | us.  What is it?

16 | **THE CLERK:**  Oh, okay.

17 | **THE COURT:**  I'm sorry for the interruption.

18 | **MR. VAN NEST:**  That's quite all right, your Honor.  We

19 | are going to look at a little more evidence before we close up.

20 | So I want to start where I started because there's a huge

21 | key functional point that wasn't even address the in the hour

22 | and a half that Oracle spent discussing this.  And that is that

23 | Sun, from the very beginning of Java, not only made the

24 | language free, but made the APIs open and free as part of their

25 | whole business plan.

1        Can I have Slide 2, please.

2        You heard from the people at Sun that were responsible for

3    Java and the Java APIs:  Mr. Schmidt, who was the CTO there for

4    18 years, and Mr. Schwartz, who was there for 13 years, and

5    both rose to high positions.  And what did they tell you?  They

6    told you in testimony that has not been challenged, not when

7    they were on the stand and not during his closing argument,

8    that the APIs were given away with the language as part of

9    their whole plan to promote the popularity of Java.

10       Let's look at the next slide, Slide 3.  This is what

11   Mr. Schmidt said.

12       "When Sun first released the language, were the APIs

13   included?

14       "Yes.

15       "Why was that done?

16       "It's not possible to use the language without the APIs."

17       And you heard testimony over and over.  Mr. Bloch said it,

18   Dr. Reinhold said it, Mr. Smith said it, their corporate

19   representative:  The APIs are critical to the language.  No

20   they're not the language itself, that's right.  They're

21   separate but they're an integral part and feature of this whole

22   thing that was given away from day one.  It's rather

23   extraordinary it when someone like Google has to call their

24   Chief Technology Officer and their CEO to prove this.  These

25   were their people speaking for their company at the time.

**REBUTTAL ARGUMENT / VAN NEST**

1    Let's look at Slide 3.

2    You saw half a dozen quotes from Mr. Schwartz, which was

3    to the effect -- and it's exactly what we have been saying all

4    along and all the evidence backs it up.  Not just from these

5    guys, but from everybody in the industry.

6    "Were the APIs marketed along with the language, in other

7    words free and open?

8    "Absolutely, yes."

9    Mr. Schwartz said they were free and open.  He said they

10   were never considered proprietary during all the years he was

11   there at Sun.  He said we shared them and compete on

12   implementations and his testimony was absolutely backed up by

13   the documents.  Look at Slide 5.  This is what Sun said at the

14   time.

15   They said publicly in a 10K filing, "We support open

16   interfaces," that's open APIs.  That is written documentary

17   confirmation of this whole thing, this whole business plan at

18   Sun.

19   I heard a lot about stealing and theft.  We're here

20   disputing whether or not Google's open use, which was made

21   known publicly, of APIs and interfaces that had been made free

22   and available by Sun is a fair use.  I'm not sure why we're

23   talking about stealing and theft.  Everything that Google did

24   was done in public, open source, on websites.  Everybody knew

25   what was going on.  This is exactly what Mr. Schwartz is

1    talking about, open interfaces in their 10K.

2        And then what happened when Android launched?  What

3    happened when Android launched was their publicly -- their

4    Chief Executive Officer on a Sun website said,

5    "Congratulations.  Welcome.  We want to support you.  We want

6    to help you."

7        They don't have an answer for any of this.  They suggested

8    that somehow he didn't believe this or that Mr. Ellison didn't

9    believe it when he waved the phone up in the air, but there is

10   internal debate at all companies.  All companies there is

11   internal debate.  There is thousands of emails in this case.

12   Sure.  You can cherrypick emails and turn it into a battle of

13   little soundbites, but the people leading these companies,

14   leading Sun and leading Google at the time took the position

15   this was a fair use, it was not objected to, it was supported.

16   They don't have an answer for this.

17       Can I have Slide 10, please.

18       Slide 10.  It's not just one post.  It's over and over and

19   over, over a period of three years, meetings, emails, calls.

20   Mr. Schwartz to Mr. Schmidt.  Mr. Gupta meeting with Mr. Rubin.

21   JavaOne in '08 where they show their new Java FX running on

22   Android.

23       What difference does it make what was being debated

24   internally at either Google or Sun?  The record of what was

25   done between these companies is one of open discussion about

1  Android.  And that's why all these emails you saw about *oh,*
2  *critical license, must have a license, they're copyrighted*, we
3  know what that's about because, again, you've heard from the
4  critical people there:  Mr. Rubin, Mr. Schwartz, Mr. Page, and
5  Mr. Schmidt.  They talked about a different type of deal back
6  in the '05, '06 period that had absolutely nothing to do with
7  the Java APIs.  It had to do with a fundamentally different
8  proposition.  We'd like to get the Sun proprietary technology
9  and use it because if we could do that, this might shorten our
10  time to market.

11      Google didn't take a shortcut.  A shortcut?  It took five
12  years to get this product out.  Shortcut?  You heard the
13  testimony from Mr. Bornstein, Mr. Rubin, and Dr. Astrachan
14  about all the time and effort that went into building Android.
15  They were trying to cut that short by reaching an agreement
16  with Sun, but when they didn't, they went forward using the
17  free and open APIs that had been open for years by Sun and
18  built their own system by themselves using their own technology
19  and/or freely available open source technology.  There were no
20  shortcuts taken whatsoever.

21      And by the way, the industry testimony you heard from
22  virtually every witness that's a programmer was to the effect
23  that forever and ever, programmers have believed the APIs to be
24  free and open.

25      Could I have Slide 15, please.

 1      You heard from Dr. Bloch who worked at Sun.  "We

 2   reimplemented APIs at Sun from other people."

 3      You heard from Mr. Schmidt.  "This was done at Sun."

 4      You heard there Mr. Schwartz.  "Examples of reimplementing

 5   APIs at Sun."

 6      Mr. Page, Mr. Bornstein, Mr. Phipps, they all talked about

 7   using open free APIs, just like the electrical outlet and the

 8   plug, just like the hamburger menu.  Those were open and

 9   shared, and you built your own implementation yourself.  That's

10   what every one of these witnesses testified to and said was

11   customary and standard.

12      They don't have an answer for this.  They haven't called

13   anyone here to tell you otherwise.  It's their company.  There

14   were lots of people working at Sun, not just Mr. Schwartz, not

15   just Mr. Phipps, not just Mr. Bloch.  But no one came in here

16   and contradicted this testimony and the public record of making

17   the APIs open from day one.

18      Now, transformative use is a fundamental part of fair use.

19   As I said, fair use is the law and fair use is intended to

20   encourage innovation.  That's why it's important to determine

21   whether Android was transformative or not.

22      You heard virtually nothing from Oracle about that except

23   one thing, which is it can't be transformative because they

24   used the same declarations, the labels that were in Java in

25   Android.  Well, that's just wrong as a matter of law.

1        Slide 17, please.

2        The law is a use can be transformative even if you're

3   using the material itself in the same way.  That's what this

4   instruction says.  To qualify as transformative, the material

5   copied need not be modified so long as the material qualifies

6   as transformative.

7        And the record now on transformative is also largely

8   undisputed.  Both Professor Astrachan and Professor Schmidt

9   acknowledged all of the changes and differences that went into

10  Android.

11       Can I have the Android stack up, please.

12       That there was a selection made of only 37 packages.  That

13  was brand new.  No one else had identified those to be used in

14  a smartphone.  New implementing code to make it work in a

15  mobile device.  Add 100 Android libraries to give you all the

16  features you need:  GPS, camera, accelerometer, all that.  Add

17  these libraries, the green ones, from open source so you can

18  browse easily, so you can watch video, so you can have

19  graphics, play games, all of the things we do that we take for

20  granted now.

21       Build a new virtual machine, the Dalvik, from scratch to

22  make it go faster so people aren't sitting waiting on their

23  smartphones.  Add Linux, an open source platform.  And as

24  Professor Schmidt, their expert, said, every part of Android

25  was customized.  Everything was done to make it work.  It was

1   like nothing else before it, including nothing else that either

2   Sun or Oracle had ever done with Java.  And they're the

3   experts.

4        Our point about their failure to build their own is not a

5   criticism of them as companies in any way.  It's to say it

6   proves this is transformative.  If the experts that have been

7   working with Java and, in the case of Sun, that invented

8   Java -- if they aren't able to use Java SE to build a

9   smartphone, if this is all they can come up with, is a failure,

10  it suggests strongly that what Google did in Android is

11  transformative.  It's something new, and a different use for

12  the APIs than anyone else had ever made.

13       Their response to that is well, it's commercial.  They

14  made billions of dollars and so on and so forth.  Well, let me

15  talk about that.  Point one, you don't have to choose between

16  commercial and transformative.  The law makes that clear, too.

17       Slide 51 please.

18       If something is highly transformative, the fact that it's

19  commercial doesn't matter.  Why?  Because the whole point of

20  fair use is to promote innovation.  And if you're successfully

21  promoting something hugely innovative, then the fact that it's

22  also commercially successful doesn't count against you.  That's

23  exactly what this jury instruction says, and I expect Judge

24  Alsup will read that to you shortly.

25       Secondly, the success of Android has nothing to do with

1    these API labels.  Right?  These API labels were in SavaJe,

2    which was a failure.  And the iPhone doesn't use Java at all.

3    So use your common sense.  It can't possibly be that using

4    these labels, which were part of the language in effect, can

5    have fueled the success of something like Android.  What fueled

6    the success of Android is all of the things that went into it

7    that are new and different, the things that made it what it is

8    today, not the labels from the method headers that are a form

9    of organization.

10        It's also the case that all this money they're talking

11   about, most of it, is not made by Google at all.  This

12   ecosystem they're talking about -- remember, Android is open

13   source.  Google gives it away.  You can use it to build

14   whatever you want.  So the money that's made, a lot of it is

15   made by developers who are selling apps, handset makers who are

16   selling phones, carriers who are selling phones, and Google

17   makes money, too, but not directly from Android.

18        The money Google makes is from its own proprietary and

19   famous technology, Google Search and Google Ads.  That's

20   where -- the money that's made, even in relation to Android, is

21   not from Android itself and certainly not from these API

22   labels.  It's made from Google Search, which runs on all

23   platforms.  It runs on iPhone, runs on desktops, runs on

24   laptops.  It's not unique or special to Android.  It runs

25   everywhere.  And the money that Google has made itself, that's

1   where that money comes from.

2       Functional, why are we looking at *Harry Potter*?  Why are

3   we looking at *Harry Potter*?  It's an admission by them that

4   Android is obviously functional and so is Java.  This isn't

5   about *Harry Potter*.  It's not a novel.  Its not a book.  It's

6   not a series of books.  It's highly functional, but they want

7   to talk about *Harry Potter* rather than what the labels do.

8       Can I have Slide 61?

9       This is the standard, the nature of the copyrighted work.

10  Now, we're looking at what is Java -- what are these labels?

11  That's the copyrighted work we're talking about.  Right?  So if

12  it's a traditional literary work, if it were *Harry Potter*, we

13  would be having a whole different discussion, but of course

14  we're not here about *Harry Potter*.

15      The more functional the work, the more this factor favors

16  fair use.  Why?  Because fair use is all about innovation.  And

17  if what you are talking about is using something that's

18  functional that contributes to innovation, then there is less

19  copyright protection, more fair use and a greater desire to

20  allow this sort of thing that is functional and creates

21  innovation.  We know what they are.  There is no big secret.

22  62 tells us -- these are names and labels.  They're the labels

23  that form the system of organization that are intended to be

24  used.  Why is that important?  They're intended to be used.

25  That's what Dr. Bloch said, Mr. Schwartz said, all the

1  witnesses.  These labels are not just for reading enjoyment or

2  like a play or a poem.  They are used to call on implementing

3  code used by developers.  That was the whole point of giving

4  them away, is to make the language itself more effective.

5  That's what all the witnesses have said, and so this is what

6  we're looking at, not *Harry Potter*.  Java.net, java.io,

7  java.security, those are all very descriptive terms for what we

8  have, what existed in Java itself.

9      In other words, the method declarations in Java are not

10  literary works.  It may have been hard to build them, it may

11  have been a creative process to build them, but that's not what

12  this factor is looking at.  It's looking at what are they at

13  the end of the day when they've been completed.

14      Market harm.  The point on market harm is now this.  Even

15  they concede there hasn't been any harm to Java SE.  Why would

16  they spend so much time talking about Java ME if they had a

17  great case on harm to Java SE?  Why is there no harm to

18  Java SE?  Java SE, that's the copyrighted work, is for desktops

19  and servers and large devices and it's doing fine.  It's doing

20  fine.  Nobody came in here and showed you any sales information

21  about Java SE going downhill.  Nobody.  And they still haven't

22  done it.  They're trying to pivot to Java ME.  But let's talk

23  about SE for a minute.

24      Could I have Slide 37 up.

25      Dr. Jaffe, even though he didn't do his homework, even

1    their expert conceded that Java SE licensing is doing fine.

2    They want to say, well, forget about the fact that we don't

3    have a smartphone with Java SE.  Okay.  Because we're a

4    licensing company.  Fine.  If you're a licensing company, show

5    me the license agreements on Java SE where you're losing money.

6    Please.  Show me.  You've got an expert on there that's one of

7    the top economists, and what did he bring?  Nothing.  You

8    didn't see a single exhibit with Dr. Jaffe.  Not one.  Not one.

9        And what he said on cross was Java SE's doing fine.  It's

10   doing fine.  So did Mr. Smith.

11       Slide 38, please.

12       Their Java SE person that we went out and got the

13   discovery from, not Dr. Jaffe, this was his job.  We went out

14   and asked this guy the questions.  Mr. Smith, he is their

15   official witness.  Very honest.  "Java SE like Java SE Advanced

16   is growing well.  Support revenue is growing well."  There

17   isn't a scrap of evidence anywhere about Java SE.  All you

18   heard about was Java ME.

19       Okay.  Let's talk about Java ME.  Java ME, number one, is

20   not the copyrighted work.  It's not the copyrighted work, but

21   even if it were, they haven't shown any harm to Java ME.

22   Java ME doesn't compete with Android.  Java ME is for feature

23   phones and small devices, not smartphones, as their witnesses

24   conceded.

25       Slide 39, please.

1    They completely ignore this.  They wave their arms.  It's

2    been devastating, it's been miserable, but hey, you didn't

3    develop Java ME into the position where it could actually

4    support a smartphone, and so to the extent Java ME isn't doing

5    well, it's because the whole market has changed and you haven't

6    changed with it.  That's not the kind of market harm that the

7    Copyright Act is talking about.

8        Android is not a substitute for Java ME.  Android is part

9    of a whole new market, a brand new category that Java ME is not

10   capable of fulfilling.  That's what Mr. Rizvi said, very clear.

11       And could I have Slide 40.

12       Mr. Stahl, "You don't believe Java ME has the features and

13   functionality needed for a smartphone?"  This is one of their

14   vice-presidents of product management.

15       "I don't think it was ever intended for that.  Java ME was

16   intentionally designed for resource-restricted hardware."

17       They're in here claiming that there's harm to that, but

18   that's -- the very nature of Java ME means they -- it can't

19   support a smartphone.

20       This is Mr. Stahl.  I don't know how more definitive we

21   can get.  "As hardware became more powerful, there would be no

22   reason, no reason to use ME."

23       And the same is true of what they said about Samsung and

24   all those other guys.  Dr. Jaffe admitted that.  The reason

25   Samsung is not re-upping, they want smartphones like Galaxy.

1   Sun is not offering that.  Java ME, not a smartphone, can't be

2   a smartphone.

3      So the whole idea of harm, they haven't proven that a bit.

4   We've shown that Android has created a brand new market and

5   brand new opportunity that has helped Java because it keeps

6   Java developers relevant and it has helped Java because now

7   Java language is still number one.  That wouldn't be true

8   without Android.  Android is the number one thing keeping Java

9   out there doing as well as it is.

10      Now, you saw a whole flood of emails, and in the time I

11   have, I'll say this.  A trial is not a test of soundbites and

12   snippets.  Mr. Bicks said it really well.  A lot of those could

13   be taken out of context.  You heard what the witness said about

14   scrubbing J words.  They didn't have a trademark license.

15      You heard what Mr. Rubins said about APIs are

16   copyrightable.  He's talking about the implementations, not the

17   labels.

18      There isn't a single document from anyone inside Sun,

19   anywhere else, that says Google was wrong or it was somehow a

20   violation to use these labels.  In fact, the one document that

21   we do have is Slide 14.  This is exactly what Google said to

22   Oracle the first time this came up, which was way, way, way

23   after Android was released.

24      "We're not going to pay for code we're not using and now

25   it's established that there is no implementing code in Android

1  that was used from Java."  That is an established fact.  "We

2  are not going to license IP we strongly believe we are not

3  violating.  APIs are open and free. And they've been open and

4  free and they have been open and free since day one at Sun with

5  Java.  And you refuse to enumerate."

6       What Mr. Eustace is talking about here is the same thing

7  we're been talking about.  Google didn't do anything wrong and

8  it was fair to do exactly what it did.

9       Could I have slide 1st, please.

10       **THE COURT:**  You are down to about two minutes.

11       **MR. VAN NEST:**  Thank you, Your Honor.  So fair use is

12  not an excuse, ladies and gentlemen.  We are here because the

13  law of copyright endorses and encourages fair use in the name

14  of innovation.  That's what this says.  The right of fair use

15  permits the use of a copyrighted work without the owner's

16  consent, without a license, without permission, and you can

17  read the jury instructions.  You will hear them from Judge

18  Alsup.  That's confirmed throughout.

19       And the point is to encourage the development of new ideas

20  built on earlier ones.  And we living here in Northern

21  California know that the best; right?  That's a key thing for

22  us.  The air we breathe, the energy we use, the products we

23  use, the cars we drive, it all depends on innovation, and we're

24  number one in the world on innovation, and that's why fair use

25  is so important and so critical, and to ridicule it and call it

1    an excuse is just flatout a lie.  It's the law.

2         And in this case, Android is exactly the kind of

3    innovation that we should be encouraging in this country.  It's

4    the kind of innovation that comes along once in a lifetime.

5    And I don't have to rely on principles like that.

6         The evidence in this case demonstrates that what Google

7    did was consistent with Sun's business practices, was supported

8    and applauded by Sun, was consistent with the law of fair use,

9    was a functional use in a transformative way that has

10   contributed to the success and betterment of lots and lots of

11   people in lots and lots of walks of life.

12        So again, ladies and gentlemen, fair use is important, and

13   I'm very happy to entrust this case to your care.  Good luck in

14   your deliberations and thanks again for all your attention.

15        Thank you, Your Honor.

16        **THE COURT:**  Thank you, Mr. Van Nest.

17        I have learned from other cases that many members of the

18   public would like to excuse themselves so they don't have to

19   sit through the reading of the instructions.  Once I start, I

20   would like you to stay and not distract the jury by leaving.

21   I'm going to pause for a few minutes to let all of you who wish

22   to leave go ahead and leave.

23        This is a time-honored moment when the judge instructs the

24   jury on the law, and in the old days, you didn't get a copy of

25   the instructions.  It was just done once verbally.  And so by

1    tradition, I insist that the gallery stay put so that you will

2    not be distracted.  I will, though, give you a copy of these

3    instructions for your convenience in the jury room.  So I will

4    now resume.  I have about 20 minutes, and then the case is

5    yours.

6                        **JURY INSTRUCTIONS**

7         **THE COURT:**  "Now I will turn to the law that applies

8    to this case.  In this trial, it has already been established

9    that the Android versions in question used aspects of Java 2

10   Standard Edition Version 1.4 and Java 2 Standard Edition

11   Version 5.0, specifically using the declaring code and the

12   structure sequence, and organization of the 37 Java API

13   packages.

14        "The pertinent versions are:  1.0, 1.1, Cupcake, Donut,

15   Eclair, Froyo, Gingerbread, Honeycomb, Ice Cream Sandwich,

16   Jelly Bean, KitKat, Lollipop and Marshmallow.

17        "Google's use of the declaring lines of code and the

18   structure, sequence, and organization of those 37 API packages

19   constituted copyright infringement unless you find that Google

20   has carried its burden as to the defense of fair use.  In other

21   words, for purposes of this trial, it is a given already

22   established that Google used certain aspects of copyrighted

23   works.  And the question remaining for you to decide is whether

24   or not Google's use was a fair use.

25        "There is no contention, however, that Google copied the

1   implementing code for the 37 API packages.  The point of

2   contention is over the declaring lines of code within the 37

3   API packages, also referred to as declarations and header

4   lines, which Google concededly used in Android which reflect

5   the structure, sequence, and organization for the Java API

6   packages.

7       "Now I will explain what fair use means under the law."

8       And I'll pause here to say this is very similar, but

9   slightly different, from the instruction that I gave you at the

10  outset of the trial so please listen carefully.

11      "One policy behind our copyright law of course is to

12  protect the compositions of authors from exploitation by

13  others.  When it applies, however, the right of fair use

14  permits the use of copyrighted works by others without the

15  copyright owner's consent.

16      "The policy behind the right of fair use is to encourage

17  and allow the development of new ideas that build on earlier

18  ones, thus providing a counterbalance to the copyright policy

19  to protect creative works.

20      "Since the Doctrine of Fair Use is an equitable rule of

21  reason, no generally-accepted definition is possible and each

22  case raising the question must be decided on its own facts.

23  And in this dispute between Oracle and Google, that question

24  falls to you for decision.

25      "Under the Copyright Act, an author owns the exclusive

1    right to use or to license his or her writings or images or

2    other copyrightable works with the statutory exception that

3    anyone may make fair use of even a copyrighted work and may do

4    so without anyone's permission and without payment of money to

5    anyone.

6        "Specifically the act states" -- and I will quote it --

7    "the fair use of a copyrighted work for purposes such as

8    criticism, comment, news reporting, teaching, including

9    multiple copies for classroom use, scholarship or research is

10   not an infringement of copyright.

11       "In determining whether the use made of a work in any

12   particular case is a fair use, the factors to be considered

13   shall include, one, the purpose and character of the use,

14   including whether such use is of a commercial nature or is it

15   for non-profit educational purposes; two, the nature of the

16   copyrighted work; three, the amount and substantiality of the

17   portion used in relation to the copyrighted work as a whole;

18   and, four, the effect of the use upon the potential market for

19   or value of the copyrighted work.

20       "I have just quoted for you the right of fair use exactly

21   as enacted by Congress.  As you just heard, the statute

22   includes several examples of some types of uses that may be

23   found to be fair uses.  But that list is not exhaustive or

24   exclusive.  In your deliberations, you must decide whether or

25   not Google has met its burden in this trial to prove that its

1    copying was a fair use.

2        "Now I will further explain each of the four statutory

3    factors.

4        "The first statutory factor concerns the purpose and

5    character of the accused use.  This factor includes these

6    issues:  One, whether and to what extent the accused use serves

7    a commercial purpose, which weighs against fair use, versus a

8    nonprofit educational purpose, which weighs in favor of fair

9    use; and, two, whether and to what extent the accused work is

10   transformative, which supports fair use.

11       "Although the act does not explicitly use the word

12   *transformative*, our courts uniformly hold that the first

13   statutory factor calls for an evaluation whether and to what

14   extent the purpose and character of the accused use is

15   transformative.

16       "What does *transformative* mean?  A use is transformative

17   if it adds something new with a further purpose or different

18   character, altering the first use with new expression, meaning,

19   or message rather than merely superseding the objects of the

20   original creation.

21       "New works have been found transformative when they use

22   copyrighted material for purposes distinct from the purpose of

23   the original material.  A use is considered transformative only

24   where a defendant changes a plaintiff's copyrighted work, or

25   where the copyrighted elements remain unchanged from the

1   original, a defendant uses them in a different context such

2   that the original work is transformed into a new creation.

3       "A work is not transformative where the user makes little

4   or no alteration to the expressive content or message of the

5   original work and uses it in the same or similar context.

6       "The extent of transformation may vary from case to case.

7   The greater the transformation, the more likely an accused use

8   will qualify as a fair use.  And the less the transformation,

9   the less likely an accused use will qualify as a fair use.

10      "To qualify as transformative, the material copyrighted

11  need not be modified in the new work so long as the material

12  and the context into which the material is used qualifies as

13  transformative under the test stated above.

14      "In this case, Google contends that it used the exact

15  lines of declaring code at issue and their SSO, together with

16  new implementing code and additional technology as part of a

17  new platform for mobile devices.

18      "Oracle contends that Sun was already using, licensing,

19  and adapting the copyrighted works in mobile and other devices.

20  It is up to you to decide the extent to which Google's use

21  qualifies as transformative under the test stated above.  But

22  you may not disqualify it from being transformative merely

23  because the declaring code and the SSO were carried over

24  without change.

25      "On the other hand, even if you find that the accused use

1   was transformative, you must weigh that and the extent of the

2   transformativeness against the commercial purpose of the use

3   and its extent, which I will now discuss.

4      "In evaluating the first statutory factor, the extent of

5   the commercial nature of the accused use must be considered.

6   In this case, all agree that Google's accused use was

7   commercial in nature but disagree over the extent.

8      "Commercial use weighs against a finding of fair use, but

9   even a commercial use may be found or not found, as the case

10  may be, to be sufficiently transformative that the first

11  statutory factor on balance sometime cuts in favor of fair use.

12     "To put it differently, the more transformative an accused

13  work, the more other factors, such as commercialism, will

14  recede in importance.

15     "By contrast, the less transformative the accused work,

16  the more other factors like commercialism will dominate.

17     "Also relevant to the first statutory factor is the

18  propriety of the accused infringer's conduct because fair use

19  presupposes good faith and fair dealing.  Where, for example,

20  the intended purpose is to supplant the copyright holder's

21  commercially-valuable right of first publication, good faith is

22  absent.

23     "In evaluating the question of the propriety of Google's

24  conduct, meaning good faith or not, you may only consider

25  evidence up to the commencement of this lawsuit on August 12,

1   2010 and may not consider events thereafter.

2       "Your decision as to fair use, however, will govern as to

3   all versions of Android at issue in this case, regardless of

4   the date of issue.  Again, in evaluating good faith or not, you

5   should limit your consideration to events before August 12,

6   2010, and disregard any evidence you have heard after that

7   date.  This evidence cutoff date applies only to the issue of

8   good faith or not.

9       "In evaluating the extent to which Google acted in good

10  faith or not, you may take into account, together with all

11  other circumstances, the extent to which Google relied upon or

12  contravened any recognized practices in the industry concerning

13  reimplementation of API libraries.

14      "You have heard evidence concerning the possibility of

15  Google asking"-- sorry.

16      "You have heard evidence concerning the possibility of

17  Google seeking a license from Oracle.  Under the law, if the

18  accused use is otherwise fair, then no permission or license

19  need be sought or granted; thus, seeking or being denied

20  permission to use a work does not weigh against a finding of

21  fair use.

22      "Similarly, you have heard evidence about various licenses

23  from the Apache Foundation, the Apache Harmony Project

24  involving Java, and the general public license.  These are

25  relevant in some ways, but Google concedes it had no license

1   from Sun or Oracle, and it is important to remember that Google

2   makes no claim that its use was pursuant to a license from Sun

3   or Oracle directly or indirectly.  Instead, Google claims that

4   its use was a fair use and therefore required no license at

5   all.

6        "The second statutory" -- so now we are up to the second

7   factor.

8        "The second statutory factor is the nature of the

9   copyrighted work.  This factor recognizes that traditional

10  literary works are closer than informational works, such as

11  instruction manuals, to the core of intended copyright

12  protection.  Creative writing and expression lie at the very

13  heart of copyright protection, so fair use is generally more

14  difficult to establish for copying of traditional literary

15  works than for copying of informational works.

16       "The focus of this statutory factor is on how close the

17  used material is to the core values of copyright protection.

18  The less the used material implicates the core values of

19  copyright protection, the more viable will be fair use and vice

20  versa.

21       "In this case, it is undisputed that the declaring code

22  and structure, sequence, and organization of the 37 API

23  packages at issue were sufficiently creative and original to

24  qualify for copyright protection.

25       "*Original*, as the term is used in copyright, means only

that the work was independently created by the author as
opposed to copied from some other works and that it possesses
at least some minimal degree of creativity.  The extent to
which the 37 API packages in question here involve greater
creativity than the minimum required to obtain copyright is
disputed and is open for you to examine; that is, you should
consider the extent to which the used materials were created
versus functional.  The more creative the work, the more this
factor disfavors fair use.  And the more functional the work,
the more this factor favors fair use.

"Even though a computer program performs functions and has
functional elements, the structure, sequence, and organization
of a computer program may be or may not be highly creative.
When there are many possible ways to structure, sequence, and
organize a program, the particular way chosen for a copyrighted
program and independent lines of declaring code may be or may
not be highly creative.

"On the other hand, when the declaring code and the
structure, sequence, and organization are dictated by
functional considerations such as efficiency, compatibility, or
industry standards, then less creativity is indicated and the
core values of copyright protection are less implicated.

"When purely functional elements are embedded in a
copyrighted work and it is necessary to copyright associated
creative elements in order to utilize those functional

1   elements, then this circumstance also favors fair use.

2   Conversely, copying creative expression that is not necessary

3   to perform the functions cuts against fair use.

4        "Google, of course, had the right to write its own code,

5   to perform any function it wished, because no one can get a

6   copyright on a general method of operation other than to get a

7   copyright on its specific implementation for that function.

8   Unless it was a fair use, however, Google did not have the

9   right to use the exact lines of declaring code and the overall

10  structure, sequence, and organization of the 37 API packages as

11  copyrighted by Sun and now owned by Oracle.

12       "Because Google was free to use the Java programming

13  language to write Android, you should also consider the extent

14  to which you find it was necessary for Google to use any and

15  all of the declaring code and structure, sequence, and

16  organization of any of the 37 API packages to write in the Java

17  language.  Such a finding to that extent only would support

18  fair use.  To the extent that you find it was not necessary,

19  however, that finding would disfavor fair use.

20       "It is established that 170 lines of code at issue are

21  technically necessary to use the Java programming language.

22  Those 170 lines of declaring code are listed in Trial Exhibit

23  9223.

24       "Because that declaring code is necessary to use the

25  language, it is established that Google's use of the declaring

1   code in Trial Exhibit 9223 was a fair use.

2       "It is for you to determine the extent to which other

3   additional declaring code beyond those lines identified in

4   Trial Exhibit 9223 either was or was not necessary for use of

5   the Java programming language.  To the extent that you find

6   they were not necessary, you still must consider whether their

7   use was or was not a fair use in light of the statutory factors

8   for fair use.

9       "This consideration also bears on the third statutory

10  factor which I -- to which I will now turn.

11      "The third statutory factor is the amount and

12  substantiality of the portion used in relation to the

13  copyrighted work as a whole, which concerns how much of the

14  overall copyrighted work was used by the accused infringer.

15  Analysis of this factor is viewed in the context of Oracle's

16  copyrighted works, namely, Java 2 Standard Edition Versions 1.4

17  and 5.0.  For this factor, the total number of lines in Android

18  is irrelevant.

19      "The fact, if true, that a substantial portion of an

20  infringing work was copied verbatim is evidence of the

21  qualitative value of the copied material, both to the

22  originator and to whoever seeks to profit from marketing

23  someone else's copyrighted work.

24      "Wholesale copying does not preclude fair use per se, but

25  it militates against a finding of fair use.  Even a small part

1   may be qualitatively the most important part of a work.  If,

2   however, the secondary user only copies as much as is necessary

3   for a transformative use, then this factor will not weigh

4   against him or her.  The extent of permissible copying varies

5   with the purpose and character of the use which relates back to

6   the first statutory factor.

7        "In assessing this third statutory factor, both the

8   quantity of the material used and the quality or importance of

9   the material used should be considered.

10       "The fourth and final statutory factor is the effect of

11  the accused infringer's use on the potential market for or

12  value of the copyrighted work.  This factor militates against

13  fair use if the accused use materially impairs the

14  marketability or value of the copyrighted work.  This is the

15  single most important statutory factor.  But it must be weighed

16  with all other factors and is not necessarily dispositive.

17       "This factor considers whether the accused work is offered

18  or used as a substitute for the original copyrighted work.

19  This factor considers not only the extent of any market harm

20  caused by the accused infringer's actions, but also whether

21  unrestricted and widespread use of the copyrighted materials of

22  the sort engaged in by the accused infringer would result in a

23  substantially-adverse impact on the potential market for the

24  copyrighted work.

25       "Market harm to the value of the copyrighted work may be a

1   matter of degree, and the importance of this factor will vary

2   not only with the amount of harm shown, but also with the

3   relative strengths of the showings on the other factors.

4        "In connection with the fourth statutory factor, the term

5   *potential market for* or *value of* refers to the value of the

6   entire copyrighted work itself and licensing opportunities for

7   the copyrighted work and its derivative works.

8        "A derivative work is a work based in whole or in

9   substantial part upon one or more preexisting copyrighted works

10  such as a musical arrangement or a dramatization based upon a

11  book, to name only two specifics, or any other form in which a

12  work may be recast or adapted.  In this case, the copyrighted

13  works in suit are Java 2 Standard Edition Versions 1.4 and 5.0.

14  So the only derivative works that count are those derived from

15  those two works.

16       "In making your evaluation under the fourth factor, you

17  should assess the harm, if any, to the potential market for or

18  value of the copyrighted work itself and to its licensing value

19  for it and its derivative works.  You may consider the broader

20  potential market for products that feature independent elements

21  in addition to the copyrighted material and their successes

22  and/or failures only to the extent that they shed light on the

23  licensing or market value of the copyrighted work itself and

24  its derivative works.  In doing this, moreover, you must ignore

25  benefits from the use to the copyrighted owner outside the

1  genre claimed to have been harmed.

2      "Actual present harm need not be shown nor is it necessary

3  to show with certainty that future harm will result so long as

4  some meaningful likelihood of future harm exists to the market

5  value of the copyrighted work or the licensing value for the

6  copyrighted work and its derivative work and traditional,

7  reasonable, or likely-to-be-developed markets.  If the intended

8  accused use is for commercial gain, that likelihood may be

9  presumed except where the second use is transformative, because

10  in cases of transformation, market substitution is at least

11  less certain and market harm may not be so readily inferred.

12      "I have now completed my explanation of the four factors

13  under the act.  You might ask, are we limited to these four

14  factors?

15      "The act states that the factors to be considered include

16  the four statutory factors, and the law holds that those four

17  factors are not exclusive and you may consider any additional

18  circumstances and evidence, pro or con, that in your judgment

19  bear upon the ultimate purpose of the Copyright Act, including

20  protection of authors and the right of fair use, namely, to

21  promote the progress of science and useful arts.

22      "It is up to you to decide whether all relevant factors,

23  when considered fully and together, favor or disfavor fair use.

24  All of these factors must be explored, discussed, and evaluated

25  by you.  No single factor is dispositive.  Your evaluation of

1    all factors must be weighed together in light of the purpose of

2    copyright, which, as our Constitution states in enumerating the

3    legislative power of Congress, is to promote the progress of

4    science and useful arts.

5         "Some factors may weigh in favor of fair use and some

6    against fair use, and you must decide, after giving the factors

7    such weight as you find appropriate based on the evidence and

8    my instructions, whether or not on balance Google has shown by

9    a preponderance of the evidence that they predominate in favor

10   of fair use.

11        "I'm now coming to the last closing instructions.  When

12   you begin your deliberations, you should elect one member of

13   your jury as your foreperson.  That person will preside over

14   the deliberations and speak for you here in court.

15        "You will then discuss the case with your fellow jurors to

16   reach agreement, if you can do so.  Your verdict must be

17   unanimous."  One hundred percent.  I'm going to repeat that.

18        "Your verdict must be unanimous," meaning all 10 of you

19   must agree.

20        "Each of you must decide the case for yourself, but you

21   should do so only after you have considered all the evidence,

22   discussed it fully with the other jurors, and listened to the

23   views of your fellow jurors.  Do not be afraid to change your

24   opinion if the discussion persuades you that you should.  Do

25   not come to a decision simply because other jurors think it is

1    right.

2        "It is important that you attempt to reach a unanimous

3    verdict, but, of course, only if each of you can do so after

4    having made your own conscientious decision.  Do not change an

5    honest belief about the weight and effect of the evidence

6    simply to reach a verdict.

7        "I will give you a special verdict form to guide your

8    deliberations.

9        "Some of you have taken notes during the trial.  Whether

10   or not you took notes, you should rely on your own memory of

11   what was said.  Notes are only to assist your memory.  You

12   should not be overly influenced by the notes.

13       "When you go into the jury room, the clerk will bring into

14   you the trial exhibits received into evidence to be available

15   for your deliberations.  The clerk will also provide you with

16   an index to them.

17       "As I noted before the trial, when you retire to the jury

18   room to deliberate, you will have with you the following

19   things:  All of the exhibits received into evidence, an index

20   of the exhibits," and I'll pause here to say there is going to

21   be one that is done by trial exhibit number, an index, and

22   there will be another index that is done by chronological

23   order.  And actually there is going to be a third index, which

24   is a shorter one that's for those video depositions that were

25   shown by video on the screen.  Sometimes they referred to

1  deposition exhibits and they used different trial numbers here

2  at trial.  So there is going -- to be to complicate your lives,

3  I'm going to have a translation chart as well.  That won't come

4  up as often, but it will come up occasionally and you'll have

5  that index as well.

6       Now, these indexes themselves are not evidence, but

7  they're there for your -- to help you sort through the

8  material.

9       "In addition, you will have a work copy of these jury

10  instructions.  Each of you will get your own copy.  Each of you

11  will get a work copy of the verdict form," which in this case

12  is just one question.  And then there will be the official

13  verdict form.

14       "When you recess at the end of the day, please place your

15  work materials in the brown envelope provided and cover up any

16  easels with your work."

17       By the way, we're also going to send in that big -- the

18  big poster board.  It might be helpful for any group

19  discussions to have the big timeline in the jury room, unless

20  you feel like you don't need it.  Then you can send it back

21  out.  But we'll send it in for starters.

22       "When you recess at the end of the day, please place your

23  work materials in the brown envelope provided and cover up any

24  easels with your work notes so that if my staff needs to go

25  into the jury room for any reason, they will not even

1   inadvertently see any of your work in progress."

2       We try to stay out of there whenever you're deliberating.

3   Occasionally there is an emergency, so we have to go in there.

4   So when you leave for the day, just make sure we don't -- we

5   won't see any of your work in progress.

6       "A court security officer will be outside the jury room

7   door during your deliberations.  If it becomes necessary during

8   your deliberations to communicate with me, you may send a note

9   through the officer signed by your foreperson or by one or more

10  members of the jury.  No member of the jury should ever attempt

11  to communicate with me, except by a signed writing, and I will

12  respond to the jury concerning the case only in writing or here

13  in open court.

14      "If you do send out a question, I will consult with the

15  lawyers before answering it, which may take some time."

16      Let me repeat that.

17      "If you do send out a question, I will consult with the

18  lawyers before answering it, which may take some time.  You may

19  continue your deliberations while waiting for any answer to any

20  question.

21      "Remember, that you are not to tell anyone, including me,

22  how the jury stands numerically or otherwise until after you

23  have reached a unanimous verdict or have been discharged.

24      "Do not disclose any vote count in any note to the Court."

25  We don't want to know how you stand.  It could be 9 to 1, it

1    could be 5 to 5.  We don't want to know any of that.  We just

2    want to know when it's unanimous.  Please don't tell us how, if

3    you send out a note, how the jury stands in any way.

4        "You have been required to be here each today from 7:45 to

5    1:00 p.m.  Now that you are going to begin your deliberations,

6    you are free to modify this schedule within reason.  For

7    example, if you wish to continue deliberating in the afternoons

8    after a lunch break, that's fine."

9        I will skip the rest of this because I understand you are

10   going to break at 1:00 each day this week anyway.  Is that

11   true?  I think that's what -- but it's up to you.  We will stay

12   here until midnight if that's what you want.  You are the boss

13   in just a few minutes.

14       "If you do not reach a verdict by the end of today, then

15   you will resume your deliberations tomorrow and thereafter.  It

16   is very important that you let us know via the officer what

17   your hours will be so that the lawyers may always be present in

18   the courthouse at any time the jury is deliberating."

19       So we're going to be waiting out here doing other work, I

20   guess, but we'll be waiting and be at your convenience while

21   you're deliberating -- as long as you're deliberating each day.

22       "Now, you may only deliberate when all of you are

23   together."  This is important.  "You may only deliberate when

24   all of you are together.  This means, for instance, that in the

25   mornings before everyone has arrived or when someone steps out

1   of the jury room to go to the restroom, you may not discuss the

2   case.  As well, the admonition that you are not to speak with

3   anyone outside the jury room about this case still applies

4   during your deliberations.

5       "Once you render a verdict on" -- okay.  Down to two more

6   paragraphs.

7       "Once you render a verdict on the fair use question, we

8   may proceed to the shorter and final phase of the trial on

9   damages issue, depending on your answer to the fair use

10  question.

11      "This would still be within the June 10th end date as

12  stated earlier.  Please do not allow any desire to complete

13  trial sooner to influence your thinking.  Once you render your

14  verdict on the fair use issue, it will be final and may not be

15  revisited or modified during the second phase.

16      "After you have reached a unanimous agreement on a

17  verdict, your foreperson will fill in, date, and sign the

18  verdict form and advise the Court that you have reached a

19  verdict.  The foreperson should hold on to the filled-in

20  verdict form and bring it into the courtroom when the jury

21  returns the verdict.

22      "Thank you for your careful attention.  The fair use issue

23  is now in your hands.  You may now retire to the jury room and

24  begin your deliberations."

25      (Proceedings were heard out of presence of the jury:)

**PROCEEDINGS**

1    **THE COURT:**  Counsel, I just realized as they left that

2    I did not tell them about the videos on the court computer

3    system.  What I will do is ask Dawn to just wheel that in there

4    and tell them that it includes the videotaped depositions that

5    they saw.  Is that acceptable?

6         **MS. HURST:**  It's not the depositions, Your Honor.

7    It's other videos that were evidentiary materials, because the

8    depositions would be transcripts.

9         **THE COURT:**  You're right.

10        **MS. HURST:**  The transcripts don't go into the jury

11   room.

12        **THE COURT:**  You're right.  Tell me what is on there

13   again.

14        **MS. HURST:**  Materials that exist solely in electronic

15   form such as source code, videotapes --

16        **THE COURT:**  The source code is on there?

17        **MS. HURST:**  Yes.

18        **THE COURT:**  It's not -- that's not in written form?

19        **MS. HURST:**  It's only in electronic form.

20        **THE COURT:**  Materials in electronic form, exhibits --

21   exhibits in electronic form; right?

22        **MS. HURST:**  Yes.

23        **THE COURT:**  Exhibits only in electronic form on

24   computer; right?

25        **MS. HURST:**  Right.

PROCEEDINGS

1          THE COURT:  Is that right?

2          MR. MULLEN:  That's right, Your Honor.

3          THE COURT:  Dawn, would you take this note, and

4   whenever you wheel it in there, tell them that's what on there.

5          THE CLERK:  Yes.

6          THE COURT:  Any objection to that?

7          MS. HURST:  No.

8          THE COURT:  Yes/no?  Any objection to Dawn telling

9   them what's on the computer?

10         MR. VAN NEST:  No, Your Honor.

11         THE COURT:  All right.  Thank you.  Okay.

12      Anything that the lawyers need the Court for?

13         MS. HURST:  Your Honor, we were hoping we might

14  discuss what schedule for Phase 2 would look like under various

15  scenarios were it to come to pass.

16         THE COURT:  Well, today I'm going to send out to you a

17  set of damages instructions and verdict form so we can have an

18  opportunity to be studying that during the deliberations.  If

19  the jury returns a verdict and there is enough time to do it,

20  we should start in immediately on the opening statements for

21  the next phase.  And I think 30 minutes per side ought to be

22  plenty of time for the next phase.

23      So if we -- and I would pre-instruct along the lines of

24  what I'm going to send out to you, but it's like I did before,

25  a draft.  I want to get your critiques on it.  But on the other

**PROCEEDINGS**

 1    hand, if we're too close to the end of the day, then we'll

 2    start the next day, the next court day.  That's what I think.

 3        I'm happy to hear what your proposals are.

 4        **MS. HURST:**  Your Honor, Professor Kearl, I believe,

 5    had asked for 24-hour notice between a verdict and starting the

 6    damages phase, and I thought the Court had earlier adopted that

 7    suggestion.  So we were sort of operating under that

 8    assumption.  It may be erroneous, but I just thought I would

 9    raise that issue.  I don't know if Mr. Cooper is still here or

10    not.

11        **THE COURT:**  I think they left.

12        **MR. VAN NEST:**  Your Honor, there is a related issue,

13    which is just kind of disclosures and getting ready.  We

14    haven't had any -- obviously Oracle would proceed first in a

15    damages phase, and what I was going to suggest is that perhaps

16    we just assume we're going to start Wednesday morning for

17    purposes of argument and get our disclosure on witnesses today,

18    as we would have, you know, in the ordinary course.  Otherwise,

19    if we go right into it, then we'll be at a big disadvantage.

20    We won't have any notice of which witness is first --

21        **THE COURT:**  I think you ought to assume the most

22    practical thing here, which is assume we're going to go to

23    Phase 2, because otherwise it doesn't matter.

24        **MR. VAN NEST:**  Right.

25        **THE COURT:**  So we should go on the assumption that

**PROCEEDINGS**

1  does matter, which is that -- and not inconvenience the jury.

2  So I think you should be giving your notices.  Oracle should be

3  giving notices of the witnesses, and it's a different question

4  about whether or not -- I have forgotten what Professor Kearl

5  wanted.  I have to go back and look and see.  I don't remember

6  agreeing to that, but maybe I did.

7       You all ought to know exactly who you are going to call

8  for your first witnesses.  That ought to be ready to go, and

9  you should know who they are and be getting your

10  counter-designations.  All of that should be rolling right

11  ahead.

12       **MR. VAN NEST:**  Right.

13       **THE COURT:**  Wednesday -- there is no way they are

14  going to get a verdict today.  But they could get a verdict

15  tomorrow.  And they might go all the way to Friday of this

16  week.  I don't know.  Let's operate on a Wednesday morning

17  assumption for purposes of getting your disclosures going so

18  that we can have that piece all set and ready to go without

19  each side contending they were sandbagged.

20       **MR. VAN NEST:**  That sounds good, Your Honor.

21       **MS. HURST:**  Your Honor, I think that works except for

22  the demonstratives, which are on 48-hour notice, and I don't

23  think we're going to have all our demonstratives ready today.

24  I would ask to put that on 24 --

25       **THE COURT:**  You can do that one on 24 for this one

 1   exception.

 2          **MS. HURST:**  Your Honor, there is one other thing I

 3   wanted to raise, which was that Google made an objection to had

 4   Dr. Reinhold reappearing during the case, during a surrebuttal

 5   case.

 6          We would like to bring Dr. Reinhold back for the damages

 7   case, and we have excluded him from the courtroom continuously

 8   since they made that objection.  He did not hear the rebuttal

 9   testimony of Dr. Astrachan.  And so we would like to be able to

10   bring him back for the damages case.

11          **THE COURT:**  Any objection?

12          **MR. VAN NEST:**  I think it's still improper,

13   Your Honor, particularly in light of the nature of his

14   testimony, which was to the effect that he was closely and

15   deeply involved with their experts.  He's the one that tried to

16   fix, quote/unquote, the testimony of Mr. Smith.  He's clearly

17   deeply engaged as an advocate in this.

18          **THE COURT:**  Well, they are all.  All these experts

19   are.

20          **MR. VAN NEST:**  But he is an employee.  He's an

21   employee of Oracle.  So, again, I don't think it's proper.  If

22   they wanted to use him further, he should not have been allowed

23   to sit in the courtroom.

24          **THE COURT:**  Somebody is over there -- Dawn, would you

25   take that person a cough drop so that they cannot interrupt the

PROCEEDINGS

1    proceedings.

2        **MS. HURST:**  Your Honor, the only witnesses he heard

3    were Oracle's witnesses.  It was during our case that he was

4    excused.  And we excluded him during the rebuttal case because

5    they raised the objection.  He wasn't even here for closing

6    arguments today.  We kept him out because, you know, we don't

7    think the objection has merit, Your Honor.  But we kept him out

8    in abundance of caution.

9        **THE COURT:**  Is he going to be addressing things that

10   came up during the first phase?

11       **MS. HURST:**  Your Honor, we anticipate that he will

12   address further the importance of APIs and related issues.  So

13   generally as a topic, yes.  But, I mean, we have always had

14   this in two phases so some things could be in the damages case.

15       **MR. VAN NEST:**  I just don't see any reason to have an

16   exception for him, especially for him, to have him in his

17   position have sat through the bulk of the trial after he

18   testified.  It's just not fair.  It puts him on a different

19   footing than any other witness that we're going to hear from,

20   other than the experts who have been here.  And it's not fair

21   to --

22       **THE COURT:**  What was your explanation -- I have

23   forgotten what your explanation was.  Did you treat him like an

24   expert?

25       **MS. HURST:**  Your Honor, it was an oversight.  It was

**PROCEEDINGS**

 1  just purely an oversight on our part.  It was inadvertence.

 2          THE COURT:  Look, do you care strongly enough about

 3  this, Mr. Van Nest, to submit a written brief?  Or do you --

 4          MR. VAN NEST:  Yes, I do.

 5          THE COURT:  Then -- submit your brief --

 6          MR. VAN NEST:  They have so many experts.  They have

 7  so many experts that can --

 8          THE COURT:  You submit your brief tonight.  We will

 9  decide it later.  Okay?

10          MR. VAN NEST:  Okay.

11          MS. HURST:  Thank you, Your Honor.

12          THE COURT:  What else do you want to go over?

13          MR. VAN NEST:  Mr. Mullen has something to hand up.

14          MR. MULLEN:  This is the revised version of the depo

15  translation sheet.  This just reflects the exhibits that were

16  used in actual video depositions, not the read-ins.

17          THE COURT:  That's how I got confused by the video

18  thing.

19          MS. HURST:  Have we seen this?  Chris, have you seen

20  this?  She is nodding no.

21          THE COURT:  Whenever you all agree on it, give it to

22  Dawn, and she'll take it in.

23          MR. VAN NEST:  Your Honor, could I just have a brief

24  proffer of what they want to call Dr. Reinhold about?  Maybe we

25  can resolve it.  But I don't know what it is that exactly they

**PROCEEDINGS**

1   want to do.

2          **THE COURT:**  I suggest this.  That by p.m., you make

3   the proffer in writing because I need to get some stuff into

4   the jury room, like the instructions and so forth.  So then

5   that will give you a chance to try to work it out overnight.

6          **MR. VAN NEST:**  Thank you.

7          **MS. HURST:**  Thank you, Your Honor.

8          **THE COURT:**  What else?

9          **MR. VAN NEST:**  That's it from us.

10         **THE COURT:**  What I'm going to do is go get these

11  instructions.  I made very small corrections as I went along.

12  They're not controversial.  I will get those done, sign them,

13  send them into the jury room with the verdict form.

14      Dawn should get the exhibits sent in.  We've got a lot of

15  mechanical things to take care of right now.

16      And I know that they're only going to be here 20 more

17  minutes, so I would like to have them completely set up with

18  what they need to do business in the morning before they leave

19  for the day.

20          We'll be in adjournment for a bit, and as soon as we know

21  who the foreperson and all that is, we'll let you know.  We'll

22  also let you know when they leave for the day.

23         **MR. VAN NEST:**  Thank you, Your Honor.

24         **THE COURT:**  Thank you.

25         **MS. HURST:**  Thank you.

1          (At 12:39 p.m. the proceedings were adjourned until

2    Tuesday, May 24, 2016.)

3                        -   -   -   -

4

5

6                    CERTIFICATE OF REPORTERS

7          We certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10   DATE:  May 23, 2016

11

12

13   _____

14   Katherine Powell Sullivan, CSR #5812, RMR, CRR
                 U.S. Court Reporter

15

16

17   _____

18   Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                 U.S. Court Reporter

19

20

21

22

23

24

25