```
                                        Volume 12

                                        Pages 2265 - 2318

                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA

                BEFORE THE HONORABLE WILLIAM H. ALSUP

ORACLE AMERICA, INC.,             )
                                  )
              Plaintiff,          )
                                  )
   VS.                            )  No. C 10-3561 WHA
                                  )
GOOGLE, INC.,                     )
                                  )
              Defendant.          )
_____  )  San Francisco, California
                                     Wednesday, May 25, 2016
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          ORRICK, HERRINGTON & SUTCLIFFE LLP
                            The Orrick Building
                            405 Howard Street
                            San Francisco, California  94105
                      BY:   **ANNETTE L. HURST, ESQUIRE**
                            **GABRIEL M. RAMSEY, ESQUIRE**

                            ORRICK, HERRINGTON & SUTCLIFFE LLP
                            The Orrick Building
                            51 West 52nd Street
                            New York, New York 10019
                      BY:   **PETER A. BICKS, ESQUIRE**
                            **LISA T. SIMPSON, ESQUIRE**

 (Appearances continued on next page)


Reported By:  Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Official Reporter - U.S. District Court

```
 1   APPEARANCES (CONTINUED):

 2   For Plaintiff:          ORRICK, HERRINGTON & SUTCLIFFE LLP
                             777 South Figueroa Street, Suite 3200
 3                           Los Angeles, California  90017-5855
                        BY: ALYSSA M. CARIDIS, ESQUIRE
 4                           GEOFFREY GAVIN MOSS, ESQUIRE

 5                           ORACLE
                             500 Oracle Parkway
 6                           Redwood City, California 94065
                        BY: MATTHEW SARBORARIA,VICE PRESIDENT
 7                            ASSOCIATE GENERAL COUNSEL

 8   For Defendant:          KEKER & VAN NEST
                             633 Battery Street
 9                           San Francisco, California  94111-1809
                        BY: ROBERT A. VAN NEST, ESQUIRE
10                           CHRISTA M. ANDERSON, ESQUIRE
                             MICHAEL S. KWUN, ESQUIRE
11                           DANIEL PURCELL, ESQUIRE
                             MATTHIAS ANDREAS KAMBER, ESQUIRE
12                           EUGENE MORRIS PAIGE, ESQUIRE
                             STEVEN P. RAGLAND, ESQUIRE
13                           EDWARD A. BAYLEY, ESQUIRE

14                           KING & SPALDING LLP
                             1185 Avenue of the Americas
15                           New York, New York 10036-4003
                        BY: BRUCE W. BABER, ESQUIRE
16
                             GOOGLE, INC.
17                           1600 Amphitheatre Parkway
                             Mountain View, California  94043
18                      BY: RENNY HWANG, LITIGATION COUNSEL

19   Also Present:           GEORGES SAAB
                             ORACLE CORPORATE REPRESENTATIVE
20
                             CATHERINE LACAVERA
21                           GOOGLE CORPORATE REPRESENTATIVE

22   For Dr. James Kearl:    FARELLA, BRAUN & MARTEL LLP
                             235 Montgomery Street
23                           San Francisco, California  94104
                        BY: JOHN L. COOPER, ESQUIRE
24

25
```

```
 1   Wednesday - May 25, 2016                          7:41 a.m.

 2                       P R O C E E D I N G S

 3                          ---oOo---

 4       (The following proceedings were held in open court,

 5   outside the presence of the jury:)

 6           THE COURT:  Good morning.

 7       (Counsel greet the Court.)

 8           THE COURT:  Have a seat, please.

 9       I'd like to bring in the jury and answer their questions.

10   I read your memorandum on the subject of the taking the notes

11   home and so forth.

12       So I'm going to bring them in now.  Is that all right with

13   you?

14           MR. VAN NEST:  Your Honor, I just want to understand

15   what the Court is going to tell them.

16           THE COURT:  I'm sorry, it will just evolve into an

17   argument.  You will get to hear it and make your objections.

18           MR. VAN NEST:  Okay.  Are you going to be requiring

19   waivers from us, or stipulation, or --

20           THE COURT:  No.

21           MR. VAN NEST:  No?  Thank you.

22           THE COURT:  No.

23       I've learned the hard way in this case it's impossible to

24   get you all -- if I start trying -- it will take an hour to

25   walk through this.  It's a simple problem.  And you have made
```

1   it much more difficult than it needs to be.

2           MR. VAN NEST:  Is there any reason to do it now as

3   opposed to closer to the end of deliberation today?

4           THE COURT:  They've asked a question.  It's on their

5   mind.  I would like to answer it.

6           MR. VAN NEST:  Okay.  Very well.

7           MR. BICKS:  Fair enough.

8           THE COURT:  All right.

9           MR. BICKS:  Can I ask, Your Honor, that we just remove

10  all this --

11          THE COURT:  Of course.  You mean the -- get rid of the

12  file cabinet.  Get rid of all the -- turn it around.

13      (Pause)

14      (Jury enters at 7:44 a.m.)

15          THE COURT:  Welcome back.  Please be seated.  Thank

16  you, again, for being so punctual.

17      And I only brought you in here because you had left a

18  message yesterday, which, I unfortunately, was not able to

19  answer before you left for the day.  So I wanted to try to

20  answer it this morning.

21      And, Ms. Yasumoto, you're the foreperson?

22          FOREPERSON MS. YASAMOTO:  Yes.

23          THE COURT:  So you're the one who sent the note;

24  right?

25          FOREPERSON MS. YASAMOTO:  (Nods head.)

PROCEEDINGS

1          **THE COURT:**  All right.  I'll read the note to refresh

2     your memory as to what it is you said in your note.

3          "Can jurors" -- this is like doctor's handwriting, I want

4     you to know.

5          (Laughter)

6          **THE COURT:**  I'm going to go slowly.

7          "Can jurors:"

8     Use my glasses.

9          "1.  Take their handwritten notes (notepads) home with

10          them each night?

11          "2.  Review trial exhibits 'on their own' if they

12          arrive early or want to stay late?

13          "3.  Take the jury instructions home with them each

14          night?"

15     So I'm going to try to give you the answers to that now.

16     And it's not an all-or-nothing situation.

17          So, first, on the notes, yes, you may take your individual

18     notes home and study them privately, silently, without

19     discussion with anyone else.

20          Don't let your loved ones or anyone else see your notes at

21     home, or review your notes, or try to engage you in a

22     discussion about your notes or anything that's happened in the

23     courtroom.

24          You understand you've got to decide the case based on what

25     you heard here in the courtroom, and saw, as opposed to

1   something that your family members or someone else might want

2   to say to you.  So you just cannot talk with anyone else about

3   the case outside the courthouse or even -- please don't even

4   let them look at your notes.

5        But here's the problem:  If we said no to this, then you

6   would be entitled to sit there in silence while you were in

7   deliberations and everyone read their notes.  That could take

8   an entire day.

9        And we can't stop you from thinking about the case; right?

10  I know you're all conscientious and you're probably doing it.

11  It may be better to let you review your notes at home rather

12  than misremember something.

13       Now, of course, always remember that it's your memory that

14  guides; not your notes.  Sometimes notes are in error.  It's a

15  memory -- your notes are only to refresh your memory.

16       So don't treat your notes as if they were a transcript.

17  Treat your notes as an aid to your memory, to jog your memory

18  as to things that you wrote down and that were -- so that you

19  will remember as you remembered it then.

20       All right.  I think I've covered that.

21       I want to jump to your third point.  It's about the jury

22  instructions.

23       Each of you have your own private copy now, right, of the

24  jury instructions?  I hope you do.

25       (Jurors nod their heads.)

1          **THE COURT:**  If you didn't, raise your hand.

2     Okay.  Everybody has got it.

3     You can do the same thing.  You can take those

4 instructions home, read it in private, in silence.  Don't let

5 anyone else see them.  And it is a public record.  However,

6 don't let anyone see it, just because they will then want to

7 engage you in conversation.

8     Now, there's a word of caution about reading those

9 instructions.  You don't want to go through and cherrypick one

10 little item, even inadvertently or innocently.  All of the

11 instructions are equally important.

12     So if you read a segment from the instructions to yourself

13 at home, please read all of that part so that you get the whole

14 picture, and not just focus on one sentence or one paragraph.

15     These took a long time for the lawyers and me to bring it

16 all together.  And sometimes there's something at the end of an

17 instruction that will modify something earlier.  So you need to

18 read all of it, if you're going to read it to yourself.  So

19 it's best to do that.

20     And, again, it's to refresh your memory as to what I said

21 to you here in open court as to what the instructions were.

22 And, of course, at that time I read all of it to you.

23     Again, no discussions with anyone.  No sharing of that

24 document with anyone.  You can do that in your private -- in

25 your privacy and silence of some time you have to yourself at

PROCEEDINGS

1    home.

2         Okay.  Now we come to one that's a little bit more

3    complicated.  And that is, let's -- I noticed some of you get

4    here early.  Good.  Others, just because of your commuting

5    schedule, I understand how that works.  And you've asked a

6    question, can you delve into the trial exhibits while you're

7    waiting for everyone else to arrive.

8         Well, first of all, this is a group decision that you as

9    the jury need to make.  I'm going to give you some guidance on

10   this in a moment.  But -- and a couple of absolute requirements

11   on this.  But if you as the jury all want to do this and allow

12   this, fine.  In the mornings that would be okay.  You could do

13   that.  But there's some considerations here.

14        First, you need to understand a few things.  You're the

15   jury and you're the decision-maker.  You're a statutory body

16   created by Congress, and you have taken an oath to do your job.

17        You have heard a lot of evidence here in the courtroom.

18   You're actually not required by law to read any of the

19   exhibits.  You've seen virtually everything already in the

20   courtroom.  However, I will tell you that most jurors and most

21   juries do read a lot of the exhibits.

22        It's your discretion how much of the evidence you want to

23   review in the course of your deliberations.  That's your call.

24   That's not the judge's call.  That's up to you.

25        You're also free, if you wish, to have silent periods,

1    while you all ten are together, where you say for the next

2    period of time you're going to let anyone review in silence any

3    particular exhibits they wish to review.  That's perfectly

4    okay.  You could do that.  That's one way to go through the

5    exhibits if you wish to do it.

6        Another way to do it is you take them slower, but you take

7    it out one at a time and discuss each one.  We have over 200

8    exhibits here.  That would take a long time.  You are not

9    required to do that, but you are free to do that if, in your

10   discretion, that is the best way to carry out your oath of

11   office.

12       It's up to you to decide how best to review the evidence

13   in the case.  Every case is a little different.  And every jury

14   has to decide that for themselves.  You're the boss on that.

15   You get to decide.

16       Now, there are some things that are absolute.  You can

17   only discuss the evidence, including exhibits, when all ten of

18   you are together.  Because discussions are deliberations.  And

19   you wouldn't want to do that if nine of you were here and one

20   of you had not yet arrived.

21       But that's not what you were asking.  You were asking can

22   you silently review them.  And the answer, if you as a group

23   decide that you can allow that, then okay.

24       But when -- if you do it, you have to just do it in

25   silence.  And you should only do that if you think that you as

1    a group -- the exhibits will stay organized and not get

2    discombobulated and would not do detriment to the jury as a

3    whole.  That's a practical consideration, but something you as

4    a group should decide, all ten of you together.

5         But then if you decide okay, no, we can do that, it will

6    work, then somebody gets here early in the morning and they

7    want to read a document, pull it out of the box and read it,

8    that's fine.  Just no discussions about it.  No discussions

9    about it.  And then, of course, they have to put it back where

10   it belongs.

11        Now, if one of you reads a document, there's no absolute

12   requirement that everyone else read the same document.  That's

13   impractical.  That could never happen unless you stayed here a

14   long time.  So the -- so if you silently read a particular

15   exhibit, you're not required to make everyone else read the

16   same exhibit.

17        Now, here's another consideration that I want you to keep

18   in mind:  Each of you ten are equally important.  Some of you

19   cannot arrive early and read documents.  And others, because of

20   your commuting schedule, can do that.

21        And those of you who have extra time to arrive a little

22   early, say, 30 minutes, and read some exhibits, if that's what

23   you wish to do, you don't have a greater say in the case than

24   someone who arrives at the last minute.

25        Each of you are equally important, and you must each make

1    your own conscientious decision about the case and not simply

2    defer to somebody else because they seem to have had more time

3    to review documents and to study the files.

4        Of course, if you think that you need to understand the

5    document in order to carry out your oath of office then, of

6    course, you have to review that document and try to understand

7    it.  And you should never delegate that decision to somebody

8    else in the room simply because they have more time to arrive

9    early.

10       So if you as a group, you the boss, you the statutory

11   body, the jury, wish to allow the exhibits in the jury room to

12   be reviewed, you may do that subject to the rules that I have

13   given you.  And those, again, are that it's done in silence,

14   and there's no discussion until all ten of you are together.

15   But when all ten of you are together, of course, then you could

16   discuss the exhibits.

17       All right.  Now, finally, we come to can you stay late and

18   review documents.  Here I'm going to discourage that, even

19   though I salute those of you who are willing to do that out of

20   civic duty.  I know you want to do the best possible job.  And

21   I am so proud of you as a jury.

22       But here's the problem with that:  Some of you cannot stay

23   late.  And so the risk is -- it's a risk; it's not an absolute.

24   But the risk is that those of you who are able to stay late

25   would somehow be viewed by others as experts on the case, and

1    you might wind up having more say in the deliberations merely

2    because you have more time to devote to the case.  And it's a

3    problem that I would not -- because every one of you is equally

4    important, and I would not want any of you to defer to someone

5    else merely because they are able to stay late into the

6    afternoon.

7         Now, if it's a matter of a few minutes to finish up

8    reading a document at the end of the session, that's okay.  But

9    what I'm talking about is staying some sustained period of time

10   after everyone else has left.  I think that's a problem and I

11   would discourage it.  And if you really, really think you

12   should do it, I would urge you to send out another note to let

13   me know so I can discuss that again with you.

14        In the mornings, the time that is not so dramatic, it's a

15   matter of half an hour or so difference between when the first

16   of you arrives and the last, so it's -- that's a matter of

17   commuting time, it's not going to make much difference there.

18   And it would put your time to good use and perhaps save time in

19   overall deliberations.

20        So the mornings are not problematic.  It's the evenings,

21   staying late in the afternoon, that is the problem.  And so I

22   want to discourage that.

23        All right.  I've answered the question.

24        Do the lawyers think I should have a sidebar and anything

25   you want to get me to say or add or subtract?

PROCEEDINGS

1      **MR. BICKS:**  No, Your Honor.  Thank you.

2      **MR. VAN NEST:**  No, Your Honor.

3      **THE COURT:**  I'm sorry I didn't get a chance to answer

4   your question yesterday, because some of you could have taken

5   your notes home and the instructions home and read them.  And I

6   missed that opportunity.  And there we are.  I'm sorry.  My

7   apologies.

8      All right.  Please return to the jury room and continue

9   your deliberations.

10      **THE CLERK:**  All rise.

11      (Jury out at 7:59 a.m. to resume deliberations.)

12      **THE COURT:**  Be seated, please.

13      All right.  You can make any objections you feel -- even

14   though you said you didn't have anything to add or subtract,

15   any objections?

16      **MR. VAN NEST:**  Yes, Your Honor.

17      Pursuant to the filing we made last night, we do object to

18   the instruction to the extent it would allow independent review

19   and research by jurors outside the presence of other jurors

20   either before or after deliberations.

21      I think, for the reasons stated in our pleading last

22   night, that's improper and would allow independent research,

23   and poses a risk of separate deliberations.

24      And so we object to that aspect of Your Honor's

25   instruction.

PROCEEDINGS

1              **THE COURT:**  I've read enough of the case law to know

2       this is within my discretion.  And almost -- very similar

3       things have been done by other judges and approved.  And I gave

4       adequate instructions to prevent any deliberations.  So I'm not

5       going to further explain it than I already have, at least right

6       now.

7          So this will avoid the problem of an extended -- they

8       could take an entire day and just have a silent reading period.

9       I've had juries do that in the past.  But then eventually there

10      would be the pressure to hurry up and decide.  And that's the

11      other side of the coin, is the -- is the Google view here is

12      just jam it through; don't let them read the documents.  And I

13      disagree with that.

14         I think the -- when they have that amount of time,

15      especially in the mornings, they should spend whatever time

16      they need to silently review so that they don't have to take

17      that time out when they're all -- the time they are all ten

18      present they can be discussing the case.  So I think your view

19      of the law is totally incorrect.

20         Objection overruled.

21         All right.  Does Oracle have any objections?

22             **MR. BICKS:**  I don't have an objection, Your Honor.  I

23      would just -- we had suggested, as a way to be helpful here on

24      the question of the exhibits, that if the Court thought it

25      would be useful to have --

PROCEEDINGS

```
 1              THE COURT:  That would be chaos.  We can't -- I saw

 2     that in your paper.  We can't send in ten copies of 200-plus

 3     exhibits.  That would be -- it would be a zoo in there.  And

 4     it's better to have one set.

 5         So thank you for that suggestion, but it would just be --

 6     I don't even know if we have room in the jury room for ten sets

 7     of documents like that.  So --

 8              MR. BICKS:  Fair enough.

 9              THE COURT:  -- I don't think that will work.

10              MR. BICKS:  Thank you.

11              THE COURT:  All right.  Are you prepared, now, to

12     discuss the proposal yesterday to delete statutory damages?

13              MR. BICKS:  Ms. Hurst is going to address that, yes.

14              THE COURT:  All right.  Ms. Hurst.

15              MS. HURST:  Your Honor, the stipulation that has been

16     offered is a conditional one that would -- whereby Google would

17     stipulate to willfulness only at such time as an election for

18     statutory damages is made.

19         Google proposes that it would reserve the right to contest

20     willfulness in phase three as part of the equitable

21     proceedings.

22         Your Honor, we think that the jury should advise on the

23     willfulness question for purposes of phase three.  We don't

24     think Google should be allowed to make a conditional

25     stipulation where it takes the issue off the table in one phase
```

PROCEEDINGS

1    and injects it back for the next.

2        So for that reason, we would not accept the stipulation

3    and would object to it and request that the Court do seek the

4    advice of the jury regarding willfulness for purposes of phase

5    three.

6            THE COURT:  All right.  Let's hear from Google.

7            MR. VAN NEST:  Your Honor, it's actually not a

8    conditional stipulation to willfulness.  It's a response to

9    what we all know is sort of a game playing here for phase two.

10        Counsel is acknowledging that it's up to Your Honor to

11   decide questions in phase three.  And our stipulation, which is

12   essentially a unilateral one, would allow that.

13        You're the one that would be the fact finder in phase

14   three, in all events.  There's no requirement that you get a

15   court advisory, unquote, verdict.

16        What we're offering is to take three of the five

17   complicated verdict questions off the form.

18        What we're saying is not we're stipulating to willfulness.

19   We're stipulating that if and when they elect statutory

20   damages, we agree that the total amount, the maximum amount,

21   will be paid.  That's the $300,000, in light of the fact that

22   there's two works here.

23        And we're also not taking off the table any evidence that

24   they want to present in phase three on any of the equitable

25   issues and on the question of attorneys' fees.

1    So the purpose of it is to, sort of, avoid having a very

2    complicated phase two, where the jury is being asked to make

3    several determinations that everybody in the courtroom knows

4    are unnecessary, because Oracle is never going to elect

5    statutory damages.

6    So I quite appreciate the fact that maybe you can't force

7    them to make the election.  I'm trying to simplify things by

8    taking that issue off the table without prejudicing anybody, by

9    offering the maximum amount of the -- of the award in the event

10   they do make such an election.  That's the idea.

11       **THE COURT:**  Well, when would they have to make that

12   election?

13       **MR. VAN NEST:**  Well, I think what Your Honor's order

14   said is anytime before judgment.  I think Your Honor has said

15   they could do it anytime before judgment.

16   I'm not sure that's right but, that's what Your Honor

17   concluded --

18       **THE COURT:**  That's what the statute says.  The statute

19   does use that phrase.

20       **MR. VAN NEST:**  Yeah.

21       **THE COURT:**  "At any time before judgment."

22       **MR. VAN NEST:**  For example, I think under the current

23   setup we could try phase two, and they could elect -- they

24   could decline the election right before closing arguments,

25   after all the evidence is in.  And we've heard all that.

PROCEEDINGS

1    I'm trying to avoid, sort of, this is all a tactical ploy,

2  really, on the part of Oracle.  So right now, the way it's set

3  up, they could do just that.

4    We could have all the evidence, whatever they're going to

5  present.  They could even allow attorney argument and then,

6  before the jury goes away to deliberate, advise the Court that

7  they're electing their actual damages and, in fact, declining

8  statutory damages.  And then we have a situation where the

9  evidence is all in.

10    So I don't see anything unfair about what we're proposing.

11  I would like a chance to file a motion to remove those issues

12  from phase two.  And we'll do that today if possible.

13    **THE COURT:**  You've already done that.  You already

14  made the motion.

15    Look -- all right.  Ms. Hurst, what do you say?

16    **MS. HURST:**  Your Honor, we don't have any intention of

17  making this argument and then electing before the jury walks in

18  for deliberations in phase two.

19    We want an answer from the jury on one question:  Whether

20  or not there was willful infringement.

21    The consequences of that verdict are significant for phase

22  three of the case.  If Google is a willful infringer, they're

23  not entitled to any of the equitable defenses.

24    The Court has lauded this jury repeatedly for its

25  diligence.  They heard the credibility of the witnesses.  I

1   know Your Honor did as well.  But it really seems like it would

2   be a sensible approach to consider what they have to say for

3   purposes of phase three.

4          THE COURT:  Maybe.  Maybe.  I respect juries a lot.

5   So I --

6          MS. HURST:  And, I guess --

7          THE COURT:  I'm not disagreeing with you.  But I am

8   worried about the conflict.

9      Let me ask you a different point, because I want to make

10  sure, before I make this decision, I have all the facts on the

11  table.

12     In writing out the verdict form, I try to put myself in

13  the position of the jury.  But I also try to think about what

14  your objections were going to be on both sides.

15     And I got to thinking, I said, you know, if I was Oracle,

16  would I want these small numbers before the jury?  The

17  statutory damages.  Right?

18         MS. HURST:  Right.

19         THE COURT:  All right.  Now, are you later on going to

20  say, oh, Judge, you can't put those numbers; oh, we've got to

21  have all these cautionary instructions; take out that small

22  number thing?

23     Because you're putting yourself in a position where the

24  jury goes in the jury room and says, Congress said this was a

25  $75,000 problem, and here they are asking for, you know, many,

PROCEEDINGS

1   many times more than that.

2       Now, so if later on you're going to be coming in here,

3   yourself, and wanting to massage the statutory thing you put

4   yourself into -- because that's what you want; you just want

5   the willfulness part -- then maybe Mr. Van Nest has a point.

6       So tell me what your objections are going to be on the

7   statutory part.

8       **MS. HURST:**  Your Honor, we were not planning to make

9   any such objection.

10      The -- I know the proposed -- the objections to the

11  proposed instructions are due at noon.  I can tell you that our

12  principal one, which we've already filed a brief on, relates to

13  the period for continuing willful infringement.

14      We understand very well the problem that the Court has

15  identified.  And I think the Court should take that as an

16  indication of our good faith, as to the purposes for requesting

17  this.

18      It is a big disparity.  And we don't intend to try to take

19  that question off of there at the last minute.  We don't intend

20  to elect right after closing arguments in phase two.

21      We're not playing games here.  We want to get equitable

22  estoppel, laches, and all these other defenses that don't

23  belong in the case over with.

24      And this jury has evaluated the credibility of these

25  witnesses, and we really think it should be entitled to weigh

1    in on this issue.

2          MR. VAN NEST:  So, Your Honor, again, my point would

3    be that they're acknowledging this is not -- if they don't

4    really need it for phase two, and it's really intended for

5    phase three -- that's what I'm hearing -- then Your Honor is

6    the one in charge of phase three.  And Your Honor has heard all

7    the same evidence that the jury has heard.

8          THE COURT:  I have, but at the same time I do

9    respect -- even if I treated it as advisory, I do -- I think

10   this is a great jury.  And they -- I would like to get the

11   benefit of their thinking even if I treat that as an advisory

12   decision.  I don't know.

13         MR. VAN NEST:  Your Honor, again, it's -- it's

14   conceded now that it's not something that's even necessary for

15   phase two.  That's what she's told you.

16         That the only thing they're asking you now is to have

17   these three questions on the verdict form for the jury to wade

18   through, when really what phase two should be about is what are

19   the appropriate damages and/or any infringer's profits; right?

20   It's not a punitive situation.

21         The awarding of actual damages and the awarding of

22   infringer's profits is not supposed to be punitive.  And,

23   obviously, they've got the willfulness question in there for

24   that purpose.

25         Because if it's conceded that it's only really relevant to

1    the equitable issues, which is what they've now conceded, why

2    in the world would we throw three questions on the jury form

3    and have them wade through all that, if this is all for your

4    benefit anyway?  Do you really need that benefit?

5           **THE COURT:**  Well, sometimes we do have advisory

6    questions on there even though it complicates the form.

7       Ms. Hurst, what do you say to that point though?

8       We could wind up having a hung jury on the question of

9    willfulness, and then they -- we might not realize that they

10    would be able to reach a verdict on other questions.

11          **MS. HURST:**  Well, Your Honor, two things.

12       First of all, we're not conceding anything.  The only way

13    they can do this, really, is to make an offer of judgment under

14    Rule 68.

15       This is covered by the Federal Rules of Civil Procedure.

16    When somebody wants to make an offer to take a claim out of the

17    case, they have to offer judgment.  And what they're doing

18    doesn't bear any of the particulars of an offer of judgment

19    compliant with Rule 68, first of all.

20       Second of all, the statute only says you can get to

21    300,000 with a willfulness finding.  That's the only way you

22    can go above 30.

23       So the implication of this is a stipulation to be a

24    willful infringer.  They're not offering, really, to stipulate

25    to that.  So, Your Honor, it doesn't comply with the rules.

**PROCEEDINGS**

1    And I just want to be clear, I'm not conceding anything.

2  But putting that aside, if we got to a point in this case where

3  the jury was hung on this question, and we knew that that was

4  the issue, of course we are going to behave reasonably and let

5  this jury come to a verdict.

6    But, really, it would be beneficial for phase three for us

7  to have this based on these triers of fact here, who are

8  considering these issues carefully as part of their fair use

9  verdict and should have the right to do so under the standards

10  of willfulness as well.

11    Your Honor, it is -- anyway, I won't belabor the point.

12  We're not going to behave unreasonably.  That's all I can say.

13    **THE COURT:**  What do you say to the offer of judgment?

14    **MR. VAN NEST:**  Well, I guess that's their third

15  argument.  I didn't hear that argument.  But if there's some

16  better procedural mechanism to do this, we'll certainly do it.

17    But it's quite clear that what is going on here has

18  nothing to do with phase two, other than, other than to suggest

19  to the jury that somehow their award should be based on a

20  punitive, on a punitive motivation.  That's what this is all

21  about.

22    She conceded, again, that this goes to phase three.  And I

23  quite agree that Your Honor has wide discretion in phase three,

24  with equitable defenses of course.

25    And if they want to present more evidence of willfulness,

**PROCEEDINGS**

1    in their eyes, for phase three, fine.  Our offer allows that.

2    If they want to present evidence of willfulness on attorneys'

3    fees question, they can do it.

4        I'm trying to respond to the real game-playing nature of

5    this, which is now out in the open.  They're now indicating to

6    Your Honor there is no issue in phase two this is relevant to.

7        And given that we don't want to suggest to the jury that

8    the phase two exercise is to be punitive in nature, why in the

9    world would we be seeking an advisory verdict on a willfulness

10   question or an innocence question; right?

11       You've got an innocence question and a willfulness

12   question.  This thing is fraught with problems.  And they're

13   bringing it on through this tactical ploy.  And I'm trying to

14   solve it in a way that gives them their full remedy, their

15   $300,000, which is all they would get.  Even if they prove

16   willfulness, that's all they'd get.

17       I'm trying to give them that and give Your Honor a way to

18   focus the issues in phase two on the real issues, instead of

19   this attempt by Oracle to inject a punitive element into it.

20   It's completely unfair, especially if we're willing to pay the

21   full amount of any statutory penalty as if they had proven

22   willfulness.

23       So, I mean, if their complaint now is some sort of

24   procedural vehicle, I'm happy to revisit that.  But that's all

25   I understood --

1          **THE COURT:**  It's not an if.  Ms. Hurst said they

2    object on the grounds that Rule 68 would bar what you're trying

3    to do.

4          **MR. VAN NEST:**  That was her third or fourth argument,

5    right.  I didn't hear that first time out --

6          **THE COURT:**  I didn't hear it first time out either.

7          **MR. VAN NEST:**  No.

8          **THE COURT:**  But I am hearing it now.

9          **MR. VAN NEST:**  I'm happy to revisit that.  But we all

10   know what's going on, and I'm trying to provide a practical

11   solution.

12         **THE COURT:**  What do you think is going on?

13         **MR. VAN NEST:**  What do I think is going on?

14      They've got this election in there so they can put in

15   evidence and argue about willfulness so they can suggest to the

16   jury that -- that somehow their damage award or their return of

17   profits should be based on a punitive motive or -- or

18   punishment.

19         **THE COURT:**  Can't you fix that with a jury

20   instruction?

21         **MR. VAN NEST:**  I don't think so, Your Honor.

22      Why would we allow -- and why would we require jurors to

23   go through three questions that may be very difficult, based on

24   the case that was tried, very difficult questions for the

25   jurors where -- but it's not even relevant, not even relevant

1     and highly prejudicial, where they've conceded that its only

2     relevance is to give Your Honor some guidance for phase three.

3         And if they want you to have guidance for phase three, our

4     stipulation affords them that ability.

5         If they have additional evidence that they want to put in,

6     that they think is important, that they think goes to

7     willfulness or innocence beyond what's already been discussed

8     and presented in phase one, they have a full right to do that

9     in phase three.

10        What I'm suggesting is, it's a tactical ploy.  We all know

11    that.  They're never going to elect the statutory damages

12    anyway.  And the only reason they've got them in there, as Your

13    Honor has observed repeatedly, is to give them the willfulness

14    question in phase two, where it really doesn't belong.

15             THE COURT:  Maybe.  Maybe.

16        But is this stipulation even in writing someplace?

17             MR. VAN NEST:  We -- I provided an email of it to

18    counsel, at his request, last night.  And I can provide it to

19    the Court this morning.

20             THE COURT:  Well --

21             MR. VAN NEST:  But, absolutely, we'll put it in

22    writing.

23             THE COURT:  The Rule 68 thing, that's a new wrinkle.

24    There is no way I would do this unless I can see it in writing

25    and the other side could see it in writing.  And then we have

PROCEEDINGS

 1   to consider the rule.

 2       So I'm not going to make any ruling on this right now.

 3           **MR. VAN NEST:**  We'll make a filing today, Your Honor.

 4           **THE COURT:**  But either side -- right now I'm going to

 5   stick with what I've sent out.  However, I understand.  I'm not

 6   making a ruling yet.

 7           **MR. VAN NEST:**  Fine, Your Honor.  We'll submit

 8   something today with the stipulation and anything else, so Your

 9   Honor has it in writing.  Thank you.

10           **THE COURT:**  All right.

11           **MS. HURST:**  Thank you, Your Honor.

12           **THE COURT:**  Can we go to the Malackowski now, the

13   motion for reconsideration?

14           **MR. VAN NEST:**  I think it's on --

15           **THE COURT:**  Is it ready?  It's not -- I thought it was

16   fully briefed now.

17           **MS. HURST:**  It is.

18           **MR. VAN NEST:**  It is, Your Honor.

19           **THE COURT:**  Ms. Hurst, you get to go first.

20           **MS. HURST:**  Your Honor, we've adhered to the

21   requirements for motions for reconsideration.  Although, the

22   Court issued a notice of strategy re trial, saying that motions

23   in limine should be revisited during the course of the trial.

24       The way the evidence came in, it was apparent that Google

25   understood, at the time, that it was submarining a hundred

 1   million dollars a year in revenue for Sun if it went ahead with

 2   an open source approach involving Java.

 3        So it was totally foreseeable to Google at the time that

 4   this would be the consequence.  And the way the evidence came

 5   in, both Mr. Rubin and others acknowledge that.  And we have

 6   provided the additional evidence for Mr. Malackowski's report,

 7   where he has analyzed the assumptions that he made, and the

 8   projections.

 9        And, Your Honor, we think that we are entitled to put on

10   the full lost profits case.

11        You heard Ms. Catz talk about $44 million in lost

12   licensing revenue from Samsung alone, other licensees, ZTE,

13   BlackBerry.  And the evidence fully supports it, Your Honor.

14   And we should be entitled to put it on.

15            THE COURT:  What's your name again?

16            MR. BAYLEY:  Ed Bayley, Your Honor.

17            THE COURT:  All right.

18            MR. BAYLEY:  Your Honor, there's very strict standards

19   that are set forth in the motions for reconsideration.  Oracle

20   has come nowhere near satisfying any of them.  The --

21            THE COURT:  Just address the merits.

22            MR. BAYLEY:  Sure.  Obviously.  So let me --

23            THE COURT:  I do have to take into account the way the

24   trial has played out.  And I also take into account motions for

25   reconsideration.  That kind of thing.

1    But we can't just revisit every motion in limine

2    willy-nilly on the theory that the trial somehow will upset the

3    balance.  But I want to think -- now that we're here, address

4    the merits.

5         MR. BAYLEY:  Sure.  Absolutely, Your Honor.

6    So let's talk about the merits.  The merits are they have

7    pointed to one email from Andy Rubin as a basis for -- again,

8    we should make sure we know what we're talking about here.  The

9    portion of the Court's ruling that Oracle is going after is

10   about the reliability of a 2008 revenue forecast from Sun.  The

11   email that they're now relying to change the balance is from

12   2006.  And it's from an internal Google employee.

13   So the idea -- and so that's one thing.  The main thing,

14   though, is that this -- this isn't a new fact.  This is an

15   email that was actually introduced into evidence in the 2012

16   trial.

17   This is in evidence that was in Mr. Malackowski -- it was

18   referred to, at least indirectly, in Mr. Malackowski's report.

19   This was something that was part of his whole analysis and part

20   of the argument that was put before Your Honor when we argued

21   this MIL a month ago.

22   So the idea that this is somehow a new fact that came out

23   in trial the first time just isn't supported at all by a

24   record.

25   The other thing is that even if it were possible, which

1    it's not, it can't possibly be material.  Because, again, we're

2    talking about something that an internal Google employee

3    thought in 2006, how can that possibly affect the reliability

4    of a 2008 forecast within Sun?

5         I mean, it's just pure speculation about what -- from

6    Mr. Rubin, about what Sun was making.  It can't possibly

7    support anything about what, you know, Sun's projections were

8    and how reliable they were.

9         The defects in Mr. Malackowski's opinion dealt with his

10   failure to actually analyze what happened after 2008, and

11   failure to analyze the actual sales and actual lost customer

12   data going forward past 2010, which is where Your Honor cut off

13   his reliance on that -- on that projection.

14        So that's where -- if there's anything that came out in

15   trial that's going to cure that, it would have to be within

16   that time period.  An email from 2006, from Google, can't

17   possibly meet that standard.

18              **THE COURT:**  Ms. Hurst, any rebuttal?

19              **MS. HURST:**  Your Honor, there was multiple, multiple

20   Google people who testified that they understood that revenue

21   would be lost.  Mr. Schmidt.  Mr. Rubin.  There was an email

22   from Mr. Lindholm acknowledging it.  The way the evidence came

23   in, it was very clear that they understood the harm to Sun that

24   would result.

25        Now, Mr. Malackowski, in extending the forecast based on

1   industry data, offered the following evidence that the extended

2   forecast was a reasonable one:

3        The mobile industry was insulated from the recession.

4        The number of mobile subscribers grew at a very high

5   annual rate.

6        The number of mobile device Internet users grew at a

7   dramatically higher rate than Mr. Malackowski used for his

8   forecast.

9        He addressed all of the Java-related factors that could

10  affect profits, such as the purported stagnation of Java.

11       He talked about the trend towards smartphones.

12       All these things are part of his analysis.

13       And, Your Honor, it should be for cross-examination.

14       Ms. Catz came and testified we lost $44 million during

15  this period of time when we're being barred from offering a

16  lost profits claim on one license alone.

17       There is substantial evidence to support the projections.

18  And these matters that they're complaining about should be

19  matters for cross-examination.

20       **THE COURT:**  Wait one second.  We're only here on

21  Malackowski.  We're not here on Catz.

22       **MS. HURST:**  Well --

23       **THE COURT:**  So the jury can consider -- if you can

24  make an argument based out of what Catz said for damages, you

25  can do that.  You don't have to have an expert.  But what's on

1    the table right now is Malackowski.

2        Am I saying his name right?

3            **MS. HURST:**  Yes, Your Honor.

4            **MR. BAYLEY:**  Yes.

5            **THE COURT:**  Malackowski seized on one projection.

6    It's one of the flimsiest things I've ever seen an expert try

7    to do with damages.

8        But he seized on one document and makes all these

9    assumptions and projections way out into the future.  And

10   that's all that -- that motion that you're trying to

11   reconsider.

12       If you want to argue damages to the jury based on what

13   Catz said, you can do that.  That's not a -- if she said it.  I

14   don't remember her saying it.  But if she -- if some other

15   witness has supported the idea of lost profits you're, of

16   course, entitled to make whatever you can out of that.  But

17   Malackowski can't -- that doesn't come back and fix up

18   something where he didn't do his professional job.

19           **MS. HURST:**  Well, Your Honor, there were other

20   forecasts.  There were other forecasts that he considered.  But

21   they would have provided even larger numbers.  So he picked the

22   most conservative one, Your Honor.  He picked the most

23   conservative forecast out of all the Sun forecasts at the time.

24   And he picked the lowest one.

25       So it's not that there weren't other forecasts, Your

PROCEEDINGS

1   Honor.  There were other forecasts.  They would have resulted

2   in a much higher figure.

3        And so, certainly, Mr. Malackowski should not be punished

4   for having picked the most conservative one, with an argument

5   that there was only ever one forecast.  That's not true.  There

6   were more forecasts.  He picked the most conservative one.  He

7   detailed the others as support.

8        And what I'm saying about Ms. Catz is that it's

9   substantial evidence in support of continuing harm during that

10  period.

11       Your Honor, this is not -- this is not a *Daubert* offense.

12  It's cross-examination.  It goes to weight, not admissibility

13  of the opinion.

14           **THE COURT:**  All right.  Thank you.  It's under

15  submission.

16       All right.  I have a question I wanted to ask you all, but

17  are there any other motions that are teed up that I can address

18  now?

19           **MR. VAN NEST:**  There is, Your Honor.  We have one

20  other issue --

21           **THE COURT:**  What is that?

22           **MR. VAN NEST:**  -- that Mr. Purcell will address.

23           **MR. PURCELL:**  Your Honor, it's not a formal motion.

24  We haven't filed anything on it.

25       We have an issue with one of our experts, Dr. Itamar

1   Simonson, who was the expert who conducted a survey of

2   applications developers.

3       Dr. Simonson, before the trial date was set, had a

4   commitment to travel out of the country, to Israel, next week

5   to teach.

6       It's now looking like the jury might not return a verdict

7   in time for him to be put on live this week.  He's not in the

8   country next week.  We want to take a short, 30 minute trial

9   deposition, and give Oracle the same amount of time, so we can

10  put him on by video.  We know it's not ideal, but we think it's

11  the only option.

12      We made that proposal to Oracle, and they did not agree.

13  So we're asking for relief from the Court.

14          **MS. SIMPSON:**  Your Honor, we object.

15      Mr. Simonson is a retained expert.  All of our other

16  retained experts have adjusted their schedules.  They've, you

17  know, made sacrifices to be here to testify live.

18      Mr. Simonson in particular has great difficulty answering

19  a question directly.  And we don't believe that a deposition is

20  going to be the right setting for him to testify.

21      We are not going to be able to accomplish anything in 30

22  minutes with this witness.  And we would request that he be

23  required to be here.

24          **THE COURT:**  What do you say to me?  I'm sorry about

25  his schedule, but why -- why would he cut the sail so close to

PROCEEDINGS

1    the wind?

2           MR. PURCELL:  Well --

3           THE COURT:  Do you know what I mean by that?  In other

4    words, he cut it pretty close, thinking that he could predict

5    exactly when the jury would return a verdict.

6           MR. PURCELL:  Well, you're right about that, Your

7    Honor.  And we were hoping this wouldn't be an issue.  And we

8    tried not to raise it until we knew it was absolutely necessary

9    to raise it.

10       I don't agree with Counsel that he had any trouble

11   answering questions directly.  But, in any event, I think it is

12   the only option, given his schedule and his teaching

13   commitments, which, as I said, he had in place before the trial

14   date was set and he would like to keep.

15          THE COURT:  Well, if I deny this request, will he show

16   up anyway?

17          MR. PURCELL:  I think the answer is no.

18          MS. SIMPSON:  Your Honor, I think that's fair.  He

19   should be here or not be here.

20       You know, it's their obligation to have the witness appear

21   for trial.  If he can't appear for trial, then he can't appear

22   for trial.

23          MR. PURCELL:  And, Your Honor, he can appear for

24   trial.  He can appear for trial by video.

25       This is an important piece of evidence.  The motivations

1    of the developers -- this is the linchpin of Oracle's entire

2    damages theory, is that, using these APIs brought developers to

3    the platform; that created apps; that created users.

4        That really is all they have to go on to support this

5    damages theory that they're trying to convince the jury to buy.

6    And Dr. Simonson's testimony is very important to rebut that.

7             **THE COURT:**  Well, wait a minute.  Your own documents

8    say that you were trying to tap into the Java app developer

9    community.  I remember seeing those documents.

10            **MR. PURCELL:**  That's true, Your Honor.  And what

11   Dr. Simonson did is he tried to test whether that actually

12   happened.

13       This was a prediction.  This is one of the many reasons

14   why Google was interested in developing a Java-based platform,

15   but that's not evidence that that actually came to past.

16       And what Dr. Simonson found is the developers actually

17   don't follow programming languages; they follow users.  And

18   that's consistent with what the actual data from Google showed

19   happened in this case.  So it's an important rebuttal to what

20   Oracle is positing as, really, the linchpin of their damages

21   theory.

22            **MS. SIMPSON:**  Your Honor, you're absolutely right that

23   the documents are going to contradict what Mr. Simonson is

24   going to testify to.  But that doesn't change the fact, if this

25   witness was so important, they should have cleared him to

1  testify in time for trial.

2      His report came in well after the trial date was set.

3  They knew what the trial date was going to be.  And, you know,

4  they should make him available to testify live in front of the

5  jury.

6      **THE COURT:**  One thing I've learned in this case --

7  both sides are just as guilty of it, so I don't mean this

8  personally to Google.

9      But one thing I've learned in this case is that no matter

10 how bad your internal documents are, you can always hire an

11 expert to explain them away.  Oracle has done it, and Google

12 has done it.

13     It's up to the jury.  It's up to them to decide how much

14 weight to give it.

15     I don't know the answer to this.  Do I have anything under

16 oath from him, from your -- this doctor?  I'm just taking your

17 word for it that he's not going show up?  And has he explained

18 under oath why it is that he made this commitment knowing that

19 we've had this trial on schedule -- admittedly it was tentative

20 for a long time, but it's been of record for, seems like, eight

21 or nine months; right?

22     **MS. SIMPSON:**  It's --

23     **THE COURT:**  Why would he commit himself to go teach in

24 Israel at a time period when he should -- he might have to be

25 here?

1    **MR. PURCELL:**  Well, Dr. Simonson actually is a native

2    of Israel.  And he goes back to Israel, I think, every summer

3    to teach.  And it's only for a week.  But I believe he had the

4    commitment.  And we can submit something, a declaration that's

5    under oath, if Your Honor wants.

6    **THE COURT:**  But commitment -- I mean, what do you mean

7    "commitment"?  They can always get somebody else over there to

8    substitute in for him.

9    **MR. PURCELL:**  They possibly could have eight or nine

10   months ago.  They can't now.

11   **MS. SIMPSON:**  Your Honor, they should have done that

12   in advance.  The trial date was set.  They should have gotten a

13   different expert if this expert couldn't appear at trial.

14       The jury is entitled to see this witness's testimony live.

15   It's just not, you know, proper for them to be able to --

16   **THE COURT:**  Well, that's usually true.  I agree.  But

17   it's also -- you know, I've had cases where somebody becomes so

18   ill they can't testify, so we let them appear by deposition.

19   **MS. SIMPSON:**  Right, Your Honor.

20       This is not this case.  We have a witness that knew the

21   dates and a witness who could have scheduled around the dates

22   and did not.

23   **MR. PURCELL:**  He couldn't have scheduled around the

24   dates because he already had this on his calendar.  And the

25   jury has watched a lot of video and read a lot of testimony,

1   heard a lot of testimony read in from witnesses who didn't

2   appear live.  This is not significantly different.

3          **THE COURT:**  Well, except that we would be doing this

4   in the middle of the trial as opposed to being able to do it in

5   front of the jury.

6       I don't know.  I'm not going to rule on this either.

7       You ought to make the best possible case you can of

8   something under oath.  And merely to say in conclusory terms

9   that he made a commitment does not answer a lot of questions,

10  like why he made the commitment in the first place.  He had a

11  commitment to you to testify in this case.  He's breaking that

12  commitment.

13      I don't know.  I don't like the lawyer teeing this up.  So

14  for right now, I'm not going to allow it.  You submit something

15  that is stronger, maybe.  And it would have to be under oath.

16  So I'm not going to say yes to this yet.

17         **MR. PURCELL:**  All right.  Thank you, Your Honor.

18         **MS. SIMPSON:**  Thank you, Your Honor.

19         **THE COURT:**  What else can you all --

20         **MR. VAN NEST:**  Mr. Cooper has an issue, Your Honor.

21         **THE COURT:**  All right.  Mr. Cooper.

22         **MR. COOPER:**  Yes, Your Honor.  John Cooper on behalf

23  of Dr. Kearl, Your Honor's Rule 706 expert.

24      Dr. Kearl is in San Francisco.  He's prepared to testify.

25  The only thing that I'm asking is a little notice so that we

1    can work out the logistics.

2        And I sent an ECF letter to the Court yesterday with a

3    request.  And I appeared this morning to work it out.

4        **THE COURT:**  Well, my thought is that we would hear

5    both sides' cases in chief.  And then he would testify, then be

6    cross-examined by both sides.  And if time permits, they would

7    even be able to put on a rebuttal case.  Certainly, Oracle gets

8    a rebuttal case, anyway, to Google.

9        But this would come -- would he come after the two main --

10   the case-in-chief?  Case-in-chief, then Kearl, and then the

11   rebuttal cases.

12       **MR. COOPER:**  Yes.  The issue really is the notice of

13   the beginning of phase two, because Dr. Kearl has said he would

14   like to be here to hear the openings.

15       **THE COURT:**  He's in San Francisco; right?

16       **MR. COOPER:**  He's in San Francisco.  We would just

17   like an hour or two notice.

18       **THE COURT:**  Oh.  What do you want me to do, send an

19   email?

20       **MR. COOPER:**  That would be wonderful.

21       **THE COURT:**  I will try to remember.

22       And I'm going to order the lawyers, I'm ordering the

23   lawyers right now -- they've got plenty of people there who

24   just sit there and watch.  I'm going to order you to call

25   Mr. Cooper as soon as you realize that the phase two is about

**PROCEEDINGS**

1  to start.

2          **MR. COOPER:**  Okay.

3          **THE COURT:**  However, I'm going to try to remember

4  myself.  I owe it to you.

5      You've done all this pro bono.  And the Court is extremely

6  grateful for your effort.  And if I forget, it's not because I

7  don't think the world of you.  It's just because there's too

8  many things on my plate right now.  But I will do my best.

9          **MR. COOPER:**  I understand.  And all we are asking is

10  that Dr. Kearl have the opportunity to be here to hear opening

11  statements.  But we appreciate your comments.

12      Thank you.

13          **THE COURT:**  Sure.  All right.

14          **MR. COOPER:**  Thank you.

15          **THE COURT:**  Anything else you want to bring up?

16          **MS. HURST:**  We have a few deposition designations,

17  Your Honor.

18          **THE COURT:**  All right.  You can hand them up.

19      My clerk asked me yesterday -- one of your many lawyers

20  had asked my clerk, made it sound like I owe you something.

21      I ruled on every single deposition designation that I got,

22  and I handed them back.  So if anyone thinks I still have

23  something in chambers, please let me know.  I don't think I do.

24      Now, you've given me some new ones, just this moment, and

25  I will get on it.

PROCEEDINGS

```
 1        Does someone think I failed to rule on something?

 2        MS. HURST:  It seems like a set might have gone

 3   missing, Your Honor.  We'll meet and confer about that.

 4        THE COURT:  What was the name of the witness?

 5        MS. HURST:  Unfortunately, Ms. Von Der Ahe is not here

 6   right now, who knows the particulars on this.

 7        THE COURT:  Well, I am amazed to hear that because I

 8   think I ruled on every single packet.

 9        MS. HURST:  It's quite possible the Court handed them

10   back and they got lost in the shuffle between the parties.

11   We'll meet and confer further.

12        THE COURT:  The last one I think I put in on your

13   table over there, seemed like that was Duimovich.  I'm not

14   positive.

15        MS. HURST:  We do have the rulings on that one, Your

16   Honor.

17        THE COURT:  I wrote on the front, I think it was the

18   last one that said "All objections overruled."

19        MS. HURST:  Okay.

20        THE COURT:  So --

21        MS. HURST:  You've got a photographic memory, I think.

22        THE COURT:  I just remember thinking it was the

23   easiest way to deal with it, was "all objections overruled." So

24   I didn't know.  On the others, I went line by line.

25        MS. HURST:  We'll figure it out.
```

1          **THE COURT:**  All right.  Figure it out.

2      Here is the question that I have, and that is this.  It

3  was the question I sent out the other day.  And a huge amount

4  of dollars ride on this.  Maybe even fair use rides on it.

5      But the ad revenue is dependent upon the search engine,

6  which preexisted all of this, the Google Search engine.

7      You know, I went back to look.  The word "Google" is in

8  the Oxford English Dictionary.  And it went in in 2006, before

9  any of this happened.  So Google and the search engine were

10  huge before Android ever was under consideration.

11      All right.  So then Android comes out, and mobile devices

12  take off like crazy.  But Apple was already there anyway.

13      If Android had not been there, then Oracle's position is

14  Java would have been there.  Java and Sun would have been

15  there.

16      But what's to say that the same amount of ad revenue

17  wouldn't have come flowing in anyway because people knew that

18  Google had the best search engine and it was already in the

19  Oxford Dictionary and Google was well established.

20      So what is to say that if Java had -- and Sun had

21  succeeded where Samsung succeeded, or Android succeeded, the

22  same amount of revenue would have flowed into -- so I'm asking,

23  what is the cause and effect between the revenue on ads versus

24  stealing -- if that's the way you want to put it -- stealing

25  the declaring lines of code?  So at one point I asked this

PROCEEDINGS

1    question before.

2         Ms. Hurst, you told me that Google was able to go to the

3    Samsungs of the world and get special deals like that the

4    search engine will get priority, and they have that written

5    into the contracts.  But none of that came into evidence.  So

6    far anyway.

7         So on our record that we have here, how do you answer that

8    question?

9         **MS. HURST:**  Well, first of all, Your Honor, I don't

10   think that's relevant to fair use.

11        But putting that aside, there was, I think, a very large

12   chart that we submitted in opposition to the Malackowski

13   *Daubert* motion, showing all the evidence of causation related

14   to the revenue.  Some of that came in during phase one.  And

15   there's more teed up to come in during phase two, as we

16   certainly considered that a damages issue.

17        What Mr. Schmidt testified during phase one is that there

18   is a huge profit from Android because it allowed them to earn

19   revenue and not have to pay -- not have to share with, for

20   example, Apple.

21        So if you take just the example that Google has raised and

22   that the Court has raised is, was Apple a noninfringing

23   alternative, well, Your Honor, they had to share 30 percent or

24   35 percent of the revenue with Apple.

25        And so it's clearly -- and this is even what Professor

 1   Kearle said in his report, that not having to share that was a

 2   profit to Google.

 3        **THE COURT:**  All right.  So maybe that's a good point.

 4   Let me see if I can put it in my own words.

 5        So let's take the alternative universe, where there had

 6   been no Android at all.  And, instead, there was a Sun platform

 7   that was just as good and all, so that Sun was now the --

 8   instead of Samsung.  Or maybe Samsung would be doing a Sun

 9   platform.

10        **MS. HURST:**  Or maybe it was Microsoft, Your Honor.

11   Maybe it was a Microsoft platform, and it was using licensed

12   Java as an application perhaps.

13        **THE COURT:**  All right.  Could have been any of those

14   things.  But still, I think what you're saying is, yes, Google

15   would still have gotten the same amount of ad revenue, but it

16   would have had to share that ad revenue with who though?  With

17   Microsoft?  With Sun?

18        **MS. HURST:**  Well, no, Your Honor.

19        It's our theory that they faced the risk of substantial

20   loss of the ad revenue because it was Microsoft who they were

21   most worried about in a position to become the dominant

22   programmable platform provider.

23        And so had it been Microsoft, they would have been out of

24   luck.  They would have been completely out of luck.

25        **THE COURT:**  How?  They still would have been doing

1   Google searches.

2          **MS. HURST:**  Well, Your Honor, what the evidence is --

3   and I've got some of phase two in my head here, so I'm going to

4   describe this.  And if we need to go back and separate it all

5   out, I will.

6       But the evidence, Your Honor, is that they were deeply

7   worried that Microsoft would lock them out of the browser on a

8   Microsoft-based phone.

9       And so if you think about it, the way most people search

10  on there smartphones they just swipe and put it in the bar.  On

11  a Microsoft phone, they would have had to go to the browser,

12  have had to open it up, had to go to Google.com and then type

13  in a search.  Most users don't have the patience for that.

14      Their witnesses have testified that that results in the

15  diversion of a significant amount of traffic.

16         **THE COURT:**  Listen, even I can do that.  I've gone to

17  various search engines.  And then it says, Do you want to put

18  this on your screen?  And I say yes.  And then it's right

19  there.  It takes about 15 seconds.

20         **MS. HURST:**  Yeah.

21         **THE COURT:**  You're telling me that the American public

22  and all these millennials, that they just wouldn't have done

23  that?

24         **MS. HURST:**  They are deeply impatient, Your Honor.

25         **THE COURT:**  Well, I don't know.

1            **MS. HURST:**  That's what the witnesses are testifying.

2    I'm just reciting what the witnesses have said.

3            **THE COURT:**  Your theory is that Microsoft -- what do

4    they call their navigator, what's that called, the navigator --

5            **MS. HURST:**  Internet Explorer.

6            **THE COURT:**  Internet Explorer.  That's it, yeah.

7        So that the Internet Explorer would have become the

8    dominant search engine, and the revenue would have dried up or

9    significantly reduced over at Google?

10           **MS. HURST:**  Or, if they had continued to earn revenue,

11   they would have had to pay sharing on it, which was also an

12   element of profit loss.

13       So even if they captured a substantial part of the revenue

14   that they could have lost to Microsoft, they would have had to

15   pay sharing on it, either to Apple or to whoever the other, you

16   know, Java platform-based licensees were.  Or to Sun itself.

17   Sun and later Oracle itself.

18           **THE COURT:**  All right.  So what is the -- you don't

19   have to respond because I'm just trying to understand the case.

20   But do you have any response?

21           **MR. KWUN:**  Yes, Your Honor.

22       So Ms. Hurst referred to what the witnesses testified to.

23   But they filed a brief and they did not cite the supposed

24   testimony of these witnesses.  There was no testimony that --

25   or any resemblance to what you just heard in phase one.

**PROCEEDINGS**

1      What we did hear in phase one is, Neal Civjan took the

2   stand and went out of his way to make it clear that Java is not

3   an operating system.  Java is middleware.  And he contrasted

4   Java from operating systems.  And that was in response to a

5   question noting that on some of the phones that were being

6   discussed, Java was not the operating system; Microsoft was the

7   operating system.

8      So you had asked a question earlier, if there had been

9   something other than Android, who would Google have shared that

10  money with?

11     And the evidence that is actually of record in phase

12  one -- and we filed our brief early on this last night.  The

13  evidence is actually of record in phase one, is that Sun would

14  not have been that operating system.  So Sun would not have

15  gotten that revenue share.

16         **THE COURT:**  But how do we know that if -- maybe they

17  would have been part of Microsoft?

18         **MR. KWUN:**  If they had been part of Microsoft -- you

19  mean maybe they would have been --

20         **THE COURT:**  What Ms. Hurst is saying is that Sun could

21  have cut a deal with Microsoft, and then Microsoft would have

22  had the so-called full stack.  Sun would have been a piece of

23  that.  Java would have been a piece of that.  And then the

24  Internet Explorer might have become the dominant engine, as

25  opposed to Google.

1    MR. KWUN:  Well, Your Honor, that's highly

2  speculative.  And there's no evidence in the record that would

3  support that in phase one.

4    THE COURT:  Well, there is evidence in the record that

5  Microsoft was a player in this market.  So there's something to

6  it.

7    MR. KWUN:  That Microsoft was a player in this market.

8  But then the jury would then need to find that in the absence

9  of Android -- and, by the way, there is no testimony that there

10  would have ever been an absence of Android.

11    Their expert has actually said -- has acknowledged -- not

12  in phase one, but if we're going to talk about what would

13  happen in phase two, has acknowledged that Android would have

14  existed in some form, no matter what.

15    But if the jury made the speculative assumption that there

16  would be no Android, and made the speculative assumption that

17  the dominant -- or that the resulting winner in this area would

18  have then been Microsoft Bing, of which there's been no

19  testimony -- Bing is the search engine that Microsoft has --

20  and, as a result of that, Sun would have formed a deal with

21  them to get part of their ad revenue, again, no testimony about

22  that, no testimony about Sun ever getting any ad

23  revenue-sharing deals.  I mean, that's speculation upon

24  speculation.

25    On the record that is actually what we had in phase one,

**PROCEEDINGS**

1  which is what we understood the order to be directed to, on the

2  actual trial evidence there is nothing that would allow

3  anything other than utter speculation.

4        **THE COURT:**  Which factor do you think that that goes

5  to?

6        **MR. KWUN:**  We would agree that it goes, one, to the

7  extent of the commerciality of the use of the declarations.  So

8  factor 1.

9        It also -- it could, theoretically, if they had made the

10  case, go to factor 4.  But because there is actually no

11  evidence of market harm to the copyrighted works, it goes to a

12  lack of evidence on market harm.  So factor 4.

13        **MS. HURST:**  I'm sorry, Your Honor, but that's just

14  ridiculous.

15        First of all, they have the burden of proof in phase one.

16  So if it's super speculative, that's their problem.  They're

17  the ones injecting noninfringing alternatives; not us.  We're

18  just talking about what happened in the real world.

19        They're trying to say it was not profitable after

20  Mr. Van Nest stood up at the Federal Circuit and admitted it

21  was entirely commercial.  Eric Schmidt, the CEO, came in here

22  and testified that Android was hugely profitable.

23        So then they want to inject some counterfactual scenario

24  to undermine the testimony of their own CEO on a matter on

25  which they bear the burden of proof?  You've got to be kidding

PROCEEDINGS

1   me.

2           MR. KWUN:  Your Honor --

3           THE COURT:  It is true that Schmidt said -- and I

4   think it was a diagram that he had, that said it was hugely

5   profitable.

6           MR. KWUN:  He had testimony about statements he made

7   in the earnings call that said that Android was hugely

8   profitable.

9       He never made a statement that the declarations were

10  hugely profitable; that the use of the declarations and the SSO

11  from 37 API packages was hugely profitable.

12      There's a world of a difference between Android and the

13  declarations and the 11,500 lines of declarations that are at

14  issue.

15      And the testimony, including from Dr. Jaffe -- excuse me,

16  Dr. Schmidt, Professor Schmidt, their expert, their technical

17  expert, is that there is a ton of work done by Google to

18  optimize Android for the mobile environment.  And that goes

19  well beyond the 11,500 lines of declaring code that's at issue.

20      So the question for fair use is the harm that was caused

21  by the use of the declaring code.  And to rely, thus, on -- on

22  statements about the profitability of Android, a platform of

23  15 million lines of code, is just not relevant.

24          MS. HURST:  That's just completely wrong.

25      The fourth factor says "harm to the copyrighted work or

1  derivatives thereof."

2       The copyrighted work is not the declaring code.  It's the

3  Java SE platform and licensed derivatives, including Java ME

4  and subsequent potential markets for Java SE.

5       That's just completely wrong what Mr. Kwun just said as a

6  matter of how the jury has been charged in this case.  They

7  have a total failure of proof on factor 4.  The only evidence

8  that they offered was that Java SE had managed to keep an even

9  or increasing revenue stream.  But that testimony did not

10  address the markets at issue where the harm occurred.

11       The fact that they were able to show that Oracle

12  miraculously replaced those lost revenue streams does not solve

13  their problem of a total failure of proof on factor 4, given

14  what the actual theory of harm was.

15       And, in fact, the Court previously rejected this narrow

16  view of the fourth factor in its order on Google's motion in

17  limine number 4, and it's implicitly rejected it in the way

18  it's charged the jury.

19       They have a total failure of proof on the most important

20  factor.  They did not come in here and show an absence of harm

21  in the relevant markets, which were phones.

22       **MR. KWUN:**  Your Honor, Dr. Jaffe, on the stand,

23  admitted that he didn't even consider what the harm was to

24  Java SE.  So that's the first point.

25       The second point on Java ME, there is no evidence

1    sufficient to allow the jury to find that Java ME is a

2    derivative work of either of the two copyrighted works at

3    issue, version 1.4 and 5.0.

4        There is testimony in the record that something -- what,

5    we don't know -- that something in Java ME came from some

6    version of Java SE.  That is not sufficient to establish that

7    the harm that they are talking about is to a work that is a

8    derivative of either of the two copyrighted works at issue.

9        We have no evidence that would allow the jury to determine

10   whether or not the material that allegedly was taken from

11   Java SE and placed in Java ME did not come from versions of

12   Java SE that predate 1.4 and 5.0.

13       **THE COURT:**  All right.  I'm not going to make any

14   ruling on it, but this helps a little.

15       Any other issues or motions that are coming up right now,

16   that we can address?

17       **MR. VAN NEST:**  I don't think so, Your Honor.

18       **MS. HURST:**  Not for us, Your Honor.

19       **THE COURT:**  Again, Mr. Cooper, you are the model of

20   what this District has been known for in the many years that

21   I've been privileged to practice in this District.

22       And your willingness to take this representation on pro

23   bono, I can't even imagine the number of hours that you've put

24   into it.

25       And I thank you on behalf of the whole system.  I thank

**PROCEEDINGS**

 1    you for your assistance in this case.

 2             **MR. COOPER:**  Thank you, Your Honor.

 3             **THE COURT:**  Okay.  We'll be in recess for a while.

 4             **MR. VAN NEST:**  Thank you, Your Honor.

 5             **MS. ANDERSON:**  Thank you, Your Honor.

 6         (Time is 8:52 a.m.  Proceedings in recess during jury

 7    deliberations.)

 8                            -   -   -   -

 9

10

11

12                    **CERTIFICATE OF REPORTER**

13         I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15

16    DATE:   Wednesday, May 25, 2016

17

18

19                    *Katherine Sullivan*

20    _____

21        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

22

23

24

25