# TRIAL EXHIBIT 3211

10-K 1 d10k.htm FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2004

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2004

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission file number: 000-50726

# Google Inc.
(Exact name of registrant as specified in its charter)

| Delaware | 77-0493581 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**1600 Amphitheatre Parkway
Mountain View, CA 94043**
(Address of principal executive offices)

**(650) 623-4000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:
**None**
Securities registered pursuant to Section 12(g) of the Act:
**Class A Common Stock, $0.001 par value
Class B Common Stock, $0.001 par value**
(Title of class)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act.)   Yes ☐   No ☒

At December 31, 2004, the last business day of the Registrant's most recently completed fiscal quarter, there were 95,542,010 shares of Registrant's Class A common stock and 178,980,030 shares of Registrant's Class B common stock outstanding, and the aggregate market value of such shares held by non-affiliates of the Registrant (based upon the closing sale price of such shares on The Nasdaq National Market on December 31, 2004) was approximately $27,286,463,824. Shares of Registrant's Class A common stock and Class B common stock held by each executive officer and director and by each entity or person that, to the Registrant's knowledge, owned 5% or more of Registrant's outstanding common stock as of December 31, 2004 have been excluded in that such persons may be deemed to be affiliates of the Registrant. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

At March 28, 2005, there were 114,754,458 shares of Registrant's Class A common stock outstanding and 162,594,769 shares of Registrant's Class B common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's Proxy Statement for the 2005 Annual Meeting of Stockholders are incorporated herein by reference in Part III of this Annual Report on Form 10-K to the extent stated herein.

Oracle America v. Google
3:10-cv-03561-WHA

GOOGLE-03169712

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
**TRIAL EXHIBIT 3211**
CASE NO. 10-03561 WHA
DATE ENTERED _____
BY _____
DEPUTY CLERK

Trial Exhibit 3211 Page 1 of 129

Table of Contents

**Risks Related to Ownership of our Common Stock**

*The trading price for our Class A common stock may be volatile.*

The trading price of our Class A common stock has been volatile since our initial public offering and will likely continue to be volatile. The trading price of our Class A common stock may fluctuate widely in response to various factors, some of which are beyond our control. These factors include:

- Quarterly variations in our results of operations or those of our competitors.
- Announcements by us or our competitors of acquisitions, new products, significant contracts, commercial relationships or capital commitments.
- Disruption to our operations or those of our Google Network members or our data centers.
- The emergence of new sales channels in which we are unable to compete effectively.
- Our ability to develop and market new and enhanced products on a timely basis.
- Commencement of, or our involvement in, litigation.
- Any major change in our board or management.
- Changes in governmental regulations or in the status of our regulatory approvals.
- Recommendations by securities analysts or changes in earnings estimates.
- Announcements about our earnings that are not in line with analyst expectations, the likelihood of which is enhanced because it is our policy not to give guidance on earnings.
- Announcements by our competitors of their earnings that are not in line with analyst expectations.
- The volume of shares of Class A common stock available for public sale.
- Short sales, hedging and other derivative transactions on shares of our Class A common stock.
- General economic conditions and slow or negative growth of related markets.

In addition, the stock market in general, and the market for technology companies in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of those companies. These broad market and industry factors may seriously harm the market price of our Class A common stock, regardless of our actual operating performance. Fluctuations in the trading price of our Class A common stock may be even more pronounced since we only recently completed our initial public offering. In the past, following periods of volatility in the overall market and the market price of a company's securities, securities class action litigation has often been instituted against these companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

*Future sales of shares by us or by our stockholders could cause our stock price to decline.*

Our Class A common stock began trading on The Nasdaq National Market on August 19, 2004; however, to date there have been a limited number of shares trading in the public market. We cannot predict the effect, if any, that market sales of shares or the availability of shares for sale will have on the prevailing trading price of our common stock from time to time. There is currently no contractual restriction on our ability to issue additional shares or on our stockholders' ability to sell their shares. Our current stockholders hold a substantial percentage of our outstanding common stock and, as of February 14, 2005, are permitted to sell these shares in the public market without restriction. Sales of a substantial number of shares of our common stock could cause our stock price to fall.

Oracle America v. Google
3:10-cv-03561-WHA

GOOGLE-03169776

Trial Exhibit 3211 Page 65 of 129

Table of Contents

*If our involvement in a September 2004 magazine article about Google were held to be in violation of the Securities Act of 1933, we could be required to repurchase securities sold in our initial public offering.*

Information about Google has been published in an article appearing in the September 2004 issue of Playboy Magazine and entitled "Playboy Interview: Google Guys." The text of the article contains information derived from an interview of Larry and Sergey conducted in April 2004, prior to our initial public offering. The article includes quotations from Larry and Sergey, and has been reprinted by a number of news media outlets. The article presented certain statements about our company in isolation and did not disclose many of the related risks and uncertainties described in the prospectus relating to our initial public offering.

We do not believe that our involvement in the Playboy Magazine article constitutes a violation of Section 5 of the Securities Act of 1933. However, if our involvement were held by a court to be in violation of the Securities Act of 1933, we could be required to repurchase the shares sold to purchasers in our initial public offering at the original purchase price, plus statutory interest from the date of purchase, for a period of one year following the date of the violation. We would contest vigorously any claim that a violation of the Securities Act occurred. The Division of Enforcement of the SEC has confirmed that it will not proceed with any enforcement action against us with respect to the Playboy Magazine article.

*We do not intend to pay dividends on our common stock.*

We have never declared or paid any cash dividend on our capital stock. We currently intend to retain any future earnings and do not expect to pay any dividends in the foreseeable future.

*The concentration of our capital stock ownership with our founders, executive officers and our directors and their affiliates will limit your ability to influence corporate matters.*

Our Class B common stock has ten votes per share and our Class A common stock has one vote per share. At December 31, 2004 our founders, executive officers and directors (and their affiliates) together owned shares of Class A common stock and Class B common stock representing approximately 68.2% of the voting power of our outstanding capital stock. In particular, at December 31, 2004, our two founders and our CEO, Larry, Sergey and Eric, controlled approximately 49.8% of our outstanding Class B common stock, representing approximately 47.2% of the voting power of our outstanding capital stock. Larry, Sergey and Eric therefore have significant influence over management and affairs and over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets, for the foreseeable future. In addition, because of this dual class structure, our founders, directors, executives and employees will continue to be able to control all matters submitted to our stockholders for approval even if they come to own less than 50% of the outstanding shares of our common stock. This concentrated control limits your ability to influence corporate matters and, as a result, we may take actions that our stockholders do not view as beneficial. As a result, the market price of our Class A common stock could be adversely affected.

*Provisions in our charter documents and under Delaware law could discourage a takeover that stockholders may consider favorable.*

Provisions in our certificate of incorporation and bylaws may have the effect of delaying or preventing a change of control or changes in our management. These provisions include the following:

- Our certificate of incorporation provides for a dual class common stock structure. As a result of this structure our founders, executives and employees have significant influence over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets. This concentrated control could discourage others from initiating any potential merger, takeover or other change of control transaction that other stockholders may view as beneficial.

Oracle America v. Google
3:10-cv-03561-WHA

GOOGLE-03169777

Trial Exhibit 3211 Page 66 of 129