KEKER & VAN NEST LLP
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
CHRISTA M. ANDERSON - # 184325
canderson@kvn.com
DANIEL PURCELL - # 191424
dpurcell@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     (415) 391-5400
Facsimile:     (415) 397-7188

KING & SPALDING LLP
BRUCE W. BABER (pro hac vice)
bbaber@kslaw.com
1180 Peachtree Street, N.E.
Atlanta, Georgia  30309
Telephone:     (404) 572-4600
Facsimile:     (404) 572-5100

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>        Plaintiffs,<br><br>    v.<br><br>GOOGLE INC.,<br><br>        Defendant. | Case No.  3:10-cv-03561 WHA<br><br>**GOOGLE INC.'S OPPOSITION TO ORACLE'S RULE 59 MOTION FOR A NEW TRIAL**<br><br>Hearing:    August 18, 2016<br>Time:      8:00 a.m.<br>Dept:      Courtroom 8, 19th Fl.<br>Judge:    Hon. William Alsup |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  ARGUMENT ........................................................................................................2

    A.  The Verdict is Not Contrary to the Clear Weight of the Evidence. .........................2

    B.  Oracle is not entitled to a new trial based on the fact that Android apps can run on Chrome OS. .................................................................................................2

        1.  Background .................................................................................................2

            a.  Oracle knew about the ability to run Android apps in Chrome OS and addressed that functionality in its expert reports. ................................................................................3

            b.  The Court limited the scope of the retrial to particular versions of Android running on smartphones and tablets. ..............4

            c.  Google's recent announcement regarding the ability of Chrome OS to run Android apps. ....................................................5

        2.  The fact that Chrome OS can run Android apps provides no basis for granting a new trial. ...............................................................................6

            a.  Oracle suffered no prejudice because functionality for running Android apps in Chrome OS was outside the scope of the retrial. ....................................................................................7

            b.  The availability of Android applications on Chrome OS does not diminish Google's transformation evidence. ....................8

            c.  The availability of Android applications on Chrome OS does not undermine any argument that Android on smartphones and tablets did not harm the market for Java SE 1.4 and 5.0. ...........................................................................10

        3.  Google had no duty to supplement its discovery responses to disclose evidence that the Court ruled was irrelevant. ..............................11

    C.  The Court's evidentiary and trial management rulings were legally correct and within the bounds of the Court's broad discretion, and Oracle fails to show substantial prejudice as a result of any of the rulings it challenges. .............11

        1.  The Court properly precluded Oracle from expanding the case to include evidence of new products that were not shown to infringe the asserted copyrights at the first trial. ....................................................12

        2.  The Court properly excluded irrelevant and prejudicial evidence from witness Stefano Mazzocchi. ..............................................................15

            a.  The Court properly limited Oracle's use of evidence from Mr. Mazzocchi. .............................................................16

i

        b.     Oracle fails to show "substantial prejudice" from exclusion of the Mazzocchi-related evidence. ................................................18

        c.     The Court properly excluded TX 5295 because it was hearsay and Oracle failed to establish that Sun was the declarant. ................................................................................19

        d.     The Court properly excluded Oracle's self-serving hearsay documents. ...................................................................23

    3.     Bifurcation was proper and not unduly prejudicial....................................24

III.     CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Apple, Inc. v. Samsung Elecs. Co.*
   No. 12-CV-00630-LHK, 2014 WL 252045 (N.D. Cal. Jan. 21, 2014) ................................. 15

*Arica Inst., Inc. v. Palmer*
   970 F.2d 1067 (2d Cir. 1992).............................................................................................. 14

*Beckway v. DeShong*
   No. C07-5072 TEH, 2012 WL 1355744 (N.D. Cal. Apr. 18, 2012) ................................. 12, 24

*Ciena Corp. v. Corvis Corp.*
   210 F.R.D. 519 (D. Del. 2002) ........................................................................................... 25

*Harper v. City of Los Angeles*
   533 F.3d 1010 (9th Cir. 2008) ........................................................................................ 11, 12

*Impact Mktg. Int'l, LLC v. Big O Tires, LLC*
   No. 2:10:CV-01809-MMD, 2012 WL 2092815 (D. Nev. June 11, 2012) ............................ 24

*J2 Glob. Commc'ns, Inc. v. Protus IP Sols.*
   No. CV 06-00566DDPAJWX, 2009 WL 910701 (C.D. Cal. Mar. 31, 2009) ........................ 25

*Jones v. Aero/Chem Corp.*
   921 F.2d 875 (9th Cir. 1990) ............................................................................................ 6, 7

*M2 Software, Inc. v. Madacy Entm't*
   421 F.3d 1073 (9th Cir. 2005) ........................................................................................... 24

*Molski v. M.J. Cable, Inc.*
   481 F.3d 724 (9th Cir. 2007) ............................................................................................... 1

*Navellier v. Sletten*
   262 F.3d 923 (9th Cir. 2001) ............................................................................................. 15

*Oracle Am., Inc. v. Google Inc.*
   750 F.3d 1339 (Fed. Cir. 2014).......................................................................................... 13

*Passantino v. Johnson & Johnson Consumer Prods.*
   212 F.3d 493 (9th Cir. 2000) ............................................................................................... 1

*Richardson v. Marsh*
   481 U.S. 200 (1987).......................................................................................................... 25

*Ruvalcaba v. City of Los Angeles*
   64 F.3d 1323 (9th Cir. 1995) ...................................................................................... 11, 15, 17

*Sana v. Hawaiian Cruises, Ltd.*
   181 F.3d 1041 (9th Cir. 1999) ........................................................................................... 23

*Sony Computer Entm't, Inc. v. Connectix Corp.*
   203 F.3d 596 (9th Cir. 2000) ............................................................................................... 6

iii

*Thought, Inc. v. Oracle Corp.*
No. 12-CV-05601-WHO, 2013 WL 5587559 (N.D. Cal. Oct. 10, 2013).................................... 15

*U.S. for Use & Benefit of Greenhalgh v. F.D. Rich Co.*
520 F.2d 886 (9th Cir. 1975) ........................................................................................ 13

*U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*
576 F.3d 1040 (9th Cir. 2009) ...................................................................................... 23

*United States v. Crawford*
239 F.3d 1086 (9th Cir. 2001) ...................................................................................... 17

*United States v. Olano*
62 F.3d 1180 (9th Cir. 1995) ........................................................................................ 23

*Wagner v. County of Maricopa*
747 F.3d 1048 (9th Cir. 2013) ...................................................................................... 21

*Wright v. Warner Books, Inc.*
953 F.2d 731 (2d Cir. 1991)........................................................................................... 13

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*
259 F.3d 1101 (9th Cir. 2001) ...................................................................................... 16

**Federal Rules**

Fed. R. Civ. P. 26.................................................................................................. 1, 11, 16, 21

Fed. R. Civ. P. 37......................................................................................................... 16, 21

Fed. R. Civ. P. 42.............................................................................................................. 24

Fed. R. Civ. P. 50............................................................................................................. 2, 8

Fed. R. Civ. P. 61.............................................................................................................. 11

Fed. R. Evid. 403 ........................................................................................... 15, 16, 17, 18

Fed. R. Evid. 701 ...................................................................................................... 17, 16

Fed. R. Evid. 801-803 ................................................................................................ 20, 23

## I.    INTRODUCTION

Oracle's motion for a new trial asks the Court to undo all of the hard work undertaken by the Court and the parties, and set aside the unanimous verdict of the ten jurors who sat through this two-week retrial of Google's fair use defense.  A new trial is an extraordinary remedy and "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Passantino v. Johnson & Johnson Consumer Prods.,* 212 F.3d 493, 510 n.15 (9th Cir. 2000)).  None of those circumstances are present here.  Oracle's motion fails to justify the extraordinary relief Oracle seeks.

*First*, Oracle's allegation of discovery misconduct by Google is unfounded.  Far from being "surprised" by an announcement at the 2016 Google I/O conference, Oracle has known since at least the fall of 2015 that Google had created functionality (the "Android Runtime for Chrome" or "ARC") allowing Android apps to be run on the Chrome Operating System ("Chrome OS"), which, in turn, runs on desktops and laptop computers.  Google timely disclosed this functionality in its discovery responses and produced related source code, and three of Oracle's experts addressed it in their expert reports.  Thereafter, however, the Court limited the scope of the retrial to Android smartphones and tablets, and did not allow Oracle to broaden the scope to include additional products such as Chrome OS with ARC.  Thus, there was no reason, much less a duty, to supplement discovery on the update of this functionality.

*Second*, Oracle's challenges to several of the Court's evidentiary rulings fail because the challenged rulings were well within the Court's broad discretion to admit or exclude evidence at trial, and because Oracle fails to show that it was substantially prejudiced as a result of any of the rulings.  The Court properly limited the scope of the *retrial* to issues raised during the first trial and excluded evidence of new products that were not at issue in the first trial.  The Court also properly excluded unfairly prejudicial and irrelevant evidence related to witness Stefano Mazzocchi—who was not even identified in Oracle's Rule 26(a) disclosures and whose testimony could have been properly excluded altogether based on Oracle's failure to comply with the disclosure rules.  Additionally, the Court properly excluded three Oracle documents on hearsay

1

grounds.  None of these rulings was an abuse of discretion, and none of them resulted in the type of substantial prejudice that would justify a new trial.

**Finally**, Oracle's argument that the Court abused its discretion by bifurcating the trial is a non-starter; Oracle itself stipulated to a bifurcated trial after the last trial concluded.  In any event, Oracle has not shown and cannot show substantial prejudice from bifurcation since extensive evidence of Android's financial performance and its alleged impact on Java SE and Java ME was presented during the liability phase of the trial.

Google's fair use defense has been tried twice.  Oracle fails to show that it is entitled to a third bite at the apple.  Accordingly, and for the reasons described in detail below, the Court should deny Oracle's Rule 59 motion for a new trial.

## II.    ARGUMENT

### A.    The Verdict is Not Contrary to the Clear Weight of the Evidence.

As this Court held in denying Oracle's Rule 50(a) motion for judgment as a matter of law, "Oracle is wrong in saying that no reasonable jury could find against it.  Under the law as stated in the final charge and on our trial record, our jury could reasonably have found for either side on the fair use issue."  ECF 1988 (Order Denying Rule 50 Motions) at 1.  Oracle's Rule 59 motion offers no new argument or authority supporting its assertion that the verdict was against the clear weight of the evidence.  Mot. at 1.  Thus, for the reasons stated in Google's opposition to Oracle's Rule 50(a) motion, the Court's order denying that motion, and Google's opposition to Oracle's Rule 50(b) motion filed herewith, Oracle is not entitled to a new trial on this basis.  ECF 1935, 1988, 2010.

### B.    Oracle is not entitled to a new trial based on the fact that Android apps can run on Chrome OS.

#### 1.    Background

During supplemental discovery, Oracle sought to broaden the case in various ways. Following motion practice, however, the Court limited the scope of the retrial.  ECF 1479 (Order re Google's Mot. to Strike) at 1.  Thus, Google had no duty to supplement discovery regarding what Oracle now incorrectly (and self-servingly) calls "Marshmallow/Chrome OS"—which is an update of the fully disclosed ARC (Android Runtime for Chrome) functionality.

2

**a.      Oracle knew about the ability to run Android apps in Chrome OS and addressed that functionality in its expert reports.**

As Oracle notes in its motion, it sought discovery into all Google products incorporating the asserted 37 Java SE API packages at issue.  *See* Mot. at 5-6.  In response, Google identified ARC and ARC Welder, among other products.  *Id.* at 6.  ARC stands for **A**pp **R**untime for **C**hrome, which allows Android applications to run on a device based on Chrome OS, an operating system developed by Google that is separate and different from Android.[1]  ARC Welder provided related functionality to allow Android app developers to test and publish those apps to Chrome OS.[2]  Oracle acknowledges that Google produced source code for ARC and ARC Welder, as well as other products such as OpenJDK-based Android, Brillo, Google Mobile Services, and Play Store.  Mot. at 6.  It also concedes that Google presented fact witnesses with knowledge of ARC, including Felix Lin and Anwar Ghuloum.  *See id.* at 6-7.  Thus, by way of its discovery efforts, Oracle knew long before the close of discovery that Google provided functionality that allowed Android apps to run on Chrome OS.

Well aware of this functionality, Oracle's experts addressed it in their opening reports.  Mr. Zeidman, an Oracle technical expert who addressed the extent to which the 37 Java SE API packages were allegedly incorporated into various different versions of Android as well as other Google products, devoted 17 paragraphs to ARC.  *See* Decl. of Karwande in Support of Google's Opp. to Oracle's Rule 59 Mot. for a New Trial ("Karwande Decl."), Ex. 1 (Zeidman Rep.) ¶¶ 126-43.  At the outset of that discussion, Mr. Zeidman noted "The App Runtime for Chrome (ARC) is a runtime environment created by Google that allows the Android runtime to be used on Chrome OS devices. One of the primary uses for this feature is the ability to run Android apps on the Chrome OS platform."  *Id.* ¶ 126 (footnote omitted).  Similarly, Dr. Kemerer, another Oracle expert, devoted a section of his report to ARC:

> I have reviewed and my technical staff, at my direction, have reviewed source code files and directories regarding Google's App Runtime for Chrome (ARC) product.  ***When ARC is installed on a Google Chromebook computer, it is able***

[1] *See* Karwande Decl., Ex. 2 (https://developer.chrome.com/apps/getstarted_arc) ("The App Runtime for Chrome (Beta), or ARC, lets you run your favorite Android apps on Chrome OS.").

[2] *See* Karwande Decl., Ex. 3 (https://chrome.google.com/webstore/detail/arc-welder/emfinbmielocnlhgmfkkmkngdoccbadn.).

> ***to run Android apps, and thus uses the Android Runtime.*** Detail about the
> copying of code from the 37 Java API packages into the Android Runtime in
> Chrome is set forth in the report of Mr. Zeidman. I have conferred with Mr.
> Zeidman and believe his method of analysis is sound and his results regarding
> such code are accurate. Therefore, ARC, operating in connection with Chrome
> and the Android runtime, necessarily reproduces the code and structure, sequence
> and organization of the 37 Java API packages.

ECF 1560-10 (Kemerer Opening Rep.) ¶ 55 (emphasis added; footnotes omitted). And Oracle's

damages expert Mr. Malackowski also devoted a stand-alone section to ARC, writing as follows:

> Google announced the App Runtime for Chrome ("ARC") project at the June
> 2014 I/O Developer Conference. ***ARC allows Google to bring Android Apps to
> the Chrome operating system. This means Google is now using Android to
> occupy the original, traditional market of the Java Platform.*** In April 2015,
> Google released an ARC Welder Chrome app that allows a user to run Android
> Apps on Chrome OS or using the Chrome web browser. ARC Welder allows
> developers to more easily test Android Apps.

ECF 1560-12 (Malackowski Opening Rep.) ¶ 172 (emphasis added; footnotes omitted). In sum,

based on the discovery provided by Google, Oracle's experts contended that Google provided

functionality (*i.e.*, ARC) that used the 37 Java SE API packages to allow Android apps to run on

Chrome OS, and that Google therefore competed with Sun/Oracle in the traditional marketplace

for Java SE. That is the same basis upon which Oracle now argues it is entitled to a new trial.

> ### b. The Court limited the scope of the retrial to particular versions of Android running on smartphones and tablets.

In addition to discussing ARC, Oracle's experts addressed a variety of other issues that

were not a part of the first trial. For example, Dr. Schmidt, Dr. Kemerer, and Mr. Zeidman

addressed alleged infringement of Java SE 6 and 7, rather than limiting themselves to the Java SE

1.4 and 5 versions that were the subject of the first trial.[3] And Dr. Kemerer and Mr. Malackowski

discussed various Google products beyond smartphones and tablets, including Android Wear,

Android TV, Android Auto, and Brillo.[4]

In response, Google filed a motion to strike portions of the opening expert reports of

Oracle's experts. ECF 1454. Following oral argument, the Court ruled that "The upcoming trial

---

[3] *See* ECF 1560-10 (Kemerer Opening Rep.) ¶¶ 47-50, 188, 208, 218 and App. G; Karwande Decl., Ex. 4 (Schmidt Opening Rep.) ¶¶ 97-106; *id.,* Ex. 1 (Zeidman Opening Rep.) ¶¶ 45, 73, 106, 120-25.

[4] *See* ECF 1560-10 (Kemerer Opening Rep.) ¶¶ 56-60 (Brillo); ECF 1560-12 (Malackowski Opening Rep.) ¶¶ 167-68 (Wear), 169-70 (TV), 171-72 (Auto), and 173 (Brillo).

4

1    will proceed as if we were back in the original trial, but now with the instructions on fair use

2    handed down by the court of appeals.  No new copyrighted works will be allowed."  ECF 1479 at

3    1.  The Court therefore limited the asserted works to Java SE 1.4 and 5.0, and also delineated

4    which specific versions of Android were at issue for purposes of the fair use retrial.  *Id.* at 1-2.

5    Moreover, the Court made clear that code outside of Android's use in phones and tablets, such as

6    ARC, would also not be part of the retrial: "Among possibly others, our trial will *not* include

7    implementations of Android in Android TV, Android Auto, Android Wear, or Brillo."  *Id.* at 2

8    (emphasis in original).  Oracle's subsequent expert reports did not address functionality such as

9    ARC, and Oracle did not attempt to offer any evidence of ARC at trial.

10
11                    **c.    Google's recent announcement regarding the ability of Chrome
                              OS to run Android apps.**

12              Oracle now complains that Google recently announced an update to Chrome OS's ability

13    to run Android apps.  On the second day of Google's annual developer conference called "Google

14    I/O" in 2016, Google announced that it was "bringing the Play Store to Chromebooks."[5]  "So this

15    means you'll now be able to access all your *favorite Android apps* and games not just on a phone

16    or a tablet, but also on a laptop *running Chrome OS.*"[6]  As this description makes clear, the laptop

17    in this example is using the Chrome OS operating system, not the Android operating system.[7]  To

18    allow Android apps to run on a Chromebook, Google is not *replacing* Chrome OS with the

19    Android operating system; instead, the Android *application framework* is being placed into a

20    Linux "container" that runs "on top of the existing Chrome OS stack."[8]  Using this technique, an

21    Android app running on a Chromebook "works like a Chrome OS app."  ECF 1998-5 (Ex. J to

22    Mot.) at 8:18-22.  "Most of the things [the app] expect[s] the Android system to do will be now

23    provided by Chrome OS . . . ."  *Id.* at 8:23-30.  Thus, this technology allows Android *apps*

---

24    [5] Karwande Decl., Ex. 5 (https://www.youtube.com/watch?v=yDy1WWUdlY8) at 5:04-5:06.

25    [6] *Id.* at 5:15-5:30 (emphasis added).  *Compare Id.,* Ex. 2
      (https://developer.chrome.com/apps/getstarted_arc) "The App Runtime for Chrome (Beta), or
26    ARC, lets you *run your favorite Android apps on Chrome OS.*" (emphasis added).

27    [7] *See id.,* Ex. 5 at 6:35-6:46 ("One of the first things you'll notice is this looks a lot like Chrome
      OS, *and that's because it is. It's the same Chrome OS our users have come to love.*") (emphasis
      added).
28    [8] *Id.* at 12:49-13:12.

(available on the Google Play Store) to run *on Chrome OS,* much like many virtualization products allow programs written for one platform to run on a different platform. *Cf. Sony Computer Entm't, Inc. v. Connectix Corp.,* 203 F.3d 596 (9th Cir. 2000) (addressing Connectix's "Virtual Game Station," which allowed games written for the Sony Playstation to run on Mac and Windows personal computers). The announcement was not a "surprise" disclosure as Oracle claims. Mot. at 1. It simply reflected an updated implementation of ARC, which Oracle had known for months allowed Android apps to run on Chrome OS.

Oracle falsely alleges that Google planned its announcement of the latest update to ARC around this lawsuit. Notably, Google has hosted the "Google I/O" developer conference every year since 2008.[9] The two-to-three day conference is usually held in late May, although it has taken place as early as May 10 (in 2011) and as late as June 29 (in 2012).[10] In January 2016, Google publicly announced that the 2016 I/O conference would take place from May 18-20, 2016.[11] At the time, the Court had not yet issued even a tentative order regarding the number of trial hours per side for the fair use portion of the retrial, and there was no way to predict when Oracle would rest its case at trial. *See* ECF 1488 (Tentative Trial Plan). Oracle's accusations that Google "waited" until Oracle rested to publicly announce the latest update of ARC is baseless.

### 2. The fact that Chrome OS can run Android apps provides no basis for granting a new trial.

Oracle argues that it is entitled to a new trial due to alleged discovery misconduct. Mot. at 2. To prevail on this theory, Oracle must (1) prove "by clear and convincing evidence" that Google obtained the fair use verdict through discovery misconduct; and (2) show that Google's alleged misconduct prevented Oracle from fully and fairly presenting its case. *Jones v. Aero/Chem Corp.,* 921 F.2d 875, 878-79 (9th Cir. 1990). Oracle fails on both prongs of the test.

---

[9] *See* Karwande Decl., Ex. 6 (https://en.wikipedia.org/wiki/Google_I/O).
[10] *See id.*
[11] *See id.,* Ex. 7 (https://plus.google.com/+SundarPichai/posts/Gi7EcHRTrNc).

**a.**     **Oracle suffered no prejudice because functionality for running Android apps in Chrome OS was outside the scope of the retrial.**

Oracle has failed to show that any purported lack of discovery concerning the availability of Android applications on Chrome OS prevented it from fully and fairly presenting its case. Oracle ignores that the Court limited the retrial to versions of Android and products that existed in 2012, and updates to those implementations. ECF 1479 at 1-2. As a result, among other products, the retrial did not address functionality such as ARC. *Id.* Indeed, in a later order, the Court specifically excluded all "evidence or expert testimony relating to Android Wear, Android Auto, Android TV, Brillo, *or any other new implementations of Android in devices other than phones or tablets.*" ECF 1781 (Mem. Op. Re Google's Motion *In Limine* No. 2 Regarding New Products) at 5 (emphasis added).

As the Court explained, "[t]he issue in the first phase of this limited retrial is whether Google's use of 37 API packages from Java 2 SE 1.4 and 5.0 in its implementations of Android in phones and tablets constituted a fair use." *Id.* at 3. Because the jury for the first trial did not determine whether there was a *prima facie* case of infringement for other products, "the jury [would] not be asked to consider that question in our [2016] trial." *Id.* Mirroring the issues that were decided by the first jury, the Court held that at the retrial "there will be no analysis of whether those new implementations constituted fair use (assuming they infringe)." *Id.* Because the new implementations were *not at issue* in the retrial, any market harm allegedly caused by those implementations was "irrelevant to the fair use analysis of the accused works." *Id.* (emphasis added). For the same reason, "any evidence that the new implementations of Android superseded the copyrighted works (thus undermining transformativeness) has no bearing on whether the accused works superseded the copyrighted works." *Id.* at 3-4.

Not only did the Court conclude that issues concerning implementations of Android on products other than phones and tablets were *irrelevant,* but the Court also further concluded that expanding the scope of the retrial risked unduly confusing the jury. The Court explained, "we already have a long list of infringing products to impose on our jury and a line must be drawn somewhere to cabin the universe under consideration." *Id.* at 5; *see also* Feb. 2, 2016 Tr. at 13:3-

7

8 ("You two have multiplied this case. It's going to be so hard for a jury to understand, to begin with. . . . I think we ought to just go back to Day One.").[12]

Accordingly, the Court's rulings effectively precluded Oracle from expanding the scope of the retrial to include Android apps running on Chrome OS.  Oracle therefore was not prejudiced by lack of discovery into this subsequent update of ARC.

Furthermore, Oracle's prior treatment of evidence related to ARC suggests that the alleged "new" evidence does not have the "great probative value" that Oracle ascribes to it.  Mot. at 4.  The premise of Oracle's argument is that the ability to run Android apps on a Chromebook shows that Android is not transformative and that Android has harmed the market for Java SE.  *See id.* at 4-5.  Oracle's argument is wrong for the reasons explained below; however, even assuming it had merit, Oracle would not be entitled to a new trial on this basis because it has long known that Android apps can run on Chromebooks (via ARC).  Indeed, Oracle's expert reports included the same argument that Oracle now claims would have allowed it to "challenge foundational aspects of Google's fair use defense."  Mot. at 4; *see, e.g.*, ECF 1560-2 (Malackowski Opening Rep.) ¶ 172 ("ARC allows Google to bring Android Apps to the Chrome operating system.  This means Google is now using Android to occupy the original, traditional market of the Java Platform.").  Yet, despite having been made aware during discovery that ARC allowed developers to "port an Android app to Chrome OS," Mot. at 3, and despite receiving full and complete discovery on ARC and ARC Welder, Oracle failed even to mention ARC in any briefing or argument regarding Google's Motion to Strike or Google's Motion *in Limine* No. 2 re New Products.  Nor did Oracle argue during trial that Google had opened the door to revisiting those rulings based on the evidence presented at trial.  This demonstrates that the alleged evidence that Oracle improperly accuses Google of withholding did not prevent Oracle from fully and fairly presenting its case.

### b.   The availability of Android applications on Chrome OS does not diminish Google's transformation evidence.

As addressed in Google's opposition to Oracle's Rule 50(b) motion, Google presented

---

[12] The parties stipulated to the only expansion of the case that the Court permitted.  *See* ECF 1781, 1488, and 1506 (noting the trial would include subsequent versions of Android released since the first trial, namely Gingerbread, Honeycomb, Ice Cream Sandwich, Jelly Bean, KitKat, Lollipop, and Marshmallow).

GOOGLE'S OPPOSITION TO ORACLE'S RULE 59 MOTION FOR A NEW TRIAL
Case No.  3:10-cv-03561 WHA

substantial evidence from which the jury was entitled to conclude that Android transformed the Java SE API declarations.  The fact that Google has also created technology to make Android applications available on Chrome OS does not diminish or undercut the evidence of transformation that the jury heard.

Professor Astrachan testified that Google added libraries to Android that are "designed specifically for the mobile platform," with features such as "location awareness for GPS"— features that are "not something you would expect on a laptop or desktop computer" running Java SE.  Tr. 1228:14-16, 1228:20-21.  Google also designed a different bytecode architecture, Dalvik, which "has smaller bytecodes than you'd find in the virtual machine on a Java SE platform," reducing power consumption and memory usage.  *Id.* at 1228:23-1229:14.  Google also selected the 37 Java API packages from Java SE that were most useful to a mobile platform, and then wrote implementing code that was optimized for mobile use.  *Id.* at. 1234:3-18.  Google combined that code with a Linux kernel that it also optimized for mobile use.  *Id.* at 1236:15-20. All of that created a new context for the declarations/SSO from the 37 Java SE API packages.  *Id.* at. 1236:22-25, 1237:7-13.  Professor Astrachan testified that the declarations/SSO were "absolutely transformed" when Google created this new context.  *Id.* at Tr. 1288:18-20.  Sun, in contrast, was unable to use Java SE to create a smartphone.  *Id.* at 1238:13-19.  Oracle's economic expert, Professor Jaffe, testified that it was a "feat" for Google to establish Android as a new, viable mobile platform—a feat that other companies, including Oracle and Sun, failed to achieve.  *Id.* at 1784:25-1785:17.  Professor Jaffe also conceded that Sun's efforts in the smartphone space—SavaJe, Acadia, Daneel—all failed or were abandoned.  *Id.* at 1799:19-1800:8.

Moreover, contrary to Oracle's out-of-context quotations (Mot. at 4), Professor Astrachan's did *not* testify that Android could never work on a desktop or laptop computer:

> Q. Now is the Android platform compatible or intraoperative with the Java SE platform?
>
> A. No, it's not. We talked about how the Java SE is designed for laptop and desktop computers, and an application written for those would use likely the 37 API packages and their implementations, but maybe the hundred-plus more that were there for a desktop or laptop computer.  So if it used all those API packages, the declaring code and implementing code to run on a desktop or laptop, we

9

1
2
3
4

> wouldn't expect it to run on a mobile device because it wouldn't use all those API packages.  And similarly, if we wrote an application that ran an Android, it would -- it might use some of those 37 independent implementations in the packages, but it might use the accelerometer and the location services, and if it used those, those new libraries that were designed specifically for the Android platform, it wouldn't work on your desktop or laptop computer. So in general, those platforms aren't compatible.

5   Tr. 1231:8-25.  Professor Astrachan was asked whether the Android platform is compatible with

6   the Java SE platform, and answered that because Java SE includes "maybe a hundred-plus more"

7   Java API packages than are implemented in Android, an application written for the Java SE

8   platform that used those additional packages wouldn't be expected to run "on a mobile device."

9   *Id.* at 1231:8-18.  Similarly, an application written for the Android platform that used Android-

10  specific APIs such as for "the accelerometer or the location services" would not run "on your

11  desktop or laptop computer."  *Id.* at 1231:19-25.  He therefore concluded that "those platforms"—

12  *i.e.*, Android and Java SE—"aren't compatible."  *Id.* at 1231:25.  As the full context shows, when

13  Professor Astrachan referred to "a mobile device," he was testifying about a device *running the*

14  *Android platform,* and when he referred to "your desktop or laptop computer," he was testifying

15  about a computer *running the Java SE platform.*

16         Indeed, the same compatibility issue arises with Android applications and Chrome OS.

17  Chromebooks generally support fewer sensors than are available in a smartphone or tablet, and

18  Android applications that require hardware unavailable on Chromebooks will "not show . . . on

19  the Play Store for Chromebooks."  ECF 1998-10 (Ex. J-1 to Mot.) at 17:54-18:36.  For example,

20  an Android application offering "turn-by-turn navigation" is unlikely to work on Chromebooks

21  because they typically do not have a GPS sensor.  *Id.* at 18:12-18.

22              **c.    The availability of Android applications on Chrome OS does
                        not undermine any argument that Android on smartphones and
23                      tablets did not harm the market for Java SE 1.4 and 5.0.**

24         Because the fair use retrial was limited to implementations of Android on smartphones

25  and tablets, the availability of Android applications on Chrome OS—on Chromebook laptops—

26  was irrelevant to the fourth fair use factor.  Moreover, Oracle's economic expert, Dr. Jaffe, did

27  not even consider whether Android had harmed market opportunities for Java SE in the desktop

28  and laptop categories.  Tr. 1860:13-24.  Dr. Jaffe never spoke with the Java SE team.  And as far

as he was aware, Java SE continues to do "just fine." *Id.* at 1861:13-23; *see also id.* at 1013:11-20 (videotaped deposition of Oracle 30(b)(6) witness Donald Smith testifying that Java SE Advanced revenue is "growing well" and that "[s]upport revenue is growing well.").

### 3. Google had no duty to supplement its discovery responses to disclose evidence that the Court ruled was irrelevant.

Oracle argues that Google failed to supplement its discovery responses to further disclose its updated development of software that makes the Android applications available to devices running Chrome OS.  On February 5, 2016, however, the Court ordered that the retrial would "proceed as if we were back in the original trial, but now with the instructions on fair use handed down by the court of appeals."  ECF 1479 at 1.  Aside from new versions of the phone and tablet implementation of Android, the retrial would not include "other versions and implementations of Android since the last operative complaint preceding the last trial" including implementations such as Android TV, Android Auto and Android Wear.  *Id.* at 2.

Following that order, new implementations of and products for Android, beyond the agreed-upon new versions of Android released for phones and tablets, were outside the scope of this case.  Thus, they were neither admissible nor reasonably calculated to lead to the discovery of admissible evidence, and, as such, the burden or expense of such discovery outweighed its likely benefit.  FED. R. CIV. P. 26(b)(1).  In short, after functionality such as ARC was deemed outside the scope of the retrial, there was neither a practical reason nor legal obligation for Google to further supplement related discovery.

### C. The Court's evidentiary and trial management rulings were legally correct and within the bounds of the Court's broad discretion, and Oracle fails to show substantial prejudice as a result of any of the rulings it challenges.

Oracle challenges several of the Court's trial and *in limine* evidentiary rulings, asserting (incorrectly) that those rulings were erroneous and that they entitle Oracle to a new trial.  The Court has "broad discretion" in deciding whether to admit or exclude evidence.  *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995).  To justify a new trial, an evidentiary ruling must be an abuse of that broad discretion *and* "substantially prejudice[]" the moving party. *Id.*; *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008); *see also* FED. R. CIV. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence—or any other

11

1   error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for

2   vacating, modifying, or otherwise disturbing a judgment or order.").  "This requires the movant to

3   demonstrate that 'more probably than not' the evidentiary error 'tainted the verdict.'"  *Beckway v.*

4   *DeShong*, No. C07-5072 TEH, 2012 WL 1355744, at *6 (N.D. Cal. Apr. 18, 2012) (quoting

5   *Harper*, 533 F.3d at 1030).

6           **1.     The Court properly precluded Oracle from expanding the case to**
                     **include evidence of new products that were not shown to infringe the**
7                    **asserted copyrights at the first trial.**

8           Oracle challenges the Court's *in limine* ruling excluding from this fair-use *retrial* evidence

9   of new Google products or implementations that were not shown to infringe Oracle's copyrights

10  at the first trial.  The new products—including Android TV, Android Auto, Android Wear, and

11  Brillo—were not part of the original trial in 2012.  *See* ECF 1781.  The Court's exclusion of these

12  products was a proper exercise of its broad discretion to manage the presentation of evidence at

13  trial, and Oracle fails to identify any authority to the contrary.

14          The original trial in 2012 was the "first of the so-called 'smartphone war' cases tried to a

15  jury."  ECF 1202 (Order re Copyrightability of Certain Replicated Elements of the Java

16  Application Programming Interface) at 1.  The first trial focused on smartphones and tablets, and

17  the Federal Circuit remanded the case because, amongst other fact disputes that prevented entry

18  of judgment as a matter of law, the Federal Circuit found that there were reasonable fact disputes

19  regarding (1) whether and to what extent use of Android in smartphones was transformative, and

20  (2) the effect of Android on the actual or potential market for a Java-based smartphone:

21          "On balance, we find that due respect for the limit of our appellate function
            requires that we remand the fair use question for a new trial. First, although it is
22          undisputed that Google's use of the API packages is commercial, the parties
            disagree on whether its use is "transformative." Google argues that it is, because it
23          wrote its own implementing code, created its own virtual machine, and
            ***incorporated the packages into a smartphone platform."***
24
            . . .
25
            "Finally, as to market impact, the district court found that 'Sun and Oracle never
26          successfully developed its own smartphone platform using Java technology.' . . .
            But Oracle argues that, when Google copied the API packages, Oracle was
27          ***licensing in the mobile and smartphone markets***, and that Android's release
            substantially harmed ***those commercial opportunities*** as well as the ***potential***
28          ***market for a Java smartphone device***. Because there are material facts in dispute
            on this factor as well, remand is necessary."

12

*Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1376-1377 (Fed. Cir. 2014) (emphases added) (internal citations omitted).  Following the remand, Oracle attempted to broaden the scope of the retrial to include new Java products <u>and</u> new Android-related products that were not related to smartphones and tablets and were not at issue in the first trial.  *Supra* at 2.  The Court rejected Oracle's attempt to broaden the scope of the retrial, and ruled that "[t]he upcoming trial will proceed as if we were ***back in the original trial***, but now with the instructions on fair use handed down by the court of appeals."  ECF 1479 at 1 (emphasis added).  And the Court later confirmed that the retrial would be limited to the issue of "whether Google's use of 37 API packages from Java 2 SE 1.4 and 5.0 in ***its implementations of Android in phones and tablets constituted a fair use***."  ECF 1781 at 3 (emphasis added).  This Court's decision to limit the retrial to smartphones and tablets—the only products or implementations at issue in the first trial and the only products as to which the jury in the first trial found infringement—was consistent with the Federal Circuit's mandate, and well within the Court's broad discretion to manage the trial.  *Cf. U.S. for Use & Benefit of Greenhalgh v. F.D. Rich Co.*, 520 F.2d 886, 889 (9th Cir. 1975) ("The trial court had no power to deviate from this court's mandate.").

Furthermore, consistent with the Federal Circuit's mandate, the Court properly limited the issues to be tried to ***fair use***, as opposed to a whole new trial on infringement.  The jury in the first trial found that Android in smartphones and tablets infringed Oracle's copyrights subject only to Google's fair use defense, and, at Oracle's urging, the Federal Circuit instructed this Court to "reinstate the jury's infringement verdict."  *Oracle*, 750 F.3d at 1381.  The Federal Circuit remanded the case for a limited retrial on fair use only, not on infringement.  *Id.*  The new Android-related products and implementations that Oracle sought to inject into this limited retrial were never at issue in the first trial and they were thus irrelevant to the fair use retrial, which was premised on an infringement verdict that was limited to the use of Android in smartphones and tablets.  ECF 1781 at 3 ("There has been no determination that the implementations of Android in other product categories infringe, and the jury will not be asked to consider that question in our trial.").  Thus, the Court was correct to exclude them because, under fair-use Factor Four, the "effect on the market must be attributable to the [alleged infringement]."  *Wright v. Warner*

1    *Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991); *see also Arica Inst., Inc. v. Palmer*, 970 F.2d 1067,

2    1078 (2d Cir. 1992) ("[T]he relevant market effect is that which stems from defendant's use of

3    plaintiff's 'expression,' not that which stems from defendant's work as a whole.").

4          Oracle's new trial motion does not address the fact that these new products or

5    implementations were not at issue in the first trial.  Instead, Oracle asserts that "[i]n all of the

6    above markets, *Android* contains the 37 Java API packages."  Mot. at 14 (emphasis added).  This

7    assertion misses the mark for several reasons.  ***First***, Oracle conflates specific products like

8    "Brillo" with the versions of Android that are used in smartphones and tablets and which were the

9    subject of the first trial.  Oracle has never proven that products like Brillo use the SSO and

10   declaring code from the 37 Java SE API packages at issue in the first trial and in this fair-use

11   retrial.[13]  And proving this fundamental point is not a mere formality, as Oracle seems to suggest.

12   Indeed, when Google explained the lack of proof related to Brillo, Oracle withdrew its claim as to

13   Brillo, conceding that "it will agree not to raise Brillo at this trial."  ECF 1612-3 at n.1.  Oracle's

14   concession and agreement not to raise Brillo at trial is a waiver of any argument based on alleged

15   harm from Brillo, and demonstrates that Oracle's claims about these new products and

16   implementations are far more complicated than Oracle suggests.

17         ***Second***, even if Oracle could have proven that these new products and implementations

18   use the SSO and declaring code at issue in the first trial, exclusion would be warranted because

19   Oracle would still need to prove infringement.  Use of some aspect of the SSO or the declaring

20   code does not constitute *per se* infringement.  In an infringement proceeding, the parties would

21   have to take discovery into and offer competent, admissible evidence of, amongst other things:

22   what code is used, what functions the code performs, and whether the use was *de minimis*.  None

23   of that has been proven with respect to Brillo, Android TV, Android Wear, or Android Auto.  The

24   Court properly recognized that injecting these new products and infringement issues into the

25   limited retrial on fair use would have further complicated an already complex trial and created a

26   ───────────────

27   [13] Oracle conceded this point by arguing in response to Google's motion i*n limine* that "Oracle
     ***can prove*** that KitKat and Lollipop are on Android, Auto TV, and Wear through a few minutes of
     technical expert testimony or through a short (3-5 page) summary judgment motion."  ECF  1612-

28   3 (Oracle's Opp. To Mot. *in Limine* #2 re New Android Products) at 1 n.1 (emphasis added); *see
     also id.* at 5-4.

1  serious risk that the jury would be unable to grasp the core issues in the case, noting:

2       That's a different problem from whether or not there is a – the use of Android in
3       these other markets with different products is – we have to draw the line
        somewhere.  We have so much for the jury to understand and grasp now, that I
4       despair at how much you lawyers think that they can – in four weeks that we're
        going to be able to teach them.

5  April 14, 2016 Tr. at 115:12-18.

6       The trial court has broad discretion—under both its inherent authority and the Federal

7  Rules of Evidence— to manage the conduct of a trial and the evidence presented by the parties.

8  *See Navellier v. Sletten,* 262 F.3d 923, 941–42 (9th Cir. 2001).  Limiting the number of asserted

9  claims and accused products is a legitimate exercise of that broad discretion.  *See, e.g.*, *Thought,*

10 *Inc. v. Oracle Corp.*, No. 12-CV-05601-WHO, 2013 WL 5587559, at *2 (N.D. Cal. Oct. 10,

11 2013) ("District courts possess the authority to limit patent claimants to a set of representative

12 claims."); *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 252045, at *1

13 (N.D. Cal. Jan. 21, 2014) ("In order to streamline the case for trial, the Court has required the

14 parties to limit their infringement contentions to 5 patents, 10 asserted claims, and 15 accused

15 products per side.").  Indeed, before the first trial in this case, this Court ordered the parties to

16 reduce the number of patent claims and prior art references in play to "ensure that only a triable

17 number of these items . . . are placed before the jury."  ECF 131 (Order re Schedule for

18 Narrowing Issues for Trial) at 1.  Oracle cites no authority holding that the Court's decision to

19 limit the scope of a retrial to the products and implementations that were proven to infringe

20 (subject to Google's fair use defense) in the first trial was an abuse of discretion, let alone an

21 abuse of discretion that "substantially prejudiced" Oracle.  *Ruvalcaba,* 64 F.3d at 1328.

22          2.       **The Court properly excluded irrelevant and prejudicial evidence from
                     witness Stefano Mazzocchi.**
23
        Oracle challenges the Court's exercise of its broad discretion under Rule 403 to exclude
24
   two limited aspects of evidence related to late and improperly disclosed witness Stefano
25
   Mazzocchi.  Mr. Mazzocchi was a member of the Apache Software Foundation at the time he
26
   wrote three emails expressing his personal opinions regarding Apache Harmony's
27
   implementation of Java.  *See* ECF 1993-27 (TX 5046), ECF 1993-33 (TX 9200), and ECF 1993-
28
   34 (TX 9201) (collectively, the "Mazzocchi emails").  Although Oracle was in possession of

15

these emails since at least May 13, 2011, it never disclosed Mr. Mazzocchi on any of its Rule 26(a)(1) disclosures and failed to call him as a witness in the first trial.  Over Google's objections, Oracle was permitted to call Mr. Mazzocchi as a witness at the retrial, and all three of his emails were admitted into evidence.[14]  Oracle used these emails and related testimony to argue to the jury that Apache believed it was doing something wrong by implementing the Java SE API packages in Harmony, and that, by extension, Google knew that its implementation of the Java SE API packages in Android was not a fair use.

The Court could have properly excluded all of this evidence as a result of Oracle's failure to comply with Rule 26(a).  *See* FED. R. CIV. P. 37(c)(1); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); ECF 26 (Standing Order) ¶ 26.  Now, Oracle seeks a new trial because the Court excluded *one* sentence (two lines), of one of the three Mazzocchi emails and excluded evidence that, two years after writing the emails, Mr. Mazzocchi became a Google employee where he does not work on Android.  The Court properly excluded this evidence under Federal Rules of Evidence 403 and 701, and, regardless, Oracle has not shown and cannot show that it was substantially prejudiced as a result of the Court's rulings.

### a.   The Court properly limited Oracle's use of evidence from Mr. Mazzocchi.

After briefing and argument from both parties regarding the admissibility of Mr. Mazzocchi's emails and testimony, and despite Oracle failing to identify Mr. Mazzocchi on its Rule 26(a)(1) disclosures, the Court permitted Oracle to call Mr. Mazzocchi as a witness and allowed Oracle to use the Mazzocchi emails but ordered Oracle to redact a single seventeen-word sentence from one of the emails because it was "too inflammatory and without foundation."  Tr. 1588:11-14.  That excluded sentence read: "This makes us already doing illegal things. In fact, Android using Harmony code is illegal as well."  *Id.* at 1588:13-14.  The Court's ruling was legally correct and well within the Court's broad discretion.

---

[14] The Court excluded TX 9200 and TX 9201 from Oracle's case in chief because they were not disclosed pursuant to Federal Rule of Civil Procedure 26(a).  Tr. 1588:21-24.  After Mr. Mazzocchi's examination by Google the Court allowed these exhibits in for impeachment.  *Id.* at 1730:20-1731:5.

16

*First*, the excluded sentence lacked foundation because Mr. Mazzocchi, a non-lawyer, purported to express a legal opinion on the legality of Android. A "lay witness may not . . . testify as to a legal conclusion." *United States v. Crawford*, 239 F.3d 1086, 1090 (9th Cir. 2001), *as amended* (Feb. 14, 2001); FED. R. EVID. 701. Oracle does not dispute that Mr. Mazzocchi is not a lawyer, has no specialized legal training, and has no knowledge of the fair use doctrine. *See* Tr. 1726:21-1727:11. The Court therefore correctly ruled that there was no foundation for Mr. Mazzocchi's statements regarding the legality of Android's implementation of Apache Harmony. *Id.* at 1588:11-14. Indeed, throughout the trial, Oracle objected to testimony that it characterized as legal opinions from non-lawyers, including testimony from its own former CEO about Sun's practices with respect to the API packages at issue in this case. *See*, *e.g.*, *id.* at 508:2-20. The Court sustained many of Oracle's objections to Mr. Schwartz's testimony. *See id.* at 508:2-8; 508:22-509:9; 510:5-6; 517:2-6. Having excluded such opinions from the plaintiff's former CEO, the Court was certainly within its discretion to exclude similar statements from Mr. Mazzocchi, a third party not even affiliated with Google or Android.

*Second*, any probative value of the excluded statement was substantially outweighed by the risk of undue prejudice to Google. The statement had little to no probative value because, as noted above, Mr. Mazzocchi is not a lawyer and had no basis for expressing a legal opinion. Additionally, Mr. Mazzocchi has never worked on Android, Tr. 1586:21-22, and had no factual bases for an opinion about the legality of Android's use of Apache Harmony. And his off-the-cuff comments about Apache and Android cannot fairly be attributed to the entire Apache organization, as Oracle wrongly suggests. Mot. at 15. Mr. Mazzocchi's statements were unduly prejudicial to Google because, as the Court found, his raw, unsupported statement about "illegal things" was "too inflammatory." Tr. 1588:11-14. Furthermore, the excluded sentence was largely cumulative in substance of other statements in the Mazzocchi email that the Court did not exclude. *Infra* at 18. The Court was therefore well within its "broad discretion" to exclude the statement under Federal Rule of Evidence 403. *See Ruvalcaba,* 64 F.3d at 1328.

*Third*, the Court correctly excluded evidence of Mr. Mazzocchi's employment by Google two years *after* he wrote the emails in question. Mr. Mazzocchi did not work at Google at the

1   time he wrote the emails and he had no authority to speak for Google.  His subsequent

2   employment at Google, where he does not work on Android, has no bearing on any issue in this

3   case.  Indeed, Oracle abandoned any argument to the contrary when it failed to object to the

4   Court's limiting instruction stating that Oracle offered the Mazzocchi emails to show "the state of

5   mind of somebody within the Apache project."  Tr. 1719:9-10 (court's limiting instruction).  The

6   emails were not relevant to *Google's* state of mind, but given Mr. Mazzocchi's current

7   employment at Google, there was a high risk that his past statements could have been incorrectly

8   construed as evidence of Google's understanding regarding its use of the declarations/SSO at

9   issue.  The Court was therefore well within its discretion in excluding this testimony.

10

11           **b.**        **Oracle fails to show "substantial prejudice" from exclusion of the Mazzocchi-related evidence.**

12          Even if the Court had erred in exercising its broad discretion under Rule 403 (which it did

13   not), Oracle would not be entitled to a new trial because it fails to show that the excluded

14   evidence tainted the verdict.  ***First***, Oracle cannot show substantial prejudice as to the two lines

15   excluded from one of the emails because that sentence was largely cumulative of other statements

16   in the emails that were admitted, such as:

- "I was working under the assumption that we could ignore the trademark (avoid stating that we are compatible), use the org.apache.java plus classload trick to avoid the java.* namespace and pretend that we don't know of any IP that we infringe until explicitly mentioned.  *But what I was missing is the fact that the copyright on the API is real and hard to ignore*."  ECF 1993-27 (TX 5046); Tr. 1717:1-7 (emphasis added).

- "Simply by implementing a class with the same signature of another in another namespace and simply by looking at available javadocs *could be considered copyright infringement*, even if the implementation is clean room."  ECF 1993-27 (TX 5046); Tr. 1717:11-15 (emphasis added).

- "*So, we are, in fact infringing* on the spec lead copyright if we distribute something that has not passed the TCK and, *we know that*."  ECF 1993-27 (TX 5046); Tr. 1717:18-21 (emphasis added).

- "The bigger question in my mind is not about hardware. [W]hat is Oracle going to do with 500 million Java powered cell phones? *What is Oracle going to do about Android's ripping off some of (now) their IP and getting away with it*?"  ECF 1993-34 (TX 9201); Tr. 1732:17-22 (emphasis added).

27          These statements are cumulative of the excluded sentence's reference to Apache and

28   Google allegedly doing "illegal things."  Oracle repeatedly used the above quoted statements to

1   argue that those working at Apache and Google knew that their Java implementation was not

2   authorized by Sun.  *See* Tr. 1943:9-24 (using Mazzocchi emails to cross-examine Google's

3   expert); *id.* at 2152:8-2154:24 (highlighting TX 5046 during closing); *Id.* at 2153:9-14

4   (connecting Mazzocchi email to Rubin during closing); *id.* at 2155:11-13 (highlighting TX 9201

5   "ripping off" language during closing); *id.* at 2155:3-5 (urging jury to look at the Mazzocchi

6   emails); *Id.* at 2157:20-21 (referring again to "ripping off" language); *id.* at 2178:23-2179:2

7   (another reference to "ripping off" language).  The jury plainly did not accept Oracle's suggestion

8   that Mr. Mazzocchi, Apache, and everyone in the industry, including Google, knew that Android

9   was not a fair use.  The single, cumulative sentence from one email would not have affected the

10  jury's verdict.

11      ***Second***, in addition to disregarding Oracle's argument about the import of the Mazzocchi

12  emails, the jury reasonably could have credited the testimony from numerous witnesses—

13  including Sun's own CEO—that Apache and GNU were not doing anything improper or unfair

14  by implementing the Java SE API packages without a license from Sun.  *Id.* at 508:22-509:9;

15  515:18-24, 517:2-16, 520:15-521:3 (Schwartz); 1023:3-1027:17; 1024:17-1028:7; 1037:6-14

16  (Phipps); 989:15-990:7; 990:18-991:17 (Bloch).

17      Oracle's complaints about its purported inability to attack Mr. Mazzocchi's credibility are

18  unfounded.  Oracle's counsel vigorously cross-examined Mr. Mazzocchi on all of these emails.

19  Oracle attempted to show bias by asking Mr. Mazzocchi whether he spoke with Google's counsel

20  before testifying in Court.  Tr. 1724:17-24.  The fact that Mr. Mazzocchi became a Google

21  employee two years after writing the email would not have provided any significant additional

22  evidence of "bias" and Oracle's suggestion that such a minor piece of evidence would have

23  affected the jury's verdict in this wide-ranging, two-week trial is unsupported by any authority.

24  The Court properly excluded Oracle's hearsay documents.

25          **c.**      **The Court properly excluded TX 5295 because it was hearsay**
                        **and Oracle failed to establish that Sun was the declarant.**
26

27      In April of 2009, Oracle reached a publicly announced deal to purchase Sun.  The deal

28  closed in January 2010, and Sun Microsystems, Inc. changed its name to Oracle America, Inc.

    Tr. 1186:6-12.  Sun is therefore the plaintiff in this case, and out-of-court statements made by Sun

                                                19

1   are hearsay unless they fit within an exception to the hearsay rules.  *See* FED. R. EVID. 801-803.

2          As part of the regulatory process to finalize its acquisition of Sun, Oracle filed a merger

3   notification and related paperwork with the European Commission ("EC"), the executive body of

4   the European Union.  Tr. 1311:10-14; 1312:15-17.  When asked about this process, Sun's-then-

5   CEO Jonathan Schwartz testified that he was not involved in the discussions and that "Oracle was

6   clear, they were the only ones who were to speak with competition authorities."  *Id.* at 597:1-

7   598:13.  Later in the trial, Oracle sought to introduce a statement, supposedly attributable to Sun,

8   contained within one of the documents Oracle filed with the EC.  *Id.* at 1313:18-19.  To overcome

9   the obvious hearsay problem that existed with offering an out-of-court statement by Sun for the

10  truth of the matter asserted, Oracle argued that the statement could be used to counter Google's

11  evidence that Sun "believed" Android was permissible and the purported insinuation that Oracle

12  had "cooked up" this lawsuit after acquiring Sun. Tr. 1309:1-6, 1311:20-22. Oracle represented to

13  the Court that it could show—presumably through evidence that was properly disclosed and

14  admissible at trial—that Sun supplied the answers within what Ms. Catz, Oracle's CEO,

15  identified as an "Oracle document." *Id.* at 1313:17-19.  Oracle's counsel represented that Oracle

16  would prvide the drafts to the Court the next day, and that "we produced all of the drafts leading

17  up to this, showing Sun's participation in the drafting." *Id.* at 1314:1-12.  Counsel was mistaken.

18         Late that night and early the next morning Oracle produced to Google—for the first

19  time—five drafts of TX 5295, the EC filing to which Ms. Catz referred in her testimony.  These

20  drafts were attached to emails exchanged among Sun's and Oracle's lawyers.  At the time of

21  production, Oracle did not notify Google that at least four of the drafts it was producing appear to

22  have been previously withheld as privileged.  *See* Tr. 1327:5-13.

23         The following morning in court, Oracle's counsel abruptly waived attorney-client

24  privilege and attempted to proffer a handpicked selection from hundreds of previously withheld

25  documents that it claimed established that Sun's lawyers had drafted the relevant statements in

26  TX 5295.  *See* Tr. 1333:10-18.  As the Court remarked, this waiver was "extraordinary."  *Id.* at

27  1328:16-19; 1329:2.  Google had never seen these draft documents before, and did not have

28  access to all of the documents related to the drafting of the EC filing because Oracle did not

produce any other of the hundreds of privileged emails related to the EC filing.  The Court rejected this belated and selective proffer of privileged documents and excluded TX 5295.  *See* FED. R. CIV. P. 37(c)(1) (If a party fails to provide information as required by Rule 26(a) "the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless").  The Court was well within its discretion in excluding this evidence.

*First*, regardless of whether Sun or Oracle was the declarant, TX 5295 was hearsay and the Court would have been correct to exclude it on that basis alone.  Sun is the plaintiff in this case, and its out-of-court statements are hearsay unless they fall within a specific exception, which the statements here do not.  TX 5295 thus could have been excluded for this reason alone.

*Second*, Oracle argues that TX 5295 should have been admitted to show Sun's "state of mind," but Oracle failed to establish through admissible evidence that Sun was the declarant of the statements in the EC filing.  This case is thus different from *Wagner v. County of Maricopa*, *see* Mot. at 21, where there was no challenge to whether the hearsay statement at issue was actually attributable to the declarant and the court did not rule on that issue.  747 F.3d 1048, 1052 (9th Cir. 2013).  Here, there was plenty of reason to doubt whether Sun actually authored the statement: it was contained within an "Oracle document," which Sun's then-CEO had no memory of, and was made after Oracle had instructed Mr. Schwartz—the CEO of Sun who had been responsible for all decisions made by the company—that Oracle employees "were the only ones who were to speak with competition authorities."  Tr. 598:2-5, 1311:10-14; 1312:15-17.  The fact that Oracle had the authority to order Sun employees, including the CEO, not to speak with the EC is more than sufficient to support the conclusion that Oracle, not Sun, controlled the company and that any statements made by "Sun" during this period were equally attributable to Oracle.  Indeed, during this same time period, Oracle CEO Larry Ellison appeared on stage at the JavaOne developer conference and informed thousands of people in the audience about what to expect regarding Java in the future, even though Oracle's acquisition of Sun had not officially closed.  Karwande Decl., Ex. 8 (TX 2939.1).  This evidence shows that Oracle was in control of the company before the acquisition finalized, and that statements nominally made by "Sun" reflect Oracle's "state of mind," not the independent views of Sun.

1    Furthermore, given Oracle's mid-trial waiver of attorney-client privilege and selective

2    late-night production of previously withheld documents, Google had no opportunity to test what

3    was actually contained in the documents within the subject matter waiver.  Oracle attempted to

4    use privileged documents—produced at the eleventh hour—to somehow prove that Sun was the

5    declarant of statements within a document that Oracle's own CEO referred to as an "Oracle

6    document," without giving Google access to related documents for use in cross-examination.  The

7    Court was not obligated to accept such gamesmanship, and it properly excluded TX 5295.

8    In any event, Oracle was not substantially prejudiced by exclusion of TX 5295.  The

9    overwhelming majority of evidence of Sun's "pre-acquisition" conduct showed that Sun accepted

10    Android as a proper use of the Java SE API packages that was consistent with Sun's long-

11    standing business practices.  *See, e.g.*, Tr. 501:8-23; 500:21-23 (Schwartz); 974:9-21, 994:10-11;

12    974:9-21; 991:18-992:2;  994:6-11 (Bloch); 362:22-363:6 (E. Schmidt); Karwande Decl., Ex. 9

13    (TX 2352) (Schwartz blog congratulating Google and welcoming Android to the Java

14    community); *id.,* Ex. 10 (TX 7459.1) (Barr blog commending Google and noting that Android

15    "shows that the era of proprietary and closed mobile platform and networks is finally drawing to

16    an end"); *id.,* Ex. 11 (TX 3441) (Schwartz email offering support for Android).  The jury was

17    entitled to rely on that evidence in reaching its verdict, and TX 5295 could not reasonably have

18    affected the verdict.  The jury also could properly have relied on the complete absence of any

19    witness testimony offered by Oracle regarding Sun's pre-acquisition view of Android.  Indeed,

20    given Oracle's emphasis on Sun's "state of mind," it is telling that Oracle did not present a single

21    Sun employee who could contradict Mr. Schwartz's sworn testimony and state that the executives

22    in charge at Sun believed Google was doing anything unfair with Android.[15]

23

24

---

25    [15] The jury understandably could have placed little weight on Oracle's attempt to persuade the
jury that Mr. Schwartz believed Android was unfair by offering evidence of Mr. Schwartz's
26    alleged views through Oracle's CEO, Ms. Catz.  *See* Tr. 1307:1-1308:5 (Catz testifying about
email exchange with Schwartz); Tr. 1308:19-1309:17 (Catz testifying about conversation with
27    Schwartz regarding Android).  Particularly so given Mr. Schwartz's unequivocal testimony that
he never suggested that Android's use of declarations/SSO was impermissible.  *Id.* at 508:22-
28    509:9; 556:23-557:5; 558:8-11.  One additional post-acquisition statement, supposedly
attributable to Sun's lawyers, would not have affected the jury's views of Sun's "state of mind."

### d.    The Court properly excluded Oracle's self-serving hearsay documents.

"Courts are rightfully wary when parties create self-serving documents and seek to offer them as business records."  *Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1046 (9th Cir. 1999). The Court has "wide discretion" when determining whether a supposed business record is sufficiently "trustworthy" to overcome the rule against hearsay.  *United States v. Olano*, 62 F.3d 1180, 1206 (9th Cir. 1995); FED. R. EVID. 803(7)(C) (business record exception not met if opponent shows "other circumstances indicate a lack of trustworthiness").  After considering three internal Oracle presentations (TX 5961, TX 6431, and TX 6470), all created shortly before or after Oracle filed this lawsuit, the Court correctly excluded these documents as "internal self-serving" records and "internal propaganda."  Tr. 1357:20-1358:6; 1498:21-23; 1499:20-24.

The authority Oracle relies on is not to the contrary.  In  *U-Haul International, Inc. v. Lumbermens Mutual Casualty Company*, the Ninth Circuit found that the district court did not abuse its discretion by finding that computer-generated summaries of payment data stored in the company's databases qualified as a business record.  576 F.3d 1040, 1044 (9th Cir. 2009).  This is precisely the type of information the Court indicated it would (and did) allow in as a business record.  *See* Tr. 1357:20-23 ("If it was just a financial statement, I would allow it."); Karwande Decl., Ex. 12 (TX 9133.1) (admitting certain slides from PowerPoint); *id.,* Ex. 13 (TX 4108) (admitting revenue forecasts for Java products).

But that is not the type of information Oracle intended to introduce through TX 5961, TX 6431, and TX 6470.  Rather, Oracle sought to introduce self-serving commentary, written shortly before and after the lawsuit was filed in July 2010, discussing Android's alleged harm to the market for Java.  For example, page 21 of TX 5961, which Oracle characterizes as "a spreadsheet of revenue and expenses for the first two quarters of fiscal year 2011 for Java embedded and forecasts for the third quarter" is actually a "FY10 Performance Assessment" that notes "Deteriorated profitability in key OEM's due to Android" and "Android & non-compliant Java implementations impacting Java revenues."  Mot. at 23; ECF 2002-20 (TX 5961) (April 2010 presentation at 21); *see also* ECF 2002-24 (TX 6470) at 14, 16 (narrative description of Android's purported impact on Java and legality in August 2010 presentation); ECF 2002-21, 2002-22 (TX

23

6431) at 59, 60, 78 (inflammatory conclusions and commentary on Android's legality in December 2010 presentation).  The Court properly excluded these self-serving presentations as hearsay not within any established exception to the hearsay rule.  *See Impact Mktg. Int'l, LLC v. Big O Tires, LLC*, No. 2:10:CV-01809-MMD, 2012 WL 2092815, at *3 (D. Nev. June 11, 2012) (document is "inherently untrustworthy because it was produced . . . during this litigation to provide evidence regarding his company's damages.").

Even assuming these three documents were admissible, Oracle was not substantially prejudiced by exclusion of the documents.  Mr. Neal Civjan, former Sun executive of sales, and Ms. Catz testified at length about the information in those presentations, including Android's supposed impact on licensing, revenue, business, and projections for future revenue.  Tr. 1633:2-1636:13 (Civjan); 1358:8-1363:6 (Catz).  The fact that this testimony was not accompanied by self-serving presentations did not "taint[]the verdict."  *Beckway,* 2012 WL 1355744, at *6.

### 3.    Bifurcation was proper and not unduly prejudicial.

"For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues [or] claims[.]"  FED. R. CIV. P. 42(b).  The trial court has "broad discretion" in deciding how to manage the trial, including whether to bifurcate liability and damages.  *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1088 (9th Cir. 2005).

Oracle fails to provide any factual or legal support for its argument that the Court abused its discretion by bifurcating liability and damages, and it does not even attempt to show that any such abuse of discretion would warrant a new trial here.  *See* Mot. at 19-20.  Nor could Oracle plausibly make such an argument because it stipulated to a bifurcated trial long ago.  Following the first trial, Oracle stipulated that "[i]n the event that Oracle's claim based on the SSO of the 37 accused API packages or any portion thereof (the 'SSO Claim') is ultimately submitted to a jury (the 'Future Jury') for an assessment and award of monetary relief, then . . . [p]roceedings with respect to the SSO Claim will be bifurcated, i.e., liability will be tried separately from willfulness and damages."  ECF 1159 (Stipulation and Order Regarding Copyright Damages) at 1.

Oracle asserts that bifurcation prevented it from presenting to the jury evidence of Google's "monetization strategy and profits."  Mot. at 20.  Oracle is wrong.  Plenty of evidence

regarding Google's Android business model and financials was admitted at trial.  *See*, *e.g.*, Tr 404:16-405:4 (Schmidt) (explaining Google's business model for Android); *Id.* at 1752:2-24 (Jaffe) (testifying about Google's business model for Android); *Id.* at 1761:25-1762:23, 1776:20-1777:14 (testifying regarding Google revenue from Android); *see also* ECF 1993-14 (TX 190); ECF 1993-25 (TX 1061); ECF 1993-29 (TX 5183).  Contrary to Oracle's argument, *see* Mot. at 20, the bifurcated trial structure did not prevent it from offering this evidence or evidence of alleged harm to Java ME at trial.  *See* Tr. 1633:2-1636:13 (Civjan); 1358:8-1363:6 (Catz); Tr. 1772:20-1777:21 (Jaffe).  In fact, such evidence was admitted at trial and Oracle emphasized it in its closing arguments.  *See*, *e.g.*, *id.* at 2140:10-2142:8 (arguing that Android is "highly commercial"), *id.* at 2166:8-2167:5 (arguing that Java ME is a derivative work of Java SE), *id.* at 2171:25-2172:16 (arguing that Oracle lost business due to Android).  Oracle offers no explanation for how bifurcation could have altered the jury's verdict in view of this evidence.

Oracle also complains that bifurcation provided a "structural incentive for the jury to return a defense verdict."  Mot. at 20.  Of course, that argument could be made about any bifurcation order, and yet bifurcation of liability and damages is a common trial management practice in complex cases.  *See, e.g.*, *Ciena Corp. v. Corvis Corp.*, 210 F.R.D. 519, 521 (D. Del. 2002) ("[B]ifurcation of complex patent trials has become common."); *J2 Glob. Commc'ns, Inc. v. Protus IP Sols.*, No. CV 06-00566DDPAJWX, 2009 WL 910701, at *4 (C.D. Cal. Mar. 31, 2009) ("Bifurcation is common in cases where the resolution of one issue may completely resolve a later issue, particularly where the case is otherwise complex."); *see also* Manual for Complex Litigation (Fourth) § 33.27 (2004).  Moreover, the Court expressly instructed the jury, "Please do not allow any desire to complete trial sooner to influence your thinking."  ECF 1981 (Final Charge to Jury) at 22.  Jurors are presumed to have followed the Court's instruction.  *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).  Oracle's suggestion to the contrary is unsupported.

## III.   CONCLUSION

For the foregoing reasons, the Court should deny Oracle's Rule 59 motion for a new trial.

//

//

1

Dated:  July 20, 2016                                KEKER & VAN NEST LLP

2

3                                              By:   */s/ Robert A. Van Nest*

4                                                    ROBERT A. VAN NEST
                                                     CHRISTA M. ANDERSON
                                                     DANIEL PURCELL

5

6                                                    Attorneys for Defendant
                                                     GOOGLE INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOOGLE'S OPPOSITION TO ORACLE'S RULE 59 MOTION FOR A NEW TRIAL
Case No.  3:10-cv-03561 WHA