Pages 1 - 78

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | | |
|---|---|---|
| ORACLE AMERICA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. C 10-3561 WHA |
| | ) | |
| GOOGLE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | San Francisco, California |
| | | Wednesday, August 17, 2016 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          ORRICK, HERRINGTON & SUTCLIFFE LLP
                            The Orrick Building
                            405 Howard Street
                            San Francisco, California  94105
                    **BY: ANNETTE L. HURST, ESQUIRE**
                         **NATHAN SHAFFER, ESQUIRE**

                            ORRICK, HERRINGTON & SUTCLIFFE LLP
                            The Orrick Building
                            51 West 52nd Street
                            New York, New York 10019
                    **BY: LISA T. SIMPSON, ESQUIRE**

(Appearances continued on next page)

Reported By:  Katherine Powell Sullivan, CSR #5812, RMR, CRR
              Official Reporter - U.S. District Court

1    **APPEARANCES (CONTINUED)**:

2    **For Plaintiff:**          ORRICK, HERRINGTON & SUTCLIFFE LLP
                                  777 South Figueroa Street, Suite 3200
3                                 Los Angeles, California  90017-5855
                             BY: **MICHELLE O'MEARA,  ESQUIRE**
4
     **For Defendant:**          KEKER & VAN NEST
5                                633 Battery Street
                                 San Francisco, California  94111-1809
6                            BY: **ROBERT A. VAN NEST, ESQUIRE**
                                 **CHRISTA M. ANDERSON, ESQUIRE**
7                                **KATE E. LAZARUS, ESQUIRE**
                                 **REID PATRICK MULLEN, ESQUIRE**
8                                **MAYA KARWANDE, ESQUIRE**
                                 **MICHAEL S. KWUN, ESQUIRE**
9                                **DANIEL PURCELL, ESQUIRE**
                                 **REID PATRICK MULLEN, ESQUIRE**
10
                                 KING & SPALDING LLP
11                               1185 Avenue of the Americas
                                 New York, New York 10036-4003
12                           BY: **BRUCE W. BABER, ESQUIRE**

13                               GOOGLE, INC.
                                 1600 Amphitheatre Parkway
14                               Mountain View, California  94043
                             BY: **RENNY HWANG, LITIGATION COUNSEL**
15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>**Wednesday - August 17, 2016**</u>                    <u>**8:47 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Case number Civil 10-3561, Oracle America, |
| 5 | Inc. versus Google, Inc. |
| 6 | **MS. HURST:**  Good morning, Your Honor. |
| 7 | **THE COURT:**  Good morning. |
| 8 | **MS. ANDERSON:**  Good morning, Your Honor. |
| 9 | **THE CLERK:**  Counsel, can you please state your |
| 10 | appearances for the record. |
| 11 | **MS. HURST:**  Your Honor, we are taking advantage of the |
| 12 | "let an associate argue" rule this morning, in part. |
| 13 | Ms. Simpson and I will address the motion for new trial. |
| 14 | We also have Mr. Nathan Shaffer with us to address the 50(b) |
| 15 | motion. |
| 16 | And Ms. O'Meara is here in case the objections to the |
| 17 | costs come up, Your Honor.  I know that's not technically on |
| 18 | calendar this morning, but we didn't know if the Court had |
| 19 | intended to address that at any point. |
| 20 | **THE COURT:**  Okay.  Thank you. |
| 21 | **MS. ANDERSON:**  Good morning, Your Honor.  Christa |
| 22 | Anderson on behalf of Google. |
| 23 | With us at counsel table here today are Mr. Bob Van Nest; |
| 24 | Mr. Reid Mullen; Ms. Kate Lazarus; Mr. Bruce Baber from King & |
| 25 | Spalding; Mr. Dan Purcell; and Ms. Maya Karwande. |

1    And with the Court's permission, we would also like to

2    take advantage of Your Honor's invitation to have younger

3    lawyers participate in the argument today.

4         **THE COURT:**  That's on which motion?

5         **MS. ANDERSON:**  With respect to the motion for new

6    trial, we would like to share the argument with Ms. Maya

7    Karwande.  And with respect to the other motion, we have

8    Mr. Mullen and Ms. Lazarus.

9         **THE COURT:**  Well, you know we went over the -- I've

10   already made a ruling on the Rule 50.

11     Who is it over there that's a young lawyer?

12        **MR. SHAFFER:**  I am, Your Honor.

13        **THE COURT:**  Are you a young lawyer?

14        **MR. SHAFFER:**  Yes.

15        **THE COURT:**  How young are you?

16        **MR. SHAFFER:**  I'm 33 years old.  And I've been in

17   private practice a little bit under two years.

18        **THE COURT:**  All right.  We'll let you start then.  You

19   get to make the Rule 50 motion.

20        **MR. SHAFFER:**  Sure, Your Honor.

21     So I'm here to renew Oracle's Rule 50 motion.  So it's

22   under Rule 50(b), which is the post-trial renewal.

23     And Oracle's position is that for each of the four factors

24   there was insufficient evidence for a jury to return a verdict

25   of fair use in Google's favor.

1        And, you know, on Factor 1, the commerciality of Android

2   is not seriously in dispute.  We heard evidence that there was

3   $42 billion dollars of revenue associated with the product.

4   There was $18 billion in revenue in 2015 alone.

5        And we also heard evidence from both sides' technical

6   experts.  And if you remove what Google copied from Java, the

7   whole system does not work.  So Java was a key component in

8   bringing them that revenue.

9        The other point, under the case law, *Harper & Row* says

10  that the question is not whether there could be some

11  noncommercial use of the product.  The question is whether or

12  not the copiest stands to gain from what they copied.  And

13  that's clear here.

14       Even if Google had some other use that's noncommercial,

15  they would still fail the test under *Harper & Row*.

16       Additionally, under the case law that applies, Google's

17  use of the material that they copied from Java was not

18  transformative.

19       I think that the testimony that really controls this issue

20  is Dr. Leonard's testimony.  He discussed economic

21  substitution, which he described as alternatives.  You know,

22  would a consumer go from one product, return -- you know,

23  Microsoft Word, they wouldn't choose to go from Microsoft Word

24  back to a typewriter.  Those aren't economic substitutes.

25       The problem with that testimony under the law is that fair

1   use absolutely considers market replacement.  That's something

2   the Ninth Circuit discussed in *Kelly v. Arriba*.

3       So when you're talking about economic substitution, you're

4   looking at alternatives.  Fair use is concerned with market

5   replacement.  Superseding uses.  Supplanting uses.

6       That's what Dr. Leonard's testimony shows happened here.

7   Google came with what they copied from Java and actually

8   supplanted and superseded the market that Java was already

9   occupying, particularly in the mobile phone market.

10      And then, you know, of course, bad faith is the third

11  subcomponent of the first fair use factor.  We have

12  overwhelming evidence that Google knew that the APIs were

13  copyrighted; Google felt that it needed a license; and it

14  decided to copy anyway.

15      Additionally, the Ninth Circuit has made clear under the

16  *Monge v. Maya* case --

17          **THE COURT:**  Don't we let the jury -- you know, you put

18  in -- I thought you had a lot of those emails.  And a jury

19  certainly could have found bad faith if the jury wanted to.

20  You put in adequate evidence to that effect.  But the other

21  side put in evidence the other way.

22      And isn't intent and subjective bad faith/good faith,

23  isn't that the most classic jury question imaginable?  And then

24  we're stuck with whatever the jury decides.  Aren't we?

25          **MR. SHAFFER:**  It would be a jury question if there was

1  evidence to support good faith.

2      **THE COURT:**  There was.  Of course there was.  You

3  can't just put on blinders and say the other side didn't put on

4  a case.  They did put on a case.

5      **MR. SHAFFER:**  I agree, Your Honor.  But --

6      **THE COURT:**  And your side tried -- take Mr. Jonathan

7  Schwartz.  He testified, basically, for Google.  And Ms. Hurst

8  tried to rake him -- or was it the other guy?

9      **MS. HURST:**  It was Mr. Bicks, Your Honor.

10      **THE COURT:**  Mr. Bicks.  He -- he raked him over the

11  coals; did a pretty good cross-examination.  But, nevertheless,

12  the witness held up pretty well.  And the jury could say, "We

13  like Jonathan Schwartz.  We didn't like that cross-examination.

14  "too bad for Oracle; they lose."

15    I mean, that's the American way.  That's the way it works

16  in trials.  You can't come in after the fact and ask the judge

17  to bail you out.

18      **MR. SHAFFER:**  Mr. Schwartz' testimony was what it was.

19  But he also testified that Sun had a licensing scheme in place.

20  Compatibility was important in order to comply --

21      **THE COURT:**  He said all of that.  Yes, you're right.

22  And that's why we have a jury.

23      **MR. SHAFFER:**  And Mr. Schwartz' testimony was also

24  that Google did not comply with the compatibility requirements.

25  And there are contemporaneous documents that show that as well.

1    Mr. Schwartz ignored the written license that was in place

2    at the time Android was released.  Android did not comply with

3    that license.  And that license actually contains that

4    compatibility requirement.

5    So Mr. Schwartz' testimony supports Oracle's position that

6    Google's use was unlicensed.  And Google's --

7    **THE COURT:**  So a jury could have concluded.  I agree

8    with that.  But so a jury could have concluded to the contrary.

9    **MR. SHAFFER:**  Your Honor --

10   **THE COURT:**  You don't seem to recognize that.

11   **MR. SHAFFER:**  I would say that the evidence that

12   Google submits on the good faith issue is largely irrelevant.

13   So, they talk about Jonathan Schwartz' blog post that

14   happened shortly after Android was announced but before any of

15   the source code was released and before Jonathan Schwartz even

16   knew what the license would be.

17   So at the time the platform was announced, it could have

18   been compatible.  It could have complied with the licensing

19   requirements.

20   It wasn't until March of the next year that Dr. Schmidt,

21   Google's former CEO, and Jonathan Schwartz had a conversation

22   where Jonathan Schwartz asked, What is the licensing terms?

23   You know Dr. Schmidt responded, It's going to be the Apache

24   license.  Only at that point did Jonathan Schwartz understand

25   that Google was not complying with the existing licensing

1   regime.

2       So all of the evidence that, sort of, comes up in that

3   intervening time period, before Sun had any reason to know the

4   scope of Google's projects, could not support good faith,

5   because Sun just simply didn't know what was going on.

6           **THE COURT:**  Let me ask a different question.

7           **MR. SHAFFER:**  Yes, Your Honor.

8           **THE COURT:**  When this case was before the Court of

9   Appeals for the Federal Circuit, your side did an excellent

10  job.  And your side asked the Court of Appeals to rule as a

11  matter of law on the record -- the whole fair issue had been

12  tried -- to rule as a matter of law that there was not fair

13  use.  And the Court of Appeals refused that request, and sent

14  it back down for trial.

15      Now, if what you're saying is correct, then the Federal

16  Circuit should have just entered judgment then and there for

17  you and not let a jury decide this case.

18      So what do you say to that?

19          **MR. SHAFFER:**  Your Honor, the Federal Circuit asked

20  for several things to happen on remand.  They gave instructions

21  that Google's evidence on transformative use wasn't going to

22  get it there.  And it said you now have an opportunity to get

23  it there.

24      They also said that Google had an opportunity to conduct a

25  filtration analysis and to firmly identify which components of

1   the Java platform were necessary to copy in order to use the

2   Java language.  Google didn't do either of those things on

3   remand.

4        So now we have an entire trial that's happened on fair

5   use.  We have a complete record.  This is not a record that was

6   before the Federal Circuit.  This is a different consideration.

7        There are several cases where the courts have made clear

8   that fair use is a mixed question of law and fact, and it can

9   be decided as a question of law on a complete record.

10       The *Worldwide Church of God* case in the Ninth Circuit.

11   The *Monge v. Maya* case, *Maya Magazines* case in the Ninth

12   Circuit.  And the *Wall Data* case.  Those are all Ninth Circuit

13   cases where the Court has said this is an issue that can be

14   resolved as a matter of law once the record is complete.

15       And here we know Google cannot meet its burden on

16   transformative use and cannot meet its burden on the filtration

17   analysis.

18            **THE COURT:**  Google cannot what on transformative use?

19            **MR. SHAFFER:**  Meet its burden.

20            **THE COURT:**  All right.  Summarize why that would be.

21            **MR. SHAFFER:**  Sure, Your Honor.

22       So on transformative use, one, Dr. Leonard's testimony

23   that I already discussed under fair use law -- this is a quote

24   from *Kelly v. Arriba Soft*.

25            "A work that supercedes the object of the original

1    serves as a market replacement for it."

2    Dr. Leonard testified that when Android came in in

3    smartphone format, it replaced the market for feature phones.

4    We have internal documents from Google saying, "We're going to

5    go downmarket and we're going to compete with feature phones."

6    That is a superseding use.  That's a nontransformative use

7    under the case law.

8    Dr. Leonard's testimony was strictly limited to the

9    concept of economic substitution, which is concerned with a

10   two-way street.  There are two products that can be used

11   interchangeably.

12   Fair use is concerned with superseding uses.  It's kind of

13   like, I wrote the story for *Rear Window*.  In the *Stewart v.*

14   *Abend* case, Alfred Hitchcock came along.  He's a brilliant man.

15   He can make a better movie than I ever could.  He says, "I get

16   to use your story for my film because I'm going to make

17   something better than you could make."

18   Well, that's not fair use.  And the Supreme Court said

19   that's not fair use.

20   Oracle had a right to use its technology, to use its

21   copyrighted work to innovate, to create derivatives.  And

22   Google came in and superseded that opportunity.  That's why

23   this cannot be a transformative use.

24   And that's evidence from Google's own economic witness.

25   The only economic witness they put on.  And he unequivocally

said smartphones came in -- Android-based smartphones came in
and replaced the market for Java-based phones.  So under those
facts, it cannot be transformative.

Additionally, as the Court held in the 50(a) order, you
know, the copied declarations and the structure, sequence and
organization serve the same purpose in both platforms.

You know, there isn't a case that says you can take a
copyrighted work and use it for the same purpose and make a
claim to transformativeness.  It's not something that the law
would permit.

So as a matter of law, Google would not be able to show
transformativeness on this record.

**THE COURT:**  Okay.  Make one more point.  Then I'm
going to give the other side a chance to respond.

**MR. SHAFFER:**  Sure, Your Honor.

I think that the other point to make is under Factor 3.
Google made a lot of arguments about the amount that they
copied and how it's insufficient to support the finding that it
was substantial and a large amount.

Well, giving Google the benefit of every doubt, the lowest
number they could come up with was 11,500 lines of code.  170
they stipulated were necessary for use of the language for
purposes of this case.

You know, we cited cases in our brief.  8,000 words from a
book is not fair use.  That's a substantial amount that's

copied.  The *Harper & Row* case, 300 words out of 200,000,

.15 percent.

    The lowest number that Google could come to in the record

is .23 percent.  *Harper & Row* said that that's a substantial

amount, especially whereas here we have evidence of what Google

copied served as the focal point for the work.

    So we have evidence from multiple witnesses.  Dr. Bloch

testified, Dr. Astrachan testified, Dr. Reinhold testified that

the declarations in the SSO is what the app programmers use;

it's what they focus on.  They don't even need to read the

implementing code, the part that Google left behind.

    So whenever you copy the focal point, it can be a very,

very small amount of the work, but it's the part that matters.

It's the part that draws you in.  It's the part that brings the

app programmers to the platform.  It's the part that brings the

reader to *Time Magazine* to read the excerpts of --

        **THE COURT:**  But it's not the part that does the actual

work.  The implementing code does the actual work.  The

declaring code sets it up so that the rest of the module will

be able to work.

    I think it's all -- isn't it all important?  The

implementing code is important.  The declaring code is

important.  I don't know if -- I think maybe you're

overemphasizing the declaring code.

        **MR. SHAFFER:**  Well, Your Honor, Dr. Bloch, you know,

and Dr. Reinhold, they both designed parts of the API.  They

both testified that you write the declaring code first.

You know, the implementing code is filled in on the back

end.  The declaring code, because it's what people use and what

they need to understand, it's what they need to memorize,

that's where all the creativity is.

And Google in its opposition more or less conceded that

the declaring code and the implementing code are at least

equally valuable.  So at that point they're talking about

50 percent of the value of the platform and using it in a

competing platform.

You know, half -- I can't think of a case where taking

half of something for a commercial purpose would be considered

a fair use or be considered insubstantial.  Even cases where

they find a fair use, they say that that factor weighs against

fair use.

Additionally, the reason that Google copied -- you know,

they didn't copy for software innovation.  There's no evidence

in the record of that.

They copied because they wanted to capture developers.

They wanted -- Mr. Rubin was very clear he was out of time; he

knew developers didn't have time to learn his -- to learn a

platform in a language they were unfamiliar with because they

were already doing that for iPhone.  iPhone had a jump

start.  So he needed 10 million Java developers that already

1     existed.  That's direct market competition.

2         Mr. Schwartz --

3              **THE COURT:**  How many?  10 million?

4              **MR. SHAFFER:**  I think it was 6 to 10 million over the

5     course of the relevant time period.

6         You know, Mr. Rubin said, "This made us a competitor with

7     Sun."  Mr. Schwartz said, "Yeah, I was upset about this.  This

8     made us competitors for the first time."  I think Mr. Rubin

9     said "for the first time."

10        But everybody understood that the action, the value of the

11    platform was its developer base.  And that's what Google took.

12    They took the part that was valuable to the developers, the

13    part that they used.  And the purpose was for competitive

14    reasons.

15        And, you know, there's really no amount that you can copy

16    that would be justified under Factor 3, the amount

17    substantiality factor, that can be used for competitive

18    reasons, because competitive reasons would support a finding of

19    market harm under Factor 4.  It would also show that the use is

20    not transformative under Factor 1.  And the case law says that

21    Factor 3 looks to both of those factors.

22             **THE COURT:**  All right.  I'll give you a rebuttal

23    opportunity.

24        Who's going to argue over here?

25             **MS. LAZARUS:**  Good morning, Your Honor.

1        **THE COURT:**  Good morning.

2        **MS. LAZARUS:**  Kate Lazarus for Google.

3        **THE COURT:**  Good morning.  Please, go ahead.

4        **MS. LAZARUS:**  Well, we'd agree with what the Court has

5   just reminded us, that this is a fact-intensive inquiry that

6   was sent back to the jury because the Federal Circuit

7   determined that none of the factors could be resolved as a

8   matter of law.

9        Particularly with something like good faith, we agree this

10  is a classic question for the jury that turns on the

11  credibility of a number of witnesses, that cannot be resolved

12  as a matter of law and should be -- should remain within the

13  province of the jury.

14       No one single factor is dispositive.  This is an equitable

15  rule of reason inquiry.  And it was up to the jury to balance

16  the evidence.

17       As to some of the points raised by Oracle, certainly we

18  think the jury could have reasonably concluded that Android was

19  transformative.

20       You recall the testimony, perhaps, from Dr. Astrachan

21  about all the different steps that Google took over a

22  three-year process to create a full-stack operating system for

23  smartphones, which never existed before.

24       They added their own implementing code; application

25  framework layers; the Java virtual machine; the Linux kernel;

and on and on.  And I think the jury certainly could have
reasonably concluded that that was a transformative use.

As to Factor 3 and the nature of the use, there doesn't
seem to be any dispute that quantitatively what Google used was
a tiny fraction, as the Court put it in its Rule 50(a) order,
less than a quarter of a percent of the total code in the
copyrighted work.

From a qualitative perspective, as the Court just pointed
out, the jury could have concluded that it's the implementing
code that does all the work.  The declarations are just the
link to that code.  We certainly never conceded that we used
50 percent of the copyrighted work.  To the contrary, we used a
tiny fraction.

And we also don't agree that the purpose of our use was
somehow illegitimate.  The Federal Circuit was aware that
Google was using the copyrighted work, to the small extent that
it did, for the purposes of promoting interoperability and
meeting developer expectations so that they could make
effective use of the language.  If that wasn't a legitimate
use, I think we would already know that.

Does the Court have any other questions?

**THE COURT:**  Well, the Federal Circuit did criticize
your side on your use of the word "interoperability," because
you never have been able to point to a single program that
could run on both platforms.  What they said.

1          So I don't know.  If I was you, I would give up on the

2     word "interoperability."  That's not the right word to use.

3          **MS. LAZARUS:**  We've tried to use the word

4     "consistency" and "compatibility."

5          **THE COURT:**  It's the QWERTY point.  That is, you have

6     to have some validity to the QWERTY point.  Q-W-E-R-T-Y.  The

7     typewriter analogy.  That point you did make during the trial.

8     But that's not the same as interoperability.

9          **MS. LAZARUS:**  The idea is that developers are used to

10    working in the language in a certain way.  And we are trying to

11    promote developers' interest in being able to go from one

12    platform to the other.

13         **THE COURT:**  That's the QWERTY point.  All right.  I

14    understand that one.  But the word "interoperability," you got

15    criticized by the Federal Circuit last time on that.  And

16    probably rightly so.

17         **MS. LAZARUS:**  The Federal Circuit did observe that an

18    interest in consistency across the platforms could promote a

19    jury finding on Factors 2 and Factors 3.

20         **THE COURT:**  That's a different point.

21         All right.  What else would you like to say?  Is that it?

22         Rebuttal time.  Okay.  Go ahead.

23         **MR. SHAFFER:**  Thank you, Your Honor.

24         The first thing I'd say on bad faith, the evidence in some

25    ways is irrelevant to the legal question.  If Google were able

1    to show bad faith, it just opens the door to the defense.

2       Bad faith is not something that's weighed against the

3    other factors.  It's a threshold issue.  The Court made that

4    clear in *Monge v. Maya Magazines*.

5       Good faith just means the defense is not foreclosed,

6    because fair use presupposes good faith.  Just means that if

7    you show good faith, you get to the rest of the factors.

8    Nothing else.

9             **THE COURT:**  Well, yeah, that's probably right.  But

10   listen.  Here's the way I think I see this:

11      You don't get to come in after the fact and reargue the

12   law.  The law that we gave, for better or worse.  And I think

13   it was for better.  I spent a lot of time on those jury

14   instructions.  Very closely patterned after what the Federal

15   Circuit recited.

16      One major exception you talked me into -- the Federal

17   Circuit said zero about good faith/bad faith; correct.

18   Correct.  And, nevertheless, you wanted an exception from what

19   the Federal Circuit said the law was on fair use.  And I gave

20   you that very exception.  And so we put that in.

21      That came out of the -- I have forgotten the name of the

22   case now, but it came out of one of the Supreme Court

23   decisions.

24      But my point is that the issue at this stage is whether or

25   not under those instructions, as given to the jury, and under

1    the evidence that went before the jury, could the jury

2    reasonably have made that decision?  The answer is, I believe,

3    yes.

4        And the -- you don't get to go back and say, well, we

5    should have instructed the jury more strongly on transformative

6    use.

7        Now, you can make that argument to the Court of Appeals if

8    the point was preserved.  That's legitimate.  But for me, you

9    would have to convince me that those instructions were in

10   error, substantial error, and that you had preserved your

11   point.

12       We can't just go try the case on a set of instructions,

13   and then -- and then act as if those instructions didn't

14   exist --

15           MR. SHAFFER:  Sure, Your Honor.

16           THE COURT:  -- and argue it from general principles,

17   snippets out of case law.

18           MR. SHAFFER:  I will say that the controlling Ninth

19   Circuit law -- which for whatever reason was not an issue at

20   the Federal Circuit -- is that good faith/bad faith is a gating

21   issue.

22       If you can show bad faith, the defense is foreclosed.  If

23   you show good faith, or good faith is shown in the record --

24           THE COURT:  The jury was not -- I don't think you even

25   asked for that instruction.  You never said, "If we show bad

1   faith the game is over."

2        You said it was just another factor to be considered under

3   Factor number 1.  And I gave you that very instruction.  So for

4   you now to try to slip in that somehow we've got to follow some

5   other -- I don't remember that.

6        Was that ever argued before?

7            **MS. LAZARUS:**  I don't think so, Your Honor.

8            **THE COURT:**  All right.  See, it's a new twist.  That

9   doesn't work.

10       I hope you're honest with the Court of Appeals.  Don't go

11  up to the Court of Appeals and say you asked for that

12  instruction unless you actually did.  I don't believe you asked

13  for such an instruction.

14           **MR. SHAFFER:**  I'm certain, Your Honor, that we did

15  cite *Monge v. Maya*.

16           **THE COURT:**  That's not enough.  On a case this

17  complicated, you've got to bring it to my attention and say,

18  "You've got to tell the jury this is a showstopper."

19           **MR. SHAFFER:**  Well, Your Honor, I know you're familiar

20  with the many rounds of briefing on the jury instructions.  I

21  do believe the argument was raised in the briefing.

22           **THE COURT:**  I disagree.

23           **MR. SHAFFER:**  Okay.

24           **THE COURT:**  So you point it out with specificity to

25  the Court of Appeals.

1          **MR. SHAFFER:**  We will do that, Your Honor.

2      Moving on, all of the things that counsel have cited in

3  the transformative use analysis are things that Google did to

4  items in Android that are unrelated to the Java SE declarations

5  and SSO.

6      They talked about what they did with implementing code

7  that was --

8          **THE COURT:**  Listen.  This is your old point, again,

9  that the words are the same.

10         **MR. SHAFFER:**  Yes, Your Honor.

11         **THE COURT:**  If the words were different, we wouldn't

12  have a copyright problem to begin with.  They're always the

13  same in a fair use case, inevitably.

14     If the words were different, there would be no copyright

15  problem to begin with.  You can't get -- you can't get

16  copyright on similarity.

17         **MR. SHAFFER:**  I actually disagree with that, Your

18  Honor.  And there's a couple of cases I pointed your attention

19  to.

20         **THE COURT:**  It has to be virtually identical.  If it's

21  not virtually -- the English language can't be monopolized by

22  you getting variations on the same concept.

23         **MR. SHAFFER:**  So I would point you to the *Micro Star*

24  *v. Formgen* case.

25         **THE COURT:**  Please do.

1      **MR. SHAFFER:**  That's a derivative case.  That's a

2  sequel case.

3      The infringing work there contained none of the protected

4  expression in the original work, but it did rely on the story

5  and the characters in the original work.  But there wasn't a

6  single piece of verbatim copying.  It's clear from the

7  decision.

8      What we're really talking about now is a copyrightability

9  analysis, whether or not substantial similarity is sufficient

10  to show infringement.  It's an infringement analysis.

11      And there are plenty of Ninth Circuit cases.  You know,

12  *The Three Boys* case, Michael Bolten copied a song -- or maybe

13  it's the other way around.  But, you know, they had to bring in

14  musicologists to explain to the jury why the songs were even

15  similar in the first place.  There was no verbatim copying

16  there.  There were elements that were taken.

17      Similarly, even if you had the SSO -- which the Federal

18  Circuit has said is copyrightable on its own accord -- each and

19  every method name within that SSO that kept the structure, the

20  sequence, and the organization the same, you would still have

21  copyright infringement because the SSO would be replicated

22  without permission in a new work.

23      **THE COURT:**  What do you say to the new decision by the

24  Ninth Circuit about the sequence, rejecting the sequence

25  argument?

1          **MR. SHAFFER:**  Your Honor, I would say that that case

2     broke no new ground.  It's the *Bikram's Yoga* case, I think, you

3     are referring to.

4          **THE COURT:**  It's the one about the yoga.

5          **MR. SHAFFER:**  Yeah, exactly.

6          **THE COURT:**  What do you say to that?

7          **MR. SHAFFER:**  That case was highly record dependent.

8     There, the Court said, you know, you have developed a

9     sequence that is dictated by medical need.  It's dictated --

10    you know, you say up and down in your materials that this is

11    the only way to achieve this result.

12    And they were very specific about that.  The choice of the

13    sequence was predetermined by scientific principles.  So that

14    is a copyrightability decision.

15         **THE COURT:**  But there they said it was not

16    copyrightable.

17         **MR. SHAFFER:**  Because it was predetermined.

18    Here we have record evidence from both sides that say that

19    Java could have been written in any number of ways.  That's a

20    party stipulation.

21         **THE COURT:**  What do you mean it was predetermined?

22    The yoga thing, this guy came up with it.  He was humming over

23    in the corner --

24         (Laughter)

25         **THE COURT:**  -- and came up with a series of steps.

1        **MR. SHAFFER:**  You and I might feel that way, Your

2   Honor, but the record in that case shows that Mr. Bikram -- I

3   think that is probably his real last name -- came up with the

4   sequence based on scientific principles that were dictated by

5   the physical nature of the human body.  That's in the opinion

6   and that's the record.

7        **THE COURT:**  Be that as it may, the Ninth Circuit said

8   the sequence was not copyrightable.

9        **MR. SHAFFER:**  In that particular --

10       **THE COURT:**  That wasn't part of our fair use trial,

11  but maybe that issue is still alive in the case.  Maybe on the

12  second appeal your side ought to bring that to the attention of

13  the Federal Circuit.

14       **MR. SHAFFER:**  I think, Your Honor, that's the other

15  point, is that we do have some law of the case here, which says

16  that what we're dealing with in this case is copyrightable.

17       So *Bikram's Yoga* --

18       **THE COURT:**  For my purposes at this trial, absolutely,

19  I agree with that.  But I'm just looking at the larger -- that

20  issue of the first ruling is not law of the case at the U.S.

21  Supreme Court.  That's still open.

22       **MR. SHAFFER:**  That's right, Your Honor.  And I

23  would -- I would think we'll make the same argument about

24  *Bikram's Yoga* there.  And I'm sure Judge Wardlaw was as

25  skeptical about the claims made by Bikram as the rest of us

were when she wrote the opinion.  But for our purposes, it's a
different factual record.  And the evidence is quite different
in that case.

   **THE COURT:**  All right.  I've got to bring this to a
close.

  Do you have any last word to say?

   **MS. LAZARUS:**  No.  We agree with your Rule 50(a)
order, and would urge you to adopt it again.

   **THE COURT:**  All right.  Thank you.

  Before we go to the other thing, who's going to argue
about the cost bill?

  Yes.  I want you to come forward a minute.  And tell me
what your name is.

   **MS. O'MEARA:**  Michelle O'Meara.

   **THE COURT:**  How many years out of law school are you?

   **MS. O'MEARA:**  I'm four years out of law school.

   **THE COURT:**  And how many years out of law school are
you?

   **MR. MULLEN:**  Oh, Your Honor, I'm about eight years out
of law school.  So I don't qualify as a young lawyer under the
Court's orders.

   **THE COURT:**  I don't want to take much of your time,
but I do want you to know -- do you know how much work we have
here -- and you're arguing over a cost bill -- and how many
social security benefit claimants I won't be able to rule on

1  while I'm ruling on your cost bill dispute?

2     Why can't you two resolve this on your own?  Why do you

3  have to get me to resolve a cost bill, a

4  two-and-a-half-million-dollar cost bill?

5         **MR. MULLEN:**  Your Honor, if I could, I'd actually turn

6  the question to Oracle.  We submitted the cost bill.  It's

7  their objections.  And we submitted further briefing on it at

8  the Court's request.  But I'll let Oracle address that

9  question.

10        **THE COURT:**  Can I do this?  Can I go through your cost

11  bill, and if I find one substantial thing I disagree with, deny

12  the entire thing?  Because I think maybe you're being greedy

13  and asking for too much.

14        **MR. MULLEN:**  I don't think so, Your Honor.

15        **THE COURT:**  I'm very inclined to do that, because I

16  don't like it when the lawyers say, "We'll ask for the moon

17  because the judge will give us half that much anyway," and make

18  me do all that work.

19     Maybe I should just deny it on the ground of greed, which

20  I have done in other cases.

21        **MR. MULLEN:**  Sure, so --

22        **THE COURT:**  Do you want to go back and try again?  Or

23  do you want me to take my -- the greed method?

24        **MR. MULLEN:**  No, Your Honor.

25     I think that we stand by the cost bill.  The costs that

1  we've submitted in there, we believe, were fully justified

2  under the law, consistent with Ninth Circuit law on any

3  discovery costs.

4      We've tried to pare it down from what was at issue at the

5  last trial.

6          **THE COURT:**  I don't believe you have.

7      Give me your best example -- what's your name, again?

8          **MR. SHAFFER:**  Michelle.

9          **THE COURT:**  Your last name.

10          **MS. O'MEARA:**  O'Meara.

11          **THE COURT:**  O'Meara?

12          **MR. SHAFFER:**  Yes, Your Honor.

13          **THE COURT:**  Ms. O'Meara, would you give me your best

14  single example of some greedy act by Google on this.  Something

15  that is so unjustified that I should just deny the entirety of

16  their cost bill, which I'm inclined to do if you can give me a

17  good example.

18          **MS. O'MEARA:**  Your Honor, I would say that, at least

19  in -- we believe that the original bill of costs award is still

20  standing for the 2010 to 2012 cost period.  So I'll refer to an

21  example from the 2015-16 costs, if that's okay with Your Honor.

22      One example that I would --

23          **THE COURT:**  Just give me one example.  Come on.  Give

24  me the example.

25          **MS. O'MEARA:**  Yes, Your Honor.  I would be happy to do

1    that.  Give me one moment.

2        One example that I would point out was, the Ninth Circuit

3    case law clearly establishes that the costs that are associated

4    with production have to be sufficiently tied to documents that

5    were actually produced.

6            **THE COURT:**  Production of what?  Documents?

7            **MS. O'MEARA:**  Yes, Your Honor.  I'm going to give an

8    example from the discovery costs that were sought.

9        So the Ninth Circuit has established that any costs that

10   are associated with those E-discovery costs have to be

11   sufficiently tied to documents that were actually produced to

12   Oracle.

13       And one instance where I think that we are seeing issues

14   where Google may be going outside of that rule is seen by

15   comparing the prior declaration that Google sought with this

16   declaration and particular costs associated to TIFF images.

17       So Google is seeking over 1 point -- costs for 1.1 million

18   pages of TIFF imaging.  But the declarations that they've

19   submitted show that there's only approximately 600,000 pages

20   that have been produced at this time period.

21       So I think that's a pretty sufficient example to show that

22   Google hasn't met its burden and is going beyond what it's

23   entitled to.

24           **THE COURT:**  Do our rules allow you to get photocopying

25   costs?  I know TIFF is even more expensive.

1        Do you get -- do our rules allow you to get photocopying

2   costs for documents produced in litigation?

3           MS. O'MEARA:  The cost to produce the document to

4   Oracle, yes, Your Honor.  So the physical

5   preparation/production of the documents.

6           THE COURT:  Okay.  So what's wrong with it?  If they

7   are entitled to get that item, what's wrong with it, again?

8           MS. O'MEARA:  So they are only entitled to the costs

9   that are associated with documents that are actually produced

10  to Oracle.  And what --

11          THE COURT:  As opposed to what?

12          MS. O'MEARA:  As to documents that were necessarily

13  collected and that were later culled down, and then that

14  production set was provided to Oracle.

15          THE COURT:  You mean they collected internally a

16  million, let's say?

17          MS. O'MEARA:  Sure.

18          THE COURT:  And then they allowed you to see 600,000,

19  but they want to charge you for the 400,000 that they didn't

20  give you?

21          MS. O'MEARA:  Yes, Your Honor.

22          THE COURT:  Is that it?

23          MS. O'MEARA:  That's an example.

24          THE COURT:  That true?

25          MR. MULLEN:  I don't think that's correct, Your Honor.

1          **THE COURT:**  You don't think or you know?

2          **MR. MULLEN:**  I don't think that's correct.  I would

3    have to go back and check the specific line item that

4    Ms. O'Meara is referring to.

5          But I think what the law allows you to do is to obtain

6    reimbursement for costs necessarily incurred in the case in --

7          **THE COURT:**  I'm not going to give you -- if you only

8    produced one document, you get it for that.  I'm not going to

9    give you the cost to go search through the company.

10          **MR. MULLEN:**  Sure.  And that's completely

11   understandable, Your Honor.

12          But I think the discrepancy, if any, that Ms. O'Meara is

13   referring to is not quite on the level of the example Your

14   Honor just gave about, you know, we only produced a single

15   document to them and tried to charge for 10 million pages.

16          **THE COURT:**  Here's what I'm going to order.  You

17   ready?

18          You two -- today is Wednesday.  Tomorrow and Friday, you

19   two get to meet and confer all day long, at whatever place you

20   want, and to go through these line items and try to reach an

21   agreement.  Failing which you let me know, and then I'm going

22   to -- I may just deny everything that you want because of greed

23   and overreaching.

24          Can you do that?  Do you have other plans?  Or can you do

25   this tomorrow and the next day?

```
 1              MR. MULLEN:  We could do it at Google, Your Honor.
 2              MS. O'MEARA:  I can certainly make it work, Your
 3      Honor.
 4              THE COURT:  All right.  I'm ordering you to please
 5      meet and confer and try to resolve the cost bill.
 6           All right.  Thank you.
 7              MR. MULLEN:  Thank you, Your Honor.
 8              THE COURT:  You two have a seat.
 9              MS. O'MEARA:  Thank you, Your Honor.
10              THE COURT:  Now, let's go to the new trial motion.
11           We're going to take a 10-minute break so the court
12      reporter can rest her fingers.
13           (Recess taken from 9:23.m. to 9:37 a.m.)
14              THE COURT:  Okay.  Ms. Hurst, Rule 59.
15              MS. HURST:  Your Honor, regarding the Rule 59 motion,
16      I want to discuss the fact that we're standing here today and
17      that Google is about to release a version of Android that will
18      run on laptops and desktops, called Chromebooks and
19      Chromeboxes.
20           Your Honor, Rule 59 incorporates the standards of
21      Rule 60(b)(2) and 60(b)(3) when there is material evidence that
22      was suppressed in connection with a trial.
23              THE COURT:  Say that again.  60 --
24              MS. HURST:  -- (b)(2) and 60(b)(3).
25           And, Your Honor, I'm referring here to the *Jones vs.*
```

1    *Aero/chem* case.  Ninth Circuit, 921 F.2d 875.

2             **THE COURT:**  All right.

3             **MS. HURST:**  Your Honor, so there's two different

4    standards here to consider.  The first is the 60(b)(2)

5    standard, which is:  Was it a game changer?  Would it have been

6    a game changer to know that Android was now being put on the

7    traditional platform for Java SE desktops and laptops?

8        The second part of the incorporated Rule 60(b) standard in

9    Rule 59 is 60(b)(3).  Under the 60(b)(3) prong, you don't have

10   to prove it would have been a game changer if you show

11   discovery misconduct.

12            **THE COURT:**  Show what?

13            **MS. HURST:**  Discovery misconduct.

14       Your Honor, I respectfully --

15            **THE COURT:**  Does the rule say that?  60(b)(3) says

16   "fraud."

17            **MS. HURST:**  Your Honor, it's fraud, misrepresentation,

18   or other misconduct.

19            **THE COURT:**  Uh-huh.

20            **MS. HURST:**  And in the *Jones vs. Aero/chem* case, Your

21   Honor, the Ninth Circuit reversed when the District Court

22   failed to hold an evidentiary hearing on discovery misconduct

23   under the 60(b)(3) prong when shortly after trial a letter was

24   produced that was relevant to the issues in hand, not

25   cumulative and, the Court ultimately determined, a potentially

1    significant piece of evidence.

2        And that is exactly the situation we have here.  On the

3    day that Oracle rested its case, Google announced, quote, We've

4    been working in secret for months, and we're building a whole

5    new platform to run Android apps on Chromebooks.

6        Your Honor, that announcement was directly contrary to the

7    discovery answers that were given by Google in this case.

8        As an example -- Dawn, can I have the ELMO?

9        **THE CLERK:**  Sure.  Okay.  One second then.

10       (Document displayed.)

11       **MS. HURST:**  Your Honor, this is Request for Admission

12   No. 281, which is Exhibit O on the motion:

13           "Admit that Google intends to use some or all of

14       Android, including declaring code and SSO from the 37 Java

15       API packages, to create a platform that runs on desktops

16       and laptops."

17           "Denied."

18       That is what they said when they answered the request for

19   admissions.  And this is what they said on the day we rested

20   our case:

21           "We're building a whole new platform to run Android

22       apps on Chromebooks."

23       **THE COURT:**  I'm sorry, what was the date -- give me

24   the dates of both of these statements again.

25       **MS. HURST:**  Your Honor, the request for admission was

1    answered on October 15th.  And this release --

2            **THE COURT:**  What year, though?

3            **MS. HURST:**  Of 2015, Your Honor.  I apologize.

4            **THE COURT:**  And the statement about --

5            **MS. HURST:**  The announcement was made in May of -- on

6    May 19th, 2016.

7            **THE COURT:**  And you -- let's see.  You said that you

8    rested your case.  Does that mean that Google went first; you

9    went second; you rested your case; and then there was a

10   rebuttal?  And then just before the rebuttal is when you -- or

11   was there a rebuttal?  I don't remember.

12           **MS. HURST:**  There was a short rebuttal.

13           **THE COURT:**  All right.  And it was just at that point

14   that the announcement came out?

15           **MS. HURST:**  That's correct.

16           **THE COURT:**  Okay.  Now I've got the timing in mind.

17           **MS. HURST:**  And, Your Honor, it wasn't just that

18   Request for Admission that sought this information.  We asked

19   interrogatories about it.  And Interrogatories 26, 27 and 29

20   all covered this subject matter.  They're in Exhibit P.

21       On December 16th, Your Honor, the last day of discovery,

22   they served a supplemental response that did not disclose this

23   new Android-based platform for desktops and laptops.

24       We served document requests, including a demand for source

25   code.  They produced source code.  They did not produce this

1    source code.

2        We took 30(b)(6) depositions.  We asked them --

3        **THE COURT:**  Wait.  Wait.  Wait.  I was following

4    everything until you got to the source code point.  Say that

5    point again.

6        **MS. HURST:**  Yes.  We asked for document requests that

7    said, Tell us your plans and give us any source code if you

8    plan to put Android on desktops and -- really, any use of

9    Android that you're making.

10       And in response to that they gave us the Android levels

11   through Marshmallow.  They gave us the secret versions of

12   Android N, that they were working on, that they said were going

13   to come under the new Open JDK.

14       They gave us a thing called Brillo and ARC Welder.  And

15   they did not give us this new platform, or any part of it, in

16   development.  Even though they gave us other in-development

17   source code, they did not give us that source code for this new

18   platform that they announced in May.

19       And they never supplemented after December 16th, Your

20   Honor, at any point in time after discovery closed.  They

21   didn't change the request for admission.  They didn't change

22   their interrogatory response.  They didn't supplement their

23   document production.  They didn't supplement their 30(b)(6)

24   deposition testimony.  All of which we asked about this.  All

25   of it.

1    And at no point did they ever disclose, either prior to

2    the close of discovery or after under Rule 26(e), that they

3    were making a platform with Android for desktops and laptops.

4    Now, does this platform infringe?  It incorporates

5    Marshmallow.  It incorporates the whole API of Marshmallow,

6    which they stipulated contains the 37 APIs.

7    So we know it infringes.  If we had had the source code

8    and come before the Court when the Court was considering the

9    new-products issues, we would have been able to say to the

10   Court, Your Honor, they're going to the core market for

11   Java SE: laptops and desktops.

12   So that gets me to the first prong, Your Honor, under

13   60(b)(2).  Was this a game changer?  Of course it was a game

14   changer.

15   The only thing their experts had to say, the only thing

16   Dr. Astrachan and Dr. Leonard had to say under Factor 4 was,

17   it's not harming Java SE because it's not on desktops and

18   laptops; it's only on smartphones.

19   The Court's 50(a) order on Factor 4, the most important

20   factor, a factor on which they had to introduce affirmative

21   evidence under the *Campbell* case, the Court's order says:

22       "Our jury could reasonably have found that use of the

23       declaring lines of code in Android caused no harm to the

24       market for copyrighted works, which were for desktop and

25       laptop computers."

1     That was the Court's analysis about the copyrighted work

2  in the 50(a) order.  It focused on this very issue, desktops

3  and laptops.

4     And now we're standing here today, a short time after this

5  trial, and they are about to go at the Java SE core market for

6  laptops and desktops using Oracle's own code.

7     This is outrageous.  They were working on it for months.

8  Google knew what they were doing.  They didn't disclose it,

9  despite diligent discovery requests.

10    And this is a game changer, under the Court's own analysis

11  of 50(a).  This was the one thing that their experts hung their

12  hats on and that the jury could have hung its hat on.  That's

13  all they had.

14    And, now, here we stand and that is gone.  That whole

15  foundation for their case is gone.  It's not transformative now

16  because it's on desktops and laptops.

17    There's no amount that is reasonable to take when it

18  wasn't necessary, when you're competing in the original market,

19  desktops and laptops.

20    It's market harm.  The whole analysis of why it might not

21  have occurred, all gone because now they're coming on desktops

22  and laptops.  And they knew it.  They knew it when they

23  announced this on the day we closed our case.

24    Mr. Chavez, who made the presentation at Google IO --

25  which is their big trade conference -- said:

1        "I'm super excited to be here because I can finally

2      tell you guys what we've been working on for the last few

3      months, so it's not a secret anymore."

4      They worked on it for months in secret.  They knew it.

5 Google had an obligation to disclose it.  We had discovery

6 requests right on point.  And it was a game changer.

7      This meets the standard under both 60(b)(2) and 60(b)(3),

8 Your Honor, in the *Jones vs. Aero/chem* case.

9      Your Honor --

10      **THE COURT:**  I want to hear on this point before we

11 move to anything else.  So are you done on this point?

12      **MS. HURST:**  Your Honor, I'm just going to say two more

13 things on this point.

14      First, the response to this is, "We did tell them about it

15 because we told them about a thing called ARC Welder."  I'll

16 tell you first why that's wrong.

17      Second, Your Honor, I'm asking that if the Court is going

18 to deny this part of the motion, that it hold an evidentiary

19 hearing and let us conduct discovery about this before it makes

20 a ruling denying the motion.  Under the *Jones vs. Aero/chem*

21 case, it is clear we are entitled to at least that much, Your

22 Honor.

23      So let me go back to the first point.  They say, "Well, we

24 disclosed this to them because we told them about ARC Welder."

25 They did tell us about ARC Welder.

But this thing they announced in May is not ARC Welder. It makes clear, if you look at the transcript of their announcement -- which is Exhibit J1 to our Rule 59 motion -- this is not ARC Welder.  They say, "ARC failed.  It had challenges.  It didn't work.  So we're building a whole new platform."

By disclosing a thing that failed, that they in testimony described as an experiment and in testimony said would only allow a few apps to run --

**THE COURT:**  At trial they said that?

**MS. HURST:**  No, no.  In discovery, Your Honor.  At trial this was never discussed at all.

**THE COURT:**  I didn't remember it.

**MS. HURST:**  Yes.

**THE COURT:**  So you're saying in depositions.

**MS. HURST:**  Yeah.

**THE COURT:**  But what was ARC supposed to be?

**MS. HURST:**  So ARC was an -- as they described it, an experiment to see if they could get some Android apps running on laptops.  And they described it -- they produced the source code for that.

In deposition, they described it as a failure.  They said they were not making it available.  They said they made it available to a few developers on a one-on-one basis.

And, Your Honor, as I showed you, they denied in their

1  response to requests for admission that they had any intention

2  or plan to port Android to laptops and desktops.

3      So we took them at their word.  They said they had an

4  experimental thing.

5          THE COURT:  Is this in your motion?

6          MS. HURST:  It is, Your Honor.

7          THE COURT:  All right.  So you've attached the

8  deposition pages?

9          MS. HURST:  We've attached the depositions, yes.

10     We took them at their word when they denied they had any

11  plan and that the thing they were working on was experimental.

12     And, moreover, by disclosing ARC Welder they didn't

13  disclose the thing that they ultimately announced, because it's

14  clear, Your Honor, that it's not ARC Welder.

15     They say it, say it when they announced it, on the day --

16  pardon me, Your Honor, I was passed a note.  It was the day all

17  evidence was closed.  Quote again, "We're building a whole new

18  platform to run Android apps on Chromebooks."

19     That platform was never disclosed in discovery in this

20  case.  Period.

21          THE COURT:  Okay.  Can I hear from the other side

22  before we go to any other points.

23          MS. ANDERSON:  Thank you, Your Honor.  Christa

24  Anderson for Google.

25     At its heart, Your Honor, Oracle's motion boils down to

1   the following two principles:

2       That Oracle was somehow denied an opportunity to make an

3   argument about encroachment on the JAVA SE desktop market that

4   it could have made if only it had received discovery it claims

5   it was entitled to receive during the discovery period.

6   Neither of these premises is correct.  With the Court's

7   permission, I would like to walk through why.

8       First, during the discovery period, Google provided full

9   discovery -- documents; depositions; source code -- concerning

10  the initial version of a product called ARC, which stands for

11  App Runtime for Chrome.  It existed during the discovery

12  period.  And it performed just the function that Oracle's

13  complaining about.

14      What's that function?  Well, the ARC product provided a

15  runtime environment and made Android apps available for use on

16  laptops that use the Chrome OS, the Chrome Operating System.

17      That Chrome Operating System is an operating system

18  available for use on laptops, often referred to as Chromebooks.

19  The ARC code -- again, that was the subject of discovery --

20  incorporated and used the accused SSO and declarations of the

21  37 Java APIs.

22      So Oracle knew full well that the accused material was

23  being used in a product that was made available so that Android

24  apps could run on laptops.

25      In fact, Oracle relied on that very discovery in its own

1    expert reports to make the same arguments that Oracle now

2    claims it was deprived of making.

3        In other words, that the use of the accused material on

4    Chrome OS devices to run Android apps on laptops encroached on

5    the traditional marked for Java SE, the laptop desktop market.

6        That's an argument that we see --

7            THE COURT:  Which expert is that?

8            MS. ANDERSON:  Yes, happy to say.  It's in the brief,

9    but it comes out in the Zeidman technical expert report.  He

10   devotes 17 paragraphs of his report to ARC.

11           THE COURT:  Whose report?

12           MS. ANDERSON:  Mr. Zeidman, Your Honor.

13           THE COURT:  How do you spell that?

14           MS. ANDERSON:  Z-e-i-d-m-a-n.

15       And in that report the technical expert for Oracle, the

16   opening report explains why he believes ARC is a runtime

17   environment that allowed Android runtime to be used on Chrome

18   OS devices.

19           THE COURT:  Did this come out at the testimony at

20   trial?

21           MS. ANDERSON:  It did not, Your Honor.  And there's a

22   reason.  It has to do with Your Honor's orders.  And I'll get

23   to that in just a moment.  There's two more expert reports, if

24   Your Honor permits me, related to this.

25       The Kemerer technical expert, in his opening report he

explains that when ARC is installed on a Chromebook computer
it's able to run Android apps, and uses the Android Runtime and
the accused -- the subject material of the declarations and
SSO.

And then in the damages report that Oracle's damages
expert served, opening report, he explained that this ARC
product, quote, allows Google to bring Android apps to occupy
the original traditional market of the Java platform.  End
quote.

So this theory that Oracle's claiming it never was allowed
to advance to defeat the argument of fair use by claiming that
the material was being used to encroach on the desktop/laptop
market had already been advanced by Oracle.

And Oracle, also in its reports, was trying to reach and
expand the scope of the trial beyond the smartphone and tablet
products into other products.  TV; Auto; Brillo; a number of
products.  And Google objected and brought it to the Court's
attention.

And so the Court issued a number of orders, two orders in
particular, that we go through in the briefing.  But the Court
ultimately struck all these other products, kind of turning the
clock back to the time of the original trial, so that the scope
of the trial was limited to smartphones and tablet products.

The first of Your Honor's orders was in February of 2016.
And in that order the Court explained, quote, the upcoming

trial will proceed as if we were back in the original trial.
End quote.  And there's a number of other comments that Your
Honor makes in that order.

But the Court also notes that the trial will not include
implementations of Android in Android TV, Android Auto, Android
Wear, and Brillo.

And, again, in May Your Honor issues an additional order
in which the Court excludes evidence or expert testimony that
relates to these other products.

The Court, in doing so, noted that in the original trial
the jury never considered whether there was a prima facie case
for infringement by other products.

The issue in the first phase of this limited retrial is
whether Google's use of the 37 API packages from the products
at issue in the implementations of Android in phones and
tablets constituted a fair use.

So Your Honor cabined the evidence in terms of mirroring
what happened in the first trial and said there wouldn't be
analysis of whether these new implementations, new instances of
Android and other products, constituted fair use.  And that was
the rulings Your Honor set forth in the scope of discovery.

In response to Your Honor's orders, both the one in
February and the one in May, we see that it's not just Google
but Oracle constrains the scope of their case according to Your
Honor's orders.

1    Oracle dropped the very arguments, it claims today it was

2  prevented from making, from its rebuttal expert reports.  So

3  you don't see rebuttal expert reports from Oracle addressing

4  the ARC issue and the theory that now Android is being used in

5  the laptop/desktop environment.  And under those circumstances,

6  we went forth to trial.

7    No party had a duty to supplement discovery about matters

8  beyond the scope of the trial.  That's setting aside the fact

9  that we believe our responses were all appropriate and accurate

10  and reflected the state of discovery during the discovery

11  period.

12    And, in fact, we see that Oracle supplemented none of its

13  written discovery responses past December 2015, reflecting the

14  understanding of the parties, as Google did.  December 2015 we

15  see the last written supplementations.

16    Google violated no duty to supplement here.  These

17  responses were accurate because what happened, Your Honor, is

18  that conceptually, yes, Google was considering developing and

19  conceiving of an updated version of ARC.  Internally, it's

20  referred to as ARC++, but externally, which we see in the

21  exhibits that were submitted by Oracle, it's discussed as being

22  the Google Play Store being made available on Chromebooks.

23    And this is an update that was not completed.  The

24  software was not developed until many, many months after the

25  close of discovery.

1      **THE COURT:**  When was it operational?

2      **MS. ANDERSON:**  When was it completed and operational

3  like a developed piece of software?  It wasn't until, I

4  believe, May, the month of trial.  Just confirming.  The month

5  of trial, Your Honor.

6      And so this product was something that was

7  ultimately released -- or will ultimately be released in a

8  limited fashion.  It's right now in, sort of, a beta release

9  phase.  But it is not a product that was fully developed,

10  written up into software code, and ready to roll during the

11  discovery period.

12      And our responses to the discovery at issue was absolutely

13  appropriate under these circumstances.

14      **THE COURT:**  Well, let's put aside the appropriateness

15  for a moment.  And let me ask you this.

16      **MS. ANDERSON:**  Yes.

17      **THE COURT:**  Do you concede that Oracle is entitled to

18  bring a new lawsuit against any product that was not in the

19  first trial?

20      **MS. ANDERSON:**  Your Honor, I believe, has actually

21  already ordered on this.  And, yes, we understand that the

22  Court has ordered for these other products that Your Honor has

23  excluded from the trial --

24      **THE COURT:**  But you're dodging --

25      **MS. ANDERSON:**  I apologize.

1          **THE COURT:**  That's a dodgey answer.

2          **MS. ANDERSON:**  Yes.

3          **THE COURT:**  That's what I've ordered.  But do you

4    concede that that's correct?

5          **MS. ANDERSON:**  Yes.  They are not precluded by this

6    trial from bringing another lawsuit as relates to the ARC++

7    product, this one that they are raising an issue about in this

8    motion.  From res judicata perspective Your Honor excluded it

9    from the case.

10        Could there be a potential for any collateral estoppel

11   issues?  I don't know.  It would depend on what would happen on

12   appeal; what orders had been issued; and how Oracle would frame

13   such a case.

14        But agreed, Your Honor, Your Honor has ordered and we

15   understand that this is not a product who the question of

16   infringement has been resolved as to.

17        **THE COURT:**  Why isn't that the answer, Ms. Hurst?

18        The poor judge in this case -- this is a problem that

19   keeps -- that keeps expanding like a vortex.

20        We can't let it go to the jury as a moving target.  We

21   have to have a fixed set of parameters.  And then why can't you

22   just sue on all these products that I didn't let in?  You can

23   sue all over again.  And maybe you win this time.  But on the

24   initial one you lose.

25        So why is it that -- why isn't that the right answer?

1    **MS. HURST:**   Your Honor, we certainly can sue.   But

2    that is not the answer to why this verdict needs to be set

3    aside.   And the reason is that this verdict is infected and

4    tainted by this problem.   Right.

5        The jury heard -- Google's whole pitch, opening,

6    witnesses, fact witnesses, experts, closing, was "We didn't

7    harm Java SE because we weren't on desktops and laptops."

8        This jury was entitled to consider the context of

9    smartphones from the perspective of yes, now they are on

10   desktops and laptops.

11       The Court's whole order on Factor 4, on 50(a), was the

12   jury could have reasonably have found that there was no harm to

13   the market for copyrighted works which were for desktop and

14   laptop computers.

15       This verdict is tainted by the suppression of plans by

16   Google to put Android on laptops and desktops.   The jury was

17   entitled to hear the whole scope of evidence about this.

18       Your Honor, we do maintain -- and it's part of our Rule 59

19   motion -- that it was erroneous to exclude those other things.

20   But even putting those aside for the moment, desktops and

21   laptops was the heart of Google's pitch.

22       The whole heart of their pitch about why putting it on

23   smartphones didn't harm Java SE was because smartphones weren't

24   desktops and laptops.   But they are now.   They are.

25       What Google has done is it has used the Java API to

1    attract developers to create apps for smartphones that are now,

2    for the first time, widely available on laptops and desktops.

3        They used the smartphone as the leading edge of the wedge

4    to suck in the entire Java SE market.  And this verdict is

5    tainted by the jury's inability to hear that evidence.

6        Viewing the smartphone in isolation was only a piece.  And

7    it was a Google jerrymandered piece of the story.  That

8    smartphone has now become the leading edge of the wedge for a

9    multi-device platform that has taken up every single Java

10   market.  Desktops; laptops; phones; cars; TVs; set-top boxes.

11   Every single place where Java used to be, now Android is using

12   Java code.

13       That's outrageous under copyright law.  That's not okay,

14   Your Honor.  And the jury was entitled to hear the full context

15   of this.

16       By arguing what they had done was never seen before, super

17   innovative, wonderful smartphone platform, was only a small

18   piece of the story.  And the whole piece of the story, which

19   they knew for months -- Ms. Anderson has just conceded -- was

20   that they were going to go to JAVA SE's core market now.

21       Let me just address this thing about ARC Welder and

22   whether it's what they did.  It's not.  They said so in their

23   announcement.  They said ARC didn't work.  It was only native.

24   We had to throw it out and start over.

25       Let me say this:  They put in no evidence of anything that

1  Ms. Anderson just said in response to this motion.  No

2  admissible evidence of any kind.  We haven't had a deposition

3  of the guy who wrote the code.  We don't have the documents.

4  We don't have the source code repository.  We don't have the

5  product development roadmaps.  When did they first start

6  working on this.  None of it.

7        And Your Honor --

8            **THE COURT:**  Let's find out.

9        Is that true?  Did you put in anything under oath in your

10  opposition on this point?

11            **MS. ANDERSON:**  Your Honor, we didn't put in the kind

12  of declarations I think Ms. Hurst is referring to, because the

13  material that we've discussed is largely reflected in the very

14  documents submitted by Oracle in support of their motion.

15        It's true that the reference to ARC++ is not in our papers

16  because publicly we refer to it as Google Play on Chromebooks.

17  But the reality is, it doesn't change what has been said.

18  Because if I could, Your Honor, walking through a little bit of

19  information to help the Court, this is stuff you see in the

20  very documents that are attached to Oracle's motion.

21        The press, when it heard the release at the IO, which

22  talked about what this ARC++ Google Play on Chromebooks does,

23  explained differences between the product and explained how the

24  original ARC had been available.  And it was something that was

25  available to put Android apps on laptops.

1    If I might, Your Honor, just to jump back before I go on

2 to a little bit more technical information that, again, you see

3 in the very attachments from Oracle, there is simply no way

4 that Oracle's complaints here about discovery, which we believe

5 are unfounded -- and I'm happy to walk through the requests

6 with Your Honor -- there's no way --

7    **THE COURT:**  You haven't done that under oath.  If

8 you're going to try to tell me what happened in the give and

9 take in discovery, it's not under oath.

10    **MS. ANDERSON:**  Well, it's on the face --

11    **THE COURT:**  It's just you talking.

12    **MS. ANDERSON:**  It's on the face of their requests,

13 Your Honor.

14    **THE COURT:**  All right.  If it's on the face of the

15 requests, all right, go ahead and make your point.

16    **MS. ANDERSON:**  Right.  If I might, though, the core of

17 Oracle's argument -- which is what began the most recent

18 response from Ms. Hurst -- is the idea that this somehow

19 tainted the trial because Oracle could have argued that Android

20 was going after the very market for Java SE.

21    They could have argued that, and did argue it in their

22 expert reports based on ARC.  It was already in the reports.

23 They argued we were using their copyrighted material, the SSO

24 and declarations, to put them in a product that made it

25 possible to run Android apps on Chromebooks and laptops, which

1    encroached on the Java SE market according to Oracle.

2         They made the argument and then they dropped it because of

3    Your Honor's orders about the scope of trial.  And we complied

4    with that order, Your Honor.

5         And on top of that, Your Honor, recall at trial,

6    Dr. Jaffe, Oracle's own expert, acknowledged and admitted on

7    cross-examination he didn't do anything to figure out if

8    Java SE was really hurt.  He didn't even talk to the gentleman

9    whose video we played at trial, who testified that Java SE was

10   doing just fine.

11        So in context, Oracle had an opportunity to and did make

12   this argument and decided not to violate Your Honor's orders

13   about the scope of the trial, which is what Google did here.

14   So neither party felt it was appropriate, under the scope of

15   the trial orders, to go beyond into other products.  And we

16   complied with that order.

17        When it comes to the actual material at issue here, you

18   see discussions in the exhibits submitted by Oracle where folks

19   are talking about the announcement at IO about ARC++ and what

20   it does.  And it's, again, referred to as Google Play, the

21   Google Play Store for Chromebooks.

22        But just to recap a little bit, to help the Court in

23   understanding the terminology that is referred to both in the

24   briefs but also in Oracle's articles that they submitted and in

25   the IO announcement, ARC -- which stands for App Runtime for

1    Chrome -- does just what its name suggests.  It provides a

2    runtime environment.

3         You see that discussed in Oracle's exhibits.  It was built

4    using something called the native client API, referred to as

5    NICL.  You see that talked about in these announcements.  And

6    that technology allowed for the use of Android apps on laptops

7    and desktops.

8         The new product Google Play Store, which is something that

9    allows you to use Android apps on laptops, Chromebooks, it has

10   been announced.  It's being rolled out slowly.  You see that

11   discussed in the news articles.

12        You see the news articles talk about the fact that Android

13   Runtime is made available in, kind of, a container to be run on

14   top of Chrome OS.  Chrome OS, Chrome Operating System, that's

15   the platform for the Chromebooks, for the laptops.

16        And there's, sort of, a container or plug-in that goes

17   into and makes available in this newer product, which is

18   analogous to but architecturally different.  Structured

19   differently.  It's a revised way of doing it.  ARC did it using

20   this native client approach.  The newer product, the Google

21   Play Store ARC++ approach, does it using a container that has

22   its own Linux stack inside.

23        So we see a different kind of product.  But both use

24   Chrome OS as the operating structure, sequence and

25   organization.  That's the platform for the laptop.

1      **THE COURT:**  Isn't each -- you said "collateral

2   estoppel" a minute ago.  I think we will try these other

3   products in a -- doesn't each use have to be evaluated as a fir

4   use one at a time?  So what might be a fair use for a

5   smartphone might not be a fair use for a laptop or a desktop?

6   So how could it possibly be a collateral estoppel?

7      **MS. ANDERSON:**  It may well have to, Your Honor.  I

8   think a lot will turn on the Court of Appeals, what happens on

9   appeal.  Obviously, if we prevail, none of this is at issue

10   potentially.  But potentially it is.

11      And it depends on what the scope of the orders are on

12   appeal and how -- how these rulings come down and, again, how

13   Oracle phrases and frames up new cases.  Which, again, it's

14   a --

15      **THE COURT:**  What do you think were the products that

16   were tried, the Google products that were tried?  What do you

17   think they were in the trial we just had?

18      **MS. ANDERSON:**  The Android versions that are listed in

19   the orders that Your Honor issued and we stipulated to,

20   including Marshmallow, as relates to smartphones and tablets.

21   Those were the products that were tried.

22      **THE COURT:**  All right.  So all of those operating

23   systems, as they relate to desktops, has not yet been tried?

24      **MS. ANDERSON:**  That's correct.  That was not within

25   the scope of the -- the desktop products, that was not within

1  the scope of Your Honor's orders.

2        **THE COURT:**  I need to bring all this to a close.  We

3  haven't gotten too far -- I mean -- all right.  Let's go to

4  your next -- Ms. Hurst, let's go to your next point for new

5  trial.

6        **MS. HURST:**  Your Honor, one more point on that.

7     We don't intend to argue everything in the new trial

8  motion.  This is the most important issue for the Court to

9  grapple with here, from our perspective.

10     So with the Court's indulgence, I would just like to

11  say --

12        **THE COURT:**  If you want to concentrate on this, go

13  ahead.  It's a huge, long motion.

14        **MS. HURST:**  I understand.

15        **THE COURT:**  So maybe you can submit most of it.

16        **MS. HURST:**  We're going to submit most of it, Your

17  Honor.  I understand.

18     This is not what they gave us in discovery.  They gave us

19  this thing called ARC.  The witnesses testified -- and this is

20  in the record -- it was an experiment; it could only run on a

21  limited number of apps; and it was available only with

22  developers on a one-to-one basis.

23        **THE COURT:**  Answer this question:  Let's say that they

24  had produced it so that you knew all about it before the trial

25  started.

1      **MS. HURST:**  Yeah.

2           **THE COURT:**  I had already ruled that we were going to

3    limit the trial, because I couldn't get you lawyers to agree

4    and so -- on what the scope of the trial would be.  So I rolled

5    it back to the trial that we had before and said that the new

6    products of the future could be tried later.

7           You know, this industry is so fast, there's no way we

8    could possibly keep up with the industry.  And so you've got to

9    try it in pieces.

10          So I said we're going to try the laptops -- I'm sorry,

11   we're going to try the smartphones and the -- what was the

12   other thing?

13          **MR. VAN NEST:**  Tablets.

14          **MS. ANDERSON:**  Tablets, Your Honor.

15          **THE COURT:**  Tablets, yes.  -- tablets and all those

16   operating systems.  And so we did.

17          I guess you can file a supplemental complaint and move to

18   the new products.  But I wouldn't have let it in anyway, would

19   I?  Why would I have let that in?

20          **MS. HURST:**  Your Honor, I've got to be honest, I'm

21   shocked to hear you say that.  And the reason I'm shocked to

22   hear you say that if you had known -- which you didn't because

23   there is no way we had this evidence, and there's no way they

24   disclosed it -- if you had known that they were putting the

25   infringing work on desktops and laptops, which the Court always

1    understood was the core market for Java SE, that you would have

2    said that's not something the jury can hear.

3          **THE COURT:**  Well, okay.

4          **MS. HURST:**  They're perpetrating a fraud on the Court

5    and the jury --

6          **THE COURT:**  Well, all right.

7          **MS. HURST:**  -- by picking and choosing what evidence

8    they hear.

9       You can't -- you could not have had Dr. Astrachan

10   testify -- let's just take a specific example.

11         **THE COURT:**  Give me --

12         **MS. HURST:**  Right.

13         **THE COURT:**  I don't want to shock you, so I'm trying

14   to take it all back.  But I don't --

15      (Laughter)

16         **THE COURT:**  I'm not following your point.  How could I

17   exclude all those new products and still let you put that into

18   evidence?

19         **MS. HURST:**  Your Honor, let's imagine --

20         **THE COURT:**  It wasn't even a new product when the

21   trial started.

22         **MS. HURST:**  Let's imagine this:  First of all, the

23   Court had granted the supplemental complaint.  Which, by the

24   way, we did not know they were planning to do full-scale

25   Android apps on desktops and laptops when we filed that

1    supplemental complaint.

2          **THE COURT:**  Yes, but then your expert reports came in,

3    and it was overreaching.  So that led to a donnybrook.  And

4    then I had to roll it all back to what the original trial was.

5    So that's the history there.

6          **MS. HURST:**  Right.

7          **THE COURT:**  But, nevertheless, answer my question.

8          **MS. HURST:**  I am answering your question.

9          **THE COURT:**  How would you have gotten it into evidence

10   even though it was not part of the --

11         **MS. HURST:**  So let's imagine we're sitting here and

12   I'm cross-examining Dr. Astrachan, and he says, as he did

13   repeatedly, and Dr. Leonard says, as he did repeatedly, "It's

14   okay, there's no harm because it's not on desktops and

15   laptops."

16       And you're sitting there, Your Honor, and you know that,

17   in fact, that is false because it is on desktops and laptops.

18   Are you really going to let those witnesses get away with

19   telling the jury something that we all know is false?  Of

20   course the Court is not going to do that.

21       Of course, the Court is not going to let their experts

22   come in and testify, "Don't worry, it's not causing harm, it's

23   not on desktops and laptops," when we're all sitting over here

24   in the chambers and we know that's false.

25       It's a fraud on the jury.  It's a mockery of the system.

1    **THE COURT:**  Yes, but the trial was about tablets and

2  smartphones.  And it is true that as to those they're not on

3  desktops.

4    **MS. HURST:**  Your Honor, the trial was about the

5  versions of Android through Marshmallow, all of which infringe

6  by stipulation.

7    The Court's focus to limiting it to some device or

8  another, with all due respect, is erroneous.  The accused

9  software is Android.  It doesn't matter what they put it in.

10  It could be on a disk and not in anything, and it would still

11  be infringing.

12    They stipulated that everything up through Marshmallow

13  infringed.  Everything Marshmallow is in should have been part

14  of this trial, and all of those products should have been in.

15    I understand the Court's donnybrook.  But of all things,

16  it was a total fraud for their witnesses to parade in here and

17  say don't worry, it's not on desktops and laptops, and the day

18  the evidence closed for them to announce it's now every Android

19  app on desktops and laptops.

20    The Court would not have allowed that, the witnesses to

21  get up here and --

22    **THE COURT:**  I don't remember how they phrased it now.

23  Did they phrase it just the way you say it?  Or did they say it

24  more artfully?

25    **MS. HURST:**  Yeah, I want to get quotes, but I'm

1    telling you, Your Honor, the way I said it.

2            **THE COURT:**  Okay.  I would like to see a quote.

3            **MS. ANDERSON:**  I think --

4            **THE COURT:**  Ms. Anderson, how did your witnesses

5    phrase it?

6            **MS. ANDERSON:**  Your Honor, they responded to the

7    questions; did not use the precise quoting that Ms. Hurst was

8    using.

9        But I think what's really important to remember here is,

10   again, Oracle's claiming that they were somehow denied the

11   opportunity to cross-examine witnesses to establish that

12   Android apps were being used on desktops.  That's false.

13       Oracle knew and put in their expert reports this very

14   argument.  They said in their expert reports, opening reports,

15   that the material, the copyrighted material, the declarations

16   and SSO, were being used in the ARC product on laptops and

17   encroaching on the Java SE market.

18       If this was an argument that was so important to them,

19   they should have raised it again.  They should have objected

20   during examination.  Whatever was the issue, they knew this

21   argument.  They put it in the expert reports by both parties.

22           **THE COURT:**  Is it true the witnesses would have come

23   back and said, "Yeah, but it didn't work"?

24           **MS. ANDERSON:**  No.

25           **THE COURT:**  Or "It was a failure"?

1          **MS. ANDERSON:**  Your Honor, that --

2          **THE COURT:**  Is that --

3          **MS. ANDERSON:**  You know, that is a very interesting

4     point that I would like to underscore.

5          It is true that using ARC, that I believe the witnesses

6     testified the numbers of applications, I think, were somewhere

7     around 100.  But the reality is that Oracle's argument that

8     somehow this new product, this updated ARC, would result in a

9     much more successful adoption of applications, Android

10    applications on laptops, underscores why Google has made fair

11    use of things.  Because the difference between those two

12    products lies not in any change relating to any copyrighted

13    material owned by Oracle.

14         Both ARC and ARC++ have the 37 Java API SSO declarations

15    that Oracle is complaining about.  The difference is the newer,

16    revised version has a whole lot more of the parts of Android

17    that were never accused, that can't be accused of infringing

18    anything.  So underscoring further the novel transformational

19    aspect of Android, not helping Oracle's case on this.

20         But, again, it all comes back to this:  Was there some

21    kind of horrible prejudice here that Oracle was denied a chance

22    to make an argument about encroaching on the laptop market?

23    No.

24         It was never denied the opportunity.  It made the argument

25    in its expert reports.  And to come here now and pretend like

1  it didn't make those expert reports and didn't make that

2  argument is simply ignoring the clear history of the case, Your

3  Honor.

4          THE COURT:  Let me ask you a question, Ms. Hurst.

5          MS. HURST:  I have the quotes for you whenever you're

6  ready.

7          THE COURT:  Give me the quotes first, and then I'll

8  ask the question.

9          MS. HURST:  These are examples, Your Honor.  And they

10  are at page 4 of our brief.  And I'll give you some others.

11      In his direct testimony that's elicited by Google,

12  Dr. Leonard testified:

13          "Java SE is on personal computers.  But Android, on

14      the other hand, is on smartphones."

15      Dr. Astrachan testified that Android was in a, quote,

16  different context because it is not on the laptop or desktop.

17      Dr. Astrachan also testified that Android, quote, wouldn't

18  work on your desktop or laptop computer.

19          THE COURT:  Who said that?

20          MS. HURST:  Astrachan.

21          THE COURT:  He's whose expert?

22          MS. HURST:  There's 1231, 19 to 25.  In closing --

23          THE COURT:  Wait.  That was at trial?

24          MS. HURST:  Trial.

25      In closing, Mr. Van Nest got up and said:

1          "Android is not a substitute.  Java SE is on personal

2     computers.  Android is on smartphones."

3          I think it was while he was standing there telling the

4     jury that, that they were announcing it over at IO that it's

5     now on desktops and laptops.

6          This is outrageous.  They are lying to the jury.  The

7     Court cannot countenance this.

8          **THE COURT:**  What do you say to Ms. Anderson's point?

9     Let me see if I can summarize her point.

10         I think she would say, okay, you make a good point that

11    the thing that they announced during the trial was better than

12    ARC.  But, nevertheless, you knew from the ARC disclosures

13    going into trial that Google was trying to migrate Android to

14    desktops, and that the product they had already identified in

15    that category was App Runtime for Chrome, called ARC.  And you

16    already knew that.  And it showed up in three expert reports

17    that you put in.

18         Now, it's true that I said the trial was not going to be

19    directed at those new products.  But, nevertheless, if -- if a

20    witness makes a false statement during the testimony, that

21    would not have precluded you from challenging that false

22    statement by saying, "Well, how about ARC?"  So you never even

23    brought that up.

24         So how did -- so what Ms. Anderson is saying is, you're

25    putting on a pretty good act.  You're pretending to be

1  outraged.  But if you really were outraged, you would have at

2  least tried to use what you did know, which is the ARC

3  material.

4      So what do you say to that argument?

5      **MS. HURST:**  Your Honor, ARC was, by their own account,

6  an experiment, and, by their accounts at the time of the

7  release of Google Play Store coming to a Chromebook near you, a

8  failure.

9      And, first of all, there's no --

10     **THE COURT:**  But it still shows they tried.  They were

11 trying to do it.

12     **MS. HURST:**  But this is about the market, Your Honor.

13 Could we really be successful in arguing, Your Honor, that

14 something that tried and failed is harm to the market?  The

15 Court has already ruled that out.

16     **THE COURT:**  No.  But nor could you argue that a

17 product that just got released was a harm to the market back

18 then.  A new product that has just been announced is not a harm

19 to the time period we were talking about.

20     **MS. HURST:**  Here's what this article says, Your

21 Honor -- well, certainly, Your Honor, anticipated harm is

22 relevant under Factor 4.  It's not just what's happened.  But

23 ARC was a dead end at the time that we took discovery.

24     **THE COURT:**  But this happens in the middle of a trial,

25 Ms. Hurst.  Can I really require that the parties be updating

```
 1   discovery responses as the trial goes on?
 2        MS. HURST:  Well, Your Honor, we're not talking about
 3   updating discovery during the trial here.  They were working on
 4   this thing for months.
 5        Here's what the article says --
 6        THE COURT:  A few months.  It said "several months."
 7        MS. HURST:  Ars Technica says:
 8        "In advance of the show we sat down with members of
 9        the Chrome OS team to get an idea of what Chrome OS users
10        are in for."
11   And here they say:
12        "The shocker is that this is not based on ARC."
13   They called it a shocker.  What the industry understood
14   when this was released was that it was shocking.
15        It was shocking to us too.  We didn't find out about it
16   until about the middle of June, Your Honor.  This was a shock
17   to the industry and to us based on the record as it had been
18   presented to us by Google.
19        And they were working on it for months.  This is not
20   should they have supplemented on May 18, the day before
21   discovery closed.  They knew about this all throughout the
22   spring of 2016.  And we don't know exactly when because we
23   haven't had any discovery on it.  Which is absolutely required
24   under that *Jones vs. Aero/chem* case, Your Honor.
25        We are entitled to get to the bottom of this.  We're
```

1    entitled to understand when they planned to do this; when they

2    started working on it; when it should have been disclosed; was

3    it before or after the Court's orders.

4        And the truth is, the timing of the Court's orders

5    wouldn't ultimately matter because the standard for discovery,

6    Your Honor, is "reasonably likely to lead to the discovery of

7    admissible evidence."

8        We never had the opportunity to cross-examine

9    Dr. Astrachan on a code base that they were building that would

10   have made Android apps widely available.  That never existed,

11   as far as we understood it at the time.  As Ars Technica, the

12   premiere publication in this industry, called it a,

13   quote-unquote, shocker.  "Shocker."

14       We're not feigning any surprise or outrage here.  It's

15   real, Your Honor.

16            **THE COURT:**  Ms. Anderson, why shouldn't I make you sit

17   for a deposition under oath -- or whoever was in charge of this

18   decision -- to explain why you didn't supplement your discovery

19   answer?

20       Now, is it really a legitimate answer to say that I had

21   given those -- said those other products were not going to be

22   in the trial?

23       That doesn't necessarily mean you don't have to answer the

24   questions as to discovery, because they could have then come

25   back and asked for reconsideration if they had had better

 1    points to make.

 2            **MS. ANDERSON:**  Your Honor --

 3            **THE COURT:**  So why shouldn't you, whoever the

 4    appropriate person is, sit for depositions to swear this time

 5    under oath as to what happened?

 6            **MS. ANDERSON:**  Your Honor, it's important to return, I

 7    believe, to what this motion is:  A motion for a new trial.

 8         And on a discovery misconduct allegation which Oracle's

 9    bringing here, the question is --

10            **THE COURT:**  No, no, no.  The rule says misconduct can

11    be a ground for a new trial.

12            **MS. ANDERSON:**  I'm not disputing that, Your Honor.

13    I'm just referring to the standard.  The standard.  And Oracle

14    acknowledges it is whether or not Oracle here has been deprived

15    of some evidence of worth at trial, they would have needed to

16    use at trial.  They were deprived of a material argument they

17    could have made.  Every time you examine that standard, Oracle

18    cannot meet it.

19         This is information and an argument that they made.  They

20    made the argument that Android was encroaching on laptops; had

21    a product, had a product out that was being used to run Android

22    apps on laptops.  They had the opportunity and did make the

23    argument in their expert reports.  They were not deprived of

24    anything of --

25            **THE COURT:**  So it was a failure in experiment.

1          **MS. ANDERSON:**  No.

2          **THE COURT:**  That's what she says.  And your people

3     said it was a failure in experiment.  And then she didn't have

4     the best evidence to use there.

5          **MS. ANDERSON:**  Well, if Oracle thought it was a

6     failure, you wouldn't know it from their expert reports.  I

7     invite the Court to read what we have quoted in our papers.

8          But Mr. Malackowski is very clear in accusing this product

9     and saying that it allows Google to bring Android apps to

10    occupy, not have an infinitesimal, unimportant effect on, but

11    to occupy the original traditional market of the Java platform.

12         Oracle went full bore in its expert reports that ARC was

13    targeting and going to occupy its market.  So they could have

14    and did make that argument.

15         They were not deprived of an argument that would have

16    worth at trial, because Your Honor decided, appropriately, that

17    you needed to have the scope of the trial reflect, among other

18    things, what happened in the original trial and what we're on

19    remand for in retrial.  That's what Your Honor did.

20         This additional claim that Oracle, Oh, well, we'd also

21    like to argue that there's an updated version that makes more

22    Android apps available, that doesn't -- that's not evidence of

23    worth under Your Honor's rulings.

24         **THE COURT:**  We may go to trial before any ruling by

25    the Court of appeals.  You're assuming that this will be

delayed for years.  We may get you to file your supplemental

complaint and be in trial January.  So -- on the follow-on

products.

**MS. ANDERSON:**  And, Your Honor, the fact that Your

Honor has carved out of this case those other products also is

a reason why this is not evidence of worth at trial that Oracle

has been precluded from advancing.  They have that carve-out in

Your Honor's orders.

**THE COURT:**  I'm not so sure.  I'm not saying yet,

without thinking about it, but I -- I think at the point where

you decided not to disclose this was possibly an important

point.

**MS. ANDERSON:**  I'd like --

**THE COURT:**  Unless you had disclosed it.  If I had

been in your position, I would have disclosed it.

**MS. ANDERSON:**  Well, I would like to point out, Your

Honor, that we produced documents in discovery.  Their

responses are accurate.  The requests they made, the RFPs they

made for documents called for, you know, platforms that would

work.  There was no such platform available for production

during the discovery period.

But I would like to point out a few documents in the

production, for Your Honor's reference.  And these are

documents that are highly confidential under the protective

order.  But I do have them available.  And I think it's

1    important for the Court --

2              **THE COURT:**  Are they in your response to this motion?

3              **MS. ANDERSON:**  They are not.  But they are in

4    production.  They have always been available to Oracle.

5              **THE COURT:**  Then you should file this under seal in a

6    declaration so that I can --

7              **MS. ANDERSON:**  Thank you, Your Honor.

8              **THE COURT:**  -- I can evaluate it.

9              **MS. ANDERSON:**  Be happy to.  Thank you, Your Honor.

10             **THE COURT:**  All right.  Can I bring it to a close now?

11             **MS. HURST:**  Yes, Your Honor.

12             **THE COURT:**  All right.  Anybody else want to take one

13   minute to summarize anything?

14             **MS. HURST:**  Your Honor, I believe Ms. Simpson would

15   like to briefly address the other products.  And then we will

16   submit the rest of our issues, Your Honor, on the papers.

17             **THE COURT:**  Okay.

18             **MS. SIMPSON:**  Good morning, Your Honor.  Lisa Simpson.

19             **THE COURT:**  Welcome back.

20             **MS. SIMPSON:**  Thank you, Your Honor.

21       I was going to address what relates very closely to what

22   we've been discussing just now, which is the exclusion order

23   which excluded the other products from the case.

24       We've had much dialogue on that already.  I don't expect

25   that there was a lot of areas that the Court would necessarily

1  have questions on.  But I would just offer the Court that those

2  other products -- and now I'm talking about Auto and TV and

3  where those --

4          **THE COURT:**  Something called Brillo.

5          **MS. SIMPSON:**  Sorry?

6          **THE COURT:**  Brillo.

7          **MS. SIMPSON:**  And Brillo.

8          **THE COURT:**  What was that?

9          **MS. SIMPSON:**  Your Honor, I don't fully understand

10  Brillo.  I'll be completely honest.

11          **THE COURT:**  Okay.  I don't either.

12     (Laughter)

13          **MS. SIMPSON:**  My understanding of it is that it

14  facilitates connections between devices and the cloud.  But

15  that is the extent of my knowledge.

16          **THE COURT:**  All right.  Well, but, see, I'm

17  sympathetic to your problem.  On the other hand, I'm

18  sympathetic to the need in a complex case to try to find some

19  plausible boundary so that the jury -- a stationary target as

20  opposed to a moving target, so that the jury will be able to

21  understand, and also so that the parties will say, okay, this

22  is the fixed universe, and we'll fight over everything else in

23  the future.

24     And there's no way to do that without making somebody a

25  little unhappy.

1          **MS. SIMPSON:**  Understood, Your Honor.

2          **THE COURT:**  You were unhappy about that piece of it,

3    but I thought it was a fair line to draw.

4          **MS. SIMPSON:**  Right.  Your Honor, I think --

5          **THE COURT:**  What new argument are you making that you

6    didn't make before?

7          **MS. SIMPSON:**  I don't think the arguments are new,

8    Your Honor.

9          The key point of this, with respect to those products, is

10   that those were not moving targets.  Those were markets that

11   Java has been in for some time.  Although they may be expanded

12   product areas for Android, they were not new products in the

13   sense that they weren't things that were established markets

14   for Java.

15         And if you look at the case law -- and, Your Honor, we

16   have discussed this at length, but if you look at the case law,

17   the case law does require that you look at these particular

18   markets.

19         The case law is very specific in the sense that it

20   requires that you look at actual markets, potential market harm

21   to derivative works and also harm if the conduct that is being

22   accused becomes widespread.

23         The cases say -- use words like "must."  "You must

24   consider these markets."  "You are required to consider these

25   markets."  "Must" comes out of *Harper*.  "Required" comes out of

*Campbell.*

The case law tells us what we're supposed to look at.  And as we went through the jury instruction process, we also borrowed from the Second Circuit case in *Texaco*, which tells us to look at reasonable, likely, and foreseeable markets and -- or traditional markets and likely and reasonable markets.

And those markets are markets that we were in.  These are all reasonable, likely, and traditional markets for Java.  These were not new markets or markets that we couldn't show we had been in previously.

So at that point it becomes imperative that the Court allow the jury to hear the entire universe of harm.  And without all of those other products in the case, the jury heard a very truncated version on the most important factor in the case.  So Factor 4, market harm, they were only able to hear a small portion of that harm evidence when they should have heard all of the harm evidence.

And what seems to be happening here is people are getting very caught up in the products or the devices.  But we didn't accuse a device or a product.  We accused Android.  And we accused those particular versions of Android.  And they've been stipulated to include the infringing material.  So the versions of Android at issue are what's at issue.

Where they put that version of Android really doesn't matter.  It matters in terms of looking at fair use and how,

1   you know, those things were used down the road.  But it doesn't

2   matter in terms of whether they should be in the case or not.

3       They should be in the case because we accused Android.

4   And everywhere that Android is being used should be part of the

5   harm evidence.  And that didn't happen here.  And that, we

6   believe, had a very negative impact on what the jury was

7   provided.

8       I know -- just to briefly address some of Google's

9   arguments, I know they argue quite a bit about the mandate of

10  the Federal Circuit and how allowing those products in would

11  violate that mandate.

12      We obviously don't agree with that.  The mandate merely

13  said that you were remanded to have proceedings consistent with

14  their orders.  There's nothing inconsistent with that order

15  with respect to looking at the full realm of evidence on market

16  harm.

17      That jury -- I know there was a lot of discussion about

18  the prior jury and what the Federal Circuit was looking at.

19  The jury in the first case did not consider just phones and

20  tablets.

21      While I know that the case was directed at that, the jury

22  verdict form itself talked about Java and Android.  Those were

23  the products in the case.  It was not a device-specific trial.

24  And the finding of the jury that Android infringes, was that

25  Android infringes.  Not Android on phones infringes.  Not

1    Android on tablets infringes.  Android infringes.

2        And now we know that Android all the way through

3    Marshmallow contains our code.  And those versions are the very

4    versions that are in the products that we wanted to bring to

5    the jury's attention.

6        **THE COURT:**  I keep saying we're going to have another

7    trial on all the other products, so that -- so that, yes,

8    Android infringes subject to fair use being proven on those

9    other products.

10       **MS. SIMPSON:**  It does, Your Honor.  But it takes away

11   from the full story of harm.  It's not harm with respect to

12   phones in one trial and then harm with respect to desktops in

13   another trial.

14       The harm is the use of Android or the use of the code, the

15   use of the Java code in Android, and what harm that is going to

16   cause all of Java's markets.

17       You can't piecemeal it.  Our position is that was an error

18   and led to quite a bit of prejudice on Oracle's position.

19       **THE COURT:**  All right.  Thank you.

20       Anyone over there want to argue?

21       **MS. ANDERSON:**  Submitted, Your Honor, on the papers.

22       **THE COURT:**  Thank you.

23       **MS. ANDERSON:**  Thank you.

24       **THE COURT:**  Now I'm going to bring it to a close

25   unless somebody has got something burning to say.

1       So the two of you -- what was your name, again?

2            **MS. O'MEARA:**  Michelle O'Meara.

3            **THE COURT:**  And you?

4            **MR. MULLEN:**  Reid Mullen.

5            **THE COURT:**  You two are going to meet tomorrow.

6            **MR. MULLEN:**  Yes, Your Honor.

7            **THE COURT:**  At least five hours a day Thursday and

8  Friday.  And send me a joint letter that is going to start out,

9  "We have reached an agreement in total" --

10      (Laughter)

11           **THE COURT:**  -- "and here it is."  That's the way the

12  letter should read.

13           **MR. MULLEN:**  I hope that's right, Your Honor.

14           **THE COURT:**  Now -- yes, hope springs eternal.

15      (Laughter)

16           **THE COURT:**  This is something you should you should be

17  able -- you're good lawyers.  You should be able to do this.

18      And I don't want you being inconsistent with the last

19  time.  On the first one, when Oracle won, you were very stingy

20  on your costs.  So if you're being inconsistent, that doesn't

21  look good.

22      So two and a half million is ridiculous.  So you're going

23  to have to get it way down.

24      All right.  Go forth.  Do good.  And send me the letter,

25  now, the joint letter on Friday.

1          Thank you.

2               **MR. VAN NEST:**  Thank you, Your Honor.

3               **MS. HURST:**  Thank you, Your Honor.

4               **MS. ANDERSON:**  Thank you, Your Honor.

5          (At 8:59 a.m. the proceedings were adjourned.)

6                         -   -   -   -

7

8                    **CERTIFICATE OF REPORTER**

9          I certify that the foregoing is a correct transcript

10  from the record of proceedings in the above-entitled matter.

11

12  DATE:   Thursday, August 18, 2016

13

14

15                       _Katherine Sullivan_

16  _____

17       Katherine Powell Sullivan, CSR #5812, RMR, CRR
                     U.S. Court Reporter
18

19

20

21

22

23

24

25