**Pages 1 - 43**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

ORACLE AMERICA, INC.,           )
                                )
          Plaintiff,            )
                                )
   VS.                          )     **NO. CV 10-03561-WHA**
                                )
GOOGLE, INC.,                   )
                                )
          Defendant.           )
_____)

San Francisco, California
Thursday, September 22, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, CA  94105
          BY:  **MELINDA HAAG, ESQUIRE**
               **ROBERT P. VARIAN, ESQUIRE**

For Defendant:

                    KING & SPALDING LLP
                    1180 Peachtree Street, N.E.
                    Atlanta, GA 30309
          BY:  **BRUCE W. BABER, ESQUIRE**

                    KING & SPALDING LLP
                    101 2nd Street - Suite 2300
                    San Francisco, CA  94105
          BY:  **JOSEPH WETZEL, ESQUIRE**

Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
                    Official Reporter
          (Appearances continued on the next page)

APPEARANCES CONTINUED:

For Defendant:

                        GOOGLE INC.
                        1600 Amphitheatre Parkway
                        Mountain View, CA 94043
                  BY:   **RENNY HWANG, ESQUIRE**

**Thursday - September 22, 2016**                              **10:32 a.m.**

### P R O C E E D I N G S

---000---

**THE CLERK:**  Calling Civil Action 10-3561, Oracle America, Inc., vs. Google, Inc.

Counsel, please approach the podium and state your appearances.

**MS. HAAG:**  Good morning, Your Honor.  Melinda Haag on behalf of the responding parts:  Ms. Hurst, Orrick, Herrington & Sutcliffe, and Oracle.

**THE COURT:**  Welcome to you.

**MS. HAAG:**  Thank you.

**MR. BABER:**  Good morning, Your Honor.  Bruce Baber for King & Spalding for Google.

**THE COURT:**  Welcome to you.

**MR. VARIAN:**  Good morning, Your Honor.  Robert Varian. I'm with Ms. Haag representing the same parties.

**THE COURT:**  Welcome.  Others are at the counsel table, but I will leave it to you two if you want to introduce them or not.

This is a motion for contempt.  The courtroom has got a lot of people out, there so I'm going to order you not to refer to or reveal the attorneys-eyes-only information or confidential information without getting my okay first, in which case I might excuse everyone from the courtroom.

1        All right.  So let's hear the moving argument.

2              MR. BABER:  Thank you, Your Honor.

3        I do have -- at counsel table with us this morning is my

4    partner, Joseph Wetzel, from our San Francisco office, and

5    Renny Hwang from Google.

6              THE COURT:  Great.  Welcome.

7              MR. BABER:  Your Honor, we appreciate your giving us

8    some time to be heard on this, and I'll try to be brief.

9        The motion we filed presents two separate but related and,

10   we say, equally-important issues about protective orders and

11   compliance with them.

12       The first issue is may an attorney, who has received and

13   been entrusted with confidential information under a protective

14   order, disclose that information in open court, regardless of

15   who is present.

16       In this case, we are using the Court's standard protective

17   order for the Northern District.  The language that's at issue

18   is from the form, and the question is whether the language of

19   that form means what it says when it says an attorney who has

20   confidential information can only disclose it to people in the

21   categories listed.

22       We think it's the Court's role to decide who gets to hear

23   information that's been designated confidential and may be

24   disclosed in open court.  It is not appropriate and we believe

25   it is prohibited by the protective order for an attorney to

1   simply share that information, disclose it publicly, without

2   the Court's ruling in advance.

3       So we think the answer to that first question is no.  If a

4   lawyer has information designated confidential under the

5   protective order, that lawyer cannot disclose it to anyone

6   other than people that the protective order permits disclosure

7   to be made to.

8       The second question in this case in particular is once

9   there has been a disclosure, once we know that an attorney has

10  disclosed confidential information to someone who is not in a

11  category that is permitted to get a disclosure under the order,

12  does that lawyer have to take steps to limit the effects of the

13  disclosure that was made.  Is there an obligation to cooperate

14  so that the information that's been disclosed doesn't get

15  disseminated any further.

16      We think the answer to that question, under the plain

17  language of the protective order, is yes.  The protective order

18  contemplates that sometimes mistakes happen.  Sometimes

19  information that's been designated confidential does get

20  disclosed to people that it shouldn't be disclosed to.  But it

21  also puts on the lawyer, or anyone else who has confidential

22  information, an obligation to use the best efforts to make sure

23  there is no further dissemination.  And we think in this case,

24  Your Honor, it's pretty straightforward both on the facts and

25  the law.

1    There is really no dispute that Oracle's counsel, in open

2  court before Judge Ryu at a hearing on a discovery dispute --

3  and we know that there was at least one member of the media

4  present -- made a disclosure of confidential information, not

5  just of Google, but of a third party, Apple, that had been

6  designated *attorneys' eyes only* under the protective order.

7    I don't believe, Your Honor, there should be any serious

8  question as to whether or not that was a violation of the

9  order.  While the order permits disclosure to the Court for

10  sure -- protective orders always have to permit disclosure to

11  the Court -- but the protective order says you can only

12  disclose the information to the Court, qualified experts, etc.

13  It does not anywhere contemplate, suggest, or permit a

14  disclosure to members of the press or members of the public.

15    Those are not -- in their brief, Oracle characterized

16  these as boilerplate provisions of the protective order.  These

17  are not boilerplate provisions.  That's the core provision of

18  the protective order, is if you, as a lawyer, as an officer of

19  the Court -- if you get confidential information you are told

20  you are now under a court order that you may only disclose it

21  to people in these certain boxes and if you make a disclosure

22  to someone who is not in one of those boxes, I think under the

23  plain language of the order, it's a violation.

24    Now, once the disclosure happened in this case --

25  Your Honor, what happened shouldn't have happened.  Okay.  Once

the disclosure was made, Google's counsel immediately said,
*Wait, wait a minute.  That's confidential.  That's from a*
*confidential deposition.  It should be under the protective*
*order.*

Judge Ryu asked, *Is that true*, and Oracle's counsel said
*Well, yes, it is from a confidential deposition, but, you know,*
*there has been media reports about this*, etc.

Your Honor, that answer should have been, *Yes.  Sorry.*
*It's confidential.  We should seal the transcript.*

That didn't happen.

We believe that violated the protective order, and it went
on from there.  We've cited in our brief the next -- a couple
days later, Google wrote a letter asking Oracle to please join
in a motion to seal the transcript.  Oracle didn't even respond
to that.

Google had to file multiple motions in front of Judge Ryu
to get that information sealed.  And she ultimately sealed it.
So she found there was good cause to seal that transcript and
keep that information confidential.

But at every turn, Oracle, instead of simply just saying,
*Yes, we see Google's put in a declaration, Apple has put in a*
*declaration; this is confidential information; we agree it*
*should be sealed*, they said, *Well, we take no position; here's*
*the reasons why the disclosure was okay*.  It was anything but
cooperating in limiting the damage from the protective order

1    breach.

2         And these issues, they're not academic.  Okay.  The

3    information that was disclosed at that hearing in front of

4    Judge Ryu became headline news, headline business news.  There

5    were articles all over the Internet quoting the transcript and

6    quoting the disclosure by Oracle's counsel that said, *We've*

7    *always wanted to know what these numbers are like regarding*

8    *this Google/Apple deal.  Well, now we know because here is what*

9    *happened in court.*

10        A few weeks later, Your Honor, we still had -- I don't

11   know if you recall, there was some final cleanup document

12   discovery with some third parties.  Well, another third party,

13   LG Electronics, came into court.  They filed a motion for

14   protective order with Judge Ryu citing what had happened with

15   the Apple data, and they asked Judge Ryu for additional

16   protection for LG data.  So we have third-party data involved

17   here.  It was Apple's information as well as Google's.

18        Your Honor, that is exactly the type of information that

19   protective orders are intended to protect.  And the

20   consequences, the results that occurred here, are exactly the

21   kinds of harm that protective orders are supposed to guard

22   against.

23        We have to have protective orders for the discovery

24   process to work.  We all know that.  But they have to be obeyed

25   and respected in order for them to perform their necessary

1    function.

2         And the Court, opposing parties, and certainly third

3    parties have to be able to expect scrupulous compliance for

4    protective orders to be effective.

5         And as I said earlier, we all live in this world nowadays

6    with protective orders.  We always have to be aware *am I about*

7    *to say something that is covered by a protective order*?  And if

8    you are, you need to have the judge know that.  You need to let

9    the other side know that.

10        But sometimes things happen.  Okay.  We all know that.

11   There but for the grace of God go I.  But when it does happen,

12   the answer is not to dispute that there was a problem, refuse

13   to cooperate, taking very simple steps that could have

14   addressed it, and, instead, requiring the other party and a

15   third party to have to spend money filing motions, filing

16   declarations, explaining why the information is confidential,

17   and then having Judge Ryu have to take time to rule on that.

18        I'm going to come back to the two legal issues in a

19   second, but I also want to just touch on a couple of things

20   about what this motion is not about, because in the briefs,

21   Your Honor, I think there is a lot of red herrings that are

22   floating around here.

23        First of all, this is not about open and public trials or

24   the procedures that might be appropriate when confidential

25   information needs to be used at trial.  This was a discovery

dispute, and *Kamakana* made clear that there is very different
standards at trial or on dispositive motions than in a
discovery dispute context.

The motion is also not about whether information can be
disclosed to the Court.  Of course it can.  The protective
order says it must, you have to permit that.  We absolutely do
not quarrel with counsel's ability to share confidential
information with the Court.  We have the procedures for filing
under seal for written documents, and in court at any time, a
lawyer is free to say, *Your Honor, I have information that is
under the protective order.  Can I share it?*

And, in fact, Your Honor, we've had a fairly consistent
history in this case of exactly that happening.  I went back
and looked at several of the transcripts back during Phase 1.
We had hearings where Mr. Holtzman from Boies Schiller came to
the Court and he said, *Well, Your Honor I have documents, but
Google designated them attorneys' eyes only*, and you said to
him, *Fine.  Please tell me what's in them*.

We have situations where Google had documents that Oracle
had designated as confidential, and Mr. Van Nest stood up and
said, *Your Honor, I have some -- an argument I would like to
make based on some Oracle documents that are designated
confidential*.  Mr. Jacobs said, *It's okay.  We de-designate
them.  You can share those in open court*.

So that's always a possibility.  But it's not appropriate

1    for a lawyer to simply share the information without warning

2    and without flagging for the Court and for opposing counsel and

3    for third parties that it's confidential.

4        Your Honor, this motion is also not about trying to punish

5    anyone.  Given the issues that have been raised, we believe it

6    is important for this Court to clarify these issues about the

7    standard protective order.  Is it the case, as Oracle argues,

8    that as long as I'm directing my comments to the Court, I can

9    just share whatever confidential information I want, regardless

10   of who is back there?

11       This is the protective order that is used in this district

12   in lots and lots and lots of technology cases.  And if that is

13   its meaning, that should be clarified.  I think, frankly, Your

14   Honor, that would come as a surprise to most lawyers.

15           **THE COURT:**  All right.  Are you done?

16           **MR. BABER:**  Almost, Your Honor.

17       I will just say I think the two core legal issues, the

18   protective order itself, categories of people you can disclose

19   to, only those people.

20       And then the other issue Oracle raises is Your Honor's

21   order that you entered when you approved the protective order

22   when you said once something is used in open court, it's no

23   longer protected, absent a further order of the Court.

24       Just like the protective order doesn't permit a lawyer to

25   stand up and share confidential information, we don't believe

your order gives you carte blanche to use whatever you want in open court.  I think your order was clear.  It was your order, Your Honor, and you can tell us what it means, but I think what your order says is once a decision has been made that the information can be used in open court, then it is up to the Court to decide whether any further protection is appropriate.

So we don't think there is any issue here that there is ambiguity in the protective order, some reasonable good faith interpretation that what happened was not a breach.  We think the language of both orders is clear, and we think the orders were violated as a result.

Google had to spend significant money filing multiple motions, dealing with LG, etc., in order to undue the effects of the disclosure.  And we think we are entitled to a compensatory award for what it cost Google to deal with that once the violation occurred.

            **THE COURT:**  All right.  Thank you.

            **MS. HAAG:**  Thank you, Your Honor.

Your Honor, the question before the Court is different, in my view, from what has been framed by Mr. Baber.  The question before the Court is whether the Court should hold an attorney, a respected trial attorney, and by extension, her law firm and her client, in contempt of court and impose sanctions, which involves a finding of bad faith based on the circumstances of this case.  So I think it's important for the Court -- for us

to step back, and if the Court will indulge me, to allow me to explain to the Court what happened in this case before the Court rules.

So January 14th of this year, there was a hearing before Judge Ryu.  It was a discovery dispute.  Discovery had closed. The expert reports were in process.  Trial was set for May, and as we know, trial started in May just a few months later.

Oracle believed that they were missing critical information -- the experts that Oracle was working with believed and were telling Oracle *We are missing critical information for our analysis*.  *We have not gotten it through discovery*.  Despite the fact that Google proffered a 30(b)(6) witness to provide that information, the information that was provided by that witness was very vague, very conclusory, limited as to time, and it was not what the expert needed, and that is what the expert was communicating to Oracle and its counsel.  So this was critical information just a few months before trial.  So Oracle seeks a discovery proceeding before Judge Ryu, and that proceeding took place on January 14th.

So there is really two sets of information.  Mr. Baber kind of puts it together, but there is really two issues that arose out of the hearing, and they are very different.

First, there was an exchange between Judge Ryu and Ms. Hurst that went on for at least 10 pages.  It started with a question from Judge Ryu to Ms. Hurst.  She wanted Judge Ryu

1    to explain how the requested information was relevant to the

2    apportionment of profits and what period of time was relevant.

3         That question led to at least a ten-page back and forth

4    very fulsome, detailed discussion between the judge and

5    Ms. Hurst.  In the course of that back and forth discussion in

6    response to the Court's question, Ms. Hurst revealed

7    information, two numbers, that are now the basis of this

8    motion.  So I'm not -- I'm referring to it in code, but two

9    numbers --

10            **THE COURT:**  Two numbers?

11            **MS. HAAG:**  I think that Google calls it the Google or

12    the Android information.  Ms. Hurst talked about those

13    numbers -- mentioned those numbers in that back and forth.

14         Google expressed no objection, no concern at any time

15    during the hearing with the revelation of those two numbers.

16            **THE COURT:**  I think I read that Mr. Van Nest jumped up

17    and said that was confidential right away.

18            **MS. HAAG:**  No, Your Honor, that's different.  So this

19    starts -- this takes place starting on Page 4 of the hearing

20    transcript, Pages 4 through 13 of the transcript.  And there's

21    no objection.  Let me -- I'll pull the transcript for you.  But

22    it starts on Page 4.

23            **THE COURT:**  All right.  Well, I think where the

24    objection was made was 29.

25            **MS. HAAG:**  Right.  So that's why it's important,

Your Honor, to really be detailed about this and to parse it out.

So Ms. Hurst is talking to the Court, and in that ten-page back and forth mentions two numbers that counsel calls the Google or the Android numbers.  Again, there is no objection to those numbers being mentioned in court, there is no concern expressed by Google at any time during the hearing.  There are meet and confer discussions after the hearing concludes where counsel is working out an order between them.  Google never mentioned during those five days of meet-and-confer discussions that there was a concern about these numbers being revealed during the hearing.

On January 19th, five days after the hearing, Google sent a letter to Ms. Hurst and Mr. Bicks.  In that letter, Google raised a concern about -- for the first time about the revelation of this Google or Android number.  That was the first time it was raised by Google as a concern.  That was January 19th.  On January -- and in that letter, Your Honor, Google asked Oracle to join a motion to seal those numbers from the transcript.

Two days later on January 21st, Oracle, through counsel -- and this gets more complicated and I'll fill this in in a minute -- responded to Google in a court filing taking no position with respect to that request.  So in terms of not being helpful, as Mr. Baber claims, two days after Google asked

for this material, these numbers, these Google/Android numbers

to be sealed, Oracle said, you know, *we take no position*.  In

other words, *we don't object*.

So those are the facts with respect to the Google or

Android numbers, Your Honor.  No objection.

Two days after Google raised the concern, Oracle filed

something in court that took no position, essentially not

objecting to that information being sealed.

And Google is asking you to hold Ms. Hurst, her law firm,

and her client in contempt for revealing those numbers in

court, for which there was no objection raised during the

hearing, and the first time there was ever any concern raised

was five days after the hearing.  They're asking you to hold

her in contempt for that.

Now I want to turn to the Apple information, which is, I

think, what the Court was referring to.  So back to the

January 14th hearing.

Later in the hearing, there is the exchange, the

discovery-related exchange.  Oracle said during the hearing

that -- I'm sorry.  Oracle said, of course during the hearing,

that it didn't have everything it needed.  Again, I'm trying to

speak in code a little bit, Your Honor, so I apologize.

Oracle said during the hearing essentially, *We don't have

what we need.  That's why we are here before you, Judge Ryu*.

Google's counsel said they do have -- *Oracle does have what it*

*needs, Your Honor*, represented that to the Court.

Oracle, through Ms. Hurst, says, *No, we don't, Your Honor*. *That's why we're here*. *We don't have the information we need*. She was trying to -- Ms. Hurst was trying to explain to Judge Ryu why it is we don't have what we need. This ping pong goes bank and forth between counsel for Google and counsel for Oracle where counsel for Google is saying *they have everything they need* and counsel for Oracle is saying *no, we don't*.

So this discussion goes back and forth. Then the parties start talking about sort of other, but related, matters, and now deeper into the hearing where you start -- where you do see the objection, Mr. Van Nest, on behalf of Google, once again says, *By the way, Oracle has what it needs*. *The 30(b)(6) witness provided it*. *Oracle has what it needs*. And, you know, essentially, *We shouldn't be here*.

Ms. Hurst, at that point, was trying to figure out, *How do I illustrate to the Court that we don't have what we need? That what was said in this 30(b)(6) transcript was vague and limited to time and it's not helpful and it's not what we need*. *How can I convey that to the Court*?

She wasn't planning to do this. She did not have the transcript, the deposition transcript, with her. She had to get one of the people from Orrick to pull it up on a computer, on a laptop. She brought up it to the lectern, and to illustrate to the Court that what this witness said during this

1    30(b)(6) deposition is not enough, it's not helpful, she

2    paraphrased what he said on the record.

3        It was at that point that counsel for Google did object,

4    and Judge Ryu, expressing a little skepticism, essentially took

5    it under submission.  She said, *I'm not going to rule right*

6    *now.  I'll address it later*.  And then they moved on.  There

7    was no further discussion of it during the hearing.  The

8    hearing continues.  They move on.

9        What's apparent, got to be apparent to everybody, is the

10   Court is holding a calendar, so there are people in the

11   courtroom because the Court had -- just like this morning, the

12   Court had a calendar.  So it had to be apparent to Mr. Van Nest

13   that there were people in the courtroom.  It had to be apparent

14   to Judge Ryu that there were people in the courtroom, as well

15   as to Orrick, of course.  No one expressed a concern about the

16   fact that there were people in the courtroom when this number

17   was discussed by Ms. Hurst.  The parties simply went on and

18   wrapped up the hearing.

19       Judge Ryu ultimately suggested and brokered a compromise

20   between the parties.  Oracle would get the information that it

21   needed and Google would be able to mask certain information,

22   redact certain information from that.  That was a suggestion by

23   the judge.  It was a good suggestion.  It was a compromise.

24   The parties accepted that.  Of course, everybody talked about

25   the fact that the devil is in the details, and so the Court

ordered them to meet and confer.  She asked them to submit then

an order on January 19th, which was five days later.

So the parties met and conferred over that five-day

period.  Again, Google didn't raise any concern about the

Google/Android numbers, and I don't believe they discussed the

Apple issue either.

On January 19th, as I said, Mr. Van Nest sent a letter to

Ms. Hurst and Mr. Bicks.  For some reason, the letter is also

sent directly to Oracle in-house counsel.  I'm not sure why

that was done.  But in any event, a letter was sent on

January 19th at 11:49 in the morning.  That letter, for the

first time, raised the concern about the Google/Android number.

It re-raised the concern about the Apple number.  And it asked

Oracle and Orrick to join in a motion to seal those portions of

the transcript.

They asked in the letter for a response by noon the next

day, January 20th.  So the letter is received by email at 11:49

in the morning on January 19th.  Three and a half hours later

at 3:30 in the afternoon, before anybody had a chance to deal

with this, and the deadline that Google asked for was noon the

next day -- at 3:30 Judge Ryu issued an order.  She hadn't

forgotten the request to seal the transcript that had been made

orally with respect to the Apple number.  So at 3:30 in the

afternoon, she issued her order, that she had essentially taken

under submission, denying Google's request to seal that portion

1    of the transcript.

2         So at that point, Orrick -- and, of course, as I know you

3    understand from your time in private practice, this is the

4    lead-up to trial, everybody is frantically busy, there is an

5    awful lot going on.  At that point Orrick and Oracle think

6    *Well, this is taken care of*.  *The judge has ruled on this*

7    *request*.  *The judge has denied that request, and it's taken*

8    *care of*.

9         On January 20th, so the day after the Court issued the --

10   well, one more thing.  The Court denied the motion to seal on

11   January 19th, and the transcript was actually made available to

12   the public 25 hours later.  So at 4:30 the next day on

13   January 20th, it was available to the public.

14        On January 20th, Google filed a motion for

15   reconsideration.  They actually -- it was procedurally

16   deficient.  It was bounced by the Court because the motion for

17   reconsideration they filed was a motion for reconsideration of

18   the Apple number because that truly was reconsideration because

19   the Court had ruled on it, but they lumped in, like they did

20   today, this Google/Android number.  The Court actually bounced

21   it and said this is procedurally incorrect.  You need to

22   separate these two things.  So that's part of all the briefing

23   that needed to be done.  It was because of that issue.

24        So on January 20th, Google files the motion for

25   reconsideration.  It's bounced.  On January 21st, the next day,

they have to re-file.  So they file it procedurally correctly the next day on the 21st.

On that same day, Oracle/Orrick filed a response and took no position to the relief they were requesting, which was sealing the transcript on January 21st.  And on January 22nd, Judge Ryu, I'm guessing, because she now sees here is the motion, it's procedurally correct, and Orrick and Oracle don't appear to be contesting it, she sealed the transcript at that point, January 22nd, pending her further ruling.  And then she ultimately ruled on the motion for reconsideration and the motion and gave Google most of the relief that it was seeking.

The Court, Judge Ryu, did not deal with all the back and forth in the papers about whether there was a violation of the protective order, whether there was contempt, whether there was bad faith or malevolent conduct.  She sort of put all of that aside.  She simply looked at it and decided, *There is good cause.  That's the standard.  And I'm going to seal this information*.

So those are the facts.  I think it's important for the Court to understand that, to separate out the Google and Android number from the Apple number, and to understand really what happened here because Google is asking you, based on those facts, to hold Ms. Hurst in contempt of court, to hold Orrick in contempt of court, and to hold Oracle in contempt of court, and to impose sanctions, which requires the Court to make a

```
1    finding of bad faith.  And I submit to Your Honor that there is
2    no bad faith here and that it's not appropriate to hold these
3    parties in contempt on these facts.
4        If the Court doesn't have any question about the facts,
5    I'm happy to talk a little bit about the legal standards as
6    well.
7             THE COURT:  Well, do you admit that she should not
8    have revealed this to the Court in the way she did?
9             MS. HAAG:  Well, Your Honor, to answer that question,
10   I think I do need to go through the legal standard, if the
11   Court will indulge me once again on that, because what we're
12   talking about is holding a party in contempt.
13            THE COURT:  What?
14            MS. HAAG:  What we are talking about is holding a
15   party in contempt.
16            THE COURT:  We are also talking about Rule 37.
17            MS. HAAG:  Well, yeah, and there's an interesting
18   point about Rule 37 as well that I would like to address.
19            THE COURT:  I see you're dodging -- this doesn't help
20   me any.  You're dodging it.  I think you're afraid to just come
21   right out and admit she screwed up.  She should never have done
22   what she did.
23            MS. HAAG:  Well --
24            THE COURT:  And whether it's good faith, bad faith, or
25   whatever, you're not helping me out.  Because to my mind, she
```

1    should never have done that.

2         I practiced for 25 years and 17 years in this job, and the

3    uniform practice in this district and everywhere else I

4    practiced in the United States was if you got attorneys' eyes

5    only, you tell the judge, *I would like to give you this, Judge,*

6    *but it's under this protective order.*  *I have to have your*

7    *permission or hand it up to you.*  *I can just hand you a copy,*

8    *and let you look at it right now.*  That's the way it's worked.

9    I bet you would admit it, too.  If she was on the other fence,

10   you would be jumping up and down about how they violated the

11   protective order.

12        So I think it's important for you to own up to it and

13   admit that it was a violation.

14            **MS. HAAG:**  Well, Your Honor --

15            **THE COURT:**  It takes away from the rest of your very

16   good argument that you made that you won't make that

17   concession.

18            **MS. HAAG:**  Well, I understand, Your Honor, and even

19   assuming a violation of the protective order --

20            **THE COURT:**  All right.  Go ahead.  This is not helping

21   me.

22            **MS. HAAG:**  I understand, Your Honor.  I would like to

23   talk about the --

24            **THE COURT:**  It's really -- your firm is one of the

25   biggest litigators in America, and next time you go into a

1    court somewhere and ask for confidential documents, I hope

2    somebody raises this and says, *Your firm violated that order*

3    *and wouldn't even admit it.  And why should we, in this next*

4    *case, give your firm access and have it treated the same way*

5    *with the same disregard that it was treated in this case.*

6        **MS. HAAG:**  I understand, Your Honor.  I would like to

7    talk about the standard for contempt because that's what --

8        **THE COURT:**  I'm not going to say -- I'm very -- I'm

9    not going to say *never*.  I'm going to reconsider this, but I'm

10   more inclined to just say she violated Rule 37.  That has a

11   much different standard.  You don't have to get into good

12   faith/bad faith, but make it very clear this was a violation.

13       And it disappoints me to no end that a firm of your

14   caliber would have done this because we depend on good lawyers

15   like you and Ms. Hurst to do it the right way instead of

16   arguing it.  Even today you won't admit that it was a violation

17   of the order.  How can we run litigation if you are going to be

18   allowed to broadcast out information like that?  You know

19   that's the right answer, and you just won't admit it.

20       **MS. HAAG:**  Well, Your Honor, I certainly understand

21   the Court's concern.  My focus was on the fact that Google is

22   seeking -- seeking an order of the Court --

23       **THE COURT:**  Let me stop you there.

24       Mr. Baber, if I were to hold this was a violation of the

25   protective order and Rule 37, you get your cost of your motion,

1    why isn't that enough?  Why do you need contempt?

2          **MR. BABER:**  We don't, Your Honor.  If you look at our

3    papers --

4          **THE COURT:**  I'm not going to go with contempt.  I'm

5    going to just say --

6          **MR. BABER:**  You don't have to.  Violation of the

7    order --

8          **THE COURT:**  -- Rule 37 -- it was a violation of the

9    protective order to do what she did, but I don't have to say it

10   was bad faith.

11         **MR. BABER:**  You don't.  That's absolutely, right.

12         **THE COURT:**  Why what do you say to that point?  Is

13   that satisfactory to you?

14        **MS. HAAG:**  Well, with respect to -- for the Court to

15   impose sanctions, the Court does have to make a finding --

16         **THE COURT:**  No, I don't.  Read 37.  Rule 37 says they

17   automatically win unless you have substantial -- the burden

18   shifts to you totally.  The burden is not on them.  Read

19   Rule 37.

20        **MS. HAAG:**  I have it here, Your Honor.

21      So there are two cases that we cite.  And I actually have

22   more, and I apologize that I --

23         **THE COURT:**  You are pushing me to the direction that I

24   have to find bad faith.  If you want me to do that, I might.

25        **MS. HAAG:**  Well, Your Honor, I would like to discuss

1   the standard, if I may.  If I may, because I do --

2         **THE COURT:**  A lawyer like Ms. Hurst ought to have

3   known that she did the wrong thing immediately.

4         **MS. HAAG:**  I completely understand, Your Honor.

5   The -- we cite two cases under 37(b)(2) that require, for a

6   finding -- for sanctions under 37(b)(2) are only to be awarded

7   in, quote, "extreme circumstances and where there is

8   willfulness, bad faith or fault of the party."  And there are

9   two cases that we cite.  One is *Fair Housing of Marin* and the

10  other is *Adams vs. Albertson*.

11        **THE COURT:**  All right.  Just a minute.

12       It says, "If the motion is granted" -- "Payment of

13  expenses.  If the motion is granted, the Court must, after

14  giving opportunity to be heard, require the party or deponent

15  whose conduct necessitated the motion, the party or attorney

16  advising that conduct or both to pay the movant's reasonable

17  expenses."

18       Then it says, "But the Court must not order this payment

19  if the movant filed a motion before attempting in good faith,

20  the opposing party's nondisclosure was substantially justified,

21  or other circumstances make an award unjust."

22       I don't see how you can read into that a willfulness

23  requirement.

24        **MS. HAAG:**  So, Your Honor, if you would look at *Fair*

25  *Housing of Marin* and *Adams vs. Albertson*, those are two cases

1   that we cited --

2           THE COURT:  I'm going to look at those.  I will look

3   at those two decisions.

4           MS. HAAG:  And then I apologize.  I have more for you.

5   And if I could explain --

6           THE COURT:  Yes.

7           MS. HAAG:  -- Rule 37.  So in looking back at Rule

8   37 -- and, frankly, late last night, Your Honor --

9   Rule 37(b)(2) on its face doesn't apply to counsel.  Rule 37 --

10  the rule reads for not obeying -- "for not obeying a discovery

11  order.  If a party or a party's officer, director, or managing

12  agent or a witness fails to obey an order," here's the

13  sanction, including contempt.

14      So I think it's actually the Court -- it would be the

15  Court's inherent authority, rather than authority under

16  37(b)(2).

17          THE COURT:  It says "the party or the attorney

18  advising that conduct or both to pay the movant's reasonable

19  expenses in making the motion."

20          MS. HAAG:  Well, I'm reading 37, Rule 37(b)(2)(A),

21  Your Honor.  I'm not sure what our disconnect is.

22          THE COURT:  I may have the wrong one.  Well, down at

23  No. 2, (b)(2) --

24          MS. HAAG:  (A).

25          THE COURT:  "Failure to comply with the court order"

is (b; (2) is "sanctions sought in the district where the action is pending" and then (A), "for not obeying a discovery order."

**MS. HAAG:** Which some courts seem to be in -- courts seem to interpret *protective order* as a discovery order for these purposes.

**THE COURT:** Well, then if that's true, then all the way down to "Payment of expenses. Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, unless it was substantially justified."

So it does say "attorney advising that party" and this is a case where the -- I mean, are you really saying that I could hold Oracle in contempt, but not the attorney who --

**MS. HAAG:** No, Your Honor --

**THE COURT:** -- who actually did the deed?

**MS. HAAG:** No, Your Honor. It's just a technicality. I think it would be the Court's inherent authority --

**THE COURT:** I disagree with that. See, you're trying to push it off into the bad faith regime, and that's not what Rule 37 says.

Look, if you want me to make a finding of bad faith or good faith, if you want to push me that far, I'm willing to do it. I'm trying to avoid that. And I want you to know, Ms. Hurst is a respected member of the -- but very experienced.

And she would have been the first to make a motion if the shoe had been on the other foot.  She knew she should not have done that.

Now, maybe in the heat of the moment, it was -- it was -- she felt that it was okay, but I -- I just believe that every good lawyer in this district, and certainly somebody with her experience, knows that you don't blurt it out in open court with the newspaper people there.  You ask the judge, *How can we handle this?*  You could hand up the document to the judge, you could ask to clear the courtroom, you could say, *Can I submit this later under seal*?  She just blurted it out.

**MS. HAAG:**  Your Honor, and that's why I wanted to explain the facts to you.  First of all, with respect to the Google/Android number, it didn't --

**THE COURT:**  It's just the Apple number that mainly bothers me.  It's the Apple number.  There was an immediate objection.

**MS. HAAG:**  There was, Your Honor.  And that's why I tried to explain the context, which is there is this back and forth between counsel for Google and Ms. Hurst.  Counsel for Google keeps insisting to the Court -- and it's actually a total of seven times throughout the hearing -- *They have what they need.  I don't know why we're here.  The 30(b)(6) witness provided this information*.  It literally went back and forth like that seven times.

1      Ms. Hurst kept saying, *No, we don't*.  Mr. Van Nest said,

2  *Yes, they do*.

3      *No, we don't*.

4      *Yes, they do*.

5      In the back and forth of that, she just thought about *How*

6  *do I illustrate to the Court that we don't have what we need*?

7  And what she did is she pulled out the transcript and

8  paraphrased it.  So --

9      **THE COURT:**  She blurted out the two numbers that

10 mattered.  That's not paraphrasing.

11     **MS. HAAG:**  Well --

12     **THE COURT:**  She blurted it out.

13     **MS. HAAG:**  She didn't read from the transcript, is my

14 point, Your Honor.  Absolutely the numbers were revealed in

15 court.

16     So it's -- it's not -- you know, there was -- there was no

17 intent to violate the protective order.  There was no bad faith

18 in doing that.  As soon as -- Oracle and Orrick did not object

19 to the sealing of the transcript when it was requested by

20 Google.

21     You know, it's just -- you know, what I would like to do

22 is -- I know the Court doesn't want me to get into the legal

23 standard for contempt, but I would like to, if the Court will

24 indulge me because this is --

25         **THE COURT:**  Go ahead.  I think I know the standard,

but nevertheless, go ahead and make the point you wish to make.

            **MS. HAAG:**  So to hold a party in contempt, there has to be clear and convincing evidence of a violation of a specific and definite order of the Court.  That's the *Bennett* case that we cite.

            **THE COURT:**  We don't have that here?  You don't think we have clear and convincing evidence here?  We got a protective order.  What if this had been -- your argument comes down to this.  That if she had had the recipe for Coca-Cola, she could have blurted that out to this courtroom right now.

            **MS. HAAG:**  Well, that fits into the legal standard for contempt, Your Honor, because I -- we're not arguing that at all.

            **THE COURT:**  Yes, you are.  You won't even admit that it was a violation of the order.

            **MS. HAAG:**  So --

            **THE COURT:**  You want to say that it was okay under the order for her to do what she did.

            **MS. HAAG:**  I'm not saying it's okay.  I'm saying she should not be held in contempt for doing so.

        So there has to be clear and convincing evidence of a violation of a specific and definite order of the Court.

        The case law provides that, "No one should be held in contempt for a violating an ambiguous order.  There can be no contempt when an order purportedly violated is ambiguous or

when there is doubt or uncertainty in the minds to whom it is

addressed.  Contempt cannot be based on a good faith and

reasonable interpretation of an order."  And finally, "The

Court has to resolve all doubts in favor of the accused."

Those are the relevant legal standards for contempt.

So I submit, Your Honor, that there was doubt and

uncertainty in the mind of Ms. Hurst about what the protective

order provided.  She had read the protective order.  She saw

that Paragraph 7 allowed disclosures to the Court, and she saw

the addendum to the order in Paragraph 5 that seemed to

contemplate that there would be disclosures of confidential

information in open court.

THE COURT:  Did her declaration actually say that

that's what she thought back then?

MS. HAAG:  I don't know that it's as clear as it could

be.

THE COURT:  I don't think it is.  I think that was an

after-the-fact thing.

MS. HAAG:  Well, in preparing for this hearing,

Your Honor, I have spent a lot of time talking about this --

THE COURT:  That doesn't count.  That doesn't count.

It has to be under oath.

MS. HAAG:  I understand.  If the Court would like us

to provide a further declaration --

THE COURT:  You have made your record.  I am not

1  asking you to do anything more.  But I am aware of what -- you

2  put a spin on it that is not supported by the sworn record.

3      **MS. HAAG:**  I understand, Your Honor.  We would like to

4  submit a further declaration, if it's -- if the Court finds it

5  appropriate.

6      **THE COURT:**  The record has been made on this.

7      **MS. HAAG:**  All right.

8      **THE COURT:**  Don't ask me to tell you what's

9  appropriate to do.  So --

10      **MS. HAAG:**  All right.

11      **THE COURT:**  -- I think -- look, what more do you want

12  to say?

13      **MS. HAAG:**  Well, Your Honor, I submit to you that this

14  is not an appropriate case for contempt.  That there is -- this

15  is not an appropriate case for sanctions.  There was no bad

16  faith in connection with the Google and Android numbers.  No

17  one, including Google, its outside counsel, its in-house

18  counsel, who were also present, noticed or thought that there

19  was anything wrong with disclosing those numbers in open court.

20      And, Your Honor, just one more point.  It doesn't appear

21  that Judge Ryu, who was actually presiding over this hearing,

22  perceived a contempt had occurred in front of her.  She's the

23  one who was there.

24      28 U.S.C. 636 actually provides -- actually provides that

25  if Judge Ryu perceives a civil contempt occurring in front of

1   her, she is required to certify that to the Court, certify the

2   facts to the Court and essentially refer it to the Court.  She

3   didn't do that.

4        So, Your Honor, I would submit to you that whether there

5   is clear and convincing evidence of a contempt, that is some

6   evidence that there isn't because Judge Ryu, who was there,

7   didn't see fit to certify it to the Court.

8            **THE COURT:**  All right.  Rebuttal.

9            **MS. HAAG:**  Your Honor, could I ask for one more thing?

10  Ms. Hurst is, of course, here.  And if the Court would like to

11  hear from her, she is more than willing to speak with the

12  Court, under oath or otherwise.

13           **THE COURT:**  The record has been made.

14       All right.  Mr. Baber.

15           **MR. BABER:**  Thank you, Your Honor.  Very briefly.

16       I think this debate about contempt or a violation of the

17  order, those are one and the same.

18           **THE COURT:**  Answer this question.  Ms. Haag cites to

19  two decisions -- I have forgotten the name that I'm going to

20  look at -- and says that Rule 37 requires bad faith.  Now,

21  that's not the way I read the rule on the surface of it, but

22  what do you say to those two decisions?

23           **MR. BABER:**  Your Honor, I don't think Rule 37 requires

24  any finding of bad faith in this situation.  You have a

25  violation of a court order.  You have --

1    **THE COURT:**  Have you read those two decisions?

2    **MR. BABER:**  If they cited them in their brief --

3    **THE COURT:**  Come on.  Answer the question.

4    **MR. BABER:**  I don't recall them.  If they cited

5    them --

6    **THE COURT:**  They did cite them.  I have got them

7    written down here somewhere.  Hang on a minute.  She did cite

8    them.

9    You ought to come prepared next time.

10   **MR. BABER:**  I apologize, Your Honor.

11   **THE COURT:**  *Fair Housing of Marin*, 285 F.3d -- she did

12   cite it.

13   **MR. BABER:**  Yes, Your Honor.

14   **THE COURT:**  The other one is *US vs. Kapalua*

15   *Construction*.  So, you know -- all right.  If you can't help me

16   with those two decisions, I just want to know what -- your spin

17   on what those two decisions hold, but if you're not prepared on

18   that, okay.

19   **MR. BABER:**  I'm not, Your Honor, but I believe in this

20   case, even if there is some requirement of bad faith or

21   willfulness or intent, I think you only need to look at what

22   happened as soon as Mr. Van Nest called out that day in front

23   of Judge Ryu that confidential information had been disclosed.

24   Did Ms. Hurst say, *Oh, you're right.  Sorry.  Should be under*

25   *seal*?  No, she didn't.  She said, *Well, yes, that's in a*

1   *deposition.  It's confidential.  But there has been a lot of*

2   *public reports, you know, about this*.  She dissembled.

3       That is not what the Court and parties should expect from

4   a lawyer who has just been told *Hey, you disclosed confidential*

5   *information*.  That was part one.  That was intentional on her

6   part.  She -- I don't know what she was thinking.  We just

7   heard from Ms. Haag about --

8           **THE COURT:**  If it's so clear-cut, then why didn't

9   Judge Ryu seal it?

10          **MR. BABER:**  Because of what Ms. Hurst said,

11  Your Honor.  If Ms. Hurst had said, *Yes, Judge Ryu, I'm sorry,*

12  *I shouldn't have done that, it should be sealed*, I don't know

13  what Judge Ryu would have done, but I strongly suspect she

14  would have sealed it, especially because she later did seal it

15  once she saw the declarations from Apple and from Google and

16  Oracle not disputing that it was designated confidential.  I

17  have got to believe Judge Ryu would not simply have taken it

18  under advisement if Ms. Hurst said -- right away acknowledged,

19  like she should have, *Sorry, that is confidential under the*

20  *protective order*.

21      It got worse then, Your Honor.  If you look at Ms. Hurst's

22  first declaration -- she left it out in later declarations

23  she's filled, but she put in her first declaration with

24  Oracle's first filing on the motions to seal it that as she

25  left the court that day, she realized there was a reporter

1    there.  It was a reporter she recognized.  Did she do anything

2    about that?  Did she tell anybody about that?  Did she mention

3    it to Judge Ryu or the Google lawyers?  No.

4         **THE COURT:**  But the order on remedies -- the order

5    does not call out that she had to do something to the newspaper

6    reporter.  It says that she has got to help retrieve copies.

7         **MR. BABER:**  Part of it is retrieving copies.

8         **THE COURT:**  Which other part of it would cover this

9    aspect?

10         **MR. BABER:**  Okay.  Paragraph 12 has several parts to

11    it.  It says, "If you learn that there has been a disclosure to

12    someone who is not authorized, you have to, A, immediately

13    notify in writing the other party of the unauthorized

14    disclosures."

15         **THE COURT:**  In this case, it was done in their

16    presence, so that's not necessary.  They knew.

17         **MR. BABER:**  Your Honor, I don't know that anybody

18    other than Ms. Hurst knew the person was, in fact, a reporter.

19    I don't know who was in the courtroom that day.  There is no

20    record on who was actually present, other than the reporter

21    Ms. Hurst recognized.

22         **THE COURT:**  It doesn't say you have to disclose who's

23    in the -- everybody knew who was in the courtroom -- that

24    people were in the courtroom.

25         What is next?

1      **MR. BABER:**  "C, you are supposed to immediately inform

2  the person or persons to whom unauthorized disclosures were

3  made of all the terms of this order."

4      She didn't do that.

5      D, she is supposed to "immediately request such person or

6  persons to execute the acknowledgment and agreement to be bound

7  that's attached to the protective order."

8          **THE COURT:**  You are saying she should have gone to the

9  newspaper reporter and said *You're bound by this order*?

10         **MR. BABER:**  Your Honor, she should have done that.

11  She should have given the Google lawyers and Judge Ryu a

12  heads-up if they were still in the courtroom that, you know, *I*

13  *just realized there is a reporter back here.*  You know -- and

14  Judge Ryu might have -- I don't know what Judge Ryu would have

15  done in those circumstances.  She might have said, *Let me*

16  *caution everybody about what you heard*, etc.  At least Google

17  would have known that, in fact, there had been a disclosure.

18         **THE COURT:**  Didn't Google know full and well that

19  there was a newspaper reporter there?  I'm sure that

20  Mr. Van Nest knew who was in the courtroom.

21         **MR. BABER:**  I do not know, Your Honor --

22         **THE COURT:**  Maybe that's your problem if you don't

23  know.  Next time you should know.  I bet you Mr. Van Nest knew

24  that that was a newspaper reporter.

25         **MR. BABER:**  I don't know, and there is no record on

1    that, Your Honor.

2         **THE COURT:**  There may be no record.  All I know is --

3    I bet there are newspaper people -- they come to all these

4    hearings, and the -- the newspaper -- you just assume that

5    there is a newspaper person in the courtroom.

6         **MR. BABER:**  Your Honor, just to finish out the thread,

7    though, we were talking about whether what happened here was

8    bad faith, willful, intentional.  I want to just note first

9    that it would be -- I find Oracle's argument ironic that they

10   don't want a finding of contempt because contempt is a bad

11   word.

12        It's very clear under Ninth Circuit law, violation of a

13   court order is contempt, and there is no good faith exception

14   to contempt.  Your Honor has cited that in a number of orders.

15   That's just law.  You don't have to have bad faith for

16   contempt.  And you are entitled to sanctions under the civil

17   contempt laws for damages such as the kinds of expense Google

18   was put to.  They don't want that.

19        But then they say, *Well, under Rule 37, you've got to show*

20   *we were bad actors.  We acted intentionally and willfully*.

21   Well, Your Honor, they did.  If you got a letter from opposing

22   counsel -- it's just like a clawback letter under the

23   protective order.  If you get a letter from opposing counsel

24   that says, *Hey, you disclosed confidential information last*

25   *week, join us in an immediate motion to seal,* what's to think

1    about?  They say, *Well, we were thinking about it* --

2                **THE COURT:**  They didn't object.

3            **MR. BABER:**  Well --

4                **THE COURT:**  You're saying it would have been better to

5    say, *We affirmatively join*, and that's that much better than

6    saying *We don't object*?

7            **MR. BABER:**  Absolutely, Your Honor.  A joint motion to

8    Judge Ryu that just said *The parties agree that these portions*

9    *of the transcript from last week should be sealed* is -- first

10   of all, would have been far quicker.  Second, much more

11   effective.  Third, much less expensive for Google than having

12   to file all these motions.  And I got to believe, again, if

13   Judge Ryu got a joint motion from the parties that said *You're*

14   *transcript from last week contains information designated*

15   *confidential under the protective order* -- we saw it later from

16   her.  As soon as she saw the motions, she sealed the file.  She

17   said, *I'm going to put this under seal until I have time to*

18   *sort this out*, and then she later sealed it.

19       So, yes, a joint motion would have done the trick.  I have

20   a high level of certainty.  So it is ironic, I think, that

21   Oracle is saying well -- and the protective order -- we should

22   not forget, the protective order itself says that if you

23   violate it, you can be subject to a finding of contempt.  That

24   is -- it's explicit.  It's in Exhibit A to the protective

25   order.  All the experts and all the in-house lawyers and other

people who sign on to the protective order explicitly acknowledge "I agree to comply with and be bound by all the terms of the stipulated protective order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt."

So I said earlier, am I wedded to the word *contempt*?  No. Was there a violation of the protective order?  Yes.  Was there a violation when the disclosure was made in court?  Absolutely. Were there additional violations when nothing happened later to try and remedy the effects?  Yes.  That's why we're here, Your Honor.

We think the Court needs to make clear what the protective order requires of counsel who are entrusted with information, and whether you do it as a contempt, whether you do it under Rule 37, Google is entitled to an award for the amounts they had to spend to get this put under seal and to limit any further damage.

**THE COURT:**  Thank you.  I have to take it under submission.

Did you wish to say anything more?

**MS. HAAG:**  Just one thing, Your Honor.

In terms of bad faith in the course of the parties' conduct, everybody took this protective order incredibly seriously.  There was huge effort and time and expense to comply with the protective order.  All kinds of things had to

1  be filed under seal, had to be redacted, filed in redacted form

2  and complete form and motions to seal, and, I mean, there was a

3  huge amount of attention paid to the confidential nature of the

4  materials at issue here and complying with the Court's

5  protective order.

6      So to think that Ms. Hurst and Orrick and Oracle acted in

7  bad faith in this instance just is not consistent with the rest

8  of the course of conduct of this litigation.

9      This is not a case like -- I think it's *Fair Housing of*

10 *Marin* where the person who was held in conduct repeatedly

11 violated the court order, disregarded it, didn't respect it.

12 In this case, this was one arguable mistake made throughout the

13 course of a very complex litigation.

14     And so I would ask the Court to not find bad faith, to not

15 impose sanctions against -- and to certainly not find contempt

16 against Ms. Hurst, Orrick, or Oracle.

17     **THE COURT:**  All right.  Thank you.  I will look it up

18 myself.

19     I was going to ask you a research question, but I've got

20 people here for the 11:00 calendar, and I owe them a hearing,

21 too.

22     Those of you here on the 11:00 calendar, I will be back in

23 five minutes, and this is under submission.

24     **MS. HAAG:**  Could I ask one more thing, Your Honor?  I

25 did bring four additional cases with me on the bad faith issue.

1     I provided them to Mr. Baber.  Is it possible for me to hand

2     them up to the Court as well?

3               **THE COURT:**  Yes.

4               **MS. HAAG:**  Thank you.

5               **THE COURT:**  Just hand them to my law clerk, please.

6               **MS. HAAG:**  I'll do that.

7               (Proceedings adjourned at 11:28 a.m.)

8

9

10                     CERTIFICATE OF REPORTER

11          I certify that the foregoing is a correct transcript

12     from the record of proceedings in the above-entitled matter.

13

14     DATE:   Monday, September 26, 2016

15

16     *Pamela A. Batalo*

17     _____
       Pamela A. Batalo, CSR No. 3593, RMR, FCRR
18     U.S. Court Reporter

19

20

21

22

23

24

25