# EXHIBIT E

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1          UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3             SAN FRANCISCO DIVISION
4  ORACLE AMERICA, INC.,
5       Plaintiff,
6         vs.            Case No. 3:10-cv-03561-WHA
7  GOOGLE, INC.,
8       Defendant.
   _____
9
10
11
12
13     *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*
14          PURSUANT TO THE PROTECTIVE ORDER
15       VIDEO DEPOSITION OF JAMES MALACKOWSKI
16              San Francisco, California
17              Wednesday, March 17, 2016
18                     Volume I
19
20
21
22  REPORTED BY:
23  REBECCA L. ROMANO, RPR, CSR No. 12546
24  JOB NO. 2265299
25  PAGES 1 - 385

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 2

```
 1         UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3            SAN FRANCISCO DIVISION
 4  ORACLE AMERICA, INC.,
 5     Plaintiff,
 6       vs.     Case No. 3:10-cv-03561-WHA
 7  GOOGLE, INC.,
 8     Defendant.
    _____
 9
10
11
12
13       DEPOSITION OF JAMES MALACKOWSKI,
14  taken on behalf of the Defendant, at
15  633 Battery Street, San Francisco, California,
16  commencing at 8:35 a.m., Wednesday,
17  March 16, 2016, before Rebecca L. Romano,
18  Certified Shorthand Reporter No. 12546
19
20
21
22
23
24
25
```

Page 3

```
 1          APPEARANCES OF COUNSEL
 2
 3  For the Plaintiff:
 4     ORRICK, HERRINGTON & SUTCLIFFE, LLP
 5     BY:  ANNETTE L. HURST
 6     BY:  ROBERT KEELE
 7     Attorneys at Law
 8     The Orrick Building
 9     405 Howard Street
10     San Francisco, California 94105-2669
11     (415) 773-4585
12     ahurst@orrick.com
13     rkeele@orrick.com
14  and
15     BY:  AYANNA LEWIS-GRUSS
16     Attorney at Law
17     51 West 52nd Street
18     New York, New York 10019-6142
19     (212) 506-5000
20     alewisgruss@orrick.com
21
22
23
24
25  /////
```

Page 4

```
 1       APPEARANCES OF COUNSEL (cont'd)
 2
 3  For the Defendant:
 4     KEKER & VAN NEST LLP
 5     BY:  DANIEL PURCELL
 6     BY:  MAYA KARWANDE
 7     Attorneys at Law
 8     633 Battery Street
 9     San Francisco, California 94111
10     (415) 773-6697
11     dpurcell@kvn.com
12     mkarwande@kvn.com
13
14  For James Kearl:
15     FARELLA BRUAN + MARTEL LLP
16     BY:  JOHN L. COOPER
17     Attorney at Law
18     Russ Building
19     235 Montgomery Street
20     San Francisco, California 94104
21     (415) 954-4400
22     jcooper@fbm.com
23
24
25  /////
```

Page 5

```
 1          APPEARANCES (cont'd)
 2
 3  ALSO PRESENT:
 4     James Kearl
 5     Brandon Miller, Videographer
 6     Deborah Miller, In-House Counsel Oracle
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  /////
```

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 6

```
 1            INDEX
 2 DEPONENT                    EXAMINATION
 3 JAMES MALACKOWSKI                   PAGE
   VOLUME I
 4
 5       BY MR. PURCELL         10, 382
 6       BY MR. COOPER          305
 7       BY MS. HURST           379
 8
 9
10
11        EXHIBITS (cont'd)
12 NUMBER                       PAGE
13       DESCRIPTION
14 Exhibit 1576   Expert Report of James
15      E. Malackowski, 1/8/2016;      51
16
17 Exhibit 1577   Responsive Expert Report
18      of James E. Malackowski,
19      2/29/2016;                    129
20
21 Exhibit 1578   Strategic Forecast,
22      OAGOOGLE0100164541,
23      7 Pages;                      262
24
25 /////
```

Page 7

```
 1        EXHIBITS (cont'd)
 2 NUMBER                       PAGE
 3       DESCRIPTION
 4 Exhibit 1579   PowerPoint - Sun, Java in
 5      Wireless Business Review,
 6      10/21/2008,
 7      OAGOOGLE0000142142 -
 8      OAGOOGLE0000142176.           267
 9
10
...
25 /////
```

Page 8

```
 1 San Francisco, California; Wednesday, March 16, 2016
 2         8:35 a.m.
 3         ---o0o---
 4     THE VIDEOGRAPHER:  Good morning.  We are
 5 on the record at 8:35 a.m. on March 16th, 2016.
 6 And this is the video-recorded deposition of
 7 James Malackowski.
 8     My name is Brandon Miller, here with our
 9 court reporter, Rebecca Romano.  We are here from
10 Veritext Legal Solutions.
11     This deposition is being held at
12 633 Battery Street, San Francisco, California.
13     The caption of this case is
14 Oracle America, Inc., versus Google, Inc.,
15 Case No. CV 10-203561-WHA [sic].
16     Please note that audio and video
17 recording will take place unless all parties agree
18 to go off the record.  Microphones are sensitive,
19 may pick up whispers, private conversations, and
20 cellular interference.
21     I am not related to any party in this
22 action, nor am I financially interested in the
23 outcome in any way.
24     At this time, will counsel please
25 introduce themselves.
```

Page 9

```
 1     MR. PURCELL:  Dan Purcell,
 2 Keker & Van Nest, representing Google.
 3     MS. KARWANDE:  Maya Karwande,
 4 Keker & Van Nest, also representing Google.
 5     MS. MILLER:  Deborah Miller, in-house at
 6 Oracle.
 7     MR. COOPER:  John Cooper of
 8 Farella Braun + Martel.  I'm the -- I'm
 9 representing Judge -- or I'm -- Jim Kearl, the
10 Judge's Rule 706 expert, Dr. Kearl.  And he's
11 sitting beside me.
12     MS. HURST:  Annette Hurst of,
13 Orrick Herrington & Sutcliffe for Oracle America, along
14 with my colleagues, Ayanna Lewis-Gruss and Robert Keele.
15     THE VIDEOGRAPHER:  You may now swear in
16 the witness.
17     THE REPORTER:  If you could raise your right
18 hand for me, please.
19     THE DEPONENT:  (Complies.)
20     THE REPORTER:  You do solemnly state,
21 under penalty of perjury, that the testimony you
22 are about to give in this deposition, shall be the
23 truth, the whole truth and nothing but the truth?
24     THE DEPONENT:  I do.
25 /////
```

3 (Pages 6 - 9)

Page 106

1 period in which they were acquired by Sun.
2    Q.  What are the dates of that period?
3    A.  I honestly don't recall from memory.
4 It's referenced within my rebuttal report.  I don't
5 remember if it was 2009 or '10, and I don't want to
6 speculate.
7    Q.  SavaJe was never able to achieve any
8 partnerships with any OEM handset manufacturers,
9 were they?
10   A.  Well, ultimately, no.  SavaJe was
11 acquired by Sun, and then ultimately shut down.  It
12 was shut down subsequent to the launch of Android.
13 And in my opinion, it was shut down in part because
14 of the launch of Android.
15   Q.  You say "in part because of the launch of
16 Android," were there other reasons why SavaJe was
17 shut down by Sun?
18   A.  Not that I'm aware of.
19   Q.  Sun didn't shut down SavaJe because it
20 wasn't able to make a -- a commercially viable
21 mobile phone product?
22   A.  That's not true.  I mean, my
23 understanding is, even prior to the acquisition by
24 Sun, SavaJe -- SavaJe had a working phone, that
25 they were named product of the year at the time,

Page 107

1 that they had sold on the marketplace tens of
2 thousands of units through Tier 2 Telco companies.
3 So I don't think it's fair to say they didn't have
4 a working product.
5    Q.  They were named product of the year by --
6 by who?
7    A.  It was one of the shows that they
8 attended in the period right before -- right when
9 they launched.  I don't recall the -- the trade
10 show.
11   Q.  So Sun had a working -- strike that.
12      SavaJe had a working phone product that
13 was commercially viable, and yet Sun chose to shut
14 it down?
15   A.  Yes.  In response to the launch of
16 Android and, in particular, the competitive dynamic
17 that was created as a launch of the Android, I
18 think as summarized in my report, and -- and we're
19 talking about a very complex process in a very
20 short way, that Sun didn't feel that it could not
21 compete with its own technology wherein its own
22 technology was given away for free or even
23 subsidized through the traffic acquisition program
24 of Google.
25   Q.  What contemporaneous records of Sun can

Page 108

1 point to showing that Sun shut SavaJe down because
2 of Android?
3    A.  I believe there's explicit discussion of
4 that within my second report that includes
5 reference to discussions with OEM partners, where
6 OEM partners describe their opportunity with
7 Android as being more attractive.  I would defer to
8 that report.  I don't recall specific documents as
9 I sit here.
10   Q.  Getting back to the mobile window, you --
11 you mentioned Nokia.
12      Nokia had never been able to develop a
13 commercially acceptable smartphone product, have
14 they?
15   A.  Well, what's a smartphone?  So there is a
16 continuum that exists between feature phones and
17 smartphones.  At the end or the bookends of the
18 continuum, I think it's very clear that a feature
19 phone is different than a smartphone.  But along
20 that continuum, I don't think it is fair to say
21 that Android -- I mean that Nokia never had a
22 product that could fairly be categorized as a
23 smartphone.  I would have to go back to look at
24 their specific products and what they were
25 producing at the time.  And even if it wasn't

Page 109

1 commercially launched, it is my understanding that
2 they clearly were using, I believe, Java SE at the
3 time in order to contemplate such.
4    Q.  What's your basis for saying that Nokia
5 was using Java SE?
6    A.  That's just my recollection in response
7 to your question.  I -- I don't recall the specific
8 documents.
9    Q.  Are you sure there are any?
10   A.  Well, if -- if my recollection is right,
11 I didn't make it up, so I would believe there are,
12 yes.
13   Q.  They would be cited in your report, I
14 would assume.
15   A.  I don't know that to be the case.  I
16 don't believe I discussed at great length whether
17 or not Nokia had a smartphone in part, because that
18 is only in relevant if you believed that there were
19 some sort of counterfactual world that needed to be
20 taken into account, which clearly there is not.  So
21 I don't think it's particularly relevant to my
22 opinions.
23   Q.  All right.  So what would Google have had
24 to deliver to market within the mobile window we
25 described, from 2005 to 2010, in order to assure

Page 110

1 the success of Android?
2    A.  A Java-based phone, hopefully
3 appropriately licensed.
4    Q.  It would have to be a Java-based system?
5    A.  In my opinion, in order to be successful
6 in that window of opportunity, as confirmed by what
7 they actually did, the actual events, the revealed
8 preference, so to speak; and as confirmed by the
9 substantial promotion of Java to the OEM community,
10 as detailed in the last exhibit, or appendix of my
11 second report; and as confirmed by the testimony in
12 this record which cited, which all points to the
13 fact that the OEMs required Java, yes, it is my
14 opinion that there was not an alternative platform
15 that would have allowed them to penetrate the
16 window and reach commercial success.
17    Q.  Other than predictive Google documents
18 before Android was released, what's your basis for
19 saying that OEMs required Java?
20    A.  I believe there are -- there's deposition
21 testimony confirming that that is, in fact, the
22 case, and testimony confirming that that was part
23 of the reason Google determined and took the action
24 that they did, supported by the fact that that's
25 what they were promoting to the OEMs.

Page 111

1    Q.  What evidence do you have that Google was
2 actually right about their predictions that OEMs
3 required Java?
4    A.  Well, I think the best evidence is that
5 the Java-based Android platform exceeded everyone's
6 expectations.  If you look to expectations or
7 benchmark of expectations is, for example, by the
8 arms' length negotiated incentives that were in --
9 in the Android acquisition documents negotiated by
10 Andy Rubin, versus what actually happened once
11 Android hit the market and reached escape velocity,
12 I think the evidence all points to the fact that
13 Google was right, that it was the right choice in
14 order to penetrate the market and capture the
15 window of opportunity.
16    Q.  Are you aware of any statement from an
17 OEM confirming that OEMs required Java?
18    A.  I can't tell you that I recall statements
19 that explicitly contain those words, but what I do
20 cite in my report is, OEMs who were paying millions
21 of dollars to access Java through appropriate
22 licensing, who made the decision to depart from
23 that, only to go to Android, which was also Java
24 based, and the explanation being that they were
25 getting the same benefits they desired -- and we

Page 112

1 know they desired them because they were willing to
2 pay millions of dollars, I think I cited a Samsung
3 example where they were paid $44 million over a
4 discrete period of time -- and then they quickly
5 transitioned to Android because they would pay
6 nothing.
7        So to me, that speaks volumes, actions
8 speak louder than words, that the OEMs demanded a
9 Java-base platform.
10    Q.  Now, why does that suggest that OEMs
11 demanded Java as opposed to being willing to use an
12 open source C++ platform?
13    A.  Because they were willing to pay with
14 significant dollars in order to obtain Java
15 pre Android under appropriate licensing.  So if it
16 were true that they would be indifferent, and if it
17 were true that Dr. Leonard's analysis of the cost
18 of moving to C++ is accurate, why would they -- why
19 would Samsung pay $44 million to Java when they
20 could just go get C++ for substantially nothing.
21    Q.  Well, because nobody had developed a
22 C++ platform yet.  I mean, you -- you can't say,
23 can you, that that proves anything, that Samsung
24 was willing to pay $44 million to license Java when
25 there was no open source C++ or Java alternative

Page 113

1 being offered by anyone, can you?
2    A.  At some point now we are talking about
3 more of a technical discussion and, for example,
4 whether Microsoft an alternative that was available
5 to them, Microsoft's platform.
6        All I can tell you is that, one, we're
7 in, again, counterfactual discussions which are not
8 applicable.  So there isn't extensive discussions
9 with this in my report because, I mean, I can't say
10 over and over again, to me the standard for
11 calculating damages of profit disgorgement in a
12 copyright case do not permit this discussion of a
13 counterfactual world.
14        But being that said, I think these are
15 largely technical discussions.  And so if you force
16 the discussion of the hypothetical, I would
17 encourage you to ask those questions of the
18 technical experts.
19    Q.  Are you offering an opinion on the legal
20 standard for copyright infringement damages?
21    A.  So that's a little bit of a nuance
22 question.  So the analogy that I use, because I'm
23 asked that frequently in a patent case, I refer to
24 the Panduit factors and the Georgia-Pacific factors
25 in virtually every case.  That's a legal standard.

29 (Pages 110 - 113)

Page 382

 1  take into account the unexpected events of the
 2  marketplace, such as the development of the -- of
 3  the consumer demand for smartphones, by way of
 4  example, or, frankly, just the total overall demand
 5  for smartphones at that time.
 6          MS. HURST:  No further questions.
 7              FURTHER EXAMINATION
 8  BY MR. PURCELL:
 9      Q.  Mr. Malackowski, really briefly, during
10  Mr. Cooper's questioning regarding Samsung phones
11  you referred to Java ME as an operating system.
12          Do you remember that?
13      A.  I -- I do not remember that reference.
14      Q.  Java ME is not an operating system,
15  correct?
16      A.  I would not describe it as such.
17      Q.  It's an applications platform, correct?
18      A.  Better questions for the technical
19  expert.  I don't believe I use either term in my
20  report.  I don't have an opinion.
21      Q.  And, likewise, Java SE is not an
22  operating system either, correct?
23      A.  Same answer.
24          MR. PURCELL:  All right.  That's all.
25          MR. COOPER:  Okay.  Let's -- let's

Page 383

 1  clarify that you, through counsel, are going to
 2  send us, what, two items?
 3          MS. HURST:  Yeah.  Let's just -- do you
 4  want to do it on or off the record?
 5          MR. COOPER:  I don't care.
 6          MS. HURST:  Let's go off the record and
 7  then we'll confirm what it is that we're sending
 8  you.
 9          THE VIDEOGRAPHER:  This concludes today's
10  deposition of James Malackowski.  The total number
11  of media used is seven.  We're going off the record
12  at 6:31 p.m.
13          (TIME NOTED:  6:31 p.m.)
14
15
16
17
18              ---o0o---
19
20
21
22
23
24
25

Page 384

 1      I, JAMES MALACKOWSKI, do hereby declare under
 2  penalty of perjury that I have read the foregoing
 3  transcript; that I have made any corrections as appear
 4  notes; that my testimony as contained herein, as
 5  corrected, is true and correct.
 6      Executed this ____ day of _____,
 7  2016, at _____,_____.
 8
 9
10
11          _____
            JAMES MALACKOWSKI
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 385

 1      I, Rebecca L. Romano, a Certified Shorthand
 2  Reporter of the State of California, do hereby certify:
 3      That the foregoing proceedings were taken before me
 4  at the time and place herein set forth; that any
 5  witnesses in the foregoing proceedings, prior to
 6  testifying, were administered an oath; that a record of
 7  the proceedings was made by me using machine shorthand
 8  which was thereafter transcribed under my direction;
 9  that the foregoing transcript is true record of the
10  testimony given.
11      Further, that if the foregoing pertains to the
12  original transcript of a deposition in a Federal Case,
13  before completion of the proceedings, review of the
14  transcript [ ] was [X] was not requested.
15      I further certify I am neither financially
16  interested in the action nor a relative or employee of
17  any attorney or any party to this action.
18      IN WITNESS WHEREOF, I have this date subscribed my
19  name.
20
21  Dated:  March 17, 2016
22
23          _Rebecca L. Romano_
            Rebecca L. Romano, RPR,
24          CSR. No 12546
25