**EXHIBIT F**



## OCEAN TOMO
INTELLECTUAL CAPITAL EQUITY

**ORACLE AMERICA, INC.**
**V.**
**GOOGLE INC.**

**CASE NO. CV 10-03561 WHA**

---

**EXPERT REPORT OF JAMES E. MALACKOWSKI**

**[CORRECTED]**

**January 8, 2016**


INTELLECTUAL CAPITAL EQUITY

1.  FIRM BACKGROUND AND QUALIFICATIONS ..................................................................3
2.  ASSIGNMENT .........................................................................................................................4
3.  SUMMARY OF OPINIONS ....................................................................................................8
4.  THE RELEVANT ENTITIES ...............................................................................................10
    4.1  SUN MICROSYSTEMS, INC. ("SUN") ...........................................................................10
    4.2  ORACLE AMERICA, INC. ..............................................................................................12
    4.3  GOOGLE INC. ...................................................................................................................14
5.  THE DISPUTE .......................................................................................................................16
    5.1  PROCEDURAL BACKGROUND.........................................................................................16
    5.2  THE EVOLUTION OF GOOGLE'S ANDROID BUSINESS ...................................................17
6.  THE JAVA PLATFORM ......................................................................................................19
    6.1  COMPONENTS OF THE JAVA PLATFORM.......................................................................20
    6.2  THE POPULARITY AND SUCCESS OF JAVA....................................................................21
7.  THE EVOLUTION OF THE MOBILE INDUSTRY ..........................................................24
    7.1  THE GROWTH OF WIRELESS CONNECTIVITY ...............................................................25
    7.2  THE GROWTH OF MOBILE DATA USAGE AND APPLICATIONS .....................................28
    7.3  SMARTPHONE ANNUAL UNIT SALES AND CONNECTIONS............................................39
    7.4  MOBILE OPERATING SYSTEM WORLDWIDE UNIT SALES AND MARKET SHARE ..........40
    7.5  APPLE INTRODUCES THE IPHONE/IPAD IN JANUARY 2007 ..........................................42
8.  GOOGLE'S MOBILE BUSINESS STRATEGY .................................................................44
    8.1  GOOGLE USES JAVA TO DEVELOP THE ANDROID PLATFORM .....................................49
    8.2  GOOGLE ESTABLISHES DISTRIBUTION PARTNERSHIPS ................................................59
    8.3  CURRENT AND ANTICIPATED ANDROID DEVICES AND USES ......................................63
    8.4  UNIQUE WINDOW OF MARKET OPPORTUNITY.............................................................68
9.  MONETARY RECOVERY FOR COPYRIGHT INFRINGEMENT ...............................71
10. ORACLE'S ACTUAL DAMAGES ......................................................................................72
    10.1 ORACLE'S JAVA ME LOST PROFITS ............................................................................72
    10.2 JAVA FX MOBILE ("ACADIA") ...................................................................................81
    10.3 OTHER ACTUAL LOSSES ..............................................................................................85
11. GOOGLE'S PROFITS ATTRIBUTABLE TO THE INFRINGEMENT .......................85
    11.1 CAUSAL NEXUS FOR THE REVENUES ATTRIBUTABLE TO THE INFRINGEMENT ...........85
    11.2 QUANTIFICATION OF ANDROID-RELATED REVENUES ...............................................114
    11.3 QUANTIFICATION OF INFRINGEMENT-RELATED COSTS AND EXPENSES ...................118
    11.4 SUMMARY OF PROFITS ATTRIBUTABLE TO THE INFRINGEMENT ...............................122
    11.5 EVIDENCE SUPPORTING THE PROFITABILITY OF ANDROID ........................................122
12. STATUTORY DAMAGES ..................................................................................................125
13. PREJUDGMENT INTEREST ............................................................................................125
14. SIGNATURE ........................................................................................................................126
JAMES E. MALACKOWSKI ...................................................................................................126

INTELLECTUAL CAPITAL EQUITY

**1.    FIRM BACKGROUND AND QUALIFICATIONS**

1. My name is James E. Malackowski and I am the Chairman and Chief Executive Officer of Ocean Tomo. Ocean Tomo provides financial products and services related to intellectual property, including expert testimony, valuation, strategy consulting, proprietary research products, investment services, risk management products, innovation management services and transaction brokerage.

2. Prior to forming Ocean Tomo, I served as a finance and investment advisor working with one of the nation's oldest investment banks as well as one of Chicago's largest private equity firms. I began my career by spending fifteen years as a management consultant and forensic accountant focused on intangible assets. In this capacity, I served numerous roles as a founding principal including Chief Executive Officer of my prior firm.

3. I have served as a consultant for clients and counsel on business valuation issues as well as all phases of the technology transfer process. I have experience as a Board Director for leading technology corporations as well as companies dealing with brand management issues. I have served in a leadership role with numerous corporate and not-for-profit entities. I am a Past President of The Licensing Executives Society International, Inc., as well as its largest chapter, LES USA & Canada, Inc.

4. Today, I focus my non-for-profit efforts with organizations leveraging science and innovation for the benefit of children or lesser developed countries. I am a Director of Children's Memorial Research Center, an affiliate of Children's Memorial Hospital in Chicago and have served since 2002 as a Trustee or Director of Invent Now, Inc., an organization providing summer enrichment programs for more than 80,000 students annually. I am the founder of the Chicago based Center for Applied Innovation (CAI), an Illinois nonprofit corporation created to manage education, public policy outreach and related economic activity around applied technology and intellectual property rights with a focus on technology transfer to lesser developed countries.

5. I am a founding and continuous member of the IP Hall of Fame Academy. The IP Hall of Fame was developed by Intellectual Asset Management (IAM) Magazine to honor the achievements of men and women who have made an outstanding contribution to the development of today's IP system and its role as an enhancer of lives across the world. Inductees are chosen each year by the IP Hall of Fame Academy from nominations sent in by members of the global IP community.

6. I have been recognized annually since 2007 by leading industry publications as one of the fifty most influential people in intellectual property and/or one of the "World's 300 Leading IP Strategists." In 2011, I was selected by the World Economic Forum as one of fewer than twenty members of the Network of Global Agenda Councils to focus on questions of IP policy. In 2013, I was inducted into the Chicago Area Entrepreneurship Hall of Fame by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration.

231. I also understand that, had Google chosen to make its own code offering for these 37 APIs, it likely would have suffered initially from errors and instability.[484] Mr. Ghuloum indicated the problems inherent in unstable code when he said "Yeah, absolutely. We switched our runtime over, and there were growing pains associated with that."[485] Therefore, I understand that any code that Google independently developed in order to meet its two-year target for market introduction, would have risked disappointing (and perhaps alienating) developers and consumers alike. Copying the Infringing Java Copyrights therefore provided Google with the ability to meet its specific timing window with a stable and familiar API from the Java platform, thus capitalizing upon the same potential market opportunity that Sun lost with Acadia.[486]

232. **Lack of Available Alternatives:** In addition to providing Google with the benefits described above, I also understand there were no commercially acceptable alternatives available to Google given its perceived market risks, other than to utilize the Infringed Java Copyrights as it did.

233. As an example, I understand Google did in fact consider using Microsoft's C# language and the .NET framework as an alternative to Java, however, each of those alternatives is proprietary to Microsoft and would have necessitated a license between Google and Microsoft.[487]

234. Although Google could also have attempted to use C++ this would not have offered a built-in developer base with as many programmers as the Java platform, and created portability issues which Java did not have.[488] Objective-C was also evaluated as an alternative but Mr. Ghuloum explained that it would have been difficult to gain developer acceptance since "Objective-C is a fairly idiosyncratic language … and clamped on this alternative syntax and alternative semantics, so I think there might have been a taste factor."[489] Finally, Google could have developed its own language, but it would be slow to develop and would not have a strong initial programmer base. Mr. Hasan Rizvi, Senior Vice President of Development for Oracle, testified that "*even a company like Google chose Java because they didn't want to go try and invent a new language. So coming up with a new language is a big deal.*"[490] Further, "*Java is the most widely adopted platform in the history already; the most developers, the most devices, et cetera.*"[491] Furthermore, Mr. Bornstein enumerated reasons for the preference of Java for Android as follows:

> "[t]here was a good open source community around developers that use the Java programming language. There were good tools, such as Eclipse, that were other open source tools that worked with

---

[484] Expert Report of Chris F. Kemerer, January 8,2016, p. 33.
[485] Deposition of Anwar Ghuloum, December 9, 2015 at p. 150.
[486] Expert Report of Chris F. Kemerer, January 8, 2016, p. 35.
[487] Email between Andy Rubin and Larry Page, October 11, 2005, GOOGLE-01-00019527 – 528 at 528; Deposition of Andrew Rubin, April 5, 2011, p. 107.
[488] Email from Brian Swetland to Mathias Agopian et al, January 2, 2006, GOOGLE-01-00019511 –513 at 512.
[489]  Deposition of Anwar Ghuloum, dated December 9, 2015, p. 114.
[490] Deposition of Hasan Rizvi, dated July 28, 2011, p. 211.
[491] Deposition of Hasan Rizvi, dated July 28, 2011, p. 239.


INTELLECTUAL CAPITAL EQUITY

### *The Impact of the Infringed Java Copyrights on Google's Market Opportunity*

241.    The Infringed Java Copyrights were essential for Google to establish Android in the wake of Apple's market entry and intense competitive pressure from Facebook. The rapid growth of the wireless industry and the infrastructure for significant mobile data bandwidth marked the widespread adoption of mobile devices and a fundamental and permanent shift from desktop to mobile internet access. The resultant window of opportunity would not have been available to Google without the marketplace business advantages provided by the Infringed Java Copyrights. Google recognized that it had to exploit this unique timing window in order to avoid having its services excluded by others from their platforms. All of Google's top executives agreed that one of their chief objectives for Android was to ensure control over a platform and to avoid the significant threat of such exclusion.[503] Google felt intense time pressure to get Android to market.[504] The stability and maturity of the existing Java API and its built-in developer base made it the only commercially viable choice for Google to reach its defined target timing window, in order to ensure the continued viability of its core search services on the mobile platform, and eventually every platform.

242.    Given the above and other record evidence in this case, it is my opinion that a significant portion of the revenue Google has realized through the Android platform is causally connected to the Infringed Java Copyrights. The Android platform cannot exist without and disproportionately relies upon the Infringed Java Copyrights; in addition, the Infringed Java Copyrights were the only available option to succeed in the time window that Google required. Google's mobile strategy depended on the Android platform, and that platform depended upon the Infringed Java Copyrights. Google would not have earned tens of billions of dollars of Android revenue without the Android platform. In my opinion, Google's Android revenue is attributable in significant part to the Infringed Java Copyrights.

243.    That Google has realized revenue because of the platform (and thus the Infringed Java Copyrights) is supported by the following slide taken from a Google Quarterly Review presentation to the Android Operating Committee which states that Android "spreads value" by having a "direct revenue impact."[505]

---

[503] GOOGLE-01-00056184 – 187 at 187; GOOGLE-22-00171914 – 951 at 923.
[504] OAGOOGLE0004936380 – 436 at 404.
[505] GOOGLE-21-00008118 – 139 at 130; GOOGLE-21-00008116 – 117.

 INTELLECTUAL CAPITAL EQUITY

I have not prepared any prejudgment interest calculations as of this date, but am prepared to do so if requested by the Court.

**14.   SIGNATURE**

I declare under penalty of perjury that the forgoing is a true and correct summary of my opinions in this matter,

_____                                    _____January 8, 2016_____

James E. Malackowski