# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:10-CV-03561-WHA |
| ) | |
| GOOGLE, INC. ) | |
| ) | |
| Defendant. ) | |

EXPERT REPORT OF
PROFESSOR JAMES R. KEARL

March 21, 2012



Subject to Protective Order – Highly Confidential

with the contribution of the patents to incremental Android revenue.[74] Also note that the denominator in Prof. Cockburn's 5.1% copyright apportionment percentage is the value of the total Java mobile patent and copyright portfolio, not the total value (i.e., revenue) of Android. As the Court has noted, the value of Android need not equal or bear any relationship to the value of the Java mobile patent and copyright portfolio. Therefore, I do not believe that the results of Prof. Cockburn's Group and Value analysis can be reliably used by Dr. Cox to estimate the percentage of Android revenue that is due to copyright infringement.

124.  Based on the admissible evidence in this matter, I am not aware of a quantitative method to estimate the percent of Android revenue or profit that is due to the alleged copyright infringement. Prof. Cockburn and Drs. Leonard and Cox have marshaled the evidence both for and against the proposition that the use of the Java APIs was important to the success of Android. While I do not have a quantitative estimate to provide the jury, my opinion is this evidence shows the use of the Java APIs was important, but not essential, to the success of Android. Thus, I would not advise the jury to conclude that all Android revenue and profits are due to the alleged copyright infringement, nor would I advise the jury to conclude that none of Android profits are due to infringement.

125.  Finally, in his most recent report Dr. Cox also presents an alternative measure of unjust enrichment damages. Dr. Cox observes that Prof. Cockburn opines that uncapping the 10% royalty rate from the 2006 negotiation ("10% of Android advertising revenue, capped at $25 million per year") is sufficient to compensate Oracle for Google's use of the entire portfolio of intellectual property, in the way Google used it (an incompatible open source implementation). Dr. Cox then uses this royalty rate to calculate the entire

---

[74] For instance, a patent that has broad application may command a very high market (asset) value, but be of only limited value to an individual licensee (because the patent has a limited impact on increasing that licensees revenues). As another example, if use of a patent allowed a reduction in costs, for instance, the patent may be valuable while not contributing to incremental revenue.

Expert Report of Professor James R. Kearl

March 21, 2012                                                                                 Charles River Associates

**Factor 13.    The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

183. As I have discussed above, with regard to the Java ME IP portfolio, the 2006 negotiations themselves provide the evidence: Google would not have been willing to enter into negotiations with Sun for Java ME IP if it did not believe (in 2006) that the use of Java ME IP would increase its revenues from the use of Android and the license amount, and the royalty rate that I derive from the February 2006 offer, is itself a best estimate of Google's willingness to pay for the in suit patents and copyrights.

**Factor 14.    The opinion testimony of qualified experts.**

**Factor 15.    The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon at the time the infringement began if both had been reasonably and voluntarily trying to reach an agreement, that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit; which amount would have been acceptable to a prudent patentee who was willing to grant a license.**

Respectfully submitted this 21st day of March, 2012.

*[signature]*

James R. Kearl