# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| ORACLE AMERICA, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. CV-03561-WHA |
| GOOGLE, INC. | ) | |
| Defendant. | ) | |

# EXPERT REPORT OF
# PROFESSOR JAMES R. KEARL

**(CORRECTED March 21, 2016)**

March 18, 2016



Subject to Protective Order – Highly Confidential

Attorney's Eyes Only

diversion ratios. Exhibit 4a.1 shows these impacts for alternative estimates of β and σ.[103] As the β coefficient decreases, damages decrease and as β increases, the damage estimate increases; likewise, as σ moves up or down it affects damages. These effects can be seen in Exhibits 4a.1, 4a.2, 4e.1, 4e.2, and 4e.3.

72. I note that neither Mr. Malackowski nor Professor Jaffe offer an alternative estimate of the decrease in market share that would be experienced by a non-infringing Android, although some of their statements suggest that they believe a non-infringing Android would have zero market share.[104] In the previous phase of this litigation, Professor Cockburn estimated that the decrease in market share of a version of Android that did not use the 37 Java APIs would range from 8% to 19%.[105] This conclusion was based on a conjoint analysis by Dr. Shugan, wherein he tested the decrease in willingness to pay by smartphone consumers when the number of apps decreased from 100,000 to 40,000 and 6,000.[106] Dr. Cox adopted a mid-point of Professor Cockburn's estimates and assumed for his opinions that the reduction in market share that a non-infringing Android would experience was 13.55%.[107]

---

[103] I test values of β and σ that are within a typical 95% confidence interval given the standard errors around which each are measured. The standard error on β is 0.004 (as noted in Kim's Table 2.7) and the standard error on σ is 0.075 (as noted in LEONARD0000001.pdf).

[104] See, for example, Reply Expert Report of Professor Adam Jaffe, Ph.D, February 29, 2016, paras. 28-29 and 35. See also Responsive Expert Report of James E. Malackowski, February 29, 2016 (Corrected), para. 60: "Assuming Android would have existed without Google's infringement is also speculative."

[105] Expert Report of Dr. Iain M. Cockburn, Revised September 15, 2011, para. 472. I realize that portions of the expert opinions in the previous litigation were ruled inadmissible by the Court, and that these rulings implicated some of the analyses I discuss here. To the degree my referencing of these previous analyses and conclusions is inappropriate, this discussion should be deleted.

[106] Expert Report of Professor Steven M. Shugan, September 12, 2011, pp. 9, 14, Appendix D, and Exhibits 3a and 4a.

[107] Expert Report of Dr. Alan J. Cox, Revised April 15, 2012, pp. 41 and 58.

any advantage to Google, I would recommend a disgorgement award of $0, and not the amounts of $32.4 million or $56.3 million offered by Dr. Leonard.[140]

103. In the event that the jury concludes the use of the 37 Java APIs was not essential to Android, but did increase the market success of Android, the apportionment task becomes more difficult. But if the jury concludes that the effect is fully measured by a decrease in market share then as noted above, the numbers range between $2.08 billion and $3.51 billion.

### 10.3. The 2006 Sun/Google Negotiation

104. In the previous phase of this litigation, the damages analyses focused heavily on the licensing negotiations between Sun and Google. In this current phase of the litigation these negotiations have barely been mentioned. I understand that Oracle is not seeking as a damages remedy a lost license fee. Therefore, the amount Sun would have been willing to accept to license the subject copyrights to Google may be irrelevant. However, it is notable that the amounts of damages at play now (under some non-infringing alternative scenarios) are large relative to the amount that Sun was apparently willing to accept to license all Java intellectual property.

105. I also note that the approaches taken by the experts in this current phase of litigation are different from the first round of expert analysis made in the previous round of Oracle v. Google litigation addressed in my 2012 report. As such, this report addresses only the current approaches put forth by Dr. Leonard, Mr. Malackowski and Professor Jaffe.

---

[140] Expert Report of Dr. Gregory K. Leonard, February 8, 2016, Exhibit 3e.

Respectfully submitted this 21st day of March, 2016

_____

J.R. Kearl