KEKER & VAN NEST LLP
ROBERT A. VAN NEST - # 84065
rvannest@kvn.com
CHRISTA M. ANDERSON - # 184325
canderson@kvn.com
DANIEL PURCELL - # 191424
dpurcell@kvn.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     (415) 391-5400
Facsimile:     (415) 397-7188

KING & SPALDING  LLP
BRUCE W. BABER (pro hac vice)
bbaber@kslaw.com
1185 Avenue of the Americas
New York, NY 10036
Telephone:     (212) 556-2100
Facsimile:     (212) 556-2222

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.,<br><br>          Plaintiffs,<br><br>     v.<br><br>GOOGLE INC.,<br><br>          Defendant. | Case No.  3:10-cv-03561 WHA<br><br>**GOOGLE INC.'S NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO STRIKE PORTIONS OF EXPERT REPORT AND TESTIMONY OF DR. JAMES R. KEARL**<br><br>Date:       April 27, 2016<br>Time:      8:00 a.m.<br>Dept.       Courtroom 8, 19th Fl.<br>Judge:    Hon. William Alsup |

PLEASE TAKE NOTICE that on April 27, 2016, pursuant to Federal Rules of Evidence 401, 402, 403, 701, and 702, as well as case law interpreting those rules, defendant Google Inc. ("Google") will, and hereby does, move the Court for an order excluding in limine certain portions of the expert report and testimony of Dr. James R. Kearl, this Court's appointed expert under Federal Rule of Evidence 706.  This motion is based on the following memorandum of points and authorities in support, the Declaration of Maya Karwande ("Karwande Decl.") and accompanying exhibits, the entire record in this matter, and on such evidence or argument as may be presented at the hearing of this motion.

## I.  INTRODUCTION

The Court's Rule 706 expert, Dr. James Kearl, has offered a series of opinions in response to the damages reports served by both parties' experts, including opinions relating to calculating what would be an appropriate amount, if any, for disgorgement of profits.  In so doing, Dr. Kearl correctly recognizes that Oracle's disgorgement theory depends entirely on a chain of events: that Google's use of the declarations/SSO allegedly allowed it to attract a large number of applications developers, who in turn developed applications that in turn purportedly brought users (and thus profits) to Android.  While there is no support in the record that this actually happened, and Oracle's theory is contradicted by market facts and economic studies, Dr. Kearl takes Oracle's theory at face value, using it as a basis for offering an extremely broad range (from $0 to $7.7 billion) of potential amounts of disgorgement of Google's Android-related profits.  Rather than identifying potential outcomes that are supported by facts and economic logic, his opinions essentially leave it up to the trier of fact to decide how large a contribution the SSO and declaring code of the 37 Java SE API packages at issue here ("declarations/SSO") made to those profits.[1]

In particular, Dr. Kearl offers three opinions, spanning an extremely broad range, that are based solely on assumptions without evidentiary support, and should be stricken.  First, Dr. Kearl

---

[1] In evaluating how much the declarations/SSO contributed to Google's Android-related profits, Dr. Kearl appropriately considered how much profit related to Android would have been made had the allegedly infringing material not been included.  In doing so, he evaluated various counterfactual situations, much like both Google's and Oracle's damages experts did in their analyses.

1
GOOGLE INC.'S MOTION TO STRIKE PORTIONS OF DR. KEARL'S EXPERT REPORT
Case No.  3:10-cv-03561 WHA

opines that, if the trier of fact believes that Android would have been less successful because the availability of applications caused users to flock to the platform, one possible outcome would be a 13.55% reduction in Android users. But his only basis for picking the 13.55% number is the market share analysis from the conjoint study offered by former Oracle expert Dr. Steven Shugan—and excluded by the Court—prior to the first trial. The Shugan analysis cannot be the basis of any admissible expert opinion here. Dr. Shugan will not even testify at trial to explain his excluded analysis.

Second and alternatively, Dr. Kearl adjusts the calculation of Google's expert Dr. Gregory Leonard, opining that the trier of fact could believe that, without the declarations/SSO, fewer applications would have been written for Android. But here, his disgorgement amount rests on factually implausible assumptions, including the assumption that large technology companies, such as Facebook and Uber, which have developed apps for multiple mobile platforms and have every incentive to do so, would have declined to develop for a non-infringing Android. This assumption is contradicted by both market facts and logic, and Dr. Kearl cannot even vouch for its plausibility.

Third, Dr. Kearl bases another disgorgement calculation on the premise that the trier of fact could conclude that, without the declarations/SSO, there would be no Android at all. But everyone—including Dr. Kearl and even Oracle's expert Mr. James Malackowski—agrees that this is not factually plausible, and that Google would have developed some version of Android even without the allegedly infringing material. In addition to having no basis in the evidence of the case, this opinion by Dr. Kearl would simply award Oracle *all* of Google's Android-related profits, even though Dr. Kearl (and Mr. Malackowski) agree that the myriad other elements of the Android platform contributed substantially to those profits. This opinion fails even to attempt to establish a causal nexus between the declarations/SSO and Google revenue, much less perform the required apportionment of profits attributable to the infringement.

As discussed in more detail below, these opinions of Dr. Kearl should be stricken as they will confuse and mislead the trier of fact with unreliable and irrelevant testimony, and rely on excluded opinions from expert witnesses who will not testify at trial.

2

II.   **RELEVANT LEGAL STANDARDS**

    A.   **Standard for excluding testimony of an expert witness.**

Trial judges serve as gatekeepers, ensuring that any expert testimony presented at trial is both relevant and reliable. *See Sundance, Inc. v. DeMonte Fabricating Ltd.,* 550 F. 3d 1356, 1364 (Fed. Cir. 2008); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Under Federal Rule of Evidence 702, a court should admit expert testimony only if it is (1) based upon sufficient facts or data, (2) the product of reliable principles and methods, and (3) delivered by a witness who has applied the principles and methods reliable to the facts of the case. Fed. R. Evid. 702. Damages expert opinion testimony that fails to meet these criteria should be excluded. *Uniloc USA, Inc. v. Microsoft Corp,* 632 F.3d 1292 (2011). The Supreme Court has emphasized courts must consider "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert v. Merrell Dow Pharm, Inc.,* 509 U.S. 579, 591 (1993).

    B.   **Standards governing recovery of disgorged profits under copyright statute.**

Under the copyright statute, a successful plaintiff is entitled to recover "any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages." 17 U.S.C. § 504(b); *see also Polar Bear Prods., Inc. v. Timex Corp.,* 384 F.3d 700, 708 (9th Cir. 2004) (reiterating the principle that a plaintiff in a copyright infringement action must establish a sufficient causal connection between the infringement and the infringer's profits it seeks to recover). Section 504(b) permits a plaintiff to seek defendant's "'direct profits—those that are generated by selling an infringing product—and 'indirect profits'— revenue that has a more attenuated nexus to the infringement.'" *Polar Bear*, 384 F.3d at 710 (quoting *Mackie v. Rieser,* 296 F.3d 909, 914 (9th Cir. 2002)). In cases seeking recovery of indirect profits (such as this), the copyright holder bears the burden of "establish[ing] the existence of a causal link before indirect profits damages can be recovered." *Id.* at 710-11; *see also Univ. of Colo. Found. , Inc. v. American Cyanamid Co.,* 196 F.3d 1366, 1375 (Fed. Cir. 1999).

As explained by the Ninth Circuit, section 504(b) "creates a two-step framework for

recovery of indirect profits: 1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and 2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement." *Polar Bear,* 384 F. 3d at 711.  Moreover, the plaintiff's burden of showing a causal nexus is particularly important when claiming indirect profits:

> 'When an infringer's profits are only remotely and speculatively attributable to infringement, courts will deny recovery to the copyright owner.' 4 NIMMER ON COPYRIGHT § 14.03, 14–34; *see also Frank I*, 772 F.2d at 517 ("a court may deny recovery of a defendant's profits if they are only remotely or speculatively attributable to the infringement").

*Id.*.  Thus, "a district court must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and subsequent indirect profits….before the parties can wrangle about apportionment."  *Mackie,* 296 F. 3d at 915.

Only after that threshold is met, does the burden shift to the defendant to prove "his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b); *Polar Bear,* 384 F.3d at 711.  Moreover, as the Ninth Circuit explained in *Cream Records, Inc. v. Jos. Schlitz Brewing Co.,* 754 F.2d 826, 828-829 (9th Cir. 1985) "where it is clear, as it is in this case, that not all of the profits are attributable to the infringing material, the copyright owner is not entitled to recover all of those profits merely because the infringer fails to establish with certainty the portion attributable to the non-infringing elements.  'In cases such as this where an infringer's profits are not entirely due to the infringement, and the evidence suggests some division which may rationally be used as a springboard **it is the duty of the court to make some apportionment**.'" *Id.* (quoting *Orgel v. Clark Boardman Co.,* 301 F.2d 119, 121 (2d Cir.1962)) (emphasis added)[2]; *see also Abend v. MCA, Inc*., 863 F.2d 1465,1480 (9th Cir. 1988) (discussing that, in *Sheldon,* "Judge Hand recognized that "no real standard" can govern this apportionment, but he "resolved to avoid the one certainly unjust course of giving the plaintiffs everything, because the defendants cannot with

---

[2] As the Second Circuit commented in *Orgel,* where the plagiarized portion of the work was 35 percent of the overall work, the very existence of the non-infringing 65 percent "is convincing evidence that some part of the commercial value of the whole is attributable thereto."  301 F.2d at 121.

certainty compute their own share.") (citing *Sheldon v. Metro-Goldwyn Pictures Corp.,* 106 F.2d 45, 51 (2d Cir. 1939)); *Polar Bear,* 384 F. 3d at 712 (recognizing "'the impropriety of awarding [plaintiff] all of [defendant's] profits on a record that reflects beyond argument that most of the these profits were attributable to elements other than the infringement.'") (citing *Cream Records,* 754 F.2d at 829).

### III.    STATEMENT OF FACTS

At issue in this re-trial is Google's allegedly infringing use of the declarations/SSO in the Android platform. The declarations/SSO are one tiny aspect of an extensive, full stack operating system with a Linux kernel, Dalvik Virtual Machine (now replaced by Android runtime), core libraries with more than one hundred admittedly non-infringing APIs, an application framework and numerous applications. Declaration of Maya Karwande in Support of Google's Motion to Strike Portions of Expert Report and Testimony of Dr. James Kearl ("Karwande Decl."), Ex. 2 ¶¶ 109-11 (Astrachan 1/8/16 Rpt.); Ex. 3 at 91:25-92:14 (Malackowski Dep. Tr.). Oracle does not accuse the overwhelming majority of the complex features of Android, and does not dispute that Google wrote its own non-infringing implementing code for the 37 Java SE APIs at issue, and that the declarations/SSO comprise less than .08% of the entire 15,000,000+ lines of the Android code base. *Id.,* Ex. 4 ¶¶ 108-11 (Malackowski 2/29/16 Rpt.); *Id.*, Ex. 3 at 223:6-16 (Malackowski Dep. Tr.).

Notwithstanding the above, Oracle has asserted enormous claims for monetary relief in this case, seeking to lay claim to an inordinate percentage of all Android-related indirect profits. On the basis of Google's use of the declarations/SSO in the vast Android platform, Oracle claims that it is entitled to disgorgement of no less than $8.8 billion. Google's damages expert strongly disagrees with these assessments, and has explained why Oracle is not entitled to the sums earned by Google through Google's use of its own, unaccused and well-established technologies (such as search and advertising technologies), developed over many years and without any use of the allegedly infringing material.

In light of the anticipated complexity of the damages opinions in this case, the Court appointed Dr. James Kearl as an expert pursuant to Federal Rule of Evidence 706. ECF No.

1395.  As a Rule 706 expert, Dr. Kearl has issued his own report offering opinions relating to the parties' experts' damages opinions.  In evaluating disgorgement, Dr. Kearl considered the methods used by the parties' experts in determining what contribution the declarations/SSO made to Google's Android-related profits, if any.  Karwande Decl., Ex. 1 ¶¶ 8, 34-79, 100-103.  Dr. Kearl concluded that the economically proper (and only practical) way to evaluate the contribution of the declarations/SSO to the relevant profit pool was to compare the profits Google made from Android with the declarations/SSO to the profits Google would have made had that material not been present in Android.  *Id. ¶¶* 8, 34-41.

## IV.    ARGUMENT

Dr. Kearl offers a series of opinions concerning alternative amounts of profits that could be awarded as disgorgement depending on how the trier of fact evaluates the evidence.  Dr. Kearl does not advocate for, or even vouch for the plausibility of, any of these alternative scenarios.  For example, he acknowledges that the trier of fact might conclude that Google's use of the declarations/SSO did not in fact attract developers, (who in turn built apps that attracted users to the platform)—in which case the declarations/SSO would have contributed little or nothing to Google's profits.  *Id.* ¶¶ 18-19.  Alternatively, without citing to evidence on the point, he suggests that the trier of fact could believe that the declarations/SSO were critical to attracting developers, and thus users, to Android, and therefore that the declarations/SSO made a significant contribution to Android profits.  *Id*.¶¶ 18-19.  While Dr. Kearl's approach to analyzing what Android would have looked like (and what profits it would have earned) in the absence of the declarations/SSO is appropriate, and indeed economically necessary,[3] several of his opinions on disgorgement are ungrounded in the facts of the case or based on improper analytical frameworks.  First, he offers a theory that relies on an already-stricken analysis from a former Oracle expert who will not testify at trial.  Second, he bases a theory on assumptions with no basis in the record

---

[3] Oracle has moved in limine to strike the opinion testimony of Google's damages expert based on non-infringing alternatives.  *See* ECF No. 1554-4.  Google will explain in its opposition to that motion why examination of a "but-for" counterfactual that considers Google's next best alternative to use of the declarations/SSO of the 37 Java SE APIs is both appropriate and even necessary here.

6
GOOGLE INC.'S MOTION TO STRIKE PORTIONS OF DR. KEARL'S EXPERT REPORT
Case No.  3:10-cv-03561 WHA

1046386

or market reality, suggesting that large technology companies who have developed applications for multiple platforms using multiple languages would have eschewed Android had Google not used the declarations/SSO at issue here.  Third, he offers a calculation based on a factual scenario that no party advances, and even Oracle dismisses as unrealistic—that Google would not have developed Android at all without the SSO/declarations.  The Court should strike each of these opinions.

> **A.  The Court should exclude Dr. Kearl's opinions that rely on expert opinions of witnesses who are not testifying and whose opinions reflect or rest upon the stricken conjoint analysis proffered by Oracle's prior damages expert, Dr. Shugan.**

Dr. Kearl offers a very broad range of potential disgorgement options, which offer little, if any, guidance to the trier of fact.  He opines that "[i]f the next best non-infringing alternative to Google was to develop a non-infringing Android, and the market success of this product would have been less than the market success of the actual (infringing) Android, disgorgement damages would depend on the difference in market success."  Karwande Decl., Ex. 1 ¶11.  He then "present[s] alternative disgorgement damages estimates for various assumed market share reductions of Android between $2.08 billion and $3.51 billion."  *Id.*  By itself, the breadth of this range – almost a *billion-and-a-half* dollars) is a problem because it is unlikely to meaningfully assist the trier of fact, but both the high and low end of the range are also separately excludable.

First, Dr. Kearl's opinion supporting his $2.08 billion disgorgement amount for a "less successful Android" improperly relies on opinions of former expert witnesses who will not testify at trial and who are opining based on a conjoint analysis that this Court *already has stricken as unreliable* during the first trial.  Specifically, Dr. Kearl explains in his report that he felt he had insufficient information from the parties' experts to identify the "alternative estimate of the decrease in market share that would be experienced by a non-infringing Android" to calculate the apportioned profit under this "less successful Android" alternative.  *Id.*  ¶ 72.  As a result, and rather than conducting his own independent analysis, Dr. Kearl relies on the stricken conjoint analysis that had been offered by Dr. Shugan prior to in the first trial, and on further analyses by Oracle's and Google's experts that used elements from that same stricken conjoint analysis.  Dr.

Kearl explains:

> In the previous phase of this litigation, Professor Cockburn estimated that the decrease in market share of a version of Android that did not use the 37 Java APIs would range from 8% to 19%. ***This conclusion was based on a conjoint analysis by Dr. Shugan****,* wherein he tested the decrease in willingness to pay by smartphone consumers when the number of apps decreased from 100,000 to 40,000 and 6,000. Dr. Cox adopted a mid-point of Professor Cockburn's estimates and assumed for his opinions that the reduction in market share that a non-infringing Android would experience was 13.55%.

*Id.* ¶72 (emphasis added) (*citing* Cockburn report, dated 9/15/11, ¶472; Shugan report, dated 9/12/11, pp. 9, 14, Appendix D and Exs. 3A and 4A; and Cox report, dated 4/15/12, at pp. 41, 58).  On the basis of these opinions from non-testifying experts (none of whom were disclosed as witnesses for or will testify at this trial), Dr. Kearl concludes that "a likely decrease in Android market share due to a smaller number of apps available would be a range of 13.55% to approximately 20% (the percentage varies year to year)," and then applies these percentages to come up with a formula for "damages between $2.08 billion and $3.51 billion as shown in Exhibits 4g and 4c.2." Karwande Decl., Ex. 1 ¶73.

But the conjoint analysis that forms the basis for the 13.55% calculation has already been stricken as unreliable.  Leading up to the first trial, Oracle had proffered several damages experts. One of those experts was Dr. Shugan, who conducted a consumer survey for purposes of estimating Android's increase in market share due to infringement.  ECF No. 785 at 13.

By Order dated March 13, 2012, this Court struck the conjoint analysis of Dr. Shugan as unreliable expert testimony, along with the opinion of Oracle's damages expert, Dr. Cockburn, who in turn relied on that improper conjoint analysis.  *Id.*  Specifically, the Court found that "Dr. Shugan's conjoint survey results are unreliable because the features selected to be surveyed, only seven in total, were purposely few in number and omitted important features that would have played an important role in real-world consumers' preferences," and that in turn "inappropriately focused consumers on artificially selected features and did not reliably determine real-world behavior." *Id.* at 14.  Accordingly, the Court held that "conjoint analysis' determination of

8

GOOGLE INC.'S MOTION TO STRIKE PORTIONS OF DR. KEARL'S EXPERT REPORT
Case No. 3:10-cv-03561 WHA

1046386

market share is STRICKEN in both Dr. Shugan's and Dr. Cockburn's reports." *Id.* at 19.[4] Once stricken, Google's expert, Dr. Cox, revised his opinion and ceased to rely on Dr. Shugan's analysis.  ECF No. 796 at 2.

Given that the Court has already concluded that this testimony is unreliable, the Court should strike Dr. Kearl's opinions relying ultimately on various experts' treatment of the stricken conjoint analysis.  Those opinions certainly would not serve the purpose of this Court's Rule 706 appointment of Dr. Kearl to help "inform and clarify issues for the jury."  *See* ECF Nos. 374 and 1395.  Instead, expert opinions based on the conjoint analysis are fundamentally unreliable and Dr. Kearl's opinions premised on that analysis cannot satisfy the provisions of Federal Rule of Evidence 702.  *See, e.g., Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1324-25 (Fed. Cir. 2014) (excluding expert opinion testimony premised on other expert's testimony that had been deemed unreliable, stating that "[t]he substance of Donohoe's testimony is no more reliable when admitted through Mulhern than through Donohoe himself"); *Sprint Commn'ns Company L.P. v. Comcast IP Holdings, LLC*, 2015 WL 410342, at *2-*3 (D. Del. 2015) (excluding patentee's first damages expert for failing to properly apportion the value of the patented feature to the accused product, and further striking a second damages expert of the patentee who relied on the apportionment analysis of the first expert in her damages analysis).  There is a serious risk of prejudice and confusion (both under Federal Rules of Evidence 403 and 703) in allowing the trier of fact to hear opinion testimony ultimately premised on stricken conjoint analysis because it invites the trier of fact to rely on material that has already been judged unreliable, proffered by experts that will not even be at trial to explain themselves.  Google will be unable to cross-examine Drs. Shugan and Cockburn in order to demonstrate to the trier of fact the unreliability of the conjoint analysis or Dr. Shugan's conclusions concerning the 13.55% decrease in market

---

[4] The Court did not strike the aspect of Dr. Shugan's analysis that concerned the relative preference between application start up time (the functionality related to the asserted patents) and availability of applications (the functionality related to the asserted copyrighted APIs), which formed the basis for Dr. Cockburn's allocation of the bundle of rights in the hypothetical license analysis.  ECF No. 785 at 16.  Dr. Kearl is not relying on that portion of the analysis and instead states in his report that he is relying on the analysis of market share which was stricken.  Karwande Decl., Ex. 1 ¶¶72-73.

share. Indeed, it is hard to imagine how the trier of fact would even begin to understand the opinions of these non-testifying experts that form the foundation for Dr. Kearl's opinions.

Accordingly, for these reasons, Dr. Kearl's opinions regarding the 13.55% loss in market share based on the Shugan analysis should be stricken.

**B.   The Court should exclude Dr. Kearl's opinions that make implausible and unsupported adjustments to Dr. Leonard's analysis regarding the effect of the declarations/SSO on Android applications.**

As part of his expert report, Google's economist Dr. Gregory Leonard analyzed whether Oracle's disgorgement theory was economically plausible and concluded it was not. Oracle's contention is that, by using the declarations/SSO in Android, Google was allegedly able to attract large numbers of applications developers that it otherwise would not have, leading to the development of many desirable applications, purportedly causing users to flock to Android and contributing significantly to Google's profits. Oracle has never offered any evidence showing that this chain of events actually occurred, offering only aspirational Google emails and presentations before Android's release, which prove nothing about real-world outcomes.

In contrast, Google's expert, Dr. Leonard, analyzed and cited several real-world economic studies that investigated whether having a large number of applications available drives users to a mobile platform and concluded the opposite is true: applications developers move to a platform only after it has a proven, sustainable user base.[5] Dr. Leonard further pointed out that, in the real world, there were very few Android applications until after the first successful Android phones were released in late 2009 (with only a few applications) and finally attracted a large number of users. Moreover, Dr. Leonard looked at the applications actually available on Android, noticing that many Android applications were:

- Also available on iOS, and written in the Objective C language for that platform;
- Developed by a developer who also created apps for iOS; and/or
- Developed by a developer who also created Android apps in a non-Java language

---

[5] *See* Karwande Decl., Ex 10 ("Platform Choice by Mobile App Developers," T. Bresnahan, et al., Stanford University, May 29, 2014); Ex. 11 at 43 (M.J. Kim, Essays on the Economics of the Smartphone and Application Industry, University of Minnesota, Ph.D. Thesis (2013)).

1  (such as C++), using Android's Native Development Kit (NDK).

2  Dr. Leonard concluded that these applications would have been developed for Android whether
3  or not Android had used the declarations/SSO—or even the Java language.  Karwande Decl., Ex.
4  9 ¶¶ 112-113, 118, 163-168, 180.

5  But the $3.51 billion high end of Dr. Kearl's disgorgement range assumes that *none of*
6  these apps would have existed on Android *but for* the declarations/SSO, and that their absence
7  would have cost Android tens of millions of users.  Karwande Decl., Ex. 1 ¶ 70.  In other words,
8  Dr. Kearl assumes without basis that, developers whose staffs actually could program in multiple
9  languages (including the less-known Objective C), actually had developed applications in those
10 languages, and had even developed apps for Android in the real world in other languages such as
11 C++ would have declined to develop for Android in the absence of the declarations/SSO.  Dr.
12 Kearl also assumed that, even as to applications that were already on the market, written in
13 Objective C for iOS, their developers would not take the limited effort necessary to port over that
14 application to Android—all because of the unavailability of the shortcuts contained in the
15 declarations/SSO.  Many of the apps Dr. Kearl excluded are the lifeblood of large technology
16 companies—Facebook and Uber, to name two—who would have every incentive to develop an
17 Android app.  Dr. Kearl does not cite any evidence to support his assumption that Android would
18 be without every single one of these apps had it not used the declarations/SSO.  Karwande Decl.,
19 Ex. 1 ¶¶ 65-70.  As discussed above, all the available evidence, including the economic studies
20 cited by Dr. Leonard, demonstrate that the growth of the Android user base preceded the growth
21 in Android apps, and the survey of application developers conducted by Google's expert Dr.
22 Itamar Simonson, point in the opposite direction.

23 Because Dr. Kearl's assumptions are implausible, unsupported by the evidence and, in
24 fact, contradicted by the only record evidence, they should be stricken.  Rule 703 requires that
25 expert witness testimony be based on "facts or data in the case that the expert has been made
26 aware of or personally observed."  Fed. R. Evid. 703.  Accordingly, courts exclude expert
27 testimony where it is not reasonably based on the evidence in the case.  *See, e.g., Feduniak v. Old*
28 *Republic Nat'l Title Co.*, No. 13-CV-02060-BLF, 2015 WL 1969369, at *4 (N.D. Cal. May 1,

2015) (excluding testimony under *Daubert* where expert applied methodology based on "assumptions for which he did not have sufficient rational bases"); *Palmisano v. Olin Corp.*, No. C-03-01607 RMW, 2005 WL 6777561, at *5 (N.D. Cal. July 5, 2005) (excluding testimony under *Daubert* where the expert "provide[d] little support for [the factual] premise" of his opinion and the facts in the record actually contradicted the premise).

\*   \*   \*

Dr. Kearl's opinions and report offers the trier of fact a breathtaking range of potential awards for disgorgement of Google's profits -- from zero to $7.7 billion dollars. Within just the one scenario of a single counterfactual discussed above ("Scenario 3" of Alternative #4), he posits a range of more than one billion dollars. *See* Karwande Decl., Ex. 1, ¶¶ 70-73. Such ranges cannot possibly assist the trier of fact with the complex task of determining to what extent (if any) a fraction of a percent of code in the Android code base contributed to Google profits earned indirectly through the sales of hardware, digital content, apps and, most remotely, advertising. *See Daubert*, 509 U.S. at 591 (proffered expert testimony should "aid the jury in resolving a factual dispute"). For this additional reason, Google respectfully requests that Dr. Kearl's opinions set forth above be stricken.

**C.  The Court should exclude Dr. Kearl's opinion concerning the "no Android" alternative because his opinion is premised on a fact scenario that no party advances, and fails to meet the causal nexus/apportionment requirements of copyright law.**

Finally, Dr. Kearl considered the hypothetical, alternate reality in which Google would have developed no Android operating system at all. If the trier of fact agrees with this alternate reality, Dr. Kearl opines, Google would have missed out on $7.7 billion in profits from Android, and Dr. Kearl posits that the trier of fact could award this entire amount to Oracle as disgorgement. Karwande Decl., Ex. 1 ¶ 9 ("If the next best non-infringing alternative for Google was not to pursue Android at all, disgorgement damages would total approximately $7.7 billion."). But this conclusion is inadmissible expert opinion testimony for two reasons. First, Dr. Kearl's opinion is premised on a proposed alternate reality that has no evidentiary support and

even Oracle's expert agrees is implausible. Second, Dr. Kearl's opinions concerning this alternative are improper because they fail to conduct any apportionment analysis under copyright law, assigning to the declarations/SSO elements of profit that all parties agree are attributable to the many other valuable features of the Android operating system.

As an initial matter, Dr. Kearl's opinions concerning the "no Android" alternative are inadmissible under Federal Rules of Evidence 702, 703 and 403 because they are contrary to the facts that will be offered at trial. Even Oracle, despite the aggressive damages positions it has taken throughout this case, concedes that Google would have launched Android even had it been unable to use the declarations/SSO. Oracle's own damages expert has opined that Google had to launch Android in some form to keep up with the move to the mobile platforms. Karwande Decl., Ex. 3 at 377:20-78:1 ("[G]iven the importance to Google to reach the mobile marketplace, and their fear of being locked out, I'm sure they would have attempted something."). And during deposition, Dr. Kearl implicitly acknowledged that he was not aware of any party offering the position at trial that no Android would have launched in the absence of the use of the declarations/SSO; he acknowledged instead that Oracle was advancing the view that Android would have launched but would not have been a success without the declarations/SSO. *Id.,* Karwande Decl., Ex. 5 at 142:5-145:13. But Federal Rule of Evidence 703 does not permit expert testimony that rests on facts divorced from the actual evidence that will be offered at trial. Instead, expert opinion testimony concerning counterfactual premises unsupported by evidence is excluded because it simply is not helpful to the trier of fact. Fed. R. Evid. 702, 703, 403; *see LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 67 (Fed. Cir. 2012) (internal citation omitted) (damages theory must be based on "sound economic and factual predicates"); *see also Daubert,* 509 U.S. at 591 (expert testimony should be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute").

Dr. Kearl's opinions based on this factually baseless hypothetical are also improper because they fail to apportion Google's Android-related profits between the infringing activity— *i.e.*, use of the declarations/SSO of the APIs—and all the other valuable components of the platform. The only profits subject to disgorgement in a copyright infringement case are those

13

GOOGLE INC.'S MOTION TO STRIKE PORTIONS OF DR. KEARL'S EXPERT REPORT
Case No. 3:10-cv-03561 WHA

1046386

actually caused by or result from the use of the infringed material.  *See, e.g., Polar Bear Prods., Inc.,* 384 F.3d at 708.  And, here, it is undisputed that the profits garnered by the Android platform are the result of numerous factors—including the underlying Linux kernel, the Android runtime, the applications framework, and the numerous applications (telephone, text messaging, maps, etc.) that come with every Android device.  *See, e.g.,* Karwande Decl., Ex. 3 at 91:25-92:14; Ex 6 at 71:10-14; 125:20-126:14; Ex 7 at 126:3-8; Ex 8 at 311:7-18; Ex. 9 ¶¶ 66-74.  In other words, no party contends that Android-related profits are due solely to the use of declarations/SSO.  Accordingly, a determination of the amount of profits that Google would have foregone in the absence of Android only informs the trier of fact of what **all aspects of Android together** allowed Google to earn in the way of (indirect) profits.  It tells the trier of fact nothing about whether there is an amount of profits due to the declarations/SSO.  Dr. Kearl's opinion that Google's total Android-related profits is a potential disgorgement amount thus must be excluded as unreliable opinion testimony that is divorced from the guidance of copyright law, and is highly likely to mislead and confuse the trier of fact.

For the above reasons, Dr. Kearl's opinions concerning the amount of profits that Google earned as a result of having Android (set forth at ¶¶ 9,11,70,71,72,73,77,78,79,103 of his report) should be excluded from this case pursuant to Federal Rules of Evidence 402, 403, 702 and 703.

## V.   CONCLUSION

As discussed above, Dr. Kearl's opinions, set forth at ¶¶ 9,11,70,71,72,73,77,78,79,103 of his report, should be stricken pursuant to Federal Rules of Evidence 402, 403, 702 and 703.

Dated:  March 30, 2016                          KEKER & VAN NEST LLP

By:   */s/ Robert A. Van Nest*
ROBERT A. VAN NEST
CHRISTA M. ANDERSON
DANIEL PURCELL

Attorneys for Defendant
GOOGLE INC.