# EXHIBIT 5

# DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL

Page 1

1      UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF CALIFORNIA
3      SAN FRANCISCO DIVISION
4  ORACLE AMERICA, INC.,
5      Plaintiff,
6          vs.          Case No. 3:10-cv-03561-WHA
7  GOOGLE, INC.,
8      Defendant.
   _____

13      *HIGHLY CONFIDENTIAL*
14    PURSUANT TO THE PROTECTIVE ORDER
15  VIDEO DEPOSITION OF JAMES R. KEARL, Ph.D.
16        San Francisco, California
17        Wednesday, March 23, 2016
18              Volume I

22  REPORTED BY:
23  REBECCA L. ROMANO, RPR, CSR No. 12546
24
25  Job No. CS2276036

Page 126

1    So I'm limited in what I can say to the
2    jury in this case because all I know are the two
3    parameters that he just specifies the number for.
4        But he gives the confidence interval
5    round of the standard error. So you can say, Well,
6    suppose it was at the boundaries of the standard
7    error up and down? Because, you know, they --
8    they -- statistically, it lies within an interval.
9        What he gives you is the expected value
10   or, loosely, the midpoint of that, but it could lie
11   at either end of the interval.
12       Does it matter for his results? And the
13   answer is, it does.
14     Q.   Looking at your $2.08 billion figure, is
15   it correct that that's based on the assumption of a
16   13.55 percent share loss in the counterfactual?
17     A.   Yes.
18     Q.   And that share loss figure is the
19   midpoint of the 7.9 percent to 19.2 percent share
20   loss range arrived by Dr. Cockborne, rely on the
21   Shugan survey in the prior trial proceedings; is
22   that right?
23     A.   Sort of. There was a fight between the
24   experts about what the midpoint was, as I recall.
25       I mean, there some dispute on something

HIGHLY CONFIDENTIAL

Page 142

1  copyrights.
2              And in -- my opinions in that case would
3  hold were we to go back to -- a -- a hypothetical
4  license approach.
5       Q.   I want to talk briefly about your
6  alternative number 5, which begins on page 40, "Do
7  not develop Android at all."
8              And I just want to read to you first --
9  well, first let me ask you, are you aware of any
10 witness or expert in this case who offered the view
11 that Google would not have done Android at all,
12 even without the 37 Java APIs?
13             MR. COOPER:  Object as to form.
14             THE DEPONENT:  My reading of
15 Professor Jaffe and Mr. Malackowski is that they
16 could be interpreted as saying, Android would have
17 failed, it would not have succeeded but for the use
18 of the 37 APIs.
19      Q.   (By Mr. Ragland)  I think my question is
20 a little bit different, and so --
21             MR. COOPER:  I'm sorry, did you finish?
22             THE DEPONENT:  I finished.
23             MR. COOPER:  Sorry.
24             THE DEPONENT:  No problem.
25      Q.   (By Mr. Ragland)  My -- my question is

1   more that, let's take a hypothetical but-for world
2   in which the SSO of the 37 Java APIs were not
3   available to Google for whatever reason, and the
4   question is whether or not they would have created
5   a smartphone platform anyway.
6              And so my question is, do you know of any
7   evidence that would suggest that, if Google was
8   told in 2006, these -- SSO of these 37 APIs are not
9   going to be part of Android, is there any evidence
10  that suggests that Google wouldn't have gone ahead
11  and created a smartphone platform anyway?
12       A.   Two responses.  You are asking me to be a
13  fact witness again, so I want to be careful on
14  that.
15              Two, again, I think one interpretation of
16  Dr. Jaffe and -- well, Professor Jaffe and
17  Mr. Malackowski is that it would not have been a
18  commercial success but for the use of the
19  Java APIs.
20              So I know it's the same answer I just
21  gave you, but I -- that's the answer that I
22  question.  I think -- you know, again, the jury
23  will have to decide, and Oracle will have to put on
24  its case.  But at least as I read those reports and
25  sat through their depositions, I think one view

1  that they have is that it would have been a
2  commercial failure for a variety of reasons if it
3  had not done what it done -- what it did.
4      Q.  And do you have any opinion on whether or
5  not that theory is credible or not?
6      A.  No.  That's not my role here.
7      Q.  And you are aware, right, that
8  Mr. Malackowski in his deposition testified that,
9  given the importance to Google to reach the mobile
10 marketplace, I'm sure they would have attempted
11 something to launch the smartphone platform?
12         MS. HURST:  Object to form.
13         THE DEPONENT:  Yeah, but I don't think
14 that changes the answer to my question -- answer to
15 your question, sorry.
16     Q.  (By Mr. Ragland)  Aside from the
17 implications -- aside from the implications or
18 opinions of Dr. Jaffe, or Mr. Malackowski, your
19 review of the record, did you see any evidence
20 indicating that a different approach by Google to a
21 smartphone platform would not have succeeded?
22         MS. HURST:  Object to the form.
23         THE DEPONENT:  Again I -- I think you are
24 asking me to go beyond what I was asked to do.  So
25 with that caveat, sure, the world is littered with

1  failed start-up platforms, including SavaJe,
2  Danger, and others that did not succeed.
3          Now, how do you understand why they
4  failed is a different issue.  But -- but -- you
5  don't have to look very far to find failures in the
6  high tech area.
7      Q.   (By Mr. Ragland)  And there's also
8  examples of the iPhone succeeding that has nothing
9  to do with Java, right?
10     A.   Sure, sure.
11     Q.   But ultimately, you don't have an opinion
12  one way or the other, right?
13     A.   I don't.
14     Q.   Putting aside the sequence structure and
15  organization of the 37 Java APIs at issue in this
16  case, do you think it's fair to say that Google
17  technology also contributed, at least in some
18  manner, to Android's success?
19          MR. COOPER:  Object to the form of that
20  question.
21          MS. HURST:  Same.
22          THE DEPONENT:  So here I sound like I'm
23  quibbling, and I am a little bit.  You say,
24  "Android's success," I would put it slightly
25  differently, which is, it's clear that Google's

HIGHLY CONFIDENTIAL

Page 209

1      I, Rebecca L. Romano, a Certified Shorthand
2   Reporter of the State of California, do hereby certify:
3      That the foregoing proceedings were taken before me
4   at the time and place herein set forth; that any
5   witnesses in the foregoing proceedings, prior to
6   testifying, were administered an oath; that a record of
7   the proceedings was made by me using machine shorthand
8   which was thereafter transcribed under my direction;
9   that the foregoing transcript is true record of the
10  testimony given.
11     Further, that if the foregoing pertains to the
12  original transcript of a deposition in a Federal Case,
13  before completion of the proceedings, review of the
14  transcript [ ] was [X] was not requested.
15     I further certify I am neither financially
16  interested in the action nor a relative or employee of
17  any attorney or any party to this action.
18     IN WITNESS WHEREOF, I have this date subscribed my
19  name.
20
21  Dated:  March 24, 2016
22
23                    _____
                      Rebecca L. Romano, RPR,
24                    CSR. No 12546
25