# EXHIBIT 22

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Page 178

 1  of disgorgement that remain in your report?
 2      A.  I think it's just the either/or.  It's
 3  either the nothing or everything.
 4          An economist has his head -- it's a hard
 5  time to get head around how you think about valuing
 6  things without thinking about what alternatives are
 7  available.
 8          And I -- I don't mean this to be nasty in
 9  any sense, but I just think Mr. Malackowski is
10  wrong about this matter, that is embedded in his
11  analysis is a but-for.  And the but-for in his is,
12  Android would not exist.  But that's still a
13  but-for analysis.  I mean, if you are going to
14  give -- if you are going to allocate all of the
15  profits, disgorge all of the profits, you're really
16  saying that it wouldn't be here except for these
17  37 APIs.  That in -- the way I'm using but-for,
18  that's a but-for analysis.
19      Q.  Now, going back to that constructive
20  license royalty from the last time, it was about
21  20 percent on gross ad revenues, was what you
22  concluded that royalty would be, in addition to the
23  $100 million; is that right?
24      A.  I would have to go back and look at the
25  report for the details, so -- but I don't remember.

Page 179

 1  I mean, it's in that range, yes.
 2      Q.  Do you recall that there was an element
 3  of it that was 20 percent of the gross margin ad
 4  revenues?
 5      A.  Yes.
 6      Q.  And if you accept -- well, the parties
 7  roughly agree on what the gross ad revenues are
 8  here, right?
 9      A.  I think it's not just roughly, they
10  agree.
11      Q.  They have agreed.
12      A.  Yes.
13      Q.  And that number --
14      A.  Well, I don't know that the parties
15  agree.  The experts have essentially the same
16  ad revenues.
17      Q.  And that's $28 billion?
18      A.  Yeah, it's almost 40 billion, and then
19  sort of comes down from there.
20      Q.  All right.  So if we go with the 40 as
21  the total pool of revenue, just applying your
22  20 percent to that, that would be $8 billion,
23  right?
24          MR. RAGLAND:  Objection.  Form.
25          THE DEPONENT:  Yeah, but I -- that --

Page 180

 1  well, if you are asking me to confirm the math, the
 2  answer is yes.  I -- I don't think it's directly
 3  applicable, however, that it's the -- the
 4  hypothetical negotiation is a different construct
 5  than -- than the disgorgement.
 6          So as I said earlier to Mr. Ragland,
 7  in -- I don't think you can lift a parameter out of
 8  one and apply it to the other.
 9      Q.  (By Ms. Hurst)  All right.  So let's
10  explore that for a second.
11          Professor Kearl, do you think, though,
12  to the extent that both of those constructs are
13  designed to try to measure value, they should still
14  come out in roughly the same ballpark?
15      A.  No.  Because they are -- they are trying
16  to measure something different.  As -- as I
17  understand it, disgorgement is that you take away
18  from the infringer all of the gain they got from
19  using the product.
20          The hypothetical negotiation is, you ask,
21  what's the expected incremental contribution of the
22  technology to the profits of the infringer.  And
23  then as I said earlier, then how would the parties
24  agree to split that in some way, and then how would
25  they then monetize that in terms of a royalty or a

Page 181

 1  royalty rate.
 2          And the disgorgement is ex post, that is
 3  it looks at, you know, how much Google made from
 4  this.  The constructive license hypothetical
 5  negotiation says, at the time before infringement
 6  occurs, when they were looking forward, how
 7  profitable do they think it would be.  And there's
 8  no reason why the ex-post profit should be equal to
 9  the ex-ante expected profits.
10      Q.  Unless their forecasts were good.
11      A.  Yes, unless they forecast -- unless they
12  were clairvoyant and saw exactly what the future
13  was.
14      Q.  And do you recall that your table 2 in
15  your first report had a forecast of about
16  $44 billion as -- at the same point in time that
17  we're now looking at 40?
18          MR. RAGLAND:  Objection.  Form.
19          THE DEPONENT:  Yeah, let's be careful
20  about whose forecast this was.
21      Q.  (By Ms. Hurst)  Right.  My apologies.
22          It -- it recited a Google forecast.
23      A.  Yes.  There was the -- the -- in my first
24  report, I faced the same problem I face in this
25  report, which is you had widely differing