ORRICK, HERRINGTON & SUTCLIFFE LLP
KAREN G. JOHNSON-MCKEWAN (SBN 121570)
kjohnson-mckewan@orrick.com
ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
GABRIEL M. RAMSEY (SBN 209218)
gramsey@orrick.com
405 Howard Street, San Francisco, CA  94105
Tel: 1.415.773.5700 / Fax: 1.415.773.5759
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
51 West 52nd Street, New York, NY  10019
Tel: 1.212.506.5000 / Fax: 1.212.506.5151

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (*pro hac vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY  10504
Tel: 1.914.749.8200 / Fax: 1.914.749.8300
STEVEN C. HOLTZMAN (SBN 144177)
sholtzman@bsfllp.com
1999 Harrison St., Ste. 900, Oakland, CA  94612
Tel: 1.510.874.1000 / Fax: 1.510.874.1460

ORACLE CORPORATION
DORIAN DALEY (SBN 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (SBN 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (SBN 211600)
matthew.sarboraria@oracle.com
RUCHIKA AGRAWAL (SBN 246058)
ruchika.agrawal@oracle.com
500 Oracle Parkway
Redwood City, CA 94065
Tel: 650.506.5200 / Fax: 650.506.7117

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC., | Case No. CV 10-03561 WHA |
| Plaintiff, | **ORACLE'S MOTION IN LIMINE #5 TO EXCLUDE GOOGLE'S SURVEY EXPERT, DR. SIMONSON** |
| v. | |
| GOOGLE INC., | Hearing:  April 27, 2016, 8:00 a.m. |
| Defendant. | Dept.: Courtroom 8, 19th Floor Judge: Honorable William H. Alsup |

ORACLE'S MOTION IN LIMINE #5 RE:
GOOGLE'S SURVEY EXPERT, DR. SIMONSON

1

**NOTICE OF MOTION, MOTION, AND STATEMENT OF RELIEF SOUGHT**

2

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  PLEASE TAKE NOTICE

3

that the following Motion *In Limine* Regarding Google's Survey Expert, Dr. Simonson will be

4

heard on April 27, 2016, at 8:00 a.m., or as soon thereafter as counsel may be heard, in Court-

5

room 8, 19th Floor of this Court, located at 450 Golden Gate Avenue, San Francisco, California,

6

the Honorable William Alsup presiding.

7

Plaintiff Oracle America, Inc. will, and hereby does, move this Court to exclude from trial

8

Google's survey expert Dr. Simonson, including his survey, analysis, opinions, and conclusions.

9

This Motion is based on this Notice of Motion and Motion; the Memorandum of Points and Au-

10

thorities below; the materials attached to the Declaration of Andrew D. Silverman (cited hereinaf-

11

ter as "Ex. __") that are being filed herewith; the record in this matter; and such other and further

12

papers, evidence, and argument as may be submitted in connection with this Motion.

13

14

Dated: March 23, 2016                                    Orrick, Herrington & Sutcliffe LLP

By: */s/ Lisa T. Simpson*

15

Lisa T. Simpson

16

Counsel for ORACLE AMERICA, INC.

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

NOTICE OF MOTION, MOTION, AND STATEMENT OF RELIEF SOUGHT

TABLE OF AUTHORITES..............................................................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

INTRODUCTION ......................................................................................................... 1

I.    DR. SIMONSON'S SURVEY AND OPINIONS SHOULD BE EXCLUDED
      ENTIRELY AS IRRELEVANT AND BASED ON FLAWED
      METHODOLOGY.................................................................................................. 1

      A.    Google's Survey Should Be Excluded Because It Asks The Wrong
            Questions, To The Wrong People, At The Wrong Time,
            And Misinterprets The Results ................................................................... 2

      B.    The Survey Should Be Rejected Because It Lacks Any Control Group........................ 5

      C.    The Results Are Skewed Because They Include Pre-Test Respondents........................ 6

II.   DR. SIMONSON SHOULD NOT BE PERMITTED TO TESTIFY IN PHASE I................ 7

CONCLUSION ............................................................................................................... 7

1

**TABLE OF AUTHORITES**

2

**Page(s)**

3

**Federal Cases**

4

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,

5
    923 F. Supp. 2d 1245 (S.D. Cal. 2013) ........................................................................6

6
*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
    No. CV 96-3281 MMM, 2003 WL 22038700 (C.D. Cal. Aug. 8, 2003) ...................7

7

8
*CytoSport, Inc. v. Vital Pharm., Inc.*,
    894 F. Supp. 2d 1285 (E.D. Cal. 2012) ......................................................................6

9
*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,

10
    618 F.3d 1025 (9th Cir. 2010) ....................................................................................1

11
*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
    No. C 12-03762 SI, 2014 WL 572290 (N.D. Cal. Feb. 11, 2014) .........................3, 4

12

13
*Lanphere Enters., Inc. v. Jiffy Lube Int'l Inc.*,
    138 F. App'x 20 (9th Cir. 2005) .............................................................................3, 5

14
*Negrete v. Allianz Life Ins. Co. of N. Am.*,

15
    No. CV 05-6838 CAS, 2013 WL 6535164 (C.D. Cal. Dec. 9, 2013)................1, 3, 4

16
*Reinsdorf v. Skechers U.S.A.*,
    922 F. Supp. 2d 866 (C.D. Cal. 2013)..................................................................1, 4, 6

17

18
*ThermoLife Int'l, LLC v. Gaspari Nutrition, Inc.*,
    No. CV-11-01056-PHX-NVW, 2014 WL 99017 (D. Az. Jan. 10, 2014)...................4

19
*Wendt v. Host Int'l, Inc.*,

20
    125 F.3d 806 (9th Cir. 1997).......................................................................................1

21

**Other Authorities**

22
Norman Bradburn, Lance Rips, and Steven Shevell, "Answering Autobiographical
    Questions: The Impact of Memory and Inference on Surveys," *Science* (1987),

23
    vol. 236, No. 4798.......................................................................................................4

24
Shari Diamond, Reference Guide on Survey Research, in *Reference Manual on*

25
    *Scientific Evidence* ....................................................................................................5

26

**Dr. Simonson Reports And Declarations In Other Matters**

27
Dr. Itamar Simonson Declaration, *Fox Broadcasting Co. v. DISH Network L.L.C.*,
    No. 2:12-cv-04520 (C.D. Cal. Sept. 19, 2014), ECF No. 437-21 ..............................2

28

ORACLE'S MOTION IN LIMINE #5 RE:
GOOGLE'S SURVEY EXPERT, DR. SIMONSON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dr. Itamar Simonson Expert Report, *Safe Auto Ins. Co. v. State Automobile Mut. Ins. Co.*, No. 2:07-cv-1121 (S.D. Oh. Oct. 27, 2008), 2008 Misc. Filings LEXIS 8685 ........................................................................... 1-2, 5

Dr. Simonson Expert Report, *Larin Corp. v. Alltrade, Inc.*, No. EDCV 06-1394 (C. D. Cal. Feb 15, 2009), 2008 Misc. Filings LEXIS 4724 ...............................................................................5

ORACLE'S MOTION IN LIMINE #5 RE:
GOOGLE'S SURVEY EXPERT, DR. SIMONSON

1
2

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

3       In yet another attempt to re-write history, Google retained Dr. Itamar Simonson, who pur-

4   ported to construct an ex post facto survey of app developers in December 2015/January 2016 to

5   try to explain why app developers *in 2007-09* may have decided to write apps for Android, even

6   if Google had not copied the 37 Java API packages.  Dr. Simonson concludes that Android app

7   developers in the critical 2007-09 window chose Android because they expected and were moti-

8   vated by the profit that would flow from writing apps for a successful platform with lots of users.

9   But, Dr. Simonson's conclusion ignores that Android was neither successful nor had lots of users

10   *when it was released in 2007-09*, one year *after* Apple beat Google to market with the iPhone.  In

11   fact, Dr. Simonson's conclusions are completely contradicted by voluminous, contemporaneous

12   evidence *from Google* explaining that Google copied the Java API packages to tap into the mas-

13   sive Java developer community so those Java developers could write all of the useful, quirky, and

14   entertaining apps that would make Android popular with consumers.  That is, Google's own doc-

15   uments show that Google's strategy for Android's success relied on app developers' attraction to

16   the Java APIs; not the promise of profits flowing to app developers.  Dr. Simonson's survey is

17   both irrelevant and unreliable and should be excluded.

18
19

**I.    DR. SIMONSON'S SURVEY AND OPINIONS SHOULD BE EXCLUDED ENTIRELY AS IRRELEVANT AND BASED ON FLAWED METHODOLOGY**

20       Survey evidence, like all other evidence, must be relevant to be admissible.  *Fortune Dy-*

21   *namic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1036 (9th Cir. 2010);

22   *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).  A survey that does not have a ten-

23   dency to make a fact of consequence more or less probable should be excluded as irrelevant.  *Ne-*

24   *grete v. Allianz Life Ins. Co. of N. Am.*, No. CV 05-6838 CAS, 2013 WL 6535164, at *2 (C.D.

25   Cal. Dec. 9, 2013).  Moreover, "[u]nless survey evidence is conducted according to accepted

26   principles, it is not admissible in the first instance."  *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp.

27   2d 866, 878 (C.D. Cal. 2013).  Dr. Simonson has conceded as much in other cases.[1]

28   _____
[1] "[I]t is well accepted that the results of surveys are contingent on the methodology being em-
ployed; if the method is flawed on key survey dimensions, the survey results become unreliable

### A.   Google's Survey Should Be Excluded Because It Asks The Wrong Questions, To The Wrong People, At The Wrong Time, And Misinterprets The Results

Dr. Simonson has argued in other cases that contemporaneous company evidence is important and that survey opinions that are "inconsistent" with a company's "own assessments, testimony, and actions … lack any real scientific basis."  Simonson *Fox* Report ¶ 21 (*supra* n.1). "When an expert relies on survey evidence that presumably disproves reality and the expectations and behavior of experts in the domain at issue, one needs to examine that survey evidence carefully." *Id.* ¶ 43.  Yet Dr. Simonson sets out here to do just that: to try to disprove the voluminous, contemporaneous evidence from Google that reveals that Google copied the 37 Java API packages to (1) tap into the massive community of "6M Java developers worldwide," TX 158 at 10, (2) "enable all [those] Java developers to quickly leverage their skills to build great Android apps," TX 238 at 1, and (3) allow Google to "leverage not only existing developers, but applications as well" for Android, TX 21.  Indeed, Google used the Java APIs as an attractive selling point when meeting with and attempting to sell Android to OEMs, touting their inclusion in Android as a key element of its future success.  *See* Ex. 19.  Google's attempts to rewrite history here must be excluded as irrelevant and unreliable.

To assist it in analyzing Dr. Simonson's survey, Oracle retained Dr. Olivier Toubia, Professor of Business and Faculty Director of the Lang Center for Entrepreneurship at Columbia Business School.  Dr. Toubia is an expert in marketing research, innovation, social networks, and behavioral economics.  Dr. Toubia found numerous, independently fatal flaws that require exclusion of Dr. Simonson's survey and his conclusions.  Specifically, the survey asks the wrong question, § I.A.1, to the wrong people, § I.A.2, far too long after the relevant time period, § I.A.3. Then Dr. Simonson misinterprets the results.  § I.A.4.

**1.    The wrong questions.**  The survey asks developers what factors would influence them

---

and irrelevant."  Simonson Rpt., *Safe Auto Ins. Co. v. State Automobile Mut. Ins. Co.*, No. 2:07-cv-1121 (S.D. Oh. Oct. 27, 2008), 2008 Misc. Filings LEXIS 8685 at ¶ 11; *accord* Simonson Decl., *Fox Broadcasting Co. v. DISH Network L.L.C.*, No. 2:12-cv-04520 (C.D. Cal. Sept. 19, 2014) ("Simonson *Fox* Report"), ECF No. 437-21 ¶ 67 ("a survey that fails to ask the right questions, relies on flawed measures, or leads respondents to choose among a biased set of options cannot provide relevant information").

*today*, *in 2015-16*, in deciding to develop apps for a new platform.  But, in 2007-09, when Android was first released, the apps market was in its infancy and no one knew if developing apps would be profitable.  Today, the apps market is well established, and app developers know there is an opportunity to make a profit, which makes them more likely today to invest in new apps and a new platform than they would have in 2007-09.  *See* Ex. 11 (Toubia Rpt.) ¶¶ 26-36.  The survey therefore "fail[s]" to "approximate actual marketplace conditions." *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, No. C 12-03762 SI, 2014 WL 572290, at *4-5 (N.D. Cal. Feb. 11, 2014).

The systematic failure to ask the correct question is most evident in Dr. Simonson's conclusion.  The question Dr. Simonson was trying to answer was what drove developers to develop apps for Android ***before*** Android was popular.  Ex. 9 (Simonson Rpt.) ¶ 14.  The results, however, led Dr. Simonson to conclude that "popularity" (i.e., "[t]he number of users or devices ***already*** using the platform") was by far the most important factor for developers.  *Id.* ¶¶ 40, 47, 58 (emphasis added).  But, obviously, Android was not popular when it was first released.

Accordingly, the survey and Dr. Simonson's conclusion should be excluded for failure to even address the question he purports to answer.  *See Lanphere Enters., Inc. v. Jiffy Lube Int'l Inc.*, 138 F. App'x 20, 24 (9th Cir. 2005) (affirming exclusion of survey because the responses provided only "marginal support" for expert's opinions); *Negrete*, 2013 WL 6535164, at *2 (excluding survey that does not make a fact "more or less probable than it would [otherwise] be").

**2. The wrong people.**  The survey seeks to report the decision-making of developers who started writing apps for Android in the critical 2007-09 time period.  But, of 152 respondents, *only 18 respondents* wrote apps for Android during that time period.  Ex. 11 (Toubia Rpt.) ¶¶ 24, 39.  This means nearly 90% of respondents *never* developed for Android during the critical time or *never* experienced the relevant market context.  *Id.*

Of those 18, ***only one*** had the decision-making authority to choose to write Android apps during the critical window.  Ex. 11 (Toubia Rpt.) ¶ 24.[2]  Many of the respondents (including the

---

[2] Dr. Simonson *attempted* to limit the survey to respondents who actually made decisions about which platform to choose.  However, his screening was far too broad, as he accepted those "who make[] *or influence*[] the decision whether to develop new applications."  Ex. 9 (Simonson Rpt.) at Ex. E2 at 2 (QA3) (emphasis added).  The "*or influence*" language sweeps in respondents who do not decide on which platforms to develop apps, but instead claim to influence their boss's de-

ORACLE'S MOTION IN LIMINE #5 RE:
GOOGLE'S SURVEY EXPERT, DR. SIMONSON

other 17 relevant Android app developers), in fact, did ***not*** have decision-making authority.  For example, in response to why the person had started writing apps for Android, caseid 100992 responded:  "We had a client project that came up for Android," and caseid 100726 responded:  "As part of a class project I started developing for Android."  Ex. 9 (Simonson Rpt.) Ex. I.   In response to a similar question about their reasons for writing apps for other platforms, caseid 100409 responded:  "I was working for a company that wanted it"; caseid 100090 responded: "People I was working for told me to"; caseid 100529 responded:  "Requirement in Masters Course work"; and caseid 10148 responded:  "Being a computer engineer, fulfilling a requirement."  *Id.*  Those respondents did not choose to write for a particular platform; their jobs chose the platform for them.  ***Only one respondent*** out of 152 was a developer in 2007-09 who had decision-making authority to develop apps for Android and chose to do so.  The survey did not include the right people.

A survey is inadmissible if it fails to examine "the proper universe" of people.  *Kwan Software Eng'g*, 2014 WL 572290, at *4-5; *ThermoLife Int'l, LLC v. Gaspari Nutrition, Inc.*, No. CV-11-01056-PHX-NVW, 2014 WL 99017, at *2 (D. Az. Jan. 10, 2015) (excluding survey that "makes no attempt to show that survey respondents were representative"); *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d at 877 (excluding survey as flawed for, among other things, being directed at an unrepresentative population).

**3. The wrong time.**  The survey suffers from another methodological flaw with respect to timing.  The few respondents who began offering apps in the relevant time frame (2007-09) made this decision 7-9 years ago.  Not only does common sense dictate that people are unlikely to remember the details of their decision-making process from that long ago without any memory aids, well-accepted survey methodology discourages surveys that purport to study things that happened that long ago due to the recall bias that results.  Ex. 11 (Toubia Rpt.) ¶¶ 21-25, 37.  A recent study

---

cisions.  Dr. Simonson must have realized the problem, because after initial pretesting, he added a question about whether respondents made their decisions independently or as part of a team, Ex, 9 (Simonson Rpt. ) ¶ 22, which revealed that only 22% of respondents "independently" made decisions as to which apps to develop, *id.* ¶ 39.  Of the 18 respondents who began developing Android apps between 2007-2009, only *one* reported "independently" making decisions about what app to develop. Ex. 9 (Simonson Rpt.) Ex. I (response of caseid 100461 to Question 11a).

ORACLE'S MOTION IN LIMINE #5 RE: GOOGLE'S SURVEY EXPERT, DR. SIMONSON

of recall found that for personal events, 20% of "critical details," selected at the time of occurrence to be "certainly remembered," are irretrievable after 1 year, and 60% are irretrievable after 5 years. Norman Bradburn, Lance Rips, and Steven Shevell, "Answering Autobiographical Questions: The Impact of Memory and Inference on Surveys," *Science* (1987), Vol. 236, No. 4798, at 158. Tellingly, Dr. Simonson readily admits to not recalling the reasons for important career decisions he has made, such as to which journal he submitted articles on his CV, despite agreeing that those articles are "important to [his] career as an academic." Ex. 26 (Simonson Dep.) 19:25-20:2.

**4. Misinterprets the results.** Though Dr. Simonson interprets the survey results to mean that developers prioritized other "economic considerations," his survey says otherwise. The single largest driver of developer decisions, according to Dr. Simonson, is "User base/Market share/Demand/Popularity/ROI." Ex. 9 (Simonson Rpt.) ¶ 40. "ROI" (return on investment) encompasses *the costs to a developer*, such as the cost to the developer of investing in learning a new programming language. The ROI is higher if a developer can write apps for a platform (like Android) based on a programming language the developer already knows, such as Java. To that developer, Android appears to be a low-investment opportunity because it requires no additional time or expense to learn the Java language. This, however, *directly counters* Dr. Simonson's conclusion (based on the same survey results) that familiarity with a programming language was not a key driver in app developers choosing a platform. If ROI is a significant factor and the ROI for Java developers was higher in writing for Android, familiarity with a programming language was a significant factor. Because the survey does not support Dr. Simonson's opinions, both should be excluded. *Lanphere Enters.*, 138 F. App'x at 24.

**B. The Survey Should Be Rejected Because It Lacks Any Control Group**

Dr. Simonson's survey also fails to include a control question or group. It is a generally accepted principle that a survey that purports to measure causation must include a proper control. Shari Diamond, *Reference Guide on Survey Research*, in *Reference Manual on Scientific Evi-*

1   *dence* at 397-98.[3]  Here, Dr. Simonson attempts to measure causation—i.e., the specific factors or

2   considerations that caused developers to decide to develop apps for a platform.  Ex. 9 (Simonson

3   Rpt.) ¶¶ 9-12; Ex. 26 (Simonson Dep.) 128:17-129:3.  Without a control, Dr. Simonson cannot

4   determine if his survey results are accurate, or reflect confounding factors or a flawed survey de-

5   sign.  Diamond, *Reference Guide* at 397-98; Ex. 11 (Toubia Rpt.) at ¶¶ 44-47.  This error alone is

6   sufficient grounds to exclude Dr. Simonson's survey.  *Reinsdorf*, 922 F. Supp. 2d at 878 (exclud-

7   ing survey where it failed to use adequate controls); *CytoSport, Inc. v. Vital Pharm., Inc.*, 894 F.

8   Supp. 2d 1285, 1291 (E.D. Cal. 2012) (excluding survey that did not control for respondents'

9   preexisting beliefs); *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245,

10  1257-58 (S.D. Cal. 2013) (excluding survey for bias, observing that "the problem was exacerbat-

11  ed because [the expert] did not use a control to test the accuracy of his survey").

12      **C.      The Results Are Skewed Because They Include Pre-Test Respondents**

13          Contrary to generally accepted survey standards, Dr. Simonson included in his final re-

14  sults, the results from a pre-test of his survey.  This means that he already knew what those re-

15  spondents had said and then made the decision whether or not to include them in his final tally.

16  Dr. Simonson's pre-test respondents answered an earlier, draft version of the survey.  Ex. 9 (Si-

17  monson Rpt.) ¶ 22.  Pre-test results are meant to ascertain whether a survey is working properly;

18  the responses are not meant to be included in the final results.  Ex. 11 (Toubia Rpt.) ¶ 62.  If a re-

19  searcher means to include the pre-test responses, he or she must commit to the plan before run-

20  ning the survey.  Ex. 27 (Toubia Dep.) 163:18-164:1.  Here, however, Dr. Simonson's inclusion

21  of pre-test responses allowed him to artificially increase the response numbers and handpick the

22  results.  For example, though Dr. Simonson surveyed only 18 developers who started writing An-

23  droid apps in the critical window, that number would have been even lower (14) without pre-test

24  results.  And, though the total responses (152) is quite low, the number would have been even

---

[3] Dr. Simonson has himself stated that "one of the most basic survey principles is that it includes a proper control."  Simonson *Safe Auto* Rpt. ¶ 45.  He has criticized surveys that fail to include a control because it "makes its results uninterpretable and makes it impossible to test the conclusion that the reported 'findings' merely reflected the survey's flaws."  Report of Dr. Simonson, *Larin Corp. v. Alltrade, Inc.*, No. EDCV 06-1394 (C. D. Cal. Feb 15, 2009), 2008 Misc. Filings LEXIS 4724 ¶ 44.

1   lower (129) without pre-test respondents.  Even more significant, Dr. Simonson decided to in-

2   clude the pre-test results only *after* reviewing the responses of the main survey.  Thus, he knew

3   whether they would bolster his conclusion or not before including them.  Ex. 26 (Simonson Dep.)

4   181:17-22.  This violates basic survey practice, as it *allowed Dr. Simonson to alter **the results*** by

5   increasing his respondents, and thus their answers, by nearly 20%.  Ex. 11 (Toubia Rpt.) ¶ 62; Ex.

6   27 (Toubia Dep.) 165:1-166:2.

7   **II.     DR. SIMONSON SHOULD NOT BE PERMITTED TO TESTIFY IN PHASE I**

8          For the foregoing reasons, the survey should be excluded and Dr. Simonson should not be

9   permitted to testify at trial.  At the very least, Dr. Simonson should not be permitted to testify in

10  Phase I on fair use.  Under this Court's scheduling order, Google was required to serve expert re-

11  ports on "Fair Use – All Factors" on January 8, 2016.  ECF Nos. 1334, 1356.  Dr. Simonson did

12  not submit a report on January 8, 2016.  He instead submitted a report the next month at the dead-

13  line for rebuttal technical reports and Google's damages report.  *Id.*  Having failed to submit a

14  report on fair use, Dr. Simonson should not be permitted to testify in Phase I on fair use.  *See*

15  *Carson Harbor Vill., Ltd. v. Unocal Corp.*, No. CV 96-3281 MMM, 2003 WL 22038700, at *2

16  (C.D. Cal. Aug. 8, 2003) (striking late expert reports).

17                                    **CONCLUSION**

18         For the foregoing reasons, Dr. Simonson's survey should be excluded, and Dr. Simonson

19  should not be permitted to testify at trial.

20

21

22

23

24

25

26

27

28

Dated: March 23, 2016

Respectfully submitted,

Orrick, Herrington & Sutcliffe LLP

By: */s/ Lisa T. Simpson*
Lisa T. Simpson

Counsel for ORACLE AMERICA, INC.