# EXHIBIT 30

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4   ORACLE AMERICA, INC.,
 5        Plaintiff,
 6           vs.             Case No. 3:10-cv-03561-WHA
 7   GOOGLE, INC.,
 8        Defendant.
     _____
 9
10
11
12
13      *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*
14          PURSUANT TO THE PROTECTIVE ORDER
15         VIDEO DEPOSITION OF JAMES MALACKOWSKI
16               San Francisco, California
17              Wednesday, March 17, 2016
18                     Volume I
19
20
21
22   REPORTED BY:
23   REBECCA L. ROMANO, RPR, CSR No. 12546
24   JOB NO. 2265299
25   PAGES 1 - 385
```

Page 162

1  discussed in your initial report, the
2  Android-related TAC Google pays to wireless
3  carriers is captured and accounted for in Android
4  profit and loss statements as apps and digital
5  content of sales."
6       A.   Yes.
7       Q.   Do you see that?
8       A.   Referring to Footnote 61, yes.
9       Q.   Right.  What's your basis for saying that
10  the Android-related TAC is included on the Android
11  P&L under the apps and digital content categories?
12       A.   So in some respects this is the most
13  complex part of the whole accounting analysis, so
14  maybe I can describe in -- in more detail.
15            If you look to the recent Google P&L
16  management reports that included ad revenues, TAC
17  was lumped into a single bucket for ads whether it
18  was search, AdSense or display.
19            In looking at the Google management
20  records, a decision was made internally to remove
21  ad revenue from this management report.  And
22  there's then discussion of how Android is not
23  profitable, because there was a huge chunk of
24  revenue that was left out.
25            And the question is, when they removed

Page 163

1  the revenue from the management reports, did they
2  also remove the associated traffic acquisition
3  cost?
4            In my investigation, I concluded that
5  they did not.  That those traffic acquisition cost
6  remained within the P&L.  And I was able to confirm
7  that in a variety of ways.
8            My first inclination that this was the
9  case is that if you looked to digital content, for
10  example, and you understood that the digital
11  content revenue was 100 percent of the revenue paid
12  by consumers, the digital content cost was greatly
13  in excess of the revenue by tens or hundreds of
14  millions of dollars, which clearly doesn't make any
15  sense unless there would be other cost within that
16  component.
17            And so I then investigated through
18  questions that I asked be directed to Mr. Gold in
19  his deposition as to what was the components of the
20  digital content and app cost of sales.
21            And what Mr. Gold says in his deposition
22  is that those represent the integrated payments to
23  carriers.  And he's asked in further details of
24  what exactly are those payments for.
25            And he explains in his deposition that

Page 164

1  those payments are for credit card processing fees,
2  for digital content cost when they pay for digital
3  content -- but largely speaking, they don't acquire
4  digital content -- and payments to carriers for
5  things that include search.
6            And so, in my opinion, the record is
7  clear that the cost associated with ad search
8  remained within that P&L and those other line
9  items.
10            I then set that analysis aside and
11  reviewed the calculation that Dr. Leonard undertook
12  where he attributed relatively greater TAC cost --
13  incremental TAC cost to search.
14            And what I found and is explained in my
15  report, the data that Dr. Leonard relies upon is
16  effectively equal to what's reported in the 10-Ks
17  as TAC associated with non-Android search.
18            And so it became clear to me that
19  Dr. Leonard was overcounting.  Because, A, he
20  didn't recognize that the search TAC was already
21  within the P&L and not removed when they moved --
22  removed the revenue line item.  And, B, his
23  incremental TAC cost was related, as I determined
24  from the documents, to non-Android elements, so
25  there would be no reason to burden an Android

Page 165

1  profit allocation with that number.
2            I apologize for the long answer.  It's
3  discussed at great length within the report.  But
4  this is perhaps the most accounting complex nuance
5  or dispute between Dr. Leonard and myself.
6       Q.   Mr. Malackowski, isn't what Dr. -- strike
7  that.
8            Mr. Malackowski, isn't what Mr. Gold
9  actually said at his deposition that the apps in
10  digital content cost of sales line items include
11  only payments to mobile phone carriers for direct
12  carrier billing, not for all content acquisition?
13       A.   No, that's not true.  There are several
14  points within Dr. -- Mr. Gold's deposition where
15  he's asked this question.  And I think you have to
16  look at the content of the deposition holistically.
17            But he specifically says more than once
18  that the payments to carriers includes search.
19       Q.   He says the payments to carriers on the
20  apps and digital content sales items reflect
21  search.
22       A.   Exactly.  And believe me, this is --
23       Q.   Where is that in Mr. Gold's deposition?
24  Can you point to --
25       A.   I don't recall if it's in my report

1  period, desktop search to TAC is irrelevant.
2       In fact, there's -- there's evidence in
3  the record that says that the search inactivity on
4  Android is different than what happens on --
5       Q.  Mr. Malackowski, I'm not talking about
6  desktop --
7       A.  -- desktop.
8       Q.  -- TAC.  I don't know why you're talking
9  about desktop TAC.
10       I'm talking about Android TAC as a
11  percentage of Android advertising revenue.
12       A.  Because the Leonard analysis starts with
13  desktop, in my opinion.
14       Q.  In your opinion.  What's that based on?
15       A.  I explained it to you.  But if you look
16  at page 20 of my rebuttal report, Figure 3, you can
17  see the first line items, "Google total AdWords
18  TAC," is the numbers that Dr. Leonard starts with.
19       Let's look at 2014, ▮▮▮▮▮▮▮▮.  But if
20  you look at what the financial statements say for
21  TAC paid to non-Android operators, ▮▮▮▮▮▮▮▮.  If
22  you look at the TAC paid to distribution partners,
23  which is non-Android, it's Apples of the world,
24  3.6 billion.
25       So if this is really -- the numbers

1  that -- that Dr. Leonard is starting with is really
2  total, total, it has to be greater than the
3  non-Android stuff to start with, and it isn't.
4       And at a minimum, it seems to be
5  substantially overlapping with and coexistent with
6  the non-Android stuff.
7       And so his number just cannot be -- his
8  global total number cannot be just -- cannot be
9  relevant.
10       And, again, go to the fundamental
11  premise.  Why is Dr. Leonard having to approximate
12  TAC for search, TAC for Android Search?
13       Google has sufficient detail to pay each
14  and every individual Website owner their -- a check
15  for when search is conducted on their Website.
16       They had these records in extraordinary
17  detail.  And it does not make sense to me that in
18  spite of that their economist has to start with an
19  overall global approximation.
20       Q.  You don't know anything about what kind
21  of records Google has, do you, Mr. Malackowski?
22       A.  Well, I do in the sense that I have
23  reviewed the record of this case.  I do in the
24  sense that I have personally implemented a Google
25  AdSense program on our Website, and they wrote me

1  checks.
2       Somehow, they figured out how much the
3  search activity my Website resulted in traffic
4  acquisition payments to me as Jim Malackowski.
5       Well --
6       Q.  You think --
7       A.  -- if they can do that, they can
8  aggregate it.
9       Q.  You think Google does that in the
10  ordinary course of its business?
11       A.  Pays individual Website owners?
12       Q.  No.  No.  No.  Aggregates all payments to
13  all Websites.
14       A.  I don't know.  Dr. Leonard's analysis
15  suggests that it doesn't.  I'm just telling you, as
16  an accountant CPA for 30 years, given the level of
17  sophistication of Google as a company, I find it
18  unusual.
19       And, more importantly, as a result of
20  them not doing it -- let's just assume they don't.
21  As a result of that, Dr. Leonard has pulled total
22  global figures, which clearly cannot be specific to
23  Android.
24       And it's clearly not fair to make a
25  comparison between total global TAC driven by

1  desktop and Android TAC.  The mix is the same,
2  the -- the use of search is different.
3       There's no reason and Dr. Leonard
4  provides no reason why those should be comparable
5  metrics.
6       Q.  How is the global desktop search
7  different from mobile search?
8       A.  It's different in that the activity of a
9  user, the search proclivity is different.  It's
10  different in the mix between Search, AdSense and
11  display.
12       There's -- Dr. Leonard provides no basis
13  to say they would be equivalent.
14       Q.  How is the search proclivity different
15  between desktop and mobile users?  What's that
16  based on?
17       A.  Within my report there's a cite -- I
18  think it was also one that was cited by the judge
19  in the last case -- that there's a 2 to 1 ratio of
20  activity.
21       Q.  Where is that?
22       A.  In my report?
23       I mean, I can look for it.  I'm happy to
24  look for it.  But there's a section in my report
25  where I cite back to, I believe, the opinions of

Page 378

1  out, I'm sure they would have attempted something.
2  What that is, I don't know. Its measure of
3  success, I don't know. Whether it would have been
4  launched in time to meet the window, I doubt it.
5      Q.  Mr. Malackowski, are your estimates of --
6  estimates of lost profit and disgorgement additive
7  in determining the amount you believe the court
8  should award Oracle, or is it your estimate of
9  disgorgement partially duplicative of your estimate
10 of lost profits?
11     A.  That is a very good fourth question.
12         And they are overlapping. I suspect that
13 there is -- I believe that there is part of the
14 lost profits calculation that is not duplicative of
15 the disgorgement calculation. But if asked and if
16 disgorgement is, in fact, awarded, I would not
17 expect the trier of fact to add on top of it my
18 lost profits calculation.
19         MR. COOPER: Given the fact that if I
20 follow up, you'll accuse of me asking you a fifth
21 question, I'm not asking -- I'm not following up.
22 I'm done.
23         THE DEPONENT: Thank you, sir.
24
25 /////

Page 379

1                    EXAMINATION
2  BY MS. HURST:
3      Q.  Mr. Malackowski, there was a reference
4  earlier -- you made a reference earlier to a
5  but-for analysis in connection with the causal
6  nexus in the Brocade case.
7          Did that involve consideration of
8  counterfactuals?
9      A.  No, it did not. If you look specifically
10 at Judge Grewal's opinion, the but-for analysis is
11 removal of the technology, the code at issue, not
12 replacement with some alternative.
13     Q.  Mr. Malackowski, earlier in talking about
14 apportionment, you referred to various experiences
15 that you've had in patent cases as relevant to your
16 ability to evaluate apportionment.
17         Do you equate your experience with the
18 appropriate methodology; that is, do you think it's
19 somehow the same methodology that is supposed to be
20 used?
21     A.  Clearly --
22         MR. PURCELL: Object to the form.
23         THE DEPONENT: Clearly, it is not the
24 same methodology. I was referring only to my
25 experience base in evaluating the contribution of

1  intellectual property over the last 30 years. But
2  I think, at some great length, I identify within my
3  report, and in our discussion today, that the
4  methodology that's applicable for patents versus
5  trade secrets versus copyrights are all very
6  different.
7      Q.  (By Ms. Hurst) If you -- in particular,
8  with respect to apportionment, do you think that
9  the hypothetical license or constructive license,
10 or hypothetical negotiation, or willing
11 buyer/willing seller approaches are the correct way
12 to handle copyright apportionment?
13         MR. PURCELL: Object to the form.
14         THE DEPONENT: No, clearly, they are not.
15 The only application of anything similar to that
16 would be if you advanced as an actual harm element
17 a loss of a license.
18     Q.  (By Ms. Hurst) And if in -- in this
19 case, in particular, are there elements in the
20 record that you have seen that, in your view, would
21 make those kinds of approaches inappropriate, in
22 connection with profit disgorgement apportionment?
23     A.  Well, I don't think there are at any way
24 methodologically appropriate to profit
25 disgorgement.

1          Putting that aside, I don't think there
2  is a way to properly assess a constructive license
3  in this case when you understand the context of the
4  negotiations between the party were about the
5  elements of security and control as the driving
6  factors. And there is no way, in my opinion, to
7  properly assess that, based upon the facts of this
8  record.
9      Q.  And were there any other facts concerning
10 the negotiations between the parties that influence
11 your conclusion that somehow looking to their
12 conduct is not an appropriate method of
13 apportionment?
14     A.  Sure. Notably, for example, the
15 risk-taking that Google was prepared to undertake
16 and, in fact, did undertake to me indicates that
17 they were clearly not a willing buyer as a fair
18 market valuation approach would consider.
19         A willing buyer does not presume that
20 level of risk. A willing buyer must presume that
21 the -- the asset at issue is valid and -- and
22 necessary for their business.
23         Second, I believe that those negotiations
24 occurred in the context at the very introduction
25 of and prior to the Android platform, but did not