# EXHIBIT 31

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
     ORACLE AMERICA, INC.
 5        Plaintiff,
 6           vs.            Case No. 3:10-cv-03561-WHA
 7   GOOGLE, INC.,
 8        Defendant.
     _____
 9
10
11
12     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
13           PURSUANT TO THE PROTECTIVE ORDER
14
15   VIDEO DEPOSITION OF GREGORY K. LEONARD, Ph.D.
16              San Francisco, California
17              Friday, March 11, 2016
18                     Volume I
19
20
21
22   REPORTED BY:
23   REBECCA L. ROMANO, RPR, CSR No. 12546
24   JOB NO. 2241706
25   PAGES 1 - 405
```

Page 1

```
 1  it used.  But as an economist I knew that it was
 2  as shorthand for what I described, so direct
 3  valuation as to the alleged infringement.
 4       Q.   (By Ms. Hurst)  I would like you not to
 5  use that shorthand, please, in answering this
 6  question because I think it leaves an ambiguity,
 7  all right?  So if you can avoid using that
 8  shorthand in your answer, I would appreciate it.
 9            Yes or no, do all of your six unjust
10  enrichment calculations depend in whole or in part
11  upon some assumption about the availability of a
12  non-infringing alternative?
13            MR. PURCELL:  Object to the form.
14            THE DEPONENT:  So, again, the first --
15  the last two -- I don't know why it matters whether
16  I call them the top-down or not, but anyway, the
17  last two, again, do not explicitly look at the --
18  taking a different approach.  It's not looking at
19  the with or without infringement.  It's doing --
20  you know, it's coming up with a percentage to apply
21  to the Android profits, so those do not.
22            And then the other ones are looking
23  directly at the value of the infringement as being
24  the difference with and without the infringement.
25       Q.   (By Ms. Hurst)  All right.  So let me
```

Page 57

```
 1  take the stand your answer.
 2            Your first four unjust enrichment
 3  calculations involve some consideration of the
 4  availability of a non-infringing alternative, and
 5  your last two do not; is that your answer?
 6            MR. PURCELL:  Object to the form.
 7            THE DEPONENT:  In terms of the way it is
 8  going about it, yes.  But, again, they should all
 9  be measuring, you know, approximately the same
10  thing.  Although, of course, the different actions
11  can have different amounts of cost savings or
12  different amount of, you know, user loss -- or user
13  amount of retention, I guess you would say,
14  associated with them.  So the numbers will differ.
15            But, I mean, the point is to -- it's --
16  they are all trying to get to the same thing, which
17  is the value of the alleged infringement which, at
18  a conceptual level, as I mentioned, has to be
19  evaluated relative to something.
20       Q.   (By Ms. Hurst)  In your fifth and sixth
21  calculations of 32 and 56 million, which you've
22  testified are unjust enrichment calculation related
23  to the apportionment of profits, how -- and those
24  are top-down calculations, using your terminology;
25  is that right?
```

Page 58

```
 1       A.   That's correct.
 2       Q.   All right.  So in those top-down
 3  calculations, you started with a pool of profits
 4  that you were apportioning, true?
 5       A.   Yes.
 6       Q.   All right.  And in making the calculation
 7  of that pool of profits that you were apportioning
 8  in your top-down methods, did you use some
 9  assumption about the availability of non-infringing
10  alternatives?
11            MR. PURCELL:  Object to the form.
12            THE DEPONENT:  I -- let's see.  No, I
13  don't believe so.  I believe I looked at a pool of
14  profits.  And then the whole point about the
15  apportionment -- I am sorry -- coming up with the
16  apportionment percentage is, you're starting with
17  the pool, and then you're figuring out what
18  percentage of that should be attributed to the
19  alleged infringement, in contrast to the bottom-up
20  approach, which is taking -- you know, which is
21  trying to directly measure and thereby apportion
22  the profits associated with the alleged
23  infringement.
24       Q.   (By Ms. Hurst)  Can you show me where in
25  your report, including the schedules, you set forth
```

Page 59

```
 1  the pool -- the calculation of the pool of profits
 2  that you use in your top-down apportionment
 3  approach.
 4       A.   Okay, let's see.  So, I mean, for
 5  instance, in Exhibit 3E, which does the top-down
 6  apportionment, you'll see Android-related profit
 7  of                                              
 8  you go to Exhibit 1a.1, you will see the
 9             dollar number right there, at the
10  bottom-right corner.
11       Q.   All right.  So Exhibit 3E, that
12  represents your two top-down apportionment methods?
13       A.   I am sorry, three -- which one was
14  that --
15       Q.   3E, that's the one you just referred
16  to --
17       A.   Right.
18       Q.   -- correct?
19            And that reflects both of your top-down
20  apportionment methods, right?
21       A.   That's right.
22       Q.   And both of those top-down apportionment
23  calculations in Exhibit 3E depend on the profit
24  calculation in Exhibit 1a.1.
25       A.   That's right.  As a starting place, yes.
```

Page 60

1    A.    I think so. I probably
2  reasonably close to linear. But, you know, as you
3  get somewhat bigger changes then, because of the
4  nonlinearity of the functions, it will -- it won't
5  continue to be linear. But that's the usual thing
6  about, you know, first order of approximations.
7    Q.    Okay. Well, tell me what you did to
8  assume larger app decreases.
9    A.    You mean what did I --
10   Q.    Did you take that into account in your
11 analysis if there were larger app decreases?
12   A.    Oh, did I redo the calculations under
13 those alternative formulations?
14   Q.    Yes.
15   A.    I don't think so. I tried some that were
16 actually smaller where, for instance, I tried to
17 say, okay, the -- identify apps that, you know, had
18 a C# -- you know, like a C#, if there's a
19 C# flashlight, I would say, okay, well, that means
20 the flashlight app on Google would be -- you know,
21 that somebody would have written a flashlight app
22 in C++ or Google, and then leave that one out.
23       But I don't think I used a smaller
24 subset. It just didn't -- didn't seem reasonable
25 given what I know.

Page 372

1    A.    Sorry, a larger, yes.
2    Q.    Larger subset.
3    A.    Keeping a smaller set or deleting a
4  larger set.
5    Q.    So you didn't do this analysis with the
6  larger set.
7    A.    No, I don't think so.
8    Q.    Okay. Now, the Kim model produces
9  certain -- strike that.
10       Please turn to paragraph 188.
11   A.    188? Okay.
12   Q.    And you see in footnote 280 there,
13 estimates a sigma of .757?
14   A.    Yes.
15   Q.    We can't find that in her dissertation.
16   A.    Yeah, that was from a personal
17 communication with Dr. Kim.
18   Q.    Okay.
19   A.    Yeah, because it wasn't reported in the
20 table, so I sent her an email and said -- or my --
21 my colleague did.
22   Q.    So you couldn't find it either.
23   A.    Yeah, yeah. So she reported it to us.
24   Q.    Did she provide -- strike that.

Page 373

1       Did she provide you with a regression
2  that produced that estimate?
3    A.    You mean the -- the other results of
4  that? I -- I think all the other results are
5  reported in her paper. I mean, in terms of the
6  coefficient estimates, this was the only parameter
7  that wasn't reported there.
8    Q.    Was this -- I'm sorry.
9    A.    No, go ahead.
10   Q.    Was this parameter the result of a
11 calculation, or did she obtain it from somewhere
12 else?
13   A.    It's a output of the statistical
14 procedure, along with the other parameters that she
15 reported.
16   Q.    And she didn't provide that statistical
17 procedure to you?
18   A.    No, no.
19   Q.    So to be clear, the other parameters in
20 her paper are from the same analysis that this
21 parameter is from?
22   A.    Yes, yeah. It's just the other
23 parameters are coefficients on particular
24 variables. So I think when she made the table
25 she -- you know, it's a natural thing to set a

Page 374

1  price and, you know, other handset characteristics
2  and give the coefficients, and she just didn't
3  report this so-called nesting parameter in the
4  nested logit model.
5    Q.    Okay. Turn to paragraph 189.
6    A.    Okay.
7    Q.    And in footnote 282, Kim estimates that
8  the parameter in question is .01.
9    A.    Right.
10   Q.    We assume this is a coefficient that's
11 identified in Table 2.7, in either column small v
12 or small vi of Kim's nesting logic; is that
13 correct?
14   A.    That's, I think, correct, yes.
15   Q.    Okay. Do you have a sense as to how the
16 Bada .01 or Sigma .757 might change over time in a
17 different market -- in different market conditions?
18   A.    Well, you know, these are supposed to be,
19 you know, consumer preference parameters so, you
20 know, the typical assumption is de-preferences like
21 that are not going to be changing over time, you
22 know, but I don't -- you know, so I don't really
23 have a sense for whether there'd be a reason for
24 that to change over time.
25       I would think that, as time went on, you

Page 375