ORRICK, HERRINGTON & SUTCLIFFE LLP
KAREN G. JOHNSON-MCKEWAN (SBN 121570)
kjohnson-mckewan@orrick.com
ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
GABRIEL M. RAMSEY (SBN 209218)
gramsey@orrick.com
405 Howard Street, San Francisco, CA 94105
Tel: 1.415.773.5700 / Fax: 1.415.773.5759
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
51 West 52nd Street, New York, NY 10019
Tel: 1.212.506.5000 / Fax: 1.212.506.5151

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (*pro hac vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY 10504
Tel: 1.914.749.8200 / Fax: 1.914.749.8300
STEVEN C. HOLTZMAN (SBN 144177)
sholtzman@bsfllp.com
1999 Harrison St., Ste. 900, Oakland, CA 94612
Tel: 1.510.874.1000 / Fax: 1.510.874.1460

ORACLE CORPORATION
DORIAN DALEY (SBN 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (SBN 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (SBN 211600)
matthew.sarboraria@oracle.com
RUCHIKA AGRAWAL (SBN 246058)
ruchika.agrawal@oracle.com
500 Oracle Parkway,
Redwood City, CA 94065
Tel: 650.506.5200 / Fax: 650.506.7117

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC. <br><br>            Plaintiff, <br>       v. <br> GOOGLE INC. <br><br>            Defendant. | Case No. CV 10-03561 WHA <br> **ORACLE'S RESPONSE TO ECF NO. 1544** <br> Dept.: Courtroom 8, 19th Floor <br> Judge: Honorable William H. Alsup |

Plaintiff Oracle America, Inc. submits this response to the Court's March 22, 2016 Request for Response, ECF No. 1544.  Contrary to Defendant Google Inc.'s contention that "Oracle simply misrepresents what Google's experts have said," ECF No. 1543 at 2, there are meaningful inconsistencies between certain of the positions taken by Google on fair use and damages.  In particular, in its response to Oracle's lost profits case, Google takes positions that are seemingly contrary to its arguments in its fair use case.

The legal context of the relevant fair use factors is helpful to understand these inconsistencies.  As Oracle explained in its recent submission on jury instructions, the first fair use factor (purpose and character of the use) contains three sub-issues: (1) was the defendant's use of the plaintiff's work commercial, (2) was the defendant's use of plaintiff's work transformative, and (3) was the defendant's copying in good or bad faith. ECF No. 1527 at 2.  A use cannot be transformative if it supplants the market for the original work.  *See id.*; *Campbell v. Acuff-Rose, Inc.*, 510 U.S. 569, 579 (1994).

The fourth factor considers the harm to the actual and potential market for and value of the copyrighted work and its derivatives.  ECF No. 1527 at 5-6.  *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1376 (Fed. Cir. 2014) ("The fourth and final factor focuses on 'the effect of the use upon the potential market for or value of the copyrighted work.'" (quoting *Harper & Row,* 471 U.S. 539, 566 (1985); *id.* ("This factor reflects the idea that fair use 'is limited to copying by others which does not materially impair the marketability of the work which is copied.'" (quoting *Harper & Row*, 471 U.S. at 566-67)).  The Supreme Court has expressly recognized that the fourth factor "must take account not only of harm to the original but also of harm to the market for derivative works."  *Harper & Row*, 471 U.S. at 568; *accord Campbell*, 510 U.S. at 593 ("Evidence of substantial harm to it would weigh against a finding of fair use, because the licensing of derivatives is an important economic incentive to the creation of originals."  (footnote omitted)).  "The Supreme Court has said that this factor is 'undoubtedly the single most important element of fair use.'"  *Oracle Am., Inc.*, 750 F.3d at 1376 (quoting *Harper & Row*, 471 U.S. at 566)).

1   Whether a use is transformative under factor one, and whether there is harm under factor
2   four, are thus two sides of the same coin.  A work is not transformative if it "merely supersede[s]
3   the objects' of the original expression." *Campbell*, 510 U.S. at 579 (brackets and quotation marks
4   omitted).  Similarly, copying is not fair where it "supersedes the objects of the original and serves
5   as a market replacement for it," because, in that instance, it is "likely that cognizable market harm
6   to the original will occur."  *Id.* at 591 (quotation marks and citation omitted).

7   Java Standard Edition ("Java SE") is the work that was copied in this case, and Java Micro
8   Edition ("Java ME") is one of the derivatives of that work.  Java ME is a derivative of Java SE
9   because it is based on and contains copyrighted material from Java SE.  *See* Declaration of Robert
10  L. Uriarte ("Uriarte Decl.") Ex. 1 (Astrachan Dep.) 101:24-25 ("most Java ME is a subset of
11  something in Java SE"); Uriarte Decl. Ex. 2 (7/8/2011 Bloch Dep.) 45:1-12 ("Java ME derived
12  from the platform formerly known as Java, currently known as Java SE, and previously known as
13  -- I don't know -- J2SE."); *Oracle Am., Inc.*, 750 F.3d at 1350 ("Sun was licensing a *derivative*
14  *version* of the Java platform for use on mobile devices: the Java Micro Edition … for use on
15  feature phones and smartphones" (emphasis added)).  Thus, in assessing fair use, the jury must
16  consider whether Android acted as a substitute for Java ME in phones and other devices.
17  *Campbell,* 510 U.S. at 593 (the relevant harm for a derivative work is "the harm of market
18  substitution") (considering whether rap parody might substitute for potential rap derivatives).  If
19  Android harmed the market for Java ME by substituting for it, that is a fact weighing very
20  strongly against fair use.

21  With this background, there are at least two seeming inconsistencies between Google's
22  responsive case on damages and its case on fair use.  They both occur in Dr. Leonard's critique of
23  Mr. Malackowski's lost profits analysis, so we set forth that analysis.

24  In estimating lost profits, Mr. Malackowski takes a late 2007/early 2008 Sun forecast from
25  the period prior to Android's presence in the market.  That forecast sets forth various future
26  scenarios for Sun's Java ME mobile phone licensing revenues.  Mr. Malackowski chooses what
27  he believes to be the fairest scenario in the forecast in light of subsequent events, compares that to
28  the actual results subsequently achieved by Sun and Oracle, and in general opines that the

difference between expected and actual results is explained by the presence of the infringing product, Android. Lost profits are calculated at $475M.

***Inconsistency One: Substitution*** One of Dr. Leonard's attacks on this approach is the assertion that the Sun forecast was unknowingly too high because of the unexpected success of iPhone. Dr. Leonard argues that Sun did not take into account the eventual success of iPhone in making its late 2007/early 2008 forecast, and that the lost profits based on this forecast would have to be adjusted downward because the failure to meet the forecast was not caused by the infringing product, Android. The premise of Dr. Leonard's argument is that iPhone, a smartphone, in fact took sales away from Java ME-licensed phones. Leonard Dep. at 389:15-17 ("So since iPhones are displacing … feature phones, that suggests that the forecasts of feature phones … were almost certainly too optimistic"). In other words, Dr. Leonard affirmatively asserts that smartphones took away sales from Java ME-licensed phones during this period of time.

Yet this would be a concession in Google's fair use case that is inconsistent with Google's position. Google's position in its case-in-chief on fair use is that Java ME was intended for feature phones, and that Android, as a smart phone platform, did not compete at all with Java ME-based phones. Uriarte Decl. Ex. 3 (Astrachan Rpt.) ¶¶ 104-106, 134-35. Yet if iPhone, a smartphone, substituted for Java ME-based mobile phones during the late 2000s, then so did Android phones. Android phones were cheaper than iPhones, and in some instances cheaper than high-end feature phones. If one was a substitute for Java ME-based mobile phones, then so was the other. Google should not be permitted to deny in Phase I during its fair use case the very same argument it intends to make in Phase II in order to reduce lost profits damages. *See Apple, Inc. v. Samsung Elecs. Co.*, No.: 12-CV-00630-LHK, 2014 U.S. Dist. LEXIS 165975, at *111 (N.D. Cal. Nov. 25, 2014) (a party may not "prevail[] in one phase of a case on an argument and then rely[] on a contradictory argument to prevail in another phase" (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000))).

***Inconsistency Two: Mobile Window of Opportunity*** A second—and related— inconsistency relates to the timing and nature of this shift to smartphones. Dr. Leonard discounts

1  the Sun forecast in Mr. Malackowski's lost profits analysis and Google's rebuttal case on fair use
2  because he asserts that Sun/Oracle would have lost the Java ME license revenues anyway, due to
3  a shift in the market towards smartphones at that exact moment in time right after the forecast.
4  Uriarte Decl. Ex. 4 (Leonard 1st Rpt.) ¶ 244-46.

5       As already noted, Mr. Malackowski's lost profits calculation depends upon Sun (and later
6  Oracle's) failure to achieve results on par with a pre-Android forecast of Java ME licensing
7  revenues. As noted, Dr. Leonard asserts that the Sun forecast is overstated because it failed to
8  anticipate that "iPhone would have been bigger" (Uriarte Decl. Ex. 5 (Leonard Dep.) at 385:7-9);
9  he also asserts *that other smartphones would have captured Java ME's share of the market*
10 *anyway*. "[E]ven if Android wasn't there, you know, again *the world was moving to*
11 *smartphones*. Java ME was really a – was used on feature phones. It just wouldn't be able to
12 compete with the iPhone or whatever other smartphones were out there, and as a consequence,
13 again, it was going to decline." (*id*. at 387:13-18) (emphasis added).

14      In other words, Dr. Leonard argues that in a proposed "but-for" world, there would have
15 been competition expected from other smart phone developers during the very same period of
16 time that iPhone and Android launched. Uriarte Decl. Ex. 4 at ¶ 244 ("[T]he shift away from
17 feature phones toward smartphones accounted for at least part of the decrease in Java ME
18 licensing revenue, and Android smartphones represented only a part of this shift because *Android*
19 *had only a share of the worldwide smartphone market.*"); *see id.* ¶ 245 ("Sun's [forecast] . . .
20 understated the effect that *the shift away from feature phones toward smartphones*, and in
21 particular the effect of the iPhone, would have had on Sun's Java ME licensing revenues.");
22 Uriarte Decl. Ex. 5 at 389:15-17 ("So since iPhones are displacing—you know, *along with other*
23 *smartphones*, are displacing feature phones, that suggests that the forecasts of feature phones,
24 basically, sales that – or licensing that Sun had made were almost certainly too optimistic."
25 (emphasis added)).

26      This is exactly one of Oracle's arguments in its fair use case: there was a window in time
27 where the market was changing and Google had a limited opportunity to capture a place in that
28 market. Google itself recognized that it faced a critical window by imposing milestone

requirements in its acquisition agreement with Android. Android's founders had just three years to get the platform completely finished and then get to market with a real product and a real carrier deal in order to earn their payouts. One of Oracle's arguments regarding the *purpose* of Google's copying of the Java API packages (first factor), is that Google could not afford to be locked out of the smartphone market and that it faced a critical window of opportunity because of the evolution of the mobile phone marketplace and the nature of platform economics. The facts and analysis underlying this argument is generally described in the report of Professor Adam Jaffe offered by Oracle. Uriarte Decl. Ex. 6 (Jaffe Rpt.) at ¶¶ 132-173.

In responding to this argument, Google argues in part that there was not really any discernible window. Uriarte Decl. Ex. 7 (Leonard Rebuttal Rpt.) at ¶ 31 ("Dr. Jaffe, like Mr. Malackowski, claims that Google had a limited window of opportunity to launch Android. However, he bases this claim entirely on anecdotal statements by Google employees, while conducting no analysis of the issue and failing to identify the beginning, ending, or duration of the claimed window."). So, on the one hand, Dr. Leonard agrees that there was a period of unexpected foment and rapid transition in the mobile phone market with the potential for other smartphone entrants, and, on the other hand, he argues that there was not really any reason for Google to be concerned about a limited window of opportunity. Google's rebuttal fair use argument that it was not racing to meet a *limited window of opportunity* for Android is directly inconsistent with Dr. Leonard's lost profits world in which fierce competition was expected from other smart phone developers during the very same period of time that Android launched.

The counterfactual world must be consistent with the real world. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (excluding expert opinion where indisputable record facts contradict or render the opinion unreasonable). Dr. Leonard's lost profits counterfactual can only work precisely *because* there were other potential smartphone entrants – companies such as Microsoft and Nokia, for example. But this is exactly what Oracle is saying regarding fair use: that Google was locked in a race with Apple and others were nipping at its heels. Google *had to take the Java API packages* for Android in order to make the crucial success window. We see the results below. At the beginning of the period Java ME-licensed

- 5 -

ORACLE'S RESPONSE RE: ECF NO. 1544
CV 10-03561 WHA

1  phones had nearly 80% of the market share and Android had 0%. At the end of the period Java
2  ME-licensed phones had nearly 0% of the market share and Android had 80%. This is not mere
3  coincidence.



16  Thus, when Dr. Leonard argues for the purpose of diminishing Oracle's lost profits claim
17  that there were *other* smartphone entrants in the same time period who would have taken share
18  away from Java ME based phones, and that Sun's forecast was wrong because it failed to
19  anticipate the rapid changes in the market, he supports Oracle's case that Google's purpose for
20  taking the Java API packages was the "pressure," Uriarte Decl. Ex. 8 (Rubin Dep.) at 179:14, and
21  "desperate" feeling, Uriarte Decl. Ex. 9 (Hoelzle Depo.) at 254:20-255:5 & Uriarte Dep. Ex. 10
22  (Ex. 5008 to Hoelzle Dep.) (July 23, 2006 email exchange between Hoelzle and Rubin), to get to
23  market in order to beat the competition and avoid being locked out of the mobile phone market,
24  Uriarte Decl. Ex. 9 at 294:25-295:23 (Google founders Page and Brin demanded strategy to avoid
25  being "blocked" on mobile and believed that if Google was "blocked" it was "going to be toast").
26  It is these inconsistencies to which Oracle was referring in its Response to the Court's
27  Order re Expected Trial Length (ECF No. 1539) that countenance in favor of one unified trial, a
28  format both parties jointly advised the Court on July 23, 2015 was the appropriate procedure for

1 | the trial Oracle therefore respectfully renews its request that the Court hold the trial in a single,
2 | unbifurcated proceeding.  ECF No. 1273 at 11 ("The parties agree that bifurcation of the trial is
3 | inappropriate at this stage of the case.").  Oracle therefore respectfully renews its request that the
4 | Court hold the trial in a single, unbifurcated trial.

Dated: March 25, 2016

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: */s/ Annette L. Hurst*
ANNETTE L. HURST

Attorneys for Plaintiff
ORACLE AMERICA, INC.

- 7 -

Oracle's Response re: ECF no. 1544
CV 10-03561 WHA