ORRICK, HERRINGTON & SUTCLIFFE LLP
KAREN G. JOHNSON-MCKEWAN (SBN 121570)
kjohnson-mckewan@orrick.com
ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
GABRIEL M. RAMSEY (SBN 209218)
gramsey@orrick.com
405 Howard Street, San Francisco, CA  94105
Tel: 1.415.773.5700 / Fax: 1.415.773.5759
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
51 West 52nd Street, New York, NY  10019
Tel: 1.212.506.5000 / Fax: 1.212.506.5151

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (*pro hac vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY  10504
Tel: 1.914.749.8200 / Fax: 1.914.749.8300
STEVEN C. HOLTZMAN (SBN 144177)
sholtzman@bsfllp.com
1999 Harrison St., Ste. 900, Oakland, CA  94612
Tel: 1.510.874.1000 / Fax: 1.510.874.1460

ORACLE CORPORATION
DORIAN DALEY (SBN 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (SBN 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (SBN 211600)
matthew.sarboraria@oracle.com
RUCHIKA AGRAWAL (SBN 246058)
ruchika.agrawal@oracle.com
500 Oracle Parkway,
Redwood City, CA 94065
Tel: 650.506.5200 / Fax: 650.506.7117

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC., | Case No. CV 10-03561 WHA |
| Plaintiff, | **ORACLE'S OPPOSITION TO GOOGLE'S MOTION IN LIMINE #6 REGARDING DAMAGES REPORT OF JAMES MALACKOWSKI** |
| v. | |
| GOOGLE INC., | Date:  April 27, 2016 at 8:00 am |
| Defendant. | Dept.: Courtroom 8, 19th Floor |
| | Judge: Honorable William H. Alsup |

1

**TABLE OF CONTENTS**

2

Page

3

TABLE OF AUTHORITIES ....................................................................... ii

4

INTRODUCTION.................................................................................... 1

5

FACTUAL AND PROCEDURAL BACKGROUND.................................. 1

6

ARGUMENT ......................................................................................... 7

7
8

I.     THE EVIDENCE SOUNDLY ESTABLISHES A CAUSAL NEXUS BETWEEN THE
       INFRINGEMENT AND GOOGLE'S ANDROID PROFITS.................................. 7

9

       A.     A "Reasonable Association" Between The Infringement And The Revenue Is
              Sufficient To Establish A Causal Nexus In The Ninth Circuit. .................... 8

10
11

       B.     The Evidence Is More Than Sufficient To Establish That The Android Revenue
              Streams Are Reasonably Associated With The Infringement...................... 11

12

       C.     Google's Out-Of-Circuit *Daubert* Orders Are Inapposite And Unpersuasive............. 14

13

II.    ORACLE'S APPROACH TO APPORTIONMENT IS PROPER ....................................... 15

14

       A.     Mr. Malackowski *Does* Apportion, Despite No Obligation To Do So. ...................... 15

15

       B.     The Commingling Approach Is Appropriately Used In This Case............................. 18

16

III.   MR. MALACKOWSKI'S LOST PROFITS OPINION IS CONSISTENT WITH LAW
       AND GOOD PRACTICE. ................................................................................... 21

17
18

       A.     There Is Sufficient Causal Link Between Android And Lost Java ME Licensing
              Profits. ............................................................................................ 21

19

       B.     Mr. Malackowski's Lost Profits Methodology Is Reliable.......................................... 22

20

CONCLUSION ..................................................................................... 25

21

22

23

24

25

26

27

28

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*A&M Records, Inc. v. Napster, Inc.*,
    114 F. Supp. 2d 896 (N.D. Cal. 2000) ..................................................................................13

*Abend v. MCA, Inc.*,
    863 F. 2d 1465 (9th Cir. 1988)...........................................................................................19

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
    923 F. Supp. 2d 1245 (S.D. Cal. 2013)..............................................................................23

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
    No. C 10-3428 PSG, 2013 WL 831528 (N.D. Cal. Jan. 10, 2013) ......................5, 9, 10, 11, 12

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP*,
    329 F.3d 923 (2003).............................................................................................................7

*Cohen v. United States*,
    100 Fed. Cl. 461 (2011) ...............................................................................................21, 22

*Complex Sys., Inc. v. ABN Ambro Bank N.V.*,
    No. 08 CIV. 7497 KBF, 2013 WL 5970065 (S.D.N.Y. Nov. 8, 2013) ...................................14

*Cream Records, Inc. v. Jos. Schlitz Brewing Co.*,
    754 F.2d 826 (9th Cir. 1985)........................................................................................19, 22

*DaimlerChrysler Servs. v. Summit Nat'l, Inc.*,
    No. 02-71871, 2006 WL 208787 (E.D. Mich. Jan. 26, 2006)..............................................14

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.* ("*Frank I*"),
    772 F.2d 505 (9th Cir. 1985)....................................................................5, 7, 8, 13, 15, 22, 23

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.* ("*Frank II*"),
    886 F.2d 1545 (9th Cir. 1989)...............................................................................8, 9, 13, 18

*Harper & Row Publ'rs, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) ........................................................................................................18, 19

*Humetrix, Inc., v. Gemplus S.C.A.*,
    268 F.3d 910 (9th Cir. 2001)................................................................................................23

*Int'l Business Machs. Corp. v. BGC Partners, Inc.*,
    No. 10 CIV. 128 PAC, 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013) ...................................14

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001)...........................................................................................23

1
2

*John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*,
     322 F.3d 26 (1st Cir. 2003) ..........................................................................................19

*McRoberts Software, Inc. v. Media 100, Inc.*,
     329 F.3d 557 (7th Cir. 2003)........................................................................................23

*Oracle Am., Inc. v. Google Inc.*,
     750 F.3d 1339 (Fed. Cir. 2014).....................................................................................21

*Polar Bear Prods., Inc. v. Timex Corp.*,
     384 F.3d 700 (9th Cir. 2004)........................................................7, 8, 9, 10, 11, 13, 17, 22, 24

*Runge v. Lee*,
     441 F.2d 579 (9th Cir. 1971).........................................................................................21

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
     309 U.S. 390 (1940) ................................................................................................18, 19

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
     395 F. 3d 416, 417-18 (7th Cir. 2005) ..........................................................................24, 25

**Federal Statutes**

17 U.S.C. § 106(2) ................................................................................................................22

17 U.S.C. § 504(b) ...............................................................................7, 8, 10, 14, 15, 17, 21, 23

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRODUCTION[1]

Google's histrionic *Daubert* motion directed to the Malackowski reports misstates the law and ignores most of the key facts of this case. By late 2004, Google recognized that it could not miss the window of opportunity to move its search-engine based advertising platform to mobile devices. Google felt pressured by competitors and understood that if its search-based ad platform was "blocked" from mobile devices, Google would be "toast." So Google infringed. It did what it knew it had to do, preparing to "make enemies along the way" because "all the alternatives suck[ed]." Google wrote only about 26% of the code in Android, and it borrowed the rest—in Sun/Oracle's case, without permission. And Google succeeded wildly, just as it had hoped to do.

Google now argues that its executives and employees did not understand their own business and were just wrong about their commercial and technical needs. To state the proposition is to refute it. Google set out to make money using an infringing product, and it made tons of it. Now it must compensate Oracle for exploiting the Java API packages without payment. That is hardly unjust, since Google gave everyone else a cut of the action.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Google makes money through search-engine based advertising. TX 3211 (2004 Google 10-K) at 1. By late 2004, Google believed the market would move to mobile devices as a means of accessing the internet, and understood that "[i]f we are unable to attract and retain a substantial number of alternative device users to our web search services or if we are slow to develop products and technologies that are more compatible with non-PC communications devices, we will fail to capture a significant share of an increasingly important portion of the market for online services." *Id.* at 58; Ex. 15, GOOGLE-29-00003710 (Google believes it has "8-12 months worldwide to become a dominant player"). Google perceived this not only as an opportunity but

---

[1] "Malack. Op. Rpt." refers to Mr. Malackowski's Corrected Opening Report, dated February 3, 2016 report, ECF No. 1578-1-4. "Malack. 2nd Rpt." refers to Mr. Malackowski's Corrected Responsive Report, dated March 14, 2016, ECF No. 1560-13.

[2] This is a short summary of the key facts that respond to Google's MIL. In response to the Court's Request Re Opposition to Motion in Limine (ECF No. 1593), Oracle also supplies a chart attached hereto of documents and existing testimony upon which Oracle may seek to rely in proving causation for disgorgement of profits. Oracle will also separately lodge a binder of these documents with the Court. Of course, while generally comprehensive, this cannot yet capture any new testimony that Oracle intends to elicit at trial.

as an existential threat.  TX 3211 at 58.  It was surrounded on all sides by Microsoft, Yahoo!, Facebook, Nokia, and others, any one of whom might choose a non-Google search provider on a mobile platform.[3]  Google co-founders Larry Page and Sergey Brin decided that Google needed its own mobile platform to avoid being "blocked" and losing out on search advertising as the market transitioned from desktop to mobile.  Google believed it would be "toast" under such circumstances.  Ex. 17 (Hoelzle Depo.) 294:20-295:12; *see* TX 3211 (2004 10-K) at 58.

So, Google purchased Android.  TX 1004.  Google pushed the Android team hard to rapidly develop a mobile platform.  The Android "skunkworks" (Ex. 17 (Hoelzle Depo.) 56:14-57:25) had milestone requirements.  TX 1004.  To obtain the full sixty-million dollar purchase price for Android, Andy Rubin and the others had to meet the crucial first milestone.  TX 1004 ¶1.5(a) & Ex. C.  Rubin and his team had three years to build the platform and launch it into the market with an actual carrier deal and real phones, not just prototypes.  *Id.* Ex. C. ("Milestone 1"). In order to meet the three-year window, the team concluded that it must have the Java API packages: (1) carriers required Java, TX 1 at 8; (2) no good alternatives existed, TX 215 (license negotiations between Sun and Google break down, causing Android engineer Chris De Salvo to wonder "where does that leave us regarding Java class libraries?  Ours are half-ass at best.  We need another half of an ass."); (3) the Java API packages would "dramatically accelerate[]" development and time to market, TX 22; and (4) the Java APIs would give Android access to a built-in developer base of more than six million developers, Ex. 40 (GOOGLE-01-00025576 at 584); ECF No. 1560-10 (Kemerer Op. Rpt.) ¶ 74.

At this point in Silicon Valley's history, everybody understood that Internet-based businesses were subject to "first mover advantage."  *See* Ex. 15, GOOGLE-29-00003710.  Being first to market was a critical imperative:  Network effects meant that the first company to amass the largest user base was often the most likely to succeed.  Ex. 16, GOOGLE-26-00008340 at 363 ("Plan (Android):  Beat Microsoft and Symbian to volume by offering an Open Source handset

---

[3] Ex. 20, GOOGLE-26-00007277 at 10 (Microsoft and Symbian); Ex. 21, GOOGLE-30-00101209 at 214 (Microsoft and Yahoo!); Ex. 22, GOOGLE-26-00006162 – 6169, at 6163 (Facebook); Ex. 23, GOOGLE-26-00006275 – 299 at 283-289 (Facebook); Ex. 24, GOOG-00360213 – 259 at 217 (Nokia).

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

1  solution."); *see* ECF No. 1560-7-8 (Jaffe Corr. Op. Rpt.) ¶¶ 34-52.  The Android team was

2  "desperate" and "under incredible schedule pressure."  Ex. 17 (Hoelzle Depo.) 254:22-255:5; Ex.

3  18 (Rubin Depo.) 178:2-180:12.  They needed the Java API packages because their own work

4  was only "half an ass."  TX 215.  But they couldn't get a license on acceptable terms, and Sun's

5  open-source license was unacceptable.  *See, e.g.*, GOOGLE-02-00076017 (PX 112) ("[W]ill

6  Sun's recent announcement about open sourcing java happen soon enough to benefit Android?"

7  Dan Bornstein replies: "It's not about timing so much as details.  The licensing that Sun is using

8  for both SE and ME are incompatible with Android's needs."); TX154 ("GPL license (sun's

9  license) doesn;t [sic] work for us."); Ex. 44 (Swetland Depo). 139:3-8 ("The decision was made

10  specifically not to [use Sun's open source libraries] because the term --  the terms of the licensing

11  were inappropriate for the platform."); *see also* ECF No. 1551-3 (Oracle MIL #1) at 3-5.

12      Then Apple launched the iPhone, and the situation got even worse.  The iPhone was light

13  years ahead of the in-development Android, "Sooner."  Ex. 26, GOOGLE-81-00007497 at 509.

14  Rubin had to go back to the drawing board.  Fred Vogelstein, The Day Google had to 'Start Over'

15  on Android, The Atlantic (Dec. 18, 2013),

16  http://www.theatlantic.com/technology/archive/2013/12/ the-day-google-had-to-start-over-on-

17  android/282479/ (Rubin:  "Holy crap, I guess we're not going to ship that [Sooner] phone.").

18  Google could not risk losing the credibility, security, and built-in developer base of Java.  TX 23

19  (Google decides it is "building a java based system: that decision is final"); Ex. 27, GOOGLE-01-

20  00019527 ("Android is building a Java OS.  We are making Java central to our solution …."); Ex.

21  28, GOOGLE-26-00006035 ("Through deep partnerships with carriers, ODMs, and developers

22  we hope to enable an open ecosystem for the mobile world and create a standard, open software

23  platform for Java-based mobile software.").

24      The declaring code and structure, sequence, and organization of the 37 Java API packages

25  were thus crucial to Android's success—from both a technical perspective, ECF No. 1560-10

26  (Kemerer Op. Rpt.) ¶¶ 141-57, and a business perspective, TX 1 at 8 (Google Product Strategy

27  presentation recommends using Java because "[c]arriers require it" and because of Java's

28  "[e]xisting pool of developers and applications").  Without the Java APIs, Android simply does

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

1   not work.  Tr. 2212:14-18 (Google technical expert, Prof. Astrachan) ("Q: What would happen if

2   you ripped those lines out of Android?  A:  Well, for the purposes of the Android core libraries,

3   those are part of it, so they need to be there for Android to work as it's been designed.")).  The

4   Java APIs are thirty times more central in Android than the other APIs.  ECF No. 1560-10

5   (Kemerer Op. Rpt.) ¶ 155.  All of the top Android apps depend upon some significant number of

6   the Java APIs, including all Google apps.  *Id.* ¶¶ 126-140.

7        Moreover, Google touted the presence of Java—and the Java APIs—in Android to the

8   carriers and OEMs in order to put together the Open Handset Alliance, giving more than 30

9   presentations describing Java as a key element of Android.  *See* ECF No. 1560-9 (Jaffe 2d Rpt.)

10  Ex. C (collecting presentations).  Google used Java to establish its credibility in the market to

11  gain adoption and to launch Android.  Google was out selling Java as part of Android at the very

12  same time that SavaJe was trying to get traction for its Java SE-based mobile phone.  Ex. 30,

13  GOOGLE-24-00198827 (Android pitch to SavaJe investor, claiming partnership with Sun).  The

14  direct effect of Android on SavaJe was acknowledged in internal Google correspondence:

15  "SavaJe probably would have got more funding if not for what we are doing."  Ex. 31, GOOGLE-

16  24-00197944.  Sun's subsequent acquisition of SavaJe and efforts to develop JavaFX and

17  OneJava were also no match for Google's promises not only to give away Android for free, but

18  also to share advertising revenue.  *See, e.g.*, Ex. 42 (2010 Q3 Earnings Call Tr. at 9 (Google CEO

19  Eric Schmidt:  Google shares Android ad revenue with operators)).  As it turned out, Sun was the

20  *only* key contributor to Android who did *not* get a cut of the revenue.

21       The first Android phone was released by HTC in late 2008 and offered for sale in 2009.[4]

22  Samsung and Motorola released Android-based phones soon thereafter.  *Id.*  By August 2010,

23  Google CEO Eric Schmidt judged that Android "[was] well past escape velocity at every level."

24  GOOGLE-26-00025770.  At the same time, Oracle was objecting to Google's unlicensed use of

25  Java.  Google looked for an alternative to Java, but found that they "all suck" and that it needed a

26  license.  TX 10.  But still Google refused, and Oracle had no choice but to sue.

27       Meanwhile, *exactly as Google planned*, Android became a huge success, grossing nearly

28

---

[4] http://www.cnet.com/news/gartner-android-ranks-2nd-in-global-smartphones/.

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

1  $41 billion in revenue through 2015.  Malack. 2nd Rpt., Ex. 8.  As shown in the below internal

2  executive presentation, Google set forth its Android strategy in phases.  The first phase was to

3  build the ecosystem.  The second phase was "Extend Our Core Business" with revenue from

4  search and display advertising and apps.  The third phase was to add "New Monetizable

5  Services."  TX 1061 at 16.  The fourth phase was to "Change the Rules/Scale," which includes

6  going "down-market to feature phones"—exactly as Google is now doing internationally with

7  Android One, knocking Java out of its few remaining phone markets.



As this slide indicates, Google anticipated realizing multiple different revenue streams on the An-

droid platform.  Mr. Malackowski's report focuses on revenues associated with hardware, apps,

digital content, and advertising.[5]  Malack. Op. Rpt. ¶ 245-281.  Google sought to earn this money

---

[5] After adding those revenues and subtracting costs, Mr. Malackowski calculates a final dis-
gorgement number of $8.8 billion.  Malack. 2nd Rpt. ¶ 280.  $8.8 billion is 37.6% of Android to-
tal gross profit from these revenue streams, a reasonable number compared to the 75% of profits
awarded in *Frank I* and the 64.5% awarded in *Brocade*, discussed below.

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

1    by creating Android and exploiting it, and Google succeeded in its plan.

2         Indeed, as shown in the highlighted entry in the following chart, Google itself termed the

3    advertising, apps and content revenue ("Android Market") as "Direct Revenue Impact," while at

4    the same time identifying a long list of other benefits to the company from Android.



19   Google had a plan.  The plan was to make money on Android through search and display adver-

20   tising, apps and content.  Google succeeded in its plan.  Cause, meet effect.

21        The Court already approved the inclusion of advertising revenue streams in the gross

22   amounts attributable to Google's infringement when it refused to disturb Dr. Cockburn's inclu-

23   sion of advertising revenue streams in his disgorgement analysis before the first trial.  ECF No.

24   685 at 2, 9, 13; *cf.* ECF No. 230 at 9 (Order re: hypothetical negotiation) ("[G]oogle is incorrect

25   in asserting that the overall value of Android is irrelevant and is further incorrect in asserting that

26   advertising revenues have nothing to do with the overall value.  Of course, they do have some-

27   thing to do with the overall value.").  In the Court's disgorgement order, it made clear that the

28   "burden is on Google to allocate [i.e., apportion] Android profit."  ECF No. 685 at 9.

1    Google now argues that its executives were incorrect or deluded when they planned to

2  make lots of money on Android and later said it was profitable.  Apparently, Android hasn't

3  earned a single penny.  And, even if it has earned any profit using the infringing APIs, Google

4  contends Android *could have* done it without the Java APIs.  So too bad Oracle.

5    This effort to rewrite history must be rejected.  As explained by the Ninth Circuit in *Frank*

6  *Music Corp. v. MGM, Inc.*, 772 F.2d 505, 518 (9th Cir. 1985) ("*Frank I*"), there are no do-overs:

7  "Just because [the infringing] element could be omitted and the show goes on does not prove that

8  the element was not important in the first instance and did not contribute to establishing the

9  show's initial popularity."  It does no good for the thief to argue that, had he not stolen, he could

10  have made the money some other way.

11                                     **ARGUMENT**

12  **I.    THE EVIDENCE SOUNDLY ESTABLISHES A CAUSAL NEXUS BETWEEN**
        **THE INFRINGEMENT AND GOOGLE'S ANDROID PROFITS.**
13

14    Google asserts that Mr. Malackowski's disgorgement of profits opinion fails to establish a

15  causal nexus between Google's infringement and *any* Android revenues.  Mot. at 8-16.  To the

16  contrary, *all* of the revenues at issue are "reasonably associated with" the infringing product,

17  Android, and that is more than sufficient to meet the Ninth Circuit's standard.  *Polar Bear Prods.,*

18  *Inc. v. Timex Corp.*, 384 F.3d 700, 715 (9th Cir. 2004) (as amended); *Frank I*, 772 F.2d at 517.

19    Oracle seeks infringer's profits from Google's sales of mobile devices containing the

20  infringing code, sales of apps and content dependent upon the infringing platform, and advertising

21  revenue generated as a result of the infringing platform.  Google makes much of a supposed

22  distinction between "direct" and "indirect" profits.  Mot. at 8.  Section 504(b) makes no such

23  distinction; rather, it simply requires disgorgement of "all profits attributable to the infringe-

24  ment."  *Polar Bear* also largely rejects any significance of this distinction.  384 F.3d at 711 n.7

25  (stating the same standard applies to both direct and indirect revenues).  And such a distinction

26  should be rejected as no better than an attempted "end-run" around the statute.  *Bucklew v.*

27  *Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 933 (2003).  In all events, whether or not there

28  is such a distinction in the law, a sufficient causal link between Android and all of the revenues

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

1   included in Mr. Malackowski's report is more than amply demonstrated.  Oracle is entitled to

2   present its entire disgorgement claim to the jury.

3        **A.**    **A "Reasonable Association" Between The Infringement And The Revenue Is**
               **Sufficient To Establish A Causal Nexus In The Ninth Circuit.**

4

5   In the first step of the disgorgement case, Oracle, the copyright owner, "is required to pre-

6   sent proof only of the infringer's gross revenue."  17 U.S.C. § 504(b).  The burden is to "establish

7   a causal connection between the infringement and the gross revenue reasonably associated with

8   the infringement."  *Polar Bear*, 384 F.3d at 715.  Ninth Circuit cases confirm that the revenues

9   sought here are properly included in the disgorgement calculation.

10   In the Ninth Circuit's seminal infringer's profits case, *Frank I*, the MGM Grand Hotel

11   performed scenes from plaintiff's musical in a theatrical show.  772 F.2d at 510.  Plaintiff sought

12   to recover multiple revenue streams: (1) revenues from the box office of the show and (2) rev-

13   enues from the hotel and gaming operations.  *Id.* at 516, 519.  The court permitted recovery of

14   "indirect profits from the hotel and gaming operations" based upon a showing that the MGM used

15   such shows to enhance its hotel and gaming revenues.  *Id.* at 517.  On subsequent appeal, the

16   court awarded plaintiff 75% of the show's profits (vacating the district court's 25% award) even

17   though the infringing songs and scenes made up about 6-10% percent of the show.  *Frank Music*

18   *Corp. v. MGM, Inc.*, 886 F.2d 1545, 1549-50 (9th Cir. 1989) ("*Frank II*").  The court also upheld

19   the award of a percentage of the "hotel and gaming operations [profits]" because there was a

20   "sufficient nexus with an infringing performance in the hotel's showroom to justify attributing

21   some percentage of the hotel's profits to the infringement."  *Id.* at 1550, 1553-54.

22   The causation question in *Frank* was not whether the revenues of the hotel and gaming

23   operations, or even the box office for the show, could be traced specifically to the particular

24   infringing Kismet songs and scenes.  Rather, the question was whether the revenues could be

25   traced to the *infringing work—i.e.*, the entire musical.  *Frank I*, 772 F.2d at 517.  The Ninth

26   Circuit found a causal link established not only for the box office receipts for the infringing show,

27   but also for the other MGM operations as well.  *Id.* at 516-17.  There was one key fact that

28   assisted in establishing the association between the show and the gaming and hotel operations:

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

1   the 1976 MGM Annual Report indicated that stage shows were in part a promotional draw that

2   "enhanced" the revenue from hotel and gaming operations.  *Id.*[6]

3          Similarly, in *Polar Bear*, the court upheld infringer's profits related to an infringing watch

4   advertisement.  Defendant Timex used parts of plaintiff's extreme kayaker film in its advertising

5   to promote Timex watches in a promotional video and in a promotional booklet, both of which

6   included other non-infringing material.  384 F.3d at 704. The court found plaintiff had established

7   a causal nexus between the advertisements and the two distinct sources of revenue based upon (1)

8   expert testimony about the contribution of the video to trade show sales and (2) a press release

9   indicating the revenue that the booklet promotion generated.  *Id.* at 712-13.  As in *Frank*, the

10  court did not require plaintiff to demonstrate that the particular infringing aspect within the over-

11  all accused advertisements specifically motivated customers.  There was no proof, for example,

12  that customers at the trade shows where the video was played were motivated to purchase the

13  watches by seeing the specific infringing images.

14         More recently, in a software case in this District, the jury awarded to Brocade 64.5% of

15  profits against A10 Networks based on A10's inclusion of 145 lines of Brocade's code among the

16  millions of lines of software in its networking equipment.  *Brocade Commc'ns Sys., Inc. v. A10*

17  *Networks, Inc.*, No. C 10-3428 PSG, 2013 WL 831528 at *2 (N.D. Cal. Jan. 10, 2013).  The

18  evidence showed that the networking equipment would not work at all without the 145 lines of

19  code.  *Id.* at *6.  The evidence also showed that the particular lines of code at issue were well

20  suited to maximize the performance characteristics of the equipment.  *Id.*  This technical approach

21  was sufficient to establish the causal nexus to revenues from all sales of the infringing networking

22  equipment.  *Id.* at *7.  Mr. Malackowski (also Brocade's expert) testified that commingling meant

23  there was no good way to apportion, and thus all profits were subject to disgorgement.  *Id.*  The

24  jury awarded 2/3 of the profits, and the award was upheld in post-trial motions.  *Id.*  The Court

25  specifically rejected an apportionment based upon a lines-of-code averaging approach.  *Id.* at *8.

26         *Mackie v. Rieser* stands in stark contrast to these fact patterns.  296 F.3d 909 (9th Cir.

27

28  [6] The court's holding that a causal nexus had been established was affirmed even though the show "suffered no decline in attendance" when the infringing scenes were removed.  *Id.* at 518.  The plaintiff was entitled to have any such doubts resolved in its favor.  *Frank II*, 886 F.2d at 1549.

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

1   2002).  In that case, defendant photographed plaintiff's sculpture and used it as part of a collage

2   that included painted swirls, music and dance terms, the Statue of Liberty, and the Seattle

3   skyline.  *Id.* at 912.  The Seattle Symphony used the collage in a 24-page promotional brochure

4   for its "Pops" series, mailing the brochure to "150,000 individuals located throughout the United

5   States."  *Id.*  The collage was on page 12 of the 24-page brochure—after the page containing the

6   information on symphony subscriptions.  *Id.*  Plaintiff's expert first admitted that proving

7   causation was impossible:  there was no evidence that the brochure had generated even a single

8   new Symphony subscription, no evidence that anyone had mailed back a subscription form, or

9   otherwise identified the brochure as a source of interest, and no evidence that the direct mail

10  campaign generated any activity at all.  *Id.* at 913.  In the absence of such evidence, plaintiff's

11  expert tried to make an "estimate (based upon multiple estimates)," and the court, unsurprisingly,

12  rejected plaintiff's demand for all of the Symphony's current and future profits.  *Id.*[7]

13          These cases demonstrate that it is the plaintiff's burden to show an association between

14  the revenue and the accused work, but that it is the defendant's burden to prove the expenses

15  associated with generating that revenue and to parcel out which of the resulting profits are due to

16  the non-infringing attributes.  The first sentence of Section 504(b) broadly entitles Oracle to

17  profits "attributable to the infringement" not already awarded as part of the actual damages.  The

18  second sentence of 504(b) explains how the jury is to go about making the relevant profit deter-

19  mination:  First, Oracle demonstrates gross revenue (reasonably associated with the infringing

20  product, Android); second, Google must prove deductible expenses and must also apportion the

21  resulting profits between infringing and non-infringing elements.

22          It is contrary to the statutory framework to place the burden on Oracle in the first step to

23  trace the revenues specifically to the infringing elements of the accused work.  Such a practice

24  would violate the shifting burdens of proof.  The "infringement" is the infringing material as it

25  was used in context with non-infringing material, not just the purloined elements divorced from

26  context.  It is *Hallelujah Hollywood* in *Frank*, or the Timex video and booklets as a whole in

27

28  _____

[7] A demand for future profits is inappropriate in all events, underscoring the degree to which
plaintiff was out of its depth in that case.

*Polar Bear*, or the revenues from the sale of the entire networking boxes in *Brocade*.  Allocating the profit between the infringing versus non-infringing elements is the second step in the statute: apportionment.  Google's principal error, repeated throughout its brief, is to conflate the two, thus collapsing the standard for apportionment with the standard for causation, violating this Court's prior order and these Ninth Circuit precedents.

### B.     The Evidence Is More Than Sufficient To Establish That The Android Revenue Streams Are Reasonably Associated With The Infringement.

There is more than enough evidence to bring this case within *Frank, Polar Bear* and *Brocade*, requiring the jury to determine the infringers' profits claim.  Google set out to earn big money using Android, and it succeeded in that goal.  There is nothing surprising or special about the fact that the revenues flowed naturally from Google's business decisions, as it intended.

The evidence here is far stronger than in *Frank.*  The MGM report in *Frank* said that stage shows were a promotional draw that "enhanced" the hotel and casino operations.  Here, Google's Android strategy document describes the categories of revenue at issue as part of the "Direct Revenue Impact" of the platform.  Such revenues were listed by Google on Android P&L statements, and Google's CEO described Android's purpose to profit from advertising.  Google's CEO and the head of Android also confirmed that Android is profitable—which is only true if one includes these now-challenged categories of revenue.  The Java APIs were included in order to enhance Android by making it accessible to six million existing Java developers and their apps.  Here, the evidence that Google specifically touted the presence of the *infringing code* to its business partners in order to launch the Android platform is a far stronger link than the general promotional draw of the overall work described in *Frank*.

The same is true when compared to *Polar Bear*.  Here, as in that case, an experienced IP valuation expert is prepared to testify based upon his review of the evidence that the intellectual property was at least in part responsible for generating the profits.  Here, as in *Polar Bear*, the IP was used to generate revenue in connection with different types of business activities (trade shows and co-branding promotions).  Unlike in *Polar Bear*, however, here there is evidence of the considerable commercial and technical significance of the infringing material.  Indeed, when

one considers that the infringing material in *Polar Bear* was merely included in an *advertisement*, and not even in the product itself, it is apparent that the causal connection in this case is much stronger.  The revenue generating activities are in fact dependent upon the infringing platform.

Similarly, as in *Brocade*, Oracle's technical expert here will opine (and Google's technical expert admits) that Android is actually dependent upon the infringing Java APIs—that is, if one removes the infringing code or any of it, Android fails.  Malack. Op. Rpt. ¶ 239; Malack. 2nd Rpt. ¶ 24.  Evidence of technical significance in light of market requirements is also abundant.  The use of the Java APIs sped up Android's development.  TX 22.  In Google's own words, "the carriers require[d] it."  TX 1 at 8.  Oracle's technical expert will demonstrate that the 37 Java API packages are *thirty times more central* to the Android platform than the other APIs supplied by Google.  ECF No. 1560-10 (Kemerer Op. Rpt.) ¶ 153.  The Java APIs gave Google access to a developer base of more than six million developers and all of their programs.  Ex. 40 (GOOGLE-01-00025576 at 584). Google touted the "Java core libraries" to carriers and OEMs.  The most important Android apps all rely upon the infringing code.  ECF No. 1560-10 (Kemerer Op. Rpt.) ¶ 135.  And, the Java APIs generated commercial credibility for the launch of the Android platform in a highly risky, uncertain, and challenging market.  Malack. Op. Rpt. ¶¶ 227-28; Ex. 38 (Leonard Depo.) at 145:20-150:10 (Google's expert admitting risks in mobile market).

Mr. Malackowski also explains that the infringed APIs provided Google several advantages critical to Android's revenues as it sought to transition, during a fast-closing window, from *desktop* search and advertising to *mobile*, including: widespread acceptance among vital partners; a familiar, well-tested applications platform; an educated developer community; and the ability to reach market faster with a stable, commercially successful product.  Malack. Op. Rpt. at ¶ 241, Malack. 2nd Rpt. ¶¶ 18, 25-26; *see generally* Malack. Op. Rpt. ¶¶ 174-78, 225-40.

Mr. Malackowski establishes that the infringement thus generated four types of Android revenue: (1) hardware sales, *id.* ¶¶ 245-48; (2) app sales, *id.* ¶¶ 249-59; (3) digital content sales, *id.* ¶¶ 260-62; and (4) advertising sales, *id.* ¶¶ 263-281.  The hardware Google sells contains Android and thus the infringing code.  The apps and digital content are part of the Google Play Store, which depends upon the infringing Android platform.  A regression analysis demonstrates

1   a very strong correlation between Google's Android advertising revenues and infringing Android

2   device activations.  Malack. Op. Rpt. ¶ 264.  In short, there is compelling evidence that the

3   Android platform is highly dependent upon the infringing material, and that all of the included

4   revenue categories are closely related to the infringing Android platform.

5        Indeed, to the extent relevant, each of the types of revenues is "direct," as that term is used

6   in infringer's profits cases, because each is realized *on* the Android platform (the infringing work

7   itself),[8] and Google internally tracks them as direct Android revenues.[9]  The causal nexus be-

8   tween Google's infringement and these types of revenue is established in myriad ways, such as

9   the testimony of Eric Schmidt, former Google CEO:  "Q: Would it be accurate to say that the

10   model Google has for Android is to make it available for free and to make money from advertis-

11   ing and the value-add services that go on top of the Android platform?  A: That's a component of

12   our strategy, yes, and – yes."  Ex. 41 (Schmidt Depo.) at 11:9-15.  The fact that Google monetizes

13   Android by selling added services and advertising instead of charging for the software does not

14   attenuate these causal connections, nor does it render Google's revenues "indirect" under infring-

15   er's profits cases.  This causal chain would be the same if a defendant took plaintiff's content to

16   draw viewers and put it on a website monetized by advertising revenue.  *See, e.g.*, *A&M Records,*

17   *Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 902 (N.D. Cal. 2000).

18        Nor, contrary to Google's assertions, does Mr. Malackowski offer an opinion of the sort

19   rejected in *Frank*, *Polar Bear*, and *Mackie*.  *See* Mot. at 11-13.  Mr. Malackowski *does not*

20   include revenues from desktop search advertising, like the *Frank II* plaintiff did in unsuccessfully

21

22   [8] By contrast, *Frank I,* 772 F.2d at 517, and *Polar Bear,* 384 F.3d at 714, involve profits earned
    through a service or product completely separate from the infringing work, such as the hotel and

23   gaming profits (distinct from the infringing theatrical show) and the sale of watches (distinct from
    the infringing promotional materials).  *See Polar Bear*, 384 F.3d at 708 (stating that indirect prof-

24   its are those that are "gained from infringements used in promotional efforts").

25   [9] *See* Malack. Op. Rpt. ¶ 243 (Google Quarterly Review presentation) (Android (including ads)
    "spreads value" by having a "direct revenue impact"); ¶ 274 (May 2015 Google internal presenta-
    tion) ("'Android Ecosystem is central to Google's success over the next 3-5 years …. In 2015,

26   ████ of revenue will occur on the Android Platform -- ████ (████ YoY) of direct revenue from
    Play and Hardware Sales; with an additional ████ (████ YoY) of revenue from Ads on An-

27   droid.'  Google's Life Time Value (LTV) analysis for Search Ads on Android devices indicated
    that Google's annual margin impact was ████ per device, and Google's device lifetime margin

28   impact was ████.").  Clearly, then, Google is mistaken that Mr. Malackowski concedes that all
    profits at issue in this case are indirect.  *See* Malack. 2nd Rpt. ¶ 27.

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

1    seeking revenues from the MGM Grand's parent company.  886 F.2d at 1554.  Nor did Mr.

2    Malackowski's calculation include a sum for Google's enhanced overall operations and brand

3    prestige from Android, though Google has benefited immensely from the 4 billion Android

4    phones sold worldwide.[10]  Nor does Oracle advance a claim as outlandish as the plaintiff in

5    *Mackie*, who sought *all* past *and future* profits from the Symphony when there was no evidence a

6    single subscription had ever been earned as a result of the promotion at issue.  296 F.3d at 912.

7        What is more, the Court already upheld inclusion of the hardware, apps, and advertising

8    revenues in the gross amounts attributable to Google's infringement, when it previously refused

9    to disturb Dr. Cockburn's inclusion of hardware, apps, and advertising revenue streams in

10   Plaintiff's disgorgement analysis during the first phase of the case.  ECF No. 685 at 2, 9, 13.

11       **C.    Google's Out-Of-Circuit *Daubert* Orders Are Inapposite And Unpersuasive.**

12       Google cites three out-of-circuit trial court *Daubert* orders for the proposition that "soft-

13   ware as part of a complex income stream is too speculative and attenuated to satisfy plaintiff's

14   burden under Section 504(b)."  Mot. at 13-16.[11]  These cases are wholly inapposite.

15       The plaintiffs in those cases tried to establish a link to *all* revenues of the defendant com-

16   panies simply for using infringing back-office-operations software.  Each involved infringing

17   works that were only expected to enhance operational efficiency and were not expected to

18   generate revenues.  *CSI*, 2013 WL 5970065 at *9; *IBM*, 2013 WL 1775437 at *4; *Daimler*, 2006

19   WL 208787 at *4.  In fact, the expert in *CSI* specifically testified that the infringing work did not

20   generate any revenues.  2013 WL 5970065 at *9.  This is a far cry from a platform that is in four

21   billion devices that have generated $41 billion in revenues.  Moreover, the back-office systems in

22   those three cases were inconsequential to anyone outside of the defendants' companies.  In con-

23   trast, here Google's business partners heard a lot about the infringed APIs:  Google had to sell

24   Android to the carriers and OEMs before consumers ever saw it, and Google heavily marketed

25   _____

26   [10] These are all significant benefits of Android that Mr. Malackowski did not include in his dis-
     gorgement calculation, rendering it conservative.  Ex. 39 (Malack. Depo.) at 37:19-24.

27   [11] *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, No. 08 CIV. 7497 KBF, 2013 WL 5970065
     (S.D.N.Y. Nov. 8, 2013) ("CSI"); *Int'l Business Machs. Corp. v. BGC Partners, Inc.*, No. 10
28   CIV. 128 PAC, 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013) ("*IBM*"); *DaimlerChrysler Servs. v.
     Summit Nat'l, Inc.*, No. 02-71871, 2006 WL 208787 (E.D. Mich. Jan. 26, 2006) ("*Daimler*").

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

1   the Java core libraries (the star component of which is the infringed APIs) to these groups.  *See,*

2   *e.g.*, Malack. 2nd Rpt. ¶¶ 18, 25-26.[12]  Developers use the infringing APIs, and the top applic-

3   ations—including Google's applications—depend upon them.

4         Google's causation attack is meritless and should be denied.

5   **II.    ORACLE'S APPROACH TO APPORTIONMENT IS PROPER**

6         Section 504(b)'s plain language and this Court's prior order puts the apportionment

7   burden on Google, not Oracle.  Nonetheless, Google seeks to exclude Mr. Malackowski's appor-

8   tionment opinion because he "conducts no apportionment of Android at all," Mot. at 2, 16-20.  It

9   was never Oracle's burden to do so.  But even so, this assertion is false: (1) though the law does

10  not require it, Mr. Malackowski *does* apportion, § II.A; (2) *further* apportionment in this case is

11  difficult, if not impossible, as evidenced by the many experts who have tried and failed, § II.B.

12        **A.    Mr. Malackowski *Does* Apportion, Despite No Obligation To Do So.**

13        Google, the infringer, "is required to prove … the elements of profit attributable to factors

14  other than the copyrighted work."  17 U.S.C. § 504(b).[13]  Google admits that "once the plaintiff

15  establishes a causal nexus between the infringement and the defendant's revenue, the burden

16  shifts to the defendant to 'prove his or her deductible expenses and the elements of profit attrib-

17  utable to factors other than the copyright work.'"  Mot. at 17.  And yet, Google seeks to exclude

18  Mr. Malackowski's opinion because he "conducts no apportionment of Android at all."  Mot. at 2.

19  This makes no sense.  Moreover, Mr. Malackowski *does* apportion.

20        Mr. Malackowski's approach to apportionment is to first seek to determine the share of

21  the profits attributable to the infringing Android platform itself, as opposed to other factors such

22  as Google's search engine, advertising network, and brand.  Mr. Malackowski calls this first

23

24  [12] Google argument that the infringed APIs could be replaced in 2016 without affecting revenues fails under Ninth Circuit precedent.  *Frank I* upheld the causal nexus finding even though the de-

25  fendant proved the show "suffered no decline in attendance" when the infringing scenes were re-
    moved:  "Just because one element could be omitted and the show goes on does not prove that the

26  element was not important in the first instance and did not contribute to establishing the show's
    initial popularity."  772 F.2d at 518.

27  [13] Before the first trial, this Court upheld Oracle's expert Dr. Cockburn's identification of hard-
    ware, app, and advertising *gross* revenues without requiring further apportionment:  "Under copy-

28  right law, the burden is on Google to allocate Android profit based on the copyrights in suit ver-
    sus other non-infringing contributions."  ECF No. 685 at 9.

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

1   apportionment step: the "Platform Contribution Factor."  The Platform Contribution Factor, once

2   determined, is to be applied against unapportioned profits in order to determine the value of

3   Android as opposed to other factors in generating those profits.  Malack. 2nd Rpt. ¶¶ 279-85.

4          To determine the Platform Contribution Factor, Mr. Malackowski looks to arm's length

5   negotiations between Google and third party mobile platform operators where they independently

6   valued the contribution of a platform to generation of advertising revenues.  He examines

7   Google's payments to non-Android, mobile operators for advertising revenues generated on their

8   platforms.  ████████████████████████████████████████████████████████████

9   ████████████████████████████████████████  These are circumstances

10  where the revenues are being split between Google—who supplies the search engine, advertising

11  network, and Google branding—and the non-Android mobile operator  ██████, who supplies the

12  platform.  Mr. Malackowski opines that such revenue sharing arrangements are a good proxy for

13  the contribution of the mobile platform to overall revenue generation.  Google's expert Dr.

14  Leonard agrees.  Ex. 38 (Leonard Depo.) at 99:12-17 ("███████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████

17  ██████████████████████████ (emphasis added)); *see also* ECF No. 1584-2 (Kearl Op.

18  Rpt.) ¶ 23 ("████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████).

22         Mr. Malackowski calculates his specific Platform Contribution Factor by taking a

23  weighted average percentage of the revenues shared between Google and non-Android mobile

24  platform providers.  ██████would be the most comparable to Google in Mr. Malackowski's view,

25  but Google refused to supply identifying information for its revenue sharing arrangements.

26  Accordingly, Mr. Malackowski uses the weighted average of all information provided.  As a

27  result, he determines that the Platform Contribution Factor is 35.6% of advertising revenues.

28         Next, Mr. Malackowski deducts expenses from Android gross ad revenue to arrive at

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

$22.6 billion in gross profit.  He then apportions 64.4% of these advertising profits to Google's *non-infringing contributions*—i.e., he multiplies $22.6 billion by the Platform Contribution Factor of 35.6%—to come up with a gross profit advertising Platform Contribution of $8.06 billion.  *Id.* ¶ 282-83.  Mr. Malackowski thus in fact allocates ***$14.6 billion*** (64.4% of the gross profits from Android) to the non-infringing components of Android, and $8.06 billion (35.6%) to the infringing components.  Schizophrenically, while Google attacks Mr. Malackowski for failing to apportion, it nonetheless *admits* that he apportions in this manner.  *See* Mot. at 6.

Finally, Mr. Malackowski includes all gross profit from Google's hardware since it contains the infringing product.  Malack. 2nd Rpt. ¶ 286.  He also notes that the gross profits from apps and digital content are not *further* apportioned because they already reflect the same type of revenue sharing that underlies the Platform Contribution Factor.  *Id.* ¶ 287.  Google splits apps and digital content revenue 30/70 with carriers and developers.  Because Google's share is a 30% platform share, there was no need for *further* apportionment; in essence, the Platform Contribution Factor was already applied.

The Ninth Circuit approved of this very manner of apportionment in *Polar Bear*.  There were two streams of revenue at issue:  (1) revenue from 12 trade shows and (2) revenue from a marketing co-promotion with Mountain Dew.  384 F.3d at 704.  For sales at trade shows, Polar Bear's expert calculated that Timex averaged $30,000 per show, for total gross revenues of $360,000.  *Id.* at 712.  The expert apportioned 10-25% of trade show sales to the infringement, and went a step further by calculating net profits.  *Id.*  The court upheld this practice, holding that Polar Bear "more than satisfied the sole requirement of 'a reasonable approximation' in assessing the amount of profits attributable to the infringing material."  *Id.*  For profits from sales resulting from the Mountain Dew booklet, Polar Bear presented a Timex press release stating the promotion generated $564,000 in sales.  *Id.*  Polar Bear trimmed this gross revenue number to $242,520 in profits, based on an estimated profit rate of 43%.  *Id.* at 712-13.  The court noted that Polar Bear was not required to "apportion" the gross revenue because "[u]nder § 504(b), the primary responsibility for further apportionment of profits fell to Timex."  *Id.* at 713.

There is absolutely nothing wrong with Mr. Malackowski's apportionment approach.

1    **B.    The Commingling Approach Is Appropriately Used In This Case.**

2        Google's real beef with is that Mr. Malackowski does not *further* apportion after the

3    Platform Contribution in order to make a guess at the value supplied by the 37 Java APIs

4    packages versus the 26% of Android code that Google wrote itself.   Ex. 11 (Schmidt 3d Rpt.)

5    ¶ 26.  Instead, he opines that under the circumstances, where Google faced significant business

6    and technical hurdles and the copyrighted code supplied essential elements of success, he cannot

7    reliably apportion further.  He relies upon a legal framework that justifies an inability to further

8    apportion when the infringing material is too intertwined, or commingled, with the non-infringing

9    material such that no reasonable division can be made.  *See Harper & Row Publ'rs, Inc. v. Nation*

10   *Enters.*, 471 U.S. 539 (1985); *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390 (1940).

11       Google rejects these Supreme Court precedents as "specious" and an invitation to the jury

12   "to ignore the statute and not to apportion."  *See* Mot. at 17.  Google is wrong.  The doctrine of

13   commingling reflects an allocation of risk in copyright law, where infringers are intentional tort-

14   feasors who bear the risk that commingling infringing and non-infringing elements may make it

15   impossible to reliably sort out.  *Harper & Row*, 471 U.S. at 567 ("With respect to apportionment

16   of profits flowing from a copyright infringement, this Court has held that an infringer who com-

17   mingles infringing and noninfringing elements must abide the consequences, unless he can make

18   a separation of the profits so as to assure to the injured party all that justly belongs to him.").[14]

19   This is a corollary to the Ninth Circuit's precedent that all doubts in calculating apportionment

20   should be resolved in the copyright owner's favor.  *See Frank II*, 886 F.2d at 1549.

21       Mr. Malackowski is not and does not claim to be a legal expert.  He has never evinced an

22   intention to tell the jury that apportionment is not legally required.  He is entitled to explain the

23   legal framework for his opinions in his expert report, as all of the experts did.  Mr. Malackowski

24   references commingling in three of the 636 paragraphs in his two reports, in order to opine that

25   the doctrine supports the idea that if no further apportionment is possible, the infringer is out of

26   _____

27   [14] Google's argument that commingling is a vestige of a bygone copyright era when apportion-
     ment was not yet statutorily required is incorrect and misses the point. Mot. at 19-20.  *Harper &*
     *Row* analyzes the same 1976 Copyright Act at issue in this case.  471 U.S. at 542. Moreover, it is
28   not Mr. Malackowski's opinion that apportionment is not required, only that *further* apportion-
     ment is not possible based on the evidence in this case.

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
                            IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

luck.  Malack. 2d Rpt. ¶¶ 18, 272, 285.  Mr. Malackowski referred to commingling in his depo-sition for the same purpose, when pushed by Google's counsel about why he did not do Google's work for it by further apportioning.  *See* Ex. 39 (Malack. Depo.) 94:19-95:11; 211:11-214:3; 221:17-21; 228:9-229:7.  Mr. Malackowski's position is fully consonant with the Supreme Court: The profits at issue cannot be further separated "so as to assure the injured party [Oracle] all that justly belongs to [it]."  *Harper & Row*, 471 U.S. at 567.[15]

In the face of these venerable Supreme Court and Ninth Circuit precedents, Google cites *Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F.2d 826, 828-829 (9th Cir. 1985), for the proposition that Mr. Malackowski may not testify that he was unable to further apportion.  Mot. at 17-18.  This argument fails.  First, the case does not stand for this proposition.  *Cream Records* states in relevant part:  "[W]here an infringer's profits are not entirely due to the infringement, *and the evidence suggests some division which may rationally be used as a springboard*[,] it is the duty of the court to make some apportionment."[16]  754 F.2d at 828-29 (emphasis added)(quotation marks omitted).   It is Mr. Malackowski's opinion, *after already making "some apportionment"*—i.e., subtracting *$14.6 billion* in profits that Google earned on Android—that no *further* apportionment is possible because the evidence *does not suggest* some rational additional division.  Malack. 2d Rpt. ¶ 272.  *Cream Records* explicitly permits this practice.[17]  The jury may be free to disagree with Mr. Malackowski's opinion after seeing the evidence for itself at trial, but there is no basis for excluding his opinion at this stage.[18]

---

[15] Google's recitation of other elements of the Android platform that Mr. Malackowski agrees al-so contributed to profits is therefore irrelevant.  *See* Mot. at 19.  His very use of the word "com-mingling" presumes that the infringing work, Android, consists of material infringing and non-infringing elements.  Again, his opinion is that *further* apportionment among these elements can-not be reliably and justly accomplished.  And Google found no legitimate way to do it either.

[16] The Supreme Court said as much in *Sheldon*, its landmark apportionment decision:  Apportion-ment may occur if "the evidence is sufficient to provide a fair basis of division." 309 U.S. at 402.

[17] So does *Abend v. MCA, Inc.*, 863 F. 2d 1465, 1480 (9th Cir. 1988), which Google also cites, as *Abend* explicitly relies on *Cream Records* and *Sheldon* for this same apportionment proposition.  *Cream Records* also involved very different facts.  While all revenue earned on malt liquor sales during the run of an infringing television ad was sufficiently causally related to be included in the disgorgement analysis, neither side presented any evidence on apportionment.  *Id.* at 827-29.  The court refused to accept that no apportionment could be made when the infringing material was on-ly ten notes of a song in a 30-second commercial; not part of the product.  *Id.*

[18] Google's reliance (Mot. 18) on *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 49-50 (1st Cir. 2003), is misplaced.  The court there rejected a jury instruction that

1    Mr. Malackowski's opinion is that the "relative contributions of the Java APIs to the total

2    Platform Contribution are extremely difficult, if not impossible, to discern with reasonable cer-

3    tainty."  Malack. 2nd Rpt. ¶ 272.  He is not alone in finding further apportionment here difficult,

4    nor is this the first time an expert has had difficulty apportioning in this case.  Attempts at appor-

5    tionment by both party's experts before the first trial were excluded.  *See, e.g.*, ECF No. 632 at 7

6    (excluding parts of Google expert Dr. Cox's apportionment analysis for relying on legally imper-

7    missible non-infringing alternatives); ECF No. 785 (excluding Dr. Cockburn's opinion relying on

8    Dr. Shugan's conjoint analysis).  The Court's expert also admitted before the first trial that he did

9    not know a reliable method of apportionment.  ECF No. 1584-2 (Kearl Op. Rpt.) ¶ 124 ("Based

10   on the admissible evidence in this matter, I am not aware of a quantitative method to estimate the

11   percent of Android revenue or profit that is due to the alleged copyright infringement.").

12   During the present phase, Google's damages expert Dr. Leonard attempts, but fails, to

13   apportion, relying impermissibly on legally irrelevant non-infringing alternatives ("NIAs"), as Dr.

14   Cox improperly did during the last phase.  *See* ECF No. 1554-4 (Oracle MIL #4) at 1-4 (collect-

15   ing authorities that NIAs are legally irrelevant to copyright disgorgement).  Dr. Leonard also uses

16   impermissible line-counting.  The Court's expert likewise improperly uses NIAs, but nevertheless

17   offers a top number in the same range as Mr. Malackowski's.  Prof. Kearl's number would be

18   even higher had he not used an improper NIA deduction.  ECF 1582-4 (Oracle MIL #6) at 1-4.

19   Professor Kearl also testified to an additional sound economic rationale for applying the

20   legal commingling rule here.  One of the problems in apportionment is when there are synergies

21   between the infringing and non-infringing material that allow the respective contributions to

22   achieve more together than the expected sum of their parts.  So, for example here, an extremely

23   popular Java API and an advertising revenue model based on Google's superior search engine

24   technology combine to create a grand-slam home run of a new mobile device platform.  There is

25   no known reliable method of allocating the surplus gains generated by these types of synergies.

26   *See* Ex. 37 (Kearl Depo.) 206:23-207:10 ("[T]he fundamental problem is that if you have

27

28   apportionment is *unavailable as a general matter* when "it's all intertwined."  Mr. Malackowski's
     opinion is that *further* apportionment, beyond the $14.6 billion he already removed, cannot be re-
     liably accomplished because the evidence does not provide a sufficient basis for division.

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

synergies, they're attributed to the jointness and, therefore, you can't parcel out the contribution of any single thing to the synergy, at least not easily."). Oracle's economist agrees. ECF No. 1582-9 (Jaffe Supp. Rpt.) ¶¶ 9, 21-24. Since the legal rule is that the infringer must not be permitted to retain any of the benefits of the infringement, the commingling rule must be employed to require disgorgement of any arguable synergies. Mr. Malackowski's Platform Contribution apportionment is an entirely appropriate analysis for the jury for this reason as well.

Google's motion to exclude Mr. Malackowski's opinions because he does not further apportion is meritless and should be denied.

### III.    MR. MALACKOWSKI'S LOST PROFITS OPINION IS CONSISTENT WITH LAW AND GOOD PRACTICE.

Google seeks to exclude as unduly speculative Mr. Malackowski's opinion that Android caused Oracle to lose $475 million in Java ME licensing profits. Mot. at 20-25. This argument fails for two reasons. First, Java ME is a derivative of Java SE (the copyrighted work at issue), and Mr. Malackowski establishes a causal link between Android and lost Java ME profits by, for example, demonstrating that Oracle lost specific Java ME licensing profits to Android. That is all Ninth Circuit law requires. Second, Mr. Malackowski's reliance on a 2008 Java ME revenue projection to estimate lost profits is supported by this Court, law, and good practice.

#### A.    There Is Sufficient Causal Link Between Android And Lost Java ME Licensing Profits.

Google asserts that Java ME is not the allegedly infringed work at issue and that it has only a little bit of Java SE in it. Mot. at 22.[19] While conceding that recovery of lost profits on a derivative work is "theoretically permissible," Google contends the plaintiff must demonstrate a link between the derivative work and the infringing work, such as evidence of lost customers. *Id.* (citing *Cohen v. United States*, 100 Fed. Cl. 461, 481-81 (2011)).[20]

---

[19] Java ME is a derivative of Java SE, as demonstrated in Oracle's Opposition to Google MIL #4 Re: Prof. Jaffe, filed concurrently herewith. *See also Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1350 (Fed. Cir. 2014) ("Sun was licensing a derivative version of the Java platform for use on mobile devices: the Java Micro Edition … for use on feature phones and smartphones.").

[20] As Google admits, plaintiffs may recover actual damages under § 504(b) when an infringement harms the market value of a derivative work. *See* Mot. at 22; *see* 5-14 Nimmer on Copyright §

1    "'[A]ctual damages' are the extent to which the market value of a copyrighted work has

2    been injured or destroyed by an infringement." *Frank I*, 772 F.2d at 512. "Actual damages must

3    be suffered 'as a result of the infringement,'" meaning that the plaintiff must establish "a causal

4    link between the infringement and the monetary remedy sought." *Polar Bear*, 384 F.3d at 708.

5    Plaintiffs may recover licensing profits lost as a result of the infringement by offering evidence of

6    lost business. *Cream Records*, 754 F.2d at 827 (plaintiff offered evidence that it lost a licensing

7    opportunity for its song after a *potential* customer withdrew from negotiations after the song was

8    used in defendants' commercial); *accord Cohen,* 100 Fed. Cl. at 482 (*cited by* Mot. at 22) ("Evi-

9    dence of lost customers" due to the infringement).

10    Mr. Malackowski bases his lost profits opinion on reams of evidence that Oracle lost *spe-*

11    *cific* Java ME customers to Android. *See, e.g.*, Malack. Op. Rpt. ¶ 190 (citing Ex. 36,

12    OAGOOGLE-0000799926, a September 2010 internal Oracle email stating that Java ME licens-

13    ing revenues from Sprint, Verizon, AT&T and T-Mobile are declining because "I see Android

14    and am run over by it in all accounts"); *id.* ¶ 213 (quoting Oracle's Larry Ellison: "It's very hard

15    to go out and compete against our own IP when someone else is giving that IP away for free"); *id.*

16    ¶ 191 ("By way of example, Michael Ringhofer testified that, as a result of having to compete

17    with free Android, Oracle recently entered into an approximately $1 million licensing agreement

18    with Samsung for the same technology Samsung had previously licensed for approximately $44

19    million."). This evidence—far stronger than the evidence in *Cream Records* because it demon-

20    strates lost business from *actual* (not potential) customers—is more than sufficient to establish

21    that Oracle lost profits to Android due to the infringement. 754 F.2d at 827.

22    **B.     Mr. Malackowski's Lost Profits Methodology Is Reliable.**

23    In estimating lost profits, Mr. Malackowski uses a 2007/2008 Sun forecast from the period

24    prior to Android's presence in the market. Malack. Op. Rpt. ¶¶ 186-89 (citing

25    OAGOOGLE0100164541). That forecast sets forth various future scenarios for Java ME mobile

26    phone licensing revenues. Mr. Malackowski chooses what he believes to be the fairest forecast in

27

28    14.02 n.9 (citing *Runge v. Lee*, 441 F.2d 579 (9th Cir. 1971) (noting that, in light of the copyright
owner's exclusive right to prepare derivative works under 17 U.S.C. § 106(2), the injury to the
market value of the copyrighted work includes any injury to the value of "sequel rights")).

ORACLE'S OPPOSITION TO GOOGLE'S MOTION
IN LIMINE #6 RE: MR. JAMES MALACKOWSKI

1  light of subsequent events, compares that to the actual results achieved by Sun/Oracle, and opines

2  that the difference between expected and actual results is largely explained by losing Java ME

3  sales to Android. *Id.* ¶¶ 186-203. He calculates lost profits at $475.4 million. *Id.* ¶ 203.

4      The amount of lost profits is "necessarily an estimate," and cannot be shown with "math-

5  ematical precision." *Humetrix, Inc., v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001) (quota-

6  tion marks omitted). What is required is non-speculative guidance that will aid the jury in their

7  determinations. *See McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 567 (7th Cir.

8  2003) (plaintiff not required to establish the actual lost licensing fee; "only to provide sufficient

9  evidence of the value so that the jury did not have to resort to undue speculation in estimating ac-

10  tual damages"). The recovery of actual damages will not be precluded, even if the amount is un-

11  certain, so long as the fact of damages is certain. *Frank I*, 772 F.2d at 513.

12      Google argues that Mr. Malackowski's use of the 2007/2008 revenue forecast unreliable.

13  Mot. at 23-25. It is not. First, this Court has already accepted this very projection as reliable.

14  *See* ECF No. 685 at 5-7 (denying Google's motion to exclude Oracle's expert Dr. Cockburn's re-

15  liance on this projection (and others) because his analysis "was based on sufficiently reliable fi-

16  nancial projections" and noting the Federal Circuit "upheld a hypothetical royalty based on a con-

17  temporaneously created business plan projecting revenue." (citing *Interactive Pictures Corp. v.*

18  *Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001)). Other courts also regularly accept

19  such projections. *See*, *e.g.*, *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d

20  1245, 1254 (S.D. Cal. 2013) (using forecasts of future sales is a "tried and true method" of calcu-

21  lating actual damages under section 504(b)).

22      Second, Mr. Malackowski uses a conservative forecast estimate of 8.3% annual revenue

23  growth, at the low end of Sun's overall 8.0-13.6% projection range. Malack. Op. Rpt. ¶189.

24  Third, Mr. Malackowski confirmed the reliability of this forecast by: (1) discussing it with

25  knowledgeable Oracle personnel to determine how the projection fit into Oracle's business strate-

26  gy at the time;[21] (2) comparing it to *actual* Java ME billings growth in prior years, which was

27

28  [21] Google disparages these discussions as "private interview[s]." Mot. at 22. Google had every opportunity to inquire regarding these discussions (in stark contrast to some of Google's expert's interviews). It is common practice, encouraged by courts, for experts to discuss damages evi-

- 23 -

1    much higher (75% from 2005 to 2006 and 22% from 2006 to 2007); and (3) comparing it to an-

2    other forecast from later in 2008, which forecast total Java ME revenue growth of approximately

3    25% from 2009 to 2010.  Malack. Op. Rpt. ¶¶ 189, 196-97.

4        Finally, experts regularly use such forecasts to calculate copyright lost profits.  The

5    Court's expert, in his first report in this case, approved of the use of this very forecast to calculate

6    lost profits, calling the approach "standard." ECF No. 1584-2 (Kearl Op. Rpt.) ¶¶ 126-127;

7    Malack. 2nd Rpt. ¶¶ 63-66.  Several intellectual property damages treatises also encourage the

8    use of forecasts, in part because preparation before suit indicates greater objectivity.[22]

9        The cases Google cites for the proposition that courts routinely exclude damages calcula-

10   tions based on forecasts are distinguishable.  *See* Mot. at 24.  The plaintiff in *Zenith Elecs. Corp.*

11   *v. WH-TV Broad. Corp.*, a contract case, relied on a projection of sales based upon a new feature

12   it had never sold before.  395 F. 3d 416, 417-18 (7th Cir. 2005).  Here, Oracle (Sun) had a track

13   record of licensing Java ME, and the 2007/2008 projection tracked actual sales for several years

14   (2009-2012) until licensing contracts began to expire and Samsung and others adopted Android.

15   Malack. Op. Rpt. ¶¶ 189-91, Fig. 25.

16       In *TK-7 Corp. v. Estate of Barbouti*, involving civil conspiracy, the expert relied on a

17   marketing study, charitably termed a projection, created by a party trying to induce others into a

18   potential investment.  993 F.2d 722, 730 (10th Cir. 1993).  In contrast, Mr. Malackowski relies on

19   an ordinary-course revenue forecasting based on actual past sales.  Malack. Op. Rpt. ¶ 189.

20       The court in *ID Security Systems Canada, Inc. v. Checkpoint Systems, Inc.,* an antitrust

21   case, upheld admission of an expert-prepared forecast for purposes of lost sales, but vacated ad-

22   mission of a separate projection for purposes of estimating lost profits from *delayed* orders, for

23   which the company had precise data.  249 F. Supp. 2d 622, 691-95 (E.D. Pa. 2003).  The projec-

24   dence with knowledgeable personnel.  *Polar Bear*, 384 F.3d at 709 ("Timex also challenges the
25   license fee award as speculative because Sepp based his valuations, in part, on consultations with
     the principals of Polar Bear.  Common sense dictates that an expert may confer with the copyright
26   holder and that the background data may be factored into calculations of actual damages.").

[22] *See, e.g.*, Robert Dunn, *Recovery of Damages for Lost Profits* at 427 (5th ed. 1988); *see also*
27   Roman L. Weil et al., *Litigation Services Handbook:  The Role of the Financial Expert* at 17 (5th
     ed. 2012) ("Practitioners usually derive revenues for a lost profits analysis using one of four ap-
28   proaches," including the "forecast approach," which is "[u]sing sales forecasts of expected per-
     formance for the business or industry to evaluate the probable effect of the harmful acts").

tion Mr. Malackowski relies on is even more reliable than the forecast the *ID Security Systems* court admitted, as it is far more conservative and was prepared before any litigation.

Finally, in *Oracle Corp. v. SAP AG*, the infringer's projection was (1) aspirational because it was based on potential revenue SAP hoped to earn after an acquisition and (2) inapposite because a significant portion of the projected revenues were to be earned through a non-infringing source. 765 F.3d 1081, 1089-90 (9th Cir. 2014). In contrast, the 2007/2008 projection that Mr. Malackowski relied on is (1) based on actual sales, (2) implies only a modest 8.3% annual growth, and (3) speaks to only one product, Java ME, unlike in *SAP*. Malack. Op. Rpt. ¶ 189.

Google's motion to exclude Mr. Malackowski's lost profits opinion should be denied.[23]

## CONCLUSION

For the foregoing reasons, Google's Motion *In Limine* #6 should be denied in its entirety.

---

[23] Google's final lost profits argument seeks to exclude as speculative Mr. Malackowski's opinion that Android undercut Sun's own nascent mobile platform (project Acadia). Mot. at 25-26. This opinion is well supported by Google and Sun documents and witnesses. Malack. Op. Rpt. ¶¶ 204-17. In pursuing Acadia, Oracle tried to sell what Google was not only giving away for free, but also subsidizing with ad revenue sharing. *Id.* ¶ 212. Google distorts this opinion and asserts Mr. Malackowski intends to tell the jury that the value of Acadia lost profits is the same as the billions Google should pay in disgorgement. Mot. at 26. Mr. Malackowski intends no such thing. His opinion that "Sun and later Oracle's actual losses attributable to the lost Acadia opportunity could be quite significant, and potentially best measured by the apportioned Android profits attributable to the Infringed Java Copyrights" is not an attempt to quantify Acadia lost profits—he explicitly states these are not quantifiable. Malack. Op. Rpt. ¶¶ 215, 217. Instead, this opinion speaks to why he thinks his lost profits calculation of $475 million is conservative and why a separate calculation is further justified to compensate for actual harm to Acadia.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  April 6, 2016                    Respectfully submitted,

                                   Orrick, Herrington & Sutcliffe LLP

                                   By: */s/ Annette L. Hurst*
                                       Annette L. Hurst

                                   Counsel for ORACLE AMERICA, INC.