# Exhibit 39

# Filed Under Seal

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1  UNITED STATES DISTRICT COURT
2  NORTHERN DISTRICT OF CALIFORNIA
3  SAN FRANCISCO DIVISION
4  ORACLE AMERICA, INC.,
5     Plaintiff,
6        vs.           Case No. 3:10-cv-03561-WHA
7  GOOGLE, INC.,
8     Defendant.
   _____
9
10
11
12
13    *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*
14       PURSUANT TO THE PROTECTIVE ORDER
15     VIDEO DEPOSITION OF JAMES MALACKOWSKI
16           San Francisco, California
17          Wednesday, March 17, 2016
18                 Volume I
19
20
21
22  REPORTED BY:
23  REBECCA L. ROMANO, RPR, CSR No. 12546
24  JOB NO. 2265299
25  PAGES 1 - 385

Page 37

1  Generally, I listed a few.
2         Without the report -- I don't want to go
3  through and -- and speculate other categories, but
4  you can find them there.
5     Q.   What are the categories listed in your
6  report?
7     A.   Well, in two respects, one, they're the
8  categories, I calculated damages specifically
9  related to.  We've listed those six grouped into
10 four.
11        And there are other categories of which
12 I've generally described and identified two.
13        You seem to be asking me the same
14 question for the third or fourth time.
15        I don't have a recollection, sitting
16 here, of other benefits associated with the taking
17 that I did not ultimately calculate because I found
18 the records not sufficient.
19    Q.   You mentioned brand enhancement.  You
20 didn't perform any quantification of the benefits
21 of brand enhancement created by the alleged
22 infringement, correct?
23    A.   Correct, which is precisely why I placed
24 them in this category of non-quantified benefit.
25    Q.   What's your basis for saying that there's

Page 38

1  brand enhancement to Google not causally connected
2  to the alleged infringement?
3     A.   So, again, defer to my report, there's
4  discussion there.
5         But I think, at a general level, the
6  success of the Android platform, on which the -- on
7  which they relied upon the copyrights at issue in
8  this case, has had general carryover benefits to
9  Google.  More people became used to search, exposed
10 to a wider search audience.
11        And I believe the records of this case
12 would suggest that once people are comfortable
13 using Google Search, perhaps introduced to them by
14 way of the mobile environment, they are likely to
15 extend their use of Google Search outside of the
16 mobile environment both generally and in comparison
17 to alternatives such as Yahoo! and Bing.
18    Q.   What's that based on, that people extend
19 their use of Google Search?
20    A.   Well, my comments to you is based upon my
21 review of the record, some of which is cited
22 specifically in my report.  I can't provide you
23 cited documents or quotes from memory, sitting
24 here.
25    Q.   You can't think of any specific evidence

Page 39

1  that you relied on that substantiates the claim
2  that people extend their use of Google Search as a
3  result of the infringement at issue?
4     A.   Not specific documents.  I would defer to
5  what's listed.
6     Q.   You also mentioned YouTube.  You didn't
7  quantify any benefit to Google as YouTube revenue
8  stream as a result of the alleged infringement
9  here, correct?
10    A.   Correct.
11    Q.   And why not?
12    A.   I did not have the information sufficient
13 to allow me to do so.
14    Q.   What information would you need to
15 perform that calculation?
16    A.   I would start by trying to understand the
17 percentage of YouTube ad benefits, in particular,
18 the display ad benefits that were from mobile as
19 opposed to other channels.
20    Q.   And what information did you not have
21 that you needed?
22    A.   I don't recall information sufficient to
23 allow me to make that distinction.
24        To the extent it was there, I -- I don't
25 recall it.

Page 40

1     Q.   Are there any other revenue streams that
2  you can think of that weren't included in your
3  quantification of wrongful profits, but you still
4  contend received some benefit as a result of the
5  infringement?
6     A.   In the two minutes since you asked me
7  that four times before, no.
8     Q.   What sources of information did you use
9  in calculating the revenue amounts that are at
10 issue for the four revenue streams you included in
11 your quantification of alleged wrongful profits?
12    A.   Google-specific records, as well as
13 estimates made by Dr. Leonard in his rebuttal
14 report.
15    Q.   When you say Google-specific records, do
16 you mean Google profit and loss statements?
17    A.   It include profit and loss statements.
18 There was reference to various management
19 presentations, reference to 10-K and other public
20 filings.
21        All of that is detailed, generally,
22 within the report and in the schedules to the
23 report.  I think I have taken some care to
24 specifically footnote by Bates number or by
25 citation to publicly available records the exact

Page 94

1  A. Correct. But it's not simply fair to
2 imply that that 1.2 billion difference is -- is --
3 is the only thing that's going on. I'm also taking
4 into account in that difference other elements of
5 contribution that are not associated with the
6 ad revenue. That's in the first part of my
7 calculation, in particular the digital content and
8 applications.
9  Q. Once you arrive at the 35.6 percent
10 platform contribution, you don't apportion further,
11 correct?
12  A. I am sorry. My last answer I said,
13 digital content and apps also include hardware. So
14 could you repeat your last question, because I was
15 thinking about my prior answer --
16  Q. Once you arrive at the 35.6 percent
17 platform contribution, you don't apportion further,
18 correct?
19  A. Well, we -- "apportion" is a -- a term of
20 art. I certainly consider further apportionment
21 and conclude that, once I've reduced it to that
22 level, leaving Google with 64 percent of the
23 economic benefit, the commingling that exist as a
24 result of the Google taking is such that I am not
25 able to, and do not believe, it's possible to

Page 95

1 apportion further at a revenue level.
2  I understand that ultimately that's
3 Dr. Leonard's obligation, and he's presented no
4 suitable apportionment that would address that.
5 I -- I -- I clearly reject the lines of the code
6 analysis for the reasons we discussed.
7  I do, however, take into account further
8 costs, which some cases suggest also are a
9 reflection of apportionment, but I don't take into
10 account a further arithmetic explicit apportionment
11 because of the commingling.
12  Q. Getting back to the technical issues, if
13 the Android runtime were removed from Android,
14 Android wouldn't work, correct?
15  A. That's a question better for a technical
16 expert. My presumption is that it would not, but I
17 don't have a technical opinion in that regard.
18  Q. And if other Android libraries were
19 removed from Android, Android wouldn't work,
20 correct?
21  A. Same answer.
22  Q. If there are multiple aspects of the
23 Android that, if they were removed, would disable
24 the operating system, how does the fact that
25 Android wouldn't work without the SSO and declaring

Page 96

1 code establish a causal nexus?
2  A. Well, we have talked about this already
3 at great length, and to sort of recap for you:
4  One, I understand from my experience,
5 including the experience with the Brocade A10 case
6 that I cited for you, that that sort of analysis is
7 applicable to understanding causal nexus
8 explicitly;
9  Two, I understand from the technical
10 experts that the APIs at issue in declaring code
11 and SSO are not like everything else, that they, in
12 fact, are relatively more important for the reasons
13 they describe;
14  And, third, from a business perspective,
15 my report is replete with extensive discussion of
16 the need for a license to the code at issue -- I'm
17 sorry -- there's extensive discussion in my report
18 discussing the need for the license of what was
19 ultimately taking, because of that unique window of
20 opportunity, competitive threat and lack of
21 alternatives.
22  Q. Mr. Malackowski, there's not any
23 discussion in your report of a need for the license
24 taken -- to -- to the material actually taken, the
25 37 APIs, the declaring code and the SSO, is there?

Page 97

1  MS. HURST: Object to the form.
2  THE DEPONENT: Well, there is, in the
3 sense that there is a need, or a recognition by
4 Google of the need for a license and the lack of
5 alternatives. We have discussed at great length
6 that those documents do not specifically call out
7 the words "37, API, declaring code," as I would
8 expect them not to, based upon my experience in
9 matters of this type.
10  MS. HURST: Can I just -- I think my
11 LiveNote stopped working, and I just want to
12 inquire.
13  MR. PURCELL: Should we go off the
14 record? That's fine.
15  THE VIDEOGRAPHER: Going off the record
16 at 10:31 a.m.
17  (Recess taken.)
18  THE VIDEOGRAPHER: Back on the record
19 at 10:32 a.m.
20  Q. (By Mr. Purcell) Mr. Malackowski, I
21 think you alluded to it in your testimony, and it's
22 mentioned in your report, you also rely on a
23 centrality analysis regarding the SSO and declaring
24 code of the 37 Java SE APIs that was performed by
25 Dr. Kemerer; is that right?

Page 211

1  Q. So your opinion is that because the
2  37 APIs are commingled with the rest of the android
3  platform, that it's appropriate to assign all the
4  value of Google's profits attributed to the
5  platform to those APIs, right?
6  A. First, if you're using 37 APIs in a very
7  shorthanded way, then I can answer that question.
8  I presume you are, and you are not making a
9  distinction between the APIs and the declaring code
10 and the SSO.
11     So if we're just talking about the
12 infringement, yes, I believe that the commingling
13 of any other contributed element with the
14 infringement, in light of the record of this case,
15 suggests that for apportionment, before deducting
16 expenses, that's that a proper conclusion.
17 Q. And how do you determine that allegedly
18 infringing material is commingled with other
19 material to trigger the application of the legal
20 theory of commingling from the Sheldon case?
21 A. Would you repeat the question, please?
22     (Record read as follows:
23     "QUESTION: And how do you determine
24     that allegedly infringing material is
25     commingled with other material to

Veritext Legal Solutions
800-567-8658                          973-410-4040

Page 212

1      trigger the application of the legal
2      theory of commingling from the
3      Sheldon case?")
4  THE DEPONENT: So there is an entire
5  section of my report that describes that.
6  Particularly in my reply report, page 79. So I
7  would refer you to that section in detail. But
8  basically it is a fact-driven analysis that
9  references both the technical experts as well as
10 the business considerations. In the end
11 concluding, quote, Under these circumstances, use
12 of the commingling standard is appropriate because
13 the Java APIs are properly viewed as a gating item
14 to the Android platform, end quote.
15 Q. (By Mr. Purcell) And that's the reason
16 why that the Java API is reviewed as a gating item?
17 A. Yes, the reasons that are provided in my
18 report. Yes.
19 Q. Are there any other gating items to the
20 Android platform other than the Java APIs?
21 A. There may be. That's the essence of the
22 commingling theory, right? Because this is, A,
23 Google's burden; and, B, specific to the notion of
24 copying, knowingly assuming the risk, it's my
25 understanding that it is an appropriate methodology

Veritext Legal Solutions
800-567-8658                          973-410-4040

Page 213

1  to determine profits using the commingling theory,
2  as I have done.
3  Q. And your understanding that it's an
4  appropriate methodology is based on what?
5  A. Similar to what we talked about earlier
6  in the day. It is based on my experience in
7  matters of this type, A. B, my review of the
8  various authorities I cite in my report, both the
9  cases and the treaties. C, my application of the
10 facts of the record, including the technical
11 expert. And, D, my confirmation of my
12 understanding of the legal theory with counsel.
13 Q. If there are multiple gating items to the
14 Android platform, how would the commingling theory
15 handle that, given that each gating item can't
16 being responsible for 100 percent of the profits of
17 the platform?
18 A. The commingling theory would put the
19 burden upon the infringer to determine whether or
20 not any of the other gating items can be fairly
21 apportioned away.
22 Q. That's not an analysis that you have
23 done?
24 A. I tried to. I have considered that. In
25 my opinion, there isn't evidence that's available

Veritext Legal Solutions
800-567-8658                          973-410-4040

Page 214

1  to do that, and in consideration of the technical
2  and business significant of the copyrights at
3  issue, it's not necessary.
4      And then I would add, third, most
5  importantly, I do not believe that Dr. Leonard's
6  line of code analysis even speaks to this issue and
7  substance, but importantly is an analysis that's
8  been rejected by courts repeatedly that there is --
9  it is not an accepted approach to use a line of
10 code apportionment because that only considers a
11 quantitative metric, and it ignores the qualitative
12 value. In the cases -- in my experience, very
13 specifically rebut that, and I point you to most --
14 most directly related to me, again, Judge Grewal,
15 who discussed that issue very specifically in the
16 Brocade case.
17 Q. What did you do -- what did you do in
18 your attempt to apportion the various components of
19 the Android platform?
20 A. I attempt to understand the technical
21 significance of the copyrights vis-a-vis the other
22 elements of the platform. I sought to understand
23 any theory advanced by defendants, and then I
24 reconciled that with my review of the business
25 conditions.

Veritext Legal Solutions
800-567-8658                          973-410-4040

Page 221

1 tables that show what the 37 APIs at issue do
2 versus others. But that's really a technical
3 discussion, and from memory I -- I couldn't
4 describe that difference to you. I would defer to
5 the technical experts.
6   Q. And, in fact, all of the implementing
7 code in the Android core libraries, that's not
8 accused of infringement?
9   A. As we discussed before lunch, true.
10   Q. And that made a contribution to the
11 functioning -- strike that.
12     That made a contribution to the profits
13 that Google earned from Android, didn't it?
14   A. Sure.
15   Q. And you haven't made any attempt to
16 quantify that?
17   A. Well, I have, because I have made an
18 attempt to address the commingling factor. There
19 is not evidence, in my opinion, that would allow
20 you to do a second or third level apportionment in
21 recognizing that it is defendants' burden.
22     I considered the apportionment metric put
23 forth by the defendants, i.e., lines of code, and
24 was able to reject that out of hand because of the
25 decisions of multiple courts and the basis for

Page 222

1 those decisions.
2   Q. You haven't attempted to independently
3 quantify the value or the contribution of the
4 implementing code in the Android core libraries to
5 Android's profit, correct?
6   A. True. That was not my assignment, and I
7 have not quantified that. I have sought
8 information in that regard as it -- a great --
9 relates to the commingling issue. I'm not aware of
10 any.
11   Q. What information have you sought that
12 would allow you to separately value the
13 contribution of the implementing code in the
14 Android core libraries to Google's Android-related
15 profits?
16   A. Most specifically information in the
17 Dr. Leonard report or the technical expert reports
18 of defendants. Generally where they would seek to
19 meet their burden by putting forth evidence of
20 apportionment to address commingling.
21   Q. What information have you personally
22 sought on that issue?
23   A. My review of the reports.
24   Q. Did you ask any of Oracle's technical
25 experts to analyze that issue?

Page 223

1   A. No, I did not.
2   Q. How would one go about analyzing that
3 issue? If you wanted to do a second or third level
4 apportionment, what you would -- what you would
5 want to see?
6   A. At that level, which is based upon our
7 conversation, which is a technical level, that's
8 outside the core of my area of expertise. I would
9 seek the counsel of the technical experts.
10   Q. What information would you, as a damages
11 quantifier, find persuasive in order to enable you
12 to do a second level apportionment between all the
13 implementing code in the Android core libraries and
14 the structure, sequence, and organization, on the
15 other hand, of 37 API packages?
16     MS. HURST: Object to the form.
17     THE DEPONENT: To the extent that there
18 was a detailed technical analysis that was
19 confirmed by the business records of the case,
20 that's the type of information I would find
21 persuasive. I can't tell you that I would find it
22 persuasive per se, because we're speaking
23 hypothetically, but that's the type of thing that I
24 would look to.
25   Q. (By Mr. Purcell) What type of detailed

Page 224

1 technical analysis would you be looking for?
2   A. Technical expert reports.
3   Q. Analyzing what?
4   A. Analyzing the contributions on a
5 quantitative way of the copyrights at issue versus
6 the other technical elements that contribute to
7 profits seeking to tie those contributions back to
8 the business records.
9   Q. You don't have any specific technical
10 analysis in mind that would be able to unpack the
11 value of the implementing code in the Android core
12 libraries versus the value of the structure,
13 sequence, and organization of the 37 Java SE API
14 packages; is that right?
15   A. Correct.
16   Q. And you understand, similarly, the
17 Android operating system contains an Android
18 runtime?
19   A. Yes.
20   Q. Do you have an understanding of what the
21 Android runtime does?
22   A. Not from a technical perspective, no.
23   Q. Do you understand how important the
24 Android runtime is to the function of the Android
25 operating system?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 228

1  profits.
2     Q.  You might even call the presence of the
3  phone functionality on a mobile phone a gating
4  item, correct?
5     A.  On a mobile phone generally?  Sure.
6     Q.  You also understand that Google's
7  strategy to -- well, strike that.  Let me finish up
8  the last line of questions.
9         You haven't made any effort to separately
10 quantify the contribution to Google's
11 Android-related profits of the preinstalled
12 applications on the Android platform, correct?
13    A.  You have asked me this question
14 repeatedly about each and every element you've
15 raised.  And, yes, I sought to understand the
16 contributions that were made to the profits of
17 Android.  I determined that that could first be
18 measured by focusing on the platform-related
19 economics.  And then I sought to specifically see
20 if there could be a second level apportionment,
21 aside from cost deductions, that would allow me to
22 distinguish between the copyrights at issue and any
23 other element and concluded that, because of the
24 commingling, there was not data sufficient for me
25 to do so.

Page 229

1         I then looked to see if Dr. Leonard,
2  consistent with his obligations, provided me a
3  route to solve that problem and concluded that he
4  did not.
5         And so, in my opinion, the best available
6  evidence of apportionment is what I've set forth in
7  my report at the level set forth in my report.
8     Q.  You also understand that Google's
9  strategy to release Android as an open source
10 platform was crucial to the success of the
11 platform, correct?
12    A.  I -- I don't believe I draw that opinion
13 in my report.  And I specifically talk about the
14 implications of certain characteristics of open
15 source platforms at various points in time.  So
16 your question would have to be more specific.
17    Q.  Sure.  Why don't you take look at
18 paragraph 58 of your responsive report on page 18.
19        So in the third sentence of that
20 paragraph you write, "Additionally, it suggests
21 Apple's closed environment would have monopolized
22 the smartphone market which ignores the success
23 that resulted from Android's free open source
24 model."
25        Do you see that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 230

1     A.  I do.
2     Q.  So at least some part of the success of
3  Android and Google's Android-related profits are a
4  result of the free open source model that Google
5  released Android under, correct?
6     A.  Well, certainly that is an element of
7  their business model.  I don't know as -- I thought
8  your last question implied that there's an
9  incremental contribution of that.  I would note
10 that this discussion we are referring to is
11 specifically in response to the Kim and Berry
12 models.  So a critique of Dr. Leonard's use of
13 those, not a general discussion of apportionment.
14    Q.  Nonetheless, Google's strategy to release
15 Android as an open source platform did make a
16 significant contribution to Android's success,
17 didn't it?
18    A.  I don't believe I use the word
19 "significant" or draw that relative qualitative
20 assessment in my report.
21    Q.  Do you have any opinion on the extent to
22 which Android would have succeeded had it not been
23 open sourced?
24    A.  Well, to the extent that it was a
25 platform that included a license from Java with the

Page 231

1  related elements of control and security, I think
2  it would have been as successful.
3     Q.  And what's that based on?
4     A.  Based upon that that was a focus of the
5  discussions early on between Android and Google.
6  That clearly -- I'm sorry.  Between Google and
7  Android and Sun.  That clearly it was Sun's
8  expectation that a license consistent with their
9  usual practice would allow Google to be successful.
10    Q.  So your testimony is that if Android had
11 not been open sourced, it would have been just as
12 successful?
13    A.  Again, I don't draw that opinion in my
14 report.  I'm merely answering your questions in
15 response to this deposition.  That's outside the
16 scope of my analysis, in large part because, again,
17 it trespasses into the world of the counterfactual,
18 which I do not believe to be relevant.
19    Q.  In any event, you made no attempt to
20 qualify the contribution to Google's
21 Android-related profits of the open source
22 strategy; is that right?
23    A.  I don't make a specific quantification of
24 that contribution.  I don't believe that that's
25 possible.