# Exhibit 43

# Filed Under Seal

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of June 30, 2005 by and among Google Inc., a Delaware corporation ("**Buyer**"), Android, Inc., a Delaware corporation (the "**Company**"), each stockholder of the Company, each of which is identified on the signature pages to this Agreement and Schedule 1.1 as may be amended prior to the Closing pursuant to Section 7.3(p) (individually, a "**Stockholder**" and collectively, the "**Stockholders**"), Andrew E. Rubin as Stockholder Agent (as such term is defined in Section 9.4), and with respect to Article VIII, Article IX, Article X and Article XI hereof only U.S. Bank, National Association as Escrow Agent. Capitalized terms used and not otherwise defined in this Agreement shall have the meanings ascribed to them in Article XI.

## RECITALS

A.  The Boards of Directors of each of Buyer and the Company believe it is in the best interests of the Company to enter into this Agreement and Buyer to purchase all issued and outstanding shares of common stock of the Company, par value $0.0001 per share (the "**Company Common Stock**") pursuant to the terms hereof.

B.  The Stockholders own all of the issued and outstanding shares of Company Common Stock.

C.  Buyer desires to acquire from the Stockholders, and the Stockholders desire to sell to Buyer, all of the issued and outstanding shares of Company Common Stock held by each such Stockholder upon the terms and conditions set forth in this Agreement (the "**Acquisition**").

NOW, THEREFORE, in consideration of the mutual agreements, covenants and other promises set forth herein, the mutual benefits to be gained by the performance thereof, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and accepted, the parties hereby agree as follows:

## ARTICLE I

## THE ACQUISITION

1.1  Purchase and Sale.

(a)  At the Closing (as defined in Section 1.8) and subject to and upon the terms and conditions of this Agreement, Buyer shall purchase from each Stockholder and each Stockholder shall sell, convey, transfer, assign and deliver to Buyer, free and clear of all Liens, encumbrances or other defects of title, all of the issued and outstanding shares of Company Common Stock held by such Stockholder as set forth opposite such Stockholder's name on Schedule 1.1.

CONFIDENTIAL                                   Oracle America v. Google, 3:10-cv-03561-WHA         GOOGLE-00303928

Trial Exhibit 1004, Page 7 of 82

(b) At the Closing, subject to Section 1.7, in consideration of the sale, assignment and transfer of such shares of Company Common Stock and the agreements of the Stockholders made in connection with the transactions contemplated hereby, Buyer shall pay to each Stockholder his or her Pro Rata Share of the Closing Purchase Price. On the day prior to the Closing Date, Company shall deliver to Buyer a certificate containing a calculation of the Adjusted Net Equity in reasonable detail, which certificate shall be deemed as a representation and warranty as if made in this Agreement.

(i) "**Adjusted Net Equity**" shall mean, as of the Closing, the sum of (a) all assets of the Company determined in accordance with generally accepted accounting principles consistently applied ("**GAAP**"), plus (b) the Shared Lease Liability, plus (c) the Google Note Balance, plus (d) $1,000,000, less (e) all Liabilities of the Company determined in accordance with GAAP.

(ii) "**Closing Purchase Price**" shall equal $11,000,000 less the Net Equity Shortfall.

(iii) "**Google Note Balance**" shall mean, as of the Closing, the principal plus accrued interest owed by the Company to Buyer pursuant to that certain Secured Promissory Note dated as of May 25, 2005 (the "**Google Note**").

(iv) "**Net Equity Shortfall**" shall mean (a) zero, if Adjusted Net Equity is zero or greater than zero and (b) the absolute value of Adjusted Net Equity, if Adjusted Net Equity is less than zero.

(v) "**Pro Rata Share**" with respect to each Stockholder shall mean the number obtained by dividing (a) the number of shares of Company Common Stock held by such Stockholder on the Closing Date, as set forth opposite such Stockholder's name on the updated Schedule 1.1 called for under Section 7.3(p), by (b) total number of shares of Company Common Stock that are outstanding on the Closing Date.

(vi) "**Shared Lease Liability**" shall mean, as of the Closing, the absolute value of the product of (a) 50% multiplied by (b) the aggregate amount of the Liability payable by the Company in connection with the Lease Modification (defined in Section 7.3(k)); *provided, however*, that in no event will the Shared Lease Liability exceed $350,000.

(c) Following the Closing, subject to the terms and conditions of this Agreement (including Section 1.7 and Article IX) and the satisfaction of the applicable Milestones, Buyer shall pay to each Stockholder his or her Pro Rata Share of up to $60,000,000 (collectively, the "**Milestone Payments**") as provided for and subject to this Article I.

1.2 Milestone Payments.

(a) The parties acknowledge and agree that Buyer's achievement of the Milestones after the Closing is a material factor in determining the valuation of the Company.

CONFIDENTIAL                                    Oracle America v. Google, 3:10-cv-03561-WHA           GOOGLE-00303929

Trial Exhibit 1004, Page 8 of 82

1.4     Support for Earn-Out Milestones.  Buyer acknowledges and agrees that the opportunity to earn the Milestone Payments is a material inducement to the Stockholders to enter into this Agreement.  After the Closing, Buyer shall provide to the Company or the Business Group commercially reasonable resources (including, without limitation, commercially reasonable personnel and equipment) in connection with the Company's or the Business Group's efforts to reach the Milestones (the "**Milestone Support**"); *provided* that (a) the foregoing shall not constitute a guarantee of employment of any Employee and Buyer may terminate any Employee, with or without cause, at any time and such termination shall not constitute a breach of this Agreement and (b) no breach shall be deemed to have occurred under this Section 1.4 unless and until the Stockholder Agent shall have given written notice to Buyer of such alleged breach and, if a violation has in fact occurred, Buyer shall have had a reasonable period of time after receipt of such notice to cure such breach.  The period of time in excess of six months from (a) the effective date that notice is given that Buyer has failed to provide Milestone Support and Buyer has acknowledged in writing that it has so failed to provide the Milestone Support until (b) the date such Milestone Support is restored is referred to as a "**Milestone Extension Period.**"

1.5     Limitations on Milestone Payments.

(a)     If Milestone 1 is not achieved pursuant to this Article I by the third anniversary of the Closing extended for any intervening Milestone Extension Period, all Milestone Payments shall be unearned, forfeited and retained permanently by Buyer.

(b)     Without limiting Section 1.5(a), if any of Milestones 2, 3 or 4 are not achieved pursuant to this Article I by the seventh anniversary of the Closing extended for any intervening Milestone Extension Period, the Milestone Payments associated with such unachieved Milestones shall be unearned, forfeited and retained permanently by Buyer.  The period from the Closing Date until the last date upon which a Milestone may be achieved is referred to as a "**Milestone Period.**"

(c)     Without limiting any other provision of this Agreement, if Buyer in its sole discretion determines not to pursue (1) the development of operating systems for mobile telephones using Company Intellectual Property (as defined in Section 2.11(a)) or Intellectual Property (as defined in Section 2.11(a)) of the Business Group developed after Closing or (2) the sale of mobile telephones enabled with such operating systems, then Buyer may, at its option by providing notice to the Stockholder Agent, (i) enter into an agreement with the Principal Stockholders or entity designated by them (which agreement shall be negotiated in good faith among Buyer and Stockholders) pursuant to which Buyer will grant to the Principal Stockholders a nonexclusive, transferable, sublicensable, irrevocable, perpetual, world-wide, royalty-free, fully paid license to (x) make, have made, use, sell, offer for sale, create derivative works and improvements of, distribute (directly or indirectly) or otherwise commercially exploit the Company Intellectual Property and derivative works or improvements thereof and practice any method or process in connection therewith, (y) copy, distribute, reproduce, and perform the Company Intellectual Property, and (z) to create derivative works of and improve on the Company Intellectual Property; (ii) release the Principal Stockholders from the noncompetition obligations under the Noncompetition Agreements (as defined in Section 7.3(l)); and (iii) if the notice provided by Buyer

CONFIDENTIAL                               Oracle America v. Google, 3:10-cv-03561-WHA        GOOGLE-00303931

Trial Exhibit 1004, Page 10 of 82

Exhibit C

Milestones

Milestone 1

Buyer's mobile telephone handset manufacturing partner(s) shall have shipped a minimum of one functional mobile telephone using an operating system developed by the Company (a "**Company Enabled Phone**"), and Buyer shall have entered into a definitive agreement with at least one wireless carrier (which carrier must provide service to a minimum of 15 million customers) providing for the service contract related to the Company Enabled Phone. The Company Enabled Phone may not be a mere prototype but rather shall be a functional mobile telephone that, if replicated, would be suitable for use by a large number of consumer end users.

Milestone 2

Buyer's mobile telephone handset manufacturing partner(s) shall have shipped an aggregate of 5 million Company Enabled Phones.

Milestone 3

Buyer's mobile telephone handset manufacturing partner(s) shall have shipped an aggregate of 10 million Company Enabled Phones.

Milestone 4

Buyer's mobile telephone handset manufacturing partner(s) shall have shipped an aggregate of 50 million Company Enabled Phones.

CONFIDENTIAL                              Oracle America v. Google, 3:10-cv-03561-WHA          GOOGLE-00304000

Trial Exhibit 1004, Page 79 of 82