# Exhibit 3

# Filed Under Seal

HIGHLY CONFIDENTIAL

Page 1

1      UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF CALIFORNIA
3          SAN FRANCISCO DIVISION
4  ORACLE AMERICA, INC.,
5     Plaintiff,
6       vs.          Case No. 3:10-cv-03561-WHA
7  GOOGLE, INC.,
8     Defendant.
   _____

9
10
11
12
13          *HIGHLY CONFIDENTIAL*
14      PURSUANT TO THE PROTECTIVE ORDER
15   VIDEO DEPOSITION OF JAMES R. KEARL, Ph.D.
16          San Francisco, California
17          Wednesday, March 23, 2016
18                Volume I
19
20
21
22  REPORTED BY:
23  REBECCA L. ROMANO, RPR, CSR No. 12546
24
25  Job No. CS2276036

Page 102

1    THE DEPONENT:  I'm not sure I understand
2 the difference between that question and the
3 question you just asked.  So...
4    Q.  (By Mr. Ragland)  I think the prior
5 question asked about miscellaneous apps.
6        And now I'm asking about not just the
7 miscellaneous bucket of apps, like for the skier
8 who doesn't want to be in an avalanche, but
9 generally apps, 100,000 versus 400,000 versus a
10 number of apps.
11       And maybe it's the same answer as the
12 prior question, and it's the same --
13    A.  It is -- it is the same answer.  And --
14    Q.  If I could turn you, please, to --
15    A.  Let me -- let me be clear, though, that
16 what my report does, I think, responsive to
17 Judge Alsup's order -- order -- Judge Alsup's order
18 is to say the jury will have before it disputed
19 facts.
20       If it comes down on the facts in this
21 way, here's a way to think about the damages that
22 follow.
23       So I haven't spent a lot of time looking
24 for facts.  I'm not trying to advocate a particular
25 position here, although I have criticized some

Page 103

1 positions as inconsistent, I think, with basic
2 economic sense.
3        But -- so whether I am or not aware of
4 that, if the jury has that evidence or evidence
5 that would lead them to understand and agree that
6 that mattered, then my report, again responsive to
7 Judge Alsup's direction, is to say, okay, here's
8 how to think about damages in that case.
9    Q.  In paragraph 65 of your report, which is
10 on pages 34 and 35 of Exhibit 1580, you say that,
11 "The way the Kim model works is that platform
12 market shares are a function of the weighted
13 availability of apps on that platform with the
14 weights determined by the popularity of the app."
15       Why -- my question is maybe very
16 simplistic.  But why do you believe that the Kim
17 model works in that way?
18    A.  If -- if you look under the hood of -- of
19 the way that Dr. Leonard sort of programs it, and
20 you also look at the more summary data and
21 discussion in Kim's chapter, the apps are weighted
22 as they enter into the various components of the
23 model.  And they are weighted by, more or less,
24 downloads -- download shares.
25       So that an app that's downloaded a

Page 104

1 million times has greater weight in the analysis
2 than an app that's downloaded five times.
3    Q.  And how is that different to your
4 understanding from what Dr. Leonard has done?
5        MR. COOPER:  Object to form.
6        THE DEPONENT:  I'm just characterizing
7 what Dr. Leonard has done, I think.  I'm not doing
8 something different than Dr. Leonard has done.  I'm
9 just trying to explain what I think he believes the
10 Kim model to be.
11       I mean, there is this issue here that's a
12 little unusual.
13       Had Dr. Leonard put forward a regression
14 in his analysis that looked like the Kim model --
15 whereas, he took discrete choice analysis, he took
16 the very transformation, he estimated a model -- we
17 would have said, give us the data and let us test.
18       I mean, it's a sensible thing to do.  And
19 Dr. Leonard is a fine econometrician, so there
20 wouldn't be disputes about whether it was refereed
21 or not refereed, at least in my view.  That
22 wasn't -- that -- that wouldn't be where you would
23 put economic weight on this.
24       You would say, Let me see the data and
25 let me test whether or not the parameter estimates

Page 105

1 that you think are important are sensitive to the
2 data, to the way the data is created, to the time,
3 and so on.
4        We have none of that.  Okay.  It's
5 literally impossible to test whether the parameters
6 that come out of the Kim model that Leonard relies
7 upon are sensitive to anything.
8        We don't know the data.  We didn't even
9 know all of the Kim model parameters.
10 Surprisingly, one of the key parameters he has to
11 get by email from -- from Kim.
12       So there's a -- a bit of a disadvantage
13 here.
14       And all I can do is to do what he's done,
15 is to say, okay, here's what the Kim model does,
16 and -- and here's how Leonard has programmed in
17 GAUSS in order to implement his market share
18 adjustments of the Kim model.
19       I can do that.  I can -- I have
20 replicated what -- what -- what he did.
21       And then said, okay, let's go a step
22 further and -- and relax some of the assumptions
23 that are in his paper about the two parameters and
24 about the things that would be or not be available
25 in the but-for world, and, if tested, the

Page 106

1 sensitivity of his conclusions to his use of those
2 parameters.
3     But what you can't do, but would like to
4 do is to test the -- test the underlying
5 sensitivity of the parameters to the data and the
6 way it was -- the structure of the model.
7   Q.  (By Mr. Ragland)  In your Scenario No. 3,
8 under your Alternative No. 4 --
9   A.  Is this page --
10   Q.  Well, it -- it is referred to on page 36
11 of your report.  And I will direct you to
12 particular paragraphs.
13     But just as sort of the foundation then,
14 you removed apps from the counterfactual as
15 compared to Dr. Leonard's analysis for that
16 scenario; is that correct?
17   A.  Yes.  But I'm limited to the universe of
18 apps that are in his original analysis.
19   Q.  And so in paragraph 70 here, on page 36,
20 you explain that in Scenario 3, "I removed
21 dual-home criteria from Scenario 2.  This resulted
22 in only 10 percent of the apps remaining in the
23 model.
24     "In this scenario there would be an
25 approximate 20 percent loss of Android users, an

Page 107

1 estimate of damages of more than 3.5 billion."
2     So how many additional apps do you draw
3 from the counterfactual as compared to
4 Dr. Leonard's analysis for this Scenario 3?
5   A.  It may be in the exhibits, so...
6     (Exhibit 1584 was marked for identification by
7 the court reporter and is attached hereto.)
8   Q.  (By Mr. Ragland)  So, Dr. Leonard, you --
9 sorry -- Dr. Kearl, you have been handed what's
10 been marked as 1584.  These are the exhibits to
11 your report, which was marked as 1580?
12   A.  Yes.
13   Q.  Okay.  So with those in front of you,
14 then I can repeat the question I had.
15     Say so in paragraph 70 on page 36 of your
16 report, you explain that, "In Scenario 3, I removed
17 the dual-home criteria from Scenario 2.  This
18 resulted in only 10 percent of the apps remaining
19 in the model."
20     And my question is, how many additional
21 apps did you draw from the counterfactual as
22 compared to Dr. Leonard's analysis?
23   A.  So if you turn to
24 Exhibit 4.A.1(Corrected).
25   Q.  And, for the record, that's within what's

Page 108

1 been marked as Exhibit 1584.
2   A.  So the first line in that exhibit is the
3 number of apps that Dr. Leonard -- unique apps that
4 Dr. Leonard has in each year, and the total number
5 of unique apps in his base model, which is 2,687,
6 over the four years.
7     Okay.  And then you can see the numbers
8 when you change to Scenario 1.  Scenario 1, you
9 lose two apps.  You'll lose one in 2013 and 2014,
10 but only one of them is unique, so you only lose
11 one unique app.
12     Scenario 2, you go down to 1814, and you
13 can see the year-by-year.
14     And Scenario 3, you go down to 344.
15 Okay.
16   Q.  So for Scenario 3 then, you removed
17 approximately 2300 and --
18   A.  Yeah, 20 -- I think I said 20 percent.
19     But this is not misleading, but this
20 doesn't quite tell you the story.  Because those 3,
21 4 -- 144 apps on -- on a download-weighted basis
22 constitute about 40 percent.
23     So -- so I think Dr. Leonard's
24 counterfactual reduces about 2 percent.  And my --
25 on my Scenario 3 counterfactual then goes from

Page 109

1 98 percent to 40 percent.
2     And -- and it's that that feeds into the
3 model, not the number of apps.  It's the number of
4 apps...
5   Q.  In Scenario 3, does this set of
6 additional apps that you draw from the
7 counterfactual include the Facebook app?
8   A.  I don't think so.  I think the Facebook
9 app is probably in the 344 that's there, because
10 it's the most downloaded app.  But -- but I don't
11 know.  I mean, I -- the -- I'm trying to think
12 whether or not we could figure it out.
13     I -- I don't remember, as I sit here,
14 whether or not Dr. Leonard has app by name or just
15 app by download weight.  So I don't know the answer
16 to that question.
17   Q.  And is the -- the same response that you
18 don't know, sitting here today, whether or not the
19 apps dropped from Scenario 3 in the counterfactual
20 includes the Skype app?
21   A.  Again, I don't know.  I would have to go
22 see whether or not the apps are identified by name.
23 I just don't recall.
24   Q.  What was your basis for removing the
25 particular apps that you did from the

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 114

```
 1  excluded all or in part, all right, and the Kim
 2  analysis that Dr. Leonard has relied upon.
 3       The Kim analysis is subject to two
 4  criticisms.
 5       One is it focuses on the wrong question.
 6  It focuses on the winning apps, and not sort of the
 7  important, but not in the top -- top 100 or 200 or
 8  1,000.  All right.
 9       But if -- if you throw out both Shugan
10  and the Kim model, then the experts on the -- on
11  the two sides here have nothing to say about the
12  important question, about what -- what would be the
13  quantitative amount of damages in the intermediate
14  case, in which the jury concluded that it wasn't an
15  all-or-nothing deal, but it was somewhere in
16  between.
17    Q.  Did you consider, in preparing your
18  report, the popularity of different programming
19  languages at the time that Android was developed?
20    A.  No.  I am not a fact witness.  You keep
21  asking me today.  I will pass.
22    Q.  And -- and -- and I'll just -- I'll just,
23  you know, say generally, I'm not trying to be
24  sinister or tricky here, or anything like that.  I
25  just want to make sure that I understand the record
```

Page 115

```
 1  properly.  And so --
 2    A.  As long as I can --
 3    Q.  I mean no disrespect, or anything like
 4  that.
 5    A.  No, no, no, no, I didn't mean that.  But
 6  as long as I can continue to answer I'm not a fact
 7  witness, that's fine.
 8    Q.  Absolutely.  Absolutely.
 9       Would you agree that from an economics
10  perspective, developers have strong incentives to
11  multi-home?
12    A.  I don't know the answer to that question.
13  I don't think it's self-evident that they have a
14  strong incentive to multi-home.
15    Q.  Okay.
16    A.  I really -- you're spending more time
17  with an economist than you want to today.  But an
18  economist -- an economist's response is always
19  going to be -- to say that depends upon the cost.
20  Right.
21       And if multi-homing costs me a lot, then
22  I'm going to be satisfied with a single platform.
23       So I don't think there's a single uniform
24  answer to that question absent of knowing about the
25  costs that different programmers face or different
```

Page 116

```
 1  categories of programmers face.
 2    Q.  Is it fair to say that you're spending
 3  more time than you want to at lawyers' services?
 4    A.  Absolutely.
 5       MR. COOPER:  Yes.
 6    Q.  (By Mr. Ragland)  Well, I should have
 7  asked a foundational question.
 8       What -- what do you mean by multi-homing?
 9    A.  Multi-homing, I think, means that I write
10  for several platforms that presumably have
11  different implementing -- well, different
12  app-support platforms.
13       That is, you've got -- this is awkwardly
14  put.  You've got to write in different languages.
15  Okay.
16    Q.  In your report, on paragraph 59, which is
17  on -- you can race to get to the page -- pages 30
18  and 31, you state in there that, "Google makes less
19  search-related profit when users switch from an
20  Android phone to another smartphone."
21       What is -- to your recollection,
22  what's the -- the evidence or basis for that -- for
23  that statement?
24    A.  This has a long predicate to it, which I
25  describe in my -- in my -- early on in the report,
```

Page 117

```
 1  which is, you would think that the nature of
 2  traffic acquisition costs would be sort of almost
 3  stipulated, that everybody would agree that the
 4  record would be clear on this matter, that we would
 5  know who pays what and how much.
 6       And the record is a hash.  It's not
 7  clear.  And the experts aren't clear either.
 8  Because I asked them this question when I had an
 9  opportunity to pose questions in depositions.
10       So it -- with that as background, it's my
11  understanding that when Google sells an ad, its
12  revenue doesn't depend upon which -- it's -- the
13  price it gets paid for placing the ad doesn't
14  depend upon which platform it's on.
15       So its revenue are platform neutral, but
16  that its costs are not.  And that the advantage of
17  Android is that it reduced traffic acquisition
18  costs.
19       That's what I believe the facts will be,
20  but they're not clear.  Okay.
21       I think there's some indirect evidence
22  that that's what Google wanted.  It wanted to
23  reduce traffic acquisition costs.
24       That may have occurred in two ways.  Only
25  one way is handled by all of the experts in this
```