# Exhibit 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ORACLE AMERICA, INC.

Plaintiff,

vs. Case No. 3:10-cv-03561-WHA

GOOGLE, INC.,

Defendant.

____________________________

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

PURSUANT TO THE PROTECTIVE ORDER

VIDEO DEPOSITION OF GREGORY K. LEONARD, Ph.D.

San Francisco, California

Friday, March 11, 2016

Volume I

REPORTED BY:

REBECCA L. ROMANO, RPR, CSR No. 12546

JOB NO. 2241706

PAGES 1 - 405

he says there is wrong.
I think those are the major ones.
Q. Anything else?
A. I mean, those are the ones that leap to mind. I'm happy again to re- -- re-invite you to give me the report and I'll be happy to go through it.
Q. How is Mr. Malackowski's calculation of TAC wrong?
A. Well, I think his claim is that the -- the -- the TAC for search is somehow already in the line items for -- under cost of sales for digital content and apps, I think, and that therefore when, you know, I've done a TAC calculation and it included some for search, that it's overstated.
But, I mean, it's just he's wrong about that. The payments that are included under digital content and apps to partners are not for the types of things we were talking about before. It's when a user, for instance, pays for an app and then -- but has it billed through his carrier statement.
So that's the only thing that's included there.
And, of course, if you think about it, it just doesn't make any -- Mr. Malackowski's claim

doesn't make any sense. Why would the TAC for search be reported in the cost of sales on the Android P&L and have the revenue that's associated with that TAC be reported on the ad P&L, which is, you know, where it is?
And the answer is, well, it's wrong, because the ad -- I mean, the TAC is also on the add P&L. And I describe how to -- to tease that out in my exhibits.
And on top of that, you know -- further, I talked to Google about this, and -- and, you know, that's -- the way I did it is consistent with what I just said and inconsistent with the way Mr. Malackowski did it.
And then, finally, if you look at the actual numbers for 2008, '9, and '10, where Google actually reported the TAC on the Android P&L, if you look at the TAC as a percentage of revenue for those years, it's basically the same kind of numbers that I'm getting for the 2011 to 2015 period, and a lot higher than the numbers that Mr. Malackowski is getting.
So, you know, that's again just a further demonstration that the way I did it was correct and the way he did it was incorrect.

Q. So where did you get your TAC number for search?
A. It's calculated in Exhibit 1- -- let's see -- 1a -- sorry -- 1d.
Q. Let me ask you something. You had all the access to Google that you wanted here in order to get any data that you wanted to perform your analysis or confirm the accuracy of any your analysis, right?
A. Right.
Q. Now TAC for search, that's -- that's a knowable number, right? It's a number that they actually paid to their search advertising partners, right?
MR. PURCELL: Object to the form.
THE DEPONENT: It's -- they certainly paid TAC to people, yes.
Q. (By Ms. Hurst) Yeah. And you could go and find out exactly how much TAC Google paid to people, right, for this period of time?
MR. PURCELL: Object to the form.
THE DEPONENT: I mean, I don't believe that's what they record in their systems. What they record in their systems is, for instance, reflected in Exhibit 1d.

Q. (By Ms. Hurst) Well, did you go look at their systems?
MR. PURCELL: Object to the form.
THE DEPONENT: I talked to them about their systems, yes.
Q. (By Ms. Hurst) Did you look at the systems yourself?
A. No. I talked to them about the nature of their systems.
Q. Okay. You did not look at the systems yourself.
MR. PURCELL: Object to the form.
THE DEPONENT: I did not look at the systems myself.
Q. (By Ms. Hurst) For example, you did not look at Hyperion?
A. I did not look at Hyperion.
Q. And you don't know whether Hyperion records actual numbers for search-related TAC, true?
A. I do not know one way or the other whether it does.
Q. And you're relying on Mr. Gold's information in concluding that you have to derive a number for search-related TAC, true?

A. Well, let's say not entirely. Because as I just mentioned, I did compare it in the 2011 to 2015 period to the earlier period, and I'm getting similar numbers which suggest that, you know, the way that I went about it is -- is correct.
Q. Well, using the appearance of similar numbers to conclude the way you went about it is correct makes the assumption that the rate of revenue sharing remain the same throughout the period, doesn't it?
A. Well, I mean, I guess -- it -- it -- it's -- that the TAC as a percentage of revenue would have been about the same, which, you know, is generally true. It's just, as an overall level, you can see it in the data.
Q. Well, did you look at any of the agreements to see whether there were escalation clauses that provided for increased percentages of revenue sharing over time?
A. No. I looked at the actual data which is here in front of us.
Q. Did you look at the agreements that provide for the percentage rate of sharing to determine whether they had increased over time?
MR. PURCELL: Object to the form.

THE DEPONENT: Well, again, I looked at the actual data. I think that's the better thing to look at.
Q. (By Ms. Hurst) Well, you derived the calculation, though, right?
You didn't look at some category for TAC search expense that was reported in the 2011 to 2015 period. You derived it, true?
A. No. Look at -- I mean, the numbers in Exhibit 1d under Google Advertising TAC are the actual TAC.
Q. Well, we're talking the search TAC, right?
A. Yeah, that's the AdWords TAC.
Q. Did you look at the agreements to determine whether the rate of percentage sharing increased over time?
MR. PURCELL: Object to the form.
THE DEPONENT: Well, which agreements are you talking about?
Q. (By Ms. Hurst) The revenue sharing agreements associated with Google Search?
MR. PURCELL: Same objection.
THE DEPONENT: Well, first of all, I don't think that those have been produced in this

case. And second of all, as I'm trying to explain to you, I looked at the actual data.
Q. (By Ms. Hurst) Did you ask for those agreements to verify whether they had maintained a constant rate of revenue sharing?
MR. PURCELL: Object to the form.
THE DEPONENT: I did not ask for those agreements, no.
Q. (By Ms. Hurst) Have you seen any evidence in the case to suggest that perhaps there might be revenue sharing agreements that increase over time or with larger volumes?
A. But at the end of the day, what matters is what the actual data shows, so...
MS. HURST: Move to strike as nonresponsive.
Q. (By Ms. Hurst) Have you seen any evidence in this case that suggests that there might be revenue sharing agreements that increase in percentage over time or with larger volumes?
MR. PURCELL: Object to the form.
THE DEPONENT: My answer actually was responsive.
I'm saying I'm looking at the actual data, and it seems to be inconsistent with what

your question seems to imply.
Q. (By Ms. Hurst) Well, when you say you're looking at the actual data, what you mean is you're looking at the data you derived.
MR. PURCELL: Object to the form.
THE DEPONENT: This is the Google advertising TAC. There's no derivation. It's right off of their P&L statements.
Q. (By Ms. Hurst) For 2011 to 2015?
A. Yes.
Q. Dr. Leonard, I would like to -- to ask you some hypothetical questions.
Have you ever heard of Napster?
A. Napster?
Q. Yes.
A. Yes.
Q. What was Napster?
A. Napster was a music sharing service.
Q. And do you remember approximately when Napster first came out?
A. I don't remember the exact date, but, I don't know, late 1990s, early 2000s.
Q. And Napster was an unlicensed distribution service for music, right?
MR. PURCELL: Object to the form.

we're happy to take a break.
THE DEPONENT: That's fine.
EXAMINATION
BY MR. COOPER
Q. Okay. My name is John Cooper. I'm with the law firm of Farella Braun + Martel, and I -- I represent Dr. Kearl, who sits next to me. And I have some very nuts-and-bolts questions to ask you about your report.
A. Okay, sure.
Q. Okay. And I don't know if you know what a Rule 706 expert is, but it is an expert that was appointed under Evidence Code Rule 706, by Judge Alsup. And so we are not here with either party in mind.
A. Sure, understood.
Q. Okay. And I'm, for the most part, going to ask you about paragraphs in your report, and that's Exhibit 5143.
A. Okay.
Q. I'd like to start with paragraph 19.
A. Okay.
(Discussion off the stenographic record.)
Q. (By Mr. Cooper) Refer to paragraph 19, and you say in there, in that sentence -- in that

paragraph, "the appropriate conceptual way to measure the causal effect of a factor on an outcome variable is to compare the difference in the outcome variable between the actual world" -- "world and the counterfactual," close quote, world.
Would a small change in your test for causality work?
MR. PURCELL: Object to the form.
THE DEPONENT: You mean would a small change -- could a small change be evaluated using this approach?
Q. (By Mr. Cooper) Yes. Or do you need to evaluate the size of the change before making the calculation regarding the change?
A. Well, I mean, this is a very conceptual statement. I mean, it's true as a general matter. You may have difficulty measuring the effect of a small change, but this is a conceptual matters, how economists define causality. And there's a big literature in economics about that.
Q. Okay. Let me ask you, could a change itself work or -- as opposed to the size of the change?
A. I am sorry, I'm not sure I understand it -- could the change...

Q. Is just -- is just the change enough, or does the magnitude of the change have to be considered?
A. Oh, oh, I see. In doing this kind of --
Q. Yes.
A. -- causal nexus?
Well, I think that may be -- I guess maybe there might be some legal stuff in there, but basically, me, I could argue, if there's difference then you have met -- yeah, there's at least some small causal effect, yeah. I mean, it's in principal, if it's anything other than zero. But if it's small, it may be very hard to measure. And if there's a lot of -- else going on, you may not be able to precisely determine whether there was an effect or not.
Q. Okay. Turn now to paragraph 23, please.
A. Okay.
Q. And you -- you are welcome to read any portion of that you want, but if Google's revenues per mobile device were higher on devices using Android than on mobile devices using other operating systems, would that be sufficient to establish a causal nexus for those revenues?
A. Maybe a causal nexus to Android, but not

necessarily to the 20 -- 37 -- not necessarily to the alleged infringement, I think is how I'd answer that.
In other words, if we compare something with or without Android, that tells us something about Android, but I think the causal nexus we are interested in here is the nexus to the alleged infringement itself, the 37 APIs.
Q. Okay. Now, please turn to paragraph 33. It's on page 21. And I know Miss Hurst asked you questions about TAC, which is traffic acquisition cost --
A. Yes.
Q. -- and I would like to ask you some more questions about that.
You -- at the bottom of that paragraph you recite what the TAC rates are for 2008, 2009 and 2010.
Why there is a variance in those rates, and why is the rate for 2009 so slow?
A. I am not sure I know the answer to that. I mean, these particular TAC figures, and then the percentages here, were reported directly in a Google-Android P&L that I think was available in the last case, as I remember. So there's nothing

calculated there. Those are just the numbers. And I'm not sure why variance exist.
Q. And you don't know why the 2009 number was lower?
A. I do not, no.
Q. You understand when I use the acronym TAC, that I'm talking the traffic acquisition costs --
A. Yes.
Q. -- okay?
For Android phone, does Google pay a TAC to an OEM?
A. For an Android phone does it pay TAC? For -- and I guess -- and you mean on search ads?
Q. Yes, including search.
A. Yeah. I think it's possible.
Q. But you don't know one way or the other?
A. Yeah, and it may have changed over time, so...
Q. For a non-Android phone, what TAC does Google pay to the OEM, if any?
A. For no-Android phone, I mean the one I'm familiar with is -- is Apple, there's iPhone. And, you know, as I discuss, that's basically -- based on that Google document, it's about 32 percent TAC.

Page 338

Q. Thirty-two percent. Okay.
And you asked about search revenue, does it vary -- does the amount of revenue or type of revenue vary with search, or AFS, or display?
A. You mean the amount of TAC?
Q. Yeah.
A. Yeah, the amount of TAC is a lot higher for those other two, because you are -- you are really paying a Website owner in those cases. And, you know, I think for whatever -- for whatever reason, the -- you end up paying a lot more to the Website owner. So if you look at the TAC rates in like 1a -- sorry, my exhibit 1a -- I am sorry.
Q. Does -- does it vary for the amount that is paid to the OEMs?
A. Does it vary from, you mean?
Q. Well, for the -- for the different types of search -- different types of payments or sources for payment?
A. Well, see, I don't think they pay the OEMs for the, for instance, display ads. Display ads would be -- or at least a vast majority of it is, you are paying the owner of the Website that is showing -- on which the ad is being shown.
Q. For an Android phone, does Google pay any

Page 339

TAC to the carrier?
A. To the carrier? Again, I think generally not, but there might be some.
Q. Okay. For a non-Android phone, what TAC does Google pay to the carrier?
A. Again, the major example there would be iPhone, which their -- I don't think -- I'm pretty sure they don't pay anything to the carrier in that case.
Q. Okay. So there wouldn't be any variance depending on the type?
A. I believe so, yeah.
Q. Okay. Does Google pay a TAC to anyone other than the carrier of the OEM?
A. And the Website owner.
Q. The Website owner?
A. Yeah.
Q. And how is that calculated?
A. Again, those are the -- those are included in the TAC amounts. Those are the display ads, for instance, with -- the biggest source of TAC there is the payment to the Website owner on which the ad is being displayed.
Q. Okay. Now, you may have answered this, but let me ask it anyway for clarification.

Page 340

In your Android TAC calculations, do these costs include payments to the OEMs, and payments to the carriers, and payments to Google network members?
A. Yeah, they would include all forms of TAC.
Q. Okay. So your -- your Android calculations would.
A. Yes.
Q. Okay. Now, I'm going to refer you, if necessary, to your Exhibit 1d?
A. Okay.
Q. And I -- the question is, you estimate Android search TAC by using overall Google AdWords TAC-to-revenue ratio, applying it to Android search revenue. This revenue range is from 5.3 to 8.1 percent. This is much lower than the Android search TAC paid to carriers as discussed -- discussed elsewhere.
Do you know why?
A. Well, this would include everything, sort of a weighted average of all TAC being paid. So I think the answer is that they are not really paying the carriers. I mean, the payments to carriers on net are very, very low, and so they don't end up

Page 341

adding up to much here.

Q. Now, refer to paragraph 44, please.

A. Okay.

Q. It appears here that you used two different methods to allocate some different overhead costs. For example, here you indicate that you allocate SG&A, which I -- G&A, which is an accounting term, using a ratio of engineers in the Android division to all Google engineers. But on paragraph 48, you allocate search and ad op expense using a regression, per footnote 70.

Is there a reason you didn't use a regression in both or, alternatively, an engineer ratio in both?

A. Yes. I mean, the engineering one headcount ratio was the natural one for the general administrative because -- or the particular categories I looked at. Like, if you take real estate, that's like the office expenses. So you know, you have a number of engineers, right, sitting in office space.

And so the amount of that office space costs that are Android, as opposed to other parts of Google, would be proportional to the number of engineers in Android. So that sort of made sense



as a way to do it there.

When I got to the Search and Advertising Product Areas, the -- the OpEx there, the problem, I guess, is that you don't really have a breakdown of how many people in Search and Advertising groups, the engineers there are working on Android, or what percent of their time was on Android. That would have been a nice way to do it, but they just didn't keep that data.

So that's why I had to turn to something else, and, you know, so I talk in here about, I notice that the -- you know, as the revenues of Search and Advertising went up, the expenses were going up too, which makes certain amount of sense, you're adding a people that deal with it all, and it's costing more, and obviously the Android portion of -- of the ad -- ad revenue was part of that driver, and so that's how I approached that there.

So it's a different set of operating expenses in paragraph 48. It's a Search and Advertising Product Area OpEx, whereas the other parts, you know, are -- are, again, things I can break down based on Google engineers -- sorry -- Android engineers.



Q. All right. Let's turn to paragraph 48, please.

A. Okay.

Q. Now, you include, and this is in quotes, incremental Search and Advertising expense, close quote, of $2.4 billion in Exhibit 1a.1; however, you don't include them in Exhibit 1a.4, for profit apportioned to Android versus search, ad, technologies, and services.

A. Right.

Q. Are they incremental to Android or not?

A. They are incremental to the ad revenue, if you consider all the ad revenue. So that's why they are in 1a.1. But over in 1a.4, what I am trying to do is, I've already broken up the ad revenue between -- I've apportioned it between, on the one hand, the advertising and search side of things, and then the rest is going to Android.

And, you know, I'm thinking about it in terms of, again, what happens when Google and -- and Apple get together, and there's a Google search add that's placed on Apple. What happens, Apple gets, you know, roughly 32 percent of the revenue, and then it deals with all the costs on the platform side; and Google gets the remainder of



that, which is 68 percent, and then it has to bear all the advertising and search costs because that's what it is providing.

So when I go in 1a.4, and I'm trying to figure out the apportionment of the profit to Android, I first of all figure out the apportionment of the revenue. And then when I get to the costs, I say, well, all the costs that Android costs I'm going to list here. But, for instance, the Search and Advertising incremental costs, I say, no, those are part of the search business and would be borne by -- by them.

So I'm sort of apportioning both the revenues and the costs. And, therefore, I end up dropping here the Search and Advertising incremental costs because they would not be part of the Android part of things.

Q. Let's refer to paragraph 62 through 64, please. And my question relates to the difference using a ratio of margin versus revenue.

You state that 68 percent of Google ad revenue should be attributed to Google search and ad technologies, and only 32 percent to Android. You base this on a ratio of the annual ad search revenue for an Android phone and the comparable