# Exhibit 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                 SAN FRANCISCO DIVISION
 4
    ORACLE AMERICA, INC.
 5       Plaintiff,
 6           vs.            Case No. 3:10-cv-03561-WHA
 7   GOOGLE, INC.,
 8       Defendant.
    _____
 9
10
11
12     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
13           PURSUANT TO THE PROTECTIVE ORDER
14
15    VIDEO DEPOSITION OF GREGORY K. LEONARD, Ph.D.
16               San Francisco, California
17                Friday, March 11, 2016
18                       Volume I
19
20
21
22   REPORTED BY:
23   REBECCA L. ROMANO, RPR, CSR No. 12546
24   JOB NO. 2241706
25   PAGES 1 - 405
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  San Francisco, California; Friday, March 11, 2016
2           9:14 a.m.
3           ---o0o---
4
5       THE VIDEOGRAPHER:  Good morning.  We are
6  on the record at 9:14 a.m., on March 11th, 2016.
7  This is the video-recorded deposition of
8  Dr. Gregory Leonard.  My name is the
9  Brandon Miller, here with court reporter,
10 Rebecca Romano.  We are here from
11 Veritext Legal Solutions.
12      This deposition is being held at
13 405 Howard Street, Tenth Floor,
14 San Francisco, California.  The caption of this
15 case is Oracle America, Incorporated, versus
16 Google, Incorporated; Case No. C:10-03561-WHA.
17      Please note that audio and video
18 recording will take place unless all parties agree
19 to go off record.  Microphones are sensitive, and
20 may pick up whispers, private conversations, and
21 cellular interference.
22      I am not related to any party in this
23 action, nor am I financially interested in the
24 outcome in any way.
25      At this time will attorneys introduce

Page 10

1  themselves.
2       MS. HURST:  Good morning.  My name is
3  Annette Hurst, from Orrick, for Oracle America.
4  With me this morning are my colleagues, Andrew Kim;
5  Ayanna Lewis-Griss; Robert Keele; Alyssa Caridis;
6  Hannah Junkerman; and from Ocean Tomo,
7  Robert McSorley.
8       MR. COOPER:  I'm John Cooper.  I'm with
9  Farella Braun + Martel.  I represent
10 Dr. James Kearl, who is Judge Alsup's Rule 706
11 expert, and Dr. Kearl is here with me.
12      MR. PURCELL:  I'm Dan Purcell from
13 Keker & Van Nest, representing Google.
14      THE VIDEOGRAPHER:  Thank you.
15      You may now swear in the witness.
16      THE REPORTER:  If you could raise your right
17 hand for me, please.
18      THE DEPONENT:  (Complies.)
19      THE REPORTER:  You do solemnly state,
20 under penalty of perjury, that the testimony you
21 are about to give in this deposition shall be the
22 truth, the whole truth and nothing but the truth?
23      THE DEPONENT: I do.
24
25 /////

Page 11

1       GREGORY LEONARD, Ph.D.,
2  having been administered an oath, was examined and
3  testified as follows:
4
5            EXAMINATION
6  BY MS. HURST:
7     Q.  Good morning.
8     A.  Good morning.
9     Q.  Do you prefer to be addressed as
10 Dr. Leonard or Mr. Leonard?
11    A.  Whatever.
12    Q.  All right.  Dr. Leonard, you've been
13 retained as an expert in litigation before?
14    A.  Yes.
15    Q.  Approximately how many times?
16    A.  I haven't counted recently, but probably
17 over a hundred.
18    Q.  And you have testified many times?
19    A.  Yes.
20    Q.  Okay.  Approximately how many times have
21 you testified in deposition?
22    A.  Again, I haven't really counted, but
23 probably, I don't know, 80 maybe.
24    Q.  And you've testified at trial?
25    A.  Yes.

Page 12

1       MR. COOPER:  Excuse me.  Dr. Leonard,
2  could we ask you to speak up a little bit.
3       THE DEPONENT:  Yeah, I know.  It's going
4  to be a problem.  I'm -- I have that problem.  I --
5  I will do my best.
6       MR. COOPER:  Okay, thank you.
7       THE DEPONENT:  All right.
8     Q.  (By Ms. Hurst)  Approximately how many
9  times have you testified at trial?
10    A.  About 30, I think.
11    Q.  And you are an economist?
12    A.  Yes.
13    Q.  You have a Ph.D. in economics?
14    A.  I do.
15    Q.  Now, in your professional experience, is
16 it ordinarily considered fair to take someone's
17 valuable property and use it for commercial gain
18 without paying for the privilege of doing so?
19      MR. PURCELL:  Object to the form.
20      THE DEPONENT:  I'm sorry, could you
21 reread that question for me, please?
22      (Record read as follows:
23      "QUESTION:  In your professional
24      experience, is it ordinarily
25      considered fair to take someone's

Page 13

4 (Pages 10 - 13)

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

**Page 42**

1 calculation?
2    A.  That, again, is looking at the costs
3 avoided, but this time associated with training
4 developers to help them be proficient in the
5 furtherances of different programming language.
6    Q.  And the 23- to-103-million range
7 calculation, what was the methodology of that
8 calculation of unjust enrichment?
9    A.  There, it's the cost savings associated
10 with Google having to, for instance, pay for the
11 development of applications, you know, that again
12 was avoided potentially by the alleged
13 infringement.
14    Q.  And the 203 million, what was the method
15 of calculation of unjust enrichment in that
16 scenario?
17    A.  In that one it's looking at the value
18 that's contributed by the alleged infringement,
19 assuming that none of the cost savings -- I am
20 sorry -- none of those activities I just described
21 took place.  So it's looking at the value that was
22 contributed from the point of view of the number of
23 additional users that the alleged infringement
24 generated and the -- and profits associated with
25 those.

**Page 43**

1    Q.  Does that 203-million calculation depend
2 on -- in any way on notions of cost savings?
3    A.  No.  It's really saying, if you didn't
4 take the actions that the costs -- that the alleged
5 infringement allow you to avoid, then that would
6 have been the consequences of that.
7    Q.  And what is the methodology that you used
8 in making your 32-million unjust enrichment
9 calculation?
10    A.  It's apportioning the profits associated
11 with Android to the alleged infringement.
12    Q.  And the 56-million calculation, what was
13 the methodology behind that?
14    A.  At a high level it's the same.  It's an
15 apportionment of the profits associated with
16 Android using a somewhat different methodology for
17 the apportionment percentage than the previous.
18    Q.  Now, are you familiar with the concept of
19 non-infringing alternatives?
20    A.  Yes.
21    Q.  And how do you understand that concept?
22       MR. PURCELL:  Object to the form.
23       THE DEPONENT:  Non-infringing alternative
24 is a -- is an action of something somebody could
25 have done that would not have infringed whatever

**Page 44**

1 the intellectual property is that is at issue in
2 the case.
3    Q.  (By Ms. Hurst)  So it's an alternative
4 course of action that the accused infringer might
5 have taken but did not in the real world, true?
6    A.  I mean, that's one way of -- of looking
7 at it, yes.
8    Q.  Now, in order for a non-infringing
9 alternative to be a viable alternative course of
10 action, it has to be both commercially and
11 technically feasible, true?
12       MR. PURCELL:  Object to the form.
13       THE DEPONENT:  Well, something that
14 wasn't at all feasible, you know, wouldn't be a
15 tremendously good alternative.  So, from an
16 economist point of view, you just look at the --
17 you look at the nature of the alternative and --
18 because again value, if anything, is really in
19 relation to the -- to some alternative.  So you've
20 got to look at what the alternatives are, and some
21 may be better than others.  And certainly those
22 considerations are ones that -- that you would look
23 at.
24    Q.  (By Ms. Hurst)  Yes or no, is it true
25 that in order for a non-infringing alternative to

**Page 45**

1 be a viable alternative course of action, it must
2 be both commercially and technically feasible?
3       MR. PURCELL:  Object to the form.
4       THE DEPONENT:  Again, I mean, if it's not
5 feasible then it won't be viable.  That's -- I
6 agree with that.
7    Q.  (By Ms. Hurst)  All right.  If it's not
8 commercially feasible, then it is not a viable
9 alternative course of action, true?
10       MR. PURCELL:  Object to the form.
11       THE DEPONENT:  Yeah, generally speaking.
12 I mean, that's -- that kind of begs the question,
13 but you would certainly look at -- at factors
14 relevant to commercial feasibility, yes.
15    Q.  (By Ms. Hurst)  And if it's not
16 technically feasible then it wouldn't be a viable
17 alternative course of action, true?
18       MR. PURCELL:  Object to the form.
19       THE DEPONENT:  Again, that's certainly
20 something one would look at.
21    Q.  (By Ms. Hurst)  Well, are there more
22 requirements in addition to commercial and
23 technical feasibility for something to be
24 considered a viable alternative course of action
25 that is a non-infringing alternative?