ORRICK, HERRINGTON & SUTCLIFFE LLP
KAREN G. JOHNSON-MCKEWAN (SBN 121570)
kjohnson-mckewan@orrick.com
ANNETTE L. HURST (SBN 148738)
ahurst@orrick.com
GABRIEL M. RAMSEY (SBN 209218)
gramsey@orrick.com
405 Howard Street, San Francisco, CA  94105
Tel: 1.415.773.5700 / Fax: 1.415.773.5759
PETER A. BICKS (*pro hac vice*)
pbicks@orrick.com
LISA T. SIMPSON (*pro hac vice*)
lsimpson@orrick.com
51 West 52nd Street, New York, NY  10019
Tel: 1.212.506.5000 / Fax: 1.212.506.5151

BOIES, SCHILLER & FLEXNER LLP
DAVID BOIES (*pro hac vice*)
dboies@bsfllp.com
333 Main Street, Armonk, NY  10504
Tel: 1.914.749.8200 / Fax: 1.914.749.8300
STEVEN C. HOLTZMAN (SBN 144177)
sholtzman@bsfllp.com
1999 Harrison St., Ste. 900, Oakland, CA  94612
Tel: 1.510.874.1000 / Fax: 1.510.874.1460

ORACLE CORPORATION
DORIAN DALEY (SBN 129049)
dorian.daley@oracle.com
DEBORAH K. MILLER (SBN 95527)
deborah.miller@oracle.com
MATTHEW M. SARBORARIA (SBN 211600)
matthew.sarboraria@oracle.com
RUCHIKA AGRAWAL (SBN 246058)
ruchika.agrawal@oracle.com
500 Oracle Parkway,
Redwood City, CA 94065
Tel: 650.506.5200 / Fax: 650.506.7117

*Attorneys for Plaintiff*
ORACLE AMERICA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ORACLE AMERICA, INC.<br><br>            Plaintiff,<br><br>     v.<br><br>GOOGLE INC.<br><br>            Defendant. | Case No. CV 10-03561 WHA<br><br>**ORACLE'S RULE 59 MOTION FOR A NEW TRIAL**<br><br>Date: August 18, 2016 at 8:00 a.m.<br>Dept.: Courtroom 8, 19th Floor<br>Judge: Honorable William Alsup |

1

## NOTICE OF MOTION AND MOTION

2    TO ALL PARTIES AND THEIR COUNSEL OF RECORD:  PLEASE TAKE NOTICE

3    that the following Rule 59 Motion for Judgment for a New Trial will be heard on August 18,

4    2016, at 8:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 8, 19th Floor of

5    this Court, located at 450 Golden Gate Avenue, San Francisco, California, the Honorable William

6    Alsup presiding.

7    Plaintiff Oracle America, Inc. will, and hereby does, move this Court for a new trial pur-

8    suant to Federal Rule of Civil Procedure Rule 59.  Oracle also requests further expedited discov-

9    ery regarding Android (or components of Android) running on laptops, desktops and servers, in-

10   cluding but not limited to Google's inclusion of the Android framework in Chrome OS.  This

11   Motion is based on this Notice of Motion and Motion; the Memorandum of Points and Authori-

12   ties below; the materials attached to the Declaration of Andrew D. Silverman (cited hereinafter as

13   "Ex. __"); the Declaration of Nathan Shaffer; the Declaration of Geoffrey G. Moss; and the Dec-

14   laration of Neal Civjan that are being filed herewith; the record in this matter; and such other and

15   further papers, evidence, and argument as may be submitted in connection with this Motion.

16

17   Dated: July 6, 2016                                        Orrick, Herrington & Sutcliffe LLP

18                                                   By:  */s/ Peter A. Bicks*
                                                          Peter A. Bicks

19                                                          Counsel for ORACLE AMERICA, INC.

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3    NOTICE OF MOTION AND MOTION ..................................................................................... ii

4    TABLE OF AUTHORITIES ................................................................................................... iv

5    MEMORANDUM OF POINTS AND AUTHORITY .................................................................. 1

6    I.      THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE........................ 1

7    II.     GOOGLE FAILED TO DISCLOSE ITS PLAN TO INSTALL ANDROID
             MARSHMALLOW ON DESKTOP AND LAPTOP COMPUTERS .............................. 1

8
             A.      Marshmallow/Chrome OS Includes All Of Android And Is Completely
9                     Different From Any Previously Disclosed Google Product ................................ 3

10           B.      Google's Failure To Disclose Marshmallow/Chrome OS Prejudiced Oracle ........ 4

11           C.      Oracle Diligently Sought Information About Android's Expansion Into
                     Laptops And Desktops During Discovery ............................................................ 5

12
     III.    ORACLE'S MARKET HARM EVIDENCE WAS IMPROPERLY LIMITED TO
13           JUST THE MOBILE PHONE AND TABLET MARKETS .............................................. 7

14   IV.     LIMITS ON USE OF THE MAZZOCCHI EMAIL PREJUDICED ORACLE.............. 15

15           A.      The Mazzocchi Email Should Not Have Been Redacted In The First
                     Instance. ...................................................................................................... 15
16
             B.      Oracle Should Have Been Permitted To Impeach Mr. Mazzocchi's
17                    Testimony That He Did Not Believe Apache Was Doing Anything Illegal........ 18

18   V.      BIFURCATING THE TRIAL PREJUDICED ORACLE AND REQUIRES A
             NEW, SINGLE PHASE TRIAL ON LIABILITY AND DAMAGES ........................... 19
19
     VI.     EXCLUSION OF CERTAIN DOCUMENTS ON HEARSAY GROUNDS
20           PREJUDICED ORACLE............................................................................................ 20

21           A.      Oracle Was Prejudiced By The Wrongful Exclusion Of Evidence That Sun
                     Believed Android Infringed Before the Oracle Acquisition. .............................. 20
22
             B.      The Court Incorrectly Excluded Damning Evidence of Market Harm Solely
23                    Because that Evidence Was in PowerPoint Format ............................................ 23

24   CONCLUSION......................................................................................................................... 25

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

*Allflex USA, Inc. v. Avid Identification Sys., Inc.*,
No. CV-06-1109-SGL, 2009 WL 8591843 (C.D. Cal. Oct. 30, 2009) ....................................7

*Averilla v. Lopez*,
862 F. Supp. 2d 987 (N.D. Cal. 2012) ....................................................................................18

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ..................................................................................................................9

*Dominguez v. Stainer*,
No. CV 12-8280 AG (FFM), 2014 U.S. Dist. LEXIS 62119
(C.D. Cal. Feb. 12, 2014) ........................................................................................................17

*Jones v. Aero/Chem Corp.*,
921 F.2d 875 (9th Cir. 1990)......................................................................................................2

*LaSalvia v. United Dairymen*,
804 F.2d 1113 (9th Cir. 1986)....................................................................................................9

*Lewy v. S. Pacific Transp. Co.*,
799 F.2d 1281 (9th Cir. 1986)..................................................................................................19

*Molski v. M.J. Cable, Inc.*,
481 F.3d 724 (9th Cir. 2007)......................................................................................................1

*Monge v. Maya Magazines, Inc.*,
688 F.3d 1164 (9th Cir. 2012)....................................................................................................5

*Montgomery Ward & Co. v. Duncan*,
311 U.S. 243 (1940) ..................................................................................................................1

*Oracle Am., Inc. v. Google Inc.*,
750 F.3d 1339 (Fed Cir. 2014)...................................................................................................9

*Planned Parenthood of S. Az. v. Neely*,
130 F.3d 400 (9th Cir. 1997)......................................................................................................9

*Ruvalcaba v. City of L.A.*,
64 F.3d 1323 (9th Cir. 1995)......................................................................................................1

*Sharon T. v. New Directions Inc.*,
No. 2:15-cv-04239-SVW-E, 2016 U.S. Dist. LEXIS 5640
(C.D. Cal. Jan. 12, 2016)..........................................................................................................17

*Stuart v. UNUM Life Ins. Co. of Am.*,
217 F.3d 1145 (9th Cir. 2000)..................................................................................................16

*U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*,
576 F.3d 1040 (9th Cir. 2009)................................................................24, 25

*United States v. Aguilar Noriega*,
831 F. Supp. 2d 1180 (C.D. Cal. 2011)..................................................17

*United States v. Cerna*,
No. CR 08-0730 WHA, 2010 U.S. Dist. LEXIS 146687
(N.D. Cal. Dec. 17, 2010) .......................................................................16

*United States v. Dhingra*,
371 F.3d 557 (9th Cir. 2004).................................................................16

*United States v. Layton*,
855 F.2d 1388 (9th Cir. 1988)...............................................................16

*United States v. Miller*,
874 F.2d 1255 (9th Cir. 1989)...............................................................21

*United States v. Paiz*,
No. CR 06-00710 WHA, 2007 WL 2143015 (N.D. Cal. July 24, 2007)................21

*United States v. Presley*,
No. CR07-5058BHS, 2008 U.S. Dist. LEXIS 7841
(W.D. Wash. Jan. 16, 2008) ...................................................................16

*Wagner v. County of Maricopa*,
747 F.3d 1048 (9th Cir. 2013)........................................................21, 22, 23

*Wharf v. Burlington N.R.R. Co.*,
60 F.3d 631 (9th Cir. 1995).....................................................................2

**Rules**

Fed. R. Civ. P. 26 ..........................................................................................7

Fed. R. Civ. P. 59 ..........................................................................................1

Fed. R. Evid. 602 ........................................................................................16

Fed. R. Evid. 801(b)....................................................................................22

Fed. R. Evid. 803(3)....................................................................................21

**MEMORANDUM OF POINTS AND AUTHORITY**

A court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law." Fed. R. Civ. P. 59(a)(1)(A). Those grounds include "that the verdict is against the weight of the evidence," or that "the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *accord Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007); *Ruvalcaba v. City of L.A.*, 64 F.3d 1323, 1328 (9th Cir. 1995) ("erroneous evidentiary ruling" a ground for a new trial).

A new trial is warranted here on several grounds, each discussed below. These issues individually, as well as cumulatively, require a new trial.[1]

## I.   THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE

For the reasons stated in Oracle's 50(b) motion filed contemporaneously herewith, a new trial is warranted. No reasonable jury could have concluded that Google's copying was a fair use and the verdict was against the weight of the evidence. *See Montgomery Ward*, 311 U.S. at 251.

## II.   GOOGLE FAILED TO DISCLOSE ITS PLAN TO INSTALL ANDROID MARSHMALLOW ON DESKTOP AND LAPTOP COMPUTERS

On the last day of evidence at trial, just after Oracle rested its case, Google made a surprise announcement that it was releasing a full version of Android Marshmallow, one of the accused works, as part of the Chrome Operating System ("Chrome OS"), "the #2 … PC [Personal Computer] operating system in the US." Ex. A at 1. Google had "secret[ly]" been working on this project "for the past few months" before trial. Ex. J at 0:18-0:26. Android Marshmallow includes the Google Play Store, which "means you'll be able to download and use [1.5 million] Android apps" on laptops and desktops running Chrome OS. *Id.* 7:14-21; *see* Ex. B. "Android Desktop apps are a real thing now" for the first time. Ex. C at 4. "[A]ll of Android Marshmallow" is included "within Chrome OS"—including the 37 API packages Google copied from Java SE. Ex. J at 7:10-7:21, 9:24 ("the whole Marshmallow API is available to you."); *see* TX 43.1

---

[1] Oracle makes this motion without prejudice to other bases that may warrant a new trial that Oracle can and will raise on appeal, such as the jury instructions, decisions on pretrial motions, and the admission and exclusion of certain evidence at trial.

1    (Android Stack Diagram); ECF No. 1981 (Jury Charge) ¶ 20 (all accused versions of Android,

2    including Marshmallow, use "the declaring code and [SSO] of the 37 Java API packages").

3         Google did not disclose its Marshmallow/Chrome OS product in response to discovery re-

4    quests specifically directed toward Chrome OS and Google's plans to make a version of Android

5    available on laptops and desktops.  Moreover, many witnesses with direct knowledge of both

6    Chrome OS and Android denied that such a project existed—or that Google even contemplated

7    such a project.  Google also did not supplement its discovery responses to include information

8    about its new Marshmallow/Chrome OS product for PCs.

9         The standard for a motion for a new trial under Rule 59 based on withheld evidence "must

10   be borrowed from cases interpreting Rule 60(b)(3)."  *Jones v. Aero/Chem Corp.*, 921 F.2d 875,

11   878 (9th Cir. 1990).  "Under Rule 60(b)(3)," a movant must first establish that "a verdict was ob-

12   tained through … misconduct," and second that the conduct "prevented the losing party from ful-

13   ly and fairly presenting his case."  *Id.* at 878-79.  "'Misconduct' does not demand proof of nefari-

14   ous intent or purpose" and "can cover even accidental omissions….  Accidents—at least avoida-

15   ble ones—should not be immune from the reach of the rule."  *Id.*  To satisfy the second prong

16   "when the case involves the withholding of information called for by discovery, the party *need*

17   *not* establish that the result in the case would be altered."  *Id.* (emphasis added).  The moving par-

18   ty need only show the withheld material's "likely worth as trial evidence, or … its value as a tool

19   for obtaining meaningful discovery."  *Id.*; *see also Wharf v. Burlington N.R.R. Co.*, 60 F.3d 631,

20   638 (9th Cir. 1995) (reversing denial of new trial despite uncertainty withheld evidence would

21   make a difference in the verdict).  Where "misconduct" and prejudice are shown under the

22   60(b)(3) standard, a new trial should be ordered if the moving party (1) "exercised due diligence

23   in their discovery requests, (2) defendant knew … of the missing [information], and had … pos-

24   session of it; and (3) defendant did not divulge [its] existence."  *Jones*, 921 F.2d at 879.

25        Google should have disclosed its plan to put Android Marshmallow on millions of con-

26   sumer laptops and desktops during discovery, and if it had, this plan would have changed the case

27   at every stage—from fact and expert discovery to the extensive *in limine* proceedings to presenta-

28   tion of evidence at trial and ultimately to the jury's verdict.  Oracle diligently sought this infor-

mation in discovery, and was repeatedly stonewalled.  A new trial is necessary to allow Oracle to present its full case, including this newly discovered and improperly withheld evidence.

**A.      Marshmallow/Chrome OS Includes All Of Android And Is Completely Different From Any Previously Disclosed Google Product**

The combined Marshmallow/Chrome OS project includes a full version of Android Marshmallow, which allows "[t]he same apps that run on phones and tablets" to be "run on Chromebooks" for the first time, "bringing together … Android and Chrome OS" and bringing "millions of [Android] developers" to "PC platforms…."  Ex. A.  Marshmallow/Chrome OS includes the "full Android framework natively," making "Chromebooks now fully compatible with any Android app," such that any laptop or desktop running Marshmallow/Chrome OS is now just "like all Android devices, regardless of whether it's a phone, tablet, or a laptop."   Ex. F at 14:14-14:36.  Marshmallow/Chrome OS includes "the whole Marshmallow API," i.e., the "full Android stack," Ex. J at 9:24-27, which all agree includes the 37 API packages Google copied from Java SE.  ECF No. 1981 (Jury Charge) ¶ 20.  Since May 19, 2016, Google has announced plans to include Marshmallow/Chrome OS on at least 63 laptops ("Chromebooks"), desktops ("Chromeboxes"), and other non-phone/tablet devices.  Ex. B; *see also* Exs. C-E, H-K, J-3.

Google did not disclose the Marshmallow/Chrome OS product during the course of this litigation, and waited to publicly announce it until Oracle rested its case at trial on May 19, 2016.  Google had previously announced an unrelated product called App Runtime Chrome ("ARC"), which allowed a developer to port an Android app to Chrome OS through an "engineer-to-engineer … relationship between the [Google] ARC team and the developer."  Ex. G at 197:6-10.  ARC Welder, the product necessary to port an Android app to Chrome OS, was available only through a direct relationship with Google.  *Id.* at 196:25-197:6.  ARC was "not like Android is running inside of Chrome OS," *id.* 195:19-196:6, and many apps written for Android, "especially the Google Play store," will not run on ARC, Ex. J at 3:02-10.  ARC was limited to "a tiny, little subset" of the "over a million applications in Google Play."  Ex. G at 196:20-23.  The ability to run full Android on Chrome OS was "completely different[]" from any prior project, and there are "no connecting points between [ARC and Marshmallow/Chrome OS]."  Ex. C at 2 (quoting

1    Google engineer Hornung).  Google built "a *whole new platform* to run Android apps on

2    Chromebooks."  Ex. J at 3:30-3:36.  "ARC wasn't good enough, so Google started over from

3    scratch."  Ex. C at 2.

4    **B.    Google's Failure To Disclose Marshmallow/Chrome OS Prejudiced Oracle**

5            Google's expansion of Android to the laptop and desktop market would have had great

6    probative value at trial, and would have reshaped the discovery landscape by providing a basis for

7    Oracle to challenge foundational aspects of Google's fair use defense.  The foundation for

8    Google's arguments regarding absence of market harm, the most important consideration under

9    fair use, was its claim that "Android is not a replacement for any version of the Java platform."

10   Tr. 287:4-5 (Google Opening).  Google argued that "Java SE 5 was created for servers and desk-

11   tops. …  Never for smartphones."  Tr. 288:22-25 (Opening).  Google put on expert witnesses to

12   testify that Android does not substitute for Java SE because "Java SE is on personal computers"

13   but "Android, on the other hand, is on smartphones."  Tr. 1898:3-4 (Leonard).  The same reason-

14   ing underpinned Google's transformative argument that Android is a "different context" because

15   it is not "on the laptop or desktop."  Tr. 1265:11-12 (Astrachan).  Thus, Google argued, Android

16   "wouldn't work on your desktop or laptop computer" because it has libraries designed for smart-

17   phones.  *Id.* 1231:19-25.  In closing, Google put it most bluntly:  "Android is not a substitute.

18   Java SE is on personal computers; Android is on smartphones."  Tr. 2124:6-7; *accord* Tr. 309:23-

19   310:4; Tr. 2122:16-17; *see* ECF 1988 (Rule 50(a) Ord.) at 19 ("On Factor Four, our jury could

20   have found that Android caused no harm to the desktop market for the copyrighted works ….").

21          The fact that Google was about to install Marshmallow, which all agree contains 11,457

22   lines of declaring code and the SSO of the 37 Java SE API packages,[2] on millions of laptops and

23   desktops, is powerful evidence conclusively rebutting Google's fair use case.  First, it proves false

24   Google's core arguments, just discussed, on transformation and market harm.  Second, if Oracle's

25   witnesses had knowledge of Google's plans, they could have presented analyses showing not only

26   market competition on desktop and servers, but actual substitution because Google "do[es]n't

27   support Java on Chrome OS,"  Ex. L at 56:25.  Each Chrome OS system sold takes market share

28   ───────────────────────────
     [2] ECF No. 1901 (Stip. Re Copied Code); Tr. 1494:15-16 (reading parties' stipulation).

1    from operating systems that do support Java SE, like Windows and Mac OSX.  And the market

2    impact is huge.  Google claims Chrome OS grew 32% last year.  Ex. J at 0:41-:45.  "[I]n Q1 of

3    this year, Chromebooks topped [Apple's] Macs in overall shipments to become the #2 most popu-

4    lar PC operating system in the US."  Ex. A.  "Schools in the US are now buying more Chrome-

5    books than all other devices combined," *id.*, and, "[b]y 2018, *a quarter of all Fortune 500 com-*

6    *panies* will have IT-supported Chromebooks," Ex. J-2.  Indeed, Android is poised to directly sub-

7    stitute for Java SE in its "traditional mark[et]" of desktops and laptops, Tr. 1860:1-2 (Jaffe), criti-

8    cal evidence on factor four, which "focuses on *potential*, not just actual, market harm,"  *Monge v.*

9    *Maya Magazines, Inc.*, 688 F.3d 1164, 1181 (9th Cir. 2012).

10       At the *in limine* stage, Oracle's response to Google's "New Products" motion would have

11   been vastly different.  *See* ECF No. 1559 (Google's MIL No. 2), 1612-3 (Oracle's Opp.).  If Ora-

12   cle could have shown that Android Marshmallow was slated for installation in laptops and desk-

13   tops, the Court might not have excluded evidence "of Android in devices other than phones or

14   tablets."  *See* ECF No. 1781 at 5 (Ord. Google's MIL No. 2); *see infra* § III.

15          **C.     Oracle Diligently Sought Information About Android's Expansion Into Lap-
16                  tops And Desktops During Discovery**

17       **1.**  Oracle asked Google to "[a]dmit that GOOGLE *intends* to use some or all of AN-

18   DROID, including DECLARING CODE and SSO from the 37 JAVA API PACKAGES, to create

19   a platform that runs on *desktops* and *laptops*."  Ex. O (RFA No. 281) (emphasis added).  "Google

20   denie[d] this request for admission."  *Id.*  Oracle asked Google to "[a]dmit Chrome OS contains

21   DECLARING CODE" and "replicates the SSO of the 37 JAVA API PACKAGES."  Ex. N (RFA

22   Nos. 254, 264).  "Google denie[d] th[ese] request[s]," too.  *Id.*

23       Oracle also served multiple interrogatories to which information regarding Google's plan

24   to release Android Marshmallow with Chrome OS was responsive.  Oracle's Interrogatories 26

25   and 27 requested that Google identify "[f]or each VERSION of ANDROID developed or released

26   by GOOGLE … all ANDROID code that contains or replicates code from the 37 JAVA API

27   PACKAGES," and "any software developed or released by GOOGLE … that contains or repli-

28   cates code from the 37 JAVA API PACKAGES."  Ex. P (Interrogatories 26 & 27); *see also id.*

1   (Interrogatories 28 & 29) (the same for the SSO).  Google understood these interrogatories to

2   concern implementations of the Java APIs running on Chrome OS because it listed ARC and

3   ARC Welder in response.  *Id.*  Google also understood these interrogatories to concern products

4   in development that were not yet released because it disclosed "unreleased versions of Android

5   incorporating OpenJDK."  *Id.*  Marshmallow/Chrome OS falls squarely within these interroga-

6   ries because it contains the entire "Android Framework … all the way down to the Hardware Ab-

7   straction Layer."  Ex. C at 2 (quoting Google engineer Hornung); *see* TX 43.1 (Android Stack).

8       Finally, Oracle served a request for production of "[s]ource code and DOCUMENTA-

9   TION for all GOOGLE software that can be used to facilitate use of ANDROID … on devices

10  other than mobile phones, including … software related to porting ANDROID to *desktop or lap-

11  top computers*."  Ex. Q (RFP 324) (emphasis added).  Google produced source code for Brillo,

12  Android based on OpenJDK, Google Mobile Services, Play Store, ARC, and ARC Welder.  Moss

13  Decl. ¶¶ 2-3.  Google did *not* produce source code related to Marshmallow/Chrome OS.

14      **2.**  Multiple Google witnesses were asked direct questions in discovery about Google's

15  plans to implement Android on Chrome OS, and none gave any indication that Google was de-

16  veloping or planned to release such a product.  Felix Lin, responsible for Product Management of

17  Chrome OS, was Google's 30(b)(6) witness about "[a]ll methods of distribution … of ANDROID

18  or its components."  Ex. R (30(b)(6) Notice Topic 4); Ex. L at 9:2-13; 62:21-23.  Mr. Lin testified

19  that Google was "***[a]bsolutely not***" "consider[ing] … folding Chrome OS into some unified sys-

20  tem with Android."  Ex. L at 25:9-13 (emphasis added).[3]  Oracle showed Mr. Lin internal an-

21  nouncements from Chrome OS and Android leads Burke and Lockheimer that Google's "goal"

22  was a "Grand Unification" of Chrome OS with the Android "developer/framework APIs."  Ex. S.

23  Mr. Lin claimed that Google did not plan "unification of all the underlying source code," Ex. M

24  at 246:3-4, but would instead present an "illusion to the end users" where Chrome OS and An-

25  droid would be "separate platforms," *id.* 250:20-251:1.  Mr. Lin thus denied that Google planned

26  to put the "whole Marshmallow API" onto Chrome OS.  *Contra* Ex. J at 9:24-27.

27      Google 30(b)(6) witness Lockheimer testified that "Chrome OS is not Android related."

28  ─────────────
[3] Discussing unverified media reports of a Chrome OS/Android merger.  *See* Ex. T.  Google also refuted these media reports publicly.  Ex. U.

Ex. G at 192:14.  30(b)(6) witness Anwar Ghuloum was asked point blank:  "Are you aware of any efforts at Google to integrate Android into Chrome?," and he responded only with a description of ARC, Ex. V at 174:24-175:10, explaining that ARC is not part of Chrome OS, but is an "add-on plug-in afterwards that you install," *id.* 176:11-13.  None of Google's witnesses gave any clue that Google planned to include the full Android Marshmallow API and access to all 1.5 million Android apps in Chrome OS.

**3.**  Even assuming that Google's 30(b)(6) witnesses truly had no clue last fall that Google intended to merge a full version of Android Marshmallow into Chrome OS, Google still had a duty to supplement its discovery responses once it knew that it was going to install Marshmallow on millions of laptops and desktops.  Fed. R. Civ. P. 26(e).  "The duty to supplement and correct disclosures and responses is a continuing duty….  [I]f … additional information becomes known …, this information must be disclosed and no additional interrogatories are necessary to obtain this information ….  The fact that a party's attorney does not know about the updated information is irrelevant; the duty exists nevertheless."  *Allflex USA, Inc. v. Avid Identification Sys., Inc.*, No. CV-06-1109-SGL, 2009 WL 8591843, at *4 (C.D. Cal. Oct. 30, 2009) (quotation marks omitted).  Google stated at its I/O Conference on May 19 that it had been "secret[ly]" "working on [Marshmallow/Chrome OS] for the last few months."  Ex. J at 0:18-0:26; *see also* Shaffer Decl. ¶ 3.  Google had months before trial to supplement its discovery responses, but did not.  Even if Google had supplemented its discovery responses on May 19, 2016, the day it publicly demonstrated its new Marshmallow/Chrome OS product, Oracle would have had time to move for a mistrial.  But because Google did not disclose its plans, and Oracle did not learn of them until after the verdict, the jury's verdict was based on an incomplete record.  *See* Shaffer Decl. ¶¶ 2-5.

Google's failure to produce evidence requested during discovery and its failure to supplement its discovery responses entitle Oracle to a new a trial as well as expedited discovery on these matters prior to the commencement of said new trial.

### III.   ORACLE'S MARKET HARM EVIDENCE WAS IMPROPERLY LIMITED TO JUST THE MOBILE PHONE AND TABLET MARKETS

A new trial is also warranted because Oracle's evidence of market harm was drastically

1   limited to only the mobile phone and tablet markets.  Oracle was precluded from submitting evi-

2   dence of the substantial harm Android caused in other markets.

3         After the Federal Circuit remanded, Oracle filed an unopposed supplemental complaint,

4   ECF No. 1287, accepted by the Court, ECF No. 1289.  Oracle's Supplemental Complaint alleges

5   infringement by new "versions of Android," and pleads that those new versions are used in "mo-

6   bile phones and tablets" and "non-handheld devices," such as "Android Wear," "Android TV,"

7   "Android Auto," and "Other Android devices," including "Google Play."  ECF No. 1292 ¶¶ 1,

8   5-9.  Google did not move to dismiss or answer.

9         Months later, Google moved to strike portions of Oracle's technical expert reports regard-

10  ing Google's infringement of new *Java* works (Java SE 6.0 and 7.0) not identified in the Supple-

11  mental Complaint.  In its February 5, 2016 Order on that motion, the Court not only struck parts

12  of expert reports relating to *Java* SE 6.0 and 7.0, it also dismissed from the *supplemental com-*

13  *plaint* implementations of *Android* in any product that was not a mobile phone or tablet.  ECF No.

14  1479 at 2 ("As to all other versions and implementations of Android since the last operative com-

15  plaint preceding the last trial, Oracle will retain the right to sue Google for infringement in a sepa-

16  rate trial or proceeding.  Among possibly others, our trial will *not* include implementations of

17  Android in Android TV, Android Auto, Android Wear, or Brillo.").

18        Google then filed a motion *in limine* addressed to Oracle's evidence of harm from An-

19  droid seeking to exclude "all evidence and argument during the jury trial regarding new products

20  that will not be in play at the retrial pursuant to this Court's February 5, 2016 Order."  ECF No.

21  1559 at 2.  The Court granted Google's motion, excluding any evidence of any "implementations

22  of Android in devices other than phones or tablets."  ECF No. 1781. at 5.  Those implementa-

23  tions, the Court explained, had been dismissed from the case, and so "Oracle will be free to sue

24  on those new products in a future trial."  *Id.*  For all the reasons stated in Oracle's Opposition to

25  Google's Motion in Limine #2, ECF No. 1612-3, that evidence should not have been excluded.

26  The order prevented Oracle from presenting to the jury important evidence of Android's harm to

27  numerous actual and potential markets for Java.

28        There was no basis for dismissing any products from the Supplemental Complaint.  Sup-

1    plementation "is favored," *Planned Parenthood of S. Az. v. Neely*, 130 F.3d 400, 402 (9th Cir.

2    1997), and "should be granted, unless undue prejudice to the opposing party will result," *LaSalvia*

3    *v. United Dairymen*, 804 F.2d 1113, 1119 (9th Cir. 1986) (quotation marks, brackets omitted).

4    The purpose of supplementing is "to promote as complete an adjudication of the dispute between

5    the parties as is possible." *Id.* Dismissing non-phone/tablet Android implementations to be pur-

6    sued in separate litigation contravenes that purpose. In fact, the Court allowed Oracle to file its

7    supplemental complaint. Moreover, the Court's *in limine* order improperly excluded significant

8    evidence relating to factors one and four, which prejudiced Oracle.

9         The fourth factor "focuses on the effect of the use upon the potential market for or value

10   of the copyrighted work." *Oracle Am., Inc. v. Google Inc.*, 750 F.3d 1339, 1376 (Fed Cir. 2014).

11   It is "undoubtedly the single most important element of fair use," because fair use is "limited to

12   copying by others which does not materially impair the marketability of the work which is cop-

13   ied." *Id.* The analysis considers not only harm to the actual or potential market for the copy-

14   righted work but also harm to "[t]he market for potential derivative uses," including "those that

15   creators of original works would … license others to develop." *Campbell v. Acuff-Rose Music,*

16   *Inc.*, 510 U.S. 569, 592 (1994). The first factor is also implicated because neither a "su-

17   persed[ing]" use nor a use "for the same intrinsic purpose" is transformative. *Oracle Am.*, 750

18   F.3d at 1374-75.

19        Oracle's fair use case before the jury was significantly undermined because it could not

20   present the full scope of Android's harm to the actual and potential markets for Java. For the

21   same reason, Oracle's fair use case before a future jury in a future separate litigation will also be

22   weaker. Oracle should have been permitted to prove all of its actual and potential harm at once.

23        Oracle would have been able to show that Android competes with both Java SE and ME

24   in a variety of markets. Because of Android's overwhelming takeover of the mobile phone mar-

25   ket, Oracle turned its focus to opportunities in other devices—only to find competition from An-

26   droid in those markets as well. Oracle's economic expert Professor Adam Jaffe detailed in his

27   report the markets where the Java SE platform and its derivatives were already competing or were

28   planning to compete. ECF Nos. 1560-7, -8 (Jaffe Op. Rpt) ¶ 319. Those established and future

markets include: mobile phones; other handheld mobile devices like tablets and e-readers; wearables; automobiles; voice over internet protocol devices; home entertainment, such as Blu-Ray players, televisions, set-top boxes, and gaming applications and consoles; GPS systems; vending machines; printers; household appliances; cameras; and payment terminals and other point-of-sale systems.  *Id.* at ¶¶ 318-430 & Ex. 22; TX 6458 at 22-24; TX 5642 at 5.  Prof. Jaffe detailed the "significant, ongoing and future harm" that Android has, is, and will continue to inflict on the actual and potential markets for Java SE and its derivatives.  *Id.* at ¶ 321.  Oracle would have offered ample evidence of harm to these markets had the Court not limited the fourth factor to phones and tablets.

Senior Director of Java Business Development David Hofert would have testified that Oracle offered Java SE in many of these markets, including automotive, set-top boxes, printers, and healthcare device markets.  *Cf.* TX 5887 at 15.  Product Management Vice President Henrik Stahl would have testified that Android harmed Java in "[a]ny market where there is a consumer-type device, multi-media entertainment dashboard or smart TV or some other type of device with a programming environment, or even broader than that, any type of device in an embedded context that has a user interface."  Ex. W at 31:20-25; *accord id.* at 99:4-9 (TVs and Cars); Ex. X at 105:11-16 (wearables, smart appliances, smart TVs, set-top boxes, automotive, and cash registers); *id.* at 54:10-13 ("[T]hreat of moving to Android [is used against Oracle] as leverage.").  Android entered all these markets because ███████████████████████████████████ ████████████████████ Ex. PP at 75:13-14; *see id.* at 180:17-181:17, 192:1-193:5, 227:17-229:14.

**Desktops and Laptops.**  As discussed above, Android is now available on desktops and laptops, one of Java's most significant non-mobile phone markets.  Those important devices, however, were excluded by the Court's order limiting the trial to just mobile phones and tablets.

**Televisions/Set-Top Boxes/Media**.  Java SE was originally developed in the early 1990s for use with set-top boxes ("STB"), is licensed for use in televisions, and is the standard on Blu-ray players.  Since 2006, Java has been the required software in all TVs in Brazil.  Android is now competing with Java in these markets.  *See e.g.*, Ex. Y at 8-16, 18; TX 4104 at 2 (goal of

1   "Extending Ecosystem" into "Android Wear, Android TV," and others); Ex. PP at 68:18-25 (sim-

2   ilar); Ex. G at 94:18-95:11.  Stahl testified at his deposition that Oracle lost business in "smart

3   TVs [and] probably set top boxes."  Ex. Z at 209:18-213:19; *see* Ex. MM at 77:13-80:24.

4       The evidence of Android's direct replacement of Java in these markets is and would have

5   been overwhelming.  ▆▆▆▆▆ for example, "[a]dopted Android for TV" and so would "not re-

6   new" its Java contract with Oracle.  TX 9179 at 4.  Another Oracle customer—in order to pres-

7   sure Oracle to lower its price on Blu-ray related licenses—threatened that it had "Android … so-

8   lutions ready for the market and are prepared to migrate their licenses to these solutions."  TX

9   5634 at 2.  The research and development director at ▆▆▆▆ told Oracle that he saw "fast adop-

10  tion of Android in the STB/Media market" and believed he "had to focus on [an] Android based

11  solution."  TX 5060 at 2.  Similarly, the General Manager of ▆▆▆▆told Oracle that while there

12  was "interest to work with Oracle for Cable TV carriers projects" there was "considerable risk

13  due to the Android threat."  TX 5840 at 2; *see also id.* at 3 ("60%-80% [of] TV vendor[s] will

14  adopt Android solution"); Ex. X at 46:21-47:1 ▆▆▆▆▆▆▆ "used to run Java" but "went to

15  Android").  The harm to Oracle has been industrywide.  Before Android expanded into this area,

16  "Oracle had significant business with TV manufacturers that were leveraging ▆▆▆▆▆▆"

17  but, once Google entered the market, "▆▆▆▆▆ moved to recommend Android in many cases,

18  which would then downstream be picked up by a large number of TV manufacturers."  Ex. W at

19  102:15-21; *see also* TX 9179 (recognizing Android as a set top box competitor to ▆▆▆▆

20  ▆▆); TX 5628 at 2 (listing "Android" under Java "Competition"); Ex QQ. at 116:22-117:22.

21      ***Automotive.***  Oracle offers (and historically offered) Java in the automotive market, re-

22  cently collaborating with car manufactures on rich display and real-time information systems.

23  *See, e.g.*, Ex. CC at 241:18-19 (describing that Java can be used as an "automotive solution for

24  infotainment"); Ex. MM at 74:13-76:19; TX 5064.  Android is now competing with Java in that

25  market.  *See* Ex. AA (2014 Google Presentation: "Automotive: Getting Google into Cars – Term

26  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

27  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

28      The automotive market is "becoming increasingly difficult" for Oracle as "Android [tries]

1   to work its way into that area as well." Ex. CC at 56:11-22.  Indeed, Oracle understood that it

2   was in a "huge battle," TX 5064 at 1, with Google in the automotive market, and that Google was

3   a "threat" to Java. TX 6905 at 7.  And Google has been successful in "pushing Android" for cars,

4   causing ████ to select Android over Java.  TX 5064 (████ goes to Android"); Ex. MM at

5   74:5 (████ is an example of a "business opportunity that Oracle has lost due to Android."); Ex.

6   QQ at 109:12-110:1  Over the past 2 years, Google has become a huge competitor, licensing to

7   approximately 50 car manufacturers through its Open Automotive Alliance.  Ex G at 101:2-5; *see*

8   Ex. DD at 292:3-293:2 (████████); Ex. W at 102:23-103:13 (same); Ex. BB (████████

9   ████████).  Again, there is evidence of direct market replacement.  *See* TX 5844 at 3

10   ████████ "decided to go with Android" over Java); Ex. MM at 41:22-42:16 ████████ "even-

11   tually went quiet" after choosing to use Android); TX 5637 (similar).

12       *Internet Of Things/Healthcare Devices*.  Android is also competing with Java in the In-

13   ternet of Things ("IoT") market and the healthcare devices market, a part of IoT.  Oracle recog-

14   nized that there are "huge potential business opportunities through various types of IoT Devices."

15   TX 5635 at 3.  "[T]hanks to Moore's law, [Oracle is] able to run applications on things like light

16   switches, thermostats, on, you know, all these different types of edge devices."  Ex. MM at 85:23-

17   25.  But "Oracle's ability to compete in the Internet of Things market is … undermined by

18   Google's use of the 37 APIs from Java."  Ex. CC at 155:3-6.  Oracle experienced "resistance" to

19   Java "because of the presence of Android."  Ex. MM at 40:4-9; *see also* Ex. G at 69:3-9.  Cus-

20   tomers told Oracle:  "Your Java APIs are not worth much anymore because I want to use the An-

21   droid APIs" so Oracle "simply [was]n't able to compete."  Ex. W at 81:23-82:5; *see also* TX

22   5627 at 2 ("Since Android is dominant … Oracle needs to be more flexible and competitive on

23   price.").  Oracle lost ████████ as "a Java embedded opportunity" because the "platform

24   chosen [wa]s Android."  TX 5063 at 1; *see* Ex. MM at 71:11-12 (similar).  ████████ too, "went

25   with Android."  TX 5894 at 1.  "You see Android in – in all these Internet of Things-marketed

26   edge devices, and that could be Oracle's market if Android wasn't there."  Ex. MM at 86:20-22.

27   In short, "Android has harmed Java in the market for the Internet of Things."  *Id.* at 81:19-84:4.

28       *Voice over IP Phones*.  There is also evidence of direct market substitution in Voice Over

IP ("VOIP") phones.  Oracle had substantial licensing of ME and SE in VOIP until the "[l]aunch of [an] Android-based VOIP multi-purpose tablet," which Oracle recognized was "likely to carve into [Oracle's] traditional VOIP phone customer base."  TX 5059 at 31.  One of the "Java Concerns" with a "Major Account" was "cost"—which was "an issue for emerging markets … especially when compared to Android."  *Id.* at 32.  Oracle "had a deal with ████… that it lost to Android."  Ex. QQ at 127:18-129:21; *see also* Ex. NN at 173:24-174:14; Ex. X at 56:21-57:9.

*Wearables*.  Oracle has been in the wearables market since at least 1998.  TX 5393 (Java ring).  Oracle viewed "[s]mall embedded" products (including wearables) as "an important market," and thought it might make some headway here in the face of Android, noting that "Android has not penetrated here as of yet [in 2012]."  TX 5893 at 1.  But like Android Auto and Android TV, Android is now firmly in the wearable market with Android Wear.  *See* Ex. G at 98:22-99:9, 357:5-11; Ex. OO at 49:42-1:05:46 (Android Wear); 1:05:51-1:09:32 (Android Auto); 1:16:20-1:17:38 (Android TV).  And Oracle "can't even have the conversation … with the companies" because they are "going in on Android."  Ex. MM at 73:16-18; *see also* TX 5062 ████announcing an "Android-Wearable platform" was "what we were afraid of"); Ex. QQ at 102:15-25.

*Home Gateway*.  A home gateway device is a communications hub that connects networked devices in the home to the internet so that they can communicate with a back-end server or database.  Oracle saw a "highly competitive opportunity" for a "Home Gateway device," but the customer was "currently leaning toward non-Oracle Java … *i.e.*, Android."  TX 5850 at 1; *see also* TX 2449 at 16 ████████).

*Printers*.  Printer "vendors that were … targeting their consumer segment, ████is an example," "actually moved to Android."  Ex. W at 98:19-23.  And since ██████"had been using Android" it "us[ed] that as leverage" forcing Oracle to "settle[] for … a  much lower price."  Ex. MM at 93:24-94:7.

*Appliances*.  A deal with ████████or a "smart appliance platform" was "lost to Android."  Ex. LL at 2-3; *see also* Ex. QQ at 82:19-83:14.

*Cameras*.  While █████"understands that Java is better than Android," they went with Android "just because it is on trend."  TX 5632 at 1.  As Smith testified, in the camera market,

"there are Android-based cameras and if there are Android-based cameras … those could have been Java-based cameras."  Ex. MM at 90:24-91:1.

*Vending Machines, Kiosks, and Point of Sale Terminals***.**   Android also "harmed the market for Java in vending machines and kiosks" and "point of sale terminals."  Ex. MM at 95:11-13; 96:10-12.  One "company that produced vending machines … said they considered Java but chose to go with Android."  Ex. W at 89:1-3.

*Machine to Machine.*   Oracle has tried to license Java in Machine to Machine applications, but has faced competition from Android.  Machine to Machine technology is used for "communication between smaller devices in a sort of automated way."  Ex. NN at 205:9-10.  One "major deal" for Oracle in this market was "lost to Dalvik [*i.e.*, Android]."  TX 5886 at 1.  Android "slam[med] the door on [Oracle's] opportunity to engage [a] market leader."  *Id.*  Oracle recognized the problem it faced competing against a free version of its own technology (*id.*):

> 1. Google doesn't care if anyone does anything to Dalvik—if data finds [its] way back to their ad machine, then great.  They also (apparently) don't care if people fork Dalvik/Android.  So, zero risk for them.  2. We however, do care if someone runs off with our code without paying because we're offering a product—it runs well, it's maintained, it has support, and a future.

\* \* \*

In all of the above markets, Android contains the 37 Java API packages.  As Google has explained, "there's now one Android SDK [Software Development Kit] for all form factors."  Ex. OO at 77:37-44.  "[T]he APIs are part of" the SDK.  Tr. 375:6-7 (E. Schmidt); Tr. 543:11-13 (Schwartz).  Google's official Android developer websites instruct developers to use the SDK for Android API Level 20 (KitKat) and 21 (Lollipop) to develop apps for Android Auto, TV, and Wear.  *See* ECF No 1612-3 (Opp. to New Products MIL) at 1 n.1; *see also* ECF No. 1465-6 (Zeidman Rpt.) ¶ 29; Ex. FF (Schmidt 3d Rpt) at ¶ 52 n.30.

Google's expansion of Android into these actual and potential markets for Java SE and its derivatives is highly probative and significant evidence on the first and fourth fair use factors.  It was improper and prejudicial to exclude from the case a significant portion of the harm Android has, is, and will continue to cause to Java.  A new trial is required.

1    **IV.    LIMITS ON USE OF THE MAZZOCCHI EMAIL PREJUDICED ORACLE**

2         Google repeatedly argued to the jury that unlicensed copying of APIs was a universally

3    accepted practice in the industry.  This false narrative was a focal point of Google's defense.

4    Google told the jury *over thirty times* during opening, summary, and closing statements that the

5    37 Java API packages were "free and open" for all to use without a license.[4]  Google pointed to

6    Apache Harmony in particular as proof that "what Google engineers did was nothing out of that

7    mainstream."  Tr. 2092:12-16.  In the rebuttal to closing argument, Google told the jury:  "There

8    isn't a single document from anyone … anywhere … that says Google was wrong or it was some-

9    how a violation to use [the declaring code from the 37 API packages]."  Tr. 2197:18-20.  Of

10   course, there *was* such a document: an April 2007 email from former Apache Director Stefano

11   Mazzocchi, which stated that "Android using Harmony code is illegal."  Ex. JJ.   But the Court

12   *sua sponte* redacted this critical sentence from the document so that the jury never saw it and re-

13   fused to lift the redaction even after Mr. Mazzocchi falsely testified that he never thought use of

14   the copyrighted works was illegal.  Against this backdrop, Oracle's inability to fully present evi-

15   dence regarding former Apache Director Mazzocchi was prejudicial and warrants a new trial.

16        **A.    The Mazzocchi Email Should Not Have Been Redacted In The First Instance.**

17        TX 5046 is an email from the Apache Software Foundation's VP of Legal Affairs to all

18   members of the Apache Software Foundation reflecting a conversation with trial witness Stefano

19   Mazzocchi about the legality of Apache Software Foundation's use of Java APIs in the Apache

20   Harmony Project.  Before admitting TX 5046 into evidence, the Court ordered Oracle to redact

21   the following sentence:  "This makes us *already* doing illegal things (in fact, Android using

22   Harmony code is illegal as well)."  The Court stated it redacted the sentence because it was "too

23   inflammatory and without foundation."  Tr. 1588:11-14.  This was error.

24        First, the Court's characterization of the subject sentence as "inflammatory" was not a

25   proper basis to exclude relevant, highly probative evidence.  To the extent the Court intended to

26   _____

27   [4] The transcript is littered with statements suggesting that Google believed it was widely agreed in
     the industry that APIs were "free and open" for all to use.  *See, e.g.,* Tr. 283:12-13; 294:24-25;
     297:2-4; 300:8-10; 302:6-7; 303:1-4; 307:4-6; 308:4-5; 314:8-9; 1158:3-6; 1158:10-11; 1158:19-
28   21; 1159:12-15; 1160: 19-20; 1161:15-16; 2092:6-9; 2096:16-17; 2097:20-21; 2099:16-17;
     2111:2-3; 2128:4-9; 2129:4-6; 2184:23-24; 2186:9; 2186: 21-22; 2188:21-24; 2189:6-10.

1   invoke Rule 403, a mere finding that evidence was "inflammatory" was not sufficient to justify

2   redaction.  "[T]o fall within the rule, the evidence must have a tendency to entice the jury to de-

3   cide the case on an improper basis."  *United States v. Presley*, No. CR07-5058BHS, 2008 U.S.

4   Dist. LEXIS 7841, at *3-4 (W.D. Wash. Jan. 16, 2008) (inflammatory evidence that defendant

5   possessed child erotica not excludable under Rule 403 where evidence was highly probative and

6   prejudice to defendant could be remedied with jury instruction) (citing *United States v. Dhingra*,

7   371 F.3d 557, 566 (9th Cir. 2004) ("bald assertion" that evidence was "inflammatory" insufficient

8   to invoke Rule 403)); *compare United States v. Layton*, 855 F.2d 1388, 1402 (9th Cir. 1988) (in-

9   flammatory speeches not excluded under 403 because rule "precludes only *unfair* prejudice")

10  *with United States v. Cerna*, No. CR 08-0730 WHA, 2010 U.S. Dist. LEXIS 146687, at *35

11  (N.D. Cal. Dec. 17, 2010) (excluding evidence "dripping with allusions to violence … death,

12  crimes, illegality, criminals, and prison no less than 50 times").  Mr. Mazzocchi's statement that

13  "Android using Harmony code is illegal" is a far cry from the evidence ordinarily deemed to be

14  "inflammatory," and it is not *unfairly* prejudicial in any event.  *Google* is the party that made

15  Apache's use of the APIs a centerpiece of its defense, so it would hardly have been unfair for the

16  jury to see that a former Harmony Director thought that what Google was doing was "illegal."

17      Second, there was no foundation problem with Mr. Mazzocchi's statement.  Rule 602 of

18  the Federal Rules of Evidence states in relevant part that "[a] witness may not testify to a matter

19  unless evidence is introduced sufficient to support a finding that the witness has personal know-

20  ledge of the matter."  *See Stuart v. UNUM Life Ins. Co. of Am.*, 217 F.3d 1145, 1154 (9th Cir.

21  2000).  Mr. Mazzocchi testified that one purpose of the Apache Software Foundation was to pro-

22  vide a means for software developers to be sheltered from lawsuits directed at the Apache Foun-

23  dation's projects, Tr. 1711:21-1712:4, and that he corresponded with the Apache Foundation's

24  VP of Legal Affairs regarding legal issues related to use of copyrighted Java APIs in the Harmo-

25  ny Project, Tr. 1712:9-1713:16.  This testimony was sufficient to provide a foundation for Mr.

26  Mazzocchi's statement that he believed Google's copying to be illegal, particularly in light of the

27  fact that the Court permitted various Google witnesses to testify as to their own subjective beliefs

28  on the matter, such as Schwartz testifying that there was nothing Sun could do about copying of

1  Java APIs, Tr. 508:22-509:9, 520:17-521:3.

2      The prejudice Oracle suffered due to the redaction of the Mazzocchi email was com-

3  pounded by the fact that Google continuously told the jury that "everybody" thought Google's

4  copying was legal.  *See Dominguez v. Stainer*, No. CV 12-8280 AG (FFM), 2014 U.S. Dist.

5  LEXIS 62119, at *55-56 (C.D. Cal. Feb. 12, 2014) (evidentiary error exacerbated by counsel's

6  repeated exploitation of ruling during opening and closings).  Specifically, Google told the jury:

7  • "[Google] did the right thing.  They used the [declaring code] that everybody thought were
8  open and free." Tr. 308:4-5.

9  • "[I]t was clear to everybody that the Java API declarations were…open and free.  Open and free, given away …." Tr. 1158:3-6.

10 • "[E]verybody assumed [method headers] were open and free." Tr. 1161:15-16.

11 • "Sun permitted … GNU Classpath and Apache Harmony… [to use] the same API declara-
12 tions that Google used in Android. So what Google did was nothing out of that mainstream." Tr. 2092:12-16.

13 • "[T]hese free API declarations, … everybody at that time assumed and understood were free
14 to use." Tr. 2092:18-20.

15 • "Forever and ever, programmers have believed APIs to be free and open."  Tr. 2188:21-24.

16 • "[U]sing open free APIs … was customary and standard."  Tr. 2189:6-11.

17     Oracle was further prejudiced by the Court precluding Oracle from using the Mazzocchi

18 email during its opening statement—one of the most important moments in a jury case.  *See, e.g.*,

19 *United States v. Aguilar Noriega*, 831 F. Supp. 2d 1180, 1204-1205 (C.D. Cal. 2011) ("In an ex-

20 ceptionally complicated case such as this, opening statements assume even greater importance

21 than is usually the case, because they enable counsel to articulate their key themes at the critical

22 point of 'first impression.'"); *Sharon T. v. New Directions Inc.*, No. 2:15-cv-04239-SVW-E, 2016

23 U.S. Dist. LEXIS 5640, at *9 (C.D. Cal. Jan. 12, 2016) ("The Court views opening statements in

24 a jury case as one of the most important parts of the case.").

25     Prior to Oracle's opening statement, Google objected that one of Oracle's slides contained

26 an excerpt of the Mazzocchi email.  Tr. 10:25-11:17 (discussing Ex. GG).  Google argued that

27 Mr. Mazzocchi was not disclosed by name in either party's Rule 26(a)(1) disclosures.[5]  The Court

28 _____

[5] Both parties' Rule 26 disclosures included former directors of the Apache Software Foundation as potential witnesses.  Exs. HH, II.

1   sustained Google's objection at the time and precluded Oracle from using the Mazzocchi email in

2   its opening statement, despite recognizing that the email was "a potentially-important document

3   in the case." Tr. 12:15-17.  Later in the trial, after full briefing on whether Mr. Mazzocchi would

4   be permitted to testify, the Court acknowledged that it should not have precluded Oracle from us-

5   ing the Mazzocchi email in its opening statement.  ECF No. 1875 at 1-2.

6        The Court's ruling deprived Oracle of the opportunity to present one of the most im-

7   portant documents in the case during its critical point of first impression with the jury.  The

8   Court's order further allowed Google to set the stage with its false claim of industry custom.

9        **B.    Oracle Should Have Been Permitted To Impeach Mr. Mazzocchi's Testimony
             That He Did Not Believe Apache Was Doing Anything Illegal**

10

11       The Court prevented Oracle from fully impeaching Mr. Mazzocchi's and establishing his

12  lack of crediblity.  First, by refusing to lift the redaction from the Mazzocchi email, the Court

13  permitted the witness's demonstrably false testimony to stand unchallenged.  During Google's

14  examination of Mr. Mazzocchi, Google's counsel asked him a series of leading questions eliciting

15  testimony that he did not think that Apache was doing anything illegal:

16       Q.  After the email exchange with Mr. Ruby, did you resign as a member from the
             Apache Software Foundation?

17

18       A.  No.

19       Q.  And what, if anything, do you conclude from the fact that you did not resign your
             membership after that email?

20

21       A.  … I would have left slamming the door if I thought that what the foundation was
             doing was causing harm or doing *any illegal things*.

22  Tr. 1727:12-23 (emphasis added).  Mr. Mazzocchi's testimony that he did not think Apache was

23  "doing any illegal things" by copying the Java APIs is the opposite of what he wrote in his email:

24  Apache was "*already* doing illegal things," TX 5046.   It was error to exclude this direct im-

25  peachment evidence.  *Averilla v. Lopez*, 862 F. Supp. 2d 987, 997 (N.D. Cal. 2012) (error to ex-

26  clude "particularized evidence of [witness's] credibility tied closely to the specific facts before

27  the jury, not just statements of her general character for truthfulness … exclusion … deprived the

28  jury of information critical to making a proper evaluation of [witness's] credibility.").

Moreover, Mr. Mazzocchi's testimony, which suggested to the jury that he would not knowingly participate in an organization that was "doing any illegal things," is doubly false; not only did Mr. Mazzocchi continue at Apache despite his belief that they were "already doing illegal things," Mr. Mazzocchi joined Google as an employee despite his belief that Android was also illegally infringing Oracle's copyrights.  Mr. Mazzocchi's subsequent employment at Google, however, was also improperly withheld from the jury.  Tr. 1589:4-5 (Court: "don't bring up that he works at Google now); Tr. 1728:20-24 (Oracle moving to elicit Mazzocchi's Google employment); *id.* 1731:6-8 (denying motion).  "Proof of a witness's bias is almost always relevant under Federal Rule 401, and therefore admissible under Federal Rule 402, because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *Lewy v. S. Pacific Transp. Co.*, 799 F.2d 1281, 1298 (9th Cir. 1986) (citation omitted).  The fact that Mr. Mazzocchi was a Google employee at the time of his testimony was a material fact bearing on Mr. Mazzocchi's pro-Google bias and his resistance to questioning from Oracle's counsel.  This important fact should not have been kept from the jury.  Although courts have discretion to exclude bias evidence under Rule 403, that discretion should be exercised in a manner that ensures that the jury has "sufficient information overall to appraise the bias and motives of a witness." *Id.*  The jury did not have sufficient information to appraise Mr. Mazzocchi's biases and motives because Oracle was not permitted to establish on cross that Mr. Mazzocchi was a Google employee.

## V. BIFURCATING THE TRIAL PREJUDICED ORACLE AND REQUIRES A NEW, SINGLE PHASE TRIAL ON LIABILITY AND DAMAGES

Oracle argued repeatedly that the trial should not have been bifurcated.  *See*, *e.g.*, ECF Nos. 1299, 1504, 1539, 1574-4.  *First*, Oracle argued it was inefficient and confusing to bifurcate because of the complete overlap of evidence between fair use, damages, and willfulness.  ECF Nos. 1504 at 4-7, 1539 at 2-4.  *Second*, Oracle argued that bifurcation was unnecessary to protect jury and ran the risk of increasing how long the jury would be required to serve.  ECF Nos. 1504 at 5-6, 1539 at 1.  *Third*, Oracle argued that bifurcation was not necessary to avoid prejudice to the parties but risked prejudicing Oracle both by separating damages from liability despite the

1    overlap in evidence and by providing the jury a structural incentive for it to render a verdict for

2    Google to avoid a second round of evidence and deliberations.  ECF No. 1504 at 6.

3         Oracle's concerns were borne out at trial.  The jury never heard Oracle's damages expert

4    testify that Java ME licensing revenues maintained an upward trajectory until Android put reve-

5    nues into free-fall in 2013.  ECF 1560-12 (Malackowski Op. Rpt.) at 77, Ex. 12.2.  The jury never

6    heard the expert's detailed explanations of how Google makes money from Android.  ECF 1560-

7    12 (Malackowski Op. Rpt.) at 86-113 (describing Google's Android monetization strategy and

8    profits); *see also* Ex. KK.  And, bifurcation provided a structural incentive for the jury to return a

9    defense verdict.  Oracle is entitled to a new, unbifurcated jury trial.

10   **VI.   EXCLUSION OF CERTAIN DOCUMENTS ON HEARSAY GROUNDS**
11   **       PREJUDICED ORACLE**

12        **A.   Oracle Was Prejudiced By The Wrongful Exclusion Of Evidence That Sun**
              **Believed Android Infringed Before the Oracle Acquisition.**

13        One of Google's central themes at trial was that Sun blessed Google's unauthorized use of

14   the 37 Java API packages, at least until Oracle acquired Sun.  In addition to calling witnesses to

15   rebut this false assertion, Oracle sought to introduce contemporaneous documents showing Sun

16   believed that Android infringed Oracle's copyrights.  One critical document was TX 5295, a re-

17   sponse to questions posed by the European Union during its inquiry into the proposed acquisition.

18   The document was jointly prepared by Sun and Oracle in 2009.  Critically, one question in the

19   document called for an explanation of "the conflict between Sun and Google with regard to

20   Google's Android."  *Id.* at 39 (Question 70).  Pre-merger, Sun's response read:  "*Sun* believes that

21   the Dalvic [sic] virtual machine plus class libraries, which together constitute the Android

22   runtime environment, are an *unauthorized derivative work of Java SE.*"  *Id.* (emphasis added).

23        Oracle's main EU submission was admitted into evidence and used by Google at trial.  TX

24   2237; Tr. 1432:16-1438:1.  But when Oracle attempted to introduce answers to follow up ques-

25   tions from the EU (TX 5295), the Court excluded that document as hearsay.  Although Oracle's

26   CEO Safra Catz, who had led the acquisition and integration of the companies, testified under

27   oath that Sun supplied this answer, the Court concluded that the document was hearsay because it

28   was *filed* by Oracle.  Tr. 1302:8-14, 1313:17-25.  Counsel for Oracle then represented that drafts

1    of this document also demonstrate that Sun supplied this answer.  Tr. 1314:1-3.  In response, the

2    Court instructed that Oracle should introduce the draft from Sun, which the Court said would be

3    admissible for the limited purpose of showing Sun's state of mind—*i.e.*, that Sun, *before* the ac-

4    quisition, believed Android was infringing, Tr. 1314:4-9.

5           The next day, when Oracle made a proffer—as the Court invited—involving these drafts

6    to provide the Court additional evidence that Sun made the statement in question, the Court con-

7    cluded that TX 5295 still could not come in because that statement was "self-serving," Tr.

8    1339:3-4, and because the drafts of TX 5295 had earlier been withheld.  Tr. 1341:18-1342:11.

9    The Court held to this ruling even when Oracle's counsel clarified that Oracle did not seek to in-

10   troduce these drafts; rather, all Oracle sought to introduce was Ms. Catz's testimony, based on her

11   own knowledge, that Sun, not Oracle made, the statement.  Tr. 1338:10-20.

12          Hearsay is admissible when it is "[a] statement of the declarant's then-existing state of

13   mind."  Fed. R. Evid. 803(3).  "The Ninth Circuit has identified three factors bearing on the

14   'foundational inquiry on admissibility under Rule 803(3): contemporaneousness, chance for re-

15   flection, and relevance.'"  *United States v. Paiz*, No. CR 06-00710 WHA, 2007 WL 2143015, at

16   *6 (N.D. Cal. July 24, 2007) (quoting *United States v. Miller*, 874 F.2d 1255, 1264 (9th Cir.

17   1989)).  In *Wagner v. County of Maricopa*, 747 F.3d 1048, 1052 (9th Cir. 2013), the Ninth Circuit

18   reversed the exclusion of state-of-mind hearsay testimony.  A witness sought to offer the details

19   of a conversation with her brother about being sexually assaulted while in jail.  *Id.*  This testimo-

20   ny was offered not to prove the incident occurred, but to prove the brother's state of mind.  *Id.*

21   The court held the three requirements of Rule 803(3) were met, despite the lapse of significant

22   time between the jail incident and the conversation, because the testimony was offered to show

23   the brother's state of mind *at the time of the conversation*.  *Id.* at 1053.

24          Similarly, TX 5295 was offered to prove Sun's state of mind *at the time Sun drafted and*

25   *authorized the filing of its response to Question 70*.  The Court recognized this fact, stating that

26   this document "would be admissible, I think, for the same limitation," Tr. 1314:8-9, *i.e.*, "to show

27   that this communication was made by Sun *before the acquisition*" in order "to meet [Google's]

28   suggestion" that Oracle "cooked up" this lawsuit, Tr. 1309:1-17 (emphasis added).  As TX 5295

1    was drafted and filed before the acquisition and that it reflects that "*Sun believes* that … the An-

2    droid runtime environment[] [is] an unauthorized derivative work of Java SE," the document

3    clearly speaks to Sun's state of mind at that time before the acquisition.  TX 5295 at 39.

4          The only issue, the Court explained, was whether Sun was the declarant, Tr. 1314:8-9.

5    Oracle presented ample evidence that Sun, not Oracle, was the declarant of the offered statement,

6    and thus it was error to exclude the document.  *See Wagner*, 747 F.3d at 1052 (citing Fed. R.

7    Evid. 801(b) ("The 'declarant' is the person who made the out-of-court statement.").  First, the

8    statement itself indicates that Sun, not Oracle was the declarant.  TX 5295 at 39 ("*Sun* believes

9    ….").  Because the document was being offered for the narrow purpose of demonstrating Sun's

10   state of mind at the time, the fact that the document was filed by Oracle is irrelevant when Sun

11   was the declarant of the statement being offered.  *See Wagner*, 747 F.3d at 1052 (holding that a

12   witness's testimony, which recited the *declarant*'s words, was admissible under 803(3)).  Second,

13   Ms. Catz testified based on her own percipient knowledge that Sun, not Oracle, was the declarant.

14   Tr. 1313:17-23.  Finally, Oracle's counsel proffered three drafts of TX 5295 as further proof, con-

15   sistent with counsel's representation to the Court, that Sun was the original declarant.  Any fur-

16   ther doubt as to the origin of the statement, or its purported self-serving nature, goes to the weight

17   of both the statement and to Ms. Catz's testimony about it, not to admissibility.  Google was free

18   to aggressively examine Ms. Catz about her testimony and the document.[6]

19         The exclusion of TX 5295 was prejudicial to Oracle's case.  Google's primary theme was

20   that Google's use was fair because Sun *always* believed the 37 Java API packages were free and

21   open.  *See, e.g.*, Tr. 2092:5-9 (Google Closing) ("And in addition to that, the Java API

22   declarations that are at issue in this lawsuit have always been treated by Sun as open and free and

23   given away, along with the language, making those Java API declarations available to every-

24   body."); Tr. 2093:15-16 ("[B]ut the evidence was not only Mr. Schwartz, but everybody else at

25   Sun supported Android."); Tr. 2094:12-15 ("Because the evidence you've heard, which I'm going

26   to review in detail, establishes that not only was Google's use of these open API declarations a

27   ──────────────
     [6] The Court determined that the *drafts* of TX 5295 were privileged and were late produced.
     Whether the drafts were privileged, however, was irrelevant to whether TX 5295 was admissible.
28   TX 5295 is an unprivileged document, it states that Sun was the declarant, and a witness with per-
     sonal knowledge corroborated this fact on the stand subject to cross examination.

ORACLE'S RULE 59 MOTION FOR A NEW TRIAL

1   fair use, but it was consistent with Sun's policy.  It was applauded by Sun executives.").  TX

2   5295 was a contemporaneous document that refutes Google's theme, showing unambiguously

3   that Sun believed in 2009, before Oracle's acquisition, that Google's use of the 37 Java API

4   packages was *not* fair, but was an unauthorized taking.  TX 5295 was one of the few palpable

5   pieces of evidence the jury could examine on this issue during deliberations.  Worse still, with its

6   exclusion, the jury was left with the misimpression that Oracle "cooked up" this lawsuit after pur-

7   chasing Sun.  Accordingly, Oracle is entitled to a new trial.  *See Wagner*, 747 F.3d at 1053-54.

8          **B.**      **The Court Incorrectly Excluded Damning Evidence of Market Harm Solely**
9                   **Because that Evidence Was in PowerPoint Format**

10   Oracle sought to introduce three PowerPoint documents prepared and used in the regular

11   course of business summarizing financial data.  One document was a budget presentation contain-

12   ing summaries of regularly prepared Oracle budget data, including future projections.  TX 5961.

13   The other documents, created by Neal Civjan, Oracle's then-Vice President of Worldwide Sales,

14   contain summaries of sales and licensing data recorded and maintained in the regular course of

15   business.  TX 6431; TX 6470. The Court excluded all three documents as hearsay.

16   Oracle CEO Safra Catz testified that these budget documents are used by Oracle execu-

17   tives in annual budget reviews regularly conducted at Oracle "to educate [them] on what is going

18   on in the business" and that such documents are regularly presented in the format of TX 5961 for

19   approval by Oracle's Executive Management Team and Board of Directors.  Tr. 1356:10-21,

20   1357:1-12.  Despite this foundation, the Court concluded:  "There are too many slide shows in

21   that document.  If it was just a financial statement, I would allow it, but there are too many slide

22   shows in that document to qualify it as a business record."  Tr. 1357:20-23.  Acknowledging the

23   Court's concern, Oracle attempted to admit only page 21 of the exhibit, a spreadsheet of revenue

24   and expenses for the first two quarters of fiscal year 2011 for Java embedded and forecasts for the

25   third quarter.  Tr. 1357:24-25.  That page contained primarily numbers, with prose only to identi-

26   fy and label the numbers.  The Court excluded that page, explaining:  "That's a speech.  It's not a

27   business record.  That's a speech."  Tr. 1358:4-6.

28   The Court did not even permit Mr. Civjan to testify to the business record foundation of

1  TX 6431 and TX 6470 before concluding they were inadmissible hearsay.  Google preemptively

2  challenged the admissibility of these documents outside the presence of the jury as inflammatory

3  hearsay, and the Court asked Oracle:  "If it's an in-house [Oracle] document, how can you possi-

4  bly -- that's just self-serving hearsay?  How can you get that into evidence?"  Tr. 1497:6-8.  Ora-

5  cle explained that Mr. Civjan would testify that the document was prepared in the regular course,

6  as was Oracle's custom, not for litigation.  Tr. 1497:15-21.  Unconvinced, the Court stated:  "I

7  don't care so much about the inflammatory part, but this [is] an internal self-serving – it is not a

8  business record.  It's just not.  It's a presentation made in-house …."  Tr. 1498:21-25.  Oracle re-

9  sponded that even though "the document is a PowerPoint, … this is the regular type of document

10  that this witness prepares with respect to his business duties in the company.  This records infor-

11  mation.  He's got a responsibility to do so accurately, and it's reported and decisions are made

12  based on the information."  Tr. 1499:14-19.  The Court nevertheless excluded the documents as

13  "self-serving," "internal propaganda," "not a business record."  Tr. 1499:20-1500:2.

14      Rule 803(6) provides that records of regularly conducted business activity are admissible

15  as an exception to hearsay if the document is:

16      [a] ... report, record, or data compilation, in any form, of acts, events, condition,
    opinions, or diagnoses, made at or near the time by, or from information transmit-
17    ted by, a person with knowledge, if kept in the course of a regularly conducted
    business activity, and if it was the regular practice of that business activity to make
18    the ... report, record or data compilation, all as shown by the testimony of the cus-
    todian or other qualified witness ... unless the source of information or the method
19    or circumstances of preparation indicate lack of trustworthiness.

20  *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1043 (9th Cir. 2009).  In *U-*

21  *Haul*, the Court upheld the admission of exhibits that contained summaries of financial data.  *Id.*

22  at 1045.  The defendant contended that, because of their format as computer-created summaries,

23  these exhibits were not business records, and were prepared solely for litigation.  *Id.* at 1044.  The

24  court disagreed, concluding that the exhibits "fit squarely within the business records exception"

25  because, among other things, the underlying data was kept in the regular course of business, and

26  preparation of the summaries themselves was part of the company's regular business practice.  *Id.*

27      In the instant case, the three PowerPoint documents the Court excluded were similar to the

28  summaries of underlying data at issue in *U-Haul*.  As Ms. Catz testified, and as Mr. Civjan would

1   have testified, a person with knowledge made or transmitted each document's underlying data at

2   or near the time of the incident recorded, and Oracle made and kept the summaries themselves in

3   the course of regularly conducted business activity.  Civjan Decl. ¶¶ 3-10; *supra* at 23.  There are

4   also additional indicia of reliability present, as it is Oracle's regular practice to track and convey

5   information in this format and Oracle executives prepared and relied upon the information sup-

6   plied in these presentations in conducting their business.  The fact that Oracle's regular practice is

7   to summarize such information in a particular computer program—one that facilitates visual in-

8   spection and easy communication—has no bearing whatsoever on the reliability of the infor-

9   mation reflected in these exhibits.  *U-Haul*, 576 F.3d at 1043 (format is "immaterial").  TX 5961

10  illustrates the point: The page that Oracle sought to introduce was nothing more than regularly-

11  tracked financial data pasted onto a PowerPoint slide.  The ".ppt" file extension cannot be dis-

12  positive.

13      The exclusion of these three exhibits greatly prejudiced Oracle.  They bore directly on the

14  most important fair use factor (actual and potential market harm) by showing the enormous nega-

15  tive financial impact Android had on Oracle's revenues in multiple markets.  TX 6470, for exam-

16  ple, contains summaries of regularly maintained sales information showing that four of Oracle's

17  primary mobile phone clients—██████████████████████—were switching to Android.

18  TX 6470 at 14.  It could not have stated the market harm Android caused more simply: "Android

19  Impact = Revenue Decline."  *Id.*  These exhibits were the primary contemporaneous and tangible

20  evidence to corroborate Oracle's assertion that Android was running over Java in multiple mar-

21  kets.  That is powerful evidence, and the jury would have had the documents with them to delib-

22  erate.  Without them, the story Oracle was narrating to the jury was missing critical evidence.

23      The Court erred in excluding TX 5961, TX 6431, and TX 6470 to Oracle's prejudice.  A

24  new trial with the admission of those documents is warranted.

### CONCLUSION

26      The Court should grant Oracle a new trial and grant Oracle additional discovery regarding

27  Android and Android components running on laptops, desktops, and servers.

28

Dated:  July 6, 2016                    Respectfully submitted,

                                        Orrick, Herrington & Sutcliffe LLP

                                By:  */s/ Peter A. Bicks*
                                        Peter A. Bicks

                                        Counsel for ORACLE AMERICA, INC.