# EXHIBIT C

# UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL

Page 1

1            UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                SAN FRANCISCO DIVISION
4  ORACLE AMERICA, INC.,
5       Plaintiff,
6          vs.              Case No. 3:10-cv-03561-WHA
7  GOOGLE, INC.,
8       Defendant.
   _____

13              *HIGHLY CONFIDENTIAL*
14         PURSUANT TO THE PROTECTIVE ORDER
15      VIDEO DEPOSITION OF JAMES R. KEARL, Ph.D.
16              San Francisco, California
17              Wednesday, March 23, 2016
18                      Volume I

22  REPORTED BY:
23  REBECCA L. ROMANO, RPR, CSR No. 12546
24
25  Job No. CS2276036

HIGHLY CONFIDENTIAL

Page 116

1   categories of programmers face.
2       Q.   Is it fair to say that you're spending
3   more time than you want to at lawyers' services?
4       A.   Absolutely.
5            MR. COOPER:  Yes.
6       Q.   (By Mr. Ragland)  Well, I should have
7   asked a foundational question.
8            What -- what do you mean by multi-homing?
9       A.   Multi-homing, I think, means that I write
10  for several platforms that presumably have
11  different implementing -- well, different
12  app-support platforms.
13           That is, you've got -- this is awkwardly
14  put.  You've got to write in different languages.
15  Okay.
16      Q.   In your report, on paragraph 59, which is
17  on -- you can race to get to the page -- pages 30
18  and 31, you state in there that, "Google makes less
19  search-related profit when users switch from an
20  Android phone to another smartphone."
21           What is -- to your recollection,
22  what's the -- the evidence or basis for that -- for
23  that statement?
24      A.   This has a long predicate to it, which I
25  describe in my -- in my -- early on in the report,

Page 117

1  which is, you would think that the nature of
2  traffic acquisition costs would be sort of almost
3  stipulated, that everybody would agree that the
4  record would be clear on this matter, that we would
5  know who pays what and how much.
6           And the record is a hash.  It's not
7  clear.  And the experts aren't clear either.
8  Because I asked them this question when I had an
9  opportunity to pose questions in depositions.
10          So it -- with that as background, it's my
11 understanding that when Google sells an ad, its
12 revenue doesn't depend upon which -- it's -- the
13 price it gets paid for placing the ad doesn't
14 depend upon which platform it's on.
15          So its revenue are platform neutral, but
16 that its costs are not.  And that the advantage of
17 Android is that it reduced traffic acquisition
18 costs.
19          That's what I believe the facts will be,
20 but they're not clear.  Okay.
21          I think there's some indirect evidence
22 that that's what Google wanted.  It wanted to
23 reduce traffic acquisition costs.
24          That may have occurred in two ways.  Only
25 one way is handled by all of the experts in this

Page 118

1  matter, including me.  And that is there was a
2  direct reduction in costs.
3          So I think -- I may get the numbers wrong
4  
5  it pays -- there's a Google document that says it
6  pays on --
7       Q.   Let me just --
8       A.   -- Android.
9       Q.   Let me break in for a moment because it
10 sounds like we're --
11         MS. HURST:  Objecting to you --
12      Q.   (By Mr. Ragland)  -- like we're getting
13 into information under the protective order for
14 which Oracle's representative has to be excused.
15         Apologies --
16      A.   I apologize.
17         MS. HURST:  No, it's not your fault.  We
18 tried to get that altered, but thank you for your
19 consideration.
20      Q.   (By Mr. Ragland)  So I'm sorry to
21 interrupt you for that.
22         Please continue if you want to refer to
23 the -- to the LiveNote feed.
24 
25

1    in -- in the costs.
2              And it's that quantitative and the
3    overall qualitative thing that informs my decision,
4    and -- and informs my -- my opinion, not
5    decision -- and is what is reflected in this
6    paragraph, and reflected, I think, in the other
7    experts' reports.
8              There's a second way that Android may
9    have mattered to Google that has not been
10   quantified by anybody, and that is whether it put
11   Google in a stronger position in negotiating what
12   ███████████████████████████████████████████████
13   prevent, for example, being blocked out of the
14   platform or -- or something of that sort.
15             Nobody has taken that on.  But, at least,
16   again, there's some qualitative things evidenced,
17   that is stuff that I've seen that suggests that
18   there was some concern about being blocked and
19   ███████████████████████████████████████████████
20   ███████████████████████████████████████████████
21   negotiating TAC up.
22             But none of that figures into anybody's
23   damages numbers here, none.  What figures into the
24   damage numbers is -- is this different than
25   acquisition costs.

HIGHLY CONFIDENTIAL

Page 120

1          So long answer.
2          To repeat the short version of this is,
3     I'm assuming that the -- that the revenues -- and I
4     think all the other experts do as well -- will be
5     more or less the same, but that Android had lower
6     acquisition -- that Google had lower acquisition
7     costs because of Android, and, therefore, its
8     profits were greater.
9          MR. RAGLAND:  And I will take this
10    opportunity to designate this transcript as highly
11    confidential under the protective order subject to
12    de-designation.
13         MS. HURST:  So I -- I just have to object
14    to that.  The Judge has already said that nothing
15    outside of the last two years should be
16    considered -- should be considered under seal at
17    this point in the case.
18         And while that particular answer I can
19    understand is consistent with prior court orders,
20    designating the whole transcript at this point in
21    the case when we have Daubert motions to file, that
22    just doesn't meet the Ninth Circuit standard for
23    compelling reasons.
24         MR. RAGLAND:  Well, my --
25         MS. HURST:  I object to you doing that.