# EXHIBIT 6

# DOCUMENT SOUGHT TO BE SEALED

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

1               UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                 SAN FRANCISCO DIVISION

4    ORACLE AMERICA, INC.,

5         Plaintiff,

6              vs.          Case No. 3:10-cv-03561-WHA

7    GOOGLE, INC.,

8         Defendant.

     _____

9

10

11

12

13      *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

14           PURSUANT TO THE PROTECTIVE ORDER

15      VIDEO DEPOSITION OF JAMES MALACKOWSKI

16             San Francisco, California

17             Wednesday, March 17, 2016

18                    Volume I

19

20

21

22   REPORTED BY:

23   REBECCA L. ROMANO, RPR, CSR No. 12546

24   JOB NO. 2265299

25   PAGES 1 - 385

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 10

1          JAMES MALACKOWSKI,
2  having been administered an oath, was examined and
3  testified as follows:
4
5          EXAMINATION
6  BY MR. PURCELL:
7      Q.  Good morning, Mr. Malackowski.
8      A.  Good morning, sir.
9      Q.  You are Oracle's expert on copyright
10 damages in this case, correct?
11     A.  I think, generally speaking, that's fair.
12 Obviously, I produced two reports that explain in
13 detail the scope of my expert opinion.
14     Q.  And we'll be getting into those later.
15         But generally speaking, you are offering
16 a damages calculation in this case regarding
17 Google's alleged wrongful profits attributable to
18 the infringement, correct?
19     A.  That's within my opinions.  My opinions
20 are broader that -- than that, including, for
21 example, lost profit opinions.
22         But generally speaking, that's true.
23     Q.  Well, that was my next question.
24         You're also offering a damages opinion
25 regarding Oracle's alleged lost profits, correct?

Page 11

1      A.  Again, included within my offered
2  reports, that's also one of the opinions.
3      Q.  And another one of the opinions in your
4  report is a calculation of Oracle's statutory
5  damages, correct?
6      A.  Yes, sir.
7      Q.  You are not offering any opinion on the
8  value of a hypothetical license to Oracle, correct?
9      A.  Not explicitly.  So I have not reached a
10 conclusion as to what a hypothetical or a
11 constructive license would be.
12     Q.  You haven't offered any calculation as to
13 the value of a hypothetical license to Oracle for
14 the intellectual property at issue here, correct?
15     A.  Well, the notion of value may be more
16 expansive in your question than I'm thinking.  But
17 I have not offered an opinion as to what the result
18 of a constructive license would be.
19     Q.  Is there some reason why you didn't
20 calculate that measure of actual damages for
21 copyright infringement here?
22     A.  Yes.  That's a measure that I considered.
23 But I didn't believe that the information that was
24 available to me was sufficient to allow me to make
25 that computation.

Page 12

1      Q.  What information would you need to make
2  that computation?
3      A.  Well, ideally, I would see market-based
4  transactions that include parameters that are
5  similar to the taking in this case, in particular,
6  market-based transactions that do not have the
7  control and security elements that are implicit
8  with the contemporaneous agreements that I did
9  find.
10     Q.  So can you give me an example of a
11 market-based transaction including a similar
12 parameter that you would want to look at in making
13 a hypothetical license determination?
14     A.  Well, I can't give you an example in
15 response to your question, because there is no such
16 thing in my understanding.
17         But, hypothetically, an example would be
18 a license similar to the taking that is asserted
19 here, which would include rights to the APIs at
20 issue without the required control and security
21 elements that were important to Sun.
22     Q.  So you would be looking for a comparable
23 license to the APIs at issue here without the
24 control and security measures that you identified;
25 is that right?

Page 13

1      A.  Generally speaking, that's true.  There
2  would be a number of other considerations that
3  would ultimately determine if you could find
4  something that was comparable, for example, the
5  scope of the taking, the benefits realized.
6         But at a high level, my -- I did
7  investigate the issue that you raise.  And my
8  conclusion was that the data was not sufficient.
9      Q.  Mr. Malackowski, how many times have you
10 offered an opinion regarding damages in litigation
11 matters?  Just roughly.
12     A.  The definition of opinions is a little
13 nebulous, and I don't mean to mince words.
14         So I have testified in court on matters
15 related to that approximately 50 times.  I have
16 provided deposition testimony two or three times
17 that amount.
18         And then there would be a large number of
19 reports where I have issued an opinion, but there
20 was no testimony.
21     Q.  All right.  So roughly 50 instances of
22 testimony in court you said; is that right?
23     A.  And/or arbitration proceedings, yes.
24     Q.  And then 100 to 150 instances of
25 testimony at deposition?

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 62

1 technical experts who address that issue.
2        But generally speaking, the stability of
3 program, which means they are -- they are not
4 changing over time, allows programmers, A, to have
5 greater confidence and familiarity with them, and
6 not have to go back and do rework or change any of
7 their analysis because of the instability.
8        I believe that's discussed in some great
9 length within the technical reports.
10    Q.   And that's Dr. Kemerer's report, correct,
11 that performs the stability analysis?
12    A.   I believe it is, yes, sir.
13    Q.   Did you conduct any particular analysis
14 yourself regarding the stability of the APIs?
15    A.   Well, not at a level of specificity as
16 Dr. Kemerer did.  I think that the concept of
17 robustness and stability is clearly described
18 qualitatively within the business records, in
19 particular, the business records of Google when
20 they describe the importance of access to the Java
21 language for the Android platform.
22        I believe these considerations are part
23 of those descriptions.
24    Q.   You didn't assist Dr. Kemerer with his
25 stability analysis, correct?

Page 63

1    A.   Correct.
2    Q.   You relied entirely on his independent
3 work on the stability analysis?
4    A.   Certainly I relied upon his work for his
5 conclusions which I cite, yes, sir.
6    Q.   And what, if any, conclusions do you --
7 strike that.
8        How did Dr. Kemerer measure stability?
9 Do you know that, as you sit here?
10    A.   I believe he looked to revisions over
11 time between the Java 37 APIs at issue and other
12 code.  But I defer to his analysis.
13        I think that's a question of methodology
14 best for him.
15    Q.   Do you know if he was looking at changes
16 to the structure sequence and organization and
17 declaring code within APIs, or do you know if he
18 was looking at changes to the implementing code
19 within APIs?
20    A.   I don't recall that level of detail from
21 memory.  I would have to go back to Dr. Kemerer's
22 report.
23    Q.   Do you have a distinction in mind between
24 declaring code, on the one hand, and implementing
25 code, on the other?

Page 64

1    A.   Do I have a lay understanding of that
2 distinction?  Yes.
3        Do I have a distinction in mind with
4 respect to Dr. Kemerer's analysis of stability?
5 No.
6    Q.   What's your lay understanding?
7    A.   Well, my lay understanding is that the
8 declaring code, which is largely what's at issue in
9 this case, is what allows app developers or other
10 developers to efficiently create programs knowing
11 that there will be implementation code beneath the
12 SSO and declaring code, of which they not need be
13 particularly familiar with, relying upon the fact
14 that the declaring code will trigger sufficient
15 implementation for their needs.
16    Q.   You realize that the implementing code in
17 this case is not accused, correct?  True?
18    A.   Of course.
19    Q.   So do you know whether Dr. Kemerer's
20 stability analysis was limited to the declaring
21 code, or do you know whether it also looked at
22 implementing code?
23    A.   I understand that to be the same question
24 you asked me a moment ago.  And I don't have a
25 further description for you.

Page 65

1        I would have to go back to Dr. Kemerer's
2 report.  That's a level of analysis that's outside
3 my scope.
4    Q.   Wouldn't the appropriate analysis for
5 Dr. Kemerer to conduct be of the declaring code and
6 not the implementing code?
7    A.   I don't have an opinion.  I think that's
8 a better question for Dr. Kemerer.
9    Q.   Is it always a good thing when an API
10 doesn't change over time?
11    A.   Is it always a good thing?
12        I think in industries of this type it's
13 probably never fair to say always or never.
14        But generally speaking, based upon my
15 investigation, there clearly are advantages to
16 stability, as described in Dr. Kemerer's report.
17    Q.   Other than what's in Dr. Kemerer's
18 report, do you have any independent conclusions
19 about the advantages of stability to API code?
20    A.   Well, from a business perspective, as
21 noted a moment ago, I believe within the record of
22 this case is confirmation that from Google's
23 perspective, there was a value in the stability of
24 the code in that it allowed more efficient access
25 to the API developers.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 90

1 code of 37 API packages as -- as of the time
2 Mr. Lindholm wrote that email?
3     A.  I do not believe at that level of detail
4 at that time.  I think it was a more general
5 discussion.
6     Q.  Do you know if the general discussion
7 involved anything related to copyright protection
8 for APIs?
9     A.  Again, I think it related to the
10 technology generally, which in my view would
11 include the patents, the copyrights, what was
12 generally available.
13     Q.  So in your view, if Oracle raises a
14 question about the technology generally, then
15 Mr. Lindholm's email is fairly interpreted as
16 referring specifically to the 37 API packages, the
17 declaring code and the SSO?
18     A.  I -- I -- I -- no.  I don't even know why
19 you would draw that conclusion, based upon what I
20 just said a few minutes ago.  I think it's more
21 general.
22     Q.  Mr. Malackowski, getting back to the
23 technical issues, I mentioned our discussion
24 earlier of Dr. Kemerer's stability analysis.  I --
25 I don't want to repeat that, but I want to discuss

Page 91

1 some of the other technical issues that you rely on
2 in support of your causal nexus conclusion.  One of
3 them is your conclusion that Android would not work
4 if the SSO and declaring code were removed.
5         Is it fair to say, that's an input to
6 your causal nexus analysis?
7     A.  I think it is an input, both as described
8 in my report and based upon my experience.  In
9 particular, I would reference my experience in the
10 Brocade A10 case, and the language of Judge Grewal
11 in that case, where he specifically cites to the
12 notion, a very equivalent notion, as an indication
13 to consider in a causal nexus -- and, frankly, in
14 reference to my causal nexus -- opinion.
15     Q.  Is there any other portion of the Android
16 operating system that if it were removed, the OS
17 would not work?
18     A.  Yes.
19     Q.  What other portions of Android would
20 disable the system if they were removed?
21     A.  That's more of a technical question.  I
22 do understand that there would be other portions --
23 you know, more than one, frankly -- that, if
24 removed, would disable the system.
25     Q.  For instance, if the Linux kernel were

Page 92

1 taken out of Android, Android wouldn't work, would
2 it?
3     A.  I -- I think that's fair.  And as I
4 considered this issue, there's a chart that's been
5 used in trial that is sort of a block diagram that
6 sets forth all of the contributions to the Android
7 platform and list the Java technology as part of
8 the core of that diagram.
9         So, yes, there would be other things, but
10 I think what the technical experts have concluded
11 is that, as it relates to Android as developed, the
12 APIs at issue are clearly central and core.  They
13 are not trivial.  And, as I have concluded, they
14 are a contribution to the profits that were earned.
15     Q.  You, in fact, concluded they are a
16 100 percent contribution to the profits that were
17 earned, correct?
18     A.  No, not at all.  I make substantial
19 apportionment in my analysis to the platform; and
20 then ultimately to a subset of that, based on
21 profitability.
22     Q.  Yes, but you assign 100 percent of the
23 contribution of the platform to the 37 APIs,
24 correct?
25     A.  Not true.  If I were to assign -- if I

Page 93

1 were to assign 100 percent of the value of the
2 platform times 35.6 percent, I would simply take the
3 revenue of Google, times 35.6 percent, and stop.
4 That's roughly $10 billion.  I don't do that.
5         The first thing that I do is recognize
6 that there are contributions made, as reflected in
7 cost, to get to gross margin.  I then take
8 35.6 percent of the platform gross margin, which
9 leaves 64 percent of all of the benefit to Google
10 directly.
11         And then I make further calculations that
12 take into account the other contributions, and cost
13 and profit related thereto, to reduce my initial
14 8 billion -- or to adjust my original
15 8-billion-dollar number to the ultimate conclusion
16 that I reach.
17         So, no, I don't think it's fair that it
18 was as simple as your question suggested.
19     Q.  You said that if you assigned 100 percent
20 of the contribution to the platform, you would end
21 up with a 10-billion-dollar number, right?
22     A.  Yes, I would.  It would be a fairly
23 simple calculation.
24     Q.  And the number you actually end up with
25 is 8.8 billion.

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 94

1    A.  Correct.  But it's not simply fair to
2  imply that that 1.2 billion difference is -- is --
3  is the only thing that's going on.  I'm also taking
4  into account in that difference other elements of
5  contribution that are not associated with the
6  ad revenue.  That's in the first part of my
7  calculation, in particular the digital content and
8  applications.
9    Q.  Once you arrive at the 35.6 percent
10 platform contribution, you don't apportion further,
11 correct?
12   A.  I am sorry.  My last answer I said,
13 digital content and apps also include hardware.  So
14 could you repeat your last question, because I was
15 thinking about my prior answer --
16   Q.  Once you arrive at the 35.6 percent
17 platform contribution, you don't apportion further,
18 correct?
19   A.  Well, we -- "apportion" is a -- term of
20 art.  I certainly consider further apportionment
21 and conclude that, once I've reduced it to that
22 level, leaving Google with 64 percent of the
23 economic benefit, the commingling that exist as a
24 result of the Google taking is such that I am not
25 able to, and do not believe, it's possible to

Page 95

1  apportion further at a revenue level.
2      I understand that ultimately that's
3  Dr. Leonard's obligation, and he's presented no
4  suitable apportionment that would address that.
5  I -- I -- I clearly reject the lines of the code
6  analysis for the reasons we discussed.
7      I do, however, take into account further
8  costs, which some cases suggest also are a
9  reflection of apportionment, but I don't take into
10 account a further arithmetic explicit apportionment
11 because of the commingling.
12   Q.  Getting back to the technical issues, if
13 the Android runtime were removed from Android,
14 Android wouldn't work, correct?
15   A.  That's a question better for a technical
16 expert.  My presumption is that it would not, but I
17 don't have a technical opinion in that regard.
18   Q.  And if other Android libraries were
19 removed from Android, Android wouldn't work,
20 correct?
21   A.  Same answer.
22   Q.  If there are multiple aspects of the
23 Android that, if they were removed, would disable
24 the operating system, how does the fact that
25 Android wouldn't work without the SSO and declaring

Page 96

1  code establish a causal nexus?
2    A.  Well, we have talked about this already
3  at great length, and to sort of recap for you:
4      One, I understand from my experience,
5  including the experience with the Brocade A10 case
6  that I cited for you, that that sort of analysis is
7  applicable to understanding causal nexus
8  explicitly;
9      Two, I understand from the technical
10 experts that the APIs at issue in declaring code
11 and SSO are not like everything else, that they, in
12 fact, are relatively more important for the reasons
13 they describe;
14      And, third, from a business perspective,
15 my report is replete with extensive discussion of
16 the need for a license to the code at issue -- I'm
17 sorry -- there's extensive discussion in my report
18 discussing the need for the license of what was
19 ultimately taking, because of that unique window of
20 opportunity, competitive threat and lack of
21 alternatives.
22   Q.  Mr. Malackowski, there's not any
23 discussion in your report of a need for the license
24 taken -- to -- to the material actually taken, the
25 37 APIs, the declaring code and the SSO, is there?

Page 97

1      MS. HURST:  Object to the form.
2      THE DEPONENT:  Well, there is is, in the
3  sense that there is a need, or a recognition by
4  Google of the need for a license and the lack of
5  alternatives.  We have discussed at great length
6  that those documents do not specifically call out
7  the words "37, API, declaring code," as I would
8  expect them not to, based upon my experience in
9  matters of this type.
10     MS. HURST:  Can I just -- I think my
11 LiveNote stopped working, and I just want to
12 inquire.
13     MR. PURCELL:  Should we go off the
14 record?  That's fine.
15     THE VIDEOGRAPHER:  Going off the record
16 at 10:31 a.m.
17     (Recess taken.)
18     THE VIDEOGRAPHER:  Back on the record
19 at 10:32 a.m.
20   Q.  (By Mr. Purcell)  Mr. Malackowski, I
21 think you alluded to it in your testimony, you
22 mentioned in your report, you also rely on a
23 centrality analysis regarding the SSO and declaring
24 code of the 37 Java SE APIs that was performed by
25 Dr. Kemerer; is that right?

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 138

1      Correct?
2      A.  Yes, sir.
3      Q.  And with respect to Android hardware
4  revenue, your opinion is that all of that revenue
5  is -- has a causal nexus to the alleged
6  infringement, correct?
7      A.  Yes, sir.
8      Q.  And similarly with respect to the Android
9  apps revenue, you opine that all of that revenue
10  has a causal nexus with the alleged infringement,
11  correct?
12      A.  Yes, sir.
13      Q.  And the same with the digital content
14  revenue, you opine that all of that revenue has a
15  causal nexus with the alleged infringement?
16      A.  Yes, sir.  And as it relates to those
17  last three, I would just note that Dr. Leonard
18  concurs.
19      Q.  And, finally, with respect to Android ad
20  revenue, you conclude that all of Google's
21  Android -- strike that.
22      You also conclude that all of the revenue
23  Google has received from advertising on Android
24  devices has causal nexus with the alleged
25  infringement, correct?

Page 139

1      A.  Yes.  Though, I ultimately will make an
2  apportionment to that revenue.  But, yes, I believe
3  there is a causal nexus to all of it.
4      Q.  So just taking them one at a time.
5  Again, I think I understand the theory, but I just
6  want you to explain it, if you could.
7      Why does the Android hardware revenue
8  have a causal nexus to the alleged infringement?
9      A.  Well, I believe that the hardware revenue
10  is the most direct in that it's my understanding
11  that the copyrights literally exist within the
12  hardware, and that that that's sufficient to prove
13  nexus for physical devices.
14      Q.  What's your basis for saying that that's
15  sufficient to prove nexus for physical devices?
16      A.  My experience in cases of this -- similar
17  to what we talked about before.  My experience
18  having worked on cases of this type, my
19  understanding of the case law, and confirmation
20  with counsel.
21      Q.  So is that your opinion that that's
22  sufficient to prove nexus, or is that your
23  underlying of what case law has held, or, I guess,
24  some combination of the two?
25      A.  I would say some combination of the two.

Page 140

1      It's my understanding of the case law,
2  but I do describe in my report the causal nexus to
3  device revenue, citing much of the same categories
4  of evidence that we've been talking about.
5      Q.  Did you do any analysis of the fact --
6  the effect of including the SSO and declaring code
7  on consumer demand for Google hardware?
8      A.  I'm not sure I understand your question.
9      In the sense that a but-for analysis as
10  to what would have been the counterfactual without
11  the code?
12      Is that your question?
13      Q.  Let's go with that.
14      A.  No.  I don't believe an assessment of the
15  counterfactual is relevant.
16      I have considered the fact that the
17  devices will not work without the code following
18  what I understand to be the case law, and in
19  particular my experience with Judge Grewal, and I
20  have considered the various business records that
21  are cited in the pages of my report.
22      Q.  Did the presence of the SSO and declaring
23  code in the Android hardware increase the sales of
24  hardware?
25      A.  As opposed to a counterfactual, I haven't

Page 141

1  studied that analysis.  It's not required.  It's,
2  in fact, more than not required, it's
3  inappropriate.
4      Q.  How can you determine the effect of
5  including infringing material in a larger work
6  without performing a counterfactual where that
7  material is not present?
8      A.  By doing the analysis, which I did, which
9  is to look at what was actually achieved, the ex
10  post analysis, and then making an assessment of an
11  apportionment.  Although that is defendants'
12  burden, I proactively done that in the way that
13  you've obviously understood and described, and is
14  detailed in my report.
15      That, I believe, is the correct approach.
16      Q.  But how can you determine whether the
17  presence of a part in a whole causes the success of
18  the whole without removing the part and analyzing
19  how successful the whole would have been in the
20  but-for world?
21      A.  So you're suggesting how can you do it
22  without a causal -- a counterfactual but-for world.
23      In some ways that's a nonsensical
24  question.
25      We are clearly told by the cases, by the

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 142

1 treaties, by this judge, that that is not a
2 relevant consideration.
3         And so how can you do it without it?  I
4 don't think it's applicable.
5         Plus, the whole purpose of disgorgement
6 is to remove the profits that are associated with
7 the taking.  So if, hypothetically, you presume
8 that Google could have achieved half as much with
9 an alternative, that does not excuse Google from
10 removing the profits on the other half that it
11 achieved by the taking.  It's simply not an
12 applicable analysis.
13     Q.  I understand you think it's not
14 applicable.  What I'm asking is, how do you prove
15 either a causal nexus or a apportionment without
16 hypothesizing a but-for world where the infringing
17 material isn't part of a larger work?
18         MS. HURST:  Object to the form.
19     Q.  (By Mr. Purcell)  How do you do it just
20 as an analytical matter?
21     A.  Through the way that I have described for
22 you at, I think, great length.
23         One is I look to the technical
24 contribution, and we have technical experts that do
25 that.

Page 143

1         I look to the business contribution.  I
2 personally look to both the expectation of the
3 business contribution and affirmation of those
4 results.
5         And then I have also looked to the
6 treaties in the -- in the law and experience that
7 I've had, which specifically tell me not to look at
8 the counterfactual.  Judge Graywal, in his order,
9 specifically tells you not to look at alternatives
10 when assessing the causation.
11         So I think I've tried to follow as
12 closely as I can what I understand to be the proper
13 methodology.  And I have great confidence that by
14 following the proper -- proper methodology, I have
15 come up with a reasoned opinion as to the
16 contributing profits, certainly as compared to
17 Dr. Leonard's lines of code analysis, which is
18 wrong for a whole bunch of reasons.  I think the
19 only reasoned opinion that's available in the
20 record of this case.
21     Q.  You mentioned the technical contribution.
22 There's nothing in the record that quantifies the
23 technical contribution of the 37 APIs to Android,
24 correct?
25     A.  I -- I would disagree.  I think we've

Page 144

1 talked about that.  I think we've talked about
2 centrality.  I think we've talked about the
3 importance within the various apps, all the
4 analysis that the technical experts undertook.
5         I think that all speaks to the technical
6 importance of the copyrights at issue.
7     Q.  You don't use any of that -- any of those
8 numbers that are derived from those analyses as
9 inputs in your apportionment analysis though, do
10 you?
11     A.  I use them as considerations within my
12 nexus arguments.  I don't use any quantitative
13 output, to be specific to your question.
14     Q.  And with respect to the business
15 contributions of Android, there's nothing in the
16 record that quantifies the business contribution of
17 the 37 APIs' SSO and declaring code to the success
18 of Android, is there?
19     A.  We have talked about this at -- at great
20 length already.  And for the nth time, there are no
21 documents that I'm aware that specifically cite the
22 words "37 declaring code," "37 API declaring code,"
23 "infringed Java copyrights."
24         There's nothing that's that specific.
25 But there are documents that, in my opinion,

Page 145

1 suggest that the license that was required from Sun
2 was, in fact, necessary in order to generate these
3 revenues and was, in fact, closely tied casually --
4 causally related to these revenues, given the
5 technical analysis, the market window of
6 opportunity, and the competitive threat.
7     Q.  And, in your view, it would be completely
8 irrelevant if there were compelling evidence
9 showing that Google would have made the exact same
10 profit without the -- the 37 APIs.
11     A.  In a copyright disgorgement case, it is,
12 in my opinion, completely irrelevant that they
13 could have done that.  Because that would give a
14 known copier the ability to have an excuse to say,
15 Well, in hindsight I could have simply done
16 something else.
17         And, in fact, Dr. Leonard, in conjunction
18 with Dr. Hausman, has specifically written papers
19 to explain why such a free option is not applicable
20 in assessment of intellectual property value.
21         And as my experience is that, no, it's
22 not a get out of jail free card if you could have
23 done it some other way.  You have to account for
24 the profits that were made using the copyright.
25     Q.  You don't think that would provide a

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 146

1 windfall to the copyright owner if, in fact, there
2 was no contribution of the infringed material to
3 the profits?
4     A.  No, because the element of a windfall, I
5 think, A, is not applicable.  But, B, if it was,
6 hypothetically, would be more relevant to an
7 assessment of actual damages and loss.
8         But the Copyright Statute, as I
9 understand from a layperson, makes it clear that
10 the copyright holder has the option, the ability to
11 both advance their actual harm as a measure of
12 damage and advance the profits made by the
13 infringer.
14         So I think it's quite conceivable that
15 you could have someone whose copyrights were taken
16 and made widely successful and get an award of
17 damages that is far greater than that individual
18 could have ever achieved under their own accord,
19 but that is the purpose of the disgorgement.
20     Q.  All right.  What's the causal nexus
21 between the SSO and declaring code of the 37 APIs
22 and Google's applications revenue?
23     A.  Well, I -- Dr. Leonard and I both agree.
24 It's a one-to-one correlation.
25         I describe within my report at page 95

Page 147

1 why I think there's a causal nexus from a -- a
2 business standpoint.  And I think the same
3 technical and legal understanding apply.
4     Q.  And what about the -- the causal nexus
5 between the SSO and declaring code of the 37 APIs
6 and the digital content revenue?
7     A.  Same answer.  Dr. Leonard and I agree
8 that there is causal connection.  And my analysis
9 extends to the technical business and legal
10 understanding.
11     Q.  Now, Google sells phone and tablet
12 hardware for the Android platform only, correct?
13     A.  True.
14     Q.  And Google sells applications through
15 Google Play only for Android devices, correct?
16     A.  That's my understanding and focus.
17     Q.  And it's sells digital content through
18 Google Play only; is that right?
19     A.  Currently, I believe that's true.
20     Q.  But google serves advertising on all
21 mobile platforms, not just Android, correct?
22     A.  They have distribution relationships
23 with, for example, Apple, and they sell mobile
24 advertising on those platforms.  It's a very large
25 business segment for them.

Page 148

1     Q.  And Google also serves advertising on
2 desktop platforms as well as mobile platforms,
3 correct?
4     A.  That is, in fact, their legacy business.
5 Yes, sir.
6     Q.  So although Google may need Android to
7 earn applications revenue or digital content
8 revenue, it doesn't need Android to earn ads
9 revenue, correct?
10     A.  True, which is why my analysis does not
11 include or apportions away the revenues associated
12 with other platforms or desktops or anything else.
13     Q.  And when Google serves an ad on a
14 non-Android platform, do you know what Google
15 technology is involved in making that happen?
16     A.  Generally, yes.  There is a -- an entire
17 category of expenses that are tracked by Google
18 that relate to their Search R&D in technology.  I
19 don't know from a technical perspective, you know,
20 the code or the like, but yes it's a -- it's an
21 entirely distinct area of technology.
22     Q.  Do you know if Google Search Engine is a
23 necessary part of serving ads on non-Android
24 platforms?
25     A.  I mean, it depends on the types of ads.

Page 149

1 But generally speaking, it's an important element,
2 yes.
3     Q.  Google Search Engine predated Android by
4 several years, correct?
5     A.  Yes, sir.
6     Q.  It does not depend on Android for its
7 existence.
8     A.  It does not depend on Android, though I
9 believe today it is informed and enhanced by
10 Android.  And I make reference to that in my
11 report, I think, at paragraph 102.
12     Q.  And Google's Web Search technology,
13 that's the foundation of Google's business,
14 correct?
15     A.  I -- I don't dispute that.
16     Q.  That's what made Google the company it is
17 today, at least -- at least initially.
18     A.  In general terms, I think that's fair.
19     Q.  And Google's ad targeting software is
20 also a necessary part of serving ads, isn't it, on
21 non-Android mobile platforms?
22     A.  I don't know if it's universally
23 necessary, but I think generally that's fair.
24     Q.  And Google's ad targeting software also
25 predated Android by several years, correct?

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 150

1   A.  Yes, sir.
2   Q.  And Google Search technology and Search
3 Engine, it's valuable, correct?
4   A.  Absolutely, and in my calculations, given
5 more value than Android.
6   Q.  And, similarly, Google's ad targeting
7 software is valuable, isn't it?
8   A.  Yes.  Collectively, individually, and
9 within my analysis, collectively given more value
10 apportionment than Android.
11   Q.  Does your causal nexus analysis do
12 anything to take account of the fact that Google
13 cannot serve ads on Android devices without using
14 the Google Search Engine and the Google ad
15 targeting software?
16   A.  Did you say does it take it into account?
17       What was the descriptor you used?  Did we
18 recognize that?  I'm sorry.
19   Q.  Does your causal nexus analysis take into
20 account the fact that Google cannot serve ads on
21 Android devices without using its search engine and
22 its ad targeting software?
23   A.  Generally, yes, and that I recognize it.
24 And, in fact, you and I spoke earlier in the day
25 about the fact that there would be other elements

Page 151

1 of the platform, that if you removed them would
2 cause the platform not to function.
3       I think this would be one of those
4 elements, which is something that's really taken
5 into account in the apportionment equation.
6   Q.  But is it relevant to your causal nexus
7 analysis?
8   A.  I think it's understood and therefore
9 relevant, sure.  I don't object to that.  It's not
10 explicit in the causal analysis, because I don't
11 think that's necessary.
12   Q.  Well, there's far more Google technology
13 involved in serving an ad on an Android device than
14 enabling the sale of an app through Google Play,
15 isn't there?
16   A.  I don't have an opinion.  I presume that
17 to be the case.  That's really a technical
18 question.
19   Q.  Well, you don't need the search engine
20 and the ad targeting software to sell an app, but
21 you do need it to serve an ad; isn't that right?
22   A.  That statement is true.
23   Q.  And so doesn't it follow from that, that
24 there's a lot more Google technology involved in
25 the process of serving an ad on an Android device

Page 152

1 than there is in purchasing an application on
2 Google Play?
3   A.  I presume that to be true.  That makes
4 common sense.  I'm just telling you that's a
5 technical question and I'm not providing a
6 technical opinion in that regard, but I certainly
7 accept that proposition.
8   Q.  Doesn't the presence of this additional
9 technology in the ad serving process mean that the
10 causal nexus between the 37 APIs and Google ad
11 revenue is much more attenuated than the causal
12 nexus between the 37 APIs and the other revenue
13 streams you identified?
14   A.  Good question.  No, it does not.
15       And, in particular, if you look to, for
16 example, the guidance from Judge Graywal, in that
17 case we were talking about load balancing
18 technology, global server load balancers.
19       And the patented -- sorry -- the
20 copyrighted technology at issue was only one piece
21 of a very complex device.  And as instructed by the
22 Court, the analysis was to determine whether or not
23 that device, in part, would function but for the
24 copyrights at issue and not to confuse that
25 analysis with all of the other technologies in the

Page 153

1 box, even though it was clear that there was other
2 technologies.  In fact, in that case there were
3 also patent claims that specifically addressed, and
4 I specifically valued other technologies.
5       That does not interrupt the copyright
6 causation analysis that I put forth in this report.
7   Q.  So, in your view, the causal nexus
8 analysis doesn't need to take account of -- of the
9 other technologies involved in enabling the
10 revenue, that's a question you address at the
11 apportionment stage; is that right?
12   A.  Exactly.
13   Q.  All right.  I would like to go to your
14 responsive report at paragraph 254 -- strike
15 that -- 255.  Same page, page 75.
16       MS. HURST:  Responsive report, you said?
17       MR. PURCELL:  Yes.
18       MS. HURST:  Thank you.
19   Q.  (By Mr. Purcell)  Are you there, sir?
20   A.  I am.
21   Q.  Okay.  You say in paragraph 255 that
22 "Developer interest and acceptance in programming
23 in Objective-C is incentivized largely by the
24 attractive developer revenue-sharing model that
25 Apple provides for its developers."

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 214

1  to do that, and in consideration of the technical
2  and business significant of the copyrights at
3  issue, it's not necessary.
4           And then I would add, third, most
5  importantly, I do not believe that Dr. Leonard's
6  line of code analysis even speaks to this issue and
7  substance, but importantly is an analysis that's
8  been rejected by courts repeatedly that there is --
9  it is not an accepted approach to use a line of
10 code apportionment because that only considers a
11 quantitative metric, and it ignores the qualitative
12 value.  In the cases -- in my experience, very
13 specifically rebut that, and I point you to most --
14 most directly related to me, again, Judge Grewal,
15 who discussed that issue very specifically in the
16 Brocade case.
17    Q.   What did you do -- what did you do in
18 your attempt to apportion the various components of
19 the Android platform?
20    A.   I attempt to understand the technical
21 significance of the copyrights vis-a-vis the other
22 elements of the platform.  I sought to understand
23 any theory advanced by defendants, and then I
24 reconciled that with my review of the business
25 conditions.

Page 215

1    Q.   What did you do to attempt to understand
2  the technical significance of the various elements
3  of the Android platform?
4    A.   My report refers back to the technical
5  expert analysis that I discuss previously.  So it
6  would include the work of Drs. Leonard, Schmidt,
7  Kemerer -- Kemerer, and the coding analysis of the
8  other -- Mr. Ziedman.
9    Q.   You mentioned Dr. Leonard in that list.
10 Was that a mistake, or did you mean --
11    A.   No.  I also considered Dr. Leonard's
12 report and his evidence as to the importance, or
13 lack thereof, of the copyrights at issue.  I
14 obviously rebut that.  And we talked about that
15 at -- at great length.
16    Q.   Which of Oracle's experts provides any
17 opinion about the technical significance of other
18 elements in the Android platform apart from the
19 structure, sequence, and organization of the
20 37 APIs?
21    A.   Well, I think all of the experts, to some
22 extent, talk about the importance of that
23 contribution relative to the Android platform as a
24 whole.  I don't know that they specifically rank
25 order or quantify quantitatively the other

Page 216

1  contributing efforts.  I don't believe that they
2  do.
3    Q.   Did you ask them to?
4    A.   I did not specifically ask that question.
5    Q.   And you made no attempt to do that
6  yourself?
7    A.   No.  From a technical perspective, I
8  don't view that I'm qualified to do that.  And,
9  again, we were talking about my rebuttal report
10 because it would have been my expectation that that
11 would have been detailed in Dr. Leonard's report.
12    Q.   You also state -- this is, again, in
13 paragraph 285 of your responsive report -- that
14 Google appears to have contributed only 26 percent
15 of the code to the platform.
16        Why is that relevant to anything?
17    A.   Again, I think that speaks to the
18 apportionment issue and the percentage of profit
19 that should be retained by Google as opposed to
20 disgorgement.  And so in many ways, similar to your
21 last line of questions, to the extent that the
22 evidence shows that Google was making a larger,
23 relatively more important, relatively unique
24 contribution, all less being equal, that would
25 argue for a larger apportionment towards Google.

Page 217

1        I think, conversely, the fact that the
2  record shows that in comparison to the contribution
3  made by Sun and Oracle, the Google contribution has
4  to be interpreted in light of the fact that it was
5  not all unique proprietary attribution to them.
6    Q.   The apportionment analysis compares
7  infringing material and non-infringing material,
8  correct?
9    A.   Well, more specifically, it seeks to
10 determine the attribution that is due to the
11 copyright holder.  By definition there might be
12 some comparison involved in that, but I don't know
13 that there has to be an explicit dual measurement
14 in comparison.
15    Q.   But it doesn't look at an attribution
16 between material that Google created and material
17 that Oracle created, does it?
18        MS. HURST:  Object to the form.
19        THE DEPONENT:  I'm back to my last
20 question.  I don't think that that's specifically
21 required.  I think what's required is to understand
22 the contribution of the copyright holder.
23    Q.   (By Mr. Purcell)  Right.  And so then why
24 is the contribution of Google relevant if we are
25 trying to understand the contribution of the

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 218

1 copyright holder?
2     A.  Well, in context, I think it's helpful to
3 understand what Oracle brought versus what Google
4 brought to the table.  Your questions a moment ago
5 sought to solicit that -- that exact comparator,
6 and so this is one way to look at that.
7     Q.  Oracle is not entitled to get profits
8 based on the contribution of anybody other than
9 Oracle, is it?
10     A.  Well, more specifically, they are not
11 entitled to any profits other than the contribution
12 of the copyrights at issue.
13     Q.  So then it is irrelevant, isn't it, that
14 third parties, other than Oracle and Google, also
15 contributed to the Android platform?
16     A.  I don't know that I would say it's
17 irrelevant.  I think it's contextual, and I provide
18 it in a contextual way.
19     Q.  It's not an input to your apportionment
20 calculation?
21     A.  No.  I mean, it perhaps helps to explain
22 the commingling aspect, but it does not result in a
23 direct input.
24     Q.  Now, you don't deny that components of
25 the Android platform, other than the SSO and

Page 219

1 declaring code of the 37 APIs, created value, do
2 you?
3     A.  I do not.
4     Q.  You don't deny that those other
5 contributions to the Android platform made
6 contributions to Google profits?
7     A.  I do not deny that.
8     Q.  We have talked about the Linux kernel
9 before, but do you have an understanding what the
10 Linux kernel in Android does?
11     A.  Really not from a technical perspective.
12 I understand that that is part of the -- sort of
13 the baseline underlying code that's used to build
14 the Android platform.
15     Q.  Do you have an understanding of the
16 extent to which the Linux kernel contributed to
17 Google's Android-related profits?
18     A.  I have not made a particular analysis or
19 quantification of that.  We talked before lunch
20 about the fact that in the description of the
21 technical components of the Android code, Linux is
22 clearly listed.  I believe it is listed at the
23 bottom.  But the Java contribution is -- listed is
24 part of the core application of that code, which I
25 believe to also be consistent with the technical

Page 220

1 conclusions of the relative importance of the Java
2 contribution.
3     Q.  So you think the fact that the Java APIs
4 are contained within the core libraries?  You think
5 that the word "core" means that they are more
6 important?
7     A.  As a layperson, I do believe that's the
8 case.
9     Q.  Not based on any technical analysis, is
10 it?
11     A.  Well, it is confirmed by the technical
12 analysis that I refer to in my report, where time
13 and time again the experts come back and say they
14 are more important.  They are more central.  They
15 are required in more cases.  They do contribute to
16 more apps.  They do contribute to more high-ranking
17 apps.  So I think it's consistent.
18     Q.  But you understand that the Android
19 operating system also contains many core libraries
20 that are not accused of infringement, correct?
21     A.  I do.
22     Q.  And do you have an understanding of what
23 those non-infringing core libraries do?
24     A.  I mean, there is discussion, that may
25 even be included in my report, where there are

Page 221

1 tables that show what the 37 APIs at issue do
2 versus others.  But that's really a technical
3 discussion, and from memory I -- I couldn't
4 describe that difference to you.  I would defer to
5 the technical experts.
6     Q.  And, in fact, all of the implementing
7 code in the Android core libraries, that's not
8 accused of infringement --
9     A.  As we discussed before lunch, true.
10     Q.  And that made a contribution to the
11 functioning -- strike that.
12         That made a contribution to the profits
13 that Google earned from Android, didn't it?
14     A.  Sure.
15     Q.  And you haven't made any attempt to
16 quantify that?
17     A.  Well, I have, because I have made an
18 attempt to address the commingling factor.  There
19 is not evidence, in my opinion, that would allow
20 you to do a second or third level apportionment in
21 recognizing that it is defendants' burden.
22         I considered the apportionment metric put
23 forth by the defendants, i.e., lines of code, and
24 was able to reject that out of hand because of the
25 decisions of multiple courts and the basis for

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 222

1 those decisions.
2     Q.  You haven't attempted to independently
3 quantify the value or the contribution of the
4 implementing code in the Android core libraries to
5 Android's profit, correct?
6     A.  True.  That was not my assignment, and I
7 have not quantified that.  I have sought
8 information in that regard as it -- a great --
9 relates to the commingling issue.  I'm not aware of
10 any.
11    Q.  What information have you sought that
12 would allow you to separately value the
13 contribution of the implementing code in the
14 Android core libraries to Google's Android-related
15 profits?
16    A.  Most specifically information in the
17 Dr. Leonard report or the technical expert reports
18 of defendants.  Generally where they would seek to
19 meet their burden by putting forth evidence of
20 apportionment to address commingling.
21    Q.  What information have you personally
22 sought on that issue?
23    A.  My review of the reports.
24    Q.  Did you ask any of Oracle's technical
25 experts to analyze that issue?

Page 223

1     A.  No, I did not.
2     Q.  How would one go about analyzing that
3 issue?  If you wanted to do a second or third level
4 apportionment, what you would -- what you would
5 want to see?
6     A.  At that level, which is based upon our
7 conversation, which is a technical level, that's
8 outside the core of my area of expertise.  I would
9 seek the counsel of the technical experts.
10    Q.  What information would you, as a damages
11 quantifier, find persuasive in order to enable you
12 to do a second level apportionment between all the
13 implementing code in the Android core libraries and
14 the structure, sequence, and organization, on the
15 other hand, of 37 API packages?
16        MS. HURST:  Object to the form.
17        THE DEPONENT:  To the extent that there
18 was a detailed technical analysis that was
19 confirmed by the business records of the case,
20 that's the type of information I would find
21 persuasive.  I can't tell you that I would find it
22 persuasive per se, because we're speaking
23 hypothetically, but that's the type of thing that I
24 would look to.
25    Q.  (By Mr. Purcell)  What type of detailed

Page 224

1 technical analysis would you be looking for?
2     A.  Technical expert reports.
3     Q.  Analyzing what?
4     A.  Analyzing the contributions on a
5 quantitative way of the copyrights at issue versus
6 the other technical elements that contribute to
7 profits seeking to tie those contributions back to
8 the business records.
9     Q.  You don't have any specific technical
10 analysis in mind that would be able to unpack the
11 value of the implementing code in the Android core
12 libraries versus the value of the structure,
13 sequence, and organization of the 37 Java SE API
14 packages; is that right?
15    A.  Correct.
16    Q.  And you understand, similarly, the
17 Android operating system contains an Android
18 runtime?
19    A.  Yes.
20    Q.  Do you have an understanding of what the
21 Android runtime does?
22    A.  Not from a technical perspective, no.
23    Q.  Do you understand how important the
24 Android runtime is to the function of the Android
25 operating system?

Page 225

1     A.  I believe that it's required.  I don't
2 have a quantitative metric of importance.
3     Q.  That's not accused of the infringement,
4 correct?  The Android runtime?
5     A.  Correct.
6     Q.  You made no attempt to separately value
7 the contribution to Google's profits of the Android
8 runtime, correct?
9     A.  No different than what we discussed a few
10 moments ago about addressing the commingling issue
11 generally.
12    Q.  And prior to the creation of the Android
13 runtime, the Android operating system contains
14 something called a Dalvik virtual machine.
15        Are you aware of that?
16    A.  I am.
17    Q.  And you are aware that that was a big
18 part of what the patent case was about in the
19 earlier trial?
20    A.  Generally, yes.
21    Q.  Do you have an understanding what the
22 Dalvik virtual machine did?
23    A.  I would just say that it is comparable to
24 the Java virtual machine and basically was an
25 element to the platform that transitioned --

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 226

1 translated code from the readable code ultimately
2 into code that was implemented by the processors.
3    Q.   And the Dalvik virtual also made a
4 contribution to Google's Android-related profits,
5 didn't it?
6    A.   I don't dispute that.
7    Q.   But you've made an attempt to quantify
8 that contribution?
9    A.   Again, the same attempt that I made for
10 the other elements of commingling.  I -- there's
11 not information that would allow me to separate out
12 that contribution.  And, importantly, that is a
13 burden that is owned by Dr. Leonard, and he's not
14 done such.
15    Q.   And the Android operating system also
16 contains various applications, correct?
17    A.   The Android platform contains certain
18 applications.  I would --
19    Q.   Such as a phone, clock, things like that?
20 Basic things?
21    A.   Yes.  I think that's true.
22    Q.   And these preinstalled applications on
23 the Android platform, they also made a contribution
24 to Google's Android-related profits, didn't they?
25    A.   Not necessarily a contribution that was

Page 227

1 unique to the platform.  I would put those more in
2 the category of contributions that extend, you
3 know, broadly.  But, sure, they would have made a
4 contribution.
5    Q.   Well, consumers expect that their mobile
6 phone will actually have a phone application, don't
7 they?
8    A.   They do; but that is, for example,
9 provided by the platform partners, too, as well.
10    Q.   Well, the software is provided by Google,
11 isn't it?
12    A.   Well, not in the case of the platform
13 partners.  I don't believe so.  Like the Apples of
14 the world.
15    Q.   We are talking about Android phones.  We
16 are not talking about the iOS phones.
17         In the case of Android phones, the Google
18 software provides the phone functionality, correct?
19    A.   True.
20    Q.   And that makes a contribution to
21 Android-related profits, correct?
22    A.   At some general level, I wouldn't dispute
23 that.  I don't believe that there is a specific
24 line item or element of revenue and profit that
25 flows to Google because of telephony revenues and

Page 228

1 profits.
2    Q.   You might even call the presence of the
3 phone functionality on a mobile phone a gating
4 item, correct?
5    A.   On a mobile phone generally?  Sure.
6    Q.   You also understand that Google's
7 strategy to -- well, strike that.  Let me finish up
8 the last line of questions.
9         You haven't made any effort to separately
10 quantify the contribution to Google's
11 Android-related profits of the preinstalled
12 applications on the Android platform, correct?
13    A.   You have asked me this question
14 repeatedly about each and every element you've
15 raised.  And, yes, I sought to understand the
16 contributions that were made to the profits of
17 Android.  I determined that that could first be
18 measured by focusing on the platform-related
19 economics.  And then I sought to specifically see
20 if there could be a second level apportionment,
21 aside from cost deductions, that would allow me to
22 distinguish between the copyrights at issue and any
23 other element and concluded that, because of the
24 commingling, there was not data sufficient for me
25 to do so.

Page 229

1         I then looked to see if Dr. Leonard,
2 consistent with his obligations, provided me a
3 route to solve that problem and concluded that he
4 did not.
5         And so, in my opinion, the best available
6 evidence of apportionment is what I've set forth in
7 my report at the level set forth in my report.
8    Q.   You also understand that Google's
9 strategy to release Android as an open source
10 platform was crucial to the success of the
11 platform, correct?
12    A.   I -- I don't believe I draw that opinion
13 in my report.  And I specifically talk about the
14 implications of certain characteristics of open
15 source platforms at various points in time.  So
16 your question would have to be more specific.
17    Q.   Sure.  Why don't you take look at
18 paragraph 58 of your responsive report on page 18.
19         So in the third sentence of that
20 paragraph you write, "Additionally, it suggests
21 Apple's closed environment would have monopolized
22 the smartphone market which ignores the success
23 that resulted from Android's free open source
24 model."
25         Do you see that?

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 230

1    A.   I do.
2    Q.   So at least some part of the success of
3   Android and Google's Android-related profits are a
4   result of the free open source model that Google
5   released Android under, correct?
6    A.   Well, certainly that is an element of
7   their business model.  I don't know as -- I thought
8   your last question implied that there's an
9   incremental contribution of that.  I would note
10  that this discussion we are referring to is
11  specifically in response to the Kim and Berry
12  models.  So a critique of Dr. Leonard's use of
13  those, not a general discussion of apportionment.
14   Q.   Nonetheless, Google's strategy to release
15  Android as an open source platform did make a
16  significant contribution to Android's success,
17  didn't it?
18   A.   I don't believe I use the word
19  "significant" or draw that relative qualitative
20  assessment in my report.
21   Q.   Do you have any opinion on the extent to
22  which Android would have succeeded had it not been
23  open sourced?
24   A.   Well, to the extent that it was a
25  platform that included a license from Java with the

Page 231

1   related elements of control and security, I think
2   it would have been as successful.
3    Q.   And what's that based on?
4    A.   Based upon that that was a focus of the
5   discussions early on between Android and Google.
6   That clearly -- I'm sorry.  Between Google and
7   Android and Sun.  That clearly it was Sun's
8   expectation that a license consistent with their
9   usual practice would allow Google to be successful.
10   Q.   So your testimony is that if Android had
11  not been open sourced, it would have been just as
12  successful?
13   A.   Again, I don't draw that opinion in my
14  report.  I'm merely answering your questions in
15  response to this deposition.  That's outside the
16  scope of my analysis, in large part because, again,
17  it trespasses into the world of the counterfactual,
18  which I do not believe to be relevant.
19   Q.   In any event, you made no attempt to
20  qualify the contribution to Google's
21  Android-related profits of the open source
22  strategy; is that right?
23   A.   I don't make a specific quantification of
24  that contribution.  I don't believe that that's
25  possible.

Page 232

1    Q.   In the event your damages calculation
2   attributes about $8.8 billion out of Google's
3   $9.8 billion profit to the platform, correct?
4    A.   To the copyrights at issue using the
5   platform as part of the analysis, yes.
6    Q.   And that's about 44 percent of Google's
7   Android-related profits?
8    A.   Okay.  I mean, mathematically that sounds
9   about right.
10   Q.   Do you believe that the structure,
11  sequence, and organization of the 37 API packages
12  from Java SE is responsible for 44 percent of
13  Android's profits?
14       MS. HURST:  Object to the form.
15       THE DEPONENT:  I don't use the word
16  "responsible."  I believe that the copyrights at
17  issue were integral to the strategy of having -- of
18  being able to avoid the platform partner cost of
19  approximately 35.6 percent, and that it's not
20  possible to further separate or apportion.
21   Q.   (By Mr. Purcell) Do you believe that
22  44 percent of Android-related profits are
23  attributable to the structure, sequence, and
24  organization of the 37 Java SE API packages?
25   A.   Again, I don't if your question is

Page 233

1   intentionally trying to limit the scope of the
2   accused infringement, but I do believe that the
3   conclusions I've reached is a fair and best
4   available metric to assess the profits that are --
5   attributable to the copyrights at issue.
6    Q.   So given all the other aspects of the
7   Android platform, you believe that 44 percent of
8   Android-related profits are attributable to these
9   10,000 lines of code in the structure, sequence,
10  and organization and declaring code of these 37 API
11  packages?
12       MS. HURST:  Object to the form.
13       THE DEPONENT:  I believe that the proper
14  form of damages in a disgorgement model is as I
15  have determined, and, therefore, yes, that that's a
16  fair measure of profit.
17   Q.   (By Mr. Purcell) Do you have any opinion
18  as to whether Google could have taken a license to
19  Sun's OpenJDK in 2007 and still gotten Android to
20  market on the same schedule?
21   A.   I do not.  I do not believe that that is
22  the case.  I think there is some discussion of the
23  OpenJDK alternative within my report that I would
24  refer you to.  I believe that there are also other
25  experts, Ms. Murray in particular, who have

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 346

1 occur whenever there are synergies?
2    A.  Well, I think that when there is
3 commingling, there could be synergies, but not
4 necessarily so.  But generically speaking, I -- I
5 think you could have synergies.  You could have
6 unexpected consequences from your original plan.
7        For example, in this case, unexpected
8 activities where the growth of the wireless market
9 greater than any expectations, the migration of
10 demand to consumer applications and not just
11 business enterprise applications.
12       Google benefited from those unexpected
13 events and earned profits as a result of those
14 because of their reliance on the copyrights at
15 issue.  But for the purpose of disgorgement, you
16 need to take an ex post accounting of that that and
17 you need to remove the benefits that Google
18 received as a result of its reliance on the
19 copyright, even though there were external or
20 unexpected impacts.
21    Q.  Can you give us examples where there is
22 no commingling?
23    A.  Well, the -- the best example is when
24 you're talking about a product that's driven by a
25 single technology or form of intellectual property.

Page 347

1        When I teach this subject, we always talk
2 about the distinction between, frankly,
3 smartphones, which are a very aggregated platform
4 or pharmaceuticals.  In pharmaceuticals, you rarely
5 have a commingling issue because the technology at
6 issue, in most cases patents.  A single patent
7 drives a compound of the drug.  So that's the
8 genetic sample that we use.
9        In copyrights, I think it might be more
10 applicable to look at the music industry, right.
11 If you have a copyright on a song, there's usually
12 not a lot of commingling at issue.  There might be
13 apportionment across the other songs in the album,
14 but not necessarily commingling.
15    Q.  Okay.  Now, you may have mentioned this,
16 but I'm going to ask you again anyway.
17       How is the legal theory of commingling
18 relevant to the opinion that you've expressed in
19 paragraph 17?
20    A.  Understanding that the copyrights at
21 issue were a gating feature and an enabling of
22 Google to reach its objective of capturing the
23 platform value for Android; i.e., as opposed to
24 like an Apple, for example.
25       Understanding that these copyrights were

Page 348

1 central to that economic benefit, I than challenged
2 the -- the -- the methodology to say, well, we know
3 that there's a platform benefit associated with the
4 copyrights and that's 35.6 percent.
5        We know we're going to leave Google with
6 64 percent.  But can we break down that
7 35.6 percent even finer to specifically identify
8 the contribution of the copyrights at issue as
9 opposed to some technology contributed by Google.
10       And what I concluded is that, no, we
11 cannot because of the commingling.  There isn't a
12 way to break those things out.  And so as I
13 understand the proper method and the case law,
14 the -- that is to the benefit of the defendant in
15 the sense that that means that all of those
16 commingled profits should be awarded in the form of
17 disgorgement after taking into account applicable
18 cost.
19    Q.  Now, Mr. Malackowski, in that last answer
20 you used the phrase or the word "gated" item.
21       What did you mean by that?  How do you
22 define that?
23    A.  Yeah, that -- that's really my language
24 that sort of picks up on this notion that there was
25 a critical window of opportunity, and it keeps

Page 349

1 reminding me to go back to the fact that it's not
2 just that the copyrights at issue were important.
3        It's that because of the unique window of
4 opportunity to enter this market, given all the
5 competitive dynamics around it, they were
6 critically important at the time.  That without
7 access to these copyrights, there would not be the
8 revenue and profit generation that there was, in my
9 opinion.
10    Q.  And that's what you mean by gated?
11    A.  Yes.  There's -- gated is not a term of
12 art or a term of case law.
13    Q.  It's not -- so it's -- it's
14 Mr. Malackowski's term?
15    A.  Yes.
16    Q.  Okay.  And you've defined what you meant
17 by that?
18    A.  Yes.
19    Q.  Now, let's move to paragraph 21, please.
20       Mr. Malackowski, are you assuming that
21 each of the bullet points is a fact, or are you
22 testifying that each of them is a fact?
23       Or do you want me to break that down into
24 two questions?
25    A.  No, I understand -- I understand.  Let me

88 (Pages 346 - 349)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 258

1  premised on the identify of those parties right
2  now, and that is totally inappropriate given
3  Google's refusal to produce these documents.
4       MR. PURCELL:  I'm actually not, Counsel.
5  I'm asking hypothetical questions.
6       Q.  (By Mr. Purcell) Do you have any reason
7  to believe, Mr. Malackowski, that Google wouldn't
8  receive advertising revenue on alternative
9  smartphone platforms but for the existence of
10  platform?
11       THE DEPONENT:  To that question, I don't
12  have a reason to believe they wouldn't, because
13  they already do receive advertising revenue on
14  non-Android platforms, and I don't have any basis
15  to believe that would disappear but for Android.
16       Q.  (By Mr. Purcell)  Taking a look at
17  paragraph 51 of your responsive report, the second
18  line of that paragraph says -- second sentence of
19  that paragraph says, "This basis assumes every
20  person in the U.S. over the age of 10 owns a mobile
21  handset."
22       You understand, don't you, that the
23  Kim model defines market size with reference to the
24  potential market rather than the actual market of
25  smartphone users?

Page 259

1       A.  That would be consistent with my
2  recollection, and also just the general definition
3  of market size, it's often referred to as sort of
4  the total available market, TAM, sure.
5       Q.  Dr. Leonard is not assuming that
6  everybody over the age of ten would own a
7  smartphone, he's defining the market as -- the
8  potential market as being Americans over the age of
9  ten; isn't that right?
10       A.  Well, so the total available market as
11  used in these papers and relied upon by Dr. Leonard
12  assumes that every person over ten is certainly a
13  candidate to own a mobile handset.  I don't believe
14  that that's a reasonable assumption.
15       Q.  Well, being a candidate on a mobile
16  handset is different from actually owning a mobile
17  handset, isn't it?
18       A.  It is.
19       Q.  So it's not true to say that Dr. Leonard
20  is assuming that every person in the United States
21  over the age of ten own a mobile handset as part of
22  his analysis.
23       A.  You could tweak it to say, this basis
24  assumes that every person in the U.S. over the age
25  of ten is a candidate to own a mobile handset.  I

Page 260

1  don't have a -- no objection to that.
2       Q.  Do you know what percentage of
3  ll-year-old Americans own mobile handsets?
4       A.  No.  Neither does Dr. Leonard.
5          (Discussion off the stenographic record.)
6       Q.  (By Mr. Purcell)  Mr. Malackowski, I
7  would like to talk a little bit about your
8  lost-profits analysis?
9       A.  Okay.
10       Q.  Oracle produced data in this case that
11  provides Sun's and Oracle's Java ME licensing
12  revenue by customer, correct?
13       A.  I believe that's true, or certainly my
14  recollection is it provided data by customers for
15  the larger customers.  I think there was
16  ultimately -- has to be expected all other
17  catchall, so I don't that everything is provided by
18  customer.
19       Q.  And various Oracle witnesses also
20  provided their best recollection of specific
21  Java ME licensing deals that they believe were
22  impeded by Android, correct?
23       A.  Well, in response to questions that they
24  were asked, I don't know that it's fair to say that
25  every witness or those witnesses that discussed

Page 261

1  this topic were fairly solicited for their best
2  available on evidence on every customer.  But, yes,
3  there were discussions of customers that were
4  candidates for a Java license.
5       Q.  You -- you didn't use the actual Java ME
6  licensing revenue data as the basis for your
7  lost-profits calculation, did you?
8       A.  I believe that I did, and that my
9  calculation was the distinction between actual and
10  projected so a basis, a fundamental basis of my
11  calculation was the actual experience.
12       Q.  But you didn't look at it on a
13  customer-by-customer level and estimate the lost
14  profits at that level, correct?
15       A.  Well, I did not create a new schedule.
16  But my recollection is that the forecast and the
17  actual information that I relied upon did go down
18  to a customer-by-customer level showing actual and
19  expected revenues, and even highlighting for the
20  expected forecast certain customers that it
21  believed would be at risk.
22       Q.  To what extent, if at all, did you use
23  the testimony of Oracle witnesses about specific
24  Java ME licensing deals they believe had been
25  impeded by Android to estimate lost profits?

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 262

1    A.   I think it's fair to say that I relied
2  upon those conversations in part to demonstrate
3  what is generally referred to as the fact of
4  damage.  But I utilize the projections and actual
5  historical accounting to determine the quantum of
6  damages.
7        MR. PURCELL:  I would like to mark this
8  as the next exhibit in order.
9        (Exhibit 1578 was marked for identification by
10 the court reporter and is attached hereto.)
11   Q.   (By Mr. Purcell)  Mr. Malackowski, is
12 Exhibit 1578 the Sun strategic forecast document
13 that you relied on in estimating lost profits?
14   A.   Yes, as noted specifically on
15 Exhibit 12.3 to my first report, footnote 1, I cite
16 this document by Bates number.
17   Q.   And if you turn to the second tab of
18 Exhibit 1578 --
19   A.   I don't know what you mean by "second
20 tab."
21   Q.   I think it's probably the second page on
22 the printout.
23        Does this page contain the four forecasts
24 that you looked at in connection with your
25 lost-profits opinion?

Page 263

1    A.   It contains four forecasts that I did
2  look at.  I looked at other others as well.
3    Q.   And the first forecast on the page, the
4  one labeled "Strategic Forecast," that's the one
5  that you used in your lost-profits calculation,
6  correct?
7    A.   Yes.
8    Q.   And the strategic forecast runs through
9  fiscal year 2010, correct?
10   A.   Yes.
11   Q.   And for 2009, it projects Java ME
12 licensing revenue of $129.7 million?
13   A.   129.696, correct.
14   Q.   And for fiscal year 2010, it projects
15 just under $140.4 million, correct?
16   A.   Yes, sir.
17   Q.   Can you turn to paragraph 186 of your
18 opening report -- keep that open, I want to ask you
19 about the two documents in conjunction.  It's
20 page 74 and 75.
21   A.   Which    paragraph?
22   Q.   186.
23   A.   Yes.
24   Q.   So you say, Sun strategic forecast
25 created in 2008 projected Java ME licensing revenue

Page 264

1  for 2009 and 2010 of 129.7 million, and
2  144.4 million.
3        Do you see that?
4    A.   Those are the numbers we were just
5  discussing.
6    Q.   Exactly.
7        And then you say, the notes to the
8  forecast list, quote, major shift to open source,
9  end quote, as a consideration.
10       Do you see that?
11   A.   I do.
12   Q.   Now, if you look at the four forecasts on
13 the page in Exhibit 1578, the note, "major shift to
14 open source" isn't a note to the strategic forecast
15 that you used, correct?
16   A.   Which is exactly why I selected it, yes.
17   Q.   It is used as the forecast to the low --
18   A.   Correct.
19   Q.   -- a note on the low forecast, correct?
20   A.   Correct.
21   Q.   All right.  So what's the significance of
22 that?
23   A.   So I considered the four forecasts that
24 are shown on this page.  This document present
25 effectively two paradigms for growth.  One is a

Page 265

1  paradigm which involves some degree of open
2  sourcing, and one that is strategic that does not.
3        Based upon the evidence of record, in
4  particular the things that we cited to earlier
5  today, the fact that the Java experiment with open
6  sourcing and an discussions with OEMs regarding the
7  copyleft issue indicated that open sourcing was
8  going to be the way this market strategically
9  developed.
10       In looking at the four forecasts, the
11 difference between the strategic forecast at the
12 top and the low, medium and high forecasts at the
13 bottom is the extent to which op-- -- there's a
14 shift to open source.
15       So the low forecast has a major shift to
16 open source, a large shift open source would reduce
17 Java; the medium forecast has a moderate to shift
18 to open source, it's in the middle; and the high
19 forecast has a minor shift to open source, less
20 movement to open source, more Java licensing
21 revenues.
22       And so I concluded that the right
23 document to use for my purposes is the strategic
24 forecast.  And the reason for that is, it does not
25 impute consideration of the movement to open source

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 266

1 which I find consistent with the other evidence of
2 record.
3     Q.   You also cite in the end of paragraph 186
4 a discussion with Michael Ringhofer?
5     A.   Yes.
6     Q.   What did Mr. Ringhofer tell you supports
7 the opinion conveyed in paragraph 186?
8     A.   It was actually discussion that you and I
9 had just had, what is the distinction in these
10 various forecast, are this -- are these the
11 forecasts that were considered by management in
12 their decision-making.
13     Q.   Now, in 2008, when the forecast was made,
14 Android had already been released, correct?
15     A.   Yes.
16     Q.   And Sun was aware of the release of
17 Android when it created this forecast.
18     A.   I think that is fair.
19     Q.   Now, the forecast, as we mentioned, only
20 goes through fiscal year 2010, but you estimated
21 Java ME licensing revenue for subsequent years
22 based on the same document, correct?
23     A.   Yes, sir.
24     Q.   And you did that by taking the roughly
25 8 percent growth rate between fiscal 209 --

Page 267

1 2009 and fiscal 2010, and assuming that same
2 year-over-year growth rate through 2015; is that
3 right?
4     A.   Yeah -- yes, sir.
5     Q.   Now, you also mention in the following
6 paragraph, paragraph 187, another forecast that you
7 looked at, correct?
8     A.   Yes, sir.
9     Q.   And that's a 2008 presentation titled,
10 "Java and Wireless Business Review."
11         And you say it contains scenarios of
12 Java ME revenue forecasts, correct?
13     A.   Yes, sir.
14     Q.   And the one you call out is the
15 best-estimate forecast in that -- that
16 presentation, correct?
17     A.   Yes, sir.
18         MR. PURCELL:  Let's mark this as 1579.
19         (Exhibit 1579 was marked for identification by
20 the court reporter and is attached hereto.)
21     Q.   (By Mr. Purcell)  Mr. Malackowski, could
22 you look at Exhibit 1579, and tell me whether
23 that's the document that you are referring to in
24 paragraph 187 of your opening report?
25     A.   Yes.  It is as noted in footnote 401 to

Page 268

1 my report.
2     Q.   You mention in your report that the
3 revenue growth rate for Java ME licensing, from
4 2009 to 2010, the best-estimate forecast in this
5 document is larger than the one in Exhibit 1578,
6 which you actually used, correct?
7     A.   Yes, sir.
8     Q.   And you say that you use the forecast you
9 actually used because it was conservative, correct?
10     A.   In part, and also because the document we
11 are now referring to, Exhibit 1579, specifically
12 takes into account and makes quantitative
13 adjustments for competition with Android.  And in
14 my opinion, in measuring the lost sales for the
15 but-for world for actual harm, we don't want to
16 infect our projection with the infringement.
17     Q.   Where does the best-estimate scenario in
18 Exhibit 1579 take account of Android?
19     A.   If you look to footnote 402 of my report,
20 on page 75, I make specific reference to the
21 portions of this document that provide my basis for
22 the Android as competing technologies, specifically
23 the quote, "competing technologies (Symbian,
24 Android) provide operators with credible
25 alternatives to Java."

Page 269

1     Q.   Mr. Malackowski, if you go back to the
2 document itself, the quote that you just read is
3 not on the best-estimate slide, correct?
4     A.   No.  I believe it's on Scenario 2.
5     Q.   Right.  And that's an alternate factual
6 scenario with less favorable assumptions for Sun,
7 correct?
8     A.   Yes.
9     Q.   So there's nothing in the best-estimate
10 forecast, at least on its face, that accounts for
11 Android, correct?
12     A.   Well, the document generally, when it
13 discusses its view of the market prior to
14 specifically preparing the various scenarios, makes
15 clear that its assessment of the market includes
16 Android.  I would direct you to page 4 of the
17 document as an example of that.
18     Q.   The other forecast document that you
19 actually used, Exhibit 1578, also generally takes
20 account of Android through its various assumptions
21 about a major, minor, or moderate shift to open
22 source, correct?
23     A.   That document is not specific to Android
24 as the competitive threat.  But regardless, even if
25 it was, only further reason to point to the

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 274

1 can repeat this --
2    Q.  Well, what is the fundamental difference?
3    A.  The fundamental difference is that the
4 strategic forecast does not have a precursor
5 section that talks about Android as a competitive
6 effect in the marketplace.  The fundamental
7 difference is, in my discussions with Oracle/Sun
8 personnel, I confirmed that this was the correct
9 forecast used in my effort to isolate out those
10 effects.  The difference is that in this second
11 document, the document talks generally about the
12 presence of Android in the marketplace.
13        Now, you may disagree with my
14 interpretation, but I think it's quite clear the
15 basis of my selection.
16    Q.  Well, you said a couple of things.  I
17 mean, first off in 1578, you agree that the very
18 same page containing the strategic forecast also
19 talks about various scenarios involving a major
20 shift to open source through Android, correct?
21    A.  I do.
22    Q.  All right.  So why did Oracle personnel
23 tell you to use the strategic forecast in
24 Exhibit 1578 rather than the best-estimate forecast
25 in Exhibit 1579?

Page 275

1        MS. HURST:  Object to the form.
2        THE DEPONENT:  My discussions with Oracle
3 personnel were to confirm the selection of the
4 projection that I used for the reason that I was
5 using it.  We had this essential conversation.
6    Q.  (By Mr. Purcell)  Did you ask them
7 whether you ought to use the best-estimate forecast
8 in Exhibit 1579?
9    A.  No.  I think I told them, it was my
10 conclusion that I'm going to use that, did they
11 concur with that, are there any issues that would
12 be raised with that.
13    Q.  Did you show them the best-estimate
14 forecast in Exhibit 1579, and ask them about the
15 pros and cons of using one versus the other?
16    A.  We had the document, yes.
17    Q.  Did you show it to them and ask them
18 which one was the more appropriate forecast to use?
19    A.  Effectively, yes.  I can't tell you that
20 I used those exact words.
21    Q.  And so why did they tell you that you
22 should use Exhibit 1578, rather than Exhibit 1579?
23    A.  Because they concurred with my
24 interpretation of the documents.  They actually, to
25 be direct, thought that my interpretation of the

Page 276

1 documents was grossly understating the expectations
2 of Java; and that, in particular, the 8 percent
3 growth rate was way too low.
4    Q.  Did you ask them why the projection was
5 the Java ME licensing revenue would decline in
6 fiscal 2012, in Exhibit 1579?
7    A.  Well, we discussed the fact that it
8 included the assessment of competition including
9 Android.
10    Q.  So they told you that, they told you that
11 the best-estimate forecast included the effect of
12 competition from Android?
13    A.  Again, I -- I don't want to stretch in my
14 recollection to your question, so I -- I will try
15 to be as fair as possible.  I don't know that we
16 had that exact conversation.  I know we had the
17 conversation over the work that I had done and the
18 conclusions that I had reached to verify that the
19 approach I was taking was the best approach.
20        They confirmed that that was the best
21 approach.  Their only criticism of what I had done
22 was that I was underestimating significantly the
23 growth rate.
24    Q.  Did you ask them why the Java licensing
25 revenue was protected to decline in fiscal 2012, in

Page 277

1 Exhibit 1579?
2    A.  I can't tell you that I specifically
3 asked them that question.  I -- I don't recall.
4    Q.  Did you run an alternative calculation
5 with an alternative growth rate based on
6 Exhibit 1579, given the decline in Java ME
7 licensing revenue in fiscal 2012?
8    A.  I ran an alternative calculation with the
9 alternative growth rate.  I wouldn't say that the
10 growth rate anticipated the decline, but
11 footnote 403 to my report describes the result of
12 that calculation which, as I referred to earlier,
13 would sig- -- significantly increase the damage
14 figures.
15    Q.  Well, I understand the growth rate
16 between fiscal '09 and fiscal 2010, on
17 Exhibit 1579, would increase damage.  My question
18 is different.
19        It's:  Did you run an alternative
20 calculation accounting for the aggregate change in
21 Java ME licensing revenue between fiscal '09, '10,
22 '11 and '12?
23    A.  No.  Because in my opinion, the decline
24 in revenues as reflected in that document are a
25 result of the competition with Android, and so that

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 290

1    Q.   (By Mr. Purcell)  But ME is not suited
2  for use in even the 2007- or 2008-style iPhone,
3  correct?
4    A.   Not within an iPhone, no.
5    Q.   Well, not within a phone that has the
6  functionality of an iPhone, with the applications
7  and the full Internet browsing, and all the other
8  features, touch screen --
9        MS. HURST:  Object to the form.
10       THE DEPONENT:  I think we are now at a
11 technical level of understanding, for example, what
12 was a BlackBerry capable of, along those lines,
13 versus the first iPhone.
14       I mean, people forget, the first iPhone
15 was not particularly successful, that it took time
16 to build up the tremendous success that it had.  I
17 would defer that comparison to the technical
18 experts.  I haven't made that comparison.
19   Q.   (By Mr. Purcell)  Well, isn't that an
20 important component of your lost-profits analysis,
21 a conclusion that these OEMs actually would have
22 wanted to license a Sun or Oracle Java platform for
23 use in the phones they were building?
24   A.   Well, I think that's important.  I think
25 that is true.  I think that's very different than

Page 291

1  the question you asked me before.
2    Q.   How, if at all, does your lost-profit =s
3  analysis account for the shift of the market from
4  feature phones to smartphones?
5    A.   To some extent I think it does not, in
6  the sense that my calculation is overly
7  conservative.  I believe that, had there been
8  perfect foresight as to the rapidly evolving
9  marketplace, in particular the consumer use of
10 that, that Sun's actual profits -- actual loss
11 would have been greater, but perhaps largely
12 measured or additionally measured with the
13 SE licensing platform.
14       I think that the ME lost-profits
15 calculation that I advance are conservative in that
16 regard and take into account that risk because of
17 the growth rate that I used.  I mean, a growth rate
18 of 8 percent is incredibly conservative in light of
19 the mobile marketplace that is -- that actually
20 occurred.
21   Q.   And how does the 8 percent year-over-year
22 growth rate, from 2009 to 2015, compare to the
23 growth rate of the feature phone market over that
24 time period?
25   A.   Well, it's significantly less.  And I

Page 292

1  would add that within my report, we don't just have
2  to take my conclusion for it, that there are
3  documents that I refer to by -- or from Sun or --
4  but importantly from Google Android, where they
5  explain that, by entering into the marketplace, Sun
6  is going to lose from their existing licensing
7  platform, which was ME at the time, hundreds of
8  millions of dollars.
9        I think one of the examples that I cite,
10 which was a quote from Google, was a recognition
11 that the impact to Sun from the Android launch, as
12 it relates to a decline in their current licensing
13 program, would be over a billion dollars.
14       So we have the contemporaneous forecast,
15 incredibly conservative growth rates, and
16 confirmation that those growth rates were
17 conservative in light of what happened, and
18 confirmation by both parties in suit that they
19 recognized the harm to Sun would be significant and
20 exceed, in some instances, the damages that I have
21 calculated.
22   Q.   You didn't do a customer-by-customer
23 analysis of Sun's Java ME licensees to confirm
24 whether their business plans included making the
25 kinds of handsets for which Java ME was suited,

Page 293

1  correct?
2    A.   Well, you have asked me that question,
3  and just to briefly recap the forecast that I use
4  include -- included customer-specific buildup.  And
5  the fact of damage exemplars that I cite, as well
6  as those cited by Dr. Jaffe, I think would speak
7  directly to the customer-specific analysis of your
8  question.
9    Q.   But did you look at, for instance Samsung
10 or Nokia specifically and analyze the extent to
11 which they were interested in releasing handsets
12 for which Java ME would be suited during the
13 2009-to-2015 time frame?
14       MS. HURST:  Object to form.
15       THE DEPONENT:  Both of those exam- --
16 examples are discussed in my report.  With respect
17 to Samsung specifically, there's discussion of the
18 ME licensing program from Sun going from
19 44 million-dollar term payment to a million-dollar
20 term payment and the reason for that decline.
21       The reason was not because Samsung no
22 longer considered the Sun technology that it was
23 licensing to be sufficient.  The reason was,
24 Samsung was dropping Sun to pick up Android.
25       The second example that you referenced

74 (Pages 290 - 293)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 294

1 was Nokia. And there we have the specific
2 information that Nokia was a large Sun ME licensee,
3 and considering for future use SE as well.
4    Q. (By Mr. Purcell) And that phone never
5 got released.
6    A. That phone never got released.
7    Q. Now, isn't it the case that Samsung very
8 well might have decided to leave Java for Android
9 because Java did not offer Samsung the kind of
10 operating system it needed to make a smartphone?
11    A. I have seen no evidence that would
12 suggest that. I would be speculating based upon
13 this record.
14    Q. So you don't provide any quantification
15 of lost profits based on Project Acadia, correct?
16    A. Well, as I describe in my report,
17 Project Acadia is an SE platform, as I understand
18 it. I discussed my view that, from a
19 fact-of-damage point of view, I believe that there
20 were damages, but that I have not been able to
21 quantify them, and I believe they speak to the
22 nexus to the profit-apportionment calculations.
23    Q. Do you intend to tell the jury in this
24 case that if -- but for Android, Sun would have
25 made 8.8 billion dollars in profit in

Page 295

1 Project Acadia?
2    A. I have not discussed my testimony with
3 counsel, though I don't believe it will extend
4 beyond what we have talked about today and the
5 scope of my reports. So that's not something I
6 would anticipate saying.
7    Q. Do you anticipate telling the jury in
8 this case that but for Android, Sun and Oracle
9 would have developed a comparably successful
10 full-stack mobile operating system to Android?
11    A. I don't believe that opinion is contained
12 within my report. If asked -- for example, if you
13 asked me on cross examination, I would certainly
14 answer that question. But I don't think that would
15 be within the scope of my direct, though counsel
16 and I haven't talked about that.
17    MR. PURCELL: All right. Let's take a
18 break, and I may be able to shortcut some of the
19 rest of this.
20    MS. HURST: Great.
21    THE VIDEOGRAPHER: We are off the record
22 at 4:00 o'clock here.
23    (Recess taken.)
24    THE VIDEOGRAPHER: We are back on the
25 record at 4:14. This marks the beginning of

Page 296

1 Media No. 6 in the deposition of James Malackowski.
2    Q. (By Mr. Purcell) Mr. Malackowski, you
3 disagree with Dr. Leonard's opinion that around the
4 time of Android's release, Sun's Java platforms had
5 run stagnant, correct?
6    A. I would say, it's more accurate to say
7 that I don't think that that opinion or that issue
8 was one of significance. But in the larger tenure
9 of the context of this case, I -- I do disagree
10 with it.
11    Q. And in any event, you didn't take that
12 potential stagnancy into account in adjusting your
13 lost profits calculation.
14    A. Correct, which would have been a
15 but-for world which, I think, would not have
16 experienced any of the stagnation that Dr. Leonard
17 addresses. Again, remember that, at the time, Java
18 was in 80 percent of all phones and had as its
19 customer the largest phone OEM in the world.
20    Q. Even at the time Android was released,
21 before that was a competitive threat to Sun, there
22 are Sun documents that discuss the stagnation of
23 the Java platform, correct?
24    A. So there are -- I think it's important to
25 understand the context of those documents, and

Page 297

1 perhaps you have them and we can mark them. My
2 recollection is, they're generally engineering
3 records. And so in my experience, to have
4 engineers say, "We need more R&D dollars to
5 continue to develop," that's not surprising.
6    I don't recall those documents being
7 customer sales or marketing records.
8    Q. If there were documents like that from
9 sales or marketing employees, that would be more
10 meaningful to you?
11    A. It would be more meaningful, though still
12 I would put it in the context of normal business
13 course. Even salespeople, if you can give them a
14 new whistle or feature, they -- they want it, and
15 it's not inapplicable for them to ask for it.
16    But in the context of this discussion,
17 given the penetration of Android, I don't believe
18 that stagnation is an issue that requires
19 adjustment in my lost-profits calculation.
20    Q. So you made no adjustment in your
21 lost-profits calculation because of these
22 contemporaneous assessments by Sun personnel that
23 their product offering, the Java platforms, had
24 grown stagnant.
25    A. No explicit adjustment. I suppose at

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 326

1 Android?
2    A.  No.
3    Q.  What advantages did Google get with
4 regard to TAC for carriers who enabled Android
5 versus carriers who enabled non-Android such as
6 Apple devices?
7    A.  It was more economically --
8    Q.  We're making technical adjustments,
9 Mr. Malackowski.
10   A.  It was more -- it was economically more
11 beneficial for Google to have traffic flow on the
12 Android platform where it was not required to share
13 TAC with distribution partners like Apple.  So the
14 whole reason for developing Android was to allow
15 Google to capture those economics.
16       And that's why, in part, I, as an
17 apportionment metric, have attempted to value the
18 contributions of the copyrights to creating that
19 proprietary platform.
20   Q.  Okay.  Let's go to paragraph 162 and 163.
21       Does or did Android 1 run on feature
22 phones or smartphones?
23   A.  So again, I believe there's a continuum
24 in that definition, but my understanding is that
25 Android 1 was trying to capture and target the

Page 327

1 broader global marketplace.  So on the continuum
2 closer to feature phones than the ultimate
3 smartphone.  It was a simpler version, but I think
4 it was characterized as a -- maybe a low-end
5 smartphone might be the best description.
6    Q.  Are the phones that you describe in these
7 paragraphs 162 and 163, are -- are those feature
8 phones or smartphones?
9    A.  I -- I think the best way to describe
10 them are low-end smartphones.
11   Q.  So they would be smartphones, but near --
12 in the continuum near the feature phones?
13   A.  Yes.
14   Q.  Okay.  Let's move on to paragraph 190.
15       Now, you indicate that in -- that by
16 2010, Spring, Verizon, AT&T and T-Mobile had
17 increased their investment in Java ME in favor of
18 Android.  We understand that these are all the
19 carriers.
20       Is this -- is it the carriers who were
21 licensing Java ME?
22   A.  At the time, the -- if you could put it
23 in context, at the time the carriers were in
24 control of the marketplace.  It's often referred to
25 as the wall of garden.  They were able to direct

Page 328

1 and dictate the technology that would be used
2 within their network.  And so to that extent they
3 were a customer target of Java.
4       Later on that completely changed.  The
5 market today is such that the OEMs are making more
6 and more of those decisions.
7    Q.  All right.  Now I'm directing your
8 attention to paragraph 191 and including figure 24.
9    A.  Yes, sir.
10   Q.  Why the increase in revenue between 2011
11 and 2012, which is well after Android -- Android
12 had been introduced?
13   A.  Well -- oh, in the historical actual
14 revenue?
15       Because when Android was first
16 introduced, it not the -- the -- the -- the
17 significant out of the gate volume success that you
18 might think it to be.  It took awhile.  It started
19 with one phone, with one carrier, and it took
20 awhile for it to build up.  So there was
21 marketplace transition that occurred.
22       Also, as part of that marketplace
23 transition, many of these Java license agreements
24 were multi-year agreements.  So there is a period
25 of time in which the marketplace transition to the

Page 329

1 Android solution -- it didn't happen, you know, you
2 overnight.  And I think the data reflects that.
3    Q.  Why was there a very drastic decline
4 between 2014 and 2015, again, well after Android --
5 Android had been introduced?
6    A.  Well, really the drastic decline starts
7 in 2013.  And you see 2012 is kind of the high
8 point of the market.  I think, again, confirming
9 that there were preexisting contracts in place,
10 that there was a period of time after the Android
11 introduction where the market would turn and did,
12 in fact, turn to Android as the solution.
13       It's just simply the stickiness of this
14 market and the time that's required to make these
15 changes.
16   Q.  In your opinion, does that explain how
17 the adoption of Android gave rise to these revenue
18 numbers?
19   A.  That explains why -- how the adoption of
20 Android affected these revenue numbers, yes, that
21 the -- the timing that you see of these numbers
22 with some continued increase after the introduction
23 of Android, but then a reversal of that some couple
24 years later is very consistent with the scope of my
25 analysis and understanding of Android's entry into

83 (Pages 326 - 329)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 342

1 content cost of sales could properly be allocated
2 to other Android-related revenues, such as Android
3 ads, or alternatively, to Android-related
4 advertising or promotional expense.
5        Did you make -- and my question is, did
6 you make any adjustments consistent with this
7 statement?
8     A.   Yes.  In that my calculation of
9 ad-related TAC is, I believe, consistent with this
10 statement, and the long discussion that we had
11 earlier today about my basis for concluding what
12 was and was not included in the P&L.
13    Q.   Now, refer to paragraph 307, please.
14    A.   Yes, sir.
15    Q.   And you say the portion of the cost of
16 sales representing TAC payments to carrier,
17 distribution partners could properly be allocated
18 to other Android-related revenue, such as Android
19 ads, or alternatively to Android-related
20 advertising or promotional expense.
21        Did you make any adjustments consistent
22 with that statement, Mr. Malackowski?
23    A.   I -- I think in some respects this is an
24 identical statement to the one above.
25    Q.   Okay.

Page 343

1     A.   And it's consistent with the analysis
2 that we talked about earlier today confirmed by the
3 testimony of Mr. Gold.
4     Q.   And so your -- your answer would be the
5 same as previously?
6     A.   Yes.
7     Q.   Now, we're done with your first report,
8 so I'd like to move on to the second report and
9 paragraph 18.
10        This is your -- this is Exhibit 1577,
11 which is your February 29th, 2016 report; is that
12 correct, Mr. Malackowski?
13    A.   Yes, sir.
14    Q.   Okay.  And I'm referencing you to
15 paragraph 18 of that.
16        Now I know that during Mr. Purcell's
17 questioning you talked about commingling, and my
18 specific question here -- and I -- I direct your
19 attention to the paragraph and you read whatever
20 you want to read is, does a damages expert need to
21 understand -- or strike that.
22        What does a damages expert need to
23 understand or know in order to apply the legal
24 theory of commingling?
25    A.   So the legal theory of commingling is

Page 344

1 tied, in my view, very closely to work that I do in
2 the context of, for example, commercial success,
3 where the damage expert's assignment is to
4 understand the contribution of the technology to
5 the profits or economics of the business.
6        And, in particular, in the patent case
7 where this comes up very frequently, the
8 Georgia-Pacific criterion require that the damages
9 expert consider the value of the invention at issue
10 as compared to old modes and devices or alternative
11 technologies.  So this is the type of analysis that
12 I have done generally for 30-plus years.
13        So with that background, the answer to
14 your question of what does the damages expert need
15 to consider, I think they need to consider the
16 scope of the intellectual property that's at issue,
17 its contribution to the business platform, and then
18 any other evidence in the case of an apportionment
19 of other technologies that are contributing and
20 metrics that might explain or allow you to segment
21 the individual contributions.
22    Q.   Is there -- and I know you're not an
23 economist, but is there an economic or business
24 test for commingling, in your opinion, Dr. -- or
25 Mr. Malackowski?

Page 345

1     A.   There is no economic or legal test in the
2 sense of 4 factors or 15 factors or an equation.
3        My understand is that it is a judgment
4 and opinion based upon the expert's review of the
5 evidence of the type that I described.
6     Q.   All right.  Mr. Malackowski, assuming
7 that this; i.e., commingling, is a legal doctrine,
8 how is it to be applied by the damages expert?
9     A.   A damages expert job requires application
10 of legal doctrines in -- in most cases, especially
11 intellectual property cases.  For example, the
12 doctrine of the Panduit criteria for lost profits
13 or the Georgia-Pacific criteria for reasonable
14 royalty.  The doctrine of commercial success for
15 the equities of -- of an injunction or secondary
16 indications of non-obviousness.
17        This is no different than that.  This
18 requires an understanding of the contribution of
19 the intellectual property to the products at issue.
20 It further recognizes a need to assess whether
21 there is other quantitative ways to separate the
22 contributions of various technologies, same skill
23 set, same application of experience informed by the
24 business records and the technical expert opinions.
25    Q.   Mr. Malackowski, doesn't commingling

87 (Pages 342 - 345)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 346

1 occur whenever there are synergies?
2    A.  Well, I think that when there is
3 commingling, there could be synergies, but not
4 necessarily so.  But generically speaking, I -- I
5 think you could have synergies.  You could have
6 unexpected consequences from your original plan.
7       For example, in this case, unexpected
8 activities where the growth of the wireless market
9 greater than any expectations, the migration of
10 demand to consumer applications and not just
11 business enterprise applications.
12       Google benefited from those unexpected
13 events and earned profits as a result of those
14 because of their reliance on the copyrights at
15 issue.  But for the purpose of disgorgement, you
16 need to take an ex post accounting of that that and
17 you need to remove the benefits that Google
18 received as a result of its reliance on the
19 copyright, even though there were external or
20 unexpected impacts.
21    Q.  Can you give us examples where there is
22 no commingling?
23    A.  Well, the -- the best example is when
24 you're talking about a product that's driven by a
25 single technology or form of intellectual property.

Page 347

1       When I teach this subject, we always talk
2 about the distinction between, frankly,
3 smartphones, which are a very aggregated platform
4 or pharmaceuticals.  In pharmaceuticals, you rarely
5 have a commingling issue because the technology at
6 issue, in most cases patents.  A single patent
7 drives a compound of the drug.  So that's the
8 genetic sample that we use.
9       In copyrights, I think it might be more
10 applicable to look at the music industry, right.
11 If you have a copyright on a song, there's usually
12 not a lot of commingling at issue.  There might be
13 apportionment across the other songs in the album,
14 but not necessarily commingling.
15    Q.  Okay.  Now, you may have mentioned this,
16 but I'm going to ask you again anyway.
17       How is the legal theory of commingling
18 relevant to the opinion that you've expressed in
19 paragraph 17?
20    A.  Understanding that the copyrights at
21 issue were a gating feature and an enabling of
22 Google to reach its objective of capturing the
23 platform value for Android; i.e., as opposed to
24 like an Apple, for example.
25       Understanding that these copyrights were

Page 348

1 central to that economic benefit, I than challenged
2 the -- the -- the methodology to say, well, we know
3 that there's a platform benefit associated with the
4 copyrights and that's 35.6 percent.
5       We know we're going to leave Google with
6 64 percent.  But can we break down that
7 35.6 percent even finer to specifically identify
8 the contribution of the copyrights at issue as
9 opposed to some technology contributed by Google.
10       And what I concluded is that, no, we
11 cannot because of the commingling.  There isn't a
12 way to break those things out.  And so as I
13 understand the proper method and the case law,
14 the -- that is to the benefit of the defendant in
15 the sense that that means that all of those
16 commingled profits should be awarded in the form of
17 disgorgement after taking into account applicable
18 cost.
19    Q.  Now, Mr. Malackowski, in that last answer
20 you used the phrase or the word "gated" item.
21       What did you mean by that?  How do you
22 define that?
23    A.  Yeah, that -- that's really my language
24 that sort of picks up on this notion that there was
25 a critical window of opportunity, and it keeps

Page 349

1 reminding me to go back to the fact that it's not
2 just that the copyrights at issue were important.
3       It's that because of the unique window of
4 opportunity to enter this market, given all the
5 competitive dynamics around it, they were
6 critically important at the time.  That without
7 access to these copyrights, there would not be the
8 revenue and profit generation that there was, in my
9 opinion.
10    Q.  And that's what you mean by gated?
11    A.  Yes.  There's -- gated is not a term of
12 art or a term of case law.
13    Q.  It's not -- so it's -- it's
14 Mr. Malackowski's term?
15    A.  Yes.
16    Q.  Okay.  And you've defined what you meant
17 by that?
18    A.  Yes.
19    Q.  Now, let's move to paragraph 21, please.
20       Mr. Malackowski, are you assuming that
21 each of the bullet points is a fact, or are you
22 testifying that each of them is a fact?
23       Or do you want me to break that down into
24 two questions?
25    A.  No, I understand -- I understand.  Let me

88 (Pages 346 - 349)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 350

1 look.
2        I would say that each of these facts are
3 really the conclusions that I reached from a review
4 of the record and opinions that I hold. I believe
5 them all to be factually true, but ultimately they
6 are also consistent with my opinions.
7        Q.  Okay.  So each of these bullet points you
8 believe to be true.  But are you assuming that
9 they're true or do you have independent reason to
10 believe they're true?
11       A.  I believe each of these bullets points
12 are supported by my independent analysis and
13 fact-finding allowing me to conclude they are true.
14       Q.  Now, let's turn to paragraph 36 of this
15 same report and we're on Exhibit 1577.
16       Now, Mr. Malackowski, you testified
17 several times in response to Mr. Purcell that
18 counterfactual analysis was inappropriate; is that
19 correct?
20       A.  Yes, sir.
21       Q.  In this situation?
22       A.  Yes, sir.
23       Q.  What, in your analysis, is the difference
24 between a but-for analysis and a counterfactual
25 analysis?

Page 351

1        A.  I frankly equate the two of those and
2 note that the but-for analysis, counterfactual
3 analysis is applicable for the assessment of lost
4 profits, but not applicable in the disgorgement
5 analysis.
6        Q.  So it's your opinion that the use of a
7 but-for or counterfactual analysis is always
8 inappropriate in estimating a disgorgement damage
9 amount; is that right?
10       A.  Yes, sir.
11       Q.  Is it always inappropriate or is it just
12 inappropriate in this case?
13       A.  Always.
14       Q.  Now, you've testified that gating -- I'm
15 sorry.
16       A.  No, no, that's okay.
17       Q.  No, if you have an answer, go ahead.
18       A.  I mean, we could talk at some length
19 today about we used the words but-for also in the
20 context of Judge Grewal's decision.  I didn't mean
21 to leave that out.  But -- but talking at a
22 fundamental level of the damage calculation, not
23 the nexus point.
24       Q.  But when Dr. -- when Judge Grewal used
25 the but-for analysis, you understood that that was

Page 352

1 synonymous with counterfactual analysis; is that
2 correct?
3        A.  Well, again, to some extent
4 counterfactual and but-for are, in my view, very
5 similar, right.  You're talking about something
6 that could have happened instead of what happened.
7        And the reference to Judge Grewal was to
8 the nexus test, not the computation and
9 apportionment of profits, which is consistent with
10 what we said a moment ago, but I just didn't want
11 to make any blanket statement that would confuse
12 the record.
13       But I look -- you look like I'm still
14 confusing you.
15       Let's -- let's move on.  In -- to
16 paragraph 37.
17       You use the phrase gating item there and
18 you've defined for me what your interpretation of
19 gating item is.
20       In your opinion, is there an economic
21 test for a gating item?
22       A.  I mean, the closest that I could suggest
23 for you is the test that's discussed in, I think,
24 Dr. Jaffe's report -- but also the technical
25 report -- that the product issue would not operate

Page 353

1 without the copyrights, that they're a central --
2 essential central to the product.
3        Q.  You said the product issue.  Do you mean
4 the product in issue?
5        A.  Yes.
6        Q.  Okay.  Now, let's refer to paragraph 44.
7        Now, in paragraph 44, you list a set of
8 inherent limitations that render the Berry model
9 inapplicable in this manner -- matter.
10       My specific question is, is it your
11 opinion that demand for smartphones is not well
12 approximated by a static discrete choice model?
13       A.  That is my business understanding of the
14 economic theory that is applied.  I think in part
15 by Dr. Berry's own admission or caveats to this
16 paper.
17       Q.  Does that answer give you -- give us all
18 of your basis for that opinion, or do you have
19 further basis?
20       A.  The -- the additional basis that I would
21 have, as a noneconomist business expert, is simply
22 that I find that there are other variables
23 impacting consumer choice interactively in this
24 market that extend beyond what I understand to be
25 the limitations of the Berry model.

89 (Pages 350 - 353)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 385

1       I, Rebecca L. Romano, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3       That the foregoing proceedings were taken before me

4   at the time and place herein set forth; that any

5   witnesses in the foregoing proceedings, prior to

6   testifying, were administered an oath; that a record of

7   the proceedings was made by me using machine shorthand

8   which was thereafter transcribed under my direction;

9   that the foregoing transcript is true record of the

10  testimony given.

11      Further, that if the foregoing pertains to the

12  original transcript of a deposition in a Federal Case,

13  before completion of the proceedings, review of the

14  transcript [ ] was [X] was not requested.

15      I further certify I am neither financially

16  interested in the action nor a relative or employee of

17  any attorney or any party to this action.

18      IN WITNESS WHEREOF, I have this date subscribed my

19  name.

20

21  Dated:  March 17, 2016

22

23                  Rebecca L. Romano, RPR,

24                  CSR. No 12546

25